# Exhibit 70



*November 16, 2018*

## Sears Holdings Corporation

Inventory Appraisal
Net Orderly Liquidation Value

**PREPARED FOR** Bank of America Merrill Lynch
**INVENTORY DATE** November 3, 2018





NEW YORK | LOS ANGELES | BOSTON | SAN FRANCISCO | CHICAGO | SYDNEY | PERTH | MELBOURNE | BRISBANE

**JX 104-1**

*Table of Contents* | Inventory Appraisal



**Nature of Engagement**.............................................................................................................................................**1**
   APPRAISAL SUMMARY...............................................................................................................................................3
**Analysis and Assumptions**........................................................................................................................................**7**
   RETAIL STORE GOB INVENTORY FOR GO-FORWARD, WAVE 1, AND WAVE 2 STORES ...............................................................7
   INVENTORY TO BE SOLD ON A WHOLESALE BASIS........................................................................................................11
**Potential Additional Recoveries** ............................................................................................................................**12**
**Company Overview** ................................................................................................................................................**14**
**Operating Metrics** .................................................................................................................................................**16**
   SEASONALITY........................................................................................................................................................16
   COMPARABLE STORE SALES.....................................................................................................................................16
   GROSS MARGIN.....................................................................................................................................................16
   INVENTORY TURNOVER...........................................................................................................................................16
**Field Visits**.............................................................................................................................................................**17**
**List of Exhibits** ......................................................................................................................................................**20**

SEARS_507B_00001346
JX 104-2

*Nature of Engagement* | Inventory Appraisal



## Nature of Engagement

### Client / Company

Tiger Valuation Services, LLC ("Tiger") has been retained by Bank of America Merrill Lynch (the "Lender") to determine the net recovery value of the inventory of Sears Holdings Corporation ("Sears Holdings" or the "Company"). The analysis assumes a court-authorized going-out-of-business ("GOB") scenario with the Company's inventory being sold either to the general public through the Company's stores in a traditional GOB sale, or on a wholesale basis for inventory which is not traditionally sold through retail stores.

On October 15, 2018, the Company filed for Chapter 11 bankruptcy protection, and on October 26, 2018, it began holding store closing events at 142 stores (65 Kmart stores and 77 Sears Full Line stores), referred to as "Wave 1" closing stores throughout Tiger's report.

On November 8, 2018, the Company announced that it will hold store closing events at an additional 40 stores (11 Kmart stores and 29 Sears Full Line stores) beginning on November 16, 2018; these 40 closing stores are referred to as "Wave 2" closing stores in Tiger's report.

Stores that are not scheduled to close are referred to as "go-forward" locations in Tiger's report. Tiger provided separate NOLVs for go-forward stores, Wave 1 closing stores, and Wave 2 closing stores. For go-forward stores, which include 239 Kmart stores, 265 Sears Full Lines stores, and 243 Sears Auto Centers, Tiger has provided a rollforward analysis for the three months ending January 2019.

Because progressive discounting would be used throughout store closing events and the most desirable products would be purchased early in the sales, NOLVs for Wave 1 and Wave 2 closing stores would decline as the sales progress. For Wave 1 closing stores, Tiger provided NOLVs for each of the 12 weeks ending January 13, 2019. For Wave 2 closing stores, Tiger provided NOLVs for each of the 12 weeks ending February 3, 2019.

### Bid Structure

The liquidation model depicted in this report values all eligible go-forward inventory on an "equity bid" basis that reflects the willingness of Tiger Valuation Services, LLC's affiliated company, Tiger Capital Group, LLC, to provide an immediate cash guarantee on the inventory.

Wave 1 closing store inventory and Wave 2 closing store inventory is valued on a "fee" basis that reflects the existing Abacus liquidation agreement to manage the liquidation. The agent's fees are $140,000 per month for Wave 1 and Wave 2 stores combined.

### Timing

The analysis is based on inventory levels as of November 3, 2018. The Company provided inventory in detail as of October 6, 2018, and also provided store count and inventory projections through January 2019. Tiger used the inventory mix as of October 6, 2018 and the Company's inventory projections when developing NOLVs for November 3, 2018.

**This appraisal values only inventory located within the United States, including merchandise in the territories of Guam and Puerto Rico.**

Store banners operated by Sears Holdings as of the appraisal date include Kmart, Sears Full Line, Sears Grand/Essentials, and Sears Auto Centers. For the purposes of this analysis, the Company's five Sears Grand/Essentials locations have been included in the Sears Full Line division.

Excluded from Tiger's analysis is the inventory at 67 locations that were in the last stages of closing at the time that Tiger's appraisal was issued; the 67 excluded stores are scheduled to close by December 16, 2018.

### Field Visits

As part of the review process, Tiger representatives visited 61 stores. The field evaluations were arranged so that representatives visited each operating retail business segment, or banner, including 25 Sears Full Line Stores, 18 Sears Auto Centers, and 18 Kmart locations; 18 of the visits were conducted at closing stores.

Page 1

SEARS_507B_00001347

## JX 104-3

*Nature of Engagement* | Inventory Appraisal



The field visits, many of which occurred announced, included observation of general store conditions, store location, local competition, inventory levels, seasonality of inventory, presentation, signage, and price points.

Inventory analyses rely in large part on information supplied by the Company to Tiger. The accuracy of the Company-supplied information was assumed and utilized throughout the report without independent verification or audit. Tiger makes no representation or warranty as to the completeness of information supplied by the Company and shall have no liability for any expressed or implied representations contained herein. Estimates in this analysis are based on the inventory levels and mix as of October 6, 2018, as well as the inventory and store conditions observed during store visits. If there is any material change in merchandise mix or store conditions, results would vary.

HIGHLY CONFIDENTIAL

SEARS_507B_00001348

**JX 104-4**

## *Nature of Engagement* | Inventory Appraisal



**Tiger's engagement did not include the following actions:**

1) **Taking or observing a physical inventory**
2) **Reviewing Company insurance coverage**
3) **Determining ownership of inventory**
4) **Reviewing inventory for any liens or encumbrances**
5) **A review of store leases**

All inventory and estimated recovery values for the inventory to be included in the retail GOB sales (see Exhibit A-1) have been provided by store group (i.e. Go-Forward, Wave 1 closing group, Wave 2 closing group) and further separated by business segment, or banner (i.e. Kmart, Sears Full Line Stores, Sears Auto Centers). For the inventory classifications to be sold on a wholesale basis, inventory information and recoveries are shown by specific category (see Exhibit B-6).

### Appraisal Summary

#### Go-Forward Stores
Based upon our review and analysis, Tiger has projected a blended net liquidation value after all expenses for eligible inventory that would be sold through go-forward stores and on a wholesale basis of 85.2% of cost as of November 3, 2018. The following table compares Tiger's updated NOLVs for the month of November to the NOLVs presented for the month of November in Tiger's previous appraisal. Tiger notes that the updated NOLVs shown in the following table apply only to inventory that would be sold through go-forward stores and on a wholesale basis.

| Sears Holdings Corporation (Exhibit A-1) Go-Forward Inventory Consolidated Net Liquidation Value Comparison Projected for November 3, 2018 vs. July 7, 2018 Appraisal (Nov Rollforward) ($ in millions) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Classification | Projected for November 3, 2018 | | | As of July 7, 2018 (Nov Rollforward) | | | Change | | |
| | Cost $ | Blended Net Rec. | % of Cost | Cost $ | Blended Net Rec. | % of Cost | Cost $ | Blended Net Rec. | % of Cost |
| **GOB Inventory** | | | | | | | | | |
| Kmart Stores | $653.5 | $572.9 | 87.7% | $1,046.0 | $917.2 | 87.7% | ($392.5) | ($344.3) | (0.0%) |
| Sears Full Line Stores | $915.2 | $906.0 | 99.0% | $1,479.6 | $1,464.9 | 99.0% | ($564.5) | ($558.9) | (0.0%) |
| Sears Auto Centers | $52.7 | $22.4 | 42.4% | $65.9 | $28.5 | 43.3% | ($13.1) | ($6.2) | (0.9%) |
| **Subtotal - GOB Inventory** | $1,621.4 | $1,501.3 | 92.6% | $2,591.5 | $2,410.7 | 93.0% | ($970.1) | ($909.4) | (0.4%) |
| **Non-Direct Sale Expenses** | N/A | ($64.8) | (3.7%) | N/A | ($84.1) | (3.1%) | N/A | $19.3 | (0.6%) |
| **Wholesale** | $117.5 | $44.7 | 38.0% | $123.0 | $47.3 | 38.5% | ($5.5) | ($2.6) | (0.4%) |
| **Total** | $1,738.9 | $1,481.2 | 85.2% | $2,714.5 | $2,373.9 | 87.5% | ($975.6) | ($892.7) | (2.3%) |

*NOLV Comparisons*

**Kmart Corporation –** Compared to the November rollforward provided in Tiger's previous appraisal, there was no significant change to the NOLV on cost for Kmart Corporation.

**Sears Full Line Stores –** As with Kmart Corporation, there was no significant change to the NOLV on cost for Sears Full Line Stores compared to the November rollforward provided in the previous analysis.

Page 3

HIGHLY CONFIDENTIAL

SEARS_507B_00001349

**JX 104-5**

*Nature of Engagement* | Inventory Appraisal

 TIGER

**Sears Auto Centers –** Compared to the November rollforward presented in the previous appraisal, the NOLV on cost for the Sears Auto Center banner has decreased by 0.9 percentage point. The Company's current projected eligible Sears Auto Center inventory is lower than the projections provided in the previous appraisal, leading to lower efficiencies on expenses, which caused liquidation expenses to increase on a percentage-to-cost basis and led to a decline in NOLV.

**Wholesale Inventory –** The NOLV on cost for inventory that would be sold on a wholesale basis during a liquidation declined by 0.4 percentage point compared to the November rollforward provided in the previous appraisal. Since Tiger's previous analysis, commercial sales inventory and repair parts, which are lower-recovering categories, increased as a proportion of wholesale inventory at cost. This shift in the inventory mix caused the total GOLV at cost for wholesale inventory to decrease compared to Tiger's prior analysis.

**Total Go-Forward Inventory –** The NOLV on cost for all eligible go-forward inventory declined by 2.3 percentage points compared to the November rollforward provided in the prior appraisal. Compared to projections provided by the Company in the previous appraisal, Kmart inventory – which Tiger has determined would achieve lower recovery values than Sears Full Line inventory in a liquidation – increased as a proportion of projected eligible go-forward inventory at cost, while Sears Full Line inventory decreased as a proportion of projected eligible go-forward inventory at cost, negatively impacting the GOLV on a percentage-to-cost basis. In addition, the Company's current projected eligible inventory for November 3, 2018 is lower than the projections provided in the previous appraisal by $975.6 million at cost, or 35.9%. While the significant decrease in eligible inventory led to a reduction in non-direct liquidation expenses on a dollar basis, it resulted in lower efficiencies on expenses, which caused liquidation expenses to increase on a percentage-to-cost basis and led to a further decline in NOLV.

*3-Month Liquidation Analysis*
At the Lender's request, Tiger has developed a three-month liquidation analysis for eligible inventory that would be sold through go-forward stores and eligible inventory that would be sold on a wholesale basis to illustrate the effect of changing inventory levels and the resulting variable expenses on estimated net liquidation values by month (Exhibit A-3a). Based upon Company-provided monthly inventory projections, blended net recovery values for GOB retail inventory and wholesale inventory were forecast for sales commencing at the beginning of each of the three months from November 2018 through January 2019.

Using the Company-provided monthly inventories, recovery values in Tiger's three-month liquidation model are based on the assumption that the Company's inventory mix and mark-ups remain consistent with the levels reported as of October 6, 2018, and that go-forward store counts will be in line with Company-provided projections. Any changes to the inventory levels, product mix, or mark-up would have a material effect on the projected recovery values provided in the three-month analysis. Using the Company's projected monthly inventories, the chart below indicates the estimated monthly recoveries for sales of inventory through go-forward stores and on a wholesale basis.

| Sears Holdings Corporation |||
|---|---|---|
| **Projected 3 Month Liquidation Analysis** |||
| **Go-Forward Inventory** |||
| **Blended Net Recovery on Cost** |||
| Projected Forward From November 3, 2018 |||
| ($ in 000s) |||

| Beginning Month | Inventory at Cost | Blended Net Recovery | % of Cost |
|---|---|---|---|
| November 2018 | $1,738,925 | $1,481,181 | 85.2% |
| December | 1,672,578 | 1,421,047 | 85.0% |
| January 2019 | 1,501,748 | 1,219,372 | 81.2% |

Page 4

SEARS_507B_00001350

**JX 104-6**

*Nature of Engagement* | Inventory Appraisal 

**Wave 1 and Wave 2 Closing Stores**
The group of Wave 1 closing stores consists of 65 Kmart stores and 77 Sears Full Line stores; Wave 1 store closing events began on October 26, 2018, and the Company projects the events to last through January 13, 2019. The group of Wave 2 closing stores consists of 11 Kmart stores and 29 Sears Full Line stores; Wave 2 closing events are scheduled to begin on November 16, 2018 and last through February 3, 2019.

For Wave 1 and Wave 2 closing stores, Tiger provided NOLVs for each week of the scheduled store closing events; each weekly NOLV represents Tiger's projected net recovery value for a sale of inventory commencing at the start of that week and lasting through the end of the projected sale term.

At its store closing events, the Company is offering progressing discounts and using highly promotional signage advertising available discounts. Tiger has assumed that the most desirable products would be purchased early in the store closing sales, with the proportion of slower-moving items – which would require greater discounts than faster-turning items – increasing as store closing events progress. Due to the progressive discounting and early sell-through of the most desirable products at closing stores, Tiger's projected NOLVs for Wave 1 and Wave 2 closing stores decline as the Company's store closing events progress.

The following table summarizes Tiger's projected rollforward NOLVs for sales at Wave 1 and Wave 2 closing stores.

| Sears Holdings Corporation Store Closing Summary Wave 1 Blended Net Recovery on Cost ($ in 000s) | | | | | Sears Holdings Corporation Store Closing Summary Wave 2 Blended Net Recovery on Cost ($ in 000s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Week | Date Range | Inventory at Cost | Blended Net Recovery | % of Cost | Week | Date Range | Inventory at Cost | Blended Net Recovery | % of Cost |
| Week 1 | 10/26 - 11/02 | $350,595 | $320,666 | 91.5% | Week 1 | 11/16 – 11/23 | $83,140 | $78,475 | 94.4% |
| Week 2 | 11/02 - 11/09 | 340,014 | 310,978 | 91.5% | Week 2 | 11/23 – 11/30 | 78,875 | 72,484 | 91.9% |
| Week 3 | 11/09 - 11/16 | 324,961 | 291,005 | 89.6% | Week 3 | 11/30 – 12/07 | 74,378 | 65,844 | 88.5% |
| Week 4 | 11/16 - 11/23 | 308,122 | 268,604 | 87.2% | Week 4 | 12/07 – 12/14 | 69,291 | 58,939 | 85.1% |
| Week 5 | 11/23 - 11/30 | 290,014 | 245,842 | 84.8% | Week 5 | 12/14 - 12/21 | 63,159 | 50,952 | 80.7% |
| Week 6 | 11/30 - 12/07 | 266,700 | 215,431 | 80.8% | Week 6 | 12/21 - 12/28 | 55,419 | 41,256 | 74.4% |
| Week 7 | 12/07 - 12/14 | 235,308 | 176,545 | 75.0% | Week 7 | 12/28 – 01/04 | 45,269 | 30,125 | 66.5% |
| Week 8 | 12/14 - 12/21 | 195,144 | 129,819 | 66.5% | Week 8 | 01/04 – 01/11 | 32,888 | 17,983 | 54.7% |
| Week 9 | 12/21 - 12/28 | 152,809 | 87,615 | 57.3% | Week 9 | 01/11 – 01/18 | 25,299 | 11,308 | 44.7% |
| Week 10 | 12/28 - 01/04 | 114,035 | 52,631 | 46.2% | Week 10 | 01/18 – 01/25 | 18,851 | 6,720 | 35.6% |
| Week 11 | 01/04 - 01/11 | 72,152 | 21,183 | 29.4% | Week 11 | 01/25 – 02/01 | 11,668 | 3,137 | 26.9% |
| Week 12 | 01/11 - 01/13 | 19,197 | 3,046 | 15.9% | Week 12 | 02/01 – 02/03 | 3,779 | 635 | 16.8% |

Page 5

HIGHLY CONFIDENTIAL

SEARS_507B_00001351

**JX 104-7**

**Nature of Engagement** | Inventory Appraisal


TIGER

### Total Company

Based on Tiger's projected NOLVs for go-forward inventory and Wave 1 and Wave 2 closing store inventory, the blended NOLV projected for a liquidation sale of all eligible inventory commencing on November 3, 2018 is 86.6% of cost. The following table compares Tiger's updated NOLVs for the month of November to the total NOLV presented for the month of November in Tiger's previous appraisal, which was based on detailed inventory as of July 7, 2018.

| Sears Holdings Corporation (Exhibit A-1) Total Company Consolidated Net Liquidation Value Comparison Projected for November 3, 2018 vs. July 7, 2018 Appraisal (Nov Rollforward) ($ in millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Classification | Projected for November 3, 2018 | | | As of July 7, 2018 (Nov Rollforward) | | | Change | | |
| | Cost $ | Blended Net Rec. | % of Cost | Cost $ | Blended Net Rec. | % of Cost | Cost $ | Blended Net Rec. | % of Cost |
| **GOB Inventory** | | | | | | | | | |
| Kmart Stores | $833.5 | $726.6 | 87.2% | $1,046.0 | $917.2 | 87.7% | ($212.6) | ($190.6) | (0.5%) |
| Sears Full Line Stores | $1,155.3 | $1,141.2 | 98.8% | $1,479.6 | $1,464.9 | 99.0% | ($324.4) | ($323.7) | (0.2%) |
| Sears Auto Centers | $52.7 | $22.4 | 42.4% | $65.9 | $28.5 | 43.3% | ($13.1) | ($6.2) | (0.9%) |
| **Subtotal - GOB Inventory** | $2,041.4 | $1,890.2 | 92.6% | $2,591.5 | $2,410.7 | 93.0% | ($550.1) | ($520.5) | (0.4%) |
| Non-Direct Sale Expenses | N/A | ($66.3) | (3.1%) | N/A | ($84.1) | (3.1%) | N/A | $17.9 | 0.0% |
| Wholesale | $117.5 | $44.7 | 38.0% | $123.0 | $47.3 | 38.5% | ($5.5) | ($2.6) | (0.4%) |
| **Total** | $2,159.0 | $1,868.6 | 86.6% | $2,714.5 | $2,373.9 | 87.5% | ($555.5) | ($505.2) | (0.9%) |

Page 6

*Analysis and Assumptions* | Inventory Appraisal  TIGER

## Analysis and Assumptions

For the purpose of determining estimated recovery values for eligible inventory available for sale, Tiger reduced the projected stock ledger inventory of $2.44 billion at cost by $169.7 million to account for various categories such as unshipped merchandise, consignment inventory, and certain accounting adjustments (see Exhibit F for full details). Also excluded from inventory available for sale is $116.8 million of Ocean In-Transit Inventory, which may not arrive in time for inclusion in the GOB sale (see the Potential Additional Recoveries section of this report).

The remaining $2.16 billion balance, which is available for liquidation, has been divided into two categories for the purpose of determining net liquidation values (see Exhibit F):

|  | Cost |
|---|---|
| Retail Store GOB Inventory | $2.04 billion |
| Inventory To Be Sold On a Wholesale Basis | $117.5 million |

### Retail Store GOB Inventory for Go-Forward, Wave 1, and Wave 2 Stores

For the purpose of determining recovery values for the retail portion of the Company's inventory, this analysis assumes and is based on the ability to conduct traditional GOB sales to the general public through the Company's retail locations.

The $2.04 billion at cost of projected inventory to be included in retail store GOB sales has an estimated retail value of approximately $5.06 billion, based on the cost-to-retail relationship as of October 6, 2018, as follows (see Exhibit B-2):

### Projected for November 3, 2018
### ($ in millions)

|  | Cost | Retail |
|---|---|---|
| **Go-Forward Stores** |  |  |
| Kmart Stores | $653.5 | $1,480.2 |
| Sears Banners | $967.9 | $2,534.7 |
| **Wave 1 Closing Stores** |  |  |
| Kmart Stores | $159.7 | $361.6 |
| Sears Banners | $180.3 | $479.8 |
| **Wave 2 Closing Stores** |  |  |
| Kmart Stores | $20.3 | $45.9 |
| Sears Banners | $59.8 | $159.0 |
| **Total** | **$2,041.4** | **$5,061.3** |

Retailers often track certain merchandise departments in their records on a cost-only basis. All Sears banner distribution center inventory, as well as Sears Auto Centers inventory, is carried in the stock ledger at cost only. The Company provided Tiger with a computed retail value for distribution center and Auto Centers inventory. Kmart distribution center inventory is carried in the stock ledger at both cost and retail.

At Kmart, departments tracked on a cost-only basis include Non-Prescription Pharmacy, Tobacco, and Alcohol, all of which are to be included in the retail store GOB sale. Using Company-supplied sales and margin information, Tiger computed a projected retail value of $3.4 million for these categories (see Exhibit A-2a).

Page 7

## JX 104-9

*Analysis and Assumptions* | Inventory Appraisal


TIGER

It is assumed that all first-quality distribution center inventory would be distributed to the retail stores for inclusion in the retail store GOB sales. For presentation purposes, all Sears banners' distribution center inventory, with the exception of Tires, is included in the Sears Full Line stores. Tires have been included in Sears Auto Center locations. (Descriptions of individual banners are provided in the Company Overview section of this report.)

Tiger assumes all Company catalog and Internet operations (Sears.com, Kmart.com, etc.) would be discontinued in the event of a liquidation, and the related inventory would be distributed to retail stores.

In order to more closely reflect actual historical selling prices, Tiger reduced the projected beginning retail inventory of $5.06 billion by $1.18 billion, or 23.4%, to reflect unknown damages, excess shrink, and a pricing adjustment. The estimated retail markdown of $1.18 billion is broken down as follows: $351.6 million for go-forward Kmart stores; $567.6 million for go-forward Sears Full Line stores; $17.0 million for Sears Auto Centers; $85.9 million for Wave 1 Kmart stores; $111.9 million for Wave 1 Sears Full Line stores; $10.9 million for Wave 2 Kmart stores; and $37.1 million for Wave 2 Sears Full Line stores (see Exhibit B-2). As a percentage of eligible GOB inventory at retail, the total markdown has been increased by 3.0 percentage points since Tiger's last appraisal.

The resulting adjusted eligible inventory available to be sold in the retail GOB sales is as follows:

| Adjusted Eligible Inventory Projected for November 3, 2018 ($ in millions) | | | | |
|---|---|---|---|---|
| | Cost | Retail | Retail Markdown | Adjusted Retail |
| **Go-Forward Inventory** | | | | |
| Kmart | $653.5 | $1,480.2 | $351.6 | $1,128.6 |
| Sears Full Line | $915.2 | $2,434.5 | $567.6 | $1,866.9 |
| Sears Auto Centers | $52.7 | $100.2 | $17.0 | $83.2 |
| **Total: Go-Forward** | **$1,621.4** | **$4,014.9** | **$936.2** | **$3,078.7** |
| **Wave 1 Inventory** | | | | |
| Kmart | $159.7 | $361.6 | $85.9 | $275.7 |
| Sears Full Line | $180.3 | $479.8 | $111.9 | $367.9 |
| **Total: Wave 1** | **$340.0** | **$841.4** | **$197.8** | **$643.6** |
| **Wave 2 Inventory** | | | | |
| Kmart | $20.3 | $45.9 | $10.9 | $35.0 |
| Sears Full Line | $59.8 | $159.0 | $37.1 | $121.9 |
| **Total: Wave 2** | **$80.0** | **$204.9** | **$48.0** | **$156.9** |
| **Total** | **$2,041.4** | **$5,061.3** | **$1,181.9** | **$3,879.3** |

HIGHLY CONFIDENTIAL

SEARS_507B_00001354

**JX 104-10**

*Analysis and Assumptions* | Inventory Appraisal

 TIGER

**Sale Period**

Tiger has reviewed each retail business segment, or banner, and independently estimated sale periods, recoveries, and expenses for each. The estimated sale terms for the retail store GOB sales vary by store group and banner and are based, in part, on the inventory mix and merchandise levels observed during store visits as well as on historical sales.

The chart below compares the projected sale term for a GOB sale of inventory reported as of the appraisal date through go-forward stores to the November rollforward provided in the previous analysis; the estimated sale term for all three banners decreased.

| Estimated Sale Term by Banner Go-Forward Stores Projected for November 3, 2018 vs. July 7, 2018 Appraisal (Nov Rollforward) | | | |
|---|---|---|---|
| | **Current Analysis** | **Previous Analysis** | **Change** |
| **Kmart** | 9.2 Weeks | 11.3 Weeks | -2.1 Weeks |
| **Sears Full Line** | 12.7 Weeks | 13.6 Weeks | -0.9 Weeks |
| **Auto Centers** | 9.3 Weeks | 11.0 Weeks | -1.7 Weeks |

The sale term for Wave 1 closing stores, which are scheduled to close on January 13, 2019, is 12 weeks, and the sale term for Wave 2 closing stores, which are scheduled to close on February 3, 2019, is 12 weeks.

This review assumes that within each store grouping, all locations would remain open throughout the entire sale term projected for their respective banners. However, it is likely that some locations would close before the forecasted end dates, whereas others would remain open beyond the estimated sale terms. The projected sale terms provided above, therefore, represent the average period of time a given store is likely to remain open during a GOB event.

**Sale Expenses**

Expenses for the retail GOB inventory sale included in this analysis consist of two categories:

- Direct Sale Expenses – Those expenses directly related to the store locations.
- Non-Direct Sale Expenses – Royalty payments, base liquidation fees, and corporate overhead required to support the retail store GOB sales.

*NOTE: Both Direct and Non-Direct Sale Expenses are reflected for the GOB sale period only.*

Expenses of the sale include a provision in the Direct Sale Expenses for operating the distribution centers in order to move the warehouse inventory to the retail locations for inclusion in the retail store GOBs. The warehousing costs for all Sears retail business segments are reflected in the Full Line Stores analysis (see Exhibit A-2b).

**Gift Certificates/Cash Cards ($40.6 million as of October 6, 2018)**

Tiger was asked by the Lender not to include gift certificates/cash card redemptions as a cost of liquidation, since these are reflected as a reserve in the borrowing base. Typically, an estimate for gift certificate/cash card redemptions is included as a direct sale expense. However, since the Lender has already reserved for this liability, it was excluded from this analysis to prevent the Company from being charged twice. As of the appraisal date, the gift certificate/cash card liability totaled $40.6 million.

HIGHLY CONFIDENTIAL

## *Analysis and Assumptions* | Inventory Appraisal


TIGER

### Shop Your Way Rewards Program

Customers can sign up for the Company's free Shop Your Way Rewards Program, which has been in operation since the end of fiscal 2009. Participants earn 10 points for every $1.00 spent on qualifying purchases at select Sears Full Line, Sears Auto Centers, and Kmart retail locations. Additional points can also be earned on qualifying home repairs and improvement services. In addition, Sears Hometown & Outlet Stores, Inc. (SHO) and Lands' End retail locations participate in the Shop Your Way program.

For every 1,000 points accumulated, members receive a $1.00 deposit into their accounts that is redeemable on future purchases at any of the participating businesses. Points are valid for one year and are tracked using membership cards presented at the point of purchase.

Tiger has assumed that during a GOB event, the Company's customers would not be able to redeem credits earned through the Shop Your Way program, and Sears would not issue new points. Tiger took the cancellation of the rewards program within Company-operated stores into consideration when developing recovery values for this analysis.

### Royalties

As of the appraisal date, the Company had agreements with several licensors, including Adam Levine, Bongo, Cannon, Everlast, Jaclyn Smith, Joe Boxer, Outdoor Life, and Route 66.

Most royalty agreements stipulate that payments are to be based on net retail sales, though several agreements require payments based on the cost value of purchased merchandise. For this review, Tiger has calculated total royalty payments of approximately $5.1 million based upon the sales of inventory on hand for these licenses. Royalty payments are projected to total $4.0 million for go-forward inventory, $849 thousand for Wave 1 closing store inventory, and $204 thousand for Wave 2 closing store inventory (see Exhibit A-2). *Note: During any GOB sale, royalty payments due will be determined by the levels of on-hand licensed inventory at the actual time of a liquidation and the sales value of the inventory at the discounted GOB selling prices.*

### Retail Store GOB Net Recovery

Based upon all the assumptions discussed, Tiger has estimated the total blended net recovery value for the combined adjusted retail GOB inventory of $2.04 billion at cost prior to non-direct sale expenses. The net recovery value for go-forward stores is $1.50 billion, the net recovery value for Wave 1 closing stores is $312.1 million, and the net recovery value for Wave 2 closing stores is $76.8 million (see Exhibit A-1):

| Blended Net Liquidation Value Retail Store GOB Inventory Projected for November 3, 2018 ($ in 000s) | | | |
|---|---|---|---|
| | Available Inv. at Cost ($) | Blended Net Recovery ($) | As a % of Available Inv. at cost |
| Go-Forward Inventory | $1,621,391 | $1,501,301 | 92.6% |
| Wave 1 Inventory | 340,014 | 312,139 | 91.8% |
| Wave 2 Inventory | 80,042 | 76,765 | 95.9% |
| Total | $2,041,447 | $1,890,206 | 92.6% |

Tiger notes that Wave 2 closing store inventory consists of a greater proportion of Sears Full Line inventory than go-forward and Wave 1 closing stores. Tiger has determined that Sears Full Line inventory will achieve higher recovery values than Kmart inventory in a liquidation. The proportion of Sears Full Line inventory as compared to the proportion of Kmart inventory included in each of the go-forward, Wave 1, and Wave 2 scenarios accounts, in part, for the differences in NOLV.

Page 10

SEARS_507B_00001356

## JX 104-12

*Analysis and Assumptions* | Inventory Appraisal


TIGER

## Inventory To Be Sold On A Wholesale Basis

Several categories of Sears Holdings inventory, totaling $117.5 million, have not been included in the retail store GOB sales, as these categories are better sold on a wholesale basis (details are reflected on Exhibit F). Inventory categories that would be sold on a wholesale basis include Prescription Pharmacy, Repair Parts, RTV/Damages, Sears Home Improvement, and others.

The recovery estimates for the classifications of inventory to be sold on a wholesale basis (see Exhibit B-6) are shown net of the associated expenses. Tiger's projected net recovery value for the wholesale portion of the Sears Holdings inventory as of November 3, 2018 is as follows:

| Blended Net Liquidation Value Wholesale Inventory Projected for November 3, 2018 ($ in 000s) | | | |
| --- | --- | --- | --- |
| | Available Inv. at Cost ($) | Blended Net Recovery ($) | As a % of Available Inv. at cost |
| **Total** | $117,534 | $44,686 | 38.0% |

Included in the inventory to be sold on a wholesale basis is Prescription Pharmacy Inventory, which was projected to total $30.6 million at cost on November 3, 2018 (Exhibit F). <u>Typically, prescription inventory is sold in conjunction with a company's prescription lists. The lists should be sold prior to any announcement regarding any store closings or GOB sales in order to prevent nearby competitors from luring away script customers and diminishing the value of the lists.</u>

The recovery values for Prescription Pharmacy Inventory reflected in this analysis are for the inventory only and do not include the value of the script lists. For a discussion of prescription lists, see the following section of this report, Potential Additional Recoveries.

HIGHLY CONFIDENTIAL

SEARS_507B_00001357

**JX 104-13**



## Potential Additional Recoveries

In addition to the net recovery values for retail store GOB inventory and inventory sold on a wholesale basis, Tiger has identified several areas of potential additional recoveries not reflected in this analysis that would be realized in a GOB scenario:

### Ocean In-Transit Inventory

Ocean In-Transit Inventory was projected to total $116.8 million at pre-landed cost as of November 3, 2018. To the extent that this inventory did arrive during a liquidation, it would either be included in the retail store GOB sale or would be sold on a wholesale basis, depending on the timing of its arrival. In either instance, it would represent additional recoveries above the net recoveries exhibited in this analysis. There would be an additional expense for Ocean In-Transit Inventory for Customs, Insurance, and Freight (CIF) costs, which would range from 10% to 30% of the cost value, depending on the item.

### Lay-away Inventory/Lay-away Receivables

Sears and Kmart stores offer customers a lay-away program in which the inventory is removed from the stock ledger when the sale is recorded and a receivable is created for the outstanding balance. As of October 6, 2018, lay-away inventory was approximately $38.1 million at cost. The outstanding lay-away receivable was approximately $14.0 million.

Additional recoveries during a GOB sale would be realized either through the collection of the outstanding receivable after providing the merchandise to the customer, or for the sale of cancelled lay-away inventory, which would be returned to stock and included in the retail store GOB sale. To the extent that the sales of any of this inventory are not completed, however, the Company would face a liability associated with the corresponding customer deposits.

### Consignment Inventory

Tiger's analysis has excluded consignment inventory from the retail GOB sale, as this inventory is not owned by the Company. However, it is common in retail GOB sales for consignors to ask the company to include consignment goods on the consignors' behalf, for which the retailer receives a commission. Any earned commissions would represent additional recoveries.

Projected consignment inventory for November 3, 2018 is approximately $2.5 million at cost, all of which is for the Kmart banner (see Exhibit F).

### Unshipped Merchandise

The Company projected unshipped goods — which consist inventory that has not yet been shipped to customers – within Sears banners to total approximately $82.0 million at cost as of November 3, 2018. Unshipped Merchandise is part of the $189.7 million excluded from beginning stock ledger inventory of $2.44 billion at cost (see Exhibit F).

Unshipped merchandise consists primarily of big-ticket items and have been excluded from the eligible beginning retail store GOB inventory, as they are fully paid for and subject to shipment to customers. In the event that merchandise is not shipped due to a cancellation by the customer prior to a GOB sale, it would be included in the liquidation and would represent additional recoveries. However, to the extent that any of this inventory is not shipped, there would be a liability associated with the corresponding customer payments.

### Prescription Lists

The value of the Company's pharmacy prescription lists has not been included in this analysis, although these scripts would be valuable in a GOB scenario. In the past, Kmart has sold script lists to third parties when locations are shuttered and the nearest Kmart store is too far to easily transfer the list and customers. Kmart locations are generally within a close proximity to drugstore chains and other big-box retailers offering pharmacy services. These competing locations would create demand for Kmart's script lists. Based upon recent script valuations for similar pharmacy prescription databases, the average return would be approximately $5.00 per prescription.

### Warranty Revenue

One significant form of additional income at Sears is Protection Agreements (Extended Warranty Coverage). Protection Agreements may still be sold during the period of the GOB sale, based on the assumption that a third party would back up the warranty.

HIGHLY CONFIDENTIAL

**Potential Additional Recoveries | Inventory Appraisal**



Warranty sales at Sears Hometown & Outlet Stores, Inc. (SHO) locations are completed through Sears Holdings, which receives 50% of the revenue from these transactions. During a liquidation, any warranty sales completed through SHO banners would also represent additional recoveries for Sears Holdings.

### Other Miscellaneous Income Items

As part of its normal course of business, the Company collects fees and income. These income items include sub-tenant rents, ATM fees, vending machine fees, and paper recycling income. Based upon the 12 months ended fiscal September 2018, these income items aggregated approximately $144.6 million, or $12.1 million per month. To the extent that these income items continue during the GOB sale, the Company would realize additional recoveries.

### Leased Department Income

The Company has several licensed businesses which operate leased departments in Sears and Kmart retail stores, including Dental Clinics, Optical Centers, Portrait Studios, Tax Service Centers, Car Rentals, Hair Salons, and Driving Schools. It is common for many leased departments to continue operating during a retail GOB sale. To the extent that leased departments do operate, additional recoveries to the estate in the form of rent and commission payments would be earned. Within all stores, leased departments generated licensed business income of approximately $46.7 million for the 12 months ended fiscal September 2018, or approximately $3.9 million per month, according to Company records.

### Auto Center Labor

Sears offers automotive services including oil changes, tune ups, wheel alignments, battery replacements, and other installations of various auto parts. Revenue from these services totaled approximately $195.0 million during the 12 months ended September 2018, or approximately $16.2 million per month. The gross recovery values assigned by Tiger to each inventory class are based on the assumption that these services would continue throughout the sale term. While Tiger has included the labor expenses related to these services in its GOB model, it has not included the service revenue generated.

HIGHLY CONFIDENTIAL

*Company Overview* | Inventory Appraisal



## Company Overview

Sears Holdings is one of the nation's largest broadline retailers, operating a total of 1,095 retail stores in the United States as of October 6, 2018, including the territories of Guam and Puerto Rico.

 

The following table summarizes the number of locations within each group of stores by banner as of October 6, 2018:

| Store Count By Banner As of October 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Banner | Go-Forward | Already in Process of Closing | Wave 1 Closings | Wave 2 Closings | Total |
| Kmart | 239 | 24 | 65 | 11 | 339 |
| Sears Full Line | 265 | 43 | 77 | 29 | 414 |
| Sears Auto Centers | 243 | 20 | 58 | 21 | 342 |
| Total | 747 | 87 | 200 | 61 | 1,095 |

The Company's product mix includes a wide variety of national brands and proprietary labels, including Kenmore, DieHard, Covington, and Canyon River Blues. Company locations compete with national retailers such as Target, Walmart, JC Penney, Kohl's, Lowe's, and Home Depot.

## Sears, Roebuck and Co.

For the purposes of this analysis, the Sears segment can be classified under two main banners:

Full Line Stores (409 Full Line, five Grand/Essentials)
Full Line Stores carry a wide selection of both hardlines (appliances, electronics, home improvement products, tools, fitness equipment, lawn care needs) and softlines (apparel, footwear, outerwear, fashion and fine jewelry, fragrances, handbags). Most Full Line stores are located within shopping malls, with a small amount operating as freestanding locations. The average Full Line store measures approximately 150,000 square feet.



*Exterior of a Sears Full Line store in California*

A total of five Sears Grand/Essentials stores are included in the Sears Full Line banner. The Company utilized the Grand/Essentials format to convert freestanding Kmart locations into one-stop, family-oriented concepts that offer the same product categories as Full Lines stores, in addition to more extensive selections of health and beauty products and dry groceries. The average Grand/Essentials location measures approximately 120,000 square feet.

Based on the eligible retail GOB inventory on hand at stores and warehouses as of the appraisal date, the product mix within Sears Full Line Stores was as follows:



Sears Auto Centers
Sears Auto Centers typically operate as standalone stores located near shopping malls. Each Sears Auto Center location has multiple garage bays for servicing vehicles and a small sales floor that also serves as the customer waiting area. Products offered at Sears Auto Centers are from major national brands of tires and batteries, including the Company's proprietary DieHard products. *NOTE: Sears Auto Centers are a sub-category within Full Line stores.*

Page 14

*Company Overview* | Inventory Appraisal





*Exterior of a Sears Auto Center in Massachusetts*

Based on the eligible retail GOB inventory on hand at stores and warehouse locations as of the appraisal date, the product mix within Sears Auto Centers was as follows:



### Kmart Corporation

A wholly-owned subsidiary of Sears Holdings Corporation, Kmart operates as a mass merchandising company that offers customers a vast range of national brands and private-label products. Kmart stores are typically located within strip malls or operate as freestanding locations.



*Exterior of a Kmart store in New York*

Most Kmart locations carry a wide assortment of general merchandise, including hardlines such as hardware, electronics, and home office supplies, as well as apparel and home goods, including lawn and garden care items. The product mix includes a selection of national brands such as Jaclyn Smith and Joe Boxer. In 2011, the Company began offering proprietary Sears product – such as Kenmore-branded merchandise – at Kmart locations. Kmart stores average about 95,000 square feet in size.

Based on the eligible retail GOB inventory on hand at stores and warehouse locations as of the appraisal date, the product mix within Kmart Corporation was as follows:



Page 15

SEARS_507B_00001361
JX 104-17

*Operating Metrics* | Inventory Appraisal



## Operating Metrics

As part of this analysis, the Company provided various inventory and sales data for each store banner for the 12 months ended fiscal June 2018.

Operating metrics by department for Kmart Corporation, Sears Full Line Stores, and Sears Auto Centers are provided in Exhibits C-1a, C-1b, and C-1c, respectively.

### Seasonality

As shown in the graph below, sales volumes are typically highest during the winter holiday selling season, while during the remainder of the year, sales remain relatively flat.



### Comparable Store Sales

During the 12 months ended September 2018, Kmart Corporation reported comp. sales decreases of 10.8%, including a 4.5% decrease during the most recent three-month period (Exhibits D-1a and D-2a).

At Sears Full Line Stores, comp. sales declined by 14.2% during the same 12-month span. During the most recent three months, comp. sales at Sears Full Line Stores decreased by 11.0% (Exhibits D-1b and D-2b).

Within Sears Auto Centers, comp. sales fell by 13.7% during the 12 months ended September 2018 and by 7.1% during the past three months (Exhibits D-1c and D-2c).

### Gross Margin

Kmart Corporation reported a gross margin of 28.2% on net sales of $3.98 billion for the 12 months ended September 2018. The margin for the Sears Full Line banner was 26.1% on net sales of $4.93 billion, while the margin at Sears Auto Centers was 28.2% on net sales of $291.8 million (Exhibits C-1, C-1a, C-1b, and C-1c).



The average gross margin reported by Kmart Corporation for the three months ended September 2018 decreased by 4.7 percentage point compared to the three months ended September 2017; the margin for Sears Full Line Stores increased by 1.7 percentage point during the same time span; and the margin for Sears Auto Centers decreased by 8.0 percentage points during the same time span (Exhibits C-2, C-2a, C-2b, and C-2c).

### Inventory Turnover

During the 12 months ended fiscal September 2018, Kmart Corporation exhibited an average inventory turnover of 2.5, which translates to 144 days' sales. The inventory turnover rate for Sears Full Line Stores was 2.4 times per annum (154 days' sales), while Sears Auto Centers experienced turns of 3.4 (108 days' sales).



Since the previous analysis, the inventory turnover rate for each banner remained relatively flat. Tiger took the Company's current inventory turnover rates into consideration when developing gross recoveries. To the extent that the Company's inventory turnover rate changes, recovery values would be positively or negatively impacted.

Page 16

*Field Visits* | Inventory Appraisal

TIGER

## Field Visits

### Overview

Tiger's field representatives visited a total of 61 Company-operated stores, including 18 Kmart locations, 25 Sears Full Line stores, and 18 Sears Auto Centers. Of the 61 locations visited, 18 were in the midst of store closing events.

### Merchandising

Company-operated stores stock a wide range of products, including apparel, accessories, footwear, appliances, home furnishings, mattresses, hardware, kitchen items, health and beauty products, food products, and automotive goods, among others.



*Handbags and accessories department at a Sears store in California*



*Section of the women's apparel department at a Kmart store in Massachusetts*

The Company's inventory is from a wide selection of national brands, such as Levi's, Maytag, LG, Samsung, Whirlpool, Cannon, Fruit of the Loom, Goodyear, Kodak, Graco, KitchenAid, Wrangler, Dockers, Dr. Scholl's, Michelin, Nike, Reebok, Sketchers, Hamilton Beach, New Balance, Cuisinart, Tide, Seiko, and Timex, among many others. In addition, some Sears Full Line locations contain Lands' End shop-in-shops. Sears Holdings also offers items from Company-owned labels, such as Kenmore and DieHard.



*Lands' End shop-in-shop at a Sears store in California*

Consistent with visits performed for Tiger's previous appraisals, field representatives noted that there were still gaps in the tools department at some locations, while other key departments, including apparel and footwear, appeared to be well stocked.

At the time of Tiger's visits, Sears Full Line and Kmart stores had begun setting up their winter holiday merchandise displays, including Christmas trees.



*Christmas trees on display at a Kmart store in New York*

Page 17

*Field Visits* **| Inventory Appraisal**



### Ticketing

Apparel and other softline merchandise is individually ticketed, usually by vendors or at distribution centers. For hardlines, the Company uses individual stickers, shelf labels, peg hook tags, and stand-up signs that employees place on or near display items. Stores typically generate these labels and signs. Product tags typically include the item number, the vendor name, a brief description, the barcode, the retail price, and, if applicable, the size and season codes.

### Discounting

At some Sears stores, stickers containing marked-down prices are affixed to product tags, while at others, employees highlight the barcodes on product tags, using specific colors for each markdown level. Signs are placed in clearance areas to notify customers what price point each color represents.

Field representatives noted that at Sears Full Line and Kmart stores, there was little clearance merchandise on sales floors; management stated that a portion of out-of-season, discontinued, and clearance merchandise had been shipped from go-forward stores to closing stores. The small amount of clearance merchandise observed at go-forward stores consisted mainly of toys and apparel.



*Apparel clearance section at a Sears store in California*

The Company also uses temporary promotions in stores. For example, at the time of Tiger's visits, Sears Full Line stores were running a "Spend and Get" promotion for Shop Your Way rewards program members, in which members received cashback points – which are distributed in installments – for qualifying purchases in specific departments. For example, customers who

spent $300 on home appliances and lawn and garden merchandise received $300 in points to use on a future purchase; customers who spent $75 on sporting goods received $25 in points; and customers who spent $60 on tools received $20 in points. In addition, Sears Full Line stores were offering up to 40% off of appliances and up to 60% - plus an additional 10% - off of mattresses.

At Kmart stores, the Company was running a similar "Spend and Get" promotion, during which Shop Your Way members who spent $50 received $20 in points. Additional temporary promotions included buy-one-get-one-50%-off for footwear, and 50% off of Halloween decorations and costumes.



*Sign promoting the "Spend and Get" offer at a Kmart in New York*

Promotions at Sears Auto Centers, meanwhile, included buy three in-stock tires, get one tire free and $100 in points; spend $300, receive $300 in points; and four Laufenn G Fit AS tires for $100.



*Signage advertising tire promotions available at a Sears Auto Center store in Massachusetts*

Page 18

*Field Visits* | Inventory Appraisal



### Loss Prevention / Inventory Control

Stores utilize cameras, alarms, and sensor tags for security. Physical inventory counts are completed on an annual basis by a third party, such as RGIS. Cycle counts are typically conducted weekly, and daily case counts are completed in jewelry departments.

### Closing Stores

During its field visits, Tiger visited 18 retail locations that were in the midst of store closing events. At closing locations, the Company is using signage with language such as "store closing sale" and "everything must go" in store windows and throughout sales floors.



*Store closing signage used at an entrance to a Sears Full Line store*



*Store closing signage used in the interior of a store*

At the Natick, Mass. closing store, discounts offered during the first week of the event ranged from 10% to 30%. Bright, color-coded rack-top signage is being used to highlight discounts available on specific product categories. For example, at the Natick, Mass. store, orange signs are used for items available at a 15% discount, and green signs are used for items available at a 30% discount. The Company is also using signs indicating updated price points for specific items at closing stores.



*Example of 15%-off store closing signage*



*Example of store closing signage used to note specific price point reductions*

HIGHLY CONFIDENTIAL

*List of Exhibits* | Inventory Appraisal 

## List of Exhibits

**A.** Total Company: Summary of Blended Net Recovery Values
- **A-1.** Total Company: Summary of Blended Net Recovery Values by Store Banner or Inventory Type
- **A-2.** Summary of Total Estimated Net Recovery Values On Retail Store GOB Inventory
- **A-2a.** Kmart Corporation: Summary of Estimated Net Recovery Values On Retail Store GOB Inventory
- **A-2b.** Sears Full Line Stores: Summary of Estimated Net Recovery Values On Retail Store GOB Inventory
- **A-2c.** Sears Auto Centers: Summary of Estimated Net Recovery Values On Retail Store GOB Inventory
- **A-3.** Total Company: Projected 3-Month Liquidation Analysis
- **A-3a.** Go-Forward Inventory: 3-Month Liquidation Summary
- **A-3b.** Store Closing Summary: Wave 1
- **A-3c.** Store Closing Summary: Wave 2

**B.** Total Company: Inventory Reconciliation
- **B-1.** Total Company: Stock Ledger Inventory at Cost
- **B-2.** Total Company: Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
- **B-3a.** Kmart Corporation: Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
- **B-3b.** Sears Full Line Stores: Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
- **B-3c.** Sears Auto Centers: Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
- **B-4.** Total Company: Inventory Classifications to be Sold On A Wholesale Basis
- **B-5.** Kmart Stores: Summary of Estimated Gross Recovery Values: Tobacco & Alcohol and Non Prescription Pharmacy
- **B-6.** Estimated Net Recovery On Total Company Inventory Sold On A Wholesale Basis

- **C-1.** Total Company: Operating Metrics
- **C-1a.** Kmart Corporation: Operating Metrics
- **C-1b.** Sears Full Line Stores: Operating Metrics
- **C-1c.** Sears Auto Centers: Operating Metrics
- **C-2.** Total Company: Operating Metrics Comparison
- **C-2a.** Kmart Corporation: Operating Metrics Comparison
- **C-2b.** Sears Full Line Stores: Operating Metrics Comparison
- **C-2c.** Sears Auto Centers: Operating Metrics Comparison

**D.** Total Company: Net Sales Seasonality
- **D-1a.** Kmart Corporation: Net Sales Seasonality & Comparable Store Sales Trend
- **D-1b.** Sears Full Line Stores: Net Sales Seasonality & Comparable Store Sales Trend
- **D-1c.** Sears Auto Centers: Net Sales Seasonality & Comparable Store Sales Trend
- **D-2.** Total Company: Graph – Sales Per Store-Week and Comp. Store Sales Comparison
- **D-2a.** Kmart Corporation: Graph – Sales Per Store-Week and Comp. Store Sales Comparison
- **D-2b.** Sears Full Line Stores: Graph – Sales Per Store-Week and Comp. Store Sales Comparison
- **D-2c.** Sears Auto Centers: Graph – Sales Per Store-Week and Comp. Store Sales Comparison

**E.** Total Company: Inventory History

**F.** Total Company: Inventory Forecast

HIGHLY CONFIDENTIAL   SEARS_507B_00001366

**JX 104-22**

**Exhibits | Inventory Appraisal**

TIGER

HIGHLY CONFIDENTIAL

## Sears Holdings Corporation
### Total Company
### Summary of Blended Net Recovery Values
### Projected for November 3, 2018 vs. July 7, 2018 (November Rollforward)
($ in 000's)

| | Go-Forward Inventory | | | Wave 1 Inventory | | | Wave 2 Inventory | | | Total Company | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost $ | NOLV | | Cost $ | NOLV | | Cost $ | NOLV | | Cost $ | NOLV | |
| | | NOLV $ | % of Cost | | NOLV $ | % of Cost | | NOLV $ | % of Cost | | NOLV $ | % of Cost |
| **Projected for November 3, 2018 (1) (2)** | | | | | | | | | | | | |
| GOB Inventory | $1,621,391 | $1,436,495 | 88.6% | $340,014 | $310,978 | 91.5% | $80,042 | $76,483 | 95.6% | $2,041,447 | $1,823,955 | 89.3% |
| Wholesale Inventory | $117,534 | $44,686 | 38.0% | $0 | $0 | - | $0 | $0 | - | $117,534 | $44,686 | 38.0% |
| **Total** | **$1,738,925** | **$1,481,181** | **85.2%** | **$340,014** | **$310,978** | **91.5%** | **$80,042** | **$76,483** | **95.6%** | **$2,158,982** | **$1,868,641** | **86.6%** |
| **July 7, 2018 Appraisal (November Rollforward) (1) (2)** | | | | | | | | | | | | |
| GOB Inventory | $2,591,517 | $2,326,550 | 89.8% | N/A | N/A | N/A | N/A | N/A | N/A | $2,591,517 | $2,326,550 | 89.8% |
| Wholesale Inventory | $123,002 | $47,317 | 38.5% | N/A | N/A | N/A | N/A | N/A | N/A | $123,002 | $47,317 | 38.5% |
| **Total** | **$2,714,520** | **$2,373,867** | **87.5%** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **$2,714,520** | **$2,373,867** | **87.5%** |
| **Change (1) (2)** | | | | | | | | | | | | |
| GOB Inventory | ($970,126) | ($890,055) | (1.2%) | N/A | N/A | N/A | N/A | N/A | N/A | ($550,070) | ($502,595) | (0.4%) |
| Wholesale Inventory | ($5,468) | ($2,631) | (0.4%) | N/A | N/A | N/A | N/A | N/A | N/A | ($5,468) | ($2,631) | (0.4%) |
| **Total** | **($975,595)** | **($892,686)** | **(2.3%)** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **($555,538)** | **($505,226)** | **(0.9%)** |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

SEARS_507B_00001367
JX 104-23

Exhibit A

## Exhibits | Inventory Appraisal

TIGER

**Sears Holdings Corporation**
**Total Company**
Summary of Blended Net Recovery Values by Store Banner or Inventory Type
Projected for November 3, 2018 vs. July 7, 2018 (November Rollforward)
($ in 000's)

| | Go-Forward Inventory | | | Wave 1 Inventory | | | Wave 2 Inventory | | | Total Company | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost $ | NOLV $ | % of Cost | Cost $ | NOLV $ | % of Cost | Cost $ | NOLV $ | % of Cost | Cost $ | NOLV $ | % of Cost |
| **Projected for November 3, 2018** | | | | | | | | | | | | |
| Kmart Stores | $653,515 | $572,880 | 87.7% | $159,667 | $136,143 | 85.3% | $20,275 | $17,589 | 86.8% | $833,458 | $726,612 | 87.2% |
| Sears Full Line Stores (1) | 915,150 | 906,041 | 99.0% | 180,347 | 175,996 | 97.6% | 59,767 | 59,176 | 99.0% | 1,155,264 | 1,141,213 | 98.8% |
| Sears Auto Centers (2) | 52,725 | 22,381 | 42.4% | - | - | - | - | - | - | 52,725 | 22,381 | 42.4% |
| Estimated Total Company GOB Net Recovery Before Other Adjustments and Corporate Expenses | $1,621,391 | $1,501,301 | 92.6% | $340,014 | $312,139 | 91.8% | $80,042 | $76,765 | 95.9% | $2,041,447 | $1,990,206 | 92.6% |
| Less: Royalty Payments (3) | | 4,039 | 0.2% | | 849 | 0.2% | | 204 | 0.3% | | 5,093 | 0.2% |
| Estimated Blended Net Recovery Before Estimated Liquidation Fees and Corporate Expenses | | $1,497,262 | 92.3% | | $311,290 | 91.6% | | $76,561 | 95.7% | | $1,885,113 | 92.3% |
| Less: Estimated Base Liquidation Fee (3) | | 12,600 | 0.8% | | 312 | 0.1% | | 78 | 0.1% | | 12,990 | 0.6% |
| Estimated Blended Net Recovery Before Corporate Expenses | | $1,484,662 | 91.6% | | $310,978 | 91.5% | | $76,483 | 95.6% | | $1,872,122 | 91.7% |
| Less: Corporate Expenses (3) | | 48,167 | 3.0% | | - | - | | - | - | | 48,167 | 2.4% |
| Blended Net Recovery For Combined Retail Store GOB Inventory | | $1,436,495 | 88.6% | | $310,978 | 91.5% | | $76,483 | 95.6% | | $1,823,955 | 89.3% |
| Add: Non-GOB Wholesale Recovery | 117,534 | 44,686 | 38.0% | - | - | - | - | - | - | 117,534 | 44,686 | 38.0% |
| **Total Company Blended Net Recovery (4) (5)** | $1,738,925 | $1,481,181 | 85.2% | $340,014 | $310,978 | 91.5% | $80,042 | $76,483 | 95.6% | $2,158,982 | $1,868,641 | 86.6% |
| **July 7, 2018 Appraisal (November Rollforward)** | | | | | | | | | | | | |
| Kmart Stores | $1,046,013 | $917,212 | 87.7% | N/A | N/A | N/A | N/A | N/A | N/A | $1,046,013 | $917,212 | 87.7% |
| Sears Full Line Stores (1) | 1,479,632 | 1,464,908 | 99.0% | N/A | N/A | N/A | N/A | N/A | N/A | 1,479,632 | 1,464,908 | 99.0% |
| Sears Auto Centers (2) | 65,873 | 28,548 | 43.3% | N/A | N/A | N/A | N/A | N/A | N/A | 65,873 | 28,548 | 43.3% |
| Estimated Total Company GOB Net Recovery Before Other Adjustments and Corporate Expenses | $2,591,517 | $2,410,668 | 93.0% | N/A | N/A | N/A | N/A | N/A | N/A | $2,591,517 | $2,410,668 | 93.0% |
| Less: Royalty Payments (3) | | 5,877 | 0.2% | | N/A | N/A | | N/A | N/A | | 5,877 | 0.2% |
| Estimated Blended Net Recovery Before Estimated Liquidation Fees and Corporate Expenses | | $2,404,790 | 92.8% | | N/A | N/A | | N/A | N/A | | $2,404,790 | 92.8% |
| Less: Estimated Base Liquidation Fee (3) | | 18,950 | 0.7% | | N/A | N/A | | N/A | N/A | | 18,950 | 0.7% |
| Estimated Blended Net Recovery Before Corporate Expenses | | $2,385,840 | 92.1% | | N/A | N/A | | N/A | N/A | | $2,385,840 | 92.1% |
| Less: Corporate Expenses (3) | | 59,290 | 2.3% | | N/A | N/A | | N/A | N/A | | 59,290 | 2.3% |
| Blended Net Recovery For Combined Retail Store GOB Inventory | | $2,326,550 | 89.8% | | N/A | N/A | | N/A | N/A | | $2,326,550 | 89.8% |
| Add: Non-GOB Wholesale Recovery | 123,002 | 47,317 | 38.5% | N/A | N/A | N/A | N/A | N/A | N/A | 123,002 | 47,317 | 38.5% |
| **Total Company Blended Net Recovery (4) (5)** | $2,714,520 | $2,373,867 | 87.5% | N/A | N/A | N/A | N/A | N/A | N/A | $2,714,520 | $2,373,867 | 87.5% |
| **Change** | | | | | | | | | | | | |
| Kmart Stores | ($392,498) | ($344,332) | (0.0%) | N/A | N/A | N/A | N/A | N/A | N/A | ($212,555) | ($190,600) | (0.5%) |
| Sears Full Line Stores (1) | (564,482) | (558,867) | (0.0%) | N/A | N/A | N/A | N/A | N/A | N/A | (324,368) | (323,695) | (0.2%) |
| Sears Auto Centers (2) | (13,147) | (6,167) | (0.9%) | N/A | N/A | N/A | N/A | N/A | N/A | (13,147) | (6,167) | (0.9%) |
| Estimated Total Company GOB Net Recovery Before Other Adjustments and Corporate Expenses | ($970,126) | ($909,366) | (0.4%) | N/A | N/A | N/A | N/A | N/A | N/A | ($550,070) | ($520,462) | (0.4%) |
| Less: Royalty Payments (3) | | (1,838) | 0.0% | | N/A | N/A | | N/A | N/A | | (784) | 0.0% |
| Estimated Blended Net Recovery Before Estimated Liquidation Fees and Corporate Expenses | | ($907,528) | (0.5%) | | N/A | N/A | | N/A | N/A | | ($519,678) | (0.5%) |
| Less: Estimated Base Liquidation Fee (3) | | (6,350) | 0.0% | | N/A | N/A | | N/A | N/A | | (5,960) | (0.1%) |
| Estimated Blended Net Recovery Before Corporate Expenses | | ($901,178) | (0.5%) | | N/A | N/A | | N/A | N/A | | ($513,718) | (0.4%) |
| Less: Corporate Expenses (3) | | (11,123) | 0.7% | | N/A | N/A | | N/A | N/A | | (11,123) | 0.1% |
| Blended Net Recovery For Combined Retail Store GOB Inventory | | ($890,055) | (1.2%) | | N/A | N/A | | N/A | N/A | | ($502,595) | (0.4%) |
| Add: Non-GOB Wholesale Recovery | (5,468) | (2,631) | (0.4%) | N/A | N/A | N/A | N/A | N/A | N/A | (5,468) | (2,631) | (0.4%) |
| **Total Company Blended Net Recovery (4) (5)** | ($975,595) | ($892,686) | (2.3%) | N/A | N/A | N/A | N/A | N/A | N/A | ($555,538) | ($505,226) | (0.9%) |

Note(s):
(1) For presentation purposes, Sears Full Line includes Full Line Stores and Grand/Essentials Stores.
(2) The Sears Auto Centers are a subcategory within the Kmart, Sears Full Line and Sears Grand stores and are not included in the total store count.
(3) Total non-direct sale expenses are equal to the sum of royalty payments, base liquidation fee, and corporate expenses.
(4) Percentages (%) and dollars ($) may not add due to rounding.
(5) This Exhibit should be read in conjunction with the full written report.

Exhibit A-1

SEARS_507B_00001368

JX 104-24

**Exhibits | Inventory Appraisal**

TIGER

HIGHLY CONFIDENTIAL

Sears Holdings Corporation
Total Company
Summary Of Total Estimated Net Recovery Values On Retail Store GOB Inventory
Projected for November 3, 2018
($ in 000s)

| | Go-Forward Inventory | | Wave 1 Inventory | | Wave 2 Inventory | | Total Company | |
|---|---|---|---|---|---|---|---|---|
| | Inventory at Cost | Adjusted Inv. at Retail (1) | Inventory at Cost | Adjusted Inv. at Retail (1) | Inventory at Cost | Adjusted Inv. at Retail (1) | Inventory at Cost | Adjusted Inv. at Retail (1) |
| Total GOB Eligible Inventory | $1,621,391 | $3,079,728 | $340,014 | $643,649 | $80,042 | $156,939 | $2,041,447 | $3,879,315 |

| | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Combined GOB Gross Recovery | $2,005,423 | 123.7% | 65.1% | $421,537 | 124.0% | 65.5% | $101,502 | 126.8% | 64.7% | $2,528,462 | 123.9% | 65.2% |
| **Controllable Expenses:** | | | | | | | | | | | | |
| Store payroll | 156,988 | 9.7% | 5.1% | 31,683 | 9.3% | 4.9% | 6,664 | 8.3% | 4.2% | 195,335 | 9.6% | 5.0% |
| Store payroll taxes and benefits | 30,912 | 1.9% | 1.0% | 6,105 | 1.8% | 0.9% | 1,310 | 1.6% | 0.8% | 38,328 | 1.9% | 1.0% |
| Incentive & retention bonus | 15,669 | 1.0% | 0.5% | 3,168 | 0.9% | 0.5% | 666 | 0.8% | 0.4% | 19,534 | 1.0% | 0.5% |
| Subtotal - Payroll | 203,569 | 12.6% | 6.6% | 40,957 | 12.0% | 6.4% | 8,641 | 10.8% | 5.5% | 253,196 | 12.4% | 6.5% |
| Advertising & promotional costs | 59,406 | 3.7% | 1.9% | 10,738 | 3.2% | 1.7% | 3,022 | 3.8% | 1.9% | 73,164 | 3.6% | 1.9% |
| Store occupancy expense | 118,679 | 7.3% | 3.9% | 32,780 | 9.6% | 5.1% | 6,224 | 7.8% | 4.0% | 157,683 | 7.7% | 4.1% |
| Store miscellaneous expense | 14,254 | 0.9% | 0.5% | 3,401 | 1.0% | 0.5% | 982 | 1.2% | 0.6% | 18,637 | 0.9% | 0.5% |
| Central Services | 234 | 0.0% | 0.0% | - | - | - | - | - | - | 234 | 0.0% | 0.0% |
| Merchandise transfers | 47,534 | 2.9% | 1.5% | 7,233 | 2.1% | 1.1% | 2,526 | 3.2% | 1.6% | 57,292 | 2.8% | 1.5% |
| Credit card fees | 28,878 | 1.8% | 0.9% | 6,070 | 1.8% | 0.9% | 1,462 | 1.8% | 0.9% | 36,410 | 1.8% | 0.9% |
| Security | 8,588 | 0.5% | 0.3% | 2,235 | 0.7% | 0.3% | 446 | 0.6% | 0.3% | 11,269 | 0.6% | 0.3% |
| Inventory insurance | 3,332 | 0.2% | 0.1% | - | - | - | 171 | 0.2% | 0.1% | 3,502 | 0.2% | 0.1% |
| Independent inventory costs (2) | 1,667 | 0.1% | 0.1% | - | - | - | 84 | 0.1% | 0.1% | 1,751 | 0.1% | 0.0% |
| Subtotal - Other Operating | 104,485 | 6.4% | 3.4% | 18,940 | 5.6% | 2.9% | 5,670 | 7.1% | 3.6% | 129,095 | 6.3% | 3.3% |
| On-site supervision | 17,952 | 1.1% | 0.6% | 5,985 | 1.8% | 0.9% | 1,180 | 1.5% | 0.8% | 25,118 | 1.2% | 0.6% |
| **Total Combined Direct Sale Expenses (3)** | 504,122 | 31.1% | 16.4% | 109,398 | 32.2% | 17.0% | 24,737 | 30.9% | 15.8% | 638,257 | 31.3% | 16.5% |
| **Estimated Total Company GOB Net Recovery Before Other Adjustments and Corporate Expenses** | $1,501,301 | 92.6% | 48.8% | $312,139 | 91.8% | 48.5% | $76,765 | 95.9% | 48.9% | $1,890,206 | 92.6% | 48.7% |
| **Less: Other Adjustments** | | | | | | | | | | | | |
| Redemption Of Gift Certificates/Cash Cards (4) | - | - | - | - | - | - | - | - | - | - | - | - |
| Royalty Payments (5) | 4,039 | 0.2% | 0.1% | 849 | 0.2% | 0.1% | 204 | 0.3% | 0.1% | 5,093 | 0.2% | 0.1% |
| **Total Other Adjustments** | 4,039 | 0.2% | 0.1% | 849 | 0.2% | 0.1% | 204 | 0.3% | 0.1% | 5,093 | 0.2% | 0.1% |
| **Estimated Blended Net Recovery Before Estimated Liquidation Fees and Corporate Expenses** | $1,497,262 | 92.3% | 48.6% | $311,290 | 91.6% | 48.4% | $76,561 | 95.7% | 48.8% | $1,885,113 | 92.3% | 48.6% |
| Less: Estimated Base Liquidation Fee (6) | 12,600 | 0.8% | 0.4% | 312 | 0.2% | 0.0% | 78 | 0.1% | 0.0% | 12,990 | 0.6% | 0.3% |
| **Estimated Blended Net Recovery Before Corporate Expenses** | $1,484,662 | 91.6% | 48.2% | $310,978 | 91.5% | 48.3% | $76,483 | 95.6% | 48.7% | $1,872,122 | 91.7% | 48.3% |
| **Less: Corporate Expenses** | | | | | | | | | | | | |
| Corporate Occupancy | 10,176 | 0.6% | 0.3% | - | - | - | - | - | - | 10,176 | 0.5% | 0.3% |
| Corporate Overhead | 25,969 | 1.6% | 0.8% | - | - | - | - | - | - | 25,969 | 1.3% | 0.7% |
| Other Closing Costs | 12,022 | 0.7% | 0.4% | - | - | - | - | - | - | 12,022 | 0.6% | 0.3% |
| Total Corporate Expenses (3) | 48,167 | 3.0% | 1.6% | - | - | - | - | - | - | 48,167 | 2.4% | 1.2% |
| **Blended Net Recovery For Combined Retail Store GOB Inventory (7) (8)** | $1,436,495 | 88.6% | 46.7% | $310,978 | 91.5% | 48.3% | $76,483 | 95.6% | 48.7% | $1,823,955 | 89.3% | 47.0% |

Note(s):
(1) Computed retail value supplied by or based on Company-supplied sales and margin information.
(2) Assumes 20% of stores would be counted.
(3) Corporate and direct sale expenses are estimated for the GOB period only.
(4) Gift certificates / cash cards are not deducted as an expense as they are reserved for in the Company's borrowing base.
(5) Royalty payments are paid based upon sales of Adam Levine, Bongo, Cannon, Everlast, Jaclyn Smith, Joe Boxer, Outdoor Life, and Route 66 merchandise.
(6) Base liquidation fee is calculated at $25,000 per store for go-forward locations before any potential incentive fee or sharing based on recovery. Wave 1 and Wave 2 liquidation fee is calculated according to the existing Abacus Liquidation Agreement.
(7) Percentages (%) and dollars ($) may not add due to rounding.
(8) This Exhibit should be read in conjunction with the full written report.

Exhibit A-2

**Exhibits | Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

### Sears Holdings Corporation
### Kmart Corporation
### Summary Of Estimated Net Recovery Values On Retail Store GOB Inventory
Projected for November 3, 2018
($ in 000s)

| | Go-Forward Inventory | | Wave 1 Inventory | | Wave 2 Inventory | | Total | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Inventory at Cost | Inventory at Retail | Inventory at Cost | Inventory at Retail | Inventory at Cost | Inventory at Retail | Inventory at Cost | Inventory at Retail | |
| **Inventory** | | | | | | | | | |
| Retail Inventory | $654,371 | $1,483,937 | $159,180 | $360,979 | $20,302 | $46,039 | $833,853 | $1,890,955 | |
| **Less: Adjustments** | | | | | | | | | |
| Adjustments For Markdowns At Retail Only | N/A | (351,609) | N/A | (85,882) | N/A | (10,509) | N/A | (448,399) | |
| Return To Vendor Goods/Damages | (2,848) | (6,362) | – | – | (88) | (197) | (2,936) | (6,559) | |
| Total Adjustments | (2,848) | (357,971) | – | (85,882) | (88) | (11,106) | (2,936) | (454,959) | |
| **Net Retail Eligible Inventory** | $651,523 | $1,125,966 | $159,180 | $275,097 | $20,213 | $34,933 | $830,916 | $1,435,996 | A |
| Non Prescription Pharmacy, Tobacco & Alcohol (1) | 1,993 | 2,650 | 487 | 648 | 62 | 82 | 2,541 | 3,380 | B |
| **Total Adjusted Inv. At Retail** | $653,515 | $1,128,617 | $159,667 | $275,745 | $20,275 | $35,015 | $833,458 | $1,439,377 | |

| | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Estimated Gross Recovery** | | | | | | | | | | | | | |
| Retail Inventory | $754,398 | 115.8% | 67.0% | $179,105 | 112.5% | 65.1% | $23,405 | 115.8% | 67.0% | $956,908 | 115.2% | 66.6% | % of A |
| Non Prescription Pharmacy, Tobacco & Alcohol | 2,123 | 106.5% | 80.1% | 504 | 103.5% | 77.8% | 66 | 106.5% | 80.1% | 2,692 | 105.9% | 79.7% | % of B |
| **Total Blended Projected Gross Recovery** | $756,520 | 115.8% | 67.0% | $179,609 | 112.5% | 65.1% | $23,471 | 115.8% | 67.0% | $959,600 | 115.1% | 66.7% | |
| **Controllable Expenses: (2)** | | | | | | | | | | | | | |
| Store payroll | 55,829 | 8.5% | 4.9% | 13,506 | 8.5% | 4.9% | 1,667 | 8.2% | 4.8% | 71,002 | 8.5% | 4.9% | |
| Store payroll taxes and benefits | 10,049 | 1.5% | 0.9% | 2,431 | 1.5% | 0.9% | 300 | 1.5% | 0.9% | 12,780 | 1.5% | 0.9% | |
| Incentive & retention bonus | 5,583 | 0.9% | 0.5% | 1,351 | 0.8% | 0.5% | 167 | 0.8% | 0.5% | 7,100 | 0.9% | 0.5% | |
| Subtotal - Payroll | 71,461 | 10.9% | 6.3% | 17,288 | 10.8% | 6.3% | 2,133 | 10.5% | 6.1% | 90,882 | 10.9% | 6.3% | |
| Advertising & promotional costs | 21,939 | 3.4% | 1.9% | 4,437 | 2.8% | 1.6% | 681 | 3.4% | 1.9% | 27,057 | 3.2% | 1.9% | |
| Store occupancy expense | 45,319 | 6.9% | 4.0% | 10,924 | 6.8% | 4.0% | 1,687 | 8.3% | 4.8% | 57,930 | 7.0% | 4.0% | |
| Store miscellaneous expense | 4,744 | 0.7% | 0.4% | 1,476 | 0.9% | 0.5% | 143 | 0.7% | 0.4% | 6,363 | 0.8% | 0.4% | |
| Warehouse and distribution expenses | 15,275 | 2.3% | 1.4% | 3,350 | 2.1% | 1.2% | 474 | 2.3% | 1.4% | 19,099 | 2.3% | 1.3% | |
| Credit card fees | 10,894 | 1.7% | 1.0% | 2,586 | 1.6% | 0.9% | 338 | 1.7% | 1.0% | 13,818 | 1.7% | 1.0% | |
| Security | 3,341 | 0.5% | 0.3% | 1,031 | 0.6% | 0.4% | 104 | 0.5% | 0.3% | 4,475 | 0.5% | 0.3% | |
| Inventory insurance | 1,234 | 0.2% | 0.1% | – | – | – | 38 | 0.2% | 0.1% | 1,272 | 0.2% | 0.1% | |
| Independent inventory costs (3) | 651 | 0.1% | 0.1% | – | – | – | 20 | 0.1% | 0.1% | 671 | 0.1% | 0.0% | |
| Subtotal - Other Operating | 36,138 | 5.5% | 3.2% | 8,444 | 5.3% | 3.1% | 1,117 | 5.5% | 3.2% | 45,699 | 5.5% | 3.2% | |
| On-site supervision | 8,783 | 1.3% | 0.8% | 2,374 | 1.5% | 0.9% | 264 | 1.3% | 0.8% | 11,421 | 1.4% | 0.8% | |
| **Total Direct Sale Expenses** | 183,641 | 28.1% | 16.3% | 43,466 | 27.2% | 15.8% | 5,882 | 29.0% | 16.8% | 232,988 | 28.0% | 16.2% | |
| **Estimated Net Recovery Before Other Adjustments and Non-Direct Sale Expenses (4) (5)** | $572,880 | 87.7% | 50.8% | $136,143 | 85.3% | 49.4% | $17,589 | 86.8% | 50.2% | $726,612 | 87.2% | 50.5% | |

Note(s):
(1) Computed retail value based on Company-supplied sales and margin information.
(2) Projected expenses based on Company-supplied information.
(3) Assumes 20% of stores would be counted.
(4) Percentages (%) and dollars ($) may not add due to rounding.
(5) This Exhibit should be read in conjunction with the full written report.

Exhibit A-2a

**Exhibits** | Inventory Appraisal                                                                TIGER

HIGHLY CONFIDENTIAL

SEARS_507B_00001371
JX 104-27

### Sears Holdings Corporation
### Sears Full Line Stores
#### Summary Of Estimated Net Recovery Values On Retail Store GOB Inventory
#### Projected for November 3, 2018
($ in 000s)

| | Go-Forward Stores | | Wave 1 Inventory | | Wave 2 Inventory | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Inventory at Cost | Inventory at Retail (1) | Inventory at Cost | Inventory at Retail (1) | Inventory at Cost | Inventory at Retail (1) | Inventory at Cost | Inventory at Retail (1) |
| **Total Inventory** | $916,526 | $2,438,446 | $180,347 | $479,818 | $59,857 | $159,251 | $1,156,730 | $3,077,515 |
| **Less: Adjustments** | | | | | | | | |
| Adjustments For Markdowns At Retail Only | N/A | (567,582) | N/A | (111,914) | N/A | (37,068) | N/A | (716,564) |
| Return To Vendor Goods/Damages | (1,376) | (3,972) | – | – | (90) | (259) | (1,466) | (4,231) |
| Total Adjustments | (1,376) | (571,555) | - | (111,914) | (90) | (37,327) | (1,466) | (720,796) |
| **Total Eligible Inventory** | $915,150 | $1,866,891 | $180,347 | $367,904 | $59,767 | $121,924 | $1,155,264 | $2,356,719 |

| | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Gross Recovery** | $1,194,810 | 130.6% | 64.0% | $241,928 | 134.1% | 65.8% | $78,031 | 130.6% | 64.0% | $1,514,769 | 131.1% | 64.3% |
| **Controllable Expenses: (2)** | | | | | | | | | | | | |
| Store payroll | 83,006 | 9.1% | 4.4% | 18,177 | 10.1% | 4.9% | 4,997 | 8.4% | 4.1% | 106,180 | 9.2% | 4.5% |
| Store payroll taxes and benefits | 16,779 | 1.8% | 0.9% | 3,674 | 2.0% | 1.0% | 1,010 | 1.7% | 0.8% | 21,463 | 1.9% | 0.9% |
| Incentive & retention bonus | 8,301 | 0.9% | 0.4% | 1,818 | 1.0% | 0.5% | 500 | 0.8% | 0.4% | 10,618 | 0.9% | 0.5% |
| Subtotal - Payroll | 108,085 | 11.8% | 5.8% | 23,669 | 13.1% | 6.4% | 6,507 | 10.9% | 5.3% | 138,262 | 12.0% | 5.9% |
| Advertising & promotional costs | 35,844 | 3.9% | 1.9% | 6,299 | 3.5% | 1.7% | 2,341 | 3.9% | 1.9% | 44,484 | 3.9% | 1.9% |
| Store occupancy expense | 70,400 | 7.7% | 3.8% | 21,856 | 12.1% | 5.9% | 4,537 | 7.6% | 3.7% | 96,793 | 8.4% | 4.1% |
| Store miscellaneous expense | 8,399 | 0.9% | 0.4% | 1,925 | 1.1% | 0.5% | 839 | 1.4% | 0.7% | 11,164 | 1.0% | 0.5% |
| Warehouse and distribution expenses (3) | 31,417 | 3.4% | 1.7% | 3,883 | 2.2% | 1.1% | 2,052 | 3.4% | 1.7% | 37,351 | 3.2% | 1.6% |
| Credit card fees | 17,205 | 1.9% | 0.9% | 3,484 | 1.9% | 0.9% | 1,124 | 1.9% | 0.9% | 21,813 | 1.9% | 0.9% |
| Security | 5,247 | 0.6% | 0.3% | 1,205 | 0.7% | 0.3% | 343 | 0.6% | 0.3% | 6,794 | 0.6% | 0.3% |
| Inventory insurance | 2,029 | 0.2% | 0.1% | – | – | – | 132 | 0.2% | 0.1% | 2,161 | 0.2% | 0.1% |
| Independent inventory costs (4) | 974 | 0.1% | 0.1% | – | – | – | 64 | 0.1% | 0.1% | 1,037 | 0.1% | 0.0% |
| Subtotal - Other Operating | 65,271 | 7.1% | 3.5% | 10,496 | 5.8% | 2.9% | 4,554 | 7.6% | 3.7% | 80,320 | 7.0% | 3.4% |
| On-site supervision | 9,169 | 1.0% | 0.5% | 3,611 | 2.0% | 1.0% | 916 | 1.5% | 0.8% | 13,697 | 1.2% | 0.6% |
| **Total Direct Sale Expenses** | 288,769 | 31.6% | 15.5% | 65,931 | 36.6% | 17.9% | 18,856 | 31.5% | 15.5% | 373,556 | 32.3% | 15.9% |
| **Estimated Net Recovery Before Other Adjustments and Non-Direct Sale Expenses (5) (6)** | $906,041 | 99.0% | 48.5% | $175,996 | 97.6% | 47.8% | $59,176 | 99.0% | 48.5% | $1,141,213 | 98.8% | 48.4% |

Note(s):
(1) Markup supplied by the Company.
(2) Projected expenses based on Company-supplied information.
(3) Sears warehouse and distribution expenses for all banners are included in Sears Full Line Stores expenses.
(4) Assumes 20% of stores would be counted.
(5) Percentages (%) and dollars ($) may not add due to rounding.
(6) This Exhibit should be read in conjunction with the full written report.

Exhibit A-2b

*Exhibits* | **Inventory Appraisal**

## Sears Holdings Corporation
### Sears Auto Centers
**Summary Of Estimated Net Recovery Values On Retail Store GOB Inventory**
**Projected for November 3, 2018**
($ in 000s)

|  |  | Inventory at Cost | Inventory at Retail |
|---|---|---|---|
| **Total Inventory** |  | $52,725 | $100,193 |
| Less: Adjustments |  | – | (16,973) |
| **Total Eligible Inventory** |  | $52,725 | $83,220 |

|  | Total $ | % of Elig. Inv. at Cost | % of Elig. Inv. at Retail |
|---|---|---|---|
| **Projected Gross Recovery (1)** | $54,093 | 102.6% | 65.0% |
| **Controllable Expenses: (2)** |  |  |  |
| Store payroll | 18,153 | 34.4% | 21.8% |
| Store payroll taxes and benefits | 4,084 | 7.7% | 4.9% |
| Incentive & retention bonus | 1,815 | 3.4% | 2.2% |
| Subtotal - Payroll | 24,053 | 45.6% | 28.9% |
| Advertising & promotional costs | 1,623 | 3.1% | 2.0% |
| Store occupancy expense | 2,960 | 5.6% | 3.6% |
| Store miscellaneous expense | 1,111 | 2.1% | 1.3% |
| Central Services | 234 | 0.4% | 0.3% |
| Merchandise transfers | 842 | 1.6% | 1.0% |
| Credit card fees | 779 | 1.5% | 0.9% |
| Inventory insurance | 69 | 0.1% | 0.1% |
| Independent inventory costs (3) | 42 | 0.1% | 0.1% |
| Subtotal - Other Operating | 3,076 | 5.8% | 3.7% |
| On-site supervision (4) | - | - | - |
| **Total Direct Sale Expenses** | 31,712 | 60.1% | 38.1% |
| **Estimated Net Recovery Before Other Adjustments and Non-Direct Sale Expenses (5) (6)** | $22,381 | 42.4% | 26.9% |

Note(s):
(1) Does not include revenue associated with service or installation.
(2) Projected expenses based on Company-supplied information.
(3) Assumes 20% of stores would be counted.
(4) On-site supervision is included in Sears Full Line Stores (Exhibit A-2b).
(5) Percentages (%) and dollars ($) may not add due to rounding.
(6) This Exhibit should be read in conjunction with the full written report.

Exhibit A-2c

**JX 104-28**

HIGHLY CONFIDENTIAL

Exhibits | **Inventory Appraisal**

TIGER

**Sears Holdings Corporation**
Total Company
3 Month Liquidation Summary
Projected for the 3 Months Ending January 2019
($ in 000s)

### Monthly Pro Forma [1] [2] [3] [4]

| Month | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Stores Inv. at Cost | NOLV % of Cost | Sears Auto Centers Inv. at Cost | NOLV % of Cost | Wholesale Inventory Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Total Company Inv. at Cost | NOLV % of Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | **Wave 1 Closings** | | | | | | | | **Wave 2 Closings** | | | | | | | | | |
| November 2018 | $653,515 | 87.7% | $915,150 | 99.0% | $52,725 | 42.4% | $117,534 | 38.0% | $64,807 | 3.7% | $1,738,925 | 85.2% | $159,667 | 85.3% | $180,347 | 97.6% | $1,161 | 0.3% | $340,014 | 91.5% | $20,275 | 86.8% | $59,767 | 99.0% | $283 | 0.4% | $80,043 | 95.6% | $2,158,982 | 86.6% |
| December | 622,086 | 87.0% | 890,045 | 99.3% | 49,676 | 41.8% | 110,772 | 35.2% | 63,320 | 3.3% | 1,672,570 | 85.0% | 127,437 | 73.6% | 138,242 | 97.8% | 757 | 0.3% | 266,700 | 80.8% | 30,788 | 85.5% | 58,086 | 94.9% | 431 | 0.5% | 78,075 | 91.9% | 2,018,153 | 84.7% |
| January 2019 | 549,512 | 83.5% | 798,561 | 99.9% | 41,054 | 40.7% | 112,571 | 36.7% | 63,650 | 4.2% | 1,501,748 | 81.2% | 53,327 | 44.8% | 58,708 | 47.8% | 237 | 0.2% | 118,035 | 46.2% | 13,296 | 67.1% | 40,133 | 77.4% | 259 | -0.5% | 53,419 | 74.4% | 1,671,201 | 78.6% |
| **Weighted Avg.** | **$608,371** | **86.2%** | **$867,919** | **99.1%** | **$47,835** | **41.7%** | **$113,626** | **36.7%** | **$63,915** | **3.9%** | **$1,637,750** | **X3.9%** | **$114,144** | **74.4%** | **$126,106** | **86.3%** | **$715** | **0.3%** | **$240,249** | **80.3%** | **$18,120** | **81.5%** | **$53,325** | **91.8%** | **$324** | **0.5%** | **$71,845** | **88.8%** | **$1,949,645** | **83.6%** |

### Previous Appraisal [1] [4] [5]

| Month | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Stores Inv. at Cost | NOLV % of Cost | Sears Auto Centers Inv. at Cost | NOLV % of Cost | Wholesale Inventory Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Total Company Inv. at Cost | NOLV % of Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | **Wave 1 Closings** | | | | | | | | **Wave 2 Closings** | | | | | | | | | |
| November 2018 | $1,046,013 | 87.7% | $1,479,632 | 99.0% | $65,875 | 49.3% | $123,002 | 58.5% | $84,117 | 3.1% | $2,714,520 | 87.5% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | $2,714,520 | 87.5% |
| December | 965,280 | 87.0% | 1,359,457 | 99.3% | 63,164 | 42.7% | 125,098 | 59.2% | 81,577 | 3.2% | 2,515,000 | 86.9% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 2,515,000 | 88.9% |
| January 2019 | 950,689 | 83.5% | 1,226,888 | 95.9% | 63,033 | 41.6% | 128,325 | 59.7% | 82,258 | 3.6% | 2,266,933 | 83.0% | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 2,266,933 | 83.0% |
| **Weighted Avg.** | **$953,994** | **86.2%** | **$1,355,325** | **98.2%** | **$64,690** | **42.6%** | **$124,808** | **35.1%** | **$82,640** | **3.3%** | **$2,498,817** | **85.9%** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **$2,498,817** | **85.9%** |

### Change [1] [4]

| Month | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Stores Inv. at Cost | NOLV % of Cost | Sears Auto Centers Inv. at Cost | NOLV % of Cost | Wholesale Inventory Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Kmart Corporation Inv. at Cost | NOLV % of Cost | Sears Full Line Inv. at Cost | NOLV % of Cost | Non-Direct Expense Expense $ | % of Cost | Total Inv. at Cost | NOLV % of Cost | Total Company Inv. at Cost | NOLV % of Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | **Wave 1 Closings** | | | | | | | | **Wave 2 Closings** | | | | | | | | | |
| November | ($392,498) | (0.0%) | ($564,482) | (0.0%) | ($13,147) | (0.9%) | ($5,468) | (0.4%) | ($19,311) | 0.6% | ($975,594) | (2.3%) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | ($555,538) | (0.9%) |
| December | (343,194) | (0.0%) | (469,412) | (0.0%) | (13,489) | (0.9%) | (14,326) | (4.0%) | (18,257) | 0.5% | (842,421) | (1.9%) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | (496,847) | (2.2%) |
| January | (301,177) | (0.0%) | (428,325) | (0.0%) | (21,909) | (0.9%) | (15,754) | (3.1%) | (18,638) | 0.6% | (765,185) | (1.8%) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | (595,731) | (4.4%) |
| **Weighted Avg.** | **($345,623)** | **(0.0%)** | **($487,406)** | **(0.0%)** | **($16,855)** | **(0.8%)** | **($11,183)** | **(2.5%)** | **($18,734)** | **0.6%** | **($861,067)** | **(2.0%)** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **($549,372)** | **(2.3%)** |

Note(s):
[1] Percentages (%) and dollars ($) may not add due to rounding.
[2] Wave 1 represents 65 Kmart stores and 77 Sears Full Line stores closing from October 25, 2018 to January 13, 2019.
[3] Wave 2 represents 11 Kmart stores and 29 Sears Full Line store closings from November 16, 2018 to February 3, 2019.
[4] This Exhibit should be read in conjunction with the full written report.
[5] The previous appraisal figures are as of Tiger's appraisal issued on September 28, 2018.

Exhibit A-3

*Exhibits* | **Inventory Appraisal**

TIGER

## Sears Holdings Corporation
### Go Forward Inventory
### Projected 3 Month Liquidation Analysis
($ in 000s)

| Month Beginning | | Nov 2018 | Dec 2018 | Jan 2019 |
|---|---|---|---|---|
| GOB Inventory at Cost | (1) | $1,621,391 | $1,561,806 | $1,389,177 |
| Wholesale Inventory at Cost | (1) | 117,534 | 110,772 | 112,571 |
| Total at Cost | | 1,738,925 | 1,672,578 | 1,501,748 |
| | | | | |
| Gross Recovery GOB | (2) | 2,005,423 | 1,933,134 | 1,720,887 |
| Gross Recovery Wholesale | (3) | 44,686 | 38,985 | 41,261 |
| Total Gross Recovery | | 2,050,109 | 1,972,119 | 1,762,148 |
| | | | | |
| Less: Total Combined Direct Sale Expenses | (4) | 504,122 | 487,752 | 479,156 |
| | | | | |
| Estimated Total Company Net Recovery Before Other | | | | |
| Adjustments and Corporate Expenses | | 1,545,987 | 1,484,367 | 1,282,992 |
| | | | | |
| Less: Total Other Adjustments (Royalties) | | 4,039 | 3,894 | 3,466 |
| | | | | |
| Less: Estimated Base Liquidation Fee | (5) | 12,600 | 12,600 | 12,600 |
| | | | | |
| Estimated Blended Net Recovery Before | | | | |
| Corporate Expenses | | 1,529,348 | 1,467,873 | 1,266,926 |
| | | | | |
| Less: Corporate Expenses | (4) | 48,167 | 46,826 | 47,554 |
| **Total Company Blended Net Recovery** | (6)(7) | **$1,481,181** | **$1,421,047** | **$1,219,372** |
| | | | | |
| **Total Company Blended Net Recovery (% of Cost)** | (7)(8) | **85.2%** | **85.0%** | **81.2%** |

Note(s):

(1) Based upon Company projected inventory information.

(2) Based on GOLVs by Banner as estimated in Tiger Valuation's October 6, 2018 analysis.

(3) Based on the Company projected inventory mix (See Exhibit F).

(4) Based upon October 6, 2018 estimated expenses.

(5) Based on $25,000 minimum fee per store.

(6) Any change in inventory mix, mark-up or levels would have a material effect on projected net recoveries.

(7) Percentages (%) and dollars ($) may not add due to rounding.

(8) This Exhibit should be read in conjunction with the full written report.

Exhibit A-3a

HIGHLY CONFIDENTIAL

SEARS_507B_00001374

**JX 104-30**

**Exhibits | Inventory Appraisal**

TIGER

HIGHLY CONFIDENTIAL

### Sears Holdings Corporation
### Store Closing Summary
Wave 1
($ in 000s)

| Week | Date Range | Kmart Corporation | | | | | Sears Full Line Stores | | | | | Non-Direct Expense | | Total Company | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Inventory at Cost by Location | | | NOLV for Sale Starting Each Week | | Inventory at Cost by Location | | | NOLV for Sale Starting Each Week | | for Sale Starting Each Week | | Inv. at Cost | NOLV for Sale Starting Each Week | |
| | | Store | Warehouse | Total | NOLV $ | % of Cost | Store | Warehouse | Total | NOLV $ | % of Cost | Exp $ | % of Cost | | NOLV $ | % of Cost |
| Week 1 | 10/26 – 11/02 | $116,499 | $49,041 | $165,540 | $142,846 | 86.3% | $140,708 | $44,347 | $185,056 | $179,054 | 96.8% | $1,235 | 0.4% | $350,595 | $320,666 | 91.5% |
| Week 2 | 11/02 – 11/09 | 110,626 | 49,041 | 159,667 | 136,143 | 85.3% | 135,999 | 44,347 | 180,347 | 175,996 | 97.6% | 1,161 | 0.3% | 340,014 | 310,978 | 91.5% |
| Week 3 | 11/09 – 11/16 | 110,784 | 41,685 | 152,469 | 126,486 | 83.0% | 134,797 | 37,695 | 172,492 | 165,589 | 96.0% | 1,070 | 0.3% | 324,961 | 291,005 | 89.6% |
| Week 4 | 11/16 – 11/23 | 117,536 | 26,972 | 144,508 | 115,912 | 80.2% | 139,223 | 24,391 | 163,614 | 153,664 | 93.9% | 971 | 0.3% | 308,122 | 268,604 | 87.2% |
| Week 5 | 11/23 – 11/30 | 121,835 | 14,712 | 136,547 | 105,170 | 77.0% | 140,163 | 13,304 | 153,467 | 141,544 | 92.2% | 873 | 0.3% | 290,014 | 245,842 | 84.8% |
| Week 6 | 11/30 – 12/07 | 127,437 | - | 127,437 | 93,856 | 73.6% | 139,262 | - | 139,262 | 122,332 | 87.8% | 757 | 0.3% | 266,700 | 215,431 | 80.8% |
| Week 7 | 12/07 – 12/14 | 113,422 | - | 113,422 | 78,684 | 69.4% | 121,886 | - | 121,886 | 98,489 | 80.8% | 629 | 0.3% | 235,308 | 176,545 | 75.0% |
| Week 8 | 12/14 – 12/21 | 93,797 | - | 93,797 | 58,293 | 62.1% | 101,347 | - | 101,347 | 72,009 | 71.1% | 483 | 0.2% | 195,144 | 129,819 | 66.5% |
| Week 9 | 12/21 – 12/28 | 74,700 | - | 74,700 | 40,627 | 54.4% | 78,109 | - | 78,109 | 47,335 | 60.6% | 348 | 0.2% | 152,809 | 87,615 | 57.3% |
| Week 10 | 12/28 – 01/04 | 55,327 | - | 55,327 | 24,779 | 44.8% | 58,708 | - | 58,708 | 28,079 | 47.8% | 227 | 0.2% | 114,035 | 52,631 | 46.2% |
| Week 11 | 01/04 – 01/11 | 34,570 | - | 34,570 | 9,805 | 28.4% | 37,582 | - | 37,582 | 11,492 | 30.6% | 115 | 0.2% | 72,152 | 21,183 | 29.4% |
| Week 12 | 01/11 – 01/13 | 7,298 | - | 7,298 | 1,030 | 14.1% | 11,899 | - | 11,899 | 2,046 | 17.2% | 30 | 0.2% | 19,197 | 3,046 | 15.9% |
| Weighted Avg. | | $90,319 | $15,121 | $105,440 | $77,803 | 47.0% | $103,307 | $13,674 | $116,981 | $99,803 | 53.9% | $658 | 0.3% | $222,421 | $176,947 | 79.6% |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Exhibit A-3b

HIGHLY CONFIDENTIAL

Exhibits | **Inventory Appraisal**

TIGER

## Sears Holdings Corporation
### Store Closing Summary
Wave 2
($ in 000s)

| Week | Date Range | Kmart Corporation | | | Sears Full Line Stores | | | Non-Direct Expense for Sale Starting Each Week | | Total Company | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Inv. at Cost | NOLV for Sale Starting Each Week | | Inv. at Cost | NOLV for Sale Starting Each Week | | | | Inv. at Cost | NOLV for Sale Starting Each Week | |
| | | | NOLV $ | % of Cost | | NOLV $ | % of Cost | Exp $ | % of Cost | | NOLV $ | % of Cost |
| Week 1 | 11/16 - 11/23 | $22,241 | $19,349 | 87.0% | $60,899 | $59,599 | 97.9% | $472 | 0.6% | $83,140 | $78,475 | 94.4% |
| Week 2 | 11/23 - 11/30 | 20,788 | 17,767 | 85.5% | 58,086 | 55,148 | 94.9% | 431 | 0.5% | 78,875 | 72,484 | 91.9% |
| Week 3 | 11/30 - 12/07 | 19,263 | 15,952 | 82.8% | 55,115 | 50,283 | 91.2% | 391 | 0.5% | 74,378 | 65,844 | 88.5% |
| Week 4 | 12/07 - 12/14 | 17,524 | 13,785 | 78.7% | 51,767 | 45,504 | 87.9% | 350 | 0.5% | 69,291 | 58,939 | 85.1% |
| Week 5 | 12/14 - 12/21 | 15,488 | 11,354 | 73.3% | 47,671 | 39,904 | 83.7% | 306 | 0.5% | 63,159 | 50,952 | 80.7% |
| Week 6 | 12/21 - 12/28 | 13,296 | 8,922 | 67.1% | 42,123 | 32,593 | 77.4% | 259 | 0.5% | 55,419 | 41,256 | 74.4% |
| Week 7 | 12/28 - 01/04 | 10,802 | 6,335 | 58.6% | 34,467 | 23,999 | 69.6% | 209 | 0.5% | 45,269 | 30,125 | 66.5% |
| Week 8 | 01/04 - 01/11 | 7,667 | 3,591 | 46.8% | 25,221 | 14,549 | 57.7% | 157 | 0.5% | 32,888 | 17,983 | 54.7% |
| Week 9 | 01/11 - 01/18 | 5,605 | 2,023 | 36.1% | 19,694 | 9,401 | 47.7% | 116 | 0.5% | 25,299 | 11,308 | 44.7% |
| Week 10 | 01/18 - 01/25 | 3,971 | 1,103 | 27.8% | 14,880 | 5,696 | 38.3% | 80 | 0.4% | 18,851 | 6,720 | 35.6% |
| Week 11 | 01/25 - 02/01 | 2,290 | 500 | 21.8% | 9,378 | 2,683 | 28.6% | 46 | 0.4% | 11,668 | 3,137 | 26.9% |
| Week 12 | 02/01 - 02/03 | 819 | 52 | 6.3% | 2,960 | 597 | 20.2% | 14 | 0.4% | 3,779 | 635 | 16.8% |
| **Weighted Avg.** | | **$11,646** | **$19,349** | **166.1%** | **$35,189** | **$59,599** | **169.4%** | **$472** | **0.6%** | **$83,140** | **$78,475** | **63.4%** |

Note(s):

(1) Percentages (%) and dollars ($) may not add due to rounding.

(2) This Exhibit should be read in conjunction with the full written report.

Exhibit A-3c

*Exhibits* | Inventory Appraisal

TIGER

## Sears Holdings Corporation
### Total Company
### Inventory Reconciliation
### As of October 6, 2018
($ in 000's)

| Classification | Borrowing Base Certificate | Tiger Valuation's Analysis | Variance |
|---|---|---|---|
| Inventory per Stock Ledger | $2,621,340 | $2,735,927 | $114,587 |
| Home Services | 117,622 | - | (117,622) |
| **Total Stock Ledger (1)** | **$2,738,962** | **$2,735,927** | **($3,035)** |
| Less Ineligible Inventory: | | | |
| Consigned Inventory | 2,500 | 2,500 | - |
| Store Closure Sale inventory in excess of four weeks | 20,541 | - | (20,541) |
| Inventory paid for in advance of shipment | 85,146 | 85,029 | (117) |
| Live plants, nursery, floral | 1,140 | - | (1,140) |
| Restaurant | 349 | - | (349) |
| Readers Market | 1,618 | - | (1,618) |
| 50% Home Services | 58,811 | 58,039 | (772) |
| Inventory at stores already in process of closing | - | 103,837 | 103,837 |
| Other (1) | - | (5,053) | (5,053) |
| **Ineligible Inventory** | **170,106** | **$244,352** | **$74,247** |
| **Less Inventory Reserves:** | | | |
| In-Transit Reserve | 171,991 | 171,391 | (601) |
| **Inventory Reserves** | **$171,991** | **$171,391** | **($601)** |
| Add: SRAC L/C's (net of 2.73% reserve) | 12,597 | - | (12,597) |
| **Net Eligible Inventory (2) (3)** | **$2,409,462** | **$2,320,185** | **($89,278)** |

Note(s):
(1) Variance is due to the exclusion of accounting adjustments in the beginning borrowing base inventory.
    Tiger Valuation incorporated this adjustment into other ineligible inventory.
(2) Dollars ($) may not add due to rounding.
(3) This Exhibit should be read in conjunction with the full written report.

Exhibit B

HIGHLY CONFIDENTIAL

*Exhibits* | **Inventory Appraisal**

TIGER

## Sears Holdings Corporation
### Total Company
**Stock Ledger Inventory at Cost**
**As of October 6, 2018**
($ in 000's)

| Classification | | Kmart Cost $ | Sears Cost $ | Total Cost $ |
|---|---|---|---|---|
| **Total Stock Ledger (1)** | | $1,089,446 | $1,649,516 | $2,738,962 |
| SRAC L/C on Trailer Inventory | | 124 | 130 | 254 |
| Inventory Reserve | | 672 | 702 | 1,374 |
| **Total Adjusted Stock Ledger** | | 1,090,243 | 1,650,348 | 2,740,591 |
| **Inventory Reclassification:** | | | | |
| Reclassifications | | 1,377 | (1,377) | - |
| **Inventory at Stores Already in Process of Closing:** | | (72,239) | (31,598) | (103,837) |
| **Less: Excluded Inventory** | | | | |
| Unshipped Merchandise | | - | 85,029 | 85,029 |
| Consignment Inventory | | 2,500 | - | 2,500 |
| 50% Home Services | | - | 58,039 | 58,039 |
| Accounting & Miscellaneous Adjustments | | | (389) | (389) |
| **Total Excluded Inventory** | | 2,500 | 142,679 | 145,179 |
| **Stock Ledger Net of Exclusions** | | 1,014,127 | $1,477,448 | $2,491,575 |
| **Less: Inventory not to be Included in Retail Store GOB** | | | | |
| Ocean In-Transit Inventory (See additional recoveries) | | $50,603 | $120,788 | $171,391 |
| Inventory Classifications to be Sold On A Wholesale Basis | | | | |
| Repair Parts (Exhibit B-4) | (2) | - | 54,494 | 54,494 |
| Sears Home Improvement (Exhibit B-4) | (2) | - | 3,545 | 3,545 |
| Prescription Pharmacy Inventory (Exhibit B-4) | (2)(3) | 32,011 | - | 32,011 |
| Commercial Sales (Builders Distributors) (Exhibit B-4) | (2) | - | 27,095 | 27,095 |
| RTV/Damages (Exhibit B-4) | (2) | 3,183 | 1,589 | 4,772 |
| Restaurant Inventory (Exhibit B-4) | (2) | 349 | - | 349 |
| **Subtotal: Inventory Classifications to be Sold On A Wholesale Basis (Exhibit B-4)** | | 35,543 | 86,723 | 122,266 |
| **Inventory Not Included in Retail Store GOB** | | 86,146 | 207,511 | 293,657 |
| **Total Adjusted Inventory To Be Included In Retail Store GOB's (4) (5)** | | $927,981 | $1,269,937 | $2,197,918 |

Note(s):
(1) Stock Ledger inventory excludes Lands' End merchandise.
(2) Inventory to be sold on a wholesale basis (Exhibit B-4 & B-6).
(3) Will be sold with prescription lists.
(4) Percentages (%) and dollars ($) may not add due to rounding.
(5) This Exhibit should be read in conjunction with the full written report..

Exhibit B-1

HIGHLY CONFIDENTIAL

JX 104-34

HIGHLY CONFIDENTIAL

*Exhibits* | **Inventory Appraisal**

TIGER

## Sears Holdings Corporation
### Total Company
**Inventory to be Included in the Retail Store GOB Sale at Cost and Retail**
Projected for November 3, 2018
($ in 000's)

| Classification | Store Count | Cost (1) (2) $ | MU (3) % | Retail (2) (4) $ | Retail Markdown (5) $ | Adjusted Retail $ | % To Total Inv. % | Avg. Retail Inv. Per Store $ |
|---|---|---|---|---|---|---|---|---|
| **Go-Forward Inventory** | | | | | | | | |
| Kmart Stores (6) | 239 | $653,515 | 55.9% | $1,480,226 | $351,609 | $1,128,617 | 29.1% | $6,193 |
| Sears Full Line Stores (7)(8) | 265 | 915,150 | 62.4% | 2,434,474 | 567,582 | 1,866,891 | 48.1% | 9,187 |
| Sears Auto Centers (9)(10) | 322 | 52,725 | 47.4% | 100,193 | 16,973 | 83,220 | 2.1% | 311 |
| **Total Go-Forward Inventory** | **826** | **$1,621,391** | **59.6%** | **$4,014,893** | **$936,165** | **$3,078,728** | **79.4%** | **$4,861** |
| **Wave 1 Inventory** | | | | | | | | |
| Kmart Stores | 65 | 159,667 | 55.8% | $361,626 | $85,882 | $275,745 | 7.1% | $5,563 |
| Sears Full Line Stores | 77 | 180,347 | 62.4% | 479,818 | 111,914 | 367,904 | 9.5% | 6,231 |
| **Total Wave 1 Inventory** | **142** | **$340,014** | **59.6%** | **$841,444** | **$197,795** | **$643,649** | **16.6%** | **$5,926** |
| **Wave 2 Inventory** | | | | | | | | |
| Kmart Stores | 11 | 20,275 | 55.9% | $45,924 | $10,909 | $35,015 | 0.9% | $4,175 |
| Sears Full Line Stores | 29 | 59,767 | 62.4% | 158,992 | 37,068 | 121,924 | 3.1% | 5,482 |
| **Total Wave 2 Inventory** | **40** | **$80,042** | **60.9%** | **$204,916** | **$47,977** | **$156,939** | **4.0%** | **$5,123** |
| **Total Adjusted Inventory to be Included in Retail Store GOB's (11) (12)** | **686** | **$2,041,447** | **59.7%** | **$5,061,252** | **$1,181,937** | **$3,879,315** | **100.0%** | **$5,021** |

Note(s):

(1) Adjusted stock ledger cost represents cost value of inventory to be included in the retail store GOB.

(2) Excludes damages / RTV merchandise.

(3) Markup (MU) supplied by Company.

(4) Includes some computed retail based upon Company-supplied sales and margin information.

(5) To capture unknown damages, excess shrink, and to more properly reflect actual selling prices, a markdown was applied to the original retail as supplied by the Company.

(6) For presentation purposes, all Kmart DC inventory is included in the Kmart stores.

(7) For presentation purposes, all Sears DC inventory (except tires) is included in the Full Line stores.

(8) For presentation purposes, Sears Full Line Stores includes 366 Full Line Stores and 5 Grand/Essentials Stores.

(9) For presentation purposes, all Sears DC tire inventory is included in the Sears Auto Centers.

(10) The 322 Sears Auto Centers are a subcategory within the Kmart, Sears Full Line and Sears Grand stores and are not included in the total store count.

(11) Percentages (%) and dollars ($) may not add due to rounding.

(12) This Exhibit should be read in conjunction with the full written report.

Exhibit B-2

*Exhibits* | **Inventory Appraisal**

**TIGER**

**Sears Holdings Corporation**
**Kmart Corporation (339 Stores)**
Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
As of October 6, 2018
($ in 000's)

| Classification | Inventory at Cost | | | MU (2) | Inventory at Retail | | |
|---|---|---|---|---|---|---|---|
| | Store $ (1) | DC $ (1) | Total $ | % | Store $ (1) | DC $ (1) | Total $ |
| **Home** | | | | | | | |
| Household Goods | 574,895 | 541,907 | $116,801 | 55.5% | $163,474 | $98,978 | $262,451 |
| Outdoor Living | 2,158 | 118 | 2,276 | 55.0% | 5,030 | 28 | 5,058 |
| Lawn & Garden | 6,349 | 1,570 | 7,919 | 43.9% | 11,014 | 2,950 | 13,964 |
| **Total Home** | 89,402 | 43,595 | 126,997 | 54.9% | 179,519 | 101,956 | 281,475 |
| **Hardlines** | | | | | | | |
| Hardware | 11,219 | 5,476 | 16,695 | 53.5% | 24,619 | 11,262 | 35,881 |
| Home Entertainment | 2,529 | 145 | 2,674 | 16.9% | 3,011 | 204 | 3,215 |
| Home Electronics | 8,450 | 3,307 | 11,757 | 34.2% | 12,684 | 5,197 | 17,881 |
| Major Home Appliances | 7,496 | 2,322 | 9,818 | 46.0% | 14,025 | 4,156 | 18,181 |
| Home Office | 2 | 445 | 448 | 46.2% | 3 | 838 | 831 |
| Tools | 109 | - | 109 | 61.6% | 282 | - | 282 |
| Cooking And Cleanup | 503 | - | 503 | 59.6% | 1,244 | - | 1,244 |
| Laundry | 737 | - | 737 | 61.4% | 1,911 | - | 1,911 |
| Plumbing & Heating | 41 | - | 41 | 34.6% | 63 | - | 63 |
| Food Storage | 1,219 | - | 1,219 | 52.1% | 2,547 | - | 2,547 |
| Audio/Visual | 177 | - | 177 | 52.2% | 370 | - | 370 |
| **Total Hardlines** | 32,481 | 11,695 | 44,177 | 46.4% | 60,759 | 21,647 | 82,406 |
| **Apparel** | | | | | | | |
| Jewelry | 21,838 | 1,370 | 23,208 | 84.3% | 136,971 | 10,624 | 147,595 |
| Womens | 37,151 | 14,051 | 51,202 | 63.1% | 94,457 | 44,210 | 138,667 |
| Intimate & Acc. | 35,244 | 16,851 | 52,095 | 60.4% | 84,079 | 47,495 | 191,574 |
| Kmart Footwear | 44,303 | 11,332 | 55,635 | 66.9% | 117,966 | 33,031 | 151,797 |
| Off-Price Apparel | 2,362 | 1,193 | 3,555 | 63.1% | 5,622 | 4,005 | 9,626 |
| Menswear | 64,219 | 19,189 | 83,408 | 54.3% | 134,514 | 48,175 | 182,689 |
| Kidsworld | 47,406 | 22,450 | 69,857 | 57.6% | 105,483 | 59,384 | 164,867 |
| Accessories | 8,272 | 4,896 | 13,168 | 71.2% | 27,442 | 18,205 | 45,647 |
| **Total Apparel** | 260,795 | 91,332 | 352,127 | 63.8% | 706,534 | 265,928 | 972,462 |
| **Drug Store** | | | | | | | |
| Beauty Care | 40,321 | 10,516 | 50,836 | 41.3% | 68,497 | 18,049 | 86,546 |
| Stationery | 8,311 | 2,560 | 10,871 | 43.7% | 15,264 | 4,359 | 19,643 |
| Cards, Wrap & Party | 166 | 12 | 178 | 40.3% | 276 | 22 | 298 |
| Health Care | 29,400 | 8,655 | 38,054 | 40.7% | 49,846 | 14,347 | 64,193 |
| **Total Drug Store** | 78,198 | 21,541 | 99,739 | 41.6% | 133,903 | 36,777 | 170,680 |
| **Food & Consumables** | | | | | | | |
| Consumables | 35,678 | 17,099 | 52,777 | 27.2% | 49,100 | 23,397 | 72,498 |
| Edible | 23,189 | 6,703 | 29,892 | 26.6% | 31,792 | 8,956 | 40,749 |
| Tobacco & Alcohol | 1,681 | 16 | 1,697 | 24.8% | 2,219 | 37 | 2,256 (1) |
| Readers Market | 1,429 | 77 | 1,506 | 42.7% | 2,493 | 134 | 2,627 |
| **Total Food & Consumables** | 61,977 | 23,895 | 85,873 | 27.3% | 85,605 | 32,525 | 118,130 |
| **General Merchandise** | | | | | | | |
| Toys And Hobbies | 48,453 | 46,365 | 94,818 | 45.3% | 87,862 | 85,412 | 173,274 |
| Seasonal | 22,219 | 16,394 | 38,613 | 67.5% | 67,935 | 50,857 | 118,792 |
| Sport Gd Athletic | 31,247 | 10,813 | 42,060 | 51.4% | 64,111 | 23,122 | 87,233 |
| Car Care | 7,879 | 942 | 8,820 | 51.7% | 16,712 | 1,933 | 18,645 |
| **Total General Merchandise** | 109,797 | 74,514 | 184,311 | 53.7% | 236,620 | 161,323 | 397,943 |
| **Pharmacy** | | | | | | | |
| Non-Prescription Pharmacy | 1,133 | - | 1,133 | 8.4% | 1,237 | - | 1,237 (1) |
| **Miscellaneous** | | | | | | | |
| Regional Merchandise | 7,027 | 163 | 7,190 | 47.4% | 13,370 | 312 | 13,681 |
| Miscellaneous | 56 | 111 | 167 | 52.6% | 117 | 235 | 352 |
| **Total Miscellaneous** | 7,083 | 273 | 7,357 | 47.6% | 13,486 | 547 | 14,034 |
| **Additional Kmart Divisions** | | | | | | | |
| RTW | 194 | 9,416 | 9,610 | 32.7% | 643 | 13,628 | 14,271 |
| 5 Child Apprl | 62 | 2,035 | 2,097 | 66.6% | 93 | 6,187 | 6,280 |
| S Boy/Grl Ap | - | 7,272 | 7,272 | 55.2% | - | 16,457 | 16,457 |
| Mens Apparel | 284 | 10,189 | 10,473 | 68.8% | 871 | 32,733 | 33,604 |
| **Total Additional Kmart Divisions** | 539 | 28,912 | 29,452 | 58.3% | 1,607 | 69,005 | 70,612 |
| **Adjusted Inventory ($)** | $635,406 | $295,758 | $931,164 | 55.8% | $1,419,269 | $689,710 | $2,108,978 |

| | | |
|---|---|---|
| Less: Non-Prescription Pharmacy, Tobacco & Alcohol (Exhibit B-5) | (2,830) | (3,766) (1) |
| Retail Inventory Excluding Non-Prescription Pharmacy, Tobacco & Alcohol | 928,335 | 2,105,215 |
| Add: Non-Prescription Pharmacy, Tobacco & Alcohol (Exhibit B-5) | 2,830 | 3,764 |
| Adjusted Inventory | 931,164 | 2,108,978 |
| Less: Return To Vendor Goods/Damages (Exhibit B-4) | (3,183) | (7,111) |
| **Total Adjusted Kmart Inventory Before Markdowns** | 927,981 | 2,101,868 |
| Less: Adjustments For Markdowns At Retail Only | | |
| Jewelry Markdown Adjustment At Retail Only | N/A (4) | (115,500) |
| Non-Jewelry Markdown Adjustment At Retail Only | N/A (4) | (383,750) |
| Total Adjustments For Markdowns At Retail Only | N/A (4) | (499,250) |
| **Total Adjusted Kmart Inventory to be Included in Kmart Retail GOB Sale (5) (6)** | $927,981 | $1,602,618 |

Note(s):
(1) Computed retail based upon Company-supplied sales and margin information. Total computed retail equals $3.8 million (see Exhibit B-5).
(2) Markup (MU) supplied by Company.
(3) DC and store inventory includes pack-away inventory which is included in estimated GOB recoveries.
(4) N/A means Not Applicable.
(5) Percentages (%) and dollars ($) may not add due to rounding.
(6) This Exhibit should be read in conjunction with the full written report.

Exhibit B-3a

*Exhibits* | Inventory Appraisal

TIGER

## Sears Holdings Corporation
### Sears Full Line Stores (409 Full Line, 5 Grand/Essentials)
### Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
### As of October 6, 2018
($ in 000's)

| Classification | Inventory at Cost | | | MU (1) | Inventory at Retail | | |
|---|---|---|---|---|---|---|---|
| | Store $ (2) | DC $ (2) | Total $ | % | Store $ (2) | DC $ (2) | Total $ |
| **Home** | | | | | | | |
| Housewares | $13,327 | $7,627 | $20,954 | 49.8% | $24,602 | $17,180 | $41,781 |
| Luggage | 3,677 | 969 | 4,646 | 70.8% | 14,459 | 1,434 | 15,893 |
| Floorcare, Sewing | 8,474 | 18,115 | 26,588 | 49.7% | 18,458 | 34,461 | 52,900 |
| Window | 1,889 | 371 | 2,260 | 60.5% | 5,115 | 607 | 5,722 |
| Custom Draperies | 2,906 | 1,118 | 4,024 | 59.4% | 7,801 | 2,099 | 9,900 |
| Floor Coverings | 405 | 107 | 512 | 58.8% | 1,086 | 158 | 1,243 |
| Lawn,Garden,Patio | 51,868 | 42,722 | 94,590 | 50.3% | 104,579 | 85,576 | 190,154 |
| Mattresses | 26,028 | 6,638 | 32,666 | 71.0% | 103,875 | 8,769 | 112,644 |
| Bed And Bath | 21,138 | 6,985 | 28,123 | 64.4% | 67,144 | 11,745 | 78,889 |
| **Total Home** | 129,712 | 84,652 | 214,364 | 57.9% | 347,096 | 162,028 | 509,126 |
| | | | | | | | |
| **Hardlines** | | | | | | | |
| Home Office | 578 | 470 | 1,048 | 67.9% | 710 | 2,555 | 3,265 |
| Tools | 57,340 | 70,600 | 127,940 | 52.5% | 135,360 | 134,025 | 269,285 |
| Cooking And Cleanup | 39,274 | 40,193 | 79,466 | 50.2% | 83,121 | 76,502 | 159,723 |
| Laundry | 27,720 | 40,467 | 68,187 | 49.6% | 62,647 | 72,563 | 135,210 |
| Paint | 1,296 | 80 | 1,376 | 38.0% | 1,986 | 232 | 2,218 |
| Water Treatment | 794 | 1,589 | 2,383 | 49.4% | 1,678 | 3,035 | 4,713 |
| Electrical Components | 2,218 | 3,592 | 5,810 | 54.1% | 5,482 | 7,184 | 12,666 |
| Plumbing & Heating | 6,812 | 8,365 | 15,177 | 52.8% | 11,463 | 20,717 | 32,180 |
| Food Storage | 40,423 | 59,926 | 100,348 | 50.4% | 78,141 | 124,125 | 202,266 |
| Audio/Visual | 2,799 | 3,900 | 6,699 | 59.9% | 3,894 | 12,822 | 16,716 |
| Bathrm Fixtur & Plumbng Acc | 122 | 3 | 125 | 51.2% | 248 | 9 | 257 |
| **Total Hardlines** | 179,576 | 229,184 | 408,560 | 51.3% | 384,729 | 453,769 | 838,499 |
| | | | | | | | |
| **Apparel** | | | | | | | |
| Junior Apparel | 7,758 | 1,467 | 9,226 | 68.9% | 23,139 | 6,496 | 29,634 |
| Costume Jewelry | 5,164 | 27 | 5,191 | 76.7% | 22,232 | 57 | 22,290 |
| Sportswear | 31,908 | 4,981 | 36,890 | 70.4% | 95,973 | 28,593 | 124,566 |
| Special Sizes | 10,351 | 1,783 | 12,135 | 69.1% | 31,419 | 7,877 | 39,296 |
| Outerwear | 9,014 | 1,489 | 4,503 | 73.6% | 9,864 | 7,167 | 17,031 |
| Bras/Panties/Daywear | 40,748 | 3,849 | 44,597 | 62.1% | 107,386 | 10,132 | 117,528 |
| Infants/Child Wear | 15,743 | 2,240 | 17,984 | 69.5% | 49,360 | 9,579 | 58,939 |
| Dresses | 3,498 | 274 | 3,771 | 72.5% | 12,507 | 1,195 | 13,701 |
| Mens Furnishings | 13,639 | 2,517 | 16,156 | 66.2% | 39,989 | 7,872 | 47,860 |
| Children's Footwear | 14,602 | 3,808 | 18,404 | 61.8% | 40,928 | 6,610 | 47,538 |
| Sleepwear/Robes | 10,622 | 1,764 | 12,386 | 71.2% | 35,285 | 7,783 | 43,068 |
| Boys Wear | 17,251 | 2,667 | 19,918 | 71.0% | 56,703 | 11,942 | 68,644 |
| Mens Sportswear | 71,500 | 9,919 | 81,419 | 69.1% | 226,585 | 36,536 | 263,120 |
| Licensed Business Apparel | 19,575 | 1,017 | 20,591 | 70.8% | 65,559 | 4,991 | 70,530 |
| Fine Jewelry | 51,914 | 4,145 | 56,059 | 61.8% | 303,752 | 5,030 | 308,782 |
| Mens Dress Clothes | 7,898 | 2,847 | 10,745 | 71.4% | 32,625 | 4,948 | 37,574 |
| Children's Hardlines | 5,326 | 2,468 | 7,794 | 50.1% | 8,906 | 6,719 | 15,625 |
| Womens Shoes | 19,704 | 5,579 | 25,283 | 71.4% | 77,762 | 10,568 | 88,349 |
| Mens Shoes | 35,490 | 18,341 | 53,831 | 57.9% | 94,935 | 32,885 | 127,824 |
| Fragrance & Bath | 9,568 | 365 | 9,933 | 44.9% | 17,039 | 983 | 18,022 |
| Hosiery | 4,043 | 832 | 4,875 | 67.8% | 13,342 | 1,780 | 15,122 |
| Adult Athletics | 18,085 | 4,533 | 22,618 | 57.1% | 43,915 | 8,818 | 52,733 |
| Girls Wear | 13,652 | 1,386 | 15,238 | 73.5% | 50,957 | 6,517 | 57,474 |
| Handbags | 11,509 | 393 | 11,901 | 72.1% | 40,695 | 1,800 | 42,695 |
| **Total Apparel** | 442,763 | 78,685 | 521,449 | 69.8% | 1,501,069 | 226,876 | 1,727,945 |
| | | | | | | | |
| **General Merchandise** | | | | | | | |
| Sporting Goods | 14,726 | 31,137 | 45,863 | 52.3% | 34,530 | 61,612 | 96,142 |
| Health And Beauty | 284 | 4 | 288 | 48.1% | 539 | 16 | 556 |
| Toys | 3,157 | 14,722 | 17,879 | 59.1% | 5,444 | 38,306 | 43,750 |
| **Total General Merchandise** | 18,167 | 45,863 | 64,030 | 54.4% | 40,514 | 99,934 | 140,448 |
| | | | | | | | |
| **Miscellaneous** | | | | | | | |
| General Merchandise | 514 | 657 | 1,172 | 53.1% | 1,504 | 994 | 2,498 |
| Miscellaneous | 1,467 | 39 | 1,506 | 58.3% | 3,516 | 98 | 3,614 |
| **Total Miscellaneous** | 1,981 | 697 | 2,678 | 56.2% | 5,020 | 1,093 | 6,112 |
| | | | | | | | |
| **Automotive** | | | | | | | |
| Automotive | 183 | - | 183 | 61.3% | 472 | - | 472 |
| | | | | | | | |
| **Adjusted Inventory (4)** | $772,182 | $439,081 | 1,211,263 | 62.4% | $2,278,901 | $943,701 | $3,222,602 |

| | | | |
|---|---|---|---|
| Less: Return To Vendor Goods/Damages (Exhibit B-4) | | (1,589) | (4,587) |
| **Total Adjusted Sears Inventory Before Markdowns** | | 1,209,674 | 3,218,014 |
| Less: Adjustments For Markdowns At Retail Only | | | |
| Jewelry Markdown Adjustment At Retail Only | N/A (3) | | (259,000) |
| Non-Jewelry Markdown Adjustment At Retail Only | N/A (3) | | (491,300) |
| Total Adjustments For Markdowns At Retail Only | N/A (3) | | (750,300) |
| **Total Adjusted Inventory to be Included in The Sears Full Line GOB Sale (4) (5)** | | $1,209,674 | $2,467,714 |

Note(s):
(1) Markup (MU) and computed retail supplied by Company.
(2) DC and store inventory includes pack-away inventory that is included in estimated GOB recoveries.
(3) N/A means Not Applicable.
(4) Percentages (%) and dollars ($) may not add due to rounding.
(5) This Exhibit should be read in conjunction with the full written report

Exhibit B-3b

JX 104-37

HIGHLY CONFIDENTIAL

*Exhibits* | **Inventory Appraisal**

**TIGER**

## Sears Holdings Corporation
### Sears Auto Centers (342 Stores)
#### Inventory to be Included in the Retail Store GOB Sale at Cost and Retail
#### As of October 6, 2018
($ in 000's)

| Classification | Inventory at Cost | | | MU (1) % | Inventory at Retail | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Store $ | DC $ | Total $ | | Store $ | DC $ | Total $ |
| **Automotive** | | | | | | | |
| Automotive | $8,687 | $2,085 | $10,772 | 60.4% | $22,419 | $4,765 | $27,184 |
| Tires | 37,621 | 11,870 | 49,491 | 43.3% | 60,305 | 27,028 | 87,333 |
| **Total Automotive** | 46,308 | 13,955 | 60,263 | 47.4% | 82,724 | 31,793 | 114,517 |
| Adjusted Inventory (3) | $46,308 | $13,955 | $60,263 | 47.4% | $82,724 | $31,793 | $114,517 |
| | | | | | | | |
| Less: Non-Jewelry Markdown Adjustment At Retail Only | | | N/A (2) | | | | (19,400) |
| | | | | | | | |
| **Total Adjusted Inventory to be Included In The Sears** | | | | | | | |
| **Auto Center GOB Sale (3) (4)** | | | $60,263 | | | | $95,117 |

Note(s):
(1) Markup (MU) supplied by the Company
(2) N/A means Not Applicable.
(3) Percentages (%) and dollars ($) may not add due to rounding.
(4) This Exhibit should be read in conjunction with the full written report.

SEARS_507B_00001382
**JX 104-38**

Exhibit B-3c

*Exhibits* | Inventory Appraisal

TIGER

# Sears Holdings Corporation
## Go-Forward Inventory
### Inventory Classifications to be Sold On A Wholesale Basis
#### As of October 6, 2018
($ in 000's)

| Classification | Kmart Inventory | | Sears Inventory | | Total Inventory | |
|---|---|---|---|---|---|---|
| | Cost $ | Retail $ | Cost $ | Retail $ | Cost $ | Retail $ |
| Repair Parts | $0 | $0 | $54,494 | N/A (4) | $54,494 | N/A (4) |
| Sears Home Improvement | – | – | 3,545 | N/A (4) | 3,545 | N/A (4) |
| Prescription Pharmacy Inventory (1) (2) | 32,011 | N/A (4) | – | – | 32,011 | N/A (4) |
| Commercial Sales (Builders Distributors) (1) | – | – | 27,095 | N/A (4) | 27,095 | N/A (4) |
| RTV Damages (1) (3) | 3,183 | 7,111 | 1,589 | 4,587 | 4,772 | 11,698 |
| Restaurant Inventory (1) | 349 | N/A (4) | – | – | 349 | N/A (4) |
| **Total (5) (6)** | **$35,543** | | **$86,723** | | **$122,266** | |

Note(s):
(1) These categories are carried in the stock ledger at cost only.
(2) Prescription pharmacy inventory will be sold with prescription lists.
(3) Retail was computed based on Company-supplied sales and margin information.
(4) N/A means Not Applicable.
(5) Percentages (%) and dollars ($) may not add due to rounding.
(6) This Exhibit should be read in conjunction with the full written report.

HIGHLY CONFIDENTIAL

SEARS_507B_00001383
JX 104-39

Exhibit B-4

TIGER

## Sears Holdings Corporation
### Kmart Stores
#### Tobacco & Alcohol, and Non Prescription Pharmacy
#### Summary Of Estimated Gross Recovery Values
#### As of October 6, 2018
($ in 000s)

| Classification | Inventory at Computed Retail (1) $ | Estimated Gross Recovery (2) % Of Retail | Estimated Gross Recovery $ |
|---|---|---|---|
| **Food And Consumables** | | | |
| Tobacco & Alcohol | $2,431 | 90.0% | $2,188 |
| **Pharmacy** | | | |
| Non Prescription Pharmacy - Store | 1,332 | 62.0% | 826 |
| **Total (3) (4)** | **$3,764** | **80.1%** | **$3,014** |

Note(s):
(1) The Company maintains values for non-prescription pharmacy, tobacco, and alcohol inventory in the stock ledger system at cost. Retail was computed value based on Company-supplied sales and margin information.
(2) Gross recoveries for the November Rollforward are included on Exhibit A-2a (Kmart Stores) for the purposes of determining net recoveries.
(3) Percentages (%) and dollars ($) may not add due to rounding.
(4) This Exhibit should be read in conjunction with the full written report.

Exhibit B-5

HIGHLY CONFIDENTIAL

JX 104-40

*Exhibits* | Inventory Appraisal                                                                    TIGER

HIGHLY CONFIDENTIAL

## Sears Holdings Corporation
### Estimated Net Recovery On Total Company Inventory Sold On A Wholesale Basis
### As of October 6, 2018
($ in 000s)

| Classification | Inventory at (1) | | Recovery (2) | |
|---|---|---|---|---|
| | Cost $ | Retail $ | Cost % | $ |
| Repair Parts | $54,494 | N/A (4) | 20.0% | $10,899 |
| Sears Home Improvement | 3,545 | N/A (4) | 20.0% | 709 |
| Prescription Pharmacy Inventory (3) | 32,011 | N/A (4) | 90.0% | 28,810 |
| Commercial Sales (Builders Distributors) | 27,095 | N/A (4) | 20.0% | 5,419 |
| RTV Damages | 4,772 | 11,698 | 15.0% | 718 |
| Restaurant Inventory | 349 | N/A (4) | 5.0% | 17 |
| **Total (5) (6)** | **$122,266** | | **38.1%** | **$46,572** |

Note(s):

(1) Inventory in stock ledger at cost only.

(2) Recovery estimates are net of expenses.

(3) Prescription Pharmacy inventory is assumed to be sold with prescription lists. Recovery shown for inventory only.
See additional recoveries for discussion of prescription lists (scripts).

(4) N/A means Not Applicable.

(5) Percentages (%) and dollars ($) may not add due to rounding.

(6) This Exhibit should be read in conjunction with the full written report.

*Exhibits* | **Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

### Sears Holdings Corporation
#### Total Company
Operating Metrics
12 Months Ending September 2018
($ in 000s)

| Division Name | Net Sales | | Gross Margin | | Avg. Inv. at Cost | | Inv. Turns | Days' Sales |
|---|---|---|---|---|---|---|---|---|
| | $ | % Total | $ | % of Net | $ | % Total | | |
| Kmart Corporation | $3,976,864 | 43.3% | $1,121,652 | 28.2% | $1,124,532 | 41.4% | 2.5 | 144 |
| Sears Full Line Stores | 4,925,542 | 53.6% | 1,287,263 | 26.1% | 1,530,266 | 56.3% | 2.4 | 154 |
| Sears Auto Centers | 291,847 | 3.2% | 82,319 | 28.2% | 61,781 | 2.3% | 3.4 | 108 |
| Total (1) (2) | $9,194,254 | 100.0% | $2,491,233 | 27.1% | $2,716,579 | 100.0% | 2.5 | 148 |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

SEARS_507B_00001386
**JX 104-42**

Exhibit C-1

*Exhibits* | **Inventory Appraisal**

**TIGER**

**Sears Holdings Corporation**
**Kmart Corporation**
Operating Metrics
12 Months Ending September 2018
($ in 000s)

| Classification | Net Sales | | Gross Margin | | Avg. Inv. at Cost | | Inv. Turns | Days' Sales |
|---|---|---|---|---|---|---|---|---|
| | $ | % Total | $ | % of Net | $ | % Total | | |
| **Home** | | | | | | | | |
| Household Goods | $224,290 | 5.6% | $63,900 | 28.5% | $141,057 | 12.5% | 1.1 | 321 |
| Outdoor Living | 52,031 | 1.3% | 9,557 | 18.4% | 2,749 | 0.2% | 15.5 | 24 |
| Lawn & Garden | 45,808 | 1.2% | 7,650 | 16.7% | 9,563 | 0.9% | 4.0 | 91 |
| Soft Home | 222,637 | 5.6% | 83,679 | 37.6% | - | - | N/A | N/A |
| Floorcare, Sewing | 23 | 0.0% | 6 | 24.1% | - | - | N/A | N/A |
| **Total Home** | **544,789** | **13.7%** | **164,791** | **30.2%** | **153,369** | **13.6%** | **2.5** | **147** |
| **Hardlines** | | | | | | | | |
| Hardware | 68,650 | 1.7% | 27,301 | 39.8% | 20,162 | 1.8% | 2.1 | 178 |
| Home Entertainment | 11,621 | 0.3% | 2,550 | 21.9% | 3,229 | 0.3% | 2.8 | 130 |
| Home Electronics | 72,044 | 1.8% | 14,888 | 20.7% | 14,198 | 1.3% | 4.0 | 91 |
| Major Home Appliances | 56,303 | 1.4% | 15,058 | 26.7% | 11,857 | 1.1% | 3.5 | 105 |
| Home Office | 5 | 0.0% | (2) | (43.8%) | 541 | 0.0% | N/A | N/A |
| Tools | 192 | 0.0% | 91 | 47.4% | 131 | 0.0% | 0.8 | 474 |
| Cooking And Cleanup | 2,885 | 0.1% | 913 | 31.6% | 807 | 0.1% | 3.2 | 112 |
| Laundry | 5,718 | 0.1% | 1,617 | 28.3% | 890 | 0.1% | 4.6 | 79 |
| Water Treatment | 0 | 0.0% | 0 | 40.9% | 49 | 0.0% | N/A | N/A |
| Food Storage | 7,292 | 0.2% | 1,699 | 23.3% | 1,472 | 0.1% | 3.8 | 96 |
| Audio/Visual | 112 | 0.0% | 19 | 17.0% | 214 | 0.0% | 0.4 | 839 |
| **Total Hardlines** | **224,822** | **5.7%** | **64,133** | **28.5%** | **53,350** | **4.7%** | **3.0** | **121** |
| **Apparel** | | | | | | | | |
| Jewelry | 64,528 | 1.6% | 23,762 | 36.8% | 28,027 | 2.5% | 1.5 | 251 |
| Womens | 270,693 | 6.8% | 87,738 | 32.4% | 61,835 | 5.5% | 3.0 | 123 |
| Intimate & Acc. | 146,865 | 3.7% | 50,969 | 34.7% | 62,913 | 5.6% | 1.5 | 239 |
| Kmart Footwear | 199,111 | 5.0% | 70,430 | 35.4% | 67,180 | 6.0% | 1.9 | 191 |
| Off-Price Apparel | 19,358 | 0.5% | 1,753 | 9.1% | 4,293 | 0.4% | 4.1 | 89 |
| Menswear | 318,488 | 8.0% | 92,090 | 28.9% | 100,728 | 9.0% | 2.2 | 162 |
| Kidsworld | 244,304 | 6.1% | 70,683 | 28.9% | 84,363 | 7.5% | 2.1 | 177 |
| Accessories | 45,479 | 1.1% | 17,623 | 38.7% | 15,902 | 1.4% | 2.8 | 208 |
| **Total Apparel** | **1,308,827** | **32.9%** | **415,049** | **31.7%** | **425,250** | **37.8%** | **2.1** | **174** |
| **Drug Store** | | | | | | | | |
| Beauty Care | 177,701 | 4.5% | 51,782 | 29.1% | 61,393 | 5.5% | 2.1 | 178 |
| Stationery | 52,872 | 1.3% | 22,186 | 42.0% | 12,886 | 1.1% | 2.4 | 153 |
| Cards, Wrap & Party | 29,888 | 0.8% | 17,334 | 58.0% | 215 | 0.0% | 58.5 | 6 |
| Health Care | 160,661 | 4.0% | 51,397 | 32.0% | 45,957 | 4.1% | 2.4 | 154 |
| **Total Drug Store** | **421,122** | **10.6%** | **142,699** | **33.9%** | **120,451** | **10.7%** | **2.3** | **158** |
| **Food & Consumables** | | | | | | | | |
| Consumables | 239,958 | 6.0% | 36,488 | 15.2% | 63,737 | 5.7% | 3.2 | 114 |
| Edible | 226,701 | 5.7% | 20,325 | 9.0% | 36,100 | 3.2% | 5.7 | 64 |
| Tobacco & Alcohol | 12,570 | 0.3% | 1,972 | 15.7% | 2,049 | 0.2% | 5.2 | 71 |
| Readers Market | 11,591 | 0.3% | 3,130 | 27.0% | 1,819 | 0.2% | 4.7 | 78 |
| Dry Grocery | 671 | 0.0% | 90 | 13.4% | - | - | N/A | N/A |
| Frozen And Dairy | 212 | 0.0% | 28 | 13.2% | - | - | N/A | N/A |
| Meat | 250 | 0.0% | 11 | 4.4% | - | - | N/A | N/A |
| Produce | 87 | 0.0% | 7 | 7.7% | - | - | N/A | N/A |
| Bakery | 98 | 0.0% | (2) | (2.1%) | - | - | N/A | N/A |
| Delicatessen | 64 | 0.0% | (5) | (7.5%) | - | - | N/A | N/A |
| Seafood | 23 | 0.0% | 8 | 36.4% | - | - | N/A | N/A |
| Floral | (0) | (0.0%) | 1 | N/A | - | - | N/A | N/A |
| **Total Food & Consumables** | **492,225** | **12.4%** | **62,053** | **12.6%** | **103,705** | **9.2%** | **4.7** | **88** |
| **General Merchandise** | | | | | | | | |
| Toys And Hobbies | 266,239 | 6.7% | 84,712 | 31.8% | 114,508 | 10.2% | 1.6 | 230 |
| Seasonal | 112,420 | 2.8% | 36,428 | 32.4% | 46,632 | 4.1% | 1.6 | 224 |
| Sport Gd Athletic | 136,276 | 3.4% | 46,425 | 34.1% | 50,794 | 4.5% | 1.8 | 206 |
| Car Care | 40,489 | 1.0% | 14,001 | 34.6% | 10,652 | 0.9% | 2.5 | 147 |
| Sporting Goods | 67 | 0.0% | 27 | 39.5% | - | - | N/A | N/A |
| **Total General Merchandise** | **555,491** | **14.0%** | **181,591** | **32.7%** | **222,586** | **19.8%** | **1.7** | **217** |
| **Pharmacy** | | | | | | | | |
| Pharmacy | 356,939 | 9.0% | 68,937 | 19.3% | 1,388 | 0.1% | N/A | N/A |
| **Miscellaneous** | | | | | | | | |
| Regional Merchandise | 18,769 | 0.5% | 4,675 | 24.9% | 8,683 | 0.8% | 1.6 | 225 |
| Misc Business | 51,187 | 1.3% | 16,321 | 31.9% | - | - | N/A | N/A |
| Home Fashions | 245 | 0.0% | 127 | 51.7% | - | - | N/A | N/A |
| Gasoline | - | - | 4 | N/A | - | - | N/A | N/A |
| Miscellaneous | - | - | - | - | 201 | 0.0% | N/A | N/A |
| **Total Miscellaneous** | **70,200** | **1.8%** | **21,128** | **30.1%** | **8,884** | **0.8%** | **5.5** | **66** |
| **Additional Kmart Divisions** | | | | | | | | |
| RTW | 1,353 | 0.0% | 691 | 51.1% | 11,606 | 1.0% | N/A | N/A |
| S Child Apprl | 171 | 0.0% | 64 | 37.4% | 2,532 | 0.2% | N/A | N/A |
| S Boy/Grl Ap | 285 | 0.0% | 183 | 64.1% | 8,782 | 0.8% | N/A | N/A |
| Mens Apparel | 640 | 0.0% | 334 | 52.3% | 12,648 | 1.1% | N/A | N/A |
| **Total Additional Kmart Divisions** | **2,448** | **0.1%** | **1,272** | **52.0%** | **35,568** | **3.2%** | **N/A** | **N/A** |
| **Total (1) (2)** | **$3,976,864** | **100.0%** | **$1,121,652** | **28.2%** | **$1,124,532** | **100.0%** | **2.5** | **144** |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Exhibit C-1a

**JX 104-43**

*Exhibits* | **Inventory Appraisal**

**TIGER**

**Sears Holdings Corporation**

**Sears Full Line Stores**

Operating Metrics

12 Months Ending September 2018

($ in 000s)

| Classification | Net Sales | | Gross Margin | | Avg. Inv. at Cost | | Inv. Turns | Days' Sales |
|---|---|---|---|---|---|---|---|---|
| | $ | % Total | $ | % of Net | $ | % Total | | |
| **Home** | | | | | | | | |
| Housewares | $59,162 | 1.2% | $6,382 | 10.8% | $26,473 | 1.7% | 2.0 | 183 |
| Nursery Stock | 69 | 0.0% | (5) | (7.5%) | - | - | N/A | N/A |
| Luggage | 13,978 | 0.3% | 5,510 | 39.4% | 5,870 | 0.4% | 1.4 | 253 |
| Floorcare, Sewing | 82,366 | 1.7% | 28,038 | 34.0% | 33,591 | 2.2% | 1.6 | 226 |
| Window | 7,491 | 0.2% | 856 | 11.4% | 2,855 | 0.2% | 2.3 | 157 |
| Custom Draperies | - | - | - | - | 5,083 | 0.3% | N/A | N/A |
| Floor Coverings | 1,450 | 0.0% | (35) | (2.4%) | 647 | 0.0% | 2.3 | 159 |
| Lawn,Garden,Patio | 357,754 | 7.3% | 54,348 | 15.2% | 119,502 | 7.8% | 2.5 | 144 |
| Mattresses | 236,821 | 4.8% | 112,937 | 47.7% | 41,269 | 2.7% | 3.0 | 122 |
| Bed And Bath | 77,856 | 1.6% | 23,626 | 30.3% | 35,530 | 2.3% | 1.5 | 239 |
| **Total Home** | **836,946** | **17.0%** | **231,657** | **27.7%** | **270,819** | **17.7%** | **2.2** | **163** |
| | | | | | | | | |
| **Hardlines** | | | | | | | | |
| Home Office | 3,043 | 0.1% | (77) | (2.5%) | 1,325 | 0.1% | 2.4 | 155 |
| Tools | 439,420 | 8.9% | 109,191 | 24.8% | 161,635 | 10.6% | 2.0 | 179 |
| Cooking And Cleanup | 399,274 | 8.1% | 85,498 | 21.4% | 100,395 | 6.6% | 3.1 | 117 |
| Laundry | 528,234 | 10.7% | 142,446 | 27.0% | 86,144 | 5.6% | 4.5 | 82 |
| Paint | 2,118 | 0.0% | 106 | 5.0% | 1,738 | 0.1% | 1.2 | 315 |
| Water Treatment | 5,887 | 0.1% | 2,402 | 40.8% | 3,011 | 0.2% | 1.2 | 315 |
| Electrical Components | 12,958 | 0.3% | 2,821 | 21.8% | 7,341 | 0.5% | 1.4 | 264 |
| Plumbing & Heating | 47,374 | 1.0% | 15,474 | 32.7% | 19,174 | 1.3% | 1.7 | 219 |
| Food Storage | 579,524 | 11.8% | 79,717 | 13.8% | 126,776 | 8.3% | 3.9 | 93 |
| Audio/Visual | 13,524 | 0.3% | (1,601) | (11.8%) | 8,463 | 0.6% | 1.8 | 204 |
| DVD | 364 | 0.0% | 51 | 13.9% | - | - | N/A | N/A |
| Bathrm Fixtur$ & Plumbng Acc | 360 | 0.0% | (12) | (3.4%) | 158 | 0.0% | 2.3 | 156 |
| **Total Hardlines** | **2,032,081** | **41.3%** | **436,015** | **21.5%** | **516,160** | **33.7%** | **3.1** | **118** |
| | | | | | | | | |
| **Apparel** | | | | | | | | |
| Junior Apparel | 40,614 | 0.8% | 7,974 | 19.6% | 11,655 | 0.8% | 2.8 | 130 |
| Costume Jewelry | 15,683 | 0.3% | 5,425 | 34.6% | 6,558 | 0.4% | 1.6 | 233 |
| Sportswear | 190,059 | 3.9% | 50,539 | 26.6% | 46,605 | 3.0% | 3.0 | 122 |
| Special Sizes | 67,561 | 1.4% | 18,144 | 26.9% | 15,331 | 1.0% | 3.2 | 113 |
| Outerwear | 23,286 | 0.5% | 7,918 | 34.0% | 5,689 | 0.4% | 2.7 | 135 |
| Bras/Panties/Daywear | 72,359 | 1.5% | 21,354 | 29.5% | 56,342 | 3.7% | 0.9 | 403 |
| Lands End Ready To Wear | 85,579 | 1.7% | 33,853 | 39.6% | - | - | N/A | N/A |
| Infants/Child Wear | 71,789 | 1.5% | 19,825 | 27.6% | 22,720 | 1.5% | 2.3 | 160 |
| Dresses | 17,637 | 0.4% | 2,373 | 13.5% | 4,764 | 0.3% | 3.2 | 114 |
| Mens Furnishings | 62,386 | 1.3% | 21,198 | 34.0% | 20,411 | 1.3% | 2.0 | 181 |
| Children's Footwear | 43,646 | 0.9% | 11,147 | 25.5% | 23,251 | 1.5% | 1.4 | 261 |
| Sleepwear/Robes | 45,285 | 0.9% | 13,476 | 29.8% | 15,649 | 1.0% | 2.0 | 180 |
| Lands End Mens | 15,396 | 0.3% | 5,409 | 35.1% | - | - | N/A | N/A |
| Boys Wear | 78,284 | 1.6% | 24,826 | 31.7% | 25,164 | 1.6% | 2.1 | 172 |
| Mens Sportswear | 325,322 | 6.6% | 99,291 | 30.5% | 102,862 | 6.7% | 2.2 | 166 |
| Licensed Business Apparel | 104,513 | 2.1% | 29,195 | 27.9% | 36,014 | 1.7% | 2.9 | 126 |
| Fine Jewelry | 143,628 | 2.9% | 46,021 | 32.0% | 70,823 | 4.6% | 1.4 | 265 |
| Mens Dress Clothes | 35,341 | 0.7% | 14,805 | 41.9% | 13,575 | 0.9% | 1.5 | 241 |
| Lands End Childrens | 15,836 | 0.3% | 4,901 | 30.9% | - | - | N/A | N/A |
| Children's Hardlines | 12,503 | 0.3% | 1,139 | 9.1% | 9,846 | 0.6% | 1.2 | 316 |
| Womens Shoes | 74,326 | 1.5% | 19,834 | 26.7% | 31,941 | 2.1% | 1.7 | 214 |
| Mens Shoes | 171,873 | 3.5% | 68,902 | 40.1% | 68,008 | 4.4% | 1.5 | 241 |
| Fragrance & Bath | 34,649 | 0.7% | 7,038 | 20.3% | 12,550 | 0.8% | 2.2 | 166 |
| Hosiery | 15,300 | 0.3% | 5,435 | 35.5% | 6,159 | 0.4% | 1.6 | 228 |
| Adult Athletics | 46,224 | 0.9% | 11,218 | 24.3% | 28,574 | 1.9% | 1.2 | 298 |
| Girls Wear | 71,857 | 1.5% | 19,691 | 27.4% | 19,252 | 1.3% | 2.7 | 135 |
| Lands End Footwear | 1,581 | 0.0% | 1,157 | 73.2% | - | - | N/A | N/A |
| Handbags | 49,459 | 1.0% | 18,329 | 37.1% | 15,036 | 1.0% | 2.1 | 176 |
| **Total Apparel** | **1,931,981** | **39.2%** | **590,417** | **30.6%** | **658,779** | **43.0%** | **2.0** | **179** |
| | | | | | | | | |
| **General Merchandise** | | | | | | | | |
| Sporting Goods | 107,147 | 2.2% | 26,969 | 25.2% | 57,942 | 3.8% | 1.4 | 264 |
| Health And Beauty | 194 | 0.0% | 54 | 28.1% | 364 | 0.0% | 0.4 | 954 |
| Toys | 5,477 | 0.1% | 220 | 4.0% | 22,588 | 1.5% | 0.2 | 1,568 |
| Pantry And Household | 476 | 0.0% | (637) | (133.7%) | - | - | N/A | N/A |
| **Total General Merchandise** | **113,294** | **2.3%** | **26,607** | **23.5%** | **80,894** | **5.3%** | **1.1** | **341** |
| | | | | | | | | |
| **Miscellaneous** | | | | | | | | |
| Furniture-In Store | 4,007 | 0.1% | 1,445 | 36.1% | - | - | N/A | N/A |
| General Merchandise | 4,388 | 0.1% | 787 | 17.9% | 1,480 | 0.1% | 2.4 | 150 |
| Miscellaneous | 794 | 0.0% | (283) | (35.7%) | 1,903 | 0.1% | N/A | N/A |
| **Total Miscellaneous** | **9,189** | **0.2%** | **1,949** | **21.2%** | **3,383** | **0.2%** | **2.1** | **171** |
| | | | | | | | | |
| **Automotive** | | | | | | | | |
| Automotive | 2,051 | 0.0% | 617 | 30.1% | 231 | 0.0% | 6.2 | 59 |
| **Total (1) (2)** | **$4,925,542** | **100.0%** | **$1,287,263** | **26.1%** | **$1,530,266** | **100.0%** | **2.4** | **154** |

Note(s):

(1) Percentages (%) and dollars ($) may not add due to rounding.

(2) This Exhibit should be read in conjunction with the full written report.

**Exhibit C-1b**

**JX 104-44**

HIGHLY CONFIDENTIAL

*Exhibits* | Inventory Appraisal

TIGER

## Sears Holdings Corporation
### Sears Auto Centers
Operating Metrics
12 Months Ending September 2018
($ in 000s)

| Classification | Net Sales | | Gross Margin | | Avg. Inv. at Cost | | Inv. Turns | Days' Sales |
|---|---|---|---|---|---|---|---|---|
| | $ | % Total | $ | % of Net | $ | % Total | | |
| **Automotive** | | | | | | | | |
| Automotive | $139,293 | 47.7% | $61,359 | 44.1% | $11,043 | 17.9% | 7.1 | 52 |
| Tires | 152,554 | 52.3% | 20,959 | 13.7% | 50,738 | 82.1% | 2.6 | 141 |
| **Total (1) (2)** | **$291,847** | **100.0%** | **$82,319** | **28.2%** | **$61,781** | **100.0%** | **3.4** | **108** |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Exhibit C-1c

HIGHLY CONFIDENTIAL

**Exhibits** | Inventory Appraisal

**TIGER**

## Sears Holdings Corporation
### Total Company
Operating Metrics Comparison
12 Months Ending September 2018 vs. June 2018
($ in 000s)

| Division Name | Net Sales $ | | | | | | Gross Margin % | | | Inventory Turnover | | | Days' Sales in Inventory | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sep 2018 | | Jun 2018 | | Change | | Sep 2018 | Jun 2018 | Pct. Pt. Chg. | Sep 2018 | Jun 2018 | Chg. | Sep 2018 | Jun 2018 | Days Chg. |
| | $ | % of Total | $ | % of Total | $ | % of Total | | | | | | | | | |
| Kmart Corporation | $3,976,864 | 43.3% | $4,477,097 | 44.5% | ($500,233) | (1.2%) | 28.2% | 29.2% | (1.0%) | 2.5 | 2.6 | (0.0) | 144 | 141 | 3 |
| Sears Full Line Stores | 4,925,542 | 53.6% | 5,279,246 | 52.4% | (353,703) | 1.2% | 26.1% | 25.7% | 0.5% | 2.4 | 2.4 | (0.1) | 154 | 150 | 3 |
| Sears Auto Centers | 291,847 | 3.2% | 315,602 | 3.1% | (23,754) | 0.0% | 28.2% | 30.2% | (2.0%) | 3.4 | 3.3 | 0.1 | 108 | 110 | (2) |
| **Total** (1) (2) | **$9,194,254** | **100.0%** | **$10,071,945** | **100.0%** | **($877,691)** | **-** | **27.1%** | **27.4%** | **(0.3%)** | **2.5** | **2.5** | **(0.0)** | **148** | **145** | **3** |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Exhibit C-2

## *Exhibits* | Inventory Appraisal

TIGER

**Sears Holdings Corporation**
**Kmart Corporation**
Operating Metrics Comparison
12 Months Ending September 2018 vs. June 2018
($ in 000s)

| Classification | Net Sales $ | | | | | | Gross Margin % | | | Inventory Turnover | | | Days' Sales in Inventory | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep 2018 | | Jun 2018 | | Change | | Sep 2018 | Jun 2018 | Pct. Pt. Chg. | Sep 2018 | Jun 2018 | Chg. | Sep 2018 | Jun 2018 | Days Chg. |
| | $ | % of Total | $ | % of Total | $ | % of Total | | | | | | | | | |
| **Home** | | | | | | | | | | | | | | | |
| Household Goods | $224,290 | 5.6% | $249,223 | 5.6% | ($24,933) | 0.1% | 28.5% | 28.4% | 0.1% | 1.1 | 1.1 | 0.0 | 321 | 324 | (3) |
| Outdoor Living | 52,031 | 1.3% | 75,217 | 1.7% | (23,186) | (0.4%) | 18.4% | 29.5% | (11.1%) | 15.5 | 2.4 | 13.1 | 24 | 155 | (131) |
| Lawn & Garden | 45,808 | 1.2% | 55,069 | 1.2% | (9,262) | (0.1%) | 16.7% | 18.9% | (2.2%) | 4.0 | 3.1 | 0.8 | 91 | 116 | (25) |
| Soft Home | 222,637 | 5.6% | 247,556 | 5.5% | (24,919) | 0.1% | 37.6% | 38.0% | (0.4%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Floorcare, Sewing | 23 | 0.0% | 15 | 0.0% | 8 | 0.0% | 24.1% | 19.4% | 4.8% | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total Home** | **544,789** | **13.7%** | **627,081** | **14.0%** | **(82,292)** | **(0.3%)** | **30.2%** | **31.5%** | **(1.2%)** | **2.5** | **2.2** | **0.3** | **147** | **166** | **(19)** |
| **Hardlines** | | | | | | | | | | | | | | | |
| Hardware | 68,650 | 1.7% | 81,211 | 1.8% | (12,561) | (0.1%) | 39.8% | 40.1% | (0.3%) | 2.1 | 2.1 | (0.1) | 178 | 173 | 5 |
| Home Entertainment | 11,621 | 0.3% | 13,078 | 0.3% | (1,457) | 0.0% | 21.9% | 23.2% | (1.2%) | 2.8 | 2.5 | 0.3 | 130 | 147 | (17) |
| Home Electronics | 72,044 | 1.8% | 80,064 | 1.8% | (8,020) | 0.0% | 20.7% | 19.5% | 1.2% | 4.0 | 3.1 | 1.0 | 91 | 120 | (29) |
| Major Home Appliances | 56,303 | 1.4% | 65,766 | 1.5% | (9,463) | (0.1%) | 26.7% | 27.0% | (0.2%) | 3.5 | 2.7 | 0.8 | 105 | 137 | (32) |
| Home Office | 5 | 0.0% | 6 | 0.0% | (1) | (0.0%) | (43.8%) | 33.9% | (77.7%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Tools | 192 | 0.0% | 160 | 0.0% | 31 | 0.0% | 47.4% | 48.8% | (1.4%) | 0.8 | 0.6 | 0.2 | 474 | 643 | (169) |
| Cooking And Cleanup | 2,885 | 0.1% | 2,483 | 0.1% | 402 | 0.0% | 31.6% | 32.6% | (0.9%) | 3.2 | 2.1 | 1.1 | 112 | 171 | (59) |
| Laundry | 5,718 | 0.1% | 5,247 | 0.1% | 471 | 0.0% | 28.3% | 27.7% | 0.6% | 4.6 | 3.3 | 1.3 | 79 | 110 | (31) |
| Food Storage | 7,292 | 0.2% | 6,421 | 0.1% | 871 | 0.0% | 23.3% | 23.4% | (0.1%) | 3.8 | 2.6 | 1.2 | 96 | 141 | (45) |
| Audio/Visual | 112 | 0.0% | 78 | 0.0% | 34 | 0.0% | 17.0% | 2.2% | 14.8% | 0.4 | 0.3 | 0.2 | 839 | 1,380 | (541) |
| **Total Hardlines** | **224,822** | **5.7%** | **254,514** | **5.7%** | **(29,692)** | **(0.0%)** | **28.5%** | **28.6%** | **(0.1%)** | **3.0** | **2.6** | **0.4** | **121** | **142** | **(21)** |
| **Apparel** | | | | | | | | | | | | | | | |
| Jewelry | 64,528 | 1.6% | 77,904 | 1.7% | (13,376) | (0.1%) | 36.8% | 37.9% | (1.1%) | 1.5 | 1.4 | 0.1 | 251 | 262 | (11) |
| Womens | 270,693 | 6.8% | 302,416 | 6.8% | (31,723) | 0.1% | 32.4% | 33.3% | (0.9%) | 3.0 | 3.4 | (0.4) | 123 | 107 | 16 |
| Intimate & Acc. | 146,865 | 3.7% | 152,838 | 3.4% | (5,973) | 0.3% | 34.7% | 36.9% | (2.2%) | 1.5 | 1.5 | 0.1 | 239 | 250 | (11) |
| Kmart Footwear | 199,111 | 5.0% | 222,686 | 5.0% | (23,575) | 0.0% | 35.4% | 34.3% | 1.1% | 1.9 | 2.4 | (0.4) | 191 | 155 | 35 |
| Off-Price Apparel | 19,368 | 0.5% | 34,378 | 0.8% | (15,020) | (0.3%) | 9.1% | 0.15 | (0.06) | 4.1 | 4.1 | (0.0) | 89 | 88 | 1 |
| Menswear | 318,488 | 8.0% | 346,205 | 7.7% | (27,716) | 0.3% | 28.9% | 31.2% | (2.3%) | 2.2 | 2.1 | 0.1 | 162 | 173 | (10) |
| Kidsworld | 244,304 | 6.1% | 282,265 | 6.3% | (37,961) | (0.2%) | 28.9% | 30.8% | (1.9%) | 2.1 | 2.5 | (0.5) | 177 | 144 | 33 |
| Accessories | 45,479 | 1.1% | 49,733 | 1.1% | (4,254) | 0.0% | 38.7% | 40.5% | (1.8%) | 1.8 | 2.3 | (0.5) | 206 | 159 | 49 |
| **Total Apparel** | **1,308,827** | **32.9%** | **1,468,425** | **32.8%** | **(159,598)** | **0.1%** | **31.7%** | **32.9%** | **(1.2%)** | **2.1** | **2.3** | **(0.2)** | **174** | **160** | **14** |
| **Drug Store** | | | | | | | | | | | | | | | |
| Beauty Care | 177,701 | 4.5% | 197,247 | 4.4% | (19,546) | 0.1% | 29.1% | 30.8% | (1.6%) | 2.1 | 1.8 | 0.3 | 178 | 206 | (28) |
| Stationery | 52,872 | 1.3% | 61,050 | 1.4% | (8,178) | (0.0%) | 42.0% | 43.2% | (1.3%) | 2.4 | 1.6 | 0.8 | 153 | 233 | (80) |
| Cards, Wrap & Party | 29,888 | 0.8% | 33,243 | 0.7% | (3,355) | 0.0% | 58.0% | 57.9% | 0.1% | 58.5 | 36.0 | 22.4 | 6 | 10 | (4) |
| Health Care | 160,661 | 4.0% | 179,990 | 4.0% | (19,329) | 0.0% | 32.0% | 32.9% | (0.9%) | 2.4 | 2.0 | 0.4 | 154 | 182 | (29) |
| **Total Drug Store** | **421,122** | **10.6%** | **471,531** | **10.5%** | **(50,409)** | **0.1%** | **33.9%** | **35.1%** | **(1.2%)** | **2.3** | **1.9** | **0.4** | **158** | **191** | **(33)** |
| **Food & Consumables** | | | | | | | | | | | | | | | |
| Consumables | 239,958 | 6.0% | 263,522 | 5.9% | (23,564) | 0.1% | 15.2% | 18.1% | (2.9%) | 3.2 | 2.2 | 1.0 | 114 | 169 | (54) |
| Edible | 226,701 | 5.7% | 250,301 | 5.6% | (23,600) | 0.1% | 9.0% | 10.9% | (1.9%) | 5.7 | 5.3 | 0.4 | 64 | 69 | (5) |
| Tobacco & Alcohol | 12,570 | 0.3% | 13,734 | 0.3% | (1,163) | 0.0% | 15.7% | 15.6% | 0.1% | 5.2 | 4.2 | 0.9 | 71 | 86 | (16) |
| Readers Market | 11,591 | 0.3% | 13,184 | 0.3% | (1,593) | (0.0%) | 27.0% | 25.3% | 1.7% | 4.7 | 3.8 | 0.8 | 78 | 95 | (17) |
| Dry Grocery | 671 | 0.0% | 990 | 0.0% | (319) | (0.0%) | 13.4% | 10.7% | 2.6% | N/A | N/A | N/A | N/A | N/A | N/A |
| Frozen And Dairy | 212 | 0.0% | 323 | 0.0% | (110) | (0.0%) | 13.2% | 6.8% | 6.4% | N/A | N/A | N/A | N/A | N/A | N/A |
| Meat | 250 | 0.0% | 407 | 0.0% | (158) | (0.0%) | 4.4% | 5.4% | (1.0%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Produce | 87 | 0.0% | 146 | 0.0% | (60) | (0.0%) | 7.7% | 8.4% | (0.7%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Bakery | 98 | 0.0% | 145 | 0.0% | (47) | (0.0%) | (2.1%) | 0.6% | (2.7%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Delicatessen | 64 | 0.0% | 99 | 0.0% | (35) | (0.0%) | (7.5%) | (7.8%) | 0.3% | N/A | N/A | N/A | N/A | N/A | N/A |
| Seafood | 23 | 0.0% | 32 | 0.0% | (9) | (0.0%) | 36.4% | 37.0% | (0.6%) | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total Food & Consumables** | **492,225** | **12.4%** | **542,883** | **12.1%** | **(50,659)** | **0.3%** | **12.6%** | **14.8%** | **(2.2%)** | **4.1** | **3.1** | **1.0** | **88** | **116** | **(28)** |
| **General Merchandise** | | | | | | | | | | | | | | | |
| Toys And Hobbies | 266,239 | 6.7% | 291,510 | 6.5% | (25,272) | 0.2% | 31.8% | 32.6% | (0.8%) | 1.6 | 1.8 | (0.2) | 230 | 208 | 22 |
| Seasonal | 112,420 | 2.8% | 113,815 | 2.5% | (1,395) | 0.3% | 32.4% | 32.4% | 0.0% | 1.6 | 16.7 | (15.1) | 224 | 22 | 202 |
| Sport Gd Athletic | 136,276 | 3.4% | 161,619 | 3.6% | (25,343) | (0.2%) | 34.1% | 35.7% | (1.6%) | 1.8 | 1.6 | 0.2 | 206 | 234 | (28) |
| Car Care | 40,489 | 1.0% | 47,053 | 1.1% | (6,564) | (0.0%) | 34.6% | 35.1% | (0.5%) | 2.5 | 2.4 | 0.1 | 147 | 153 | (6) |
| Sporting Goods | 67 | 0.0% | 71 | 0.0% | (4) | 0.0% | 39.5% | 38.9% | 0.6% | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total General Merchandise** | **555,491** | **14.0%** | **614,069** | **13.7%** | **(58,578)** | **0.3%** | **32.7%** | **33.6%** | **(0.9%)** | **1.7** | **2.1** | **(0.4)** | **217** | **175** | **42** |
| **Pharmacy** | | | | | | | | | | | | | | | |
| Pharmacy | 356,939 | 9.0% | 410,765 | 9.2% | (53,825) | (0.2%) | 19.3% | 18.8% | 0.5% | N/A | N/A | N/A | N/A | N/A | N/A |
| **Miscellaneous** | | | | | | | | | | | | | | | |
| Regional Merchandise | 18,769 | 0.5% | 20,323 | 0.5% | (1,554) | 0.0% | 24.9% | 27.4% | (2.4%) | 1.6 | 1.4 | 0.3 | 225 | 270 | (45) |
| Misc Business | 51,187 | 1.3% | 64,915 | 1.4% | (13,728) | (0.2%) | 31.9% | 28.0% | 3.9% | N/A | N/A | N/A | N/A | N/A | N/A |
| Home Fashions | 245 | 0.0% | 282 | 0.0% | (36) | (0.0%) | 51.7% | 52.7% | (1.0%) | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total Miscellaneous** | **70,200** | **1.8%** | **85,519** | **1.9%** | **(15,319)** | **(0.1%)** | **30.1%** | **27.9%** | **2.2%** | **5.5** | **5.5** | **0.0** | **66** | **66** | **(0)** |
| **Additional Kmart Divisions** | | | | | | | | | | | | | | | |
| RTW | 1,353 | 0.0% | 1,356 | 0.0% | (3) | 0.0% | 51.1% | 46.5% | 4.6% | N/A | N/A | N/A | N/A | N/A | N/A |
| S Child Apprl | 171 | 0.0% | 174 | 0.0% | (3) | 0.0% | 37.4% | 43.2% | (5.8%) | N/A | N/A | N/A | N/A | N/A | N/A |
| S Boy/Grl Ap | 285 | 0.0% | 268 | 0.0% | 17 | 0.0% | 64.1% | 59.5% | 4.6% | N/A | N/A | N/A | N/A | N/A | N/A |
| Mens Apparel | 640 | 0.0% | 513 | 0.0% | 127 | 0.0% | 52.3% | 53.2% | (0.9%) | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total Additional Kmart Divisions** | **2,448** | **0.1%** | **2,311** | **0.1%** | **137** | **0.0%** | **52.0%** | **49.2%** | **2.7%** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |
| **Total (1) (2)** | **$3,976,864** | **100.0%** | **$4,477,097** | **100.0%** | **($500,233)** | **-** | **28.2%** | **29.2%** | **(1.0%)** | **2.5** | **2.6** | **(0.0)** | **144** | **141** | **3** |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

**Exhibit C-2a**

HIGHLY CONFIDENTIAL

**JX 104-47**

**Exhibits** | Inventory Appraisal

TIGER

### Sears Holdings Corporation
### Sears Full Line Stores
Operating Metrics Comparison
12 Months Ending September 2018 vs. June 2018
($ in 000s)

| Classification | Net Sales $ | | | | | | Gross Margin % | | | Inventory Turnover | | | Days' Sales in Inventory | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep 2018 | | Jun 2018 | | Change | | Sep 2018 | Jun 2018 | Pct. Pt. Chg. | Sep 2018 | Jun 2018 | Chg. | Sep 2018 | Jun 2018 | Days Chg. |
| | $ | % of Total | $ | % of Total | $ | % of Total | | | | | | | | | |
| **Home** | | | | | | | | | | | | | | | |
| Housewares | $59,162 | 1.2% | $63,700 | 1.2% | ($4,539) | (0.0%) | 10.8% | 12.2% | (1.5%) | 2.0 | 2.0 | (0.0) | 183 | 180 | 3 |
| Nursery Stock | 69 | 0.0% | 61 | 0.0% | 8 | 0.0% | (7.5%) | (9.4%) | 1.9% | N/A | N/A | N/A | N/A | N/A | N/A |
| Luggage | 13,978 | 0.3% | 14,997 | 0.3% | (1,018) | (0.0%) | 39.4% | 35.3% | 4.1% | 1.4 | 1.6 | (0.1) | 253 | 231 | 22 |
| Floorcare, Sewing | 82,366 | 1.7% | 89,148 | 1.7% | (6,781) | (0.0%) | 34.0% | 34.7% | (0.7%) | 1.6 | 1.8 | (0.2) | 226 | 205 | 21 |
| Window | 7,491 | 0.2% | 8,138 | 0.2% | (647) | (0.0%) | 11.4% | 17.9% | (6.4%) | 2.3 | 2.2 | 0.1 | 157 | 165 | (8) |
| Floor Coverings | 1,450 | 0.0% | 1,381 | 0.0% | 69 | 0.0% | (2.4%) | 1.5% | (3.9%) | 2.3 | 1.6 | 0.7 | 159 | 228 | (69) |
| Lawn,Garden,Patio | 357,754 | 7.3% | 397,495 | 7.5% | (39,741) | (0.3%) | 15.2% | 15.1% | 0.1% | 2.5 | 2.1 | 0.5 | 144 | 177 | (33) |
| Mattresses | 236,821 | 4.8% | 263,322 | 5.0% | (26,501) | (0.2%) | 47.7% | 48.9% | (1.2%) | 3.0 | 2.6 | 0.4 | 122 | 139 | (17) |
| Bed And Bath | 77,856 | 1.6% | 78,071 | 1.5% | (215) | 0.1% | 30.3% | 30.6% | (0.3%) | 1.5 | 1.7 | (0.2) | 239 | 217 | 22 |
| **Total Home** | 836,946 | 17.0% | 916,313 | 17.4% | (79,366) | (0.4%) | 27.7% | 28.2% | (0.5%) | 2.2 | 2.0 | 0.2 | 163 | 179 | (15) |
| **Hardlines** | | | | | | | | | | | | | | | |
| Home Office | 3,043 | 0.1% | 3,888 | 0.1% | (845) | (0.0%) | (2.5%) | (8.2%) | 5.6% | 2.4 | 2.6 | (0.2) | 155 | 141 | 14 |
| Tools | 439,420 | 8.9% | 466,925 | 8.8% | (27,504) | 0.1% | 24.8% | 24.9% | (0.1%) | 2.0 | 2.6 | (0.6) | 179 | 140 | 39 |
| Cooking And Cleanup | 399,274 | 8.1% | 424,306 | 8.0% | (25,032) | 0.1% | 21.4% | 21.9% | (0.5%) | 3.1 | 2.5 | 0.6 | 117 | 146 | (29) |
| Laundry | 528,234 | 10.7% | 578,212 | 11.0% | (49,978) | (0.2%) | 27.0% | 25.6% | 1.3% | 4.5 | 3.0 | 1.5 | 82 | 121 | (40) |
| Paint | 2,118 | 0.0% | 2,071 | 0.0% | 47 | 0.0% | 5.0% | 8.1% | (3.1%) | 1.2 | 1.1 | 0.1 | 315 | 336 | (20) |
| Water Treatment | 5,887 | 0.1% | 6,621 | 0.1% | (734) | (0.0%) | 40.8% | 40.2% | 0.6% | 1.2 | 1.5 | (0.3) | 315 | 248 | 67 |
| Electrical Components | 12,956 | 0.3% | 13,705 | 0.3% | (747) | 0.0% | 21.8% | 20.9% | 0.9% | 1.4 | 2.8 | (1.5) | 264 | 128 | 136 |
| Plumbing & Heating | 47,374 | 1.0% | 47,108 | 0.9% | 266 | 0.1% | 32.7% | 33.4% | (0.7%) | 1.7 | 1.0 | 0.7 | 219 | 381 | (161) |
| Food Storage | 579,524 | 11.8% | 625,058 | 11.8% | (45,534) | (0.1%) | 13.8% | 14.5% | (0.8%) | 3.9 | 2.9 | 1.0 | 93 | 126 | (34) |
| Audio/Visual | 13,524 | 0.3% | 19,845 | 0.4% | (6,320) | (0.1%) | (11.8%) | (12.2%) | 0.4% | 1.8 | 4.8 | (3.0) | 204 | 76 | 129 |
| DVD | 364 | 0.0% | 332 | 0.0% | 32 | 0.0% | 13.9% | 18.9% | (5.0%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Bathrm Fixturs & Plumbng Acc | 360 | 0.0% | 479 | 0.0% | (120) | (0.0%) | 1.3% | 7.0% | (10.4%) | 2.3 | 1.8 | 0.6 | 156 | 205 | (49) |
| **Total Hardlines** | 2,032,081 | 41.3% | 2,188,550 | 41.5% | (156,469) | (0.2%) | 21.5% | 21.4% | 0.1% | 3.1 | 2.7 | 0.4 | 118 | 136 | (18) |
| **Apparel** | | | | | | | | | | | | | | | |
| Junior Apparel | 40,614 | 0.8% | 40,158 | 0.8% | 456 | 0.1% | 19.6% | 16.7% | 2.9% | 2.8 | 3.0 | (0.2) | 130 | 121 | 9 |
| Costume Jewelry | 15,683 | 0.3% | 16,186 | 0.3% | (503) | 0.0% | 34.6% | 35.8% | (1.2%) | 1.6 | 1.5 | 0.1 | 233 | 250 | (17) |
| Sportswear | 190,059 | 3.9% | 209,275 | 4.0% | (19,216) | (0.1%) | 26.6% | 23.2% | 3.4% | 3.0 | 4.1 | (1.1) | 122 | 88 | 34 |
| Special Sizes | 67,561 | 1.4% | 75,660 | 1.4% | (8,099) | (0.1%) | 26.9% | 23.1% | 3.8% | 3.2 | 4.7 | (1.5) | 113 | 77 | 36 |
| Outerwear | 23,286 | 0.5% | 24,610 | 0.5% | (1,324) | 0.0% | 34.0% | 31.8% | 2.2% | 2.7 | 38.7 | (36.0) | 135 | 9 | 126 |
| Bras/Panties/Daywear | 72,353 | 1.5% | 74,321 | 1.4% | (1,968) | 0.1% | 29.5% | 30.4% | (0.9%) | 0.9 | 1.0 | (0.1) | 403 | 379 | 24 |
| Lands End Ready To Wear | 85,579 | 1.7% | 92,847 | 1.8% | (7,267) | (0.0%) | 39.6% | 39.8% | (0.3%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Infants/Child Wear | 71,789 | 1.5% | 77,714 | 1.5% | (5,925) | (0.0%) | 27.6% | 25.0% | 2.6% | 2.3 | 3.0 | (0.7) | 160 | 123 | 37 |
| Dresses | 17,637 | 0.4% | 19,713 | 0.4% | (2,076) | (0.0%) | 13.5% | 13.6% | (0.1%) | 3.2 | 3.4 | (0.2) | 114 | 108 | 6 |
| Mens Furnishings | 62,386 | 1.3% | 65,002 | 1.2% | (2,616) | 0.0% | 34.0% | 35.8% | (1.8%) | 2.0 | 2.4 | (0.4) | 181 | 150 | 31 |
| Children's Footwear | 43,646 | 0.9% | 46,609 | 0.9% | (2,964) | 0.0% | 25.5% | 20.7% | 4.8% | 1.4 | 1.9 | (0.5) | 261 | 189 | 72 |
| Sleepwear/Robes | 45,295 | 0.9% | 48,203 | 0.9% | (2,908) | 0.0% | 29.8% | 27.9% | 1.9% | 2.0 | 3.1 | (1.0) | 180 | 119 | 61 |
| Lands End Mens | 15,396 | 0.3% | 16,878 | 0.3% | (1,481) | (0.0%) | 35.1% | 35.2% | (0.1%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Boys Wear | 78,284 | 1.6% | 85,238 | 1.6% | (6,954) | (0.0%) | 31.7% | 30.6% | 1.1% | 2.1 | 2.6 | (0.5) | 172 | 141 | 30 |
| Mens Sportswear | 325,322 | 6.6% | 335,548 | 6.4% | (10,226) | 0.2% | 30.5% | 29.6% | 0.9% | 2.2 | 2.5 | (0.3) | 166 | 147 | 19 |
| Licensed Business Apparel | 104,513 | 2.1% | 111,127 | 2.1% | (6,614) | 0.0% | 27.9% | 25.7% | 2.2% | 2.9 | 3.6 | (0.7) | 126 | 102 | 24 |
| Fine Jewelry | 143,628 | 2.9% | 146,908 | 2.8% | (3,280) | 0.1% | 32.0% | 33.1% | (1.1%) | 1.4 | 1.4 | (0.0) | 265 | 258 | 7 |
| Mens Dress Clothes | 35,341 | 0.7% | 38,383 | 0.7% | (3,042) | (0.0%) | 41.9% | 41.2% | 0.7% | 1.5 | 2.0 | (0.5) | 241 | 181 | 60 |
| Lands End Childrens | 15,836 | 0.3% | 18,275 | 0.3% | (2,438) | (0.0%) | 30.9% | 33.0% | (2.0%) | N/A | N/A | N/A | N/A | N/A | N/A |
| Children's Hardlines | 12,503 | 0.3% | 13,322 | 0.3% | (819) | 0.0% | 9.1% | 12.2% | (3.1%) | 1.2 | 1.4 | (0.3) | 316 | 254 | 62 |
| Womens Shoes | 74,326 | 1.5% | 75,463 | 1.4% | (1,136) | 0.1% | 26.7% | 22.6% | 4.1% | 1.7 | 3.0 | (1.3) | 214 | 122 | 92 |
| Mens Shoes | 171,873 | 3.5% | 175,874 | 3.3% | (4,001) | 0.2% | 40.1% | 39.3% | 0.8% | 1.5 | 1.6 | (0.1) | 241 | 230 | 12 |
| Fragrance & Bath | 34,649 | 0.7% | 35,428 | 0.7% | (779) | 0.0% | 20.3% | 17.5% | 2.8% | 2.2 | 2.1 | 0.1 | 166 | 176 | (10) |
| Hosiery | 15,300 | 0.3% | 15,676 | 0.3% | (375) | 0.0% | 35.5% | 38.4% | (2.9%) | 1.6 | 1.8 | (0.2) | 228 | 203 | 25 |
| Adult Athletics | 46,224 | 0.9% | 48,598 | 0.9% | (2,374) | 0.0% | 24.3% | 22.5% | 1.8% | 1.2 | 1.4 | (0.2) | 298 | 254 | 44 |
| Girls Wear | 71,857 | 1.5% | 79,069 | 1.5% | (7,212) | (0.0%) | 27.4% | 25.9% | 1.5% | 2.7 | 3.3 | (0.6) | 135 | 111 | 24 |
| Lands End Footwear | 1,581 | 0.0% | 1,908 | 0.0% | (327) | (0.0%) | 73.2% | 36.3% | 36.9% | N/A | N/A | N/A | N/A | N/A | N/A |
| Handbags | 49,459 | 1.0% | 51,652 | 1.0% | (2,193) | 0.0% | 37.1% | 36.3% | 0.8% | 2.1 | 2.4 | (0.3) | 176 | 153 | 24 |
| **Total Apparel** | 1,931,981 | 39.2% | 2,039,646 | 38.6% | (107,665) | 0.6% | 30.6% | 29.2% | 1.4% | 2.0 | 2.5 | (0.4) | 179 | 149 | 30 |
| **General Merchandise** | | | | | | | | | | | | | | | |
| Sporting Goods | 107,147 | 2.2% | 116,923 | 2.2% | (9,776) | (0.0%) | 25.2% | 25.7% | (0.5%) | 1.4 | 1.5 | (0.2) | 264 | 236 | 28 |
| Health And Beauty | 194 | 0.0% | 134 | 0.0% | 59 | 0.0% | 28.1% | (12.5%) | 40.5% | 0.4 | 0.5 | (0.2) | 954 | 669 | 286 |
| Toys | 5,477 | 0.1% | 4,642 | 0.1% | 835 | 0.0% | 4.0% | 1.7% | 2.4% | 0.2 | 2.0 | (1.7) | 1,568 | 185 | 1,384 |
| Pantry And Household | 476 | 0.0% | 703 | 0.0% | (227) | (0.0%) | (133.7%) | (79.2%) | (54.5%) | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total General Merchandise** | 113,294 | 2.3% | 122,402 | 2.3% | (9,108) | (0.0%) | 23.5% | 24.1% | (0.6%) | 1.1 | 1.6 | (0.5) | 341 | 231 | 110 |
| **Miscellaneous** | | | | | | | | | | | | | | | |
| Furniture-In Store | 4,007 | 0.1% | 3,860 | 0.1% | 147 | 0.0% | 36.1% | 36.4% | (0.3%) | N/A | N/A | N/A | N/A | N/A | N/A |
| General Merchandise | 4,388 | 0.1% | 5,780 | 0.1% | (1,392) | (0.0%) | 17.9% | 43.7% | (25.7%) | 2.4 | 2.4 | 0.0 | 150 | 153 | (3) |
| Miscellaneous | 794 | 0.0% | 659 | 0.0% | 135 | 0.0% | (35.7%) | (49.0%) | 13.3% | N/A | N/A | N/A | N/A | N/A | N/A |
| **Total Miscellaneous** | 9,189 | 0.2% | 10,299 | 0.2% | (1,110) | (0.0%) | 21.2% | 35.0% | (13.8%) | 2.1 | 1.6 | 0.5 | 171 | 229 | (59) |
| **Automotive** | | | | | | | | | | | | | | | |
| Automotive | 2,051 | 0.0% | 2,037 | 0.0% | 14 | 0.0% | 30.1% | 37.4% | (7.4%) | 6.2 | 4.7 | 1.5 | 59 | 77 | (19) |
| **Total (1) (2)** | $4,925,542 | 100.0% | $5,279,246 | 100.0% | ($353,703) | - | 26.1% | 25.7% | 0.5% | 2.4 | 2.4 | (0.1) | 154 | 150 | 3 |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Exhibit C-2b

HIGHLY CONFIDENTIAL

**JX 104-48**

*Exhibits* | **Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

## Sears Holdings Corporation
### Sears Auto Centers
Operating Metrics Comparison
12 Months Ending September 2018 vs. June 2018
($ in 000s)

| Classification | Net Sales $ | | | | | | Gross Margin % | | | Inventory Turnover | | | Days' Sales in Inventory | | |
| | Sep 2018 | | Jun 2018 | | Change | | Sep 2018 | Jun 2018 | Pct. Pt. Chg. | Sep 2018 | Jun 2018 | Chg. | Sep 2018 | Jun 2018 | Days Chg. |
| | $ | % of Total | $ | % of Total | $ | % of Total | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Automotive** | | | | | | | | | | | | | | | |
| Automotive | $139,293 | 47.7% | $151,151 | 47.9% | ($11,858) | (0.2%) | 44.1% | 46.0% | (1.9%) | 7.1 | 6.8 | 0.2 | 52 | 53 | (2) |
| Tires | 152,554 | 52.3% | 164,451 | 52.1% | (11,896) | 0.2% | 13.7% | 15.6% | (1.9%) | 2.6 | 2.6 | 0.0 | 141 | 143 | (2) |
| **Total (1) (2)** | **$291,847** | **100.0%** | **$315,602** | **100.0%** | **($23,754)** | **-** | **28.2%** | **30.2%** | **(2.0%)** | **3.4** | **3.3** | **0.1** | **108** | **110** | **(2)** |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Exhibit C-2c

**Exhibits** | Inventory Appraisal

**TIGER**

HIGHLY CONFIDENTIAL

SEARS_507B_00001394
**JX 104-50**

## Sears Holdings Corporation
### Total Company
### Net Sales Seasonality
### For the 12 Months Ending September 2018
($ in 000s)

| Month | Sales $ | No. of Stores | No. of Weeks | Sales Per Store Week $ | % to Total |
|-------|---------|---------------|--------------|------------------------|------------|
| October 2017 | $695,335 | 1,569 | 4 | $110.8 | 7.2% |
| November | 1,022,602 | 1,542 | 4 | 165.8 | 10.8% |
| December | 1,375,746 | 1,468 | 5 | 187.4 | 12.2% |
| January | 758,162 | 1,428 | 5 | 106.2 | 6.9% |
| February | 642,709 | 1,419 | 4 | 113.2 | 7.4% |
| March 2018 | 755,311 | 1,412 | 5 | 107.0 | 7.0% |
| April 2018 | 557,178 | 1,310 | 4 | 106.3 | 6.9% |
| May | 681,260 | 1,287 | 4 | 132.3 | 8.6% |
| June | 836,631 | 1,276 | 5 | 131.1 | 8.6% |
| July | 607,777 | 1,213 | 4 | 125.3 | 8.2% |
| August | 606,073 | 1,181 | 4 | 128.3 | 8.4% |
| September 2018 | 655,469 | 1,095 | 5 | 119.7 | 7.8% |
| **Total (1) (2)** | **$9,194,254** | | **53** | **$1,533.5** | **100.0%** |
| **Average** | **$766,188** | **1,349** | | **$127.8** | |

Note(s):
(1) Percentages (%) and dollars ($) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

Source(s):
"Item 34 - GM by Div by Month Sep 2018" report and
"Item 35 - Sales by Store - 12 months ended P8FY18" report.

Exhibit D

**Exhibits | Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

## Sears Holdings Corporation
### Kmart Corporation
### Net Sales Seasonality & Comparable Store Sales Trend
### For the 12 Months Ending September 2018 vs. 2017
($ in 000s)

| Month | For the 12 Months Ended September 2018 | | | | | Comparable Store Sales (1) | | | |
| | Sales $ | No. of Stores | No. of Weeks | Sales Per Store Week | | Comp. Sales $ | | Change | |
| | | | | $ | % to Total | TY | LY | $ | % |
|---|---|---|---|---|---|---|---|---|---|
| October | $336,817 | 510 | 4 | $165.1 | 7.5% | $173,451 | $208,691 | ($35,240) | (16.9%) |
| November | 433,172 | 483 | 4 | 224.2 | 10.2% | 223,270 | 255,121 | (31,851) | (12.5%) |
| December | 646,882 | 432 | 5 | 299.5 | 13.6% | 347,727 | 410,552 | (62,824) | (15.3%) |
| January | 329,724 | 432 | 5 | 152.7 | 6.9% | 179,415 | 167,621 | 11,794 | (14.4%) |
| February | 275,965 | 432 | 4 | 159.7 | 7.2% | 145,846 | 166,265 | (20,419) | (12.3%) |
| March | 322,279 | 429 | 5 | 150.2 | 6.8% | 198,472 | 220,705 | (22,233) | (10.1%) |
| April | 227,534 | 365 | 4 | 155.8 | 7.1% | 158,036 | 194,064 | (36,028) | (18.6%) |
| May | 261,449 | 364 | 4 | 179.6 | 8.2% | 179,152 | 193,657 | (14,505) | (7.5%) |
| June | 351,266 | 363 | 5 | 193.5 | 8.8% | 239,579 | 253,040 | (13,461) | (5.3%) |
| July | 264,341 | 360 | 4 | 183.6 | 8.3% | 176,599 | 197,672 | (21,073) | (10.7%) |
| August | 249,654 | 356 | 4 | 175.3 | 8.0% | 171,121 | 175,399 | (4,278) | (2.4%) |
| September | 277,782 | 339 | 5 | 163.9 | 7.4% | 195,379 | 195,712 | (333) | (0.2%) |
| Total (2) (3) | $3,976,864 | | 53 | $2,203.1 | 100.0% | $2,388,048 | $2,638,498 | ($250,450) | (11.2%) |
| Average | $331,405 | 405 | | $183.6 | | $45,058 | $50,740 | ($5,683) | |

| | | | |
|---|---|---|---|
| 6-Month Trend: | $1,119,866 | $1,209,544 | ($89,677) | (7.4%) |

Note(s):
(1) Comparable store sales represent go-forward locations only.
(2) Percentages (%) and dollars ($) may not add due to rounding.
(3) This Exhibit should be read in conjunction with the full written report.

Source(s):
"Item 34 - GM by Div by Month Sep 2018" report and "Item 35 - Sales by Store - 12 months ended P8FY18" report.

SEARS_507B_00001395
JX 104-51

Exhibit D-1a

HIGHLY CONFIDENTIAL

*Exhibits* | **Inventory Appraisal**

**TIGER**

## Sears Holdings Corporation
### Sears Full Line Stores
#### Net Sales Seasonality & Comparable Store Sales Trend
#### For the 12 Months Ending September 2018 vs. 2017
($ in 000s)

| Month | For the 12 Months Ended September 2018 (1) | | | | | Comparable Store Sales (1) (2) | | | |
| | Sales $ | No. of Stores | No. of Weeks | Sales Per Store Week | | Comp. Sales $ | | Change | |
| | | | | $ | % to Total | TY | LY | $ | % |
|---|---|---|---|---|---|---|---|---|---|
| October | $332,551 | 574 | 4 | $144.8 | 6.8% | $176,576 | $213,114 | ($36,537) | (17.1%) |
| November | 560,110 | 574 | 4 | 244.0 | 11.5% | 300,368 | 350,250 | (49,883) | (14.2%) |
| December | 693,036 | 574 | 5 | 241.5 | 11.3% | 367,812 | 452,417 | (84,605) | (18.7%) |
| January | 400,002 | 551 | 5 | 145.2 | 6.8% | 205,326 | 197,533 | 7,793 | (16.8%) |
| February | 346,503 | 550 | 4 | 157.5 | 7.4% | 175,328 | 204,006 | (28,678) | (14.1%) |
| March | 407,129 | 547 | 5 | 148.9 | 7.0% | 217,730 | 257,667 | (39,937) | (15.5%) |
| April | 309,794 | 509 | 4 | 152.2 | 7.1% | 176,196 | 212,518 | (36,322) | (17.1%) |
| May | 399,455 | 509 | 4 | 196.2 | 9.2% | 219,876 | 226,584 | (6,708) | (3.0%) |
| June | 460,549 | 507 | 5 | 181.7 | 8.5% | 248,669 | 294,977 | (46,308) | (15.7%) |
| July | 324,145 | 486 | 4 | 166.7 | 7.8% | 175,495 | 205,985 | (30,491) | (14.8%) |
| August | 337,385 | 471 | 4 | 179.1 | 8.4% | 194,508 | 198,318 | (3,810) | (1.9%) |
| September | 354,883 | 414 | 5 | 171.4 | 8.1% | 223,460 | 252,803 | (29,343) | (11.6%) |
| **Total (3) (4)** | **$4,925,542** | | **53** | **$2,129.1** | **100.0%** | **$2,681,343** | **$3,066,171** | **($384,828)** | **(14.2%)** |
| **Average** | **$410,462** | **522** | | **$177.4** | | **$50,591** | **$58,965** | **($8,373)** | |

| 6-Month Trend: | $1,238,204 | $1,391,184 | ($152,980) | (11.0%) |
|---|---|---|---|---|

Note(s):
(1) Sales, store count and comparable store sales include Grand/Essentials stores.
(2) Comparable store sales represent go-forward locations only.
(3) Percentages (%) and dollars ($) may not add due to rounding.
(4) This Exhibit should be read in conjunction with the full written report.

Source(s):
"Item 34 - GM by Div by Month Sep 2018" report and "Item 35 - Sales by Store - 12 months ended P8FY18" report.

SEARS_507B_00001396
JX 104-52

Exhibit D-1b

*Exhibits* | **Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

## Sears Holdings Corporation
### Sears Auto Centers
### Net Sales Seasonality & Comparable Store Sales Trend
### For the 12 Months Ending September 2018 vs. 2017
($ in 000s)

| Month | For the 12 Months Ended September 2018 | | | | | Comparable Store Sales (1) | | | |
| | Sales $ | No. of Stores | No. of Weeks | Sales Per Store Week | | Comp. Sales $ | | Change | |
| | | | | $ | % to Total | TY | LY | $ | % |
|---|---|---|---|---|---|---|---|---|---|
| October | $25,967 | 485 | 4 | $13.4 | 8.6% | $14,356 | $17,258 | ($2,903) | (16.8%) |
| November | 29,321 | 485 | 4 | 15.1 | 9.7% | 16,389 | 19,982 | (3,592) | (18.0%) |
| December | 35,828 | 462 | 5 | 15.5 | 9.9% | 20,349 | 25,668 | (5,320) | (20.7%) |
| January | 28,436 | 445 | 5 | 12.8 | 8.2% | 16,664 | 15,327 | 1,337 | (13.0%) |
| February | 20,242 | 437 | 4 | 11.6 | 7.4% | 12,142 | 14,213 | (2,072) | (14.6%) |
| March | 25,903 | 436 | 5 | 11.9 | 7.6% | 16,078 | 18,874 | (2,797) | (14.8%) |
| April | 19,850 | 436 | 4 | 11.4 | 7.3% | 12,406 | 14,730 | (2,325) | (15.8%) |
| May | 20,356 | 414 | 4 | 12.3 | 7.9% | 13,229 | 14,851 | (1,623) | (10.9%) |
| June | 24,816 | 406 | 5 | 12.2 | 7.8% | 16,614 | 18,937 | (2,323) | (12.3%) |
| July | 19,291 | 367 | 4 | 13.1 | 8.4% | 13,234 | 14,892 | (1,659) | (11.1%) |
| August | 19,034 | 354 | 4 | 13.4 | 8.6% | 13,468 | 14,277 | (809) | (5.7%) |
| September | 22,804 | 342 | 5 | 13.3 | 8.5% | 16,646 | 17,476 | (830) | (4.7%) |
| **Total (2) (3)** | **$291,847** | | **53** | **$156.1** | **100.0%** | **$181,573** | **$206,487** | **($24,914)** | **(13.7%)** |
| **Average** | **$24,321** | **422** | | **$13.0** | | **$3,426** | **$3,971** | **($545)** | |

| | 6-Month Trend: | $85,596 | $95,164 | ($9,568) | (7.1%) |
|---|---|---|---|---|---|

**Note(s):**
(1) Comparable store sales represent go-forward locations only.
(2) Percentages (%) and dollars ($) may not add due to rounding.
(3) This Exhibit should be read in conjunction with the full written report.

**Source(s):**
"Item 34 - GM by Div by Month Sep 2018" report and "Item 35 - Sales by Store - 12 months ended P8FY18" report.

SEARS_507B_00001397
JX 104-53

Exhibit D-1c

**Exhibits | Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

### Sears Holdings Corporation
### Total Company
#### 12 Months Ending September 2018 vs. September 2017
($ in 000s)



Sales Per Store Week



Comparable Stores Sales

SEARS_507B_00001398
**JX 104-54**

Exhibit D-2

**Exhibits** | **Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

### Sears Holdings Corporation
### Kmart Corporation
12 Months Ending September 2018 vs. September 2017
($ in 000s)





SEARS_507B_0001399
**JX 104-55**

Exhibit D-2a

*Exhibits* | **Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

### Sears Holdings Corporation
### Sears Full Line Stores
12 Months Ending September 2018 vs. September 2017
($ in 000s)





SEARS_507B_00001400
**JX 104-56**

Exhibit D-2b

**Exhibits** | **Inventory Appraisal**

**TIGER**

HIGHLY CONFIDENTIAL

## Sears Holdings Corporation
### Sears Auto Centers
12 Months Ending September 2018 vs. September 2017
($ in 000s)





SEARS_507B_00001401
**JX 104-57**

Exhibit D-2c

*Exhibits* | **Inventory Appraisal**

TIGER

### Sears Holdings Corporation
#### Total Company
#### Inventory History
#### For the 12 Months Ending September 2018 vs. 2017
($ in 000s)

**12 Months Ending September 2018 (1) (2) (3)**

| Month | Kmart Corporation | | | | Sears Full Line Stores | | | | Sears Auto Centers | | | |
| | Inventory at Cost | No. of Stores | Cost Inv. Per Store | | Inventory at Cost | No. of Stores | Cost Inv. Per Store | | Inventory at Cost | No. of Stores | Cost Inv. Per Store | |
| | | | Cost $ | % to Avg. | | | Cost $ | % to Avg. | | | Cost $ | % to Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October 2017 | $1,451,934 | 510 | $2,847 | 102.6% | $1,740,286 | 574 | $3,032 | 103.5% | $72,449 | 485 | $149 | 102.1% |
| November | 1,330,811 | 483 | 2,755 | 99.3% | 1,766,220 | 574 | 3,077 | 105.0% | 72,286 | 485 | 149 | 101.9% |
| December | 1,128,286 | 432 | 2,612 | 94.2% | 1,551,855 | 574 | 2,704 | 92.3% | 70,233 | 462 | 152 | 103.9% |
| January | 1,126,045 | 432 | 2,607 | 94.0% | 1,503,664 | 551 | 2,729 | 93.1% | 68,125 | 445 | 153 | 104.7% |
| February | 1,089,989 | 432 | 2,523 | 91.0% | 1,502,967 | 550 | 2,733 | 93.2% | 64,743 | 437 | 148 | 101.3% |
| March 2018 | 1,075,241 | 429 | 2,506 | 90.4% | 1,532,933 | 547 | 2,802 | 95.6% | 61,224 | 436 | 140 | 96.0% |
| April 2018 | 1,059,301 | 365 | 2,902 | 104.6% | 1,556,809 | 509 | 3,059 | 104.4% | 62,150 | 436 | 143 | 97.5% |
| May | 1,041,894 | 364 | 2,862 | 103.2% | 1,523,984 | 509 | 2,994 | 102.2% | 59,648 | 414 | 144 | 98.5% |
| June | 1,030,025 | 363 | 2,838 | 102.3% | 1,467,215 | 507 | 2,894 | 98.7% | 57,970 | 406 | 143 | 97.6% |
| July | 1,052,359 | 360 | 2,923 | 105.4% | 1,430,941 | 486 | 2,944 | 100.5% | 54,583 | 367 | 149 | 101.7% |
| August | 1,056,315 | 356 | 2,967 | 107.0% | 1,395,244 | 471 | 2,962 | 101.1% | 51,651 | 354 | 146 | 99.8% |
| September 2018 | 1,052,187 | 339 | 3,104 | 111.9% | 1,391,071 | 414 | 3,360 | 114.7% | 46,308 | 342 | 135 | 92.6% |
| **Average** | **$1,124,532** | **405** | **$2,774** | **100.0%** | **$1,530,266** | **522** | **$2,931** | **100.0%** | **$61,781** | **422** | **$146** | **100.0%** |

**12 Months Ending September 2017 (1) (2) (3)**

| Month | Kmart Corporation | | | | Sears Full Line Stores | | | | Sears Auto Centers | | | |
| | Inventory at Cost | No. of Stores | Cost Inv. Per Store | | Inventory at Cost | No. of Stores | Cost Inv. Per Store | | Inventory at Cost | No. of Stores | Cost Inv. Per Store | |
| | | | Cost $ | % to Avg. | | | Cost $ | % to Avg. | | | Cost $ | % to Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October 2016 | $2,302,939 | 801 | $2,847 | 113.5% | $2,274,174 | 678 | $3,354 | 109.3% | $75,142 | 623 | $121 | 97.4% |
| November | 2,177,551 | 799 | 2,725 | 107.5% | 2,288,202 | 676 | 3,385 | 110.3% | 74,234 | 622 | 119 | 96.4% |
| December | 1,855,405 | 799 | 2,322 | 91.6% | 2,012,085 | 674 | 2,985 | 97.3% | 69,756 | 622 | 112 | 90.6% |
| January | 1,793,366 | 735 | 2,440 | 96.3% | 1,997,264 | 672 | 2,972 | 96.9% | 69,044 | 620 | 111 | 89.9% |
| February | 1,690,382 | 734 | 2,303 | 90.9% | 1,995,802 | 669 | 2,983 | 97.2% | 68,851 | 587 | 117 | 94.7% |
| March 2017 | 1,668,956 | 629 | 2,653 | 104.7% | 1,952,831 | 636 | 3,070 | 100.1% | 69,637 | 586 | 119 | 96.0% |
| April 2017 | 1,632,860 | 624 | 2,617 | 103.3% | 1,978,218 | 628 | 3,150 | 102.7% | 68,257 | 583 | 117 | 94.6% |
| May | 1,593,008 | 623 | 2,557 | 100.9% | 1,997,303 | 627 | 3,185 | 103.8% | 69,837 | 533 | 131 | 105.8% |
| June | 1,510,979 | 619 | 2,441 | 96.3% | 1,906,336 | 626 | 3,045 | 99.2% | 69,389 | 522 | 133 | 107.4% |
| July | 1,442,700 | 610 | 2,365 | 93.3% | 1,793,449 | 622 | 2,883 | 94.0% | 68,542 | 506 | 135 | 109.4% |
| August | 1,446,037 | 602 | 2,402 | 94.8% | 1,754,720 | 617 | 2,844 | 92.7% | 68,264 | 499 | 137 | 110.5% |
| September 2017 | 1,468,539 | 547 | 2,685 | 105.9% | 1,699,005 | 582 | 2,919 | 95.1% | 70,068 | 490 | 143 | 115.5% |
| **Average** | **$1,715,227** | **677** | **$2,534** | **100.0%** | **$1,970,783** | **642** | **$3,069** | **100.0%** | **$70,085** | **566** | **$124** | **100.0%** |

**Change (1) (2) (3)**

| Month | Kmart Corporation | | | | Sears Full Line Stores | | | | Sears Auto Centers | | | |
| | Inventory at Cost | No. of Stores | Cost Inv. Per Store | | Inventory at Cost | No. of Stores | Cost Inv. Per Store | | Inventory at Cost | No. of Stores | Cost Inv. Per Store | |
| | | | Cost $ | % Chg. | | | Cost $ | % Chg. | | | Cost $ | % Chg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October | ($851,005) | (291) | ($28) | (1.0%) | ($533,889) | (104) | ($322) | (9.6%) | ($2,693) | (138) | $29 | 23.8% |
| November | (846,740) | (316) | 30 | 1.1% | (521,982) | (102) | (308) | (9.1%) | (1,947) | (137) | 30 | 24.9% |
| December | (727,119) | (367) | 290 | 12.5% | (460,229) | (100) | (282) | (9.4%) | 476 | (160) | 40 | 35.6% |
| January | (667,320) | (303) | 167 | 6.8% | (493,600) | (121) | (243) | (8.2%) | (918) | (175) | 42 | 37.5% |
| February | (600,393) | (302) | 220 | 9.6% | (492,835) | (119) | (251) | (8.4%) | (4,108) | (150) | 31 | 26.3% |
| March | (593,716) | (200) | (147) | (5.5%) | (419,898) | (89) | (268) | (8.7%) | (8,413) | (150) | 22 | 18.2% |
| April | (573,559) | (259) | 285 | 10.9% | (421,410) | (119) | (91) | (2.9%) | (6,107) | (147) | 25 | 21.8% |
| May | (551,114) | (259) | 305 | 11.9% | (473,319) | (118) | (191) | (6.0%) | (10,189) | (119) | 13 | 10.0% |
| June | (480,954) | (256) | 397 | 16.2% | (439,121) | (119) | (151) | (5.0%) | (11,419) | (116) | 10 | 7.4% |
| July | (390,341) | (250) | 558 | 23.6% | (362,508) | (136) | 61 | 2.1% | (13,959) | (139) | 13 | 9.8% |
| August | (389,722) | (246) | 565 | 23.5% | (359,476) | (146) | 118 | 4.2% | (16,613) | (145) | 9 | 6.7% |
| September | (416,352) | (208) | 419 | 15.6% | (307,934) | (168) | 441 | 15.1% | (23,760) | (148) | (8) | (5.3%) |
| **Average** | **($590,695)** | **(271)** | **$240** | **9.5%** | **($440,517)** | **(120)** | **($138)** | **(4.5%)** | **($8,304)** | **(144)** | **$22** | **18.1%** |

Note(s):
(1) Inventory levels are shown prior to adjustments.
(2) Percentages (%) and dollars ($) may not add due to rounding.
(3) This Exhibit should be read in conjunction with the full written report.

Source(s):
"Item 13, 15, 16 – InvatCostbyDivbyMonthSep18" report.

Exhibit E

HIGHLY CONFIDENTIAL

JX 104-58

*Exhibits* | **Inventory Appraisal**

**TIGER**

## Sears Holdings Corporation
### Total Company
### Inventory Forecast
#### For the 3 Months Ending December 2018
(\$ in 000s)

| Classification | Oct 2018 | Nov 2018 | Dec 2018 |
|---|---|---|---|
| **Domestic stock ledger inventory** | \$2,436,802 | \$2,427,651 | \$1,984,786 |
| **Less: Excluded Inventory** | | | |
| Unshipped Merchandise | 82,000 | 126,000 | 81,000 |
| Consignment | 2,500 | 2,500 | 2,500 |
| Home Services 50% | 58,826 | 59,206 | 59,151 |
| Accting & misc. | 26,383 | 85,212 | 50,520 |
| **Total Excluded Inventory** | 169,709 | 272,918 | 193,171 |
| **Stock ledger net of Exclusions** | \$2,267,094 | \$2,154,732 | \$1,791,615 |
| **Less: Inventory not to be included in Retail Store GOB** | | | |
| Ocean In-Transit | 116,842 | 143,370 | 125,264 |
| Less: Decon to DC inventory | (8,730) | (6,790) | (4,850) |
| Repair Parts | 51,736 | 52,116 | 52,061 |
| Sears Home Improvement | 3,545 | 3,545 | 3,545 |
| Pharmacy | 30,643 | 24,431 | 27,168 |
| Commercial Sales (includes Industrial Tools) | 159 | 159 | 159 |
| Builder Distributors | 26,700 | 25,770 | 24,886 |
| RTV/Damages | 4,402 | 4,402 | 4,402 |
| Restaurant | 349 | 349 | 349 |
| **Inventory Not Included in Retail Store GOB** | 225,646 | 247,352 | 232,985 |
| **Inventory to be Sold on a Wholesale Basis** | 117,534 | 110,772 | 112,571 |
| **Go-Forward Inventory** | \$1,621,391 | \$1,561,806 | \$1,389,177 |
| **Wave 1 Closings** | 340,014 | 266,700 | 114,035 |
| **Wave 2 Closings** | 80,042 | 78,875 | 55,419 |
| **Total Adjusted Inventory to be Included in Retail Store GOB (1) (2)** | \$2,041,447 | \$1,907,381 | \$1,558,630 |

Note(s):
(1) Dollars (\$) may not add due to rounding.
(2) This Exhibit should be read in conjunction with the full written report.

**Exhibit F**

HIGHLY CONFIDENTIAL

*Limitations & Disclaimer* | Inventory Appraisal



TIGER

In addition to the specific assumptions, qualifications, limitations, and disclaimers set forth elsewhere in this Net Orderly Liquidation Value of Inventory Report ("the Report"), the statements and conclusions expressed herein are subject to the following limitations, qualifications, and disclaimer:

1.  No responsibility is assumed for matters of a legal nature which might affect the property that is the subject of this Report or the rights of any person therein or thereon. Without limiting the generality of the foregoing, the annexed Report assumes that the Company has good and marketable title to the property that is the subject of this Report; that such property is not subject to any liens, claims, encumbrances, or impediments to its free transferability; that the property is not subject to any claims by third parties or otherwise the subject of any litigation, arbitration, or other proceedings; that there are no existing or threatened defaults or breaches of any contracts or other agreements with vendors, suppliers, customers, or other parties concerning the subject property; that such property conforms to all statutes, regulations, rules, and codes that might relate to or affect the use, sale, or other disposition of the property (including, without limitation, all product safety rules and regulations applicable to the property); and that the Company is in compliance with all laws and regulations applicable to it and to its business. The Report further assumes that all manufacturers' and other warranties relating to all such property are in place and in full force and effect, and that none of the property is subject to any product recall.

2.  Tiger has not been engaged to review any legal matters or to render any advice of a legal nature. The reader is advised to consult with his or her attorney on rules of law as they apply to the property in question (including as to the disposition thereof). The discussion in this Appendix should be considered neither a list of legal considerations nor legal advice. Tiger recommends that the reader rely on his or her own counsel for legal advice.

3.  The three-month and 12-week pro forma included in the annexed Report ("the Pro Forma") are based upon total inventory, as projected by the Company. Tiger has assumed that the departmental mix (as to type, category, brand, style, and description) for the projected monthly inventories will be similar to that of the most recent appraisal conducted by Tiger with respect to the Company, if applicable. Any difference between the assumed departmental mix and the actual mix of the subject inventory, or between projected liquidation expenses and actual liquidation expenses could alter the outcome of the projected recovery values.

4.  The recovery values projected in the Pro Forma are based upon all of the financial and inventory information which has been supplied by the Company, and Tiger has relied on the truth, accuracy, and completeness of all such information without independent verification, except as otherwise expressly set forth in the Report. Any change in circumstances relating to the Company, the inventory, competitive environment, or market sector in which the Company operates may result in material changes in recoveries on the subject inventory. Such changes in circumstances may include (but are not limited to) material changes in the quantity, quality, mix, and assortment of the inventory; material changes in the Company's sales and margins; material adverse changes in the Company's operations; and the Company's failure to take all normal-course permanent markdowns on inventory. In rendering the Report, Tiger has assumed that the Company will operate in the ordinary course throughout the period to which the Pro Forma relate, and that there will be no material adverse changes in the Company's business.

5.  The Pro Forma assume peaceful use and occupancy of all store locations throughout any liquidation period. In the event that the Company is subject to a bankruptcy proceeding, the Company may not have use of all or any store locations beyond period for rejection or assumption of leases prescribed by the United States Bankruptcy Code. Tiger notes that under the Bankruptcy Code, a debtor is generally required to assume or reject leases of real property within 120 days after the filing of the bankruptcy petition. This may be extended for a period of 90 days by the Bankruptcy Court, but no further extension is permitted unless a lessor should consent to such further extension. There can be no assurance that a Bankruptcy Court will grant an initial extension of the date for the debtor's assumption or rejection of leases, or that any lessor would consent to



any further extension. In the event of a bankruptcy proceeding, these limitations may limit the Company's ability to generate the recoveries described in the Pro Forma herein. Tiger recommends that the reader rely on his or her own counsel for legal advice regarding such matters.

6. It is an express condition of this Report that none of Tiger's affiliates, officers, directors, members, or employees are required to provide testimony or appear in any proceeding regarding this Report, unless otherwise expressly agreed upon by Tiger and the recipient of this Report.

7. The opinions expressed herein as to value are premised on the specific methods of sale contemplated by this Report (including, without limitation, the stated length of sale) and must not be relied upon in conjunction with any other proposed method of disposition of the subject assets.

8. This Report has been prepared in large part based upon information furnished by the Company or other third parties. The accuracy, completeness, and reliability of all such information has been assumed and relied upon by Tiger, and, except as otherwise specifically described herein, Tiger has not independently verified or audited any such information. Tiger makes no representation or warranty as to the completeness or accuracy of information furnished by third parties, and Tiger shall have no liability for the failure of any such information to be complete and correct in any respect.

9. All opinions as to value set forth in this Report are presented as Tiger's considered opinion, based on the facts and data described in this Report and information that has been provided to Tiger. Statements as to value set forth herein are opinions only and are not warranties or representations of fact. No responsibility is assumed for any inability to dispose of the subject assets at the values projected herein, and, except as expressly set forth herein, no representation or warranty is made as to the value or marketability of any such assets. The opinions expressed herein are not a guarantee of future success or performance of any asset disposition that may be undertaken or any decision to sell or not to sell all or any part of the subject assets. Unless otherwise expressly agreed in writing, Tiger does not undertake to update this Report based on any changes of circumstances relative to the Company, the subject assets, the Company's competitive environment, or economic circumstances generally.

10. The opinions expressed in this Report are illustrative of Tiger's view of the net liquidation value of the subject assets, based on the conditions and assumptions set forth in this Report, to be achieved through a competitive auction process involving multiple retail liquidation firm bidders and absent any material and adverse circumstances affecting the liquidation of the subject assets, the auction or sale process, and the retail liquidation industry generally. The opinions expressed in this Report do not constitute an offer by Tiger or its affiliates to provide any liquidation services with respect to the subject assets or otherwise, or a guaranty of the results of any liquidation of the subject assets or the results of any auction or other bidding process with respect to the liquidation of the subject assets, or an indication of Tiger's willingness to participate in any such auction or sale process, or a warranty of any bid that Tiger might submit in any such auction or sale process. The results of any auction or other sale process with respect to the liquidation of the subject assets is dependent upon a variety of factors, including, without limitation, the willingness of retail liquidation firms to participate in any such auction or process; the terms, conditions, and limitations imposed in connection with any such process and any proposed Agency Agreement or other contract or agreement relating thereto; and general business conditions affecting the retail liquidation sector. The retail liquidation industry in the United States is characterized by a limited number of nationally recognized participants. The success of any auction or other sale process relative to the liquidation of the subject assets is dependent upon the creation of a competitive auction environment. With a limited number of potential buyers, the willingness of any one or more retail liquidators to participate aggressively in an auction for the subject assets may be critical to the success of the auction process and the value received with respect to the subject assets. Any individual retail liquidator's willingness to bid or perform services is dependent upon such liquidator's current circumstances, including other ongoing or potential liquidation opportunities, availability of personnel, and constraints of



capital. There can be no assurance that any or all of the bidders in any such process would participate or bid at the levels forecast in this Report.

11. Tiger represents that, except as disclosed in writing to the addressee(s) of this Report, Tiger has no present or contemplated future interest with respect to the Company, the property appraised, or the subject matter of this Report. Tiger's compensation for preparing this Report is not contingent upon the appraised value of the property or the other opinions and conclusions expressed herein.

12. This Report has not been compiled under the standards of any certifying organization or society.

13. This Report does not identify or discuss every contingency, statement, assumption, or condition affecting the Company, the assets subject to this Report, and the disposition thereof, and this Report is limited accordingly. Where appropriate, Tiger has stated the contingencies, statements, and assumptions it has relied upon in the preparation of this Report. All Schedules and Exhibits annexed hereto should be read in conjunction with the body of this Report in order that the underlying assumptions upon which the results are based are fully understood.

14. The opinions expressed herein are valid only for the express and stated purpose of providing information and assistance to the parties to whom this Report is specifically addressed, and are not in any way, implied or expressed, to be construed, used, circulated, quoted, relied upon, or otherwise referred to for any other purpose or by any other person without Tiger's express written authorization. Possession of this Report, or a copy thereof, does not carry with it the right of publication or reliance, which may only be based upon Tiger's express written authorization.

HIGHLY CONFIDENTIAL

# Exhibit 71

HIGHLY CONFIDENTIAL

SEARS_UCC00365797



FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408
CONFIDENTIAL

HOULIHAN LOKEY

FTI CONSULTING

Akin Gump
STRAUSS HAUER & FELD LLP

# Sears Holdings Corporation

ILLUSTRATIVE RECOVERY CONSIDERATIONS

JANUARY 11, 2019 | CONFIDENTIAL



BURIAN -8
Saul Burian
1/30/2019
S. Arielle Santos
CCR-NJ, CLR
LexitasNG

**JOINT EX. 125**
## JX 105-1

HIGHLY CONFIDENTIAL

*FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY*
*SUBJECT TO FRE 408*
*CONFIDENTIAL*

## Statement of Limiting Conditions

This confidential presentation ("Presentation") has been prepared by Houlihan Lokey ("Houlihan Lokey," "Houlihan," or "HL"), FTI Consulting ("FTI"), and Akin Gump Strauss Hauer & Feld ("Akin", and together, the "UCC Advisors") for settlement and discussion purposes in respect of Sears Holdings Corporation (together with its subsidiaries, "Sears", the "Debtors", or the "Company") only and is subject to Rule 408 of the Federal Rules of Evidence and other rules of similar import. The content contained herein is the property of the UCC Advisors. This Presentation may not be copied or distributed without the express consent of the UCC Advisors. By your receipt and review of these materials, you agree to be bound by the terms of this Statement of Limiting Conditions, which are in addition to your confidentiality obligations to the Company.

This Presentation shall not be considered to form part of any offer for purchase, sale or subscription of or solicitation or invitation of any offer to buy, sell or subscribe for any securities, or to be a commitment by any party to enter into a transaction or transactions on the terms described herein.

Distribution of this document or disclosure of any Confidential Information set forth herein to any party other than the intended recipient of this Presentation is expressly prohibited without the prior written authorization of the UCC Advisors.

SEARS_UCC0036579B

Akin Gump ▦ F_T_I HOULIHAN LOKEY

**JX 105-2**

HIGHLY CONFIDENTIAL

SEARS_UCC00365799

*FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY*
*SUBJECT TO FRE 408*
*CONFIDENTIAL*

## Illustrative Liquidation Analysis – Overview

*The information contained herein is intended to represent illustrative recoveries and related considerations based on diligence performed to date by the UCC Advisors. The numbers in this presentation are subject to ongoing diligence and may change materially as a result of further diligence*

- The analysis presented herein attempts to assess the sources of recovery values available to general unsecured creditors ("GUCs") based on a number of assumptions and on a consolidated basis
  - The UCC Advisors have not yet been provided sufficient asset and claim data by legal entity, including intercompany balances pre and post filing, to analyze unsecured creditor recoveries on an entity-by-entity basis
- The analysis assumes the Debtors start the final wave of GOBs for the 425 stores after January 24, 2019 led by incumbent liquidator Abacus Advisors and SB360 on an advisory fee basis (~90% NOLV and include ~$7mm of proceeds from sharing of augment)
- The remainder of the Company's assets are assumed to be sold through an orderly process, with values consistent with recent bids, appraisals, and initial estimates by the UCC Advisors
  - The estimated GUC pool is based on information made available by the Debtors and certain assumptions made by the UCC Advisors, including, but not limited to, lease rejection claims, pension and post-retirement benefits, and deficiency claims associated with encumbered asset values
- In addition, the illustrative recoveries contained herein do not reflect potential proceeds from the sale of Kenmore and Diehard, which are not projected to provide recoveries to GUCs absent assumption of the protection agreements and agreement with PBGC in a winddown scenario and will not provide any value to general unsecured creditors in the ESL going concern bid other than to the extent purchased "from" the PBGC

### Illustrative GUC Recoveries (On a Consolidated Basis)

| | Low | Midpoint | High |
|---|---|---|---|
| Illustrative Recoveries (Excluding Any Potential Litigation Proceeds) | 6.6% | 13.2% | 20.6% |

| Illustrative Recoveries Including Low/Mid/High Sensitized Recoveries for Litigation Proceeds (Seritage and Lands' End) And Sensitivity Analysis for ESL Debt Subject to Equitable Subordination and/or Recharacterization (Applied Pro Rata to All ESL Claims) | | |
|---|---|---|
| | Low | Midpoint | High |
| $0mm of ESL Debt Subordinated and/or Recharacterized | 12.5% | 22.8% | 34.3% |
| $250mm of ESL Debt Subordinated and/or Recharacterized | 15.7% | 26.9% | 39.2% |
| $500mm of ESL Debt Subordinated and/or Recharacterized | 18.9% | 30.9% | 44.1% |
| $750mm of ESL Debt Subordinated and/or Recharacterized | 22.1% | 35.0% | 49.0% |
| $1,000mm of ESL Debt Subordinated and/or Recharacterized | 25.3% | 39.0% | 54.0% |
| $1,250mm of ESL Debt Subordinated and/or Recharacterized | 28.5% | 43.1% | 58.9% |
| $1,500mm of ESL Debt Subordinated and/or Recharacterized | 31.6% | 47.1% | 63.8% |
| $1,750mm of ESL Debt Subordinated and/or Recharacterized | 34.8% | 51.1% | 68.7% |
| $2,000mm of ESL Debt Subordinated and/or Recharacterized | 38.0% | 55.2% | 73.6% |
| $2,250mm of ESL Debt Subordinated and/or Recharacterized | 41.2% | 59.2% | 78.5% |
| $2,500mm of ESL Debt Subordinated and/or Recharacterized | 44.4% | 63.3% | 83.4% |

*Note: See page 7 for ESL debt detail*

Akin Gump   F.T.I   HOULIHAN LOKEY

JX 105-3

HIGHLY CONFIDENTIAL

## Asset Value Details
(Exclusive of Any Recoveries in Respect of Estimated GUC Litigation)

FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408
CONFIDENTIAL

Set forth below is a table showing the Debtors' illustrative asset values, as provided by M-III, compared to a range currently being refined by FTI and Houlihan

| Summary Asset Values | | | | | |
|---|---|---|---|---|---|
| ($ in millions) | M-III Illustrative Values | HL & FTI Illustrative Values | | | |
| Assets | | Low | Midpoint | High | Commentary |
| Total DIP ABL Collateral | $2,121 | $2,015 | $2,121 | $2,228 | Includes GOB Receipts and Pharmacy Scripts |
| Total Specified Assets | $27 | $36 | $41 | $46 | Includes 250 W 34 St, 770 Broadway, and 2044 Montauk Hwy |
| **Encumbered Real Estate & IP / GL Collateral** | | | | | |
| Sparrow Real Estate | $513 | NA | NA | NA | |
| Dove Real Estate | 448 | NA | NA | NA | |
| IP / GL Collateral | 166 | NA | NA | NA | |
| **Total Encumbered Real Estate & IP / GL Collateral** | **$1,127** | **NA** | **NA** | **NA** | Conservative analysis that assumes no equity value |
| **Unencumbered Assets** | | | | | |
| Sears Home Services (SHS) | $177 | $77 | $139 | $202 | Includes SHIP Proceeds, Cross Country Renewal Commissions and SHS |
| Monark | 0 | 0 | 7 | 14 | M-III assumed no positive sale proceeds, HL & FTI assumed to generate $0mm - $15mm gross proceeds (shown net of 6% transaction fee) |
| Innovel | 0 | 0 | 5 | 9 | M-III assumed no positive sale proceeds, HL & FTI assumed to generate $0mm - $10mm gross proceeds (shown net of 6% transaction fee) |
| Total Other Assets | 716 | 1,164 | 1,441 | 1,722 | Includes SRAC MTNs proceeds, other receivables, credit card tort claim, NOLs, customer data, unencumbered real estate, external augment proceeds and preference actions |
| **Total Unencumbered Assets without Litigation Proceeds** | **$893** | **$1,241** | **$1,592** | **$1,947** | |
| **Total Assets** | **$4,168** | **$3,292** | **$3,754** | **$4,221** | |
| Memo: Kenmore and Diehard | 100 | TBD | TBD | TBD | M-III estimates $100mm of Kenmore and DieHard proceeds, but excluded from analysis given a sale is not projected to provide recovery to GUCs absent an agreement with the PBGC |

Akin Gump    FTI    HOULIHAN LOKEY

SEARS_UCC003665800

**JX 105-4**

HIGHLY CONFIDENTIAL

SEARS_UCC00365801

*FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY*
*SUBJECT TO FRE 408*
*CONFIDENTIAL*

# ESL Going Concern Bid Assumptions

Set forth below is a summary of the consideration included in ESL's bid as well as the most recent claim assumption as provided by the Debtors

- The most recent ESL bid still leaves the estate administratively insolvent and thereby provides no recovery to unsecured creditors
- Notwithstanding the fact that the ESL Bid contemplates providing no recovery to unsecured creditors, ESL proposes taking significant assets which, while difficult to value, may provide substantial value to ESL
  - Real Estate – ESL proposes acquiring substantially all real estate value[1] of the estates and will benefit from the ability to redevelop and/or monetize over a longer timeframe
  - NOLs – Substantial value exists that ESL should be able to capture
  - Intellectual Property – ESL contemplates acquiring substantially all IP, including the Sears and Kmart marks
- Value provided to certain vendors, employees, and other third parties through the assumption of certain administrative claims may be short-lived given the substantial cash burn of the going concern entity
- While the bid contemplates a release for ESL, the estates would likely still be able to pursue litigation actions against Seritage and other Lands' End shareholders
  - The value of such litigation should be compared to the relatively straightforward prosecution of these claims in the absence of a release for ESL

## Summary of ESL Bid Assumptions

| Sources of Value | |
| --- | --- |
| Cash from New ABL ($1.3 billion total facility) | $950 |
| Dove Credit Bid | 544 |
| IP / GL Credit Bid | 231 |
| FILO Credit Bid | 125 |
| Second Lien Credit Bid | 434 |
| **Total Credit Bid** | **$1,334** |
| LC Facility Roll-Over | 271 |
| Junior DIP Roll-Over[2] | 115 |
| **Total Roll-Over** | **$386** |
| Assumption of Sparrow Liability | 592 |
| Assumption of PA Liability[3] | 1,009 |
| Assumption of SYW Points and Gift Card | 81 |
| **Total Assumption of Non-Administrative Liabilities** | **$1,682** |
| 503(b)(9) | 139 |
| Accounts Payable | 166 |
| Severance | 43 |
| Property Taxes | 135 |
| Postpetition Rent to Sparrow | 21 |
| Cure Costs | 150 |
| **Total Assumed Administrative Claims**[4] | **$654** |
| Cash for ESL Release[5] | 35 |
| **Total Bid Consideration** | **$4,941** |

| Administrative and Priority Claim Detail | Gross Claim | ESL Adj.[4] | Net Claim |
| --- | --- | --- | --- |
| 503(b)(9) | $139 | ($139) | - |
| Accounts Payable | 166 | (166) | - |
| Severance | 43 | (43) | - |
| WARN | 18 | - | 18 |
| Franchise Taxes | 3 | - | 3 |
| Property Taxes | 135 | (135) | - |
| RemainCo Winddown Cost | 80 | - | 80 |
| Professional Fees | 102 | - | 102 |
| KCD IP Payments[6] | 86 | - | 86 |
| Postpetition Rent to Sparrow[7] | 21 | (21) | - |
| Cure Costs | 150 | (150) | - |
| ESL Reimbursement and Professional Fee Adjustment | 37 | - | 37 |
| **Total Administrative Claims** | **$980** | **($654)** | **$326** |
| ABL DIP | 950 | (850) | 100 |
| Junior DIP | 175 | (115) | 60 |
| **Total Administrative & Priority Claims** | **$2,105** | **($1,619)** | **$486** |
| ESL Release Cash Consideration | | | (35) |
| Company Cash | | | (89) |
| Professional Fee Carve-Out | | | (89) |
| MTN Sale Proceeds | | | (81) |
| SHIP Sale Proceeds | | | (45) |
| **Deficit** | | | **$147** |

Source: ESL bid and Debtor estimates
(1) The value of real estate that remains in the estate is still being determined but is unlikely to cover the substantial administrative shortfall
(2) ESL offered to roll over Cyrus-owned portion of entire Junior DIP ($230mm of $350mm). Reflects same ownership share applied to M-III's estimated $175mm balance at closing
(3) In exchange for the forgiveness of $1,009mm in protection agreement liabilities, ESL will acquire the KCD IP Notes currently held by Sears Re
(4) Pursuant to section 2.3(k) of the revised APA, there is no guarantee that ESL would be required to pay certain administrative claims which it contemplates assuming
(5) No consideration provided for Cyrus release
(6) Represents post-petition royalty payments owed to KCD IP (~$29mm/month for 3 months)
(7) Post-petition rent owed is estimated to be $7mm/month for 3 months

Akin Gump    F T I    HOULIHAN LOKEY

**JX 105-5**

HIGHLY CONFIDENTIAL

SEARS_UCC003365802

*FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY*
*SUBJECT TO FRE 408*
*CONFIDENTIAL*

## Preliminary Schedule of GUC Claims

Set forth below is a detailed schedule of GUC claims as currently estimated by M-III as well as by FTI and Houlihan

| GUC Detail | | | | |
|---|---|---|---|---|
| ($ in millions) | | | | |
| General Unsecured Claims | ESL Bid Estimate | M-III Illustrative Claims | HL & FTI Base Case Illustrative Claims | Commentary |
| **Lease Rejection, Payables, Accrued Liabilities, and Preference Claims** | | | | |
| Estimated Lease Rejection Damages (217 Stores) | 100 | 100 | | Reflects 1 year's rent for 217 stores estimated by M-III |
| Estimated Lease Rejection Damages (182 Additional Stores) | TBD | TBD | | |
| **Total Lease Rejection Damages** | 100 | 100 | 445 | Based on FTI's estimate of total rejection damages |
| Payments & Waivers Related to First Day Motions | (96) | (96) | (96) | Excludes $44mm payroll payments in consideration for change of terms |
| Pension and Post-Retirement Benefits | 1,160 | 1,160 | 1,160 | Per M-III, but believe PBGC will file a higher claim |
| Total Account Payables | 703 | 703 | 703 | Net of ~$45mm critical vendor payments |
| Total Accrued & Other Liabilities | 283 | 283 | 283 | Estimated by M-III based on the Deloitte balance sheet |
| Preference Claims | | | TBD | |
| **Total Lease Rejection, Payables, Accrued Liabilities, and Preference Claims** | $2,150 | $2,150 | $2,495 | |
| 507(b) Adequate Protection Claims | TBD | TBD | TBD | |
| **Funded Unsecured Debt** | | | | |
| SRAC Unsecured PIK Notes | 108 | 108 | 108 | Pre-petition claim per First Day Declaration |
| SRAC Unsecured Notes | 186 | 186 | 186 | Pre-petition claim per First Day Declaration |
| SRAC MTN held by Cyrus | 252 | 252 | 252 | Per the MTN auction results (ECF No. 1019) |
| 8.00% Unsecured PIK Toggle Notes | 223 | 223 | 223 | Pre-petition claim per First Day Declaration |
| 8.00% Unsecured Notes | 411 | 411 | 411 | Pre-petition claim per First Day Declaration |
| **Total Funded Unsecured Debt** | $1,179 | $1,179 | $1,179 | |
| **Total Deficiency Claims** | $1,150 | $1,900 | $2,000 | **Preliminary and illustrative** |
| **Total GUC Claims** | $4,478 | $5,228 | $5,673 | |

Memo: ESL holds approximately $2,668mm of Sears' debt, see page 7 for further detail

(1)  The estimate does not consider any mitigation, and ~$133mm relates to Seritage
(2)  SRAC MTNs held by Cyrus do not include the ~$650mm in principal of the MTNs

Akin Gump    FTI    HOULIHAN LOKEY

**JX 105-6**

HIGHLY CONFIDENTIAL

SEARS_UCC003365803

FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408
CONFIDENTIAL

## Current ESL Holdings

| Current Estimates of ESL Portion of Sears' Debt Outstanding | | | |
|---|---|---|---|

($ in millions)

| | Total Debt | ESL % | ESL $ |
|---|---|---|---|
| Prepetition FILO | $125 | 56.0% | $70 |
| Prepetition LC[(1)] | 176 | 39.0% | 69 |
| Prepetition 2nd Lien PIK Term Loan | 317 | 99.0% | 314 |
| Prepetition 2nd Lien Line of Credit Loans | 570 | 89.0% | 507 |
| Prepetition 2nd Lien Notes (PIK) | 175 | 12.0% | 21 |
| Prepetition 2nd Lien Notes (Cash) (Subordinated) | 89 | 0.0% | - |
| **Total Prepetition 2nd Lien** | **$1,152** | **73.1%** | **$842** |
| Dove - Cascade | 108 | 0.0% | - |
| Dove - JPP | 723 | 100.0% | 723 |
| Sparrow - UBS | 102 | 100.0% | 102 |
| Sparrow - Mezzanine | 513 | 100.0% | 513 |
| IP/Ground Lease Term Loan | 231 | 66.0% | 153 |
| **Total Secured Claims** | **$3,130** | | **$2,472** |
| 8.00% Unsecured PIK Toggle Notes | 223 | 88.0% | 196 |
| 8.00% Unsecured Notes | 411 | 0.0% | - |
| **Total** | **$3,764** | | **$2,668** |

(1) Prepetition LC is reduced by $75mm of workers' compensation and $20mm of custom bonds (per Debtors' guidance)

Akin Gump    FTI    HOULIHAN LOKEY

JX 105-7

HIGHLY CONFIDENTIAL

SEARS_UCC003065804



CORPORATE FINANCE
FINANCIAL ADVISORY SERVICES
FINANCIAL RESTRUCTURING
STRATEGIC CONSULTING

HL.com

**JX 105-8**

# Exhibit 72

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

**Minutes of a Meeting of the**
**Restructuring Committee of the Board of Directors of**
**Sears Holdings Corporation**

**December 17, 2018**

A meeting of the Restructuring Committee (the "Committee") of the Board of Directors (the "Board") of Sears Holdings Corporation (the "Company") was held on December 17, 2018, beginning at 12:30 p.m. (Eastern) at the offices of Weil, Gotshal and Manges LLP ("Weil"), 767 Fifth Avenue, New York, NY 10153.

**Committee Members Present**
- Alan J. Carr
- Ann N. Reese
- William L. Transier

**Materials Presented (attached as Exhibits)**
- Indicative Bid Summary and Analysis (see Exhibit A)
- GOB/Liquidation Analysis (see Exhibit B)
- Abacus Documents (see Exhibit C)
- Creditor Recovery Considerations (see Exhibit D)
- Winddown Preparation Summary (see Exhibit E)
- Global Sale Process Status Update (see Exhibit F)
- Updated Global Sale Process Timeline (see Exhibit G)

With a quorum being present and the meeting having been duly noticed and convened, the Committee was ready to proceed with business. Also present by invitation were Rob Riecker, Chief Financial Officer and member of the Office of the Chief Executive; Luke Valentino, Vice President, Deputy General Counsel & Corporate Secretary of the Company; Mohsin Meghji, Chief Restructuring Officer of the Company; Ray Schrock, Jacqueline Marcus, Greg Danilow, Ellen Odoner, Garrett Fail, Sunny Singh, Jessica Liou, Naomi Munz, Kaitlin Descovich, Natasha Hwangpo, and Paloma Van Groll, of Weil, Gotshal & Manges LLP, attorneys for the Company ("Weil"); Chris Good, Colin Adams, Brian Griffith and Bill Gallagher of M-III Partners, LLC, restructuring advisor to the Company ("M-III"); Brandon Aebersold, Levi Quaintance, Conor Matthews and Jack Weinberger of Lazard Frères & Co. LLC, the Company's investment banker ("Lazard"); Paul Basta and Kelley Cornish of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Subcommittee of the Committee; and, for a portion of the meeting, representatives of Abacus Advisors LLC ("Abacus").

Mr. Schrock reviewed the matters to be addressed at the meeting.

Mr. Aebersold reported that, upon an initial review of the December 15th proposal submitted by ESL Investments Inc. ("ESL"), ESL's proposal was not appropriately responsive to the deficiencies identified by the Committee and communicated to ESL following the December 11th meeting.

WEIL:\96844933\3\73219.0006

SEARS_UCC00413767
**JOINT EX. 113**
**JX 106-1**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

Mr. Aebersold reported his understanding that Cyrus would be interested in rolling its interest into debt rather than equity of the buyer entity. He noted that Cyrus was still not under a non-disclosure agreement with the Company.

Mr. Schrock reported that Weil had discussed with Cleary, Gottlieb, Stein & Hamilton LLP, counsel to ESL, the need for ESL to increase the value of its proposal and that ESL's deadline for doing so would be December 28th.

The advisors noted ESL's position that it had a $400 million claim for diminution in the value of its second lien collateral.

The advisors answered questions from the Committee about whether ESL understood the need to make a bid that could be accepted by the Committee within two weeks. It was noted that, prior to December 28th, ESL needed (1) to confirm that actionable financing had been secured, including cash backstopping its credit bid for encumbered assets as well as cash for its purchase of unencumbered assets and (2) to allocate values to the various components of the Company included in its bid.

The Committee and the advisors discussed the process and timeline for evaluating proposals received on December 28th. It was determined that a telephonic Committee meeting would be set for December 30th followed by an in-person meeting on January 2nd or 3rd to determine whether ESL was a "qualified bidder." Mr. Schrock

The advisors responded to questions from the Committee regarding the "qualified bid" determination, including the absolute minimum for the ESL bid to be considered "qualified." The advisors noted that certain requirements could be waived under certain circumstances.

The Committee and the advisors discussed the need to compare ESL's going concern bid submitted on December 28th with a liquidation scenario.

Alan Cohen, Terry Corrigan and Ted Roberts of Abacus joined the meeting at approximately 1:45 p.m. The Abacus representatives presented their materials and responded to questions from the Committee.

The Abacus presentation concluded and the Abacus representatives left the meeting at approximately 2:20 p.m.

The Committee and the advisors discussed the liquidation sale process and the indicative bids received to date from the liquidators. Mr. Meghji stated that, subject to being comfortable that Abacus had the capacity to do the work as it presented, Abacus had provided the most favorable proposal for the Company. Mr. Meghji noted that Abacus had demonstrated good results historically, based on an analysis made by M-III. The Committee and the advisors

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

decided to reconsider the comparisons once final liquidation bids were submitted later that month.

The Committee and the advisors discussed how to ensure that the Company had the necessary funds available to operate until mid-February when a going concern transaction could be completed, should the Committee wish to select this alternative. The Committee discussed with the advisors the recommendation from Abacus and M-III that the Company proceed as soon as possible with going-out-of-business sales at 80 additional stores. Following discussion, at the recommendation of the advisors, the Committee determined that 80 additional stores should be closed and directed the Company to proceed with identifying the stores to be closed and filing the appropriate motions with the Bankruptcy Court.

Mr. Adams presented an updated version of the Creditor Recovery Considerations presentation. He and Mr. Good highlighted differences between the Company's and ESL's numbers as well as changes since the presentation was first made on December 11th, including a reduction in the estimated proceeds for the sale of Sears Home Services, a reduction in the sales of the credit card tort claims and certain changes in the claims waterfall. The Committee and the advisors discussed M-III's analysis. Among other things, Mr. Adams noted that, if ESL's Section 507(b) claim for diminution in value of the second lien collateral were taken into account, the payout to the unsecured creditors would be effectively reduced to $0. Mr. Schrock responded to questions from the Committee about ESL's Section 507(b) claim and also discussed carve-outs for certain administrative costs that the second lien creditors had agreed to. Weil and M-III also discussed potential real estate recoveries. Mr. Adams confirmed that M-III had walked the Committee of Unsecured Creditors (the "UCC") through information showing how the appraisals and realization differed. It was also noted that the presentation did not take into account any values for avoidance actions or for the litigation claims against ESL that are within the Subcommittee's purview.

Mr. Schrock reported that Weil had begun a dialogue with the Public Benefit Guaranty Corporation (the "PBGC") through PJT Partners, Inc., its financial advisor, about the consideration that the PBGC would accept in exchange for a settlement. The PBGC was expected to respond later in the week.

Mr. Schrock also reported that there was a hearing set for January 11th at which Judge Drain could determine whether he would permit ESL's credit bid. Mr. Schrock ███████████████████████████████████████████████████████

Mr. Schrock discussed expectations for the Bankruptcy Court proceedings the following day, December 18th. He noted that Judge Drain had not seen the exchange with the UCC but that it would be discussed as part of a pre-hearing conference in Chambers. Mr. Schrock discussed the materials to be presented to the Bankruptcy Court on December 18th on the status of the global sale process.

Mr. Schrock noted that ███████████████████████████████████████████████████

CONFIDENTIAL

JX 106-3

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

The Committee determined that, at the Board meeting scheduled for later that evening, Mr. Schrock should update the Board on what was to be expected at the hearing on December 18th and the Committee's view of the deficiencies of the ESL proposal. The Committee directed Mr. Schrock to inform the Board that, in light of the deficiencies, the Committee could not give stalking horse protection to ESL; however, instead of immediately pivoting to a liquidation scenario, the Committee was taking responsible steps to plan for liquidation should that be required. Mr. Schrock was directed to emphasize that December 28th was the deadline for ESL's proposal after which the Committee's decision whether to proceed with the going concern sale or with liquidation must be made.

Mr. Meghji stated that he was working with Mr. Riecker, the Company's Human Resources team and others at the Company to be prepared for a wind down, should that be required, including the preparation of communications and WARN notices to employees. Mr. Schrock stated that the practical difficulties of operating during a winddown would be substantial and a chapter 11 plan of reorganization would need to be prepared immediately.

There being no further business for the Committee, the meeting was adjourned at approximately 4:50 p.m.

CONFIDENTIAL
SEARS_UCC00413770

**JX 106-4**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

**Exhibit A**

**Indicative Bid Summary and Analysis**

See attached.

CONFIDENTIAL

SEARS_UCC00413771

**JX 106-5**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

**Exhibit B**

**GOB/Liquidation Analysis**

See attached.

WEIL:\96844933\3\73219.0006

SEARS_UCC00413772

**JX 106-6**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

## Exhibit C

**Abacus Documents**

See attached.

WEIL:\96844933\3\73219.0006

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

## Exhibit D

**Creditor Recovery Considerations**

See attached.

WEIL:\96844933\3\73219.0006

SEARS_UCC00413774

**JX 106-8**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

**Exhibit E**

**Winddown Preparation Summary**

See attached.

WEIL:\96844933\3\73219.0006

SEARS_UCC00413775

**JX 106-9**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

**Exhibit F**

**Global Sale Process Update**

See attached.

WEIL:\96844933\3\73219.0006

SEARS_UCC00413776

**JX 106-10**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
WEIL DRAFT 1/24/18

**Exhibit G**

**Updated Global Sale Process Timeline**

See attached.

WEIL:\96844933\3\73219.0006

# Exhibit 73

**Minutes of a Meeting of the**
**Restructuring Committee of the Board of Directors of**
**Sears Holdings Corporation**

**December 30, 2018**

A meeting of the Restructuring Committee (the "Committee") of the Board of Directors (the "Board") of Sears Holdings Corporation (the "Company") was held by telephone on December 30, 2018, beginning at 3:30 p.m. (Eastern).

**Committee Members Present**
- Alan J. Carr
- Paul G. DePodesta
- Ann N. Reese
- William L. Transier

**Materials Presented (attached as Exhibits)**
- Global Sale Process: Bid Qualification Overview (see Exhibit A)
- Binding Bid Summary and Going Concern Analysis (see Exhibit B)
- Liquidation Bids Review (see Exhibit C)
- Preliminary Real Estate Sales Plan (see Exhibit D)
- Project Transform – ESL Bid Presentation (see Exhibit E)

With a quorum being present and the meeting having been duly noticed and convened, the Committee was ready to proceed with business. Also present by invitation were Rob Riecker, Chief Financial Officer and member of the Office of the Chief Executive; Luke Valentino, Vice President, Deputy General Counsel and Corporate Secretary of the Company; Mohsin Meghji, Chief Restructuring Officer of the Company; Ray Schrock, Jacqueline Marcus, Greg Danilow, Ellen Odoner, Garrett Fail, Sunny Singh, Naomi Munz, Kaitlin Descovich and Natasha Hwangpo of Weil, Gotshal & Manges LLP, attorneys for the Company ("Weil"); Chris Good, Colin Adams, Brian Griffith and Bill Gallagher of M-III Partners, LP, restructuring advisor to the Company; Brandon Aebersold and Levi Quaintance of Lazard Frères & Co. LLC, the Company's investment banker ("Lazard"); and Paul Basta, Kelley Cornish and Robert Britton of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to the Subcommittee of the Committee.

Mr. Schrock stated that the purpose of the meeting was to discuss the process for evaluating the going concern proposal from ESL Investments, Inc. ("ESL"), the proposals for other assets of the Company and the liquidator proposals. Mr. Schrock stated that the Committee would not be asked to make formal determinations during the meeting.

Mr. Schrock stated that the immediate question before the Committee was whether the ESL bid submitted on December 28, 2018 (the "December 28 ESL Bid") was "qualified" under the criteria set forth in the order approved by the Bankruptcy Court. Mr. Schrock reviewed the key requirements for a qualified bid. He stated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL

EXHIBIT
VCC    22
1   31 19
MARK RICHMAN, RPR

SEARS_UCC00413809

**JOINT EX. 145**
**JX 107-1**

██████████████████████████   He noted that even using the calculations of ESL's advisors, the December 28 ESL Bid would render the estate administratively insolvent by approximately $350 million. Mr. Schrock stated ██████████████████████████████████ ESL still had not completed its negotiations with Cyrus Capital Partners, L.P. ("Cyrus"), which was a necessary part of ESL's bid.

The Committee and the advisors discussed that January 7th would likely be the date for announcing the Committee's determination based on the available information and the Status Conference schedule with the Bankruptcy Court that day.

The Committee and the advisors also discussed alternative steps if ESL did not ultimately submit a bid that could be qualified, including adjourning the global sale auction date until February 14th and negotiating a chapter 11 plan at the same time.

The advisors discussed in greater detail the deficiencies of the December 28 ESL Bid referred to in slide 15 of Exhibit A, including that (1) it is contingent on a number of items (the ability to credit bid, receipt of a release, a documented transaction with Cyrus and a fully committed real estate financing); (2) it provides an inadequate deposit for a going concern bid; (3) conditional financing; (4) it leaves a significant shortfall in the amount of cash needed for administrative solvency; (5) it provides minimal consideration for unencumbered assets such as the Sparrow equity; ESL's argument that secured creditors would do better if the December 28 ESL Bid were accepted notwithstanding economic issues with its bid.

Mr. Aebersold discussed the proposed terms of each of the two bids received, including the December 28 ESL Bid and ESL's alternative bid for Innovel, Sears Home Services, including Parts Direct, Shop Your Way data and certain intellectual property as well as a credit bid for intellectual property and real estate. He referred to slide 8 of Exhibit B, which showed the financial analysis of the December 28 ESL Bid by both Lazard, including the approximately $350 million shortfall in liquidity to pay administrative claims and confirm a chapter 11 plan.

Mr. Meghji stated that the advisors were of the view that if the approximately $350 million shortfall was not made up, the December 28 ESL Bid was not viable. He emphasized that the Company was short on time.

The advisors responded to questions from the Committee and discussed the shortfall.

Mr. Meghji stated that ESL believed that the wind down scenario was worse than what it was offering, so the Committee should accept ESL's better alternative even if it rendered the Company administratively insolvent. Mr. Schrock noted that if the Company accepts the December 28 ESL Bid, it would be admitting administrative insolvency.

Mr. Schrock stated that at the Committee's next meeting the advisors would review with the Committee an updated wind down analysis in order to evaluate the different paths.

CONFIDENTIAL                                    SEARS_UCC00413810

**JX 107-2**

The Committee and the advisors discussed communications with the Committee of Unsecured Creditors.

Mr. Schrock conveyed a request from ESL to present the December 28 ESL Bid directly to the Committee. The Committee welcomed the opportunity to obtain additional information for its evaluation, but noted that it should not delay the Committee's decision-making. Accordingly, it was determined to schedule the meeting for January 2nd in connection with the scheduled in-person meeting of the Committee.

Mr. Aebersold presented the key terms of the bids for Sears Home Services. He stressed the importance of rescheduling the auction for February 2019 to extend the sales process for Sears Home Services, Kenmore, DieHard and Parts Direct if a bid from ESL was not ultimately qualified. He noted that this timing would also give ESL the opportunity to assemble a back-up bid focused on Sears Home Services.

Mr. Adams presented the key terms of the liquidation bids. The advisors discussed with the Committee the potential for Abacus Advisors to team up with SB360 Capital Partners.

Mr. Gallagher presented a summary of the preliminary real estate sales plan and the real estate bids received to date.

The Committee and the advisors discussed next steps, which included the advisors going back to ESL's advisors to improve the December 28 ESL Bid and p reparation by the advisors for the Committee's January 2nd meeting.

The advisors discussed the Company's cash flow and performance and noted that the analysis of the December 28 ESL Proposal took into account the cash accumulated from the business based on the budget with actual results considered.

There being no further business for the Committee, the meeting was adjourned at approximately 4:40 p.m.

CONFIDENTIAL

**JX 107-3**

**Exhibit A**

**Global Sale Process: Bid Qualification Overview**

See attached.

CONFIDENTIAL

SEARS_UCC00413812

**JX 107-4**

## Exhibit B

**Binding Bid Summary and Going Concern Analysis**

See attached.

CONFIDENTIAL

SEARS_UCC00413813

**JX 107-5**

**<u>Exhibit C</u>**

**Liquidation Bids Review**

See attached.

CONFIDENTIAL

SEARS_UCC00413814

**JX 107-6**

**Exhibit D**

**Preliminary Real Estate Sales Plan**

See attached.

CONFIDENTIAL

SEARS_UCC00413815

**JX 107-7**

**<u>Exhibit E</u>**

**Project Transform – ESL Bid Presentation**

See attached.

CONFIDENTIAL

SEARS_UCC00413816

**JX 107-8**

# Exhibit 74

CONFIDENTIAL - DO NOT DISTRIBUTE

### *Advisory Bid Comparison*

| Advisory Bid Recoveries | | | | Baseline |
|---|---|---|---|---|
| ($ in millions) | 1/5/19 Hilco/Gordon Brothers JV | 1/4/19 Tiger / Great American JV | 1/4/19 SB360 | Abacus Proposal |
| FLS/Kmart Inventory at Cost | $ 1,431.8 | $ 1,431.8 | $ 1,431.8 | $ 1,431.8 |
| SAC Inventory at Cost | 21.9 | 21.9 | 21.9 | 21.9 |
| Wholesale Inventory at Cost | 56.3 | 56.3 | 56.3 | 56.3 |
| Delivered Ocean-In-Transit Inventory at Cost | 40.0 | 40.0 | 40.0 | 40.0 |
| **Total Inventory At Cost** | $ 1,550.0 | $ 1,550.0 | $ 1,550.0 | $ 1,550.0 |
| | | | | |
| FLS/Kmart Inventory Gross Recovery | $ 1,751.8 | $ 1,751.8 | $ 1,751.8 | $ 1,751.8 |
| SAC Inventory Gross Recovery | 22.4 | 22.4 | 22.4 | 22.4 |
| Wholesale Inventory Gross Recovery | 32.4 | 32.4 | 32.4 | 32.4 |
| Delivered Ocean-In-Transit Inventory Gross Recovery | 36.0 | 36.0 | 36.0 | 36.0 |
| Additional Proceeds Included In Gross Recovery | - | - | - | - |
| Gross Recovery Proceeds Subject To Agreement | $ 1,842.7 | $ 1,842.7 | $ 1,842.7 | 1,842.7 |
| | | | | |
| *Gross Proceeds as % of Inventory at Cost* | *118.9%* | *118.9%* | *118.9%* | *118.9%* |
| | | | | |
| Less: Operating Expenses | (406.9) | (406.9) | (406.9) | (406.9) |
| Less: SAC Expenses | (13.3) | (13.3) | (13.3) | (13.3) |
| Total Operating Expenses | (420.2) | (420.2) | (420.2) | (420.2) |
| | | | | |
| Agent Fee % Of Gross Proceeds | 1.75% | 2.00% | 0.19% | 0.05% |
| Agent Fee $ | (32.2) | (36.9) | (3.5) | (0.9) |
| | | | | |
| Net Proceeds to Company After Agent Fee | 1,390.2 | 1,385.6 | 1,419.0 | 1,421.6 |
| NOLV % | 89.7% | 89.4% | 91.5% | 91.7% |
| | | | | |
| Additional Proceeds Not Subject To Agreement | 125.9 | 125.9 | 125.9 | 125.9 |
| Net Proceeds From Excluded Inventory | - | - | - | - |
| Gift Card Expenses | (9.1) | (9.1) | (9.1) | (9.1) |
| Total Net Proceeds to Company With Additional Proceeds and Costs | 1,507.1 | 1,502.5 | 1,535.8 | 1,538.4 |
| | | | | |
| **Total Inventory** | 1,550.0 | 1,550.0 | 1,550.0 | 1,550.0 |
| **Total Net Proceeds** | 1,507.1 | 1,502.5 | 1,535.8 | 1,538.4 |
| **Total Proceeds as % of Total Inventory** | 97.2% | 96.9% | 99.1% | 99.3% |

1/5/2019

Confidential

RS_UCC_00002828

**JOINT EX. 033**
**JX 108-1**

# Exhibit 75

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED AUGUST 4, 2018**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number 000-51217, 001-36693

# SEARS HOLDINGS CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **20-1920798** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **3333 BEVERLY ROAD, HOFFMAN ESTATES, ILLINOIS** | **60179** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: (847) 286-2500**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐  Accelerated filer ☒  Non-accelerated filer (Do not check if a smaller reporting company) ☐  Smaller reporting company ☐  Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐ No ☒

As of September 7, 2018, the registrant had 108,992,750 common shares, $0.01 par value, outstanding.

**JX 114-1**

**SEARS HOLDINGS CORPORATION**
**INDEX TO QUARTERLY REPORT ON FORM 10-Q**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

| | | Page |
|---|---|---|
| PART I - FINANCIAL INFORMATION | | |
| Item 1. | Financial Statements | |
| | Condensed Consolidated Statements of Operations (Unaudited) for the 13 and 26 Weeks Ended August 4, 2018 and July 29, 2017 | 3 |
| | Condensed Consolidated Statements of Comprehensive Loss (Unaudited) for the 13 and 26 Weeks Ended August 4, 2018 and July 29, 2017 | 4 |
| | Condensed Consolidated Balance Sheets (Unaudited) at August 4, 2018, July 29, 2017 and February 3, 2018 | 5 |
| | Condensed Consolidated Statements of Cash Flows (Unaudited) for the 26 Weeks Ended August 4, 2018 and July 29, 2017 | 6 |
| | Condensed Consolidated Statements of Deficit (Unaudited) for the 26 Weeks Ended August 4, 2018 and July 29, 2017 | 7 |
| | Notes to Condensed Consolidated Financial Statements (Unaudited) | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 69 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 94 |
| Item 4. | Controls and Procedures | 94 |
| PART II - OTHER INFORMATION | | |
| Item 1. | Legal Proceedings | 95 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 95 |
| Item 6. | Exhibits | 95 |

**JX 114-2**

**SEARS HOLDINGS CORPORATION**
**Condensed Consolidated Statements of Operations**
(Unaudited)

PART I. FINANCIAL INFORMATION

*Item 1. Financial Statements*

| | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| *millions, except per share data* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| **REVENUES** | | | | |
| Merchandise sales | $    2,428 | $    3,414 | $    4,640 | $    6,743 |
| Services and other[1][2] | 754 | 864 | 1,433 | 1,734 |
| Total revenues | 3,182 | 4,278 | 6,073 | 8,477 |
| **COSTS AND EXPENSES** | | | | |
| Cost of sales, buying and occupancy - merchandise sales[3] | 2,055 | 2,815 | 3,954 | 5,594 |
| Cost of sales and occupancy - services and other[1] | 425 | 491 | 812 | 980 |
| Total cost of sales, buying and occupancy | 2,480 | 3,306 | 4,766 | 6,574 |
| Selling and administrative | 864 | 1,123 | 1,770 | 2,344 |
| Depreciation and amortization | 66 | 83 | 133 | 170 |
| Impairment charges | 77 | 5 | 91 | 20 |
| Gain on sales of assets | (103) | (380) | (268) | (1,121) |
| Total costs and expenses | 3,384 | 4,137 | 6,492 | 7,987 |
| Operating income (loss) | (202) | 141 | (419) | 490 |
| Interest expense | (188) | (123) | (354) | (251) |
| Interest and investment income (loss) | 2 | (12) | 3 | (14) |
| Other loss | (139) | (246) | (172) | (292) |
| Loss before income taxes | (527) | (240) | (942) | (67) |
| Income tax (expense) benefit | 19 | (10) | 10 | 62 |
| **NET LOSS ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $    (508) | $    (250) | $    (932) | $    (5) |
| **NET LOSS PER COMMON SHARE ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | | | | |
| Basic loss per share | $    (4.68) | $    (2.33) | $    (8.61) | $    (0.05) |
| Diluted loss per share | $    (4.68) | $    (2.33) | $    (8.61) | $    (0.05) |
| Basic weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |
| Diluted weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |

[1] Includes merchandise sales to Sears Hometown and Outlet Stores, Inc. ("SHO") of $197 million and $257 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $381 million and $511 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively. Pursuant to the terms of the separation, merchandise is sold to SHO at cost.

[2] Includes revenue from Lands' End, Inc. ("Lands' End") for retail services and rent for Lands' End Shops at owned Sears locations, participation in the Shop Your Way® program and corporate shared services of $7 million and $12 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $16 million and $24 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively.

[3] Includes rent expense (consisting of straight-line rent expense offset by amortization of a deferred gain on sale-leaseback) of $13 million and $19 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, pursuant to the master lease with Seritage Growth Properties ("Seritage"). Also includes installment expenses of $9 million and $12 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $18 million and $24 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively.

See accompanying notes.

**JX 114-3**

**SEARS HOLDINGS CORPORATION**
**Condensed Consolidated Statements of Comprehensive Income (Loss)**
(Unaudited)

| millions | 13 Weeks Ended | | | | 26 Weeks Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | August 4, 2018 | | July 29, 2017 | | August 4, 2018 | | July 29, 2017 | |
| Net loss | $ | (508) | $ | (250) | $ | (932) | $ | (5) |
| Other comprehensive income | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | 218 | | 127 | | 254 | | 177 |
| Currency translation adjustments, net of tax | | (1) | | - | | - | | 1 |
| Total other comprehensive income | | 217 | | 127 | | 254 | | 178 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (291) | $ | (123) | $ | (678) | $ | 173 |

See accompanying notes.

4

**JX 114-4**

**SEARS HOLDINGS CORPORATION**
**Condensed Consolidated Balance Sheets**
(Unaudited)

| *millions* | | August 4, 2018 | | July 29, 2017 | | February 3, 2018 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | $ | 193 | $ | 212 | $ | 182 |
| Restricted cash | | 248 | | 230 | | 154 |
| Accounts receivable[1] | | 327 | | 370 | | 343 |
| Merchandise inventories | | 2,714 | | 3,433 | | 2,798 |
| Prepaid expenses and other current assets[2] | | 386 | | 334 | | 346 |
| Total current assets | | 3,868 | | 4,579 | | 3,823 |
| Property and equipment (net of accumulated depreciation and amortization of $2,276, $2,676 and $2,381) | | 1,444 | | 1,969 | | 1,729 |
| Goodwill | | 269 | | 269 | | 269 |
| Trade names and other intangible assets | | 1,090 | | 1,249 | | 1,168 |
| Other assets | | 266 | | 301 | | 284 |
| **TOTAL ASSETS** | $ | 6,937 | $ | 8,367 | $ | 7,273 |
| **LIABILITIES** | | | | | | |
| Current liabilities | | | | | | |
| Short-term borrowings[3] | $ | 1,254 | $ | 546 | $ | 915 |
| Current portion of long-term debt and capitalized lease obligations[4] | | 196 | | 1,052 | | 968 |
| Merchandise payables | | 487 | | 670 | | 576 |
| Other current liabilities[5] | | 1,474 | | 1,700 | | 1,575 |
| Unearned revenues | | 652 | | 704 | | 641 |
| Other taxes | | 214 | | 302 | | 247 |
| Total current liabilities | | 4,277 | | 4,974 | | 4,922 |
| Long-term debt and capitalized lease obligations[6] | | 3,504 | | 2,405 | | 2,249 |
| Pension and postretirement benefits | | 1,164 | | 1,731 | | 1,619 |
| Deferred gain on sale-leaseback | | 305 | | 455 | | 362 |
| Sale-leaseback financing obligation | | 347 | | 230 | | 247 |
| Unearned revenues | | 853 | | 593 | | 539 |
| Other long-term liabilities | | 770 | | 992 | | 935 |
| Long-term deferred tax liabilities | | 119 | | 643 | | 126 |
| Total Liabilities | | 11,339 | | 12,023 | | 10,999 |
| Commitments and contingencies | | | | | | |
| **DEFICIT** | | | | | | |
| Total Deficit | | (4,402) | | (3,656) | | (3,726) |
| **TOTAL LIABILITIES AND DEFICIT** | $ | 6,937 | $ | 8,367 | $ | 7,273 |

[1]Includes $22 million, $25 million and $28 million of net amounts receivable from SHO, and $1 million, $4 million and $1 million of amounts receivable from Seritage at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. Also includes $1 million of net amounts receivable from Lands' End at July 29, 2017 and February 3, 2018.
[2] Includes $6 million prepaid rent to Seritage at both August 4, 2018 and February 3, 2018.
[3] Includes balances held by related parties of $525 million, $245 million and $645 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, related to our Line of Credit Loans for all periods presented and also our Incremental Loans at February 3, 2018. See Note 2 for defined terms and Notes 2 and 11 for further information.
[4] Includes balances held by related parties of $131 million and $146 million at July 29, 2017 and February 3, 2018, respectively, related to our 2016 Secured Loan Facility for both periods and also our Old Senior Secured Notes at February 3, 2018. See Note 2 for defined terms and Notes 2 and 11 for further information.
[5] Includes $9 million and $24 million of amounts payable to Seritage at August 4, 2018 and July 29, 2017, respectively.
[6]Includes balances held by related parties of $2.3 billion, $1.6 billion and $1.5 billion at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, related to our Subsidiary Notes, Old Senior Unsecured Notes, Second Lien Term Loan, and 2016 Term Loan for all periods presented, our Consolidated Secured Loan Facility, FILO Loan, Mezzanine Loan, Additional Mezzanine Loans, New Senior Secured Notes and New Senior Unsecured Notes at August 4, 2018, our Term Loan Facility at August 4, 2018 and February 3, 2018, our 2017 Secured Loan Facility at July 29, 2017 and February 3, 2018, and our Old Senior Secured Notes at July 29, 2017. See Note 2 for defined terms and Notes 2 and 11 for further information.

See accompanying notes.

JX 114-5

**SEARS HOLDINGS CORPORATION**
**Condensed Consolidated Statements of Cash Flows**
(Unaudited)

| | 26 Weeks Ended | |
| --- | --- | --- |
| millions | August 4, 2018 | July 29, 2017 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (932) | $ (5) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Deferred tax valuation allowance | - | (200) |
| Tax benefit resulting from Other Comprehensive Income allocation | (27) | - |
| Depreciation and amortization | 133 | 170 |
| Impairment charges | 91 | 20 |
| Gain on sales of assets | (268) | (1,121) |
| Pension and postretirement plan contributions | (343) | (134) |
| Pension plan settlements | 108 | 200 |
| Payment for insurance transaction | (208) | - |
| Proceeds from Citibank amendment | 425 | - |
| Mark-to-market adjustments of financial instruments | - | 17 |
| Amortization of deferred gain on sale-leaseback | (34) | (40) |
| Amortization of debt issuance costs and accretion of debt discount | 64 | 62 |
| Non-cash PIK interest | 37 | - |
| Other | - | (36) |
| Change in operating assets and liabilities (net of acquisitions and dispositions): | | |
| Deferred income taxes | (8) | 99 |
| Merchandise inventories | 84 | 509 |
| Merchandise payables | (89) | (378) |
| Income and other taxes | (22) | (24) |
| Other operating assets | 65 | 52 |
| Other operating liabilities | (112) | (329) |
| Net cash used in operating activities | (1,036) | (1,138) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from sales of property and investments | 322 | 569 |
| Proceeds from Craftsman Sale | - | 572 |
| Proceeds from sales of receivables[1] | - | 293 |
| Purchases of property and equipment | (32) | (41) |
| Net cash provided by investing activities | 290 | 1,393 |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from debt issuances[2] | 1,235 | 330 |
| Repayments of debt[3] | (869) | (717) |
| Increase in short-term borrowings, primarily 90 days or less | 389 | 216 |
| Proceeds from sale-leaseback financing | 130 | 89 |
| Debt issuance costs[4] | (34) | (17) |
| Net cash provided by (used in) financing activities | 851 | (99) |
| | | |
| NET INCREASE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 105 | 156 |
| **TOTAL CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF YEAR** | 336 | 286 |
| **TOTAL CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF PERIOD** | $ 441 | $ 442 |
| | | |
| Supplemental Cash Flow Data: | | |
| Income taxes paid, net of refunds | $ 12 | $ 28 |
| Cash interest paid[5] | 223 | 196 |
| Unpaid liability to acquire equipment and software | 10 | 6 |
| PIK interest included within other operating liabilities | 11 | - |

[1] Proceeds in 2017 include $63 million from JPP, LLC and JPP II, LLC, entities affiliated with ESL (as defined in Note 1), for the sale of receivables.
[2] Proceeds in 2018 include $891 million from related parties in connection with the Consolidated Secured Loan Facility, FILO Loan, Mezzanine Loan, Additional Mezzanine Loans, Line of Credit Loans and additional borrowings from the 2017 Secured Loan Facility. Proceeds in 2017 include $245 million from related parties in connection with the Line of Credit Loans. See Notes 2 and 11 for further information.
[3] Repayments in 2018 include $67 million to related parties in connection with the Term Loan Facility, 2017 Secured Loan Facility, Incremental Loans and 2016 Secured Loan Facility. Repayments in 2017 include $183 million to related parties in connection with the 2017 Secured Loan Facility, 2016 Secured Loan Facility and 2016 Term Loan. See Notes 2 and 11 for further information.
[4] Includes fees related to our borrowings of $13 million paid to related parties during the 26 weeks ended August 4, 2018. Includes a one-time extension fee equal to $4 million to JPP, LLC and JPP II, LLC, entities affiliated with ESL (as defined in Note 1) during the 26 weeks ended July 29, 2017. See Note 2 for further information.
[5] Cash interest paid includes $103 million and $82 million interest paid to related parties related to our borrowings during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively. See Notes 2 and 11 for further information.

See accompanying notes.

JX 114-6

**SEARS HOLDINGS CORPORATION**
**Condensed Consolidated Statements of Deficit**
(Unaudited)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Deficit Attributable to Holdings' Shareholders | | | | |
| *dollars and shares in millions* | Number of Shares | Common Stock | Treasury Stock | Capital in Excess of Par Value | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Total |
| Balance at January 28, 2017 | 107 $ | 1 $ | (5,891) $ | 9,130 $ | (5,519) $ | (1,552) $ | (3,831) |
| Comprehensive income | | | | | | | |
| Net loss | - | - | - | - | (5) | - | (5) |
| Pension and postretirement adjustments, net of tax | - | - | - | - | - | 177 | 177 |
| Currency translation adjustments, net of tax | - | - | - | - | - | 1 | 1 |
| Total Comprehensive Income | | | | | | | 173 |
| Stock awards | - | - | 27 | (28) | - | - | (1) |
| Associate stock purchase | - | - | 3 | - | - | - | 3 |
| Balance at July 29, 2017 | 107 $ | 1 $ | (5,861) $ | 9,102 $ | (5,524) $ | (1,374) $ | (3,656) |
| Balance at February 3, 2018 | 108 $ | 1 $ | (5,820) $ | 9,063 $ | (5,898) $ | (1,072) $ | (3,726) |
| Comprehensive loss | | | | | | | |
| Net loss | - | - | - | - | (932) | - | (932) |
| Pension and postretirement adjustments, net of tax | - | - | - | - | - | 254 | 254 |
| Currency translation adjustments, net of tax | - | - | - | - | - | - | - |
| Total Comprehensive Loss | | | | | | | (678) |
| Stock awards | 1 | - | 97 | (103) | - | - | (6) |
| Associate stock purchase | - | - | 8 | - | - | - | 8 |
| Balance at August 4, 2018 | 109 $ | 1 $ | (5,715) $ | 8,960 $ | (6,830) $ | (818) $ | (4,402) |

See accompanying notes.

7

**JX 114-7**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements**
**(Unaudited)**

**NOTE 1-BASIS OF PRESENTATION**

Sears Holdings Corporation ("Holdings") is the parent company of Kmart Holding Corporation ("Kmart") and Sears, Roebuck and Co. ("Sears"). Holdings (together with its subsidiaries, "we," "us," "our," or the "Company") was formed as a Delaware corporation in 2004 in connection with the merger of Kmart and Sears (the "Merger"), on March 24, 2005. We are an integrated retailer with 866 full-line and specialty retail stores as of August 4, 2018 in the United States, operating through Kmart and Sears. We operate under two reportable segments: Kmart and Sears Domestic.

These interim unaudited Condensed Consolidated Financial Statements have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC"). Accordingly, they do not include all of the information and footnotes required in annual consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America. In the opinion of management, all adjustments (which include normal recurring adjustments) considered necessary for a fair presentation have been included. Operating results for the interim period are not necessarily indicative of the results that may be expected for the full fiscal year. The retail business is seasonal in nature, and we generate a high proportion of our revenues and operating cash flows during the fourth quarter of our fiscal year, which includes the holiday season. These interim financial statements and related notes should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

**Citibank Amendment**

In May 2018, the Company entered into an amendment to the program agreement with Citibank, N.A. (the "Citibank Amendment"), pursuant to which Citibank offers Sears proprietary and co-branded credit cards and administers the associated credit card program (the "Program"). The Citibank Amendment provides for a five year extension (through November 2, 2025) of our 15-year co-brand and private label credit card relationship along with long-term marketing arrangements that include ongoing enhancements to the Shop Your Way MasterCard rewards program.

The Citibank Amendment removes Sears' credit cards, other than Sears' proprietary cards, not enrolled in a rewards program or enrolled in the "Thank You" rewards program (the "TY/NR Portfolio") from the Program. Under a separate marketing agreement entered into in conjunction with the Citibank Amendment, the Company will continue to receive payments from Citibank in respect of the TY/NR Portfolio, which payments will be determined substantially consistent with how such payments were determined under the Program prior to the Citibank Amendment through December 31, 2020 and will thereafter be based on total sales for the TY/NR Portfolio. Credit cards in the TY/NR Portfolio will continue to be accepted in Sears' sales channels. The Citibank Amendment provides for the Company to continue to receive payments from Citibank in respect of the remaining card portfolio under the Program, which payments will be determined substantially consistent with how such payments were determined under the Program prior to the Citibank Amendment through December 31, 2020 and will thereafter be based on new account spend and total sales for the credit card portfolio.

The Citibank Amendment removes the Company's right to purchase, or arrange for a third party to purchase, Program-related assets in certain circumstances, including upon termination or expiry of the Program, except that the Company will have such right if it elects to extend the Program through November 2, 2027, subject to the satisfaction of the performance conditions, and the Program continues through such date, or in certain circumstances if Sears terminates the Program Agreement because of an uncured material breach of Citibank's obligations thereunder. Sears will have no right to purchase the TY/NR Portfolio being removed from the Program.

Pursuant to the Citibank Amendment, Citibank paid Sears $425 million, and Sears funded a reserve for the benefit of Citibank in the amount of $25 million through an irrevocable standby letter of credit from a third party financial institution. The Company accounted for the Citibank Amendment in accordance with accounting standards applicable to revenue from contracts with customers. The Company initially deferred the $425 million received for the Citibank Amendment and will recognize the revenue over the term of the Program as we satisfy the related performance obligation over time. During the 26 weeks ended August 4, 2018, the Company recognized revenues of $14 million, and expects to recognize revenue of $57 million within the next 12 months and $354 million of revenue

8

**JX 114-8**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

thereafter. The Company has accordingly included these amounts within current and long-term unearned revenues, respectively.

**Adoption of Accounting Standards Update:** *Revenue from Contracts with Customers*

In May 2014, the Financial Accounting Standards Board ("FASB") issued accounting standards updates which replace the current revenue recognition standards. Subsequently, the FASB has also issued accounting standards updates which clarify the guidance. The new revenue recognition standard provides a five-step analysis of transactions to determine when and how revenue is recognized. The core principle is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The updates may be applied retrospectively for each period presented or as a cumulative-effect adjustment at the date of adoption.

The Company adopted the update in the first quarter of 2018 using the full retrospective method, and, therefore, comparative financial statements of prior years have been adjusted to apply the new standard retrospectively. The adoption impacted the accounting for our Shop Your Way® program, revenues from gift cards and merchandise returns. The expense for Shop Your Way points was previously recognized as customers earned points and recorded within cost of sales. The new guidance requires the Company to allocate the transaction price to products and points on a relative standalone selling price basis, deferring the portion of revenue allocated to the points and recognizing a contract liability for unredeemed points. The change in the accounting for the Shop Your Way program reduced revenue, but had no impact to gross margin. The new guidance also changed the timing of recognition of the unredeemed portion of our gift cards, which was previously recognized using the remote method. The new guidance requires application of the proportional method. The Company reports revenues from merchandise sales net of estimated returns. The new guidance requires the Company to record both an asset and a liability for anticipated customer returns.

The Company elected the following practical expedients with respect to accounting standards for revenue from contracts with customers:

- The Company elected not to disclose the aggregate amount of the transaction price allocated to remaining performance obligations for its contracts that are one year or less, as the revenue is expected to be recognized within the next year;

- The Company has applied the accounting guidance using the portfolio approach as we believe that the effects of applying the guidance to the portfolio would not differ materially from applying the guidance to the individual contracts within that portfolio;

- For completed contracts, the Company has elected to not restate contracts that begin and end within the same annual reporting period;

- For completed contracts that have variable consideration, the Company has elected to use the transaction price at the date the contract was completed rather than estimating variable consideration amounts in the comparative reporting periods;

- The Company applied the update retrospectively for each period presented, but for all reporting periods presented before the date of initial application, the Company elected not to disclose the amount of the transaction price allocated to the remaining performance obligations or an explanation of when the entity expects to recognize that amount as revenue;

- For contracts that were modified before the beginning of the earliest reporting period, the Company has elected to not retrospectively restate the contract for those contract modifications and there was no aggregate effect of modifications that occurred before the beginning of the earliest period.

The Company has made an accounting policy election to exclude from the measurement of transaction price all taxes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction and collected by the Company from a customer (sales tax, value added tax, etc.).

The Company has made an accounting policy election to account for shipping and handling activities performed after a customer obtains control of the good as activities to fulfill the promise to transfer the good.

9

**JX 114-9**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

The following financial statement line items for the periods presented were affected by the adoption of the new standard. Operating income for the 13- and 26- week periods ended July 29, 2017 also contains the impact of the accounting standards update related to classification of net periodic pension cost, of $246 million and $292 million, respectively. Also, retained deficit as of January 31, 2016 increased from $3,291 million, as originally reported, to $3,310 million as a result of the adoption of the new standard.

*Condensed Consolidated Statement of Operations*

| | 13 Weeks Ended | | |
| | July 29, 2017 | | |
| *millions, except per share data* | **As Originally Reported** | **As Adjusted** | **Effect of Adoption of New Standard** |
|---|---|---|---|
| Merchandise sales | $ 3,498 | $ 3,414 | $ (84) |
| Services and other | 867 | 864 | (3) |
| Cost of sales, buying and occupancy - merchandise sales | 2,902 | 2,815 | (87) |
| Operating (loss) income | (106) | 141 | 247 |
| Net loss attributable to Holdings' Shareholders | (251) | (250) | 1 |
| Basic loss per share | (2.34) | (2.33) | 0.01 |

| | 26 Weeks Ended | | |
| | July 29, 2017 | | |
| *millions, except per share data* | **As Originally Reported** | **As Adjusted** | **Effect of Adoption of New Standard** |
|---|---|---|---|
| Merchandise sales | $ 6,927 | $ 6,743 | $ (184) |
| Services and other | 1,739 | 1,734 | (5) |
| Cost of sales, buying and occupancy - merchandise sales | 5,785 | 5,594 | (191) |
| Operating income | 196 | 490 | 294 |
| Net loss attributable to Holdings' Shareholders | (7) | (5) | 2 |
| Basic loss per share | (0.07) | (0.05) | 0.02 |

10

**JX 114-10**

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements-(Continued)
(Unaudited)

*Condensed Consolidated Balance Sheets*

| millions | January 28, 2017 | | |
|---|---|---|---|
| | As Originally Reported | As Adjusted | Effect of Adoption of New Standard |
| Prepaid expenses and other current assets | $ 285 | $ 300 | $ 15 |
| Other current liabilities | 1,956 | 1,971 | 15 |
| Other long-term liabilities | 1,002 | 1,009 | 7 |
| Total Deficit | (3,824) | (3,831) | (7) |

| millions | July 29, 2017 | | |
|---|---|---|---|
| | As Originally Reported | As Adjusted | Effect of Adoption of New Standard |
| Prepaid expenses and other current assets | $ 318 | $ 334 | $ 16 |
| Other current liabilities | 1,686 | 1,700 | 14 |
| Other long-term liabilities | 985 | 992 | 7 |
| Total Deficit | (3,651) | (3,656) | (5) |

| millions | February 3, 2018 | | |
|---|---|---|---|
| | As Originally Reported | As Adjusted | Effect of Adoption of New Standard |
| Prepaid expenses and other current assets | $ 335 | $ 346 | $ 11 |
| Other current liabilities | 1,568 | 1,575 | 7 |
| Other long-term liabilities | 928 | 935 | 7 |
| Total Deficit | (3,723) | (3,726) | (3) |

*Condensed Consolidated Statements of Cash Flows*

| millions | 26 Weeks Ended | | |
|---|---|---|---|
| | July 29, 2017 | | |
| | As Originally Reported | As Adjusted | Effect of Adoption of New Standard |
| Net loss | $ (7) | $ (5) | $ 2 |
| Change in other operating liabilities | (327) | (329) | (2) |

The Company's accounting policies, as updated from our Annual Report on Form 10-K for the year ended February 3, 2018, pursuant to the adoption of the new standard, are as follows.

*Revenue Recognition*

Revenues from contracts with customers include sales of merchandise, services and extended service contracts, delivery and handling revenues related to merchandise sold, and fees earned from co-branded credit card programs. Revenue is measured based on the amount of fixed consideration that we expect to receive, reduced by estimates for variable consideration such as returns and promotional discounts. Revenue also excludes any amounts collected on behalf of third parties, including sales taxes. In arrangements where we have multiple performance obligations, the transaction price is allocated to each performance obligation using the relative stand-alone selling price. We generally determine stand-alone selling prices based on the prices charged to customers or using expected cost plus a

11

**JX 114-11**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

margin. We generally receive payments from customers for sales of merchandise, extended service contracts, product installation, and delivery and handling at the point of sale and payments from customers for services, fees from co-branded credit card programs and agreements with SHO and Lands' End when the performance obligations are satisfied.

We recognize revenues from retail operations upon the transfer of control of the goods to the customer. The Company satisfies its performance obligation at the point of sale for retail store transactions and upon delivery for online transactions. We defer the recognition of layaway sales and profit until the period in which the customer takes possession of the merchandise, which is when our related performance obligation has been satisfied. For retail store and online transactions where the Company has not transferred control of the goods to the customer at the end of the period, the performance obligation is generally satisfied in the following reporting period.

Revenues from the sale of service contracts and the related direct acquisition costs are deferred and amortized over the lives of the associated contracts, while the associated service costs are expensed as incurred. The Company satisfies its performance obligations for service contracts over time as the Company is obligated to perform the related services over the contract period, while payment from the customer is generally received at the inception of the service contract. Revenues from product installation and repair services are recognized at the time the services are provided, which is also when the Company has satisfied its performance obligations.

Revenues earned in connection with our agreements with SHO and Lands' End are earned upon the transfer of control of merchandise or the satisfaction of the service performance obligation.

The Company has a Shop Your Way program in which customers earn points on purchases which may be redeemed to pay for future purchases. Points earned pursuant to the Shop Your Way program represent performance obligations and the Company allocates revenue between the merchandise or service and Shop Your Way points based on the relative stand-alone selling price of each performance obligation. The Company uses a portfolio approach and the expected cost plus margin approach to determine the stand-alone selling price of Shop Your Way points. The Company's assessment also incorporates our estimate of Shop Your Way points that we expect will not be redeemed (breakage) based on historical redemption patterns. Revenue related to Shop Your Way points is initially deferred and recognized when the points are redeemed or expire. The Company expects to recognize revenue related to the Shop Your Way points performance obligation within one year from when the points are earned by the customer.

We sell gift cards to customers at our retail stores and through our direct to customer operations. The gift cards generally do not have expiration dates. Revenues from gift cards are recognized when the gift card is redeemed by the customer. The Company also recognizes the estimated value of gift cards we expect will not be redeemed (gift card breakage) as revenue in proportion to the redemption of gift cards based on historical redemption patterns when we determine that we do not have a legal obligation to remit the value of the unredeemed gift cards to the relevant jurisdictions.

We also earn revenues through arrangements with third-party financial institutions that manage and directly extend credit relative to our co-branded credit card programs. The third-party financial institutions pay us for generating new accounts and sales activity on co-branded cards, as well as for selling other financial products to cardholders. We recognize these revenues over time as our related performance obligations have been satisfied.

Revenues from merchandise sales are reported net of estimated returns and exclude sales taxes. The typical return period is 30 days and the refund liability for returns is calculated as a percentage of sales based on historical return percentages. Estimated returns are recorded as a reduction of sales and cost of sales. We offer assurance-type warranties on certain Kenmore®, Craftsman®, and DieHard® branded products, as well as on certain services, that we do not consider performance obligations.

*Cost of Sales, Buying and Occupancy*

Cost of sales, buying and occupancy are comprised principally of the costs of merchandise, buying, warehousing and distribution (including receiving and store delivery costs), retail store occupancy costs, product repair, and home service and installation costs, customer shipping and handling costs, vendor allowances, markdowns and physical inventory losses.

12

**JX 114-12**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Pension Benefit Guaranty Corporation Agreement**

On March 18, 2016, we entered into a five-year pension plan protection and forbearance agreement (the "PPPFA") with the Pension Benefit Guaranty Corporation ("PBGC"), pursuant to which the Company has agreed to continue to protect, or "ring-fence," pursuant to customary covenants, the assets of certain special purpose subsidiaries (the "Relevant Subsidiaries") holding real estate and/or intellectual property assets. Also under the agreement, the Relevant Subsidiaries granted the PBGC a springing lien on the ring-fenced assets, which lien will be triggered only by (a) failure to make required contributions to the Company's pension plans (the "Plans"), (b) prohibited transfers of ownership interests in the Relevant Subsidiaries, (c) termination events with respect to the Plans, or (d) bankruptcy events with respect to the Company or certain of its material subsidiaries. Under the PPPFA, the PBGC has agreed to forbear from initiating an involuntary termination of the Plans, except upon the occurrence of specified conditions, one of which is based on the aggregate market value of the Company's issued and outstanding stock. As of the date of this report, the Company's stock price is such that the PBGC would be permitted to cease forbearance. The PBGC has been given notice in accordance with the terms of the PPPFA and has not communicated any intention to cease its forbearance.

In November 2017, we entered into an amendment to the PPPFA which provided for the release of 138 of our properties from a ring-fence arrangement, which is further described below and in Note 5.

In August 2018, we entered into an amendment to the PPPFA which provided for the release of 12 of our properties from a ring fence arrangement, which had originally been granted in connection with the Craftsman Sale, as defined below, in exchange for a contribution of $32 million into an escrow for the benefit of our pension plans (the "Required Deposit"). The Required Deposit was made on August 30, 2018, using funds generated from the sale and leaseback of one of the 12 properties.

**Craftsman Brand Sale**

On March 8, 2017, the Company closed its sale of the Craftsman brand to Stanley Black & Decker (the "Craftsman Sale"). The transaction provides Stanley Black & Decker with the right to develop, manufacture and sell Craftsman-branded products outside of Holdings and Sears Hometown & Outlet Stores, Inc. distribution channels. As part of the transaction, Holdings is permitted to continue to offer Craftsman-branded products, sourced from existing suppliers, through its current retail channels via a perpetual license from Stanley Black & Decker, which will be royalty-free for the first 15 years after closing and royalty-bearing thereafter.

The Company received an initial upfront payment of $525 million, subject to closing costs and an adjustment for working capital changes, at closing. In addition, Stanley Black & Decker will pay a further $250 million in cash in three years (the "Craftsman Receivable") and Holdings will receive payments of between 2.5% and 3.5% on new Stanley Black & Decker sales of Craftsman products made during the 15 year period following the closing. In connection with the Craftsman Sale, we recognized a gain in our Kmart segment of $492 million within gain on sales of assets in the Condensed Consolidated Statements of Operations for the 26 weeks ended July 29, 2017, and initially established a receivable of $234 million for the net present value of the Craftsman Receivable. During the 13 weeks ended July 29, 2017, we sold the Craftsman Receivable to a third-party purchaser.

In connection with the closing of the Craftsman Sale, Holdings reached an agreement with the PBGC pursuant to which the PBGC consented to the sale of the Craftsman-related assets that had been "ring-fenced" under the PPPFA and certain related transactions. As a condition to obtaining this consent, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the value of the Craftsman Receivable, with such payments being fully credited against certain of the Company's minimum pension funding obligations in 2017, 2018 and 2019.

The Company also granted a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension funding obligations through the end of 2019 and agreed to certain other amendments to the PPPFA. The real estate assets were released from the ring-fence arrangement in August 2018 as described above and in Note 5.

13

JX 114-13

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Cash and Cash Equivalents and Restricted Cash**

Our cash and cash equivalents include all highly liquid investments with original maturities of three months or less at the date of purchase. The Company classifies cash balances that are legally restricted pursuant to contractual arrangements as restricted cash. The restricted cash balance relates to amounts deposited in escrow for the benefit of our pension plans at each of August 4, 2018, July 29, 2017 and February 3, 2018.

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the Condensed Consolidated Balance Sheets that sum to the total of the same such amounts shown in the Condensed Consolidated Statements of Cash Flows as of August 4, 2018, July 29, 2017 and February 3, 2018.

| millions | August 4, 2018 | | July 29, 2017 | | February 3, 2018 | |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 110 | $ | 121 | $ | 113 |
| Cash posted as collateral | | 5 | | 4 | | 4 |
| Credit card deposits in transit | | 78 | | 87 | | 65 |
| Total cash and cash equivalents | | 193 | | 212 | | 182 |
| Restricted cash | | 248 | | 230 | | 154 |
| Total cash balances | $ | 441 | $ | 442 | $ | 336 |

**Depreciation Expense**

Depreciation expense included within depreciation and amortization reported in the Condensed Consolidated Statements of Operations was $65 million and $82 million for the 13 week periods ended August 4, 2018 and July 29, 2017, respectively, and $131 million and $168 million for the 26 week periods ended August 4, 2018 and July 29, 2017, respectively.

**Liquidity**

We need liquidity to fund both working capital requirements of our businesses and necessary capital expenditures as well as to be available for general corporate purposes, including debt repayments and pension plan contributions. We have experienced losses and negative cash flows for a number of years and while we continue to focus on our overall profitability, including managing expenses, we have continued to incur operating losses in the second quarter and first half of 2018, and continued to fund cash used in operating activities with cash from investing and financing activities. In addition, we will be required to fund a debt payment of $134 million during October 2018, in addition to $668 million of other debt maturing in the next twelve months.

*Recent Sources of Incremental Liquidity*

The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows from operations experienced over the past several years. These actions can be broadly broken down into three categories: (i) financing transactions; (ii) asset sales; and (iii) operational streamlining, including store closings. These financing activities have included the completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility. The actions relative to our assets have included transactions to monetize the value of certain assets such as the sale of the Craftsman brand to Stanley Black & Decker in the first quarter of 2017 for consideration consisting of upfront cash payments and a future royalty stream, sales of properties and investments for proceeds of $1.1 billion in fiscal 2017, and an amendment to our credit card program agreement with Citibank, N.A. which resulted in a payment to the Company of $425 million during the second quarter of 2018. Streamlining actions have included a restructuring program announced at the beginning of 2017 (which produced cost savings during that year and into 2018) and the closure of 137 stores during 2018, and an additional 149 stores that will close during the second half of 2018. The Company intends to take further actions to streamline operations in 2018 to achieve additional cost reductions unrelated to store closures.

14

**JX 114-14**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

In addition to previous actions taken, the Company may access other sources of liquidity to support its operations. For instance, we are permitted to obtain longer-term secured financing maturing outside of the maturity date of our domestic credit facility which would not be subject to borrowing base limitations (see Note 2 of Notes to Consolidated Financial Statements). Other options which may be available to us, which we will evaluate and seek to execute as appropriate, include refinancing existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

*Asset Monetization*

A special committee of the board of directors (the "Board") of the Company (the "Special Committee") is overseeing a formal process to explore the sale of our Kenmore brand and related assets, the Sears Home Improvement Products business of the Sears Home Services division and the Parts Direct business of the Sears Home Services division (collectively, the "Sale Assets"). As previously reported, the Board received a letter from ESL Investments, Inc. ("ESL") expressing the view that the Company should pursue a divestiture of the Sale Assets in order to maximize their value, and expressing interest in participating as a purchaser of all or a portion of the Sale Assets should the Company do so. The Board established the Special Committee, which consists solely of independent directors, and is advised by independent advisors, to evaluate any proposals that may be received from ESL with respect to the Sale Assets, to actively solicit third-party interest in the Sale Assets, and to explore any other alternatives with respect to the Sale Assets that may maximize value for the Company. On August 14, 2018 the Special Committee received a non-binding proposal letter from ESL to acquire the Kenmore brand and related assets and the Sears Home Improvement Products business of the Sears Home Services division, each subject to various conditions including obtaining debt financing, and, in the case of Kenmore, obtaining equity financing on terms acceptable to ESL. The Special Committee is evaluating the proposal, and potentially other proposals as part of its formal process.

We also continue to explore ways to unlock value across a range of other assets and to maximize the value of our Sears Home Services, Innovel and Sears Auto Centers businesses, as well as our DieHard brand, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings.

Our efforts also continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio, as we look to de-lever our balance sheet, provide liquidity and continue in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

*Actions to Address Liquidity Needs*

The following actions, which are intended to fund liquidity needs over the next twelve months, are in various stages of completion as of the date of this filing. We believe these actions, some of which we expect, subject to our governance processes, including the process being overseen by the Special Committee, to include related party participation and funding and, in the case of Sale Assets that are sold to ESL, subject to approval by a majority of the disinterested stockholders of Holdings, if completed, would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements.

• Sales of properties securing the remaining principal amount of the Secured Loans to fund the repayment of such Secured Loans;

• Additional borrowings under the Mezzanine Loan Agreement, Term Loan Facility and the Consolidated Secured Loan Facility;

• Monetization of the Sale Assets;

• Extension of maturities beyond September 2019 of Line of Credit Loans under the Second Lien Credit Agreement;

• Additional borrowings secured by real estate assets, borrowings under the short-term basket, or other borrowings;

• Amendments to the terms of certain of our financing arrangements, including to allow interest on some of our debt to paid-in-kind;

15

**JX 114-15**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

- Further evaluation and right-sizing of our store base, including evaluation of our business categories; and

- Further restructurings to help manage expenses and improve profitability, including additional store closures and the accomplishments of our planned cost savings initiatives.

While we believe that completion of these actions would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements, these actions have not been fully executed as of the date of this report and certain of the actions have not received necessary approvals (including but not limited to approval of the Special Committee and approval of a majority of the disinterested stockholders of the Company in the case of certain proposed transactions with ESL), and/or are at too early of a stage in the process to be considered probable of occurring under applicable accounting guidance as of the date of this report. Accordingly, because we cannot at this time conclude that these actions are probable of occurring under such accounting standards, substantial doubt is deemed to exist about our ability to continue as a going concern. The Company continues to move forward with these proposed actions, including the process being overseen by the Special Committee, and discussions with lenders, in order to complete these actions. The Company believes that completion of these actions, or in some cases substantial progress towards such completion, would alleviate or eliminate the substantial doubt. The Company will continue to reevaluate this assessment.

The PPPFA contains certain limitations on our ability to sell assets, including the Kenmore brand and related assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA and the ability to utilize related party borrowings to provide liquidity when there are short-term delays in the closing of transactions.

The success of the foregoing actions is subject to various risks, uncertainties and other factors, including market conditions, interest in specific assets and our ability to close the sales of assets at valuations and within time frames that are acceptable to us, our ability to effectively and timely execute the above actions to improve the operating performance of our businesses and, in certain cases, the approval and participation of third parties, including our creditors and the PBGC.

If we continue to experience operating losses and we are not able to generate additional liquidity through the actions described above or through some combination of other actions, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement or other financing agreement. Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such deficiency. As of August 4, 2018, our borrowing base was below the above threshold, and if our borrowing base is below the above threshold at the end of our third quarter of 2018, it would trigger an obligation to repurchase or repay second lien debt, in an amount equal to the excess of our funded debt secured by liens on our inventory as of November 3, 2018 over the borrowing base. If we fail to make such repurchase or repayment, we would be in violation of our covenants under our Second Lien Credit Agreement and the indenture relating to our New Senior Secured Notes.

**Sears Canada**

At each of August 4, 2018, July 29, 2017 and February 3, 2018, the Company was the beneficial holder of approximately 12 million, or 12%, of the common shares of Sears Canada. In July 2017, Sears Canada filed for court protection and trading of its common shares was suspended. Accordingly, we recognized other-than-temporary impairment of $12 million, thereby reducing the carrying value to zero, within interest and investment loss in our Condensed Consolidated Statements of Operations during the 13- and 26- weeks ended July 29, 2017.

16

**JX 114-16**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

## NOTE 2-BORROWINGS

Total borrowings were as follows:

| millions | | August 4, 2018 | | July 29, 2017 | | February 3, 2018 |
|---|---|---|---|---|---|---|
| **Short-term borrowings:** | | | | | | |
| Secured borrowings | $ | 660 | $ | 216 | $ | 271 |
| Line of credit loans | | 570 | | 330 | | 500 |
| Incremental loans | | - | | - | | 144 |
| Secured loan | | 24 | | - | | - |
| **Long-term debt, including current portion:** | | | | | | |
| Notes and debentures outstanding | | 3,639 | | 3,360 | | 3,145 |
| Capitalized lease obligations | | 61 | | 97 | | 72 |
| Total borrowings | $ | 4,954 | $ | 4,003 | $ | 4,132 |

The fair value of long-term debt, excluding capitalized lease obligations, was $3.5 billion at August 4, 2018, $3.3 billion at July 29, 2017 and $2.8 billion at February 3, 2018. The fair value of our debt was estimated based on quoted market prices for the same or similar issues or on current rates offered to us for debt of the same remaining maturities. Our long-term debt instruments are valued using Level 2 measurements as defined in Note 5 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

*Letter of Credit Facility*

On December 28, 2016, the Company, through Sears Roebuck Acceptance Corp. ("SRAC") and Kmart Corporation (together with SRAC, the "Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into the Letter of Credit and Reimbursement Agreement (the "LC Facility") providing for a $500 million secured standby letter of credit facility (of which $271 million was committed at August 4, 2018) from JPP, LLC and JPP II, LLC, entities affiliated with ESL (collectively, the "Lenders"), with Citibank, N.A., serving as administrative agent and issuing bank.

In August 2017, the Company executed amendments to the LC Facility. The amendments, among other things, extended the maturity to December 28, 2018, eliminated the unused portion of the facility and released the real estate collateral that secured the original LC Facility. The amended LC Facility also permits the Lenders to syndicate all or a portion of their commitments under the facility to other lenders, of which $165 million has been syndicated to unaffiliated third party lenders as of August 4, 2018. In April 2018, the Company executed amendments to the LC Facility, which extended the maturity to December 28, 2019.

The amended LC Facility is guaranteed by the same subsidiaries of the Company that guarantee the obligations under the Amended Domestic Credit Agreement, as defined below. The amended LC Facility is secured by substantially the same collateral as the Amended Domestic Credit Agreement. The amended LC Facility contains a borrowing base calculation, pursuant to which the borrowers are required to cash collateralize the LC Facility if the aggregate obligations under the Amended Domestic Credit Agreement, amended LC Facility and certain other cash management and similar obligations exceed the Modified Borrowing Base, as defined in the amended LC Facility, as of the end of any calendar month.

To secure their obligation to participate in letters of credit issued under the LC Facility, the lenders under the LC Facility are required to maintain cash collateral on deposit with the Issuing Bank in an amount equal to 102% of the commitments under the LC Facility (the "Lender Deposit"). The Borrowers paid the Lenders an upfront fee equal to 1.00% of the aggregate amount of the Lender Deposit, and in connection with the extension of the maturity of the LC Facility in April 2018, the Borrowers paid the Lenders an upfront fee equal to 0.50% of the aggregate amount of the Lender Deposit. In addition, the Borrowers are required to pay a commitment fee on the average daily amount of the Lender Deposit (as such amount may be increased or decreased from time to time) equal to the Eurodollar Rate (as defined under the Amended Domestic Credit Facility) plus 11.0%, as well as certain other fees. The Borrowers are also required to pay a fee equal to 0.50% of the aggregate amount of the Lender Deposit in connection with the

17

**JX 114-17**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

termination of the LC Facility, whether at maturity or otherwise, or of any reduction in the amount of the Lenders' commitments under the LC Facility.

The LC Facility includes certain representations and warranties, affirmative and negative covenants and other undertakings, which are subject to important qualifications and limitations set forth in the LC Facility. The LC Facility also contains certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If an event of default occurs, the Lenders may terminate all or any portion of the commitments under the LC Facility, require the Borrowers to cash collateralize the LC Facility and/or exercise any rights they might have under any of the related facility documents (including against the collateral), subject to certain limitations. At each of August 4, 2018, July 29, 2017 and February 3, 2018, we had $271 million of letters of credit outstanding under the LC Facility.

*Secured Loan and Mezzanine Loan*

On March 14, 2018, the Company, through SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC (collectively, the "Secured Loan Borrowers"), entities wholly-owned and controlled indirectly by the Company, entered into a Credit Agreement (the "Credit Agreement") with the lenders party thereto (collectively, the "Secured Lenders"). The Credit Agreement provides for a $200 million term loan (the "Secured Loan") that was initially secured by the Secured Loan Borrowers' interests in 138 real properties that were released from a ring-fence arrangement with the PBGC. The Secured Loan had an original maturity date of December 14, 2018. The Company used the proceeds of the Secured Loan to make a contribution to the Company's pension plans and for general corporate purposes.

Also on March 14, 2018, the Company, through SRC Sparrow 2 LLC (the "Mezzanine Loan Borrower"), an entity wholly-owned and controlled indirectly by the Company, entered into a Mezzanine Loan Agreement (the "Mezzanine Loan Agreement") with the Lenders, entities affiliated with ESL. The Mezzanine Loan Agreement provides for a $240 million term loan (the "Mezzanine Loan") that is secured by a pledge of the equity interests in SRC O.P. LLC, the direct parent company of the entities that own the 138 real properties that initially secured the obligations of the Secured Loan Borrowers under the Credit Agreement. The Mezzanine Loan matures on July 20, 2020. The Company used the proceeds of the Mezzanine Loan to make a contribution to the Company's pension plans.

The Mezzanine Loan Agreement contains an uncommitted accordion feature pursuant to which the Mezzanine Loan Borrower may incur additional loans ("Additional Mezzanine Loans") subject to certain conditions set forth in the Mezzanine Loan Agreement and the Credit Agreement. During the first half of 2018, the Company obtained Additional Mezzanine Loans of $273 million.

On June 29, 2018, the Secured Loan Borrowers entered into a Second Amendment to the Credit Agreement with the Secured Lenders that increased the loan-to-value cap applicable to the aggregate principal amount of the Secured Loan, the Mezzanine Loan and the Additional Mezzanine Loans that may be incurred under the Credit Agreement and the Mezzanine Loan Agreement from 55% to 69%. The Mezzanine Loan Agreement was also amended to make a conforming change to the loan-to-value cap to increase such cap from 55% to 69%. No upfront or other fees were paid by the Secured Loan Borrowers in connection with these amendments.

On August 31, 2018, the Secured Loan Borrowers entered into a Third Amendment to the Credit Agreement with the Secured Lenders pursuant to which the Secured Loan Borrowers borrowed an additional $113 million from the Secured Lenders (together with the original $200 million term loan, the "Secured Loans"), which was used for general corporate purposes. The Secured Loans are secured by the Secured Loan Borrowers' interests in 119 real properties. The Secured Loans mature on August 30, 2019. The Company paid an upfront commitment fee of 2.75% of the additional borrowings.

The Secured Loans, the Mezzanine Loan and the Additional Mezzanine Loans are guaranteed by the Company and certain of its subsidiaries. The Secured Loan originally had interest at an annual interest rate of LIBOR plus 6.5% for the first three months the Secured Loan is outstanding, LIBOR plus 7.5% for the fourth through the sixth month the Secured Loan is outstanding and LIBOR plus 8.5% for the seventh through the ninth month the Secured Loan is outstanding. The Secured Loans will bear interest at an annual interest rate of LIBOR plus 6.5% for the first four months following the Third Amendment to the Credit Agreement, LIBOR plus 7.5% for the fifth through eighth

18

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

month, and LIBOR plus 8.5% for the ninth through twelve month. Accrued interest is payable monthly during the term of the Secured Loans. The Mezzanine Loan and the Additional Mezzanine Loans bear interest at an annual interest rate of LIBOR plus 11.0%, with accrued interest payable monthly during the term of the Mezzanine Loan and the Additional Mezzanine Loans. The Company paid an upfront commitment fee of 1.5% of the principal amount of the Secured Loan, and paid an arrangement fee. The Mezzanine Borrowers paid upfront commitment fees equal to 1.8% of the principal amount of the Mezzanine Loan and the Additional Mezzanine Loans.

To the extent permitted under other debt of the Company or its affiliates, the Secured Loans, the Mezzanine Loan and the Additional Mezzanine Loans may be prepaid at any time in whole or in part, without penalty or premium. The Secured Loan Borrowers are required to apply the net proceeds of the sale of any real property collateral for the Secured Loans to repay the Secured Loans. Following repayment in full of the Secured Loans, the Mezzanine Loan Borrower is required to apply the net proceeds of the sale of any real property that served as collateral for the Secured Loans to repay the Mezzanine Loan and the Additional Mezzanine Loans. The Company used proceeds of $170 million to pay a portion of the Secured Loan during the 26 weeks ended August 4, 2018.

The Credit Agreement and the Mezzanine Loan Agreement include certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The Credit Agreement and the Mezzanine Loan Agreement have certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Secured Loan Lenders and the Mezzanine Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have (including against the collateral), and require the Secured Loan Borrowers or Mezzanine Loan Borrower to pay a default interest rate of 2.0% in excess of the base interest rate.

At August 4, 2018, the carrying value of the Secured Loan, net of the remaining debt issuance costs, was $24 million. The Secured Loan is included within short-term borrowings in the Condensed Consolidated Balance Sheets at August 4, 2018. At August 4, 2018, the carrying value of the Mezzanine Loan, net of the remaining debt issuance costs, was $230 million. At August 4, 2018, the carrying value of the Additional Mezzanine Loans, net of the remaining debt issuance costs, was $269 million.

*Term Loan Facility*

On January 4, 2018, the Borrowers entered into a Term Loan Credit Agreement (the "Term Loan Credit Agreement") providing for a secured term loan facility (the "Term Loan Facility") from the Lenders, entities affiliated with ESL. The Term Loan Facility is guaranteed by the Company and certain of its subsidiaries that guarantee the Company's other material debt or own material intellectual property. The Term Loan Facility is secured by substantially all of the unencumbered intellectual property of the Company and its subsidiaries, other than intellectual property relating to the Kenmore and DieHard brands, as well as by certain real property interests, in each case subject to certain exclusions. On January 4, 2018, $100 million was borrowed under the Term Loan Facility. The Term Loan Facility also contains an uncommitted incremental loan feature that, subject to the satisfaction of certain conditions, including the consent of the Agent, would permit up to an additional $200 million to be borrowed from other counterparties and secured by the same collateral as the initial loan under the Term Loan Facility. An additional $30 million was borrowed under the Term Loan Facility on January 19, 2018.

On January 29, 2018, the Company entered into an Amendment to the Term Loan Credit Agreement (the "Term Loan Facility Amendment"), pursuant to which an additional $20 million was borrowed from the Lenders and a further $60 million was borrowed from certain unaffiliated lenders, bringing the total amount borrowed under the Term Loan Facility to $210 million at February 3, 2018. The Term Loan Facility Amendment, among other changes, separates the loans under the Term Loan Facility into two tranches. On February 26, 2018, the Company entered into another amendment to the Term Loan Credit Agreement pursuant to which an additional $40 million was borrowed from the Lenders.

The loans under the Term Loan Facility bear interest at a weighted average annual interest rate of LIBOR plus 12.5%, which during the first year must be paid in kind by capitalizing interest. The loans under the Term Loan Facility mature on July 20, 2020. The Company used the proceeds of the Term Loan Facility for general corporate purposes. No upfront or arrangement fees were paid in connection with the Term Loan Facility. The loans under the

19

**JX 114-19**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

Term Loan Facility are prepayable without premium or penalty. The Company used proceeds of $30 million to pay interest and a portion of the Term Loan Facility during the 26 weeks ended August 4, 2018.

The Term Loan Facility includes certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the intellectual property and real property collateral. The Term Loan Facility has certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have (including against the collateral), and require the Borrowers to pay a default interest rate.

At August 4, 2018 and February 3, 2018, the carrying value of the Term Loan Facility, net of the remaining debt issuance costs, was $233 million and $206 million, respectively. The carrying value includes paid-in-kind interest of $15 million and $1 million at August 4, 2018 and February 3, 2018, respectively.

*Consolidated Secured Loan Facility*

On June 4, 2018, the Company, through the Incremental Loan Borrowers (as defined below), entered into a Third Amended and Restated Loan Agreement (the "Consolidated Loan Agreement") with the 2016 Secured Loan Lenders (as defined below), which amends and restates the Second Amended and Restated Loan Agreement, dated as of October 18, 2017. In connection with the Consolidated Loan Agreement, the 2016 Secured Loan Lenders made an additional advance in an aggregate principal amount of approximately $186 million, which was used to repay the loans outstanding under the 2016 Secured Loan Facility and terminate the agreement. In connection therewith, the mortgages on the 13 real properties securing the 2016 Secured Loan Facility were released and these properties were pledged as collateral for the loan under the Consolidated Loan Agreement (the "Consolidated Secured Loan Facility"). After giving effect to the additional advance, the aggregate principal amount of the loan outstanding under the Consolidated Loan Agreement as of June 4, 2018 was approximately $779 million. The Consolidated Secured Loan Facility matures on July 20, 2020.

On September 12, 2018, the Company, through the Incremental Loan Borrowers, entered into a First Amendment to the Consolidated Loan Agreement with the 2016 Secured Loan Lenders, pursuant to which certain of the Incremental Loan Borrowers (the "Additional Advance Borrowers") received an additional advance in aggregate principal amount of $75 million (the "Additional Advance") and granted the 2016 Secured Loan Lenders a first priority lien on an additional 20 real properties. No Incremental Loan Borrower other than the Additional Advance Borrowers shall have any liabilities or obligations in connection with the Additional Advance.

After giving effect to the Additional Advance, the aggregate principal amount of the loan outstanding under the Consolidated Loan Agreement as of September 12, 2018 was approximately $831 million. Approximately $108 million of Consolidated Secured Loan Facility, which as of closing of the Additional Advance was held by Cascade Investment, LLC, is structured as a "first out" tranche evidenced by promissory note "A" ("Note A") and bears interest at LIBOR plus 6.50% per annum. The remainder of Consolidated Secured Loan Facility is evidenced by promissory note "B" ("Note B"), which as of closing of the Additional Advance was held by JPP, LLC and JPP II, LLC, entities affiliated with ESL, and bears interest at LIBOR plus 9.00% per annum. The Consolidated Secured Loan Facility matures on July 20, 2020.

The Incremental Loan Borrowers paid approximately $1.6 million in upfront fees to the 2016 Secured Loan Lenders in connection with the Consolidated Loan Agreement and the Additional Advance Borrowers paid approximately $0.4 million in upfront fees to the 2016 Secured Loan Lenders in connection with the Additional Advance. In addition, to the extent any portion of the loan evidenced by Note A remains outstanding on March 12, 2019, the Incremental Loan Borrowers must pay the holder of Note A an additional fee of 1.00% of the principal amount outstanding under Note A as of such date, and to the extent any portion of the loan evidenced by Note A remains outstanding on September 12, 2019, the Incremental Loan Borrowers must pay the holder of Note A an additional fee of 2.00% of the principal amount outstanding under Note A as of such date.

The Incremental Loan Borrowers have the right, at any time prior to October 15, 2018, to request an additional advance under the Consolidated Loan Agreement in an amount not to exceed $50 million. The making of any such additional advance and the amount thereof shall be subject to the 2016 Secured Loan Lenders' sole discretion and the payment of an origination fee equal to 0.5% of the amount so advanced. If no such additional advance is made,

20

**JX 114-20**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

or if an additional advance is made in an amount less than $50 million, the 2016 Secured Loan Lenders shall reasonably promptly release their liens on certain of the additional 20 real properties pledged in connection with the Additional Advance.

The Consolidated Secured Loan Facility is guaranteed by the Company and, after giving effect to the Additional Advance, is secured by a first priority lien on 88 real properties owned or leased by the Incremental Loan Borrowers, which includes real property that initially secured the 2017 Secured Loan Facility, Incremental Loans and 2016 Secured Loan Facility. To the extent permitted under other debt of the Company or its affiliates, the Consolidated Secured Loan Facility may be prepaid at any time in whole or in part, without penalty or premium. The Incremental Loan Borrowers are required to apply the net proceeds of the sale of any real property collateral to repay the Consolidated Secured Loan Facility. Any such prepayments or repayments will be applied first to Note A until Note A is repaid in full, and then to Note B, provided, that the holder of Note A shall have the right to waive any such prepayment or repayment (other than in connection with a repayment of the Consolidated Secured Loan Facility in full at maturity or any other prepayment in full or repayment in full of the Consolidated Secured Loan Facility), in which case (x) such prepayment or repayment shall be applied to Note B and (y) such amount shall reduce the principal amount of indebtedness deemed outstanding under Note A solely for the purpose of calculating the delayed origination fees described above. The Company used proceeds of $23 million to pay interest and a portion of the Consolidated Secured Loan Facility during the 26 weeks ended August 4, 2018.

The Consolidated Loan Agreement includes certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The Consolidated Loan Agreement has certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the 2016 Secured Loan Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the Consolidated Secured Loan Facility documents (including against the collateral), and require the Incremental Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%.

The carrying value of the Consolidated Secured Loan Facility, net of the remaining debt issuance costs, was $748 million at August 4, 2018.

*2017 Secured Loan Facility*

On January 3, 2017, the Company, through Sears, Kmart Stores of Illinois LLC, Kmart of Washington LLC and Kmart Corporation (collectively, "2017 Secured Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, obtained a $500 million real estate loan facility (the "2017 Secured Loan Facility") from the Lenders, entities affiliated with ESL. On January 3, 2017, $321 million was funded under the 2017 Secured Loan Facility, and an additional $179 million was drawn by the Company prior to January 28, 2017. The 2017 Secured Loan Facility had an original maturity of July 20, 2020. The Company used the proceeds of the 2017 Secured Loan Facility for general corporate purposes.

During October 2017, the Company, through the 2017 Secured Loan Borrowers and SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC (collectively, "Incremental Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into amended and restated loan agreements (the "Incremental Loans") with the Lenders, entities affiliated with ESL. The Company borrowed $200 million pursuant to the Incremental Loans, and used the proceeds for general corporate purposes. The Incremental Loans had an original maturity of July 6, 2018.

On March 8, 2018, the Company, through the 2017 Secured Loan Borrowers and SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc. and Troy Coolidge No. 13, LLC (collectively, "Second Incremental Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into a second amendment to the Incremental Loans (the "Second Amendment") with the Lenders, entities affiliated with ESL. Pursuant to the Second Amendment, the Second Incremental Loan Borrowers borrowed an additional $100 million from the Lenders, which had an original maturity of July 20, 2020 and had the same terms as the 2017 Secured Loan Facility, as amended. The Company used the proceeds for general corporate purposes.

21

JX 114-21

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

On June 4, 2018, the 2017 Secured Loan Facility and Incremental Loans were amended and restated by the Consolidated Loan Agreement described above.

Initially, the 2017 Secured Loan Facility had an annual base interest rate of 8%, with accrued interest payable monthly during the term of the 2017 Secured Loan Facility. Pursuant to the Second Amendment, the interest rate increased to LIBOR plus 9%. The Borrowers paid an upfront commitment fee equal to 1.0% of the full principal amount of the 2017 Secured Loan Facility and paid a funding fee equal to 1.0% of the amounts drawn under the 2017 Secured Loan Facility at the time such amounts were drawn. The Incremental Loans had an annual interest rate of 11%, with accrued interest payable monthly. No upfront or funding fees were paid in connection with the Incremental Loans or the Second Amendment.

The 2017 Secured Loan Facility and Incremental Loans were guaranteed by the Company and certain of its subsidiaries, and were secured by a first priority lien on 69 real properties owned by the 2017 Secured Loan Borrowers and Incremental Loan Borrowers and guarantors at inception of the 2017 Secured Loan Facility, and an additional seven real properties owned by the Incremental Loan Borrowers at inception of the Incremental Loans. In certain circumstances, the Lenders and the 2017 Secured Loan Borrowers, Incremental Loan Borrowers and Second Incremental Loan Borrowers were permitted to substitute one or more properties as collateral. To the extent permitted under other debt of the Company or its affiliates, the 2017 Secured Loan Facility was permitted to be prepaid at any time in whole or in part, without penalty or premium. The 2017 Secured Loan Borrowers were required to apply the net proceeds of the sale of any real property collateral for the 2017 Secured Loan Facility to repay the loan. The Company used proceeds of $20 million and $39 million to pay interest and a portion of the 2017 Secured Loan Facility during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively, and $6 million to pay interest and a portion of the Incremental Loans during the 26 weeks ended August 4, 2018.

The 2017 Secured Loan Facility and Incremental Loans included certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The 2017 Secured Loan Facility and Incremental Loans had certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there was an event of default, the Lenders may have declared all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the 2017 Secured Loan Facility or Incremental Loan documents (including against the collateral), and required the 2017 Secured Loan Borrowers, Incremental Loan Borrowers or Second Incremental Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%.

The carrying value of the 2017 Secured Loan Facility, net of the remaining debt issuance costs, was $446 million and $374 million at July 29, 2017 and February 3, 2018, respectively. The carrying value of the Incremental Loans, net of the remaining debt issuance costs, was $144 million at February 3, 2018. The Incremental Loans were included within short-term borrowings in the Condensed Consolidated Balance Sheets at February 3, 2018.

*2016 Secured Loan Facility*

On April 8, 2016, the Company, through Sears, Sears Development Co., Innovel, Big Beaver of Florida Development, LLC and Kmart Corporation (collectively, "2016 Secured Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, obtained a $500 million real estate loan facility (the "2016 Secured Loan Facility") from JPP, LLC, JPP II, LLC, and Cascade Investment, LLC (collectively, the "2016 Secured Loan Lenders"). JPP, LLC and JPP II, LLC are entities affiliated with ESL. The first $250 million of the 2016 Secured Loan Facility was funded on April 8, 2016 and the remaining $250 million was funded on April 22, 2016. The funds were used to reduce outstanding borrowings under the Company's asset-based revolving credit facility and for general corporate purposes. The 2016 Secured Loan Facility had an original maturity date of July 7, 2017. In May 2017, the Company reached an agreement to extend the maturity of $400 million of the 2016 Secured Loan Facility to January 2018, with options to further extend the maturity of the loan for up to an additional six months, to July 6, 2018, subject to the satisfaction of certain conditions and the payment of certain fees. On November 21, 2017, the Company notified the 2016 Secured Loan Lenders of its exercise of the first such option to extend the maturity to April 6, 2018, subject to the payment of an extension fee on January 8, 2018, which fee was paid on January 8, 2018. On February 5, 2018, the Company notified the 2016 Secured Loan Lenders of its exercise of the second such option to extend the maturity to July 6, 2018, subject to the payment of an extension fee on April 6,

22

**JX 114-22**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

2018, which fee was paid on April 6, 2018. The 2016 Secured Loan Facility was included within current portion of long-term debt in the Condensed Consolidated Balance Sheets at July 29, 2017 and February 3, 2018. The carrying value of the 2016 Secured Loan Facility, net of the remaining debt issuance costs, was $258 million and $251 million at July 29, 2017 and February 3, 2018, respectively. As noted above, on June 4, 2018, the Company repaid all loans outstanding under the 2016 Secured Loan Facility, and terminated the agreement.

The 2016 Secured Loan Facility had an annual base interest rate of 8%, with accrued interest payable monthly during the term of the 2016 Secured Loan Facility. The 2016 Secured Loan Borrowers paid an upfront commitment fee equal to 1.0% of the full principal amount of the 2016 Secured Loan Facility and paid a funding fee equal to 1.0% at the time such amounts were drawn. In connection with the May 2017 maturity extension, the Company paid a one-time extension fee equal to $8 million to the extending lenders.

The 2016 Secured Loan Facility was guaranteed by the Company and was originally secured by a first priority lien on 21 real properties owned by the 2016 Secured Loan Borrowers. The 2016 Secured Loan Facility included customary representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral.

The 2016 Secured Loan Facility had customary events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the 2016 Secured Loan Lenders may have declared all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the 2016 Secured Loan Facility documents (including against the collateral), and required the 2016 Secured Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%. The 2016 Secured Loan Facility was permitted to be prepaid at any time in whole or in part, without penalty or premium. The 2016 Secured Loan Borrowers were required to apply the net proceeds of the sale of any real property collateral for the 2016 Secured Loan Facility to repay the loan. The Company used proceeds of $67 million and $238 million to pay interest and a portion of the 2016 Secured Loan Facility during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively.

*Domestic Credit Agreement*

The Borrowers and Holdings are party to an amended and restated credit agreement (the "Amended Domestic Credit Agreement") with a syndicate of lenders. Pursuant to the Amended Domestic Credit Agreement, the Borrowers have borrowed two senior secured term loan facilities having original principal amounts of $1.0 billion and $750 million (the "Term Loan" and "2016 Term Loan," respectively). The Amended Domestic Credit Agreement currently provides for a $1.5 billion asset-based revolving credit facility (the "Revolving Facility") with a $1.0 billion letter of credit sub-facility, which matures on July 20, 2020. The Term Loan had an original maturity of June 30, 2018 and the 2016 Term Loan matures on July 20, 2020. In December 2017, the Company entered into an agreement to extend the maturity of the Term Loan to January 20, 2019, with the option to further extend the maturity to July 20, 2019, subject to certain conditions, including payment of an extension fee equal to 2.0% of the principal amount of the Term Loan outstanding at the time of such extension. The Amended Domestic Credit Agreement includes an accordion feature that allows the Borrowers to use, subject to borrowing base requirements, existing collateral for the facility to obtain up to $1.0 billion of additional borrowing capacity, of which $750 million was utilized for the 2016 Term Loan (described below). The Amended Domestic Credit Agreement also includes a FILO tranche feature that allows up to an additional $500 million of borrowing capacity and allows Holdings and its subsidiaries to undertake short-term borrowings outside the facility up to $1.0 billion. In February 2018, the Borrowers entered into an amendment that increased the size of the general debt basket to $1.25 billion.

23

**JX 114-23**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

On March 21, 2018, the Company, through the Borrowers, entered into a fifth amendment (the "Fifth Amendment") and a sixth amendment (the "Sixth Amendment") to the Amended Domestic Credit Agreement pursuant to which the Borrowers borrowed a $125 million FILO term loan (the "FILO Loan") and made certain other changes to the Amended Domestic Credit Agreement. The FILO Loan matures on July 20, 2020. The FILO Loan bears interest at a rate per annum equal to the Eurodollar Rate plus a margin of 8.50% (subject to a floor of 1.50%) (or a base rate plus a margin of 7.50%). The Borrowers are required to pay an early repayment premium of the greater of a make-whole through eight months and 3.00% in the event the FILO Loan is repaid within the first year, and 2.00% in the event the FILO Loan is repaid within the second year. The FILO Loan is guaranteed by the same guarantors and secured by the same assets as the existing loans under the Amended Domestic Credit Agreement, but ranks junior in right of recovery from the collateral relative to such existing loans. The Company paid a fee of 2.25% of the FILO Loan to the initial lenders of the FILO Loan. The initial lenders of the FILO Loan include JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Thomas J. Tisch. The Company received approximately $122 million in net proceeds from the FILO Loan, which proceeds were using to reduce outstanding borrowings under our revolving credit facility. The carrying value of the FILO Loan, net of the remaining discount and debt issuance costs, was $122 million at August 4, 2018.

Revolving advances under the Amended Domestic Credit Agreement bear interest at a rate equal to, at the election of the Borrowers, either the London Interbank Offered Rate ("LIBOR") or a base rate, in either case plus an applicable margin dependent on Holdings' consolidated leverage ratio (as measured under the Amended Domestic Credit Agreement). The margin with respect to borrowings ranges from 3.50% to 4.00% for LIBOR loans and from 2.50% to 3.00% for base rate loans. The Amended Domestic Credit Agreement also provides for the payment of fees with respect to issued and undrawn letters of credit at a rate equal to the margin applicable to LIBOR loans and a commitment fee with respect to unused amounts of the Revolving Facility at a rate equal to 0.625% per annum.

The Revolving Facility is in place as a funding source for general corporate purposes and is secured by a first lien on substantially all of our domestic inventory and credit card and pharmacy receivables, and is subject to a borrowing base formula to determine availability. The Revolving Facility is guaranteed by all domestic subsidiaries of Holdings that own inventory or credit card or pharmacy receivables. The Revolving Facility also permits aggregate second lien indebtedness of up to $2.0 billion, of which $1.1 billion in second lien indebtedness was outstanding at August 4, 2018, resulting in $0.9 billion of permitted second lien indebtedness, subject to limitations contained in our other outstanding indebtedness. If, through asset sales or other means, the value of the above eligible assets is not sufficient to support borrowings of up to the full amount of the commitments under this facility, we will not have full access to the facility, but rather could have access to a lesser amount determined by the borrowing base. Such a decline in the value of eligible assets also could result in our inability to borrow up to the full amount of second lien indebtedness permitted by the domestic credit facility, but rather we could be limited to borrowing a lesser amount determined by the borrowing base as calculated pursuant to the terms of such indenture.

The Term Loan bears interest at a rate equal to, at the election of the Borrowers, either LIBOR (subject to a 1.00% LIBOR floor) or a base rate, plus an applicable margin for LIBOR loans of 4.50% and for base rate loans of 3.50%. Currently, the Borrowers are required to repay the Term Loan in quarterly installments of $2.5 million, with the remainder of the Term Loan maturing January 20, 2019, subject to the right of the Borrowers to extend the maturity to July 20, 2019. Additionally, the Borrowers are required to make certain mandatory repayments of the Term Loan from excess cash flow (as defined in the Amended Domestic Credit Agreement). The Term Loan may be prepaid in whole or part without penalty. The Term Loan is secured by the same collateral as the Revolving Facility on a pari passu basis with the Revolving Facility, and is guaranteed by the same subsidiaries of the Company that guarantee the Revolving Facility. At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, we had borrowings of $98 million, $727 million and $400 million under the Term Loan, and carrying value, net of the remaining discount and debt issuance costs, of $94 million, $723 million and $391 million. The Company repaid the Term Loan during August 2018, resulting in no borrowings outstanding as of the date of this report. A portion of the proceeds received from the Craftsman Sale were used to reduce outstanding borrowings under the Term Loan during 2017.

Amounts borrowed pursuant to the 2016 Term Loan bear interest at a rate equal to LIBOR plus 750 basis points, subject to a 1.00% LIBOR floor. The Company received approximately $722 million in net proceeds from the 2016 Term Loan, which proceeds were used to reduce outstanding borrowings under its asset-based revolving credit facility. The 2016 Term Loan has a maturity date of July 20, 2020, which is the same maturity date as the Company's revolving credit facility commitments, and does not amortize. The 2016 Term Loan is subject to a prepayment

24

**JX 114-24**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

premium of 2% of the aggregate principal amount of the 2016 Term Loan prepaid on or prior to April 8, 2017 and 1% of the aggregate principal amount of the 2016 Term Loan prepaid after April 8, 2017 and on or prior to April 8, 2018. The obligations under the Amended Domestic Credit Agreement, including the 2016 Term Loan, are secured by a first lien on substantially all of the domestic inventory and credit card and pharmacy receivables of the Company and its subsidiaries and aggregate advances under the Amended Domestic Credit Agreement are subject to a borrowing base formula. The carrying value of the 2016 Term Loan, net of the remaining discount and debt issuance costs, was $561 million, $555 million and $559 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. A portion of the proceeds received from the Craftsman Sale were also used to reduce outstanding borrowings under the 2016 Term Loan during 2017.

The Amended Domestic Credit Agreement limits our ability to make restricted payments, including dividends and share repurchases, subject to specified exceptions that are available if, in each case, no event of default under the credit facility exists immediately before or after giving effect to the restricted payment. These include exceptions that require that projected availability under the credit facility, as defined, to be at least 15%, exceptions that may be subject to certain maximum amounts and an exception that requires that the restricted payment is funded from cash on hand and not from borrowings under the credit facility. Further, the Amended Domestic Credit Agreement includes customary covenants that restrict our ability to make dispositions, prepay debt and make investments, subject, in each case, to various exceptions. The Amended Domestic Credit Agreement also imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement and a requirement that the fixed charge ratio at the last day of any quarter be not less than 1.0 to 1.0. As of August 4, 2018, our fixed charge ratio continues to be less than 1.0 to 1.0, and we are subject to these other requirements based on our availability. If availability under the domestic revolving credit facility were to fall below 10%, the Company would be required to test the fixed charge coverage ratio, and would not comply with the facility, and the lenders under the facility could demand immediate payment in full of all amounts outstanding and terminate their obligations under the facility. In addition, the domestic credit facility provides that in the event we make certain prepayments of indebtedness, for a period of one year thereafter we must maintain availability under the facility of at least 12.5%, and it prohibits certain other prepayments of indebtedness.

At August 4, 2018, July 29, 2017 and February 3, 2018, we had $660 million, $216 million and $271 million, respectively, of Revolving Facility borrowings and $120 million, $389 million and $377 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, of letters of credit outstanding under the Revolving Facility. At August 4, 2018, July 29, 2017 and February 3, 2018, the amount available to borrow under the Revolving Facility was $98 million, $191 million and $69 million, respectively, which reflects the effect of the springing fixed charge coverage ratio covenant and the borrowing base limitation. The majority of the letters of credit outstanding are used to provide collateral for our insurance programs.

*Second Lien Credit Agreement*

On September 1, 2016, the Company, SRAC, and Kmart Corporation (together with SRAC, the "ABL Borrowers") entered into a Second Lien Credit Agreement with the Lenders thereunder, entities affiliated with ESL, pursuant to which the ABL Borrowers borrowed $300 million under a term loan (the "Second Lien Term Loan"). The Company received net proceeds of $291 million, which were used for general corporate purposes.

The maturity date for the Second Lien Term Loan is July 20, 2020 and the Second Lien Term Loan will not amortize. The Second Lien Term Loan bears interest at a rate equal to, at the election of the ABL Borrowers, either LIBOR (subject to a 1.00% floor) or a specified prime rate ("Base Rate"), in either case plus an applicable margin. The margin with respect to the Second Lien Term Loan is 7.50% for LIBOR loans and 6.50% for Base Rate loans.

The Second Lien Credit Agreement was amended on July 7, 2017, providing an uncommitted line of credit facility under which subsidiaries of the Company may from time to time borrow line of credit loans ("Line of Credit Loans") with maturities less than 180 days, subject to applicable borrowing base limitations, in an aggregate principal amount not to exceed $500 million at any time outstanding. In February 2018, the Second Lien Credit Agreement was further amended to, among other things, increase the maximum aggregate principal amount of the Line of Credit Loans to $600 million, extend the maximum duration of the Line of Credit Loans to 270 days and increase the size of the general debt basket to $1.25 billion. During 2017, the Company received aggregate proceeds of $610 million from the issuance of Line of Credit Loans from various lenders, some of which are entities affiliated with ESL, Bruce R. Berkowitz, and Thomas J. Tisch. The Company made repayments of $110 million during 2017,

JX 114-25

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

some of which were to related parties. During 2018, the Company received an additional $70 million from the issuance of Line of Credit Loans from ESL. See Note 11 for further information. The proceeds were used for the repayment of indebtedness and general corporate purposes.

The Second Lien Credit Agreement was further amended on January 9, 2018. This amendment amended the borrowing base definition in the Second Lien Credit Agreement to increase the advance rate for inventory to 75% from 65% and also deferred the collateral coverage test for purposes of the mandatory repayment covenant in the Second Lien Credit Agreement such that no such mandatory repayment can be required until the end of the third quarter of 2018. In connection with the closing of the Exchange Offers, the Company also entered into an amendment to its Second Lien Credit Agreement. The amendment provides the Company with the option to pay interest on its outstanding $300 million principal amount Second Lien Term Loan in kind, and also provides that the Company's obligation under the term loan is convertible into common stock of the Company, on the same conversion terms as the New Senior Secured Notes (as defined below).

Following consummation of the Exchange Offers, the Company's obligations under the Second Lien Credit Agreement are secured on a pari passu basis with the Company's obligations under that certain Indenture, dated as of March 20, 2018, pursuant to which the Company issued its New Senior Secured Notes. The collateral includes inventory, receivables and other related assets of the Company and its subsidiaries which are obligated on the Second Lien Term Loan and the New Senior Secured Notes. The Second Lien Credit Agreement is guaranteed by all domestic subsidiaries of the Company that guarantee the Company's obligations under its existing Revolving Facility.

On July 5, 2018, the Company and the other parties thereto entered into a Fifth Amendment (the "Second Lien Credit Agreement Amendment") to the Second Lien Credit Agreement. The Second Lien Credit Agreement Amendment provides for the incurrence by the Company of approximately $45 million of alternative tranche line of credit loans (the "New Loans") in exchange for a like principal amount of the Company's outstanding 6 5/8% Senior Secured Notes due 2018, which notes were canceled.

The New Loans mature on October 15, 2018, which was the same maturity date of the Old Senior Secured Notes (as defined below). Amounts outstanding under the New Loans may be prepaid at any time, subject to a make-whole prepayment premium. The New Loans bear interest at a rate equal to 6 5/8% per annum, which was the same rate as the Old Senior Secured Notes. Interest on the New Loans is payable from April 15, 2018 on the maturity date of the New Loans. The New Loans otherwise generally have similar terms to the existing loans under the Second Lien Credit Agreement; provided that the lenders under the New Loans benefit from certain additional covenants. The New Loans are guaranteed by SRAC, Kmart and the other subsidiaries of the Company that guarantee the existing loans under the Second Lien Credit Agreement and are secured by the same assets of the Company and its subsidiaries that secure the existing loans under the Second Lien Credit Agreement.

The Second Lien Credit Agreement includes representations and warranties, covenants and other undertakings, and events of default that are substantially similar to those contained in the Amended Domestic Credit Agreement. The Second Lien Credit Agreement requires the ABL Borrowers to prepay amounts outstanding under the Amended Domestic Credit Agreement and/or the Second Lien Credit Agreement in order to avoid a Collateral Coverage Event (as defined below). The carrying value of the Second Lien Term Loan, net of the remaining debt issuance costs, was $308 million, $293 million and $294 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. The carrying value includes paid-in-kind interest of $12 million at August 4, 2018. The carrying value of the Line of Credit Loans, including the New Loans, was $570 million, $330 million and $500 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively.

*Old Senior Secured Notes and New Senior Secured Notes*

In October 2010, we sold $1.0 billion aggregate principal amount of senior secured notes (the "Old Senior Secured Notes"), which bear interest at 6 5/8% per annum and mature on October 15, 2018. Concurrent with the closing of the sale of the Old Senior Secured Notes, the Company sold $250 million aggregate principal amount of Old Senior Secured Notes to the Company's domestic pension plan in a private placement, none of which remain in the domestic pension plan as a result of the Tender Offer discussed below. The Old Senior Secured Notes are guaranteed by certain subsidiaries of the Company and are secured by a security interest in certain assets consisting primarily of domestic inventory and receivables (the "Collateral"). The lien that secures the Old Senior Secured Notes is junior in

26

JX 114-26

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

priority to the liens on such assets that secure obligations under the Amended Domestic Credit Agreement, as well as certain other first priority lien obligations, and, following consummation of the Exchange Offers, obligations under the indenture relating to the New Senior Secured Notes. The Company used the net proceeds of this offering to repay borrowings outstanding under a previous domestic credit agreement on the settlement date and to fund the working capital requirements of our retail businesses, capital expenditures and for general corporate purposes. Prior to consummation of the Exchange Offers, the indenture under which the Old Senior Secured Notes (the "Old Senior Secured Notes Indenture") were issued contained restrictive covenants that, among other things, (1) limited the ability of the Company and certain of its domestic subsidiaries to create liens and enter into sale and leaseback transactions and (2) limited the ability of the Company to consolidate with or merge into, or sell other than for cash or lease all or substantially all of its assets to, another person. The indenture also provided for certain events of default, which, if any were to occur, would permit or require the principal and accrued and unpaid interest on all the then outstanding Old Senior Secured Notes to be due and payable immediately. In connection with the consummation of the Exchange Offers, we entered into a supplemental indenture to the Old Senior Secured Notes Indenture that eliminated substantially all of the restrictive covenants and certain events of default in the Old Senior Secured Notes Indenture. The supplemental indenture, among other things, eliminated the obligation of the Company to offer to repurchase all outstanding Old Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if the borrowing base (as calculated pursuant to the indenture) falls below the principal value of the Old Senior Secured Notes plus any other indebtedness for borrowed money that is secured by liens on the Collateral for two consecutive quarters or upon the occurrence of certain change of control triggering events. The Company may call the Old Senior Secured Notes at a premium based on the "Treasury Rate" as defined in the indenture, plus 50 basis points.

On January 9, 2018, the Company and certain of its subsidiaries entered into a Fourth Supplemental Indenture (the "Supplemental Indenture") with Wilmington Trust, National Association, as successor trustee and collateral agent, amending the Old Senior Secured Notes Indenture. The Supplemental Indenture amended the borrowing base definition in the Old Senior Secured Notes Indenture to increase the advance rate for inventory to 75% from 65%. The Supplemental Indenture also defers the collateral coverage test for purposes of the repurchase offer covenant in the Indenture and restarts it with the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018).

The carrying value of Old Senior Secured Notes, net of the remaining discount and debt issuance costs, was $89 million, $303 million and $303 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. The carrying value of Old Senior Secured Notes is included within current portion of long-term debt in the Condensed Consolidated Balance Sheets at August 4, 2018.

In February 2018, the Company commenced the Exchange Offers pursuant to which it offered to issue in exchange for its outstanding Senior Secured Notes new 6 5/8% Senior Secured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option. The Exchange Offers expired on March 15, 2018. Approximately $169.8 million principal amount of the Senior Secured Notes were validly tendered, accepted and canceled, including $20 million principal amount of Old Senior Secured Notes held by ESL, and the Company issued a like principal amount of New Senior Secured Notes. The New Senior Secured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at a conversion price of $5.00 per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period. The New Senior Secured Notes bear interest at a rate of 6.625% per annum and the Company will pay interest semi-annually on April 15 and October 15 of each year, which interest may, at the option of the Company, be paid in kind. The New Senior Secured Notes mature in October 2019.

The New Senior Secured Notes are guaranteed by certain subsidiaries of the Company and are secured by a security interest in the Collateral. The lien that secures the New Senior Secured Notes is junior in priority to the liens on such assets that secure obligations under the Amended Domestic Credit Agreement, as well as certain other first priority lien obligations, and senior to the lien on such assets that secure obligations under the Old Senior Secured Notes Indenture. The indenture under which the New Senior Secured Notes (the "New Senior Secured Notes Indenture") were issued contains restrictive covenants that, among other things, (1) limit the ability of the Company and certain of its domestic subsidiaries to create liens and enter into sale and leaseback transactions and (2) limit the ability of the Company to consolidate with or merge into, or sell other than for cash or lease all or substantially all of its assets

27

**JX 114-27**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

to, another person. The New Senior Secured Notes Indenture also provides for certain events of default, which, if any were to occur, would permit or require the principal and accrued and unpaid interest on all the then outstanding New Senior Secured Notes to be due and payable immediately. The New Senior Secured Notes Indenture also requires the Company to offer to repurchase all outstanding New Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if the borrowing base (as calculated pursuant to the indenture) falls below the principal value of the New Senior Secured Notes plus any other indebtedness for borrowed money that is secured by liens on the Collateral for two consecutive quarters or upon the occurrence of certain change of control triggering events. As of August 4, 2018, our borrowing base was below the above threshold, and if our borrowing base is below the above threshold at the end of our third quarter of 2018, it would trigger an obligation to repurchase or repay second lien debt, in an amount equal to the excess of our funded debt secured by liens on our inventory as of November 3, 2018 over the borrowing base.

The carrying value of New Senior Secured Notes, net of the remaining discount and debt issuance costs, was $175 million at August 4, 2018. The carrying value includes paid-in-kind interest of $6 million at August 4, 2018.

*Old Senior Unsecured Notes and New Senior Unsecured Notes*

On October 20, 2014, the Company announced its Board of Directors had approved a rights offering allowing its stockholders to purchase up to $625 million in aggregate principal amount of 8% senior unsecured notes due 2019 and warrants to purchase shares of its common stock. The subscription rights were distributed to all stockholders of the Company as of October 30, 2014, the record date for this rights offering, and every stockholder had the right to participate on the same terms in accordance with its pro rata ownership of the Company's common stock, except that holders of the Company's restricted stock that was unvested as of the record date received cash awards in lieu of subscription rights. This rights offering closed on November 18, 2014 and was oversubscribed.

Accordingly, on November 21, 2014, the Company issued $625 million aggregate original principal amount of 8% senior unsecured notes due 2019 (the "Old Senior Unsecured Notes") and received proceeds of $625 million which were used for general corporate purposes. The Old Senior Unsecured Notes are the unsecured and unsubordinated obligations of the Company and rank equal in right of payment with the existing and future unsecured and unsubordinated indebtedness of the Company. The Old Senior Unsecured Notes bear interest at a rate of 8% per annum and the Company will pay interest semi-annually on June 15 and December 15 of each year. The Old Senior Unsecured Notes are not guaranteed.

We accounted for the Old Senior Unsecured Notes in accordance with accounting standards applicable to distinguishing liabilities from equity and debt with conversion and other options. Accordingly, we allocated the proceeds received for the Old Senior Unsecured Notes based on the relative fair values of the Old Senior Unsecured Notes and warrants, which resulted in a discount to the notes of approximately $278 million. The fair value of the Old Senior Unsecured Notes and warrants was estimated based on quoted market prices for the same issues using Level 1 measurements as defined in Note 5 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018. The discount is being amortized over the life of the Old Senior Unsecured Notes using the effective interest method with an effective interest rate of 11.55%. Approximately $24 million and $26 million of the discount was amortized during the 26 week periods ended August 4, 2018 and July 29, 2017, respectively. The remaining discount was approximately $71 million, $169 million and $140 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. The carrying value of the Old Senior Unsecured Notes, net of the remaining discount and debt issuance costs, was approximately $340 million, $454 million and $483 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively.

In February 2018, the Company commenced the Exchange Offers, pursuant to which it offered to issue in exchange for its outstanding Senior Unsecured Notes new 8% Senior Unsecured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option. The Exchange Offers expired on March 15, 2018. Approximately $214 million principal amount of the Old Senior Unsecured Notes were validly tendered, accepted and canceled, including $187.6 million principal amount of Old Senior Unsecured Notes by ESL, and the Company issued a like principal amount of New Senior Unsecured Notes. The New Senior Unsecured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at a conversion price of $8.33 per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period.

28

JX 114-28

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

The New Senior Unsecured Notes are the unsecured and unsubordinated obligations of the Company and rank equal in right of payment with the existing and future unsecured and unsubordinated indebtedness of the Company. The New Senior Unsecured Notes bear interest at a rate of 8% per annum and the Company will pay interest semi-annually on June 15 and December 15 of each year, which interest may, at the option of the Company, be paid in kind. The New Senior Unsecured Notes are not guaranteed.

The Company allocated $45 million of the remaining discount from the Old Senior Unsecured Notes to the New Senior Unsecured Notes. Approximately $8 million of the discount was amortized during the 26 week period ended August 4, 2018. The remaining discount was approximately $37 million at August 4, 2018. The carrying value of the New Senior Unsecured Notes, net of the remaining discount and debt issuance costs, was approximately $185 million at August 4, 2018. The carrying value includes paid-in-kind interest of $9 million at August 4, 2018.

*Wholly-owned Insurance Subsidiary and Intercompany Securities*

We have numerous types of insurable risks, including workers' compensation, product and general liability, automobile, warranty, asbestos and environmental claims and the extended service contracts we sell to our customers. Certain of the associated risks are managed through Holdings' wholly-owned insurance subsidiary, Sears Reinsurance Company Ltd. ("Sears Re"), a Bermuda Class 3 insurer.

In accordance with applicable insurance regulations, Sears Re holds marketable securities to support the insurance coverage it provides. Sears has utilized two securitization structures to issue specific securities in which Sears Re has invested its capital to fund its insurance obligations. In November 2003, Sears formed a Real Estate Mortgage Investment Conduit, or REMIC. The real estate associated with 138 properties was contributed to indirect wholly-owned subsidiaries of Sears, and then leased back to Sears. The contributed properties were mortgaged and the REMIC issued to wholly-owned subsidiaries of Sears (including Sears Re) $1.3 billion (par value) of securities (the "REMIC Securities") that were secured by the mortgages and collateral assignments of the store leases. Payments to the holders on the REMIC Securities were funded by the lease payments. In March 2018, in connection with the Credit Agreement and Mezzanine Loan Agreement described above, the REMIC was unwound and the REMIC Securities were extinguished.

In May 2006, a subsidiary of Holdings contributed the rights to use the Kenmore, Craftsman and DieHard trademarks in the U.S. and its possessions and territories to KCD IP, LLC, an indirect wholly-owned subsidiary of Holdings. KCD IP, LLC has licensed the use of the trademarks to subsidiaries of Holdings, including Sears and Kmart. Asset-backed securities with a par value of $1.8 billion (the "KCD Securities") were issued by KCD IP, LLC and subsequently purchased by Sears Re, the collateral for which includes the trademark rights and royalty income. Payments to the holders on the KCD Securities are funded by the royalty payments. In connection with the Craftsman Sale, KCD Securities with par value of $900 million were redeemed in March 2017.

The issuers of the REMIC Securities and KCD Securities and the owners of these real estate and trademark assets are bankruptcy remote, special purpose entities that are indirect wholly-owned subsidiaries of Holdings. Cash flows received from rental streams and licensing fee streams paid by Sears, Kmart, other affiliates and third parties, are used for the payment of fees and interest on these securities, through the extinguishment of the REMIC Securities in March 2018. Since the inception of the REMIC and KCD IP, LLC, the REMIC Securities and the KCD Securities have been entirely held by our wholly-owned consolidated subsidiaries, through the extinguishment of the REMIC Securities in March 2018. At each of August 4, 2018, July 29, 2017 and February 3, 2018, the net book value of the securitized trademark rights was approximately $0.7 billion. The net book value of the securitized real estate assets was approximately $0.6 billion and $0.5 billion at July 29, 2017 and February 3, 2018, respectively.

*Trade Creditor Matters*

We have ongoing discussions concerning our liquidity and financial position with the vendor community and third parties that offer various credit protection services to our vendors. The topics discussed have included such areas as pricing, payment terms and ongoing business arrangements. As of the date of this report, we have not experienced any significant disruption in our access to merchandise or our operations.

29

**JX 114-29**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

## NOTE 3-STORE CLOSING CHARGES, SEVERANCE COSTS, IMPAIRMENTS AND REAL ESTATE TRANSACTIONS

*Store Closings and Severance*

We closed five stores in our Kmart segment and 24 stores in our Sears Domestic segment during the 13 week period ended August 4, 2018, and 72 stores in our Kmart segment and 65 stores in our Sears Domestic segment during the 26 week period ended August 4, 2018. An additional 43 stores in our Kmart segment and 106 stores in our Sears Domestic segment will close during the second half of 2018 that we previously announced would close.

We closed 14 stores in our Kmart segment and seven stores in our Sears Domestic segment during the 13 week period ended July 29, 2017, and 125 stores in our Kmart segment and 51 stores in our Sears Domestic segment during the 26 week period ended July 29, 2017.

In accordance with accounting standards governing costs associated with exit or disposal activities, expenses related to future rent payments for which we no longer intend to receive any economic benefit are accrued for when we cease to use the leased space and have been reduced for any estimated sublease income. We expect to record additional charges of approximately $75 million during 2018 related to stores that we had previously made the decision to close, but have not yet closed.

Store closing costs and severance recorded for the 13- and 26- week periods ended August 4, 2018 and July 29, 2017 were as follows:

| millions | Markdowns[1] | | Severance Costs[2] | | Lease Termination Costs[2] | | Other Charges[2] | | Impairment and Accelerated Depreciation[3] | | Total Store Closing Costs | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kmart | $ | 17 | $ | 1 | $ | (7) | $ | 2 | $ | - | $ | 13 |
| Sears Domestic | | 26 | | 10 | | 9 | | 6 | | 10 | | 61 |
| Total for the 13 week period ended August 4, 2018 | $ | 43 | $ | 11 | $ | 2 | $ | 8 | $ | 10 | $ | 74 |
| | | | | | | | | | | | | |
| Kmart | $ | 68 | $ | 8 | $ | (18) | $ | 10 | $ | 4 | $ | 72 |
| Sears Domestic | | 21 | | 23 | | 10 | | 6 | | 4 | | 64 |
| Total for the 13 week period ended July 29, 2017 | $ | 89 | $ | 31 | $ | (8) | $ | 16 | $ | 8 | $ | 136 |
| | | | | | | | | | | | | |
| Kmart | $ | 14 | $ | 2 | $ | 22 | $ | 3 | $ | 1 | $ | 42 |
| Sears Domestic | | 38 | | 13 | | 40 | | 8 | | 13 | | 112 |
| Total for the 26 week period ended August 4, 2018 | $ | 52 | $ | 15 | $ | 62 | $ | 11 | $ | 14 | $ | 154 |
| | | | | | | | | | | | | |
| Kmart | $ | 78 | $ | 13 | $ | (2) | $ | 13 | $ | 5 | $ | 107 |
| Sears Domestic | | 26 | | 34 | | 35 | | 7 | | 9 | | 111 |
| Total for the 26 week period ended July 29, 2017 | $ | 104 | $ | 47 | $ | 33 | $ | 20 | $ | 14 | $ | 218 |

---

[1]  Recorded within cost of sales, buying and occupancy in the Condensed Consolidated Statements of Operations.
[2]  Recorded within selling and administrative in the Condensed Consolidated Statements of Operations. Lease termination costs are net of estimated sublease income, and include the reversal of closed store reserves for which the lease agreement has been terminated and the reversal of deferred rent balances related to closed stores.
[3]  Recorded within depreciation and amortization in the Condensed Consolidated Statements of Operations.

JX 114-30

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

Store closing costs and severance accruals of $246 million, $228 million and $261 million at August 4, 2018, July 29, 2017 and February 3, 2018 respectively, were as shown in the table below. Store closing accruals included $123 million, $128 million and $126 million within other current liabilities and $123 million, $100 million and $135 million within other long-term liabilities in the Condensed Consolidated Balance Sheets at August 4, 2018, July 29, 2017, and February 3, 2018, respectively.

| millions | Severance Costs | | Lease Termination Costs | | Other Charges | | Total | |
|---|---|---|---|---|---|---|---|---|
| Balance at July 29, 2017 | $ | 48 | $ | 162 | $ | 18 | $ | 228 |
| Store closing costs | | 36 | | 109 | | 12 | | 157 |
| Store closing capital lease obligations | | - | | 8 | | - | | 8 |
| Payments/utilizations | | (35) | | (79) | | (18) | | (132) |
| Balance at February 3, 2018 | | 49 | | 200 | | 12 | | 261 |
| Store closing costs | | 15 | | 72 | | 11 | | 98 |
| Payments/utilizations | | (29) | | (69) | | (15) | | (113) |
| Balance at August 4, 2018 | $ | 35 | $ | 203 | $ | 8 | $ | 246 |

*Long-Lived Assets and Indefinite-Lived Intangible Assets*

In accordance with accounting standards governing the impairment or disposal of long-lived assets, we performed an impairment test of certain of our long-lived assets due to events and changes in circumstances during the 13- and 26- week periods ended August 4, 2018 that indicated an impairment might have occurred. As a result of impairment testing, the Company recorded impairment charges of $8 million, which was recorded within the Sears Domestic segment during the 13 week period ended August 4, 2018, and $22 million, of which $16 million and $6 million were recorded within the Sears Domestic and Kmart segments, respectively, during the 26 week period ended August 4, 2018.

As a result of impairment testing, the Company recorded impairment charges of $5 million, of which $2 million and $3 million were recorded within the Sears Domestic and Kmart segments, respectively, during the 13 week period ended July 29, 2017, and $20 million, of which $12 million and $8 million were recorded within the Sears Domestic and Kmart segments, respectively, during the 26 week period ended July 29, 2017.

In our quarterly report on Form 10-Q filed for the first quarter of 2018, the Company disclosed that impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including changes that occur as a result of the formal process of the Special Committee to explore the sale of the Sale Assets. On August 14, 2018, the Special Committee received a non-binding proposal from ESL to acquire the Kenmore brand and related assets for $400 million, which is below the carrying value of the Kenmore trade name at August 4, 2018. The Special Committee is evaluating the non-binding proposal, and potentially other proposals, as part of its formal process. In addition to receipt of the non-binding proposal, due to the decline in revenues Kenmore experienced in the first half of 2018, we determined indications of potential impairment exist with respect to the Kenmore trade name and accordingly performed an impairment assessment. The fair value determined as a result of our impairment assessment was derived using the relief from royalty method, which is a specific application of the discounted-cash-flow method, which is a form of the income approach. The relief from royalty method requires inputs considered level 3 under the fair value hierarchy and assumptions related to projected revenues; assumed royalty rates that could be payable if the Company did not own the asset; and a discount rate. These estimates include assumptions that are based on historical data, management forecasts, and a variety of external sources. As a result of our impairment assessment, we recorded an impairment charge related to the Kenmore trade name of $69 million during the 13- and 26- week periods ended August 4, 2018. The impairment is recorded within the Sears Domestic segment and included within impairment charges on our Condensed Consolidated Statement of Operations.

Further indefinite-lived intangible impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including deterioration in the macroeconomic environment, retail industry,

31

**JX 114-31**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

deterioration in our performance or our future projections, if actual results are not consistent with our estimates and assumptions used in the analysis, or changes in our plans for one or more indefinite-lived intangible assets, including changes that occur as a result of the formal process of the Special Committee to explore the sale of the Sale Assets, such as if the Special Committee were to accept an offer for the acquisition of the Kenmore trade name at a price less than its carrying value. Further, our business is seasonal in nature, and we generate a higher portion of our revenues and operating cash flows during the fourth quarter of our fiscal year, which includes the holiday season. The intangible asset impairment analysis is particularly sensitive to changes in the projected revenue growth rate and the assumed weighted-average cost of capital. Changes to these key assumptions could result in revisions of management's estimates of the fair value of the indefinite-lived intangible assets and could result in impairment charges in the future, which could be material to our results of operations. We will continue to monitor for such changes in facts or circumstances, which may be indicators of potential impairment triggers, and may result in impairment charges in the future, which could be material to our results of operations.

*Gain on Sales of Assets*

We recognized $268 million and $1.1 billion in gains on sales of assets during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively, which were primarily a result of several real estate transactions. Real estate transactions in 2018 included properties that served as collateral for our real estate facilities for which proceeds of $316 million were used to pay interest and a portion of the Secured Loan, Term Loan Facility, 2016 Secured Loan Facility, 2017 Secured Loan Facility, Incremental Loans and Consolidated Secured Loan Facility. Real estate transactions in 2017 included properties that served as collateral for our real estate facilities for which proceeds of $277 million were used to pay interest and a portion of the 2016 Secured Loan Facility and 2017 Secured Loan Facility. Gains in 2017 also included a gain of $492 million in connection with the Craftsman Sale, which is further described in Note 1.

*Seritage Transaction and JV Transactions*

On April 1, 2015, April 13, 2015 and April 30, 2015, Holdings and General Growth Properties, Inc. ("GGP"), Simon Property Group, Inc. ("Simon") and The Macerich Company ("Macerich"), respectively, announced that they entered into three distinct real estate joint ventures (collectively, the "JVs"). Holdings contributed 31 properties to the JVs where Holdings currently operates stores (the "JV properties"), in exchange for a 50% interest in the JVs and $429 million in cash ($426 million, net of closing costs) (the "JV transactions"). The JV transactions valued the JV properties at $858 million in the aggregate.

On July 7, 2015, Holdings completed its rights offering and sale-leaseback transaction (the "Seritage transaction") with Seritage Growth Properties ("Seritage"), an independent publicly traded real estate investment trust ("REIT"). As part of the Seritage transaction, Holdings sold 235 properties to Seritage (the "REIT properties") along with Holdings' 50% interest in the JVs. Holdings received aggregate gross proceeds from the Seritage transaction of $2.7 billion ($2.6 billion, net of closing costs). The Seritage transaction valued the REIT properties at $2.3 billion in the aggregate.

In connection with the Seritage transaction and JV transactions, Holdings entered into agreements with Seritage and the JVs under which Holdings initially leased 255 of the properties (the "Master Leases"), with the remaining properties being leased by Seritage to third parties. Holdings has closed 39 stores pursuant to recapture notices from Seritage or the JVs and 65 stores pursuant to lease terminations. An additional 33 stores will close in 2018 pursuant to lease terminations and recapture notices. Also, in July 2017, Seritage sold a 50% joint venture interest in five of the properties and Holdings will pay rent to the new landlord.

We accounted for the Seritage transaction and JV transactions in accordance with accounting standards applicable to real estate sales and sale-leaseback transactions. We determined that the Seritage and JV transactions qualify for sales recognition and sale-leaseback accounting, with the exception of four properties for which we had continuing involvement as a result of an obligation to redevelop the stores for a third-party tenant and pay rent on behalf of the third-party tenant until it commenced rent payments to the JVs.

With the exception of the four properties that had continuing involvement, in accordance with accounting standards related to sale-leaseback transactions, Holdings recognized any loss on sale immediately, any gain on sale in excess of the present value of minimum lease payments immediately, and any remaining gain was deferred and will be

32

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

recognized in proportion to the related rent expense over the lease term. Accordingly, during the second quarter of 2015, Holdings recognized an immediate net gain of $508 million within gain on sales of assets in the Consolidated Statement of Operations for 2015. The remaining gain of $894 million was deferred and will be recognized in proportion to the related rent expense, which is a component of cost of sales, buying and occupancy, in the Condensed Consolidated Statements of Operations, over the lease term.

During the 13- and 26- weeks ended August 4, 2018, respectively, Holdings recorded gains of $28 million and $68 million related to recapture and termination activity in connection with REIT properties and JV properties. During the 13- and 26- weeks ended July 29, 2017, respectively, Holdings recorded gains of $36 million and $78 million related to recapture and termination activity in connection with REIT properties and JV properties. The Master Leases provide Seritage and the JVs rights to recapture 100% of certain stores. The Master Leases also provide Seritage and the JVs a recapture right with respect to approximately 50% of the space within the stores at the REIT properties and JV properties (subject to certain exceptions), in addition to all of the automotive care centers, all outparcels or outlots, and certain portions of parking areas and common areas, except as set forth in the Master Leases, for no additional consideration. As space is recaptured pursuant to the recapture right, Holdings' obligation to pay rent is reduced proportionately. Accordingly, Holdings recognizes gains equal to the unamortized portion of the gain that had previously been deferred which exceeds the present value of minimum lease payments, as reduced due to recapture activity. The Master Leases also provide Holdings certain rights to terminate the Master Leases with respect to REIT properties or JV properties that cease to be profitable for operation. In order to terminate the Master Lease for a certain property, Holdings must make a payment to Seritage or the JV of an amount equal to one year of rent (together with taxes and other expenses) with respect to such property. The Company recognizes the corresponding expenses for termination payments to Seritage when we notify Seritage of our intention to terminate the leases and the stores are announced for closure. We recorded expense of $9 million and $20 million for termination payments to Seritage during the 13- and 26- weeks ended August 4, 2018, respectively, and $24 million during the 26 weeks ended July 29, 2017, of which $9 million and $24 million was reported as amounts payable to Seritage at August 4, 2018 and July 29, 2017, respectively.

Holdings also recorded immediate gains of $40 million during 2017, of which $17 million and $40 million was recorded during the 13- and 26- weeks ended July 29, 2017, respectively, for the amount of gains on sale in excess of the present value of minimum lease payments for two of the properties that were previously accounted for as financing transactions. As the redevelopment at the stores had been completed and the third-party tenant had commenced rent payments to the JVs, the Company determined that the continuing involvement no longer existed and that the properties qualified for sales recognition and sale-leaseback accounting.

*Sale-Leaseback Financing Transactions*

Holdings received cash proceeds for sale-leaseback financing transactions of $130 million and $89 million during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively. We accounted for the other transactions as financing transactions in accordance with accounting standards applicable to sale-leaseback transactions as a result of other forms of continuing involvement, including an earn-out provision and the requirement to prepay rent for one year. Accordingly, Holdings recorded a sale-leaseback financing obligation of $347 million, $230 million and $247 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, which is classified as a long-term sale-leaseback financing obligation in the Condensed Consolidated Balance Sheets. The sale-leaseback financing obligation related to the four properties that had continuing involvement decreased to $70 million at February 3, 2018 as two of the properties qualified for sales recognition and sale-leaseback accounting as further described above. Additionally, Holdings recorded immediate gains of $21 million during the 26 weeks ended August 4, 2018 for three properties that were previously accounted for as financing transactions as the leaseback ended and it was determined that sales recognition was appropriate. We continued to report real property assets of $100 million, $62 million and $66 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, in our Condensed Consolidated Balance Sheets, which are included in our Sears Domestic segment.

*Other Real Estate Transactions*

In addition to the Seritage transaction, JV transactions and other sale-leaseback financing transactions described above, we recorded gains on the sales of assets for other significant items described as follows.

33

**JX 114-33**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

During the 13 week period ended August 4, 2018, we recorded gains on the sales of assets of $48 million recognized on the sale or amendment and lease termination of 16 Sears Full-line stores and two non-retail locations in our Sears Domestic segment for which we received $116 million cash proceeds. During the 13 week period ended August 4, 2018, we also recorded gains on the sales of assets of $23 million recognized on the sale or amendment and lease termination of three Kmart stores in our Kmart segment for which we received $33 million cash proceeds.

During the 26 week period ended August 4, 2018, we recorded gains on the sales of assets of $117 million recognized on the sale or amendment and lease termination of 25 Sears Full-line stores and six non-retail locations in our Sears Domestic segment for which we received $227 million cash proceeds. During the 26 week period ended August 4, 2018, we also recorded gains on the sales of assets of $40 million recognized on the sale or amendment and lease termination of 12 Kmart stores in our Kmart segment for which we received $51 million cash proceeds.

During the 13 week period ended July 29, 2017, we recorded gains on the sales of assets of $250 million recognized on the sale or amendment and lease termination of nine Sears Full-line stores in our Sears Domestic segment for which we received $276 million cash proceeds. During the 13 week period ended July 29, 2017, we also recorded gains on the sales of assets of $12 million recognized on the sale or amendment and lease termination of one Kmart store in our Kmart segment for which we received $20 million cash proceeds.

During the 26 week period ended July 29, 2017, we recorded gains on the sales of assets of $346 million recognized on the sale or amendment and lease termination of 12 Sears Full-line stores in our Sears Domestic segment for which we received $380 million cash proceeds. During the 26 week period ended July 29, 2017, we also recorded gains on the sales of assets of $40 million recognized on the sale or amendment and lease termination of two Kmart stores in our Kmart segment for which we received $48 million cash proceeds.

Certain sales of our properties had leaseback arrangements. We determined that the transactions with leaseback arrangements qualify for sales recognition and sale-leaseback accounting. In accordance with accounting standards related to sale-leaseback transactions, Holdings recognized any loss on sale immediately, any gain on sale in excess of the present value of minimum lease payments immediately, and any remaining gain was deferred and will be recognized in proportion to the related rent expense over the lease term. At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, $161 million, $156 million and $138 million of the deferred gain on sale-leaseback is classified as current within other current liabilities, and $305 million, $455 million and $362 million is classified as long-term deferred gain on sale-leaseback in the Condensed Consolidated Balance Sheets. For the other transactions, we determined that we have surrendered substantially all of our rights and obligations, and, therefore, immediate gain recognition is appropriate.

Holdings recorded rent expense at properties with leaseback arrangements that have deferred gains of $14 million and $22 million within cost of sales, buying and occupancy in the Condensed Consolidated Statements of Operations for the 13 week periods ended August 4, 2018 and July 29, 2017, respectively, and $30 million and $44 million for the 26 week periods ended August 4, 2018 and July 29, 2017, respectively. Rent expense consisted of straight-line rent expense offset by amortization of deferred gain on sale-leaseback, as shown in the tables below.

| millions | 13 Weeks Ended August 4, 2018 | | | 13 Weeks Ended July 29, 2017 | | |
|---|---|---|---|---|---|---|
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
| Straight-line rent expense | $ 5 | $ 25 | $ 30 | $ 5 | $ 36 | $ 41 |
| Amortization of deferred gain on sale-leaseback | (3) | (13) | (16) | (2) | (17) | (19) |
| Rent expense | $ 2 | $ 12 | $ 14 | $ 3 | $ 19 | $ 22 |

| millions | 26 Weeks Ended August 4, 2018 | | | 26 Weeks Ended July 29, 2017 | | |
|---|---|---|---|---|---|---|
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
| Straight-line rent expense | $ 9 | $ 55 | $ 64 | $ 11 | $ 73 | $ 84 |
| Amortization of deferred gain on sale-leaseback | (5) | (29) | (34) | (6) | (34) | (40) |
| Rent expense | $ 4 | $ 26 | $ 30 | $ 5 | $ 39 | $ 44 |

34

**JX 114-34**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**NOTE 4-EQUITY**

*Loss per Share*

The following table sets forth the components used to calculate basic and diluted loss per share attributable to Holdings' shareholders.

| | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| *millions, except loss per share* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Basic weighted average shares | 108.5 | 107.3 | 108.3 | 107.2 |
| Diluted weighted average shares | 108.5 | 107.3 | 108.3 | 107.2 |
| | | | | |
| Net loss attributable to Holdings' shareholders | $ (508) | $ (250) | $ (932) | $ (5) |
| | | | | |
| Loss per share attributable to Holdings' shareholders: | | | | |
| Basic | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Diluted | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |

*Accumulated Other Comprehensive Loss*

The following table displays the components of accumulated other comprehensive loss:

| *millions* | August 4, 2018 | July 29, 2017 | February 3, 2018 |
| --- | --- | --- | --- |
| Pension and postretirement adjustments (net of tax of $(198), $(225), and $(225), respectively) | $ (817) | $ (1,372) | $ (1,071) |
| Currency translation adjustments (net of tax of $0 for all periods presented) | (1) | (2) | (1) |
| Accumulated other comprehensive loss | $ (818) | $ (1,374) | $ (1,072) |

Pension and postretirement adjustments relate to the net actuarial loss on our pension and postretirement plans recognized as a component of accumulated other comprehensive loss.

*Income Tax Expense Allocated to Each Component of Other Comprehensive Income*

Income tax expense allocated to each component of other comprehensive income was as follows:

| | 13 Weeks Ended August 4, 2018 | | | 13 Weeks Ended July 29, 2017 | | |
| --- | --- | --- | --- | --- | --- | --- |
| *millions* | Before Tax Amount | Tax Expense | Net of Tax Amount | Before Tax Amount | Tax Expense | Net of Tax Amount |
| Other comprehensive income | | | | | | |
| Pension and postretirement adjustments[1] | $ 245 | $ (27) | $ 218 | $ 127 | $ - | $ 127 |
| Currency translation adjustments | (1) | - | (1) | - | - | - |
| Total other comprehensive income | $ 244 | $ (27) | $ 217 | $ 127 | $ - | $ 127 |

| | 26 Weeks Ended August 4, 2018 | | | 26 Weeks Ended July 29, 2017 | | |
| --- | --- | --- | --- | --- | --- | --- |
| *millions* | Before Tax Amount | Tax Expense | Net of Tax Amount | Before Tax Amount | Tax Expense | Net of Tax Amount |
| Other comprehensive income | | | | | | |
| Pension and postretirement adjustments[1] | $ 281 | $ (27) | $ 254 | $ 177 | $ - | $ 177 |
| Currency translation adjustments | - | - | - | 1 | - | 1 |
| Total other comprehensive income | $ 281 | $ (27) | $ 254 | $ 178 | $ - | $ 178 |

[1]Included in the computation of net periodic benefit expense. See Note 5 to the Condensed Consolidated Financial Statements.

JX 114-35

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

### NOTE 5-BENEFIT PLANS

*Pension and Postretirement Benefit Plans*

We provide benefits to certain associates who are eligible under various defined benefit pension plans, contributory defined benefit pension plans and other postretirement plans, primarily retiree medical benefits. For purposes of determining the periodic expense of our defined benefit plans, we use the fair value of plan assets as the market related value. The following table summarizes the components of total net periodic benefit expense, recorded within other loss in the Condensed Consolidated Statements of Operations, for our retirement plans:

| | 13 Weeks Ended | | | | 26 Weeks Ended | | | |
|---|---|---|---|---|---|---|---|---|
| millions | August 4, 2018 | | July 29, 2017 | | August 4, 2018 | | July 29, 2017 | |
| Components of net periodic expense: | | | | | | | | |
| Interest cost | $ | 37 | $ | 45 | $ | 74 | $ | 98 |
| Expected return on plan assets | | (41) | | (46) | | (81) | | (103) |
| Amortization of experience losses[1] | | 142 | | 247 | | 178 | | 297 |
| Net periodic expense | $ | 138 | $ | 246 | $ | 171 | $ | 292 |

[1] Amortization of the experiences losses for the 13- and 26- weeks ended August 4, 2018 includes $108 million as a result of the lump sum settlement described below. Amortization of experience losses for the 13- and 26- weeks ended July 29, 2017 includes $200 million as a result of the pension annuity purchase described below.

*Contributions*

During the 13- and 26- week periods ended August 4, 2018, we made total contributions of $57 million and $343 million, respectively, to our pension and postretirement plans, including amounts contributed from the escrow created pursuant to the PPPFA. During the 13- and 26- week periods ended July 29, 2017, we made total contributions of $65 million and $134 million, respectively, to our pension and postretirement plans. We anticipate making aggregate contributions to our defined benefit and postretirement plans of approximately $219 million over the remainder of 2018. As discussed in Note 1, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the Craftsman Receivable. During the second quarter of 2017, we sold the Craftsman Receivable to a third-party purchaser, and deposited the proceeds into an escrow for the benefit of our pension plans. We subsequently contributed a portion of the proceeds received from the sale of the Craftsman Receivable to our pension plans, which contribution was credited against the Company's minimum pension funding obligations in 2017. Under our agreement with the PBGC, the remaining proceeds will also be contributed to our pension plans, and when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019.

The Company also agreed to grant a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension obligations through the end of 2019, which were released from the ring-fence arrangement in August 2018 in exchange for a contribution of $32 million into an escrow for the benefit of our pension plans.

In November 2017, the Company announced an amendment to the PPPFA that allowed the Company to pursue the monetization of 138 of our properties that were subject to a ring-fence arrangement created under the PPPFA. In March 2018, the Company closed on the Secured Loan and the Mezzanine Loan, which transactions released the properties from the ring-fence arrangement. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. Under our agreement with the PBGC, the escrowed amount will also be contributed to our pension plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019 described above. Following such transactions, the Company has been relieved of contributions to our pension plans for approximately two years (other than the contributions from escrow described above and a $20 million

36

**JX 114-36**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

supplemental payment made during the second quarter of 2018. The ultimate amount of pension contributions could be affected by factors such as changes in applicable laws, as well as financial market and investment performance and demographic changes.

*Pension Plan Settlements*

Effective April 27, 2018, the Company amended its domestic pension plans, primarily related to lump sum benefit eligibility, and began notifying certain former employees of the Company of its offer to pay those employees' pension benefit in a lump sum. Former employees eligible for the voluntary lump sum payment option are generally those who are vested traditional formula participants of Plan 1 and Plan 2 who terminated employment prior to January 1, 2018, and who have not yet started receiving monthly payments of their pension benefits. The Company offered the one-time voluntary lump sum window in an effort to reduce its long-term pension obligations and ongoing annual pension expense. This voluntary offer was made to approximately 12,000 eligible terminated vested participants representing approximately $550 million of the Company's total qualified pension plan liabilities. Eligible participants had until July 1, 2018 to make their election. The Company made payments of approximately $315 million and $28 million to employees who made the election and funded the payments from existing assets of Plan 1 and Plan 2, respectively. The lump sum offer resulted in a non-cash charge of $108 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations immediately upon settlement during the 13 week period ending August 4, 2018.

In May 2017, the Company executed an irrevocable agreement to purchase a group annuity contract from Metropolitan Life Insurance Company ("MLIC"), under which MLIC will pay future pension benefit payments to approximately 51,000 retirees from Plan 2. The agreement calls for a transfer of approximately $515 million of Plan 2's benefit obligations to MLIC. This action had an immaterial impact on the funded status of our total pension obligations, but reduced the size of the Company's combined pension plan, reduced future cost volatility, and reduced future plan administrative expenses. Due to the annuity purchase, we were required to remeasure our pension obligations. In connection with the remeasurement, we updated the effective discount rate assumption to 3.85% as of May 31, 2017. The annuity purchase resulted in a non-cash charge of $200 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement during the 13 week period ending July 29, 2017.

**NOTE 6-INCOME TAXES**

We had gross unrecognized tax benefits of $135 million at August 4, 2018, $153 million at July 29, 2017 and $130 million at February 3, 2018. Of the amount at August 4, 2018, $107 million would, if recognized, impact our effective tax rate, with the remaining amount being comprised of unrecognized tax benefits related to gross temporary differences or any other indirect benefits. During the 13- and 26- weeks ended August 4, 2018, gross unrecognized tax benefits increased by $3 million and $5 million, respectively, due to state activity. During the 13- and 26- weeks ended July 29, 2017, gross unrecognized tax benefits increased by $3 million and $11 million, respectively, due to state activity. We expect that our unrecognized tax benefits could decrease by as much as $9 million over the next 12 months for tax audit settlements and the expiration of the statute of limitations for certain jurisdictions.

We classify interest expense and penalties related to unrecognized tax benefits and interest income on tax overpayments as components of income tax expense. At August 4, 2018, July 29, 2017 and February 3, 2018, the total amount of interest and penalties included in our tax accounts in our Condensed Consolidated Balance Sheet was $57 million ($45 million net of federal benefit), $67 million ($44 million net of federal benefit) and $51 million ($40 million net of federal benefit), respectively. The total amount of net interest expense (net of federal benefit) recognized as part of income tax expense in our Condensed Consolidated Statements of Operations was $2 million for each of the 13 weeks ended August 4, 2018 and July 29, 2017, and $4 million for each of the 26 week periods ended August 4, 2018 and July 29, 2017.

We file income tax returns in both the United States and various foreign jurisdictions. The U.S. Internal Revenue Service ("IRS") has completed its examination of all federal tax returns of Holdings through the 2009 return, and all matters arising from such examinations have been resolved. In addition, Holdings and Sears are under examination

37

**JX 114-37**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

by various state, local and foreign income tax jurisdictions for the years 2003 through 2016, and Kmart is under examination by such jurisdictions for the years 2006 through 2016.

At the end of 2017, we had a federal and state net operating loss ("NOL") deferred tax asset of $1.7 billion, which will expire predominately between 2019 and 2037. We have credit carryforwards of $899 million, which will expire between 2018 and 2037.

In connection with the Craftsman Sale in the first quarter of 2017, the Company realized a tax benefit of $101 million on the deferred taxes related to the indefinite-life intangible for the trade name sold to Stanley Black & Decker. In addition, the Company incurred a taxable gain of approximately $963 million. There was no federal income tax payable resulting from the taxable gain due to the utilization of NOL tax attributes of approximately $361 million with a valuation allowance release of the same amount. However, there was state income tax of $4 million payable after the utilization of state tax attributes.

At February 3, 2018, we had a valuation allowance of $4.2 billion. The amount of the deferred tax asset considered realizable, however, could be adjusted in the future if estimates of future taxable income during the carryforward period are reduced or increased, or if objective negative evidence in the form of cumulative losses is no longer present and additional weight may be given to subjective evidence such as our projections for growth. We will continue to evaluate our valuation allowance for any change in circumstances that causes a change in judgment about the realizability of the deferred tax asset.

Income tax expense or benefit from continuing operations is generally determined without regard to other categories of earnings, such as discontinued operations and other comprehensive income ("OCI"). An exception is provided in the authoritative accounting guidance when there is income from categories other than continuing operations and a loss from continuing operations in the current year. In this case, the tax benefit allocated to continuing operations is the amount by which the loss from continuing operations reduces the tax expense recorded with respect to the other categories of earnings, even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year losses, income from other sources, including gain from pension and other postretirement benefits recorded as a component of OCI, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets. As a result, for the second quarter ended August 4, 2018, the Company recorded a tax expense of $27 million in OCI related to the gain on pension and other postretirement benefits, and recorded a corresponding tax benefit of $27 million in continuing operations.

The application of the requirements for accounting for income taxes in interim periods, after consideration of our valuation allowance, causes a significant variation in the typical relationship between income tax expense and pretax accounting income. As such, for the 13 weeks ended August 4, 2018 and July 29, 2017, our effective income tax rates were a benefit of 3.6% and an expense of 4.2%, respectively, and for the 26 weeks ended August 4, 2018 and July 29, 2017, our effective tax rates were a benefit of 1.1% and 92.5%, respectively. Our tax rate continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic jurisdictions where it is not more likely than not that such benefits would be realized. The 2018 rate reflects the impacts of the valuation allowance release through continuing operations creating a tax benefit with the offsetting tax expense reflected in OCI as discussed earlier, a tax benefit on the deferred taxes related to the partial impairment of the Kenmore trade name, and the Tax Cuts and Jobs Act, including the federal rate of 21%, the effect of taxes on foreign earnings and changes to previously deductible expenses. In addition, the 13- and 26- weeks ended August 4, 2018 were positively impacted by the reversal of deferred taxes related to indefinite-life assets associated with property sales and negatively impacted by foreign branch taxes and state income taxes. During the first quarter of 2017, the Company realized a significant tax benefit on the reversal of deferred taxes related to the Craftsman Sale.

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cut and Jobs Act (the "Tax Act"). The Tax Act made broad and complex changes to the U.S. tax code that will affect our years ending February 3, 2018 and February 2, 2019, including, but not limited to, (1) reducing the U.S. federal corporate tax rate to 21%, (2) requiring a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries that is payable over eight years and (3) various other miscellaneous changes that are effective in 2017. With the lower U.S. federal corporate rate effective beginning January 1, 2018, our U.S. federal corporate tax rate for 2017 was a blended rate of 33.717% and for 2018 is the statutory rate of 21%.

38

JX 114-38

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements-(Continued)
(Unaudited)

In addition to the 21% reduced federal corporate tax rate, the Tax Act also established new laws that will affect 2018, including, but not limited to, (1) the creation of the base erosion anti-abuse tax ("BEAT"), a new minimum tax; (2) a general elimination of U.S. federal income taxes on dividends from foreign subsidiaries; (3) a new provision designed to tax global intangible low-taxed income ("GILTI"); (4) a new limitation on deductible interest expense; (5) limitations on the deductibility of certain executive compensation; (6) limitations on the use of foreign tax credits ("FTCs") to reduce the U.S. income tax liability; and (7) limitations on net operating losses ("NOLs") generated in tax years beginning after December 31, 2017, to 80% of taxable income with indefinite carryovers.

The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. In accordance with SAB 118, a company must reflect the income tax effects of those aspects of the Tax Act for which the accounting under accounting standards applicable to income taxes is complete. To the extent that a company's accounting for certain income tax effects of the Tax Act is incomplete but is able to determine a reasonable estimate, it must record a provisional estimate in the financial statements. If a company cannot determine a provisional estimate to be included in the financial statements, it should continue to apply accounting standards applicable to income taxes on the basis of the provisions of the tax laws that were in effect immediately before the enactment of the Tax Act.

The income tax benefit for the period ended February 3, 2018 included a tax benefit of $470 million related to the impacts of the Tax Act. The impacts of the Tax Act primarily consist of a net benefit for the corporate rate reduction of $222 million, a net benefit for the valuation allowance release of $270 million, and a net expense for the transition tax of $11 million.

For various reasons discussed below, our accounting for the following elements of the Tax Act is incomplete as of the year ending February 3, 2018 and the second quarter of 2018. We will continue to refine our calculations as additional analysis is completed. However, we were able to make reasonable estimates of certain effects and, therefore, recorded provisional adjustments as follows:

*Reduction of U.S. federal corporate tax rate:* As a result of the reduced corporate rate, our deferred tax assets, liabilities, and valuation allowance decreased. Further, as we had a net deferred tax liability after valuation allowance, these decreases resulted in a deferred income tax benefit of $222 million for the year ended February 3, 2018. While we were able to make a reasonable estimate of the impact of the reduction in the corporate rate, it may be affected by other analysis related to the Tax Act, including, but not limited to, our calculation of deemed repatriation of deferred foreign income and state tax effect of adjustments made to federal temporary differences. We have not adjusted our provisional tax benefit of $222 million recorded at February 3, 2018 as of the second quarter of 2018.

*Valuation Allowances:* The Company assessed whether its valuation allowance analyses are affected by various aspects of the Tax Act (e.g., deemed repatriation of deferred foreign income, new categories of FTC's, and other miscellaneous provisions of the Tax Act), any corresponding determination of the need for a change in a valuation allowance is also provisional. We have not adjusted our provisional net tax benefit of $270 million at February 3, 2018 as of the second quarter of 2018.

*Global Intangible Low Taxes Income:* The Tax Act creates a new requirement that certain income (i.e., GILTI) earned by controlled foreign corporations ("CFCs") must be included in the gross income of the CFC's U.S. shareholder. GILTI is the excess of the shareholder's "net CFC tested income" over the net deemed tangible income return, which is currently defined as the excess of (1) 10% of the aggregate of the U.S. shareholder's pro rate share of the qualified business asset investment of each CFC with respect to which it is a U.S. shareholder over (2) the amount of certain interest expense taken into account in the determination of net CFC-tested income.

Because of the complexity of the new GILTI tax rules, we are continuing to evaluate this provision of the Tax Act and the application of accounting standards applicable to income taxes. In accordance with accounting standards applicable to income taxes, we are allowed to make an accounting policy choice of (1) treating taxes due on future U.S. inclusions in taxable income related to GILTI as a current-period expense when incurred (the "period cost method") or (2) factoring such amounts into a company's measurement of its deferred taxes (the "deferred method"). We selected the period cost method in the year ending February 3, 2018. We have estimated that our GILTI tax for the year ending February 2, 2019 will be $3 million and have included it in our annual effective tax rate ("AETR")

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

calculation. While the estimated GILTI inclusion will increase our taxable income by $12.4 million, it results in no income tax payable due to the utilization of NOL attributes of $3 million with a valuation allowance release of the same amount. We will continue to refine our calculations throughout 2018.

*Deemed Repatriation Transition Tax*: The Deemed Repatriation Transition Tax ("Transition Tax") is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of certain of our foreign subsidiaries. To determine the amount of the Transition Tax, we must determine, in addition to other factors, the amount of post-86 E&P of the relevant subsidiaries, as well as the amount of non-U.S. income taxes paid on such earnings. We were able to make a reasonable estimate of the Transition Tax and recorded a provisional Transition Tax obligation of $6 million and a provisional withholding tax obligation of $11 million at February 3, 2018. As a result of our valuation allowance on NOLs, only the $11 million withholding tax obligation resulted in a current tax expense. While we are continuing to gather additional information to more precisely compute the amount of the Transition Tax, we did not adjust our estimate of the provisional Transition Tax as of the second quarter of fiscal 2018.

*Other Tax Act Provisions:* The Company's AETR also reflects the impact of other Tax Act provisions, including, but not limited to, the new limitation on deductible interest expense, limitations on the deductibility of certain executive compensation, and the disallowance of certain miscellaneous provisions.

**NOTE 7-SUMMARY OF SEGMENT DATA**

These reportable segment classifications are based on our business formats, as described in Note 1. The Kmart format represents both an operating and reportable segment. The Sears Domestic reportable segment consists of the aggregation of several business formats. These formats are evaluated by our Chief Operating Decision Maker ("CODM") to make decisions about resource allocation and to assess performance.

Each of these segments derives its revenues from the sale of merchandise and related services to customers, primarily in the United States. The merchandise and service categories, which represent revenues from contracts with customers, are as follows. The other category includes revenues from contracts with customers, as described below, and also includes rental revenues.

(i)     Hardlines-consists of home appliances, consumer electronics, lawn & garden, tools & hardware, automotive parts, household goods, toys, housewares and sporting goods;

(ii)    Apparel and Soft Home-includes women's, men's, kids', footwear, jewelry, accessories and soft home;

(iii)   Food and Drug-consists of grocery & household, pharmacy and drugstore;

(iv)    Service-includes repair, installation and automotive service and extended contract revenue; and

(v)     Other-includes revenues earned in connection with our agreements with SHO and Lands' End, as well as credit revenues and rental revenues.

40

**JX 114-40**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

| millions | | 13 Weeks Ended August 4, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | Kmart | | Sears Domestic | | Sears Holdings |
| Merchandise sales | | | | | | |
| Hardlines | $ | 242 | $ | 1,196 | $ | 1,438 |
| Apparel and Soft Home | | 307 | | 400 | | 707 |
| Food and Drug | | 281 | | 2 | | 283 |
| Total merchandise sales | | 830 | | 1,598 | | 2,428 |
| Services and other | | | | | | |
| Services | | 1 | | 406 | | 407 |
| Other | | 9 | | 338 | | 347 |
| Total services and other | | 10 | | 744 | | 754 |
| Total revenues | | 840 | | 2,342 | | 3,182 |
| Costs and expenses | | | | | | |
| Cost of sales, buying and occupancy - merchandise sales | | 679 | | 1,376 | | 2,055 |
| Cost of sales and occupancy - services and other | | 1 | | 424 | | 425 |
| Total cost of sales, buying and occupancy | | 680 | | 1,800 | | 2,480 |
| Selling and administrative | | 192 | | 672 | | 864 |
| Depreciation and amortization | | 9 | | 57 | | 66 |
| Impairment charges | | - | | 77 | | 77 |
| Gain on sales of assets | | (25) | | (78) | | (103) |
| Total costs and expenses | | 856 | | 2,528 | | 3,384 |
| Operating loss | $ | (16) | $ | (186) | $ | (202) |
| Total assets | $ | 1,619 | $ | 5,318 | $ | 6,937 |
| Capital expenditures | $ | 8 | $ | 10 | $ | 18 |

41

**JX 114-41**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

| | 13 Weeks Ended July 29, 2017 | | |
| millions | Kmart | Sears Domestic | Sears Holdings |
|---|---|---|---|
| Merchandise sales | | | |
| Hardlines | $ 426 | $ 1,521 | $ 1,947 |
| Apparel and Soft Home | 511 | 462 | 973 |
| Food and Drug | 493 | 1 | 494 |
| Total merchandise sales | 1,430 | 1,984 | 3,414 |
| Services and other | | | |
| Services | 1 | 476 | 477 |
| Other | 11 | 376 | 387 |
| Total services and other | 12 | 852 | 864 |
| Total revenues | 1,442 | 2,836 | 4,278 |
| Costs and expenses | | | |
| Cost of sales, buying and occupancy - merchandise sales | 1,161 | 1,654 | 2,815 |
| Cost of sales and occupancy - services and other | 1 | 490 | 491 |
| Total cost of sales, buying and occupancy | 1,162 | 2,144 | 3,306 |
| Selling and administrative | 323 | 800 | 1,123 |
| Depreciation and amortization | 14 | 69 | 83 |
| Impairment charges | 3 | 2 | 5 |
| Gain on sales of assets | (79) | (301) | (380) |
| Total costs and expenses | 1,423 | 2,714 | 4,137 |
| Operating income | $ 19 | $ 122 | $ 141 |
| Total assets | $ 2,019 | $ 6,348 | $ 8,367 |
| Capital expenditures | $ 3 | $ 16 | $ 19 |

42

**JX 114-42**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

| millions | | Kmart | | Sears Domestic | | Sears Holdings |
|---|---|---|---|---|---|---|
| | | | | 26 Weeks Ended August 4, 2018 | | |
| Merchandise sales | | | | | | |
| Hardlines | $ | 441 | $ | 2,257 | $ | 2,698 |
| Apparel and Soft Home | | 607 | | 761 | | 1,368 |
| Food and Drug | | 571 | | 3 | | 574 |
| Total merchandise sales | | 1,619 | | 3,021 | | 4,640 |
| Services and other | | | | | | |
| Services | | 2 | | 783 | | 785 |
| Other | | 16 | | 632 | | 648 |
| Total services and other | | 18 | | 1,415 | | 1,433 |
| Total revenues | | 1,637 | | 4,436 | | 6,073 |
| Costs and expenses | | | | | | |
| Cost of sales, buying and occupancy - merchandise sales | | 1,320 | | 2,634 | | 3,954 |
| Cost of sales and occupancy - services and other | | 4 | | 808 | | 812 |
| Total cost of sales, buying and occupancy | | 1,324 | | 3,442 | | 4,766 |
| Selling and administrative | | 443 | | 1,327 | | 1,770 |
| Depreciation and amortization | | 18 | | 115 | | 133 |
| Impairment charges | | 6 | | 85 | | 91 |
| Gain on sales of assets | | (65) | | (203) | | (268) |
| Total costs and expenses | | 1,726 | | 4,766 | | 6,492 |
| Operating loss | $ | (89) | $ | (330) | $ | (419) |
| Total assets | $ | 1,619 | $ | 5,318 | $ | 6,937 |
| Capital expenditures | $ | 16 | $ | 16 | $ | 32 |

43

**JX 114-43**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

| millions | | Kmart | | Sears Domestic | | Sears Holdings |
|---|---|---|---|---|---|---|
| | | | | 26 Weeks Ended July 29, 2017 | | |
| Merchandise sales | | | | | | |
| Hardlines | $ | 792 | $ | 2,949 | $ | 3,741 |
| Apparel and Soft Home | | 1,024 | | 931 | | 1,955 |
| Food and Drug | | 1,045 | | 2 | | 1,047 |
| Total merchandise sales | | 2,861 | | 3,882 | | 6,743 |
| Services and other | | | | | | |
| Services | | 2 | | 944 | | 946 |
| Other | | 26 | | 762 | | 788 |
| Total services and other | | 28 | | 1,706 | | 1,734 |
| Total revenues | | 2,889 | | 5,588 | | 8,477 |
| Costs and expenses | | | | | | |
| Cost of sales, buying and occupancy - merchandise sales | | 2,341 | | 3,253 | | 5,594 |
| Cost of sales and occupancy - services and other | | 5 | | 975 | | 980 |
| Total cost of sales, buying and occupancy | | 2,346 | | 4,228 | | 6,574 |
| Selling and administrative | | 715 | | 1,629 | | 2,344 |
| Depreciation and amortization | | 27 | | 143 | | 170 |
| Impairment charges | | 8 | | 12 | | 20 |
| Gain on sales of assets | | (676) | | (445) | | (1,121) |
| Total costs and expenses | | 2,420 | | 5,567 | | 7,987 |
| Operating income | $ | 469 | $ | 21 | $ | 490 |
| Total assets | $ | 2,019 | $ | 6,348 | $ | 8,367 |
| Capital expenditures | $ | 9 | $ | 32 | $ | 41 |

44

JX 114-44

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

## NOTE 8-SUPPLEMENTAL FINANCIAL INFORMATION

Other long-term liabilities at August 4, 2018, July 29, 2017 and February 3, 2018 consisted of the following:

| millions | August 4, 2018 | July 29, 2017 | February 3, 2018 |
|---|---|---|---|
| Self-insurance reserves | 351 | 533 | 491 |
| Other | 419 | 459 | 444 |
| Total | $ 770 | $ 992 | $ 935 |

The Company accounted for the Insurance Transaction in accordance with accounting standards applicable to extinguishment of liabilities. The Company determined that it has been legally released from being the primary obligor under certain workers' compensation and auto per occurrence deductible losses. Accordingly, we accounted for the Insurance Transaction as an extinguishment, and de-recognized the related self-insurance reserves and recognized a loss of $27 million, for the difference between the cash paid and the carrying value of related self-insurance reserves, within selling and administrative in the Condensed Consolidated Statement of Operations for the 26 week period ended August 4, 2018.

The Company sells service contracts that provide for preventative maintenance and repair/replacement coverage on consumer products over periods of time ranging from 12 to 144 months. Revenues from the sale of service contracts, and the related direct acquisition costs, are deferred and amortized on a straight-line basis over the lives of the associated contracts, while the associated service costs are expensed as incurred. The Company satisfies its performance obligations for service contracts over time as we are obligated to perform the related services over the contract period, while payment from the customer is generally received at the inception of the service contract.

The table below shows activity related to unearned revenues for service contracts, which are recorded within current and long-term unearned revenues in the Condensed Consolidated Balance Sheets. During the 26 weeks ended August 4, 2018, the Company recognized revenues of $347 million that were included within unearned revenues at February 3, 2018. During the 26 weeks ended July 29, 2017, the Company recognized revenues of $401 million that were included within unearned revenues at January 28, 2017. The Company expects to recognize revenue of $560 million within the next 12 months and $480 million of revenue thereafter and has accordingly included these amounts within current and long-term unearned revenues, respectively.

| millions | Unearned Revenues |
|---|---|
| Balance at July 29, 2017 | $ 1,219 |
| Sales of service contracts | 325 |
| Revenue recognized on existing service contracts | (430) |
| Balance at February 3, 2018 | 1,114 |
| Sales of service contracts | 310 |
| Revenue recognized on existing service contracts | (384) |
| Balance at August 4, 2018 | $ 1,040 |

Deferred acquisition costs included $41 million, $45 million and $41 million within prepaid expenses and other current assets and $133 million, $152 million and $141 million within other assets in the Condensed Consolidated Balance Sheets at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. Amortization of deferred acquisition costs included within selling and administrative expense in the Condensed Consolidated Statements of Operations was $25 million and $27 million for the 13 week periods ended August 4, 2018 and July 29, 2017, respectively, and $51 million and $54 million for the 26 week periods ended August 4, 2018 and July 29, 2017, respectively.

During the second quarter of 2018, the Company identified an error in its footnote disclosures related to deferred acquisition costs. The amount of current and non-current deferred acquisition costs previously disclosed in the first quarter 2018 footnote were $145 million and $268 million as of February 3, 2018, respectively. The Company evaluated the materiality of the misstated footnote disclosure and concluded that it was immaterial to prior periods.

JX 114-45

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

The Company has revised the disclosure of deferred acquisition costs at February 3, 2018 above, which had no impact on our condensed consolidated financial statements.

**NOTE 9-LEGAL PROCEEDINGS**

We are a defendant in several lawsuits containing class or collective action allegations in which the named plaintiffs are former associates who allege violations of various wage and hour laws under California law, including alleged misclassification, failure to pay for every hour worked, failure to pay for missed meal and rest periods, and other violations of the California Labor Code. The complaints generally seek unspecified monetary damages, injunctive relief, or both. Further, certain of these proceedings are in jurisdictions with reputations for aggressive application of laws and procedures against corporate defendants. We also are a defendant in putative class action or representative lawsuits in California relating to alleged failure to comply with California laws pertaining to certain operational, marketing, and pricing practices. The California laws alleged to have been violated in each of these lawsuits provide the potential for significant statutory penalties. At this time, the Company is not able to either predict the outcome of these lawsuits or reasonably estimate a potential range of loss with respect to the lawsuits.

We are subject to various other legal and governmental proceedings and investigations, including some involving the practices and procedures in our more highly regulated businesses. Some matters contain class action allegations, environmental and asbestos exposure allegations and other consumer-based, regulatory claims, each of which may seek compensatory, punitive or treble damage claims (potentially in large amounts), as well as other types of relief. At this time, the Company is not able to either predict the outcome of these lawsuits or reasonably estimate a potential range of loss with respect to these lawsuits.

In accordance with accounting standards regarding loss contingencies, we accrue an undiscounted liability for those contingencies where the incurrence of a loss is probable and the amount can be reasonably estimated, and we disclose the amount accrued and the amount of a reasonably possible loss in excess of the amount accrued, if such disclosure is necessary for our financial statements to not be misleading. We do not record liabilities when the likelihood that the liability has been incurred is probable but the amount cannot be reasonably estimated, or when the liability is believed to be only reasonably possible or remote.

Because litigation outcomes are inherently unpredictable, our evaluation of legal proceedings often involves a series of complex assessments by management about future events and can rely heavily on estimates and assumptions. If the assessments indicate that loss contingencies that could be material to any one of our financial statements are not probable, but are reasonably possible, or are probable, but cannot be estimated, then we disclose the nature of the loss contingencies, together with an estimate of the range of possible loss or a statement that such loss is not reasonably estimable. While the consequences of certain unresolved proceedings are not presently determinable, and an estimate of the probable and reasonably possible loss or range of loss in excess of amounts accrued for such proceedings cannot be reasonably made, an adverse outcome from such proceedings could have a material effect on our earnings in any given reporting period. However, in the opinion of our management, after consulting with legal counsel, and taking into account insurance and reserves, the ultimate liability related to current outstanding matters is not expected to have a material effect on our financial position or capital resources.

**NOTE 10-RECENT ACCOUNTING PRONOUNCEMENTS**

*Compensation - Retirement Benefits*

In August 2018, the FASB issued an accounting standards update which modifies disclosure requirements for defined benefit and postretirement plans. This update is effective for fiscal years beginning after December 15, 2020, with early adoption permitted. The amendments in this update should be applied on a retrospective basis to all periods presented. We are currently evaluating the effect the update will have on our disclosures.

*Fair Value Measurements*

In August 2018, the FASB issued an accounting standards update which modifies disclosure requirements on fair value measurements. This update is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value

**JX 114-46**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial fiscal year of adoption. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted upon issuance of this Update. An entity is permitted to early adopt any removed or modified disclosures upon issuance of this Update and delay adoption of the additional disclosures until their effective date. We are currently evaluating the effect the update will have on our disclosures.

*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*

In February 2018, the FASB issued an accounting standards update which allows a reclassification from accumulated other comprehensive income to retained earnings for stranded tax effects resulting from the Tax Cuts and Jobs Act. This update is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. The amendments in this update should be applied either in the period of adoption or retrospectively to each period (or periods) in which the effect of the change in the U.S. federal corporate income tax rate in the Tax Cuts and Jobs Act is recognized. We are currently evaluating the effect the update will have on our consolidated financial statements.

*Accounting for Certain Financial Instruments with Down Round Features*

In July 2017, the FASB issued an accounting standards update which changes the classification analysis of certain equity-linked financial instruments (or embedded features) with down round features. When determining whether certain financial instruments should be classified as liabilities or equity instruments, a down round feature no longer precludes equity classification when assessing whether the instrument is indexed to an entity's own stock. The amendments also clarify existing disclosure requirements for equity-classified instruments. As a result, a freestanding equity-linked financial instrument (or embedded conversion option) no longer would be accounted for as a derivative liability at fair value as a result of the existence of a down round feature. For freestanding equity classified financial instruments, the amendments require entities that present earnings per share to recognize the effect of the down round feature when it is triggered. The update is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018, with early adoption is permitted. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Compensation - Retirement Benefits*

In March 2017, the FASB issued an accounting standards update which requires an employer to report the service cost component in the same line item or items as other compensation costs arising from services rendered by the pertinent employees during the period. It also requires the other components of net periodic pension cost and net periodic postretirement benefit cost to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations, if one is presented. This update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied retrospectively. The Company adopted the update in the first quarter of 2018. The adoption of the new standard reduced selling and administrative and increased other loss in the Condensed Consolidated Statements of Operations by $246 million and $292 million for the 13- and 26- weeks ended July 29, 2017, respectively.

*Business Combinations*

In January 2017, the FASB issued an accounting standards update which clarifies the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of businesses. The amendments in this update provide a screen to determine when a set is not a business. The screen requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated. If the screen is not met, the amendments in this update require that to be considered a business, a set must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. This update is

47

JX 114-47

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied prospectively. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Income Taxes - Intra-Entity Transfers of Assets Other Than Inventory*

In October 2016, the FASB issued an accounting standards update to improve the accounting for the income tax consequences of intra-entity transfers of assets other than inventory. Current accounting standards prohibit the recognition of current and deferred income taxes for an intra-entity asset transfer until the asset has been sold to an outside party. In addition, interpretations of this guidance have developed in practice for transfers of certain intangible and tangible assets. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes in accounting standards. To more faithfully represent the economics of intra-entity asset transfers, the amendments in this update require that entities recognize the income tax consequences of an intra-entity transfer of an asset other than inventory when the transfer occurs. The amendments in this update do not change accounting standards for the pre-tax effects of an intra-entity asset transfer under accounting standards applicable to consolidation, or for an intra-entity transfer of inventory. The update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted as of the beginning of an annual reporting period. The amendments in this update should be applied on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Statement of Cash Flows - Classification of Certain Cash Receipts and Cash Payments*

In August 2016, the FASB issued accounting standards updates which address diversity in practice in how certain cash receipts and cash payments are presented and classified in the statement of cash flows, including: debt prepayment or debt extinguishment costs; settlement of zero-coupon debt instruments or other debt instruments with coupon interest rates that are insignificant in relation to the effective interest rate of the borrowing; contingent consideration payments made after a business combination; proceeds from the settlement of insurance claims; proceeds from the settlement of corporate-owned life insurance policies; distributions received from equity method investees; beneficial interests in securitization transactions; and separately identifiable cash flows and application of the predominance principle. These updates were effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied using a retrospective transition method to each period presented. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Leases*

In February 2016, the FASB issued an accounting standards update which replaces the current lease accounting standard. The update will require, among other items, lessees to recognize a right-of-use asset and a lease liability for most leases. Extensive quantitative and qualitative disclosures, including significant judgments made by management, will be required to provide greater insight into the extent of revenue and expense recognized and expected to be recognized from existing contracts. The new standard provides for certain practical expedients. The update is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. In July 2018, the FASB issued an update which provides an additional transition method allowing entities to only apply the new lease standard in the year of adoption. The update also provides a practical expedient for lessors to combine non-lease components with related lease components if certain conditions are met. We have selected our leasing software solution and are in the process of identifying changes to our business processes, systems and controls to support adoption of the new standard in fiscal 2019. We are currently evaluating the effect the update will have on our consolidated financial statements, and expect the update will have a material impact on our consolidated financial statements.

48

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

*Revenue from Contracts with Customers*

In May 2014, the FASB issued an accounting standards update which replaces the current revenue recognition standards. Subsequently, the FASB has also issued accounting standards updates which clarify the guidance. As discussed in Note 1, the Company adopted the update in the first quarter of 2018 using the full retrospective adoption method. See Note 1 for further information.

*Other Income - Gains and Losses from the De-recognition of Non-financial assets*

In May 2014, the FASB also issued Subtopic 610-20 as part of the accounting standards update *Revenue from Contracts with Customers*. Subsequently, the FASB issued accounting standards updates which clarify the guidance. The update provides guidance on the recognition and measurement of transfers of non-financial assets to parties that are not customers and amends or supersedes existing guidance within accounting standards related to intangible assets and real estate sales on determining the gain or loss recognized upon de-recognition of a non-financial asset. The effective date of the update is aligned with the requirements in the new revenue standard. The amendments in this update may be applied using a full or modified retrospective adoption method. The Company adopted the update in the first quarter of 2018 using the modified retrospective adoption method to contracts not complete at the adoption date. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

**NOTE 11-RELATED PARTY DISCLOSURE**

Mr. Lampert is Chairman of our Board of Directors and is the Chairman and Chief Executive Officer of ESL. Additionally, on February 1, 2013, Mr. Lampert became our Chief Executive Officer, in addition to his role as Chairman of the Board. ESL owned approximately 49% of our outstanding common stock at August 4, 2018 (excluding shares of common stock that ESL may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock and through debt conversion features).

Bruce R. Berkowitz was a member of our Board of Directors from February 2016 through October 2017. Mr. Berkowitz serves as the Chief Investment Officer of Fairholme Capital Management, LLC, an investment adviser registered with the SEC, and is the President and a Director of Fairholme Funds, Inc., a SEC-registered investment company providing investment management services to three mutual funds (together with Fairholme Capital Management, LLC and other affiliates, "Fairholme"). Fairholme owned approximately 16% of our outstanding common stock at August 4, 2018 (excluding shares of common stock that Fairholme may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock).

Thomas J. Tisch has been an independent member of our Board of Directors since 2005. Mr. Tisch owned approximately 3% of our outstanding common stock at August 4, 2018 (excluding shares of common stock that Mr. Tisch may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock and through debt conversion features).

*Unsecured Commercial Paper*

During the 26 week periods ended August 4, 2018 and July 29, 2017, ESL and its affiliates held unsecured commercial paper issued by SRAC, an indirect wholly-owned subsidiary of Holdings. For the commercial paper outstanding to ESL, the weighted average of each of maturity, annual interest rate and principal amount outstanding was 7.0 days, 11% and $8 million and 8.1 days, 8% and $58 million, respectively, during the 26 week periods ended August 4, 2018 and July 29, 2017. The largest aggregate amount of principal outstanding to ESL at any time since the beginning of 2018 was $50 million, and $0.4 million of interest was paid by SRAC to ESL during the 26 week period ended August 4, 2018.

The commercial paper purchases were made in the ordinary course of business on substantially the same terms, including interest rates, as terms prevailing for comparable transactions with other persons, and did not present features unfavorable to the Company.

**JX 114-49**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

*LC Facility*

On December 28, 2016, the Company, through the Borrowers, entered into the LC Facility, which was subsequently amended in August 2017. At each of August 4, 2018, July 29, 2017 and February 3, 2018, we had $271 million of letters of credit outstanding under the LC Facility. The letters of credit outstanding under the LC Facility were initially committed by entities affiliated with ESL, and the Lenders maintain cash collateral on deposit with the Issuing Bank of $108 million. $165 million of the amount originally committed under the LC Facility has been syndicated to unaffiliated third party lenders as of August 4, 2018. See Note 2 for additional information regarding the LC Facility, as amended.

*FILO Loan*

On March 21, 2018, the Company, through the Borrowers, obtained the FILO Loan. The initial lenders of the FILO Loan include JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Mr. Tisch. At August 4, 2018, JPP LLC and JPP II, LLC and Benefit Street 2018 LLC, respectively, held $70 million and $25 million of principal amount of the FILO Loan.

*Mezzanine Loan and Additional Mezzanine Loans*

On March 14, 2018, the Company, through the Mezzanine Loan Borrower, entered into the Mezzanine Loan Agreement with the Lenders, entities affiliated with ESL. The Mezzanine Loan Agreement contains an uncommitted accordion feature pursuant to which the Mezzanine Loan Borrower may incur Additional Mezzanine Loans, subject to certain conditions. At August 4, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $463 million of aggregate principal amount of Mezzanine Loan and Additional Mezzanine Loans.

*Term Loan Facility*

On January 4, 2018, the Company, through the Borrowers, obtained a $300 million loan facility from the Lenders, entities affiliated with ESL. At August 4, 2018 and February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $150 million and $151 million, respectively, of principal amount of the Term Loan Facility. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the Term Loan Facility, of which $11 million were repaid to entities affiliated with ESL. See Note 2 for additional information regarding the Term Loan Facility.

*Consolidated Secured Loan Facility*

On June 4, 2018, the Company, through the Incremental Loan Borrowers, entered into the Consolidated Loan Agreement with the 2016 Secured Loan Lenders, which amends and restates the Second Amended and Restated Loan Agreement, dated as of October 18, 2017, and terminates the 2016 Secured Loan Facility. The Consolidated Secured Loan Facility matures on July 20, 2020, and a portion of the Consolidated Secured Loan Facility, as evidenced by Note B, as of closing was held by JPP, LLC and JPP II, LLC, entities affiliated with ESL. At August 4, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $686 million of principal amount of the Consolidated Secured Loan Facility. See Note 2 for additional information regarding the Consolidated Secured Loan Facility.

*2017 Secured Loan Facility*

On January 3, 2017, the Company, through the 2017 Secured Loan Borrowers, obtained a $500 million real estate loan facility from the Lenders, entities affiliated with ESL. On March 8, 2018, the Company borrowed an additional $100 million from the Lenders, which had an original maturity of July 20, 2020 and had the same terms as the 2017 Secured Loan Facility, as amended. At July 29, 2017 and February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $461 million and $384 million of principal amount of the 2017 Secured Loan Facility, respectively. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2017 Secured Loan Facility during the 26 weeks ended August 4, 2018, of which $17 million was repaid to entities affiliated with ESL. Approximately $39 million of proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2017 Secured Loan Facility during the 26 weeks ended July 29, 2017, all

50

JX 114-50

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

of which were repaid to entities affiliated with ESL. During October 2017, the Company, through the Incremental Loan Borrowers, obtained Incremental Loans totaling $200 million from the Lenders. At February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $145 million of principal amount of the Incremental Loans. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the Incremental Loans during the 26 weeks ended August 4, 2018, of which $6 million was repaid to entities affiliated with ESL. On June 4, 2018, the 2017 Secured Loan Facility and Incremental Loans were amended and restated by the Consolidated Loan Agreement described above. See Note 2 for additional information regarding the 2017 Secured Loan Facility, Incremental Loans and Consolidated Secured Loan Facility.

*2016 Secured Loan Facility*

In April 2016, the Company, through the 2016 Secured Loan Borrowers, obtained a $500 million real estate loan facility from the 2016 Secured Loan Lenders, some of which are entities affiliated with ESL. At July 29, 2017 and February 3, 2018, entities affiliated with ESL held $131 million and $126 million, respectively, of principal amount of the 2016 Secured Loan Facility. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2016 Secured Loan Facility during the 26 weeks ended August 4, 2018, of which $33 million was repaid to entities affiliated with ESL. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2016 Secured Loan Facility during the 26 weeks ended July 29, 2017, of which $84 million were repaid to entities affiliated with ESL. On June 4, 2018, the 2016 Secured Loan Facility was terminated by the Consolidated Loan Agreement described above. See Note 2 for additional information regarding the 2016 Secured Loan Facility, as amended, and Consolidated Secured Loan Facility.

*2016 Term Loan*

In April 2016, the Company, through the ABL Borrowers, obtained a $750 million senior secured term loan under the Amended Domestic Credit Agreement with a syndicate of lenders, including $146 million (net of original issue discount) from JPP, LLC and JPP II, LLC, entities affiliated with ESL, and $100 million from the Company's domestic pension plans. At August 4, 2018, the Company's domestic pension plans held $76 million of principal amount of the 2016 Term Loan. At July 29, 2017 and February 3, 2018, JPP LLC and JPP II, LLC, and the Company's domestic pension plans, respectively, held $114 million and $76 million, respectively, and $38 million and $77 million, respectively, of principal amount of the 2016 Term Loan. As disclosed in Note 2, a portion of the proceeds received from the Craftsman Sale were used to reduce outstanding borrowings under the 2016 Term Loan during the 26 weeks ended July 29, 2017, of which $36 million and $24 million was repaid to JPP LLC and JPP II, LLC, and the Company's domestic pension plans, respectively. See Note 2 for additional information regarding the 2016 Term Loan.

*Second Lien Credit Agreement*

In September 2016, the Company, through the ABL Borrowers, obtained a $300 million Second Lien Term Loan from the Lenders, entities affiliated with ESL. At each of August 4, 2018, July 29, 2017 and February 3, 2018, JPP LLC and JPP II, LLC held $300 million of principal amount of the Second Lien Term Loan.

Additionally, as further discussed in Note 2, in July 2017, the Company amended its Second Lien Credit Agreement to create an additional $500 million Line of Credit Facility. The Company received $610 million in net proceeds from Line of Credit Loans during 2017, including $480 million, $25 million and $20 million from ESL and its affiliates, Mr. Berkowitz and his affiliates, and Mr. Tisch and his affiliates, respectively, which also represents the principal amount of Line of Credit Loans held by Mr. Berkowitz and his affiliates at July 29, 2017, by Mr. Tisch and his affiliates at August 4, 2018, July 29, 2017 and February 3, 2018 and by ESL and its affiliates at February 3, 2018. ESL and its affiliates held $200 million principal amount of Line of Credit Loans at July 29, 2017. During the 13 weeks ended May 5, 2018, the Company received an additional $70 million proceeds from Line of Credit Loans from ESL and its affiliates, bringing the principal amount of Line of Credit Loans held by ESL and its affiliates to $505 million at August 4, 2018. The Company made repayments of $25 million during 2017 to Mr. Berkowitz and his affiliates. See Note 2 for additional information regarding the Second Lien Credit Agreement, as amended.

JX 114-51

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

*Old Senior Secured Notes and New Senior Secured Notes*

At July 29, 2017 and February 3, 2018, Mr. Lampert and ESL held an aggregate of approximately $11 million and $20 million of principal amount of the Company's Old Senior Secured Notes. At August 4, 2018, Mr. Lampert and ESL held an aggregate of approximately $21 million of principal amount of the Company's New Senior Secured Notes.

At July 29, 2017 Fairholme held an aggregate of approximately $46 million of principal amount of the Company's Old Senior Secured Notes.

*Subsidiary Notes*

At July 29, 2017, Mr. Lampert and ESL held an aggregate of $3 million of principal amount of unsecured notes issued by SRAC (the "Subsidiary Notes").

At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, Fairholme held an aggregate of $8 million, $14 million and $9 million of principal amount of Subsidiary Notes.

*Old Senior Unsecured Notes and Warrants and New Senior Unsecured Notes and Warrants*

At both July 29, 2017 and February 3, 2018, Mr. Lampert and ESL held an aggregate of approximately $188 million of principal amount of the Company's Old Senior Unsecured Notes, and 10,033,472 warrants to purchase shares of Holdings' common stock.

At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, Fairholme held an aggregate of approximately $330 million, $362 million and $336 million of principal amount of the Company's Old Senior Unsecured Notes, and 5,560,517, 6,648,050 and 5,768,185 warrants to purchase shares of Holdings' common stock.

At both July 29, 2017 and February 3, 2018, Mr. Tisch and his affiliates held an aggregate of approximately $10 million of principal amount of the Company's Old Senior Unsecured Notes. At July 29, 2017 and February 3, 2018, respectively, Mr. Tisch and his affiliates held 697,204 and 465,599 warrants to purchase shares of Holdings' common stock.

At August 4, 2018, Mr. Lampert and ESL held an aggregate of approximately $195 million of principal amount of the Company's New Senior Unsecured Notes and 10,033,472 warrants to purchase shares of Holdings' common stock. At August 4, 2018, Mr. Tisch and his affiliates held an aggregate of approximately $11 million of principal amount of the Company's New Senior Unsecured Notes and 465,599 warrants to purchase shares of Holdings' common stock.

*Sears Canada*

ESL owns approximately 45% of the outstanding common shares of Sears Canada (based on publicly available information as of July 27, 2017).

*Lands' End*

ESL owns approximately 67% of the outstanding common stock of Lands' End (based on publicly available information as of January 24, 2018). Holdings and certain of its subsidiaries entered into a transition services agreement in connection with the spin-off pursuant to which Lands' End and Holdings agreed to provide, on an interim, transitional basis, various services, including but not limited to, tax services, logistics services, auditing and compliance services, inventory management services, information technology services and continued participation in certain contracts shared with Holdings and its subsidiaries, as well as agreements related to Lands' End Shops at Sears and participation in the Shop Your Way program. The majority of the services under the transition services agreement with Lands' End have expired or been terminated. In July 2016, the Company and Lands' End executed an agreement pursuant to which the Company will provide foreign buying office support and sourcing services to Lands' End. The agreement expires on June 30, 2020.

Amounts due to or from Lands' End are non-interest bearing, and generally settled on a net basis. Holdings invoices Lands' End on at least a monthly basis. At both July 29, 2017 and February 3, 2018, Holdings reported a net amount receivable from Lands' End of $1 million within accounts receivable in the Condensed Consolidated Balance Sheet.

52

**JX 114-52**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

Amounts related to revenue from retail services and rent for Lands' End Shops at Sears, participation in the Shop Your Way program and corporate shared services were $10 million and $15 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $21 million and $30 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017. The amounts Lands' End earned related to call center services and commissions were $1 million for the 13 week period ended August 4, 2018 and $1 million and $2 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017.

*SHO*

ESL owns approximately 58% of the outstanding common stock of SHO (based on publicly available information as of November 8, 2017). Holdings and certain of its subsidiaries engage in transactions with SHO pursuant to various agreements with SHO which, among other things, (1) govern the principal transactions relating to the rights offering and certain aspects of our relationship with SHO following the separation, (2) establish terms under which Holdings and certain of its subsidiaries will provide SHO with services, and (3) establish terms pursuant to which Holdings and certain of its subsidiaries will obtain merchandise for SHO.

These agreements were originally made in the context of a parent-subsidiary relationship and were negotiated in the overall context of the separation. In May 2016, the Company and SHO agreed to changes to a number of their related agreements, including extending the merchandise and services agreement until February 1, 2020.

A summary of the nature of related party transactions involving SHO is as follows:

- SHO obtains a significant amount of its merchandise from the Company. We have also entered into certain agreements with SHO to provide logistics, handling, warehouse and transportation services. SHO also pays a royalty related to the sale of Kenmore, Craftsman and DieHard products and fees for participation in the Shop Your Way program.

- SHO receives commissions from the Company for the sale of merchandise made through www.sears.com, extended service agreements, delivery and handling services and credit revenues.

- The Company provides SHO with shared corporate services. These services include accounting and finance and information technology.

Amounts due to or from SHO are non-interest bearing, settled on a net basis, and have payment terms of 10 days after the invoice date. The Company invoices SHO on a weekly basis. At August 4, 2018, July 29, 2017 and February 3, 2018, Holdings reported a net amount receivable from SHO of $22 million, $25 million and $28 million, respectively, within accounts receivable in the Condensed Consolidated Balance Sheets. Amounts related to the sale of inventory and related services, royalties, and corporate shared services $219 million and $286 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $424 million and $567 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017. The net amounts SHO earned related to commissions were $16 million and $19 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $31 million and $36 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017. Additionally, the Company has guaranteed lease obligations for certain SHO store leases that were assigned as a result of the separation. See Note 4 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018 for further information related to these guarantees.

Also in connection with the separation, the Company entered into an agreement with SHO and the agent under SHO's secured credit facility, whereby the Company committed to continue to provide services to SHO in connection with a realization on the lender's collateral after default under the secured credit facility, notwithstanding SHO's default under the underlying agreement with us, and to provide certain notices and services to the agent, for so long as any obligations remain outstanding under the secured credit facility.

**JX 114-53**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

*Seritage*

ESL owns approximately 6.2% of the total voting power of Seritage, and approximately 43.5% of the limited partnership units of Seritage Growth Properties, L.P. (the "Operating Partnership"), the entity that now owns the properties sold by the Company in the Seritage transaction and through which Seritage conducts its operations (based on publicly available information as of May 7, 2018). Mr. Lampert is also currently the Chairman of the Board of Trustees of Seritage. Fairholme owns approximately 4.9% of the outstanding Class A common shares of Seritage and 100% of the outstanding Class C non-voting common shares of Seritage (based on publicly available information as of March 16, 2018).

In connection with the Seritage transaction as described in Note 3, Holdings entered into the Master Leases with Seritage. The initial amount of aggregate annual base rent under the master lease was $134 million for the REIT properties, with increases of 2% per year beginning in the second lease year. At both August 4, 2018 and February 3, 2018, Holdings reported prepaid rent of $6 million within prepaid expenses and other current assets in the Condensed Consolidated Balance Sheets. Holdings recorded rent expense of $13 million and $19 million, respectively, in cost of sales, buying and occupancy for the 13 week periods ended August 4, 2018 and July 29, 2017. Rent expense consists of straight-line rent expense of $20 million and $32 million, respectively, offset by amortization of a deferred gain recognized pursuant to the sale and leaseback of properties from Seritage of $7 million and $13 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017.

Holdings recorded rent expense of $27 million and $38 million, respectively, in cost of sales, buying and occupancy for the 26 week periods ended August 4, 2018 and July 29, 2017. Rent expense consists of straight-line rent expense of $43 million and $64 million, respectively, offset by amortization of a deferred gain recognized pursuant to the sale and leaseback of properties from Seritage of $16 million and $26 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017.

In addition to base rent under the Master Leases, Holdings pays monthly installment expenses for property taxes and insurance at all REIT properties where Holdings is a tenant and installment expenses for common area maintenance, utilities and other operating expenses at REIT properties that are multi-tenant locations where Holdings and other third parties are tenants. The initial amount of aggregate installment expenses under the Master Leases was $70 million, based on estimated installment expenses, and currently is $37 million as a result of recapture activity and reconciling actual installment expenses. Holdings paid $9 million and $12 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $18 million and $24 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017, recorded in cost of sales, buying and occupancy. At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, Holdings reported an amount receivable from Seritage of $1 million, $4 million and $1 million within accounts receivable in the Condensed Consolidated Balance Sheets.

JX 114-54

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**NOTE 12-GUARANTOR/NON-GUARANTOR SUBSIDIARY FINANCIAL INFORMATION**

At August 4, 2018, the principal amount outstanding of the Old Senior Secured Notes and New Senior Secured Notes was $264 million, including paid-in-kind interest. The Old Senior Secured Notes were issued in 2010 by Sears Holdings Corporation ("Parent"). The Old Senior Secured Notes and New Senior Secured Notes are guaranteed by certain of our 100% owned domestic subsidiaries that own the collateral for the Old Senior Secured Notes and New Senior Secured Notes, as well as by Sears Holdings Management Corporation and SRAC (the "guarantor subsidiaries"). The following condensed consolidated financial information presents the Condensed Consolidating Balance Sheets at August 4, 2018, July 29, 2017 and February 3, 2018, the Condensed Consolidating Statements of Operations and the Condensed Consolidating Statements of Comprehensive Income (Loss) for the 13- and 26- week periods ended August 4, 2018 and July 29, 2017, and the Condensed Consolidating Statements of Cash Flows for the 26 week periods ended August 4, 2018 and July 29, 2017 of (i) Parent; (ii) the guarantor subsidiaries; (iii) the non-guarantor subsidiaries; (iv) eliminations and (v) the Company on a consolidated basis.

The principal elimination entries relate to investments in subsidiaries and intercompany balances and transactions including transactions with our wholly-owned non-guarantor insurance subsidiary. The Company has accounted for investments in subsidiaries under the equity method. The guarantor subsidiaries are 100% owned directly or indirectly by the Parent and all guarantees are joint, several and unconditional. Additionally, the notes are secured by a security interest in certain assets consisting primarily of domestic inventory and credit card receivables of the guarantor subsidiaries, and consequently may not be available to satisfy the claims of the Company's general creditors. Certain investments primarily held by non-guarantor subsidiaries are recorded by the issuers at historical cost and are recorded at fair value by the holder.

55

**JX 114-55**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Balance Sheet**
**August 4, 2018**

| millions | | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|
| Current assets | | | | | | | | | | |
| Cash and cash equivalents | $ | - | $ | 159 | $ | 34 | $ | - | $ | 193 |
| Restricted cash | | 248 | | - | | - | | - | | 248 |
| Intercompany receivables | | - | | - | | 29,162 | | (29,162) | | - |
| Accounts receivable | | 2 | | 301 | | 24 | | - | | 327 |
| Merchandise inventories | | - | | 2,714 | | - | | - | | 2,714 |
| Prepaid expenses and other current assets | | 234 | | 866 | | 690 | | (1,404) | | 386 |
| Total current assets | | 484 | | 4,040 | | 29,910 | | (30,566) | | 3,868 |
| Total property and equipment, net | | - | | 847 | | 597 | | - | | 1,444 |
| Goodwill and intangible assets | | - | | 337 | | 1,120 | | (98) | | 1,359 |
| Other assets | | 185 | | 1,320 | | 962 | | (2,201) | | 266 |
| Investment in subsidiaries | | 8,356 | | 28,136 | | - | | (36,492) | | - |
| TOTAL ASSETS | $ | 9,025 | $ | 34,680 | $ | 32,589 | $ | (69,357) | $ | 6,937 |
| Current liabilities | | | | | | | | | | |
| Short-term borrowings | $ | - | $ | 1,440 | $ | 24 | $ | (210) | $ | 1,254 |
| Current portion of long-term debt and capitalized lease obligations | | 89 | | 477 | | - | | (370) | | 196 |
| Merchandise payables | | - | | 487 | | - | | - | | 487 |
| Intercompany payables | | 11,094 | | 18,068 | | - | | (29,162) | | - |
| Other current liabilities | | 15 | | 1,871 | | 1,313 | | (859) | | 2,340 |
| Total current liabilities | | 11,198 | | 22,343 | | 1,337 | | (30,601) | | 4,277 |
| Long-term debt and capitalized lease obligations | | 2,608 | | 2,644 | | 499 | | (2,247) | | 3,504 |
| Pension and postretirement benefits | | - | | 1,162 | | 2 | | - | | 1,164 |
| Deferred gain on sale-leaseback | | - | | 290 | | 15 | | - | | 305 |
| Sale-leaseback financing obligation | | - | | 128 | | 219 | | - | | 347 |
| Long-term deferred tax liabilities | | - | | - | | 350 | | (231) | | 119 |
| Unearned revenues | | - | | 603 | | 415 | | (165) | | 853 |
| Other long-term liabilities | | - | | 703 | | 67 | | - | | 770 |
| Total Liabilities | | 13,806 | | 27,873 | | 2,904 | | (33,244) | | 11,339 |
| EQUITY (DEFICIT) | | | | | | | | | | |
| Shareholder's equity (deficit) | | (4,781) | | 6,807 | | 29,685 | | (36,113) | | (4,402) |
| Total Equity (Deficit) | | (4,781) | | 6,807 | | 29,685 | | (36,113) | | (4,402) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ | 9,025 | $ | 34,680 | $ | 32,589 | $ | (69,357) | $ | 6,937 |

56

**JX 114-56**

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements-(Continued)
(Unaudited)

**Condensed Consolidating Balance Sheet**
**July 29, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash and cash equivalents | $ - | $ 180 | $ 32 | $ - | $ 212 |
| Restricted cash | 230 | - | - | - | 230 |
| Intercompany receivables | - | - | 27,871 | (27,871) | - |
| Accounts receivable | - | 350 | 20 | - | 370 |
| Merchandise inventories | - | 3,433 | - | - | 3,433 |
| Prepaid expenses and other current assets | 31 | 677 | 432 | (806) | 334 |
| Total current assets | 261 | 4,640 | 28,355 | (28,677) | 4,579 |
| Total property and equipment, net | - | 1,262 | 707 | - | 1,969 |
| Goodwill and intangible assets | - | 355 | 1,261 | (98) | 1,518 |
| Other assets | 405 | 1,304 | 1,532 | (2,940) | 301 |
| Investment in subsidiaries | 9,302 | 27,717 | - | (37,019) | - |
| TOTAL ASSETS | $ 9,968 | $ 35,278 | $ 31,855 | $ (68,734) | $ 8,367 |
| Current liabilities | | | | | |
| Short-term borrowings | $ - | $ 689 | $ - | $ (143) | $ 546 |
| Current portion of long-term debt and capitalized lease obligations | - | 1,052 | - | - | 1,052 |
| Merchandise payables | - | 672 | (2) | - | 670 |
| Intercompany payables | 11,416 | 16,455 | - | (27,871) | - |
| Other current liabilities | 37 | 2,147 | 1,133 | (611) | 2,706 |
| Total current liabilities | 11,453 | 21,015 | 1,131 | (28,625) | 4,974 |
| Long-term debt and capitalized lease obligations | 2,130 | 3,036 | - | (2,761) | 2,405 |
| Pension and postretirement benefits | - | 1,727 | 4 | - | 1,731 |
| Deferred gain on sale-leaseback | - | 455 | - | - | 455 |
| Sale-leaseback financing obligation | - | 141 | 89 | - | 230 |
| Long-term deferred tax liabilities | 48 | - | 738 | (143) | 643 |
| Unearned revenues | - | 305 | 481 | (193) | 593 |
| Other long-term liabilities | - | 913 | 79 | - | 992 |
| Total Liabilities | 13,631 | 27,592 | 2,522 | (31,722) | 12,023 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (3,663) | 7,686 | 29,333 | (37,012) | (3,656) |
| Noncontrolling interest | - | - | - | - | - |
| Total Equity (Deficit) | (3,663) | 7,686 | 29,333 | (37,012) | (3,656) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 9,968 | $ 35,278 | $ 31,855 | $ (68,734) | $ 8,367 |

JX 114-57

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Balance Sheet**
**February 3, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash and cash equivalents | $    - | $    152 | $    30 | $    - | $    182 |
| Restricted cash | 154 | - | - | - | 154 |
| Intercompany receivables | - | - | 27,993 | (27,993) | - |
| Accounts receivable | - | 322 | 21 | - | 343 |
| Merchandise inventories | - | 2,798 | - | - | 2,798 |
| Prepaid expenses and other current assets | 309 | 910 | 478 | (1,351) | 346 |
| Total current assets | 463 | 4,182 | 28,522 | (29,344) | 3,823 |
| Total property and equipment, net | - | 1,043 | 686 | - | 1,729 |
| Goodwill and intangible assets | - | 346 | 1,189 | (98) | 1,437 |
| Other assets | 179 | 1,331 | 1,159 | (2,385) | 284 |
| Investment in subsidiaries | 8,787 | 27,774 | - | (36,561) | - |
| TOTAL ASSETS | $    9,429 | $    34,676 | $    31,556 | $    (68,388) | $    7,273 |
| Current liabilities | | | | | |
| Short-term borrowings | $    144 | $    937 | $    - | $    (166) | $    915 |
| Current portion of long-term debt and capitalized lease obligations | 303 | 897 | - | (232) | 968 |
| Merchandise payables | - | 576 | - | - | 576 |
| Intercompany payables | 11,099 | 16,894 | - | (27,993) | - |
| Other current liabilities | 16 | 1,970 | 1,426 | (949) | 2,463 |
| Total current liabilities | 11,562 | 21,274 | 1,426 | (29,340) | 4,922 |
| Long-term debt and capitalized lease obligations | 1,991 | 2,734 | - | (2,476) | 2,249 |
| Pension and postretirement benefits | - | 1,616 | 3 | - | 1,619 |
| Deferred gain on sale-leaseback | - | 360 | 2 | - | 362 |
| Sale-leaseback financing obligation | - | 158 | 89 | - | 247 |
| Long-term deferred tax liabilities | - | - | 349 | (223) | 126 |
| Unearned revenues | - | 271 | 446 | (178) | 539 |
| Other long-term liabilities | - | 867 | 68 | - | 935 |
| Total Liabilities | 13,553 | 27,280 | 2,383 | (32,217) | 10,999 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (4,124) | 7,396 | 29,173 | (36,171) | (3,726) |
| Noncontrolling interest | - | - | - | - | - |
| Total Equity (Deficit) | (4,124) | 7,396 | 29,173 | (36,171) | (3,726) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $    9,429 | $    34,676 | $    31,556 | $    (68,388) | $    7,273 |

58

**JX 114-58**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 13 Weeks Ended August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ - | $ 2,416 | $ - | $ 12 | $ 2,428 |
| Services and other | 1 | 766 | 528 | (541) | 754 |
| Total revenues | 1 | 3,182 | 528 | (529) | 3,182 |
| Cost of sales, buying and occupancy - merchandise sales | 1 | 2,028 | - | 26 | 2,055 |
| Cost of sales and occupancy - services and other | - | 521 | 215 | (311) | 425 |
| Total cost of sales, buying and occupancy | 1 | 2,549 | 215 | (285) | 2,480 |
| Selling and administrative | 3 | 918 | 187 | (244) | 864 |
| Depreciation and amortization | - | 53 | 13 | - | 66 |
| Impairment charges | - | - | 77 | - | 77 |
| Gain on sales of assets | - | (80) | (23) | - | (103) |
| Total costs and expenses | 4 | 3,440 | 469 | (529) | 3,384 |
| Operating income (loss) | (3) | (258) | 59 | - | (202) |
| Interest expense | (205) | (278) | (75) | 370 | (188) |
| Interest and investment income | 56 | 117 | 218 | (389) | 2 |
| Other loss | - | (139) | - | - | (139) |
| Income (loss) before income taxes | (152) | (558) | 202 | (19) | (527) |
| Income tax (expense) benefit | - | 27 | (8) | - | 19 |
| Equity (deficit) in earnings in subsidiaries | (337) | 98 | - | 239 | - |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (489) | $ (433) | $ 194 | $ 220 | $ (508) |

59

**JX 114-59**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 13 Weeks Ended July 29, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ - | $ 3,406 | $ - | $ 8 | $ 3,414 |
| Services and other | - | 885 | 563 | (584) | 864 |
| Total revenues | - | 4,291 | 563 | (576) | 4,278 |
| Cost of sales, buying and occupancy - merchandise sales | - | 2,795 | - | 20 | 2,815 |
| Cost of sales and occupancy - services and other | - | 584 | 220 | (313) | 491 |
| Total cost of sales, buying and occupancy | - | 3,379 | 220 | (293) | 3,306 |
| Selling and administrative | (33) | 1,229 | 210 | (283) | 1,123 |
| Depreciation and amortization | - | 67 | 16 | - | 83 |
| Impairment charges | - | 5 | - | - | 5 |
| (Gain) loss on sales of assets | 6 | (386) | - | - | (380) |
| Total costs and expenses | (27) | 4,294 | 446 | (576) | 4,137 |
| Operating income (loss) | 27 | (3) | 117 | - | 141 |
| Interest expense | (154) | (237) | (4) | 272 | (123) |
| Interest and investment income (loss) | 28 | 64 | 168 | (272) | (12) |
| Other loss | - | (246) | - | - | (246) |
| Income (loss) before income taxes | (99) | (422) | 281 | - | (240) |
| Income tax (expense) benefit | - | 21 | (31) | - | (10) |
| Equity (deficit) in earnings in subsidiaries | (151) | 176 | - | (25) | - |
| NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS | $ (250) | $ (225) | $ 250 | $ (25) | $ (250) |

60

**JX 114-60**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 26 Weeks Ended August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ - | $ 4,619 | $ - | $ 21 | $ 4,640 |
| Services and other | 1 | 1,446 | 1,045 | (1,059) | 1,433 |
| Total revenues | 1 | 6,065 | 1,045 | (1,038) | 6,073 |
| Cost of sales, buying and occupancy - merchandise sales | 1 | 3,894 | - | 59 | 3,954 |
| Cost of sales and occupancy - services and other | - | 998 | 427 | (613) | 812 |
| Total cost of sales, buying and occupancy | 1 | 4,892 | 427 | (554) | 4,766 |
| Selling and administrative | 6 | 1,873 | 375 | (484) | 1,770 |
| Depreciation and amortization | - | 106 | 27 | - | 133 |
| Impairment charges | - | 11 | 80 | - | 91 |
| Gain on sales of assets | - | (187) | (81) | - | (268) |
| Total costs and expenses | 7 | 6,695 | 828 | (1,038) | 6,492 |
| Operating income (loss) | (6) | (630) | 217 | - | (419) |
| Interest expense | (387) | (564) | (91) | 688 | (354) |
| Interest and investment income | 89 | 176 | 445 | (707) | 3 |
| Other loss | - | (172) | - | - | (172) |
| Income (loss) before income taxes | (304) | (1,190) | 571 | (19) | (942) |
| Income tax (expense) benefit | - | 61 | (51) | - | 10 |
| Equity (deficit) in earnings in subsidiaries | (609) | 357 | - | 252 | - |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (913) | $ (772) | $ 520 | $ 233 | $ (932) |

61

JX 114-61

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 26 Weeks Ended July 29, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ - | $ 6,730 | $ - | $ 13 | $ 6,743 |
| Services and other | - | 1,756 | 1,161 | (1,183) | 1,734 |
| Total revenues | - | 8,486 | 1,161 | (1,170) | 8,477 |
| Cost of sales, buying and occupancy - merchandise sales | - | 5,547 | - | 47 | 5,594 |
| Cost of sales and occupancy - services and other | - | 1,188 | 443 | (651) | 980 |
| Total cost of sales, buying and occupancy | - | 6,735 | 443 | (604) | 6,574 |
| Selling and administrative | (32) | 2,515 | 427 | (566) | 2,344 |
| Depreciation and amortization | - | 138 | 32 | - | 170 |
| Impairment charges | - | 20 | - | - | 20 |
| Gain on sales of assets | (486) | (635) | - | - | (1,121) |
| Total costs and expenses | (518) | 8,773 | 902 | (1,170) | 7,987 |
| Operating income (loss) | 518 | (287) | 259 | - | 490 |
| Interest expense | (271) | (458) | (8) | 486 | (251) |
| Interest and investment income (loss) | 38 | 103 | 331 | (486) | (14) |
| Other loss | - | (292) | - | - | (292) |
| Income (loss) before income taxes | 285 | (934) | 582 | - | (67) |
| Income tax (expense) benefit | - | 150 | (88) | - | 62 |
| Equity (deficit) in earnings in subsidiaries | (290) | 349 | - | (59) | - |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (5) | $ (435) | $ 494 | $ (59) | $ (5) |

62

**JX 114-62**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 13 Weeks Ended August 4, 2018**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (489) | $ | (433) | $ | 194 | $ | 220 | $ | (508) |
| Other comprehensive income (loss) | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | - | | 218 | | - | | - | | 218 |
| Currency translation adjustments, net of tax | | - | | - | | (1) | | - | | (1) |
| Unrealized net loss, net of tax | | (8) | | - | | - | | 8 | | - |
| Total other comprehensive income (loss) | | (8) | | 218 | | (1) | | 8 | | 217 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (497) | $ | (215) | $ | 193 | $ | 228 | $ | (291) |

63

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**


**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 13 Weeks Ended July 29, 2017**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (250) | $ | (225) | $ | 250 | $ | (25) | $ | (250) |
| Other comprehensive income | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | - | | 127 | | - | | - | | 127 |
| Total other comprehensive income | | - | | 127 | | - | | - | | 127 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (250) | $ | (98) | $ | 250 | $ | (25) | $ | (123) |

64

**JX 114-64**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 26 Weeks Ended August 4, 2018**

| millions | | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (913) | $ | (772) | $ | 520 | $ | 233 | $ | (932) |
| Other comprehensive income (loss) | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | - | | 254 | | - | | - | | 254 |
| Currency translation adjustments, net of tax | | - | | - | | - | | - | | - |
| Unrealized net gain (loss), net of tax | | (8) | | - | | 3 | | 5 | | - |
| Total other comprehensive income (loss) | | (8) | | 254 | | 3 | | 5 | | 254 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (921) | $ | (518) | $ | 523 | $ | 238 | $ | (678) |

**JX 114-65**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 26 Weeks Ended July 29, 2017**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (5) | $ | (435) | $ | 494 | $ | (59) | $ | (5) |
| Other comprehensive income | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | - | | 177 | | - | | - | | 177 |
| Currency translation adjustments, net of tax | | - | | - | | 1 | | - | | 1 |
| Unrealized net gain, net of tax | | - | | - | | 26 | | (26) | | - |
| Total other comprehensive income | | - | | 177 | | 27 | | (26) | | 178 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (5) | $ | (258) | $ | 521 | $ | (85) | $ | 173 |

66

**JX 114-66**

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Cash Flows**
**For the 26 Weeks Ended August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 8 | $ (1,170) | $ 126 | $ - | $ (1,036) |
| Proceeds from sales of property and investments | - | 160 | 162 | - | 322 |
| Purchases of property and equipment | - | (28) | (4) | - | (32) |
| Net investing with Affiliates | (245) | (94) | (795) | 1,134 | - |
| Net cash provided by (used in) investing activities | (245) | 38 | (637) | 1,134 | 290 |
| Proceeds from debt issuances | 327 | 195 | 713 | - | 1,235 |
| Repayments of long-term debt | (88) | (611) | (170) | - | (869) |
| Increase in short-term borrowings, primarily 90 days or less | - | 389 | - | - | 389 |
| Proceeds from sale-leaseback financing | - | 130 | - | - | 130 |
| Debt issuance costs | (2) | (4) | (28) | - | (34) |
| Net borrowing with Affiliates | 94 | 1,040 | - | (1,134) | - |
| Net cash provided by financing activities | 331 | 1,139 | 515 | (1,134) | 851 |
| NET INCREASE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 94 | 7 | 4 | - | 105 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | 154 | 152 | 30 | - | 336 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF PERIOD | $ 248 | $ 159 | $ 34 | $ - | $ 441 |

67

JX 114-67

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements-(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Cash Flows**
**For the 26 Weeks Ended July 29, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (11) | $ (1,436) | $ 309 | $ - | $ (1,138) |
| Proceeds from sales of property and investments | - | 569 | - | - | 569 |
| Proceeds from Craftsman sale | 572 | - | - | - | 572 |
| Proceeds from sales of receivables | 293 | - | - | - | 293 |
| Purchases of property and equipment | - | (36) | (5) | - | (41) |
| Net investing with Affiliates | (582) | - | (298) | 880 | |
| Net cash provided by (used in) investing activities | 283 | 533 | (303) | 880 | 1,393 |
| Proceeds from debt issuances | - | 330 | - | - | 330 |
| Repayments of long-term debt | (39) | (678) | - | - | (717) |
| Increase in short-term borrowings, primarily 90 days or less | - | 216 | - | - | 216 |
| Proceeds from sale-leaseback financing | - | 89 | - | - | 89 |
| Debt issuance costs | (3) | (14) | - | - | (17) |
| Net borrowing with Affiliates | - | 880 | - | (880) | - |
| Net cash provided by (used in) financing activities | (42) | 823 | - | (880) | (99) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 230 | (80) | 6 | - | 156 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | - | 260 | 26 | - | 286 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF PERIOD | $ 230 | $ 180 | $ 32 | $ - | $ 442 |

68

**JX 114-68**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion should be read in conjunction with Part II, Item 7 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

**OVERVIEW OF HOLDINGS**

Holdings, the parent company of Kmart and Sears, was formed in connection with the March 24, 2005 merger of these two companies. We are an integrated retailer with significant physical and intangible assets, as well as virtual capabilities enabled through technology. We operate a national network of stores with 866 full-line and specialty retail stores in the United States as of August 4, 2018, operating as Kmart and Sears. Further, we operate a number of websites under the Sears.com and Kmart.com banners, which offer millions of products and provide the capability for our members and customers to engage in cross-channel transactions such as *free store pickup; buy in store/ship to home; and buy online, return in store.* We are also the home of Shop Your Way®, a free membership program that connects its members to personalized products, programs and partners that help them save time and money every day. Through an extensive network of national and local partners, members can shop thousands of their favorite brands, dine out and access an array of exclusive partners to earn points to redeem for savings on future purchases at Sears, Kmart, Lands' End and at ShopYourWay.com.

We conduct our operations in two business segments: Kmart and Sears Domestic. The nature of operations conducted within each of these segments is discussed within the "Business Segments" section of Item 1 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018. Our business segments have been determined in accordance with accounting standards regarding the determination, and reporting, of business segments.

*69*

**JX 114-69**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*CONSOLIDATED RESULTS OF OPERATIONS*

| | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| *millions, except per share data and percentages* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| **REVENUES** | | | | |
| Merchandise sales | $ 2,428 | $ 3,414 | $ 4,640 | $ 6,743 |
| Services and other | 754 | 864 | 1,433 | 1,734 |
| Total revenues | 3,182 | 4,278 | 6,073 | 8,477 |
| **COSTS AND EXPENSES** | | | | |
| Cost of sales, buying and occupancy - merchandise sales | 2,055 | 2,815 | 3,954 | 5,594 |
| Gross margin dollars - merchandise sales | 373 | 599 | 686 | 1,149 |
| *Gross margin rate - merchandise sales* | *15.4%* | *17.5%* | *14.8%* | *17.0%* |
| Cost of sales and occupancy - services and other | 425 | 491 | 812 | 980 |
| Gross margin dollars - services and other | 329 | 373 | 621 | 754 |
| *Gross margin rate - services and other* | *43.6%* | *43.2%* | *43.3%* | *43.5%* |
| Total cost of sales, buying and occupancy | 2,480 | 3,306 | 4,766 | 6,574 |
| Total gross margin dollars | 702 | 972 | 1,307 | 1,903 |
| *Total gross margin rate* | *22.1%* | *22.7%* | *21.5%* | *22.4%* |
| Selling and administrative | 864 | 1,123 | 1,770 | 2,344 |
| *Selling and administrative expense as a percentage of total revenues* | *27.2%* | *26.3%* | *29.1%* | *27.7%* |
| Depreciation and amortization | 66 | 83 | 133 | 170 |
| Impairment charges | 77 | 5 | 91 | 91 |
| Gain on sales of assets | (103) | (380) | (268) | (1,121) |
| Total costs and expenses | 3,384 | 4,137 | 6,492 | 7,987 |
| Operating income (loss) | (202) | 141 | (419) | 490 |
| Interest expense | (188) | (123) | (354) | (251) |
| Interest and investment income (loss) | 2 | (12) | 3 | (14) |
| Other loss | (139) | (246) | (172) | (292) |
| Loss before income taxes | (527) | (240) | (942) | (67) |
| Income tax (expense) benefit | 19 | (10) | 10 | 62 |
| **NET LOSS ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (508) | $ (250) | $ (932) | $ (5) |
| **NET LOSS PER COMMON SHARE ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | | | | |
| Basic loss per share | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Diluted loss per share | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Basic weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |
| Diluted weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |

70

**JX 114-70**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

References to comparable store sales amounts within the following discussion include sales for all stores operating for a period of at least 12 full months, including remodeled and expanded stores, but excluding store relocations and stores that have undergone format changes. Comparable store sales amounts include sales from sears.com and kmart.com shipped directly to customers. These online sales resulted in a benefit to our comparable store sales of 50 basis points for both the 13- and 26- week periods ended August 4, 2018, and a negative impact to our comparable store sales of 70 basis points for both the 13- and 26- week periods ended July 29, 2017. In addition, comparable store sales have been adjusted for the change in the unshipped sales reserves recorded at the end of each reporting period, which resulted in a negative impact of approximately 50 basis points for both the 13- and 26- week periods ended August 4, 2018, respectively. The change in unshipped sales reserves resulted in a benefit of approximately 60 basis points and 40 basis points, respectively, for the 13- and 26- week periods ended July 29, 2017.

Our fiscal 2018 second quarter and first half was comprised of the 13- and 26- week periods, respectively, ended August 4, 2018, while our fiscal 2017 second quarter and first half was comprised of the 13- and 26- week periods, respectively, ended July 29, 2017. This one week shift in sales had no impact on the comparable store sales results reported herein due to the fact that for purposes of reporting comparable store sales for the second quarter, weeks 14 through 26 for fiscal 2018 have been compared to weeks 15 through 27 of fiscal 2017, and for purposes of reporting comparable sales for the first half, weeks one through 26 for fiscal 2018 have been compared to weeks two through 27 of fiscal 2017, thereby eliminating the impact of the one week shift.

***Net Loss Attributable to Holdings' Shareholders, Net Loss per Share and Adjusted EBITDA***

We recorded a net loss attributable to Holdings' shareholders of $508 million, or $4.68 loss per diluted share, and $250 million, or $2.33 loss per diluted share, for the second quarter of 2018 and 2017, respectively. For the first half, we recorded a net loss attributable to Holdings' shareholders of $932 million, or $8.61 loss per diluted share, and $5 million, or $0.05 loss per diluted share, in 2018 and 2017, respectively.

In addition to our net loss attributable to Holdings' shareholders determined in accordance with Generally Accepted Accounting Principles ("GAAP"), for purposes of evaluating operating performance, we use Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA").

Adjusted EBITDA was determined as follows:

| millions | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Net loss attributable to Holdings per statement of operations | $ (508) | $ (250) | $ (932) | $ (5) |
| Income tax expense (benefit) | (19) | 10 | (10) | (62) |
| Interest expense | 188 | 123 | 354 | 251 |
| Interest and investment loss | (2) | 12 | (3) | 14 |
| Other loss | 139 | 246 | 172 | 292 |
| Operating income (loss) | (202) | 141 | (419) | 490 |
| Depreciation and amortization | 66 | 83 | 133 | 170 |
| Gain on sales of assets | (103) | (380) | (268) | (1,121) |
| Impairment charges | 77 | 5 | 91 | 20 |
| Before excluded items | (162) | (151) | (463) | (441) |
| | | | | |
| Closed store reserve and severance | 64 | 128 | 140 | 204 |
| Other[1] | 2 | (24) | 20 | (9) |
| Amortization of deferred Seritage gain | (16) | (19) | (34) | (40) |
| Adjusted EBITDA | $ (112) | $ (66) | $ (337) | $ (286) |

[1] The 13-week period ended August 4, 2018 consisted of items associated with natural disasters, as well as transaction costs associated with strategic initiatives, while the 26-week period ended August 4, 2018 consisted of items associated with an insurance transaction and natural disasters, as well as transaction costs associated with strategic initiatives. The 13- and 26-

**JX 114-71**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

week periods ended July 29, 2017 consisted of items associated with legal matters and transaction costs associated with strategic initiatives.

Adjusted EBITDA for our segments was as follows:

| millions | 13 Weeks Ended | | | | | |
| | August 4, 2018 | | | July 29, 2017 | | |
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
|---|---|---|---|---|---|---|
| Operating income (loss) per statement of operations | $ (16) | $ (186) | $ (202) | $ 19 | $ 122 | $ 141 |
| Depreciation and amortization | 9 | 57 | 66 | 14 | 69 | 83 |
| Gain on sales of assets | (25) | (78) | (103) | (79) | (301) | (380) |
| Impairment charges | - | 77 | 77 | 3 | 2 | 5 |
| Before excluded items | (32) | (130) | (162) | (43) | (108) | (151) |
| Closed store reserve and severance | 13 | 51 | 64 | 68 | 60 | 128 |
| Other[1] | (12) | 14 | 2 | (24) | - | (24) |
| Amortization of deferred Seritage gain | (3) | (13) | (16) | (2) | (17) | (19) |
| Adjusted EBITDA | $ (34) | $ (78) | $ (112) | $ (1) | $ (65) | $ (66) |
| % to revenues | (4.0)% | (3.3)% | (3.5)% | (0.1)% | (2.3)% | (1.5)% |

| millions | 26 Weeks Ended | | | | | |
| | August 4, 2018 | | | July 29, 2017 | | |
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
|---|---|---|---|---|---|---|
| Operating income (loss) per statement of operations | $ (89) | $ (330) | $ (419) | $ 469 | $ 21 | $ 490 |
| Depreciation and amortization | 18 | 115 | 133 | 27 | 143 | 170 |
| Gain on sales of assets | (65) | (203) | (268) | (676) | (445) | (1,121) |
| Impairment charges | 6 | 85 | 91 | 8 | 12 | 20 |
| Before excluded items | (130) | (333) | (463) | (172) | (269) | (441) |
| Closed store reserve and severance | 41 | 99 | 140 | 102 | 102 | 204 |
| Other[1] | (12) | 32 | 20 | (24) | 15 | (9) |
| Amortization of deferred Seritage gain | (5) | (29) | (34) | (6) | (34) | (40) |
| Adjusted EBITDA | $ (106) | $ (231) | $ (337) | $ (100) | $ (186) | $ (286) |
| % to revenues | (6.5)% | (5.2)% | (5.5)% | (3.5)% | (3.3)% | (3.4)% |

[1] The 13-week period ended August 4, 2018 consisted of items associated with natural disasters, as well as transaction costs associated with strategic initiatives, while the 26-week period ended August 4, 2018 consisted of items associated with an insurance transaction and natural disasters, as well as transaction costs associated with strategic initiatives. The 13- and 26- week periods ended July 29, 2017 consisted of items associated with legal matters and transaction costs associated with strategic initiatives.

72

**JX 114-72**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

The following tables set forth the impact each excluded item used in calculating Adjusted EBITDA had on specific income and expense amounts reported in our Consolidated Statements of Operations during the 13- and 26- weeks ended August 4, 2018 and July 29, 2017.

| *millions* | 13 Weeks Ended August 4, 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Other Excluded Items:** | | **Closed store reserve and severance** | | **Other[1]** | | **Amortization of deferred Seritage gain** | | **Total** |
| Gross margin impact | $ | 43 | $ | - | $ | (16) | $ | 27 |
| Selling and administrative impact | | 21 | | 2 | | - | | 23 |
| Total | $ | 64 | $ | 2 | $ | (16) | $ | 50 |

| *millions* | 13 Weeks Ended July 29, 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Other Excluded Items:** | | **Closed store reserve and severance** | | **Other[1]** | | **Amortization of deferred Seritage gain** | | **Total** |
| Gross margin impact | $ | 89 | $ | - | $ | (19) | $ | 70 |
| Selling and administrative impact | | 39 | | (24) | | - | | 15 |
| Total | $ | 128 | $ | (24) | $ | (19) | $ | 85 |

| *millions* | 26 Weeks Ended August 4, 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Other Excluded Items:** | | **Closed store reserve and severance** | | **Other[1]** | | **Amortization of deferred Seritage gain** | | **Total** |
| Gross margin impact | $ | 52 | $ | - | $ | (34) | $ | 18 |
| Selling and administrative impact | | 88 | | 20 | | - | | 108 |
| Total | $ | 140 | $ | 20 | $ | (34) | $ | 126 |

| *millions* | 26 Weeks Ended July 29, 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Other Excluded Items:** | | **Closed store reserve and severance** | | **Other[1]** | | **Amortization of deferred Seritage gain** | | **Total** |
| Gross margin impact | $ | 104 | $ | - | $ | (40) | $ | 64 |
| Selling and administrative impact | | 100 | | (9) | | - | | 91 |
| Total | $ | 204 | $ | (9) | $ | (40) | $ | 155 |

[1] The 13- week period ended August 4, 2018 consisted of items associated with natural disasters, as well as transactions costs associated with strategic initiatives, while the 26- week period ended August 4, 2018 consisted of items associated with an insurance transaction and natural disasters, as well as transaction costs associated with strategic initiatives. The 13- and 26- week periods ended July 29, 2017 consisted of items associated with legal matters and transaction costs associated with strategic initiatives.

Adjusted EBITDA is computed as net loss attributable to Sears Holdings Corporation appearing on the Statements of Operations excluding income attributable to noncontrolling interests, income tax (expense) benefit, interest expense, interest and investment loss, other loss, depreciation and amortization, gain on sales of assets and impairment charges. In addition, it is adjusted to exclude certain significant items as set forth below. Our management uses Adjusted EBITDA to evaluate the operating performance of our businesses, as well as executive compensation metrics, for comparable periods. Adjusted EBITDA should not be used by investors or other third parties as the sole basis for formulating investment decisions as it excludes a number of important cash and non-cash recurring items.

While Adjusted EBITDA is a non-GAAP measurement, management believes that it is an important indicator of ongoing operating performance, and useful to investors, because:

73

**JX 114-73**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

- EBITDA excludes the effects of financings and investing activities by eliminating the effects of interest and depreciation costs;

- Management considers gains/(losses) on the sale of assets to result from investing decisions rather than ongoing operations; and

- Other significant items, while periodically affecting our results, may vary significantly from period to period and have a disproportionate effect in a given period, which affects comparability of results. We have adjusted our results for these items to make our statements more comparable and therefore more useful to investors as the items are not representative of our ongoing operations and reflect past investment decisions.

Pension expense is recorded within other loss, which is excluded from Adjusted EBITDA, and further explained as follows:

- Pension expense - Contributions to our pension plans remain a significant use of our cash on an annual basis. Cash contributions to our pension and postretirement plans are separately disclosed on the cash flow statement. While the Company's pension plans are frozen, and thus associates do not currently earn pension benefits, we have a legacy pension obligation for past service performed by Kmart and Sears associates. The annual pension expense included in our statement of operations related to these legacy domestic pension plans was relatively minimal in years prior to 2009. However, due to the severe decline in the capital markets that occurred in the latter part of 2008, and the resulting abnormally low interest rates, which continue to persist, our pension and postretirement benefit expense was $657 million in 2017, $317 million in 2016 and $228 million in 2015. Pension expense is comprised of interest cost, expected return on plan assets and recognized net loss and other. This adjustment eliminates total net periodic benefit from the statement of operations to improve comparability. Pension expense is included in the determination of net loss.

In conjunction with executing a lump sum settlement offer in April 2018, the Company recorded non-cash charges of $108 million during the second quarter of 2018, for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement. Also, in conjunction with executing an agreement to purchase group annuity contracts in May 2017, the Company recorded non-cash charges of $200 million during the second quarter of 2017, for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement.

The components of net periodic expense were as follows:

| millions | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Components of net periodic expense: | | | | |
| Interest cost | $ 37 | $ 45 | $ 74 | $ 98 |
| Expected return on plan assets | (41) | (46) | (81) | (103) |
| Amortization of experience losses | 142 | 247 | 178 | 297 |
| Net periodic expense | $ 138 | $ 246 | $ 171 | $ 292 |

In accordance with GAAP, we recognize on the balance sheet actuarial gains and losses for defined benefit pension plans annually in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement during a fiscal year. For income statement purposes, these actuarial gains and losses are recognized throughout the year through an amortization process. The Company recognizes in its results of operations, as a corridor adjustment, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets. Accumulated gains/losses that are inside the 10% corridor are not recognized, while accumulated actuarial gains/losses that are outside the 10% corridor are amortized over the "average future service" of the population and are included in the recognized net loss and other line item above.

74

**JX 114-74**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Actuarial gains and losses occur when actual experience differs from the estimates used to allocate the change in value of pension plans to expense throughout the year or when assumptions change, as they may each year. Significant factors that can contribute to the recognition of actuarial gains and losses include changes in discount rates used to remeasure pension obligations on an annual basis or upon a qualifying remeasurement, differences between actual and expected returns on plan assets and other changes in actuarial assumptions. Management believes these actuarial gains and losses are primarily financing activities that are more reflective of changes in current conditions in global financial markets (and in particular interest rates) that are not directly related to the underlying business and that do not have an immediate, corresponding impact on the benefits provided to eligible retirees. For further information on the actuarial assumptions and plan assets referenced above, see Management's Discussion and Analysis of Financial Condition and Results of Operations - Application of Critical Accounting Policies and Estimates - Defined Benefit Pension Plans, and Note 7 of Notes to Consolidated Financial Statements included in our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

These other significant items included in Adjusted EBITDA are further explained as follows:

- Closed store reserve and severance - We are transforming our Company to a less asset-intensive business model. Throughout this transformation, we continue to make choices related to our stores, which could result in sales, closures, lease terminations or a variety of other decisions.

- Other - Consisted of items associated with an insurance transaction, natural disasters, legal matters and transaction costs associated with strategic initiatives.

- Amortization of deferred Seritage gain - A portion of the gain on the Seritage transaction and certain other sale-leaseback transactions were deferred and will be recognized in proportion to the related rent expense, which is a component of cost of sales, buying and occupancy in the Consolidated Statements of Operations, over the lease terms. Management considers the amortization of the deferred Seritage gain to result from investing decisions rather than ongoing operations.

*13-week period ended August 4, 2018 compared to the 13-week period ended July 29, 2017*

*Revenues and Comparable Store Sales*

Total revenues decreased $1.1 billion to $3.2 billion for the second quarter of 2018 compared to the prior year second quarter, primarily driven by the decrease in merchandise sales of $986 million. The decline in merchandise sales was primarily driven by having fewer Kmart and Sears Full-line stores in operation, which accounted for approximately $824 million of the decline, as well as a 3.9% decline in comparable store sales during the quarter, which accounted for approximately $92 million of the decline. Services and other revenues declined $110 million for the second quarter of 2018, primarily driven by a decline in service-related revenues of approximately $70 million, as well as a decline in revenues from Sears Hometown and Outlet Stores, Inc. ("SHO") of approximately $65 million.

Kmart comparable store sales declined 3.7% during the second quarter of 2018 primarily driven by declines in the pharmacy, grocery & household and drugstore categories. Kmart also experienced positive comparable store sales in several categories including apparel, toys and footwear. Sears Domestic comparable store sales decreased 4.0% during the second quarter of 2018, primarily driven by decreases in the home appliances, mattresses, and consumer electronics categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel, footwear and jewelry.

*Gross Margin*

Total gross margin decreased $270 million to $702 million for the second quarter of 2018, as compared to the prior year second quarter, primarily due to the above noted decline in sales, as well as a decline in gross margin rate for merchandise sales. Gross margin for the second quarter of 2018 included charges related to store closures of $43 million, compared to $89 million for the second quarter of 2017. Gross margin for the quarter also included credits of $16 million and $19 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

75

JX 114-75

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Kmart's gross margin rate for the second quarter declined 40 basis points compared to the prior year second quarter, while Sears Domestic's gross margin rate declined 130 basis points for the quarter. Gross margin for Kmart and Sears Domestic were negatively impacted by expenses associated with store closures. Excluding the impact of significant items noted in our Adjusted EBITDA tables, Kmart's gross margin rate would have declined 330 basis points, while Sears Domestic's gross margin rate would have declined 80 basis points. The decline in Kmart's gross margin rate was primarily due to lower margins in the apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy category. The decline in Sears Domestic's gross margin rate was primarily due to a gross margin rate decline in the home appliances category. Both formats experienced an increase in promotional activity during the second quarter of 2018 compared to the prior year quarter, including an increase in Shop Your Way points.

In addition, as a result of the Seritage and JV transactions, the second quarter of 2018 included additional rent expense of approximately $29 million while the second quarter of 2017 included additional rent expense of approximately $44 million. Due to the structure of the leases, we expect that our cash rent obligations to Seritage and the joint venture partners will decline, over time, as space in these stores is recaptured. From the inception of the Seritage transaction to the end of our second quarter, we have received recapture notices on 64 properties and also exercised our right to terminate the lease on 75 properties.

*Selling and Administrative Expenses*

Selling and administrative expenses decreased $259 million in the second quarter of 2018 compared to the prior year, as expense reductions were realized as a result of the strategic actions to improve our operational efficiencies and reduce costs.

The second quarters of 2018 and 2017 included significant items related to store closings and severance, items associated with natural disasters, legal matters and transaction costs associated with strategic initiatives which aggregated to expense of $23 million and $15 million, respectively. Excluding these items, selling and administrative expenses declined $267 million from the prior year quarter primarily due to a decrease in payroll expense. In addition, advertising expense also declined as we shift away from traditional advertising to use of Shop Your Way points, which is included within gross margin.

Our selling and administrative expenses as a percentage of total revenues ("selling and administrative expense rate") was 27.2% for the second quarter of 2018, compared to 26.3% in the prior year, and increased due to the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $17 million in the second quarter of 2018 to $66 million, primarily due to having fewer assets to depreciate.

*Impairment Charges*

We recorded impairment charges of $77 million in the second quarter of 2018, which included impairment of $69 million related to the Kenmore trade name, as well as $8 million related to the impairment of long-lived assets. We recorded impairment charges of $5 million during the second quarter of 2017, related to the impairment of long-lived assets. Impairment charges recorded are described further in Note 3 of Notes to Condensed Consolidated Financial Statements.

*Gain on Sales of Assets*

We recorded total gains on sales of assets for the quarter of $103 million in 2018 and $380 million in 2017, which were primarily a result of several real estate transactions. The gains recorded during 2018 included gains of $71 million recognized on the sale or amendment and lease termination of 21 locations and $28 million as a result of recapture and lease termination activity. The gains recorded during 2017 included $262 million recognized on the sale of nine Sears Full-line stores and one Kmart store and $53 million of gains as a result of recapture activity and one store that qualified for sales recognition and sale-leaseback accounting in the second quarter. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

76

JX 114-76

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Operating Income (Loss)*

The Company reported an operating loss of $202 million in the second quarter of 2018 compared to operating income of $141 million in the second quarter of 2017. Operating loss for the second quarter of 2018 and operating income for the second quarter of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $50 million and $85 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gain on sales of assets. Taking these significant items into consideration, the increase in operating loss in 2018 was primarily driven by the overall decline in gross margin noted above, partially offset by the decrease in selling and administrative expenses.

*Interest and Investment Gain (Loss)*

We recorded an interest and investment gain of $2 million during the second quarter of 2018 compared to a loss of $12 million during the second quarter of 2017. The second quarter of 2017 included a loss of $12 million related to our equity investment in Sears Canada.

*Income Taxes*

Our effective tax rate for the second quarter of 2018 was a benefit of 3.6% compared to an expense rate of 4.2% in the prior year second quarter. The application of the requirements for accounting for income taxes in interim periods, after consideration of our valuation allowance, causes a significant variation in the typical relationship between income tax expense and pretax income. Our tax rate in 2018 continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic jurisdictions where it is not more likely than not that such benefits would be realized. The 2018 rate reflects the impacts of the valuation allowance release through continuing operations, relating to the gain on pension and other postretirement benefits, creating a tax benefit with the offsetting tax expense reflected in OCI, a tax benefit on the deferred taxes related to the partial impairment of the Kenmore trade name and the Tax Cuts and Jobs Act, including the federal tax rate of 21%, the effect of taxes on foreign earnings and changes to previously deductible expenses. The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. We made reasonable estimates of certain effects of the Tax Act and recorded provisional adjustments for fiscal 2017 which we will continue to refine throughout fiscal 2018. In addition, the second quarter of 2018 was positively impacted by the reversal of deferred taxes related to indefinite-life assets associated with property sales and negatively impacted by foreign branch taxes and state income taxes. During the first quarter of 2017, the Company realized a significant tax benefit on the reversal of deferred taxes related to the Craftsman Sale. In addition, during the second quarter of 2017, the Company realized a tax benefit on the reversal of deferred taxes related to indefinite-life assets associated with property sold during the quarter.

*26-week period ended August 4, 2018 compared to the 26-week period ended July 29, 2017*

*Revenues and Comparable Store Sales*

Total revenues decreased $2.4 billion to $6.1 billion for the first half of 2018, as compared to revenues of $8.5 billion for the first half of 2017, primarily driven by the decrease in merchandise sales of $2.1 billion. The decrease in revenue was primarily driven by the effect of having fewer Kmart and Sears Full-line stores in operation, which accounted for $1.6 billion of the decline, as well as a decrease in comparable store sales of 8.2% during the first half of 2018, which accounted for $391 million of the revenue decline. Services and other revenues declined $301 million during the first half of 2018 as compared to the first half of 2017, primarily driven by a decline in service-related revenues of approximately $161 million, as well as a decline in revenues from SHO of approximately $141 million during the first half of 2018 compared to the first half of 2017.

Kmart comparable store sales decreased 7.1%, primarily driven by declines experienced in the pharmacy, grocery & household, drugstore and sporting good categories. Kmart did experience positive comparable stores sales in several categories including apparel, toys, jewelry and footwear. Sears Domestic comparable store sales decreased 8.9%, primarily driven by decreases in the home appliances, lawn & garden, mattresses and consumer electronics

**JX 114-77**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel and jewelry.

*Gross Margin*

Total gross margin decreased $596 million to $1.3 billion for the first half of 2018, as compared to the prior year, primarily due to the above noted decline in sales, as well as a decline in gross margin rate for merchandise sales. Gross margin for the first half of 2018 included charges related to store closures of $52 million, compared to $104 million for the first half of 2017. Gross margin for the first half also included credits of $34 million and $40 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

As compared to the prior year period, Kmart's gross margin rate for the first half of 2018 improved 30 basis points, while Sears Domestic's gross margin rate declined 190 basis points. Gross margin for Kmart and Sears Domestic were negatively impacted by expenses associated with store closures. Excluding the impact of significant items noted in the Adjusted EBITDA tables, Kmart's gross margin rate would have declined 160 basis points, while Sears Domestic's gross margin rate would also have declined 160 basis points. The decline in Kmart's gross margin rate was primarily driven by apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy category. The decline in Sears Domestic's gross margin rate was primarily driven by rate declines in the apparel and home appliances categories.

In addition, as a result of the Seritage and JV transactions, the first half of 2018 and 2017 included additional rent expense of approximately $61 million and $89 million, respectively. Due to the structure of the leases, we expect that our cash rent obligations to Seritage and the joint venture partners will decline, over time, as space in these stores is recaptured. From the inception of the Seritage transaction to the end of our second quarter, we have received recapture notices on 64 properties and also exercised our right to terminate the lease on 75 properties.

*Selling and Administrative Expenses*

Selling and administrative expenses decreased $574 million in the first half of 2018 compared to the first half of 2017, as expense reductions were realized as a result of the strategic actions to improve our operational efficiencies and reduce costs.

The first half of 2018 and 2017 included significant items related to store closings and severance, items associated with an insurance transaction, natural disasters, legal matters and transaction costs associated with strategic initiatives which aggregated to expense of $108 million and $91 million, respectively. Excluding these items, selling and administrative expenses in 2018 declined $591 million from the first half of the prior year primarily due to a decrease in payroll expense. In addition, advertising expense also declined as we shift away from traditional advertising to use of Shop Your Way points, which is included within gross margin.

Our selling and administrative expense rate was 29.1% for the first half of 2018, compared to 27.7% in the prior year, and increased as the decrease in expenses noted above was more than offset by the decline in revenues.

78

**JX 114-78**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $37 million in the first half of 2018 to $133 million, primarily due to having fewer assets to depreciate.

*Impairment Charges*

We recorded impairment charges of $91 million during the first half of 2018, which included impairment of $69 million related to the Kenmore trade name, as well as $22 million related to the impairment of long-lived assets. We recorded impairment charges of $20 million during the first half of 2017, related to the impairment of long-lived assets. Impairment charges recorded are described further in Note 3 of Notes to Condensed Consolidated Financial Statements.

*Gain on Sales of Assets*

We recorded total gains on sales of assets of $268 million and $1.1 billion for the first half of 2018 and 2017, respectively. The gains recorded during 2018 included gains of $157 million recognized on the sale or amendment and lease termination of 43 locations, $68 million as a result of recapture and lease termination activity and $21 million that was previously deferred for three stores that qualified for sales recognition and sale-leaseback accounting. The gains recorded during 2017 included a gain of $492 million recognized on the Craftsman Sale, in addition to $386 million recognized on the sale of 12 Sears Full-line stores and two Kmart stores and $118 million of gains as a result of recapture and lease termination activity and two stores that qualified for sales recognition and sale-leaseback accounting in the first half. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

The Company reported an operating loss of $419 million in the first half of 2018 as compared to operating income of $490 million in the first half of 2017. Operating loss for the first half of 2018 and operating income for the first half of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $126 million and $155 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in operating loss in 2018 was primarily driven by the overall decline in gross margin noted above, partially offset by the decrease in selling and administrative expenses.

*Interest and Investment Gain (Loss)*

We recorded an interest and investment gain of $3 million during the first half of 2018 compared to a loss of $14 million during the first half of 2017. The first half of 2017 included a loss of $17 million related to our equity investment in Sears Canada.

*Income Taxes*

Our effective tax rate for the first half of 2018 was a benefit rate of 1.1% compared to a benefit rate of 92.5% for the first half of 2017. The application of the requirements for accounting for income taxes in interim periods, after consideration of our valuation allowance, causes a significant variation in the typical relationship between income tax expense and pretax income. Our tax rate in 2018 continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic jurisdictions where it is not more likely than not that such benefits would be realized. The 2018 rate reflects the impacts of the valuation allowance release through continuing operations, relating to the gain on pension and other postretirement benefits, creating a tax benefit with the offsetting tax expense reflected in OCI, a tax benefit on the deferred taxes related to the partial impairment of the Kenmore trade name and the Tax Cuts and Jobs Act, including the federal tax rate of 21%, the effect of taxes on foreign earnings and changes to previously deductible expenses. The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. We made reasonable estimates of certain effects

JX 114-79

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

of the Tax Act and recorded provisional adjustments for fiscal 2017 which we will continue to refine throughout fiscal 2018. In addition, the first half of 2018 was positively impacted by the reversal of deferred taxes related to indefinite-life assets associated with property sales and negatively impacted by foreign branch taxes and state income taxes. During the first half of 2017, the Company realized a significant tax benefit on the reversal of deferred taxes related to the Craftsman Sale.

**JX 114-80**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*SEGMENT OPERATIONS*

The following discussion of our business segment results is organized into two reportable segments: Kmart and Sears Domestic.

**Kmart**

Kmart results and key statistics were as follows:

| | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| *millions, except number of stores* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Total revenues | $ 840 | $ 1,442 | $ 1,637 | $ 2,889 |
| | | | | |
| Cost of sales, buying and occupancy | 680 | 1,162 | 1,324 | 2,346 |
| Gross margin dollars | 160 | 280 | 313 | 543 |
| *Gross margin rate* | *19.0%* | *19.4%* | *19.1%* | *18.8%* |
| Selling and administrative | 192 | 323 | 443 | 715 |
| *Selling and administrative expense as a percentage of total revenues* | *22.9%* | *22.4%* | *27.1%* | *24.7%* |
| Depreciation and amortization | 9 | 14 | 18 | 27 |
| Impairment charges | - | 3 | 6 | 8 |
| Gain on sales of assets | (25) | (79) | (65) | (676) |
| Total costs and expenses | 856 | 1,423 | 1,726 | 2,420 |
| Operating income (loss) | $ (16) | $ 19 | $ (89) | $ 469 |
| Adjusted EBITDA | $ (34) | $ (1) | $ (106) | $ (100) |
| Number of stores | | | 360 | 610 |

*13-week period ended August 4, 2018 compared to the 13-week period ended July 29, 2017*

*Revenues and Comparable Store Sales*

For the quarter, Kmart's revenues decreased by $602 million to $840 million in 2018, primarily due to the effect of having fewer stores in operation, which accounted for approximately $536 million of the decline, as well as the decrease in comparable store sales of 3.7%, which accounted for approximately $34 million of the decline.

The decline in comparable store sales for the quarter was primarily driven by declines in the pharmacy, grocery & household and drugstore categories. Kmart also experienced positive comparable store sales in several categories including apparel, toys and footwear.

*Gross Margin*

For the quarter, Kmart generated total gross margin dollars of $160 million in 2018 compared to $280 million in 2017. Gross margin for the second quarter included charges of $17 million and $68 million in 2018 and 2017, respectively, related to store closures. Gross margin for the second quarter also included credits of $3 million and $2 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Kmart's gross margin rate for the quarter declined 40 basis points to 19.0% in 2018 from 19.4% in 2017. Excluding the impact of significant items recorded in gross margin during the quarter, Kmart's gross margin rate would have declined 330 basis points. The decline in Kmart's gross margin rate was primarily due to lower margins in the apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy

JX 114-81

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

category. Kmart experienced an increase in promotional activity during the second quarter of 2018 compared to the prior year quarter, including an increase in Shop Your Way points.

In addition, as a result of the Seritage and JV transactions, the second quarter of 2018 and 2017 included additional rent expense of approximately $4 million and $5 million, respectively.

*Selling and Administrative Expenses*

For the quarter, Kmart's selling and administrative expenses decreased $131 million in 2018 as compared to the second quarter in 2017. Selling and administrative expenses for the second quarter of 2018 and 2017 were impacted by significant items related to store closures, as well as legal matters, which aggregated to income of $16 million in 2018 and $24 million in 2017. Excluding these items, selling and administrative expenses decreased $139 million primarily due to decreases in payroll and advertising expenses.

Kmart's selling and administrative expense rate for the quarter was 22.9% in 2018 and 22.4% in 2017 and increased due to the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Gain on Sales of Assets*

Kmart recorded a total gain on sales of assets for the quarter of $25 million and $79 million in 2018 and 2017, respectively, which were primarily a result of several real estate transactions. The gains recorded in the second quarter of 2018 included gains of $23 million recognized on the sale or amendment and lease termination of three locations. The gains recorded in the second quarter of 2017 included $12 million recognized on the sale of one Kmart store and $3 million of gains as a result of recapture activity. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the quarter, Kmart recorded an operating loss of $16 million and operating income of $19 million in 2018 and 2017, respectively. Operating loss for the second quarter of 2018 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating income of $2 million, while operating income for the second quarter of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $42 million. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in Kmart's operating loss in 2018 was primarily driven by the decline in Kmart's gross margin noted above, partially offset by a decrease in selling and administrative expenses.

***26-week period ended August 4, 2018 compared to the 26-week period ended July 29, 2017***

*Revenues and Comparable Store Sales*

For the first half of 2018, Kmart's revenues decreased by $1.3 billion to $1.6 billion, primarily due to the effect of having fewer stores in operation, which accounted for approximately $1.1 billion of the decline, as well as the decrease in comparable store sales, which accounted for approximately $130 million of the decline.

Comparable store sales decreased 7.1%, primarily driven by declines experienced in the pharmacy, grocery & household, drugstore and sporting good categories. Kmart did experience positive comparable stores sales in several categories including apparel, toys, jewelry and footwear.

*Gross Margin*

For the first half of 2018, Kmart generated $313 million in gross margin compared to $543 million in the first half of 2017. The decrease in Kmart's gross margin dollars is due to a decrease in revenues, as well as a decrease in gross margin rate. Gross margin for the first half of the year included charges of $14 million and $78 million in 2018 and 2017, respectively, related to store closures. Gross margin for the first half of the year also included credits of $5 million and $6 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

82

JX 114-82

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Kmart's gross margin rate for the first half of the year improved 30 basis points to 19.1% in 2018 from 18.8% in 2017. Excluding the impact of significant items recorded in gross margin during the first half of the year, Kmart's gross margin rate would have declined 160 basis points primarily driven by apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy category.

In addition, as a result of the Seritage and JV transactions, the first half of 2018 and 2017 included additional rent expense of approximately $8 million and $11 million, respectively.

*Selling and Administrative Expenses*

For the first half of 2018, Kmart's selling and administrative expenses decreased $272 million as compared to the first half of 2017. Selling and administrative expenses for the first half of 2018 and 2017 were impacted by significant items related to store closings and severance, as well as legal matters, which aggregated to expense of $15 million in 2018 and $0 million in 2017. Excluding these items, selling and administrative expenses decreased $287 million primarily due to decreases in payroll and advertising expenses.

Kmart's selling and administrative expense rate for the first half was 27.1% and 24.7% in 2018 and 2017, respectively, and increased primarily due to the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Gain on Sales of Assets*

Kmart recorded a total gain on sales of assets for the first half of $65 million and $676 million in 2018 and 2017, respectively. The gains recorded in the first half of 2018 included gains of $40 million recognized on the sale or amendment and lease termination of 12 locations. The gains recorded in the first half of 2017 included a gain of $492 million recognized on the Craftsman Sale, in addition to $40 million recognized on the sale of two Kmart stores and $30 million of gains as a result of recapture and lease termination activity. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the first half of the year, Kmart recorded an operating loss of $89 million in 2018, compared to operating income of $469 million in 2017. Operating loss for the first half of 2018 and operating income for the first half of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $24 million in 2018 and $72 million in 2017. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in Kmart's operating loss in 2018 was primarily driven by the decline in Kmart's gross margin noted above, partially offset by a decrease in selling and administrative expenses.

**JX 114-83**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

**Sears Domestic**

Sears Domestic results and key statistics were as follows:

| | 13 Weeks Ended | | 26 Weeks Ended | |
| | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
|---|---|---|---|---|
| *millions, except number of stores* | | | | |
| Total revenues | $ 2,342 | $ 2,836 | $ 4,436 | $ 5,588 |
| Cost of sales, buying and occupancy | 1,800 | 2,144 | 3,442 | 4,228 |
| Gross margin dollars | 542 | 692 | 994 | 1,360 |
| *Gross margin rate* | *23.1%* | *24.4%* | *22.4%* | *24.3%* |
| Selling and administrative | 672 | 800 | 1,327 | 1,629 |
| *Selling and administrative expense as a percentage of total revenues* | *28.7%* | *28.2%* | *29.9%* | *29.2%* |
| Depreciation and amortization | 57 | 69 | 115 | 143 |
| Impairment charges | 77 | 2 | 85 | 12 |
| Gain on sales of assets | (78) | (301) | (203) | (445) |
| Total costs and expenses | 2,528 | 2,714 | 4,766 | 5,567 |
| Operating income (loss) | $ (186) | $ 122 | $ (330) | $ 21 |
| Adjusted EBITDA | $ (78) | $ (65) | $ (231) | $ (186) |
| Number of: | | | | |
| Full-line stores | | | 482 | 619 |
| Specialty stores | | | 24 | 21 |
| Total Sears Domestic Stores | | | 506 | 640 |

***13-week period ended August 4, 2018 compared to the 13-week period ended July 29, 2017***

*Revenues and Comparable Store Sales*

For the quarter, Sears Domestic's revenues decreased by $494 million to $2.3 billion. The decline in revenue was primarily driven by the effect of having fewer Full-line stores in operation, which accounted for approximately $288 million of the decline, as well as a decrease in comparable store sales of 4.0%, which accounted for $58 million of the decline. Sears Domestic's revenues also included a decline in service-related revenues of approximately $70 million, as well as a decline in revenues from SHO of approximately $65 million.

The decline in comparable store sales for the quarter was primarily driven by decreases in the home appliances, mattresses, and consumer electronics categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel, footwear and jewelry.

*Gross Margin*

For the quarter, Sears Domestic generated gross margin dollars of $542 million in 2018, compared to $692 million in 2017. Gross margin for the second quarter included charges of $26 million and $21 million in 2018 and 2017, respectively, related to store closures. Gross margin for the second quarter also included credits of $13 million and $17 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Sears Domestic's gross margin rate for the quarter declined 130 basis points to 23.1% in 2018 from 24.4% in 2017. Excluding the impact of significant items recorded in gross margin during the quarter, Sears Domestic's gross margin rate would have declined 80 basis points primarily due to the gross margin rate decline in the home

84

**JX 114-84**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

appliances category. Sears Domestic experienced an increase in promotional activity during the second quarter of 2018 compared to the prior year quarter, including an increase in Shop Your Way points.

In addition, as a result of the Seritage and JV transactions, the second quarter of 2018 and 2017 included additional rent expense of approximately $25 million and $39 million, respectively.

*Selling and Administrative Expenses*

For the quarter, Sears Domestic's selling and administrative expenses decreased $128 million in 2018 as compared to the prior year. Selling and administrative expenses for the second quarter of 2018 and 2017 were impacted by significant items related to store closures and severance, items associated with natural disasters and transaction costs associated with strategic initiatives, which aggregated to expense of $39 million and $39 million, respectively. Excluding these items, selling and administrative expenses decreased $128 million primarily due to decreases in payroll expense and advertising expenses.

Sears Domestic's selling and administrative expense rate for the quarter was 28.7% in 2018 and 28.2% in 2017 and increased primarily due to the decline in revenues, as well as the overall increase in expenses noted above.

*Gain on Sales of Assets*

Sears Domestic recorded a total gain on sales of assets for the quarter of $78 million and $301 million in 2018 and 2017, respectively. The gains recorded in the second quarter of 2018 included gains of $48 million recognized on the sale or amendment and lease termination of 18 locations and $28 million as a result of recapture and lease termination activity. The gains recorded in the second quarter of 2017 included $250 million recognized on the sale of nine Sears Full-line stores and $50 million of gains as a result of recapture activity and one store that qualified for sales recognition and sale-leaseback accounting in the second quarter. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the quarter, Sears Domestic reported an operating loss of $186 million and operating income of $122 million in 2018 and 2017, respectively. Sears Domestic's operating loss for the second quarter of 2018 and operating income for the second quarter of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $52 million and $43 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in operating loss at Sears Domestic in 2018 was primarily driven by the decline in gross margin noted above, partially offset by a decrease in selling and administrative expenses.

***26-week period ended August 4, 2018 compared to the 26-week period ended July 29, 2017***

*Revenues and Comparable Store Sales*

For the first half of 2018, Sears Domestic's revenues decreased by $1.2 billion to $4.4 billion. The decline in revenue was primarily driven by the effect of having fewer Full-line stores in operation, which accounted for approximately $534 million of the decline, as well as a decrease in comparable store sales of 8.9%, which accounted for approximately $261 million of the decline. Sears Domestic's revenues also included a decline in service-related revenues of approximately $161 million, as well as a decline in revenues from SHO of approximately $141 million.

Comparable store sales for the first half of 2018 declined primarily driven by decreases in the home appliances, lawn & garden, mattresses and consumer electronics categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel and jewelry.

*Gross Margin*

For the first half of the year, Sears Domestic generated gross margin dollars of $1.0 billion and $1.4 billion in 2018 and 2017, respectively. Gross margin for the first half of the year included charges of $38 million and $26 million in 2018 and 2017, respectively, related to store closures. Gross margin for the first half of 2018 and 2017 also included

**JX 114-85**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

credits of $29 million and $34 million, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Sears Domestic's gross margin rate for the first half of the year declined 190 basis points to 22.4% in 2018 from 24.3% in 2017. Excluding the impact of significant items recorded in gross margin during the first half of 2018 and 2017, Sears Domestic's gross margin rate would have declined 160 basis points primarily due to rate declines in the apparel and home appliances categories.

In addition, as a result of the Seritage and JV transactions, the first half of 2018 and 2017 included additional rent expense of approximately $53 million and $78 million, respectively.

*Selling and Administrative Expenses*

For the first half of the year, Sears Domestic's selling and administrative expenses decreased $302 million in 2018 as compared to the prior year. Selling and administrative expenses for the first half of 2018 and 2017 were impacted by significant items related to store closures and severance, items associated with an insurance transaction, natural disasters and transaction costs associated with strategic initiatives, which aggregated to expense of $93 million and $91 million, respectively. Excluding these items, selling and administrative expenses decreased $304 million in the first half of 2018 primarily due to decreases in payroll and advertising expenses.

Sears Domestic's selling and administrative expense rate for the first half of the year was 29.9% in 2018 and 29.2% in 2017 and increased as a result of the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $28 million in the first half of 2018 to $115 million, primarily due to having fewer assets to depreciate.

*Gain on Sales of Assets*

Sears Domestic recorded a total gain on sales of assets of $203 million and $445 million for the first half of 2018 and 2017, respectively. The gains recorded in the first half of 2018 included gains of $117 million recognized on the sale or amendment and lease termination of 31 locations, $68 million as a result of recapture and lease termination activity and $21 million that was previously deferred for three stores that qualified for sales recognition and sale-leaseback accounting. The gains recorded in the first half of 2017 included gains of $346 million recognized on the sale of 12 Sears Full-line stores and $88 million of gains as a result of recapture and lease termination activity and two stores that qualified for sales recognition and sale-leaseback accounting in the first half. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the first half of the year, Sears Domestic reported an operating loss of $330 million and operating income of $21 million in 2018 and 2017, respectively. Sears Domestic's operating loss for the first half of 2018 and operating income for the first half of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $102 million and $83 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the operating loss in 2018 was primarily driven by the decline in gross margin noted above, partially offset by a decrease in selling and administrative expenses.

86

**JX 114-86**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

**ANALYSIS OF CONSOLIDATED FINANCIAL CONDITION**

**Cash Balances**

Our cash and cash equivalents include all highly liquid investments with original maturities of three months or less at the date of purchase. Our cash balances as of August 4, 2018, July 29, 2017 and February 3, 2018 are detailed in the following table.

| millions | August 4, 2018 | | July 29, 2017 | | February 3, 2018 | |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 110 | $ | 121 | $ | 113 |
| Cash posted as collateral | | 5 | | 4 | | 4 |
| Credit card deposits in transit | | 78 | | 87 | | 65 |
| Total cash and cash equivalents | | 193 | | 212 | | 182 |
| Restricted cash | | 248 | | 230 | | 154 |
| Total cash balances | $ | 441 | $ | 442 | $ | 336 |

We had total cash balances of $441 million at August 4, 2018, compared to $442 million at July 29, 2017 and $336 million at February 3, 2018.

At various times, we have posted cash collateral for certain outstanding letters of credit and self-insurance programs. Such cash collateral is classified within cash and cash equivalents given that we have the ability to substitute letters of credit at any time for this cash collateral and it is therefore readily available to us. Our invested cash may include, from time to time, investments in, but not limited to, commercial paper, federal, state and municipal government securities, floating-rate notes, repurchase agreements and money market funds. Cash amounts held in these short-term investments are readily available to us. Credit card deposits in transit include deposits in transit from banks for payments related to third-party credit card and debit card transactions. The Company classifies cash balances that are legally restricted pursuant to contractual arrangements as restricted cash. The restricted cash balance relates to amounts deposited into an escrow for the benefit of our pension plans at each of August 4, 2018, July 29, 2017 and February 3, 2018.

We classify outstanding checks in excess of funds on deposit within other current liabilities and reduce cash balances when these checks clear the bank on which they were drawn. Outstanding checks in excess of funds on deposit were $66 million, $61 million and $74 million as of August 4, 2018, July 29, 2017 and February 3, 2018, respectively.

**Operating Activities**

During the first half of 2018, we used net cash in operating activities of $1.0 billion compared to $1.1 billion in the first half of 2017. Our primary source of operating cash flows is the sale of goods and services to customers, while the primary use of cash in operations is the purchase of merchandise inventories and the payment of operating expenses. We used less cash in operations for the first half of 2018 compared to the prior year primarily due to declines in merchandise payables and other liabilities, partially offset by a reduction in merchandise inventories. In addition, the Company received $425 million from Citibank pursuant to the Amendment as discussed in Note 1 of Notes to Condensed Consolidated Financial, and made payments of $208 million in connection with a commercial arrangement related to our insurance program.

Merchandise inventories were $2.7 billion and $3.4 billion at August 4, 2018 and July 29, 2017, respectively, while merchandise payables were $487 million and $670 million at August 4, 2018 and July 29, 2017, respectively. Our merchandise inventory balances at August 4, 2018 decreased approximately $719 million from the prior year third quarter due to both store closures and improved productivity. Sears Domestic inventory decreased in virtually all categories, with the most notable decreases in the apparel, tools and outdoor living categories. Kmart inventory also decreased in virtually all categories, with the most notable decreases in the apparel, drugstore, home, pharmacy and grocery & household categories.

**JX 114-87**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

**Investing Activities**

During the first half of 2018, we generated net cash flows from investing activities of $290 million, which consisted of cash proceeds from the sale of properties and investments of $322 million, partially offset by cash used for capital expenditures of $32 million. During the first half of 2017, we generated net cash flows from investing activities of $1.4 billion, which consisted of cash proceeds from the Craftsman Sale of $572 million, from the sale of properties and investments of $569 million and from the sale of receivables of $293 million, partially offset by cash used for capital expenditures of $41 million.

**Financing Activities**

For the first half of 2018, we generated net cash flows from financing activities of $851 million, which primarily consisted of proceeds of $513 million from borrowings under the Mezzanine Loan Agreement, $287 million of additional borrowings from the 2017 Secured Loan Facility, which includes an additional $186 million of borrowings under the Consolidated Secured Loan facility, $200 million from the Secured Loan and $125 million from the FILO Loan, as well as an increase in short-term borrowings of $389 million. These proceeds were partially offset by repayments of debt of $869 million, primarily repayments of amounts outstanding under the Company's Term Loan, the 2016 Secured Loan Facility, the Secured Loan, the 2017 Secured Loan Facility, the Line of Credit Loans and the Term Loan Facility. During the first half of 2017, we used net cash flows in financing activities of $99 million, which primarily consisted of repayments of debt of $717 million, primarily repayments of amounts outstanding under the Company's term loan, the 2016 Secured Loan Facility and the 2017 Secured Loan Facility, partially offset by proceeds of $330 million from the Line of Credit Loans, as well as an increase in short-term borrowings of $216 million.

**Liquidity**

We need liquidity to fund both working capital requirements of our businesses and necessary capital expenditures as well as to be available for general corporate purposes, including debt repayments and pension plan contributions. We have experienced losses and negative cash flows for a number of years and while we continue to focus on our overall profitability, including managing expenses, we have continued to incur operating losses in the second quarter and first half of 2018, and continued to fund cash used in operating activities with cash from investing and financing activities. In addition, we will be required to fund a debt payment of $134 million during October 2018, in addition to $668 million of other debt maturing in the next twelve months.

*Recent Sources of Incremental Liquidity*

The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows from operations experienced over the past several years. These actions can be broadly broken down into three categories: (i) financing transactions; (ii) asset sales; and (iii) operational streamlining, including store closings. These financing activities have included the completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility. The actions relative to our assets have included transactions to monetize the value of certain assets such as the sale of the Craftsman brand to Stanley Black & Decker in the first quarter of 2017 for consideration consisting of upfront cash payments and a future royalty stream, sales of properties and investments for proceeds of $1.1 billion in fiscal 2017, and an amendment to our credit card program agreement with Citibank, N.A. which resulted in a payment to the Company of $425 million during the second quarter of 2018. Streamlining actions have included a restructuring program announced at the beginning of 2017 (which produced cost savings during that year and into 2018) and the closure of 137 stores during 2018, and an additional 149 stores that will close during the second half of 2018. The Company intends to take further actions to streamline operations in 2018 to achieve additional cost reductions unrelated to store closures.

In addition to previous actions taken, the Company may access other sources of liquidity to support its operations. For instance, we are permitted to obtain longer-term secured financing maturing outside of the maturity date of our domestic credit facility which would not be subject to borrowing base limitations (see Note 2 of Notes to Consolidated Financial Statements). Other options which may be available to us, which we will evaluate and seek to

88

**JX 114-88**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

execute as appropriate, include refinancing existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

*Asset Monetization*

A special committee of the board of directors (the "Board") of the Company (the "Special Committee") is overseeing a formal process to explore the sale of our Kenmore brand and related assets, the Sears Home Improvement Products business of the Sears Home Services division and the Parts Direct business of the Sears Home Services division (collectively, the "Sale Assets"). As previously reported, the Board received a letter from ESL Investments, Inc. ("ESL") expressing the view that the Company should pursue a divestiture of the Sale Assets in order to maximize their value, and expressing interest in participating as a purchaser of all or a portion of the Sale Assets should the Company do so. The Board established the Special Committee, which consists solely of independent directors, and is advised by independent advisors, to evaluate any proposals that may be received from ESL with respect to the Sale Assets, to actively solicit third-party interest in the Sale Assets, and to explore any other alternatives with respect to the Sale Assets that may maximize value for the Company. On August 14, 2018 the Special Committee received a non-binding proposal letter from ESL to acquire the Kenmore brand and related assets and the Sears Home Improvement Products business of the Sears Home Services division, each subject to various conditions including obtaining debt financing, and, in the case of Kenmore, obtaining equity financing on terms acceptable to ESL. The Special Committee is evaluating the proposal, and potentially other proposals as part of its formal process.

We also continue to explore ways to unlock value across a range of other assets and to maximize the value of our Sears Home Services, Innovel and Sears Auto Centers businesses, as well as our DieHard brand, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings.

Our efforts also continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio, as we look to de-lever our balance sheet, provide liquidity and continue in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

*Actions to Address Liquidity Needs*

The following actions, which are intended to fund liquidity needs over the next twelve months, are in various stages of completion as of the date of this filing. We believe these actions, some of which we expect, subject to our governance processes, including the process being overseen by the Special Committee, to include related party participation and funding and, in the case of Sale Assets that are sold to ESL, subject to approval by a majority of the disinterested stockholders of Holdings, if completed, would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements.

- Sales of properties securing the remaining principal amount of the Secured Loans to fund the repayment of such Secured Loans;

- Additional borrowings under the Mezzanine Loan Agreement, Term Loan Facility and the Consolidated Secured Loan Facility;

- Monetization of the Sale Assets;

- Extension of maturities beyond September 2019 of Line of Credit Loans under the Second Lien Credit Agreement;

- Additional borrowings secured by real estate assets, borrowings under the short-term basket, or other borrowings;

- Amendments to the terms of certain of our financing arrangements, including to allow interest on some of our debt to paid-in-kind;

- Further evaluation and right-sizing of our store base, including evaluation of our business categories; and

- Further restructurings to help manage expenses and improve profitability, including additional store closures and the accomplishments of our planned cost savings initiatives.

**JX 114-89**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

While we believe that completion of these actions would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements, these actions have not been fully executed as of the date of this report and certain of the actions have not received necessary approvals (including but not limited to approval of the Special Committee and approval of a majority of the disinterested stockholders of the Company in the case of certain proposed transactions with ESL), and/or are at too early of a stage in the process to be considered probable of occurring under applicable accounting guidance as of the date of this report. Accordingly, because we cannot at this time conclude that these actions are probable of occurring under such accounting standards, substantial doubt is deemed to exist about our ability to continue as a going concern. The Company continues to move forward with these proposed actions, including the process being overseen by the Special Committee, and discussions with lenders, in order to complete these actions. The Company believes that completion of these actions, or in some cases substantial progress towards such completion, would alleviate or eliminate the substantial doubt. The Company will continue to reevaluate this assessment.

The PPPFA contains certain limitations on our ability to sell assets, including the Kenmore brand and related assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA and the ability to utilize related party borrowings to provide liquidity when there are short-term delays in the closing of transactions.

The success of the foregoing actions is subject to various risks, uncertainties and other factors, including market conditions, interest in specific assets and our ability to close the sales of assets at valuations and within time frames that are acceptable to us, our ability to effectively and timely execute the above actions to improve the operating performance of our businesses and, in certain cases, the approval and participation of third parties, including our creditors and the PBGC.

If we continue to experience operating losses and we are not able to generate additional liquidity through the actions described above or through some combination of other actions, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement or other financing agreement. Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such deficiency. As of August 4, 2018, our borrowing base was below the above threshold, and if our borrowing base is below the above threshold at the end of our third quarter of 2018, it would trigger an obligation to repurchase or repay second lien debt, in an amount equal to the excess of our funded debt secured by liens on our inventory as of November 3, 2018 over the borrowing base. If we fail to make such repurchase or repayment, we would be in violation of our covenants under our Second Lien Credit Agreement and the indenture relating to our New Senior Secured Notes.

Our outstanding borrowings at August 4, 2018, July 29, 2017 and February 3, 2018 were as follows:

| millions | August 4, 2018 | | July 29, 2017 | | February 3, 2018 | |
|---|---|---|---|---|---|---|
| Short-term borrowings: | | | | | | |
| Secured borrowings | $ | 660 | $ | 216 | $ | 271 |
| Line of credit loans | | 570 | | 330 | | 500 |
| Incremental loans | | - | | - | | 144 |
| Secured loan | | 24 | | - | | - |
| Long-term debt, including current portion: | | | | | | |
| Notes and debentures outstanding | | 3,639 | | 3,360 | | 3,145 |
| Capitalized lease obligations | | 61 | | 97 | | 72 |
| Total borrowings | $ | 4,954 | $ | 4,003 | $ | 4,132 |

90

**JX 114-90**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

We fund our peak sales season working capital needs through our domestic revolving credit facility and commercial paper markets and secured short-term debt.

| millions | 13 Weeks Ended | | | | 26 Weeks Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | August 4, 2018 | | July 29, 2017 | | August 4, 2018 | | July 29, 2017 | |
| Secured borrowings: | | | | | | | | |
| Maximum daily amount outstanding during the period | $ | 937 | $ | 629 | $ | 937 | $ | 629 |
| Average amount outstanding during the period | | 703 | | 524 | | 600 | | 366 |
| Amount outstanding at period-end | | 660 | | 216 | | 660 | | 216 |
| Weighted average interest rate | | 6.9% | | 6.0% | | 6.8% | | 6.0% |
| | | | | | | | | |
| Unsecured commercial paper: | | | | | | | | |
| Maximum daily amount outstanding during the period | $ | 31 | $ | 160 | $ | 50 | $ | 160 |
| Average amount outstanding during the period | | 3 | | 56 | | 9 | | 39 |
| Amount outstanding at period-end | | - | | - | | - | | - |
| Weighted average interest rate | | 12.8% | | 8.3% | | 12.3% | | 8.2% |
| | | | | | | | | |
| Line of credit loans: | | | | | | | | |
| Maximum daily amount outstanding during the period | $ | 570 | $ | 330 | $ | 570 | $ | 330 |
| Average amount outstanding during the period | | 557 | | 54 | | 558 | | 27 |
| Amount outstanding at period-end | | 570 | | 330 | | 570 | | 330 |
| Weighted average interest rate | | 11.4% | | 9.0% | | 11.2% | | 9.0% |

See the following sections in Note 2 of Notes to Condensed Consolidated Financial for information about our domestic revolving credit facility and commercial paper markets and secured short-term debt: "Domestic Credit Agreement" (which includes a discussion of our Term Loan and 2016 Term Loan), "Letter of Credit Facility," "Consolidated Secured Loan Facility," "2017 Secured Loan Facility," "2016 Secured Loan Facility," "Second Lien Credit Agreement," "Old Senior Secured Notes and New Senior Secured Notes," "Old Senior Unsecured Notes and New Senior Unsecured Notes," and "Wholly-owned Insurance Subsidiary and Intercompany Securities."

*Intangible Asset Impairment Assessment*

We continue to monitor our performance and further indefinite-lived intangible impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including deterioration in the macroeconomic environment, retail industry, deterioration in our performance or our future projections, if actual results are not consistent with our estimates and assumptions used in our impairment assessments, or changes in our plans for one or more indefinite-lived intangible assets, including changes that occur as a result of the formal process of the Special Committee to explore the sale of the Sale Assets, such as if the Special Committee were to accept an offer for the acquisition of the Kenmore trade name at a price less than its carrying value. Further, our business is seasonal in nature, and we generate a higher portion of our revenues and operating cash flows during the fourth quarter of our fiscal year, which includes the holiday season. The intangible asset impairment analysis is particularly sensitive to changes in the projected revenue growth rate and the assumed weighted-average cost of capital. Changes to these key assumptions could result in revisions of management's estimates of the fair value of the indefinite-lived intangible assets and could result in impairment charges in the future, which could be material to our results of operations.

**Recent Accounting Pronouncements**

See Part I, Item 1, "Financial Statements - Notes to Condensed Consolidated Financial Statements," Note 10 - "Recent Accounting Pronouncements," for information regarding new accounting pronouncements.

JX 114-91

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION*

Certain statements made in this Quarterly Report on Form 10-Q and in other public announcements by us contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995. Forward-looking statements include information concerning our future financial performance and liquidity, business strategy, plans, goals and objectives. Statements preceded or followed by, or that otherwise include, the words "believes," "expects," "anticipates," "intends," "estimates," "plans," "forecast," "is likely to" and similar expressions or future or conditional verbs such as "will," "may" and "could" are generally forward-looking in nature and not historical facts. Such statements are based upon the current beliefs and expectations of the Company's management and are subject to significant risks and uncertainties, many of which are beyond the Company's control, which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Actual results may differ materially from those set forth in the forward-looking statements.

The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: our ability to effectively and timely execute financing and asset sale transactions and other actions to enhance our financial flexibility and liquidity to successfully fund our transformation; changes in market conditions and our credit rating, which may continue to limit our access to capital markets and other financing sources and materially increase our borrowing costs; our ability to achieve cost savings initiatives; vendors' lack of willingness to do business with us or to provide acceptable payment terms or otherwise restricting financing to purchase inventory or services; our ability to effectively compete in a highly competitive retail industry; our ability of offer merchandise and services that our member and customers want; our ability to successfully implement our integrated retail strategy to transform our business into a member-centric retailer; our ability to successfully manage our inventory levels; initiatives to improve our liquidity through inventory management and other actions; the process being overseen by the Special Committee to explore the sale of the Sale Assets, including the result of any required vote of a majority of the disinterested stockholders of Holdings; the effect of worldwide economic conditions, an economic downturn, a renewed decline in customers' spending patterns, inflation and changing prices of energy; our failure to execute effective advertising efforts; the negative impact as a result of the recapture rights included in the Master Leases in connection with the Seritage transaction and the JV transactions; potential liabilities in connection with the separation of Sears Hometown and Outlet Stores and Lands' End or other asset transactions which may arise under fraudulent conveyance and transfer laws and legal capital requirements; the review and challenge of certain dividend payments received by us from Sears Canada, Inc. and other transactions involving Sears Canada, Inc.; disruptions to our computer systems which are used to implement our integrated retail strategy, process transactions, summarize results and otherwise manage our business; our ability to maintain the security of our members and customers, associate or company information; payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business operations; the impact of the seasonality of our business and customers spending patterns on the annual operating results; our dependence on sources outside the United States for significant amounts of our merchandise, which may be impacted by changes in U.S. and international trade regulations, including new or increased duties, tariffs, retaliatory tariffs, trade limitations and termination or renegotiation of the North American Free Trade Agreement; our reliance on third parties to provide us with services in connection with the administration of certain aspects of our business; impairment charges for goodwill and intangible assets or fixed-asset impairment for long-lived assets; our ability to attract, motivate and retain key executives and other associates; the substantial influence exerted over the Company by affiliates of our Chairman and Chief Executive Officer, whose interests may diverge from other stockholders' interests; our ability to protect or preserve the image of our brands and our intellectual property rights; the effect of product safety concerns or claims concerning the services we offer; the outcome of pending and/or future legal proceedings, including shareholder litigation, changes in laws and government regulations, product liability, patent infringement and qui tam claims and proceedings with respect to which the parties have reached a preliminary settlement; the timing, amount and other risks related to the pension and postretirement benefit plan obligations; our failure to realize the anticipated benefits of the Craftsman sale; our failure to comply with federal, state, local and international laws; consumer spending impacted by weather conditions and natural disasters; the volatility of our stock price; and increases in employee wages and the cost of employee benefits.

92

**JX 114-92**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Certain of these and other factors are discussed in more detail in our Annual Report on Form 10-K for the fiscal year ended February 3, 2018 and in our other filings with the Securities and Exchange Commission, which may be accessed through the Commission's website at www.sec.gov.

While we believe that our forecasts and assumptions are reasonable, we caution that actual results may differ materially. We intend the forward-looking statements to speak only as of the time made and do not undertake to update or revise them as more information becomes available, except as required by law.

93

**JX 114-93**

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*ntitative and Qualitative Disclosures About Market Risk*

We face market risk exposure in the form of interest rate risk. This market risk arises from our debt obligations.

*Interest Rate Risk*

We manage interest rate risk through the use of fixed and variable-rate funding. All debt securities are considered non-trading. At August 4, 2018, 67% of our debt portfolio was variable rate. Based on the size of this variable rate debt portfolio at August 4, 2018, which totaled approximately $3.3 billion, an immediate 100 basis point change in interest rates would have affected annual pretax funding costs by $33 million. These estimates do not take into account the effect on income resulting from invested cash or the returns on assets being funded. These estimates also assume that the variable rate funding portfolio remains constant for an annual period and that the interest rate change occurs at the beginning of the period.

*Item 4. Controls and Procedures*

Our management, with the participation of our principal executive and financial officers, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report (the "Evaluation Date"). Based on this evaluation, the principal executive and financial officers concluded that, as of the Evaluation Date, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate to allow timely decisions regarding required disclosure.

In addition, based on that evaluation, no changes in our internal control over financial reporting have occurred during our last quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**JX 114-94**

**SEARS HOLDINGS CORPORATION**

PART II. OTHER INFORMATION

*al Proceedings*

See Part I, Item 1, "Financial Statements-Notes to Condensed Consolidated Financial Statements," Note 9-"Legal Proceedings," for additional information regarding legal proceedings, which information is incorporated herein by this reference.

*Item 2. Unregistered Sales of Equity Securities and Use of Proceeds*

The following table provides information about shares of common stock we acquired during the second quarter of 2018. During the 13-week period ended August 4, 2018, we did not repurchase any shares of our common stock under our common share repurchase program. At August 4, 2018, we had approximately $504 million of remaining authorization under the program.

| | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[1] | Average Price Paid per Share for Publicly Announced Program | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|---|
| May 6, 2018 to June 2, 2018 | 1,161 | $ 2.28 | - | $ - | |
| June 3, 2018 to July 7, 2018 | - | - | - | - | |
| July 8, 2018 to August 4, 2018 | - | - | - | - | |
| Total | 1,161 | $ 2.28 | - | $ - | $ 503,907,832 |

[1] Our common share repurchase program was initially announced on September 14, 2005 and has a total authorization since inception of the program of $6.5 billion, including the authorizations to purchase up to an additional $500 million of common stock on each of December 17, 2009 and May 2, 2011. The program has no stated expiration date.

The Amended Domestic Credit Agreement limits our ability to make restricted payments, including dividends and share repurchases, subject to specified exceptions that are available if, in each case, no event of default under the credit facility exists immediately before or after giving effect to the restricted payment. These include exceptions that require that projected availability under the credit facility, as defined, is at least 15%, exceptions that may be subject to certain maximum amounts and an exception that requires that the restricted payment is funded from cash on hand and not from borrowings under the credit facility. Further, the Amended Domestic Credit Agreement includes customary covenants that restrict our ability to make dispositions, prepay debt and make investments, subject, in each case, to various exceptions. The Amended Domestic Credit Agreement also imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement and a requirement that the fixed charge ratio at the last day of any quarter be not less than 1.0 to 1.0.

*ibits*

Certain of the agreements filed with or incorporated by reference into this report contain representations and warranties and other agreements and undertakings by us and third parties. These representations and warranties, agreements and undertakings have been made as of specific dates, may be subject to important qualifications and limitations agreed to by the parties to the agreement in connection with negotiating the terms of the agreement, and have been included in the agreement for the purpose of allocating risk between the parties to the agreement rather than to establish matters as facts. Any such representations and warranties, agreements, and undertakings have been made solely for the benefit of the parties to the agreement and should not be relied upon by any other person.

(b)    Exhibits

JX 114-95

**SEARS HOLDINGS CORPORATION**
**EXHIBIT INDEX**

| | |
|---|---|
| 3.1 | Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K, dated March 24, 2005, filed on March 24, 2005 (File No. 000-51217)). |
| 3.2 | Second Amended and Restated By-Laws (incorporated by reference to Exhibit 3.2 to Registrant's Current Report on Form 8-K, dated May 8, 2018, filed on May 10, 2018 (File No. 001-36693)). |
| 10.1 | Third Amended and Restated Loan Agreement, dated as of June 4, 2018, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC, collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated June 4, 2018, filed on June 4, 2018 (File No. 001-36693)). |
| 10.2 | Second Amendment to Credit Agreement, dated as of June 29, 2018, among SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as the borrowers, the lenders party thereto and UBS AG, Stamford Branch, as administrative agent (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated June 29, 2018, filed on July 6, 2018 (File No. 001-36693)). |
| 10.3 | Fifth Amendment to Mezzanine Loan Agreement, dated as of June 29, 2018, between SRC Sparrow 2 LLC, as borrower, and JPP, LLC, as administrative agent (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated June 29, 2018, filed on July 6, 2018 (File No. 001-36693)). |
| 10.4 | Fifth Amendment to Second Lien Credit Agreement, dated as of July 5, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K, dated June 29, 2018, filed on July 6, 2018 (File No. 001-36693)). |
| *10.5 | Clarification and Correction to Sixth Amendment to Third Amended and Restated Credit Agreement, dated as of June 4, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders party thereto, Bank of America, N.A., as administrative agent, and the other parties thereto. |
| *10.6 | Schedules, Exhibits and Amendments to the Amended and Restated Program Agreement, dated as of July 15, 2003, amended and restated as of November 3, 2003, by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA, N.A.)) (1) |
| *10.7 | Sixth Amendment to Mezzanine Loan Agreement, dated as of July 25, 2018, between SRC Sparrow 2 LLC, as borrower, and JPP, LLC, as administrative agent. |
| 10.8 | Amendment to Transaction Documents, dated as of August 30, 2018, by and among Sears Holdings Corporation, certain of its subsidiaries and Pension Benefit Guaranty Corporation (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated August 30, 2018, filed on September 4, 2018 (File No. 001-36693)). |
| 10.9 | Third Amendment to Credit Agreement, dated as of August 31, 2018, among SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as the borrowers, the lenders party thereto and UBS AG, Stamford Branch, as administrative agent (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated August 30, 2018, filed on September 4, 2018 (File No. 001-36693)). |
| *31.1 | Certifications of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| *31.2 | Certifications of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |

**JX 114-96**

**SEARS HOLDINGS CORPORATION**
**EXHIBIT INDEX**

*32.1    Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

*32.2    Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101    The following financial information from the Quarterly Report on Form 10-Q for the fiscal quarter ended August 4, 2018, formatted in XBRL (eXtensible Business Reporting Language) and furnished electronically herewith: (i) the Condensed Consolidated Statements of Operations (Unaudited) for the 13 and 26 weeks ended August 4, 2018 and July 29, 2017; (ii) the Condensed Consolidated Statements of Comprehensive Loss (Unaudited) for the 13 and 26 weeks ended August 4, 2018 and July 29, 2017; (iii) the Condensed Consolidated Balance Sheets (Unaudited) as of August 4, 2018, July 29, 2017 and February 3, 2018; (iv) the Condensed Consolidated Statements of Cash Flows (Unaudited) for the 26 weeks ended August 4, 2018 and July 29, 2017; (v) the Condensed Consolidated Statements of Deficit (Unaudited) for the 26 weeks ended August 4, 2018 and July 29, 2017; and (vi) the Notes to the Condensed Consolidated Financial Statements (Unaudited).

---

\*    Filed herewith

(1)    Confidential treatment was requested as to omitted portions of this Exhibit. The omitted material has been filed separately with the Securities and Exchange Commission.

E-2

**JX 114-97**

**SEARS HOLDINGS CORPORATION**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SEARS HOLDINGS CORPORATION

Date: September 13, 2018

By:       /s/ ROBERT A. RIECKER

Name:      **Robert A. Riecker**

Title:      **Chief Financial Officer\***

\*Mr. Riecker is signing this report both as a duly authorized officer and as the principal accounting officer.

E-3

**JX 114-98**

EXHIBIT 10.5

CLARIFICATION AND CORRECTION TO SIXTH AMENDMENT TO THIRD AMENDED AND RESTATED CREDIT AGREEMENT

CLARIFICATION AND CORRECTION TO SIXTH AMENDMENT TO THIRD AMENDED AND RESTATED CREDIT AGREEMENT (this "Clarification"), dated as of June 4, 2018, between:

SEARS HOLDINGS CORPORATION, a Delaware corporation ("Holdings"),

SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation, and KMART CORPORATION, a Michigan corporation (the "Borrowers"),

The Lenders party hereto,

the Co-Collateral Agents, and

BANK OF AMERICA, N.A., as Administrative Agent (the "Agent"),

in consideration of the mutual covenants herein contained and benefits to be derived herefrom.

W I T N E S S E T H:

WHEREAS, Holdings, the Borrowers, the Lenders party thereto, the Co-Collateral Agents party thereto, and the Agent, among others, are party to that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015, as amended pursuant to that certain First Amendment to Third Amended and Restated Credit Agreement, dated as of April 8, 2016, that certain Second Amendment to Third Amended and Restated Credit Agreement, dated as of February 10, 2017, that certain Third Amendment to Third Amended and Restated Credit Agreement, dated as of December 12, 2017, that certain Fourth Amendment to Third Amended and Restated Credit Agreement, dated as of February 7, 2018, that certain Fifth Amendment to Third Amended and Restated Credit Agreement, dated as of the March 21, 2018, and that certain Sixth Amendment to Third Amended and Restated Credit Agreement (the "Sixth Amendment"), dated as of March 21, 2018 (the "Existing Credit Agreement"; the Existing Credit Agreement as amended by the Sixth Amendment (giving effect to this Clarification), the "Amended Credit Agreement");

WHEREAS, pursuant to the Sixth Amendment, the parties thereto established a "first-in, last-out" facility (the "FILO Facility") in accordance with the terms of Section 2.20 of the Existing Credit Agreement; and

WHEREAS, Section 2.20(d) of the Existing Credit Agreement provides that the FILO Facility shall be established pursuant to an amendment thereto to the extent necessary to reflect the existence and terms of the FILO Facility and to effect other amendments thereto and to the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent and the Borrowers, to effect the provisions of such Section, with the consent of the FILO Lenders, the

**JX 114-99**

Co-Collateral Agents and the Borrower (such consents not to be unreasonably withheld), but without the need for further consents from the Lenders; and

WHEREAS, the parties to the Sixth Amendment have determined that Part II of Annex C to the Sixth Amendment inadvertently omitted certain prior amendments that had been made to the Guarantee and Collateral Agreement pursuant to that certain Confirmation, Ratification and Amendment of Ancillary Loan Documents, dated as of April 8, 2016, among Holdings, the Borrowers, the Subsidiary Guarantors, and the Agent; and

WHEREAS, such inadvertently omitted provisions are unrelated to the establishment of the FILO Facility, and the omission thereof was ineffective under Section 2.20 of the Credit Agreement; and

WHEREAS, Holdings, the Borrowers, the FILO Lenders, the Co-Collateral Agents and the Agent have agreed to enter into this Clarification to correct such inadvertent omission.

NOW THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto hereby agree as follows:

1.   <u>Incorporation of Terms.</u>  All capitalized terms not otherwise defined herein shall have the same meaning as in the Existing Credit Agreement.

2.   <u>Clarification and Correction to Sixth Amendment</u>.  <u>Annex C</u> to the Sixth Amendment is hereby replaced with  <u>Annex C</u> hereto.

3.   <u>Conditions to Effectiveness</u>.  This Clarification shall become effective on the date that each of the following conditions precedent has been fulfilled as reasonably determined by the Agent (provided that, with respect to matters that require the satisfaction or consent of the Co-Collateral Agents, the Borrowers, the FILO Lenders or any other Person, the Agent may infer such satisfaction or consent from the delivery by such Persons of their executed counterpart signature pages hereto or to such other agreements to which such Person is a party):

a.     This Clarification shall have been duly executed and delivered by Holdings, the Borrowers, each 2018 FILO Lender, the Co-Collateral Agents and the Agent, and the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

b.     Each Loan Party shall have duly executed and delivered to the Agent a reaffirmation (in form and substance satisfactory to the Agent) of its obligations (including guarantees) and liens under the Loan Documents.

4.   <u>Binding Effect</u>.  The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, the Lenders and their respective successors and assigns.

2

**JX 114-100**

5.  <u>Expenses</u>. The Borrowers shall reimburse the Agent and the Co-Collateral Agents for all reasonable and documented out-of-pocket expenses incurred in connection herewith, including, without limitation, reasonable attorneys' fees.

6.  <u>Multiple Counterparts</u>.  This Clarification may be executed in multiple counterparts, each of which shall constitute an original and together which shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Clarification by facsimile or in electronic (i.e. "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Clarification.

7.  <u>Governing Law</u>.  THIS CLARIFICATION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

8.  <u>FATCA</u>. For purposes of determining withholding taxes imposed under FATCA, the Loan Parties, the Agent and the Co-Collateral Agents shall treat (and the Lenders hereby authorize the Agent and the Co-Collateral Agents to treat) the Amended Credit Agreement as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

9.  <u>Effect of Clarification</u>. The execution, delivery and effectiveness of this Clarification shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of the Agents or the Lenders under the Existing Credit Agreement, nor constitute a waiver of any provision of the Existing Credit Agreement. Except as provided herein and in the Amended Credit Agreement, all of the terms and conditions of the Existing Credit Agreement (including the Exhibits thereto) and the other Loan Documents shall remain in full force and effect, and each Borrower hereby reaffirms its obligations (including obligations under any guarantee) and liens granted thereunder. This Clarification is not intended by the parties to be, and shall not be construed to be, a novation of the Existing Credit Agreement or an accord and satisfaction in regard thereto. Wherever possible, each provision of this Clarification shall be interpreted in such manner as to be valid under applicable Requirements of Law. If any provision is found to be invalid under applicable Requirements of Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of this Clarification shall remain in full force and effect. This Clarification shall each constitute a Loan Document for all purposes of the Amended Credit Agreement.

[remainder of page intentionally left blank]

3

**JX 114-101**

IN WITNESS WHEREOF, this Clarification has been duly executed and delivered by each of the parties hereto as of the date first above written.

HOLDINGS:

**SEARS HOLDINGS CORPORATION**

By: /s/ Robert A. Riecker

Name: Robert A. Riecker

Title: Chief Financial Officer

BORROWERS:

**SEARS ROEBUCK ACCEPTANCE CORP.**

By: /s/ Robert A. Riecker

Name: Robert A. Riecker

Title: Vice President, Finance

**KMART CORPORATION**

By: /s/ Robert A. Riecker

Name: Robert A. Riecker

Title: Chief Financial Officer

4

**JX 114-102**

**BANK OF AMERICA, N.A.**, as Agent and Co-Collateral Agent

By: /s/ Brian Lindblom
Name: Brian Lindblom
Title: Senior Vice President

5

**JX 114-103**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Co-Collateral Agent

By: /s/ Joseph Burt
Name: Joseph Burt
Title: Director

6

JX 114-104

**JPP, LLC**, as 2018 FILO Lender

By: /s/ Edward S. Lampert
Name: Edward S. Lampert
Title: Member

**JPP II, LLC**, as 2018 FILO Lender

By: RBS Partners, L.P., as Manager

By: ESL Investments, Inc., as General Partner

By: /s/ Edward S. Lampert
Name: Edward S. Lampert
Title: Chairman and Chief Executive Officer

7

**JX 114-105**

**GACP II, L.P.**, as 2018 FILO Lender

By: /s/ John Ahn

Name: John Ahn

Title: President

**JX 114-106**

**Benefit Street 2018 LLC**, as 2018 FILO Lender

By: /s/ Thomas J. Tisch
Name: Thomas J. Tisch
Title: Manager

**JX 114-107**

Annex C

Amendments to Guarantee and Collateral Agreement

Part I

"FILO Liabilities" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants and indemnities of, any Loan Party arising under any Loan Document or otherwise with respect to the FILO Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Loan Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

Part II

6.4 Application of Proceeds. If an Event of Default shall have occurred and be continuing, and the Obligations shall have been accelerated or a Liquidation shall have been commenced, except (i) to the extent otherwise agreed by all Lenders, or (ii) with respect to any revisions made pursuant to Section 8.1 hereof in connection with the implementation of the FILO Facility, to the extent agreed by the Co-Collateral Agents pursuant to Section 2.20 of the Credit Agreement, the Agent shall apply all or any part of Proceeds constituting Collateral, whether or not held in the Agent's Account, and any proceeds of the guarantee set forth in Section 2, in payment of the Obligations in the following order:

First, to pay all incurred and unpaid fees, expenses, indemnities, and other amounts (including fees, charges and disbursements of counsel to the Agent and the Co-Collateral Agents) payable to the Agent and the Co-Collateral Agents (each in its capacity as such) under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

Second, to pay all incurred and unpaid expenses, indemnities, and other amounts (other than principal, interest and fees, and Obligations relating to Cash Management Services and Bank Products or relating to any FILO Loan) payable to the Lenders, the Swingline Lender and the Issuing Lenders (including fees, charges and disbursements of counsel to the respective Lenders, the Swingline Lender and the Issuing Lenders and amounts payable under Section 2.12), under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

Third, to pay all accrued and unpaid interest on all Permitted Overadvances, to the Agent or pro rata among the Lenders, as applicable, according to the amounts of such Obligations then due and owing and remaining unpaid to each;

10

**JX 114-108**

Fourth, to pay all the unpaid principal on all Permitted Overadvances, to the Agent or pro rata among the Lenders, as applicable, according to the amounts of such Obligations then due and owing and remaining unpaid to each;

Fifth, to pay all accrued and unpaid interest on the Swingline Advances (to the extent that Swingline Advances have not been refinanced by a Revolving Advance);

Sixth, to pay all the unpaid principal of the Swingline Advances (to the extent that Swingline Advances have not been refinanced by a Revolving Advance);

Seventh, to pay all accrued and unpaid interest on all Advances, the Term Loan and the 2016 Term Loan, and fees, payable to the Lenders and the Issuing Lenders under the Loan Documents (other than such amounts relating to any FILO Loan), pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

Eighth, to pay all the unpaid principal on all Advances, the Term Loan and the 2016 Term Loan, pro rata among the Lenders according to the amounts of such Obligations then due and owing and remaining unpaid to the Lenders;

Ninth, to pay all other amounts then due and owing and remaining unpaid in respect of the Obligations (other than Obligations relating to Cash Management Services and Bank Products or relating to any FILO Loan), pro rata among the Lenders according to the amounts of the Obligations (other than Obligations relating to Cash Management Services and Bank Products or relating to any FILO Loan) then due and owing and remaining unpaid to the Lenders;

Tenth, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Cash Management Services and the prepayment, settlement and termination of Cash Management Services, pro rata among the applicable Lenders and Affiliates thereof according to the amounts then due and owing and remaining unpaid in respect of Cash Management Services;

Eleventh, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Bank Products (other than the 2016 Letter of Credit Facility), pro rata among the applicable Lenders and Affiliates thereof according to the amounts that would become due and owing upon the prepayment, settlement and termination of such Bank Products;

Twelfth, to pay all accrued and unpaid interest on the FILO Loan, and fees, payable to the FILO Lenders under the Loan Documents, pro rata among such Persons according to the amounts of such Obligations then due and owing and remaining unpaid to each;

Thirteenth, to pay all the unpaid principal on the FILO Loan, pro rata among the FILO Lenders according to the amounts of such Obligations then due and owing and remaining unpaid to the FILO Lenders;

Fourteenth, to pay all other amounts then due and owing and remaining unpaid in respect of the Obligations relating to any FILO Loan (other than, while any Default or Event of Default pursuant to Section 7.01(e) of the Credit Agreement is continuing, amounts referred to in clause

11

JX 114-109

Fifteenth below), rata among the FILO Lenders according to the amounts of the Obligations relating to any FILO Loan, then due and owing and remaining unpaid to the FILO Lenders;

Fifteenth, while any Default or Event of Default pursuant to Section 7.01(e) of the Credit Agreement is continuing, to pay all amounts then due and owing and remaining unpaid in respect of the Obligations relating to any FILO Loan pursuant to Section 2.05(c) of the Credit Agreement, rata among the FILO Lenders according to the amounts of the Obligations relating to any FILO Loan) then due and owing and remaining unpaid to the FILO Lenders; provided that no such amount shall be paid until the payment in full in cash of all Obligations, the termination of all Commitments and termination or cash collateralization of all Letters of Credit in accordance with Section 9.01(b) (and, in the event that any such Obligations, Commitments or obligations with respect to Letters of Credit are replaced or refinanced by any debtor-in-possession facility, the repayment in full in cash and/or termination or cash collateralization thereof in accordance with the terms of such debtor-in-possession facility and any related orders (including financing and cash collateral orders)), in each case excluding, however, Obligations referred to in clause Sixteenth below;

Sixteenth, to the applicable Lenders or Affiliates thereof towards the payment of amounts then due and owing and remaining unpaid in respect of Bank Products constituting the 2016 Letter of Credit Facility, pro rata among the applicable Lenders and Affiliates thereof according to the amounts that would become due and owing upon the prepayment, settlement and termination of such Bank Products; and

Seventeenth, any balance remaining after the Obligations shall have been paid in full, no Letters of Credit shall be outstanding (unless the same has been cash collateralized in an amount equal to 105% of the aggregate then undrawn and unexpired amount of such Letters of Credit and all other Reimbursement Obligations or back-to-back letters of credit from an issuer and on terms acceptable to the Issuing Lender have been provided in respect of such Letters of Credit) and the Commitments shall have terminated shall be paid over to the Borrowers or to whomsoever may be lawfully entitled to receive the same.

JX 114-110

Exhibit 10.6

**Schedules, Exhibits and Amendments to the**
**Amended and Restated Program Agreement,**
**dated as of July 15, 2003, amended and restated as of November 3, 2003, by and among**
**Sears, Roebuck and Co.,**
**Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) and**
**Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA, N.A.))**

*** Certain confidential information contained in this document, marked by [***], has been omitted and filed separately with the Securities and Exchange Commission. Confidential treatment has been requested with respect to this omitted information.

Schedule 3.1
Initial Membership of Program Committee

**Sears Members**

| Name | Position at Sears |
|------|-------------------|
| 1. Lucinda M. Baier | Senior Vice President, General Manager Sears Credit |
| 2. Jerry Hinck | Vice President, Marketing-Credit Card Products |
| 3. Steven Trussell | Director, Finance-Business Analysis |

**Purchaser Members**

| Name | Position at Purchaser |
|------|-----------------------|
| 1. Edward Garofalo | Executive Vice President, Business Manager |
| 2. Leslie McNamara | Senior Vice President, Marketing |
| 3. Sammy Soohoo | Senior Vice President, Risk Management |

**JX 114-112**

Schedule 3.5
Initial Membership of Executive Committee

**Sears Members**

| | Name | Position at Sears |
|---|---|---|
| 1. | Lucinda M. Baier | Senior Vice President, General Manager Sears Credit |
| 2. | Kristine K Crow | Vice President Customer Relationship Management |
| 3. | William White III | Executive Vice President/General Manager Store Operations |

**Purchaser Members**

| | Name | Position at Purchaser |
|---|---|---|
| I. | Vikram Atal | Executive Vice President, Expansion Markets |
| 2. | Edward Garofalo | Executive Vice President, Business Manager |
| 3. | Herb Gover | Executive Vice President, Director of Private Label and Commercial |

**JX 114-113**

Schedule 4.1
Form of Business Plan

No later than [***] of each year, Sears and Purchaser shall jointly develop the Business Plan, an [***] business plan beginning [***] of the following year that describes strategies for growth and required investment (capital, IT, marketing, human resources, etc.) that are needed to deliver the Program. The Business Plan process provides an opportunity to ensure that Purchaser and Sears are in agreement on key strategies and goals for the relationship and to ensure alignment with corporate goals. The Business Plan provides strategic direction and is direct input to the development of the Marketing Plan. The Marketing Plan should be more tactical in nature and created with significantly more detail. To the extent that this Schedule is inconsistent with the Agreement, the Agreement shall control.

To ensure the proper level of coordination and data analysis occurs, it is expected that the planning process will begin in [***] to ensure a [***] completion date.

The Business Plan should contain the following components [***]:

**Business Performance - Current Year vs. Plan:**

- Current Year Forecast vs. Plan (Market P&L format)

- Key Metrics will include the following:

| Credit and Financial Products | Retail |
|---|---|
| [***] | [***] |
| ***] | |

[***]

**Industry Overview:**

- Industry Overview will include:

JX 114-114

| [***] | [***] |
|---|---|
| [***] | [***] |

**Strategic Goals and Strategies to Achieve Goals** - New strategies or modifications to existing strategies should be developed and goals identified for each strategy. Gap and Opportunity analysis is performed to determine how existing strategies should be modified and new strategies should be added.

- Overview of current business strategy

- Gap/Opportunity Analysis

| Credit and Financial Products | Retail |
|---|---|
| [***] | [***] |

-          [***]

**Resource Requirements and Implementation Plans** - The strategy is translated into resource requirements to ensure that the appropriate commitments are made against the agreed projects and strategies. Resources should be identified to include the categories listed below:

**JX 114-115**

**]

JX 114-116

**Profit and Loss Statement** - Market P & L format will be used and provide:
**]

**Accounts Receivable Calculation:**
**]

**Portfolio Quality:**
**]

**Operating Metrics:**
**]

---

**JX 114-117**

[***]

**JX 114-118**

**Operation Metrics**

[***]

**Risk Metrics**

[***]

**JX 114-119**

**Example of Market P & L:**



In all cases, this form of Business Plan as well as additional metrics may be added as agreed by both parties.

Schedule 4.2
Form of Marketing Plan

For each Program Period, Sears and Purchaser shall jointly develop the Marketing Plan. The parties shall give special consideration to the program objectives outlined in Section 3.2 of the Program Agreement. The Marketing Plan for each Program Period shall be approved by the Program Committee no later than [***] prior to the start of such Program Period. Sears and Purchaser shall continue to conduct their activities in conformity with the existing marketing practices, as appropriately adjusted for seasonality, until the new Marketing Plan is adopted and such existing marketing practices are superseded. The fact that an item, [***], shall be discussed in formulating the Marketing Plan [***] is important in formulating the Marketing Plan. To the extent that this Schedule is inconsistent with the Agreement, the Agreement shall control.

To ensure alignment, integration and execution, it is critical that both parties review the following:

**<u>Overview</u>**

[***]

---

Acquisitions

Metrics

[***]

**Point of Sale**

[***]

JX 114-122

[***]

<u>Disclosures</u>

Ordinary course timing of Disclosure change-outs will be agreed upon.

[***]

---

**JX 114-123**

[***]

**<u>ECM / Portfolio Management</u>**

[***]

---

**JX 114-124**

[***]

**<u>Other</u>**

[***]

JX 114-125

[***]

A Marketing Budget prepared in accordance with Section 4.2(d) shall be included.

[***]

JX 114-126

Schedule 6.3
Licensed Purchaser Marks

| TRADEMARK | GOODS AND SERVICES | REG. NO. |
|---|---|---|
| CHOICE[1] | Class 36: credit card services. | 1,206,796 |
| CITI | Class 36: financial services, namely, extending consumer and industrial loans to others; factoring services; credit card servicing and the purchasing and servicing of consumer receivables associate therewith; commercial lending; servicing loans and extensions of credit; real estate lending; mortgage financing and mortgage servicing, investment advisory and financial advisory services; providing venture capital to others. | 1,181,467 |
| CITI & ARC DESIGN | Class 36: financial services, namely, banking; credit card; commercial and consumer lending and financing; real estate and mortgage brokerage; trust, estate, and fiduciary management, planning and consulting; securities and fund investment and investment advisory consulting services; securities brokerage and trading services for others; facilitating secure financial transactions, namely, electronic funds transfers, electronic cash transactions, electronic credit card transactions; electronic bill payment, electronic debit transactions; and insurance services, namely, underwriting, and brokerage of property, casualty and life insurance policies and annuity contracts; providing online interactive news and information in the banking and financial industries provided via a global computer network. | 2,424,088 |
| CITIBANK | Class 36: banking services; insurance and financial. | 691,815 |

[1] For use by Sears and its Affiliates, solely in connection with the Program, in the Marks RAPID CHOICE and SEARS CHOICE REWARDS. (The parties acknowledge that the "SEARS" portion of such mark is owned by Sears.)

**JX 114-127**

Schedule 7.1
Certain Purchaser Payments

OWTH INITIATIVES.

   (a)        [***]

   1.             [***]

   (b)        [***]

   [***]

RKETING SUPPORT.

   (a)        [***]

ANCIAL SERVICES INCENTIVES.

[***]

JX 114-129

Schedule 13.5(c)
Appraisal Assumptions

**JX 114-130**

EXHIBIT A
[***]

Sears National Bank primarily issues the following types of accounts. Sears has provided copies of representative Account Agreements to Purchaser.

•Proprietary Accounts. Customers may use their proprietary accounts to purchase goods and services sold and made available through Sears stores and affiliates, concessionaires and other selected outlets. These accounts are:

• Sears Proprietary Card Accounts: The Sears Card is the primary proprietary card, and can be used at all Sears Full-line Stores, Sears Hardware, Sears Auto Centers, Sears authorized Dealer Stores, Scan Shop at Home catalogs, sears.com, Orchard Supply Hardware, Lands' End stores, catalogs and web-site, and Sears Product Repair Services technicians. As part of an effort to expand card utility, Sears Cards are also accepted at a variety of external merchants, including AOL, Avis and Terminix. Sears Card accounts may be opened in store, via direct mail, or the Internet

• Sears Charge PLUS Accounts: Sears Charge PLUS accounts are an alternative credit product offered to customers making high-dollar-value purchases of specified products. No plastic card is issued to the holder of a Sears Charge PLUS account. Customers are given paper documentation of the account and a record of the account is kept in Sears' credit database. The terms for Sears Charge PLUS accounts are equivalent to those for the Sears Card in all respects except for credit lines and acceptance. Credit lines for Sears Charge PLUS accounts are typically [***] to [***] higher than the Sears Card at time of acquisition, and a Sears Charge PLUS account requires a minimum purchase of [***] to open or a [***] purchase to charge to an existing account. Sears Charge PLUS accounts can only be opened in Hardlines departments.

• Home Improvement Accounts: Sears' Home Improvement Product Services business offers the Home Improvement Account to finance qualified products and services. The primary HIPS products and services include installed HVAC, windows, entry doors, kitchen and bathroom remodeling, security alarms, floor coverings, drapery, vinyl siding, and fencing. While consulting with the customer in the home or retail stores, HIPS sales associates discuss potential payment alternatives with the customer, including the option to apply for a Home Improvement Account with a competitive APR, rapid approval, and higher credit limits to accommodate high-dollar-value purchases.

•Sears Co-Branded Card Accounts. The Sears Co-Branded Cards are the Sears Gold MasterCard and The Great Indoors Gold MasterCard, which are general-purpose cards that customers may use wherever MasterCard is accepted to purchase goods and services. Customers may also use the Sears Co-Branded Cards for other purposes including cash advances, balance transfers and convenience checks.

• The Sears Gold MasterCard: The Sears Gold MasterCard provides all of the benefits that Sears Card provides, in addition to the general purpose features described above. A Sears Gold MasterCard can be opened in any location that a Sears Card account may be opened today, as well as through direct mail. Additionally, Sears Gold MasterCard accounts may enroll in the Sears Choice Rewards program described in Exhibit G to this Agreement.

• The Great Indoors Gold MasterCard: The Great Indoors Gold MasterCard is similar to the Sears Gold MasterCard but the account can only be opened at a Great Indoors store. A small number of The Great Indoors Gold MasterCard accounts have been opened via direct mail. The Great Indoors Gold MasterCard account holders are automatically enrolled in The Great Indoors Rewards program described in Exhibit G to this Agreement.

**JX 114-131**

**Premier Status:** Sears offers Sears Card and Sears Gold MasterCard Account holders the ability to upgrade their Accounts to Premier status through the issuance of Sears Premier Card or Sears Premier Gold MasterCard Accounts, respectively. For details of the Premier Program, see Exhibit F to this Agreement.

Sears, Roebuck and Co. issues the following proprietary accounts:

   • Commercial One Business Accounts ("Commercial One") - Designed for business owners, home builders, contractors, and property managers, the Sears Commercial One Business Account allows commercial users to efficiently manage all Sears business purchases on a single account designed to ease expense tracking and record keeping. The Company accepts Commercial One accounts at Sears Stores and Affiliates. Currently, the Accounts are billed via invoice, [***].

Sears Roebuck de Puerto Rico issues the Sears Puerto Rico Card, which is similar to the Sears Card issued by Sears National Bank, and Home Improvement Accounts, which are similar to those issued by Sears National Bank. Principal terms of these Accounts are listed on the following pages.

---

[***]

JX 114-133

EXHIBIT B
Financial Products


[***]

---

**JX 114-134**

[***]

---

JX 114-135

**Clubs and Services**

<u>Overview</u>

Sears offers various fee-based service programs as a further enhancement to its credit products, providing Sears with an additional source of revenue. Clubs and Services products include [***].

<u>Distribution/Marketing</u>

[***]

<u>Underwriting/Product Delivery</u>

The Credit Card Registration product is serviced by [***] under a servicing agreement for a specified per member-per month fee. The Auto Club is underwritten and serviced by [***], who assumes all business risk and pays Sears a commission based on the product and channel utilized to write business. Previously, [***] provided the Auto Club. [***] members continue to be serviced by [***], and a commission will continue to be paid to Sears during the run-off period. Additional products underwritten and serviced by [***] also continue to be in run-off, with a commission paid to Sears.

JX 114-136

EXHIBIT C
Sears Stores

A. **Full-line Stores** - 870 Full-line Stores, averaging approximately 90,000 net selling square feet, located primarily in shopping malls across the nation and offering.

- **Hardline and Softline** product offerings.

- **Sears Auto Centers** - Offer major national brands of tires, Sears exclusive DieHard brand and other brands of batteries, and related automotive services.

- **Sears.com** - Sears online presence, offering a limited assortment of hardline and softline merchandise and providing customers the option of buying online and picking up their merchandise in Full-line Stores.

B. **Specialty Stores** - 1,300 specialty stores, located primarily in freestanding, off-the-mall locations or high-traffic neighborhood shopping centers.

- **Dealer Stores** - 770 primarily independently owned stores, predominately located in smaller communities and averaging 5,300 net selling square feet, that offer appliances, electronics, lawn and garden merchandise, hardware, and automobile batteries. Dealer stores operate under the Sears brand and carry exclusive Sears brands such as Craftsman, Kenmore, and Diehard, as well as a wide assortment of national brands. Dealer Stores are not generally owned by Sears, but from time to time some ten or fewer Dealer Stores may be owned by Sears.

- **Hardware Stores** - 250 neighborhood hardware stores under the Sears Hardware and Orchard Supply Hardware brands, averaging from 21,000 to 41,000 net selling square feet, that carry Craftsman tools and lawn and garden equipment, a wide assortment of national brands, and other home improvement products.

- **National Tire & Battery** - 225 stores that offer major national brands of tires, DieHard and other brands of batteries, and related services.

- **The Great Indoors** - 20 stores specializing in home decorating and remodeling, averaging approximately 100,000 net selling square feet, dedicated to the four main rooms of the house: kitchen, bedroom, bathroom, and great room.

- **Commercial Sales** - Primarily targets home builders, remodelers, and property managers for appliance purchasers, as well as vocational schools, factory maintenance, and service companies for industrial tool purchases.

- **Sears Outlet Stores** - 38 stores averaging 2,.000 net selling square feet that offer appliances, electronics, and lawn and garden merchandise at a discount.

C. **Direct to Customer** - The Direct to Customer business includes Lands' End online and catalog operations, as well as Lands' End's 15 retail stores. Lands' End is the nation's largest direct apparel merchant and a leading provider of classic women's, men's, and children's apparel and footwear. The retail stores, averaging 7,000 net selling square feet, offer traditional styled casual clothing for men, women, and children primarily from overstock catalog and online offerings. Direct to Customer also includes direct marketing of goods and services memberships, merchandise through specialty catalogs and impulse and continuity merchandise.

D. **Product Repair Services** - Product repair, service contract protection, and installation services are provided for all major brands of home products through a national network of approximately 13,000 service technicians who are all Sears employees. This business also sells and services cooling and heating systems.

EXHIBIT D
[***]

| Business Name | Relationship | # of Locations | Expiration date of Contract |
|---|---|---|---|
| [***] | | | |
| | | | |
| [***] | | | |
| [***] | | | |
| | | | |
| [***] | | | |
| | | | |
| [***] | | | |

**JX 114-138**

**Exhibit E - Service Standards**

[Superseded by later amendment]

---

**JX 114-139**

Exhibit F
Premier Program

<u>Description:</u>

A "best" retail customer recognition program that overlays the [***] that rewards Sears Credit Card customers based on their spending behavior at Sears.

Sears Cardholders can automatically qualify for the "Premier" status by spending a minimum (generally [***]) in a [***] period ([***]) or can be "invited" to the program based on the number of trips or other relationships they maintain with Sears. A [***] minimum Sears Credit Card relationship is required to be considered for this program.

"Premier" level Sears Credit Cards are issued with a [***] expiration. Re-qualification is based on the same qualification criteria. Accounts not re-qualifying for "Premier" status are re-issued as a [***].

Customers must maintain a good credit rating to qualify for the program and its benefits.

<u>Benefits:</u>

Premier Cardholder benefits include: [***].

**JX 114-140**

<u>Exhibit G</u>
<u>Customer Value Propositions</u>

➢ Sears currently offers [***] rewards programs detailed in the table below:

[***]

---

**JX 114-141**

**<u>Sears Choice Rewards Redemptions</u>**

[***]

JX 114-142

**Sears Choice Rewards [***]**

[***]

EXHIBIT H
Special Credit Card Programs and POS Incentives

**<u>Card Events</u>**

[Superseded by later amendment]

**<u>[***] Financing Promotions</u>**

[Superseded by later amendment]

---

**JX 114-144**

**<u>POS Incentives</u>**

[Superseded by later amendment]

---

**JX 114-145**

EXHIBIT I

**MERCHANT AGREEMENT**
**BY AND BETWEEN**
**SEARS, ROEBUCK AND CO.**
**AND**
**CITIBANK USA, N.A.**

**THIS MERCHANT AGREEMENT** (the "Merchant Agreement") is entered into as of _____, 2003 (the "Effective Date"), by and among SEARS ROEBUCK AND CO., a New York corporation ("Sears"), and Citibank USA, N.A., a national banking association ("Purchaser").

## RECITALS

**WHEREAS**, Sears is, among other things, engaged in the business of selling merchandise and services through retail stores, catalogs and other means;

**WHEREAS**, Sears and certain of Sears' Affiliates (collectively, "Sellers") and Citicorp, a Delaware corporation and an affiliate of Purchaser ("Citicorp"), have entered into the Purchase, Sale and Servicing Transfer Agreement, dated as of July 15, 2003, as it may be amended from time to time (the "Purchase Agreement"), pursuant to which Citicorp has agreed to acquire from Sellers, and Sellers have agreed to sell to Citicorp, or certain of its Affiliates, those assets and liabilities associated with Sears' existing credit card and financial products businesses, on the terms and subject to the conditions of the Purchase Agreement;

**WHEREAS**, Sears, Sears Intellectual Property Management Company and Purchaser have entered into a Program Agreement, dated as of even date hereof (the "Program Agreement"), pursuant to which Sears and Purchaser will issue and service Sears Credit Cards (as defined in the Purchase Agreement), issue existing and new credit and financial products, process and service related accounts and engage in certain joint marketing efforts, on the terms and subject to the terms and conditions set forth in the Program Agreement; and

**WHEREAS**, Sears desires to enter into a relationship with Purchaser for, among other things, the acceptance of the Sears Credit Cards in Stores (as such terms are defined in the Program Agreement).

**NOW, THEREFORE**, in consideration of the premises and mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Sears hereby agree as follows:

**JX 114-146**

## ARTICLE I - DEFINITIONS

Capitalized terms used in this Merchant Agreement, if not hereinafter defined, have the meanings given to them in the Program Agreement.

1.1 "**Authorization**" means a valid authorization code provided by Purchaser to Sears with respect to a Card Sale when Sears is presented with a Card Account number.

1.2 "**Authorization Center**" means the system accessed by Sears for the purpose of obtaining authorization codes and instructions on handling Card Sales.

1.3 "**Card Association Regulations**" means the by-laws, procedures, rules and regulations of the Card Association, as they may be amended from time to time by the Card Association.

1.4 "**Card Sale**" is a sale of Merchandise by Sears to a Cardholder through the use of a Sears Credit Card.

1.5 "**Card Sale Date**" means the transaction date for any Card Sale.

1.6 "**Co-Branded Card Sale**" is a sale of Merchandise by Sears to a Cardholder through the use of a Sears Co-Branded Card.

1.7 "**Chargeback**" is the reversal of a charge against a Card Sale previously presented by Sears to Purchaser for payment, in accordance with Section 3.3 of this Merchant Agreement and Section 3 of the Rules.

1.8 "**Cost of Funds Adjustment**" will have the meaning set forth in Section 3.2.

1.9 "**Designated Participant**" will have the meaning set forth in Section 12.24.

1.10 "**Electronic Card Capture Device**" means a device intended to electronically transmit Sales Data to Purchaser, which can be either a physical or virtual "point of sale" device.

1.11 "**Merchant Agreement**" has the meaning set forth in the preamble hereto.

1.12 "**Merchant Operating Rules and Regulations**" or the "**Rules**" means, with respect to the Sears Credit Cards, the rules outlined in Schedule A attached hereto and incorporated herein by reference, as may be amended from time to time in accordance with Section 12.25.

1.13 "**Processor**" means any organization, including Purchaser, that captures Sales Transactions on behalf of Sears.

1.14 "**Program Agreement**" has the meaning set forth in the recitals hereto.

1.15 "**Purchase Agreement**" has the meaning set forth in the recitals hereto.

**JX 114-147**

**1.16 "Refund"** means any non-cash refund, return, or price adjustment of a Card Sale made through the use of a Sears Credit Card.

**1.17 "Refund Record"** means all documents or data used to evidence any Refund.

**1.18 "Sales Data"** means data representing Sales Transactions related to a Card Sale, Refund or credit.

**1.19 "Sales Record"** means all documents or data presented to Purchaser as evidence of a Card Sale or credit.

**1.20 "Sales Transaction"** means any single Card Sale, Refund or representment to an Account by Sears and processed through Purchaser or a processor, including an Authorization and ticket capture as a single transaction.

**1.21 "Sears"** has the meaning set forth in the preamble hereto.

**1.22 "Settlement Account"** means the account maintained at a depository institution and designated by Sears to which funds due to Sears for Card Sales are credited, such depository institution to be a member of the Automated Clearing House Association.

**1.23 "Settlement Amounts"** means the daily amounts resulting from clearing Card Sales, including sales volume, representments, any taxes collected and other agreed upon credits, minus Chargebacks, Refunds, any agreed upon fees and other agreed upon debits.

**1.24 Construction.** References in this Merchant Agreement to any gender include references to all genders, and references in this Merchant Agreement to the singular include references to the plural and vice versa. Unless the context otherwise requires, the term "party" when used in this Merchant Agreement means a party to this Merchant Agreement. References in this Merchant Agreement to a party or other Person include their permitted Successors and assigns. The words "include," "includes" and "including" when used in this Merchant Agreement shall be deemed to be followed by the phrase "without limitation." Unless the context otherwise requires, references in this Merchant Agreement to Articles, Sections and Schedules shall be deemed references to Articles and Sections of, and Schedules to, this Merchant Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Merchant Agreement refer to this Merchant Agreement in its entirety and not to any particular Article, Section or provision of this Merchant Agreement.

### ARTICLE II - CERTAIN COVENANTS

**2.1 Card Association Regulations.** [***]

**2.2 Current Sears Practices.** [***]

### ARTICLE III - PURCHASER OBLIGATIONS

JX 114-148

**3.1 Purchaser Services.** Purchaser will process for Sears Sales Transactions on Sears Credit Cards and shall provide to Sears the following additional services with respect to Sears Credit Cards:

**3.1.1**       Provide real-time and batch processing capabilities for Authorizations, according to the Service Standards set forth in Schedule E of the Program Agreement;

**3.1.2**       Provide a 24-hour Authorization help desk, according to the Service Standards set forth in Schedule E of the Program Agreement;

**3.1.3**       Provide electronic transmission of Sales Data into Purchaser's systems;

**3.1.4**       Send settlement, Chargeback, and other agreed-upon transaction reports to Sears, in a form and format mutually agreed upon by the parties.

**3.1.5**       Use commercially reasonable efforts to monitor and mitigate fraud;

**3.1.6**       Answer Sears' inquiries concerning Sales Transactions;

**3.1.7**       Fund Sears Settlement Account, in accordance with Section 3.2 of this Merchant Agreement; and

**3.1.8**       Manage change requests and problem reports from Sears in a timely manner.

**3.1.9**       Comply with the service standards set forth in Exhibit E to the Program Agreement.

**3.2 Payment of Settlement Amounts on Card Sales.** Purchaser will pay the daily Settlement Amounts with respect to Card Sales via wire transfer to the Settlement Account in accordance with the following time periods: [***]. The parties acknowledge and agree that, if all or a portion of the Settlement Amounts due are not paid to Sears by [***] from the date such Settlement Amounts were due until and including the date such Settlement Amounts are paid in full. [***] shall be calculated using the formula set forth on Schedule B. In the event all or a portion of the required Sales Data is not received by Purchaser and its processor by [***], or such data is unreadable, Purchaser will not be required to process the Sales Data containing any missing or unreadable data, and shall immediately inform Sears of such missing or unreadable data. Sears will be responsible for retrieving or resubmitting the Sales Data in completed form. Sears will be responsible for the loss, damage or destruction of Sales Data until such Sales Data is received by Purchaser and its processor. Purchaser shall not be liable for any fees and costs arising from any delays in receipt of funds or errors in Settlement Account entries caused by Sears or third parties. Sears agrees not to close the Settlement Account without providing Purchaser at least [***] prior written notice of such closure and substitution of another account. Sears shall be solely responsible for all fees and costs associated with the Settlement Account. The amounts paid will be the full amount indicated in the Settlement Amounts, as reported, with no deduction, reduction, or setoff for any reason,

**JX 114-149**

except as expressly provided for herein or under Section 7.8 of the Program Agreement. All Settlement Amounts shall be paid in United States currency, unless otherwise agreed. Sears authorizes Purchaser to initiate credit or debit entries and adjustments to the Settlement Account. Sears agrees that, in the event of termination of this Merchant Agreement, it will maintain the Settlement Account with reasonably sufficient funds until Sears and Purchaser agree that all Chargebacks and other adjustments are processed, and will permit Purchaser to credit and debit the Settlement Account until all such charges are finalized. Chargebacks and other adjustments will be settled as provided in this Merchant Agreement.

### 3.3 Chargeback Rights and Procedures for Card Sales.

3.3.1          Subject to the Rules and the terms and conditions set forth in this Merchant Agreement, any payment made by Purchaser to Sears in connection with a Card Sale may be charged back to Sears [***], except in cases of Chargebacks related to losses on credit limit or other credit-related overrides on protection agreements, extended warranty protection, maintenance agreements, or similar products under Section 3.1(iii) of the Rules, which can be charged back without limit as to time. The parties will work together in good faith to resolve Cardholder disputes presented [***].

3.3.2          Purchaser is not required to pay Sears for a Card Sale that is charged back. If Purchaser has already paid Sears for such Card Sale, Purchaser may, at its sole discretion, either (i) deduct the amount to be charged back from the daily Settlement Amount or debit the Settlement Account; or (ii) offset the amount to be charged back from any other future payment to Sears. In the event that the Settlement Account contains insufficient funds or charges, Purchaser may demand that Sears pay Purchaser the amount of the Chargeback, and Sears will make such payment within [***] of such demand.

3.3.3          If Purchaser processes a Chargeback and the amount of the Card Sale or the disputed amount is subsequently paid by the Cardholder, Purchaser will reimburse Sears for such amount.

**3.4 Cardholder Complaints.** Purchaser will cooperate with Sears consistent with the terms of the Program Agreement, including Section 5 thereof, in addressing Cardholder complaints that arise in connection with a Card Sale.

**3.5 Electronic Data Transmissions and Equipment.** Unless otherwise provided herein, Purchaser will transmit, or cause to be transmitted, to Sears all data required under this Merchant Agreement via electronic transmission in mutually agreed upon formats. The parties may, from time to time, agree as to changes to any electronic format(s) used in connection with the transactions contemplated by this Merchant Agreement. [***]

**JX 114-150**

**3.6 Sears Co-Branded Cards.** Subject to Section 2.1, Purchaser will comply with the Card Association Regulations applicable to it in connection with the operation of all applicable aspects of the Program related to the Sears Co-Branded Cards, other than those applicable to Co-Branded Card Sale transactions, wherein Sears Co-Branded Card transactions are to be processed as Sears Card transactions.

## ARTICLE IV - SEARS OBLIGATIONS

**4.1 General Duties.** Sears will comply with the terms of this Merchant Agreement, the Rules, and the Card Association Regulations, as applicable, in connection with the acceptance of Sears Credit Cards and in submitting Sales Transactions and Sales Records for processing. Without limiting the generality of the foregoing, Sears will: (a) honor each valid Sears Credit Card presented by Cardholders; (b) treat each Sales Transaction no less favorably than Sears treats other credit card transactions; (c) not establish minimum or maximum amounts for Card Sales, Sales Transactions or Sales Records; (d) not impose any surcharge on Card Sales or Sales Transactions; and (e) include any Sales Tax on a Sales Transaction in the total charge amount. During the term of this Merchant Agreement, Sears will, and will use reasonable best efforts to cause its Designated Participants to, maintain a merchant relationship with the Card Association for the purpose of accepting Credit Cards for purchases of Merchandise.

**4.2 Use of Forms.** Unless otherwise provided herein, Sears will use such forms of Card Sales, Sales Records and Refund Records as is determined by mutual agreement of the parties.

**4.3 Electronic Transmission Requirements.** Unless otherwise provided herein, Sears will transmit, or cause to be transmitted, all data required under this Merchant Agreement via electronic transmission in mutually agreed upon formats.

**4.4 Equipment.** [***]

**4.5 Sears Co-Branded Cards.** Subject to Section 2.1, Sears will comply with the Card Association Regulations applicable to merchants in connection with the operation of all applicable aspects of the Program related to the Sears Co-Branded Cards, other than those applicable to Co-Branded Card Sale transactions, wherein Sears Co-Branded Card transactions will not be subject to an interchange fee except in accordance with Section 7.3 of the Program Agreement, and are to be processed as Sears Card transactions.

**4.6 Sears Subsidiaries.** Sears and Purchaser agree that the Sears Subsidiaries named on Schedule C, attached hereto and incorporated herein by reference, will accept Sears Credit Cards, and Sears will cause each such Subsidiary to comply with, and will be responsible for each Subsidiary's compliance with, the terms and conditions set forth in this Merchant Agreement as if such Subsidiary was Sears. Should any such Subsidiary, at any time, cease to be an Affiliate of Sears, Sears and Purchaser will determine whether such Subsidiary will continue to have the ability to accept Sears Credit Cards on the terms of the merchant agreement in effect for Partner Merchants at that time, or on such other terms as the

parties agree, and such Subsidiary shall be deleted from Schedule C. Further, if Sears desires that any Sears Subsidiary at any time should no longer accept Sears Credit Cards, Sears will provide written notice to Purchaser and such Sears Subsidiary shall be deemed deleted from Schedule C as of the effective date set forth in such notice, which shall be no less than 15 days after Purchaser's receipt of such notice, unless otherwise agreed upon by the parties. If a new Sears Subsidiary which is not named on Schedule C becomes or will become subject to the Program Agreement, Sears shall provide Purchaser with written notice thereof and such Subsidiary shall be deemed added to Schedule C as of the effective date set forth in such notice. Sears shall guarantee the obligations of the Sears Subsidiaries named on Schedule C, as amended from time to time.

## ARTICLE V - CONFIDENTIAL INFORMATION

The parties agree that the terms and conditions with respect to Confidential Information as set forth in the Program Agreement will apply to information disclosed to or observed or otherwise obtained by one party with regard to the other party in the course of the negotiation of this Merchant Agreement and each party's performance of its obligations hereunder.

## ARTICLE VI - SEARS REPRESENTATIONS AND WARRANTIES

**6.1 Generally.** Sears hereby warrants and represents, as of the date of presentment to Purchaser of each Sales Record for a Card Sale:

**6.1.1**     All Sales Records and Refund Records that Sears presents to Purchaser are genuine and arise out of bona fide Card Sales of Merchandise by Sears in the ordinary course of business and that all such records are originated by Sears in compliance with this Merchant Agreement and the Rules;

**6.1.2**     Sears has title to all Sales Records presented to Purchaser, there are no liens or other encumbrances on such Sales Records and Sears has the authority to present such Sales Records to Purchaser;

**6.1.3**     No Sales Record is subject to any dispute, set-off or counterclaim due to any act or omission of Sears, except for those created as a result of the acts or omissions of Purchaser;

**6.1.4**     The Card Sale did not arise out of any fraud or malfeasance of any employee or agent of Sears;

**6.1.5**     The Sales Records are free from any alteration not authorized by the Cardholder;

**6.1.6**     With respect to any transaction in which a Sears Credit Card is not physically presented to Sears, the Sears Credit Card and Account information contained in the Sales Data is accurate and correct; and

**JX 114-152**

**6.1.7**          The Sales Transaction is in compliance with all applicable Laws.

**6.2** [***]

## ARTICLE VII - USE OF TRADEMARKS

The parties agree that the terms and conditions with respect to the use of the Sears Licensed Marks and the Licensed Purchaser Marks set forth in the Program Agreement and the Licensing Agreement will apply to the use of such Marks for purposes of this Merchant Agreement.

## ARTICLE VIII - RECORDS

**8.1 Generally.** Sears will retain electronic records of all Sales Records and Refund Records (and any other transaction records) for at least seven years after the date when Sears presents the records to Purchaser. If Sears cannot retain electronic records of all or a portion of any such records, then Sears will retain either the original, or a legible microfilm copy of both sides, of all Sales Records and Refund Records (and any other transaction records) for at least seven years after the date when Sears presents the records to Purchaser.

**8.2 Requests for Copies.** Sears will provide Purchaser with copies of the electronic records of all Sales Records or Refund Records (and any other transaction records), or, if there is no electronic record, a copy of either the original paper or of the microfilmed version of such Sales Records or Refund Records (and any other transaction records) (in size comparable to the original paper record), and any other documentary evidence available to Sears and reasonably requested by Purchaser to meet its obligations under applicable Laws (including its obligations under Regulation Z of the Board of Governors of the Federal Reserve System) or to respond to questions concerning Accounts.

**8.3 Systems Access.** Sears will provide Purchaser's employees or contractors, who have a need to know, with "view only' access to Sears' systems with respect to Sales Records and Refund Records, and Purchaser will provide Sears' contract sales employees with "view only" access to TS2 Commercial to assist in resolving customer disputes. The parties agree that each party will be reimbursed by the other party for services provided under this Section 8.3 based on its actual costs of providing such services, taking into account, if applicable, a reasonable allocation of overhead.

## ARTICLE IX - COMPLIANCE WITH LAW

**9.1 Sears' Compliance.** Sears will comply with all Laws applicable to Sears and Sears' business as they relate to Sales Transactions.

**9.2 Purchaser's Compliance.** Purchaser will comply with all Laws applicable to Purchaser and Purchaser's business as they relate to Sales Transactions.

## ARTICLE X - DEFENSE AND INDEMNIFICATION

**JX 114-153**

**10.1 By Sears.** Sears shall be liable to, and shall defend, indemnify and hold harmless, Purchaser and its Subsidiaries and Affiliates and their respective directors, officers, employees and permitted assigns from and against any Losses arising out of [***].

**10.2 By Purchaser.** Purchaser shall be liable to, and shall defend, indemnify and hold harmless, Sears, and its Subsidiaries and Affiliates and their respective directors, officers, employees and permitted assigns from and against any Losses arising out of [***].

**10.3 Procedures for Indemnification.** The parties agree to follow the procedures for indemnification set forth in Section 11.3 of the Program Agreement for purposes of indemnification under this Merchant Agreement.

<div align="center">

**ARTICLE XI - TERM AND TERMINATION**

</div>

**11.1 Term.** This Merchant Agreement shall commence on the Effective Date, and shall continue in full force and effect during the Term of the Program Agreement; provided, however, that Purchaser may terminate this Merchant Agreement with respect to any Subsidiary listed on Schedule C after such Subsidiary fails to perform any of its material obligations or breaches, any of its material covenants hereunder in any material respect, and such failure or breach shall have continued unremedied for 30 days after delivery of written notice from Purchaser of its intention to terminate this Merchant Agreement with respect to such Subsidiary, absent remedy of such failure or breach within the 30-day period.

**11.2 Effect of Termination.** Upon the effective date of any termination of this Merchant Agreement, Sears' rights hereunder to make Card Sales, to present Sales Records to Purchaser, and to use Sales Record forms, Refund Record forms, promotional materials, and any other items provided by Purchaser hereunder, will immediately cease. The provisions of Sections 3.2, 3.3, 3.4, 4.2, 4.3, 8.1 and 8.2 and Articles V, VI, VII, IX, X, XI and XII, as well as Sears' obligations in connection with any Sales Record or Refund Record accepted by Purchaser (whether before or after any termination of this Merchant Agreement), including Sears' Charge-back obligations, will survive any termination of this Merchant Agreement.

<div align="center">

**ARTICLE XII - GENERAL**

</div>

**12.1 Successors and Assigns.** Section 14.1 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.2 Entire Agreement.** Section 14.2 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.3 Relationship of the Parties.** Section 14.3 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.4 Force Majeure.** Section 14.4 of the Program Agreement is incorporated herein, *mutatis mutandis*.

JX 114-154

**12.5 Books and Records.** Section 14.5 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.6 Public Announcements.** Section 14.6 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.7 Audits.** Section 14.7 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.8 Assignment; Delegation of Services.** Section 14.8 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.9 Change in Law; Severability.** Section 14.9 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.10 Survival.** Section 14.10 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.11 Expenses.** Section 14.11 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.12 Amendment and Waiver.** Section 14.12 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.13 Remedies; Specific Performance.** Section 14.13 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.14 Table of Contents; Headings.** Section 14.14 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.15 Limitation on Rights of Others.** Section 14.15 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.16 Counterparts; Effectiveness.** Section 14.16 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.17 Payments.** Section 14.17 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.18 Drafting.** Each party acknowledges that its legal counsel participated in the drafting of this Merchant Agreement. The parties hereby agree that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Merchant Agreement to favor one party over any other.

**12.19 Governing Law.** This Merchant Agreement shall in all respects be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard to the conflict of laws principles of such state.

**JX 114-155**

**12.20 Waiver of Jury Trial.** EACH PARTY TO THIS MERCHANT AGREEMENT WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS MERCHANT AGREEMENT.

**12.21 Jurisdiction; Consent to Service of Process.** Section 14.21 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.22 Notices.** Section 14.22 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.23 Escalation; Arbitration.** Sections 14.23 and 14.24 of the Program Agreement are incorporated herein, *mutatis mutandis*.

**12.24 Designated Participants.** Each of Sears and Purchaser shall use its reasonable best efforts to have Purchaser enter into separate merchant processing agreements with each of Sears' Affiliates and Partner Merchants that accept Sears Credit Cards ("Designated Participants"), in accordance with Section 12.2 of the Program Agreement. Until Purchaser enters into such merchant processing agreement with any such Designated Participant, (1) Sears shall communicate with Purchaser on behalf of the Designated Participant on all matters, (ii) Purchaser shall not be required to render any performance hereunder to the Designated Participant, and Purchaser shall have fulfilled all of its obligations and responsibilities hereunder with respect to any participation by the Designated Participant by rendering performance to Sears on behalf of the Designated Participant, (iii) Sears shall be responsible for rendering to Designated Participant any performance rendered to Sears by Purchaser on behalf of the Designated Participant, and (iv) nothing in this Merchant Agreement, whether express or implied, shall give or be construed to give any such Designated Participant any legal or equitable right, remedy or claim under or in respect of this Merchant Agreement, it being understood that any legal or equitable right, remedy or claim with respect to matters set forth in this Section 12.24 shall inure exclusively to Sears.

**12.25 Modification of Rules.** [***]

**12.26 Conflict with Program Agreement.** Notwithstanding anything to the contrary contained herein, in the event of a conflict between either this Merchant Agreement or the Rules and the Program Agreement, the Program Agreement shall control.

*Signature Page Follows*

**JX 114-156**

**IN WITNESS WHEREOF**, Sears and Purchaser have caused their duly authorized representatives to execute this Merchant Agreement as of the date set forth below the signature of each.

**SEARS, ROEBUCK AND CO. CITIBANK USA, N.A.**

By: By:

Title: Title:

Date: Date:

JX 114-157

**SCHEDULE A**

# Sears Credit Card
# Merchant Operating
# Rules and Regulations

*These Rules and Regulations contain procedures that will be followed in connection with the acceptance of a Sears Credit Card and will govern all Sears Credit Card Sales Transactions. These Rules and Regulations are not applicable to Sears Co-Branded Cards except for Co-Branded Card Sales.*

**JX 114-158**

[***]

---

JX 114-159

[***]

A-1

JX 114-160

[***]

ATTACHMENT A TO SCHEDULE A
PAGE 1

JX 114-161

**SCHEDULE B**

Cost of Funds Adjustment

[***]

B-1

JX 114-162

**SCHEDULE C**

**SEARS SUBSIDIARIES WHICH
ACCEPT THE SEARS CREDIT CARDS**

California Builder Appliances, Inc.
Florida Builder Appliances, Inc.
Koolvent Aluminum Products, Inc.
Lands' End, Inc.
[***]
Sears Carpet and Upholstery Care, Inc.
Sears Franchise Services Corp.
Sears Home Improvement Services Company (a.k.a., SHIP)
[***]
Sears, Roebuck de Puerto Rico, Inc.
Sears Shop at Home Services, Inc.

C-1

**JX 114-163**

<u>EXHIBIT J</u>

[Superseded by later amendment]

**JX 114-164**



EXHIBIT K

[Superseded by later amendment]

---

**JX 114-165**

EXHIBIT L

[***]

JX 114-166

EXECUTION COPY

## AMENDMENT NO. 1

**AMENDMENT No. 1** (this "Amendment"), dated as of July 26, 2004, to the Program Agreement, dated as of July 15, 2003 and as amended and restated as of November 3, 2003 (the "Program Agreement"), by and among Sears, Roebuck and Co. ("Sears"), Sears Intellectual Property Management and Citibank (USA) N.A. ("Citibank"). All terms used herein but not defined shall have the meaning ascribed thereto in the Program Agreement

**WHEREAS**, the Parties have heretofore executed and entered into the Program Agreement;

**WHEREAS**, pursuant to Section 14.12 of the Program Agreement, the Parties may amend the Program Agreement by a written instrument executed by each of the Parties;

**WHEREAS**, the Parties wish to amend the Program Agreement as follows.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, the Parties hereto agree as follows:

1. [Superseded by later amendment]

2. Except as expressly set forth herein, the Program Agreement shall continue in full force and effect without amendment thereto.

3. This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

4. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

*[SIGNATURE PAGE FOLLOWS]*

**JX 114-167**

IN WITNESS WHEREOF, each Party hereto has caused this Amendment to be duly executed on its behalf as of the day and year first above written.

SEARS, ROEBUCK AND CO.

By: /s/ Glenn Richter
Name: Glenn Richter
Title: Executive Vice President and Chief Financial Officer

SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY

By: /s/ Andrew R. Ginger
Name: Andrew R. Ginger
Title: Vice President

CITIBANK (USA) N.A.

By: /s/ Douglas C. Morrison
Name: Douglas C. Morrison
Title: Vice President Citicards
Chief Financial Officer/O&T
Finance

*[SIGNATURE PAGE TO AMENDMENT NO. 1]*

**JX 114-168**

**EXECUTION VERSION**

**AMENDMENT NO. 2**

AMENDMENT No. 2 (this "Amendment"), effective as of September 1, 2007, to the Program Agreement, originally dated as of July 15, 2003, as amended and restated as of November 3, 2003 and as further amended by Amendment No. 1 on July 26, 2004 (the "Program Agreement"), originally executed by and among Sears, Roebuck and Co. ("Sears"), Sears Intellectual Property Management Company ("Sears IP") and Citibank (South Dakota), N.A., as successor in interest to Citibank (USA) N.A. ("Purchaser") (together the "Parties"). All terms used herein but not defined shall have the meanings ascribed thereto in the Program Agreement or the Term Sheet (as hereinafter defined).

WHEREAS, Sears, Sears DP and Purchaser have heretofore executed and entered into the Program Agreement;

WHEREAS, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by each of the parties thereto;

WHEREAS, the Parties entered into a binding term sheet, dated April 29, 2005 and attached hereto as Annex A (the "Term Sheet"), which reflected their understanding with respect to certain matters covered in the Program Agreement and the Parties have been operating the Program since then under the terms of such Term Sheet;

WHEREAS, the Parties wish to further amend the Program Agreement to reflect the provisions of the Term Sheet relating to Deferred Interest Financing (as defined below) as well as certain other provisions of the Term Sheet.

NOW, THEREFORE, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, the Parties hereto agree as follows:

1. The Parties intend to incorporate the provisions of the Term Sheet relating to Deferred Interest Financing as well as certain other provisions into the Program Agreement as follows, provided that references to "Kmart" cards (or accounts) therein shall be references to Sears Credit Cards issued (or Accounts opened) at Kmart Stores (other than Sears Inside locations) and effective as of September 1, 2007, in the event of a conflict between any provision of this Amendment (excluding Annex A) and any provision of the Term Sheet, the terms of this Amendment (excluding Annex A) shall take precedence and govern over the terms of the Term Sheet.

2. The definitions from Section 2 of the Term Sheet shall be incorporated into Section 1.1 of the Program Agreement and placed in their correct alphabetical order. The following definitions shall be added and placed in their alphabetically correct order:

1

**JX 114-169**

"Deferred Interest Financing" means [***] or (b) if the Cardholder defaults under the Account Agreement.

"Non-Promotional Sales" means all sales on a Sears Credit Card other than Deferred Interest Financing sales.

3.  The title of the defined term [***] in Section 1.1 of the Program Agreement shall be deleted and replaced with the title "Deferred Interest Financing" (and the term [***] in the defined term shall be deleted and replaced with the term "deferred interest") and moved to its alphabetically correct order, and references to [***] in the Program Agreement and the schedules and exhibits attached thereto, shall be replaced with references to "Deferred Interest Financing." For the avoidance of doubt, it is understood and agreed that there shall be no more [***] or similar products offered under the Program. In addition, the second section of Exhibit H of the Program Agreement, titled [***] is hereby deleted in its entirety and re-titled "Deferred Interest Financing Promotions" and replaced as follows:

"Stores offer in-store credit promotions and Deferred Interest Financing to stimulate and complete retail sales. The Stores generally control these retail-related credit offers, with promotional decisions being made on a merchandise category basis. Under the terms of the Deferred Interest Financing promotions, qualifying purchases from Sears Stores financed using a Sears Credit Card [***]. For a Cardholder to be eligible for such minimum payment terms on promotional items such Cardholder is required to make timely payments on all amounts due for non-promotional credit activity; otherwise, the entire Account balance shall be considered delinquent and subject to standard finance charges and fee."

4.  The Program Agreement shall be amended to include a new section at the end of Article III as follows:

"3.7 Program Performance. The [***] and the [***] of Sears shall meet [***] to discuss Program performance."

5.  Section 7.5(a) of the Program Agreement is hereby amended by substituting "Purchaser" with "the parties".

6.  Section 8.9 of the Program Agreement, together with references thereto and defined terms contained therein, are hereby deleted in their entirety.

7.  Sections 1 and 2 of Schedule 7.1 of the Program Agreement are hereby deleted and replaced in their entirety with new Sections 1 and 2 of Schedule 7.1 attached hereto as Annex B.

8.  Exhibit J of the Program Agreement is hereby deleted in its entirety and replaced with a new Exhibit J attached hereto as Annex C.

2

**JX 114-170**

9. Exhibit K of the Program Agreement is hereby amended by deleting the text under the heading "Merchant Discount" and replacing it with the following: "The Merchant Discount shall be [***]."

10. This Amendment may be executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

11. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

[Signature pages follow]

3

**JX 114-171**

      IN WITNESS WHEREOF, each Party hereto has caused this Amendment to be duly executed on its behalf as of the day and year first above written.

SEARS, ROEBUCK AND CO.

By: /s/ Susan Erlich_____
Name: Susan Erlich
Title: Senior Vice President, General Manager

SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY

By: /s/ Mary Tortorice
Name: Mary Tortorice
Title: Vice President, Deputy General Counsel

CITIBANK (SOUTH DAKOTA), N.A., as successor in Interest to CITIBANK (USA) N.A.

By: /s/ Douglas C. Morrison
Name: Douglas C. Morrison
Title: Vice President and Chief Financial Officer

**JX 114-172**



**Annex A**

The Term Sheet

**JX 114-173**

Terms Sheet
For
Revision of Program Agreement
Between
Sears, Roebuck and Co. and Citibank USA, N.A.

This terms sheet (the "Terms Sheet") describing the revisions to be made to the Amended and Restated Program Agreement dated as of July 15, 2003, as amended and restated on November 3, 2003 by and between Sears, Roebuck and Co., Sears Intellectual Property Management Company (hereinafter "Sears"), and Citibank USA, NA. ("Citibank"), and formalizing the terms in the letter dated November 16. 2004 from Glenn Richter of Sears to Steve Freiberg of CitiCards, is made as of April 29, 2005 and will remain in effect, unless earlier terminated, for the duration of the Program Agreement. [***]

1. Definitive Agreement.

Upon execution of this Terms Sheet, the parties agree to promptly draft and enter into an amended and restated Program Agreement which will reflect the terms of this Terms Sheet. The parties agree to negotiate in good faith any additional terms and conditions to be included in the new amended and restated program agreement to reflect any needed changes to the Program Agreement, as revised, to include: (i) Sears Holdings Corporation as a party thereto; (ii) any modifications that the parties mutually agree are required to effect the intent of this Terms Share and (iii) to establish mutually agreed upon Service Goals relating to the matters covered by this Terms Sheet Except for those changes, the parties intend that no Anther changes should be made to the Program Agreement.

2. Definitions.

To the extent that capitalized terms are used, they shall have the same meaning min the Program Agreement. Any reference to a brand includes any successor or replacement brand. The following terms have the meaning ascribed to them below:

Home Category: The Home Category Includes: Home office; home appliances; home electronics; floorcare and sewing; tools/paint; lawn/home improvement/fitness; and mattresses. A Sears Store need not have all of these departments to be considered to have a Home Category, but must have at least one.

Store Formats:

Sears Store: For purposes of this Terms Sheet, a Sears Store shall include a Home Category. A Sears Store shall also include any store format already branded Sears or The Great Indoors, or Orchard Supply Hardware Corporation as of the date of this Terms Sheet, (including but not limited to Sears Grand, Sears Essentials, Sears Hardware, Sears Dealer Store end all Full Line Sears Stores) as well as any future The Great Indoors, Orchard Supply Hardware

**JX 114-174**

Corporation, Sears Full Line Store, Sears Essentials Format Store, Sears Grand, Sears Hardware or Sears Dealer Stores.

Sears Full Line Store: A store that is branded solely as Sears or Sears, Roebuck and Co. on the exterior, carries an assortment of Home Category departments, and is not a Sears Dealer Store or Sears Outlet Store. A listing of the Sears Full Line Stores as of April 30, 2005, shall be made a part of the revised Program Agreement. In addition, in order for any new stores to be classified as a Sears Full Line Store, the store must be substantially similar to the Sears Full Line Stores existing at the time of execution of this Terms Sheet.

Sears Essentials Format Store: A store meeting the definition of a Sears Essentials Format Store will be considered a Sears Store for purposes of Exhibit A of this Terms Sheet. A Sears Essentials Format Store will always have a Home Category, and may also include a pharmacy. Sales in the Home Category will comprise no less than [***] of the total balance of sales (not including sales from pharmacy or gift card redemptions) of the store.

The balance of sales at the Sears Essentials Format Stores will be monitored by measuring the balance of sales figures in the aggregate twice a year for all Sears Essentials Format Stores based on sales (less sales from pharmacy and gift card redemptions) from January 1 through June 30, and then again from July 1 through December 31 (each an Evaluation Period). Only those Sears Essentials Format Stores that have been open at least 12 months from their respective grand opening dates (to allow that store to fully develop its Home Category sales division) will be included in the balance of sales calculation, and no such calculation will take place until there are 20 Sears Essentials Format Stores open at least one year from their grand opening date. Thus, it is possible that some Sears Essential Stores will not be included in the calculation of balance of sales for the full 6 month period because they will not have been open for one year past the grand opening until sometime after January 1 or July 1, or because there are not 20 stores that meet the criteria. They will be included for each calendar month that they meet the above criteria.

Kmart Store: A Kmart store is one that has Kmart, Super K Mart or Big K branded on its exterior. A Kmart store may also have a Sears Inside located within its store.

Sears Inside: A Sears Inside store location is one where the exterior of the store is not primarily branded as Sears, (but could be branded with another Sears Holdings Corporation subsidiary name) and contains either a) a home appliances section offering home appliances such as but not limited to refrigerators or washers and dryers or b) two other Sears Home Category assortments.

Accounts:

A Sears Branded Account is any Account that may be issued pursuant to the terms of the Program Agreement as revised, other than a Kmart Account.

JX 114-175

A Kmart Account is an Account issued pursuant to the Program Agreement that carries the Kmart (or any derivative thereof such as but not limited to Big K or Super K Mart) brand name.

<u>Internal Sales</u>:

An internal sale is one where Merchandise is charged to an Account.

3. Terms Sheet Binding; Assignment.

This Terms Sheet shall be binding upon and inure to the benefit of the parties and their successors and assigns.

4. Governing Law.

The rights and duties of the parties will be governed by the local law of the State of Delaware without regard to principles of choice or conflict of law.

5. Notices.

All notices required or permitted to be given under this Terms Sheet or any amended and restated Program Agreement shall be sufficient if sent by either certified mail, return receipt requested, facsimile or hand delivery to the parties at the respective addresses set forth in the Program Agreement or to such other address as the party receiving the notice has designated by notice to the other party.

6. Entire Agreement.

This Terms Sheet, including all exhibits hereto, constitute the complete, final and exclusive statement of the terms of the Terms Sheet among the parties pertaining to the subject matter hereof and supersede all prior letters of intent, understandings, negotiations and discussions of the parties. No modification or rescission of this Terms Sheet shall be binding unless executed in writing by the party to be bound thereby.

7. Counterparts; Effectiveness.

This Terms Sheet may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same contract.

SIGNATURES FOLLOW ON THE NEXT PAGE

**JX 114-176**

IN WITNESS WHEREOF, Citibank and Sears have caused this Terms Sheet to be executed by persons duly authorized as of the date of first above stated.

Sears, Roebuck and Co.                                    Citibank USA, N.A.


By: /s/Alan J. Lacy_____          By: _____/s/ Douglas C. Morrison_

Name: _____Alan J. Lacy_____          Name: Douglas C. Morrison____

Title: Chief Executive Officer, Sears Holdings      Title: Vice President and Chief Financial Officer_


Sears Intellectual Property Management Company

By: /s/ Andrea Cannon_____

Name: ___Andrea Cannon_____

Title: ____Secretary_____

---

**JX 114-177**

**EXHIBIT A**

[***]

JX 114-178

[***]

JX 114-179

[***]

JX 114-180



Annex B

Schedule 7.1

[Superseded by later amendment]

JX 114-181



Exhibit A to Schedule 7.1

[Superseded by later amendment]

JX 114-182

Exhibit B to Annex A

[Superseded by later amendment]

JX 114-183



Annex C

<u>EXHIBIT J</u>

[Superseded by later amendment]

JX 114-184

# AMENDMENT NO. 3

**AMENDMENT No. 3** (this "<u>Amendment</u>"), effective as of January 1, 2008, to the Program Agreement, originally dated as of July 15, 2003, as amended and restated as of November 3, 2003 and as further amended by Amendment No. 1 and Amendment No. 2 (the "<u>Program Agreement</u>"), originally executed by and among Sears, Roebuck and Co. ("<u>Sears</u>"). Sears Intellectual Property Management Company ("<u>Sears IP</u>") and Citibank (South Dakota), N.A., as successor in interest to Citibank (USA) N.A. ("<u>Purchaser</u>") (together the "<u>Parties</u>"). All terms used herein but not defined shall have the meanings ascribed thereto in the Program Agreement or the Term Sheet (as hereinafter defined).

**WHEREAS**, Sears, Sears IP and Purchaser have heretofore executed and entered into the Program Agreement:

**WHEREAS**, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by each of the parties thereto:

**WHEREAS**, the parties desire to amend the Agreement to incorporate certain provisions therein;

**WHEREAS**, Section 4.5 of that Agreement allowed Additional Products to be offered to Sears Credit Card customers after November 3, 2003 and designated as Financial Products:

**WHEREAS**, the parties desire to, and have begun to, offer such Financial Products; and

**WHEREAS**, the Parties wish to further amend the Program Agreement to include the following supplemental financial products terms and conditions with respect to the Additional Financial Products offered by Purchaser subsequent to November 3, 2003, under the Agreement and the Services related to each such Additional Financial Product that Purchaser shall provide to certain Sears Credit Card customers;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, the Parties hereto agree as follows:

## finitions

All capitalized terms not defined herein have the same meaning as the Agreement.

"Additional Financial Product(s)" means [***] product(s) offered by Purchaser to Sears Credit Card customers pursuant to this Amendment which is not a Credit Card or a New Payment Card.

"Additional Financial Product Exhibit" means each and every Additional Financial Product Exhibit that is approved in writing by Purchaser and by Sears and attached hereto.

**JX 114-185**

"Financial Products Customers" means Sears Credit Cardholders who agree to enroll, or otherwise accept or participate, in Additional Financial Products.

"Marketing Materials" shall have the same meaning as "Solicitation Materials."

"Sears Cardholders" or "Cardholders" shall mean individuals or businesses who are issued, or authorized to use, a Sears Credit Card issued by Purchaser.

"Services" means [***]

### lditional Financial Product Authorization and General Obligations

A. Purchaser is authorized to undertake the Additional Financial Product(s) described in the approved Additional Financial Product Exhibit(s) appended to this Amendment. Each Additional Financial Product shall be governed by the terms of a separate Additional Financial Product Exhibit, the Agreement and this Amendment. Each Additional Financial Product Exhibit is hereby incorporated by reference and made part of this Amendment.

B. Each Additional Financial Product Exhibit shall accurately describe the Additional Financial Product to which it relates. Each Exhibit shall include, as applicable and to the extent not covered in, or different from, the Agreement, [***]. To the extent that there is a conflict between the Agreement and any particular Additional Financial Product Exhibit, the terms of the Additional Financial Product Exhibit shall control. Purchaser shall provide [***], except to the extent that any such changes are required by applicable law or regulation.

C. In undertaking Additional Financial Products pursuant to this Amendment. Purchaser shall comply with the terms set forth in each approved Additional Financial Product Exhibit and. as applicable, with the provisions on (i) the licensing Supplement by and between Sears, Roebuck and Co. Sears Intellectual Property Management Company. Sears Brands, LLC and Citibank (South Dakota), N.A. as successor in interest to Citibank (USA) N.A. dated November 3, 2003; and (ii) the Management Information Systems Standards set forth in Attachment A to this Amendment; each of which is incorporated by reference and made a part of this Amendment.

D. Unless the applicable Additional Financial Product Exhibit states differently, [***]

### 1arketing

A. Purchaser may market each Additional Financial Product as agreed to by the parties, including through [***]. If the parties agree to market [***].

B. In addition, [***].

C. Purchaser shall, by the [***] business day of each calendar month while this Amendment remains in effect. submit to Sears in writing an [***].

2

**JX 114-186**

**dditional Financial Product Membership/Contents of Solicitation Materials**

    A. Unless the parties agree otherwise in writing, all Additional Financial Product memberships will be [***].

    B. All Marketing Materials used to enroll Cardholders [***]:

        [***]

        [***]

        [***]

**rollment Processing**

    A. An enrollment shall be deemed to take place when [***]. Notwithstanding the foregoing, no Cardholder's oral or written agreement to enroll will be deemed to be complete and effective until [***]. Purchaser shall [***] and where allowed by law, shall provide such evidence to Sears upon [***] business days' request.

    B. Charges for Additional Financial Product membership fees [***].

    C. Purchaser shall ensure that [***], unless otherwise required by law or agreed to by Sears: provided, however, that [***]. Purchaser shall ensure that appropriate MIS reports are prepared periodically. in accordance with the requirement set forth in Attachment A to the Amendment to [***].

**Membership Fulfillment Kits**

    A. Where applicable, [***], shall mail membership fulfillment kits by means of at least third class mail to all new Additional Financial Product members within [***] business days of each enrollment. [***]

**Changes in Membership Fees or Benefits for Financial Product Customers**

    [***]

**Billing Financial Product Customers**

    Purchaser shall have [***]

**ccount Managers**

    Each party shall designate an account manager for each Additional Financial Product, who shall be responsible for managerial responsibilities with respect to the Additional Financial Product. The parties may designate such other of its employees to the Additional Financial Product on a full-time or part-time basis as required.

3

JX 114-187

**lditional Financial Product Expenses**

Except as otherwise provided in an Additional Financial Product Exhibit, this Amendment or the Agreement, Purchaser shall be [***].

**1arketing Material Review and Approval**

Purchaser shall [***]

**tention; Satisfaction**

A. Purchaser shall [***]

B. Purchaser shall [***]

**Term; Termination**

This Amendment shall remain in effect as long as the Agreement is in effect.

**Additional Notices**

Any notice or communication required under this Amendment will be effective when received and sufficient if given in writing and delivered by certified mail, registered mail or by an overnight delivery service of general commercial use (such as United States Postal Service, United Parcel Service, Federal Express, or Airborne) addressed as follows:

| | |
|---|---|
| To Purchaser: | Citicorp Credit Services, Inc.<br>One Court Square - 34th Floor<br>Long Island City, New York 11120<br>Attention: Senior Vice President. Franchise Leveraging. Products |
| With a copy to: | Citicorp Credit Services, Inc.<br>One Court Square - 41st Floor<br>Long Island City. New York 11120<br>Attention: Associate General Counsel, Franchise Leveraging Products |
| With a copy to: | Citicorp Credit Services, Inc. (USA)<br>50 Northwest Point Blvd<br>Elk Grove Village. Illinois 60007-1032<br>Attn: Citi-Sears Relationship Manager<br>Fax No. 224-222-4070 |
| To Sears: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |

4

JX 114-188

Attn: SVP and Manager - Financial Products
Fax No. 847-286-6004

With a copy to:                Sears Holdings Corporation
                               3333 Beverly Road
                               Hoffman Estates, Illinois 60179
                               Attn: General Counsel
                               Fax No. 847-286-2471

Or, to such other person or address as any such party may designate by notice duly given to the other party as provided herein. Such notice or communication shall be deemed to have been given upon the date of receipt.

**Entire Amendment; Conflicts; Amendment**

A. This Amendment, together with the Agreement, the attached Additional Financial Product Exhibit(s), and any Attachments, constitutes the entire Agreement between Purchaser and Purchaser with respect to the subject matters addressed herein and supersedes and replaces all previous agreements between the parties and their predecessors with respect to the subject matter hereof.

B. In the event of any conflict between terms set out in this Amendment and an individual Additional Financial Product Exhibit, the provisions of the Additional Financial Product Exhibit shall be controlling.

C. In the event of any conflict between terms set out in this Amendment and the Agreement, the provisions of this Amendment shall be controlling. Except as specifically amended herein, the terms and conditions of the Agreement shall remain in full force and effect.

D. This Amendment is and shall he binding upon and inure to the benefit of both parties and their respective legal representatives, successors, and permitted assigns and may not he changed or modified except in a writing signed by both parties.

E. This Amendment may he executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

F. This Agreement shalt he governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

*[SIGNATURE PAGE FOLLOWS]*

5

**JX 114-189**

IN WITNESS WHEREOF, each Party hereto has caused this Amendment to be dui) executed on its behalf as of the day and year first above written.


SEARS, ROEBUCK AND CO.


By: /s/ Susan P. Erlich
Name: Susan P. Erlich
Title: Senior Vice President


SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY


By: /s/ Mary Tortorice
Name: Mary Tortorice
Title: Vice President, Deputy General Counsel


CITIBANK (SOUTH DAKOTA), N.A., as successor in interest to CITIBANK (USA) N.A.


By: /s/ Douglas C. Morrison
Name: Douglas C. Morrison
Title: Vice President and Chief Financial Officer

---

**JX 114-190**

**ATTACHMENT A**

[***]

---

JX 114-191

<u>**ATTACHMENT B**</u>

<u>**CUSTOMER SERVICE AND PERFORMANCE STANDARDS**</u>

Telephone, Timeliness/Quality Standards (tracked daily and reported monthly):

A Service Level requiring [***] of all customer service calls to be answered within [***] seconds, and a daily [***] seconds will be maintained. The average daily monthly [***] for calls to the customer service telephone lines shall not exceed [***]%.

**JX 114-192**

**AMENDMENT NO. 4**

THIS AMENDMENT No. 4 ("Amendment No. 4"), effective as of October 1, 2011, (the "Amendment No. 4 Effective Date"), to the Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended by the parties from time to time (the "Program Agreement"), is executed this 14th day of October 14, 2011, by and among Sears, Roebuck and Co. ("Sears"), Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) ("Sears Brands") and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), N.A.) ("Purchaser") (individually, a "Party" and together, the "Parties"). All terms used herein but not defined herein shall have the meaning ascribed thereto in the Program Agreement or the Term Sheet (as hereinafter defined).

WHEREAS, Sears, Sears Brands and Purchaser have heretofore executed and entered into the Program Agreement;

WHEREAS, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by each of the Parties thereto;

WHEREAS, the Parties wish to further amend the Program Agreement to reflect changes to the Program to incorporate new card products and other changes:

NOW, THEREFORE, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

**1.** The following defined terms will be added to, or, where applicable, replace definitions in, Section 1.1 in alphabetically correct order:

"Actual Point Cost" means a dollar amount equal to the product of Points awarded in a calendar quarter multiplied by the applicable Point Factor, multiplied by the Actual Redemption Rate.

"Actual Redemption Rate" means the Redemption Rate measured and calculated as of the expiration date of the Points for which the actual Redemption Rate is being determined. In the case where an Actual Redemption Rate is being determined for a period that includes multiple Point Expiration Dates, all of the Points subject to expiration during the period for which the determination is being made shall be included in the calculation.

"Base Redemption Rate" means the average Redemption Rate of Points awarded under the [***] in each calendar quarter. The Base Redemption Rate shall be reset as of the first day of each calendar quarter based on the Redemption Rate of Points that were awarded during the prior [***] months and that have expired during the preceding calendar quarter. The initial Base Redemption Rate is [***].

**JX 114-193**

"Bonus Cardholder" means a SYWR Program member who is also a Sears Credit Card Cardholder, has supplied a valid email address to the SYWR Program, and has not opted-out of receiving promotional emails from the SYWR Program.

"Deferred Interest Financing" means promotional financing pursuant to [***], and the Cardholder otherwise complies with the terms of the promotional offer.

"Duplicate Account" means, with respect to a Sears Credit Card or Account other than a Sears Home Improvement Account, the second or any subsequent Account issued to a Sears Customer under the Program.

"Holiday Period" means the Parties' mutually agreed upon retail calendar sales period that starts on or about [***] and concludes on or [***].

"Incremental Sales Incentive" has the meaning given in Schedule 7.1 hereto.

"Initial Point Cost" means a dollar amount equal to the product of Points awarded in a calendar quarter multiplied by the applicable Point Factor multiplied by the Base Redemption Rate.

"Kmart Net Internal Consumer Credit Sales" means a Net Internal Consumer Credit Sale on a Sears Credit Card or Account at a Store with a Kmart Store Format.

"Lands' End Store" means a Store branded "Lands' End." For purposes of this Amendment No. 4, Lands' End shall be considered a Sears Store Format.

"MyGofer Store" means a Store that consists of an Internet based shopping service branded "mygofer" that allows a consumer to place an Internet order for Merchandise that is fulfilled by a local Kmart Store. For purposes of this Amendment No. 4, MyGofer shall be considered a Kmart Store Format.

"Net External Consumer Credit Sale" means a purchase made using a SYWR MasterCard that qualifies for an award of Points under the SYWR Program as determined by Purchaser.

"Net Internal Consumer Credit Sales" means sales to consumers of Merchandise that qualify for an award of Points under the SYWR Program [***] on a Sears Credit Card or Account other than a HIPs Account or a Commercial One Account.

"Points Factor" means the Point Face Value used to calculate the amount payable by Purchaser for Points awarded hereunder in connection with the use of a Sears Credit Card.

"Points" means points as defined in the SYWR Program terms and conditions in effect from time to time. Points can be expressed as either a multiple of Points per dollar [***] or as a percentage of the purchase amount.

"Point Face Value" means [***]. Points expressed in multiples, [***] have a Point Face Value equivalent to the multiple. [***]

---

JX 114-194

"Redemption Rate" means a percentage obtained by dividing the number of Points awarded in a given period into the number of those Points that have been subsequently redeemed. For purposes of calculating the Redemption Rate, Points shall be deemed to [***].

"Sears Net Internal Consumer Credit Sales" means a Net Internal Consumer Credit Sale at a Store with a Sears Store Format, excluding Orchard Supply Hardware. For purposes of this Amendment No. 4, Lands' End shall be considered a Sears Store Format.

"SYWR Credit Cards" means the SYWR Card and the SYWR MasterCard. The SYWR Credit Cards are Sears Credit Cards. SYWR Cards can, upon the mutual written agreement of the Parties, include any other Sears Credit Card that has been converted via substitution or appropriate annotation on the applicable data processing systems as becoming a SYWR Credit Card.

"SYWR Card" means, as of the SYWR Launch Date, the primary proprietary card issued under the Program for the purchases of Merchandise issued to Sears Customers, as further described on Exhibit A-1. The SYWR Card is a Sears Proprietary Card.

"SYWR Launch Date" means the mutually agreed upon date as of which the primary credit cards offered by Purchaser under the Program are the SYWR Card and the SYWR MasterCard.

"SYWR MasterCard" means, as of the SYWR Launch Date, the primary General Purpose Credit Card, as further described on Exhibit A-1. The SYWR MasterCard is a Sears Co-Branded Card.

"SYWR Program" means the Shop Your Way Rewards Program offered, serviced, administered and maintained by Sears, as further described on Exhibit G-1.

"Store Format" means any of the store formats described in the Terms Sheet attached as Annex A to Amendment No. 2 to the Program Agreement.

**2.** Section 2.1 of the Agreement is hereby renumbered subsection 2.1(a), and a new subsection 2.1(b) is added to read as follows:

2.1(b) <u>SYWR Credit Cards</u>. As of the SYWR Launch Date:

(i) Purchaser shall offer, issue and service, and Sears shall accept, and cause its Affiliates and Third Party Sears Merchants, and use it reasonable best efforts to cause the Third Party Non-Sears Merchants to accept, as payment for Merchandise the SYWR Card and SYWR MasterCard in compliance with the purchase authorization and other operating procedures set forth in the Merchant Agreement;

(ii) [***]

(iii) [***]

**3.** A new Subsection 2.1(c) is hereby added to read as follows:

JX 114-195

2.1(c) Duplicate Accounts. From and after the Amendment No. 4 Effective Date, Purchaser may decline any application for a Sears Credit Card the approval of which would result in the applicant having a Duplicate Account.

**4.** Subsection 5.6(b) is hereby deleted in its entirety and replaced with the following:

5.6(b)(i) Purchaser shall [***]

5.6(b)(ii) Notwithstanding Subsection 5.6(b)(i) above, Purchaser may at its sole discretion [***].

5.6(b)(iii) Purchaser shall have a [***] structure specifically designed to support the Program, and Purchaser shall provide [***] in each case as Purchaser deems reasonably necessary. Purchaser shall maintain adequate computer and communications systems and other equipment and facilities necessary or appropriate for servicing the Accounts and Financial Products accounts in accordance therewith. [***]

**5.** A new Subsection 5.8 is hereby added to read as follows:

5.8 SYWR Program. From and after the Amendment No. 4 Effective Date, Sears and Purchaser shall provide the SYWR Program for Sears Credit Card Cardholders and, as of the SYWR Launch Date, as the sole Customer Value Proposition for SYWR Credit Cards, in each case as set forth below:

(a) Operation of [***] Program. (i) Sears shall control and be responsible in all respects for the operation and administration of the SYWR Program, including, but not limited to, [***]. Sears hereby represents and warrants that it has full right and authority, including but not limited to intellectual property rights, to offer the SYWR Program and make it available to Purchaser and Sears Credit Card Cardholders as contemplated hereunder.

(ii) (A) Sears may amend or modify the SYWR Program at any time at its discretion; [***].

(B) In the event Sears makes a change to the SYWR Program described in Subsections 5.8(a)(ii)(A)-(D) [***] after the effective date of such change [***] in accordance with the provisions of this Section 5.8 or [***] for the [***] period immediately preceding the effective date of such change.

(iii) Sears shall operate the SYWR Program in compliance with applicable Law, including with respect to the offering, marketing, advertising and fulfillment of the program, and applicable accounting principles, including but not limited to Generally Accepted Accounting Principles. [***].

(iv) Purchaser acknowledges that Sears provides the SYWR Program to its Customers without regard to the means used to pay for purchases. Unless the Parties mutually agree otherwise, [***] Sears agrees that [***].

**JX 114-196**

(b) <u>Customer Value Proposition</u>. SYWR Credit Card Cardholders shall be [***].

[***]

(d) <u>2011 Holiday Period</u>. [***]

(e) <u>Store Format; Changes</u>. The Store Format at the time of a sale shall dictate the Points earned in connection with the sale, and Sears shall award Points consistent therewith. In the event that Sears changes a Store Format: (i) Points will be awarded to Sears Credit Card Cardholders consistent with the changed Store Format; and (ii) Purchaser shall pay [***] as of the Amendment No. 4 Effective Date.

(f) <u>Existing Customer Value Propositions</u>. Notwithstanding the availability of the SYWR Program, Sears and Purchaser agree to continue to provide the Customer Value Propositions in existence on the Amendment No. 4 Effective Date, as reflected on Exhibit G hereof, to those Cardholders who are otherwise eligible and enrolled in the respective programs, on a basis consistent with the manner in which those value propositions were offered [***], including but not limited to terms and conditions [***].

(g) <u>Information Reporting; Audit</u>. Sears shall provide Purchaser the information regarding the operation of the SYWR Program and Points awarded to Sears Credit Card Cardholders as set forth in Schedule 5.8(g) attached hereto. From time to time during the Term, [***].

(h) <u>Points Factor Adjustment</u>. The reports attached hereto as Schedule 5.8(h) provides certain information regarding the performance of the SYWR Program prior to the Amendment No. 4 Effective Date, including but not limited to the Redemption Rate. Purchaser may, at its discretion, [***].

(i) <u>Additional Points</u>. Sears shall make available [***].

(j) <u>Cardholder Requested Migration</u>. Sears and Purchaser shall [***].

(k) <u>External Sales Reports</u>. Purchaser shall [***].

**6.** Section 1(a) of Schedule 7.1 of the Program Agreement, as contained in Annex B to Amendment No. 2, is hereby deleted and replaced in its entirety with new Section 1(a) of Schedule 7.1 attached hereto as Annex A. For the avoidance of doubt, the Parties have agreed that, except as set forth in Section 1(a) of Schedule 7.1, as amended by this Amendment No. 4, [***]. Accordingly, Sections 1 and 3 of Exhibit A to the Terms Sheet, and Section 1(b) of Schedule 7.1 are hereby deleted in their entirety as of the Amendment No. 4 Effective Date.

**7.** A new Section 3 is hereby added to Schedule 7.1 of the Program Agreement, to read as follows:

3. <u>Shop Your Way Rewards Support</u>. [***]

**JX 114-197**

**8.** A new Section 4 is hereby added to Schedule 7.1 of the Program Agreement, to read as follows:

4. <u>Incremental Sales Incentive</u>. [***].

**9.** Each of Sears and Purchaser agree that upon the full and complete execution of this Amendment No. 4, [***] the Program Agreement shall continue into its first renewal term, [***]; <u>provided</u>, <u>however</u>, that nothing in this Amendment No. 4 shall, nor shall it be deemed to, affect either Party's right to terminate the Program Agreement under any provision hereof, other than termination at the Initial Expiration Date upon [***] advance notice as contemplated by Section 13.1 hereof.

This Amendment may be executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

IN WITNESS WHEREOF, each Party hereto has caused this Amendment to be duly executed on its behalf as of the day and year first above written.

<div align="center">

**SIGNATURE PAGE FOLLOWS.**

</div>

<div align="right">

**JX 114-198**

</div>

SEARS, ROEBUCK AND CO.


By: /s/ Jai Holtz
Name: Jai Holtz
Title: Vice President


SEARS BRANDS BUSINESS UNIT CORPORATION, as successor in interests to SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY


By: /s/ Charles Hansen
Name: Charles Hansen
Title: Vice President


CITIBANK, N.A., as successor in interest to CITIBANK (SOUTH DAKOTA), N.A., as successor in interest to CITIBANK (USA) N.A.


By: /s/ Douglas C. Morrison
Name: Douglas C. Morrison
Title: Vice President

---

**JX 114-199**

**Annex A**

**Schedule 7.1 - Section 1(a)**

[Superseded by later amendment]

**JX 114-200**

**Exhibit A-1**

[***]

**JX 114-201**

**Exhibit G-1**

**Terms and Conditions of the *Shop Your Way Reward<sup>SM</sup>* Program**
**Effective Date June 1, 2011**

These Terms and Conditions ("Terms") apply to the Shop Your Way Rewards Program ("Program") offered by Sears Holdings Management Corporation ("SHMC") to Shop Your Way Rewards members in good standing ("Member" or "you"). Please read these Terms carefully, as they govern all aspects of the Program. Please visit shopyourwayrewards.com for the most current Terms. Upon completion of an application for membership to the Program, you will be issued a Rewards Card and/or Member Number ("Card") for use when making Program-eligible purchases.

<u>Purchases:</u> Program-eligible purchases shall include all qualifying purchases made by you on products and services at Sears, Sears Grand, Sears Essentials, Sears Hometown, Sears Home Appliances Showrooms, Sears Hardware, Sears Outlet, Sears Auto Centers, Sears Home Services, Kmart, Lands' End, food concessions within Sears and Kmart locations, Lands' End online and catalog orders, the great indoors and mygofer stores located in the United States and Puerto Rico and participating SHMC-branded Web sites ("Qualifying Purchases"). Program-eligible purchases shall also include qualifying prescriptions filled by you at Kmart pharmacies regardless of co-pays and insurance coverage ("Qualifying Prescriptions"). Qualifying Prescriptions shall exclude prescriptions paid for in whole or in part by state and/or federal healthcare programs and prescriptions purchased in AL, AR, NJ, MA and NY and controlled substances prescriptions in LA. Program not available in stores located in Guam and United States Virgin Islands. Payments toward layaway purchases shall not count as Qualifying Purchases until after you have made your final layaway payment. Qualifying Purchases shall specifically exclude all sales taxes, all service fees, all donations to charitable organizations, all commercial account purchases, and all purchases made by you of lottery tickets; licenses; tobacco; alcohol; firearms; gift cards; postage; bill payments; credit card payments; gasoline; Western Union services; prior layaway purchases; purchases for which points were redeemed; ServiceLive; Sears and Kmart licensed businesses, including but not limited to Optical, Portrait, Hearing, and Tax Services; charges for shipping or delivery; sears.com purchases that are not completed through the sears.com cart; and Sears or Kmart auctions on eBay, which are all considered non-qualifying purchases under the Program and for the purpose of your Program participation ("Non-Qualifying Purchases").

<u>Points:</u> Present your Card when making a Qualifying Purchase and you will earn one base point for every ten (10) cents you spend on a Qualifying Purchase and one (1) additional base point for each Qualifying Purchase that includes an additional amount that is more than four (4) cents and less than ten (10) cents. For example, a Qualifying Purchase of $10.75 will earn 108 base points. Similarly, a Qualifying Purchase of $20.22 will earn 202 base points. Present your Card when filling a Qualifying Prescription, and you will earn 500 base points for each Qualifying Prescription you fill. You may also earn additional points, such as bonus points, on certain Qualifying Purchases in accordance with the terms of SHMC's published policies and/or other

**JX 114-202**

published SHMC offers. You may also earn additional points on non-purchase activities in accordance with the terms published by SHMC, provided however, that residents of Canada and Mexico will be excluded from earning points on such non-purchase activities. You may also earn additional points on certain purchases from eligible third parties in accordance with the terms published by SHMC. Points will be issued to you in your Member Account within approximately thirty (30) days of your Qualifying Purchase and made available for your review on shopyourwayrewards.com ("Issuance"). Points for Qualifying Prescriptions may be issued on a quarterly basis. The timing for issuing points is subject to change. Points will accrue and be stored in your Member Account for each Qualifying Purchase or Qualifying Prescription on which you have earned points and will be available for your use in making additional Qualifying Purchases after Issuance. Points cannot be redeemed for purchases from Sears Home Services nor Prescriptions. For all returns associated with a Qualifying Purchase (whether such return is made by you or a gift recipient or similar third party) or Qualifying Prescription filled by you (whether such return is made0 by you or a third party), SHMC will deduct the points earned from the Qualifying Purchase or Qualifying Prescription from your Member Account. If your Member Account balance is less than the value of the points earned, SHMC shall reserve the right to deduct the value of the points from any refund amount. ALL POINTS EXPIRE AT THE END OF THE CALENDAR QUARTER FOLLOWING THE TWELVE (12) MONTH ANNIVERSARY OF THE DATE THE POINTS WERE EARNED BY THE MEMBER. Calendar quarter end dates are December 31, March 31, June 30, and September 30. For example, points earned on November 1, 2010 will expire on December 31, 2011, POINTS SHALL NOT BE EARNED ON QUALIFYING PURCHASES MADE OR QUALIFYING PRESCRIPTIONS FILLED PRIOR TO THE MEMBER'S ENROLLMENT DATE OR PRIOR TO THE START DATE OF ANY POINTS BONUS OFFER PROMOTIONS ASSOCIATED WITH THE PROGRAM. From time to time, SHMC may offer you the chance to win various prizes, including points. There is NO PURCHASE NECESSARY TO PLAY OR TO WIN. Rules and restrictions will apply to such promotions.

**Enrollment:** There is no annual membership fee. Membership in the Program is open to customers 13 years of age and older who are (a) residents of the United States of America and/or Puerto Rico; or (b) after July 31, 2011, residents of Canada and/or Mexico, provided that such individuals may earn and redeem Points only for purchase transactions completed entirely in the United States of America and/or Puerto Rico. **To enroll in the Program, you must provide your first name, last name, ZIP code, valid unique email address or mobile telephone number and agree to receive promotional email messages or text messages from the Program.** To be eligible to earn bonus points in addition to the base points described in the Points section above, you must maintain a valid email address in your account and remain opted-in to receiving promotional emails from the Program ("Bonus Members"). Members with a valid email address in their account who opt out of receiving promotional emails from the Program will receive only base points for Qualifying Purchases and Qualifying Prescriptions ("Base Members"). SHMC reserves the right to request proof of identification and age to verify customer's eligibility for the Program membership participation and Members' compliance with the Program's Terms.

JX 114-203

**<u>Overall Program Terms</u>:** The Program is void where prohibited by law. Participation in the Program is subject to any terms and conditions, rules, policies and procedures that SHMC may, at its sole discretion, establish or change at any time without notice. SHMC also reserves the right to make changes to the Program's earning rates, points, structure, in whole or in part, at any time, such as raising or lowering point levels, revising the procedures and rules for earning or redeeming points or limiting the period for which accrued points are valid. Any changes can be made without advance notice. SHMC may make these changes even though such changes may affect the Member's ability to use points already accumulated. You are responsible for remaining knowledgeable about the Program Terms and Conditions. Members are entitled to only one Member Account. If Member surrenders or loses their Member Card, Member may be issued a new Member Card and issued points (including negative balances) will be transferred to the new Member Card. The Card remains the property of SHMC and must be surrendered upon request. No credit or cash will be given for unused points. Program account numbers are not transferable and are not for sale, resale or barter. SHMC is not responsible for lost or stolen cards or any resulting misuse. Points awarded to Members may be taxable. All taxes arc the sole responsibility of the Member who is awarded the points. All transactions involving the use of points are subject to review and verification by SHMC. SHMC reserves the right, at its sole discretion, to adjust account status due to computer error, machine malfunction, employee, customer or other error, fraud or other misuse of the Program. All points are for one-time use and are final, unless otherwise determined by SHMC, in its sole discretion. SHMC reserves the right to terminate points, or any portion thereof, at any time, without prior written or electronic notice. Regardless of how much you participate in the Program, benefits can be terminated at any time at the sole discretion of SHMC. Your right to transfer points earned or granted under the Program is strictly limited. The sale of points is prohibited and may result in the confiscation or cancellation of your points as well as suspension or termination of your membership. The interpretation and application of the Program's Terms and Conditions are at the sole discretion and determination of SHMC, which in each case shall be final and conclusive. SHMC assumes no responsibility for errors caused by incorrect Member information. If you wish to discontinue your participation in the Program, you may cancel at any time by contacting: Shop Your Way Rewards Customer Relations at P.O. Box 365, Dodgeville, WI 53533 or by calling 800.991.8708 during business hours. Important Notice Concerning Credit Card / Financing Offers: THE INFORMATION YOU HAVE GIVEN SHMC FOR THE PROGRAM MAY BE USED TO MAKE PREAPPROVED CREDIT OFFERS TO YOU. The laws of the state of Illinois shall apply to the Program, without regard to any conflict-of-law rules. Any legal action relating to the Program must be filed in state or federal courts located in Cook County, Illinois. SHMC and its affiliates, employees and individuals eligible for an Associate discount are eligible to participate in the Program; see <u>88sears.com</u> for Associate enrollment and participation guidelines.

*These Terms and Conditions ("Terms") apply to the Shop Your Way Rewards Program ("Program") offered by Sears Holdings Management Corporation ("SHMC") to Shop Your Way Rewards members in good standing ("Member" or "you"). Please read these Terms carefully, as they govern all aspects of the Program. Please visit <u>www.shopyourwayrewards.com</u> for the most current Terms.

---

**JX 114-204**

**Schedule 5.8(a)(v)**

[***]

JX 114-205

**Schedule 5.8(d)**

[***]

---

JX 114-206

**Schedule 5.8(g)**

[***]

JX 114-207

**Kmart Monthly Point Summary Report**

[***]

JX 114-208

# AMENDMENT NO. 5

**THIS AMENDMENT No. 5** ("<u>Amendment No. 5</u>"), effective as of October 1, 2015, to the Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended by the parties from time to time (the "<u>Program Agreement</u>"), is executed this 21st day of January, 2016, by and among Sears, Roebuck and Co. ("<u>Sears</u>"), Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) ("<u>Sears Brands</u>") and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), N.A.) ("<u>Purchaser</u>") (individually, a "<u>Party</u>" and together, the "<u>Parties</u>"). All terms used herein but not defined herein shall have the meaning ascribed thereto in the Program Agreement.

**WHEREAS**, Sears, Sears Brands and Purchaser have heretofore executed and entered into the Program Agreement;

**WHEREAS**, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by each of the Parties thereto;

**WHEREAS**, the Parties wish to further amend the Program Agreement to reflect certain changes to the Program:

**NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

1. The following defined terms will be added to, or, where applicable, replace definitions in, Section 1.1 in alphabetically correct order:

"<u>Actual Redemption Rate</u>" means the Redemption Rate measured and calculated as of the expiration date of the SYW Points for which the actual Redemption Rate is being determined. In the case where an Actual Redemption Rate is being determined for a period that includes multiple SYW Point expiration dates, all of the SYW Points subject to expiration during the period for which the determination is being made shall be included in the calculation.

"<u>Expiring Rewards Programs</u>" means the following loyalty or rewards programs: (i) Sears Choice Rewards; (ii) Sears Cash Rewards; and (iii) The Great Indoors Rewards program.

"<u>Loyalty Fund</u>" has the meaning set forth in <u>Section 5.10(a)</u>.

"<u>Loyalty Fund Plan</u>" has the meaning set forth in <u>Section 5.10(b)</u>.

"<u>Non-Rewards Card</u>" means any Sears Credit Card not enrolled in a rewards program. For the avoidance of doubt, a Sears Credit Card that (i) is enrolled in the SYW Program, but (ii) is not a SYW Credit Card, shall not be deemed to be enrolled in a rewards program for purposes of this Agreement.

"<u>SHO</u>" means Sears Hometown and Outlet Stores, Inc.

**JX 114-209**

"<u>SYW Credit Cards</u>" means the SYW Card and the SYW MasterCard. The SYW Credit Cards are Sears Credit Cards. A Sears Credit Card will become an SWY Credit Card after such Sears Credit Card is linked to the SYW Program pursuant to the procedures set forth in the Account Application. SYW Credit Cards can, upon the mutual written agreement of Sears and Purchaser, include any other Sears Credit Card that has been converted via substitution or appropriate annotation on the applicable data processing systems as becoming a SYW Credit Card.

"<u>Thank You Rewards Launch Date</u>" means [***] or such other date as Sears and Purchaser may mutually agree in writing.

"<u>Thank You Rewards Program</u>" has the meaning set forth in <u>Section 7.9(a)</u>.

2. Each of the following defined terms shall be amended as follows:

(a) All references to the acronym "SYWR" in the Program Agreement shall be amended and replaced with the acronym "SYW".

(b) The following defined terms shall be amended to add the acronym "SYW" before the word "Point" or "Points" (as applicable), and all references to such terms in the Program Agreement shall be deemed to include "SYW" before the word "Point" or "Points" (as applicable): (i) Actual Point Cost; (ii) Initial Point Cost; (iii) Points Factor; (iv) Points; and (v) Point Face Value.

3. The introductory paragraph of Section 5.8 of the Program Agreement is hereby amended by deleting the words [***], and, subsequent to giving effect to the other amendments to Section 5.8 of the Program Agreement contemplated by this Amendment No. 5, renumbering the remaining subsections accordingly:

4. Section 5.8(b) of the Program Agreement is hereby amended by: (1) deleting the first sentence of the introductory paragraph and replacing it with the following: "SYW Credit Card Cardholders that are enrolled in the SYW Program shall be awarded SYW Points in accordance with the SYW Program and this <u>Section 5.8</u>."; and (2) subject to <u>Section 5.10(f)</u>, (a) deleting clauses (i) and (ii) in their entirety; (b) deleting clause (iii) and replacing it with a new clause (i) as set forth below; and (c) renumbering clauses (iv) and (v) to be clauses (ii) and (iii):

(i) SYW MasterCard

| External Sales |
| --- |
|  |
| [***] |

5. Sections 5.8(c), (d) and (e) of the Program Agreement are hereby deleted in their entirety and replaced, in each case, with: "[INTENTIONALLY OMITTED]".

2

**JX 114-210**

6. Section 5.8(h) of the Program Agreement are hereby deleted in its entirety and replaced with the following:

"5.8(h) <u>Actual Redemption Rate Adjustment</u>. Sears shall provide [***] <u>Schedule 5.8(h) attached to Amendment No. 4 to the Program Agreement</u>. The reports attached as <u>Schedule 5.8(h)</u> provide certain information regarding the performance of the SYW Program prior to the Amendment No. 4 Effective Date, including but not limited to the Redemption Rate. Such reports may be amended and/or supplemented by the Parties from time-to-time by mutual agreement."

7. Section 5.8(j) of the Program Agreement is hereby deleted in its entirety and replaced with the following:

"5.8(j) <u>Migration</u>. Sears agrees that it shall not, [***]

8. A new Section 5.9 is hereby added to read as follows:

"5.9 <u>Termination of Expiring Rewards Programs</u>. Beginning as of the Thank You Rewards Launch Date, Purchaser shall commence terminating the Expiring Rewards Programs."

9. A new Section 5.10 (and corresponding Schedules 5.10 and 5.10(f)) is hereby added to read as follows:

"5.10 <u>Loyalty Fund</u>.

(a) In addition to any commitments to contribute funds to the Marketing Budget referred to in <u>Section 4.2(d)</u>, during the period beginning on [***], and in [***] during the Term, Sears and Purchaser shall make available [***] on <u>Schedule 5.10</u> to [***], to be used in accordance with, and as authorized by, this <u>Section 5.10</u>; <u>provided</u>, <u>however</u>, that the availability requirement for the final calendar year of the Term shall [***] The parties agree [***] in which such amounts were made available and that the Loyalty Fund is intended to be used in its entirety each year. In the event that the loyalty initiatives and campaigns in a calendar year do not utilize the full amount of the available Loyalty Fund for such year, then (i) [***]

(b) Prior to each calendar year during the Term, Purchaser and Sears shall jointly develop a Loyalty Fund plan providing for the use of the Loyalty Fund to create loyalty initiatives and campaigns for the Program for such upcoming calendar year (a "<u>Loyalty Fund Plan</u>"). The Loyalty Fund Plan for each calendar year shall be approved by the Program Committee prior to the start of such calendar year.

(c) [***] The Program Committee shall assess the success of the Loyalty Fund Plan on a [***] and shall agree to such changes to the Loyalty Fund Plan throughout the remainder of the Term that the Program Committee determines may be necessary or desirable. [***]

3

**JX 114-211**

(d) All costs and expenses associated with the implementation of any initiative or campaign pursuant to the Loyalty Fund Plan shall, unless otherwise specified in the Loyalty Fund Plan, be paid out of the Loyalty Fund (which, unless otherwise specified in the Loyalty Fund Plan, [***]).

(e) Purchaser shall include SYW Program enrollment language (which will include SYW CardLink language) on Sears Co-Branded Cardholder applications for the remainder of the Term, unless (i) [***], (ii) due to changes in Law (as determined by Purchaser), the SYW Program enrollment language may not be part of the Sears Co-Branded Cardholder application, or (iii) otherwise mutually agreed by the parties; provided that, Purchaser shall, prior to removing the SYW Program enrollment language pursuant to clause (ii), provide notice to Sears, and, upon Sears' request review such change with Sears..

(f) Sears shall provide Purchaser the information regarding the Loyalty Fund and SYW Points awarded to Sears Credit Card Cardholders as set forth on Schedule 5.10(f). The reports attached hereto as Schedule 5.10(f) provide certain information regarding the performance of the Loyalty Fund, including but not limited to the Redemption Rate. Such reports may be amended and/or supplemented by the parties from time-to-time by mutual agreement.

(g) Notwithstanding the foregoing, the parties hereby agree that, upon not less than one hundred and fifty (150) days' prior written notice from Sears to Purchaser, Sears may terminate the Loyalty Fund, in which case, (i) clauses (a) through (f) of this Section 5.10 (and all obligations of the parties included therein) shall automatically terminate as of the termination of the Loyalty Fund, and (ii) the effect of the amendment to Section 5.8(b) set forth in clause (2) of item 4 of Amendment No. 5 to the Program Agreement shall be void as of a date to be mutually agreed by the parties; provided that [***]

10. A new Section 5.11 is hereby added to read as follows:

"5.11 Audits. Purchaser may, at its discretion, utilize a Third Party Auditor to conduct an audit of Sears' books and records regarding the SYW Program to determine the accuracy of the information contained in Schedule 5.10(f). Sears shall make such books and records as are reasonably necessary to conduct the audit available to the Third Party Auditor, at a time and under such conditions as may be reasonably agreed upon by Sears and Purchaser. In the event that the audit determines that the information reflected in the Schedule 5.10(f) report [***]

11. A new Section 7.9 is hereby added to read as follows:

"7.9 Thank You Rewards.

(a) Following the Thank You Rewards Launch Date, Purchaser may [***] (the "Thank You Rewards Program"). In addition, following the termination of an Existing Rewards Program in accordance with Section 5.9, Purchaser [***]

(b) At the time Sears Co-Branded Cardholders become eligible for the Thank You Rewards Program in accordance with Section 5.9, Purchaser shall [***] The cost of each

4

JX 114-212

such SYW Point is [***] until [***]. The parties will review and adjust the SYW Point cost as mutually agreed on an [***] no later than the [***] Program Committee meeting of the new year.

 (c) [***]

 (d) [***]

 12. Subsection 14.22(b) is hereby deleted in its entirety and replaced with the following:

 (b) If to the Purchaser:

Citibank, N.A.

  701 E. 60th North
  Sioux Falls, South Dakota 57105
  Attn: Douglas C. Morrison
  Fax No.: (605) 330-6745

  with a copy to:

  Citicorp Credit Services, Inc. (USA)
  50 Northwest Point Blvd.
  Elk Grove Village, IL 60007
  Attn: General Manager
  Fax No.: (224) 222-4029

  with a copy to:

  Citi Cards
  1 Court Square
  Long Island City, NY 11101
  Attn: Anne Robinson
 General Counsel - Global Cards
Fax No.: 718-248-1334

with a copy to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Attention: Scott Petepiece, Esq.
Fax No.: (646) 848-8576

 13. Section 6 of Schedule 7.1 of the Program Agreement is hereby deleted in its entirety and replaced with the following:

<div align="center">5</div>

JX 114-213

[***], on a [***] basis, the following amounts: (i) beginning January 1, 2014, [***] (as previously agreed in that certain letter agreement, dated [***], between Purchaser, Sears and Sears Brands), plus (ii) beginning on the Thank You Rewards Launch Date, [***]; provided that, in each case, [***] Further, [***]; provided, further, that, in the event that Section 5.8(b)(i) of the Program Agreement is amended, or Purchaser's obligations thereunder cease (or are terminated), clause (ii) of this Section 6 of Schedule 7.1 shall terminate automatically, without any further action by any party."

14. Exhibit G of the Agreement is hereby amended by adding the following section:

[***]

This Amendment may be executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

This Amendment shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

*[SIGNATURE PAGE FOLLOWS]*

6

JX 114-214

IN WITNESS WHEREOF, each Party hereto has caused this Amendment to be duly executed on its behalf as of the day and year first above written.

SEARS, ROEBUCK AND CO.

By:                                          /s/ Jai Holtz
                                             Name: Jai Holtz
                                             Title: President Financial Services

SEARS BRANDS BUSINESS UNIT CORPORATION, as successor in interest to SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY

By:                                          /s/ Timothy S. Hickey
                                             Name: Timothy Hickey
                                             Title: Vice President

CITIBANK, N.A., as successor in interest to CITIBANK (SOUTH DAKOTA), N.A., as successor in interest to CITIBANK (USA) N.A.

By:                                          /s/ Douglas C. Morrison
                                             Name: Douglas C. Morrison
                                             Title: Vice President

[Signature Page to Amendment No. 5]

**JX 114-215**

**SCHEDULE 5.10**
**LOYALTY FUND**

[***]

**II.**    **Changes to Funding:**

[***]

1)    Store Closures

a.            [***]

b.            [***]

2)    Sales

a.            [***]

b.            [***]

c.            [***]

d.            [***]

[Sch-5.10]

**JX 114-216**

**SCHEDULE 5.10(f)**
[***]


[***]




[Sch-5.10(f)]

JX 114-217

[***]

[Sch-5.10(f)]

JX 114-218

[***]

[Sch-5.10(f)]

JX 114-219

[***]

[Sch-5.10(f)]

JX 114-220

[***]

[Sch-5.10(f)]

JX 114-221



[***]

[Sch-5.10(f)]

JX 114-222



[***]

[Sch-5.10(f)]

JX 114-223

**AMENDMENT NO. 6**

**THIS AMENDMENT No. 6** (this "Amendment No. 6"), effective as of October 11, 2016 (the "Effective Date"), to the Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended by the parties from time to time (the "Program Agreement"), is executed this 11th day of October, 2016, by and among Sears, Roebuck and Co. ("Sears"), Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) ("Sears Brands") and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), (N.A.) ("Purchaser") (individually, a "Party" and together, the "Parties"). All terms used herein but not defined herein shall have the meaning ascribed thereto in the Program Agreement.

**WHEREAS**, Sears, Sears Brands and Purchaser have heretofore executed and entered into the Program Agreement;

**WHEREAS**, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by each of the Parties thereto;

**WHEREAS**, the Parties wish to further amend the Program Agreement to reflect certain changes to the Program:

**NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

**1. New Customer Value Proposition**. The Parties agree to offer a new, enhanced Shop Your Way Program to SYW MasterCard Cardholders (the "SYW Plus Program"), the terms of which are set forth below. The Program Agreement is hereby amended, effective as of the Effective Date (unless otherwise specified herein), as follows:

a. SYW Plus Program. The SYW Plus Program, which is further described on Exhibit G-2 attached hereto, will be offered to SYW MasterCard Cardholders in accordance with the terms set forth herein. [***] Section 5.8 of the Program Agreement; however, [***] described in such Exhibit G-2.

b. SYW Points. [***] as provided in Section 5.8 of the Program Agreement with respect to [***]; provided, however, that [***] 5.10 of the Program Agreement; provided, further, that [***] (Full Line Stores Sears Grand, Sears Dealer Store (Sears Hometown Stores, Sears Home Appliance Showrooms, and Sears Hardware), Kmart, mygofer and Lands' End merchandise within Sears stores as described on Exhibit G-2 attached hereto. For the avoidance of doubt, (x) [***] to the requirements of Section 5.10(d) of the Program Agreement; provided, however, that at the August 2017 Program Committee meeting, the Parties will discuss whether, [***] as required under Section 5.10 of the Program Agreement.

**JX 114-224**

c. <u>Reporting Requirements</u>. The reporting requirements for the SYW Plus Program will be the same as for the SYW Program required under Section 5.8 of the Program Agreement. [***] In addition, Sears agrees to provide reporting and other information necessary, in a format agreed to by the Parties that demonstrates that the SYW Points earned by Cardholders are being awarded by Sears as contemplated by the terms of the Program Agreement as amended hereby, which reports will be reviewed at each Program Committee Meeting.

d. <u>Eligible Participants; Term</u>.

i. Eligible SYW MasterCard Cardholders existing as of [***] will be enrolled automatically [***] in the SYW Plus Program beginning on [***] through [***]. The parties shall cooperate to send to SYW MasterCard Cardholders [***] an initial direct mail piece describing the SYW Plus Program [***] through [***]; provided, however, that based on the performance of the SYW Plus Program, Purchaser may, [***] to [***], to avoid mailing Account Agreement materials during the Holiday Period. The direct mail piece will be mailed [***].

ii. Eligible SYW MasterCard Accounts opened after [***] through the date new SYW MasterCard Accounts are [***] enrolled in the SYW Plus Program as described in paragraph (d)(iii) below will be enrolled [***] in the SYW Plus Program by [***]. The parties will cooperate to send to SYW MasterCard Cardholders [***] a direct mail piece describing the SYW Plus Program and that it will be available [***] through [***] (or, if enrollment occurs prior to [***], such earlier date such that the [***]. The direct mail piece will be mailed [***].

iii. Purchaser will use commercially reasonable efforts to [***] enroll [***] eligible SYW MasterCard Accounts opened from [***] through [***] in the SYW Plus Program for a [***]; provided, however, that such [***] enrollment shall commence no later than [***]. SYW MasterCard Accounts opened after [***].

iv. The Parties agree to discuss in good faith the feasibility of accelerating the [***] enrollment date in clause (iii) above and, consequently, the corresponding dates in clause (ii) above.

e. <u>New Account Applications</u>. Purchaser shall develop and make accessible a new Account Application for the SYW MasterCard in January 2017, which will describe the SYW Plus Program [***].

f. <u>New Card Plastic</u>. [***], provided the design for the new card is mutually agreed in writing by the Parties no later than [***] (the date such new card is available, the "<u>New Card Launch Date</u>"). The new card plastic will contain prominent "Shop Your Way" branding; however, the new SYW MasterCard will still be identified as the Sears

2

**JX 114-225**

MasterCard on the card. The new card plastic will be sent to new SYW MasterCard Accounts opened on or after the New Card Launch Date. The new card plastic will be sent to eligible SYW MasterCard Cardholders existing as of [***] and any other eligible Cardholders enrolled in the SYW Plus Program pursuant to paragraph 1(d) above prior to the New Card Launch Date [***].

    g. New Card Product.

    i. Purchaser will develop and, subject to the completion of the modifications contemplated by paragraph (h)(ii) below, offer a new SYW MasterCard card product (the "SYW Plus MasterCard"), which would offer the SYW Plus Program as a card feature, plus other card benefits as determined by Purchaser. Any SYW Plus MasterCard would (A) be developed and available by February, 2018, (B) have, [***] and (C) include a new card plastic developed for the SYW Plus MasterCard; provided, however, that Purchaser will have no obligation to offer the SYW Plus MasterCard after December 31, 2018, unless mutually agreed in writing by the Parties.

    ii. Prior to the end of the SYW Plus Program promotional term described above, eligible SYW MasterCard Cardholders will be offered the opportunity to apply for the SYW Plus MasterCard and to convert such Cardholder's SYW MasterCard to a SYW Plus MasterCard. In the event any such SYW MasterCard Cardholder becomes a SYW Plus MasterCard Cardholder, such Cardholder will receive the full benefit of the SYW Plus Program offered on a promotional basis prior to becoming a SYW Plus MasterCard Cardholder. In the event any such SYW MasterCard Cardholder does not become a SYW Plus MasterCard Cardholder, such Cardholder will remain (A) a SYW MasterCard Cardholder and (B) for the duration of the promotional period applicable to such Cardholder, a participant in the SYW Plus Program (as described in paragraph (d) above).

    iii. Purchaser agrees to [***]

    h. Sears Obligations.

    i. Sears will, prior to the launch of the SYW Plus Program, use its best efforts to modify the SYW linking process at point of sale such that all approved SYW MasterCard Accounts and, if applicable, SYW Plus MasterCard Accounts are fully enrolled in all aspects of the SYW Program, including the SYW Plus Program, CardLink and SYW partners.

    ii. Prior to the launch of the SYW Plus Program, Sears will [***] to modify all customer purchase channels, including point of sale, to recognize the SYW MasterCard and, if applicable, SYW Plus MasterCard as participating in the SYW Program and not require the provision by the Cardholder of the SYW member number or the Cardholder phone number. [***].

<p style="text-align:center">3</p>

<p style="text-align:right"><strong>JX 114-226</strong></p>

iii. Prior to the launch of the SYW Plus Program, Sears will [***] to fully integrate the SYW Plus Program into its digital assets so that Cardholders can readily review the number and expiration date of SYW Points earned as well as how the SYW Points were earned.

iv. Sears agrees that the [***]

i. Transaction Data and SYW Program Data. [***]

j. Billing Statements. [***] Once developed, the billing statement will contain language substantially similar to the following: [***]

2. Notices. Subsection 14.22(b) of the Program Agreement is hereby deleted in its entirety and replaced with the following:

If to the Purchaser:

Citibank, N.A.
701 E. 60th North
Sioux Falls, South Dakota 57105
Attn: Douglas C. Morrison
Fax No.: (605) 330-6745

with a copy to:

Citicorp Credit Services, Inc. (USA)
50 Northwest Point Blvd.
Elk Grove Village, IL 60007
Attn: General Manager
Fax No.: (224) 222-4029

with a copy to:

Citi Cards
1 Court Square
Long island City, NY 11101
Attn: General Counsel - Global Cards
Fax No.: (718) 248-1334

3. Conflicts; Continuing Effect. To the extent that any provision of this Amendment No. 6 with respect to the SYW Plus Program conflicts with any provision of the Program Agreement, the provisions of this Amendment No. 6 shall govern. Except as expressly provided herein, nothing contained herein shall constitute an amendment, modification or waiver of any provision of the Program Agreement and the Program Agreement shall remain in full force and effect.

4

**JX 114-227**

4. Counterparts. This Amendment No. 6 may be executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

5. Governing Law. This Amendment No. 6 shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

*[SIGNATURE PAGE FOLLOWS]*

5

**JX 114-228**

IN WITNESS WHEREOF, each Party hereto has caused this Amendment No. 6 to be duly executed on its behalf as of the day and year first above written.


SEARS, ROEBUCK AND CO.


By: /s/ Terry Rolecek
Name: Terry Rolecek
Title: Head of SYW Financial Services


SEARS BRANDS BUSINESS UNIT CORPORATION, as successor in interest to SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY


By: /s/ Terry Rolecek
Name: Terry Rolecek
Title: Vice President


CITIBANK, N.A., as successor in interest to CITIBANK (SOUTH DAKOTA), N.A., as successor in interest to CITIBANK (USA) N.A.


By: /s/ Craig D. Vallorano
Name: Craig D. Vallorano
Title: Senior Vice President

*[SIGNATURE PAGE TO AMENDMENT NO. 6]*

JX 114-229

**EXHIBIT G-2**

<u>**Shop Your Way Plus Program**</u>

Eligible Cardholders will have the opportunity to participate in the SYW Plus Program.

The SYW Points awarded under the SYW Plus Program are subject to the Shop Your Way terms and conditions located at www.shopyoutway.corn/terms.

Eligible Cardholders will receive extra SYW Points for eligible purchases which are made and post to the SYW MasterCard/SYW Plus MasterCard account as disclosed in the offer made to the Cardholder. These extra SYW Points are inclusive of any base or Sears base points earned. When extra point offers are combined, total points earned will be less than the combined point totals for each individual offer. Base points mean the 1% back in points that SYW MasterCard Cardholders currently receive on purchases that are made outside of Sears, Kmart or other Program Stores or are described below as "certain non-eligible purchases". Sears base points mean those points awarded under the tender-neutral portion of the SYW Program.

Cardholders may only earn 5% back on eligible gas station purchases and 3% back in points on eligible restaurant and grocery store purchases on the first combined purchases of $10,000 during the promotional period (or other timeframe disclosed to the Cardholder) and then 1% thereafter.

5% back in points on eligible gas station purchases, for the first $10,000 (which includes the eligible restaurant and grocery store purchases) during the promotional period and then 1% in base points thereafter. (5% back in points equals 4% in extra points and I% in base points.) ***Certain Non-Eligible Purchases***. Cardholders will only earn 1% back in base points, not 5%, for gas purchased at superstores, supermarkets, convenience stores and warehouse clubs or for fuel used for non-automobile purposes.

3% back in points on eligible restaurant (including cafes, bars, lounges and fast food restaurants) and eligible grocery store purchases for the first $10,000 (which includes the eligible gas station purchases) during the promotional period and then 1% in base points thereafter. (3% back in points equals 2% in extra points and 1% in base points.) ***Certain Non-Eligible Purchases***. Cardholders will only earn 1% in base points, not 3%, for restaurant purchases made at bakeries and certain restaurants/cafes inside department stores, grocery or warehouse clubs. Cardholders will only earn 1% in base points, not 3%, for grocery purchases made at superstores, convenience stores, gas stations, warehouse clubs, and discount stores.

2% back in points on purchases at Sears (Full Line Stores Sears Grand, Sears Dealer Stores (Sears Hometown Stores, Sears Home Appliance Showrooms, and Sears Hardware), Kmart, mygofer and for Lands' End merchandise within Sears stores and that are "qualifying purchases" under the Shop Your Way program. (2% back in points equals 1% in extra points and 1% in Sears base points.)

No points are awarded for balance transfers, cash advance transactions, cash advance transactions designated as purchases, convenience checks, returned purchases, disputed or

**JX 114-230**

unauthorized purchases/fraudulent transactions, annual credit card membership fees, money orders, wire transfers, bets, lottery tickets, or casino gaming chips, credit insurance premiums, AccountCare fees, interest charges and credit card fees.

Points will post to the Cardholder's Shop Your Way account within approximately one week after the eligible purchase is made. Merchants must submit charges under the appropriate merchant code or industry code for Cardholders to receive the extra Shop Your Way Points. Merchant category codes determine the level of Points awarded. The Parties do not determine whether Merchants appropriately identify all transactions Cardholders make on their Account but do reserve the right to determine which purchases qualify for points. By accepting Shop Your Way member benefits and offers, the Cardholder agrees to the Shop Your Way terms and conditions, available at www.shopyourway.comiterms. The Shop Your Way program is offered by Sears Holdings Management Corporation. Purchaser is not responsible for products or services offered by other companies.

**JX 114-231**

**AMENDMENT NO. 7**

    **THIS AMENDMENT NO. 7** (this "<u>Amendment No. 7</u>"), effective as of December 1, 2017 (the "<u>Effective Date</u>"), to the Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended by the parties from time to time (the "<u>Program Agreement</u>"), is executed this 5th day of December, 2017, by and among Sears, Roebuck and Co. ("<u>Sears</u>"), Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) ("<u>Sears Brands</u>") and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), N.A.) ("<u>Purchaser</u>") (individually, a "<u>Party</u>" and together, the "<u>Parties</u>"). All terms used herein but not defined herein shall have the meaning ascribed thereto in the Program Agreement.

    **WHEREAS**, Sears, Sears Brands and Purchaser have heretofore executed and entered into the Program Agreement;

    **WHEREAS**, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by each of the Parties thereto;

    **WHEREAS**, the Parties wish to further amend the Program Agreement to reflect certain changes to the Program:

    **NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

    **1. Extension of SYW Plus Program**. The SYW Plus Program shall be extended as follows:

    a. Eligible SYW MasterCard Cardholders enrolled in the SYW Plus Program as of the Effective Date will have their enrollment in such program automatically extended, [***], for an additional twelve (12) month promotional period from the date such Cardholder's initial promotional period in the SYW Plus Program was scheduled to expire ("<u>Extended SYW Plus Program Period</u>"). The parties shall cooperate to send to such SYW MasterCard Cardholders, [***], a direct mail piece describing the extension of the SYW Plus Program and that it will be available on a promotional basis [***] for an additional twelve (12) month period.

    b. Purchaser will automatically enroll, [***], eligible SYW MasterCard Accounts opened from the Effective Date through [***] in the SYW Plus Program for a twelve (12) month promotional term from the date the Account is opened ("<u>New Account Initial SYW Plus Program Period</u>"). Such Cardholders will also be eligible for an Extended SYW Plus Program Period.

    c. Purchaser will automatically enroll, [***], eligible SYW MasterCard Accounts opened from [***] in the SYW Plus Program for a New Account Initial SYW

**JX 114-232**

Plus Program Period. SYW MasterCard Accounts opened after [***] will not be enrolled automatically in the SYW Plus Program unless mutually agreed to in writing by the Parties.

d. [***] commencing in 2018 and continuing thereafter as provided therein. For the avoidance of doubt, [***] as described on Exhibit G-2 to Amendment No. 6, effective as of October 11, 2016, to the Program Agreement.

**2. New Card Product**. Section 1(g) of Amendment No. 6, effective as of October 11, 2016, to the Program Agreement is hereby deleted in its entirety and the provisions thereof shall no longer have any force or effect.

**3. [***]** In accordance with Section 7.5(d) of the Program Agreement, [***] as of the Effective Date until December 31, 2018; provided, however, that (a) from and after December 31, 2018, [***] As of the Effective Date, the following [***] may be offered:

[***]

The Program Committee will determine the minimum purchase requirements for [***] In addition, Sears will not offer [***].

**4. [***]**. Effective as of December 3, 2017, [***].

**5. In-Store Payments**. Section 12.3 of the Program Agreement is hereby deleted in its entirety and replaced with the following:

In-Store Payments. The parties shall continue to support In-Store Payments. Sears acknowledges and agrees that all In-Store payments (including In-Store Payments received after the termination of this Agreement) are at all times the property of Purchaser, and Sears expressly and irrevocably disclaims and prospectively waives any and all right, title, claim or interest in or to the In-Store Payments at law or in equity, and that In-Store payments do not constitute property of Sears for any purpose, including without limitation under section 541 of title 11 of the United States Code. Sears further acknowledges and agrees that Purchaser has the sole and exclusive right to receive and retain all In-Store Payments and to pursue collection of all amounts outstanding on any Account. If Sears or its Affiliates shall receive any In-Store Payments, Sears shall, directly or through its Affiliates, be deemed to hold such In-Store Payments in trust for Purchaser until such payments are either delivered to Purchaser or applied to reduce amounts payable by Purchaser to Sears pursuant to the Merchant Agreement. Sears shall give or cause to be given to each Person making an In-Store Payment a receipt for such payment. In-Store Payments shall be credited to the Account of the

2

JX 114-233

relevant Cardholder as of the date of actual receipt by Sears or its Affiliates. In the event that In-Store Payments received by Sears and its Affiliates and creditable to Purchaser pursuant to the Merchant Agreement on any Business Day exceed amounts payable by Purchaser to Sears on such Business Day, Sears shall be required to remit such excess to Purchaser no later than two Business Days thereafter or, if earlier, the date on which the Settlement Amounts (as defined in the Merchant Agreement) with respect to sales of Merchandise made on the same day that the In-Store Payment is received are paid to Sears under the Merchant Agreement. In the event that In-Store Payments paid by check are returned for insufficient funds, Purchaser will promptly reimburse Sears for the amount of any returned checks (to the extent such amount was paid by Sears to Purchaser), any bank or other third party fees associated therewith, and any third party fees incurred by Sears in representing checks for payment; provided, however, that Sears shall comply with Purchaser's reasonable instructions regarding the processing of such returned checks. The termination of this Agreement shall not affect Sears' obligations under this Agreement with respect to In-Store Payments received after termination of this Agreement. For the avoidance of doubt, Sears shall be solely responsible and liable to Purchaser for all In-Store Payments received by any Affiliate, Third Party Sears Merchant, or Third Party Non-Sears Merchant, as if such in-Store Payments had been paid directly to Sears.

     **6. Integration**. The Program Agreement is hereby amended by the addition of the following section 14.26:

14.26 <u>Integration</u>. Purchaser and Sears agree that each of the (i) Program Related Agreements, (ii) Purchase Agreement, (iii) Sales Tax Recovery Filings Agreement, (iv) Servicing Agreement, (v) [***], (vi) Transition Services Agreement and (vii) all amendments and letter agreements executed in connection with any of the foregoing are integrated and non-severable parts of one and the same transaction among the parties, each representing an essential, necessary and interdependent component of such transaction; and Purchaser and Sears each agree that all of the foregoing agreements comprising such transaction constitute one single agreement and are integrated and non-severable for all purposes at law and in equity, including, without limitation, for purposes of section 365 of title 11 of the United States Code and Delaware law, and that any breach of any one of such agreements shall be deemed a breach under all such agreements.

<center>3</center>

<center>**JX 114-234**</center>

**7. Notices**. Subsection 14.22(b) of the Program Agreement is hereby deleted in its entirety and replaced with the following:

a. If to the Purchaser:

Citibank, N.A.
50 Northwest Point Blvd.
Elk Grove Village, IL 60007
Attn: Craig Vallorano
Fax No.: (224) 222-4070

with a copy to:

Citicorp Credit Services, Inc. (USA)
50 Northwest Point Blvd.
Elk Grove Village, IL 60007
Attn: General Manager
Fax No.: (224) 222-4029

with a copy to:

Citi Cards
1 Court Square
Long Island City, NY 11101
Attn: General Counsel - Global Cards
Fax No.: (718) 248-1334

**8. Conflicts Continuing Effect**. To the extent that any provision of this Amendment No. 7 conflicts with any provision of the Program Agreement (including, for the avoidance of doubt, the schedules and exhibits attached thereto), the provisions of this Amendment No. 7 shall govern. Except as expressly provided herein, nothing contained herein shall constitute an amendment, modification or waiver of any provision of the Program Agreement (including, for the avoidance of doubt, the schedules and exhibits attached thereto) and the Program Agreement (including, for the avoidance of doubt, the schedules and exhibits attached thereto) shall remain in full force and effect.

**9. Counterparts**. This Amendment No. 7 may be executed in any number of counterparts (including by facsimile), each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**10. Governing Law**. This Amendment No. 7 shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

*[SIGNATURE PAGE FOLLOWS]*

4

**JX 114-235**

IN WITNESS WHEREOF, each Party hereto has caused this Amendment No. 7 to be duly executed on its behalf as of the day and year first above written.


SEARS, ROEBUCK AND CO.


By: /s/ Terry Rolecek
Name: Terry Rolecek
Title: Head of SYW Financial Services


SEARS BRANDS BUSINESS UNIT CORPORATION, as successor in interest to SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY


By: /s/ Terry Rolecek
Name: Terry Rolecek
Title: Vice President


CITIBANK, NA., as successor in interest to CITIBANK (SOUTH DAKOTA), NA., as successor in interest to CITIBANK (USA) N.A.


By: /s/ Craig D. Vallorano
Name: Craig D. Vallorano
Title: Senior Vice President


*[SIGNATURE PAGE TO AMENDMENT NO. 7]*

JX 114-236

EXECUTION VERSION

## AMENDMENT NO. 8

**THIS AMENDMENT NO. 8** (this "<u>Amendment No. 8</u>"), effective as of May 18, 2018 (the "<u>Amendment No. 8 Effective Date</u>"), to the Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended from time to time (the "<u>Program Agreement</u>"), is executed this 18th day of May, 2018, by and among Sears, Roebuck and Co. ("<u>Sears</u>"), Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) ("<u>Sears Brands</u>"), and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), N.A.) ("<u>Purchaser</u>") (individually, a "<u>Party</u>" and together, the "<u>Parties</u>"). All terms used herein but not defined in Section I hereof shall have the meanings ascribed thereto in the Program Agreement and, except as otherwise indicated herein, the rules of construction provided therein apply to this Amendment No. 8.

**WHEREAS**, Sears, Sears Brands, and Purchaser have heretofore executed and entered into the Program Agreement;

**WHEREAS**, pursuant to Section 14.12 of the Program Agreement, the Program Agreement may be amended by a written instrument executed by the Parties thereto;

**WHEREAS**, the Parties wish to further amend the Program Agreement to reflect certain changes to the Program;

**WHEREAS**, contemporaneously with the execution and delivery of this Amendment No. 8, the Parties are entering into a marketing agreement ("<u>Marketing Agreement</u>"), which contains terms relating to Sears' acceptance of and compensation by Purchaser with respect to certain Former NR/TY Cards (as defined below), on the terms and subject to the conditions set forth in the Marketing Agreement; and

**WHEREAS**, contemporaneously with the execution and delivery of this Amendment No. 8 and the Marketing Agreement, Sears and Purchaser are also entering into a new merchant agreement ("<u>New Merchant Agreement</u>"), which contains terms relating to certain Former NR/TY Cards, on the terms and subject to the conditions set forth in the New Merchant Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

**A.   <u>Changes to the Product Suite</u>**

1.        <u>Section 4.8 and Related Provisions</u>.

a.                    A new Section 4.8 is inserted as follows: "Upon the parties' mutual agreement, Purchaser shall replace, with respect to each SYW MasterCard in existence on or after the Amendment No. 8 Effective Date, the then-existing plastic with plastic bearing a mutually agreed card design that includes the

"Shop Your Way" Sears Licensed Mark but no other Sears Licensed Mark ("New SYW Card Design"). Also upon the parties' mutual agreement Sears and Purchaser will develop, produce and deploy, as replacements for all Solicitation Materials referring to SYW MasterCards but not bearing the New SYW Card Design, Solicitation Materials bearing such design."

b.          Section 4.3 is amended by inserting, in the parenthesis immediately following the first comma, the following: "except as otherwise provided herein,".

2.          **Section 4.2(e) and Related Provisions**.

a.          The Letter Amendment to the Program Agreement re: Sears MasterCard Substitution and External Sales Letter Agreement, dated May 21, 2014, is amended by:

i.          Replacing the reference to "Section 4.1(c)(i)" in Section 2 with "Section 4.2(c)(i)"; and

ii.         Replacing the references to "Section 4.1(d) in Section 2 and Section 3 with "Section 4.2(e)".

b.          Section 4.2(e) is amended by:

i.          Redesignating the existing first paragraph as subsection (i);

ii.         Deleting the existing second paragraph; and

iii.        Inserting a new subsection (ii) as follows:

"(A)        From and after the Amendment No. 8 Effective Date, each NR Non-Program Card and TY Non-Program Card and the related account shall not be part of the Program or subject to any Integrated Agreement, and Sears will have no rights or obligations with respect thereto except as Sears and Purchaser may expressly provide in another agreement (each such card, a "Former NR/TY Card"). For the avoidance of doubt, subject only to such Sears rights as are set forth in such other agreement, Purchaser shall have the right with respect to each Former NR/TY Card, from time to time as Purchaser may deem expedient in its sole discretion, to market such card, Transfer it, re-brand it without using Sears Licensed Marks, and convert to a Purchaser card not bearing such Sears Licensed Marks.

(B)         Notwithstanding any provision of any Integrated Agreement to the contrary: (I) Purchaser's communications

2

JX 114-238

with NR Non-Program Card and TY Non-Program Card Cardholders in connection with Purchaser's implementation of its rights with respect to Former NR/TY Cards shall not constitute Solicitation Materials or be subject to Sears' approval; and (II) with respect to each NR Non-Program Card and TY Non-Program Card, and its respective successor Former NR/TY Card, as between Sears and Purchaser, Purchaser shall have sole ownership of all account documentation (such term being understood to have the same scope as "Account Documentation", *mutatis mutandis*) and other data, books and records and Cardholder Information that is in existence on the Amendment No. 8 Effective Date, and Sears shall immediately return to Purchaser, all of the same that is then in its possession or control; provided, that (i) nothing in this Section 4.2(e) shall be construed to restrict Sears from maintaining or making use of, or requiring Sears to return, data, books, records and Cardholder Information in its possession other than by virtue of the Program or this Agreement (including, e.g., customer information independently in Sears' possession); and (ii) Sears may retain one archived copy of such material, which may be used solely for regulatory or compliance purposes and may not be used for any other purpose except as the parties may otherwise agree.".

iv.    Inserting a new subsection (iii) as follows: "At such times after the Amendment No. 8 Effective Date as Purchaser shall determine in its sole discretion, Purchaser may substitute, for each Sears Conversion Private Label Card that is a Conversion-Eligible Sears Card, a SYW MasterCard, which SYW MasterCard shall be automatically enrolled in the SYW Plus Program pursuant to Section 1(d) of Amendment No. 6; provided, that as to Accounts that have had no transactions during the [***] period preceding substitution, Purchaser may exercise this right in the event the Cardholder does not opt-out from such substitution (it being understood that as to other Accounts, Purchaser may exercise such right only upon Cardholder opt-in or pursuant to such other method as is agreed to by the parties for the purpose of minimizing Cardholder disruption or dissatisfaction). Purchaser does not anticipate commencing such substitution prior to [***]. Purchaser shall promptly notify Sears of the changes to Sears' customer information, authorization, point of sale, application processing, financial, technical support or other systems that are necessary in

3

**JX 114-239**

connection with the conversions required by this Section 4.2(e)(iii) and Sears shall, [***] complete such changes in a timeframe and manner such that no later than [***], Purchaser has confirmed, in its reasonable discretion using market-standard testing procedures, that such changes are adequate. For the avoidance of doubt, if Sears does not comply with such obligations, then Purchaser, without limiting its other rights hereunder, may implement its rights under Sections 4.2(e)(i) and 7.9(a) with respect to the Sears Conversion Private Label Cards that are Conversion-Eligible Sears Cards (it being understood that, in any event, Purchaser anticipates converting certain Sears Credit Cards pursuant to Section 4.2(e)(i) no later than [***]; provided, that notwithstanding anything in Section 4.2(e)(i) to the contrary, any conversion thereunder would be to a SYW MasterCard, except as the parties may otherwise agree.".

v.                          Inserting a new subsection (iv) as follows: [***]. On the effective date of the Commercial One Termination (I) Purchaser shall close all existing Sears Commercial One Business Accounts to future transactions; provided, that Purchaser shall continue to own the Sears Commercial One Business Accounts and the related Accounts Receivable subject to this Agreement and (II) Section 2.3 shall cease to apply to accounts and programs offered by Sears and its Affiliates that are designed for business owners, home builders, contractors and property managers, or that otherwise would have constituted Sears Commercial One Business Accounts had they existed prior to the Commercial One Termination. [***]

c.                          A new Section 4.9 is inserted as follows: "Purchaser shall use commercially reasonable efforts to support Sears' efforts to [***]. Sears acknowledges that any such [***] will be subject to and be required to comply with Purchaser's generally applicable policies and procedures for similar programs, and be required to enter into an agreement or agreements with Purchaser consistent with such policies and procedures.".

d.                          Notwithstanding anything to the contrary in any Integrated Agreement, from and after the Amendment No. 8 Effective Date, all references to "Account," "Sears Credit Card," "Sears Co-Branded Card," "Cardholder," "Sears Repurchase Assets," or any similar term, or any terms that reference such terms shall be automatically deemed to exclude the Former NR/TY Cards and related accounts and cardholders.

4

**JX 114-240**

3.         **New Section 5.2(e)**.

a.              A new Section 5.2(e) is inserted as follows: "Notwithstanding any other provision of any Integrated Agreement to the contrary, from and after the first day of any calendar year (or such earlier date as the parties may mutually agree), Purchaser may permanently cease accepting any application for Sears Cards in Full-Line Stores if, during the [***] ending on the last day of any calendar month during the immediately preceding calendar year, [***] of less than [***] ("Full-Line Store Cessation Day"); provided, that (i) such cessation shall not commence during a Holiday Period; and (ii) notwithstanding the occurrence of the Full-Line Store Cessation Day, Purchaser shall, consistent with its contractual rights with respect to such channels, continue to acquire [***] through and including the Termination Date. Purchaser shall reasonably determine the occurrence of the Full-Line Store Cessation Day.".

b.              At the request of Purchaser or Sears, Purchaser and Sears will consult in good faith regarding mutual efforts to maintain [***].

**B.    Changes to the Program Economics**

1.         **General Terms.**

a.              Without limiting Section A(2)(d) hereof, and notwithstanding anything to the contrary in any Integrated Agreement, from and after the Amendment No. 8 Effective Date, the Former NR/TY Cards will be excluded for all purposes from all economic calculations and payments by Purchaser to Sears and its Affiliates under the Program Agreement and vice versa, including pursuant to Article VII, Schedules 7.1-A and 7.1-B, and Exhibit J.

b.              All amounts owing from Purchaser to Sears and its Affiliates with respect to periods occurring prior to the Amendment No. 8 Effective Date will be paid in accordance with the terms of the Program Agreement in effect immediately prior to the Amendment No. 8 Effective Date, prorated as applicable.

2.         **Section 4.2(d) and Related Provisions**.

a.              Section 4.2(d) is amended by deleting the phrase "and shall generally be consistent with Sears' current levels as set forth on Schedule 4.2" and replacing the same with the phrase "as calculated in accordance with Annex 1 to Schedule 4.2".

b.              A new Annex 1 is added to Schedule 4.2 in the form attached hereto as Annex A.

5

**JX 114-241**

3.  **Section 5.8 and Related Provisions**.

a.  A new Section 5.8(a)(v) is inserted as follows:

"(A)  Notwithstanding anything in any Integrated Agreement to the contrary, from and after the Amendment No. 8 Effective Date and subject to applicable Law, Sears shall have the right from time to time in its discretion to conduct tests of new protocols and methods with respect to [***] (each such test, an "SYW Test"), subject to the following:

1.  Sears shall be responsible for all expenses related to each SYW Test unless such expenses previously have been approved by the Program Committee;

2.  [***]

3.  [***]

4.  The results of each SYW Test will be discussed by the Program Committee and the Program Committee shall consider the desirability of expanding the Cardholder population and adjusted redemption methodology provided for in the SYW Test; and

5.  [***]

4.  **Section 5.10 and Related Provisions**.

a.  Notwithstanding anything in any Integrated Agreement to the contrary, from and after December 31, 2018, neither party shall have any obligation to make any contributions to the Loyalty Fund.

5.  **Article VII and Related Provisions**.

a.  Section 7.1 is amended by:

i.  Redesignating the existing text as subsection (a);

ii.  Replacing the first sentence in the text redesignated as subsection (a) with the following text: "In consideration of the services to be rendered by Sears in connection with the performance of its obligations under the Integrated Agreements, including under this Agreement, within the parameters of Schedule 7.1-A, from and after the Amendment No. 8 Effective Date through and including December 31, 2020, Purchaser or its Affiliates will pay to Sears or, at the direction of Sears, a Subsidiary of Sears, the respective amounts set forth on

6

JX 114-242

Schedule 7.1-A with respect to the Co-Branded Accounts, Proprietary Accounts and Financial Products accounts (collectively, "Sears Fees"); provided, that successor Financial Products shall be treated as Financial Products for purposes hereunder."; and

iii.                           Creating a new subsection (b) as follows: "In consideration of the services to be rendered by Sears in connection with the performance of its obligations under the Integrated Agreements, including this Agreement within the parameters of Schedule 7.1-B, commencing January 1, 2021 through the Termination Date, Purchaser or its Affiliates will pay to Sears or, at the direction of Sears, a Subsidiary of Sears, the Sears Fees set forth on Schedule 7.1-B; provided, that successor Financial Products shall be treated as Financial Products for purposes hereunder.".

b.             Schedule 7.1 is deleted and replaced with Schedule 7.1-A in the form attached hereto as Annex B.

c.             A new Schedule 7.1-B, in the form attached hereto as Annex C, is inserted into the Program Agreement.

d.             Notwithstanding anything to the contrary in any Integrated Agreement, from and after the Amendment No. 8 Effective Date, [***].

e.             Exhibit K is deleted.

f.             A new Section 7.10 is added as follows: "Amendment No. 8 Payment. As soon as reasonably practical after the Amendment No. 8 Effective Date, and in no event later than the first Business Day thereafter, subject to Section 8.8(a), Purchaser shall pay to Sears the amount of $425,000,000.".

6.       **Amendment No. 6.**

a.             Section 1 of Amendment No. 6 is amended by deleting the word "New" in the heading thereof and replacing the same with the phrase "SYW Plus Program".

b.             Section 1(d) of Amendment No. 6 is amended by deleting clauses (i) through (iv) thereof and replacing them in their entirety with the following:

"As of a date mutually agreed to by the parties, all SYW MasterCard Accounts existing as of the Amendment No. 8 Effective Date or newly opened thereafter, will be [***].

c.             Section 1(e) of Amendment No. 6 is amended by deleting the text thereof and replacing it with the following:

7

**JX 114-243**

"Purchaser shall develop and make accessible a new Account Application for the SYW MasterCard as of a date mutually agreed to by the parties, [***].

7.      **Amendment No. 7**.

a.              Section 1 of Amendment No. 7 is amended by deleting "as follows:" from the introduction thereto and clauses (a) through (d) thereof and replacing them with the following:

[***]

8.      **Exhibit H**.

a.              The text following the heading "POS Incentives" on Exhibit H is amended by replacing it with the following:

"Purchaser shall reasonably determine, in consultation with Sears, the nature, amount, and duration of Point of Sale (POS) offers from time to time, to encourage Sears Customers who do not have existing Sears credit products to open an Account. [***]

**C.   Changes to the Term and Form of the Program Related Agreements**

1.      **Section 13.1**. Section 13.1 is amended by:

a.              In the caption, deleting "Initial" and inserting in lieu thereof "Existing";

b.              Deleting the first two sentences and redesignating the remaining sentences as subsection (d);

c.              Inserting a new subsection (a) as follows: "The existing term of this Agreement ("Existing Term") shall commence on the Amendment No. 8 Effective Date, and shall continue, unless sooner terminated pursuant to Section 13.2 or 13.3, through November 2, 2025 ("Initial Expiration Date")";

d.              Inserting a new subsection (b) as follows: "This Agreement shall renew for an additional two-year term (i.e., through November 2, 2027) ("Additional Term") if Sears has delivered to Purchaser a notice of Sears' intent to renew the Agreement no later than [***] and during the rolling [***] period immediately preceding the delivery of such notice, [***] of no less than [***]; provided, that Sears may give notice of intent to renew the Agreement [***]. If Purchaser delivers a notice of termination pursuant to Section 13.3(b), then from and after such delivery, a notice delivered pursuant to this Section 13.1(b), whether delivered before or after such notice of termination, shall be of no force or effect.".

8

**JX 114-244**

2.        **Section 13.2.** Section 13.2 is amended by replacing Section 13.2(c) with "[RESERVED]".

3.        **Section 13.3.** Section 13.3 is amended by replacing Section 13.3(c) with "[RESERVED]".

4.        **New Section 14.27.** A new Section 14.27 is inserted as follows:

"14.27. Amended and Restated Program Agreement. From and after the Amendment No. 8 Effective Date, Purchaser and Sears shall use commercially reasonable efforts to draft, execute and deliver an amended and restated Agreement (the "Amended and Restated Program Agreement") no later than [***] after the Amendment No. 8 Effective Date. The parties intend that the Amended and Restated Program Agreement will: (a) combine into a single agreement each Integrated Agreement other than the Purchase Agreement; (b) delete all provisions thereof that apply exclusively to time periods that have been completed; and (c) except for wording and definitional changes of a clarifying nature, preserve the existing language of the Integrated Agreements to the extent practicable; provided, that the Amended and Restated Program Agreement will include revisions to Exhibit L to reflect Program performance as of the Amendment No. 8 Effective Date and the similar provisions in similar programs as of such date.".

5.        **Marketing Agreement.** The due execution and delivery of the Marketing Agreement, in substantially the form set forth in Annex F hereto, shall be a condition precedent to the effectiveness of this Amendment No. 8.

6.        **New Merchant Agreement.** The due execution and delivery of the New Merchant Agreement, in substantially the form set forth in Annex G hereto, shall be a condition precedent to the effectiveness of this Amendment No. 8.

**D.    Changes to the Repurchase Options**

1.        **Section 8.6.**

a.        Section 8.6(a)(i) is amended by deleting the second sentence thereof.

b.        Section 8.6(b) is amended and restated in its entirety to read "Disposed Stores shall no longer be "Stores" subject to the Program."

c.        Section 8.6(c) is deleted in its entirety and replaced with "[RESERVED]"

d.        Section 8.6(d) is amended by deleting the first sentence thereof in its entirety and replacing it with the following:

9

**JX 114-245**

"Without limiting any other right of Purchaser hereunder (including under Section 4.2(e)(iii)), in connection with any disposition under Section 8.6(a)(i), Purchaser may convert to a different product that does not use a brand (or any successor brand) of a Person set forth on Exhibit A to the Marketing Agreement, (x) any Sears Proprietary Cards branded with the Marks of the Sold Chain Stores (provided, that such Marks are not successor Marks to "Sears") and all Accounts and associated Accounts Receivable that are attributable to such Sears Proprietary Cards, in the case of Sold Chain Stores; and (y) in the case of Sold Chain Stores or Sold Area Stores, any other Accounts for which at least [***] of the purchase activity (measured by [***]) is attributable to such Sold Chain Stores or to such Sold Area Stores, as applicable, along with the associated Accounts Receivable.".

e.          Section 8.6(d) is amended by deleting each reference to "has a brand that does not compete with Sears" and replacing it with "does not use a brand (or any successor brand) of a Person set forth on Exhibit A to the Marketing Agreement".

2.          **Section 13.2(d)**. Section 13.2(d) is amended by deleting the proviso to clause (ii) thereof.

3.          **Sections 13.4 through 13.6 and Section 13.9**. Sections 13.4 through 13.6 (including the schedules thereto) are deleted and replaced with the provisions set forth in Annex J attached hereto, and a new Section 13.9 is added in the form attached as Annex J hereto.

E.    **Changes to Reserve Provision**

1.          **Section 8.8**.

a.          Section 8.8 is deleted and replaced with the following:

"Reserves

(a)          Notwithstanding any provision of any Integrated Agreement to the contrary, on the Amendment No. 8 Effective Date, Purchaser shall establish a reserve in the amount of [***]. Such reserve shall be funded by Sears' delivery to Purchaser of an irrevocable standby letter of credit in favor of Purchaser from a financial institution other than Citigroup that is rated [***] or higher by Standard & Poor's Ratings and [***] or higher from Moody's Investors Service, and otherwise in form and substance reasonably acceptable to Purchaser (an "Eligible Letter of Credit"); provided, that Sears shall deliver such Eligible Letter of Credit no later than 10 Business Days after the Amendment No. 8 Effective Date, and, from the Amendment No. 8 Effective Date until such delivery, Purchaser shall maintain the reserve provided for in this Section 8.8 by retaining [***] of the amount otherwise

10

JX 114-246

payable to Sears pursuant to Section 7.10 (such retained amount to be remitted to Sears, or, upon Sears' written instruction, the issuer of such Eligible Letter of Credit, upon Purchaser's receipt of such Eligible Letter of Credit); and <u>provided, further</u> that Purchaser may draw on such Eligible Letter of Credit and maintain the reserve by retaining the amount of such draw in the event that such Eligible Letter of Credit is not renewed or replaced by Sears with another Eligible Letter of Credit by no later than [***] prior to its expiration. Purchaser may access and use the reserve provided for in this Section 8.8(a) including, for the avoidance of doubt, by drawing on the letter of credit required hereunder, in Purchaser's sole discretion to discharge or satisfy contingent liabilities relating to the performance of Sears' duties under the Program (<u>e.g.</u>, non-delivery of Merchandise, timely processing of In-Store Payments, warranty obligations, credit returns, chargebacks or other such similar obligations) and otherwise reimburse Purchaser for any losses arising out of amounts owing from Sears to Purchaser under any of the Integrated Agreements to the extent such amounts have not been paid by Sears and have not been recouped, set-off or otherwise deducted from amounts otherwise owed by Purchaser to Sears in accordance with the Program Agreement. If Purchaser accesses and uses the reserve, it shall promptly notify Sears in writing following such access and use, including a description of Purchaser's reasons for such access and use. Notwithstanding anything in this Section 8.8 or Schedule 8.8(b) to the contrary, in no event shall, as of any given time, the sum of (x) the remaining amount of the reserve established hereunder and (y) the aggregate amount of such reserve already accessed and used by Purchaser pursuant to Section 8.8(a) exceed [***].

(b)          The amount of the reserve provided for in Section 8.8(a) shall be subject to adjustment from time to time as set forth in Schedule 8.8(b); <u>provided</u>, that no such adjustment shall be made unless the reserve is maintained through an Eligible Letter of Credit.".

(c)          A new Schedule 8.8(b), in the form attached hereto as Annex I, is inserted into the Program Agreement.

**F.    Changes to Set-off Provision and Related Provisions**

1.          **Section 7.8**.

a.          Section 7.8 is deleted in its entirety and replaced with:

"<u>Recoupment and Set-off</u>. All amounts owing now or hereafter from one party to another under the Integrated Agreements (which are expressly agreed by the parties to constitute a single transaction) may be recouped, set-off or otherwise deducted from amounts due from the other party under any Integrated Agreement, without consent of such other party. [***] Sears

11

**JX 114-247**

acknowledges that any credit, return, chargeback or other circumstance where Purchaser credits any amount to an Account for any Merchandise returned after the date of filing of any petition under Title 11 of the United States Code relates back to the date of purchase of such Merchandise for the purposes of recoupment, set-off or other deduction and constitutes a single integrated transaction. For the avoidance of doubt, nothing in this Section 7.8 shall limit Purchaser's rights under Section 8.8 or require any notice by Purchaser of the exercise of its rights thereunder.".

2.      **Section 14.17(a)**.

a.      Section 14.17(a) is amended by deleting " or otherwise" in the first sentence thereof.

G.   **Changes Regarding Sales Practices, Data Security and Related Matters**

1.      **Section 8.7(d)**.

a.      Section 8.7(d) is deleted and Section 8.7(e) is redesignated accordingly.

2.      **Section 8.9**.

a.      A new Section 8.9 is added to the Program Agreement as follows:

:ales Practices.

(a)      Sears shall not offer any sales incentives to employees, subcontractors or any other Person in connection with the taking of applications for, or the opening or usage of, Accounts, without the prior written approval of Purchaser; <u>provided</u>, that subject to annual reviews by Purchaser and any applicable change in Law subsequent to the Amendment No. 8 Effective Date, Purchaser hereby approves the incentive practices described on <u>Schedule 8.9(a)</u>, in each case solely in the form thereof last reviewed by Purchaser prior to the Amendment No. 8 Effective Date. For clarity, any changes to the incentive practices described on <u>Schedule 8.9(a)</u> from those last presented to Purchaser for review prior the Amendment No. 8 Effective Date shall require Purchaser's written approval, other than immaterial value-related changes that do not increase the aggregate value of per-Store incentives and operational changes that are *de minimis* in effect; provided that any change to the incentives provided to individual employees or representatives shall require Purchaser's written approval.

(b)      Except for such other prior course of dealing as the parties may have mutually determined to establish (which the parties will cooperate to appropriately document following the Amendment No. 8 Effective Date):

12

**JX 114-248**

| i. | Purchaser shall promptly refer to Sears any Cardholder complaint regarding the quality of Merchandise or otherwise related to Sears |
|---|---|
| ii. | Sears shall promptly refer to Purchaser any Cardholder complaint regarding an Account or the Program or otherwise related to Purchaser; |
| iii. | Each party shall track complaints received by it from or on behalf of Cardholders or from any Governmental Authority in a manner that enables it to determine if it receives an inordinate amount of complaints regarding a particular matter so that such party (A) can determine if there is a Program related issue and (B) use commercially reasonable efforts to promptly correct problems; and |
| iv. | Sears will submit sufficient, timely, and usable information regarding its complaint tracking to enable Purchaser to analyze complaint activity and trends for risk management purposes. |

(c)     Sears represents and warrants to Purchaser that as of the Amendment No. 8 Effective Date, neither Sears nor its Affiliates, nor any merchant whose goods/services are sold on Sears Marketplace (a "Marketplace Vendor") sells [***]. Sears shall, at least annually, certify its compliance with this Section 8.9(c), in such form as may be mutually agreed to by the Parties.

(d)     Without limiting the parties' respective obligations under Section 5.6(e), Sears shall train [***] its employees and the employees of its Affiliates having any involvement with the Program so as to be able to properly fulfill Sears's and the Affiliates' responsibilities under the Program, including compliance with applicable Law, the Rules (as defined in the Merchant Agreement) and any other written instructions provided by Purchaser under this Agreement or any other Integrated Agreement relating to the operation of the Program. Purchaser shall have the right to review all of Sears's training materials and sessions, and Sears shall implement any reasonable recommendations made by Purchaser with respect to such materials and sessions. Sears shall conduct its training [***] to ensure that all such employees are properly trained in all relevant aspects of the Program. Sears shall also conduct additional training as requested by Purchaser if Purchaser reasonably determines that employees of Sears or its Affiliates are not complying with applicable Law, the Rules (as defined in the Merchant Agreement), or other written instructions of Purchaser relating to the operation of the Program. Sears shall track and maintain evidence of all such trainings and provide evidence of such trainings to Purchaser as reasonably requested by Purchaser.

(e)     Notwithstanding anything to the contrary herein, Purchaser, after consultation with Sears, may take any actions and make any changes to the Program required to comply with Purchaser's implementation of its policies

13

JX 114-249

and procedures relating to anti-money laundering, sanctions, customer identification and anti-bribery and corruption and Sears agrees to provide reasonable cooperation in connection therewith.

(f)    <u>Cooperation with Governmental Authorities</u>. Without limiting the respective rights and obligations of the parties under Section 14.7, Sears acknowledges that Purchaser and its Affiliates are subject to regulatory oversight by Governmental Authorities and that such Governmental Authorities have the authority to examine, audit and inspect the activities of Sears and its Affiliates conducted pursuant to this Agreement. Sears shall and shall cause its Affiliates to, promptly cooperate with all Governmental Authorities having jurisdiction over Purchaser or its Affiliates in connection with any examination, audit or inquiry relating to the Program or this Agreement, and shall promptly cooperate with Purchaser in connection with any examination or audit of, or inquiry to, Purchaser or its Affiliates by such Governmental Authority. Such cooperation shall include permitting representatives of Purchaser and Governmental Authorities to visit any Sears offices and offices of any of its Affiliates that Sears engages in any capacity in connection with the Program. In connection with any such examination, audit or inquiry, Purchaser shall (I) provide as much advance notice to Sears of the examination, audit or inquiry as is reasonably practicable under the circumstances, (II) use commercially reasonable efforts to minimize disruptions to the operations and business of Sears and its Affiliates, and (III) reimburse Sears and its Affiliates for any reasonable and documented out-of-pocket expenses incurred in connection with cooperating with the examination, audit or inquiry. Sears shall, and shall cause its Affiliates to, promptly comply with any guidance, recommendations or requirements of a Governmental Authority arising from any examination, audit or inquiry. Further, if Purchaser reasonably determines that changes to policies or procedures utilized by Sears or its Affiliates in connection with the Program are needed based on the results of any such examination, audit or inquiry, Sears shall, and shall cause its Affiliates to, promptly implement any changes requested by Purchaser.

(g)    <u>Third-Party Contracts</u>. Sears shall ensure that all agreements with its Affiliates require such Affiliates to cooperate with Purchaser and Governmental Authorities with respect to all matters set forth in Sections 14.7 or 8.9(f); <u>provided,</u> that with respect to any such agreements with non-controlled Affiliates and third-party service providers entered into prior to the Amendment No. 8 Effective Date, Sears shall use commercially reasonable efforts to cause such Affiliates and third-party service providers to cooperate in a manner consistent with the intent and purpose of this Section 8.9.

(h)    <u>Information Security</u>

14

JX 114-250

i.        <u>Safeguarding Protected Data</u>. Sears and Purchaser shall protect, safeguard and securely maintain the confidentiality and integrity of Protected Data it stores or that is in its possession or control, and that is stored by or in the possession or control of its Affiliates.

ii.        <u>Information Security Program</u>. Sears and Purchaser shall establish, implement and maintain an information security program ("<u>Information Security Program</u>") that includes, at a minimum, the following:

i.        standards relating to privacy and security of Protected Data that (1) are no less stringent than the Payment Card Industry Data Security Standards adopted by the Payment Card Industry Security Standards Council, as amended from time to time, and (2) comply in all respects with applicable Laws that applies to the privacy and protection of such data (collectively, the "<u>Security Standards</u>");

ii.        appropriate administrative, technical and physical safeguards to (1) ensure the security, confidentiality and integrity of Protected Data; (2) protect against any anticipated threats or hazards to the security or integrity of Protected Data; (3) protect against unauthorized access to or use of Protected Data which could result in substantial harm or inconvenience to a Cardholder or the other party; and (4) ensure the proper disposal of Protected Data;

iii.        requirements to (1) conduct a risk assessment to identify and assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Protected Data and evaluate and improve, where necessary, the effectiveness of its safeguards; (2) implement appropriate access controls to limit access to Protected Data; (3) educate and train personnel regarding information security practices and procedures, including the Security Standards and the requirements of the party's Information Security Program; (4) appropriately restrict the storage of Protected Data on laptops, portable devices or other portable media and where Protected Data must be stored on devices, encrypt all Protected Data stored on laptops and, where technically feasible, on other portable devices and portable media; and (5) use industry standard passwords, firewalls and anti-malware measures to protect Protected Data stored on computer systems;

iv.        an information security incident reporting process to (1) ensure that the party has the immediate ability to address, contain and mitigate any possible risk stemming from an actual, alleged

15

JX 114-251

or potential unauthorized access, disclosure, compromise or theft of Protected Data, improper handling or disposal of Protected Data, theft of information or technology assets, and/or the inadvertent or intentional disclosure of Protected Data, and (2) ensure a consistent process for identifying, reporting, investigating and closing information security incidents; and

v.                           a requirement to encrypt all Protected Data that shall travel across public networks or that is transmitted wirelessly.

iii.              Each party shall continually review and update its Information Security Program in a commercially reasonable manner to address newly identified or emerging security risks.

(i)        <u>Review of Security Standards and Information Security Program</u>. To enable a party to assess another party's compliance with the requirements in Section 8.9(h) above, a party may request from another party such information relating to its Security Standards and Information Security Program as the requesting party deems reasonably necessary. Such other party shall provide the requested information, or provide alternative information as may be reasonably suitable for assessing such other party's Security Standards and Information Security Program (such as policies and procedures, internal or external audit reports or self-assessments), within thirty (30) days after receipt of the request. Such other party shall also cooperate with the requesting party in addressing any reasonable concerns relating to possible deficiencies in such other party's Security Standards and Information Security Program. Each party shall cause its Affiliates to whom it has disclosed Protected Data to comply with the requirements of this Section 8.9(i).

(j)        <u>Data Security Breaches</u>. Each party shall promptly notify the other parties (except in instances where notice is prohibited by applicable Law or a Governmental Authority requests that notice be withheld or delayed) in the event it becomes aware of any unauthorized use, modification, destruction or disclosure of, or access to, Sears Customer Information, Cardholder Information or Transaction Data, as applicable (any of the foregoing, a "<u>Data Security Breach</u>"), and take such actions as are commercially reasonable or necessary to assess the nature and scope of such Data Security Breach to prevent further Data Security Breaches. The party that experienced the Data Security Breach shall have the sole right to determine whether to provide notice to Governmental Authorities and any affected Cardholders, as well as the timing and form of such notice, and the other party shall provide such cooperation as may reasonably be requested in connection with such notice to Governmental Authorities and Cardholders; <u>provided</u>, that if the Data Security Breach is experienced by Sears and Sears

16

JX 114-252

determines not to provide notice to Governmental Authorities or affected Cardholders, Purchaser may nonetheless notify Cardholders of such Data Security Breach and shall consult with Sears with respect to such notice. The party that experienced the Data Security Breach shall pay the applicable costs and expenses relating to each such Data Security Breach set forth on Schedule 8.9(j).

(k)          In the event of any conflict between the terms of Sections 8.9(h) through 8.9(j) or Section 9.6 and Article IX, the terms of Sections 8.9(h) through 8.9(j) or Section 9.6, as applicable, shall control."

b.          A new Schedule 8.9(a), in the form attached hereto as Annex D, is inserted into the Program Agreement.

c.          A new Schedule 8.9(j), in the form attached hereto as Annex E, is inserted into the Program Agreement.

3.          **Section 9.6**.

a.          A new Section 9.6 is added to the Program Agreement as follows:

Affiliate/Vendor Data Security

(a)          [***]

(b)          Schedule 9.6 sets forth additional security requirements applicable to Sears to the extent Sears, or any of its Affiliates or third-party service providers, stores, or has in its possession or control, any Cardholder Information or Transaction Data.".

b.          A new Schedule 9.6, in the form attached hereto as Annex H, is inserted into the Program Agreement.

**H.   Additional Representations and Warranties of Sears**

1.          **Section 10.3**.

a.          A new Section 10.3(a) is added to the Program Agreement as follows:

"Additional Representations and Warranties of Sears. Sears represents and warrants that [***].

b.          A new Section 10.3(b) is added to the Program Agreement as follows:

"Financial Reporting. Sears shall deliver to Purchaser (i) [***], in each case contemporaneously with Sears' delivery thereof to such agent, (ii) any notice of default, acceleration, foreclosure or waiver under such Credit Facilities or

17

**JX 114-253**

any other credit facilities, and (iii) [***] of the end of each calendar quarter, a report for such quarter substantially in the form attached to that certain Officer's Certificate, dated April 3, 2018, that was delivered to Purchaser."

**I.    Changes to General Provisions**

1.        **Section 14.8.**

a.            A new Section 14.8(d) is added as follows: "Following the Amendment No. 8 Effective Date, Sears may request that Purchaser provide the information set forth on <u>Schedule 13.9-B</u> to Sears for use by Sears solely in connection with [***]. Purchaser shall deliver such information to Sears within [***] of Sears' written request. Any information provided by Purchaser to Sears pursuant to this Section 14.8(d) shall be the Confidential Information of Purchaser. Sears may, however, disclose such Confidential Information to third parties solely for the purposes for which Sears is permitted to use such Confidential Information pursuant to this Section 14.8(d); <u>provided</u>, that Sears shall obtain a customary confidentiality agreement (in a form reasonably satisfactory to Purchaser) from any such third party recipient to which data contemplated under <u>Schedule 13.9-B</u> is to be provided, and Purchaser shall be made a party or a third party beneficiary to such confidentiality agreement. Purchaser makes no representation or warranty regarding the accuracy or completeness of any information provided pursuant to this Section 14.8(d), including for the purpose for which Sears or any third party intends to use it. Sears agrees not to represent to any third party that Purchaser is the source of the information or make any representation whatsoever regarding its accuracy or completeness.".

b.            Upon Sears' request, Purchaser will discuss with Sears such amendments to any Integrated Agreement or other agreements between the parties that Sears believes are necessary to permit Sears to [***]; <u>provided</u>, that Purchaser reserves all its rights to withhold its approval of any such amendments.

**J.    Definitions**

1.        The following defined terms will be added to, or, where applicable, replace or revise the existing definitions in, Section 1.1 in alphabetically correct order:

a.            "<u>Account</u>" means any account under which a purchase, cash advance or balance transfer transaction may be or has been made by or to a Person (or any Person authorized by such Person) pursuant to an Account Agreement established by Purchaser relating to a Program Product that is subject to the terms of this Agreement as of the time of determination, and includes (i) all of the Account Documentation related to the account; and (ii) any and all other rights, remedies, benefits, interests and titles, whether legal or

18

**JX 114-254**

equitable, to which Purchaser may now or at any time hereafter be entitled in respect of the foregoing.

b.        "Additional Term" has the meaning set forth in Section 13.1(b).

c.        "Amended and Restated Program Agreement" has the meaning set forth in Section 14.27.

d.        "Amendment No. 6" means that certain amendment to the Amended and Restated Program Agreement, effective as of October 11, 2016, by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), (N.A.).

e.        "Amendment No. 7" means that certain amendment to the Amended and Restated Program Agreement, effective as of December 1, 2017, by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), (N.A.).

f.        "Amendment No. 8 Effective Date" means May 18, 2018.

g.        "Credit Card" is hereby amended by inserting after the words "a credit card": " or other access device (whether tangible or intangible)".

h.        "Commercial One Termination" has the meaning set forth in Section 4.2(e)(iv).

i.        "Credit Facilities" has the meaning set forth in Section 10.3(b).

j.        "Conversion-Eligible Sears Card" means a Sears Proprietary Card for which the related Cardholder, as of the time immediately preceding the applicable conversion, meets Purchaser's applicable underwriting criteria.

k.        "Data Security Breach" has the meaning set forth in Section 8.9(j).

l.        "Eligible Letter of Credit" has the meaning set forth in Section 8.8(a).

m.        "Existing Term" has the meaning set forth in Section 13.1(a).

n.        "Former NR/TY Card" has the meaning set forth in Section 4.2(e)(ii)(A).

o.        "Full-Line Store Cessation Day" has the meaning set forth in Section 5.2(e).

19

JX 114-255

p.          "Information Security Program" has the meaning set forth in Section 8.9(h)(b).

q.          "Initial Expiration Date" has the meaning set forth in Section 13.1(a).

r.          "Integrated Agreement" means, collectively, the agreements and amendments referenced in clauses (i)-(vii) of Section 14.26. For the avoidance of doubt, the Marketing Agreement and New Merchant Agreement are not Integrated Agreements.

s.          "Marketing Support" has the meaning set forth in Annex 1 to Schedule 4.2.

t.          "Marketplace Vendor" has the meaning set forth in Section 8.9(c).

u.          "Merchant Agreement" means the Merchant Agreement as amended from time to time.

v.          "New Accounts" means, as of any date, with respect to a particular type of Accounts or group thereof, Accounts that were established in accordance herewith within the rolling twelve-month period preceding such date. A reference to "New Accounts" without reference to a particular type of Accounts or group thereof shall be deemed to refer to all Credit Card Accounts established in accordance herewith within such period.

w.          "New Financial Products" means any product offered by Purchaser to Sears Credit Card customers pursuant to this Agreement (i) that is not a Credit Card or New Payment Card, and (ii) that is initially offered to such customers pursuant to mutual agreement of the parties on or after the Amendment No. 8 Effective Date.

x.          "Net Sales Volume" means, for any measurement period and for any category of Credit Cards or Accounts, an amount equal to (i) gross credit sales thereon (including gift card sales, sales tax, delivery charges and any other amount included in the full amount charged by the Cardholder) during such period, minus (ii) the sum of credits for returned goods or cancelled services and other credits granted at the point of sale (such as concessions, discounts and adjustments) with respect to such Credit Cards or Accounts during such period. For the avoidance of doubt, the term shall not include any balance transfer or cash advance transaction.

y.          "New Merchant Agreement" means the New Merchant Agreement entered into among the parties as of the Amendment No. 8 Effective Date, as amended from time to time.

z.          "New SYW Card Design" has the meaning set forth in Section 4.8.

20

JX 114-256

aa.         "<u>Non-Promotional Sales</u>" means, for any measurement period, the Net Sales Volume for such period; <u>provided</u>, that such Net Sales Volume relates exclusively to Merchandise sales made at a Store during such period (other than Deferred Interest Financing, MPP or other promotional pricing offer sales.)

ab.         "<u>NR Non-Program Card</u>" means a Non-Rewards Card, other than a TY Non-Program Card or a Sears Proprietary Card, but (subject to the foregoing) the term does include a Sears Credit Card that is not a SYW Credit Card but is enrolled in the SYW Program.

ac.         "<u>Protected Data</u>" means, with respect to Sears, Cardholder Information and Transaction Data; and with respect to Purchaser, Sears Customer Information.

ad.         "<u>SYW Card</u>" means a SYW Credit Card other than a SYW MasterCard.

ae.         "<u>SYW Test</u>" has the meaning set forth in Section 5.8(a)(v)(A).

af.         "<u>Sears Conversion Private Label Card</u>" means a Sears Proprietary Card, excluding [***], but including the SYW Card.

ag.         "<u>Sears Customer Information</u>" means all personally identifiable information, and all other personal information (including information recorded on a tokenized or anonymized basis) regarding a Sears Customer that is obtained by or on behalf of Sears or its Affiliates, including in connection with the Customer making a purchase of Merchandise, enrolling in the SYW Program, or other contacts with Sears. Notwithstanding the foregoing, Sears Customer Data shall exclude any Cardholder Information.

ah.         "<u>Security Standards</u>" has the meaning set forth in Section 8.9(h)(b)(i).

ai.         "<u>TY Non-Program Card</u>" means a Non-Rewards Card, other than a Sears Proprietary Card, whose holder has been enrolled in the Thank You Rewards Program.

2. The following defined terms will be deleted from Section 1.1:

a.         "Attributable Assets"

b.         "Combination Termination Premium Amount"

c.         "Minimum Repurchase Price"

JX 114-257

K.  **Miscellaneous**

**1. Integration**. Purchaser and Sears agree that each of this Amendment No. 8 and all of the other Integrated Agreements are integrated and non-severable parts of one and the same transaction among the parties, each representing an essential, necessary and interdependent component of such transaction; and Purchaser and Sears each agree that all of the Integrated Agreements comprising such transaction constitute one single agreement and are integrated and non-severable for all purposes at Law and in equity, including for purposes of section 365 of title 11 of the United States Code and Delaware law, and that any breach of any one of such agreements shall be deemed a breach under all such agreements.

**2. Caption, Article and Section References**. Caption, Article and Section references herein apply to the Program Agreement or as otherwise specified.

**3. Captions and Titles**. Captions of the articles and sections of this Amendment No. 8 are for convenient reference only and are not intended as a summary of such articles or sections and do not affect, limit, modify or construe the contents thereof.

**4. Conflicts; Continuing Effect**. To the extent that any provision of this Amendment No. 8 conflicts with any provision of any Integrated Agreement (including, for clarity, the schedules and exhibits attached thereto, and any amendments to any Integrated Agreement entered into subsequent to the Amendment No. 8 Effective Date), the provisions of this Amendment No. 8 shall govern. Except as expressly provided herein, including in the preceding sentence, nothing contained herein shall constitute an amendment, modification or waiver of any provision of any Integrated Agreement (including, for clarity, the schedules and exhibits attached thereto) and such Integrated Agreement (including, for clarity, the schedules and exhibits attached thereto) shall remain in full force and effect.

**5. Further Assurances**. Each of Sears and Sears Brands, on the one hand, and Purchaser, on the other hand, shall duly execute and deliver, or cause to be duly executed and delivered, such further instruments and do and cause to be done such further acts and things, including the filing of such assignments, agreements, documents, and instruments, as may be necessary or as another Party may reasonably request in connection with this Amendment No. 8 or to carry out more effectively the provisions and purposes hereof, or to better assure and confirm unto such other Party its rights and remedies under this Amendment No. 8.

**6. Counterparts**. This Amendment No. 8 may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**7. Governing Law**. This Amendment No. 8 shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflict of laws principles of such State.

JX 114-258

*[SIGNATURE PAGE FOLLOWS]*

23

**JX 114-259**

IN WITNESS WHEREOF, each Party hereto has caused this Amendment No. 8 to be duly executed on its behalf as of the day and year first above written.


SEARS, ROEBUCK AND CO.


By: /s/ Robert A. Riecker
Name: Robert A. Riecker
Title: Chief Financial Officer


SEARS BRANDS BUSINESS UNIT CORPORATION, as successor in interest to SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY


By: /s/ Robert A. Riecker
Name: Robert A. Riecker
Title: Vice President


CITIBANK, NA., as successor in interest to CITIBANK (SOUTH DAKOTA), NA., as successor in interest to CITIBANK (USA) N.A.


By: /s/ Craig D. Vallorano
Name: Craig D. Vallorano
Title: Senior Vice President


*[SIGNATURE PAGE TO AMENDMENT NO. 8]*

**JX 114-260**

**ANNEX A**

Annex 1 to Schedule 4.2
Marketing Support

From and after January 1, 2019, the minimum amount of the marketing support ("Marketing Support") for each calendar year shall be the greater of (A) [***] and (B) the amount calculated by multiplying the [***] on [***] in the prior calendar year by [***]. Notwithstanding the foregoing, Purchaser shall not be required to fund the Marketing Support for any calendar year if in the preceding calendar year the [***] was less than [***].

For avoidance of doubt, use of this Marketing Support is applicable to all eligible purchases of Merchandise as covered by specific agreements between the parties covering various Sears business unit promotions as charged to eligible Sears Credit Cards and Former NR/TY Cards (as allowed under the Marketing Agreement).

Annex A-1

JX 114-261

**ANNEX B**

Schedule 7.1-A
Certain Purchaser Payments through December 31, 2020

From and after the Amendment No. 8 Effective Date through and including December 31, 2020:

1.
   [***]

Annex B-1

JX 114-262

[***]

Annex B-2

**JX 114-263**

**ANNEX C**

Schedule 7.1-B
Certain Purchaser Payments From and After January 1, 2021

From and after January 1, 2021: [***]

Annex C-1

JX 114-264

[***]

Annex C-2

JX 114-265

[***]

Annex C-3

JX 114-266

[***]

Annex C-4

JX 114-267

**ANNEX D**

**Schedule 8.9(a)**

**Sales Practices**

Annex D-1

JX 114-268

| Program | Timing | Description |
|---------|--------|-------------|
|         |        | [***] |
|         |        |       |
|         |        |       |
|         |        |       |
|         |        |       |

*For all purposes under this Annex D, calculation of Credit Share shall include Former NR/TY Cards.

Annex D-2

JX 114-269

Annex D-3

JX 114-270

**ANNEX E**

**Schedule 8.9(j)**

**Data Security Breach Costs and Expenses**

Costs and expenses shall be allocated in accordance with [***].

JX 114-271

ANNEX F

**Form of Marketing Agreement**

**MARKETING AGREEMENT**

       **THIS MARKETING AGREEMENT** (this "Agreement"), effective as of May 18, 2018 (the "Effective Date"), is executed this 18th day of May, 2018, by and among Sears, Roebuck and Co. ("Sears"), Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) ("Sears Brands"), and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), N.A.) ("Purchaser") (individually, a "Party" and together, the "Parties").

       **WHEREAS**, Sears, Sears Brands and Purchaser have heretofore executed and entered into a Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended by the parties from time to time including pursuant to Amendment No. 8 (defined below) (collectively, the "Program Agreement");

       **WHEREAS**, pursuant to Section C(5) of Amendment No. 8 to the Program Agreement being entered into by the Parties concurrently with this Agreement ("Amendment No. 8"), the Parties have agreed to enter into this Agreement to set forth certain terms relating to Former NR/TY Cards which will cease to be Program Products subject to the Program Agreement;

       **NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Defined Terms**.

a.      Capitalized terms used herein but not defined herein shall have the respective meanings ascribed thereto in the Program Agreement except that, to the extent any such capitalized term is defined in the Program Agreement with reference to any category of Credit Cards, including NR Non-Program Cards and TY Non-Program Cards, then, for the purposes of this Agreement, such term shall be understood to refer only to Former NR/TY Cards.

b.      References in this Agreement to any gender include references to all genders, and references in this Agreement to the singular include references to the plural and vice versa. Unless the context otherwise requires, the term "party" when used in this Agreement means a party to this Agreement and references to "a party" or the "other party" shall, when referring to Sears or Sears Brands, be deemed to be references to Sears and Sears Brands collectively. References in this Agreement to a party or other Person include their respective Successors and assigns. The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation." Unless the context

Annex F-1

**JX 114-272**

otherwise requires, references in this Agreement to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Section or provision of this Agreement.

2. **Acknowledgement of Former NR/TY Cards**.

a.       Pursuant to Section 4.2(e)(ii) of the Program Agreement, from and after the Effective Date, each Former NR/TY Card and the related account shall not be part of the Program or subject to any Integrated Agreement, and Sears will have no rights or obligations with respect thereto except as provided in this Agreement, the New Merchant Agreement or as Sears and Purchaser may expressly provide in another agreement. For the avoidance of doubt, subject only to such Sears rights as are set forth in this Agreement, the New Merchant Agreement or such other agreement, Purchaser shall have the right with respect to each Former NR/TY Card, from time to time as Purchaser may deem expedient in its sole discretion, to market such card, Transfer it, re-brand it without using Sears Licensed Marks, and convert to a Purchaser card not bearing such Sears Licensed Marks.

b.       Prior to the termination or expiration of this Agreement, Purchaser shall not issue any Former NR/TY Card bearing a Mark of a Person identified in Exhibit A to this Agreement and shall not [***].

c.       Except as otherwise expressly set forth in this Agreement, with respect to each Former NR/TY Card, as between Sears and Purchaser, Purchaser's right to use all account documentation (such term being understood to have the same scope as "Account Documentation", *mutatis mutandis*) and other data, books and records and Cardholder Information that is in existence on the Effective Date, shall be without restriction.

d.       If and to the extent that any Former NR/TY Card that has not been canceled on or before the date of any termination or expiration of this Agreement bears any Sears Licensed Mark, then with respect to such Former NR/TY Cards, Purchaser shall, within [***] from the date of termination or expiration of this Agreement reissue [***] new card plastics not bearing any Sears Licensed Marks.

e.       [***]

3. **Non-Program Credit Card Processing**. Contemporaneously with the execution and delivery of this Agreement, the Parties shall enter into a new merchant agreement, which contains terms relating to authorizations, settlement procedures, merchandise returns, chargebacks and other operating procedures solely with respect to the converted Former NR/TY Cards contemplated by Section 2 above, on the terms and subject to the conditions set forth in such new merchant agreement.

<center>Annex F-2</center>

<center>**JX 114-273**</center>

4. **Payments through 2020**. From and after the Effective Date and through December 31, 2020, Purchaser shall pay to Sears the amounts contemplated by Schedule 4 attached with respect to the relevant Former NR/TY Cards, notwithstanding that they are no longer Sears Credit Cards or Program Products subject to the Program Agreement.

5. **Payments after 2020**. From and after January 1, 2021, Purchaser shall pay to Sears the amounts contemplated by Schedule 5 attached with respect to the relevant Former NR/TY Cards, notwithstanding that they are no longer Sears Credit Cards or Program Products subject to the Program Agreement.

6. **Promotional Offers**.

a.     <u>Deferred Interest Financing</u>. The Former NR/TY Cards shall continue to be eligible to participate in Deferred Interest Financing under Exhibit H of the Program Agreement, which Deferred Interest Financing shall be subject to the terms of Exhibit J of the Program Agreement, notwithstanding that the Former NR/TY Cards are no longer Sears Credit Cards or Program Products subject to the Program Agreement; <u>provided</u>, that such Deferred Interest Financings shall only be for [***] increments.

b.     <u>Major Purchase Plan</u>. The Former NR/TY Cards shall continue to be eligible to participate in MPP under Exhibit J of the Program Agreement and Section 3 of Amendment No. 7, which MPP shall be subject to the terms of Exhibit J of the Program Agreement and Section 3 of Amendment No. 7, notwithstanding that the Former NR/TY Cards are no longer Sears Credit Cards or Program Products subject to the Program Agreement.

c.     <u>Use of Marks</u>. The parties agree that the terms and conditions with respect to the use of the Sears Licensed Marks and the Licensed Purchaser Marks set forth in the Program Agreement and the Licensing Agreement will apply to the use of such Marks for purposes of this Agreement *mutatis mutandis*, <u>provided</u>, that the parties shall include terms relating to Marks licensing and related provisions in the Amended and Restated Program Agreement.

7. **Systems and Interfaces**. The systems and facilities in use prior to the Amendment No. 8 Effective Date for the NR Non-Program Cards and TY Non-Program Cards shall continue to be used for the Former NR/TY Cards subject to such modifications as the parties may agree.; Notwithstanding the foregoing, in the event of Sears' material failure to implement any necessary systems changes within a reasonable mutually agreed timeframe [***] Purchaser shall cease to be obligated to provide the promotional offers contemplated under Section 6 of the Marketing Agreement and the "on-us" treatment contemplated by this New Merchant Agreement.

8. **Reporting**. Purchaser shall provide reporting necessary for Sears to confirm and support payments made under Schedules 4 and 5. Initial reporting shall start at a date agreed upon by both parties, taking into consideration a reasonable time needed by Purchaser to effect

Annex F-3

JX 114-274

changes to internal processes required to reflect removal of Former NR/TY Card accounts from the Program. Purchaser shall provide other reporting that may be agreed upon by the parties from time to time.

9. **Term**.

a.          The initial term of this Agreement shall commence on the Effective Date, and shall continue, unless sooner terminated, until November 2, 2025.

b.          Sears shall have the right to extend the initial term of this Agreement, subject to satisfaction of all preconditions set forth in Section 13.1(b) of the Program Agreement, once for an additional term of up to two (2) years for the duration of the Additional Term.

c.          Notwithstanding anything herein to the contrary, this Agreement will terminate automatically and without further termination action being required by any Party, upon the Termination Date and/or upon any termination or expiration of the New Merchant Agreement.

10. **Representations and Warranties; Sears Covenant**.

a.          <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants the following as of the date hereof:

        i) <u>Organization</u>. Purchaser is a national association duly organized, validly existing and in good standing under the laws of the United States, and is in compliance with its articles of incorporation and bylaws. Purchaser is a member in good standing of the Card Association.

        ii) <u>Capacity; Authority; Validity</u>. Purchaser has all necessary corporate power and authority to enter into this Agreement and to perform all of the obligations to be performed by it under this Agreement. This Agreement and the consummation by Purchaser of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Purchaser, and this Agreement has been duly executed and delivered by Purchaser, constitutes the valid and binding obligation of Purchaser and is enforceable in accordance with its terms.

        iii) <u>Conflicts; Defaults</u>. Neither the execution and delivery of this Agreement by Purchaser, nor the consummation of the transactions contemplated herein by Purchaser, shall (i) conflict with, result in the breach of, constitute a default under or accelerate the performance required by, the terms of any contract, instrument or commitment to which Purchaser is a party or by which Purchaser is bound; (ii) violate the certificate of incorporation, bylaws, or any other equivalent organizational document of Purchaser; or (iii) require any consent or approval under any judgment, order, writ, decree, permit or license to which Purchaser is a party or

Annex F-4

JX 114-275

by which it is bound, other than, in the case of (i) above, breaches, defaults or accelerations that would not prevent or reasonably be expected to prevent Purchaser from executing this Agreement or impact Purchaser's compliance with the terms of this Agreement. Purchaser is not subject to any agreement (x) requiring fundamental changes in the operation of the Program; and (y) with any Governmental Authority that would prevent the consummation of the transactions contemplated by, or its ongoing performance of, this Agreement.

iv) <u>Litigation</u>. There is no claim, litigation, proceeding, arbitration, investigation or material controversy pending before any Governmental Authority to which Purchaser is a party and by which it is bound, that would reasonably be expected to prevent Purchaser's compliance with the terms of this Agreement.

v) <u>No Consents, Etc</u>. No consent of any Person (including any stockholder or creditor of Purchaser) and no consent, license, permit, approval, authorization or exemption by notice of, report to or registration, filing or declaration with, any Governmental Authority is required in connection with the execution or delivery of this Agreement by Purchaser, the validity of this Agreement with respect to Purchaser, the enforceability of this Agreement against Purchaser, the consummation by Purchaser of the transactions contemplated hereby or the performance by Purchaser of its obligations hereunder.

b.          <u>Representations and Warranties of Sears</u>. Each of Sears and Sears Brands, respectively, hereby represent and warrant the following as of the date hereof with respect to itself:

i) <u>Organization</u>. Sears is a corporation duly organized, validly existing and in good standing under the laws of the State of New York, and is in compliance with its articles of incorporation and bylaws. Sears Brands is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and is in compliance with its articles of incorporation and bylaws.

ii) <u>Capacity; Authority: Validity</u>. Each of Sears and Sears Brands has all necessary power and authority to enter into this Agreement and to perform all of the obligations to be performed by it under this Agreement. This Agreement and the consummation by Sears and Sears Brands of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Sears and Sears Brands, and this Agreement has been duly executed and delivered by Sears and Sears Brands, constitutes the valid and binding obligation of Sears and Sears Brands and is enforceable in accordance with its terms.

iii) <u>Conflicts; Defaults</u>. Neither the execution and delivery of this Agreement by Sears and Sears Brands, nor the consummation of the transactions contemplated herein by Sears and Sears Brands, shall (i) conflict with, result in the breach of, constitute a default under or accelerate the performance required by the

Annex F-5

**JX 114-276**

terms of any contract, instrument or commitment to which Sears or Sears Brands is a party or by which Sears or Sears Brands is bound; (ii) violate the certificate of incorporation, bylaws, or any other equivalent organizational document of Sears or Sears Brands; or (iii) require any consent or approval under any judgment, order, writ, decree, permit or license to which Sears or Sears Brands is a party or by which Sears and Sears Brands is bound, other than, in the case of (i) above, breaches, defaults or accelerations that would not prevent or reasonably be expected to prevent Sears or Sears Brands from executing this Agreement or impact Sears' or Sears Brands' compliance with the terms of this Agreement. Neither Sears nor Sears Brands is subject to any agreement (x) requiring fundamental changes in the operation of the Program; and (y) with any Governmental Authority that would prevent the consummation of the transactions contemplated by, or its ongoing performance of, this Agreement.

iv) <u>Litigation</u>. There is no claim, litigation, proceeding, arbitration, investigation or material controversy pending before any Governmental Authority to which Sears or Sears Brands is a party and by which it is bound, that would reasonably be expected to prevent Sears and Sears Brands' compliance with the terms of this Agreement.

v) <u>No Consents, Etc</u>. No consent of any person (including any stockholder or creditor of Sears or Sears Brands) and no consent, license, permit, approval, authorization or exemption by notice of, report to or registration, filing or declaration with, any Governmental Authority is required in connection with the execution or delivery of this Agreement by Sears and Sears Brands, the validity of this Agreement with respect to Sears and Sears Brands, the enforceability of this Agreement against Sears and Sears Brands, the consummation by Sears and Sears Brands of the transactions contemplated hereby, or the performance by Sears and Sears Brands of its obligations hereunder.

vi) <u>Intellectual Property Rights</u>. Sears and its Subsidiaries own the Sears Licensed Marks and have the authority to grant the license to Purchaser pursuant to the Licensing Agreement to use the Sears Licensed Marks. The use by Purchaser of the Sears Licensed Marks in the Licensed Territory during the term of the Licensing Agreement, as set forth therein, will not dilute those Marks and will not infringe on the Intellectual Property rights of any third party or any right of privacy.

**11. Indemnification.**

a.    <u>By Sears</u>. Sears shall, without duplication of its obligations under the Program Agreement, be liable to and shall indemnify, defend and hold harmless, Purchaser and its Affiliates and their respective directors, officers, employees and permitted assigns from and against any Losses arising out of, connected with or resulting from the following, to the extent not caused by any act or omission of Purchaser or its Affiliates:

<div align="center">Annex F-6</div>

**JX 114-277**

i) any Merchandise of a Sears Covered Party (including any product liability or warranty claim with respect thereto), whether or not financed with an account related to a Former NR/TY Card;

ii) the sale of any Merchandise of a Sears Covered Party, including any and all advertising, promotions, marketing programs or documents for such Merchandise;

iii) any misrepresentation or unauthorized representation to third parties by employees of Sears or its Affiliates or Sears Covered Party in connection with this Agreement or the transactions contemplated hereunder;

iv) any act, or omission where there was a duty to act, by Sears, its Affiliates or Sears Covered Party or their respective employees, officers, directors, shareholders or agents hired by either Sears or any of its Affiliates, relating to an account relating to a Former NR/TY Card or any accounts receivable relating thereto;

v) any material breach by Sears or its Affiliates of a covenant, representation or warranty herein, in the New Merchant Agreement or the Licensing Agreement;

vi) [***]; or

vii) any third party claim, action, suit or proceeding ("Claim") arising out of or relating to any infringement, inducement of infringement, dilution, misappropriation or other violation of any third party Intellectual Property arising from [***].

b.      <u>By Purchaser</u>. Purchaser, without duplication of its obligations under the Program Agreement, shall be liable to and shall indemnify, defend and hold harmless Sears, and its Subsidiaries and Affiliates and their respective directors, officers and employees and permitted assigns from and against any Losses arising out of, connected with or resulting from following, to the extent not caused by any act or omission of Sears or its Affiliates:

i) any products and services offered by Purchaser and its Subsidiaries and Affiliates;

ii) any act or omission where there was a duty to act, by Purchaser or its Affiliates or any of their respective employees, officers, directors, shareholders or agents hired by Purchaser or its Affiliates relating to a Former NR/TY Card account or a related account receivable;

Annex F-7

**JX 114-278**

iii) any misrepresentation or unauthorized representation to third parties by employees of Purchaser or its Affiliates in connection with a Former NR/TY Card account;

iv) any material breach by Purchaser or its Affiliates of a covenant, representation or warranty herein, or in the New Merchant Agreement or in the Licensing Agreement;

v) [***]; or

vi) any third party Claim arising out of or relating to any infringement, inducement of infringement, dilution, misappropriation or other violation of any third party Intellectual Property arising from [***].

c.      Procedures for Indemnification. (i) (A) In the event any claim is made, any suit or action is commenced, or any knowledge is received of a state of facts that, if not corrected, would give rise to a right of indemnification of a Party hereunder ("Indemnified Party") by the other Party ("Indemnifying Party"), the Indemnified Party will give written notice to the Indemnifying Party as promptly as practicable, but, in the case of lawsuit, in no event later than the time necessary to enable the Indemnifying Party to file a timely answer to the complaint; provided, that failure to give timely notice shall not relieve the Indemnifying Party of its obligations hereunder except to the extent it is actually prejudiced thereby. Such written notice shall describe such claim in reasonable detail including the sections of this Agreement which form the basis for such claim. The Indemnified Party shall make available to the Indemnifying Party and its counsel and accountants at reasonable times and for reasonable periods, during normal business hours, all books and records of the Indemnified Party relating to any such possible claim for indemnification, and each Party will render to the other such assistance as it may reasonably require of the other (at the expense of the Party requesting assistance) in order to insure prompt and adequate defense of any suit, claim or proceeding based upon a state of facts that may give rise to a right of indemnification hereunder.

(B) [***].

i) Subject to the terms hereof, the Indemnifying Party shall have the right to defend, or to direct the defense of, any such suit, claim or proceeding. The Indemnifying Party shall notify the Indemnified Party via facsimile transmission, with a copy by mail, within thirty days (or sooner, if the nature of the claim so requires) of having been notified pursuant to Section 11(c)(i), whether the Indemnifying Party elects to employ counsel and assume the defense of any such claim, suit or action. If the Indemnifying Party does not timely notify the Indemnified Party of its election to assume the defense (after a second notice has been given any time within or after the time period described above), the Indemnifying Party shall be bound by any determination in such suit, claim or

Annex F-8

**JX 114-279**

proceeding or any compromise or settlement effected by the Indemnified Party; provided, that the Indemnified Party shall not compromise or settle a suit, claim or proceeding that includes an admission of liability of the Indemnifying Party or seeks any material non-monetary relief, without the written consent of the Indemnifying Party, which shall not be unreasonably withheld. The Indemnifying Party shall institute and maintain any such defense diligently and reasonably and shall keep the Indemnified Party fully advised of the status thereof. The Indemnified Party shall have the right to employ its own counsel if the Indemnifying Party so elects to assume such defense, but the fees and expenses of such counsel shall be at the Indemnified Party's expense, unless (A) the employment of such counsel shall have been authorized in writing by the Indemnifying Party; (B) such Indemnified Party shall have reasonably concluded that the interests of such parties are conflicting such that it would be inappropriate for the same counsel to represent both parties (in which case the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party); or (C) the Indemnifying Party shall not have employed counsel to take charge of the defense of such action within a reasonable time after electing to assume the defense thereof, and in any of such events such reasonable fees and expenses shall be borne by the Indemnifying Party.

ii) The Indemnifying Party shall have the right to compromise and settle any suit, claim or proceeding in the name of the Indemnified Party; provided, that the Indemnifying Party shall not compromise or settle a suit, claim or proceeding (A) unless it indemnifies the Indemnified Party for all Losses arising out of or relating thereto and (B) that includes an admission of liability of the Indemnified Party or seeks any material non-monetary relief, without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld. Any final judgment or decree entered in any claim, suit or action for which the Indemnifying Party did not assume the defense in accordance herewith shall be deemed to have been consented to by, and shall (subject to the other provisions hereof) be binding upon, the Indemnifying Party as fully as if the Indemnifying Party had assumed the defense thereof and a final judgment or decree had been entered in such claim, suit or action, or with regard to such claim, suit or action by a court of competent jurisdiction for the amount of such settlement, compromise, judgment or decree. The Indemnifying Party shall be subrogated to any claims or rights of the Indemnified Party as against any other persons with respect to any amount paid by the Indemnifying Party under this Section 11.

iii) Amounts owing under this Section 11 shall be paid promptly upon written demand for indemnification containing in reasonable detail the facts giving rise to such liability; provided, that, if the Indemnifying Party notifies the Indemnified Party within 30 days of receipt of such demand that it disputes its obligations to indemnify and the Parties are not otherwise able to reach agreement after completing the escalation provisions set forth in Section 14.23 of the Program Agreement, the controversy shall be settled by binding arbitration pursuant to the provisions of Section 14.24 of the Program Agreement.

Annex F-9

JX 114-280

iv) The terms of this Section 11 shall survive the termination of this Agreement.

12. **Sales Practices**.

a.        Except for such other prior course of dealing as the parties may have mutually determined to establish (which the parties will cooperate to appropriately document following the Amendment No. 8 Effective Date):

i.        Purchaser shall promptly refer to Sears any Cardholder complaint regarding the quality of Merchandise or otherwise related to Sears;

ii.        Sears shall promptly refer to Purchaser any Cardholder complaint regarding a Former NR/TY Card account or otherwise related to Purchaser;

iii.        Each party shall track complaints received by it from or on behalf of Cardholders or from any Governmental Authority in a manner that enables it to determine if it receives an inordinate amount of complaints regarding a particular matter so that such party (A) can determine if there is an issue related to this Agreement and (B) use commercially reasonable efforts to promptly correct problems; and

iv.        Sears will submit sufficient, timely, and usable information regarding its complaint tracking to enable Purchaser to analyze complaint activity and trends for risk management purposes.

b.        Sears represents and warrants to Purchaser that as of the Amendment No. 8 Effective Date, neither Sears nor its Affiliates, nor any merchant whose goods/services are sold on Sears Marketplace (a "Marketplace Vendor") sells [***].

c.        Notwithstanding anything to the contrary herein, Purchaser, after consultation with Sears, may take any actions and make any changes to this Agreement required to comply with Purchaser's implementation of its policies and procedures relating to anti-money laundering, sanctions, customer identification and anti-bribery and corruption and Sears agrees to provide reasonable cooperation in connection therewith.

d.        Sears acknowledges that Purchaser and its Affiliates are subject to regulatory oversight by Governmental Authorities and that such Governmental Authorities have the authority to examine, audit and inspect the activities of Sears and its Affiliates conducted pursuant to this Agreement. Sears shall and shall cause its Affiliates to, promptly cooperate with all Governmental Authorities having jurisdiction over Purchaser or its Affiliates in connection with any examination, audit or inquiry relating to this Agreement, and shall promptly cooperate with Purchaser in connection with any examination or audit of, or inquiry to, Purchaser

Annex F-10

**JX 114-281**

or its Affiliates by such Governmental Authority. Such cooperation shall include permitting representatives of Purchaser and Governmental Authorities to visit any Sears offices and offices of any of its Affiliates that Sears engages in any capacity in connection with this Agreement. In connection with any such examination, audit or inquiry, Purchaser shall (1) provide as much advance notice to Sears of the examination, audit or inquiry as is reasonably practicable under the circumstances, (2) use commercially reasonable efforts to minimize disruptions to the operations and business of Sears and its Affiliates, and (3) reimburse Sears and its Affiliates for any reasonable and documented out-of-pocket expenses incurred in connection with cooperating with the examination, audit or inquiry. Sears shall, and shall cause its Affiliates to, promptly comply with any guidance, recommendations or requirements of a Governmental Authority arising from any examination, audit or inquiry. Further, if Purchaser reasonably determines that changes to policies or procedures utilized by Sears or its Affiliates in connection with this Agreement are needed based on the results of any such examination, audit or inquiry, Sears shall, and shall cause its Affiliates to, promptly implement any changes requested by Purchaser.

e.        Sears shall ensure that all agreements with its Affiliates require such Affiliates to cooperate with Purchaser and Governmental Authorities with respect to all matters set forth in Section 12(d); provided, that with respect to any such agreements with non-controlled Affiliates and third-party service providers entered into prior to the Amendment No. 8 Effective Date, Sears shall use commercially reasonable efforts to cause such Affiliates and third-party service providers to cooperate in a manner consistent with the intent and purpose of this Section 12.

## 13. Data Security.

a.        [***].

b.        Schedule 13 sets forth additional security requirements applicable to Sears to the extent Sears, or any of its Affiliates or third-party service providers, stores, or has in its possession or control, any Cardholder Information or Transaction Data.

c.        Information Security

i.        Safeguarding Protected Data. Sears and Purchaser shall protect, safeguard and securely maintain the confidentiality and integrity of Protected Data it stores or that is in its possession or control, and that is stored by or in the possession or control of its Affiliates.

ii.        Information Security Program. Sears and Purchaser shall establish, implement and maintain an information security program ("Information Security Program") that includes, at a minimum, the following:

Annex F-11

**JX 114-282**

1.  standards relating to privacy and security of Protected Data that (1) are no less stringent than the Payment Card Industry Data Security Standards adopted by the Payment Card Industry Security Standards Council, as amended from time to time, and (2) comply in all respects with Applicable Laws that apply to the privacy and protection of such data (collectively, the "Security Standards");

2.  appropriate administrative, technical and physical safeguards to (1) ensure the security, confidentiality and integrity of Protected Data; (2) protect against any anticipated threats or hazards to the security or integrity of Protected Data; (3) protect against unauthorized access to or use of Protected Data which could result in substantial harm or inconvenience to a Cardholder or the other party; and (4) ensure the proper disposal of Protected Data;

3.  requirements to (1) conduct a risk assessment to identify and assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Protected Data and evaluate and improve, where necessary, the effectiveness of its safeguards; (2) implement appropriate access controls to limit access to Protected Data; (3) educate and train personnel regarding information security practices and procedures, including the Security Standards and the requirements of the party's Information Security Program; (4) appropriately restrict the storage of Protected Data on laptops, portable devices or other portable media and where Protected Data must be stored on devices, encrypt all Protected Data stored on laptops and, where technically feasible, on other portable devices and portable media; and (5) use industry standard passwords, firewalls and anti-malware measures to protect Protected Data stored on computer systems;

4.  an information security incident reporting process to (1) ensure that the party has the immediate ability to address, contain and mitigate any possible risk stemming from an actual, alleged or potential unauthorized access, disclosure, compromise or theft of Protected Data, improper handling or disposal of Protected Data, theft of information or technology assets, and/or the inadvertent or intentional disclosure of Protected Data, and (2) ensure a consistent process for identifying, reporting, investigating and closing information security incidents; and

5.  a requirement to encrypt all Protected Data that shall travel across public networks or that is transmitted wirelessly.

Annex F-12

**JX 114-283**

iii.        Each party shall continually review and update its Information Security Program in a commercially reasonable manner to address newly identified or emerging security risks.

d.        Review of Security Standards and Information Security Program. To enable a party to assess another party's compliance with the requirements in Section 13(c) above, a party may request from another party such information relating to its Security Standards and Information Security Program as the requesting party deems reasonably necessary. Such other party shall provide the requested information, or provide alternative information as may be reasonably suitable for assessing such other party's Security Standards and Information Security Program (such as policies and procedures, internal or external audit reports or self-assessments), within thirty (30) days after receipt of the request. Such other party shall also cooperate with the requesting party in addressing any reasonable concerns relating to possible deficiencies in such other party's Security Standards and Information Security Program. Each party shall cause its Affiliates to whom it has disclosed Protected Data to comply with the requirements of this Section 13(d).

e.        In the event of any conflict between the terms of this Section13 or Section 14 and Article IX of the Program Agreement, the terms of this Section13 or Section 14, as applicable, shall control.

14. **Data Security Breaches**. Each party shall promptly notify the other parties (except in instances where notice is prohibited by applicable Law or a Governmental Authority requests that notice be withheld or delayed) in the event it becomes aware of any unauthorized use, modification, destruction or disclosure of, or access to, Sears Customer Information, Cardholder Information or Transaction Data, as applicable (any of the foregoing, a "Data Security Breach"), and take such actions as are commercially reasonable or necessary to assess the nature and scope of such Data Security Breach to prevent further Data Security Breaches. The party that experienced the Data Security Breach shall have the sole right to determine whether to provide notice to Governmental Authorities and any affected Cardholders, as well as the timing and form of such notice, and the other party shall provide such cooperation as may reasonably be requested in connection with such notice to Governmental Authorities and Cardholders; provided, that if the Data Security Breach is experienced by Sears and Sears determines not to provide notice to Governmental Authorities or affected Cardholders, Purchaser may nonetheless notify Cardholders of such Data Security Breach and shall consult with Sears with respect to such notice. The party that experienced the Data Security Breach shall pay the applicable costs and expenses relating to each such Data Security Breach set forth on Schedule 8.9(j) of the Program Agreement.

15. **Miscellaneous**.

a.        Incorporated Terms.

i) **Confidentiality**. Article IX of the Program Agreement is incorporated herein, *mutatis mutandis*.

ii) **Entire Agreement.** Section 14.2 of the Program Agreement is incorporated herein, *mutatis mutandis*.

iii) **Relationship of the Parties.** Section 14.3 of the Program Agreement is incorporated herein, *mutatis mutandis*.

iv) **Force Majeure.** Section 14.4 of the Program Agreement is incorporated herein, *mutatis mutandis*.

v) **Books and Records.** Section 14.5 of the Program Agreement is incorporated herein, *mutatis mutandis*.

vi) **Public Announcements.** Section 14.6 of the Program Agreement is incorporated herein, *mutatis mutandis*.

vii) **Audits.** Section 14.7 of the Program Agreement is incorporated herein, *mutatis mutandis*.

viii) **Delegation of Services.** Section 14.8(b) of the Program Agreement is incorporated herein, *mutatis mutandis*.

ix) **Change in Law; Severability.** Section 14.9 of the Program Agreement is incorporated herein, *mutatis mutandis*.

x) **Survival.** Section 14.10 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xi) **Expenses.** Section 14.11 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xii) **Amendment and Waiver.** Section 14.12 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xiii) **Remedies; Specific Performance.** Section 14.13 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xiv) **Table of Contents; Headings.** Section 14.14 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xv) **Limitation on Rights of Others.** Section 14.15 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xvi) **Counterparts; Effectiveness.** Section 14.16 of the Program Agreement is incorporated herein, *mutatis mutandis*.

Annex F-14

JX 114-285

xvii) **Payments.** Section 14.17 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xviii) **Drafting.** Each party acknowledges that its legal counsel participated in the drafting of this Agreement. The parties hereby agree that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor one party over any other.

xix) **Governing Law.** This Agreement shall in all respects be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard to the conflict of laws principles of such state.

xx) **Waiver of Jury Trial.** EACH PARTY TO THIS AGREEMENT WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

xxi) **Jurisdiction; Consent to Service of Process.** Section 14.21 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xxii) **Notices.** Section 14.22 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xxiii) **Escalation; Arbitration.** Sections 14.23 and 14.24 of the Program Agreement are incorporated herein, *mutatis mutandis*.

xxiv) **Taxes.** Section 14.25 of the Program Agreement is incorporated herein, *mutatis mutandis*.

xxv) **Effectiveness**. The due execution and delivery of the Program Agreement and the New Merchant Agreement shall be a condition precedent to the effectiveness of this Agreement.

b.        <u>Assignment</u>. A Party hereto shall not Transfer this Agreement or any of its rights hereunder without the prior written consent of the other Party hereto (which consent may be withheld in such other Party's sole discretion), and any such purported Transfer without such consent shall be void; <u>provided</u>, that Purchaser may Transfer this Agreement, and all of the rights and obligations contained herein (including licenses granted herein, notwithstanding any contrary limitation on sub-license rights), in whole or in part, to a wholly-owned Subsidiary of Citigroup upon notice to Sears but without Sears' consent, and Sears may Transfer this Agreement and all of the rights and obligations contained herein, in whole or in part, to a wholly-owned Subsidiary, <u>provided</u>, that in each such case that such Subsidiary is reasonably capable of performing the obligations of Purchaser or

Annex F-15

JX 114-286

:ars, as applicable, hereunder; _provided,_ further, that the Transferring Party shall remain obligated and liable to the other Party without diminution of such obligation or liability (or the other Party's rights or benefits) by virtue of such Transfer and references to Purchaser or Sears, as applicable, hereunder shall include such Transferee.

c.      <u>Conflicts</u>. To the extent that any provision of this Agreement conflicts with any provision of the Integrated Agreements (including, for clarity, the schedules and exhibits attached thereto), the provisions of this Agreement shall govern.

d.      <u>Recoupment and Set-off</u>. All amounts owing now or hereafter from one party to another under the New Merchant Agreement (which is expressly agreed by the Parties to constitute a single transaction) may be recouped, set-off or otherwise deducted from amounts due from such other party under the New Merchant Agreement, without prior notice to or consent of such other party. Sears acknowledges that any credit, return, chargeback or other circumstance where Purchaser credits any amount to an Account for any Merchandise returned after the date of filing of any petition under Title 11 of the United States Code relates back to the date of purchase of such Merchandise for the purposes of recoupment, set-off or other deduction and constitutes a single integrated transaction. [***]

e.      <u>Integration</u>. Purchaser and Sears agree that each of the New Marketing Agreement, this Agreement, and all amendments and letter agreements executed in connection with any of the foregoing are integrated and non-severable parts of one and the same transaction among the Parties, each representing an essential, necessary and interdependent component of such transaction; and each party to either agreement agrees that all of the foregoing agreements comprising such transaction constitute one single agreement and are integrated and non-severable for all purposes at law and in equity, including for purposes of section 365 of title 11 of the United States Code and Delaware law, and that any breach of any one of such agreements shall be deemed a breach under all such agreements.

*[SIGNATURE PAGE FOLLOWS]*

Annex F-16

**JX 114-287**

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be duly executed on its behalf as of the day and year first above written.


SEARS, ROEBUCK AND CO.


By:
Name:
Title


SEARS BRANDS BUSINESS UNIT CORPORATION, as successor in interest to SEARS INTELLECTUAL PROPERTY MANAGEMENT COMPANY


By:
Name:
Title


CITIBANK, NA., as successor in interest to CITIBANK (SOUTH DAKOTA), NA., as successor in interest to CITIBANK (USA) N.A.


By:
Name:
Title

Annex F-17

**JX 114-288**

**EXHIBIT A**
**MARKS PROHIBITED TO APPEAR ON FORMER NR/TY CARDS**

[***]

Annex F-18

**JX 114-289**

<u>Schedule 4</u>
Purchaser Payments Through December 31, 2020

1.     From and after the Amendment No. 8 Effective Date through and including December 31, 2020, with respect to Former
        NR/TY Cards, without duplication of any payment made pursuant to the Program Agreement:

a. [***]

Annex F-19

JX 114-290

<u>Schedule 5</u>
Purchaser Payments After December 31, 2020

[***]

Annex F-20

JX 114-291

**Schedule 13**
**Additional Security Requirements**

1. [***]

Annex F-21

**JX 114-292**

**ANNEX G**

**Form of New Merchant Agreement**

**NEW MERCHANT AGREEMENT**
**BY AND BETWEEN**
**SEARS, ROEBUCK AND CO.**
**AND**
**CITIBANK, N.A.**

**THIS NEW MERCHANT AGREEMENT** (the "New <u>Merchant Agreement</u>"), effective as of May 18, 2018 (the "<u>Effective Date</u>"),by and between SEARS ROEBUCK AND CO., a New York corporation ("<u>Sears</u>"), and Citibank, N.A., a national banking association (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA), N.A.) ("<u>Purchaser</u>").

**RECITALS**

**WHEREAS**, Sears is, among other things, engaged in the business of selling merchandise and services through retail stores, catalogs and other means;

**WHEREAS**, Sears and certain of Sears' Affiliates (collectively, "<u>Sellers</u>") and Citicorp, a Delaware corporation and an affiliate of Purchaser ("<u>Citicorp</u>"), have entered into the Purchase, Sale and Servicing Transfer Agreement, dated as of July 15, 2003, as it may be amended from time to time (the "<u>Purchase Agreement</u>"), pursuant to which Citicorp has agreed to acquire from Sellers, and Sellers have agreed to sell to Citicorp, or certain of its Affiliates, those assets and liabilities associated with Sears' existing credit card and financial products businesses, on the terms and subject to the conditions of the Purchase Agreement;

**WHEREAS**, Sears, Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company, "<u>Sears Brands</u>") and Purchaser have heretofore executed and entered into a Program Agreement, originally dated as of July 15, 2003, amended and restated as of November 3, 2003, and as further amended by the parties from time to time including pursuant to Amendment No. 8 (defined below) (collectively, the "Program Agreement");

**WHEREAS**, pursuant to Section C(6) of Amendment No. 8 to the Program Agreement being entered into by the Parties concurrently with this Agreement ("<u>Amendment No. 8</u>"), the Parties have agreed to enter into this Agreement to set forth certain terms relating to Former NR/TY Cards which will cease to be Program Products subject to the Program Agreement;

**WHEREAS**, Sears desires to enter into a relationship with Purchaser for, among other things, the acceptance of the Former NR/TY Cards in Stores (as such terms are defined in the Program Agreement).

Annex G-1

JX 114-293

**NOW, THEREFORE**, in consideration of the premises and mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Sears hereby agree as follows:

### ARTICLE I - DEFINITIONS

Capitalized terms used in this New Merchant Agreement, if not hereinafter defined, have the respective meanings given to them in the Program Agreement except that, to the extent any such capitalized term is defined in the Program Agreement with reference to any category of Credit Cards, including NR Non-Program Card or TY Non-Program Cards, then for the purposes of this New Merchant Agreement, such term shall be understood to refer only to Former NR/TY Cards.

**1.1** "Authorization" means a valid authorization code provided by Purchaser to Sears with respect to a Card Sale when Sears is presented with a Card Account number.

**1.2** "Authorization Center" means the system accessed by Sears for the purpose of obtaining authorization codes and instructions on handling Card Sales.

**1.3** "Card Network Regulations" means the by-laws, procedures, rules and regulations of the Card Network, as they may be amended from time to time by the Card Network.

**1.4** "Card Sale" is a sale of Merchandise by Sears to a Cardholder through the use of a Former NR/TY Card.

**1.5** "Card Sale Date" means the transaction date for any Card Sale.

**1.7** "Chargeback" is the reversal of a charge against a Card Sale previously presented by Sears to Purchaser for payment, in accordance with Section 3.3 of this New Merchant Agreement and Section 3 of the Rules.

**1.8** "Cost of Funds Adjustment" will have the meaning set forth in Section 3.2.

**1.9** "Designated Participant" will have the meaning set forth in Section 12.24.

**1.10** "Electronic Card Capture Device" means a device intended to electronically transmit Sales Data to Purchaser, which can be either a physical or virtual "point of sale" device.

**1.11** "In-Store Payment" means a payment on or related to an account associated with a Former NR/TY Card made by a cardholder thereof (or any Person acting on behalf of such cardholder) at a Store.

**1.12** "Merchant Operating Rules and Regulations" or the "Rules" means, with respect to the Former NR/TY Cards, the rules outlined in Schedule A attached hereto and

Annex G-2

**JX 114-294**

incorporated herein by reference, as may be amended from time to time in accordance with Section 12.25.

**1.13** "New Merchant Agreement" has the meaning set forth in the preamble hereto.

**1.14** "Processor" means any organization, including Purchaser, that captures Sales Transactions on behalf of Sears.

**1.15** "Program Agreement" has the meaning set forth in the recitals hereto.

**1.16** "Purchase Agreement" has the meaning set forth in the recitals hereto.

**1.17** "Refund" means any non-cash refund, return, or price adjustment of a Card Sale made through the use of a Former NR/TY Card.

**1.18** "Refund Record" means all documents or data used to evidence any Refund.

**1.19** "Sales Data" means data representing Sales Transactions related to a Card Sale, Refund or credit.

**1.20** "Sales Record" means all documents or data presented to Purchaser as evidence of a Card Sale or credit.

**1.21** "Sales Transaction" means any single Card Sale, Refund or representment to an Account by Sears and processed through Purchaser or a processor, including an Authorization and ticket capture as a single transaction.

**1.22** "Sears" has the meaning set forth in the preamble hereto.

**1.23** "Settlement Account" means the account maintained at a depository institution and designated by Sears to which funds due to Sears for Card Sales are credited, such depository institution to be a member of the Automated Clearing House Association.

**1.24** "Settlement Amounts" means the daily amounts payable by Purchaser to Sears resulting from clearing Card Sales, including sales volume, representments, any taxes collected and other credits, after recouping Chargebacks, Refunds, fees and other debits.

**1.25 Construction.** References in this New Merchant Agreement to any gender include references to all genders, and references in this New Merchant Agreement to the singular include references to the plural and vice versa. Unless the context otherwise requires, the term "party" when used in this New Merchant Agreement means a party to this New Merchant Agreement. References in this New Merchant Agreement to a party or other Person include their permitted Successors and assigns. The words "include," "includes" and "including" when used in this New Merchant Agreement shall be deemed to be followed by the phrase "without limitation." Unless the context otherwise requires, references in this New Merchant Agreement to Articles, Sections and Schedules shall be deemed references to Articles and Sections of, and Schedules to, this New Merchant Agreement. Unless the context

Annex G-3

**JX 114-295**

otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this New Merchant Agreement refer to this New Merchant Agreement in its entirety and not to any particular Article, Section or provision of this New Merchant Agreement.

## ARTICLE II - CERTAIN COVENANTS

**2.1 Card Network Regulations.** The parties agree that, to the extent the Card Network Regulations apply to agreements of the same type as this New Merchant Agreement, and the Card Network Regulations require either party to render performance to a Cardholder at a higher level than required herein or in the Rules, the Card Network Regulations shall control.

**2.2 Current Sears Practices.** Sears represents and warrants that all provisions herein or in the Rules that relate to Sears' processing standards are consistent in all material respects with Sears' processing standards as of the twelve-month period prior to the Effective Date. If any such provision does not accurately represent any such processing standard, the parties agree to renegotiate such inconsistent standard.

**2.3 In-Store Payments.** The parties shall continue to support In-Store Payments. Sears acknowledges and agrees that all In-Store payments (including In-Store Payments received after the termination of this New Merchant Agreement) are at all times the property of Purchaser, and Sears expressly and irrevocably disclaims and prospectively waives any and all right, title, claim or interest in or to the In-Store Payments at law or in equity, and that In-Store payments do not constitute property of Sears for any purpose, including without limitation under section 541 of title 11 of the United States Code. Sears further acknowledges and agrees that Purchaser has the sole and exclusive right to receive and retain all In-Store Payments and to pursue collection of all amounts outstanding on any Former NR/TY Card Account. If Sears or its Affiliates shall receive any In-Store Payments, Sears shall, directly or through its Affiliates, be deemed to hold such In-Store Payments in trust for Purchaser until such payments are either delivered to Purchaser or applied to reduce amounts payable by Purchaser to Sears pursuant to this New Merchant Agreement. Sears shall give or cause to be given to each Person making an In-Store Payment a receipt for such payment. In-Store Payments shall be credited to the Former NR/TY Card Account of the relevant Former NR/TY Card Cardholder as of the date of actual receipt by Sears or its Affiliates. In the event that In-Store Payments received by Sears and its Affiliates and creditable to Purchaser pursuant to this New Merchant Agreement on any Business Day exceed amounts payable by Purchaser to Sears on such Business Day, Sears shall be required to remit such excess to Purchaser no later than two Business Days thereafter or, if earlier, the date on which the Settlement Amounts (as defined in the Merchant Agreement) with respect to sales of Merchandise made on the same day that the In-Store Payment is received are paid to Sears under this New Merchant Agreement. In the event that In-Store Payments paid by check are returned for insufficient funds, Purchaser will promptly reimburse Sears for the amount of any returned checks (to the extent such amount was paid by Sears to Purchaser), any bank or other third party fees associated therewith, and any third party fees incurred by Sears in representing checks for

Annex G-4

JX 114-296

payment; underline{provided}, that Sears shall comply with Purchaser's reasonable instructions regarding the processing of such returned checks. The termination of this New Merchant Agreement shall not affect Sears' obligations under this New Merchant Agreement with respect to In-Store Payments received after termination of this New Merchant Agreement. For the avoidance of doubt, Sears shall be solely responsible and liable to Purchaser for all In-Store Payments received by any Affiliate, Third Party Sears Merchant, or Third Party Non-Sears Merchant, as if such in-Store Payments had been paid directly to Sears.

## ARTICLE III - PURCHASER OBLIGATIONS

**3.1 Purchaser Services.** Purchaser will process for Sears Sales Transactions on Former NR/TY Cards and shall provide to Sears the following additional services with respect to Former NR/TY Cards:

**3.1.1**     Provide real-time and batch processing capabilities for Authorizations, according to the Service Standards set forth in Schedule E of the Program Agreement;

**3.1.2**     Provide a 24-hour Authorization help desk, according to the Service Standards set forth in Schedule E of the Program Agreement;

**3.1.3**     Provide electronic transmission of Sales Data into Purchaser's systems;

**3.1.4**     Send settlement, Chargeback, and other agreed-upon transaction reports to Sears, in a form and format mutually agreed upon by the parties;

**3.1.5**     Use commercially reasonable efforts to monitor and mitigate fraud;

**3.1.6**     Answer Sears' inquiries concerning Sales Transactions;

**3.1.7**     Fund Sears Settlement Account, in accordance with Section 3.2 of this New Merchant Agreement;

**3.1.8**     Manage change requests and problem reports from Sears in a timely manner; and

**3.1.9**     Comply with the service standards set forth in Exhibit E to the Program Agreement.

**3.2 Payment of Settlement Amounts on Card Sales.** Purchaser will pay the daily Settlement Amounts with respect to Card Sales by ACH to the Settlement Account in accordance with the following time periods: [***]. The parties acknowledge and agree that, if all or a portion of the Settlement Amounts due are not paid to Sears by [***], Purchaser will reimburse Sears for its cost of funds adjustment (the "Cost of Funds Adjustment") from the date such Settlement Amounts were due until and including the date such Settlement Amounts are paid in full. The Cost of Funds Adjustment shall be calculated using the formula set forth on Schedule B. If all or a portion of the required Sales Data is not received by Purchaser and

Annex G-5

**JX 114-297**

its processor by [***], or such data is unreadable, Purchaser will not be required to process the Sales Data containing any missing or unreadable data, and shall immediately inform Sears of such missing or unreadable data. Sears will be responsible for retrieving or resubmitting the Sales Data in completed form. Sears will be responsible for the loss, damage or destruction of Sales Data until such Sales Data is received by Purchaser and its processor. Purchaser shall not be liable for any fees and costs arising from any delays in receipt of funds or errors in Settlement Account entries caused by Sears or third parties. Sears agrees not to close the Settlement Account without providing Purchaser at least [***] prior written notice of such closure and substitution of another account. Sears shall be solely responsible for all fees and costs associated with the Settlement Account. The amounts paid will be the full amount indicated in the Settlement Amounts, as reported, with no deduction, reduction, recoupment, or setoff for any reason, except as expressly provided for herein or under Section 7.8 of the Program Agreement. All Settlement Amounts shall be paid in United States currency, unless otherwise agreed. Sears authorizes Purchaser to initiate credit or debit entries and adjustments to the Settlement Account. If this New Merchant Agreement terminates, Sears will maintain the Settlement Account with reasonably sufficient funds until Sears and Purchaser agree that all Chargebacks and other adjustments are processed, and Sears will permit Purchaser to credit and debit the Settlement Account until all such charges are finalized. Chargebacks and other adjustments will be settled as provided in this New Merchant Agreement.

### 3.3 Chargeback Rights and Procedures for Card Sales.

3.3.1    Subject to the Rules and the terms and conditions set forth in this New Merchant Agreement, any payment made by Purchaser to Sears in connection with a Card Sale may be charged back to Sears until the expiration of 120 days after the Card Sale Date (including 120 days after termination of this New Merchant Agreement), except in cases of Chargebacks related to losses on credit limit or other credit-related overrides on protection agreements, extended warranty protection, maintenance agreements, or similar products under Section 3.1(iii) of the Rules, which can be charged back without limit as to time. The parties will work together in good faith to resolve Cardholder disputes presented after the 120-day Chargeback period.

3.3.2    Purchaser is not required to pay Sears for a Card Sale that is charged back. If Purchaser has already paid Sears for such Card Sale, Purchaser may, at its sole discretion, either (i) recoup the amount to be charged back from the daily Settlement Amount or debit the Settlement Account; or (ii) recoup the amount to be charged back from any other future payment to Sears. If the Settlement Account contains insufficient funds or charges, Purchaser may demand that Sears pay Purchaser the amount of the Chargeback, and Sears will make such payment within three Business Days of such demand.

Annex G-6

**JX 114-298**

3.3.3        If Purchaser processes a Chargeback and the amount of the Card Sale or the disputed amount is subsequently paid by the Cardholder, Purchaser will reimburse Sears for such amount.

**3.4 Cardholder Complaints.** Purchaser will cooperate with Sears consistent with the terms of the Program Agreement, including Section 5 thereof, in addressing Cardholder complaints that arise in connection with a Card Sale.

**3.5 Electronic Data Transmissions and Equipment.** Unless otherwise provided herein, Purchaser will transmit, or cause to be transmitted, to Sears all data required under this New Merchant Agreement via electronic transmission in mutually agreed upon formats. The parties may, from time to time, agree as to changes to any electronic format(s) used in connection with the transactions contemplated by this New Merchant Agreement. [***]

**3.6 Purchaser Card Network Compliance.** Subject to Section 2.1, Purchaser will comply with the Card Network Regulations applicable to it in connection with the processing of Former NR/TY Cards, except to the extent transactions effected using Former NR/TY Cards are processed as on-us transactions.

### ARTICLE IV - SEARS OBLIGATIONS

**4.1 General Duties.** Sears will comply with the terms of this New Merchant Agreement, the Rules, and the Card Network Regulations, as applicable, in connection with the acceptance of Former NR/TY Cards and in submitting Sales Transactions and Sales Records for processing. Without limiting the generality of the foregoing, Sears will: (a) honor each valid Former NR/TY Card presented by Cardholders if it is authorized to do so by this New Merchant Agreement, the Rules, and the Card Network Regulations; (b) treat each Sales Transaction no less favorably than Sears treats other credit card transactions; (c) not establish minimum or maximum amounts for Card Sales, Sales Transactions or Sales Records; (d) not impose any surcharge on Card Sales or Sales Transactions; and (e) include any Sales Tax on a Sales Transaction in the total charge amount. During the term of this New Merchant Agreement, Sears will, and will use commercially reasonable efforts to cause its Designated Participants to, maintain a merchant relationship with the Card Network for the purpose of accepting Credit Cards for purchases of Merchandise.

**4.2 Use of Forms.** Unless otherwise provided herein, Sears will use such forms of Card Sales, Sales Records and Refund Records as is determined by mutual agreement of the parties.

**4.3 Electronic Transmission Requirements.** Unless otherwise provided herein, Sears will transmit, or cause to be transmitted, all data required under this New Merchant Agreement via electronic transmission in mutually agreed upon formats.

**4.4 Equipment.** [***]

---

Annex G-7

**4.5 Sears Card Network Compliance.** Subject to Section 2.1, Sears will comply with the Card Network Regulations applicable to it in connection with the processing of Former NR/TY Cards, except to the extent transactions effected using Former NR/TY Cards are processed as on-us transactions.

**4.6 Sears Subsidiaries.** Sears and Purchaser agree that the Sears Subsidiaries named on Schedule C, attached hereto and incorporated herein by reference, will accept Former NR/TY Cards, and Sears will cause each such Subsidiary to comply with, and will be responsible for each Subsidiary's compliance with, the terms and conditions set forth in this New Merchant Agreement as if such Subsidiary was Sears. Should any such Subsidiary, at any time, cease to be an Affiliate of Sears, Sears and Purchaser will determine whether such Subsidiary will continue to have the ability to accept Former NR/TY Cards on the terms of the merchant agreement in effect for Partner Merchants at that time, or on such other terms as the parties agree, and such Subsidiary shall be deleted from Schedule C. Further, if Sears desires that any Sears Subsidiary at any time should no longer accept Former NR/TY Cards, Sears will provide written notice to Purchaser and such Sears Subsidiary shall be deemed deleted from Schedule C as of the effective date set forth in such notice, which shall be no less than 15 days after Purchaser's receipt of such notice, unless otherwise agreed upon by the parties. If a new Sears Subsidiary which is not named on Schedule C becomes or will become subject to the Program Agreement, Sears shall provide Purchaser with written notice thereof and such Subsidiary shall be deemed added to Schedule C as of the effective date set forth in such notice. Sears shall guarantee the obligations of the Sears Subsidiaries named on Schedule C, as amended from time to time.

**4.7 Financial Reporting.** [***] of the end of each calendar quarter, a report for such quarter substantially in the form attached to that certain Officer's Certificate, dated April 3, 2018, that was delivered to Purchaser.

**4.8 Notice of Store Closures**. Sears shall give Purchaser written notice of its intention to conduct, at one or more retail outlets, a liquidation, "going-out-of-business," store-closure, or similar sale. Notice by Sears of any store closing will be given contemporaneously with any public announcement of such closing.

**4.9 [RESERVED]**

**4.10 Sales Practices**.

**4.10.1** Except for such other prior course of dealing as the parties may have mutually determined to establish (which the parties will cooperate to appropriately document following the Amendment No. 8 Effective Date):

(a) Purchaser shall promptly refer to Sears any Cardholder complaint regarding the quality of Merchandise or otherwise related to Sears;

Annex G-8

JX 114-300

(b) Sears shall promptly refer to Purchaser any Cardholder complaint regarding a Former NR/TY Card account or otherwise related to Purchaser;

(c) Each party shall track complaints received by it from or on behalf of Former NR/TY Card cardholders or from any Governmental Authority in a manner that enables it to determine if it receives an inordinate amount of complaints regarding a particular matter so that such party (i) can determine if there is an issue related to this New Merchant Agreement and (ii) use commercially reasonable efforts to promptly correct problems; and

(d) Sears will submit sufficient, timely, and usable information regarding its complaint tracking to enable Purchaser to analyze complaint activity and trends for risk management purposes.

**4.10.2** [***]

**4.10.3** Sears shall train [***] its employees and the employees of its Affiliates having any involvement with the Program so as to be able to properly fulfill Sears's and the Affiliates' responsibilities under this New Merchant Agreement, including compliance with applicable Law, the Rules and any other written instructions provided by Purchaser under this New Merchant Agreement. Purchaser shall have the right to review all of Sears's training materials and sessions, and Sears shall implement any reasonable recommendations made by Purchaser with respect to such materials and sessions. Sears shall conduct its training [***] to ensure that all such employees are properly trained in all relevant aspects of this New Merchant Agreement. Sears shall also conduct additional training as requested by Purchaser if Purchaser reasonably determines that employees of Sears or its Affiliates are not complying with applicable Law, the Rules, or other written instructions of Purchaser relating to this New Merchant Agreement. Sears shall track and maintain evidence of all such trainings and provide evidence of such trainings to Purchaser as reasonably requested by Purchaser.

**4.10.4** Notwithstanding anything to the contrary herein, Purchaser, after consultation with Sears, may take any actions and make any changes to this New Merchant Agreement required to comply with Purchaser's implementation of its policies and procedures relating to anti-money laundering, sanctions, customer identification and anti-bribery and corruption and Sears agrees to provide reasonable cooperation in connection therewith.

**4.10.5** Sears acknowledges that Purchaser and its Affiliates are subject to regulatory oversight by Governmental Authorities and that such Governmental Authorities have the authority to examine, audit and inspect the activities of Sears and its Affiliates conducted pursuant to this New Merchant Agreement. Sears shall and shall cause its Affiliates to, promptly cooperate with all Governmental Authorities having jurisdiction over Purchaser or its Affiliates in connection with any examination, audit or inquiry relating to the Program or this New Merchant Agreement, and shall promptly

Annex G-9

**JX 114-301**

cooperate with Purchaser in connection with any examination or audit of, or inquiry to, Purchaser or its Affiliates by such Governmental Authority. Such cooperation shall include permitting representatives of Purchaser and Governmental Authorities to visit any Sears offices and offices of any of its Affiliates that Sears engages in any capacity in connection with this New Merchant Agreement. In connection with any such examination, audit or inquiry, Purchaser shall (A) provide as much advance notice to Sears of the examination, audit or inquiry as is reasonably practicable under the circumstances, (B) use commercially reasonable efforts to minimize disruptions to the operations and business of Sears and its Affiliates, and (C) reimburse Sears and its Affiliates for any reasonable and documented out-of-pocket expenses incurred in connection with cooperating with the examination, audit or inquiry. Sears shall, and shall cause its Affiliates to, promptly comply with any guidance, recommendations or requirements of a Governmental Authority arising from any examination, audit or inquiry. Further, if Purchaser reasonably determines that changes to policies or procedures utilized by Sears or its Affiliates in connection with this New Merchant Agreement are needed based on the results of any such examination, audit or inquiry, Sears shall, and shall cause its Affiliates to, promptly implement any changes requested by Purchaser.

**4.10.6** Sears shall ensure that all agreements with its Affiliates require such Affiliates to cooperate with Purchaser and Governmental Authorities with respect to all matters set forth in Sections 4.10.5; provided, that with respect to any such agreements with non-controlled Affiliates and third-party service providers entered into prior to the Amendment No. 8 Effective Date, Sears shall use commercially reasonable efforts to cause such Affiliates and third-party service providers to cooperate in a manner consistent with the intent and purpose of this Section 4.10.

## 4.11 Data Security

**4.11.1** [***]

**4.11.2** Schedule 4.11.2 sets forth additional security requirements applicable to Sears to the extent Sears, or any of its Affiliates or third-party service providers, stores, or has in its possession or control, any Cardholder Information or Transaction Data.

## 4.12      Information Security

**4.12.1** Safeguarding Protected Data. Sears and Purchaser shall protect, safeguard and securely maintain the confidentiality and integrity of Protected Data it stores or that is in its possession or control, and that is stored by or in the possession or control of its Affiliates.

**4.12.2** Information Security Program. Sears and Purchaser shall establish, implement and maintain an information security program ("Information Security Program") that includes, at a minimum, the following:

Annex G-10

JX 114-302

(a) standards relating to privacy and security of Protected Data that (1) are no less stringent than the Payment Card Industry Data Security Standards adopted by the Payment Card Industry Security Standards Council, as amended from time to time, and (2) comply in all respects with Applicable Laws that apply to the privacy and protection of such data (collectively, the "Security Standards");

(b) appropriate administrative, technical and physical safeguards to (1) ensure the security, confidentiality and integrity of Protected Data; (2) protect against any anticipated threats or hazards to the security or integrity of Protected Data; (3) protect against unauthorized access to or use of Protected Data which could result in substantial harm or inconvenience to a Cardholder or the other party; and (4) ensure the proper disposal of Protected Data;

(c) requirements to (1) conduct a risk assessment to identify and assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Protected Data and evaluate and improve, where necessary, the effectiveness of its safeguards; (2) implement appropriate access controls to limit access to Protected Data; (3) educate and train personnel regarding information security practices and procedures, including the Security Standards and the requirements of the party's Information Security Program; (4) appropriately restrict the storage of Protected Data on laptops, portable devices or other portable media and where Protected Data must be stored on devices, encrypt all Protected Data stored on laptops and, where technically feasible, on other portable devices and portable media; and (5) use industry standard passwords, firewalls and anti-malware measures to protect Protected Data stored on computer systems;

(d) an information security incident reporting process to (1) ensure that the party has the immediate ability to address, contain and mitigate any possible risk stemming from an actual, alleged or potential unauthorized access, disclosure, compromise or theft of Protected Data, improper handling or disposal of Protected Data, theft of information or technology assets, and/or the inadvertent or intentional disclosure of Protected Data, and (2) ensure a consistent process for identifying, reporting, investigating and closing information security incidents; and

(e) a requirement to encrypt all Protected Data that shall travel across public networks or that is transmitted wirelessly.

**4.12.3** Review of Security Standards and Information Security Program. Each party shall continually review and update its Information Security Program in a commercially reasonable manner to address newly identified or emerging security risks.

4.13      **Review of Security Standards and Information Security Program**. To enable a party to assess the other party's compliance with the requirements in

JX 114-303

Section 4.12 above, a party may request from the other party such information relating to its Security Standards and Information Security Program as the requesting party deems reasonably necessary. Such other party shall provide the requested information, or provide alternative information as may be reasonably suitable for assessing such other party's Security Standards and Information Security Program (such as policies and procedures, internal or external audit reports or self-assessments), within thirty (30) days after receipt of the request. Such other party shall also cooperate with the requesting party in addressing any reasonable concerns relating to possible deficiencies in such other party's Security Standards and Information Security Program. Each party shall cause its Affiliates to whom it has disclosed Protected Data to comply with the requirements of this Section 4.13. In the event of any conflict between the terms of Section 4.11 through Section 4.14 and Article V, the terms of Section 4.11 through Section 4.14, as applicable, shall control.

4.14     **Data Security Breaches**. Each party shall promptly notify the other (except in instances where notice is prohibited by applicable Law or a Governmental Authority requests that notice be withheld or delayed) in the event it becomes aware of any unauthorized use, modification, destruction or disclosure of, or access to, Sears Customer Information, Cardholder Information or Transaction Data, as applicable (any of the foregoing, a "Data Security Breach"), and take such actions as are commercially reasonable or necessary to assess the nature and scope of such Data Security Breach to prevent further Data Security Breaches. The party that experienced the Data Security Breach shall have the sole right to determine whether to provide notice to Governmental Authorities and any affected Cardholders, as well as the timing and form of such notice, and the other party shall provide such cooperation as may reasonably be requested in connection with such notice to Governmental Authorities and Cardholders; provided, that if the Data Security Breach is experienced by Sears and Sears determines not to provide notice to Governmental Authorities or affected Cardholders, Purchaser may nonetheless notify Cardholders of such Data Security Breach and shall consult with Sears with respect to such notice. The party that experienced the Data Security Breach shall pay the applicable costs and expenses relating to each such Data Security Breach set forth on Schedule 8.9(j) of the Program Agreement.

### ARTICLE V - CONFIDENTIAL INFORMATION

The parties agree that the terms and conditions with respect to Confidential Information as set forth in the Program Agreement will apply to information disclosed to or observed or otherwise obtained by one party with regard to the other party in the course of the negotiation of this New Merchant Agreement and each party's performance of its obligations hereunder.

Annex G-12

**JX 114-304**

## ARTICLE VI - SEARS REPRESENTATIONS AND WARRANTIES

**6.1 Generally.** Sears hereby warrants and represents, as of the date of presentment to Purchaser of each Sales Record for a Card Sale:

**6.1.1**     All Sales Records and Refund Records that Sears presents to Purchaser are genuine and arise out of bona fide Card Sales of Merchandise by Sears in the ordinary course of business and that all such records are originated by Sears in compliance with this New Merchant Agreement and the Rules;

**6.1.2**     Sears has title to all Sales Records presented to Purchaser, there are no liens or other encumbrances on such Sales Records and Sears has the authority to present such Sales Records to Purchaser;

**6.1.3**     No Sales Record is subject to any dispute, set-off or counterclaim due to any act or omission of Sears, except for those created as a result of the acts or omissions of Purchaser;

**6.1.4**     The Card Sale did not arise out of any fraud or malfeasance of any employee or agent of Sears;

**6.1.5**     The Sales Records are free from any alteration not authorized by the Cardholder;

**6.1.6**     With respect to any transaction in which a Former NR/TY Card is not physically presented to Sears, the Former NR/TY Card and Account information contained in the Sales Data is accurate and correct or as described in Exhibit A (attached);

**6.1.7**     The Sales Transaction is in compliance with all applicable Laws; and

**6.2** [***]

## ARTICLE VII - USE OF TRADEMARKS

The parties agree that the terms and conditions with respect to the use of the Sears Licensed Marks and the Licensed Purchaser Marks set forth in the Program Agreement and the Licensing Agreement will apply to the use of such Marks for purposes of this New Merchant Agreement *mutatis mutandis*, provided, that the parties shall include terms relating to Marks licensing and related provisions in the Amended and Restated Program Agreement.

## ARTICLE VIII - RECORDS

**8.1 Generally.** Sears will retain electronic records of all Sales Records and Refund Records (and any other transaction records) for at least seven years after the date when Sears presents the records to Purchaser. If Sears cannot retain electronic records of all or a portion

Annex G-13

JX 114-305

of any such records, then Sears will retain either the original, or a legible microfilm copy of both sides, of all Sales Records and Refund Records (and any other transaction records) for at least seven years after the date when Sears presents the records to Purchaser.

**8.2 Requests for Copies.** Sears will provide Purchaser with copies of the electronic records of all Sales Records or Refund Records (and any other transaction records), or, if there is no electronic record, a copy of either the original paper or of the microfilmed version of such Sales Records or Refund Records (and any other transaction records) (in size comparable to the original paper record), and any other documentary evidence available to Sears and reasonably requested by Purchaser to meet its obligations under applicable Laws (including its obligations under Regulation Z of the Board of Governors of the Federal Reserve System) or to respond to questions concerning Accounts.

**8.3 Systems Access.** Sears will provide Purchaser's employees or contractors, who have a need to know, with "view only' access to Sears' systems with respect to Sales Records and Refund Records, and Purchaser will provide Sears' contract sales employees with "view only" access to chargeback entry system to assist in resolving customer disputes. The parties agree that each party will be reimbursed by the other party for services provided under this Section 8.3 based on its actual costs of providing such services, taking into account, if applicable, a reasonable allocation of overhead.

<div align="center">

**ARTICLE IX - COMPLIANCE WITH LAW**

</div>

**9.1 Sears' Compliance.** Sears will comply with all Laws applicable to Sears and Sears' business as they relate to Sales Transactions.

**9.2 Purchaser's Compliance.** Purchaser will comply with all Laws applicable to Purchaser and Purchaser's business as they relate to Sales Transactions.

<div align="center">

**ARTICLE X - DEFENSE AND INDEMNIFICATION**

</div>

**10.1 By Sears.** Sears shall be liable to, and shall defend, indemnify and hold harmless, Purchaser and its Subsidiaries and Affiliates and their respective directors, officers, employees and permitted assigns from and against any Losses arising out of [***].

**10.2 By Purchaser.** Purchaser shall be liable to, and shall defend, indemnify and hold harmless, Sears, and its Subsidiaries and Affiliates and their respective directors, officers, employees and permitted assigns from and against any Losses arising out of [***].

**10.3 Procedures for Indemnification.** The parties agree to follow the procedures for indemnification set forth in Section 11.3 of the Program Agreement for purposes of indemnification under this New Merchant Agreement.

<div align="center">

**ARTICLE XI - TERM AND TERMINATION**

</div>

**11.1 Term.** This New Merchant Agreement shall commence on the Effective Date, and shall continue in full force and effect during the Term of the Program Agreement;

<div align="center">

Annex G-14

</div>

**JX 114-306**

provided, that Purchaser may terminate this New Merchant Agreement with respect to any Subsidiary listed on Schedule C after such Subsidiary fails to perform any of its material obligations or breaches, any of its material covenants hereunder in any material respect, and such failure or breach shall have continued unremedied for 30 days after delivery of written notice from Purchaser of its intention to terminate this New Merchant Agreement with respect to such Subsidiary, absent remedy of such failure or breach within the 30-day period. Notwithstanding anything herein to the contrary, this Agreement will terminate automatically and without further termination action being required by any Party, upon the Termination Date and/or upon the termination or expiration of the Marketing Agreement.

**11.2 Effect of Termination.** Upon the effective date of any termination of this New Merchant Agreement, Sears' rights hereunder to make Card Sales, to present Sales Records to Purchaser, and to use Sales Record forms, Refund Record forms, promotional materials, and any other items provided by Purchaser hereunder, will immediately cease. The provisions of Sections 3.2, 3.3, 3.4, 4.2, 4.3, 8.1 and 8.2 and Articles V, VI, VII, IX, X, XI and XII, as well as Sears' obligations in connection with any Sales Record or Refund Record accepted by Purchaser (whether before or after any termination of this New Merchant Agreement), including Sears' Chargeback obligations, will survive any termination of this New Merchant Agreement.

### ARTICLE XII - GENERAL

**12.1 Successors and Assigns.** Section 14.1 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.2 Entire Agreement.** Section 14.2 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.3 Relationship of the Parties.** Section 14.3 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.4 Force Majeure.** Section 14.4 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.5 Books and Records.** Section 14.5 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.6 Public Announcements.** Section 14.6 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.7 Audits.** Section 14.7 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.8 Assignment; Delegation of Services.** Section 14.8 of the Program Agreement is incorporated herein, *mutatis mutandis*.

JX 114-307

**12.9 Change in Law; Severability.** Section 14.9 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.10 Survival.** Section 14.10 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.11 Expenses.** Section 14.11 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.12 Amendment and Waiver.** Section 14.12 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.13 Remedies; Specific Performance.** Section 14.13 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.14 Table of Contents; Headings.** Section 14.14 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.15 Limitation on Rights of Others.** Section 14.15 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.16 Counterparts; Effectiveness.** Section 14.16 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.17 Payments.** Section 14.17 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.18 Drafting.** Each party acknowledges that its legal counsel participated in the drafting of this New Merchant Agreement. The parties hereby agree that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this New Merchant Agreement to favor one party over any other.

**12.19 Governing Law.** This New Merchant Agreement shall in all respects be governed by and construed in accordance with the internal Laws of the State of Delaware, without regard to the conflict of laws principles of such state.

**12.20 Waiver of Jury Trial.** EACH PARTY TO THIS MERCHANT AGREEMENT WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS MERCHANT AGREEMENT.

**12.21 Jurisdiction; Consent to Service of Process.** Section 14.21 of the Program Agreement is incorporated herein, *mutatis mutandis*.

Annex G-16

JX 114-308

**12.22 Notices.** Section 14.22 of the Program Agreement is incorporated herein, *mutatis mutandis*.

**12.23 Escalation; Arbitration.** Sections 14.23 and 14.24 of the Program Agreement are incorporated herein, *mutatis mutandis*.

**12.24 Designated Participants.** Each of Sears and Purchaser shall use its commercially reasonable efforts to have Purchaser enter into separate merchant processing agreements for Former NR/TY Cards with each of Sears' Affiliates and Partner Merchants that accept Sears Credit Cards ("Designated Participants"), in accordance with Section 12.2 of the Program Agreement. Until Purchaser enters into such merchant processing agreement with any such Designated Participant, (i) Sears shall communicate with Purchaser on behalf of the Designated Participant on all matters, (ii) Purchaser shall not be required to render any performance hereunder to the Designated Participant, and Purchaser shall have fulfilled all of its obligations and responsibilities hereunder with respect to any participation by the Designated Participant by rendering performance to Sears on behalf of the Designated Participant, (iii) Sears shall be responsible for rendering to Designated Participant any performance rendered to Sears by Purchaser on behalf of the Designated Participant, , and (iv) nothing in this New Merchant Agreement, whether express or implied, shall give or be construed to give any such Designated Participant any legal or equitable right, remedy or claim under or in respect of this New Merchant Agreement, it being understood that any legal or equitable right, remedy or claim with respect to matters set forth in this Section 12.24 shall inure exclusively to Sears. Sears shall guarantee the obligations of the Designated Participants pursuant to this Section 12.24 and the agreements contemplated hereunder to the extent such Persons are Third Party Sears Merchants. Notwithstanding the foregoing, in the event of Sears' material failure to implement any necessary systems changes within a reasonable mutually agreed timeframe (which shall be at Purchaser's expense with respect to point of sale changes; provided that Purchaser shall not be required to bear the expense of more than one series of point of sale changes in the aggregate under this Section 12.24, Section 7 of the Marketing Agreement, and Section 4.2(e)(iii) of the Program Agreement) Purchaser shall cease to be obligated to provide the promotional offers contemplated under Section 6 of the Marketing Agreement and the "on-us" treatment contemplated by this New Merchant Agreement.

**12.25 Modification of Rules; Corrections.** Purchaser and Sears may modify the Rules upon mutual agreement. The parties agree to cooperate to appropriately correct this New Merchant Agreement in the event of any manifest error or inadvertent omission.

**12.26 Conflict with Program Agreement.** Notwithstanding anything to the contrary contained herein, in the event of a conflict between either this New Merchant Agreement or the Rules and the Program Agreement, the Program Agreement shall control.

**12.27 Effectiveness.** The due execution and delivery of the Program Agreement and the Marketing Agreement shall be a condition precedent to the effectiveness of this New Merchant Agreement.

<div align="center">Annex G-17</div>

**JX 114-309**

**12.28 Setoff and Recoupment.** All amounts owing now or hereafter from one party to the other under the Marketing Agreement (which is expressly agreed by the Parties to constitute a single transaction) may be recouped, set-off or otherwise deducted from amounts due from the other party under the Marketing Agreement, without prior notice to or consent of the other party. Sears acknowledges that any credit, return, Chargeback or other circumstance where Purchaser credits any amount to an Account for any goods and services returned after the date of filing of any petition under Title 11 of the United States Code relates back to the date of purchase of such goods and services for the purposes of recoupment, set-off or other deduction and constitutes a single integrated transaction. [***]

**12.29 Integration.** Purchaser and Sears agree that each of the Marketing Agreement, this New Merchant Agreement, and all amendments and letter agreements executed in connection with any of the foregoing are integrated and non-severable parts of one and the same transaction among the Parties, each representing an essential, necessary and interdependent component of such transaction; and each party to either agreement agrees that all of the foregoing agreements comprising such transaction constitute one single agreement and are integrated and non-severable for all purposes at law and in equity, including for purposes of section 365 of title 11 of the United States Code and Delaware law, and that any breach of any one of such agreements shall be deemed a breach under all such agreements.

*Signature Page Follows*

Annex G-18

**JX 114-310**

**IN WITNESS WHEREOF**, Sears and Purchaser have caused their duly authorized representatives to execute this New Merchant Agreement as of the date set forth below the signature of each.

**SEARS, ROEBUCK AND CO. CITIBANK, N.A.**

By: By:

Title: Title:

Date: Date:

Annex G-19

JX 114-311

**Exhibit A**
**Card Not Present Liability Requirements**

[***]

Annex G-20

JX 114-312

**SCHEDULE A**

# Sears Credit Card Merchant Operating Rules and Regulations

*These Rules and Regulations contain procedures that will be followed in connection with the acceptance of a Former NR/TY Card and will govern all Former NR/TY Card Sales Transactions. The parties agree to cooperate to appropriately correct this Schedule A in the event of any manifest error or inadvertent omission.*

[***]

Annex G-21

**JX 114-313**

**7. Capitalized Terms**

Capitalized terms used herein and not otherwise defined will have the meanings given to them in the New Merchant Agreement or the Program Agreement. If there are any conflicts between the terms of the New Merchant Agreement and these Rules, the New Merchant Agreement shall govern.

Annex G-22

**JX 114-314**

[***]

Annex G-23

**JX 114-315**

**Schedule 4.11.2**

**Additional Security Requirements**

[***]

Annex G-24

JX 114-316

**SCHEDULE B**

Cost of Funds Adjustment

[***]

Annex G-25

JX 114-317

**SCHEDULE C**

**SEARS SUBSIDIARIES WHICH
ACCEPT THE SEARS CREDIT CARDS**

California Builder Appliances, Inc.
Florida Builder Appliances, Inc.
Koolvent Aluminum Products, Inc.
Lands' End, Inc.
MaxServe, Inc.
NTW Incorporated
Sears Carpet and Upholstery Care, Inc.
Sears Franchise Services Corp.
Sears Home Improvement Services Company (a.k.a., SHIP)
Sears, Roebuck de Puerto Rico, Inc.
Sears Shop at Home Services, Inc.

**JX 114-318**

**ANNEX H**

**Schedule 9.6**

**Additional Security Requirements**

[***]

Annex H-1

**JX 114-319**

**ANNEX I**

**<u>Schedule 8.8(b)</u>**

The Parties will cooperate in good faith to negotiate a Schedule 8.8(b) to be incorporated into the Amended and Restated Program Agreement, which shall at a minimum include the following features:

[***]

Annex I-1

**JX 114-320**

**ANNEX J**

Section 13.4 <u>Effective Termination Date; Effect of Notice of Termination</u>.

(a) <u>Effective Termination Date</u>. The effective termination date of this Agreement (the "Termination Date") shall be (i) in the event of the expiration of the Existing Term or the Additional Term, the last day thereof; (ii) in the event a notice of termination is delivered pursuant to Section 13.2 or 13.3 (other than pursuant to Section 13.2(a) or 13.3(a)), the date specified in such notice, which shall not be less than [***] after the date notice of termination is received by the non-terminating party; and (iii) upon the occurrence of any event described in Sections 13.2(a) or 13.3(a), immediately without requirement of any notice..

(b) <u>Continuing Performance</u>. Subject to Section 13.6, Sears and Purchaser shall continue to perform their respective obligations under this Agreement through the later of the Termination Date or, if Sears has elected to exercise its Repurchase Option, the closing of the Repurchase Option (the "Renewal Termination Date"). During the period between (A) notice of termination or the date that is one year prior to the expiration of the Existing Term or the Additional Term, as applicable; and (B) the later of the Termination Date or, if applicable, the Renewal Termination Date, (i) Purchaser shall have no new obligation to spend any additional amounts under the Marketing Plan, the Marketing Support or any other marketing commitments, other than existing requirements that cannot be terminated without a loss of service or value to Cardholders or Financial Products Customers and Sears' obligations hereunder shall be reduced accordingly; (ii) neither Sears nor Purchaser shall solicit any Cardholders or any individual on the Cardholder List for any Credit Card (other than a Sears Credit Card) to replace a Sears Credit Card; and (iii) Sears and Purchaser shall mutually agree on all customer communications relating to termination of this Agreement; provided that Sears may not withhold its consent from any communications that Purchaser may be required by Law to make to Cardholders.

(c) <u>Provision of Information</u>. Upon notice of termination or non-renewal, and upon request by Sears, Purchaser shall disclose to Sears, or any Person designated by Sears, information concerning the Accounts, excluding the terms of this Agreement (other than the provisions of Article XIII relating to the Repurchase Option), for purposes of determining whether to exercise the Repurchase Option and, upon exercise, for purposes of effectuating such exercise; provided that Sears shall first have obtained a written confidentiality agreement from each such Person in form and substance similar to the Confidentiality Agreement (as defined in the Purchase Agreement). Purchaser shall cooperate with Sears and any such Person(s) in providing information concerning the assets, including the Accounts, that are included in the Sears Repurchase Assets.

Section 13.5 <u>Repurchase of Assets upon Expiration</u>.

(a) <u>Repurchase Option</u>. Upon expiration of the Additional Term at its natural expiration date, or upon delivery of notice of termination of this Agreement from Sears to Purchaser pursuant to Section 13.2(b), Sears shall have the option to purchase, or arrange for the purchase by another Person, from Purchaser (A) all (but not less than all) of the Accounts, along

JX 114-321

with all (but not less than all) of the Accounts Receivables originated under such Accounts (other than Accounts that have been charged-off, or have had electronic notice of bankruptcy or notice of fraud given), together with all related Account Documentation and other data, books and records and Cardholder Information that is in existence as of the date of such purchase; and (B) all (but not less than all) of the New Financial Products, together with all related documentation and other data, books and records and Cardholder Information that is in existence as of the date of such purchase; (collectively, the "Sears Repurchase Assets"), on the terms and conditions set forth in this Article XIII. For clarity and notwithstanding anything else to the contrary in this Agreement, in no event shall the closing of any sale of the Sears Repurchase Assets occur pursuant to this Agreement other than in the event that either (i) (A) the Additional Term option is exercisable and exercised by Sears in accordance with Section 13.1(b), and (B) the Additional Term is fully completed; or (ii) Sears has validly terminated this Agreement pursuant to Section 13.2(b) following any applicable notice and cure periods. The parties agree that the Amended and Restated Program Agreement will provide for rights for Sears in connection with Section 13.2(g) that are substantially similar to the rights provided in this Section 13.5(a) with respect to Section 13.2(b), with such rights to be provided to Sears to include, for the avoidance of doubt, the option to purchase, or arrange for the purchase by another Person, from Purchaser of the Sears Repurchase Assets upon delivery of notice of termination of this Agreement from Sears to Purchaser pursuant to Section 13.2(g); provided, that the Amended and Restated Program Agreement incorporates an updated Exhibit L.

(b) Repurchase Notice. [***] with the delivery by Sears to Purchaser of a notice of termination pursuant to Section 13.2(b), or within the period that is no [***] prior to the expiration of the Additional Term, as applicable, Sears shall notify Purchaser of whether it shall exercise the Repurchase Option; provided that any such exercise shall be subject to the last sentence of Section 13.5(a). If Sears fails to timely deliver notice of exercise of the Repurchase Option to Purchaser, Sears shall be deemed to have elected not to exercise the Repurchase Option. Any notice of exercise of the Repurchase Option shall include the name of an Independent Appraiser selected by Sears..

(c) Repurchase Price Determination. The purchase price ("Repurchase Price") for the Sears Repurchase Assets will be determined in accordance with this Section 13.5(c). The Repurchase Price will be equal to [***]. Upon receipt of notice of Sears' election to exercise the Repurchase Option, Purchaser shall also nominate an Independent Appraiser and provide written notice of such nomination to Sears within [***] of receipt of the exercise notice from Sears. Within [***] of the receipt of such nomination by the other party, each of Sears and Purchaser shall advise the other party that they either accept or challenge the other party's selection of Independent Appraiser. In the event that either party objects to the Independent Appraiser nominated by the other party, the parties will negotiate in good faith to resolve such difference promptly and, in the event that no resolution is obtained within [***] after the date of notice of any objection to any nominated Independent Appraiser is given, either party may initiate arbitration proceedings pursuant to Section 14.24 herein. If both of the nominated Independent Appraisers are acceptable, each of Sears and Purchaser shall promptly retain their respective nominated Independent Appraisers and provide such information to both Independent Appraisers as is necessary to permit each of the Independent Appraisers to provide a valuation of the Sears

Annex J-2

Repurchase Assets no later than a date selected by the parties for such purpose (which date will be not later than [***]) after the date on which the parties have agreed on the designation of the Independent Appraisers); provided, that the information provided to both Independent Appraisers shall be identical. Such appraisals shall be performed on the basis of the assumptions set forth in Schedule 13.5(c). The fair market value shall be the average of the valuations received from the Independent Appraisers, and such averaged valuation shall not be subject to Section 14.24 and shall be final and binding on the parties and enforceable in any court having jurisdiction, unless the valuations made by the two Independent Appraisers differ by more than an amount [***] (such difference, "De Minimis Difference"). If the valuations made by the two Independent Appraisers differ by more than a De Minimis Difference, such Independent Appraisers will jointly select a third Independent Appraiser of recognized standing and experience in valuing credit card portfolios, who shall be retained jointly and compensated jointly and equally by Sears and Purchaser. If the two Independent Appraisers fail to jointly agree on a third Independent Appraiser within [***] of the receipt by both parties of the evaluation of the other party's Independent Appraiser, at the request of any party, such Independent Appraiser shall be selected by the CPR within [***] of such request. Such third Independent Appraiser will provide a valuation of the Sears Repurchase Assets as of the appraisal date selected by the parties (as described above) using the same information that was made available to the initial two Independent Appraisers, and based upon the assumptions set forth in Schedule 13.5(c). If (i) the initial valuations delivered by the initial two Independent Appraisers differ by an amount [***]; and (ii) the valuation delivered by the third Independent Appraiser is between the two initial valuations delivered by the initial two Independent Appraisers or differs from either of such valuations by any amount equal to or less than a De Minimis Difference, the fair market value will be the average of the three appraisals, and such averaged valuation shall be final and binding on the parties and enforceable in any court having jurisdiction. If (i) the initial valuations delivered by the initial two Independent Appraisers differ by an amount [***] and the third appraisal is not between the two initial valuations delivered by the initial two Independent Appraisers and differs from both of such valuations by an amount greater than a De Minimis Difference; or (ii) the valuations delivered by the initial two Independent Appraisers differ by an amount [***] as of the appraisal date, the fair market value will be the average of the two valuations received from any two of the three Independent Appraisers that are closest in amount to each other, and the third valuation will be disregarded, and such averaged valuation shall not be subject to Section 14.24 and be final and binding on the parties and enforceable in any court having jurisdiction. The expenses of any Independent Appraiser nominated by Sears shall be borne by Sears and the expense of any Independent Appraiser nominated by Purchaser shall be borne by Purchaser.

(d) Repurchase Agreement. After the purchase price for the Sears Repurchase Assets is established, Purchaser and Sears shall cooperate to negotiate in good faith a definitive purchase agreement (the "Repurchase Agreement") upon terms, including conditions, representations, warranties and indemnities, [***]. Purchaser shall not unreasonably withhold or delay its execution of the Repurchase Agreement or any other documents necessary to effectuate such sale. The parties to the Repurchase Agreement shall use all reasonable best efforts to ensure that the closing date for such purchase (the "Repurchase Closing Date") occurs [***]; provided, that the Repurchase Option shall expire in the event that the Repurchase Closing Date does not

Annex J-3

occur on or prior to the later of [***]. Any buyer acting on behalf of Sears in the exercise of the Repurchase Option shall be bound by this subsection as if it were Sears.

(e) <u>Treatment of Securitized Assets</u>. In the event that Purchaser has securitized or participated any of the Accounts, or the Accounts Receivables included therein, that are included in the Sears Repurchase Assets, the parties will cooperate to transfer such assets, or Purchaser's interest in and servicing rights with respect to such assets, to Sears or its assignee on reasonable terms under a Repurchase Agreement, and the manner and terms of such transfer shall be taken into account in the determination of fair market value in connection with the determination of the Repurchase Price.

(f) <u>Orderly Transfer</u>. Purchaser shall use all reasonable best efforts to assist Sears or its assignee to convert the processing and servicing of the Sears Repurchase Assets to Sears, its assignee or its processor, as the case may be, as soon as practicable after the Repurchase Closing Date. [***]

(g) <u>Solicitation</u>. Without the prior written consent of Purchaser, Sears shall not, and shall cause its respective Affiliates not to, during the Term and for a period of [***] from the expiration of the Term, and provided that no Repurchase Option has been exercised pursuant to Section 13.5 hereof, solicit, hire or cause to be solicited for employment (other than pursuant to any general circulation not specifically targeted to the employees of Purchaser), any individual who is an employee of Purchaser. Notwithstanding anything contained in this Section 13.5 to the contrary, Sears and its Affiliates shall not be prohibited from soliciting for employment or hiring employee of Purchaser who have been terminated by Purchaser, [***].

Section 13.6 <u>Treatment of Sears Repurchase Assets Upon Termination</u>.

(a) If Sears purchases, or arranges for the purchase of, the Sears Repurchase Assets, and the Repurchase Closing Date is to occur after the original date of expiration or termination of this Agreement, this Agreement shall be extended and shall remain in full force and effect until the Repurchase Closing Date; provided, that, commencing on the date of termination or expiration of the Agreement, [***].

(a) In the event that Sears does not purchase or arrange for the purchase of the Sears Repurchase Assets in accordance with this Agreement, from the date of termination or expiration of this Agreement (i) Purchaser shall, within [***] (the "<u>Post-Termination Period</u>"), (w) cease to use the Sears Licensed Marks and shall not thereafter claim any right, title, or interest in or to the Sears Licensed Marks granted pursuant to this Agreement and the Licensing Agreement, and (x) reissue at its expense new card plastics not bearing any Sears Licensed Marks for those Accounts retained by Purchaser, (ii) during and after the Post-Termination Period, Purchaser shall not originate new Accounts (<u>provided</u>, however, that Purchaser may conclude any solicitation that is required by applicable Law), and (iii) [***].

Section 13.9 <u>Sears Data Rights Upon Certain Termination Events</u>.

Annex J-4

**JX 114-324**

(a) At any time during the [***] period following a Commercial One Termination, Sears may request the information set forth on Schedule 13.9-A with respect to the Sears Commercial One Business Accounts. Purchaser shall deliver such information to Sears within [***] of Sears' written request.

(b) In the event that Sears does not meet the conditions for the Additional Term and this Agreement terminates on the Initial Expiration Date, then at any time during the period within [***] of the Initial Expiration Date, Sears may request the information set forth on Schedule 13.9-B with respect to the Sears Credit Cards. Purchaser shall deliver such information to Sears within [***] of Sears' written request.

(c) Any information provided by Purchaser to Sears pursuant to this Section 13.9 shall be the Confidential Information of Purchaser. [***] Purchaser makes no representation or warranty regarding the accuracy or completeness of any information provided pursuant to this Section 13.9, including for the purpose for which Sears intends to use it. Sears agrees not to represent to any third party that Purchaser is the source of the information or make any representation whatsoever regarding its accuracy or completeness.

Annex J-5

**Schedule 13.9 -A**

**Account Performance Data**

With respect to the Commercial One Business Accounts, Purchaser will provide to Sears the following data on an aggregated basis for non-recourse and recourse Commercial One Accounts:

[***]

JX 114-326

**Schedule 13.9 -B**

**Account Performance Data**

With respect to the applicable types of Accounts contemplated under Section 13.9(b), as applicable, Purchaser will provide to Sears the following data on an aggregated basis across all such Accounts, in each case solely to the extent applicable to such type of Account(s):

[***]

Annex J-7

**JX 114-327**

EXHIBIT 10.7

SIXTH AMENDMENT TO MEZZANINE LOAN AGREEMENT

This Sixth Amendment to Mezzanine Loan Agreement (this "Amendment"), dated as of July 25, 2018, is by and between JPP, LLC, as administrative agent (together with its successors and assigns, "Administrative Agent") and SRC SPARROW 2 LLC ("Borrower") and amends that certain Mezzanine Loan Agreement, dated as of March 14, 2018, as the same was amended pursuant to that certain Amendment to Mezzanine Loan Agreement dated as of April 13, 2018 (the "First Amendment"), as was further amended by that certain Second Amendment to Loan Agreement, dated as of April 20, 2018 (the "Second Amendment"), as was further amended by that certain Third Amendment to Mezzanine Loan Agreement, dated as of April 26, 2018 (the "Third Amendment"),as was further amended by that certain Fourth Amendment to Mezzanine Loan Agreement, dated as of May 7, 2018 (the "Fourth Amendment") and as was further amended by that certain Fifth Amendment to Mezzanine Loan Agreement, dated as of June 29, 2018 (the "Fifth Amendment" and, as amended to date and as may be further amended or otherwise modified from time to time, the "Loan Agreement"; all capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement).

RECITALS

WHEREAS, on March 14, 2018 (the "Closing Date"), Administrative Agent, Lenders and Borrower entered into the Loan Agreement;

WHEREAS, on the Closing Date, Lenders made a loan in the aggregate principal amount equal to $240,000,000;

WHEREAS, pursuant to the First Amendment, Lender made an additional loan to the Borrower in the amount of $66,656,928.36 on April 13, 2018, which amount was secured by the Collateral;

WHEREAS, pursuant to the Second Amendment, Lender made an additional loan to the Borrower in the amount of $72,279,812 on April 20, 2018, which amount was secured by the Collateral;

WHEREAS, pursuant to the Third Amendment, Lender made an additional loan to the Borrower in the amount of $5,014,131 on April 26, 2018, which amount was secured by the Collateral;

WHEREAS, pursuant to the Fourth Amendment, Lender made an additional loan to the Borrower in the amount of $4,242,863 on May 7, 2018, which amount was secured by the Collateral;

WHEREAS, pursuant to the Fifth Amendment, Lender made an additional loan to the Borrower in the amount of $50,000,000 on June 29, 2018, which amount was secured by the Collateral;

**JX 114-328**

WHEREAS, certain of the Lenders desire to make an additional loan to the Borrower in the amount of $75,000,000, which amount shall be secured by the Collateral;

WHEREAS, Lender and Borrower desire to amend the Loan Agreement in the manner hereinafter set forth;

In pursuance of such agreement and for good and valuable consideration, Lender and Borrower hereby agree as follows:

Section 1. Amendments of Loan Agreement. Lender and Borrower hereby amend the Loan Agreement as follows:

(a) All references in the Loan Documents to the "Loan Agreement" shall mean the Loan Agreement as amended to date and as amended by this Amendment.

(b) The following definition shall be added to Section 1.01 of the Loan Agreement:

"Sixth Additional Advance Date" means July 25, 2018.

(c) The definition of "Commitment" in Section 1.01 of the Loan Agreement is hereby replaced in its entirety by the following:

"Commitment" means, with respect to each Lender, such Lender's commitment to make a Loan to Borrower, which Loans were made on the Effective Date, the Additional Advance Date, the Second Additional Advance Date, the Third Additional Advance Date, the Fourth Additional Advance Date, the Fifth Additional Advance Date and the Sixth Additional Advance Date. The amount of each Lender's Commitment is set forth on Schedule 2.01. The aggregate amount of the Commitment of all Lenders as of the Sixth Additional Advance Date is $513,193,734.36.

(d) The definition of "Note" in Section 1.01 of the Loan Agreement is hereby replaced in its entirety by the following:

"Note" means, collectively, (i) that certain Sixth Amended and Restated Promissory Note A-1, dated as of the Sixth Additional Advance Date, in the original principal amount of $406,820,950.96 made by Borrower to JPP, LLC, (ii) that certain Sixth Amended and Restated Promissory Note A-2, dated as of the Sixth Additional Advance Date, in the original principal amount of $106,372,783.40, made by Borrower to JPP II, LLC and (iii) each other note delivered by Borrower pursuant to Section 2.09(f), in each case, as such note may be replaced by multiple Notes in accordance with Section 2.09(f) and as otherwise assigned (in whole or in part), amended, restated, replaced, supplemented or otherwise modified in accordance herewith.

(e) All references in the Loan Documents to the Note shall refer to the "Note" as amended by this Amendment.

(f) Schedule 2.01 of the Loan Agreement is hereby replaced in its entirety by

2

**JX 114-329**

the Schedule 2.01 attached to this Amendment.

Section 2. Miscellaneous.

(a) Borrower hereby (i) unconditionally ratifies and confirms, renews and reaffirms all of its obligations under the Loan Agreement and each of the other Loan Documents, (ii) acknowledges and agrees that such obligations remain in full force and effect, binding on and enforceable against it in accordance with the terms, covenants and conditions of the Loan Agreement as amended hereby and the other Loan Documents, in each case, without impairment, and (iii) waives and releases any and all claims, actions, causes of action, suits, and defenses that Borrower might have against Lender for or by reason of any matter, cause or thing whatsoever relating to the Loan.

(b) Borrower hereby represents and warrants that as of the date hereof and subject to the matters set forth on Schedule 1 attached hereto, (i) Borrower has the power and authority to enter into this Amendment and to perform its obligations under the Loan Agreement as amended hereby, (ii) Borrower has by proper action duly authorized the execution and delivery of this Amendment by Borrower, (iii) this Amendment has been duly executed and delivered by Borrower and constitutes Borrower's legal, valid and binding obligations, enforceable in accordance with its terms, subject to bankruptcy, insolvency and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles,
(iv) Borrower is not in default under the Loan Agreement or any of the other Loan Documents beyond any applicable notice and cure periods, (v) Borrower has no defenses, offsets or counterclaims against the Indebtedness, and (vi) each of the representations and warranties of Borrower contained in the Loan Documents is true and correct in all material respects as of the date hereof.

(c) Each Guarantor hereby (i) unconditionally approves and consents to this Amendment, (ii) unconditionally ratifies, confirms, renews and reaffirms all of its obligations under the Loan Documents to which it is a party (the "Guarantor Documents"),
(ii) acknowledges and agrees that its obligations under the Guarantor Documents remain in full force and effect, binding on and enforceable against it in accordance with the terms, covenants and conditions of such documents without impairment, and (iii) waives and releases any and all claims, actions, causes of action, suits, and defenses that it might have against Lender for or by reason of any matter, cause or thing whatsoever relating to the Loan.

(d) Each Guarantor hereby represents and warrants that as of the date hereof(i) it has the power and authority to acknowledge this Amendment and to perform its obligations under the Guarantor Documents after giving effect to this Amendment, (ii) it has by proper action duly authorized such acknowledgement and performance, (iii) it is not in default under any Guarantor Document beyond any applicable notice and cure periods, (iv) it has no defenses, offsets or counterclaims against its obligations under the Guarantor Documents, and (v) each of the representations and warranties contained in the Guarantor Documents is true and correct in all material respects as of the date hereof.

(e) Borrower and Guarantor acknowledge and agree that no oral communication or course of dealing from or on behalf of Lender shall constitute any waiver, agreement, commitment, or evidence of any assurance or intention of Lender with respect to the Loans, the Loan Agreement and/or the other Loan Documents, and that any waiver, agreement,

3

**JX 114-330**

commitment, assurance, or intention of Lender with respect to the Loans, the Loan Agreement and/or the other Loan Documents shall be effective only if in writing and duly executed by Lender. Borrower and Guarantor acknowledge and agree that no Default or Event of Default shall be deemed to have been waived by Lender unless such waiver is in writing and duly executed by Lender.

(f) This Amendment shall be governed by and construed and interpreted in accordance with the laws of the State of New York without regard to principles of conflicts of law.

(g) This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Copies of originals, including copies delivered by facsimile, pdf or other electronic means, shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Amendment.

The terms and provisions of Section 9.14 of the Loan Agreement are incorporated herein by reference and shall apply to Borrower and Guarantor hereunder with the same force and effect as if fully set forth herein.

*[Signatures on following page.]*

4

JX 114-331

Executed and delivered as of the date first hereinabove set forth.

LENDER:

JPP, LLC, a Delaware limited liability company,
as Administrative Agent
By: /s/ Edward S. Lampert
Name: Edward S. Lampert
Title: Authorized Signatory


JPP, LLC, a Delaware limited liability company,
as Lender
By: /s/ Edward S. Lampert
Name: Edward S. Lampert
Title: Authorized Signatory


JPP II, LLC, a Delaware limited liability company,
as Lender
By: /s/ Edward S. Lampert
Name: Edward S. Lampert
Title: Authorized Signatory


BORROWER:

SRC SPARROW 2 LLC, a Delaware limited liability company


By: /s/ Robert A. Riecker
Name: Robert A. Riecker
Title: President

5

**JX 114-332**

**Solely with respect to the provisions herein that reference Guarantor:**

GUARANTOR:

SEARS HOLDINGS CORPORATION, a Delaware corporation

By: /s/ Robert A. Riecker
Name: Robert A. Riecker
Title: Chief Financial Officer

SEARS, ROEBUCK AND CO., a New York corporation

By: /s/ Robert A. Riecker
Name: Robert A. Riecker
Title: Chief Financial Officer

6

**JX 114-333**

**<u>Schedule 1</u>**

**<u>Exceptions to Representations and Warranties</u>**

1. The organizational chart attached hereto as Schedule 3.01 has not been updated and continues to show certain Mortgaged Properties (as defined in the Mortgage Loan Agreement) that have been sold in accordance with the Mortgage Loan Agreement since the date of the Fourth Amendment.

2. With respect to Section 3.06, all matters disclosed in that certain Notice Regarding Verified Complaint dated June 8, 2018 delivered by Borrower to Lender.

**JX 114-334**

Schedule 3.01
Organizational Chart

[Attached.]

**JX 114-335**

**PROJECT SPARROW**
**POST-RESTRUCTURING ORGANIZATIONAL CHART**



Note: This chart does not reflect various leases and subleases in connection with the existing master lease structuring.

**JX 114-336**

Schedule 2.01 - Commitments

| LENDER | COMMITMENT |
|---|---|
| JPP, LLC | $357,820,950.96 |
| JPP II, LLC | $105,372,783.40 |
| Luxor Capital, LLC | $50,000,000.00 |
| **AGGREGATE COMMITMENTS** | $513,193,734.36 |

**JX 114-337**

**EXHIBIT 31.1**

**CERTIFICATIONS**

I, Edward S. Lampert, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Sears Holdings Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 13, 2018

/s/ Edward S. Lampert
Edward S. Lampert
Chairman of the Board and Chief Executive Officer
Sears Holdings Corporation

**JX 114-338**

**EXHIBIT 31.2**

**CERTIFICATIONS**

I, Robert A. Riecker, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Sears Holdings Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 13, 2018

/s/ Robert A. Riecker
Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation

**JX 114-339**

EXHIBIT 32.1

**CERTIFICATION**
**Pursuant to 18 U.S.C. 1350 as adopted by Section 906 of the Sarbanes-Oxley Act of 2002**

Edward S. Lampert, Chairman of the Board and Chief Executive Officer of Sears Holdings Corporation (the "Company"), has executed this certification in connection with the filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended August 4, 2018 (the "Report").

The undersigned hereby certifies that, to his knowledge:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

September 13, 2018


/s/ Edward S. Lampert
Edward S. Lampert
Chairman of the Board and Chief
Executive Officer

**JX 114-340**

**EXHIBIT 32.2**

**CERTIFICATION**
**Pursuant to 18 U.S.C. 1350 as adopted by Section 906 of the Sarbanes-Oxley Act of 2002**

Robert A. Riecker, Chief Financial Officer of Sears Holdings Corporation (the "Company"), has executed this certification in connection with the filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended August 4, 2018 (the "Report").

The undersigned hereby certifies that, to his knowledge:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

September 13, 2018

/s/ Robert A. Riecker
Robert A. Riecker
Chief Financial Officer

**JX 114-341**

# Exhibit 76

EX-10.1 2 d233737dex101.htm EX-10.1

**Exhibit 10.1**

*EXECUTION VERSION*

**SECOND LIEN CREDIT AGREEMENT**

Dated as of September 1, 2016

among

**SEARS HOLDINGS CORPORATION**

and

**SEARS ROEBUCK ACCEPTANCE CORP.**
and
**KMART CORPORATION,**
as Borrowers

and

**THE LENDERS NAMED HEREIN**,

and

JPP, LLC,
as Agent

**JX 115-1**

## TABLE OF CONTENTS

|  | **Page** |
|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | 1 |
| SECTION 1.01. Certain Defined Terms | 1 |
| SECTION 1.02. Computation of Time Periods | 24 |
| SECTION 1.03. Accounting Terms | 24 |
| SECTION 1.04. Other Interpretive Provisions | 24 |
| ARTICLE II AMOUNTS AND TERMS OF THE TERM LOAN | 25 |
| SECTION 2.01. The Term Loan | 25 |
| SECTION 2.02. Reserved | 25 |
| SECTION 2.03. Reserved | 25 |
| SECTION 2.04. Reserved | 25 |
| SECTION 2.05. Fees | 25 |
| SECTION 2.06. Reserved | 25 |
| SECTION 2.07. Repayment of Term Loan | 25 |
| SECTION 2.08. Interest | 26 |
| SECTION 2.09. Interest Rate Determination | 27 |
| SECTION 2.10. Optional Conversion of Term Loan Borrowings | 27 |
| SECTION 2.11. Optional and Mandatory Prepayments of Term Loan | 27 |
| SECTION 2.12. Increased Costs | 28 |
| SECTION 2.13. Illegality | 29 |
| SECTION 2.14. Payments and Computations | 29 |
| SECTION 2.15. Taxes | 30 |
| SECTION 2.16. Sharing of Payments, Etc. | 33 |
| SECTION 2.17. Use of Proceeds of the Term Loan | 33 |
| SECTION 2.18. Extension of Loans | 33 |
| SECTION 2.19. Incremental Term Loans | 34 |
| ARTICLE III RESERVED | 36 |
| ARTICLE IV CONDITIONS TO EFFECTIVENESS | 36 |
| SECTION 4.01. Conditions Precedent to Effectiveness | 36 |
| SECTION 4.02. Conditions Precedent to Each Extension of Credit | 37 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | 38 |
| SECTION 5.01. Representations and Warranties of the Borrowers | 38 |
| ARTICLE VI COVENANTS | 41 |
| SECTION 6.01. Affirmative Covenants | 41 |
| SECTION 6.02. Negative Covenants | 47 |
| SECTION 6.03. Financial Covenant | 51 |
| ARTICLE VII EVENTS OF DEFAULT | 51 |
| SECTION 7.01. Events of Default | 51 |

i

ARTICLE VIII THE AGENT 53

SECTION 8.01. Appointment 53
SECTION 8.02. Delegation of Duties 54
SECTION 8.03. Exculpatory Provisions 54
SECTION 8.04. Reliance by Agent 54
SECTION 8.05. Notice of Default 54
SECTION 8.06. Non-Reliance on Agents and Other Lenders 54
SECTION 8.07. Reports and Financial Statements 55
SECTION 8.08. Indemnification 55
SECTION 8.09. Agent in Its Individual Capacity 56
SECTION 8.10. Successor Agent 56
SECTION 8.11. Reserved 56
SECTION 8.12. Defaulting Lenders 56

ARTICLE IX MISCELLANEOUS 57

SECTION 9.01. Amendments, Etc. 57
SECTION 9.02. Notices, Etc. 57
SECTION 9.03. No Waiver; Remedies 58
SECTION 9.04. Costs and Expenses 58
SECTION 9.05. Right of Set-off 59
SECTION 9.06. Binding Effect; Effectiveness 60
SECTION 9.07. Assignments and Participations 60
SECTION 9.08. Confidentiality 62
SECTION 9.09. Governing Law 62
SECTION 9.10. Execution in Counterparts 62
SECTION 9.11. Jurisdiction, Etc. 62
SECTION 9.12. WAIVER OF JURY TRIAL 63
SECTION 9.13. Release of Collateral or Guarantee Obligation 63
SECTION 9.14. PATRIOT Act Notice 63
SECTION 9.15. Integration 63
SECTION 9.16. Replacement of Lenders 63
SECTION 9.17. No Advisory or Fiduciary Capacity 64

ARTICLE X GUARANTEE 65

SECTION 10.01. Guarantee 65
SECTION 10.02. Right of Contribution 65
SECTION 10.03. No Subrogation 65
SECTION 10.04. Amendments, etc. with Respect to Obligations 66
SECTION 10.05. Guarantee Absolute and Unconditional 66
SECTION 10.06. Reinstatement 67
SECTION 10.07. Payments 67
SECTION 10.08. Additional Guarantors 67
SECTION 10.09. Releases 67

ii

**JX 115-3**

SCHEDULES

Schedule 1.01          Lenders; Commitments
Schedule 5.01(n)       Pension Plan Issues
Schedule 5.01(p)       UCC Filing Jurisdictions
Schedule 5.01(s)       Existing Rights to Purchase Equity Interests
Schedule 5.01(t)       Labor Matters
Schedule 6.01(j)       Financial and Collateral Reports
Schedule 6.02(d)       Restricted Payments
Schedule 6.02(k)
   (ii)                Investment Policy

EXHIBITS

Exhibit A          Reserved
Exhibit B          Form of Assignment and Acceptance
Exhibit C          Reserved
Exhibit D          Reserved
Exhibit E          Reserved
Exhibit F          Reserved
Exhibit G          Reserved
Exhibit H          Reserved
Exhibit I          Form of Compliance Certificate
Exhibit J          Form of Joinder Agreement

iii

**JX 115-4**

SECOND LIEN CREDIT AGREEMENT (this "Agreement") dated as of September 1, 2016, among SEARS HOLDINGS CORPORATION, a Delaware corporation ("Holdings"), SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation ("SRAC"), KMART CORPORATION, a Michigan corporation ("Kmart Corp."), the banks, financial institutions and other institutional lenders listed on the signature pages hereof or pursuant to any joinder hereto or through an assignment as provided in Section 9.07 hereof as Term Lenders, JPP, LLC, a Delaware limited liability company, as administrative agent and collateral administrator (the "Agent").

W I T N E S S E T H:

WHEREAS, Holdings, SRAC, Kmart Corp., certain lenders, Wells Fargo Bank, National Association, f/k/a Wells Fargo Retail Finance, LLC. and General Electric Capital Corporation, as co-collateral agents and co-syndication agents, JPMorgan Chase Bank, N.A. and Barclays Bank PLC, as documentation agents, Merrill Lynch, Pierce, Fenner & Smith Incorporated f/k/a Banc of America Securities LLC, Wells Fargo Retail Finance, LLC and GE Capital Markets, Inc. as joint lead arrangers and joint bookrunners, and the First Lien Agent (as defined below), are party to the First Lien Credit Agreement (as defined below); and

WHEREAS, the Borrowers have requested that the Lenders make term loans to the Borrowers on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accelerated Borrowing Base Delivery Event" means either (i) the occurrence and continuance of any Event of Default, or (ii) the failure of the Borrowers for three (3) days (whether or not consecutive) during any thirty (30) day period to maintain Capped Excess Availability equal to at least 15% of the Line Cap. For purposes of this Agreement, the occurrence of an Accelerated Borrowing Base Delivery Event shall be deemed continuing at the Agent's option (x) so long as such Event of Default shall be continuing, and/or (y) if the Accelerated Borrowing Base Delivery Event arises as a result of the Borrowers' failure to maintain Capped Excess Availability as required hereunder, until Capped Excess Availability has exceeded 15% of the Line Cap for thirty (30) consecutive calendar days, in which case an Accelerated Borrowing Base Delivery Event shall no longer be deemed to be continuing for purposes of this Agreement. The termination of an Accelerated Borrowing Base Delivery Event as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Accelerated Borrowing Base Delivery Event in the event that the conditions set forth in clauses (i) or (ii) hereof again arise.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) a purchase of a controlling interest in, the equity interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a controlling interest in the equity interests, of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Additional Commitment Lender" has the meaning set forth in Section 2.19(c).

**JX 115-5**

"Additional Extending Lenders" has the meaning set forth in Section 2.18(c).

"Additional First Lien Debt" means any Debt that is issued or guaranteed by a Borrower and/or any Guarantor (other than the First Lien Credit Agreement Obligations) which Debt and guarantees are permitted to be issued hereunder and are secured by the Collateral (or a portion thereof) on a pari passu basis with the First Lien Credit Agreement Obligations. The Borrowers may designate any such Debt to be Additional First Lien Debt by written notice to the Agent, provided such designation shall not result in the aggregate amount of Priority Obligations exceeding the amounts permitted pursuant to Section 6.02 hereof.

"Additional First Lien Debt Documents" means, with respect to any series, issue or class of Additional First Lien Debt, the promissory notes, loan agreements, indentures, or other operative agreements evidencing or governing such Indebtedness, in each case, as may be amended, restated, amended and restated, modified, supplemented, replaced, extended, renewed and/or refinanced from time to time in accordance with the terms of this Agreement.

"Additional First Lien Debt Obligations" means, with respect to any series, issue or class of Additional First Lien Debt, all amounts owing pursuant to the terms of such Additional First Lien Debt, including, without limitation, the obligation (including guarantee obligations) to pay principal, interest, letter of credit commissions, reimbursement obligations, charges, expenses, fees, attorneys costs, indemnities and other amounts.

"Adjusted Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining Consolidated Net Income for such period, the sum of (i) Consolidated Interest Expense for such period, (ii) income tax expense for such period, (iii) all amounts attributable to depreciation and amortization expense for such period, (iv) any items of loss resulting from the sale of assets other than in the ordinary course of business for such period, (v) any non-cash charges for tangible or intangible impairments or asset write downs for such period (excluding any write downs or write-offs of Inventory other than write-downs or write-offs of Inventory related to up to 100 store closings in any four consecutive fiscal quarters), and (vi) any other non-cash charges for such period (including non-cash charges arising from share-based payments to employees or directors, but excluding (1) any non-cash charge already added back to Consolidated Net Income in the calculation of Adjusted Consolidated EBITDA in a prior period, (2) any non-cash charge that relates to the write-down or write-off of Inventory other than write-downs or write-offs of Inventory related to up to 100 store closings in any four consecutive fiscal quarters, and (3) non-cash charges for which a cash payment is required to be made in that or any other period), minus (b) without duplication and to the extent included in Consolidated Net Income for such period, (i) any items of gain resulting from the sale of assets other than in the ordinary course of business for such period, (ii) any cash payments made during such period in respect of non-cash charges described in clause (a)(vi) taken in a prior period and (iii) any non-cash items of income for such period, all calculated on a Consolidated basis in accordance with GAAP (excluding any non-cash income already deducted from Consolidated Net Income in the calculation of Adjusted Consolidated EBITDA in a prior period). For the purposes of calculating Adjusted Consolidated EBITDA in connection with any determination of the Consolidated Leverage Ratio or Fixed Charge Ratio, (i) if at any time during the applicable four-quarter period, Holdings or any of its Subsidiaries shall have made any Material Disposition, the Adjusted Consolidated EBITDA for such fiscal quarter shall be reduced by an amount equal to the Adjusted Consolidated EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such period or increased by an amount equal to the Adjusted Consolidated EBITDA (if negative) attributable thereto for such fiscal period and (ii) if at any time during the applicable four-quarter period, Holdings or any of its Subsidiaries shall have made a Material Acquisition, Adjusted Consolidated EBITDA for such period shall be calculated after giving pro forma effect thereto as if such Material Acquisition occurred on the first day of such period. As used in this definition, "Material Acquisition" means any acquisition of property or series of related acquisitions of property that (a) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Person and (b) involves the payment of

**JX 115-6**

consideration by Holdings and its Subsidiaries in excess of $100,000,000; and "Material Disposition" means any Disposition of property or series of related Dispositions of property that yields gross proceeds to Holdings or any of its Subsidiaries in excess of $100,000,000.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"Agent" has the meaning provided in the Preamble, or any successor thereto. For purposes of the Security Agreement, the Agent shall be a "Pari Passu Agent", as defined therein.

"Applicable Lending Office" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance, and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit B hereto.

"Authorized Officer" means, as to Holdings, any Borrower or any other Loan Party, its president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance, executive vice president, finance or any other person designated by it and acceptable to the Agent. Any document delivered hereunder that is signed by an Authorized Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month Interest Period) plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by the First Lien Agent as its "prime rate." Any change in such rate announced by the First Lien Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Advance" means a Term Loan Borrowing that bears interest as provided in 2.08(b)(i) applicable.

"Borrower Information" has the meaning specified in Section 9.08.

"Borrowers" means, collectively, SRAC and Kmart Corp.; provided that in the event SRAC is dissolved, merged with and into Holdings or any Subsidiary of Holdings or otherwise ceases to exist in accordance with Section 6.01(d), then Holdings shall designate that Holdings or a direct wholly owned Domestic Subsidiary of Holdings become a Borrower for all purposes of the Loan Documents.

"Borrowing" means a borrowing consisting of simultaneous Term Loans of the same Type made by each of the applicable Lenders pursuant to Section 2.01 or Section 2.03 provided that no more than ten (10) Interest Periods in the aggregate for Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

3

**JX 115-7**

"Borrowing Base" means, as of any date, the sum of (1) 90% of the book value (calculated in accordance with GAAP) of the accounts receivable of the Loan Parties, on a consolidated basis, on such date and (2) 65% of the book value (calculated in accordance with GAAP) of the inventory of the Loan Parties, on a consolidated basis, on such date.

"Borrowing Base Certificate" means a certificate, signed by an Authorized Officer of Holdings and in a form reasonably acceptable to the Agent, setting forth the calculation of the Borrowing Base as of the relevant date.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York, New York or Boston, Massachusetts or, in the case of matters relating to SRAC, Greenville, Delaware or, in the case of matters relating to Kmart Corp., Detroit, Michigan, and, if the applicable Business Day relates to any Eurodollar Rate Advances, a day of the year on which dealings are carried on in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, all cash expenditures made or costs incurred for the acquisition or improvement of fixed or capital assets of such Person, in each case that are (or should be) set forth as capital expenditures in a consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capped Excess Availability" means, at any time, "Capped Excess Availability" as defined in the First Lien Credit Agreement (or analogous term in any successor agreement).

"Cash Equivalents" means investments of Holdings and its Subsidiaries recorded as cash or cash equivalents in accordance with GAAP.

"Class" means (a) the class consisting of Term Lenders, (b) any class of Extending Lenders and, if applicable, Additional Extending Lenders having a Commitment established pursuant to Section 2.18, and (c) any Class of Incremental Term Loans established pursuant to Section 2.19, as the context may require. For clarity, except as expressly provided herein, each Lender shall have the same rights and obligations under this Agreement and the other Loan Documents.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien (excluding any license granted to the Collateral Agent (and deemed to be a Lien pursuant to the definition thereof) for the sole purpose of enabling the Collateral Agent to exercise rights and remedies with respect to Liens otherwise granted on the Collateral) is purported to be created by any Security Document.

"Collateral Agent" has the meaning provided in the Security Agreement.

"Collateral Coverage Certificate" means with respect to any annual or quarterly financial statements provided pursuant to Section 6.01(j), a certificate signed by a financial officer of the Borrowers setting forth an accurate calculation of the Borrowing Base and the Total Extensions of Credit as of the last day of the period covered by such annual or quarterly financial statements.

"Commitments" means, collectively the Term Commitments, and if applicable, the Incremental Term Loan Commitments.

4

JX 115-8

"Commonly Controlled Entity" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"Consolidated" refers to the consolidation of accounts of Holdings and its Subsidiaries in accordance with GAAP and as presented on a GAAP basis.

"Consolidated Interest Expense" means for any period for any Person, total interest expense of such Person (including that attributable to Capital Lease Obligations and other expenses classified as interest expense in accordance with GAAP) on a Consolidated basis with respect to all outstanding Debt of such Person, as determined in accordance with GAAP.

"Consolidated Leverage Ratio" means, as of any given day, the ratio of (a) Consolidated Total Debt on such day to (b) Adjusted Consolidated EBITDA for the four immediately preceding fiscal quarters for which financial statements are available or were required to have been delivered pursuant to Section 6.01(j).

"Consolidated Net Income" means, for any period, the consolidated net income (or loss) of Holdings and its Subsidiaries, determined on a Consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of Holdings) in which Holdings or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Holdings or such Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary of Holdings (other than a Loan Party) to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Consolidated Total Debt" means, at any date, the aggregate principal amount of all Debt of Holdings and its Subsidiaries at such date, determined on a Consolidated basis in accordance with GAAP, but excluding (i) issued but not funded letters of credit, (ii) reimbursement obligations which are characterized as trade payables and are not overdue with respect to trade letters of credit and (iii) contingent obligations.

"Convert", "Conversion" and "Converted" each refers to a conversion of a Term Loan Borrowing of one Type into a Term Loan Borrowing of the other Type, pursuant to Section 2.09 or 2.10.

"Covenant Compliance Event" means "Capped Excess Availability" at any time is less than $150,000,000.

"Credit Card Accounts Receivable" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Loan Party resulting from charges by a customer of a Loan Party on credit cards issued by such issuer in connection with the sale of goods by a Loan Party or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) the Collateral Agent, and (iv) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"DC" means any distribution center owned or leased and operated by any Loan Party.

5

**JX 115-9**

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money (excluding interest payable thereon unless such interest has been accrued and added to the principal amount of such indebtedness), (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables incurred in the ordinary course of such Person's business and (ii) any such obligations which are due less than twelve months from the date of incurrence), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeals bonds arising in the ordinary course of business and other than the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business) or in respect of bankers' acceptances or letters of credit, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all direct recourse payment obligations of such Person in respect of any accounts receivable sold by such Person, (g) all Debt of others referred to in clauses (a) through (f) above or clause (h) below and other payment obligations guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss, and (h) all Debt referred to in clauses (a) through (g) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Defaulting Lender" means any Lender (as reasonably determined by the Agent) that (a) has failed to fund any portion of its obligations required to be funded by it hereunder within three Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, (c) has failed, within three Business Days after request by the Agent, to confirm that it will comply with the terms of this Agreement relating to its Commitments, provided that such Lender shall cease to be a Defaulting Lender under this clause (c) upon the Agent's receipt of such confirmation, (d) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

6

JX 115-10

"Disposition" means any sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any equity interests).

"Dollars" and "$" refers to lawful money of the United States.

"Domestic Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"Domestic Subsidiary" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico).

"Effective Date" means the first date on which the conditions set forth in Section 4.01 are satisfied (or waived in accordance with Section 9.01), such date being September 1, 2016.

"Eligible Assignee" means (a) a commercial bank or any other Person engaged in the business of making asset based or commercial loans, or any fund or other Person (other than a natural Person) that invests in loans, which bank, Person or fund, together with its Affiliates, has a combined capital and surplus in excess of $300,000,000 and which bank, Person or fund is approved by the Agent, and, unless an Event of Default has occurred and is continuing at the time any assignment is effected in accordance with Section 9.07, the Borrowers, in each case such approval not to be unreasonably withheld or delayed, (b) an existing Lender or an Affiliate of an existing Lender or an Approved Fund, or (c) any Permitted Holder; provided that neither the Borrowers nor an Affiliate of the Borrowers (other than a Permitted Holder) shall qualify as an Eligible Assignee.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Holdings, the Borrowers, or any of their Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and issued thereunder.

7

JX 115-11

"ERISA Affiliate" means any Person that for purposes of Title IV of ERISA is a member of any Borrower's controlled group, or under common control with such Borrower, within the meaning of Section 414 of the Internal Revenue Code.

"ERISA Event" means (a) (i) the occurrence of a Reportable Event, as defined herein, or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to Section 4043(b)(2)) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Sections 303(k) or 4068(a) of ERISA shall have been met with respect to any Plan; (g) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan, or (h) the Borrowers or any ERISA Affiliate incur liabilities under Section 4069 of ERISA.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Eurodollar Lending Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

"Eurodollar Rate" means,

(a) for any Interest Period with respect to a Eurodollar Rate Advance, the rate per annum (which shall in no event be less than zero) equal to the London interbank offered rate administered by ICE Benchmark Administration Limited ("ICE LIBOR"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the First Lien Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "Eurodollar Rate" for such Interest Period shall be the rate per annum determined by the Agent (which shall in no event be less than zero) to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Advance being made, continued or converted and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b) for any interest calculation with respect to a Base Rate Advance on any date, the rate per annum (which shall in no event be less than zero) equal to (i) ICE LIBOR, at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the First Lien Agent (which shall in no event be less than zero) to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Advance being made or

8

JX 115-12

maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"Eurodollar Rate Advance" means any Term Loan Borrowing that bears interest as provided in Section 2.08(b)(ii).

"Eurodollar Rate Reserve Percentage" for any Interest Period for a Eurodollar Rate Advance by any Lender means the reserve percentage applicable to such Lender two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the minimum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"Events of Default" has the meaning specified in Section 7.01.

"Excess Cash Flow" means, for any fiscal year of Holdings, the excess of (a) the sum, without duplication, of (i) Consolidated Net Income for such fiscal year (excluding gains and losses from the sale of assets or businesses outside the ordinary course of business included in the calculation of such Consolidated Net Income), plus (ii) expenses reducing Consolidated Net Income incurred or made with respect to any Plan, plus (iii) depreciation, amortization and other non-cash charges reducing Consolidated Net Income (excluding any non-cash charges to the extent they represent an accrual or reserve for potential cash charges in any future period or amortization of a prepaid cash gain that was paid in a prior period and excluding any such charges which were excluded in the calculation of Consolidated Net Income as set forth in clause (a)(i) above), *minus* (b) the sum, without duplication, of (i) contributions made in cash to any Plan, plus (ii) non-cash gains and other non-cash items increasing Consolidated Net Income (other than any such gains and items which were excluded in the calculation of Consolidated Net Income as set forth in clause (a)(i) above), plus (iii) the amount of scheduled payments and mandatory prepayments of principal, interest, fees, premiums and make whole or prepayment payments on account of Debt for borrowed money made in cash (excluding any repayments of Obligations hereunder and of prepayments of any revolving credit facility unless there is an equivalent permanent reduction in the commitments thereunder and excluding any such payments or prepayments to the extent financed with the proceeds of Debt), and scheduled payments and mandatory prepayments of Capital Lease Obligations (excluding any interest expense portion thereof deducted in the calculation of Consolidated Net Income and excluding any such payments or prepayments to the extent financed with the proceeds of Debt), plus (iv) the amount of optional prepayments of principal on account of Priority Obligations or the Term Loan made in cash during such fiscal year (as a result of which, in the case of repayments under any revolving credit facility, the revolving credit commitments have been permanently reduced correspondingly), except to the extent that such prepayments are funded with Debt, plus (v) Capital Expenditures made in cash during such fiscal year, except to the extent financed with the proceeds of Debt, plus (vi) the amount of Permitted Acquisitions and Permitted Investments (pursuant to clauses (d), (i), (o), (q) and (r) of the definition thereof) made in cash during such fiscal year, except to the extent financed with the proceeds of Debt.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated and including any Taxes imposed in lieu of income Taxes), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in any Extension of Credit or Commitment pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in such Extension of Credit or

9

JX 115-13

Commitment (other than pursuant to an assignment request by the Borrower under <u>Section 9.16</u>) or (ii) in the case of a Lender, such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to <u>Section 2.15</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 2.15(e)</u> or <u>(f)</u> and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"<u>Existing Intercreditor Agreement</u>" means that certain Amended and Restated Intercreditor Agreement, dated as of the date hereof, by and among the First Lien Agent, the Collateral Agent, their permitted successors and assigns, and the other parties thereto from time to time.

"<u>Existing Second Lien Notes</u>" means the 6 ⅝% Senior Secured Notes due 2018 of Holdings outstanding as of the Effective Date.

"<u>Extended Term Loans</u>" has the meaning set forth in Section 2.18(a).

"<u>Extending Lenders</u>" has the meaning set forth in Section 2.18(b).

"<u>Extension Amendment</u>" has the meaning set forth in Section 2.18(d).

"<u>Extension Election</u>" has the meaning set forth in Section 2.18(b).

"<u>Extension Request</u>" has the meaning specified in Section 2.18(b).

"<u>Extensions of Credit</u>" means as to any Lender at any time, an amount equal to the sum of (the outstanding principal amount of the Term Loans held by such Lender.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of The Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"<u>First Lien Agent</u>" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement Documents, or any successor administrative agent and collateral agent, including, if applicable, in respect of any other Priority Obligations.

"<u>First Lien Credit Agreement</u>" means the Third Amended and Restated Credit Agreement, dated as of July 21, 2015 by and among Holdings, the Borrowers, the lenders party thereto in their capacities as lenders thereunder, the First Lien Agent, as agent and the other agents party thereto, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, guarantors, institutional investors or agents), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case as and to the extent not prohibited by this Agreement.

10

JX 115-14

"First Lien Credit Agreement Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"First Lien Credit Agreement Obligations" means all amounts owing pursuant to the First Lien Credit Agreement and the First Lien Credit Documents, including, without limitation, the obligation (including guarantee obligations) to pay principal, interest, letter of credit commissions, reimbursement obligations, charges, expenses, fees, attorneys costs, indemnities and other amounts, together with all obligations in respect of banking products and cash management services secured pursuant to the First Lien Credit Documents.

"Fixed Charge Ratio" means, the ratio, determined as of the end of each fiscal month of the Borrowers for the most recently ended twelve fiscal months, of (a) Adjusted Consolidated EBITDA minus the unfinanced portion of Capital Expenditures (but including Capital Expenditures financed with proceeds of the revolving facility under the First Lien Credit Agreement) minus taxes paid in cash net of refunds (but in no event less than zero), to (b) Fixed Charges, all calculated on a Consolidated basis in accordance with GAAP.

"Fixed Charges" means, with reference to any period, without duplication, Consolidated Interest Expense paid or payable in cash, plus scheduled principal payments on Debt made during such period, plus Capital Lease Obligation payments made during such period, all calculated on a Consolidated basis.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" has the meaning specified in Section 1.03.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members" means, collectively, Holdings, the Borrowers and their respective Subsidiaries.

"Guarantors" means, collectively, each Loan Party in its capacity as a guarantor pursuant to Article X.

"Hazardous Materials" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"Holdings" has the meaning provided in the Preamble.

"Incremental Effective Date" has the meaning provided in Section 2.19(e).

"Incremental Term Lender" shall mean a Term Lender with an Incremental Term Loan Commitment or an outstanding Incremental Term Loan.

"Incremental Term Loan Commitment" shall mean the commitment of any Term Lender, established pursuant to Section 2.19, to make Incremental Term Loans.

11

"Incremental Term Loans" shall mean Term Loans made by one or more Term Lenders to one or more of the Borrowers pursuant to Section 2.19.

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Insolvency" means with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent" means pertaining to a condition of Insolvency.

"Intellectual Property" has the meaning given to such term in the Security Agreement.

"Interest Period" means, for each Eurodollar Rate Advance comprising part of the same Term Loan Borrowing the period commencing on the date of such Eurodollar Rate Advance or the date of the Conversion of any Base Rate Advance into such Eurodollar Rate Advance and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the applicable Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two or three months, as the applicable Borrower may, upon notice received by the Agent no later than 12:00 noon on the third Business Day prior to the first day of such Interest Period, select; provided, however, that:

(a) a Borrower may not select any Interest Period with respect to a Term Loan Borrowing constituting a Eurodollar Rate Advance that ends after the Termination Date;

(b) Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Borrowing shall be of the same duration;

(c) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period of one month or longer to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(d) whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Inventory" as defined in the UCC.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of equity interests of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.

"Kmart" means Kmart Holding Corporation, a Delaware corporation.

"Kmart Corp." has the meaning provided in the Preamble.

12

"Lenders" means, collectively, the Term Lenders.

"Lien" means any lien, security interest or other charge or encumbrance of any kind or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor, and any easement, right of way or other encumbrance on title to real property, but excluding consignments or bailments of goods of third parties and the interests of lessors under operating leases.

"Line Cap" means the "Line Cap" as defined in the First Lien Credit Agreement.

"Loan Documents" means this Agreement, the Security Documents, the Notes, each Borrowing Base Certificate, any other document or instrument now or hereafter designated by the Borrowers and the Agent as a "Loan Document" and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties" means each Group Member that is a party to a Loan Document.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of Holdings and its Subsidiaries taken as a whole, or (b) the ability of the Loan Parties taken as a whole to perform their material obligations under the Loan Documents or (c) the validity or enforceability of the Loan Documents taken as a whole or the rights and remedies of the Agent, the Collateral Agent or the Lenders thereunder taken as a whole (including, but not limited to, the enforceability or priority of any Liens granted to the Collateral Agent under the Loan Documents).

"Material Subsidiary Guarantor" means a Subsidiary Guarantor that, at the time of determination, accounts for more than 2% of both the total assets and total revenues of Holdings on a consolidated basis (and, together with all other Material Subsidiary Guarantors accounts for more than 5% of both the total assets and total revenues of Holdings on a consolidated basis).

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Holdings or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Holdings or any ERISA Affiliate and at least one Person other than Holdings and the ERISA Affiliates or (b) was so maintained and in respect of which Holdings or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Net Proceeds" means, (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries of any property or any casualty or condemnation of such property, the excess, if any, of (i) the sum of cash and cash equivalents received in such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Debt that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Collateral Agent's Lien, if any, on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Debt under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, reasonable and customary attorneys' fees, accountants' fees, investment banking fees, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates), (C) transfer Taxes paid as a result thereof, and (b) the excess of (i) the sum of the cash and cash equivalents received in connection with the issuance of any equity interests of any Loan Party or any Permitted Refinancing Debt over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party in connection therewith.

13

"Non-Consenting Lender" has the meaning specified in Section 9.16.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means a promissory note of any Borrower payable to the order of any Lender evidencing the Term Commitment of such Lender.

"Obligations" means all amounts owing pursuant to this Agreement and the other Loan Documents,, including, without limitation, the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorneys costs, indemnities and other amounts.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Extension of Credit or Loan Document pursuant to an assignment request by the Borrowers under Section 9.16).

"Other Taxes" has the meaning specified in Section 2.15.

"PACA" means the Perishable Agricultural Commodities Act of 1930, as amended.

"PASA" means the Packers and Stockyards Act of 1921, as amended.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Holdings or any ERISA Affiliate or to which Holdings or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Perfection Certificate" means that certain perfection certificate dated as of the Effective Date and delivered to the Agent with respect to the Borrowers and the other Loan Parties==.

"Permitted Acquisition" means any Acquisition permitted under Section 6.02(c).

"Permitted Debt" means each of the following as long as no Default or Event of Default exists at the time of incurrence thereof or would arise from the incurrence thereof:

(a) Debt outstanding on the Effective Date (other than obligations under the First Lien Credit Agreement);

(b) Debt of any Loan Party to any other Loan Party;

(c) Debt of Holdings or any Subsidiary of Holdings which is not a Loan Party to any Loan Party; provided, that (1) such Debt is incurred in the ordinary course of business consistent with past practices in connection with cash management, (2) such Debt shall not exceed $100,000,000 in the

14

aggregate at any one time outstanding or (3) (i) at the time of incurrence of any such Debt and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing, and (ii) after giving effect to any such Debt (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0;

(d) Debt of any Group Member to any Subsidiary of Holdings which is not a Loan Party;

(e) (i) purchase money Debt used to finance the acquisition of any fixed or capital assets, including Capital Lease Obligations, and any Debt assumed in connection with the acquisition of any such assets or secured solely by a Lien on any such assets prior to the acquisition thereof, and (ii) Debt incurred in connection with sale-leaseback transactions with respect to assets not constituting Collateral;

(f) Debt of any Person that becomes a Subsidiary in an Acquisition permitted in accordance with Section 6.02 (c), which Debt is existing at the time such Person becomes a Subsidiary (other than Debt incurred solely in contemplation of such Person's becoming a Subsidiary);

(g) the Obligations;

(h) other Debt in an amount not to exceed $1,000,000,000 in the aggregate outstanding at any time;

(i) Debt described in Section 6.02(a)(vi), provided, that such Debt (i) does not have a maturity date which is earlier than the Termination Date in effect at the time of the incurrence of such Debt, (ii) is incurred on arm's-length terms, (iii) [reserved], and (iv) the security documents, if any, with respect to such Debt are reasonably satisfactory to the Agent in its Permitted Discretion;

(j) any other Debt, provided, that such Debt (i) does not require the repayment of principal prior to the Termination Date in effect at the time of the incurrence of such Debt in excess of 1.0% of the original principal amount thereof per annum (excluding, for the avoidance of doubt, repayments required as a result of the sale of assets and repayments required in connection with an event that would constitute an Event of Default under Section 7.01(g) hereof) (ii) does not have a maturity date which is earlier than the Termination Date in effect at the time of the incurrence of such Debt, and (iii) is incurred on arm's-length terms;

(k) Debt of the type specified in clause (g) of the definition thereof to the extent such Debt constitutes a Permitted Investment;

(l) Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations (including, in each case, letters of credit issued to provide such bonds, guaranties and similar obligations), in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(m) Debt arising from overdraft facilities and/or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services (including, but not limited to, intraday, ACH, credit cards, and purchasing card/T&E services) in the ordinary course of business; provided, that (x) such Debt (other than credit cards or purchase cards) is extinguished within ten Business Days of notification to the applicable Loan Party of its incurrence and (y) such Debt in respect of credit cards or purchase cards is extinguished within 60 days from its incurrence;

(n) Debt arising from agreements of Holdings or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations, in each case, incurred or assumed in connection with any Permitted Acquisition or the disposition of any business, assets or any

15

Subsidiary not prohibited by this Agreement, other than guarantees of Debt incurred by any Person acquiring all or any portion of such business, assets or any Subsidiary for the purpose of financing such Acquisition;

(o) Debt consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p) Debt on account of letters of credit issued for the account of any Loan Party by any other Person;

(q) Permitted Refinancing Debt; and

(r) Debt outstanding pursuant to the First Lien Credit Agreement and other Priority Obligations in an aggregate principal amount not to exceed $4,250,000,000.

"Permitted Discretion" means a determination made in good faith and in the exercise of commercially reasonable business judgment; provided, however, that so long as the First Lien Credit Agreement remains outstanding, the Agent shall exercise its Permitted Discretion in a manner that is no more restrictive or onerous with respect to the Loan Parties than any corresponding exercise of Permitted Discretion by the First Lien Agent.

"Permitted Dispositions" means any of the following:

(a) transfers and Dispositions of Inventory in the ordinary course of business;

(b) transfers and Dispositions among the Loan Parties;

(c) transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to any Loan Party;

(d) transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to other Subsidiaries which are not Loan Parties;

(e) transfers and Dispositions (other than transfers and Dispositions of Inventory, Credit Card Accounts Receivable or any other collateral for the Term Loans)) to any Subsidiary of Holdings which is not a Loan Party by any Loan Party provided, that any such Disposition of Collateral shall be (i) undertaken in the ordinary course of business or (ii) on terms that are fair and reasonable and no less favorable to the Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not a Subsidiary of Holdings;

(f) the sale of surplus, obsolete or worn out equipment or other property in the ordinary course of business by the Borrowers or any Subsidiary;

(g) transfers and Dispositions of all or any portion of any Loan Party's assets, including any equity interests of its Subsidiaries (other than the equity interests or substantially all of the assets of either Borrower or of Sears), provided, that immediately after giving effect to any such disposition, (i) no Default or Event of Default then exists, (ii) either (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap (provided that, with respect to the transfer or Disposition of the assets of, or any equity interest in, a Material Subsidiary Guarantor (other than Sears), such Pro Forma and Projected Capped Excess Availability is at least the greater of (x) 25% of the Line Cap or (y) $750,000,000), or (B) such Loan Party uses the Net Proceeds of such Disposition to repay Priority Obligations in an amount equal to the lesser of (x) 100% of such Net Proceeds and (y) an amount sufficient to cause Pro Forma and Projected Capped Excess Availability to be 15% or more of the Line Cap (or, with respect to the transfer or Disposition of the assets of, or any equity interest in, a Material Subsidiary Guarantor (other than Sears), an

16

**JX 115-20**

amount sufficient to cause Pro Forma and Projected Capped Excess Availability to be the greater of (x) 25% of the Line Cap or (y) $750,000,000), (iii) if the Disposition is to a Subsidiary or Affiliate of a Loan Party which is not a Loan Party, such Disposition shall be on terms that are fair and reasonable and no less favorable to the Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not a Subsidiary or Affiliate of a Loan Party, and (iv) Capped Excess Availability is no less than Capped Excess Availability immediately prior to such Disposition;

(h) transfers and Dispositions which constitute Restricted Payments or Permitted Investments that are otherwise permitted hereunder;

(i) Dispositions permitted pursuant to Section 6.02(b) hereof;

(j) the sale of other Policy Investments in the ordinary course of business;

(k) the sale or Disposition of defaulted receivables and the compromise, settlement and collection of receivables in the ordinary course of business or in bankruptcy or other proceedings concerning the other account party thereon and not as part of an accounts receivable financing transaction;

(l) leases, licenses or subleases or sublicenses of any real or personal property not constituting Collateral in the ordinary course of business;

(m) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind (other than, in each case, with respect to rights to license the Related Intellectual Property, unless the limited license granted to the Collateral Agent in such Related Intellectual Property pursuant to the Loan Documents remains in effect and is acknowledged by the licensee) to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect;

(n) sales of Inventory determined by the management of the applicable Loan Party not to be saleable in the ordinary course of business of such Loan Party or any of the Loan Parties; and

(o) transfers of assets, including Inventory, in connection with Store closings (and/or department closings within Stores) permitted pursuant to Section 6.02(l).

"Permitted Holder" means ESL Investments, Inc. and any of its Affiliates other than a Group Member.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists at the time of the making such of Investment or would arise from the making of such Investment:

(a) Investments existing on, or contractually committed as of, the Effective Date;

(b) (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Effective Date, (ii) Investments by any Loan Party and its Subsidiaries in Loan Parties, and (iii) Investments by Subsidiaries that are not Loan Parties in Holdings or any Subsidiary;

(c) other Investments of any Loan Party in any other Subsidiary of Holdings which is not a Loan Party; provided, that (1) such Investment is incurred in the ordinary course of business consistent with past practices in connection with cash management, (2) such Investments shall not exceed $100,000,000 in the aggregate at any one time outstanding and the Pro Forma and Projected Capped Excess Availability is at least 25% of the Line Cap, or (3) (a) at the time of any such Investment and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing, and (b) after giving effect to any such Investment (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0;

17

JX 115-21

(d) Investments of any Loan Party in any other Person not constituting an Acquisition; provided that (a) at the time of any such Investment and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing, and (b) after giving effect to any such Investment (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0;

(e) Investments constituting a Permitted Acquisition and Investments held by the Person acquired in such Acquisition at the time of such Acquisition (and not acquired in contemplation of such Acquisition);

(f) Investments arising out of the receipt of non-cash consideration for the sale of assets otherwise permitted under this Agreement;

(g) Policy Investments;

(h) Investments in Swap Contracts not entered into for speculative purposes;

(i) to the extent not prohibited by applicable law, (1) advances to officers, directors and employees and consultants of the Loan Parties made for travel, entertainment, relocation and other ordinary business purposes and (2) advances to officers, directors and employees and consultants of non-Loan Parties made for travel, entertainment, relocation and other ordinary business purposes, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder;

(j) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by any Group Member as a result of a foreclosure by any Loan Party with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(k) Reserved;

(l) Investments made with the common stock of Holdings;

(m) accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business;

(n) Guarantees by Holdings or any Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Debt, in each case entered into by Holdings or any Subsidiary in the ordinary course of business;

(o) (1) advances in the form of a prepayment of expenses of any Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable Loan Party and (2) advances in the form of a prepayment of expenses of any non-Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable non-Loan Party, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder;

(p) Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other Persons, provided that no such Investment shall impair in any manner the limited license granted to the Collateral Agent in such Intellectual Property pursuant to the Loan Documents;

(q) Investments in joint ventures that own real properties upon which Stores are located existing as of the Effective Date and entered into hereafter in the ordinary course of business; and

(r) other Investments in an amount not to exceed $250,000,000 in the aggregate outstanding at any time; provided that no Investment pursuant to this clause (r) shall be made by any Loan Party in any Subsidiary of Holdings which is not a Loan Party.

18

JX 115-22

"Permitted Liens" means:

(a) Liens for taxes, assessments and governmental charges or levies to the extent such taxes, assessments or governmental charges are being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained;

(b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(c) landlords' Liens arising in the ordinary course of business securing (i) rents not yet due and payable, (ii) rent for Stores in an amount not to exceed the monthly base rent due for the immediately preceding calendar month and (iii) rents for Stores in excess of the amount set forth in the preceding clause (ii) so long as such amounts are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(d) any attachment or judgment lien not constituting an Event of Default under Section 7.01(f);

(e) Liens presently existing or hereafter created in favor of the Agent or the Collateral Agent, on behalf of the Credit Parties;

(f) Liens arising by the terms of commercial letters of credit, entered into in the ordinary course of business to secure reimbursement obligations thereunder, provided that such Liens only encumber the title documents and underlying goods relating to such letters of credit or cash and cash equivalents as permitted under clause (m) hereof;

(g) claims under PACA and PASA;

(h) Liens in favor of issuers of credit cards arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(i) Liens incurred or deposits made by any Group Member in the ordinary course of business in connection with workers' compensation and other casualty insurance lines, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(j) easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business, or in respect of any real property which is part of the Collateral, any title defects, liens, charges or encumbrances (other than such prohibited monetary Liens) which the title company is prepared to endorse or insure by exclusion or affirmative endorsement reasonably acceptable to the Agent and which is included in any title policy;

(k) any interest or title of a lessor or sublessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Agreement;

19

JX 115-23

(l) normal and customary rights of setoff upon deposits of cash or other Liens originating solely by virtue of any statutory or common law provision, or ordinary course contractual obligation, relating to bankers' liens, rights of setoff or similar rights in favor of banks or other depository institutions;

(m) Liens on cash and cash equivalents securing obligations in respect of standby or trade letters of credit not constituting Obligations or trade-related bank guarantees;

(n) Liens granted to consignors who have properly perfected on consigned Inventory owned by such consignors and created in the ordinary course of business;

(o) Liens on premium rebates securing financing arrangements with respect to insurance premiums;

(p) deposits and other customary Liens to secure the performance of bids, trade contracts (other than for Debt), leases (other than Capital Lease Obligations), statutory and regulatory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(q) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Debt or (ii) relating to pooled deposit or sweep accounts of the Borrowers or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any Subsidiary;

(r) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s) Liens solely on any cash earnest money deposits made by any Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(t) Liens on securities that are the subject of repurchase agreements constituting Policy Investments;

(u) Liens on cash and cash equivalents securing Swap Contracts incurred in the ordinary course of business; and

(v) other Liens on cash and cash equivalents in an amount not to exceed $25,000,000 held by a third party as security for any obligation (other than Debt) permitted to be incurred by any Group Member hereunder.

"Permitted Refinancing Debt" shall mean any Debt issued in exchange for, or the Net Proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Debt being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Debt); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Debt does not exceed the principal amount (or accreted value, if applicable) of the Debt so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the maturity date of such Permitted Refinancing Debt shall not be earlier than the maturity date of the Debt being Refinanced and weighted average life to maturity of such Permitted Refinancing Debt shall be greater than or equal to the weighted average life to maturity of the Debt being Refinanced, (c) if the Debt being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Debt shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those

20

JX 115-24

contained in the documentation governing the Debt being Refinanced, (d) no Permitted Refinancing Debt shall have different obligors, or greater guarantees or security, or higher priority guarantees or security, than the Debt being Refinanced; and (e) the Permitted Refinancing Debt shall otherwise be on terms which would not reasonably likely result in a Material Adverse Effect.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Policy Investments" means Investments made in accordance with the investment policy of the Loan Parties set forth on Schedule 6.02(k)(ii), as such policy may be amended from time to time with the reasonable consent of the Agent, such consent not to be unreasonably withheld.

"Priority Obligations" means, collectively, the First Lien Credit Agreement Obligations and the Additional First Lien Debt Obligations.

"Pro Forma and Projected Capped Excess Availability" shall mean, for any date of calculation, after giving effect to the applicable transaction or payment, the pro forma and projected Capped Excess Availability for the subsequent twelve (12) fiscal month period, determined as of the last day of each fiscal month in such period and based on Holdings' good faith projections that are used to run the businesses of the Borrowers and prepared in accordance with past practice, which projections shall be reasonably satisfactory to the Agent.

"Pro Forma Fixed Charge Ratio" shall mean, for any date of calculation, the Fixed Charge Ratio as of the last day of the most recently completed fiscal quarter for which financial statements are available or were required to have been delivered pursuant to Section 6.01(j) (the "Reference Date"), after giving pro forma effect to any applicable transaction or payment as if such transaction or payment had occurred on the first day of the four fiscal quarter period ending on the Reference Date.

"Pro Rata Share" means, as to any Lender as of any date of determination, a percentage equal to (i) the sum of such Lender's share of the outstanding principal amount of the Term Loan as of such date, divided by (ii) the aggregate outstanding principal amount of the Term Loan as of such date.

"Recipient" means the Agent, the Collateral Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 9.07(e).

"Related Intellectual Property" means such rights with respect to the Intellectual Property of Holdings and its Subsidiaries as are reasonably necessary to permit the Collateral Agent to enforce its rights and remedies under the Loan Documents with respect to the Collateral.

"REMIC Certificates" means the SRC Commercial Mortgage Trust 2003-1 Mortgage Pass-Through Certificates in the aggregate face amount of $1,312,416,000 (as amended, supplemented or otherwise modified, replaced or refinanced, in any case in a manner not materially adverse to the Lenders).

"Reorganization" means with respect to any Multiemployer Plan, the condition that such Plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

21

"Required Lenders" means, at any time, the holders of more than 50% of the principal amount of the Term Loan then outstanding.

"Requirements of Law" means as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interests in Holdings or any Subsidiary of Holdings, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity interests in Holdings or any Subsidiary of Holdings or any option, warrant or other right to acquire any such equity interests in Holdings or any Subsidiary of Holdings.

"Sears" means Sears, Roebuck and Co., a New York corporation.

"SEC" means the United States Securities and Exchange Commission.

"Security Agreement" means that certain Security Agreement, dated as of October 12, 2010, by Holdings and certain of its subsidiaries in favor of Wilmington Trust, National Association (as successor to Wells Fargo Bank, National Association), in its capacity as collateral agent thereunder, as such Security Agreement may be amended, supplemented or otherwise modified from time to time, including by that certain First Amendment to Security Agreement, dated as of the date hereof, and that certain Pari Passu Joinder Agreement, dated as of the date hereof.

"Security Documents" means the collective reference to the Security Agreement, and all other security documents hereafter delivered to the Collateral Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Borrower or any ERISA Affiliate and no Person other than such Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which any Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"Solvent" means, when used with respect to any Person, that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (c) such Person will be able to pay its debts as they mature.

"SRAC" has the meaning provided in the Preamble.

"Store" means any store owned or leased and operated by any Loan Party.

"Store Closure Sale" means a store closure sale that, if including more than twenty (20) stores (whether in one transaction or a series of related transactions), is properly managed by an independent, nationally recognized, professional retail inventory liquidation firm reasonably acceptable to the Agent, over a defined period that is anticipated by the Borrowers not to exceed 12 weeks (on average) from the date of the same commencement.

22

JX 115-26

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of the issued and outstanding capital stock or other equity interest having ordinary voting power to elect a majority of the Board of Directors or other governing body of such corporation, partnership, joint venture, limited liability company, trust or estate (irrespective of whether at the time capital stock or other equity interests of any other class or classes of such corporation, partnership, joint venture, limited liability company, trust or estate shall or might have voting power upon the occurrence of any contingency), is at the time directly or indirectly owned by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Subsidiary Guarantor" means each direct and indirect wholly owned Domestic Subsidiary of Holdings, that owns Inventory, Credit Card Accounts Receivable, or other Collateral.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means, as to any Term Lender, the obligation of such Term Lender to make its portion of the Term Loan on the Effective Date, and thereafter, each Incremental Term Loan Commitment, if any.

"Term Lenders" means, collectively, any Persons party hereto as a Term Lender, and each Person that shall become a party hereto as a Term Lender pursuant to Section 9.07 and shall include all future Term Lenders who hold an Extended Term Loan or Incremental Term Loan.

"Term Loan" means, collectively, (i) the term loans made by the Term Lenders on the Effective Date pursuant to Section 2.01(b) and (ii) any Incremental Term Loans.

"Term Loan Borrowing" means a portion of the Term Loan of a particular Type; provided that no Term Loan Borrowing shall be in an aggregate principal amount of less than $5,000,000 and each Term Loan Borrowing constituting a Eurodollar Rate Advance shall be in a principal amount that is an integral multiple of $1,000,000 (unless no portion of the Term Loan constitutes a Base Rate Advance), and no more than ten (10) Interest Periods in the aggregate for Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

"Term Loan Margin" (a) with respect to any outstanding portion of the Term Loan that is a Eurodollar Rate Advance, 7.50% per annum, and (b) with respect to any outstanding portion of the Term Loan that is a Base Rate Advance, 6.50% per annum.

"Termination Date" means July 20, 2020.

23

JX 115-27

"Total Extensions of Credit" means at any time, the aggregate, outstanding principal amount of indebtedness for borrowed money of the Loan Parties secured by Liens on the Collateral, including any applicable Priority Obligations and/or the Existing Second Lien Notes.

"Trading With the Enemy Act" means 50 U.S.C. § 1 et seq., as amended.

"Type" means either a Base Rate Advance or a Eurodollar Rate Advance.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York, provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Internal Revenue Code for the applicable plan year.

"Voting Stock" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

SECTION 1.02. Computation of Time Periods. In this Agreement, unless otherwise specified, (a) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" (b) "including" means "including without limitation"; and (c) any reference to a time of day means Eastern time.

SECTION 1.03. Accounting Terms. All accounting terms not specifically defined herein or in the other Loan Documents shall be construed in accordance with U.S. generally accepted accounting principles ("GAAP") which for purposes of Section 6.03 shall be consistently applied. If at any time any change in U.S. generally accepted accounting principles would affect the computation of any financial ratio or requirement set forth herein, and either the Borrowers or the Required Lenders shall so request, the Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders which shall not be unreasonably withheld), provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change in principles, and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. For the avoidance of doubt, no retroactive change in GAAP shall apply to the construction of accounting terms under this Agreement in the absence of an amendment hereto in accordance with the terms of this Section 1.03.

SECTION 1.04. Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document, the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified

24

(subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

ARTICLE II

AMOUNTS AND TERMS OF THE TERM LOAN

SECTION 2.01. The Term Loan.

(a) Reserved.

(b) Each Term Lender severally agrees, on the terms and conditions hereinafter set forth, to make its portion of the Term Loan to the Borrowers on the Effective Date in a principal amount not to exceed the Term Commitment of such Term Lender. Amounts repaid in respect of the Term Loan may not be reborrowed. Upon each Term Lender's making of its portion of the Term Loan, the Term Commitment of such Term Lender shall be terminated.

SECTION 2.02. Reserved.

SECTION 2.03. Reserved.

SECTION 2.04. Reserved.

SECTION 2.05. Fees. (a) Upfront fees. The Borrowers shall pay to each Lender an upfront fee on the Effective Date in an amount equal to 3.0% of such Lender's Term Commitment, which fee shall be paid by the netting of such amount from the proceeds of the Term Loans.

(b) Term Loan Repayment Premium. In the event that, prior to the two year anniversary of the Effective Date, all or any portion of the Term Loans is voluntarily prepaid, refinanced or replaced (a "Prepayment Transaction"), the Borrowers shall pay (x) a prepayment premium equal to 2.00% of the aggregate principal amount of the Term Loan so prepaid, refinanced or replaced, if such Prepayment Transaction occurs on or prior to the first anniversary of the Effective Date, and (y) a prepayment premium equal to 1.00% of the aggregate principal amount of the Term Loan so prepaid, refinanced or replaced, if such Prepayment Transaction occurs after the first anniversary of the Effective Date but on or prior to the second anniversary of the Effective Date. Such amounts shall be due and payable on the date of effectiveness of such Prepayment Transaction.

(c) Other Fees. The Borrowers shall pay to the Agent the agency and administrative fees, if any, as may be separately agreed in writing between the Borrowers and such party.

SECTION 2.06. Reserved.

SECTION 2.07. Repayment of Term Loan.

(a) Reserved.

(b) Each Borrower shall repay to the Agent for the ratable account of the Term Lenders on the Termination Date the aggregate principal amount of the Term Loan then outstanding.

25

SECTION 2.08. Interest.

(a) Reserved.

(b) Term Loan. Each Borrower shall pay interest on the unpaid principal amount of the Term Loan made to it and owing to each Term Lender from the Effective Date until such principal amount shall be paid in full, at the following rates per annum:

(i) Base Rate Advances. During such periods as any outstanding portion of the Term Loan is a Base Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times to the sum of (x) the Base Rate in effect from time to time plus (y) the Term Loan Margin for Base Rate Advances, payable in arrears quarterly on the 5th day subsequent to the last day of each month during such periods and on the date such Base Rate Advance shall be Converted or paid in full.

(ii) Eurodollar Rate Advances. During such periods as any outstanding portion of the Term Loan is a Eurodollar Rate Advance, each such Term Loan Borrowing shall earn interest at a rate per annum equal at all times during each Interest Period for such Eurodollar Rate Advance to the greater of (A) 1.00% or (B) the Eurodollar Rate for such Interest Period for such outstanding portion of the Term Loan plus, in either case, the Term Loan Margin for Eurodollar Rate Advances, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such Eurodollar Rate Advance shall be Converted or paid in full.

(c) Reserved.

(d) Reserved.

(e) Default Interest. Upon the occurrence and during the continuance of an Event of Default, at the option of the Agent or on the request of the Required Lenders, the Borrowers shall pay interest on the principal amount of the Term Loan then outstanding, payable in arrears on the dates referred to in Sections 2.08(b) above, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on the outstanding amount of the Term Loan pursuant to Section 2.08(b)(i) above. Further, the Borrowers shall pay interest, to the fullest extent permitted by law, on the amount of any interest, fee or other amount (other than principal) payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on Base Rate Advances pursuant to Section 2.08(b)(i).

(f) Regulation D Compensation. Each Lender that is subject to reserve requirements of the Board of Governors of the Federal Reserve System (or any successor) may require the Borrowers to pay, contemporaneously with each payment of interest on the Eurodollar Rate Advances, additional interest on the related Eurodollar Rate Advances of such Lender at the rate per annum equal to the excess of (i) (A) the applicable Eurodollar Rate divided by (B) one minus the Eurodollar Rate Reserve Percentage over (ii) the applicable Eurodollar Rate. Any Lender wishing to require payment of such additional interest (x) shall so notify the Agent and the Borrowers, in which case such additional interest on the Eurodollar Rate Advances of such Lender shall be payable to such Lender at the place indicated in such notice with respect to each Interest Period commencing at least five Business Days after the giving of such notice and (y) shall notify the Agent and the Borrowers at least five Business Days prior to each date on which interest is payable on the amount then due it under this Section. Each such notification shall be accompanied by such information as the Borrowers may reasonably request.

26

SECTION 2.09. <u>Interest Rate Determination</u>. (a) The Agent shall give prompt notice to the Borrowers and the Lenders of the applicable interest rate determined by the Agent for purposes of Section 2.08(b).

(b) If, with respect to any Eurodollar Rate Advances, the Required Lenders notify the Agent at least one Business Day before the date of any proposed Eurodollar Rate Advance that the Eurodollar Rate for any Interest Period for such Eurodollar Rate Advances will not adequately reflect the cost to such Required Lenders of making, funding or maintaining their respective Eurodollar Rate Advances for such Interest Period, the Agent shall forthwith so notify the Borrowers and the Lenders, whereupon (i) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance, and (ii) the obligation of the Lenders to Convert Base Rate Advances into Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

(c) If any Borrower shall fail to select the duration of any Interest Period for any Eurodollar Rate Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, the Agent will forthwith so notify such Borrower and the Lenders and such Eurodollar Rate Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

(d) On the date on which the aggregate unpaid principal amount of Eurodollar Rate Advances comprising any Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $5,000,000, such Eurodollar Rate Advances shall automatically Convert into Base Rate Advances.

(e) Upon the occurrence and during the continuance of any Event of Default, at the option of the Agent or on the request of the Required Lenders (i) each Eurodollar Rate Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance and (ii) the obligation of the Lenders to Convert any outstanding portion of the Term Loan into Eurodollar Rate Advances shall be suspended.

SECTION 2.10. <u>Optional Conversion of Term Loan Borrowings</u>. The Borrowers may on any Business Day, upon notice given to the Agent not later than 12:00 noon on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Sections 2.09 and 2.13, Convert any Term Loan Borrowing of one Type into a Term Loan Borrowing of the other Type; <u>provided</u>, <u>however</u>, that any Conversion of Eurodollar Rate Advances into Base Rate Advances shall be made only on the last day of an Interest Period for such Eurodollar Rate Advances. Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) Term Loan Borrowings to be Converted, and (iii) if such Conversion is into Eurodollar Rate Advances, the duration of the initial Interest Period for each such Term Loan Borrowing. Each notice of Conversion shall be irrevocable and binding on the applicable Borrower.

SECTION 2.11. <u>Optional and Mandatory Prepayments of Term Loan</u>.

(a) (i) Reserved.

(ii) Any Borrower may, subject to the terms of this Section 2.11(a)(ii) and Section 2.05(b) and upon notice given not later than 12:00 noon on the date three Business Days prior to such prepayment to the Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given such Borrower shall, prepay the outstanding principal amount of the Term Loan in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that (w) each partial prepayment shall be in an aggregate principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof, (x) reserved, (y) reserved, and (z) in the event of any such prepayment of a Eurodollar Rate Advance, the applicable Borrower shall be obligated to reimburse the Lenders in respect thereof pursuant to Section 9.04(c).

(b) Reserved.

(c) No later than ten (10) Business Days following the last day of any fiscal quarter of Holdings (the "<u>Reference Quarter</u>"), if (i) the Total Extensions of Credit as of the last day of the Reference Quarter exceeded the Borrowing Base as of the last day of the Reference Quarter, and (ii) the Total Extensions of Credit as of the last

27

JX 115-31

day of the fiscal quarter of Holdings immediately preceding the Reference Quarter exceeded the Borrowing Base as of the last day of the fiscal quarter of Holdings immediately preceding the Reference Quarter, the Borrowers shall prepay the Term Loans in an amount equal to the excess described in the foregoing clause (i).

(d) Reserved.

(e) The Borrowers shall prepay Priority Obligation and/or Term Loans in an amount necessary to avoid the occurrence of a Collateral Coverage Event (as defined in the Indenture for the Existing Second Lien Notes).

(f) Reserved.

(g) The Borrowers shall prepay (x) the Term Loan in an amount equal to 50% of Excess Cash Flow for each fiscal year of Holdings beginning with the fiscal year ending on or about January 31, 2016, and (y) the Term Loan and the 2016 Term Loan on a ratable basis in an aggregate amount equal to 50% of Excess Cash Flow for each fiscal year of Holdings beginning with the fiscal year ending on or about January 31, 2017. Each prepayment under this clause (g) shall be made within 90 days following the end of each applicable fiscal year of Holdings; provided, however, that no prepayment shall be required under this clause (g) if, after compliance with any prepayment obligation in any Priority Obligation, any Priority Obligations remain outstanding on the date on which such prepayment would otherwise be required.

(h) The Borrowers shall deliver to the Agent, in connection with each prepayment required under Section 2.11 (g), a certificate signed by an Authorized Officer of the Borrowers setting forth in reasonable detail the calculation of the amount of such prepayment.

(i) Any prepayment of the Term Loan pursuant to clauses (c), (e) or (g) of this Section 2.11 shall be applied, first, to any Base Rate Advances then outstanding and the balance of such prepayment, if any, to the Eurodollar Rate Advances then outstanding.

SECTION 2.12. Increased Costs. (a) If, due to either (i) after the Effective Date the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law) made or issued after the Effective Date, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Advances (excluding for purposes of this Section 2.12 any such increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.15 shall govern) and (ii) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided that a Lender claiming additional amounts under this Section 2.12(a) agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office and/or take other commercially reasonable action if the making of such a designation or the taking of such actions would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. A certificate as to the amount of such increased cost, submitted to the Borrowers and the Agent by such Lender, shall be entitled to a presumption of correctness. If any Borrower so notifies the Agent after any Lender notifies the Borrowers of any increased cost pursuant to the foregoing provisions of this Section 2.12(a), such Borrower may, upon payment of such increased cost to such Lender, replace such Lender with a Person that is an Eligible Assignee in accordance with the terms of Section 9.07 (and the Lender being so replaced shall take all action as may be necessary to assign its rights and obligations under this Agreement to such Eligible Assignee).

(b) If any Lender determines that compliance with any change after the Effective Date in law or regulation or any guideline or request after the Effective Date from any central bank or other governmental authority (whether or not having the force of law) affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender or any entity controlling such Lender and that the amount of such capital

28

or liquidity is increased by or based upon the existence of such Lender's commitment to lend hereunder and other commitments of this type, then, upon demand by such Lender (with a copy of such demand to the Agent), the Borrowers shall pay to the Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender or such entity in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender's commitment to lend hereunder. A certificate as to such amounts submitted to the Borrowers and the Agent by such Lender shall be entitled to a presumption of correctness. Notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder issued in connection therewith or in implementation thereof and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in law covered by this Section 2.12 regardless of the date enacted, adopted, issued or implemented.

(c) The Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or capital, liquidity or reserve requirement or pursuant to Section 2.15 for any Taxes incurred more than six months prior to the date that such Lender notifies the Borrowers of the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax and of such Lender's intention to claim compensation therefor; provided that if the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.13. Illegality. Notwithstanding any other provision of this Agreement, if any Lender shall notify the Agent that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for any Lender or its Eurodollar Lending Office to perform its obligations hereunder to make Eurodollar Rate Advances or to fund or maintain Eurodollar Rate Advances hereunder, (a) each Eurodollar Rate Advance will automatically, upon such demand, Convert into a Base Rate Advance and (b) the obligation of the Lenders to Convert Term Loan Borrowings into Eurodollar Rate Advances shall be suspended until the Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 2.14. Payments and Computations. (a) The Borrowers shall make each payment hereunder and under the other Loan Documents, without any right of counterclaim or set-off, not later than 1:00 P.M. on the day when due in U.S. dollars to the Agent into the account specified by the Agent in writing from time to time in same day funds. The Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or commitment fees ratably (other than amounts payable pursuant to Section 2.12, 2.15 or 9.04(c)) to the Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(c), from and after the effective date specified in such Assignment and Acceptance, the Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b) Each Borrower hereby authorizes each Lender, if and to the extent payment owed by it to such Lender is not made when due hereunder or under the other Loan Documents, to charge from time to time against any or all of such Borrower's accounts with such Lender any amount so due. Any such Lender so charging such accounts shall deliver the proceeds therefrom to the Agent for distribution to the Credit Parties in the manner set forth herein and in the other Loan Documents.

(c) All computations of interest based on the Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate or the Federal Funds Rate and of duration-based fees, if any, shall be made by the Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or commitment fees are payable. Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

**JX 115-33**

(d) Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee, as the case may be; provided, however, that, if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e) Unless the Agent shall have received notice from any Borrower prior to the date on which any payment is due by it to the Lenders hereunder that such Borrower will not make such payment in full, the Agent may assume that the applicable Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent such Borrower shall not have so made such payment in full to the Agent, each Lender shall repay to the Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Agent, at the Federal Funds Rate.

SECTION 2.15. Taxes. (a) Any and all payments by the Borrowers to or for the account of any Lender, the Agent or the Collateral Agent hereunder or under the other Loan Documents or any other documents to be delivered hereunder shall be made, in accordance with Section 2.14 or the applicable provisions of such other documents, free and clear of and without deduction for any and all present or future Taxes (excluding any Excluded Taxes). If the Borrowers shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document or any other documents to be delivered hereunder to any Lender, the Agent or the Collateral Agent, (i) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable shall be increased as may be necessary so that after making all required deductions for Indemnified Taxes (including deductions for Indemnified Taxes applicable to additional sums payable under this Section 2.15) such Lender, the Agent and the Collateral Agent (as the case may be) receive an amount equal to the sum each would have received had no such deductions of Indemnified Taxes been made, (ii) the Borrowers shall make such deductions as are determined by such Borrowers to be required based upon the information and documentation it has received pursuant to Sections 2.15(e) and (f) and (iii) the Borrowers shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b) In addition, the Borrowers shall pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under the other Loan Documents or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the other Loan Documents or any other documents to be delivered hereunder, but excluding (i) any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 9.16), and (ii) all other United States federal taxes other than withholding taxes (hereinafter referred to as "Other Taxes"). Other Taxes shall not include any Taxes imposed on, or measured by reference to, gross income, net income or gain.

(c) Without duplication of any additional amounts paid pursuant to Section 2.15(a), the Borrowers shall indemnify each Lender, the Agent and the Collateral Agent for and hold it harmless against the full amount of Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.15) imposed on or paid by such Lender, the Agent or the Collateral Agent (as the case may be) and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto. This indemnification shall be made within 30 days from the date such Lender, the Agent or the Collateral Agent (as the case may be) makes written demand therefor.

(d) Within 30 days after the date of any payment of Indemnified Taxes, the Borrowers shall furnish to the Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

30

JX 115-34

(e) Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(i) Without limiting the generality of the foregoing:

(a) Each Lender that is a United States person, on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers or the Agent), shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax on payments pursuant to this Agreement or the other Loan Documents; and

(b) Each Lender organized under the laws of a jurisdiction outside the United States, and each other Lender that is not a domestic corporation within the meaning of Section 7701(a)(30) of the Internal Revenue Code:

(1) represents that all payments to be made to it under this Agreement or any other Loan Document are exempt from United States withholding tax (including backup withholding tax) under an applicable statute or tax treaty;

(2) on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Forms W-8BEN, W-8BEN-E or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or the other Loan Documents; and

(3) on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made.

If the form provided by a Lender at the time such Lender first becomes a party to this Agreement indicates a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Indemnified Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such form; provided, however, that, if at the date of the Assignment and Acceptance pursuant to which a Lender assignee becomes a

31

JX 115-35

party to this Agreement, the Lender assignor was entitled to payments under subsection (a) in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Indemnified Taxes) United States withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN, W-8BEN-E, or W-8ECI, that the Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrowers and shall not be obligated to include in such form or document such confidential information. For purposes of this subsection (e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(f) For any period with respect to which a Lender has failed to provide the Borrowers with the appropriate form, certificate or other document described in Section 2.15(e) (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring subsequent to the date on which a form, certificate or other document originally was required to be provided, or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under Section 2.15(a) or (c) with respect to Indemnified Taxes imposed by the United States by reason of such failure; provided, however, that should a Lender become subject to Indemnified Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrowers shall take such steps as the Lender shall reasonably request to assist the Lender to recover such Indemnified Taxes. Further, if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3) (C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph (f), "FATCA" shall include any amendments made to FATCA after The Effective Date.

(g) Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.15 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(h) Any Lender claiming any additional amounts payable pursuant to this Section 2.15 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Eurodollar Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(i) If any Lender determines, in its sole discretion exercised in good faith, that it has actually and finally realized, by reason of a refund, deduction or credit of any Indemnified Taxes paid or reimbursed by the Borrowers pursuant to subsection (a) or (c) above in respect of payments under this Agreement or the other Loan Documents, a current monetary benefit that it would otherwise not have obtained, and that would result in the total payments under this Section 2.15 exceeding the amount needed to make such Lender whole, such Lender shall pay to the Borrowers, with reasonable promptness following the date on which it actually realizes such benefit, an amount equal to the amount of such excess, net of all out-of-pocket expenses incurred by such Lender reasonably allocable in securing such refund, deduction or credit, provided that the Borrowers, upon the request of such Lender, agree to repay the amount paid over to the Borrowers to such Lender in the event such Lender is required to repay such refund to such jurisdiction. Nothing in this subsection (i) shall be construed to require any Lender to make available to the Borrowers or any other Person its tax returns or any confidential tax information.

(j) If the Agent, the Collateral Agent or any Lender, as the case may be, shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by Borrower pursuant to this Section 2.15, including Indemnified Taxes or Other Taxes as to which it has been indemnified by Borrower, or with respect to which Borrower or a Group Member that is a signatory hereto has paid additional amounts pursuant to this Section 2.15, it shall notify Borrower of the availability of such refund claim and, if the Agent, the Collateral Agent or any

Lender, as the case may be, determines in good faith that making a claim for refund will not have any adverse consequence to its taxes or business operations, shall, after receipt of a request by Borrower, make a claim to such Governmental Authority for such refund at Borrower's expense.

32

JX 115-37

SECTION 2.16. <u>Sharing of Payments, Etc</u>. If any Lender shall obtain any payment from any Group Member (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Term Loan or other amounts owing to it (other than pursuant to Section 2.05(b), 2.07, 2.11, 2.12, 2.15, 2.18, 2.19 or 9.04(c)) in excess of its ratable share, such Lender shall forthwith purchase from the other Lenders such participations in the Term Loan or other amounts owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 2.16 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

SECTION 2.17. <u>Use of Proceeds of the Term Loan</u>. The proceeds of the Term Loan shall be available (and each Borrower agrees that it shall use such proceeds) for general corporate purposes of Holdings and its Subsidiaries, including, without limitation, for Acquisitions, Capital Expenditures, cash dividends, payment of any of the Obligations, and stock and bond repurchases, all to the extent not prohibited under the Loan Documents.

SECTION 2.18. <u>Extension of Loans</u>.

(a) <u>Extension of Term Loans</u>. The Borrowers may at any time and from time to time request that all or a portion of the Term Loans be amended to extend the termination date with respect to all or a portion thereof (any such Term Loans which have been so amended, "<u>Extended Term Loans</u>") and to provide for other terms consistent with this Section 2.18. In order to establish any Extended Term Loans, the Borrowers shall provide a notice to the Agent (who shall provide a copy of such notice to each of the Term Lenders) (each, a "<u>Extension Request</u>") setting forth the proposed terms (which shall be determined in consultation with the Agent) of the Extended Term Loans to be established, which shall (x) be identical as offered to each Term Lender (including as to the proposed interest rates and fees payable) and offered pro rata to each Term Lender hereunder, and (y) be identical to the Term Loans hereunder, except that: (i) the maturity date of the Extended Term Loans shall be later than the Termination Date, (ii) payments of interest and fees may be at different rates on Extended Term Loans (and related outstandings) (iii) the terms of the Extended Term Loans may provide, subject to the consent of the Required Lenders (excluding from the calculation thereof, any Term Lenders who decline to extend their Term Loans) for other or different covenants and terms that apply solely to any period after the Termination Date, or, if earlier, the repayment in full of Term Loans that are not Extended Term Loans, and (iv) (A) reserved; (B) all repayments of the Term Loans (including Extended Term Loans) shall be made on a pro rata basis (except for (1) payments of interest and fees at different rates on commitments (and related outstandings) in accordance with the rights of the applicable Class and (2) repayments required upon the maturity date of the Term Loans of any Class); and (C) reserved; <u>provided</u>, <u>further</u>, that (A) reserved, (B) reserved, (C) in connection with an Extension Request with respect to the Term Loans either (i) the Term Lenders collectively have consented to the applicable Extension Request with respect to a majority in amount of the Term Loans or (ii) simultaneously with the effectiveness of the maturity extension in respect of the Extended Term Loans, the Term Loans that are not Extended Term Loans shall be paid in full (the foregoing not being deemed to modify or waive the provisions of Section 2.11 hereof regarding the conditions precedent to repayment of the Term Loans), (D) reserved and (E) all documentation in respect of such extension shall be consistent with the foregoing.

33

JX 115-38

(b) <u>Extension Request</u>. The Borrowers shall provide the applicable Extension Request at least ten (10) Business Days (or such shorter period as may be agreed by the Agent) prior to the date on which the applicable Lenders are requested to respond. No Lender shall have any obligation to agree to provide any Extended Term Loan pursuant to any Extension Request. Any Lender (each, an "<u>Extending Lender</u>") wishing to have all or a portion of its Term Loans subject to such Extension Request amended into Extended Term Loan shall notify the Agent (each, an "<u>Extension Election</u>") on or prior to the date specified in such Extension Request of the amount of its Term Loans which it has elected to request be amended into Extended Term Loan (subject to any minimum denomination requirements imposed by the Agent). In the event that the aggregate principal amount of Term Loans in respect of which applicable Term Lenders shall have accepted the relevant Extension Request exceeds the amount of Extended Term Loan requested to be extended pursuant to the Extension Request, Extension Elections shall be amended to reflect allocations of Term Loans as agreed by Agent and the Borrowers.

(c) <u>New Lenders</u>. Following any Extension Request made by the Borrowers in accordance with this Section 2.18, if the Term Lenders shall have declined to agree during the period specified in Section 2.18(b) above to provide Extended Term Loan in an aggregate principal amount equal to the amount requested by the Borrowers in such Extension Request, the Borrowers may request that banks, financial institutions or other institutional lenders or investors (including any Extending Lender) provide an Extended Term Loan or a commitment to provide an additional term loan tranche hereunder (the "<u>Additional Extending Lenders</u>"); <u>provided</u> that such Extended Term Loan of such Additional Extending Lenders (i) shall be in an aggregate principal amount for all such Additional Extending Lenders not to exceed the aggregate principal amount of Extended Term Loan so declined to be provided by the existing Lenders and (ii) shall be on identical terms to the terms applicable to the terms specified in the applicable Extension Request (and any Extended Term Loan provided by existing Lenders in respect thereof) and, if a new tranche of term loans is to be incurred including other terms as are customary for a term loan provided that the maturity term for any term loan commitment hereunder shall not be earlier than the Termination Date; <u>provided further</u> that, as a condition to the effectiveness of any Extended Term Loan or term loan commitment of any Additional Extending Lender, the Agent shall have consented (such consent not to be unreasonably withheld or delayed) to each Additional Extending Lender. Upon the earlier of the Termination Date (including a deemed Termination Date in accordance with clause (C) of the proviso to Section 2.18(a) above) or such earlier date as any declining Term Lenders may agree), (a) the Term Loans of the applicable declining Term Lenders will be repaid in an aggregate principal amount equal to the Extended Term Loans provided by Additional Extending Lenders and (b) the term loan commitment of each such Additional Extending Lender will become effective. The Extended Term Loans of Additional Extending Lenders will be incorporated as Term Loans hereunder in the same manner in which Extended Term Loans of existing Term Lenders are incorporated hereunder pursuant to this Section 2.18.

(d) <u>Extension Amendment</u>. Extended Term Loans and term loan commitments of Additional Extending Lenders shall be established pursuant to an amendment (each, an "<u>Extension Amendment</u>") to this Agreement among the Borrower, the Agent and each Extending Lender and each Additional Extending Lender, if any, providing an Extended Term Loan or a term loan commitment as applicable, thereunder, which shall be consistent with the provisions set forth in Sections 2.18(a), (b) and (c) above (but which shall not require the consent of any other Lender). The effectiveness of any Extension Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in Section 4.02 and, to the extent reasonably requested by the Agent, receipt by the Agent of legal opinions, board resolutions and officers' certificates consistent with those delivered on the Effective Date. The Agent shall promptly notify each Lender as to the effectiveness of each Extension Amendment. Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to an Extension Amendment, without the consent of any other Lenders, to the extent necessary to (i) reflect the existence and terms of the Extended Term Loans or the term loan commitments as the case may be, incurred pursuant thereto and (ii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent and the Borrowers, to effect the provisions of this Section.

SECTION 2.19. <u>Incremental Term Loans</u>.

(a) <u>Request for Incremental Term Loan Commitments</u>. Provided no Default or Event of Default then exists or would arise therefrom, upon notice to the Agent (which shall promptly notify the Term Lenders), the Borrowers may make Incremental Term Loan Commitment requests from time to time; <u>provided</u>, <u>however</u>, that (w)

34

no such Incremental Term Loan Commitments may be made without the consent of the Agent, whose consent shall not be unreasonably withheld, (x) the aggregate amount of all Incremental Term Loan Commitments (including, once funded, all Incremental Term Loans) pursuant to this Section 2.19(a) shall not exceed $200,000,000, (y) each Incremental Term Loan Commitment request shall be in a minimum amount of $25,000,000, and (z) the Borrowers may request Incremental Term Loan Commitments a maximum of eight separate times. At the time of sending such notice, the Borrowers (in consultation with the Agent) shall specify the time period within which each existing Term Lender is requested to respond (which shall in no event be less than ten Business Days from the date of delivery of such notice to the Term Lenders).

(b) Lender Elections. Each Term Lender shall notify the Agent within the time period described in Section 2.19 (a) whether or not it agrees to make an Incremental Term Loan Commitment on the terms requested and, if so, in what amount. Any Term Lender not responding within such time period shall be deemed to have declined to participate, and no Term Lender shall have any obligation to participate.

(c) Notification by Agent. The Agent shall notify the Borrowers and each existing Term Lender of the Term Lenders' responses to each request made under Section 2.19(a). To achieve the full amount of any Incremental Term Loan Commitment request, subject to the approval of the Agent (which approval shall not be unreasonably withheld), to the extent that the existing Term Lenders decline to participate, or decline to participate in the full amount requested by the Borrowers, other consenting Eligible Assignees (each an "Additional Commitment Lender") may become an Incremental Term Lender hereunder and furnish an Incremental Term Loan Commitment in the amount requested by the Borrowers under Section 2.19(a) and not provided by the existing Term Lenders.

(d) Conditions to Effectiveness of each Incremental Term Loan Commitment. As a condition precedent to the effectiveness of each Incremental Term Loan Commitment, (i) the Borrowers shall deliver to the Agent a certificate of each Borrower dated as of the applicable Incremental Effective Date signed by an Authorized Officer of such Borrower (A) certifying and attaching the resolutions adopted by the board of directors (or other applicable governing body) of such Borrower approving or consenting to such Incremental Term Loan Commitment, and (B) certifying that, before and after giving effect to such Incremental Term Loan Commitment, the representations and warranties contained in Article V hereof and the other Loan Documents are true and correct in all material respects on and as of the Incremental Effective Date, except to the extent (1) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, and (2) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), (ii) the Borrowers, the Agent, each Term Lender providing an Incremental Term Loan Commitment (including each Additional Commitment Lender, if any) shall have executed and delivered an amendment (each, an "Incremental Amendment") to this Agreement (which amendment shall not require the consent of any other Lender) in such form as the Agent shall reasonably require to establish such Incremental Term Loan Commitment; provided, that any Incremental Term Loans made pursuant to such Incremental Term Loan Commitments (A) except as to amortization, final maturity date and participation in mandatory prepayments (which shall, subject to the other clauses of this proviso, be determined by the Borrower and the Incremental Term Lenders in their sole discretion), shall have (x) the same terms as the Term Loans made on the Effective Date (or any other Class of Incremental Term Loans) and form part of the same Class as such Term Loans or (y) such other terms as shall be reasonably satisfactory to the Agent, in which case they shall be part of a separate Class; (B) shall have a maturity date no earlier than the Termination Date, (C) shall, if subject to amortization, not amortize prior to the Termination Date, and (D) may participate on a pro rata basis or a less than pro rata basis (but not a greater than pro rata basis) than the Term Loans borrowed on the Effective Date in any mandatory or voluntary prepayment hereunder (and shall not otherwise be mandatorily or voluntarily prepayable); (iii) the Borrowers shall have paid such fees to the Additional Commitment Lenders and the other Term Lenders who agree to provide such Incremental Term Loans, as the Borrowers and such Lenders may agree; (iv) the Borrowers shall deliver to the Agent and the Lenders an opinion or opinions, in form and substance reasonably satisfactory to the Agent, from counsel to the Borrowers reasonably satisfactory to the Agent and dated such date; and (vi) no Default or Event of Default shall exist or result therefrom.

(e) Effectiveness of Incremental Amendments; Conflicting Provisions. The Agent shall promptly notify each Lender as to the effectiveness of each Incremental Amendment (such date of effectiveness, the "Incremental Effective Date"). Each of the parties hereto hereby agrees that this Agreement and the other Loan

35

JX 115-40

Documents may be amended pursuant to an Incremental Amendment, without the consent of any other Lenders, to the extent necessary to (i) reflect the existence and terms of the Incremental Term Loan Commitments and the Incremental Term Loans incurred pursuant thereto and (ii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent and the Borrowers, to effect the provisions of this Section 2.19. This Section 2.19 shall supersede any provisions in Sections 2.16 or 9.01 to the contrary.

ARTICLE III

RESERVED

ARTICLE IV

CONDITIONS TO EFFECTIVENESS

SECTION 4.01. <u>Conditions Precedent to Effectiveness</u>. The effectiveness of this Agreement is conditioned upon satisfaction of the following conditions precedent:

(a) The Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by an Authorized Officer of the signing Loan Party, each dated the Effective Date (or, in the case of certificates of governmental officials, a recent date before such date) and each in form and substance satisfactory to the Agent:

(i) this Agreement duly executed by each of Holdings, the Borrowers, the Agent, and the Lenders.

(ii) the Security Documents (including, without limitation, the Security Agreement), each duly executed by the applicable Loan Parties;

(iii) reserved;

(iv) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Loan Party as the Agent may reasonably require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party and (B) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(v) copies of each Loan Party's organization or other governing documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where failure to so qualify could reasonably be expected to have a Material Adverse Effect;

(vi) an opinion of in house counsel to Holdings and of one or more special or local counsel to Holdings, the Borrowers, and the other Loan Parties, addressed to the Agent and each Lender as to such matters as the Agent may reasonably request;

(vii) a certificate signed by an Authorized Officer of Holdings and the Borrowers certifying (A) that the conditions specified in Section 4.02 have been satisfied and (B) that the incurrence of the Term Loans does not conflict with (i) the indenture governing the Existing

36

Second Lien Notes or (ii) the First Lien Credit Agreement, (B) that the Loan Parties, taken as a whole, are Solvent as of the date hereof after giving effect to the transactions contemplated hereby and (C) that the Perfection Certificate is true and correct in all material respects; and

(viii) such other customary certificates, documents or consents as the Agent reasonably may require.

(b) all actions required by law or reasonably requested by the Collateral Agent or the Agent to be undertaken, and all, documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral Agent or the Agent to be filed, registered, or recorded to create or perfect the Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent

(c) Reserved.

(d) Reserved.

(e) Reserved.

(f) Reserved.

(g) Reserved.

(h) The conditions set forth in Section 4.02 shall be satisfied.

(i) There shall have been no event or circumstance since January 30, 2016 that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(j) All fees required to be paid to the Agent on or before the Effective Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Effective Date shall have been paid in full.

(k) The Borrowers shall have paid all costs and expenses of the Agent (to the extent set forth in Section 9.04(a)) incurred in connection with or relating to this Agreement and the other Loan Documents, including reasonable fees, charges and disbursements of counsel to the Agent, to the extent invoiced prior to or on the Effective Date, (provided that such payment shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

SECTION 4.02. Conditions Precedent to Each Extension of Credit. The obligation of each Lender to make an Extension of Credit on any date shall be subject to the conditions precedent that the effectiveness of this Agreement shall have occurred and on the date of such Extension of Credit the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the applicable Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the applicable Borrower that on the date of such Borrowing such statements are true):

(i) the representations and warranties made by each Loan Party in or pursuant to the Loan Documents are true and correct on and as of such date in all material respects, before and after giving effect to such Extension of Credit and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), and (C) such representations relate to Section 5.01(f), in which case the representation shall be limited to clause (c) of the definition of "Material Adverse Effect";

37

JX 115-42

(ii) no event has occurred and is continuing, or would result from such Extension of Credit or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default; and

(iii) after giving effect to such Extension of Credit, (A) the sum of the Total Extensions of Credit will not exceed the Borrowing Base, and (B) no Collateral Coverage Event (as defined in the Indenture for the Existing Second Lien Notes) shall result therefrom.

The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties.


ARTICLE V

REPRESENTATIONS AND WARRANTIES

SECTION 5.01. Representations and Warranties of the Borrowers. Holdings and the Borrowers hereby jointly and severally represent and warrant as follows:

(a) Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Loan Party's powers, have been duly authorized by all necessary organizational action, and do not contravene (i) the charter or by-laws or other organizational or governing documents of such Loan Party or (ii) law or any contractual restriction binding on or affecting any Loan Party, except, for purposes of this clause (ii), to the extent such contravention would not reasonably be expected to have a Material Adverse Effect.

(c) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by any Loan Party of any Loan Document to which it is a party that has not already been obtained if the failure to obtain such authorization, approval or other action could reasonably be expected to result in a Material Adverse Effect.

(d) Each Loan Document has been duly executed and delivered by each Loan Party party thereto. This Agreement constitutes, and each other Loan Document will constitute upon execution, the legal, valid and binding obligation of each Loan Party party thereto enforceable against such Loan Party in accordance with its respective terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(e) The consolidated balance sheet of Holdings and its Subsidiaries as at January 30, 2016, and the related consolidated statements of income and cash flows of Holdings and its Subsidiaries for the fiscal year then ended, accompanied by an opinion of Deloitte & Touche LLP, independent public accountants, copies of which have been furnished to the Agent, fairly present the consolidated financial condition of Holdings and its Subsidiaries as at such date and the consolidated results of the operations of Holdings and its Subsidiaries for the period ended on such date, all in accordance with GAAP consistently applied.

(f) Since January 30, 2016, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(g) There is no action, suit, investigation, litigation or proceeding, including any Environmental Action, which is pending or, to Holdings or any Borrower's knowledge, threatened affecting Holdings, the Borrowers or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect other than as reported in filings with the SEC made prior to the date hereof.

38

(h) On the Effective Date and the date on which any Incremental Term Loans are borrowed, not more than five (5%) percent of the value of the assets of the Borrowers and their respective Subsidiaries on a consolidated basis will be margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System).

(i) No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(j) All United States Federal income tax returns and all other material tax returns which are required to be filed have been filed by or on behalf of Holdings, the Borrowers and their respective Subsidiaries, and all taxes due with respect to Holdings, the Borrowers and their respective Subsidiaries pursuant to such returns or pursuant to any assessment received by Holdings, the Borrowers or any Subsidiary have been paid except to the extent permitted in Section 6.01(b). The charges, accruals and reserves on the books of Holdings, the Borrowers and their Subsidiaries in respect of taxes or other governmental charges have been made in accordance with, and to the extent required by, GAAP.

(k) All written factual information heretofore furnished by Holdings, the Borrowers or their Subsidiaries to the Agent or any Lender (including the Perfection Certificate) for purposes of or in connection with this Agreement or any other Loan Document, taken as a whole, was true and correct in all material respects on the date as of which such information was stated or certified, provided that with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

(l) (i) Each Loan Party has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property necessary for the conduct of its business and except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, and (ii) no Inventory, Credit Card Account Receivable, DC or Related Intellectual Property is subject to any Lien except as permitted by Section 6.02(a).

(m) Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (i) each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted; (ii) no material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor do Holdings or the Borrowers know of any valid basis for any such claim; and (iii) the use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

(n) Except as disclosed in the publicly available reports of Holdings filed with the SEC prior to the Effective Date or as would not reasonably be expected to result in a Material Adverse Effect, (i) neither a Reportable Event nor a failure to meet minimum required contributions (in accordance with Section 430 or any prior applicable section of the Internal Revenue Code or Section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, (ii) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other applicable federal or state laws, and (iii) no termination of a Single Employer Plan has occurred. Except as set forth on Schedule 5.01(n), no Lien imposed under the Internal Revenue Code or ERISA exists on account of any Plan, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Each Single Employer Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the United States Internal Revenue Service (the "IRS") and, to the best knowledge of Holdings and the Borrowers, nothing has occurred which would cause the loss of, such qualification. Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 430 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 430 of the Internal Revenue Code has been made with respect to any Plan. There are no pending or, to the best knowledge of Holdings and the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would

39

JX 115-44

reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary duty rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur, in each case that would reasonably be expected to result in a Material Adverse Effect. Neither any Loan Party nor any ERISA Affiliate has incurred, or would reasonably be expected to incur, any liability under Title IV of ERISA with respect to any Pension Plan, other than premiums due and not delinquent under Section 4007 of ERISA or as would not reasonably be expected to have a Material Adverse Effect; neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and, to the knowledge of the Borrowers, no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan except as would not reasonably be expected to have a Material Adverse Effect; and neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA. Except as would not reasonably be expected to have a Material Adverse Effect, neither Holdings, the Borrowers nor any Commonly Controlled Entity has had a complete or partial withdrawal (as such terms are defined in Sections 4203 and 4205 of ERISA, respectively) from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA. No such Multiemployer Plan is in Reorganization or Insolvent except as would not reasonably be expected to result in aggregate liability to Holdings and its Subsidiaries of $100,000,000 or more.

(o) Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Group Member (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(p) The Security Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Credit Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. Financing statements and other filings specified in Section 5.01(p) in appropriate form have been filed in the offices set forth on Schedule 5.01(p). On the Effective Date, the security interests granted pursuant to the Security Agreement shall, to the extent a security interest in such Collateral can be perfected by filing a UCC financing statement, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to the Lien or claim of any other Person (except Liens permitted by Section 6.02(a) securing Priority Obligations and/or the Existing Second Lien Notes and Liens which by operation of law would have priority over the Liens securing the Obligations).

(q) The Loan Parties, taken as a whole, are, and after giving effect to the incurrence of all Debt and obligations incurred in connection herewith will be, Solvent.

(r) The properties of the Loan Parties are insured as required pursuant to Section 6.01(c) hereof. Each insurance policy required to be maintained by the Loan Parties pursuant to Section 6.01(c) is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

(s) As of the Effective Date: (1) except as listed on Schedule 5.01(s), there are no outstanding rights to purchase any equity interests in any Subsidiary of a Loan Party, and (2) the copies of the organization and governing documents of each Loan Party and each amendment hereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

(t) As of the Effective Date, except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of Holdings or any Borrower, threatened, (b) the hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign law dealing with such matters, (c) all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.01(t) (as updated by the Borrowers from time to time) (i) no Loan Party or any Subsidiary is a party to or

40

JX 115-45

bound by any collective bargaining agreement, management agreement or any material bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (excluding in each case individual employment agreements) and (ii) no employee of a Loan Party is also an employee of the Permitted Holder. There are no representation proceedings pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, in each case which would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries which would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u) No broker or finder brought about the obtaining, making or closing of the Term Loan or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

(v) Reserved.

(w) To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the United States Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977, and (iv) the Corruption of Foreign Public Officials Act, as amended (the "FCPA"). No part of the proceeds of any credit extensions will be used, directly or, to the Loan Parties' knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(x) None of Holdings, the Borrowers, nor any of their respective Subsidiaries, nor, to the knowledge of the Borrowers, any director, officer, employee, agent or affiliate of the Borrowers is an individual or entity (for purposes of this clause (x), a "Person") that is, or is owned or controlled by Persons that are the subject of any sanctions (A) administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury or other applicable sanctions authority or (B) pursuant to the U.S. Iran Sanctions Act, as amended, or Executive Order 13590 (collectively, "Sanctions") or (C) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, without limitation, Burma/Myanmar, Iran, North Korea, Sudan and Syria). The Loan Parties will not, directly or, to their knowledge, indirectly, use the proceeds of any credit extensions, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person in any manner that would directly or indirectly result in a violation of Sanctions by any Person.

(xi) As of the Effective Date, each Person (other than A&E Factory Service, LLC) that has provided a guarantee of any First Lien Credit Agreement Obligations is a Guarantor hereunder and has executed the Security Agreement as a "Grantor" thereunder (as such term is defined in the Security Agreement).

41

JX 115-46

ARTICLE VI

COVENANTS

SECTION 6.01. <u>Affirmative Covenants</u>. So long as any Term Loan or other Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid or any Lender shall have any Commitment hereunder, each of Holdings and the Borrowers will, and will cause each of their Subsidiaries to:

(a) <u>Compliance with Laws, Etc.</u> Comply in all respects with all applicable Requirements of Law, such compliance to include compliance with ERISA and Environmental Laws, except for such non-compliance as would not reasonably be expected to have a Material Adverse Effect.

(b) <u>Payment of Taxes, Etc.</u> Pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property (ii) all payments required to be made to any Pension Plan, and (iii) all lawful claims that, if unpaid, might by law become a Lien upon its property; <u>provided</u> that neither Holdings, the Borrowers nor any of their Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim (x) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors or (y) if such non-payments, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect.

(c) <u>Maintenance of Insurance</u>. Maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is consistent with prudent business practice; <u>provided</u> that Holdings, the Borrowers and their Subsidiaries may self-insure to the extent consistent with prudent business practice; <u>provided</u> <u>further</u> that policies maintained with respect to any Collateral located at a warehouse or DC shall provide coverage for Inventory at (x) the retail selling price of such Inventory less any permanent markdowns, consistent with the Loan Parties' past practices, or (y) another selling price permitted by the Agent in its Permitted Discretion. None of the Credit Parties shall be a co-insurer with any Loan Party or any other Person with respect to any fire and extended coverage policies maintained with respect to any Collateral without the prior written consent of the Agent. Within thirty (30) days following delivery of written notice from the Agent to Holdings, Holdings shall notify the insurers and use commercially reasonable efforts to have such policies amended to include such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties. Holdings shall cause the Agent to be named as an additional insured party on such policies within thirty (30) days following the Effective Date (or such longer period as the Agent may agree to in its reasonable discretion). The Borrowers shall deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, evidence of renewal or replacement of a policy previously delivered to the Agent, including an insurance binder therefor, together with evidence satisfactory to the Agent of payment of the premium therefor and, upon request of the Agent, a copy of such renewal or replacement policy. In the event that the Borrowers fail to maintain any such insurance as required pursuant to this Section 6.01(c), the Agent may obtain such insurance on behalf of the Borrowers and the Loan Parties shall reimburse the Agent as provided herein for all costs and expenses in connection therewith; the Agent's obtaining of such insurance shall not be deemed a cure or waiver of any Default or Event of Default arising from the Loan Parties' failure to comply with the provisions of this Section 6.01(c).

(d) <u>Preservation of Corporate Existence, Etc.</u> Preserve and maintain its corporate existence, material rights (charter and statutory) and franchises; <u>provided</u> that (i) Holdings, the Borrowers and their Subsidiaries may consummate any merger or consolidation permitted under Section 6.02(b); (ii) neither Holdings nor the Borrowers nor any of their Subsidiaries shall be required to preserve or maintain the corporate existence of any Subsidiary (other than Sears, SRAC, Kmart Corp. or any Material Subsidiary Guarantors) if the Board of Directors of the parent of such Subsidiary, or an executive officer of such parent to whom such Board of Directors has delegated the requisite authority, shall determine that the preservation and maintenance thereof is no longer desirable in the conduct of the business of such parent and that the loss thereof is not disadvantageous in any material respect to the Borrowers, Sears, any Material Subsidiary Guarantor, such parent or the Lenders; (iii) Sears shall not be required to preserve or maintain the corporate existence of SRAC, provided that in the event SRAC is dissolved, merged with or into Holdings or any Subsidiary of Holdings or otherwise ceases to exist, then Sears shall or shall cause a direct wholly owned Domestic Subsidiary of Sears to, execute and deliver to the Agent an assumption agreement with respect to SRAC's obligations under the Loan Documents in form and substance reasonably satisfactory to the Agent and such other officer certificates, legal opinions, financing statements (if applicable) and documentation as the Agent reasonably requests; (iv) none of Holdings, the Borrowers or any of Material Subsidiary Guarantors shall be required to preserve any right or franchise of any Subsidiary (other than a Material Subsidiary Guarantor) if the Board of Directors of Holdings, such Borrower or such Material Subsidiary

JX 115-47

42

**JX 115-48**

Guarantor shall determine that the preservation thereof is no longer desirable in the conduct of its business and that the loss thereof is not disadvantageous in any material respect to Holdings, the Borrowers, such Material Subsidiary Guarantor or the Lenders and (v) no Subsidiary Guarantor which is not a Material Subsidiary Guarantor shall be required to preserve or maintain its corporate existence if (A) no Default or Event of Default has occurred and is continuing, and (B) such Subsidiary Guarantor is merged or liquidated into another Subsidiary Guarantor.

(e) <u>Inspection Rights</u>. Subject to reasonable confidentiality limitations and requirements imposed by Holdings or the Borrowers due to competitive concerns or otherwise, at any reasonable time and from time to time (but no more than twice a year unless a Default or an Event of Default has occurred and is continuing), permit the Agent or any of the Lenders or any agents or representatives thereof, at the Lenders' expense, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Holdings, the Borrowers and any of their Subsidiaries, and to discuss the affairs, finances and accounts of Holdings, the Borrowers and any of their Subsidiaries, as the case may be, with any of their officers or directors and with their independent certified public accountants.

(f) <u>Keeping of Books</u>. Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Holdings, the Borrowers and each such Subsidiary in accordance with GAAP in effect from time to time.

(g) <u>Maintenance of Properties, Etc.</u> Except as otherwise permitted pursuant to Section 6.02(b), or where the failure to do so, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect, maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(h) <u>Transactions with Affiliates</u>. Conduct all transactions otherwise permitted under this Agreement with any of their Affiliates on terms that are fair and reasonable and no less favorable to Holdings, the applicable Borrower or their respective Subsidiaries than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate other than (i) as required by any applicable Requirement of Law, (ii) so long as no Default or Event of Default has occurred and is continuing, transactions between or among the Loan Parties and any of their Subsidiaries, to the extent not prohibited hereunder, or (iii) if a Default or Event of Default has occurred and is continuing, transactions in the ordinary course of business between or among the Loan Parties and any of their Subsidiaries and transactions between or among Loan Parties, to the extent not prohibited hereunder; <u>provided</u>, that the foregoing shall not prohibit (i) any Loan Party or any Subsidiary thereof from entering into employment arrangements with its officers and retention and other agreements with officers and directors pursuant to the reasonable requirements of its business or (ii) any transactions pursuant to the agreements in effect on the date hereof.

(i) <u>Further Assurances</u>.

(i) With respect to any (i) Inventory, Credit Card Accounts Receivable and other Collateral acquired after the Effective Date by any Group Member that is or is required to become a Loan Party hereunder and (ii) any property required to become subject to a perfected Lien in favor of the Collateral Agent pursuant to Section 6.02 (a)(vi) hereunder, promptly (i) execute and deliver to the Collateral Agent such amendments to the Security Agreement or such other documents as the Agent or the Collateral Agent, may reasonably request in order to grant to the Collateral Agent, for the benefit of the Credit Parties, a security interest in such property and (ii) take all actions as the Agent, may reasonably request to grant to the Collateral Agent, for the benefit of the Credit Parties, a perfected security interest in such property with the priority required herein, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Agent or the Collateral Agent; provided, however, that notwithstanding anything to the contrary in this Agreement, the Borrowers shall not be required to deliver any blocked account agreement, deposit account control agreement or similar agreement, or provide any notices to any credit card processor or third-party payors (nor shall the Agent provide any such notice).

43

JX 115-49

(ii) With respect to any new Domestic Subsidiary which is created or acquired after the Effective Date by any Group Member and which owns any Inventory, Credit Card Accounts Receivable and other Collateral related to such receivables and Inventory, or which guarantees any Priority Obligations, promptly cause such new Domestic Subsidiary to (i) become a party to this Agreement pursuant to Section 10.08 hereof, (ii) become a party to the Security Agreement, (iii) take such actions as the Agent, may reasonably request to grant to the Collateral Agent for the benefit of the Credit Parties a security interest, with the priority and perfection required herein, in the Collateral described in the Security Agreement held by such new Domestic Subsidiary, including, to the extent applicable, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Agent, (iv) if requested by the Agent, deliver to the Agent an officer's certificate with respect to such Domestic Subsidiary in form and substance reasonably satisfactory to the Agent, and (v) if requested by Agent, deliver to the Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent.

(j) Reporting Requirements. Furnish to the Agent:

(i) as soon as available and in any event within 50 days after the end of each of the first three fiscal quarters of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such quarter and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) (1) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I, including in reasonable detail the calculations necessary to determine the Fixed Charge Ratio (whether or not compliance therewith is then required under Section 6.03), provided that in the event of any change in GAAP used in the preparation of such financial statements, subject to Section 1.03, the Borrowers shall also provide, if necessary for the calculation of the Fixed Charge Ratio, a statement of reconciliation conforming such financial statements to GAAP (the Borrowers being permitted to satisfy the requirements of clause (i)(a) by delivery, in the manner provided in Section 9.02(b), of its quarterly report on form 10-Q (or any successor form), as filed with the SEC) and (2) a Collateral Coverage Certificate (which may be incorporated in the Compliance Certificate contemplated by clause (1) above);

(ii) as soon as available and in any event within 95 days after the end of each fiscal year of Holdings, (a) a copy of the annual audit report for such year for Holdings and its Subsidiaries, containing the consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its Subsidiaries for such fiscal year, in each case reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by its Board-appointed auditor of national standing (b) a consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for such fiscal year duly certified by an Authorized Officer of Holdings as having been prepared in accordance with GAAP, and (c) (1) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit I, including in reasonable detail the calculations necessary to determine the Fixed Charge Ratio (whether or not compliance therewith is then required under Section 6.03), provided that in the event of any change in GAAP used in the preparation of such financial statements, the Borrowers shall also provide, if necessary for the calculation of the Fixed Charge Ratio, a statement of reconciliation conforming such financial statements to GAAP (the Borrowers being permitted to satisfy the requirements of clause (ii)(a) by delivery, in the manner provided in Section 9.02 (b), of its annual report on form 10-K (or any successor form), as filed with the SEC) and (2) a Collateral Coverage Certificate (which may be incorporated in the Compliance Certificate contemplated by clause (1) above);

44

(iii) as soon as available and in any event within 10 Business Days of the end of each fiscal month (and, if any fiscal quarter does not end on the last day of a fiscal month, within 10 Business Days of the end of such fiscal quarter), a Borrowing Base Certificate as of the end of the preceding fiscal month (or, as applicable, fiscal quarter) and supporting information satisfactory to the Agent in its Permitted Discretion with respect to the determination of the Borrowing Base; provided, that upon the occurrence and during the continuance of an Accelerated Borrowing Base Delivery Event, such Borrowing Base Certificate and supporting information shall be delivered on Friday of each week (or, if Friday is not a Business Day, on the next succeeding Business Day), as of the close of business on the immediately preceding Saturday (and within 10 Business Days of the end of each fiscal quarter with respect to the last day of such fiscal quarter);

(iv) promptly and in any event within five days after any Authorized Officer of Holdings or any Borrower has knowledge of the occurrence and continuance of a Default or Event of Default, a statement of an Authorized Officer of Holdings or such Borrower setting forth details of such Default or Event of Default and the action that Holdings or such Borrower has taken and proposes to take with respect thereto;

(v) promptly after the sending or filing thereof, copies of all quarterly and annual reports and proxy solicitations that Holdings sends to its public security holders generally, and copies of all reports on form 8-K (or its equivalent) and registration statements for the public offering (other than pursuant to employee Plans) of securities that Holdings or any of its Subsidiaries files with the SEC or any national securities exchange;

(vi) promptly after the commencement thereof, notice of all actions and proceedings before any court, governmental agency or arbitrator affecting Holdings, the Borrowers or any of their Subsidiaries of the type described in Section 5.01(g);

(vii) as soon as available, but in any event no later than 60 days after the end of each fiscal year of Holdings, forecasts prepared by management of Holdings for Holdings and its domestic Subsidiaries in form satisfactory to the Agent and containing information reasonably required by the Agent;

(viii) (A) contemporaneously with the delivery of the reports required pursuant to clauses (i) and (ii) above, a report (which may take the form of a footnote to Holdings' quarterly and annual reports filed with the SEC and delivered to the Agent) setting forth the estimated Unfunded Pension Liability of Holdings and its Subsidiaries, and (B) promptly after receipt thereof by the Loan Parties, a copy of the funded status report received from the Loan Parties' actuaries with respect to amounts to be funded under the Loan Parties' Pension Plan;

(ix) promptly, notice of any event that the Loan Parties reasonably believes has resulted in a Material Adverse Effect;

(x) the financial and collateral reports described on Schedule 6.01(j), at the times set forth in such Schedule;

(xi) during the continuance of an Accelerated Borrowing Base Delivery Event, as soon as available and in any event within 30 days after the end of each fiscal month of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such month and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such

45

month, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents, including in reasonable detail the calculations necessary to determine the Fixed Charge Ratio (whether or not compliance therewith is then required under Section 6.03), provided that in the event of any change in GAAP used in the preparation of such financial statements, subject to Section 1.03, the Borrowers shall also provide, if necessary for the calculation of the Fixed Charge Ratio, a statement of reconciliation conforming such financial statements to GAAP; and

(xii) such other information respecting Holdings, the Borrowers or any of their Subsidiaries, or the Borrowing Base as the Agent or any Lender through the Agent may from time to time reasonably request.

Reports and financial statements required to be delivered by the Borrowers pursuant to clauses (i)(a), (ii)(a) and (v) of this subsection (j) shall be deemed to have been delivered on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a notice to the Agent and the Lenders and that is accessible by the Lenders without charge.

(k) Reserved.

(l) Reserved.

(m) Cash Management. The Borrowers shall maintain in effect the cash management arrangements currently existing pursuant to the First Lien Credit Agreement, including with respect to deposit account control agreements and credit card processors, or such other arrangements not less favorable to the Agent and the Lenders as to which the Agent may consent, such consent not to be unreasonably withheld.

(n) Liens on Non-Collateral Assets. In the event of the incurrence of Debt and the granting of a Lien pursuant to Section 6.02(a)(vi) hereof, grant, and cause each of its Subsidiaries to, grant the Collateral Agent, as security for the Obligations, a Lien on the assets of Holdings or any of its Subsidiaries which is the subject of the Lien of the Person holding such Debt (to the extent that such assets do not then constitute Collateral) pursuant to Section 6.02(a)(vi) hereof.

(o) Physical Inventories. Cause physical inventories and periodic cycle counts to be undertaken, at the expense of the Loan Parties, in each case consistent with past practices (but in no event less frequently than one physical inventory per fiscal year), conducted by such inventory takers and following such methodology as is consistent with the immediately preceding inventory or as otherwise may be satisfactory to the Agent in its Permitted Discretion. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Loan Parties, within five (5) days following the completion of any such inventory, shall provide the Collateral Agent and the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(p) Reserved.

(q) Security Documents. Holdings shall, and shall cause each other Loan Party to, and each other Loan Party shall, make all filings (including filings of continuation statements and amendments to financing statements that may be necessary to continue the effectiveness of such financing statements) and take all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Loan Parties) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest subject only to Permitted Liens.

46

(r) <u>Post-Closing Matters</u>. Within 15 Business Days after the Effective Date, cause A&E Factory Service, LLC to (i) become a party to this Agreement pursuant to Section 10.08 hereof, (ii) become a party to the Security Agreement, (iii) take such actions as the Agent may reasonably request to grant to the Collateral Agent for the benefit of the Credit Parties a security interest, with the priority and perfection required herein, in the Collateral described in the Security Agreement held by A&E Factory Service, LLC, including, to the extent applicable, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Agent, (iv) if requested by the Agent, deliver to the Agent an officer's certificate with respect to A&E Factory Service, LLC in form and substance reasonably satisfactory to the Agent and (v) if requested by the Agent, deliver to the Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent.

SECTION 6.02. <u>Negative Covenants</u>. So long as any Obligation (other than contingent indemnification obligations for which no claim shall have then been asserted) shall remain unpaid or any Lender shall have any Commitment hereunder, each of Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to:

(a) <u>Liens, Etc.</u> Create or suffer to exist any Lien upon property of Holdings, the Borrowers or any Domestic Subsidiary constituting Inventory, Credit Card Accounts Receivable or any other Collateral or any Related Intellectual Property, other than:

(i) Permitted Liens,

(ii) Liens existing on the Effective Date, other than liens securing Priority Obligations,

(iii) the replacement, extension or renewal of any Lien permitted by clause (ii) above upon or on the same property theretofore subject thereto (and on any additions to any such property and in any property taken in replacement or substitution for any such property), or the replacement, extension or renewal (without increase in the amount) of the Debt secured thereby,

(iv) to the extent any Liens permitted by clause (ii) above are terminated (and not replaced, extended or renewed in accordance with clause (iii) above), Liens not otherwise permitted by clause (iii) above securing Debt in an amount up to the amount of Debt secured by such terminated Liens; <u>provided</u> that (A) any such Lien (and the Debt secured thereby) shall be incurred no later than ninety (90) days after the termination of the Lien permitted by clause (ii) above, and (B) any such Lien shall be granted on the same property (and on any additions to such property or any property taken by the Loan Parties in replacement or substitution for such property) as the terminated Lien,

(v) Liens on Related Intellectual Property with Persons that have entered into an agreement, reasonably satisfactory to the Agent, acknowledging the limited license granted to the Collateral Agent in such trademarks or trade names pursuant to the Loan Documents and agreeing to abide by, and not interfere with, such limited license;

(vi) Liens to secure (A) the Existing Second Lien Notes and any Permitted Refinancing Debt with respect thereto and (B) additional Debt of the Borrowers for borrowed money in an aggregate principal amount not to exceed, at any time outstanding, the difference between $2,000,000,000 and the sum of (1) the principal amount of Debt outstanding pursuant to the preceding clause (A) and (2) the outstanding balance of the Term Loan, <u>provided</u>, that, (1) no Default or Event of Default then exists or would arise from the incurrence of such Debt or the granting of such Lien, (2) Reserved, (3) such Lien shall be pari passu with or subordinate to the Lien of the Collateral Agent securing the Term Loans, and junior to the Lien securing the Priority Obligations, in each case pursuant to arrangements reasonably satisfactory to the Agent (including without limitation through joinder to the Existing Intercreditor Agreement and/or the Security Agreement), (4) if the Debt secured by such Liens is secured by both Collateral and by property

47

JX 115-53

and assets of any Loan Party which do not constitute Collateral, the Collateral Agent shall have obtained a Lien on such property and assets that do not otherwise constitute Collateral to secure the Obligations, pari passu with the Lien of the holder of such Debt pursuant arrangements reasonably satisfactory to the Agent, and (5) the documentation granting such Lien shall be in form and substance reasonably satisfactory to the Agent in its Permitted Discretion; and

(vii) Liens to secure obligations under the First Lien Credit Agreement and other Priority Obligations, to the extent constituting Permitted Debt.

(b) <u>Fundamental Changes</u>. Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing (i) any Subsidiary of any Borrower may merge into such Borrower in a transaction in which such Borrower is the surviving entity, (ii) any Subsidiary of Holdings may merge into Holdings or any other Subsidiary of Holdings (provided that (A) if Kmart Corp. is a party to such merger, such merger shall be with Holdings, Kmart or a direct Subsidiary of Kmart Corp. and Kmart Corp. shall be the continuing or surviving entity, (B) if any Subsidiary Guarantor is a party to such merger (other than with a Borrower or Holdings), such Subsidiary Guarantor shall be the continuing or surviving entity or the continuing or surviving entity shall become a Subsidiary Guarantor and (C) if SRAC is a party to such merger, then Sears shall comply with the requirements of Section 6.01(d)), (iii) any Subsidiary of Holdings other than the Borrowers may sell, transfer, lease or otherwise dispose of its assets to any Borrower, to Holdings or to a Subsidiary of Holdings (provided that if such sale or transfer includes Collateral and the transferee is not the Borrower or Holdings, the transferee shall be a Subsidiary Guarantor), (iv) any Subsidiary of Holdings other than the Borrowers or Sears may sell, transfer, lease or otherwise dispose of its assets to a Person that is not a Subsidiary or merge with a Person that is not a Subsidiary, in each case pursuant to a Permitted Disposition, (v) any Subsidiary of Holdings other than the Borrowers, Sears or any Material Subsidiary Guarantor (except, in the case of SRAC, as provided in Section 6.01(d)) may liquidate or dissolve if Holdings and the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of Holdings, the Borrowers, Sears, the other Material Subsidiary Guarantors and their Subsidiaries and is not disadvantageous in any material respect to Holdings, the Borrowers, Sears, the other Material Subsidiary Guarantors or the Lenders; <u>provided</u>, that a Material Subsidiary Guarantor may liquidate or dissolve into a Person that is a Subsidiary of Holdings immediately prior to such liquidation or dissolution, if the continuing or surviving entity is or shall become a Subsidiary Guarantor in accordance with Section 6.01(i)(ii), and (vi) Holdings or any Subsidiary of Holdings may merge with a Person that is not a Subsidiary of Holdings immediately prior to such merger if, in the case of any merger involving Holdings, a Borrower or a Subsidiary Guarantor, Holdings, such Borrower or such Subsidiary Guarantor, as applicable, is the continuing or surviving entity or, in the case of any merger involving a Subsidiary Guarantor, the continuing or surviving entity shall become a Subsidiary Guarantor in accordance with Section 6.01(i)(ii).

(c) <u>Acquisitions</u>. Make any Acquisition unless (a) at the time of any such Acquisition and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (b) after giving effect to any such Acquisition (A) Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0, and (D) immediately after giving effect to any such Acquisition, Holdings and the Borrowers shall comply with Section 6.01(i) to the extent applicable, (c) such Acquisition shall have been approved by the Board of Directors of the Person (or similar governing body if such Person is not a corporation) which is the subject of such Acquisition and such Person shall not have announced that it will oppose such Acquisition or shall not have commenced any action which alleges that such Acquisition shall violate applicable law, and (d) any assets acquired shall be utilized in, and if the Acquisition involves a merger, consolidation or acquisition of equity interests, the Person which is the subject of such Acquisition shall be engaged in, a business engaged by, or related to a business engaged by, the Loan Parties as of The Effective Date.

(d) <u>Restricted Payments</u>.

(i) Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, if at the date of declaration thereof (either before or immediately after giving effect thereto and the payment

48

JX 115-54

thereof), a Default or Event of Default shall have occurred and be continuing, except that at any time that a Default or Event of Default shall exist and be continuing, (A) Holdings may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock, (B) Subsidiaries of Holdings may declare and pay dividends to Holdings, the Borrowers or another wholly owned Subsidiary of any Borrower and (C) non-wholly-owned Subsidiaries may declare and pay dividends to the holders of their equity interests other than a Group Member on a ratable basis.

(ii) Declare or make, or agree to pay or make, directly or indirectly, any other Restricted Payment (other than a Restricted Payment to a Loan Party), except that if no Default or Event of Default shall have occurred and be continuing (either before or immediately after giving effect thereto and the payment thereof):

(A) Holdings and its Subsidiaries may make Restricted Payments in an aggregate amount not to exceed $1,500,000,000 from and after the Effective Date through the Termination Date, provided, that, (i) immediately after giving effect to any such Restricted Payment, Pro Forma and Projected Capped Excess Availability is greater than 50% of the Line Cap and (ii) Restricted Payments pursuant to this subsection (A) shall not exceed $1,000,000,000 in any rolling twelve month period;

(B) Holdings and its Subsidiaries may make other Restricted Payments, provided, that, immediately after giving effect thereto (i) Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (ii) the Pro Forma Fixed Charge Ratio shall be at least 1.05 to 1.0; provided, that, for purposes of the calculation of Pro Forma Fixed Charge Ratio (x) Adjusted Consolidated EBITDA and Consolidated Interest Expense shall be computed on a trailing four quarter basis, and scheduled principal payments shall be computed on a four quarter forward basis, and (y) the amount of the Restricted Payment paid in cash being made in connection with the calculation shall be added to Fixed Charges;

(C) Holdings and its Subsidiaries may make other Restricted Payments in cash or in kind (with values equal to the amount of any cash otherwise distributable hereunder) (1) in an amount not to exceed the Net Proceeds of any common stock issuances by Holdings after the Effective Date, (2) in an amount not to exceed the Net Proceeds of any Permitted Dispositions of the type set forth in clauses (f) and (g) of the definition thereof, and (3) in an amount not to exceed any dividends and distributions received (directly or indirectly) on account of equity interests in any Subsidiary of Holdings which is not a Loan Party, and (4) to the stockholders of Holdings in the form of the equity interests of the subsidiaries set forth on Schedule 6.02(d), provided, that (x) in each case, immediately after giving effect thereto, the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (y) the aggregate amount of any such Restricted Payments pursuant to clauses (1) through (and including) (3) (whether in cash or in other property or a combination thereof) shall not exceed in any twelve consecutive months 75% of any such Net Proceeds, dividends and distributions received in such twelve consecutive month period; provided that Restricted Payments made pursuant to this clause (C) in cash during any twelve consecutive month period shall not exceed $125,000,000. For the avoidance of doubt, any Net Proceeds of the type described in clauses (1) through and including (3) of this Section 6.02(d)(ii)(C) may be utilized to repay the Obligations or Priority Obligations and shall not be required to be segregated prior to making any Restricted Payments otherwise permitted under this clause (C); and

(D) Holdings and its Subsidiaries may make other Restricted Payments as long as (i)(A) such Restricted Payment is funded from cash on hand and not from proceeds of Debt, (B) for the 120 days before any such Restricted Payment, no revolving credit loans were outstanding under the First Lien Credit Agreement, and (C) for each of the 120 days before any such Restricted Payment, the Borrowers shall have had cash on hand sufficient to make such Restricted Payment without the necessity of obtaining proceeds

49

JX 115-55

of revolving advances under the First Lien Credit Agreement for the operations of their businesses or for the purpose of making such Restricted Payment, and (ii) after giving effect to such Restricted Payment, no revolving advances under the First Lien Credit Agreement are outstanding.

(e) <u>Negative Pledge Clauses</u>. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Holdings or any Subsidiary of Holdings to create, incur, assume or suffer to exist any Lien in favor of the Collateral Agent upon the Collateral (as defined in the Security Agreement and other Security Documents in effect from time to time, and including assets which become Collateral pursuant to Section 6.01(n)), whether now owned or hereafter acquired, other than any agreement relating to any Lien on cash and cash equivalents not prohibited by Section 6.02(a) (including, for the avoidance of doubt, the First Lien Credit Agreement Documents and any Additional First Lien Debt Documents).

(f) <u>Clauses Restricting Subsidiary Distributions</u>. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of Holdings other than a Loan Party to (a) make Restricted Payments in respect of any equity interests of such Subsidiary held by, or pay any indebtedness owed to, Holdings or any other Subsidiary of Holdings, (b) make loans or advances to, or other investments in, Holdings or any other Subsidiary of Holdings or (c) transfer any of its assets to Holdings or any other Subsidiary of Holdings, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under this Agreement and the other Loan Documents, the First Lien Credit Agreement Documents or any Additional First Lien Debt Documents; (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or any portion of the equity interests or assets of such Subsidiary; (iii) the provisions contained in any agreement governing indebtedness existing as of the Effective Date (and in any refinancing of such indebtedness so long as no more restrictive than those contained in the respective existing indebtedness); (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or a Subsidiary of any Borrower entered into in the ordinary course of business, (v) customary restrictions and conditions contained in the documents relating to any Lien, so long as such Lien is not prohibited hereunder and such restrictions or conditions relate only to the specific asset subject to such Lien; (vi) customary provisions restricting assignment of any contract entered into by any Borrower or any Subsidiary of any Borrower in the ordinary course of business, (vii) any agreement or instrument governing acquired debt, which restriction is not applicable to any Person or the properties or assets of any Person, other than the Person or the properties or assets of the Person acquired pursuant to the respective acquisition and so long as the respective encumbrances or restrictions were not created (or made more restrictive) in connection with or in anticipation of the respective acquisition; (viii) customary provisions restricting the assignment of licensing agreements, management agreements or franchise agreements entered into by any Borrower or any of its Subsidiaries in the ordinary course of business; (ix) restrictions on the transfer of assets securing purchase money obligations and capitalized lease obligations; (x) customary net worth provisions contained in real property leases entered into by Subsidiaries of any Borrower, so long as the applicable Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations, (xi) restrictions in respect of the REMIC Certificates and the real property assets related thereto, the Intellectual Property held by KCD IP, LLC and any proceeds of the foregoing, and (xii) such other restrictions as the Borrowers and Agent and/or the Collateral Agent may agree.

(g) <u>Accounting Changes</u>. Make or permit any change in accounting policies or reporting practices, except as required or permitted by GAAP.

(h) <u>Reserved</u>.

(i) <u>Dispositions</u>. Make any Disposition except Permitted Dispositions.

(j) <u>Debt; Prepayment of Debt</u>.

(i) Create, incur, assume, suffer to exist or otherwise become or remain liable with respect to, any Debt, except Permitted Debt;

(ii) Reserved; and

50

(iii) Prepay any Debt (other than Priority Obligations) unless at the time of any such prepayment and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing. Further, if Holdings, the Borrowers or any of their Subsidiaries shall prepay any Debt (other than Priority Obligations) on any date (each, a "Prepayment Date") then the Borrowers shall not permit Capped Excess Availability to be less than 12.5% of the Line Cap (or such lesser amount as may be permitted under the First Lien Credit Agreement) at any time from the Prepayment Date until one year following the Prepayment Date; provided this sentence shall not apply to prepayments of Debt (for the avoidance of doubt, other than intercompany Debt) (A) with the proceeds of the incurrence of Permitted Debt as long as the maturity of such Permitted Debt (i) with respect to Permitted Debt prepaying Debt having a maturity of one year or less, is at least sixty (60) days later than the maturity of the Debt so refinanced, or (ii) with respect to all other Debt, is later than the maturity of the Debt so refinanced and the latest Termination Date, or (B) with the proceeds from the issuance of equity interests in a Group Member (other than to another Group Member), or (C) in a principal amount not to exceed $25,000,000 in the aggregate in any fiscal year. For the avoidance of doubt, the foregoing sub-sections (ii) and (iii) of this Section 6.02(j) will not apply to the repayment of the Obligations, which are rather governed by the provisions of Article II hereof.

(k) Investments. Make any Investments, except Permitted Investments.

(l) Store Closings. Close more than 250 full line Sears or Kmart Stores in any fiscal quarter or more than 500 full line Sears or Kmart Stores in any four consecutive fiscal quarters without the consent of the Agent, such consent not to be unreasonably withheld and/or fail to comply with the requirements of the definition of Store Closure Sale when and as applicable.

SECTION 6.03. Financial Covenant. During the continuance of a Covenant Compliance Event, each of Holdings and the Borrowers will not permit the Fixed Charge Ratio as of the last day of any fiscal month of Holdings to be less than 1.0 to 1.0.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01. Events of Default. If any of the following events ("Events of Default") shall occur and be continuing:

(a) Any Borrower shall fail to pay (i) any principal of any Term Loan when the same becomes due and payable, or (ii) any interest on any Term Loan or any fees, or any other amounts payable under this Agreement or any other Loan Document, in each case under this clause (ii), within three (3) days after the same becomes due and payable; or

(b) Any representation or warranty made by any Loan Party herein or in any other Loan Document shall prove to have been incorrect in any material respect when made; or

(c) (i) Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 6.01 (d), (e), (h), (j) (other than 6.01(j)(viii)), or (m), 6.02, or 6.03 of this Agreement or (ii) any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, if such failure shall remain unremedied for thirty (30) days after written notice thereof shall have been given to Holdings and the Borrowers by the Agent or any Lender; or

(d) Any Group Member shall fail to pay principal of at least $50,000,000 on any Debt that is outstanding (but excluding Debt outstanding hereunder) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any Debt that is outstanding in a

51

JX 115-57

principal amount of at least $50,000,000 and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid or redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made and is accepted in an amount of at least $50,000,000 (in each case other than (i) a scheduled prepayment, redemption or purchase, or (ii) a mandatory prepayment, redemption or purchase, or a required offer to prepay, redeem or purchase, that results from the voluntary sale or transfer of property or assets), in each case prior to the stated maturity thereof; or

(e) Any Group Member shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Group Member seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 90 days, or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or any Group Member shall take any corporate action to authorize any of the actions set forth above in this subsection (e); or

(f) A judgment or order for the payment of money in excess of $50,000,000 (net of any portion of such judgment to be paid by a third-party insurer as to which coverage has not been disputed) shall be rendered against any Group Member and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g) (i) Any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 35% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right) and such "person" or "group" shall beneficially own (as such term is used herein) a greater percentage of the equity Securities of Holdings entitled to vote for members of the Board of Directors than the Permitted Holders shall, collectively, beneficially own; or (ii) during any period of 12 consecutive months, a majority of the members of the Board of Directors or other equivalent governing body of Holdings cease to be composed of individuals (x) who were members of that board or equivalent governing body on the first day of such period, (y) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (x) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (z) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clauses (x) and (y) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (iii) Holdings shall cease for any reason to own, directly or indirectly, 100% of the Voting Stock of Sears and Kmart; or

(h) (i) Any Borrower or any of its ERISA Affiliates shall incur, or shall be reasonably likely to incur liability in excess of $100,000,000 in the aggregate as a result of one or more of the following: (i) the occurrence of any ERISA Event; (ii) the partial or complete withdrawal of such Borrower or any of its ERISA Affiliates from a Multiemployer Plan; or (iii) the reorganization or termination of a Multiemployer Plan; or (iv) the PBGC shall have filed a notice of Lien; or

(i) Any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Loan Party shall so state in writing, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby, including as a result of the failure to comply with Section 4.4 of the Security Agreement; or

52

**JX 115-58**

(j) The guarantees contained in Article X hereof shall cease, for any reason, to be in full force and effect or any Loan Party shall so state in writing;

then, and in any such event, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions upon notice to the Borrowers: (i) Reserved; and (ii) declare the Term Loan, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Term Loan, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to any Borrower under the United States Bankruptcy Code, (A) Reserved and (B) the Term Loan, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers.

It is understood and agreed that if the Term Loans are accelerated pursuant to this Section 7.01 for any reason, including without limitation because of the commencement of any insolvency proceeding or other proceeding pursuant to any debtor relief laws, the premium payable pursuant to Section 2.05(b) (the "Term Loan Prepayment Premium") determined as of the date of acceleration will also be due and payable as though the 2016 Term Loans were voluntarily prepaid as of such date and shall constitute part of the Obligations in respect of the Term Loans, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Term Lender's lost profits as a result thereof. Any Term Loan Prepayment Premium payable in accordance with the immediately preceding sentence shall be presumed to be the liquidated damages sustained by each Term Lender as the result of the early termination and the Loan Parties agree that it is reasonable under the circumstances currently existing. The Term Loan Prepayment Premium shall also be payable in the event the Term Loans are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure. EACH LOAN PARTY EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION INCLUDING IN CONNECTION WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION OF THE TERM LOANS PURSUANT TO ANY INSOLVENCY PROCEEDING OR OTHER PROCEEDING PURSUANT TO ANY DEBTOR RELIEF LAWS. Each Loan Party expressly agrees that: (A) the Term Loan Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Term Loan Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between Term Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Term Loan Prepayment Premium; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each Loan Party expressly acknowledges that its agreement to pay the Term Loan Prepayment Premium to the Term Lenders as herein described is a material inducement for the Term Lenders to provide the Term Commitment and provide the Term Loans.

ARTICLE VIII

THE AGENT

SECTION 8.01. Appointment. Each Lender hereby irrevocably designates and appoints JPP, LLC, a Delaware limited liability company, as Agent, under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. For clarity, and notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, no consent of the Lenders shall be required to amend this Agreement or the Loan Documents to (i) cause additional assets to become Collateral or to add additional Subsidiaries as guarantors of the Obligations, or (ii) implement the provisions of Sections 2.18, 8.12 or 9.13(c), and the Agent and the Loan Parties shall be entitled to execute any and all amendments necessary or desirable to

53

JX 115-59

accomplish any of the foregoing and such amendments shall be binding on the other parties hereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth in this Agreement and the other Loan Documents to which it is a party, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent.

SECTION 8.02. Delegation of Duties. The Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 8.03. Exculpatory Provisions. No Agent (for purposes of this Article VIII, "Agent" and "Agents" shall mean the collective reference to the Agent and any other Lender designated as an "Agent" for purposes of this Agreement nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party that is a party thereto to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

SECTION 8.04. Reliance by Agent. The Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by them to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by the Agent. The Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as they deem appropriate or they shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Term Loan.

SECTION 8.05. Notice of Default. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent has received notice from a Lender, Holdings or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 8.06. Non-Reliance on Agents and Other Lenders. Each Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender represents to the Agent that it has,

54

JX 115-60

independently and without reliance upon the Agent, or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make the Term Loan hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent hereunder, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Agent or the Collateral Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 8.07. <u>Reports and Financial Statements</u>. By signing this Agreement, each Lender:

(a) Reserved;

(b) is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements and reports required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "<u>Reports</u>") (which the Agent agrees to so deliver);

(c) expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e) agrees to keep all Reports confidential in accordance with the provisions of this Agreement; and

(f) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) reserved; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender or Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agent and any such other Lender or Person preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

SECTION 8.08. <u>Indemnification</u>. The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), ratably according to their respective Pro Rata Shares in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon the Term Loan shall have been paid in full, in accordance with such Pro Rata Shares immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loan) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Term Loan and all other amounts payable hereunder.

55

JX 115-61

SECTION 8.09. <u>Agent in Its Individual Capacity</u>. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to Term Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 8.10. <u>Successor Agent</u>.

(a) The Agent may resign as Agent upon 30 days' notice to the Lenders and the Borrowers. If the Agent shall resign as Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default shall have occurred and be continuing) be subject to approval by the Borrowers (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Agent, and the term "Agent" shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of Term Loan. If no successor agent has accepted appointment as Agent by the date that is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Agent hereunder, until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

SECTION 8.11. <u>Reserved</u>.

SECTION 8.12. <u>Defaulting Lenders</u>.

(a) <u>Adjustments</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i) <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and this Section 8.12.

(b) <u>Defaulting Lender Waterfall</u>. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 9.05 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Extension of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; fifth, if so determined by the Agent and the Borrowers, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Extensions of Credit under this Agreement; sixth, to the payment of any amounts owing to the Non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

56

JX 115-62

(c) <u>Consents</u>. If a Lender becomes a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not in limitation thereof, except as set forth in the last sentence hereof, such Defaulting Lender's right to participate in decision-making rights related to the Obligations in respect of Required Lender votes, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal. Notwithstanding anything else provided herein, any amendment, waiver determination, consent or notification under Section 9.01 that would (i) reduce the principal amount of the Term Loan made by such Defaulting Lender, (ii) alter the terms and conditions of this sentence or (iii) otherwise disproportionately affect a Defaulting Lender, will require the consent of such Defaulting Lender.

(d) <u>Defaulting Lender Cure</u>. If the Borrowers and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01. <u>Amendments, Etc.</u> No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Borrower or any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, waiver or consent shall (a) unless in writing and also signed by each Lender directly affected thereby, do any of the following: (i) increase the amount or extend the expiration date of any Lender's Commitment, (ii) reduce the principal of, or interest on, the Term Loan or any fees or other amounts payable hereunder or (iii) postpone any date fixed for any payment of principal of, or interest on, the Term Loan or any fees or other amounts payable hereunder; provided that any waiver or reduction of any payment of the Term Loan from any Excess Cash Flow may be waived or modified solely with the written consent of the Term Lenders then holding a majority in amount of the Term Loans; (b) unless in writing and signed by all of the Lenders, do any of the following: (i) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Term Loan, or the number of Lenders, that shall be required for the Lenders or any of them to take any action hereunder, (ii) other than in accordance with Section 9.13, release all or substantially all of the Collateral or release all or substantially all of the guarantors from their obligations under the Article X hereof, (iii) except as expressly permitted herein or in any other Loan Document, subordinate the Liens granted hereunder or under the other Loan Documents, to any other Lien, (iv) amend this Section 9.01, (v) amend the definitions of "Required Lenders" or (vi) other than in accordance with Section 6.01(d), release either Borrower from all of its obligations hereunder, (c) reserved; (d) unless in writing and signed by the Agent (in addition to the Lenders required above to take such action), amend, modify or waive any provision of Article VIII or affect the rights or duties of the Agent under this Agreement or any other Loan Document; (e) reserved, or (g) unless in writing signed by members of any Class holding a majority in amount of such Class, have a materially disproportionate adverse effect on such Class.

SECTION 9.02. <u>Notices, Etc.</u> (a) All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied or delivered, (i) if to Holdings, any Borrower or any Subsidiary Guarantor, at its address at 3333 Beverly Road, Hoffman Estates, Illinois 60179, Attention: General Counsel, with a copy to Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attention: Scott Charles; (ii) if to any Lender, at its address set forth in its completed administrative questionnaire delivered to the Agent; and (iii) if to the Agent, at its address at ESL Investments, Inc., 1170 Kane Concourse, Suite 200 Bay Harbor Islands, FL 33154, Attention: Edward S. Lampert, CEO; <u>provided</u> that notices required to be delivered pursuant to Section 6.01(j)(i), (ii), (iii), and (v) shall be delivered to the Agent and the Lenders as specified in Section 9.02(b). All such notices and communications shall, when mailed, telecopied, telegraphed or emailed, be effective when deposited in the mails, telecopied, delivered to the telegraph company or confirmed by email, respectively, except that notices and communications to the Agent pursuant to Article II or VIII

57

shall not be effective until received by the Agent. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any exhibit hereto or thereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof.

(b) Holdings and the Borrowers agree that materials required to be delivered pursuant to Sections 6.01(j)(i), (ii), (iii) and (v), shall be deemed delivered to the Agent on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a written notice to the Agent and the Lenders and that is accessible by the Lenders without charge or if not so posted, may be delivered to the Agent in an electronic medium in a format acceptable to the Agent by email to eslaccounting@eslinvest.com. Holdings and the Borrowers agree that the Agent may make such materials, as well as any other written information, documents, instruments and other material relating to Holdings, the Borrowers, any of their Subsidiaries or any other materials or matters relating to this Agreement, the Loan Documents or any of the transactions contemplated hereby (collectively, the "Communications") available to the Lenders by posting such notices on Intralinks or a substantially similar electronic system (the "Platform"). Holdings and the Borrowers acknowledge that (i) the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, (ii) the Platform is provided "as is" and "as available" and (iii) neither the Agent nor any of its Affiliates warrants the accuracy, adequacy or completeness of the Communications or the Platform and each expressly disclaims liability for errors or omissions in the Communications or the Platform. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent or any of its Affiliates in connection with the Platform.

(c) Each Lender agrees that notice to it (as provided in the next sentence) (a "Notice") specifying that any Communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; provided that if requested by any Lender the Agent shall deliver a copy of the Communications to such Lender by email or telecopier. Each Lender agrees (i) to notify the Agent in writing of such Lender's e-mail address to which a Notice may be sent by electronic transmission (including by electronic communication) on or before the date such Lender becomes a party to this Agreement (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

SECTION 9.03. No Waiver; Remedies. No failure on the part of any Lender or the Agent to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04. Costs and Expenses. (a) Holdings and the Borrowers jointly and severally agree to pay promptly all reasonable costs and expenses of the Agent in connection with the preparation, execution, delivery, distribution (including via the internet or through a service such as Intralinks), administration, modification and amendment of this Agreement, the other Loan Documents and the other documents to be delivered hereunder, including, (A) all due diligence, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, consultant, and audit expenses, (B) reserved, and (C) the reasonable fees and expenses of counsel for the Agent with respect thereto and with respect to advising the Agent as to their rights and responsibilities under this Agreement and the other Loan Documents. Holdings and the Borrowers further jointly and severally agree to pay on demand all costs and expenses of the Agent and the Lenders, if any (including reasonable counsel fees and expenses), in connection with the enforcement of, or protection of their rights under, (whether through negotiations, legal proceedings or otherwise) of this Agreement, the other Loan Documents and the other documents to be delivered hereunder, including reasonable fees and expenses of one counsel for the Agent, and one counsel for the Lenders in connection with the enforcement of or protection rights under this Section 9.04(a).

(b) Holdings and the Borrowers jointly and severally agree to indemnify and hold harmless the Agent and each Lender and each of their Affiliates and their officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses

58

(including reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) this Agreement, the other Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the Term Loan, and (ii) the actual or alleged presence of Hazardous Materials on any property of Holdings, the Borrowers or any of their Subsidiaries or any Environmental Action relating in any way to Holdings, the Borrowers or any of their Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Holdings, any Borrower, its directors, equityholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Holdings and the Borrowers also agree not to assert any claim for special, indirect, consequential or punitive damages against the Agent, any Lender, any of their Affiliates, or any of their respective directors, officers, employees, attorneys and agents, on any theory of liability, arising out of or otherwise relating to this Agreement, the other Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Term Loan.

(c) If (i) any payment of principal of, or Conversion of, any Eurodollar Rate Advance is made by any Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Advance, as a result of a payment or Conversion pursuant to Section 2.09(d) or (e), 2.11 or 2.13, acceleration of the maturity of the Term Loan pursuant to Section 7.01 or for any other reason, or by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Advance upon an assignment of rights and obligations under this Agreement pursuant to Section 9.07 as a result of a demand by any Borrower pursuant to Section 9.07(a), or (ii) any Borrower fails to prepay, borrow, continue or convert any Eurodollar Rate Advance on the date or in the amount notified by any Borrower; the applicable Borrower shall, promptly after notice by such Lender setting forth in reasonable detail the calculations used to quantify such amount (with a copy of such notice to the Agent), pay to the Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion, including any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance. For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 9.04(c), each Lender shall be deemed to have funded each Eurodollar Rate Advance made by it at the Eurodollar Rate for such Advance by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Advance was in fact so funded.

(d) Without prejudice to the survival of any other agreement of Holdings or any Borrower hereunder, the agreements and obligations of Holdings and the Borrowers contained in Sections 2.12, 2.15 and 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 9.05. Right of Set-off. Upon (i) the occurrence and during the continuance of any Event of Default and (ii) the making of the request or the granting of the consent specified by Section 7.01 to authorize the Agent to declare the Extensions of Credit due and payable pursuant to the provisions of Section 7.01, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of Holdings or any Loan Party against any and all of the obligations of Holdings and the Loan Parties now or hereafter existing under this Agreement, the other Loan Documents and the Extensions of Credit of such Lender, whether or not such Lender shall have made any demand under this Agreement or the other Loan Documents. Each Lender agrees promptly to notify Holdings or the applicable Loan Party (with a copy to the Agent) after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender and its Affiliate under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender and its Affiliate may have.

59

JX 115-65

SECTION 9.06. Binding Effect; Effectiveness. When this Agreement has been executed by Holdings, the Borrowers, the Agent, and the Lenders, this Agreement shall thereafter be binding upon and inure to the benefit of Holdings, the Borrowers, the Agent, each Lender and their respective successors and assigns; provided, that, except with respect to Sections 9.07 and 9.08, this Agreement shall only become effective upon satisfaction of the conditions precedent set forth in Section 4.01 and none of the provisions of this Agreement, including without limitation provisions in respect of Term Loans to be made by or issued by any Lender, and in respect of any covenant, fee, indemnity, default, and expense reimbursement made by any Loan Party or for which any Loan Party is liable hereunder, shall become effective, nor shall any representation herein be deemed to be made, until the satisfaction of such conditions.

SECTION 9.07. Assignments and Participations. (a) Each Lender may, upon notice to the Borrowers and the Agent and with the consent, not to be unreasonably withheld or delayed, of the Agent, and, unless an Event of Default has occurred and is continuing, the Borrowers (which consent shall be deemed given by the Borrowers if the Borrowers have not responded to a request for such consent within ten (10) Business Days), assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of the Term Loan and other amounts owing to it and any Note or Notes held by it); provided, however, that (i) reserved; (ii) reserved, (iii) each such assignment with respect to any Class of rights and obligations shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement with respect to such Class, (iv) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of all of a Lender's rights and obligations under this Agreement, the amount of the Term Loan of the assigning Term Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000 or an integral multiple of $1,000,000 in excess thereof (or, if less, the entire outstanding amount of the Term Loan held by such Term Lender) unless the Borrowers and the Agent otherwise agree, (v) each such assignment shall be to an Eligible Assignee, (vi) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, and the parties to such assignment (other than the Borrowers and the Agent) shall deliver together therewith any Note subject to such assignment and a processing and recordation fee of $3,500 (except no such fee shall be payable for assignments to a Lender, an Affiliate of a Lender or an Approved Fund), and (vii) any Lender may, without the approval of the Borrowers, but with notice to the Borrowers, assign all or a portion of its rights and obligations to any of its Affiliates or to another Lender. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.12, 2.15 and 9.04 to the extent any claim thereunder relates to an event arising prior such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b) In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Agent, the applicable pro rata share of Term Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon). Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c) By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty

60

JX 115-66

and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or the performance or observance by the Borrowers of any of their obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 5.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d) Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with any Note or Notes subject to such assignment, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit B hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrowers.

(e) The Agent shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the principal amount of the Term Loan owing to each Term Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f) Each Lender may, without the consent of the Agent or any Loan Party, sell participations to one or more banks or other entities (other than the Borrowers or any of their Affiliates that is not a Permitted Holder) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of the Term Loan owing to it and any Note or Notes held by it); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrowers, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Loan Document, or consent to any departure by any Borrower therefrom, except to the extent that such amendment, waiver or consent would require the affirmative vote of the Lender from which it purchased its participation pursuant to Section 9.01(a).

(g) Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant, any information relating to Holdings, the Borrowers or their Subsidiaries furnished to such Lender by or on behalf of the Borrowers; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Borrower Information relating to Holdings, the Borrowers or their Subsidiaries received by it from such Lender in accordance with Section 9.08.

(h) Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including the portion of the Term Loan owing to it and any Notes held by it), including, without limitation, in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

61

JX 115-67

(i) The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender to facilitate transactions of the type described in paragraph (g) above.

(j) Neither Holdings nor any Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each of the Lenders (except, in the case of SRAC, pursuant to Section 6.01(d)).

SECTION 9.08. Confidentiality. Neither the Agent nor any Lender may disclose to any Person any confidential, proprietary or non-public information of Holdings or the Borrowers furnished to the Agent or the Lenders by Holdings or the Borrowers (such information being referred to collectively herein as the "Borrower Information"), except that each of the Agent and each of the Lenders may disclose Borrower Information (i) to its and its Affiliates' employees, officers, directors, agents and advisors to whom disclosure is required to enable the Agent or such Lender to perform its obligations under this Agreement and the other Loan Documents or in connection with the administration or monitoring of this Agreement and the other Loan Documents by the Agent or such Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Borrower Information and instructed to keep such Borrower Information confidential on substantially the same terms as provided herein), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party to this Agreement and the other Loan Documents, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement and the other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 9.08, to any assignee or participant, or any prospective assignee or participant, (vii) to the extent such Borrower Information (A) is or becomes generally available to the public on a non-confidential basis other than as a result of a breach of this Section 9.08 by the Agent or such Lender, as the case may be, or (B) is or becomes available to the Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrowers or any of their Subsidiaries and (viii) with the consent of the Borrowers.

SECTION 9.09. Governing Law. This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of laws principles thereof but including Section 5-1401 and 5-1402 of the New York General Obligations Law.

SECTION 9.10. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.11. Jurisdiction, Etc. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Holdings and each of the Borrowers hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to Holdings or such Borrower at its address specified pursuant to Section 9.02. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents in the courts of any jurisdiction.

(b) Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

62

JX 115-68

SECTION 9.12. <u>WAIVER OF JURY TRIAL</u>. EACH OF HOLDINGS, THE BORROWERS, THE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE ACTIONS OF THE AGENT, OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 9.13. <u>Release of Collateral or Guarantee Obligation</u>. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Agent is hereby irrevocably authorized by each Lender (without requirement of consent of or notice to any Lender) to take (or request that the Collateral Agent take), and hereby agrees to take (or request that the Collateral Agent take), any action requested by the Borrowers having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document (including, without limitation, any Permitted Disposition) or that has been consented to in accordance with Section 9.01; <u>provided that</u> the guarantee obligations of Sears may not be released without the consent of the Required Lenders, or (ii) under the circumstances described in paragraph (b) below.

(b) At such time as the Term Loan and all other Obligations shall have been paid in full in cash and the Commitments have been terminated, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(c) Each of the Lenders irrevocably authorizes and directs the Agent to, and upon the request of the Borrower the Agent shall, take (or request that the Collateral Agent take) such actions and enter into such agreements or instruments as may be necessary or appropriate to subordinate, or make pari passu or senior, as the case may be, any Lien on any Collateral or other property granted to or held by the Agent or Collateral Agent under or in connection with any Loan Document to the Liens securing any First Lien Credit Agreement, other Priority Obligations or other Debt not constituting Priority Obligations, in each case to the extent such Debt and Liens are otherwise permitted to be incurred hereunder.

SECTION 9.14. <u>PATRIOT Act Notice</u>. Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or the Agent, as applicable, to identify such Borrower in accordance with the PATRIOT Act. Each Borrower hereby agrees to provide such information promptly upon the request of any Lender or the Agent.

SECTION 9.15. <u>Integration</u>. This Agreement and the other Loan Documents represent the agreement of Holdings, the Borrowers, the Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Agent, the Collateral Agent or any Lender relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

SECTION 9.16. <u>Replacement of Lenders</u>. If any Lender requests compensation under <u>Section 2.12</u> or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, if any Lender does not consent (a "<u>Non-Consenting Lender</u>") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender (or each Lender of a Class) and that has been approved by the Required Lenders (or a majority of such Class) or any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 9.07</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a) the Borrowers shall have paid to the Agent the assignment fee specified in <u>Section 9.07</u>;

63

JX 115-69

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its ratable share of the Term Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter;

(d) with respect to the replacement of any Non-Consenting Lender, such amendment, waiver or consent can be effected as a result of such assignment (together with all other assignments required by the Agent to be made pursuant to this paragraph); and

(d) such assignment does not conflict with applicable laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

SECTION 9.17. No Advisory or Fiduciary Capacity. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

64

**JX 115-70**

ARTICLE X

GUARANTEE

SECTION 10.01. <u>Guarantee</u>.

(a) Each of the Guarantors (other than the Borrowers) hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Agent, for the ratable benefit of the Credit Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by each Borrower when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations of such Borrower. Each Borrower hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Agent, for the ratable benefit of the Credit Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by each other Borrower when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations of each such other Borrower.

(b) Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor (other than, as to their respective Obligations, the Borrowers) hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 10.02).

(c) Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Article X or affecting the rights and remedies of any Agent or any other Credit Party hereunder.

(d) The guarantee contained in this Article X shall remain in full force and effect until all the Obligations (other than contingent indemnification obligations for which no claim shall have then been asserted) and the obligations of each Guarantor under the guarantee contained in this Article X shall have been satisfied by payment in full, notwithstanding that from time to time during the term of this Agreement any of the Borrowers may be free from any Obligations.

(e) No payment made by any of the Borrowers, any of the Guarantors, any other guarantor or any other Person or received or collected by the Agent or any other Credit Party from any of the Borrowers, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of any of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of any of the Obligations or any payment received or collected from such Guarantor in respect of any of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until each of the Obligations (other than contingent indemnification obligations for which no claim shall have then been asserted) are paid in full.

SECTION 10.02. <u>Right of Contribution</u>. Each Guarantor (other than Holdings) hereby agrees that to the extent that a Guarantor (other than Holdings) shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor (other than Holdings) hereunder which has not paid its proportionate share of such payment. Each Guarantor's (other than Holdings') right of contribution shall be subject to the terms and conditions of Section 10.03. The provisions of this Section 10.02 shall in no respect limit the obligations and liabilities of any Guarantor to the Agent and the other Credit Parties, and each Guarantor shall remain liable to the Agent and the other Credit Parties for the full amount guaranteed by such Guarantor hereunder. This Section 10.02 shall not apply to Sears in its capacity as a Guarantor of the Obligations of SRAC, or to Kmart in its capacity as a Guarantor of the Obligations of Kmart Corp.

SECTION 10.03. <u>No Subrogation</u>. Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Agent or any other Credit Party, no Guarantor shall be entitled to be subrogated to any of the rights of the Agent or any other Credit Party against any Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by the Agent or any other Credit Party for the payment of any of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution, reimbursement or indemnification from any Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder, and notwithstanding the foregoing, in the event that any Guarantor possesses any such rights of subrogation, contribution, reimbursement or indemnification, all such rights shall in all respects be subordinated and junior in right of payment, until all amounts owing

JX 115-71

to the Agent and the other Credit Parties by each of the Borrowers on account of its Obligations (other than contingent indemnification obligations for which no

65

JX 115-72

claim shall have then been asserted) are paid in full. If any amount shall be paid to any Guarantor on account of such subrogation, contribution, reimbursement or indemnification rights at any time when any of the Obligations (other than contingent indemnification obligations for which no claim shall have then been asserted) shall not have been paid in full, such amount shall be held by such Guarantor in trust for the Agent and the other Credit Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be transferred as the Agent directs in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Agent, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Agent may determine.

SECTION 10.04. Amendments, etc. with Respect to Obligations. Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by the Agent or any other Credit Party may be rescinded by the Agent or such other Credit Party and any of the Obligations continued, and any of the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Agent, the Collateral Agent or any other Credit Party, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Agent (or the Required Lenders or all Lenders, as the case may be) or any other Credit Party, if applicable, may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Agent or any other Credit Party for the payment of any of the Obligations may be sold, exchanged, waived, surrendered or released. Neither the Agent nor any other Credit Party shall have any obligation to any Loan Party or other Person, to protect, secure, perfect or insure any Lien at any time held by it as security for any of the Obligations or for the guarantee contained in this Article X or any property subject thereto.

SECTION 10.05. Guarantee Absolute and Unconditional.

(a) Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Agent or any other Credit Party upon the guarantee contained in this Article X or acceptance of the guarantee contained in this Article X; each of the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Article X; and all dealings between any of the Borrowers and any of the Guarantors, on the one hand, and the Agent and the other Credit Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Article X. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon any of the Borrowers or any of the Guarantors with respect to any of the Obligations. Each Guarantor understands and agrees that the guarantee contained in this Article X shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (i) the validity or enforceability of this Agreement, any other Loan Document or any other document made, delivered or given in connection with any of the foregoing, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Agent or any other Credit Party, (ii) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Borrower or any other Person against the Agent or any other Credit Party, or (iii) any other circumstance whatsoever (with or without notice to or knowledge of any Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of any of the Borrowers for the Obligations, or of such Guarantor under the guarantee contained in this Article X, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Agent or any other Credit Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrowers, any other Guarantor or any other Person or against any collateral security or guarantee for any of the Obligations or any right of offset with respect thereto, and any failure by the Agent or any other Credit Party to make any such demand, to pursue such other rights or remedies or to collect any payments from any of the Borrowers, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of any Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Agent or any other Credit Party against any Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

https://www.xtractresearch.com/Document/raw/id/Ocr7Z5alH8f2IcJhhk9w?docID=30591...    10/2/2018

JX 115-73

(b) The obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other document made, delivered or given in connection with any of the foregoing or any other agreement, by any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than upon a written release of such Guarantor from the Agent or upon the indefeasible payment in full in cash of all the Obligations).

(c) The Agent and the other Credit Parties may, at their election upon the occurrence and during the continuance of an Event of Default, foreclose on any Collateral held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such Collateral in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any Guarantor, or exercise any other right or remedy available to them against any Guarantor, without affecting or impairing in any way the liability of any other Guarantor hereunder except to the extent that all the Obligations (other than contingent indemnification obligations for which no claim shall have then been asserted) have been indefeasibly paid in full in cash. Each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any other Guarantor, as the case may be, or any Collateral.

SECTION 10.06. Reinstatement. The guarantee contained in this Article X shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Agent or any other Credit Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

SECTION 10.07. Payments. Each Guarantor hereby guarantees that payments hereunder will be paid without set-off or counterclaim in Dollars, to such account as the Agent may designate in accordance with Section 9.02 of this Agreement.

SECTION 10.08. Additional Guarantors. Each Subsidiary of the Borrowers that is required to become a party to this Agreement pursuant to Section 6.01(i) shall become a Guarantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of a joinder to this Agreement substantially in the form of Exhibit J hereto.

SECTION 10.09. Releases. At the request and sole expense of the Borrowers, the Agent shall release any Guarantor from its obligations hereunder, including, without limitation, its obligations pursuant to Article X hereof, and shall execute and deliver to the Borrowers all releases or other documentation reasonably necessary or desirable to evidence such release, in the event that all the equity interest of such Guarantor shall be sold, transferred or otherwise disposed of in a transaction permitted by this Agreement and/or in the event that such Guarantor shall dispose of all or substantially all of its assets and shall cease to own any Collateral.

67

**JX 115-74**

[Remainder of page intentionally left blank]

68

JX 115-75

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

SEARS HOLDINGS CORPORATION

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
         Accounting Officer

KMART CORPORATION

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
         Accounting Officer

SEARS ROEBUCK ACCEPTANCE
CORPORATION

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Finance

*[Signature Page – Second Lien Credit Agreement]*

JX 115-76

A&E HOME DELIVERY, LLC

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

A&E LAWN & GARDEN, LLC

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

A&E SIGNATURE SERVICE, LLC

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

CALIFORNIA BUILDER APPLIANCES, INC.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

FLORIDA BUILDER APPLIANCES, INC.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

KLC, INC.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

KMART HOLDING CORPORATION

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President, Controller and Chief
        Accounting Officer

KMART OF MICHIGAN, INC.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:  Vice President

*[Signature Page – Second Lien Credit Agreement]*

JX 115-77

KMART OF WASHINGTON LLC
By:      Kmart Corporation, as Sole Member

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
         Accounting Officer


KMART OPERATIONS LLC

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
         Accounting Officer


KMART STORES OF ILLINOIS LLC
By:      Kmart Corporation, as Sole Member

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
         Accounting Officer


KMART STORES OF TEXAS LLC
By:      Kmart Corporation, as Sole Member

By:      /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
         Accounting Officer


KMART.COM LLC
By:      BlueLight.com, as Sole Member

By:      /s/ Lawrence J. Meerschaert
Name: Lawrence J. Meerschaert
Title:   Vice President


*[Signature Page – Second Lien Credit Agreement]*

MYGOFER LLC
By:       Kmart Corporation, as Sole Member

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
          Accounting Officer


PRIVATE BRANDS, LTD.

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President


SEARS BRANDS MANAGEMENT
CORPORATION

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President


SEARS HOLDINGS MANAGEMENT
CORPORATION

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
          Accounting Officer


SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   President


SEARS OPERATIONS LLC

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and Chief
          Accounting Officer


SEARS PROTECTION COMPANY

By:       /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President


*[Signature Page – Second Lien Credit Agreement]*

JX 115-79

SEARS PROTECTION COMPANY
(FLORIDA), L.L.C.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President

SEARS, ROEBUCK AND CO.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President, Controller and
          Chief Accounting Officer

SEARS, ROEBUCK DE PUERTO RICO, INC.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President

SOE, INC.

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President

STARWEST, LLC

By:    /s/ Robert A. Riecker
Name: Robert A. Riecker
Title:   Vice President

*[Signature Page – Second Lien Credit Agreement]*

**JX 115-80**

JPP, LLC,
as Agent and as a Lender

By:    /s/ Edward S. Lampert
Name: Edward S. Lampert
Title:   Authorized Signatory

JPP II, LLC,
as a Lender

By:    /s/ Edward S. Lampert
Name: Edward S. Lampert
Title:   Authorized Signatory

*[Signature Page – Second Lien Credit Agreement]*

**JX 115-81**

**SCHEDULE 1.01**

**Lenders; Commitments**

| Term Lender | Term Loan Outstanding |
|---|---|
| JPP, LLC | $ 188,842,000 |
| JPP II, LLC | $ 111,158,000 |
| TOTAL | $ 300,000,000 |

**JX 115-82**

**SCHEDULE 5.01(n)**

**Pension Plan Issues**

**-None-**

JX 115-83

**SCHEDULE 5.01(p)**

**UCC Filing Jurisdictions**

| Grantor | Jurisdiction |
| --- | --- |
| Sears Roebuck Acceptance Corp. | Delaware |
| Kmart Corporation | Michigan, Puerto Rico and Guam |
| Sears Holdings Corporation | Delaware |
| Kmart Holding Corporation | Delaware |
| KLC, Inc. | Texas |
| Kmart Stores of Illinois LLC | Illinois |
| Kmart Stores of Texas LLC | Texas |
| Kmart of Michigan, Inc. | Michigan |
| Kmart of Washington LLC | Washington |
| Kmart.com LLC | Delaware |
| MyGofer LLC | Delaware |
| Sears Brands Management Corporation | Delaware and Puerto Rico |
| Sears, Roebuck and Co. | New York, Puerto Rico and Guam |
| California Builder Appliances, Inc. | Delaware |
| Florida Builder Appliances, Inc. | Delaware |
| SOE, Inc. | Delaware |
| StarWest, LLC | Delaware |
| Private Brands, Ltd. | Delaware |
| Sears Home Improvement Products, Inc. | Pennsylvania |
| Sears, Roebuck de Puerto Rico, Inc. | Delaware and Puerto Rico |
| Sears Holdings Management Corporation | Delaware and Puerto Rico |
| Sears Protection Company | Illinois |
| Sears Protection Company (Florida), L.L.C. | Florida |
| A&E Home Delivery, LLC | Delaware |
| A&E Lawn & Garden, LLC | Delaware |
| A&E Signature Service, LLC | Delaware |
| Sears Operations LLC | Delaware |
| Kmart Operations LLC | Delaware |

**JX 115-84**

**SCHEDULE 5.01(s)**

**Existing Rights to Purchase Equity Interests**

**-None-**

**SCHEDULE 5.01(t)**

**Labor Matters**

**Collective Bargaining Agreements**

| Loan Party or other Subsidiary | Union | Contract Term |
|---|---|---|
| Kmart Corporation - Distribution Center – Manteno, IL | IBT # 705 | 2/2/15-2/4/18 |
| Kmart Corporation - Distribution Center – Morrisville, PA | UAW # 8275 | 9/11/16-3/8/20 |
| Kmart Corporation – Distribution Center – Warren, OH | UAW | 9/3/15-9/8/18 |
| Sears Roebuck - PRS. – Detroit, MI | IBT #243 | 10/19/14-10/18/17 |
| Sears Roebuck - MDO – Detroit, MI | IBT #243 | 10/27/14-10/26/17 |
| Sears Roebuck - PRS. – Toledo, OH | IBEW #1076 | 2/1/16-1/31/18 |
| Sears Roebuck – Retail – Chicago, IL | IUOE #399 | 7/1/15-6/30/19 |
| Sears Roebuck - Auto Center – Fairview Heights, IL | UFCW #881 | 3/22/15-3/24/18 |
| Sears Roebuck - PRS – Belleville, IL | UFCW #881 | 3/22/15-3/24/18 |
| Sears Roebuck - Retail – Fairview Heights, IL | UFCW #881 | 3/22/15-3/24/18 |
| Sears Roebuck - PRS – Akron, OH | IBT #348 | 5/4/15-5/18/18 |
| Sears Roebuck - PRS – Cleveland, OH | UFCW #880 | 2/1/16-1/31/19 |
| Sears Roebuck – Retail – Wilkes Barre, PA | IBT #401 | 7/1/16-6/30/19 |
| Sears Roebuck - Retail– Minneapolis, MN | IUOE #70 | 6/1/16-5/31/19 |
| Sears Roebuck - PRS – Penn-Jersey (Philadelphia), PA | IBT #107 | 7/15/11-3/31/16 |
| Kmart Corporation – Distribution Center – Chambersburg, PA | UNITE # 196 | 3/8/15-3/3/18 |
| Kmart Corporation – Distribution Center – Mira Loma, CA | UNITE # 512 | 1/13/12-1/12/18 |
| Sears Roebuck - PRS – McMurray (Pittsburgh), PA | USWA Dist. 10 | 1/1/14-12/31/16 |
| Sears Roebuck – PRS – Anchorage, AK | IBEW 1547 | 11/1/12-4/30/15 (Extended through 10/31/16) |
| Sears Roebuck – PRS – Bloomingdale (Chicago), IL | IBEW 134 | 2/1/15-1/31/17 |
| Sears Roebuck - MDO – Sacramento, CA | IBT #150 | 9/1/16-8/31/19 |
| Sears Roebuck - PRS – St. Louis (Fenton), MO | IBT #688 | 12/1/13-11/30/16 |
| Sears Logistics Services, Inc. - Kent, WA – DDC | IBT # 174 | 11/1/13-10/31/16 |
| Sears Logistics Services, Inc. - Kent, WA - MDO | IBT # 117 | 12/4/13-9/30/16 |

**Material Bonus, Restricted Stock, Stock Option, or Stock Appreciation Plans**

1.  Sears Holdings Corporation Umbrella Incentive Program and First Amendment thereto

2.  Sears Holdings Corporation Annual Incentive Plan

3. Long-Term Incentive Plans

    a. Sears Holdings Corporation 2008 Long-Term Incentive Plan

    b. Sears Holdings Corporation 2009 Long-Term Incentive Plan

    c. Sears Holdings Corporation 2010 Long-Term Incentive Plan and First Amendment thereto

    d. Sears Holdings Corporation Long-Term Incentive Program, effective April 27, 2011

    e. Sears Holdings Corporation Cash Long-Term Incentive Plan, amended and restated effective April 10, 2015

4. Stock Plans

    a. Sears Holdings Corporation 2006 Stock Plan and First Amendment thereto

    b. Sears Holdings Corporation 2013 Stock Plan

**SCHEDULE 6.01(j)**

**Financial and Collateral Reports**

Reporting Requirements

**A.** WITHIN 10 BUSINESS DAYS AFTER THE END OF EACH FISCAL MONTH[1]
    1. Borrowing Base Certificate
    2. Summary Source document of Stock Ledger
    3. Summary Source document of Sears inventory ineligibles
    4. Summary Source document of KMart inventory ineligibles
    5. Memo item of retail sales
    6. Summary Source document of Home Service Inventory
    7. Summary Source document showing In-Transit Inventory
    8. Summary Source document showing Credit Card A/R
    9. Summary Source document of Pharmacy A/R
    10. Summary Source document of Pharmacy A/R ineligibles
    11. Gift Card Liability Report
    12. Monthly Store Rent in WA, VA, PA
    13. Monthly DC Rent
    14. Report showing PACA/PASA Liability
    15. Tracking Summary (see schedule)

**B.** WITHIN 30 DAYS AFTER THE END OF EACH FISCAL MONTH[2]
    1. Consolidated Balance Sheet
        (i) Holdings and its Subsidiaries
        (ii) Holdings and its domestic Subsidiaries
    2. Consolidated Statement of Income (including cumulative from previous year end)
        (i) Holdings and its Subsidiaries
        (ii) Holdings and its domestic Subsidiaries
    3. Consolidated Statement of Cash Flows (including cumulative from previous year end)
        (i) Holdings and its Subsidiaries
        (ii) Holdings and its domestic Subsidiaries
    4. Compliance Certificate with Fixed Charge Ratio calculation

**C.** WITHIN 50 DAYS AFTER THE END OF THE FIRST THREE FISCAL QUARTERS
    1. Consolidated Balance Sheet
        (i) Holdings and its Subsidiaries
        (ii) Holdings and its domestic Subsidiaries
    2. Consolidated Statement of Income (including cumulative from previous year end)
        (i) Holdings and its Subsidiaries
        (ii) Holdings and its domestic Subsidiaries
    3. Consolidated Statement of Cash Flows (including cumulative from previous year end)
        (i) Holdings and its Subsidiaries
        (ii) Holdings and its domestic Subsidiaries
    4. Compliance Certificate with Fixed Charge Ratio calculation

    **D.** WITHIN 60 DAYS AFTER THE END OF EACH FISCAL YEAR
    1. Forecast

---

[1]    Upon the occurrence and during the continuance of an Accelerated Borrowing Base Delivery Event, such Borrowing Base Certificate and supporting information shall be delivered on Friday of each week (or, if Friday is not a Business Day, on the next succeeding Business Day), as of the close of business on the immediately preceding Saturday.

[2]    Only applicable during an Accelerated Borrowing Base Delivery Event

**JX 115-88**

**E.** WITHIN 95 DAYS OF FISCAL YEAR END

1. Annual Audited Consolidated Balance Sheet of Holdings and its Subsidiaries
2. Annual Consolidated Balance Sheet of Holdings and its domestic Subsidiaries
3. Annual Audited Consolidated Statement of Income of Holdings and its Subsidiaries
4. Annual Consolidated Statement of Income of Holdings and its domestic Subsidiaries
5. Annual Audited Consolidated Statement of Cash Flows of Holdings and its Subsidiaries
6. Annual Consolidated Statement of Cash Flows of Holdings and its domestic Subsidiaries
7. Compliance Certificate with Fixed Charge Ratio calculation

**JX 115-89**

**SCHEDULE 6.02(d)**

**Restricted Payments**

Sears Canada Inc.

### SCHEDULE 6.02(k)(ii)

### Investment Policy

- Direct obligations of the United States government (U.S. Treasury Bills, Notes and Bonds) which are fully guaranteed by same.

- Direct obligations of federal agencies ("Agencies" are arms of the federal government and their securities are backed by the full faith and credit of the U.S. government) and government-sponsored entities ("GSEs" are privately owned and publicly chartered organizations which were created by acts of Congress and their securities are not backed by the full faith and credit of the U.S. government).

- Money Market Funds which have a minimum of $5 billion in assets, offer immediate redemption of shares, have a minimum of three years investment history, and have the highest rating by two of Standard & Poor's, Moody's or Fitch. All funds must be 2a7 eligible.

- Commercial paper (unsecured or asset backed) issued by any corporation or bank having a maturity of 6 months or less and rated A1/ P1/F1 by two of S&P, Moody's or Fitch, respectively, or having a maturity of 3 months or less and rated at least A2/P2/F2 by two of S&P, Moody's and Fitch, respectively.

- Money market investments such as, certificates of deposits, notes or time deposits issued by any domestic commercial bank or a domestic branch of certain foreign banks having a maturity of 6 months or less that are rated A1 or AA/P1or Aa2/F1 or AA by two of S&P, Moody's or Fitch, respectively.

- Repurchase agreements with domestic financial firms that are rated A/A2/A by two of S&P, Moody's or Fitch, respectively. Permissible marketable securities allowed for repurchase or reverse repurchase agreements include any Eligible Investments listed above. Each Repo dealer is limited to $1.0 billion in exposure regardless of the underlying securities.

JX 115-91

**EXHIBIT B**

**ASSIGNMENT AND ACCEPTANCE**

This Assignment and Acceptance (this "Assignment and Acceptance") is dated as of the Effective Date set forth below and is entered into by and between [the][each][3] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][4] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][5] hereunder are several and not joint.][6] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by [each, the] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) the portion of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Term Lender][their respective capacities as Term Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Term Lender)][the respective Assignors (in their respective capacities as Term Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by [the][any] Assignor.

1.    Assignor[s]: _____

_____

_____

---

3    For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

4    For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

5    Select as appropriate.

6    Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.  Assignee[s]: _____

_____

3.  Borrowers: Sears Roebuck Acceptance Corp., a Delaware corporation, and Kmart Corporation, a Michigan corporation.

4.  Agent: JPP, LLC, a Delaware limited liability company, as the Agent under the Credit Agreement.

5.  Credit Agreement: Second Lien Credit Agreement dated as of September 1, 2016 (as such may be amended, modified, supplemented or restated hereafter, the "Credit Agreement") by, among others, Sears Holdings Corporation, the Borrowers, certain subsidiaries of Sears Holding Corporation, the Term Lenders party thereto and JPP, LLC, as Agent.

6.  Assigned Interest[s]:

| Assignor[s][7] | Assignee[s][8] | Aggregate Amount of Term Loan for all Term Lenders[9] | Amount of Term Loan Assigned[10] | Percentage Assigned of Term Loan[11] |
|---|---|---|---|---|
| | | $_____ | $_____ | _____% |
| | | $_____ | $_____ | _____% |

[7.  Trade Date:        ][12]

Effective Date: [            ] [TO BE INSERTED BY AGENT AND WHICH SHALL BE THE DATE OF DELIVERY OF THIS ASSIGNMENT AND ACCEPTANCE FOR RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:     _____
Name:   _____
Title:  _____

---

[7]  List each Assignor, as appropriate.
[8]  List each Assignee, as appropriate.
[9]  Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.
[10] Subject to minimum amount requirements pursuant to Section 9.07(a) of the Credit Agreement.
[11] Set forth, to at least 4 decimals, as a percentage of the Term Loan of all applicable Term Lenders thereunder.
[12] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

EX-10.1                                                                      Page 94 of 112

ASSIGNEE
[NAME OF ASSIGNEE]

By: _____
Name: _____
Title: _____

[Consented to and]13 Accepted:

JPP, LLC, as
Agent

By: _____
Name: _____
Title: _____

_____

13   To the extent that the Agent's consent is required under Section 9.07(a) of the Credit Agreement.

[Consented to:][14]

SEARS ROEBUCK ACCEPTANCE CORP., as
a Borrower

By: _____
Name: _____
Title: _____

KMART CORPORATION, as a Borrower

By: _____
Name: _____
Title: _____

---

[14]     To the extent required under Section 9.07(a) of the Credit Agreement.

JX 115-95

### ANNEX 1 TO ASSIGNMENT AND ACCEPTANCE

STANDARD TERMS AND CONDITIONS FOR

ASSIGNMENT AND ACCEPTANCE

1. <u>Representations and Warranties</u>.

1.1. <u>Assignor</u>. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Loan Parties or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Loan Parties or any other Person of any of their respective obligations under any Loan Document.

1.2. <u>Assignee</u>. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Term Lender under the Credit Agreement, (ii) it meets all the requirements to be an Eligible Assignee under the Credit Agreement (subject to such consents, if any, as may be required under Section 9.07(a) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Term Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Term Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.01(j) thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, and (vii) if it is a Lender that is organized under the laws of a jurisdiction other than that in which the Borrowers are residents for tax purposes, to the extent reasonably requested by the Agent, attached hereto are duly completed and executed by [the][such] Assignee, any U.S. Internal Revenue Service forms required under Section 2.15 of the Credit Agreement; and (b) agrees that (i) it will, independently and without reliance upon the Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Term Lender.

**JX 115-96**

2. <u>Payments</u>. From and after the Effective Date, the Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued up to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3. <u>General Provisions</u>. This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance. This agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

4. <u>Fees</u>. This Assignment and Acceptance shall be delivered to the Agent with a processing and recordation fee of $3,500, to the extent required by the terms of the Credit Agreement, unless such fee has been waived by the Agent in its sole discretion.

**Exhibit J**

FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT, dated as of [          , 20    ], made by [                                    ] (the "Additional Guarantor"), in favor of [      ], as agent (in such capacity, the "Agent"), for the banks, financial institutions and other institutional lenders (the "Lenders") parties to the Second Lien Credit Agreement referred to below. All capitalized terms not defined herein shall have the meaning ascribed to them in such Second Lien Credit Agreement.

W I T N E S S E T H :

WHEREAS, Sears Holdings Corporation ("Holdings"), Sears Roebuck Acceptance Corp. ("SRAC"), Kmart Corporation ("Kmart Corp." and, together with SRAC, the "Borrowers"), the Lenders and JPP, LLC, as administrative agent and collateral administrator, have entered into a certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement");

WHEREAS, the Second Lien Credit Agreement requires the Additional Guarantor to become a party to the Second Lien Credit Agreement; and

WHEREAS, the Additional Guarantor has agreed to execute and deliver this Joinder Agreement in order to become a party to the Second Lien Credit Agreement;

NOW, THEREFORE, IT IS AGREED:

1. Second Lien Credit Agreement. By executing and delivering this Joinder Agreement, the Additional Guarantor, as provided in Section 10.08 of the Second Lien Credit Agreement, hereby becomes a party to the Second Lien Credit Agreement as a Guarantor thereunder with the same force and effect as if originally named therein as a Guarantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Guarantor thereunder.

2. Governing Law. THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW BUT INCLUDING SECTIONS 5-1401 and 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

[Remainder of Page intentionally left blank]

**JX 115-98**

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GUARANTOR]

By: _____
     Name:
     Title:

**JX 115-99**

EXHIBIT I

Form of Compliance Certificate

COMPLIANCE CERTIFICATE

Date of Certificate:           , 20

To:  JPP, LLC, as Agent
     c/o ESL Investments, Inc.,
     1170 Kane Concourse, Suite 200
     Bay Harbor Islands, FL 33154
     Attention: Edward S. Lampert, CEO

Ladies and Gentlemen:

Reference is made to a certain Second Lien Credit Agreement, dated as of September 1, 2016 (as modified, amended, supplemented or restated and in effect from time to time, the "Credit Agreement") by, among others, Sears Holdings Corporation, a Delaware corporation ("Holdings"), Sears Roebuck Acceptance Corp., a Delaware corporation, and Kmart Corporation, a Michigan corporation (individually, a "Borrower", and collectively, the "Borrowers"), the lenders from time to time party thereto and JPP, LLC, a Delaware limited liability company, as administrative agent and collateral administrator (the "Agent"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned, as a duly authorized and acting Authorized Officer of Holdings, hereby certifies on behalf of Holdings and each of the other Loan Parties as of the date hereof the following:

1.   No Defaults or Events of Default.

     (a)  Since               (the date of the last similar certification), and except as set forth in Appendix I, no Default or Event of Default has occurred.

     (b)  If a Default or Event of Default has occurred since               (the date of the last similar certification), the Loan Parties have taken or propose to take those actions with respect to such Default or Event of Default as described on said Appendix I.

2.   Financial Calculations.

     (a)  Attached hereto as Appendix IIA are reasonably detailed calculations necessary to determine the Fixed Charge Ratio as of the last day of the [fiscal quarter][fiscal year] ended               (whether or not compliance therewith is then required under Section 6.03 of the Credit Agreement).

     (b)  Attached hereto as Appendix IIB are reasonably detailed calculations necessary to determine Excess Cash Flow for the fiscal year ended               .[15]

_____

[15]   Include only with fiscal year-end financial statements

JX 115-100

3.   Financial Statements.

[*Use following paragraph (a) for fiscal quarter-end financial statements*]

(a)   Attached hereto as Appendix III are the unaudited consolidated balance sheet of Holdings and its Subsidiaries for the fiscal quarter ended                    , and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such fiscal quarter, and the consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter (or if not attached, a copy of the quarterly report filed with the SEC on form 10-Q, reflecting such consolidated balance sheets and consolidated statements of income and cash flows, has been delivered to the Agent in accordance with Section 9.02(b) of the Credit Agreement).

[*Use following paragraphs (b) and (c) for fiscal year-end financial statements*]

(b)   Attached hereto as Appendix III are the audited consolidated balance sheet of Holdings and its Subsidiaries for the fiscal year ended                    , and the consolidated statements of income and cash flows of Holdings and its Subsidiaries for such fiscal year, accompanied by a report without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, which report has been prepared by a Board-appointed auditor of national standing (or if not attached, a copy of the annual report filed with the SEC on form 10-K, reflecting such consolidated balance sheet and consolidated statements of income and cash flows of Holdings and its Subsidiaries, has been delivered to the Agent in accordance with Section 9.02(b) of the Credit Agreement).

(c)   Attached hereto as Appendix IV are the unaudited consolidated balance sheet of Holdings and its domestic Subsidiaries for the fiscal year ended                    , and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for such fiscal year.

4.   No Material Accounting Changes, Etc.

(a)   The financial statements furnished to the Agent for the [fiscal quarter/fiscal year] ended                    were prepared in accordance with GAAP.

(b)   Except as set forth in Appendix V, there has been no change in GAAP used in the preparation of the financial statements furnished to the Agent for the [fiscal quarter/fiscal year] ended                    . If any such change has occurred, a statement of reconciliation conforming such financial statements to GAAP is attached hereto in Appendix V if necessary for the calculation of the Fixed Charge Ratio.

5.   Collateral Coverage.

(a)   Set forth below are the Borrowing Base and the Total Extensions of Credit as of the last day of the [fiscal quarter][fiscal year] ended                    .

Borrowing Base:                    _____

Total Extensions of Credit:        _____

*[Signature page follows]*

**JX 115-102**

IN WITNESS WHEREOF, a duly authorized and acting Authorized Officer of Holdings, on behalf of Holdings and each of the other Loan Parties, has duly executed this Compliance Certificate as of          , 20   .

HOLDINGS:

SEARS HOLDINGS CORPORATION

By:                    _____
Name:
Title:

**JX 115-103**

APPENDIX I

Except as set forth below, no Default or Event of Default has occurred. [If a Default or Event of Default has occurred, the following describes the nature of the Default or Event of Default in reasonable detail and the steps, if any, being taken or contemplated by the Loan Parties to be taken on account thereof.]

JX 115-104

APPENDIX IIA

A. <u>Calculation of Fixed Charge Ratio</u>: Required whether or not compliance under Section 6.03 of the Credit Agreement is then required. Calculated for the most recently ended four fiscal quarters.

1.   Adjusted Consolidated EBITDA[16] for such period (all calculated on a Consolidated basis in accordance with GAAP (excluding any non-cash income already deducted from Consolidated Net Income in the calculation of Adjusted Consolidated EBITDA in a prior period)):

   (a)   Consolidated Net Income for such period:                           _____

         <u>Plus</u> the following, without duplication and to extent deducted in determining
         Consolidated Net Income for such period:

   (b)   Consolidated Interest Expense for such period:                     _____

   (c)   income tax expense for such period:                                _____

   (d)   all amounts attributable to depreciation and amortization expense for such period:   _____

   (e)   any items of loss resulting from the sale of assets other than in the ordinary course of
         business for such period:                                          _____

   (f)   any non-cash charges for tangible or intangible impairments or asset write downs for such
         period (excluding any write downs or write-offs of Inventory other than write-downs or
         write-offs of Inventory related to up to 100 store closings in any four consecutive fiscal
         quarters):                                                         _____

   (g)   any other non-cash charges for such period (including non-cash charges arising from
         share-based payments to employees or directors, but excluding (1) any non- cash charge
         already added back to Consolidated Net Income in the calculation of Adjusted
         Consolidated EBITDA in a prior period, (2) any non-cash charge that

───────────────
[16]   For the purposes of calculating Adjusted Consolidated EBITDA in connection with any determination of the Fixed Charge Ratio, (i) if at any time during the applicable four-quarter period, Holdings or any of its Subsidiaries shall have made any Material Disposition, the Adjusted Consolidated EBITDA for such fiscal quarter shall be reduced by an amount equal to the Adjusted Consolidated EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such period or increased by an amount equal to the Adjusted Consolidated EBITDA (if negative) attributable thereto for such fiscal period and (ii) if at any time during the applicable four-quarter period, Holdings or any of its Subsidiaries shall have made a Material Acquisition, Adjusted Consolidated EBITDA for such period shall be calculated after giving pro forma effect thereto as if such Material Acquisition occurred on the first day of such period. As used in this definition, "Material Acquisition" means any acquisition of property or series of related acquisitions of property that (a) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Person and (b) involves the payment of consideration by Holdings and its Subsidiaries in excess of $100,000,000; and "Material Disposition" means any Disposition of property or series of related Dispositions of property that yields gross proceeds to Holdings or any of its Subsidiaries in excess of $100,000,000.

relates to the write-down or write-off of Inventory other than write-downs or write-offs of Inventory related to up to 100 store closings in any four consecutive fiscal quarters, and (3) non-cash charges for which a cash payment is required to be made in that or any other period):

_____

<u>Minus</u> the following, without duplication and to the extent included in Consolidated Net Income for such period:

(h)    any items of gain resulting from the sale of assets other than in the ordinary course of business for such period:

_____

(i)    any cash payments made during such period in respect of non-cash charges described in Line 1(g) above taken in a prior period:

_____

(j)    any non-cash items of income for such period:

_____

(k)    Adjusted Consolidated EBITDA [Line 1(a), plus the sum of Lines 1(b) through 1(g), minus the sum of Lines 1(h) through 1(j)]:

_____

2.    <u>Minus the following</u>:

(a)    the unfinanced portion of Capital Expenditures made during such period (but including Capital Expenditures financed with proceeds of the revolving facility under the First Lien Credit Agreement):

_____

(b)    taxes paid in cash net of refunds during such period (but in no event less than zero):

_____

3.    Line 1(k), minus Lines 2(a) and 2(b):

_____

4.    Fixed Charges for such period (all calculated on a Consolidated basis):

(a)    Consolidated Interest Expense paid or payable in cash:

_____

       <u>Plus</u>

(b)    scheduled principal payments on Debt made during such period:

_____

       <u>Plus</u>

(c)    Capital Lease Obligation payments made during such period:

_____

(d)    Fixed Charges [The sum of Lines 4(a) through 4(c)]:

_____

5.    FIXED CHARGE RATIO AS OF THE FISCAL [QUARTER] [YEAR] ENDED [Line 3 divided by Line 4(d)]:

_____

B. <u>Fixed Charge Ratio Covenant</u>: During the continuance of a Covenant Compliance Event, each of Holdings and the Borrowers will not permit the Fixed Charge Ratio as of the last day of any fiscal quarter of Holdings to be less than 1.0 to 1.0.

1.    Is covenant required to be tested?                    Yes _____    No _____
2.    If covenant is required to be tested, in compliance?  Yes _____    No _____

<u>APPENDIX IIB</u>

A. <u>Calculation of Excess Cash Flow</u>: The sum, without duplication, of:

1. Consolidated Net Income for such fiscal year (excluding gains and losses from the sale of assets or businesses outside the ordinary course of business included in the calculation of such Consolidated Net Income):                                                                    $

   <u>Plus</u>

2. expenses reducing Consolidated Net Income incurred or made with respect to any Plan:           $

   <u>Plus</u>

3. depreciation, amortization and other non-cash charges reducing Consolidated Net Income (excluding any non-cash charges to the extent they represent an accrual or reserve for potential cash charges in any future period or amortization of a prepaid cash gain that was paid in a prior period and excluding any such charges which were excluded in the calculation of Consolidated Net Income as set forth in Line A.1. above):                                                                    $

4. The sum of Lines 1-3:                                                                    $

   <u>Minus the sum, without duplication, of the following</u>:

5. contributions made in cash to any Plan:                                                  $

   <u>Plus</u>

6. non-cash gains and other non-cash items increasing Consolidated Net Income (other than any such gains and items which were excluded in the calculation of Consolidated Net Income as set forth in Line A.1. above):                                                                    $

   <u>Plus</u>

7. the amount of scheduled payments and mandatory prepayments of principal, interest, fees, premiums and make whole or prepayment payments on account of Debt for borrowed money made in cash (excluding any repayments of Obligations and of prepayments of any revolving credit facility (unless there is an equivalent permanent reduction in the commitments thereunder and excluding any such payments or prepayments to the extent financed with the proceeds of Debt)), and scheduled payments and mandatory prepayments of Capital Lease Obligations (excluding any interest expense portion thereof deducted in the calculation of Consolidated Net Income and excluding any such payments or prepayments to the extent financed with the proceeds of Debt):                                $

   <u>Plus</u>

8.  the amount of optional prepayments of principal on account of Priority Obligations or the Term Loan made in cash during such fiscal year (as a result of which, in the case of the repayments under any revolving credit facility, the revolving credit commitments have been permanently reduced correspondingly), except to the extent that such prepayments are funded with Debt:                    $

Plus

9.  Capital Expenditures made in cash during such fiscal year, except to the extent financed with the proceeds of Debt:                    $

Plus

10. the amount of Permitted Acquisitions and Permitted Investments (pursuant to clauses (d), (i), (o), (q) and (r) of the definition thereof) made in cash during such fiscal year, except to the extent financed with the proceeds of Debt:                    $

11. The sum of Lines 5-10:                    $

12. Excess Cash Flow (Line 4 minus Line 11):                    $

APPENDIX III

JX 115-110

APPENDIX IV

JX 115-111

APPENDIX V

JX 115-112

# Exhibit 77

EX-10.1

EX-10.1 2 d432379dex101.htm EX-10.1

<div align="right">**Exhibit 10.1**</div>

<div align="center">

**SECOND AMENDMENT TO
LETTER OF CREDIT AND REIMBURSEMENT AGREEMENT**

</div>

SECOND AMENDMENT TO LETTER OF CREDIT AND REIMBURSEMENT AGREEMENT (this "Amendment") dated as of August 1, 2017 between

SEARS HOLDINGS CORPORATION, a Delaware corporation ("Holdings"),

SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation, and KMART CORPORATION, a Michigan corporation (the "Borrowers"),

JPP, LLC and JPP II, LLC, as L/C Lenders, and

CITIBANK, N.A., as Administrative Agent (the "Agent") and Issuing Bank (the "Issuing Bank"),

in consideration of the mutual covenants herein contained and benefits to be derived herefrom.

<div align="center">

W I T N E S S E T H:

</div>

WHEREAS, Holdings, the Borrowers, the L/C Lenders party thereto, the Agent and the Issuing Bank, are party to that certain Letter of Credit and Reimbursement Agreement (as amended pursuant to that certain First Amendment to Letter of Credit and Reimbursement Agreement dated as of March 2, 2017, the "Existing LC Facility Agreement"; the Existing LC Facility Agreement as amended hereby, the "Amended LC Facility Agreement"); and

WHEREAS, Holdings, the Borrowers, the Required L/C Lenders, the Issuing Bank and the Agent have agreed to amend the Existing LC Facility Agreement.

NOW THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto hereby agree as follows:

1. Incorporation of Terms. All capitalized terms not otherwise defined herein shall have the same meaning as in the Existing LC Facility Agreement.

2. Representations and Warranties. Each Borrower hereby represents and warrants that (i) no Default or Event of Default exists under the Existing LC Facility Agreement or under any other Loan Document as of the date hereof, and (ii) all representations and warranties contained in the Amended LC Facility Agreement and the other Loan Documents are true and correct in all material respects as of the date hereof, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they are true and correct in all respects, and (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties are true and correct in all material respects as of such earlier date).

<div align="right">

**JX 116-1**

</div>

EX-10.1

3.  Release by Borrowers. Each Borrower hereby acknowledges and agrees that it has no actual knowledge of any defenses or claims against any L/C Lender, the Agent, the Issuing Bank, any of their Affiliates, or any of their respective officers, directors, employees, attorneys, representatives, predecessors, successors, or assigns with respect to the Obligations, and that if such Borrower now has, or ever did have, any defenses or claims with respect to the Obligations against any L/C Lender, the Agent, the Issuing Bank or any of their respective officers, directors, employees, attorneys, representatives, predecessors, successors, or assigns, whether known or unknown, at law or in equity, from the beginning of the world through this date and through the time of effectiveness of this Amendment, all of them are hereby expressly **WAIVED**, and each Borrower hereby **RELEASES** each L/C Lender, the Agent, the Issuing Bank and their respective officers, directors, employees, attorneys, representatives, predecessors, successors, and assigns from any liability therefor.

4.  Amendments to Existing LC Facility Agreement. The Existing LC Facility Agreement is hereby amended to delete the red stricken text (indicated textually in the same manner as the following example: stricken text) and to add the blue double-underlined text (indicated textually in the same manner as the following example: double-underlined) as set forth in the pages of the Amended LC Facility Agreement attached as Annex A hereto. Except as provided herein and in the Amended LC Facility Agreement, all of the terms and conditions of the Existing LC Facility Agreement shall remain in full force and effect.

5.  Conditions to Effectiveness. This Amendment shall become effective on the date (the "Amendment No. 2 Effective Date") that each of the following conditions precedent has been fulfilled as determined by the Agent:

    a.  This Amendment shall have been duly executed and delivered by Holdings, the Borrowers, each L/C Lender, the Issuing Bank and the Agent, and the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

    b.  The Agent's receipt of the following, each of which shall be originals or pdf copies (followed promptly by originals) unless otherwise specified, each properly executed by an Authorized Officer of the signing Loan Party (or, if applicable, the signing L/C Lender), each dated as of the Amendment No. 2 Effective Date (or, in the case of certificates of governmental officials, a recent date before the Amendment No. 2 Effective Date) and each in form and substance satisfactory to Agent:

        i.  a reaffirmation agreement (the "Amendment No. 2 Reaffirmation Agreement") reaffirming (i) the guaranty and the liens granted under the Guarantee and Collateral Agreement duly executed and delivered by each Loan Party party to the Guarantee and Collateral Agreement and (ii) the liens granted under the Collateral Agreement (as defined in the Amended LC Facility Agreement).

-2-

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-2**

EX-10.1

ii.    a perfection certificate with respect to the Borrowers and the other Loan Parties (the "<u>Amendment No. 2 Perfection Certificate</u>").

iii.    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Loan Party and each L/C Lender as the Agent may reasonably require evidencing (A) the authority of each Loan Party or L/C Lender to enter into this Amendment and the other documents or instruments executed or to be executed in connection with this Amendment to which such Loan Party or L/C Lender is a party or is to be a party and (B) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Amendment and such other documents to which such Loan Party is a party or is to be a party;

iv.    copies of each Loan Party's and L/C Lender's organization or other governing documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party or L/C Lender is duly organized or formed, and that each Loan Party or L/C Lender is validly existing and in good standing in its jurisdiction of organization;

v.    (A) an opinion of in house counsel to Holdings and of one or more special or local counsel to Holdings, the Borrowers, and the other Loan Parties, addressed to the Agent and each Lender as to such matters as the Agent may reasonably request and (B) an opinion of counsel to the L/C Lenders, addressed to the Agent and Issuing Bank as to such matters as the Agent may reasonably request;

vi.    a certificate signed by an Authorized Officer of Holdings and the Borrowers certifying (A) the conditions specified in Section 5.b. have been satisfied or will be substantially simultaneously with the Amendment No. 2 Effective Date, (B) the representations and warranties made by each Loan Party in or pursuant to this Amendment (including Sections 2, 5.c and 5.d hereof) and the other Loan Documents are true and correct on and as of the date hereof in all material respects, before and after giving effect to the Amendment, as though made on and as of such date, except to the extent that (a) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, and (b) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date), (C) both immediately before and immediately after giving effect to the

-3-

**JX 116-3**

EX-10.1

Amendment, no event has occurred and is continuing that constitutes a Default or an Event of Default, (D) that no Collateral Coverage Event (as defined in the Indenture for the Existing Second Lien Notes) shall exist as of the date hereof, (E) to the Solvency of the Loan Parties, taken as a whole, as of the Amendment No. 2 Effective Date after giving effect to the transactions contemplated hereby, (F) that the Amendment No. 2 Perfection Certificate is true and correct in all material respects, and (G) that attached to such certificates are the true and correct executed copies of the Guarantee and Collateral Agreement and the Existing Intercreditor Agreement;

vii.     results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Liens permitted by <u>Section 6.02(a)</u> of the Amended LC Facility Agreement;

viii.    such other customary certificates, documents or consents as the Agent reasonably may require; and

ix.      an Existing Agent Acknowledgement and Consent, duly executed by the Existing Agent and Holdings, and the Borrowers.

c.    Since January 30, 2017, there shall not have been any event, circumstance or effect that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

d.    After giving effect to this Amendment and the transactions contemplated hereunder, Capped Excess Availability shall not be less than $150,000,000.

e.    The Borrowers shall have paid all fees, expenses and other amounts due and owing to the Agent, the Issuing Bank and the L/C Lenders that have executed this Amendment.

6.    <u>Binding Effect</u>. The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto, the L/C Lenders, the Issuing Bank and their respective successors and assigns.

7.    <u>Expenses</u>. The Borrowers shall reimburse the Agent and the L/C Lenders for all reasonable and documented out-of-pocket expenses incurred in connection herewith, including, without limitation, reasonable attorneys' fees.

8.    <u>Multiple Counterparts</u>. This Amendment may be executed in multiple counterparts, each of which shall constitute an original and together which shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e. "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

-4-

**JX 116-4**

EX-10.1

9.  Governing Law. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

10. Jurisdiction. Section 9.11 of the Existing LC Facility Agreement is hereby incorporated by reference, mutatis mutandis, as if it were fully set forth in this Amendment.

11. **WAIVER OF JURY TRIAL. EACH OF HOLDINGS, THE BORROWERS, THE AGENT, THE ISSUING BANK AND THE L/C LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AMENDMENT OR THE OTHER LOAN DOCUMENTS OR THE ACTIONS OF THE AGENT, THE ISSUING BANK OR ANY L/C LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.**

12. L/C Lender Reaffirmation. Each L/C Lender hereby confirms its assignments, pledges and grants of security interests, as applicable, under the Cash Collateral Agreement, and agrees that such assignments, pledges and grants of security interests shall continue to be in full force and effect, shall continue to secure full payment and performance of the "Obligations" (as defined in the Cash Collateral Agreement), and shall accrue to the benefit of the Secured Party for its benefit and the benefit of the Agent and the Issuing Bank.

13. No Novation. Neither this Amendment nor the Amended LC Facility Agreement shall extinguish the Obligations under and as defined in the Cash Collateral Agreement or discharge or release the priority of the Cash Collateral Agreement or any other security therefor. Nothing contained herein or in the Amended LC Facility Agreement shall be construed as a substitution or novation of the Obligations under and as defined in the Cash Collateral Agreement or instruments securing the same, which shall remain in full force and effect. Nothing implied in this Amendment, the Amended LC Facility Agreement or in any other document contemplated hereby or thereby shall be construed as a release or other discharge of any L/C Lender from any of its Obligations under and as defined in the Cash Collateral Agreement.

[Remainder of page intentionally left blank; Signature pages follow.]

-5-

**JX 116-5**

EX-10.1

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by each of the parties hereto as of the date first above written.

HOLDINGS:

**SEARS HOLDINGS CORPORATION**

By:    /s/ Robert A. Riecker
Name:  Robert A. Riecker
Title:   Chief Financial Officer

BORROWERS:

**SEARS ROEBUCK ACCEPTANCE CORP.**

By:    /s/ Robert A. Riecker
Name:  Robert A. Riecker
Title:   Vice President, Finance

**KMART CORPORATION**

By:    /s/ Robert A. Riecker
Name:  Robert A. Riecker
Title:   Controller and Head of Capital Markets Activities

[Signature page to LC and Reimbursement Agreement Amendment]

**JX 116-6**

EX-10.1

<div style="text-align: right">

**Citibank, N.A.,** as Agent and as Issuing Bank

By:  /s/ David L. Smith
Name: David L. Smith
Title: Vice President and Director

</div>

[Signature page to LC and Reimbursement Agreement Amendment]

**JX 116-7**

EX-10.1

**JPP, LLC,** as an L/C Lender

By:  /s/ Edward S. Lampert
       Name: Edward S. Lampert
       Title: Member

[*Signature page to LC and Reimbursement Agreement Amendment*]

**JX 116-8**

EX-10.1

**JPP II, LLC,** as an L/C Lender

By: RBS Partners, L.P., as Manager

By: ESL Investments, Inc., as General Partner

By:  /s/ Edward S. Lampert
      Name: Edward S. Lampert
      Title: Chairman and Chief Executive Officer

[*Signature page to LC and Reimbursement Agreement Amendment*]

**JX 116-9**

EX-10.1

Annex A

Conformed LC Facility Agreement

[See Attached]

**JX 116-10**

EX-10.1

---

# LETTER OF CREDIT AND REIMBURSEMENT AGREEMENT

dated as of December 28, 2016

as amended March 2, 2017

as amended August 1, 2017

among

## SEARS HOLDINGS CORPORATION

and

## SEARS ROEBUCK ACCEPTANCE CORP.

and

## KMART CORPORATION,

as Borrowers

and

## CERTAIN FINANCIAL INSTITUTIONS,

as L/C Lenders

and

## CITIBANK, N.A.,

as Administrative Agent and Issuing Bank

JX 116-11

EX-10.1

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** | | 2 |
| Section 1.01 | Certain Defined Terms | 2 |
| Section 1.02 | Computation of Time Periods | 35 |
| Section 1.03 | Accounting Terms | 35 |
| Section 1.04 | Other Interpretive Provisions | 36 |
| Section 1.05 | Change of Currency | ~~34~~36 |
| **ARTICLE II Payments; Taxes; Lender Cash Collateral Account; Etc.** | | ~~35~~37 |
| Section 2.01 | [Reserved] | ~~35~~37 |
| Section 2.02 | [Reserved] | ~~35~~37 |
| Section 2.03 | [Reserved] | ~~35~~37 |
| Section 2.04 | [Reserved] | ~~35~~37 |
| Section 2.05 | Fees | ~~35~~37 |
| Section 2.06 | Optional Termination or Reduction of the L/C Commitments | 38 |
| Section 2.07 | ~~[Reserved]~~Reduction or Termination of the L/C Commitments | 38 |
| Section 2.08 | [Reserved] | 38 |
| Section 2.09 | [Reserved] | 38 |
| Section 2.10 | [Reserved] | 38 |
| Section 2.11 | Mandatory Reduction of L/C Commitments | 38 |
| Section 2.12 | Increased Costs | 39 |
| Section 2.13 | [Reserved] | 40 |
| Section 2.14 | Payments and Computations | 40 |
| Section 2.15 | Taxes | ~~39~~41 |
| Section 2.16 | Sharing of Payments, Etc. | 45 |
| ~~Section 2.17~~ | ~~Increase of L/C Commitments~~ | ~~43~~ |
| **ARTICLE III AMOUNT AND TERMS OF THE LETTERS OF CREDIT** | | 46 |
| Section 3.01 | L/C Commitment | 46 |
| Section 3.02 | Procedure for Issuance of Letter of Credit | ~~45~~47 |
| Section 3.03 | Fees and Other Charges | 48 |
| Section 3.04 | Letter of Credit Participations | 48 |
| Section 3.05 | Reimbursement Obligation of the Borrowers | 50 |
| Section 3.06 | Obligations Absolute | 50 |
| Section 3.07 | Letter of Credit Payments | ~~48~~50 |
| Section 3.08 | Applications | ~~48~~51 |
| Section 3.09 | Use of Letters of Credit | ~~48~~51 |
| Section 3.10 | Currency Equivalents Generally; Exchange Rates | 51 |
| Section 3.11 | Borrowers Cash Collateral | ~~49~~52 |
| Section 3.12 | Replacement and Cancellation of Letters of Credit | 53 |
| **ARTICLE IV CONDITIONS TO EFFECTIVENESS** | | 53 |
| Section 4.01 | Conditions Precedent to Effectiveness | 53 |
| Section 4.02 | Conditions Precedent to Each Issuance of a Letter of Credit | 55 |

i

**JX 116-12**

EX-10.1

ARTICLE V REPRESENTATIONS AND WARRANTIES                                                56
        Section 5.01        Representations and Warranties of the Borrowers                56
        Section 5.02        Representations and Warranties of the Lenders                  62

ARTICLE VI COVENANTS                                                                      62
        Section 6.01        Affirmative Covenants                                          62
        Section 6.02        Negative Covenants                                            ~~67~~70
        Section 6.03        Financial Covenant                                            ~~72~~76

ARTICLE VII EVENTS OF DEFAULT                                                             ~~72~~76
        Section 7.01        Events of Default                                             ~~72~~76

ARTICLE VIII THE AGENT                                                                    ~~76~~79
        Section 8.01        Appointment                                                   ~~76~~79
        Section 8.02        Delegation of Duties                                          ~~76~~80
        Section 8.03        Exculpatory Provisions                                        ~~76~~80
        Section 8.04        Reliance by Agent                                             ~~77~~80
        Section 8.05        Notice of Default                                             ~~77~~81
        Section 8.06        Non-Reliance on Agent and Other Lenders                       ~~77~~81
        Section 8.07        Reports and Financial Statements                              ~~78~~82
        Section 8.08        Indemnification                                               ~~78~~82
        Section 8.09        Agent in Its Individual Capacity                              ~~79~~83
        Section 8.10        Successor Agent                                               ~~79~~83
        Section 8.11        [Reserved]                                                    ~~80~~83
        Section 8.12        [Reserved]                                                    ~~80~~83

ARTICLE IX MISCELLANEOUS                                                                  ~~80~~84
        Section 9.01        Amendments, Etc.                                              ~~80~~84
        Section 9.02        Notices, Etc.                                                 ~~82~~86
        Section 9.03        No Waiver; Remedies                                           ~~83~~87
        Section 9.04        Costs and Expenses                                            ~~84~~88
        Section 9.05        Right of Set-off                                              ~~85~~89
        Section 9.06        Binding Effect; Effectiveness                                 ~~85~~89
        Section 9.07        Assignments and Participations                                ~~85~~89
        Section 9.08        Confidentiality                                               ~~89~~93
        Section 9.09        Governing Law                                                 ~~89~~93
        Section 9.10        Execution in Counterparts                                     ~~89~~93
        Section 9.11        Jurisdiction, Etc.                                            ~~90~~94
        **Section 9.12**    **WAIVER OF JURY TRIAL**                                      ~~90~~94
        Section 9.13        Release of Collateral or Guarantee Obligation                 ~~90~~94
        Section 9.14        PATRIOT Act Notice                                            ~~91~~96
        Section 9.15        Integration                                                   ~~91~~96
        Section 9.16        Replacement of L/C Lenders                                     ~~92~~96
        Section 9.17        No Advisory or Fiduciary Capacity                             ~~92~~97
        Section 9.18        Acknowledgement and Consent to Bail-In of EEA Financial Institutions  ~~93~~97

ii

**JX 116-13**

EX-10.1

Section 9.19     Reinstatement                              ~~94~~98
Section 9.20     Existing Agent Acknowledgment              99
Section 9.21     Cash Collateral of L/C Lenders             99

iii

**JX 116-14**

EX-10.1

SCHEDULES

Schedule 1.01(a)          Lenders; L/C Commitments
Schedule 1.01(b)          ~~Real Estate Collateral~~Existing Letters of Credit
Schedule 5.01(n)          Pension Plan Issues
Schedule 5.01(p)          UCC Financing Statements; Control Agreements
Schedule 5.01(t)          Labor Matters
Schedule 5.01(aa)         Bank Products and Cash Management Services
Schedule 6.02(k)(ii)      Investment Policy

EXHIBITS

Exhibit A        Form of Assignment and Acceptance
Exhibit B        Form of Compliance Certificate
Exhibit C        Form of Existing Agent Acknowledgement and Consent

iv

**JX 116-15**

EX-10.1

LETTER OF CREDIT AND REIMBURSEMENT AGREEMENT (this "Agreement") dated as of December 28, 2016, as amended March 2, 2017 (the "Amendment No. 1 Effective Date") as further amended August 1, 2017 (the "Amendment No. 2 Effective Date"), among SEARS HOLDINGS CORPORATION, a Delaware corporation ("Holdings"), SEARS ROEBUCK ACCEPTANCE CORP., a Delaware corporation ("SRAC"), KMART CORPORATION, a Michigan corporation ("Kmart Corp."), CITIBANK, N.A. (the "Bank"), as administrative agent (in such capacity, the "Agent"), and as the Issuing Bank (as further defined below, the "Issuing Bank") and financial institutions from time to time party hereto as L/C lenders (each an "L/C Lender").

W I T N E S S E T H:

WHEREAS, Holdings, SRAC, Kmart Corp., Wells Fargo Bank, National Association (f/k/a Wells Fargo Retail Finance, LLC) and Bank of America, N.A., as co-collateral agents (together with their successors and permitted assigns under the Existing Credit Agreement, the "Co-Collateral Agents"), and Bank of America, N.A., as administrative agent (the "Existing Agent"), are party to that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended by the First Amendment to the Third Amended and Restated Credit Agreement, dated as of, April 8, 2016, the "Existing Credit Agreement");

WHEREAS, the Existing Credit Agreement was amended on February 10, 2017, pursuant to the Second Amendment to the Third Amended and Restated Credit Agreement (as amended, supplemented or otherwise modified from time to time consistent with the terms of this Agreement, the "Amended Credit Agreement");

WHEREAS, the ABL Obligations are secured by the ABL Collateral;

WHEREAS, each Borrower has requested that (a) the Issuing Bank issue Letters of Credit for its account or the account of its subsidiaries pursuant to the terms of this Agreement and (b) on and after the Effective Date, this Agreement, the Letters of Credit issued hereunder, and all other Obligations shall be designated as, and shall constitute, Bank Products and an Other LC Facility under the Existing Credit Agreement; and

WHEREAS, the Existing Agent and the Loan Parties have agreed that this Agreement, the Letters of Credit issued hereunder, and all other Obligations constitute "Bank Products," an "Other LC Facility" and "Obligations" as each such term is defined under the Existing Credit Agreement.

WHEREAS, it is a condition to the obligations of the Issuing Bank and the L/C Lenders to provide extensions of credit hereunder that the Obligations be secured by a first priority security interest in the ABL Collateral, subject to the ABL Loan Documents, and that each of the L/C Lenders maintains at all times an amount in the Lender Cash Collateral Account of such L/C Lender equal to or greater than one hundred two percent (102%) of the L/C Commitment of such L/C Lender;

WHEREAS, concurrently herewith, the Loan Parties party to the Guarantee and Collateral Agreement will execute and deliver the Reaffirmation Agreement;

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-16**

EX-10.1

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

<div align="center">

**ARTICLE I**
**DEFINITIONS AND ACCOUNTING TERMS**

</div>

Section 1.01 <u>Certain Defined Terms</u>. For each term defined herein by reference to the Existing Credit Agreement as in effect on the Effective Date, (i) each capitalized term used in such definition in the Existing Credit Agreement shall, for purposes of this Agreement and the other Loan Documents, have the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date and (ii) <u>subject to the proviso at the end of Section 9.01,</u> such definitions shall continue to apply for purposes of the Loan Documents regardless of whether the Existing Credit Agreement or any other ABL Loan Document is terminated, replaced, or refinanced, and regardless of whether the Obligations thereunder have been paid in full or discharged. As used in this Agreement (including the preamble and the recitals), the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>ABL Advances</u>" means the "Advances" as defined in the Existing Credit Agreement as in effect on the Effective Date.

"<u>ABL Collateral</u>" means the "Collateral" as defined in the Existing Credit Agreement as in effect on the Effective Date.

"<u>ABL Lenders</u>" means the "Lenders" as defined in the Existing Credit Agreement as in effect on the Effective Date.

"<u>ABL Loan Documents</u>" means the "Loan Documents" as defined in the Existing Credit Agreement as in effect on the Effective Date.

"<u>ABL Loan Parties</u>" means each Group Member that is a party to an ABL Loan Document.

"<u>ABL Obligations</u>" means the "Obligations" as defined in the ~~Existing~~ Amended Credit Agreement ~~as in effect on the Effective Date~~.

"<u>Accelerated Borrowing Base Delivery Event</u>" has the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date.

"<u>Acquisition</u>" means, with respect to any Person (a) a purchase of a controlling interest in, the equity interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a controlling interest in the equity interests, of any Person, in each case in any transaction or group of transactions which are part of a common plan.

<div align="center">2</div>

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

<div align="right">

**JX 116-17**

</div>

EX-10.1

"Additional ABL Availability Amount" means any increase in availability under the revolving facility of the Existing Credit Agreement above the amount reported in the borrowing base certificate most recently delivered to the Co-Collateral Agents prior to the Effective Date (the "Specified BBC"), other than increases arising solely as a result of (i) increases or decreases in usage of, and/or borrowings and repayments under, the Existing Credit Agreement or (ii) changes resulting from the Borrowers' delivery of Borrowing Base Certificates after the Effective Date that calculate availability in a manner consistent with, and including reserve amounts equal to or greater than (on a percentage or absolute basis, as applicable) those reported in, the Specified BBC, in each case without giving effect to any amendments, consent or waivers to the Existing Credit Agreement. "Adjusted Consolidated EBITDA" has the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"Agent" has the meaning provided in the preamble to this Agreement, or any successor thereto.

"Agent's Account" means an account maintained by the Agent and designated from time to time by the Agent in writing to the Borrowers and the L/C Lenders.

"Aggregate L/C Commitments" means, at any time, the sum of the L/C Commitments of all the L/C Lenders at such time. As of the Amendment No. 2 Effective Date, the Aggregate L/C Commitments are $200,000,000. two hundred seventy one million sixty-seven thousand dollars ($271,067,000).

"Alternative Currency" means any currency other than Dollars.

"Alternative Currency Equivalent" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Agent or the Issuing Bank, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"Amendment No. 1 Effective Date" has the meaning provided in the preamble to this Agreement.

"Amendment No. 2 Effective Date" has the meaning provided in the preamble to this Agreement.

"Applicable Office" means, with respect to each Lender, the office of such Lender specified as its "Applicable Office" on the signature pages hereof or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrowers and the Agent.

3

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-18**

EX-10.1

"Application" means an application, in such form as the Issuing Bank may specify from time to time, requesting the Issuing Bank to open a Letter of Credit.

"Approved Fund" means any Fund that is administered or managed by (a) an L/C Lender, (b) an Affiliate of an L/C Lender or (c) an entity or an Affiliate of an entity that administers or manages an L/C Lender.

"Assignment and Acceptance" means an assignment and acceptance entered into by an L/C Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit A hereto or such other form as the Agent may agree in its discretion.

"Authorized Officer" means, (i) as to Holdings, any Borrower or any other Loan Party, its president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance, executive vice president, finance or any other person designated by it and acceptable to the Agent and (ii) as to any L/C Lender its member, manager, president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance, executive vice president, finance or any other person designated by it and acceptable to the Agent. Any document delivered hereunder that is signed by an Authorized Officer of a Loan Party or L/C Lender shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party or L/C Lender, as applicable and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Loan Party or L/C Lender, as applicable.

"Available L/C Commitment" means as to any L/C Lender at any time, an amount equal to the excess, if any, of (a) such L/C Lender's L/C Commitment then in effect over (b) such L/C Lender's L/C Extensions of Credit then outstanding.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank" has the meaning provided in the preamble to this Agreement, and its successors.

"Bank Product" has the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the NYFRB Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month interest period) plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by the Bank as its "prime rate." The "prime rate" is a rate set by the Bank based upon various factors including the Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

4

**JX 116-19**

EX-10.1

---

"Borrower Information" has the meaning specified in Section 9.08.

"Borrowers" means, collectively, SRAC and Kmart Corp.~~; provided that in the event SRAC is dissolved, merged with and into Holdings or any Subsidiary of Holdings or otherwise ceases to exist in accordance with Section 6.01(d), then Holdings shall designate that Holdings or a direct wholly owned Domestic Subsidiary of Holdings become a Borrower for all purposes of the Loan Documents~~.

"Borrowing Base" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Borrowing Base Certificate" means a certificate, signed by an Authorized Officer of Holdings, substantially in the form delivered from time to time pursuant to the Existing Credit Agreement.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York, New York or Boston, Massachusetts or, in the case of matters relating to SRAC, Greenville, Delaware or, in the case of matters relating to Kmart Corp., Detroit, Michigan.

"Capital Expenditures" means, with respect to any Person for any period, all cash expenditures made or costs incurred for the acquisition or improvement of fixed or capital assets of such Person, in each case that are (or should be) set forth as capital expenditures in a consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capped Excess Availability" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Cash Collateral Agreement" means ~~a Cash Collateral Agreement in respect of the Lender Cash Collateral Accounts, duly executed by each L/C Lender, the Issuing Bank and the Collateral Agent (as defined in the Cash Collateral Agreement):~~ the Cash Collateral Agreement, dated as of December 28, 2016 (without regard to any amendments thereto, the "Original Cash Collateral Agreement"), among the L/C Lenders from time to time party thereto, Citibank, N.A., as secured party, and Citibank, N.A., acting through its Agency and Trust Division, as collateral agent, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, including in connection with the joinder of additional L/C Lenders, in the case of any such amendment, amendment and restatement, supplement or other modification, in form

5

**JX 116-20**

EX-10.1

and substance reasonably acceptable to the Agent, the Issuing Bank and the L/C Lenders party thereto (it being understood and agreed that the terms and conditions of the Original Cash Collateral Agreement are acceptable to the Agent and the Issuing Bank).

"Cash Collateralize" means, in respect of an obligation, provide and pledge (as a first priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to the Agent and the Issuing Bank (and "Cash Collateralization" and "Cash Collateralizing" have corresponding meanings).

"Cash Equivalents" means investments of Holdings and its Subsidiaries recorded as cash or cash equivalents in accordance with GAAP.

"Cash Management Services" has the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date.

"Co-Collateral Agents" has the meaning set forth in the recitals to this Agreement.

"Collateral" means (a) the ABL Collateral, (b) cash collateral provided by the Borrowers pursuant to the terms hereof (including Section 3.11), (c) from and after the delivery of Mortgages with respect to the Real Estate Collateral, the Real Estate Collateral the "Collateral" as defined in the Collateral Agreement and (d) all other property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is created or purported to be created by any Security Document.

"Collateral Agreement" means the Collateral Agreement, dated as of June 21, 2017, among Sears Holdings Management Corporation, as a grantor, the other grantors from time to time party thereto, Holdings, the Borrowers, and the Agent.

"Collateral Coverage Event" shall have the meaning assigned to such term in the Indenture for the Existing Second Lien Notes.

"Commonly Controlled Entity" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"Consolidated" refers to the consolidation of accounts of Holdings and its Subsidiaries in accordance with GAAP and as presented on a GAAP basis.

"Consolidated Interest Expense" means for any period for any Person, total interest expense of such Person (including that attributable to Capital Lease Obligations and other expenses classified as interest expense in accordance with GAAP) on a Consolidated basis with respect to all outstanding Debt of such Person, as determined in accordance with GAAP.

"Covenant Compliance Event" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

6

**JX 116-21**

"Credit Card Program Assets" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Credit Card Program Documents" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Credit Card Royalty Securitization" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Credit Card Royalty Securitization Subsidiary" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Credit Party" or "Credit Parties" means (a) individually, (i) each L/C Lender and its Affiliates, (ii) the Agent, (iii) the Issuing Bank, and (iv) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"DC" means any distribution center owned or leased and operated by any Loan Party.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money (excluding interest payable thereon unless such interest has been accrued and added to the principal amount of such indebtedness), (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables incurred in the ordinary course of such Person's business and (ii) any such obligations which are due less than twelve months from the date of incurrence), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeals bonds arising in the ordinary course of business and other than the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business) or in respect of bankers' acceptances or letters of credit, (d) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all direct recourse payment obligations of such Person in respect of any accounts receivable sold by such Person, (g) all Debt of others referred to in clauses (a) through (f) above or clause (h) below and other payment obligations guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss, and (h) all Debt referred to in clauses (a) through (g) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

7

**JX 116-22**

EX-10.1

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"December Real Estate Loan" means that certain term Loan Agreement between JPP, LLC, JPP II, LLC, the Loan Parties and/or certain affiliates of the Loan Parties, dated on or about the Effective Date, secured by the Real Estate Collateral.as of January 3, 2017.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Designated Transaction Proceeds" means an amount equal to the sum of:

(i) 100% of the Net Proceeds from any issuance or incurrence of Debt for borrowed money by Holdings or any of its Subsidiaries other than (v) borrowings under the December Real Estate Loan, (w) any proceeds from any Permitted Refinancing Debt in respect of the Real Estate Term Loan, (x) borrowings under the existing revolving facility under the Existing Credit Agreement (without giving effect to any increase in the amount thereof after the date hereof), (y) Debt of Holdings or any of its Subsidiaries that is owing to Holdings or any of its Subsidiaries to the extent permitted to be incurred hereunder, and (z) amounts borrowed under commercial paper facilities; plus

(ii) 100% of the Net Proceeds from the sale or issuance of equity interests by and capital contributions to Holdings or any of its Subsidiaries other than (i) any sales or issuances of equity interests to or capital contributions from Holdings or any Subsidiary of Holdings (other than capital contributions from Holdings or any Subsidiary of Holdings made with the proceeds of equity issuance to Persons other than Holdings or any Subsidiary of Holdings), (ii) any issuance of directors' qualifying shares or (iii) any sales or issuances of equity interests of Holdings or any Subsidiary to management or employees of Holdings or such Subsidiary under any employee stock option or stock purchase plan or employee benefit plan in existence at the Effective Date; plus

(iii) 100% of the Net Proceeds from any Disposition pursuant to clause (g), (i) (if such Disposition is to a Person that is neither a Loan Party nor a Subsidiary of Holdings) or (p) of the definition of Permitted Dispositions; plus

(iv) 100% of the Additional ABL Availability Amount.

"Disposition" means any sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests).

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Agent or the Issuing Bank, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

8

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-23**

EX-10.1

"Dollars" and "$" refers to lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which each of the conditions precedent in Section 4.02 are4.01 were first satisfied (or waived by the Agent, the Issuing Bank and the L/C Lenders in accordance with Section 9.01)., such date being December 28, 2016.

"Eligible Assignee" means (a) a commercial bank or any other Person engaged in the business of making asset based or commercial loans, or any fund or other Person (other than a natural Person) that invests in loans, which bank, Person or fund, together with its Affiliates, has a combined capital and surplus in excess of $300,000,000 and which bank, Person or fund is a Lender (as defined in the Existing Credit Agreement) or Affiliate of a Lender (as defined in the Existing Credit Agreement) under the Existing Credit Agreement and makes the representations and warranties set forth in Section 5.02 hereof and in the Assignment and Acceptance and is approved by the Agent and the Issuing Bank or (b) an existing L/C Lender or an Affiliate of an existing L/C Lender or an Approved Fund; provided that neither Holdings, the Borrowers nor any of their respective Subsidiaries nor an Affiliate of Holdings, any Borrower or any of their respective Subsidiaries (other than the Permitted Holders) shall qualify as an Eligible Assignee.

"Eligible Inventory" has the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

9

**JX 116-24**

EX-10.1

"<u>Environmental Law</u>" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Holdings, the Borrowers, or any of their Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Environmental Permit</u>" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and issued thereunder.

"<u>ERISA Affiliate</u>" means any Person that for purposes of Title IV of ERISA is a member of any Borrower's controlled group, or under common control with such Borrower, within the meaning of Section 414 of the Internal Revenue Code.

"<u>ERISA Event</u>" means (a) (i) the occurrence of a Reportable Event, as defined herein, or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to Section 4043(b)(2)) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Sections 303(k) or 4068(a) of ERISA shall have been met with respect to any Plan; (g) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan, or (h) the Borrowers or any ERISA Affiliate incur liabilities under Section 4069 of ERISA.

10

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-25**

EX-10.1

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Eurodollar Rate" means, on any date, the rate per annum (which shall in no event be less than zero) equal to (i) ICE Benchmark Administration Limited ("ICE LIBOR"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the Agent from time to time) at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of ~~one month~~three months commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Agent (which shall in no event be less than zero) to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the outstanding Reimbursement Obligations and with a term equal to ~~one month~~three months would be offered by the Bank''s London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"Events of Default" has the meaning specified in Section 7.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in any L/C Extensions of Credit or L/C Commitment pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in such L/C Extensions of Credit or L/C Commitment (other than pursuant to an assignment request by the Borrower under Section 9.16) or (ii) in the case of a Lender, such Lender changes its Applicable Office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender''s assignor immediately before such Lender became a party hereto or changed its Applicable Office, (c) Taxes attributable to such Recipient''s failure to comply with Section 2.15(e), (f), or (g) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Agent" has the meaning set forth in the recitals to this Agreement.

"Existing Agent Acknowledgement and Consent" means an acknowledgment and consent executed by Holdings, the Borrowers, and Bank of America, N.A., in its capacity as the Existing Agent, substantially in the form of Exhibit C hereto.

"Existing Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"Existing Intercreditor Agreement" means the Amended and Restated Intercreditor Agreement, dated as of September 1, 2016, by and among the Co-Collateral Agents, as the ABL agents, and Wilmington Trust, National Association (as successor to Wells Fargo Bank, National Association), as the second lien agent.

11

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-26**

EX-10.1

"Existing Letters of Credit" means the letter of credit described on Schedule 1.01(b).

"Existing Second Lien Credit Agreement" means that Second Lien Credit Agreement, dated as of September 1, 2016, between Holdings, SRAC, Kmart Corp., the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator.

"Existing Second Lien Notes" means $301,000,000 aggregate principal amount of 6 5/8% Senior Secured Notes due 2018 of Holdings outstanding as of the Effective Date and any notes issued in exchange therefor pursuant to that certain Indenture, dated as of October 12, 2010, by and among Holdings and the guarantors party thereto and Wells Fargo Bank, National Association, as trustee and collateral agent.

"Facility Cap" means ~~five~~two hundred seventy one million sixty-seven thousand dollars ($~~500,000,000~~271,067,000).

"FATCA" means Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Fee Letter" means the Fee Letter dated the date hereof, among Holdings, the Borrowers, and Citigroup Global Markets Inc., as amended from time to time.

"Federal Funds Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate.

"Fixed Charge Ratio" means, the ratio, determined as of the end of each fiscal month of the Borrowers for the most recently ended twelve fiscal months, of (a) Adjusted Consolidated EBITDA minus the unfinanced portion of Capital Expenditures (but including Capital Expenditures financed with proceeds of ABL Advances made under the Existing Credit Agreement) minus taxes paid in cash net of refunds (but in no event less than zero), to (b) Fixed Charges, all calculated on a Consolidated basis in accordance with GAAP.

"Fixed Charges" means, with reference to any period, without duplication, Consolidated Interest Expense paid or payable in cash, plus scheduled principal payments on Debt made during such period, plus Capital Lease Obligation payments made during such period, all calculated on a Consolidated basis.

~~"Flood Compliance Documents" means, with respect to each Real Property Collateral, the following documents and instruments in form and substance in order to comply with the Flood Laws: (1) a completed life of loan standard flood hazard determination form addressed to the mortgagee or beneficiary under the Mortgage and otherwise complying with the Flood Laws, (2) if the improvements to the Real Property Collateral are located in a special flood hazard~~

12

**JX 116-27**

EX-10.1

area, a notification to such party as holds title to the applicable Real Property Collateral ("Borrower Notice") and, if applicable, notification to such party that flood insurance coverage under the National Flood Insurance Program is not available because the community does not participate in the such program, (3) documentation evidencing receipt by such party as holds title to the Real Property Collateral of the Borrower Notice and (4) if the Borrower Notice is required to be given and flood insurance is available in the community in which the Real Property Collateral is located, a copy of the flood insurance policy, the application by the party as holds title to the Real Property Collateral for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, and such other evidence of flood insurance reasonably requested by Agent for compliance with Flood Laws, each in a form and substance reasonably satisfactory to the Agent.

"Flood Laws" means, collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto and related legislation (including the regulations of the Board of Governors of the Federal Reserve System) and any substitution therefor and, if applicable, any regulations promulgated thereunder.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" has the meaning specified in Section 1.03.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members" means, collectively, Holdings, the Borrowers and their respective Subsidiaries.

"Guarantee and Collateral Agreement" means that certain Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, among the ABL Loan Parties and the Co-Collateral Agents.

"Hazardous Materials" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"Holdings" has the meaning provided in the preamble to this Agreement.

13

JX 116-28

EX-10.1

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Insolvency" means with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent" means pertaining to a condition of Insolvency.

"Intellectual Property" has the meaning set forth in the Guarantee and Collateral Agreement as in effect on the Effective Date.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Inventory" as defined in the UCC.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of equity interests of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Exposure" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired maximum amount of all then outstanding Letters of Credit (whether or not (i) such maximum amount is then in effect under any such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit or (ii) the conditions to drawing can then be satisfied), but excluding any such Letter of Credit that is backstopped by a Satisfactory Letter of Credit; plus (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed or discharged by (x) the Borrower, pursuant to Section 3.05, or (y) where the L/C Lenders have reimbursed the Issuing Bank, including where the Issuing Bank has reimbursed itself using funds on deposit in the Lender Cash Collateral Accounts pursuant to Section 3.04; provided that if any payment or withdrawal has been made and such payment is required to be rescinded, restored or returned upon the insolvency, bankruptcy, or reorganization of any Person or otherwise, such payment or withdrawal shall be deemed not to have occurred hereunder; plus (c) [reserved]; plus (d) the amount of Available L/C Commitments. For all purposes of this Agreement, (a) if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn, and (b) with respect to any references to the Issuer Exposure being "zero" or no longer "outstanding", the Available L/C Commitments referred to clause (d) hereof shall mean that all of the L/C Lenders' L/C Commitments shall have been terminated or shall have expired, and the obligation of the Issuing Bank to issue Letters of Credit pursuant to Section 3.01(a) has been terminated.

14

**JX 116-29**

EX-10.1

"Issuing Bank" means the Bank, it being understood that the Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by its Affiliates, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Kmart" means Kmart Holding Corporation, a Delaware corporation.

"Kmart Corp." has the meaning provided in the preamble to this Agreement.

"L/C Commitment" means, as to any L/C Lender, the obligation of such L/C Lender to participate in Letters of Credit in an aggregate principal amount up to (a) the amount set forth opposite such L/C Lender's name on Schedule 1.01(a) ~~as such amount may be increased from time to time in accordance with Section 2.17~~ or (b) if such L/C Lender has entered into any Assignment and Acceptance, the amount set forth for such L/C Lender in the Register maintained by the Agent pursuant to Section 9.07(d), in each case, as such amount may be reduced (i) pursuant to Section 2.06, (ii) by an amount equal to the amount by which any Letter of Credit has been drawn to the extent the Issuing Bank has been reimbursed for such drawing (including by (x) the Borrower, pursuant to Section 3.05, or (y) where the L/C Lenders have reimbursed the Issuing Bank, including where the Issuing Bank has reimbursed itself using funds on deposit in the Lender Cash Collateral Accounts pursuant to Section 3.04), (iii) by an amount equal to the face amount of any Letter of Credit that has been returned to ~~Citi~~the Agent for cancellation _prior to the L/C Termination Date_, unless a replacement therefor is issued ~~substantially simultaneously~~within 30 days thereof (but, in any event, prior to the L/C Termination Date) to the same or ~~a related~~similar beneficiary and the Required L/C Lenders have provided their consent in writing to the issuance of such replacement _(such consent not to be unreasonably conditioned, delayed or withheld); provided, that (x) the Agent shall promptly notify each L/C Lender that a Letter of Credit has been returned to it for cancellation and any L/C Lender may, by written notice to the Agent no later than three (3) Business Days after the date of such notification from the Agent (the "Reduction Election Period"), elect to waive any reduction of its L/C Commitment pursuant to this clause (iii) so long as the aggregate amount in such L/C Lender's Lender Cash Collateral Account would not be less than 102% of its L/C Commitment Percentage times the Issuer Exposure both immediately before and immediately after giving effect to such waiver and (y) no later than two (2) Business Days after the expiration of the Reduction Election Period, the Agent shall notify each L/C Lender of the election made by each other L/C Lender pursuant to the foregoing clause (x) and each L/C Lender may by written notice to the Agent no later than one (1) Business Day after the date of such notification from the Agent update such election so long as the aggregate amount in such L/C Lender's Lender Cash Collateral Account would not be less than 102% of its L/C Commitment Percentage times the Issuer Exposure both immediately before and immediately after giving effect to such election,_ (iv) by an amount equal to the face amount of any Letter of Credit that has expired _prior to the L/C Termination Date_, unless a replacement therefor is issued ~~substantially simultaneously~~within 30 days thereof (but, in any event, prior to the L/C Termination Date) to the same or a ~~related~~similar beneficiary and the Required L/C Lenders have provided their consent in writing to the issuance of such replacement_ (such consent not to be unreasonably conditioned, delayed or withheld)_, provided that, to the extent on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn, and (v) by the amount by which the face amount of any Letter of Credit has been permanently reduced.

15

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-30**

EX-10.1

"L/C Commitment Percentage" means, as to any L/C Lender at any time, the percentage which such L/C Lender's L/C Commitment then constitutes of the Aggregate L/C Commitments or, at any time after the Aggregate L/C Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such L/C Lender's participation in L/C Obligations constitutes of the aggregate principal amount of the L/C Obligations then outstanding.

"L/C Extension" means, with respect to any Letter of Credit, the issuance, extension of the expiry date, or the renewal or increase of the amount thereof.

"L/C Extensions of Credit" means as to any L/C Lender at any time, an amount equal to such L/C Lender's L/C Commitment Percentage of the Issuer Exposure (other than clause (d) of the definition thereof) then outstanding.

"L/C Lender Insolvency Event" means that (i) an L/C Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) such L/C Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such L/C Lender or its Parent Company, or such L/C Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment.

"L/C Lenders" means, collectively, any Persons signatory hereto as an L/C Lender, and each Person that shall become a party hereto as an L/C Lender pursuant to Section 9.07.

"L/C Lender Exposure" means at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired maximum amount of all then outstanding Letters of Credit (whether or not (i) such maximum amount is then in effect under any such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit or (ii) the conditions to drawing can then be satisfied), but excluding any such Letter of Credit that is backstopped by a Satisfactory Letter of Credit; plus (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed or discharged by the Borrower (including, pursuant to Section 3.05 (and, for the avoidance of doubt, in the case where the L/C Lenders have reimbursed the Issuing Bank, including where the Issuing Bank has reimbursed itself using funds on deposit in the Lender Cash Collateral Accounts pursuant to Section 3.04, such drawings under Letters of Credit shall be considered to not have been reimbursed or discharged by the Borrower)); plus (c)[reserved.]; plus (d) the amount of Available L/C Commitments. For all purposes of this Agreement, (aA) if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn, and (bB) with respect to any references to the L/C Lender Exposure being "zero" or no longer "outstanding", the Available L/C Commitments referred to clause (d) hereof shall mean that all of the L/C Lenders' L/C Commitments shall have been terminated or shall have expired, and the obligation of the Issuing Bank to issue Letters of Credit pursuant to Section 3.01(a) has been terminated, and (C) in no event shall the L/C Cash Collateral Account of an L/C Lender secure the L/C Lender Exposure of any other L/C Lender.

16

**JX 116-31**

EX-10.1

"L/C Obligations" means at any time, an amount equal to the sum of paragraphs (a) and (b) (but not (d)) of the definition of L/C Lender Exposure and all accrued and unpaid fees, taxes and expenses payable in connection with any Letter of Credit.

"L/C Termination Date" means ~~the first anniversary of the Effective Date~~ December 28, 2018.

"Lender Cash Collateral Account" means, with respect to any L/C Lender, the Applicable Account (as defined in the Cash Collateral Agreement) of such L/C Lender, and "Lender Cash Collateral Accounts" means, collectively, all such Applicable Accounts.

"Lenders" means the Issuing Bank and the L/C Lenders.

"Letters of Credit" means (a) the collective reference to irrevocable standby letters of credit under which the Issuing Bank agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member in respect of obligations of such Group Member incurred pursuant to contracts made or performances undertaken or to be undertaken or like matters relating to contracts to which such Group Member is or proposes to become a party, including, without limiting the foregoing, for insurance purposes or in respect of advance payments or as bid or performance bonds or for any other purpose for which a standby letter of credit might be issued and (b) the Existing Letters of Credit; individually, a "Letter of Credit".

"Lien" means any lien, security interest or other charge or encumbrance of any kind or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor, and any easement, right of way or other encumbrance on title to real property, but excluding consignments or bailments of goods of third parties and the interests of lessors under operating leases.

"Line Cap" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Loan Documents" means this Agreement, each Letter of Credit, ~~the~~ each Reaffirmation Agreement, the Existing Agent Acknowledgement and Consent, each Security Document, and any other document or instrument pursuant to this Agreement now or hereafter designated by the Borrowers and the Agent as a "Loan Document" and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties" means each ABL Loan Party and each other Group Member that is a party to a Loan Document.

17

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-32**

EX-10.1

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations or assets of Holdings and its Subsidiaries taken as a whole, or (b) the ability of the Loan Parties taken as a whole to perform their material obligations under the Loan Documents or (c) the validity or enforceability of the Loan Documents taken as a whole or the rights and remedies of the Co-Collateral Agents, the Agent, the Issuing Bank or the L/C Lenders thereunder taken as a whole (including, but not limited to, the enforceability or priority of any Liens granted to the Co-Collateral Agents under the ABL Loan Documents or to the Agent under the applicable Loan Documents).

"Material Subsidiary Guarantor" means a Subsidiary Guarantor that, at the time of determination, accounts for more than 5% of both the total assets and total revenues of Holdings on a consolidated basis (and, together with all other Material Subsidiary Guarantors accounts for more than 10% of both the total assets and total revenues of Holdings on a consolidated basis).

"Modified Borrowing Base" means, as of any date, the sum of (1) 90% of the book value (calculated in accordance with GAAP) of the accounts receivable of the Borrowers and Subsidiary Guarantors, on a consolidated basis, and (2) 75% of the book value (calculated in accordance with GAAP) of the inventory of the Borrowers and the Subsidiary Guarantors, on a consolidated basis. Unless otherwise specified, the Modified Borrowing Base shall refer to the Modified Borrowing Base as of the date set forth in the most recently delivered Modified Borrowing Base Certificate.

"Modified Borrowing Base Certificate" means a certificate, signed by an Authorized Officer of Holdings, certifying (1) the amount of the Modified Borrowing Base as of the date specified therein and (2) a calculation of the aggregate amount of the Obligations (as defined in the Guarantee and Collateral Agreement), other than ordinary course cash management obligations as of such date.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents or other security document granting a Lien on the Real Estate Collateral in favor of the Agent on behalf of the L/C Lenders and the Issuing Bank to secure the Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time and in form and substance reasonably satisfactory to the L/C Lenders, the Agent, the Issuing Bank and the Borrowers, provided that (i) Mortgages that are substantially similar to the mortgages delivered in connection with the December Real Estate Loan shall be deemed to be reasonably satisfactory and (ii) each Mortgage shall contain an automatic termination provision incorporating the provisions of Section 9.13(c) of this Agreement.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Holdings or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Holdings or any ERISA Affiliate and at least one Person other than Holdings and the ERISA Affiliates or (b) was so maintained and in respect of which Holdings or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

18

**JX 116-33**

"Net Proceeds" means, (a) with respect to any Disposition by Holdings or any of its Subsidiaries of any property or any casualty or condemnation of such property, the excess, if any, of (i) the sum of cash and cash equivalents received by Holdings or any of its Subsidiaries (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the out-of-pocket expenses incurred by Holdings or such Subsidiary in connection with such transaction (including, without limitation, attorneys' fees, accountants' fees, investment banking fees, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by Holdings or any of its Subsidiaries to third parties (other than Affiliates), (B) transfer taxes paid as a result thereof, (C) payments required to be made to governmental authorities and/or third parties in connection with such sale (including to obtain consents or approvals required for such sale) and amounts required by governmental authorities to be retained by applicable entities and (D) any Debt secured by such property that is required to be repaid from the proceeds of such sale (including, with respect to property that is collateral for the December Real Estate Loan, repayment of the December Real Estate Loan in an amount required pursuant to the terms of the December Real Estate Loan), and (b) with respect to any equity issuance, capital contribution and/or the incurrence of Debt for borrowed money by Holdings or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received by Holdings or any of its Subsidiaries in connection with such transaction over (ii) the underwriting discounts and commissions, and other out-of-pocket expenses, incurred by Holdings or any of its Subsidiaries in connection therewith.

"Non-Consenting Lender" has the meaning specified in Section 9.16.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received to the Agent from a Federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations" shall mean all obligations and liabilities of each Loan Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under or in connection with this Agreement or any other Loan Document to which such Loan Party is a party, in each case whether on account of principal, interest (including, without limitation, any interest accruing (and interest that would have accrued but for the filing or commencement of such proceeding) at the then applicable rate provided in this Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding with respect to such Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or amounts otherwise (including, without limitation, all fees and disbursements of counsel to the Agent or to any other Credit Party and all reimbursement obligations, fees, indemnities, costs, expenses or other

19

JX 116-34

EX-10.1

---

amounts accruing (or that would have accrued but for the filing or commencement of such proceeding) after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding with respect to such Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) that in each case are required to be paid by such Loan Party pursuant to the terms of this Agreement or any other Loan Document.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any L/C Extensions of Credit or Loan Document pursuant to an assignment request by the Borrowers under Section 9.16).

"Other LC Facility" has the meaning assigned to such term in the Existing Credit Agreement as in effect on the Effective Date.

"Other Taxes" has the meaning specified in Section 2.15.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"PACA" means the Perishable Agricultural Commodities Act of 1930, as amended.

"Parent Company" means, with respect to an L/C Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such L/C Lender, and/or any Person of which such L/C Lender is a Subsidiary.

"Participant Register" has the meaning set forth in Section 9.07(f).

"PASA" means the Packers and Stockyards Act of 1921, as amended.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Holdings or any ERISA Affiliate or to which Holdings or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

20

**JX 116-35**

"Perfection Certificate" means a certificate dated as of the Amendment No. 2 Effective Date with respect to the Borrowers and the other Loan Parties in form reasonably satisfactory to the Agent.

"Permitted Debt" means each of the following as long as no Default or Event of Default exists at the time of incurrence thereof or would arise from the incurrence thereof:

(a) Debt committed or outstanding on the Effective Date and set forth in the Perfection Certificate, excluding the Real Estate Term Loan, and Debt under the Amended Credit Agreement (but including the December Real Estate Loan) and any commercial paper but including, for the avoidance of doubt, future draws under the Existing Credit Agreement to the extent not in excess of the commitments thereunder as of the Effective Date;

(b) Debt of any Loan Party to any other Loan Party;

(c) Debt of Holdings or any Subsidiary of Holdings which is not a Loan Party to any Loan Party; provided, that (1) such Debt is incurred in the ordinary course of business consistent with past practices in connection with cash management, (2) such Debt shall not exceed $100,000,000 in the aggregate at any one time outstanding or (3) (i) at the time of incurrence of any such Debt and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing, and (ii) after giving effect to any such Debt (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0;

(d) Debt of any Group Member to any Subsidiary of Holdings which is not a Loan Party;

(e) (i) purchase money Debt used to finance the acquisition of any fixed or capital assets, including Capital Lease Obligations, and any Debt assumed in connection with the acquisition of any such assets or secured solely by a Lien on any such assets prior to the acquisition thereof, and (ii) Debt incurred in connection with sale-leaseback transactions with respect to assets not constituting Collateral;

(f) Debt of any Person that becomes a Subsidiary in an Acquisition permitted in accordance with Section 6.02(c), which Debt is existing at the time such Person becomes a Subsidiary (other than Debt incurred solely in contemplation of such Person's becoming a Subsidiary);

(g) the Obligations;

(h) other Debt in an aggregate amount outstanding at any time, inclusive of the Real Estate Term Loan and any commercial paper, not to exceed the greater of (x) $1,000,000,000; provided that not more than $500,000,000 of such Debt shall consist of Short Term Debt (including, without limitation, Short Term commercial paper) and (y) the amount permitted to be incurred under clause (h) of the definition of "Permitted Debt" in the Amended Credit Agreement (as the same may be amended from time to time);

21

**JX 116-36**

EX-10.1

(i) Debt described in Section 6.02(a)(vi), provided, that such Debt (i) does not have a maturity date which is earlier than the L/C Termination Date, (ii) is incurred on arm's-length terms, (iii) is subject to an intercreditor agreement in the form of the Existing Intercreditor Agreement or Exhibit F to the Existing Credit Agreement (or such other forms as the Co-Collateral Agents may agree in their Permitted Discretion), and (iv) the security documents, if any, with respect to such Debt are reasonably satisfactory to the Co-Collateral Agents in their Permitted Discretion;

(j) any other Debt, provided, that such Debt (i) does not require the repayment of principal prior to the L/C Termination Date in excess of 1.0% of the original principal amount thereof per annum (excluding, for the avoidance of doubt, repayments required as a result of the sale of assets and repayments required in connection with an event that would constitute an Event of Default under Section 7.01(g) hereof) (ii) does not have a maturity date which is earlier than the L/C Termination Date, and (iii) is incurred on arm's-length terms;

(k) Debt of the type specified in clause (g) of the definition thereof to the extent such Debt constitutes a Permitted Investment;

(l) Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations (including, in each case, letters of credit issued to provide such bonds, guaranties and similar obligations), in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(m) Debt arising from overdraft facilities and/or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services (including, but not limited to, intraday, automated clearing house transfers, credit cards, and purchasing card/T&E services) in the ordinary course of business; provided, that (x) such Debt (other than credit cards or purchase cards) is extinguished within ten Business Days of notification to the applicable Loan Party of its incurrence and (y) such Debt in respect of credit cards or purchase cards is extinguished within 60 days from its incurrence;

(n) Debt arising from agreements of Holdings or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations, in each case, incurred or assumed in connection with any the disposition of any business, assets or any Subsidiary not prohibited by this Agreement, other than guarantees of Debt incurred by any Person acquiring all or any portion of such business, assets or any Subsidiary for the purpose of financing such Acquisition;

(o) Debt consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

22

**JX 116-37**

EX-10.1

(p) Debt on account of Other LC Facilities and on account of letters of credit issued for the account of any Loan Party by any other Person

(q) Debt arising from a Credit Card Royalty Securitization in an amount not to exceed $500,000,000, so long as the Net Proceeds (as defined in the Amended Credit Agreement) of such Credit Card Securitization received by Holdings or any Subsidiary are applied as required by clause (q) of the definition of "Permitted Debt" in the Amended Credit Agreement; ~~and~~

(r) Debt outstanding under the Amended Credit Agreement so long as after giving effect to the incurrence and use of proceeds thereto and any substantially simultaneous repayment of existing Debt and any other transaction contemplated to occur substantially simultaneously therewith, the aggregate amount of the Obligations (as defined in the Guarantee and Collateral Agreement) would not exceed the Modified Borrowing Base; and

(s) ~~(r)~~ Permitted Refinancing Debt.

"Permitted Discretion" means a determination made in good faith and in the exercise of commercially reasonable business judgment.

"Permitted Dispositions" means any of the following:

(a) transfers and Dispositions of Inventory in the ordinary course of business;

(b) transfers and Dispositions among the Loan Parties;

(c) transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to any Loan Party;

(d) transfers and Dispositions by any Subsidiary of Holdings which is not a Loan Party to other Subsidiaries which are not Loan Parties;

(e) transfers and Dispositions (other than transfers and Dispositions of Collateral) to any Subsidiary of Holdings which is not a Loan Party by any Loan Party provided, that any such Disposition ~~of Collateral~~ shall be (i) undertaken in the ordinary course of business or (ii) on terms that are fair and reasonable and no less favorable to the Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not a Subsidiary of Holdings;

(f) the sale of surplus, obsolete or worn out equipment or other property in the ordinary course of business by the Borrowers or any Subsidiary;

23

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-38**

(g) transfers and Dispositions of assets of Holdings or any Subsidiary of Holdings as follows:

(i) Dispositions of real property securing the December Real Estate Loan so long as the Net Proceeds (as defined in the Amended Credit Agreement) of such Disposition are applied as required by clause (g)(i) of the definition of "Permitted Dispositions" in the Amended Credit Agreement;

(ii) Transfers and Dispositions of any assets held by Holdings or any Subsidiary of Holdings, including any equity interests in any Subsidiary (other than the equity interests of either Borrower or of Sears), in exchange for total consideration in an amount not to exceed $1,000,000 with respect to any transaction or series of related transactions; and

(iii) Other transfers and Dispositions of any assets held by Holdings or any of its Subsidiaries, including any equity interests of its Subsidiaries (other than substantially all of the assets of either Borrower or of Sears), including, but not limited to, (u) all or any part of the Innovel home delivery and installation business, (v) any equity interests of any Subsidiaries (other than the equity interests of either Borrower or of Sears), (w) real property, (x) Intellectual Property (including, without limitation, the Kenmore, Craftsman and Die Hard brands), (y) all or any part of the Sears Automotive Center business and (z) all or any part of the Home Services Business of Holdings and its Subsidiaries, provided, that immediately after giving effect to such Disposition and the application of the proceeds thereof, (i) no Default or Event of Default then exists, (ii) either (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap (provided that, with respect to the transfer or Disposition of the assets of, or any equity interest in, a Material Subsidiary Guarantor (other than Sears), such Pro Forma and Projected Capped Excess Availability is at least the greater of (x) 25% of the Line Cap or (y) $750,000,000), or (B) such Loan Party uses the Net Proceeds of such Disposition (1) to reduce the L/C Commitments andor Cash Collateralize any amounts pursuant to Section 2.11 and/or (2) in a manner consistent with clause (ii)(B) of the provisioproviso to clause (g)(iii) of the definition of "Permitted Dispositions" in the Amended Credit Agreement, (iii) if the Disposition is to a Subsidiary or Affiliate of a Loan Party which is not a Loan Party, such Disposition shall be on terms that are fair and reasonable and no less favorable to the Loan Party than it would obtain in a comparable arm''s length transaction with a Person that is not a Subsidiary or Affiliate of a Loan Party, and (iv) Capped Excess Availability is no less than Capped Excess Availability immediately prior to such Disposition;

(h) transfers and Dispositions which constitute Restricted Payments or Permitted Investments that are otherwise permitted hereunder;

(i) Dispositions permitted pursuant to Section 6.02(b) hereof;

(j) the sale of other Policy Investments in the ordinary course of business;

24

JX 116-39

(k) the sale or Disposition of defaulted receivables and the compromise, settlement and collection of receivables in the ordinary course of business or in bankruptcy or other proceedings concerning the other account party thereon and not as part of an accounts receivable financing transaction;

(l) leases, licenses or subleases or sublicenses of any real or personal property not constituting Collateral in the ordinary course of business;

(m) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind (other than, in each case, with respect to rights to license the Related Intellectual Property, unless the limited license granted to the Co-Collateral Agents in such Related Intellectual Property pursuant to the ABL Loan Documents remains in effect and is acknowledged by the licensee) to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect;

(n) sales of Inventory (other than Eligible Inventory) determined by the management of the applicable Loan Party not to be saleable in the ordinary course of business of such Loan Party or any of the Loan Parties;

(o) transfers of assets, including Inventory, in connection with Store closings (and/or department closings within Stores) permitted pursuant to Section 6.02(l); and

(p) Dispositions of Credit Card Program Assets to or by a Credit Card Royalty Securitization Subsidiary pursuant to a Credit Card Royalty Securitization so long as the Net Proceeds (as defined in the Amended Credit Agreement) of such Credit Card Royalty Securitization are applied consistent with clause (q) of the definition of "Permitted Dispositions" in the Amended Credit Agreement.

"Permitted Holder" means ESL Investments, Inc. and any of its Affiliates other than a Group Member.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists at the time of the making such Investment or would arise from the making of such Investment:

(a) Investments existing on, or contractually committed as of, the "Effective Date" (as defined in the Existing Credit Agreement as in effect on the Effective Date), and the other investments set forth in the Perfection Certificate;

(b) (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Effective Date, (ii) Investments by any Loan Party and its Subsidiaries in Loan Parties, and (iii) Investments by Subsidiaries that are not Loan Parties in Holdings or any Subsidiary;

(c) other Investments of any Loan Party in any other Subsidiary of Holdings which is not a Loan Party; provided, that (1) such Investment is incurred in the ordinary course of business consistent with past practices in connection with cash management, (2) such Investments shall not exceed $100,000,000 in the aggregate at any one time outstanding and the Pro Forma and Projected Capped Excess Availability is at least 25% of the Line Cap, or (3) (a) at the time of any such Investment and immediately after giving pro forma effect thereto,

25

**JX 116-40**

EX-10.1

no Default or Event of Default shall have occurred and be continuing, and (b) after giving effect to any such Investment (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0;

(d) Investments of any Loan Party in any other Person not constituting an Acquisition; provided that (a) at the time of any such Investment and immediately after giving pro forma effect thereto, no Default or Event of Default shall have occurred and be continuing, and (b) after giving effect to any such Investment (A) the Pro Forma and Projected Capped Excess Availability is at least 15% of the Line Cap, and (B) the Pro Forma Fixed Charge Ratio shall be at least 1.0 to 1.0;

(e) Investments arising out of the receipt of non-cash consideration for the sale of assets otherwise permitted under this Agreement;

(f) Policy Investments;

(g) Investments in Swap Contracts not entered into for speculative purposes;

(h) to the extent not prohibited by applicable law, (1) advances to officers, directors and employees and consultants of the Loan Parties made for travel, entertainment, relocation and other ordinary business purposes and (2) advances to officers, directors and employees and consultants of non-Loan Parties made for travel, entertainment, relocation and other ordinary business purposes, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder;

(i) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by any Group Member as a result of a foreclosure by any Loan Party with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(j) any Investment made prior to the Effective Date under paragraph (e) of the definition of "Permitted Investment" (as defined in the Existing Credit Agreement as in effect on the Effective Date);

(k) (i) Investments consisting of contributions of Credit Card Program Assets to a Credit Card Royalty Securitization Subsidiary in connection with a Credit Card Royalty Securitization and/or (ii) Investments made with the common stock of Holdings;

(l) accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business;

(m) Guarantees by Holdings or any Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Debt, in each case entered into by Holdings or any Subsidiary in the ordinary course of business;

26

**JX 116-41**

EX-10.1

(n) (1) advances in the form of a prepayment of expenses of any Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable Loan Party and (2) advances in the form of a prepayment of expenses of any non-Loan Party, so long as such expenses are being paid in accordance with customary trade terms of the applicable non-Loan Party, provided, in the case of this clause (2), such advances are made by non-Loan Parties and not with the proceeds of any Investments made by any Loan Party in such non-Loan Party unless otherwise permitted hereunder;

(o) Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other Persons, provided that no such Investment shall impair in any manner the limited license granted to the Co-Collateral Agents in such Intellectual Property pursuant to the ABL Loan Documents;

(p) Investments in joint ventures that own real properties upon which Stores are located existing as of the "Effective Date" (as defined in the Existing Credit Agreement as in effect on the Effective Date) and entered into hereafter in the ordinary course of business;

(q) other Investments in an amount not to exceed $50,000,000 in the aggregate outstanding at any time, subject to compliance with the proviso to clause (r) of the definition of "Permitted Investments" in the Amended Credit Agreement ; and

(r) Investments in joint ventures made pursuant to a contribution of assets (other than cash or cash equivalents) constituting all or a portion of the Sears Automotive Center business ~~and/or~~, the DieHard ~~business~~, Kenmore or Craftsman businesses (including related trademarks and other intellectual property),~~subject to compliance with the proviso to clause (s) of the definition of "Permitted Investments" in the Amended Credit Agreement~~ the Innovel home delivery and installation business and/or the Home Services Business.

"Permitted Liens" means:

(a) Liens for taxes, assessments and governmental charges or levies to the extent such taxes, assessments or governmental charges are being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained;

(b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

(c) landlords' Liens arising in the ordinary course of business securing (i) rents not yet due and payable, (ii) rent for Stores in an amount not to exceed the monthly base rent due for the immediately preceding calendar month and (iii) rents for Stores in excess of the amount set forth in the preceding clause (ii) so long as such amounts are being contested in good faith by appropriate proceedings and as to which appropriate reserves are being maintained;

27

**JX 116-42**

EX-10.1

(d) any attachment or judgment lien not constituting an Event of Default under Section 7.01(f);

(e) Liens presently existing or hereafter created in favor of (i) the Co-Collateral Agents to secure the ABL Obligations, and (ii) the Co-Collateral Agents or the Agent to secure the Obligations;

(f) Liens arising by the terms of commercial letters of credit entered into in the ordinary course of business to secure reimbursement obligations thereunder; provided that such Liens only encumber the title documents and underlying goods relating to such letters of credit or cash and cash equivalents as permitted under clause (m) hereof;

(g) claims under PACA and PASA;

(h) Liens in favor of issuers of credit cards arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(i) Liens incurred or deposits made by any Group Member in the ordinary course of business in connection with workers' compensation and other casualty insurance lines, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(j) easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business, or in respect of any real property which is part of the Collateral, any title defects, liens, charges or encumbrances (other than such prohibited monetary Liens) which the title company is prepared to endorse or insure by exclusion or affirmative endorsement reasonably acceptable to the Agent and which is included in any title policy, and as to Real Estate Collateral, the Liens securing the December Real Estate Loan and any Liens permitted to encumber the Real Estate Collateral pursuant to the terms of the December Real Estate Loan;

(k) any interest or title of a lessor or sublessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Agreement;

(l) normal and customary rights of setoff upon deposits of cash or other Liens originating solely by virtue of any statutory or common law provision, or ordinary course contractual obligation, relating to bankers' liens, rights of setoff or similar rights in favor of banks or other depository institutions;

(m) Liens on cash and cash equivalents securing obligations in respect of Other L/C Facilities (as defined in the Existing Credit Agreement) and in respect of standby or trade letters of credit not constituting ABL Obligations or trade related bank guarantees;

28

**JX 116-43**

(n) Liens granted to consignors who have properly perfected on consigned Inventory owned by such consignors and created in the ordinary course of business;

(o) Liens on premium rebates securing financing arrangements with respect to insurance premiums;

(p) deposits and other customary Liens to secure the performance of bids, trade contracts (other than for Debt), leases (other than Capital Lease Obligations), statutory and regulatory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(q) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Debt or (ii) relating to pooled deposit or sweep accounts of the Borrowers or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any Subsidiary;

(r) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s) Liens solely on any cash earnest money deposits made by any Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(t) Liens on securities that are the subject of repurchase agreements constituting Policy Investments;

(u) Liens on cash and cash equivalents securing Swap Contracts incurred in the ordinary course of business; and

(v) other Liens on cash and cash equivalents in an amount not to exceed $25,000,000 held by a third party as security for any obligation (other than Debt) permitted to be incurred by any Group Member hereunder.

"Permitted Refinancing Debt" shall mean any Debt issued in exchange for, or the Net Proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Debt being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Debt); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Debt does not exceed the principal amount (or accreted value, if applicable) of the Debt so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the maturity date of such Permitted Refinancing Debt shall not be earlier than the maturity date of the Debt being Refinanced and weighted average life to maturity of such Permitted Refinancing Debt shall be greater than or equal to the weighted average life to maturity of the Debt being Refinanced, (c) if the Debt being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted

29

**JX 116-44**

EX-10.1

Refinancing Debt shall be subordinated in right of payment to such Obligations on terms at least as favorable to the L/C Lenders as those contained in the documentation governing the Debt being Refinanced, (d) other than with respect to any Refinancing of ~~the Real Estate Term Loan~~Debt under the Amended Credit Agreement, no Permitted Refinancing Debt shall ~~have different obligors, or greater guarantees or security, or higher priority guarantees or security, than the Debt being Refinanced~~be secured by the Collateral on a senior or pari-passu basis with the Obligations; and (e) the Permitted Refinancing Debt shall otherwise be on terms which would not reasonably likely result in a Material Adverse Effect.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Policy Investments" means Investments made in accordance with the investment policy of the Loan Parties set forth on Schedule 6.02(k)(ii), as such policy may be amended from time to time with the reasonable consent of the Agent, such consent not to be unreasonably withheld.

"Pro Forma and Projected Capped Excess Availability" shall mean, for any date of calculation, after giving effect to the applicable transaction or payment, the pro forma and projected Capped Excess Availability for the subsequent twelve (12) fiscal month period, determined as of the last day of each fiscal month in such period and based on Holdings*'* good faith projections that are used to run the businesses of the Borrowers and prepared in accordance with past practice, which projections shall be reasonably satisfactory to the Agent.

"Pro Forma and Projected Suppressed Availability" shall mean, for any date of calculation, after giving effect to the applicable transaction or payment, the pro forma and projected Suppressed Availability for the subsequent twelve (12) fiscal month period, determined as of the last day of each fiscal month in such period and based on Holdings*'* good faith projections that are used to run the businesses of the Borrowers and prepared in accordance with past practice, which projections shall be reasonably satisfactory to the Agent.

"Pro Forma Fixed Charge Ratio" shall mean, for any date of calculation, the Fixed Charge Ratio as of the last day of the most recently completed fiscal quarter for which financial statements are available or were required to have been delivered pursuant to Section 6.01(j) (the "Reference Date"), after giving pro forma effect to any applicable transaction or payment as if such transaction or payment had occurred on the first day of the four fiscal quarter period ending on the Reference Date.

"~~Property" means each parcel of real property that constitutes Real Estate Collateral, as described in greater detail under the applicable Mortgage, together with all buildings and other improvements thereon and all personal property encumbered by the Mortgages, together with all rights pertaining to such property. "~~Reaffirmation Agreement" means (i) the Reaffirmation Agreement~~" means a reaffirmation agreement~~, dated as of the Effective Date, in form and substance reasonably satisfactory to the Agent, duly executed by each Loan Party party to the Guarantee and Collateral Agreement, reaffirming the guaranty and the liens granted thereunder.

30

**JX 116-45**

EX-10.1

(ii) the Reaffirmation Agreement, dated as of the Amendment No. 2 Effective Date, in form and substance reasonably satisfactory to the Agent, duly executed by each Loan Party party to the Guarantee and Collateral Agreement, reaffirming the guaranty and the liens granted thereunder, and (iii) each other reaffirmation agreement in form and substance reasonably satisfactory to the Agent and from time to time executed and delivered by one or more Loan Parties in connection with this Agreement or any other Loan Document.

"Real Estate Collateral" means (a) the real property of the Borrowers or its Subsidiaries set forth in Schedule 1.01(b) and (b) any additional real property that serves as collateral under the December Real Estate Loan, as may be amended, restated or supplemented from time to time, but excluding in each case any property with respect to which the cost of compliance with Flood Laws would be unreasonably large in comparison with the benefit of delivering a Mortgage with respect to such property hereunder, as reasonably determined by the Required L/C Lenders and for the avoidance of doubt no Mortgage shall be delivered with respect to any such property securing this Agreement immediately prior to the Amendment No. 2 Effective Date.

"Real Estate Term Loan" means, the Amended and Restated Loan Agreement, dated as of April 8, 2016, May 22, 2017, between JPP, LLC and JPP II, LLC, each a Delaware limited liability company and Cascade Investment, L.L.C., as initial lenders, and Sears, Sears Development Co., Innovel Solutions, Inc., Big Beaver of Florida Development, LLC, and Kmart Corp., collectively, as borrower.

"Receivables Coverage Ratio" means the ratio, determined as of the end of each fiscal month of SRAC, for the most recently ended twelve fiscal months, of (a) the amount of intercompany receivables owed to SRAC to (b) the Debt of SRAC to the extent Debt of such type would appear as a liability on the balance sheet of SRAC (and excluding, for the avoidance of doubt, Debt of the type described in clause (g) of the definition thereof).

"Recipient" means the Agent, the Issuing Bank, any L/C Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 9.07(d).

"Reimbursement Obligation" means the obligation of the Borrowers to reimburse the Issuing Bank pursuant to Section 3.05 for amounts drawn under Letters of Credit.

"Related Intellectual Property" means such rights with respect to the Intellectual Property of Holdings and its Subsidiaries as are reasonably necessary to permit the Co-Collateral Agents to enforce their rights and remedies under the ABL Loan Documents with respect to the ABL Collateral.

"REMIC Certificates" means the SRC Commercial Mortgage Trust 2003-1 Mortgage Pass-Through Certificates in the aggregate face amount of $1,312,416,000 (as amended, supplemented or otherwise modified, replaced or refinanced, in any case in a manner not materially adverse to the L/C Lenders).

31

**JX 116-46**

EX-10.1

"Reorganization" means with respect to any Multiemployer Plan, the condition that such Plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Required L/C Lenders" means, at any time, the holders of more than 50% of the sum of the Aggregate L/C Commitments then in effect, or, if the Aggregate L/C Commitments have been terminated, the holders of more than 50% of the L/C Lender Exposure then outstanding.

"Requirements of Law" means as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Rescinded Amount" means "Rescinded Amount" as defined in Section 9.19(b) of this Agreement.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interests in Holdings or any Subsidiary of Holdings, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such equity interests in Holdings or any Subsidiary of Holdings or any option, warrant or other right to acquire any such equity interests in Holdings or any Subsidiary of Holdings.

"Revaluation Date" means with respect to any Letter of Credit or other Obligations denominated in an Alternative Currency, each of the following: (a) each date of issuance of a Letter of Credit, (b) each date of an amendment of any such Letter of Credit, (c) each date of any payment by the Issuing Bank under any such Letter of Credit, (d) the first Business Day of each fiscal month and (e) such additional dates as the Agent or the Issuing Bank shall determine or the Required L/C Lenders shall require.

"Satisfactory Letter of Credit" means a letter of credit from a financial institution reasonably acceptable to the Issuing Bank and in a form reasonably acceptable to the Issuing Bank, other than any letter of credit issued under the Existing Credit Agreement or any letter of credit that is recourse, directly or indirectly, to Holdings, any of the Borrowers or any of their respective Subsidiaries.

"Sears" means Sears, Roebuck and Co., a New York corporation.

"SEC" means the United States Securities and Exchange Commission.

"Security Documents" means the collective reference to (i) the Guarantee and Collateral Agreement, and all other security documents hereafter delivered to the Co-Collateral Agents granting a Lien on any property of any Person to secure the Obligations and the ABL Obligations, (ii) the each Reaffirmation Agreement, and (iii) the Mortgages. Collateral Agreement.

32

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-47**

EX-10.1

"Senior Unsecured Notes" means those certain 8% senior unsecured notes due 2019 issued by Holdings pursuant to the First Supplemental Indenture dated November 19, 2014 by and between Holdings, as Issuer and Computershare Trust Company, N.A. as Trustee.

"Short Term" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Single Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Borrower or any ERISA Affiliate and no Person other than such Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which any Borrower or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"Solvent" means, when used with respect to any Person, that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (c) such Person will be able to pay its debts as they mature.

"Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"SRAC" has the meaning provided in the preamble to this Agreement.

"Store" means any store owned or leased and operated by any Loan Party.

"Store Closure Sale" means a store closure sale that, if including more than twenty (20) stores (whether in one transaction or a series of related transactions), is properly managed by an independent, nationally recognized, professional retail inventory liquidation firm reasonably acceptable to the Co-Collateral Agents, over a defined period that is anticipated by the Borrowers not to exceed 12 weeks (on average) from the date of the same commencement.

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of the issued and outstanding capital stock or other equity interests having ordinary voting power to elect a majority of the Board of Directors or other governing body of such corporation, partnership, joint venture, limited liability company, trust or estate (irrespective of whether at the time capital stock or other equity interests of any other class or classes of such corporation, partnership, joint venture, limited liability company, trust or estate shall or might have voting power upon the occurrence of any contingency), is at the time directly or indirectly owned by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person''s other Subsidiaries.

33

**JX 116-48**

EX-10.1

"Subsidiary Guarantor" means each Person that is a "Subsidiary Guarantor" from time to time under the Existing Credit Agreement or each other direct or indirect wholly owned Domestic Subsidiary of Holdings that becomes a Subsidiary Guarantor pursuant to Section 6.01(i)(vii).

"Suppressed Availability" has the meaning assigned to such term in the Amended Credit Agreement as in effect on the Amendment No. 1 Effective Date.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Third Party Payors" means any private health insurance company that is obligated to reimburse or otherwise make payments to pharmacies which sell prescription drugs to eligible patients under any insurance contract with such private health insurer.

"Trading With the Enemy Act" means 50 U.S.C. § 1 et seq., as amended.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided, further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

34

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-49**

EX-10.1

"UCP" means the Uniform Customs and Practices for Documentary Credit Operations (UCP 600).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Internal Revenue Code for the applicable plan year.

"Voting Stock" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02 Computation of Time Periods. In this Agreement, unless otherwise specified, (a) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" (b) "including" means "including without limitation"; and (c) any reference to a time of day means Eastern time.

Section 1.03 Accounting Terms. All accounting terms not specifically defined herein or in the other Loan Documents shall be construed in accordance with U.S. generally accepted accounting principles ("GAAP") which for purposes of Section 6.03 shall be consistently applied. If at any time any change in U.S. generally accepted accounting principles would affect the computation of any financial ratio or requirement set forth herein, and either the Borrowers or the Required L/C Lenders shall so request, the Agent and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required L/C Lenders which shall not be unreasonably withheld); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change in principles, and (ii) the Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. For the avoidance of doubt, no retroactive change in GAAP shall apply to the construction of accounting terms under this Agreement in the absence of an amendment hereto in accordance with the terms of this Section 1.03.

35

**JX 116-50**

EX-10.1

Section 1.04 <u>Other Interpretive Provisions</u>. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document, the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person''s successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.05 <u>Change of Currency</u>.

(a) Each obligation of each Borrower to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the Effective Date shall be redenominated into Euro at the time of such adoption. If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency.

(b) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

(c) Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

36

**JX 116-51**

EX-10.1

## ARTICLE II

## Payments; Taxes; Lender Cash Collateral Account; Etc.

Section 2.01 [Reserved].

Section 2.02 [Reserved].

Section 2.03 [Reserved].

Section 2.04 [Reserved].

Section 2.05 Fees.

(a) Commitment Fee. The Borrowers jointly and severally agree to pay to the Agent for the account of each L/C Lender a commitment fee on the average daily amount of funds required to be held and actually held, in the Lender Cash Collateral Account of such L/C Lender during the period for which such payment is being made at a rate per annum equal to ~~5.75~~the Eurodollar Rate plus 11%, payable in arrears monthly on the 3rd day subsequent to the last day of each month and commencing on the Effective Date and ending on the date that the L/C Lender Exposure is reduced to zero. The L/C Lenders agree to provide the Agent with a statement of the amount due pursuant to this Section 2.05(a) on or before the 2nd day subsequent to the last day of each month, and the Borrowers agree that such statement shall be conclusive absent manifest error. The Agent may conclusively rely on such statement and shall have no duty to independently investigate amounts due pursuant to this Section 2.05(a).

(b) Upfront Fee. The Borrowers jointly and severally agree to pay to the Agent for the account of each L/C Lender as of the Amendment No. 2 Effective Date, an upfront fee equal to ~~(i) 1.50~~1.00% of the aggregate amount of funds ~~deposited by such L/C Lender into the Lender Cash Collateral Account of such L/C Lender on the Effective Date, payable on the date that such L/C Lender funds such deposit, or if later, the Effective Date, and (ii) 1.50% of the amount of funds deposited by~~on deposit from such L/C Lender into the Lender Cash Collateral Account of such L/C Lender ~~in connection with any increase in L/C Commitments as of the effective date thereof in accordance with Section 2.17, payable on the date that such L/C Lender funds such deposit, or if later, such effective date. In addition, the Borrowers jointly and severally agree to pay to each L/C Lender (or to the Agent for the account of each L/C Lender) an additional fee equal to 0.10% of the amount of any increase in L/C Commitment of such L/C Lender in accordance with Section 2.17, payable on the effective date of such increase~~as of the Amendment No. 2 Effective Date.

(c) Other Fees. Holdings and the Borrowers shall pay to the Agent the fees set forth in the Fee Letter.

(d) Applicability of Fees and Interest after the L/C Termination Date. Notwithstanding anything to the forgoing, all fees and interest payable to, or for the account of an L/C Lender, shall continue to be payable even after the L/C Termination Date, to the extent that (x) all funds have not been (or are not entitled to be) released from the Lender Cash Collateral Accounts, or (y) any reimbursement obligations of the Borrowers to any L/C Lenders are still outstanding, as applicable.

37

**JX 116-52**

EX-10.1

(e) Default Rate. At any time after the occurrence and during the continuance of an Event of Default, all fees and interest due and payable by the Borrowers pursuant to Section 2.05(b) and Section 3.05 of this Agreement shall be increased by 2% per annum above the applicable rate and shall be payable upon demand by the L/C Lenders.

Section 2.06 Optional Termination or Reduction of the L/C Commitments.

(a) Subject to Section 2.06(b) and Section 2.07, the Borrowers shall have the right, without penalty or premium and upon at least three Business Days' irrevocable notice to the Agent, to permanently terminate in whole or permanently reduce in part the unused portions of the respective L/C Commitments of the L/C Lenders; provided that no such termination or reduction of the L/C Commitments shall be permitted if, after giving effect thereto and to any payments of any Reimbursement Obligations made on the effective date thereof, the aggregate L/C Lender Exposure would exceed the aggregate amount of the L/C Commitments as so reduced. Any partial reduction of the L/C Commitments shall be in the aggregate amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b) The Agent will promptly notify the L/C Lenders of any termination or reduction of the Aggregate L/C Commitments under Section 2.06(a). Upon any reduction of the Aggregate L/C Commitments, the L/C Commitment of each L/C Lender shall be reduced by such L/C Lender's L/C Commitment Percentage of such reduction amount.

Section 2.07 Reduction or Termination of the L/C Commitments. Upon any reduction or termination of the L/C Commitments of the L/C Lenders on or prior to the date that is six months after the Amendment No. 2 Effective Date (whether as a result of the exercise of remedies due to an Event of Default, including pursuant to Section 7.01(e), or otherwise, but excluding any reduction pursuant to clauses (iii) or (iv) of the definition of "L/C Commitment" due to the failure of the Required L/C Lenders to provide their consent in writing as contemplated thereby), the Borrowers shall pay to each L/C Lender whose L/C Commitments are so reduced or terminated an early reduction/termination fee equal to the Commitment Fee that would have accrued with respect to such reduced or terminated L/C Commitments from such date of reduction or termination until the date that is six months after the Amendment No. 2 Effective Date.

Section 2.08 ~~Section 2.07~~ [Reserved].

Section 2.09 ~~Section 2.08~~ [Reserved].

Section 2.10 ~~Section 2.09~~ [Reserved].

~~Section 2.10 [Reserved].~~

Section 2.11 Mandatory Reduction of L/C Commitments. ~~The L/C Commitments shall be reduced automatically and irrevocably by (a) 50% of the amount by which the Designated Transaction Proceeds since the Effective Date exceed $500,000,000 but do~~

38

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-53**

EX-10.1

~~not exceed $1,000,000,000, plus (b) 100% of the amount by which the Designated Transaction Proceeds since the Effective Date exceed $1,000,000,000, minus (c) the amount of any reduction of the L/C Commitments in accordance with Section 2.06 or clauses (iii) or (v) of the definition of "L/C Commitment" substantially concurrently with the receipt of any such Designated Transaction Proceeds. If, after giving effect to such reduction~~If, at any time, the aggregate L/C Lender Exposure exceeds the Aggregate L/C Commitments, the Borrowers shall Cash Collateralize or provide backstop Satisfactory Letters of Credit in respect of such excess in accordance with Section 3.11. ~~Notwithstanding the foregoing, the Required L/C Lenders may decline or waive (in their sole discretion) any required reduction of the L/C Commitments pursuant to this Section 2.11 on account of all L/C Lenders and Issuing Bank.~~

Section 2.12 Increased Costs. (a) If, due to either (i) after the Effective Date the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law) made or issued after the Effective Date, there shall be any increase in the cost to any Lender of agreeing to issue, participate in, fund or maintain, or issuing, participating in, funding or maintaining Letters of Credit (excluding for purposes of this Section 2.12 any such increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.15 shall govern) and (ii) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Applicable Office or any political subdivision thereof), then the Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided that a Lender claiming additional amounts under this Section 2.12(a) agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Office and/or take other commercially reasonable action if the making of such a designation or the taking of such actions would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. A certificate as to the amount of such increased cost, submitted to the Borrowers and the Agent by such Lender, shall be entitled to a presumption of correctness. If any Borrower so notifies the Agent after any L/C Lender notifies the Borrowers of any increased cost pursuant to the foregoing provisions of this Section 2.12(a), such Borrower may, upon payment of such increased cost to such L/C Lender, replace such L/C Lender with a Person that is an Eligible Assignee in accordance with the terms of Section 9.16 (and the L/C Lender being so replaced shall take all action as may be necessary to assign its rights and obligations under this Agreement to such Eligible Assignee).

(b) If any Lender determines that compliance with any change after the Effective Date in law or regulation or any guideline or request after the Effective Date from any central bank or other governmental authority (whether or not having the force of law) affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender or any entity controlling such Lender and that the amount of such capital or liquidity is increased by or based upon the existence of such Lender's commitment hereunder and other commitments of this type, then, upon demand by such Lender (with a copy of such demand to the Agent), the Borrowers shall pay to the Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender or

39

JX 116-54

EX-10.1

such entity in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender's commitment hereunder. A certificate as to such amounts submitted to the Borrowers and the Agent by such Lender shall be entitled to a presumption of correctness. Notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder issued in connection therewith or in implementation thereof and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in law covered by this Section 2.12 regardless of the date enacted, adopted, issued or implemented.

(c) The Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or capital, liquidity or reserve requirement or pursuant to Section 2.15 for any Taxes incurred more than six months prior to the date that such Lender notifies the Borrowers of the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax and of such Lender's intention to claim compensation therefor; provided that if the change or issuance giving rise to such increased costs or capital, liquidity or reserve requirement or Tax is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13 [Reserved].

Section 2.14 Payments and Computations.

(a) The Borrowers shall make each payment hereunder and under the other Loan Documents, without any right of counterclaim or set-off, not later than 2:00 P.M. on the day when due in U.S. dollars to the Agent at the Agent's Account in same day funds. The Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or commitment fees ratably (other than amounts payable pursuant to Section 2.12 or 2.15) to the applicable L/C Lenders for the account of their respective Applicable Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Office, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(c), from and after the effective date specified in such Assignment and Acceptance, the Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the L/C Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b) Each Borrower hereby authorizes each Lender, if and to the extent payment owed by it to such Lender is not made when due hereunder or under the other Loan Documents, to charge from time to time against any or all of such Borrower's accounts with such Lender any amount so due. Any such Lender so charging such accounts shall deliver the proceeds therefrom to the Agent for distribution to the Credit Parties in the manner set forth herein and in the other Loan Documents.

40

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-55**

EX-10.1

(c) All computations of interest based on the ~~Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the~~ Eurocurrency Rate, Federal Funds Rate and of letter of credit fees, commitment fees and other fees shall be made by the Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or commitment fees are payable. Each determination by the Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d) Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment fee, as the case may be.

(e) Unless the Agent shall have received notice from any Borrower prior to the date on which any payment is due by it to the Lenders hereunder that such Borrower will not make such payment in full, the Agent may assume that the applicable Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each applicable Lender on such due date an amount equal to the amount then due such Lender. If and to the extent such Borrower shall not have so made such payment in full to the Agent, each Lender shall repay to the Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Agent, at the Federal Funds Rate.

Section 2.15 Taxes.

(a) Any and all payments by the Borrowers to or for the account of any Recipient hereunder or under the other Loan Documents or any other documents to be delivered hereunder shall be made, in accordance with Section 2.14 or the applicable provisions of such other documents, free and clear of and without deduction for any and all present or future Taxes (except as required by applicable law). If the Borrowers and/or Agent shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document or any other documents to be delivered hereunder to any Recipient, (i) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable shall be increased as may be necessary so that after making all required deductions for Indemnified Taxes (including deductions for Indemnified Taxes applicable to additional sums payable under this Section 2.15) such Recipient receives an amount equal to the sum it would have received had no such deductions of Indemnified Taxes been made, (ii) the Borrowers and/or Agent shall make such deductions as are determined by such Borrowers and/or Agent to be required based upon the information and documentation it has received pursuant to Sections 2.15(e) and (f) and (iii) the Borrowers and/or Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrowers shall pay any present or future stamp or documentary taxes or any other excise taxes, charges or similar levies that arise from any payment made hereunder or under the other Loan Documents or from the execution, delivery or

41

**JX 116-56**

EX-10.1

registration of, performing under, or otherwise with respect to, this Agreement or the other Loan Documents or any other documents to be delivered hereunder, but excluding any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 9.16) (hereinafter referred to as "Other Taxes"). Other Taxes shall not include any Taxes imposed on, or measured by reference to, gross income, net income or gain.

(c) Without duplication of any additional amounts paid pursuant to Section 2.15(a), the Borrowers shall jointly and severally indemnify each Recipient for and hold it harmless against the full amount of Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted by any Governmental Authority on amounts payable under this Section 2.15) imposed on or paid by such Recipient or withheld or deducted from a payment to such Recipient and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. This indemnification shall be made within 30 days from the date such Recipient or the Agent (as the case may be) makes written demand therefor.

(d) Within 30 days after the date of any payment of Indemnified Taxes, the Borrowers shall furnish to the Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

(e) Any Lender or other Recipient that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender or other Recipient, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender or other Recipient is subject to backup withholding or information reporting requirements.

(i) Without limiting the generality of the foregoing:

(1) each Lender that is a United States person (or is a disregarded entity within the meaning of Treasury Regulation Section 301.7701-3 of a United States person), on or prior to the date of its execution and delivery of this Agreement and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender, and from time to time thereafter as reasonably requested in writing by the Borrowers or the Agent, shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Form W-9 certifying that such Lender (or, in the case or a disregarded entity, its owner) is exempt from U.S. federal backup withholding tax on payments pursuant to this Agreement or the other Loan Documents; and

42

**JX 116-57**

EX-10.1

(2) each Lender that is not a United States person (and is not a disregarded entity within the meaning of Treasury Regulation Section 301.7701-3 of a United States person):

(A) on or prior to the date of its execution and delivery of this Agreement and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with two executed originals of Internal Revenue Service Forms W-8BEN, W-8BEN-E or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Lender (or, in the case of a disregarded entity, its owner) is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or the other Loan Documents; and

(B) on or prior to the date of its execution and delivery of this Agreement and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender and from time to time thereafter as reasonably requested in writing by the Borrowers (but only so long as such Lender remains lawfully able to do so), shall provide each of the Agent and the Borrowers with executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made.

If the form provided by a Lender or other Recipient at the time such Lender or other Recipient first becomes a party to this Agreement (or, with respect to a Lender, changes its Applicable Office) indicates a United States interest withholding tax rate in excess of zero (or if no form is provided at such time), withholding tax at such rate (or, respectively, at the maximum rate) shall be considered excluded from Indemnified Taxes unless and until such Lender or other Recipient provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such form; provided, however, that, if at the date of the Assignment and Acceptance pursuant to which a Lender assignee becomes a party to this Agreement, the Lender assignor was entitled to payments under Section 2.15(a) in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Indemnified Taxes) United States withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this Section 2.15(e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN, W-8BEN-E, or W-8ECI, that the Lender or other Recipient reasonably considers to be confidential, the Lender or other Recipient shall give notice thereof to the Borrowers and shall not be obligated to include in such form or document such confidential information. For purposes of this Section 2.15(e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

43

**JX 116-58**

EX-10.1

(f) For any period with respect to which a Lender or other Recipient has failed to provide the Borrowers with the appropriate form, certificate or other document described in Section 2.15(e) (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring subsequent to the date on which a form, certificate or other document originally was required to be provided, or if such form, certificate or other document otherwise is not required under Section 2.15(e)), such Lender or other Recipient shall not be entitled to indemnification under Section 2.15(a) or (c) with respect to Indemnified Taxes imposed by the United States by reason of such failure; provided, however, that should a Lender or other Recipient become subject to Indemnified Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrowers shall take such steps as the Lender or other Recipient shall reasonably request to assist the Lender or other Recipient to recover such Indemnified Taxes. Further, if a payment made to a Lender or other Recipient under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or other Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or other Recipient shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such Lender or other Recipient has complied with such Lender's or other Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph (f), "FATCA" shall include any amendments made to FATCA after the Effective Date.

(g) Each Lender and other Recipient agrees that if any form or certification it previously delivered pursuant to this Section 2.15 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

(h) Any Lender claiming any additional amounts payable pursuant to this Section 2.15 agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(i) If any Lender or other Recipient determines, in its sole discretion exercised in good faith, that it has actually and finally realized, by reason of a refund, a deduction or credit of any Indemnified Taxes paid or reimbursed by the Borrowers pursuant to Section 2.15(a) or Section 2.15(c) above in respect of payments under this Agreement or the other Loan Documents, a current monetary benefit that it would otherwise not have obtained, and that would result in the total payments under this Section 2.15 exceeding the amount needed to make such Lender or other Recipient whole, such Lender or other Recipient shall pay to the Borrowers, with reasonable promptness following the date on which it actually realizes such benefit, an amount equal to the amount of such excess, net of all out-of-pocket expenses incurred

44

**JX 116-59**

EX-10.1

by such Lender or other Recipient reasonably allocable in securing such refund, deduction or credit and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrowers, upon the request of such Lender or other Recipient, agree to repay the amount paid over to the Borrowers to such Lender or other Recipient (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such Lender or other Recipient is required to repay such refund to such jurisdiction. Nothing in this Section 2.15(i) shall be construed to require any Lender or other Recipient to make available to the Borrowers or any other Person its tax returns or any confidential tax information.

(j) If the Agent or any Lender or other Recipient, as the case may be, shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by Borrower pursuant to this Section 2.15, including Indemnified Taxes or Other Taxes as to which it has been indemnified by Borrower, or with respect to which Borrower or a Group Member that is a signatory hereto has paid additional amounts pursuant to this Section 2.15, it shall notify Borrower of the availability of such refund claim and, if the Agent or any Lender or other Recipient, as the case may be, determines in good faith that making a claim for refund will not have any adverse consequence to its taxes or business operations, shall, after receipt of a request by Borrower, make a claim to such Governmental Authority for such refund at Borrower's expense.

Section 2.16 Sharing of Payments, Etc. If any L/C Lender shall obtain any payment from any Group Member (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Reimbursement Obligations or other amounts owing to it (other than pursuant to Section 2.12 or 2.15) in excess of its ratable share, such L/C Lender shall forthwith purchase from the other L/C Lenders such participations or other amounts owing to them as shall be necessary to cause such purchasing L/C Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing L/C Lender, such purchase from each L/C Lender shall be rescinded and such L/C Lender shall repay to the purchasing L/C Lender the purchase price to the extent of such recovery together with an amount equal to such L/C Lender's ratable share (according to the proportion of (i) the amount of such L/C Lender's required repayment to (ii) the total amount so recovered from the purchasing L/C Lender) of any interest or other amount paid or payable by the purchasing L/C Lender in respect of the total amount so recovered. The Borrowers agree that any L/C Lender so purchasing a participation from another L/C Lender pursuant to this Section 2.16 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such L/C Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 2.17 Increase of L/C Commitments. At any time and from time to time, upon the request of the Borrowers and with notice to the Agent and the Issuing Bank, any L/C Lender may increase its L/C Commitment by electing (in its sole discretion) to deposit or cause to be deposited into the Lender Cash Collateral Account of such L/C Lender an amount equal to 102% of such increase; provided, in no event shall the aggregate L/C Commitments exceed the Facility Cap, provided, further, that each increase after the Effective Date shall be in increments of not less than $25,000,000.

45

JX 116-60

EX-10.1

---

# ARTICLE III

## AMOUNT AND TERMS OF THE LETTERS OF CREDIT

Section 3.01 L/C Commitment.

(a) Subject to the terms and conditions hereof, the Issuing Bank, in reliance on the agreements of the L/C Lenders set forth in Section 3.04(a), agrees to issue Letters of Credit for the account of any Borrower (on behalf of such Borrower or on behalf of any other Group Member) on any Business Day during the period from the Effective Date until the date that is thirty (30) days prior to the L/C Termination Date in such form as may be approved from time to time by the Issuing Bank; provided that the Issuing Bank shall not have any obligation to issue any Letter of Credit if (i) such Letter of Credit is not a replacement Letter of Credit to which the Required L/C Lenders have provided their consent in accordance with clause (iii) or (iv) of the definition of L/C Commitment, or (ii) after giving effect to such issuance, (x) the Issuer Exposure would exceed the lesser of (1) the aggregate L/C Commitments of all L/C Lenders and (2) the Facility Cap, or (y) the aggregate amount in the Lender Cash Collateral Accounts would be less than 102% of the Issuer Exposure.

(b) Each Letter of Credit shall (i) be denominated in Dollars or any other lawful foreign currency which is approved in writing on a case by case basis by the Issuing Bank, the Required L/C Lenders and the Agent in their sole and absolute discretion and (ii) expire no later than the earlier of one year following the date of issuance of such Letter of Credit; provided that, in the event that any Letter of Credit is outstanding on the date that is thirty (30) days prior to the L/C Termination Date, the Borrowers shall on or before such date, Cash Collateralize an amount equal to 102% of the L/C Obligations with respect to all such Letters of Credit pursuant to Section 3.11. and the L/C Termination Date (it being understood that a Letter of Credit shall not be deemed to expire later than the earlier of one year following the date of issuance or the L/C Termination Date solely due to the inclusion of an auto-renewal provision meeting the requirements of Section 3.01(e) below). Each Application and each Letter of Credit shall be subject to either the International Standby Practices (ISP 98) of the International Chamber of Commerce or the UCP, and, to the extent not inconsistent therewith, the laws of the State of New York.

(c) The Issuing Bank shall not at any time be obligated to issue any Letter of Credit if (i) such issuance would conflict with, or cause the Issuing Bank or any L/C Lender to exceed any limits imposed by, any applicable Requirement of Law, (ii) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any law applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Issuing Bank in good faith deems material to it; (iii) such issuance would violate one

46

JX 116-61

EX-10.1

or more policies of the Issuing Bank applicable to letters of credit generally; (iv) the conditions precedent to each issuance of a Letter of Credit set forth in Section 4.02 have not been satisfied; (v) at the time of such issuance (x) the Cash Collateral Agreement shall have ceased for any reason to be in full force and effect or (y) any L/C Lender or Loan Party shall so state in writing or (z) any Lien created by the Cash Collateral Agreement shall cease to be enforceable and of the same effect and priority purported to be created thereby; or (vi) at the time of such proposed L/C Extension there has been a drawing under any Letter of Credit outstanding hereunder for which the Borrowers have not made all payments required to be made by the Borrowers under Section 3.05.

(d) Unless previously terminated, the L/C Commitments of each L/C Lender shall terminate and be reduced to zero on the L/C Termination Date.

(e) Notwithstanding Section 3.01(c):

(i) the Issuing Bank shall not, other than with the written consent of the Required L/C Lenders, issue any Letter of Credit if such Letter of Credit contains any provisions for automatic reinstatement of all or any portion of the stated amount thereof after any drawing thereunder or after the expiry date of such Letter of Credit;

(ii) the Issuing Bank shall not issue a Letter of Credit which includes a provision whereby such Letter of Credit shall be renewed or extended automatically for additional consecutive periods unless (x) the Required L/C Lenders have provided their written consent, (y), pursuant to the terms of the Letter of Credit, the Issuing Bank may notify the beneficiary thereof within the time period specified in such Letter of Credit (which notification shall not exceed ninety (90)be delivered at least sixty (60) days prior to the then-applicable expiration date), or, if no such time period is specified, at least thirty (30) days prior to the then-applicable expiration date, that such Letter of Credit will not be renewed or extended, and (z), Following (but not before) the earlier of (i) the occurrence and continuance of an Event of Default and (ii) October 13, 2018, the Issuing Bank shall make such notification to the beneficiary as described in clause (y) abovethe prior sentence promptly upon request by the Required L/C Lenders.

Section 3.02 Procedure for Issuance of Letter of Credit. Any Borrower may from time to time request that the Issuing Bank issue a Letter of Credit for its account (on behalf of such Borrower or on behalf of any other Group Member) by delivering to the Issuing Bank and the Agent at their addresses for notices specified herein an Application therefor, completed to the satisfaction of the Issuing Bank, and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request. Upon receipt of any Application, the Issuing Bank will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Bank be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the

47

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-62**

EX-10.1

beneficiary thereof or as otherwise may be agreed to by the Issuing Bank and the applicable Borrower. The Issuing Bank shall furnish a copy of such Letter of Credit to the applicable Borrower promptly following the issuance thereof. The Issuing Bank shall promptly notify the Agent of the issuance, extension or amendment of Letters of Credit and any drawings or other payments under Letters of Credit issued by the Issuing Bank. A request by a Borrower for issuance of a Letter of Credit may be subject to the effectiveness of an increase in the L/C Commitments of one of more L/C Lenders pursuant to Section 2.17.

Section 3.03 <u>Fees and Other Charges</u>.

(a) The Borrowers shall pay to the Issuing Bank for its own account a fronting fee of 0.125% per annum on the undrawn and unexpired amount of each Letter of Credit, payable monthly in arrears on the 3rd day subsequent to the last day of each month after the issuance date.

(b) In addition to the foregoing fees, the Borrowers shall pay or reimburse the Issuing Bank for such normal and customary costs and expenses as are incurred or charged by the Issuing Bank in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit issued by the Issuing Bank, unless otherwise agreed.

Section 3.04 <u>Letter of Credit Participations</u>.

(a) The Issuing Bank irrevocably agrees to grant and hereby grants to each L/C Lender, and, to induce the Issuing Bank to issue Letters of Credit, each L/C Lender irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Bank, on the terms and conditions set forth below, for such L/C Lender's own account and risk an undivided interest equal to such L/C Lender's L/C Commitment Percentage in the Issuing Bank's obligations and rights under and in respect of each Letter of Credit issued by the Issuing Bank and the amount of each draft paid by the Issuing Bank thereunder. Each L/C Lender agrees with the Issuing Bank that, if a draft is paid under any Letter of Credit issued by the Issuing Bank for which the Issuing Bank is not reimbursed in full by the Borrowers in accordance with the terms of this Agreement, such L/C Lender shall pay to the Issuing Bank upon demand at the Issuing Bank's address for notices specified herein an amount equal to such L/C Lender's L/C Commitment Percentage of the amount of such draft, or any part thereof, that is not so reimbursed, provided that (x) in lieu of making any demands under this <u>Section 3.04(a)</u>, the Issuing Bank may withdraw funds from such L/C Lender's Lender Cash Collateral Account; or (y) so long as funds sufficient to pay such amount are in such L/C Lender's Lender Cash Collateral Account and are available to the Issuing Bank without stay or delay, such L/C Lender may satisfy any demands made under this <u>Section 3.04(a)</u> by the Issuing Bank, by directing the Issuing Bank to withdraw funds from such L/C Lender's Lender Cash Collateral Account, in each case, to satisfy such payment obligations in accordance with Section 45 of the Cash Collateral Agreement. The Issuing Bank shall give prompt notice of such withdrawal in accordance with the Cash Collateral Agreement. Each L/C Lender's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right that such L/C Lender may have against the Issuing Bank, the Borrowers or any other Person for any reason

48

**JX 116-63**

EX-10.1

whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Article IV, (iii) any adverse change in the condition (financial or otherwise) of the Borrowers or any other Loan Party, (iv) any breach of this Agreement or any other Loan Document by the Borrowers, any other Loan Party or any other Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing; provided that each L/C Lender shall only be obligated to make any such payment in Dollars (and not any foreign currency) in accordance with the provisions of Section 3.10 hereof.

(b) If any amount required to be paid by any L/C Lender to the Issuing Bank pursuant to Section 3.04(a) in respect of any unreimbursed portion of any payment made by the Issuing Bank under any Letter of Credit is paid to the Issuing Bank within three Business Days after the date such payment is due, such L/C Lender shall pay to the Issuing Bank on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to the Issuing Bank, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Lender pursuant to Section 3.04(a) is not made available to the Issuing Bank by such L/C Lender within three Business Days after the date such payment is due, the Issuing Bank shall be entitled to recover from such L/C Lender, on demand, the ~~Base~~Eurodollar Rate plus ~~5.25~~11% per annum. A certificate of the Issuing Bank submitted to any L/C Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error, provided that (x) in lieu of making any demands under this Section 3.04(b), the Issuing Bank may withdraw funds from such L/C Lender~~'~~'s Lender Cash Collateral Account; or (y) so long as funds sufficient to pay such amount are in such L/C Lender's Lender Cash Collateral Account and are available to the Issuing Bank without stay or delay, such L/C Lender may satisfy any demands made under this Section 3.04(b) by the Issuing Bank, by directing the Issuing Bank to withdraw funds from such L/C Lender's Lender Cash Collateral Account, in each case, to satisfy such payment obligations in accordance with Section ~~4~~5 of the Cash Collateral Agreement. The Issuing Bank shall give prompt notice of such withdrawal in accordance with the Cash Collateral Agreement.

(c) Whenever, at any time after the Issuing Bank has made payment under any Letter of Credit issued by the Issuing Bank and has received from any L/C Lender its pro rata share of such payment in accordance with Section 3.04(a) or (b), the Issuing Bank receives any payment related to such Letter of Credit (whether directly from the applicable Borrower or otherwise, including proceeds of collateral applied thereto by the Issuing Bank), or any payment of interest on account thereof, the Issuing Bank will distribute to such L/C Lender its pro rata share thereof; provided, however, that in the event that any such payment received by the Issuing Bank shall be required to be rescinded, restored or returned by the Issuing Bank upon the bankruptcy, insolvency or reorganization of any Person or otherwise, such L/C Lender shall return to the Issuing Bank the portion thereof previously distributed by the Issuing Bank to it, provided, further, that if such L/C Lender (x) is an L/C Lender with respect to which an L/C Lender Insolvency Event has occurred and is continuing with respect to such L/C Lender or its Parent Company, or if such L/C Lender or its Parent Company has become the subject of a Bail-In Action, and (y) such L/C Lender has defaulted on its obligations to the Issuing Bank, then the Issuing Bank may apply any such proceeds first to such defaulted obligations and after such defaulted obligations are paid in full, pay any remainder to such L/C Lender.

49

**JX 116-64**

EX-10.1

Section 3.05 <u>Reimbursement Obligation of the Borrowers</u>. If any draft is paid under any Letter of Credit, the applicable Borrower shall reimburse the Issuing Bank for the amount of (a) the draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by the Issuing Bank in connection with such payment, not later than 12:00 Noon on (i) the Business Day immediately following the day that the applicable draft is paid if Borrower receives notice of such draft on such day prior to 10:00 A.M. or (ii) if clause (i) above does not apply, the second Business Day immediately following the day that the draft is paid. Interest shall be payable on any such amounts from the date on which the relevant draft is drawn until paid at ~~(x) until the Business Day next succeeding the date of the relevant drawing,~~ a rate equal to the ~~Base~~<u>Eurodollar</u> Rate plus ~~5.25~~<u>11</u>% per annum~~, and (y) thereafter, at a rate per annum equal to the Base Rate plus 8.25%~~.

Section 3.06 <u>Obligations Absolute</u>. Each Borrower<u>'</u>s obligations under this <u>Article III</u> shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that any Borrower may have or have had against the Issuing Bank, any beneficiary of a Letter of Credit or any other Person. Each Borrower also agrees with the Issuing Bank that the Issuing Bank shall not be responsible for, and such Borrower<u>'</u>s Reimbursement Obligations under <u>Section 3.05</u> shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among such Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of such Borrower against any beneficiary of such Letter of Credit or any such transferee. The Issuing Bank shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Issuing Bank that issued such Letter of Credit. Each Borrower agrees that any action taken or omitted by the Issuing Bank under or in connection with any Letter of Credit issued by the Issuing Bank or the related drafts or documents, if done in the absence of gross negligence or willful misconduct, shall be binding on such Borrower and shall not result in any liability of the Issuing Bank to such Borrower.

Section 3.07 <u>Letter of Credit Payments</u>. If any draft shall be presented for payment under any Letter of Credit, the Issuing Bank shall promptly notify the applicable Borrower of the date and amount thereof. The responsibility of the Issuing Bank to the Borrowers in connection with any draft presented for payment under any Letter of Credit issued by the Issuing Bank shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

50

**JX 116-65**

EX-10.1

Section 3.08 <u>Applications</u>. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this <u>Article III</u>, the provisions of this <u>Article III</u> shall apply.

Section 3.09 <u>Use of Letters of Credit</u>. The Letters of Credit shall be available (and each Borrower agrees that it shall use such Letters of Credit) for general corporate purposes of Holdings and its Subsidiaries.

Section 3.10 <u>Currency Equivalents Generally; Exchange Rates</u>.

(a) The Agent or the Issuing Bank, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of Letters of Credit and other Obligations denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date occurs. Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any Alternative Currency for purposes of the Loan Documents shall be such Dollar Equivalent amount as determined by the Agent or the Issuing Bank, as applicable, in accordance with the first sentence of this <u>clause (a)</u>. The Borrowers and the L/C Lenders will be promptly informed of the results of such calculations. Notwithstanding the foregoing, for purposes of this Agreement and the other Loan Documents, where the permissibility of a transaction or determinations of required actions or circumstances (excluding in connection with the matters referred to in <u>clause (b)</u> below) depend upon compliance with, or are determined by reference to, amounts stated in Dollars, such amounts shall be deemed to refer to Dollars or Dollar Equivalents and any requisite currency translation shall be based on the Spot Rate, and the permissibility of actions taken under <u>Section 6.02</u> shall not be affected by subsequent fluctuations in exchange rates; <u>provided</u> that if Permitted Refinancing Debt is incurred to refinance other Debt, and such Permitted Refinancing Debt would cause the applicable Dollar denominated limitation to be exceeded if calculated at the Spot Rate in effect on the Business Day immediately preceding the date of such refinancing, such Dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of Permitted Refinancing Debt does not exceed the principal amount of such Debt being refinanced except as permitted hereunder.

(b) Wherever in this Agreement in connection with any payment of any Obligations or the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Obligation or Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Agent or the Issuing Bank, as the case may be.

51

**JX 116-66**

EX-10.1

Section 3.11 <u>Borrowers Cash Collateral</u>.

(a) If:

(i) any Event of Default occurs and is continuing and the Required L/C Lenders require the Borrowers to Cash Collateralize the L/C Lender Exposure;

(ii) an Event of Default set forth under Section 7.01(e) occurs and is continuing;

(iii) for any reason, any Letter of Credit is outstanding at the time of termination in full of the L/C Commitments and backstop Satisfactory Letters of Credit are not in place;

(iv) for any reason, any Letter of Credit is outstanding at the time that the aggregate L/C Lender Exposure exceed the L/C Commitments (including as a result of a reduction pursuant to Section 2.11) and backstop Satisfactory Letters of Credit are not in place; or

(v) any Letter of Credit is outstanding at the time the Existing Credit Agreement or the Guarantee and Collateral Agreement is terminated, replaced or refinanced and backstop Satisfactory Letters of Credit are not in place; or

(i) at any time that the aggregate amount of the Obligations (as defined in the Guarantee and Collateral Agreement) exceeds the Modified Borrowing Base, as set forth in the most recently delivered Modified Borrowing Base Certificate.

then the Borrowers shall at such time (or in the case of clause (vi) within 10 days of such occurrence, provided that the Obligations (as defined in the Guarantee and Collateral Agreement) then continue to exceed the Modified Borrowing Base, as set forth in the most recent Modified Borrowing Base Certificate) deposit in a cash collateral account maintained by the Agent, an amount equal to 102% of the aggregate L/C Lender Exposure (or, in the case of clause (iv) or (vi), 102% of the amount of such excess), and shall do so not later than 2:00 P.M. on (x) in the case of the immediately preceding clause (i), (iii) or (iv), (1) the first Business Day immediately following the day that the Borrowers receives notice thereof, if such notice is received on such day prior to 12:00 noon or (2) if clause (1) above does not apply, the second Business Day immediately following the day that the Borrowers receive such notice and (y) in the case of the immediately preceding clause (ii) or (v), the Business Day on which an Event of Default set forth under Section 7.01(e) occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day.

(b) The Borrowers hereby grant to the Agent, for the benefit of the L/C Lenders, a security interest in all cash collateral accounts established pursuant to Section 3.11(a), and all cash deposited and all balances therein and all proceeds of the foregoing. Cash collateral held by the Agent pursuant to this Agreement (including pursuant to Article VII) may be invested in cash equivalents selected by the Agent in its sole discretion. Upon the drawing of

52

**JX 116-67**

EX-10.1

any Letter of Credit for which funds are on deposit as cash collateral, such funds shall be applied, to the extent permitted under applicable Requirements of Law, to reimburse the Issuing Bank, or, to the extent any L/C Lender has paid the Issuing Bank in respect of any amounts not reimbursed by the Borrowers pursuant to Section 3.04(a), to reimburse the L/C Lenders. To the extent the amount of any such cash collateral exceeds 102% of the then current amount of all L/C Lender Exposure and so long as no Event of Default has occurred and is continuing, the excess shall be refunded to the Borrowers. In the case of clause (i) or (ii) above, if such Event of Default is cured or waived and no other Event of Default is then occurring and continuing, the amount of any such cash collateral shall be refunded to the Borrowers.

Section 3.12 Replacement and Cancellation of Letters of Credit. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, to the extent that the Issuer Exposure exceeds the Aggregate L/C Commitments at any time, whether as a result of Section 2.11, the occurrence of the L/C Termination Date, or otherwise, and regardless of whether there are backstop Satisfactory Letters of Credit, the Borrowers shall use their reasonable best efforts to cause a replacement letter of credit to be issued, or other credit support or collateral to be provided to the applicable beneficiaries thereof and cause the Letters of Credit to be returned to the Issuing Bank and cancelled, such that after giving effect to all returns and cancellations pursuant to this sentence, the Issuer Exposure does not exceed the Aggregate L/C Commitments.

## ARTICLE IV

## CONDITIONS TO EFFECTIVENESS

Section 4.01 Conditions Precedent to Effectiveness. The effectiveness of this Agreement is conditioned upon satisfaction of the following conditions precedent:

(a) The Agent's receipt of the following, each of which shall be originals or pdf copies (followed promptly by originals) unless otherwise specified, each properly executed by an Authorized Officer of the signing Loan Party (or, in the case of this Agreement, the Cash Collateral Agreement and any other document, certificate or instrument required to be signed by the L/C Lenders, the signing L/C Lender), each dated as of the Effective Date (or, in the case of certificates of governmental officials, a recent date before the Effective Date) and each in form and substance satisfactory to the Agent:

(i) this Agreement duly executed by each of Holdings, the Borrowers, the Agent, and the Lenders.

(ii) The Reaffirmation Agreement duly executed by each Loan Party party to the Guarantee and Collateral Agreement;

(iii) a duly executed Cash Collateral Agreement;

(iv) all other Loan Documents to the extent reasonably requested by the Agent, each duly executed by the applicable Loan Parties;

53

**JX 116-68**

EX-10.1

(v) the Perfection Certificate duly executed by each of Holdings and the other Loan Parties;

(vi) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Loan Party and each L/C Lender as the Agent may reasonably require evidencing (A) the authority of each Loan Party or L/C Lender to enter into this Agreement and the other Loan Documents to which such Loan Party or L/C Lender is a party or is to be a party and (B) the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(vii) copies of each Loan Party's and L/C Lender's organization or other governing documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party or L/C Lender is duly organized or formed, and that each Loan Party or L/C Lender is validly existing, in good standing and qualified to engage in business in each jurisdiction where failure to so qualify could reasonably be expected to have a Material Adverse Effect;

(viii) (A) An opinion of in house counsel to Holdings and of one or more special or local counsel to Holdings, the Borrowers, and the other Loan Parties, addressed to the Agent and each Lender as to such matters as the Agent may reasonably request and (B) an opinion of counsel to the L/C Lenders, addressed to the Agent and Issuing Bank as to such matters as the Agent may reasonably request;

(ix) a certificate signed by an Authorized Officer of Holdings and the Borrowers certifying (A) that the conditions specified in Section 4.02 have been satisfied, (B) to the Solvency of the Loan Parties, taken as a whole, as of the Effective Date after giving effect to the transactions contemplated hereby, (C) that the Perfection Certificate is true and correct in all material respects, and (D) that attached to such certificates are the true and correct executed copies of the Guarantee and Collateral Agreement and the Existing Intercreditor Agreement;

(x) results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Liens permitted by Section 6.02(a);

(xi) such other customary certificates, documents or consents as the Agent reasonably may require; and

(xii) the Existing Agent Acknowledgement and Consent, duly executed by the Existing Agent and Holdings, and the Borrowers.

54

**JX 116-69**

EX-10.1

(b) The conditions set forth in Section 4.02 (other than clause (v) thereof) shall be satisfied.

(c) There shall have been no event or circumstance since January 30, 2016 that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(d) All fees required to be paid to the Agent on or before the Effective Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Effective Date shall have been paid in full.

(e) The Borrowers shall have paid all costs and expenses of the Agent (to the extent set forth in Section 9.04(a)) incurred in connection with or relating to this Agreement and the other Loan Documents, including reasonable fees, charges and disbursements of counsel to the Agent, to the extent invoiced prior to or on the Effective Date; provided that such payment shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent.

Section 4.02 Conditions Precedent to Each Issuance of a Letter of Credit. The obligation of the Issuing Bank to issue a Letter of Credit on any date shall be subject to the conditions precedent that the effectiveness of this Agreement shall have occurred and on the date of such L/C Extension the following statements shall be true (and each Application for a Letter of Credit shall constitute a representation and warranty by the applicable Borrower that on the date of such Application such statements are true):

(i) the representations and warranties made by (x) each Loan Party in or pursuant to the Loan Documents and (y) by the L/C Lenders in Section 5.02 hereof in or pursuant to the Cash Collateral Agreement or any Assignment and Acceptance, assumption, joinder or similar agreement pursuant to which such L/C Lender becomes a party hereto, in each case, are true and correct on and as of such date in all material respects, before and after giving effect to such L/C Extension, as though made on and as of such date, except to the extent that (A) such representations or warranties are qualified by a materiality standard, in which case they shall be true and correct in all respects, and (B) such representations or warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(ii) no event has occurred and is continuing, or would result from such L/C Extension, that constitutes a Default or an Event of Default;

(iii) after giving effect to such L/C Extension, no Collateral Coverage Event (as defined in the Indenture for the Existing Second Lien Notes) shall result therefrom;

(iv) the Issuing Bank and Agent shall have received a certificate from each L/C Lender executed by an Authorized Officer of such L/C Lender confirming the accuracy of such L/C Lender's representations and warranties as set forth in Section 4.02(i)(y) above;

55

**JX 116-70**

(v) the Issuer Exposure shall not exceed the L/C Commitments, and the aggregate amount on deposit in the Lender Cash Collateral Accounts shall not be less than 102% of the Issuer Exposure, in each case, after giving effect to such L/C Extension; and

(vi) if the Letter of Credit to be issued is of the type described in Section 3.01(e)(i) or (e)(ii) the Issuing Bank and the Agent shall have received an instruction letter from the Required L/C Lenders requiring the Issuing Bank to issue such Letter of Credit; provided that by executing and delivering this Agreement, the Required L/C Lenders hereby direct the Issuing Bank to issue a Letter of Credit in the amount of $200,000,000 contemplated to be issued to the party previously disclosed by the Borrowers to the Issuing Bank, on or about the Effective Date, pursuant to Section 3.01(e).

The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required L/C Lenders otherwise direct the Agent to cease issuing Letters of Credit, the L/C Lenders will participate in all Letters of Credit whenever issued, which are requested by a Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Agent acting in the interests of the Credit Parties, provided, however, the issuance of any such Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01 Representations and Warranties of the Borrowers. Holdings and the Borrowers hereby jointly and severally represent and warrant as follows:

(a) Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby or thereby, are within such Loan Party's powers, have been duly authorized by all necessary organizational action, and (x) will not result in a breach of any of the terms and provisions of, or constitute a default under, the Existing Credit Agreement, and (y) do not contravene (i) the charter or by-laws or other organizational or governing documents of such Loan Party or (ii) law or any contractual restriction binding on or affecting any Loan Party, except, for purposes of this clause (ii), to the extent such contravention would not reasonably be expected to have a Material Adverse Effect.

56

**JX 116-71**

EX-10.1

(c) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by any Loan Party of any Loan Document to which it is a party that has not already been obtained if the failure to obtain such authorization, approval or other action could reasonably be expected to result in a Material Adverse Effect.

(d) Each Loan Document has been duly executed and delivered by each Loan Party party thereto. This Agreement constitutes, and each other Loan Document will constitute upon execution, the legal, valid and binding obligation of each Loan Party party thereto enforceable against such Loan Party in accordance with its respective terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(e) The consolidated balance sheet of Holdings and its Subsidiaries as at January 30, 2016,2017, and the related consolidated statements of income and cash flows of Holdings and its Subsidiaries for the fiscal year then ended, accompanied by an opinion of Deloitte & Touche LLP, independent public accountants, copies of which have been furnished to the Agent, fairly present the consolidated financial condition of Holdings and its Subsidiaries as at such date and the consolidated results of the operations of Holdings and its Subsidiaries for the period ended on such date, all in accordance with GAAP consistently applied.

(f) Since January 30, 2016,2017, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(g) There is no action, suit, investigation, litigation or proceeding, including any Environmental Action, which is pending or, to Holdings or any Borrower's knowledge, threatened affecting Holdings, the Borrowers or any of their respective Subsidiaries before any court, Governmental Authority or arbitrator that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect other than as reported in filings with the SEC made prior to the date hereof.

(h) Following each L/C Extension, not more than five (5%) percent of the value of the assets of the Borrowers and their respective Subsidiaries on a consolidated basis will be margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System).

(i) No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(j) All United States Federal income tax returns and all other material tax returns which are required to be filed have been filed by or on behalf of Holdings, the Borrowers and their respective Subsidiaries, and all taxes due with respect to Holdings, the Borrowers and their respective Subsidiaries pursuant to such returns or pursuant to any assessment received by Holdings, the Borrowers or any Subsidiary have been paid except to the extent permitted in Section 6.01(b). The charges, accruals and reserves on the books of Holdings, the Borrowers and their Subsidiaries in respect of taxes or other governmental charges have been made in accordance with, and to the extent required by, GAAP.

57

JX 116-72

EX-10.1

(k) All written factual information heretofore furnished by Holdings, the Borrowers or their Subsidiaries to the Agent or any Lender (including the Perfection Certificate) for purposes of or in connection with this Agreement or any other Loan Document, taken as a whole, was true and correct in all material respects on the date as of which such information was stated or certified; provided that with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

(l) (i) Each Loan Party has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property necessary for the conduct of its business and except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, and (ii) no Collateral, DC or Related Intellectual Property is subject to any Lien except as permitted by Section 6.02(a).

(m) Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (i) each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted; (ii) no material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor do Holdings or the Borrowers know of any valid basis for any such claim; and (iii) the use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

(n) Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, (i) neither a Reportable Event nor a failure to meet minimum required contributions (in accordance with Section 430 or any prior applicable section of the Internal Revenue Code or Section 302 of ERISA) has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Plan, (ii) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code and other applicable federal or state laws, and (iii) no termination of a Single Employer Plan has occurred. Except as set forth on Schedule 5.01(n), no Lien imposed under the Internal Revenue Code or ERISA exists on account of any Plan, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Each Single Employer Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the United States Internal Revenue Service (the "IRS") and, to the best knowledge of Holdings and the Borrowers, nothing has occurred which would cause the loss of, such qualification. Except as set forth on Schedule 5.01(n) or as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 430 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 430 of the Internal Revenue Code has been made with respect to any Plan. There are no pending or, to the best knowledge of Holdings and the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan

58

**JX 116-73**

that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary duty rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur, in each case that would reasonably be expected to result in a Material Adverse Effect. Neither any Loan Party nor any ERISA Affiliate has incurred, or would reasonably be expected to incur, any liability under Title IV of ERISA with respect to any Pension Plan, other than premiums due and not delinquent under Section 4007 of ERISA or as would not reasonably be expected to have a Material Adverse Effect; neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and, to the knowledge of the Borrowers, no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan except as would not reasonably be expected to have a Material Adverse Effect; and neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA. Except as would not reasonably be expected to have a Material Adverse Effect, neither Holdings, the Borrowers nor any Commonly Controlled Entity has had a complete or partial withdrawal (as such terms are defined in Sections 4203 and 4205 of ERISA, respectively) from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA. No such Multiemployer Plan is in Reorganization or Insolvent except as would not reasonably be expected to result in aggregate liability to Holdings and its Subsidiaries of $100,000,000 or more.

(o) Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Group Member (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(p) The Guarantee and Collateral Agreement is effective to create in favor of the Co-Collateral Agents, for the benefit of the Credit Parties, a legal, valid and enforceable security interest in the ABL Collateral described therein and proceeds thereof. The Guarantee and Collateral Agreement constitutes, to the extent a security interest can be perfected by filing the UCC financing statements specified on Schedule 5.01(p) and by executing the control agreements described on Schedule 5.01(p), a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the ABL Collateral and the proceeds thereof, as security for the ABL Obligations, in each case prior and superior in right to the Lien or claim of any other Person (except Liens permitted by Section 6.02(a) which by operation of law would have priority over the Liens securing the ABL Obligations). ~~Each Mortgage, upon execution and delivery thereof by the parties thereto, will create in favor of the Agent for the benefit of the L/C Lenders and the Issuing Bank, a legal, valid and enforceable second lien, subject to Permitted Liens, security interest in all the applicable mortgagor's right, title and interest in and to the Real Estate Collateral subject thereto and the proceeds thereof, and when the Mortgages have been filed in the appropriate filing or recording office in the jurisdictions specified therein, the Mortgages will constitute a fully perfected security interest in all right, title and interest of the mortgagors in the Real Estate Collateral and the proceeds thereof, prior and superior to the rights of any other Person, except for rights secured by Liens permitted under Section 6.02.~~

59

**JX 116-74**

EX-10.1

(q) The Loan Parties, taken as a whole, are, and after giving effect to the incurrence of all Debt and obligations incurred in connection herewith will be, Solvent.

(r) The properties of the Loan Parties are insured as required pursuant to Section 6.01(c) hereof. Each insurance policy required to be maintained by the Loan Parties pursuant to Section 6.01(c) is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

(s) As of the Effective Date, the copies of the organization and governing documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

(t) As of the Effective Date, except as would not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of Holdings or any Borrower, threatened, (b) the hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign law dealing with such matters, (c) all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.01(t) (as updated by the Borrowers from time to time) (i) no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement or any material bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (excluding in each case individual employment agreements) and (ii) no employee of a Loan Party is also an employee of the Permitted Holder. There are no representation proceedings pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition, in each case which would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of Holdings or any Borrower, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries which would, individually or in the aggregate, be reasonably expected to result in a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

60

JX 116-75

EX-10.1

(u) No broker or finder brought about the obtaining, making or closing of the transactions contemplated by this Agreement and the other Loan Documents, and, other than amounts payable pursuant to the Fee Letter, no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

(v) No Loan Party has any obligation to any Permitted Holder with respect to any consulting, management or similar fee; provided, that, for the avoidance of doubt, the foregoing shall not apply to (i) any arrangement disclosed in Holdings' annual report on form 10-K for the fiscal year ended January 30, 2016; (ii) any employment arrangement between any Loan Party and an individual Person who is also an employee of a Permitted Holder, so long as such employment arrangements are (x) on terms that are fair and reasonable and comparable to terms provided to employees in comparable positions for companies of a comparable size and no less favorable to such Loan Party than it would obtain in a comparable arm's length transaction with a Person that is not an employee of a Permitted Holder and (y) in the case of any officer (as defined in Rule 16a-1 under the Securities Exchange Act of 1934) or director of Holdings, any beneficial owner (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of more than 10.0% of Holdings' equity interests or any Person that ranks in the top five in compensation among all employees of the Loan Parties, approved by a majority of disinterested members of the board of directors of Holdings in good faith; or (iii) any obligation arising from any financial advisory, financing or underwriting services or other investment banking activities provided by a Permitted Holder so long as (x) such services directly relate to and are provided in conjunction with an acquisition or divestiture or other specific transaction conducted outside the ordinary course of business, (y) such services are on terms that are fair and reasonable and comparable to terms provided by independent financial advisory, financing or underwriting service provider or other investment banking service providers and (z) compensation for such services are approved by a majority of disinterested members of the board of directors of Holdings in good faith.

(w) To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the United States Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the PATRIOT Act, (iii) the United States Foreign Corrupt Practices Act of 1977, and (iv) the Corruption of Foreign Public Officials Act, as amended (the "FCPA"). No Letter of Credit or any part of any drawing thereunder will be used, directly or, to the Loan Parties' knowledge, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(x) None of Holdings, the Borrowers, nor any of their respective Subsidiaries, nor, to the knowledge of the Borrowers, any director, officer, employee, agent or affiliate of the Borrowers is an individual or entity (for purposes of this clause (x), a "Person") that is, or is owned or controlled by Persons that are the subject of any sanctions (A) administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury or other applicable sanctions authority or (B) pursuant to the U.S. Iran Sanctions Act, as amended,

61

JX 116-76

EX-10.1

or Executive Order 13590 (collectively, "Sanctions") or (C) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, without limitation, Iran, North Korea, Sudan, Crimea, Cuba and Syria). The Loan Parties will not, directly or, to their knowledge, indirectly, use or permit to be used any Letter of Credit or any part of any drawing thereunder or lend, contribute or otherwise make available the proceeds thereof to any Subsidiary, joint venture partner or other Person in any manner that would directly or indirectly result in a violation of Sanctions by any Person.

(y) (i) This Agreement, each Letter of Credit, and all Obligations under the Loan Documents are Bank Products and "Bank Products" as defined in the Existing Intercreditor Agreement, (ii) this Agreement and each Letter of Credit is an Other LC Facility, (iii) the Obligations are "Borrower Obligations" and "Guarantor Obligations" as defined in the Guarantee and Collateral Agreement, and (iv) the Obligations are "ABL Obligations" as defined in the Existing Intercreditor Agreement.

(z) No Loan Party is an EEA Financial Institution.

(aa) Except for this Agreement, each Letter of Credit and all Obligations under this Loan Documents, and except as set forth on Schedule 5.01(aa), none of the Loan Parties have any Bank Products or Cash Management Services.

Section 5.02 Representations and Warranties of the Lenders. Each of the L/C Lenders represents and warrants to the Borrowers that it is a "Lender" or an "Affiliate of a Lender" (in each case, as defined in the Existing Credit Agreement).

# ARTICLE VI

# COVENANTS

Section 6.01 Affirmative Covenants. So long as any L/C Lender Exposure is outstanding, each of Holdings and the Borrowers will, and will cause each of their Subsidiaries to:

(a) Compliance with Laws, Etc. Comply in all respects with all applicable Requirements of Law, such compliance to include compliance with ERISA and Environmental Laws, except for such non-compliance as would not reasonably be expected to have a Material Adverse Effect.

(b) Payment of Taxes, Etc. Pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property (ii) all payments required to be made to any Pension Plan, and (iii) all lawful claims that, if unpaid, might by law become a Lien upon its property; provided that neither Holdings, the Borrowers nor any of their Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim (x) that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors or (y) if such non-payments, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect.

62

**JX 116-77**

EX-10.1

(c) <u>Maintenance of Insurance</u>. At all times comply with the insurance requirements set forth in Section 6.01(c) of the Existing Credit Agreement, and each other insurance requirement set forth in each other ABL Loan Document, each as in effect on the Effective Date.

(d) <u>Preservation of Corporate Existence, Etc</u>. Preserve and maintain its corporate existence, material rights (charter and statutory) and franchises; <u>provided</u> that (i) Holdings, the Borrowers and their Subsidiaries may consummate any merger or consolidation permitted under <u>Section 6.02(b)</u>; (ii) neither Holdings nor the Borrowers nor any of their Subsidiaries shall be required to preserve or maintain the corporate existence of any Subsidiary (other than Sears, SRAC, Kmart Corp. or any Material Subsidiary Guarantors) if the Board of Directors of the parent of such Subsidiary, or an executive officer of such parent to whom such Board of Directors has delegated the requisite authority, shall determine that the preservation and maintenance thereof is no longer desirable in the conduct of the business of such parent and that the loss thereof is not disadvantageous in any material respect to the Borrowers, Sears, any Material Subsidiary Guarantor, such parent or the Lenders; (iii) ~~Sears shall not be required to preserve or maintain the corporate existence of SRAC; provided that in the event SRAC is dissolved, merged with or into Holdings or any Subsidiary of Holdings or otherwise ceases to exist, then Sears shall or shall cause a direct wholly owned Domestic Subsidiary of Sears to, execute and deliver to the Agent an assumption agreement with respect to SRAC's obligations under the Loan Documents in form and substance reasonably satisfactory to the Agent and such other officer certificates, legal opinions, financing statements (if applicable) and documentation as the Agent reasonably requests; (iv)~~ none of Holdings, the Borrowers or any of Material Subsidiary Guarantors shall be required to preserve any right or franchise of any Subsidiary (other than a Material Subsidiary Guarantor) if the Board of Directors of Holdings, such Borrower or such Material Subsidiary Guarantor shall determine that the preservation thereof is no longer desirable in the conduct of its business and that the loss thereof is not disadvantageous in any material respect to Holdings, the Borrowers, such Material Subsidiary Guarantor or the Lenders and (~~v~~iv) no Subsidiary Guarantor which is not a Material Subsidiary Guarantor shall be required to preserve or maintain its corporate existence if (A) no Default or Event of Default has occurred and is continuing, and (B) such Subsidiary Guarantor is merged or liquidated into another Subsidiary Guarantor; <u>provided</u> that contemporaneously with the occurrence of any of the actions permitted to be taken pursuant to clauses (i) ~~–~~ (~~v~~iv) above, the Borrowers shall furnish to the Agent an updated Borrowing Base Certificate.

(e) <u>Inspection Rights</u>. In addition to the Agent<u>'</u>s rights under <u>Section 6.01(k)</u> hereof, subject to reasonable confidentiality limitations and requirements imposed by Holdings or the Borrowers due to competitive concerns or otherwise, at any reasonable time and from time to time (but no more than twice a year unless a Default or an Event of Default has occurred and is continuing), permit the Agent or any of the Lenders or any agents or representatives thereof, at the Lenders<u>'</u> expense, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Holdings, the Borrowers and any of their Subsidiaries, and to discuss the affairs, finances and accounts of Holdings, the Borrowers and any of their Subsidiaries, as the case may be, with any of their officers or directors and with their independent certified public accountants.

63

**JX 116-78**

EX-10.1

(f) Keeping of Books. Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Holdings, the Borrowers and each such Subsidiary in accordance with GAAP in effect from time to time.

(g) Maintenance of Properties, Etc. Except as otherwise permitted pursuant to Section 6.02(b), or where the failure to do so, either individually or in the aggregate, would not be reasonably expected to have a Material Adverse Effect, maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(h) ~~Transactions with Affiliates~~ Intentionally Omitted. ~~Conduct all transactions otherwise permitted under this Agreement with any of their Affiliates on terms that are fair and reasonable and no less favorable to Holdings, the applicable Borrower or their respective Subsidiaries than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate other than (i) as required by any applicable Requirement of Law, (ii) so long as no Default or Event of Default has occurred and is continuing, transactions between or among the Loan Parties and any of their Subsidiaries, to the extent not prohibited hereunder, or (iii) if a Default or Event of Default has occurred and is continuing, transactions in the ordinary course of business between or among the Loan Parties and any of their Subsidiaries and transactions between or among Loan Parties, to the extent not prohibited hereunder; provided, that the foregoing shall not prohibit (x) any Loan Party or any Subsidiary thereof from entering into employment arrangements with its officers and retention and other agreements with officers and directors pursuant to the reasonable requirements of its business or (y) any transactions in effect on the "Effective Date" (as defined in the Existing Credit Agreement as in effect on the Effective Date).~~

(i) Further Assurances.

(i) At all times comply with the further assurances requirements set forth in Section 6.01(i) of the Amended Credit Agreement, and each other further assurance or similar requirement set forth in each other ABL Loan Document, each as in effect on the Amendment No. 1 Effective Date.

(ii) With respect to any (i) ABL Collateral acquired after the Effective Date by any Group Member that is or is required to become a Loan Party hereunder and (ii) any property required to become subject to a perfected Lien in favor of the Co-Collateral Agents pursuant to the Existing Credit Agreement, promptly (i) execute and deliver to the Co-Collateral Agents such amendments to the Guarantee and Collateral Agreement or such other documents as the Agent may reasonably request in order to grant to the Co-Collateral Agents, for the benefit of the Credit Parties, a security interest in such property and (ii) take all actions as the Agent, may reasonably request to grant to the Co-Collateral Agents, for the benefit of the Credit Parties, a perfected security interest in such property with the priority required herein, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Agent and the delivery of blocked account and other control agreements as may be reasonably requested by the Agent.

64

**JX 116-79**

(iii) With respect to any new Domestic Subsidiary (other than any Credit Card Royalty Securitization Subsidiary) which is created or acquired after the Effective Date by any Group Member and which owns any ABL Collateral, promptly cause such new Domestic Subsidiary to (i) become a party to the Guarantee and Collateral Agreement, (ii) take such actions as the Agent, may reasonably request to grant to the Co-Collateral Agents for the benefit of the Credit Parties a security interest, with the priority and perfection required herein, in the ABL Collateral held by such new Domestic Subsidiary, including, to the extent applicable, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Agent and the delivery of blocked account and other control agreements, (iii) if requested by the Agent, deliver to the Agent an officer's certificate with respect to such Domestic Subsidiary in form and substance reasonably satisfactory to the Agent, and (iv) if requested by the Agent, deliver to the Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent.

(iv) In the event the Borrowers or the other Loan Parties open a new deposit account in which funds of any of the Loan Parties are concentrated, or commence concentrating funds in an existing deposit account that is not subject to a control agreement, at the request of the Agent, the Borrowers shall deliver or cause to be delivered to the Co-Collateral Agents with a copy to the Agent a control agreement reasonably satisfactory in form and substance to the Agent with respect to such account.

(v) In the event that the ABL Collateral owned by Private Brands, Ltd. at any time exceeds $50,000,000, if requested by the Agent, deliver to the Agent legal opinions with respect to perfection of the Co-Collateral Agents' Liens and such other matters as the Agent may reasonably request, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent.

(vi) As promptly as practicable, and in any event (A) with respect to real property that falls within clause (a) of the definition of Real Estate Collateral, within 30 days after the Effective Date and (B) with respect to any real property that falls within clause (b) of the definition of Real Estate Collateral, 30 days after the date on which such real property becomes subject to a Mortgage securing the December Real Estate Loan, or in each case, such other date as may be reasonably agreed in writing between the Borrowers and the Required L/C Lenders, the Borrowers shall, and shall cause each other Loan Party to (i) deliver Flood Compliance Documents (as applicable) for each Real Estate Collateral in compliance with the Flood Laws, (ii) deliver a title search lien report from a nationally recognized title insurance company for each real property that is

65

JX 116-80

EX-10.1

Real Estate Collateral, (iii) deliver to a title company reasonably acceptable to the Agent an original fully assembled Mortgage with respect to each real property that is Real Estate Collateral duly executed, acknowledged and witnessed and delivered by the record owner of such real property that is Real Estate Collateral in escrow with the only condition of release to the Agent being notice by the Agent to such title company of the compliance with subsection (i) hereof, (iv) take actions as reasonably requested by the mortgagee or beneficiary under the Mortgage to permit it or its agent to make all appropriate filings in the recording offices in any relevant jurisdictions, such that the Mortgages will constitute a fully perfected second lien, subject to Permitted Liens, security interest in all right, title and interest of the mortgagors in the Real Estate Collateral, including, the payment of funds sufficient to pay applicable mortgage tax or other recording charge or amounts necessary for the recording of the Mortgage, (v) provide confirmation from local counsel or the title insurance company in each jurisdiction that the form of the Mortgage is in a form sufficient for recording in the applicable jurisdiction, and (vi) deliver such other instruments, documents or take other actions to as reasonably requested by the L/C Lenders in connection with the satisfaction of the delivers pursuant to this subsection (vi), provided that, the Required L/C Lenders may waive the requirements of clauses (iii) – (vi) of this Section 6.01(i)(vi), including the requirement to deliver Mortgages with respect to any Property or all of the Properties upon written notice to the Borrowers (and, for the avoidance of doubt, without requiring the consent or approval of the Agent or Issuing Bank).

(vii) On or prior to the date that a Domestic Subsidiary of Holdings that is not a Loan Party executes and delivers a Mortgage, the Loan Parties shall cause such Domestic Subsidiary to (i) become a Subsidiary Guarantor by completing a guarantee agreement in form and substance reasonably satisfactory to the Agent, (ii) if requested by the Agent or the Required L/C Lenders, deliver to the Agent and/or Required L/C Lenders an officer's certificate with respect to such Domestic Subsidiary in form and substance reasonably satisfactory to the Agent and Required L/C Lenders, and such other documents that are consistent with those delivered pursuant to Section 4.01, and (iii) if requested by the Agent or Required L/C Lenders, deliver to the Agent and/or Required L/C Lenders legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent and Required L/C Lenders.

(j) <u>Reporting Requirements</u>. Furnish to the Agent:

(i) as soon as available and in any event within 50 days after the end of each of the first three fiscal quarters of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such quarter and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash

66

**JX 116-81**

flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP, and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit B, including in reasonable detail the calculations necessary to determine the Fixed Charge Ratio (whether or not compliance therewith is then required under Section 6.03), provided that in the event of any change in GAAP used in the preparation of such financial statements, subject to Section 1.03, the Borrowers shall also provide, if necessary for the calculation of the Fixed Charge Ratio, a statement of reconciliation conforming such financial statements to GAAP (the Borrowers being permitted to satisfy the requirements of clause (i)(a) by delivery, in the manner provided in Section 9.02(b), of its quarterly report on form 10-Q (or any successor form), as filed with the SEC);

(ii) as soon as available and in any event within 95 days after the end of each fiscal year of Holdings, (a) a copy of the annual audit report for such year for Holdings and its Subsidiaries, containing the consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its Subsidiaries for such fiscal year, in each case reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by its Board-appointed auditor of national standing, (b) a consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such fiscal year and consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for such fiscal year duly certified by an Authorized Officer of Holdings as having been prepared in accordance with GAAP, and (c) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit B, including in reasonable detail the calculations necessary to determine the Fixed Charge Ratio (whether or not compliance therewith is then required under Section 6.03), provided that in the event of any change in GAAP used in the preparation of such financial statements, the Borrowers shall also provide, if necessary for the calculation of the Fixed Charge Ratio, a statement of reconciliation conforming such financial statements to GAAP (the Borrowers being permitted to satisfy the requirements of clause (ii)(a) by delivery, in the manner provided in Section 9.02(b), of its annual report on form 10-K (or any successor form), as filed with the SEC);

(iii) concurrently with the delivery of each Borrowing Base Certificate to the Existing Agent pursuant to the terms of the Existing Credit Agreement (and in any event within 10 Business Days of the end of each fiscal month or, upon the occurrence and during the continuance of an Accelerated Borrowing Base Delivery Event, no later than Friday of each week (or, if Friday is not a Business Day, on the next succeeding Business Day)), (A) a copy of such Borrowing Base Certificate and (B) a Modified Borrowing Base Certificate as of the last Business Day of the preceding fiscal month (or Friday or following Business Day, as applicable);

67

JX 116-82

EX-10.1

(iv) promptly and in any event within five days after any Authorized Officer of Holdings or any Borrower has knowledge of the occurrence and continuance of a Default or Event of Default, a statement of an Authorized Officer of Holdings or such Borrower setting forth details of such Default or Event of Default and the action that Holdings or such Borrower has taken and proposes to take with respect thereto;

(v) promptly after the sending or filing thereof, copies of all quarterly and annual reports and proxy solicitations that Holdings sends to its public security holders generally, and copies of all reports on form 8-K (or its equivalent) and registration statements for the public offering (other than pursuant to employee Plans) of securities that Holdings or any of its Subsidiaries files with the SEC or any national securities exchange;

(vi) promptly after the commencement thereof, notice of all actions and proceedings before any court, governmental agency or arbitrator affecting Holdings, the Borrowers or any of their Subsidiaries of the type described in <u>Section 5.01(g)</u>;

(vii) as soon as available, but in any event no later than 60 days after the end of each fiscal year of Holdings, forecasts prepared by management of Holdings for Holdings and its domestic Subsidiaries in form satisfactory to the Agent and containing information reasonably required by the Agent;

(viii) (A) contemporaneously with the delivery of the reports required pursuant to clauses (i) and (ii) above, a report (which may take the form of a footnote to Holdings<u>'</u> quarterly and annual reports filed with the SEC and delivered to the Agent) setting forth the estimated Unfunded Pension Liability of Holdings and its Subsidiaries, and (B) promptly after receipt thereof by the Loan Parties, a copy of the funded status report received from the Loan Parties<u>'</u> actuaries with respect to amounts to be funded under the Loan Parties<u>'</u> Pension Plan;

(ix) promptly, notice of any event that the Loan Parties reasonably believes has resulted in a Material Adverse Effect;

(x) concurrently with the delivery thereof to the Existing Agent or any Co-Collateral Agent, copies of all reports, certificates, notices and other information delivered to the Existing Agent or any Co-Collateral Agent in connection with the ABL Loan Documents;

68

**JX 116-83**

EX-10.1

(xi) during the continuance of an Accelerated Borrowing Base Delivery Event, as soon as available and in any event within 30 days after the end of each fiscal month of each fiscal year of Holdings, (a) the consolidated balance sheet of Holdings and its Subsidiaries and the consolidated balance sheet of Holdings and its domestic Subsidiaries as of the end of such month and consolidated statements of income and cash flows of Holdings and its Subsidiaries and the consolidated statements of income and cash flows of Holdings and its domestic Subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such month, duly certified (subject to year-end audit adjustments) by an Authorized Officer of Holdings as having been prepared in accordance with GAAP and (b) a certificate of an Authorized Officer of Holdings as to compliance with the terms of this Agreement and the other Loan Documents in the form of Exhibit B, including in reasonable detail the calculations necessary to determine the Fixed Charge Ratio (whether or not compliance therewith is then required under Section 6.03), provided that in the event of any change in GAAP used in the preparation of such financial statements, subject to Section 1.03, the Borrowers shall also provide, if necessary for the calculation of the Fixed Charge Ratio, a statement of reconciliation conforming such financial statements to GAAP; and

(xii) such other information respecting Holdings, the Borrowers or any of their Subsidiaries, or the Borrowing Base as the Agent or any Lender through the Agent may from time to time reasonably request.

Reports and financial statements required to be delivered by the Borrowers pursuant to clauses (i)(a), (ii)(a) and (v) of this subsection (j) shall be deemed to have been delivered on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a notice to the Agent and the Lenders and that is accessible by the Lenders without charge.

(k) Collateral Monitoring and Review. Upon the request of the Required L/C Lenders, after reasonable notice and during normal business hours, permit the Agent or professionals (including, consultants, accountants, and/or appraisers) retained by the Agent to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) the Loan Parties'' practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, related to the calculation of the Borrowing Base. The Borrowers shall pay the reasonable out-of-pocket fees and expenses of the Agent (including, without limitation, the reasonable charges of professionals) in connection with two inventory appraisals and two commercial finance examinations each fiscal year (which the Agent shall be obligated to undertake for the benefit of the Credit Parties), in each case to the extent requested by the Required L/C Lenders. Notwithstanding the foregoing, the Agent may cause (i) additional appraisals and commercial finance examinations to be undertaken (A) as it in its Permitted Discretion deems necessary or appropriate, at its own expense, and (B) if required by applicable law or if a Default or an Event of Default has occurred and is continuing, in each case, at the expense of the Borrowers. Any inventory appraisal or commercial finance examination requested by the Agent shall be scheduled at such time as the Agent, in consultation with the Borrowers, may agree in order to minimize any disruption to the conduct of the Borrowers'' business.

69

**JX 116-84**

EX-10.1

(l) <u>Landlord Waivers, Access Agreements and Customs Broker Agreements</u>. At all times comply with the requirements set forth in Section 6.01(l) of the Existing Credit Agreement, and each other similar requirement set forth in each other ABL Loan Document, each as in effect on the Effective Date.

(m) <u>Cash Management</u>. At all times comply with the cash management requirements set forth in Sections 6.01(i) and (m) of the Existing Credit Agreement, and each other cash management requirement set forth in each other ABL Loan Document, each as in effect on the Effective Date.

(n) <u>Liens on Non-Collateral Assets</u>. At all times comply with the requirements set forth in Section 6.01(n) of the Existing Credit Agreement, and each other similar requirement set forth in each other ABL Loan Document, each as in effect on the Effective Date.

(o) <u>Physical Inventories</u>. Cause physical inventories and periodic cycle counts to be undertaken, at the expense of the Loan Parties, in each case consistent with past practices (but in no event less frequently than one physical inventory per fiscal year), conducted by such inventory takers and following such methodology as is consistent with the immediately preceding inventory or as otherwise may be satisfactory to the Agent in its Permitted Discretion. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Loan Parties, within five (5) days following the completion of any such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(p) <u>Obligations and Loan Documents are Bank Products and an Other LC Facility</u>. Ensure that at all times (i) this Agreement, each Letter of Credit, and all Obligations under the Loan Documents are Bank Products and "Bank Products" as defined in the Existing Intercreditor Agreement, (ii) this Agreement and each Letter of Credit is an Other LC Facility, (iii) the Obligations are "Borrower Obligations" and "Guarantor Obligations" as defined in the Guarantee and Collateral Agreement, and (iv) the Obligations are "ABL Obligations" as defined in the Existing Intercreditor Agreement.

Section 6.02 <u>Negative Covenants</u>. So long as any L/C Lender Exposure is outstanding, each of Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to:

(a) <u>Liens, Etc</u>. Create or suffer to exist any Lien upon property of Holdings, the Borrowers or any Domestic Subsidiary constituting Collateral or any Related Intellectual Property, other than:

(i) Permitted Liens,

(ii) the Liens existing on the "Effective Date" (as defined in the Existing Credit Agreement as in effect on the Effective Date) and set forth in the Perfection Certificate,

70

**JX 116-85**

EX-10.1

(iii) the replacement, extension or renewal of any Lien permitted by clause (ii) above upon or on the same property theretofore subject thereto (and on any additions to any such property and in any property taken in replacement or substitution for any such property), or the replacement, extension or renewal (without increase in the amount) of the Debt secured thereby,

(iv) to the extent any Liens permitted by clause (ii) above are terminated (and not replaced, extended or renewed in accordance with clause (iii) above), Liens not otherwise permitted by clause (iii) above securing Debt in an amount up to the amount of Debt secured by such terminated Liens; provided that (A) any such Lien (and the Debt secured thereby) shall be incurred no later than ninety (90) days after the termination of the Lien permitted by clause (ii) above, and (B) any such Lien shall be granted on the same property (and on any additions to such property or any property taken by the Loan Parties in replacement or substitution for such property) as the terminated Lien,

(v) Liens on Related Intellectual Property with Persons that have entered into an agreement, reasonably satisfactory to the Co-Collateral Agents, acknowledging the limited license granted to the Co-Collateral Agents in such trademarks or trade names pursuant to the ABL Loan Documents and agreeing to abide by, and not interfere with, such limited license;

(vi) Liens on the Collateral (other than the Real Estate Collateral) to secure (A) the Existing Second Lien Notes, the Existing Second Lien Term Loan and any Permitted Refinancing Debt with respect to either of them and (B) additional Debt of the Borrowers for borrowed money in an aggregate principal amount not to exceed, at any time outstanding, the difference between $2,000,000,000 and the principal amount of Debt outstanding pursuant to the preceding clause (A), provided, that, (1) no Default or Event of Default then exists or would arise from the incurrence of such Debt or the granting of such Lien, (2) such Lien shall be subordinate to the Lien of the Co-Collateral Agents and the holder of such Lien shall have entered into an intercreditor agreement substantially in the form of the Existing Intercreditor Agreement, or such other form as the Co-Collateral Agents may reasonably agree, (3) if the Debt secured by such Liens is secured by both Collateral and by property and assets of any Loan Party which do not constitute Collateral, the Co-Collateral Agents shall have obtained a Lien on such property and assets that do not otherwise constitute Collateral to secure the Obligations, subordinate to the Lien of the holder of such Debt pursuant to an intercreditor agreement substantially in the form of the Existing Intercreditor Agreement, or such other form as the Co-Collateral Agents may reasonably agree, and (4) the documentation granting such Lien shall be in form and substance reasonably satisfactory to the Co-Collateral Agents in their Permitted Discretion; and

(vii) Liens arising under or in connection with a Credit Card Royalty Securitization; provided that any Liens granted by a Loan Party pursuant to this clause (vii) shall be limited to Credit Card Program Assets.

71

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-86**

EX-10.1

(b) <u>Fundamental Changes</u>. Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing (i) any Subsidiary of any Borrower may merge into such Borrower in a transaction in which such Borrower is the surviving entity, (ii) any Subsidiary of Holdings <u>other than SRAC</u> may merge into Holdings or any other Subsidiary of Holdings (provided that (A) if Kmart Corp. is a party to such merger, such merger shall be with Holdings, Kmart or a direct Subsidiary of Kmart Corp. and Kmart Corp. shall be the continuing or surviving entity<u>, and</u> (B) if any Subsidiary Guarantor is a party to such merger (other than with a Borrower or Holdings), such Subsidiary Guarantor shall be the continuing or surviving entity or the continuing or surviving entity shall become a Subsidiary Guarantor ~~and (C) if SRAC is a party to such merger, then Sears shall comply with the requirements of Section 6.01(d)~~), (iii) any Subsidiary of Holdings other than the Borrowers may sell, transfer, lease or otherwise dispose of its assets to any Borrower, to Holdings or to a Subsidiary of Holdings (provided that if such sale or transfer includes Collateral and the transferee is not the Borrower or Holdings, the transferee shall be a Subsidiary Guarantor), (iv) any Subsidiary of Holdings other than the Borrowers or Sears may sell, transfer, lease or otherwise dispose of its assets to a Person that is not a Subsidiary or merge with a Person that is not a Subsidiary, in each case pursuant to a Permitted Disposition, (v) any Subsidiary of Holdings other than the Borrowers, Sears or any Material Subsidiary Guarantor ~~(except, in the case of SRAC, as provided in Section 6.01(d))~~ may liquidate or dissolve if Holdings and the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of Holdings, the Borrowers, Sears, the other Material Subsidiary Guarantors and their Subsidiaries and is not disadvantageous in any material respect to Holdings, the Borrowers, Sears, the other Material Subsidiary Guarantors or the Lenders; <u>provided</u>, that a Material Subsidiary Guarantor may liquidate or dissolve into a Person that is a Subsidiary of Holdings immediately prior to such liquidation or dissolution, if the continuing or surviving entity is or shall become a Subsidiary Guarantor in accordance with <u>Section 6.01(i)</u>, (vi) Holdings or any Subsidiary of Holdings <u>other than SRAC</u> may merge with a Person that is not a Subsidiary of Holdings immediately prior to such merger if, in the case of any merger involving Holdings, a Borrower or a Subsidiary Guarantor, Holdings, such Borrower or such Subsidiary Guarantor, as applicable, is the continuing or surviving entity or, in the case of any merger involving a Subsidiary Guarantor, the continuing or surviving entity shall become a Subsidiary Guarantor in accordance with <u>Section 6.01(i)</u> and (vii) any Credit Card Royalty Securitization Subsidiary may sell or otherwise finance or Dispose of the assets subject to the Credit Card Royalty Securitization; <u>provided</u> that contemporaneously with (x) the occurrence of any of the actions permitted to be taken pursuant to the foregoing clauses (i) through (vi) of this clause (b) or (y) the consummation of a Credit Card Royalty Securitization, the Borrowers shall furnish to the Agent an updated Borrowing Base Certificate.

(c) <u>Acquisitions</u>. Make any Acquisition.

(d) <u>Restricted Payments</u>. Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that (A) Holdings may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock, (B) Subsidiaries of Holdings may declare and pay dividends to Holdings, the Borrowers or another wholly owned Subsidiary of any Borrower and (C) non-wholly-owned Subsidiaries may declare and pay dividends to the holders of their equity interests other than a Group Member on a ratable basis.

72

**JX 116-87**

EX-10.1

(e) <u>Negative Pledge Clauses</u>. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of Holdings or any Subsidiary of Holdings to create, incur, assume or suffer to exist any Lien in favor of (i) the Co-Collateral Agents upon the ABL Collateral (including assets which become Collateral pursuant to <u>Section 6.01(n)</u>) or (ii) the Agent upon the Collateral (other than ABL Collateral), in each case whether now owned or hereafter acquired, other than that any agreement relating to any Lien on cash and cash equivalents not prohibited by <u>Section 6.02(a)</u>.

(f) <u>Clauses Restricting Subsidiary Distributions</u>. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of Holdings other than a Loan Party to (a) make Restricted Payments in respect of any equity interests of such Subsidiary held by, or pay any indebtedness owed to, Holdings or any other Subsidiary of Holdings, (b) make loans or advances to, or other investments in, Holdings or any other Subsidiary of Holdings or (c) transfer any of its assets to Holdings or any other Subsidiary of Holdings, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under this Agreement and the other Loan Documents; (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or any portion of the equity interests or assets of such Subsidiary that is permitted by the terms of this Agreement; (iii) the provisions contained in any agreement governing Debt existing as of the Effective Date (and in any refinancing of such Debt that is permitted by the terms of this Agreement so long as no more restrictive than those contained in the respective agreement governing such existing Debt); (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or a Subsidiary of any Borrower entered into in the ordinary course of business, (v) customary restrictions and conditions contained in the documents relating to any Lien, so long as such Lien is not prohibited hereunder and such restrictions or conditions relate only to the specific asset subject to such Lien; (vi) customary provisions restricting assignment of any contract entered into by any Borrower or any Subsidiary of any Borrower in the ordinary course of business, (vii) any agreement or instrument governing acquired debt, which restriction is not applicable to any Person or the properties or assets of any Person, other than the Person or the properties or assets of the Person acquired pursuant to the respective acquisition and so long as the respective encumbrances or restrictions were not created (or made more restrictive) in connection with or in anticipation of the respective acquisition; (viii) customary provisions restricting the assignment of licensing agreements, management agreements or franchise agreements entered into by any Borrower or any of its Subsidiaries in the ordinary course of business; (ix) restrictions on the transfer of assets securing purchase money obligations and Capital Lease Obligations; (x) customary net worth provisions contained in real property leases entered into by Subsidiaries of any Borrower, so long as the applicable Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations, (xi) restrictions in respect of the REMIC Certificates and the real property assets related thereto, the Intellectual Property held by KCD IP, LLC and any proceeds of the foregoing, (xii) restrictions governing a Subsidiary of Holdings in connection with a Credit Card Royalty Securitization and (xiii) such other restrictions as the Borrowers and the Agent may agree.

73

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-88**

EX-10.1

(g) <u>Accounting Changes</u>. Make or permit any change in accounting policies or reporting practices, except as required or permitted by GAAP.

(h) <u>Collateral Coverage Event</u>. Permit or suffer to exist a Collateral Coverage Event.

(i) <u>Dispositions</u>. Make any Disposition except Permitted Dispositions.

(j) <u>Debt; Prepayment of Debt</u>.

(i) Create, incur, assume, suffer to exist or otherwise become or remain liable with respect to, any Debt, except Permitted Debt; and

(ii) Prepay any Debt <u>earlier than 90 days prior to its stated maturity</u> other than (A) <s>(x) ABL Advances or (y) to the extent required to be prepaid pursuant to the terms of the Amended Credit Agreement, other</s> Debt outstanding under the Amended Credit Agreement<s>); provided that any prepayment under this clause (ii)(A)(y) made from Designated Transaction Proceeds shall reduce the capacity under clause (ii)(C) by an equal amount</s>, (B) any other Debt with the proceeds of Permitted Refinancing Debt with respect thereto <s>or (C) in an amount up to the amount of Designated Transaction Proceeds received by the Loan Parties on or after the date hereof in respect of which the L/C Commitments are not automatically reduced in accordance with Section 2.11. For the avoidance of doubt, the Borrowers shall be required to comply with Section 2.11 notwithstanding any prepayment of Debt using Designated Transaction Proceeds or otherwise</s><u>, (C) Debt owed by Holdings or any of its Subsidiaries to Holdings or any of its Subsidiaries, or (D) to the extent permitted under</u> <span style="color:green"><u>the Amended Credit Agreement,</u></span> <u>Debt (including the Real Estate Term Loan and the December Real Estate Loan) with the proceeds of the disposition of any collateral therefor (or, to the extent permitted under the Amended Credit Agreement, with the proceeds of a draw under the Amended Credit Agreement to the extent the obligations under the Amended Credit Agreement are first repaid with proceeds of the applicable disposition of collateral for the applicable Debt) to the extent such Disposition is otherwise permitted hereunder.</u>

(k) <u>Investments</u>. Make any Investments, except Permitted Investments.

(l) <u>Store Closings</u>. Close more than 250 full line Sears or Kmart Stores in any fiscal quarter or more than 500 full line Sears or Kmart Stores in any four consecutive fiscal quarters without the consent of the Agent, such consent not to be unreasonably withheld and/or fail to comply with the requirements of the definition of Store Closure Sale when and as applicable.

74

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-89**

EX-10.1

(m) <u>Existing Credit Agreement and ABL Loan Documents</u>.

(i) Without the prior written consent of the Issuing Bank, the Agent and the Required L/C Lenders, enter into, request or permit to exist any amendment, restatement, replacement, supplement or other modification to, or waiver of, any provision of any ABL Loan Document, in each case that would (A) increase any advance rate percentage set forth in the definition of "Borrowing Base", (B) amend, restate, supplement, modify or waive the definition of "Bank Products", "Other L/C Facility" or Section 6.01(i) or (n) of the Existing Credit Agreement and any related definitions thereto, (C) amend, restate, supplement, modify or waive any provision of the Guaranty and Collateral Agreement, including any definition used therein that is defined by reference to the Existing Credit Agreement, (D) amend, restate, supplement, modify or waive any provision of the Existing Intercreditor Agreement, except in the case of this clause (D) ministerial amendments in connection with the addition or removal of Debt facilities subject thereto, (E) release all or substantially all of the "Collateral" (as defined in the Existing Credit Agreement) or release all or substantially all of the guarantors from their obligations under, or all or substantially all of the value of the guarantees under, the Guarantee and Collateral Agreement, or (F) except as expressly permitted under the Existing Credit Agreement or the "Loan Documents" (as defined in the Existing Credit Agreement), subordinate the Liens granted under the Existing Credit Agreement or under the other "Loan Documents" (as defined in the Existing Credit Agreement), to any other Lien; or amend <u>Section 9.01</u> of the Existing Credit Agreement;

(ii) Request any increases to any commitments under, or request that any additional term loans be made pursuant to any ABL Loan Document, otherwise exercise any rights under <u>Section 2.19</u> of the Existing Credit Agreement, or enter into any agreement the effect of which would increase the commitments under, or result in the incurrence of additional term loans pursuant to, any ABL Loan Document;

(iii) Request any FILO Facility (as defined in the Existing Credit Agreement), or otherwise exercise any rights under, <u>Section 2.20</u> of the Existing Credit Agreement, or enter into any agreement the effect of which would establish a FILO Facility, or result in the incurrence of additional loans pursuant to a FILO Facility under any ABL Loan Document;

(iv) Terminate, refinance in full or replace the Existing Credit Agreement unless the Obligations have been paid in full and the aggregate L/C Lender Exposure is reduced to zero; and

(v) Enter, incur or otherwise become a party to any other Bank Products or Cash Management Services, other than Cash Management Services incurred in the ordinary course of business.

75

**JX 116-90**

EX-10.1

(n) *Transactions with Affiliates.* Enter into a transaction with any of its Affiliates (including any transaction between Holdings or any of its Subsidiaries, on the one hand, and JPP, LLC, JPP II, LLC or any of their affiliates, in their capacity as a L/C Lender, on the other hand) other than on terms that are fair and reasonable and no less favorable to Holdings, the applicable Borrower or their respective Subsidiaries than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate, except that the following transactions with any shall be permitted at any time (i) transactions with any of its Affiliates as required by any applicable Requirement of Law, (ii) so long as no Default or Event of Default has occurred and is continuing, transactions between or among the Loan Parties and any of their Subsidiaries (other than transactions to which SRAC is a party after the Amendment No. 2 Effective Date unless such transaction is on terms that are (a) no less favorable to SRAC than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate or (b) undertaken in the ordinary course, substantially consistent with past practices), to the extent not prohibited hereunder, or (iii) if a Default or Event of Default has occurred and is continuing, transactions in the ordinary course of business between or among the Loan Parties and any of their Subsidiaries and transactions between or among Loan Parties (other than transactions to which SRAC is a party after the Amendment No. 2 Effective Date unless such transaction is on terms that are (a) no less favorable to SRAC than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate or (b) undertaken in the ordinary course, substantially consistent with past practices), to the extent not prohibited hereunder; provided, that the foregoing shall not prohibit (x) any Loan Party or any Subsidiary thereof from entering into employment arrangements with its officers and retention and other agreements with officers and directors pursuant to the reasonable requirements of its business, (y) any transactions pursuant to contractual arrangements in effect on the Effective Date or (z) any transaction approved by the Related Party Transaction Committee of the Board of Directors of Holdings.

Section 6.03 <u>Financial <s>Covenant</s>Covenants</u>. (a) During the continuance of a Covenant Compliance Event, each of Holdings and the Borrowers will not permit the Fixed Charge Ratio as of the last day of any fiscal month of Holdings to be less than 1.0 to <s>1.0.</s>1.0 and (b) each of Holdings and the Borrowers will not permit the Receivables Coverage Ratio as of the last day of any fiscal month to be less than 1.1 to 1.0.

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01 <u>Events of Default</u>. If any of the following events ("Events of Default") shall occur and be continuing:

(a) Any Borrower shall fail to pay (i) any principal of any Reimbursement Obligation when the same becomes due and payable, or (ii) any interest on any Reimbursement Obligation or any fees, or any other amounts payable under this Agreement or any other Loan Document, in each case under this clause (ii), within three (3) days after the same becomes due and payable; provided, that no Event of Default shall occur under this clause (a), if (i) the Issuing Bank has reimbursed itself using funds on deposit in the Lender Cash Collateral Accounts pursuant to <u>Section 3.04(b)</u>, (ii) there are no drawings that have not either been reimbursed by the Borrowers or by using funds in the Lender Cash Collateral Accounts, and (iii) the obligation to issue additional Letters of Credit has been terminated unless one or more of the L/C Lenders whose cash collateral was so applied shall have notified the Borrowers that it has elected to treat such occurrence as an Event of Default; or

76

**JX 116-91**

EX-10.1

(b) Any representation or warranty made by any Loan Party herein or in any other Loan Document shall prove to have been incorrect in any material respect when made; or

(c) (i) Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in <u>Section 2.11</u>, <u>3.11</u>, <u>3.12</u>, <u>6.01(d)</u>, <u>(e)</u>, <u>(h)</u>, <u>(j)</u> (other than <u>6.01(j)(viii)</u>), <u>(k)</u>, <u>(m)</u>, or <u>(p)</u>, <u>6.02</u>, or <u>6.03</u> of this Agreement or (ii) any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, if such failure shall remain unremedied for thirty (30) days after written notice thereof shall have been given to Holdings and the Borrowers by the Agent or any Lender; or

(d) Any Group Member shall fail to pay principal under the Existing Credit Agreement or of at least $50,000,000 on any other Debt that is outstanding (but excluding Debt outstanding hereunder) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and, other than with respect to the ABL Loan Documents, such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any ABL Loan Document, or any other agreement or instrument relating to any other Debt that is outstanding in a principal amount of at least $50,000,000, and shall continue after the applicable grace period, if any, specified in such ABL Loan Document or such other agreement or instrument, if the effect of such event or condition is to accelerate the maturity of or terminate the commitments in respect of the Debt under the ABL Loan Documents or such other Debt; or the Debt under the Existing Credit Agreement or any other such Debt shall be declared to be due and payable, or required to be prepaid or redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made and is accepted in an amount of (other than in the case of Debt under the Existing Credit Agreement) at least $50,000,000 (in each case other than (i) a scheduled prepayment, redemption or purchase, or (ii) a mandatory prepayment, redemption or purchase, or a required offer to prepay, redeem or purchase, that results from the voluntary sale or transfer of property or assets), in each case prior to the stated maturity thereof; or

(e) Any Group Member shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Group Member seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 90 days, or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or any Group Member shall take any corporate action to authorize any of the actions set forth above in this subsection (e); or

77

**JX 116-92**

EX-10.1

(f) A judgment or order for the payment of money in excess of $50,000,000 (net of any portion of such judgment to be paid by a third-party insurer as to which coverage has not been disputed) shall be rendered against any Group Member and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g) (i) Any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than a Permitted Holder becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 35% or more of the equity securities of Holdings entitled to vote for members of the Board of Directors of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right) and such "person" or "group" shall beneficially own (as such term is used herein) a greater percentage of the equity Securities of Holdings entitled to vote for members of the Board of Directors than the Permitted Holders shall, collectively, beneficially own; or (ii) during any period of 12 consecutive months, a majority of the members of the Board of Directors or other equivalent governing body of Holdings cease to be composed of individuals (x) who were members of that board or equivalent governing body on the first day of such period, (y) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (x) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (z) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (x) and (y) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (iii) Holdings shall cease for any reason to own, directly or indirectly, 100% of the Voting Stock of Sears and Kmart; or

(h) (i) Any Borrower or any of its ERISA Affiliates shall incur, or shall be reasonably likely to incur liability in excess of $100,000,000 in the aggregate as a result of one or more of the following: (i) the occurrence of any ERISA Event; (ii) the partial or complete withdrawal of such Borrower or any of its ERISA Affiliates from a Multiemployer Plan; or (iii) the reorganization or termination of a Multiemployer Plan; or (iv) the PBGC shall have filed a notice of Lien; or

(i) Any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Loan Party shall so state in writing, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby, including as a result of the failure to comply with Section 5.4 of the Guarantee and Collateral Agreement; or

78

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-93**

EX-10.1

(j) The guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so state in writing;

then, and in any such event, the Agent, at the request of the Required L/C Lenders shall, take any or all of the following actions upon notice to the Borrowers: (i) declare the L/C Commitment of each L/C Lender and the commitment of the Issuing Bank to issue Letters of Credit hereunder to be terminated, whereupon the same shall forthwith terminate; and (ii) declare all amounts payable under this Agreement and the other Loan Documents (including all amounts of the L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to any Loan Party under the United States Bankruptcy Code or any other Event of Default under Section 7.01(e), (A) the L/C Commitment of each Lender shall automatically be terminated and (B) all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers.

With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph or for which the outstanding amount of any drawing under any Letters of Credit (including any taxes, fees, charges and other costs and expenses incurred by the Issuing Bank in connection therewith) have not then been fully reimbursed or discharged by the Borrowers pursuant to Section 3.05, the Borrowers shall at such time deposit in a cash collateral account maintained by the Agent, an amount equal to 102% of the L/C Obligations with respect to all such Letters of Credit and all other Reimbursement Obligations. Amounts held in such cash collateral account shall be applied by the Agent to the payment of drafts drawn under such Letters of Credit and the other Reimbursement Obligations, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon and all Reimbursement Obligations fully reimbursed or discharged, if any, shall be applied to repay other Obligations hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other Obligations hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Borrowers (or such other Person as may be lawfully entitled thereto).

## ARTICLE VIII

## THE AGENT

Section 8.01 Appointment. Each Lender hereby irrevocably designates and appoints Bank as Agent under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. For clarity, and

79

**JX 116-94**

EX-10.1

notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, no consent of the Lenders shall be required to amend this Agreement or the Loan Documents to (i) cause additional assets to become Collateral or to add additional Subsidiaries as guarantors of the Obligations, or (ii) implement the provisions of Section 8.12, and the Agent and the Loan Parties shall be entitled to execute any and all amendments necessary or desirable to accomplish any of the foregoing and such amendments shall be binding on the other parties hereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth in this Agreement and the other Loan Documents to which it is a party, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent.

Section 8.02 Delegation of Duties. Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 8.03 Exculpatory Provisions. No Agent (for purposes of this Article VIII, "Agent" and "Agents" shall mean the collective reference to the Agent and any other Lender designated as an "Agent" for purposes of this Agreement, including any lead arrangers, syndication agent or documentation agent) nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct); or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party that is a party thereto to perform its obligations hereunder or thereunder; provided that the Agent will not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or any Requirement of Law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any Debtor Relief Law. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

Section 8.04 Reliance by Agent. The Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, facsimile, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by

80

JX 116-95

EX-10.1

the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Required L/C Lenders as they deem appropriate or they shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by them by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required L/C Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all present and future L/C Lenders and all future holders of the Reimbursement Obligations.

Section 8.05 <u>Notice of Default</u>. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent has received notice from a Lender, Holdings or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required L/C Lenders (or, if so specified by this Agreement, all Lenders); <u>provided</u> that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06 <u>Non-Reliance on Agent and Other Lenders</u>. Each Lender expressly acknowledges that neither the Agent nor any of its respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent hereunder, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates.

81

**JX 116-96**

EX-10.1

Section 8.07 <u>Reports and Financial Statements</u>. By signing this Agreement, each Lender:

(a) is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements and reports required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "<u>Reports</u>");

(b) expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d) agrees to keep all Reports confidential in accordance with the provisions of this Agreement; and

(e) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender or Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any credit extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in any Letter of Credit, or the indemnifying Lender's purchase of, a Reimbursement Obligation; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender or Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agent and any such other Lender or Person preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 8.08 <u>Indemnification</u>. The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), ratably according to their respective L/C Commitment Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the L/C Commitments of any L/C Lender shall have terminated, in accordance with such L/C Commitment Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment Reimbursement Obligations) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of, the L/C Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Agent under or in connection with any of

82

**JX 116-97**

EX-10.1

the foregoing; underline(provided) that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Obligations and all other amounts payable under the Loan Documents.

Section 8.09 <u>Agent in Its Individual Capacity</u>. The Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Agent were not an Agent. With respect to any Letter of Credit issued or participated in by it, the Agent shall have the same rights and powers under this Agreement and the other Loan Documents as the Issuing Bank or L/C Lender, as applicable, and may exercise the same as though it were not an Agent, and the terms "Issuing Bank", "Lender" and "Lenders" shall include the Agent in its individual capacity.

Section 8.10 <u>Successor Agent</u>.

(a) The Agent may resign as Agent upon 30 days' notice to the Lenders and the Borrowers. If the Agent shall resign as Agent under this Agreement and the other Loan Documents, then the Required L/C Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default shall have occurred and be continuing) be subject to approval by the Borrowers (which approval shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of the Agent, the Agent may appoint, after consulting with the Required L/C Lenders and the Borrowers (unless an Event of Default shall have occurred and be continuing), a successor agent from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to the rights, powers and duties of the Agent, and the term "Agent" shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of Reimbursement Obligations. If no successor agent has accepted appointment as Agent by the date that is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Agent hereunder, until such time, if any, as the Required L/C Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as Agent, the provisions of this <u>Article VIII</u> and <u>Sections 9.04</u>, <u>9.09</u>, <u>9.11</u> and <u>9.12</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

Section 8.11 [<u>Reserved</u>].

Section 8.12 [<u>Reserved</u>].

83

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-98**

EX-10.1

---

## ARTICLE IX

## MISCELLANEOUS

Section 9.01 <u>Amendments, Etc</u>. No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Borrower or any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required L/C Lenders (or by the Agent with the approval of the Required L/C Lenders), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, waiver or consent shall:

(a) unless in writing and also signed by each L/C Lender directly affected thereby, do any of the following:

(i) ~~increase the amount or~~ extend the expiration date of any L/C Lender<u>'s</u> Commitment;

(ii) reduce the principal of, or interest on the Reimbursement Obligations, the amounts deposited in any Lender Cash Collateral Account, or any fees or other amounts payable hereunder; or

(iii) postpone any date fixed for any payment of principal of, or interest on, the Reimbursement Obligations or Cash Collateralization of the L/C Lender Exposure, Issuer Exposure, L/C Obligations or any fees or other amounts payable hereunder, provided that this clause (iii) shall not apply to a waiver or amendment of the terms of Section 2.11 hereof;

(b) unless in writing and signed by all of the Lenders, do any of the following:

<u>(i) increase the amount of (A) any L/C Lender's Commitment or (B) the Aggregate L/C Commitment (as in effect on the Amendment No. 2 Effective Date);</u>

<u>(ii)</u> ~~(i)~~ change the percentage of the L/C Commitments, L/C Extensions of Credit or of the aggregate unpaid principal amount of the Reimbursement Obligations or the number of Lenders, that shall be required for the Lenders or any of them to take any action hereunder;

<u>(iii)</u> ~~(ii)~~ other than in accordance with <u>Section 9.13</u>, release all or substantially all of the Collateral ~~(other than the Real Estate Collateral, which may be released upon the sole consent of the Required L/C Lenders at the request of the Borrowers or pursuant to Section 9.13(c))~~ or release all or substantially all of the guarantors from their obligations under, or all or substantially all of the value of the guarantees under, the Guarantee and Collateral Agreement;

84

**JX 116-99**

EX-10.1

(iv) ~~(iii)~~ except as expressly permitted herein or in any other Loan Document, subordinate the Liens granted hereunder or under the other Loan Documents ~~(other than Liens in respect of the Real Estate Collateral)~~, to any other Lien;

(v) ~~(iv)~~ amend this Section 9.01;

(vi) ~~(v)~~ amend the definition of "Required L/C Lenders"; or "L/C Commitment Percentage";

(vii) ~~(vi)~~ other than in accordance with Section 6.01(d), release either Borrower from all of its obligations hereunder; or

(viii) amend or modify the pro rata requirements of Section 2.06 or 2.14;

(c) [reserved];

(d) unless in writing and signed by the Agent (in addition to the Lenders required above to take such action), amend, modify or waive any provision of Article VIII or affect the rights or duties of the Agent under this Agreement or any other Loan Document;

(e) [reserved];

(f) unless in writing and signed by the Issuing Bank (in addition to the L/C Lenders required above to take such action):

(i) amend, modify or waive, Section 2.12, Section 2.14, Section 2.15 (other than where such proposed amendment or waiver applies only to an L/C Lender(s) and does not apply to or adversely affect the Issuing Bank), ~~Section 2.17,~~ Section 4.01, Section 4.02, or any provision of Article III (or amend, modify or waive any defined term as such term is used in such Section or Article),

(ii) amend, modify or waive any provision of Article V, Article VI or Article VII (or amend, modify or waive any defined term as such term is used in such Article) if the effect of such amendment, modification or waiver would result, directly or indirectly, in:

(1) to the extent such amendment, modification or waiver has a comparable provision in the Existing Credit Agreement, the representations, warranties, covenants or Events of Default herein being less restrictive on the Borrowers than the comparable provision, if any, in the Existing Credit Agreement (after giving effect to any such amendment, modification or waiver in the Existing Credit Agreement after the Effective Date); or

85

**JX 116-100**

EX-10.1

(2) to the extent such amendment, modification or waiver has a comparable provision in the Existing Credit Agreement, a waiver or elimination of an Event of Default hereunder unless the comparable "Event of Default" (as defined in the Existing Credit Agreement) has been waived or eliminated under the Existing Credit Agreement (after giving effect to any such amendment, modification or waiver in the Existing Credit Agreement after the Effective Date); or

(3) a waiver of any Event of Default resulting, directly or indirectly, from the failure of the Borrowers to make any payment due under Article III or to make any other payment due to the Issuing Bank or Agent hereunder; provided that, notwithstanding the foregoing provisions of this clause, the Required L/C Lenders may waive any Event of Default due to the failure of the Borrowers to make payments to the Issuing Bank if both (x) the Issuing Bank has been reimbursed for all outstanding drawings by either the Borrowers or use of cash collateral provided by the L/C Lenders and (y) there are no outstanding Letters of Credit that is not backstopped by a Satisfactory Letter of Credit;

(g) amend, modify or waive any provision of this Article IX (or defined terms used herein) in a manner adverse to the Issuing Bank, unless in writing and signed by the Issuing Bank;

(h) amend, modify or waive any provision expressly requiring the Issuing Bank's consent hereunder without consent of the Issuing Bank; or (i) amend, modify or waive any provision if the effect is to permit Mortgages to be delivered, accepted or released from escrow prior to the satisfaction of the Flood Compliance Documents unless consented to in writing by the Issuing Bank and the Agent.

Section 9.02 Notices, Etc.

(a) All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, faxed or delivered, (i) if to Holdings, any Borrower or any Subsidiary Guarantor, at its address at 3333 Beverly Road, Hoffman Estates, Illinois 60179, Attention: General Counsel, with a copy to Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attention: Scott Charles; (ii) if to any Lender, at its address set forth in its completed administrative questionnaire delivered to the Agent; (iii) if to the Agent, at its address at Citibank, N.A., 390 Greenwich Street, 1st Floor, New York, NY 10013, Attention: David L. Smith, with a copy to Skadden, Arps, Slate, Meagher & Flom LLP, 155 N Wacker Dr., Suite 2800, Chicago, IL 60606, Attention: Seth Jacobson and (iv) if to the Issuing Bank, Citibank, N.A., 390 Greenwich Street, 1st Floor, New York, NY 10013, Attention: David L. Smith, with a copy to Skadden, Arps, Slate, Meagher & Flom LLP, 155 N Wacker Dr., Suite 2800, Chicago, IL 60606, Attention: Seth Jacobson and (v) as to each other party, at such other address as shall be designated by such party in a written notice to the Borrowers, the Agent and the Issuing Bank; provided that notices required to be delivered pursuant to Section 6.01(j)(i), (ii), (iii), and (v) shall be delivered to the Agent and the Lenders as specified in Section 9.02(b). All such notices and communications shall, when mailed, faxed, telegraphed or emailed, be effective when deposited in the mails, faxed, delivered to the telegraph company or confirmed by email, respectively, except that notices and communications to the Agent pursuant to Article II, III or VIII shall not be effective until received by the Agent. Delivery by facsimile of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any exhibit hereto or thereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof.

86

**JX 116-101**

EX-10.1

(b) Holdings and the Borrowers agree that materials required to be delivered pursuant to <u>Sections 6.01(j)(i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(v)</u>, shall be deemed delivered to the Agent (solely to the extent such reports and financial statements comply with the requirements of <u>Sections 6.01(j) (i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(v)</u>, as applicable) on the date on which Holdings causes such reports, or reports containing such financial statements, to be posted on the Internet at www.sec.gov or at such other website identified by the Borrowers in a written notice to the Agent and the Lenders and that is accessible by the Lenders without charge or if not so posted, may be delivered to the Agent in an electronic medium in a format acceptable to the Agent by email to david.l2.smith@citi.com. Holdings and the Borrowers agree that the Agent may make such materials, as well as any other written information, documents, instruments and other material relating to Holdings, the Borrowers, any of their Subsidiaries or any other materials or matters relating to this Agreement, the Loan Documents or any of the transactions contemplated hereby (collectively, the "<u>Communications</u>") available to the Lenders by posting such notices on Intralinks or a substantially similar electronic system (the "<u>Platform</u>"). Holdings and the Borrowers acknowledge that (i) the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, (ii) the Platform is provided "as is" and "as available" and (iii) neither the Agent nor any of its Affiliates warrants the accuracy, adequacy or completeness of the Communications or the Platform and each expressly disclaims liability for errors or omissions in the Communications or the Platform. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent or any of its Affiliates in connection with the Platform.

(c) Each Lender agrees that notice to it (as provided in the next sentence) (a "<u>Notice</u>") specifying that any Communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; <u>provided</u> that if requested by any Lender the Agent shall deliver a copy of the Communications to such Lender by email or facsimile. Each Lender agrees (i) to notify the Agent in writing of such Lender''s e-mail address to which a Notice may be sent by electronic transmission (including by electronic communication) on or before the date such Lender becomes a party to this Agreement (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

Section 9.03 <u>No Waiver; Remedies</u>. No failure on the part of any Lender or the Agent to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

87

**JX 116-102**

EX-10.1

Section 9.04 <u>Costs and Expenses</u>.

(a) Holdings and the Borrowers jointly and severally agree to pay promptly all reasonable costs and expenses of the Agent, the Collateral Agent (as defined in the Cash Collateral Agreement), and the Lenders in connection with the preparation, execution, delivery, distribution (including via the internet or through a service such as Intralinks), administration, modification and amendment of this Agreement, the other Loan Documents and the other documents to be delivered hereunder, including, (A) all due diligence (including diligence with respect to the Collateral and in connection with real property surveys, appraisals, flood diligence, and title work), syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, consultant, and audit expenses, (B) subject to <u>Section 6.01(k)</u>, all expenses incurred in connection with inspections, verifications, examinations and appraisals relating to the Borrowing Base and the Collateral, and (C) the reasonable fees and expenses of counsel for the Agent, the Collateral Agent, and the Lenders with respect thereto and with respect to advising the Agent, the Collateral Agent, and the Lenders as to its rights and responsibilities under this Agreement, the Cash Collateral Agreement and the other Loan Documents, including, without limitation, the fees and expenses set forth in the Fee Letter. Holdings and the Borrowers further jointly and severally agree to pay on demand all costs and expenses of the Agent, the Collateral Agent, and the Lenders, if any (including reasonable counsel fees and expenses), in connection with the enforcement of, or protection of their rights under, (whether through negotiations, legal proceedings or otherwise) this Agreement, the Cash Collateral Agreement, the other Loan Documents and the other documents to be delivered hereunder, including reasonable fees and expenses of one counsel for the Agent, one counsel for the Collateral Agent, and one counsel for the Lenders in connection with the enforcement of or protection rights under this <u>Section 9.04(a)</u>.

(b) Holdings and the Borrowers jointly and severally agree to indemnify and hold harmless the Agent, the Collateral Agent, each Lender and each of their Affiliates and their officers, directors, employees, agents and advisors (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) this Agreement, the other Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the Letters of Credit, and (ii) the actual or alleged presence of Hazardous Materials on any property of Holdings, the Borrowers or any of their Subsidiaries or any Environmental Action relating in any way to Holdings, the Borrowers or any of their Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this <u>Section 9.04(b)</u> applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Holdings, any Borrower, its directors, equityholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Holdings and the Borrowers also agree not to assert any claim for special, indirect, consequential or punitive damages against the Agent, any Lender, any of their Affiliates, or any of their respective directors, officers, employees, attorneys and agents, on any theory of liability, arising out of or otherwise relating to this Agreement, the other Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the Letters of Credit.

88

**JX 116-103**

EX-10.1

(c) [Reserved].

(d) Without prejudice to the survival of any other agreement of Holdings or any Borrower hereunder, the agreements and obligations of Holdings and the Borrowers contained in Sections 2.12, 2.15 and 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 9.05 Right of Set-off. Upon (i) the occurrence and during the continuance of any Event of Default and (ii) the making of the request or the granting of the consent specified by Section 7.01, if applicable, to authorize the Agent to declare the L/C Obligations due and payable pursuant to the provisions of Section 7.01, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of Holdings or any Loan Party against any and all of the obligations of Holdings and the Loan Parties now or hereafter existing under this Agreement, the other Loan Documents and the L/C Obligations of such Lender, whether or not such Lender shall have made any demand under this Agreement or the other Loan Documents. Each Lender agrees promptly to notify Holdings or the applicable Loan Party (with a copy to the Agent) after any such set-off and application; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender and its Affiliate under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender and its Affiliate may have.

Section 9.06 Binding Effect; Effectiveness. When this Agreement has been executed by Holdings, the Borrowers, the Agent, and the Lenders, this Agreement shall thereafter be binding upon and inure to the benefit of Holdings, the Borrowers, the Agent, the Issuing Bank, each Lender and their respective successors and assigns; provided, that, except with respect to Sections 9.07 and 9.08, this Agreement shall only become effective upon satisfaction of the conditions precedent set forth in Section 4.01 and none of the provisions of this Agreement, including without limitation provisions in respect of Letters of Credit to be made by or issued by the Issuing Bank, and in respect of any covenant, fee, indemnity, default, and expense reimbursement made by any Loan Party or for which any Loan Party is liable hereunder, shall become effective, nor shall any representation herein be deemed to be made, until the satisfaction of such conditions.

Section 9.07 Assignments and Participations.

(a) Each L/C Lender may, upon notice to the Borrowers and the Agent and with the consent, not to be unreasonably withheld or delayed, of the Agent and the Issuing Bank and, unless an Event of Default has occurred and is continuing, the Borrowers, assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its L/C Commitment and other amounts owing to it); provided, however, that

89

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

**JX 116-104**

EX-10.1

(i) such assignee shall have executed and delivered to the Issuing Bank and the Agent a joinder to the Cash Collateral Agreement in form and substance reasonably satisfactory to the Issuing Bank and the Agent (or an amendment or amendment and restatement thereof consistent with the requirements in the definition of Cash Collateral Agreement), together with all opinions, certificates and other documents required by the Issuing Bank and the Agent in connection therewith, and shall have deposited in the Lender Cash Collateral Account of such assignee an amount equal to 102% of any L/C Commitment assigned to it; (ii) [reserved], (iii) [reserved], (iv) except in the case of an assignment to a Person that, immediately prior to such assignment, was an L/C Lender, an Affiliate of an L/C Lender or an Approved Fund or an assignment of all of an L/C Lender's rights and obligations under this Agreement, the amount of the L/C Commitment of the assigning L/C Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $10,000,000 (unless an Event of Default has occurred and is continuing, in which case not less than $5,000,000) or an integral multiple of $1,000,000 in excess thereof unless the Agent and the Borrowers otherwise agree, (v) each such assignment shall be to an Eligible Assignee, (vi) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, and the parties to such assignment (other than the Agent) shall deliver a processing and recordation fee of $3,500 (except no such fee shall be payable for assignments to an L/C Lender, an Affiliate of an L/C Lender or an Approved Fund), and (vii) any L/C Lender may assign all or a portion of its rights and obligations to any of its Affiliates or to another L/C Lender. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of an L/C Lender hereunder and (y) the L/C Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.12, 2.15 and 9.04 to the extent any claim thereunder relates to an event arising prior such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning L/C Lender's rights and obligations under this Agreement, such L/C Lender shall cease to be a party hereto).

(b) [Reserved].

(c) By executing and delivering an Assignment and Acceptance, the L/C Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, Section 5.02 hereof or in the Cash Collateral Agreement, such assigning L/C Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning L/C Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Loan Parties or the performance or observance by the Borrowers of any of their obligations under this Agreement or any other instrument or document furnished pursuant

90

JX 116-105

EX-10.1

hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in <u>Section 6.01(j)</u> and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning L/C Lender or any other L/C Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as an L/C Lender.

(d) Upon its receipt of an Assignment and Acceptance executed by an assigning L/C Lender and an assignee representing that it is an Eligible Assignee, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of <u>Exhibit A</u> hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrowers.

(e) The Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at its address referred to in <u>Section 9.02</u> a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the L/C Lenders and the L/C Commitment of, and principal amount (and stated interest) of the L/C Obligations owing to, each L/C Lender from time to time, and the account party, beneficiary, amount, expiration date, and other economic terms of each Letter of Credit issued hereunder (the "<u>Register</u>"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agent and the L/C Lenders may treat each Person whose name is recorded in the Register as an L/C Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(f) Each L/C Lender may, without the consent of the Agent or any Loan Party, sell participations to one or more banks or other entities (other than Holdings or any of its Subsidiaries) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its L/C Commitment); <u>provided</u>, <u>however</u>, that (i) such L/C Lender's obligations under this Agreement (including its L/C Commitment to the Borrowers and its obligations to the Issuing Bank hereunder) shall remain unchanged, (ii) such L/C Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) [reserved], (iv) the Borrowers, the Agent and the other Lenders shall continue to deal solely and directly with such L/C Lender in connection with such L/C Lender's rights and obligations under this Agreement, and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Loan Document, or consent to any departure by any Borrower therefrom, except to the extent that such amendment, waiver or consent would require the affirmative vote of the L/C Lender from which

91

**JX 116-106**

EX-10.1

it purchased its participation pursuant to Section 9.01(a). Each L/C Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the L/C Commitment, L/C Obligation or other obligations under the Loan Documents (the "Participant Register"); provided that no L/C Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any L/C Commitment, L/C Obligation or other obligations under the Loan Documents) to any Person except to the extent that such disclosure is necessary to establish that such L/C/ Commitment, L/C Obligation or other obligation under the Loan Documents is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such L/C Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(g) Any L/C Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant, any information relating to Holdings, the Borrowers or their Subsidiaries furnished to such L/C Lender by or on behalf of the Borrowers; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Borrower Information relating to Holdings, the Borrowers or their Subsidiaries received by it from such L/C Lender in accordance with Section 9.08.

(h) Notwithstanding any other provision set forth in this Agreement, any L/C Lender may at any time (i) create a security interest in all or any portion of its rights under this Agreement, including, without limitation, in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System and (ii) assign to one or more special purpose funding vehicles (each, an "SPV") all or any portion of its funded L/C Obligations (without the corresponding L/C Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such L/C Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any L/C Obligation that such L/C Lender would otherwise be obligated to fund pursuant to this Agreement. Such SPVs shall have all the rights which a L/C Lender making or holding such L/C Obligations would have under this Agreement, but no obligations; provided, that no SPV shall be entitled to compensation pursuant to Section 2.12 or 2.15 in excess of that to which the applicable L/C Lender would otherwise have been entitled. The L/C Lender shall remain liable for all its original obligations under this Agreement, including its L/C Commitment (although the unused portion thereof shall be reduced by the principal amount of any L/C Obligations held by an SPV). Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the L/C Lender (as agent for the SPV) and not separately to the SPV unless the Agent and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.

92

JX 116-107

EX-10.1

(i) [Reserved].

(j) Neither Holdings nor any Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Agent and each of the Lenders (except, in the case of SRAC, pursuant to Section 6.01(d)).

Section 9.08 <u>Confidentiality</u>. Neither the Agent nor any Lender may disclose to any Person any confidential, proprietary or non-public information of Holdings or the Borrowers furnished to the Agent or the Lenders by Holdings or the Borrowers (such information being referred to collectively herein as the "<u>Borrower Information</u>"), except that each of the Agent and each of the Lenders may disclose Borrower Information (i) to its and its Affiliates'' employees, officers, directors, agents and advisors to whom disclosure is required to enable the Agent or such Lender to perform its obligations under this Agreement and the other Loan Documents or in connection with the administration or monitoring of this Agreement and the other Loan Documents by the Agent or such Lender (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Borrower Information and instructed to keep such Borrower Information confidential on substantially the same terms as provided herein), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party to this Agreement and the other Loan Documents, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement and the other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this <u>Section 9.08</u>, to any assignee or participant, or any prospective assignee or participant, (vii) to the extent such Borrower Information (A) is or becomes generally available to the public on a non-confidential basis other than as a result of a breach of this <u>Section 9.08</u> by the Agent or such Lender, as the case may be, or (B) is or becomes available to the Agent or such Lender on a non-confidential basis from a source other than Holdings, the Borrowers or any of their Subsidiaries and (viii) with the consent of the Borrowers.

Section 9.09 <u>Governing Law</u>. This Agreement and the other Loan Documents shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of laws principles thereof but including Section 5-1401 and 5-1402 of the New York General Obligations Law.

Section 9.10 <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic transmission in ".pdf" format shall be effective as delivery of a manually executed counterpart of this Agreement.

93

**JX 116-108**

EX-10.1

Section 9.11 <u>Jurisdiction, Etc.</u>

(a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof (<u>provided</u> that the Agent or the Required L/C Lenders may bring actions to enforce any Security Document governed by laws other than the State of New York in the jurisdiction of such other governing law, in which case Holdings and the Borrowers shall submit to the jurisdiction of a court of competent jurisdiction in such jurisdiction), in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Holdings and each of the Borrowers hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to Holdings or such Borrower at its address specified pursuant to <u>Section 9.02</u>. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 9.12 **WAIVER OF JURY TRIAL. EACH OF HOLDINGS, THE BORROWERS, THE AGENT, THE ISSUING BANK AND THE L/C LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE ACTIONS OF THE AGENT, THE ISSUING BANK OR ANY L/C LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.**

Section 9.13 <u>Release of Collateral or Guarantee Obligation.</u>

(a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Co-Collateral Agents are (solely with respect to the ABL Collateral) and the Agent is (with respect to all other Collateral) hereby irrevocably authorized by each Lender (without requirement of consent of or notice to any Lender) to take, and hereby agree to take, any action requested by the Borrowers having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document (including, without limitation, any Permitted Disposition) or that has been consented to in accordance with <u>Section 9.01</u>; <u>provided</u> that the guarantee obligations of Sears may not be released without the consent of the Required L/C Lenders and the Issuing Bank, or (ii) under the circumstances described in paragraph (b) below.

94

**JX 116-109**

(b) At such time as the aggregate L/C Lender Exposure is zero, the Collateral (other than the ABL Collateral except as provided in the Existing Credit Agreement) shall be released from the Liens created by the Security Documents (other than the Guarantee and Collateral Agreement except as provided in the Existing Credit Agreement), and the Security Documents (other than the Guarantee and Collateral Agreement except as provided in the Existing Credit Agreement) and all obligations (other than those expressly stated to survive such termination) of the Agent and each Loan Party under such Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(c) ~~At such time as a Property is released from the liens of the mortgage securing the December Real Estate Loan (such released Property, a "December Real Estate Loan Released Property"), such December Real Estate Loan Released Property shall automatically and unconditionally be released from the Liens created by the Mortgage (x) without requiring the execution of a release of mortgage or the recording of any document (including a release of mortgage)~~ in the land title records with respect to such termination or the taking of any other action, ~~(y) without requiring any approval or consent of the Agent, Issuing Bank or L/C Lenders, and (z) notwithstanding any Default or Event of Default hereunder. Agent and Issuing Bank hereby agree (at Borrower's sole cost and expense) that within 15 days' following receipt of instructions from the Required L/C Lenders directing the release of Liens created by a Mortgage on a Property being released under the December Real Estate Loan, Agent and Issuing Bank shall, notwithstanding~~ As of the Amendment No. 2 Effective Date, the Agent, Issuing Bank and L/C Lenders hereby unconditionally (I) terminate that certain Guarantee Agreement, by and among SHC Desert Springs, LLC, Troy Coolidge No. 13, LLC, Innovel Solutions, Inc., MaxServ, Inc. (the "Released Guarantors"), as Guarantors, and Agent and (II) release the Real Estate Collateral from securing the Obligations and agree that the Real Estate Collateral shall not constitute "Collateral" for any purposes hereunder. Notwithstanding any Default or Event of Default hereunder ~~nor~~or any other event or condition affecting the Borrowers, the ~~L/C~~L/C Lenders, the Issuing Bank, the Agent or ~~Agent, execute~~the Collateral, the Agent and the Issuing Bank shall (at Borrowers' sole cost and expense) promptly upon receipt thereof execute and deliver to the Borrowers a release and discharge of the ~~liens securing such Property subject to the December Real Estate Loan Property Release under the Mortgage (which may be in the form of a partial release of mortgage if such Mortgage covers multiple Properties) and deliver such release to the Borrower~~Liens encumbering the Real Estate Collateral (including the Mortgages) and any Borrower or any of its Subsidiaries may record and cause any title company to record such releases in the land title records as determined by such Borrower or such Subsidiary. The Agent, the Issuing Bank and ~~L/C~~the L/C Lenders hereby authorize any title company ~~issuing a policy of title insurance with respect to a December Real Estate Loan Released Property~~to rely on this Section 9.13(c). The release of the Liens securing the Real Estate Collateral shall be prepared by the Borrowers and delivered for execution to the Agent, the Issuing Bank and the L/C Lenders.

95

JX 116-110

EX-10.1

Section 9.14 <u>PATRIOT Act Notice</u>. Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower, Holdings and each Subsidiary Guarantor that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, Holdings and each Subsidiary Guarantor, which information includes the name and address of such Borrower, Holdings and such Subsidiary Guarantor and other information that will allow such Lender or the Agent, as applicable, to identify such Borrower, Holdings and such Subsidiary Guarantor in accordance with the PATRIOT Act. Each Borrower and Holdings hereby agrees for itself and on behalf of each Subsidiary Guarantor to provide such information promptly upon the request of any Lender or the Agent.

Section 9.15 <u>Integration</u>. This Agreement and the other Loan Documents represent the agreement of Holdings, the Borrowers, the Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Agent or any Lender relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.16 <u>Replacement of L/C Lenders</u>. If any L/C Lender requests compensation under <u>Section 2.12</u> or if the Borrowers are required to pay any additional amount to any L/C Lender or any Governmental Authority for the account of any L/C Lender pursuant to <u>Section 2.15</u>, if any L/C Lender does not consent (a "<u>Non-Consenting Lender</u>") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each L/C Lender and that has been approved by the Required L/C Lenders, then the Borrowers may, at their sole expense and effort, upon notice to such L/C Lender and the Agent, require such L/C Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 9.07</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another L/C Lender, if a L/C Lender accepts such assignment), <u>provided</u> that:

(a) the Borrowers shall have paid to the Agent the assignment fee specified in <u>Section 9.07</u>;

(b) such L/C Lender shall have received payment of an amount equal to its ratable share of the outstanding Reimbursement Obligations actually funded by such L/C Lender, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding Reimbursement Obligations, interest and fees) or the Borrowers (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.15</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d) with respect to the replacement of any Non-Consenting Lender, such amendment, waiver or consent can be effected as a result of such assignment (together with all other assignments required by the Agent to be made pursuant to this paragraph); and

(e) such assignment does not conflict with applicable laws.

96

**JX 116-111**

EX-10.1

An L/C Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such L/C Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Section 9.17 <u>No Advisory or Fiduciary Capacity</u>. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the letter of credit facility provided for hereunder and any related arranging, syndication or other services in connection therewith (including in connection with any amendment, restatement, consent, supplement, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, restatement, consent, supplement, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, restatement, consent, supplement, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, restatement, consent, supplement, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

Section 9.18 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

97

**JX 116-112**

EX-10.1

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.19 <u>Reinstatement.</u>

(a) If at any time any amount paid by any L/C Lender or by any other Person in respect of any "Obligations" as defined in the Cash Collateral Agreement is rescinded or must otherwise be restored or returned for any reason, including upon the insolvency, bankruptcy, or reorganization of any Person or otherwise, each L/C Lender's obligations hereunder or under the Cash Collateral Agreement with respect to that payment shall be reinstated at such time and this Agreement and the Cash Collateral Agreement, if terminated, shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. All rights, interests, agreements, and obligations of each L/C Lender under this Agreement and the Cash Collateral Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any insolvency proceeding by or against any L/C Lender or any other circumstance which otherwise might constitute a defense available to, or a discharge of any L/C Lender in respect of its obligations hereunder or under the Cash Collateral Agreement.

(b) If at any time any amount paid by any Loan Party or by any other Person in respect of any Obligations is rescinded or must otherwise be restored or returned for any reason, including upon the insolvency, bankruptcy, or reorganization of any Person or otherwise (such amount, the "<u>Rescinded Amount</u>"), each L/C Lender's and each Loan Party's obligations under this Agreement and the Cash Collateral Agreement with respect to such Rescinded Amount and the obligations that gave rise to payment of such Rescinded Amount, including, without limitation, pursuant to Article III hereof, shall be reinstated at such time and this Agreement, if terminated, shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. In addition, if, at any time, any Rescinded Amount has been paid or transferred by the Issuing Bank to any L/C Lender, such L/C Lender shall immediately pay to the Issuing Bank the amount of such Rescinded Amount received by such L/C Lender.

98

https://www.sec.gov/Archives/edgar/data/1310067/000119312517246830/d432379dex101.htm[7/1/2019 5:49:28 AM]

EX-10.1

Section 9.20 <u>Existing Agent Acknowledgment</u>

(a) Each of the Lenders, the Agent and the Loan Parties acknowledges that (i) in order for this Agreement and the Letters of Credit to qualify as Bank Products and an "Other L/C Facility" (as defined in the Existing Credit Agreement), Bank of America, N. A., in its capacity as Existing Agent and the "Borrowers" under the Existing Credit Agreement are required to agree to such designation, (ii) pursuant to the Existing Agent Acknowledgment and Consent attached as Exhibit C to this Agreement the Existing Agent and the "Borrowers" under the Existing Credit Agreement have agreed to such designation and (iii) such designation is subject to the conditions and limitations set forth in the Existing Agent Acknowledgment and Consent.

<u>Section 9.21</u> <u>Cash Collateral of L/C Lenders.</u> Each of Holdings and the Borrowers hereby acknowledges and agrees that (a) none of Holdings or any Borrower shall have any rights to any Lender Cash Collateral Account or the funds on deposit therein (or any other pledged collateral relating thereto) and (b) to the extent permitted by any Cash Collateral Agreement, all funds held in any Lender Cash Collateral Account (and other collateral relating thereto) may be released to the applicable L/C Lender pursuant to the terms thereof.

[Remainder of page intentionally left blank.]

99

**JX 116-114**

EX-10.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**SEARS HOLDINGS CORPORATION**

By: _____
Name:  Robert A. Riecker
Title:   Vice President, Controller and
         Chief Accounting Officer

**SEARS ROEBUCK ACCEPTANCE CORP.**

By: _____
Name:  Robert A. Riecker
Title:   Vice President, Finance

**KMART CORPORATION**

By: _____
Name:  Robert A. Riecker
Title:   Vice President, Controller and
         Chief Accounting Officer

[Signature page to Letter of Credit and Reimbursement Agreement]

**JX 116-115**

EX-10.1

**CITIBANK, N.A.,** as Agent and as the Issuing Bank

By: _____
Name:  David Smith
Title:   Vice President

Applicable Office:

390 Greenwich St, 1st Floor
New York, NY 10013

[Signature page to Letter of Credit and Reimbursement Agreement]

JX 116-116

EX-10.1

**JPP, LLC,** as an L/C Lender

By: _____
Name:  Edward S. Lampert
Title:   Member

[Signature page to Letter of Credit and Reimbursement Agreement]

**JX 116-117**

EX-10.1

**JPP II, LLC**, as an L/C Lender

By: RBS Partners, L.P., as Manager

By: ESL Investments, Inc., as General Partner

By: _____
Name:  Edward S. Lampert
Title:   Chairman and Chief Executive Officer

[Signature page to Letter of Credit and Reimbursement Agreement]

JX 116-118

# Exhibit 78

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4       --------------------------------X

5       In re:                          Chapter 11

6       SEARS HOLDINGS                  Case No:

7       CORPORATION, et al.,            18-23538 (RDD)

8                  Debtor.

9       --------------------------------X

10

11             * * * HIGHLY CONFIDENTIAL * * *

12             DEPOSITION OF MOHSIN MEGHJI

13                New York, New York

14                January 29, 2019

15

16

17

18      Reported by:

19      MARY F. BOWMAN, RPR, CRR

20      JOB NO. 154846

21

22

23

24

25

JX 117-1

|  | Page 2 |
|---|---|

1
2
3
4
5     January 29, 2019
6     9:35 a.m.
7
8
9         Proceedings, held at the offices
10    of Akin Gump Strauss Hauer & Feld LLP, One
11    Bryant Park, New York, New York, before
12    Mary F. Bowman, a Registered Professional
13    Reporter, Certified Realtime Reporter, and
14    Notary Public of the State of New Jersey.
15
16
17
18
19
20
21
22
23
24
25

|  | Page 3 |
|---|---|

1
2                   APPEARANCES:
3
4
5     WEIL, GOTSHAL & MANGES
6     Attorneys for Debtors, and
7     Debtors-in-Possession:  Sears Holdings
8     Corporation, et al.,
9         200 Crescent Court
10        Dallas, Texas  75201-6950
11    BY:  PAUL GENENDER, ESQ.
12        JENNIFER CROZIER, ESQ.
13
14
15    AKIN GUMP STRAUSS HAUER & FELD
16    Attorneys for Unsecured Creditors:
17        One Bryant Park
18        Bank of America Tower
19        New York, New York 10036
20    BY:  JOSEPH SORKIN, ESQ.
21        JOHN KANE, ESQ.
22        PHILIP DUBLIN, ESQ. (a.m. session)
23
24
25

|  | Page 4 |
|---|---|

1
2                   APPEARANCES:
3
4     Paul, Weiss, Rifkind, Wharton & Garrison
5     Attorneys for the Subcommittee of the
6     Board of Sears Holdings
7         1285 Avenue of the Americas
8         New York, NY 10019
9     BY:  ROBERT BRITTON, ESQ.
10        KAREN KING, ESQ.
11
12
13    Cleary Gottlieb Steen & Hamilton
14    Attorneys for Defendants
15        One Liberty Plaza
16        New York, NY 10006
17    BY:  LINA BENSMAN, ESQ.
18        RACHEL POLAN, ESQ.
19
20
21
22
23
24
25

|  | Page 5 |
|---|---|

1
2                   APPEARANCES:
3
4     SKADDEN ARPS SLATE MEAGHER & FLOM
5     Attorneys for Bank of America DIP Lender
6         4 Times Square
7         New York, New York  10036
8     BY:  GEORGE HOWARD, ESQ.
9
10
11    Also Present:
12        Sharmeen Khan, FTI Consulting
13        Matt Diaz, FTI Consulting
14        Natalie Weelborg, Houlihan Lokey
15        Bradley C. Geer, Houlihan Lokey
16        Ross Rosenstein, Houlihan Lokey
17
18
19
20
21
22
23
24
25

JX 117-2

Page 6

Meghji - Highly Confidential
1
2      MR. GENENDER:  Rules, one
3  objection good for all and we are going
4  to mark the entire transcript highly
5  confidential subject to changes in
6  designation.  Agreed?
7      MR. SORKIN:  Agreed.
8  MOHSIN MEGHJI,
9      called as a witness by the parties,
10     having been duly sworn, testified as
11     follows:
12 EXAMINATION BY
13 BY MR. SORKIN:
14     Q.   Good morning, Mr. Meghji.  My
15 name is Joseph Sorkin.  I'm an attorney at
16 Akin Gump, and we represent the official
17 committee of unsecured creditors.
18     Have you had your deposition
19 taken before?
20     A.   Good morning.  In this matter?
21     Q.   In any matter.
22     A.   Yes.
23     Q.   As a result, I'm not going to go
24 through a long introduction of rules.  I'm
25 sure you're familiar with the experience.

Page 7

Meghji - Highly Confidential
1
2  If you need to take a break at any point
3  today, just let me know, and I'd just ask
4  that you not take a break in the middle of
5  a question, but otherwise, just let me know
6  and I'm happy to accommodate you.
7      If at any point you don't
8  understand one of my questions, just let me
9  know and I'll reask it.  Is that OK?
10     A.   Perfect.
11     Q.   Other than if Mr. Genender
12 objects with respect to a question seeking
13 attorney/client privileged information, if
14 he objects, it is OK for you to still go
15 ahead and answer, assuming you understand
16 my question.
17     Is that understood?
18     A.   Yes.
19     MR. GENENDER:  If I don't want
20 you to answer, I will instruct you not
21 to answer.
22     THE WITNESS:  Great.
23     Q.   Mr. Meghji, do you understand
24 that you are appearing today both in your
25 individual capacity -- in other words,

Page 8

Meghji - Highly Confidential
1
2  based on the information you know
3  individually -- as well as a 30(b)(6)
4  representative?
5      A.   Correct.
6      Q.   And you understand that, as a
7  30(b)(6) representative, you've been
8  designated to testify on behalf of the
9  debtors with respect to certain topics.
10     A.   Correct.
11     Q.   Let me hand you what we are going
12 to mark as Exhibit 16.
13     (Exhibit 16, e-mail thread
14     beginning date January 28, 2019 marked
15     for identification, as of this date.)
16     Q.   Mr. Meghji, can you take a
17 minute to review what has been marked as
18 Exhibit 16 and tell me if you have seen
19 that document before.
20     A.   I don't recall seeing this
21 document, but I understand it.
22     Q.   Do you understand that with
23 respect to the topics in which the
24 attorneys from Weil have designated you as
25 the 30(b)(6) representative, you're

Page 9

Meghji - Highly Confidential
1
2  prepared to speak on those topics?
3      A.   To the best of my knowledge.
4      Q.   Other than meeting with counsel
5  or speaking to counsel, did you do anything
6  to prepare to testify on these topics?
7      A.   No.
8      Q.   You didn't speak with anybody
9  else at M-III or anyone else outside the
10 presence of counsel?
11     A.   No.
12     Q.   Have you reviewed any of the
13 deposition transcripts that have been taken
14 in this matter?
15     A.   I briefly skimmed last week
16 Mr. Kamlani's transcript, but I don't think
17 I read it all.  I just did a quick skim
18 when it came out.
19     Q.   Can you tell me why it was that
20 you skimmed that transcript?
21     A.   It was in an e-mail I got that
22 was one of the attachments, so I opened it
23 up and looked at it.  But it was late at
24 night, and I really didn't have time to go
25 through all of it.

**JX 117-3**

Page 10

1           Meghji - Highly Confidential
2       Q.   Understood.  Was there anything
3   about your review of that transcript that
4   refreshed your recollection about either
5   certain facts or events that took place in
6   this case?
7       A.   From that transcript?
8       Q.   From that transcript.
9       A.   No.
10      Q.   In preparation for this
11  deposition, did you review any transcripts
12  from the court or the auction transcript?
13      A.   I don't recall doing that.
14      Q.   I want to step back and
15  understand a little bit about how you
16  became involved -- strike that.
17          Can we have an understanding that
18  if I refer to the debtors, Sears or the
19  company, I'm referring to the same entity?
20  Does that make sense to you?
21      A.   Sure, as a whole.
22      Q.   As a whole.
23          To the extent we need to talk
24  about a specific business unit or entity
25  within Sears, I will specify that.  Does

Page 11

1           Meghji - Highly Confidential
2   that make sense?
3       A.   Perfect.
4       Q.   If you need me to specify a
5   specific business unit, please let me know.
6       A.   I will.
7       Q.   And to the extent we talk about
8   the entity that will exist if, in fact, the
9   sale transaction is closed, can we refer to
10  that as NewCo?
11      A.   Sure.
12      Q.   Again, at any point if you don't
13  understand which entity I'm referring to,
14  please let me know.
15          With respect to Sears, can you
16  explain to me how you first became involved
17  in Sears?
18      A.   So I was approached in April or
19  May of 2016 by counsel for Sears, Mr. Scott
20  Charles, who introduced me to Mr. Lampert
21  and indicated that they needed some
22  assistance with respect to liquidity,
23  treasury planning, et cetera, and wanted to
24  speak to me.
25          I met with Mr. Lampert in his

Page 12

1           Meghji - Highly Confidential
2   office in a week or so after that, and we
3   had a couple-week discussion thereafter.
4   In discussions with Mr. Kamlani, he then
5   retained my firm and engaged a small team
6   of -- initially it was a couple of people,
7   two people, to help with liquidity
8   management, looking for additional sources
9   of liquidity.
10          And over time, over the ensuing
11  couple of years, I had a team of four to
12  five people kind of working with the
13  finance department of the company in a
14  variety of roles.
15      Q.   When was it, do you recall, that
16  you were actually engaged by Sears?
17      A.   Approximately May 2016.
18      Q.   And that was M-III that was
19  engaged?
20      A.   Correct.
21      Q.   What is your title at M-III?
22      A.   I'm managing partner.
23      Q.   Were you the individual who
24  started M-III?
25      A.   Yes.

Page 13

1           Meghji - Highly Confidential
2       Q.   When was it started?
3       A.   M-III really began business in,
4   I'd say, October or November of 2014,
5   somewhere in that time frame, as sort of an
6   operating entity.  And the advisory side of
7   the business really commenced in earnest
8   probably in early 2016.
9       Q.   How did you know Mr. Charles when
10  he reached out to you in May of 2016?
11      A.   I'd known him for a long time.
12  We had worked together on a bunch of
13  different cases where he was counsel and I
14  was a financial advisor.
15      Q.   Did you know Mr. Lampert prior to
16  May of 2016?
17      A.   No.
18      Q.   You had never met him prior to
19  that time?
20      A.   No.
21      Q.   Did you know Mr. Kamlani prior to
22  May of 2016?
23      A.   No.
24      Q.   What was your understanding of
25  the role specifically that M-III would play

JX 117-4

Page 14

Meghji - Highly Confidential
1  Meghji - Highly Confidential
2  with respect to liquidity management at
3  Sears when you were first engaged?
4      A.   When we were first engaged, I
5  think the company was tight on liquidity or
6  felt they might become tight on liquidity,
7  and they were looking for help in improving
8  their treasury processes as well as finding
9  additional sources of liquidity.
10     Q.   What does that mean, to find
11 additional sources of liquidity?
12     A.   Looking for ways in which, you
13 know, either payment processes could be
14 improved, forecasting, in particular, how
15 treasury and liquidity could be improved,
16 looking at ways in which the borrowing base
17 could be tightened up or -- so a variety
18 of -- it wasn't sort of something clear.
19 It was a list of ten steps.  It was really
20 just going to talk to the CFO or really the
21 treasurer and help figure out if there were
22 things we could be doing about it.
23     Q.   With respect to liquidity, is
24 that really working to better manage the
25 cash inflows and outflows of the company?

Page 15

1  Meghji - Highly Confidential
2      A.   Correct.  That's sort of a good,
3  broad way of putting it.
4      Q.   Have you been engaged
5  consistently by Sears from May 2016 through
6  the time of filing?
7      MR. GENENDER:  You being --
8      Q.   M-III, sorry.
9      A.   So M-III has had a team, I've had
10 a team of people working through that May
11 2016 on through now.  It was a smaller
12 team.  My personal involvement was fairly
13 limited and episodic.
14     So once in a while, I would get
15 more involved if there was something going
16 on the team needed my guidance on or
17 Mr. Kamlani or Mr. Lampert wanted to speak
18 to me about something.
19     But I was not sort of actively
20 involved through that process.
21     Q.   Who were the individuals that
22 were actively involved with respect to
23 M-III's engagement at Sears from May 2016
24 until the petition date?
25     A.   So given the length of it, we

Page 16

1  Meghji - Highly Confidential
2  moved the team around somewhat, but a
3  couple of individuals, Brian Griffith and
4  Chris Good, Brian is managing director,
5  Chris Good is a director now.
6      And a couple of sort of
7  individuals who were associates when they
8  started, are vice presidents now, Wesley
9  Sima and Enrique Acevedo have spent a lot
10 of time.  But occasionally we have taken
11 months where we sat people to give people a
12 break from the grind of travel.
13     Q.   You indicated that your personal
14 involvement with respect to the engagement
15 by Sears of M-III, again, prepetition was
16 intermittent.
17     A.   Right.
18     Q.   Can you describe for me the
19 situations you recall where you became more
20 involved?
21     MR. GENENDER:  Prepetition?
22     Q.   Prepetition.
23     A.   So it was more -- there would be
24 sort of a weekly -- at some point after a
25 few months of our involvement, we would

Page 17

1  Meghji - Highly Confidential
2  have a weekly Monday morning call with
3  Mr. Lampert, and so kind of each week, as
4  the team was preparing to present and have
5  a weekly update discussion with
6  Mr. Lampert, which was generally by video
7  conference, I would look at the materials
8  they had prepared which could be in a
9  variety of different areas, mainly
10 supporting the finance team, CFO,
11 treasurer, and the FP&A area, on things
12 they were doing that our guys could help
13 them with.
14     Q.   What were the specific issues
15 that you recall, if any, prepetition where
16 you got directly, more directly involved?
17     A.   So one in particular that I
18 recall is where Mr. Lampert was pretty
19 focused on the IT costs of the company and
20 wanted some help and perspective on how to
21 get those reduced because this is at a
22 point where the company was really focused
23 on reducing corporate, its corporate,
24 overall its SG&A corporate costs which
25 included IT.

JX 117-5

Meghji - Highly Confidential

They hired a firm called Teneo to help do all that. But the one area this firm had not made sufficient progress in Mr. Lampert's mind was the IT area, and one of Teneo' senior individuals was the interim head of IT at Sears as well, so he was concerned about whether they were doing enough or not. He asked me to take a look.

I had spent a week or so at the company interviewing different people in different areas to identify where there might be opportunities and then sort of gave him a high level view of where there might be pockets of value.

That work product -- or if I can call it "work product," it was sort of more of an outline of, here's some places you can look at -- was then handed off to one of the executives to implement.

Q. And when you talked about the company being focused on reducing SG&A expense, was that the entire time that M-III was engaged prepetition, or did that come into existence at a certain point in

Meghji - Highly Confidential

time?

A. I'm not -- do you mean the focus on cutting costs?

Q. Correct.

A. I -- look, I can't -- I wasn't involved enough all the way through to sort of completely accurately answer that question. But my impression was there were -- like anything, there were times where they were heavily focused on certain things versus the others. And there was a period of time where Teneo came in and had a huge focus on cutting costs.

Q. With respect to the focus on cutting the IT costs, do you remember approximately when that was when you got involved?

A. I would have to go and check the exact -- my recollection is that it was -- it would have been October, November of 2017. But I could be wrong.

Q. Can you tell me, prior to M-III's engagement by Sears in May of 2016, what was your personal experience in the retail

Meghji - Highly Confidential

space?

A. I don't think I had worked in a retail company directly, but in my prior firm -- my prior firm was Loughlin Meghji and Company, which I comanaged for ten years. We had an individual named Ken Simon who represented almost exclusively unsecured creditors committees for retail companies.

So as part of kind of working with him, I was involved in a series of assignments, mostly kind of overseeing or really supporting. He was really the retail expert. So I learned a bunch of things along the way doing that.

Q. OK, when you say you learned a bunch of things along the way and that you were supporting him, can you be a little more specific what that means?

A. We looked at retail companies undergoing Chapter 11 proceedings where we were -- where my firm and Ken Simon was the lead partner on advising unsecured creditors committees.

Meghji - Highly Confidential

Q. Was that firm and Ken Simon advising as a retail expert or as a financial advisor generally?

A. In his case, both.

Q. Can you tell me some of the matters that you personally were involved in at your prior firm that were retail bankruptcy cases?

A. The one -- a couple that I recall sort of off the top was Filene's and Syms. There were probably a bunch of other smaller ones. Hancock Fabrics was another one that I spent some time looking at. But not -- I can't recall much more. It was a long time ago.

Q. During the prepetition period during M-III's engagement on Sears, who was the individual that you most frequently had direct contact with?

A. Sorry, can you define what "prepetition period" means?

Q. Sure. May 2016 until October 15, 2018.

MR. GENENDER: Who was the person

6

**JX 117-6**

Page 22

1        Meghji - Highly Confidential
2    at Sears?
3        Q.    At Sears, correct.
4        A.    It was -- it varied at different
5    times during the process.  But it could
6    have -- the range of individuals we dealt
7    with primarily -- I dealt with primarily
8    included Kunal Kamlani, Jason Hollar, who
9    was the CFO prior to Rob Riecker, and then
10    Rob Riecker.
11        So Rob and Jason were obviously
12    with the company.  Kunal was with DSL, and
13    then occasionally I would have a
14    conversation during our weekly meetings, if
15    I attended those, which I didn't attend all
16    of them.  But when I attended them, then I
17    talked to Mr. Lampert.
18        Q.    I want to focus on 2018.  So
19    prepetition, the period I'm looking at is
20    January until October of 2018.
21        Is that clear?
22        A.    Yes.
23        Q.    Can you tell me at what point in
24    time during that period M-III became
25    involved in preparing for a potential

Page 23

1        Meghji - Highly Confidential
2    bankruptcy filing?
3        A.    Specifically in preparing for a
4    bankruptcy filing?
5        Q.    Yes.
6        A.    Subject to my understanding of
7    preparing for a bankruptcy filing, which
8    may be different than yours, I would say
9    that that was -- that began in early
10    October.
11        Q.    What is your understanding of
12    preparing for a bankruptcy filing?
13        A.    Some work that we did
14    specifically with the anticipation of the
15    Chapter 11 filing.
16        Q.    Was there a period of time before
17    early October of 2018 where M-III was
18    engaged with the company in preparing for a
19    sale process associated with a potential
20    bankruptcy filing?
21        MR. GENENDER:  Objection, form.
22        A.    Say that again.
23        Q.    Sure.  I understand that with
24    respect to specifically preparing papers
25    and actually getting ready to file for a

Page 24

1        Meghji - Highly Confidential
2    bankruptcy, you understood that M-III first
3    became involved in that process in early
4    October of 2018, is that correct?
5        A.    Correct.
6        Q.    What I'm trying to understand is,
7    was there a time period prior to that where
8    M-III was engaged with Sears in an effort
9    to prepare for selling assets in connection
10    with a bankruptcy filing?
11        A.    No.
12        Q.    Do you know if there were any
13    other advisors who were involved with Sears
14    prior to October of 2018 in preparing for,
15    in preparing to sell assets in connection
16    with the bankruptcy filing?
17        A.    So there was a special committee
18    of the board, and they had a financial
19    advisor, Centerview Partners, and a legal
20    advisor, Weil Gotshal.
21        My understanding was that they
22    were doing more of that, but to be honest,
23    we were not involved in that process, so I
24    cannot tell you anything more than what my
25    impression was.

Page 25

1        Meghji - Highly Confidential
2        Q.    Understood.  What was your
3    impression?
4        A.    My impression was that all
5    sale-related issues were sort of handled at
6    the company by the specialty -- by the
7    special committee.
8        Q.    So prior to October -- strike
9    that.
10        Was M-III involved, at any point
11    now, prepetition or post-petition, in
12    populating data rooms in order to
13    facilitate a sale of the company's assets?
14        A.    I don't recall us being involved
15    in populating data rooms before filing.
16        Post-filing, I think we have been
17    working in concert with Sears personnel and
18    Lazard.  We are the assisting -- members of
19    my team have been assisting Lazard in
20    populating or providing data for the data
21    rooms.
22        Q.    As between the various advisors,
23    whose responsibility is it to populate the
24    data rooms, as far as you understand?
25        A.    I think the ultimate, the

JX 117-7

Page 26

Meghji - Highly Confidential

1      Meghji - Highly Confidential
2  ultimate responsibility, my understanding,
3  was that it was sort of -- Lazard was the
4  point for the sale process.  Lazard were
5  investment bankers and M&A advisors.
6      But I think it was sort of a
7  joint process at their direction and lead
8  in terms of how, you know, what to put in
9  when, et cetera.
10     Q.   Are you aware of the existence of
11 any data room that contained materials for
12 potential purchasers of any of the
13 company's assets that existed prior to the
14 filing of bankruptcy?
15     A.   Not specifically, although there
16 might have been some data -- not that I had
17 ever gone into myself.
18     Q.   Understood.  And I'm just asking
19 you individually.  You weren't aware of any
20 that existed prior to filing?
21     A.   Not that I knew specifically.
22     Q.   Mr. Meghji, I want to talk to you
23 now about a topic that you have been
24 designated as a 30(b)(6) witness, and that
25 is administrative insolvency.

Page 27

1      Meghji - Highly Confidential
2      Can you tell me, from the time of
3  filing, what your role was with respect to
4  assessing administrative solvency or
5  insolvency of the company?
6      A.   What -- so just to understand the
7  question, what my role was with respect to
8  assessing administrative insolvency?
9      Q.   Correct.
10     A.   So I'm the chief restructuring
11 officer of the company.  The -- some
12 combination of my team, working with Sears'
13 finance department and the CFO, was
14 responsible for producing and preparing the
15 financial projections and the debtor, in
16 particular the debtor-in-possession, of
17 financing projections for the company and
18 for the debtors while in bankruptcy.
19     So we were pretty focused on
20 looking at and ensuring that the estates
21 were run in a way that stayed
22 administratively solvent.
23     Q.   Was that a focus of the companies
24 from the beginning of the filing?
25     MR. GENENDER:  Objection, form.

Page 28

1      Meghji - Highly Confidential
2      A.   Can you define "focus"?
3      Q.   Sure.
4      Was it important to the company
5  that the estates remain administratively
6  solvent?
7      A.   Yes.
8      Q.   Why?
9      A.   There had in particular been a
10 recent case called ToysRUs, which had
11 become administratively insolvent, and so
12 there was significant concern from
13 stakeholders really from the beginning of
14 the Chapter 11 proceedings on that.
15     And, frankly, we just, as a
16 management team, as advisors, were really
17 focused on ensuring that this would not
18 repeat here.
19     Q.   At what point in time did the
20 company begin to prepare a specific
21 administrative solvency analysis, to the
22 extent it did?
23     So I understand -- again, just to
24 clarify and set the stage.  I understand
25 you talked about projections that M-III

Page 29

1      Meghji - Highly Confidential
2  prepared along with Sears finance
3  department and the CFO with respect to DIP
4  financing.
5      I understand that those
6  projections would have included projections
7  with respect to cash flow forecasts,
8  13-week cash flow forecasts, correct?
9      A.   Correct.
10     Q.   At some point, did the company
11 begin preparing a separate analysis or a
12 separate document with respect to the
13 administrative solvency or insolvency of
14 the estate?
15     A.   I don't recall each specific
16 administratively -- administrative solvency
17 analysis being done, but the first time we
18 did a sort wind-down and liquidation
19 analysis, that was one of the things we
20 were focused on to ensure that, in the
21 event the company was liquidated or wound
22 down, there was, you know, that it remained
23 administratively solvent.
24     Q.   Do you recall when the company
25 first prepared a wind-down or liquidation

Page 30

1        Meghji - Highly Confidential
2    analysis?
3        A.    I don't remember the exact
4    timing, but it would have been in the
5    November -- that process began sometime in
6    November and probably would have -- the
7    first cut of that would have been done in
8    sort of late November, December.
9        Q.    And if I say "wind-down" or
10   "liquidation," do those mean the same
11   things to you?
12       A.    I use those words
13   interchangeably, orderly wind-down and
14   liquidation, at least in terms of how we
15   are documenting it.
16       Q.    That's what I wanted to clarify,
17   so that if either one of us says "orderly
18   liquidation" or "wind-down," those are --
19   that means a liquidation of the assets of
20   the company and a wind-down of the estate,
21   correct?
22       A.    Yes.
23       Q.    Can you tell me what M-III's role
24   was with respect to preparing the wind-down
25   analyses that the debtors prepared?

Page 31

1        Meghji - Highly Confidential
2        A.    Yes.  My colleagues and I,
3    working with people from the company,
4    guidance from counsel, and some input from
5    Lazard as our bankers, kind of we were the
6    point in putting together an analysis of
7    what a wind-down would look like in terms
8    of the cash flow projection, when assets
9    would be monetized, what operations would
10   be closed and when, what operations would
11   be sold as a going concern, et cetera.
12       So really we were a key part of
13   creating that plan.
14       Q.    Can you describe for me what
15   factors you considered in creating the
16   wind-down projections in order to maximize
17   the value of the estate's assets?
18       A.    I'm not sure I really understand
19   that question.
20       Q.    Sure.  So I -- in creating a
21   wind-down analysis, there are a number of
22   assumptions that go into it, correct?
23       A.    Yes, many assumptions that go
24   into that.
25       Q.    What were, to the extent you can

Page 32

1        Meghji - Highly Confidential
2    tell me, some of the big-picture factors
3    that you considered in determining what
4    assumptions and what inputs would go into
5    the wind-down analyses?
6        For example, did you consider
7    that a certain amount of time would be
8    necessary to market assets for -- so the
9    amount of time necessary to adequately
10   market assets, was that a factor?
11       So my question now, stepping
12   back, is, can you describe for me what
13   factors you considered in determining what
14   assumptions and inputs you made into the
15   wind-down analysis?
16       A.    So bigger -- I'll give you some
17   big-picture factors that may not include
18   everything, and I may remember ten others
19   later.
20       Q.    Understood.
21       A.    But big-picture factors were,
22   number one, what businesses, what business
23   units out of kind of the debtors' complex
24   could be marketed as going concerns, and
25   what businesses would need to actually be

Page 33

1        Meghji - Highly Confidential
2    truly wound down or shut down; the
3    liquidity and funding available to do so
4    because the companies, as you know, filed
5    for bankruptcy because they were losing
6    money and continued to do so after; and the
7    viability within the right time to maximize
8    value around a sale process and kind of
9    comparing for each sort of different unit,
10   whether a wind-down would realize a higher
11   amount of value than a sale.
12       Q.    Can you describe for me when you
13   began the process of determining which
14   business units could be marketed as opposed
15   to wound down?
16       A.    When I began the process?
17       Q.    When you did.
18       A.    I think there was a sort of sales
19   process, a global sales process motion
20   filed with the court, and I believe it was
21   sometime in November.  But, again, I could
22   have the dates wrong.
23       And at that point, Lazard, on
24   behalf of the company, was out marketing
25   every business in parts or as a whole for

**JX 117-9**

Page 34

```
1              Meghji - Highly Confidential
2    sale.  So I did not make a determination of
3    what was to be sold or not.  That was going
4    to be the market.
5        Q.   Is it your understanding that
6    with respect to the marketing of any of the
7    assets of the company, whether individual
8    assets or assets that could be combined as
9    a going concern, that was really Lazard
10   that was responsible for that process?
11       A.   In terms of leading the sale,
12   yes.
13       Q.   Are you aware of any marketing
14   process that was -- that Lazard engaged in
15   prior to the petition date?
16       A.   I don't think they -- I don't
17   think I am.
18       Q.   Are you aware of any marketing
19   process that any other advisor engaged in
20   prior to the petition date?
21       A.   Yes, I believe Centerview was
22   marketing certain assets for sale.
23       Q.   Do you recall when that was?
24       A.   My -- to the best of my
25   recollection -- again, it's been a long few
```

Page 35

```
1              Meghji - Highly Confidential
2    months in Sears land -- the summer time, I
3    would say.
4        Q.   Do you recall which assets they
5    were marketing?
6        A.   I know Kenmore was one.  Again, I
7    don't recall specifically, but I have a
8    feeling the Home Services business might
9    have been another one.
10       Q.   Any others that you're aware of?
11       A.   DieHard would be the other brand,
12   alongside Kenmore.
13       Q.   Any others?
14       A.   Not that I can recall right now.
15            Can we take a five-minute break?
16       Q.   Sure.
17            (Recess taken; 10:13 to 10:20
18   a.m.)
19       Q.   Mr. Meghji, I want to come back
20   to the discussion of the wind-down analyses
21   that you performed a little later.
22            But for now, let me go back to
23   administrative solvency.  You indicated
24   previously that in preparing projections
25   and ensuring that the estates remained
```

Page 36

```
1              Meghji - Highly Confidential
2    administratively solvent, you worked with
3    individuals in the Sears finance department
4    and the CFO.
5            I know the CFO is Mr. Riecker.
6    Can you tell me, who were the individuals
7    you interfaced with and worked with at the
8    Sears finance department other than
9    Mr. Riecker?
10       A.   Mr. Naren Sinha, who is the head
11   of FP&A, so there were certain items
12   relating to the wind-down, particularly
13   around the stores going out of business
14   process, which he had a lot of knowledge
15   of.
16            Those would be the two sort of
17   primary people.  But, again, depending on
18   the different areas of input, members of my
19   team would have interacted with lots of
20   other people to kind of tighten up and
21   project certain line items and expenses and
22   receipts.
23       Q.   Can you describe for me generally
24   what the factors are or inputs are in
25   performing an administrate solvency
```

Page 37

```
1              Meghji - Highly Confidential
2    analysis?
3            MR. GENENDER:  Objection to form.
4        A.   So I did not perform -- you seem
5    to be describing this administrative
6    solvency analysis like it was some sort of
7    defined term.  There was no such specific
8    process undertaken.
9        Q.   I'm trying to understand just
10   generally.  You indicated that the company
11   was focused on remaining administratively
12   solvent, correct?
13       A.   Right.
14       Q.   I'm trying to understand
15   generally the information that you would
16   have considered and that the company
17   considered in determining whether or not
18   they would be able to remain
19   administratively solvent.
20            MR. GENENDER:  Objection, form.
21       A.   How I understood this is that we
22   did our projections in a wind-down
23   liquidation -- or any scenario where we
24   were focused on ensuring at all times the
25   company could meet its post-petition
```

**JX 117-10**

1       Meghji - Highly Confidential
2  obligations.
3     Q.   In looking at the projections, I
4  assume that there are inputs.  So, for
5  example, on one side, you will have claims
6  or expenses that the company is going to
7  have to pay over a certain period of time
8  on a certain schedule that you have to take
9  into account on sort of one side of the
10  equation, and the other side of the
11  equation are the sort of assets, the cash
12  inflows that the company will have in order
13  to pay those claims and on what schedule
14  that happens.
15     Is that generally correct?  Am I
16  understanding that generally correctly?
17     MR. GENENDER:  Objection, form.
18     A.   Sounds reasonable.
19     Q.   And we will look at specific
20  documents to talk about each of the
21  specific categories that make up those
22  claims and those assets.  But I'm just
23  trying to understand generally kind of what
24  the thinking is in terms of looking at
25  claims, looking at assets or cash inflows,

1       Meghji - Highly Confidential
2  and then understanding how to manage the
3  cash at the company in order to pay what
4  needs to be paid on -- in a timely manner
5  without running out of money.  Right?  Am I
6  understanding that correctly?
7     A.   Yeah, I'm not -- again, I'm not
8  sure how exactly you're going about this
9  the way you describe it.
10     What I would say is that, at all
11  times, my focus was ensuring that the
12  estates were run and managed in a way where
13  we could meet all of our obligations, our
14  post-petition obligations, as they felt it.
15     Q.   I appreciate that.  That is
16  helpful.
17     Why don't we go ahead and look at
18  a specific document, if we could.  I'm
19  going to hand you what has been previously
20  marked as Exhibit 14.
21     Mr. Meghji, could you take a few
22  minutes to look at Exhibit 14 which is an
23  e-mail and then an attachment.
24     A.   Yes.
25     Q.   Mr. Meghji, can you tell me what

1       Meghji - Highly Confidential
2  Exhibit 14 is.
3     A.   Exhibit 14 is a set of discussion
4  materials that were put together by Lazard
5  with input from us which summarizes the
6  treatment of administrative claims and a
7  few other items under the ESL deal.
8     Q.   And if you could go back to the
9  first page of Exhibit 14, the e-mail.  You
10  will see that it's an e-mail from someone
11  at Weil to a large group of individuals,
12  including yourself, sort of two-thirds of
13  the way down on the left-hand side, six
14  lines from the top.  Do you see that?
15     A.   Yes.
16     Q.   And this was sent at 10:14 on
17  Wednesday, January 16.
18     Do you see that?
19     A.   Yes.
20     Q.   Do you recall that Wednesday,
21  January 16 was the day -- actually, later
22  in the day on the day on which the debtors
23  had accepted the ESL bid and then were
24  subsequently negotiating the asset purchase
25  agreement?

1       Meghji - Highly Confidential
2     A.   Correct.
3     Q.   Is it correct then that this set
4  of discussion materials are the materials
5  with respect to administrative solvency
6  that the board or the restructuring
7  committee of the board had in front of them
8  when they were making the decision to
9  accept and finalize the ESL bid?
10     A.   Again, I'm not sure I follow that
11  question.
12     Q.   Sure.  If you can look at the
13  attachment.  Slide 1, which is, at the
14  heading, is "Additional value required."
15     Do you see that?
16     A.   Yes.
17     Q.   If you look at the box, the gold
18  box, it says, "Pro forma additional value
19  required, 62 million dollars."
20     Do you see that?
21     A.   Yes.
22     Q.   What role did M-III have in
23  preparing the information on slide 1?
24     A.   So this slide was prepared by
25  Lazard.  I think that they had -- they

**JX 117-11**

Page 42

1        Meghji - Highly Confidential
2   would have discussed certain of the input
3   items with us along the way, so it was sort
4   of an iterative process, and we were
5   answering questions and providing input as
6   they did that.
7        Q.   Was -- when you say Lazard
8   prepared the slide 1, is it your
9   understanding that Lazard was responsible
10  for calculating the 503 -- for example, the
11  503(b)(9), the amount of the 503(b)(9)
12  claims that are included?
13       A.   No, I don't believe Lazard was.
14  That was information that in combination --
15  that the company would have provided to
16  them through M-III.
17       So that's an example of one where
18  they took input from us.
19       Q.   So can you tell me, in terms of
20  the information that is shown on slide 1,
21  which information was Lazard responsible
22  for compiling and which information was
23  some combination of M-III and the company
24  responsible for compiling?
25       A.   Yeah, I mean, I can give you a

Page 43

1        Meghji - Highly Confidential
2   general idea.  But at the end of the day,
3   it wasn't -- you know, it wasn't sort of
4   one individual responsible for a single
5   point.  It wasn't sort of done that way.
6        Q.   Understood.
7        A.   It was a combination of advisors
8   kind of working together as we did that.
9   But -- go ahead.
10       Q.   Let's start generally, and then
11  maybe as we go through it, we can talk
12  specifically.
13       What I am trying to understand
14  generally is you indicated that Lazard
15  prepared this slide.
16       What I'm wondering is, based on
17  how you described M-III's involvement in
18  determining and managing liquidity, many of
19  these inputs appear to me to be liquidity
20  issues, cash flow issues.
21       So my understanding was, with
22  respect to those amounts and who was
23  responsible for them, that would fall more
24  towards M-III and the finance team at the
25  company as opposed to Lazard.

Page 44

1        Meghji - Highly Confidential
2        A.   Correct.
3        Q.   So let me step back then and just
4   bigger picture, and we will go through this
5   specifically, on January 16, this
6   presentation in Exhibit 14 indicates that
7   the ESL bid does not address a
8   62-million-dollar shortfall in terms of
9   getting the company to administrative
10  solvency.  And let's set aside the KCD
11  royalties for a minute.  Is that correct?
12       MR. GENENDER:  Object to form.
13       A.   That's correct, if you just look
14  at this page.
15       Q.   Understood.
16       And then, again, just based on
17  the information on this page -- and I
18  appreciate we will go through -- there are
19  additional pages to this presentation.
20       A.   There were additional ways that
21  we all considered to address this
22  shortfall.
23       Q.   If you look at pages 2, 3 and 4
24  of Exhibit -- of the deck attached in
25  Exhibit 14, do those talk about additional

Page 45

1        Meghji - Highly Confidential
2   ways of identifying incremental sources and
3   risks to managing the shortfall?
4        A.   Correct.  Page 3 shows
5   incremental sources of value and some
6   risks.
7        Q.   Understood.  Going back to page
8   1, is it correct that the box in gold
9   identifying the pro forma additional value
10  required to get the company to
11  administrative solvency is 62 million
12  dollars?
13       MR. GENENDER:  Objection to form.
14       A.   It says, "Pro forma additional
15  value required is 62," so I think you read
16  that very correctly.
17       Q.   And was there any other number
18  outside of the 62-million-dollar number and
19  the information provided in this deck that
20  was provided to the restructuring
21  subcommittee on January 16, when the
22  restructuring subcommittee was making its
23  decision to accept the ESL bid?
24       MR. GENENDER:  Which committee?
25       Q.   The restructuring committee of

JX 117-12

Page 46

Meghji - Highly Confidential

1         Meghji - Highly Confidential
2 the board.
3        MR. GENENDER:  You said
4    subcommittee twice.
5    Q.  I apologize, restructuring
6 committee.
7    A.  The question is, was there any
8 number provided at all?
9    Q.  Strike that.  Let me ask it
10 again.
11        MR. GENENDER:  Yeah.
12        (Pause)
13    Q.  Let me ask that question again.
14      Other than the information with
15 respect to additional value required to get
16 the company to administrative solvency that
17 is contained in Exhibit 14, was there any
18 other information provided to the
19 restructuring committee on January 16,
20 2019?
21        MR. GENENDER:  Objection, form.
22    A.  By whom?  Me?
23    Q.  By any advisor that you're aware
24 of.
25        MR. GENENDER:  Objection to form.

Page 47

1         Meghji - Highly Confidential
2    A.  I don't recall.  This was a long
3 fluid day.  There was lots going on.  There
4 was a lot of back and forth.  I don't
5 recall what was -- if you have something
6 specific you want to talk about, I'm happy
7 to look at it.  But I don't know what
8 you're talking about.
9        MR. GENENDER:  You might want to
10    define when January 16 began and when
11    it ended.  One of those dates went
12    late.
13    Q.  Mr. Meghji, are you aware of any
14 presentation other than Exhibit 14 that was
15 presented to the restructuring committee
16 during the time of the auction with respect
17 to administrative solvency?
18        MR. GENENDER:  Objection, form.
19    A.  When you say "during the time of
20 the auction," can you define what time from
21 and to?
22    Q.  Sure.
23      You were at Weil's offices
24 beginning on January 14 when the auction
25 began, correct?

Page 48

1         Meghji - Highly Confidential
2    A.  Correct.
3    Q.  And you might not have been at
4 Weil's offices when the auction closed at 3
5 a.m. on January 17, but I will represent to
6 you that at 3 a.m., the auction record was
7 closed on January 17.  Do you recall that?
8    A.  Yes.
9    Q.  Were you at Weil's offices at
10 that point?
11    A.  I was not.
12    Q.  You are aware then that the
13 auction process occurred from roughly 9 or
14 10 a.m. on January 14 until 3 a.m. on
15 January 17, correct?
16    A.  Correct.
17    Q.  During that time, who -- which of
18 the advisors to the debtors presented
19 information to the restructuring committee
20 with respect to the administrative solvency
21 of the debtors in connection with any ESL
22 bid?
23    A.  It was --
24        MS. BENSMAN:  Objection.
25    A.  It was generally Lazard that

Page 49

1         Meghji - Highly Confidential
2 presented the information.  But Lazard and
3 we would have looked at the information
4 together before they presented it.
5    Q.  Are you aware of any table of
6 information that contained and ultimately
7 built up to a pro forma additional value
8 required in connection with an ESL bid to
9 get the company to administrative solvency
10 that was different than what's represented
11 on slide 1 and that was presented to the
12 restructuring committee during the time of
13 the auction?
14    A.  There were many schedules
15 produced over that period.  There were many
16 sort of iterations of these -- there were
17 drafts that were done.  I can't
18 specifically recall what was presented
19 when.  Unless I have it.
20    Q.  At the time that the auction
21 closed, did you have any different
22 understanding about the information that
23 was contained in slide 1 of Exhibit 14 that
24 led to a pro forma additional value
25 required of 62 million dollars?

Page 50

Meghji - Highly Confidential

1
2     A.   At the time the auction closed
3  which was, you said, 3 a.m. --
4     Q.   3 a.m. on January 17.
5     A.   -- on January 17?  I think I was
6  fast asleep.  So I don't recall.
7     Q.   So this -- I'm actually not
8  trying to make this complicated.  What I'm
9  trying to understand is, I have an exhibit
10 that was provided to the board at 10:30,
11 OK, that was provided to the restructuring
12 committee of the board.  You're copied on
13 it, 10:30 on January 16, that shows --
14    A.   10:24 p.m.  This is one you gave
15 me.
16    Q.   10:24 p.m., that shows a pro
17 forma additional value required of 62
18 million dollars.  There is a shortfall to
19 get the company to administrative solvency,
20 correct?
21    A.   Correct.
22    Q.   I understand in this deck there
23 are other theoretical ways that the company
24 could address that shortfall, correct?
25    A.   Well, I would disagree with the

Page 51

Meghji - Highly Confidential

1
2  word "theoretical" because I think if you
3  look on page 3, there are some clear
4  actions that could solve and address that.
5     Q.   In addition to the actions, so I
6  will accept your characterization that on
7  page 3, there are actions that can -- the
8  company can take to address the
9  administrative shortfall.
10      I just want to understand that we
11 are all in agreement that the number the
12 company was working from in terms of an
13 administrative shortfall at the time of the
14 auction was 62 million dollars.  Is that
15 correct?
16      MR. GENENDER:  Objection, form.
17    A.   That's -- that makes sense.
18    Q.   If we look at the information on
19 slide 1, you will see on the left side
20 there are administrative claims under the
21 heading "Administrative and other priority
22 claims."
23      Do you see that?
24    A.   Yes.
25    Q.   I want to talk through those.

Page 52

Meghji - Highly Confidential

1
2  The first one are 503(b)(9) claims, do you
3  see that?
4     A.   Yes.
5     Q.   What are 503(b)(9) claims?
6     A.   So in general terms, they are
7  claims arising from vendors who supplied
8  goods in the 20 days prior to filing.
9     Q.   How did the company determine
10 that 173 million dollars is the correct
11 amount of the 503(b)(9) claims that
12 currently exist or that existed at the time
13 this information was prepared?
14    A.   The finance department went back
15 and reviewed all of the shipments, goods
16 supplied within the prior 20 days, worked
17 through that and came back with the
18 estimate of that.
19    Q.   Who was it in the finance
20 department that was responsible for
21 preparing that information?
22    A.   I don't know specifically who it
23 was, but it was a member of Mr. Riecker's
24 team.  And it might have been more than one
25 individual.

Page 53

Meghji - Highly Confidential

1
2     Q.   Understood.
3      What was M-III's role in
4  determining 503(b)(9) claims?
5     A.   We reviewed -- we reviewed the
6  analysis provided by those folks.  I think
7  we also reviewed, as Deloitte, which was
8  assembling the claims analysis for the
9  company, one of the members of my team
10 reviewed their work product.  So we would
11 have reviewed for reasonableness any of the
12 analysis done by the finance department
13 and/or Deloitte.
14      But again, I wasn't directly and
15 personally involved in those.
16    Q.   When you say "reviewed the
17 analysis," can you describe for me what
18 that physical analysis looked like?
19    A.   I can't because I didn't do it
20 myself.
21    Q.   Is it your understanding that
22 there was some sort of physical, whether it
23 was an Excel spreadsheet or a paper
24 document, that listed all the 503(b)(9)
25 claims?

JX 117-14

Page 54

Meghji - Highly Confidential

1
2    A.   I assume there is.
3    Q.   Who would I go to to find that
4    document?
5    A.   I would need to find out which
6    member of my team specifically pulled that
7    together.
8        MR. SORKIN:  Mr. Genender, we are
9    asking that information be made
10   available with respect to the 503(b)(9)
11   claims that were analyzed in connection
12   with Exhibit 14 and to the extent it's
13   any different currently.
14       MR. GENENDER:  You can make any
15   request after the deposition.  We will
16   take them up, and assuming it hasn't
17   already been produced, we will consider
18   it.
19       MR. SORKIN:  Understood.
20   Q.   Do you know whether that
21   173-million-dollar number reflects all of
22   the 503(b)(9) claims that have been made to
23   date?
24   A.   I believe so, but I don't know
25   that specifically.

Page 55

Meghji - Highly Confidential

1
2    Q.   Do you know whether that number
3    reflects any anticipated claims that may be
4    made in the future?
5    A.   I don't.
6    Q.   Do you know whether there is a
7    bar date for 503(b)(9) claims that has been
8    set by the court?
9    A.   I don't think there is a bar date
10   been set.
11   Q.   As a result, does that mean there
12   might be 503(b)(9) claims that are made in
13   the future?
14       MR. GENENDER:  Objection, form.
15   A.   There might.
16   Q.   And what I'm trying to understand
17   is, has there been a reconciliation at the
18   company between the claims that have
19   already been made already in this
20   bankruptcy proceeding and the claims, the
21   potential claims that are on the books and
22   records of the company.
23       MR. GENENDER:  No question
24   pending.  You have to ask a question.
25   You stated what you are trying to

Page 56

Meghji - Highly Confidential

1
2    understand.  Let's ask him a question.
3    It's a little easier that way.
4    Q.   Has there been a reconciliation
5    between the claims that have already been
6    made in this bankruptcy proceeding and the
7    claims or the potential claims that are on
8    the books and records of the company?
9    A.   I believe the company has gone
10   through a process of validating all the
11   claims it has on its books.  But I can't
12   specifically tell you what's been done.
13   Q.   Were you involved in any analysis
14   that the company did of determining the
15   amount of the 503(b)(9) claims as of -- or
16   the company anticipated as of October 15,
17   the filing date?
18   A.   At the time?
19   Q.   At the time.
20   A.   No.
21   Q.   Do you know what the estimate of
22   503(b)(9) claims was at the petition date?
23   A.   I don't recall.
24   Q.   Can you tell me what involvement,
25   if any, you had in preparing this debtors'

Page 57

Meghji - Highly Confidential

1
2    schedules of assets and liabilities?
3    A.   I did not have any direct
4    involvement.
5    Q.   Who did?
6    A.   Deloitte took the laboring oar,
7    and Mr. Riecker, as chief financial officer
8    of the company and member of the office of
9    CEO, was involved, was heavily involved in
10   looking at that.
11       And one of the members of my
12   team, Mary Korycki, was acting as sort of
13   an intermediary in making sure, as a
14   facilitator for information between the
15   company and Deloitte.
16   Q.   Do you know what the amount of
17   inventory purchased across all of the
18   debtor entities during the 20 days
19   prefiling is, based on the statements of
20   assets and liabilities?
21   A.   I don't.
22   Q.   If that number -- if I represent
23   to you that number is roughly 370 million
24   dollars, do you have any reason to dispute
25   that?

**JX 117-15**

Page 58

Meghji - Highly Confidential
1
2   MR. GENENDER:  Objection, form.
3   A.   Like I said, I don't know the
4   number.
5   Q.   And you don't know to what
6   extent, if any, the 173 million dollars
7   included on Exhibit 14 had been reconciled
8   with that 370-million-dollar number?
9   A.   I don't.
10  Q.   If we go to the next category of
11  administrative claims on slide 1, Exhibit
12  14, it says "Accounts payable."
13       What are those?
14  A.   Those are amounts due to vendors,
15  suppliers, for services or goods received
16  after filing.
17  Q.   The total number reflected is 196
18  million dollars.  Do you see that?
19  A.   Correct.
20  Q.   Do you know what analysis was
21  done to determine that number?
22  A.   I think that was the estimate
23  from the company's finance department in
24  the accounts payable area.
25       Merchandise and nonmerchandise

Page 59

1            Meghji - Highly Confidential
2   payables were estimated to be on the books
3   that had been received after filing for
4   bankruptcy that had been unpaid for.
5   Q.   Do you know, of the 196 million
6   dollars, what amount was merchandise and
7   what amount was not merchandise?
8   A.   I don't recall off the top of my
9   head.
10  Q.   Do you know whether there is a
11  particular document or file that reflects
12  the buildup of the 196 million dollars of
13  accounts payable?
14  A.   I'm sure there is.
15  Q.   Do you know who would have that?
16  A.   Somebody in the company's finance
17  department would have it or one of my
18  colleagues.
19  Q.   Have you seen it?
20  A.   I may have seen it along the way.
21  I just don't -- I see a lot of things
22  during the day.  So I -- in most of these
23  cases, there were schedules supporting it
24  that I might have glanced at, but I don't
25  recall specifically.

Page 60

1            Meghji - Highly Confidential
2   Q.   The -- do you know whether there
3   is any updated information that shows, as
4   of today, what the accounts payable number
5   is?
6   A.   That's -- there is an ongoing
7   process in resolving and finalizing and
8   updating these accounts payable estimates.
9       So one thing, for instance, on
10  the 196 million, I know that there was a
11  block of payables, somewhere between 15 to
12  30 million dollars, that were distributed.
13  We included those in that number, but some
14  of those have been continued -- some of
15  those are and continue to be resolved in
16  terms of working them out to see if they
17  are valid payables or not.
18  Q.   Actually, let's go back to the
19  503(b)(9) claims for a minute.
20       Do you know how many individual
21  503(b)(9) claims make up the 173 million
22  dollars?
23  A.   I don't.
24  Q.   Is it more than 100?
25  A.   It's possible, but I don't know.

Page 61

1            Meghji - Highly Confidential
2   Q.   With respect to the accounts
3   payable, do you know how many individual
4   accounts payable there are that make up the
5   196 million dollars?
6   A.   I don't.
7   Q.   Is it more than 100?
8   A.   I couldn't tell you for sure.
9   Q.   So you don't know if it is more
10  than a thousand?
11  A.   I'd be surprised if it was more
12  than a thousand, but I wouldn't be
13  surprised if it is more than 100.
14  Q.   Do you have any understanding of
15  the average amount of the accounts payable
16  that make up 196 million dollars?
17  A.   No.
18  Q.   Do you have any understanding of
19  the largest account payable included in
20  that 196 million dollars?
21  A.   I don't, not off the top of my
22  head.
23  Q.   Do you have any sense of the
24  order of magnitude of the top five accounts
25  payable that make up that 196 million

JX 117-16

Page 62

Meghji - Highly Confidential

1
2  dollars?
3      A.   Yeah, if you look, there are
4  large suppliers like Whirlpool, but some of
5  those were CI -- you know, cash in advance.
6  So I think that we have managed our cash in
7  advance.
8          I couldn't tell you right off the
9  top of my head because I haven't studied
10 the AP schedules recently to do that.
11     Q.   That information should be laid
12 out clearly on the schedule that shows the
13 accounts payable?
14     A.   Yes, it is readily available, and
15 there is no point in me guessing what that
16 is.
17     Q.   With respect to the next
18 category, "Severance and WARN," what is
19 that?
20     A.   This is severance payments due to
21 employees who are not going to have jobs
22 continuing on as part of ESL transaction,
23 and WARN notice payments are the same.
24     Q.   Do you know how the
25 20-million-dollar number associated with

Page 63

Meghji - Highly Confidential

1
2  severance and WARN administrative claims is
3  calculated?
4      A.   I didn't specifically calculate
5  it.  It was provided by our HR department.
6          So typically it would be based on
7  amounts due under the company's transition
8  pay program which is the severance program,
9  and based on number of service with a cap
10 of ten weeks, something of that range.
11         And that's -- it would have
12 been -- it would have been calculated in
13 compliance with the current severance
14 program.
15     Q.   Do you have an understanding of
16 whether there is some schedule or document
17 that shows the buildup of that 20 million
18 dollars?
19     A.   Yes.
20     Q.   Who would have that?
21     A.   Again, the company's finance
22 department or HR department would have it.
23     Q.   Have you seen a schedule for the
24 severance and WARN payments totalling 20
25 million dollars?

Page 64

Meghji - Highly Confidential

1
2      A.   I don't recall today whether I
3  have or not.
4      Q.   The next category, employee
5  claims, what is that?
6      A.   My understanding is that's
7  prepetition employee claims of various
8  sorts.  Probably prepetition employee
9  severance costs that were unpaid, but that
10 would be one of the items.  There may be
11 other types of employee claims.
12     Q.   And is it your understanding that
13 those are claims that would be
14 administrative claims of the estate?
15     A.   That's my understanding.
16     Q.   And as far as the buildup of that
17 8 million, have you seen any buildup for
18 that 8 million?
19     A.   I don't recall.
20     Q.   Do you know who would have that?
21     A.   The company would have it.
22     Q.   Franchise taxes, there is a
23 3 million dollar number.  Do you know
24 specifically what that is?
25     A.   I don't.

Page 65

Meghji - Highly Confidential

1
2      Q.   Do you know who would know?
3      A.   I can get you the name of
4  somebody that would know.
5      Q.   And I assume that, similarly,
6  there is a buildup for that 3 million
7  dollars, correct?
8      A.   Correct.
9      Q.   The property taxes, 135 million
10 dollars, do you see that?
11     A.   Yes.
12     Q.   Have you seen a buildup of that
13 135 million dollars?
14     A.   There were -- I have seen various
15 versions of property tax liability buildups
16 along the way, and, again, similar to
17 accounts payable and so on, this is a
18 balance that changes over time as property
19 taxes are paid and incurred as we go.  So
20 this is a changing estimate.
21     Q.   Is that, in terms of the buildup
22 of that 135 million dollars, is that a
23 document that the company would have
24 prepared and keep -- and continued to keep?
25     A.   The company has a system for

JX 117-17

Page 66

Meghji - Highly Confidential

tracking property taxes payable.

Q.   Have you seen it?

A.   I've seen various schedules, so yes.

Q.   The last category, "RemainCo wind-down costs," what are those?

A.   That was an estimate of wind-down costs for essentially winding down the estate post the sale to ESL.

Q.   How was that number determined?

A.   That number was estimated in conjunction with Lazard counsel in terms of what would be an estimate to wind down the rest of the estate after a sale.

Q.   Did you have any -- or did M-III have any involvement in determining that 80-million-dollar number?

A.   We discussed that in general with counsel and with Lazard.

Q.   Have you seen any document that shows the buildup of what those costs are?

A.   There wasn't a very detailed buildup.  It was sort of three components to that, around cost of future litigation,

Page 67

Meghji - Highly Confidential

cost of winding down and collecting any remaining assets and liabilities and cost of filing a plan of reorganization.

Q.   Do you remember how those three categories of costs were broken out?

A.   I may have this off slightly, but my recollection is that it was 35 million dollars for litigation costs, 25 million dollars for winding down assets and liabilities, primarily assets related to what was left over, and then 20 million for doing a plan of reorganization and getting that through.

Q.   Do you remember who determined that a rough estimate or an estimate of the costs for future litigation would be 35 million dollars?

A.   I don't.  Not specifically.

Q.   What assets would remain, could be sold or wound down in that 25 million dollar number?

A.   So I think at the time this estimate was done, the number of assets that were getting left behind was bigger.

Page 68

Meghji - Highly Confidential

There was a bunch of receivables, there was a bunch of leases that were getting left behind.  But I think that number sort of stayed there really to keep a conservative number for wind-down costs.

Q.   What assets are you aware of that would continue to remain with the company after a sale to ESL assuming the sale is approved?

A.   So there is a bunch of inventory in, you know, the wave, what we call the Wave 3, the 80 stores that were closed in early January.  There is going to be inventory, we estimate, somewhere around 43 to 50 million dollars that will need to be collected thereafter.  There are probably a handful of smaller lease and real estate items that need to be sold as well and maybe some other items that I can't remember right now.

Q.   Do you have any understanding of the aggregate value of the assets that are -- would remain behind with the debtors in the event of a sale to ESL?

Page 69

Meghji - Highly Confidential

A.   Not off the top of my head, but I can -- if I can refresh my recollection based on this.

Q.   Sure.

A.   If you look at page 3 of this document that you have, residual value in GOB of 43 million.  There was a First Data deposit of 28 million dollars that we are trying to collect back.

Q.   I'm -- I apologize, I didn't mean to cut you off.

A.   And then there is a bunch of other smaller items that I can't specifically recall.

Q.   If you are not able to collect the first date of deposit prior to close, do the debtors still maintain that as an asset of the estate?

MR. GENENDER:  Objection, form.

A.   I need to confirm this with counsel, but that's my personal belief.  But I need to, you know, confirm that with counsel.

Q.   Is there a provision in the APA

JX 117-18

Page 70

Meghji - Highly Confidential

1  that you're aware of that would address
2  that issue?  And specifically, I'm talking
3  about the issue of who would be able to --
4  who retains ownership of the deposit with
5  First Data in the event it is not provided
6  back to the debtors prior to closing?
7      MR. GENENDER:  Objection to form.
8      A.   I don't recall a specific First
9  Data provision in the APA.
10     Q.   Are you aware of any provision
11 that would govern that issue?
12     MR. GENENDER:  Objection to form.
13     A.   Not directly, no.  It's a
14 question I would pose to counsel.
15     Q.   Understood.
16         But is it fair to say, based on
17 your understanding of the assets or
18 potential assets that would remain with the
19 estate, at most the value would be in the
20 neighborhood of 75 million dollars?
21     A.   I couldn't say that.  I would
22 need to look at sort of schedules that are
23 more current than this.  We have done some
24 additional analysis in the last week or so

Page 71

Meghji - Highly Confidential

1  which shows sort of areas of opportunity,
2  so if I had those, I could address the
3  question.
4      Q.   Who prepared that analysis?
5      A.   We did.
6      Q.   M-III did?
7      A.   M-III did, with input from the
8  company and others.
9      Q.   Is that a document that you have
10 seen in the last week?
11     A.   Yes.
12     Q.   And other than the categories of
13 assets we have talked about, the inventory
14 in Wave 3, the smaller leases and real
15 estate, potentially this deposit with First
16 Data, are there any other categories of
17 assets that you're aware of?
18     A.   I would like to pull that up so
19 that -- I'm getting older and my memory is
20 not that good.  I think it is best if I
21 answer that with the schedule.
22     Q.   Understood.
23     MR. SORKIN:  And, Mr. Genender, I
24 will take you up on the offer earlier,

Page 72

Meghji - Highly Confidential

1  instead of going through each of these
2  and making a specific request, many of
3  which I don't believe we have seen in
4  the production yet and are covered by
5  the requests we've made, at the end of
6  this -- I don't want to interrupt the
7  deposition and ask for each one.  But
8  we are making that request as a
9  blanket, and we will follow up
10 specifically after the deposition.
11     MR. GENENDER:  Yeah.  Don't
12 misinterpret my sounds as acquiescence.
13 You can request whatever you want
14 afterwards, and we are happy to take it
15 up, continue to work in good faith and
16 get you anything that we haven't and
17 that is responsive to the request.
18     MR. SORKIN:  Understood.  We are
19 on the record.  We have now preserved
20 it, and I don't want to waste time with
21 that back and forth.
22     MR. GENENDER:  Yes, we have both
23 preserved it.
24     Q.   If we go back to slide 1 of

Page 73

Meghji - Highly Confidential

1  Exhibit 14.
2      (Pause)
3      Q.   And I would just ask if -- there
4  wasn't a question pending so --
5      MR. GENENDER:  No, he has got a
6  privilege question.
7      Q.   OK, to the extent we need to take
8  a break, if you have a privilege question,
9  I understand, and you need to consult,
10 that's fine.  Understood.
11     A.   Can I go ahead?
12     Q.   If we need to take a break.  I
13 don't think there is a question pending, so
14 I don't think you need to consult about
15 anything.  If there is something we need to
16 clarify after a break, I'm happy to take a
17 break and do that.
18     MR. GENENDER:  He is allowed to
19 talk to me whenever he wants if there
20 is not a question pending.
21     So do you need to visit with me
22 on something?
23     THE WITNESS:  Yes.
24     MR. SORKIN:  Why don't we take a

**JX 117-19**

Page 74

Meghji - Highly Confidential

1    break, if there is an issue that you
2    need to address.
3
4         THE WITNESS:  This will be a very
5    quick one.
6         MR. SORKIN:  Understood.
7         (Recess taken; 11:04 to 11:07
8    a.m.)
9         Q.    Mr. Meghji, if we could go to
10   slide 14, line 1.  We have gone through
11   each of the individual line item categories
12   on the administrative claims, do you see
13   that?
14        A.    Yes.
15        Q.    And again, can you tell me who it
16   was that was responsible for determining
17   the amounts for each of those individual
18   line items?  And when I say "who it was," I
19   understand you might not know the specific
20   individual.  I'm trying to understand M-III
21   versus Lazard, versus the company.
22        A.    This schedule is prepared by
23   Lazard.  So I think you should talk to
24   somebody at Lazard and have those, because
25   I didn't prepare this.

Page 75

Meghji - Highly Confidential

1
2         Q.    And I understand you didn't
3    prepare the document, but with respect to
4    determining what amounts make up each of
5    the account categories under the
6    administrative claims, do you have an
7    understanding of which entity was
8    responsible for that?
9         A.    Which entity was responsible for
10   each number?
11        Q.    Correct.
12        A.    I think the numbers -- the input
13   numbers that were company related would
14   have come from a combination of Sears
15   management and/or M-III working with
16   Lazard.
17        Q.    If you look at the next column
18   over, there is a "Deduct less ESL value."
19        Do you see that?
20        A.    Yes.
21        Q.    Can you describe for me what that
22   is?
23        A.    My understanding of that is
24   that's the value of claims that are being
25   assumed as part of the ESL deal.

Page 76

Meghji - Highly Confidential

1
2         Q.    What was your role in negotiating
3    the amounts of -- that are shown in the ESL
4    value column, column on slide 1?
5         A.    I did not negotiate the deal with
6    ESL.  That was done by Lazard as our
7    advisor.  But that was in discussions with
8    Lazard to answer any questions they had and
9    provide the input.
10        Q.    With respect to the 139 million
11   dollars of 503(b)(9) claims, do you see
12   that?
13        A.    Yes.
14        Q.    What was your understanding of
15   why ESL, to the extent they did, believed
16   that 139 million dollars was sufficient to
17   address the 503(b)(9) claims?
18        A.    What happened with that was there
19   was a prior estimate provided by the
20   company which had been -- which is what ESL
21   essentially agreed to and then the estimate
22   changed at some point by 34 million dollars
23   based on certain new information that came
24   to light.
25        Q.    Do you know what that new

Page 77

Meghji - Highly Confidential

1
2    information was?
3         A.    The new information was that
4    certain items in the company's accounts
5    payable ledger had been misapplied to
6    non503(b)(9) claims, and that was
7    corrected.
8         Q.    When you say "that was
9    corrected," does that mean there were
10   amounts, cash amounts that actually went
11   out to the door to non503(b)(9) claims that
12   should have been directed to 503(b)(9)
13   claims?
14        A.    No, it was just how it was
15   applied in the company's accounts payable
16   system.
17        Q.    Understood.
18        Was it -- is it your
19   understanding that ESL had previously
20   agreed to assume 139 million dollars' worth
21   of liabilities on 503(b)(9) claims based on
22   that prior estimate and they refused to
23   increase it?
24        A.    I think you would have to really
25   ask Lazard that question because they were

**JX 117-20**

Page 78

Meghji - Highly Confidential

1  the point on the negotiation and I don't
2  want to replay that because I wasn't
3  directly involved.
4      Q.   Is that the same for each of the
5  additional numbers identified in this
6  column, the 166 million dollars for
7  accounts payable, the 134 million dollars
8  for property taxes that are -- that show a
9  shortfall to what ESL is contributing or
10  assuming versus the company estimates?
11     A.   Again, I think it's a better
12  question for Lazard.
13     Q.   Understood.  That's why I am
14  trying to clarify, I don't want to ask you
15  questions that you don't know, but I also
16  don't want to miss the opportunity to ask
17  you those questions.
18         The next section down, the other
19  claims, do you see that?
20     A.   Yes.
21     Q.   Skip down to the cure costs, the
22  fourth line down, do you see that?
23     A.   Yes.
24     Q.   What are cure costs?

Page 79

Meghji - Highly Confidential

1      A.   Cure costs are contractual
2  obligations that would need to be
3  discharged or settled if contracts were
4  assumed going forward.
5      Q.   How was the 200 million dollars
6  of cure cost determined?
7          MR. GENENDER:  Objection to form.
8      A.   I think it was determined by
9  Deloitte and/or some company personnel, but
10  I did not determine them.
11     Q.   Do you know if anyone at M-III
12  was involved in determining the
13  200-million-dollar number?
14     A.   I don't think so.
15     Q.   Did you know who at the company
16  was involved?
17     A.   I don't recall the individual.
18     Q.   Transfer taxes, what are those?
19     A.   Taxes payable on transfers of
20  entities.
21     Q.   And is it your understanding here
22  that, again, the same thing that -- the
23  column "Less ESL value" shows or reflects
24  the amount that ESL is contributing in

Page 80

Meghji - Highly Confidential

1  connection with its bid?
2      A.   That's what it appears.
3      Q.   With respect to the transfer
4  taxes and the mechanics liens and the cure
5  costs, for that matter, do you have any
6  understanding what the mechanism is in the
7  APA for ESL to actually pay those amounts?
8      A.   On the mechanism, no, I don't.  I
9  think you are better off to ask Lazard or
10  Weil that question.
11     Q.   With respect to the APA
12  generally, did you have any role in
13  negotiating the terms or the provisions of
14  the APA?
15     A.   Not directly, no.
16     Q.   If you look at the right side of
17  the chart on slide 1 of Exhibit 14, there
18  is then a 356-million-dollar number that
19  shows the remaining claims as carried over
20  to the top.
21         Do you see that?
22     A.   Yes.
23     Q.   And then there are amounts that
24  the company has to address those

Page 81

Meghji - Highly Confidential

1  potential -- or that potential shortfall.
2  Do you see that?
3      A.   Yes.
4      Q.   The first one, "Company cash
5  available at close," what is that?
6      A.   So it says, footnote 5, just
7  reading that, it says, "Company cash is
8  assumed to include 50 million available to
9  close and 29 million available post-close,
10  tasks detailed in appendix."
11         So I will -- if I go to page 6,
12  there is a breakdown of that, shown on page
13  6.
14     Q.   And the at close is the estimated
15  total available of 50 million dollars?
16     A.   Yes.
17     Q.   The post-close is the 29 million?
18     A.   Correct.
19     Q.   So let's talk about the buildup
20  of those.  The first one, store cash, that
21  shows 15 million dollars at close, what is
22  that?
23     A.   That's cash in registers held at
24  stores around the country.

JX 117-21

Page 82

1        Meghji - Highly Confidential
2        Q.    And that's cash that at close
3    would be an asset of the debtors' estate?
4        A.    Correct.
5        Q.    Do you know whether that's
6    reflected in the APA?
7        A.    My understanding is that ESL will
8    pay for it, for that up to 17 million
9    dollars.
10        Q.    Understood.  So that ESL at close
11    will pay 17 million dollars, and the cash
12    itself will stay in the registers of the
13    stores that are being transferred to sell?
14        A.    That seems fair.
15        Q.    The next one, "Cash in transit,"
16    do you see that?
17        A.    Yes.
18        Q.    What is that?
19        A.    This is cash in transit from the
20    stores into the company's sort of central
21    bank, central cash management system.
22        Q.    So it shows at close there is 15
23    million dollars in transit.  Do you see
24    that?
25        A.    Yes.

Page 83

1        Meghji - Highly Confidential
2        Q.    Can you explain what that is
3    exactly?
4        A.    What what is exactly?
5        Q.    The 15 million dollars.  I'm
6    trying to understand, you say that's money
7    that's in transit.  Is that at the time of
8    closing there is cash in armored cars
9    that's on its way to the bank, is that
10    correct?
11        A.    That would be one of the key
12    items, yes.
13        Q.    What other items are there?
14        A.    The other items would be cash in
15    regional banks.  I guess that's the next
16    line over, the regional bank cash, but
17    cash -- there is a process of collecting
18    the cash and sending it, in some cases, to
19    regional banks and then ultimately
20    transmitting it to the company's kind of
21    central cash management system which runs
22    through where the senior DIP account.
23        Q.    Other than cash in armored cars,
24    is there anything else that you can think
25    of that makes up the 15 million dollars of

Page 84

1        Meghji - Highly Confidential
2    cash at close with respect to cash in
3    transit?
4        A.    Not -- not specifically to my
5    knowledge, but I think, again, I would
6    defer to Mr. Riecker and the company's
7    treasurer to provide more detail on that to
8    you.  I relied on Rob.
9        Q.    Mr. Meghji, can you look up at
10    the top of this document, it says
11    "Additional value required, detail company
12    cash."
13        Do you see that?
14        A.    Yes.
15        Q.    Can you read the line below that?
16        A.    "The following provide further
17    detail to the company's projected cash
18    balance at close identified by M-III."
19        Q.    Who other than you at M-III
20    should I talk to if I want to understand
21    the information in slide 6?
22        A.    There is a couple of individuals,
23    Brian Griffith and Chris Good, who worked
24    very closely with the finance department
25    who have prepared and tracked this

Page 85

1        Meghji - Highly Confidential
2    information.
3        Q.    OK.
4        Going back to the "Cash in
5    transit line post-close," there is another
6    15 million dollars.  Do you see that?
7        A.    Yes.
8        Q.    What is that?
9        A.    That would be cash that didn't
10    make it in by the time the closing date.
11    So it's cash that came out of that process
12    a day or two later.
13        Q.    OK.  So is the entire 30 million
14    dollars identified by cash in transit cash
15    that is in armored cars?
16        A.    I don't know if that's -- if it
17    is all in the armored cars.
18        Q.    I'm just trying to understand,
19    that's the only -- because we have regional
20    bank cash on the next line.  I can't think
21    of anything else that would be in the
22    category of cash in transit, and I'm just
23    trying to understand if you're aware of
24    anything else, because 30 million dollars
25    of cash in armored cars sort of in the days

**JX 117-22**

Page 86

Meghji - Highly Confidential

1
2 around the closing seems like a lot, but
3 maybe that's not. I just don't know. I'm
4 trying to understand.
5     MR. GENENDER: Is there a
6 question there?
7     Q.   Can you think of anything else
8 other than cash in armored cars that would
9 make up the 30 million dollars of cash in
10 transit?
11     A.   Not right now.
12     Q.   The regional bank cash, again,
13 can you describe for me what that is?
14     A.   That is cash held in regional
15 bank accounts.
16     Q.   And the cash in those bank
17 accounts at closing shows an estimate of 10
18 million dollars. Do you see that?
19     A.   Yes.
20     Q.   Are you aware of a provision in
21 the APA that provides that the cash in
22 those regional bank accounts is property of
23 the debtors?
24     A.   Not specifically that I can
25 recall.

Page 87

Meghji - Highly Confidential

1
2     Q.   And then post-close, there is 4
3 million dollars of cash at regional -- in
4 regional bank cash. Can you describe for
5 me what the difference is between the 10
6 million dollars at close and 4 million
7 dollars post-close?
8     A.   I presume, just looking at it, is
9 that there would be an amount of money that
10 could come in and be moved directly at
11 closing and some where it might take a
12 couple more days to do that.
13     Q.   The subsidiary businesses, there
14 is 3 million dollars in cash at close. Do
15 you see that?
16     A.   Yes.
17     Q.   The notes suggest that's cash in
18 Monarch, Innovel, SHS, which is Sears Home
19 Services, correct?
20     A.   Yes.
21     Q.   And other subsidiary businesses,
22 correct?
23     A.   Yes.
24     Q.   Do you know whether or not the
25 APA addresses cash in subsidiary businesses

Page 88

Meghji - Highly Confidential

1
2 at close?
3     A.   Not that I -- I haven't read the
4 specific provision in the APA.
5     Q.   Israel cash, what is that?
6     A.   Cash held in an Israeli
7 subsidiary of the company.
8     Q.   And you don't know whether or not
9 the APA has a provision that addresses the
10 ownership of that cash, do you?
11     MR. GENENDER: Objection, form.
12     A.   I don't specifically recall a
13 provision in the APA.
14     Q.   The utility deposit shows 10
15 million dollars post-close. Do you see
16 that?
17     A.   Yes.
18     Q.   What is that?
19     A.   That's a deposit that's been
20 posted by the debtors for utilities.
21     Q.   This assumes that that deposit is
22 returned to the debtors post-close?
23     A.   Correct.
24     Q.   Do you know how the APA addresses
25 that deposit?

Page 89

Meghji - Highly Confidential

1
2     A.   Not -- not the specific utility
3 deposit.
4     Q.   Do you know how it addresses
5 utility deposits generally or deposits
6 generally?
7     A.   I don't recall the exact
8 provision.
9     Q.   And then the next line,
10 "Trap/unavailable cash," there is 15
11 million dollars at close.
12     Do you know what that is?
13     A.   There are other buckets of cash,
14 so there is an Indian subsidiary that had
15 some cash that we are looking into to see
16 how much of that would divert back.
17     Q.   Do you know how much of that 15
18 million dollars is in the subsidiary in
19 India?
20     A.   I don't specifically.
21     Q.   Other than cash in the subsidiary
22 in India, are you aware of what else makes
23 up that 15 million dollars?
24     A.   Not specifically. I think there
25 are pockets of value that either my

JX 117-23

Page 90

Meghji - Highly Confidential

1      colleagues or the finance department had
2      come up in making this estimate at the
3      time, and there is a series of work streams
4      going on around capturing that cash to come
5      in either before closing or at closing.
6          Q.    And with respect to each of the
7      categories, each of the sources of company
8      cash identified on slide 6 of Exhibit 14,
9      is there a buildup somewhere that shows for
10     each of the categories where those amounts
11     are and how much they are?
12         A.    Yes, there is.
13         Q.    And is that with M-III?
14         A.    I don't know if it's with M-III,
15     but certainly it would be with somebody
16     from -- Sears would have it and we would
17     have access to it as well.
18         Q.    If we go back to slide 1.
19             We -- again, we are going back to
20     the right-hand column, "Additional value
21     required."  We talked about the first two
22     lines, company cash, correct?  Is that
23     correct?
24         A.    Yes.

Page 91

Meghji - Highly Confidential

1          Q.    The next line, "Professional fee
2      carve-out account," what is that?
3          A.    That's an account that is a
4      separate carve-out account where amounts of
5      professional fees it would set aside.
6          Q.    The MTN sale proceeds, I think we
7      understand what that is.
8              The U-Haul sale proceeds, what is
9      that?
10         A.    There was a series of properties
11     that were sold to U-Haul, and the 7 million
12     represents the amount of unencumbered
13     value.
14         Q.    The insurance proceeds, what is
15     that?
16         A.    The insurance proceeds are
17     proceeds related to Puerto Rico hurricane
18     claims year, year and a half ago, for which
19     we had filed insurance claims, and these
20     are proceeds that are in the process of
21     being collected by the company.
22         Q.    And those are proceeds that,
23     pursuant to the transaction with ESL, will
24     remain assets of the debtors' estate?

Page 92

Meghji - Highly Confidential

1          A.    Correct.
2          Q.    The ship security deposit, what
3      is that?
4          A.    There was a sale of the ship
5      entity that had been negotiated, and it was
6      a 6 million dollar deposit that was part of
7      that sale.
8          Q.    Where is that cash now?
9          A.    The 6 million dollars?
10         Q.    The 6 million dollars.
11         A.    I don't know.
12         Q.    Who would know?
13         A.    Lazard.
14         Q.    Do you know whether there is a
15     dispute with respect to who owns -- whether
16     or not the debtors own that 6 million
17     dollars currently?
18         A.    We believe the debtors own that 6
19     million dollars, but it's not been
20     collected yet.
21         Q.    Do you know whether the potential
22     purchaser of the ship believes that the
23     debtors own that 6 million dollars?
24         A.    I don't specifically.

Page 93

Meghji - Highly Confidential

1          Q.    If we go down below that, you
2      will see a memo, "KCD royalties."  Do you
3      see that?
4          A.    Correct.
5          Q.    And there is 112 million dollars,
6      is that correct?
7          A.    Yes.
8          Q.    What are the KCD royalties?
9          A.    These are royalties paid on the
10     Kenmore and DieHard brands, sales related
11     to that.
12         Q.    They are royalties paid from
13     which entity to which entity?
14         A.    From -- I can't recall the
15     exact -- the entity -- paid from Sears
16     Holdings to KCD.
17         Q.    Paid from a debtor entity to a
18     nondebtor entity, correct?
19         A.    Yes, correct.
20         Q.    Do you have a view -- these are
21     royalties that have accrued post-petition,
22     correct?
23         A.    The 112, I believe, has some
24     large minimum monthly amount that's a

**JX 117-24**

Page 94

1       Meghji - Highly Confidential
2  contractual amount.
3       Based on my understanding, that's
4  not something we had to pay.  There was
5  sort of a round tripping of those royalties
6  with another debtor entity, and we don't
7  expect that to be a valid claim.
8       Q.   Why is it your understanding that
9  you don't intend to pay that?
10      A.   I don't know the details of that
11  because I haven't really delved into it,
12  but based on guidance I've been given by
13  our advisors, legal advisors, it's not
14  something we expect to pay.  So I've not
15  delved into that, frankly, any more detail
16  than that.
17      Q.   Other than what you've been told
18  by your legal advisors, your understanding
19  is simply there is a legal reason that you
20  do not have to pay that?
21      A.   Yes.
22      Q.   Is that correct?
23      A.   Um-hm.  Yes.
24      Q.   When you say "a round tripping,"
25  do you know which entities are involved in

Page 95

1       Meghji - Highly Confidential
2  that round tripping?
3       A.   Not -- not off the top of my
4  head.
5       Q.   Do you know whether it is two
6  entities or more than two?
7       A.   I don't.
8       Q.   And do you know if all of those
9  entities are debtors or nondebtors or some
10  combination of the above?
11      A.   Some combination of the above.
12      Q.   If we go back for a just a minute
13  on slide 1 to the ABL DIP, do you see that?
14      A.   Yes.
15      Q.   And the ABL DIP reflects a
16  priority claim of 950 million dollars,
17  correct?
18      A.   Yes.
19      Q.   And the amount that ESL was
20  willing to contribute or would have
21  financing for in terms of a new ABL DIP was
22  850 million.  Do you see that?
23      A.   Yes.
24      Q.   So there was a 100-million-dollar
25  shortfall, correct?

Page 96

1       Meghji - Highly Confidential
2       A.   Yes.
3       Q.   Do you how that 950 million
4  dollars was determined?  In terms of why it
5  was 950 million dollars that was included
6  as the amount of the administrative claim?
7       A.   I don't -- I don't remember
8  specifically, but I assume it's sort of
9  tied to the debtor-in-possession financing
10  projections that we made.
11      Q.   Mr. Meghji, we are going to hand
12  you what's being marked as Exhibit 17.
13      (Exhibit 17, document entitled
14   project blue revised cash flow budget
15   going concern marked for
16   identification, as of this date.)
17      Q.   Mr. Meghji, could you take a
18  minute to look at Exhibit 17 and tell me
19  what it is once you have had a chance to
20  review it.
21      A.   Yes, I believe this is a weekly
22  cash flow forecast for the debtors.
23      Q.   Who prepared Exhibit 17?
24      A.   It's some members of the M-III
25  team combined with management.

Page 97

1       Meghji - Highly Confidential
2       Q.   The date on Exhibit 17 is
3  January 11, 2019 on the cover.  Do you see
4  that?
5       A.   Yes.
6       Q.   I'll represent to you that, in
7  terms of the cash flow budgets we
8  received -- strike that.
9       Is it your understanding that the
10  cash flow budgets are prepared on a weekly
11  basis?
12      A.   They are updated on a weekly
13  basis.
14      Q.   And I will represent to you that
15  January 11 is the revised cash flow budget
16  closest in time to January 16, which was
17  the date of Exhibit 14.  Is that -- do you
18  have any reason to believe that is not the
19  case?
20      A.   I don't.
21      Q.   If you could turn to slide 3 of
22  Exhibit 17 and look at the bottom of the
23  page, it's note -- memo 36, "Senior DIP and
24  1L balance."
25      A.   Yes.

Page 98

Meghji - Highly Confidential

1
2      Q.   And if you go across, you will
3  see a box in gray that has 992 million
4  dollars.  Do you see that?
5      A.   Yes.
6      Q.   What is your understanding of the
7  992 million dollars that's reflected in
8  that gray box?
9      A.   It says that is projected senior
10  DIP and first lien balance of 992 million.
11      Q.   Projected as of February 9, 2019?
12      A.   2/9/19.
13      Q.   And in connection with the
14  preparation of Exhibit 14, is it your
15  understanding that the assumption of an
16  anticipated close date would be February 9,
17  2019?
18          MR. GENENDER:  Objection to form.
19      A.   Can you repeat that to me again.
20      Q.   Sure.
21          What is your understanding of
22  when the anticipated close date was that
23  the advisors of the debtors had in mind
24  when preparing Exhibit 14?
25      A.   I believe the 8th of February.

Page 99

Meghji - Highly Confidential

1
2      Q.   February.
3          Is it the case then that the 992
4  million dollars was the amount that the
5  debtors and their advisors had projected
6  being drawn on the ABL at the time of
7  closing --
8      A.   That's --
9      Q.   -- when preparing -- excuse me,
10  when preparing Exhibit 14?
11      A.   When preparing Exhibit 14.  I
12  think you need to ask Lazard that question.
13      Q.   OK.
14      A.   Because they prepared it.
15      Q.   OK.  Did you have a -- let me ask
16  you, did you have an understanding that the
17  amount outstanding on the ABL DIP would be
18  950 million dollars and not 992 million
19  dollars on January 16, 2019?
20      A.   Please repeat that again.
21      Q.   Let me ask it more generally.
22          What was your understanding on
23  January 16 of the amount that would be
24  outstanding on the ABL DIP at the time of
25  close?  Of an anticipated close with ESL?

Page 100

Meghji - Highly Confidential

1
2      A.   The latest DIP projection we had
3  was -- showed 992 million dollars.
4  However, my recollection that -- I don't
5  recall the exact number, what I thought on
6  that day, but I -- given the way the budget
7  was prepared, given the sort of
8  conservatism that had been built into the
9  budget, I was confident the actual amount
10  would be less than what's been projected.
11  But I don't recall exactly what was -- what
12  I thought at the time.
13      Q.   How much less than the 992
14  million dollars projected were you
15  confident that the amount outstanding would
16  be on January 16?
17      A.   I don't remember the exact
18  number.  In terms of ability to get to a
19  closing, by the time we got to recommend --
20  you know, got to a point where we
21  recommended the deal to the restructuring
22  committee, I was confident we could hit the
23  closing conditions.
24      Q.   Were you also confident that you
25  could manage the estate to administrative

Page 101

Meghji - Highly Confidential

1
2  solvency?
3      A.   Yes.
4      Q.   How confident?
5      A.   Question again?
6      Q.   How confident?
7      A.   Pretty confident.
8          MR. SORKIN:  We have been going a
9  little while.  Why don't take a short
10  break for the benefit of others in the
11  room.  And then go again and -- off the
12  record.
13          (Recess; 11:37 a.m.)
14      Q.   Mr. Meghji, if we can go back to
15  Exhibit 14 and I want to look at slide 2
16  for just a minute.
17          Can you describe for me what is
18  reflected on slide 2?
19      A.   Do you want me to just read
20  what's here?
21      Q.   Well, let me start by asking you
22  who prepared the substantive information
23  that's contained on slide 2?
24      A.   This slide was prepared by
25  Lazard.

JX 117-26

Page 102

Meghji - Highly Confidential

1  Q.   And when you say that, again, I'm
2  not asking who compiled it, who sat and
3  sort of typed it in.  What I want to
4  understand is, substantively, who should I
5  talk to to really dig into the numbers and
6  understand what's reflected on slide 2?
7       MR. GENENDER:  Objection to form.
8       A.   I think input for this was
9  provided by lots of different people.  As
10 we have repeatedly talked about earlier.
11 So I'm not sure -- I think you should start
12 with Lazard.  If there are specific
13 questions you have, I'm happy to answer
14 them.
15      But as I read this, it's a
16 summary of what claims we see, what's
17 assumed by ESL, what the remaining claims
18 that are left over which adds up to the 356
19 million.  And then how we essentially
20 defined the 62-million-dollar, at the time,
21 potential deficiency which needs to be
22 addressed by the upsides and opportunities
23 we talked about earlier.
24      Q.   And as I understand it, it

Page 103

Meghji - Highly Confidential

1  reflects the same information that was
2  contained in Exhibit 1 in a different
3  format.  And what I'm trying to understand
4  is, why the different format, what are
5  you -- what was the company communicating
6  through presenting it in this format as
7  opposed to slide 1?
8       A.   I think you need to ask Lazard
9  that question because they prepared this in
10 this form.
11      Q.   OK.  Slide 3, if we can go to
12 that, and we talked a little bit about
13 slide 3 in Exhibit 14 as potential sources
14 of value and risks associated with the
15 administrative shortfall, correct?
16      A.   Yes.
17      Q.   Administrative claim shortfall,
18 excuse me.
19      Who was it that prepared the
20 substantive information or identified the
21 substantive information in Exhibit -- in
22 slide 3?
23      A.   Again, this schedule was prepared
24 by Lazard with input from management,

Page 104

Meghji - Highly Confidential

1  myself and my team.
2       Q.   So let's look at the two larger
3  categories of information, as I see it, of
4  incremental sources of value and risks.
5  The first is "Potential incremental
6  sources."  Do you see that?
7       A.   I do.
8       Q.   And under the potential
9  incremental sources, the first one is
10 "Residual value in GOB," and as I
11 understand it, we talked about that
12 earlier.  That's the 43 million dollars in
13 inventory that's being currently sold as
14 part of the going-out-of-business process?
15      A.   Yes, from 80 stores.
16      Q.   Then additional budget savings of
17 8 million dollars at close, indicates it's
18 based on M-III analysis, do you see that?
19      A.   Yes.
20      Q.   Can you tell me what that is?
21      A.   Just reading that, that means
22 that off of the DIP budget, there is 8
23 million dollars of opportunity as against
24 that budget.

Page 105

Meghji - Highly Confidential

1  Q.   When you say "opportunity," are
2  there specific items that make up that 8
3  million dollars?
4       A.   Again, Lazard prepared the
5  schedule, so why it was bucketed here
6  versus there, it's something I don't know.
7       Q.   The next category, "Reduction in
8  wind-down costs," negative 20 million
9  dollars, and in the notes, "Reduction due
10 to inclusion of additional assets in ESL
11 bid."
12      Do you see that?
13      A.   Yes.
14      Q.   Do you have an understanding of
15 what the assets were that make up that 20
16 million dollars?
17      A.   No.  Again, I think Lazard
18 prepared this.  You should ask them.
19      Q.   First Data, we talked about that
20 previously, those are deposits currently
21 sitting at First Data, correct?
22      A.   Correct.
23      Q.   Do you know whether there had
24 been any negotiations with First Data about

JX 117-27

Page 106

Meghji - Highly Confidential

accessing that 28 million dollars in deposit?

A. Yes.

Q. Tell me about those discussions.

A. I have spoken to the CFO, chief financial officer, of First Data several times over the past week, and he's considering our request to return those funds. I requested those funds be returned to us as soon as possible prior to closing, and they have requested some additional information from NewCo which they are assessing.

Q. Other than considering your request and requesting additional information from NewCo, has the CFO of First Data made any commitment to you that any amount of that 28 million dollars will be returned prior to close?

A. He has made no commitment to me in terms of what would be returned.

Q. Or if --

A. But he has indicated that, subject to satisfying their diligence

Page 107

Meghji - Highly Confidential

requests, they would be open to returning some or all of that money.

Q. The disputed accounts payable, there is a 15-million-dollar number. Do you see that?

A. Yes.

Q. Can you tell me what that is?

A. Reading this line, and as I think we spoke earlier, there were about 30 million dollars of accounts payable, post-petition accounts payable, that the company disputes for a variety of reasons or has a hold on, and this is an assumption that half of it will be resolved in our favor so that's what has been taken into account here.

Q. Do you know how many accounts payable make up that 30 million dollars?

A. I don't.

Q. Do you have any understanding about the -- of the largest account payable within that 30 million dollars?

A. I don't.

Q. Do you have an understanding of

Page 108

Meghji - Highly Confidential

any specific commitment by any counterparty to resolve any account payable dispute?

A. Not specifically. But here is something you should be aware of, which is that, in general, having spoken to Rob Riecker, CFO, as well as other members of my team, in general, for a company this size, there are always disputed accounts payable. And the history, as I've been advised, is that it's very reasonable to expect that half or more would not have to be dealt with, paid.

Q. And do you know what time frame those disputed accounts payable will be resolved on?

A. No. Although some effort and work is going on right now to clarify those and to -- given the -- given where we are in the process, there is obviously a lot of urgency to trying to resolve as many of those as possible.

Q. Can you give me an example of what that is in terms of a disputed account payable?

Page 109

Meghji - Highly Confidential

A. Examples that have been cited to me are either defective goods being delivered or goods being delivered that just are not in a saleable position. So those are probably the best couple of examples, where essentially a company either would return the goods or can't sell them and does not feel it owes that money.

Q. OK, understood.

Did you have any sense of whether the disputed accounts payable are or could also be with respect to some sort of rebate or discount that the company felt wasn't applied?

A. That's certainly not how I've thought about them. There are rebates and receivables which is a separate category away from this.

Q. Away from it, OK, understood.

Do you know whether disputed accounts payable have anything to do with potential offsets on 503(b)(9) claims or other claims as part of the bankruptcy process?

Page 110

Meghji - Highly Confidential

1
2      A.   I don't.  I haven't delved into
3   that level of detail.  I've relied on
4   others who deal with this day to day.
5      Q.   OK.
6      A.   And the company.
7      Q.   The items we just discussed, the
8   total potential value of incremental or --
9   strike that.
10      The total potential incremental
11   value associated with those items is 114
12   million dollars.  Do you see that?
13      A.   That's what this says.
14      Q.   And in addition, there is a
15   potential incremental source of the
16   additional ABL reduction.  Do you see that?
17      A.   Correct.
18      Q.   Of 39 million dollars?
19      A.   Yes.
20      Q.   Can you explain to me how the
21   company could accomplish the additional
22   reduction of the 39 million dollars in
23   connection with the ABL?
24      A.   Yes, so -- and there are more --
25   there are more updated schedules and

Page 111

Meghji - Highly Confidential

1   analysis which I believe has been shared
2   with your advisors around all of these
3   issues.
4      But the 39 and the 8 basically is
5   a composition -- was an estimate at the
6   point around where either our cash receipts
7   would be better than was projected, our
8   cash disbursements for expenses, for things
9   like critical vendors, et cetera, would be
10   lower than what was in the budget.
11      Q.   Understood.  So the 8 million
12   dollars above in the additional budget
13   savings is part of the 39 million dollars,
14   is that correct?
15      A.   No.  If you read this line, it
16   says, "Excludes 8 million dollars of
17   outperformance accounted for above."
18      Q.   Understood.  Sorry, so the 8
19   million dollars is outperformance.  Is that
20   out performance that has already happened,
21   and the 39 million dollars is what may
22   happen in the future?  Or can you explain
23   to me the difference between the 39 and the
24   8?
25

Page 112

Meghji - Highly Confidential

1
2      A.   I cannot.  Lazard prepared the
3   schedule so, you know, you can -- they can
4   explain it to you.  I'm just saying, in
5   general, I look at those two items together
6   as, from my perspective, how the company
7   will outperform the budget.  Since this
8   schedule is put together, there are
9   actually several items that solidify this
10   even more, and there is a bunch more.  We
11   expect this number to be higher.
12      Q.   Understood.
13      So if we now look at the risks to
14   proceeds below that, do you see that?
15      A.   Yes.
16      Q.   Cash, there is a negative 25
17   million at close, negative 15 post-close
18   for a total of negative 40.
19      Can you explain what that is?
20      A.   Yes.  When we went through the
21   schedule around, I think it was, page 6,
22   "Additional value required detail company
23   cash."
24      There was concern around whether
25   all of this could be collected and

Page 113

Meghji - Highly Confidential

1
2   collected in time for closing, so I believe
3   that line item is simply to take that risk
4   into account.
5      Q.   Do you know how the 50 percent
6   number was determined?
7      A.   Again, I think you should ask
8   Lazard that question.  I don't.
9      Q.   Based on your experience, do you
10   have any expectation that the company will
11   be able to recover more than 50 percent of
12   the company cash outlined on slide 6?
13      A.   The company and its advisors,
14   including my team, are doing everything it
15   can to collect all of the cash in the
16   system, to identify, collect all the cash
17   in the system.  There are more updated
18   schedules than this that we should refer
19   to, because this is somewhat outdated at
20   this point.
21      Q.   Understood.  And to understand
22   with any level of specificity what amount
23   of the cash has been collected, we should
24   look at a more recent schedule, correct?
25      A.   That's -- that's my answer.

JX 117-29

Page 114

Meghji - Highly Confidential

1
2    Q.    And with respect to the next
3    category, "Ship deposit," we talked about
4    that already, and "Other."
5          Do you know, at the time Exhibit
6    14 was prepared, what other risks were
7    lumped into this other category?
8    A.    No.
9    Q.    And is that again something we
10   would have to discuss with Lazard?
11   A.    You can.
12   Q.    You don't know though?
13   A.    I didn't prepare this line.
14   Q.    During the time of the auction,
15   when this document was presented to the
16   board and the members of the restructuring
17   committee, did you have any discussion with
18   the board or restructuring committee about
19   any other risks to proceeds?
20   A.    Any other -- let me understand
21   this.  Discussion about any other risk to
22   proceeds.  Now, what do you mean by
23   "proceeds"?
24   Q.    So if you look at slide 3.
25   A.    Yes.

Page 115

Meghji - Highly Confidential

1
2    Q.    Slide 3 is part of Exhibit 14.
3    Exhibit 14 was presented to the board
4    during the time of the auction, correct?
5    A.    Um-hm.
6    Q.    Is that correct?
7    A.    Yes.
8    Q.    As I understand it, Exhibit 3
9    outlines in more detail some potential
10   incremental sources of value to address the
11   potential administrative shortfall and also
12   addresses potential risks to proceeds.
13   Correct?
14   A.    Yes.
15   Q.    Is that correct?  So what I want
16   to know, I see specific items listed here,
17   but within the category of "Other," did you
18   or anyone else provide any greater
19   specificity in terms of your meetings with
20   board members with respect to these other
21   risks?
22         MR. GENENDER:  Objection, form.
23   A.    I don't recall any specifics that
24   I provided or anybody else provided.  What
25   I will say is -- in that regard is that, on

Page 116

Meghji - Highly Confidential

1
2    balance, we felt that the incremental
3    sources and value combined with the risks
4    would generate enough value to plug the
5    62-million-dollar hole in administrative
6    insolvency that you had identified or that
7    was mentioned in the earlier pages.
8          So that was the ultimate
9    objective is to get to -- get to closing,
10   meet the closing conditions and ensure that
11   there is enough value and opportunity left
12   over net of the risks to plug the
13   administrative insolvency hole.
14         And we have done lots of work
15   since then to -- and we continue to press
16   to validate and confirm that.
17   Q.    Other than the information that
18   is included in Exhibit 14, do you recall
19   any specific information that was provided
20   to the board or the members of the
21   restructuring committee during the auction
22   with respect to ways in which the
23   administrative shortfall would be
24   addressed?
25         MR. GENENDER:  Objection to form.

Page 117

Meghji - Highly Confidential

1
2    A.    There was lots of discussions
3    had, so that's information.  But I don't
4    recall pieces of paper.
5    Q.    Tell me what you recall about
6    those discussions.
7    A.    Discussions really around being
8    able to manage the DIP facility and budget
9    to get to closing.  So I think it was
10   encompassed in my earlier discussion to
11   ensure that there were opportunities around
12   managing receipts, disbursements, critical
13   vendors, et cetera, and we can provide and
14   have provided additional information that
15   can give -- that should shed some light on
16   that.
17   Q.    Mr. Meghji, the court reporter
18   has just handed you what was previously
19   marked as Exhibit 15.  If you can take a
20   minute to look at that document and let me
21   know once you have had a chance to review
22   it.
23   A.    Yes.
24   Q.    Mr. Meghji, can you tell me what
25   Exhibit 15 is?

JX 117-30

Meghji - Highly Confidential

1   A.   It's a weekly tracking document
2  that we created for both ourselves and to
3  share with the restructuring committee of
4  the board, some information around the
5  progress we were making on buying the
6  liabilities, plugging the admin solvency
7  gap, if you will, of 62 that was identified
8  and how we could mitigate that with the
9  opportunities and issues that we had also
10  identified to plug those.
11   Q.   And when we spoke earlier about
12  updated information with respect to the
13  gap, is this, this being Exhibit 15, what
14  you were talking about?
15   A.   This is as of January 23.
16   Q.   Is there a more recent update on
17  the transform transaction weekly tracking?
18   A.   I believe there was one done as
19  of January 25.
20   Q.   If you look at slide 2 on Exhibit
21  15.
22   A.   Yes.
23   Q.   And just to orient, if you look
24  at the column that says "Original gap," it

Meghji - Highly Confidential

1  shows a 62-million-dollar number.  Do you
2  see that?
3   A.   Yes.
4   Q.   Is it your understanding that was
5  the 62 million dollars that we looked at in
6  Exhibit 14?
7   MR. GENENDER:  Objection to form.
8   A.   Yes.
9   Q.   And if you look at the next two
10  columns, there is a change in estimate and
11  an identified favorable variance to get to
12  a revised gap.  Do you see that?
13   A.   Yes.
14   Q.   And the revised gap, as of
15  January 23, was 36 million dollars,
16  correct?
17   A.   Correct.
18   Q.   In the January 25 report that you
19  mentioned, do you know whether that revised
20  gap is any different than 36 million
21  dollars?
22   A.   I don't recall off the top of my
23  head.  All these items are sort of moving,
24  so I think we are making progress in moving

Meghji - Highly Confidential

1  these initiatives along.
2   But the other point of this is,
3  that's the gap, and on the right, where it
4  says "Potential mitigating items" is 165
5  million dollars of items that could
6  mitigate that gap.
7   Q.   Understood.  And we will talk
8  about those.
9   What I want to know is, in the
10  January 25 update that you mentioned, is
11  the 36 million dollar number different?
12   MR. GENENDER:  Objection, form.
13  Document speaks for itself.
14   A.   I don't recall.
15   MR. SORKIN:  He's talking about a
16  document that we don't have and hasn't
17  been produced.
18   MR. GENENDER:  Stop, stop.
19  That's not true.  It has been produced.
20  OK?
21   MR. SORKIN:  We can go look for
22  that.
23   MR. GENENDER:  Please do.  But I
24  just want the record to be clear, you

Meghji - Highly Confidential

1  said earlier that there were a number
2  of documents that you don't believe
3  were produced.  We are looking into
4  that.  I obviously have not agreed with
5  you, but that document, I can tell you
6  with 112 percent certainty, has been
7  produced.
8   MR. SORKIN:  OK.
9   MR. GENENDER:  Thanks.  Maybe
10  even 114 percent certainty.
11   MR. SORKIN:  That's a lot of
12  certainty.
13   MR. GENENDER:  Yup.  Yup.  I have
14  a lot of confidence in the people I
15  work with.
16   Q.   So why don't we set that aside
17  because I want to make sure, Mr. Meghji,
18  you have the most up-to-date information in
19  front of you when we go through this.
20   A.   OK.
21   MR. GENENDER:  Joseph, I'll give
22  you the guys the number.
23   MR. SORKIN:  OK, thanks.
24   MR. GENENDER:  We are not trying

JX 117-31

1          Meghji - Highly Confidential
2    to -- I'm happy to make it easier for
3    you guys.
4          MR. SORKIN:  No, I understand.
5    No, I appreciate it.
6          MR. GENENDER:  I'm told Sears-UCC
7    413607.
8          MR. SORKIN:  Thank you.  I
9    appreciate it.
10         MR. GENENDER:  Correct?
11         MS. CROZIER:  00 between UCC and
12    413.
13         MR. GENENDER:  Yes.
14         MR. SORKIN:  Thank you.
15         MR. GENENDER:  You bet.
16         Q.   Mr. Meghji, the court reporter
17    has handed you what was previously marked
18    as Exhibit 7.  If you could just take a
19    minute and look at that document and tell
20    me if you have ever seen it before, and I
21    will represent to you that I believe this
22    was a document produced by ESL.
23         MR. GENENDER:  This is from, this
24    was marked at --
25         MR. SORKIN:  This was marked

1          Meghji - Highly Confidential
2    originally at Mr. Kamlani's, correct.
3         A.   Boy.  Sorry.
4          MR. GENENDER:  An eye test.
5         A.   It looks familiar, but I can't
6    really see what's in here.
7         Q.   Do you recall having any input
8    into liquidity analyses in terms of
9    go-forward liquidity with NewCo with ESL?
10        A.   "Input" meaning what?
11        Q.   Meaning if you look at Exhibit 7,
12    is this a document you've seen before and
13    had input into?  Were you involved in
14    creating this document?
15        A.   I was not involved.  I've seen it
16    before.
17        Q.   Understood.
18        A.   I believe I received it about a
19    week or ten days ago but had no input in
20    preparing it.
21        Q.   In what context did you receive
22    it?
23        A.   I had requested -- we had
24    requested a copy of their liquidity
25    analysis, and it was sent to us.

1          Meghji - Highly Confidential
2         Q.   Did you request that prior to the
3    auction, during the auction or after the
4    auction?
5         A.   I believe it was after.
6         Q.   Why did you request it?
7         A.   We wanted to understand what the
8    company -- what NewCo's liquidity picture
9    looked like.
10        Q.   Why?
11        A.   To understand what the liquidity
12    picture looked like and what the sort of
13    viability of their plan was.
14        Q.   And why was it important for
15    Sears, the debtors, to understand the
16    viability of the NewCo plan?
17        A.   I wanted to make sure that the
18    liabilities that they were assuming were
19    capable of being discharged.  Among other
20    reasons.
21        Q.   Do you know if any liquidity
22    analysis was provided by ESL to anyone at
23    the company prior to the auction?
24        A.   I don't.
25        Q.   Do you have an understanding of

1          Meghji - Highly Confidential
2    the capital structure of NewCo?
3         A.   Today?
4         Q.   Yes.
5         A.   I do.
6         Q.   What is that based on?
7         A.   I think it is based on looking at
8    this document in, at least, some part and a
9    couple of discussions I had in relation to
10    this document.  If you look at page, second
11    to last page, I think there was a summary
12    of debt of NewCo in there.
13        Q.   Other than the debts that will
14    provide capital to NewCo, are you aware of
15    any other cash that is being -- or any
16    other capital that is being provided to
17    NewCo at close?
18        A.   I'm not.
19        Q.   Did you ask NewCo to provide any
20    additional cash in addition to the debt
21    that it will be receiving at close?
22        A.   Did I personally ask them for
23    that?
24        Q.   Yes.
25        A.   No, I have not.

JX 117-32

Meghji - Highly Confidential
1
2      Q.   Do you know if anyone at the
3  company has?
4      A.   I don't, but I was not the guy
5  negotiating the deal with ESL.
6      Q.   My apologies if I asked you this.
7  Do you now, having seen the capital
8  structure of NewCo, have a reasonable
9  degree of comfort that NewCo will be able
10 to perform on the liabilities it is
11 assuming under the APA?
12     A.   With the caveat that we are
13 continuing to look and assess the liquidity
14 projections, based on what I've seen so
15 far, which I would reserve the right to
16 change my opinion on, but based on what
17 I've seen so far, I believe the liquidity
18 projections are reasonable.
19     Q.   Are there particular either
20 concerns or information that you would
21 still need to see with respect to the
22 liquidity projections in order to get you
23 comfortable that the -- that NewCo will be
24 able to perform and meet the obligations
25 it's assuming under the APA?

1         Meghji - Highly Confidential
2         MR. GENENDER:   Objection to form.
3      A.   Can you repeat the question.
4      Q.   Sure, let me ask it differently.
5         You indicated that you are still
6  receiving information and looking at it.
7  Is there particular information that you
8  are still looking for from ESL?
9      A.   Specifically the question that I
10 asked was around their accounts payable
11 projections, particularly in the first
12 month, where they have, if I read this
13 correctly, the 275 million and where we
14 have requested additional support around
15 that number, which we are -- we haven't
16 received.
17        Away from that, there is work
18 that my colleagues and I are doing to
19 continue to analyze this and compare it to
20 sort of our own thoughts.
21     Q.   Are you aware of any right that
22 the debtors have under the APA to terminate
23 the transaction in the event that you
24 determine, based on the analysis that
25 you've begun post-auction, that the company

1         Meghji - Highly Confidential
2  is not able to satisfy its obligations
3  under the APA?
4      A.   A specific provision in the APA?
5      Q.   Yes.
6      A.   I'm not.
7         MR. GENENDER:   Objection to form.
8      Q.   When you said you requested some
9  information about a 275-million-dollar
10 account payable, can you describe for me in
11 more detail what that issue was?
12     A.   Well, it's a line that says
13 "Change AP 275 in the month of February,"
14 on the second to last page.
15     Q.   Understood.
16        And what is -- in the change in
17 AP, that means there is an increase in the
18 accounts payable from month to month --
19 excuse me, from closing to end of February
20 of a hundred and -- excuse me, almost 100
21 million dollars?
22     A.   No.  It's 275 million dollars.
23     Q.   Strike that.  If we can look at
24 the accounts payable information at
25 closing, it's 166 million dollars, correct?

1         Meghji - Highly Confidential
2      A.   I'm sorry, I don't see that.
3      Q.   Maybe I'm looking at the wrong
4  275.  I'm looking on page 8.  Is that the
5  wrong page?
6         MR. GENENDER:   This doesn't have
7  a page, 4465?
8      A.   I'm looking at UCC 00004465.
9      Q.   OK, I was looking at 4466.  I
10 apologize.
11        I now see where you are, where
12 there is a 275-million-dollar number at the
13 end of February for change in accounts
14 payable.
15        Is that an increase of 275
16 million dollars in the amount of accounts
17 payable that NewCo will have to pay to
18 others, other third parties?
19     A.   That's an increase in the
20 accounts payable during the month of
21 February 2019 of 275.
22     Q.   What is the question you have of
23 ESL with respect to that increase?
24     A.   Just how they came up -- came up
25 with that amount.

JX 117-33

---

Page 130

Meghji - Highly Confidential

1
2    Q.   And what is your understanding of
3    how they came up with that amount at this
4    point?
5    A.   At this point, my understanding
6    of that is that it includes the 166 million
7    that was assumed plus some number of days
8    of additional credit they will get in the
9    first month.
10   Q.   So this, as you understand it,
11   the increase in accounts payable is not as
12   a result of additional inventory coming in.
13   It's a result of longer terms that they
14   would negotiate with third parties?
15   MR. GENENDER:  Objection to form.
16   A.   I don't -- can you restate your
17   question.
18   Q.   Sure, let me just ask it
19   differently.
20   What is your understanding of the
21   108 million dollars that -- by which the
22   accounts payable will increase from close
23   until February?
24   A.   My understanding of that would be
25   that goods would be supplied to the

---

Page 131

Meghji - Highly Confidential

1
2    company, to NewCo, in exchange for accounts
3    payable terms.
4    Q.   Have you seen any information
5    from ESL that identify specifically goods
6    and vendors that will make up that change?
7    A.   The change of 109?
8    Q.   Yes.
9    A.   No.
10   Q.   Have you asked for that
11   information?
12   A.   No.
13   Q.   Is it your understanding that
14   that is simply information, that that's a
15   change that NewCo hopes will occur?
16   A.   I don't know what their hopes and
17   wishes are.  I was simply trying to get
18   my -- I was simply trying to formulate my
19   own judgment of whether that's reasonable
20   or not.
21   Q.   And at this point you have not
22   yet formed your own judgment about whether
23   that's reasonable?
24   A.   Not on the 275.
25   Q.   What is it that you expect to

---

Page 132

Meghji - Highly Confidential

1
2    receive that would help you form your own
3    judgment about whether that's reasonable?
4    A.   Well, I understand the 109, and
5    that doesn't, in my opinion, based on my
6    experience and understanding of the company
7    and supplier behavior, that does not seem
8    unreasonable to me.
9    It's the 106 that I'm trying to
10   understand how that results in additional
11   payable terms.
12   Q.   I apologize, I think I just
13   misunderstood a number.
14   You said that you understand that
15   the 109, but it's the 106 that you're
16   trying to understand.  What is the 109 and
17   what is the 106?
18   A.   So the 275 is made up of 166
19   million that you talked about --
20   Q.   Right.
21   A.   -- plus the 109 which you
22   mistakenly called 108.
23   Q.   Understood.
24   A.   But I'm not counting.
25   I broke those two items -- I

---

Page 133

Meghji - Highly Confidential

1
2    broke the 275 into those two components,
3    and essentially my view is that the 109
4    million is what they would get in terms of
5    new terms from suppliers.  That didn't seem
6    unreasonable to me.  In fact, it seems very
7    reasonable.
8    And the 166, I don't know -- I
9    still have not understood yet how that
10   would result in additional terms for the
11   company.
12   Q.   Because the 166 are claims that
13   are already owed, correct?
14   A.   Correct.  Or least that's my
15   understanding of it.
16   Q.   And is there specific information
17   that you requested from ESL to help you
18   understand how the -- they would get
19   additional terms on the 166 million?
20   A.   I've asked them to explain that
21   to me, and I'm waiting for an answer.
22   Q.   Mr. Meghji, I'm going to hand you
23   what has been previously marked as Exhibit
24   6.
25   Let me ask you, do you remember

---

JX 117-34

Meghji - Highly Confidential

1  Meghji - Highly Confidential
2  the first time that you saw a business plan
3  prepared by ESL?
4      A.    A document of ESL's business
5  plan?
6      Q.    Yes.
7      A.    Not specifically.  I don't.
8      Q.    Do you recall whether it was at
9  any point before the weekend prior to the
10 auction?
11     A.    Again, I -- my memory is a little
12 bit hazy, but we -- sometime in December, I
13 attended parts of a meeting that ESL had
14 with its prospective exit financing lenders
15 or prospective new lenders for the exit,
16 the senior ABL facility, and I believe as
17 part of that process, they had presented a
18 business plan.  And I had sat in for short
19 parts of that meeting.
20     Q.    Do you know if the business plan
21 that ESL presented to the prospective
22 lenders in December was the company's
23 business plan or ESL's business plan?
24     A.    That's what I'm having trouble
25 recollecting, so I would have to go back

1  Meghji - Highly Confidential
2  and check, but I just can't remember that.
3  My apologies because the last few months
4  have been a big, big fog in terms of all
5  these documents.
6      Q.    Let me go back and talk now about
7  the company's business plan.
8            Can you describe for me what your
9  involvement was, if any, in preparing the
10 company's business plan post-petition?
11     A.    Yes.  So in conjunction with the
12 members of the office of the CEO, which is
13 three individuals, Greg Ladley, Leena
14 Munjal and Rob Riecker, along with many
15 others, the head of FP&A, Naren Sinha, as
16 well as a whole layer of other management
17 people, working with some members of my
18 team, there was a process undertaken to
19 build what I'd call a bottoms-up business
20 plan, starting with store-by-store
21 projections and business-by-business
22 projections around how to come up with a
23 go-forward business plan.
24     Q.    What was your understanding of
25 why it was necessary post-petition to

1  Meghji - Highly Confidential
2  prepare a bottoms-up business plan?
3      A.    What was my understanding of
4  that?
5      Q.    Correct.
6      A.    The company was in bankruptcy.
7  We needed to look at the prospect of what
8  the go-forward business was.  And so I
9  think everyone agreed it made sense to
10 create a business plan to see what
11 potential opportunity existed to continue
12 the business as a going concern.
13     Q.    Was there not a bottoms-up
14 business plan that existed prior to
15 bankruptcy that the advisors could use to
16 make that assessment?
17     A.    Not that I know of.
18     Q.    Let me hand you what has been
19 previously marked Exhibit 5.
20           Mr. Meghji, if you could just
21 take a minute to look at Exhibit 5 and tell
22 me whether Exhibit 5 reflects the latest
23 version of the company's bottoms-up
24 business plan that was prepared
25 post-filing?

1  Meghji - Highly Confidential
2      A.    It does not.
3      Q.    What is your understanding of the
4  company's most recent business plan and
5  when that document was prepared?
6      A.    So this is the latest document in
7  this form that was done, but it was based
8  on a 505-store go-forward footprint.
9            After this was done, the company
10 made the decision to close another 80
11 stores, so much of the information in here
12 still applies, at least in terms of
13 strategy and kind of initiatives, et
14 cetera, but the go-forward store footprint
15 was 425 stores, and the numbers were
16 updated to reflect that.
17     Q.    Understood.  Thank you for that
18 clarification.
19           If you look at slide 7, and I
20 want to look at the assumptions in the
21 first category, the retail category, so
22 it's the top right-hand box of assumptions
23 on slide 7.  Do you see that?
24     A.    Yes.
25     Q.    And if you look at the third

Page 138

1    Meghji - Highly Confidential
2    bullet down, it states, "Management
3    operational initiatives drive improving
4    same-store sales comps of, in 2019,
5    negative 2.4 percent, 2020, positive 2.7
6    percent and 2021, positive 3.5 percent."
7    Do you see that?
8        A.    Yes.
9        Q.    What role do you have in
10   determining the projections for the
11   same-store sales comps included in the
12   assumptions on page 7?
13       A.    So as the process of building
14   these projections was going on and the
15   company and the management team and office
16   of the CEO iterated through these, I had
17   constant discussions with them around what
18   was reasonable, what was not, how could
19   they get there.
20       So I had, you know, kind of a
21   pretty active role in working with them in
22   terms of raising issues and questions
23   around those, the assumptions in the
24   business plan.
25       Q.    Based on the information you had

Page 139

1    Meghji - Highly Confidential
2    available when Exhibit 5 was prepared, do
3    you agree that you believed that
4    assumptions for same store sales comps that
5    are included on slide 7 were reasonable?
6        A.    Yes.
7        Q.    Did you believe that the --
8    strike that.
9        Can you tell me what it was that
10   you recall doing to determine that --
11   strike that.
12       Can you tell me what it was
13   specifically about the projections with
14   respect to sales comps that allowed you to
15   believe that they were reasonable?
16       MR. GENENDER:  Same-store sales
17   comps?
18       Q.    Yes.
19       A.    Yes.  May I point you to some
20   other pages in this --
21       Q.    Sure, absolutely.
22       A.    -- so that we can look at that?
23       So first, I would take you to
24   page 11 of this deck.  And the company had
25   had obviously a history of fairly negative

Page 140

1    Meghji - Highly Confidential
2    same-store comps over the past few years,
3    in addition to missing budgets that they
4    had created.
5    So from my perspective, I was
6    very focused on understanding that we had a
7    credible path to get to something that was
8    reasonable and had a good chance of being
9    achieved.
10   I spent a lot of time looking at
11   and understanding -- if you look at the
12   chart on the right on page 11, you'll see
13   that this is a history of same-store sales
14   comps for Sears and Kmart from February 18
15   to September 18.
16   Beginning in -- two of the three
17   members of the office of the CEO's, Greg
18   Ladley and Leena Munjal, Greg is the head
19   of soft lines who joined the company
20   sometime in October or November of 2017,
21   after spending 27 years at Ralph Lauren in
22   a senior capacity.
23   Leena had been at the company in
24   different roles for some time.  But
25   beginning in January of 2018, she took over

Page 141

1    Meghji - Highly Confidential
2    and led the company sort of past, frankly,
3    not that successful experience around
4    driving sales and marketing, et cetera.
5    The two of them took that process
6    over, implemented some changes around how
7    the ShopYourWay program was used, how
8    points per user marketing expenses, applied
9    it initially and began kind of a new
10   approach around the soft line business for
11   apparel, the soft line, so the online
12   business for apparel and began to apply a
13   combination of points offerings, along with
14   pricing adjustments and began doing sort of
15   experiments to see what would impact, if
16   they could change with performance.
17   They began that in the February,
18   sort of Jan/Feb 2018 time frame.  They
19   expanded that to the bricks and mortar
20   apparel business over the course of time.
21   They then applied it to the hard lines
22   business and got some additional
23   contribution from Citi, which is their
24   credit card partner, to fund some of those,
25   made some changes around supply and

JX 117-36

1        Meghji - Highly Confidential
2   logistics issues, so minimum order pricing,
3   et cetera.
4        And then, finally, in the
5   July/August time frame also kind of layered
6   in some traditional TV advertising and so
7   on, and the combination of those efforts
8   really started to move the needle on
9   same-store sales comps.
10       So I spent a lot of time
11  discussing with these guys what they did,
12  understood that -- you know, those efforts
13  clearly bore a lot more fruit than anything
14  I had seen in the prior couple of years of
15  my involvement with the company, although I
16  had never dabbled in it to this extent.
17       So that gave me a lot of comfort
18  around the fact that they had a very clear
19  game plan around how they would move that.
20       Q.   Other than the approaches you
21  described generally -- and I know it was
22  Mr. Ladley and Ms. Munjal who were focused
23  on the ShopYourWay initiatives and
24  approach -- can you describe in any more
25  detail what it was that they did that

1        Meghji - Highly Confidential
2   generated increased same-store sales comps?
3        A.   Sorry, can you please repeat
4   that.
5        Q.   Sure.
6        A.   I thought I answered that
7   questioning at length before, so I'm trying
8   to understand what else you are looking
9   for.
10       Q.   I guess you said you had a lot of
11  discussions, that they really implemented
12  it.  I'm wondering if -- and you did.  You
13  described your understanding of
14  ShopYourWay.
15       I'm wondering if there were any
16  specific initiatives or specific
17  initiatives implemented that you didn't
18  discuss generally -- strike that.
19       Do you have any understanding
20  about what impact the ShopYourWay
21  initiatives and changes had on the margin
22  at Sears over the time period reflected on
23  Exhibit 11?
24       A.   Not specifically.  But in general
25  terms -- and, again, I haven't looked at

1        Meghji - Highly Confidential
2   some of this data recently.  But in general
3   terms, the combination of providing
4   ShopYourWay points, along with ensuring
5   that, where there are high redemptions of
6   certain items using points, that they were
7   increasing the pricing of those, really
8   allowed them to mitigate the effect of
9   margin loss and manage that.
10       So that was a key element,
11  because I think the company in the past had
12  had situations where they would blow out a
13  lot of points, get people in that way, but
14  margins would get hurt.
15       The sort of benefit of this sort
16  of series of initiatives was that there was
17  a very careful eye to ensuring that margin
18  wasn't getting overly hurt at the cost of
19  increasing same-store sales.  But I can't
20  recite the data off the top of my head.
21       Q.   OK, understood.
22       Do you recall what ends -- I have
23  the document.  I don't have enough copies
24  for everyone in the room, but I do for the
25  witness and witness' counsel.  It has been

1        Meghji - Highly Confidential
2   previously marked as Exhibit 6.
3        Can you take a minute and look at
4   Exhibit 6 and tell me if you recognize that
5   document.
6        A.   Generally, it looks like I've
7   seen either this or a version of this
8   document.  It's the ESL business plan.
9        Q.   And looking at it now, do you
10  have any recollection of whether an ESL
11  business plan was the business plan that
12  was presented in December to potential
13  lenders or whether it was a company
14  business plan?
15       A.   I can't recall that off the top
16  of my head.  I could check, and I'll let
17  you know.
18       Q.   If you could look at slide 4 on
19  Exhibit 6.  Under the first bolded bullet,
20  there is a dash that states, "Base case
21  assumes brick and mortar SSS, same-store
22  sales, growth of negative 1 percent in
23  2019, based on its performance prior to
24  filing as well as 125 basis points of
25  margin improvements."

Page 146

1          Meghji - Highly Confidential
2          Do you see that?
3      A.   Yes.
4      Q.   Do you have any understanding of
5  how the negative 1 percent projected
6  same-store sales growth in 2019 was
7  determined in the ESL business plan?
8      A.   No.
9      Q.   And if we look back at Exhibit 5,
10  the same-store sales percent projected for
11  the company's business plan in December was
12  negative 2.4 percent, correct?
13      A.   Yes.
14      Q.   Have you done any analysis to
15  determine whether or not you believe ESL
16  can achieve negative 1 percent same-store
17  sales growth as opposed to the negative 2.4
18  percent projected by the company?
19          MR. GENENDER:  Can we have that
20      read back.
21          (Record read)
22      A.   I have not done any specific
23  analysis of whether they could achieve
24  negative 1 versus negative 2.4.
25          I felt comfortable with our

Page 147

1          Meghji - Highly Confidential
2  ability, based on my involvement in the
3  heart of the company's business plan, that
4  negative 2.4 was achievable.  But I
5  presumed that they had some other thoughts
6  and ideas around what they would do to
7  bring down, get that down.
8      Q.   And you agree that negative 1
9  percent same-store sales growth is better
10  performance than negative 2.4 percent
11  same-store sales growth, correct?
12      A.   Yes.
13      Q.   And do you know whether anybody
14  at the company has done any analysis to
15  determine whether negative 1 percent
16  same-store sales growth under the ESL
17  business plan is a reasonable assumption
18  that will allow NewCo to be viable over the
19  course of the first year?
20      A.   Just repeat that last question,
21  can you?
22      Q.   Sure.
23          Has -- are you aware of anyone at
24  the debtors who has done any analysis to
25  determine whether the assumptions NewCo,

Page 148

1          Meghji - Highly Confidential
2  ESL, has used with respect to same store
3  sales growth are reasonable and will allow
4  for NewCo to be a viable company in the
5  first year that it -- of its existence?
6      A.   Yes.
7          MR. GENENDER:  Object to form.
8      A.   I've had discussions with the
9  office of the CEO members and, you know,
10  again, the discussions focus around -- I've
11  asked them the question of, is it
12  reasonable to assume negative 1 versus
13  negative 2.4.
14          And if you look at the year as a
15  whole, fiscal year 2019, then I think the
16  view is -- I'd say at least my impression
17  is that they're comfortable that you can
18  hit somewhere between that number, that
19  negative 1 percent is not an unreasonable
20  target.
21          The issue is more around kind of
22  the spacing of what would the first half
23  versus second half look like, and I think
24  so -- but as a whole, I think their view is
25  it's reasonable and achievable, or at least

Page 149

1          Meghji - Highly Confidential
2  that was sort of my takeaway.
3      Q.   What is the -- what is the
4  current same-store sales growth performance
5  of a company in bankruptcy?
6      A.   A decline of somewhere between,
7  you know, depending on the week, 12 -- the
8  DIP financing forecast assumes negative 15
9  percent.  And it's been sort of plus or
10  minus a couple of points around that for
11  the most part.
12      Q.   If you look back at Exhibit 5, on
13  slide 11 that you pointed to, it took the
14  company roughly nine months to get from 15
15  to 17 percent negative same-store sales
16  growth to zero to negative 1 percent,
17  correct, in 2018?
18      A.   Eight months, yes.
19      Q.   Eight months, is there any reason
20  you believe that ESL could achieve on
21  average negative 1 percent same-store sales
22  growth over the course of fiscal year 2019
23  and get from negative 15 percent roughly
24  that's been happening in bankruptcy to on
25  average over the course of the year

---

Page 150

Meghji - Highly Confidential

1 negative 1 percent?
2     MR. GENENDER:  Objection, form.
3     A.   So as it's been explained to me,
4 the reason this took eight months is they
5 were trying to figure out what worked and
6 what didn't work, and coming up with really
7 an algorithm, if I can call it that, or a
8 strategy around how to do that.  So there
9 was a lot of testing and trial and error
10 going on.
11     There is always continued trial
12 and error with marketing and sales and
13 pricing and so on.  But I don't know about
14 ESL, but I'm talking about the office of
15 the CEO and two members, Greg and Leena in
16 particular, they feel like they have a path
17 that they can go and execute on.  They
18 don't know -- that will be faster than what
19 this was.  How much faster, it's hard to
20 tell.
21     But there is a level of
22 confidence that they can go and attack that
23 post-bankruptcy, so -- and get that moved
24 certainly within a year.

---

Page 151

Meghji - Highly Confidential

1
2     Q.   And if I wanted to talk to
3 someone specifically about kind of what
4 they figured out or about algorithm, as you
5 referred to it, that would be Mr. Ladley or
6 Ms. Munjal?
7     MR. GENENDER:  Objection,
8 mischaracterizes his testimony.
9     A.   Say again.
10     Q.   If I wanted to talk to someone
11 about how they were going to replicate the
12 improvement in performance over the course
13 of 2018 by using ShopYourWay in 2019 and on
14 a faster timeline, I would need to talk to
15 Ms. Munjal or Mr. Ladley, right?
16     A.   I simply told you how I heard
17 about it.
18     Q.   Understood.  But I'm just trying
19 to understand, is there anybody else other
20 than Mr. Ladley or Ms. Munjal that I would
21 need to talk to?
22     MR. GENENDER:  Objection.
23     A.   Those are the two key members.
24     MR. SORKIN:  Why don't we go
ahead and take a break now for lunch.
25     (Luncheon recess; 12:55 p.m.)

---

Page 152

Meghji - Highly Confidential

1
2     AFTERNOON SESSION
3         1:40 p.m.
4     (Exhibit 18, document Bates
5 stamped Sears UCC 413607 marked for
6 identification, as of this date.)
7 BY MR. SORKIN:
8     Q.   Mr. Meghji, we are going to hand
9 you what has been marked as UCC Exhibit 18.
10 As Mr. Genender indicated previously, there
11 was an updated transform transaction weekly
12 tracking that was provided to us in the
13 production of the last few days that we've
14 now identified.  Thank you for the Bates
15 number.
16     That's dated January 25.  Is this
17 the document you were recalling earlier?
18     A.   Yes.
19     Q.   And as far as you know, was this
20 the most recent version of the tracking
21 document with respect to administrative
22 solvency?
23     A.   Yes.
24     Q.   If we can look at page 2.  Is it
25 the case the company is currently

---

Page 153

Meghji - Highly Confidential

1
2 projecting a 62-million-dollar
3 administrative shortfall in the revised gap
4 column on slide 2?
5     A.   This is as of January 25, and
6 obviously this is a -- this whole exercise
7 is a work in process to get to closing,
8 assuming the deal gets approved.
9     So, yes, this is the working
10 schedule around where we were.
11     Q.   And if you look at the column
12 next to the revised gap, the potential
13 mitigating items that has a dotted box
14 around it, those are items totalling 201
15 million dollars that you have identified as
16 potential sources of money to address the
17 62-million-dollar shortfall, correct?
18     A.   Yes.
19     Q.   Let me walk through just a few of
20 the changes to make sure I understand them.
21     On the 503(b)(9) claims, if we go
22 across the original difference between the
23 estimate and what ESL was assuming was 34
24 million dollars, it looks like there has
25 been a change of a positive 1 million

---

1    Meghji - Highly Confidential
2 dollars so that the gap is now 33 million.
3        Do you see that?
4    A.   Yes.
5    Q.   Do you know what the 1 million
6 dollar change in estimate relates to?
7    A.   I don't.
8    Q.   Do you know who would?
9    A.   Not specifically.  What I would
10 say, though, is that as all these estimates
11 now get looked at and refined or reconciled
12 and so on, these are sort of changes that
13 are occurring as we tighten all of these
14 estimates.  So that's the process that's
15 going on.
16    Q.   Then if we go down to the ABL
17 DIP, do you see that line?
18    A.   Yes.
19    Q.   And there is a change in estimate
20 of a negative 29 million dollars, do you
21 see that?
22    A.   Yes.
23    Q.   And next to that, there is a
24 25-million-dollar identified favorable
25 variance, do you see that?

1    Meghji - Highly Confidential
2    A.   Yes.
3    Q.   So if I understand that
4 correctly, that means the gap in the past
5 had been larger than it is now, that you
6 have shown improvement with respect to
7 performance towards the budget, correct?
8    A.   Yes.
9    Q.   So right now, the gap is 104
10 million dollars instead of the larger gap
11 that existed at the time of the auction?
12    A.   Sure.
13    Q.   Based on estimates.  Then we go
14 down to professional fees, it looks like
15 there has been a small reduction of 6
16 million dollars in the estimate for
17 professional fees, is that correct?
18    A.   That's what it looks like.
19    Q.   And then let's go down to
20 "Additional value identified."  Can you
21 explain to me the company cash available at
22 close and the changes associated with that
23 line?
24    A.   Yes.  So if you turn to page 4,
25 which is the page headed "Opportunity and

1    Meghji - Highly Confidential
2 actions as of 1/25/19," if you look down at
3 the second column from the bottom which is
4 entitled "Cash," you will see two columns,
5 identified favorable variance of 30 million
6 and identified opportunity of 20.  And that
7 breaks out as follows, as described under
8 the potential actions, speeding of regional
9 cash collection of 17 million dollars.
10        So this is, you know, as we
11 talked about earlier, whether it is cash in
12 trucks or the in-transit and sort of
13 accelerating that so that instead of being
14 a two- or three-day period, it is a one-day
15 period, then you can pay down your -- so
16 we're actually working with the armored
17 carrier that moves the stuff around to see
18 if there are ways to accelerate that.
19        Repatriating cash from Israel,
20 which is 6 million net of any withholding.
21 Store cash of 17 million, which we talked
22 about earlier.  And utility deposits of 10
23 million dollars which, again, I think we
24 spoke about before, but the company's view
25 is that that's really tied to a

1    Meghji - Highly Confidential
2 bankruptcy-related deposit, so we feel like
3 we are entitled to get it back, and it's
4 not part of the ongoing operation of the
5 company.
6    Q.   OK.  And just so I understand,
7 the identified favorable variance which is
8 a heading for information on both slides 2
9 and slides 4, can you explain to me what an
10 identified favorable variance is versus an
11 identified opportunity?
12    A.   It's really -- I think the way
13 the schedule was designed by one of my
14 colleagues, the identified favorable
15 variance number is just somewhere where the
16 degree of confidence is much higher and a
17 very likely to happen, you know, category,
18 as opposed to identified opportunity which
19 is something we have identified but are
20 still working on trying to actualize or get
21 there.
22    Q.   OK.  Let's go ahead and finish
23 with the remainder of the lines on slide 2.
24 I think there is only one more where there
25 is -- again, the professional fee carve-out

TSG Reporting - Worldwide       877-702-9580

**JX 117-40**

Page 158

Meghji - Highly Confidential

just reflects the change above the corresponding change in the estimate that's 6 million dollars less, and then the insurance proceeds.

The insurance proceeds show a change in estimate of a negative 8 million dollars and a revised gap of 5 million dollars. Can you explain that?

A.   It's money that has been collected.

Q.   So the 8 million is collected and the 5 million remains?

A.   Correct. It's not a problem. We were expecting the cash to come in, and it has come in.

Q.   And then the potential mitigating items, those total the 201 million dollars, and is it the case that the potential mitigating items are explained in more detail on slide 4?

A.   Correct.

Q.   Let's go to slide 4, then, and make sure I understand these categories of potential opportunities.

Page 159

Meghji - Highly Confidential

On the prescription scripts, can you explain to me what the 0 to 15 million dollar opportunity is?

A.   Yes. So as part of ESL's borrowing base in terms of assets that they require at closing, it comprises of inventory and receivables, and script, script appraisals, the value of the scripts is a part of that asset base.

We have commissioned -- actually, I shouldn't say we. ESL and their -- it's really their lenders which happened to be BAML which is the agent for our current exit facility and theirs, has commissioned an appraisal of what scripts will be -- are projected to be outstanding at closing at a -- there is a valuation of $7.50 a script, it's about 25 million dollars.

If that script value gets appraised at a higher level, then, you know, that will increase. And our estimate is that we don't know for sure, but our estimate is that it's going to be somewhere in the 10, 11 -- 10- to 12-dollar range per

Page 160

Meghji - Highly Confidential

script ultimately, so that's an opportunity.

Q.   And what range would the appraisal have to be in per script to achieve the 15-million-dollar opportunity?

A.   I have to -- can I pull my phone out and do some quick math?

Q.   Sure.

A.   So at 12 dollars, it would be 40 million dollars which would be a 15-million-dollar increment. So we -- I don't necessarily expect it to be 12 dollars, but I expect it to be somewhere between 10 and 12.

Q.   And --

A.   So that's why the opportunity is 0 to 15.

Q.   Understood. And if it is 10 dollars, do you know what that would -- that opportunity would translate to in dollars?

A.   It's about 3300 scripts, give or take. So you can do the math based off of that per dollar.

Page 161

Meghji - Highly Confidential

Q.   So it would be an additional 8 million dollars availability, at 10 dollars a script?

A.   Um-hm.

Q.   Is that correct?

A.   Yup. It's really 3.3 million dollars per dollar increase.

Q.   And you're expecting that appraisal -- on here it indicates 1/28 which was yesterday. Did you receive that?

A.   No.

Q.   Do you know when you're going to receive it?

A.   Imminently.

Q.   Imminently?

A.   Today or tomorrow. It may have already been done.

Q.   Once the appraisal is received, is there anything the banks need to do to approve the value in the appraisal?

A.   I'm not certain of the technicalities, but my understanding is that once -- at least substantively, once the appraisal comes in, that is allowed to

JX 117-41

Meghji - Highly Confidential

roll into the minimum kind of borrowing base consideration.

Q.   OK.  And just so I understand how these pages relate, while we are on this topic, if you can go back to slide 3 on Exhibit 18.  There is a line, the first line under the conditions to close, "New ABL collateral."

Do you see that?

A.   Yes.

Q.   Is the idea with the -- the prescriptions, the pharmaceutical prescriptions, is that that will get you closer to the target of 1.6 -- $1,657,000,000 under the APA?

A.   Well, if you look on the column to the left, our projected balance is higher.  It's 1.678.

Q.   Let me ask it differently, because I maybe didn't read this correctly.

Is the 0 to 15 million dollar opportunity included somewhere in the line on slide 3 in connection with new ABL collateral?

Meghji - Highly Confidential

A.   No, the 15 is not.  My point is the 15 adds to the 1678, not the 1657.  So it actually increases the cushion which would then allow us to do some other things to that -- that could impact us positively in other ways.

Q.   Understood.  And just so I'm clear, and I think the potential mitigating items on slide 3 of 15 million dollars for the new ABL collateral, if you look at note 1, that's the same revised script appraisals that we are talking about, correct?

A.   Yes, correct.  All of those are the same item.

Q.   Understood.  That's what I just wanted to make sure.  So if that is achieved, it would increase the 1678, 15 million more?

A.   So if you look at it, it says there is headroom of 21, and under the revised cushion on the new ABL collateral, next to the 15, and if you achieve that, then that would go to 36.

Meghji - Highly Confidential

Q.   Understood.  OK.

So back on slide 4, the inventory.  Can you explain to me what the opportunity is as identified by the inventory line?

A.   Well, so as of when this was done on the 25th -- and, again, this is a moving target because the company changes every day in lots of respects -- there was an expectation, based on kind of buying patterns included in the DIP forecast, that our inventory could be up to 30 million dollars higher than the target inventory required under the agreement.

Q.   And is that the same inventory that we talked about that would be part of the 1657 under the new ABL collateral target per APA on slide 3?

A.   Yes.

Q.   So is it your understanding that everything above 1657 is inventory that would be available to the debtors to maintain that inventory and sell it post-close?

Meghji - Highly Confidential

A.   Well, as we sit here today, what we are looking at doing is -- if we project the inventory to be 30 million dollars higher, rather than buying it and then figuring out the way to sell it when we sold the rest of the company, if we can project it clearly enough, then we won't buy it and as a result not borrow more money and sort of manage it that way.

So it's -- there is sort of multiple different levers you could pull, but essentially what that is saying is there is 30 million dollars of room in terms of levers you could pull if we do end up with the scenario you described, where there is inventory in excess and we want to go sell it, I presume we could -- there is a bunch of ways we could do that.

Q.   Let's look then at the potential actions next to the inventory line, and I think this will explain some of what you were talking about, the different ways to monetize or act on that opportunity.

The first is the sale of excess

**JX 117-42**

1      Meghji - Highly Confidential
2  inventory. Am I correct in assuming that
3  that would be simply taking excess
4  inventory out of existing stores that will
5  be sold to ESL under the proposed sale and
6  selling it through the GOB process?
7      A.   That could be an option, sure.
8      Q.   Have you done any analysis to
9  determine what inventory is available for
10  that and what the costs would be associated
11  with obtaining that inventory?
12      A.   I don't -- I don't get your
13  question. Can you restate or repeat it.
14      Q.   Sure.
15      And I understand the analysis of,
16  we might have 30 million dollars in excess
17  of the 1657 required under the APA for
18  inventory.
19      What I am trying to understand
20  is, practically, if there is excess, and
21  you want to sell that excess inventory,
22  what do the debtors have to do preclose to
23  go get it and then actually act on selling
24  it?
25      A.   So we have a strong -- the

1      Meghji - Highly Confidential
2  company has a very strong inventory
3  planning management team, and we are
4  working very closely with them to ensure
5  that, to the extent that there are
6  buckets -- pockets of excess inventory or
7  projected excess inventory, first and
8  foremost, let's not spend the money.
9      So my first option is, we don't
10  need the headache to go spend the money and
11  create either higher AP where we have terms
12  of CIA which is mostly what we are doing,
13  so the DIP balance doesn't increase
14  unnecessarily. That's a way of kind of
15  managing that.
16      Secondly, if -- to the extent we
17  have some inventory items that we needed to
18  move, let's identify that and proactively
19  plan for that. I don't think it's -- the
20  company has over 500 stores today, 80 of
21  which are in GOB, 425 operating. So moving
22  inventory around isn't like an
23  earth-shattering problem.
24      Q.   Do you have specific inventory
25  that you're aware of, you have identified,

1      Meghji - Highly Confidential
2  that makes up some part of this 30 million
3  dollars that you would intend to sell?
4      A.   No.
5      Q.   Next line down, transfer to GOB,
6  is that any different than what we have
7  been talking about in terms of sale of
8  excess inventory?
9      A.   No.
10      Q.   The next line, reduce or cancel
11  POs, I assume that's purchase orders?
12      A.   Yes.
13      Q.   That's what you were talking
14  about previously, which is to not acquire
15  the inventory in the first place, correct?
16      A.   Yes.
17      Q.   Last one, increase receiving days
18  to six days per week. What is that?
19      A.   So there are lead times around
20  trucking arrangements and so on that, for
21  efficiency, in terms of moving goods
22  around, you could schedule deliveries that
23  happen weekly or biweekly or -- here we
24  have just put a contingency plan in place
25  so that if we need to move inventory that's

1      Meghji - Highly Confidential
2  in transit in faster to meet our minimum
3  inventory hurdle, we can do that.
4      Q.   That sounds like it's planning
5  for the downside of the inventory, meaning
6  if you need to hurry up and get more
7  inventory on the shelves in order to meet
8  the 1657, that's what that action goes to,
9  correct?
10      MR. GENENDER:   Objection to form.
11      A.   I don't think it is a shelves
12  thing. It is really more of inventory
13  coming to the distribution center.
14      Q.   So --
15      A.   Look, we're not -- this is a
16  holistic massive business. We are not
17  looking at the schedule or these
18  initiatives more during -- to address this
19  interview. It's really around planning to
20  optimize how we run the business and do so.
21      Q.   I completely understand. I was
22  just trying to understand if you are
23  increasing the receiving days, that in my
24  mind, as I understand it, is to increase
25  inventory in order to meet the minimum of

JX 117-43

Page 170

Meghji - Highly Confidential

the 1657, not to take advantage of whatever
overage of the 1657 there might be.

A.    But the faster you move that in,
the less you have to buy on the other hand.

Q.    Understand.

A.    Do you see what I am saying?

Q.    I do, I do.

On the comments section, there is
inventory potentially higher in DIP budget
than target 9.4 million of Amazon
inventory -- or, excuse me, I think those
are two different ones.  Strike that.

Inventory potentially higher in
DIP budget than target.  I think I
understand that based on our discussion.

The second one, 9.4 million of
Amazon inventory will be brought back into
inventory and has already been paid for.
Do you know what that is?

A.    Yes, so there is a bunch of
Kenmore product that was prepetition
acquired or sold to Amazon, that Amazon
hasn't paid for, and Amazon has come back
to the company of its own sort of

Page 171

Meghji - Highly Confidential

initiative and proposed that we take back
that inventory -- the inventory is already
sitting in our DCs -- in exchange for the
receivable.

And we are looking at doing that
because the benefit of that is,
effectively, we are setting on a receivable
of 9.4 million dollars, and if we take that
back into inventory, it is good inventory,
we can sell it to our stores, and it meets
the, you know, it works toward the minimum
inventory test.

So, again, this is all sort of
fungible inventory, and we have 1.6 billion
dollars of inventory, so there is lots of
ins and outs on that part of it.

Q.    Understood.

Is that 9.4 million part of the
30 million dollars of opportunity?

A.    I don't believe it is.  It is
actually separate from that.  But, again,
this sort of changes -- this -- the deal
with Amazon isn't final either.  This is --
this was a -- it's in the -- it still --

Page 172

Meghji - Highly Confidential

it actually hasn't even made it into the
opportunity set, the 9.4.

Q.    Who is the individual that is
communicating with Amazon about that
94-million-dollar opportunity?

A.    Amongst others, the primary kind
of communications point is a gentleman
named Peter Boutros who heads up the KCD
business.

Q.    Has Amazon indicated that they
are prepared by any date certain to agree
to accept a receivable for that inventory?

A.    I am sorry, they cannot -- it's a
receivable we have.  So they will -- they
want to give the inventory back --

Q.    Understood.

A.    -- in settlement of that payable
that they have.  Not to be too much of an
accountant.

Q.    I appreciate that I used the
wrong term.

So has Amazon indicated that they
are prepared to provide the inventory back
to you, back to Sears, by any date certain?

Page 173

Meghji - Highly Confidential

A.    So this discussion started by
them expressing their desire to do this,
but I think there are mechanical issues
around that we are thinking through around
how to execute that.  And there is some
legal issues that are being worked through
with their counsel as well.

So it's -- it's more than an
idea.  It's not a fully baked opportunity
until we develop it.

Q.    I think the next line, GOBs, we
have discussed.

The next line is "Specified
receivables."  Can you explain what
specified receivables are?

A.    Yes, so if you turn to page 3.
Under the conditions to close summary, we
dealt with the new ABL collateral limits.
The next line below is specified
receivables which is a basket of
receivables from a variety of issues.

The target for the APA was 255
million.  The projected balance at close is
292 million.  So we are looking at

44

JX 117-44

Meghji - Highly Confidential

opportunities are to collect or accelerate collections of some of those items.  Still hit the 255 minimum, but use anything we collect to pay down the DIP balance.

Q.    And is there a list of the receivables that make up the 36-million-dollar cushion?

A.    A couple of the bigger ones are listed there.  There is a UPS rebate of 8 million dollars that we are working to collect.  And then there is a show of Sears Hometown receivable of 34 million because the debtors do some work, buy inventory, et cetera, for Sears Hometown, and this is the receivable.

So we were looking to figure out a way to accelerate the collection.

Q.    Is Sears Hometown and outlet a nondebtor?

A.    Yes.

Q.    And other than doing some work to try and identify the ability to collect on that, have you had any -- is there any commitment from Sears Hometown that they

Meghji - Highly Confidential

will pay some or all of that 34-million-dollar receivable by any date certain?

A.    No.

Q.    Are there any other -- these identify some of the -- two of the larger ones.  Do you know how much the Monarch receivable is, order of magnitude?

A.    I don't.

Q.    Do you know how many other receivables are out there to act upon?

A.    291 million dollars.

Q.    Of that amount, do you know -- do you know how many individual entities or companies are on the other side of those receivables?

A.    It's a whole basket of things.  I can't tell you off the top of my head.

Q.    Who is responsible for managing that?  Is there someone at M-III or the company?

A.    There is an M-III team that's basically working with all the different -- there is a ton of different people at the

Meghji - Highly Confidential

company because this touches a lot of different areas.  And so we are project managing the process of how to accelerate or collect or identify where all that is.

Q.    Do you know what happens to those receivables after close?

A.    The 255?

Q.    The 292.  Assume you can't act on 36 million, 292 million dollars of receivables at close, is there an offset in the purchase price that ESL pays?

A.    We have to deliver 255 of it to ESL.

Q.    Understood.

If you deliver 292, what happens to the 36 million dollar difference?

A.    We are working really hard to deliver no more than 255.1.

Q.    I understand.

And do you know what happens under the APA if you deliver more?  Who gets the benefit of those receivables?

A.    As the APA is structured, they get the benefit of that.  But we are going

Meghji - Highly Confidential

to work really hard to mitigate that so that doesn't happen.

Q.    What is your understanding of when the anticipated close date would be?

A.    February 8.

Q.    So you have until February 8 to act on the 36 million dollars of potential receivables, correct?

A.    Correct.

Q.    The next line, 503(b)(9) claims. I know we have talked about 503(b)(9) claims.  The identified opportunity here is 5 to 10 million dollars.

Do you know how many vendors are on the other side of that potential 5 to 10 million dollars?

A.    How many vendors comprise the 5 to 10?

Q.    Correct.

A.    No, it's -- it's a bunch of vendors.

Q.    And in order to be able to monetize those opportunities, does that require an agreement with any individual

Meghji - Highly Confidential

vendor so that you can minimize the
potential amount of their 503(b)(9) claim?

A.    So there is a couple of different
items in here.  The first one, if you look
on the right, it says, "Use critical vendor
payments to reduce 503(b)(9) liability."

So we have budgeted critical
vendor dollars in the DIP financing budget
from now through closing, and part of this
is to use some of that budget as long as we
can manage our DIP limits to ensure that if
we can reduce some of the 503(b)(9) claims
through that process where it makes sense,
then we can -- we are exploring those
opportunities.

In addition to that, we are
looking at sort of vendor rebate claims,
and so where essentially a vendor owes us
money and looking to settle some of those
through some of the 503(b)(9) claims
through that.

Q.    So the idea is that you have
money to use for critical vendor payments
that you might use to pay 503(b)(9) claims

Meghji - Highly Confidential

and in the process negotiate down a lower
amount of a 503(b)(9) claim?

A.    Correct.

Q.    And -- but that requires a
negotiation with each individual vendor,
correct?

A.    Yes.

Q.    And is there anybody other than
Mr. Acevedo who is working on that task?

A.    Yes.  Mr. Acevedo is simply --
he's a member of my team.  He's simply
quarterbacking that.

As you know, Sears has 45,000
people.  So we are not using all 45,000 to
do that, but there is lots of people at
corporate headquarters who deal with these
vendors.  They are the ones doing it.

Q.    And it requires an individual
vendor-by-vendor negotiation, correct?

A.    Correct.  But each business unit
has essentially relationship people, so
this is -- I'm sensing you're concerned
about one guy going out and taking on the
world.  There is an institution and an

Meghji - Highly Confidential

infrastructure that can go do this very
quickly.

Q.    Are those, is that 5- to
10-million-dollar opportunity an
opportunity that has to be capitalized upon
prior to close?

A.    All of these opportunities we are
working to capitalize prior to close.  I
don't know what "has to be" means.

Q.    Does -- do the debtors lose the
benefit of that potential 5- to
10-million-dollar opportunity if it is not
achieved prior to close?

A.    We will not spend the critical
vendor dollars, so we will still have the
cash.  We will use it to pay down the debt.
It's simply a question of determining
what's the best use of that funding.

Q.    Do you have a list of the
503(b)(9) claims that ESL is assuming?

A.    Just going back to the earlier
page on page 2, I'm sure we have a list of
the 173, and I'm sure we have a list of the
173.  They have sort of capped their number

Meghji - Highly Confidential

at 139.

So if your financial advisors
don't have it, we will be happy to provide
it to you.

Q.    That's my question.  Have they
capped the total amount at 139, or have
they identified a specific list of
503(b)(9) claims totalling -- that total up
to 139 that is specific?

A.    In other words, is this 139 a
vendor-by-vendor limit?

Q.    Correct.

A.    No.

Q.    It's an aggregate limit that the
debtors can use to pay as they see fit?

A.    No, I think you're putting words
in my mouth.  You asked me two different
questions.  You took my answer to one and
extrapolated it to something else.  So
start again.

Q.    Let me ask differently.

ESL has agreed to assume up to
139 million dollars of 503(b)(9) claims,
correct?

Meghji - Highly Confidential

1
2      A.    Correct.
3      Q.    Which claims will be paid with
4  that 139 million dollars?
5      A.    I don't know that we have had a
6  specific discussion around the mechanics of
7  how that would be done.  What we have done
8  is agree that they would pay 139 million
9  dollars of 503(b)(9) claims.
10     Q.    Do you expect to have that
11 discussion --
12     A.    Yes.
13     Q.    -- with ESL?
14     A.    At some point.
15     Q.    But you haven't had it yet?
16     A.    Correct.  I haven't had it.
17     Q.    Do you know if anybody at the
18 company has had it yet?
19     A.    I don't know if anybody at the
20 company has had it.
21          But, again, what we are trying to
22 do right now is get, get that 173 through a
23 variety initiatives as close to 139 as
24 possible.  And there will need to be,
25 obviously, coordination between the estate

Meghji - Highly Confidential

1
2  and the ESL to make sure the right amounts
3  are being paid and to the right people.
4      Q.    And I understand that and
5  appreciate that.
6          And what I was just trying to
7  understand is, it's my understanding based
8  on your earlier testimony that those
9  503(b)(9) claims might contain merchandise
10 claims, nonmerchandise claims, that ESL
11 might have an interest in paying some and
12 not others to the extent they are going to
13 have an ongoing relationship with certain
14 of them.  And I'm wondering whether ESL has
15 provided to the debtors a list of which of
16 the 503(b)(9) claims should be paid out of
17 the 139 million dollars.
18     A.    They have not.
19     Q.    Do you know what the mechanism is
20 for payment of those -- that 139 million
21 dollars of 503(b)(9) claims?
22     A.    We have not -- I have not engaged
23 in a discussion or plan on that yet.  I
24 expect to discuss with counsel, our counsel
25 and ESL ultimately in terms of how that's

Meghji - Highly Confidential

1
2  done.
3      Q.    Do you have any understanding
4  about whether ESL will pay those claims
5  directly or whether the debtor will first
6  pay and then have to be reimbursed by ESL?
7      A.    I've not had that specific
8  discussion on the mechanics.
9      Q.    OK, let's go back to the next
10 line on slide 4, accounts payable.
11          And accounts payable shows a
12 30-million-dollar identified favorable
13 variance.  Do you see that?
14     A.    Yes.
15     Q.    And as I understand it, that
16 category is, of all the categories on the
17 page, the highest degree of certainty of
18 achieving, correct?
19     A.    It's in the column that indicates
20 that, yes.
21     Q.    Can you explain to me what it is
22 that -- what those 30 million dollars are?
23     A.    You know, this is sort of one
24 item that I haven't delved into
25 specifically in detail because I was told

Meghji - Highly Confidential

1
2  that, by a couple of people that it was
3  under control and in hand.
4          So I focused on some of the other
5  stuff, to be honest.
6      Q.    Am I to understand generally,
7  though, the idea would be to not make
8  payments on certain accounts payable in the
9  aggregate of 30 million dollars in order to
10 achieve that?  Is that --
11     A.    So the idea would be what they
12 are assuming 160 million -- 166 million
13 dollars of accounts payable.  If we
14 anticipate through -- just going back to
15 our earlier discussion this morning, if you
16 recall there was a point in time we looked
17 at a schedule where the balance was 196
18 million, they took the, they agreed to take
19 166, my answer was, you know, there is a
20 bunch of disputed hold items and other
21 opportunities, and if we buy less
22 inventory, which is the early point we
23 talked about, then your accounts payable
24 would be less.
25          So this is really an opportunity

JX 117-47

Meghji - Highly Confidential

1  to the extent we again project our accounts
2  payable to be less than 166, we can buy
3  inventory to make, you know, to ensure we
4  hit that because they are assuming that
5  liability.  These are all kind of
6  interrelated variables to some extent
7  managing receivable collections, inventory
8  levels, payables, et cetera, to hit all of
9  these -- this, we have set up a system to
10  really track this on a daily basis or very
11  frequent basis to ensure that we hit all
12  the hurdles optimally on page 3.
13     Q.   OK, I think you sort of
14  anticipated one of my questions is, when
15  you say it's interrelated, what I'm trying
16  to understand is the accounts payable
17  identified variance of 30 million dollars,
18  does that also show up the accounts payable
19  build on the senior DIP balance down below
20  where it is 15 million dollars, is that 15
21  million part of the 30?
22     A.   Yeah, I think it very well may
23  be.  But I think that those items below are
24  what directly impact the DIP balance.  Some

Meghji - Highly Confidential

1  of these other ones above, above that last
2  sort of row, hit some of the other target
3  items.
4     Q.   Understood.
5          If that's the case, shouldn't the
6  subtotal of 85 million and 231 be above the
7  senior DIP balance, at least with respect
8  to some items?
9          In other words, isn't it double
10  counting to say there is 85 million dollars
11  in identified favorable variance and 231
12  million in identified opportunity when that
13  30 million dollars of accounts payable is
14  included in both the identified favorable
15  variance and under the senior DIP balance?
16          MR. GENENDER:  Objection, form.
17     A.   I'm not sure it is double
18  counted.  So I sort of -- my earlier
19  answer, let me correct my earlier answer to
20  your question.  I'm not conceding that the
21  30 and the 15 are direct overlap.
22     Q.   OK.
23     A.   But I, again --
24     Q.   But you don't know?

Meghji - Highly Confidential

1     A.   But I don't know.
2     Q.   Who would I talk to to find out?
3     A.   I would -- I'm -- one of my
4  colleagues Brian Griffith has been sort of
5  tasked with this process.  He's been
6  running point on that.
7     Q.   Do you know -- do you have a list
8  from ESL of which accounts payable it would
9  like the company to pay or that it's
10  willing to pay of the 166 million dollars
11  in assumed liabilities it's agreed to take
12  on?
13     A.   Say the question again.
14     Q.   Sure.  As I asked you with the
15  503(b)(9) claims, has ESL provided the
16  company a list of the accounts payable it
17  wants the company to pay?
18     A.   No.
19     Q.   Do you expect that to happen?
20     A.   No, I think my expectation is we
21  will give them the list of what accounts
22  payable -- we are running the company right
23  now.  So they are the buyer.
24          We will tell them, here is

Meghji - Highly Confidential

1  your -- here is the claims you need to pay,
2  not the -- I don't know that they are
3  capable of coming up with that list.
4     Q.   And do you know whether there is
5  a mechanism in place with respect to the
6  accounts payable, meaning, can you tell
7  them, this is what you need to pay, or is
8  ESL expecting you to pay and then to -- the
9  debtors to pay and then to reimburse the
10  debtors?
11     A.   Again, the mechanics haven't been
12  worked out, but I assume that it will be
13  done on a coordinated basis.  And I think
14  under the APA, at least my understanding --
15  I could be wrong, but my understanding is
16  they are assuming those liabilities, so
17  they will assume the liability and pay
18  them.  And we will tell them what
19  liabilities to assume.
20     Q.   And my question then is, what if
21  they don't pay them?  Is the debtor off the
22  hook for having to pay those accounts
23  payable liabilities?
24          MR. GENENDER:  Objection to form.

1        Meghji - Highly Confidential
2    A.   I think that's a legal question.
3    MR. GENENDER:  You just correctly
4 guessed one of the bases of my
5 objection.
6    Q.   You don't know under the APA what
7 happens --
8    THE WITNESS:  It was a lucky
9 guess.
10    MR. GENENDER:  It was an informed
11 guess.
12    Q.   You don't understand under the
13 APA what happens in that situation?
14    A.   No.
15    MR. GENENDER:  Objection, form.
16 Still asking for a legal opinion.
17    You can answer if you know.
18    A.   Can you repeat the question.
19    Q.   I'm saying, you don't know under
20 the APA one way or the other what the
21 outcome is in that situation?
22    A.   I don't know.
23    Q.   As the individual who was brought
24 on two and a half, three years ago now to
25 manage liquidity issues at Sears, do you

1        Meghji - Highly Confidential
2 have any concerns about the fact that these
3 issues that go straight to the liquidity
4 needs of the debtors haven't been addressed
5 as far as you know?
6    MR. GENENDER:  Objection, form,
7 and that pretty blatantly misstates the
8 testimony.
9    A.   I was never brought on to manage
10 liquidity two and a half years ago.
11    Q.   M-III, when it was brought on in
12 2016, was brought on to advise in
13 connection with liquidity concerns,
14 correct?
15    A.   To advise the finance department
16 and assist with certain specific
17 initiatives.  So, yeah, we -- we were not
18 responsible for liquidity of the company.
19    Q.   I understand.  But given that
20 focus at Sears over the last several years,
21 do you have any concerns that the mechanics
22 for how over 300 million -- 300 million
23 dollars of liabilities that ESL has
24 purportedly agreed to assume have not been
25 worked out yet?

1        Meghji - Highly Confidential
2    MR. GENENDER:  Objection to form.
3    A.   Repeat that, please.
4    (Record read)
5    A.   I don't have concerns related to
6 the past few years that affect this
7 transaction.  One has nothing to do with
8 the other.
9    This transaction was negotiated
10 last week.  So we are working through a lot
11 of things.
12    Q.   Do you have any concerns that you
13 are currently working towards a February 8
14 close date and the mechanics of how over
15 300 million dollars of liabilities have not
16 been worked out with the potential
17 purchaser yet?
18    MR. GENENDER:  Objection, form.
19    A.   I have concerns about lots of
20 things in life.  But I have tremendous
21 confidence that the debtors and the
22 advisors to the company can work through
23 all of those to a closing and to discharge
24 the estate's responsibilities.
25    Q.   You don't have any understanding

1        Meghji - Highly Confidential
2 about what will happen at close if those
3 issues aren't able to be worked through, do
4 you?
5    MR. GENENDER:  Objection, form.
6    A.   I have -- we are working day and
7 night to get this to a closing and to
8 achieve all of our objectives.
9    Q.   If you skip over the property tax
10 line and go to "Other assets," do you see
11 that on slide -- still on slide 4 of
12 Exhibit 18?
13    A.   Exhibit 18?
14    Q.   18.  The "Other assets" line, do
15 you see that?
16    A.   Yes.
17    Q.   In the potential actions, it
18 identifies 245 million dollars of other
19 balance sheet assets.  Do you see that?
20    A.   Yes.
21    Q.   What are those?
22    A.   It's a whole kind of mish-mash of
23 other balance sheet -- other asset items
24 listed on the company's balance sheet that
25 we are going through to determine the

**JX 117-49**

Meghji - Highly Confidential

1  value, the ability to kind of collect
2  those, modify those, et cetera.
3  So it's just, again, another
4  group of items that we need to work through
5  to understand how it can either be
6  monetized or not.
7  Q.   Are those unencumbered assets?
8  A.   I don't know.  We are looking
9  into those.
10  Q.   Can you give me any examples of
11  some of the things that make up the 245
12  million dollars of other balance sheet
13  assets?
14  A.   Not off the top of my head.
15  Q.   Do you know if that 245 million
16  dollars is duplicative or is an aggregate
17  of the other items identified above it on
18  slide 4?
19  A.   I don't believe it's duplicative,
20  but, again, part of this process, this
21  exercise, that Chris Good, who is my
22  colleague, and others are undertaking is
23  really to look at, is it duplicative, is it
24  not, is it incremental?
25

Meghji - Highly Confidential

1  
2  Q.   What happens to those 245 million
3  dollars of other assets if nothing is done
4  to act on them prior to close?
5  A.   If you look at the comments on
6  the side on the right, it says "Other
7  assets in balance sheet not identified in
8  the APA."
9  So, again, we are exploring the
10  possibility of whether these assets that
11  haven't specifically been picked up in the
12  APA can be monetizable and can be
13  additional value to the estate.
14  Q.   Do you know if those are assets
15  that have actually been excluded from the
16  APA, or are they just assets that have not
17  been specifically identified in the APA?
18  A.   We don't.  Again, I'll just keep
19  repeating myself over and over.  We don't
20  know the exact nature of all of this.  We
21  are investigating those, and we will know
22  as soon as that exercise is completed.
23  Q.   If you are able to identify what
24  actually makes up those assets, do you know
25  what value ESL paid for those assets?

Meghji - Highly Confidential

1  
2  MR. GENENDER:  Objection, form.
3  A.   I don't know that ESL bought
4  them.
5  Q.   OK.  The next category, cash, I
6  think we have talked a lot about what makes
7  this up.  But here, we have an identified
8  favorable variance of 30 million dollars.
9  Does that mean there is 30 million dollars
10  of cash that you have actually recouped for
11  the debtors' estate already?
12  A.   No, it means that we have
13  identified 30 million dollars out of that
14  list in the middle where we feel pretty
15  confident that it's going to be there.
16  Q.   What are the items on the list in
17  the middle that make up that 30 million
18  dollars?
19  A.   So the store cash of 17 would be
20  one of them.  The cash repatriation from
21  Israel which is, again, being worked on is
22  probably another one.  And then some
23  portion of the speed up the regional cash
24  is sort of to me the estimated 30 with the
25  rest being the 20.

Meghji - Highly Confidential

1  
2  This is an estimate of allocating
3  those initiatives between the 30 and 20.
4  Q.   So you have a fair degree of
5  certainty of acting on the 30 million
6  dollars than the 20 million dollars, is
7  that correct?
8  A.   Put it this way, again, this
9  schedule wasn't done for this deposition.
10  This schedule was done to track this for,
11  you know, business purposes.
12  There is a basket of 50 million
13  dollars of opportunity, and what I was
14  looking for from the guys that managed this
15  process for me, both the company and the --
16  and the M-III team is to give me a
17  degree -- their degree of judgment and
18  confidence around what portion of the 50
19  is, you know, solid and what's to come.
20  So it doesn't necessarily -- just
21  to be clear, it doesn't necessarily mean
22  that this is identified by line item.  So
23  it's really a judgment call on some
24  portions of the four or five things
25  identified in the potential action section,

Page 198

Meghji - Highly Confidential

1  Meghji - Highly Confidential
2  to say 30 of it looks pretty solid, 20 we
3  are still working on.
4       Q.   The cash to be repatriated from
5  Israel, does that sit in a debtor or
6  nondebtor entity right now?
7       A.   It's a nondebtor entity.
8       Q.   Do the debtors have any control
9  over that nondebtor entity that you're
10 aware of?
11      A.   I believe so.
12      Q.   What control is that?
13      A.   It owns it.
14      Q.   Does that nondebtor entity that
15 holds the cash in Israel have a separate
16 board?
17      A.   I don't recall who was on the
18 board.
19      Q.   Do you have an understanding of
20 what the process would be by which the
21 debtors would repatriate the cash from the
22 Israeli nondebtor entity?
23      A.   No.  Listen, I'm the CRO of the
24 company.  I have asked people to come back
25 and, you know, come back and reflect a plan

Page 199

1  Meghji - Highly Confidential
2  to repatriate cash.  So I haven't delved
3  into every last detail of every one of
4  these.
5       Q.   I understand.  I just need to
6  know who I have to ask.  You have been
7  designated as the 30(b)(6) witness on these
8  specific issues, so that's why I am asking.
9       A.   Sure.
10      MR. GENENDER:  Which specific
11 issue are you talking about?
12      MR. SORKIN:  Documents relating
13 to the company's analysis of
14 administrative claims, documents
15 relating to the company's
16 administrative solvency analysis and
17 any inputs included in their
18 liquidation analysis.
19      MR. GENENDER:  OK.  I didn't see
20 anything in there about Israel.
21      Q.   Well, Mr. Meghji, can we look at
22 the senior DIP balance.  I know we've
23 talked about some of the potential actions
24 that are identified here.  Can we look at
25 the pro rata February rent of 20 million

Page 200

1  Meghji - Highly Confidential
2  dollars?  Do you see that line?
3       A.   Yes.
4       Q.   Is that 20 million dollars in
5  rent savings assuming a February 8 close?
6       A.   When you say "rent savings," I'm
7  not sure it's really savings.
8       Q.   Let me ask a different question.
9  What makes up that 20 million dollars?
10      A.   The 20 million dollars is the
11 proportion -- assuming a February 8
12 closing.  It's the portion of February rent
13 that is estimated to occur after the 8th
14 and, therefore, for the account of the
15 buyer.
16      Q.   So -- but, and so my question is,
17 that assumes a closing on February 8,
18 correct?
19      A.   Yes.
20      Q.   So if there is a closing later
21 than February 8, there will be a decrease
22 to that potential savings, correct?
23      A.   Correct.
24      Q.   The hurricane proceeds of 5
25 million dollars, as we spoke about earlier,

Page 201

1  Meghji - Highly Confidential
2  that's already been accounted for to get us
3  down to the 62-million-dollar insolvency
4  gap, correct?  If we look at slide 2.
5       A.   It's been accounted for in the
6  solvency tracker numbers, sure.  But this
7  is the senior DIP issue.
8       Q.   Understood.
9       So what I'm saying is, if you
10 achieve this 5 million dollars of
11 additional cash coming in in terms of
12 insurance proceeds, that's not going to
13 help your 62-million-dollar solvency gap,
14 correct?
15      A.   I think it is.
16      Q.   Will it make your solvency gap 57
17 million, or will it keep it -- it assumes
18 that you get that in order to get to the 62
19 million?
20      A.   It's -- I just want to check if
21 it's under 104.  So if you look on page 2,
22 and I appreciate your diligence, if you
23 look on page 2, the line that says "Revised
24 gap of negative 104," under the ABL DIP, do
25 you see that?

1          Meghji - Highly Confidential
2     Q.    Yes, I see that.
3     A.    And you see that has notes,
4  footnote number 3?
5     Q.    Yes.
6     A.    If you look under footnote number
7  3, maybe you'll find it because I didn't,
8  the 118 does not include the 5 million
9  dollars of hurricane proceeds, so I don't
10 believe it's duplicative.
11    Q.    I see.  So the 104-million-dollar
12 revised gap that shows the 118 million
13 dollars in potential mitigating items is
14 part of the claims section, and then below
15 is the 5 million dollars and that is not
16 included in the 118?
17    A.    Yes.
18    Q.    Understood.
19    A.    And I know that because it was a
20 mistake in an earlier version.
21    Q.    I think we have talked about the
22 First Data proceeds already.  If we can
23 look at slide 3 on this same exhibit,
24 Exhibit 18.
25          Are you familiar with a provision

1          Meghji - Highly Confidential
2  in the APA that provides that, at close,
3  1.2 billion dollars must be drawn on the
4  first lien ABL facility and the junior DIP
5  facility and that, if not, there are
6  offsets depending upon what those drawers
7  are?
8     A.    This is the 850 plus the 350?
9     Q.    Yes.
10    A.    Correct.
11    Q.    And so your understanding is that
12 at close there must be 1.2 billion dollars
13 drawn on -- with those two facilities
14 combined, correct?
15    A.    I don't know about there must be.
16 But I think it can be no more than that.
17    Q.    It can be no more than that.  If
18 it is more than that, do you have an
19 understanding of what happens?
20    A.    That ESL is only obliged to take
21 on the 1.2.
22    Q.    Do you know whether they have the
23 ability to terminate the transaction if it
24 is more than 1.2 billion?
25    A.    I think my understanding is that

1          Meghji - Highly Confidential
2  if we don't meet the conditions to close,
3  more broadly, then they don't have to
4  close.
5     Q.    Do you have an understanding of
6  what happens if it is less than 1.2 drawn?
7  So, for example, if it is 1.1 billion, are
8  there any changes in the terms?
9     A.    They get the benefit.  They
10 essentially get the benefit of that.
11    Q.    Meaning that they do not have
12 to -- they only have to fund the 1.1
13 billion, correct?
14    A.    That's what I believe.
15    Q.    Do you have an understanding that
16 they also get a credit for 100 million
17 dollars in liabilities that they were to
18 have assumed?
19    A.    I assume that's correct.
20    Q.    So that if the debtors are short
21 some amount of money, ESL gets the benefit
22 both of not having to take on that debt and
23 reducing the liabilities.  Were you
24 involved in the negotiation of that
25 provision at all?

1          Meghji - Highly Confidential
2     A.    No, not directly.
3     Q.    Do you -- were you part of any
4  discussions related to whether or not that
5  was a reasonable provision to agree to?
6     A.    I don't think you can look at
7  that in isolation, one provision.  There
8  were a lot of different elements over a
9  period of weeks that was negotiated.  But I
10 would say that I'm not the best person to
11 address that.  The negotiations were
12 handled by Weil and Lazard, and so you are
13 better off asking them those questions.
14    Q.    Well, can I ask you, does that
15 seem fair that the debtors managing cash
16 diligently and not drawing on their ABL
17 facilities would result in ESL getting the
18 benefit by double the amount, first because
19 it doesn't have to take on the debt and
20 second because it decreases the liability
21 dollar for dollar?
22    A.    You're asking if that's fair?
23    Q.    I'm asking if that's fair.
24    A.    I'm not qualified to opine on
25 fairness.  This is a business deal.

Meghji - Highly Confidential
1
2       Q.   Were you aware of any issue
3   arising on January 16 at the auction in
4   connection with that provision?
5       MR. GENENDER:  Which provision?
6       Q.   This is the 1.2 billion dollar
7   provision in the APA that the debtors
8   cannot have drawn more than 1.2 billion
9   dollars, and if so, it provides a walk
10  right to ESL, and if not, ESL gets the
11  benefit, two times the benefit in anything
12  less?
13      A.   I don't know about --
14      MR. GENENDER:  Objection to form.
15      A.   I don't know about an issue.
16  When you say "issue," can you explain what
17  that means?
18      Q.   Sure.  My understanding is, based
19  on Mr. Kamlani's testimony, it was an issue
20  that was percolating, so I'm wondering if
21  there was an discussion amongst the
22  advisors to try and resolve this issue or
23  if there was an understanding about why it
24  was needed, whether ESL would continue to
25  insist on it.

Meghji - Highly Confidential
1
2       I'm trying to understand what
3   happened on -- between the agreement of the
4   debtors to accept the ESL bid subject to
5   documentation, and the documentation.
6       A.   So I was not --
7       MR. GENENDER:  Objection to form.
8       A.   I was not at Weil Gotshal after
9   the -- after about 3 a.m. -- 3:30 a.m. on
10  the 16th through the rest of the day.
11  There were tons of issues that were
12  negotiated with regard to the APA, the
13  business deal, et cetera.  And when my
14  input was required, people would call me
15  about that.
16      But, no, I don't know sort of all
17  the puts and takes around that.  I know
18  that there were various issues that were
19  open that were being worked through.  That
20  was one of them.  It was a hard-fought
21  negotiation, and I think overall we ended
22  up with this deal which I think is fine.
23      Q.   On slide 4 of Exhibit 18, there
24  were a number of -- we went through and
25  discussed a number of opportunities and

Meghji - Highly Confidential
1
2   actions that could be taken to address
3   the -- any potential administrative
4   shortfall, correct?
5       A.   Yes.
6       Q.   Is there anywhere in Exhibit 18
7   where you identify potential downsides
8   where -- in other words, where the
9   administrative shortfall amount could grow
10  between now and close.
11      A.   No, this is, this is the kind of
12  opportunity tracker.  So some of the -- it
13  doesn't identify specifically the downsides
14  which is -- we are looking at sort of court
15  expenses and those kind of things tied to
16  timing of closing separately.
17      Q.   Do you have a separate document
18  that is tracking the risks the same way
19  that you have a document like Exhibit 18
20  that was tracking the upsides?
21      A.   We don't have one right now.  But
22  that's something I have asked to be
23  prepared so we can monitor kind of both
24  sides of the item.
25      The first focus had been on

Meghji - Highly Confidential
1
2   getting these initiatives underway, and now
3   I think there are people looking at working
4   capital items that arguably could go the
5   other way, and there are other working
6   capital items there that could also be --
7   so I think all of these items are being
8   looked at to see what could be positive or
9   negative.
10      Q.   In terms of some of the potential
11  negatives or downsides, do you agree that
12  the APA does not address what happens with
13  respect to accrued payroll due at closing?
14      A.   That's correct.
15      Q.   As of the most recent cash
16  forecast, do you agree that that amount
17  could be as much as 44 million dollars
18  assuming a close that goes beyond February
19  8?
20      A.   Assuming a close that goes -- can
21  you repeat that?  I don't understand the
22  question.
23      Q.   Sure.  What is your understanding
24  if -- of the amount of potential liability
25  of payroll due at closing, assuming an

JX 117-53

Page 210

1        Meghji - Highly Confidential
2  February 8 close date?
3        A.   I don't have a final exact
4  number.  But my -- the range I've been
5  given is that it could be anywhere from 30
6  to 40 million dollars, and that's again
7  being firmed up and finalized.
8        Q.   Right now, without an agreement
9  from ESL to take on that obligation, that's
10 an obligation that the debtors would have
11 to meet, correct?
12       MR. GENENDER:  Objection, form.
13       A.   Correct.  Offset by other things
14 that we've talked about here that would be
15 identified as well.
16       So, for instance, prepaid rent
17 would be one item.  There is other prepaid
18 expenses that we are looking at which would
19 be ways in which to mitigate that.
20       Q.   Right, the 201 million dollars of
21 potential mitigating items, right?
22       A.   Actually, there is a couple of
23 other items where we -- prepaid insurance,
24 for instance, which is not on this list.
25 So there are a variety of other items that

Page 211

1        Meghji - Highly Confidential
2  could also go into that pot as we go
3  through.
4        Q.   But to be fair, if we had one
5  list that had all the items that go into
6  the pot, we would have to add 30 to 40
7  million dollars to the 62-million-dollar
8  shortfall, so that would grow to 92 to 102
9  million dollars, correct?
10       A.   Offset by 200 plus million of
11 opportunity.
12       Q.   Correct.  Understood.  But when
13 we are looking at -- I just want to make
14 sure I understand we have got the total
15 amount of potential liabilities and total
16 amount of potential opportunities.
17       Have there been any discussions
18 with ESL with respect to whether or not ESL
19 will take on that payroll due at closing
20 liability?
21       A.   I had a discussion yesterday with
22 Mr. Kamlani to talk about the fact that we
23 are putting together a list of -- I had a
24 discussion last week with ESL's advisor,
25 Ernst & Young, which is helping on the

Page 212

1        Meghji - Highly Confidential
2  transition matters, where we talked in
3  general about things that go both ways
4  around this, on the transition arrangements
5  as well as costs that go either way.
6        And I had a follow-up discussion
7  yesterday with Mr. Kamlani indicating that
8  we need to start thinking and talk about
9  this, and he said, yes, I agree, let's get
10 kind of a list together with all of the
11 items, and we can talk through that.
12       Q.   Did he give any indication that
13 ESL was prepared to take on the liabilities
14 associated with the accrued payroll due at
15 closing?
16       A.   We didn't have a specific
17 discussion or negotiation about that.  I
18 simply wanted them to alert him to the fact
19 that -- and he was aware of it prior to my
20 conversation.
21       Q.   Was another one of the issues you
22 discussed in terms of potential downsides
23 or negatives for the debtors the
24 reimbursement under the KCD notes for the
25 protection agreement warranties?

Page 213

1        Meghji - Highly Confidential
2        A.   The reimbursement of the -- no,
3  I've not discussed that.
4        Q.   Is it your understanding, until
5  the KCD notes get transferred, ESL will
6  service the warranty claims and protection
7  agreements, and the debtors will reimburse
8  ESL for the associated costs?
9        A.   You know what, I haven't looked
10 at that very closely.  So I can't confirm
11 that 100 percent.
12       Q.   Do you have an understanding that
13 that's a 30-million-dollar-a-month issue?
14       MR. GENENDER:  Objection to form.
15       A.   Based on guidance I've been
16 given, I don't expect it to be an issue.
17       Q.   Is that guidance similar to what
18 we had talked about earlier with respect to
19 the payment of the royalties in that you --
20 your understanding from counsel is that the
21 notes will be transferred timely?
22       A.   Correct.
23       Q.   Have you done any calculations to
24 determine the costs associated with any
25 closing delay beyond February 8 or 9?

JX 117-54

Page 214

Meghji - Highly Confidential

1
2      A.   Yes, we -- again, I don't
3   remember -- we haven't done this recently,
4   but I know there is a cost associated with
5   delaying the closing beyond February 8.
6      Q.   Do you have an understanding on a
7   daily basis or directionally the amount of
8   costs associated with the closing delay?
9      A.   Not specifically for the week
10  after the 8th.  But, you know, when we went
11  into court in January, the 6th, I had been
12  asked to sort of estimate a number, and it
13  was up to 6 and a half-ish million number a
14  day.  But that was for January.
15     Q.   Understood.  And you haven't
16  undertaken the same exercise for February?
17     A.   I have not, no.
18     Q.   OK.  Do you understand that in
19  the APA, there is a provision that with
20  respect to a number of the liabilities that
21  we have discussed, so 503(b)(9) claims,
22  accounts payable, property taxes, there is
23  a provision that says or that allows ESL to
24  pay potentially at 120 days after close?
25     A.   I don't remember exactly where

Page 215

Meghji - Highly Confidential

1
2   that ended up.  But that was still
3   obviously talked about in terms of timing,
4   and there was sort of -- I don't recall off
5   the top of my head where that finally ended
6   up in terms of timing and conditionalities.
7      Q.   Understood.  Wherever that ended
8   up, have you performed any analysis to
9   determine from the date of close until
10  potential payments are required under the
11  APA by ESL, the liquidity forecasts for the
12  debtors and whether they will be able to
13  survive without those payments?
14     A.   A liquidity forecast for the
15  debtors?
16     Q.   Correct.
17          MR. GENENDER:  Objection to form.
18     A.   OK, so I just want to understand
19  this --
20     Q.   Sure.
21     A.   -- because my understanding is
22  that ESL is assuming those liabilities and
23  is going to pay them on behalf of the
24  debtors.  So I don't really get how the
25  debtors survive or don't survive without

Page 216

Meghji - Highly Confidential

1
2   that.
3      Q.   And under the APA, and I
4   understand you didn't negotiate it and --
5   I'm not asking you a legal question.  I
6   will represent to you that, under the APA,
7   those payments are not due until up to 120
8   days following the closing date or a plan
9   confirmation date.  So it might be six
10  months out or further when ESL actually has
11  to pay those obligations.
12          My question is, if those
13  obligations become due in advance of that,
14  is the debtor in a position to make those
15  payments?
16     A.   The debtor is not expecting to
17  pay those after selling the company.  OK?
18     Q.   OK.  Has there been any analysis
19  performed of potential liabilities relating
20  to employee benefits that might accrue
21  post-close?
22     A.   Can you give me an example of
23  that?
24     Q.   Sure.  So, for example, in the
25  event that there is a healthcare claim

Page 217

Meghji - Highly Confidential

1
2   under a self-insured plan that the debtors
3   don't learn about until post-close, but
4   that is a liability of the debtors that
5   came into existence preclose, have the
6   debtors done any analysis to determine the
7   amount of those potential liabilities?
8      A.   Not that I know of.
9          MR. SORKIN:  This might be a good
10  time for a break.  I think that's the
11  end of that topic.
12          (Recess)
13     Q.   Mr. Meghji, a couple additional
14  questions on a couple of topics we were
15  discussing.
16          First, on the KCD notes, is it
17  your understanding that the debtors' cost
18  of servicing under the warranties and
19  protection agreements is approximately 30
20  million dollars a month?
21     A.   The debtors' cost of servicing --
22     Q.   -- the warranties and protection
23  agreements.
24     A.   I don't know what that number is
25  off the top of my head.  I haven't really

JX 117-55

1      Meghji - Highly Confidential
2  looked at it.
3      Q.   Do you know if that number is
4  identified in the weekly cash flow
5  projections as a line item?
6      A.   I don't think it is specifically.
7      Q.   Do you know whether or not the
8  transfer of the KCD notes requires a
9  transfer from an applicable Bermuda
10 regulatory authority?
11     MR. GENENDER:  Objection to form.
12     A.   I cannot speak to the details of
13 that.
14     Q.   In addition to the cash flow, the
15 weekly cash flow forecasts, one of which we
16 identified as Exhibit, I believe, if you
17 could help me out --
18     A.   17?
19     Q.   -- 17, I think, as we discussed,
20 Exhibit 17 was a weekly cash flow forecast
21 that gets updated and prepared by M-III, is
22 that correct?
23     A.   Correct.  With input from the
24 company.
25     Q.   Is there another weekly cash flow

1      Meghji - Highly Confidential
2  forecast or other cash flow forecast
3  separate from the cash flow forecast like
4  those in Exhibit 17 that is prepared by the
5  company?
6      A.   There is not a weekly forecast.
7  There is a daily forecast prepared by
8  Treasury for over periods of time, it's a
9  shorter period of time, and it -- really,
10 that's -- that forecast, in some respects,
11 in respect to some line items,
12 disbursements, et cetera, informs and
13 provides input to what we do as a
14 13-week -- or the weekly cash flow
15 forecast.
16     Q.   Are there any numbers in those
17 two reports that are different?
18     A.   First of all, the time periods
19 don't necessarily always align because -- I
20 don't remember the exact -- how far it goes
21 ahead, but the -- this is a historical
22 forecasting process that the company had
23 that -- so as an instance, we -- I looked
24 at this a few weeks ago and the sales
25 growth projections or declined projections

1      Meghji - Highly Confidential
2  were different than ours but we didn't sort
3  of rely on that.
4      We kept -- I kept the process
5  going because there are certain items in
6  particular on the disbursement items that
7  are done and form a part of the --
8  essentially inform one of the inputs that
9  go into the company, the company's weekly
10 DIP forecast.
11     Another example, they don't
12 include any bankruptcy-related
13 disbursements.  So it is really not a
14 complete forecast.  It is sort of a
15 holdover of a forecasting process prior to
16 bankruptcy that we continued to allow us to
17 benefit from processes the company had in
18 place.
19     Q.   Is there anything that you rely
20 on with respect to the company's historical
21 forecasting process as opposed to the
22 information you have in the weekly cash
23 flows like Exhibit 17?
24     A.   In general terms, you know,
25 without going into specifics because I

1      Meghji - Highly Confidential
2  don't do the forecast myself --
3      Q.   Understood, understood.
4      A.   In general terms, in relation to
5  the disbursements side of our forecast, so
6  merchandise payments to vendors, SG&A or
7  corporate costs and so forth, I would say
8  for those things, that's a very good sort
9  of baseline that we use from that.
10 Obviously there is things that, as we look
11 out and if we see differences, those are
12 amended or tweaked.
13     But on the disbursement side, we
14 did, to some extent, rely on that as an
15 input to our forecast.
16     Q.   During the auction, do you --
17 strike that.
18     During the auction, can you
19 describe for me your role in communications
20 with either the entire restructuring
21 committee or the restructuring subcommittee
22 in terms of providing them information over
23 the course of the auction?
24     MR. GENENDER:  I'm going to
25 object and instruct you in answering

Page 222

Meghji - Highly Confidential

1    that question not to reveal
2    communications that are privileged,
3    understood that if that's the
4    situation -- and he's not asking you
5    for those either.
6        MR. SORKIN:  I'm not.
7        MR. GENENDER:  So if you're -- if
8    it was the situation where Weil was
9    involved in talking to the
10   restructuring committee or, in turn,
11   counsel for the restructuring
12   subcommittee, whatever, he's not asking
13   you that.
14       THE WITNESS:  Paul Weiss?
15       MR. GENENDER:  Paul Weiss, yes.
16   Yes.  That's -- as my hand gesture
17   meant, exactly.
18       So answer -- are you clear on
19   that instruction?
20       THE WITNESS:  Yes.
21       MR. GENENDER:  You can answer
22   subject to that.
23   Q.   Sure, sure.
24   A.   Can you repeat the question.

Page 223

Meghji - Highly Confidential

1    Q.   Why don't we start a little
2    differently.
3        Can you explain for me the
4    process of communicating with the
5    restructuring committee during the course
6    of the auction to the extent you were
7    involved?
8    A.   The process of communicating with
9    the subcommittee during --
10   Q.   I started with the committee.
11   A.   With the restructuring committee?
12   Q.   Yes.
13   A.   I think there was a series of
14   meetings and calls where issues relating to
15   the auction or projections around liquidity
16   and/or admin insolvency were -- or solvency
17   were discussed.
18   Q.   And what was your role in
19   connection with those meetings and calls?
20   A.   I was part of the advisory team
21   which comprised of Lazard, ourselves, and
22   Weil on behalf of the company along with
23   representatives of management around sort
24   of issues, all the issues that came up.

Page 224

Meghji - Highly Confidential

1    Some issues I had opinions on,
2    others I didn't, and so I provided input
3    where it was relevant or where I was asked.
4    Q.   Do you recall which issues you
5    provided input on with respect to the
6    restructuring committee during the course
7    of the auction?
8    A.   Not -- that wasn't a specific
9    issue where I can recall I provided input
10   and nobody else or what -- so I'm not
11   really sure what you're getting at.
12   Q.   That's fair.  Was there a, in
13   terms of categories of information that the
14   committee or the other advisors looked to
15   you to address, for example, whether it's
16   liquidity issues or insolvency issues, was
17   there a particular category where the
18   advisors and the committee, the
19   restructuring committee looked to you, or
20   were responsibilities sort of divided up
21   amongst everyone and everybody responded to
22   the committee with respect to any
23   particular issue?
24   A.   So I would say, in general,

Page 225

Meghji - Highly Confidential

1    issues around the company's cash flow and
2    liquidity and some of the actions we
3    discussed earlier around conditions to
4    close, around admin -- admin solvency were
5    issues that we had involvement in.
6    Q.   Are there any others that you can
7    think of that you were particularly
8    involved in?
9    A.   I'm sure there are many others,
10   but I can't recall every one.
11   Q.   The discussions you had with the
12   restructuring committee, did you also have
13   separate discussions with just the
14   restructuring subcommittee during the
15   course of the auction?
16   A.   I don't recall during the auction
17   ever meeting only with the subcommittee.
18   Although I might have.  It was a long
19   60-hour process, so I might have walked
20   into a discussion and been in one or two --
21   I don't recall a formal meeting where it
22   was just the subcommittee that I can
23   remember.
24   Q.   Did you provide any advice to any

Page 226

Meghji - Highly Confidential
1    Meghji - Highly Confidential
2    of the debtors' advisors or to the board or
3    any committee of the board with respect to
4    the viability of the ESL go-forward
5    business plan during the auction?
6         MR. GENENDER:  In a nonprivileged
7    setting.  That's my instruction.
8         A.   Not in my nonprivileged setting.
9         Q.   Did you at any point advise
10   either the restructuring committee as a
11   whole or any individual member of the
12   restructuring committee that you believed
13   the ESL go-forward business plan was
14   viable?
15        A.   I don't think I had a discussion.
16   I can't recall having a discussion with
17   anybody during the auction around the ESL
18   business plan.  However, we had had many
19   discussions, several discussions around the
20   company's business plan which was, you
21   know, going back to November, December.  So
22   we had had discussions, myself along with
23   the office of the CEO, with the
24   restructuring committee and the board
25   around the company's business plan.

Page 227

1    Meghji - Highly Confidential
2         Q.   Did those discussions occur
3    during the auction, or was it --
4         A.   It was before that.
5         Q.   Before the auction.
6         Did you provide any advice to the
7    restructuring committee or any individual
8    member of the restructuring committee that
9    the company's business plan was a viable
10   business plan?
11        A.   We presented the business plan.
12   I was part of the team that presented it,
13   and so all of those actions were laid out
14   clearly.  And, yes, I told them that it was
15   my view that while the company's business
16   plan was not without risk or upside, I
17   believed it was viable.
18        Q.   And in connection -- strike that.
19        Did you provide any advice to the
20   restructuring committee or any individual
21   member at any point that the ESL business
22   plan was viable as far as you were
23   concerned because it largely was based on
24   the company's business plan?
25        A.   I don't think I had that specific

Page 228

1    Meghji - Highly Confidential
2    discussion with anyone.
3         MR. GENENDER:  Again, my
4    instruction to all these questions is
5    not to -- your answers are all without
6    revealing privileged communications.
7         Q.   Mr. Meghji, have you seen any
8    allocation of value associated with ESL's
9    bid?
10        Let me clarify, I think --
11   clarify what I'm asking for.  Have you seen
12   any allocation of the contribution that ESL
13   is making its bid lined up with the assets
14   it is acquiring?  In other words, a value,
15   a match between the contribution between
16   the credit bid and other assets and
17   assumption of liabilities versus the assets
18   it's acquiring?
19        A.   I'm not sure I follow the
20   question.  I've seen a recovery analysis
21   that was already prepared of what -- how
22   the bid frames out by capital structure.
23        MR. GENENDER:  Would you reask
24   your question.
25        A.   I'm not sure I understand your

Page 229

1    Meghji - Highly Confidential
2    question.
3         Q.   What I am looking for is an
4    allocation of value.  In other words, an
5    allocation that shows that if you break
6    down the 5.2 billion dollar number of ESL's
7    bid, the assets it's acquiring are worth a
8    certain amount within that 5.2 billion.
9         So, for example, Sears Home
10   Services is worth 100 million dollars, and
11   we are contributing this value, this 100
12   million dollars of value, in exchange for
13   Sears Home Services.
14        So what I'm wondering is, have
15   you seen a breakdown of the 5.2 billion
16   dollar purchase price that lines up with
17   and allocates the value associated with the
18   assets ESL is acquiring?
19        A.   No, I haven't.
20        Q.   Is that something that you expect
21   to prepare or have any understanding that
22   the debtors will prepare?
23        A.   I'm not expecting to prepare that
24   and nobody is requesting that.
25        Q.   Have you seen a sources and uses

JX 117-58

1          Meghji - Highly Confidential
2   of the proceeds that will come into the
3   debtors upon close and the uses associated
4   with those sources?
5          A.   Lazard has prepared several
6   sources and uses analysis, and I have seen
7   the various iterations that they have
8   circulated.
9          Q.   And can you describe for me at
10  what level of detail the documents you are
11  thinking about describe the sources and
12  uses?
13         A.   I really cannot.  Basically it
14  was done as sources of consideration and
15  who -- how the uses were arrived.
16         Q.   Mr. Meghji, we are handing you
17  what has been previously marked as UCC
18  Exhibit 3.  I'll represent to you that this
19  is an attachment to the notice of sale that
20  was filed with the court that outlines the
21  material terms of the successful bid and
22  the ESL bid.  If you could just take a
23  minute to review that document.
24         A.   OK.
25         Q.   Have you seen this document

1          Meghji - Highly Confidential
2   before?
3          A.   I believe so.
4          Q.   And we don't need to go through
5   the whole thing, I actually just wanted to
6   focus on one section, the purchase price.
7   You are welcome to read as much as you
8   would like.  On page 3, and then 3b and
9   then the four romanettes after that
10  identify the credit bid amounts in
11  connection with the successful ESL bid.
12         Do you see that?
13         A.   Page 3s subparagraph(a) under
14  purchase price?
15         Q.   Subparagraph (b) under purchase
16  price.
17         A.   Subparagraph (b).
18         Q.   And the romanettes i through iv
19  identify the amounts being credit bid by
20  ESL.  Do you see that?
21         A.   Yes.
22         Q.   Do you have an understanding, if
23  we look at the first romanette, the IP
24  ground lease term loan facility, it
25  indicates a credit bid of approximately 231

1          Meghji - Highly Confidential
2   million dollars.  Do you have an
3   understanding of which assets are being
4   acquired with the credit bid of that
5   facility?
6          A.   Not specifically.
7          Q.   Are you aware of any valuation
8   that the debtors had done with respect to
9   the assets that are being acquired by that
10  facility?
11         A.   Not that I've seen.
12         Q.   With respect to the next one, the
13  FILO facility of approximately 125 million
14  dollars, are you aware of the assets that
15  ESL is acquiring with that credit bid of
16  that facility?
17         A.   What specific assets it was
18  acquiring with that specific --
19         Q.   Correct.
20         A.   No.
21         Q.   Do you understand the way a
22  credit bid works is that you acquire
23  specific assets that are collateral to a
24  particular facility?
25         A.   Yes.

1          Meghji - Highly Confidential
2          Q.   And I guess what I'm asking then
3   is you haven't seen a breakdown -- when I
4   say an allocation, one form an allocation
5   might take is an allocation to show that
6   with the 231 million dollar credit bid, ESL
7   is acquiring these particular assets.
8   That's what I was talking about with
9   respect to an allocation.
10         A.   I've not seen that.  Again, this
11  is -- these are questions that might be --
12  might be stuff Lazard has done.  But I've
13  not seen it.
14         Q.   With respect to the last two
15  facilities, you are not aware specifically
16  which assets are being acquired?
17         A.   Not specifically.
18         Q.   In connection with the real
19  estate that is being acquired, have you
20  been involved in determining the value of
21  any of the debtors' real estate assets?
22         A.   What do you mean by "value"?
23         Q.   I mean the amount that they are
24  worth for any purpose.
25         MR. GENENDER:  Object to form.

Page 234

Meghji - Highly Confidential

1
2    A.   The amount they are worth for any
3    purpose whatsoever?  I'm not sure -- can
4    you ask me the question again?  I'm not
5    sure I understand what that means.
6    Q.   Is it your understanding that in
7    connection with the proposed sale to ESL,
8    ESL will acquire substantially all of the
9    real estate that the debtors currently own?
10   A.   Yes.
11   Q.   Have you been involved in
12   determining what the value of that real
13   estate is?
14        MR. GENENDER:  Objection, form.
15   A.   We sought and received appraisals
16   of many of the unencumbered properties, if
17   not all, and also -- yeah, so I think there
18   were appraisals received for a bunch of
19   real estate.
20   Q.   OK.  And who prepared those
21   appraisals?
22   A.   JLL.
23   Q.   What was your role in connection
24   with the appraisals that JLL prepared?
25   A.   I was involved in approving --

Page 235

Meghji - Highly Confidential

1
2    retaining the appraiser and then,
3    thereafter, looked at a summary high-level
4    portfolio level.  I didn't examine all the
5    appraisals individually, but I looked at
6    the output of what those appraisals were
7    generally.
8    Q.   When was the decision made to
9    retain JLL?
10   A.   Fairly -- I mean, I would say
11   October.  Maybe November.  It was late
12   October, early November.
13   Q.   At the time that JLL was retained
14   or the decision was made to retain JLL,
15   what was the purpose for obtaining the
16   appraisals?
17   A.   So JLL was initially retained to
18   help with the sale process, which they were
19   coordinating, getting bids and indications
20   of interest for the real estate.  And at
21   some point in -- it was either November,
22   might have been early December, or maybe
23   early December, somewhere in that late
24   November, early December time frame, we
25   asked them to undertake an appraisal of all

Page 236

Meghji - Highly Confidential

1
2    the unencumbered real estate.
3    Q.   What was the purpose for
4    undertaking the appraisal at that time?
5    A.   To get some sense of value in
6    either a sale or liquidation so that we
7    could establish what options made sense for
8    the company to maximize the value.
9    Q.   Why was the decision not made
10   prior to November, early December to have
11   JLL undertake a written appraisal process
12   for all of the unencumbered real estate?
13   A.   Why was it not made before
14   November?
15   Q.   Right.
16   A.   The company filed for Chapter 11
17   on October 15.  And we were in a sort of
18   process where we were trying to stabilize
19   all kinds of things.  We were focused on
20   getting vendors back to shipping goods to
21   us which was -- so there was a lot going on
22   immediately post-filing, and then sometime
23   over the ensuing weeks, we started looking
24   at what alternatives the company might deal
25   with.  We started a sales process which was

Page 237

Meghji - Highly Confidential

1
2    around mid-November.
3    It was really in connection with
4    that that it was decided ultimately by the
5    restructuring committee to go ahead and get
6    appraisals.
7    Q.   When did JLL begin preparing
8    information to market the individual real
9    estate assets, if it did so?
10        MR. GENENDER:  Objection, form.
11   A.   I don't remember the exact time
12   frame, but it was sometime after
13   mid-November.  So it would have been
14   somewhere in between mid-November and early
15   December, in that two- or three-week
16   period.
17   Q.   Recognizing that JLL was the one
18   that was doing the appraisals and the work
19   associated with the real estate, were you
20   the one -- were you the individual at the
21   company who was responsible for providing
22   direction to JLL as to when they should
23   undertake larger tasks or not?
24   A.   Not directly.  Sears has a head
25   of real estate, Jane Warden, and one of my

**JX 117-60**

1      Meghji - Highly Confidential
2   colleagues, one of my partners, Bill
3   Gallagher was involved.  So it was really a
4   combination of Bill and Jane that
5   interacted with JLL, along with some
6   involvement from Lazard, some involvement
7   from Weil Gotshal's real estate department
8   as well.
9      Q.   Do you have any understanding as
10  to whether or not beginning the marketing
11  process in November and having indications
12  of interest due the end of December was a
13  reasonable amount of time to obtain
14  indications of interest with respect to
15  real estate assets?
16     MR. GENENDER:  Objection, form.
17  A.   Repeat that, please.
18  Q.   Sure.
19     Did you -- do you have an opinion
20  about whether or not the amount of time
21  with which the market had to submit an
22  indication of interest on particular --
23  specific real estate assets was a
24  reasonable amount of time for market
25  participants to evaluate the value of those

1      Meghji - Highly Confidential
2   individual real estate assets?
3      A.   I don't have a view on what's
4   reasonable generally or not.  In the
5   context of Sears' Chapter 11 proceedings,
6   everything was moving at lightning speed.
7   And when you looked, as your clients have
8   continually stressed to us, at the amount
9   of money the company was losing, when you
10  looked at the totality of our DIP financing
11  arrangements which had very tight time
12  frames for running a sales process, it was
13  absolutely reasonable.  We had no choice.
14     Q.   In connection with the appraisal
15  process, do you know what -- strike that.
16     In connection with the JLL
17  appraisal process, do you know how, if at
18  all, JLL viewed the indications of interest
19  that the company received with respect to
20  particular real estate assets?
21     A.   The question is, how did JLL view
22  the indications of interest?
23     Q.   So my understanding -- and this
24  could be wrong, and if you're not the right
25  person, I understand.

1      Meghji - Highly Confidential
2      My understanding is JLL conducted
3   appraisals for all of the individual real
4   estate assets in both encumbered and
5   unencumbered in the Sears portfolio.
6      MR. GENENDER:  Is that a
7   question?
8      Q.   I am asking you, that's my
9   understanding, is that correct?
10     MR. GENENDER:  Objection to form.
11     A.   My understanding is that they
12  did -- they looked at substantially if not
13  all of the unencumbered real estate.  I
14  don't know to what extent they did on the
15  encumbered real estate.  So they may have,
16  but I just don't know.
17     Q.   Do you have an understanding of
18  what methodology JLL used to determine the
19  appropriate appraisal value for any
20  individual unencumbered real estate asset?
21     A.   I'm not a real estate expert, nor
22  am I a real estate appraiser.  But from
23  a -- my perspective as the CRO of the
24  company, what -- I've been sort of told in
25  terms of how they approached this, was to

1      Meghji - Highly Confidential
2   look at dark store valuations,
3   fundamentally look at the differential
4   between current market rates and the
5   contractual lease rates for rent and
6   essentially present value them at an
7   appropriate discount rate and then
8   determine in a forced sale situation with a
9   large number of stores kind of coming on
10  the market, et cetera, in a short time
11  frame because of the timing constraints,
12  what that would generate.  And that in
13  particular was sort of how a large chunk of
14  the unencumbered properties were valued.
15     Q.   Did you have any role in
16  determining the methodology that you just
17  described?
18     A.   No.
19     Q.   Who, if anyone, did?  Strike
20  that.
21     Other than JLL, who, if anyone,
22  had involvement in determining the
23  methodology that JLL applied in determining
24  values?
25     A.   I think JLL did.

Meghji - Highly Confidential

1     Meghji - Highly Confidential
2     Q.    That's why I wanted -- was there
3  anyone at M-III that JLL worked with in
4  determining the methodology that they
5  applied?
6           MR. GENENDER:  That JLL applied?
7     Q.    JLL.
8     A.    JLL was an independent nationally
9  recognized firm.  So Bill Gallagher, my
10 partner, and Noah Zatzkin were the two
11 individuals working or sort of
12 intermediaries or, you know, conduits
13 between Sears and JLL.
14          But, no, I don't think anybody
15 from my team told JLL what methodology to
16 use.
17    Q.    With respect to the appraisals
18 that JLL provided -- strike that.
19          Did JLL ultimately provide
20 appraisals for the unencumbered assets to
21 the company?
22    A.    I believe so.
23    Q.    Do you know when that was?
24    A.    It was -- the first batch was
25 received in January 11.  And then there was

1     Meghji - Highly Confidential
2  a few more that came later.
3     Q.    And what, if anything, did you do
4  to rely on those values from JLL?
5     A.    Explain by "rely" on that.
6     Q.    Is there anything that you did
7  with those appraisals in order to make
8  other calculations or other determinations
9  in the course of the work that you are
10 doing for the company?
11    A.    Yes, I think one of the things we
12 were doing at the time was a wind-down
13 analysis or a liquidation analysis, an
14 orderly wind-down analysis of the company,
15 and we took some of the data from those
16 valuations and included that in our
17 analysis of what the estimated recoveries
18 would be for the unencumbered values.
19    Q.    Other than the use of the JLL
20 appraisal values and the wind-down
21 analysis, is there anything else that you
22 are aware of that the company used those
23 appraisals for?
24    A.    Used the JLL appraisal for?
25    Q.    Yes.

1     Meghji - Highly Confidential
2     A.    I don't think so.
3     Q.    Other than simply taking the
4  output that JLL provided with respect to
5  the work that they did, did you have any
6  role in evaluating or determining the
7  values, determining whether the values that
8  JLL provided were reasonable or accurate?
9     A.    I mean, we compared -- this is a
10 large portfolio of properties.  Somewhere
11 in between 3 and 400 properties, as a
12 whole, we kind of relied on it.  But in
13 some instances, some of the appraised
14 values were much higher than indications we
15 received or other data points that existed
16 at the company, so going sort of both ways.
17 But, no, I think nothing other than that.
18 We didn't do anything with it.
19    Q.    When you talk about JLL providing
20 appraisals and maybe the indication of
21 interest being dramatically different from
22 that or vice versa, who was it that took
23 that information and evaluated it or looked
24 at those two different pieces of
25 information and assessed that?

1     Meghji - Highly Confidential
2     A.    It was a combination of my
3  colleagues and a couple of people from the
4  company.
5     Q.    The colleagues you mentioned,
6  Mr. Gallagher?
7     A.    Mr. Gallagher and Mr. Zatzkin.
8     Q.    And who at the company?
9     A.    It would be Roger Puerto and Jane
10 Borden.
11          (Exhibit 19, e-mail thread,
12    beginning dated January 13, 2019 at
13    3:42:01 marked for identification, as
14    of this date.)
15    Q.    Mr. Meghji, the court reporter
16 has handed you what has been marked as
17 Exhibit 19, if you could take a minute to
18 review that document.  It's an e-mail with
19 several Excel attachments.  And tell me
20 whether you've seen this document before.
21    A.    I was not copied on this e-mail,
22 but the attachment looks familiar.
23    Q.    If we look then at the
24 attachment, can you tell me what the
25 attachment is?

Meghji - Highly Confidential

A.   It looks like a summary of sort
of properties and the estimated proceeds
that we have assumed in the liquidation
analysis, along with a few other data
points, including current high indicative
offer, JLL value, JLL liquidation value,
A&G value.

Q.   And if you can look at the first
page of this spreadsheet for me, it has a
small box that looks like a summary.

A.   Yes.

Q.   First of all, do you know who
prepared the spreadsheet attachment in
Exhibit 19?

A.   I assume it was Noah Zatzkin, who
was one of my colleagues.

Q.   Is it your understanding that
this spreadsheet attached to Exhibit 18 or
included in the Exhibit 18 was prepared by
M-III?

A.   It was prepared by Noah who works
for M-III.

Q.   It appears that on the first
page, there is a summary of the real estate

Meghji - Highly Confidential

assets and both gross proceeds and net
proceeds.  Do you see that?

A.   Yes.

Q.   So on the first line, there is a
transaction fee assumed of 6 percent.  Do
you see that?

A.   Yes.

Q.   Do you know who determined that 6
percent was the appropriate transaction
fee?

A.   I think it was probably Bill
Gallagher who was sort of the senior person
on my team, kind of overseeing real estate.

Q.   Below, there is a summary of the
unencumbered real estate -- strike that.

Is RE real estate?

A.   Yes.

Q.   Can you tell me what EST.CF is?

A.   I don't know for sure, to be
honest.  I'm assuming it's cash flow, but I
could be wrong.

Q.   OK.  Underneath is "Leased core."
Do you know what that represents?

A.   I think in the context of this,

Meghji - Highly Confidential

core was the word that the real estate team
used as part of the assets that ESL was
bidding for, the stores.

Q.   So those are the assets that ESL
was bidding for within -- so the 425
stores?

A.   Correct.

Q.   That were leased properties?

A.   Leased and then the second
line --

Q.   And the second line is the owned
properties within the 425?

A.   Yes.

Q.   And the noncore and pipeline were
assets outside of the 425?

A.   That's my assumption.

Q.   And the pipeline would be
distribution center assets or just other
assets or what is -- strike that.

What is your understanding of the
pipeline?

A.   Other assets that were in the --
in the process of being sold.

Q.   And the estimated -- does EST

Meghji - Highly Confidential

mean estimated?

A.   I believe so.

Q.   Estimated gross proceeds, the
indication here is 634.5 million dollars,
correct?

A.   Correct.

Q.   And the transaction fees, that's
the 6 percent, so you deduct the 38.1
million and the net, the estimated net
proceeds are 596.5 million.  Do you see
that?

A.   Correct.

Q.   This number, the 596.5 million,
is that the number you used in your
wind-down analysis?

A.   I believe the number we had used
was 561 million dollars.

Q.   Do you know what the relation is,
if any, between the 561 million dollars
that you used in the wind-down and 596.5 on
Exhibit 19?

A.   Do I know -- sorry, can you
please repeat that.

Q.   Sure.  Do you know the

1    Meghji - Highly Confidential
2  relationship, if any, between the 561
3  million dollars you used in the wind-down
4  and the 596.5 shown here?
5    A.   Yes, my understanding of that is
6  that there was three or four properties for
7  which we received appraisals after the 11th
8  and, therefore, they were not -- the input
9  of those appraisals were not included in
10  the 561.
11    Q.   So those appraisals increase the
12  value --
13    A.   By 36 --
14    Q.   -- by 36 million?  OK.
15    A.   Or 35 million dollars.
16    Q.   Understood.
17       If you could look at -- if you
18  could look at the first page of the
19  spreadsheet after the summary page we were
20  looking at, and at the top, there is a
21  category in the upper left that says
22  "Leased core."  Do you see that?  I
23  appreciate that it's small.
24    A.   Is this page 2 at the bottom?
25    Q.   Page 2 at the bottom, "leased

1    Meghji - Highly Confidential
2  core" in the top left-hand corner.
3    A.   Yes, yes.
4    Q.   So I believe, if you looked at
5  the next four pages, all of those say
6  "leased core" at the top, and if you do the
7  running total, the count to the left that
8  ends up with 315.
9    A.   Yes.
10    Q.   Do you see that?
11    A.   Yes.
12    Q.   Is it your understanding that
13  there were roughly 315 leased properties
14  that were part of the 425 that were being
15  sold as part of the ESL bid?
16    A.   Presumably that are unencumbered.
17    Q.   That are unencumbered, yes.
18  Understood.
19       Do you take -- do you understand
20  what calculations, if any, were done by
21  your colleagues at M-III to determine the
22  values and the estimated proceeds that are
23  included on this chart?
24    A.   In -- at a high level, yes.
25    Q.   Let's look at the fifth one down

1    Meghji - Highly Confidential
2  which is Torrance, California.
3    A.   On page 2?
4    Q.   On page 2, yes.
5       So just to make sure I understand
6  some of the columns going across, the Green
7  boxes at the top where it says "Estimated
8  proceeds," it's my understanding that those
9  are the proceeds that total the estimated
10  gross and net proceeds on the first page we
11  looked at.  Is that consistent with your
12  understanding?
13    A.   Yes.
14    Q.   So if I look at that number for
15  the Torrance property, it is 12 million 5
16  thousand dollars -- excuse me, 12,055,011
17  dollars, do you see that?
18    A.   Yes.
19    Q.   If I go to the right, it looks
20  like the current high indicative offer
21  received was 500,000 dollars, correct?
22    A.   Correct.
23    Q.   The JLL value is 46,800,000
24  dollars, correct?
25    A.   Yes.  But I -- I think the JLL

1    Meghji - Highly Confidential
2  value, this column here, I believe,
3  represents a small subset of appraisals
4  that were done before November in the
5  October time frame, and the methodology on
6  that was that it was capturing all of the
7  present value -- it was really looking at
8  appraising this from a landlord's
9  perspective.
10    Q.   And how would it be different
11  appraising the property from a landlord's
12  perspective versus the tenant's
13  perspective?
14    A.   Well, it was -- again, this is
15  how it has been explained to me, and it
16  makes sense to me, so I'll explain it to
17  you.  It's not really -- it's looking at a
18  lease which is what you're selling here,
19  and looking at it, what you could monetize
20  it in terms of a process to a third-party
21  buyer as opposed to capturing all of the
22  value in favor of the landlord.
23    Q.   So the first column that JLL
24  valued was for appraisals using a different
25  methodology prior to the November time

**JX 117-64**

Page 254

1     Meghji - Highly Confidential
2  period where they were doing the appraisals
3  that are in the second -- the next column,
4  JLL liquidation value, is that correct?
5     A.    Yeah.  And the difference is that
6  when that was done, it was unclear where
7  the company was or could be headed, what
8  the sale process would be.
9     I think when you look at the
10 column that says "JLL liquidation value,"
11 it was -- guidance that was provided was
12 that we are looking to essentially
13 liquidate the company and to -- for JLL to
14 provide us with an appraisal value in the
15 context of an orderly wind-down as opposed
16 to what it might be here where you're
17 monetizing something potentially on a going
18 concern basis with a much longer time
19 frame, et cetera.  And the A&G values, I
20 believe, were similarly done on the same
21 basis.
22    Q.    The same basis as the JLL
23 liquidation value or the going concern?
24    A.    As the original, original value.
25 But, again, I -- A&G is a more kind of

Page 255

1     Meghji - Highly Confidential
2  liquidation type firm.  It's -- it operates
3  on the distressed scale.  So it might
4  have -- I wasn't as involved in sort of
5  those discussions.
6     Q.    So your understanding is that
7  current high indicative offer is the
8  highest indicative offer that the debtors
9  received during the December, January,
10 December 2018, January 2019 time frame?
11    A.    Correct.
12    Q.    The JLL value is the value based
13 on the appraisals JLL did in October time
14 frame of 2018, assuming a sort of going
15 concern value for the property?
16    MR. GENENDER:  Objection, form.
17    A.    You know, I don't know that I
18 would say going concern value.  I think I
19 was just -- the methodology was that all of
20 the rent differential, the present value of
21 that that accrues to a landlord, it was
22 sort of appraised on that basis as opposed
23 to what a third-party buyer might pay for
24 it.
25    Q.    The next category, the JLL

Page 256

1     Meghji - Highly Confidential
2  liquidation value, what is your
3  understanding of the methodology used for
4  that set of appraisals?
5     A.    I think it was a similar
6  methodology, but essentially with an
7  understanding that these leases would
8  actually be marketed for sale in a time
9  constrained, limited window process through
10 an orderly wind-down with -- the full chain
11 dark store liquidation of Sears.
12    Q.    Do you know what amount of time
13 was provided for them to assume an orderly
14 liquidation process?
15    A.    The outside lease projection date
16 was May 13 -- or is May 13.  And I think --
17 I don't recall exactly because I didn't
18 have the discussion, but it was in the 45-
19 to 60-day kind of time frame.  It was a
20 relatively compressed time period.
21    Q.    Is the last value, the A&G value,
22 do you remember when those appraisals were
23 prepared?
24    A.    I think they were done in October
25 as well.

Page 257

1     Meghji - Highly Confidential
2     Q.    Is your understanding that the
3  methodology used was more akin to the JLL
4  value or the JLL liquidation value?
5     A.    I'm not certain, to be honest,
6  what -- which end of the spectrum that the
7  A&G fell into.
8     Q.    Do you know whether there were
9  additional appraisals that the company had
10 done on its unencumbered real estate assets
11 in the last year, year and a half in
12 addition to the ones identified here?
13    A.    There may have been.  I didn't --
14 we didn't -- certainly I did not look at
15 those.
16    Q.    My understanding based on other
17 deposition testimony is that there were
18 Cushman & Wakefield appraisals.  If I tell
19 you that, does that refresh your
20 recollection?
21    A.    Sure.  But I don't recall which
22 ones they were or when they were done.
23    Q.    OK, do you know why the Cushman &
24 Wakefield appraisals were not included in
25 the analysis in Exhibit 19?

1    Meghji - Highly Confidential
2        MR. GENENDER:  Objection to form.
3        A.    I think the -- the Cushman -- all
4    the appraisals done prebankruptcy were in a
5    different sort of context, i.e., before the
6    company filed for Chapter 11.  So I think
7    we were really focused on values
8    post-filing Chapter 11.
9        Q.    Do you know what discount JLL
10   applied in its liquidation values?
11       A.    Not specifically.
12       Q.    I asked you earlier with respect
13   to JLL, but with respect to JLL in October,
14   JLL in terms of liquidation or A&G in
15   October or November, did you have any input
16   into the methodology they used to determine
17   value, each one of them?
18       A.    Personally?  No.
19       Q.    Yes.
20       A.    No.
21       Q.    Do you know if anyone at M-III
22   had input into the methodologies they used?
23       A.    I think Mr. Gallagher was in
24   discussions with them.  I don't know that
25   he told them -- we had sought an

1    Meghji - Highly Confidential
2    independent appraisal, so I don't think he
3    directed them to do things a certain way,
4    but I think he was certainly -- he has a
5    lot of experience in real estate.  He has
6    seen divested portfolios, or at least
7    overseen the divestiture of real estate
8    loans and other assets.
9        So he was interacting and
10   discussing this with them, as were Jane and
11   Roger.
12       Q.    So if we could look back at the
13   Torrance property, can you tell me how your
14   colleagues at M-III arrived at the
15   12,055,000 -- 12,055,011-dollar number from
16   the other numbers?
17       A.    May I?
18       Q.    Sure, please, use the calculator.
19       A.    Yes, I think -- my understanding
20   is what they did, given, as you can see,
21   sort of the range of data points around
22   this property, they basically averaged
23   these numbers and then applied a 50 percent
24   discount to that to get to an estimated
25   proceeds.

1    Meghji - Highly Confidential
2        Q.    So for the Torrance example on
3    page 2, they averaged the indicative, the
4    current high indicative offer of 500,000,
5    the JLL value of 46.8 million and the A&G
6    value of almost -- or approximately 25
7    million, to get to 24.1 million and then
8    took a 50 percent discount on that to get
9    to a little over 12 million dollars, is
10   that right?
11       A.    Correct.
12       Q.    Who determined that methodology?
13       A.    I believe that was done by
14   Mr. Gallagher.
15       Q.    Have you ever seen this
16   methodology applied before?
17       A.    I have not, no, but I have not
18   seen kind of appraisals for estimated
19   values done at this scale either.
20       Q.    Do you know if Mr. Gallagher has
21   ever applied this methodology before?
22       MR. GENENDER:  Objection, form.
23       A.    I don't.
24       Q.    You don't know one way or the
25   other.  So do you know whether this

1    Meghji - Highly Confidential
2    methodology is based on any commonly
3    accepted treaties in the real estate
4    valuation industry?
5        MR. GENENDER:  Objection, form.
6        A.    No, I -- I don't know whether
7    it's -- you know, this was not an appraisal
8    methodology.  This was a process of kind of
9    applying some judgment to data points in
10   coming up with an estimated value on a
11   portfolio in terms of what the unencumbered
12   properties would realize.
13       Q.    At this point, the only use that
14   output has seen is as an input to your
15   wind-down analysis, correct?
16       A.    Correct.
17       Q.    Other than -- and if this is a
18   question for Mr. Gallagher, I understand.
19       Other than the use of this
20   methodology here in Exhibit 19, do you know
21   if there is anywhere else I could look to
22   to see the same or a similar methodology
23   applied?
24       MR. GENENDER:  Objection to form.
25       A.    I don't understand your question.

JX 117-66

Meghji - Highly Confidential

1  Q.   Is there another case, is there a
2  book, is there real estate valuation
3  course?  Is there anywhere else I could go
4  to to see a description of the philosophy
5  behind or why this is the appropriate
6  methodology?
7  A.   I can't answer that.
8  Q.   Other than Mr. Gallagher, is
9  there anyone who could answer that that
10 you're aware of?
11 MR. GENENDER:  Objection to form.
12 A.   I don't know.
13 Q.   In the methodology that was
14 applied in Exhibit 19, what happened if
15 there was no indicative offer?
16 MR. GENENDER:  Objection to form.
17 A.   Again, looking at page 3, it
18 appears where there was no indicative
19 offer, the JLL liquidation value was taken
20 as the appraised -- as the estimated
21 proceeds number at JLL.
22 Q.   What would happen if there was no
23 JLL liquidation value?
24 A.   I think the high indicative offer

Meghji - Highly Confidential

1  was discounted at 50 percent and that was
2  taken in the estimated proceeds.
3  Q.   Do you know what specific
4  qualifications Mr. Gallagher has with
5  respect to real estate valuation?
6  A.   This was not a valuation
7  exercise.  But I don't know what specific
8  qualifications Mr. Gallagher has as an
9  appraiser.
10 Q.   The JLL, in determining their
11 liquidation value, assumed a constrained
12 time frame, 45 to 60 days, for a
13 liquidation process, correct?
14 A.   I believe so.
15 Q.   The bids that were received in
16 connection with the unencumbered real
17 estate assets, were those bids that were
18 subject to a 45- or 60-day marketing
19 process?
20 A.   I don't recall specifically.
21 Q.   But you would agree that there
22 was no marketing process before the bid
23 procedures motion was approved by the
24 court, correct, for the real estate?

Meghji - Highly Confidential

1  A.   Before November?
2  Q.   Before November.
3  A.   No.
4  Q.   In a situation where there was
5  just an indication of interest but no
6  professional appraisal, did M-III still
7  apply a 50 percent discount to the
8  indication of interest?
9  A.   I'm looking for such an example.
10 Maybe you could point one out.
11 Q.   Sure.  On page 2, the second from
12 the bottom line, the Greensboro facility,
13 there was a 2.3-million-dollar indicative
14 offer, and it appears that 50 percent
15 discount was applied, is that correct?
16 A.   That's what it appears.
17 Q.   And you don't know why that was
18 done, correct?
19 A.   Look, I think as Mr. Gallagher
20 explained to me and I sort of -- as we
21 looked at this, I think when you look at
22 any individual property, you could sort of
23 certainly argue, because the data points,
24 as you've seen even from the examples you

Meghji - Highly Confidential

1  have shown me on Torrance, California,
2  which ranged from half a million to 46
3  million, in terms of data points around
4  indicated interest of appraisers --
5  indications of interest to appraisals, to
6  that and I think in several instances there
7  were indications received where people were
8  under the misimpression that for leased
9  properties they would bid them as owned
10 properties, at least one example of that,
11 where there was a significant gap where
12 somebody had given an indication in the
13 region of 20 million dollars.
14 So I think what this exercise was
15 attempting to do was provide on a
16 portfolio-wide basis, kind of take all of
17 these appraisal data points, received at
18 kind of different points, the original JLL
19 ones, the liquidation ones, the A&G ones,
20 the indications of interest, and really
21 come up with a kind of overall portfolio
22 valuation or estimate -- not a valuation --
23 excuse me, let me correct that.  Not a
24 valuation per se but an estimated proceeds

1          Meghji - Highly Confidential
2    number.
3          And the way I looked at it was
4    that, you know, it had to be somewhere
5    within plus or minus 20 percent. So the
6    561 number could easily overall be 100
7    million less or 100 million more, but we
8    had to deliver on that, in the sense that
9    the company needed -- as the monetization
10   process occurred, so I think that was a
11   basis on which the estimated proceeds
12   numbers were done, and this was
13   Mr. Gallagher's sort of best judgment of
14   doing that having overseen sort of real
15   estate-based loan and asset loan and
16   monetizations before.
17   Q.   So when I was -- when I was
18   approaching this and looking at it as a
19   valuation, that was incorrect?
20   A.   I think the point of this was to
21   inform that if we went out and in an
22   orderly wind-down sold all of these dark
23   store properties all at once in a
24   compressed time frame, what would they
25   realize. And that's what the 561 estimated

1          Meghji - Highly Confidential
2    as, with plus or minus sort of 20 percent
3    as a variability.
4          MR. GENENDER: Can we take a
5    break any time soon?
6          MR. SORKIN: I'm happy to take a
7    break. I still have some more on this,
8    but I'm happy to take a break.
9          (Recess)
10   Q.   Mr. Meghji, we are back on the
11   record. I just want to go through a couple
12   more general categories of the real estate
13   assets that are included in Exhibit 19. If
14   you look past the leased core, there is one
15   page, page 6 of owned core assets, and
16   there are 14 assets there.
17         Do you see that?
18   A.   Yes.
19   Q.   Do you know whether the
20   methodology to determine the estimated
21   proceeds for the owned core assets was any
22   different than the leased core assets?
23         MR. GENENDER: Objection to form.
24   A.   I don't think it was a 50 percent
25   discount applied. There was approximately

1          Meghji - Highly Confidential
2    a 7 -- 17 percent discount applied, and the
3    reason for that obviously was that leased
4    properties are much harder to sell for a
5    variety of reasons, especially in this kind
6    of a situation where you'd have an almost
7    unprecedented compressed liquidation of
8    leased properties, so it is a little bit
9    different.
10   Q.   OK. Understood. But up until
11   the final discount was applied, which here
12   was 17 percent as opposed to roughly 50
13   percent previously, the same steps were
14   applied up until then?
15   A.   I believe so.
16   Q.   The next categories, unencumbered
17   noncore and pipeline, and there are 74
18   properties there, do you see that?
19   A.   Yes.
20   Q.   Do you have an understanding of
21   what process or what methodology was
22   applied for those?
23   A.   I'm just going to have a quick
24   look if that's OK.
25   Q.   Sure.

1          Meghji - Highly Confidential
2          MR. GENENDER: Objection, form.
3    A.   I think, similar to the core
4    owned, it was sort of more analogous to
5    that in terms of the smaller discount
6    having been applied than, you know, than
7    the sort of leased appraised values. But
8    again, I don't know -- I don't recall the
9    exact sort of process.
10   Q.   Do you have an understanding of
11   what, if we are looking at page 7 of
12   Exhibit 19, the attachment to Exhibit 19,
13   the list price pipeline price, do you know
14   what that is? It's right in the middle.
15         MR. GENENDER: Objection, form.
16   A.   Yes, I believe that's where there
17   is sort of a pipeline of offers for these
18   properties.
19   Q.   And where does this pipeline come
20   from?
21   A.   It is really a creation of what
22   offers are in process that the company is
23   dealing with.
24   Q.   Behind the next blue sheet, there
25   appears to be a list -- I don't know if it

**JX 117-68**

Meghji - Highly Confidential
1  Meghji - Highly Confidential
2  it's, quite honestly, duplicative of what
3  we've already looked at. I don't know if
4  you know what this list is. It doesn't
5  appear to have the same columns that
6  address valuations.
7     A.   I don't have -- I don't recall
8  ever going through this before.
9     Q.   With respect to --
10    A.   I'm sorry --
11    MR. GENENDER: There's no
12  question.
13    Q.   There is no question.
14    Mr. Meghji, can I look at Exhibit
15  19? I just want to make sure I have the
16  same version in terms of what's stapled
17  together.
18    Thank you. Just for the record,
19  I'll note that on the cover of Exhibit 19,
20  it appears that there are two of the
21  identical file if you look in the
22  attachments listing. So the first document
23  behind the blue sheet and the last document
24  are the same.
25    I just recognized, I wanted to

1  Meghji - Highly Confidential
2  clarify that for the record. It looks like
3  the attachment itself was attached twice.
4     MR. GENENDER: We move to strike
5  all your questions.
6     Thank you for letting us know.
7  It doesn't affect anything you asked,
8  any pages you asked about.
9     MR. SORKIN: It doesn't affect
10  anything I asked. I just wanted to
11  clarify because I confused myself when
12  I looked at the last section. It is
13  the same as the first. We have already
14  gone over it.
15    MR. GENENDER: Fair enough.
16    Q.   Mr. Meghji, if you total up the
17  number of properties, the leased core, the
18  total is 315, the owned core, the total is
19  14, and the unencumbered noncore and
20  pipeline is 74, that totals 403.
21    Do you know how many unencumbered
22  assets, real estate assets the debtors
23  currently hold?
24    A.   I think there is several hundred
25  more for which we assigned no values.

1  Meghji - Highly Confidential
2     Q.   Why was that?
3     A.   Because either the market to --
4  kind of contractual differential was too
5  small, or the lease term was too small for
6  a variety of reasons, based on input from
7  the appraisers or otherwise, it was
8  concluded that there was not significant
9  value.
10    And again, just going back to --
11  look, I was on the board of ToysRUs which
12  is the other recent. In my opinion, there
13  is nothing analogous to the Sears full
14  chain liquidation, if one were to occur,
15  but the closest parallel was Toys in recent
16  years.
17    Toys' stores were smaller,
18  arguably more marketable as a result, and
19  when they did this and we got data from
20  A&G, one of our advisors on this, which is
21  one of the reasons Mr. Gallagher kind of
22  went through and approached it this way, is
23  only 40 percent of the leases they put out
24  for sale in the market as a whole got bids
25  and were sold, and they were sold for

1  Meghji - Highly Confidential
2  somewhere approaching 50 percent of the
3  appraised values.
4     So all that kind of factored in
5  to the estimated proceeds number that we
6  had come up with.
7     Q.   I recall asking you before the
8  last break if you understood whether the
9  methodology Mr. Gallagher applied was based
10  on any prior experience or otherwise, and
11  you indicated that you didn't know. Did
12  you speak to Mr. Gallagher during the last
13  break?
14    A.   No.
15    Q.   Did you do anything to refresh
16  your recollection about what methodology
17  Mr. Gallagher might have employed in doing
18  the real estate appraisals that we looked
19  at in Exhibit 19?
20    MR. GENENDER: Objection to form.
21    A.   No.
22    MR. GENENDER: Just for the
23  record, knowing an experience is not
24  methodology.
25    MR. SORKIN: Can we look at the

1    Meghji - Highly Confidential
2  transcript, but I believe the
3  transcript is clear.
4    MR. GENENDER:  Absolutely.
5    Q.    You can put that document to the
6  side.
7    (Exhibit 20, document entitled
8  Wind-Down Analysis dated January 14,
9  2019 marked for identification, as of
10  this date.)
11    Q.   Mr. Meghji, the court reporter
12  has handed you what has been marked as
13  Exhibit 20.  Could you take a minute to
14  review that document, please.
15    A.   Yes.
16    Q.   What is Exhibit 20?
17    A.   Exhibit 20 is a summary of the
18  wind-down of orderly liquidation analysis,
19  the key assumptions driving that and the
20  creditor recovery matrix which is sort of
21  the output in the process.
22    Q.   If we look at slide 5, there is
23  an indication on unencumbered real estate
24  values that the recoveries assumes 561
25  million dollars net of transaction costs,

1    Meghji - Highly Confidential
2  do you see that?
3    A.   Correct.
4    Q.   When we spoke earlier about 561
5  as an input, is that -- this is consistent
6  with what you recalled?
7    A.   Yes.
8    Q.   If you look at the -- at slide 7,
9  I believe it is the last slide of the
10  document, can you show me where the 561
11  million dollars of real estate shows up in
12  the creditor recovery matrix?
13    A.   No.  I -- this is not really the
14  cash flow waterfall of that.  What this is
15  is essentially, looking at this, it's a
16  recovery of how the cash flows and who ends
17  up with it by stakeholder.  So it is really
18  a summary of the recovery of how the
19  proceeds are divvied up.
20    Q.   OK, so the 561 million dollars of
21  unencumbered real estate doesn't show up
22  specifically, but isn't it what is included
23  as well as other unencumbered value in the
24  500 million dollars under the junior DIP
25  collateral, the 175 million dollars under

1    Meghji - Highly Confidential
2  the junior DIP collateral and 240 million
3  dollars under the wind-down reserve?
4    A.   I presume that's sort of where it
5  flows through.
6    Q.   Do you know or do you have
7  somewhere a schedule of all of the assets
8  included in those three buckets that we
9  just mentioned, the 500 dollars that's
10  shown under the junior DIP collateral,
11  along with 175 million, the 240 million
12  dollars --
13    A.   We have a model that backs up how
14  the asset sale proceeds flow through
15  this -- through the different categories
16  and who the value ultimately flow to.
17    Q.   In that model, did you run that
18  at or around the same time, January 14 of
19  2019?
20    A.   Yes.
21    Q.   And was there any recovery to
22  unsecured creditors under that analysis?
23  Was it any different than what we see on
24  slide 7?
25    A.   No, the slide 7 is the output off

1    Meghji - Highly Confidential
2  that.
3    Q.   The output.  Understood.  So what
4  you are saying is there is another chart
5  that shows additional detail?
6    A.   Around this, yes.  Correct.
7    Q.   On slide 7, can you explain to me
8  the methodology by which you applied the
9  remaining assets as against the
10  administrative and other priority claims?
11    A.   You mean all the nonpledged
12  assets?
13    Q.   Correct.  Well, let me start --
14  so under the creditors, there are
15  administrative and other priority claims of
16  1 point -- roughly 1.4 billion dollars, do
17  you see that?
18    A.   Yes.
19    Q.   And we have talked a lot in the
20  administrative insolvency context about a
21  lot of those categories, correct?
22    A.   Yes.
23    Q.   More specifically.  What I want
24  to understand is how you applied the
25  remaining assets to satisfy that 1.4

Page 278

Meghji - Highly Confidential

billion dollars to come to the, what's
represented here, 100 percent recovery for
administrative and other priority claims.

A.   So in general, the sort of
waterfall of how assets were divvied up for
unencumbered, previously unencumbered
assets, they went in to fill the wind-down
reserve to the extent of 240 million
dollars.

Away from that, for the
encumbered collateral, all the proceeds
went to first admin claims and other
priority claims -- admin claims in the
process of -- that were incurred in the
process of liquidating the collateral which
included a whole series of items.

Then it went to pay the senior
DIP ABL balance, the junior DIP balance,
and on down that list.  The FILO, 125, the
CDLC facility, and then it went to the
507(b) adequate protection claim which was
a -- which was 331 million.

And at that point, it sort of ran
out of -- so that wasn't paid in full.  And

Page 279

Meghji - Highly Confidential

any creditors below that, in this analysis
that did not recover anything, excluding,
obviously, the Dove loans and the GL/IP
loan which had separate collateral.

Q.   OK.  And under this analysis
there was -- the debtors' estate was
administratively solvent, correct?

A.   Correct.

Q.   Why was it that you determined to
apply first the remaining unencumbered
value before using the first lien
collateral?

A.   I don't think I -- so ask that
question again, please.

Q.   Sure.  What I heard in your last
answer was that the unencumbered assets in
the wind-down reserve were used first, the
carve-out was carved out separately, the
unencumbered assets were then used to
satisfy the junior DIP collateral, then the
first lien, and then it flowed down to the
DIP ABL and junior DIP.  Maybe I heard that
wrong.

A.   To the extent that, for

Page 280

Meghji - Highly Confidential

instance -- let me be clear.  For instance,
inventory and receivables which would be --
everything would be monetized as and when
it occurred.  I was simply talking about
where the proceeds of those items would go.

So for previously -- for pledged
collateral, it would follow the waterfall I
described.  For non -- for previously
unencumbered collateral, it would first go
into the wind-down reserve and then go to
pay the other items.

So I did not mean that you would
start and only exclusively focus on the
unencumbered collateral and not pledged
collateral.  The process of monetization
would occur as soon as the wind-down began.

Q.   What methodology, if any, did you
apply with respect to applying a surcharge
on the admin claims with respect to
monetization of assets?

A.   So if you look on page 2, so
three bullet points up from the bottom, it
says, "The imposition of a 4 percent charge
of encumbered assets sold throughout the

Page 281

Meghji - Highly Confidential

case pursuant to 506(c) of the Bankruptcy
Code with the exception of the first lien
and prepetition ABL collateral and junior
DIP collateral due to the 506(c) waivers
granted those lenders in their capacity as
DIP lenders."

And if you look on page 7, you
will see that there was approximately 4
percent charges on the Dove and IP/GL
collateral.

Q.   How did you determine that the
assumptions you made or the surcharge you
had, as indicated on page 2, was
appropriate?

A.   The 4 percent?

Q.   Yes.

A.   Really in discussion with Lazard
and counsel.

MR. GENENDER:  I will instruct
you to say no more on that comment.

Q.   So in determining what surcharge,
if any, to apply in connection with admin
and priority claims, you didn't apply any
independent analysis yourself to determine

JX 117-71

Page 282

Meghji - Highly Confidential

1    Meghji - Highly Confidential
2    what was the appropriate way to assign
3    value in the waterfall?
4         MR. GENENDER: Objection, he just
5    answered that. He just said. He just
6    said --
7         A.  Again, it was sort of based on
8    guidance from counsel.
9         Q.  Can you describe for me -- have
10   you had an opportunity to review the papers
11   and declarations and reports that the
12   creditors committee filed on Saturday?
13        A.  Not to the fullest -- not the
14   entirety because you guys filed a lot, the
15   paper. I have skimmed through some of it.
16        Q.  Do you have an understanding that
17   within those is an expert report that
18   contains a valuation on the real estate
19   that is significantly higher than the
20   value, the 561 million dollars applied by
21   you in this analysis?
22        A.  I do.
23        Q.  I'm not asking you to agree, but
24   assuming for a minute that the value of the
25   unencumbered real estate were double what

Page 283

1    Meghji - Highly Confidential
2    you had included, just roughly a billion
3    dollars. What impact, if at all, would
4    that have had in your analysis on slide 7?
5         MR. GENENDER: Objection to form.
6         A.  First of all, I completely
7    disagree with the premise. I think that
8    the number we have used under the band and
9    so on that we described is much more
10   reasonable and in line with the
11   circumstances of the company.
12        But I presume here it would --
13   the first couple of 100 million of value
14   would flow in to cover the deficiency of
15   the adequate protection claim, and then
16   thereafter, I would need to look at --
17   really, I would need to consult with
18   counsel on the waterfall below that.
19        Q.  If you look at footnote 6, which
20   is a footnote to unsecured and deficiency
21   claims, do you see that?
22        A.  Footnote 6 on page 7?
23        Q.  Yes.
24        A.  Yes.
25        Q.  The Deloitte report that

Page 284

1    Meghji - Highly Confidential
2    references 3.4 billion dollars in unsecured
3    claims, what report is that?
4         A.  Deloitte has been working on
5    behalf of debtors to assemble claims
6    information, and so I presume you'd prefer
7    us to read the Deloitte report.
8         MR. GENENDER: Where are you
9    saying it says report, Joseph?
10        Q.  Oh, I apologize. Let me ask, is
11   there a document that you've seen that
12   identified from Deloitte --
13        A.  No.
14        MR. GENENDER: Just for the
15   record, the footnote doesn't refer --
16   the footnote says what it says, but it
17   doesn't say there was a Deloitte
18   report.
19        Q.  I agree. So it states, I quote,
20   "Draft estimate of gross liability per
21   Deloitte of 3.4 billion dollars," and then
22   the footnote goes on. So let me ask the
23   question again.
24        Are you aware of any document
25   that you have reviewed that sets forth the

Page 285

1    Meghji - Highly Confidential
2    claims that make up the 3.4 billion
3    dollars?
4         A.  I have not reviewed a report.
5         Q.  Did you speak with Deloitte to
6    obtain that information?
7         A.  I have not personally spoken to
8    Deloitte.
9         Q.  The next item in that same
10   footnote says, "Plus about a billion
11   dollars of PA liability." Is that purchase
12   agreement?
13        A.  Protection agreement.
14        Q.  Protection agreement, I
15   apologize.
16        And the 1 billion dollar
17   estimate, where does that come from?
18        A.  I believe that's the notional
19   value of the protection liabilities
20   purchased by customers of Sears that are
21   still outstanding.
22        Q.  And when you say "notional
23   value," what does that mean?
24        A.  It means face value, as opposed
25   to the discounted present value which is

JX 117-72

Page 286

Meghji - Highly Confidential

1    what is on the balance sheet.
2    Q.    Based on the historical
3    experience at Sears, what is the expected
4    payout on claims associated with a notional
5    value of about a billion dollars?
6    A.    I don't know specifically what
7    that is.  All I can tell you is that there
8    is -- there is a balance sheet liability
9    number that's somewhere in the region of
10   430 to 450 million dollars.
11   Q.    And did you use 430 to 450
12   million dollars to determine the total
13   amount of unsecured deficiency claims?
14   A.    Reading this footnote, it says
15   approximately a billion dollars.
16   Q.    Why did you use a billion and not
17   the balance sheet amount?
18   A.    Because that's sort of the
19   notional face value.
20   Q.    And is there any relation as far
21   as you know in your experience between the
22   notional face value and the actual claims
23   experience at the company?
24   A.    Is there any relation?
25

Page 287

Meghji - Highly Confidential

1    Q.    Yes.
2    A.    I think the balance sheet value I
3    mentioned would represent the company's
4    kind of discounted present value of the
5    cost of servicing those protection
6    agreements, whereas the billion dollars is
7    what I believe the customers paid for.
8    Q.    Why was it that you decided to
9    include the billion dollars and not the
10   balance sheet liability?
11   A.    That's an assumption.  The exact
12   amount of that would ultimately be
13   determined later.  For the purposes of this
14   analysis, that's -- we were simply
15   indicating what the assumption is.
16   Q.    If we go back up to the adequate
17   protection 507(b) claim of 331 million
18   dollars, the footnote is there if you want
19   to take a minute to read it.
20   A.    Yes.
21   Q.    Based on that footnote, footnote
22   4A, my understanding is that you -- you
23   used the information provided by counsel to
24   include the information on the adequate
25

Page 288

Meghji - Highly Confidential

1    protection 507(b) claim?
2    A.    Correct, we applied the
3    methodology counsel guided us on.
4    Q.    Going back to footnote 6, do you
5    have any understanding of how Deloitte
6    determined the 3.4 billion dollar number?
7    A.    No, I've not had discussions.
8         (Exhibit 21, document entitled,
9         "Project Survivor Scenario Discussion"
10        dated December 2018 marked for
11        identification, as of this date.)
12   Q.    Mr. Meghji, the court reporter
13   has handed you what has been marked as
14   Exhibit 21.  Can you take a minute to
15   review that document and let me know once
16   you have had a chance to review it.
17   A.    OK.
18   Q.    Do you know what Exhibit 21 is?
19   A.    Yes, this was a document that was
20   put together in response to a request from
21   the unsecured creditors committee's
22   financial advisors in exploring the
23   standalone -- the option of kind of doing a
24   standalone reorganization of the Sears Home
25

Page 289

Meghji - Highly Confidential

1    Services business, and this was a high
2    level initial sort of review of a couple of
3    options, one assuming the protection
4    liability book and one -- and one where it
5    was not.
6    Q.    Was this a document that was
7    presented to anyone other than the
8    unsecured creditors committee's advisors?
9    A.    Not that I'm aware of.
10   Q.    Let's go back for a minute to
11   Exhibit 20, the wind-down recoveries from
12   January 2019.  This document, Exhibit 20,
13   is dated January 14, 2019, do you see that?
14   A.    Yes.
15   Q.    Do you know if this was -- strike
16   that.
17        Did you present a wind-down
18   recoveries scenario to the restructuring
19   committee in connection with assessing the
20   ESL bid and alternative scenarios --
21   A.    I'm sorry --
22   Q.    -- during the auction?
23   A.    Say again.
24   Q.    Sure.
25

**JX 117-73**

1          Meghji - Highly Confidential
2          During the auction, did you
3    present a wind-down scenario to the members
4    of the restructuring committee in order to
5    help them assess the value associated with
6    the ESL bid?
7          MR. GENENDER:  You can answer
8    that yes or no.
9      A.   I'm sorry, you are going to have
10   to repeat that one more time.
11     Q.   Sure, understood.
12          During the auction, did you
13   present a wind-down scenario to the members
14   of the restructuring committee in order to
15   help them assess the value associated with
16   the ESL bid?
17     A.   Yes.
18     Q.   Is the wind-down scenario on
19   slide 7 of Exhibit 20 the scenario you
20   presented to the restructuring committee?
21     A.   I believe so.
22     Q.   When you look at the numbers now,
23   is there anything about the numbers that
24   you believe was different at the time of
25   the auction when you presented to them?

1          Meghji - Highly Confidential
2          MR. GENENDER:  Objection, form.
3    Say that again.  Different?
4      Q.   Sure.  I guess you believed this
5    was the information presented to the
6    restructuring committee at the time of the
7    auction.  I just wanted to make sure, when
8    you look at total claims and recoveries,
9    it's a 66 percent number.  Is that
10   consistent with your recollection of what
11   you presented to the restructuring
12   committee at the auction?
13          MR. GENENDER:  Which point in
14   the -- objection to form.
15     Q.   Mr. Meghji, this is dated January
16   14, correct?
17     A.   As of January 14, this is what
18   was presented.
19     Q.   Did you do a different wind-down
20   scenario between January 14 and 3 a.m. on
21   January 17?
22     A.   I don't believe so.
23     Q.   Do you recall in discussions with
24   ESL in connection with the liquidity
25   analysis that ESL has indicated that it

1          Meghji - Highly Confidential
2    plans to sell roughly 600 million dollars
3    of real estate over the course of the next
4    several years in connection with NewCo?
5          MR. GENENDER:  Objection, form.
6      A.   I have not discussed that with
7    them.
8      Q.   Did you have any involvement in
9    negotiating the credit bid from ESL and
10   whether or not they would be allowed to
11   credit bid any associated release and
12   payment of 35 million dollars?
13          MR. GENENDER:  Objection to form.
14     A.   No.
15          MR. SORKIN:  Why don't we just
16   take a couple minutes.  I think I am
17   pretty close to wrapping up.  I just
18   want to make sure I haven't missed
19   anything.
20          (Recess)
21          MR. SORKIN:  Mr. Meghji, thank
22   you.  I have no further questions.
23          MR. GENENDER:  We will reserve
24   all questions until time of trial.
25          MR. SORKIN:  I assume no one else

1          Meghji - Highly Confidential
2    has questions.
3          (Time noted 5:43 p.m.)
4
5          _____
6               MOHSIN MEGHJI
7
7    Subscribed and sworn to
8    before me this      day
9    of MO          , 2018.
10
11   _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**JX 117-74**

Page 294

1          Meghji - Highly Confidential
2              INDEX:
3    WITNESS         EXAM BY:        PAGE:
4    M. Meghji       Mr. Sorkin        5
5
6        EXHIBIT INDEX:
7    NUMBER        DESCRIPTION        PAGE:
8    Exhibit 16  e-mail thread beginning date      9
9          January 28, 2019
10   Exhibit 17  document entitled project blue    97
11         revised cash flow budget going
12         concern
13   Exhibit 18  document Bates stamped Sears     153
14         UCC 413607
15   Exhibit 19  e-mail thread, beginning        246
16         dated January 13, 2019 at
17         3:42:01
18   Exhibit 20  document entitled Wind-Down     275
19         Analysis dated January 14,
20         2019
21   Exhibit 21  document entitled, "Project      289
22         Survivor Scenario Discussion"
23         dated December 2018
24
25

Page 295

1          Meghji - Highly Confidential
2              CERTIFICATE
3    STATE OF NEW JERSEY )
4                        )ss:
4    COUNTY OF UNION     )
5        I, MARY F. BOWMAN, a Registered
6    Professional Reporter, Certified
7    Realtime Reporter, and Notary Public
8    within and for the State of New Jersey,
9    do hereby certify:
10       That MOHSIN MEGHJI, the witness
11   whose deposition is hereinbefore set
12   forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by such witness.
15       I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage and that I
18   am in no way interested in the outcome
19   of this matter.
20       In witness whereof, I have
21   hereunto set my hand this 29th day of
22   January 2019.
23
24   _____
              MARY F. BOWMAN, RPR, CRR
25

Page 296

1          ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg.  No.  Now Reads   Should Read  Reason
6    ____ ____ _____  _____  _____
7    ____ ____ _____  _____  _____
8    ____ ____ _____  _____  _____
9    ____ ____ _____  _____  _____
10   ____ ____ _____  _____  _____
11   ____ ____ _____  _____  _____
12   ____ ____ _____  _____  _____
13   ____ ____ _____  _____  _____
14   ____ ____ _____  _____  _____
15   ____ ____ _____  _____  _____
16   ____ ____ _____  _____  _____
17   ____ ____ _____  _____  _____
18   ____ ____ _____  _____  _____
19   ____ ____ _____  _____  _____
20
21   _____
           Signature of Deponent
22
     SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2019.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____

JX 117-75

**A**

**A&G (9)**
246:8 254:19,25
256:21 257:7
258:14 260:5
265:20 272:20

**a.m (14)**
2:6 3:22 35:18 48:5,6
48:14,14 50:3,4
74:8 101:13 207:9,9
291:20

**ability (5)**
100:18 147:2 174:23
194:2 203:23

**ABL (22)**
95:13,15,21 99:6,17
99:24 110:16,23
134:16 154:16
162:9,24 163:11,23
164:18 173:19
201:24 203:4
205:16 278:19
279:23 281:4

**able (12)**
37:18 69:16 70:4
113:11 117:8 126:9
126:24 128:2
177:23 193:3
195:23 215:12

**absolutely (3)**
139:21 239:13 274:4

**accelerate (2)**
156:18 174:2,18
176:4

**accelerating (1)**
156:13

**accept (5)**
41:9 45:23 51:6
172:13 207:4

**accepted (2)**
40:23 261:3

**access (1)**
90:18

**accessing (1)**
106:2

**accommodate (1)**
7:6

**accomplish (1)**
110:21

**account (14)**
38:9 61:19 75:5 83:22
91:3,4,5 107:17,22
108:3,24 113:4
128:10 200:14

**accountant (1)**

172:20

**accounted (3)**
111:18 201:2,5

**accounts (49)**
58:12,24 59:13 60:4,8
61:2,4,15,24 62:13
65:17 77:4,15 78:8
86:15,17,22 107:4
107:11,12,18 108:9
108:15 109:12,22
127:10 128:18,24
129:13,16,20
130:11,22 131:2
184:10,11 185:8,13
185:23 186:2,17,19
187:14 188:9,17,22
189:7,23 214:22

**accrue (1)**
216:20

**accrued (3)**
93:22 209:13 212:14

**accrues (1)**
255:21

**accurate (1)**
244:8

**accurately (1)**
19:8

**Acevedo (3)**
16:9 179:10,11

**achievable (2)**
147:4 148:25

**achieve (8)**
146:16,23 149:20
160:6 163:24
185:10 193:8
201:10

**achieved (3)**
140:9 163:19 180:14

**achieving (1)**
184:18

**acquiescence (1)**
72:13

**acquire (3)**
168:14 232:22 234:8

**acquired (3)**
170:23 232:4,9
233:16,19

**acquiring (7)**
228:14,18 229:7,18
232:15,18 233:7

**act (6)**
165:24 166:23 175:12
176:9 177:8 195:4

**acting (2)**
57:12 197:5

**action (3)**

169:8 197:25 295:17

**actions (11)**
51:4,5,7 156:2,8
165:21 193:17
199:23 208:2 225:3
227:13

**active (1)**
138:21

**actively (2)**
15:19,22

**actual (2)**
100:9 286:23

**actualize (1)**
157:20

**add (1)**
211:6

**addition (7)**
51:5 110:14 125:20
140:3 178:17
218:14 257:12

**additional (42)**
12:8 14:9,11 41:14,18
44:19,20,25 45:9,14
46:15 49:7,24 50:17
70:25 78:6 84:11
90:21 104:17
105:11 106:12,16
110:16,21 111:13
112:22 117:14
125:20 127:14
130:8,12 132:10
133:10,19 141:22
155:20 161:2
195:13 201:11
217:13 257:9 277:5

**address (18)**
44:7,21 50:24 51:4,8
70:2 71:3 74:3
76:17 80:25 115:10
153:16 169:18
205:11 208:2
209:12 224:16
270:6

**addressed (3)**
102:23 116:24 191:4

**addresses (5)**
87:25 88:9,24 89:4
115:12

**adds (2)**
102:19 163:3

**adequate (4)**
278:22 283:15 287:17
287:25

**adequately (1)**
32:9

**adjustments (1)**

141:14

**admin (8)**
118:7 223:17 225:5,5
278:13,14 280:20
281:23

**administrate (1)**
36:25

**administrative (44)**
26:25 27:4,8 28:21
29:13,16 35:23 37:5
40:6 41:5 44:9
45:11 46:16 47:17
48:20 49:9 50:19
51:9,13,20,21 58:11
63:2 64:14 74:12
75:6 96:6 100:25
103:16,18 115:11
116:5,13,23 152:21
153:3 199:14,16
208:3,9 277:10,15
277:20 278:4

**administratively (9)**
27:22 28:5,11 29:16
29:23 36:2 37:11,19
279:8

**advance (3)**
62:5,7 216:13

**advantage (1)**
170:2

**advertising (1)**
142:6

**advice (3)**
225:25 227:6,19

**advise (3)**
191:12,15 226:9

**advised (1)**
108:11

**advising (2)**
20:24 21:3

**advisor (8)**
13:14 21:4 24:19,20
34:19 46:23 76:7
211:24

**advisors (23)**
24:13 25:22 26:5
28:16 43:7 48:18
94:13,13,18 98:23
99:5 111:3 113:13
136:15 181:3
192:22 206:22
224:15,19 226:2
272:20 288:23
289:9

**advisory (2)**
13:6 223:21

**affect (3)**

192:6 271:7,9

**AFTERNOON (1)**
152:2

**agent (1)**
159:14

**aggregate (4)**
68:23 181:15 185:9
194:17

**ago (6)**
21:16 91:19 123:19
190:24 191:10
219:24

**agree (11)**
139:3 147:8 172:12
182:8 205:5 209:11
209:16 212:9
263:22 282:23
284:19

**agreed (10)**
6:6,7 76:21 77:20
121:5 136:9 181:23
185:18 188:12
191:24

**agreement (10)**
40:25 51:11 164:15
177:25 207:3 210:8
212:25 285:12,13
285:14

**agreements (4)**
213:7 217:19,23
287:7

**ahead (8)**
7:15 39:17 43:9 73:12
151:24 157:22
219:21 237:5

**akin (4)**
2:10 3:15 6:16 257:3

**al (2)**
1:7 3:8

**alert (1)**
212:18

**algorithm (2)**
150:8 151:4

**align (1)**
219:19

**allocates (1)**
229:17

**allocating (1)**
197:2

**allocation (8)**
228:8,12 229:4,5
233:4,4,5,9

**allow (4)**
147:18 148:3 163:5
220:16

**allowed (5)**

73:19 139:14 144:8
161:25 292:10
**allows (1)**
214:23
**alongside (1)**
35:12
**alternative (1)**
289:21
**alternatives (1)**
236:24
**Amazon (9)**
170:11,18,23,23,24
171:24 172:5,11,23
**amended (1)**
221:12
**America (2)**
3:18 5:5
**Americas (1)**
4:7
**amount (51)**
32:7,9 33:11 42:11
52:11 56:15 57:16
59:6,7 61:15 79:25
87:9 91:13 93:25
94:2 95:19 96:6
99:4,17,23 100:9,15
106:19 113:22
129:16,25 130:3
175:14 178:3 179:3
181:7 204:21
205:18 208:9
209:16,24 211:15
211:16 214:7 217:7
229:8 233:23 234:2
238:13,20,24 239:8
256:12 286:14,18
287:13
**amounts (15)**
43:22 58:14 63:7
74:17 75:4 76:3
77:10,10 80:8,24
90:11 91:5 183:2
231:10,19
**analogous (2)**
269:4 272:13
**analyses (4)**
30:25 32:5 35:20
123:8
**analysis (58)**
28:21 29:11,17,19
30:2 31:6,21 32:15
37:2,6 53:6,8,12,17
53:18 56:13 58:20
70:25 71:5 104:19
111:2 123:25
124:22 127:24

146:14,23 147:14
147:24 166:8,15
199:13,16,18 215:8
216:18 217:6
228:20 230:6
243:13,13,14,17,21
246:5 249:16
257:25 261:15
274:8,18 276:22
279:2,6 281:25
282:21 283:4
287:15 291:25
294:19
**analyze (1)**
127:19
**analyzed (1)**
54:11
**and/or (4)**
53:13 75:15 79:10
223:17
**answer (20)**
7:15,20,21 19:8 71:22
76:8 102:14 113:25
133:21 181:19
185:19 187:20,20
190:17 222:19,22
262:8,10 279:17
290:7
**answered (2)**
143:6 282:5
**answering (2)**
42:5 221:25
**answers (1)**
228:5
**anticipate (1)**
185:14
**anticipated (7)**
55:3 56:16 98:16,22
99:25 177:5 186:15
**anticipation (1)**
23:14
**anybody (9)**
9:8 115:24 147:13
151:19 179:9
182:17,19 226:17
242:14
**AP (4)**
62:10 128:13,17
167:11
**APA (39)**
69:25 70:10 80:8,12
80:15 82:6 86:21
87:25 88:4,9,13,24
126:11,25 127:22
128:3,4 162:16
164:19 166:17

173:23 176:22,24
189:15 190:6,13,20
195:8,12,16,17
203:2 206:7 207:12
209:12 214:19
215:11 216:3,6
**apologies (2)**
126:6 135:3
**apologize (6)**
46:5 69:11 129:10
132:12 284:10
285:15
**apparel (3)**
141:11,12,20
**appear (2)**
43:19 270:5
**APPEARANCES (3)**
3:2 4:2 5:2
**appearing (1)**
7:24
**appears (7)**
80:3 246:24 262:19
264:15,17 269:25
270:20
**appendix (1)**
81:11
**applicable (1)**
218:9
**applied (25)**
77:15 109:15 141:8
141:21 241:23
242:5,6 258:10
259:23 260:16,21
261:23 262:15
264:16 267:25
268:2,11,14,22
269:6 273:9 277:8
277:24 282:20
288:3
**applies (1)**
137:12
**apply (6)**
141:12 264:8 279:11
280:19 281:23,24
**applying (2)**
261:9 280:19
**appraisal (19)**
159:16 160:5 161:10
161:19,21,25
235:25 236:4,11
239:14,17 240:19
243:20,24 254:14
259:2 261:7 264:7
265:18
**appraisals (33)**
159:9 163:13 234:15

234:18,21,24 235:5
235:6,16 237:6,18
240:3 242:17,20
243:7,23 244:20
250:7,9,11 253:3,24
254:2 255:13 256:4
256:22 257:9,18,24
258:4 260:18 265:6
273:18
**appraised (6)**
159:21 244:13 255:22
262:21 269:7 273:3
**appraiser (3)**
235:2 240:22 263:10
**appraisers (2)**
265:5 272:7
**appraising (2)**
253:8,11
**appreciate (8)**
39:15 44:18 122:5,9
172:21 183:5
201:22 250:23
**approach (2)**
141:10 142:24
**approached (3)**
11:18 240:25 272:22
**approaches (1)**
142:20
**approaching (2)**
266:18 273:2
**appropriate (6)**
240:19 241:7 247:10
262:6 281:15 282:2
**approve (1)**
161:21
**approved (3)**
68:10 153:8 263:24
**approving (1)**
234:25
**approximately (9)**
12:17 19:17 217:19
231:25 232:13
260:6 267:25 281:9
286:16
**April (1)**
11:18
**area (4)**
17:11 18:3,5 58:24
**areas (5)**
17:9 18:12 36:18 71:2
176:3
**arguably (2)**
209:4 272:18
**argue (1)**
264:24
**arising (2)**

52:7 206:3
**armored (7)**
83:8,23 85:15,17,25
86:8 156:16
**ARPS (1)**
5:4
**arrangements (3)**
168:20 212:4 239:11
**arrived (2)**
230:15 259:14
**aside (3)**
44:10 91:6 121:17
**asked (17)**
18:9 126:6 127:10
131:10 133:20
148:11 181:18
188:15 198:24
208:22 214:12
224:4 235:25
258:12 271:7,8,10
**asking (17)**
26:18 54:9 101:21
102:3 190:16 199:8
205:13,22,23 216:5
222:5,13 228:11
233:2 240:8 273:7
282:23
**asleep (1)**
50:6
**assemble (1)**
284:5
**assembling (1)**
53:8
**assess (3)**
126:13 290:5,15
**assessed (1)**
244:25
**assessing (4)**
27:4,8 106:14 289:20
**assessment (1)**
136:16
**asset (8)**
40:24 69:19 82:3
159:10 193:23
240:20 266:15
276:14
**assets (93)**
24:9,15 25:13 26:13
30:19 31:8,17 32:8
32:10 34:7,8,8,22
35:4 38:11,22,25
57:2,20 67:3,10,11
67:20,24 68:7,23
70:18,19 71:14,18
91:25 105:11,16
159:6 193:10,14,19

194:8,14 195:3,7,10
195:14,16,24,25
228:13,16,17 229:7
229:18 232:3,9,14
232:17,23 233:7,16
233:21 237:9
238:15,23 239:2,20
240:4 242:20 247:2
248:3,5,16,19,20,23
257:10 259:8
263:18 267:13,15
267:16,21,22
271:22,22 276:7
277:9,12,25 278:6,8
279:17,20 280:21
280:25
**assign (1)**
282:2
**assigned (1)**
271:25
**assignments (1)**
20:13
**assist (1)**
191:16
**assistance (1)**
11:22
**assisting (2)**
25:18,19
**associated (19)**
23:19 62:25 103:15
110:11 155:22
166:10 212:14
213:8,24 214:4,8
228:8 229:17 230:3
237:19 286:5 290:5
290:15 292:11
**associates (1)**
16:7
**assume (17)**
38:4 54:2 65:5 77:20
96:8 148:12 168:11
176:9 181:23
189:13,18,20
191:24 204:19
246:16 256:13
292:25
**assumed (10)**
75:25 79:5 81:9
102:18 130:7
188:12 204:18
246:4 247:6 263:12
**assumes (6)**
88:21 145:21 149:8
200:17 201:17
274:24
**assuming (24)**

7:15 54:16 68:9 78:11
124:18 126:11,25
153:8,23 166:2
180:21 185:12
186:5 189:17 200:5
200:11 209:18,20
209:25 215:22
247:21 255:14
282:24 289:4
**assumption (7)**
98:15 107:14 147:17
228:17 248:17
287:12,16
**assumptions (12)**
31:22,23 32:4,14
137:20,22 138:12
138:23 139:4
147:25 274:19
281:13
**attached (3)**
44:24 246:19 271:3
**attachment (9)**
39:23 41:13 230:19
245:22,24,25
246:14 269:12
271:3
**attachments (3)**
9:22 245:19 270:22
**attack (1)**
150:23
**attempting (1)**
265:16
**attend (1)**
22:15
**attended (3)**
22:15,16 134:13
**attorney (1)**
6:15
**attorney/client (1)**
7:13
**attorneys (6)**
3:6,16 4:5,14 5:5 8:24
**auction (39)**
10:12 47:16,20,24
48:4,6,13 49:13,20
50:2 51:14 114:14
115:4 116:21 124:3
124:3,4,23 134:10
155:11 206:3
221:16,18,23 223:7
223:16 224:8
225:16,17 226:5,17
227:3,5 289:23
290:2,12,25 291:7
291:12
**authority (1)**

218:10
**availability (1)**
161:3
**available (11)**
33:3 54:10 62:14 81:6
81:9,10,16 139:2
155:21 164:23
166:9
**Avenue (1)**
4:7
**average (3)**
61:15 149:21,25
**averaged (2)**
259:22 260:3
**aware (31)**
26:10,19 34:13,18
35:10 46:23 47:13
48:12 49:5 68:7
70:2,11 71:18 85:23
86:20 89:22 108:5
125:14 127:21
147:23 167:25
198:10 206:2
212:19 232:7,14
233:15 243:22
262:11 284:24
289:10

_____
**B**
**b (2)**
231:15,17
**back (49)**
10:14 32:12 35:19,22
40:8 44:3 45:7 47:4
52:14,17 60:18
69:10 70:7 72:22,25
85:4 89:16 90:19,20
95:12 101:14
134:25 135:6 146:9
146:20 149:12
157:3 162:6 164:3
170:18,24 171:2,10
172:16,24,25
180:22 184:9
185:14 198:24,25
226:21 236:20
259:12 267:10
272:10 287:17
288:5 289:11
**backs (1)**
276:13
**baked (1)**
173:10
**balance (27)**
65:18 84:18 97:24
98:10 116:2 162:18

167:13 173:24
174:5 185:17
186:20,25 187:8,16
193:19,23,24
194:13 195:7
199:22 278:19,19
286:2,9,18 287:3,11
**BAML (1)**
159:14
**band (1)**
283:8
**bank (11)**
3:18 5:5 82:21 83:9
83:16 85:20 86:12
86:15,16,22 87:4
**bankers (2)**
26:5 31:5
**bankruptcy (23)**
1:2 21:9 23:2,4,7,12
23:20 24:2,10,16
26:14 27:18 33:5
55:20 56:6 59:4
109:24 136:6,15
149:5,24 220:16
281:2
**bankruptcy-related...**
157:2 220:12
**banks (3)**
83:15,19 161:20
**bar (2)**
55:7,9
**base (5)**
14:16 145:20 159:6
159:10 162:3
**based (40)**
8:2 43:16 44:16 57:19
63:6,9 69:4 70:17
76:23 77:21 94:3,12
104:19 113:9 125:6
125:7 126:14,16
127:24 132:5 137:7
138:25 145:23
147:2 155:13
160:24 164:11
170:16 183:7
206:18 213:15
227:23 255:12
257:16 261:2 272:6
273:9 282:7 286:3
287:22
**baseline (1)**
221:9
**bases (1)**
190:4
**basically (4)**
111:5 175:24 230:13

259:22
**basis (13)**
97:11,13 145:24
186:11,12 189:14
214:7 254:18,21,22
255:22 265:17
266:11
**basket (3)**
173:21 175:18 197:12
**batch (1)**
242:24
**Bates (3)**
152:4,14 294:13
**began (12)**
13:3 23:9 30:5 33:13
33:16 47:10,25
141:9,12,14,17
280:17
**beginning (10)**
8:14 27:24 28:13
47:24 140:16,25
238:10 245:12
294:8,15
**begun (1)**
127:25
**behalf (5)**
8:8 33:24 215:23
223:23 284:5
**behavior (1)**
132:7
**belief (1)**
69:22
**believe (48)**
33:20 34:21 42:13
54:24 56:9 72:4
92:19 93:24 96:21
97:18 98:25 111:2
113:2 118:19 121:3
122:21 123:18
124:5 126:17
134:16 139:7,15
146:15 149:20
171:21 194:20
198:11 202:10
204:14 218:16
231:3 242:22 249:3
249:17 251:4 253:2
254:20 260:13
263:15 268:15
269:16 274:2 275:9
285:18 287:8
290:21,24 291:22
**believed (5)**
76:15 139:3 226:12
227:17 291:4
**believes (1)**

92:23
**benefit (13)**
101:10 144:15 171:7
176:23,25 180:12
204:9,10,21 205:18
206:11,11 220:17
**benefits (1)**
216:20
**BENSMAN (2)**
4:17 48:24
**Bermuda (1)**
218:9
**best (7)**
9:3 34:24 71:21 109:6
180:19 205:10
266:13
**bet (1)**
122:15
**better (6)**
14:24 78:12 80:10
111:8 147:9 205:13
**beyond (3)**
209:18 213:25 214:5
**bid (32)**
40:23 41:9 44:7 45:23
48:22 49:8 80:2
105:12 207:4 228:9
228:13,16,22 229:7
230:21,22 231:10
231:11,19,25 232:4
232:15,22 233:6
251:15 263:23
265:10 289:21
290:6,16 292:9,11
**bidding (2)**
248:4,6
**bids (4)**
235:19 263:16,18
272:24
**big (2)**
135:4,4
**big-picture (3)**
32:2,17,21
**bigger (4)**
32:16 44:4 67:25
174:9
**Bill (4)**
238:2,4 242:9 247:12
**billion (25)**
171:15 203:3,12,24
204:7,13 206:6,8
229:6,8,15 277:16
278:2 283:2 284:2
284:21 285:2,10,16
286:6,16,17 287:7
287:10 288:7

**bit (4)**
10:15 103:13 134:12
268:8
**biweekly (1)**
168:23
**blanket (1)**
72:10
**blatantly (1)**
191:7
**block (1)**
60:11
**blood (1)**
295:17
**blow (1)**
144:12
**blue (4)**
96:14 269:24 270:23
294:10
**board (19)**
4:6 24:18 41:6,7 46:2
50:10,12 114:16,18
115:3,20 116:20
118:5 198:16,18
226:2,3,24 272:11
**bolded (1)**
145:19
**book (2)**
262:3 289:5
**books (4)**
55:21 56:8,11 59:2
**Borden (1)**
245:10
**bore (1)**
142:13
**borrow (1)**
165:9
**borrowing (3)**
14:16 159:6 162:2
**bottom (6)**
97:22 156:3 250:24
250:25 264:13
280:23
**bottoms-up (4)**
135:19 136:2,13,23
**bought (1)**
196:3
**Boutros (1)**
172:9
**Bowman (4)**
1:19 2:12 295:5,24
**box (8)**
41:17,18 45:8 98:3,8
137:22 153:13
246:11
**boxes (1)**
252:7

**Boy (1)**
123:3
**Bradley (1)**
5:15
**brand (1)**
35:11
**brands (1)**
93:11
**break (18)**
7:2,4 16:12 35:15
73:9,13,17,18 74:2
101:10 151:24
217:10 229:5 267:5
267:7,8 273:8,13
**breakdown (3)**
81:13 229:15 233:3
**breaks (1)**
156:7
**Brian (4)**
16:3,4 84:23 188:5
**brick (1)**
145:21
**bricks (1)**
141:19
**briefly (1)**
9:15
**bring (1)**
147:7
**BRITTON (1)**
4:9
**broad (1)**
15:3
**broadly (1)**
204:3
**broke (2)**
132:25 133:2
**broken (1)**
67:6
**brought (5)**
170:18 190:23 191:9
191:11,12
**Bryant (2)**
2:11 3:17
**bucketed (1)**
105:6
**buckets (3)**
89:13 167:6 276:8
**budget (17)**
96:14 97:15 100:6,9
104:17,23,25
111:11,13 112:7
117:8 155:7 170:10
170:15 178:9,11
294:11
**budgeted (1)**
178:8

**budgets (3)**
97:7,10 140:3
**build (2)**
135:19 186:20
**building (1)**
138:13
**buildup (11)**
59:12 63:17 64:16,17
65:6,12,21 66:22,24
81:20 90:10
**buildups (1)**
65:15
**built (2)**
49:7 100:8
**bullet (3)**
138:2 145:19 280:23
**bunch (14)**
13:12 20:15,18 21:12
68:2,3,11 69:13
112:10 165:19
170:21 177:21
185:20 234:18
**business (58)**
10:24 11:5 13:3,7
32:22 33:14,25 35:8
36:13 134:2,4,18,20
134:23,23 135:7,10
135:19,23 136:2,8
136:10,12,14,24
137:4 138:24
141:10,12,20,22
145:8,11,11,14
146:7,11 147:3,17
169:16,20 172:10
179:21 197:11
205:25 207:13
226:5,13,18,20,25
227:9,10,11,15,21
227:24 289:2
**business-by-busines...**
135:21
**businesses (5)**
32:22,25 87:13,21,25
**buy (5)**
165:9 170:5 174:14
185:21 186:3
**buyer (4)**
188:24 200:15 253:21
255:23
**buying (3)**
118:6 164:11 165:5

---
**C**
---
**C (1)**
5:15
**calculate (1)**

63:4
**calculated (2)**
63:3,12
**calculating (1)**
42:10
**calculations (3)**
213:23 243:8 251:20
**calculator (1)**
259:18
**California (1)**
252:2 265:2
**call (7)**
17:2 18:17 68:12
135:19 150:8
197:23 207:14
**called (4)**
6:9 18:2 28:10 132:22
**calls (2)**
223:15,20
**cancel (1)**
168:10
**cap (1)**
63:9
**capable (2)**
124:19 189:4
**capacity (3)**
7:25 140:22 281:6
**capital (7)**
125:2,14,16 126:7
209:4,6 228:22
**capitalize (1)**
180:9
**capitalized (1)**
180:6
**capped (2)**
180:25 181:7
**capturing (3)**
90:5 253:6,21
**card (1)**
141:24
**careful (1)**
144:17
**carried (1)**
80:20
**carrier (1)**
156:17
**cars (6)**
83:8,23 85:15,17,25
86:8
**carve-out (4)**
91:3,5 157:25 279:19
**carved (1)**
279:19
**case (13)**
1:6 10:6 21:5 28:10
97:19 99:3 145:20

97:19 99:3 145:20
152:25 158:19
187:6 262:2 281:2
296:2
**cases (4)**
13:13 21:9 59:23
83:18
**cash (110)**
14:25 29:7,8 31:8
38:11,25 39:3 43:20
62:5,6 77:10 81:5,8
81:21,24 82:2,11,15
82:19,21 83:8,14,16
83:17,18,21,23 84:2
84:2,12,17 85:4,9,11
85:14,14,20,22,25
86:8,9,12,14,16,21
87:3,4,14,17,25 88:5
88:6,10 89:10,13,15
89:21 90:5,9,23
92:9 96:14,22 97:7
97:10,15 111:7,9
112:16,23 113:12
113:15,16,23
125:15,20 155:21
156:4,9,11,19,21
158:15 180:17
196:5,10,19,20,23
198:4,15,21 199:2
201:11 205:15
209:15 218:4,14,15
218:20,25 219:2,3
219:14 220:22
225:2 247:21
275:14,16 294:11
**categories (16)**
38:21 67:6 71:13,17
74:11 75:5 90:8,11
104:4 158:24
184:16 224:14
267:12 268:16
276:15 277:21
**category (18)**
58:10 62:18 64:4 66:6
85:22 105:8 109:18
114:3,7 115:17
137:21,21 157:17
184:16 196:5
224:18 250:21
255:25
**caveat (1)**
126:12
**CDLC (1)**
278:21
**center (2)**
169:13 248:19

**Centerview (2)**
24:19 34:21
**central (3)**
82:20,21 83:21
**CEO (6)**
57:9 135:12 138:16
148:9 150:16
226:23
**CEO's (1)**
140:17
**certain (25)**
8:9 10:5 18:25 19:11
32:7 34:22 36:11,21
38:7,8 42:2 76:23
77:4 144:6 161:22
172:12,25 175:4
183:13 185:8
191:16 220:5 229:8
257:5 259:3
**certainly (6)**
90:16 109:16 150:25
257:14 259:4
264:24
**certainty (5)**
121:7,11,13 184:17
197:5
**CERTIFICATE (1)**
295:2
**Certified (2)**
2:13 295:6
**certify (2)**
295:9,15
**cetera (15)**
11:23 26:9 31:11
111:10 117:13
137:14 141:4 142:3
174:15 186:9 194:3
207:13 219:12
241:10 254:19
**CFO (10)**
14:20 17:10 22:9
27:13 29:3 36:4,5
106:6,17 108:7
**chain (2)**
256:10 272:14
**chance (4)**
96:19 117:21 140:8
288:17
**change (15)**
119:11 126:16 128:13
128:16 129:13
131:6,7,15 141:16
153:25 154:6,19
158:2,3,7
**changed (1)**
76:22

**changes (11)**
6:5 65:18 141:6,25
143:21 153:20
154:12 155:22
164:9 171:23 204:8
**changing (1)**
65:20
**Chapter (8)**
1:5 20:22 23:15 28:14
236:16 239:5 258:6
258:8
**characterization (1)**
51:6
**charge (1)**
280:24
**charges (1)**
281:10
**Charles (2)**
11:20 13:9
**chart (4)**
80:18 140:12 251:23
277:4
**check (4)**
19:19 135:2 145:16
201:20
**chief (3)**
27:10 57:7 106:6
**choice (1)**
239:13
**Chris (4)**
16:4,5 84:23 194:22
**chunk (1)**
241:13
**CI (1)**
62:5
**CIA (1)**
167:12
**circulated (1)**
230:8
**circumstances (1)**
283:11
**cited (1)**
109:2
**Citi (1)**
141:23
**claim (11)**
94:7 95:16 96:6
103:18 178:3 179:3
216:25 278:22
283:15 287:18
288:2
**claims (96)**
38:5,13,22,25 40:6
42:12 51:20,22 52:2
52:5,7,11 53:4,8,25
54:11,22 55:3,7,12

55:18,20,21 56:5,7,7
56:11,15,22 58:11
60:19,21 63:2 64:5
64:7,11,13,14 74:12
75:6,24 76:11,17
77:6,11,13,21 78:20
80:20 91:19,20
102:17,18 109:23
109:24 133:12
153:21 177:11,13
178:13,18,21,25
180:21 181:9,24
182:3,9 183:9,10,10
183:16,21 184:4
188:16 189:2
199:14 202:14
213:6 214:21
277:10,15 278:4,13
278:14,14 280:20
281:24 283:21
284:3,5 285:2 286:5
286:14,23 291:8
**clarification (1)**
137:18
**clarify (9)**
28:24 30:16 73:17
78:15 108:18
228:10,11 271:2,11
**clear (10)**
14:18 22:21 51:3
120:25 142:18
163:9 197:21
222:19 274:3 280:2
**clearly (4)**
62:12 142:13 165:8
227:14
**Cleary (1)**
4:13
**clients (1)**
239:7
**close (54)**
69:17 81:6,10,15,22
82:2,10,22 84:2,18
86:17 87:6,14 88:2
89:11 98:16,22
99:25,25 104:18
106:20 112:17
125:17,21 130:22
137:10 155:22
162:8 173:18,24
176:7,11 177:5
180:7,9,14 182:23
192:14 193:2 195:4
200:5 203:2,12
204:2,4 208:10
209:18,20 210:2

214:24 215:9 225:5
230:3 292:17
**closed (7)**
11:9 31:10 48:4,7
49:21 50:2 68:13
**closely (3)**
84:24 167:4 213:10
**closer (1)**
162:15
**closest (2)**
97:16 272:15
**closing (35)**
70:7 83:8 85:10 86:2
87:11 90:6,6 99:7
100:19,23 106:11
113:2 116:9,10
117:9 128:19,25
153:7 159:7,17
178:10 192:23
193:7 200:12,17,20
208:16 209:13,25
211:19 212:15
213:25 214:5,8
216:8
**Code (1)**
281:3
**collateral (22)**
162:9,25 163:11,23
164:18 173:19
232:23 275:25
276:2,10 278:12,16
279:5,13,21 280:8
280:10,15,16 281:4
281:5,11
**colleague (1)**
194:23
**colleagues (12)**
31:2 59:18 90:2
127:18 157:14
188:5 238:2 245:3,5
246:17 251:21
259:14
**collect (10)**
69:10,16 113:15,16
174:2,5,12,23 176:5
194:2
**collected (8)**
68:17 91:22 92:21
112:25 113:2,23
158:11,12
**collecting (2)**
67:2 83:17
**collection (2)**
156:9 174:18
**collections (2)**
174:3 186:8

JX 117-80

**column (16)**
75:17 76:4,4 78:7
79:24 90:21 118:25
153:4,11 156:3
162:17 184:19
253:2,23 254:3,10
**columns (4)**
119:11 156:4 252:6
270:5
**comanaged (1)**
20:6
**combination (12)**
27:12 42:14,23 43:7
75:14 95:10,11
141:13 142:7 144:3
238:4 245:2
**combined (4)**
34:8 96:25 116:3
203:14
**come (19)**
18:25 35:19 75:14
87:10 90:3,5 135:22
158:15,16 170:24
197:19 198:24,25
230:2 265:22
269:19 273:6 278:2
285:17
**comes (1)**
161:25
**comfort (2)**
126:9 142:17
**comfortable (3)**
126:23 146:25 148:17
**coming (7)**
130:12 150:7 169:13
189:4 201:11 241:9
261:10
**commenced (1)**
13:7
**comment (1)**
281:21
**comments (2)**
170:9 195:5
**COMMISSION (1)**
296:25
**commissioned (2)**
159:11,15
**commitment (4)**
106:18,21 108:2
174:25
**committee (43)**
6:17 24:17 25:7 41:7
45:24,25 46:6,19
47:15 48:19 49:12
50:12 100:22
114:17,18 116:21

118:4 221:21
222:11 223:6,11,12
224:7,15,19,20,23
225:13 226:3,10,12
226:24 227:7,8,20
237:5 282:12
289:20 290:4,14,20
291:6,12
**committee's (2)**
288:22 289:9
**committees (2)**
20:9,25
**commonly (1)**
261:2
**communicating (4)**
103:6 172:5 223:5,9
**communications (4)**
172:8 221:19 222:3
228:6
**companies (5)**
20:10,21 27:23 33:4
175:16
**company (154)**
10:19 12:13 14:5,25
17:19,22 18:11,22
20:4,6 22:12 23:18
25:6 27:5,11,17
28:4,20 29:10,21,24
30:20 31:3 33:24
34:7 37:10,16,25
38:6,12 39:3 42:15
42:23 43:25 44:9
45:10 46:16 49:9
50:19,23 51:8,12
52:9 53:9 55:18,22
56:8,9,14,16 57:8,15
64:21 65:23,25 68:8
71:9 74:21 75:13
76:20 78:11 79:10
79:16 80:25 81:5,8
84:11 88:7 90:8,23
91:22 103:6 107:13
108:8 109:7,14
110:6,21 112:6,22
113:10,12,13 124:8
124:23 126:3
127:25 131:2 132:6
133:11 136:6 137:9
138:15 139:24
140:19,23 141:2
142:15 144:11
145:13 146:18
147:14 148:4 149:5
149:14 152:25
155:21 157:5 164:9
165:7 167:2,20

170:25 175:22
176:2 182:18,20
188:10,17,18,23
191:18 192:22
197:15 198:24
216:17 218:24
219:5,22 220:9,17
223:23 236:8,16,24
237:21 239:9,19
240:24 242:21
243:10,14,22
244:16 245:4,8
254:7,13 257:9
258:6 266:9 269:22
283:11 286:24
**company's (32)**
25:13 26:13 58:23
59:16 63:7,21 77:4
77:15 82:20 83:20
84:6,17 134:22
135:7,10 136:23
137:4 146:11 147:3
156:24 193:24
199:13,15 220:9,20
225:2 226:20,25
227:9,15,24 287:4
**compare (1)**
127:19
**compared (1)**
244:9
**comparing (1)**
33:9
**compiled (1)**
102:3
**compiling (2)**
42:22,24
**complete (1)**
220:14
**completed (1)**
195:22
**completely (3)**
19:8 169:21 283:6
**complex (1)**
32:23
**compliance (1)**
63:13
**complicated (1)**
50:8
**components (2)**
66:24 133:2
**composition (1)**
111:6
**compressed (3)**
256:20 266:24 268:7
**comprise (1)**
177:18

**comprised (1)**
223:22
**comprises (1)**
159:7
**comps (9)**
138:4,11 139:4,14,17
140:2,14 142:9
143:2
**conceding (1)**
187:21
**concern (11)**
28:12 31:11 34:9
96:15 112:24
136:12 254:18,23
255:15,18 294:12
**concerned (3)**
18:8 179:23 227:23
**concerns (8)**
32:24 126:20 191:2
191:13,21 192:5,12
192:19
**concert (1)**
25:17
**concluded (1)**
272:8
**conditionalities (1)**
215:6
**conditions (6)**
100:23 116:10 162:8
173:18 204:2 225:4
**conducted (1)**
240:2
**conduits (1)**
242:12
**conference (1)**
17:7
**confidence (5)**
121:15 150:23 157:16
192:21 197:18
**confident (8)**
100:9,15,22,24 101:4
101:6,7 196:15
**confidential (292)**
1:11 6:1,5 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1

58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1

236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
**confirm (4)**
69:21,23 116:16
213:10
**confirmation (1)**
216:9
**confused (1)**
271:11
**conjunction (2)**
66:13 135:11
**connection (25)**
24:9,15 48:21 49:8
54:11 80:2 98:13
110:23 162:24
191:13 206:4
223:20 227:18
231:11 233:18
234:7,23 237:3
239:14,16 263:17
281:23 289:20
291:24 292:4
**conservatism (1)**
100:8
**conservative (1)**
68:5
**consider (2)**
32:6 54:17
**consideration (2)**
162:3 230:14
**considered (6)**
31:15 32:3,13 37:16
37:17 44:21
**considering (2)**
106:9,15
**consistent (3)**
252:11 275:5 291:10
**consistently (1)**

15:5
**constant (1)**
138:17
**constrained (2)**
256:9 263:12
**constraints (1)**
241:11
**consult (3)**
73:10,15 283:17
**Consulting (2)**
5:12,13
**contact (1)**
21:20
**contain (1)**
183:9
**contained (6)**
26:11 46:17 49:6,23
101:23 103:3
**contains (1)**
282:18
**context (6)**
123:21 239:5 247:25
254:15 258:5
277:20
**contingency (1)**
168:24
**continually (1)**
239:8
**continue (7)**
60:15 68:8 72:16
116:15 127:19
136:11 206:24
**continued (5)**
33:6 60:14 65:24
150:12 220:16
**continuing (2)**
62:22 126:13
**contracts (1)**
79:4
**contractual (4)**
79:2 94:2 241:5 272:4
**contribute (1)**
95:20
**contributing (3)**
78:10 79:25 229:11
**contribution (3)**
141:23 228:12,15
**control (3)**
185:3 198:8,12
**conversation (2)**
22:14 212:20
**coordinated (1)**
189:14
**coordinating (1)**
235:19
**coordination (1)**

182:25
**copied (2)**
50:12 245:21
**copies (1)**
144:23
**copy (1)**
123:24
**core (12)**
247:23 248:2 250:22
251:2,6 267:14,15
267:21,22 269:3
271:17,18
**corner (1)**
251:2
**corporate (5)**
17:23,23,24 179:17
221:7
**Corporation (2)**
1:7 3:8
**correct (145)**
8:5,10 12:20 15:2
19:5 22:3 24:4,5
27:9 29:8,9 30:21
31:22 37:12 38:15
41:2,3 44:2,11,13
45:4,8 47:25 48:2
48:15,16 50:20,21
50:24 51:15 52:10
58:19 65:7,8 75:11
81:19 82:4 83:10
87:19,22 88:23
90:23,24 92:2 93:5
93:7,19,20,23 94:22
95:17,25 103:16
105:22,23 110:17
111:15 113:24
115:4,6,13,15
119:17,18 122:10
123:2 128:25
133:13,14 136:5
146:12 147:11
149:17 153:17
155:7,17 158:14,22
161:6 163:14,15
166:2 168:15 169:9
177:9,10,20 179:4,7
179:20,21 181:13
181:25 182:2,16
184:18 187:20
191:14 197:7
200:18,22,23 201:4
201:14 203:10,14
204:13,19 208:4
209:14 210:11,13
211:9,12 213:22
215:16 218:22,23

232:19 240:9 248:8
249:6,7,13 252:21
252:22,24 254:4
255:11 260:11
261:15,16 263:14
263:25 264:16,19
265:24 275:3 277:6
277:13,21 279:8,9
288:3 291:16
**corrected (2)**
77:7,9
**correctly (7)**
38:16 39:6 45:16
127:13 155:4
162:21 190:3
**corresponding (1)**
158:3
**cost (9)**
66:25 67:2,3 79:7
144:18 214:4
217:17,21 287:6
**costs (25)**
17:19,24 19:4,14,16
64:9 66:7,9,22 67:6
67:9,17 68:6 78:22
78:25 79:2 80:6
105:9 166:10 212:5
213:8,24 214:8
221:7 274:25
**counsel (22)**
9:4,5,10 11:19 13:13
31:4 66:13,20 69:22
69:24 70:15 144:25
173:8 183:24,24
213:20 222:12
281:19 282:8
283:18 287:24
288:4
**count (1)**
251:7
**counted (1)**
187:19
**counterparty (1)**
108:2
**counting (2)**
132:24 187:11
**country (1)**
81:25
**COUNTY (1)**
295:4
**couple (22)**
12:6,11 16:3,6 21:10
84:22 87:12 109:6
125:9 142:14
149:10 174:9 178:4
185:2 210:22

217:13,14 245:3
267:11 283:13
289:3 292:16
**couple-week (1)**
12:3
**course (12)**
141:20 147:19 149:22
149:25 151:12
221:23 223:6 224:7
225:16 243:9 262:4
292:3
**court (14)**
1:2 3:9 10:12 33:20
55:8 117:17 122:16
208:14 214:11
230:20 245:15
263:25 274:11
288:13
**cover (3)**
97:3 270:19 283:14
**covered (1)**
72:5
**create (2)**
136:10 167:11
**created (2)**
118:3 140:4
**creating (4)**
31:13,15,20 123:14
**creation (1)**
269:21
**credible (1)**
140:7
**credit (13)**
130:8 141:24 204:16
228:16 231:10,19
231:25 232:4,15,22
233:6 292:9,11
**creditor (2)**
274:20 275:12
**creditors (10)**
3:16 6:17 20:9,25
276:22 277:14
279:2 282:12
288:22 289:9
**Crescent (1)**
3:9
**critical (6)**
111:10 117:12 178:6
178:8,24 180:15
**CRO (2)**
198:23 240:23
**CROZIER (2)**
3:12 122:11
**CRR (2)**
1:19 295:24
**cure (5)**

**JX 117-82**

78:22,25 79:2,7
80:5
**current (9)**
63:13 70:24 149:4
159:14 241:4 246:6
252:20 255:7 260:4
**currently (9)**
52:12 54:13 92:18
104:14 105:21
152:25 192:13
234:9 271:23
**cushion (3)**
163:4,23 174:8
**Cushman (3)**
257:18,23 258:3
**customers (2)**
285:20 287:8
**cut (2)**
30:7 69:12
**cutting (3)**
19:4,14,16

**D**

**dabbled (1)**
142:16
**daily (3)**
186:11 214:7 219:7
**Dallas (1)**
3:10
**dark (3)**
241:2 256:11 266:22
**dash (1)**
145:20
**data (28)**
25:12,15,20,20,24
26:11,16 69:8 70:6
70:10 71:17 105:20
105:22,25 106:7,18
144:2,20 202:22
243:15 244:15
246:5 259:21 261:9
264:24 265:4,18
272:19
**date (33)**
8:14,15 15:24 34:15
34:20 54:23 55:7,9
56:17,22 69:17
85:10 96:16 97:2,17
98:16,22 152:6
172:12,25 175:3
177:5 192:14 210:2
215:9 216:8,9
245:14 256:15
274:10 288:12
294:8 296:3
**dated (9)**

152:16 245:12 274:8
288:11 289:14
291:15 294:16,19
294:23
**dates (2)**
33:22 47:11
**day (17)**
40:21,22,22 43:2 47:3
59:22 85:12 100:6
110:4,4 164:10
193:6 207:10
214:14 293:8
295:21 296:23
**days (14)**
52:8,16 57:18 85:25
87:12 123:19 130:7
152:13 168:17,18
169:23 214:24
216:8 263:13
**DCs (1)**
171:4
**deal (13)**
40:7 75:25 76:5
100:21 110:4 126:5
153:8 171:23
179:17 205:25
207:13,22 236:24
**dealing (1)**
269:23
**dealt (4)**
22:6,7 108:13 173:19
**debt (5)**
125:15,20 180:17
204:22 205:19
**debtor (10)**
1:8 27:15 57:18 93:18
94:6 184:5 189:22
198:5 216:14,16
**debtor-in-possessio...**
27:16 96:9
**debtors (57)**
3:6 8:9 10:18 27:18
30:25 40:22 48:18
48:21 68:24 69:18
70:7 86:23 88:20,22
92:17,19,24 95:9
96:22 98:23 99:5
124:15 127:22
147:24 164:23
166:22 174:14
180:11 181:16
183:15 189:10,11
191:4 192:21 198:8
198:21 204:20
205:15 206:7 207:4
210:10 212:23

213:7 215:12,15,24
215:25 217:2,4,6
229:22 230:3 232:8
234:9 255:8 271:22
284:5
**debtors' (10)**
32:23 56:25 82:3
91:25 196:11
217:17,21 226:2
233:21 279:7
**Debtors-in-Possessi...**
3:7
**debts (1)**
125:13
**December (16)**
30:8 134:12,22
145:12 146:11
226:21 235:22,23
235:24 236:10
237:15 238:12
255:9,10 288:11
294:23
**decided (2)**
237:4 287:9
**decision (6)**
41:8 45:23 137:10
235:8,14 236:9
**deck (4)**
44:24 45:19 50:22
139:24
**declarations (1)**
282:11
**decline (1)**
149:6
**declined (1)**
219:25
**decrease (1)**
200:21
**decreases (1)**
205:20
**deduct (2)**
75:18 249:9
**defective (1)**
109:3
**Defendants (1)**
4:14
**defer (1)**
84:6
**deficiency (4)**
102:22 283:14,20
286:14
**define (4)**
21:21 28:2 47:10,20
**defined (2)**
37:7 102:21
**degree (6)**

126:9 157:16 184:17
197:4,17,17
**delay (2)**
213:25 214:8
**delaying (1)**
214:5
**deliver (5)**
176:13,16,19,22
266:8
**delivered (2)**
109:4,4
**deliveries (1)**
168:22
**Deloitte (14)**
53:7,13 57:6,15 79:10
283:25 284:4,7,12
284:17,21 285:5,8
288:6
**delved (5)**
94:11,15 110:2
184:24 199:2
**department (17)**
12:13 27:13 29:3 36:3
36:8 52:14,20 53:12
58:23 59:17 63:5,22
63:22 84:24 90:2
191:15 238:7
**depending (3)**
36:17 149:7 203:6
**Deponent (2)**
296:4,21
**deposit (14)**
69:9,17 70:5 71:16
88:14,19,21,25 89:3
92:3,7 106:3 114:3
157:2
**deposition (12)**
1:12 6:18 9:13 10:11
54:15 72:8,11 197:9
257:17 295:11,13
296:3
**deposits (4)**
89:5,5 105:21 156:22
**describe (18)**
16:18 31:14 32:12
33:12 36:23 39:9
53:17 75:21 86:13
87:4 101:17 128:10
135:8 142:24
221:19 230:9,11
282:9
**described (8)**
43:17 142:21 143:13
156:7 165:16
241:17 280:9 283:9
**describing (1)**

37:5
**description (2)**
262:5 294:7
**designated (4)**
8:8,24 26:24 199:7
**designation (1)**
6:6
**designed (1)**
157:13
**desire (1)**
173:3
**detail (14)**
84:7,11,17 94:15
110:3 112:22 115:9
128:11 142:25
158:21 184:25
199:23 230:10 277:5
**detailed (2)**
66:23 81:11
**details (2)**
94:10 218:12
**determination (1)**
34:2
**determinations (1)**
243:8
**determine (21)**
52:9 58:21 79:11
127:24 139:10
146:15 147:15,25
166:9 193:25
213:24 215:9 217:6
240:18 241:8
251:21 258:16
267:20 281:12,25
286:13
**determined (12)**
66:11 67:15 79:7,9
96:4 113:6 146:7
247:9 260:12
279:10 287:14
288:7
**determining (23)**
32:3,13 33:13 37:17
43:18 53:4 56:14
66:17 74:16 75:4
79:13 138:10
180:18 233:20
234:12 241:16,22
241:23 242:4 244:6
244:7 263:11
281:22
**develop (1)**
173:11
**Diaz (1)**
5:13
**DieHard (2)**

**difference (5)**
87:5 111:24 153:22
176:17 254:5
**differences (1)**
221:11
**different (43)**
13:13 17:9 18:11,12
22:4 23:8 33:9
36:18 49:10,21
54:13 102:10 103:3
103:5 119:21
120:12 140:24
165:12,23 168:6
170:13 175:24,25
176:3 178:4 181:18
200:8 205:8 219:17
220:2 244:21,24
253:10,24 258:5
265:19 267:22
268:9 276:15,23
290:24 291:3,19
**differential (3)**
241:3 255:20 272:4
**differently (5)**
127:4 130:19 162:20
181:22 223:3
**dig (1)**
102:6
**diligence (2)**
106:25 201:22
**diligently (1)**
205:16
**DIP (42)**
5:5 29:3 83:22 95:13
95:15,21 97:23
98:10 99:17,24
100:2 104:23 117:8
149:8 154:17
164:12 167:13
170:10,15 174:5
178:9,12 186:20,25
187:8,16 199:22
201:7,24 203:4
220:10 239:10
275:24 276:2,10
278:19,19 279:21
279:23,23 281:5,7
**direct (3)**
21:20 57:3 187:22
**directed (2)**
77:12 259:3
**direction (2)**
26:7 237:22
**directionally (1)**
214:7
**directly (12)**

17:16,16 20:4 53:14
70:14 78:4 80:16
87:10 184:5 186:25
205:2 237:24
**director (2)**
16:4,5
**disagree (2)**
50:25 283:7
**disbursement (2)**
220:6 221:13
**disbursements (5)**
111:9 117:12 219:12
220:13 221:5
**discharge (1)**
192:23
**discharged (2)**
79:4 124:19
**discount (11)**
109:14 241:7 258:9
259:24 260:8 264:8
264:16 267:25
268:2,11 269:5
**discounted (3)**
263:2 285:25 287:5
**discuss (3)**
114:10 143:18 183:24
**discussed (12)**
42:2 66:19 110:7
173:13 207:25
212:22 213:3
214:21 218:19
223:18 225:4 292:6
**discussing (3)**
142:11 217:15 259:10
**discussion (28)**
12:3 17:5 35:20 40:3
41:4 114:17,21
117:10 170:16
173:2 182:6,11
183:23 184:8
185:15 206:21
211:21,24 212:6,17
225:21 226:15,16
228:2 256:18
281:18 288:10
294:22
**discussions (23)**
12:4 76:7 106:5 117:2
117:6,7 125:9
138:17 143:11
148:8,10 205:4
211:17 225:12,14
226:19,19,22 227:2
255:5 258:24 288:8
291:23
**dispute (3)**

57:24 92:16 108:3
**disputed (7)**
107:4 108:9,15,24
109:12,21 185:20
**disputes (1)**
107:13
**distressed (1)**
255:3
**distributed (1)**
60:12
**distribution (2)**
169:13 248:19
**DISTRICT (1)**
1:3
**divert (1)**
89:16
**divested (1)**
259:6
**divestiture (1)**
259:7
**divided (1)**
224:21
**divvied (2)**
275:19 278:6
**document (59)**
8:19,21 29:12 39:18
53:24 54:4 59:11
63:16 65:23 66:21
69:7 71:10 75:3
84:10 96:13 114:15
117:20 118:2
120:14,17 121:6
122:19,22 123:12
123:14 125:8,10
134:4 137:5,6
144:23 145:5,8
152:4,17,21 208:17
208:19 230:23,25
245:18,20 270:22
270:23 274:5,7,14
275:10 284:11,24
288:9,16,20 289:7
289:13 294:10,13
294:18,21
**documentation (2)**
207:5,5
**documenting (1)**
30:15
**documents (6)**
38:20 121:3 135:5
199:12,14 230:10
**doing (23)**
10:13 14:22 17:12
18:8 20:16 24:22
67:13 113:14
127:18 139:10

141:14 165:3
167:12 171:6
174:22 179:18
237:18 243:10,12
254:2 266:14
273:17 288:24
**dollar (18)**
64:23 67:22 92:7
120:12 154:6 159:4
160:25 161:8
162:22 176:17
205:21,21 206:6
229:6,16 233:6
285:16 288:7
**dollars (223)**
41:19 45:12 49:25
50:18 51:14 52:10
57:24 58:6,18 59:6
59:12 60:12,22 61:5
61:16,20 62:2 63:18
63:25 65:7,10,13,22
67:9,10,18 68:16
69:9 70:21 76:11,16
76:22 78:7,8 79:6
81:16,22 82:9,11,23
83:5,25 85:6,14,24
86:9,18 87:3,6,7,14
88:15 89:11,18,23
92:10,11,18,20,24
93:6 95:16 96:4,5
98:4,7 99:4,18,19
100:3,14 104:13,18
104:24 105:4,10,17
106:2,19 107:11,19
107:23 110:12,18
110:22 111:13,14
111:17,20,22 119:6
119:16,22 120:6
128:21,22,25
129:16 130:21
153:15,24 154:2,20
155:10,16 156:9,23
158:4,8,9,18 159:19
160:10,11,14,20,22
161:3,3,8 163:10
164:14 165:4,14
166:16 168:3 171:9
171:16,20 174:11
175:13 176:10
177:8,14,17 178:9
180:16 181:24
182:4,9 183:17,21
184:22 185:9,13
186:18,21 187:11
187:14 188:11
191:23 192:15

193:18 194:13,17
195:3 196:8,9,13,18
197:6,6,13 200:2,4,9
200:10,25 201:10
202:9,13,15 203:3
203:12 204:17
206:9 209:17 210:6
210:20 211:7,9
217:20 229:10,12
232:2,14 249:5,18
249:20 250:3,15
252:16,17,21,24
260:9 265:14
274:25 275:11,20
275:24,25 276:3,9
276:12 277:16
278:2,10 282:20
283:3 284:2,21
285:3,11 286:6,11
286:13,16 287:7,10
287:19 292:2,12
**dollars' (1)**
77:20
**door (1)**
77:11
**dotted (1)**
153:13
**double (4)**
187:10,18 205:18
282:25
**Dove (2)**
279:4 281:10
**downside (1)**
169:5
**downsides (4)**
208:7,13 209:11
212:22
**Draft (1)**
284:20
**drafts (1)**
49:17
**dramatically (1)**
244:21
**drawers (1)**
203:6
**drawing (1)**
205:16
**drawn (5)**
99:6 203:3,13 204:6
206:8
**drive (1)**
138:3
**driving (2)**
141:4 274:19
**DSL (1)**
22:12

**DUBLIN (1)**
3:22
**due (12)**
58:14 62:20 63:7
105:10 209:13,25
211:19 212:14
216:7,13 238:12
281:5
**duly (2)**
6:10 295:12
**duplicative (5)**
194:17,20,24 202:10
270:2

**E**

**e-mail (10)**
8:13 9:21 39:23 40:9
40:10 245:11,18,21
294:8,15
**earlier (23)**
71:25 102:11,24
104:13 107:10
116:7 117:10
118:12 121:2
152:17 156:11,22
180:22 183:8
185:15 187:19,20
200:25 202:20
213:18 225:4
258:12 275:4
**early (12)**
13:8 23:9,17 24:3
68:14 185:22
235:12,22,23,24
236:10 237:14
**earnest (1)**
13:7
**earth-shattering (1)**
167:23
**easier (2)**
56:3 122:2
**easily (1)**
266:6
**effect (1)**
144:8
**effectively (1)**
171:8
**efficiency (1)**
168:21
**effort (2)**
24:8 108:17
**efforts (2)**
142:7,12
**eight (3)**
149:18,19 150:5
**either (21)**

10:4 14:13 30:17
89:25 90:6 109:3,8
111:7 126:19 145:7
167:11 171:24
194:6 212:5 221:20
222:6 226:10
235:21 236:6
260:19 272:3
**element (1)**
144:10
**elements (1)**
205:8
**employed (1)**
273:17
**employee (5)**
64:4,7,8,11 216:20
**employees (1)**
62:21
**encompassed (1)**
117:10
**encumbered (4)**
240:4,15 278:12
280:25
**ended (5)**
47:11 207:21 215:2,5
215:7
**ends (3)**
144:22 251:8 275:16
**engaged (12)**
12:5,16,19 14:3,4
15:4 18:24 23:18
24:8 34:14,19
183:22
**engagement (4)**
15:23 16:14 19:24
21:18
**Enrique (1)**
16:9
**ensuing (2)**
12:10 236:23
**ensure (7)**
29:20 116:10 117:11
167:4 178:12 186:4
186:12
**ensuring (7)**
27:20 28:17 35:25
37:24 39:11 144:4
144:17
**entire (4)**
6:4 18:23 85:13
221:20
**entirety (1)**
282:14
**entities (6)**
57:18 79:21 94:25
95:6,9 175:15

**entitled (8)**
96:13 156:4 157:3
274:7 288:9 294:10
294:18,21
**entity (19)**
10:19,24 11:8,13 13:6
75:7,9 92:6 93:14
93:14,16,18,19 94:6
198:6,7,9,14,22
**episodic (1)**
15:13
**equation (2)**
38:10,11
**Ernst (1)**
211:25
**ERRATA (1)**
296:1
**error (2)**
150:10,13
**ESL (107)**
40:7,23 41:9 44:7
45:23 48:21 49:8
62:22 66:10 68:9,25
75:18,25 76:3,6,15
76:20 77:19 78:10
79:24,25 80:8 82:7
82:10 91:24 95:19
99:25 102:18
105:11 122:22
123:9 124:22 126:5
127:8 129:23 131:5
133:17 134:3,13,21
145:8,10 146:7,15
147:16 148:2
149:20 150:15
153:23 159:12
166:5 176:12,14
180:21 181:23
182:13 183:2,10,14
183:25 184:4,6
188:9,16 189:9
191:23 195:25
196:3 203:20
204:21 205:17
206:10,10,24 207:4
210:9 211:18,18
212:13 213:5,8
214:23 215:11,22
216:10 226:4,13,17
227:21 228:12
229:18 230:22
231:11,20 232:15
233:6 234:7,8 248:3
248:5 251:15
289:21 290:6,16
291:24,25 292:9

**ESL's (6)**
134:4,23 159:5
211:24 228:8 229:6
**especially (1)**
268:5
**ESQ (10)**
3:11,12,20,21,22 4:9
4:10,17,18 5:8
**essentially (14)**
66:9 76:21 102:20
109:7 133:3 165:13
178:19 179:22
204:10 220:8 241:6
254:12 256:6
275:15
**EST (1)**
248:25
**EST.CF (1)**
247:19
**establish (1)**
236:7
**estate (60)**
29:14 30:20 64:14
66:10,15 68:18
69:19 70:20 71:16
82:3 91:25 100:25
182:25 195:13
196:11 233:19,21
234:9,13,19 235:20
236:2,12 237:9,19
237:25 238:7,15,23
239:2,20 240:4,13
240:15,20,21,22
246:25 247:14,16
247:17 248:2
257:10 259:5,7
261:3 262:3 263:6
263:18,25 267:12
271:22 273:18
274:23 275:11,21
279:7 282:18,25
292:3
**estate's (2)**
31:17 192:24
**estate-based (1)**
266:15
**estates (4)**
27:20 28:5 35:25
39:12
**estimate (30)**
52:18 56:21 58:22
65:20 66:8,14 67:16
67:16,24 68:15
76:19,21 77:22
86:17 90:3 111:6
119:11 153:23

154:6,19 155:16
158:3,7 159:22,24
197:2 214:12
265:23 284:20
285:17
**estimated (24)**
59:2 66:12 81:15
196:24 200:13
243:17 246:3
248:25 249:2,4,10
251:22 252:7,9
259:24 260:18
261:10 262:21
263:3 265:25
266:11,25 267:20
273:5
**estimates (5)**
60:8 78:11 154:10,14
155:13
**et (17)**
1:7 3:8 11:23 26:9
31:11 111:10
117:13 137:13
141:4 142:3 174:14
186:9 194:3 207:13
219:12 241:10
254:19
**evaluate (1)**
238:25
**evaluated (1)**
244:23
**evaluating (1)**
244:6
**event (5)**
29:21 68:25 70:6
127:23 216:25
**events (1)**
10:5
**everybody (1)**
224:22
**exact (12)**
19:20 30:3 89:7 93:16
100:5,17 195:20
210:3 219:20
237:11 269:9
287:12
**exactly (7)**
39:8 83:3,4 100:11
214:25 222:18
256:17
**EXAM (1)**
294:3
**EXAMINATION (1)**
6:12
**examine (1)**
235:4

JX 117-85

**example (14)**
32:6 38:5 42:10,17
108:23 204:7
216:22,24 220:11
224:16 229:9 260:2
264:10 265:11
**examples (4)**
109:2,7 194:11
264:25
**Excel (2)**
53:23 245:19
**exception (1)**
281:3
**excess (9)**
165:17,25 166:3,16
166:20,21 167:6,7
168:8
**exchange (3)**
131:2 171:4 229:12
**excluded (1)**
195:15
**Excludes (1)**
111:17
**excluding (1)**
279:3
**exclusively (2)**
20:8 280:14
**excuse (7)**
99:9 103:19 128:19
128:20 170:12
252:16 265:24
**execute (2)**
150:18 173:6
**executives (1)**
18:20
**exercise (6)**
153:6 194:22 195:22
214:16 263:8
265:15
**exhibit (106)**
8:12,13,18 39:20,22
40:2,3,9 44:6,24,25
46:17 47:14 49:23
50:9 54:12 58:7,11
73:2 80:18 90:9
96:12,13,18,23 97:2
97:17,22 98:14,24
99:10,11 101:15
103:3,14,22 114:5
115:2,3,8 116:18
117:19,25 118:14
118:21 119:7
122:18 123:11
133:23 136:19,21
136:22 139:2
143:23 145:2,4,19

146:9 149:12 152:4
152:9 162:7 193:12
193:13 202:23,24
207:23 208:6,19
218:16,20 219:4
220:23 230:18
245:11,17 246:15
246:19,20 249:22
257:25 261:20
262:15 267:13
269:12,12 270:14
270:19 273:19
274:7,13,16,17
288:9,15,19 289:12
289:13 290:19
294:6,8,10,13,15,18
294:21
**exist (2)**
11:8 52:12
**existed (7)**
26:13,20 52:12
136:11,14 155:11
244:15
**existence (4)**
18:25 26:10 148:5
217:5
**existing (1)**
166:4
**exit (3)**
134:14,15 159:15
**expanded (1)**
141:19
**expect (12)**
94:7,14 108:12
112:11 131:25
160:13,14 182:10
183:24 188:20
213:16 229:20
**expectation (3)**
113:10 164:11 188:21
**expected (1)**
286:4
**expecting (5)**
158:15 161:9 189:9
216:16 229:23
**expense (1)**
18:23
**expenses (6)**
36:21 38:6 111:9
141:8 208:15
210:18
**experience (11)**
6:25 19:25 113:9
132:6 141:3 259:5
273:10,23 286:4,22
286:24

**experiments (1)**
141:15
**expert (4)**
20:15 21:3 240:21
282:17
**EXPIRES (1)**
296:25
**explain (20)**
11:16 83:2 110:20
111:23 112:4,19
133:20 155:21
157:9 158:9 159:3
164:4 165:22
173:15 184:21
206:16 223:4 243:5
253:16 277:7
**explained (4)**
150:4 158:20 253:15
264:21
**exploring (3)**
178:15 195:9 288:23
**expressing (1)**
173:3
**extent (19)**
10:23 11:7 28:22
31:25 54:12 85:6
73:8 76:15 142:16
167:5,16 183:12
186:2,7 221:14
223:7 240:14 278:9
279:25
**extrapolated (1)**
181:20
**eye (2)**
123:4 144:17

_____

**F**

**F (4)**
1:19 2:12 295:5,24
**Fabrics (1)**
21:13
**face (3)**
285:24 286:20,23
**facilitate (1)**
25:13
**facilitator (1)**
57:14
**facilities (3)**
203:13 205:17 233:15
**facility (13)**
117:8 134:16 159:15
203:4,5 231:24
232:5,10,13,16,24
264:13 278:21
**fact (6)**
11:8 133:6 142:18

191:2 211:22
212:18
**factor (1)**
32:10
**factored (1)**
273:4
**factors (6)**
31:15 32:2,13,17,21
36:24
**facts (1)**
10:5
**fair (9)**
70:17 82:14 197:4
205:15,22,23 211:4
224:13 271:15
**fairly (3)**
15:12 139:25 235:10
**fairness (1)**
205:25
**faith (1)**
72:16
**fall (1)**
43:23
**familiar (4)**
6:25 123:5 202:25
245:22
**far (9)**
25:24 64:16 126:15
126:17 152:19
191:5 219:20
227:22 286:21
**fast (1)**
50:6
**faster (5)**
150:19,20 151:14
169:2 170:4
**favor (2)**
107:16 253:22
**favorable (10)**
119:12 154:24 156:5
157:7,10,14 184:12
187:12,15 196:8
**February (25)**
98:11,16,25 99:2
128:13,19 129:13
129:21 130:23
140:14 141:17
177:6,7 192:13
199:25 200:5,11,12
200:17,21 209:18
210:2 213:25 214:5
214:16
**fee (4)**
91:2 157:25 247:6,11
**feel (4)**
109:9 150:17 157:2

196:14
**feeling (1)**
35:8
**fees (4)**
91:6 155:14,17 249:8
**Feld (2)**
2:10 3:15
**fell (1)**
257:7
**felt (5)**
14:6 39:14 109:14
116:2 146:25
**fifth (1)**
251:25
**figure (3)**
14:21 150:6 174:17
**figured (1)**
151:4
**figuring (1)**
165:6
**file (3)**
23:25 59:11 270:21
**filed (8)**
33:4,20 91:20 230:20
236:16 258:6
282:12,14
**Filene's (1)**
21:11
**filing (20)**
15:6 23:2,4,7,12,15
23:20 24:10,16
25:15 26:14,20 27:3
27:24 52:8 56:17
58:16 59:3 67:4
145:24
**fill (1)**
278:8
**FILO (2)**
232:13 278:20
**final (3)**
171:24 210:3 268:11
**finalize (1)**
41:9
**finalized (1)**
210:7
**finalizing (1)**
60:7
**finally (2)**
142:4 215:5
**finance (16)**
12:13 17:10 27:13
29:2 36:3,8 43:24
52:14,19 53:12
58:23 59:16 63:21
84:24 90:2 191:15
**financial (8)**

13:14 21:4 24:18
27:15 57:7 106:7
181:3 288:23
**financing (8)**
27:17 29:4 95:21 96:9
134:14 149:8 178:9
239:10
**find (5)**
14:10 54:3,5 188:3
202:7
**finding (1)**
14:8
**fine (2)**
73:11 207:22
**finish (1)**
157:22
**firm (10)**
12:5 18:2,4 20:5,5,23
21:2,8 242:9 255:2
**firmed (1)**
210:7
**first (67)**
11:16 14:3,4 24:2
29:17,25 30:7 40:9
52:2 69:8,17 70:6,9
71:16 81:5,21 90:22
98:10 104:6,10
105:20,22,25 106:7
106:18 127:11
130:9 134:2 137:21
139:23 145:19
147:19 148:5,22
162:7 165:25 167:7
167:9 168:15 178:5
184:5 202:22 203:4
205:18 208:25
217:16 219:18
231:23 242:24
246:9,13,24 247:5
250:18 252:10
253:23 270:22
271:13 278:13
279:11,12,18,22
280:10 281:3 283:6
283:13
**fiscal (2)**
148:15 149:22
**fit (1)**
181:16
**five (3)**
12:12 61:24 197:24
**five-minute (1)**
35:15
**FLOM (1)**
5:4
**flow (24)**

29:7,8 31:8 43:20
96:14,22 97:7,10,15
218:4,14,15,20,25
219:2,3,14 225:2
247:21 275:14
276:14,16 283:14
294:11
**flowed (1)**
279:22
**flows (1)**
220:23 275:16 276:5
**fluid (1)**
47:3
**focus (12)**
19:3,14,15 22:18
27:23 28:2 39:11
148:10 191:20
208:25 231:6
280:14
**focused (14)**
17:19,22 18:22 19:11
27:19 28:17 29:20
37:11,24 140:6
142:22 185:4
236:19 258:7
**fog (1)**
135:4
**folks (1)**
53:6
**follow (4)**
41:10 72:10 228:19
280:8
**follow-up (1)**
212:6
**following (2)**
84:16 216:8
**follows (2)**
6:11 156:7
**footnote (15)**
81:7 202:4,6 283:19
283:20,22 284:15
284:16,22 285:10
286:15 287:19,22
287:22 288:5
**footprint (2)**
137:8,14
**forced (1)**
241:8
**forecast (18)**
96:22 149:8 164:12
209:16 215:14
218:20 219:2,2,3,6,7
219:10,15 220:10
220:14 221:2,5,15
**forecasting (4)**
14:14 219:22 220:15

220:21
**forecasts (4)**
29:7,8 215:11 218:15
**foremost (1)**
167:8
**form (70)**
23:21 27:25 37:3,20
38:17 44:12 45:13
46:21,25 47:18
51:16 55:14 58:2
69:20 70:8,13 79:8
88:11 98:18 102:8
103:11 115:22
116:25 119:8
120:13 127:2 128:7
130:15 132:2 137:7
148:7 150:3 169:10
187:17 189:25
190:15 191:6 192:2
192:18 193:5 196:2
206:14 207:7
210:12 213:14
215:17 218:11
220:7 233:4,25
234:14 237:10
238:16 240:10
255:16 258:2
260:22 261:5,24
262:12,17 267:23
269:2,15 273:20
283:5 291:2,14
292:5,13
**forma (6)**
41:18 45:9,14 49:7,24
50:17
**formal (1)**
225:22
**format (3)**
103:4,5,7
**formed (1)**
131:22
**formulate (1)**
131:18
**forth (5)**
47:4 72:22 221:7
284:25 295:12
**forward (1)**
79:5
**four (5)**
12:11 197:24 231:9
250:6 251:5
**fourth (1)**
78:23
**FP&A (3)**
17:11 36:11 135:15
**frame (14)**

13:5 108:14 141:18
142:5 235:24
237:12 241:11
253:5 254:19
255:10,14 256:19
263:13 266:24
**frames (2)**
228:22 239:12
**Franchise (1)**
64:22
**frankly (3)**
28:15 94:15 141:2
**frequent (1)**
186:12
**frequently (1)**
21:19
**front (2)**
41:7 121:20
**fruit (1)**
142:13
**FTI (2)**
5:12,13
**full (3)**
256:10 272:13 278:25
**fullest (1)**
282:13
**fully (1)**
173:10
**fund (2)**
141:24 204:12
**fundamentally (1)**
241:3
**funding (2)**
33:3 180:19
**funds (2)**
106:10,10
**fungible (1)**
171:15
**further (4)**
84:16 216:10 292:22
295:15
**future (5)**
55:4,13 66:25 67:17
111:23

---

**G**

**Gallagher (17)**
238:3 242:9 245:6,7
247:13 258:23
260:14,20 261:18
262:9 263:5,9
264:20 272:21
273:9,12,17
**Gallagher's (1)**
266:13
**game (1)**

142:19
**gap (21)**
118:8,14,25 119:13
119:15,21 120:4,7
153:3,12 154:2
155:4,9,10 158:8
201:4,13,16,24
202:12 265:12
**Garrison (1)**
4:4
**Geer (1)**
5:15
**Genender (129)**
3:11 6:2 7:11,19 15:7
16:21 21:25 23:21
27:25 37:3,20 38:17
44:12 45:13,24 46:3
46:11,21,25 47:9,18
51:16 54:8,14 55:14
55:23 58:2 69:20
70:8,13 71:24 72:12
72:23 73:6,19 79:8
86:5 88:11 98:18
102:8 115:22
116:25 119:8
120:13,19,24
121:10,14,22,25
122:6,10,13,15,23
123:4 127:2 128:7
129:6 130:15
139:16 146:19
148:7 150:3 151:7
151:22 152:10
169:10 187:17
189:25 190:3,10,15
191:6 192:2,18
193:5 196:2 199:10
199:19 206:5,14
207:7 210:12
213:14 215:17
218:11 221:24
222:8,16,22 226:6
228:3,23 233:25
234:14 237:10
238:16 240:6,10
242:6 255:16 258:2
260:22 261:5,24
262:12,17 267:4,23
269:2,15 270:11
271:4,15 273:20,22
274:4 281:20 282:4
283:5 284:8,14
290:7 291:2,13
292:5,13,23
**general (14)**
43:2 52:6 66:19 108:6

108:8 112:5 143:24
144:2 212:3 220:24
221:4 224:25
267:12 278:5
**generally (21)**
17:6 21:4 36:23 37:10
37:15 38:15,16,23
43:10,14 48:25
80:13 89:5,6 99:21
142:21 143:18
145:6 185:6 235:7
239:4
**generate (2)**
116:4 241:12
**generated (1)**
143:2
**gentleman (1)**
172:8
**GEORGE (1)**
5:8
**gesture (1)**
222:17
**getting (12)**
23:25 44:9 67:13,25
68:3 71:20 144:18
205:17 209:2
224:12 235:19
236:20
**give (13)**
16:11 32:16 42:25
108:23 117:15
121:22 160:23
172:16 188:22
194:11 197:16
212:12 216:22
**given (12)**
15:25 94:12 100:6,7
108:19,19 191:19
210:5 213:16
259:20 265:13
295:14
**GL/IP (1)**
279:4
**glanced (1)**
59:24
**global (1)**
33:19
**go (68)**
6:23 7:14 9:24 19:19
31:22,23 32:4 35:22
39:17 40:8 43:9,11
44:4,18 54:3 58:10
60:18 65:19 72:25
73:12 74:9 81:12
90:19 93:2 95:12
98:2 101:11,14

103:12 120:22
121:20 134:25
135:6 150:18,23
151:24 153:21
154:16 155:13,19
157:22 158:23
162:6 163:25
165:18 166:23
167:10 180:2 184:9
191:3 193:10 209:4
211:2,2,5 212:3,5
220:9 231:4 237:5
252:19 262:4
267:11 280:6,10,11
287:17 289:11
**go-forward (7)**
123:9 135:23 136:8
137:8,14 226:4,13
**GOB (5)**
69:8 104:11 166:6
167:21 168:5
**GOBs (1)**
173:12
**goes (5)**
169:8 209:18,20
219:20 284:22
**going (61)**
6:3,23 8:11 14:20
15:15 31:11 32:24
34:3,9 36:13 38:6
39:8,19 45:7 47:3
62:21 68:14 72:2
79:5 85:4 90:5,20
96:11,15 101:8
108:18 133:22
136:12 138:14
150:11 151:11
152:8 154:15
159:24 161:13
176:25 179:24
180:22 183:12
185:14 193:25
196:15 201:12
215:23 220:5,25
221:24 226:21
236:21 244:16
252:6 254:17,23
255:14,18 268:23
270:8 272:10 288:5
290:9 294:11
**going-out-of-busine...**
104:15
**gold (2)**
41:17 45:8
**good (14)**
6:3,14,20 15:2 16:4,5

71:21 72:16 84:23
140:8 171:10
194:22 217:9 221:8
**goods (10)**
52:8,15 58:15 109:3,4
109:8 130:25 131:5
168:21 236:20
**Gotshal (3)**
3:5 24:20 207:8
**Gotshal's (1)**
238:7
**Gottlieb (1)**
4:13
**govern (1)**
70:12
**granted (1)**
281:6
**gray (2)**
98:3,8
**Great (1)**
7:22
**greater (1)**
115:18
**Green (1)**
252:6
**Greensboro (1)**
264:13
**Greg (4)**
135:13 140:17,18
150:16
**Griffith (3)**
16:3 84:23 188:5
**grind (1)**
16:12
**gross (4)**
247:2 249:4 252:10
284:20
**ground (1)**
231:24
**group (2)**
40:11 194:5
**grow (2)**
208:9 211:8
**growth (11)**
145:22 146:6,17
147:9,11,16 148:3
149:4,16,22 219:25
**guess (6)**
83:15 143:10 190:9
190:11 233:2 291:4
**guessed (1)**
190:4
**guessing (1)**
62:15
**guidance (7)**
15:16 31:4 94:12

213:15,17 254:11
282:8
**guided (1)**
288:4
**Gump (3)**
2:10 3:15 6:16
**guy (2)**
126:4 179:24
**guys (6)**
17:12 121:23 122:3
142:11 197:14
282:14

_____

**H**

**half (9)**
91:19 107:15 108:12
148:22,23 190:24
191:10 257:11
265:3
**half-ish (1)**
214:13
**Hamilton (1)**
4:13
**Hancock (1)**
21:13
**hand (10)**
8:11 39:19 96:11
133:22 136:18
152:8 170:5 185:3
222:17 295:21
**handed (6)**
18:19 117:18 122:17
245:16 274:12
288:14
**handful (1)**
68:18
**handing (1)**
230:16
**handled (2)**
25:5 205:12
**happen (7)**
111:23 157:17 168:23
177:3 188:20 193:2
262:23
**happened (5)**
76:18 111:21 159:13
207:3 262:15
**happening (1)**
149:24
**happens (10)**
38:14 176:6,16,21
190:7,13 195:2
203:19 204:6
209:12
**happy (9)**
7:6 47:6 72:15 73:17

102:14 122:2 181:4
267:6,8
**hard (4)**
141:21 150:20 176:18
177:2
**hard-fought (1)**
207:20
**harder (1)**
268:4
**Hauer (2)**
2:10 3:15
**hazy (1)**
134:12
**head (17)**
18:7 36:10 59:9 61:22
62:9 69:2 95:4
119:24 135:15
140:18 144:20
145:16 175:19
194:15 215:5
217:25 237:24
**headache (1)**
167:10
**headed (2)**
155:25 254:7
**heading (3)**
41:14 51:21 157:8
**headquarters (1)**
179:17
**headroom (1)**
163:22
**heads (1)**
172:9
**healthcare (1)**
216:25
**heard (3)**
151:16 279:16,23
**heart (1)**
147:3
**heavily (2)**
19:11 57:9
**held (4)**
2:9 81:24 86:14 88:6
**help (13)**
12:7 14:7,21 17:12,20
18:3 132:2 133:17
201:13 218:17
235:18 290:5,15
**helpful (1)**
39:16
**helping (1)**
211:25
**hereinbefore (1)**
295:11
**hereunto (1)**
295:21

**JX 117-88**

**high (9)**
18:14 144:5 246:6
251:24 252:20
255:7 260:4 262:25
289:2
**high-level (1)**
235:3
**higher (12)**
33:10 112:11 157:16
159:21 162:19
164:14 165:5
167:11 170:10,14
244:14 282:19
**highest (2)**
184:17 255:8
**highly (292)**
1:11 6:1,4 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1

149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
**hired (1)**
18:2
**historical (3)**
219:21 220:20 286:3
**history (3)**
108:10 139:25 140:13
**hit (7)**

100:22 148:18 174:4
186:5,9,12 187:3
**hold (3)**
107:14 185:20 271:23
**Holdings (4)**
1:6 3:7 4:6 93:17
**holdover (1)**
220:15
**holds (1)**
198:15
**hole (2)**
116:5,13
**holistic (1)**
169:16
**Hollar (1)**
22:8
**Home (5)**
35:8 87:18 229:9,13
288:25
**Hometown (4)**
174:13,15,19,25
**honest (4)**
24:22 185:5 247:21
257:5
**honestly (1)**
270:2
**hook (1)**
189:23
**hopes (2)**
131:15,16
**Houlihan (3)**
5:14,15,16
**HOWARD (1)**
5:8
**HR (2)**
63:5,22
**huge (1)**
19:14
**hundred (2)**
128:20 271:24
**hurdle (1)**
169:3
**hurdles (1)**
186:13
**hurricane (3)**
91:18 200:24 202:9
**hurry (1)**
169:6
**hurt (2)**
144:14,18

_____
**I**
_____
**i.e (1)**
258:5
**idea (6)**
43:2 162:12 173:10

178:23 185:7,11
**ideas (1)**
147:6
**identical (1)**
270:21
**identification (6)**
8:15 96:16 152:6
245:13 274:9
288:12
**identified (43)**
78:6 84:18 85:14 90:9
103:21 116:6 118:8
118:11 119:12
152:14 153:15
154:24 155:20
156:5,6 157:7,10,11
157:14,18,19 164:5
167:25 177:13
181:8 184:12
186:18 187:12,13
187:15 194:18
195:7,17 196:7,13
197:22,25 199:24
210:15 218:4,16
257:12 284:12
**identifies (1)**
193:18
**identify (12)**
18:12 113:16 131:5
167:18 174:23
175:7 176:5 195:23
208:7,13 210,10,19
**identifying (2)**
45:2,9
**immediately (1)**
236:22
**Imminently (2)**
161:15,16
**impact (5)**
141:15 143:20 163:6
186:25 283:3
**implement (1)**
18:20
**implemented (3)**
141:6 143:11,17
**important (2)**
28:4 124:14
**imposition (1)**
280:24
**impression (5)**
19:9 24:25 25:3,4
148:16
**improved (2)**
14:14,15
**improvement (2)**
151:12 155:6

**improvements (1)**
145:25
**improving (2)**
14:7 138:3
**in-transit (1)**
156:12
**include (6)**
32:17 81:9 202:8
220:12 287:10,25
**included (26)**
17:25 22:8 29:6 42:12
58:7 60:13 61:19
96:5 116:18 138:11
139:5 162:23
164:12 187:15
199:17 202:16
243:16 246:20
250:9 251:23
257:24 267:13
275:22 276:8
278:17 283:2
**includes (1)**
130:6
**including (3)**
40:12 113:14 246:6
**inclusion (1)**
105:11
**incorrect (1)**
266:19
**increase (14)**
77:23 128:17 129:15
129:19,23 130:11
130:22 159:22
161:8 163:19
167:13 168:17
169:24 250:11
**increased (1)**
143:2
**increases (1)**
163:4
**increasing (3)**
144:7,19 169:23
**increment (1)**
160:12
**incremental (11)**
45:2,5 104:5,6,10
110:8,10,15 115:10
116:2 194:25
**incurred (2)**
65:19 278:15
**independent (3)**
242:8 259:2 281:25
**INDEX (2)**
294:2,6
**India (2)**
89:19,22

**Indian (1)**
89:14
**indicated (14)**
11:21 16:13 35:23
37:10 43:14 106:24
127:5 152:10
172:11,23 265:5
273:11 281:14
291:25
**indicates (5)**
44:6 104:18 161:10
184:19 231:25
**indicating (2)**
212:7 287:16
**indication (8)**
212:12 238:22 244:20
249:5 264:6,9
265:13 274:23
**indications (9)**
235:19 238:11,14
239:18,22 244:14
265:6,8,21
**indicative (10)**
246:6 252:20 255:7,8
260:3,4 262:16,19
262:25 264:14
**individual (28)**
7:25 12:23 20:7 21:19
34:7 43:4 52:25
60:20 61:3 74:11,17
74:20 79:18 172:4
175:15 177:25
179:6,19 190:23
226:11 227:7,20
237:8,20 239:2
240:3,20 264:23
**individually (3)**
8:3 26:19 235:5
**individuals (11)**
15:21 16:3,7 18:6
22:6 36:3,6 40:11
84:22 135:13
242:11
**industry (1)**
261:4
**inflows (3)**
14:25 38:12,25
**inform (2)**
220:8 266:21
**information (66)**
7:13 8:2 37:15 41:23
42:14,20,21,22
44:17 45:19 46:14
46:18 48:19 49:2,3
49:6,22 51:18 52:13
52:21 54:9 57:14

60:3 62:11 76:23
77:2,3 84:21 85:2
101:22 103:2,21,22
104:4 106:13,17
116:17,19 117:3,14
118:5,13 121:19
126:20 127:6,7
128:9,24 131:4,11
131:14 133:16
137:11 138:25
157:8 220:22
221:22 224:14
237:8 244:23,25
284:6 285:6 287:24
287:25 291:5
**informed (1)**
190:10
**informs (1)**
219:12
**infrastructure (1)**
180:2
**initial (1)**
289:3
**initially (3)**
12:6 141:9 235:17
**initiative (1)**
171:2
**initiatives (13)**
120:2 137:13 138:3
142:23 143:16,17
143:21 144:16
169:18 182:23
191:17 197:3 209:2
**Innovel (1)**
87:18
**input (28)**
31:4 36:18 40:5 42:2
42:5,18 71:8 75:12
76:9 102:9 103:25
123:7,10,13,19
207:14 218:23
219:13 221:15
224:3,6,10 250:8
258:15,22 261:14
272:6 275:5
**inputs (7)**
32:4,14 36:24 38:4
43:19 199:17 220:8
**ins (1)**
171:17
**insist (1)**
206:25
**insolvency (10)**
26:25 27:5,8 29:13
116:6,13 201:3
223:17 224:17

277:20
**insolvent (1)**
28:11
**instance (6)**
60:9 210:16,24
219:23 280:2,2
**instances (2)**
244:13 265:7
**institution (1)**
179:25
**instruct (3)**
7:20 221:25 281:20
**instruction (3)**
222:20 226:7 228:4
**insurance (7)**
91:15,17,20 158:5,6
201:12 210:23
**intend (2)**
94:9 168:3
**interacted (2)**
36:19 238:5
**interacting (1)**
259:9
**interchangeably (1)**
30:13
**interest (13)**
183:11 235:20 238:12
238:14,22 239:18
239:22 244:21
264:6,9 265:5,6,21
**interested (1)**
295:18
**interfaced (1)**
36:7
**interim (1)**
18:7
**intermediaries (1)**
242:12
**intermediary (1)**
57:13
**intermittent (1)**
16:16
**interrelated (2)**
186:7,16
**interrupt (1)**
72:7
**interview (1)**
169:19
**interviewing (1)**
18:11
**introduced (1)**
11:20
**introduction (1)**
6:24
**inventory (57)**
57:17 68:11,15 71:14

104:14 130:12
159:8 164:4,6,13,14
164:16,22,24 165:4
165:17,21 166:2,4,9
166:11,18,21 167:2
167:6,7,17,22,24
168:8,15,25 169:3,5
169:7,12,25 170:10
170:12,14,18,19
171:3,3,10,10,13,15
171:16 172:13,16
172:24 174:14
185:22 186:4,8
280:3
**investigating (1)**
195:21
**investment (1)**
26:5
**involved (36)**
10:16 11:16 15:15,20
15:22 16:20 17:16
19:7,18 20:12 21:7
22:25 24:3,13,23
25:10,14 53:15
56:13 57:9,9 78:4
79:13,17 94:25
123:13,15 204:24
222:10 223:8 225:9
233:20 234:11,25
238:3 255:4
**involvement (15)**
15:12 16:14,25 43:17
56:24 57:4 66:17
135:9 142:15 147:2
225:6 238:6,6
241:22 292:8
**IP (1)**
231:23
**IP/GL (1)**
281:10
**isolation (1)**
205:7
**Israel (6)**
88:5 156:19 196:21
198:5,15 199:20
**Israeli (2)**
88:6 198:22
**issue (17)**
70:3,4,12 74:2 128:11
148:21 199:11
201:7 206:2,15,16
206:19,22 213:13
213:16 224:10,24
**issues (27)**
17:14 25:5 43:20,20
111:4 118:10

138:22 142:2 173:4
173:7,22 190:25
191:3 193:3 199:8
207:11,18 212:21
223:15,25,25 224:2
224:5,17,17 225:2,6
**item (9)**
74:11 113:3 163:16
184:24 197:22
208:24 210:17
218:5 285:9
**items (55)**
36:11,21 40:7 42:3
64:10 68:19,20
69:14 74:18 77:4
83:12,13,14 105:3
110:7,11 112:5,9
115:16 119:24
120:5,6 132:25
144:6 153:13,14
158:18,20 163:10
167:17 174:3 178:5
185:20 186:24
187:4,9 193:23
194:5,18 196:16
202:13 209:4,6,7
210:21,23,25 211:5
212:11 219:11
220:5,6 278:17
280:6,12
**iterated (1)**
138:16
**iterations (2)**
49:16 230:7
**iterative (1)**
42:4
**iv (1)**
231:18

---

**J**

**Jan/Feb (1)**
141:18
**Jane (4)**
237:25 238:4 245:9
259:10
**January (52)**
1:14 2:5 8:14 22:20
40:17,21 44:5 45:21
46:19 47:10,24 48:5
48:7,14,15 50:4,5,13
68:14 97:3,15,16
99:19,23 100:16
118:16,20 119:16
119:19 120:11
140:25 152:16
153:5 206:3 214:11

214:14 242:25
245:12 255:9,10
274:8 276:18
289:13,14 291:15
291:17,20,21 294:9
294:16,19 295:22
**Jason (2)**
22:8,11
**JENNIFER (1)**
3:12
**Jersey (3)**
2:14 295:3,8
**JLL (57)**
234:22,24 235:9,13
235:14,17 236:11
237:7,17,22 238:5
239:16,18,21 240:2
240:18 241:21,23
241:25 242:3,6,7,8
242:13,15,18,19
243:4,19,24 244:4,8
244:19 246:7,7
252:23,25 253:23
254:4,10,13,22
255:12,13,25 257:3
257:4 258:9,13,13
258:14 260:5
262:20,22,24
263:11 265:19
**JOB (1)**
1:20
**jobs (1)**
62:21
**JOHN (1)**
3:21
**joined (1)**
140:19
**joint (1)**
26:7
**Joseph (4)**
3:20 6:15 121:22
284:9
**judgment (7)**
131:19,22 132:3
197:17,23 261:9
266:13
**July/August (1)**
142:5
**junior (8)**
203:4 275:24 276:2
276:10 278:19
279:21,23 281:4

———————
**K**
**Kamlani (6)**
12:4 13:21 15:17 22:8

211:22 212:7
**Kamlani's (3)**
9:16 123:2 206:19
**KANE (1)**
3:21
**KAREN (1)**
4:10
**KCD (9)**
44:10 93:3,9,17 172:9
212:24 213:5
217:16 218:8
**keep (5)**
65:24,24 68:5 195:18
201:17
**Ken (3)**
20:7,23 21:2
**Kenmore (4)**
35:6,12 93:11 170:22
**kept (2)**
220:4,4
**key (5)**
31:12 83:11 144:10
151:23 274:19
**Khan (1)**
5:12
**kind (44)**
12:12 17:3 20:11,13
31:5 32:23 33:8
36:20 38:23 43:8
83:20 137:13
138:20 141:9 142:5
148:21 151:3 162:2
164:11 167:14
172:7 186:6 193:22
194:2 208:11,15,23
212:10 241:9
244:12 247:14
254:25 256:19
260:18 261:8
265:17,19,22 268:5
272:4,21 273:4
287:5 288:24
**kinds (1)**
236:19
**KING (1)**
4:10
**Kmart (1)**
140:14
**knew (1)**
26:21
**know (212)**
7:3,5,9 8:2 11:5,14
13:9,15,21 14:13
24:12 26:8 29:22
33:4 35:6 36:5 43:3
47:7 52:22 54:20,24

55:2,6 56:21 57:16
58:3,5,20 59:5,10,15
60:2,10,20,25 61:3,9
62:5,24 64:20,23
65:2,2,4 68:12
69:23 74:19 76:25
78:16 79:12,16 82:5
85:16 86:3 87:24
88:8,24 89:4,12,17
90:15 92:12,13,15
92:22 94:10,25 95:5
95:8 100:20 105:7
105:24 107:18
108:14 109:21
112:3 113:5 114:5
114:12 115:16
117:21 119:20
120:10 124:21
126:2 131:16 133:8
134:20 136:17
138:20 142:12,21
145:17 147:13
148:9 149:7 150:14
150:19 152:19
154:5,8 156:10
157:17 159:22,23
160:20 161:13
170:20 171:12
175:8,11,14,15
176:6,21 177:12,15
179:14 180:10
182:5,17,19 183:19
184:23 185:19
186:4 187:25 188:2
188:8 189:3,5 190:6
190:17,19,22 191:5
194:9,16 195:14,20
195:21,24 196:3
197:11,19 198:25
199:6,22 202:19
203:15,22 206:13
206:15 207:16,17
213:9 214:4,10
217:8,24 218:3,7
220:24 226:21
239:15,17 240:14
240:16 242:12,23
246:13 247:9,20,24
249:19,23,25
255:17,17 256:12
257:8,23 258:9,21
258:24 260:20,24
260:25 261:6,7,20
262:13 263:4,8
264:18 266:4
267:19 269:6,8,13

269:25 270:3,4
271:6,21 273:11
276:6 286:7,22
288:16,19 289:16
**knowing (1)**
273:23
**knowledge (3)**
9:3 36:14 84:5
**known (1)**
13:11
**Korycki (1)**
57:12
**Kunal (2)**
22:8,12

———————
**L**
**laboring (1)**
57:6
**Ladley (6)**
135:13 140:18 142:22
151:5,15,20
**laid (2)**
62:11 227:13
**Lampert (8)**
11:20,25 13:15 15:17
17:3,6,18 22:17
**Lampert's (1)**
18:5
**land (1)**
35:2
**landlord (2)**
253:22 255:21
**landlord's (2)**
253:8,11
**large (6)**
40:11 62:4 93:25
241:9,13 244:10
**largely (1)**
227:23
**larger (5)**
104:3 155:5,10 175:7
237:23
**largest (2)**
61:19 107:22
**late (5)**
9:23 30:8 47:12
235:11,23
**latest (3)**
100:2 136:22 137:6
**Lauren (1)**
140:21
**layer (1)**
135:16
**layered (1)**
142:5
**Lazard (46)**

25:18,19 26:3,4 31:5
33:23 34:9,14 40:4
41:25 42:7,9,13,21
43:14,25 48:25 49:2
66:13,20 74:21,23
74:24 75:16 76:6,8
77:25 78:13 80:10
92:14 99:12 101:25
102:13 103:9,25
105:5,18 112:2
113:8 114:10
205:12 223:22
230:5 233:12 238:6
281:18
**lead (3)**
20:24 26:7 168:19
**leading (1)**
34:11
**learn (1)**
217:3
**learned (2)**
20:15,17
**lease (6)**
68:18 231:24 241:5
253:18 256:15
272:7
**leased (14)**
247:23 248:9,10
250:22,25 251:6,13
265:9 267:14,22
268:3,8 269:7
271:17
**leases (4)**
68:3 71:15 256:7
272:23
**led (2)**
49:24 141:2
**ledger (1)**
77:5
**Leena (4)**
135:13 140:18,23
150:16
**left (9)**
51:19 67:12,25 68:3
102:19 116:11
162:18 250:21
251:7
**left-hand (2)**
40:13 251:2
**legal (8)**
24:19 94:13,18,19
173:7 190:2,16
216:5
**Lender (1)**
5:5
**lenders (7)**

134:14,15,22
145:13 159:13
281:6,7
**length (2)**
15:25 143:7
**let's (16)**
43:10 44:10 56:2
60:18 81:20 104:3
155:19 157:22
158:23 165:20
167:8,18 184:9
212:9 251:25
289:11
**letting (1)**
271:6
**level (9)**
18:14 110:3 113:22
150:22 159:21
230:10 235:4
251:24 289:3
**levels (1)**
186:9
**levers (2)**
165:12,15
**liabilities (24)**
57:2,20 67:3,11 77:21
118:7 124:18
126:10 188:12
189:17,20,24
191:23 192:15
204:17,23 211:15
212:13 214:20
215:22 216:19
217:7 228:17
285:19
**liability (13)**
65:15 178:7 186:6
189:18 205:20
209:24 211:20
217:4 284:20
285:11 286:9
287:11 289:5
**Liberty (1)**
4:15
**lien (5)**
98:10 203:4 279:12
279:22 281:3
**liens (1)**
80:5
**life (1)**
192:20
**light (2)**
76:24 117:15
**lightning (1)**
239:6
**limit (2)**

181:12,15
**limited (2)**
15:13 256:9
**limits (2)**
173:19 178:12
**LINA (1)**
4:17
**line (44)**
36:21 74:10,11,18
78:23 83:16 84:15
85:5,20 89:9 91:2
107:9 111:16 113:3
114:13 128:12
141:10,11 154:17
155:23 162:7,8,23
164:6 165:21 168:5
168:10 173:12,14
173:20 177:11
184:10 193:10,14
197:22 200:2
201:23 218:5
219:11 247:5
248:11,12 264:13
283:10
**lined (1)**
228:13
**lines (6)**
40:14 90:23 140:19
141:21 157:23
229:16
**liquidate (1)**
254:13
**liquidated (1)**
29:21
**liquidating (1)**
278:16
**liquidation (30)**
29:18,25 30:10,14,18
30:19 37:23 199:18
236:6 243:13 246:4
246:7 254:4,10,23
255:2 256:2,11,14
257:4 258:10,14
262:20,24 263:12
263:14 265:20
268:7 272:14
274:18
**liquidity (33)**
11:22 12:7,9 14:2,5,6
14:9,11,15,23 33:3
43:18,19 123:8,9,24
124:8,11,21 126:13
126:17,22 190:25
191:3,10,13,18
215:11,14 223:16
224:17 225:3

291:24
**list (21)**
14:19 174:6 180:20
180:23,24 181:8
183:15 188:8,17,22
189:4 196:14,16
210:24 211:5,23
212:10 269:13,25
270:4 278:20
**listed (4)**
53:24 115:16 174:10
193:24
**Listen (1)**
198:23
**listing (1)**
270:22
**litigation (3)**
66:25 67:9,17
**little (10)**
10:15 20:19 35:21
56:3 101:9 103:13
134:11 223:2 260:9
268:8
**LLP (1)**
2:10
**loan (4)**
231:24 266:15,15
279:5
**loans (2)**
259:8 279:4
**logistics (1)**
142:2
**Lokey (3)**
5:14,15,16
**long (7)**
6:24 13:11 21:16
34:25 47:2 178:11
225:19
**longer (2)**
130:13 254:18
**look (101)**
17:7 18:9,19 19:6
31:7 38:19 39:17,22
41:12,17 44:13,23
47:7 51:3,18 62:3
69:6 70:23 75:17
80:17 84:9 96:18
97:22 101:15 104:3
112:5,13 113:24
114:24 117:20
118:21,24 119:10
120:22 122:19
123:11 125:10
126:13 128:23
136:7,21 137:19,20
137:25 139:22

140:11 145:3,18
146:9 148:14,23
149:12 152:24
153:11 156:2
162:17 163:11,21
165:20 169:15
178:5 194:24 195:5
199:21,24 201:4,21
201:23 202:6,23
205:6 221:10
231:23 241:2,3
245:23 246:9
250:17,18 251:25
252:14 254:9
257:14 259:12
261:21 264:20,22
267:14 268:24
270:14,21 272:11
273:25 274:22
275:8 280:22 281:8
283:16,19 290:22
291:8
**looked (29)**
9:23 20:21 49:3 53:18
119:6 124:9,12
143:25 154:11
185:16 209:8 213:9
218:2 219:23
224:15,20 235:3,5
239:7,10 240:12
244:23 251:4
252:11 264:22
266:3 270:3 271:12
273:18
**looking (49)**
12:8 14:7,12,16 21:14
22:19 27:20 38:3,24
38:25 57:10 87:8
89:15 121:4 125:7
127:6,8 129:3,4,8,9
140:10 143:8 145:9
165:3 169:17 171:6
173:25 174:17
178:18,20 194:9
197:14 208:14
209:3 210:18
211:13 229:3
236:23 250:20
253:7,17,19 254:12
262:18 264:10
266:18 269:11
275:15
**looks (11)**
123:5 145:6 153:24
155:14,18 198:2
245:22 246:2,11

252:19 271:2
**lose (1)**
180:11
**losing (2)**
33:5 239:9
**loss (1)**
144:9
**lot (24)**
16:9 36:14 47:4 59:21
86:2 108:20 121:12
121:15 140:10
142:10,13,17
143:10 144:13
150:10 176:2
192:10 196:6 205:8
236:21 259:5
277:19,21 282:14
**lots (9)**
36:19 47:3 102:10
116:14 117:2
164:10 171:16
179:16 192:19
**Loughlin (1)**
20:5
**lower (2)**
111:11 179:2
**lucky (1)**
190:8
**lumped (1)**
114:7
**lunch (1)**
151:24
**Luncheon (1)**
151:25

―――――――――――
                 **M**
―――――――――――
**M (1)**
294:4
**M-III (44)**
9:9 12:18,21,24 13:3
13:25 15:8,9 16:15
18:24 22:24 23:17
24:2,8 25:10 28:25
41:22 42:16,23
43:24 66:16 71:7,8
74:20 75:15 79:12
84:18,19 90:14,15
96:24 104:19
175:21,23 191:11
197:16 218:21
242:3 246:21,23
251:21 258:21
259:14 264:7
**M-III's (6)**
15:23 19:23 21:18
30:23 43:17 53:3

26:5
**magnitude (2)**
61:24 175:9
**maintain (2)**
69:18 164:24
**making (9)**
41:8 45:22 57:13 72:3
72:9 90:3 118:6
119:25 228:13
**manage (9)**
14:24 39:2 100:25
117:8 144:9 165:10
178:12 190:25
191:9
**managed (3)**
39:12 62:6 197:14
**management (13)**
12:8 14:2 28:16 75:15
82:21 83:21 96:25
103:25 135:16
138:2,15 167:3
223:24
**managing (10)**
12:22 16:4 43:18 45:3
117:12 167:15
175:20 176:4 186:8
205:15
**MANGES (1)**
3:5
**manner (1)**
39:4
**margin (4)**
143:21 144:9,17
145:25
**margins (1)**
144:14
**mark (2)**
6:4 8:12
**marked (21)**
8:14,17 39:20 96:12
96:15 117:19
122:17,24,25
133:23 136:19
145:2 152:5,9
230:17 245:13,16
274:9,12 288:11,14
**market (10)**
32:8,10 34:4 237:8
238:21,24 241:4,10
272:3,24
**marketable (1)**
272:18
**marketed (3)**
32:24 33:14 256:8
**marketing (12)**
33:24 34:6,13,18,22

35:5 141:4,8 150:13
238:10 263:19,23
**marriage (1)**
295:17
**Mary (5)**
1:19 2:12 57:12 295:5
295:24
**massive (1)**
169:16
**match (1)**
228:15
**material (1)**
230:21
**materials (5)**
17:7 26:11 40:4 41:4
41:4
**math (2)**
160:8,24
**matrix (2)**
274:20 275:12
**Matt (1)**
5:13
**matter (5)**
6:20,21 9:14 80:6
295:19
**matters (2)**
21:7 212:2
**maximize (3)**
31:16 33:7 236:8
**MEAGHER (1)**
5:4
**mean (18)**
14:10 19:3 30:10
42:25 55:11 69:11
77:9 114:22 196:9
197:21 233:22,23
235:10 244:9 249:2
277:11 280:13
285:23
**meaning (5)**
123:10,11 169:5
189:7 204:11
**means (11)**
20:20 21:22 30:19
104:22 128:17
155:4 180:10
196:12 206:17
234:5 285:24
**meant (1)**
222:18
**mechanical (1)**
173:4
**mechanics (6)**
80:5 182:6 184:8
189:12 191:21
192:14

**mechanism (4)**
80:7,9 183:19 189:6
**meet (9)**
37:25 39:13 116:10
126:24 169:2,7,25
204:2 210:11
**meeting (5)**
9:4 134:13,19 225:18
225:22
**meetings (4)**
22:14 115:19 223:15
223:20
**meets (1)**
171:11
**Meghji (328)**
1:12 6:1,8,14 7:1,23
8:1,16 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1,5 21:1 22:1
23:1 24:1 25:1 26:1
26:22 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1,19
36:1 37:1 38:1 39:1
39:21,25 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1,13 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1,9 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1,9 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1,11,17
97:1 98:1 99:1
100:1 101:1,14
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1,17,24 118:1
119:1 120:1 121:1
121:18 122:1,16
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1,22
134:1 135:1 136:1

136:20 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1,8 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1,21 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1,13
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1,7 229:1
230:1,16 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1,15
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1,10 268:1
269:1 270:1,14
271:1,16 272:1
273:1 274:1,11
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1,13
289:1 290:1 291:1
291:15 292:1,21

293:1,5 294:1,4
295:1,10
**member (7)**
52:23 54:6 57:8
179:12 226:11
227:8,21
**members (17)**
25:18 36:18 53:9
57:11 96:24 108:7
114:16 115:20
116:20 135:12,17
140:17 148:9
150:16 151:23
290:3,13
**memo (2)**
93:3 97:23
**memory (2)**
71:20 134:11
**mentioned (6)**
116:7 119:20 120:11
245:5 276:9 287:4
**merchandise (5)**
58:25 59:6,7 183:9
221:6
**met (2)**
11:25 13:18
**methodologies (1)**
258:22
**methodology (29)**
240:18 241:16,23
242:4,15 253:5,25
255:19 256:3,6
257:3 258:16
260:12,16,21 261:2
261:8,20,22 262:7
262:14 267:20
268:21 273:9,16,24
277:8 280:18 288:4
**mid-November (3)**
237:2,13,14
**middle (4)**
7:4 196:14,17 269:14
**million (263)**
41:19 45:11 49:25
50:18 51:14 52:10
57:23 58:6,18 59:5
59:12 60:10,12,21
61:5,16,20,25 63:17
63:25 64:17,18,23
65:6,9,13,22 67:8,9
67:12,18,21 68:16
69:8,9 70:21 76:10
76:16,22 77:20 78:7
78:8 79:6 81:9,10
81:16,18,22 82:8,11
82:23 83:5,25 85:6

85:13,24 86:9,18
87:3,6,6,14 88:15
89:11,18,23 91:12
92:7,10,11,17,20,24
93:6 95:16,22 96:3
96:5 98:3,7,10 99:4
99:18,18 100:3,14
102:20 104:13,18
104:24 105:4,9,17
106:2,19 107:11,19
107:23 110:12,18
110:22 111:12,14
111:17,20,22
112:17 119:6,16,21
120:6,12 127:13
128:21,22,25
129:16 130:6,21
132:19 133:4,19
153:15,24,25 154:2
154:5,20 155:10,16
156:5,9,20,21,23
158:4,7,8,12,13,18
159:3,19 160:11
161:3,7 162:22
163:10,20 164:13
165:4,14 166:16
168:2 170:11,17
171:9,19,20 173:24
173:25 174:11,13
175:13 176:10,10
176:17 177:8,14,17
181:24 182:4,8
183:17,20 184:22
185:9,12,12,18
186:18,21,22 187:7
187:11,13,14
188:11 191:22,22
192:15 193:18
194:13,16 195:2
196:8,9,13,17 197:5
197:6,12 199:25
200:4,9,10,25
201:10,17,19 202:8
202:12,15 204:16
209:17 210:6,20
211:7,9,10 214:13
217:20 229:10,12
232:2,13 233:6
249:5,10,11,14,18
249:20 250:3,14,15
252:15 260:5,7,7,9
265:3,4,14 266:7,7
274:25 275:11,20
275:24,25 276:2,11
276:11 278:9,23
282:20 283:13

286:11,13 287:18
292:2,12
**mind (3)**
18:5 98:23 169:24
**minimize (1)**
178:2
**minimum (7)**
93:25 142:2 162:2
169:2,25 171:12
174:4
**minus (3)**
149:10 266:5 267:2
**minute (17)**
8:17 44:11 60:19
95:12 96:18 101:16
117:20 122:19
136:21 145:3
230:23 245:17
274:13 282:24
287:20 288:15
289:11
**minutes (2)**
39:22 292:16
**misapplied (1)**
77:5
**mischaracterizes (1)**
151:8
**mish-mash (1)**
193:22
**misimpression (1)**
265:9
**misinterpret (1)**
72:13
**missed (1)**
292:18
**missing (1)**
140:3
**misstates (1)**
191:7
**mistake (1)**
202:20
**mistakenly (1)**
132:22
**misunderstood (1)**
132:13
**mitigate (5)**
118:9 120:7 144:8
177:2 210:19
**mitigating (7)**
120:5 153:13 158:17
158:20 163:9
202:13 210:21
**MO (1)**
293:9
**model (2)**
276:13,17

**modify (1)**
194:3
**MOHSIN (4)**
1:12 6:8 293:5 295:10
**Monarch (2)**
87:18 175:8
**Monday (1)**
17:2
**monetizable (1)**
195:12
**monetization (3)**
266:9 280:16,21
**monetizations (1)**
266:16
**monetize (3)**
165:24 177:24 253:19
**monetized (3)**
31:9 194:7 280:4
**monetizing (1)**
254:17
**money (15)**
33:6 39:5 83:6 87:9
107:3 109:9 153:16
158:10 165:10
167:8,10 178:20,24
204:21 239:9
**monitor (1)**
208:23
**month (7)**
127:12 128:13,18,18
129:20 130:9
217:20
**monthly (1)**
93:25
**months (9)**
16:11,25 35:2 135:3
149:14,18,19 150:5
216:10
**morning (4)**
6:14,20 17:2 185:15
**mortar (2)**
141:19 145:21
**motion (2)**
33:19 263:24
**mouth (1)**
181:18
**move (6)**
142:8,19 167:18
168:25 170:4 271:4
**moved (3)**
16:2 87:10 150:24
**moves (1)**
156:17
**moving (6)**
119:24,25 164:8
167:21 168:21

239:6
**MTN (1)**
91:7
**multiple (1)**
165:12
**Munjal (6)**
135:14 140:18 142:22
151:6,15,20

_____
## N

**name (3)**
6:15 65:3 296:2
**named (2)**
20:7 172:9
**Naren (2)**
36:10 135:15
**Natalie (1)**
5:14
**nationally (1)**
242:8
**nature (1)**
195:20
**necessarily (4)**
160:13 197:20,21
219:19
**necessary (3)**
32:8,9 135:25
**need (36)**
7:2 10:23 11:4 32:25
54:5 68:16,19 69:21
69:23 70:23 73:8,10
73:13,15,16,22 74:3
79:3 99:12 103:9
126:21 151:14,21
161:20 167:10
168:25 169:6
182:24 189:2,8
194:5 199:5 212:8
231:4 283:16,17
**needed (6)**
11:21 15:16 136:7
167:17 206:24
266:9
**needle (1)**
142:8
**needs (3)**
39:4 102:22 191:4
**negative (30)**
105:9 112:16,17,18
138:5 139:25
145:22 146:5,12,16
146:17,24,24 147:4
147:8,10,15 148:12
148:13,19 149:8,15
149:16,21,23 150:2
154:20 158:7

201:24 209:9
**negatives (2)**
209:11 212:23
**negotiate (4)**
76:5 130:14 179:2
216:4
**negotiated (4)**
92:6 192:9 205:9
207:12
**negotiating (5)**
40:24 76:2 80:14
126:5 292:9
**negotiation (6)**
78:2 179:6,20 204:24
207:21 212:17
**negotiations (2)**
105:25 205:11
**neighborhood (1)**
70:21
**net (7)**
116:12 156:20 247:2
249:10,10 252:10
274:25
**never (3)**
13:18 142:16 191:9
**new (27)**
1:3,13,13 2:11,11,14
3:19,19 4:8,16 5:7,7
76:23,25 77:3 95:21
133:5 134:15 141:9
162:8,24 163:11,23
164:18 173:19
295:3,8
**NewCo (20)**
11:10 106:13,17
123:9 124:16 125:2
125:12,14,17,19
126:8,9,23 129:17
131:2,15 147:18,25
148:4 292:4
**NewCo's (1)**
124:8
**night (2)**
9:24 193:7
**nine (1)**
149:14
**Noah (3)**
242:10 246:16,22
**non (1)**
280:9
**non503(b)(9) (2)**
77:6,11
**noncore (3)**
248:15 268:17 271:19
**nondebtor (7)**
93:19 174:20 198:6,7

198:9,14,22
**nondebtors (1)**
95:9
**nonmerchandise (2)**
58:25 183:10
**nonpledged (1)**
277:11
**nonprivileged (2)**
226:6,8
**Notary (2)**
2:14 295:7 296:25
**note (3)**
97:23 163:11 270:19
**noted (1)**
293:3
**notes (8)**
87:17 105:10 202:3
212:24 213:5,21
217:16 218:8
**notice (2)**
62:23 230:19
**notional (5)**
285:18,22 286:5,20
286:23
**November (20)**
13:4 19:21 30:5,6,8
33:21 140:20
226:21 235:11,12
235:21,24 236:10
236:14 238:11
253:4,25 258:15
264:2,3
**number (73)**
31:21 32:22 45:17,18
46:8 51:11 54:21
55:2 57:22,23 58:4
58:8,17,21 60:4,13
62:25 63:9 64:23
66:11,12,18 67:22
67:24 68:4,6 75:10
79:14 80:19 100:5
100:18 107:5
112:11 113:6 119:2
120:12 121:2,23
127:15 129:12
130:7 132:13
148:18 152:15
157:15 180:25
202:4,6 207:24,25
210:4 214:12,13,20
217:24 218:3 229:6
241:9 249:14,15,17
252:14 259:15
262:22 266:2,6
271:17 273:5 283:8
286:10 288:7 291:9

294:7
**numbers (12)**
75:12,13 78:6 102:6
137:15 201:6
219:16 259:16,23
266:12 290:22,23
**NY (2)**
4:8,16

_____
**O**

**oar (1)**
57:6
**object (4)**
44:12 148:7 221:25
233:25
**objection (68)**
6:3 23:21 27:25 37:3
37:20 38:17 45:13
46:21,25 47:18
48:24 51:16 55:14
58:2 69:20 70:8,13
79:8 88:11 98:18
102:8 115:22
116:25 119:8
120:13 127:2 128:7
130:15 150:3 151:7
151:22 169:10
187:17 189:25
190:5,15 191:6
192:2,18 193:5
196:2 206:14 207:7
210:12 213:14
215:17 218:11
234:14 237:10
238:16 240:10
255:16 258:2
260:22 261:5,24
262:12,17 267:23
269:2,15 273:20
282:4 283:5 291:2
291:14 292:5,13
**objective (1)**
116:9
**objectives (1)**
193:8
**objects (2)**
7:12,14
**obligation (2)**
210:9,10
**obligations (8)**
38:2 39:13,14 79:3
126:24 128:2
216:11,13
**obliged (1)**
203:20
**obtain (2)**

238:13 285:6
**obtaining (2)**
166:11 235:15
**obviously (10)**
22:11 108:20 121:5
139:25 153:6
182:25 215:3
221:10 268:3 279:4
**occasionally (2)**
16:10 22:13
**occur (5)**
131:15 200:13 227:2
272:14 280:17
**occurred (3)**
48:13 266:10 280:5
**occurring (1)**
154:13
**October (19)**
13:4 19:21 21:23
22:20 23:10,17 24:4
24:14 25:8 56:16
140:20 235:11,12
236:17 253:5
255:13 256:24
258:13,15
**offer (10)**
71:25 246:7 252:20
255:7,8 260:4
262:16,20,25
264:15
**offerings (1)**
141:13
**offers (2)**
269:17,22
**office (8)**
12:2 57:8 135:12
138:15 140:17
148:9 150:15
226:23
**officer (3)**
27:11 57:7 106:7
**offices (2)**
2:9 47:23 48:4,9
**official (1)**
6:16
**offset (3)**
176:11 210:13 211:10
**offsets (2)**
109:23 203:6
**Oh (1)**
284:10
**OK (42)**
7:9,14 20:17 50:11
73:8 85:3,13 99:13
99:15 103:12
109:10,20 110:5

120:21 121:9,21,24
129:9 144:21 157:6
157:22 162:4 164:2
184:9 186:14
187:23 196:5
199:19 214:18
215:18 216:17,18
230:24 234:20
247:23 250:14
257:23 268:10,24
275:20 279:6
288:18
**older (1)**
71:20
**once (8)**
15:14 96:19 117:21
161:19,24,24
266:23 288:16
**one-day (1)**
156:14
**ones (11)**
21:13 170:13 174:9
175:8 179:18 187:2
257:12,22 265:20
265:20,20
**ongoing (3)**
60:6 157:4 183:13
**online (1)**
141:11
**open (2)**
107:2 207:19
**opened (1)**
9:22
**operates (1)**
255:2
**operating (2)**
13:6 167:21
**operation (1)**
157:4
**operational (1)**
138:3
**operations (2)**
31:9,10
**opine (1)**
205:24
**opinion (5)**
126:16 132:5 190:16
238:19 272:12
**opinions (1)**
224:2
**opportunities (12)**
18:13 102:23 117:11
118:10 158:25
174:2 177:24
178:16 180:8
185:21 207:25

211:16
**opportunity (32)**
71:2 78:17 104:24
105:2 116:11
136:11 155:25
156:6 157:11,18
159:4 160:3,6,17,21
162:23 164:5
165:24 171:20
172:3,6 173:10
177:13 180:5,6,13
185:25 187:13
197:13 208:12
211:11 282:10
**opposed (11)**
33:14 43:25 103:8
146:17 157:18
220:21 253:21
254:15 255:22
268:12 285:24
**optimally (1)**
186:13
**optimize (1)**
169:20
**option (3)**
166:7 167:9 288:24
**options (2)**
236:7 289:4
**order (16)**
25:12 31:16 38:12
39:3 61:24 126:22
142:2 169:7,25
175:9 177:23 185:9
201:18 243:7 290:4
290:14
**orderly (8)**
30:13,17 243:14
254:15 256:10,13
266:22 274:18
**orders (1)**
168:11
**orient (1)**
118:24
**original (5)**
118:25 153:22 254:24
254:24 265:19
**originally (1)**
123:2
**outcome (2)**
190:21 295:18
**outdated (1)**
113:19
**outflows (1)**
14:25
**outlet (1)**
174:19

**outline (1)**
18:18
**outlined (1)**
113:12
**outlines (2)**
115:9 230:20
**outperform (1)**
112:7
**outperformance (2)**
111:18,20
**output (6)**
235:6 244:4 261:14
274:21 276:25
277:3
**outs (1)**
171:17
**outside (4)**
9:9 45:18 248:16
256:15
**outstanding (5)**
99:17,24 100:15
159:17 285:21
**overage (1)**
170:3
**overall (4)**
17:24 207:21 265:22
266:6
**overlap (1)**
187:22
**overly (1)**
144:18
**overseeing (2)**
20:13 247:14
**overseen (2)**
259:7 266:14
**owed (1)**
133:13
**owes (2)**
109:9 178:19
**owned (6)**
248:12 265:10 267:15
267:21 269:4
271:18
**ownership (2)**
70:5 88:10
**owns (2)**
92:16 198:13

**P**
**p.m (5)**
50:14,16 151:25
152:3 293:3
**PA (1)**
285:11
**page (54)**
40:9 44:14,17 45:4,7

51:3,7 69:6 81:12
81:13 97:23 112:21
125:10,11 128:14
129:4,5,7 138:12
139:24 140:12
152:24 155:24,25
173:17 180:23,23
184:17 186:13
201:21,23 231:8,13
246:10,25 250:18
250:19,24,25 252:3
252:4,10 260:3
262:18 264:12
267:15,15 269:11
280:22 281:8,14
283:22 294:3,7
**pages (7)**
44:19,23 116:7
139:20 162:5 251:5
271:8
**paid (15)**
39:4 65:19 93:10,13
93:16,18 108:13
170:19,24 182:3
183:3,16 195:25
278:25 287:8
**paper (3)**
53:23 117:4 282:15
**papers (2)**
23:24 282:10
**parallel (1)**
272:15
**Park (2)**
2:11 3:17
**part (30)**
20:11 31:12 62:22
75:25 92:7 104:15
109:24 111:14
115:2 125:8 134:17
149:11 157:4 159:5
159:10 164:17
168:2 171:17,19
178:10 186:22
194:21 202:14
205:3 220:7 223:21
227:12 248:3
251:14,15
**participants (1)**
238:25
**particular (16)**
14:14 17:17 27:16
28:9 59:11 126:19
127:7 150:17 220:6
224:18,24 232:24
233:7 238:22
239:20 241:13

**particularly (3)**
36:12 127:11 225:8
**parties (4)**
6:9 129:18 130:14
295:16
**partner (4)**
12:22 20:24 141:24
242:10
**partners (2)**
24:19 238:2
**parts (3)**
33:25 134:13,19
**path (2)**
140:7 150:17
**patterns (1)**
164:12
**Paul (4)**
3:11 4:4 222:15,16
**Pause (2)**
46:12 73:3
**pay (38)**
38:7,13 39:3 63:8
80:8 82:8,11 94:4,9
94:14,20 129:17
156:15 174:5 175:2
178:25 180:17
181:16 182:8 184:4
184:6 188:10,11,18
189:2,8,9,10,18,22
189:23 214:24
215:23 216:11,17
255:23 278:18
280:12
**payable (55)**
58:12,24 59:13 60:4,8
61:3,4,15,19,25
62:13 65:17 66:2
77:5,15 78:8 79:20
107:4,11,12,19,22
108:3,10,15,25
109:12,22 127:10
128:10,18,24
129:14,17,20
130:11,22 131:3
132:11 172:18
184:10,11 185:8,13
185:23 186:3,17,19
187:14 188:9,17,23
189:7,24 214:22
**payables (4)**
59:2 60:11,17 186:9
**paying (1)**
183:11
**payment (4)**
14:13 183:20 213:19
292:12

**payments (11)**
62:20,23 63:24 178:7
178:24 185:8
215:10,13 216:7,15
221:6
**payout (1)**
286:5
**payroll (4)**
209:13,25 211:19
212:14
**pays (1)**
176:12
**pending (4)**
55:24 73:5,14,21
**people (25)**
12:6,7,12 15:10 16:11
16:11 18:11 31:3
36:17,20 102:10
121:15 135:17
144:13 175:25
179:15,16,22 183:3
185:2 198:24
207:14 209:3 245:3
265:8
**percent (45)**
113:5,11 121:7,11
138:5,6,6 145:22
146:5,10,12,16,18
147:9,10,15 148:19
149:9,15,16,21,23
150:2 213:11 247:6
247:10 249:9
259:23 260:8 263:2
264:8,15 266:5
267:2,24 268:2,12
268:13 272:23
273:2 278:3 280:24
281:10,16 291:9
**percolating (1)**
206:20
**Perfect (2)**
7:10 11:3
**perform (3)**
37:4 126:10,24
**performance (7)**
111:21 141:16 145:23
147:10 149:4
151:12 155:7
**performed (3)**
35:21 215:8 216:19
**performing (1)**
36:25
**period (17)**
19:13 21:17,22 22:19
22:24 23:16 24:7
38:7 49:15 143:22

156:14,15 205:9
219:9 237:16 254:2
256:20
**periods (2)**
219:8,18
**person (4)**
21:25 205:10 239:25
247:13
**personal (4)**
15:12 16:13 19:25
69:22
**personally (5)**
21:7 53:15 125:22
258:18 285:7
**personnel (2)**
25:17 79:10
**perspective (7)**
17:20 112:6 140:5
240:23 253:9,12,13
**Peter (1)**
172:9
**petition (4)**
15:24 34:15,20 56:22
**Pg (1)**
296:5
**pharmaceutical (1)**
162:13
**PHILIP (1)**
3:22
**philosophy (1)**
262:5
**phone (1)**
160:7
**physical (2)**
53:18,22
**picked (1)**
195:11
**picture (3)**
44:4 124:8,12
**pieces (2)**
117:4 244:24
**pipeline (8)**
248:15,18,22 268:17
269:13,17,19
271:20
**place (5)**
10:5 168:15,24 189:6
220:18
**places (1)**
18:18
**plan (47)**
31:13 67:4,13 124:13
124:16 134:2,5,18
134:20,23,23 135:7
135:10,20,23 136:2
136:10,14,24 137:4

138:24 142:19
145:8,11,11,14
146:7,11 147:3,17
167:19 168:24
183:23 198:25
216:8 217:2 226:5
226:13,18,20,25
227:9,10,11,16,22
227:24
**planning (4)**
11:23 167:3 169:4,19
**plans (1)**
292:2
**play (1)**
13:25
**Plaza (1)**
4:15
**please (11)**
11:5,14 99:20 120:24
143:3 192:3 238:17
249:24 259:18
274:14 279:15
**pledged (2)**
280:7,15
**plug (3)**
116:4,12 118:11
**plugging (1)**
118:7
**plus (8)**
130:7 132:21 149:9
203:8 211:10 266:5
267:2 285:10
**pockets (3)**
18:15 89:25 167:6
**point (42)**
7:2,7 11:12 16:24
17:22 18:25 22:23
25:10 26:4 28:19
29:10 31:6 33:23
43:5 48:10 62:15
76:22 78:2 100:20
111:7 113:20 120:3
130:4,5 131:21
134:9 139:19 163:2
172:8 182:14
185:16,22 188:7
226:9 227:21
235:21 261:13
264:11 266:20
277:16 278:24
291:13
**pointed (1)**
149:13
**points (16)**
141:8,13 144:4,6,13
145:24 149:10

244:15 246:6
259:21 261:9
264:24 265:4,18,19
280:23
**POLAN (1)**
4:18
**populate (1)**
25:23
**populating (3)**
25:12,15,20
**portfolio (5)**
235:4 240:5 244:10
261:11 265:22
**portfolio-wide (1)**
265:17
**portfolios (1)**
259:6
**portion (3)**
196:23 197:18 200:12
**portions (1)**
197:24
**POs (1)**
168:11
**pose (1)**
70:15
**position (2)**
109:5 216:14
**positive (4)**
138:5,6 153:25 209:8
**positively (1)**
163:6
**possibility (1)**
195:10
**possible (4)**
60:25 106:11 108:22
182:24
**post (1)**
66:10
**post-auction (1)**
127:25
**post-bankruptcy (1)**
150:24
**post-close (11)**
81:10,18 85:5 87:2,7
88:15,22 112:17
164:25 216:21
217:3
**post-filing (4)**
25:16 136:25 236:22
258:8
**post-petition (7)**
25:11 37:25 39:14
93:22 107:12
135:10,25
**posted (1)**
88:20

**pot (2)**
211:2,6
**potential (52)**
22:25 23:19 26:12
55:21 56:7 70:19
81:2,2 92:22 102:22
103:14 104:6,9
109:23 110:8,10,15
115:9,11,12 120:5
136:11 145:12
153:12,16 156:8
158:17,19,25 163:9
165:20 177:8,16
178:3 180:12
192:16 193:17
197:25 199:23
200:22 202:13
208:3,7 209:10,24
210:21 211:15,16
212:22 215:10
216:19 217:7
**potentially (5)**
71:16 170:10,14
214:24 254:17
**practically (1)**
166:20
**prebankruptcy (1)**
258:4
**preclose (2)**
166:22 217:5
**prefer (1)**
284:6
**prefiling (1)**
57:19
**premise (1)**
283:7
**prepaid (3)**
210:16,17,23
**preparation (2)**
10:10 98:14
**prepare (10)**
9:6 24:9 28:20 74:25
75:3 114:13 136:2
229:21,22,23
**prepared (45)**
9:2 17:8 29:2,25
30:25 41:24 42:8
43:15 52:13 65:24
71:5 74:22 84:25
96:23 97:10 99:14
100:7 101:22,24
103:10,20,24 105:5
105:19 112:2 114:6
134:3 136:24 137:5
139:2 172:12,24
208:23 212:13

218:21 219:4,7
228:21 230:5
234:20,24 246:14
246:20,22 256:23
**preparing (23)**
17:4 22:25 23:3,7,12
23:18,24 24:14,15
27:14 29:11 30:24
35:24 41:23 52:21
56:25 98:24 99:9,10
99:11 123:20 135:9
237:7
**prepetition (13)**
16:15,21,22 17:15
18:24 21:17,22
22:19 25:11 64:7,8
170:22 281:4
**prescription (1)**
159:2
**prescriptions (2)**
162:13,14
**presence (1)**
9:10
**present (10)**
5:11 17:4 241:6 253:7
255:20 285:25
287:5 289:18 290:3
290:13
**presentation (3)**
44:6,19 47:14
**presented (19)**
47:15 48:18 49:2,4,11
49:18 114:15 115:3
134:17,21 145:12
227:11,12 289:8
290:20,25 291:5,11
291:18
**presenting (1)**
103:7
**preserved (1)**
72:20,24
**presidents (1)**
16:8
**press (1)**
116:15
**Presumably (1)**
251:16
**presume (5)**
87:8 165:18 276:4
283:12 284:6
**presumed (1)**
147:5
**pretty (8)**
17:18 27:19 101:7
138:21 191:7
196:14 198:2

292:17
**previously (16)**
35:24 39:19 77:19
105:21 117:18
122:17 133:23
136:19 145:2
152:10 168:14
230:17 268:13
278:7 280:7,9
**price (7)**
176:12 229:16 231:6
231:14,16 269:13
269:13
**pricing (4)**
141:14 142:2 144:7
150:14
**primarily (3)**
22:7,7 67:11
**primary (2)**
36:17 172:7
**prior (38)**
13:15,18,21 19:23
20:4,5 21:8 22:9
24:7,14 25:8 26:13
26:20 34:15,20 52:8
52:16 69:17 70:7
76:19 77:22 106:11
106:20 124:2,23
134:9 136:14
142:14 145:23
180:7,9,14 195:4
212:19 220:15
236:10 253:25
273:10
**priority (7)**
51:21 95:16 277:10
277:15 278:4,14
281:24
**privilege (2)**
73:7,9
**privileged (3)**
7:13 222:3 228:6
**pro (7)**
41:18 45:9,14 49:7,24
50:16 199:25
**proactively (1)**
167:18
**probably (8)**
13:8 21:12 30:6 64:8
68:17 109:6 196:22
247:12
**problem (2)**
158:14 167:23
**procedures (1)**
263:24
**proceeding (2)**

55:20 56:6
**proceedings (4)**
2:9 20:22 28:14 239:5
**proceeds (39)**
91:7,9,15,17,18,21,23
112:14 114:19,22
114:23 115:12
158:5,6 200:24
201:12 202:9,22
230:2 246:3 247:2,3
249:4,11 251:22
252:8,9,10 259:25
262:22 263:3
265:25 266:11
267:21 273:5
275:19 276:14
278:12 280:6
**process (74)**
15:20 22:5 23:19 24:3
24:23 26:4,7 30:5
33:8,13,16,19,19
34:10,14,19 36:14
37:8 42:4 48:13
56:10 60:7 83:17
85:11 91:21 104:15
108:20 109:25
134:17 135:18
138:13 141:5 153:7
154:14 166:6 176:4
178:14 179:2 188:6
194:21 197:15
198:20 219:22
220:4,15,21 223:5,9
225:20 235:18
236:11,18,25
238:11 239:12,15
239:17 248:24
253:20 254:8 256:9
256:14 261:8
263:14,20,23
266:10 268:21
269:9,22 274:21
278:15,16 280:16
**processes (3)**
14:8,13 220:17
**produced (7)**
49:15 54:17 120:18
120:20 121:4,8
122:22
**producing (1)**
27:14
**product (4)**
18:16,17 53:10
170:22
**production (2)**
72:5 152:13

**professional (8)**
2:12 91:2,6 155:14,17
157:25 264:7 295:6
**program (4)**
63:8,8,14 141:7
**progress (3)**
18:4 118:6 119:25
**project (9)**
36:21 96:14 165:3,8
176:3 186:2 288:10
294:10,21
**projected (14)**
84:17 98:9,11 99:5
100:10,14 111:8
146:5,10,18 159:17
162:18 167:7
173:24
**projecting (1)**
153:2
**projection (3)**
31:8 100:2 256:15
**projections (23)**
27:15,17 28:25 29:6,6
31:16 35:24 37:22
38:3 96:10 126:14
126:18,22 127:11
135:21,22 138:10
138:14 139:13
218:5 219:25,25
223:16
**properties (19)**
91:11 234:16 241:14
244:10,11 246:3
248:9,13 250:6
251:13 261:12
265:10,11 266:23
268:4,8,18 269:18
271:17
**property (14)**
65:9,15,18 66:2 78:9
86:22 193:9 214:22
252:15 253:11
255:15 259:13,22
264:23
**proportion (1)**
200:11
**proposed (3)**
166:5 171:2 234:7
**prospect (1)**
136:7
**prospective (3)**
134:14,15,21
**protection (13)**
212:25 213:6 217:19
217:22 278:22
283:15 285:13,14

285:19 287:6,18
288:2 289:4
**provide (15)**
76:9 84:7,16 115:18
117:13 125:14,19
172:24 181:4
225:25 227:6,19
242:19 254:14
265:16
**provided (30)**
42:15 45:19,20 46:8
46:18 50:10,11 53:6
63:5 70:6 76:19
102:10 115:24,24
116:19 117:14
124:22 125:16
152:12 183:15
188:16 224:3,6,10
242:18 244:4,8
254:11 256:13
287:24
**provides (4)**
86:21 203:2 206:9
219:13
**providing (6)**
25:20 42:5 144:3
221:22 237:21
244:19
**provision (18)**
69:25 70:10,11 86:20
88:4,9,13 89:8
128:4 202:25
204:25 205:5,7
206:4,5,7 214:19,23
**provisions (1)**
80:14
**Public (3)**
2:14 295:7 296:25
**Puerto (2)**
91:18 245:9
**pull (4)**
71:19 160:7 165:12
165:15
**pulled (1)**
54:6
**purchase (8)**
40:24 168:11 176:12
229:16 231:6,14,15
285:11
**purchased (2)**
57:17 285:20
**purchaser (2)**
92:23 192:17
**purchasers (1)**
26:12
**purportedly (1)**

191:24
**purpose (4)**
233:24 234:3 235:15
236:3
**purposes (2)**
197:11 287:14
**pursuant (2)**
91:24 281:2
**put (8)**
26:8 40:4 112:8
168:24 197:8
272:23 274:5
288:21
**puts (1)**
207:17
**putting (4)**
15:3 31:6 181:17
211:23

_____

**Q**

**qualifications (2)**
263:5,9
**qualified (1)**
205:24
**quarterbacking (1)**
179:13
**question (61)**
7:5,12,16 19:9 27:7
31:19 32:11 41:11
46:7,13 55:23,24
56:2 70:15 71:4
73:5,7,9,14,21 77:25
78:13 80:11 86:6
99:12 101:5 103:10
113:8 127:3,9
129:22 130:17
147:20 148:11
166:13 180:18
181:6 187:21
188:14 189:21
190:2,18 200:8,16
209:22 216:5,12
222:2,25 228:20,24
229:2 234:4 239:21
240:7 261:18,25
270:12,13 279:15
284:23
**questioning (1)**
143:7
**questions (17)**
7:8 42:5 76:8 78:16
78:18 102:14
138:22 181:19
186:15 205:13
217:14 228:4
233:11 271:5

292:22,24 293:2
**quick (4)**
9:17 74:5 160:8
268:23
**quickly (1)**
180:3
**quite (1)**
270:2
**quote (1)**
284:19

_____

**R**

**RACHEL (1)**
4:18
**raising (1)**
138:22
**Ralph (1)**
140:21
**ran (1)**
278:24
**range (6)**
22:6 63:10 159:25
160:4 210:4 259:21
**ranged (1)**
265:3
**rata (1)**
199:25
**rate (1)**
241:7
**rates (2)**
241:4,5
**RDD (1)**
1:7
**reached (1)**
13:10
**read (16)**
9:17 45:15 84:15 88:3
101:19 102:16
111:16 127:12
146:20,21 162:21
192:4 231:7 284:7
287:20 296:5
**readily (1)**
62:14
**reading (4)**
81:8 104:22 107:9
286:15
**Reads (1)**
296:5
**ready (1)**
23:25
**real (47)**
68:18 71:15 233:18
233:21 234:9,12,19
235:20 236:2,12
237:8,19,25 238:7

JX 117-98

Page 24

237:8,19,25 238:7
238:15,23 239:2,20
240:3,13,15,20,21
240:22 246:25
247:14,16,17 248:2
257:10 259:5,7
261:3 262:3 263:6
263:17,25 266:14
267:12 271:22
273:18 274:23
275:11,21 282:18
282:25 292:3
**realize (3)**
33:10 261:12 266:25
**really (54)**
9:24 13:3,7 14:19,20
14:24 17:22 20:14
20:14 28:13,16
31:12,18 34:9 68:5
77:24 94:11 102:6
117:7 123:6 142:8
143:11 144:7 150:7
156:25 157:12
159:13 161:7
169:12,19 176:18
177:2 185:25
186:11 194:24
197:23 200:7
215:24 217:25
219:9 220:13
224:12 230:13
237:3 238:3 253:7
253:17 258:7
265:21 269:21
275:13,17 281:18
283:17
**Realtime (2)**
2:13 295:7
**reask (2)**
7:9 228:23
**reason (7)**
57:24 94:19 97:18
149:19 150:5 268:3
296:5
**reasonable (23)**
38:18 108:11 126:8
126:18 131:19,23
132:3 133:7 138:18
139:5,15 140:8
147:17 148:3,12,25
205:5 238:13,24
239:4,13 244:8
283:10
**reasonableness (1)**
53:11
**reasons (5)**

107:13 124:20 268:5
272:6,21
**rebate (3)**
109:13 174:10 178:18
**rebates (1)**
109:17
**recall (62)**
8:20 10:13 12:15
16:19 17:15,18
21:10,15 25:14
29:15,24 34:23 35:4
35:7,14 40:20 47:2
47:5 48:7 49:18
50:6 56:23 59:8,25
64:2,19 69:15 70:9
79:18 86:25 88:12
89:7 93:15 100:5,11
115:23 116:18
117:4,5 119:23
120:15 123:7 134:8
139:10 144:22
145:15 185:16
198:17 215:4 224:5
224:10 225:11,17
225:22 226:16
256:17 257:21
263:21 269:8 270:7
273:7 291:23
**recalled (1)**
275:6
**recalling (1)**
152:17
**receipts (3)**
36:22 111:7 117:12
**receivable (9)**
171:5,8 172:13,15
174:13,16 175:3,9
186:8
**receivables (15)**
68:2 109:18 159:8
173:15,16,21,22
174:7 175:12,17
176:7,11,23 177:9
280:3
**receive (4)**
123:21 132:2 161:11
161:14
**received (17)**
58:15 59:3 97:8
123:18 127:16
161:19 234:15,18
239:19 242:25
244:15 250:7
252:21 255:9
263:16 265:8,18
**receiving (4)**

125:21 127:6 168:17
169:23
**recess (7)**
35:17 74:7 101:13
151:25 217:12
267:9 292:20
**recite (1)**
144:20
**recognize (1)**
145:4
**recognized (2)**
242:9 270:25
**Recognizing (1)**
237:17
**recollecting (1)**
134:25
**recollection (10)**
10:4 19:20 34:25 67:8
69:3 100:4 145:10
257:20 273:16
291:10
**recommend (1)**
100:19
**recommended (1)**
100:21
**reconciled (2)**
58:7 154:11
**reconciliation (2)**
55:17 56:4
**record (12)**
48:6 72:20 101:12
120:25 146:21
192:4 267:11
270:18 271:2
273:23 284:15
295:13
**records (2)**
55:22 56:8
**recouped (1)**
196:10
**recover (2)**
113:11 279:3
**recoveries (5)**
243:17 274:24 289:12
289:19 291:8
**recovery (7)**
228:20 274:20 275:12
275:16,18 276:21
278:3
**redemptions (1)**
144:5
**reduce (3)**
168:10 178:7,13
**reduced (1)**
17:21
**reducing (3)**

17:23 18:22 204:23
**reduction (5)**
105:8,10 110:16,22
155:15
**refer (4)**
10:18 11:9 113:18
284:15
**references (1)**
284:2
**referred (1)**
151:5
**referring (2)**
10:19 11:13
**refined (1)**
154:11
**reflect (2)**
137:16 198:25
**reflected (6)**
58:17 82:6 98:7
101:18 102:7
143:22
**reflects (8)**
54:21 55:3 59:11
79:24 95:15 103:2
136:22 158:2
**refresh (3)**
69:3 257:19 273:15
**refreshed (1)**
10:4
**refused (1)**
77:22
**regard (2)**
115:25 207:12
**region (2)**
265:14 286:10
**regional (11)**
83:15,16,19 85:19
86:12,14,22 87:3,4
156:8 196:23
**Registered (2)**
2:12 295:5
**registers (2)**
81:24 82:12
**regulatory (1)**
218:10
**reimburse (2)**
189:10 213:7
**reimbursed (1)**
184:6
**reimbursement (2)**
212:24 213:2
**relate (1)**
162:5
**related (7)**
67:11 75:13 91:18
93:11 192:5 205:4

295:16
**relates (1)**
154:6
**relating (5)**
36:12 199:12,15
216:19 223:15
**relation (5)**
125:9 221:4 249:19
286:21,25
**relationship (3)**
179:22 183:13 250:2
**relatively (1)**
256:20
**release (1)**
292:11
**relevant (1)**
224:4
**relied (3)**
84:8 110:3 244:12
**rely (5)**
220:3,19 221:14
243:4,5
**remain (7)**
28:5 37:18 67:20 68:8
68:24 70:19 91:25
**RemainCo (1)**
66:6
**remainder (1)**
157:23
**remained (2)**
29:22 35:25
**remaining (7)**
37:11 67:3 80:20
102:18 277:9,25
279:11
**remains (1)**
158:13
**remember (16)**
19:16 30:3 32:18 67:5
67:15 68:21 96:7
100:17 133:25
135:2 214:3,25
219:20 225:24
237:11 256:22
**rent (7)**
199:25 200:5,6,12
210:16 241:5
255:20
**reorganization (3)**
67:4,13 288:25
**repatriate (2)**
198:21 199:2
**repatriated (1)**
198:4
**Repatriating (1)**
156:19

JX 117-99

**repatriation (1)**
196:20
**repeat (14)**
28:18 98:19 99:20
127:3 143:3 147:20
166:13 190:18
192:3 209:21
222:25 238:17
249:24 290:10
**repeatedly (1)**
102:11
**repeating (1)**
195:19
**replay (1)**
78:3
**replicate (1)**
151:11
**report (8)**
119:19 282:17 283:25
284:3,7,9,18 285:4
**Reported (1)**
1:18
**reporter (9)**
2:13,13 117:17
122:16 245:15
274:11 288:13
295:6,7
**reports (2)**
219:17 282:11
**represent (9)**
6:16 48:5 57:22 97:6
97:14 122:21 216:6
230:18 287:4
**representative (3)**
8:4,7,25
**representatives (1)**
223:24
**represented (3)**
20:8 49:10 278:3
**represents (3)**
91:13 247:24 253:3
**request (10)**
54:15 72:3,9,14,18
106:9,16 124:2,6
288:21
**requested (7)**
106:10,12 123:23,24
127:14 128:8
133:17
**requesting (2)**
106:16 229:24
**requests (2)**
72:6 107:2
**require (2)**
159:7 177:25
**required (15)**

41:14,19 45:10,15
46:15 49:8,25 50:17
84:11 90:22 112:22
164:15 166:17
207:14 215:10
**requires (3)**
179:5,19 218:8
**reserve (6)**
126:15 276:3 278:9
279:18 280:11
292:23
**residual (2)**
69:7 104:11
**resolve (3)**
108:3,21 206:22
**resolved (3)**
60:15 107:15 108:16
**resolving (1)**
60:7
**respect (69)**
7:12 8:9,23 11:15,22
14:2,23 15:22 16:14
19:15 23:24 27:3,7
29:3,7,12 30:24
34:6 41:5 43:22
46:15 47:16 48:20
54:10 61:2 62:17
75:3 76:10 80:4,12
84:2 90:7 92:16
109:13 114:2
115:20 116:22
118:13 126:21
129:23 139:14
148:2 152:21 155:6
187:8 189:6 209:13
211:18 213:18
214:20 219:11
220:20 224:6,23
226:3 232:8,12
233:9,14 238:14
239:19 242:17
244:4 258:12,13
263:6 270:9 280:19
280:20
**respects (2)**
164:10 219:10
**responded (1)**
224:22
**response (1)**
288:21
**responsibilities (2)**
192:24 224:21
**responsibility (2)**
25:23 26:2
**responsible (14)**
27:14 34:10 42:9,21

42:24 43:4,23 52:20
74:16 75:8,9 175:20
191:18 237:21
**responsive (1)**
72:18
**rest (4)**
66:15 165:7 196:25
207:10
**restate (2)**
130:16 166:13
**restructuring (39)**
27:10 41:6 45:20,22
45:25 46:5,19 47:15
48:19 49:12 50:11
100:21 114:16,18
116:21 118:4
221:20,21 222:11
222:12 223:6,12
224:7,20 225:13,15
226:10,12,24 227:7
227:8,20 237:5
289:19 290:4,14,20
291:6,11
**result (8)**
6:23 55:11 130:12,13
133:10 165:9
205:17 272:18
**results (1)**
132:10
**retail (8)**
19:25 20:4,9,15,21
21:3,8 137:21
**retain (2)**
235:9,14
**retained (3)**
12:5 235:13,17
**retaining (1)**
235:2
**retains (1)**
70:5
**return (2)**
106:9 109:8
**returned (4)**
88:22 106:10,20,22
**returning (1)**
107:2
**reveal (1)**
222:2
**revealing (1)**
228:6
**review (12)**
8:17 10:3,11 96:20
117:21 230:23
245:18 274:14
282:10 288:16,17
289:3

**reviewed (10)**
9:12 52:15 53:5,5,7
53:10,11,16 284:25
285:4
**revised (13)**
96:14 97:15 119:13
119:15,20 153:3,12
158:8 163:12,23
201:23 202:12
294:11
**Rico (1)**
91:18
**Riecker (8)**
22:9,10 36:5,9 57:7
84:6 108:7 135:14
**Riecker's (1)**
52:23
**Rifkind (1)**
4:4
**right (34)**
16:17 33:7 35:14
37:13 39:5 62:8
68:21 80:17 86:11
108:18 120:4
126:15 127:21
132:20 140:12
151:15 155:9 178:6
182:22 183:2,3
188:23 195:6 198:6
206:10 208:21
210:8,20,21 236:15
239:24 252:19
260:10 269:14
**right-hand (2)**
90:21 137:22
**risk (3)**
113:3 114:21 227:16
**risks (12)**
45:3,6 103:15 104:5
112:13 114:6,19
115:12,21 116:3,12
208:18
**Rob (6)**
22:9,10,11 84:8 108:6
135:14
**ROBERT (1)**
4:9
**Roger (2)**
245:9 259:11
**role (15)**
13:25 27:3,7 30:23
41:22 53:3 76:2
80:13 138:9,21
221:19 223:19
234:23 241:15
244:6

**roles (2)**
12:14 140:24
**roll (1)**
162:2
**romanette (1)**
231:23
**romanettes (2)**
231:9,18
**room (4)**
26:11 101:11 144:24
165:14
**rooms (4)**
25:12,15,21,24
**Rosenstein (1)**
5:16
**Ross (1)**
5:16
**rough (1)**
67:16
**roughly (9)**
48:13 57:23 149:14
149:23 251:13
268:12 277:16
283:2 292:2
**round (3)**
94:5,24 95:2
**row (1)**
187:3
**royalties (8)**
44:11 93:3,9,10,13,22
94:5 213:19
**RPR (2)**
1:19 295:24
**rules (2)**
6:2,24
**run (4)**
27:21 39:12 169:20
276:17
**running (5)**
39:5 188:7,23 239:12
251:7
**runs (1)**
83:21

_____S_____
**sale (30)**
11:9 23:19 25:13 26:4
33:8,11 34:2,11,22
66:10,15 68:9,9,25
91:7,9 92:5,8
165:25 166:5 168:7
230:19 234:7
235:18 236:6 241:8
254:8 256:8 272:24
276:14
**sale-related (1)**

25:5
**saleable (1)**
109:5
**sales (28)**
33:18,19 93:11 138:4
138:11 139:4,14,16
140:13 141:4 142:9
143:2 144:19
145:22 146:6,10,17
147:9,11,16 148:3
149:4,15,21 150:13
219:24 236:25
239:12
**same-store (18)**
138:4,11 139:16
140:2,13 142:9
143:2 144:19
145:21 146:6,10,16
147:9,11,16 149:4
149:15,21
**sat (3)**
16:11 102:3 134:18
**satisfy (3)**
128:2 277:25 279:21
**satisfying (1)**
106:25
**Saturday (1)**
282:12
**savings (6)**
104:17 111:14 200:5
200:6,7,22
**saw (1)**
134:2
**saying (7)**
112:4 165:13 170:7
190:19 201:9 277:4
284:9
**says (27)**
30:17 41:18 45:14
58:12 81:7,8 84:10
98:9 110:13 111:17
118:25 120:5
128:12 163:21
178:6 195:6 201:23
214:23 250:21
252:7 254:10
280:24 284:9,16,16
285:10 286:15
**scale (2)**
255:3 260:19
**scenario (10)**
37:23 165:16 288:10
289:19 290:3,13,18
290:19 291:20
294:22
**scenarios (1)**

289:21
**schedule (21)**
38:8,13 62:12 63:16
63:23 71:22 74:22
103:24 105:6 112:3
112:8,21 113:24
153:10 157:13
168:22 169:17
185:17 197:9,10
276:7
**schedules (8)**
49:14 57:2 59:23
62:10 66:4 70:23
110:25 113:18
**Scott (1)**
11:19
**script (8)**
159:8,9,19,20 160:2,5
161:4 163:12
**scripts (4)**
159:2,9,16 160:23
**se (1)**
265:25
**Sears (52)**
1:6 3:7 4:6 10:18,25
11:15,17,19 12:16
14:3 15:5,23 16:15
18:7 19:24 21:18
22:2,3 24:8,13
25:17 29:2 35:2
36:3,8 75:14 87:18
90:17 93:16 124:15
140:14 143:22
152:5 172:25
174:12,15,19,25
179:14 190:25
191:20 229:9,13
237:24 240:5
242:13 256:11
272:13 285:20
286:4 288:25
294:13
**Sears' (2)**
27:12 239:5
**Sears-UCC (1)**
122:6
**second (10)**
125:10 128:14 148:23
156:3 170:17
205:20 248:10,12
254:3 264:12
**Secondly (1)**
167:16
**section (6)**
78:19 170:9 197:25
202:14 231:6

271:12
**security (1)**
92:3
**see (96)**
40:10,14,18 41:15,20
51:19,23 52:3 58:18
59:21 60:16 65:10
74:12 75:19 76:11
78:20,23 80:22 81:3
82:16,23 84:13 85:6
86:18 87:15 88:15
89:15 93:3,4 95:13
95:22 97:3 98:3,4
102:17 104:4,7,19
105:13 107:6
110:12,16 112:14
115:16 119:3,13
123:6 126:21 129:2
129:11 136:10
137:23 138:7
140:12 141:15
146:2 154:3,17,21
154:25 156:4,17
162:10 170:7
181:16 184:13
193:10,15,19
199:19 200:2
201:25 202:2,3,11
209:8 221:11
231:12,20 247:3,7
249:11 250:22
251:10 252:17
259:20 261:22
262:5 267:17
268:18 275:2
276:23 277:17
281:9 283:21
289:14
**seeing (1)**
8:20
**seeking (1)**
7:12
**seen (39)**
8:18 59:19,20 63:23
64:17 65:12,14 66:3
66:4,21 71:11 72:4
122:20 123:12,15
126:7,14,17 131:4
142:14 145:7 228:7
228:11,20 229:15
229:25 230:6,25
232:11 233:3,10,13
245:20 259:6
260:15,18 261:14
264:25 284:11
**self-insured (1)**

217:2
**sell (11)**
24:15 82:13 109:8
164:24 165:6,18
166:21 168:3
171:11 268:4 292:2
**selling (5)**
24:9 166:6,23 216:17
253:18
**sending (1)**
83:18
**senior (13)**
18:6 83:22 97:23 98:9
134:16 140:22
186:20 187:8,16
199:22 201:7
247:13 278:18
**sense (11)**
10:20 11:2 51:17
61:23 109:11 136:9
178:14 236:5,7
253:16 266:8
**sensing (1)**
179:23
**sent (2)**
40:16 123:25
**separate (10)**
29:11,12 91:5 109:18
171:22 198:15
208:17 219:3
225:14 279:5
**separately (2)**
208:16 279:19
**September (1)**
140:15
**series (6)**
20:12 90:4 91:11
144:16 223:14
278:17
**service (2)**
63:9 213:6
**services (6)**
35:8 58:15 87:19
229:10,13 289:2
**servicing (3)**
217:18,21 287:6
**session (2)**
3:22 152:2
**set (13)**
28:24 40:3 41:3 44:10
55:8,10 91:6 121:17
172:3 186:10 256:4
295:11,21
**sets (1)**
284:25
**setting (3)**

171:8 226:7,8
**settle (1)**
178:20
**settled (1)**
79:4
**settlement (1)**
172:18
**severance (7)**
62:18,20 63:2,8,13,24
64:9
**SG&A (3)**
17:24 18:22 221:6
**share (1)**
118:4
**shared (1)**
111:2
**Sharmeen (1)**
5:12
**shed (1)**
117:15
**sheet (13)**
193:19,23,24 194:13
195:7 269:24
270:23 286:2,9,18
287:3,11 296:1
**shelves (2)**
169:7,11
**ship (4)**
92:3,5,23 114:3
**shipments (1)**
52:15
**shipping (1)**
236:20
**ShopYourWay (6)**
141:7 142:23 143:14
143:20 144:4
151:13
**short (4)**
101:9 134:18 204:20
241:10
**shorter (1)**
219:9
**shortfall (19)**
44:8,22 45:3 50:18,24
51:9,13 78:10 81:2
95:25 103:16,18
115:11 116:23
153:3,17 208:4,9
211:8
**show (7)**
78:9 158:6 174:12
186:19 233:5
275:10,21
**showed (1)**
100:3
**shown (7)**

42:20 76:3 81:13
155:6 250:4 265:2
276:10
**shows (21)**
45:4 50:13,16 60:3
62:12 63:17 66:22
71:2 79:24 80:20
81:22 82:22 86:17
88:14 90:10 119:2
184:11 202:12
229:5 275:11 277:5
**SHS (1)**
87:18
**shut (1)**
33:2
**side (13)**
13:6 38:5,9,10 40:13
51:19 80:17 175:16
177:16 195:6 221:5
221:13 274:6
**sides (1)**
208:24
**Signature (1)**
296:21
**significant (3)**
28:12 265:12 272:8
**significantly (1)**
282:19
**Sima (1)**
16:9
**similar (5)**
65:16 213:17 256:5
261:22 269:3
**similarly (2)**
65:5 254:20
**Simon (3)**
20:8,23 21:2
**simply (14)**
94:19 113:3 131:14
131:17,18 151:16
166:3 179:11,12
180:18 212:18
244:3 280:5 287:15
**single (1)**
43:4
**Sinha (2)**
36:10 135:15
**sit (2)**
165:2 198:5
**sitting (2)**
105:22 171:4
**situation (7)**
190:13,21 222:5,9
241:8 264:5 268:6
**situations (2)**
16:19 144:12

**six (3)**
40:13 168:18 216:9
**size (1)**
108:9
**SKADDEN (1)**
5:4
**skim (1)**
9:17
**skimmed (3)**
9:15,20 282:15
**skip (2)**
78:22 193:9
**SLATE (1)**
5:4
**slide (61)**
41:13,23,24 42:8,20
43:15 49:11,23
51:19 58:11 72:25
74:10 76:4 80:18
84:21 90:9,19 95:13
97:21 101:15,18,23
101:24 102:7 103:8
103:12,14,23
113:12 114:24
115:2 118:21
137:19,23 139:5
145:18 149:13
153:4 157:23
158:21,23 162:6,24
163:10 164:3,19
184:10 193:11,11
194:19 201:4
202:23 207:23
274:22 275:8,9
276:24,25 277:7
283:4 290:19
**slides (2)**
157:8,9
**slightly (1)**
67:7
**small (7)**
12:5 155:15 246:11
250:23 253:3 272:5
272:5
**smaller (7)**
15:11 21:13 68:18
69:14 71:15 269:5
272:17
**soft (3)**
140:19 141:10,11
**sold (15)**
31:11 34:3 67:21
68:19 91:12 104:14
165:7 166:5 170:23
248:24 251:15
266:22 272:25,25

280:25
**solid (2)**
197:19 198:2
**solidify (1)**
112:9
**solve (1)**
51:4
**solvency (24)**
27:4 28:21 29:13,16
35:23 36:25 37:6
41:5 44:10 45:11
46:16 47:17 48:20
49:9 50:19 101:2
118:7 152:22
199:16 201:6,13,16
223:17 225:5
**solvent (7)**
27:22 28:6 29:23 36:2
37:12,19 279:8
**somebody (5)**
59:16 65:4 74:24
90:16 265:13
**somewhat (2)**
16:2 113:19
**soon (4)**
106:11 195:22 267:5
280:17
**Sorkin (32)**
3:20 6:7,13,15 54:8
54:19 71:24 72:19
73:25 74:6 101:8
120:16,22 121:9,12
121:24 122:4,8,14
122:25 151:24
152:7 199:12 217:9
222:7 267:6 271:9
273:25 292:15,21
292:25 294:4
**sorry (11)**
15:8 21:21 111:19
123:3 129:2 143:3
172:14 249:23
270:10 289:22
290:9
**sort (101)**
13:5 14:18 15:2,19
16:6,24 18:13,17
19:7 21:11 25:5
26:3,6 29:18 30:8
33:9,18 36:16 37:6
38:9,11 40:12 42:3
43:3,5 49:16 53:22
57:12 66:24 68:4
70:23 71:2 82:20
85:25 94:5 96:8
100:7 102:4 109:13

119:24 124:12
127:20 141:2,14,18
144:15,15 149:2,9
154:12 156:12
165:10,11 170:25
171:14,23 178:18
180:25 184:23
186:14 187:3,19
188:5 196:24
207:16 208:14
214:12 215:4 220:2
220:14 221:8
223:24 224:21
236:17 240:24
241:13 242:11
244:16 246:2
247:13 255:4,14,22
258:5 259:21
264:21,23 266:13
266:14 267:2 269:4
269:7,9,17 274:20
276:4 278:5,24
282:7 286:19 289:3
**sorts (1)**
64:8
**sought (2)**
234:15 258:25
**sounds (3)**
38:18 72:13 169:4
**source (1)**
110:15
**sources (18)**
12:8 14:9,11 45:2,5
90:8 103:14 104:5,7
104:10 115:10
116:3 153:16
229:25 230:4,6,11
230:14
**SOUTHERN (1)**
1:3
**space (1)**
20:2
**spacing (1)**
148:22
**speak (7)**
9:2,8 11:24 15:17
218:12 273:12
285:5
**speaking (1)**
9:5
**speaks (1)**
120:14
**special (2)**
24:17 25:7
**specialty (1)**
25:6

**specific (43)**
10:24 11:5 17:14
20:20 28:20 29:15
37:7 38:19,21 39:18
47:6 70:9 72:3
74:19 88:4 89:2
102:13 105:3 108:2
115:16 116:19
128:4 133:16
143:16,16 146:22
167:24 181:8,10
182:6 184:7 191:16
199:8,10 212:16
224:9 227:25
232:17,18,23
238:23 263:4,8
**specifically (50)**
13:25 23:3,14,24
26:15,21 35:7 43:12
44:5 49:18 52:22
54:6,25 56:12 59:25
63:4 64:24 67:19
69:15 70:3 72:11
84:4 86:24 88:12
89:20,24 92:25 96:8
108:4 127:9 131:5
134:7 139:13
143:24 151:3 154:9
184:25 195:11,17
208:13 214:9 218:6
232:6 233:15,17
258:11 263:21
275:22 277:23
286:7
**specificity (2)**
113:22 115:19
**specifics (2)**
115:23 220:25
**specified (3)**
173:14,16,20
**specify (2)**
10:25 11:4
**spectrum (1)**
257:6
**speed (2)**
196:23 239:6
**speeding (1)**
156:8
**spend (3)**
167:8,10 180:15
**spending (1)**
140:21
**spent (5)**
16:9 18:10 21:14
140:10 142:10
**spoke (5)**

107:10 118:12
156:24 200:25
275:4
**spoken (3)**
106:6 108:6 285:7
**spreadsheet (5)**
53:23 246:10,14,19
250:19
**Square (1)**
5:6
**ss (1)**
295:3
**SSS (1)**
145:21
**stabilize (1)**
236:18
**stage (1)**
28:24
**stakeholder (1)**
275:17
**stakeholders (1)**
28:13
**stamped (2)**
152:5 294:13
**standalone (2)**
288:24,25
**stapled (1)**
270:16
**start (8)**
43:10 101:21 102:12
181:21 212:8 223:2
277:13 280:14
**started (8)**
12:24 13:2 16:8 142:8
173:2 223:11
236:23,25
**starting (1)**
135:20
**State (3)**
2:14 295:3,8
**stated (1)**
55:25
**statements (1)**
57:19
**states (4)**
1:2 138:2 145:20
284:19
**stay (1)**
82:12
**stayed (2)**
27:21 68:5
**Steen (1)**
4:13
**step (2)**
10:14 44:3
**stepping (1)**

32:11
**steps (2)**
14:19 268:13
**stop (2)**
120:19,19
**store (9)**
81:21 137:14 139:4
148:2 156:21
196:19 241:2
256:11 266:23
**store-by-store (1)**
135:20
**stores (15)**
36:13 68:13 81:25
82:13,20 104:16
137:11,15 166:4
167:20 171:11
241:9 248:4,7
272:17
**straight (1)**
191:3
**strategy (2)**
137:13 150:9
**Strauss (2)**
2:10 3:15
**streams (1)**
90:4
**stressed (1)**
239:8
**strike (19)**
10:16 25:8 46:9 97:8
110:9 128:23 139:8
139:11 143:18
170:13 221:17
227:18 239:15
241:19 242:18
247:16 248:20
271:4 289:16
**strong (2)**
166:25 167:2
**structure (3)**
125:2 126:8 228:22
**structured (1)**
176:24
**studied (1)**
62:9
**stuff (3)**
156:17 185:5 233:12
**subcommittee (10)**
4:5 45:21,22 46:4
221:21 222:13
223:10 225:15,18
225:23
**subject (6)**
6:5 23:6 106:25 207:4
222:23 263:19

**submit (1)**
238:21
**Subparagraph (2)**
231:15,17
**subparagraph(a) (1)**
231:13
**Subscribed (2)**
293:7 296:22
**subsequently (1)**
40:24
**subset (1)**
253:3
**subsidiary (7)**
87:13,21,25 88:7
89:14,18,21
**substantially (2)**
234:8 240:12
**substantive (3)**
101:22 103:21,22
**substantively (2)**
102:5 161:24
**subtotal (1)**
187:7
**successful (3)**
141:3 230:21 231:11
**sufficient (2)**
18:4 76:16
**suggest (1)**
87:17
**summarizes (1)**
40:5
**summary (11)**
102:17 125:11 173:18
235:3 246:2,11,25
247:15 250:19
274:17 275:18
**summer (1)**
35:2
**supplied (3)**
52:7,16 130:25
**supplier (1)**
132:7
**suppliers (3)**
58:15 62:4 133:5
**supply (1)**
141:25
**support (1)**
127:14
**supporting (4)**
17:10 20:14,19 59:23
**surcharge (2)**
280:19 281:13,22
**sure (70)**
6:25 10:21 11:11
21:23 23:23 28:3
31:18,20 35:16 39:8

41:10,12 47:22
57:13 59:14 61:8
69:5 98:20 102:12
121:18 124:17
127:4 130:18
139:21 143:5
147:22 153:20
155:12 158:24
159:23 160:9
163:18 166:7,14
180:23,24 183:2
187:18 188:15
199:9 200:7 201:6
206:18 209:23
211:14 215:20
216:24 222:24,24
224:12 225:10
228:19,25 234:3,5
238:18 247:20
249:25 252:5
257:21 259:18
264:12 268:25
270:15 279:16
289:25 290:11
291:4,7 292:18
**surprised (2)**
61:11,13
**survive (3)**
215:13,25,25
**Survivor (2)**
288:10 294:22
**sworn (4)**
6:10 293:7 295:12
296:22
**Syms (1)**
21:11
**system (7)**
65:25 77:16 82:21
83:21 113:16,17
186:10

_____
**T**
**table (1)**
49:5
**take (49)**
7:2,4 8:16 18:9 35:15
38:8 39:21 51:8
54:16 71:25 72:15
73:8,13,17,25 87:11
96:17 101:9 113:3
117:19 122:18
136:21 139:23
145:3 151:24
160:24 170:2 171:2
171:9 185:18
188:12 203:20

204:22 205:19
210:9 211:19
212:13 230:22
233:5 245:17
251:19 265:17
267:4,6,8 274:13
287:20 288:15
292:16
**takeaway (1)**
149:2
**taken (9)**
6:19 9:13 16:10 35:17
74:7 107:16 208:2
262:20 263:3
**takes (1)**
207:17
**talk (25)**
10:23 11:7 14:20
26:22 38:20 43:11
44:25 47:6 51:25
73:20 74:23 81:20
84:20 102:6 120:8
135:6 151:2,10,14
151:21 188:3
211:22 212:8,11
244:19
**talked (25)**
18:21 22:17 28:25
71:14 90:22 102:11
102:24 103:13
104:12 105:20
114:3 132:19
156:11,21 164:17
177:12 185:23
196:6 199:23
202:21 210:14
212:2 213:18 215:3
277:19
**talking (13)**
47:8 70:3 118:15
120:16 150:15
163:13 165:23
168:7,13 199:11
222:10 233:8 280:5
**target (9)**
148:20 162:15 164:9
164:14,19 170:11
170:15 173:23
187:3
**task (1)**
179:10
**tasked (1)**
188:6
**tasks (2)**
81:11 237:23
**tax (2)**

taxes (9)
64:22 65:9,19 66:2
78:9 79:19,20 80:5
214:22
team (33)
12:5,11 15:9,10,12,16
16:2 17:4,10 25:19
27:12 28:16 36:19
43:24 52:24 53:9
54:6 57:12 96:25
104:2 108:8 113:14
135:18 138:15
167:3 175:23
179:12 197:16
223:21 227:12
242:15 247:14
248:2
technicalities (1)
161:23
tell (40)
8:18 9:19 19:23 21:6
22:23 24:24 27:2
30:23 32:2 36:6
39:25 42:19 56:12
56:24 61:8 62:8
74:15 96:18 104:21
106:5 107:8 117:5
117:24 121:6
122:19 136:21
139:9,12 145:4
150:21 175:19
188:25 189:7,19
245:19,24 247:19
257:18 259:13
286:8
ten (5)
14:19 20:6 32:18
63:10 123:19
tenant's (1)
253:12
Teneo (2)
18:2 19:13
Teneo' (1)
18:6
term (4)
37:7 172:22 231:24
272:5
terminate (2)
127:22 203:23
terms (57)
26:8 30:14 31:7 34:11
38:24 42:19 44:8
51:12 52:6 60:16
65:21 66:13 80:14
95:21 96:4 97:7
100:18 106:22

108:24 115:19
123:8 130:13 131:3
132:11 133:4,5,10
133:19 135:4
137:12 138:22
143:25 144:3 159:6
165:15 167:11
168:7,21 183:25
201:11 204:8
209:10 212:22
215:3,6 220:24
221:4,22 224:14
230:21 240:25
253:20 258:14
261:11 265:4 269:5
270:16
test (2)
123:4 171:13
testified (1)
6:10
testify (2)
8:8 9:6
testimony (6)
151:8 183:8 191:8
206:19 257:17
295:14
testing (1)
150:10
Texas (1)
3:10
thank (7)
122:8,14 137:17
152:14 270:18
271:6 292:21
thanks (2)
121:10,24
theirs (1)
159:15
theoretical (2)
50:23 51:2
thing (4)
60:9 79:23 169:12
231:5
things (23)
14:22 17:11 19:12
20:16,18 29:19
30:11 59:21 111:9
163:5 175:18
192:11,20 194:12
197:24 208:15
210:13 212:3 221:8
221:10 236:19
243:11 259:3
think (123)
9:16 14:5 20:3 25:16
25:25 26:6 33:18

34:16,17 41:25
45:15 50:5 51:2
53:6 55:9 58:22
62:6 67:23 68:4
71:21 73:14,15
74:23 75:12 77:24
78:12 79:9,15 80:10
83:24 84:5 85:20
86:7 89:24 91:7
99:12 102:9,12
103:9 105:18 107:9
112:21 113:7 117:9
119:25 125:7,11
132:12 136:9
144:11 148:15,23
148:24 156:23
157:12,24 163:9
165:22 167:19
169:11 170:12,15
173:4,12 181:17
186:14,23,24
188:21 189:14
190:2 196:6 201:15
202:21 203:16,25
205:6 207:21,22
209:3,7 217:10
218:6,19 223:14
225:8 226:15
227:25 228:10
234:17 241:25
242:14 243:11
244:2,17 247:12,25
252:25 254:9
255:18 256:5,16,24
258:3,6,23 259:2,4
259:19 262:25
264:20,22 265:7,15
266:10,20 267:24
269:3 271:24
279:14 283:7 287:3
292:16
thinking (4)
38:24 173:5 212:8
230:11
third (3)
129:18 130:14 137:25
third-party (2)
253:20 255:23
thought (4)
100:5,12 109:17
143:6
thoughts (2)
127:20 147:5
thousand (3)
61:10,12 252:16
thread (4)

8:13 245:11 294:8,15
three (8)
66:24 67:5 135:13
140:16 190:24
250:6 276:8 280:23
three-day (1)
156:14
three-week (1)
237:15
tied (3)
96:9 156:25 208:15
tight (3)
14:5,6 239:11
tighten (2)
36:20 154:13
tightened (1)
14:17
time (93)
9:24 12:10 13:5,11,19
15:6 16:10 18:23
19:2,13 21:14,16
22:24 23:16 24:7
27:2 28:19 29:17
32:7,9 33:7 35:2
38:7 47:16,19,20
48:17 49:12,20 50:2
51:13 52:12 56:18
56:19 65:18 67:23
72:21 83:7 85:10
90:4 97:16 99:6,24
100:12,19 102:21
108:14 113:2 114:5
114:14 115:4 134:2
140:10,24 141:18
141:20 142:5,10
143:22 155:11
185:16 217:10
219:8,9,18 235:13
235:24 236:4
237:11 238:13,20
238:24 239:11
241:10 243:12
253:5,25 254:18
255:10,13 256:8,12
256:19,20 263:13
266:24 267:5
276:18 290:10,24
291:6 292:24 293:3
timeline (1)
151:14
timely (2)
39:4 213:21
times (8)
5:6 19:10 22:5 37:24
39:11 106:8 168:19
206:11

timing (5)
30:4 208:16 215:3,6
241:11
title (1)
12:21
today (8)
7:3,24 60:4 64:2
125:3 161:17 165:2
167:20
told (8)
94:17 122:6 151:16
184:25 227:14
240:24 242:15
258:25
tomorrow (1)
161:17
ton (1)
175:25
tons (1)
207:11
top (22)
21:11 40:14 59:8
61:21,24 62:9 69:2
80:21 84:10 95:3
119:23 137:22
144:20 145:15
175:19 194:15
215:5 217:25
250:20 251:2,6
252:7
topic (3)
26:23 162:6 217:11
topics (5)
8:9,23 9:2,6 217:14
Torrance (5)
252:2,15 259:13
260:2 265:2
total (17)
58:17 81:16 110:8,10
112:18 158:18
181:7,9 211:14,15
251:7 252:9 271:16
271:18,18 286:13
291:8
totality (1)
239:10
totalling (3)
63:24 153:14 181:9
totals (1)
271:20
touches (1)
176:2
Tower (1)
3:18
Toys (1)
272:15

JX 117-104

**Toys' (1)**
272:17
**ToysRUs (2)**
28:10 272:11
**track (2)**
186:11 197:10
**tracked (1)**
84:25
**tracker (2)**
201:6 208:12
**tracking (7)**
66:2 118:2,18 152:12
152:20 208:18,20
**traditional (1)**
142:6
**transaction (13)**
11:9 62:22 91:24
118:18 127:23
152:11 192:7,9
203:23 247:6,10
249:8 274:25
**transcript (9)**
6:4 9:16,20 10:3,7,8
10:12 274:2,3
**transcripts (2)**
9:13 10:11
**transfer (5)**
79:19 80:4 168:5
218:8,9
**transferred (3)**
82:13 213:5,21
**transfers (1)**
79:20
**transform (2)**
118:18 152:11
**transit (10)**
82:15,19,23 83:7 84:3
85:5,14,22 86:10
169:2
**transition (3)**
63:7 212:2,4
**translate (1)**
160:21
**transmitting (1)**
83:20
**Trap/unavailable (1)**
89:10
**travel (1)**
16:12
**treasurer (3)**
14:21 17:11 84:7
**treasury (4)**
11:23 14:8,15 219:8
**treaties (1)**
261:3
**treatment (1)**

40:6
**tremendous (1)**
192:20
**trial (3)**
150:10,12 292:24
**tripping (3)**
94:5,24 95:2
**trouble (1)**
134:24
**trucking (1)**
168:20
**trucks (1)**
156:12
**true (2)**
120:20 295:13
**truly (1)**
33:2
**try (2)**
174:23 206:22
**trying (34)**
24:6 37:9,14 38:23
43:13 50:8,9 55:16
55:25 69:10 74:20
78:15 83:6 85:18,23
86:4 103:4 108:21
121:25 131:17,18
132:9,16 143:7
150:6 151:18
157:20 166:19
169:22 182:21
183:6 186:16 207:2
236:18
**turn (4)**
97:21 155:24 173:17
222:11
**TV (1)**
142:6
**tweaked (1)**
221:12
**twice (2)**
46:4 271:3
**two (29)**
12:7 36:16 85:12
90:22 95:5,6 104:3
112:5 119:10
132:25 133:2
140:16 141:5
150:16 151:23
156:4 170:13 175:7
181:18 190:24
191:10 203:13
206:11 219:17
225:21 233:14
242:10 244:24
270:20
**two- (2)**

156:14 237:15
**two-thirds (1)**
40:12
**type (1)**
255:2
**typed (1)**
102:4
**types (1)**
64:11
**typically (1)**
63:6

_____
**U**

**U-Haul (2)**
91:9,12
**UCC (6)**
122:11 129:8 152:5,9
230:17 294:14
**ultimate (3)**
25:25 26:2 116:8
**ultimately (8)**
49:6 83:19 160:2
183:25 237:4
242:19 276:16
287:13
**Um-hm (3)**
94:23 115:5 161:5
**unclear (1)**
254:6
**undergoing (1)**
20:22
**Underneath (1)**
247:23
**understand (92)**
7:8,15,23 8:6,21,22
10:15 11:13 23:23
24:6 25:24 27:6
28:23,24 29:5 31:18
37:9,14 38:23 43:13
50:9,22 51:10 55:16
56:2 73:10 74:19,20
75:2 83:6 84:20
85:18,23 86:4 91:8
102:5,7,25 103:4
104:12 113:21
114:20 115:8 122:4
124:7,11,15 130:10
132:4,10,14,16
133:18 143:8
151:19 153:20
155:3 157:6 158:24
162:4 166:15,19
169:21,22,24 170:6
170:16 176:20
183:4,7 184:15
185:6 186:17

190:12 191:19
194:6 199:5 207:2
209:21 211:14
214:18 215:18
216:4 228:25
232:21 234:5
239:25 251:19
252:5 261:18,25
277:24
**understanding (108)**
10:17 13:24 23:6,11
24:21 26:2 34:5
38:16 39:2,6 42:9
43:21 49:22 53:21
61:14,18 63:15 64:6
64:12,15 68:22
70:18 75:7,23 76:14
77:19 79:22 80:7
82:7 94:3,8,18 97:9
98:6,15,21 99:16,22
105:15 107:21,25
119:5 124:25 130:2
130:5,20,24 131:13
132:6 133:15
135:24 136:3 137:3
140:6,11 143:13,19
146:4 161:23
164:21 177:4 183:7
184:3 189:15,16
192:25 198:19
203:11,19,25 204:5
204:15 206:18,23
209:23 213:4,12,20
214:6 215:21
217:17 229:21
231:22 232:3 234:6
238:9 239:23 240:2
240:9,11,17 246:18
248:21 250:5
251:12 252:8,12
255:6 256:3,7 257:2
257:16 259:19
268:20 269:10
282:16 287:23
288:6
**understood (57)**
7:17 10:2 24:2 25:2
26:18 32:20 37:21
43:6 44:15 45:7
53:2 54:19 70:16
71:23 72:19 73:11
74:6 77:17 78:14
82:10 109:10,20
111:12,19 112:12
113:21 120:8
123:17 128:15

132:23 133:9
137:17 142:12
144:21 151:18
160:19 163:8,17
164:2 171:18
172:17 176:15
187:5 201:8 202:18
211:12 214:15
215:7 221:3,3 222:4
250:16 251:18
268:10 273:8 277:3
290:11
**undertake (3)**
235:25 236:11 237:23
**undertaken (3)**
37:8 135:18 214:16
**undertaking (2)**
194:23 236:4
**underway (1)**
209:2
**unencumbered (31)**
91:13 194:8 234:16
236:2,12 240:5,13
240:20 241:14
242:20 243:18
247:16 251:16,17
257:10 261:11
263:17 268:16
271:19,21 274:23
275:21,23 278:7,7
279:11,17,20
280:10,15 282:25
**UNION (1)**
295:4
**unit (4)**
10:24 11:5 33:9
179:21
**UNITED (1)**
1:2
**units (2)**
32:23 33:14
**unnecessarily (1)**
167:14
**unpaid (2)**
59:4 64:9
**unprecedented (1)**
268:7
**unreasonable (3)**
132:8 133:6 148:19
**unsecured (10)**
3:16 6:17 20:9,24
276:22 283:20
284:2 286:14
288:22 289:9
**up-to-date (1)**
121:19

**update (3)**
17:5 118:17 120:11
**updated (8)**
60:3 97:12 110:25
113:17 118:13
137:16 152:11
218:21
**updating (1)**
60:8
**upper (1)**
250:21
**UPS (1)**
174:10
**upside (1)**
227:16
**upsides (2)**
102:23 208:20
**urgency (1)**
108:21
**use (18)**
30:12 136:15 174:4
178:6,11,24,25
180:17,19 181:16
221:9 242:16
243:19 259:18
261:13,19 286:12
286:17
**user (1)**
141:8
**uses (5)**
229:25 230:3,6,12,15
**utilities (1)**
88:20
**utility (4)**
88:14 89:2,5 156:22

—————————
           **V**
—————————

**valid (2)**
60:17 94:7
**validate (1)**
116:16
**validating (1)**
56:10
**valuation (11)**
159:18 232:7 261:4
262:3 263:6,7
265:23,23,25
266:19 282:18
**valuations (3)**
241:2 243:16 270:6
**value (104)**
18:15 31:17 33:8,11
41:14,18 45:5,9,15
46:15 49:7,24 50:17
68:23 69:7 70:20
75:18,24 76:4 79:24

84:11 89:25 90:21
91:14 103:15 104:5
104:11 110:8,11
112:22 115:10
116:3,4,11 155:20
159:9,20 161:21
194:2 195:13,25
228:8,14 229:4,11
229:12,17 233:20
233:22 234:12
236:5,8 238:25
240:19 241:6 246:7
246:7,8 250:12
252:23 253:2,7,22
254:4,10,14,23,24
255:12,12,15,18,20
256:2,21,21 257:4,4
258:17 260:5,6
261:10 262:20,24
263:12 272:9
275:23 276:16
279:12 282:3,20,24
283:13 285:19,23
285:24,25 286:6,20
286:23 287:3,5
290:5,15
**valued (2)**
241:14 253:24
**values (16)**
241:24 243:4,18,20
244:7,7,14 251:22
254:19 258:7,10
260:19 269:7
271:25 273:3
274:24
**variability (1)**
267:3
**variables (1)**
186:7
**variance (11)**
119:12 154:25 156:5
157:7,10,15 184:13
186:18 187:12,16
196:8
**varied (1)**
22:4
**variety (9)**
12:14 14:17 17:9
107:13 173:22
182:23 210:25
268:5 272:6
**various (6)**
25:22 64:7 65:14 66:4
207:18 230:7
**vendor (8)**
178:2,6,9,18,19,24

179:6 180:16
**vendor-by-vendor (2)**
179:20 181:12
**vendors (11)**
52:7 58:14 111:10
117:13 131:6
177:15,18,22
179:18 221:6
236:20
**versa (1)**
244:22
**version (5)**
136:23 145:7 152:20
202:20 270:16
**versions (1)**
65:15
**versus (11)**
19:12 74:21,21 78:11
105:7 146:24
148:12,23 157:10
228:17 253:12
**viability (4)**
33:7 124:13,16 226:4
**viable (6)**
147:18 148:4 226:14
227:9,17,22
**vice (2)**
16:8 244:22
**video (1)**
17:6
**view (9)**
18:14 93:21 133:3
148:16,24 156:24
227:15 239:3,21
**viewed (1)**
239:18
**visit (1)**
73:22

—————————
           **W**
—————————

**waiting (1)**
133:21
**waivers (1)**
281:5
**Wakefield (2)**
257:18,24
**walk (2)**
153:19 206:9
**walked (1)**
225:20
**want (35)**
7:19 10:14 22:18
26:22 35:19 47:6,9
51:10,25 72:7,14,21
78:3,15,17 84:20
101:15,19 102:4

115:15 120:10,25
121:18 137:20
165:17 166:21
172:16 201:20
211:13 215:18
267:11 270:15
277:23 287:19
292:18
**wanted (15)**
11:23 15:17 17:20
30:16 124:7,17
151:2,10 163:18
212:18 231:5 242:2
270:25 271:10
291:7
**wants (2)**
73:20 188:18
**Warden (1)**
237:25
**WARN (4)**
62:18,23 63:2,24
**warranties (3)**
212:25 217:18,22
**warranty (1)**
213:6
**wasn't (15)**
14:18 19:6 43:3,3,5
53:14 66:23 73:5
78:3 109:14 144:18
197:9 224:9 255:4
278:25
**waste (1)**
72:21
**waterfall (5)**
275:14 278:6 280:8
282:3 283:18
**wave (3)**
68:12,13 71:15
**way (33)**
15:3 19:7 20:16,18
27:21 39:9,12 40:13
42:3 43:5 56:3
59:20 65:16 83:9
100:6 144:13
157:12 165:6,10
167:14 174:18
190:20 197:8
208:18 209:5 212:5
232:21 259:3
260:24 266:3
272:22 282:2
295:18
**ways (13)**
14:12,16 44:20 45:2
50:23 116:22
156:18 163:7

165:19,23 210:19
212:3 244:16
**we're (2)**
156:16 169:15
**we've (5)**
72:6 152:13 199:22
210:14 270:3
**Wednesday (2)**
40:17,20
**week (13)**
9:15 12:2 17:3 18:10
70:25 71:11 106:8
123:19 149:7
168:18 192:10
211:24 214:9
**weekend (1)**
134:9
**weekly (19)**
16:24 17:2,5 22:14
96:21 97:10,12
118:2,18 152:11
168:23 218:4,15,20
218:25 219:6,14
220:9,22
**weeks (4)**
63:10 205:9 219:24
236:23
**Weelborg (1)**
5:14
**Weil (10)**
3:5 8:24 24:20 40:11
80:11 205:12 207:8
222:9 223:23 238:7
**Weil's (3)**
47:23 48:4,9
**Weiss (3)**
4:4 222:15,16
**welcome (1)**
231:7
**went (12)**
47:11 52:14 77:10
112:20 207:24
214:10 266:21
272:22 278:8,13,18
278:21
**weren't (1)**
26:19
**Wesley (3)**
16:8
**Wharton (1)**
4:4
**whatsoever (1)**
234:3
**whereof (1)**
295:20
**Whirlpool (1)**

62:4
**willing (2)**
95:20 188:11
**wind (1)**
66:14
**wind-down (44)**
29:18,25 30:9,13,18
  30:20,24 31:7,16,21
  32:5,15 33:10 35:20
  36:12 37:22 66:7,8
  68:6 105:9 243:12
  243:14,20 249:16
  249:21 250:3
  254:15 256:10
  261:15 266:22
  274:8,18 276:3
  278:8 279:18
  280:11,17 289:12
  289:18 290:3,13,18
  291:19 294:18
**winding (3)**
66:9 67:2,10
**window (1)**
256:9
**wishes (1)**
131:17
**withholding (1)**
156:20
**witness (14)**
6:9 7:22 26:24 73:24
  74:4 144:25 190:8
  199:7 222:15,21
  294:7 295:10,14,20
**witness' (1)**
144:25
**wondering (6)**
43:16 143:12,15
  183:14 206:20
  229:14
**word (2)**
51:2 248:2
**words (8)**
7:25 30:12 181:11,17
  187:10 208:8
  228:14 229:4
**work (20)**
18:16,17 23:13 53:10
  72:16 90:4 108:18
  116:14 121:16
  127:17 150:7 153:7
  174:14,22 177:2
  192:22 194:5
  237:18 243:9 244:5
**worked (15)**
13:12 20:3 36:2,7
  52:16 84:23 150:6

173:7 189:13
191:25 192:16
193:3 196:21
207:19 242:3
**working (30)**
12:12 14:24 15:10
  20:11 25:17 27:12
  31:3 43:8 51:12
  60:16 75:15 135:17
  138:21 153:9
  156:16 157:20
  167:4 174:11
  175:24 176:18
  179:10 180:9
  192:10,13 193:6
  198:3 209:3,5
  242:11 284:4
**works (3)**
171:12 232:22 246:22
**world (1)**
179:25
**worth (5)**
77:20 229:7,10
  233:24 234:2
**wouldn't (1)**
61:12
**wound (4)**
29:21 33:2,15 67:21
**wrapping (1)**
292:17
**written (1)**
236:11
**wrong (9)**
19:22 33:22 129:3,5
  172:22 189:16
  239:24 247:22
  279:24

_____
**X**
_____

**X (2)**
1:4,9

_____
**Y**
_____

**yeah (9)**
39:7 42:25 46:11 62:3
  72:12 186:23
  191:17 234:17
  254:5
**year (11)**
91:19,19 147:19
  148:5,14,15 149:22
  149:25 150:25
  257:11,11
**years (11)**
12:11 20:7 140:2,21
  142:14 190:24

191:10,20 192:6
272:16 292:4
**yesterday (3)**
161:11 211:21 212:7
**York (11)**
1:3,13,13 2:11,11
  3:19,19 4:8,16 5:7,7
**Young (1)**
211:25
**Yup (3)**
121:14,14 161:7

_____
**Z**
_____

**Zatzkin (3)**
242:10 245:7 246:16
**zero (1)**
149:16

_____
**0**
_____

**0 (3)**
159:3 160:18 162:22
**00 (1)**
122:11
**00004465 (1)**
129:8

_____
**1**
_____

**1 (33)**
41:13,23 42:8,20 45:8
  49:11,23 51:19
  58:11 72:25 74:10
  76:4 80:18 90:19
  95:13 103:3,8
  145:22 146:5,16,24
  147:8,15 148:12,19
  149:16,21 150:2
  153:25 154:5
  163:12 277:16
  285:16
**1,657,000,000 (1)**
162:16
**1.1 (2)**
204:7,12
**1.2 (7)**
203:3,12,21,24 204:6
  206:6,8
**1.4 (2)**
277:16,25
**1.6 (2)**
162:15 171:15
**1.678 (1)**
162:19
**1/25/19 (1)**
156:2
**1/28 (1)**
161:10

**1:40 (1)**
152:3
**10 (12)**
48:14 86:17 87:5
  88:14 156:22
  159:25 160:15,19
  161:3 177:14,16,19
**10- (1)**
159:25
**10-million-dollar (2)**
180:5,13
**10:13 (1)**
35:17
**10:14 (1)**
40:16
**10:20 (1)**
35:17
**10:24 (2)**
50:14,16
**10:30 (2)**
50:10,13
**100 (12)**
60:24 61:7,13 128:20
  204:16 213:11
  229:10,11 266:6,7
  278:3 283:13
**100-million-dollar (1)**
95:24
**10006 (1)**
4:16
**10019 (1)**
4:8
**10036 (2)**
3:19 5:7
**102 (1)**
211:8
**104 (3)**
155:9 201:21,24
**104-million-dollar (1)**
202:11
**106 (3)**
132:9,15,17
**108 (2)**
130:21 132:22
**109 (6)**
131:7 132:4,15,16,21
  133:3
**11 (16)**
1:5 20:22 23:15 28:14
  97:3,15 139:24
  140:12 143:23
  149:13 159:25
  236:16 239:5
  242:25 258:6,8
**11:04 (1)**
74:7

**11:07 (1)**
74:7
**11:37 (1)**
101:13
**112 (3)**
93:6,24 121:7
**114 (2)**
110:11 121:11
**118 (3)**
202:8,12,16
**11th (1)**
250:7
**12 (6)**
149:7 160:10,13,15
  252:15 260:9
**12-dollar (1)**
159:25
**12,055,000 (1)**
259:15
**12,055,011 (1)**
252:16
**12,055,011-dollar (1)**
259:15
**12:55 (1)**
151:25
**120 (2)**
214:24 216:7
**125 (3)**
145:24 232:13 278:20
**1285 (1)**
4:7
**13 (4)**
245:12 256:16,16
  294:16
**13-week (2)**
29:8 219:14
**134 (1)**
78:8
**135 (3)**
65:9,13,22
**139 (13)**
76:10,16 77:20 181:2
  181:7,10,11,24
  182:4,8,23 183:17
  183:20
**14 (40)**
39:20,22 40:2,3,9
  44:6,25 46:17 47:14
  47:24 48:14 49:23
  54:12 58:7,12 73:2
  74:10 80:18 90:9
  97:17 98:14,24
  99:10,11 101:15
  103:14 114:6 115:2
  115:3 116:18 119:7
  267:16 271:19

274:8 276:18
289:14 291:16,17
291:20 294:19
**15 (31)**
21:23 56:16 60:11
81:22 82:22 83:5,25
85:6 89:10,17,23
112:17 117:19,25
118:14,22 149:8,14
149:23 159:3
160:18 162:22
163:2,3,10,19,24
186:21,21 187:22
236:17
**15-million-dollar (3)**
107:5 160:6,12
**153 (1)**
294:13
**154846 (1)**
1:20
**16 (16)**
8:12,13,18 40:17,21
44:5 45:21 46:19
47:10 50:13 97:16
99:19,23 100:16
206:3 294:8
**160 (1)**
185:12
**165 (1)**
120:5
**1657 (7)**
163:3 164:18,22
166:17 169:8 170:2
170:3
**166 (11)**
78:7 128:25 130:6
132:18 133:8,12,19
185:12,19 186:3
188:11
**1678 (2)**
163:3,19
**16th (1)**
207:10
**17 (26)**
48:5,7,15 50:4,5 82:8
82:11 96:12,13,18
96:23 97:2,22
149:15 156:9,21
196:19 218:18,19
218:20 219:4
220:23 268:2,12
291:21 294:10
**173 (6)**
52:10 58:6 60:21
180:24,25 182:22
**173-million-dollar (1)**

54:21
**175 (2)**
275:25 276:11
**18 (15)**
140:14,15 152:4,9
162:7 193:12,13,14
202:24 207:23
208:6,19 246:19,20
294:13
**18-23538 (1)**
1:7
**19 (14)**
245:11,17 246:15
249:22 257:25
261:20 262:15
267:13 269:12,12
270:15,19 273:19
294:15
**196 (9)**
58:17 59:5,12 60:10
61:5,16,20,25
185:17
**1L (1)**
97:24

────────── **2** ──────────

**2 (22)**
44:23 101:15,18,23
102:7 118:21
152:24 153:4 157:8
157:23 180:23
201:4,21,23 250:24
250:25 252:3,4
260:3 264:12
280:22 281:14
**2.3-million-dollar (1)**
264:14
**2.4 (7)**
138:5 146:12,17,24
147:4,10 148:13
**2.7 (1)**
138:5
**2/9/19 (1)**
98:12
**20 (28)**
52:8,16 57:18 63:17
63:24 67:12 105:9
105:16 156:6
196:25 197:3,6
198:2 199:25 200:4
200:9,10 265:14
266:5 267:2 274:7
274:13,16,17
289:12,13 290:19
294:18
**20-million-dollar (1)**

62:25
**200 (3)**
3:9 79:6 211:10
**200-million-dollar (1)**
79:14
**201 (3)**
153:14 158:18 210:20
**2014 (1)**
13:4
**2016 (12)**
11:19 12:17 13:8,10
13:16,22 15:5,11,23
19:24 21:23 191:12
**2017 (2)**
19:22 140:20
**2018 (15)**
21:24 22:18,20 23:17
24:4,14 140:25
141:18 149:17
151:13 255:10,14
288:11 293:9
294:23
**2019 (26)**
1:14 2:5 8:14 46:20
97:3 98:11,17 99:19
129:21 138:4
145:23 146:6
148:15 149:22
151:13 245:12
255:10 274:9
276:19 289:13,14
294:9,16,20 295:22
296:23
**2020 (1)**
138:5
**2021 (1)**
138:6
**21 (5)**
163:22 288:9,15,19
294:21
**23 (2)**
118:16 119:16
**231 (4)**
187:7,12 231:25
233:6
**24.1 (1)**
260:7
**240 (3)**
276:2,11 278:9
**245 (4)**
193:18 194:12,16
195:2
**246 (1)**
294:15
**25 (10)**
67:9,21 112:16

118:20 119:19
120:11 152:16
153:5 159:19 260:6
**25-million-dollar (1)**
154:24
**255 (4)**
173:23 174:4 176:8
176:13
**255.1 (1)**
176:19
**25th (1)**
164:8
**27 (1)**
140:21
**275 (10)**
127:13 128:13,22
129:4,15,21 131:24
132:18 133:2
294:18
**275-million-dollar (2)**
128:9 129:12
**28 (5)**
8:14 69:9 106:2,19
294:9
**289 (1)**
294:21
**29 (5)**
1:14 2:5 81:10,18
154:20
**291 (1)**
175:13
**292 (4)**
173:25 176:9,10,16
**29th (1)**
295:21

────────── **3** ──────────

**3 (37)**
44:23 45:4 48:4,6,14
50:3,4 51:3,7 64:23
65:6 68:13 69:6
71:15 87:14 97:21
103:12,14,23
114:24 115:2,8
162:6,24 163:10
164:19 173:17
186:13 202:4,7,23
207:9 230:18 231:8
244:11 262:18
291:20
**3.3 (1)**
161:7
**3.4 (4)**
284:2,21 285:2 288:7
**3.5 (1)**
138:6

**3:30 (1)**
207:9
**3:42:01 (2)**
245:13 294:17
**30 (31)**
60:12 85:13,24 86:9
107:10,19,23 156:5
164:13 165:4,14
166:16 168:2
171:20 184:22
185:9 186:18,22
187:14,22 196:8,9
196:13,17,24 197:3
197:5 198:2 210:5
211:6 217:19
**30-million-dollar (1)**
184:12
**30-million-dollar-a-... (1)**
213:13
**30(b)(6) (5)**
8:3,7,25 26:24 199:7
**300 (3)**
191:22,22 192:15
**315 (3)**
251:8,13 271:18
**33 (1)**
154:2
**3300 (1)**
160:23
**331 (2)**
278:23 287:18
**34 (3)**
76:22 153:23 174:13
**34-million-dollar (1)**
175:3
**35 (4)**
67:8,17 250:15
292:12
**350 (1)**
203:8
**356 (1)**
102:19
**356-million-dollar (1)**
80:19
**36 (10)**
97:23 119:16,21
120:12 163:25
176:10,17 177:8
250:13,14
**36-million-dollar (1)**
174:8
**370 (1)**
57:23
**370-million-dollar (1)**
58:8
**38.1 (1)**

**JX 117-108**

249:9
**39 (6)**
110:18,22 111:5,14
111:22,24
**3b (1)**
231:8
**3s (1)**
231:13

---

**4**

**4 (17)**
5:6 44:23 87:2,6
145:18 155:24
157:9 158:21,23
164:3 184:10
193:11 194:19
207:23 280:24
281:9,16
**40 (5)**
112:18 160:10 210:6
211:6 272:23
**400 (1)**
244:11
**403 (1)**
271:20
**413 (1)**
122:12
**413607 (3)**
122:7 152:5 294:14
**425 (6)**
137:15 167:21 248:6
248:13,16 251:14
**43 (3)**
68:15 69:8 104:13
**430 (2)**
286:11,12
**44 (1)**
209:17
**4465 (1)**
129:7
**4466 (1)**
129:9
**45 (1)**
263:13
**45- (2)**
256:18 263:19
**45,000 (2)**
179:14,15
**450 (2)**
286:11,12
**46 (1)**
265:3
**46,800,000 (1)**
252:23
**46.8 (1)**
260:5

**4A (1)**
287:23

---

**5**

**5 (19)**
81:7 136:19,21,22
139:2 146:9 149:12
158:8,13 177:14,16
177:18 200:24
201:10 202:8,15
252:15 274:22
294:4
**5- (2)**
180:4,12
**5.2 (3)**
229:6,8,15
**5:43 (1)**
293:3
**50 (15)**
68:16 81:9,16 113:5
113:11 197:12,18
259:23 260:8 263:2
264:8,15 267:24
268:12 273:2
**500 (3)**
167:20 275:24 276:9
**500,000 (2)**
252:21 260:4
**503 (1)**
42:10
**503(b)(9) (38)**
42:11,11 52:2,5,11
53:4,24 54:10,22
55:7,12 56:15,22
60:19,21 76:11,17
77:12,21 109:23
153:21 177:11,12
178:3,7,13,21,25
179:3 180:21 181:9
181:24 182:9 183:9
183:16,21 188:16
214:21
**505-store (1)**
137:8
**506(c) (2)**
281:2,5
**507(b) (3)**
278:22 287:18 288:2
**561 (11)**
249:18,20 250:2,10
266:6,25 274:24
275:4,10,20 282:20
**57 (1)**
201:16
**596.5 (4)**
249:11,14,21 250:4

---

**6**

**6 (27)**
81:12,14 84:21 90:9
92:7,10,11,17,19,24
112:21 113:12
133:24 145:2,4,19
155:15 156:20
158:4 214:13 247:6
247:9 249:9 267:15
283:19,22 288:5
**60 (1)**
263:13
**60-day (2)**
256:19 263:19
**60-hour (1)**
225:20
**600 (1)**
292:2
**62 (9)**
41:19 45:11,15 49:25
50:17 51:14 118:8
119:6 201:18
**62-million-dollar (10)**
44:8 45:18 102:21
116:5 119:2 153:2
153:17 201:3,13
211:7
**634.5 (1)**
249:5
**66 (1)**
291:9
**6th (1)**
214:11

---

**7**

**7 (17)**
91:12 122:18 123:11
137:19,23 138:12
139:5 268:2 269:11
275:8 276:24,25
277:7 281:8 283:4
283:22 290:19
**7.50 (1)**
159:18
**74 (2)**
268:17 271:20
**75 (1)**
70:21
**75201-6950 (1)**
3:10

---

**8**

**8 (26)**
64:17,18 104:18,23
105:3 111:5,12,17

111:19,25 129:4
158:7,12 161:2
174:10 177:6,7
192:13 200:5,11,17
200:21 209:19
210:2 213:25 214:5
**80 (4)**
68:13 104:16 137:10
167:20
**80-million-dollar (1)**
66:18
**85 (2)**
187:7,11
**850 (2)**
95:22 203:8
**8th (3)**
98:25 200:13 214:10

---

**9**

**9 (5)**
48:13 98:11,16
213:25 294:8
**9.4 (5)**
170:11,17 171:9,15
172:3
**9:35 (1)**
2:6
**92 (1)**
211:8
**94-million-dollar (1)**
172:6
**950 (4)**
95:16 96:3,5 99:18
**97 (1)**
294:10
**992 (7)**
98:3,7,10 99:3,18
100:3,13

JX 117-109

# Exhibit 79

**EXECUTION VERSION**

---

SEARS HOLDINGS CORPORATION,

THE GUARANTORS PARTY HERETO

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee and Collateral Agent

INDENTURE

Dated as of October 12, 2010

6⅝% Senior Secured Notes due 2018

---

**JX 118-1**

## CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310 (a)(1) | 7.05 |
| (a)(2) | 7.05 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.06 |
| (b) | 7.04; 7.06; 12.02 |
| (b)(1) | 7.06 |
| (c) | N.A. |
| 311 (a) | 6.11 |
| (b) | 6.11 |
| (c) | N.A. |
| 312 (a) | 2.06 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313 (a) | 7.11 |
| (b)(1) | N.A. |
| (b)(2) | 7.01(a); 7.11 |
| (c) | 7.11; 12.02 |
| (d) | 7.11 |
| 314 (a) | 4.02; 4.03; 11.03; 12.02 |
| (b) | 11.02 |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | 11.03 |
| (e) | 12.05 |
| (f) | N.A. |
| 315 (a) | N.A. |
| (b) | 7.03; 12.02 |
| (c) | 7.02 |
| (d) | 7.02(b) |
| (e) | 6.12 |
| 316 (a)(last sentence) | 2.10 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.08 |
| (c) | 8.04 |
| 317 (a)(1) | 6.09 |
| (a)(2) | 6.10 |
| (b) | 2.05 |
| 318 (a) | 12.01 |

N.A. means Not Applicable
Note:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of the Indenture.

**JX 118-2**

## TABLE OF CONTENTS

**Page**

ARTICLE ONE

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.   Definitions ...................................................................................................1
SECTION 1.02.   Other Definitions .........................................................................................14
SECTION 1.03.   Incorporation by Reference of Trust Indenture Act. ...................................15
SECTION 1.04.   Rules of Construction ..................................................................................15

ARTICLE TWO

THE NOTES

SECTION 2.01.   Amount of Notes ..........................................................................................16
SECTION 2.02.   Form and Dating ...........................................................................................17
SECTION 2.03.   Execution and Authentication ......................................................................17
SECTION 2.04.   Registrar and Paying Agent ..........................................................................18
SECTION 2.05.   Paying Agent To Hold Money in Trust .........................................................18
SECTION 2.06.   Holder Lists ...................................................................................................19
SECTION 2.07.   Transfer and Exchange ..................................................................................19
SECTION 2.08.   Replacement Notes ........................................................................................20
SECTION 2.09.   Outstanding Notes .........................................................................................20
SECTION 2.10.   Treasury Notes ...............................................................................................20
SECTION 2.11.   Temporary Notes ...........................................................................................21
SECTION 2.12.   Cancellation ...................................................................................................21
SECTION 2.13.   Defaulted Interest ..........................................................................................21
SECTION 2.14.   CUSIP Number ..............................................................................................21
SECTION 2.15.   Deposit of Moneys .........................................................................................22
SECTION 2.16.   Book-Entry Provisions for Global Notes .......................................................22
SECTION 2.17.   Special Transfer Provisions ...........................................................................23
SECTION 2.18.   Computation of Interest .................................................................................25

ARTICLE THREE

REDEMPTION AND PREPAYMENT

SECTION 3.01.   Election To Redeem; Notices to Trustee ........................................................25
SECTION 3.02.   Selection by Trustee of Notes to Be Redeemed ............................................25
SECTION 3.03.   Notice of Redemption ....................................................................................26
SECTION 3.04.   Effect of Notice of Redemption .....................................................................27
SECTION 3.05.   Deposit of Redemption Price .........................................................................27
SECTION 3.06.   Notes Redeemed in Part .................................................................................27
SECTION 3.07.   Optional Redemption .....................................................................................27
SECTION 3.08.   Mandatory Redemption ..................................................................................28

JX 118-3

<u>Page</u>

ARTICLE FOUR

COVENANTS

SECTION 4.01.   Payment of Notes .................................................................28
SECTION 4.02.   Reports to Holders ...............................................................28
SECTION 4.03.   Compliance Certificate ..........................................................29
SECTION 4.04.   Limitations on Liens .............................................................29
SECTION 4.05.   Limitation on Sale and Leaseback Transactions ...........................29
SECTION 4.06.   Additional Guarantees ...........................................................30
SECTION 4.07.   Change of Control Offer .........................................................30
SECTION 4.08.   Collateral Coverage Offer .......................................................31
SECTION 4.09.   Calculations .......................................................................31

ARTICLE FIVE

SUCCESSOR CORPORATION

SECTION 5.01.   Limitations on Mergers and Sales of Assets ...............................32
SECTION 5.02.   Successor Person Substituted ..................................................32

ARTICLE SIX

DEFAULTS AND REMEDIES

SECTION 6.01.   Events of Default .................................................................32
SECTION 6.02.   Acceleration ........................................................................33
SECTION 6.03.   Other Remedies ...................................................................34
SECTION 6.04.   Waiver or Rescission of Past Defaults and Events of Default ............34
SECTION 6.05.   Control by Majority ..............................................................34
SECTION 6.06.   Limitation on Suits ...............................................................35
SECTION 6.07.   No Personal Liability of Directors, Officers, Employees and
                Stockholders ......................................................................35
SECTION 6.08.   Rights of Holders To Receive Payment .......................................35
SECTION 6.09.   Collection Suit by Trustee .......................................................36
SECTION 6.10.   Trustee May File Proofs of Claim ..............................................36
SECTION 6.11.   Priorities ..........................................................................36
SECTION 6.12.   Undertaking for Costs ...........................................................37
SECTION 6.13.   Restoration of Rights and Remedies ..........................................37
SECTION 6.14.   Appointment and Authorization of Wells Fargo Bank, National
                Association as Collateral Agent ................................................37

ARTICLE SEVEN

TRUSTEE

SECTION 7.01.   Acceptance of Trusts Upon Specified Conditions ...........................38
SECTION 7.02.   Duties of Trustee in Case of Default ..........................................40
SECTION 7.03.   Notice to Holders of Defaults ..................................................41
SECTION 7.04.   Resignation and Removal of Trustee and Notice Thereof ..................41

-ii-

**JX 118-4**

**Page**

SECTION 7.05.  Qualifications of Trustee .................................................................41
SECTION 7.06.  Disqualification Of Trustee By Reason Of Conflicting Interest ...............42
SECTION 7.07.  Appointment of Successor Trustee......................................................42
SECTION 7.08.  Merger, Conversion or Consolidation of Trustee or Transfer of Its
                        Corporate Trust Business; Authentication of Notes by Successor
                        Trustee..............................................................................43
SECTION 7.09.  Trustee Required to Account for Amounts Collected As Creditor of
                        the Issuer Under Certain Conditions .........................................43
SECTION 7.10.  Trustee May Rely on Officer's Certificate ...........................................43
SECTION 7.11.  Reports by Trustee .........................................................................44
SECTION 7.12.  Collateral Agent. ............................................................................44

ARTICLE EIGHT

AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 8.01.  Without Consent of Holders ..............................................................44
SECTION 8.02.  With Consent of Holders ..................................................................45
SECTION 8.03.  Compliance with Trust Indenture Act .................................................46
SECTION 8.04.  Revocation and Effect of Consents ....................................................46
SECTION 8.05.  Notation on or Exchange of Notes .....................................................47
SECTION 8.06.  Trustee to Sign Amendments, Etc......................................................47

ARTICLE NINE

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 9.01.  Discharge of Indenture ...................................................................47
SECTION 9.02.  Legal Defeasance ..........................................................................48
SECTION 9.03.  Covenant Defeasance .....................................................................49
SECTION 9.04.  Deposited Money and Government Securities to Be Held in Trust;
                        Other Miscellaneous Provisions..............................................50
SECTION 9.05.  Reinstatement................................................................................50
SECTION 9.06.  Moneys Held by Paying Agent ..........................................................51
SECTION 9.07.  Moneys Held by Trustee...................................................................51

ARTICLE TEN

GUARANTEE OF NOTES

SECTION 10.01.  Guarantee....................................................................................51
SECTION 10.02.  Execution and Delivery of Notation of Guarantee ...............................52
SECTION 10.03.  Limitation of Guarantee..................................................................52
SECTION 10.04.  Release of Guarantor .....................................................................53
SECTION 10.05.  Waiver of Subrogation....................................................................53

**JX 118-5**

**Page**

## ARTICLE ELEVEN

## SECURITY

SECTION 11.01.   Security Documents; Additional Collateral .............................................. 54
SECTION 11.02.   Recording, Registration and Opinions ..................................................... 54
SECTION 11.03.   Releases of Liens on Collateral ............................................................... 54
SECTION 11.04.   Form and Sufficiency of Release ............................................................ 55
SECTION 11.05.   Possession and Use of Collateral ............................................................ 55
SECTION 11.06.   Purchaser Protected ................................................................................ 55
SECTION 11.07.   Authorization of Actions To Be Taken by the Collateral Agent
                 Under the Security Documents ................................................................ 56
SECTION 11.08.   Authorization of Receipt of Funds by the Trustee Under the Security
                 Agreement ............................................................................................... 56
SECTION 11.09.   Powers Exercisable by Receiver or Collateral Agent .............................. 56

## ARTICLE TWELVE

## MISCELLANEOUS

SECTION 12.01.   Trust Indenture Act Controls .................................................................. 56
SECTION 12.02.   Notices .................................................................................................... 56
SECTION 12.03.   Communications by Holders with Other Holders ................................... 57
SECTION 12.04.   Certificate and Opinion as to Conditions Precedent ............................... 57
SECTION 12.05.   Statements Required in Certificate and Opinion ..................................... 58
SECTION 12.06.   Rules by Trustee and Agents ................................................................... 58
SECTION 12.07.   Business Days; Legal Holidays ............................................................... 58
SECTION 12.08.   Governing Law ....................................................................................... 58
SECTION 12.09.   No Adverse Interpretation of Other Agreements ..................................... 59
SECTION 12.10.   Successors ............................................................................................... 59
SECTION 12.11.   Multiple Counterparts ............................................................................ 59
SECTION 12.12.   Table of Contents, Headings, Etc. .......................................................... 59
SECTION 12.13.   Separability ............................................................................................. 59
SECTION 12.14.   Waiver of Jury Trial ............................................................................... 60
SECTION 12.15.   Force Majeure ......................................................................................... 60
SECTION 12.16.   Intercreditor Agreement .......................................................................... 60

Schedule A      List of Guarantors

EXHIBITS

Exhibit A       Form of Note
Exhibit B       Form of Legend for Rule 144A Notes and Other Notes That Are Restricted Notes
Exhibit C       Form of Legend for Regulation S Note
Exhibit D       Form of Legend for Global Note
Exhibit E       Form of Certificate To Be Delivered in Connection with Transfers to Non-QIB Accred-
                ited Investors
Exhibit F       Form of Certificate To Be Delivered in Connection with Transfers Pursuant to Regula-
                tion S

**JX 118-6**

Page

Exhibit G        Notation of Guarantee

-v-

**JX 118-7**

INDENTURE, dated as of October 12, 2010, among SEARS HOLDINGS CORPORA-TION, a Delaware corporation (the "Issuer"), the Guarantors (as defined herein) listed on Schedule A hereto and WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee (the "Trustee") and Collateral Agent (as defined herein).

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined herein):

ARTICLE ONE

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.       Definitions.

"Additional First Lien Obligations" means any indebtedness of the Issuer or any Restricted Subsidiary, other than the Credit Agreement Obligations, that is secured by a Lien on the Collateral ranking contractually prior to the Notes Liens and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; *provided* that the representative of such Additional First Lien Obligations executes a joinder agreement to the Intercreditor Agreement (or another intercreditor agreement on terms not less favorable to the Holders of Notes than the Intercreditor Agreement) agreeing to be bound thereby. At the Issuer's option, any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be "Additional First Lien Obligations".

"Additional Interest" means any additional interest pursuant to Section 5 of the Initial Purchasers Registration Rights Agreement or Section 4 of the Pension Plan Registration Rights Agreement, as applicable.

"Additional Notes" means an unlimited principal amount of Notes having identical terms and conditions (other than issue date, issue price and initial interest payment date) to the Notes issued on the Issue Date pursuant to Article Two.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Collateral Agent, Depository Custodian, any Registrar, Paying Agent or agent for service of notices and demands.

"Applicable Procedures" means, with respect to any transfer, payment, tender, redemption or exchange of or for beneficial interests in any Global Certificate, the rules and procedures of the Depository, Euroclear and Clearstream that apply to such transfer, payment, tender, redemption or exchange.

"Attributable Debt" in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value discounted at the rate of interest implicit in the terms of the lease (as determined in good faith by the Issuer) of the obligations of the lessee under such lease for net rental payments during the remaining term of the lease (including any period for which such lease has been extended or may, at the Issuer's option, be extended).

**JX 118-8**

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"Board of Directors" means either the board of directors of the Issuer or any duly authorized committee of that board or any committee of officers or other representatives of the Issuer duly authorized by a Board Resolution to act on behalf of that board or in its stead.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Borrowing Base", means, as of any date, the sum of (1) 90% of the book value (calculated in accordance with GAAP) of the accounts receivable of the Issuer and the Guarantors, on a consolidated basis, on such date and (2) 65% of the book value (calculated in accordance with GAAP) of the inventory of the Issuer and the Guarantors, on a consolidated basis, on such date.

"Capital Stock" means, as to any Person, the capital stock of such Person of every class, whether now or hereafter authorized, regardless of whether such capital stock shall be limited to a fixed sum or percentage with respect to the rights of the holders thereof to participate in dividends and in the distribution of assets upon the voluntary or involuntary liquidation, dissolution or winding up of such Person.

"Change of Control" means the occurrence of any of the following: (1) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or more series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person, other than a Permitted Holder, the Issuer or one of its Subsidiaries; (2) the Issuer becomes aware of the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any Person other than a Permitted Holder becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the Issuer's outstanding Voting Stock or other Voting Stock into which the Issuer's Voting Stock is reclassified, consolidated, exchanged or changed, measured by voting power rather than number of shares; (3) the first day on which a majority of the members of the Issuer's Board of Directors are not Continuing Directors; or (4) the adoption of a plan relating to the Issuer's liquidation or dissolution. Notwithstanding the foregoing, a transaction will not be deemed to involve a Change of Control under clause (2) above if (i) the Issuer becomes a direct or indirect wholly-owned subsidiary of a holding company and (ii)(A) the direct or indirect holders of the Voting Stock of such holding company immediately following that transaction are substantially the same as the holders of the Issuer's Voting Stock immediately prior to that transaction or (B) immediately following that transaction no Person (other than a holding company satisfying the requirements of this sentence or a Permitted Holder) is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"Change of Control Notice" has the meaning provided in the definition of "Change of Control Offer."

"Change of Control Offer" means a written offer (the "Change of Control Notice") sent by or on behalf of the Issuer by first-class mail, postage prepaid, or by electronic delivery to each Holder, with a copy to the Trustee, at its address appearing in the register for the Notes on the date of the Change of Control Offer offering to purchase all outstanding Notes in accordance with Section 4.07. Unless otherwise required by applicable law, the Change of Control Notice shall specify the payment date (the "Change of Control Payment Date") for the Change of Control Offer, which shall be not less than 30 days nor more than 60 days after the date such Change of Control Notice is mailed or electronically delivered.

-2-

JX 118-9

The Change of Control Notice shall contain all the information required by applicable law to be included therein and shall describe the transaction that constitutes or may constitute the Change of Control Triggering Event. The Change of Control Notice shall also state:

    (1)    that the Change of Control Offer is being made pursuant to Section 4.07 of this Indenture;

    (2)    the Change of Control Payment Date;

    (3)    the Change of Control Payment;

    (4)    that the Holder may tender all or any portion of the Notes registered in the name of such Holder and that any portion of a Note tendered must be tendered in denominations of $2,000 principal amount or an integral multiple of $1,000 in excess thereof and that all Notes tendered in such manner for payment and not withdrawn shall be accepted;

    (5)    the place or places where Notes are to be surrendered for tender pursuant to the Change of Control Offer;

    (6)    that interest on any Note not tendered pursuant to the Change of Control Offer will continue to accrue;

    (7)    that on the Change of Control Payment Date the Change of Control Payment will become due and payable upon each Note being accepted for payment pursuant to the Change of Control Offer and that, unless the Issuer defaults in the payment of the Change of Control Payment therefor, interest thereon shall cease to accrue on and after the Change of Control Payment Date;

    (8)    that each Holder electing to tender all or any portion of a Note pursuant to the Change of Control Offer will, subject to Applicable Procedures, be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, at the place or places specified in the Change of Control Notice on or prior to the close of business on a date no earlier than the third Business Day prior to the Change of Control Payment Date (such Note being, if the Issuer so requires, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Issuer duly executed by, the Holder thereof or its attorney duly authorized in writing);

    (9)    that Holders will, subject to Applicable Procedures, be entitled to withdraw all or any portion of Notes tendered if the Issuer receives, not later than the close of business on the fifth Business Day preceding the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder tendered, the certificate number of the Note the holder tendered and a statement that such Holder is withdrawing all or a portion of its tender;

    (10)    that in the case of any Holder whose Note is purchased only in part, subject to Applicable Procedures, the Issuer shall execute and deliver to the Holder of such Note without service charge, a new Note or Notes, in an aggregate principal amount equal to and in exchange for the unpurchased portion of the Note so tendered, in denominations of $2,000 principal amount or integral multiples of $1,000 in excess thereof; and

**JX 118-10**

(11)      if mailed or electronically delivered prior to the date of consummation of the applicable Change of Control, that the Change of Control Offer is conditioned on the Change of Control Triggering Event occurring on or prior to the applicable Change of Control Payment Date.

"Change of Control Payment Date" has the meaning provided in the definition of "Change of Control."

"Change of Control Triggering Event" means the occurrence of both a Change of Control and a Ratings Event.

"Collateral" means, collectively, "Collateral" (as defined in the Security Agreement) and all other property subject or purported to be subject from time to time to a Lien in favor of the Collateral Agent for its benefit and for the benefit of the Trustee and the Holders and the holders of any Pari Passu Junior Lien Obligations.

"Collateral Agent" means the Trustee, in its capacity as Collateral Agent under the Security Documents together with its successors in such capacity.

"Collateral Coverage Certificate" means with respect to any annual or quarterly financial statements provided pursuant to Section 4.02, a certificate signed by a financial officer of the Issuer setting forth an accurate calculation of the Borrowing Base as of the last day of the period covered by such annual or quarterly financial statements, a calculation of the principal amount of outstanding indebtedness for borrowed money on such date that is secured by Liens on the Collateral pursuant to clauses (2) and (3) of the definition of "Permitted Liens" and stating whether or not a Collateral Coverage Event has occurred.

"Collateral Coverage Event" shall be deemed to have occurred if, prior to a Fall-Away Event, as of the last day of any two consecutive fiscal quarters of the Issuer, the Borrowing Base as of each such day is less than the principal amount of the Issuer's consolidated indebtedness for borrowed money outstanding on such day that is secured by Liens on the Collateral.

"Collateral Coverage Notice" has the meaning provided in the definition of "Collateral Coverage Offer."

"Collateral Coverage Offer" means a written offer (a "Collateral Coverage Notice") sent by or on behalf of the Issuer by first-class mail, postage prepaid, or by electronic delivery to each Holder, with a copy to the Trustee, at its address appearing in the register for the Notes on the date of the Collateral Coverage Offer offering to repurchase a portion (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of such Holder's Notes on the terms set forth hereunder up to an aggregate principal amount of Notes for all Holders equal to the Collateral Coverage Required Amount in accordance with Section 4.08. Unless otherwise required by applicable law, the Collateral Coverage Notice shall specify the payment date (the "Collateral Coverage Payment Date") for the Collateral Coverage Offer, which shall be not less than 30 days nor more than 60 days after the date such Collateral Coverage Notice is mailed or electronically delivered. The Collateral Coverage Notice shall contain all the information required by applicable law to be included therein and shall describe the circumstances requiring such Collateral Coverage Offer. The Collateral Coverage Notice shall also state:

(1)      that the Collateral Coverage Offer is being made pursuant to Section 4.08 of this Indenture;

-4-

**JX 118-11**

(2)      the Collateral Coverage Payment Date;

(3)      the Collateral Coverage Event Payment;

(4)      that the Holder may tender all or any portion of the Notes registered in the name of such Holder and that any portion of a Note tendered must be tendered in denominations of $2,000 principal amount or an integral multiple of $1,000 in excess thereof, *provided* that in the event the aggregate principal amount of Notes validly tendered for purchase in the Collateral Coverage Offer exceeds the Collateral Coverage Required Amount for such Collateral Coverage Offer, the Issuer will accept for payment only the Collateral Coverage Required Amount of Notes on a *pro rata* basis from Holders who have validly tendered their Notes in such Collateral Coverage Offer (subject to rounding such that all remaining Notes are in a minimum principal amount of $2,000 and in whole multiples of $1,000 in excess thereof);

(5)      the place or places where Notes are to be surrendered for tender pursuant to the Collateral Coverage Offer;

(6)      that interest on any Note not tendered pursuant to the Collateral Coverage Offer will continue to accrue;

(7)      that on the Collateral Coverage Payment Date, the Collateral Coverage Event Payment will become due and payable upon each Note being accepted for payment pursuant to the Collateral Coverage Offer and that, unless the Issuer defaults in the payment of the Collateral Coverage Event Payment therefor, interest thereon shall cease to accrue on and after the Collateral Coverage Payment Date;

(8)      that each Holder electing to tender all or any portion of a Note pursuant to the Collateral Coverage Offer will, subject to Applicable Procedures, be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, at the place or places specified in the Collateral Coverage Notice on or prior to the close of business on a date no earlier than the third Business Day prior to the Collateral Coverage Payment Date (such Note being, if the Issuer so requires, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Issuer duly executed by, the Holder thereof or its attorney duly authorized in writing);

(9)      that Holders will, subject to Applicable Procedures, be entitled to withdraw all or any portion of Notes tendered if the Issuer receives, not later than the close of business on the fifth Business Day preceding the Collateral Coverage Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder tendered, the certificate number of the Note the Holder tendered and a statement that such Holder is withdrawing all or a portion of its tender; and

(10)      that in the case of any Holder whose Note is purchased only in part, subject to Applicable Procedures, the Issuer shall execute and deliver to the Holder of such Note without service charge, a new Note or Notes, in an aggregate principal amount equal to and in exchange for the unpurchased portion of the Note so tendered, in denominations of $2,000 principal amount or integral multiples of $1,000 in excess thereof.

"Collateral Coverage Payment Date" has the meaning provided in the definition of "Collateral Coverage Offer."

-5-

**JX 118-12**

"Collateral Coverage Required Amount" means, with respect to any Collateral Coverage Event, an amount equal to the difference between (a) the principal amount of the Issuer's consolidated indebtedness for borrowed money that is secured by Liens on the Collateral outstanding on the date of occurrence of such Collateral Coverage Event and (b) the Borrowing Base on such date.

"Commission" means the Securities and Exchange Commission, as from time to time constituted, or, if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"Comparable Treasury Issue" means the United States Treasury security selected by an Independent Investment Banker as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (1) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotations, or (2) if the Issuer obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such Reference Treasury Dealer Quotations.

"Consolidated Net Tangible Assets" means the aggregate amount of the Issuer's assets (less applicable reserves and other properly deductible items) and the Issuer's Subsidiaries' assets after deducting therefrom (a) all current liabilities (excluding current maturities of long-term debt and current maturities under capital leases) and (b) all goodwill, trade names, patents, unamortized debt discount and expense and other like intangibles, all as set forth on the Issuer's most recent consolidated balance sheet and computed in accordance with GAAP.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Issuer who (A) was a member of such Board of Directors on the Issue Date or (B) was nominated for election, elected or appointed to such Board of Directors with the approval of a majority of the continuing directors who were members of such Board of Directors at the time of such nomination, election or appointment (either by a specific vote or by approval of a proxy statement in which such member was named as a nominee for election as a director, without objection to such nomination).

"Credit Agreement" means the Amended and Restated Credit Agreement, dated as of May 21, 2009, among the Issuer, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial institutions party thereto as lenders, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Retail Finance, LLC, as co-collateral agent, and General Electric Capital Corporation, as co-collateral agent, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, replaced or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available borrowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Credit Agreement Agent" means, collectively, the co-collateral agents under the Credit Agreement.

-6-

**JX 118-13**

"Credit Agreement Obligations" means the Obligations owed to the lenders and agents under the Credit Agreement.

"Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

"Default" means an Event of Default or an event that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"Depository" means, with respect to the Notes issued in the form of one or more Global Notes, The Depository Trust Company or another Person designated as Depository by the Issuer, which Person must be a clearing agency registered under the Exchange Act.

"Depository Custodian" means the Trustee, as custodian of each Global Note for the Depository.

"Domestic Subsidiary" means any Subsidiary of the Issuer which is not a Foreign Subsidiary.

"Equity Interests" of any Person means any and all shares, interests, participations, rights in or other equivalents (however designated) of such Person's Capital Stock, other equity interests whether now outstanding or issued after the Issue Date, partnership interests (whether general or limited), limited liability company interests, any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, and any rights (other than debt securities convertible into Equity Interests), warrants or options exchangeable for or convertible into such Equity Interests.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Exchange Offer" has the meaning provided in the applicable Registration Rights Agreement.

"Exchange Securities" has the meaning provided in the applicable Registration Rights Agreement.

"Fall-Away Event" means the satisfaction of the following conditions on any date following the Issue Date: (i) the Issuer shall have a corporate family rating of at least Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, (ii) no Default shall have occurred and be continuing on such date, (iii) the Issuer and its Restricted Subsidiaries shall (after giving effect to the release of the Notes Liens and any concurrent release of Liens to occur on such date) have no Liens on any of their assets or properties other than Permitted Liens which are permitted to be outstanding following a Fall-Away Event and (iv) the Issuer shall have delivered to the Trustee an Officer's Certificate certifying that the foregoing conditions are satisfied and requesting that the Notes Liens be released.

"Fitch" means Fitch Inc., a subsidiary of Fimalac, S.A., and its successors.

"Foreign Subsidiary" means any Subsidiary of the Issuer which is not organized under the laws of the United States or any state thereof or the District of Columbia, and any Subsidiary of any such Subsidiary.

JX 118-14

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

"Government Securities" means securities that are (i) direct obligations of the United States for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, which, in either case under clause (i) or (ii), are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such obligation or a specific payment of interest on or principal of any such obligation held by such custodian for the account of the holder of a depository receipt; *provided,* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the obligation or the specific payment of interest on or principal of the obligation evidenced by such depository receipt.

"Guarantee" means a guarantee of the Notes on the terms set forth in this Indenture.

"Guarantor" means each Subsidiary or other Person that has provided a Guarantee for so long as such Guarantee remains in effect.

"Holder" means a Person in whose name a Note is registered.

"Indenture" means this Indenture as amended, restated or supplemented from time to time in accordance with the terms hereof.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Initial Purchasers" means Banc of America Securities LLC, Wells Fargo Securities, LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co. and Citigroup Global Markets Inc.

"Initial Purchasers Registration Rights Agreement" means the registration rights agreement to be dated as of the Issue Date among the Issuer, the Guarantors and Banc of America Securities LLC, as representative of the Initial Purchasers, relating to the registration of the Notes with the Commission.

"Institutional Accredited Investor" means an institution that is an "accredited investor" as that term is defined in Rule 501(a)(1), (2), (3) or (7) promulgated under the Securities Act.

"Intercreditor Agreement" means, collectively, the intercreditor agreement dated as of the Issue Date by and among the Issuer, the Guarantors, the Collateral Agent and the Credit Agreement Agent and any other intercreditor agreement entered into in accordance with the terms hereof in connection with any Additional First Lien Obligations or Pari Passu Junior Lien Obligations.

"interest" means, with respect to the Notes, interest and Additional Interest, if any, on the Notes.

-8-

**JX 118-15**

"Interest Payment Dates" means each April 15 and October 15, commencing April 15, 2011.

"Investment Grade Rating" means a rating equal to or higher than BBB- (or the equivalent) by Fitch, Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, and the equivalent investment grade credit rating from any replacement Rating Agency or Rating Agencies selected by the Issuer.

"Issue Date" means October 12, 2010.

"Issuer" has the meaning provided in the preamble hereof.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement.

"Moody's" means Moody's Investors Service, Inc.

"Non-U.S. Person" means a Person who is not a U.S. person, as defined in Regulation S.

"Notes" means $1,250.0 million of 6⅞% Senior Secured Notes due 2018, any Additional Notes issued under this Indenture and any Exchange Securities.

"Notes Liens" means the Liens securing the Obligations outstanding under the Notes and the Indenture.

"Obligations" means all obligations for principal, premium, interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any indebtedness.

"Officer" means the Chairman of the Board, the President, Chief Executive Officer, Chief Financial Officer, any Executive Vice President, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Issuer, or any direct or indirect parent of the Issuer, as applicable.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer or Treasurer of the Issuer.

"Opinion of Counsel" means a written opinion reasonably satisfactory in form and substance to the Trustee from legal counsel, who may be an employee of or counsel to the Issuer or any Guarantor, or other counsel who is reasonably acceptable to the Trustee, stating the matters required by Section 12.05, if applicable, and delivered to the Trustee.

"Pari Passu Junior Lien Obligations" means any indebtedness of the Issuer or any Guarantor that is secured by a Lien on the Collateral equally and ratably with the Notes Liens and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; *provided* that the representative of such Pari Passu Junior Lien Obligations executes a joinder agreement to the Security Agreement and the Intercreditor Agreement or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an en-

-9-

**JX 118-16**

forcement of the Notes Liens or the Liens securing such Pari Passu Junior Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Pari Passu Junior Lien Obligations, be distributed to the Trustee and each other agent for the holders of Pari Passu Junior Lien Obligations on a *pro rata* basis based on the amount of outstanding obligations of each such class. At the Issuer's option, any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be Pari Passu Junior Lien Obligations.

"Pension Plan Registration Rights Agreement" means the registration rights agreement to be dated as of the Issue Date among the Issuer, the Guarantors and Sears Holdings Pension Trust relating to the registration of the Notes with the Commission.

"Permitted Holders" means (i) ESL Investments, Inc. and its Affiliates, (ii) any group (as defined in Rule 13d-3 under the Exchange Act) of which ESL Investments, Inc. or an Affiliate of ESL Investments, Inc. is a member so long as ESL Investments, Inc. and its Affiliates own a majority of the Issuer's Voting Stock owned by all members of such group and (iii) to the extent a Change of Control Triggering Event has occurred and a Change of Control Offer completed, any Person whose acquisition of the Issuer's Voting Stock caused such Change of Control Triggering Event and an Affiliate of such Person.

"Permitted Liens" means the following types of Liens:

(1)     Liens existing as of the Issue Date (other than Liens securing indebtedness under the Credit Agreement);

(2)     prior to the occurrence of a Fall-Away Event, Liens on the Collateral securing indebtedness (including indebtedness under the Credit Agreement) in an aggregate outstanding principal amount not to exceed an amount equal to the Borrowing Base (measured as of the end of the calendar month most recently ended prior to the date of any applicable incurrence of indebtedness) less the outstanding principal amount of Notes outstanding at such time, other than Additional Notes; *provided* that for purposes of this clause (2), Liens on Collateral securing (a) indebtedness under the Credit Agreement in a principal amount not to exceed $2.45 billion shall be deemed to be Permitted Liens and (b) indebtedness under any other revolving credit facility shall be deemed to be Permitted Liens; provided, in the case of this clause (b), on the date firm commitments under such revolving credit facility are received by the Issuer and its Restricted Subsidiaries, indebtedness secured by Liens on the Collateral in the full amount of all firm commitments under each then existing revolving credit facility secured by Liens on the Collateral in reliance on this clause (2) (including commitments then outstanding under the Credit Agreement, if any) could have been incurred under this clause (2) had the full amount of such firm commitments been funded on such date;

(3)     Liens securing the Notes and the Guarantees issued on the Issue Date (and any registered exchange notes and related guarantees issued in exchange therefore);

(4)     Liens of the Issuer or a Subsidiary of the Issuer on assets of any Subsidiary of the Issuer;

(5)     Liens for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to which the Issuer or its Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

-10-

**JX 118-17**

(6)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, maritime and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(7)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations or to secure or which results from required payments or deposits in connection with litigation (in each case, exclusive of obligations for the payment of borrowed money);

(8)    judgment Liens so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceedings may be initiated shall not have expired;

(9)    easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Issuer or any of its Subsidiaries;

(10)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(11)    Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(12)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer or any of its Subsidiaries, including rights of offset and set-off;

(13)    Liens securing indebtedness incurred to finance the purchase price or cost of construction of fixed or capital assets (or additions, substantial repairs, alterations or substantial improvements thereto) or of Equity Interests in a third party, *provided* that (x) such Liens and the indebtedness secured thereby are incurred within twelve months of the later of acquisition or completion of construction (or addition, repair, alteration or improvement) and full operation thereof and (y) such Liens extend only to the assets the acquisition, construction, repair, replacement or improvement of which is financed thereby or, in the case of an acquisition of Equity Interests in a third party which becomes a Subsidiary as a result of such acquisition, the assets owned by such third party;

(14)    Liens on the assets, property or Capital Stock of a Person at the time such Person becomes a Restricted Subsidiary; *provided*, that such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary; *provided*,

-11-

JX 118-18

*further*, that such Liens do not extend to any property owned by the Issuer or any other Restricted Subsidiary;

(15)    Liens on assets or property existing at the time the Issuer or a Restricted Subsidiary acquired such assets or property, including by means of merger, amalgamation or consolidation with or into the Issuer or a Restricted Subsidiary; *provided*, that such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary; *provided, further*, that such Liens do not extend to any other property owned by the Issuer or any Restricted Subsidiary;

(16)    Liens to secure obligations in respect of Cash Management Services and Bank Products (each as defined in the Credit Agreement); and

(17)    from and after the occurrence of a Fall-Away Event, other Liens on property owned by the Issuer or any of its Subsidiaries securing indebtedness having an aggregate principal amount not to exceed, as of any date of incurrence of such secured indebtedness pursuant to this clause and after giving effect to such incurrence and the application of the proceeds therefrom, 15% of the Issuer's Consolidated Net Tangible Assets as of the last day of the most recent fiscal quarter for which financial statements have been delivered pursuant to Section 4.02.

"Person" means any individual, partnership, corporation, limited liability company, joint stock company, business trust, trust, unincorporated association, joint venture or other entity, or a government or political subdivision or agency thereof.

"Physical Notes" means certificated Notes in registered form that are not registered in the name of the Depository or its nominee in substantially the form set forth in Exhibit A.

"Primary Treasury Dealer" has the meaning provided in the definition of "Reference Treasury Dealers".

"Private Placement Legend" means the legend initially set forth on the Rule 144A Notes and other Notes that are Restricted Notes in the form set forth in Exhibit B.

"Qualified Institutional Buyer" or "QIB" shall have the meaning specified in Rule 144A promulgated under the Securities Act.

"Rating Agencies" means (1) each of Fitch, Moody's and S&P; and (2) if Fitch, Moody's or S&P ceases to rate the Notes or fails to make a rating of the Notes publicly available, at the sole option of the Issuer, a "nationally recognized statistical rating organization" as defined in Section 3 of the Exchange Act, selected by the Issuer (as certified by a resolution of the Board of Directors of the Issuer) as a replacement agency for Fitch, Moody's or S&P, or any of them, as the case may be.

"Ratings Event" means that the rating on the Notes is lowered by at least two of the three Rating Agencies and the Notes are rated below an Investment Grade Rating by at least two of the three Rating Agencies (it being understood that for purposes of this definition if fewer than three Rating Agencies maintain ratings of the Notes at the time of a Change of Control, the Notes will be deemed for purposes of this definition to have been downgraded in connection with such Change of Control (prior to any actual downgrades) by a number of Rating Agencies equal to the excess of 3 over the number of Rating Agencies that maintain ratings of the Notes at such time), on any day during the period (which period will be extended so long as the rating of the Notes is under publicly announced consideration for a possible downgrade by any of the Rating Agencies) commencing 60 days prior to the first public notice of the oc-

-12-

JX 118-19

currence of a Change of Control or the Issuer's intention to effect a Change of Control and ending 60 days following consummation of such Change of Control.

"Redemption Date" when used with respect to any Note to be redeemed means the date fixed for such redemption pursuant to the terms of the Notes.

"Reference Treasury Dealers" means (1) Banc of America Securities LLC and its successors; provided, however, that if any of the foregoing shall cease to be a primary Government Securities dealer (a "Primary Treasury Dealer"), the Issuer shall substitute another nationally recognized investment banking firm that is a Primary Treasury Dealer, and (2) two other Primary Treasury Dealers selected by the Issuer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Issuer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Issuer by such Reference Treasury Dealer at 5:00 p.m. on the third Business Day preceding such Redemption Date.

"Registration Rights Agreement" means the Initial Purchasers Registration Rights Agreement or the Pension Plan Registration Rights Agreement, as applicable and "Registration Rights Agreement" means, collectively, the Initial Purchasers Registration Rights Agreement and the Pension Plan Registration Rights Agreement.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S-X" means Regulation S-X promulgated under the Securities Act.

"Responsible Officer" when used with respect to the Trustee, means an officer or assistant officer assigned to the Corporate Trust Services department of the Trustee (or any successor group of the Trustee) with direct responsibility for the administration of this Indenture or the Security Documents and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"Restricted Note" has the same meaning as "Restricted Security" set forth in Rule 144(a)(3) promulgated under the Securities Act; provided that the Trustee shall be entitled to request and conclusively rely upon an Opinion of Counsel with respect to whether any Note is a Restricted Note.

"Restricted Subsidiary" means each Domestic Subsidiary of the Issuer other than Orchard Supply Hardware Stores Corporation and its Subsidiaries.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

**JX 118-20**

"Security Agreement" means the security agreement dated as of the Issue Date among the Collateral Agent, the Issuer and the Grantors (as defined therein).

"Security Documents" means the Security Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral to the Collateral Agent for the benefit of the Holders of Notes.

"Specified Subsidiary" means any wholly-owned Restricted Subsidiary with Credit Card Accounts Receivable (as defined in the Security Agreement and for purposes of such definition, substituting the words "Domestic Subsidiary" for "Guarantor" in each instance where such term is used) and Inventory (as defined in the Security Agreement) the combined book value of which exceeds $100.0 million and which has incurred indebtedness for money borrowed in excess of $100.0 million.

"Subsidiary" means a corporation, a majority of the outstanding Voting Stock of which is owned, directly or indirectly, by the Issuer or by one or more other Subsidiaries, or by the Issuer and one or more other Subsidiaries.

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to a maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Trust Indenture Act" or "TIA" means the Trust Indenture Act of 1939, as amended.

"Trustee" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture, and thereafter means the successor serving hereunder.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided, however*, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other that the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"Voting Stock" means, with respect to any specified Person as of any date, the Capital Stock of such Person that is at the time entitled to vote generally in the election of the board of directors or comparable governing body of such Person.

SECTION 1.02.    Other Definitions.

The definitions of the following terms may be found in the sections indicated as follows:

| Term | Defined in Section |
|---|---|
| "Agent Members" | 2.16(a) |
| "Authentication Order" | 2.01 |
| "Business Day" | 12.07 |
| "Change of Control Payment" | 4.07 |
| "Collateral Coverage Event Payment" | 4.08 |
| "Covenant Defeasance" | 9.03 |

-14-

**JX 118-21**

| | |
|---|---|
| "Event of Default" | 6.01 |
| "Global Notes" | 2.16(a) |
| "Institutional Accredited Investor Notes" | 2.02 |
| "Legal Defeasance" | 9.02 |
| "Legal Holiday" | 12.07 |
| "Paying Agent" | 2.04 |
| "Registrar" | 2.04 |
| "Regulation S Global Note" | 2.16(a) |
| "Regulation S Notes" | 2.02 |
| "Restricted Global Note" | 2.16(a) |
| "Restricted Period" | 2.16(f) |
| "Rule 144A Notes" | 2.02 |
| "Sale and Leaseback Transaction" | 4.05(a) |

SECTION 1.03.    <u>Incorporation by Reference of Trust Indenture Act</u>.

Whenever this Indenture refers to a provision of the TIA, the portion of such provision required to be incorporated herein in order for this Indenture to be qualified under the TIA is incorporated by reference in and made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"<u>indenture securities</u>" means the Notes and the Guarantees.

"<u>indenture securityholder</u>" means a Holder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" or "<u>institutional trustee</u>" means the Trustee.

"<u>obligor on the indenture securities</u>" means the Issuer, the Guarantors or any other obligor on the Notes.

All other terms used in this Indenture that are defined by the TIA, defined in the TIA by reference to another statute or defined by Commission rule have the meanings therein assigned to them.

SECTION 1.04.    <u>Rules of Construction</u>.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it herein, whether defined expressly or by reference;

(2)    "or" is not exclusive;

(3)    words in the singular include the plural, and in the plural include the singular;

(4)    words used herein implying any gender shall apply to both genders;

(5)    "herein," hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or Subsection;

-15-

JX 118-22

(6)    unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(7)    "$," "U.S. Dollars" and "United States Dollars" each refer to United States dollars, or such other money of the United States that at the time of payment is legal tender for payment of public and private debts;

(8)    the words "including," "includes" and similar words shall be deemed to be followed by "without limitation"; and

(9)    references to sections of or rules under the Securities Act, the Exchange Act and the TIA shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time.

## ARTICLE TWO

## THE NOTES

SECTION 2.01.    <u>Amount of Notes</u>.

The Trustee shall, upon the receipt of a written order of the Issuer signed by an Officer of the Issuer (an "<u>Authentication Order</u>"), the applicable Notes duly executed by the Issuer, and the notation of Guarantee to be endorsed thereon duly executed by each Guarantor, authenticate (i) Notes for original issue on the Issue Date in the aggregate principal amount not to exceed $1,250,000,000 and (ii) Additional Notes in an unlimited principal amount, to the extent permitted by Section 4.04. The Authentication Order shall specify the amount of Notes to be authenticated, the date on which the Notes are to be authenticated, and the names and delivery instructions for each Holder of the Notes. Furthermore, Notes may be authenticated or delivered upon registration or transfer, or in lieu of, other Notes pursuant to Section 2.07, 2.08, 2.11, 3.06 or 8.05 or in connection with a Change of Control Offer pursuant to Section 4.07 or Collateral Coverage Offer pursuant to Section 4.08. The Trustee shall be entitled to receive an Opinion of Counsel of the Issuer and the Guarantors in connection with such authentication of Notes that this Indenture will constitute valid and legally binding obligations of the Issuer and the Guarantors, and that such Notes, when duly authenticated and executed by the Issuer and duly authenticated by the Trustee in the manner provided in this Indenture and delivered against payment of the purchase price therefor, will constitute valid and binding obligations of the Issuer, and that the Guarantees, when duly authorized and executed by the Guarantors, will constitute valid and binding obligations of such Guarantors, enforceable in accordance with their terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws relating to or affecting the rights or remedies of creditors generally, (ii) the application of general principles of equity, and (iii) applicable law and public policy with respect to rights to indemnity and contribution.

Upon receipt of an Authentication Order, the Trustee shall authenticate Notes in substitution for Notes originally issued to reflect any name change of the Issuer. Any Additional Notes shall be part of the same issue as the Notes being issued on the Issue Date and will vote on all matters as one class with the Notes being issued on the Issue Date, including, without limitation, waivers, amendments, redemptions and offers to purchase. For the purposes of this Indenture, references to the Notes include Additional Notes, if any.

Upon receipt of an Authentication Order, the applicable Notes duly executed by the Issuer, the notation of Guarantee to be endorsed thereon duly executed by each Guarantor, and an Officer's

-16-

**JX 118-23**

Certificate certifying that a registration statement relating to an exchange offer specified in the applicable Registration Rights Agreement or any registration rights agreement relating to the Additional Notes is effective, the Trustee shall authenticate an additional series of Notes for issuance in exchange for the Notes tendered for exchange pursuant to such exchange offer registered under the Securities Act. Exchange Securities may have such distinctive series designations and such changes in the form thereof as are specified in the Authentication Order referred to in the preceding sentence.

The principal of, premium, if any, and interest, if any, on the Notes shall be payable at the office or agency of the Issuer maintained for such purpose in the Borough of Manhattan, the City of New York, State of New York, or at such other office or agency of the Issuer as may be maintained for such purpose pursuant to Section 2.04; *provided, however*, that, at the option of the Issuer, each installment of interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the registry maintained by the Registrar or (ii) wire transfer to an account located in the United States maintained by the payee. Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by the Depository. If Additional Interest is payable on the Notes, the Issuer shall provide an Officer's Certificate to the Trustee on or before the record date for each Interest Payment Date on which such Additional Interest is payable setting forth the amount of such Additional Interest in reasonable detail. The Trustee may provide a copy of such Officer's Certificate or other notice received from the Issuer relating to Additional Interest to any Holder upon request.

SECTION 2.02.    Form and Dating.

The Notes and the Trustee's certificate of authentication with respect thereto shall be substantially in the form set forth in Exhibit A, which is incorporated in and forms a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rule or usage to which the Issuer is subject. Without limiting the generality of the foregoing, Notes offered and sold to Qualified Institutional Buyers in reliance on Rule 144A ("Rule 144A Notes") and Notes offered and sold to Institutional Accredited Investors ("Institutional Accredited Investor Notes") shall bear the legend and include the form of assignment set forth in Exhibit B, and Notes offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes") shall bear the legend and include the form of assignment set forth in Exhibit C. The Issuer shall approve the form of the Notes and any notation, legend or endorsement on them. Each Note shall be dated the date of its authentication.

The terms and provisions contained in the Notes shall constitute, and are expressly made, a part of this Indenture and, to the extent applicable, the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and agree to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes may be presented for registration of transfer and exchange at the offices of the Registrar.

SECTION 2.03.    Execution and Authentication.

At least one Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

-17-

**JX 118-24**

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Trustee by manual or facsimile signature, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder. Notwithstanding the foregoing, if any Note shall have been authenticated and delivered hereunder but never issued and sold by the Issuer, and the Issuer shall deliver such Note to the Trustee for cancellation as provided in Section 2.12, for all purposes of this Indenture such Note shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the benefits of this Indenture.

The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Notes. Unless otherwise provided in the appointment, an authenticating agent may authenticate the Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Issuer and Affiliates of the Issuer. Each Paying Agent is designated as an authenticating agent for purposes of this Indenture.

The Notes shall be issuable only in registered form without coupons in denominations of $2,000 principal amount and integral multiples of $1,000 in excess thereof.

SECTION 2.04.    Registrar and Paying Agent.

The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange (the "Registrar"), and an office or agency where Notes may be presented for payment (the "Paying Agent") and an office or agency where notices and demands to or upon the Issuer, if any, in respect of the Notes and this Indenture may be served. The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer may have one or more additional Paying Agents. The term "Paying Agent" includes any additional Paying Agent. The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and the Trustee.

The Issuer shall enter into an appropriate agency agreement, which shall incorporate the provisions of the TIA, with any Agent that is not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such Agent. The Issuer shall notify the Trustee of the name and address of any such Agent. If the Issuer fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such and shall be entitled to appropriate compensation in accordance with Section 7.01(a). The Issuer or any of its Subsidiaries may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Issuer initially appoints the Trustee as Registrar, Paying Agent and Agent for service of notices and demands in connection with the Notes and this Indenture and the Corporate Trust Office of the Trustee as its office for purposes of this Section 2.04.

SECTION 2.05.    Paying Agent To Hold Money in Trust.

Prior to 10:00 a.m., New York City time, on each due date of the principal or interest on any Notes, the Issuer shall deposit with the Paying Agent a sum sufficient to pay such principal and interest when so becoming due. Each Paying Agent shall hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of or premium or interest on the Notes (whether such money has been paid to it by the Issuer or any other obligor on the Notes or the Guarantors), and the Issuer and the Paying Agent shall notify the Trustee of any default by the Issuer (or any other obligor on the Notes) in making any such payment. If the Issuer or a Subsidiary of the Issuer

-18-

JX 118-25

serves as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund. Money held in trust by the Paying Agent need not be segregated except as required by law and in no event shall the Paying Agent be liable for any interest on any money received by it hereunder. The Issuer at any time may require the Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed and the Trustee may at any time during the continuance of any Event of Default specified in clause (1) or (2) of Section 6.01, upon written request to the Paying Agent, require such Paying Agent to pay forthwith all money so held by it to the Trustee and to account for any funds disbursed by the Paying Agent. Upon making such payment, the Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06.    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least two Business Days before each Interest Payment Date, and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

SECTION 2.07.    Transfer and Exchange.

Subject to Sections 2.16 and 2.17, when Notes are presented to the Registrar with a request from the Holder of such Notes to register a transfer or to exchange them for an equal principal amount of Notes of other authorized denominations, the Registrar shall register the transfer or exchange such notes as requested if the requirements of this Indenture are met. Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Registrar, duly executed by the Holder thereof or his attorneys duly authorized in writing. To permit registrations of transfers and exchanges, the Issuer shall issue and execute and the Trustee shall authenticate new Notes (and the Guarantors shall execute the notation of Guarantee thereon) evidencing such transfer or exchange at the Registrar's request. No service charge shall be made to the Holder for any registration of transfer or exchange. The Issuer may require from the Holder payment of a sum sufficient to cover any transfer taxes or other governmental charge that may be imposed in relation to a transfer or exchange, but this provision shall not apply to any exchange pursuant to Section 2.11, 3.06, 4.07, 4.08 or 8.05 (in which events the Issuer shall be responsible for the payment of such taxes). The Registrar shall not be required to exchange or register a transfer of any Note for a period of 15 days immediately preceding the mailing or electronic delivery of notice of redemption of Notes to be redeemed or of any Note selected, called or being called for redemption except the unredeemed portion of any Note being redeemed in part.

Any Holder of the Global Note shall, by acceptance of such Global Note, agree that transfers of the beneficial interests in such Global Note may be effected only through a book entry system maintained by the Holder of such Global Note (or its agent), and that ownership of a beneficial interest in the Global Note shall be required to be reflected in a book entry.

Each Holder of a Note agrees to indemnify the Issuer, the Guarantors and the Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Note in violation of any provision of this Indenture and/or applicable federal or state securities law.

Except as expressly provided herein, neither the Trustee nor the Registrar shall have any duty to monitor the Issuer's compliance with or have any responsibility with respect to the Issuer's compliance with any federal or state securities laws. The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or

-19-

**JX 118-26**

under applicable law with respect to any transfer of any interest in any Notes (including any transfers between or among the Depository's participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation, as is expressly required by, and to do so if and when expressly required by, the terms of this Indenture and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.08.    Replacement Notes.

If a mutilated Note is surrendered to the Registrar or the Trustee, or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note (and the Guarantors shall execute the notation of Guarantee thereon) if the Holder of such Note furnishes to the Issuer and the Trustee evidence reasonably acceptable to them of the ownership and the destruction, loss or theft of such Note and if the requirements of Section 8-405 of the UCC are met. If required by the Trustee or the Issuer, an indemnity bond shall be posted by such Holder, sufficient in the judgment of both to protect the Issuer, the Guarantors, the Trustee or any Paying Agent from any loss that any of them may suffer if such Note is replaced. The Issuer and the Trustee may charge such Holder for their reasonable out-of-pocket expenses in replacing such Note (including, without limitation, attorneys' fees and disbursements). Every replacement Note shall constitute a contractual Obligation of the Issuer.

SECTION 2.09.    Outstanding Notes.

The Notes outstanding at any time are all Notes that have been authenticated by the Trustee except for (a) those cancelled by it, (b) those delivered to it for cancellation, (c) to the extent set forth in Sections 9.01 and 9.02, on or after the date on which the conditions set forth in Section 9.01 or 9.02 have been satisfied, those Notes theretofore authenticated and delivered by the Trustee hereunder and (d) those described in this Section 2.09 as not outstanding. Subject to Section 2.10, a Note does not cease to be outstanding because the Issuer or one of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.08, it ceases to be outstanding unless the Trustee and the Issuer receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser in whose hands such Note is a legal, valid and binding obligation of the Issuer. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If the principal of any Note is considered paid under Section 4.01, it shall cease to be outstanding and interest thereon shall cease to accrue. If the Paying Agent holds, on any Redemption Date or maturity date, money sufficient to pay all accrued interest and principal with respect to the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10.    Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any declaration of acceleration or notice of default or direction, waiver or consent or any amendment, modification or other change to this Indenture, Notes owned by the Issuer or any Affiliate of the Issuer shall be disregarded as though they were not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent or any amendment, modification or other change to this Indenture, only Notes as to which a Responsible Officer of the Trustee has received an Officer's Certificate stating that such Notes are so owned shall be so disregarded. Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee

-20-

JX 118-27

established to the satisfaction of the Trustee the pledgee's right so to act with respect to the Notes and that the pledgee is not the Issuer, a Guarantor, any other obligor on the Notes or any of their respective Affiliates.

SECTION 2.11.    Temporary Notes.

Until definitive Notes are prepared and ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate definitive Notes in exchange for temporary Notes. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as definitive Notes.

SECTION 2.12.    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall (subject to the record-retention requirements of the Exchange Act) dispose of such cancelled Notes in its customary manner. The Trustee shall deliver a certificate of such disposal to the Issuer upon its request therefor. The Issuer may not reissue or resell, or issue new Notes to replace, Notes that the Issuer has redeemed or paid, or that have been delivered to the Trustee for cancellation.

SECTION 2.13.    Defaulted Interest.

If the Issuer defaults on a payment of interest on the Notes, it shall pay the defaulted interest, plus (to the extent permitted by law) any interest payable on the defaulted interest, in accordance with the terms hereof, to the Persons who are Holders on a subsequent special record date, which date shall be at least five Business Days prior to the payment date. The Issuer shall fix such special record date and payment date in a manner satisfactory to the Trustee. The Issuer shall promptly mail or electronically deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest, and interest payable on defaulted interest, if any, to be paid. The Issuer may make payment of any defaulted interest in any other lawful manner not inconsistent with the requirements (if applicable) of any securities exchange on which the Notes may be listed and, upon such notice as may be required by such exchange, if, after written notice given by the Issuer to the Trustee of the proposed payment pursuant to this sentence, such manner of payment shall be deemed practicable by the Trustee.

SECTION 2.14.    CUSIP Number.

The Issuer in issuing the Notes may use a "CUSIP" number, ISIN and "Common Code" number (in each case if then generally in use), and if so, such CUSIP number, ISIN and Common Code number shall be included in notices, including notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness or accuracy of such number either as printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes. The Issuer shall promptly notify the Trustee of any such CUSIP number, ISIN and Common Code number used by the Issuer in connection with the issuance of the Notes and of any change in the CUSIP number, ISIN and Common Code number.

-21-

**JX 118-28**

SECTION 2.15.      Deposit of Moneys.

Prior to 10:00 a.m., New York City time, on each Interest Payment Date, maturity date, Change of Control Payment Date and Collateral Coverage Payment Date, as the case may be, the Issuer shall have deposited with the Paying Agent in immediately available funds money sufficient to make cash payments, if any, due on such Interest Payment Date, maturity date, Change of Control Payment Date and Collateral Coverage Payment Date, as the case may be. The principal and interest on Global Notes shall be payable to the Depository or its nominee, as the case may be, as the sole registered owner and the sole holder of the Global Notes represented thereby in accordance with Applicable Procedures. The principal and interest on Physical Notes shall be payable, either in person or by mail, at the office of the Paying Agent and further in connection with the payment of principal, upon presentment of such Physical Notes at the office of the Paying Agent.

SECTION 2.16.      Book-Entry Provisions for Global Notes.

(a)      Rule 144A Notes and Institutional Accredited Investor Notes initially shall be represented by notes in registered, global form without interest coupons (collectively, the "Restricted Global Notes"). Regulation S Notes initially shall be represented by one or more notes in registered, global form without interest coupons (collectively, the "Regulation S Global Notes," and, together with the Restricted Global Note and any other global notes representing Notes, the "Global Notes"). The Global Notes shall bear legends as set forth in Exhibit D. The Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Depository Custodian and (iii) bear legends as set forth in Exhibit B with respect to Restricted Global Notes and Exhibit C with respect to Regulation S Global Notes.

Members of, or direct or indirect participants in, the Depository ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Depository Custodian, or under the Global Notes, and the Depository may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)      Transfers of Global Notes shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees. Subject to Section 2.16(e), interests of beneficial owners in the Global Notes may be transferred or exchanged for Physical Notes in accordance with the rules and procedures of the Depository and the provisions of Section 2.17. In addition, subject to Section 2.16(e), a Global Note shall be exchangeable for Physical Notes if (i) the Depository (x) notifies the Issuer that it is unwilling or unable to continue as depository for such Global Note and the Issuer thereupon fails to appoint a successor depository within 90 days thereof or (y) has ceased to be a clearing agency registered under the Exchange Act and the Issuer thereupon fails to appoint a successor depository within 90 days thereof or (ii) there shall have occurred and be continuing an Event of Default with respect to the Notes and the Depository shall have requested the issuance of Physical Notes. In all cases, Physical Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository (in accordance with Applicable Procedures).

(c)      In connection with any transfer or exchange of a portion of the beneficial interest in any Global Note to beneficial owners pursuant to paragraph (b), the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal

**JX 118-29**

amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Issuer shall execute, and the Trustee shall upon receipt of an Authentication Order from the Issuer authenticate and make available for delivery, one or more Physical Notes of like tenor and amount.

(d)    In connection with the transfer of Global Notes as an entirety to beneficial owners pursuant to paragraph (b), the Global Notes shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by the Depository in writing in exchange for its beneficial interest in the Global Notes, an equal aggregate principal amount of Physical Notes of authorized denominations.

(e)    Any Physical Note constituting a Restricted Note delivered in exchange for an interest in a Global Note pursuant to paragraph (b), shall, except as otherwise provided by paragraphs (a)(i)(x) and (c) of Section 2.17, bear the Private Placement Legend or, in the case of the Regulation S Global Note, the legend set forth in Exhibit C, in each case, unless the Issuer determines otherwise in compliance with applicable law.

(f)    On or prior to the 40th day after the later of the commencement of the offering of the Notes represented by the Regulation S Global Note and the issue date of such Notes (such period through and including such 40th day, the "Restricted Period"), a beneficial interest in a Regulation S Global Note may be transferred to a Person who takes delivery in the form of an interest in the corresponding Restricted Global Note only upon receipt by the Trustee of a written certification from the transferor to the effect that such transfer is being made (i)(a) to a Person whom the transferor reasonably believes is a Qualified Institutional Buyer in a transaction meeting the requirements of Rule 144A or (b) pursuant to another exemption from the registration requirements under the Securities Act which is accompanied by an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee regarding the availability of such exemption and (ii) in accordance with all applicable securities laws of any state of the United States or any other jurisdiction.  During the Restricted Period, a beneficial interest in the Regulation S Global Note may not be exchanged for a Physical Note.

(g)    Beneficial interests in the Restricted Global Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the Trustee a written certificate to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available).

(h)    Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in another Global Note shall, upon transfer, cease to be an interest in such Global Note and become an interest in such other Global Note and, accordingly, shall thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(i)    The Holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

SECTION 2.17.    Special Transfer Provisions.

(a)    Transfers to Non-QIB Institutional Accredited Investors and Non-U.S. Persons. The following provisions shall apply with respect to the registration of any proposed transfer of a Note

-23-

JX 118-30

constituting a Restricted Note to any Institutional Accredited Investor which is not a QIB or to any Non-U.S. Person:

  (i) the Registrar shall register the transfer of any Note constituting a Restricted Note, whether or not such Note bears the Private Placement Legend, if (x) the requested transfer is after the date such Note shall be freely transferable under Rule 144 as certified in an Officer's Certificate or (y) (1) in the case of a transfer to an Institutional Accredited Investor which is not a QIB (excluding Non-U.S. Persons), the proposed transferee has delivered to the Registrar a certificate substantially in the form of <u>Exhibit E</u> hereto and an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee or (2) in the case of a transfer to a Non-U.S. Person (including a QIB), the proposed transferor has delivered to the Registrar a certificate substantially in the form of <u>Exhibit F</u> hereto; *provided* that in the case of any transfer of a Note bearing the Private Placement Legend for a Note not bearing the Private Placement Legend, the Registrar has received an Officer's Certificate authorizing such transfer; and

  (ii) if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note, upon receipt by the Registrar of (x) the certificate, if any, required by paragraph (i) above and (y) instructions given in accordance with the Depository's and the Registrar's procedures,

whereupon (a) the Registrar shall reflect on its books and records the date and (if the transfer does not involve a transfer of outstanding Physical Notes) a decrease in the principal amount of a Global Note in an amount equal to the principal amount of the beneficial interest in a Global Note to be transferred, and (b) the Registrar shall reflect on its books and records the date and an increase in the principal amount of a Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note transferred or the Issuer shall execute and the Trustee shall authenticate and make available for delivery one or more Physical Notes of like tenor and amount.

  (b) <u>Transfers to QIBs</u>.  The following provisions shall apply with respect to the registration or any proposed registration of transfer of a Note constituting a Restricted Note to a QIB (excluding transfers to Non-U.S. Persons):

  (i) the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on such Holder's Note stating, or has otherwise advised the Issuer and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on such Holder's Note stating, or has otherwise advised the Issuer and the Registrar in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A; and

  (ii) if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in the Global Note, upon receipt by the Registrar of instructions given in accordance with the Applicable Procedures, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Global Note in an amount equal to the principal amount of the Physical Notes to be transferred, and the Trustee shall cancel the Physical Notes so transferred.

-24-

**JX 118-31**

(c)    _Private Placement Legend_.  Upon the registration of transfer, exchange or re-placement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend.  Upon the registration of transfer, exchange or replacement of Notes bearing the Private Placement Legend, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (i) it has received the Officer's Certificate required by paragraph (a)(i)(y) of this Section 2.17, (ii) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee to the effect that neither such legend nor the related restrictions on transfer are re-quired in order to maintain compliance with the provisions of the Securities Act or (iii) such Note has been sold pursuant to an effective registration statement under the Securities Act and the Registrar has received an Officer's Certificate from the Issuer to such effect or such Note has been exchanged in the Exchange Offer under the applicable Registration Rights Agreement.

(d)    _General_.  By its acceptance of any Note bearing the Private Placement Legend, each Holder of such Note acknowledges the restrictions on transfer of such Note set forth in this Inden-ture and in the Private Placement Legend and agrees that it will transfer such Note only as provided in this Indenture.

The Registrar shall retain for a period of two years or as may otherwise be required by applicable law copies of all letters, notices and other written communications received pursuant to Section 2.16 or this Section 2.17.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable notice to the Registrar.

SECTION 2.18.    _Computation of Interest_.

Interest on the Notes shall be computed on the basis of a 360-day year of twelve 30-day months.

## ARTICLE THREE

### REDEMPTION AND PREPAYMENT

SECTION 3.01.    _Election To Redeem; Notices to Trustee_.

If the Issuer elects to redeem Notes pursuant to Section 3.07, at least 30 days prior to the Redemption Date (unless a shorter notice shall be agreed to in writing by the Trustee) but not more than 60 days before the Redemption Date, except that any such notice to the Trustee may be given to the Trus-tee more than 60 days prior to a Redemption Date if the notice is issued in connection with a Legal De-feasance or a satisfaction or discharge of this Indenture pursuant to Section 9.01, the Issuer shall notify the Trustee in writing of the Redemption Date, the principal amount of Notes to be redeemed and the re-demption price, and deliver to the Trustee an Officer's Certificate stating that such redemption will com-ply with the conditions contained in Section 3.07.  Notice given to the Trustee pursuant to this Section 3.01 may not be revoked after the time that notice is given to Holders pursuant to Section 3.03.  If the re-demption price is not known at the time such notice is to be given, the actual redemption price, calculated as described in the terms of the Notes, will be set forth in an Officer's Certificate of the Issuer delivered to the Trustee no later than two Business Days prior to the Redemption Date.

SECTION 3.02.    _Selection by Trustee of Notes to Be Redeemed_.

In the event that less than all of the Notes are to be redeemed pursuant to a redemption made pursuant to Section 3.07, selection of the Notes for redemption shall be made in accordance with

-25-

JX 118-32

Applicable Procedures if the Notes are Global Notes, otherwise by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or, if the Notes are not then listed on a national securities exchange, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate; *provided, however,* that no Notes of a principal amount of $2,000 or less shall be redeemed in part. The Trustee shall promptly notify the Issuer of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount thereof to be redeemed. The Trustee may select for redemption portions of the principal of the Notes that have denominations larger than $2,000 in whole multiples of $1,000 in excess thereof. For all purposes of this Indenture unless the context otherwise requires, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Issuer may acquire Notes by means other than redemption, whether pursuant to an Issuer tender offer, open market purchase or otherwise; *provided* such acquisition does not otherwise violate the other terms of this Indenture.

SECTION 3.03.      Notice of Redemption.

At least 30 days, and no more than 60 days, before a Redemption Date, the Issuer shall mail by first-class mail or electronically deliver, or cause to be mailed by first-class mail or electronically delivered, a notice of redemption to each Holder of Notes to be redeemed at his or her last address as the same appears on the registry books maintained by the Registrar pursuant to Section 2.04, except that redemption notices may be mailed or electronically delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of this Indenture.

The notice shall identify the Notes to be redeemed (including the CUSIP numbers, ISIN and Common Code numbers, if any thereof) and shall state:

(1)      the Redemption Date;

(2)      the redemption price and the amount of premium, if any, or manner of computation if not then known, and accrued interest to be paid;

(3)      if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date and upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued;

(4)      the name and address of the Paying Agent;

(5)      that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)      that unless the Issuer defaults in making the redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(7)      the provision of Section 3.07, as the case may be, pursuant to which the Notes called for redemption are being redeemed; and

(8)      the aggregate principal amount of Notes that are being redeemed.

At the Issuer's request, the Trustee shall forward the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Trustee has received notice of such request at least 45

-26-

JX 118-33

days prior to such Redemption Date unless a shorter time is agreed to by the Trustee. In such event, the Issuer shall provide the Trustee with the information required by this Section 3.03.

SECTION 3.04.    Effect of Notice of Redemption.

Once the notice of redemption described in Section 3.03 is mailed or electronically delivered, Notes called for redemption become due and payable on the Redemption Date and at the redemption price, including any premium, plus interest accrued to the Redemption Date. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price, including any premium, plus interest accrued to the Redemption Date; *provided* that if the Redemption Date is after a regular record date and on or prior to the Interest Payment Date, the accrued interest shall be payable to the Holder of the redeemed Notes registered on the relevant record date, and *provided, further*, that if a Redemption Date is a Legal Holiday, payment shall be made on the next succeeding Business Day with the same force and effect as if made on such Redemption Date and no interest shall accrue for the period from such Redemption Date to such succeeding Business Day. Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.05.    Deposit of Redemption Price.

On or prior to 10:00 a.m., New York City time, on each Redemption Date, the Issuer shall deposit with the Paying Agent in immediately available funds money sufficient to pay the redemption price of, including premium, if any, and accrued interest on all Notes to be redeemed on that date other than Notes or portions thereof called for redemption on that date which have been delivered by the Issuer to the Trustee for cancellation.

On and after any Redemption Date, if money sufficient to pay the redemption price of, including premium, if any, and accrued interest on Notes called for redemption shall have been made available in accordance with the preceding paragraph, the Notes called for redemption will cease to accrue interest and the only right of the Holders of such Notes will be to receive payment of the redemption price of and, subject to the first proviso in Section 3.04, accrued and unpaid interest on such Notes to the Redemption Date. If any Note surrendered for redemption shall not be so paid, interest will be paid, from the Redemption Date until such redemption payment is made, on the unpaid principal of the Note and (to the extent permitted by applicable law) any interest not paid on such unpaid principal, in each case, at the rate and in the manner provided in the Notes.

SECTION 3.06.    Notes Redeemed in Part.

Upon surrender of a Note that is redeemed in part, the Issuer shall execute and the Trustee shall authenticate for the Holder thereof a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

SECTION 3.07.    Optional Redemption.

At any time and from time to time the Issuer may redeem the Notes in whole or in part, at its option, at a redemption price equal to the greater of (1) 100% of the principal amount of the Notes to be redeemed and (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the Redemption Date at the Treasury Rate, plus 50 basis points, plus accrued interest thereon to the Redemption Date.

Unless the Issuer defaults in payment of the redemption price, on and after the Redemption Date, interest will cease to accrue on the Notes or portions thereof called for redemption.

-27-

JX 118-34

SECTION 3.08.        Mandatory Redemption.

       The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

## ARTICLE FOUR

### COVENANTS

SECTION 4.01.        Payment of Notes.

       The Issuer shall pay the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes and this Indenture.  An installment of principal or interest shall be considered paid on the date it is due if the Trustee or Paying Agent holds as of 10:00 a.m., New York City time, on that date money designated for and sufficient to pay such installment.

       The Issuer shall pay interest on overdue principal (including post-petition interest in a proceeding under any Bankruptcy Law), and overdue interest, to the extent lawful, at the rate specified in the Notes.

SECTION 4.02.        Reports to Holders.

       (a)        Whether or not required by the rules and regulations of the Commission, so long as any Notes are outstanding, the Issuer shall file with the Commission (unless the Commission will not accept such filings) and furnish to the Trustee and Holders all quarterly and annual financial information (including a Management's Discussion and Analysis of Financial Condition and Results of Operations) that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Notes were registered under the Exchange Act and on or prior to the dates on which such filings with the Commission would be required to be made.  Notwithstanding the foregoing, prior to the commencement of the exchange offer contemplated by the Initial Purchasers Registration Rights Agreement or the effectiveness of the shelf registration statement contemplated by such Registration Rights Agreement, such reports shall not be required to include any financial information required by Rule 3-10 of Regulation S-X.

       (b)        The Issuer shall deliver to the Trustee a Collateral Coverage Certificate together with each delivery of quarterly or annual financial information required by Section 4.02(a).

       (c)        The Issuer shall, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise furnishing such information pursuant to Rule 12g3-2(b) of the Exchange Act, furnish to Holders and to prospective investors, upon their request, the information required to be delivered pursuant to clause (d)(4) of Rule 144A.

       (d)        Notwithstanding the foregoing, if the Issuer is exempt from the requirements of Section 13 or 15(d) of the Exchange Act under Rule 12h-5 of the Exchange Act, the Issuer shall not be required to file such reports and documents with the Commission under Section 13 or 15(d) of the Exchange Act (or any successor provisions thereto) or provide such annual reports and such information, documents and other reports to the Trustee and Holders so long as (i) a direct parent entity that guarantees the Notes files such annual reports and such information, documents and other reports with the Commission, (ii) such parent entity, the Issuer and each Guarantor are in compliance with the requirements set forth in Rule 3-10 of Regulation S-X under the Exchange Act and (iii) the Issuer provides the Trustee and

JX 118-35

Holders with such annual reports and such information, documents and other reports filed by such parent entity.

(e)      Notwithstanding the foregoing, the Issuer shall be deemed to have furnished the reports referred to in Section 4.02(a) to the Trustee and to Holders if the Issuer has filed such reports with the Commission via the EDGAR filing system and such reports are publicly available.

(f)      Delivery of reports, information and documents to the Trustee hereunder is for informational purposes only and the Trustee's receipt of any such reports, information and documents shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates or statements delivered to the Trustee pursuant to Section 4.03).

(g)      To the extent applicable, the Issuer shall comply with TIA § 314(a).

SECTION 4.03.      <u>Compliance Certificate</u>.

The Issuer shall deliver to the Trustee, within 120 days after the end of each fiscal year, a written statement that need not comply with Section 12.05 signed by its principal executive officer, principal accounting officer or principal financial officer, stating that:

(a)      a review of the activities of the Issuer during such year with regard to its compliance with this Indenture has been made under such officer's supervision; and

(b)      to the best of such officer's knowledge, based on such review, the Issuer has fulfilled all its obligations under this Indenture throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof, all without regard to grace periods or notice requirements.

SECTION 4.04.      <u>Limitations on Liens</u>.

The Issuer shall not, and shall not cause or permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens (other than Permitted Liens) of any kind against or upon (i) prior to the occurrence of a Fall-Away Event, the Collateral or any proceeds thereof and (ii) from and after the occurrence of a Fall-Away Event, any property or assets of the Issuer or any of its Restricted Subsidiaries or any proceeds thereof, in each case, to secure indebtedness for borrowed money and whether such assets are owned on the Issue Date or acquired after the Issue Date.

SECTION 4.05.      <u>Limitation on Sale and Leaseback Transactions</u>.

(a)      The Issuer shall not, and shall not permit any Restricted Subsidiary to, enter into any arrangement with any Person providing for the sale by the Issuer or any Restricted Subsidiary of any property more than 180 days following the Issuer's or such Restricted Subsidiary's acquisition of such property, with the intention of taking back a lease of such property (a "<u>Sale and Leaseback Transaction</u>") unless the terms of such sale or transfer have been determined by the Issuer's Board of Directors to be fair and arm's-length and either:

(i)      within 12 months after the receipt of the proceeds of the sale or transfer, the Issuer or any of its Subsidiaries applies an amount equal to the net proceeds of the sale or transfer

**JX 118-36**

to the prepayment or retirement of indebtedness (other than any indebtedness that is subordinated to the Notes); or

(ii)     the Issuer or such Restricted Subsidiary would be entitled, at the effective date of the sale or transfer, to incur indebtedness secured by a Lien on such property (and such Attributable Debt shall be deemed to be secured by a Lien on such property) in an amount at least equal to the Attributable Debt in respect of the Sale and Leaseback Transaction pursuant to Section 4.04.

(b)     Clause (a) of this Section 4.05 will not apply to any Sale and Leaseback Transaction (i) for a term of not more than three years including renewals; or (ii) between the Issuer and a Subsidiary or between Subsidiaries, *provided* that the lessor is the Issuer or a wholly owned Subsidiary of the Issuer.

SECTION 4.06.    Additional Guarantees.

If, any of the Domestic Subsidiaries of the Issuer becomes a Specified Subsidiary, then the Issuer shall cause such Specified Subsidiary (unless such Specified Subsidiary is already a Guarantor) to:

(a)     execute and deliver to the Trustee a supplemental indenture pursuant to which such Specified Subsidiary shall unconditionally guarantee all of the Issuer's obligations under the Notes and this Indenture and, unless a Fall-Away Event has occurred, enter into joinders to the Security Documents to grant the Collateral Agent a Lien on the assets of such Subsidiary constituting Collateral; and

(b)     deliver to the Trustee one or more Opinions of Counsel that, subject to customary qualifications, such supplemental indenture and guarantee (i) have been duly authorized, executed and delivered by such Subsidiary and (ii) constitute valid and legally binding obligations of such Subsidiary, enforceable in accordance with their terms.

SECTION 4.07.    Change of Control Offer.

(a)     If a Change of Control Triggering Event occurs with respect to the Notes, unless the Issuer has exercised its right to redeem the Notes pursuant to Section 3.07, the Issuer shall commence a Change of Control Offer no later than 30 days following any Change of Control Triggering Event (or at the Issuer's option, prior to any Change of Control, but after the public announcement of the Change of Control).  In the Change of Control Offer, the Issuer shall offer payment in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest, if any, on the Notes repurchased, to the date of purchase (the "Change of Control Payment").

(b)     On the Change of Control Payment Date, the Issuer shall, to the extent lawful: (i) accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer; (ii) deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and (iii) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased.

(c)     The Issuer shall not be required to make a Change of Control Offer upon the occurrence of a Change of Control Triggering Event if a third party makes such an offer in the manner, at the times and otherwise in compliance with the requirements for an offer made by the Issuer and the third party repurchases all Notes properly tendered and not withdrawn under its offer.

-30-

JX 118-37

(d)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Triggering Event. To the extent that the provisions of any securities laws or regulations conflict with this Section 4.07, the Issuer shall comply with the applicable securities laws and regulations and will not be deemed to have breached the Issuer's obligations under this Section 4.07 by virtue of such conflicts.

SECTION 4.08.    Collateral Coverage Offer.

(a)    If prior to the occurrence of a Fall-Away Event, a Collateral Coverage Event occurs, unless the Issuer has exercised its option to redeem such Notes, the Issuer shall make a Collateral Coverage Offer no later than 30 days following any Collateral Coverage Event. In a Collateral Coverage Offer, the Issuer shall offer payment in cash equal to 101% of the aggregate principal amount of Notes repurchased, plus accrued and unpaid interest, if any, on the Notes repurchased to the date of repurchase (a "Collateral Coverage Event Payment").

(b)    On the Collateral Coverage Payment Date, the Issuer shall, to the extent lawful:

(i)    accept for payment all Notes or portions of Notes properly tendered pursuant to the Collateral Coverage Offer; *provided* that in the event the aggregate principal amount of Notes validly tendered for purchase in the Collateral Coverage Offer exceeds the Collateral Coverage Required Amount for such Collateral Coverage Offer, the Issuer will, subject to the applicable procedures of the Depository, accept for payment only the Collateral Coverage Required Amount of Notes on a *pro rata* basis from Holders who have validly tendered their Notes in such Collateral Coverage Offer (subject to rounding such that all remaining Notes are in a minimum principal amount of $2,000 and in whole multiples of $1,000 in excess thereof);

(ii)    deposit with the Paying Agent an amount equal to the Collateral Coverage Event Payment in respect of all Notes or portions of Notes required to be accepted for payment as provided hereunder; and

(iii)    deliver or cause to be delivered to the Trustee the Notes accepted for purchase together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased.

(c)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act, and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Collateral Coverage Event. To the extent that the provisions of any such securities laws or regulations conflict with this Section 4.08, the Issuer shall comply with those securities laws and regulations and will not be deemed to have breached the Issuer's obligations under this Section 4.08 by virtue of any such conflict.

SECTION 4.09.    Calculations.

Issuer will be responsible for making calculations called for under the Notes, including but not limited to determination of redemption price, premium, if any, Additional Interest, and other amounts payable on the Notes, if any. The Issuer will make the calculations in good faith and, absent manifest error, its calculations will be final and binding on the Holders of the notes. The Issuer will provide a schedule of its calculations to the Trustee when applicable, and the Trustee is entitled to rely conclusively on the accuracy of the Issuer's calculations without independent verification.

JX 118-38

## ARTICLE FIVE

### SUCCESSOR CORPORATION

SECTION 5.01.    <u>Limitations on Mergers and Sales of Assets.</u>

The Issuer shall not consolidate with or merge into another Person, or sell other than for cash or lease all or substantially all of the Issuer's assets to another Person, unless:

(a)    either the Issuer is the continuing Person or the successor Person (if other than the Issuer) expressly assumes by supplemental indenture the obligations of the Issuer under this Indenture and the Notes;

(b)    immediately after the merger, consolidation, sale or lease, no Default shall have occurred and be continuing; and

(c)    the Issuer shall deliver, or cause to be delivered, to the Trustee, in form reasonably satisfactory to the Trustee, an Officer's Certificate and an Opinion of Counsel, each stating that such transaction or series of transactions and the supplemental indenture, if any, in respect thereto comply with this covenant and that all conditions precedent herein provided for relating to such transaction or series of transactions have been satisfied and stating whether, in the case of a sale or lease, the Issuer shall be released from its obligations and covenants under this Indenture in accordance with Section 5.02.

SECTION 5.02.    <u>Successor Person Substituted.</u>

Upon any consolidation or merger, or any transfer of all or substantially all of the properties or assets of the Issuer in accordance with Section 5.01, the successor Person formed by such consolidation or into which the Issuer is merged or to which such transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture and the Notes with the same effect as if such successor entity had been named as the Issuer herein and therein, and thereafter the predecessor Person shall be relieved of all obligations and covenants under this Indenture and the Notes, but, in the case of a lease of all or substantially all its assets, the predecessor will not be released from the obligation to pay the principal of and interest on the Notes.

## ARTICLE SIX

### DEFAULTS AND REMEDIES

SECTION 6.01.    <u>Events of Default.</u>

Each of the following in an "<u>Event of Default</u>":

(1)    the failure of the Issuer to pay any installment of interest on any Note, when and as the same shall become due and payable, which failure shall have continued unremedied for a period of 30 days;

(2)    the failure of the Issuer to pay the principal or premium, if any, on any Note, when and as the same shall become due and payable, whether at maturity as therein expressed, by call for redemption, by declaration as authorized by this Indenture or otherwise;

-32-

**JX 118-39**

(3)    the failure of the Issuer to observe and perform any other of the covenants or agreements on the part of the Issuer contained in this Indenture (including any indenture supplemental hereto), which failure shall not have been remedied to the satisfaction of the Trustee, or without provision deemed by the Trustee to be adequate for the remedying thereof having been made, for a period of 60 days after the written notice specified below shall have been given;

(4)    the entry by a court having jurisdiction in the premises of a decree or order for relief in respect of the Issuer in an involuntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Issuer or for substantially all of its property, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 90 consecutive days;

(5)    the commencement by the Issuer of a voluntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or similar official) of the Issuer or for substantially all of its property, or the making by it of an assignment for the benefit of creditors; or

(6)    any Lien purported to be created by any Security Document on Collateral with a book value in excess of $100.0 million shall cease to be a valid and enforceable Lien except in accordance with the Security Documents, which failure shall not have been remedied to the satisfaction of the Trustee, or without provision deemed by the Trustee to be adequate for the remedying thereof having been made, for a period of 30 days after the written notice specified below shall have been given.

A Default with respect to Notes under clauses (3) and (6) of this Section 6.01 shall not be an Event of Default until the Trustee (by notice to the Issuer) or the Holders of at least 25% in aggregate principal amount of the outstanding Notes (by notice to the Issuer and the Trustee) gives written notice of the Default to the Issuer and the Issuer does not cure such Default within the time specified in clauses (3) or (6) above, as applicable, after receipt of such notice.  Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."

SECTION 6.02.    Acceleration.

If an Event of Default (other than an Event of Default specified in clause (4) or (5) of Section 6.01), shall have occurred and be continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes to be due and payable by notice in writing to the Issuer and the Trustee specifying the respective Event of Default and that it is a "notice of acceleration", and the same shall become immediately due and payable.

If an Event of Default specified in clause (4) or (5) of Section 6.01 occurs, then all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

-33-

JX 118-40

SECTION 6.03.    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of, or premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture and may take any necessary action requested of it as Trustee to settle, compromise, adjust or otherwise conclude any proceedings to which it is a party.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

SECTION 6.04.    Waiver or Rescission of Past Defaults and Events of Default.

(1)    At any time after a declaration of acceleration with respect to the Notes as described in Section 6.02, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may rescind and cancel such declaration and its consequences:

(a)    if the rescission would not conflict with any judgment or decree;

(b)    if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of the acceleration;

(c)    to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid;

(d)    if the Issuer has paid the Trustee its reasonable compensation and reimbursed the Trustee for its expenses, disbursements and advances; and

(e)    in the event of the cure or waiver of an Event of Default of the type described in clauses (4) or (5) of Section 6.01, the Trustee shall have received an Officer's Certificate and an Opinion of Counsel that such Event of Default has been cured or waived.

No such rescission shall affect any subsequent Default or impair any right consequent thereto.

(2)    The Holders of a majority in aggregate principal amount of the Notes issued and then outstanding under this Indenture may waive any existing Default or Event of Default under this Indenture, and its consequences, except (a) a Default described in clause (1) or (2) of Section 6.01 and (b) in respect of a covenant or provision in this Indenture that cannot be modified or amended without the consent of each Holder of an outstanding Note affected thereby.

SECTION 6.05.    Control by Majority.

Subject to the other provisions of this Indenture and applicable law, the Holders of a majority in aggregate principal amount of the Notes then outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee by this Indenture.  Subject to Section 7.02, the Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines may be unduly

-34-

**JX 118-41**

prejudicial to the rights of another Holder not taking part in such direction (it being understood the Trustee shall have no obligation to determine whether any such actions or forebearances are unduly prejudicial to such other Holders), and the Trustee shall have the right to decline to follow any such direction if the Trustee, being advised by counsel, determines that the action so directed may not lawfully be taken or if the Trustee in good faith shall, by a Responsible Officer, determine that the proceedings so directed may result in costs and expenses of the Trustee for which it has no source of payment or recovery or involve it in personal liability to which it does not have adequate indemnity; *provided* that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

SECTION 6.06.    Limitation on Suits.

No Holder of any Note shall have any right to institute an action, suit or proceeding at law or in equity with respect to this Indenture, or for the execution of any trust hereunder or for the appointment of a receiver or for any other remedy hereunder, in each case with respect to an Event of Default with respect to such Notes, unless (1) such Holder previously shall have given to the Trustee written notice of the occurrence of one or more Events of Default with respect to such Notes; (2) the Holders of at least 25% in aggregate principal amount of the outstanding Notes of such series shall have requested the Trustee in writing to take action in respect of the matter complained of; and (3) such Holder or Holders have offered to the Trustee security and indemnity satisfactory to it against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee, for 60 days after receipt of such notification, request and offer of security and indemnity, shall have neglected or refused to institute any such action, suit or proceeding, and such notification, request and offer of security and indemnity are hereby declared in every such case to be conditions precedent to any such action, suit or proceeding by any Holder of any Note, it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by his or their action to enforce any right hereunder, except in the manner herein provided, and that every action, suit or proceeding at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of the outstanding Notes of such series; *provided, however,* that nothing contained in this Indenture or in the Notes shall affect or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of (and premium, if any) and (subject to Section 2.13) interest on the Notes of such series to the respective Holders of such Notes at the stated maturity expressed in such Notes, or affect or impair the right, which is also absolute and unconditional, of such Holders to institute suit to enforce any such payment.

SECTION 6.07.    No Personal Liability of Directors, Officers, Employees and Stockholders.

No direct or indirect parent, and no past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Issuer, any Subsidiary or any direct or indirect parent (other than the Guarantors pursuant to the Guarantees), as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Indenture or any Guarantee, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. This waiver and release are part of the consideration for issuance of the Notes and the Guarantees. This waiver may not be effective to waive liabilities under the securities laws.

SECTION 6.08.    Rights of Holders To Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal of, or premium, if any, and interest of the Note (including Additional Interest, if any) on or after the respective due dates expressed in the Note, or to bring suit for the enforcement of any such payment on or after such respective dates shall not be impaired or affected without the consent of the Holder.

-35-

JX 118-42

SECTION 6.09.    Collection Suit by Trustee.

If an Event of Default in payment of principal, premium or interest specified in clause (1) or (2) of Section 6.01 occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any Guarantor (or any other obligor on the Notes) for the whole amount of unpaid principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case at the rate set forth in the Notes.

SECTION 6.10.    Trustee May File Proofs of Claim.

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Issuer or any Guarantor (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same after deduction of its charges and expenses to the extent that any such charges and expenses are not paid out of the estate in any such proceedings and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.01(a).  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.01(a) hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that may be distributable in respect of the Issuer's or Guarantors' obligations under this Indenture or that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept on behalf of any Holder any plan or reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceedings.  The Trustee may, unless prohibited by applicable law, vote for the election of a trustee in bankruptcy or similar person and shall be entitled to participate as a member of any official committee of creditors in the matter as it deems necessary or advisable.

SECTION 6.11.    Priorities.

Subject to the terms of the Intercreditor Agreement and the Security Documents, if the Trustee collects any money or property pursuant to this Article Six or from the Collateral Agent pursuant to any Security Document, it shall pay out the money or property in the following order:

First:  to the Collateral Agent for amounts due in accordance with the terms of the Security Documents;

Second:  to the Trustee for amounts due under Section 7.01(a);

Third:  to Holders for interest accrued on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest;

-36-

JX 118-43

Fourth:  to Holders for principal amounts due and unpaid on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal; and

Fifth:  to the Issuer or, if applicable, the Guarantors, as their respective interests may appear.

The Trustee, upon prior notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.11.

SECTION 6.12.    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.12 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.08 or a suit by Holders of more than 10% in principal amount of the Notes then outstanding.

SECTION 6.13.    Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every case, subject to any determination in such proceeding, the Issuer, the Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

SECTION 6.14.    Appointment and Authorization of Wells Fargo Bank, National Association as Collateral Agent.

(a)    Wells Fargo Bank, National Association is hereby designated and appointed as the Collateral Agent of the Holders under the Security Documents, and is authorized as the Collateral Agent for such Holders to execute and enter into each of the Security Documents and all other instruments relating to the Security Documents and (i) to take action and exercise such powers as are expressly required or permitted hereunder and under the Security Documents and all instruments relating hereto and thereto and (ii) to exercise such powers and perform such duties as are in each case, expressly delegated to the Collateral Agent by the terms hereof and thereof together with such other powers as are reasonably incidental hereto and thereto.

(b)    Notwithstanding any provision to the contrary elsewhere in this Indenture or the Security Documents, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein or therein or any fiduciary relationship with any Holder, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or any Security Document or otherwise exist against the Collateral Agent.

(c)    The Collateral Agent may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder or under the Security Documents in good faith and in accordance with the advice or opinion of such counsel.

-37-

JX 118-44

ARTICLE SEVEN

TRUSTEE

SECTION 7.01.    Acceptance of Trusts Upon Specified Conditions.

The Trustee accepts the trusts created by this Indenture upon the terms and conditions hereof, including the following, to all of which the parties hereto and the Holders from time to time of the Notes agree:

(a)    Trustee Entitled to Compensation and Expenses.  The Trustee shall be entitled to such compensation as is agreed upon in writing for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and the Issuer agrees to pay such compensation, and all other reasonable expenses (including the fees and expenses of Trustee's counsel and experts), disbursements and advances incurred or made by the Trustee hereunder, promptly on demand from time to time as such services shall be rendered and as such expenses shall be incurred.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Trustee and any predecessor trustee hereunder for, and to hold it or them harmless against, any loss, liability, claim, damage or expense incurred without its or their own negligence or willful misconduct, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder and the performance of its or their duties, as well as the costs and expenses of defending itself or themselves against any claim (whether asserted by the Issuer, a Holder or any other Person) or liability in connection with the exercise or performance of any of its or their powers or duties hereunder.  As security for the performance of the obligations of the Issuer under this subsection (a), the Trustee shall have a lien therefor on any moneys or property held or collected by the Trustee hereunder prior to any rights therein of the Holders.  When the Trustee incurs expenses or renders services in connection with an Event of Default specified in clause (4) or (5) of Section 6.01, the expenses (including the reasonable charges and expenses of its counsel and experts) and the compensation for the services are intended to constitute expenses of administration under any applicable Bankruptcy Law.  Notwithstanding any provisions of this Indenture to the contrary, the obligations of the Issuer and the Guarantors to indemnify the Trustee under this Section 7.01(a) shall survive any satisfaction and discharge under Article 9, the termination of this Indenture or the resignation or removal of the Trustee.

(b)    Trustee May Act by Agents and Attorneys.  The Trustee may execute any of the trusts or powers hereof and perform any duty hereunder either directly or by its agents and attorneys and shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(c)    Trustee Not Responsible for Recitals of Fact.  The Trustee shall not be responsible in any manner whatsoever for the correctness of the recitals contained herein or in the Notes (except its certificates of authentication thereon) or the Guarantees, all of which are made by the Issuer solely; and the Trustee shall not be responsible or accountable in any manner whatsoever for or with respect to the validity or execution or sufficiency of this Indenture or of the Notes (except its certificates of authentication thereon) or the Guarantees, and the Trustee makes no representation with respect thereto.  The Trustee shall not be accountable for the use or application by the Issuer of any Notes, or the proceeds of any Notes.  Neither the Trustee nor the Collateral Agent shall be responsible for or make any representation as to the existence, genuineness, value or protection of any Collateral, for the legality, effectiveness or sufficiency of any Security Document, or for the creation, perfection, priority, sufficiency or protection of any Notes Liens.  Neither the Trustee nor the Collateral Agent shall be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any

-38-

JX 118-45

time or times or otherwise perfecting or maintaining the perfection of any Lien or security interest in the Collateral.

(d)  <u>Trustee May Consult With Counsel</u>.  The Trustee may consult with counsel of its selection and, to the extent permitted by Section 7.02, the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered to be taken by the Trustee hereunder in good faith and in accordance with such advice or Opinion of Counsel.

(e)  <u>Trustee May Rely Upon Certificate as to Adoption of Resolutions; Requests May Be Evidenced by Officer's Certificate</u>.  The Trustee, to the extent permitted by Section 7.02, may conclusively rely upon the certificate of the secretary or one of the assistant secretaries of the Issuer as to the adoption of any resolution by the Board of Directors or stockholders of the Issuer, and any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by, and whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, offering or omitting any action hereunder, the Trustee may conclusively rely upon an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed).

(f)  <u>Trustee May Become Owner or Pledgee of Notes</u>.  The Trustee or any agent of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and, subject to Sections 7.06 and 7.09, may otherwise deal with the Issuer with the same rights it would have had if it were not a Trustee or such agent.

(g)  <u>Segregation of Funds</u>.  Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing with the Issuer.

(h)  <u>Action at Request of or with Consent of Holder Binding on Future Holders</u>.  Any action taken by the Trustee pursuant to any provision hereof at the request or with the consent of any Person who at the time is the Holder of Notes shall be conclusive and binding in respect of any such Notes upon all future Holders thereof or of any Notes or other securities that may be issued for or in lieu thereof in whole or in part, whether or not such Note shall have noted thereon the fact that such request or consent had been made or given.

(i)  <u>Trustee May Rely on Instruments Believed by It to Be Genuine</u>.  Subject to the provisions of Section 7.02, the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper party or parties.

(j)  <u>Trustee Need Not Exercise Rights or Powers Unless Indemnified by Holders</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be under any obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any Holders, pursuant to any provision of this Indenture, unless one or more Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities that may be incurred by it therein or thereby.

(k)  <u>Trustee Not Liable for Action Taken or Omitted in Good Faith</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within its discretion or within the rights or powers conferred upon it by this Indenture.

JX 118-46

(l)      <u>Trustee Not Bound to Make Investigation</u>.  Subject to the provisions of the first paragraph of Section 7.02, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document.

(m)      <u>Trustee Not Deemed to Have Knowledge of Default</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be deemed to have knowledge or notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless the Holders of not less than 25% in aggregate principal amount of the outstanding Notes notify the Trustee in writing thereof.

(n)      <u>Limitation on Liability</u>.  In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(o)      <u>Agents Protected</u>.  The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated, reimbursed and indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

SECTION 7.02.    <u>Duties of Trustee in Case of Default</u>.

If one or more Events of Default shall have happened, then, during the continuance thereof, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

None of the provisions of this Indenture shall be construed as relieving the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that, anything contained in this Indenture to the contrary notwithstanding:

(a)      <u>When No Default Subsisting</u>.  Unless and until an Event of Default with respect to the Notes of any series shall have happened, which at the time is continuing,

(i)      the Trustee undertakes to perform such duties and only such duties with respect to the Notes as are specifically set out in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee, whose duties and obligations shall be determined solely by the express provisions of this Indenture, and

(ii)      the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of the Trustee, upon certificates and opinions furnished to it pursuant to the express provisions of this Indenture; but in the case of any such certificates or opinions which, by the provisions of this Indenture, are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(b)      <u>Trustee Not Liable for Error of Judgment Made in Good Faith by Responsible Officer</u>.  The Trustee shall not be liable to any Holder or to any other Person for error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

-40-

**JX 118-47**

(c)    Trustee Not Liable for Certain Action or Non-Action at Direction of Holders of Majority of Notes. The Trustee shall not be liable to any Holder or to any other Person with respect to any action taken or omitted to be taken by it in good faith, in accordance with the direction of Holders given as provided in Section 6.05, relating to the time, method and place of conducting any proceeding for any remedy available to it, or any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority of the Notes outstanding concerning the exercise of any trust or power conferred upon it by this Indenture.

None of the provisions of this Indenture shall be construed as requiring the Trustee to expend or risk its own funds or otherwise to incur any personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or remedies, if adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 7.03.    Notice to Holders of Defaults.

Within 90 days after the occurrence thereof, the Trustee shall give to the Holders of the Notes notice of each Default known to the Trustee, unless such Default shall have been cured or waived before the giving of such notice; but, unless such Default be the failure to pay the principal of (or premium, if any) or interest on any of the Notes when and as the same shall become due and payable the Trustee shall be protected in withholding such notice, if and so long as the board of directors, the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Notes.

SECTION 7.04.    Resignation and Removal of Trustee and Notice Thereof.

The Trustee, or any successor to it hereafter appointed, may at any time resign and be discharged of the trusts hereby created with respect to the Notes by giving to the Issuer notice in writing and by mailing or electronically delivering notice thereof to the Holders of the Notes. Such resignation shall take effect upon the appointment of a successor Trustee by the Issuer and the acceptance of such appointment by such successor Trustee. Any Trustee hereunder may be removed with respect to the Notes at any time by the Holders of a majority in aggregate principal amount of the outstanding Notes, acting pursuant to the provisions of Article 8.

Upon its resignation or removal, any Trustee shall be entitled to the payment of reasonable compensation for the services rendered hereunder by such Trustee and to the payment of all reasonable expenses incurred hereunder and all moneys then due to it hereunder. The Trustee's rights to compensation, reimbursement and indemnification provided in Section 7.01(a) shall survive its resignation or removal.

SECTION 7.05.    Qualifications of Trustee.

There shall at all times be a Trustee under this Indenture, and such Trustee shall at all times be a corporation organized and doing business under the laws of the United States or of any state thereof, which is authorized under such laws to exercise corporate trust powers and is subject to supervision or examination by federal or state authority and which has a combined capital and surplus of not less than $50,000,000. For the purposes of this Section 7.05, the combined capital and surplus of any such Trustee shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published by such Trustee; *provided* that such reports are published at least annually, pursuant to law or to the requirements of a federal or state supervising or examining authority. If such Trustee or any successor shall at any time cease to have the qualifications prescribed in this Section 7.05, it shall promptly resign as Trustee hereunder.

-41-

JX 118-48

SECTION 7.06.    Disqualification Of Trustee By Reason Of Conflicting Interest.

       If the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture.

SECTION 7.07.    Appointment of Successor Trustee.

       In case at any time the Trustee shall resign, or shall be removed, or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver of the Trustee or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee or of its property of affairs for the purpose of rehabilitation, conservation or liquidation with respect to the Notes, the Issuer shall promptly appoint a successor Trustee. If a successor Trustee does not take office within 60 days after the retiring Trustee resigns, is removed, becomes incapable of acting, is adjudged a bankrupt or insolvent or is taken charge or control of as described in the preceding sentence, a successor Trustee may be appointed by the Holders of a majority in aggregate principal amount of the outstanding Notes, by an instrument or instruments in writing signed in duplicate by such Holders and filed, one original thereof with the Issuer and the other with the successor Trustee; but, until a successor Trustee shall have been so appointed by the Holders of Notes as herein authorized, the Issuer, or, in case all or substantially all the assets of the Issuer shall be in the possession of one or more Custodians or receivers lawfully appointed, or of trustees in bankruptcy or reorganization proceedings (including a trustee or trustees appointed under the provisions of the Federal bankruptcy laws, as now or hereafter constituted), or of assignees for the benefit of creditors, such receivers, Custodians, trustees or assignees, as the case may be, by an instrument in writing, shall appoint a successor Trustee with respect to the Notes. Subject to the provisions of Sections 7.04, 7.05 and 7.06, upon the appointment as aforesaid of a successor Trustee with respect to the Notes, the Trustee with respect of the Notes shall cease to be Trustee hereunder. After any such appointment (other than by the Holders of Notes) the person making such appointment shall forthwith cause notice thereof to be mailed or electronically delivered to the Holders of Notes at their addresses as the same shall then appear on the registry of the Notes maintained by the Registrar pursuant to Section 2.04; but any successor Trustee so appointed shall immediately and without further act be superseded by a successor Trustee appointed by the Holders of Notes in the manner above prescribed, if such appointment be made prior to the expiration of one year from the date of the mailing or electronic delivery of such notice by the Issuer, or by such receivers, trustees or assignees.

       If any Trustee shall resign because of conflict of interest as provided in Section 7.06 and a successor Trustee shall not have been appointed by the Issuer or by the Holders of the Notes or, if any successor Trustee so appointed shall not have accepted its appointment within 30 days after such appointment shall have been made, the resigning Trustee may apply at the expense of the Issuer to any court of competent jurisdiction for the appointment of a successor Trustee. If in any other case a successor Trustee shall not be appointed pursuant to the foregoing provisions of this Section 7.07 within three months after such appointment might have been made hereunder, the Holder of any Note or any retiring Trustee may, at the expense of the Issuer, apply to any court of competent jurisdiction to appoint a successor Trustee. Such court may thereupon, in any such case, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

       Any successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor Trustee and to the Issuer, or to the receivers, trustees, assignees or court appointing it, as the case may be, an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations with respect to such series of such predecessor Trustee with like effect as if originally named as Trustee hereunder, and such predecessor Trustee, upon payment of its

-42-

JX 118-49

charges and disbursements then unpaid, shall thereupon become obligated to pay over, and such successor Trustee shall be entitled to receive, all moneys and properties held by such predecessor Trustee as Trustee hereunder.  Nevertheless, on the written request of the Issuer or of the successor Trustee or of the Holders of at least 10% in aggregate principal amount of the outstanding Notes, such predecessor Trustee, upon payment of its said charges and disbursements, shall execute and deliver an instrument transferring to such successor Trustee upon the trusts herein expressed all the rights, powers and trusts of such predecessor Trustee and shall assign, transfer and deliver to the successor Trustee all moneys and properties held by such predecessor Trustee; and, upon request of any such successor Trustee, the Issuer shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Trustee all such authority, rights, powers, trusts, immunities, duties and obligations.

SECTION 7.08.    Merger, Conversion or Consolidation of Trustee or Transfer of Its Corporate Trust Business; Authentication of Notes by Successor Trustee.

Any corporation into which the Trustee or any successor to it in the trusts created by this Indenture shall be merged or converted, or any corporation with which it or any successor to it shall be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee or any such successor to it shall be a party, or any corporation to which the Trustee or any successor to it shall sell or otherwise transfer all or substantially all of the corporate trust business of the Trustee, shall be the successor Trustee under this Indenture without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture with respect to the Notes, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor Trustee hereunder or in the name of the successor Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture, *provided* that the certificate of the Trustee shall have.

SECTION 7.09.    Trustee Required to Account for Amounts Collected As Creditor of the Issuer Under Certain Conditions.

If and when the Trustee shall be or become a creditor of the Issuer (or any other obligor upon the Notes), the Trustee shall be subject to the provisions of the Trust Indenture Act regarding the collection of claims against the Issuer (or any such other obligor).

SECTION 7.10.    Trustee May Rely on Officer's Certificate.

Subject to Section 7.02, and subject to the provisions of Section 12.04 with respect to the certificates required thereby, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence or bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate with respect thereto delivered to the Trustee, and such Officer's Certificate, in the absence of negligence or willful misconduct on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered to be taken or omitted by it under the provisions of this Indenture upon the faith thereof.

-43-

**JX 118-50**

SECTION 7.11.    Reports by Trustee.

(a)    The Trustee shall transmit to Holders such reports concerning the Trustee and its actions under this Indenture as may be required pursuant to the Trust Indenture Act at the times and in the manner provided pursuant thereto. If required by Section 313(a) of the Trust Indenture Act, the Trustee shall, within sixty days after each March 15 following the date of this Indenture, deliver to Holders a brief report, dated as of such March 15, which complies with the provisions of such Section 313(a).

(b)    A copy of each such report shall, at the time of such transmission to Holders, be filed by the Trustee with each stock exchange, if any, upon which the Notes are listed, with the Commission and with the Issuer. The Issuer will promptly notify the Trustee when the Notes are listed on any stock exchange and of any delisting thereof.

SECTION 7.12.    Collateral Agent.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated, reimbursed and indemnified, are extended to, and shall be enforceable by, the Collateral Agent as if the Collateral Agent were named as the Trustee herein and the Security Documents were named as this Indenture herein.

## ARTICLE EIGHT

### AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 8.01.    Without Consent of Holders.

The Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) may amend, waive or supplement this Indenture, the Notes and the Security Documents, without prior notice to or consent of any Holder:

(1)    to issue Additional Notes under this Indenture;

(2)    to cure any ambiguity, omission, defect or inconsistency;

(3)    to provide for the assumption by a successor of the obligations of the Issuer under this Indenture and the Notes, or provide for the assumption by a successor of the obligations of a Guarantor under this Indenture, in each case, to the extent otherwise permitted under this Indenture;

(4)    to comply with requirements of the Commission in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(5)    to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

(6)    to add additional Guarantees of the Notes or additional assets as Collateral;

(7)    to release a Guarantor as provided in section 10.04;

-44-

JX 118-51

(8)    to allow for the addition of Additional First Lien Obligations and Pari Passu Junior Lien Obligations under the Security Documents (including by way of entry into an additional Intercreditor Agreement) to the extent not prohibited by this Indenture (including, in the case of Pari Passu Junior Lien Obligations that are not secured by the Security Agreement, to enter into conforming modifications to the Intercreditor Agreement or an additional intercreditor agreement with any collateral agent for the holders of such obligations providing that the Liens of the Collateral Agent and such other collateral agent on any Collateral shall be pari passu and that amounts received in connection with an enforcement of the Notes Liens or the Liens securing such Pari Passu Junior Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Pari Passu Junior Lien Obligations, be distributed to the Trustee and the agent(s) for the holders of Pari Passu Junior Lien Obligations on a pro rata basis based on the amount of outstanding obligations of each such class);

(9)    release Guarantees and/or Collateral as otherwise permitted in this Indenture and the Security Documents;

(10)    to provide for uncertificated Notes in addition to, or in place of, certificated Notes; or

(11)    to add to the covenants of the Issuer or a Guarantor for the benefit of the Holders of the Notes or to surrender any right or power conferred upon the Issuer or a Guarantor.

SECTION 8.02.    With Consent of Holders.

(a)    This Indenture, the Notes or the Security Documents may be amended or supplemented by the Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) with the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), and any existing Default under, or compliance with any provision of each of this Indenture or the Notes may be waived (except a Default in respect of the payment of principal or interest on the Notes) with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with any purchase of, or tender offer or exchange offer for, Notes).

(b)    Without the consent of each Holder affected, an amendment, supplement or waiver of this Indenture may not:

(1)    extend the fixed maturity of the Notes,

(2)    reduce the rate or extend the time of payment of interest on the Notes,

(3)    reduce the principal amount or the premium, if any, of the Notes or reduce the amount of the principal payable on any date,

(4)    change the coin or currency in which principal of or any premium or interest on any Notes are payable, or

(5)    impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof.

-45-

**JX 118-52**

(c)     Furthermore, an amendment, supplement or waiver of this Indenture may not:

(1)    reduce the percentage of Notes, the consent of the Holders of which is required for any such modification without the consent of the Holders of all Notes then outstanding (including Notes held by Affiliates of the Issuer);

(2)    modify without the written consent of the Trustee the rights, duties or immunities of the Trustee; or

(3)    except as expressly permitted under this Indenture, (i) release all or substantially all of the Collateral from the Liens securing the Notes or (ii) release one or more Guarantors from their Guarantees (or otherwise limit the liability of one or more Guarantors with respect to their obligations under their Guarantees) if such release or limitation is in respect of substantially all of the value provided by all Guarantors under the Guarantees, in each case without the consent of Holders of at least 75% in aggregate principal amount of the outstanding Notes.

After an amendment, supplement or waiver under this Section 8.02 becomes effective, the Issuer shall mail or electronically deliver to each Holder affected thereby a notice briefly describing the amendment, supplement or waiver.

Upon the written request of the Issuer and upon the receipt by the Trustee of evidence reasonably satisfactory to the Trustee of the consent of the Holders as aforesaid and upon receipt by the Trustee of the documents described in Section 8.06, the Trustee shall join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture, in which case the Trustee may, but shall not be obligated to, enter into such amended or supplemental indenture. It shall not be necessary for the consent of the Holders under this Section 8.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

SECTION 8.03.    Compliance with Trust Indenture Act.

Every amendment or supplement to this Indenture, the Notes or the Guarantees shall comply with the TIA as then in effect.

SECTION 8.04.    Revocation and Effect of Consents.

Until an amendment, supplement, waiver or other action becomes effective, a consent to it by a Holder of a Note is a continuing consent conclusive and binding upon such Holder and every subsequent Holder of the same Note or portion thereof, and of any Note issued upon the transfer thereof or in exchange therefor or in place thereof, even if notation of the consent is not made on any such Note. Any such Holder or subsequent Holder, however, may revoke the consent as to his Note or portion of a Note, if the Trustee receives the written notice of revocation before the date the amendment, supplement, waiver or other action becomes effective.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement, or waiver. If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to

-46-

JX 118-53

be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

After an amendment, supplement, waiver or other action becomes effective, it shall bind every Holder.

SECTION 8.05.    Notation on or Exchange of Notes.

If an amendment, supplement, or waiver changes the terms of a Note, the Trustee (in accordance with the specific written direction of the Issuer) shall request the Holder of the Note (in accordance with the specific written direction of the Issuer) to deliver it to the Trustee. In such case, the Trustee shall place an appropriate notation on the Note about the changed terms and return it to the Holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue, the Guarantors shall endorse, and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

SECTION 8.06.    Trustee to Sign Amendments, Etc.

The Trustee or Collateral Agent, as the case may be, shall sign any amendment, supplement or waiver authorized pursuant to this Article Eight if the amendment, supplement or waiver does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Collateral Agent. If it does, the Trustee or the Collateral Agent, as the case may be, may, but need not, sign it. In signing or refusing to sign such amendment, supplement or waiver the Trustee or the Collateral Agent, as the case may be, shall be entitled to receive and, subject to Section 7.02, shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel stating, in addition to the matters required by Section 12.04, that such amendment, supplement or waiver is authorized or permitted by this Indenture and all conditions precedent required hereunder to such amendment, supplement or waiver have been satisfied.

ARTICLE NINE

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 9.01.    Discharge of Indenture.

(a)    The Issuer may terminate its obligations and the obligations of the Guarantors under the Notes, the Guarantees and this Indenture, except the obligations referred to in the last paragraph of this Section 9.01, if

(1)    all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, have been delivered to the Trustee for cancellation, or

(2)    (A) all Notes not delivered to the Trustee for cancellation otherwise (x) have become due and payable by reason of the mailing or electronic delivery of a notice of redemption or otherwise, (y) will become due and payable by reason of the mailing or electronic delivery of a notice of redemption or otherwise, or may be called for redemption within one year or (B) have been called for redemption pursuant to Section 3.07 and, in any case, the Issuer has irrevocably deposited or caused to be deposited with the Trustee as trust funds, in trust solely for the benefit of the Holders, cash in U.S. Dollars, Government Securities, or a combination

-47-

JX 118-54

thereof, in amounts as will be sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium and Additional Interest, if any, and accrued interest through the date of maturity or redemption,

(b)     the Issuer has paid or caused to be paid all sums payable by it under this Indenture, and

(c)     the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money or proceeds from Government Securities toward the payment of the Notes at maturity or the Redemption Date, as the case may be.

In addition, if the Issuer delivers an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to satisfaction and discharge have been complied with, the Trustee shall acknowledge in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes, the Guarantees and this Indenture except for those surviving obligations specified below.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Issuer in Sections 7.01(a), 9.04 and 9.05 shall survive such satisfaction and discharge.

SECTION 9.02.     Legal Defeasance.

(a)     The Issuer may at its option be discharged from its obligations with respect to the Notes and the Guarantors discharged from their obligations under the Guarantees on the date the conditions set forth in clause (b) of this Section 9.02 are satisfied (hereinafter, "Legal Defeasance"). For this purpose, such Legal Defeasance means that the Issuer shall be deemed to have paid and discharged the entire indebtedness represented by the Notes and to have satisfied all its other obligations under such Notes and this Indenture insofar as such Notes are concerned (and the Trustee, at the expense of the Issuer, shall, subject to Section 9.05, execute instruments in form and substance reasonably satisfactory to the Trustee and Issuer acknowledging the same), except for the following which shall survive until otherwise terminated or discharged hereunder:  (A) the rights of Holders to receive solely from the trust funds described in clause (b) of this Section 9.02 and as more fully set forth in Section 9.04, payments in respect of the principal of, premium and Additional Interest, if any, and interest on such Notes when such payments are due from the trust referred to in clause (b) of this Section 9.02, (B) the Issuer's obligations hereunder with respect to such Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust, (C) the rights, powers, trusts, duties, and immunities of the Trustee hereunder (including claims of, or payments to, the Trustee under or pursuant to Section 7.01(a)), and the Issuer's obligations in connection therewith, and (D) this Article Nine.  Subject to compliance with this Article Nine, the Issuer may exercise its option under this Section 9.02 with respect to the Notes notwithstanding the prior exercise of its option under Section 9.03 with respect to the Notes.

(b)     The following shall be the conditions to the application of Section 9.02(a) to the outstanding Notes:

(i)     the Issuer shall have deposited with the Trustee, in trust, money and/or Government Securities that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of inde-

-48-

JX 118-55

pendent public accountants expressed in a written certification thereof delivered to the Trustee, to pay the principal of, premium, if any, and accrued interest on the Notes on the stated maturity of such payments in accordance with the terms of the Indenture and the Notes;

(ii)     the Issuer shall have delivered to the Trustee either (x) an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the exercise of the option of the Issuer under clause (a) of this Section 9.02 and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred, which Opinion of Counsel must be based upon (and accompanied by a copy of) a published ruling of the Internal Revenue Service or other change in applicable U.S. federal income tax law after the Issue Date to the same effect or (y) a ruling directed to the Trustee received from the Internal Revenue Service to the same effect as the aforementioned Opinion of Counsel;

(iii)     immediately after giving effect to such deposit on a pro forma basis, no Default or Event of Default shall have occurred and be continuing on the date of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound; and

(iv)     the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to such Legal Defeasance have been complied with.

SECTION 9.03.     Covenant Defeasance.

(a)     At the option of the Issuer, (x) the Issuer and the Guarantors shall be released from their respective obligations under Sections 4.02 (except for obligations mandated by the TIA) and 4.03 through 4.09 and (y) clause (3) of Section 6.01 shall no longer apply with respect to the outstanding Notes on and after the date the conditions set forth in clause (b) of this Section 9.03 are satisfied (hereinafter, "Covenant Defeasance"). For this purpose, such Covenant Defeasance means that the Issuer and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such specified Section or portion thereof, whether directly or indirectly by reason of any reference elsewhere herein to any such specified Section or portion thereof or by reason of any reference in any such specified Section or portion thereof to any other provision herein or in any other document, but the remainder of this Indenture and the Notes shall be unaffected thereby.

(b)     The following shall be the conditions to the application of Section 9.03(a) to the outstanding Notes:

(i)     the deposit with the Trustee, in trust, of U.S. legal tender and/or Government Securities that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay the principal of, premium, if any, and accrued interest on the Notes on the scheduled maturity of such payments in accordance with the terms of this Indenture and the Notes;

(ii)     the delivery by the Issuer to the Trustee of an Opinion of Counsel to the effect that the beneficial owners of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance of certain covenants

-49-

JX 118-56

and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(iii)    immediately after giving effect to such deposit on a pro forma basis, no Default or Event of Default shall have occurred and be continuing on the date of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound; and

(iv)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to such Covenant Defeasance have been complied with.

SECTION 9.04.    <u>Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions</u>.

All money and Government Securities (including the proceeds thereof) deposited with the Trustee pursuant to Section 9.02(b) or 9.03(b) in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent), to the Holders of such Notes, of all sums due and to become due thereon in respect of principal, premium, if any, and accrued interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer and the Guarantors shall (on a joint and several basis) pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Government Securities deposited pursuant to Section 9.02(b) or 9.03(b) or the principal, premium, if any, and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article Nine to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time any money or Government Securities held by it as provided in Section 9.02(b) and 9.03(b) which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof which would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

SECTION 9.05.    <u>Reinstatement</u>.

If the Trustee or Paying Agent is unable to apply any U.S. Dollars or Government Securities in accordance with Section 9.01, 9.02 or 9.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and each Guarantor's obligations under this Indenture, the Notes and the Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to this Article Nine until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Dollars or Government Securities in accordance with Section 9.01, 9.02 or 9.03, as the case may be; *provided* that if the Issuer or the Guarantors have made any payment of principal of, premium, if any, or accrued interest on any Notes because of the reinstatement of their obligations, the Issuer or the Guarantors, as the case may be, shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Dollars or Government Securities held by the Trustee or Paying Agent.

JX 118-57

SECTION 9.06.    Moneys Held by Paying Agent.

In connection with the satisfaction and discharge of this Indenture, all moneys then held by any Paying Agent under the provisions of this Indenture shall, upon written demand of the Issuer, be paid to the Trustee, or if sufficient moneys have been deposited pursuant to Section 9.02(b) or 9.03(b), to the Issuer (or, if such moneys had been deposited by the Guarantors, to such Guarantors), and thereupon such Paying Agent shall be released from all further liability with respect to such moneys.

SECTION 9.07.    Moneys Held by Trustee.

Subject to applicable law, any moneys deposited with the Trustee or any Paying Agent or then held by the Issuer or the Guarantors in trust for the payment of the principal of, or premium, if any, or interest on any Note that are not applied but remain unclaimed by the Holder of such Note for two years after the date upon which the principal of, or premium, if any, or interest on such Note shall have respectively become due and payable shall be repaid to the Issuer (or, if appropriate, the Guarantors), or if such moneys are then held by the Issuer or the Guarantors in trust, such moneys shall be released from such trust; and the Holder of such Note entitled to receive such payment shall thereafter, as an unsecured general creditor, look only to the Issuer and the Guarantors for the payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money shall thereupon cease; *provided* that the Trustee or any such Paying Agent, before being required to make any such repayment, may, at the expense of the Issuer and the Guarantors, either mail or electronically deliver to each Holder affected, at the address shown in the register of the Notes maintained by the Registrar pursuant to Section 2.06, or cause to be published once a week for two successive weeks, in a newspaper published in the English language, customarily published each Business Day and of general circulation in the City of New York, New York or the United States, a notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such mailing, electronic delivery or publication, any unclaimed balance of such moneys then remaining will be repaid to the Issuer. After payment to the Issuer or the Guarantors or the release of any money held in trust by the Issuer or any Guarantors, as the case may be, Holders entitled to the money must look only to the Issuer and the Guarantors for payment as general unsecured creditors unless applicable abandoned property law designates another Person.

ARTICLE TEN

GUARANTEE OF NOTES

SECTION 10.01.    Guarantee.

Subject to the provisions of this Article Ten, each Guarantor, by execution of this Indenture, jointly and severally, unconditionally guarantees to each Holder and to the Trustee and their respective successors and assigns (i) the due and punctual payment of the principal of and interest and premium, if any, on each Note, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on the overdue principal of and interest on the Notes, to the extent lawful, and the due and punctual payment of all other Obligations of the Issuer to the Holders or the Trustee all in accordance with the terms of such Note, this Indenture and the Registration Rights Agreements, and (ii) in the case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise. Each Guarantor, by execution of this Indenture, agrees that its obligations hereunder shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of any such Note or this Indenture, any failure to enforce the provisions of any such Note, this Indenture or the Registration Rights Agreements, any waiver, modi-

-51-

JX 118-58

fication or indulgence granted to the Issuer or any other Guarantor with respect thereto by the Holder of such Note, or any other circumstances which may otherwise constitute a legal or equitable discharge of a surety or such Guarantor.

Each Guarantor hereby waives diligence, presentment, demand for payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to any such Note or the Indebtedness evidenced thereby and all demands whatsoever, and covenants that this Guarantee will not be discharged as to any such Note except by payment in full of the principal thereof and interest thereon. Each Guarantor hereby agrees that, as between such Guarantor, on the one hand, and the Holders and the Trustee, on the other hand, (i) subject to this Article Ten, the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article Six for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Obligations as provided in Article Six, subject to any rescission thereof pursuant to Section 6.04, such Obligations (whether or not due and payable) shall forthwith become due and payable by each Guarantor for the purpose of this Guarantee.

SECTION 10.02.    Execution and Delivery of Notation of Guarantee.

To further evidence the Guarantee set forth in Section 10.01, each Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit G hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of each Guarantor. The validity and enforceability of any Guarantee shall not be affected by the fact that it is not affixed to any particular Note.

Each of the Guarantors hereby agrees that its Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

If an Officer of a Guarantor (or general partner or member thereof) whose signature is on this Indenture or a notation of Guarantee no longer holds that office at the time the Trustee authenticates the Note on which such Guarantee is endorsed or at any time thereafter, such Guarantor's Guarantee of such Note shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of any Guarantee set forth in this Indenture on behalf of the Guarantor.

SECTION 10.03.    Limitation of Guarantee.

Each Guarantor, the Trustee, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Guarantee or pursuant to its contribution obligations under this Indenture, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law. Each Guarantor that makes a payment or

-52-

JX 118-59

distribution under a Guarantee shall be entitled to a contribution from each other Guarantor in a *pro rata* amount based on the assets of each Guarantor.

SECTION 10.04.   Release of Guarantor.

A Guarantor shall be automatically and unconditionally released from all of its obligations under its Guarantee:

(i)    in the event of a sale or other transfer of Equity Interests in such Guarantor or dissolution of such Guarantor in compliance with the terms of this Indenture following which such Guarantor ceases to be a Subsidiary;

(ii)    upon such Guarantor ceasing to be a borrower or guarantor under any Credit Agreement and the Issuer's delivery of an Officer's Certificate to the Trustee requesting the release and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to such transactions have been complied with and that such release is authorized and permitted hereunder; or

(iii)    in connection with a discharge of this Indenture pursuant to Section 9.01 or Covenant Defeasance or Legal Defeasance.

and in each such case, the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to such transactions have been complied with and that such release is authorized and permitted hereunder.

Upon being provided the Officer's Certificate and Opinion of Counsel mentioned in clause (ii) above, the Trustee shall execute any documents reasonably requested by the Issuer or a Guarantor in order to evidence the release of such Guarantor from its obligations under its Guarantee endorsed on the Notes and under this Article Ten.

SECTION 10.05.   Waiver of Subrogation.

Each Guarantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against the Issuer that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under its Guarantee and this Indenture, including, without limitation, any right of subrogation, reimbursement, exoneration, indemnification, and any right to participate in any claim or remedy of any Holder of Notes against the Issuer, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including, without limitation, the right to take or receive from the Issuer, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or Security on account of such claim or other rights.  If any amount shall be paid to any Guarantor in violation of the preceding sentence and the Notes shall not have been paid in full, such amount shall have been deemed to have been paid to such Guarantor for the benefit of, and held in trust for the benefit of, the Holders, and shall forthwith be paid to the Trustee for the benefit of such Holders to be credited and applied upon the Notes, whether matured or unmatured, in accordance with the terms of this Indenture. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the waiver set forth in this Section 10.05 is knowingly made in contemplation of such benefits.

-53-

JX 118-60

ARTICLE ELEVEN

SECURITY

SECTION 11.01.    <u>Security Documents; Additional Collateral</u>.

(a)    <u>Security Documents</u>.  In order to secure the due and punctual payment of the Obligations outstanding under the Notes and the Guarantees, the Issuer, the Guarantors, the Collateral Agent and the other parties thereto have simultaneously with the execution of this Indenture entered or, in accordance with the provisions of this Article Eleven and the provisions of the Security Agreement, will enter into the Security Documents.

(b)    The Issuer shall, and shall cause each Guarantor to, and each Guarantor shall, make all filings (including filings of continuation statements and amendments to financing statements that may be necessary to continue the effectiveness of such financing statements) and take all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Guarantors) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest subject only to Permitted Liens.

(c)    <u>Additional Collateral</u>.  With respect to assets acquired after the Issue Date, the Issuer or applicable Guarantor will take the actions required by the Security Agreement.

SECTION 11.02.    <u>Recording, Registration and Opinions</u>.

The Issuer and the Guarantors shall furnish to the Trustee, (a) upon or no later than 30 days following the Issue Date, an Opinion of Counsel stating that this Indenture or the Security Documents or financing statements with respect thereto, as applicable, have been properly recorded and filed so as to make the Notes Liens effective, and reciting the details of such action, and (b) at least 30 days prior to the anniversary of the Issue Date in each year an Opinion of Counsel, dated as of such date, either (i) stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording, and refiling of this Indenture or the Security Documents, as applicable, as are necessary to maintain the Notes Liens under applicable law to the extent required by the Security Documents other than any action as described therein to be taken and such opinion may refer to prior Opinions of Counsel and contain customary qualifications and exceptions and may rely on an Officer's Certificate of the Issuer or (ii) stating that, in the opinion of such counsel, no such action is necessary to maintain such Notes Liens or security interests.

SECTION 11.03.    <u>Releases of Liens on Collateral</u>.

The Liens on the Collateral pursuant to the Security Documents shall automatically and without the need for any further action by any Person be released:

(a)    as to any property, or portion thereof, subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(b)    in whole, upon:

(i)    a satisfaction and discharge of this Indenture under Section 9.01 hereof; or

-54-

**JX 118-61**

(ii)    a Legal Defeasance or Covenant Defeasance of this Indenture under Section 9.02 or Section 9.03, respectively;

(c)    as to any property that (i) is sold, transferred or otherwise disposed of by the Issuer or any Guarantor (other than to the Issuer or another Guarantor) in a transaction not prohibited by this Indenture at the time of such transfer or disposition or (ii) is owned or at any time acquired by a Guarantor that has been released from its Guarantee, concurrently with the release of such Guarantee;

(d)    in whole or in part, in accordance with the applicable provisions of the Intercreditor Agreement;

(e)    in whole or in part, in accordance with Section 8.01 or 8.02; and

(f)    in whole, upon the occurrence of a Fall-Away Event.

To the extent applicable, the Issuer shall comply with TIA § 314(b) and, following qualification of the Indenture under the TIA (if required), TIA § 314(d). Any certificate or opinion required by TIA § 314(d) may be made by an Officer of the Issuer except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert appointed by the Issuer, who shall be approved by the Trustee.

SECTION 11.04.    Form and Sufficiency of Release.

In the event that any Lien is to be released pursuant to Section 11.03, and the Issuer or such Guarantor requests the Collateral Agent to furnish a written disclaimer, release or quitclaim of any interest in such property under the Security Documents, upon receipt of an Officer's Certificate and Opinion of Counsel to the effect that such release complies with Section 11.03 and specifying the provision in Section 11.03 pursuant to which such release is being made (upon which the Trustee and Collateral Agent may exclusively and conclusively rely), the Collateral Agent shall execute, acknowledge and deliver to the Issuer or such Guarantor such an instrument in the form provided by the Issuer, and providing for release without recourse and shall take such other action as the Issuer or such Guarantor may reasonably request and as necessary to effect such release.

SECTION 11.05.    Possession and Use of Collateral.

Subject to the provisions of this Indenture and the Security Documents, the Issuer and the Guarantors shall have the right to remain in possession and retain exclusive control of and to exercise all rights with respect to the Collateral, to freely operate, manage, develop, lease, use, consume and enjoy the Collateral, to alter or repair any Collateral so long as such alterations and repairs do not impair the Lien of the Security Documents thereon, and to collect, receive, use, invest and dispose of the reversions, remainders, interest, rents, lease payments, issues, profits, revenues, proceeds and other income thereof.

SECTION 11.06.    Purchaser Protected.

No purchaser or grantee of any property or rights purporting to be released shall be bound to ascertain the authority of the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority so long as the conditions set forth in Section 11.04 have been satisfied.

JX 118-62

SECTION 11.07.    Authorization of Actions To Be Taken by the Collateral Agent Under the Security Documents.

The Holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents. Furthermore, each Holder of a Note, by accepting such Note, agrees, acknowledges and consents to the terms (including, but not limited to, waivers, representations and covenants) of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Security Documents in each of its capacities thereunder.

SECTION 11.08.    Authorization of Receipt of Funds by the Trustee Under the Security Agreement.

The Trustee is authorized to receive any funds for the benefit of Holders distributed under the Security Documents to the Trustee and to apply such funds as provided in Section 6.11.

SECTION 11.09.    Powers Exercisable by Receiver or Collateral Agent.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article Eleven upon the Issuer or any Guarantor, as applicable, with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or any Guarantor, as applicable, or of any officer or officers thereof required by the provisions of this Article Eleven.

ARTICLE TWELVE

MISCELLANEOUS

SECTION 12.01.    Trust Indenture Act Controls.

Except as otherwise specified herein, if any provision of this Indenture limits, qualifies or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control. If any provision of this Indenture modifies any TIA provision that may be so modified, such TIA provision shall be deemed to apply to this Indenture as so modified. If any provision of this Indenture excludes any TIA provision that may be so excluded, such TIA provision shall be excluded from this Indenture.

The provisions of TIA §§ 310 through 317 that impose duties on any Person (including the provisions automatically deemed included unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

SECTION 12.02.    Notices.

Except for notice or communications to Holders, any notice or communication shall be given in writing and delivered in person, sent by telecopy, delivered electronically, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

-56-

**JX 118-63**

If to the Issuer or any Guarantor:

    Sears Holdings Corporation
    3333 Beverly Road
    Hoffman Estates, Illinois  60179
    Facsimile: (847) 286-2055
    Attention: Treasurer

copy to:

    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, New York  10019
    Facsimile:  (212) 403-2000
    Attention:  James Cole Jr.

If to the Trustee:

    Wells Fargo Bank, National Association
    230 W. Monroe Street, Suite 2900
    Chicago, IL 60606
    Facsimile:  (312) 726-2158
    Attention:  Corporate Trust Services

All notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; at the time delivered, if delivered electronically; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.  If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.  Any notice or communication to a Holder may be mailed or electronically delivered.

The Issuer, the Guarantors or the Trustee by written notice to the others may designate additional or different addresses for subsequent notices or communications.

In case by reason of the suspension of regular mail service, or by reason of any other cause, it shall be impossible to mail any notice or communication as required by this Indenture, then such method of notification as shall be made with the approval of the Trustee shall constitute a sufficient mailing of such notice.

SECTION 12.03.    Communications by Holders with Other Holders.

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 12.04.    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer to the Trustee to take any action or refrain from taking any action under this Indenture, upon request of the Trustee, the Issuer shall furnish to the Trustee:

-57-

JX 118-64

(1)    an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.05) stating that, in the opinion of the signer, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.05) stating that, in the opinion of such counsel, all such conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with.

SECTION 12.05.    Statements Required in Certificate and Opinion.

Each certificate and opinion with respect to compliance by or on behalf of the Issuer or any Guarantor with a condition or covenant provided for in this Indenture shall include:

(1)    a statement that each individual making such certificate or opinion has read such condition or covenant;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of each such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such condition or covenant has been complied with; and

(4)    a statement as to whether or not, in the opinion of each such individual, such condition or covenant has been complied with;

*provided* that, with respect to matters of fact, legal counsel delivering such Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 12.06.    Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or meetings of Holders.  The Registrar and Paying Agent may make reasonable rules for their functions.

SECTION 12.07.    Business Days; Legal Holidays.

A "Business Day" is a day that is not a Legal Holiday.  A "Legal Holiday" is a Saturday, a Sunday or other day on which (i) the Trustee or commercial banks in the City of New York are authorized or required by law to close or (ii) the New York Stock Exchange is not open for trading.  If a payment date is a Legal Holiday, payment may be made at that place on the next succeeding day that is not a Legal Holiday with the same force and effect as if made on such payment date, and no interest shall accrue for the intervening period.

SECTION 12.08.    Governing Law.

THIS INDENTURE, THE GUARANTEES AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION

JX 118-65

WOULD BE REQUIRED THEREBY. EACH OF THE PARTIES HERETO HEREBY IRREVOCA-
BLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT SIT-
TING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK OR ANY FEDERAL
COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN RE-
SPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS
INDENTURE, THE GUARANTEES AND THE NOTES, AND IRREVOCABLY ACCEPTS FOR IT-
SELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, EXCLU-
SIVE JURISDICTION OF THE AFORESAID COURTS. EACH OF THE PARTIES HERETO IR-
REVOCABLY WAIVES, TO THE FULLEST EXTENT THAT IT MAY EFFECTIVELY DO SO UN-
DER APPLICABLE LAW, TRIAL BY JURY AND ANY OBJECTION WHICH IT MAY NOW OR
HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PRO-
CEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, AC-
TION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN IN-
CONVENIENT FORUM. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY
HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COM-
MENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER PARTY
HERETO IN ANY OTHER JURISDICTION. CERTAIN MORTGAGES AND OTHER SECURITY
DOCUMENTS WILL BE GOVERNED BY THE LAWS OF OTHER STATES.

SECTION 12.09.    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret another indenture, loan, security or debt
agreement of the Issuer or any Subsidiary thereof. No such indenture, loan, security or debt agreement
may be used to interpret this Indenture.

SECTION 12.10.    Successors.

All agreements of the Issuer and the Guarantors in this Indenture and the Notes shall bind
their respective successors. All agreements of the Trustee, any additional trustee and any Paying Agents
in this Indenture shall bind their respective successors.

SECTION 12.11.    Multiple Counterparts.

The parties may sign multiple counterparts of this Indenture. Each signed counterpart
shall be deemed an original, but all of them together represent one and the same agreement.

SECTION 12.12.    Table of Contents, Headings, Etc.

The table of contents, cross-reference sheet and headings of the Articles and Sections of
this Indenture have been inserted for convenience of reference only, are not to be considered a part
hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

SECTION 12.13.    Separability.

Each provision of this Indenture shall be considered separable and if for any reason any
provision which is not essential to the effectuation of the basic purpose of this Indenture or the Notes shall
be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions
shall not in any way be affected or impaired thereby.

-59-

JX 118-66

SECTION 12.14.    Waiver of Jury Trial.

EACH OF THE ISSUER, GUARANTORS AND THE TRUSTEE HEREBY IRREVO-
CABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND
ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELAT-
ING TO THIS INDENTURE, THE NOTES, THE GUARANTEES OR THE TRANSACTIONS CON-
TEMPLATED HEREBY.

SECTION 12.15.    Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the per-
formance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its
control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or
military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunc-
tions of utilities, communications or computer (software and hardware) services; it being understood that
the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking indus-
try to resume performance as soon as practicable under the circumstances.

SECTION 12.16.    Intercreditor Agreement.

This Indenture, the Notes, the Security Documents, the Trustee, the Collateral Agent and
the Holders are subject to and bound by the terms of the Intercreditor Agreement.

*[Signature Pages Follow]*

-60-

**JX 118-67**

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed all as of the date and year first written above.

SEARS HOLDINGS CORPORATION, as Issuer

By: *William K. Phelan*

Name: William K. Phelan
Title: Senior Vice President, Controller and Chief Accounting Officer

KMART CORPORATION
KMART HOLDING CORPORATION
KMART MANAGEMENT CORPORATION
SEARS HOLDINGS MANAGEMENT CORPORATION
SEARS, ROEBUCK AND CO.,
as Guarantors

By: *William K. Phelan*

Name: William K. Phelan
Title: Senior Vice President and Controller

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KLC, INC.
KMART OF MICHIGAN, INC.
LANDS' END DIRECT MERCHANTS, INC.
LANDS' END, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS, INC.
SEARS OUTLET STORES, L.L.C.
SEARS PROTECTION COMPANY
SEARS ROEBUCK ACCEPTANCE CORP.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC,
as Guarantors

By: *William K. Phelan*

Name: William K. Phelan
Title: Vice President

Signature Page to Indenture

**JX 118-68**

KMART.COM LLC, as Guarantor

By: Bluelight.com, Inc., its Member

By: _____
    Name: William K. Phelan
    Title: Vice President


KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC, as Guarantors

By: Kmart Corporation, its Member

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


SEARS PROTECTION COMPANY (FLORIDA),
L.L.C., as Guarantor

By: Sears Protection Company, its Member

By: _____
    Name: William K. Phelan
    Title: Vice President


A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
SEARS AUTHORIZED HOMETOWN STORES,
LLC
SEARS HOME APPLIANCE SHOWROOMS,
LLC, as Guarantors

By: Sears, Roebuck and Co., its Member

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


Signature Page to Indenture

**JX 118-69**

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee and Collateral Agent

By:

Name: Gregory S. Clarke
Title: Vice President

Signature Page to Indenture

JX 118-70

SCHEDULE A

LIST OF GUARANTORS

A&E Home Delivery, LLC
A&E Lawn & Garden, LLC
A&E Signature Service, LLC
California Builder Appliances, Inc.
Florida Builder Appliances, Inc.
KLC, Inc.
Kmart Corporation
Kmart Holding Corporation
Kmart Management Corporation
Kmart of Michigan, Inc.
Kmart of Washington LLC
Kmart Stores of Illinois LLC
Kmart Stores of Texas LLC
Kmart.com LLC
Lands' End Direct Merchants, Inc.
Lands' End, Inc.
MyGofer LLC
Private Brands, Ltd.
Sears Authorized Hometown Stores, LLC
Sears Brands Management Corporation
Sears Holdings Management Corporation
Sears Home Appliance Showrooms, LLC
Sears Home Improvement Products, Inc.
Sears Outlet Stores, L.L.C.
Sears Protection Company
Sears Protection Company (Florida), L.L.C.
Sears Roebuck Acceptance Corp.
Sears, Roebuck and Co.
Sears, Roebuck de Puerto Rico, Inc.
SOE, Inc.
StarWest, LLC

**JX 118-71**

<u>EXHIBIT A</u>

CUSIP:                                                                      No.
ISIN:

## SEARS HOLDINGS CORPORATION

$[            ]

6⅝% SENIOR SECURED NOTES DUE 2018


     SEARS HOLDINGS CORPORATION, a Delaware corporation, promises to pay to _____, or registered assigns, the principal sum of _____ Dollars [(subject to adjustment as reflected in the Schedule of Increases or Decreases in Global Note attached hereto)][1] on October 15, 2018.

     Interest Payment Dates:  April 15 and October 15.

     Record Dates:  April 1 and October 1.

     Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

---

[1] Use Schedule of Increases or Decreases if Global Note.

A-1

**JX 118-72**

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually or by facsimile by its duly authorized officer.

SEARS HOLDINGS CORPORATION

By: _____

        Name:
        Title:

A-2

JX 118-73

Certificate of Authentication

This is one of the Notes referred to in the within-mentioned Indenture.

Dated:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee

By: _____
            Authorized Signatory

A-3

**JX 118-74**

[FORM OF REVERSE OF NOTE]

SEARS HOLDINGS CORPORATION

6⅝% SENIOR SECURED NOTES DUE 2018

1    Interest. Sears Holdings Corporation (the "Issuer"), a Delaware corporation, promises to pay, until the principal hereof is paid or made available for payment, interest on the principal amount set forth on the face hereof at a rate of 6⅝% per annum. Interest hereon will accrue from and including the most recent date to which interest has been paid or, if no interest has been paid, from and including October 12, 2010 to but excluding the date on which interest is paid. Interest shall be payable in arrears on each April 15 and October 15, commencing on April 15, 2011. Interest will be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal and on overdue interest (to the full extent permitted by law) at a rate equal to the interest rate on the Notes.

2    Method of Payment. The Issuer will pay interest hereon (except defaulted interest) to the Persons who are registered Holders at the close of business on April 1 or October 1 next preceding the Interest Payment Date; provided that if an Interest Payment Date falls on a Legal Holiday, interest will be payable on the next succeeding day that is not a Legal Holiday with the same force and effect as if made on such Interest Payment Date, and no interest shall accrue for the intervening period. Holders must surrender Notes to a Paying Agent to collect principal payments. The Issuer will pay principal and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. At the option of the Issuer, each installment of interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the registry maintained by the Registrar or (ii) wire transfer to an account located in the United States maintained by the payee. Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by the Depositary.

3    Paying Agent and Registrar. Initially, Wells Fargo Bank, National Association (the "Trustee") will act as a Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar or co-registrar without notice. The Issuer or any of its Affiliates may act as Paying Agent or Registrar.

4    Indenture. The Issuer issued the Notes under an Indenture dated as of October 12, 2010 (the "Indenture") among the Issuer, the Guarantors (as defined in the Indenture) and the Trustee. This is one of an issue of Notes of the Issuer issued, or to be issued, under the Indenture. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (15 U.S. Code §§ 77aaa-77bbbb), as amended from time to time. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of them. Capitalized and certain other terms used herein and not otherwise defined have the meanings set forth in the Indenture.

5.    Optional Redemption.

(a)    The Notes may be redeemed in whole or in part, at the Issuer's option, at any time and from time to time at a redemption price equal to the greater of (1) 100% of the principal amount of the Notes to be redeemed and (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the Redemption Date at the Treasury Rate, plus 50 basis points, plus accrued interest thereon to the Redemption Date.

A-4

JX 118-75

(b)    In the event of a redemption of fewer than all of the Notes, if the Notes are Global Notes selection for redemption shall be made in accordance with Applicable Procedures, otherwise the Trustee shall select the Notes to be redeemed in compliance with Section 3.02 of the Indenture.

6.    <u>Notice of Redemption</u>.  Notice of redemption will be mailed at least 30 days but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at his registered address, except that redemption notice may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture.  On and after the Redemption Date, unless the Issuer defaults in making the redemption payment, interest ceases to accrue on Notes or portions thereof called for redemption.

7.    <u>Offers to Purchase upon a Change of Control Triggering Event</u>.  The Indenture provides that upon the occurrence of a Change of Control Triggering Event and subject to further limitations contained therein, the Issuer shall make an offer to purchase outstanding Notes in accordance with the procedures set forth in Section 4.07 of the Indenture.

8.    <u>Offers to Purchase upon a Collateral Coverage Event</u>.  The Indenture provides that upon the occurrence of a Collateral Coverage Event and subject to further limitations contained therein, the Issuer shall make an offer to purchase outstanding Notes in accordance with the procedures set forth in Section 4.08 of the Indenture.

9.    <u>Registration Rights</u>.  Pursuant to the Registration Rights Agreements, the Issuer will be obligated, under certain circumstances, to consummate an exchange offer pursuant to which the Holder of this Note shall have the right to exchange this Note for notes which have been registered under the Securities Act, in like principal amount and having substantially identical terms as the Notes.  The Holders shall be entitled to receive certain additional interest payments in the event such exchange offer is not consummated and upon certain other conditions, all pursuant to and in accordance with the terms of the applicable Registration Rights Agreement.

10.    <u>Denominations, Transfer, Exchange</u>.  The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof.  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay to it any taxes and fees required by law or permitted by the Indenture.

11.    <u>Persons Deemed Owners</u>.  The registered Holder of this Note may be treated as the owner of this Note for all purposes.

12.    <u>Unclaimed Money</u>.  If money for the payment of principal or interest remains unclaimed for two years, the Trustee will pay the money back to the Issuer at its written request.  After that, Holders entitled to the money must look to the Issuer for payment as general unsecured creditors unless an "abandoned property" law designates another Person.

13.    <u>Amendment, Supplement, Waiver, Etc</u>.  The Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) may, without the consent of the Holders of any outstanding Notes, amend, waive or supplement the Indenture, the Notes or the Security Documents for certain specified purposes set forth in the Indenture, including, among other things, curing ambiguities, defects or inconsistencies, complying with the requirements of the Commission in order to maintain or effect the qualification of the Indenture under the Trust Indenture Act of 1939, as amended, and making any change that does not adversely affect the legal rights under the Indenture of any Holder.  Other amendments and modifications of the Indenture, the Notes or the Security Documents may be made by the Issuer, and the

A-5

JX 118-76

Trustee or the Collateral Agent, if a party thereto) with the consent of the Holders of not less than a ma-jority of the aggregate principal amount of the outstanding Notes, subject to certain exceptions set forth in the Indenture requiring the consent of the Holders of the particular Notes to be affected.

14.   Successor Corporation.   When a successor Person assumes all the obligations of its predecessor under the Notes and the Indenture and the transaction complies with the terms of Article Five of the Indenture, the predecessor corporation will, except as provided in Article Five, be released from those obligations.

15.   Defaults and Remedies.   Events of Default are set forth in the Indenture.   Subject to certain limitations in the Indenture, if an Event of Default (other than an Event of Default specified in clause (4) or (5) of Section 6.01 of the Indenture) occurs and is continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the outstanding Notes may, by written notice to the Trustee and the Issuer, declare all principal of and accrued interest on all Notes to be immediately due and payable and such amounts shall become immediately due and payable.   If an Event of Default specified in clause (4) or (5) of Section 6.01 of the Indenture occurs, the principal amount of and interest on, all Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.   Holders may not enforce the Indenture or the Notes except as provided in the Indenture.   The Trustee may require security or indemnity satisfactory to it before it enforces the Indenture or the Notes.   Subject to certain limitations, Holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power.   The Trustee may withhold from Holders notice of any continuing default (except a default in payment of principal, pre-mium, if any, or interest on the Notes when and as the same shall become due and payable) if the execu-tive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith de-termines that the withholding of such notice is in the interests of the Holders of the Notes.

16.   Trustee Dealings with Issuer.   The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not Trustee.

17.   Discharge.   The Issuer's and the Guarantors' obligations pursuant to the Inden-ture will be discharged, except for obligations pursuant to certain sections thereof, subject to the terms of the Indenture, upon the payment of all the Notes or upon the irrevocable deposit with the Trustee of United States Dollars or Government Securities sufficient to pay when due principal of and interest on the Notes to maturity or redemption, as the case may be.

18.   Guarantees.   The Notes will be entitled to the benefits of certain Guarantees made for the benefit of the Holders.   Reference is hereby made to the Indenture for a statement of the re-spective rights, limitations of rights, duties and obligations thereunder of the Guarantors, the Trustee and the Holders.

19.   Security Documents and Intercreditor Agreement.   The obligations of the Issuer and the Guarantors under the Indenture, the Notes and the Guarantees are secured by a Lien on the Col-lateral pursuant to the Security Documents.   The provisions of the Indenture, the Notes and the Security Documents are subject to the Intercreditor Agreement.

20.   Authentication.   This Note shall not be valid until the Trustee signs the certificate of authentication on the other side of this Note.

21.   Governing Law.   This Note shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of

A-6

JX 118-77

law to the extent that the application of the law of another jurisdiction would be required thereby.  Each of the Trustee, the Issuer, the Guarantors and the Holders hereby irrevocably submits to the exclusive jurisdiction of any New York State court sitting in the Borough of Manhattan in the City of New York or any federal court sitting in the Borough of Manhattan in the City of New York in respect of any suit, action or proceeding arising out of or relating to the Indenture and this Note, and irrevocably accepts for itself and in respect of its property, generally and unconditionally, exclusive jurisdiction of the aforesaid courts.

        22.   <u>Abbreviations</u>.  Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TENANT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

        The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois  60179
Facsimile: (847) 286-2055
Attention: Treasurer

A-7

**JX 118-78**

## ASSIGNMENT

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint: _____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

Date: _____        Your Signature: _____

(Sign exactly as your name appears on
the other side of this Note)

Signature Guarantee:_____

### SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-8

**JX 118-79**

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial principal amount of this Global Note is $_____. The following increases or decreases in this Global Note have been made:

| Date | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Depository Custodian |
|------|------|------|------|------|

A-9

JX 118-80

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.07 or Section 4.08 of the Indenture, check the appropriate box:

Section 4.07 [    ]        Section 4.08 [    ]

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.07 or Section 4.08 of the Indenture, state the amount:  $_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the other side of this Note)

_____
Signature Guaranteed

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**JX 118-81**

EXHIBIT B

[FORM OF LEGEND FOR 144A NOTES AND OTHER NOTES
THAT ARE RESTRICTED NOTES]

THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY IS-SUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN AP-PLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVI-DENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THE SECURITY EVI-DENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECU-RITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(a) IN-SIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BE-LIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE AC-COUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE RE-QUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURI-TIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SE-CURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIRE-MENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL AC-CEPTABLE TO THE ISSUER IF THE ISSUER SO REQUESTS), (2) TO THE ISSUER OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PUR-CHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.

B-1

**JX 118-82**

[FORM OF ASSIGNMENT FOR 144A NOTES AND OTHER NOTES
THAT ARE RESTRICTED NOTES]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint: _____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

[Check One]

☐    (a)    this Note is being transferred in compliance with the exemption from registration under the Securities Act provided by Rule 144A thereunder.

or

☐    (b)    this Note is being transferred other than in accordance with (a) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date: _____        Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee:_____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

B-2

JX 118-83

TO BE COMPLETED BY PURCHASER IF (a) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____          _____
                                       NOTICE:  To be executed by an executive officer

B-3

**JX 118-84**

<u>EXHIBIT C</u>

[FORM OF LEGEND FOR REGULATION S NOTE]

THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGI-NALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMP-TION THEREFROM.  EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THERE-UNDER.  THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(a) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER IF THE ISSUER SO REQUESTS), (2) TO THE ISSUER OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PUR-CHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE.  NO REPRESENTATION CAN BE MADE AS TO THE AVAIL-ABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.

C-1

**JX 118-85**

[FORM OF ASSIGNMENT FOR REGULATION S NOTE]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint: _____

_____

Agent to transfer this Note on the books of the Issuer. The Agent may substitute another to act for him.

[Check One]

☐    (a)    this Note is being transferred in compliance with the exemption from registration under the Securities Act provided by Rule 144A thereunder.

or

☐    (b)    this Note is being transferred other than in accordance with (a) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date: _____    Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee:_____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

C-2

**JX 118-86**

TO BE COMPLETED BY PURCHASER IF (a) ABOVE IS CHECKED

    The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____

_____
NOTICE:  To be executed by an executive officer

C-3

**JX 118-87**

<u>EXHIBIT D</u>

[FORM OF LEGEND FOR GLOBAL NOTE]

Any Global Note authenticated and delivered hereunder shall bear a legend (which would be in addition to any other legends required in the case of a Restricted Note) in substantially the following form:

**THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY.  THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.**

Unless this Certificate is presented by an authorized representative of The Depository Trust Company (a New York corporation) ("DTC") to the Issuer or its agent for registration of transfer, exchange, or payment, and any Certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as is requested by an authorized representative of DTC), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

D-1

**JX 118-88**

<u>EXHIBIT E</u>

Form of Certificate To Be
Delivered in Connection with
<u>Transfers to Non-QIB Accredited Investors</u>

Wells Fargo Bank, National Association
Attn: DAPS Reorg
MAC N9303-121
608 2nd Ave South
Minneapolis, MN  55479

Ladies and Gentlemen:

     In connection with our proposed purchase of 6⅝% Senior Secured Notes due 2018 (the "<u>Notes</u>") of Sears Holdings Corporation, a Delaware corporation (the "<u>Issuer</u>"), we confirm that:

     1.    We understand that any subsequent transfer of the Notes is subject to certain restrictions and conditions set forth in the Indenture dated as of October 12, 2010 relating to the Notes and we agree to be bound by, and not to resell, pledge or otherwise transfer the Notes except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

     2.    We understand that the Notes have not been registered under the Securities Act or any other applicable securities laws, have not been and will not be qualified for sale under the securities laws of any non-U.S. jurisdiction and that the Notes may not be offered, sold, pledged or otherwise transferred except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell any Notes, we will do so only (i) to the Issuer or any subsidiary thereof, (ii) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined in Rule 144A), (iii) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you a signed letter containing certain representations and agreements relating to the restrictions on transfer of the Notes, (iv) outside the United States to persons other than U.S. persons in offshore transactions meeting the requirements of Rule 904 of Regulation S under the Securities Act, (v) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if applicable) or (vi) pursuant to an effective registration statement, and we further agree to provide to any person purchasing any of the Notes from us a notice advising such purchaser that resales of the Notes are restricted as stated herein.

     3.    We understand that, on any proposed resale of any Notes, we will be required to furnish to you and the Issuer such certifications, legal opinions and other information as you and the Issuer may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

     4.    We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the

**JX 118-89**

Notes, and we and any accounts for which we are acting each are able to bear the economic risk of our or their investment, as the case may be.

     5.     We are acquiring the Notes purchased by us for our account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

     6.     We are not acquiring the Notes with a view toward the distribution thereof in a transaction that would violate the Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction.

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Purchaser]

By: _____
          Name:
          Title:

Dated: _____

E-2

**JX 118-90**

<u>EXHIBIT F</u>

Form of Certificate To Be Delivered
in Connection with Transfers
<u>Pursuant to Regulation S</u>

Wells Fargo Bank, National Association
Attn: DAPS Reorg
MAC N9303-121
608 2nd Ave South
Minneapolis, MN  55479

      Re:    Sears Holdings Corporation (the "<u>Issuer</u>")
            <u>6⅝% Senior Secured Notes due 2018 (the "Notes")</u>

Dear Sirs:

In connection with our proposed sale of $ _____ aggregate principal amount of the Notes, we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, we represent that:

(1)    the offer of the Notes was not made to a U.S. person or to a person in the United States;

(2)    either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(3)    no directed selling efforts have been made in the United States in contravention of the requirements of Rule 904(a) of Regulation S;

(4)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

(5)    we have advised the transferee of the transfer restrictions applicable to the Notes.

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Purchaser]

By:    _____

F-1

**JX 118-91**

EXHIBIT G

NOTATION OF GUARANTEE

For value received, each of the undersigned (the "Guarantors") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association, as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the Guarantors to the Holders and to the Trustee pursuant to the Guarantees and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

*[Signature Pages Follow]*

G-1

**JX 118-92**

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of Guarantee to be signed by a duly authorized officer.

[GUARANTORS]

By: _____
      Name:
      Title:

**JX 118-93**

# Exhibit 80

# FIRST SUPPLEMENTAL INDENTURE

This FIRST SUPPLEMENTAL INDENTURE, dated as of April 5, 2011 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), the New Guarantor (as defined below), and Wells Fargo Bank, National Association, as Trustee and Collateral Agent (the "Trustee").

## W I T N E S S E T H

WHEREAS the Company and the existing Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS Private Brands, Ltd. ("New Guarantor") is a company organized and incorporated under the laws of Delaware, and is a Specified Subsidiary;

WHEREAS Private Brands, Ltd., a West Virginia corporation and an existing guarantor of the Notes under the Indenture, shall merge with the New Guarantor (the "Merger") with the New Guarantor surviving the Merger;

WHEREAS Section 4.06 of the Indenture requires the New Guarantor to execute a supplemental indenture to unconditionally guarantee all of the Company's obligations under the Notes and the Indenture;

WHEREAS Section 8.01 of the Indenture provides that without the consent of any Holder of Notes, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents to add additional Guarantees of the Notes or additional assets as Collateral; and

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company and of each Guarantor, the Company and the Guarantors have requested the Trustee join with them in the execution and delivery of this Supplemental Indenture, and in accordance with Section 4.06, Section 8.06 and Section 12.04 of the Indenture have delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

W/1758232

**JX 119-1**

2.    <u>Agreement to Guarantee</u>.  The New Guarantor hereby agrees, jointly and severally with all existing Guarantors, to unconditionally guarantee the Company's obligations under the Notes on the terms and subject to the conditions set forth in Article Ten of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture.  The New Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit A hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such notation of Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of the New Guarantor.

3.    <u>Notices</u>.  All notices or other communications to the New Guarantor shall be given as provided in Section 12.02 of the Indenture.

4.    <u>Ratification of Indenture; Supplemental Indenture Part of Indenture</u>.  Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

6.    <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or the Guarantee of the New Guarantor.  The recitals contained herein shall be taken as the statements of the Company, the Guarantors and the New Guarantor, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct of or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

7.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

8.    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]


2

**JX 119-2**

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
        Name:  William K. Phelan
        Title:  Senior Vice President, Controller
               and Chief Accounting Officer

KMART CORPORATION
KMART HOLDING CORPORATION
KMART MANAGEMENT CORPORATION
SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS, ROEBUCK AND CO.,
as Guarantors

By: _____
        Name: William K. Phelan
        Title: Senior Vice President and Controller

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KLC, INC.
LANDS' END DIRECT MERCHANTS, INC.
LANDS' END, INC.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT
PRODUCTS, INC.
SEARS PROTECTION COMPANY
SEARS ROEBUCK ACCEPTANCE CORP.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC,
as Guarantors

By: _____
        Name: William K. Phelan
        Title: Vice President

*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

**JX 119-3**

KMART.COM LLC, as Guarantor

By: Bluelight.com, Inc., its Member

By: _____
    Name: William K. Phelan
    Title: Vice President


KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC, as Guarantors

By: Kmart Corporation, its Member

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


SEARS PROTECTION COMPANY
(FLORIDA), L.L.C., as Guarantor

By: Sears Protection Company, its Member

By: _____
    Name: William K. Phelan
    Title: Vice President


A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
SEARS AUTHORIZED HOMETOWN
STORES, LLC
SEARS HOME APPLIANCE SHOWROOMS,
LLC, as Guarantors

By: Sears, Roebuck and Co., its Member

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

**JX 119-4**

KMART OF MICHIGAN, INC.
SEARS OUTLET STORES, L.L.C.,
as Guarantors

By: _____
    Name: Dorian R. Williams
    Title: Authorized Person


PRIVATE BRANDS, LTD.
As New Guarantor

By: _____
    Name:  Alfred B. Jasser
    Title:  Treasurer


WELLS FARGO BANK, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent


By: _____
    Name: Gregory Clarke
    Title: Vice President


*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

**JX 119-5**

KMART OF MICHIGAN, INC.
SEARS OUTLET STORES, L.L.C.,
as Guarantors

By: _____
    Name: Dorian R. Williams
    Title: Authorized Person

PRIVATE BRANDS, LTD.
As New Guarantor

By: _____
    Name:
    Title:

WELLS FARGO BANK, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By: _____
    Name: Gregory Clarke
    Title: Vice President

*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

**JX 119-6**

EXHIBIT A

## NOTATION OF GUARANTEE

For value received, Private Brands, Ltd. (the "Guarantor") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association, as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the Guarantor to the Holders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[Signature Pages Follow]

**JX 119-7**

IN WITNESS WHEREOF, the Guarantor has caused this notation of Guarantee to be signed by a duly authorized officer.

PRIVATE BRANDS, LTD.
As Guarantor

By:
Name: Alfred H. Jasser
Title: Treasurer

**JX 119-8**

# Exhibit 81

## SECOND SUPPLEMENTAL INDENTURE

This SECOND SUPPLEMENTAL INDENTURE, dated as of July 7, 2015 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), the New Guarantors (as defined below), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

W I T N E S S E T H

WHEREAS the Company and the existing Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS each of Kmart Operations LLC and Sears Operations LLC (each a "New Guarantor") is a limited liability company organized under the laws of Delaware, and is a Specified Subsidiary;

WHEREAS Section 4.06 of the Indenture requires each New Guarantor to execute a supplemental indenture to unconditionally guarantee all of the Company's obligations under the Notes and the Indenture;

WHEREAS Section 8.01 of the Indenture provides that without the consent of any Holder of Notes, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents to add additional Guarantees of the Notes or additional assets as Collateral; and

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company and of each Guarantor, the Company and the Guarantors have requested the Trustee join with them in the execution and delivery of this Supplemental Indenture, and in accordance with Section 4.06, Section 8.06 and Section 12.04 of the Indenture have delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, each New Guarantor, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    Defined Terms.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.    Agreement to Guarantee.  Each New Guarantor hereby agrees, jointly and severally with all existing Guarantors, to unconditionally guarantee the Company's obligations under the Notes on the terms and subject to the conditions set forth in Article Ten of the

**JX 120-1**

Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture. Each New Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit A hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such notation of Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of the New Guarantor.

3.    <u>Notices</u>.  All notices or other communications to each New Guarantor shall be given as provided in Section 12.02 of the Indenture.

4.    <u>Ratification of Indenture; Supplemental Indenture Part of Indenture</u>. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

6.    <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or the Guarantee of the New Guarantor.  The recitals contained herein shall be taken as the statements of the Company, the Guarantors and each New Guarantor, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

7.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

8.    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

**JX 120-2**

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
  Name:  Robert A. Schriesheim
  Title:   Executive Vice President and Chief
       Financial Officer

**NEW GUARANTORS:**

KMART OPERATIONS LLC
SEARS OPERATIONS LLC

By: _____
  Name: Lawrence J. Meerschaert
  Title:  Vice President, Tax, Assistant
       Treasurer and Secretary

**GUARANTORS:**

A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KLC, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____
  Name: Lawrence J. Meerschaert
  Title:  Vice President

*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

**JX 120-3**

KMART.COM LLC

By:    Bluelight.com, Inc., its Member

By:    _____
     Name:  Lawrence J. Meerschaert
     Title:   Vice President


KMART CORPORATION

By:    _____
     Name:  Robert A. Riecker
     Title:   Vice President, Controller and Chief
            Accounting Officer


KMART HOLDING CORPORATION
KMART OF MICHIGAN, INC.
SEARS, ROEBUCK AND CO.

By:    _____
     Name:  Lawrence J. Meerschaert
     Title:   Vice President, Assistant Treasurer
            and Secretary


SEARS HOLDINGS MANAGEMENT
CORPORATION

By:    _____
     Name:  Lawrence J. Meerschaert
     Title:   Vice President, Tax and Assistant
            Treasurer


*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

**JX 120-4**

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By:    Kmart Corporation, its Member

By: _____
    Name: Robert A. Riecker
    Title:   Vice President, Controller and Chief
            Accounting Officer

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
    Name: Karen M. Smathers
    Title:   President

*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

**JX 120-5**

WILMINGTON TRUST, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By:
Name:    Lynn M. Steiner
Title:    Vice President

*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

EXHIBIT A

NOTATION OF GUARANTEE

For value received, Sears Operations LLC and Kmart Operations LLC (the "New Guarantors") have jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association (subsequently replaced by Wilmington Trust, National Association), as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the New Guarantors to the Holders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[Signature Pages Follow]

**JX 120-7**

IN WITNESS WHEREOF, the New Guarantors have caused this notation of Guarantee to be signed by a duly authorized officer.

KMART OPERATIONS LLC

By: _____
Name: Lawrence J. Meerschaert
Title:   Vice President, Tax, Assistant
Treasurer and Secretary

SEARS OPERATIONS LLC

By: _____
Name: Lawrence J. Meerschaert
Title:   Vice President, Tax, Assistant
Treasurer and Secretary

[Notation of Guarantee Signature Page]

**JX 120-8**

# Exhibit 82

## THIRD SUPPLEMENTAL INDENTURE

This THIRD SUPPLEMENTAL INDENTURE, dated as of September 19, 2016 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), the New Guarantor (as defined below), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

### W I T N E S S E T H

WHEREAS the Company and the existing Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS A&E Factory Service, LLC (the "New Guarantor") is a limited liability company organized under the laws of Delaware, and is a Subsidiary;

WHEREAS Section 8.01 of the Indenture provides that without the consent of any Holder of Notes, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents to add additional Guarantees of the Notes or additional assets as Collateral; and

WHEREAS the Company has requested the Trustee join with it in the execution and delivery of this Supplemental Indenture, and in accordance with Section 8.06 and Section 12.04 of the Indenture have delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    Defined Terms.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.    Agreement to Guarantee.  The New Guarantor hereby agrees, jointly and severally with all existing Guarantors, to unconditionally guarantee the Company's obligations under the Notes on the terms and subject to the conditions set forth in Article Ten of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture.  The New Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit A hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such notation of Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of the New Guarantor.

**JX 121-1**

3.    Notices.  All notices or other communications to the New Guarantor shall be given as provided in Section 12.02 of the Indenture.

4.    Ratification of Indenture; Supplemental Indenture Part of Indenture. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    Governing Law.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

6.    Trustee Makes No Representation.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or the Guarantee of the New Guarantor.  The recitals contained herein shall be taken as the statements of the Company, the Guarantors and the New Guarantor, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

7.    Counterparts.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

8.    Effect of Headings.  The Section headings herein are for convenience only and shall not effect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

**JX 121-2**

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By:

Name:  Robert A. Schriesheim
Title:    Executive Vice President and Chief
          Financial Officer

**NEW GUARANTOR:**

A&E FACTORY SERVICE, LLC

By:

Name: Robert A. Riecker
Title:   Vice President

*[Signature Page to Third Supplemental Indenture]*

**JX 121-3**

WILMINGTON TRUST, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By:
Name:        Lynn M. Steiner
Title:         Vice President

*[Signature Page to Third Supplemental Indenture]*

**JX 121-4**

**EXHIBIT A**

### NOTATION OF GUARANTEE

For value received, A&E Factory Service, LLC (the "New Guarantor") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association (subsequently replaced by Wilmington Trust, National Association), as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the New Guarantor to the Holders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantee. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[Signature Pages Follow]

**JX 121-5**

IN WITNESS WHEREOF, the New Guarantor has caused this notation of Guarantee to be signed by a duly authorized officer.

A&E FACTORY SERVICE, LLC

By:  _____

      Name: Robert A. Riecker
      Title:   Vice President

*[Notation of Guarantee Signature Page]*

**JX 121-6**

# Exhibit 83

## FOURTH SUPPLEMENTAL INDENTURE

This FOURTH SUPPLEMENTAL INDENTURE, dated as of January 9, 2018 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

### W I T N E S S E T H

WHEREAS the Company and the Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS Section 8.02(a) of the Indenture provides that with the consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes, other than notes held by the Company or affiliates of the Company (the "Requisite Consents"), the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents, subject to certain exceptions;

WHEREAS the Requisite Consents for the adoption of the amendments to the Indenture set forth herein have been obtained, and this Supplemental Indenture complies with the requirements of Article 8 of the Indenture;

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company, and the Company has requested the Trustee join with it in the execution and delivery of this Supplemental Indenture;

WHEREAS in accordance with Section 8.06 and Section 12.04 of the Indenture, the Company has delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution and delivery have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    Defined Terms.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.    Definition of Borrowing Base.  Clause (2) of the definition of "Borrowing Base" as set forth in the Indenture is hereby amended and restated in its entirety as follows:

**JX 122-1**

"(2) 75% of the book value (calculated in accordance with GAAP) of the inventory of the Issuer and the Guarantors, on a consolidated basis, on such date."

3.    Definition of "Collateral Coverage Event" as set forth in the Indenture is hereby amended and restated in its entirety as follows:

"'Collateral Coverage Event' shall be deemed to have occurred if, prior to a Fall-Away Event, as of the last day of any two consecutive fiscal quarters of the Issuer each ending on or after August 4, 2018 (which is the last day of the second fiscal quarter of the fiscal year of the Issuer ending on February 2, 2019), the Borrowing Base as of each such day is less than the principal amount of the Issuer's consolidated indebtedness for borrowed money outstanding on such day that is secured by Liens on the Collateral."

4.    _Effectiveness_.  This Supplemental Indenture and the amendments to the Indenture set forth herein shall become effective upon execution by all parties hereto.

5.    _Ratification of Indenture; Supplemental Indenture Part of Indenture_. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

6.    _Governing Law_.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

7.    _Trustee Makes No Representation_.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.  The recitals contained herein shall be taken as the statements of the Company and the Guarantors, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

8.    _Counterparts_.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the

2

**JX 122-2**

original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

9.      <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

**JX 122-3**

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer


SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
Name:  Robert A. Riecker
Title:   Vice President, Finance


KMART CORPORATION

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer


*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-4**

A&E FACTORY SERVICE, LLC

By: _____
Name:  Robert A. Riecker
Title:    Vice President


A&E HOME DELIVERY, LLC

By: _____
Name:  Robert A. Riecker
Title:    Vice President


A&E LAWN & GARDEN, LLC

By: _____
Name:  Robert A. Riecker
Title:    Vice President


A&E SIGNATURE SERVICE, LLC

By: _____
Name:  Robert A. Riecker
Title:    Vice President


CALIFORNIA BUILDER APPLIANCES, INC.

By: _____
Name:  Robert A. Riecker
Title:    Vice President


FLORIDA BUILDER APPLIANCES, INC.

By: _____
Name:  Robert A. Riecker
Title:    Vice President


*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-5**

KLC, INC.

By: _____
Name: Robert A. Riecker
Title:   Vice President


KMART HOLDING CORPORATION

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


KMART OF MICHIGAN, INC.

By: _____
Name: Robert A. Riecker
Title:   Vice President


KMART OF WASHINGTON LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


KMART OPERATIONS LLC

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-6**

KMART STORES OF ILLINOIS LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


KMART STORES OF TEXAS LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


KMART.COM LLC
By: BlueLight.com, as Sole Member

By: _____
Name: Robert A. Riecker
Title:   Vice President


MYGOFER LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


PRIVATE BRANDS, LTD.

By: _____
Name: Robert A. Riecker
Title:   Vice President


*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-7**

SEARS BRANDS MANAGEMENT
CORPORATION

By:
Name:  Robert A. Riecker
Title:   Vice President


SEARS HOLDINGS MANAGEMENT
CORPORATION

By:
Name:  Robert A. Riecker
Title:   President


SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By:
Name:  Robert A. Riecker
Title:   President


SEARS OPERATIONS LLC

By:
Name:  Robert A. Riecker
Title:   Chief Financial Officer


SEARS PROTECTION COMPANY

By:
Name:  Robert A. Riecker
Title:   Vice President


*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-8**

SEARS PROTECTION COMPANY (FLORIDA), L.L.C.

By: _____
Name: Robert A. Riecker
Title:   Vice President


SEARS, ROEBUCK AND CO.

By: _____
Name: Robert A. Riecker
Title:   Chief Financial Officer


SEARS, ROEBUCK DE PUERTO RICO, INC.

By: _____
Name: Robert A. Riecker
Title:   Vice President


SOE, INC.

By: _____
Name: Robert A. Riecker
Title:   Vice President


STARWEST, LLC

By: _____
Name: Robert A. Riecker
Title:   Vice President


*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-9**

WILMINGTON TRUST, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By: _____
Name: Lynn M. Steiner
Title: Vice President

*[Signature Page to Fourth Supplemental Indenture]*

**JX 122-10**

# Exhibit 84

EXECUTION VERSION

### FIFTH SUPPLEMENTAL INDENTURE

This FIFTH SUPPLEMENTAL INDENTURE, dated as of March 20, 2018 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

W I T N E S S E T H

WHEREAS the Company and the Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS Section 8.02(a) of the Indenture provides that with the consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes, other than notes held by the Company or affiliates of the Company (the "Requisite Consents"), the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents, subject to certain exceptions;

WHEREAS, the Company has solicited consents (the "Consent Solicitation") from eligible Holders of the Notes to certain proposed amendments to the Indenture as set forth herein (the "Proposed Amendments") pursuant to the terms of the Company's Confidential Offering Memorandum and Consent Solicitation Statement dated February 15, 2018 (the "Offering Memorandum");

WHEREAS, the Company has offered pursuant to the Offering Memorandum to exchange the Notes for new 6-5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (the "Exchange Offer");

WHEREAS, pursuant to the Consent Solicitation, the Requisite Consents for the adoption of the Proposed Amendments have been obtained, and this Supplemental Indenture complies with the requirements of Article 8 of the Indenture;

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company, and the Company has requested the Trustee join with it in the execution and delivery of this Supplemental Indenture;

WHEREAS in accordance with Section 8.06 and Section 12.04 of the Indenture, the Company has delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution and delivery have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

**JX 123-1**

1.   <u>Defined Terms</u>. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.   The Indenture is hereby amended by deleting the following sections of the Indenture in their entirety:

- Section 4.02 Reports to Holders

- Section 4.04 Limitation on Liens

- Section 4.05 Limitation on Sale and Leaseback Transactions

- Section 4.06 Additional Guarantees

- Section 4.07 Change of Control Offer

- Section 4.08 Collateral Coverage Offer

- Section 5.01 Limitations on Mergers and Sales of Assets (only with respect to clauses (b) and (c))

- Section 6.01 Events of Default (only with respect to clause (6))

- Section 11.01(b) (solely to the extent that it requires the liens securing the Notes to be subject only to Permitted Liens)

Any and all references to any sections of the Indenture or Global Notes which are deleted by any section of this Supplemental Indenture, and any and all obligations related solely to such deleted sections throughout the Indenture or Global Notes, are of no further force or effect. Any and all terms defined in the Indenture or Global Notes which are (i) used in any sections of the Indenture or Global Notes deleted by any Section of this Supplemental Indenture and (ii) not otherwise used in any other section of the Indenture or Global Notes not affected by this Supplemental Indenture, are hereby deleted.

3.   The following defined terms contained in the Indenture are hereby amended and restated in their entirety as follows:

"*Additional First Lien Obligations*" means any indebtedness of the Issuer or any Restricted Subsidiary, other than the Credit Agreement Obligations, that is secured by a Lien on the Collateral ranking contractually prior to the Notes Liens; *provided* that the representative of such Additional First Lien Obligations executes a joinder agreement to the Intercreditor Agreement (or another intercreditor agreement on terms not less favorable to the Holders of Notes than the Intercreditor Agreement) agreeing to be bound thereby. At the Issuer's option, any indebtedness secured by a Lien may be "Additional First Lien Obligations".

"*Pari Passu Junior Lien Obligations*" means any indebtedness of the Issuer or any Guarantor that is secured by a Lien on the Collateral equally and ratably with the Notes Liens; *provided* that the representative of such Pari Passu Junior Lien Obligations executes a joinder

2

JX 123-2

agreement to the Security Agreement and the Intercreditor Agreement or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Notes Liens or the Liens securing such Pari Passu Junior Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Pari Passu Junior Lien Obligations, be distributed to the Trustee and each other agent for the holders of Pari Passu Junior Lien Obligations on a *pro rata* basis based on the amount of outstanding obligations of each such class. At the Issuer's option, any indebtedness secured by a Lien may be "Pari Passu Junior Lien Obligations".

4.    The Intercreditor Agreement is hereby amended and restated in its entirety, subject to the execution thereof by the other parties thereto, in the form attached hereto as Exhibit A and the Collateral Trustee is authorized and directed by the requisite holders of the Notes and by the Issuer to enter into an amended and restated Intercreditor Agreement in the form attached hereto as Exhibit A.

5.    The Security Agreement is hereby amended and restated in its entirety, subject to the execution thereof by the other parties thereto, in the form attached hereto as Exhibit B and the Trustee and Collateral Trustee is authorized and directed by the requisite holders of the Notes and by the Issuer to enter into an amended and restated Security Agreement in the form attached hereto as Exhibit B.

6.    Effectiveness.  This Supplemental Indenture shall become effective upon execution by all parties hereto, however the amendments to the Indenture and the Security Documents set forth in Sections 2 through 5 above shall not become operative until the Exchange Offer is consummated and shall become effective and operative immediately and automatically, without further notice or other action by any party, upon consummation of the Exchange Offer.

7.    Ratification of Indenture; Supplemental Indenture Part of Indenture. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

8.    Governing Law.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

9.    Trustee Makes No Representation.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.  The recitals contained herein shall be taken as the statements of the Company and the Guarantors, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

3

**JX 123-3**

10.    Counterparts.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

11.    Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4

**JX 123-4**

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART CORPORATION
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By: _____
    Name:  Robert A. Riecker
    Title:  President

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President, Finance

*[Signature Page to Fifth Supplemental Indenture]*

**JX 123-5**

A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
KLC, INC.
KMART OF MICHIGAN, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President

KMART.COM LLC

By: BlueLight.com, Inc., its Member

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By: Kmart Corporation, its Member

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

*[Signature Page to Fifth Supplemental Indenture]*

**JX 123-6**

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Trustee and Collateral Agent

By:

Name:   Lynn M. Steiner
Title:   Vice President

*[Signature Page to Fifth Supplemental Indenture]*

**JX 123-7**