# Exhibit 85

Execution Version

**THIS INSTRUMENT OF RESIGNATION, APPOINTMENT, AND ACCEPTANCE** (this "Instrument"), dated as of June 25, 2014 ("Effective Date"), is by and among Sears Holdings Corporation, a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), Wilmington Trust, National Association, a national banking association duly organized and existing under the laws of the United States of America (the "Successor Trustee"), and Wells Fargo Bank, National Association, a national banking association duly organized and existing under the laws of the United States of America (the "Resigning Trustee"). Capitalized terms not otherwise defined herein shall have the same meaning ascribed to such terms in the Indenture (as defined below).

## RECITALS

WHEREAS, pursuant to an Indenture dated as of October 12, 2010 (as supplemented, the "Indenture") between the Company, the Guarantors party thereto and the Resigning Trustee, the Company issued the aggregate of $1,250,000,000 of its 6.625% Senior Secured Notes due 2018 (the "Old Notes");

WHEREAS, pursuant to the Indenture, on September 6, 2011, the Company exchanged $987,430,000 in aggregate principal amount of the Old Notes for an equal principal amount of notes (together with the Old Notes, the "Notes"), the terms of which are identical in all material respects to the terms of the Old Notes, except that such notes issued in the exchange were registered under the Securities Act of 1933, as amended, are generally not subject to transfer restrictions, are not entitled to registration rights and do not have the right to earn additional interest under circumstances relating to the Company's registration obligations;

WHEREAS, the Company appointed the Resigning Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents;

WHEREAS, there is currently issued and outstanding $1,240,000,000 in aggregate principal amount of the Notes;

WHEREAS, in connection with the issuance of the Notes, the Resigning Trustee, the Company and certain of its Subsidiaries, entered into that certain Security Agreement, dated as of October 12, 2010 (the "Security Agreement");

WHEREAS, in connection with the issuance of the Notes, the Resigning Trustee and the ABL Agents party thereto entered into that certain Intercreditor Agreement, dated as of October 12, 2010 (the "Intercreditor Agreement");

WHEREAS, Section 7.04 of the Indenture provides that the Trustee may at any time resign by giving written notice of such resignation to the Company and to the

**JX 124-1**

Holders and Section 7.07 of the Indenture provides that the Company shall promptly appoint a successor Trustee;

WHEREAS, Section 7.07 of the Indenture provides that any successor Trustee appointed in accordance with the Indenture shall execute, acknowledge and deliver to the Company and to its predecessor Trustee an instrument accepting such appointment under the Indenture, and thereupon the resignation of the predecessor Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, duties and obligations of the predecessor Trustee;

WHEREAS, Section 7.01(o) of the Indenture provides that all of the rights of the Trustee are exercisable by the Trustee in its other capacities under the Indenture, including without limitation, as Registrar, Paying Agent, Depository Custodian and Collateral Agent;

WHEREAS, the Resigning Trustee has given written notice dated May 7, 2014 to the Company and to the Holders of Securities that it is resigning under the Indenture;

WHEREAS, the Resigning Trustee desires to resign as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes, and the Company desires to appoint the Successor Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes to succeed the Resigning Trustee under the Indenture and the Security Documents; and

WHEREAS, the Successor Trustee is willing to and does hereby accept the appointment as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian, and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents.

NOW, THEREFORE, in consideration of the covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    *Acceptance of Resignation of Resigning Trustee; Appointment of Successor Trustee.*  Pursuant to Sections 7.01(o) and 7.07 of the Indenture, the Resigning Trustee hereby resigns as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents. The Company accepts the resignation of the Resigning Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes and hereby appoints the Successor Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents.

2.    *Company Representations, Warranties and Covenants.*  The Company represents and warrants to the Successor Trustee that:

**JX 124-2**

a.    It is duly organized and validly existing;

b.    The execution and delivery of this Instrument have been duly authorized by the Company;

c.    The Indenture and the First Supplemental Indenture, dated as of April 5, 2011 (the "First Supplemental Indenture") were validly and lawfully executed and delivered by the Company and are in full force and effect and the Notes were validly issued by the Company;

d.    The Security Documents, and each amendment or supplement thereto, if any, including the Assumption Agreement dated April 5, 2011 in connection with Private Brands, Ltd. becoming an Additional Guarantor and party to the Security Agreement (the "Assumption Agreement"), were validly and lawfully executed and delivered by the Company and are in full force and effect;

e.    Other than the First Supplemental Indenture, the Assumption Agreement, the Release of Guarantors dated October 11, 2012 in connection with the release of Sears Home Appliance Showrooms, LLC, Sears Authorized Hometown Stores, LLC, and Sears Outlet Stores, LLC, and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014 in connection with the release of Lands' End, Inc. and Lands' End Direct Merchants, Inc., the Indenture and Security Documents have not been amended or supplemented and no terms thereof have been waived;

f.    The Company has performed or fulfilled each covenant, agreement and condition on its part to be performed or fulfilled under the Indenture and the Security Documents on or prior to the date hereof;

g.    No Default, Event of Default under the Indenture or Security Documents has occurred or is continuing, and no other event has occurred and is continuing which is, or after notice or lapse of time would become, an Event of Default under the Indenture;

h.    No covenant or condition contained in the Indenture or Security Documents has been waived by the Company or, to the best of the Company's knowledge, by Holders of the percentage in aggregate principal amount of the Notes required to effect any such waiver;

i.    There is no action, suit or proceeding pending or, to the best of the Company's knowledge, threatened against the Company before any court or any governmental authority arising out of any act or omission of the Company under the Indenture;

j.    All conditions precedent relating to the appointment of Wilmington Trust, National Association as successor Trustee, Collateral Agent, Registrar,

3

**JX 124-3**

Paying Agent and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents have been complied with by the Company;

k.  Other than the Security Agreement and the Intercreditor Agreement, no other Security Documents have been executed and delivered;

l.  No action is required under the Intercreditor Agreement in connection with the succession evidenced by this Agreement;

m.  The Company will provide, as of or promptly after the Effective Date, updated Schedules 1, 2 and 3 to the Security Agreement, reflecting the changes resulting from the Assumption Agreement, the Release of Guarantors dated October 11, 2012 and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014; and

n.  To the extent not delivered by the Resigning Trustee pursuant to section 3.c below, the Company shall deliver to Successor Trustee, as of or promptly after the Effective Date hereof, all of the documents listed in Exhibit B hereto.


3.  ***Resigning Trustee Representations, Warranties and Covenants***.  The Resigning Trustee hereby represents and warrants to the Successor Trustee that:

a.  No covenant or condition contained in the Indenture or Security Documents has been waived by the Resigning Trustee or, to the best of the Responsible Officer's knowledge who is signing this document, by the Holders of the percentage in aggregate principal amount of the Notes required by the Indenture or Security Documents to effect any such waiver;

b.  There is no action, suit or proceeding pending or, to the best of the Responsible Officer's knowledge who is signing this document, threatened against the Resigning Trustee before any court or governmental authority arising out of any action or omission by the Resigning Trustee as Trustee, Collateral Agent, Paying Agent, Registrar, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents;

c.  Resigning Trustee shall deliver to Successor Trustee, as of or promptly after the Effective Date hereof, all of the documents in its possession listed in Exhibit B hereto;

d.  The execution and delivery of this Instrument have been duly authorized by the Resigning Trustee, and this Instrument constitutes the Resigning Trustee's legal, valid, binding and enforceable obligation;

4

**JX 124-4**

e.      The Resigning Trustee certifies that $1,240,000,000 in principal amount of the Notes is outstanding and all interest accrued through but not including April 15, 2014 has been paid;

f.      To the best of the Resigning Trustee's knowledge, no Default or Event of Default has occurred under the Indenture and no event has occurred and is continuing which is, or after notice or lapse of time would become, an Event of Default under the Indenture;

g.      Other than the First Supplemental Indenture, the Assumption Agreement, the Release of Guarantors dated October 11, 2012 in connection with the release of Sears Home Appliance Showrooms, LLC, Sears Authorized Hometown Stores, LLC, and Sears Outlet Stores, LLC, and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014 in connection with the release of Lands' End, Inc. and Lands' End Direct Merchants, Inc., the Indenture and Security Documents have not been amended or supplemented and no terms thereof have been waived; and

h.      To the best of the Resigning Trustee's knowledge, no action is required under the Intercreditor Agreement in connection with the succession evidenced by this Agreement.

4.      ***Successor Trustee Representation and Warranty.*** The Successor Trustee represents and warrants to the Resigning Trustee and the Company that:

a.      It is eligible to serve as Trustee under Section 7.05 of the Indenture and is not disqualified under the provisions of Section 7.06 of the Indenture.

b.      This Instrument has been duly authorized, executed and delivered on behalf of Successor Trustee and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

5.      ***Acceptance by Successor Trustee.*** The Successor Trustee hereby accepts appointment as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian, and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents. The Successor Trustee will perform said rights, powers, and duties upon the terms and conditions set forth in the Indenture. Promptly after the execution and delivery of this Instrument, the Successor Trustee shall cause a notice, a form of which is annexed hereto as Exhibit A, to be sent to each Holder of the Notes. References in the Indenture to "Corporate Trust Office" or other similar terms shall be deemed to refer to the corporate trust office of the Successor Trustee, which is currently located at: 50 South Sixth Street, Suite 1290, Minneapolis, Minnesota 55402, Attention: Sears Holdings Corp. Administrator.

6.      ***Assignment etc. by Resigning Trustee.*** Effective on the Effective Date, the Resigning Trustee hereby confirms, assigns, transfers, delivers and conveys to the

5

**JX 124-5**

Successor Trustee, as Trustee under the Indenture, upon the trusts expressed in the Indenture, all rights, powers, trusts privileges, duties, and obligations which the Resigning Trustee now holds under and by virtue of the Indenture and the Security Documents, and effective as of such date does hereby pay over to the Successor Trustee any and all property and moneys held by the Resigning Trustee under and by virtue of the Indenture and the Security Documents.

7.    ***Additional Documentation.***    The Resigning Trustee, for the purposes of, and to the extent necessary to, more fully and certainly vesting in and confirming to the Successor Trustee the rights, powers, trusts, privileges, duties, and obligations hereby assigned, transferred, delivered and conveyed, agrees, upon reasonable written request of the Successor Trustee or the Company, to execute, acknowledge, and deliver such further instruments of conveyance and further assurance and to do such other things as may be reasonably requested by the Successor Trustee or the Company.

8.    ***Choice of Laws.***    This Instrument shall be governed by the laws of the State of New York.

9.    ***Counterparts.***    This Instrument may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all counterparts shall constitute but one Instrument.

10.    ***Survival of Company's Obligations to Resigning Trustee.*** Notwithstanding the resignation of the Resigning Trustee as Trustee under the Indenture, the Company shall remain obligated under the Indenture to compensate, reimburse, and indemnify the Resigning Trustee as provided in the Indenture, and nothing contained in this Instrument shall in any way abrogate the obligations of the Company to the Resigning Trustee under the Indenture or any lien created in favor of the Resigning Trustee thereunder.

11.    ***Notices.***    All notices, whether faxed or mailed, will be deemed received when sent pursuant to the following instructions:

TO THE SUCCESSOR TRUSTEE:

Wilmington Trust, National Association
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Telephone:    612-217-5667
Fax:          612-217-5651
Attention:    Sears Holdings Corp. Administrator


TO THE RESIGNING TRUSTEE:

**JX 124-6**

Wells Fargo Bank, National Association
Attn: Corporate Trust Services
10 South Wacker Drive, 13th Floor
Chicago, IL 60606
Telephone:      312-845-4385
Fax:              312-726-2158
Attention:      Sears Holdings Corp. Administrator


TO THE COMPANY:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Telephone:      847-286-2500
Fax:              847-286-4511
Attention:      Treasurer

12.    ***Effectiveness.***  This Instrument, the resignation of the Resigning Trustee as Trustee, Collateral Agent and Agent for service of notices and demands in connection with the Notes and the appointment of the Successor Trustee as Trustee, Collateral Agent and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents shall be effective as of the close of business on the date first set forth above, upon the execution and delivery hereof by each of the parties hereto; *provided*, that the resignation of the Resigning Trustee as Registrar, Paying Agent and Depository Custodian and the appointment of the Successor Trustee as Registrar, Paying Agent and Depository Custodian shall be effective on July 10, 2014 which is ten (10) business days after the date first above written.

JX 124-7

**IN WITNESS WHEREOF,** the parties hereto have executed this Instrument as of the date set forth above.

**SEARS HOLDINGS CORPORATION**, as Company

By_____

Its Vice President and Treasurer


**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Successor Trustee

By_____

Its_____



**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Resigning Trustee

By_____

Its_____

JX 124-8

**IN WITNESS WHEREOF,** the parties hereto have executed this Instrument as of the date set forth above.

**SEARS HOLDINGS CORPORATION,** as Company

By_____

Its_____


**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Successor Trustee

By_____

Its_____Vice President_____


**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Resigning Trustee

By_____

Its_____

8

**JX 124-9**

**IN WITNESS WHEREOF,** the parties hereto have executed this Instrument as of the date set forth above.

**SEARS HOLDINGS CORPORATION**, as Company

By_____

Its_____

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Successor Trustee

By_____

Its_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Resigning Trustee

By_____

Its _____ VICE PRESIDENT_____

8

**Execution Version**

EXHIBIT A

NOTICE OF APPOINTMENT OF SUCCESSOR TRUSTEE

To the Holders of:

Sears Holdings Corporation

6.625% Senior Secured Notes due 2018

CUSIP Nos.: 812350AC0 (144A), U8124CAB0 (RegS), 812350AD8 (AI), and
812350AE6 (Reg)

We hereby notify you of the resignation of Wells Fargo Bank, National
Association, as Trustee, Collateral Agent, Registrar, Paying Agent and Agent for
service of notices and demands under the Indenture, dated as of October 12, 2010,
pursuant to which your Notes were issued and are outstanding.

Sears Holdings Corporation has appointed Wilmington Trust, National
Association, whose Corporate Trust Office is located at 50 South Sixth Street,
Suite 1290, Minneapolis, Minnesota 55402, Attention:  Sears Holdings Corp.
Administrator and Wilmington Trust, National Association has accepted
appointment as successor Trustee, Collateral Agent, Registrar, Paying Agent,
Depository Custodian and Agent for service of notices and demands under the
Indenture.

Wells Fargo Bank, National Association's resignation as Trustee, Collateral
Agent and Agent for service of notices and demands and Wilmington Trust,
National Association's appointment as Trustee, Collateral Agent and Agent for
service of notices and demands under the Indenture were effective as of the
opening of business on June 26, 2014 and Wells Fargo Bank, National
Association's resignation as Registrar, Paying Agent and Depository Custodian
and Wilmington Trust, National Association's appointment as Registrar, Paying
Agent and Depository Custodian will be effective as of the opening of business on
July 10, 2014.

Dated: [          ], 2014

Wilmington Trust, National Association,
As Trustee

**JX 124-11**

<u>EXHIBIT B</u>

Documents to be delivered by Resigning Trustee to Successor Trustee as to the Indenture and Security Documents:

1.    Copies of fully executed versions of the Indenture, the First Supplemental Indenture, the Security Agreement, and the Intercreditor Agreement, the Assumption Agreement, the Release of Guarantors dated October 11, 2012 in connection with the release of Sears Home Appliance Showrooms, LLC, Sears Authorized Hometown Stores, LLC, and Sears Outlet Stores, LLC, and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014 in connection with the release of Lands' End, Inc. and Lands' End Direct Merchants, Inc.

2.    File of closing documents from original issuance.

3.    Certified List of Noteholders as of the Effective Date and as of effective date for the Registrar succession, certificate detail and all "stop transfers" and the reason for such "stop transfers" (or, alternatively, if there are a substantial number of registered Noteholders, the computer tape reflecting the identity of such Noteholders).

4.    Copies of any official notices sent by the Trustee to the Noteholders of the Notes pursuant to the terms of the Indenture during the past twelve months.

5.    Copies of most recent compliance items, including without limitation, the most recent compliance certificate delivered pursuant to Section 4.03 of the Indenture, most recent SEC reports delivered pursuant to Section 4.02 of the Indenture and most recent annual perfection opinion delivered pursuant to Section 11.02 of the Indenture, delivered to the Resigning Trustee pursuant to terms of the Indenture and Security Documents.

6.    The original Global Notes with original face amounts as follows:  812350AC0 (144A) Cert A-1 $481,030,000 dated October 12, 2010 and Cert A-2 $500,000,000 dated October 12, 2010; U8124CAB0 (RegS) Cert S-1 $18,970,000 dated October 12, 2010; 812350AD8 (AI) Cert D-1 $0.00 dated October 12, 2010; and 812350AE6 (Reg) Cert E-1 $500,000,000 dated September 6, 2011, Cert E-2 $487,430,000 dated September 6, 2011 and Cert E-3 $5,000,000 dated September 28, 2012.

7.    Trust account statements (asset & transaction) for the one-year period preceding the date of this Agreement.

8.    Securities debt service records.

9.    Filed, stamped copies of all existing financing statements.

**JX 124-12**

# Exhibit 86

EXECUTION VERSION

SEARS HOLDINGS CORPORATION,

THE GUARANTORS PARTY HERETO

and

COMPUTERSHARE TRUST COMPANY, N.A.,
as Trustee

INDENTURE

Dated as of March 20, 2018

$6^5/_8\%$ Senior Secured Convertible PIK Toggle Notes due 2019

**JX 125-1**

## CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
| --- | --- |
| 310(a)(1) | 7.05 |
| (a)(2) | 7.05 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.06 |
| (b) | 7.04; 7.06; 12.02 |
| (b)(1) | 7.06 |
| (c) | N.A. |
| 311(a) | 6.11 |
| (b) | 6.11 |
| (c) | N.A. |
| 312(a) | 2.06 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.11 |
| (b)(1) | N.A. |
| (b)(2) | 7.01(a); 7.11 |
| (c) | 7.11; 12.02 |
| (d) | 7.11 |
| 314(a) | 4.02; 4.03; 11.03; 12.02 |
| (b) | 11.02 |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | 11.03 |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | N.A. |
| (b) | 7.03; 12.02 |
| (c) | 7.02 |
| (d) | 7.02(b) |
| (e) | 6.12 |
| 316(a) (last sentence) | 2.10 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.08 |
| (c) | 8.04 |
| 317(a)(1) | 6.09 |
| (a)(2) | 6.10 |
| (b) | 2.05 |
| 318(a) | 12.01 |

N.A. means Not Applicable.

Note:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of the Indenture.

**JX 125-2**

# TABLE OF CONTENTS

**Page**

### ARTICLE ONE

### DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.   Definitions.................................................................................1
SECTION 1.02.   Other Definitions .......................................................................20
SECTION 1.03.   Incorporation by Reference of Trust Indenture Act.......................21
SECTION 1.04.   Rules of Construction .................................................................21

### ARTICLE TWO

### THE NOTES

SECTION 2.01.   Amount of Notes........................................................................22
SECTION 2.02.   Form and Dating ........................................................................23
SECTION 2.03.   Execution and Authentication.....................................................23
SECTION 2.04.   Registrar, Paying Agent and Conversion Agent ...........................24
SECTION 2.05.   Paying Agent to Hold Money in Trust..........................................25
SECTION 2.06.   Holder Lists................................................................................25
SECTION 2.07.   Transfer and Exchange ...............................................................26
SECTION 2.08.   Replacement Notes .....................................................................27
SECTION 2.09.   Outstanding Notes......................................................................27
SECTION 2.10.   Treasury Notes ...........................................................................28
SECTION 2.11.   Temporary Notes ........................................................................28
SECTION 2.12.   Cancellation ...............................................................................28
SECTION 2.13.   Defaulted Interest.......................................................................28
SECTION 2.14.   CUSIP Number ..........................................................................29
SECTION 2.15.   Deposit of Moneys......................................................................29
SECTION 2.16.   Book-Entry Provisions for Global Notes......................................29
SECTION 2.17.   Special Transfer Provisions ........................................................31
SECTION 2.18.   Computation of Interest ..............................................................33
SECTION 2.19.   Registration Rights......................................................................33

### ARTICLE THREE

### REDEMPTION AND PREPAYMENT

SECTION 3.01.   Election to Redeem; Notices to Trustee........................................34
SECTION 3.02.   Selection by Trustee of Notes to Be Redeemed..............................34
SECTION 3.03.   Notice of Redemption .................................................................34
SECTION 3.04.   Effect of Notice of Redemption ...................................................35
SECTION 3.05.   Deposit of Redemption Price .......................................................36

**JX 125-3**

SECTION 3.06.    Notes Redeemed in Part ...................................................................36
SECTION 3.07.    Optional Redemption .......................................................................36
SECTION 3.08.    Mandatory Redemption .....................................................................36

ARTICLE FOUR

COVENANTS

SECTION 4.01.    Payment of Notes ............................................................................37
SECTION 4.02.    Reports to Holders ...........................................................................38
SECTION 4.03.    Compliance Certificate .....................................................................39
SECTION 4.04.    Limitations on Liens ........................................................................39
SECTION 4.05.    Limitation on Sale and Leaseback Transactions ...............................39
SECTION 4.06.    Additional Guarantees .....................................................................40
SECTION 4.07.    Change of Control Offer ...................................................................40
SECTION 4.08.    Collateral Coverage Offer .................................................................41
SECTION 4.09.    Calculations .....................................................................................41
SECTION 4.10.    Interest Payments on Other Indebtedness .........................................42
SECTION 4.11.    Subsequent Exchanges of Senior Secured Notes, Senior Unsecured Notes ...............................................................................................42

ARTICLE FIVE

SUCCESSOR CORPORATION

SECTION 5.01.    Limitations on Mergers and Sales of Assets ....................................42
SECTION 5.02.    Successor Person Substituted ...........................................................43

ARTICLE SIX

DEFAULTS AND REMEDIES

SECTION 6.01.    Events of Default .............................................................................43
SECTION 6.02.    Acceleration .....................................................................................44
SECTION 6.03.    Other Remedies ................................................................................44
SECTION 6.04.    Waiver or Rescission of Past Defaults and Events of Default ............45
SECTION 6.05.    Control by Majority ..........................................................................45
SECTION 6.06.    Limitation on Suits ...........................................................................46
SECTION 6.07.    No Personal Liability of Directors, Officers, Employees and Stockholders ...................................................................................46
SECTION 6.08.    Rights of Holders to Receive Payment .............................................47
SECTION 6.09.    Collection Suit by Trustee ................................................................47
SECTION 6.10.    Trustee May File Proofs of Claim .....................................................47
SECTION 6.11.    Priorities ..........................................................................................48
SECTION 6.12.    Undertaking for Costs ......................................................................48
SECTION 6.13.    Restoration of Rights and Remedies .................................................48

**JX 125-4**

SECTION 6.14.    Appointment and Authorization of Wilmington Trust, National Association as Collateral Agent .........................................................49

## ARTICLE SEVEN

### TRUSTEE

SECTION 7.01.    Acceptance of Trusts upon Specified Conditions ..............................49
SECTION 7.02.    Duties of Trustee in Case of Default ................................................52
SECTION 7.03.    Notice to Holders of Defaults ..........................................................53
SECTION 7.04.    Resignation and Removal of Trustee and Notice Thereof ................53
SECTION 7.05.    Qualifications of Trustee ..................................................................54
SECTION 7.06.    Disqualification of Trustee by Reason of Conflicting Interest .........54
SECTION 7.07.    Appointment of Successor Trustee ...................................................54
SECTION 7.08.    Merger, Conversion or Consolidation of Trustee or Transfer of Its Corporate Trust Business; Authentication of Notes by Successor Trustee ...............................................................................................55
SECTION 7.09.    Trustee Required to Account for Amounts Collected as Creditor of the Issuer under Certain Conditions ...................................................56
SECTION 7.10.    Trustee May Rely on Officer's Certificate .......................................56
SECTION 7.11.    Reports by Trustee ...........................................................................56
SECTION 7.12.    Collateral Agent ...............................................................................56

## ARTICLE EIGHT

### AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 8.01.    Without Consent of Holders .............................................................57
SECTION 8.02.    With Consent of Holders ...................................................................58
SECTION 8.03.    Compliance with Trust Indenture Act ...............................................59
SECTION 8.04.    Revocation and Effect of Consents ...................................................59
SECTION 8.05.    Notation on or Exchange of Notes ....................................................60
SECTION 8.06.    Trustee to Sign Amendments, Etc. ...................................................60

## ARTICLE NINE

### DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 9.01.    Discharge of Indenture .....................................................................60
SECTION 9.02.    Legal Defeasance ..............................................................................61
SECTION 9.03.    Covenant Defeasance ........................................................................63
SECTION 9.04.    Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions .....................................................64
SECTION 9.05.    Reinstatement ...................................................................................64
SECTION 9.06.    Moneys Held by Paying Agent .........................................................64
SECTION 9.07.    Moneys Held by Trustee ...................................................................65

**JX 125-5**

# ARTICLE TEN

## GUARANTEE OF NOTES

SECTION 10.01. Guarantee ................................................................................65
SECTION 10.02. Execution and Delivery of Notation of Guarantee ...................66
SECTION 10.03. Limitation of Guarantee .........................................................66
SECTION 10.04. Release of Guarantor...............................................................67
SECTION 10.05. Waiver of Subrogation ............................................................67

# ARTICLE ELEVEN

## SECURITY

SECTION 11.01. Security Documents; Additional Collateral ...............................68
SECTION 11.02. Recording, Registration and Opinions....................................68
SECTION 11.03. Releases of Liens on Collateral...............................................69
SECTION 11.04. Form and Sufficiency of Release .............................................69
SECTION 11.05. Possession and Use of Collateral .............................................70
SECTION 11.06. Purchaser Protected ...............................................................70
SECTION 11.07. Authorization of Actions to Be Taken by the Collateral Agent under the Security Documents ....................................................70
SECTION 11.08. Authorization of Receipt of Funds by the Trustee under the Security Agreement........................................................................70
SECTION 11.09. Powers Exercisable by Receiver or Collateral Agent ...................70

# ARTICLE TWELVE

## CONVERSION

SECTION 12.01. Conversion Rights...................................................................71
SECTION 12.02. Conversion Procedures ...........................................................71
SECTION 12.03. Settlement upon Conversion ...................................................73
SECTION 12.04. Common Stock Issued upon Conversion ..................................74
SECTION 12.05. Adjustment of Conversion Rate, Conversion Price ...................74
SECTION 12.06. Responsibility of Trustee ........................................................76
SECTION 12.07. Notice of Adjustment..............................................................76
SECTION 12.08. Mandatory Conversion...........................................................77

# ARTICLE THIRTEEN

## MISCELLANEOUS

SECTION 13.01. Trust Indenture Act Controls ..................................................79
SECTION 13.02. Notices ...................................................................................79
SECTION 13.03. Communications by Holders with Other Holders.........................80
SECTION 13.04. Certificate and Opinion as to Conditions Precedent ......................80

**JX 125-6**

SECTION 13.05. Statements Required in Certificate and Opinion ............................................81
SECTION 13.06. Rules by Trustee and Agents ...................................................................81
SECTION 13.07. Business Days; Legal Holidays ................................................................81
SECTION 13.08. Governing Law ......................................................................................81
SECTION 13.09. No Adverse Interpretation of Other Agreements............................................82
SECTION 13.10. Successors ............................................................................................82
SECTION 13.11. Multiple Counterparts ............................................................................82
SECTION 13.12. Table of Contents, Headings, Etc. ...........................................................82
SECTION 13.13. Separability ..........................................................................................82
SECTION 13.14. Waiver of Jury Trial................................................................................83
SECTION 13.15. Force Majeure .......................................................................................83
SECTION 13.16. Intercreditor Agreement..........................................................................83

Schedule A     List of Guarantors

EXHIBITS

Exhibit A     Form of Note
Exhibit B     Form of Legend for Notes that Are Restricted Notes
Exhibit C     Form of Legend for Regulation S Note
Exhibit D     Form of Legend for Global Note
Exhibit E     Form of Certificate to Be Delivered in Connection with Transfers Other than to a QIB Pursuant to Rule 144A and Other Than Pursuant to Regulation S
Exhibit F     Form of Certificate to Be Delivered in Connection with Transfers Pursuant to Regulation S
Exhibit G     Notation of Guarantee

**JX 125-7**

INDENTURE, dated as of March 20, 2018, among SEARS HOLDINGS CORPORATION, a Delaware corporation (the "Issuer"), the Guarantors (as defined herein) listed on Schedule A hereto and COMPUTERSHARE TRUST COMPANY, N.A., as trustee (the "Trustee").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined herein):

ARTICLE ONE

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions.

"Accredited Investor" means a Person that is an "accredited investor" as that term is defined in Rule 501(a) promulgated under the Securities Act.

"Accredited Investor Notes" means Notes offered and sold to Accredited Investors.

"Additional First Lien Obligations" means any indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Restricted Subsidiary, other than the Credit Agreement Obligations, that is secured by a Lien on the Collateral ranking contractually prior to the Notes Liens and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; provided that the representative of such Additional First Lien Obligations executes a joinder agreement or amendment to, or amendment and restatement of, the Intercreditor Agreement causing such representative to be bound thereby (or another intercreditor agreement on terms not less favorable to the Holders of Notes than the Intercreditor Agreement).  At the Issuer's option, any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be "Additional First Lien Obligations."

"Additional Notes" means an unlimited principal amount of Notes having identical terms and conditions (other than issue date, issue price and initial interest payment date) to the Notes issued on the Issue Date pursuant to Article Two; provided that the PIK Interest Notes shall not constitute Additional Notes.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Collateral Agent, Depository Custodian, any Registrar, Paying Agent, Conversion Agent or agent for service of notices and demands.

"Applicable Procedures" means, with respect to any transfer, payment, tender, redemption or exchange of or for beneficial interests in any Global Certificate, the rules and

**JX 125-8**

procedures of the Depository, Euroclear and Clearstream that apply to such transfer, payment, tender, redemption or exchange.

"Attributable Debt" in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value discounted at the rate of interest implicit in the terms of the lease (as determined in good faith by the Issuer) of the obligations of the lessee under such lease for net rental payments during the remaining term of the lease (including any period for which such lease has been extended or may, at the Issuer's option, be extended).

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"Board of Directors" means either the board of directors of the Issuer or any duly authorized committee of that board or any committee of officers or other representatives of the Issuer duly authorized by a Board Resolution to act on behalf of that board or in its stead.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Borrowing Base" means, as of any date, the sum of (1) 90% of the book value (calculated in accordance with GAAP) of the accounts receivable of the Issuer and the Guarantors, on a consolidated basis, on such date and (2) 75% of the book value (calculated in accordance with GAAP) of the inventory of the Issuer and the Guarantors, on a consolidated basis, on such date.

"Business Combination" means a merger, consolidation, statutory share exchange, amalgamation, tender offer, recapitalization, reorganization, scheme of arrangement or similar transaction that requires the approval of the Issuer's stockholders.

"Capital Stock" means, as to any Person, the capital stock of such Person of every class, whether now or hereafter authorized, regardless of whether such capital stock shall be limited to a fixed sum or percentage with respect to the rights of the holders thereof to participate in dividends and in the distribution of assets upon the voluntary or involuntary liquidation, dissolution or winding up of such Person.

"Change of Control" means the occurrence of any of the following:  (1) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or more series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person, other than a Permitted Holder, the Issuer or one of its Subsidiaries; (2) the Issuer becomes aware of the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any Person other than a Permitted Holder becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the Issuer's outstanding Voting Stock or other Voting Stock into which the Issuer's Voting Stock is reclassified, consolidated, exchanged or changed, measured by voting power rather than number of shares; (3) the first day on which a majority of the members of the Issuer's Board of Directors are not Continuing Directors; or (4) the adoption of a plan relating to the Issuer's

**JX 125-9**

liquidation or dissolution.  Notwithstanding the foregoing, a transaction will not be deemed to involve a Change of Control under clause (2) above if (i) the Issuer becomes a direct or indirect wholly-owned subsidiary of a holding company and (ii)(A) the direct or indirect holders of the Voting Stock of such holding company immediately following that transaction are substantially the same as the holders of the Issuer's Voting Stock immediately prior to that transaction or (B) immediately following that transaction no Person (other than a holding company satisfying the requirements of this sentence or a Permitted Holder) is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

        "Change of Control Notice" has the meaning provided in the definition of "Change of Control Offer."

        "Change of Control Offer" means a written offer (the "Change of Control Notice") sent by or on behalf of the Issuer by first-class mail, postage prepaid, or by electronic delivery to each Holder, with a copy to the Trustee, at its address appearing in the register for the Notes on the date of the Change of Control Offer offering to purchase all outstanding Notes in accordance with Section 4.07.  Unless otherwise required by applicable law, the Change of Control Notice shall specify the payment date (the "Change of Control Payment Date") for the Change of Control Offer, which shall be not less than 30 days nor more than 60 days after the date such Change of Control Notice is mailed or electronically delivered.  The Change of Control Notice shall contain all the information required by applicable law to be included therein and shall describe the transaction that constitutes or may constitute the Change of Control Triggering Event.  The Change of Control Notice shall also state:

        (1)    that the Change of Control Offer is being made pursuant to Section 4.07 of this Indenture;

        (2)    the Change of Control Payment Date;

        (3)    the Change of Control Payment;

        (4)    that the Holder may tender all or any portion of the Notes registered in the name of such Holder and that any portion of a Note tendered must be tendered in denominations of $2,000 principal amount or an integral multiple of $1,000 in excess thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof) and that all Notes tendered in such manner for payment and not withdrawn shall be accepted;

        (5)    the place or places where Notes are to be surrendered for tender pursuant to the Change of Control Offer;

        (6)    that interest on any Note not tendered pursuant to the Change of Control Offer will continue to accrue;

        (7)    that on the Change of Control Payment Date the Change of Control Payment will become due and payable upon each Note being accepted for payment pursuant to the Change of Control Offer and that, unless the Issuer defaults in the

JX 125-10

payment of the Change of Control Payment therefor, interest thereon shall cease to accrue on and after the Change of Control Payment Date;

(8)    that each Holder electing to tender all or any portion of a Note pursuant to the Change of Control Offer will, subject to Applicable Procedures, be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, at the place or places specified in the Change of Control Notice on or prior to the close of business on a date no earlier than the third Business Day prior to the Change of Control Payment Date (such Note being, if the Issuer so requires, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Issuer duly executed by, the Holder thereof or its attorney duly authorized in writing);

(9)    that Holders will, subject to Applicable Procedures, be entitled to withdraw all or any portion of Notes tendered if the Issuer receives, not later than the close of business on the fifth Business Day preceding the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder tendered, the certificate number of the Note the holder tendered and a statement that such Holder is withdrawing all or a portion of its tender;

(10)    that in the case of any Holder whose Note is purchased only in part, subject to Applicable Procedures, the Issuer shall execute and deliver to the Holder of such Note without service charge, a new Note or Notes, in an aggregate principal amount equal to and in exchange for the unpurchased portion of the Note so tendered, in denominations of $2,000 principal amount or integral multiples of $1,000 in excess thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof); and

(11)    if mailed or electronically delivered prior to the date of consummation of the applicable Change of Control, that the Change of Control Offer is conditioned on the Change of Control Triggering Event occurring on or prior to the applicable Change of Control Payment Date.

"Change of Control Payment Date" has the meaning provided in the definition of "Change of Control."

"Change of Control Triggering Event" means the occurrence of both a Change of Control and a Ratings Event.

"Close of Business" means 5:00 p.m., New York City time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means, collectively, "Collateral" (as defined in the Security Agreement) and all other property subject or purported to be subject from time to time to a Lien in favor of the Collateral Agent for its benefit and for the benefit of the Trustee and the Holders and the holders of any Second Lien Obligations.

JX 125-11

"Collateral Agent" means Wilmington Trust, National Association, in its capacity as successor collateral agent under the Security Documents together with its successors in such capacity.

"Collateral Coverage Certificate" means with respect to any annual or quarterly financial statements provided pursuant to Section 4.02, a certificate signed by a financial officer of the Issuer setting forth an accurate calculation of the Borrowing Base as of the last day of the period covered by such annual or quarterly financial statements, a calculation of the principal amount of outstanding indebtedness for borrowed money on such date that is secured by Liens on the Collateral pursuant to clauses (2) and (3) of the definition of "Permitted Liens" and stating whether or not a Collateral Coverage Event has occurred.

"Collateral Coverage Event" shall be deemed to have occurred if, prior to a Fall-Away Event, as of the last day of any two consecutive fiscal quarters of the Issuer (each ending on or after August 4, 2018, the last day of the second fiscal quarter of the fiscal year of the Issuer ending on February 2, 2019), the Borrowing Base as of each such day is less than the principal amount of the Issuer's consolidated indebtedness for borrowed money outstanding on such day that is secured by Liens on the Collateral.

"Collateral Coverage Notice" has the meaning provided in the definition of "Collateral Coverage Offer."

"Collateral Coverage Offer" means a written offer (a "Collateral Coverage Notice") sent by or on behalf of the Issuer by first-class mail, postage prepaid, or by electronic delivery to each Holder, with a copy to the Trustee, at its address appearing in the register for the Notes on the date of the Collateral Coverage Offer offering to repurchase a portion (equal to $2,000 or an integral multiple of $1,000 in excess thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof)) of such Holder's Notes on the terms set forth hereunder up to an aggregate principal amount of Notes for all Holders equal to the Collateral Coverage Required Amount in accordance with Section 4.08. Unless otherwise required by applicable law, the Collateral Coverage Notice shall specify the payment date (the "Collateral Coverage Payment Date") for the Collateral Coverage Offer, which shall be not less than 30 days nor more than 60 days after the date such Collateral Coverage Notice is mailed or electronically delivered. The Collateral Coverage Notice shall contain all the information required by applicable law to be included therein and shall describe the circumstances requiring such Collateral Coverage Offer. The Collateral Coverage Notice shall also state:

(1)    that the Collateral Coverage Offer is being made pursuant to Section 4.08 of this Indenture;

(2)    the Collateral Coverage Payment Date;

(3)    the Collateral Coverage Event Payment;

(4)    that the Holder may tender all or any portion of the Notes registered in the name of such Holder and that any portion of a Note tendered must be tendered in denominations of $2,000 principal amount or an integral multiple of $1,000 in excess

-5-

**JX 125-12**

thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof), *provided* that in the event the aggregate principal amount of Notes validly tendered for purchase in the Collateral Coverage Offer exceeds the Collateral Coverage Required Amount for such Collateral Coverage Offer, the Issuer will accept for payment only the Collateral Coverage Required Amount of Notes on a *pro rata* basis from Holders who have validly tendered their Notes in such Collateral Coverage Offer (subject to rounding such that all remaining Notes are in a minimum principal amount of $2,000 and in whole multiples of $1,000 in excess thereof) (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof);

(5)    the place or places where Notes are to be surrendered for tender pursuant to the Collateral Coverage Offer;

(6)    that interest on any Note not tendered pursuant to the Collateral Coverage Offer will continue to accrue;

(7)    that on the Collateral Coverage Payment Date, the Collateral Coverage Event Payment will become due and payable upon each Note being accepted for payment pursuant to the Collateral Coverage Offer and that, unless the Issuer defaults in the payment of the Collateral Coverage Event Payment therefor, interest thereon shall cease to accrue on and after the Collateral Coverage Payment Date;

(8)    that each Holder electing to tender all or any portion of a Note pursuant to the Collateral Coverage Offer will, subject to Applicable Procedures, be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, at the place or places specified in the Collateral Coverage Notice on or prior to the close of business on a date no earlier than the third Business Day prior to the Collateral Coverage Payment Date (such Note being, if the Issuer so requires, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Issuer duly executed by, the Holder thereof or its attorney duly authorized in writing);

(9)    that Holders will, subject to Applicable Procedures, be entitled to withdraw all or any portion of Notes tendered if the Issuer receives, not later than the close of business on the fifth Business Day preceding the Collateral Coverage Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder tendered, the certificate number of the Note the Holder tendered and a statement that such Holder is withdrawing all or a portion of its tender; and

(10)    that in the case of any Holder whose Note is purchased only in part, subject to Applicable Procedures, the Issuer shall execute and deliver to the Holder of such Note without service charge, a new Note or Notes, in an aggregate principal amount equal to and in exchange for the unpurchased portion of the Note so tendered, in denominations of $2,000 principal amount or integral multiples of $1,000 in excess

**JX 125-13**

thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof).

"Collateral Coverage Payment Date" has the meaning provided in the definition of "Collateral Coverage Offer."

"Collateral Coverage Required Amount" means, with respect to any Collateral Coverage Event, an amount equal to the difference between (a) the principal amount of the Issuer's consolidated indebtedness for borrowed money that is secured by Liens on the Collateral outstanding on the date of occurrence of such Collateral Coverage Event and (b) the Borrowing Base on such date.

"Commission" means the Securities and Exchange Commission, as from time to time constituted, or, if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"Common Stock" means, subject to Section 12.05, the shares of common stock, par value $0.01 per share, of the Issuer authorized at the date of this Indenture as originally executed or shares of any class or classes of common stock resulting from any reclassification or reclassifications thereof; provided, however, that if at any time there shall be more than one such resulting class from any reclassification or reclassifications, the shares so issuable on conversion of Notes shall include shares of all such classes, and the shares of each such class then so issuable shall be in the applicable proportion as provided by Section 12.05(d).

"Comparable Treasury Issue" means the United States Treasury security selected by an Independent Investment Banker as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (1) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotations, or (2) if the Issuer obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such Reference Treasury Dealer Quotations.

"Consolidated Net Tangible Assets" means the aggregate amount of the Issuer's assets (less applicable reserves and other properly deductible items) and the Issuer's Subsidiaries' assets after deducting therefrom (a) all current liabilities (excluding current maturities of long-term debt and current maturities under capital leases) and (b) all goodwill, trade names, patents, unamortized debt discount and expense and other like intangibles, all as set forth on the Issuer's most recent consolidated balance sheet and computed in accordance with GAAP.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Issuer who (A) was a member of such Board of Directors on the Issue Date or (B) was nominated for election, elected or appointed to such Board of Directors with the approval of a majority of the continuing directors who were members of such Board of Directors

JX 125-14

at the time of such nomination, election or appointment (either by a specific vote or by approval of a proxy statement in which such member was named as a nominee for election as a director, without objection to such nomination).

"<u>Conversion Price</u>" means, in respect of each Note, as of any date, $1,000 divided by the Conversion Rate in effect on such date. The initial Conversion Price is $5 per share of Common Stock.

"<u>Conversion Rate</u>" means initially 200 shares of Common Stock per $1,000 principal amount of Notes, subject to adjustment as set forth herein.

"<u>Credit Agreement</u>" means the Third Amended and Restated Credit Agreement, dated as of July 21, 2015, among the Issuer, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders from time to time party thereto, the issuing lenders from time to time party thereto, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association, as co-collateral agent, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements have been or may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, replaced or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available borrowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"<u>Credit Agreement Agent</u>" means, collectively, the co-collateral agents under the Credit Agreement.

"<u>Credit Agreement Obligations</u>" means the Obligations owed to the lenders and agents under the Credit Agreement.

"<u>Custodian</u>" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

"<u>Default</u>" means an Event of Default or an event that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"<u>Definitive Note</u>" means a certificated Note that is not a Global Note.

"<u>Depository</u>" means, with respect to the Notes issued in the form of one or more Global Notes, The Depository Trust Company or another Person designated as Depository by the Issuer, which Person must be a clearing agency registered under the Exchange Act.

"<u>Depository Custodian</u>" means the Trustee, as custodian of each Global Note for the Depository.

"<u>Domestic Subsidiary</u>" means any Subsidiary of the Issuer that is not a Foreign Subsidiary.

JX 125-15

"Equity Interests" of any Person means any and all shares, interests, participations, rights in or other equivalents (however designated) of such Person's Capital Stock, other equity interests whether now outstanding or issued after the Issue Date, partnership interests (whether general or limited), limited liability company interests, any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, and any rights (other than debt securities convertible into Equity Interests), warrants or options exchangeable for or convertible into such Equity Interests.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Fair Market Value" means, with respect to any security or other property, the fair market value of such security or other property as determined by the Board of Directors, acting in good faith.

"Fall-Away Event" means the satisfaction of the following conditions on any date following the Issue Date:  (i) the Issuer shall have a corporate family rating of at least Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, (ii) no Default shall have occurred and be continuing on such date, (iii) the Issuer and its Restricted Subsidiaries shall (after giving effect to the release of the Notes Liens and any concurrent release of Liens to occur on such date) have no Liens on any of their assets or properties other than Permitted Liens that are permitted to be outstanding following a Fall-Away Event and (iv) the Issuer shall have delivered to the Trustee an Officer's Certificate certifying that the foregoing conditions are satisfied and requesting that the Notes Liens be released.

"Fitch" means Fitch Inc., a subsidiary of Fimalac, S.A., and its successors.

"Foreign Subsidiary" means (i) any Subsidiary of the Issuer that is not (a) organized under the laws of the United States or any state thereof or the District of Columbia or (b) treated as a domestic entity or a partnership or a division of a domestic entity for U.S. tax purposes or (ii) any Subsidiary that is (a) a domestic partnership or disregarded entity for U.S. tax purposes and (b) owned by a Subsidiary described in clause (i).

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

"Government Securities" means securities that are (i) direct obligations of the United States for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, which, in either case under clause (i) or (ii), are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such obligation or a specific payment of interest on or principal of any such obligation held by such custodian for the account of the holder of a

**JX 125-16**

depository receipt; *provided*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the obligation or the specific payment of interest on or principal of the obligation evidenced by such depository receipt.

"Guarantee" means a guarantee of the Notes on the terms set forth in this Indenture.

"Guarantor" means each Subsidiary or other Person that has provided a Guarantee for so long as such Guarantee remains in effect.

"Holder" means a Person in whose name a Note is registered.

"Indenture" means this Indenture as amended, restated or supplemented from time to time in accordance with the terms hereof.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Intercreditor Agreement" means, collectively, the second amended and restated intercreditor agreement dated as of the Issue Date by and among the Issuer, the Guarantors, the Collateral Agent and the Credit Agreement Agent and any other intercreditor agreement entered into in accordance with the terms hereof in connection with any Additional First Lien Obligations or Second Lien Obligations.

"interest" means, with respect to the Notes, interest on the Notes.

"Interest Payment Dates" means each April 15 and October 15, commencing April 15, 2018.

"Investment Grade Rating" means a rating equal to or higher than BBB- (or the equivalent) by Fitch, Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, and the equivalent investment grade credit rating from any replacement Rating Agency or Rating Agencies selected by the Issuer.

"Issue Date" means March 20, 2018.

"Issuer" has the meaning provided in the preamble hereof.

"Junior Second Lien Obligations" means the Senior Secured Notes and any indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the Liens securing the Senior Secured Notes (or by the same Liens that secure the Senior Secured Notes), that is entitled to distributions on an equal and ratable basis with the Senior Secured Notes pursuant to the Security Documents or otherwise, and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; *provided* that the representative of such Junior Second Lien Obligations executes a joinder agreement or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received

**JX 125-17**

in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) of the Collateral Agent, the Trustee and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid among first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to the Trustee and each other trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to each trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to the Issuer.  At the Issuer's option (as certified to the Trustee and the Collateral Agent pursuant to an Officer's Certificate), any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be Junior Second Lien Obligations.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement.

"Market Disruption Event" means, if the Common Stock is listed for trading on The NASDAQ Global Select Market or listed on another U.S. national or regional securities exchange, the occurrence or existence during the one-half hour period ending on the scheduled close of trading on any Scheduled Trading Day of any material suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the stock exchange or otherwise) in the Common Stock or in any options contracts or futures contracts relating to the Common Stock.

"Market Price" means, with respect to a particular security, on any date of determination, the last reported sale price regular way or, in case no such reported sale takes place on such day, the average of the last closing bid and ask prices regular way, in either case on the NASDAQ Global Select Market or if not listed on the NASDAQ Global Select Market, the principal national securities exchange on which the applicable securities are listed or admitted to trading, or if not listed or admitted to trading on any national securities exchange, the average of the closing bid and ask prices as furnished by two members of the Financial Industry Regulatory Authority, Inc. selected from time to time by the Issuer for that purpose.  "Market Price" will be determined without reference to after hours or extended hours trading.  If such security is not listed and traded in a manner that the quotations referred to above are available for the period required hereunder, the market price per share of Common Stock will be deemed to be the fair market value per share of such security as determined in good faith by the Board of Directors in reliance on an opinion of a nationally recognized independent investment banking corporation retained by the Issuer for this purpose; *provided* that if any such security is listed or traded on a non-U.S. market, such fair market value will be determined by reference to the closing price of such security as of the end of the most recently ended Business Day in such market prior to the date of determination; and further provided that if making such determination requires the conversion of any currency other than U.S. dollars into U.S. dollars, such conversion will be

JX 125-18

done in accordance with customary procedures based on the closing price for conversion of such currency into U.S. dollars quoted by Bloomberg on such conversion date. For the purposes of determining the market price of Common Stock on the "trading day" preceding, on or following the occurrence of an event, (i) that trading day will be deemed to commence immediately after the regular scheduled closing time of trading on the NASDAQ Global Select Market or, if trading is closed at an earlier time, such earlier time and (ii) that trading day will end at the next regular scheduled closing time, or if trading is closed at an earlier time, such earlier time (for the avoidance of doubt, and as an example, if the market price is to be determined as of the last trading day preceding a specified event and the closing time of trading on a particular day is 4:00 p.m. and the specified event occurs at 5:00 p.m. on that day, the market price would be determined by reference to such 4:00 p.m. closing price).

"Moody's" means Moody's Investors Service, Inc.

"Non-U.S. Person" means a Person who is not a U.S. person, as defined in Regulation S.

"Notes" means $169,824,000 of $6^5/_8\%$ Senior Secured Convertible PIK Toggle Notes due 2019 issued on the Issue Date, the PIK Interest Notes (or any increase in the principal amount of a Global Note related to PIK Interest) and any Additional Notes issued under this Indenture, all of which will be treated as a single class for all purposes under this Indenture; *provided* that if any Additional Notes are not fungible with the Notes issued on the Issue Date for U.S. federal income tax purposes, or to the extent required by applicable securities laws or regulations or procedures of the Depository, such Additional Notes will have a separate CUSIP number.

"Notes Liens" means the Liens securing the Notes Obligations.

"Notes Obligations" means all Obligations under or in respect of this Indenture, the Notes (including Additional Notes and PIK Interest Notes) and any Security Document.

"Notes Shares" means the number of shares of Common Stock issuable upon conversion of each Note.

"Obligations" means all obligations for principal, premium, interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any indebtedness.

"Officer" means the Chairman of the Board, the President, Chief Executive Officer, Chief Financial Officer, any Executive Vice President, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Issuer, or any direct or indirect parent of the Issuer, as applicable.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer or Treasurer of the Issuer.

"Open of Business" means 9:00 am, New York City time.

JX 125-19

"Opinion of Counsel" means a written opinion reasonably satisfactory in form and substance to the Trustee from legal counsel, who may be an employee of or counsel to the Issuer or any Guarantor, who is reasonably acceptable to the Trustee, stating the matters required by Section 13.05, if applicable, and delivered to the Trustee.

"Permitted Holders" means (i) ESL Investments, Inc. and its Affiliates, (ii) any group (as defined in Rule 13d-3 under the Exchange Act) of which ESL Investments, Inc. or an Affiliate of ESL Investments, Inc. is a member so long as ESL Investments, Inc. and its Affiliates own a majority of the Issuer's Voting Stock owned by all members of such group and (iii) to the extent a Change of Control Triggering Event has occurred and a Change of Control Offer completed, any Person whose acquisition of the Issuer's Voting Stock caused such Change of Control Triggering Event and an Affiliate of such Person.

"Permitted Liens" means the following types of Liens:

(1)    Liens existing as of the Issue Date (other than Liens securing indebtedness under the Credit Agreement);

(2)    prior to the occurrence of a Fall-Away Event, (A) Liens on the Collateral securing indebtedness (including indebtedness under the Credit Agreement) in an aggregate outstanding principal amount not to exceed an amount equal to the Borrowing Base (measured as of the end of the calendar month most recently ended prior to the date of any applicable incurrence of indebtedness) less the outstanding principal amount of Notes outstanding at such time, other than Additional Notes; *provided* that for purposes of this clause (2), Liens on Collateral securing (a) indebtedness under the Credit Agreement in a principal amount not to exceed $2.45 billion shall be deemed to be Permitted Liens and (b) indebtedness under any other revolving credit facility shall be deemed to be Permitted Liens; *provided*, in the case of this clause (b), on the date firm commitments under such revolving credit facility are received by the Issuer and its Restricted Subsidiaries, indebtedness secured by Liens on the Collateral in the full amount of all firm commitments under each then existing revolving credit facility secured by Liens on the Collateral in reliance on this clause (2) (including commitments then outstanding under the Credit Agreement, if any) could have been incurred under this clause (2) had the full amount of such firm commitments been funded on such date; and (B) Liens on the Collateral securing Junior Second Lien Obligations;

(3)    Liens securing the Notes and the Guarantees issued on the Issue Date (and any registered exchange notes and related guarantees issued in exchange therefore) and any Obligations with respect to the Notes and Guarantees, including interest paid-in-kind thereon in accordance with the terms of the Indenture;

(4)    Liens of the Issuer or a Subsidiary of the Issuer on assets of any Subsidiary of the Issuer;

(5)    Liens for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to

-13-

**JX 125-20**

which the Issuer or its Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

(6)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, maritime and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(7)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return of money bonds and other similar obligations or to secure or which results from required payments or deposits in connection with litigation (in each case, exclusive of obligations for the payment of borrowed money);

(8)    judgment Liens so long as such Lien is adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceedings may be initiated shall not have expired;

(9)    easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Issuer or any of its Subsidiaries;

(10)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(11)    Liens securing reimbursement obligations with respect to commercial letters of credit that encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(12)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer or any of its Subsidiaries, including rights of offset and set-off;

(13)    Liens securing indebtedness incurred to finance the purchase price or cost of construction of fixed or capital assets (or additions, substantial repairs, alterations or substantial improvements thereto) or of Equity Interests in a third party, *provided* that (x) such Liens and the indebtedness secured thereby are incurred within twelve months of the later of acquisition or completion of construction (or addition, repair, alteration or improvement) and full operation thereof and (y) such Liens extend only to the assets the acquisition, construction, repair, replacement or improvement of which is financed

-14-

**JX 125-21**

thereby or, in the case of an acquisition of Equity Interests in a third party that becomes a Subsidiary as a result of such acquisition, the assets owned by such third party;

(14)   Liens on the assets, property or Capital Stock of a Person at the time such Person becomes a Restricted Subsidiary; *provided*, that such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary; *provided*, *further*, that such Liens do not extend to any property owned by the Issuer or any other Restricted Subsidiary;

(15)   Liens on assets or property existing at the time the Issuer or a Restricted Subsidiary acquired such assets or property, including by means of merger, amalgamation or consolidation with or into the Issuer or a Restricted Subsidiary; *provided* that such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary; *provided*, *further*, that such Liens do not extend to any other property owned by the Issuer or any Restricted Subsidiary;

(16)   Liens to secure obligations in respect of Cash Management Services and Bank Products (each as defined in the Credit Agreement);

(17)   from and after the occurrence of a Fall-Away Event, other Liens on property owned by the Issuer or any of its Subsidiaries securing indebtedness having an aggregate principal amount not to exceed, as of any date of incurrence of such secured indebtedness pursuant to this clause and after giving effect to such incurrence and the application of the proceeds therefrom, 15% of the Issuer's Consolidated Net Tangible Assets as of the last day of the most recent fiscal quarter for which financial statements have been delivered pursuant to Section 4.02; and

(18)   Liens on the Collateral in favor of the Collateral Agent and the Trustee relating to the Collateral Agent's and Trustee's administrative fees and expenses with respect to the Collateral, the Indenture and the Security Documents.

"<u>Person</u>" means any individual, partnership, corporation, limited liability company, joint stock company, business trust, trust, unincorporated association, joint venture or other entity, or a government or political subdivision or agency thereof.

"<u>Physical Notes</u>" means certificated Notes in registered form that are not registered in the name of the Depository or its nominee in substantially the form set forth in <u>Exhibit A</u>.

"<u>Primary Treasury Dealer</u>" has the meaning provided in the definition of "Reference Treasury Dealers."

"<u>Private Placement Legend</u>" means the legend initially set forth on Notes that are Restricted Notes in the form set forth in <u>Exhibit B</u>.

"<u>Pro Rata Repurchase</u>" means any purchase of shares of Common Stock by the Issuer pursuant to any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or any other offer available to substantially all

JX 125-22

holders of Common Stock.  The "Effective Date" of a Pro Rata Repurchase shall mean the date of acceptance of shares for purchase or exchange by the Issuer under any tender or exchange offer which is a Pro Rata Repurchase or the date of purchase with respect to any Pro Rata Repurchase that is not a tender or exchange offer.

"Qualified Institutional Buyer" or "QIB" shall have the meaning specified in Rule 144A promulgated under the Securities Act.

"Rating Agencies" means (1) each of Fitch, Moody's and S&P; and (2) if Fitch, Moody's or S&P ceases to rate the Notes or fails to make a rating of the Notes publicly available, at the sole option of the Issuer, a "nationally recognized statistical rating organization" as defined in Section 3 of the Exchange Act, selected by the Issuer (as certified by a resolution of the Board of Directors of the Issuer) as a replacement agency for Fitch, Moody's or S&P, or any of them, as the case may be.

"Ratings Event" means that the rating on the Notes is lowered by at least two of the three Rating Agencies and the Notes are rated below an Investment Grade Rating by at least two of the three Rating Agencies (it being understood that for purposes of this definition if fewer than three Rating Agencies maintain ratings of the Notes at the time of a Change of Control, the Notes will be deemed for purposes of this definition to have been downgraded in connection with such Change of Control (prior to any actual downgrades) by a number of Rating Agencies equal to the excess of 3 over the number of Rating Agencies that maintain ratings of the Notes at such time), on any day during the period (which period will be extended so long as the rating of the Notes is under publicly announced consideration for a possible downgrade by any of the Rating Agencies) commencing 60 days prior to the first public notice of the occurrence of a Change of Control or the Issuer's intention to effect a Change of Control and ending 60 days following consummation of such Change of Control.

"Record Date" means, with respect to any Interest Payment Date, the date fixed for determining Holders of record entitled to interest on such Interest Payment Date.

"Redemption Date" when used with respect to any Note to be redeemed means the date fixed for such redemption pursuant to the terms of the Notes.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Issuer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Issuer by such Reference Treasury Dealer at 5:00 p.m. on the third Business Day preceding such Redemption Date.

"Reference Treasury Dealers" means (1) Banc of America Securities LLC and its successors; *provided*, *however*, that if any of the foregoing shall cease to be a primary Government Securities dealer (a "Primary Treasury Dealer"), the Issuer shall substitute another nationally recognized investment banking firm that is a Primary Treasury Dealer, and (2) two other Primary Treasury Dealers selected by the Issuer.

"Regulation S" means Regulation S promulgated under the Securities Act.

**JX 125-23**

"Regulation S-X" means Regulation S-X promulgated under the Securities Act.

"Responsible Officer" when used with respect to the Trustee, means an officer or assistant officer assigned to the Corporate Trust Services department of the Trustee (or any successor group of the Trustee) with direct responsibility for the administration of this Indenture or the Security Documents and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"Restricted Note" has the same meaning as "Restricted Security" set forth in Rule 144(a)(3) promulgated under the Securities Act; *provided* that the Trustee shall be entitled to request and conclusively rely upon an Opinion of Counsel with respect to whether any Note is a Restricted Note.

"Restricted Subsidiary" means each Domestic Subsidiary of the Issuer other than Orchard Supply Hardware Stores Corporation and its Subsidiaries.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144 Certification" means a certification by a Holder to the Issuer, in such form as prescribed by the Trustee, that (i) such Holder is not, and has not been during the preceding three (3) months, an executive officer, director or Affiliate of the Issuer and (ii) a period of at least twelve (12) months has passed since the Notes were acquired from the Issuer or a director, officer or "Affiliate," (within the meaning of Rule 144(a)(1) under the Securities Act), of the Issuer, as such period is computed in accordance with paragraph (d) of Rule 144 under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Scheduled Trading Day" means a day that is scheduled to be a Trading Day on the principal U.S. national or regional securities exchange or market on which the Common Stock is listed or admitted for trading.  If the Common Stock is not listed or admitted for trading, "Scheduled Trading Day" means a Business Day.

"Second Lien Credit Facilities" means all obligations of any kind, including in respect of the term loan and the line of credit facility, under the Second Lien Credit Agreement, dated as of September 1, 2016, among the Issuer, the subsidiaries of the Issuer from time to time party thereto, the lenders from time to time party thereto and JPP, LLC, as administrative agent and collateral administrator, and any related documents (including, without limitation, any guarantee agreements and security documents), in each case as such agreements have been or may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, replaced or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available borrowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such

**JX 125-24**

agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Second Lien Obligations" means any Senior Second Lien Obligations and/or Junior Second Lien Obligations, as the case may be.

"Second Lien Term Loan" means the $300 million term loan due 2020 outstanding on the Issue Date made pursuant to the Second Lien Credit Facilities.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Security Agreement" means the amended and restated security agreement, dated as of March 20, 2018, among the Collateral Agent, the other agents from time to time party thereto, the Issuer and the Grantors from time to time party thereto (as amended, supplemented or otherwise modified from time to time), which the Trustee has joined as representative on behalf of the Holders of the Notes.

"Security Documents" means the Security Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral to the Collateral Agent for the benefit of the Holders of the Notes and the Trustee.

"Senior Second Lien Obligations" means the Notes Obligations and any indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Guarantor (including the Second Lien Credit Facilities) that is secured by a Lien on the Collateral ranking equally and ratably with the Liens securing the Notes Obligations (or by the same Liens that secure the Notes Obligations), that is entitled to distributions on such Lien on an equal and ratable basis with the Notes Obligations pursuant to the Security Documents or otherwise and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; *provided* that the representative of such Senior Second Lien Obligations executes a joinder agreement or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent, providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) of the Collateral Agent, the Trustee and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed to the Trustee and each other trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to each trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to the Issuer.  At the Issuer's option (as certified to the Trustee and the Collateral Agent pursuant to an Officer's Certificate), any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be Senior Second Lien Obligations.

JX 125-25

"<u>Senior Secured Notes</u>" means the 6 5/8% Senior Secured Notes due 2018 of the Issuer issued pursuant to the indenture, dated as of October 12, 2010, by and among the Issuer, the Guarantors from time to time party thereto and Wilmington Trust, National Association, as successor trustee and collateral agent (as amended, supplemented or otherwise modified from time to time).

"<u>Senior Unsecured Notes</u>" means the 8% Senior Unsecured Notes due 2019 of the Issuer issued pursuant to the indenture, dated as of November 21, 2014, between the Issuer and Computershare Trust Company, N.A., as trustee (as amended, supplemented or otherwise modified from time to time).

"<u>Senior Unsecured Convertible Notes</u>" means the 8% Senior Unsecured Convertible PIK Toggle Notes due 2019 of the Issuer issued pursuant to the indenture, dated as of March 20, 2018, between the Issuer and Computershare Trust Company, N.A., as trustee (as amended, supplemented or otherwise modified from time to time).

"<u>Specified Subsidiary</u>" means any wholly-owned Restricted Subsidiary with Credit Card Accounts Receivable (as defined in the Security Agreement and for purposes of such definition, substituting the words "Domestic Subsidiary" for "Guarantor" in each instance where such term is used) and Inventory (as defined in the Security Agreement) the combined book value of which exceeds $100.0 million and that has incurred indebtedness for money borrowed in excess of $100.0 million.

"<u>Subsidiary</u>" means a corporation, a majority of the outstanding Voting Stock of which is owned, directly or indirectly, by the Issuer or by one or more other Subsidiaries, or by the Issuer and one or more other Subsidiaries.

"<u>Trading Day</u>" means a Scheduled Trading Day on which (i) there is no Market Disruption Event, and (ii) trading in the Common Stock generally occurs on The NASDAQ Global Select Market or, if the Common Stock is not then listed on The NASDAQ Global Select Market, on the principal other U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then traded.  If the Common Stock is not so listed or traded, "Trading Day" means a "Business Day."

"<u>Treasury Rate</u>" means, with respect to any Redemption Date, the rate per annum, as determined by the Issuer, equal to the semi-annual equivalent yield to a maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"<u>Trust Indenture Act</u>" or "<u>TIA</u>" means the Trust Indenture Act of 1939, as amended.

"<u>Trustee</u>" has the meaning provided in the preamble hereof until a successor replaces it in accordance with the applicable provisions of this Indenture, and thereafter means the successor serving hereunder.

JX 125-26

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"Voting Stock" means, with respect to any specified Person as of any date, the Capital Stock of such Person that is at the time entitled to vote generally in the election of the board of directors or comparable governing body of such Person.

SECTION 1.02.   Other Definitions.

The definitions of the following terms may be found in the sections indicated as follows:

| Term | Defined in Section |
| --- | --- |
| "Agent Members" | 2.16(a) |
| "Authentication Order" | 2.01 |
| "Business Day" | 13.07 |
| "Change of Control Payment" | 4.07(a) |
| "Collateral Coverage Event Payment" | 4.08(a) |
| "Conversion Agent" | 2.04 |
| "Conversion Date" | 12.02(a) |
| "Conversion Notice" | 12.02(a) |
| "Covenant Defeasance" | 9.03(a) |
| "Event of Default" | 6.01 |
| "Global Notes" | 2.16(a) |
| "Global Accredited Investor Notes" | 2.16(a) |
| "Legal Defeasance" | 9.02(a) |
| "Legal Holiday" | 13.07 |
| "Mandatory Conversion" | 12.08(a) |
| "Mandatory Conversion Date" | 12.08(b) |
| "Mandatory Conversion Notice" | 12.08(b) |
| "Mandatory Conversion Notice Date" | 12.08(b) |
| "Mandatory Conversion Trigger Period" | 12.08(a) |
| "Paying Agent" | 2.04 |
| "PIK Interest" | 4.01 |
| "PIK Interest Note" | 2.03 |
| "PIK Notice" | 4.01 |
| "PIK Payment" | 2.03 |
| "Registrar" | 2.04 |
| "Regulation S Global Notes" | 2.16(a) |
| "Regulation S Notes" | 2.02 |
| "Restricted Period" | 2.16(f) |
| "Sale and Leaseback Transaction" | 4.05(a) |

JX 125-27

| Term | Defined in Section |
|------|--------------------|
| "Settlement Amount" ........................................................ | 12.03(a) |
| "Unrestricted Global Accredited Investor Notes" ............. | 2.16(a) |

SECTION 1.03.    Incorporation by Reference of Trust Indenture Act.

Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA, whenever this Indenture refers to a provision of the TIA, the portion of such provision required to be incorporated herein in order for this Indenture to be qualified under the TIA is incorporated by reference in and made a part of this Indenture.  The Issuer shall provide written notice to the Trustee promptly upon the requirement that this Indenture be qualified under the TIA.  The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes and the Guarantees.

"indenture securityholder" means a Holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor on the indenture securities" means the Issuer, the Guarantors or any other obligor on the Notes.

All other terms used in this Indenture that are defined by the TIA, defined in the TIA by reference to another statute or defined by Commission rule have the meanings therein assigned to them.

SECTION 1.04.    Rules of Construction.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it herein, whether defined expressly or by reference;

(2)    "or" is not exclusive;

(3)    words in the singular include the plural, and in the plural include the singular;

(4)    words used herein implying any gender shall apply to both genders;

(5)    "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or Subsection;

(6)    unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial

**JX 125-28**

statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(7)    "$," "U.S. Dollars" and "United States Dollars" each refer to United States dollars, or such other money of the United States that at the time of payment is legal tender for payment of public and private debts;

(8)    the words "including," "includes" and similar words shall be deemed to be followed by "without limitation"; and

(9)    references to sections of or rules under the Securities Act, the Exchange Act and the TIA shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time.

ARTICLE TWO

THE NOTES

SECTION 2.01.    Amount of Notes.

The Trustee shall (a) upon the receipt of a written order of the Issuer signed by an Officer of the Issuer (an "Authentication Order"), any applicable Notes duly executed by the Issuer, and any applicable notation of Guarantee to be endorsed thereon duly executed by each Guarantor, authenticate (i) Notes for original issue on the Issue Date in the aggregate principal amount not to exceed $169,824,000, (ii) Additional Notes in an unlimited principal amount, to the extent permitted by Section 4.04 and (iii) PIK Interest Notes that may be issued under this Indenture and (b) upon the receipt of an Authentication Order, increase the principal amount of any Global Note as a result of a PIK Payment in the amount set forth in the applicable PIK Notice; provided that the aggregate principal amount of Notes outstanding under this Indenture shall be limited to the sum of (x) $310,000,000 and (y) the aggregate amount of PIK Payments made pursuant to this Indenture.  The Authentication Order shall specify the amount of Notes to be authenticated or increased, the date on which the Notes are to be authenticated or increased, and the names and delivery instructions for each Holder of the Notes (with respect to authentication).  Furthermore, Notes may be authenticated or delivered upon registration or transfer, or in lieu of, other Notes pursuant to Section 2.07, Section 2.08, Section 2.11, Section 3.06 or Section 8.05 or in connection with a Change of Control Offer pursuant to Section 4.07 or Collateral Coverage Offer pursuant to Section 4.08.  The Trustee shall be entitled to receive an Opinion of Counsel of the Issuer and the Guarantors in connection with any authentication of Notes on the Issue Date, the authentication of any Additional Notes and the authentication of any PIK Interest Notes that this Indenture constitutes a valid and legally binding obligation of the Issuer and the Guarantors and that such Notes, when duly authorized and executed by the Issuer and duly authenticated by the Trustee in the manner provided in this Indenture and delivered against payment of the purchase price therefor, will constitute valid and binding obligations of the Issuer, and that the Guarantees, when duly authorized and executed by the Guarantors, will constitute valid and binding obligations of such Guarantors, enforceable in accordance with their terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws relating to or affecting the rights or remedies of creditors

JX 125-29

generally, (ii) the application of general principles of equity, and (iii) applicable law and public policy with respect to rights to indemnity and contribution.

Upon receipt of an Authentication Order, the Trustee shall authenticate Notes in substitution for Notes originally issued to reflect any name change of the Issuer. Any Additional Notes and any PIK Interest Notes shall be part of the same issue as the Notes being issued on the Issue Date and will vote on all matters as one class with the Notes being issued on the Issue Date, including, without limitation, waivers, amendments, redemptions and offers to purchase. For the purposes of this Indenture, references to the Notes include Additional Notes and PIK Interest Notes, if any.

The principal of, premium, if any, and interest, if any, on the Notes shall be payable at the office or agency of the Issuer maintained for such purpose pursuant to Section 2.04; *provided*, *however*, that, at the option of the Issuer, each installment of interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the registry maintained by the Registrar or (ii) wire transfer to an account located in the United States maintained by the payee. Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by the Depository.

SECTION 2.02.    Form and Dating.

The Notes and the Trustee's certificate of authentication with respect thereto shall be substantially in the form set forth in Exhibit A, which is incorporated in and forms a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rule or usage to which the Issuer is subject. Without limiting the generality of the foregoing, Notes offered and sold to Accredited Investors who have made a Rule 144 Certification shall not bear the Private Placement Legend, Notes offered and sold to Accredited Investors who have not made a Rule 144 Certification shall bear the Private Placement Legend and include the form of assignment set forth in Exhibit B, and Notes offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes") shall bear the legend and include the form of assignment set forth in Exhibit C. The Issuer shall approve the form of the Notes and any notation, legend or endorsement on them. Each Note shall be dated the date of its authentication.

The terms and provisions contained in the Notes shall constitute, and are expressly made, a part of this Indenture and, to the extent applicable, the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and agree to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes may be presented for registration of transfer and exchange at the offices of the Registrar.

SECTION 2.03.    Execution and Authentication.

At least one Officer shall sign the Notes for the Issuer by manual or facsimile signature.

JX 125-30

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Trustee by manual signature, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.  Notwithstanding the foregoing, if any Note shall have been authenticated and delivered hereunder but never issued and sold by the Issuer, and the Issuer shall deliver such Note to the Trustee for cancellation as provided in Section 2.12, for all purposes of this Indenture such Note shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the benefits of this Indenture.

The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Notes.  Unless otherwise provided in the appointment, an authenticating agent may authenticate the Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as an Agent to deal with the Issuer and Affiliates of the Issuer.  Each Paying Agent is designated as an authenticating agent for purposes of this Indenture.

The Notes shall be issuable only in registered form without coupons in denominations of $2,000 principal amount and integral multiples of $1,000 in excess thereof, subject to the issuance of PIK Interest Notes or the increase in the principal amount of a Global Note in order to evidence PIK Interest, which PIK Interest Notes or increased principal amount of a Global Note will be in denominations of $1.00 and integral multiples of $1.00 in excess thereof.  On any Interest Payment Date on which the Issuer pays PIK Interest (a "PIK Payment"), with respect to a Global Note, the Trustee, or the Depository at the direction of the Trustee, will increase the principal amount of such Global Note, effective as of the applicable Interest Payment Date, by an amount equal to the PIK Interest payable, rounded up to the nearest whole dollar, for the relevant interest period on the principal amount of such Global Note, to the credit of the Holders on the relevant Record Date and an adjustment will be made on the books and records of the Trustee with respect to such Global Note to reflect such increase.  Following an increase in the principal amount of a Global Note as a result of the payment of PIK Interest, such Global Notes will bear interest on such increased principal amount from and after the relevant Interest Payment Date.  On any Interest Payment Date on which the Issuer makes a PIK Payment by issuing definitive Notes (a "PIK Interest Note") under this Indenture having the same terms as the Notes, the principal amount of any such PIK Interest Note issued to any Holder, for the relevant interest period as of the relevant Record Date for such Interest Payment Date, will be rounded up to the nearest whole dollar.

SECTION 2.04.    Registrar, Paying Agent and Conversion Agent.

The Issuer shall maintain (i) an office or agency where Notes may be presented for registration of transfer or for exchange (the "Registrar"), (ii) an office or agency where Notes may be presented for payment (the "Paying Agent"), (iii) an office or agency where the Notes may be presented for conversion (the "Conversion Agent") and (iv) an office or agency where

-24-

JX 125-31

notices and demands to or upon the Issuer, if any, in respect of the Notes and this Indenture may be served. The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer may have one or more additional Paying Agents. The term "Paying Agent" includes any additional Paying Agent. The Issuer may remove any Registrar, Paying Agent or Conversion Agent upon written notice to such Registrar, Paying Agent, or Conversion Agent and the Trustee.

Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA, the Issuer shall enter into an appropriate agency agreement, which shall incorporate the provisions of the TIA, with any Agent that is not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such Agent. The Issuer shall notify the Trustee of the name and address of any such Agent. If the Issuer fails to maintain a Registrar, Paying Agent or Conversion Agent, or fails to give the foregoing notice, the Trustee shall act as such and shall be entitled to appropriate compensation in accordance with Section 7.01(a). The Issuer or any of its Subsidiaries may act as Paying Agent, Registrar, Conversion Agent, co-registrar or transfer agent.

The Issuer initially appoints the Trustee as Registrar, Paying Agent and Agent for service of notices and demands in connection with the Notes and this Indenture. The Issuer initially appoints Computershare Trust Company, N.A. and Computershare Inc. to act as Conversion Agent pursuant to a Voluntary Conversion Agent Agreement dated as of the date of this Indenture.

SECTION 2.05.    Paying Agent to Hold Money in Trust.

Prior to 10:00 a.m., New York City time, on each due date of the principal or interest on any Notes, the Issuer shall deposit with the Paying Agent a sum sufficient to pay such principal and interest when so becoming due. Each Paying Agent shall hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of or premium or interest on the Notes (whether such money has been paid to it by the Issuer or any other obligor on the Notes or the Guarantors), and the Issuer and the Paying Agent shall notify the Trustee of any default by the Issuer (or any other obligor on the Notes) in making any such payment. If the Issuer or a Subsidiary of the Issuer serves as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund. Money held in trust by the Paying Agent need not be segregated except as required by law and in no event shall the Paying Agent be liable for any interest on any money received by it hereunder. The Issuer at any time may require the Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed and the Trustee may at any time during the continuance of any Event of Default specified in clause (1) or (2) of Section 6.01, upon written request to the Paying Agent, require such Paying Agent to pay forthwith all money so held by it to the Trustee and to account for any funds disbursed by the Paying Agent. Upon making such payment, the Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06.    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders. If the Trustee is not the

**JX 125-32**

Registrar, the Issuer shall furnish to the Trustee at least two Business Days before each Interest Payment Date, and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

SECTION 2.07.    Transfer and Exchange.

Subject to Sections 2.16 and 2.17, when Notes are presented to the Registrar with a request from the Holder of such Notes to register a transfer or to exchange them for an equal principal amount of Notes of other authorized denominations, the Registrar shall register the transfer or exchange such notes as requested if the requirements of this Indenture are met.  Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Registrar, duly executed by the Holder thereof or its attorneys duly authorized in writing.  To permit registrations of transfers and exchanges, the Issuer shall issue and execute and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate new Notes (and the Guarantors shall execute the notation of Guarantee thereon) evidencing such transfer or exchange at the Registrar's request.  No service charge shall be made to the Holder for any registration of transfer or exchange.  The Issuer may require from the Holder payment of a sum sufficient to cover any transfer taxes or other governmental charge that may be imposed in relation to a transfer or exchange, but this provision shall not apply to any exchange pursuant to Section 2.11, 3.06, 4.07, 4.08 or 8.05 (in which events the Issuer shall be responsible for the payment of such taxes).  The Registrar shall not be required to exchange or register a transfer of any Note for a period of 15 days immediately preceding the mailing or electronic delivery of notice of redemption of Notes to be redeemed or of any Note selected, called or being called for redemption except the unredeemed portion of any Note being redeemed in part.

Any Holder of the Global Note shall, by acceptance of such Global Note, agree that transfers of the beneficial interests in such Global Note may be effected only through a book entry system maintained by the Holder of such Global Note (or its agent), and that ownership of a beneficial interest in the Global Note shall be required to be reflected in a book entry.

A beneficial interest in a Restricted Global Accredited Investor Note may be exchanged by any Holder thereof for a beneficial interest in an Unrestricted Global Accredited Investor Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Accredited Investor Note if the exchange or transfer complies with the requirements of this Section 2.07 and Section 2.17.

Each Holder of a Note agrees to indemnify the Issuer, the Guarantors and the Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Note in violation of any provision of this Indenture and/or applicable federal or state securities law.

Except as expressly provided herein, neither the Trustee nor the Registrar shall have any duty to monitor the Issuer's compliance with or have any responsibility with respect to the Issuer's compliance with any federal or state securities laws.  The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on

JX 125-33

transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Notes (including any transfers between or among the Depository's participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation, as is expressly required by, and to do so if and when expressly required by, the terms of this Indenture and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.08.    Replacement Notes.

If a mutilated Note is surrendered to the Registrar or the Trustee, or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate a replacement Note (and the Guarantors shall execute the notation of Guarantee thereon) if the Holder of such Note furnishes to the Issuer and the Trustee evidence reasonably acceptable to them of the ownership and the destruction, loss or theft of such Note and if the requirements of Section 8-405 of the UCC are met.  If required by the Trustee or the Issuer, an indemnity bond shall be posted by such Holder, sufficient in the judgment of both to protect the Issuer, the Guarantors, the Trustee and any Paying Agent from any loss that any of them may suffer if such Note is replaced.  The Issuer and the Trustee may charge such Holder for their reasonable out-of-pocket expenses in replacing such Note (including, without limitation, attorneys' fees and disbursements).  Every replacement Note shall constitute a contractual Obligation of the Issuer.

SECTION 2.09.    Outstanding Notes.

The Notes outstanding at any time are all Notes that have been authenticated by the Trustee except for (a) those cancelled by it, (b) those delivered to it for cancellation, (c) to the extent set forth in Sections 9.01 and 9.02, on or after the date on which the conditions set forth in Section 9.01 or 9.02 have been satisfied, those Notes theretofore authenticated and delivered by the Trustee hereunder and (d) those described in this Section 2.09 as not outstanding.  Subject to Section 2.10, a Note does not cease to be outstanding because the Issuer or one of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.08, it ceases to be outstanding unless the Trustee and the Issuer receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser in whose hands such Note is a legal, valid and binding obligation of the Issuer.  A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If the principal of any Note is considered paid under Section 4.01, it shall cease to be outstanding and interest thereon shall cease to accrue.  If the Paying Agent holds, on any Redemption Date or maturity date, money sufficient to pay all accrued interest and principal with respect to the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

JX 125-34

SECTION 2.10.    Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any declaration of acceleration or notice of default or direction, waiver or consent or any amendment, modification or other change to this Indenture, Notes owned by the Issuer or any Affiliate of the Issuer shall be disregarded as though they were not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent or any amendment, modification or other change to this Indenture, only Notes as to which a Responsible Officer of the Trustee has received an Officer's Certificate stating that such Notes are so owned shall be so disregarded. Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee established to the satisfaction of the Trustee the pledgee's right so to act with respect to the Notes and that the pledgee is not the Issuer, a Guarantor, any other obligor on the Notes or any of their respective Affiliates.

SECTION 2.11.    Temporary Notes.

Until definitive Notes are prepared and ready for delivery, the Issuer may prepare and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate definitive Notes in exchange for temporary Notes. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as definitive Notes.

SECTION 2.12.    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and each Paying Agent and Conversion Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange, conversion or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, conversion, payment, replacement or cancellation and shall (subject to the record-retention requirements of the Exchange Act) dispose of such cancelled Notes in its customary manner. The Trustee shall deliver a certificate of such disposal to the Issuer upon its request therefor. The Issuer may not reissue or resell, or issue new Notes to replace, Notes that the Issuer has redeemed or paid, or that have been delivered to the Trustee for cancellation.

SECTION 2.13.    Defaulted Interest.

If the Issuer defaults on a payment of interest on the Notes, it shall pay the defaulted interest, plus (to the extent permitted by law) any interest payable on the defaulted interest, in accordance with the terms hereof, to the Persons who are Holders on a subsequent special record date, which date shall be at least five Business Days prior to the payment date. The Issuer shall fix such special record date and payment date in a manner satisfactory to the Trustee. The Issuer shall promptly mail or electronically deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest, and interest payable on defaulted interest, if any, to be paid. The Issuer may make payment of any defaulted interest in any other

**JX 125-35**

lawful manner not inconsistent with the requirements (if applicable) of any securities exchange on which the Notes may be listed and, upon such notice as may be required by such exchange, if, after written notice given by the Issuer to the Trustee of the proposed payment pursuant to this sentence, such manner of payment shall be deemed practicable by the Trustee.

SECTION 2.14.    CUSIP Number.

The Issuer in issuing the Notes may use one or more "CUSIP" numbers, ISIN and "Common Code" numbers (in each case if then generally in use), and if so, such CUSIP numbers, ISIN and Common Code numbers shall be included in notices, including notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness or accuracy of such number either as printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes.  The Issuer shall promptly notify the Trustee of any such CUSIP numbers, ISIN and Common Code numbers used by the Issuer in connection with the issuance of the Notes and of any change in the CUSIP numbers, ISIN and Common Code numbers.

SECTION 2.15.    Deposit of Moneys.

Prior to 10:00 a.m., New York City time, on each Interest Payment Date, maturity date, Change of Control Payment Date and Collateral Coverage Payment Date, as the case may be, the Issuer shall have deposited with the Paying Agent in immediately available funds money sufficient to make cash payments, if any, due on such Interest Payment Date, maturity date, Change of Control Payment Date and Collateral Coverage Payment Date, as the case may be. The principal and interest on Global Notes shall be payable to the Depository or its nominee, as the case may be, as the sole registered owner and the sole holder of the Global Notes represented thereby in accordance with Applicable Procedures.  The principal and interest on Physical Notes shall be payable, either in person or by mail, at the office of the Paying Agent and further in connection with the payment of principal, upon presentment of such Physical Notes at the office of the Paying Agent.

SECTION 2.16.    Book-Entry Provisions for Global Notes.

(a)    Accredited Investor Notes initially shall be represented by one or more notes in registered, global form without interest coupons (collectively, the "Global Accredited Investor Notes").  Regulation S Notes initially shall be represented by one or more notes in registered, global form without interest coupons (collectively, the "Regulation S Global Notes," and, together with the Global Accredited Investor Notes and any other global notes representing Notes, the "Global Notes").  The Global Notes shall bear legends as set forth in Exhibit D.  The Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Depository Custodian and (iii) except for Global Accredited Investor Notes issued to, or for the account of, Accredited Investors who have each made a Rule 144 Certification ("Unrestricted Global Accredited Investor Notes"), bear the Private Placement Legend with respect to Global Accredited Investor Notes (Global Accredited Investor Notes bearing the Private Placement Legend, "Restricted Global Accredited Investor Notes") and Exhibit C with respect to Regulation S Global Notes.

JX 125-36

Members of, or direct or indirect participants in, the Depository ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Depository Custodian, or under the Global Notes, and the Depository may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)      Transfers of Global Notes shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees.  Subject to Section 2.16(e), interests of beneficial owners in the Global Notes may be transferred or exchanged for Physical Notes in accordance with the rules and procedures of the Depository and the provisions of Section 2.17. In addition, subject to Section 2.16(e), a Global Note shall be exchangeable for Physical Notes if (i) the Depository (x) notifies the Issuer that it is unwilling or unable to continue as depository for such Global Note and the Issuer thereupon fails to appoint a successor depository within 90 days thereof or (y) has ceased to be a clearing agency registered under the Exchange Act and the Issuer thereupon fails to appoint a successor depository within 90 days thereof or (ii) there shall have occurred and be continuing an Event of Default with respect to the Notes and the Depository shall have requested the issuance of Physical Notes.  In all cases, Physical Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository (in accordance with Applicable Procedures).

(c)      In connection with any transfer or exchange of a portion of the beneficial interest in any Global Note to beneficial owners pursuant to paragraph (b), the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Issuer shall execute, and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate and make available for delivery, one or more Physical Notes of like tenor and amount.

(d)      In connection with the transfer of Global Notes as an entirety to beneficial owners pursuant to paragraph (b), the Global Notes shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate and deliver, to each beneficial owner identified by the Depository in writing in exchange for its beneficial interest in the Global Notes, an equal aggregate principal amount of Physical Notes of authorized denominations.

(e)      Any Physical Note constituting a Restricted Note delivered in exchange for an interest in a Global Note pursuant to paragraph (b), shall bear the Private Placement Legend or, in the case of the Regulation S Global Note, the legend set forth in Exhibit C, in each case, unless the Issuer determines otherwise in compliance with applicable law.

(f)      On or prior to the expiration of the six-month distribution compliance period as defined in Regulation S (the "Restricted Period"), a beneficial interest in a Regulation S Global

JX 125-37

Note may be transferred to a Person who takes delivery in the form of an interest in the corresponding Regulation S Global Note only upon receipt by the Trustee of a written certification from the transferor to the effect that such transfer is being made (i)(x) to a Person whom the transferor reasonably believes is a Qualified Institutional Buyer in a transaction meeting the requirements of Rule 144A or (y) pursuant to another exemption from the registration requirements under the Securities Act which is accompanied by an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee regarding the availability of such exemption and (ii) in accordance with all applicable securities laws of any state of the United States or any other jurisdiction.  During the Restricted Period, a beneficial interest in the Regulation S Global Note may not be exchanged for a Physical Note

(g)     Beneficial interests in a Regulation S Global Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor and, if applicable pursuant to Rule 903 of Regulation S, transferee, first deliver to the Trustee a written certificate to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available).

(h)     Beneficial interests in a Global Accredited Investor Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the Trustee a written certificate to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available).

(i)     Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in another Global Note shall, upon transfer, cease to be an interest in such Global Note and become an interest in such other Global Note and, accordingly, shall thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(j)     The Holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

SECTION 2.17.     Special Transfer Provisions.

(a)     Transfers Other Than to a QIB Pursuant to Rule 144A.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Note other than pursuant to Rule 144A:

(i)     the Registrar shall register the transfer of any Note constituting a Restricted Note, whether or not such Note bears the Private Placement Legend, if (x) the requested transfer is after the date such Note shall be freely transferable under Rule 144 as certified in an Officer's Certificate, *provided* that no Officer's Certificate shall be required in respect of Notes issued to Accredited Investors who have each made a Rule 144 Certification, (y) the requested transfer is otherwise in compliance with Rule 144 as certified in an Officer's Certificate, or (z) (1) in the case of a transfer other than to a QIB

**JX 125-38**

(excluding Non-U.S. Persons) pursuant to Rule 144A, the proposed transferee has delivered to the Registrar a certificate substantially in the form of Exhibit E hereto and an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee or (2) in the case of a transfer to a Non-U.S. Person (including a QIB), the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit F hereto; *provided* that in the case of any transfer of a Note bearing the Private Placement Legend for a Note not bearing the Private Placement Legend, the Registrar has received an Officer's Certificate authorizing such transfer; and

(ii)     if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note, upon receipt by the Registrar of (x) the certificate, if any, required by paragraph (i) above and (y) instructions given in accordance with the Depository's and the Registrar's procedures,

whereupon (a) the Registrar shall reflect on its books and records the date and (if the transfer does not involve a transfer of outstanding Physical Notes) a decrease in the principal amount of a Global Note in an amount equal to the principal amount of the beneficial interest in a Global Note to be transferred, and (b) the Registrar shall reflect on its books and records the date and an increase in the principal amount of a Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note transferred or the Issuer shall execute and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate and make available for delivery one or more Physical Notes of like tenor and amount.

(b)     Transfers to QIBs pursuant to Rule 144A.  The following provisions shall apply with respect to the registration or any proposed registration of transfer of a Note constituting a Restricted Note to a QIB pursuant to Rule 144A (excluding transfers to Non-U.S. Persons):

(i)     the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on such Holder's Note stating, or has otherwise advised the Issuer and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on such Holder's Note stating, or has otherwise advised the Issuer and the Registrar in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A; and

(ii)     if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in the Global Note, upon receipt by the Registrar of instructions given in accordance with the Applicable Procedures, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Global Note in an amount

JX 125-39

equal to the principal amount of the Physical Notes to be transferred, and the Trustee shall cancel the Physical Notes so transferred.

(c)    <u>Private Placement Legend</u>.  Upon the registration of transfer, exchange or replacement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend.  Upon the registration of transfer, exchange or replacement of Notes bearing the Private Placement Legend, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (i) it has received the Officer's Certificate required by paragraph (a)(i) of this Section 2.17, (ii) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (iii) such Note has been sold pursuant to an effective registration statement under the Securities Act.

(d)    <u>General</u>.  By its acceptance of any Note bearing the Private Placement Legend, each Holder of such Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in the Private Placement Legend and agrees that it will transfer such Note only as provided in this Indenture.

The Registrar shall retain for a period of two years or as may otherwise be required by applicable law copies of all letters, notices and other written communications received pursuant to Section 2.16 or this Section 2.17.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable notice to the Registrar.

SECTION 2.18.    <u>Computation of Interest</u>.

Interest on the Notes shall be computed on the basis of a 360-day year of twelve 30-day months.

SECTION 2.19.    <u>Contingent Registration Rights</u>.  If the Issuer fails to timely file all periodic reports it is required to file pursuant to the Exchange Act, the Issuer will grant customary resale shelf registration rights to certain Holders of at least 25% of the principal amount of Notes outstanding as of the Issue Date, as specified in the following sentence, if as a result of such failure, such Holders are unable to sell their Notes pursuant to Rule 144 of the Exchange Act.  Upon receipt of a written request from any Holder of Notes representing that it holds Notes representing at least 25% of the principal amount of Notes outstanding as of the Issue Date and satisfaction of the condition set forth in the preceding sentence, the Issuer will use commercially reasonable best efforts to cause to become effective a shelf registration statement relating to resales of such Notes and to keep that shelf registration statement effective until no securities registered thereunder constitute registrable securities.  The Issuer will, in the event of such a shelf registration, provide to each Holder of Notes representing at least 25% of the principal amount of Notes outstanding as of the Issue Date copies of a prospectus, notify each such Holder when the shelf registration statement has become effective and take such other actions as necessary or appropriate to permit resales of the Notes.  A Holder of Notes that sells Notes under the shelf registration statement generally will be required to make certain representations to the Issuer to be named as a selling security holder in the related prospectus and

JX 125-40

to deliver a prospectus to purchasers, and will be subject to certain of the civil liability provisions under the Securities Act, in connection with those sales.  Holders of Notes will also be required to suspend their use of the prospectus included in the shelf registration statement under specified circumstances upon receipt of notice from the Issuer.

ARTICLE THREE

REDEMPTION AND PREPAYMENT

SECTION 3.01.    Election to Redeem; Notices to Trustee.

If the Issuer elects to redeem Notes pursuant to Section 3.07, at least 30 days prior to the Redemption Date (unless a shorter notice shall be agreed to in writing by the Trustee) but not more than 60 days before the Redemption Date, except that any such notice to the Trustee may be given to the Trustee more than 60 days prior to a Redemption Date if the notice is issued in connection with a Legal Defeasance or a satisfaction or discharge of this Indenture pursuant to Section 9.01, the Issuer shall notify the Trustee in writing of the Redemption Date, the principal amount of Notes to be redeemed and the redemption price, and deliver to the Trustee an Officer's Certificate stating that such redemption will comply with the conditions contained in Section 3.07.  Notice given to the Trustee pursuant to this Section 3.01 may not be revoked after the time that notice is given to Holders pursuant to Section 3.03.  If the redemption price is not known at the time such notice is to be given, the actual redemption price, calculated as described in the terms of the Notes, will be set forth in an Officer's Certificate of the Issuer delivered to the Trustee no later than two Business Days prior to the Redemption Date.

SECTION 3.02.    Selection by Trustee of Notes to Be Redeemed.

In the event that less than all of the Notes are to be redeemed pursuant to a redemption made pursuant to Section 3.07, selection of the Notes for redemption shall be made on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate in accordance with Applicable Procedures; *provided*, *however*, that no Notes of a principal amount of $2,000 or less shall be redeemed in part.  The Trustee shall promptly notify the Issuer of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount thereof to be redeemed.  The Trustee may select for redemption portions of the principal of the Notes that have denominations larger than $2,000 in whole multiples of $1,000 in excess thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof).  For all purposes of this Indenture unless the context otherwise requires, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.  The Issuer may acquire Notes by means other than redemption, whether pursuant to an Issuer tender offer, open market purchase or otherwise; *provided* that such acquisition does not otherwise violate the other terms of this Indenture.

SECTION 3.03.    Notice of Redemption.

At least 30 days, and no more than 60 days, before a Redemption Date, the Issuer shall mail by first-class mail or electronically deliver, or cause to be mailed by first-class mail or electronically delivered, a notice of redemption to each Holder of Notes to be redeemed at its last

-34-

**JX 125-41**

address as the same appears on the registry books maintained by the Registrar pursuant to Section 2.04, except that redemption notices may be mailed or electronically delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of this Indenture.

The notice shall identify the Notes to be redeemed (including the CUSIP numbers, ISIN and Common Code numbers, if any thereof) and shall state:

> (1)     the Redemption Date;

> (2)     the redemption price and the amount of premium, if any, or manner of computation if not then known, and accrued interest to be paid;

> (3)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date and upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued;

> (4)     the name and address of the Paying Agent;

> (5)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

> (6)     that unless the Issuer defaults in making the redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

> (7)     the provision of Section 3.07, as the case may be, pursuant to which the Notes called for redemption are being redeemed; and

> (8)     the aggregate principal amount of Notes that are being redeemed.

At the Issuer's request, the Trustee shall forward the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Trustee has received notice of such request at least 45 days prior to such Redemption Date unless a shorter time is agreed to by the Trustee. In such event, the Issuer shall provide the Trustee with the information required by this Section 3.03.

SECTION 3.04.    Effect of Notice of Redemption.

Once the notice of redemption described in Section 3.03 is mailed or electronically delivered, Notes called for redemption become due and payable on the Redemption Date and at the redemption price, including any premium, plus interest accrued to the Redemption Date. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price, including any premium, plus interest accrued to the Redemption Date; *provided* that if the Redemption Date is after a regular Record Date and on or prior to the Interest Payment Date, the accrued interest shall be payable to the Holder of the redeemed Notes registered on the relevant Record Date, and *provided*, *further*, that if a Redemption Date is a Legal Holiday, payment shall be made on the next succeeding Business Day with the same force and effect as if made on such

JX 125-42

Redemption Date and no interest shall accrue for the period from such Redemption Date to such succeeding Business Day. Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.05.    Deposit of Redemption Price.

Prior to any Redemption Date, the Issuer shall deposit with the Paying Agent in immediately available funds money sufficient to pay the redemption price of (including premium, if any) and accrued and unpaid interest to, but not including, the Redemption Date on all outstanding Notes to be redeemed on that Redemption Date.

On and after any Redemption Date, if money sufficient to pay the redemption price of, including premium, if any, and accrued interest on Notes called for redemption shall have been made available in accordance with the preceding paragraph, the Notes called for redemption will cease to accrue interest and the only right of the Holders of such Notes will be to receive payment of the redemption price of and, subject to the first proviso in Section 3.04, accrued and unpaid interest on such Notes to the Redemption Date. If any Note surrendered for redemption shall not be so paid, interest will be paid, from the Redemption Date until such redemption payment is made, on the unpaid principal of the Note and (to the extent permitted by applicable law) any interest not paid on such unpaid principal, in each case, at the rate and in the manner provided in the Notes.

SECTION 3.06.    Notes Redeemed in Part.

Upon surrender of a Note that is redeemed in part, the Issuer shall execute and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate for the Holder thereof a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

SECTION 3.07.    Optional Redemption.

At any time and from time to time the Issuer may redeem the Notes in whole or in part, at its option, at a redemption price equal to the greater of (1) 100% of the principal amount of the Notes to be redeemed and (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon (excluding interest accrued through the Redemption Date) discounted to the Redemption Date at the Treasury Rate, plus 50 basis points, plus accrued interest thereon to the Redemption Date.

Unless the Issuer defaults in payment of the redemption price, on and after the Redemption Date, interest will cease to accrue on the Notes or portions thereof called for redemption.

SECTION 3.08.    Mandatory Redemption.

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

JX 125-43

# ARTICLE FOUR

## COVENANTS

SECTION 4.01.    Payment of Notes.

The Issuer shall pay the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes and this Indenture.  An installment of principal or cash interest shall be considered paid on the date it is due if the Trustee or Paying Agent holds as of 10:00 a.m., New York City time, on that date money designated for and sufficient to pay such installment.

Interest payable on the Interest Payment Date of April 15, 2018 will be paid entirely in PIK Interest.  In the event that the Issuer determines to pay PIK Interest for any other interest period, then the Issuer will deliver a notice (a "PIK Notice") to the Trustee no later than five (5) Business Days prior to the Record Date with respect to the applicable Interest Payment Date, which notice will state the total amount of interest to be paid on the Interest Payment Date and the amount of such interest to be paid as PIK Interest.  The Trustee, on behalf of the Issuer, will promptly deliver a corresponding notice provided by the Issuer to the Holders.  PIK Interest will be considered paid on the date due if on such date the Trustee has received (i) with respect to any Global Notes, an Authentication Order to increase the balance of such Global Notes to reflect such PIK Interest and (ii) with respect to any Definitive Notes, PIK Interest Notes duly executed by the Issuer and any applicable notations of guarantee to be endorsed thereon duly executed by each Guarantor together with an Authentication Order requesting the authentication of such PIK Interest Notes by the Trustee.  In connection with the payment of PIK Interest in respect of the Notes, the Issuer will, without the consent of Holders (and without regard to any restrictions or limitations set forth under this Article Four), increase the outstanding principal amount of the Global Notes, if any, and issue PIK Interest Notes under this Indenture with respect to any Definitive Notes, if any.

Interest will be payable, at the election of the Issuer, in whole or, to the extent consistent with the procedures of the Depository, in part (i) as cash interest and/or (ii) by increasing the principal amount of the outstanding Global Notes, if any, and by issuing PIK Interest Notes with respect to the Definitive Notes, if any ("PIK Interest").  If the Issuer fails to timely make an election with respect to payment of interest on any Interest Payment Date (other than the Interest Payment Date of April 15, 2018), then interest shall be payable on such date in the same form as paid with respect to the immediately preceding Interest Payment Date; provided, that the Issuer shall provide an Authentication Order to the Trustee in accordance with the preceding paragraph on each Interest Payment Date on which the Issuer will pay PIK Interest whether or not the Issuer makes an election to pay PIK Interest with respect to such Interest Payment Date.

The Issuer shall pay interest on overdue principal (including post-petition interest in a proceeding under any Bankruptcy Law), and overdue interest, to the extent lawful, in cash at the rate specified in the Notes.

**JX 125-44**

SECTION 4.02.    Reports to Holders.

(a)    Whether or not required by the rules and regulations of the Commission, so long as any Notes are outstanding, the Issuer shall file with the Commission (unless the Commission will not accept such filings) and furnish to the Trustee and Holders all quarterly and annual financial information (including a Management's Discussion and Analysis of Financial Condition and Results of Operations) that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Notes were registered under the Exchange Act and on or prior to the dates on which such filings with the Commission would be required to be made.  Notwithstanding the foregoing, such reports shall not be required to include any financial information required by Rule 3-10 of Regulation S-X.

(b)    The Issuer shall deliver to the Trustee a Collateral Coverage Certificate together with each delivery of quarterly or annual financial information required by Section 4.02(a).

(c)    The Issuer shall, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise furnishing such information pursuant to Rule 12g3-2(b) of the Exchange Act, furnish to Holders and to prospective investors, upon their request, the information required to be delivered pursuant to clause (d)(4) of Rule 144A.

(d)    Notwithstanding the foregoing, if the Issuer is exempt from the requirements of Section 13 or 15(d) of the Exchange Act under Rule 12h-5 of the Exchange Act, the Issuer shall not be required to file such reports and documents with the Commission under Section 13 or 15(d) of the Exchange Act (or any successor provisions thereto) or provide such annual reports and such information, documents and other reports to the Trustee and Holders so long as (i) a direct parent entity that guarantees the Notes files such annual reports and such information, documents and other reports with the Commission, (ii) such parent entity, the Issuer and each Guarantor are in compliance with the requirements set forth in Rule 3-10 of Regulation S-X under the Exchange Act and (iii) the Issuer provides the Trustee and Holders with such annual reports and such information, documents and other reports filed by such parent entity.

(e)    Notwithstanding the foregoing, the Issuer shall be deemed to have furnished the reports referred to in Section 4.02(a) to the Trustee and to Holders if the Issuer has filed such reports with the Commission via the EDGAR filing system and such reports are publicly available.

(f)    Delivery of reports, information and documents to the Trustee hereunder is for informational purposes only and the Trustee's receipt of any such reports, information and documents shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates or statements delivered to the Trustee pursuant to Section 4.03).

(g)    To the extent applicable, the Issuer shall comply with TIA § 314(a) (it being understood that shall not be applicable at any time at which this Indenture is not required pursuant to the TIA to be qualified under the TIA).

JX 125-45

SECTION 4.03.    Compliance Certificate.

The Issuer shall deliver to the Trustee, within 120 days after the end of each fiscal year, a written statement that need not comply with Section 13.05 signed by its principal executive officer, principal accounting officer or principal financial officer, stating that:

(a)    a review of the activities of the Issuer during such year with regard to its compliance with this Indenture has been made under such officer's supervision; and

(b)    to the best of such officer's knowledge, based on such review, the Issuer has fulfilled all its obligations under this Indenture throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof, all without regard to grace periods or notice requirements.

SECTION 4.04.    Limitations on Liens.

The Issuer shall not, and shall not cause or permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens (other than Permitted Liens) of any kind against or upon (i) prior to the occurrence of a Fall-Away Event, the Collateral or any proceeds thereof and (ii) from and after the occurrence of a Fall-Away Event, any property or assets of the Issuer or any of its Restricted Subsidiaries or any proceeds thereof, in each case, to secure indebtedness for borrowed money and whether such assets are owned on the Issue Date or acquired after the Issue Date.

SECTION 4.05.    Limitation on Sale and Leaseback Transactions.

(a)    The Issuer shall not, and shall not permit any Restricted Subsidiary to, enter into any arrangement with any Person providing for the sale by the Issuer or any Restricted Subsidiary of any property more than 180 days following the Issuer's or such Restricted Subsidiary's acquisition of such property, with the intention of taking back a lease of such property (a "Sale and Leaseback Transaction") unless the terms of such sale or transfer have been determined by the Issuer's Board of Directors to be fair and arm's-length and either:

(i)    within 12 months after the receipt of the proceeds of the sale or transfer, the Issuer or any of its Subsidiaries applies an amount equal to the net proceeds of the sale or transfer to the prepayment or retirement of indebtedness (other than any indebtedness that is subordinated to the Notes); or

(ii)    the Issuer or such Restricted Subsidiary would be entitled, at the effective date of the sale or transfer, to incur indebtedness secured by a Lien on such property (and such Attributable Debt shall be deemed to be secured by a Lien on such property) in an amount at least equal to the Attributable Debt in respect of the Sale and Leaseback Transaction pursuant to Section 4.04.

(b)    Clause (a) of this Section 4.05 will not apply to any Sale and Leaseback Transaction (i) for a term of not more than three years including renewals; or (ii) between the

**JX 125-46**

Issuer and a Subsidiary or between Subsidiaries, *provided* that the lessor is the Issuer or a wholly owned Subsidiary of the Issuer.

SECTION 4.06.    Additional Guarantees.

If, any of the Domestic Subsidiaries of the Issuer becomes a Specified Subsidiary, then the Issuer shall cause such Specified Subsidiary (unless such Specified Subsidiary is already a Guarantor) to:

(a)    execute and deliver to the Trustee a supplemental indenture pursuant to which such Specified Subsidiary shall unconditionally guarantee all of the Issuer's obligations under the Notes and this Indenture and, unless a Fall-Away Event has occurred, enter into joinders to the Security Documents to grant the Collateral Agent a Lien on the assets of such Subsidiary constituting Collateral; and

(b)    deliver to the Trustee one or more Opinions of Counsel that, subject to customary qualifications, such supplemental indenture and guarantee (i) have been duly authorized, executed and delivered by such Subsidiary and (ii) constitute valid and legally binding obligations of such Subsidiary, enforceable in accordance with their terms.

SECTION 4.07.    Change of Control Offer.

(a)    If a Change of Control Triggering Event occurs with respect to the Notes, unless the Issuer has exercised its right to redeem the Notes pursuant to Section 3.07, the Issuer shall commence a Change of Control Offer no later than 30 days following any Change of Control Triggering Event (or at the Issuer's option, prior to any Change of Control, but after the public announcement of the Change of Control).  In the Change of Control Offer, the Issuer shall offer payment in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest, if any, on the Notes repurchased, to the date of purchase (the "Change of Control Payment").

(b)    On the Change of Control Payment Date, the Issuer shall, to the extent lawful: (i) accept for payment all Notes or portions of Notes validly tendered pursuant to the Change of Control Offer; (ii) deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes validly tendered; and (iii) deliver or cause to be delivered to the Trustee for cancellation the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased.

(c)    The Issuer shall not be required to make a Change of Control Offer upon the occurrence of a Change of Control Triggering Event if a third party makes such an offer in the manner, at the times and otherwise in compliance with the requirements for an offer made by the Issuer and the third party repurchases all Notes validly tendered and not withdrawn under its offer.

(d)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change

**JX 125-47**

of Control Triggering Event.  To the extent that the provisions of any securities laws or regulations conflict with this Section 4.07, the Issuer shall comply with the applicable securities laws and regulations and will not be deemed to have breached the Issuer's obligations under this Section 4.07 by virtue of such conflicts.

SECTION 4.08.    Collateral Coverage Offer.

(a)    If prior to the occurrence of a Fall-Away Event, a Collateral Coverage Event occurs, unless the Issuer has exercised its option to redeem such Notes, the Issuer shall make a Collateral Coverage Offer no later than 30 days following any Collateral Coverage Event.  In a Collateral Coverage Offer, the Issuer shall offer payment in cash equal to 101% of the aggregate principal amount of Notes repurchased, plus accrued and unpaid interest, if any, on the Notes repurchased to the date of repurchase (a "Collateral Coverage Event Payment").

(b)    On the Collateral Coverage Payment Date, the Issuer shall, to the extent lawful:

(i)    accept for payment all Notes or portions of Notes properly tendered pursuant to the Collateral Coverage Offer; *provided* that in the event the aggregate principal amount of Notes validly tendered for purchase in the Collateral Coverage Offer exceeds the Collateral Coverage Required Amount for such Collateral Coverage Offer, the Issuer will, subject to the applicable procedures of the Depository, accept for payment only the Collateral Coverage Required Amount of Notes on a *pro rata* basis from Holders who have validly tendered their Notes in such Collateral Coverage Offer (subject to rounding such that all remaining Notes are in a minimum principal amount of $2,000 and in whole multiples of $1,000 in excess thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof));

(ii)    deposit with the Paying Agent an amount equal to the Collateral Coverage Event Payment in respect of all Notes or portions of Notes required to be accepted for payment as provided hereunder; and

(iii)    deliver or cause to be delivered to the Trustee for cancellation the Notes accepted for purchase together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased.

(c)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act, and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Collateral Coverage Event.  To the extent that the provisions of any such securities laws or regulations conflict with this Section 4.08, the Issuer shall comply with those securities laws and regulations and will not be deemed to have breached the Issuer's obligations under this Section 4.08 by virtue of any such conflict.

SECTION 4.09.    Calculations.

Issuer will be responsible for making calculations called for under the Notes, including but not limited to determination of redemption price, premium, if any, and other amounts payable on the Notes, if any.  The Issuer will make the calculations in good faith and, absent

JX 125-48

manifest error, its calculations will be final and binding on the Holders of the Notes. The Issuer will provide a schedule of its calculations to the Trustee when applicable, and the Trustee is entitled to rely conclusively on the accuracy of the Issuer's calculations without independent verification.

SECTION 4.10.    Interest Payments on Other Indebtedness.

If the Issuer elects to pay interest, in whole or in part, on the Notes in the form of PIK Interest, the Issuer shall thereafter also pay (or cause to be paid) not less than (i) a corresponding pro rata portion of the interest due with respect to the Second Lien Term Loan and (ii) all interest due with respect to the Senior Unsecured Convertible Notes in kind, in each case to the fullest extent permitted under the documentation governing such indebtedness, until such time as the Issuer elects to resume paying interest on the Notes in cash in full.

SECTION 4.11.    Subsequent Exchanges of Senior Secured Notes, Senior Unsecured Notes.

(a)    The Issuer will not, and will not cause or permit its Restricted Subsidiaries to, consummate any exchange offer for any of the Senior Secured Notes with newly issued indebtedness secured by Liens on the Collateral with a contractual ranking senior to the Liens securing the Notes.

(b)    The Issuer will not issue any indebtedness that is convertible into shares of Common Stock where (1) such indebtedness is issued in an exchange offer for any of the Senior Secured Notes or any of the Senior Unsecured Notes, and (2) the conversion rate with respect to such newly issued indebtedness is more than the Conversion Rate then in effect (after giving effect to any adjustments set forth herein) unless (subject to any requisite approval of the Issuer's shareholders under the NASDAQ's listing rules) the Conversion Rate is adjusted to be the same as the conversion rate with respect to such indebtedness.

ARTICLE FIVE

SUCCESSOR CORPORATION

SECTION 5.01.    Limitations on Mergers and Sales of Assets.

The Issuer shall not consolidate with or merge into another Person, or sell other than for cash or lease all or substantially all of the Issuer's assets to another Person, unless:

(a)    either the Issuer is the continuing Person or the successor Person (if other than the Issuer) expressly assumes by supplemental indenture the obligations of the Issuer under this Indenture and the Notes;

(b)    immediately after the merger, consolidation, sale or lease, no Default shall have occurred and be continuing; and

(c)    if the Issuer is not the continuing Person or the successor Person, the Issuer or the continuing Person or the successor Person shall deliver, or cause to be delivered, to the Trustee,

JX 125-49

an Officer's Certificate and an Opinion of Counsel, each stating that such transaction or series of transactions and the supplemental indenture with respect thereto comply with this Indenture and that such supplemental indenture constitutes the legal, valid and binding obligation of the continuing Person or the successor Person (subject to customary exceptions).

SECTION 5.02.   Successor Person Substituted.

Upon any consolidation or merger, or any transfer of all or substantially all of the properties or assets of the Issuer in accordance with Section 5.01, the successor Person formed by such consolidation or into which the Issuer is merged or to which such transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture and the Notes with the same effect as if such successor entity had been named as the Issuer herein and therein, and thereafter the predecessor Person shall be relieved of all obligations and covenants under this Indenture and the Notes, but, in the case of a lease of all or substantially all its assets, the predecessor will not be released from the obligation to pay the principal of and interest on the Notes.

ARTICLE SIX

DEFAULTS AND REMEDIES

SECTION 6.01.   Events of Default.

Each of the following is an "Event of Default":

(1)   the failure of the Issuer to pay any installment of interest on any Note, when and as the same shall become due and payable, which failure shall have continued unremedied for a period of 30 days;

(2)   the failure of the Issuer to pay the principal or premium, if any, on any Note, when and as the same shall become due and payable, whether at maturity as therein expressed, by call for redemption, by declaration as authorized by this Indenture or otherwise;

(3)   the failure of the Issuer to observe and perform any other of the covenants or agreements on the part of the Issuer contained in this Indenture (including any indenture supplemental hereto), which failure shall not have been remedied, or without provision for the remedying thereof having been made, for a period of 60 days after the written notice specified below shall have been given;

(4)   the entry by a court having jurisdiction in the premises of a decree or order for relief in respect of the Issuer in an involuntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Issuer or for substantially all of its property, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 90 consecutive days;

**JX 125-50**

(5)      the commencement by the Issuer of a voluntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or similar official) of the Issuer or for substantially all of its property, or the making by it of an assignment for the benefit of creditors; or

(6)      any Lien purported to be created by any Security Document on Collateral with a book value in excess of $100.0 million shall cease to be a valid and enforceable Lien except in accordance with the Security Documents, which failure shall not have been remedied, or without provision for the remedying thereof having been made, for a period of 30 days after the written notice specified below shall have been given.

A Default with respect to Notes under clauses (3) and (6) of this Section 6.01 shall not be an Event of Default until the Trustee (by notice to the Issuer) or the Holders of at least 25% in aggregate principal amount of the outstanding Notes (by notice to the Issuer and the Trustee) gives written notice of the Default to the Issuer and the Issuer does not cure such Default within the time specified in clause (3) or (6) above, as applicable, after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."

SECTION 6.02.    Acceleration.

If an Event of Default (other than an Event of Default specified in clause (4) or (5) of Section 6.01), shall have occurred and be continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes to be due and payable by notice in writing to the Issuer and the Trustee specifying the respective Event of Default and that it is a "notice of acceleration," and the same shall become immediately due and payable.

If an Event of Default specified in clause (4) or (5) of Section 6.01 occurs, then all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

SECTION 6.03.    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of, or premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture and may take any necessary action requested of it as Trustee to settle, compromise, adjust or otherwise conclude any proceedings to which it is a party.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any

JX 125-51

Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

SECTION 6.04.    <u>Waiver or Rescission of Past Defaults and Events of Default</u>.

(1)    At any time after a declaration of acceleration with respect to the Notes as described in Section 6.02, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may rescind and cancel such declaration and its consequences:

(a)    if the rescission would not conflict with any judgment or decree;

(b)    if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of the acceleration;

(c)    to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid in cash;

(d)    if the Issuer has paid the Trustee its reasonable compensation, reimbursed the Trustee for its expenses, disbursements and advances and paid any other amounts due the Trustee under Section 7.01(a); and

(e)    in the event of the cure or waiver of an Event of Default of the type described in clause (4) or (5) of Section 6.01, the Trustee shall have received an Officer's Certificate and an Opinion of Counsel that such Event of Default has been cured or waived.

No such rescission shall affect any subsequent Default or impair any right consequent thereto.

(2)    The Holders of a majority in aggregate principal amount of the Notes issued and then outstanding under this Indenture may waive any existing Default or Event of Default under this Indenture, and its consequences, except (a) a Default described in clause (1) or (2) of Section 6.01 and (b) in respect of a covenant or provision in this Indenture that cannot be modified or amended without the consent of each Holder of an outstanding Note affected thereby.

SECTION 6.05.    <u>Control by Majority</u>.

Subject to the other provisions of this Indenture and applicable law, the Holders of a majority in aggregate principal amount of the Notes then outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee by this Indenture.  The Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or that is unduly prejudicial to the rights of another Holder not taking part in such direction (it being understood the Trustee shall have no obligation to determine whether any such actions or forebearances are

JX 125-52

unduly prejudicial to such other Holders), and the Trustee shall have the right to decline to follow any such direction if the Trustee, being advised by counsel, determines that the action so directed may not lawfully be taken or if the Trustee in good faith shall, by a Responsible Officer, determine that the proceedings so directed may result in costs and expenses of the Trustee for which it has no source of payment or recovery or involve it in personal liability to which it does not have indemnity satisfactory to it; *provided* that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

SECTION 6.06.    <u>Limitation on Suits</u>.

No Holder of any Note shall have any right to institute an action, suit or proceeding at law or in equity with respect to this Indenture, or for the execution of any trust hereunder or for the appointment of a receiver or for any other remedy hereunder, in each case with respect to an Event of Default with respect to such Notes, unless (1) such Holder previously shall have given to the Trustee written notice of the occurrence of one or more Events of Default with respect to such Notes; (2) the Holders of at least 25% in aggregate principal amount of the outstanding Notes shall have requested the Trustee in writing to take action in respect of such Event of Default in its own name as Trustee; and (3) such Holder or Holders have offered to the Trustee security and indemnity satisfactory to the Trustee against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee, for 60 days after receipt of such notification, request and offer of security and indemnity, shall have failed to institute any such action, suit or proceeding and no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the outstanding Notes, and such notification, request and offer of security and indemnity are hereby declared in every such case to be conditions precedent to any such action, suit or proceeding by any Holder of any Note, it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by its or their action to enforce any right hereunder, except in the manner herein provided, and that every action, suit or proceeding at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of the outstanding Notes; *provided*, *however*, that nothing contained in this Indenture or in the Notes shall affect or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of (and premium, if any) and (subject to Section 2.13) interest on the Notes to the respective Holders of such Notes at the stated maturity expressed in such Notes, or affect or impair the right, which is also absolute and unconditional, of such Holders to institute suit to enforce any such payment.

SECTION 6.07.    <u>No Personal Liability of Directors, Officers, Employees and Stockholders</u>.

No direct or indirect parent, and no past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Issuer, any Subsidiary or any direct or indirect parent (other than the Guarantors pursuant to the Guarantees), as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Indenture or any Guarantee, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. This waiver and release are part of the consideration for issuance of the Notes and the Guarantees. This waiver may not be effective to waive liabilities under the securities laws.

JX 125-53

SECTION 6.08.    <u>Rights of Holders to Receive Payment</u>.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal of, or premium, if any, and interest of the Note on or after the respective due dates expressed in the Note, or to bring suit for the enforcement of any such payment on or after such respective dates shall not be impaired or affected without the consent of the Holder.

SECTION 6.09.    <u>Collection Suit by Trustee</u>.

If an Event of Default in payment of principal, premium or interest specified in clause (1) or (2) of Section 6.01 occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any Guarantor (or any other obligor on the Notes) for the whole amount of unpaid principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case in cash and at the rate set forth in the Notes.

SECTION 6.10.    <u>Trustee May File Proofs of Claim</u>.

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Issuer or any Guarantor (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same after deduction of its charges and expenses to the extent that any such charges and expenses are not paid out of the estate in any such proceedings and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.01(a).  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.01(a) hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that may be distributable in respect of the Issuer's or Guarantors' obligations under this Indenture or that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan or reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceedings.  The Trustee may, unless prohibited by applicable law, vote for the election of a trustee in bankruptcy or similar person and shall be entitled to participate as a member of any official committee of creditors in the matter as it deems necessary or advisable.

**JX 125-54**

SECTION 6.11.    <u>Priorities</u>.

Subject to the terms of the Intercreditor Agreement and the Security Documents, if the Trustee collects any money or property pursuant to this Article Six or from the Collateral Agent pursuant to any Security Document, it shall pay out the money or property in the following order:

First:  to the Collateral Agent for amounts due in accordance with the terms of the Security Documents;

Second:  to the Trustee for all amounts due to the Trustee under Section 7.01(a);

Third:  to Holders for interest accrued on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest;

Fourth:  to Holders for principal amounts due and unpaid on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal; and

Fifth:  to the Issuer or, if applicable, the Guarantors, as their respective interests may appear.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.11.

SECTION 6.12.    <u>Undertaking for Costs</u>.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.12 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.08 or a suit by Holders of more than 10% in principal amount of the Notes then outstanding.

SECTION 6.13.    <u>Restoration of Rights and Remedies</u>.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every case, subject to any determination in such proceeding, the Issuer, the Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

JX 125-55

SECTION 6.14.    Appointment and Authorization of Wilmington Trust, National Association as Collateral Agent.

(a)    Wilmington Trust, National Association is hereby designated and appointed as the Collateral Agent of the Holders and the Trustee under the Security Documents, and is authorized as the Collateral Agent for such Holders and the Trustee to execute and enter into each of the Security Documents and all other instruments relating to the Security Documents and (i) to take action and exercise such powers as are expressly required or permitted hereunder and under the Security Documents and all instruments relating hereto and thereto and (ii) to exercise such powers and perform such duties as are in each case, expressly delegated to the Collateral Agent by the terms hereof and thereof together with such other powers as are reasonably incidental hereto and thereto.  The Collateral Agent is an express third party beneficiary of the provisions of this Indenture relating to the rights, powers, trusts, immunities, duties and obligations of the Collateral Agent.

(b)    Notwithstanding any provision to the contrary elsewhere in this Indenture or the Security Documents, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein or therein or any fiduciary relationship with any Holder, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or any Security Document or otherwise exist against the Collateral Agent.

(c)    The Collateral Agent may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder or under the Security Documents in good faith and in accordance with the advice or opinion of such counsel.

ARTICLE SEVEN

TRUSTEE

SECTION 7.01.    Acceptance of Trusts upon Specified Conditions.

The Trustee accepts the trusts created by this Indenture upon the terms and conditions hereof, including the following, to all of which the parties hereto and the Holders from time to time of the Notes agree:

(a)    Trustee Entitled to Compensation and Expenses.  The Trustee shall be entitled to such compensation as is agreed upon in writing for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust).  Each of the Issuer and the Guarantors agrees to pay such compensation, and all reasonable expenses (including the fees and expenses of Trustee's counsel and experts), disbursements and advances incurred or made by the Trustee hereunder and under any Security Documents to which the Trustee is a party, promptly on demand from time to time as such services shall be rendered and as such expenses shall be incurred.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Trustee and any predecessor trustee hereunder for, and to hold it or them harmless against, any loss, liability,

**JX 125-56**

claim, damage or expense incurred without its or their own negligence, bad faith or willful misconduct on its or their part, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder and the performance of its or their duties, as well as the costs and expenses of defending itself or themselves against any claim (whether asserted by the Issuer, a Holder or any other Person) or liability in connection with the exercise or performance of any of its or their powers or duties hereunder or under any Security Documents to which the Trustee is a party.  As security for the performance of the obligations of the Issuer and the Guarantors under this subsection (a), the Trustee shall have a lien therefor on any moneys or property held or collected by the Trustee hereunder prior to any rights therein of the Holders.  When the Trustee incurs expenses or renders services in connection with an Event of Default specified in clause (4) or (5) of Section 6.01, the expenses (including the reasonable charges and expenses of its counsel and experts) and the compensation for the services are intended to constitute expenses of administration under any applicable Bankruptcy Law.  Notwithstanding any provisions of this Indenture to the contrary, the obligations of the Issuer and the Guarantors to indemnify the Trustee under this Section 7.01(a) shall survive any satisfaction and discharge under Article Nine, the termination of this Indenture or the resignation or removal of the Trustee.

(b)    Trustee May Act by Agents and Attorneys.  The Trustee may execute any of the trusts or powers hereof and perform any duty hereunder either directly or by its agents and attorneys and shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(c)    Trustee Not Responsible for Recitals of Fact.  The Trustee shall not be responsible in any manner whatsoever for the correctness of the recitals contained herein or in the Notes (except its certificates of authentication thereon) or the Guarantees, all of which are made by the Issuer solely; and the Trustee shall not be responsible or accountable in any manner whatsoever for or with respect to the validity or execution or sufficiency of this Indenture or of the Notes (except its certificates of authentication thereon) or the Guarantees, and the Trustee makes no representation with respect thereto.  The Trustee shall not be accountable for the use or application by the Issuer of any Notes, or the proceeds of any Notes.  Neither the Trustee nor the Collateral Agent shall be responsible for or make any representation as to the existence, genuineness, value or protection of any Collateral, for the legality, effectiveness or sufficiency of any Security Document, or for the creation, perfection, priority, sufficiency or protection of any Notes Liens.  Neither the Trustee nor the Collateral Agent shall be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Lien or security interest in the Collateral.

(d)    Trustee May Consult With Counsel.  The Trustee may consult with counsel of its selection and, to the extent permitted by Section 7.02, the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered to be taken or omitted by the Trustee hereunder in good faith and in reliance on such advice or Opinion of Counsel.

(e)    Trustee May Rely Upon Certificate as to Adoption of Resolutions; Requests May Be Evidenced by Officer's Certificate.  The Trustee, to the extent permitted by Section 7.02, may

JX 125-57

conclusively rely upon the certificate of the secretary or one of the assistant secretaries of the Issuer as to the adoption of any resolution by the Board of Directors or stockholders of the Issuer, and any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by, and whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, offering or omitting any action hereunder, the Trustee may conclusively rely upon an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed).

(f)    <u>Trustee May Become Owner or Pledgee of Notes</u>.  The Trustee or any agent of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and, subject to Sections 7.06 and 7.09, may otherwise deal with the Issuer with the same rights it would have had if it were not a Trustee or such agent.

(g)    <u>Segregation of Funds</u>.  Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing with the Issuer.

(h)    <u>Action at Request of or with Consent of Holder Binding on Future Holders</u>.  Any action taken by the Trustee pursuant to any provision hereof at the request or with the consent of any Person who at the time is the Holder of Notes shall be conclusive and binding in respect of any such Notes upon all future Holders thereof or of any Notes or other securities that may be issued for or in lieu thereof in whole or in part, whether or not such Note shall have noted thereon the fact that such request or consent had been made or given.

(i)    <u>Trustee May Rely on Instruments Believed by It to Be Genuine</u>.  Subject to the provisions of Section 7.02, the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper party or parties.

(j)    <u>Trustee Need Not Exercise Rights or Powers Unless Indemnified by Holders</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be under any obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any Holders, pursuant to any provision of this Indenture or any Security Document, unless one or more Holders shall have offered security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(k)    <u>Trustee Not Liable for Action Taken or Omitted in Good Faith</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within its discretion or within the rights or powers conferred upon it by this Indenture.

(l)    <u>Trustee Not Bound to Make Investigation</u>.  Subject to the provisions of the first paragraph of Section 7.02, the Trustee shall not be bound to make any investigation into the facts

JX 125-58

or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document.

(m)    Trustee Not Deemed to Have Knowledge of Default.  The Trustee shall not be deemed to have knowledge or notice of any Default or Event of Default unless a Responsible Officer of the Trustee has received written notice thereof, which notice shall refer to this Indenture and be a "notice of default" or "notice of event of default."

(n)    Limitation on Liability.  In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(o)    Agents Protected.  The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated, reimbursed and indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

SECTION 7.02.    Duties of Trustee.

(a)    If one or more Events of Default shall have happened, then, during the continuance thereof, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set out in this Indenture or any Security Document to which the Trustee is a party, and no implied covenants or obligations shall be read into this Indenture or any Security Document against the Trustee, whose duties and obligations shall be determined solely by the express provisions of this Indenture, and

(ii)    the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of the Trustee, upon certificates and opinions furnished to it pursuant to the express provisions of this Indenture; but in the case of any such certificates or opinions which, by the provisions of this Indenture, are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(c)    None of the provisions of this Indenture shall be construed as relieving the Trustee from liability for its own negligent action, its own negligent failure to act, its own bad faith or its own willful misconduct, except that:

(i)    This subsection (c) shall not be construed to limit the effect of subsection (b) of this Section.

JX 125-59

(ii)    The Trustee shall not be liable to any Holder or to any other Person for error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(iii)    The Trustee shall not be liable to any Holder or to any other Person with respect to any action taken or omitted to be taken by it in good faith, in accordance with the direction of Holders given as provided in Section 6.05, relating to the time, method and place of conducting any proceeding for any remedy available to it, or any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority of the Notes outstanding concerning the exercise of any trust or power conferred upon it by this Indenture.

(iv)    None of the provisions of this Indenture shall be construed as requiring the Trustee to expend or risk its own funds or otherwise to incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or remedies, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.02.

SECTION 7.03.    Notice to Holders of Defaults.

Within 90 days after the occurrence thereof, the Trustee shall give to the Holders of the Notes notice of each Default known to the Trustee, unless such Default shall have been cured or waived before the giving of such notice; but, unless such Default be the failure to pay the principal of (or premium, if any) or interest on any of the Notes when and as the same shall become due and payable, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Notes.

SECTION 7.04.    Resignation and Removal of Trustee and Notice Thereof.

The Trustee, or any successor to it hereafter appointed, may at any time resign and be discharged of the trusts hereby created with respect to the Notes by giving to the Issuer notice in writing and by mailing or electronically delivering notice thereof to the Holders of the Notes. Such resignation shall take effect upon the appointment of a successor Trustee by the Issuer and the acceptance of such appointment by such successor Trustee.  Any Trustee hereunder may be removed with respect to the Notes at any time by the Holders of a majority in aggregate principal amount of the outstanding Notes.

Upon its resignation or removal, any Trustee shall be entitled to the payment of reasonable compensation for the services rendered hereunder by such Trustee and to the payment of all reasonable expenses incurred hereunder and all moneys then due to it hereunder.  The Trustee's rights to compensation, reimbursement and indemnification provided in Section 7.01(a) shall survive its resignation or removal.

JX 125-60

SECTION 7.05.    Qualifications of Trustee.

There shall at all times be a Trustee under this Indenture, and such Trustee shall at all times be a Person organized and doing business under the laws of the United States or of any state thereof, which is authorized under such laws to exercise corporate trust powers and is subject to supervision or examination by federal or state authority and which has a combined capital and surplus, together with its immediate parent, of not less than $25,000,000.  For the purposes of this Section 7.05, the combined capital and surplus of any such Trustee shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published by such Trustee; *provided* that such reports are published at least annually, pursuant to law or to the requirements of a federal or state supervising or examining authority.  If such Trustee or any successor shall at any time cease to have the qualifications prescribed in this Section 7.05, it shall promptly resign as Trustee hereunder.

SECTION 7.06.    Disqualification of Trustee by Reason of Conflicting Interest.

Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA, if the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture.

SECTION 7.07.    Appointment of Successor Trustee.

In case at any time the Trustee shall resign, or shall be removed, or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver of the Trustee or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee or of its property of affairs for the purpose of rehabilitation, conservation or liquidation with respect to the Notes, the Issuer shall promptly appoint a successor Trustee.  If a successor Trustee does not take office within 30 days after the retiring Trustee resigns, is removed, becomes incapable of acting, is adjudged a bankrupt of insolvent or is taken charge or control of as described in the preceding sentence, a successor Trustee may be appointed by the Holders of a majority in aggregate principal amount of the outstanding Notes, by an instrument or instruments in writing signed in duplicate by such Holders and filed, one original thereof with the Issuer and the other with the successor Trustee; but, until a successor Trustee shall have been so appointed by the Holders of Notes as herein authorized, the Issuer, or, in case all or substantially all the assets of the Issuer shall be in the possession of one or more Custodians or receivers lawfully appointed, or of trustees in bankruptcy or reorganization proceedings (including a trustee or trustees appointed under the provisions of the Federal bankruptcy laws, as now or hereafter constituted), or of assignees for the benefit of creditors, such receivers, Custodians, trustees or assignees, as the case may be, by an instrument in writing, shall appoint a successor Trustee with respect to the Notes.  Subject to the provisions of Sections 7.04, 7.05 and 7.06, upon the appointment as aforesaid of a successor Trustee with respect to the Notes, the Trustee with respect of the Notes shall cease to be Trustee hereunder.  After any such appointment (other than by the Holders of Notes) the Person making such appointment shall forthwith cause notice thereof to be mailed or electronically delivered to the Holders of Notes at their addresses as the same shall then appear on the registry of the Notes maintained by the Registrar pursuant to

JX 125-61

Section 2.04; but any successor Trustee so appointed shall immediately and without further act be superseded by a successor Trustee appointed by the Holders of Notes in the manner above prescribed, if such appointment be made prior to the expiration of one year from the date of the mailing or electronic delivery of such notice by the Issuer, or by such receivers, trustees or assignees.

If any Trustee shall resign and a successor Trustee shall not have been appointed by the Issuer or by the Holders of the Notes or, if any successor Trustee so appointed shall not have accepted its appointment within 30 days after such appointment shall have been made, the resigning Trustee may apply at the expense of the Issuer to any court of competent jurisdiction for the appointment of a successor Trustee.  Such court may thereupon, in any such case, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor Trustee and to the Issuer, or to the receivers, trustees, assignees or court appointing it, as the case may be, an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations of such predecessor Trustee with like effect as if originally named as Trustee hereunder, and such predecessor Trustee, upon payment of its charges, disbursements and other amounts then unpaid, shall thereupon become obligated to pay over, and such successor Trustee shall be entitled to receive, all moneys and properties held by such predecessor Trustee as Trustee hereunder.  Nevertheless, on the written request of the Issuer or of the successor Trustee or of the Holders of at least 10% in aggregate principal amount of the outstanding Notes, such predecessor Trustee, upon payment of its said charges, disbursements and other amounts, shall execute and deliver an instrument transferring to such successor Trustee upon the trusts herein expressed all the rights, powers and trusts of such predecessor Trustee and shall assign, transfer and deliver to the successor Trustee all moneys and properties held by such predecessor Trustee; and, upon request of any such successor Trustee, the Issuer shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Trustee all such authority, rights, powers, trusts, immunities, duties and obligations.

SECTION 7.08.    Merger, Conversion or Consolidation of Trustee or Transfer of Its Corporate Trust Business; Authentication of Notes by Successor Trustee.

Any Person into which the Trustee or any successor to it in the trusts created by this Indenture shall be merged or converted, or any Person with which it or any successor to it shall be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee or any such successor to it shall be a party, or any Person to which the Trustee or any successor to it shall sell or otherwise transfer all or substantially all of the corporate trust business of the Trustee, shall be the successor Trustee under this Indenture, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture with respect to the Notes, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name

JX 125-62

of any predecessor Trustee hereunder or in the name of the successor Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.09.    Trustee Required to Account for Amounts Collected as Creditor of the Issuer under Certain Conditions.

Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the Trust Indenture Act, if and when the Trustee shall be or become a creditor of the Issuer (or any other obligor upon the Notes), the Trustee shall be subject to the provisions of the Trust Indenture Act regarding the collection of claims against the Issuer (or any such other obligor).

SECTION 7.10.    Trustee May Rely on Officer's Certificate.

Subject to Section 7.02, and subject to the provisions of Section 13.04 with respect to the certificates required thereby, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence, bad faith or willful misconduct on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate with respect thereto delivered to the Trustee, and such Officer's Certificate, in the absence of negligence, willful misconduct or willful misconduct on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered to be taken or omitted by it under the provisions of this Indenture upon the faith thereof.

SECTION 7.11.    Reports by Trustee.

(a)    Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the Trust Indenture Act, the Trustee shall transmit to Holders such reports concerning the Trustee and its actions under this Indenture as may be required pursuant to the Trust Indenture Act at the times and in the manner provided pursuant thereto.  Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the Trust Indenture Act, if required by Section 313(a) of the Trust Indenture Act, the Trustee shall, within sixty days after each May 15 following the date of this Indenture, deliver to Holders a brief report, dated as of such May 15, which complies with the provisions of such Section 313(a).

(b)    A copy of each such report shall, at the time of such transmission to Holders, be filed by the Trustee with each stock exchange, if any, upon which the Notes are listed, with the Commission and with the Issuer.  The Issuer will promptly notify the Trustee when the Notes are listed on any stock exchange and of any delisting thereof.

SECTION 7.12.    Collateral Agent.

The rights, privileges, protections, immunities and benefits given to the Trustee on its own behalf (and not on behalf of the Holders), including, without limitation, its right to be compensated, reimbursed and indemnified, are extended to, and shall be enforceable by, the Collateral Agent as if the Collateral Agent were named as the Trustee herein and the Security Documents were named as this Indenture herein.

JX 125-63

# ARTICLE EIGHT

## AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 8.01.    <u>Without Consent of Holders</u>.

The Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) may amend, waive or supplement this Indenture, the Notes and the Security Documents, without prior notice to or consent of any Holder:

(1)      to issue Additional Notes and PIK Interest Notes under this Indenture;

(2)      to cure any ambiguity, omission, defect or inconsistency;

(3)      to provide for the assumption by a successor of the obligations of the Issuer under this Indenture and the Notes, or provide for the assumption by a successor of the obligations of a Guarantor under this Indenture, in each case, to the extent otherwise permitted under this Indenture;

(4)      to comply with requirements of the Commission in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(5)      to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

(6)      to add additional Guarantees of the Notes or additional assets as Collateral;

(7)      to release a Guarantor as provided in Section 10.04;

(8)      to allow for the addition of Additional First Lien Obligations and additional Second Lien Obligations under the Security Documents (including by way of entry into an additional Intercreditor Agreement) to the extent not prohibited by this Indenture (including, in the case of Second Lien Obligations that are not secured by the Security Agreement, to enter into conforming modifications to the Intercreditor Agreement or one or more additional intercreditor agreements with any collateral agent for the holders of such obligations providing that the Liens of the Collateral Agent and such other collateral agent on any Collateral shall be pari passu or, to the extent applicable, that the Liens of the Collateral Agent shall be senior to such other collateral agent on any Collateral) and that amounts received in connection with an enforcement of the Liens under the Security Documents or the Liens securing any other Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Second Lien Obligations, be distributed to the Trustee and the agent(s) for the holders of Second Lien Obligations in accordance with the terms of the Security Documents;

**JX 125-64**

(9)    to release Guarantees and/or Collateral as otherwise permitted in this Indenture and the Security Documents;

(10)    to evidence and provide for the acceptance of appointment by a successor trustee and/or a successor collateral agent and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one trustee;

(11)    to provide for uncertificated Notes in addition to, or in place of, certificated Notes; or

(12)    to add to the covenants of the Issuer or a Guarantor for the benefit of the Holders of the Notes or to surrender any right or power conferred upon the Issuer or a Guarantor.

SECTION 8.02.    <u>With Consent of Holders</u>.

(a)    This Indenture, the Notes or the Security Documents may be amended or supplemented by the Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) with the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), and any existing Default under, or compliance with any provision of each of this Indenture or the Notes may be waived (except a Default in respect of the payment of principal or interest on the Notes) with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with any purchase of, or tender offer or exchange offer for, Notes).

(b)    Without the consent of each Holder affected, an amendment, supplement or waiver of this Indenture may not:

(1)    extend the fixed maturity of the Notes,

(2)    reduce the rate or extend the time of payment of interest on the Notes,

(3)    reduce the principal amount or the premium, if any, of the Notes or reduce the amount of the principal payable on any date,

(4)    change the coin or currency in which principal of or any premium or interest on any Notes are payable, or

(5)    impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof.

(c)    Furthermore, an amendment, supplement or waiver of this Indenture may not:

**JX 125-65**

(1)     reduce the percentage of Notes, the consent of the Holders of which is required for any such modification without the consent of the Holders of all Notes then outstanding (including Notes held by Affiliates of the Issuer);

(2)     modify without the written consent of the Trustee the rights, duties or immunities of the Trustee; or

(3)     except as expressly permitted under this Indenture, (i) release all or substantially all of the Collateral from the Liens securing the Notes or (ii) release one or more Guarantors from their Guarantees (or otherwise limit the liability of one or more Guarantors with respect to their obligations under their Guarantees) if such release or limitation is in respect of substantially all of the value provided by all Guarantors under the Guarantees, in each case without the consent of Holders of at least 75% in aggregate principal amount of the outstanding Notes.

After an amendment, supplement or waiver under this Section 8.02 becomes effective, the Issuer shall mail or electronically deliver to each Holder affected thereby a notice briefly describing the amendment, supplement or waiver.

Upon the written request of the Issuer and upon the receipt by the Trustee of evidence reasonably satisfactory to the Trustee of the consent of the Holders as aforesaid and upon receipt by the Trustee of the documents described in Section 8.06, the Trustee shall join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture, in which case the Trustee may, but shall not be obligated to, enter into such amended or supplemental indenture.  It shall not be necessary for the consent of the Holders under this Section 8.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

SECTION 8.03.     Compliance with Trust Indenture Act.

Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA, every amendment or supplement to this Indenture, the Notes or the Guarantees shall comply with the TIA as then in effect.

SECTION 8.04.     Revocation and Effect of Consents.

Until an amendment, supplement, waiver or other action becomes effective, a consent to it by a Holder of a Note is a continuing consent conclusive and binding upon such Holder and every subsequent Holder of the same Note or portion thereof, and of any Note issued upon the transfer thereof or in exchange therefor or in place thereof, even if notation of the consent is not made on any such Note.  Any such Holder or subsequent Holder, however, may revoke the consent as to his Note or portion of a Note, if the Trustee receives the written notice of revocation before the date the amendment, supplement, waiver or other action becomes effective.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement, or waiver.  If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were

JX 125-66

Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

After an amendment, supplement, waiver or other action becomes effective, it shall bind every Holder.

SECTION 8.05.    <u>Notation on or Exchange of Notes</u>.

If an amendment, supplement, or waiver changes the terms of a Note, the Trustee (in accordance with the specific written direction of the Issuer) shall request the Holder of the Note (in accordance with the specific written direction of the Issuer) to deliver it to the Trustee.  In such case, the Trustee shall place an appropriate notation on the Note about the changed terms and return it to the Holder.  Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue, the Guarantors shall endorse, and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

SECTION 8.06.    <u>Trustee to Sign Amendments, Etc.</u>

The Trustee or Collateral Agent, as the case may be, shall sign any amendment, supplement or waiver authorized pursuant to this Article Eight if the amendment, supplement or waiver does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Collateral Agent, respectively.  If it does, the Trustee or the Collateral Agent, as the case may be, may, but need not, sign it.  No amendment, supplement or waiver shall affect the rights, duties, liabilities or immunities of the Trustee or the Collateral Agent without the express written consent of the Trustee or the Collateral Agent, as applicable.  In signing or refusing to sign such amendment, supplement or waiver the Trustee or the Collateral Agent, as the case may be, shall be entitled to receive and shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel each stating, in addition to the matters required by Section 13.04, that such amendment, supplement or waiver is authorized or permitted by this Indenture and all conditions precedent required hereunder to such amendment, supplement or waiver have been satisfied.

ARTICLE NINE

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 9.01.    <u>Discharge of Indenture</u>.

(a)    The Issuer may terminate its obligations and the obligations of the Guarantors under the Notes, the Guarantees and this Indenture, except the obligations referred to in the last paragraph of this Section 9.01, if

(1)    all Notes that have been authenticated (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been

**JX 125-67**

deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation, or

(2)    all Notes not delivered to the Trustee for cancellation otherwise (x) have become due and payable by reason of the mailing or electronic delivery of a notice of redemption or otherwise, (y) will become due and payable by reason of the mailing or electronic delivery of a notice of redemption or otherwise, or may be called for redemption within one year or (z) have been called for redemption pursuant to Section 3.07 and, in any case, the Issuer has irrevocably deposited or caused to be deposited with the Trustee as trust funds, in trust solely for the benefit of the Holders, cash in U.S. Dollars, Government Securities, or a combination thereof, in amounts as will be sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium, and accrued interest through the date of maturity or redemption,

(b)    the Issuer has paid or caused to be paid all sums payable by it under this Indenture,

(c)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money or proceeds from Government Securities toward the payment of the Notes at maturity or the Redemption Date, as the case may be, and

(d)    the Issuer has delivered to the Trustee and the Collateral Agent an Officer's Certificate and an Opinion of Counsel each stating that all conditions precedent in the Indenture relating to satisfaction and discharge have been complied with.

Upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes, the Guarantees and this Indenture except for those surviving obligations specified below.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Issuer in Sections 7.01(a), 9.04 and 9.05 shall survive such satisfaction and discharge.

SECTION 9.02.    Legal Defeasance.

(a)    The Issuer may at its option be discharged from its obligations with respect to the Notes and the Guarantors discharged from their obligations under the Guarantees on the date the conditions set forth in clause (b) of this Section 9.02 are satisfied (hereinafter, "Legal Defeasance"). For this purpose, such Legal Defeasance means that the Issuer shall be deemed to have paid and discharged the entire indebtedness represented by the Notes and to have satisfied all its other obligations under such Notes and this Indenture insofar as such Notes are concerned (and the Trustee, at the expense of the Issuer, shall, subject to Section 9.05, execute instruments requested by the Issuer acknowledging the same), except for the following which shall survive until otherwise terminated or discharged hereunder: (A) the rights of Holders to receive solely

**JX 125-68**

from the trust funds described in clause (b) of this Section 9.02 and as more fully set forth in Section 9.04, payments in respect of the principal of, premium and interest on such Notes when such payments are due from the trust referred to in clause (b) of this Section 9.02, (B) the Issuer's obligations hereunder with respect to such Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust, (C) the rights, powers, trusts, duties, and immunities of the Trustee hereunder (including claims of, or payments to, the Trustee under or pursuant to Section 7.01(a)), and the Issuer's obligations in connection therewith, and (D) this Article Nine.  Subject to compliance with this Article Nine, the Issuer may exercise its option under this Section 9.02 with respect to the Notes notwithstanding the prior exercise of its option under Section 9.03 with respect to the Notes.

(b)      The following shall be the conditions to the application of Section 9.02(a) to the outstanding Notes:

(i)      the Issuer shall have deposited with the Trustee, in trust, money and/or Government Securities that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay the principal of, premium, if any, and accrued interest on the Notes on the stated maturity of such payments in accordance with the terms of the Indenture and the Notes;

(ii)      the Issuer shall have delivered to the Trustee either (x) an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the exercise of the option of the Issuer under clause (a) of this Section 9.02 and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred, which Opinion of Counsel must be based upon (and accompanied by a copy of) a published ruling of the Internal Revenue Service or other change in applicable U.S. federal income tax law after the Issue Date to the same effect or (y) a ruling directed to the Trustee received from the Internal Revenue Service to the same effect as the aforementioned Opinion of Counsel;

(iii)      immediately after giving effect to such deposit on a pro forma basis, no Default or Event of Default shall have occurred and be continuing on the date of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound; and

(iv)      the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that all conditions precedent to such Legal Defeasance have been complied with.

JX 125-69

SECTION 9.03.    Covenant Defeasance.

(a)    At the option of the Issuer, (x) the Issuer and the Guarantors shall be released from their respective obligations under Sections 4.02 (except for obligations mandated by the TIA), 4.03 (except for obligations mandated by the TIA) through 4.09 and 4.11 and (y) clause (3) of Section 6.01 shall no longer apply with respect to the outstanding Notes on and after the date the conditions set forth in clause (b) of this Section 9.03 are satisfied (hereinafter, "Covenant Defeasance").  For this purpose, such Covenant Defeasance means that the Issuer and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such specified Section or portion thereof, whether directly or indirectly by reason of any reference elsewhere herein to any such specified Section or portion thereof or by reason of any reference in any such specified Section or portion thereof to any other provision herein or in any other document, but the remainder of this Indenture and the Notes shall be unaffected thereby.

(b)    The following shall be the conditions to the application of Section 9.03(a) to the outstanding Notes:

(i)    the deposit with the Trustee, in trust, of U.S. legal tender and/or Government Securities that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay the principal of, premium, if any, and accrued interest on the Notes on the scheduled maturity of such payments in accordance with the terms of this Indenture and the Notes;

(ii)    the delivery by the Issuer to the Trustee of an Opinion of Counsel to the effect that the beneficial owners of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance of certain covenants and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(iii)    immediately after giving effect to such deposit on a pro forma basis, no Default or Event of Default shall have occurred and be continuing on the date of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound; and

(iv)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that all conditions precedent to such Covenant Defeasance have been complied with.

JX 125-70

SECTION 9.04.    Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions.

All money and Government Securities (including the proceeds thereof) deposited with the Trustee pursuant to Sections 9.02(b) or 9.03(b) in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent), to the Holders of such Notes, of all sums due and to become due thereon in respect of principal, premium, if any, and accrued interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer and the Guarantors shall (on a joint and several basis) pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Government Securities deposited pursuant to Section 9.02(b) or 9.03(b) or the principal, premium, if any, and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article Nine to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time any money or Government Securities held by it as provided in Section 9.02(b) and 9.03(b) which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof which would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

SECTION 9.05.    Reinstatement.

If the Trustee or Paying Agent is unable to apply any U.S. Dollars or Government Securities in accordance with Section 9.01, 9.02 or 9.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and each Guarantor's obligations under this Indenture, the Notes and the Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to this Article Nine until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Dollars or Government Securities in accordance with Section 9.01, 9.02 or 9.03, as the case may be; *provided* that if the Issuer or the Guarantors have made any payment of principal of, premium, if any, or accrued interest on any Notes because of the reinstatement of their obligations, the Issuer or the Guarantors, as the case may be, shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Dollars or Government Securities held by the Trustee or Paying Agent.

SECTION 9.06.    Moneys Held by Paying Agent.

In connection with the satisfaction and discharge of this Indenture, all moneys then held by any Paying Agent under the provisions of this Indenture shall, upon written demand of the Issuer, be paid to the Trustee, or if sufficient moneys have been deposited pursuant to Section 9.02(b) or 9.03(b), to the Issuer (or, if such moneys had been deposited by the Guarantors, to such Guarantors), and thereupon such Paying Agent shall be released from all further liability with respect to such moneys.

JX 125-71

SECTION 9.07.   <u>Moneys Held by Trustee</u>.

Subject to applicable law, any moneys deposited with the Trustee or any Paying Agent or then held by the Issuer or the Guarantors in trust for the payment of the principal of, or premium, if any, or interest on any Note that are not applied but remain unclaimed by the Holder of such Note for two years after the date upon which the principal of, or premium, if any, or interest on such Note shall have respectively become due and payable shall be repaid to the Issuer (or, if appropriate, the Guarantors), or if such moneys are then held by the Issuer or the Guarantors in trust, such moneys shall be released from such trust; and the Holder of such Note entitled to receive such payment shall thereafter, as an unsecured general creditor, look only to the Issuer and the Guarantors for the payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money shall thereupon cease; *provided* that the Trustee or any such Paying Agent, before being required to make any such repayment, may, at the expense of the Issuer and the Guarantors, either mail or electronically deliver to each Holder affected, at the address shown in the register of the Notes maintained by the Registrar pursuant to Section 2.06, or cause to be published once a week for two successive weeks, in a newspaper published in the English language, customarily published each Business Day and of general circulation in the City of New York, New York or the United States, a notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such mailing, electronic delivery or publication, any unclaimed balance of such moneys then remaining will be repaid to the Issuer.  After payment to the Issuer or the Guarantors or the release of any money held in trust by the Issuer or any Guarantors, as the case may be, Holders entitled to the money must look only to the Issuer and the Guarantors for payment as general unsecured creditors unless applicable abandoned property law designates another Person.

ARTICLE TEN

GUARANTEE OF NOTES

SECTION 10.01.   <u>Guarantee</u>.

Subject to the provisions of this Article Ten, each Guarantor, by execution of this Indenture, jointly and severally, unconditionally guarantees to each Holder and to the Trustee and their respective successors and assigns (i) the due and punctual payment of the principal of and interest and premium, if any, on each Note, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on the overdue principal of and interest on the Notes, to the extent lawful, and the due and punctual payment of all other Obligations of the Issuer to the Holders or the Trustee all in accordance with the terms of such Note and this Indenture, and (ii) in the case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise.  Each Guarantor, by execution of this Indenture, agrees that its obligations hereunder shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of any such Note or this Indenture, any failure to enforce the provisions of any such Note or this Indenture, any waiver, modification or indulgence granted to the Issuer or any other Guarantor with respect thereto by the Holder of such Note, or any other

JX 125-72

circumstances which may otherwise constitute a legal or equitable discharge of a surety or such Guarantor.

Each Guarantor hereby waives diligence, presentment, demand for payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to any such Note or the Indebtedness evidenced thereby and all demands whatsoever, and covenants that this Guarantee will not be discharged as to any such Note except by payment in full of the principal thereof and interest thereon. Each Guarantor hereby agrees that, as between such Guarantor, on the one hand, and the Holders and the Trustee, on the other hand, (i) subject to this Article Ten, the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article Six for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Obligations as provided in Article Six, subject to any rescission thereof pursuant to Section 6.04, such Obligations (whether or not due and payable) shall forthwith become due and payable by each Guarantor for the purpose of this Guarantee.

SECTION 10.02.    Execution and Delivery of Notation of Guarantee.

To further evidence the Guarantee set forth in Section 10.01, each Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit G hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of each Guarantor. The validity and enforceability of any Guarantee shall not be affected by the fact that it is not affixed to any particular Note.

Each of the Guarantors hereby agrees that its Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

If an Officer of a Guarantor (or general partner or member thereof) whose signature is on this Indenture or a notation of Guarantee no longer holds that office at the time the Trustee authenticates the Note on which such Guarantee is endorsed or at any time thereafter, such Guarantor's Guarantee of such Note shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of any Guarantee set forth in this Indenture on behalf of the Guarantor.

SECTION 10.03.    Limitation of Guarantee.

Each Guarantor, the Trustee, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by

**JX 125-73**

or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Guarantee or pursuant to its contribution obligations under this Indenture, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law. Each Guarantor that makes a payment or distribution under a Guarantee shall be entitled to a contribution from each other Guarantor in a *pro rata* amount based on the assets of each Guarantor.

SECTION 10.04.    Release of Guarantor.

A Guarantor shall be automatically and unconditionally released from all of its obligations under its Guarantee:

(i)    in the event of a sale or other transfer of Equity Interests in such Guarantor or dissolution of such Guarantor in compliance with the terms of this Indenture following which such Guarantor ceases to be a Subsidiary;

(ii)    upon such Guarantor ceasing to be a borrower or guarantor under any Credit Agreement; or

(iii)    in connection with a discharge of this Indenture pursuant to Section 9.01 or Covenant Defeasance or Legal Defeasance.

and in each such case, the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to such transactions have been complied with and that such release is authorized and permitted hereunder.

Upon being provided the Officer's Certificate and Opinion of Counsel mentioned above, the Trustee shall execute any documents reasonably requested by the Issuer or a Guarantor in order to evidence the release of such Guarantor from its obligations under its Guarantee endorsed on the Notes and under this Article Ten.

SECTION 10.05.    Waiver of Subrogation.

Each Guarantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against the Issuer that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under its Guarantee and this Indenture, including, without limitation, any right of subrogation, reimbursement, exoneration, indemnification, and any right to participate in any claim or remedy of any Holder of Notes against the Issuer, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including, without limitation, the right to take or receive from the Issuer, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or Security on account of such claim or other rights. If any amount shall be paid to any Guarantor in violation of the preceding sentence and the Notes shall not have been paid in full, such amount shall have been deemed to have been paid to such Guarantor for the benefit of, and held in trust for the benefit of, the Holders, and shall forthwith be paid to the Trustee for the benefit of such Holders to be credited and applied upon the Notes, whether matured or unmatured, in accordance with the terms of this Indenture. Each Guarantor acknowledges that it will receive direct and indirect

JX 125-74

benefits from the financing arrangements contemplated by this Indenture and that the waiver set forth in this Section 10.05 is knowingly made in contemplation of such benefits.

## ARTICLE ELEVEN

## SECURITY

SECTION 11.01.   <u>Security Documents; Additional Collateral</u>.

(a)      <u>Security Documents</u>.  In order to secure the due and punctual payment of the Obligations outstanding under this Indenture, the Notes and the Guarantees, the Issuer, the Guarantors, the Collateral Agent and the other parties thereto have simultaneously with the execution of this Indenture entered or, in accordance with the provisions of this Article Eleven and the provisions of the Security Agreement, will enter into the Security Documents.

(b)      The Issuer shall, and shall cause each Guarantor to, and each Guarantor shall, make all filings (including filings of continuation statements and amendments to financing statements that may be necessary to continue the effectiveness of such financing statements) and take all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Guarantors) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest subject only to Permitted Liens.

(c)      <u>Additional Collateral</u>.  With respect to assets acquired after the Issue Date, the Issuer or applicable Guarantor will take the actions required by the Security Agreement.

SECTION 11.02.   <u>Recording, Registration and Opinions</u>.

Solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA, solely to the extent required to comply with TIA § 314(b), the Issuer and each of the Guarantors shall furnish to the Trustee, (a) upon or no later than 30 days following the Issue Date, an Opinion of Counsel stating that this Indenture or the Security Documents or financing statements with respect thereto, as applicable, have been properly recorded and filed so as to make the Notes Liens effective, and reciting the details of such action, and (b) at least 30 days prior to the anniversary of the Issue Date in each year an Opinion of Counsel, dated as of such date, either (i) stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording, and refiling of this Indenture or the Security Documents, as applicable, as are necessary to maintain the Notes Liens under applicable law to the extent required by the Security Documents other than any action as described therein to be taken and such opinion may refer to prior Opinions of Counsel and contain customary qualifications and exceptions and may rely on an Officer's Certificate of the Issuer or (ii) stating that, in the opinion of such counsel, no such action is necessary to maintain such Notes Liens or security interests.

JX 125-75

SECTION 11.03.   Releases of Liens on Collateral.

The Liens on the Collateral pursuant to the Security Documents shall automatically and without the need for any further action by any Person be released as to the Notes Obligations:

(a)      as to any property, or portion thereof, subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(b)      in whole, upon:

(i)      a satisfaction and discharge of this Indenture under Section 9.01 hereof; or

(ii)      a Legal Defeasance or Covenant Defeasance of this Indenture under Section 9.02 or Section 9.03, respectively;

(c)      as to any property that (i) is sold, transferred or otherwise disposed of by the Issuer or any Guarantor (other than to the Issuer or another Guarantor) in a transaction not prohibited by this Indenture at the time of such transfer or disposition or (ii) is owned or at any time acquired by a Guarantor that has been released from its Guarantee, concurrently with the release of such Guarantee;

(d)      in whole or in part, in accordance with the applicable provisions of the Intercreditor Agreement;

(e)      in whole or in part, in accordance with Section 8.01 or 8.02; and

(f)      in whole, upon the occurrence of a Fall-Away Event.

To the extent applicable, the Issuer shall comply with TIA § 314(a) and, following qualification of this Indenture under the TIA (if required), TIA § 314(d).  Any certificate or opinion required by TIA § 314(d) may be made by an Officer of the Issuer except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert appointed by the Issuer, who shall be approved by the Trustee.  For the avoidance of doubt, the requirements of this paragraph shall not be applicable to the extent that the Indenture is not required to be qualified pursuant to the TIA.

SECTION 11.04.   Form and Sufficiency of Release.

In the event that any Lien is to be released pursuant to Section 11.03, and the Issuer or such Guarantor requests the Collateral Agent to furnish a written disclaimer, release or quitclaim of any interest in such property under the Security Documents, upon receipt by the Trustee and the Collateral Agent of an Officer's Certificate and Opinion of Counsel each stating that such release complies with Section 11.03 and specifying the provision in Section 11.03 pursuant to which such release is being made (upon which the Trustee and Collateral Agent may exclusively and conclusively rely), the Collateral Agent shall execute, acknowledge and deliver to the Issuer or such Guarantor such an instrument in the form provided by the Issuer, and providing for release without recourse and shall take such other action as the Issuer or such Guarantor may reasonably request and as necessary to effect such release.

JX 125-76

SECTION 11.05.   <u>Possession and Use of Collateral</u>.

Subject to the provisions of this Indenture and the Security Documents, the Issuer and the Guarantors shall have the right to remain in possession and retain exclusive control of and to exercise all rights with respect to the Collateral, to freely operate, manage, develop, lease, use, consume and enjoy the Collateral, to alter or repair any Collateral so long as such alterations and repairs do not impair the Lien of the Security Documents thereon, and to collect, receive, use, invest and dispose of the reversions, remainders, interest, rents, lease payments, issues, profits, revenues, proceeds and other income thereof.

SECTION 11.06.   <u>Purchaser Protected</u>.

No purchaser or grantee of any property or rights purporting to be released shall be bound to ascertain the authority of the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority so long as the conditions set forth in Section 11.04 have been satisfied.

SECTION 11.07.   <u>Authorization of Actions to Be Taken by the Collateral Agent and Trustee under the Security Documents</u>.

The Holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents.  Furthermore, each Holder of a Note, by accepting such Note, agrees, acknowledges and consents to the terms (including, but not limited to, waivers, representations and covenants) of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Security Documents to which it is a party, respectively, in each of its capacities thereunder.  Without limiting the generality of the foregoing, each Holder of a Note, by accepting such Note, authorizes and directs the Trustee to execute and deliver the Security Agreement as the representative on behalf of the Holders of the Notes, including to authorize and direct the Collateral Agent to execute and deliver the Intercreditor Agreement.

SECTION 11.08.   <u>Authorization of Receipt of Funds by the Trustee under the Security Agreement</u>.

The Trustee is authorized to receive any funds for the benefit of Holders distributed under the Security Documents to the Trustee and to apply such funds as provided in Section 6.11.

SECTION 11.09.   <u>Powers Exercisable by Receiver or Collateral Agent</u>.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article Eleven upon the Issuer or any Guarantor, as applicable, with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or any Guarantor, as applicable, or of any officer or officers thereof required by the provisions of this Article Eleven.

**JX 125-77**

## ARTICLE TWELVE

## CONVERSION

SECTION 12.01.    Conversion Rights.

Subject to, and upon compliance with, the provisions of this Article Twelve, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted would result in the issuance of at least one whole share of Common Stock upon conversion) of such Note at any time at the Conversion Rate.

Notwithstanding the foregoing, except for any Person who beneficially owned more than 4.9% of the Common Stock immediately prior to the issuance of Notes on the Issue Date, to the extent that any proposed conversion of the Notes by any Holder would result in any Person beneficially owning more than 4.9% of the Common Stock, the Notes will not be convertible at the option of such Holder to such extent.

Notwithstanding the foregoing, except for any Person who directly or indirectly owned (including by virtue of relevant tax attribution rules) more than 9.9% of the vote or value of the Common Stock (as calculated for purposes of Section 871(h)(3) of the Code) immediately prior to the issuance of Notes on the Issue Date, to the extent that any proposed conversion of the Notes by any Holder would result in any non-U.S. Person directly or indirectly owning (including by virtue of relevant tax attribution rules) more than 9.9% of the vote or value of the Common Stock (as calculated for purposes of Section 871(h)(3) of the Code), the Notes will not be convertible at the option of such Holder to such extent.

SECTION 12.02.    Conversion Procedures.

(a)    General.  To exercise the conversion right with respect to a beneficial interest in a Global Note, the owner of such beneficial interest must (i) comply with the Applicable Procedures for converting a beneficial interest in a Global Note, (ii) pay the funds, if any, required by Section 12.02(f) and (iii) pay any taxes or duties if required pursuant to Section 12.02(g).

To exercise the conversion right with respect to any Definitive Note, the Holder of such Definitive Note must (i) complete and manually sign a conversion notice in the form set forth in the Form of Notice of Conversion (the "Conversion Notice") or a facsimile of the Conversion Notice; (ii) deliver such signed and completed Conversion Notice, which is irrevocable, and the definitive Note to the Conversion Agent; (iii) if required, furnish appropriate endorsements and transfer documents; (iv) if required, make any payment required under Section 12.02(f); and (v) if required, pay all transfer or similar governmental charges or duties as set forth in Section 12.02(g).

For any Note, the date on which the Holder of such Note (or Holder of a beneficial interest in a Global Note) satisfies all of the applicable requirements set forth above with respect to such Note shall be the conversion date (the "Conversion Date") with respect to such Note (or beneficial interest).

JX 125-78

(b)    Holder of Record.  Each conversion shall be deemed to have been effected as to any such Notes (or portion thereof) surrendered for conversion at the Close of Business on the applicable Conversion Date; *provided*, *however*, the Person in whose name any shares of Common Stock shall be issuable upon conversion, if any, shall be treated as a stockholder of record as of the Close of Business on the Conversion Date.  For the avoidance of doubt, until a Holder is deemed to become the holder of record of shares of Common Stock issuable upon conversion of such Holder's Notes as contemplated in the immediately preceding sentence, such Holder shall not have any rights as a holder of the Common Stock with respect to the shares of Common Stock issuable upon conversion of such Notes.  At the Close of Business on the Conversion Date for a Note, the converting Holder shall no longer be the Holder of such Note.

(c)    Endorsement.  Any Notes surrendered for conversion shall, unless shares of Common Stock issuable on conversion are to be issued in the same name as the registration of such Notes, be duly endorsed by, or be accompanied by instruments of transfer in form satisfactory to the Issuer duly executed by, the Holder or its duly authorized attorney.

(d)    Definitive Notes.  If any Definitive Notes shall be surrendered for partial conversion, the Issuer shall execute and the Trustee (upon receipt of an Authentication Order from the Issuer) shall authenticate and deliver to the Holder of the Definitive Notes so surrendered, without charge, new Definitive Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Definitive Notes.

(e)    Global Notes.  Upon the conversion of a beneficial interest in Global Notes, the Trustee shall make a notation in its records as to the reduction in the principal amount represented thereby.  The Issuer shall notify the Trustee in writing of any conversions of Notes effected through any Conversion Agent other than the Trustee.

(f)    Interest Due upon Conversion.  If a Holder converts a Note after the Close of Business on a Record Date but prior to the Open of Business on the Interest Payment Date corresponding to such Record Date, such Holder must accompany such Note with an amount of cash equal to the amount of interest that will be payable on such Note on the corresponding Interest Payment Date; *provided*, *however*, that a Holder need not make such payment (1) if the Conversion Date follows the Record Date immediately preceding the Maturity Date; (2) if the Issuer has specified a redemption date that is after a Record Date and on or prior to the Business Day immediately following the corresponding Interest Payment Date and the relevant Conversion Date occurs after such Record Date and on or prior to such Interest Payment Date; or (3) to the extent of any overdue interest, if any overdue interest exists at the time of conversion with respect to such Notes.

(g)    Taxes Due upon Conversion.  If a Holder converts a Note, the Issuer will pay any documentary, stamp or similar issue or transfer tax due on the issue of any shares of the Common Stock upon such conversion, unless the tax is due because the Holder requests that any shares be issued in a name other than the Holder's name, in which case the Holder will pay any such taxes.  The Conversion Agent may refuse to deliver the Common Stock to be issued in a name other than such Holder's name until the Conversion Agent receives a sum sufficient to pay any tax or duty which will be due because such shares are to be issued in a name other than such Holder's name.  Nothing herein shall preclude any tax withholding required by law or regulation.

JX 125-79

SECTION 12.03.   Settlement upon Conversion.

(a)   Settlement.  Subject to this Section 12.03 and Sections 12.05 and 12.07 hereof, upon conversion of any Note, the Issuer shall deliver to Holders, in full satisfaction of its conversion obligation under Section 12.01 hereof, in respect of each $1,000 principal amount of Notes being converted, a Settlement Amount.

(i)   [Reserved].

(ii)   Settlement Amount.  The shares of Common Stock in respect of any conversion of Notes (the "Settlement Amount") shall be computed as follows:  the Issuer shall deliver to the converting Holder, in respect of each $1,000 principal amount of its Notes being converted, a number of shares of Common Stock equal to the Conversion Rate, rounded down to the nearest whole share pursuant to Section 12.03(b).

(iii)   Delivery Obligation.  The Issuer shall deliver the Settlement Amount due in respect of its conversion obligation under Section 12.03 hereof, not later than the third Business Day immediately following the relevant Conversion Date.

(b)   Fractional Shares.  Notwithstanding the foregoing, the Issuer will not issue fractional shares of Common Stock as part of the Settlement Amount due with respect to any converted Note.  Instead, if any Settlement Amount includes a fraction of a share of the Common Stock, the number of shares of Common Stock issuable will be rounded down to the nearest whole share.

(c)   Conversion of Multiple Notes by a Single Holder.  If a Holder surrenders more than one Note for conversion on a single Conversion Date the Issuer will calculate the number of shares of Common Stock due with respect to such Notes as if such Holder had surrendered for conversion one Note having an aggregate principal amount equal to the sum of the principal amounts of each of the Notes surrendered for conversion by such Holder on the same Conversion Date.

(d)   Settlement of Accrued Interest and Deemed Payment of Principal.  If a Holder converts a Note, the Issuer will not adjust the Conversion Rate to account for any accrued and unpaid interest on such Note, and the Issuer's delivery or payment of shares of Common Stock into which a Note is convertible will be deemed to satisfy and discharge in full the Issuer's obligation to pay the principal of, and accrued and unpaid interest, if any, on, such Note to, but excluding, the Conversion Date; provided, however, that subject to Section 12.02(f), if a Holder converts a Note after the Close of Business on a Record Date and prior to the Open of Business on the corresponding Interest Payment Date, the Issuer will still be obligated to pay the interest due on such Interest Payment Date to the Holder of such Note on such Record Date. As a result, except as otherwise provided in the proviso to the immediately preceding sentence, any accrued and unpaid interest with respect to a converted Note will be deemed to be paid in full rather than cancelled, extinguished or forfeited.

(e)   Notices.  Whenever a Conversion Date occurs with respect to a Note, the Conversion Agent will, as promptly as possible, and in no event later than the Open of Business on the second Business Day immediately following such Conversion Date, deliver to the Issuer

**JX 125-80**

and the Trustee notice that a Conversion Date has occurred, which notice will state such Conversion Date, the principal amount of Notes converted on such Conversion Date and the names of the Holders that converted Notes on such Conversion Date.

SECTION 12.04.   <u>Common Stock Issued upon Conversion</u>.

(a)      The Issuer shall at all times reserve out of its authorized but unissued shares of Common Stock a number of shares of Common Stock sufficient to permit the conversion, in accordance herewith, of all of the then-outstanding Notes.

(b)      Any shares of Common Stock delivered upon the conversion of the Notes will be newly issued shares or treasury shares, duly and validly issued, fully paid, nonassessable, free from preemptive rights and free of any lien or adverse claim (except to the extent of any lien or adverse claim created by the action or inaction of the Holder or other Person to whom such shares of Common Stock will be delivered).  In addition, the Issuer will comply with all federal and state securities laws regulating the offer and delivery of any shares of Common Stock issuable upon conversion of the Notes. The Issuer will also cause any shares of Common Stock issuable upon conversion of a Note to be listed on whatever stock exchange(s) the Common Stock is listed on the date the converting Holder becomes a record holder of such Common Stock.

(c)      If any shares of the Common Stock issued upon conversion will, upon delivery, be "restricted securities" (within the meaning of Rule 144 or any successor provision in effect at such time), except as the Issuer may otherwise determine in compliance with applicable law, such shares of Common Stock (i) will be issued in physical, certificated form; (ii) will not be held in book-entry form through the facilities of the Depository; and (iii) will bear any restrictive legends the Issuer or the Transfer Agent deems necessary to comply with applicable law.

SECTION 12.05.   <u>Adjustment of Conversion Rate, Conversion Price</u>.

The Conversion Rate and the Conversion Price shall be subject to adjustment from time to time as follows; *provided* that if more than one subsection of this Section 12.05 is applicable to a single event, the subsection shall be applied that produces the largest adjustment and no single event shall cause an adjustment under more than one subsection of this Section 12.05 so as to result in duplication:

(a)      <u>Stock Splits, Subdivisions, Reclassifications or Combinations</u>.  If the Issuer shall (i) declare and pay a dividend or make a distribution on its Common Stock in shares of Common Stock, (ii) subdivide or reclassify the outstanding shares of Common Stock into a greater number of shares, or (iii) combine or reclassify the outstanding shares of Common Stock into a smaller number of shares, the number of Notes Shares at the time of the record date for such dividend and distribution or the effective date of such subdivision, combination or reclassification will be proportionately adjusted so that a Holder of Notes after such date will be entitled, upon conversion of such Notes, to the number of shares of Common Stock that it would have received in respect of the number of Notes Shares it would have owned on account of the Notes had such Notes been converted immediately prior to such date.  The Conversion Price in effect immediately prior to the record date for such dividend or distribution or the effective date of such

JX 125-81

subdivision, combination or reclassification will be adjusted by multiplying such Conversion Price by the quotient of (x) the number of Notes Shares immediately prior to such adjustment divided by (y) the new number of Notes Shares as determined in accordance with the immediately preceding sentence.

(b)    Other Distributions. In case the Issuer shall fix a record date for the making of a distribution to all holders of shares of its Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends of its Common Stock and other dividends or distributions referred to in Section 12.05(a)), in each such case, the Conversion Price in effect prior to such record date shall be reduced immediately thereafter or at such later date as the Board of Directors may determine for purposes of the determination of Fair Market Value of the distribution (but in any event not later than 10 Business Days after the first date on which the Common Stock trades regular way on the principal national securities exchange on which the Common Stock is listed or admitted to trading without the right to receive such distribution) to the price determined by multiplying the Conversion Price in effect immediately prior to the reduction by the quotient of (x) the Market Price of the Common Stock on the last Trading Day preceding the first date on which the Common Stock trades regular way on the principal national securities exchange on which the Common Stock is listed or admitted to trading without the right to receive such distribution, minus the amount of cash and/or the Fair Market Value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock divided by (y) such Market Price on such date specified in clause (x).  Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Notes Shares shall be increased (and the Conversion Rate increased proportionately) to the number obtained by multiplying the Notes Shares immediately prior to such adjustment by the quotient of (x) the Conversion Price in effect immediately prior to the distribution giving rise to this adjustment divided by (y) the new Conversion Price determined in accordance with the immediately preceding sentence. In the event that such distribution is not so made, the Conversion Price, Conversion Rate and the number of Notes Shares then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Conversion Price, Conversion Rate and the number of Notes Shares that would then be in effect if such record date had not been fixed.

(c)    Certain Repurchases of Common Stock.  In case the Issuer effects a Pro Rata Repurchase of Common Stock, then the Conversion Price shall be reduced to the price determined by multiplying the Conversion Price in effect immediately prior to the Effective Date of such Pro Rata Repurchase by a fraction of which the numerator shall be (i) the product of (x) the number of shares of Common Stock outstanding immediately prior to such Pro Rata Repurchase and (y) the Market Price of a share of Common Stock on the Trading Day immediately preceding the first public announcement by the Issuer or any of its Affiliates of the intent to effect such Pro Rata Repurchase, minus (ii) the aggregate purchase price of the Pro Rata Repurchase, and of which the denominator shall be the product of (x) the number of shares of Common Stock outstanding immediately prior to such Pro Rata Repurchase minus the number of shares of Common Stock so repurchased and (y) the Market Price per share of Common Stock on the Trading Day immediately preceding the first public announcement by the Issuer of the intent to effect such Pro Rata Repurchase.  In such event, the number of Notes Shares shall be increased (and the Conversion Rate increased proportionately) to the number obtained by

-75-

**JX 125-82**

multiplying the number of Notes Shares immediately prior to such adjustment by the quotient of (x) the Conversion Price in effect immediately prior to the Pro Rata Repurchase giving rise to this adjustment divided by (y) the new Conversion Price determined in accordance with the immediately preceding sentence. For the avoidance of doubt, no increase to the Conversion Price or decrease in the number of Notes Shares (or Conversion Rate) shall be made pursuant to this Section 12.05(c).

(d)     Business Combinations; Reclassifications of Common Stock.  In case of any Business Combination or any reclassification of Common Stock (other than a reclassification of Common Stock referred to in Section 12.05(a)), the right of a Holder of a Note to receive shares of Common Stock upon conversion of a Note shall be converted into the right to receive the number and amount of shares of stock or other securities or property (including cash) upon conversion of a Note that the Common Stock issuable upon conversion of such Note immediately prior to such Business Combination or reclassification would have been entitled to receive upon closing of such Business Combination or reclassification.

SECTION 12.06.   Responsibility of Trustee and Conversion Agent.  Neither the Trustee nor the Conversion Agent has any duty or responsibility to calculate the Conversion Price, Conversion Rate or Notes Shares or to determine when an adjustment under this Article Twelve should be made, how it should be made or what such adjustment should be, but may accept as conclusive evidence of the correctness of any such adjustment, and shall be protected in relying upon, the Officer's Certificate with respect thereto which the Issuer is obligated to file with the Trustee pursuant to Section 12.07 hereof.  Neither the Trustee nor the Conversion Agent makes any representation as to the validity or value of any securities or assets issued upon conversion of Notes, and neither the Trustee nor the Conversion Agent shall be responsible for the failure by the Issuer to comply with any provisions of this Article Twelve.

Neither the Trustee nor the Conversion Agent shall be responsible for any failure of the Issuer to make any cash payment or to issue, transfer or deliver any shares of Common Stock or stock or share certificates or other securities or property upon the surrender of any Note for the purpose of conversion; and neither the Trustee nor the Conversion Agent shall be responsible or liable for any failure of the Issuer to comply with any of the covenants of the Issuer contained in this Article Twelve.  Without limiting the generality of the foregoing, neither the Trustee nor the Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into, or Officer's Certificate delivered, in connection with this Article Twelve relating either to the kind or amount of shares of stock or securities or other property or assets (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in Section 12.05 or to any adjustment to be made with respect thereto, but may accept as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officer's Certificate which the Issuer shall be obligated to deliver pursuant to Section 12.07.

SECTION 12.07.   Notice of Adjustment.  Whenever the Conversion Rate and Conversion Price is adjusted, the Issuer shall promptly mail, cause to be mailed or delivered electronically (if held at DTC) to Holders at the addresses appearing on the Registrar's books a notice of the adjustment and file with the Trustee an Officer's Certificate briefly stating the facts

**JX 125-83**

requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence of the correctness of such adjustment.

SECTION 12.08.   Mandatory Conversion.

(a)     The Issuer may elect at its option to cause all (but not less than all) of the Notes to be mandatorily converted (the "Mandatory Conversion") within 30 days following the end of any 30 consecutive Trading Day period, ending on or after July 2, 2018, during which the volume weighted average trading price of the Common Stock on the NASDAQ Global Select Market (or any successor market thereto) exceeds $10.00 for a period of 20 Trading Days (any such 30 consecutive Trading Day period, a "Mandatory Conversion Trigger Period").  The volume-weighted average trading price referenced in the preceding sentence will be calculated by the Issuer and neither the Trustee nor any Conversion Agent or Paying Agent shall have any duty to confirm or verify, or in any case, be responsible for, the Issuer's calculation.

(b)     In order to exercise the Mandatory Conversion pursuant to Section 12.08(a), the Issuer or, at the written request and expense of the Issuer, the Trustee on behalf of the Issuer, shall deliver to each Holder of the Notes a notice (a "Mandatory Conversion Notice") of exercise of the Mandatory Conversion within five Business Days after the end of the Mandatory Conversion Trigger Period (the date such Mandatory Conversion Notice is sent to the Holders in the manner herein provided, the "Mandatory Conversion Notice Date").  The Issuer will select the date on which the Notes will be converted pursuant to the Mandatory Conversion, which shall be not more than 30 calendar days after the Mandatory Conversion Trigger Period concludes (such date, the "Mandatory Conversion Date").  The Issuer shall also deliver a copy of such Mandatory Conversion Notice to the Trustee concurrently with the delivery thereof to the Holders to the extent that the Trustee does not deliver such Mandatory Conversion Notice on behalf of the Issuer.  If such Mandatory Conversion Notice is to be given by the Trustee, the Issuer shall prepare and provide the form and content of such Mandatory Conversion Notice to the Trustee at least three Business Days prior to the date the notice will be delivered to the Holders (or such later date as the Trustee may approve).  With respect to Definitive Notes, such delivery shall be by first class mail, and with respect to Global Notes, such delivery shall be pursuant to the Applicable Procedures of the Depository.  The Mandatory Conversion Notice, if sent in the manner herein provided, shall be conclusively presumed to have been duly given, whether or not any Holder receives such Mandatory Conversion Notice.

(c)     The Mandatory Conversion Notice shall state:

(i)     the Mandatory Conversion Notice Date;

(ii)     the Mandatory Conversion Trigger Period;

(iii)     the aggregate principal amount of Notes to be mandatorily converted;

(iv)     the CUSIP number, ISIN and/or "Common Code" number, if any, printed on the Notes being converted;

JX 125-84

(v)     that no representation is made as to the correctness or accuracy of the CUSIP number or ISIN and/or "Common Code" number, if any, listed in such notice or printed on the Notes;

(vi)     the Mandatory Conversion Date;

(vii)     the Conversion Rate and Conversion Price then in effect;

(viii)     that on and after the Mandatory Conversion Date interest on the Notes to be converted will cease to accrue; and

(ix)     the name and address of each Paying Agent and Conversion Agent and the place or places where such Notes are to be surrendered for conversion.

(d)     Each Holder of a Note, by the Holder's acceptance thereof, agrees to take the following actions prior to the Mandatory Conversion Date in respect of its Notes subject to a Mandatory Conversion:  (i) if a Definitive Note, surrender the mandatorily converted Note to the Conversion Agent (or in respect of a Global Note, take any actions required for the surrender of a beneficial interest in such Note pursuant to the Applicable Procedures), (ii) furnish appropriate endorsements and transfer documents if required by the Registrar, the Conversion Agent or the Applicable Procedures, (iii) pay any transfer or other tax, if required by Section 12.02(g), (iv) if the Note is a Global Note, complete and deliver to the Depository any required instructions pursuant to the Applicable Procedures and (v) any other action necessary to effectuate the Mandatory Conversion as may be reasonably requested by the Issuer.  In the event that a Holder of Notes does not take any of the actions set forth in the immediately preceding sentence prior to the Mandatory Conversion Date, each Holder of a Note, by such Holder's acceptance thereof, authorizes and directs the Issuer to take any action on such Holder's behalf to effectuate the Mandatory Conversion and appoints the Issuer such Holder's attorney-in-fact for any and all such purposes.

(e)     The Issuer will deliver to the Holders of Notes, not later than the third Business Day immediately following the Mandatory Conversion Date for such Notes, a number of shares of Common Stock equal to the product of (A)(x) the aggregate principal amount of such Notes to be converted divided by (y) $1,000 and (B) the Conversion Rate in effect on such Conversion Date, rounded down to the nearest whole number.  Upon the Mandatory Conversion Date, unless the Issuer defaults in delivering or paying the amounts due pursuant to the foregoing sentence, interest on the Notes or portion of Notes so called for the Mandatory Conversion shall cease to accrue and the Holders thereof shall have no right in respect of such Notes except the right to receive the shares of Common Stock and cash, if any, to which they are entitled pursuant to this Section 12.08.  Upon a conversion pursuant to this Section 12.08, the Person in whose name such shares of Common Stock will be registered will become the Holder of record of such shares of Common Stock at the Close of Business on the Mandatory Conversion Date for such Note.

(f)     If any of the provisions of this Section 12.08 are inconsistent with applicable law at the time of such Mandatory Conversion, such law shall govern.

JX 125-85

ARTICLE THIRTEEN

MISCELLANEOUS

SECTION 13.01.    <u>Trust Indenture Act Controls</u>.

Except as otherwise specified herein, if any provision of this Indenture limits, qualifies or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.  If any provision of this Indenture modifies any TIA provision that may be so modified, such TIA provision shall be deemed to apply to this Indenture as so modified.  If any provision of this Indenture excludes any TIA provision that may be so excluded, such TIA provision shall be excluded from this Indenture.

The provisions of TIA §§ 310 through 317 that impose duties on any Person (including the provisions automatically deemed included unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

This Section 13.01 shall apply solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA.

SECTION 13.02.    <u>Notices</u>.

Except for notice or communications to Holders, any notice or communication shall be given in writing and delivered in person, sent by telecopy, delivered electronically, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

If to the Issuer or any Guarantor:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois  60179
Facsimile:  (847) 286-2055
Attention:  Treasurer

copy to:

Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, New York  10019
Facsimile:  (212) 403-2000
Attention:  Joshua A. Feltman

**JX 125-86**

If to the Trustee:

> Computershare Trust Company, N.A.
> Attn.: Corporate Trust Dept. –SEARS
> 8742 Lucent Boulevard, Suite 225
> Highlands Ranch, Colorado 80129
> Facsimile No.: 303-262-0608
> Email: corporate.trust@computershare.com

All notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; at the time delivered, if delivered electronically; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.  If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.  Any notice or communication to a Holder may be mailed or electronically delivered.

The Issuer, the Guarantors or the Trustee by written notice to the others may designate additional or different addresses for subsequent notices or communications.

In case by reason of the suspension of regular mail service, or by reason of any other cause, it shall be impossible to mail any notice or communication as required by this Indenture, then such method of notification as shall be made with the approval of the Trustee shall constitute a sufficient mailing of such notice.

SECTION 13.03.    Communications by Holders with Other Holders.

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.04.    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any Guarantor to the Trustee to take any action or refrain from taking any action under this Indenture or any Security Document to which the Trustee is a party, the Issuer shall furnish to the Trustee:

> (1)    an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05) stating that, in the opinion of the signer, all conditions precedent, if any, provided for in this Indenture and such Security Document, as applicable, relating to the proposed action have been complied with; and

> (2)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05) stating that, in the opinion of such counsel, all such conditions precedent, if any, provided for in this

**JX 125-87**

Indenture and such Security Document, as applicable, relating to the proposed action have been complied with.

SECTION 13.05.   Statements Required in Certificate and Opinion.

Each certificate and opinion with respect to compliance by or on behalf of the Issuer or any Guarantor with a condition or covenant provided for in this Indenture or any Security Document, as applicable, shall include:

(1)     a statement that each individual making such certificate or opinion has read such condition or covenant;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of each such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such condition or covenant has been complied with; and

(4)     a statement as to whether or not, in the opinion of each such individual, such condition or covenant has been complied with; *provided* that, with respect to matters of fact, legal counsel delivering such Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 13.06.   Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or meetings of Holders.  The Registrar and Paying Agent may make reasonable rules for their functions.

SECTION 13.07.   Business Days; Legal Holidays.

A "Business Day" is a day that is not a Legal Holiday.  A "Legal Holiday" is a Saturday, a Sunday or other day on which (i) the Trustee or commercial banks in the City of New York are authorized or required by law to close or (ii) the New York Stock Exchange is not open for trading.  If a payment date is a Legal Holiday, payment may be made at that place on the next succeeding day that is not a Legal Holiday with the same force and effect as if made on such payment date, and no interest shall accrue for the intervening period.

SECTION 13.08.   Governing Law.

THIS INDENTURE, THE GUARANTEES AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT SITTING IN THE BOROUGH OF

JX 125-88

MANHATTAN IN THE CITY OF NEW YORK OR ANY FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE GUARANTEES AND THE NOTES, AND IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT THAT IT MAY EFFECTIVELY DO SO UNDER APPLICABLE LAW, TRIAL BY JURY AND ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER PARTY HERETO IN ANY OTHER JURISDICTION.  CERTAIN MORTGAGES AND OTHER SECURITY DOCUMENTS WILL BE GOVERNED BY THE LAWS OF OTHER STATES.

SECTION 13.09.   No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret another indenture, loan, security or debt agreement of the Issuer or any Subsidiary thereof.  No such indenture, loan, security or debt agreement may be used to interpret this Indenture.

SECTION 13.10.   Successors.

All agreements of the Issuer and the Guarantors in this Indenture and the Notes shall bind their respective successors.  All agreements of the Trustee, any additional trustee and any Paying Agents in this Indenture shall bind their respective successors.

SECTION 13.11.   Multiple Counterparts.

The parties may sign multiple counterparts of this Indenture.  Each signed counterpart shall be deemed an original, but all of them together represent one and the same agreement.

SECTION 13.12.   Table of Contents, Headings, Etc.

The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

SECTION 13.13.   Separability.

Each provision of this Indenture shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purpose of this Indenture or the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

JX 125-89

SECTION 13.14.   Waiver of Jury Trial.

EACH OF THE ISSUER, GUARANTORS AND THE TRUSTEE HEREBY IRREVO-CABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 13.15.   Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 13.16.   Intercreditor Agreement.

This Indenture, the Notes, the Security Documents, the Trustee, the Collateral Agent and the Holders are subject to and bound by the terms of the Intercreditor Agreement.

*[Signature Pages Follow]*

**JX 125-90**

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed all as of the date and year first written above.

SEARS HOLDINGS CORPORATION, as Issuer

By: _____

Name: Robert A. Riecker
Title: Chief Financial Officer

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART CORPORATION
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.,
as Guarantors

By: _____

Name: Robert A. Riecker
Title: Chief Financial Officer

SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.,
as Guarantors

By: _____

Name: Robert A. Riecker
Title: President

SEARS ROEBUCK ACCEPTANCE CORP.
as Guarantor

By: _____

Name: Robert A. Riecker
Title: Vice President, Finance

Signature Page to Indenture

**JX 125-91**

A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
KLC, INC.
KMART OF MICHIGAN, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA), L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC,
as Guarantors

By: _____
        Name:  Robert A. Riecker
        Title:  Vice President

KMART.COM LLC, as Guarantor

By: BlueLight.com, Inc., its Member

By: _____
        Name:  Robert A. Riecker
        Title:  Vice President

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC, as Guarantors

By: Kmart Corporation, its Member

By: _____
        Name:  Robert A. Riecker
        Title:  Chief Financial Officer

Signature Page to Indenture

**JX 125-92**

COMPUTERSHARE TRUST COMPANY, N.A., as Trustee

By: _____

Name: Michael A. Smith
Title:  Trust Officer

Signature Page to Indenture

JX 125-93

<u>SCHEDULE A</u>

LIST OF GUARANTORS

A&E Factory Service, LLC
A&E Home Delivery, LLC
A&E Lawn & Garden, LLC
A&E Signature Service, LLC
California Builder Appliances, Inc.
Florida Builder Appliances, Inc.
KLC, Inc
Kmart Corporation
Kmart Holding Corporation
Kmart of Michigan, Inc.
Kmart of Washington LLC
Kmart Operations LLC
Kmart Stores of Illinois LLC
Kmart Stores of Texas LLC
Kmart.com LLC (f/k/a Bluelight.com LLC)
MyGofer LLC
Private Brands, Ltd.
Sears Brands Management Corporation (f/k/a Sears International Marketing, Inc.)
Sears Holdings Management Corporation
Sears Home Improvement Products, Inc.
Sears Operations LLC
Sears Protection Company
Sears Protection Company (Florida), L.L.C.
Sears Roebuck Acceptance Corp.
Sears, Roebuck and Co.
Sears, Roebuck de Puerto Rico, Inc.
SOE, Inc. (f/k/a SOE, LLC)
StarWest, LLC

**JX 125-94**

<u>EXHIBIT A</u>

CUSIP:                                                            No.
ISIN:

### SEARS HOLDINGS CORPORATION

Initial Principal Amount $[            ]

6$^5/_8$% SENIOR SECURED CONVERTIBLE PIK TOGGLE NOTES DUE 2019

SEARS HOLDINGS CORPORATION, a Delaware corporation, promises to pay to [_____] [CEDE & CO.][1], or registered assigns, the principal sum [of _____ Dollars] [set forth on the Schedule of Increases or Decreases in the Global Note attached hereto][2] on October 15, 2019.

Interest Payment Dates:  April 15 and October 15.

Record Dates:  April 1 and October 1.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

---

[1] Use Schedule of Increases or Decreases if Global Note.
[2] Use Schedule of Increases or Decreases if Global Note.

A-1

JX 125-95

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually or by facsimile by its duly authorized officer.

SEARS HOLDINGS CORPORATION

By: _____
      Name:
      Title:

A-2

**JX 125-96**

Certificate of Authentication

This is one of the Notes referred to in the within-mentioned Indenture.

Dated:                                    COMPUTERSHARE TRUST COMPANY, N.A.,
                                          as Trustee

                                          By: _____
                                                    Authorized Signatory

**JX 125-97**

[FORM OF REVERSE OF NOTE]

SEARS HOLDINGS CORPORATION

6⅝% SENIOR SECURED CONVERTIBLE PIK TOGGLE NOTES DUE 2019

1.    Interest.

Sears Holdings Corporation (the "Issuer"), a Delaware corporation, promises to pay, until the principal hereof is paid or made available for payment, interest on the principal amount set forth on the face hereof, as increased by any PIK Interest (as defined below), at a rate of 6⅝% per annum.  Interest hereon will accrue from and including the most recent date to which interest has been paid or, if no interest has been paid, from and including October 15, 2017 to but excluding the date on which interest is paid.  Interest shall be payable in arrears on each April 15 and October 15, commencing on April 15, 2018.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.  The Issuer shall pay interest on overdue principal and on overdue interest (to the full extent permitted by law) at a rate equal to the interest rate on the Notes.

Interest will be payable, at the election of the Issuer, in whole or, to the extent consistent with the procedures of the Depository, in part as (a) cash interest ("Cash Interest") and/or (b) by increasing the principal amount of the outstanding Global Notes, if any, and by issuing PIK Interest Notes with respect to the Definitive Notes, if any ("PIK Interest").  Interest payable on the Interest Payment Date of April 15, 2018 will be paid entirely in PIK Interest.

In the event that the Issuer determines to pay any PIK Interest for any other interest period, then the Issuer will deliver a notice (a "PIK Notice") to the Trustee no later than five (5) Business Days prior to the record date with respect to the applicable Interest Payment Date, which notice will state the total amount of interest to be paid on the Interest Payment Date and the amount of such interest to be paid as PIK Interest. The Trustee, on behalf of the Issuer, will promptly deliver a corresponding notice provided by the Issuer to the Holders.  If the Issuer fails to timely make an election with respect to payment of interest on any Interest Payment Date (other than the Interest Payment Date of April 15, 2018), then interest shall be payable on such date in the same form as paid with respect to the immediately preceding Interest Payment Date; provided, that the Issuer shall provide an Authentication Order to the Trustee in accordance with the Indenture on each Interest Payment Date on which the Issuer will pay PIK Interest whether or not the Issuer makes an election to pay PIK Interest with respect to such Interest Payment Date.

2.    Method of Payment.  The Issuer will pay interest hereon (except defaulted interest) to the Persons who are registered Holders at the Close of Business on April 1 or October 1 (each a "Record Date") next preceding the Interest Payment Date; provided that if an Interest Payment Date falls on a Legal Holiday, interest will be payable on the next succeeding day that is not a Legal Holiday with the same force and effect as if made on such Interest Payment Date, and no interest shall accrue for the intervening period.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Issuer will pay principal and interest (other than PIK Interest) in money of the United States of America that at the time of payment is legal tender for payment of public and private debts.  At the option of the Issuer, each installment

A-4

**JX 125-98**

of Cash Interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the registry maintained by the Registrar or (ii) wire transfer to an account located in the United States maintained by the payee. Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by the Depository.

PIK Interest will be considered paid on the date due if on such date the Trustee has received (a) with respect to any Global Notes, an Authentication Order from the Issuer signed by an Officer of the Issuer to increase the balance of such Global Note to reflect such PIK Interest and (b) with respect to any Definitive Notes, PIK Interest Notes duly executed by the Issuer together with an Authentication Order of the Issuer signed by an Officer of the Issuer requesting the authentication of such PIK Interest Notes by the Trustee. In connection with the payment of PIK Interest in respect of the Notes, the Issuer will, without the consent of Holders (and without regard to any restrictions or limitations set forth under Article Four of the Indenture), increase the outstanding principal amount of the Global Notes, if any, and issue PIK Interest Notes under the Indenture with respect to the Definitive Notes, if any.

3.    Paying Agent and Registrar.  Initially, Computershare Trust Company, N.A. (the "Trustee") will act as a Paying Agent and Registrar, and Computershare Trust Company, N.A. and Computershare Inc., will act as Conversion Agent. The Issuer may appoint and change any Paying Agent, Conversion Agent, Registrar or co-registrar without notice.  The Issuer or any of its Affiliates may act as Paying Agent, Conversion Agent or Registrar.

4.    Indenture.  The Issuer issued the Notes under an Indenture dated as of March 20, 2018 (the "Indenture") among the Issuer, the Guarantors (as defined in the Indenture) and the Trustee.  This is one of an issue of Notes of the Issuer issued, or to be issued, under the Indenture.  The terms of the Notes include those stated in the Indenture and, solely at any time at which this Indenture is required pursuant to the TIA to be qualified under the TIA, those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (15 U.S. Code §§ 77aaa-77bbbb), as amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of them.  Capitalized and certain other terms used herein and not otherwise defined have the meanings set forth in the Indenture.

5.    Optional Redemption.

(a)    The Notes may be redeemed in whole or in part, at the Issuer's option, at any time and from time to time at a redemption price equal to the greater of (1) 100% of the principal amount of the Notes to be redeemed and (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon (excluding interest accrued to the Redemption Date) discounted to the Redemption Date at the Treasury Rate, plus 50 basis points, plus accrued interest thereon to the Redemption Date.

(b)    In the event of a redemption of fewer than all of the Notes, the Trustee shall select the Notes to be redeemed in compliance with Section 3.02 of the Indenture.

**JX 125-99**

6.        <u>Notice of Redemption</u>.  Notice of redemption will be mailed (or, in the case of book-entry interests, transmitted electronically) at least 30 days but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at its registered address, except that redemption notice may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture.  On and after the Redemption Date, unless the Issuer defaults in making the redemption payment, interest will cease to accrue on Notes or portions thereof called for redemption.

7.        <u>Offers to Purchase upon a Change of Control Triggering Event</u>.  The Indenture provides that upon the occurrence of a Change of Control Triggering Event and subject to further limitations contained therein, the Issuer shall make an offer to purchase outstanding Notes in accordance with the procedures set forth in Section 4.07 of the Indenture.

8.        <u>Offers to Purchase upon a Collateral Coverage Event</u>.  The Indenture provides that upon the occurrence of a Collateral Coverage Event and subject to further limitations contained therein, the Issuer shall make an offer to purchase outstanding Notes in accordance with the procedures set forth in Section 4.08 of the Indenture.

9.        <u>Contingent Registration Rights</u>.  If the Issuer fails to timely file all periodic reports it is required to file pursuant to the Exchange Act, the Issuer will grant customary resale shelf registration rights to certain Holders of at least 25% of the principal amount of Notes outstanding as of the Issue Date, as specified in the following sentence, if as a result of such failure, such Holders are unable to sell their Notes pursuant to Rule 144 of the Securities Act. Upon receipt of a written request from any Holder of Notes representing that it holds Notes representing at least 25% of the principal amount of Notes outstanding as of the Issue Date and satisfaction of the condition set forth in the preceding sentence, the Issuer will use commercially reasonable best efforts to cause to become effective a shelf registration statement relating to resales of such Notes and to keep that shelf registration statement effective until no securities registered thereunder constitute registrable securities.  The Issuer will, in the event of such a shelf registration, provide to each Holder of Notes representing at least 25% of the principal amount of Notes outstanding as of the Issue Date copies of a prospectus, notify each such Holder when the shelf registration statement has become effective and take such other actions as necessary or appropriate to permit resales of the Notes.  A Holder of Notes that sells Notes under the shelf registration statement generally will be required to make certain representations to the Issuer to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, and will be subject to certain of the civil liability provisions under the Securities Act, in connection with those sales. Holders of Notes will also be required to suspend their use of the prospectus included in the shelf registration statement under specified circumstances upon receipt of notice from the Issuer.

10.        <u>Denominations, Transfer, Exchange</u>.  The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof (or if a PIK Payment has been made, in minimum denominations of $2,000 and any integral multiple of $1.00 in excess thereof).  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate

JX 125-100

endorsements and transfer documents and to pay to it any taxes and fees required by law or permitted by the Indenture.

11.    <u>Conversion</u>.  Subject to, and upon compliance with, the provisions of Article Twelve of the Indenture, and subject to the limitations set forth in Section 12.01 of the Indenture, a Holder shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted would result in the issuance of at least one whole share of Common Stock upon conversion) of such Note at any time at the Conversion Rate, in accordance with Article Twelve of the Indenture.

The Issuer may elect at its option to cause all (but not less than all) of the Notes to be mandatorily converted within 30 days following the end of any 30 consecutive Trading Day period, ending on or after July 2, 2018, during which the volume weighted average trading price of the Common Stock on the NASDAQ Global Select Market (or any successor market thereto) exceeds $10.00 for a period of 20 Trading Days, upon the terms and conditions set forth in Section 12.08 of the Indenture.

12.    <u>Persons Deemed Owners</u>.  The registered Holder of this Note may be treated as the owner of this Note for all purposes.

13.    <u>Unclaimed Money</u>.  If money for the payment of principal or interest remains unclaimed for two years, the Trustee will pay the money back to the Issuer at its written request. After that, Holders entitled to the money must look to the Issuer for payment as general unsecured creditors unless an "abandoned property" law designates another Person.

14.    <u>Amendment, Supplement, Waiver, Etc.</u>  The Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) may, without the consent of the Holders of any outstanding Notes, amend, waive or supplement the Indenture, the Notes or the Security Documents for certain specified purposes set forth in the Indenture, including, among other things, curing ambiguities, defects or inconsistencies, complying with the requirements of the Commission in order to maintain or effect the qualification of the Indenture under the Trust Indenture Act of 1939, as amended, and making any change that does not adversely affect the legal rights under the Indenture of any Holder.  Other amendments and modifications of the Indenture, the Notes or the Security Documents may be made by the Issuer, the Guarantors, and the Trustee (or the Collateral Agent, if a party thereto) with the consent of the Holders of not less than a majority of the aggregate principal amount of the outstanding Notes, subject to certain exceptions set forth in the Indenture requiring the consent of the Holders of the particular Notes to be affected.

15.    <u>Successor Person</u>.  When a successor Person assumes all the obligations of its predecessor under the Notes and the Indenture and the transaction complies with the terms of Article Five of the Indenture, the predecessor Person will, except as provided in Article Five, be released from those obligations.

16.    <u>Defaults and Remedies</u>.  Events of Default are set forth in the Indenture.  Subject to certain limitations in the Indenture, if an Event of Default (other than an Event of Default specified in clause (4) or (5) of Section 6.01 of the Indenture) occurs and is continuing, the

A-7

**JX 125-101**

Trustee or the Holders of not less than 25% in aggregate principal amount of the outstanding Notes may, by written notice to the Trustee and the Issuer, declare all principal of and accrued interest on all Notes to be immediately due and payable and such amounts shall become immediately due and payable.  If an Event of Default specified in clause (4) or (5) of Section 6.01 of the Indenture occurs, the principal amount of and interest on, all Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  The Trustee may require security or indemnity satisfactory to it before it enforces the Indenture or the Notes.  Subject to certain limitations, Holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders notice of any continuing default (except a default in payment of principal, premium, if any, or interest on the Notes when and as the same shall become due and payable) if the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Notes.

17.    <u>Trustee Dealings with Issuer</u>.  The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not Trustee.

18.    <u>Discharge</u>.  The Issuer's and the Guarantors' obligations pursuant to the Indenture will be discharged, except for obligations pursuant to certain sections thereof, subject to the terms of the Indenture, upon the payment of all the Notes or upon the irrevocable deposit with the Trustee of United States Dollars or Government Securities sufficient to pay when due principal of and interest on the Notes to maturity or redemption, as the case may be.

19.    <u>Guarantees</u>.  The Notes will be entitled to the benefits of certain Guarantees made for the benefit of the Holders and the Trustee.  Reference is hereby made to the Indenture for a statement of the respective rights, limitations of rights, duties and obligations thereunder of the Guarantors, the Trustee and the Holders.

20.    <u>Security Documents and Intercreditor Agreement</u>.  The obligations of the Issuer and the Guarantors under the Indenture, the Notes and the Guarantees are secured by a Lien on the Collateral pursuant to the Security Documents.  The provisions of the Indenture, the Notes and the Security Documents are subject to the Intercreditor Agreement.

21.    <u>Authentication</u>.  This Note shall not be valid until the Trustee signs the certificate of authentication on the other side of this Note.

22.    <u>Governing Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.  Each of the Trustee, the Issuer, the Guarantors and the Holders hereby irrevocably submits to the exclusive jurisdiction of any New York State court sitting in the Borough of Manhattan in the City of New York or any federal court sitting in the Borough of Manhattan in the City of New York in respect of any suit, action or proceeding arising out of or

JX 125-102

relating to the Indenture and this Note, and irrevocably accepts for itself and in respect of its property, generally and unconditionally, exclusive jurisdiction of the aforesaid courts.

23.    <u>Abbreviations</u>.  Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TENANT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois  60179
Facsimile:  (847) 286-2055
Attention:  Treasurer

JX 125-103

## ASSIGNMENT

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint:_____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

Date: _____   Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

## SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**JX 125-104**

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial outstanding principal amount of this Global Note is $_____.  The following increases or decreases in this Global Note have been made, including as a result of payments of PIK Interest, exchanges of a part of this Global Note for an interest in another Global Note or Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note:

| Date | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Depository Custodian |
|------|------|------|------|------|
|  |  |  |  |  |

A-11

**JX 125-105**

FORM OF NOTICE OF CONVERSION

To:    Sears Holdings Corporation
        3333 Beverly Road
        Hoffman Estates, Illinois  60179
        Facsimile:  (847) 286-2055
        Attention:  Treasurer

        Computershare Inc.
        480 Washington Blvd, 27th Floor
        Jersey City, NJ 07310
        Attn:  Corp Actions Relationship Manager

        Computershare Inc.
        250 Royall St.
        Canton, Massachusetts  02021
        Attn: Corp Actions Relationship Manager

        With a copy to:

        Computershare Inc.
        250 Royall St.
        Canton, Massachusetts  02021
        Attn: Legal Department

The undersigned owner of this Note hereby irrevocably exercises the option to convert this Note, or a portion thereof (if the portion to be converted would result in the issuance of at least one whole share of Common Stock upon conversion) below designated, into a number of shares of Common Stock in accordance with the terms of the Indenture referred to in this Note, and directs that any shares of Common Stock deliverable upon conversion, together with any Notes representing any unconverted principal amount hereof, be delivered to the registered holder hereof unless a different name is indicated below.

Subject to certain exceptions set forth in the Indenture, if this notice is being delivered after the Close of Business on a Record Date and prior to the Open of Business on the Interest Payment Date corresponding to such Record Date, this notice must be accompanied by payment of an amount equal to the interest payable on such Interest Payment Date on the principal amount of this Note to be converted.  If any shares of Common Stock are to be issued in the name of a Person other than the undersigned, the undersigned will pay all transfer taxes payable with respect to such issuance and transfer as set forth in the Indenture.

| Principal amount to be converted | Certificate No.(s) (if in certificated form) | Beneficial Ownership of Issuer Common Stock (prior |
|---|---|---|

**JX 125-106**

(if less than all):                                          to conversion):


$                                                           shares

(if the portion to be converted
would result in the issuance of
at least one whole share of
Common Stock upon
conversion)

**JX 125-107**

Check the boxes below, if applicable.  If such boxes are checked, the undersigned certifies that the below is accurate.

☐**THE UNDERSIGNED IS NOT, AND HAS NOT BEEN DURING THE PRECEDING THREE (3) MONTHS, A DIRECTOR, OFFICER OR "AFFILIATE" OF THE ISSUER AS THAT TERM IS DEFINED IN RULE 144(a)(1) UNDER THE SECURITIES ACT.**

☐**A PERIOD OF AT LEAST TWELVE (12) MONTHS HAS PASSED SINCE THE NOTES WERE ACQUIRED FROM THE ISSUER OR A DIRECTOR, OFFICER OR "AFFILIATE," WITHIN THE MEANING OF RULE 144(a)(1) UNDER THE SECURITIES ACT, OF THE ISSUER, AS COMPUTED UNDER RULE 144(d) UNDER THE SECURITIES ACT.**

If you want the share certificate representing the Common Stock, if any, issuable upon conversion made out in another person's name, fill in the form below:

_____

(Insert other person's social security or tax I.D. number)

_____

_____

_____

(Print or type other person's name, address and zip code)

   If this Note is held through a custodian, name of the custodian through which the Note is held:

  Name of Beneficial Holder: _____

  Social security or tax I.D. number: _____

  DTC Custodian's Participant Number: _____

  DTC Custodian's Name: _____

  DTC Custodian's Participant Number: _____

Dated: _____   Signed:_____

           (Sign exactly as your name(s) appear(s) on the other side of this Note)

A-14

**JX 125-108**

Signature Guarantee: _____

## SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**JX 125-109**

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.07 or Section 4.08 of the Indenture, check the appropriate box:

Section 4.07 [    ]               Section 4.08 [    ]

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.07 or Section 4.08 of the Indenture, state the amount:  $_____

If this Note is held through a custodian, name of the custodian through which the Note is held:

Name of Beneficial Holder: _____

Social security or tax I.D. number: _____

DTC Custodian's Participant Number: _____

DTC Custodian's Name: _____

DTC Custodian's Participant Number: _____

Date:_____

Your Signature:_____
(Sign exactly as your name appears on the other side of this Note)

_____
Signature Guaranteed

## SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**JX 125-110**

<u>EXHIBIT B</u>

[FORM OF LEGEND FOR NOTES
THAT ARE RESTRICTED NOTES]

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR, THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) INSIDE THE UNITED STATES TO AN ACCREDITED INVESTOR THAT, PRIOR TO SUCH TRANSFER, FURNISHES (OR HAS FURNISHED ON ITS BEHALF BY A U.S. BROKER-DEALER) TO THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE RESTRICTIONS ON TRANSFER OF THIS SECURITY (THE FORM OF WHICH LETTER CAN BE OBTAINED FROM THE ISSUER), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT (IF AVAILABLE), (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (F) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS) OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY, IF THE PROPOSED TRANSFEREE IS AN ACCREDITED INVESTOR, THE HOLDER MUST, PRIOR TO SUCH TRANSFER, FURNISH TO THE TRUSTEE AND THE ISSUER SUCH CERTIFICATIONS, LEGAL OPINIONS OR OTHER INFORMATION AS EITHER OF THEM MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH TRANSFER IS BEING MADE PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. HEDGING TRANSACTIONS INVOLVING THIS SECURITY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

**JX 125-111**

[FORM OF ASSIGNMENT FOR NOTES
THAT ARE RESTRICTED NOTES]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint:_____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

[Check If Applicable]

☐      Documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If the foregoing box is not checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date: _____      Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**JX 125-112**

EXHIBIT C

[FORM OF LEGEND FOR REGULATION S NOTE]

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR, THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) INSIDE THE UNITED STATES TO AN ACCREDITED INVESTOR THAT, PRIOR TO SUCH TRANSFER, FURNISHES (OR HAS FURNISHED ON ITS BEHALF BY A U.S. BROKER-DEALER) TO THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE RESTRICTIONS ON TRANSFER OF THIS SECURITY (THE FORM OF WHICH LETTER CAN BE OBTAINED FROM THE ISSUER), (D) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT (IF AVAILABLE), (E) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (F) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS) OR (G) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY, IF THE PROPOSED TRANSFEREE IS AN ACCREDITED INVESTOR, THE HOLDER MUST, PRIOR TO SUCH TRANSFER, FURNISH TO THE TRUSTEE AND THE ISSUER SUCH CERTIFICATIONS, LEGAL OPINIONS OR OTHER INFORMATION AS EITHER OF THEM MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH TRANSFER IS BEING MADE PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. HEDGING TRANSACTIONS INVOLVING THIS SECURITY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

**JX 125-113**

## [FORM OF ASSIGNMENT FOR REGULATION S NOTE]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint:_____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

### [Check If Applicable]

☐       Documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If the foregoing box is not checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date: _____    Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

### SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

**JX 125-114**

EXHIBIT D

[FORM OF LEGEND FOR GLOBAL NOTE]

Any Global Note authenticated and delivered hereunder shall bear a legend (which would be in addition to any other legends required in the case of a Restricted Note) in substantially the following form:

**THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY.  THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.**

Unless this Certificate is presented by an authorized representative of The Depository Trust Company (a New York corporation) ("DTC") to the Issuer or its agent for registration of transfer, exchange, or payment, and any Certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as is requested by an authorized representative of DTC), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1272 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED) FOR U.S. FEDERAL INCOME TAX PURPOSES.  UPON WRITTEN REQUEST, THE ISSUER SHALL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE ISSUER AT 3333 BEVERLY ROAD, HOFFMAN ESTATES, IL  60179 ATTN: GENERAL COUNSEL.

**JX 125-115**

<u>EXHIBIT E</u>

Form of Certificate to Be
Delivered in Connection with
<u>Transfers Other than to a QIB Pursuant to  Rule 144A and Other Than Pursuant to Regulation S</u>

Computershare Trust Company, N.A.
Attn.: Corporate Trust Dept. –SEARS
8742 Lucent Boulevard, Suite 225
Highlands Ranch, Colorado 80129
Facsimile No.: 303-262-0608
Email: corporate.trust@computershare.com
Ladies and Gentlemen:

In connection with our proposed purchase of $6^5/_8$% Senior Secured Convertible PIK Toggle Notes due 2019 (the "<u>Notes</u>") of Sears Holdings Corporation, a Delaware corporation (the "<u>Issuer</u>"), we confirm that:

1.      We understand that any subsequent transfer of the Notes is subject to certain restrictions and conditions set forth in the Indenture dated as of March 20, 2018 relating to the Notes and we agree to be bound by, and not to resell, pledge or otherwise transfer the Notes except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

2.      We understand that the Notes have not been registered under the Securities Act or any other applicable securities laws, have not been and will not be qualified for sale under the securities laws of any non-U.S. jurisdiction and that the Notes may not be offered, sold, pledged or otherwise transferred except as permitted in the following sentence. We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell any Notes, we will do so only (i) to the Issuer or any subsidiary thereof, (ii) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined in Rule 144A), (iii) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you a signed letter containing certain representations and agreements relating to the restrictions on transfer of the Notes, (iv) outside the United States to persons other than U.S. persons in offshore transactions meeting the requirements of Rule 904 of Regulation S under the Securities Act, (v) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if applicable) or (vi) pursuant to an effective registration statement, and we further agree to provide to any person purchasing any of the Notes from us a notice advising such purchaser that resales of the Notes are restricted as stated herein.

3.      We understand that, on any proposed resale of any Notes, we will be required to furnish to you and the Issuer such certifications, legal opinions and other information as you and the Issuer may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

E-1

**JX 125-116**

4.        We are an "accredited investor" (as defined in Rule 501 under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting each are able to bear the economic risk of our or their investment, as the case may be.

5.        We are acquiring the Notes purchased by us for our account or for one or more accounts (each of which is an "accredited investor") as to each of which we exercise sole investment discretion.

6.        We are not acquiring the Notes with a view toward the distribution thereof in a transaction that would violate the Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction.

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Purchaser]

By:_____
   Name:
   Title:

Dated:_____

**JX 125-117**

<u>EXHIBIT F</u>

Form of Certificate to Be Delivered
in Connection with Transfers
<u>Pursuant to Regulation S</u>

Computershare Trust Company, N.A.
Attn.: Corporate Trust Dept. –SEARS
8742 Lucent Boulevard, Suite 225
Highlands Ranch, Colorado 80129
Facsimile No.: 303-262-0608
Email: corporate.trust@computershare.com

      Re:     Sears Holdings Corporation (the "<u>Issuer</u>")
              $6^5/_8$% Senior Secured Convertible PIK Toggle Notes due 2019 (the "<u>Notes</u>")

Dear Sirs:

In connection with our proposed sale of $\_\_\_\_\_ aggregate principal amount of the Notes, we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, we represent that:

      (1)     the offer of the Notes was not made to a U.S. person or to a person in the United States;

      (2)     either (a) at the time the buy offer was originated, the transferee outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

      (3)     no directed selling efforts have been made in the United States in contravention of the requirements of Rule 904(a) of Regulation S;

      (4)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

      (5)     we have advised the transferee of the transfer restrictions applicable to the Notes.

JX 125-118

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Purchaser]

By:_____

JX 125-119

<u>EXHIBIT G</u>

NOTATION OF GUARANTEE

For value received, each of the undersigned (the "<u>Guarantors</u>") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of March 20, 2018 by and among Sears Holdings Corporation, the Guarantors party thereto and Computershare Trust Company, N.A., as Trustee (as amended, restated or supplemented from time to time, the "<u>Indenture</u>"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the Guarantors to the Holders and to the Trustee pursuant to the Guarantees and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[*Signature Pages Follow*]

G-1

**JX 125-120**

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of Guarantee to be signed by a duly authorized officer.

[GUARANTORS]

By:_____
    Name:
    Title:

**JX 125-121**

# Exhibit 87

EXECUTION VERSION

# AMENDED AND RESTATED SECURITY AGREEMENT

among

**SEARS HOLDINGS CORPORATION,**
**and certain of its Subsidiaries,**
as Grantors

and

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Collateral Agent

Dated as of March 20, 2018

**THIS SECURITY AGREEMENT is subject to the terms and provisions of the Amended and Restated Intercreditor Agreement, dated as of March 20, 2018 (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Wilmington Trust, National Association, as Second Lien Agent and Bank of America, N.A. and Wells Fargo Bank, National Association, each as an ABL Agent and the other persons from time to time party thereto.**

**JX 126-1**

TABLE OF CONTENTS

Page

SECTION 1. DEFINED TERMS ........................................................................................2
   1.1    Definitions .......................................................................................................2
   1.2    Other Definitional Provisions .........................................................................8
   1.3    Perfection Certificate .......................................................................................9

SECTION 2. GRANT OF SECURITY INTEREST.............................................................9
   2.1    Collateral; Grant of Security Interest .............................................................9
   2.2    No Assumption of Liability .............................................................................9

SECTION 3. REPRESENTATIONS AND WARRANTIES .................................................9
   3.1    Title; No Other Liens ......................................................................................9
   3.2    Perfected Liens ..............................................................................................10
   3.3    Jurisdiction of Organization ..........................................................................10
   3.4    Credit Card Accounts Receivable ..................................................................10
   3.5    Related Intellectual Property..........................................................................10
   3.6    Dealer Store Inventory ...................................................................................11

SECTION 4. COVENANTS ...............................................................................................11
   4.1    Delivery of Instruments and Chattel Paper ...................................................11
   4.2    [Intentionally Omitted] ..................................................................................11
   4.3    Maintenance of Perfected Security Interest; Further Documentation.............11
   4.4    Changes in Name, etc. ...................................................................................11

SECTION 5. REMEDIAL PROVISIONS............................................................................12
   5.1    Certain Matters Relating to Credit Card Accounts Receivable .....................12
   5.2    Communications with Obligors; Grantors Remain Liable .............................12
   5.3    [Intentionally Omitted] ..................................................................................12
   5.4    Application of Proceeds..................................................................................12
   5.5    Code and Other Remedies .............................................................................13
   5.6    Deficiency......................................................................................................15
   5.7    Grant of License in Intellectual Property, Software and other Assets ...........15

SECTION 6. THE COLLATERAL AGENT ........................................................................17
   6.1    Collateral Agent's Appointment as Attorney-in-Fact, etc. ...........................17
   6.2    Duty of Collateral Agent ...............................................................................18
   6.3    Execution of Financing Statements ...............................................................19
   6.4    Authority of the Collateral Agent ..................................................................19
   6.5    Pari Passu Obligations ...................................................................................19

SECTION 7. MISCELLANEOUS ......................................................................................19
   7.1    Intercreditor Agreement.................................................................................19
   7.2    Pari Passu Obligations ...................................................................................19
   7.3    Amendments in Writing .................................................................................20
   7.4    Notices ...........................................................................................................20
   7.5    No Waiver by Course of Conduct; Cumulative Remedies .............................21
   7.6    Enforcement Expenses; Indemnification .......................................................21
   7.7    Successors and Assigns ..................................................................................22

**JX 126-2**

7.8     [Intentionally Omitted] ...............................................................................22
7.9     Counterparts..............................................................................................22
7.10    Severability ...............................................................................................22
7.11    Section Headings .......................................................................................22
7.12    Integration.................................................................................................22
7.13    GOVERNING LAW....................................................................................22
7.14    Acknowledgements ....................................................................................22
7.15    Additional Grantors ...................................................................................23
7.16    Releases .....................................................................................................23
7.17    Jurisdiction, Etc. .......................................................................................23
7.18    WAIVER OF JURY TRIAL.........................................................................24

SCHEDULES

Schedule 1      Grantors; Notice Addresses
Schedule 2      Perfection Matters
Schedule 3      Jurisdictions of Organization

**JX 126-3**

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT, dated as of March 20, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by SEARS HOLDINGS CORPORATION, a Delaware corporation (the "Issuer"), and the subsidiaries of the Issuer from time to time party hereto (the "Subsidiary Obligors" and, together with the Issuer, the "Grantors"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent (in such capacity and, together with any successors and assigns, the "Collateral Agent").

### W I T N E S S E T H

WHEREAS, the Issuer, the Grantors and the Collateral Agent are party to that certain Security Agreement, dated as of October 12, 2010, as amended by that certain First Amendment to Security Agreement, dated as of September 1, 2016 (as further amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Existing Security Agreement");

WHEREAS, the parties hereto desire to amend and restate the Existing Security Agreement as provided herein;

WHEREAS, reference is made to that certain indenture, dated as of October 12, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "2010 Indenture"), by and among the Issuer, the Guarantors and WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as successor trustee (in such capacity, the "2010 Trustee") and Collateral Agent, pursuant to which the Issuer issued $1,250,000,000 aggregate original principal of 6 5/8% Senior Secured Notes due 2018 (together with any Exchange Securities (as defined in the 2010 Indenture) and any Additional Notes (as defined in the 2010 Indenture) issued under the 2010 Indenture, the "Senior Secured Notes").

WHEREAS, reference is further made to that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among the Issuer, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the Guarantors, the lenders from time to time party thereto and JPP, LLC, as administrative agent and collateral administrator (the "Second Lien Credit Agreement Agent"), pursuant to which the borrowers have obtained a term loan in the aggregate amount of $300 million and established an uncommitted line of credit facility.

WHEREAS, reference is further made to that certain indenture, dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "2018 Indenture"), by and among the Issuer, the Guarantors and COMPUTERSHARE TRUST COMPANY, N.A., in its capacity as trustee (in such capacity, the "2018 Trustee"), pursuant to which the Issuer issued $169,824,000.00 aggregate principal of 6 5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (together with any PIK Interest Notes (or any increase in the principal amount of a Global Note related to PIK Interest) and any Additional Notes issued under the 2018 Indenture, the "Senior Secured Convertible Notes").

WHEREAS, each of the Issuer and each Subsidiary Obligor is either a primary obligor or has unconditionally guaranteed all of the Secured Obligations.

**JX 126-4**

WHEREAS, from time to time after the date hereof, the Issuer may, subject to the terms and conditions of this Agreement and the other Second Lien Documents, incur additional Junior Second Lien Obligations that are secured by Liens ranking equally and ratably with the Liens securing the existing Secured Obligations and entitled to distributions on an equal and ratable basis with the Senior Secured Notes.

WHEREAS, from time to time after the date hereof, the Issuer may, subject to the terms and conditions of this Agreement and the other Second Lien Documents, incur additional Senior Second Lien Obligations that are secured by Liens ranking equally and ratably with the Liens securing the existing Secured Obligations and entitled to distributions on an equal and ratable basis with the Senior Secured Convertible Notes and the obligations under the Second Lien Credit Agreement.

WHEREAS, this Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of all Secured Obligations.

WHEREAS, the Issuer, the other Grantors, the Collateral Agent and the ABL Agents, have entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of the date hereof (as amended, modified, supplemented or restated and in effect from time to time, the "Intercreditor Agreement"), establishing the relative rights and priorities of the Secured Parties and the First Lien Secured Parties in respect of the Collateral.

WHEREAS, each Grantor will receive substantial benefits from the issuance and maintenance of the Secured Obligations and each is, therefore, willing to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Collateral Agent hereby agree as follows:

## SECTION 1.  DEFINED TERMS

1.1    Definitions.

(a)    Unless otherwise defined herein, terms defined in the 2018 Indenture and used herein shall have the meanings given to them in the 2018 Indenture, and the following terms are used herein as defined in the New York UCC: Accounts, Chattel Paper, Control, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Proceeds and Supporting Obligations.

(b)    The following terms shall have the following meanings:

"ABL Agents" has the meaning provided in the Intercreditor Agreement.

"ABL Obligations" has the meaning provided in the Intercreditor Agreement.

"ABL Secured Parties" has the meaning provided in the Intercreditor Agreement.

"Additional First Lien Agent" means the Person appointed to act as trustee, agent or representative for the holders of Additional First Lien Obligations pursuant to any Additional First Lien Agreement.

"Additional First Lien Agreement" means any indenture, credit agreement or other agreement, if any, pursuant to which any Grantor has or will incur Additional First Lien Obligations.

JX 126-5

"Agreement" has the meaning provided in the preamble hereof.

"Collateral" has the meaning provided in Section 2.1 hereof.

"Collateral Agent" has the meaning provided in the preamble hereof.

"Copyrights" means (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office and (ii) the right to obtain all renewals thereof.

"Copyright Licenses" means any written agreement naming any Grantor as licensor or licensee granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of July 21, 2015, among the Issuer, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders from time to time party thereto, the issuing lenders from time to time party thereto, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association, as co-collateral agent, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements have been or may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, replaced or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available borrowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Credit Card Accounts Receivables" means all Accounts together with all income, payments, and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to the Issuer or any Guarantor resulting from charges by a customer of the Issuer or such Guarantor on credit cards issued by such issuer in connection with the sale of goods by the Issuer or such Guarantor or services performed by the Issuer or such Guarantor.

"Discharge of First Lien Obligations" means the Discharge of ABL Obligations (as defined in the Intercreditor Agreement) and the payment in full in cash of all outstanding Additional First Lien Obligations.

"Discharge of Obligations" means in the case of any series of Secured Obligations, including the Senior Secured Notes, the Senior Secured Convertible Notes and the Second Lien Credit Agreement Obligations, the repayment, discharge or defeasance of such series of Secured Obligations under such agreement or such other event which entitles the Grantors to obtain a release of the Liens securing such Secured Obligations under the Security Documents (including, with respect to the 2010 Indenture and the 2018 Indenture, a discharge or defeasance of the such indenture in accordance with its terms).

"Discharge of Senior Second Lien Obligations" means the occurrence of a Discharge of Obligations with respect to all Senior Second Lien Obligations.

JX 126-6

"Event of Default" means (i) an "Event of Default" under and as defined in the 2018 Indenture, the 2010 Indenture or the Second Lien Credit Agreement, or (ii) an "Event of Default" or equivalent term under and as defined in any Junior Second Lien Agreement or any Senior Second Lien Agreement.

"Final Date" means the first date on which a Discharge of Obligations shall have occurred with respect to all of the Secured Obligations.

"First Lien Collateral Agents" means (i) the ABL Agents and (ii) the Additional First Lien Agents.

"First Lien Obligations" means (i) the ABL Obligations and (ii) the Additional First Lien Obligations.

"First Lien Secured Parties" means (i) the ABL Secured Parties and (ii) each Additional First Lien Agent and each holder of Additional First Lien Obligations.

"First Lien Security Agreement" means that certain Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, by and among the Issuer, the grantors party thereto and Bank of America, N.A., Wells Fargo Bank, National Association and General Electric Capital Corporation, as co-collateral agents, as the same has been or may be amended, supplemented or otherwise modified from time to time.

"Grantors" has the meaning provided in the preamble hereof.

"Guarantors" has the meaning provided in the preamble hereof.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement" has the meaning provided in the recitals hereof.

"Issuer" has the meaning provided in the preamble hereof.

"Junior Second Lien Agent" means any Person appointed to act as trustee, agent or representative for the holders of a series of Junior Second Lien Obligations pursuant to any Second Lien Document.

"Junior Second Lien Agreement" means any indenture, credit agreement or other agreement, if any, designated as such by the Issuer pursuant to, and as permitted by, Section 7.2 hereof.

"Junior Second Lien Joinder Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Junior Second Lien Obligations" means (i) the Senior Secured Note Obligations and (ii) any other indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Subsidiary Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the

**JX 126-7**

Liens securing the Senior Secured Note Obligations (or by the same Liens that secure the Senior Secured Note Obligations, including hereunder) and that is entitled to distributions on an equal and ratable basis with the Senior Secured Note Obligations pursuant to the Security Documents or otherwise; provided that the representative of such Junior Second Lien Obligations executes a joinder agreement (including, without limitation, pursuant to Section 7.2) or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement and in accordance with Section 5.4 hereof, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) payable to the Collateral Agent, the 2010 Trustee, the 2018 Trustee, the Second Lien Credit Agreement Agent and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to each trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to the 2010 Trustee and each other trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to Holdings.  At the Issuer's option (as certified to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent pursuant to an Officer's Certificate), any indebtedness of the Issuer or the Subsidiary Guarantors secured by a Lien on the Collateral may be Junior Second Lien Obligations.  For the avoidance of doubt, any obligations designated as Junior Second Lien Obligations pursuant to Section 7.2, subject to satisfaction of the requirements set forth therein, shall constitute Junior Second Lien Obligations.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent License" means all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent.

"Perfection Certificate" means that certain perfection certificate executed and delivered by the Grantors in connection with the execution and delivery of the 2010 Indenture, dated on or about the Issue Date (as defined in the 2010 Indenture).

"Required Secured Parties" means (i) until the Discharge of Senior Second Lien Obligations, the holders of a majority in aggregate principal amount of Senior Second Lien Obligations constituting Secured Obligations, voting together as a single class and (ii) from and after the Discharge of Senior Second Lien Obligations, the holders of a majority in aggregate principal amount of Junior Second Lien Obligations constituting Secured Obligations, voting together as a single class.

"Second Lien Credit Agreement Documents" means the Second Lien Credit Agreement, the Loan Documents (as defined in the Second Lien Credit Agreement) and the Security Documents.

JX 126-8

"Second Lien Credit Agreement Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the Second Lien Credit Agreement Agent and holders of the loans and other obligations under the Second Lien Credit Agreement Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Second Lien Credit Agreement Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Second Lien Credit Agreement Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Second Lien Documents" means the Second Lien Credit Agreement Documents, the Senior Secured Note Documents, the Senior Secured Convertible Note Documents and any other document or agreement governing any other indebtedness or other obligations that may constitute Secured Obligations, including any applicable Junior Second Lien Agreement and Senior Second Lien Agreement.

"Secured Obligations" means the collective reference to (i) the Senior Secured Note Obligations, (ii) Senior Secured Convertible Note Credit Agreement Obligations, (iii) the Second Lien Credit Agreement Obligations, (iv) all other Senior Second Lien Obligations under or in respect of any Senior Second Lien Agreement and any related agreements and documentation, and (v) all other Junior Second Lien Obligations under or in respect of any Junior Second Lien Agreement and any related agreements and documentation.

"Secured Parties" shall mean, collectively, the Collateral Agent, the 2010 Trustee, the holders of Senior Secured Notes, the Second Lien Credit Agreement Agent, the lenders and additional agents under the Second Lien Credit Agreement, the 2018 Trustee, the Holders of Senior Secured Convertible Notes, each Junior Second Lien Agent, each holder of Junior Second Lien Obligations under or pursuant to a Junior Second Lien Agreement, each Senior Second Lien Agent and each holder of Senior Second Lien Obligations under or pursuant to a Senior Second Lien Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Documents" means this Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral or any other assets to the Collateral Agent for the benefit of the Secured Parties.

"Senior Second Lien Agent" means any Person appointed to act as trustee, agent or representative for the holders of a series of Senior Second Lien Obligations pursuant to any Second Lien Document.

"Senior Second Lien Agreement" means any indenture, credit agreement or other agreement, if any, designated as such by the Issuer pursuant to, and as permitted by, Section 7.2 hereof.

-6-

**JX 126-9**

"Senior Second Lien Joinder Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Senior Second Lien Obligations" means the (i) Senior Secured Convertible Note Obligations, (ii) the Second Lien Credit Agreement Obligations, and (iii) any other indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Subsidiary Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the Liens securing the obligations in respect of the Senior Secured Convertible Note Obligations (or by the same Liens that secure obligations in respect of the Senior Secured Convertible Note Obligations and Second Lien Credit Agreement Obligations, including hereunder) and that is entitled to distributions on such Lien on an equal and ratable basis with the Senior Secured Convertible Note Obligations and Second Lien Credit Agreement Obligations pursuant to the Security Documents or otherwise; provided that the representative of such Senior Second Lien Obligations executes a joinder agreement or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement and in accordance with Section 5.4 hereof, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) payable to the Collateral Agent, the 2010 Trustee, the 2018 Trustee, the Second Lien Credit Agreement Agent and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to each trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to the 2010 Trustee and each other trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to Holdings. At the Issuer's option (as certified to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent pursuant to an Officer's Certificate), any indebtedness secured by a Lien on the Collateral may be Senior Second Lien Obligations.  For the avoidance of doubt, any obligations designated as Senior Second Lien Obligations pursuant to Section 7.2, subject to satisfaction of the requirements set forth therein, shall constitute Senior Second Lien Obligations.

"Senior Secured Note Documents" means the Senior Secured Notes, any guarantees thereof, the 2010 Indenture and the Security Documents.

"Senior Secured Note Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the 2010 Trustee and holders of the Senior Secured Notes under the Senior Secured Note Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Senior Secured Note Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Senior Secured Note Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any

**JX 126-10**

exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Senior Secured Convertible Note Documents" means the Senior Secured Convertible Notes, any guarantees thereof, the 2018 Indenture and the Security Documents.

"Senior Secured Convertible Note Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the 2018 Trustee and holders of the Senior Secured Convertible Notes under the Senior Secured Convertible Note Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Senior Secured Note Convertible Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Senior Secured Convertible Note Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Software" means all "software" as such term is defined in the New York UCC used by any Grantor to process, assemble, prepare for sale, market for sale, sell or otherwise dispose of the Collateral, other than software embedded in any category of goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Trademarks" means (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto and (ii) the right to obtain all renewals thereof.

"Trademark License" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein," "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)    Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

JX 126-11

1.3      <u>Perfection Certificate</u>.  The Collateral Agent, each Grantor and each Secured Party agree that the Perfection Certificate and all descriptions of Collateral therein and schedules, amendments and supplements thereto are and shall at all times remain a part of this Agreement.

## SECTION 2.  GRANT OF SECURITY INTEREST

2.1      <u>Collateral; Grant of Security Interest</u>.  Each Grantor hereby grants to the Collateral Agent for the equal and ratable benefit of the Secured Parties a security interest in all of the following property now owned, or at any time hereafter acquired, by such Grantor or in which such Grantor now has, or at any time in the future may acquire, any right, title or interest (collectively, the "<u>Collateral</u>"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Secured Obligations:

(a)      all Credit Card Accounts Receivable;

(b)      all Inventory;

(c)      all Chattel Paper relating to Credit Card Accounts Receivable;

(d)      all Instruments relating to Credit Card Accounts Receivable;

(e)      all Documents relating to any Inventory;

(f)      all books and records pertaining to the Collateral; and

(g)      to the extent not otherwise included, all Proceeds, insurance claims, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

2.2      <u>No Assumption of Liability</u>.  The security interest in the Collateral granted to the Collateral Agent is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.  Anything contained herein to the contrary notwithstanding, each Grantor shall remain liable under any contracts and agreements included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement and the Second Lien Documents had not been executed, the exercise by Collateral Agent of any of its rights hereunder or any of the Second Lien Documents shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and the Collateral Agent shall not have any obligation or liability under any contracts, licenses, and agreements included in the Collateral by reason of this Agreement or any of the Second Lien Documents, nor shall Collateral Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

## SECTION 3.  REPRESENTATIONS AND WARRANTIES

Each Grantor represents and warrants to the Collateral Agent and the other Secured Parties that:

3.1      <u>Title; No Other Liens</u>.  Except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and any other Permitted Lien, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No

**JX 126-12**

financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except (i) such as have been filed in favor of the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement or (ii) as are permitted by the Second Lien Documents.

3.2    <u>Perfected Liens</u>.

(a)    The security interests granted pursuant to this Agreement (a) upon completion of the filings specified on Schedule 2 (which, in the case of all financing statements referred to on said Schedule 2, have been delivered to the Collateral Agent in completed form) will constitute valid perfected security interests in all of the Collateral as to which a Lien can be perfected by filing in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof and (b) are prior to all other Liens on the Collateral in existence on the date hereof other than Permitted Liens having priority over the Liens of the Collateral Agent pursuant to applicable law or the Intercreditor Agreement.

(b)    Notwithstanding anything herein to the contrary, prior to the Discharge of First Lien Obligations, the requirements of this Agreement to deliver Collateral and any certificates, instruments or related documents to the Collateral Agent shall be deemed satisfied by delivery of such Collateral and such certificates, instruments or related documents to any First Lien Collateral Agent.  The Issuer shall deliver copies of any such certificates, instruments or related documents to the Collateral Agent.

3.3    <u>Jurisdiction of Organization</u>.    On the date hereof, such Grantor's jurisdiction of organization and identification number from the jurisdiction of organization (if any) are specified on Schedule 3.  Such Grantor has furnished to the Collateral Agent a charter, certificate of incorporation or other formation document and good standing certificate dated as of a date which is recent to the date hereof.

3.4    <u>Credit Card Accounts Receivable</u>.

(a)    No amount payable to such Grantor under or in connection with any Credit Card Accounts Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent).

(b)    Except as would not be reasonably expected to result in a material adverse effect on the business or financial condition of the Issuer and its Subsidiaries considered as a whole (a "<u>Material Adverse Effect</u>"), there are no facts, events or occurrences which would impair the validity of any Credit Card Accounts Receivable, or tend to reduce the amount payable thereunder from the face amount of the claim or invoice or statements delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent) with respect thereto (other than arising in the ordinary course of business).

3.5    <u>Related Intellectual Property</u>.    Such Grantor owns or has a license to use all Intellectual Property which is reasonably necessary to sell the Collateral in the ordinary course.  Such Grantor shall take all reasonable and necessary steps to maintain and preserve the benefit of each Trademark License, Copyright License and Patent License which relates to Intellectual Property to the extent that the use of such Intellectual Property would be reasonably necessary in connection with the Collateral Agent's enforcement of any of its remedies under the Second Lien Documents.

JX 126-13

3.6    Dealer Store Inventory.  Except as would not be reasonably expected to result in a Material Adverse Effect, (a) all of the Inventory at each Dealer Store is owned by a Grantor free and clear of any and all Liens or claims of others except for any Permitted Liens, and (b) all such Inventory is subject to a legal, valid and perfected security interest in favor of the applicable Grantor, which is prior to any other Lien on such Inventory.

SECTION 4.  COVENANTS

Each Grantor covenants and agrees with the Collateral Agent and the other Secured Parties that, until the Final Date:

4.1    Delivery of Instruments and Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Chattel Paper or transferable records, such Instrument, Chattel Paper or transferable records, shall be promptly delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent), duly indorsed in a manner satisfactory to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent), to be held as Collateral pursuant to this Agreement.

4.2    [Intentionally Omitted].

4.3    Maintenance of Perfected Security Interest; Further Documentation.

(a)    Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 3.2 and shall defend such security interest against the claims and demands of all Persons whomsoever, subject to the rights of such Grantor under the Security Documents to dispose of the Collateral.

(b)    Each Grantor shall file, and if reasonably requested by the Collateral Agent will execute or authenticate and deliver to the Collateral Agent, all financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Collateral Agent may reasonably request, from time to time in order to maintain a perfected security interest in the Collateral owned by such Grantor subject only to (i) Liens securing the First Lien Obligations and (ii) any other Permitted Lien.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Collateral Agent herein.

(c)    Each Grantor agrees that, in the event any Grantor, pursuant to the First Lien Security Agreement, takes any action to grant or perfect a Lien in favor of any First Lien Collateral Agent in any assets that constitute Collateral (other than Proceeds in the form of cash or cash equivalents) hereunder, such Grantor shall, to the extent reasonable, take a corresponding action to grant or perfect a Lien (subject to the Intercreditor Agreement) in such Collateral in favor of the Collateral Agent to secure the Secured Obligations without the request of the Collateral Agent.

4.4    Changes in Name, etc.  Such Grantor will not, except upon 15 days' prior written notice to the Collateral Agent, and the filing of all additional financing statements and other documents necessary to maintain the validity, perfection and priority of the security interests provided for herein and other documents necessary or reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests provided for herein, change its organizational form from that of a

-11-

JX 126-14

registered entity to an unregistered entity (or from an unregistered entity to a registered entity), change its jurisdiction of organization from that referred to in Section 3.3 or change its name or organizational form.

## SECTION 5.  REMEDIAL PROVISIONS

5.1    <u>Certain Matters Relating to Credit Card Accounts Receivable</u>.  At the Collateral Agent's request (or, if prior to the Discharge of First Lien Obligations, at the request of any First Lien Collateral Agent for the benefit of the Collateral Agent), at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall deliver to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent) all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Credit Card Accounts Receivable.

5.2    <u>Communications with Obligors; Grantors Remain Liable</u>.

(a)    The Collateral Agent (or, if prior to the Discharge of First Lien Obligations, any First Lien Collateral Agent for the benefit of the Collateral Agent) in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default communicate with obligors under the Credit Card Accounts Receivable to verify with them to the satisfaction of the Collateral Agent the existence, amount and terms of any Credit Card Accounts Receivable.

(b)    Upon the request of the Collateral Agent after the Discharge of First Lien Obligations, at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Credit Card Accounts Receivable that the Credit Card Accounts Receivable have been assigned to the Collateral Agent for the benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Credit Card Accounts Receivable to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  Neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any Credit Card Accounts Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Party of any payment relating thereto, nor shall the Collateral Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Credit Card Accounts Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

5.3    [<u>Intentionally Omitted</u>].

5.4    <u>Application of Proceeds</u>.  Subject to the terms of the Intercreditor Agreement, any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies, or received by the Collateral Agent in respect of all or any part of the Collateral in connection with any bankruptcy, insolvency, reorganization or similar proceeding of any Grantor, shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, as follows:

**JX 126-15**

First, to pay all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) owing to the Collateral Agent in its capacity as such in accordance with the terms of this Agreement and the other Second Lien Documents;

Second, to the 2010 Trustee in its capacity as such in accordance with the terms of the 2010 Indenture, to the Second Lien Credit Agreement Agent in its capacity as such in accordance with the terms of the Second Lien Credit Agreement, to the 2018 Trustee in its capacity as such in accordance with the terms of the 2018 Indenture and to any other Junior Second Lien Agent or Senior Second Lien Agent in its capacity as such in accordance with the terms of the applicable Junior Second Lien Agreement or Senior Second Lien Agreement, in each case ratably;

Third, to ratably pay all amounts owing to holders of Senior Second Lien Obligations (including interest, costs and attorneys' fees owed to the holders of Senior Second Lien Obligations, whether or not a claim is allowed against the Issuer or any Grantor for such interest, fees, indemnification payments, expense reimbursements and other amounts in any related bankruptcy proceeding) in accordance with the terms of the 2018 Indenture, the Second Lien Credit Agreement and any other Senior Second Lien Agreements;

Fourth, to ratably pay all amounts owing to holders of Junior Second Lien Obligations (including interest, costs and attorneys' fees owed to the holders of Junior Second Lien Obligations, whether or not a claim is allowed against the Issuer or any Grantor for such interest, fees, indemnification payments, expense reimbursements and other amounts in any related bankruptcy proceeding) in accordance with the terms of the 2010 Indenture and any other Junior Second Lien Agreements; and

Fifth, to pay the Issuer or to whomsoever may be lawfully entitled to receive the same.

All applications of proceeds pursuant to clause First above, clause Second above, clause Third above and clause Fourth above, respectively, shall be allocated among the applicable Secured Parties on a *pro rata* basis according to the principal, interest and/or other amounts owing in respect of the applicable Secured Obligations owing to such Secured Parties at the time of the distribution. In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Fourth of this Section 5.4, the Grantors shall remain liable, jointly and severally, for any deficiency.

If, despite the provisions of this Agreement, any Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the Secured Obligations to which it is then entitled in accordance with this Agreement, such Secured Party shall hold such payment or recovery in trust for the benefit of all Secured Parties for distribution in accordance with this Section 5.4.

Upon the request of the Collateral Agent prior to any distribution under this Section 5.4, each Secured Party shall provide to the Collateral Agent certificates, in form and substance reasonably satisfactory to the Collateral Agent, setting forth the respective amounts referred to in Section 5.4, that each such Secured Party believes it is entitled to receive, and the Collateral Agent shall be fully entitled to rely on such certificates.

5.5    Code and Other Remedies.

(a)    If an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, may (and at the direction of the Required Secured Parties shall (subject to any right of the Collateral Agent to require indemnity from such persons prior to taking any enforcement action)) exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other

JX 126-16

instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the New York UCC or any other applicable law.  Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may (and at the direction of the Required Secured Parties shall (subject to any right of the Collateral Agent to require indemnity from such persons prior to taking any enforcement action)) in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Each purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor.  The Collateral Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption, stay, valuation or appraisal on the part of any Grantor, which right or equity is hereby waived and released, and may credit against the purchase price the amount of any claim then due and payable from any Grantor on account of the Secured Obligations owed to the Collateral Agent, and the Collateral Agent may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor.  Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral and make it available to the Collateral Agent at the Grantor's sole risk and expense, at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.5, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Collateral Agent hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, in the order set forth in Section 5.4, and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including, without limitation, Section 9-615(a)(3) of the New York UCC, need the Collateral Agent account for the surplus, if any, to any Grantor.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against any Collateral Agent arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.  The Collateral Agent shall not be obligated to make any sale or other disposition of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale or other disposition of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Any public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale.  If any of the Collateral is sold, leased, or otherwise disposed of by the Collateral Agent on credit, the Secured Obligations shall not be deemed to have been reduced as a result thereof unless and until payment is finally received thereon by the Collateral Agent.

(b)    If an Event of Default shall occur and be continuing, with respect to any Collateral consisting of Inventory, the Collateral Agent may conduct one or more going out of business sales, in the Collateral Agent's own right or by one or more agents and contractors.  Such sale(s) may be conducted upon any premises owned, leased, or occupied by any Grantor.  The Collateral Agent and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of

JX 126-17

which other goods shall remain the sole property of the Collateral Agent or such agent or contractor). Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Collateral Agent or such agent or contractor and neither any Grantor nor any Person claiming under or in right of any Grantor shall have any interest therein. Each purchaser at any such going out of business sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor.

(c)     If an Event of Default shall occur and be continuing, with respect to any Collateral consisting of Accounts, the Collateral Agent may: (i) demand, collect and receive any amounts relating thereto, as the Collateral Agent may reasonably determine; (ii) commence and prosecute any actions in any court for the purposes of collecting any such Accounts and enforcing any other rights in respect thereof; (iii) defend, settle or compromise any action brought and, in connection therewith, give such discharges or releases as the Collateral Agent may reasonably deem appropriate; (iv) without limiting the Collateral Agent's rights set forth in Section 6.1, receive, open and dispose of mail addressed to any Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods giving rise to such Accounts or securing or relating to such Accounts, on behalf of and in the name of such Grantor; and (v) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any such Accounts or the goods or services which have given rise thereto, as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes.

(d)     If an Event of Default shall occur and be continuing, with or without legal process and with or without prior notice or demand for performance, the Collateral Agent may enter upon, occupy, and use any premises owned or occupied by each Grantor. The Collateral Agent shall not be required to remove any of the Collateral from any such premises upon taking possession thereof, and may render any Collateral unusable to the Grantors. In no event shall the Collateral Agent be liable to any Grantor for use or occupancy by the Collateral Agent of any premises pursuant to this Section 5.5, nor for any charge (such as wages for the Grantors' employees and utilities) reasonably incurred in connection with the Collateral Agent's exercise of its rights and remedies hereunder.

(e)     For purposes of this Section 5.5, a written and fully executed agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof. The Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full.

(f)     To the extent permitted by applicable law, each Grantor hereby waives all rights of redemption, stay, valuation and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent shall have no obligation to marshal any of the Collateral or resort to any of the property or assets of any Grantor in any particular manner or order.

5.6     Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Secured Obligations and the fees and disbursements of any attorneys employed by the Collateral Agent or any other Secured Party to collect such deficiency.

5.7     Grant of License in Intellectual Property, Software and other Assets.

JX 126-18

(a)    For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby (i) assigns and transfers to the Collateral Agent and grants the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or any other compensation to such Grantor or any Affiliate of such Grantor) to use, license or sublicense, any related Intellectual Property now owned or licensed or hereafter owned, licensed or otherwise acquired by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof and (ii) irrevocably agrees that the Collateral Agent may sell any of such Grantor's Inventory directly to any Person, including, without limitation, Persons who have previously purchased such Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Collateral Agent's rights under this Agreement, may sell Inventory which bears any Trademark owned by or licensed to such Grantor and any Inventory that is covered by any Copyright owned by or licensed to such Grantor and the Collateral Agent may finish any work in process and affix any Trademark owned by or licensed to such Grantor and sell such Inventory as provided herein; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such Intellectual Property, this Agreement shall not constitute a license to use, license or sublicense, any Intellectual Property to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such Intellectual Property, except to the extent that (x) the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (y) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such Intellectual Property was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

(b)    For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby assigns and transfers to the Collateral Agent and grants to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or any other compensation to such Grantor or any other Person) to use, license or sublicense, any Software now owned or licensed or hereafter owned, licensed or otherwise acquired by such Grantor; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such Software, this Agreement shall not constitute a license to use, license or sublicense, any Software to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such Software, except to the extent that (i) the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (ii) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such Software was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

(c)    Without duplication of the rights granted to the Collateral Agent in clauses (a) and (b) of this Section 5.7, and for the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby assigns and transfers to the Collateral Agent and grants to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an

**JX 126-19**

irrevocable, nonexclusive license (exercisable without payment of royalty, rent or any other compensation to such Grantor or any other Person), to use, license or sublicense, any real property or personal property of such Grantor which does not constitute Collateral, including but not limited to, all Equipment, Fixtures, General Intangibles and Goods, whether now or hereafter owned, leased or occupied by such Grantor; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such real or personal property, this Agreement shall not constitute a license to use, license or sublicense, any real or personal property to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any lease, contract, license, agreement, instrument or other document evidencing or giving rise to such property or any rights therein, except to the extent that (i) the term in such lease, contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (ii) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such real property or personal property was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

SECTION 6.  THE COLLATERAL AGENT

6.1   Collateral Agent's Appointment as Attorney-in-Fact, etc.

(a)   Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to, or assent by such Grantor, to do any or all of the following:

(i)   in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Credit Card Accounts Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Credit Card Accounts Receivable or with respect to any other Collateral whenever payable;

(ii)   pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iii)   execute, in connection with any sale provided for in Section 5.5, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(iv)   (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder as the Collateral Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other

-17-

**JX 126-20**

documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; and (7) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and any other Secured Party's security interest therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 6.1(a) to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 6.1(a) unless an Event of Default shall have occurred and be continuing.

(b)    Without limitation to the Collateral Agent's or any other Secured Party's rights to payment, reimbursement or indemnification under any other Security Document, the expenses of the Collateral Agent incurred in connection with actions undertaken as provided in Sections 6.1 and 7.6 shall be payable by any applicable Grantor to the Collateral Agent on demand.

(c)    Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

6.2    Duty of Collateral Agent.  The applicable provisions of the Second Lien Documents are herein incorporated by reference and shall be applicable to the rights, obligations, privileges, protections, immunities and benefits given to the Collateral Agent hereunder, including without limitation its right to be compensated, reimbursed, and indemnified, and are extended to, and shall be enforceable by, each agent, custodian and other person employed to act on behalf of the Collateral Agent hereunder.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the New York UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account.  The Collateral Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Liens on the Collateral.  Neither the Collateral Agent nor any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Collateral Agent and the other Secured Parties hereunder are solely to protect the Collateral Agent's and the other Secured Parties' interests in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct, as determined by a final and non-appealable judgment of a court of competent jurisdiction.  In furtherance and not in limitation of

JX 126-21

the foregoing, Wilmington Trust, National Association hereby agrees to act as Collateral Agent under and as defined in the 2018 Indenture upon and in accordance with the express terms and conditions contained therein and the other Senior Secured Convertible Note Documents, as applicable.

6.3    <u>Execution of Financing Statements</u>.  Each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Agreement.

6.4    <u>Authority of the Collateral Agent</u>.   Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Collateral Agent and the other Secured Parties, be governed by the Second Lien Documents and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

6.5    <u>Second Lien Obligations</u>.   The Collateral Agent shall be permitted to rely on any certificate, direction or consent delivered by any agent with respect to any series of Secured Obligations under any Second Lien Documents with respect to all matters relating to the relevant Secured Obligations.

SECTION 7.  MISCELLANEOUS

7.1    <u>Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder, in each case, with respect to the Collateral are subject to the limitations and provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control.  By its execution and delivery of this Agreement, each Junior Second Lien Agent and Senior Second Lien Agent authorizes and directs the Collateral Agent to execute and deliver the Intercreditor Agreement and perform its obligations thereunder, binding such Junior Second Lien Agent and Senior Second Lien Agents and their respective Secured Parties to the terms thereof.

7.2    <u>Second Lien Obligations</u>. On or after the date hereof and so long as not prohibited by the Second Lien Documents with respect to each series of Secured Obligations, the Issuer may from time to time designate any indenture, credit agreement or other contract to be a Junior Second Lien Agreement or Senior Second Lien Agreement and the indebtedness and other obligations thereunder to be secured as Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, by delivering to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent, if any, (a) a certificate signed by an Officer of the Issuer (i) identifying the obligations so designated and the initial aggregate principal amount or face amount thereof, (ii) stating that such agreement is designated as a Junior Second Lien Agreement or Senior Second Lien Agreement, as applicable, and such obligations are designated as (A) Secured Obligations and (B) Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, for purposes hereof, (iii) representing that such designation of such obligations as Secured Obligations and Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, complies with the terms of  the Second Lien Documents with respect to each series of Secured Obligations and (iv) specifying the name and address of the Junior Second Lien Agent or Senior Second Lien Agent, as applicable, for such obligations and (b) a fully executed Junior Second Lien Joinder Agreement or Senior Second Lien Joinder Agreement, as applicable.  Each Junior Second Lien

-19-

**JX 126-22**

Agent and Senior Second Lien Agent that becomes party hereto pursuant to a Junior Second Lien Joinder Agreement or Senior Second Lien Joinder Agreement agrees that upon the satisfaction of all conditions set forth in the preceding sentence, the Collateral Agent shall act as agent under this Agreement for such Junior Second Lien Agent or Senior Second Lien Agent and the holders of such Junior Second Lien Obligations or Senior Second Lien Obligations, and as Collateral Agent for the benefit of all Secured Parties, including without limitation, any Secured Party that holds any such Junior Second Lien Obligations or Senior Second Lien Obligations, and each such Junior Second Lien Agent or Senior Second Lien Agent, for itself and the other holders of the applicable Junior Second Lien Obligations or Senior Second Lien Obligations, agrees to the appointment, and acceptance of the appointment, of the Collateral Agent as agent for such Junior Second Lien Agent or Senior Second Lien Agent and the holders of such Junior Second Lien Obligations or Senior Second Lien Obligations, as set forth in each Junior Second Lien Joinder Agreement and Senior Second Lien Joinder Agreement and agrees, on behalf of itself and each Secured Party it represents, to be bound by this Agreement and to be subject to, and, if requested, to become a party to, the Intercreditor Agreement.  Notwithstanding the foregoing, it is understood that the Issuer shall not designate, or re-designate, any Senior Second Lien Agreement existing on the date hereof as a Junior Second Lien Agreement (and any related Senior Second Lien Obligations as Junior Second Lien Obligations) without the consent of the applicable Senior Second Lien Agent.

7.3    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with the provisions of each Junior Second Lien Agreement and Senior Second Lien Agreement.

7.4    Notices.  All notices, requests and demands to or upon the Collateral Agent or any Grantor hereunder shall be given in writing and delivered in person, sent by telecopy, delivered electronically, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

To the Collateral Agent:

Wilmington Trust, National Association, as Collateral Agent
Global Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Sears Holdings Corporation Administrator

To any Grantor:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179
Facsimile:  (847) 286-2055
Attention:  Treasurer

With a copy to (which shall not constitute notice):

Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 403-2000
Attention: Joshua A. Feltman

JX 126-23

Any such notice, request or demand to or upon any Junior Second Lien Agent or Senior Second Lien Agent shall be addressed to such Junior Second Lien Agent or Senior Second Lien Agent at its notice address set forth in the applicable Second Lien Document.

7.5    No Waiver by Course of Conduct; Cumulative Remedies.    Neither the Collateral Agent nor any other Secured Party shall by any act (except by a written instrument pursuant to Section 7.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Collateral Agent or any other Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Collateral Agent or any other Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Collateral Agent or such other Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

7.6    Enforcement Expenses; Indemnification.    Without limitation to the Collateral Agent's or any other Secured Party's rights to payment, compensation, reimbursement or indemnification under any other Security Document:

(a)    each Grantor jointly and severally agrees to pay or reimburse the Collateral Agent and the other Secured Parties for all their costs and expenses incurred in collecting against any Grantor under this Agreement or otherwise enforcing or preserving any rights under this Agreement and the other Security Documents, including, without limitation, the fees and disbursements of the Secured Parties' counsel in accordance with the terms of the Second Lien Documents;

(b)    each Grantor agrees to pay, and to save the Collateral Agent and the other Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement and the other Security Documents;

(c)    each Grantor agrees to pay, and to save the Collateral Agent and the other Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and the other Security Documents other than such as arise from the gross negligence or willful misconduct of such Person; and

(d)    to the fullest extent permitted by applicable Law, no Grantor shall assert, and each Grantor hereby waives, any claim against the Collateral Agent and the other Secured Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Security Document or any agreement or instrument contemplated hereby, or the transactions contemplated hereby or thereby.  Neither the Collateral Agent nor any other Secured Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by the Collateral Agent or other Secured Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Security Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of the Collateral Agent or other Secured Party as determined by a final and non-appealable judgment of a court of competent jurisdiction.

-21-

JX 126-24

The agreements in this Section 7.6 shall survive repayment of the Secured Obligations and all other amounts payable under the Security Documents and the other Second Lien Documents, the replacement of the Collateral Agent, the release of the Collateral from the Liens created hereby and the termination of this Agreement.

7.7    Successors and Assigns.    This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement except as permitted by each of the Second Lien Documents.

7.8    [Intentionally Omitted].

7.9    Counterparts.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.    Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic mail of a "PDF" file shall be effective as delivery of a manually executed counterpart of this Agreement.

7.10    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.11    Section Headings.    The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

7.12    Integration.    This Agreement and the other Security Documents represent the agreement of the Grantors, the Collateral Agent and the other Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Collateral Agent or the other Secured Parties relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Security Documents.

7.13    GOVERNING LAW.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

7.14    Acknowledgements.    Each Grantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Security Documents to which it is a party;

(b)    neither the Collateral Agent nor any other Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Security Document, and the relationship between the Grantors, on the one hand, and the Collateral Agent and the other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

-22-

JX 126-25

(c)      no joint venture is created hereby or by the other Security Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

7.15    <u>Additional Grantors.</u> Each Subsidiary of the Issuer that is required to become a party to this Agreement pursuant to Section 4.06 of the 2018 Indenture or pursuant to any other Second Lien Document shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of <u>Exhibit II</u> hereto to the Collateral Agent.

7.16    <u>Releases.</u> This Agreement shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon each Grantor and the successors and assigns thereof and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their respective successors, indorsees, transferees and assigns until the Final Date.  In addition, the security interests granted hereunder shall terminate and be released, in whole or in part, (i) as to the obligations under the 2010 Indenture and the Senior Secured Notes, as provided in the 2010 Indenture, (ii) as to the obligations under the Second Lien Credit Agreement, as provided in the Second Lien Credit Agreement, (iii) as to the obligations under the 2018 Indenture and the Senior Secured Convertible Notes, as provided in the 2018 Indenture and (iv) as to any other Junior Second Lien Obligations or Senior Second Lien Obligations that may become Secured Obligations, as provided in the applicable Junior Second Lien Agreement or Senior Second Lien Agreement; <u>provided</u>, <u>however</u>, that this Agreement and the security interest granted herein shall be reinstated if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization of the Issuer or other Grantor.  At the request and sole expense of any Grantor following any such termination, the Collateral Agent shall deliver to such Grantor any Collateral held by the Collateral Agent hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

7.17    <u>Jurisdiction, Etc.</u>

(a)      Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Security Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Each Grantor hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to the Issuer at its address specified pursuant to Section 13.02 of the 2018 Indenture.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Security Documents in the courts of any jurisdiction.

(b)      Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Security Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

-23-

JX 126-26

7.18    WAIVER OF JURY TRIAL.  EACH GRANTOR AND THE COLLATERAL AGENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER SECURITY DOCUMENTS OR THE ACTIONS OF THE COLLATERAL AGENT OR ANY OTHER SECURED PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

7.19    The 2010 Trustee is executing this Agreement solely as Trustee under the 2010 Indenture. All rights, privileges, protections and immunities in favor of the 2010 Trustee under the 2010 Indenture are incorporated herein by reference.  The 2018 Trustee is executing this Agreement solely as Trustee under the 2018 Indenture. All rights, privileges, protections and immunities in favor of the 2018 Trustee under the 2018 Indenture are incorporated herein by reference.

[Remainder of page intentionally left blank]

JX 126-27

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**Grantors:**

SEARS HOLDINGS CORPORATION

By: _____
       Name:  Robert A. Riecker
       Title:  Chief Financial Officer

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART CORPORATION
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.

By: _____
       Name:  Robert A. Riecker
       Title:  Chief Financial Officer

SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By: _____
       Name:  Robert A. Riecker
       Title:  President

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
       Name:  Robert A. Riecker
       Title:  Vice President, Finance

Signature Page to Security Agreement

**JX 126-28**

A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
KLC, INC.
KMART OF MICHIGAN, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President

KMART.COM LLC

By: BlueLight.com, Inc., its Member

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By: Kmart Corporation, its Member

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

Signature Page to Security Agreement

**JX 126-29**

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By: *Lynn M. Steiner*
　　Name:　Lynn M. Steiner
　　Title:　Vice President

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as 2010 Trustee

By: *Lynn M. Steiner*
　　Name:　Lynn M. Steiner
　　Title:　Vice President

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A.,
as 2018 Trustee


By: _____
　　Name:
　　Title:


JPP, LLC,
as Second Lien Credit Agreement Agent


By: _____
　　Name:
　　Title:


*[Signature Page to Security Agreement]*

**JX 126-30**

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
     Name:
     Title:

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as 2010 Trustee

By: _____
     Name:
     Title:

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A.,
as Trustee

By: _____
     Name:  Michael A. Smith
     Title:  Trust Officer

JPP, LLC

By: _____
     Name:
     Title:

*[Signature Page to Security Agreement]*

**JX 126-31**

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
        Name:
        Title:

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as 2010 Trustee

By: _____
        Name:
        Title:

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A.

By: _____
        Name:
        Title:

JPP, LLC

By: _____
        Name:  Edward S. Lampert
        Title:  Member

*[Signature Page to Security Agreement]*

**JX 126-32**

Schedule 1

GRANTORS AND NOTICE ADDRESSES OF GRANTORS

| Grantor | Notice Address |
|---|---|
| Sears Roebuck Acceptance Corp. | 3711 Kennett Pike<br>Greenville, DE 19807 |
| Kmart Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Holdings Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Factory Service, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Home Delivery, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Lawn & Garden, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Signature Service, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| California Builder Appliances, Inc. | 6085 State Farm Dr., Suite 200<br>Rohnert Park, CA 94928 |
| Florida Builder Appliances, Inc. | 1742 W. Atlantic Blvd.<br>Pompano Beach, FL 33069 |
| KLC, Inc. | 5000 San Dario<br>Laredo, TX 78041 |
| Kmart Holding Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart of Michigan, Inc. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart of Washington LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Operations LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Stores of Illinois LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Stores of Texas LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart.com LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |

JX 126-33

| Grantor | Notice Address |
|---------|----------------|
| MyGofer LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Private Brands, Ltd. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Brands Management Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Holdings Management Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Home Improvement Products, Inc. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Operations LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Protection Company | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Protection Company (Florida), L.L.C. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears, Roebuck and Co. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears, Roebuck de Puerto Rico, Inc. | Montehiedra Town Center-Kmart 2nd Flr.<br>9410 Avenida Los Romeros<br>San Juan, PR 00926 |
| SOE, Inc. | 9025 S. Kyrene Road<br>Tempe, AZ 85284 |
| StarWest, LLC | 9025 S. Kyrene Road<br>Tempe, AZ 85284 |

**JX 126-34**

Schedule 2

FILINGS

Uniform Commercial Code Filings

UCC-1 Financing Statements to be filed against the Grantors specified below with the Secretary of State of the jurisdictions set forth next to such Grantor's name:

| Grantor | Jurisdiction |
| --- | --- |
| Sears Roebuck Acceptance Corp. | Delaware |
| Kmart Corporation | Michigan, Puerto Rico and Guam |
| Sears Holdings Corporation | Delaware |
| A&E Factory Service, LLC | Delaware |
| A&E Home Delivery, LLC | Delaware |
| A&E Lawn & Garden, LLC | Delaware |
| A&E Signature Service, LLC | Delaware |
| California Builder Appliances, Inc. | Delaware |
| Florida Builder Appliances, Inc. | Delaware |
| KLC, Inc. | Texas |
| Kmart Holding Corporation | Delaware |
| Kmart of Michigan, Inc. | Michigan |
| Kmart of Washington LLC | Washington |
| Kmart Operations LLC | Delaware |
| Kmart Stores of Illinois LLC | Illinois |
| Kmart Stores of Texas LLC | Texas |
| Kmart.com LLC | Delaware |
| MyGofer LLC | Delaware |
| Private Brands, Ltd. | Delaware |
| Sears Brands Management Corporation | Delaware and Puerto Rico |
| Sears Holdings Management Corporation | Delaware and Puerto Rico |
| Sears Home Improvement Products, Inc. | Pennsylvania |
| Sears Operations LLC | Delaware |
| Sears Protection Company | Illinois |
| Sears Protection Company (Florida), L.L.C. | Florida |

<strong>JX 126-35</strong>

| Sears, Roebuck and Co. | New York, Puerto Rico and Guam |
| Sears, Roebuck de Puerto Rico, Inc. | Delaware and Puerto Rico |
| SOE, Inc. | Delaware |
| StarWest, LLC | Delaware |

**JX 126-36**

<u>Schedule 3</u>

LOCATION OF JURISDICTION OF ORGANIZATION

| Grantor | Jurisdiction of Organization | Identification Number |
|---|---|---|
| Sears Roebuck Acceptance Corp. | Delaware | 0506120 |
| Kmart Corporation | Michigan | 142467 |
| Sears Holdings Corporation | Delaware | 3881360 |
| A&E Factory Service, LLC | Delaware | 3457178 |
| A&E Home Delivery, LLC | Delaware | 3877029 |
| A&E Lawn & Garden, LLC | Delaware | 3748766 |
| A&E Signature Service, LLC | Delaware | 3748765 |
| California Builder Appliances, Inc. | Delaware | 2862479 |
| Florida Builder Appliances, Inc. | Delaware | 2143982 |
| KLC, Inc. | Texas | 1276656 |
| Kmart Holding Corporation | Delaware | 3648953 |
| Kmart of Michigan, Inc. | Michigan | 33800A |
| Kmart of Washington LLC | Washington | 602292492 |
| Kmart Operations LLC | Delaware | 5671829 |
| Kmart Stores of Illinois LLC | Illinois | 00912026 |
| Kmart Stores of Texas LLC | Texas | 800200422 |
| Kmart.com LLC | Delaware | 3138594 |
| MyGofer LLC | Delaware | 4631467 |
| Private Brands, Ltd. | West Virginia | 110640 |
| Sears Brands Management Corporation | Delaware | 0617118 |
| Sears Holdings Management Corporation | Delaware | 4041132 |
| Sears Home Improvement Products, Inc. | Pennsylvania | 2204417 |
| Sears Operations LLC | Delaware | 5671833 |
| Sears Protection Company | Illinois | 61825622 |
| Sears Protection Company (Florida), L.L.C. | Florida | L03000020977 |
| Sears, Roebuck and Co. | New York | NONE |
| Sears, Roebuck de Puerto Rico, Inc. | Delaware | 0561919 |
| SOE, Inc. | Delaware | 3816328 |

**JX 126-37**

| StarWest, LLC | Delaware | 3833707 |

**JX 126-38**

<u>EXHIBIT I</u>

[Form of]

**[JUNIOR SECOND LIEN]/[SENIOR SECOND LIEN] JOINDER AGREEMENT**

The undersigned (the "<u>[Junior Second Lien]/[Senior Second Lien] Agent</u>") is the [agent/trustee/representative] for Persons wishing to become "Secured Parties" (the "New Secured Parties") under the Amended and Restated Security Agreement, dated as of March 20, 2018 (as amended and/or supplemented, the "Security Agreement" (terms used without definition herein have the meanings assigned to such terms by the Security Agreement)) among Sears Holdings Corporation, the other Grantors party thereto, Wilmington Trust, National Association, as Collateral Agent (the "Collateral Agent") and the other agents party thereto.

In consideration of the foregoing, the undersigned hereby:

(i)    represents that the [Junior Second Lien]/[Senior Second Lien] Agent has been authorized by the New Secured Parties to become a party to the Security Agreement on behalf of the New Secured Parties under that [DESCRIBE OPERATIVE AGREEMENT] (the obligations thereunder and under the ancillary documents referred to therein, the "New Secured Obligations") and to act as the [Junior Second Lien]/[Senior Second Lien] Agent for the New Secured Parties hereunder and under the Security Agreement;

(ii)    acknowledges that the New Secured Parties have received a copy of the Security Agreement;

(iii)    irrevocably appoints and authorizes the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Security Agreement and the other Security Documents as are delegated to the Collateral Agent by the terms thereof, together with all such powers as are reasonably incidental thereto; and

(iv)    accepts and acknowledges, for itself and the other New Secured Parties, the terms of the Security Agreement applicable to it and the New Secured Parties and agrees to serve as [Junior Second Lien]/[Senior Second Lien] Agent for the New Secured Parties with respect to the New Secured Obligations and agrees on its own behalf and on behalf of the New Secured Parties to be bound by the terms of the Security Agreement and the other Security Documents applicable to holders of Secured Obligations, with all the rights and obligations of a Secured Party thereunder and bound by all the provisions thereof as fully as if it had been a Secured Party on the effective date of the Security Agreement.

The name and address of the representative for purposes of Section 7.4 of the Security Agreement are as follows:

**[name and address of [Junior Second Lien]/[Senior Second Lien] Agent]**

**JX 126-39**

IN WITNESS WHEREOF, the undersigned has caused this [Junior Second Lien]/[Senior Second Lien] Joinder Agreement to be duly executed by its authorized officer as of the _____ day of , 20__.

[NAME]

By: _____
     Name:
     Title:


AGREED TO AND ACCEPTED:

The Collateral Agent hereby acknowledges its acceptance of this [Junior Second Lien]/[Senior Second Lien] Joinder Agreement and agrees to act as Collateral Agent for the New Secured Parties, subject to the terms of the [agency agreement, dated as of _____].

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____
     Name:
     Title:

**JX 126-40**

EXHIBIT II

## FORM OF ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT, dated as of [_____, 20__], made by [_____] (the "Additional Grantor"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, as collateral agent (the "Collateral Agent"), for the benefit of the Secured Parties pursuant to the Security Agreement referred to below.  All capitalized terms not defined herein shall have the meaning ascribed to them in such Security Agreement.

W I T N E S S E T H

WHEREAS, Sears Holdings Corporation ("Holdings") and certain of its Subsidiaries (other than the Additional Grantor) have entered into that certain Amended and Restated Security Agreement, dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"), in favor of the Collateral Agent for the benefit of the Secured Parties;

WHEREAS, the Security Agreement and/or the applicable Second Lien Documents (as defined in the Security Agreement) requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement.

NOW, THEREFORE, IT IS AGREED:

1. Security Agreement.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 7.15 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder, and grants to the Collateral Agent for the benefit of the Secured Parties a security interest in all Collateral of such Additional Grantor to secure the Secured Obligations.  The information set forth in Annex 1-A hereto is hereby added to the information set forth in the Schedules to the Security Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Section 3 of the Security Agreement is, as to such Additional Grantor, true and correct on and as of the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2. Governing Law.  THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

[Remainder of Page intentionally left blank]

**JX 126-41**

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]

By: _____
    Name:
    Title:

JX 126-42

Annex 1-A to
Assumption Agreement

Supplement to Schedule 1

Supplement to Schedule 2

Supplement to Schedule 3

JX 126-43

# Exhibit 88

EXHIBIT I
TO
ADDENDUM TO PROOF OF CLAIM FILED BY
WILMINGTON TRUST, NATIONAL ASSOCIATION
AS INDENTURE TRUSTEE AND COLLATERAL AGENT

PERFECTION OF SECURITY INTERESTS

**DEBTOR**: Sears Holdings Corporation, a Delaware corporation ("Holdings")

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552621 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655941 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Kmart Corporation, a Michigan corporation ("Kmart")

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| MI SOS | 2010137071- 6 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| MI SOS | 2015088447- 3 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 28756 | 10/13/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 29179 | 6/23/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005803 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

1

54948054v.4

**DEBTOR**: Sears, Roebuck and Co., a New York corporation ("SRAC")

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| NY SOS | 201010120551842 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| NY SOS | 201608150389181 | 8/15/2016 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 28757 | 10/13/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 29178 | 6/23/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010 005906 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552951 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656170 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005908 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: A&E Home Delivery, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550047 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2654746 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

JX 127-2

18-23561-rdd    Claim 1-1    Filed 02/20/19    Pg 207 of 213

54948054v.4

**DEBTOR**: A&E Lawn & Garden, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550377 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2654829 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: A&E Signature Service, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550617 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655032 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: California Builder Appliances, Inc., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550781 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655198 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Florida Builder Appliances, Inc., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550880 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655248 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: KLC, Inc., a Texas corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| TX SOS | 10-0029500067 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| TX SOS | 15-00202816 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

54948054v.4

**JX 127-4**

**DEBTOR**: Kmart Stores of Illinois LLC, an Illinois limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| IL SOS | 15671645 FS | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| IL SOS | 9362229 CT | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Kmart Stores of Texas LLC, a Texas limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| TX SOS | 10-0029500188 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| TX SOS | 15-00202815 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Kmart Holding Corporation, a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3551052 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655339 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Kmart Management Corporation, a Michigan corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| MI SOS | 2010137072-8 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| MI SOS | 2015088445-9 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Kmart of Michigan, Inc., a Michigan corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| MI SOS | 2010137075-4 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| MI SOS | 2015088446-1 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

54948054v.4

**DEBTOR**: Kmart of Washington LLC, a Washington limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| WA SOS | 2010-286-2911-6 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| WA SOS | 2015-173-1581-0 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Kmart.com LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010-3551169 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015-2655503 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: MyGofer LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010-3552241 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015-265594 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Private Brands, Ltd., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2011-1274409 | 4/6/2011 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2014-2601474 | 7/1/2014 | UCC-3 Amendment | Wilmington Trust, National Association, as Collateral Agent |
| DE SOS | 2015-4635032 | 10/12/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

JX 127-6

18-23561-rdd   Claim 1-1   Filed 02/20/19   Pg 211 of 213

**DEBTOR**: Sears Protection Company, an Illinois corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| IL SOS | 15671653 FS | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| IL SOS | 9362228 CT | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: SOE, Inc., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3553140 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656287 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears Brands Management Corporation., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552597 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655727 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005909 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears Holdings Management Corporation, a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552670 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656006 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005910 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

54948054v.4

JX 127-7

18-23561-rdd    Claim 1-1    Filed 02/20/19    Pg 212 of 213

**DEBTOR**: Sears Home Improvement Products Inc., a Pennsylvania corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| PA SOS | 2010101403403 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| PA SOS | 2015062307829 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears Protection Company (Florida), L.L.C., a Florida limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| FL SOS | 201003379646 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| FL SOS | 201504201653 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears Roebuck Acceptance Corp., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552795 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656071 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: StarWest, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3553223 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656337 | 6/22/2015 | UCC3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: A&E Factory Service, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2016 5717614 | 9/19/2016 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

54948054v.4

**DEBTOR**: Kmart Operations LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2015 2918638 | 7/7/2015 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears Operations LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2015 2918596 | 7/7/2015 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

54948054v.4

# Exhibit 89

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ MaxServ, Inc. (18-23550) | ☐ Wally Labs LLC (18-23563) | ☐ Kmart of Michigan, Inc. (18-23576) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ Private Brands, Ltd. (18-23551) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ SHC Desert Springs, LLC (18-23577) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Sears Development Co. (18-23552) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SOE, Inc. (18-23578) |
| ✓ Kmart Operations LLC (18-23540) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ StarWest, LLC (18-23579) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ KBL Holding Inc. (18-23567) | ☐ STI Merchandising, Inc. (18-23580) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KLC, Inc. (18-23568) | ☐ Troy Coolidge No. 13, LLC (18-23581) |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ BlueLight.com, Inc. (18-23582) |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Kmart of Washington LLC (18-23570) | ☐ Sears Brands, L.L.C. (18-23583) |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Protection Company (18-23558) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Buying Services, Inc. (18-23584) |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Kmart.com LLC (18-23585) |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ MyGofer LLC (18-23573) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Corporation (18-23549) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Promotions LLC (18-23630) |

RECEIVED

JAN 04 2019

PRIME CLERK LLC

*1823538800030071*

[ ✓ ] Date Stamped Copy Returned
[ ] No Self-Addressed Stamped Envelope
[ ] No Copy Provided

## Modified Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

JPP, LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o Cleary Gottlieb Steen & Hamilton
Attn: Sean O'Neal
One Liberty Plaza
New York, NY 10006

Contact phone  212-225-2416

Contact email  soneal@cgsh.com

Where should payments to the creditor be sent? (if different)

ESL Investments, Inc.
1170 Kane Concourse Suite 200
Bay Harbor Islands, FL 33154
c/o Harold Talisman

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Proof of Claim

page 1

Claim Number: 7253

**JX 129-1**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 890,683,112.72 ; See Annex A . **Does this amount include interest or other charges?**

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned; See Annex A

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe:  Liens on credit card receivables and inventory; see Annex A

**Basis for perfection:**  See Annex A
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $ see Annex A

**Amount of the claim that is secured:**  $ 890,683,112.72

**Amount of the claim that is unsecured:**  $ 0 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ N/A

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed        **Term Loan:** Variable Rate;
☐ Variable     **Second Lien Line of Credit Loans:** Fixed Rate; See Annex A

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.  $ _____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Modified Form 410                    **Proof of Claim**                    page 2

**JX 129-2**

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. Check one:

|  |  | Amount entitled to priority |
|---|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | | $_____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.    $_____

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/24/2018  (mm/dd/yyyy)

_Signature_

**Print the name of the person who is completing and signing this claim:**

**Name of the person who is completing and signing this claim:**

| Name | Harold Talisman | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Authorized Signatory | | |
| Company | JPP, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1170 Kane Concourse Suite 200 | | |
| | Number   Street | | |
| | Bay Harbor Islands | FL | 33154 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

Modified Form 410                          **Proof of Claim**                          page 3

**JX 129-3**

## ANNEX A TO PROOF OF CLAIM OF JPP, LLC., AS AGENT

JPP, LLC, as agent, ("JPP" or, in its role as agent, "Agent[1]") for the lenders under that

certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended by the First

Amendment to Second Lien Credit Agreement, dated as of July 7, 2017, the Second Amendment

to Second Lien Credit Agreement, dated as of January 9, 2018, the Third Amendment to Second

Lien Credit Agreement, dated as of February 7, 2018, the Fourth Amendment to Second Lien

Credit Agreement, dated as of March 20, 2018, the Fifth Amendment to Second Lien Credit

Agreement, dated as of July 5, 2018, and as may be further amended, restated, supplemented or

otherwise modified from time to time, the "Credit Agreement"), by and among (a) JPP and JPP

II, LLC ("JPP II" and collectively with JPP, the "Initial Lender"), (b) Sears Roebuck Acceptance

Corp. and Kmart Corporation (collectively, as borrower the "Borrower"); and (c) Sears Holdings

Corporation ("Sears") and certain Sears affiliates as guarantors[2] (the Borrower together with the

Guarantor, the "Obligors") hereby files the accompanying proof of claim (the "Proof of Claim")

against the Obligors.  On October 15, 2018 (the "Petition Date"), the Obligors and certain

affiliated debtors filed voluntary petitions under chapter 11 of Title 11 of the United States Code,

11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code") in the United States Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court").  As described in the

Proof of Claim and set forth in more detail herein, Agent holds a claim against each of the

---

[1]        The defined term "Agent" shall also include any affiliates that act on behalf of Agent, as well as any
successors or assigns thereof.

[2]        Sears Holdings Corporation; Kmart Corporation; Sears Roebuck Acceptance Corp.; A&E Home Delivery,
LLC; A&E Lawn & Garden, LLC; A&E Signature Service, LLC; California Builder Appliances, Inc.; Florida
Builder Appliances, Inc.; KLC, Inc.; Kmart Holding Corporation; Kmart Of Michigan, Inc.; Kmart of Washington;
Kmart Operations LLC; Kmart Stores of Illinois LLC; Kmart Stores of Texas LLC; Kmart.com LLC; Mygofer LLC;
Private Brands, Ltd.; Sears Brands Management Corporation; Sears Holdings Management Corporation; Sears
Home Improvement Products, Inc.; Sears Operations LLC; Sears Protection Company; Sears Protection Company
(Florida), L.L.C.; Sears, Roebuck and Co.; Sears Roebuck De Puerto Rico, Inc.; Soe, Inc.; Starwest, LLC; A&E
Factory Service, LLC (collectively, the "Guarantor").

**JX 129-4**

Obligors arising from the Credit Agreement, which is secured by valid and enforceable security interests in the form of second liens on Borrower's inventory, credit card accounts receivable, and related assets (the "Second Lien Collateral"), as set out in the Amended and Restated Security Agreement (the "Security Agreement"), dated as of March 20, 2018 (the "Claim").[3]

Basis for Claim

1.    The Credit Agreement, with JPP as agent, provides for (a) a term loan, (b) line of credit loans, and (c) alternative tranche line of credit loans, as described in further detail herein.

　　a.  Term Loan

2.    The Obligors and the Initial Lender entered into a term loan under the Second Lien Credit Agreement, dated as of September 1, 2016, with a maturity date of July 20, 2020 and with the obligations owing thereunder bearing interest at a rate, at the election of the Borrower, of either the London Interbank Offered Rate ("LIBOR") (subject to a 1.00% floor) or a specified prime rate ("Base Rate[4]"), in either case plus an applicable margin. The applicable margin with respect to the term loan is 7.50% for LIBOR loans and 6.50% for Base Rate loans. *See* Sears Holdings Corp., Form 8-K, Ex. 10.1 Second Lien Credit Agreement (Sept. 2, 2016), https://www.sec.gov/Archives/edgar/data/1310067/000119312516700856/d233737dex101.htm.

3.    The Obligors and the Initial Lender entered into that certain Fourth Amendment to Second Lien Credit Agreement, dated as of March 20, 2018, pursuant to which interest may be paid, at the Borrower's election, in cash in same day funds or by increasing the Loan's

---

[3]    This Annex constitutes a part of the Proof of Claim and is incorporated therein by reference. This Annex also incorporates by reference to the Proof of Claim certain supporting documents relating to the Claim, which documents are in the possession of the Obligors. To the extent that the Obligors require such supporting documents, the Agent will provide copies upon request.

[4]    The Base Rate is a daily "fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month Interest Period) plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by the First Lien Agent as its 'prime rate.'"

**JX 129-5**

outstanding principal amount by the amount of interest payable (a "PIK Election"). *See* Sears

Holdings Corp., Form 8-K, Ex. 10.1 Fourth Amendment to Second Lien Credit Agreement (Mar.

23, 2018),

https://www.sec.gov/Archives/edgar/data/1310067/000119312518092755/d500560dex101.htm.

       b.  Line of Credit Loans

     4.     The Obligors and the Initial Lender entered into a line of credit under that certain

First Amendment to Second Lien Credit Agreement, dated as of July 7, 2017, with loans made

thereunder maturing within 179 days or less and with the obligations owing thereunder bearing

interest at rates as set forth in proposals and amendments thereto. *See* First Amendment to

Second Lien Credit Agreement.  Sears Holdings Corp., Form 8-K, Ex. 10.1 First Amendment to

Second Lien Credit Agreement (Jul. 7, 2017),

https://www.sec.gov/Archives/edgar/data/1310067/000119312517224336/d411783dex101.htm.

The Obligors and the Initial Lender entered into that certain Third Amendment to Second Lien

Credit Agreement, dated as of February 7, 2018, pursuant to which the maximum maturity of

loans made under the line of credit was extended to 270 days. *See* Sears Holdings Corp., Form

8-K, Ex. 10.2 Third Amendment to Second Lien Credit Agreement (Feb. 13, 2018),

https://www.sec.gov/Archives/edgar/data/1310067/000119312518042511/d538330dex102.htm.

       c.  Alternative Tranche Line of Credit Loans

     5.     The Obligors, the Initial Lender, and Och-Ziff Capital Structure Arbitrage Master

Fund Ltd. ("Och-Ziff"), as lender, entered into alternative tranche line of credit loans under that

certain Fifth Amendment to Second Lien Credit Agreement, dated as of July 5, 2018, with a

maturity date of October 15, 2018 and with the obligations owing thereunder bearing interest at a

rate of 6 5/8% per annum. *See* Sears Holdings Corp., Form 8-K, Ex. 10.3 Fifth Amendment to

**JX 129-6**

Second Lien Credit Agreement (Jul. 6, 2018),

https://www.sec.gov/Archives/edgar/data/1310067/000119312518213777/d663253dex103.htm.

Amount of Claim

2.      Agent hereby asserts a Claim against the Obligors in respect of any and all amounts arising under the Credit Agreement, including, without limitation:

    a.  secured claims under the term loan:

        i.  owed to JPP of not less than $218,708,933.33 as of the Petition Date, including not less than $218,620,586.65 on account of principal plus not less than $88,346.68 on account of interest accrued on such obligation prior to the Petition Date (provided, however, that to the extent that interest payments were received on or after the Petition Date as adequate protection payments, pursuant to the debtor-in-possession financing orders, or otherwise, the claim in respect of interest will be adjusted accordingly);

        ii.  owed to JPP II of not less than $99,901,301.06 as of the Petition Date, including not less than $99,860,946.30 on account of principal plus not less than $40,354.76 on account of interest accrued on such obligation prior to the Petition Date (provided, however, that to the extent that interest payments were received on or after the Petition Date as adequate protection payments, pursuant to the debtor-in-possession financing orders, or otherwise, the claim in respect of interest will be adjusted accordingly);

    b.  secured claims under the line of credit loans:

4

i.  owed to JPP of not less than $386,075,497.39 as of the Petition Date, including not less than $384,497,250.00 on account of principal plus not less than $1,578,247.39 on account of interest accrued on such obligation prior to the Petition Date (provided, however, that to the extent that interest payments were received on or after the Petition Date as adequate protection payments, pursuant to the debtor-in-possession financing orders, or otherwise, the claim in respect of interest will be adjusted accordingly);

ii.  owed to JPP II of not less than $120,997,380.94 as of the Petition Date, including not less than $120,502,750.00 on account of principal plus not less than $494,630.94 on account of interest accrued on such obligation prior to the Petition Date (provided, however, that to the extent that interest payments were received on or after the Petition Date as adequate protection payments, pursuant to the debtor-in-possession financing orders, or otherwise, the claim in respect of interest will be adjusted accordingly);

iii.  owed to Thomas J. Tisch of not less than $20,000,000 as of the Petition Date, including not less than $20,000,000 on account of principal plus interest accrued thereon prior to the Petition Date;

c.  secured claims under the alternative tranche line of credit loans:

i.  owed to Och-Ziff of not less than $45,000,000 as of the Petition Date, including not less than $45,000,000 on account of principal plus interest thereon prior to the Petition Date;

5

**JX 129-8**

    d.   claims for post-petition interest at the Default Rate, as defined in the Credit

        Agreement, of 2% per annum greater than the pre-petition interest rate on the

        secured claims under the Credit Agreement;

    e.   a claim for all reasonable out-of-pocket expenses, including legal fees

        incurred by Agent or lenders by reason of the enforcement and protection of

        their rights in accordance with the Credit Agreement, plus any contingent

        and/or unliquidated claims not presently ascertainable.

3.     As of the Petition Date, the total owed to the Initial Lender under the Second Lien

Credit Agreement is \$825,683,112.72, comprised of \$823,481,532.95 (principal) and

\$2,201,579.77 (accrued interest).  Sears has acknowledged that Obligors owe approximately

\$887.1 million under the Credit Agreement, of which approximately \$313,929,000 is owed to the

Initial Lender under the term loan and approximately \$507,300,000 is owed to the Initial Lender

under the line of credit loans.  *See* Declaration of Robert A. Riecker, Sears Holdings

Corporation, No. 18-23538 (Bankr. S.D.N.Y. Oct. 15, 2018) (D.I. 3).

4.     The Claim is not subject to any known claims, counterclaims, setoffs or defenses

by the Obligors.  The Agent reserves any and all rights including, without limitation, all rights of

setoff and recoupment, that the Agent may have against the Borrower, the Guarantor or their

related entities.

Security Interest

5.     The Claim is secured as set out in the Amended and Restated Security Agreement,

dated as of March 20, 2018 (the "Security Agreement"), by valid and enforceable second liens

on the Second Lien Collateral and is guaranteed by the Guarantor.[5]  *See* Sears Holdings Corp.,

---

[5]     Documents evidencing the perfection of the lenders' security interest are in the possession of the Obligors.
To the extent that the Obligors require such perfection documents, the Agent will provide copies upon request.

**JX 129-9**

Form 8-K, Ex. 10.1 Second Lien Credit Agreement (Sept. 2, 2016). As defined and set forth in

the Security Agreement, the Second Lien Collateral includes:

> (a) all Credit Card Accounts Receivable;
>
> (b) all Inventory;
>
> (c) all Chattel Paper relating to Credit Card Accounts Receivable;
>
> (d) all Instruments relating to Credit Card Accounts Receivable;
>
> (e) all Documents relating to any Inventory;
>
> (f) all books and records pertaining to the Collateral; and
>
> (g) to the extent not otherwise included, all Proceeds, insurance claims,
>
> Supporting Obligations and products of any and all of the foregoing and all
>
> collateral security and guarantees given by any Person with respect to any of the
>
> foregoing.

Sears Holdings Corp., Form 8-K, Ex. 10.2 Amended and Restated Security Agreement (Mar. 23,

2018),

https://www.sec.gov/Archives/edgar/data/1310067/000119312518092755/d500560dex102.htm.

6.      The Credit Agreement is secured *pari passu* with Borrower's obligations under

the 6 5/8% Senior Secured Notes, issued pursuant to an Indenture dated as of October 12, 2010.

The Credit Agreement ranks junior in right of recovery relative to the obligations under the Third

Amended and Restated Credit Agreement, dated as of July 21, 2015. *See* Sears Holdings Corp.,

Form 8-K, Ex. 10.3 Intercreditor Agreement (Sept. 2, 2016),

https://www.sec.gov/Archives/edgar/data/1310067/000119312516700856/d233737dex103.htm.

7.      As of the Petition Date, on information and belief, the value of the collateral

securing payment of the obligations owing under the Credit Agreement was not less than the

**JX 129-10**

outstanding principal balance under the Credit Agreement and interest accrued thereon through the Petition Date.  To the extent that the Bankruptcy Court or any other court of competent jurisdiction determines that the value of the collateral is less than the value of the Claim, Agent hereby asserts, in addition to the secured Claim described herein, an unsecured deficiency claim against the Obligors for the full amount of the Claim.

<u>Reservation of Rights</u>

8.      In filing the Proof of Claim, Agent expressly reserves all rights and causes of action, including, without limitation, contingent or unliquidated rights that it may have against the Obligors of any of their related entities, and any rights and causes of action it may have under foreign law.  This description and classification of claims by Agent is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of Agent.

9.      Agent reserves the right to withdraw, amend, clarify, modify, or supplement this Claim to assert additional claims or additional grounds for its Claim.  Agent also reserves all rights accruing to it against the Obligors and their respective estates, and the filing of this Claim is not intended to be and shall not be construed as (a) an election of remedy; (b) a waiver or limitation of any rights of Agent; or (c) a waiver or release of any rights of Agent in any person or property in which Agent has an interest including any interest held in constructive trust in favor of Agent.  In addition, Agent reserves the right to supplement this Claim with relevant documents to the extent necessary.  Furthermore, Agent reserves the right to withdraw this Claim for any reason whatsoever.

10.      The Proof of Claim is filed without prejudice to the filing by Agent or its affiliates of additional proofs of claim or requests for payment with respect to any other indebtedness,

8

JX 129-11

liability or obligation of any of the Obligors.  Agent does not, by this Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    In executing and filing this Claim, Agent does not submit to the jurisdiction of the Bankruptcy Court for any purpose other than with respect to this Claim against the Obligors and does not waive or release:  (a) any rights or remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or subsidiary of the Borrower or the Guarantor, an assignee, guarantor or otherwise; (b) any obligation owed to them, or any right to any security that may be determined to be held by one of them or for their benefit; (c) any past, present or future defaults (or events of default) by the Obligors or others; or (d) any right to the subordination, in favor of Agent, of indebtedness or liens held by other creditors of the Borrower.  The filing of the Proof of Claim is not, and shall not be construed as, an election of remedies or limitation of rights or remedies.

12.    Nothing contained in the Proof of Claim nor any subsequent appearance, pleading, claim, or suit is intended to be a waiver or release of:  (a) the right of Agent to have final orders in non-core matters entered only after de novo review by a district court judge; (b) the right of Agent to a jury trial in any proceeding so triable herein or, in any case, any controversy or proceeding related hereto; (c) the right of Agent to have the reference withdrawn by the United States District Court for the Southern District of New York in any matter subject to mandatory or discretionary withdrawal; (d) the right of Agent to have any unliquidated portions of its Claim determined by applicable state courts; or (e) any other rights, claims, actions, defenses, setoffs or recoupments to which Agent is or may be entitled under agreements, documents or instruments, in law or equity, all of which rights, claims, actions, defenses, setoffs and recoupments are expressly reserved.

JX 129-12

<u>Amendments</u>

13.     The Agent expressly reserves its right to file any separate or additional proofs of claim with respect to the Claims set forth herein or otherwise (which proofs of claim, if so filed, shall not be deemed to supersede this proof of claim unless expressly so stated therein), to amend or supplement this Proof of Claim in any respect, including with respect to the filing of an additional or amended claim for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

10

**JX 129-13**

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

| | | |
|---|---|---|
| WASHINGTON, D.C. | One Liberty Plaza | ROME |
| PARIS | New York, NY 10006-1470 | MILAN |
| BRUSSELS | T: +1 212 225 2000 | HONG KONG |
| LONDON | F: +1 212 225 3999 | BEIJING |
| FRANKFURT | clearygottlieb.com | BUENOS AIRES |
| COLOGNE | | SÃO PAULO |
| MOSCOW | D: +1(212) 225-2386 | ABU DHABI |
| | mmooney@cgsh.com | SEOUL |

January 4, 2019

<u>VIA COURIER</u>

Sears Holdings Corporation
  Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

      Re:  *In re Sears Holdings Corporation*, Case No. 18-23538 (Bankr. S.D.N.Y.) et al. - Proofs of Claim of JPP, LLC and JPP II, LLC.

Dear Sir or Madam:

      Enclosed please find Proofs of Claim as set forth in the attached Schedule A.

      Sincerely,
      Cleary Gottlieb Steen & Hamilton LLP

      Margot G. Mooney

Enclosures

cc:  Jonathan Hurwitz, Joseph Sorkin, Ray Schrock and Sunny Singh

Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the cities listed above.

**JX 129-14**

Prime Clerk LLC, p. 2

## SCHEDULE A:
### Enclosed Proofs of Claim

**FILO Term Loan**

1.  Original Proofs of Claim of JPP, LLC, as lender, to be filed in:

    - A&E Factory Service, LLC, Case No. 18-23543-rdd

    - A&E Home Delivery, LLC, Case No. 18-23544-rdd

    - A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

    - A&E Signature Service, LLC, Case No. 18-23546-rdd

    - California Builder Appliances, Inc., Case No. 18-23565-rdd

    - Florida Builder Appliances, Inc., Case No. 18-23566-rdd

    - KLC, Inc., Case No. 18-23568-rdd

    - Kmart Corporation, Case No. 18-23549-rdd

    - Kmart Holding Corporation, Case No. 18-23539-rdd

    - Kmart of Michigan, Inc., Case No. 18-23576-rdd

    - Kmart of Washington LLC, Case No. 18-23570-rdd

    - Kmart Operations LLC, Case No. 18-23540-rdd

    - Kmart Stores of Illinois LLC, Case No. 18-23571-rdd

    - Kmart Stores of Texas LLC, Case No. 18-23572-rdd

    - Kmart.com LLC, Case No. 18-23585-rdd

    - MyGofer LLC, Case No. 18-23573-rdd

    - Private Brands, Ltd., Case No. 18-23551-rdd

    - Sears Brands Management Corporation, Case No. 18-23586-rdd

    - Sears Holdings Corporation, Case No. 18-23538-rdd

    - Sears Holdings Management Corporation, Case No. 18-23553-rdd

**JX 129-15**

Prime Clerk LLC, p. 3

- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

- Sears Operations LLC, Case No. 18-23541-rdd

- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC, Case No. 18-23579-rdd

2. Original Proofs of Claim of JPP II, LLC, as lender, to be filed in:

- A&E Factory Service, LLC, Case No. 18-23543-rdd

- A&E Home Delivery, LLC, Case No. 18-23544-rdd

- A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

- A&E Signature Service, LLC, Case No. 18-23546-rdd

- California Builder Appliances, Inc., Case No. 18-23565-rdd

- Florida Builder Appliances, Inc., Case No. 18-23566-rdd

- KLC, Inc., Case No. 18-23568-rdd

- Kmart Corporation, Case No. 18-23549-rdd

- Kmart Holding Corporation, Case No. 18-23539-rdd

- Kmart of Michigan, Inc., Case No. 18-23576-rdd

- Kmart of Washington LLC, Case No. 18-23570-rdd

- Kmart Operations LLC, Case No. 18-23540-rdd

- Kmart Stores of Illinois LLC, Case No. 18-23571-rdd

- Kmart Stores of Texas LLC, Case No. 18-23572-rdd

Prime Clerk LLC, p. 4

- Kmart.com LLC, Case No. 18-23585-rdd

- MyGofer LLC, Case No. 18-23573-rdd

- Private Brands, Ltd., Case No. 18-23551-rdd

- Sears Brands Management Corporation, Case No. 18-23586-rdd

- Sears Holdings Corporation, Case No. 18-23538-rdd

- Sears Holdings Management Corporation, Case No. 18-23553-rdd

- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

- Sears Operations LLC, Case No. 18-23541-rdd

- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC, Case No. 18-23579-rdd

**Second Lien Credit Agreement**

1. Original Proofs of Claim of JPP, LLC, as agent, to be filed in:

- A&E Factory Service, LLC, Case No. 18-23543-rdd

- A&E Home Delivery, LLC, Case No. 18-23544-rdd

- A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

- A&E Signature Service, LLC, Case No. 18-23546-rdd

- California Builder Appliances, Inc., Case No. 18-23565-rdd

- Florida Builder Appliances, Inc., Case No. 18-23566-rdd

- KLC, Inc., Case No. 18-23568-rdd

**JX 129-17**

Prime Clerk LLC, p. 5

- Kmart Corporation, Case No. 18-23549-rdd

- Kmart Holding Corporation, Case No. 18-23539-rdd

- Kmart of Michigan, Inc., Case No. 18-23576-rdd

- Kmart of Washington, LLC, Case No. 18-23570-rdd

- Kmart Operations, LLC, Case No. 18-23540-rdd

- Kmart Stores of Illinois, LLC, Case No. 18-23571-rdd

- Kmart Stores of Texas, LLC, Case No. 18-23572-rdd

- Kmart.com, LLC, Case No. 18-23585-rdd

- MyGofer, LLC, Case No. 18-23573-rdd

- Private Brands, Ltd., Case No. 18-23551-rdd

- Sears Brands Management Corporation, Case No. 18-23586-rdd

- Sears Holdings Corporation, Case No. 18-23538-rdd

- Sears Holdings Management Corporation, Case No. 18-23553-rdd

- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

- Sears Operations, LLC, Case No. 18-23541-rdd

- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC, Case No. 18-23579-rdd

**JX 129-18**

Prime Clerk LLC, p. 6

**PIK Notes**

1.  Original Proofs of Claim of JPP, LLC, as lender, to be filed in:

    - A&E Factory Service, LLC, Case No. 18-23543-rdd

    - A&E Home Delivery, LLC, Case No. 18-23544-rdd

    - A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

    - A&E Signature Service, LLC, Case No. 18-23546-rdd

    - California Builder Appliances, Inc., Case No. 18-23565-rdd

    - Florida Builder Appliances, Inc., Case No. 18-23566-rdd

    - KLC, Inc., Case No. 18-23568-rdd

    - Kmart Corporation, Case No. 18-23549-rdd

    - Kmart Holding Corporation, Case No. 18-23539-rdd

    - Kmart of Michigan, Inc., Case No. 18-23576-rdd

    - Kmart of Washington LLC, Case No. 18-23570-rdd

    - Kmart Operations LLC, Case No. 18-23540-rdd

    - Kmart Stores of Illinois LLC, Case No. 18-23571-rdd

    - Kmart Stores of Texas LLC, Case No. 18-23572-rdd

    - Kmart.com LLC, Case No. 18-23585-rdd

    - MyGofer LLC, Case No. 18-23573-rdd

    - Private Brands, Ltd., Case No. 18-23551-rdd

    - Sears Brands Management Corporation, Case No. 18-23586-rdd

    - Sears Holdings Corporation, Case No. 18-23538-rdd

    - Sears Holdings Management Corporation, Case No. 18-23553-rdd

    - Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

    - Sears Operations LLC, Case No. 18-23541-rdd

**JX 129-19**

Prime Clerk LLC, p. 7

- Sears Protection Company (Florida), LLC, Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC., Case No. 18-23579-rdd

2.  Original Proofs of Claim of JPP II, LLC, as lender, to be filed in:

- A&E Factory Service, LLC, Case No. 18-23543-rdd

- A&E Home Delivery, LLC, Case No. 18-23544-rdd

- A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

- A&E Signature Service, LLC, Case No. 18-23546-rdd

- California Builder Appliances, Inc., Case No. 18-23565-rdd

- Florida Builder Appliances, Inc., Case No. 18-23566-rdd

- KLC, Inc., Case No. 18-23568-rdd

- Kmart Corporation, Case No. 18-23549-rdd

- Kmart Holding Corporation, Case No. 18-23539-rdd

- Kmart of Michigan, Inc., Case No. 18-23576-rdd

- Kmart of Washington LLC, Case No. 18-23570-rdd

- Kmart Operations LLC, Case No. 18-23540-rdd

- Kmart Stores of Illinois LLC, Case No. 18-23571-rdd

- Kmart Stores of Texas LLC, Case No. 18-23572-rdd

- Kmart.com LLC, Case No. 18-23585-rdd

- MyGofer LLC, Case No. 18-23573-rdd

**JX 129-20**

Prime Clerk LLC, p. 8

- Private Brands, Ltd., Case No. 18-23551-rdd
- Sears Brands Management Corporation, Case No. 18-23586-rdd
- Sears Holdings Corporation, Case No. 18-23538-rdd
- Sears Holdings Management Corporation, Case No. 18-23553-rdd
- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd
- Sears Operations LLC, Case No. 18-23541-rdd
- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd
- Sears Protection Company, Case No. 18-23558-rdd
- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd
- Sears, Roebuck and Co., Case No. 18-23537-rdd
- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd
- SOE, Inc., Case No. 18-23578-rdd
- StarWest, LLC., Case No. 18-23579-rdd

**L/C Facility Agreement**

1. Original Proofs of Claim of JPP, LLC, as lender, to be filed in:

- A&E Factory Service, LLC, Case No. 18-23543-rdd
- A&E Home Delivery, LLC, Case No. 18-23544-rdd
- A&E Lawn & Garden, LLC, Case No. 18-23545-rdd
- A&E Signature Service, LLC, Case No. 18-23546-rdd
- California Builder Appliances, Inc., Case No. 18-23565-rdd
- Florida Builder Appliances, Inc., Case No. 18-23566-rdd
- KLC, Inc., Case No. 18-23568-rdd
- Kmart Corporation, Case No. 18-23549-rdd
- Kmart Holding Corporation, Case No. 18-23539-rdd

**JX 129-21**

Prime Clerk LLC, p. 9

- Kmart of Michigan, Inc., Case No. 18-23576-rdd

- Kmart of Washington, LLC, Case No. 18-23570-rdd

- Kmart Operations, LLC, Case No. 18-23540-rdd

- Kmart Stores of Illinois, LLC, Case No. 18-23571-rdd

- Kmart Stores of Texas, LLC, Case No. 18-23572-rdd

- Kmart.com, LLC, Case No. 18-23585-rdd

- MyGofer, LLC, Case No. 18-23573-rdd

- Private Brands, Ltd., Case No. 18-23551-rdd

- Sears Brands Management Corporation, Case No. 18-23586-rdd

- Sears Holdings Corporation, Case No. 18-23538-rdd

- Sears Holdings Management Corporation, Case No. 18-23553-rdd

- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

- Sears Operations, LLC, Case No. 18-23541-rdd

- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC, Case No. 18-23579-rdd

2. Original Proofs of Claim of JPP II, LLC, as lender, to be filed in:

- A&E Factory Service, LLC, Case No. 18-23543-rdd

- A&E Home Delivery, LLC, Case No. 18-23544-rdd

- A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

**JX 129-22**

Prime Clerk LLC, p. 10

- A&E Signature Service, LLC, Case No. 18-23546-rdd

- California Builder Appliances, Inc., Case No. 18-23565-rdd

- Florida Builder Appliances, Inc., Case No. 18-23566-rdd

- KLC, Inc., Case No. 18-23568-rdd

- Kmart Corporation, Case No. 18-23549-rdd

- Kmart Holding Corporation, Case No. 18-23539-rdd

- Kmart of Michigan, Inc., Case No. 18-23576-rdd

- Kmart of Washington, LLC, Case No. 18-23570-rdd

- Kmart Operations, LLC, Case No. 18-23540-rdd

- Kmart Stores of Illinois, LLC, Case No. 18-23571-rdd

- Kmart Stores of Texas, LLC, Case No. 18-23572-rdd

- Kmart.com, LLC, Case No. 18-23585-rdd

- MyGofer, LLC, Case No. 18-23573-rdd

- Private Brands, Ltd., Case No. 18-23551-rdd

- Sears Brands Management Corporation, Case No. 18-23586-rdd

- Sears Holdings Corporation, Case No. 18-23538-rdd

- Sears Holdings Management Corporation, Case No. 18-23553-rdd

- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

- Sears Operations, LLC, Case No. 18-23541-rdd

- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck de Puerto Rico, Inc., Case No. 18-23561-rdd

**JX 129-23**

Prime Clerk LLC, p. 11

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC, Case No. 18-23579-rdd

**IP/GL Credit Agreement**

1. Original Proofs of Claim of JPP, LLC, as agent, to be filed in:

- A&E Factory Service, LLC, Case No. 18-23543-rdd

- A&E Home Delivery, LLC, Case No. 18-23544-rdd

- A&E Lawn & Garden, LLC, Case No. 18-23545-rdd

- A&E Signature Service, LLC, Case No. 18-23546-rdd

- California Builder Appliances, Inc., Case No. 18-23565-rdd

- Florida Builder Appliances, Inc., Case No. 18-23566-rdd

- KLC, Inc., Case No. 18-23568-rdd

- Kmart Corporation, Case No. 18-23549-rdd

- Kmart Holding Corporation, Case No. 18-23539-rdd

- Kmart of Michigan, Inc., Case No. 18-23576-rdd

- Kmart of Washington LLC, Case No. 18-23570-rdd

- Kmart Operations LLC, Case No. 18-23540-rdd

- Kmart Stores of Illinois LLC, Case No. 18-23571-rdd

- Kmart Stores of Texas LLC, Case No. 18-23572-rdd

- Kmart.com LLC, Case No. 18-23585-rdd

- MyGofer LLC, Case No. 18-23573-rdd

- Private Brands, Ltd., Case No. 18-23551-rdd

- Sears Brands Business Unit Corporation, Case No. 18-23574-rdd

- Sears Brands Management Corporation, Case No. 18-23586-rdd

- Sears Brands, L.L.C., Case No. 18-23583-rdd

**JX 129-24**

Prime Clerk LLC, p. 12

- Sears Development Co., Case No. 18-23552-rdd

- Sears Holdings Corporation, Case No. 18-23538-rdd

- Sears Holdings Management Corporation, Case No. 18-23553-rdd

- Sears Home Improvement Products, Inc., Case No. 18-23555-rdd

- Sears Operations LLC, Case No. 18-23541-rdd

- Sears Protection Company (Florida), L.L.C., Case No. 18-23569-rdd

- Sears Protection Company, Case No. 18-23558-rdd

- Sears Roebuck Acceptance Corp., Case No. 18-23560-rdd

- Sears, Roebuck and Co., Case No. 18-23537-rdd

- Sears, Roebuck De Puerto Rico, Inc., Case No. 18-23561-rdd

- SOE, Inc., Case No. 18-23578-rdd

- StarWest, LLC, Case No. 18-23579-rdd

- STI Merchandising, Inc., Case No. 18-23580-rdd



# Prime Clerk

## **Brooklyn**

### CLAIM/BALLOT HAND DELIVERY CONFIRMATION SHEET

DATE RECEIVED: _____ 1/4/19 _____

CASE: _____ Sears _____

NO. OF CLAIMS: _____ 236 _____

NO. OF BALLOTS: _____

COPIES: _____ 236 _____

RECEIVED BY: _____ KR _____

**JX 129-26**

# Exhibit 90

# Consideration Provided by ESL in the Sale Transaction

- ESL has agreed to commit approximately $5.2 billion in the form of cash and non-cash consideration, including without limitation the following:
  1. A cash payment of approximately $885 million;
  2. A credit bid pursuant to section 363(k) of the Bankruptcy Code of secured debt facilities totaling up to approximately $1.3 billion;
  3. The assumption of $621 million of senior indebtedness (including $350 million of the amounts owed under the Junior DIP Facility and up to $271 million of the Stand-Alone L/C Facility) into exit facilities, which is equivalent to cash; and
  4. The assumption of certain other of the Debtors' liabilities in the total amount of approximately $1.3 billion, including, among others:
     i. certain liabilities for warranties and protection agreements or other services contracts (other than warranties relating to certain intellectual property) for the goods and services of Sellers sold or performed prior to the closing, including any liabilities owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements;

**JX 130-1**

# Consideration Provided by ESL in the Sale Transaction (cont'd)

ii.    certain customer credits that relate to existing customer loyalty programs, including, Shop Your Way, and any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers since January 1, 2018;

iii.    all cure costs solely with respect to the agreements that ESL is assuming pursuant to the Asset Purchase Agreement;

iv.    up to $43 million of certain severance reimbursement obligations (which may be reduced in certain circumstances);

v.    up to $139 million of liabilities under section 503(b)(9) of the Bankruptcy Code (which may be reduced in certain circumstances);

vi.    up to $166 million in certain accounts payable (which may be reduced in certain circumstances);

vii.    payables for ordered merchandise not yet received by the Debtors;

viii.    certain property taxes;

ix.    certain environmental liabilities, among other potential claims; and

x.    certain mechanic's liens totaling approximately $3.75 million.

JX 130-2

# Exhibit 91

# The Benefits of the Sale Transaction Outweigh an Orderly Winddown

|  | Winddown | Sale Transaction |
|---|---|---|
| **Treatment** | | |
| **Debtors' Enterprise** | ▪ GOB remaining stores<br>▪ Certain businesses or divisions sold in parts<br>▪ Orderly liquidation of remaining assets | ▪ Sold as a going-concern |
| **Employees** | ▪ A majority, if not all, employees will be terminated<br>▪ Winddown estate will face significant employee claims | ▪ Tens of thousands of employees offered continued employment<br>▪ Employee claims (e.g. severance) will be minimized |
| **Protection Agreement Liabilities** | ▪ Protection Agreements will be rejected<br>▪ Winddown estate will face claims arising from the Protection Agreements | ▪ Assumption of the Protection Agreements<br>▪ Protection Agreement claims eliminated |
| **Avoidance Actions and Litigation Claims** | ▪ No claims against ESL are released | ▪ Only recharacterization, equitable subordination, and other claims affecting ESL's ability to credit bid are being released<br>▪ All other claims remain with the Debtors' estates |
| **Second Lien 507(b) Claims** | ▪ Debtors' estimate up to approximately $331 million in section 507(b) claims<br>▪ Significant litigation in connection with such claims is expected | ▪ Capped at $50 million from proceeds of claims or causes of action with distributions in excess of $50 million treated as an unsecured claim |
| **Vendors** | ▪ No ongoing business relationship<br>▪ Significant unsecured claims arising from contract rejection, including 503(b)(9) | ▪ Ongoing business relationship<br>▪ Cure costs paid by the Buyer |
| **General Claims Pool** | ▪ Substantial | ▪ Mitigated by ongoing operations and the assumption of cure costs, 503(b)(9) claims, and Protection Agreements |

15

**JX 131-1**

# The Benefits of the Sale Transaction Outweigh an Orderly Winddown (cont'd)

| | Winddown | Sale Transaction |
|---|---|---|
| **Assumed Creditor Recoveries** | | |
| **Administrative and Other Priority Claims** | 100% | 100% |
| **DIP ABL Facility** | 100% | 100% |
| **Junior DIP Facility** | 100% | 100% |
| **FILO Term Loan Facility** | 100% | 100% |
| **Stand-Alone L/C Facility** | 100% | 100% |
| **Second Lien 507(b) Claims** | 41% | N/A |
| **Second Lien PIK Term Loan** | 0% | 41% |
| **Second Lien L/C Loans** | 0% | 41% |
| **Second Lien PIK Notes** | 0% | 41% |
| **Second Lien Notes** | 0% | 0% |
| **Consolidated Loans (Note A)** | 100% | 100% |
| **Consolidated Loans (Note B)** | 44% | 60% |
| **IP/Ground Lease Term Loan** | 69% | 100% |
| **General Unsecured Claims** | 0% | 1% |

[1] The assumed creditor recoveries reflect the numbers presented in the Winddown Recovery Analysis (Singh Dec. Ex. 2 to Ex. C.).

[2] The Sale Transaction at its baseline provides for 96% recovery on account of administrative claims. But, the Debtors reasonably believe that under a Sale Transaction all administrative claims will be paid in full and the remaining 4% (or approximately $62 million) gap can be bridged with mitigating items such as outperformance of the DIP Budget, maintained inventory levels, etc., as more fully set forth in section III.B herein. Assuming such measures can bridge the gap, the Debtors believe the $35 million received as consideration for the Credit Bid Release will flow to general unsecured creditors. If the gap remains unfilled, the Debtors will utilize the $35 million to fill that gap rather than flowing through the waterfall to general unsecured creditors.

[3] The recovery to general unsecured claims does not take into account any recoveries on account of avoidance actions or proceeds of litigation asserted against ESL and any affiliates.

JX 131-2