# Exhibit 92

**Fill in this information to identify the case:**

Debtor 1    Sears Holdings Corporation

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Southern District of New York

Case number    18-23538-rdd

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Wilmington Trust, National Association, as indenture trustee and collateral agent
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Edward M. Fox - Seyfarth Shaw LLP
Name

620 Eighth Avenue
Number        Street

New York            NY        10018
City                State            ZIP Code

Contact phone    212-218-4646

Contact email    emfox@seyfarth.com

Where should payments to the creditor be sent? (if different)

Name

Number        Street

City                State            ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☐ No

☑ Yes. Claim number on court claims registry (if known) _____    Filed on ___/___/___
                                                                       MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☐ No

☑ Yes. Who made the earlier filing?

JX 132-1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $ 91,950,191.25 . Does this amount include interest or other charges?

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned.

**9. Is all or part of the claim secured?**

☐ No
☑ Yes.   The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe:   see attached Addendum

Basis for perfection:   see attached Addendum
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $ Unknown
Amount of the claim that is secured:   $ Unknown

Amount of the claim that is unsecured:   $ Unknown   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $ _____

Annual Interest Rate (when case was filed) 6-5/8%
☑ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

**JX 132-2**

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(_2_) that applies. | $ Unknown |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3: Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    02/20/2019
                    MM / DD / YYYY

*Signature*

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Rita Marie Ritrovato |
| | First name    Middle name    Last name |
| Title | Vice President |
| Company | Wilmington Trust, National Association |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1100 North Market Street - Rodney Square North |
| | Number    Street |
| | Wilmington                    DE        19890 |
| | City                          State     ZIP Code |
| Contact phone | 302-636-5137 |
| Email | rritrovato@wilmingtontrust.com |

**JX 132-3**

## ADDENDUM TO PROOF OF CLAIM OF
## WILMINGTON TRUST, NATIONAL ASSOCIATION,
## AS SUCCESSOR INDENTURE TRUSTEE AND
## SUCCESSOR COLLATERAL AGENT,
## AGAINST

| | | |
|---|---|---|
| SEARS, ROEBUCK AND CO. (CASE NO. 18-23537-rdd) | KMART CORPORATION (CASE NO. 18-23549-rdd) | SEARS PROTECTION COMPANY (FLORIDA), L.L.C. (CASE NO. 18-23569-rdd) |
| SEARS HOLDINGS CORPORATION (CASE NO. 18-23538-rdd) | PRIVATE BRANDS, LTD. (CASE NO. 18-23551-rdd) | KMART OF WASHINGTON LLC (CASE NO. 18-23570-rdd) |
| KMART HOLDING CORPORATION (CASE NO. 18-23539-rdd) | SEARS HOLDINGS MANAGEMENT CORPORATION (CASE NO. 18-23553-rdd) | KMART STORES OF ILLINOIS LLC (CASE NO. 18-23571-rdd) |
| KMART OPERATIONS LLC (CASE NO. 18-23540-rdd) | SEARS HOME IMPROVEMENT PRODUCTS, INC. (CASE NO. 18-23555-rdd) | KMART STORES OF TEXAS LLC (CASE NO. 18-23572-rdd) |
| SEARS OPERATIONS LLC (CASE NO. 18-23541-rdd) | SEARS PROTECTION COMPANY (CASE NO. 18-23558-rdd) | MYGOFER LLC (CASE NO. 18-23573-rdd) |
| A&E FACTORY SERVICE, LLC (CASE NO. 18-23543-rdd) | SEARS ROEBUCK ACCEPTANCE CORP. (CASE NO. 18-23560-rdd) | KMART OF MICHIGAN, INC. (CASE NO. 18-23576-rdd) |
| A&E HOME DELIVERY, LLC (CASE NO. 18-23544-rdd) | SEARS, ROEBUCK DE PUERTO RICO, INC. (CASE NO. 18-23561-rdd) | SOE, INC. (CASE NO. 18-23578-rdd) |
| A&E LAWN & GARDEN LLC (CASE NO. 18-23545-rdd) | CALIFORNIA BUILDER APPLIANCES, INC. (CASE NO. 18-23565-rdd) | STARWEST, LLC (CASE NO. 18-23579-rdd) |
| A&E SIGNATURE SERVICE, LLC (CASE NO. 18-23546-rdd) | FLORIDA BUILDER APPLIANCES, INC. (CASE NO. 18-23566-rdd) | KMART.COM LLC (CASE NO. 18-23585-rdd) |
| | KLC, INC. (CASE NO. 18-23568-rdd) | SEARS BRANDS MANAGEMENT CORPORATION (CASE NO. 18-23586-rdd) |

54683809v.3

**JX 132-4**

1.      Pursuant to an Indenture dated as of October 12, 2010 (the "Initial Indenture"; true and correct copy annexed hereto as Exhibit A) among Sears Holdings Corporation (the "Issuer"), the Guarantors Party Thereto, and Wells Fargo Bank, National Association ("Wells Fargo"), as trustee and collateral agent, the Issuer issued $1,250,000,000 of 6-5/8% Senior Secured Notes due 2018 (the "Notes").

2.      The Initial Indenture was amended by a First Supplemental Indenture dated as of April 5, 2011 (the "First Supplement"; true and correct copy annexed hereto as Exhibit B), a Second Supplemental Indenture dated as of July 7, 2015 (the "Second Supplement"; true and correct copy annexed hereto as Exhibit C), a Third Supplemental Indenture dated as of September 19, 2016 (the "Third Supplement"; true and correct copy annexed hereto as Exhibit D), a Fourth Supplemental Indenture dated as of January 9, 2018 (the "Fourth Supplement"; true and correct copy annexed hereto as Exhibit E) and a Fifth Supplemental Indenture dated as of March 20, 2018 (the Fifth Supplement"; true and correct copy annexed hereto as Exhibit F), the Initial Indenture as amended, supplemented or otherwise modified by the First Supplement, the Second Supplement, the Third Supplement, the Fourth Supplement and the Fifth Supplement, the "Indenture").

3.      Pursuant to an instrument of resignation, appointment, and acceptance, dated June 25, 2014 (the "Tri-Party Agreement"; true and correct copy annexed hereto as Exhibit G), by and among the Issuer, Wells Fargo, and Wilmington Trust, National Association, Wells Fargo resigned as the indenture trustee, and Wilmington Trust was appointed as Successor Trustee (the "Indenture Trustee") and Successor Agent (the "Collateral Agent") (in such capacities, "Wilmington Trust").

54683809v.3

**JX 132-5**

4.    Pursuant to the terms of the Indenture, repayment of the Notes is guaranteed by each of Sears, Roebuck and Co., Kmart Holding Corporation, Kmart Operations LLC, Sears Operations LLC, A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E Lawn & Garden LLC, A&E Signature Service, LLC, Kmart Corporation, Private Brands, Ltd., Sears Holdings Management Corporation, Sears Home Improvement Products, Inc., Sears Protection Company, Sears Roebuck Acceptance Corp., Sears, Roebuck de Puerto Rico, Inc., California Builder Appliances, Inc., Florida Builder Appliances, Inc., KLC, Inc., Sears Protection Company (Florida), L.L.C., Kmart of Washington LLC, Kmart Stores of Illinois LLC, Kmart Stores of Texas LLC, Mygofer LLC, Kmart of Michigan, Inc., SOE, Inc., Starwest, LLC, Kmart.com LLC, Sears Brands Management Corporation (collectively, the "Guarantors").

5.    Pursuant to a Security Agreement dated as of October 12, 2010, among the Issuer, the Grantors Party Thereto (the "Grantors") and Wells Fargo, as amended by a First Amendment to security agreement dated as of September 1, 2016 among the Issuer, the Grantors Party Thereto and the Collateral Agent, and as amended and restated by an Amended and Restated Security Agreement dated as of March 20, 2018 among the Issuer, the Grantors Party Thereto and the Collateral Agent, (the "Security Agreement"; true and correct copy annexed hereto as Exhibit H), the Issuer and the Grantors granted a security interest (the "Security Interest") in all of the Collateral (as defined in the Security Agreement) to secure payment of the fees and expenses of the Collateral Agent and the Indenture Trustee and repayment of the Notes.

6.    The Security Interest has been perfected by, *inter alia*, the filing of UCC-1 financing statements against the Grantors with the Secretaries of State of Delaware, Florida, Illinois, Michigan, New York, Pennsylvania, Puerto Rico, Texas and Washington and the Commissioner of Banking and Insurance of Guam, all as more particularly set forth on the chart

54683809v.3

**JX 132-6**

annexed hereto as Exhibit I, and such other documents as are necessary or appropriate to perfect the Security Interests including, without limitation, UCC-3 continuation statements.

7.    On October 15, 2018 (the "Petition Date"), the Issuer and each of the Guarantors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code.

8.    As of the Petition Date, the Issuer and each Guarantor was, and remains, indebted to the Indenture Trustee in the amount of Ninety-One Million, Nine Hundred Fifty Thousand, One Hundred Ninety-One and 25/100 Dollars ($91,950,191.25), consisting of Eighty-Nine Million, Two Thousand and 00/100 Dollars ($89,002,000.00) in principal amount plus Two Million, Nine Hundred Forty-Eight Thousand, One Hundred Ninety-One and 25/100 Dollars ($2,948,191.25) of accrued and unpaid interest owing with respect to the Notes as of the Petition Date.  Wilmington Trust reserves its rights pursuant to 11 U.S.C. § 506(b).

9.    Wilmington Trust asserts against the Issuer, and against each Guarantor, a claim for the full amount owing under the Indenture as set forth in this Proof of Claim.  This claim is secured to the extent of the value of the Collateral and is otherwise unsecured.

10.    Pursuant to Section 7.01 of the Indenture and Section 7.6 of the Security Agreement, Wilmington Trust is entitled to payment of its fees and expenses, including the fees and disbursements of its counsel and experts, as Indenture Trustee and as Collateral Agent, respectively, (collectively, the "Fees and Expenses") which amounts are presently unliquidated.

11.    To secure the obligations of Issuer and each Guarantor to the Indenture Trustee under Section 7.01 of the Indenture and to the Collateral Agent under Section 7.6 of the Security Agreement, Section 5.4 of the Security Agreement provides for payment of all such fees and expenses out of the proceeds of the Collateral.  In addition, pursuant to Section 7.01 of the Indenture, Wilmington Trust has a lien prior to the Notes on all money or property held or collected by it as Indenture Trustee or Collateral Agent.

54683809v.3

**JX 132-7**

12.    Pursuant to Fed R. Bankr. P. 3021, all distributions on account of the claim under the Indenture asserted hereby must be made to Wilmington Trust.

13.    Pursuant to Fed. R. Bankr. P. 3003(c)(5) and Section 6.10 of the Indenture, Wilmington Trust is authorized to file this Proof of Claim on behalf of all holders of the Notes.

14.    Without prejudice to its right to assert that the Fees and Expenses incurred on and after the Petition Date constitute an administrative expense claim under Sections 503 and 507 of the Bankruptcy Code and Section 7.01 of the Indenture, Wilmington Trust hereby reserves the right to amend or supplement this Proof of Claim to include, among other things, accrued and unpaid Expenses incurred by Wilmington Trust after the Petition Date.

15.    In its capacity as Indenture Trustee and Collateral Agent, Wilmington Trust further reserves the right to file any request for payment of an administrative expense to which it may be entitled, including as a super priority administrative expense for diminution in value of the Collateral from and after the Petition Date, in an amount to be determined.

16.    The Issuer and each Guarantor is further obligated to Wilmington Trust pursuant to Section 7.01 of the Indenture and Section 7.6 of the Security Agreement in an unliquidated amount for any costs and expenses incurred or to be incurred by Wilmington Trust in defending itself against any claim or liability in connection with the exercise or performance of its obligations under the Indenture or under the Security Agreement, respectively.

17.    Wilmington Trust expressly reserves the right to amend or supplement this Proof of Claim if it should deem it necessary and appropriate for any reason, including, without limitation, to provide an updated statement of amounts due or for any other purpose for which a Proof of Claim filed in this case may be amended.

18.    The filing of this Proof of Claim is not: (i) a waiver or release of any rights of Wilmington Trust or of any holder of the Notes against any person, entity, or property;

54683809v.3

**JX 132-8**

(ii) consent by Wilmington Trust or any holder of the Notes to the jurisdiction of this Court, or to its exercise of the judicial power or to its entry of final orders and judgments, with respect to the subject matter of this claim, any objections or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving Wilmington Trust or the holders of the Notes; or (iii) a waiver of the right of Wilmington Trust or the holders of the Notes to move to withdraw the reference, or otherwise to challenge the jurisdiction of, or the exercise of the judicial power by, this Court with respect to the subject matter of this claim, any objections or other proceedings commenced with respect thereto or any other proceedings commenced in this case against, or otherwise involving, Wilmington Trust or the holders of the Notes.

6

JX 132-9

# EXHIBIT A

JX 132-10

EXECUTION VERSION

---

SEARS HOLDINGS CORPORATION,

THE GUARANTORS PARTY HERETO

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee and Collateral Agent

INDENTURE

Dated as of October 12, 2010

6⅝% Senior Secured Notes due 2018

---

## CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.05 |
| (a)(2) | 7.05 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.06 |
| (b) | 7.04; 7.06; 12.02 |
| (b)(1) | 7.06 |
| (c) | N.A. |
| 311(a) | 6.11 |
| (b) | 6.11 |
| (c) | N.A. |
| 312(a) | 2.06 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.11 |
| (b)(1) | N.A. |
| (b)(2) | 7.01(a); 7.11 |
| (c) | 7.11; 12.02 |
| (d) | 7.11 |
| 314(a) | 4.02; 4.03; 11.03; 12.02 |
| (b) | 11.02 |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | 11.03 |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | N.A. |
| (b) | 7.03; 12.02 |
| (c) | 7.02 |
| (d) | 7.02(b) |
| (e) | 6.12 |
| 316(a)(last sentence) | 2.10 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.08 |
| (c) | 8.04 |
| 317(a)(1) | 6.09 |
| (a)(2) | 6.10 |
| (b) | 2.05 |
| 318(a) | 12.01 |

N.A. means Not Applicable

Note:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of the Indenture.

JX 132-12

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

**Page**

<p style="text-align:center">ARTICLE ONE</p>

<p style="text-align:center">DEFINITIONS AND INCORPORATION BY REFERENCE</p>

| | | |
|---|---|---|
| SECTION 1.01. | Definitions | 1 |
| SECTION 1.02. | Other Definitions | 14 |
| SECTION 1.03. | Incorporation by Reference of Trust Indenture Act | 15 |
| SECTION 1.04. | Rules of Construction | 15 |

<p style="text-align:center">ARTICLE TWO</p>

<p style="text-align:center">THE NOTES</p>

| | | |
|---|---|---|
| SECTION 2.01. | Amount of Notes | 16 |
| SECTION 2.02. | Form and Dating | 17 |
| SECTION 2.03. | Execution and Authentication | 17 |
| SECTION 2.04. | Registrar and Paying Agent | 18 |
| SECTION 2.05. | Paying Agent To Hold Money in Trust | 18 |
| SECTION 2.06. | Holder Lists | 19 |
| SECTION 2.07. | Transfer and Exchange | 19 |
| SECTION 2.08. | Replacement Notes | 20 |
| SECTION 2.09. | Outstanding Notes | 20 |
| SECTION 2.10. | Treasury Notes | 20 |
| SECTION 2.11. | Temporary Notes | 21 |
| SECTION 2.12. | Cancellation | 21 |
| SECTION 2.13. | Defaulted Interest | 21 |
| SECTION 2.14. | CUSIP Number | 21 |
| SECTION 2.15. | Deposit of Moneys | 22 |
| SECTION 2.16. | Book-Entry Provisions for Global Notes | 22 |
| SECTION 2.17. | Special Transfer Provisions | 23 |
| SECTION 2.18. | Computation of Interest | 25 |

<p style="text-align:center">ARTICLE THREE</p>

<p style="text-align:center">REDEMPTION AND PREPAYMENT</p>

| | | |
|---|---|---|
| SECTION 3.01. | Election To Redeem; Notices to Trustee | 25 |
| SECTION 3.02. | Selection by Trustee of Notes to Be Redeemed | 25 |
| SECTION 3.03. | Notice of Redemption | 26 |
| SECTION 3.04. | Effect of Notice of Redemption | 27 |
| SECTION 3.05. | Deposit of Redemption Price | 27 |
| SECTION 3.06. | Notes Redeemed in Part | 27 |
| SECTION 3.07. | Optional Redemption | 27 |
| SECTION 3.08. | Mandatory Redemption | 28 |

JX 132-13

Page

ARTICLE FOUR

COVENANTS

SECTION 4.01.    Payment of Notes .................................................................28
SECTION 4.02.    Reports to Holders ..............................................................28
SECTION 4.03.    Compliance Certificate .......................................................29
SECTION 4.04.    Limitations on Liens ...........................................................29
SECTION 4.05.    Limitation on Sale and Leaseback Transactions ...............29
SECTION 4.06.    Additional Guarantees ........................................................30
SECTION 4.07.    Change of Control Offer .....................................................30
SECTION 4.08.    Collateral Coverage Offer ..................................................31
SECTION 4.09.    Calculations ........................................................................31

ARTICLE FIVE

SUCCESSOR CORPORATION

SECTION 5.01.    Limitations on Mergers and Sales of Assets ......................32
SECTION 5.02.    Successor Person Substituted ..............................................32

ARTICLE SIX

DEFAULTS AND REMEDIES

SECTION 6.01.    Events of Default.................................................................32
SECTION 6.02.    Acceleration ........................................................................33
SECTION 6.03.    Other Remedies ...................................................................34
SECTION 6.04.    Waiver or Rescission of Past Defaults and Events of Default ...............34
SECTION 6.05.    Control by Majority .............................................................34
SECTION 6.06.    Limitation on Suits ..............................................................35
SECTION 6.07.    No Personal Liability of Directors, Officers, Employees and
                 Stockholders ........................................................................35
SECTION 6.08.    Rights of Holders To Receive Payment ..............................35
SECTION 6.09.    Collection Suit by Trustee ..................................................36
SECTION 6.10.    Trustee May File Proofs of Claim ......................................36
SECTION 6.11.    Priorities .............................................................................36
SECTION 6.12.    Undertaking for Costs.........................................................37
SECTION 6.13.    Restoration of Rights and Remedies ..................................37
SECTION 6.14.    Appointment and Authorization of Wells Fargo Bank, National
                 Association as Collateral Agent ...........................................37

ARTICLE SEVEN

TRUSTEE

SECTION 7.01.    Acceptance of Trusts Upon Specified Conditions................38
SECTION 7.02.    Duties of Trustee in Case of Default ..................................40
SECTION 7.03.    Notice to Holders of Defaults ............................................41
SECTION 7.04.    Resignation and Removal of Trustee and Notice Thereof........41

JX 132-14

**Page**

SECTION 7.05.    Qualifications of Trustee ...................................................................41
SECTION 7.06.    Disqualification Of Trustee By Reason Of Conflicting Interest ...............42
SECTION 7.07.    Appointment of Successor Trustee....................................................42
SECTION 7.08.    Merger, Conversion or Consolidation of Trustee or Transfer of Its Corporate Trust Business; Authentication of Notes by Successor Trustee.......................................................................................43
SECTION 7.09.    Trustee Required to Account for Amounts Collected As Creditor of the Issuer Under Certain Conditions ...............................................43
SECTION 7.10.    Trustee May Rely on Officer's Certificate ...........................................43
SECTION 7.11.    Reports by Trustee ..........................................................................44
SECTION 7.12.    Collateral Agent. .............................................................................44

ARTICLE EIGHT

AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 8.01.    Without Consent of Holders ...............................................................44
SECTION 8.02.    With Consent of Holders ....................................................................45
SECTION 8.03.    Compliance with Trust Indenture Act ..................................................46
SECTION 8.04.    Revocation and Effect of Consents .....................................................46
SECTION 8.05.    Notation on or Exchange of Notes .......................................................47
SECTION 8.06.    Trustee to Sign Amendments, Etc. ......................................................47

ARTICLE NINE

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 9.01.    Discharge of Indenture ......................................................................47
SECTION 9.02.    Legal Defeasance ..............................................................................48
SECTION 9.03.    Covenant Defeasance ........................................................................49
SECTION 9.04.    Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions..................................................50
SECTION 9.05.    Reinstatement...................................................................................50
SECTION 9.06.    Moneys Held by Paying Agent ...........................................................51
SECTION 9.07.    Moneys Held by Trustee....................................................................51

ARTICLE TEN

GUARANTEE OF NOTES

SECTION 10.01.    Guarantee.......................................................................................51
SECTION 10.02.    Execution and Delivery of Notation of Guarantee ...............................52
SECTION 10.03.    Limitation of Guarantee.....................................................................52
SECTION 10.04.    Release of Guarantor ........................................................................53
SECTION 10.05.    Waiver of Subrogation......................................................................53

**JX 132-15**

<div align="right"><u>Page</u></div>

ARTICLE ELEVEN

SECURITY

| | | |
|---|---|---|
| SECTION 11.01. | Security Documents; Additional Collateral | 54 |
| SECTION 11.02. | Recording, Registration and Opinions | 54 |
| SECTION 11.03. | Releases of Liens on Collateral | 54 |
| SECTION 11.04. | Form and Sufficiency of Release | 55 |
| SECTION 11.05. | Possession and Use of Collateral | 55 |
| SECTION 11.06. | Purchaser Protected | 55 |
| SECTION 11.07. | Authorization of Actions To Be Taken by the Collateral Agent Under the Security Documents | 56 |
| SECTION 11.08. | Authorization of Receipt of Funds by the Trustee Under the Security Agreement | 56 |
| SECTION 11.09. | Powers Exercisable by Receiver or Collateral Agent | 56 |

ARTICLE TWELVE

MISCELLANEOUS

| | | |
|---|---|---|
| SECTION 12.01. | Trust Indenture Act Controls | 56 |
| SECTION 12.02. | Notices | 56 |
| SECTION 12.03. | Communications by Holders with Other Holders | 57 |
| SECTION 12.04. | Certificate and Opinion as to Conditions Precedent | 57 |
| SECTION 12.05. | Statements Required in Certificate and Opinion | 58 |
| SECTION 12.06. | Rules by Trustee and Agents | 58 |
| SECTION 12.07. | Business Days; Legal Holidays | 58 |
| SECTION 12.08. | Governing Law | 58 |
| SECTION 12.09. | No Adverse Interpretation of Other Agreements | 59 |
| SECTION 12.10. | Successors | 59 |
| SECTION 12.11. | Multiple Counterparts | 59 |
| SECTION 12.12. | Table of Contents, Headings, Etc. | 59 |
| SECTION 12.13. | Separability | 59 |
| SECTION 12.14. | Waiver of Jury Trial | 60 |
| SECTION 12.15. | Force Majeure | 60 |
| SECTION 12.16. | Intercreditor Agreement | 60 |

| | | |
|---|---|---|
| Schedule A | List of Guarantors | |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Note |
| Exhibit B | Form of Legend for Rule 144A Notes and Other Notes That Are Restricted Notes |
| Exhibit C | Form of Legend for Regulation S Note |
| Exhibit D | Form of Legend for Global Note |
| Exhibit E | Form of Certificate To Be Delivered in Connection with Transfers to Non-QIB Accredited Investors |
| Exhibit F | Form of Certificate To Be Delivered in Connection with Transfers Pursuant to Regulation S |

**JX 132-16**

Page

Exhibit G    Notation of Guarantee

JX 132-17

INDENTURE, dated as of October 12, 2010, among SEARS HOLDINGS CORPORA-TION, a Delaware corporation (the "Issuer"), the Guarantors (as defined herein) listed on Schedule A hereto and WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee (the "Trustee") and Collateral Agent (as defined herein).

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as defined herein):

## ARTICLE ONE

### DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions.

"Additional First Lien Obligations" means any indebtedness of the Issuer or any Restricted Subsidiary, other than the Credit Agreement Obligations, that is secured by a Lien on the Collateral ranking contractually prior to the Notes Liens and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; *provided* that the representative of such Additional First Lien Obligations executes a joinder agreement to the Intercreditor Agreement (or another intercreditor agreement on terms not less favorable to the Holders of Notes than the Intercreditor Agreement) agreeing to be bound thereby.  At the Issuer's option, any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be "Additional First Lien Obligations".

"Additional Interest" means any additional interest pursuant to Section 5 of the Initial Purchasers Registration Rights Agreement or Section 4 of the Pension Plan Registration Rights Agreement, as applicable.

"Additional Notes" means an unlimited principal amount of Notes having identical terms and conditions (other than issue date, issue price and initial interest payment date) to the Notes issued on the Issue Date pursuant to Article Two.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means the Collateral Agent, Depository Custodian, any Registrar, Paying Agent or agent for service of notices and demands.

"Applicable Procedures" means, with respect to any transfer, payment, tender, redemption or exchange of or for beneficial interests in any Global Certificate, the rules and procedures of the Depository, Euroclear and Clearstream that apply to such transfer, payment, tender, redemption or exchange.

"Attributable Debt" in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value discounted at the rate of interest implicit in the terms of the lease (as determined in good faith by the Issuer) of the obligations of the lessee under such lease for net rental payments during the remaining term of the lease (including any period for which such lease has been extended or may, at the Issuer's option, be extended).

JX 132-18

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"Board of Directors" means either the board of directors of the Issuer or any duly authorized committee of that board or any committee of officers or other representatives of the Issuer duly authorized by a Board Resolution to act on behalf of that board or in its stead.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Borrowing Base" means, as of any date, the sum of (1) 90% of the book value (calculated in accordance with GAAP) of the accounts receivable of the Issuer and the Guarantors, on a consolidated basis, on such date and (2) 65% of the book value (calculated in accordance with GAAP) of the inventory of the Issuer and the Guarantors, on a consolidated basis, on such date.

"Capital Stock" means, as to any Person, the capital stock of such Person of every class, whether now or hereafter authorized, regardless of whether such capital stock shall be limited to a fixed sum or percentage with respect to the rights of the holders thereof to participate in dividends and in the distribution of assets upon the voluntary or involuntary liquidation, dissolution or winding up of such Person.

"Change of Control" means the occurrence of any of the following: (1) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or more series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person, other than a Permitted Holder, the Issuer or one of its Subsidiaries; (2) the Issuer becomes aware of the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any Person other than a Permitted Holder becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the Issuer's outstanding Voting Stock or other Voting Stock into which the Issuer's Voting Stock is reclassified, consolidated, exchanged or changed, measured by voting power rather than number of shares; (3) the first day on which a majority of the members of the Issuer's Board of Directors are not Continuing Directors; or (4) the adoption of a plan relating to the Issuer's liquidation or dissolution. Notwithstanding the foregoing, a transaction will not be deemed to involve a Change of Control under clause (2) above if (i) the Issuer becomes a direct or indirect wholly-owned subsidiary of a holding company and (ii)(A) the direct or indirect holders of the Voting Stock of such holding company immediately following that transaction are substantially the same as the holders of the Issuer's Voting Stock immediately prior to that transaction or (B) immediately following that transaction no Person (other than a holding company satisfying the requirements of this sentence or a Permitted Holder) is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"Change of Control Notice" has the meaning provided in the definition of "Change of Control Offer."

"Change of Control Offer" means a written offer (the "Change of Control Notice") sent by or on behalf of the Issuer by first-class mail, postage prepaid, or by electronic delivery to each Holder, with a copy to the Trustee, at its address appearing in the register for the Notes on the date of the Change of Control Offer offering to purchase all outstanding Notes in accordance with Section 4.07.  Unless otherwise required by applicable law, the Change of Control Notice shall specify the payment date (the "Change of Control Payment Date") for the Change of Control Offer, which shall be not less than 30 days nor more than 60 days after the date such Change of Control Notice is mailed or electronically delivered.

JX 132-19

The Change of Control Notice shall contain all the information required by applicable law to be included therein and shall describe the transaction that constitutes or may constitute the Change of Control Triggering Event. The Change of Control Notice shall also state:

(1) that the Change of Control Offer is being made pursuant to Section 4.07 of this Indenture;

(2) the Change of Control Payment Date;

(3) the Change of Control Payment;

(4) that the Holder may tender all or any portion of the Notes registered in the name of such Holder and that any portion of a Note tendered must be tendered in denominations of $2,000 principal amount or an integral multiple of $1,000 in excess thereof and that all Notes tendered in such manner for payment and not withdrawn shall be accepted;

(5) the place or places where Notes are to be surrendered for tender pursuant to the Change of Control Offer;

(6) that interest on any Note not tendered pursuant to the Change of Control Offer will continue to accrue;

(7) that on the Change of Control Payment Date the Change of Control Payment will become due and payable upon each Note being accepted for payment pursuant to the Change of Control Offer and that, unless the Issuer defaults in the payment of the Change of Control Payment therefor, interest thereon shall cease to accrue on and after the Change of Control Payment Date;

(8) that each Holder electing to tender all or any portion of a Note pursuant to the Change of Control Offer will, subject to Applicable Procedures, be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, at the place or places specified in the Change of Control Notice on or prior to the close of business on a date no earlier than the third Business Day prior to the Change of Control Payment Date (such Note being, if the Issuer so requires, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Issuer duly executed by, the Holder thereof or its attorney duly authorized in writing);

(9) that Holders will, subject to Applicable Procedures, be entitled to withdraw all or any portion of Notes tendered if the Issuer receives, not later than the close of business on the fifth Business Day preceding the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder tendered, the certificate number of the Note the holder tendered and a statement that such Holder is withdrawing all or a portion of its tender;

(10) that in the case of any Holder whose Note is purchased only in part, subject to Applicable Procedures, the Issuer shall execute and deliver to the Holder of such Note without service charge, a new Note or Notes, in an aggregate principal amount equal to and in exchange for the unpurchased portion of the Note so tendered, in denominations of $2,000 principal amount or integral multiples of $1,000 in excess thereof; and

JX 132-20

(11)      if mailed or electronically delivered prior to the date of consummation of the applicable Change of Control, that the Change of Control Offer is conditioned on the Change of Control Triggering Event occurring on or prior to the applicable Change of Control Payment Date.

"Change of Control Payment Date" has the meaning provided in the definition of "Change of Control."

"Change of Control Triggering Event" means the occurrence of both a Change of Control and a Ratings Event.

"Collateral" means, collectively, "Collateral" (as defined in the Security Agreement) and all other property subject or purported to be subject from time to time to a Lien in favor of the Collateral Agent for its benefit and for the benefit of the Trustee and the Holders and the holders of any Pari Passu Junior Lien Obligations.

"Collateral Agent" means the Trustee, in its capacity as Collateral Agent under the Security Documents together with its successors in such capacity.

"Collateral Coverage Certificate" means with respect to any annual or quarterly financial statements provided pursuant to Section 4.02, a certificate signed by a financial officer of the Issuer setting forth an accurate calculation of the Borrowing Base as of the last day of the period covered by such annual or quarterly financial statements, a calculation of the principal amount of outstanding indebtedness for borrowed money on such date that is secured by Liens on the Collateral pursuant to clauses (2) and (3) of the definition of "Permitted Liens" and stating whether or not a Collateral Coverage Event has occurred.

"Collateral Coverage Event" shall be deemed to have occurred if, prior to a Fall-Away Event, as of the last day of any two consecutive fiscal quarters of the Issuer, the Borrowing Base as of each such day is less than the principal amount of the Issuer's consolidated indebtedness for borrowed money outstanding on such day that is secured by Liens on the Collateral.

"Collateral Coverage Notice" has the meaning provided in the definition of "Collateral Coverage Offer."

"Collateral Coverage Offer" means a written offer (a "Collateral Coverage Notice") sent by or on behalf of the Issuer by first-class mail, postage prepaid, or by electronic delivery to each Holder, with a copy to the Trustee, at its address appearing in the register for the Notes on the date of the Collateral Coverage Offer offering to repurchase a portion (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of such Holder's Notes on the terms set forth hereunder up to an aggregate principal amount of Notes for all Holders equal to the Collateral Coverage Required Amount in accordance with Section 4.08. Unless otherwise required by applicable law, the Collateral Coverage Notice shall specify the payment date (the "Collateral Coverage Payment Date") for the Collateral Coverage Offer, which shall be not less than 30 days nor more than 60 days after the date such Collateral Coverage Notice is mailed or electronically delivered. The Collateral Coverage Notice shall contain all the information required by applicable law to be included therein and shall describe the circumstances requiring such Collateral Coverage Offer. The Collateral Coverage Notice shall also state:

(1)      that the Collateral Coverage Offer is being made pursuant to Section 4.08 of this Indenture;

-4-

JX 132-21

(2)      the Collateral Coverage Payment Date;

(3)      the Collateral Coverage Event Payment;

(4)      that the Holder may tender all or any portion of the Notes registered in the name of such Holder and that any portion of a Note tendered must be tendered in denominations of $2,000 principal amount or an integral multiple of $1,000 in excess thereof, *provided* that in the event the aggregate principal amount of Notes validly tendered for purchase in the Collateral Coverage Offer exceeds the Collateral Coverage Required Amount for such Collateral Coverage Offer, the Issuer will accept for payment only the Collateral Coverage Required Amount of Notes on a *pro rata* basis from Holders who have validly tendered their Notes in such Collateral Coverage Offer (subject to rounding such that all remaining Notes are in a minimum principal amount of $2,000 and in whole multiples of $1,000 in excess thereof);

(5)      the place or places where Notes are to be surrendered for tender pursuant to the Collateral Coverage Offer;

(6)      that interest on any Note not tendered pursuant to the Collateral Coverage Offer will continue to accrue;

(7)      that on the Collateral Coverage Payment Date, the Collateral Coverage Event Payment will become due and payable upon each Note being accepted for payment pursuant to the Collateral Coverage Offer and that, unless the Issuer defaults in the payment of the Collateral Coverage Event Payment therefor, interest thereon shall cease to accrue on and after the Collateral Coverage Payment Date;

(8)      that each Holder electing to tender all or any portion of a Note pursuant to the Collateral Coverage Offer will, subject to Applicable Procedures, be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, at the place or places specified in the Collateral Coverage Notice on or prior to the close of business on a date no earlier than the third Business Day prior to the Collateral Coverage Payment Date (such Note being, if the Issuer so requires, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Issuer duly executed by, the Holder thereof or its attorney duly authorized in writing);

(9)      that Holders will, subject to Applicable Procedures, be entitled to withdraw all or any portion of Notes tendered if the Issuer receives, not later than the close of business on the fifth Business Day preceding the Collateral Coverage Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder tendered, the certificate number of the Note the Holder tendered and a statement that such Holder is withdrawing all or a portion of its tender; and

(10)      that in the case of any Holder whose Note is purchased only in part, subject to Applicable Procedures, the Issuer shall execute and deliver to the Holder of such Note without service charge, a new Note or Notes, in an aggregate principal amount equal to and in exchange for the unpurchased portion of the Note so tendered, in denominations of $2,000 principal amount or integral multiples of $1,000 in excess thereof.

"Collateral Coverage Payment Date" has the meaning provided in the definition of "Collateral Coverage Offer."

JX 132-22

"Collateral Coverage Required Amount" means, with respect to any Collateral Coverage Event, an amount equal to the difference between (a) the principal amount of the Issuer's consolidated indebtedness for borrowed money that is secured by Liens on the Collateral outstanding on the date of occurrence of such Collateral Coverage Event and (b) the Borrowing Base on such date.

"Commission" means the Securities and Exchange Commission, as from time to time constituted, or, if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"Comparable Treasury Issue" means the United States Treasury security selected by an Independent Investment Banker as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial prac-tice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"Comparable Treasury Price" means, with respect to any Redemption Date, (1) the aver-age of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotations, or (2) if the Issuer obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such Reference Treasury Dealer Quotations.

"Consolidated Net Tangible Assets" means the aggregate amount of the Issuer's assets (less applicable reserves and other properly deductible items) and the Issuer's Subsidiaries' assets after deducting therefrom (a) all current liabilities (excluding current maturities of long-term debt and current maturities under capital leases) and (b) all goodwill, trade names, patents, unamortized debt discount and expense and other like intangibles, all as set forth on the Issuer's most recent consolidated balance sheet and computed in accordance with GAAP.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Issuer who (A) was a member of such Board of Directors on the Issue Date or (B) was nominated for election, elected or appointed to such Board of Directors with the approval of a majority of the continuing directors who were members of such Board of Directors at the time of such nomination, election or appointment (either by a specific vote or by approval of a proxy statement in which such member was named as a nominee for election as a director, without objection to such nomination).

"Credit Agreement" means the Amended and Restated Credit Agreement, dated as of May 21, 2009, among the Issuer, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial in-stitutions party thereto as lenders, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Retail Finance, LLC, as co-collateral agent, and General Electric Capital Corporation, as co-collateral agent, together with the related documents thereto (including, without limita-tion, any guarantee agreements and security documents), in each case as such agreements may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, re-placed or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available bor-rowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Credit Agreement Agent" means, collectively, the co-collateral agents under the Credit Agreement.

JX 132-23

"Credit Agreement Obligations" means the Obligations owed to the lenders and agents under the Credit Agreement.

"Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

"Default" means an Event of Default or an event that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"Depository" means, with respect to the Notes issued in the form of one or more Global Notes, The Depository Trust Company or another Person designated as Depository by the Issuer, which Person must be a clearing agency registered under the Exchange Act.

"Depository Custodian" means the Trustee, as custodian of each Global Note for the Depository.

"Domestic Subsidiary" means any Subsidiary of the Issuer which is not a Foreign Subsidiary.

"Equity Interests" of any Person means any and all shares, interests, participations, rights in or other equivalents (however designated) of such Person's Capital Stock, other equity interests whether now outstanding or issued after the Issue Date, partnership interests (whether general or limited), limited liability company interests, any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, and any rights (other than debt securities convertible into Equity Interests), warrants or options exchangeable for or convertible into such Equity Interests.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Exchange Offer" has the meaning provided in the applicable Registration Rights Agreement.

"Exchange Securities" has the meaning provided in the applicable Registration Rights Agreement.

"Fall-Away Event" means the satisfaction of the following conditions on any date following the Issue Date: (i) the Issuer shall have a corporate family rating of at least Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, (ii) no Default shall have occurred and be continuing on such date, (iii) the Issuer and its Restricted Subsidiaries shall (after giving effect to the release of the Notes Liens and any concurrent release of Liens to occur on such date) have no Liens on any of their assets or properties other than Permitted Liens which are permitted to be outstanding following a Fall-Away Event and (iv) the Issuer shall have delivered to the Trustee an Officer's Certificate certifying that the foregoing conditions are satisfied and requesting that the Notes Liens be released.

"Fitch" means Fitch Inc., a subsidiary of Fimalac, S.A., and its successors.

"Foreign Subsidiary" means any Subsidiary of the Issuer which is not organized under the laws of the United States or any state thereof or the District of Columbia, and any Subsidiary of any such Subsidiary.

JX 132-24

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

"Government Securities" means securities that are (i) direct obligations of the United States for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, which, in either case under clause (i) or (ii), are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such obligation or a specific payment of interest on or principal of any such obligation held by such custodian for the account of the holder of a depository receipt; *provided*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the obligation or the specific payment of interest on or principal of the obligation evidenced by such depository receipt.

"Guarantee" means a guarantee of the Notes on the terms set forth in this Indenture.

"Guarantor" means each Subsidiary or other Person that has provided a Guarantee for so long as such Guarantee remains in effect.

"Holder" means a Person in whose name a Note is registered.

"Indenture" means this Indenture as amended, restated or supplemented from time to time in accordance with the terms hereof.

"Independent Investment Banker" means one of the Reference Treasury Dealers appointed by the Issuer.

"Initial Purchasers" means Banc of America Securities LLC, Wells Fargo Securities, LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Goldman, Sachs & Co. and Citigroup Global Markets Inc.

"Initial Purchasers Registration Rights Agreement" means the registration rights agreement to be dated as of the Issue Date among the Issuer, the Guarantors and Banc of America Securities LLC, as representative of the Initial Purchasers, relating to the registration of the Notes with the Commission.

"Institutional Accredited Investor" means an institution that is an "accredited investor" as that term is defined in Rule 501(a)(1), (2), (3) or (7) promulgated under the Securities Act.

"Intercreditor Agreement" means, collectively, the intercreditor agreement dated as of the Issue Date by and among the Issuer, the Guarantors, the Collateral Agent and the Credit Agreement Agent and any other intercreditor agreement entered into in accordance with the terms hereof in connection with any Additional First Lien Obligations or Pari Passu Junior Lien Obligations.

"interest" means, with respect to the Notes, interest and Additional Interest, if any, on the Notes.

JX 132-25

"Interest Payment Dates" means each April 15 and October 15, commencing April 15, 2011.

"Investment Grade Rating" means a rating equal to or higher than BBB- (or the equivalent) by Fitch, Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, and the equivalent investment grade credit rating from any replacement Rating Agency or Rating Agencies selected by the Issuer.

"Issue Date" means October 12, 2010.

"Issuer" has the meaning provided in the preamble hereof.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement.

"Moody's" means Moody's Investors Service, Inc.

"Non-U.S. Person" means a Person who is not a U.S. person, as defined in Regulation S.

"Notes" means $1,250.0 million of 6⅝% Senior Secured Notes due 2018, any Additional Notes issued under this Indenture and any Exchange Securities.

"Notes Liens" means the Liens securing the Obligations outstanding under the Notes and the Indenture.

"Obligations" means all obligations for principal, premium, interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any indebtedness.

"Officer" means the Chairman of the Board, the President, Chief Executive Officer, Chief Financial Officer, any Executive Vice President, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Issuer, or any direct or indirect parent of the Issuer, as applicable.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer or Treasurer of the Issuer.

"Opinion of Counsel" means a written opinion reasonably satisfactory in form and substance to the Trustee from legal counsel, who may be an employee of or counsel to the Issuer or any Guarantor, or other counsel who is reasonably acceptable to the Trustee, stating the matters required by Section 12.05, if applicable, and delivered to the Trustee.

"Pari Passu Junior Lien Obligations" means any indebtedness of the Issuer or any Guarantor that is secured by a Lien on the Collateral equally and ratably with the Notes Liens and that is permitted to be incurred pursuant to clause (2) of the definition of "Permitted Liens"; *provided* that the representative of such Pari Passu Junior Lien Obligations executes a joinder agreement to the Security Agreement and the Intercreditor Agreement or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an en-

-9-

JX 132-26

forcement of the Notes Liens or the Liens securing such Pari Passu Junior Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Pari Passu Junior Lien Obligations, be distributed to the Trustee and each other agent for the holders of Pari Passu Junior Lien Obligations on a *pro rata* basis based on the amount of outstanding obligations of each such class.  At the Issuer's option, any indebtedness secured by a Lien permitted by clause (2) of the definition of "Permitted Liens" may be Pari Passu Junior Lien Obligations.

"Pension Plan Registration Rights Agreement" means the registration rights agreement to be dated as of the Issue Date among the Issuer, the Guarantors and Sears Holdings Pension Trust relating to the registration of the Notes with the Commission.

"Permitted Holders" means (i) ESL Investments, Inc. and its Affiliates, (ii) any group (as defined in Rule 13d-3 under the Exchange Act) of which ESL Investments, Inc. or an Affiliate of ESL Investments, Inc. is a member so long as ESL Investments, Inc. and its Affiliates own a majority of the Issuer's Voting Stock owned by all members of such group and (iii) to the extent a Change of Control Triggering Event has occurred and a Change of Control Offer completed, any Person whose acquisition of the Issuer's Voting Stock caused such Change of Control Triggering Event and an Affiliate of such Person.

"Permitted Liens" means the following types of Liens:

(1)      Liens existing as of the Issue Date (other than Liens securing indebtedness under the Credit Agreement);

(2)      prior to the occurrence of a Fall-Away Event, Liens on the Collateral securing indebtedness (including indebtedness under the Credit Agreement) in an aggregate outstanding principal amount not to exceed an amount equal to the Borrowing Base (measured as of the end of the calendar month most recently ended prior to the date of any applicable incurrence of indebtedness) less the outstanding principal amount of Notes outstanding at such time, other than Additional Notes; *provided* that for purposes of this clause (2), Liens on Collateral securing (a) indebtedness under the Credit Agreement in a principal amount not to exceed $2.45 billion shall be deemed to be Permitted Liens and (b) indebtedness under any other revolving credit facility shall be deemed to be Permitted Liens; provided, in the case of this clause (b), on the date firm commitments under such revolving credit facility are received by the Issuer and its Restricted Subsidiaries, indebtedness secured by Liens on the Collateral in the full amount of all firm commitments under each then existing revolving credit facility secured by Liens on the Collateral in reliance on this clause (2) (including commitments then outstanding under the Credit Agreement, if any) could have been incurred under this clause (2) had the full amount of such firm commitments been funded on such date;

(3)      Liens securing the Notes and the Guarantees issued on the Issue Date (and any registered exchange notes and related guarantees issued in exchange therefore);

(4)      Liens of the Issuer or a Subsidiary of the Issuer on assets of any Subsidiary of the Issuer;

(5)      Liens for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to which the Issuer or its Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

-10-

JX 132-27

(6)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, maritime and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(7)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations or to secure or which results from required payments or deposits in connection with litigation (in each case, exclusive of obligations for the payment of borrowed money);

(8)    judgment Liens so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceedings may be initiated shall not have expired;

(9)    easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Issuer or any of its Subsidiaries;

(10)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(11)    Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(12)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer or any of its Subsidiaries, including rights of offset and set-off;

(13)    Liens securing indebtedness incurred to finance the purchase price or cost of construction of fixed or capital assets (or additions, substantial repairs, alterations or substantial improvements thereto) or of Equity Interests in a third party, *provided* that (x) such Liens and the indebtedness secured thereby are incurred within twelve months of the later of acquisition or completion of construction (or addition, repair, alteration or improvement) and full operation thereof and (y) such Liens extend only to the assets the acquisition, construction, repair, replacement or improvement of which is financed thereby or, in the case of an acquisition of Equity Interests in a third party which becomes a Subsidiary as a result of such acquisition, the assets owned by such third party;

(14)    Liens on the assets, property or Capital Stock of a Person at the time such Person becomes a Restricted Subsidiary; *provided*, that such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary; *provided*,

-11-

**JX 132-28**

*further*, that such Liens do not extend to any property owned by the Issuer or any other Restricted Subsidiary;

(15)    Liens on assets or property existing at the time the Issuer or a Restricted Subsidiary acquired such assets or property, including by means of merger, amalgamation or consolidation with or into the Issuer or a Restricted Subsidiary; *provided*, that such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary; *provided, further*, that such Liens do not extend to any other property owned by the Issuer or any Restricted Subsidiary;

(16)    Liens to secure obligations in respect of Cash Management Services and Bank Products (each as defined in the Credit Agreement); and

(17)    from and after the occurrence of a Fall-Away Event, other Liens on property owned by the Issuer or any of its Subsidiaries securing indebtedness having an aggregate principal amount not to exceed, as of any date of incurrence of such secured indebtedness pursuant to this clause and after giving effect to such incurrence and the application of the proceeds therefrom, 15% of the Issuer's Consolidated Net Tangible Assets as of the last day of the most recent fiscal quarter for which financial statements have been delivered pursuant to Section 4.02.

"Person" means any individual, partnership, corporation, limited liability company, joint stock company, business trust, trust, unincorporated association, joint venture or other entity, or a government or political subdivision or agency thereof.

"Physical Notes" means certificated Notes in registered form that are not registered in the name of the Depository or its nominee in substantially the form set forth in Exhibit A.

"Primary Treasury Dealer" has the meaning provided in the definition of "Reference Treasury Dealers".

"Private Placement Legend" means the legend initially set forth on the Rule 144A Notes and other Notes that are Restricted Notes in the form set forth in Exhibit B.

"Qualified Institutional Buyer" or "QIB" shall have the meaning specified in Rule 144A promulgated under the Securities Act.

"Rating Agencies" means (1) each of Fitch, Moody's and S&P; and (2) if Fitch, Moody's or S&P ceases to rate the Notes or fails to make a rating of the Notes publicly available, at the sole option of the Issuer, a "nationally recognized statistical rating organization" as defined in Section 3 of the Exchange Act, selected by the Issuer (as certified by a resolution of the Board of Directors of the Issuer) as a replacement agency for Fitch, Moody's or S&P, or any of them, as the case may be.

"Ratings Event" means that the rating on the Notes is lowered by at least two of the three Rating Agencies and the Notes are rated below an Investment Grade Rating by at least two of the three Rating Agencies (it being understood that for purposes of this definition if fewer than three Rating Agencies maintain ratings of the Notes at the time of a Change of Control, the Notes will be deemed for purposes of this definition to have been downgraded in connection with such Change of Control (prior to any actual downgrades) by a number of Rating Agencies equal to the excess of 3 over the number of Rating Agencies that maintain ratings of the Notes at such time), on any day during the period (which period will be extended so long as the rating of the Notes is under publicly announced consideration for a possible downgrade by any of the Rating Agencies) commencing 60 days prior to the first public notice of the oc-

JX 132-29

currence of a Change of Control or the Issuer's intention to effect a Change of Control and ending 60 days following consummation of such Change of Control.

"Redemption Date" when used with respect to any Note to be redeemed means the date fixed for such redemption pursuant to the terms of the Notes.

"Reference Treasury Dealers" means (1) Banc of America Securities LLC and its successors; *provided, however,* that if any of the foregoing shall cease to be a primary Government Securities dealer (a "Primary Treasury Dealer"), the Issuer shall substitute another nationally recognized investment banking firm that is a Primary Treasury Dealer, and (2) two other Primary Treasury Dealers selected by the Issuer.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Issuer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Issuer by such Reference Treasury Dealer at 5:00 p.m. on the third Business Day preceding such Redemption Date.

"Registration Rights Agreement" means the Initial Purchasers Registration Rights Agreement or the Pension Plan Registration Rights Agreement, as applicable and "Registration Rights Agreement" means, collectively, the Initial Purchasers Registration Rights Agreement and the Pension Plan Registration Rights Agreement.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S-X" means Regulation S-X promulgated under the Securities Act.

"Responsible Officer" when used with respect to the Trustee, means an officer or assistant officer assigned to the Corporate Trust Services department of the Trustee (or any successor group of the Trustee) with direct responsibility for the administration of this Indenture or the Security Documents and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"Restricted Note" has the same meaning as "Restricted Security" set forth in Rule 144(a)(3) promulgated under the Securities Act; *provided* that the Trustee shall be entitled to request and conclusively rely upon an Opinion of Counsel with respect to whether any Note is a Restricted Note.

"Restricted Subsidiary" means each Domestic Subsidiary of the Issuer other than Orchard Supply Hardware Stores Corporation and its Subsidiaries.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

JX 132-30

"Security Agreement" means the security agreement dated as of the Issue Date among the Collateral Agent, the Issuer and the Grantors (as defined therein).

"Security Documents" means the Security Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral to the Collateral Agent for the benefit of the Holders of Notes.

"Specified Subsidiary" means any wholly-owned Restricted Subsidiary with Credit Card Accounts Receivable (as defined in the Security Agreement and for purposes of such definition, substituting the words "Domestic Subsidiary" for "Guarantor" in each instance where such term is used) and Inventory (as defined in the Security Agreement) the combined book value of which exceeds $100.0 million and which has incurred indebtedness for money borrowed in excess of $100.0 million.

"Subsidiary" means a corporation, a majority of the outstanding Voting Stock of which is owned, directly or indirectly, by the Issuer or by one or more other Subsidiaries, or by the Issuer and one or more other Subsidiaries.

"Treasury Rate" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to a maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date.

"Trust Indenture Act" or "TIA" means the Trust Indenture Act of 1939, as amended.

"Trustee" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture, and thereafter means the successor serving hereunder.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided, however,* that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other that the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"Voting Stock" means, with respect to any specified Person as of any date, the Capital Stock of such Person that is at the time entitled to vote generally in the election of the board of directors or comparable governing body of such Person.

SECTION 1.02.   Other Definitions.

The definitions of the following terms may be found in the sections indicated as follows:

| Term | Defined in Section |
|---|---|
| "Agent Members" | 2.16(a) |
| "Authentication Order" | 2.01 |
| "Business Day" | 12.07 |
| "Change of Control Payment" | 4.07 |
| "Collateral Coverage Event Payment" | 4.08 |
| "Covenant Defeasance" | 9.03 |

-14-

**JX 132-31**

| | |
|---|---|
| "Event of Default" | 6.01 |
| "Global Notes" | 2.16(a) |
| "Institutional Accredited Investor Notes" | 2.02 |
| "Legal Defeasance" | 9.02 |
| "Legal Holiday" | 12.07 |
| "Paying Agent" | 2.04 |
| "Registrar" | 2.04 |
| "Regulation S Global Note" | 2.16(a) |
| "Regulation S Notes" | 2.02 |
| "Restricted Global Note" | 2.16(a) |
| "Restricted Period" | 2.16(f) |
| "Rule 144A Notes" | 2.02 |
| "Sale and Leaseback Transaction" | 4.05(a) |

SECTION 1.03.    Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the TIA, the portion of such provision required to be incorporated herein in order for this Indenture to be qualified under the TIA is incorporated by reference in and made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes and the Guarantees.

"indenture securityholder" means a Holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor on the indenture securities" means the Issuer, the Guarantors or any other obligor on the Notes.

All other terms used in this Indenture that are defined by the TIA, defined in the TIA by reference to another statute or defined by Commission rule have the meanings therein assigned to them.

SECTION 1.04.    Rules of Construction.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it herein, whether defined expressly or by reference;

(2)    "or" is not exclusive;

(3)    words in the singular include the plural, and in the plural include the singular;

(4)    words used herein implying any gender shall apply to both genders;

(5)    "herein," hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or Subsection;

-15-

JX 132-32

(6)    unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(7)    "$," "U.S. Dollars" and "United States Dollars" each refer to United States dollars, or such other money of the United States that at the time of payment is legal tender for payment of public and private debts;

(8)    the words "including," "includes" and similar words shall be deemed to be followed by "without limitation"; and

(9)    references to sections of or rules under the Securities Act, the Exchange Act and the TIA shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time.

ARTICLE TWO

THE NOTES

SECTION 2.01.    Amount of Notes.

The Trustee shall, upon the receipt of a written order of the Issuer signed by an Officer of the Issuer (an "Authentication Order"), the applicable Notes duly executed by the Issuer, and the notation of Guarantee to be endorsed thereon duly executed by each Guarantor, authenticate (i) Notes for original issue on the Issue Date in the aggregate principal amount not to exceed $1,250,000,000 and (ii) Additional Notes in an unlimited principal amount, to the extent permitted by Section 4.04. The Authentication Order shall specify the amount of Notes to be authenticated, the date on which the Notes are to be authenticated, and the names and delivery instructions for each Holder of the Notes. Furthermore, Notes may be authenticated or delivered upon registration or transfer, or in lieu of, other Notes pursuant to Section 2.07, 2.08, 2.11, 3.06 or 8.05 or in connection with a Change of Control Offer pursuant to Section 4.07 or Collateral Coverage Offer pursuant to Section 4.08. The Trustee shall be entitled to receive an Opinion of Counsel of the Issuer and the Guarantors in connection with such authentication of Notes that this Indenture will constitute valid and legally binding obligations of the Issuer and the Guarantors, and that such Notes, when duly authorized and executed by the Issuer and duly authenticated by the Trustee in the manner provided in this Indenture and delivered against payment of the purchase price therefor, will constitute valid and binding obligations of the Issuer, and that the Guarantees, when duly authorized and executed by the Guarantors, will constitute valid and binding obligations of such Guarantors, enforceable in accordance with their terms, subject to (i) bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws relating to or affecting the rights or remedies of creditors generally, (ii) the application of general principles of equity, and (iii) applicable law and public policy with respect to rights to indemnity and contribution.

Upon receipt of an Authentication Order, the Trustee shall authenticate Notes in substitution for Notes originally issued to reflect any name change of the Issuer. Any Additional Notes shall be part of the same issue as the Notes being issued on the Issue Date and will vote on all matters as one class with the Notes being issued on the Issue Date, including, without limitation, waivers, amendments, redemptions and offers to purchase. For the purposes of this Indenture, references to the Notes include Additional Notes, if any.

Upon receipt of an Authentication Order, the applicable Notes duly executed by the Issuer, the notation of Guarantee to be endorsed thereon duly executed by each Guarantor, and an Officer's

JX 132-33

Certificate certifying that a registration statement relating to an exchange offer specified in the applicable Registration Rights Agreement or any registration rights agreement relating to the Additional Notes is effective, the Trustee shall authenticate an additional series of Notes for issuance in exchange for the Notes tendered for exchange pursuant to such exchange offer registered under the Securities Act.  Exchange Securities may have such distinctive series designations and such changes in the form thereof as are specified in the Authentication Order referred to in the preceding sentence.

The principal of, premium, if any, and interest, if any, on the Notes shall be payable at the office or agency of the Issuer maintained for such purpose in the Borough of Manhattan, the City of New York, State of New York, or at such other office or agency of the Issuer as may be maintained for such purpose pursuant to Section 2.04; *provided*, *however*, that, at the option of the Issuer, each installment of interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the registry maintained by the Registrar or (ii) wire transfer to an account located in the United States maintained by the payee.  Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by the Depository.  If Additional Interest is payable on the Notes, the Issuer shall provide an Officer's Certificate to the Trustee on or before the record date for each Interest Payment Date on which such Additional Interest is payable setting forth the amount of such Additional Interest in reasonable detail.  The Trustee may provide a copy of such Officer's Certificate or other notice received from the Issuer relating to Additional Interest to any Holder upon request.

SECTION 2.02.    Form and Dating.

The Notes and the Trustee's certificate of authentication with respect thereto shall be substantially in the form set forth in Exhibit A, which is incorporated in and forms a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, rule or usage to which the Issuer is subject.  Without limiting the generality of the foregoing, Notes offered and sold to Qualified Institutional Buyers in reliance on Rule 144A ("Rule 144A Notes") and Notes offered and sold to Institutional Accredited Investors ("Institutional Accredited Investor Notes") shall bear the legend and include the form of assignment set forth in Exhibit B, and Notes offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes") shall bear the legend and include the form of assignment set forth in Exhibit C.  The Issuer shall approve the form of the Notes and any notation, legend or endorsement on them.  Each Note shall be dated the date of its authentication.

The terms and provisions contained in the Notes shall constitute, and are expressly made, a part of this Indenture and, to the extent applicable, the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and agree to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes may be presented for registration of transfer and exchange at the offices of the Registrar.

SECTION 2.03.    Execution and Authentication.

At least one Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

-17-

JX 132-34

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Trustee by manual or facsimile signature, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.  Notwithstanding the foregoing, if any Note shall have been authenticated and delivered hereunder but never issued and sold by the Issuer, and the Issuer shall deliver such Note to the Trustee for cancellation as provided in Section 2.12, for all purposes of this Indenture such Note shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the bene-fits of this Indenture.

The Trustee may appoint an authenticating agent reasonably acceptable to the Issuer to authenticate the Notes.  Unless otherwise provided in the appointment, an authenticating agent may au-thenticate the Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as an Agent to deal with the Issuer and Affiliates of the Issuer.  Each Paying Agent is designated as an authenti-cating agent for purposes of this Indenture.

The Notes shall be issuable only in registered form without coupons in denominations of $2,000 principal amount and integral multiples of $1,000 in excess thereof.

SECTION 2.04.    Registrar and Paying Agent.

The Issuer shall maintain an office or agency where Notes may be presented for registra-tion of transfer or for exchange (the "Registrar"), and an office or agency where Notes may be presented for payment (the "Paying Agent") and an office or agency where notices and demands to or upon the Is-suer, if any, in respect of the Notes and this Indenture may be served.  The Registrar shall keep a register of the Notes and of their transfer and exchange.  The Issuer may have one or more additional Paying Agents.  The term "Paying Agent" includes any additional Paying Agent.  The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and the Trustee.

The Issuer shall enter into an appropriate agency agreement, which shall incorporate the provisions of the TIA, with any Agent that is not a party to this Indenture.  The agreement shall imple-ment the provisions of this Indenture that relate to such Agent.  The Issuer shall notify the Trustee of the name and address of any such Agent.  If the Issuer fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such and shall be entitled to appropriate compensa-tion in accordance with Section 7.01(a).  The Issuer or any of its Subsidiaries may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Issuer initially appoints the Trustee as Registrar, Paying Agent and Agent for service of notices and demands in connection with the Notes and this Indenture and the Corporate Trust Office of the Trustee as its office for purposes of this Section 2.04.

SECTION 2.05.    Paying Agent To Hold Money in Trust.

Prior to 10:00 a.m., New York City time, on each due date of the principal or interest on any Notes, the Issuer shall deposit with the Paying Agent a sum sufficient to pay such principal and inter-est when so becoming due.  Each Paying Agent shall hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of or premium or interest on the Notes (whether such money has been paid to it by the Issuer or any other obligor on the Notes or the Guarantors), and the Issuer and the Paying Agent shall notify the Trustee of any default by the Issuer (or any other obligor on the Notes) in making any such payment.  If the Issuer or a Subsidiary of the Issuer

JX 132-35

serves as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund. Money held in trust by the Paying Agent need not be segregated except as required by law and in no event shall the Paying Agent be liable for any interest on any money received by it hereunder. The Issuer at any time may require the Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed and the Trustee may at any time during the continuance of any Event of Default specified in clause (1) or (2) of Section 6.01, upon written request to the Paying Agent, require such Paying Agent to pay forthwith all money so held by it to the Trustee and to account for any funds disbursed by the Paying Agent. Upon making such payment, the Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06.    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least two Business Days before each Interest Payment Date, and at such other times as the Trustee may reasonably request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

SECTION 2.07.    Transfer and Exchange.

Subject to Sections 2.16 and 2.17, when Notes are presented to the Registrar with a request from the Holder of such Notes to register a transfer or to exchange them for an equal principal amount of Notes of other authorized denominations, the Registrar shall register the transfer or exchange such notes as requested if the requirements of this Indenture are met. Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Registrar, duly executed by the Holder thereof or his attorneys duly authorized in writing. To permit registrations of transfers and exchanges, the Issuer shall issue and execute and the Trustee shall authenticate new Notes (and the Guarantors shall execute the notation of Guarantee thereon) evidencing such transfer or exchange at the Registrar's request. No service charge shall be made to the Holder for any registration of transfer or exchange. The Issuer may require from the Holder payment of a sum sufficient to cover any transfer taxes or other governmental charge that may be imposed in relation to a transfer or exchange, but this provision shall not apply to any exchange pursuant to Section 2.11, 3.06, 4.07, 4.08 or 8.05 (in which events the Issuer shall be responsible for the payment of such taxes). The Registrar shall not be required to exchange or register a transfer of any Note for a period of 15 days immediately preceding the mailing or electronic delivery of notice of redemption of Notes to be redeemed or of any Note selected, called or being called for redemption except the unredeemed portion of any Note being redeemed in part.

Any Holder of the Global Note shall, by acceptance of such Global Note, agree that transfers of the beneficial interests in such Global Note may be effected only through a book entry system maintained by the Holder of such Global Note (or its agent), and that ownership of a beneficial interest in the Global Note shall be required to be reflected in a book entry.

Each Holder of a Note agrees to indemnify the Issuer, the Guarantors and the Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Note in violation of any provision of this Indenture and/or applicable federal or state securities law.

Except as expressly provided herein, neither the Trustee nor the Registrar shall have any duty to monitor the Issuer's compliance with or have any responsibility with respect to the Issuer's compliance with any federal or state securities laws. The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or

-19-

JX 132-36

under applicable law with respect to any transfer of any interest in any Notes (including any transfers between or among the Depository's participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation, as is expressly required by, and to do so if and when expressly required by, the terms of this Indenture and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.08.    Replacement Notes.

If a mutilated Note is surrendered to the Registrar or the Trustee, or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note (and the Guarantors shall execute the notation of Guarantee thereon) if the Holder of such Note furnishes to the Issuer and the Trustee evidence reasonably acceptable to them of the ownership and the destruction, loss or theft of such Note and if the requirements of Section 8-405 of the UCC are met.  If required by the Trustee or the Issuer, an indemnity bond shall be posted by such Holder, sufficient in the judgment of both to protect the Issuer, the Guarantors, the Trustee or any Paying Agent from any loss that any of them may suffer if such Note is replaced.  The Issuer and the Trustee may charge such Holder for their reasonable out-of-pocket expenses in replacing such Note (including, without limitation, attorneys' fees and disbursements).  Every replacement Note shall constitute a contractual Obligation of the Issuer.

SECTION 2.09.    Outstanding Notes.

The Notes outstanding at any time are all Notes that have been authenticated by the Trustee except for (a) those cancelled by it, (b) those delivered to it for cancellation, (c) to the extent set forth in Sections 9.01 and 9.02, on or after the date on which the conditions set forth in Section 9.01 or 9.02 have been satisfied, those Notes theretofore authenticated and delivered by the Trustee hereunder and (d) those described in this Section 2.09 as not outstanding.  Subject to Section 2.10, a Note does not cease to be outstanding because the Issuer or one of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.08, it ceases to be outstanding unless the Trustee and the Issuer receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser in whose hands such Note is a legal, valid and binding obligation of the Issuer.  A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If the principal of any Note is considered paid under Section 4.01, it shall cease to be outstanding and interest thereon shall cease to accrue.  If the Paying Agent holds, on any Redemption Date or maturity date, money sufficient to pay all accrued interest and principal with respect to the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10.    Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any declaration of acceleration or notice of default or direction, waiver or consent or any amendment, modification or other change to this Indenture, Notes owned by the Issuer or any Affiliate of the Issuer shall be disregarded as though they were not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent or any amendment, modification or other change to this Indenture, only Notes as to which a Responsible Officer of the Trustee has received an Officer's Certificate stating that such Notes are so owned shall be so disregarded.  Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee

-20-

JX 132-37

established to the satisfaction of the Trustee the pledgee's right so to act with respect to the Notes and that the pledgee is not the Issuer, a Guarantor, any other obligor on the Notes or any of their respective Affiliates.

SECTION 2.11.    <u>Temporary Notes</u>.

Until definitive Notes are prepared and ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes.  Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate definitive Notes in exchange for temporary Notes.  Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as definitive Notes.

SECTION 2.12.    <u>Cancellation</u>.

The Issuer at any time may deliver Notes to the Trustee for cancellation.  The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall (subject to the record-retention requirements of the Exchange Act) dispose of such cancelled Notes in its customary manner.  The Trustee shall deliver a certificate of such disposal to the Issuer upon its request therefor.  The Issuer may not reissue or resell, or issue new Notes to replace, Notes that the Issuer has redeemed or paid, or that have been delivered to the Trustee for cancellation.

SECTION 2.13.    <u>Defaulted Interest</u>.

If the Issuer defaults on a payment of interest on the Notes, it shall pay the defaulted interest, plus (to the extent permitted by law) any interest payable on the defaulted interest, in accordance with the terms hereof, to the Persons who are Holders on a subsequent special record date, which date shall be at least five Business Days prior to the payment date.  The Issuer shall fix such special record date and payment date in a manner satisfactory to the Trustee.  The Issuer shall promptly mail or electronically deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest, and interest payable on defaulted interest, if any, to be paid.  The Issuer may make payment of any defaulted interest in any other lawful manner not inconsistent with the requirements (if applicable) of any securities exchange on which the Notes may be listed and, upon such notice as may be required by such exchange, if, after written notice given by the Issuer to the Trustee of the proposed payment pursuant to this sentence, such manner of payment shall be deemed practicable by the Trustee.

SECTION 2.14.    <u>CUSIP Number</u>.

The Issuer in issuing the Notes may use a "CUSIP" number, ISIN and "Common Code" number (in each case if then generally in use), and if so, such CUSIP number, ISIN and Common Code number shall be included in notices, including notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness or accuracy of such number either as printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes.  The Issuer shall promptly notify the Trustee of any such CUSIP number, ISIN and Common Code number used by the Issuer in connection with the issuance of the Notes and of any change in the CUSIP number, ISIN and Common Code number.

JX 132-38

SECTION 2.15.    <u>Deposit of Moneys</u>.

Prior to 10:00 a.m., New York City time, on each Interest Payment Date, maturity date, Change of Control Payment Date and Collateral Coverage Payment Date, as the case may be, the Issuer shall have deposited with the Paying Agent in immediately available funds money sufficient to make cash payments, if any, due on such Interest Payment Date, maturity date, Change of Control Payment Date and Collateral Coverage Payment Date, as the case may be. The principal and interest on Global Notes shall be payable to the Depository or its nominee, as the case may be, as the sole registered owner and the sole holder of the Global Notes represented thereby in accordance with Applicable Procedures. The principal and interest on Physical Notes shall be payable, either in person or by mail, at the office of the Paying Agent and further in connection with the payment of principal, upon presentment of such Physical Notes at the office of the Paying Agent.

SECTION 2.16.    <u>Book-Entry Provisions for Global Notes</u>.

(a)    Rule 144A Notes and Institutional Accredited Investor Notes initially shall be represented by notes in registered, global form without interest coupons (collectively, the "<u>Restricted Global Notes</u>"). Regulation S Notes initially shall be represented by one or more notes in registered, global form without interest coupons (collectively, the "<u>Regulation S Global Notes</u>," and, together with the Restricted Global Note and any other global notes representing Notes, the "<u>Global Notes</u>"). The Global Notes shall bear legends as set forth in <u>Exhibit D</u>. The Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Depository Custodian and (iii) bear legends as set forth in <u>Exhibit B</u> with respect to Restricted Global Notes and <u>Exhibit C</u> with respect to Regulation S Global Notes.

Members of, or direct or indirect participants in, the Depository ("<u>Agent Members</u>") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Depository Custodian, or under the Global Notes, and the Depository may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of the Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)    Transfers of Global Notes shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees. Subject to Section 2.16(e), interests of beneficial owners in the Global Notes may be transferred or exchanged for Physical Notes in accordance with the rules and procedures of the Depository and the provisions of Section 2.17. In addition, subject to Section 2.16(e), a Global Note shall be exchangeable for Physical Notes if (i) the Depository (x) notifies the Issuer that it is unwilling or unable to continue as depository for such Global Note and the Issuer thereupon fails to appoint a successor depository within 90 days thereof or (y) has ceased to be a clearing agency registered under the Exchange Act and the Issuer thereupon fails to appoint a successor depository within 90 days thereof or (ii) there shall have occurred and be continuing an Event of Default with respect to the Notes and the Depository shall have requested the issuance of Physical Notes. In all cases, Physical Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository (in accordance with Applicable Procedures).

(c)    In connection with any transfer or exchange of a portion of the beneficial interest in any Global Note to beneficial owners pursuant to paragraph (b), the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal

JX 132-39

amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Issuer shall execute, and the Trustee shall upon receipt of an Authentication Order from the Issuer authenticate and make available for delivery, one or more Physical Notes of like tenor and amount.

(d)    In connection with the transfer of Global Notes as an entirety to beneficial owners pursuant to paragraph (b), the Global Notes shall be deemed to be surrendered to the Trustee for cancellation, and the Issuer shall execute, and the Trustee shall authenticate and deliver, to each beneficial owner identified by the Depository in writing in exchange for its beneficial interest in the Global Notes, an equal aggregate principal amount of Physical Notes of authorized denominations.

(e)    Any Physical Note constituting a Restricted Note delivered in exchange for an interest in a Global Note pursuant to paragraph (b), shall, except as otherwise provided by paragraphs (a)(i)(x) and (c) of Section 2.17, bear the Private Placement Legend or, in the case of the Regulation S Global Note, the legend set forth in Exhibit C, in each case, unless the Issuer determines otherwise in compliance with applicable law.

(f)    On or prior to the 40th day after the later of the commencement of the offering of the Notes represented by the Regulation S Global Note and the issue date of such Notes (such period through and including such 40th day, the "Restricted Period"), a beneficial interest in a Regulation S Global Note may be transferred to a Person who takes delivery in the form of an interest in the corresponding Restricted Global Note only upon receipt by the Trustee of a written certification from the transferor to the effect that such transfer is being made (i)(a) to a Person whom the transferor reasonably believes is a Qualified Institutional Buyer in a transaction meeting the requirements of Rule 144A or (b) pursuant to another exemption from the registration requirements under the Securities Act which is accompanied by an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee regarding the availability of such exemption and (ii) in accordance with all applicable securities laws of any state of the United States or any other jurisdiction. During the Restricted Period, a beneficial interest in the Regulation S Global Note may not be exchanged for a Physical Note.

(g)    Beneficial interests in the Restricted Global Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the Trustee a written certificate to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available).

(h)    Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in another Global Note shall, upon transfer, cease to be an interest in such Global Note and become an interest in such other Global Note and, accordingly, shall thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(i)    The Holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

SECTION 2.17.    Special Transfer Provisions.

(a)    Transfers to Non-QIB Institutional Accredited Investors and Non-U.S. Persons. The following provisions shall apply with respect to the registration of any proposed transfer of a Note

-23-

**JX 132-40**

constituting a Restricted Note to any Institutional Accredited Investor which is not a QIB or to any Non-U.S. Person:

    (i)    the Registrar shall register the transfer of any Note constituting a Restricted Note, whether or not such Note bears the Private Placement Legend, if (x) the requested transfer is after the date such Note shall be freely transferable under Rule 144 as certified in an Officer's Certificate or (y) (1) in the case of a transfer to an Institutional Accredited Investor which is not a QIB (excluding Non-U.S. Persons), the proposed transferee has delivered to the Registrar a certificate substantially in the form of Exhibit E hereto and an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee or (2) in the case of a transfer to a Non-U.S. Person (including a QIB), the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit F hereto; *provided* that in the case of any transfer of a Note bearing the Private Placement Legend for a Note not bearing the Private Placement Legend, the Registrar has received an Officer's Certificate authorizing such transfer; and

    (ii)    if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note, upon receipt by the Registrar of (x) the certificate, if any, required by paragraph (i) above and (y) instructions given in accordance with the Depository's and the Registrar's procedures,

whereupon (a) the Registrar shall reflect on its books and records the date and (if the transfer does not involve a transfer of outstanding Physical Notes) a decrease in the principal amount of a Global Note in an amount equal to the principal amount of the beneficial interest in a Global Note to be transferred, and (b) the Registrar shall reflect on its books and records the date and an increase in the principal amount of a Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note transferred or the Issuer shall execute and the Trustee shall authenticate and make available for delivery one or more Physical Notes of like tenor and amount.

    (b)    Transfers to QIBs.  The following provisions shall apply with respect to the registration or any proposed registration of transfer of a Note constituting a Restricted Note to a QIB (excluding transfers to Non-U.S. Persons):

    (i)    the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on such Holder's Note stating, or has otherwise advised the Issuer and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on such Holder's Note stating, or has otherwise advised the Issuer and the Registrar in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A; and

    (ii)    if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in the Global Note, upon receipt by the Registrar of instructions given in accordance with the Applicable Procedures, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Global Note in an amount equal to the principal amount of the Physical Notes to be transferred, and the Trustee shall cancel the Physical Notes so transferred.

**JX 132-41**

(c)    _Private Placement Legend_.  Upon the registration of transfer, exchange or re-placement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend.  Upon the registration of transfer, exchange or replacement of Notes bearing the Private Placement Legend, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (i) it has received the Officer's Certificate required by paragraph (a)(i)(y) of this Section 2.17, (ii) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Issuer and the Trustee to the effect that neither such legend nor the related restrictions on transfer are re-quired in order to maintain compliance with the provisions of the Securities Act or (iii) such Note has been sold pursuant to an effective registration statement under the Securities Act and the Registrar has received an Officer's Certificate from the Issuer to such effect or such Note has been exchanged in the Exchange Offer under the applicable Registration Rights Agreement.

(d)    _General_.  By its acceptance of any Note bearing the Private Placement Legend, each Holder of such Note acknowledges the restrictions on transfer of such Note set forth in this Inden-ture and in the Private Placement Legend and agrees that it will transfer such Note only as provided in this Indenture.

The Registrar shall retain for a period of two years or as may otherwise be required by applicable law copies of all letters, notices and other written communications received pursuant to Section 2.16 or this Section 2.17.  The Issuer shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable notice to the Registrar.

SECTION 2.18.    Computation of Interest.

Interest on the Notes shall be computed on the basis of a 360-day year of twelve 30-day months.

<p style="text-align:center">ARTICLE THREE</p>

<p style="text-align:center">REDEMPTION AND PREPAYMENT</p>

SECTION 3.01.    Election To Redeem; Notices to Trustee.

If the Issuer elects to redeem Notes pursuant to Section 3.07, at least 30 days prior to the Redemption Date (unless a shorter notice shall be agreed to in writing by the Trustee) but not more than 60 days before the Redemption Date, except that any such notice to the Trustee may be given to the Trus-tee more than 60 days prior to a Redemption Date if the notice is issued in connection with a Legal De-feasance or a satisfaction or discharge of this Indenture pursuant to Section 9.01, the Issuer shall notify the Trustee in writing of the Redemption Date, the principal amount of Notes to be redeemed and the re-demption price, and deliver to the Trustee an Officer's Certificate stating that such redemption will com-ply with the conditions contained in Section 3.07.  Notice given to the Trustee pursuant to this Section 3.01 may not be revoked after the time that notice is given to Holders pursuant to Section 3.03.  If the re-demption price is not known at the time such notice is to be given, the actual redemption price, calculated as described in the terms of the Notes, will be set forth in an Officer's Certificate of the Issuer delivered to the Trustee no later than two Business Days prior to the Redemption Date.

SECTION 3.02.    Selection by Trustee of Notes to Be Redeemed.

In the event that less than all of the Notes are to be redeemed pursuant to a redemption made pursuant to Section 3.07, selection of the Notes for redemption shall be made in accordance with

<p style="text-align:center">-25-</p>

JX 132-42

Applicable Procedures if the Notes are Global Notes, otherwise by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or, if the Notes are not then listed on a national securities exchange, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate; *provided, however*, that no Notes of a principal amount of $2,000 or less shall be redeemed in part. The Trustee shall promptly notify the Issuer of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount thereof to be redeemed. The Trustee may select for redemption portions of the principal of the Notes that have denominations larger than $2,000 in whole multiples of $1,000 in excess thereof. For all purposes of this Indenture unless the context otherwise requires, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Issuer may acquire Notes by means other than redemption, whether pursuant to an Issuer tender offer, open market purchase or otherwise; *provided* such acquisition does not otherwise violate the other terms of this Indenture.

SECTION 3.03.    Notice of Redemption.

At least 30 days, and no more than 60 days, before a Redemption Date, the Issuer shall mail by first-class mail or electronically deliver, or cause to be mailed by first-class mail or electronically delivered, a notice of redemption to each Holder of Notes to be redeemed at his or her last address as the same appears on the registry books maintained by the Registrar pursuant to Section 2.04, except that redemption notices may be mailed or electronically delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of this Indenture.

The notice shall identify the Notes to be redeemed (including the CUSIP numbers, ISIN and Common Code numbers, if any thereof) and shall state:

(1)    the Redemption Date;

(2)    the redemption price and the amount of premium, if any, or manner of computation if not then known, and accrued interest to be paid;

(3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date and upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued;

(4)    the name and address of the Paying Agent;

(5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)    that unless the Issuer defaults in making the redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(7)    the provision of Section 3.07, as the case may be, pursuant to which the Notes called for redemption are being redeemed; and

(8)    the aggregate principal amount of Notes that are being redeemed.

At the Issuer's request, the Trustee shall forward the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Trustee has received notice of such request at least 45

-26-

JX 132-43

days prior to such Redemption Date unless a shorter time is agreed to by the Trustee. In such event, the Issuer shall provide the Trustee with the information required by this Section 3.03.

SECTION 3.04.        Effect of Notice of Redemption.

Once the notice of redemption described in Section 3.03 is mailed or electronically delivered, Notes called for redemption become due and payable on the Redemption Date and at the redemption price, including any premium, plus interest accrued to the Redemption Date. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price, including any premium, plus interest accrued to the Redemption Date; *provided* that if the Redemption Date is after a regular record date and on or prior to the Interest Payment Date, the accrued interest shall be payable to the Holder of the redeemed Notes registered on the relevant record date, and *provided*, *further*, that if a Redemption Date is a Legal Holiday, payment shall be made on the next succeeding Business Day with the same force and effect as if made on such Redemption Date and no interest shall accrue for the period from such Redemption Date to such succeeding Business Day. Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.05.        Deposit of Redemption Price.

On or prior to 10:00 a.m., New York City time, on each Redemption Date, the Issuer shall deposit with the Paying Agent in immediately available funds money sufficient to pay the redemption price of, including premium, if any, and accrued interest on all Notes to be redeemed on that date other than Notes or portions thereof called for redemption on that date which have been delivered by the Issuer to the Trustee for cancellation.

On and after any Redemption Date, if money sufficient to pay the redemption price of, including premium, if any, and accrued interest on Notes called for redemption shall have been made available in accordance with the preceding paragraph, the Notes called for redemption will cease to accrue interest and the only right of the Holders of such Notes will be to receive payment of the redemption price of and, subject to the first proviso in Section 3.04, accrued and unpaid interest on such Notes to the Redemption Date. If any Note surrendered for redemption shall not be so paid, interest will be paid, from the Redemption Date until such redemption payment is made, on the unpaid principal of the Note and (to the extent permitted by applicable law) any interest not paid on such unpaid principal, in each case, at the rate and in the manner provided in the Notes.

SECTION 3.06.        Notes Redeemed in Part.

Upon surrender of a Note that is redeemed in part, the Issuer shall execute and the Trustee shall authenticate for the Holder thereof a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

SECTION 3.07.        Optional Redemption.

At any time and from time to time the Issuer may redeem the Notes in whole or in part, at its option, at a redemption price equal to the greater of (1) 100% of the principal amount of the Notes to be redeemed and (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the Redemption Date at the Treasury Rate, plus 50 basis points, plus accrued interest thereon to the Redemption Date.

Unless the Issuer defaults in payment of the redemption price, on and after the Redemption Date, interest will cease to accrue on the Notes or portions thereof called for redemption.

-27-

JX 132-44

SECTION 3.08.     Mandatory Redemption.

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

ARTICLE FOUR

COVENANTS

SECTION 4.01.     Payment of Notes.

The Issuer shall pay the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes and this Indenture.  An installment of principal or interest shall be considered paid on the date it is due if the Trustee or Paying Agent holds as of 10:00 a.m., New York City time, on that date money designated for and sufficient to pay such installment.

The Issuer shall pay interest on overdue principal (including post-petition interest in a proceeding under any Bankruptcy Law), and overdue interest, to the extent lawful, at the rate specified in the Notes.

SECTION 4.02.     Reports to Holders.

(a)     Whether or not required by the rules and regulations of the Commission, so long as any Notes are outstanding, the Issuer shall file with the Commission (unless the Commission will not accept such filings) and furnish to the Trustee and Holders all quarterly and annual financial information (including a Management's Discussion and Analysis of Financial Condition and Results of Operations) that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Notes were registered under the Exchange Act and on or prior to the dates on which such filings with the Commission would be required to be made.  Notwithstanding the foregoing, prior to the commencement of the exchange offer contemplated by the Initial Purchasers Registration Rights Agreement or the effectiveness of the shelf registration statement contemplated by such Registration Rights Agreement, such reports shall not be required to include any financial information required by Rule 3-10 of Regulation S-X.

(b)     The Issuer shall deliver to the Trustee a Collateral Coverage Certificate together with each delivery of quarterly or annual financial information required by Section 4.02(a).

(c)     The Issuer shall, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise furnishing such information pursuant to Rule 12g3-2(b) of the Exchange Act, furnish to Holders and to prospective investors, upon their request, the information required to be delivered pursuant to clause (d)(4) of Rule 144A.

(d)     Notwithstanding the foregoing, if the Issuer is exempt from the requirements of Section 13 or 15(d) of the Exchange Act under Rule 12h-5 of the Exchange Act, the Issuer shall not be required to file such reports and documents with the Commission under Section 13 or 15(d) of the Exchange Act (or any successor provisions thereto) or provide such annual reports and such information, documents and other reports to the Trustee and Holders so long as (i) a direct parent entity that guarantees the Notes files such annual reports and such information, documents and other reports with the Commission, (ii) such parent entity, the Issuer and each Guarantor are in compliance with the requirements set forth in Rule 3-10 of Regulation S-X under the Exchange Act and (iii) the Issuer provides the Trustee and

JX 132-45

Holders with such annual reports and such information, documents and other reports filed by such parent entity.

(e)     Notwithstanding the foregoing, the Issuer shall be deemed to have furnished the reports referred to in Section 4.02(a) to the Trustee and to Holders if the Issuer has filed such reports with the Commission via the EDGAR filing system and such reports are publicly available.

(f)     Delivery of reports, information and documents to the Trustee hereunder is for informational purposes only and the Trustee's receipt of any such reports, information and documents shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates or statements delivered to the Trustee pursuant to Section 4.03).

(g)     To the extent applicable, the Issuer shall comply with TIA § 314(a).

SECTION 4.03.     Compliance Certificate.

The Issuer shall deliver to the Trustee, within 120 days after the end of each fiscal year, a written statement that need not comply with Section 12.05 signed by its principal executive officer, principal accounting officer or principal financial officer, stating that:

(a)     a review of the activities of the Issuer during such year with regard to its compliance with this Indenture has been made under such officer's supervision; and

(b)     to the best of such officer's knowledge, based on such review, the Issuer has fulfilled all its obligations under this Indenture throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof, all without regard to grace periods or notice requirements.

SECTION 4.04.     Limitations on Liens.

The Issuer shall not, and shall not cause or permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens (other than Permitted Liens) of any kind against or upon (i) prior to the occurrence of a Fall-Away Event, the Collateral or any proceeds thereof and (ii) from and after the occurrence of a Fall-Away Event, any property or assets of the Issuer or any of its Restricted Subsidiaries or any proceeds thereof, in each case, to secure indebtedness for borrowed money and whether such assets are owned on the Issue Date or acquired after the Issue Date.

SECTION 4.05.     Limitation on Sale and Leaseback Transactions.

(a)     The Issuer shall not, and shall not permit any Restricted Subsidiary to, enter into any arrangement with any Person providing for the sale by the Issuer or any Restricted Subsidiary of any property more than 180 days following the Issuer's or such Restricted Subsidiary's acquisition of such property, with the intention of taking back a lease of such property (a "Sale and Leaseback Transaction") unless the terms of such sale or transfer have been determined by the Issuer's Board of Directors to be fair and arm's-length and either:

(i)     within 12 months after the receipt of the proceeds of the sale or transfer, the Issuer or any of its Subsidiaries applies an amount equal to the net proceeds of the sale or transfer

-29-

to the prepayment or retirement of indebtedness (other than any indebtedness that is subordinated to the Notes); or

    (ii)    the Issuer or such Restricted Subsidiary would be entitled, at the effective date of the sale or transfer, to incur indebtedness secured by a Lien on such property (and such Attributable Debt shall be deemed to be secured by a Lien on such property) in an amount at least equal to the Attributable Debt in respect of the Sale and Leaseback Transaction pursuant to Section 4.04.

    (b)    Clause (a) of this Section 4.05 will not apply to any Sale and Leaseback Transaction (i) for a term of not more than three years including renewals; or (ii) between the Issuer and a Subsidiary or between Subsidiaries, *provided* that the lessor is the Issuer or a wholly owned Subsidiary of the Issuer.

SECTION 4.06.    Additional Guarantees.

    If, any of the Domestic Subsidiaries of the Issuer becomes a Specified Subsidiary, then the Issuer shall cause such Specified Subsidiary (unless such Specified Subsidiary is already a Guarantor) to:

    (a)    execute and deliver to the Trustee a supplemental indenture pursuant to which such Specified Subsidiary shall unconditionally guarantee all of the Issuer's obligations under the Notes and this Indenture and, unless a Fall-Away Event has occurred, enter into joinders to the Security Documents to grant the Collateral Agent a Lien on the assets of such Subsidiary constituting Collateral; and

    (b)    deliver to the Trustee one or more Opinions of Counsel that, subject to customary qualifications, such supplemental indenture and guarantee (i) have been duly authorized, executed and delivered by such Subsidiary and (ii) constitute valid and legally binding obligations of such Subsidiary, enforceable in accordance with their terms.

SECTION 4.07.    Change of Control Offer.

    (a)    If a Change of Control Triggering Event occurs with respect to the Notes, unless the Issuer has exercised its right to redeem the Notes pursuant to Section 3.07, the Issuer shall commence a Change of Control Offer no later than 30 days following any Change of Control Triggering Event (or at the Issuer's option, prior to any Change of Control, but after the public announcement of the Change of Control). In the Change of Control Offer, the Issuer shall offer payment in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest, if any, on the Notes repurchased, to the date of purchase (the "Change of Control Payment").

    (b)    On the Change of Control Payment Date, the Issuer shall, to the extent lawful: (i) accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer; (ii) deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and (iii) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased.

    (c)    The Issuer shall not be required to make a Change of Control Offer upon the occurrence of a Change of Control Triggering Event if a third party makes such an offer in the manner, at the times and otherwise in compliance with the requirements for an offer made by the Issuer and the third party repurchases all Notes properly tendered and not withdrawn under its offer.

-30-

**JX 132-47**

(d)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Triggering Event. To the extent that the provisions of any securities laws or regulations conflict with this Section 4.07, the Issuer shall comply with the applicable securities laws and regulations and will not be deemed to have breached the Issuer's obligations under this Section 4.07 by virtue of such conflicts.

SECTION 4.08.    Collateral Coverage Offer.

(a)    If prior to the occurrence of a Fall-Away Event, a Collateral Coverage Event occurs, unless the Issuer has exercised its option to redeem such Notes, the Issuer shall make a Collateral Coverage Offer no later than 30 days following any Collateral Coverage Event. In a Collateral Coverage Offer, the Issuer shall offer payment in cash equal to 101% of the aggregate principal amount of Notes repurchased, plus accrued and unpaid interest, if any, on the Notes repurchased to the date of repurchase (a "Collateral Coverage Event Payment").

(b)    On the Collateral Coverage Payment Date, the Issuer shall, to the extent lawful:

(i)    accept for payment all Notes or portions of Notes properly tendered pursuant to the Collateral Coverage Offer; *provided* that in the event the aggregate principal amount of Notes validly tendered for purchase in the Collateral Coverage Offer exceeds the Collateral Coverage Required Amount for such Collateral Coverage Offer, the Issuer will, subject to the applicable procedures of the Depository, accept for payment only the Collateral Coverage Required Amount of Notes on a *pro rata* basis from Holders who have validly tendered their Notes in such Collateral Coverage Offer (subject to rounding such that all remaining Notes are in a minimum principal amount of $2,000 and in whole multiples of $1,000 in excess thereof);

(ii)    deposit with the Paying Agent an amount equal to the Collateral Coverage Event Payment in respect of all Notes or portions of Notes required to be accepted for payment as provided hereunder; and

(iii)    deliver or cause to be delivered to the Trustee the Notes accepted for purchase together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased.

(c)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act, and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Collateral Coverage Event. To the extent that the provisions of any such securities laws or regulations conflict with this Section 4.08, the Issuer shall comply with those securities laws and regulations and will not be deemed to have breached the Issuer's obligations under this Section 4.08 by virtue of any such conflict.

SECTION 4.09.    Calculations.

Issuer will be responsible for making calculations called for under the Notes, including but not limited to determination of redemption price, premium, if any, Additional Interest, and other amounts payable on the Notes, if any. The Issuer will make the calculations in good faith and, absent manifest error, its calculations will be final and binding on the Holders of the notes. The Issuer will provide a schedule of its calculations to the Trustee when applicable, and the Trustee is entitled to rely conclusively on the accuracy of the Issuer's calculations without independent verification.

-31-

JX 132-48

## ARTICLE FIVE

### SUCCESSOR CORPORATION

SECTION 5.01.    <u>Limitations on Mergers and Sales of Assets</u>.

The Issuer shall not consolidate with or merge into another Person, or sell other than for cash or lease all or substantially all of the Issuer's assets to another Person, unless:

(a)    either the Issuer is the continuing Person or the successor Person (if other than the Issuer) expressly assumes by supplemental indenture the obligations of the Issuer under this Indenture and the Notes;

(b)    immediately after the merger, consolidation, sale or lease, no Default shall have occurred and be continuing; and

(c)    the Issuer shall deliver, or cause to be delivered, to the Trustee, in form reasonably satisfactory to the Trustee, an Officer's Certificate and an Opinion of Counsel, each stating that such transaction or series of transactions and the supplemental indenture, if any, in respect thereto comply with this covenant and that all conditions precedent herein provided for relating to such transaction or series of transactions have been satisfied and stating whether, in the case of a sale or lease, the Issuer shall be released from its obligations and covenants under this Indenture in accordance with Section 5.02.

SECTION 5.02.    <u>Successor Person Substituted</u>.

Upon any consolidation or merger, or any transfer of all or substantially all of the properties or assets of the Issuer in accordance with Section 5.01, the successor Person formed by such consolidation or into which the Issuer is merged or to which such transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture and the Notes with the same effect as if such successor entity had been named as the Issuer herein and therein, and thereafter the predecessor Person shall be relieved of all obligations and covenants under this Indenture and the Notes, but, in the case of a lease of all or substantially all its assets, the predecessor will not be released from the obligation to pay the principal of and interest on the Notes.

## ARTICLE SIX

### DEFAULTS AND REMEDIES

SECTION 6.01.    <u>Events of Default</u>.

Each of the following in an "<u>Event of Default</u>":

(1)    the failure of the Issuer to pay any installment of interest on any Note, when and as the same shall become due and payable, which failure shall have continued unremedied for a period of 30 days;

(2)    the failure of the Issuer to pay the principal or premium, if any, on any Note, when and as the same shall become due and payable, whether at maturity as therein expressed, by call for redemption, by declaration as authorized by this Indenture or otherwise;

-32-

JX 132-49

(3)      the failure of the Issuer to observe and perform any other of the covenants or agreements on the part of the Issuer contained in this Indenture (including any indenture supplemental hereto), which failure shall not have been remedied to the satisfaction of the Trustee, or without provision deemed by the Trustee to be adequate for the remedying thereof having been made, for a period of 60 days after the written notice specified below shall have been given;

(4)      the entry by a court having jurisdiction in the premises of a decree or order for relief in respect of the Issuer in an involuntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Issuer or for substantially all of its property, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 90 consecutive days;

(5)      the commencement by the Issuer of a voluntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or similar official) of the Issuer or for substantially all of its property, or the making by it of an assignment for the benefit of creditors; or

(6)      any Lien purported to be created by any Security Document on Collateral with a book value in excess of $100.0 million shall cease to be a valid and enforceable Lien except in accordance with the Security Documents, which failure shall not have been remedied to the satisfaction of the Trustee, or without provision deemed by the Trustee to be adequate for the remedying thereof having been made, for a period of 30 days after the written notice specified below shall have been given.

A Default with respect to Notes under clauses (3) and (6) of this Section 6.01 shall not be an Event of Default until the Trustee (by notice to the Issuer) or the Holders of at least 25% in aggregate principal amount of the outstanding Notes (by notice to the Issuer and the Trustee) gives written notice of the Default to the Issuer and the Issuer does not cure such Default within the time specified in clauses (3) or (6) above, as applicable, after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."

SECTION 6.02.      Acceleration.

If an Event of Default (other than an Event of Default specified in clause (4) or (5) of Section 6.01), shall have occurred and be continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding may declare all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes to be due and payable by notice in writing to the Issuer and the Trustee specifying the respective Event of Default and that it is a "notice of acceleration", and the same shall become immediately due and payable.

If an Event of Default specified in clause (4) or (5) of Section 6.01 occurs, then all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

JX 132-50

SECTION 6.03.    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of, or premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture and may take any necessary action requested of it as Trustee to settle, compromise, adjust or otherwise conclude any proceedings to which it is a party.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

SECTION 6.04.    Waiver or Rescission of Past Defaults and Events of Default.

(1)    At any time after a declaration of acceleration with respect to the Notes as described in Section 6.02, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may rescind and cancel such declaration and its consequences:

(a)    if the rescission would not conflict with any judgment or decree;

(b)    if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of the acceleration;

(c)    to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid;

(d)    if the Issuer has paid the Trustee its reasonable compensation and reimbursed the Trustee for its expenses, disbursements and advances; and

(e)    in the event of the cure or waiver of an Event of Default of the type described in clauses (4) or (5) of Section 6.01, the Trustee shall have received an Officer's Certificate and an Opinion of Counsel that such Event of Default has been cured or waived.

No such rescission shall affect any subsequent Default or impair any right consequent thereto.

(2)    The Holders of a majority in aggregate principal amount of the Notes issued and then outstanding under this Indenture may waive any existing Default or Event of Default under this Indenture, and its consequences, except (a) a Default described in clause (1) or (2) of Section 6.01 and (b) in respect of a covenant or provision in this Indenture that cannot be modified or amended without the consent of each Holder of an outstanding Note affected thereby.

SECTION 6.05.    Control by Majority.

Subject to the other provisions of this Indenture and applicable law, the Holders of a majority in aggregate principal amount of the Notes then outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee by this Indenture.  Subject to Section 7.02, the Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines may be unduly

-34-

JX 132-51

prejudicial to the rights of another Holder not taking part in such direction (it being understood the Trustee shall have no obligation to determine whether any such actions or forebearances are unduly prejudicial to such other Holders), and the Trustee shall have the right to decline to follow any such direction if the Trustee, being advised by counsel, determines that the action so directed may not lawfully be taken or if the Trustee in good faith shall, by a Responsible Officer, determine that the proceedings so directed may result in costs and expenses of the Trustee for which it has no source of payment or recovery or involve it in personal liability to which it does not have adequate indemnity; *provided* that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

SECTION 6.06.    Limitation on Suits.

No Holder of any Note shall have any right to institute an action, suit or proceeding at law or in equity with respect to this Indenture, or for the execution of any trust hereunder or for the appointment of a receiver or for any other remedy hereunder, in each case with respect to an Event of Default with respect to such Notes, unless (1) such Holder previously shall have given to the Trustee written notice of the occurrence of one or more Events of Default with respect to such Notes; (2) the Holders of at least 25% in aggregate principal amount of the outstanding Notes of such series shall have requested the Trustee in writing to take action in respect of the matter complained of; and (3) such Holder or Holders have offered to the Trustee security and indemnity satisfactory to it against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee, for 60 days after receipt of such notification, request and offer of security and indemnity, shall have neglected or refused to institute any such action, suit or proceeding, and such notification, request and offer of security and indemnity are hereby declared in every such case to be conditions precedent to any such action, suit or proceeding by any Holder of any Note, it being understood and intended that no one or more of such Holders shall have any right in any manner whatsoever by his or their action to enforce any right hereunder, except in the manner herein provided, and that every action, suit or proceeding at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of the outstanding Notes of such series; *provided, however,* that nothing contained in this Indenture or in the Notes shall affect or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of (and premium, if any) and (subject to Section 2.13) interest on the Notes of such series to the respective Holders of such Notes at the stated maturity expressed in such Notes, or affect or impair the right, which is also absolute and unconditional, of such Holders to institute suit to enforce any such payment.

SECTION 6.07.    No Personal Liability of Directors, Officers, Employees and Stockholders.

No direct or indirect parent, and no past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Issuer, any Subsidiary or any direct or indirect parent (other than the Guarantors pursuant to the Guarantees), as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Indenture or any Guarantee, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. This waiver and release are part of the consideration for issuance of the Notes and the Guarantees. This waiver may not be effective to waive liabilities under the securities laws.

SECTION 6.08.    Rights of Holders To Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal of, or premium, if any, and interest of the Note (including Additional Interest, if any) on or after the respective due dates expressed in the Note, or to bring suit for the enforcement of any such payment on or after such respective dates shall not be impaired or affected without the consent of the Holder.

-35-

JX 132-52

SECTION 6.09.    Collection Suit by Trustee.

If an Event of Default in payment of principal, premium or interest specified in clause (1) or (2) of Section 6.01 occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any Guarantor (or any other obligor on the Notes) for the whole amount of unpaid principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case at the rate set forth in the Notes.

SECTION 6.10.    Trustee May File Proofs of Claim.

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Issuer or any Guarantor (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same after deduction of its charges and expenses to the extent that any such charges and expenses are not paid out of the estate in any such proceedings and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.01(a).  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.01(a) hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that may be distributable in respect of the Issuer's or Guarantors' obligations under this Indenture or that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan or reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceedings.  The Trustee may, unless prohibited by applicable law, vote for the election of a trustee in bankruptcy or similar person and shall be entitled to participate as a member of any official committee of creditors in the matter as it deems necessary or advisable.

SECTION 6.11.    Priorities.

Subject to the terms of the Intercreditor Agreement and the Security Documents, if the Trustee collects any money or property pursuant to this Article Six or from the Collateral Agent pursuant to any Security Document, it shall pay out the money or property in the following order:

First:  to the Collateral Agent for amounts due in accordance with the terms of the Security Documents;

Second:  to the Trustee for amounts due under Section 7.01(a);

Third:  to Holders for interest accrued on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest;

-36-

JX 132-53

Fourth:  to Holders for principal amounts due and unpaid on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal; and

Fifth:  to the Issuer or, if applicable, the Guarantors, as their respective interests may appear.

The Trustee, upon prior notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.11.

SECTION 6.12.     Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.12 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.08 or a suit by Holders of more than 10% in principal amount of the Notes then outstanding.

SECTION 6.13.     Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every case, subject to any determination in such proceeding, the Issuer, the Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

SECTION 6.14.     Appointment and Authorization of Wells Fargo Bank, National Association as Collateral Agent.

(a)     Wells Fargo Bank, National Association is hereby designated and appointed as the Collateral Agent of the Holders under the Security Documents, and is authorized as the Collateral Agent for such Holders to execute and enter into each of the Security Documents and all other instruments relating to the Security Documents and (i) to take action and exercise such powers as are expressly required or permitted hereunder and under the Security Documents and all instruments relating hereto and thereto and (ii) to exercise such powers and perform such duties as are in each case, expressly delegated to the Collateral Agent by the terms hereof and thereof together with such other powers as are reasonably incidental hereto and thereto.

(b)     Notwithstanding any provision to the contrary elsewhere in this Indenture or the Security Documents, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein or therein or any fiduciary relationship with any Holder, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or any Security Document or otherwise exist against the Collateral Agent.

(c)     The Collateral Agent may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder or under the Security Documents in good faith and in accordance with the advice or opinion of such counsel.

-37-

JX 132-54

ARTICLE SEVEN

TRUSTEE

SECTION 7.01.    Acceptance of Trusts Upon Specified Conditions.

The Trustee accepts the trusts created by this Indenture upon the terms and conditions hereof, including the following, to all of which the parties hereto and the Holders from time to time of the Notes agree:

(a)    Trustee Entitled to Compensation and Expenses.  The Trustee shall be entitled to such compensation as is agreed upon in writing for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and the Issuer agrees to pay such compensation, and all other reasonable expenses (including the fees and expenses of Trustee's counsel and experts), disbursements and advances incurred or made by the Trustee hereunder, promptly on demand from time to time as such services shall be rendered and as such expenses shall be incurred.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Trustee and any predecessor trustee hereunder for, and to hold it or them harmless against, any loss, liability, claim, damage or expense incurred without its or their own negligence or willful misconduct, arising out of or in connection with the acceptance or administration of the trust or trusts hereunder and the performance of its or their duties, as well as the costs and expenses of defending itself or themselves against any claim (whether asserted by the Issuer, a Holder or any other Person) or liability in connection with the exercise or performance of any of its or their powers or duties hereunder.  As security for the performance of the obligations of the Issuer under this subsection (a), the Trustee shall have a lien therefor on any moneys or property held or collected by the Trustee hereunder prior to any rights therein of the Holders.  When the Trustee incurs expenses or renders services in connection with an Event of Default specified in clause (4) or (5) of Section 6.01, the expenses (including the reasonable charges and expenses of its counsel and experts) and the compensation for the services are intended to constitute expenses of administration under any applicable Bankruptcy Law.  Notwithstanding any provisions of this Indenture to the contrary, the obligations of the Issuer and the Guarantors to indemnify the Trustee under this Section 7.01(a) shall survive any satisfaction and discharge under Article 9, the termination of this Indenture or the resignation or removal of the Trustee.

(b)    Trustee May Act by Agents and Attorneys.  The Trustee may execute any of the trusts or powers hereof and perform any duty hereunder either directly or by its agents and attorneys and shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(c)    Trustee Not Responsible for Recitals of Fact.  The Trustee shall not be responsible in any manner whatsoever for the correctness of the recitals contained herein or in the Notes (except its certificates of authentication thereon) or the Guarantees, all of which are made by the Issuer solely; and the Trustee shall not be responsible or accountable in any manner whatsoever for or with respect to the validity or execution or sufficiency of this Indenture or of the Notes (except its certificates of authentication thereon) or the Guarantees, and the Trustee makes no representation with respect thereto.  The Trustee shall not be accountable for the use or application by the Issuer of any Notes, or the proceeds of any Notes.  Neither the Trustee nor the Collateral Agent shall be responsible for or make any representation as to the existence, genuineness, value or protection of any Collateral, for the legality, effectiveness or sufficiency of any Security Document, or for the creation, perfection, priority, sufficiency or protection of any Notes Liens.  Neither the Trustee nor the Collateral Agent shall be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any

-38-

JX 132-55

time or times or otherwise perfecting or maintaining the perfection of any Lien or security interest in the Collateral.

(d)    <u>Trustee May Consult With Counsel</u>.  The Trustee may consult with counsel of its selection and, to the extent permitted by Section 7.02, the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered to be taken by the Trustee hereunder in good faith and in accordance with such advice or Opinion of Counsel.

(e)    <u>Trustee May Rely Upon Certificate as to Adoption of Resolutions; Requests May Be Evidenced by Officer's Certificate</u>.  The Trustee, to the extent permitted by Section 7.02, may conclusively rely upon the certificate of the secretary or one of the assistant secretaries of the Issuer as to the adoption of any resolution by the Board of Directors or stockholders of the Issuer, and any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by, and whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, offering or omitting any action hereunder, the Trustee may conclusively rely upon an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed).

(f)    <u>Trustee May Become Owner or Pledgee of Notes</u>.  The Trustee or any agent of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and, subject to Sections 7.06 and 7.09, may otherwise deal with the Issuer with the same rights it would have had if it were not a Trustee or such agent.

(g)    <u>Segregation of Funds</u>.  Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing with the Issuer.

(h)    <u>Action at Request of or with Consent of Holder Binding on Future Holders</u>.  Any action taken by the Trustee pursuant to any provision hereof at the request or with the consent of any Person who at the time is the Holder of Notes shall be conclusive and binding in respect of any such Notes upon all future Holders thereof or of any Notes or other securities that may be issued for or in lieu thereof in whole or in part, whether or not such Note shall have noted thereon the fact that such request or consent had been made or given.

(i)    <u>Trustee May Rely on Instruments Believed by It to Be Genuine</u>.  Subject to the provisions of Section 7.02, the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper party or parties.

(j)    <u>Trustee Need Not Exercise Rights or Powers Unless Indemnified by Holders</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be under any obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any Holders, pursuant to any provision of this Indenture, unless one or more Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities that may be incurred by it therein or thereby.

(k)    <u>Trustee Not Liable for Action Taken or Omitted in Good Faith</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within its discretion or within the rights or powers conferred upon it by this Indenture.

JX 132-56

(l)    <u>Trustee Not Bound to Make Investigation</u>.  Subject to the provisions of the first paragraph of Section 7.02, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document.

(m)    <u>Trustee Not Deemed to Have Knowledge of Default</u>.  Subject to the provisions of Section 7.02, the Trustee shall not be deemed to have knowledge or notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless the Holders of not less than 25% in aggregate principal amount of the outstanding Notes notify the Trustee in writing thereof.

(n)    <u>Limitation on Liability</u>.  In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(o)    <u>Agents Protected</u>.  The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated, reimbursed and indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each Agent, custodian and other Person employed to act hereunder.

SECTION 7.02.    <u>Duties of Trustee in Case of Default</u>.

If one or more Events of Default shall have happened, then, during the continuance thereof, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

None of the provisions of this Indenture shall be construed as relieving the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that, anything contained in this Indenture to the contrary notwithstanding:

(a)    <u>When No Default Subsisting</u>.  Unless and until an Event of Default with respect to the Notes of any series shall have happened, which at the time is continuing,

(i)    the Trustee undertakes to perform such duties and only such duties with respect to the Notes as are specifically set out in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee, whose duties and obligations shall be determined solely by the express provisions of this Indenture, and

(ii)    the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of the Trustee, upon certificates and opinions furnished to it pursuant to the express provisions of this Indenture; but in the case of any such certificates or opinions which, by the provisions of this Indenture, are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(b)    <u>Trustee Not Liable for Error of Judgment Made in Good Faith by Responsible Officer</u>.  The Trustee shall not be liable to any Holder or to any other Person for error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

-40-

JX 132-57

(c)     Trustee Not Liable for Certain Action or Non-Action at Direction of Holders of Majority of Notes.  The Trustee shall not be liable to any Holder or to any other Person with respect to any action taken or omitted to be taken by it in good faith, in accordance with the direction of Holders given as provided in Section 6.05, relating to the time, method and place of conducting any proceeding for any remedy available to it, or any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority of the Notes outstanding concerning the exercise of any trust or power conferred upon it by this Indenture.

None of the provisions of this Indenture shall be construed as requiring the Trustee to expend or risk its own funds or otherwise to incur any personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or remedies, if adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 7.03.     Notice to Holders of Defaults.

Within 90 days after the occurrence thereof, the Trustee shall give to the Holders of the Notes notice of each Default known to the Trustee, unless such Default shall have been cured or waived before the giving of such notice; but, unless such Default be the failure to pay the principal of (or premium, if any) or interest on any of the Notes when and as the same shall become due and payable the Trustee shall be protected in withholding such notice, if and so long as the board of directors, the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Notes.

SECTION 7.04.     Resignation and Removal of Trustee and Notice Thereof.

The Trustee, or any successor to it hereafter appointed, may at any time resign and be discharged of the trusts hereby created with respect to the Notes by giving to the Issuer notice in writing and by mailing or electronically delivering notice thereof to the Holders of the Notes.  Such resignation shall take effect upon the appointment of a successor Trustee by the Issuer and the acceptance of such appointment by such successor Trustee.  Any Trustee hereunder may be removed with respect to the Notes at any time by the Holders of a majority in aggregate principal amount of the outstanding Notes, acting pursuant to the provisions of Article 8.

Upon its resignation or removal, any Trustee shall be entitled to the payment of reasonable compensation for the services rendered hereunder by such Trustee and to the payment of all reasonable expenses incurred hereunder and all moneys then due to it hereunder.  The Trustee's rights to compensation, reimbursement and indemnification provided in Section 7.01(a) shall survive its resignation or removal.

SECTION 7.05.     Qualifications of Trustee.

There shall at all times be a Trustee under this Indenture, and such Trustee shall at all times be a corporation organized and doing business under the laws of the United States or of any state thereof, which is authorized under such laws to exercise corporate trust powers and is subject to supervision or examination by federal or state authority and which has a combined capital and surplus of not less than $50,000,000. For the purposes of this Section 7.05, the combined capital and surplus of any such Trustee shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published by such Trustee; *provided* that such reports are published at least annually, pursuant to law or to the requirements of a federal or state supervising or examining authority.  If such Trustee or any successor shall at any time cease to have the qualifications prescribed in this Section 7.05, it shall promptly resign as Trustee hereunder.

-41-

JX 132-58

SECTION 7.06.    <u>Disqualification Of Trustee By Reason Of Conflicting Interest</u>.

If the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture.

SECTION 7.07.    <u>Appointment of Successor Trustee</u>.

In case at any time the Trustee shall resign, or shall be removed, or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver of the Trustee or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee or of its property of affairs for the purpose of rehabilitation, conservation or liquidation with respect to the Notes, the Issuer shall promptly appoint a successor Trustee.  If a successor Trustee does not take office within 60 days after the retiring Trustee resigns, is removed, becomes incapable of acting, is adjudged a bankrupt or insolvent or is taken charge or control of as described in the preceding sentence, a successor Trustee may be appointed by the Holders of a majority in aggregate principal amount of the outstanding Notes, by an instrument or instruments in writing signed in duplicate by such Holders and filed, one original thereof with the Issuer and the other with the successor Trustee; but, until a successor Trustee shall have been so appointed by the Holders of Notes as herein authorized, the Issuer, or, in case all or substantially all the assets of the Issuer shall be in the possession of one or more Custodians or receivers lawfully appointed, or of trustees in bankruptcy or reorganization proceedings (including a trustee or trustees appointed under the provisions of the Federal bankruptcy laws, as now or hereafter constituted), or of assignees for the benefit of creditors, such receivers, Custodians, trustees or assignees, as the case may be, by an instrument in writing, shall appoint a successor Trustee with respect to the Notes.  Subject to the provisions of Sections 7.04, 7.05 and 7.06, upon the appointment as aforesaid of a successor Trustee with respect to the Notes, the Trustee with respect of the Notes shall cease to be Trustee hereunder.  After any such appointment (other than by the Holders of Notes) the person making such appointment shall forthwith cause notice thereof to be mailed or electronically delivered to the Holders of Notes at their addresses as the same shall then appear on the registry of the Notes maintained by the Registrar pursuant to Section 2.04; but any successor Trustee so appointed shall immediately and without further act be superseded by a successor Trustee appointed by the Holders of Notes in the manner above prescribed, if such appointment be made prior to the expiration of one year from the date of the mailing or electronic delivery of such notice by the Issuer, or by such receivers, trustees or assignees.

If any Trustee shall resign because of conflict of interest as provided in Section 7.06 and a successor Trustee shall not have been appointed by the Issuer or by the Holders of the Notes or, if any successor Trustee so appointed shall not have accepted its appointment within 30 days after such appointment shall have been made, the resigning Trustee may apply at the expense of the Issuer to any court of competent jurisdiction for the appointment of a successor Trustee.  If in any other case a successor Trustee shall not be appointed pursuant to the foregoing provisions of this Section 7.07 within three months after such appointment might have been made hereunder, the Holder of any Note or any retiring Trustee may, at the expense of the Issuer, apply to any court of competent jurisdiction to appoint a successor Trustee.  Such court may thereupon, in any such case, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor Trustee and to the Issuer, or to the receivers, trustees, assignees or court appointing it, as the case may be, an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations with respect to such series of such predecessor Trustee with like effect as if originally named as Trustee hereunder, and such predecessor Trustee, upon payment of its

-42-

charges and disbursements then unpaid, shall thereupon become obligated to pay over, and such successor Trustee shall be entitled to receive, all moneys and properties held by such predecessor Trustee as Trustee hereunder.  Nevertheless, on the written request of the Issuer or of the successor Trustee or of the Holders of at least 10% in aggregate principal amount of the outstanding Notes, such predecessor Trustee, upon payment of its said charges and disbursements, shall execute and deliver an instrument transferring to such successor Trustee upon the trusts herein expressed all the rights, powers and trusts of such predecessor Trustee and shall assign, transfer and deliver to the successor Trustee all moneys and properties held by such predecessor Trustee; and, upon request of any such successor Trustee, the Issuer shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Trustee all such authority, rights, powers, trusts, immunities, duties and obligations.

SECTION 7.08.    <u>Merger, Conversion or Consolidation of Trustee or Transfer of Its Corporate Trust Business; Authentication of Notes by Successor Trustee</u>.

Any corporation into which the Trustee or any successor to it in the trusts created by this Indenture shall be merged or converted, or any corporation with which it or any successor to it shall be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee or any such successor to it shall be a party, or any corporation to which the Trustee or any successor to it shall sell or otherwise transfer all or substantially all of the corporate trust business of the Trustee, shall be the successor Trustee under this Indenture without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture with respect to the Notes, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor Trustee hereunder or in the name of the successor Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture, *provided* that the certificate of the Trustee shall have.

SECTION 7.09.    <u>Trustee Required to Account for Amounts Collected As Creditor of the Issuer Under Certain Conditions</u>.

If and when the Trustee shall be or become a creditor of the Issuer (or any other obligor upon the Notes), the Trustee shall be subject to the provisions of the Trust Indenture Act regarding the collection of claims against the Issuer (or any such other obligor).

SECTION 7.10.    <u>Trustee May Rely on Officer's Certificate</u>.

Subject to Section 7.02, and subject to the provisions of Section 12.04 with respect to the certificates required thereby, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence or bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate with respect thereto delivered to the Trustee, and such Officer's Certificate, in the absence of negligence or willful misconduct on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered to be taken or omitted by it under the provisions of this Indenture upon the faith thereof.

-43-

JX 132-60

SECTION 7.11.    <u>Reports by Trustee</u>.

(a)    The Trustee shall transmit to Holders such reports concerning the Trustee and its actions under this Indenture as may be required pursuant to the Trust Indenture Act at the times and in the manner provided pursuant thereto.  If required by Section 313(a) of the Trust Indenture Act, the Trustee shall, within sixty days after each March 15 following the date of this Indenture, deliver to Holders a brief report, dated as of such March 15, which complies with the provisions of such Section 313(a).

(b)    A copy of each such report shall, at the time of such transmission to Holders, be filed by the Trustee with each stock exchange, if any, upon which the Notes are listed, with the Commission and with the Issuer.  The Issuer will promptly notify the Trustee when the Notes are listed on any stock exchange and of any delisting thereof.

SECTION 7.12.    <u>Collateral Agent</u>.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be compensated, reimbursed and indemnified, are extended to, and shall be enforceable by, the Collateral Agent as if the Collateral Agent were named as the Trustee herein and the Security Documents were named as this Indenture herein.

## ARTICLE EIGHT

### AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 8.01.    <u>Without Consent of Holders</u>.

The Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) may amend, waive or supplement this Indenture, the Notes and the Security Documents, without prior notice to or consent of any Holder:

(1)    to issue Additional Notes under this Indenture;

(2)    to cure any ambiguity, omission, defect or inconsistency;

(3)    to provide for the assumption by a successor of the obligations of the Issuer under this Indenture and the Notes, or provide for the assumption by a successor of the obligations of a Guarantor under this Indenture, in each case, to the extent otherwise permitted under this Indenture;

(4)    to comply with requirements of the Commission in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(5)    to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

(6)    to add additional Guarantees of the Notes or additional assets as Collateral;

(7)    to release a Guarantor as provided in section 10.04;

JX 132-61

(8)    to allow for the addition of Additional First Lien Obligations and Pari Passu Junior Lien Obligations under the Security Documents (including by way of entry into an additional Intercreditor Agreement) to the extent not prohibited by this Indenture (including, in the case of Pari Passu Junior Lien Obligations that are not secured by the Security Agreement, to enter into conforming modifications to the Intercreditor Agreement or an additional intercreditor agreement with any collateral agent for the holders of such obligations providing that the Liens of the Collateral Agent and such other collateral agent on any Collateral shall be pari passu and that amounts received in connection with an enforcement of the Notes Liens or the Liens securing such Pari Passu Junior Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Pari Passu Junior Lien Obligations, be distributed to the Trustee and the agent(s) for the holders of Pari Passu Junior Lien Obligations on a pro rata basis based on the amount of outstanding obligations of each such class);

(9)    release Guarantees and/or Collateral as otherwise permitted in this Indenture and the Security Documents;

(10)    to provide for uncertificated Notes in addition to, or in place of, certificated Notes; or

(11)    to add to the covenants of the Issuer or a Guarantor for the benefit of the Holders of the Notes or to surrender any right or power conferred upon the Issuer or a Guarantor.

SECTION 8.02.    With Consent of Holders.

(a)    This Indenture, the Notes or the Security Documents may be amended or supplemented by the Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) with the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), and any existing Default under, or compliance with any provision of each of this Indenture or the Notes may be waived (except a Default in respect of the payment of principal or interest on the Notes) with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with any purchase of, or tender offer or exchange offer for, Notes).

(b)    Without the consent of each Holder affected, an amendment, supplement or waiver of this Indenture may not:

(1)    extend the fixed maturity of the Notes,

(2)    reduce the rate or extend the time of payment of interest on the Notes,

(3)    reduce the principal amount or the premium, if any, of the Notes or reduce the amount of the principal payable on any date,

(4)    change the coin or currency in which principal of or any premium or interest on any Notes are payable, or

(5)    impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof.

JX 132-62

(c)     Furthermore, an amendment, supplement or waiver of this Indenture may not:

(1)   reduce the percentage of Notes, the consent of the Holders of which is required for any such modification without the consent of the Holders of all Notes then outstanding (including Notes held by Affiliates of the Issuer);

(2)   modify without the written consent of the Trustee the rights, duties or immunities of the Trustee; or

(3)   except as expressly permitted under this Indenture, (i) release all or substantially all of the Collateral from the Liens securing the Notes or (ii) release one or more Guarantors from their Guarantees (or otherwise limit the liability of one or more Guarantors with respect to their obligations under their Guarantees) if such release or limitation is in respect of substantially all of the value provided by all Guarantors under the Guarantees, in each case without the consent of Holders of at least 75% in aggregate principal amount of the outstanding Notes.

After an amendment, supplement or waiver under this Section 8.02 becomes effective, the Issuer shall mail or electronically deliver to each Holder affected thereby a notice briefly describing the amendment, supplement or waiver.

Upon the written request of the Issuer and upon the receipt by the Trustee of evidence reasonably satisfactory to the Trustee of the consent of the Holders as aforesaid and upon receipt by the Trustee of the documents described in Section 8.06, the Trustee shall join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture, in which case the Trustee may, but shall not be obligated to, enter into such amended or supplemental indenture. It shall not be necessary for the consent of the Holders under this Section 8.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

SECTION 8.03.     Compliance with Trust Indenture Act.

Every amendment or supplement to this Indenture, the Notes or the Guarantees shall comply with the TIA as then in effect.

SECTION 8.04.     Revocation and Effect of Consents.

Until an amendment, supplement, waiver or other action becomes effective, a consent to it by a Holder of a Note is a continuing consent conclusive and binding upon such Holder and every subsequent Holder of the same Note or portion thereof, and of any Note issued upon the transfer thereof or in exchange therefor or in place thereof, even if notation of the consent is not made on any such Note.  Any such Holder or subsequent Holder, however, may revoke the consent as to his Note or portion of a Note, if the Trustee receives the written notice of revocation before the date the amendment, supplement, waiver or other action becomes effective.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement, or waiver.  If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to

-46-

JX 132-63

be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

After an amendment, supplement, waiver or other action becomes effective, it shall bind every Holder.

SECTION 8.05.    Notation on or Exchange of Notes.

If an amendment, supplement, or waiver changes the terms of a Note, the Trustee (in accordance with the specific written direction of the Issuer) shall request the Holder of the Note (in accordance with the specific written direction of the Issuer) to deliver it to the Trustee. In such case, the Trustee shall place an appropriate notation on the Note about the changed terms and return it to the Holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue, the Guarantors shall endorse, and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

SECTION 8.06.    Trustee to Sign Amendments, Etc.

The Trustee or Collateral Agent, as the case may be, shall sign any amendment, supplement or waiver authorized pursuant to this Article Eight if the amendment, supplement or waiver does not adversely affect the rights, duties, liabilities or immunities of the Trustee or the Collateral Agent. If it does, the Trustee or the Collateral Agent, as the case may be, may, but need not, sign it. In signing or refusing to sign such amendment, supplement or waiver the Trustee or the Collateral Agent, as the case may be, shall be entitled to receive and, subject to Section 7.02, shall be fully protected in relying upon an Officer's Certificate and an Opinion of Counsel stating, in addition to the matters required by Section 12.04, that such amendment, supplement or waiver is authorized or permitted by this Indenture and all conditions precedent required hereunder to such amendment, supplement or waiver have been satisfied.

## ARTICLE NINE

### DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 9.01.    Discharge of Indenture.

(a)    The Issuer may terminate its obligations and the obligations of the Guarantors under the Notes, the Guarantees and this Indenture, except the obligations referred to in the last paragraph of this Section 9.01, if

(1)    all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, have been delivered to the Trustee for cancellation, or

(2)    (A) all Notes not delivered to the Trustee for cancellation otherwise (x) have become due and payable by reason of the mailing or electronic delivery of a notice of redemption or otherwise, (y) will become due and payable by reason of the mailing or electronic delivery of a notice of redemption or otherwise, or may be called for redemption within one year or (B) have been called for redemption pursuant to Section 3.07 and, in any case, the Issuer has irrevocably deposited or caused to be deposited with the Trustee as trust funds, in trust solely for the benefit of the Holders, cash in U.S. Dollars, Government Securities, or a combination

-47-

thereof, in amounts as will be sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium and Additional Interest, if any, and accrued interest through the date of maturity or redemption,

(b)    the Issuer has paid or caused to be paid all sums payable by it under this Indenture, and

(c)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money or proceeds from Government Securities toward the payment of the Notes at maturity or the Redemption Date, as the case may be.

In addition, if the Issuer delivers an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to satisfaction and discharge have been complied with, the Trustee shall acknowledge in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes, the Guarantees and this Indenture except for those surviving obligations specified below.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Issuer in Sections 7.01(a), 9.04 and 9.05 shall survive such satisfaction and discharge.

SECTION 9.02.    Legal Defeasance.

(a)    The Issuer may at its option be discharged from its obligations with respect to the Notes and the Guarantors discharged from their obligations under the Guarantees on the date the conditions set forth in clause (b) of this Section 9.02 are satisfied (hereinafter, "Legal Defeasance").  For this purpose, such Legal Defeasance means that the Issuer shall be deemed to have paid and discharged the entire indebtedness represented by the Notes and to have satisfied all its other obligations under such Notes and this Indenture insofar as such Notes are concerned (and the Trustee, at the expense of the Issuer, shall, subject to Section 9.05, execute instruments in form and substance reasonably satisfactory to the Trustee and Issuer acknowledging the same), except for the following which shall survive until otherwise terminated or discharged hereunder:  (A) the rights of Holders to receive solely from the trust funds described in clause (b) of this Section 9.02 and as more fully set forth in Section 9.04, payments in respect of the principal of, premium and Additional Interest, if any, and interest on such Notes when such payments are due from the trust referred to in clause (b) of this Section 9.02, (B) the Issuer's obligations hereunder with respect to such Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust, (C) the rights, powers, trusts, duties, and immunities of the Trustee hereunder (including claims of, or payments to, the Trustee under or pursuant to Section 7.01(a)), and the Issuer's obligations in connection therewith, and (D) this Article Nine.  Subject to compliance with this Article Nine, the Issuer may exercise its option under this Section 9.02 with respect to the Notes notwithstanding the prior exercise of its option under Section 9.03 with respect to the Notes.

(b)    The following shall be the conditions to the application of Section 9.02(a) to the outstanding Notes:

(i)    the Issuer shall have deposited with the Trustee, in trust, money and/or Government Securities that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of inde-

-48-

JX 132-65

pendent public accountants expressed in a written certification thereof delivered to the Trustee, to pay the principal of, premium, if any, and accrued interest on the Notes on the stated maturity of such payments in accordance with the terms of the Indenture and the Notes;

(ii)    the Issuer shall have delivered to the Trustee either (x) an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the exercise of the option of the Issuer under clause (a) of this Section 9.02 and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred, which Opinion of Counsel must be based upon (and accompanied by a copy of) a published ruling of the Internal Revenue Service or other change in applicable U.S. federal income tax law after the Issue Date to the same effect or (y) a ruling directed to the Trustee received from the Internal Revenue Service to the same effect as the aforementioned Opinion of Counsel;

(iii)    immediately after giving effect to such deposit on a pro forma basis, no Default or Event of Default shall have occurred and be continuing on the date of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound; and

(iv)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to such Legal Defeasance have been complied with.

SECTION 9.03.    Covenant Defeasance.

(a)    At the option of the Issuer, (x) the Issuer and the Guarantors shall be released from their respective obligations under Sections 4.02 (except for obligations mandated by the TIA) and 4.03 through 4.09 and (y) clause (3) of Section 6.01 shall no longer apply with respect to the outstanding Notes on and after the date the conditions set forth in clause (b) of this Section 9.03 are satisfied (hereinafter, "Covenant Defeasance"). For this purpose, such Covenant Defeasance means that the Issuer and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such specified Section or portion thereof, whether directly or indirectly by reason of any reference elsewhere herein to any such specified Section or portion thereof or by reason of any reference in any such specified Section or portion thereof to any other provision herein or in any other document, but the remainder of this Indenture and the Notes shall be unaffected thereby.

(b)    The following shall be the conditions to the application of Section 9.03(a) to the outstanding Notes:

(i)    the deposit with the Trustee, in trust, of U.S. legal tender and/or Government Securities that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (without consideration of any reinvestment of such principal and interest), in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay the principal of, premium, if any, and accrued interest on the Notes on the scheduled maturity of such payments in accordance with the terms of this Indenture and the Notes;

(ii)    the delivery by the Issuer to the Trustee of an Opinion of Counsel to the effect that the beneficial owners of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance of certain covenants

JX 132-66

and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(iii)    immediately after giving effect to such deposit on a pro forma basis, no Default or Event of Default shall have occurred and be continuing on the date of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound; and

(iv)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to such Covenant Defeasance have been complied with.

SECTION 9.04.    <u>Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions</u>.

All money and Government Securities (including the proceeds thereof) deposited with the Trustee pursuant to Section 9.02(b) or 9.03(b) in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent), to the Holders of such Notes, of all sums due and to become due thereon in respect of principal, premium, if any, and accrued interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer and the Guarantors shall (on a joint and several basis) pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Government Securities deposited pursuant to Section 9.02(b) or 9.03(b) or the principal, premium, if any, and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article Nine to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time any money or Government Securities held by it as provided in Section 9.02(b) and 9.03(b) which, in the opinion of a nationally recognized firm of independent public account-ants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof which would then be required to be deposited to effect an equivalent Legal Defeasance or Cove-nant Defeasance.

SECTION 9.05.    <u>Reinstatement</u>.

If the Trustee or Paying Agent is unable to apply any U.S. Dollars or Government Securi-ties in accordance with Section 9.01, 9.02 or 9.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and each Guarantor's obligations under this Indenture, the Notes and the Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to this Article Nine until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Dollars or Government Securities in accordance with Section 9.01, 9.02 or 9.03, as the case may be; *provided* that if the Issuer or the Guarantors have made any payment of principal of, premium, if any, or accrued interest on any Notes because of the reinstatement of their obligations, the Issuer or the Guarantors, as the case may be, shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Dollars or Government Securities held by the Trustee or Paying Agent.

JX 132-67

SECTION 9.06.    <u>Moneys Held by Paying Agent</u>.

In connection with the satisfaction and discharge of this Indenture, all moneys then held by any Paying Agent under the provisions of this Indenture shall, upon written demand of the Issuer, be paid to the Trustee, or if sufficient moneys have been deposited pursuant to Section 9.02(b) or 9.03(b), to the Issuer (or, if such moneys had been deposited by the Guarantors, to such Guarantors), and thereupon such Paying Agent shall be released from all further liability with respect to such moneys.

SECTION 9.07.    <u>Moneys Held by Trustee</u>.

Subject to applicable law, any moneys deposited with the Trustee or any Paying Agent or then held by the Issuer or the Guarantors in trust for the payment of the principal of, or premium, if any, or interest on any Note that are not applied but remain unclaimed by the Holder of such Note for two years after the date upon which the principal of, or premium, if any, or interest on such Note shall have respectively become due and payable shall be repaid to the Issuer (or, if appropriate, the Guarantors), or if such moneys are then held by the Issuer or the Guarantors in trust, such moneys shall be released from such trust; and the Holder of such Note entitled to receive such payment shall thereafter, as an unsecured general creditor, look only to the Issuer and the Guarantors for the payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money shall thereupon cease; *provided* that the Trustee or any such Paying Agent, before being required to make any such repayment, may, at the expense of the Issuer and the Guarantors, either mail or electronically deliver to each Holder affected, at the address shown in the register of the Notes maintained by the Registrar pursuant to Section 2.06, or cause to be published once a week for two successive weeks, in a newspaper published in the English language, customarily published each Business Day and of general circulation in the City of New York, New York or the United States, a notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such mailing, electronic delivery or publication, any unclaimed balance of such moneys then remaining will be repaid to the Issuer.  After payment to the Issuer or the Guarantors or the release of any money held in trust by the Issuer or any Guarantors, as the case may be, Holders entitled to the money must look only to the Issuer and the Guarantors for payment as general unsecured creditors unless applicable abandoned property law designates another Person.

ARTICLE TEN

GUARANTEE OF NOTES

SECTION 10.01.    <u>Guarantee</u>.

Subject to the provisions of this Article Ten, each Guarantor, by execution of this Indenture, jointly and severally, unconditionally guarantees to each Holder and to the Trustee and their respective successors and assigns (i) the due and punctual payment of the principal of and interest and premium, if any, on each Note, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on the overdue principal of and interest on the Notes, to the extent lawful, and the due and punctual payment of all other Obligations of the Issuer to the Holders or the Trustee all in accordance with the terms of such Note, this Indenture and the Registration Rights Agreements, and (ii) in the case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise.  Each Guarantor, by execution of this Indenture, agrees that its obligations hereunder shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of any such Note or this Indenture, any failure to enforce the provisions of any such Note, this Indenture or the Registration Rights Agreements, any waiver, modi-

JX 132-68

fication or indulgence granted to the Issuer or any other Guarantor with respect thereto by the Holder of such Note, or any other circumstances which may otherwise constitute a legal or equitable discharge of a surety or such Guarantor.

Each Guarantor hereby waives diligence, presentment, demand for payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to any such Note or the Indebtedness evidenced thereby and all demands whatsoever, and covenants that this Guarantee will not be discharged as to any such Note except by payment in full of the principal thereof and interest thereon. Each Guarantor hereby agrees that, as between such Guarantor, on the one hand, and the Holders and the Trustee, on the other hand, (i) subject to this Article Ten, the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article Six for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Obligations as provided in Article Six, subject to any rescission thereof pursuant to Section 6.04, such Obligations (whether or not due and payable) shall forthwith become due and payable by each Guarantor for the purpose of this Guarantee.

SECTION 10.02.   Execution and Delivery of Notation of Guarantee.

To further evidence the Guarantee set forth in Section 10.01, each Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit G hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of each Guarantor. The validity and enforceability of any Guarantee shall not be affected by the fact that it is not affixed to any particular Note.

Each of the Guarantors hereby agrees that its Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

If an Officer of a Guarantor (or general partner or member thereof) whose signature is on this Indenture or a notation of Guarantee no longer holds that office at the time the Trustee authenticates the Note on which such Guarantee is endorsed or at any time thereafter, such Guarantor's Guarantee of such Note shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of any Guarantee set forth in this Indenture on behalf of the Guarantor.

SECTION 10.03.   Limitation of Guarantee.

Each Guarantor, the Trustee, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Guarantee or pursuant to its contribution obligations under this Indenture, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law. Each Guarantor that makes a payment or

-52-

JX 132-69

distribution under a Guarantee shall be entitled to a contribution from each other Guarantor in a *pro rata* amount based on the assets of each Guarantor.

SECTION 10.04.    Release of Guarantor.

A Guarantor shall be automatically and unconditionally released from all of its obligations under its Guarantee:

> (i)    in the event of a sale or other transfer of Equity Interests in such Guarantor or dissolution of such Guarantor in compliance with the terms of this Indenture following which such Guarantor ceases to be a Subsidiary;

> (ii)    upon such Guarantor ceasing to be a borrower or guarantor under any Credit Agreement and the Issuer's delivery of an Officer's Certificate to the Trustee requesting the release and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to such transactions have been complied with and that such release is authorized and permitted hereunder; or

> (iii)    in connection with a discharge of this Indenture pursuant to Section 9.01 or Covenant Defeasance or Legal Defeasance.

and in each such case, the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to such transactions have been complied with and that such release is authorized and permitted hereunder.

Upon being provided the Officer's Certificate and Opinion of Counsel mentioned in clause (ii) above, the Trustee shall execute any documents reasonably requested by the Issuer or a Guarantor in order to evidence the release of such Guarantor from its obligations under its Guarantee endorsed on the Notes and under this Article Ten.

SECTION 10.05.    Waiver of Subrogation.

Each Guarantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against the Issuer that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under its Guarantee and this Indenture, including, without limitation, any right of subrogation, reimbursement, exoneration, indemnification, and any right to participate in any claim or remedy of any Holder of Notes against the Issuer, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including, without limitation, the right to take or receive from the Issuer, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or Security on account of such claim or other rights. If any amount shall be paid to any Guarantor in violation of the preceding sentence and the Notes shall not have been paid in full, such amount shall have been deemed to have been paid to such Guarantor for the benefit of, and held in trust for the benefit of, the Holders, and shall forthwith be paid to the Trustee for the benefit of such Holders to be credited and applied upon the Notes, whether matured or unmatured, in accordance with the terms of this Indenture. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the waiver set forth in this Section 10.05 is knowingly made in contemplation of such benefits.

JX 132-70

ARTICLE ELEVEN

SECURITY

SECTION 11.01.     Security Documents; Additional Collateral.

(a)     Security Documents.  In order to secure the due and punctual payment of the Obligations outstanding under the Notes and the Guarantees, the Issuer, the Guarantors, the Collateral Agent and the other parties thereto have simultaneously with the execution of this Indenture entered or, in accordance with the provisions of this Article Eleven and the provisions of the Security Agreement, will enter into the Security Documents.

(b)     The Issuer shall, and shall cause each Guarantor to, and each Guarantor shall, make all filings (including filings of continuation statements and amendments to financing statements that may be necessary to continue the effectiveness of such financing statements) and take all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Issuer and its Guarantors) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest subject only to Permitted Liens.

(c)     Additional Collateral.  With respect to assets acquired after the Issue Date, the Issuer or applicable Guarantor will take the actions required by the Security Agreement.

SECTION 11.02.     Recording, Registration and Opinions.

The Issuer and the Guarantors shall furnish to the Trustee, (a) upon or no later than 30 days following the Issue Date, an Opinion of Counsel stating that this Indenture or the Security Documents or financing statements with respect thereto, as applicable, have been properly recorded and filed so as to make the Notes Liens effective, and reciting the details of such action, and (b) at least 30 days prior to the anniversary of the Issue Date in each year an Opinion of Counsel, dated as of such date, either (i) stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording, and refiling of this Indenture or the Security Documents, as applicable, as are necessary to maintain the Notes Liens under applicable law to the extent required by the Security Documents other than any action as described therein to be taken and such opinion may refer to prior Opinions of Counsel and contain customary qualifications and exceptions and may rely on an Officer's Certificate of the Issuer or (ii) stating that, in the opinion of such counsel, no such action is necessary to maintain such Notes Liens or security interests.

SECTION 11.03.     Releases of Liens on Collateral.

The Liens on the Collateral pursuant to the Security Documents shall automatically and without the need for any further action by any Person be released:

(a)     as to any property, or portion thereof, subject to such Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(b)     in whole, upon:

(i)     a satisfaction and discharge of this Indenture under Section 9.01 hereof; or

JX 132-71

(ii)     a Legal Defeasance or Covenant Defeasance of this Indenture under Section 9.02 or Section 9.03, respectively;

(c)     as to any property that (i) is sold, transferred or otherwise disposed of by the Issuer or any Guarantor (other than to the Issuer or another Guarantor) in a transaction not prohibited by this Indenture at the time of such transfer or disposition or (ii) is owned or at any time acquired by a Guarantor that has been released from its Guarantee, concurrently with the release of such Guarantee;

(d)     in whole or in part, in accordance with the applicable provisions of the Intercreditor Agreement;

(e)     in whole or in part, in accordance with Section 8.01 or 8.02; and

(f)     in whole, upon the occurrence of a Fall-Away Event.

To the extent applicable, the Issuer shall comply with TIA § 314(b) and, following qualification of the Indenture under the TIA (if required), TIA § 314(d). Any certificate or opinion required by TIA § 314(d) may be made by an Officer of the Issuer except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert appointed by the Issuer, who shall be approved by the Trustee.

SECTION 11.04.     Form and Sufficiency of Release.

In the event that any Lien is to be released pursuant to Section 11.03, and the Issuer or such Guarantor requests the Collateral Agent to furnish a written disclaimer, release or quitclaim of any interest in such property under the Security Documents, upon receipt of an Officer's Certificate and Opinion of Counsel to the effect that such release complies with Section 11.03 and specifying the provision in Section 11.03 pursuant to which such release is being made (upon which the Trustee and Collateral Agent may exclusively and conclusively rely), the Collateral Agent shall execute, acknowledge and deliver to the Issuer or such Guarantor such an instrument in the form provided by the Issuer, and providing for release without recourse and shall take such other action as the Issuer or such Guarantor may reasonably request and as necessary to effect such release.

SECTION 11.05.     Possession and Use of Collateral.

Subject to the provisions of this Indenture and the Security Documents, the Issuer and the Guarantors shall have the right to remain in possession and retain exclusive control of and to exercise all rights with respect to the Collateral, to freely operate, manage, develop, lease, use, consume and enjoy the Collateral, to alter or repair any Collateral so long as such alterations and repairs do not impair the Lien of the Security Documents thereon, and to collect, receive, use, invest and dispose of the reversions, remainders, interest, rents, lease payments, issues, profits, revenues, proceeds and other income thereof.

SECTION 11.06.     Purchaser Protected.

No purchaser or grantee of any property or rights purporting to be released shall be bound to ascertain the authority of the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority so long as the conditions set forth in Section 11.04 have been satisfied.

JX 132-72

SECTION 11.07.    Authorization of Actions To Be Taken by the Collateral Agent Under the Security Documents.

The Holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents.  Furthermore, each Holder of a Note, by accepting such Note, agrees, acknowledges and consents to the terms (including, but not limited to, waivers, representations and covenants) of and authorizes and directs the Trustee (in each of its capacities) and the Collateral Agent to enter into and perform the Security Documents in each of its capacities thereunder.

SECTION 11.08.    Authorization of Receipt of Funds by the Trustee Under the Security Agreement.

The Trustee is authorized to receive any funds for the benefit of Holders distributed under the Security Documents to the Trustee and to apply such funds as provided in Section 6.11.

SECTION 11.09.    Powers Exercisable by Receiver or Collateral Agent.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article Eleven upon the Issuer or any Guarantor, as applicable, with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or any Guarantor, as applicable, or of any officer or officers thereof required by the provisions of this Article Eleven.

ARTICLE TWELVE

MISCELLANEOUS

SECTION 12.01.    Trust Indenture Act Controls.

Except as otherwise specified herein, if any provision of this Indenture limits, qualifies or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.  If any provision of this Indenture modifies any TIA provision that may be so modified, such TIA provision shall be deemed to apply to this Indenture as so modified.  If any provision of this Indenture excludes any TIA provision that may be so excluded, such TIA provision shall be excluded from this Indenture.

The provisions of TIA §§ 310 through 317 that impose duties on any Person (including the provisions automatically deemed included unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

SECTION 12.02.    Notices.

Except for notice or communications to Holders, any notice or communication shall be given in writing and delivered in person, sent by telecopy, delivered electronically, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

-56-

**JX 132-73**

If to the Issuer or any Guarantor:

> Sears Holdings Corporation
> 3333 Beverly Road
> Hoffman Estates, Illinois  60179
> Facsimile: (847) 286-2055
> Attention: Treasurer

copy to:

> Wachtell Lipton Rosen & Katz
> 51 West 52nd Street
> New York, New York  10019
> Facsimile:  (212) 403-2000
> Attention:  James Cole Jr.

If to the Trustee:

> Wells Fargo Bank, National Association
> 230 W. Monroe Street, Suite 2900
> Chicago, IL 60606
> Facsimile:  (312) 726-2158
> Attention:  Corporate Trust Services

All notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; at the time delivered, if delivered electronically; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.  If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.  Any notice or communication to a Holder may be mailed or electronically delivered.

The Issuer, the Guarantors or the Trustee by written notice to the others may designate additional or different addresses for subsequent notices or communications.

In case by reason of the suspension of regular mail service, or by reason of any other cause, it shall be impossible to mail any notice or communication as required by this Indenture, then such method of notification as shall be made with the approval of the Trustee shall constitute a sufficient mailing of such notice.

SECTION 12.03.   <u>Communications by Holders with Other Holders</u>.

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Guarantors, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 12.04.   <u>Certificate and Opinion as to Conditions Precedent</u>.

Upon any request or application by the Issuer to the Trustee to take any action or refrain from taking any action under this Indenture, upon request of the Trustee, the Issuer shall furnish to the Trustee:

-57-

JX 132-74

(1)      an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.05) stating that, in the opinion of the signer, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.05) stating that, in the opinion of such counsel, all such conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with.

SECTION 12.05.    Statements Required in Certificate and Opinion.

Each certificate and opinion with respect to compliance by or on behalf of the Issuer or any Guarantor with a condition or covenant provided for in this Indenture shall include:

(1)      a statement that each individual making such certificate or opinion has read such condition or covenant;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of each such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such condition or covenant has been complied with; and

(4)      a statement as to whether or not, in the opinion of each such individual, such condition or covenant has been complied with;

*provided* that, with respect to matters of fact, legal counsel delivering such Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 12.06.    Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or meetings of Holders.  The Registrar and Paying Agent may make reasonable rules for their functions.

SECTION 12.07.    Business Days; Legal Holidays.

A "Business Day" is a day that is not a Legal Holiday.  A "Legal Holiday" is a Saturday, a Sunday or other day on which (i) the Trustee or commercial banks in the City of New York are authorized or required by law to close or (ii) the New York Stock Exchange is not open for trading.  If a payment date is a Legal Holiday, payment may be made at that place on the next succeeding day that is not a Legal Holiday with the same force and effect as if made on such payment date, and no interest shall accrue for the intervening period.

SECTION 12.08.    Governing Law.

THIS INDENTURE, THE GUARANTEES AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION

JX 132-75

WOULD BE REQUIRED THEREBY. EACH OF THE PARTIES HERETO HEREBY IRREVOCA-BLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT SIT-TING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK OR ANY FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN RE-SPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE GUARANTEES AND THE NOTES, AND IRREVOCABLY ACCEPTS FOR IT-SELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, EXCLU-SIVE JURISDICTION OF THE AFORESAID COURTS. EACH OF THE PARTIES HERETO IR-REVOCABLY WAIVES, TO THE FULLEST EXTENT THAT IT MAY EFFECTIVELY DO SO UN-DER APPLICABLE LAW, TRIAL BY JURY AND ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PRO-CEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, AC-TION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN IN-CONVENIENT FORUM. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COM-MENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER PARTY HERETO IN ANY OTHER JURISDICTION. CERTAIN MORTGAGES AND OTHER SECURITY DOCUMENTS WILL BE GOVERNED BY THE LAWS OF OTHER STATES.

SECTION 12.09.   No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret another indenture, loan, security or debt agreement of the Issuer or any Subsidiary thereof. No such indenture, loan, security or debt agreement may be used to interpret this Indenture.

SECTION 12.10.   Successors.

All agreements of the Issuer and the Guarantors in this Indenture and the Notes shall bind their respective successors. All agreements of the Trustee, any additional trustee and any Paying Agents in this Indenture shall bind their respective successors.

SECTION 12.11.   Multiple Counterparts.

The parties may sign multiple counterparts of this Indenture. Each signed counterpart shall be deemed an original, but all of them together represent one and the same agreement.

SECTION 12.12.   Table of Contents, Headings, Etc.

The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

SECTION 12.13.   Separability.

Each provision of this Indenture shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purpose of this Indenture or the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

-59-

JX 132-76

SECTION 12.14.    Waiver of Jury Trial.

EACH OF THE ISSUER, GUARANTORS AND THE TRUSTEE HEREBY IRREVO-
CABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND
ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELAT-
ING TO THIS INDENTURE, THE NOTES, THE GUARANTEES OR THE TRANSACTIONS CON-
TEMPLATED HEREBY.

SECTION 12.15.    Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the per-
formance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its
control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or
military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunc-
tions of utilities, communications or computer (software and hardware) services; it being understood that
the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking indus-
try to resume performance as soon as practicable under the circumstances.

SECTION 12.16.    Intercreditor Agreement.

This Indenture, the Notes, the Security Documents, the Trustee, the Collateral Agent and
the Holders are subject to and bound by the terms of the Intercreditor Agreement.

[*Signature Pages Follow*]

-60-

JX 132-77

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed all as of the date and year first written above.

SEARS HOLDINGS CORPORATION, as Issuer

By: _____
     Name: William K. Phelan
     Title: Senior Vice President, Controller and
     Chief Accounting Officer


KMART CORPORATION
KMART HOLDING CORPORATION
KMART MANAGEMENT CORPORATION
SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS, ROEBUCK AND CO.,
as Guarantors

By: _____
     Name: William K. Phelan
     Title: Senior Vice President and Controller


CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KLC, INC.
KMART OF MICHIGAN, INC.
LANDS' END DIRECT MERCHANTS, INC.
LANDS' END, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.
SEARS OUTLET STORES, L.L.C.
SEARS PROTECTION COMPANY
SEARS ROEBUCK ACCEPTANCE CORP.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC,
as Guarantors

By: _____
     Name: William K. Phelan
     Title: Vice President


Signature Page to Indenture

JX 132-78

KMART.COM LLC, as Guarantor

By: Bluelight.com, Inc., its Member

By: _____
     Name: William K. Phelan
     Title: Vice President


KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC, as Guarantors

By: Kmart Corporation, its Member

By: _____
     Name: William K. Phelan
     Title: Senior Vice President and Controller


SEARS PROTECTION COMPANY (FLORIDA), L.L.C., as Guarantor

By: Sears Protection Company, its Member

By: _____
     Name: William K. Phelan
     Title: Vice President


A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
SEARS AUTHORIZED HOMETOWN STORES, LLC
SEARS HOME APPLIANCE SHOWROOMS, LLC, as Guarantors

By: Sears, Roebuck and Co., its Member

By: _____
     Name: William K. Phelan
     Title: Senior Vice President and Controller


Signature Page to Indenture

JX 132-79

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee and Collateral Agent

By:

Name: Gregory S. Clarke
Title: Vice President

Signature Page to Indenture

JX 132-80

SCHEDULE A

LIST OF GUARANTORS

A&E Home Delivery, LLC
A&E Lawn & Garden, LLC
A&E Signature Service, LLC
California Builder Appliances, Inc.
Florida Builder Appliances, Inc.
KLC, Inc.
Kmart Corporation
Kmart Holding Corporation
Kmart Management Corporation
Kmart of Michigan, Inc.
Kmart of Washington LLC
Kmart Stores of Illinois LLC
Kmart Stores of Texas LLC
Kmart.com LLC
Lands' End Direct Merchants, Inc.
Lands' End, Inc.
MyGofer LLC
Private Brands, Ltd.
Sears Authorized Hometown Stores, LLC
Sears Brands Management Corporation
Sears Holdings Management Corporation
Sears Home Appliance Showrooms, LLC
Sears Home Improvement Products, Inc.
Sears Outlet Stores, L.L.C.
Sears Protection Company
Sears Protection Company (Florida), L.L.C.
Sears Roebuck Acceptance Corp.
Sears, Roebuck and Co.
Sears, Roebuck de Puerto Rico, Inc.
SOE, Inc.
StarWest, LLC

<u>EXHIBIT A</u>

CUSIP:                                                                                                No.
ISIN:

## SEARS HOLDINGS CORPORATION

$[                    ]

### 6⅝% SENIOR SECURED NOTES DUE 2018

SEARS HOLDINGS CORPORATION, a Delaware corporation, promises to pay to _____, or registered assigns, the principal sum of _____ Dollars [(subject to adjustment as reflected in the Schedule of Increases or Decreases in Global Note attached hereto)][1] on October 15, 2018.

Interest Payment Dates:  April 15 and October 15.

Record Dates:  April 1 and October 1.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

_____

[1] Use Schedule of Increases or Decreases if Global Note.

A-1

**JX 132-82**

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually or by facsimile by its duly authorized officer.

SEARS HOLDINGS CORPORATION

By: _____
       Name:
       Title:

A-2

JX 132-83

Certificate of Authentication

This is one of the Notes referred to in the within-mentioned Indenture.

Dated:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee

By: _____
Authorized Signatory

A-3

JX 132-84

[FORM OF REVERSE OF NOTE]

SEARS HOLDINGS CORPORATION

6⅝% SENIOR SECURED NOTES DUE 2018

1    Interest. Sears Holdings Corporation (the "Issuer"), a Delaware corporation, promises to pay, until the principal hereof is paid or made available for payment, interest on the principal amount set forth on the face hereof at a rate of 6⅝% per annum. Interest hereon will accrue from and including the most recent date to which interest has been paid or, if no interest has been paid, from and including October 12, 2010 to but excluding the date on which interest is paid. Interest shall be payable in arrears on each April 15 and October 15, commencing on April 15, 2011. Interest will be computed on the basis of a 360-day year of twelve 30-day months. The Issuer shall pay interest on overdue principal and on overdue interest (to the full extent permitted by law) at a rate equal to the interest rate on the Notes.

2    Method of Payment. The Issuer will pay interest hereon (except defaulted interest) to the Persons who are registered Holders at the close of business on April 1 or October 1 next preceding the Interest Payment Date; provided that if an Interest Payment Date falls on a Legal Holiday, interest will be payable on the next succeeding day that is not a Legal Holiday with the same force and effect as if made on such Interest Payment Date, and no interest shall accrue for the intervening period. Holders must surrender Notes to a Paying Agent to collect principal payments. The Issuer will pay principal and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. At the option of the Issuer, each installment of interest may be paid by (i) check mailed to addresses of the Persons entitled thereto as such addresses shall appear on the registry maintained by the Registrar or (ii) wire transfer to an account located in the United States maintained by the payee. Payments in respect of Notes represented by a Global Note (including principal, premium, if any, and interest) will be made by wire transfer of immediately available funds to the accounts specified by the Depository.

3    Paying Agent and Registrar. Initially, Wells Fargo Bank, National Association (the "Trustee") will act as a Paying Agent and Registrar. The Issuer may appoint and change any Paying Agent or Registrar or co-registrar without notice. The Issuer or any of its Affiliates may act as Paying Agent or Registrar.

4    Indenture. The Issuer issued the Notes under an Indenture dated as of October 12, 2010 (the "Indenture") among the Issuer, the Guarantors (as defined in the Indenture) and the Trustee. This is one of an issue of Notes of the Issuer issued, or to be issued, under the Indenture. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (15 U.S. Code §§ 77aaa-77bbbb), as amended from time to time. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of them. Capitalized and certain other terms used herein and not otherwise defined have the meanings set forth in the Indenture.

5.    Optional Redemption.

(a)    The Notes may be redeemed in whole or in part, at the Issuer's option, at any time and from time to time at a redemption price equal to the greater of (1) 100% of the principal amount of the Notes to be redeemed and (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon discounted to the Redemption Date at the Treasury Rate, plus 50 basis points, plus accrued interest thereon to the Redemption Date.

A-4

(b)       In the event of a redemption of fewer than all of the Notes, if the Notes are Global Notes selection for redemption shall be made in accordance with Applicable Procedures, otherwise the Trustee shall select the Notes to be redeemed in compliance with Section 3.02 of the Indenture.

6.       <u>Notice of Redemption</u>.  Notice of redemption will be mailed at least 30 days but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at his registered address, except that redemption notice may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture.  On and after the Redemption Date, unless the Issuer defaults in making the redemption payment, interest ceases to accrue on Notes or portions thereof called for redemption.

7.       <u>Offers to Purchase upon a Change of Control Triggering Event</u>.  The Indenture provides that upon the occurrence of a Change of Control Triggering Event and subject to further limitations contained therein, the Issuer shall make an offer to purchase outstanding Notes in accordance with the procedures set forth in Section 4.07 of the Indenture.

8.       <u>Offers to Purchase upon a Collateral Coverage Event</u>.  The Indenture provides that upon the occurrence of a Collateral Coverage Event and subject to further limitations contained therein, the Issuer shall make an offer to purchase outstanding Notes in accordance with the procedures set forth in Section 4.08 of the Indenture.

9.       <u>Registration Rights</u>.  Pursuant to the Registration Rights Agreements, the Issuer will be obligated, under certain circumstances, to consummate an exchange offer pursuant to which the Holder of this Note shall have the right to exchange this Note for notes which have been registered under the Securities Act, in like principal amount and having substantially identical terms as the Notes.  The Holders shall be entitled to receive certain additional interest payments in the event such exchange offer is not consummated and upon certain other conditions, all pursuant to and in accordance with the terms of the applicable Registration Rights Agreement.

10.      <u>Denominations, Transfer, Exchange</u>.  The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof.  A Holder may transfer or exchange Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay to it any taxes and fees required by law or permitted by the Indenture.

11.      <u>Persons Deemed Owners</u>.  The registered Holder of this Note may be treated as the owner of this Note for all purposes.

12.      <u>Unclaimed Money</u>.  If money for the payment of principal or interest remains unclaimed for two years, the Trustee will pay the money back to the Issuer at its written request.  After that, Holders entitled to the money must look to the Issuer for payment as general unsecured creditors unless an "abandoned property" law designates another Person.

13.      <u>Amendment, Supplement, Waiver, Etc</u>.  The Issuer, the Guarantors and the Trustee (or the Collateral Agent, if a party thereto) may, without the consent of the Holders of any outstanding Notes, amend, waive or supplement the Indenture, the Notes or the Security Documents for certain specified purposes set forth in the Indenture, including, among other things, curing ambiguities, defects or inconsistencies, complying with the requirements of the Commission in order to maintain or effect the qualification of the Indenture under the Trust Indenture Act of 1939, as amended, and making any change that does not adversely affect the legal rights under the Indenture of any Holder.  Other amendments and modifications of the Indenture, the Notes or the Security Documents may be made by the Issuer, and the

A-5

JX 132-86

Trustee or the Collateral Agent, if a party thereto) with the consent of the Holders of not less than a majority of the aggregate principal amount of the outstanding Notes, subject to certain exceptions set forth in the Indenture requiring the consent of the Holders of the particular Notes to be affected.

14.    <u>Successor Corporation</u>.  When a successor Person assumes all the obligations of its predecessor under the Notes and the Indenture and the transaction complies with the terms of Article Five of the Indenture, the predecessor corporation will, except as provided in Article Five, be released from those obligations.

15.    <u>Defaults and Remedies</u>.  Events of Default are set forth in the Indenture.  Subject to certain limitations in the Indenture, if an Event of Default (other than an Event of Default specified in clause (4) or (5) of Section 6.01 of the Indenture) occurs and is continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the outstanding Notes may, by written notice to the Trustee and the Issuer, declare all principal of and accrued interest on all Notes to be immediately due and payable and such amounts shall become immediately due and payable.  If an Event of Default specified in clause (4) or (5) of Section 6.01 of the Indenture occurs, the principal amount of and interest on, all Notes shall <u>ipso facto</u> become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  The Trustee may require security or indemnity satisfactory to it before it enforces the Indenture or the Notes.  Subject to certain limitations, Holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders notice of any continuing default (except a default in payment of principal, premium, if any, or interest on the Notes when and as the same shall become due and payable) if the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Notes.

16.    <u>Trustee Dealings with Issuer</u>.  The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuer or its Affiliates, and may otherwise deal with the Issuer or its Affiliates, as if it were not Trustee.

17.    <u>Discharge</u>.  The Issuer's and the Guarantors' obligations pursuant to the Indenture will be discharged, except for obligations pursuant to certain sections thereof, subject to the terms of the Indenture, upon the payment of all the Notes or upon the irrevocable deposit with the Trustee of United States Dollars or Government Securities sufficient to pay when due principal of and interest on the Notes to maturity or redemption, as the case may be.

18.    <u>Guarantees</u>.  The Notes will be entitled to the benefits of certain Guarantees made for the benefit of the Holders.  Reference is hereby made to the Indenture for a statement of the respective rights, limitations of rights, duties and obligations thereunder of the Guarantors, the Trustee and the Holders.

19.    <u>Security Documents and Intercreditor Agreement</u>.  The obligations of the Issuer and the Guarantors under the Indenture, the Notes and the Guarantees are secured by a Lien on the Collateral pursuant to the Security Documents.  The provisions of the Indenture, the Notes and the Security Documents are subject to the Intercreditor Agreement.

20.    <u>Authentication</u>.  This Note shall not be valid until the Trustee signs the certificate of authentication on the other side of this Note.

21.    <u>Governing Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of

JX 132-87

law to the extent that the application of the law of another jurisdiction would be required thereby.  Each of the Trustee, the Issuer, the Guarantors and the Holders hereby irrevocably submits to the exclusive jurisdiction of any New York State court sitting in the Borough of Manhattan in the City of New York or any federal court sitting in the Borough of Manhattan in the City of New York in respect of any suit, action or proceeding arising out of or relating to the Indenture and this Note, and irrevocably accepts for itself and in respect of its property, generally and unconditionally, exclusive jurisdiction of the aforesaid courts.

22.   _Abbreviations_.  Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TENANT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois  60179
Facsimile: (847) 286-2055
Attention: Treasurer

A-7

JX 132-88

ASSIGNMENT

I or we assign and transfer this Note to:

_____
(Insert assignee's social security or tax I.D. number)

_____

_____

_____
(Print or type name, address and zip code of assignee)

and irrevocably appoint: _____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

Date: _____     Your Signature: _____
(Sign exactly as your name appears on
the other side of this Note)

Signature Guarantee:_____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-8

**JX 132-89**

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial principal amount of this Global Note is $_____.  The following increases or decreases in this Global Note have been made:

| Date | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Depository Custodian |
|---|---|---|---|---|

A-9

JX 132-90

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.07 or Section 4.08 of the Indenture, check the appropriate box:

Section 4.07 [      ]          Section 4.08 [      ]

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.07 or Section 4.08 of the Indenture, state the amount:  $_____

Date: _____

Your Signature:  _____
(Sign exactly as your name appears on the other side of this Note)

_____
Signature Guaranteed

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-10

**JX 132-91**

<u>EXHIBIT B</u>

[FORM OF LEGEND FOR 144A NOTES AND OTHER NOTES
THAT ARE RESTRICTED NOTES]

THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY IS-SUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN AP-PLICABLE EXEMPTION THEREFROM.  EACH PURCHASER OF THE SECURITY EVI-DENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.  THE HOLDER OF THE SECURITY EVI-DENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECU-RITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(a) IN-SIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BE-LIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE AC-COUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE RE-QUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURI-TIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SE-CURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIRE-MENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL AC-CEPTABLE TO THE ISSUER IF THE ISSUER SO REQUESTS), (2) TO THE ISSUER OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PUR-CHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE.  NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.

**JX 132-92**

[FORM OF ASSIGNMENT FOR 144A NOTES AND OTHER NOTES
THAT ARE RESTRICTED NOTES]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint: _____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

[Check One]

☐   (a)   this Note is being transferred in compliance with the exemption from registration under the Securities Act provided by Rule 144A thereunder.

or

☐   (b)   this Note is being transferred other than in accordance with (a) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date: _____     Your Signature: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee:_____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

B-2

JX 132-93

TO BE COMPLETED BY PURCHASER IF (a) ABOVE IS CHECKED

 The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____     _____

               NOTICE:  To be executed by an executive officer

B-3

JX 132-94

EXHIBIT C

[FORM OF LEGEND FOR REGULATION S NOTE]

THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGI-NALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMP-TION THEREFROM.  EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THERE-UNDER.  THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1)(a) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (b) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (c) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF APPLICABLE) OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER IF THE ISSUER SO REQUESTS), (2) TO THE ISSUER OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PUR-CHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN CLAUSE (A) ABOVE.  NO REPRESENTATION CAN BE MADE AS TO THE AVAIL-ABILITY OF THE EXEMPTION PROVIDED BY RULE 144 FOR RESALE OF THE SECURITY EVIDENCED HEREBY.

JX 132-95

[FORM OF ASSIGNMENT FOR REGULATION S NOTE]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint:  _____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.

[Check One]

☐    (a)    this Note is being transferred in compliance with the exemption from registration under the Securities Act provided by Rule 144A thereunder.

or

☐    (b)    this Note is being transferred other than in accordance with (a) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date:  _____    Your Signature:  _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee:_____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

C-2

JX 132-96

TO BE COMPLETED BY PURCHASER IF (a) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Date: _____          _____

NOTICE:  To be executed by an executive officer

C-3

JX 132-97

<u>EXHIBIT D</u>

[FORM OF LEGEND FOR GLOBAL NOTE]

   Any Global Note authenticated and delivered hereunder shall bear a legend (which would be in addition to any other legends required in the case of a Restricted Note) in substantially the following form:

     **THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDEN- TURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSI- TARY OR A NOMINEE OF A DEPOSITARY.  THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDEN- TURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.**

     Unless this Certificate is presented by an authorized representative of The Depository Trust Company (a New York corporation) ("DTC") to the Issuer or its agent for registration of transfer, exchange, or payment, and any Certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as is requested by an authorized representative of DTC), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

**JX 132-98**

<u>EXHIBIT E</u>

Form of Certificate To Be
Delivered in Connection with
<u>Transfers to Non-QIB Accredited Investors</u>

Wells Fargo Bank, National Association
Attn: DAPS Reorg
MAC N9303-121
608 2nd Ave South
Minneapolis, MN  55479

Ladies and Gentlemen:

In connection with our proposed purchase of  6⅝% Senior Secured Notes due 2018 (the "<u>Notes</u>") of Sears Holdings Corporation, a Delaware corporation (the "<u>Issuer</u>"), we confirm that:

1.      We understand that any subsequent transfer of the Notes is subject to certain restrictions and conditions set forth in the Indenture dated as of October 12, 2010 relating to the Notes and we agree to be bound by, and not to resell, pledge or otherwise transfer the Notes except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

2.      We understand that the Notes have not been registered under the Securities Act or any other applicable securities laws, have not been and will not be qualified for sale under the securities laws of any non-U.S. jurisdiction and that the Notes may not be offered, sold, pledged or otherwise transferred except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell any Notes, we will do so only (i) to the Issuer or any subsidiary thereof, (ii) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined in Rule 144A), (iii) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you a signed letter containing certain representations and agreements relating to the restrictions on transfer of the Notes, (iv) outside the United States to persons other than U.S. persons in offshore transactions meeting the requirements of Rule 904 of Regulation S under the Securities Act, (v) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if applicable) or (vi) pursuant to an effective registration statement, and we further agree to provide to any person purchasing any of the Notes from us a notice advising such purchaser that resales of the Notes are restricted as stated herein.

3.      We understand that, on any proposed resale of any Notes, we will be required to furnish to you and the Issuer such certifications, legal opinions and other information as you and the Issuer may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the

**JX 132-99**

Notes, and we and any accounts for which we are acting each are able to bear the economic risk of our or their investment, as the case may be.

5.      We are acquiring the Notes purchased by us for our account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

6.      We are not acquiring the Notes with a view toward the distribution thereof in a transaction that would violate the Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction.

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[Name of Purchaser]

By: _____
    Name:
    Title:

Dated: _____

E-2

**JX 132-100**

EXHIBIT F

Form of Certificate To Be Delivered
in Connection with Transfers
Pursuant to Regulation S

Wells Fargo Bank, National Association
Attn: DAPS Reorg
MAC N9303-121
608 2nd Ave South
Minneapolis, MN  55479

Re:    Sears Holdings Corporation (the "Issuer")
       6⅝% Senior Secured Notes due 2018 (the "Notes")

Dear Sirs:

In connection with our proposed sale of $ _____ aggregate principal amount of the Notes, we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act") and, accordingly, we represent that:

(1)    the offer of the Notes was not made to a U.S. person or to a person in the United States;

(2)    either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

(3)    no directed selling efforts have been made in the United States in contravention of the requirements of Rule 904(a) of Regulation S;

(4)    the transaction is not part of a plan or scheme to evade the registration require-ments of the Securities Act; and

(5)    we have advised the transferee of the transfer restrictions applicable to the Notes.

You are entitled to rely upon this letter and are irrevocably authorized to produce this let-ter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Purchaser]

By:  _____

F-1

**JX 132-101**

<u>EXHIBIT G</u>

## NOTATION OF GUARANTEE

For value received, each of the undersigned (the "<u>Guarantors</u>") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association, as Trustee (as amended, restated or supplemented from time to time, the "<u>Indenture</u>"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the Guarantors to the Holders and to the Trustee pursuant to the Guarantees and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

*[Signature Pages Follow]*

G-1

**JX 132-102**

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of Guarantee to be signed by a duly authorized officer.

[GUARANTORS]

By: _____

    Name:

    Title:

JX 132-103

# EXHIBIT B

JX 132-104

## FIRST SUPPLEMENTAL INDENTURE

This FIRST SUPPLEMENTAL INDENTURE, dated as of April 5, 2011 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), the New Guarantor (as defined below), and Wells Fargo Bank, National Association, as Trustee and Collateral Agent (the "Trustee").

### W I T N E S S E T H

WHEREAS the Company and the existing Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS Private Brands, Ltd. ("New Guarantor") is a company organized and incorporated under the laws of Delaware, and is a Specified Subsidiary;

WHEREAS Private Brands, Ltd., a West Virginia corporation and an existing guarantor of the Notes under the Indenture, shall merge with the New Guarantor (the "Merger") with the New Guarantor surviving the Merger;

WHEREAS Section 4.06 of the Indenture requires the New Guarantor to execute a supplemental indenture to unconditionally guarantee all of the Company's obligations under the Notes and the Indenture;

WHEREAS Section 8.01 of the Indenture provides that without the consent of any Holder of Notes, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents to add additional Guarantees of the Notes or additional assets as Collateral; and

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company and of each Guarantor, the Company and the Guarantors have requested the Trustee join with them in the execution and delivery of this Supplemental Indenture, and in accordance with Section 4.06, Section 8.06 and Section 12.04 of the Indenture have delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    _Defined Terms_.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.    <u>Agreement to Guarantee</u>.  The New Guarantor hereby agrees, jointly and severally with all existing Guarantors, to unconditionally guarantee the Company's obligations under the Notes on the terms and subject to the conditions set forth in Article Ten of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture.  The New Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit A hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such notation of Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of the New Guarantor.

3.    <u>Notices</u>.  All notices or other communications to the New Guarantor shall be given as provided in Section 12.02 of the Indenture.

4.    <u>Ratification of Indenture; Supplemental Indenture Part of Indenture</u>. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

6.    <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or the Guarantee of the New Guarantor.  The recitals contained herein shall be taken as the statements of the Company, the Guarantors and the New Guarantor, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

7.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

8.    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
    Name:  William K. Phelan
    Title:  Senior Vice President, Controller
           and Chief Accounting Officer


KMART CORPORATION
KMART HOLDING CORPORATION
KMART MANAGEMENT CORPORATION
SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS, ROEBUCK AND CO.,
as Guarantors

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KLC, INC.
LANDS' END DIRECT MERCHANTS, INC.
LANDS' END, INC.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT
PRODUCTS, INC.
SEARS PROTECTION COMPANY
SEARS ROEBUCK ACCEPTANCE CORP.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC,
as Guarantors

By: _____
    Name: William K. Phelan
    Title: Vice President


*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

KMART.COM LLC, as Guarantor

By: Bluelight.com, Inc., its Member

By: _____
    Name: William K. Phelan
    Title: Vice President


KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC, as Guarantors

By: Kmart Corporation, its Member

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


SEARS PROTECTION COMPANY
(FLORIDA), L.L.C., as Guarantor

By: Sears Protection Company, its Member

By: _____
    Name: William K. Phelan
    Title: Vice President


A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
SEARS AUTHORIZED HOMETOWN
STORES, LLC
SEARS HOME APPLIANCE SHOWROOMS,
LLC, as Guarantors

By: Sears, Roebuck and Co., its Member

By: _____
    Name: William K. Phelan
    Title: Senior Vice President and Controller


*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

KMART OF MICHIGAN, INC.
SEARS OUTLET STORES, L.L.C.,
as Guarantors

By: _____
    Name: Dorian R. Williams
    Title: Authorized Person


PRIVATE BRANDS, LTD.
As New Guarantor

By: _____
    Name: Alfred E. Jasser
    Title: Treasurer


WELLS FARGO BANK, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent


By: _____
    Name: Gregory Clarke
    Title: Vice President


*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

**JX 132-109**

KMART OF MICHIGAN, INC.
SEARS OUTLET STORES, L.L.C.,
as Guarantors

By: _____
    Name: Dorian R. Williams
    Title: Authorized Person

PRIVATE BRANDS, LTD.
As New Guarantor

By: _____
    Name:
    Title:

WELLS FARGO BANK, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By: _____
    Name: Gregory Clarke
    Title: Vice President

*[Signature Page to Private Brands (Delaware) Supplemental Indenture]*

JX 132-110

EXHIBIT A

## NOTATION OF GUARANTEE

For value received, Private Brands, Ltd. (the "Guarantor") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association, as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the Guarantor to the Holders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[Signature Pages Follow]

JX 132-111

IN WITNESS WHEREOF, the Guarantor has caused this notation of Guarantee to be signed by a duly authorized officer.

PRIVATE BRANDS, LTD.
As Guarantor

By:

Name:  Alfred H. Nasser
Title:  Treasurer

EXHIBIT C

JX 132-113

### SECOND SUPPLEMENTAL INDENTURE

This SECOND SUPPLEMENTAL INDENTURE, dated as of July 7, 2015 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), the New Guarantors (as defined below), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

### W I T N E S S E T H

WHEREAS the Company and the existing Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS each of Kmart Operations LLC and Sears Operations LLC (each a "New Guarantor") is a limited liability company organized under the laws of Delaware, and is a Specified Subsidiary;

WHEREAS Section 4.06 of the Indenture requires each New Guarantor to execute a supplemental indenture to unconditionally guarantee all of the Company's obligations under the Notes and the Indenture;

WHEREAS Section 8.01 of the Indenture provides that without the consent of any Holder of Notes, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents to add additional Guarantees of the Notes or additional assets as Collateral; and

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company and of each Guarantor, the Company and the Guarantors have requested the Trustee join with them in the execution and delivery of this Supplemental Indenture, and in accordance with Section 4.06, Section 8.06 and Section 12.04 of the Indenture have delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, each New Guarantor, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    Defined Terms. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.    Agreement to Guarantee. Each New Guarantor hereby agrees, jointly and severally with all existing Guarantors, to unconditionally guarantee the Company's obligations under the Notes on the terms and subject to the conditions set forth in Article Ten of the

**JX 132-114**

Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture. Each New Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit A hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such notation of Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of the New Guarantor.

3.    Notices.  All notices or other communications to each New Guarantor shall be given as provided in Section 12.02 of the Indenture.

4.    Ratification of Indenture; Supplemental Indenture Part of Indenture. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    Governing Law.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

6.    Trustee Makes No Representation.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or the Guarantee of the New Guarantor.  The recitals contained herein shall be taken as the statements of the Company, the Guarantors and each New Guarantor, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

7.    Counterparts.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

8.    Effect of Headings.  The Section headings herein are for convenience only and shall not effect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

JX 132-115

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____

Name:  Robert A. Schriesheim
Title:   Executive Vice President and Chief Financial Officer

**NEW GUARANTORS:**

KMART OPERATIONS LLC
SEARS OPERATIONS LLC

By: _____

Name: Lawrence J. Meerschaert
Title:  Vice President, Tax, Assistant Treasurer and Secretary

**GUARANTORS:**

A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KLC, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS, INC.
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA), L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____

Name: Lawrence J. Meerschaert
Title:   Vice President

*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

KMART.COM LLC

By:    Bluelight.com, Inc., its Member

By:    _____
       Name:  Lawrence J. Meerschaert
       Title:  Vice President


KMART CORPORATION

By:    _____
       Name:  Robert A. Riecker
       Title:  Vice President, Controller and Chief
               Accounting Officer


KMART HOLDING CORPORATION
KMART OF MICHIGAN, INC.
SEARS, ROEBUCK AND CO.

By:    _____
       Name:  Lawrence J. Meerschaert
       Title:  Vice President, Assistant Treasurer
               and Secretary


SEARS HOLDINGS MANAGEMENT
CORPORATION

By:    _____
       Name:  Lawrence J. Meerschaert
       Title:  Vice President, Tax and Assistant
               Treasurer


*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

**JX 132-117**

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By:     Kmart Corporation, its Member

By: _____
     Name: Robert A. Riecker
     Title:  Vice President, Controller and Chief
            Accounting Officer

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
     Name: Karen M. Smathers
     Title:   President

*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

JX 132-118

WILMINGTON TRUST, NATIONAL ASSOCIATION
As Trustee and Collateral Agent

By:

Name:    Lynn M. Steiner
Title:    Vice President

*[Signature Page to Kmart Operations LLC and Sears Operations LLC Supplemental Indenture]*

EXHIBIT A

NOTATION OF GUARANTEE

For value received, Sears Operations LLC and Kmart Operations LLC (the "New Guarantors") have jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association (subsequently replaced by Wilmington Trust, National Association), as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the New Guarantors to the Holders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantees. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[Signature Pages Follow]

JX 132-120

IN WITNESS WHEREOF, the New Guarantors have caused this notation of Guarantee to be signed by a duly authorized officer.

KMART OPERATIONS LLC

By: _____
    Name: Lawrence J. Meerschaert
    Title:  Vice President, Tax, Assistant
           Treasurer and Secretary

SEARS OPERATIONS LLC

By: _____
    Name: Lawrence J. Meerschaert
    Title:  Vice President, Tax, Assistant
           Treasurer and Secretary

[Notation of Guarantee Signature Page]

# EXHIBIT D

JX 132-122

### THIRD SUPPLEMENTAL INDENTURE

This THIRD SUPPLEMENTAL INDENTURE, dated as of September 19, 2016 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), the New Guarantor (as defined below), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

### W I T N E S S E T H

WHEREAS the Company and the existing Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS A&E Factory Service, LLC (the "New Guarantor") is a limited liability company organized under the laws of Delaware, and is a Subsidiary;

WHEREAS Section 8.01 of the Indenture provides that without the consent of any Holder of Notes, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents to add additional Guarantees of the Notes or additional assets as Collateral; and

WHEREAS the Company has requested the Trustee join with it in the execution and delivery of this Supplemental Indenture, and in accordance with Section 8.06 and Section 12.04 of the Indenture have delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.    Defined Terms.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.    Agreement to Guarantee.  The New Guarantor hereby agrees, jointly and severally with all existing Guarantors, to unconditionally guarantee the Company's obligations under the Notes on the terms and subject to the conditions set forth in Article Ten of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a Guarantor under the Indenture.  The New Guarantor hereby agrees that a notation of such Guarantee, substantially in the form included in Exhibit A hereto, shall be endorsed on each Note authenticated and delivered by the Trustee and such notation of Guarantee shall be executed by either manual or facsimile signature of an Officer or an Officer of a general partner or member, as the case may be, of the New Guarantor.

**JX 132-123**

3.      _Notices_.  All notices or other communications to the New Guarantor shall be given as provided in Section 12.02 of the Indenture.

4.      _Ratification of Indenture; Supplemental Indenture Part of Indenture_. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.      _Governing Law_.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

6.      _Trustee Makes No Representation_.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or the Guarantee of the New Guarantor.  The recitals contained herein shall be taken as the statements of the Company, the Guarantors and the New Guarantor, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

7.      _Counterparts_.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

8.      _Effect of Headings_.  The Section headings herein are for convenience only and shall not effect the construction thereof.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

JX 132-124

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By:

Name: Robert A. Schriesheim

Title:   Executive Vice President and Chief Financial Officer

**NEW GUARANTOR:**

A&E FACTORY SERVICE, LLC

By:

Name: Robert A. Riecker

Title:   Vice President

*[Signature Page to Third Supplemental Indenture]*

JX 132-125

WILMINGTON TRUST, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By:

Name:    Lynn M. Steiner
Title:    Vice President

*[Signature Page to Third Supplemental Indenture]*

JX 132-126

EXHIBIT A

## NOTATION OF GUARANTEE

For value received, A&E Factory Service, LLC (the "New Guarantor") has jointly and severally unconditionally guaranteed, to the extent set forth in the Indenture dated as of October 12, 2010 by and among Sears Holdings Corporation, the Guarantors party thereto and Wells Fargo Bank, National Association (subsequently replaced by Wilmington Trust, National Association), as Trustee (as amended, restated or supplemented from time to time, the "Indenture"), and subject to the provisions of the Indenture, (a) the due and punctual payment of the principal of, and premium, if any, and interest on the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration, required purchase or otherwise, the due and punctual payment of interest on overdue principal of, and premium and, to the extent permitted by law, interest, and the due and punctual performance of all other obligations of the Issuer to the Holders or the Trustee, all in accordance with the terms set forth in Article Ten of the Indenture, and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, required purchase or otherwise, all in accordance with the terms set forth in Article Ten of the Indenture.

The obligations of the New Guarantor to the Holders and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article Ten of the Indenture, and reference is hereby made to the Indenture for the precise terms and limitations of the Guarantee. Each Holder of the Note to which this notation of Guarantee is endorsed, by accepting such Note, agrees to and shall be bound by such provisions.

[Signature Pages Follow]

JX 132-127

IN WITNESS WHEREOF, the New Guarantor has caused this notation of Guarantee to be signed by a duly authorized officer.

A&E FACTORY SERVICE, LLC

By: _____

Name: Robert A. Riecker
Title:   Vice President

*[Notation of Guarantee Signature Page]*

JX 132-128

# EXHIBIT E

## FOURTH SUPPLEMENTAL INDENTURE

This FOURTH SUPPLEMENTAL INDENTURE, dated as of January 9, 2018 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

### W I T N E S S E T H

WHEREAS the Company and the Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS Section 8.02(a) of the Indenture provides that with the consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes, other than notes held by the Company or affiliates of the Company (the "Requisite Consents"), the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents, subject to certain exceptions;

WHEREAS the Requisite Consents for the adoption of the amendments to the Indenture set forth herein have been obtained, and this Supplemental Indenture complies with the requirements of Article 8 of the Indenture;

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company, and the Company has requested the Trustee join with it in the execution and delivery of this Supplemental Indenture;

WHEREAS in accordance with Section 8.06 and Section 12.04 of the Indenture, the Company has delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution and delivery have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1.   Defined Terms.  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2.   Definition of Borrowing Base.  Clause (2) of the definition of "Borrowing Base" as set forth in the Indenture is hereby amended and restated in its entirety as follows:

"(2) 75% of the book value (calculated in accordance with GAAP) of the inventory of the Issuer and the Guarantors, on a consolidated basis, on such date."

3.    Definition of "Collateral Coverage Event" as set forth in the Indenture is hereby amended and restated in its entirety as follows:

"'Collateral Coverage Event' shall be deemed to have occurred if, prior to a Fall-Away Event, as of the last day of any two consecutive fiscal quarters of the Issuer each ending on or after August 4, 2018 (which is the last day of the second fiscal quarter of the fiscal year of the Issuer ending on February 2, 2019), the Borrowing Base as of each such day is less than the principal amount of the Issuer's consolidated indebtedness for borrowed money outstanding on such day that is secured by Liens on the Collateral."

4.    <u>Effectiveness</u>.  This Supplemental Indenture and the amendments to the Indenture set forth herein shall become effective upon execution by all parties hereto.

5.    <u>Ratification of Indenture; Supplemental Indenture Part of Indenture</u>. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

6.    <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

7.    <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.  The recitals contained herein shall be taken as the statements of the Company and the Guarantors, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

8.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the

JX 132-131

original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

9.    Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

JX 132-132

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
Name:  Robert A. Riecker
Title:   Vice President, Finance

KMART CORPORATION

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer

*[Signature Page to Fourth Supplemental Indenture]*

**JX 132-133**

A&E FACTORY SERVICE, LLC

By: _____
Name:   Robert A. Riecker
Title:   Vice President


A&E HOME DELIVERY, LLC

By: _____
Name:   Robert A. Riecker
Title:   Vice President


A&E LAWN & GARDEN, LLC

By: _____
Name:   Robert A. Riecker
Title:   Vice President


A&E SIGNATURE SERVICE, LLC

By: _____
Name:   Robert A. Riecker
Title:   Vice President


CALIFORNIA BUILDER APPLIANCES, INC.

By: _____
Name:   Robert A. Riecker
Title:   Vice President


FLORIDA BUILDER APPLIANCES, INC.

By: _____
Name:   Robert A. Riecker
Title:   Vice President


*[Signature Page to Fourth Supplemental Indenture]*

**JX 132-134**

KLC, INC.

By: _____
Name:  Robert A. Riecker
Title:   Vice President


KMART HOLDING CORPORATION

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer


KMART OF MICHIGAN, INC.

By: _____
Name:  Robert A. Riecker
Title:   Vice President


KMART OF WASHINGTON LLC
By: Kmart Corporation, as Sole Member

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer


KMART OPERATIONS LLC

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer


*[Signature Page to Fourth Supplemental Indenture]*

**JX 132-135**

KMART STORES OF ILLINOIS LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:  Chief Financial Officer


KMART STORES OF TEXAS LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:  Chief Financial Officer


KMART.COM LLC
By: BlueLight.com, as Sole Member

By: _____
Name: Robert A. Riecker
Title:  Vice President


MYGOFER LLC
By: Kmart Corporation, as Sole Member

By: _____
Name: Robert A. Riecker
Title:  Chief Financial Officer


PRIVATE BRANDS, LTD.

By: _____
Name: Robert A. Riecker
Title:  Vice President


*[Signature Page to Fourth Supplemental Indenture]*

JX 132-136

SEARS BRANDS MANAGEMENT
CORPORATION

By:
Name:  Robert A. Riecker
Title:  Vice President

SEARS HOLDINGS MANAGEMENT
CORPORATION

By:
Name:  Robert A. Riecker
Title:  President

SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By:
Name:  Robert A. Riecker
Title:  President

SEARS OPERATIONS LLC

By:
Name:  Robert A. Riecker
Title:  Chief Financial Officer

SEARS PROTECTION COMPANY

By:
Name:  Robert A. Riecker
Title:  Vice President

*[Signature Page to Fourth Supplemental Indenture]*

**JX 132-137**

SEARS PROTECTION COMPANY (FLORIDA), L.L.C.

By: _____
Name:  Robert A. Riecker
Title:   Vice President


SEARS, ROEBUCK AND CO.

By: _____
Name:  Robert A. Riecker
Title:   Chief Financial Officer


SEARS, ROEBUCK DE PUERTO RICO, INC.

By: _____
Name:  Robert A. Riecker
Title:   Vice President


SOE, INC.

By: _____
Name:  Robert A. Riecker
Title:   Vice President


STARWEST, LLC

By: _____
Name:  Robert A. Riecker
Title:   Vice President


*[Signature Page to Fourth Supplemental Indenture]*

**JX 132-138**

WILMINGTON TRUST, NATIONAL
ASSOCIATION
As Trustee and Collateral Agent

By: _____
Name: Lynn M. Steiner
Title: Vice President

*[Signature Page to Fourth Supplemental Indenture]*

JX 132-139

# EXHIBIT F

JX 132-140

EXECUTION VERSION

## FIFTH SUPPLEMENTAL INDENTURE

This FIFTH SUPPLEMENTAL INDENTURE, dated as of March 20, 2018 (this "Supplemental Indenture"), is entered into by and among Sears Holdings Corporation (the "Company"), the Guarantors (as defined in the Indenture), and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (the "Trustee").

W I T N E S S E T H

WHEREAS the Company and the Guarantors have heretofore executed and delivered to the Trustee an Indenture, dated as of October 12, 2010 (as amended, supplemented or otherwise modified in accordance with its terms, the "Indenture"), providing for the issuance of 6-5/8% Senior Secured Notes due 2018, in aggregate principal amount of $1,250,000,000 (the "Notes");

WHEREAS Section 8.02(a) of the Indenture provides that with the consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes, other than notes held by the Company or affiliates of the Company (the "Requisite Consents"), the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Security Documents, subject to certain exceptions;

WHEREAS, the Company has solicited consents (the "Consent Solicitation") from eligible Holders of the Notes to certain proposed amendments to the Indenture as set forth herein (the "Proposed Amendments") pursuant to the terms of the Company's Confidential Offering Memorandum and Consent Solicitation Statement dated February 15, 2018 (the "Offering Memorandum");

WHEREAS, the Company has offered pursuant to the Offering Memorandum to exchange the Notes for new 6-5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (the "Exchange Offer");

WHEREAS, pursuant to the Consent Solicitation, the Requisite Consents for the adoption of the Proposed Amendments have been obtained, and this Supplemental Indenture complies with the requirements of Article 8 of the Indenture;

WHEREAS the execution and delivery of this Supplemental Indenture has been authorized by the Board of Directors of the Company, and the Company has requested the Trustee join with it in the execution and delivery of this Supplemental Indenture;

WHEREAS in accordance with Section 8.06 and Section 12.04 of the Indenture, the Company has delivered an Officer's Certificate and an Opinion of Counsel to the Trustee stating that the Supplemental Indenture is authorized or permitted by the Indenture and that all conditions precedent to its execution and delivery have been complied with.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Company, the Guarantors and the Trustee mutually covenant and agree for the benefit of each other and the equal and ratable benefit of the Holders of the Notes as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Indenture.

2. The Indenture is hereby amended by deleting the following sections of the Indenture in their entirety:

- Section 4.02 Reports to Holders

- Section 4.04 Limitation on Liens

- Section 4.05 Limitation on Sale and Leaseback Transactions

- Section 4.06 Additional Guarantees

- Section 4.07 Change of Control Offer

- Section 4.08 Collateral Coverage Offer

- Section 5.01 Limitations on Mergers and Sales of Assets (only with respect to clauses (b) and (c))

- Section 6.01 Events of Default (only with respect to clause (6))

- Section 11.01(b) (solely to the extent that it requires the liens securing the Notes to be subject only to Permitted Liens)

Any and all references to any sections of the Indenture or Global Notes which are deleted by any section of this Supplemental Indenture, and any and all obligations related solely to such deleted sections throughout the Indenture or Global Notes, are of no further force or effect. Any and all terms defined in the Indenture or Global Notes which are (i) used in any sections of the Indenture or Global Notes deleted by any Section of this Supplemental Indenture and (ii) not otherwise used in any other section of the Indenture or Global Notes not affected by this Supplemental Indenture, are hereby deleted.

3. The following defined terms contained in the Indenture are hereby amended and restated in their entirety as follows:

"*Additional First Lien Obligations*" means any indebtedness of the Issuer or any Restricted Subsidiary, other than the Credit Agreement Obligations, that is secured by a Lien on the Collateral ranking contractually prior to the Notes Liens; *provided* that the representative of such Additional First Lien Obligations executes a joinder agreement to the Intercreditor Agreement (or another intercreditor agreement on terms not less favorable to the Holders of Notes than the Intercreditor Agreement) agreeing to be bound thereby. At the Issuer's option, any indebtedness secured by a Lien may be "Additional First Lien Obligations".

"*Pari Passu Junior Lien Obligations*" means any indebtedness of the Issuer or any Guarantor that is secured by a Lien on the Collateral equally and ratably with the Notes Liens; *provided* that the representative of such Pari Passu Junior Lien Obligations executes a joinder

2

agreement to the Security Agreement and the Intercreditor Agreement or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Notes Liens or the Liens securing such Pari Passu Junior Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement, after payment of expenses of the Collateral Agent and the collateral agent for each other class of Pari Passu Junior Lien Obligations, be distributed to the Trustee and each other agent for the holders of Pari Passu Junior Lien Obligations on a *pro rata* basis based on the amount of outstanding obligations of each such class. At the Issuer's option, any indebtedness secured by a Lien may be "Pari Passu Junior Lien Obligations".

4.    The Intercreditor Agreement is hereby amended and restated in its entirety, subject to the execution thereof by the other parties thereto, in the form attached hereto as Exhibit A and the Collateral Trustee is authorized and directed by the requisite holders of the Notes and by the Issuer to enter into an amended and restated Intercreditor Agreement in the form attached hereto as Exhibit A.

5.    The Security Agreement is hereby amended and restated in its entirety, subject to the execution thereof by the other parties thereto, in the form attached hereto as Exhibit B and the Trustee and Collateral Trustee is authorized and directed by the requisite holders of the Notes and by the Issuer to enter into an amended and restated Security Agreement in the form attached hereto as Exhibit B.

6.    Effectiveness.  This Supplemental Indenture shall become effective upon execution by all parties hereto, however the amendments to the Indenture and the Security Documents set forth in Sections 2 through 5 above shall not become operative until the Exchange Offer is consummated and shall become effective and operative immediately and automatically, without further notice or other action by any party, upon consummation of the Exchange Offer.

7.    Ratification of Indenture; Supplemental Indenture Part of Indenture. Except as expressly amended or supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

8.    Governing Law.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

9.    Trustee Makes No Representation.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.  The recitals contained herein shall be taken as the statements of the Company and the Guarantors, and the Trustee assumes no responsibility for their correctness.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct or affecting the liability or affording protection to the Trustee, whether or not elsewhere herein so provided.

3

**JX 132-143**

10.    Counterparts.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

11.    Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

JX 132-144

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, as of the day and year first written above.

SEARS HOLDINGS CORPORATION

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART CORPORATION
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

SEARS HOLDINGS MANAGEMENT
CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS,
INC.

By: _____
    Name:  Robert A. Riecker
    Title:  President

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President, Finance

*[Signature Page to Fifth Supplemental Indenture]*

**JX 132-145**

A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
KLC, INC.
KMART OF MICHIGAN, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____
        Name:  Robert A. Riecker
        Title:  Vice President

KMART.COM LLC

By: BlueLight.com, Inc., its Member

By: _____
        Name:  Robert A. Riecker
        Title:  Vice President

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By: Kmart Corporation, its Member

By: _____
        Name:  Robert A. Riecker
        Title:  Chief Financial Officer

*[Signature Page to Fifth Supplemental Indenture]*

**JX 132-146**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee and Collateral Agent

By:

Name:   Lynn M. Steiner
Title:   Vice President

*[Signature Page to Fifth Supplemental Indenture]*

**JX 132-147**

# EXHIBIT G

JX 132-148

Execution Version

**THIS INSTRUMENT OF RESIGNATION, APPOINTMENT, AND ACCEPTANCE** (this "Instrument"), dated as of June 25, 2014 ("Effective Date"), is by and among Sears Holdings Corporation, a corporation duly organized and existing under the laws of the State of Delaware (the "Company"), Wilmington Trust, National Association, a national banking association duly organized and existing under the laws of the United States of America (the "Successor Trustee"), and Wells Fargo Bank, National Association, a national banking association duly organized and existing under the laws of the United States of America (the "Resigning Trustee"). Capitalized terms not otherwise defined herein shall have the same meaning ascribed to such terms in the Indenture (as defined below).

## RECITALS

WHEREAS, pursuant to an Indenture dated as of October 12, 2010 (as supplemented, the "Indenture") between the Company, the Guarantors party thereto and the Resigning Trustee, the Company issued the aggregate of $1,250,000,000 of its 6.625% Senior Secured Notes due 2018 (the "Old Notes");

WHEREAS, pursuant to the Indenture, on September 6, 2011, the Company exchanged $987,430,000 in aggregate principal amount of the Old Notes for an equal principal amount of notes (together with the Old Notes, the "Notes"), the terms of which are identical in all material respects to the terms of the Old Notes, except that such notes issued in the exchange were registered under the Securities Act of 1933, as amended, are generally not subject to transfer restrictions, are not entitled to registration rights and do not have the right to earn additional interest under circumstances relating to the Company's registration obligations;

WHEREAS, the Company appointed the Resigning Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents;

WHEREAS, there is currently issued and outstanding $1,240,000,000 in aggregate principal amount of the Notes;

WHEREAS, in connection with the issuance of the Notes, the Resigning Trustee, the Company and certain of its Subsidiaries, entered into that certain Security Agreement, dated as of October 12, 2010 (the "Security Agreement");

WHEREAS, in connection with the issuance of the Notes, the Resigning Trustee and the ABL Agents party thereto entered into that certain Intercreditor Agreement, dated as of October 12, 2010 (the "Intercreditor Agreement");

WHEREAS, Section 7.04 of the Indenture provides that the Trustee may at any time resign by giving written notice of such resignation to the Company and to the

**JX 132-149**

Holders and Section 7.07 of the Indenture provides that the Company shall promptly appoint a successor Trustee;

WHEREAS, Section 7.07 of the Indenture provides that any successor Trustee appointed in accordance with the Indenture shall execute, acknowledge and deliver to the Company and to its predecessor Trustee an instrument accepting such appointment under the Indenture, and thereupon the resignation of the predecessor Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, duties and obligations of the predecessor Trustee;

WHEREAS, Section 7.01(o) of the Indenture provides that all of the rights of the Trustee are exercisable by the Trustee in its other capacities under the Indenture, including without limitation, as Registrar, Paying Agent, Depository Custodian and Collateral Agent;

WHEREAS, the Resigning Trustee has given written notice dated May 7, 2014 to the Company and to the Holders of Securities that it is resigning under the Indenture;

WHEREAS, the Resigning Trustee desires to resign as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes, and the Company desires to appoint the Successor Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes to succeed the Resigning Trustee under the Indenture and the Security Documents; and

WHEREAS, the Successor Trustee is willing to and does hereby accept the appointment as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian, and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents.

NOW, THEREFORE, in consideration of the covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   _**Acceptance of Resignation of Resigning Trustee; Appointment of Successor Trustee.**_  Pursuant to Sections 7.01(o) and 7.07 of the Indenture, the Resigning Trustee hereby resigns as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents.  The Company accepts the resignation of the Resigning Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes and hereby appoints the Successor Trustee as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents.

2.   _**Company Representations, Warranties and Covenants.**_  The Company represents and warrants to the Successor Trustee that:

2

JX 132-150

a.    It is duly organized and validly existing;

b.    The execution and delivery of this Instrument have been duly authorized
by the Company;

c.    The Indenture and the First Supplemental Indenture, dated as of April 5,
2011 (the "First Supplemental Indenture") were validly and lawfully
executed and delivered by the Company and are in full force and effect
and the Notes were validly issued by the Company;

d.    The Security Documents, and each amendment or supplement thereto, if
any, including the Assumption Agreement dated April 5, 2011 in
connection with Private Brands, Ltd. becoming an Additional Guarantor
and party to the Security Agreement (the "Assumption Agreement"), were
validly and lawfully executed and delivered by the Company and are in
full force and effect;

e.    Other than the First Supplemental Indenture, the Assumption Agreement,
the Release of Guarantors dated October 11, 2012 in connection with the
release of Sears Home Appliance Showrooms, LLC, Sears Authorized
Hometown Stores, LLC, and Sears Outlet Stores, LLC, and the Instrument
Evidencing Release of Guarantee and Release of Liens on Collateral dated
April 4, 2014 in connection with the release of Lands' End, Inc. and
Lands' End Direct Merchants, Inc., the Indenture and Security Documents
have not been amended or supplemented and no terms thereof have been
waived;

f.    The Company has performed or fulfilled each covenant, agreement and
condition on its part to be performed or fulfilled under the Indenture and
the Security Documents on or prior to the date hereof;

g.    No Default, Event of Default under the Indenture or Security Documents
has occurred or is continuing, and no other event has occurred and is
continuing which is, or after notice or lapse of time would become, an
Event of Default under the Indenture;

h.    No covenant or condition contained in the Indenture or Security
Documents has been waived by the Company or, to the best of the
Company's knowledge, by Holders of the percentage in aggregate
principal amount of the Notes required to effect any such waiver;

i.    There is no action, suit or proceeding pending or, to the best of the
Company's knowledge, threatened against the Company before any court
or any governmental authority arising out of any act or omission of the
Company under the Indenture;

j.    All conditions precedent relating to the appointment of Wilmington Trust,
National Association as successor Trustee, Collateral Agent, Registrar,

3

JX 132-151

Paying Agent and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents have been complied with by the Company;

k.   Other than the Security Agreement and the Intercreditor Agreement, no other Security Documents have been executed and delivered;

l.   No action is required under the Intercreditor Agreement in connection with the succession evidenced by this Agreement;

m.   The Company will provide, as of or promptly after the Effective Date, updated Schedules 1, 2 and 3 to the Security Agreement, reflecting the changes resulting from the Assumption Agreement, the Release of Guarantors dated October 11, 2012 and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014; and

n.   To the extent not delivered by the Resigning Trustee pursuant to section 3.c below, the Company shall deliver to Successor Trustee, as of or promptly after the Effective Date hereof, all of the documents listed in Exhibit B hereto.

3.   ***Resigning Trustee Representations, Warranties and Covenants.***   The Resigning Trustee hereby represents and warrants to the Successor Trustee that:

a.   No covenant or condition contained in the Indenture or Security Documents has been waived by the Resigning Trustee or, to the best of the Responsible Officer's knowledge who is signing this document, by the Holders of the percentage in aggregate principal amount of the Notes required by the Indenture or Security Documents to effect any such waiver;

b.   There is no action, suit or proceeding pending or, to the best of the Responsible Officer's knowledge who is signing this document, threatened against the Resigning Trustee before any court or governmental authority arising out of any action or omission by the Resigning Trustee as Trustee, Collateral Agent, Paying Agent, Registrar, Depository Custodian and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents;

c.   Resigning Trustee shall deliver to Successor Trustee, as of or promptly after the Effective Date hereof, all of the documents in its possession listed in Exhibit B hereto;

d.   The execution and delivery of this Instrument have been duly authorized by the Resigning Trustee, and this Instrument constitutes the Resigning Trustee's legal, valid, binding and enforceable obligation;

4

**JX 132-152**

e.      The Resigning Trustee certifies that $1,240,000,000 in principal amount of the Notes is outstanding and all interest accrued through but not including April 15, 2014 has been paid;

f.      To the best of the Resigning Trustee's knowledge, no Default or Event of Default has occurred under the Indenture and no event has occurred and is continuing which is, or after notice or lapse of time would become, an Event of Default under the Indenture;

g.      Other than the First Supplemental Indenture, the Assumption Agreement, the Release of Guarantors dated October 11, 2012 in connection with the release of Sears Home Appliance Showrooms, LLC, Sears Authorized Hometown Stores, LLC, and Sears Outlet Stores, LLC, and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014 in connection with the release of Lands' End, Inc. and Lands' End Direct Merchants, Inc., the Indenture and Security Documents have not been amended or supplemented and no terms thereof have been waived; and

h.      To the best of the Resigning Trustee's knowledge, no action is required under the Intercreditor Agreement in connection with the succession evidenced by this Agreement.

4.      ***Successor Trustee Representation and Warranty.***  The Successor Trustee represents and warrants to the Resigning Trustee and the Company that:

a.      It is eligible to serve as Trustee under Section 7.05 of the Indenture and is not disqualified under the provisions of Section 7.06 of the Indenture.

b.      This Instrument has been duly authorized, executed and delivered on behalf of Successor Trustee and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

5.      ***Acceptance by Successor Trustee.***  The Successor Trustee hereby accepts appointment as Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian, and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents.  The Successor Trustee will perform said rights, powers, and duties upon the terms and conditions set forth in the Indenture. Promptly after the execution and delivery of this Instrument, the Successor Trustee shall cause a notice, a form of which is annexed hereto as Exhibit A, to be sent to each Holder of the Notes.  References in the Indenture to "Corporate Trust Office" or other similar terms shall be deemed to refer to the corporate trust office of the Successor Trustee, which is currently located at:  50 South Sixth Street, Suite 1290, Minneapolis, Minnesota 55402, Attention:  Sears Holdings Corp. Administrator.

6.      ***Assignment etc. by Resigning Trustee.***  Effective on the Effective Date, the Resigning Trustee hereby confirms, assigns, transfers, delivers and conveys to the

5

**JX 132-153**

Successor Trustee, as Trustee under the Indenture, upon the trusts expressed in the Indenture, all rights, powers, trusts privileges, duties, and obligations which the Resigning Trustee now holds under and by virtue of the Indenture and the Security Documents, and effective as of such date does hereby pay over to the Successor Trustee any and all property and moneys held by the Resigning Trustee under and by virtue of the Indenture and the Security Documents.

7.    *Additional Documentation.*   The Resigning Trustee, for the purposes of, and to the extent necessary to, more fully and certainly vesting in and confirming to the Successor Trustee the rights, powers, trusts, privileges, duties, and obligations hereby assigned, transferred, delivered and conveyed, agrees, upon reasonable written request of the Successor Trustee or the Company, to execute, acknowledge, and deliver such further instruments of conveyance and further assurance and to do such other things as may be reasonably requested by the Successor Trustee or the Company.

8.    *Choice of Laws.*   This Instrument shall be governed by the laws of the State of New York.

9.    *Counterparts.*   This Instrument may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all counterparts shall constitute but one Instrument.

10.    *Survival of Company's Obligations to Resigning Trustee.* Notwithstanding the resignation of the Resigning Trustee as Trustee under the Indenture, the Company shall remain obligated under the Indenture to compensate, reimburse, and indemnify the Resigning Trustee as provided in the Indenture, and nothing contained in this Instrument shall in any way abrogate the obligations of the Company to the Resigning Trustee under the Indenture or any lien created in favor of the Resigning Trustee thereunder.

11.    *Notices.*   All notices, whether faxed or mailed, will be deemed received when sent pursuant to the following instructions:

TO THE SUCCESSOR TRUSTEE:

Wilmington Trust, National Association
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Telephone:    612-217-5667
Fax:    612-217-5651
Attention:    Sears Holdings Corp. Administrator


TO THE RESIGNING TRUSTEE:

**JX 132-154**

Wells Fargo Bank, National Association
Attn:  Corporate Trust Services
10 South Wacker Drive, 13th Floor
Chicago, IL 60606
Telephone:    312-845-4385
Fax:            312-726-2158
Attention:      Sears Holdings Corp. Administrator


TO THE COMPANY:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Telephone:    847-286-2500
Fax:            847-286-4511
Attention:      Treasurer

12.    *Effectiveness.*  This Instrument, the resignation of the Resigning Trustee as Trustee, Collateral Agent and Agent for service of notices and demands in connection with the Notes and the appointment of the Successor Trustee as Trustee, Collateral Agent and Agent for service of notices and demands in connection with the Notes under the Indenture and the Security Documents shall be effective as of the close of business on the date first set forth above, upon the execution and delivery hereof by each of the parties hereto; *provided*, that the resignation of the Resigning Trustee as Registrar, Paying Agent and Depository Custodian and the appointment of the Successor Trustee as Registrar, Paying Agent and Depository Custodian shall be effective on July 10, 2014 which is ten (10) business days after the date first above written.

JX 132-155

**IN WITNESS WHEREOF,** the parties hereto have executed this Instrument as of the date set forth above.

**SEARS HOLDINGS CORPORATION**, as Company

By _____

Its Vice President and Treasurer

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Successor Trustee

By _____

Its _____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Resigning Trustee

By _____

Its _____

JX 132-156

**IN WITNESS WHEREOF,** the parties hereto have executed this Instrument as of the date set forth above.

**SEARS HOLDINGS CORPORATION**, as Company

By_____

Its_____

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Successor Trustee

By _____

Its _____ Vice President _____


**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Resigning Trustee

By_____

Its_____

8

JX 132-157

**IN WITNESS WHEREOF,** the parties hereto have executed this Instrument as of the date set forth above.

**SEARS HOLDINGS CORPORATION**, as Company

By_____

   Its_____

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Successor Trustee

By_____

   Its_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Resigning Trustee

By _____

   Its _____ *VICE PRESIDENT*

8

**JX 132-158**

**Execution Version**

## EXHIBIT A

NOTICE OF APPOINTMENT OF SUCCESSOR TRUSTEE

To the Holders of:

Sears Holdings Corporation

6.625% Senior Secured Notes due 2018

CUSIP Nos.: 812350AC0 (144A), U8124CAB0 (RegS), 812350AD8 (AI), and
812350AE6 (Reg)

We hereby notify you of the resignation of Wells Fargo Bank, National Association, as Trustee, Collateral Agent, Registrar, Paying Agent and Agent for service of notices and demands under the Indenture, dated as of October 12, 2010, pursuant to which your Notes were issued and are outstanding.

Sears Holdings Corporation has appointed Wilmington Trust, National Association, whose Corporate Trust Office is located at 50 South Sixth Street, Suite 1290, Minneapolis, Minnesota 55402, Attention: Sears Holdings Corp. Administrator and Wilmington Trust, National Association has accepted appointment as successor Trustee, Collateral Agent, Registrar, Paying Agent, Depository Custodian and Agent for service of notices and demands under the Indenture.

Wells Fargo Bank, National Association's resignation as Trustee, Collateral Agent and Agent for service of notices and demands and Wilmington Trust, National Association's appointment as Trustee, Collateral Agent and Agent for service of notices and demands under the Indenture were effective as of the opening of business on June 26, 2014 and Wells Fargo Bank, National Association's resignation as Registrar, Paying Agent and Depository Custodian and Wilmington Trust, National Association's appointment as Registrar, Paying Agent and Depository Custodian will be effective as of the opening of business on July 10, 2014.

Dated: [          ], 2014

Wilmington Trust, National Association,
As Trustee

**JX 132-159**

<u>EXHIBIT B</u>

Documents to be delivered by Resigning Trustee to Successor Trustee as to the Indenture and Security Documents:

1.   Copies of fully executed versions of the Indenture, the First Supplemental Indenture, the Security Agreement, and the Intercreditor Agreement, the Assumption Agreement, the Release of Guarantors dated October 11, 2012 in connection with the release of Sears Home Appliance Showrooms, LLC, Sears Authorized Hometown Stores, LLC, and Sears Outlet Stores, LLC, and the Instrument Evidencing Release of Guarantee and Release of Liens on Collateral dated April 4, 2014 in connection with the release of Lands' End, Inc. and Lands' End Direct Merchants, Inc.

2.   File of closing documents from original issuance.

3.   Certified List of Noteholders as of the Effective Date and as of effective date for the Registrar succession, certificate detail and all "stop transfers" and the reason for such "stop transfers" (or, alternatively, if there are a substantial number of registered Noteholders, the computer tape reflecting the identity of such Noteholders).

4.   Copies of any official notices sent by the Trustee to the Noteholders of the Notes pursuant to the terms of the Indenture during the past twelve months.

5.   Copies of most recent compliance items, including without limitation, the most recent compliance certificate delivered pursuant to Section 4.03 of the Indenture, most recent SEC reports delivered pursuant to Section 4.02 of the Indenture and most recent annual perfection opinion delivered pursuant to Section 11.02 of the Indenture, delivered to the Resigning Trustee pursuant to terms of the Indenture and Security Documents.

6.   The original Global Notes with original face amounts as follows:  812350AC0 (144A) Cert A-1 $481,030,000 dated October 12, 2010 and Cert A-2 $500,000,000 dated October 12, 2010; U8124CAB0 (RegS) Cert S-1 $18,970,000 dated October 12, 2010; 812350AD8 (AI) Cert D-1 $0.00 dated October 12, 2010; and 812350AE6 (Reg) Cert E-1 $500,000,000 dated September 6, 2011, Cert E-2 $487,430,000 dated September 6, 2011 and Cert E-3 $5,000,000 dated September 28, 2012.

7.   Trust account statements (asset & transaction) for the one-year period preceding the date of this Agreement.

8.   Securities debt service records.

9.   Filed, stamped copies of all existing financing statements.

**JX 132-160**

EXHIBIT H

EXECUTION VERSION

## AMENDED AND RESTATED SECURITY AGREEMENT

among

**SEARS HOLDINGS CORPORATION,**
**and certain of its Subsidiaries,**
as Grantors

and

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Collateral Agent

Dated as of March 20, 2018

**THIS SECURITY AGREEMENT is subject to the terms and provisions of the Amended and Restated Intercreditor Agreement, dated as of March 20, 2018 (as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Wilmington Trust, National Association, as Second Lien Agent and Bank of America, N.A. and Wells Fargo Bank, National Association, each as an ABL Agent and the other persons from time to time party thereto.**

# TABLE OF CONTENTS

                                                                              Page

SECTION 1. DEFINED TERMS .................................................................2
    1.1    Definitions .........................................................................2
    1.2    Other Definitional Provisions ..............................................8
    1.3    Perfection Certificate ..........................................................9

SECTION 2. GRANT OF SECURITY INTEREST..................................9
    2.1    Collateral; Grant of Security Interest ...................................9
    2.2    No Assumption of Liability ..................................................9

SECTION 3. REPRESENTATIONS AND WARRANTIES .......................9
    3.1    Title; No Other Liens ...........................................................9
    3.2    Perfected Liens ....................................................................10
    3.3    Jurisdiction of Organization ................................................10
    3.4    Credit Card Accounts Receivable .........................................10
    3.5    Related Intellectual Property ................................................10
    3.6    Dealer Store Inventory .........................................................11

SECTION 4. COVENANTS ......................................................................11
    4.1    Delivery of Instruments and Chattel Paper ...........................11
    4.2    [Intentionally Omitted] ........................................................11
    4.3    Maintenance of Perfected Security Interest; Further Documentation .....11
    4.4    Changes in Name, etc. ..........................................................11

SECTION 5. REMEDIAL PROVISIONS....................................................12
    5.1    Certain Matters Relating to Credit Card Accounts Receivable .....12
    5.2    Communications with Obligors; Grantors Remain Liable .......12
    5.3    [Intentionally Omitted] ........................................................12
    5.4    Application of Proceeds.........................................................12
    5.5    Code and Other Remedies .....................................................13
    5.6    Deficiency.............................................................................15
    5.7    Grant of License in Intellectual Property, Software and other Assets .......15

SECTION 6. THE COLLATERAL AGENT ...............................................17
    6.1    Collateral Agent's Appointment as Attorney-in-Fact, etc. ....17
    6.2    Duty of Collateral Agent.......................................................18
    6.3    Execution of Financing Statements ......................................19
    6.4    Authority of the Collateral Agent .........................................19
    6.5    Pari Passu Obligations ..........................................................19

SECTION 7. MISCELLANEOUS..............................................................19
    7.1    Intercreditor Agreement........................................................19
    7.2    Pari Passu Obligations ..........................................................19
    7.3    Amendments in Writing ........................................................20
    7.4    Notices ..................................................................................20
    7.5    No Waiver by Course of Conduct; Cumulative Remedies ......21
    7.6    Enforcement Expenses; Indemnification ...............................21
    7.7    Successors and Assigns .........................................................22

JX 132-163

| | | |
|---|---|---|
| 7.8 | [Intentionally Omitted] | 22 |
| 7.9 | Counterparts | 22 |
| 7.10 | Severability | 22 |
| 7.11 | Section Headings | 22 |
| 7.12 | Integration | 22 |
| 7.13 | GOVERNING LAW | 22 |
| 7.14 | Acknowledgements | 22 |
| 7.15 | Additional Grantors | 23 |
| 7.16 | Releases | 23 |
| 7.17 | Jurisdiction, Etc. | 23 |
| 7.18 | WAIVER OF JURY TRIAL | 24 |

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule 1 | Grantors; Notice Addresses |
| Schedule 2 | Perfection Matters |
| Schedule 3 | Jurisdictions of Organization |

JX 132-164

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT, dated as of March 20, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by SEARS HOLDINGS CORPORATION, a Delaware corporation (the "Issuer"), and the subsidiaries of the Issuer from time to time party hereto (the "Subsidiary Obligors" and, together with the Issuer, the "Grantors"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent (in such capacity and, together with any successors and assigns, the "Collateral Agent").

W I T N E S S E T H

WHEREAS, the Issuer, the Grantors and the Collateral Agent are party to that certain Security Agreement, dated as of October 12, 2010, as amended by that certain First Amendment to Security Agreement, dated as of September 1, 2016 (as further amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Existing Security Agreement");

WHEREAS, the parties hereto desire to amend and restate the Existing Security Agreement as provided herein;

WHEREAS, reference is made to that certain indenture, dated as of October 12, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "2010 Indenture"), by and among the Issuer, the Guarantors and WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as successor trustee (in such capacity, the "2010 Trustee") and Collateral Agent, pursuant to which the Issuer issued $1,250,000,000 aggregate original principal of 6 5/8% Senior Secured Notes due 2018 (together with any Exchange Securities (as defined in the 2010 Indenture) and any Additional Notes (as defined in the 2010 Indenture) issued under the 2010 Indenture, the "Senior Secured Notes").

WHEREAS, reference is further made to that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among the Issuer, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the Guarantors, the lenders from time to time party thereto and JPP, LLC, as administrative agent and collateral administrator (the "Second Lien Credit Agreement Agent"), pursuant to which the borrowers have obtained a term loan in the aggregate amount of $300 million and established an uncommitted line of credit facility.

WHEREAS, reference is further made to that certain indenture, dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "2018 Indenture"), by and among the Issuer, the Guarantors and COMPUTERSHARE TRUST COMPANY, N.A., in its capacity as trustee (in such capacity, the "2018 Trustee"), pursuant to which the Issuer issued $169,824,000.00 aggregate principal of 6 5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (together with any PIK Interest Notes (or any increase in the principal amount of a Global Note related to PIK Interest) and any Additional Notes issued under the 2018 Indenture, the "Senior Secured Convertible Notes").

WHEREAS, each of the Issuer and each Subsidiary Obligor is either a primary obligor or has unconditionally guaranteed all of the Secured Obligations.

**JX 132-165**

WHEREAS, from time to time after the date hereof, the Issuer may, subject to the terms and conditions of this Agreement and the other Second Lien Documents, incur additional Junior Second Lien Obligations that are secured by Liens ranking equally and ratably with the Liens securing the existing Secured Obligations and entitled to distributions on an equal and ratable basis with the Senior Secured Notes.

WHEREAS, from time to time after the date hereof, the Issuer may, subject to the terms and conditions of this Agreement and the other Second Lien Documents, incur additional Senior Second Lien Obligations that are secured by Liens ranking equally and ratably with the Liens securing the existing Secured Obligations and entitled to distributions on an equal and ratable basis with the Senior Secured Convertible Notes and the obligations under the Second Lien Credit Agreement.

WHEREAS, this Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of all Secured Obligations.

WHEREAS, the Issuer, the other Grantors, the Collateral Agent and the ABL Agents, have entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of the date hereof (as amended, modified, supplemented or restated and in effect from time to time, the "Intercreditor Agreement"), establishing the relative rights and priorities of the Secured Parties and the First Lien Secured Parties in respect of the Collateral.

WHEREAS, each Grantor will receive substantial benefits from the issuance and maintenance of the Secured Obligations and each is, therefore, willing to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Collateral Agent hereby agree as follows:

## SECTION 1.  DEFINED TERMS

1.1     Definitions.

(a)     Unless otherwise defined herein, terms defined in the 2018 Indenture and used herein shall have the meanings given to them in the 2018 Indenture, and the following terms are used herein as defined in the New York UCC: Accounts, Chattel Paper, Control, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Proceeds and Supporting Obligations.

(b)     The following terms shall have the following meanings:

"ABL Agents" has the meaning provided in the Intercreditor Agreement.

"ABL Obligations" has the meaning provided in the Intercreditor Agreement.

"ABL Secured Parties" has the meaning provided in the Intercreditor Agreement.

"Additional First Lien Agent" means the Person appointed to act as trustee, agent or representative for the holders of Additional First Lien Obligations pursuant to any Additional First Lien Agreement.

"Additional First Lien Agreement" means any indenture, credit agreement or other agreement, if any, pursuant to which any Grantor has or will incur Additional First Lien Obligations.

-2-

"Agreement" has the meaning provided in the preamble hereof.

"Collateral" has the meaning provided in Section 2.1 hereof.

"Collateral Agent" has the meaning provided in the preamble hereof.

"Copyrights" means (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office and (ii) the right to obtain all renewals thereof.

"Copyright Licenses" means any written agreement naming any Grantor as licensor or licensee granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of July 21, 2015, among the Issuer, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders from time to time party thereto, the issuing lenders from time to time party thereto, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association, as co-collateral agent, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements have been or may be amended (including any amendment and restatement thereof), supplemented or otherwise modified, replaced or refinanced from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including, without limitation, increasing the amount of available borrowings thereunder or adding Subsidiaries of the Issuer as additional borrowers or guarantors thereunder) all or any portion of the indebtedness under such agreement or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Credit Card Accounts Receivables" means all Accounts together with all income, payments, and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to the Issuer or any Guarantor resulting from charges by a customer of the Issuer or such Guarantor on credit cards issued by such issuer in connection with the sale of goods by the Issuer or such Guarantor or services performed by the Issuer or such Guarantor.

"Discharge of First Lien Obligations" means the Discharge of ABL Obligations (as defined in the Intercreditor Agreement) and the payment in full in cash of all outstanding Additional First Lien Obligations.

"Discharge of Obligations" means in the case of any series of Secured Obligations, including the Senior Secured Notes, the Senior Secured Convertible Notes and the Second Lien Credit Agreement Obligations, the repayment, discharge or defeasance of such series of Secured Obligations under such agreement or such other event which entitles the Grantors to obtain a release of the Liens securing such Secured Obligations under the Security Documents (including, with respect to the 2010 Indenture and the 2018 Indenture, a discharge or defeasance of the such indenture in accordance with its terms).

"Discharge of Senior Second Lien Obligations" means the occurrence of a Discharge of Obligations with respect to all Senior Second Lien Obligations.

JX 132-167

"Event of Default" means (i) an "Event of Default" under and as defined in the 2018 Indenture, the 2010 Indenture or the Second Lien Credit Agreement, or (ii) an "Event of Default" or equivalent term under and as defined in any Junior Second Lien Agreement or any Senior Second Lien Agreement.

"Final Date" means the first date on which a Discharge of Obligations shall have occurred with respect to all of the Secured Obligations.

"First Lien Collateral Agents" means (i) the ABL Agents and (ii) the Additional First Lien Agents.

"First Lien Obligations" means (i) the ABL Obligations and (ii) the Additional First Lien Obligations.

"First Lien Secured Parties" means (i) the ABL Secured Parties and (ii) each Additional First Lien Agent and each holder of Additional First Lien Obligations.

"First Lien Security Agreement" means that certain Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, by and among the Issuer, the grantors party thereto and Bank of America, N.A., Wells Fargo Bank, National Association and General Electric Capital Corporation, as co-collateral agents, as the same has been or may be amended, supplemented or otherwise modified from time to time.

"Grantors" has the meaning provided in the preamble hereof.

"Guarantors" has the meaning provided in the preamble hereof.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement" has the meaning provided in the recitals hereof.

"Issuer" has the meaning provided in the preamble hereof.

"Junior Second Lien Agent" means any Person appointed to act as trustee, agent or representative for the holders of a series of Junior Second Lien Obligations pursuant to any Second Lien Document.

"Junior Second Lien Agreement" means any indenture, credit agreement or other agreement, if any, designated as such by the Issuer pursuant to, and as permitted by, Section 7.2 hereof.

"Junior Second Lien Joinder Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Junior Second Lien Obligations" means (i) the Senior Secured Note Obligations and (ii) any other indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Subsidiary Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the

JX 132-168

Liens securing the Senior Secured Note Obligations (or by the same Liens that secure the Senior Secured Note Obligations, including hereunder) and that is entitled to distributions on an equal and ratable basis with the Senior Secured Note Obligations pursuant to the Security Documents or otherwise; provided that the representative of such Junior Second Lien Obligations executes a joinder agreement (including, without limitation, pursuant to Section 7.2) or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement and in accordance with Section 5.4 hereof, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) payable to the Collateral Agent, the 2010 Trustee, the 2018 Trustee, the Second Lien Credit Agreement Agent and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to each trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to the 2010 Trustee and each other trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to Holdings.  At the Issuer's option (as certified to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent pursuant to an Officer's Certificate), any indebtedness of the Issuer or the Subsidiary Guarantors secured by a Lien on the Collateral may be Junior Second Lien Obligations.  For the avoidance of doubt, any obligations designated as Junior Second Lien Obligations pursuant to Section 7.2, subject to satisfaction of the requirements set forth therein, shall constitute Junior Second Lien Obligations.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent License" means all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent.

"Perfection Certificate" means that certain perfection certificate executed and delivered by the Grantors in connection with the execution and delivery of the 2010 Indenture, dated on or about the Issue Date (as defined in the 2010 Indenture).

"Required Secured Parties" means (i) until the Discharge of Senior Second Lien Obligations, the holders of a majority in aggregate principal amount of Senior Second Lien Obligations constituting Secured Obligations, voting together as a single class and (ii) from and after the Discharge of Senior Second Lien Obligations, the holders of a majority in aggregate principal amount of Junior Second Lien Obligations constituting Secured Obligations, voting together as a single class.

"Second Lien Credit Agreement Documents" means the Second Lien Credit Agreement, the Loan Documents (as defined in the Second Lien Credit Agreement) and the Security Documents.

JX 132-169

"Second Lien Credit Agreement Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the Second Lien Credit Agreement Agent and holders of the loans and other obligations under the Second Lien Credit Agreement Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Second Lien Credit Agreement Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Second Lien Credit Agreement Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Second Lien Documents" means the Second Lien Credit Agreement Documents, the Senior Secured Note Documents, the Senior Secured Convertible Note Documents and any other document or agreement governing any other indebtedness or other obligations that may constitute Secured Obligations, including any applicable Junior Second Lien Agreement and Senior Second Lien Agreement.

"Secured Obligations" means the collective reference to (i) the Senior Secured Note Obligations, (ii) Senior Secured Convertible Note Obligations, (iii) the Second Lien Credit Agreement Obligations, (iv) all other Senior Second Lien Obligations under or in respect of any Senior Second Lien Agreement and any related agreements and documentation, and (v) all other Junior Second Lien Obligations under or in respect of any Junior Second Lien Agreement and any related agreements and documentation.

"Secured Parties" shall mean, collectively, the Collateral Agent, the 2010 Trustee, the holders of Senior Secured Notes, the Second Lien Credit Agreement Agent, the lenders and additional agents under the Second Lien Credit Agreement, the 2018 Trustee, the Holders of Senior Secured Convertible Notes, each Junior Second Lien Agent, each holder of Junior Second Lien Obligations under or pursuant to a Junior Second Lien Agreement, each Senior Second Lien Agent and each holder of Senior Second Lien Obligations under or pursuant to a Senior Second Lien Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Documents" means this Agreement, the Intercreditor Agreement and each other document entered into to grant a security interest in the Collateral or any other assets to the Collateral Agent for the benefit of the Secured Parties.

"Senior Second Lien Agent" means any Person appointed to act as trustee, agent or representative for the holders of a series of Senior Second Lien Obligations pursuant to any Second Lien Document.

"Senior Second Lien Agreement" means any indenture, credit agreement or other agreement, if any, designated as such by the Issuer pursuant to, and as permitted by, Section 7.2 hereof.

JX 132-170

"Senior Second Lien Joinder Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Senior Second Lien Obligations" means the (i) Senior Secured Convertible Note Obligations, (ii) the Second Lien Credit Agreement Obligations, and (iii) any other indebtedness and related obligations, including interest, fees and expenses, of the Issuer or any Subsidiary Guarantor that is secured by a Lien on the Collateral ranking equally and ratably with the Liens securing the obligations in respect of the Senior Secured Convertible Note Obligations (or by the same Liens that secure obligations in respect of the Senior Secured Convertible Note Obligations and Second Lien Credit Agreement Obligations, including hereunder) and that is entitled to distributions on such Lien on an equal and ratable basis with the Senior Secured Convertible Note Obligations and Second Lien Credit Agreement Obligations pursuant to the Security Documents or otherwise; provided that the representative of such Senior Second Lien Obligations executes a joinder agreement or amendment to, or amendment and restatement of, the applicable Security Documents and the Intercreditor Agreement, or enters into an additional intercreditor agreement with the Collateral Agent providing that any amounts received in respect of the Collateral in connection with an enforcement of the Liens securing any Second Lien Obligations (or received in respect of such Liens in any bankruptcy or insolvency proceeding) shall, subject to the Intercreditor Agreement and in accordance with Section 5.4 hereof, after payment of all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) payable to the Collateral Agent, the 2010 Trustee, the 2018 Trustee, the Second Lien Credit Agreement Agent and each other trustee or agent for any class of Second Lien Obligations in their capacities as such (which shall be paid first to the Collateral Agent and then among each such trustee or agent on a pro rata basis), be distributed first to each trustee or agent for a class of Senior Second Lien Obligations for distribution to the holders thereof on a pro rata basis based on the amount of outstanding obligations of each such class until all Senior Second Lien Obligations are paid in full and only thereafter to the 2010 Trustee and each other trustee or agent for a class of Junior Second Lien Obligations for distribution to the holders thereof until all Junior Second Lien Obligations are paid in full and thereafter to Holdings. At the Issuer's option (as certified to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent pursuant to an Officer's Certificate), any indebtedness secured by a Lien on the Collateral may be Senior Second Lien Obligations.  For the avoidance of doubt, any obligations designated as Senior Second Lien Obligations pursuant to Section 7.2, subject to satisfaction of the requirements set forth therein, shall constitute Senior Second Lien Obligations.

"Senior Secured Note Documents" means the Senior Secured Notes, any guarantees thereof, the 2010 Indenture and the Security Documents.

"Senior Secured Note Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the 2010 Trustee and holders of the Senior Secured Notes under the Senior Secured Note Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Senior Secured Note Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Senior Secured Note Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any

-7-

JX 132-171

exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Senior Secured Convertible Note Documents" means the Senior Secured Convertible Notes, any guarantees thereof, the 2018 Indenture and the Security Documents.

"Senior Secured Convertible Note Obligations" means the collective reference to (i) all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Grantor at the rate provided for in the respective documentation, whether or not such claim for post-petition interest is allowed in any such proceeding), fees, costs, expenses and indemnities, including the fees and expenses of counsel) owing to the Collateral Agent, the 2018 Trustee and holders of the Senior Secured Convertible Notes under the Senior Secured Convertible Note Documents and the due performance and compliance by the Grantors with all of the terms, conditions and agreements contained in the Senior Secured Note Convertible Documents; (ii) any and all sums advanced by the Collateral Agent in accordance with any of the Senior Secured Convertible Note Documents in order to preserve the Collateral or preserve its security interest in the Collateral; and (iii) in the event of any proceedings for the collection or enforcement of any indebtedness, obligations or liabilities of the Grantors referred to in clause (i) above, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs.

"Software" means all "software" as such term is defined in the New York UCC used by any Grantor to process, assemble, prepare for sale, market for sale, sell or otherwise dispose of the Collateral, other than software embedded in any category of goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Trademarks" means (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto and (ii) the right to obtain all renewals thereof.

"Trademark License" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein," "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)    Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

-8-

JX 132-172

1.3    <u>Perfection Certificate</u>.  The Collateral Agent, each Grantor and each Secured Party agree that the Perfection Certificate and all descriptions of Collateral therein and schedules, amendments and supplements thereto are and shall at all times remain a part of this Agreement.

## SECTION 2.  GRANT OF SECURITY INTEREST

2.1    <u>Collateral; Grant of Security Interest</u>.  Each Grantor hereby grants to the Collateral Agent for the equal and ratable benefit of the Secured Parties a security interest in all of the following property now owned, or at any time hereafter acquired, by such Grantor or in which such Grantor now has, or at any time in the future may acquire, any right, title or interest (collectively, the "<u>Collateral</u>"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Secured Obligations:

(a)    all Credit Card Accounts Receivable;

(b)    all Inventory;

(c)    all Chattel Paper relating to Credit Card Accounts Receivable;

(d)    all Instruments relating to Credit Card Accounts Receivable;

(e)    all Documents relating to any Inventory;

(f)    all books and records pertaining to the Collateral; and

(g)    to the extent not otherwise included, all Proceeds, insurance claims, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

2.2    <u>No Assumption of Liability</u>.  The security interest in the Collateral granted to the Collateral Agent is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.  Anything contained herein to the contrary notwithstanding, each Grantor shall remain liable under any contracts and agreements included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement and the Second Lien Documents had not been executed, the exercise by Collateral Agent of any of its rights hereunder or any of the Second Lien Documents shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and the Collateral Agent shall not have any obligation or liability under any contracts, licenses, and agreements included in the Collateral by reason of this Agreement or any of the Second Lien Documents, nor shall Collateral Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

## SECTION 3.  REPRESENTATIONS AND WARRANTIES

Each Grantor represents and warrants to the Collateral Agent and the other Secured Parties that:

3.1    <u>Title; No Other Liens</u>.  Except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and any other Permitted Lien, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No

–9–

JX 132-173

financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except (i) such as have been filed in favor of the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement or (ii) as are permitted by the Second Lien Documents.

3.2     Perfected Liens.

(a)     The security interests granted pursuant to this Agreement (a) upon completion of the filings specified on Schedule 2 (which, in the case of all financing statements referred to on said Schedule 2, have been delivered to the Collateral Agent in completed form) will constitute valid perfected security interests in all of the Collateral as to which a Lien can be perfected by filing in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof and (b) are prior to all other Liens on the Collateral in existence on the date hereof other than Permitted Liens having priority over the Liens of the Collateral Agent pursuant to applicable law or the Intercreditor Agreement.

(b)     Notwithstanding anything herein to the contrary, prior to the Discharge of First Lien Obligations, the requirements of this Agreement to deliver Collateral and any certificates, instruments or related documents to the Collateral Agent shall be deemed satisfied by delivery of such Collateral and such certificates, instruments or related documents to any First Lien Collateral Agent.  The Issuer shall deliver copies of any such certificates, instruments or related documents to the Collateral Agent.

3.3     Jurisdiction of Organization.    On the date hereof, such Grantor's jurisdiction of organization and identification number from the jurisdiction of organization (if any) are specified on Schedule 3.  Such Grantor has furnished to the Collateral Agent a charter, certificate of incorporation or other formation document and good standing certificate dated as of a date which is recent to the date hereof.

3.4     Credit Card Accounts Receivable.

(a)     No amount payable to such Grantor under or in connection with any Credit Card Accounts Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent).

(b)     Except as would not be reasonably expected to result in a material adverse effect on the business or financial condition of the Issuer and its Subsidiaries considered as a whole (a "Material Adverse Effect"), there are no facts, events or occurrences which would impair the validity of any Credit Card Accounts Receivable, or tend to reduce the amount payable thereunder from the face amount of the claim or invoice or statements delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent) with respect thereto (other than arising in the ordinary course of business).

3.5     Related Intellectual Property.  Such Grantor owns or has a license to use all Intellectual Property which is reasonably necessary to sell the Collateral in the ordinary course.  Such Grantor shall take all reasonable and necessary steps to maintain and preserve the benefit of each Trademark License, Copyright License and Patent License which relates to Intellectual Property to the extent that the use of such Intellectual Property would be reasonably necessary in connection with the Collateral Agent's enforcement of any of its remedies under the Second Lien Documents.

-10-

JX 132-174

3.6    <u>Dealer Store Inventory</u>.  Except as would not be reasonably expected to result in a Material Adverse Effect, (a) all of the Inventory at each Dealer Store is owned by a Grantor free and clear of any and all Liens or claims of others except for any Permitted Liens, and (b) all such Inventory is subject to a legal, valid and perfected security interest in favor of the applicable Grantor, which is prior to any other Lien on such Inventory.

SECTION 4.  COVENANTS

Each Grantor covenants and agrees with the Collateral Agent and the other Secured Parties that, until the Final Date:

4.1    <u>Delivery of Instruments and Chattel Paper</u>.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Chattel Paper or transferable records, such Instrument, Chattel Paper or transferable records, shall be promptly delivered to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent), duly indorsed in a manner satisfactory to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent), to be held as Collateral pursuant to this Agreement.

4.2    [<u>Intentionally Omitted</u>].

4.3    <u>Maintenance of Perfected Security Interest; Further Documentation</u>.

(a)    Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 3.2</u> and shall defend such security interest against the claims and demands of all Persons whomsoever, subject to the rights of such Grantor under the Security Documents to dispose of the Collateral.

(b)    Each Grantor shall file, and if reasonably requested by the Collateral Agent will execute or authenticate and deliver to the Collateral Agent, all financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Collateral Agent may reasonably request, from time to time in order to maintain a perfected security interest in the Collateral owned by such Grantor subject only to (i) Liens securing the First Lien Obligations and (ii) any other Permitted Lien.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Collateral Agent herein.

(c)    Each Grantor agrees that, in the event any Grantor, pursuant to the First Lien Security Agreement, takes any action to grant or perfect a Lien in favor of any First Lien Collateral Agent in any assets that constitute Collateral (other than Proceeds in the form of cash or cash equivalents) hereunder, such Grantor shall, to the extent reasonable, take a corresponding action to grant or perfect a Lien (subject to the Intercreditor Agreement) in such Collateral in favor of the Collateral Agent to secure the Secured Obligations without the request of the Collateral Agent.

4.4    <u>Changes in Name, etc.</u>  Such Grantor will not, except upon 15 days' prior written notice to the Collateral Agent, the filing of all additional financing statements and other documents necessary to maintain the validity, perfection and priority of the security interests provided for herein and other documents necessary or reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests provided for herein, change its organizational form from that of a

JX 132-175

registered entity to an unregistered entity (or from an unregistered entity to a registered entity), change its jurisdiction of organization from that referred to in Section 3.3 or change its name or organizational form.

## SECTION 5. REMEDIAL PROVISIONS

5.1    <u>Certain Matters Relating to Credit Card Accounts Receivable</u>.  At the Collateral Agent's request (or, if prior to the Discharge of First Lien Obligations, at the request of any First Lien Collateral Agent for the benefit of the Collateral Agent), at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall deliver to the Collateral Agent (or, if prior to the Discharge of First Lien Obligations, to any First Lien Collateral Agent for the benefit of the Collateral Agent) all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Credit Card Accounts Receivable.

5.2    <u>Communications with Obligors; Grantors Remain Liable</u>.

(a)    The Collateral Agent (or, if prior to the Discharge of First Lien Obligations, any First Lien Collateral Agent for the benefit of the Collateral Agent) in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default communicate with obligors under the Credit Card Accounts Receivable to verify with them to the satisfaction of the Collateral Agent the existence, amount and terms of any Credit Card Accounts Receivable.

(b)    Upon the request of the Collateral Agent after the Discharge of First Lien Obligations, at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Credit Card Accounts Receivable that the Credit Card Accounts Receivable have been assigned to the Collateral Agent for the benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Credit Card Accounts Receivable to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  Neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any Credit Card Accounts Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Party of any payment relating thereto, nor shall the Collateral Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Credit Card Accounts Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

5.3    <u>[Intentionally Omitted]</u>.

5.4    <u>Application of Proceeds</u>.  Subject to the terms of the Intercreditor Agreement, any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies, or received by the Collateral Agent in respect of all or any part of the Collateral in connection with any bankruptcy, insolvency, reorganization or similar proceeding of any Grantor, shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, as follows:

JX 132-176

First, to pay all indemnities, compensation and expenses (including the fees and expenses of counsel and experts) owing to the Collateral Agent in its capacity as such in accordance with the terms of this Agreement and the other Second Lien Documents;

Second, to the 2010 Trustee in its capacity as such in accordance with the terms of the 2010 Indenture, to the Second Lien Credit Agreement Agent in its capacity as such in accordance with the terms of the Second Lien Credit Agreement, to the 2018 Trustee in its capacity as such in accordance with the terms of the 2018 Indenture and to any other Junior Second Lien Agent or Senior Second Lien Agent in its capacity as such in accordance with the terms of the applicable Junior Second Lien Agreement or Senior Second Lien Agreement, in each case ratably;

Third, to ratably pay all amounts owing to holders of Senior Second Lien Obligations (including interest, costs and attorneys' fees owed to the holders of Senior Second Lien Obligations, whether or not a claim is allowed against the Issuer or any Grantor for such interest, fees, indemnification payments, expense reimbursements and other amounts in any related bankruptcy proceeding) in accordance with the terms of the 2018 Indenture, the Second Lien Credit Agreement and any other Senior Second Lien Agreements;

Fourth, to ratably pay all amounts owing to holders of Junior Second Lien Obligations (including interest, costs and attorneys' fees owed to the holders of Junior Second Lien Obligations, whether or not a claim is allowed against the Issuer or any Grantor for such interest, fees, indemnification payments, expense reimbursements and other amounts in any related bankruptcy proceeding) in accordance with the terms of the 2010 Indenture and any other Junior Second Lien Agreements; and

Fifth, to pay the Issuer or to whomsoever may be lawfully entitled to receive the same.

All applications of proceeds pursuant to clause First above, clause Second above, clause Third above and clause Fourth above, respectively, shall be allocated among the applicable Secured Parties on a *pro rata* basis according to the principal, interest and/or other amounts owing in respect of the applicable Secured Obligations owing to such Secured Parties at the time of the distribution. In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Fourth of this Section 5.4, the Grantors shall remain liable, jointly and severally, for any deficiency.

If, despite the provisions of this Agreement, any Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the Secured Obligations to which it is then entitled in accordance with this Agreement, such Secured Party shall hold such payment or recovery in trust for the benefit of all Secured Parties for distribution in accordance with this Section 5.4.

Upon the request of the Collateral Agent prior to any distribution under this Section 5.4, each Secured Party shall provide to the Collateral Agent certificates, in form and substance reasonably satisfactory to the Collateral Agent, setting forth the respective amounts referred to in Section 5.4, that each such Secured Party believes it is entitled to receive, and the Collateral Agent shall be fully entitled to rely on such certificates.

5.5    Code and Other Remedies.

(a)    If an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, may (and at the direction of the Required Secured Parties shall (subject to any right of the Collateral Agent to require indemnity from such persons prior to taking any enforcement action)) exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other

JX 132-177

instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the New York UCC or any other applicable law.  Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may (and at the direction of the Required Secured Parties shall (subject to any right of the Collateral Agent to require indemnity from such persons prior to taking any enforcement action)) in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Each purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor.  The Collateral Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption, stay, valuation or appraisal on the part of any Grantor, which right or equity is hereby waived and released, and may credit against the purchase price the amount of any claim then due and payable from any Grantor on account of the Secured Obligations owed to the Collateral Agent, and the Collateral Agent may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor.  Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral and make it available to the Collateral Agent at the Grantor's sole risk and expense, at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.5, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Collateral Agent hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, in the order set forth in Section 5.4, and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including, without limitation, Section 9-615(a)(3) of the New York UCC, need the Collateral Agent account for the surplus, if any, to any Grantor.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against any Collateral Agent arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.  The Collateral Agent shall not be obligated to make any sale or other disposition of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale or other disposition of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Any public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice of such sale.  If any of the Collateral is sold, leased, or otherwise disposed of by the Collateral Agent on credit, the Secured Obligations shall not be deemed to have been reduced as a result thereof unless and until payment is finally received thereon by the Collateral Agent.

(b)     If an Event of Default shall occur and be continuing, with respect to any Collateral consisting of Inventory, the Collateral Agent may conduct one or more going out of business sales, in the Collateral Agent's own right or by one or more agents and contractors.  Such sale(s) may be conducted upon any premises owned, leased, or occupied by any Grantor.  The Collateral Agent and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of

-14-

JX 132-178

which other goods shall remain the sole property of the Collateral Agent or such agent or contractor). Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Collateral Agent or such agent or contractor and neither any Grantor nor any Person claiming under or in right of any Grantor shall have any interest therein. Each purchaser at any such going out of business sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor.

(c)    If an Event of Default shall occur and be continuing, with respect to any Collateral consisting of Accounts, the Collateral Agent may: (i) demand, collect and receive any amounts relating thereto, as the Collateral Agent may reasonably determine; (ii) commence and prosecute any actions in any court for the purposes of collecting any such Accounts and enforcing any other rights in respect thereof; (iii) defend, settle or compromise any action brought and, in connection therewith, give such discharges or releases as the Collateral Agent may reasonably deem appropriate; (iv) without limiting the Collateral Agent's rights set forth in Section 6.1, receive, open and dispose of mail addressed to any Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods giving rise to such Accounts or securing or relating to such Accounts, on behalf of and in the name of such Grantor; and (v) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any such Accounts or the goods or services which have given rise thereto, as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes.

(d)    If an Event of Default shall occur and be continuing, with or without legal process and with or without prior notice or demand for performance, the Collateral Agent may enter upon, occupy, and use any premises owned or occupied by each Grantor. The Collateral Agent shall not be required to remove any of the Collateral from any such premises upon taking possession thereof, and may render any Collateral unusable to the Grantors. In no event shall the Collateral Agent be liable to any Grantor for use or occupancy by the Collateral Agent of any premises pursuant to this Section 5.5, nor for any charge (such as wages for the Grantors' employees and utilities) reasonably incurred in connection with the Collateral Agent's exercise of its rights and remedies hereunder.

(e)    For purposes of this Section 5.5, a written and fully executed agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof. The Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full.

(f)    To the extent permitted by applicable law, each Grantor hereby waives all rights of redemption, stay, valuation and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent shall have no obligation to marshal any of the Collateral or resort to any of the property or assets of any Grantor in any particular manner or order.

5.6    Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Secured Obligations and the fees and disbursements of any attorneys employed by the Collateral Agent or any other Secured Party to collect such deficiency.

5.7    Grant of License in Intellectual Property, Software and other Assets.

-15-

JX 132-179

(a)    For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby (i) assigns and transfers to the Collateral Agent and grants the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or any other compensation to such Grantor or any Affiliate of such Grantor) to use, license or sublicense, any related Intellectual Property now owned or licensed or hereafter owned, licensed or otherwise acquired by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof and (ii) irrevocably agrees that the Collateral Agent may sell any of such Grantor's Inventory directly to any Person, including, without limitation, Persons who have previously purchased such Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Collateral Agent's rights under this Agreement, may sell Inventory which bears any Trademark owned by or licensed to such Grantor and any Inventory that is covered by any Copyright owned by or licensed to such Grantor and the Collateral Agent may finish any work in process and affix any Trademark owned by or licensed to such Grantor and sell such Inventory as provided herein; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such Intellectual Property, this Agreement shall not constitute a license to use, license or sublicense, any Intellectual Property to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such Intellectual Property, except to the extent that (x) the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (y) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such Intellectual Property was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

(b)    For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby assigns and transfers to the Collateral Agent and grants to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or any other compensation to such Grantor or any other Person) to use, license or sublicense, any Software now owned or licensed or hereafter owned, licensed or otherwise acquired by such Grantor; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such Software, this Agreement shall not constitute a license to use, license or sublicense, any Software to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such Software, except to the extent that (i) the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (ii) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such Software was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

(c)    Without duplication of the rights granted to the Collateral Agent in clauses (a) and (b) of this Section 5.7, and for the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 5 at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby assigns and transfers to the Collateral Agent and grants to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, an

JX 132-180

irrevocable, nonexclusive license (exercisable without payment of royalty, rent or any other compensation to such Grantor or any other Person), to use, license or sublicense, any real property or personal property of such Grantor which does not constitute Collateral, including but not limited to, all Equipment, Fixtures, General Intangibles and Goods, whether now or hereafter owned, leased or occupied by such Grantor; provided that, notwithstanding the foregoing, except as provided in any agreement between the Collateral Agent and the owner or licensor of such real or personal property, this Agreement shall not constitute a license to use, license or sublicense, any real or personal property to the extent such license or sublicense is prohibited by or results in the termination of or requires any consent not obtained under, any lease, contract, license, agreement, instrument or other document evidencing or giving rise to such property or any rights therein, except to the extent that (i) the term in such lease, contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law, or (ii) the contract, license, agreement, instrument or other document pursuant to which such Grantor was granted its rights to any such real property or personal property was issued by a Subsidiary or Affiliate of such Grantor (and is not subject to an applicable constraint in an over-license or other agreement with a third party).

SECTION 6.  THE COLLATERAL AGENT

6.1    Collateral Agent's Appointment as Attorney-in-Fact, etc.

(a)    Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to, or assent by such Grantor, to do any or all of the following:

(i)    in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Credit Card Accounts Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Credit Card Accounts Receivable or with respect to any other Collateral whenever payable;

(ii)    pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iii)    execute, in connection with any sale provided for in Section 5.5, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(iv)    (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder as the Collateral Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other

JX 132-181

documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; and (7) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and any other Secured Party's security interest therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 6.1(a) to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 6.1(a) unless an Event of Default shall have occurred and be continuing.

(b)    Without limitation to the Collateral Agent's or any other Secured Party's rights to payment, reimbursement or indemnification under any other Security Document, the expenses of the Collateral Agent incurred in connection with actions undertaken as provided in Sections 6.1 and 7.6 shall be payable by any applicable Grantor to the Collateral Agent on demand.

(c)    Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

6.2    Duty of Collateral Agent.  The applicable provisions of the Second Lien Documents are herein incorporated by reference and shall be applicable to the rights, obligations, privileges, protections, immunities and benefits given to the Collateral Agent hereunder, including without limitation its right to be compensated, reimbursed, and indemnified, and are extended to, and shall be enforceable by, each agent, custodian and other person employed to act on behalf of the Collateral Agent hereunder.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the New York UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account.  The Collateral Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Liens on the Collateral.  Neither the Collateral Agent nor any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Collateral Agent and the other Secured Parties hereunder are solely to protect the Collateral Agent's and the other Secured Parties' interests in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct, as determined by a final and non-appealable judgment of a court of competent jurisdiction.  In furtherance and not in limitation of

JX 132-182

the foregoing, Wilmington Trust, National Association hereby agrees to act as Collateral Agent under and as defined in the 2018 Indenture upon and in accordance with the express terms and conditions contained therein and the other Senior Secured Convertible Note Documents, as applicable.

6.3     Execution of Financing Statements.  Each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Agreement.

6.4     Authority of the Collateral Agent.  Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Collateral Agent and the other Secured Parties, be governed by the Second Lien Documents and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

6.5     Second Lien Obligations.  The Collateral Agent shall be permitted to rely on any certificate, direction or consent delivered by any agent with respect to any series of Secured Obligations under any Second Lien Documents with respect to all matters relating to the relevant Secured Obligations.

SECTION 7.  MISCELLANEOUS

7.1     Intercreditor Agreement.  Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder, in each case, with respect to the Collateral are subject to the limitations and provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control.  By its execution and delivery of this Agreement, each Junior Second Lien Agent and Senior Second Lien Agent authorizes and directs the Collateral Agent to execute and deliver the Intercreditor Agreement and perform its obligations thereunder, binding such Junior Second Lien Agent and Senior Second Lien Agents and their respective Secured Parties to the terms thereof.

7.2     Second Lien Obligations.  On or after the date hereof and so long as not prohibited by the Second Lien Documents with respect to each series of Secured Obligations, the Issuer may from time to time designate any indenture, credit agreement or other contract to be a Junior Second Lien Agreement or Senior Second Lien Agreement and the indebtedness and other obligations thereunder to be secured as Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, by delivering to the Collateral Agent, each Junior Second Lien Agent and each Senior Second Lien Agent, if any, (a) a certificate signed by an Officer of the Issuer (i) identifying the obligations so designated and the initial aggregate principal amount or face amount thereof, (ii) stating that such agreement is designated as a Junior Second Lien Agreement or Senior Second Lien Agreement, as applicable, and such obligations are designated as (A) Secured Obligations and (B) Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, for purposes hereof, (iii) representing that such designation of such obligations as Secured Obligations and Junior Second Lien Obligations or Senior Second Lien Obligations, as applicable, complies with the terms of  the Second Lien Documents with respect to each series of Secured Obligations and (iv) specifying the name and address of the Junior Second Lien Agent or Senior Second Lien Agent, as applicable, for such obligations and (b) a fully executed Junior Second Lien Joinder Agreement or Senior Second Lien Joinder Agreement, as applicable.  Each Junior Second Lien

-19-

JX 132-183

Agent and Senior Second Lien Agent that becomes party hereto pursuant to a Junior Second Lien Joinder Agreement or Senior Second Lien Joinder Agreement agrees that upon the satisfaction of all conditions set forth in the preceding sentence, the Collateral Agent shall act as agent under this Agreement for such Junior Second Lien Agent or Senior Second Lien Agent and the holders of such Junior Second Lien Obligations or Senior Second Lien Obligations, and as Collateral Agent for the benefit of all Secured Parties, including without limitation, any Secured Party that holds any such Junior Second Lien Obligations or Senior Second Lien Obligations, and each such Junior Second Lien Agent or Senior Second Lien Agent, for itself and the other holders of the applicable Junior Second Lien Obligations or Senior Second Lien Obligations, agrees to the appointment, and acceptance of the appointment, of the Collateral Agent as agent for such Junior Second Lien Agent or Senior Second Lien Agent and the holders of such Junior Second Lien Obligations or Senior Second Lien Obligations, as set forth in each Junior Second Lien Joinder Agreement and Senior Second Lien Joinder Agreement and agrees, on behalf of itself and each Secured Party it represents, to be bound by this Agreement and to be subject to, and, if requested, to become a party to, the Intercreditor Agreement.  Notwithstanding the foregoing, it is understood that the Issuer shall not designate, or re-designate, any Senior Second Lien Agreement existing on the date hereof as a Junior Second Lien Agreement (and any related Senior Second Lien Obligations as Junior Second Lien Obligations) without the consent of the applicable Senior Second Lien Agent.

7.3    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with the provisions of each Junior Second Lien Agreement and Senior Second Lien Agreement.

7.4    Notices.  All notices, requests and demands to or upon the Collateral Agent or any Grantor hereunder shall be given in writing and delivered in person, sent by telecopy, delivered electronically, delivered by commercial courier service or mailed by first-class mail, postage prepaid, addressed as follows:

To the Collateral Agent:

Wilmington Trust, National Association, as Collateral Agent
Global Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Sears Holdings Corporation Administrator

To any Grantor:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179
Facsimile:  (847) 286-2055
Attention:  Treasurer

With a copy to (which shall not constitute notice):

Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 403-2000
Attention: Joshua A. Feltman

JX 132-184

Any such notice, request or demand to or upon any Junior Second Lien Agent or Senior Second Lien Agent shall be addressed to such Junior Second Lien Agent or Senior Second Lien Agent at its notice address set forth in the applicable Second Lien Document.

7.5    <u>No Waiver by Course of Conduct; Cumulative Remedies</u>.  Neither the Collateral Agent nor any other Secured Party shall by any act (except by a written instrument pursuant to <u>Section 7.1</u>), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Collateral Agent or any other Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Collateral Agent or any other Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Collateral Agent or such other Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

7.6    <u>Enforcement Expenses; Indemnification</u>.  Without limitation to the Collateral Agent's or any other Secured Party's rights to payment, compensation, reimbursement or indemnification under any other Security Document:

(a)    each Grantor jointly and severally agrees to pay or reimburse the Collateral Agent and the other Secured Parties for all their costs and expenses incurred in collecting against any Grantor under this Agreement or otherwise enforcing or preserving any rights under this Agreement and the other Security Documents, including, without limitation, the fees and disbursements of the Secured Parties' counsel in accordance with the terms of the Second Lien Documents;

(b)    each Grantor agrees to pay, and to save the Collateral Agent and the other Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement and the other Security Documents;

(c)    each Grantor agrees to pay, and to save the Collateral Agent and the other Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and the other Security Documents other than such as arise from the gross negligence or willful misconduct of such Person; and

(d)    to the fullest extent permitted by applicable Law, no Grantor shall assert, and each Grantor hereby waives, any claim against the Collateral Agent and the other Secured Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Security Document or any agreement or instrument contemplated hereby, or the transactions contemplated hereby or thereby.  Neither the Collateral Agent nor any other Secured Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by the Collateral Agent or other Secured Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Security Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of the Collateral Agent or other Secured Party as determined by a final and non-appealable judgment of a court of competent jurisdiction.

-21-

**JX 132-185**

The agreements in this Section 7.6 shall survive repayment of the Secured Obligations and all other amounts payable under the Security Documents and the other Second Lien Documents, the replacement of the Collateral Agent, the release of the Collateral from the Liens created hereby and the termination of this Agreement.

7.7    Successors and Assigns.    This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement except as permitted by each of the Second Lien Documents.

7.8    [Intentionally Omitted].

7.9    Counterparts.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic mail of a "PDF" file shall be effective as delivery of a manually executed counterpart of this Agreement.

7.10    Severability.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7.11    Section Headings.    The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

7.12    Integration.    This Agreement and the other Security Documents represent the agreement of the Grantors, the Collateral Agent and the other Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Collateral Agent or the other Secured Parties relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Security Documents.

7.13    GOVERNING LAW.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

7.14    Acknowledgements.    Each Grantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Security Documents to which it is a party;

(b)    neither the Collateral Agent nor any other Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Security Document, and the relationship between the Grantors, on the one hand, and the Collateral Agent and the other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

JX 132-186

(c)    no joint venture is created hereby or by the other Security Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

7.15    Additional Grantors.    Each Subsidiary of the Issuer that is required to become a party to this Agreement pursuant to Section 4.06 of the 2018 Indenture or pursuant to any other Second Lien Document shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of Exhibit II hereto to the Collateral Agent.

7.16    Releases.    This Agreement shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon each Grantor and the successors and assigns thereof and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their respective successors, indorsees, transferees and assigns until the Final Date.    In addition, the security interests granted hereunder shall terminate and be released, in whole or in part, (i) as to the obligations under the 2010 Indenture and the Senior Secured Notes, as provided in the 2010 Indenture, (ii) as to the obligations under the Second Lien Credit Agreement, as provided in the Second Lien Credit Agreement, (iii) as to the obligations under the 2018 Indenture and the Senior Secured Convertible Notes, as provided in the 2018 Indenture and (iv) as to any other Junior Second Lien Obligations or Senior Second Lien Obligations that may become Secured Obligations, as provided in the applicable Junior Second Lien Agreement or Senior Second Lien Agreement; provided, however, that this Agreement and the security interest granted herein shall be reinstated if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization of the Issuer or other Grantor.    At the request and sole expense of any Grantor following any such termination, the Collateral Agent shall deliver to such Grantor any Collateral held by the Collateral Agent hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

7.17    Jurisdiction, Etc.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Security Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Each Grantor hereby irrevocably consents to the service of process in any action or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail, postage prepaid, to the Issuer at its address specified pursuant to Section 13.02 of the 2018 Indenture.    Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.    Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Security Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Security Documents in any New York State or federal court.    Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

JX 132-187

7.18    <u>WAIVER OF JURY TRIAL</u>.  EACH GRANTOR AND THE COLLATERAL AGENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER SECURITY DOCUMENTS OR THE ACTIONS OF THE COLLATERAL AGENT OR ANY OTHER SECURED PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

7.19    The 2010 Trustee is executing this Agreement solely as Trustee under the 2010 Indenture. All rights, privileges, protections and immunities in favor of the 2010 Trustee under the 2010 Indenture are incorporated herein by reference.  The 2018 Trustee is executing this Agreement solely as Trustee under the 2018 Indenture. All rights, privileges, protections and immunities in favor of the 2018 Trustee under the 2018 Indenture are incorporated herein by reference.

[Remainder of page intentionally left blank]

-24-

JX 132-188

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**Grantors:**

SEARS HOLDINGS CORPORATION

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

CALIFORNIA BUILDER APPLIANCES, INC.
FLORIDA BUILDER APPLIANCES, INC.
KMART CORPORATION
KMART HOLDING CORPORATION
KMART OPERATIONS LLC
SEARS OPERATIONS LLC
SEARS, ROEBUCK AND CO.

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

SEARS HOLDINGS MANAGEMENT CORPORATION
SEARS HOME IMPROVEMENT PRODUCTS, INC.

By: _____
    Name:  Robert A. Riecker
    Title:  President

SEARS ROEBUCK ACCEPTANCE CORP.

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President, Finance

JX 132-189

A&E FACTORY SERVICE, LLC
A&E HOME DELIVERY, LLC
A&E LAWN & GARDEN, LLC
A&E SIGNATURE SERVICE, LLC
KLC, INC.
KMART OF MICHIGAN, INC.
PRIVATE BRANDS, LTD.
SEARS BRANDS MANAGEMENT
CORPORATION
SEARS PROTECTION COMPANY
SEARS PROTECTION COMPANY (FLORIDA),
L.L.C.
SEARS, ROEBUCK DE PUERTO RICO, INC.
SOE, INC.
STARWEST, LLC

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President

KMART.COM LLC

By: BlueLight.com, Inc., its Member

By: _____
    Name:  Robert A. Riecker
    Title:  Vice President

KMART OF WASHINGTON LLC
KMART STORES OF ILLINOIS LLC
KMART STORES OF TEXAS LLC
MYGOFER LLC

By: Kmart Corporation, its Member

By: _____
    Name:  Robert A. Riecker
    Title:  Chief Financial Officer

Signature Page to Security Agreement

JX 132-190

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _Lynn M. Steiner_
    Name:  Lynn M. Steiner
    Title:  Vice President

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as 2010 Trustee

By: _Lynn M. Steiner_
    Name:  Lynn M. Steiner
    Title:  Vice President

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A., as 2018 Trustee

By: _____
    Name:
    Title:

JPP, LLC, as Second Lien Credit Agreement Agent

By: _____
    Name:
    Title:

*[Signature Page to Security Agreement]*

**Collateral Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____
    Name:
    Title:

**Junior Second Lien Agent:**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as 2010 Trustee

By: _____
    Name:
    Title:

**Senior Second Lien Agents:**

COMPUTERSHARE TRUST COMPANY, N.A., as Trustee

By: _____
    Name:  Michael A. Smith
    Title:  Trust Officer

JPP, LLC

By: _____
    Name:
    Title:

*[Signature Page to Security Agreement]*

**JX 132-192**

Collateral Agent:

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____
     Name:
     Title:

Junior Second Lien Agent:

WILMINGTON TRUST, NATIONAL ASSOCIATION, as 2010 Trustee

By: _____
     Name:
     Title:

Senior Second Lien Agents:

COMPUTERSHARE TRUST COMPANY, N.A.

By: _____
     Name:
     Title:

JPP, LLC

By: _____
     Name:  Edward S. Lampert
     Title:  Member

*[Signature Page to Security Agreement]*

**JX 132-193**

Schedule 1

## GRANTORS AND NOTICE ADDRESSES OF GRANTORS

| Grantor | Notice Address |
|---|---|
| Sears Roebuck Acceptance Corp. | 3711 Kennett Pike<br>Greenville, DE 19807 |
| Kmart Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Holdings Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Factory Service, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Home Delivery, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Lawn & Garden, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| A&E Signature Service, LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| California Builder Appliances, Inc. | 6085 State Farm Dr., Suite 200<br>Rohnert Park, CA 94928 |
| Florida Builder Appliances, Inc. | 1742 W. Atlantic Blvd.<br>Pompano Beach, FL 33069 |
| KLC, Inc. | 5000 San Dario<br>Laredo, TX 78041 |
| Kmart Holding Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart of Michigan, Inc. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart of Washington LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Operations LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Stores of Illinois LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart Stores of Texas LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Kmart.com LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |

**JX 132-194**

| Grantor | Notice Address |
|---|---|
| MyGofer LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Private Brands, Ltd. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Brands Management Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Holdings Management Corporation | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Home Improvement Products, Inc. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Operations LLC | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Protection Company | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears Protection Company (Florida), L.L.C. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears, Roebuck and Co. | 3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| Sears, Roebuck de Puerto Rico, Inc. | Montehiedra Town Center-Kmart 2nd Flr.<br>9410 Avenida Los Romeros<br>San Juan, PR 00926 |
| SOE, Inc. | 9025 S. Kyrene Road<br>Tempe, AZ 85284 |
| StarWest, LLC | 9025 S. Kyrene Road<br>Tempe, AZ 85284 |

**JX 132-195**

Schedule 2

FILINGS

Uniform Commercial Code Filings

UCC-1 Financing Statements to be filed against the Grantors specified below with the Secretary of State of the jurisdictions set forth next to such Grantor's name:

| Grantor | Jurisdiction |
| --- | --- |
| Sears Roebuck Acceptance Corp. | Delaware |
| Kmart Corporation | Michigan, Puerto Rico and Guam |
| Sears Holdings Corporation | Delaware |
| A&E Factory Service, LLC | Delaware |
| A&E Home Delivery, LLC | Delaware |
| A&E Lawn & Garden, LLC | Delaware |
| A&E Signature Service, LLC | Delaware |
| California Builder Appliances, Inc. | Delaware |
| Florida Builder Appliances, Inc. | Delaware |
| KLC, Inc. | Texas |
| Kmart Holding Corporation | Delaware |
| Kmart of Michigan, Inc. | Michigan |
| Kmart of Washington LLC | Washington |
| Kmart Operations LLC | Delaware |
| Kmart Stores of Illinois LLC | Illinois |
| Kmart Stores of Texas LLC | Texas |
| Kmart.com LLC | Delaware |
| MyGofer LLC | Delaware |
| Private Brands, Ltd. | Delaware |
| Sears Brands Management Corporation | Delaware and Puerto Rico |
| Sears Holdings Management Corporation | Delaware and Puerto Rico |
| Sears Home Improvement Products, Inc. | Pennsylvania |
| Sears Operations LLC | Delaware |
| Sears Protection Company | Illinois |
| Sears Protection Company (Florida), L.L.C. | Florida |

**JX 132-196**

| Sears, Roebuck and Co. | New York, Puerto Rico and Guam |
| Sears, Roebuck de Puerto Rico, Inc. | Delaware and Puerto Rico |
| SOE, Inc. | Delaware |
| StarWest, LLC | Delaware |

<u>Schedule 3</u>

LOCATION OF JURISDICTION OF ORGANIZATION

| Grantor | Jurisdiction of Organization | Identification Number |
|---|---|---|
| Sears Roebuck Acceptance Corp. | Delaware | 0506120 |
| Kmart Corporation | Michigan | 142467 |
| Sears Holdings Corporation | Delaware | 3881360 |
| A&E Factory Service, LLC | Delaware | 3457178 |
| A&E Home Delivery, LLC | Delaware | 3877029 |
| A&E Lawn & Garden, LLC | Delaware | 3748766 |
| A&E Signature Service, LLC | Delaware | 3748765 |
| California Builder Appliances, Inc. | Delaware | 2862479 |
| Florida Builder Appliances, Inc. | Delaware | 2143982 |
| KLC, Inc. | Texas | 1276656 |
| Kmart Holding Corporation | Delaware | 3648953 |
| Kmart of Michigan, Inc. | Michigan | 33800A |
| Kmart of Washington LLC | Washington | 602292492 |
| Kmart Operations LLC | Delaware | 5671829 |
| Kmart Stores of Illinois LLC | Illinois | 00912026 |
| Kmart Stores of Texas LLC | Texas | 800200422 |
| Kmart.com LLC | Delaware | 3138594 |
| MyGofer LLC | Delaware | 4631467 |
| Private Brands, Ltd. | West Virginia | 110640 |
| Sears Brands Management Corporation | Delaware | 0617118 |
| Sears Holdings Management Corporation | Delaware | 4041132 |
| Sears Home Improvement Products, Inc. | Pennsylvania | 2204417 |
| Sears Operations LLC | Delaware | 5671833 |
| Sears Protection Company | Illinois | 61825622 |
| Sears Protection Company (Florida), L.L.C. | Florida | L03000020977 |
| Sears, Roebuck and Co. | New York | NONE |
| Sears, Roebuck de Puerto Rico, Inc. | Delaware | 0561919 |
| SOE, Inc. | Delaware | 3816328 |

**JX 132-198**

| StarWest, LLC | Delaware | 3833707 |

JX 132-199

<u>EXHIBIT I</u>

[Form of]

**[JUNIOR SECOND LIEN]/[SENIOR SECOND LIEN] JOINDER AGREEMENT**

The undersigned (the "<u>[Junior Second Lien]/[Senior Second Lien] Agent</u>") is the [agent/trustee/representative] for Persons wishing to become "Secured Parties" (the "New Secured Parties") under the Amended and Restated Security Agreement, dated as of March 20, 2018 (as amended and/or supplemented, the "Security Agreement" (terms used without definition herein have the meanings assigned to such terms by the Security Agreement)) among Sears Holdings Corporation, the other Grantors party thereto, Wilmington Trust, National Association, as Collateral Agent (the "Collateral Agent") and the other agents party thereto.

In consideration of the foregoing, the undersigned hereby:

(i)    represents that the [Junior Second Lien]/[Senior Second Lien] Agent has been authorized by the New Secured Parties to become a party to the Security Agreement on behalf of the New Secured Parties under that [DESCRIBE OPERATIVE AGREEMENT] (the obligations thereunder and under the ancillary documents referred to therein, the "New Secured Obligations") and to act as the [Junior Second Lien]/[Senior Second Lien] Agent for the New Secured Parties hereunder and under the Security Agreement;

(ii)    acknowledges that the New Secured Parties have received a copy of the Security Agreement;

(iii)    irrevocably appoints and authorizes the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Security Agreement and the other Security Documents as are delegated to the Collateral Agent by the terms thereof, together with all such powers as are reasonably incidental thereto; and

(iv)    accepts and acknowledges, for itself and the other New Secured Parties, the terms of the Security Agreement applicable to it and the New Secured Parties and agrees to serve as [Junior Second Lien]/[Senior Second Lien] Agent for the New Secured Parties with respect to the New Secured Obligations and agrees on its own behalf and on behalf of the New Secured Parties to be bound by the terms of the Security Agreement and the other Security Documents applicable to holders of Secured Obligations, with all the rights and obligations of a Secured Party thereunder and bound by all the provisions thereof as fully as if it had been a Secured Party on the effective date of the Security Agreement.

The name and address of the representative for purposes of Section 7.4 of the Security Agreement are as follows:

**[name and address of [Junior Second Lien]/[Senior Second Lien] Agent]**

IN WITNESS WHEREOF, the undersigned has caused this [Junior Second Lien]/[Senior Second Lien] Joinder Agreement to be duly executed by its authorized officer as of the _____ day of ___, 20__.

[NAME]

By: _____
     Name:
     Title:


AGREED TO AND ACCEPTED:

The Collateral Agent hereby acknowledges its acceptance of this [Junior Second Lien]/[Senior Second Lien] Joinder Agreement and agrees to act as Collateral Agent for the New Secured Parties, subject to the terms of the [agency agreement, dated as of _____].

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____
     Name:
     Title:

EXHIBIT II

FORM OF ASSUMPTION AGREEMENT

ASSUMPTION AGREEMENT, dated as of [_____, 20__], made by [_____] (the "Additional Grantor"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, as collateral agent (the "Collateral Agent"), for the benefit of the Secured Parties pursuant to the Security Agreement referred to below.  All capitalized terms not defined herein shall have the meaning ascribed to them in such Security Agreement.

W I T N E S S E T H

WHEREAS, Sears Holdings Corporation ("Holdings") and certain of its Subsidiaries (other than the Additional Grantor) have entered into that certain Amended and Restated Security Agreement, dated as of March 20, 2018 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"), in favor of the Collateral Agent for the benefit of the Secured Parties;

WHEREAS, the Security Agreement and/or the applicable Second Lien Documents (as defined in the Security Agreement) requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement.

NOW, THEREFORE, IT IS AGREED:

1. Security Agreement.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 7.15 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder, and grants to the Collateral Agent for the benefit of the Secured Parties a security interest in all Collateral of such Additional Grantor to secure the Secured Obligations.  The information set forth in Annex 1-A hereto is hereby added to the information set forth in the Schedules to the Security Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Section 3 of the Security Agreement is, as to such Additional Grantor, true and correct on and as of the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2. Governing Law. THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

[Remainder of Page intentionally left blank]

**JX 132-202**

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]

By: _____

Name:

Title:

JX 132-203

Annex 1-A to
Assumption Agreement

Supplement to Schedule 1

Supplement to Schedule 2

Supplement to Schedule 3

# EXHIBIT I

JX 132.206

EXHIBIT I
TO
ADDENDUM TO PROOF OF CLAIM FILED BY
WILMINGTON TRUST, NATIONAL ASSOCIATION
AS INDENTURE TRUSTEE AND COLLATERAL AGENT

PERFECTION OF SECURITY INTERESTS

**DEBTOR:** Sears Holdings Corporation, a Delaware corporation ("Holdings")

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552621 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655941 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Kmart Corporation, a Michigan corporation ("Kmart")

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| MI SOS | 2010137071- 6 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| MI SOS | 2015088447- 3 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 28756 | 10/13/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 29179 | 6/23/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005803 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

1

54948054v.4

JX 132.207

**DEBTOR**: Sears, Roebuck and Co., a New York corporation ("SRAC")

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| NY SOS | 201010120551842 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| NY SOS | 201608150389181 | 8/15/2016 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 28757 | 10/13/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Guam Commissioner of Banking & Insurance | 29178 | 6/23/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010 005906 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552951 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656170 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005908 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: A&E Home Delivery, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550047 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2654746 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

2

54948054v.4

**DEBTOR: A&E Lawn & Garden, LLC, a Delaware limited liability company**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550377 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2654829 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: A&E Signature Service, LLC, a Delaware limited liability company**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550617 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655032 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: California Builder Appliances, Inc., a Delaware corporation**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550781 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655198 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: Florida Builder Appliances, Inc., a Delaware corporation**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3550880 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655248 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: KLC, Inc., a Texas corporation**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| TX SOS | 10-0029500067 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| TX SOS | 15-00202816 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

3

54948054v.4

JX 132.209

**DEBTOR: Kmart Stores of Illinois LLC, an Illinois limited liability company**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| IL SOS | 15671645 FS | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| IL SOS | 9362229 CT | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: Kmart Stores of Texas LLC, a Texas limited liability company**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| TX SOS | 10-0029500188 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| TX SOS | 15-00202815 | 6/22/2015 | UCC-3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: Kmart Holding Corporation, a Delaware corporation**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3551052 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655339 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: Kmart Management Corporation, a Michigan corporation**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| MI SOS | 20101370072-8 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| MI SOS | 2015088445-9 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR: Kmart of Michigan, Inc., a Michigan corporation**

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| MI SOS | 20101370075-4 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| MI SOS | 2015088446-1 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

4

54948054v.4

JX 132.210

**DEBTOR:** Kmart of Washington LLC, a Washington limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| WA SOS | 2010-286-2911-6 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| WA SOS | 2015-173-1581-0 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Kmart.com LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010-3551169 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015-2655503 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** MyGofer LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010-3552241 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015-265594 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Private Brands, Ltd., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2011-1274409 | 4/6/2011 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2014-2601474 | 7/1/2014 | UCC-3 Amendment | Wilmington Trust, National Association, as Collateral Agent |
| DE SOS | 2015-4635032 | 10/12/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

5

54948054v.4

JX 132.211

**DEBTOR:** Sears Protection Company, an Illinois corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| IL SOS | 15671653 FS | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| IL SOS | 9362228 CT | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** SOE, Inc., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3553140 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656287 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Sears Brands Management Corporation., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552597 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2655727 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005909 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Sears Holdings Management Corporation, a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552670 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656006 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |
| Puerto Rico SOS | 2010005910 | 10/28/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| Puerto Rico SOS | illegible | 7/2/2014 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

6

54948054v.4

**DEBTOR:** Sears Home Improvement Products Inc., a Pennsylvania corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| PA SOS | 2010101403403 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| PA SOS | 201506230782 9 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Sears Protection Company (Florida), L.L.C., a Florida limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| FL SOS | 201003379646 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| FL SOS | 201504201653 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** Sears Roebuck Acceptance Corp., a Delaware corporation

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3552795 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656071 | 6/22/2015 | UCC-3 Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** StarWest, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2010 3553223 | 10/12/2010 | UCC-1 Financing Statement | Wells Fargo Bank, National Association, as Collateral Agent |
| DE SOS | 2015 2656337 | 6/22/2015 | UCC3 - Continuation | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR:** A&E Factory Service, LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2016 5717614 | 9/19/2016 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

7

54948054v.4

JX 132.213

**DEBTOR**: Kmart Operations LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2015 2918638 | 7/7/2015 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

**DEBTOR**: Sears Operations LLC, a Delaware limited liability company

| Jurisdiction | Filing Number | Filing Date | Type of Filing | Secured Party |
|---|---|---|---|---|
| DE SOS | 2015 2918596 | 7/7/2015 | UCC-1 Financing Statement | Wilmington Trust, National Association, as Collateral Agent |

8

54948054v.4

# Exhibit 93

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | RECEIVED |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | APR 04 2019 |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☑ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | PRIME CLERK LLC |



182353880006750

## Proof of Claim
04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:  Identify the Claim

| | | |
|---|---|---|
| **1. Who is the current creditor?** | Computershare Trust Company, N.A., as Indenture Trustee for 6.625% Second Lien PIK Notes | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? | |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Kelley Drye & Warren, LLP, Attn: Pamela Bruzzese-Szczygiel<br>101 Park Avenue<br>New York, NY  10178<br><br>Contact phone  212-808-7800<br>Contact email  PBruzzese-Szczygiel@kelleydrye.com | **Where should payments to the creditor be sent?** (if different)<br><br>Computershare Trust Company, N.A., as Trustee<br>Attn: Michael A. Smith<br>2950 Express Drive South, Suite 210<br>Islandia, NY 11749<br><br>Contact phone  631-233-6330<br>Contact email  michael.smith2@computershare.com |
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known)_____ | Filed on  MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? | |

Date Stamped Copy Returned
No Self-Addressed Stamped Envelope
No Copy Provided

**Claim Number: 14268**

# JX 133-1

| **Part 2:** | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $_____181,252,919.00_____   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

____see addendum____

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   ____see addendum____

**Basis for perfection:**   ____see addendum____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed) ____6.63____ %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**JX 133-2**

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.    $_____

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/01/2019    (mm/dd/yyyy)

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name of the person who is completing and signing this claim:

| Name | Michael A. Smith | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Vice President - Trust Officer | | |
| Company | Computershare Trust Company, N.A. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 2950 Express Drive South, Suite 210 | | |
| | Number    Street | | |
| | Islandia | NY | 11749 |
| | City | State | ZIP Code |
| Contact phone | 631-233-6330 | Email | michael.smith2@computershare.com |

**JX 133-3**

**ADDENDUM TO MASTER PROOF OF CLAIM OF COMPUTERSHARE TRUST COMPANY, N.A., AS INDENTURE TRUSTEE UNDER THE INDENTURE DATED AS OF MARCH 20, 2018 (AS AMENDED AND SUPPLEMENTED)**

## I.    BASIS FOR CLAIM

Computershare Trust Company, N.A. ("***Computershare***") is the indenture trustee for the holders of the 6.625% Senior Secured Convertible PIK Toggle Notes due 2019 (the "***Second Lien PIK Notes***") issued under the Indenture, dated as of March 20, 2018 by and among Sears Holdings Corporation, as Issuer (the "***Issuer***"), the guarantors party thereto, including Sears Roebuck Acceptance Corp. (the "***Debtor***"), Computershare, as Trustee (the "***Indenture Trustee***") (as it thereafter may have been amended, supplemented or modified from time to time, the "***Indenture***"),[1] pursuant to which the Issuer issued the Second Lien PIK Notes. Pursuant to the terms of the Indenture, repayment of the Second Lien PIK Notes is guaranteed by the Debtor and by each of the affiliates of the Issuer listed on Exhibit A hereto.

Pursuant to the Indenture, the Issuer issued the Second Lien PIK Notes, of which approximately $181,253,000 in aggregate principal amount, plus charges, fees and other amounts owing under the Second Lien PIK Notes Documents (defined below) or applicable law, were outstanding as of the Petition Date (defined below). The specific claim amounts asserted at this time are specified below in Part II.

Pursuant to the *Order (I) Establishing Deadline to File Proofs of Claim and Procedures Relating Thereto, (II) Approving the Form and Manner of Notice Thereof, (III) Approving Procedures for the Resolution of Claims Asserted Pursuant to 11 U.S.C. § 503(B)(9), and (IV) Prohibiting Vendors From Pursuing Such Claims Outside the Procedures* [Doc. No. 2676] (the "***Bar Date Order***"), Section 6.10 of the Indenture and Rule 3003 of the Federal Rules of Bankruptcy Procedure, the Indenture Trustee is authorized to file this Master Proof of Claim

---

[1]    Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Indenture.

4836-0760-5649v.1

**JX 133-4**

against the Debtor on behalf of itself and each holder of the Second Lien PIK Notes (the

"*Noteholders*") in the chapter 11 case of the Issuer.

As permitted by the Bar Date Order, because of the voluminous nature of the Second

Lien PIK Notes, the Indenture and any related documentation (collectively, the "*Second Lien*

*PIK Notes Documents*") that support this Master Proof of Claim, most of which are or should

be in the Debtor's possession, the Second Lien PIK Notes Documents are not annexed hereto,

but each is hereby expressly incorporated by reference.  Counsel for the Indenture Trustee will

make copies of the Second Lien PIK Notes Documents available to any party in interest who

requests them in writing within ten (10) business days after counsel receives such request.

Requests for copies of the Second Lien PIK Notes Documents should be in writing and directed

to counsel for the Indenture Trustee, Kelley Drye & Warren LLP, 101 Park Avenue, New York,

New York 10178, Attention: Benjamin D. Feder, Esq., bfeder@kelleydrye.com.

## II.    CLASSIFICATION OF CLAIMS AND TOTAL
## AMOUNT OF CLAIMS AT TIME CASE FILED

Pursuant to the Second Lien PIK Notes Documents, the Debtor, as a guarantor under the

Indenture, was, as of October 15, 2018, the date the Debtor filed a voluntary petition for relief

under chapter 11 of the Bankruptcy Code (the "*Petition Date*"), and is currently absolutely and

unconditionally indebted to the Indenture Trustee, on behalf of itself and the Noteholders, in the

amount of not less than $181,252,919.00, which consists of the following:

        (a)    Principal Amount:  $ 181,252,919.00, which includes $5,811,498.00 of

PIK Interest which was to be issued on October 15, 2018, less the principal

amount of the portion of the Second Lien PIK Notes which comprised Credit Bid

Obligations.[2]

---

[2]    As defined in the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II)
Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and*

**JX 133-5**

(b)    Accrued Unpaid Interest:

        (i)    accrued and unpaid interest from and after the Petition Date at the rate of interest specified in the Second Lien PIK Notes and the Indenture; plus

        (ii)    interest on overdue installments of interest and Special Interest, to the extent lawful, from and after the Petition Date at the rate of interest specified in the Second Lien PIK Notes and the Indenture.

(c)    Classification of Claims:

        (i)    Secured Claim against the Debtor:  This Master Proof of Claim asserts a claim against the Debtor secured by valid, binding, continuing, enforceable and properly perfected liens on, and security interests in, the Collateral.  The liens on the Collateral arise under both law and equity.  Accordingly, this Master Proof of Claim is filed against the Debtor as a secured claim to the extent of the value of the Collateral.

        (ii)    Unsecured Claim against the Debtor:  Subject to, and without in any way waiving or limiting the rights of the Indenture Trustee and/or the Noteholders under the Bankruptcy Code as holders of a secured claim, if the value of the Collateral is less than the total amount of the secured claim described above (including all accrued and unpaid interest and costs and all other amounts to which the Indenture Trustee and/or the Noteholders may be entitled under the Second Lien PIK Notes Documents), the remainder of such claim is filed as a general unsecured claim against the Debtor, to the extent of any deficiency.

(d)    Indenture Trustee Compensation and Expenses:

The Debtor is obligated to the Indenture Trustee for any and all amounts due and to become due to the Indenture Trustee, whether arising before or after the Petition Date, for its compensation, for all reasonable out-of-pocket expenses incurred or made by the Indenture Trustee (including the reasonable compensation and expenses, disbursements and advances  of the Indenture Trustee's agents, counsel (including, without limitation, Kelley Drye & Warren

---

*Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases In Connection Therewith and (IV) Granting Related Relief* [Doc. No. 2507] (the "***Sale Order***").

JX 133-6

LLP and any additional or successor counsel), accountants and experts), for indemnification and for all other amounts due or to become due to the Indenture Trustee under the Indenture (including Section 7.01 thereof) or any other Second Lien PIK Notes Document (collectively, the "***Indenture Trustee Charges***").  The Indenture Trustee will continue to incur Indenture Trustee Charges from and after the date hereof, which amounts are not fixed at this time but constitute a part of this Master Proof of Claim.  The Indenture Trustee does not waive any rights with respect to the Indenture Trustee Charges by not stating a specific figure therefor at this time.  The Indenture Trustee has a lien prior to the Second Lien PIK Notes for all Indenture Trustee Charges on all money or property held or collected by the Indenture Trustee and is entitled to priority payment pursuant to Section 6.11 of the Indenture.

 (e) <u>Other Unliquidated Amounts</u>.

 The Debtor is obligated to the Indenture Trustee for any and all other amounts due or to become due with respect to, arising from or in connection with the Second Lien PIK Notes Documents on any basis, in law or in equity, whether now due or hereafter arising, which amounts may presently be unliquidated or contingent, but may become fixed and liquidated in the future, and all damages for breach of any covenant, representation, warranty or other provision of the Indenture or the other Second Lien PIK Notes Documents. Such amounts include, among other things, all amounts related to a make-whole and/or optional redemption provisions contained in the Indenture and the Second Lien PIK Notes.  The total of all such other amounts cannot, at this time, be reasonably calculated or estimated, and the Indenture Trustee does not waive any rights with respect to such other amounts by not stating a specific figure therefore at this time.

 All payments or distributions on account of the claim under the Indenture asserted hereby must be made to or at the direction of the Indenture Trustee. Prior to making any payments or

**JX 133-7**

distributions on account of such claim, the Debtor should consult with counsel for the Indenture

Trustee regarding the delivery of such payments or distributions.

## III.   INQUIRY NOTICE

This Master Proof of Claim serves, and is intended to serve, as a notice of a claim against

the Debtor for any and all amounts due or to become due under the Second Lien PIK Notes

Documents to the Indenture Trustee and/or the Noteholders as set forth in this Master Proof of

Claim, the provisions of each of which are expressly incorporated herein by reference, whether

or not summarized or identified specifically in this Master Proof of Claim, and all interested

parties are on notice of, and advised to examine carefully the provisions of the Second Lien PIK

Notes Documents to determine, among other things, the full scope of this Master Proof of Claim.

## IV.   RESERVATION OF RIGHTS

This Master Proof of Claim is not an election of remedies or waiver of any claims not

expressly asserted herein.  The Indenture Trustee does not waive, and expressly reserves, all

rights and remedies at law or in equity that Computershare, individually or as Indenture Trustee,

has or may have against the Debtor, or any other person or entity, including, without limitation,

rights that can be asserted by the Indenture Trustee on behalf of the Noteholders, whether such

right or remedy arises before, upon or after the Petition Date.  The Indenture Trustee further

reserves all of its procedural and substantive defenses to any claim that may be asserted against

Computershare, individually or as Indenture Trustee, by the Debtor, or any other person or

entity.  Nothing in this Master Proof of Claim is intended or should be construed to limit the

Indenture Trustee's rights, remedies, or interests with respect to the subject matter of this Master

Proof of Claim.

The Indenture Trustee also reserves the right to (i) amend, revise, update, or supplement

this Master Proof of Claim at any time and in any respect, including, without limitation, the

addition of further documents and information, as necessary or appropriate to support, amend,

**JX 133-8**

quantify or correct amounts, to provide additional detail regarding the claims set forth herein, to assert alternative theories of recovery, or to fix the amount of any contingent or unliquidated claim, (ii) file additional proofs of claim for additional claims that may be based on the same or additional documents or other liability or indebtedness of the Debtor, to the Indenture Trustee, and (iii) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the above amounts and additional amounts.

This Master Proof of Claim is not intended to be, and shall not be construed as (i) a waiver of any defaults, or (ii) a waiver or limitation of any rights at law or equity, remedies, claims or interests of the Indenture Trustee, including, without limitation, the right to seek a trial by jury with respect to any contested proceeding arising from or pertaining to any of the claims set forth herein.  Without in any way limiting the generality of the above reservations of rights, the Indenture Trustee hereby expressly reserves the right to assert that the portion of its fees and expenses (including the fees and expenses of its agents and counsel) relating to services rendered on and after the Petition Date constitute expenses of administration under the United States Bankruptcy Code to the extent such expenses are not otherwise paid in full, and the Indenture Trustee reserves the right to file a claim, application or request for payment of administrative expenses.

**V.    JUDGMENTS**

No judgment has been rendered on this Master Proof of Claim or the matters set forth herein.

**VI.    CREDITS AND SETOFF**

As of the Petition Date, to the best of the Indenture Trustee's knowledge, other than as may be set forth in the Sale Order, the claims asserted in this Master Proof of Claim are not subject to any setoffs or counterclaims.  To the extent the Debtor asserts any claims against the

6

**JX 133-9**

Indenture Trustee or the Noteholders (or any of them), the Indenture Trustee reserves the right to assert that such claims are subject to the rights of setoff and/or recoupment.

JX 133-10

**Exhibit A**

**Guarantors**

A&E Factory Service, LLC
A&E Home Delivery, LLC
A&E Lawn & Garden, LLC
A&E Signature Service, LLC
California Builder Appliances, Inc.
Florida Builder Appliances, Inc.
KLC, Inc
Kmart Corporation
Kmart Holding Corporation
Kmart of Michigan, Inc.
Kmart of Washington LLC
Kmart Operations LLC
Kmart Stores of Illinois LLC
Kmart Stores of Texas LLC
Kmart.com LLC (f/k/a Bluelight.com LLC)
MyGofer LLC
Private Brands, Ltd.
Sears Brands Management Corporation (f/k/a Sears International Marketing, Inc.)
Sears Holdings Management Corporation
Sears Home Improvement Products, Inc.
Sears Operations LLC
Sears Protection Company
Sears Protection Company (Florida), L.L.C.
Sears Roebuck Acceptance Corp.
Sears, Roebuck and Co.
Sears, Roebuck de Puerto Rico, Inc.
SOE, Inc. (f/k/a SOE, LLC)
StarWest, LLC

JX 133-11



# Prime Clerk

## <u>Manhattan</u>

### <u>CLAIM/BALLOT HAND DELIVERY</u>
### <u>CONFIRMATION SHEET</u>

DATE RECEIVED: _____ 4/4/19 _____

CASE: _____ Sears _____

NO. OF CLAIMS: _____ 28 _____

NO. OF BALLOTS: _____

COPIES: _____ 28 _____

RECEIVED BY: _____ Sms _____

**JX 133-12**

# Exhibit 94



# Project Blue
# Wind Down Budget

January 10, 2019

**PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408**

SEARS HOLDINGS

CONFIDENTIAL

SEARS-WT_000093

**JX 134-1**

**PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408**

# Wind Down Budget Lender Paydown and Collateral

- **Total book value of first lien collateral as of 1/3/2019 borrowing base: $1.9bn**
  - Includes $1.83bn of inventory, $57mm of CC receivables, and $8mm of Rx receivables
    - Does not include pharmacy scripts or pari passu DIP collateral
- **We project realization of a 90% NOLV on liquidated inventory in wave 3 and wave 4 during the liquidation**
- **Gross proceeds from all sources over the 13 weeks is $2.3bn (net of sales tax)**
  - Gross proceeds from merchandise liquidation of $1,853mm
  - Normal course non-GOB merchandise receipts of $244mm
  - Other cash receipts of $134mm
  - Pharmacy Script proceeds of $70mm
  - Augment net proceeds of $7mm
  - Non-refundable ESL deposit forfeit of $17mm
  - Estimated TSA receipts of $10mm
- **DIP ABL is fully paid by week ending 3/16/19**
  - No increase in net ABL borrowings over the 13 weeks ending 4/6/2019
  - FILO is fully paid by week ending 3/23/2019
- **Collateral coverage increases consistently over the 13 weeks ending 4/6/2019**

**LTV Calculation as of Week Ending:**

| 1/5 2019 | 1/12 2019 | 1/19 2019 | 1/26 2019 | 2/2 2019 | 2/9 2019 | 2/16 2019 | 2/23 2019 | 3/2 2019 | 3/9 2019 | 3/16 2019 | 3/23 2019 | 3/30 2019 | 4/6 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79% | 85% | 87% | 85% | 84% | 82% | 85% | 81% | 91% | 68% | 27% | 34% | 0% | 0% |

[1] The final Wave 4 GOB sales continue one week past the 13 week period ending 4/6/19
[2] Value excluded over time period includes: $20mm from final week of GOB sale, $174mm of normal course COGS, $64mm of customer deposits, $65mm of pledged receivables, and $12mm of other
[3] NOLV calculated for the 13 week period represents blended average of wave 2, wave 3, and wave 4; due to the lower NOLV for the tail end of wave 2, blended NOLV during the time period is below 90%

| 13 Weeks Ending 4/6/19 | |
|---|---|
| **1L SUMMARY** | |
| DIP Revolver | 452 |
| DIP Term Loan | 424 |
| ABL LC | 119 |
| FILO | 125 |
| **Total** | **$1,119** |
| **COLLATERAL SUMMARY** | |
| Inventory (Book) | $1,829 |
| CC Receivables | 57 |
| Pharmacy Receivables | 8 |
| **Gross Collateral - 1/4/19** | **$1,894** |
| Less: Adjustments[2] | (333) |
| Subject for GOB Liquidation | $1,560 |
| **PROCEEDS SUMMARY** | |
| Gross proceeds generated over 13-week period ending 4/6/2019: | $2,335 |
| GOB Proceeds | $1,853 |
| Liquidation Expense | (457) |
| Net GOB Proceeds | $1,396 |
| NOLV % [3] | 89% |
| ABL Paydown | (994) |
| FILO Paydown | (125) |
| **Total 1L Paydown** | **($1,119)** |



SEARS HOLDINGS    2

SEARS-WT_000094
**JX 134-2**

**PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408**

# Wind Down Budget Lender Paydown and Collateral – Sensitivity Analysis at 83% NOLV

> *The Company also ran an alternative scenario showing GOB sales yielding an 83% NOLV, in this scenario results are as follows:*

- **Total book value of first lien collateral as of 1/3/2019 borrowing base: $1.9bn**
  - Includes $1.83bn of inventory, $57mm of CC receivables, and $8mm of Rx receivables
    - Does not include pharmacy scripts or pari passu DIP collateral
- **We project realization of a 83% NOLV on liquidated inventory in wave 3 and wave 4 during the liquidation**
- **Gross proceeds from all sources over the 13 weeks is $2.2bn (net of sales tax)**
  - Gross proceeds from merchandise liquidation of $1,745mm
  - Normal course non-GOB merchandise receipts of $244mm
  - Other cash receipts of $134mm
  - Pharmacy Script proceeds of $70mm
  - Augment net proceeds of $7mm
  - Non-refundable ESL deposit forfeit of $17mm
  - Estimated TSA receipts of $10mm
- **DIP ABL is fully paid by 3/23/19**
  - No increase in net ABL borrowings over the 13 weeks ending 4/6/2019
  - FILO is fully paid by week ending 4/6/2019
- **Collateral coverage increases consistently over the 13 weeks ending 4/6/2019**

| 13 Weeks Ending 4/6/19 | |
|---|---:|
| **1L SUMMARY** | |
| DIP Revolver | 452 |
| DIP Term Loan | 424 |
| ABL LC | 119 |
| FILO | 125 |
| **Total** | **$1,119** |
| **COLLATERAL SUMMARY** | |
| Inventory (Book) | $1,829 |
| CC Receivables | 57 |
| Pharmacy Receivables | 8 |
| **Gross Collateral - 1/4/19** | **$1,894** |
| Less: Adjustments[2] | (333) |
| Subject for GOB Liquidation | **$1,560** |
| **PROCEEDS SUMMARY** | |
| Gross proceeds generated over 13-week period ending 4/6/2019: | $2,226 |
| GOB Proceeds | $1,745 |
| Liquidation Expense | (457) |
| Net GOB Proceeds | $1,288 |
| *NOLV %* [3] | 83% |
| ABL Paydown | (994) |
| FILO Paydown | (125) |
| **Total 1L Paydown** | **($1,119)** |

**LTV Calculation as of Week Ending:**

| 1/5 2019 | 1/12 2019 | 1/19 2019 | 1/26 2019 | 2/2 2019 | 2/9 2019 | 2/16 2019 | 2/23 2019 | 3/2 2019 | 3/9 2019 | 3/16 2019 | 3/23 2019 | 3/30 2019 | 4/6 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79% | 85% | 87% | 86% | 86% | 86% | 81% | 79% | 65% | 69% | 82% | 88% | 99% | 0% |

[1] The final Wave 4 GOB sales continue one week past the 13 week period ending 4/6/19
[2] Value excluded over time period includes: $20mm from final week of GOB sale, $174mm of normal course COGS, $64mm of customer deposits, $65mm of pledged receivables, and $12mm of other
[3] NOLV calculated for the 13 week period represents blended average of wave 2, wave 3, and wave 4; due to the lower NOLV for the tail end of wave 2, blended NOLV during the time period is ~83%



SEARS HOLDINGS    3

**PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408**

# Wind Down Budget Weekly Cash Flows
## (1 of 2)

| Month | December | January | | | | February | | | | March | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | |
| Retail Week EoP | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 | 3/23/19 | 3/30/19 | 4/6/19 | 13 - 25 |
| Unique Week | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 | 201907 | 201908 | 201909 | |
| **INVENTORY LIQUIDATION[1]** | | | | | | | | | | | | | | | |
| [1] GOB Sales Receipts | 30 | 29 | 26 | 84 | 246 | 223 | 213 | 192 | 175 | 162 | 141 | 126 | 120 | 115 | 1,853 |
| [2] GOB Rent | 0 | (9) | 0 | 0 | 0 | (17) | (6) | 0 | 0 | (17) | (6) | 0 | 0 | (10) | (64) |
| [3] GOB Addt'l Expenses | 0 | (6) | (6) | (13) | (38) | (38) | (38) | (38) | (38) | (38) | (38) | (35) | (35) | (35) | (392) |
| [4] GOB Liquidator Fees | 0 | 0 | 0 | 0 | (0) | 0 | 0 | 0 | (0) | 0 | 0 | 0 | (0) | 0 | (1) |
| [5] Pharmacy Script Proceeds | 0 | 13 | 0 | 13 | 0 | 13 | 0 | 13 | 0 | 13 | 6 | 0 | 0 | 0 | 70 |
| [6] External Augment Proceeds | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 6 |
| **GOB Net Proceeds** | $30 | $27 | $20 | $84 | $210 | $182 | $171 | $168 | $138 | $120 | $105 | $92 | $85 | $71 | $1,473 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | |
| [7] Normal Course Net Merchandise Receipts[2] | 157 | 96 | 80 | 69 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 244 |
| [8] Plus: PA Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| [9] Plus: Other Cash Receipts[3] | 0 | 23 | 21 | 19 | 15 | 13 | 11 | 10 | 8 | 6 | 6 | 0 | 0 | 0 | 131 |
| [10] Plus: Non-Operating Receipts[4] | 0 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| [11] Plus: Sales Tax Receipts | 0 | 12 | 10 | 14 | 21 | 19 | 18 | 16 | 15 | 13 | 12 | 10 | 10 | 9 | 178 |
| [12] Plus: TSA & CSA Receipts | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 10 |
| [13] **Total Non-GOB Operating Receipts** | $157 | $130 | $128 | $102 | $36 | $32 | $30 | $27 | $23 | $21 | $19 | $12 | $11 | $11 | $584 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | |
| [14] Merchandise Vendors[5] | (58) | (40) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (40) |
| [15] Rent & Occupancy | 0 | (2) | (2) | (2) | (2) | (2) | (2) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (20) |
| [16] Corporate Retail Payroll[6] | (59) | (56) | (39) | (38) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (7) | (7) | (250) |
| [17] Other SG&A Disbursements[7] | (38) | (47) | (40) | (45) | (30) | (35) | (21) | (24) | (22) | (23) | (21) | (21) | (21) | (22) | (372) |
| [18] Sales Tax | 0 | 0 | 0 | (36) | 0 | 0 | (58) | 0 | 0 | (44) | 0 | 0 | (31) | 0 | (169) |
| [19] **Total Operating Disbursements** | ($156) | ($145) | ($81) | ($121) | ($46) | ($50) | ($94) | ($38) | ($35) | ($81) | ($35) | ($35) | ($60) | ($30) | ($852) |
| [20] Less: CapEx[8] | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (14) |
| [21] **Net Cash Flow** | $30 | $11 | $66 | $64 | $199 | $163 | $106 | $156 | $124 | $59 | $88 | $67 | $36 | $51 | $1,191 |



CONFIDENTIAL

SEARS-WT_000096

**JX 134-4**

**PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408**

# Wind Down Budget Weekly Cash Flows
(2 of 2)

| | December | January | | | | February | | | | March | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week** | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | |
| **Retail Week EoP** | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 | 3/23/19 | 3/30/19 | 4/6/19 | |
| **Unique Week** | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 | 201907 | 201908 | 201909 | 13 - 25 |
| **Net Cash Flow** | $30 | $11 | $66 | $64 | $199 | $163 | $106 | $156 | $124 | $59 | $88 | $67 | $36 | $51 | $1,191 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| [22] Utility Deposits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [23] Professional Fees[8] | (10) | 0 | 0 | 0 | (19) | 0 | 0 | 0 | (24) | 0 | 0 | 0 | 0 | (11) | (54) |
| [24] Critical Vendor Payments | (3) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [25] Insurance Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [26] Gift Card Redemptions | 0 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | 0 | 0 | 0 | 0 | 0 | (10) |
| [27] KEIP / KERP | 0 | 0 | (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (6) |
| [28] Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [29] PTO | 0 | 0 | 0 | (4) | 0 | 0 | 0 | 0 | (3) | 0 | 0 | 0 | 0 | 0 | (8) |
| [30] Severance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (14) | 0 | 0 | 0 | 0 | 0 | (14) |
| [31] 503(b)(9)[10] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [32] Warranty Refunds[10] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [33] Post-Petition AP | 0 | (43) | (39) | (24) | (11) | (10) | (3) | (5) | (2) | (2) | (1) | (0) | (0) | (0) | (140) |
| [34] KCD Payment | 0 | 0 | (17) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (17) |
| [35] Priority Tax Claims | 0 | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (27) |
| [34] Post-Petition TSA/CSA | 0 | 0 | 0 | 0 | 0 | 0 | (1) | (1) | (1) | (2) | (2) | (2) | (2) | (2) | (10) |
| [36] Chapter 11 Related | ($13) | ($46) | ($66) | ($27) | ($38) | ($13) | ($7) | ($9) | ($48) | ($6) | ($5) | ($4) | ($4) | ($14) | ($286) |
| [37] Less: Cash Interest | (3) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (29) |
| [38] Less: Financing Fees | (3) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [39] Total Other Non-Operating Disbursements | ($6) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($2) | ($29) |
| [40] Cash Flows Before Asset Sales (w/ Excess Proceeds) | $10 | ($37) | ($2) | $35 | $159 | $148 | $104 | $144 | $74 | $51 | $81 | $62 | $30 | $34 | $883 |
| [46] Total Asset Sales | $0 | $0 | $21 | $0 | $0 | $0 | $216 | $27 | $16 | $115 | $0 | $17 | $8 | $7 | $428 |
| [47] Wind-Down Reserve Funding | 0 | 0 | 0 | 0 | 0 | 0 | (50) | (27) | (16) | (66) | 0 | 0 | 0 | 0 | (159) |
| [48] Net Cash Flow Before Financing | $10 | ($37) | $20 | $35 | $159 | $148 | $263 | $144 | $74 | $100 | $81 | $79 | $38 | $41 | $1,145 |
| [49] Financing | (45) | 37 | (20) | (35) | (159) | (148) | (263) | (144) | (74) | (100) | (81) | (29) | (8) | (7) | (1,030) |
| [50] Net Cash Flow | ($35) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $50 | $30 | $34 | $114 |
| [51] Available Cash | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | 49 | 80 | 114 | 114 |
| [52] Net Availability | 112 | 159 | 126 | 135 | 130 | 129 | 76 | 80 | 18 | 88 | 109 | 46 | 20 | 0 | 0 |
| [53] Wind-down Reserve | 81 | 81 | 81 | 81 | 81 | 81 | 131 | 158 | 174 | 240 | 240 | 240 | 240 | 240 | 240 |
| [54] Total Liquidity (Availability + Cash + WDR) | $193 | $240 | $207 | $216 | $210 | $210 | $207 | $238 | $192 | $328 | $349 | $336 | $339 | $354 | $354 |
| Memo: Wind-down Reserve Balance[11] | 81 | 81 | 81 | 81 | 81 | 81 | 131 | 158 | 174 | 240 | 240 | 240 | 240 | 240 | 240 |
| Memo: Carve-Out Account | 89 | 89 | 89 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| Memo: Sr. DIP & ABL Balance | 994 | 932 | 912 | 823 | 664 | 516 | 413 | 269 | 194 | 43 | 0 | 0 | 0 | 0 | 0 |
| Memo: FILO Balance | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 12 | 0 | 0 | 0 | 0 | 0 |
| Memo: Jr. DIP Balance | 75 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 226 | 301 | 284 | 276 | 269 | 269 |
| Memo: Availability before Jr. DIP Draw | 112 | 59 | 126 | 135 | 130 | 129 | 76 | 80 | 18 | (12) | 34 | 46 | 20 | 0 | 0 |




SEARS HOLDINGS

5

SEARS-WT_000097

**JX 134-5**



# Supporting Schedules



CONFIDENTIAL

SEARS-WT_000098

**JX 134-6**

**PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408**

## Key Assumptions – Operations

- **Operating Receipts**
  - Cash receipts are assumed to be generated through the following channels during the wind-down period:
    - Sales of merchandise in the normal course in the weeks leading up to the GOBs
    - Continued service revenues (direct-to-consumer repair services, B2B repair, warranty commissions, etc.)
    - Continued non-operating receipts (pass-through and non-pass-through) such as Citi credit card accrued interest sharing, insurance proceeds, dividends from foreign subsidiaries and litigation recoveries
    - Asset sales including both encumbered and unencumbered collateral
  - Same-store sales
    - Analysis assumes negative 15% same-store sales for all stores until the wind-down period begins on 1/15/19
    - Stores are assumed to maintain a 29% gross margin throughout the projection period, excluding GOBs, which are assumed to run at a net negative margin resulting in an ~90% Net Orderly Liquidation Value
      - The Wave 4 GOB sales includes $6.6mm of proceeds from sharing the greater of 20% of sales and 40% of gross margin on $30mm of augment at cost
    - All sales shown on a preliminary basis net of taxes, including sales taxes, pass-through, and royalties
  - The wind-down analysis assumes 4 waves of GOBs
    - Wave 1: 142 Stores beginning 10/28/18 ending 1/6/19
    - Wave 2: 40 Stores beginning 11/18/18 ending 1/26/19
    - Wave 3: 80 Stores starting on 1/3/2019
    - Wave 4: 425 Stores starting on 1/24/2019
  - Other Inflows
    - Minimal PA sales during GOB ($200k per week)
    - Negative 15% YoY declines in Other Revenues, including Service Revenues

- **Operating Disbursements**
  - COGS Disbursements
    - Merchandise vendors assumed to be primarily on cash-in-advance terms with 4-day average shipping time in the period leading up to the wind-down with some merch AP and non-merch AP based post-filing actuals;
      - Outstanding merchandise AP is assumed to be paid out during the case
    - Following the transition to the wind-down mode, no additional merchandise disbursements are made (last week of disbursements assumed to be the week ending 1/6/19, with no associated inventory receipts thereafter) and merchant teams are immediately rationalized other than a small number of key employees to oversee vendor relations
  - SG&A Disbursements
    - Assumes all dark store leases are rejected immediately (Company rejected 234 leases on 10/16/18) and GOB leases are rejected at the end of the GOB sales period; as the last set of GOBs is projected to run from the week ending 1/26/19 to the week ending 4/13/19, lease payments would be paid on a per diem basis through the end of GOBs
    - Immediate RIF of non-core; non-key personnel beginning 1/15/19 – 60 days of WARN following RIF announcement
    - Uses the Company's detailed Payroll, Benefits, Non-Merch and Tax projection to project cost
      - Assumes logistics costs are right-sized to reflect lower store count
    - GOB store payroll and other expenses are removed at the end of the GOB sales
      - GOBs expected to last ~11 weeks in line with historical actuals
    - Capex assumes historical levels of maintenance with reductions in line with store closures, primarily to keep stores safe and compliant

7

SEARS-WT_000099

**JX 134-7**

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408

# Footnotes to Operating Budget

1. Inventory liquidation assumes 90% NOLV before proceeds from Pharmacy scripts or augment. Assumed shrink of 6%.

2. Normal course net merchandise receipts represent cash collected by stores prior to GOB period.

3. Other cash receipts include service businesses and other ancillary cash generating activities of the business (e.g. direct-to-consumer repair services, B2B repair, warranty commissions, vending, etc.)

4. Includes $17mm ESL non-refundable deposit

5. Merchandise vendor payments for CIA goods assumed to cease immediately; however, payments for post-petition goods already received are shown to be paid in the line item for post-petition AP on page 5 (line item # 33)

6. Corporate retail payroll includes payroll expenses less GOB payroll

7. Other SG&A disbursements assumed to reduce steadily as the Company systematically shuts down it's functions and completes the GOB process for the brick & mortar stores as well as various asset sales

8. Capital expenditures are projected to be paid to the extent necessary to maintain safety and regulatory during a liquidation sale (i.e. repairing floors, ADA ramps, etc.); all capital expenditures assumed to be for maintenance purposes and estimates are preliminary; please see the Company's latest capital forecast provided as an addendum to this presentation for additional detail

9. Professional fees assumed to be paid from the carveout account established for such purpose which is currently funded with ~$88mm, $54mm assumed to be released during 13-week period ending 4/6/19

10. Claims arising under section 503(b)9 of the bankruptcy code as well as contingent claims related to the post-petition sale of protection agreements prior to the underwriting deal with Assurant are assumed to be paid from the wind down reserve at the end of the case

11. Wind down reserve is assumed to be fully funded with the proceeds of the previously unencumbered Jr. DIP collateral up to $240mm and held until the conclusion of the case in order to be used to fund any residual administrative claims of the estate, unless otherwise noted

8

SEARS-WT_000100

JX 134-8

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408

# Wind Down Budget – Borrowing Base

| Month | December | January | | | | February | | | | March | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| Retail Week EoP | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 | 3/23/19 | 3/30/19 | 4/6/19 |
| Unique Week | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 | 201907 | 201908 | 201909 |
| **Inventory Roll** | | | | | | | | | | | | | | |
| Beginning Inventory | $1,899 | $1,829 | $1,740 | $1,663 | $1,562 | $1,348 | $1,198 | $1,048 | $898 | $748 | $597 | $447 | $307 | $169 |
| Plus: Merchandise Receipts | 76 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: GOB Wave 1 COGS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: GOB Wave 2 COGS | 0 | (9) | (8) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: GOB Wave 3 COGS | 0 | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (2) | 0 | 0 |
| Less: GOB Wave 4 COGS | 0 | 0 | 0 | (39) | (138) | (138) | (138) | (138) | (138) | (138) | (138) | (138) | (138) | (138) |
| Less: Merchandise COGS | (146) | (68) | (57) | (49) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Deposit Fulfillment | 0 | 0 | 0 | (64) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (12) |
| Ending Inventory | $1,829 | $1,740 | $1,663 | $1,562 | $1,348 | $1,198 | $1,048 | $898 | $748 | $597 | $447 | $307 | $169 | $19 |
| | | | | | | | | | | | | | | |
| **BB Calculation** | | | | | | | | | | | | | | |
| In-transit Reserve | ($45) | ($99) | ($88) | ($91) | ($77) | ($63) | ($61) | ($51) | ($40) | $0 | $0 | $0 | $0 | $0 |
| Ineligible Reserve | (118) | (62) | (66) | (63) | (61) | (56) | (47) | (38) | (28) | 0 | 0 | 0 | 0 | 0 |
| GOB Reserve | (87) | (13) | (6) | (3) | (9) | (62) | (121) | (168) | (211) | (239) | (256) | (206) | (143) | (19) |
| Decon to DC | 3 | 3 | 5 | 3 | 3 | 2 | 2 | 2 | 2 | 1 | 1 | 0 | 0 | 0 |
| SRAC LC In-Transit | 4 | 4 | 4 | 4 | 4 | 3 | 4 | 3 | 3 | 2 | 2 | 2 | 1 | 0 |
| Total Ineligible Inventory | ($243) | ($167) | ($151) | ($149) | ($138) | ($176) | ($224) | ($251) | ($274) | ($236) | ($253) | ($204) | ($142) | ($19) |
| | | | | | | | | | | | | | | |
| **Net Eligible Inventory** | **$1,585** | **$1,573** | **$1,512** | **$1,414** | **$1,210** | **$1,022** | **$824** | **$646** | **$473** | **$362** | **$194** | **$103** | **$27** | **$0** |
| | | | | | | | | | | | | | | |
| Adj. NOLV % | 81.4% | 81.4% | 81.4% | 81.4% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% |
| | | | | | | | | | | | | | | |
| NOLV of Net Eligible Inventory | $1,291 | $1,280 | $1,231 | $1,151 | $1,004 | $849 | $684 | $536 | $393 | $300 | $161 | $86 | $23 | $0 |
| 87.5% Advance Rate | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% |
| NOLV of Net Eligible Inv. Multiplied by 87.5% Advance Rate | $1,129 | $1,120 | $1,077 | $1,007 | $879 | $742 | $599 | $469 | $344 | $263 | $141 | $75 | $20 | $0 |
| | | | | | | | | | | | | | | |
| **Inventory Contribution to Borrowing Base** | **$1,129** | **$1,120** | **$1,077** | **$1,007** | **$879** | **$742** | **$599** | **$469** | **$344** | **$263** | **$141** | **$75** | **$20** | **$0** |
| | | | | | | | | | | | | | | |
| Other Borrowing Base Components | | | | | | | | | | | | | | |
| Credit Card Receivables Net (87.5% Advance Rate) | 50 | 33 | 28 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pharmacy Receivables Net (87.5% Advance Rate) | 7 | 4 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Availability Reserve | (56) | (42) | (40) | (38) | (33) | (29) | (25) | (22) | (18) | (14) | (11) | (7) | 0 | 0 |
| Carveout Reserve | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | 0 | 0 |
| **Borrowing Base** | **$1,108** | **$1,094** | **$1,046** | **$974** | **$825** | **$692** | **$552** | **$426** | **$304** | **$227** | **$109** | **$46** | **$20** | **$0** |
| *(Sum of Inventory Contribution and Other Components)* | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| LTV Covenant Calculation | 79.1% | 84.7% | 86.8% | 85.3% | 84.0% | 81.5% | 85.4% | 81.4% | 91.3% | 68.1% | 27.3% | 33.7% | 0.0% | 0.0% |
| | | | | | | | | | | | | | | |
| **Debt Outstanding** | | | | | | | | | | | | | | |
| DIP / ABL | ($994) | ($932) | ($912) | ($823) | ($664) | ($516) | ($413) | ($269) | ($194) | ($43) | $-- | $-- | $-- | $-- |
| Holdback | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| FILO Pushdown | (2) | (3) | (8) | (16) | (31) | (46) | (63) | (78) | (92) | (95) | -- | -- | -- | -- |
| **Pro Forma Available to Borrow under ABL** | **$112** | **$159** | **$126** | **$135** | **$130** | **$129** | **$76** | **$80** | **$18** | **$88** | **$109** | **$46** | **$20** | **$0** |
| | | | | | | | | | | | | | | |
| FILO Outstanding | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (12) | 0 | 0 | 0 |
| **FILO Cushion / Surplus (at 15%)** | **($2)** | **($3)** | **($8)** | **($16)** | **($31)** | **($46)** | **($63)** | **($78)** | **($92)** | **($95)** | **$4** | **$9** | **$2** | **$0** |
| | | | | | | | | | | | | | | |
| **Total Pro Forma Availability to Borrow** | **$112** | **$159** | **$126** | **$135** | **$130** | **$129** | **$76** | **$80** | **$18** | **$88** | **$109** | **$46** | **$20** | **$0** |

 

CONFIDENTIAL

SEARS-WT_000101

**JX 134-9**

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES – SUBJECT TO FRE 408

# Wind Down Budget – Debt Schedule

| Month | December | January | | | | February | | | | March | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| Retail Week EoP | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 | 3/23/19 | 3/30/19 | 4/6/19 |
| Unique Week | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 | 201907 | 201908 | 201909 |
| **Structure Summary** | | | | | | | | | | | | | | |
| **Junior DIP** | | | | | | | | | | | | | | |
| Junior DIP DD Term Loan | 75.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 225.8 | 300.8 | 283.5 | 275.6 | 268.7 |
| Total Jr. DIP | $75.0 | $175.0 | $175.0 | $175.0 | $175.0 | $175.0 | $175.0 | $175.0 | $175.0 | $225.8 | $300.8 | $283.5 | $275.6 | $268.7 |
| **Total DIP** | | | | | | | | | | | | | | |
| Pre-Rollup Senior DIP Term Loan | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Revolver | 452 | 390 | 410 | 321 | 282 | 134 | 152 | 8 | 73 | 0 | 0 | 0 | 0 | 0 |
| Prepetition ABL Revolver | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Term Loan B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Term Loan | 424 | 424 | 384 | 384 | 264 | 264 | 142 | 142 | 69 | 43 | 0 | 0 | 0 | 0 |
| ABL Normal Course LC | 119 | 119 | 119 | 119 | 119 | 119 | 119 | 119 | 52 | 0 | 0 | 0 | 0 | 0 |
| Total DIP & ABL 1L Credit Outstanding | $994 | $932 | $912 | $823 | $664 | $516 | $413 | $269 | $194 | $43 | $0 | $0 | $0 | $0 |
| **Other 1L & 1.5L Credit** | | | | | | | | | | | | | | |
| ESL/Citi LC | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 |
| FILO | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 12 | 0 | 0 | 0 |
| Total Other 1L Credit Outstanding | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $283 | $271 | $271 | $271 |
| **Senior Real Estate Debt** | | | | | | | | | | | | | | |
| Dove Loans | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 |
| Sparrow Loans | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 |
| Total 1L Real Estate Debt Outstanding | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 | $723 |
| **Total Interest Expense** | | | | | | | | | | | | | | |
| Senior DIP Cash Interest | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 1st Lien Cash Interest | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Real Estate Cash Interest | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Total Cash Interest | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 | $2 |



CONFIDENTIAL

SEARS-WT_000102

JX 134-10

# Exhibit 95

## SEARS HOLDINGS



SUBJECT TO FRE 408; CONFIDENTIAL; DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Project Blue
# Actuals From Week ended January 26 through February 9

5/13/19



JX 135-1

SUBJECT TO FRE 408; CONFIDENTIAL; DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Actuals For 3 Weeks Prior to Close

| Retail Month | January | | February | Total |
|---|---|---|---|---|
| **Budget Week** | 15 | 16 | 17 | 15 - 17 |
| **Forecast / Actual** | ACT | ACT | ACT | ACT |
| **Week Ending** | 1/26/19 | 2/2/19 | 2/9/19 | 2/9/19 |
| **Retail Week** | 201851 | 201852 | 201901 | |
| **CASH RECEIPTS** | | | | |
| [1] **Total Cash Receipts** | $116 | $133 | $150 | $399 |
| **OPERATING DISBURSEMENTS** | | | | |
| [2] Merchandise Vendors | ($61) | ($54) | ($8) | ($123) |
| [3] Occupancy | 0 | 0 | (27) | (27) |
| [4] Payroll, Taxes, and Benefits | (32) | (49) | (33) | (113) |
| [5] Other SG&A Disbursements | (57) | (57) | (30) | (144) |
| [6] GOB Rent | 0 | 0 | 0 | 0 |
| [7] GOB Additional Expenses / Benefit | 0 | 0 | 0 | 0 |
| **Total Operating Disbursements** | ($150) | ($160) | ($98) | ($408) |
| [8] CapEx | (1) | (0) | 0 | (1) |
| **Net Operating Cash Flow** | ($35) | ($28) | $52 | ($11) |
| **NON-OPERATING CASH FLOW** | | | | |
| [9] Utility Deposits | $0 | $0 | $0 | $0 |
| [10] Professional Fees | (1) | (6) | (1) | (7) |
| [11] KEIP / KERP | 0 | (3) | 0 | (3) |
| **Chapter 11 Related Disbursements** | ($1) | ($8) | ($1) | ($10) |
| [12] Cash Interest | ($2) | ($4) | ($5) | ($11) |
| [13] Financing Fees | 0 | 0 | 0 | 0 |
| **Other Non-Operating Disbursements** | ($2) | ($4) | ($5) | ($11) |
| **Net Cash Flow Before Financing** | ($38) | ($41) | $47 | ($32) |
| [14] Financing | (145) | 51 | (42) | (135) |
| **Net Cash Flow** | ($182) | $10 | $5 | ($167) |
| Available Cash | $0 | $8 | $0 | $0 |
| Net Availability Before Buyer Financing | 164 | 115 | 84 | 84 |
| [15] Buyer Financing | 0 | 0 | 0 | 0 |
| [16] **Memo: Total Liquidity (Availability + Cash)** | $164 | $123 | $84 | $84 |
| [17] Memo: Wind-down Account - Restricted Cash | $88 | $88 | $88 | $88 |
| [18] Memo: Carve-Out Account - Restricted Cash | $107 | $109 | $120 | $120 |
| [19] Memo: Sr. DIP & 1L Balance | $841 | $892 | $850 | $850 |
| [20] Memo: Jr DIP Balance | $350 | $350 | $350 | $350 |

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    2

**JX 135-2**

# Exhibit 96

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# SEARS HOLDINGS

## ADMIN SOLVENCY TRACKER AND BUDGET UPDATE

**July 10, 2019**




**JX 136-1**

<div style="border:1px solid red;color:red;text-align:center">
PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES
</div>

# Admin Solvency Tracker

*Under the closing estimates, the Company is projecting a ~$7mm administrative surplus; the Company has identified ~$34mm of potential mitigating items that provide additional cushion*

**Sears Holdings Corporation**
**Administrative Solvency Tracker**
*Dated: 7/08/2019*

| | Actual | Forecast | Total | Transform Liabilities | Base Case | Mitigating Items | Mitigated Scenario | Downside Case | |
|---|---|---|---|---|---|---|---|---|---|
| **Admin Claims** | | | | | | | | | |
| (1) 503(b)9 | $ - | $ 181 | $ 181 | $ (139) | $ (42) | $ 5 | $ (37) | $ - | $ (42) |
| (2) Accounts Payable | - | 180 | 180 | (166) | (14) | - | (14) | - | (14) |
| (3) Accrued Payroll | $42 | - | 42 | - | (42) | - | (42) | - | (42) |
| (4) GOB Expense | 26 | - | 26 | - | (26) | - | (26) | - | (26) |
| (5) Accrued Sales Tax | 20 | - | 20 | - | (20) | - | (20) | - | (20) |
| (6) Severance, WARN, and EE Claims | 11 | 1 | 13 | (13) | - | - | - | - | - |
| (7) Franchise Taxes | 1 | 2 | 3 | - | (3) | - | (3) | - | (3) |
| (8) Net TSA | - | 1 | 1 | - | (1) | - | (1) | - | (1) |
| (9) US Trustee Fees | 2 | 1 | 3 | - | (3) | - | (3) | - | (3) |
| (10) Board Fees | 1 | 1 | 2 | - | (2) | - | (2) | - | (2) |
| (11) RemainCo Winddown Costs | 86 | 30 | 117 | - | (117) | - | (117) | - | (117) |
| (12) Professional Fees | 72 | - | 72 | - | (72) | - | (72) | - | (72) |
| (13) Net Prepaid Inventory Shortfall | - | - | - | 55 | (55) | - | (55) | - | (55) |
| (14) Disputed Items | - | - | - | - | - | - | - | (67) | (67) |
| (15) Other Potential Liabilities | - | 10 | 10 | - | (10) | - | (10) | - | (10) |
| **Total** | 261 | 407 | 669 | (263) | (406) | 5 | (401) | (67) | (473) |
| | | | | | | | | | |
| **Assets** | | | | | | | | | |
| (16) Professional Fee Carve-Out Account | $ 72 | $ - | $ 72 | $ - | $ 72 | $ - | $ 72 | $ - | $ 72 |
| (17) MTN Notes | 81 | - | 81 | - | 81 | - | 81 | - | 81 |
| (18) U-HAUL | 7 | - | 7 | - | 7 | - | 7 | - | 7 |
| (19) SHIP Security Deposit | 5 | - | 5 | - | 5 | - | 5 | - | 5 |
| (20) GOB Inventory Gross | 59 | 9 | 69 | - | 69 | - | 69 | - | 69 |
| (21) ESL Payment at Close | 35 | - | 35 | - | 35 | - | 35 | - | 35 |
| (22) Cash in Stores | 9 | - | 9 | - | 9 | - | 9 | - | 9 |
| (23) Utility Deposit | - | 10 | 10 | - | 10 | - | 10 | - | 10 |
| (24) Cash in Transit at Close | 12 | 20 | 32 | - | 32 | - | 32 | - | 32 |
| (25) Credit Card Receivables | 15 | 0 | 15 | - | 15 | - | 15 | - | 15 |
| (26) Israel Cash | 3 | - | 3 | - | 3 | - | 3 | - | 3 |
| (27) Pro-Rated Rent | 5 | 11 | 16 | - | 16 | - | 16 | - | 16 |
| (28) Specified Receivables | - | - | - | - | - | 17 | 17 | - | - |
| (29) Residual Real Estate | 17 | 21 | 37 | - | 37 | 3 | 40 | - | 37 |
| (30) Excess Inventory Proceeds | - | 6 | 6 | - | 6 | - | 6 | (6) | - |
| (31) Calder Sculpture | - | 4 | 4 | - | 4 | 6 | 10 | - | 4 |
| (32) Hoffman Estates Tax Credit | 3 | 3 | 6 | - | 6 | 4 | 10 | - | 6 |
| (33) Other Cash Accounts | 4 | - | 4 | - | 4 | - | 4 | (4) | (0) |
| (34) Other Proceeds | 2 | - | 2 | - | 2 | - | 2 | - | 2 |
| (35) Avoidance Actions | - | - | - | - | - | - | - | - | - |
| **Total** | 327 | 85 | 413 | - | 413 | 30 | 442 | (10) | 403 |
| **Solvency / (Gap)** | $ 66 | | | | $ 7 | $ 34 | $ 41 | $ (77) | $ (70) |

 

1

**JX 136-2**

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# Admin Solvency Tracker (cont'd)

**Notes:**

(1)  Reflects maximum estimate of $181mm of 503(b)(9) claims with potential for reduction of $5mm through claims reconciliation
(2)  Revised to reflect latest estimate of 2/10/19 closing AP of $180mm
(3)  All accrued payroll liabilities have been satisfied
(4)  GOB Expense reflects GOB Payroll and GOB Rent; all GOB expenses from week 9 – week 11 assumed to be severance
(5)  All accrued sales tax liabilities as of close have been satisfied, however the estate will still owe residual sales taxes on GOB activity post-close
(6)  Assumes Transform will pay severance per APA; all GOB expenses from week 9 – week 11 assumed to be severance
(7)  Franchise tax estimates provided by Company and reflect franchise tax payments in jurisdictions that assess franchise taxes
(8)  Net cost of transition service agreements
(9)  Reflects fees payable to the U.S. Trustee
(10)  Fees payable to board members in consideration for services
(11)  Costs to wind down remainder of estate
(12)  Updated to reflect latest professional fee carveout estimate
(13)  Prepaid Inventory Shortfall estimated at $63mm, offset by $8mm of excess Warranty Receivables
(14)  Disputed items reflect $50mm placeholder to account for risk of specified receivables shortfall and $17mm reflecting 50% of the difference between the estate's estimate of the Prepaid Inventory Shortfall amount and Transform's estimate of the Prepaid Inventory Shortfall amount
(15)  $10mm of estimated Other Potential Liabilities subject to continued review and analysis by counsel
(16)  Updated to reflect latest professional fee carveout estimate
(17)  Net proceeds from MTN note sale, cash held in wind down account
(18)  Net proceeds earmarked for wind down account from sale of unencumbered properties to U-HAUL, cash held in wind down account
(19)  Refund of SHIP deposit by Service.com, cash held in wind down account
(20)  The estate has realized $59mm of gross recovery and expect an additional $9mm as part of cash reconciliation
(21)  Credit bid release payment by ESL of $35mm
(22)  Post-close payment by ESL of $9mm for cash in stores which was paid the week of close
(23)  Assumes return of $10mm utility deposit to estate
(24)  Includes $12mm of cash in regional banks and $20mm of cash in transit currently being withheld by Transform
(25)  Received $13.3mm from First Data on 6/7/19 and $1.3mm from Amex on 6/26; Remaining $0.4mm represents excess credit card receivables from pre-close activity being withheld by Transform
(26)  Cash in transit payment of $3mm from Transform related to transfer of cash from Israeli subsidiary
(27)  Rent proration payment as a result of occupancy expense proration; currently being withheld by Transform
(28)  Assumes 50% collection of excess book value of Specified Receivables of $34mm as potential mitigating item
(29)  Reflects estimated sale value of residual real estate not acquired by Transform
(30)  Reflects 90% recovery on excess inventory delivered at close, stemming from delivery of $1.664bn of collateral vs. $1.657bn requirement
(31)  Includes $4mm estimate for $15mm -$25mm Calder sculpture (subject to ongoing litigation)
(32)  Represents $6mm Hoffman estates tax credit refund
(33)  Includes cash in Luxottica account, consignment reserve account, and Sparrow Holding account
(34)  Various other vendor proceeds
(35)  Preference firms still conducting diligence related to potential preference recoveries

 

**JX 136-3**

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# Weekly Cash Flow Budget – Base Case

| Retail Month | February | | | March | | | | April | | | | May | | | | June | | | | July | | | | August | | | | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | | | | | |
| Forecast / Actual | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | | | | | |
| Week Ending | 2/16 | 2/23 | 3/2 | 3/9 | 3/16 | 3/23 | 3/30 | 4/6 | 4/13 | 4/20 | 4/27 | 5/4 | 5/11 | 5/18 | 5/25 | 6/1 | 6/8 | 6/15 | 6/22 | 6/29 | 7/6 | 7/13 | 7/20 | 7/27 | 8/3 | 8/10 | 8/17 | 8/24 | 8/31 | | | | | |

**CASH RECEIPTS**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wave 3 GOB Inflows | $5 | $17 | $14 | $11 | $9 | $2 | $0 | ($0) | $0 | $0 | ($0) | $0 | $0 | ($0) | $0 | $0 | $0 | $- | $- | $- | $- | $9 | $- | $- | $- | $- | $- | $- | $- | | | | | $69 |
| Cash In Transit Proceeds | 9 | - | - | - | 3 | - | - | 3 | - | - | - | - | - | - | - | - | - | - | - | - | 20 | - | - | - | - | - | - | - | - | | | | | 32 |
| Cash from Israel | - | - | - | 3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | | 3 |
| Credit Card Receivables | - | - | - | - | - | - | - | - | - | - | - | - | - | 13 | - | 1 | - | 0 | - | - | - | - | - | - | - | - | - | - | - | | | | | 15 |
| Cash In Stores | 9 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | | 9 |
| Real Estate Asset Sales | - | 4 | 5 | - | - | - | - | - | 3 | - | 2 | 2 | - | - | 1 | - | 0 | - | - | 1 | - | 19 | - | - | - | - | - | - | - | | | | | 37 |
| Excess Inventory Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 6 | - | - | - | - | - | - | - | | | | | 6 |
| ESL Closing Proceeds | 35 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | | 35 |
| TSA Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 0 | - | - | - | - | - | - | - | | | | | 1 |
| SHIP Deposit | - | - | - | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 6 | - | - | - | - | - | - | - | | | | | 5 |
| Utility Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10 | - | - | - | - | - | - | - | - | | | | | 10 |
| Hoffman Estates Tax Credit | - | - | - | - | - | - | - | - | - | - | - | - | 3 | - | - | - | - | - | - | - | - | 3 | - | - | - | - | - | - | - | | | | | 6 |
| Calder Statue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4 | - | - | - | - | - | | | | | 4 |
| Pro-Rated Rent | - | - | - | - | - | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 11 | - | - | - | - | - | - | - | | | | | 16 |
| ESL Severance Assumption[1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 13 | - | - | - | | | | | 13 |
| ESL 503b9 Assumption | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 139 | - | - | - | | | | | 139 |
| Other Proceeds | - | - | - | - | - | - | - | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | - | - | - | - | - | - | - | - | | | | | 2 |
| **Total Oldco Receipts** | $58 | $22 | $19 | $15 | $13 | $2 | $8 | $0 | $3 | $0 | $2 | $2 | $3 | $3 | $1 | $0 | $15 | $0 | $0 | $1 | $0 | $2 | $0 | $4 | $66 | $- | $- | $- | $4 | $152 | $- | $- | | $401 |

**CASH DISBURSEMENTS**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OldCo Accrued Payroll & Benefits | ($29) | ($14) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | | | | | ($42) |
| Taxes | - | (5) | (7) | - | (0) | (4) | - | - | (0) | (0) | (0) | (2) | - | - | (0) | (0) | (0) | - | - | (1) | - | - | - | - | - | - | - | - | - | | | | | (26) |
| GOB Operating Costs[1] | - | - | (6) | (6) | (3) | (1) | (3) | (4) | - | - | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | | (26) |
| Professional Fee Carve Out Funding[2] | - | - | (20) | - | (15) | - | (7) | - | - | - | - | - | (19) | (1) | (8) | - | (2) | (2) | - | (4) | (6) | (2) | (2) | (2) | (2) | (2) | (2) | (6) | (5) | | | | | (107) |
| Post-Petition Payables | - | - | - | - | - | - | (1) | - | - | - | - | - | - | - | - | - | - | - | - | - | (13) | - | - | - | - | - | - | - | - | | | | | (181) |
| 503(b)(9) Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (181) | - | - | - | | | | | (181) |
| TSA Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1) | - | - | - | - | - | - | - | - | | | | | (1) |
| Franchise Tax | - | - | - | (0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0) | - | - | - | - | - | - | - | - | | | | | (1) |
| Severance & WARN | - | - | - | - | (1) | - | - | (1) | (1) | (8) | - | - | - | - | - | - | (1) | - | - | (1) | - | - | - | - | - | - | - | - | - | | | | | (13) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | (0) | (2) | - | - | - | - | - | - | - | - | (1) | - | - | - | - | - | (1) | - | | | | | (3) |
| Board Fees | - | - | - | (0) | - | (0) | - | (0) | (0) | - | - | - | - | - | - | (0) | - | - | - | (0) | (1) | - | (0) | - | (0) | (0) | (0) | - | (0) | | | | | (3) |
| Net Prepaid Inventory Shortfall | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (10) | - | - | - | - | - | - | - | | | | | (55) |
| Other Potential Liabilities | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (55) | - | - | - | - | | | | | (55) |
| Other Liabilities and Expenses | (1) | (0) | (0) | - | (0) | (1) | - | (0) | (3) | (1) | - | (1) | (0) | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | - | - | (0) | - | - | - | - | | | | | (9) |
| **Total Oldco Disbursements** | ($29) | ($19) | ($33) | ($6) | ($18) | ($7) | ($10) | ($4) | ($4) | ($2) | ($9) | ($6) | ($52) | ($20) | ($8) | ($0) | ($5) | ($3) | ($0) | ($5) | ($11) | ($2) | ($25) | ($2) | ($2) | ($2) | ($2) | ($6) | ($241) | ($0) | ($0) | | | ($486) |

**PASS-THROUGH RECEIPTS**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NewCo Payroll Remittance | $5 | $11 | $26 | $23 | $28 | $24 | $27 | $23 | $23 | $29 | $25 | $33 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | | | | | $276 |
| NewCo Licensing Remittance | 5 | 3 | 3 | 3 | 3 | 4 | 4 | 3 | 3 | 3 | 4 | 4 | 3 | 4 | 5 | 3 | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | | | | 104 |
| **Total Pass-Through Receipts** | $10 | $14 | $29 | $26 | $31 | $27 | $31 | $26 | $26 | $32 | $29 | $37 | $3 | $4 | $5 | $3 | $4 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | | | | | $380 |

**PASS-THROUGH DISBURSEMENTS**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NewCo Payroll | ($5) | ($11) | ($26) | ($23) | ($28) | ($24) | ($27) | ($23) | ($23) | ($29) | ($25) | ($33) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | | | | | ($276) |
| Licensing Payments For NewCo | (5) | (3) | (3) | (3) | (3) | (4) | (4) | (3) | (3) | (3) | (4) | (4) | (3) | (4) | (5) | (3) | (4) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | | | | | (104) |
| **Total Pass-Through Disbursements** | ($10) | ($14) | ($29) | ($26) | ($31) | ($27) | ($31) | ($26) | ($26) | ($32) | ($29) | ($37) | ($3) | ($4) | ($5) | ($3) | ($4) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | | | | | ($380) |

| **Net Cash Flow** | 28 | 2 | (14) | 9 | (5) | (5) | (2) | (4) | (1) | (2) | (6) | (5) | (2) | (17) | (1) | (8) | 15 | (3) | (3) | 1 | (4) | (9) | (2) | 11 | 41 | (2) | (2) | (2) | 2 | (6) | (89) | (0) | (0) | (85) |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Available Cash | $92 | $120 | $123 | $108 | $117 | $112 | $107 | $105 | $101 | $100 | $98 | $92 | $87 | $85 | $68 | $67 | $59 | $74 | $71 | $68 | $69 | $65 | $56 | $54 | $66 | $106 | $104 | $102 | $100 | $102 | $96 | $7 | $7 | $92 |
| Change in Available Cash | 28 | 2 | (14) | 9 | (5) | (5) | (2) | (4) | (1) | (2) | (6) | (5) | (2) | (17) | (1) | (8) | 15 | (3) | (3) | 1 | (4) | (9) | (2) | 11 | 41 | (2) | (2) | (2) | 2 | (6) | (89) | (0) | (0) | (85) |
| Ending Available Cash | $120 | $123 | $108 | $117 | $112 | $107 | $105 | $101 | $100 | $98 | $92 | $87 | $85 | $68 | $67 | $59 | $74 | $71 | $68 | $69 | $65 | $56 | $54 | $66 | $106 | $104 | $102 | $100 | $102 | $96 | $7 | $7 | $7 | $7 |

**ENDING CASH BALANCES**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OldCo Operating Accounts | $28 | $31 | $16 | $21 | $15 | $11 | $9 | $5 | $11 | $9 | $9 | $0 | $7 | $3 | $17 | $14 | $11 | $13 | $8 | $- | $11 | $33 | $33 | $31 | $29 | $27 | $29 | $22 | $- | | | | | $- |
| Consignment Accounts | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | | | | | - |
| Wind-Down Account | 88 | 88 | 88 | 93 | 93 | 93 | 93 | 86 | 86 | 88 | 74 | 74 | 59 | 59 | 51 | 53 | 53 | 53 | 53 | 52 | 51 | 51 | 70 | 70 | 70 | 70 | 69 | 68 | 67 | | | | | - |
| Professional Fee Carve Out Account | 111 | 105 | 109 | 105 | 114 | 100 | 96 | 92 | 89 | 84 | 66 | 61 | 54 | 67 | 68 | 73 | 72 | 73 | 69 | 68 | 72 | 74 | 73 | 72 | 71 | 70 | 69 | 68 | 67 | 61 | - | - | - | - |
| **Total Cash** | $231 | $227 | $217 | $222 | $226 | $208 | $201 | $194 | $190 | $183 | $158 | $149 | $139 | $136 | $136 | $132 | $147 | $144 | $138 | $137 | $137 | $131 | $128 | $138 | $178 | $175 | $172 | $168 | $169 | $157 | $7 | $7 | | $7 |




(1)  All GOB expenses from week 9 – week 11 are assumed to be severance (2 weeks after the final store closure)
(2)  $107mm of total funding represents ~$111mm of total accrual from February 2019 to October 2019 less ~$10mm of accruals for the 1st week of February less ~$2mm Lazard accrual plus ~$9mm of under funded balance for week ending 2/9

**JX 136-4**

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

## Professional Fee Details

| Period: | Feb-19 Total | Mar-19 Total | Apr-19 Total | May-19 Total (a) | Jun-19 Total | Jul-19 Total | Aug-19 Total | Sep-19 Total | Oct-19 Total | Feb - Oct Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Estate Professionals** | | | | | | | | | | |
| Weil, Gotshal & Manges | $8,650,000 | $4,300,000 | $5,150,000 | $5,300,000 | $3,800,000 | $4,000,000 | $3,000,000 | $1,250,000 | $1,250,000 | $36,700,000 |
| M-III Advisory Partners | 2,666,667 | 2,500,000 | 3,000,000 | (1,250,000) | 1,200,000 | 1,200,000 | 1,000,000 | 750,000 | 750,000 | 11,816,667 |
| Lazard | 200,000 | 200,000 | 200,000 | (1,713,605) | - | 100,000 | 100,000 | - | - | (913,605) |
| Wachtell | 137,500 | 150,000 | - | (1,676,482) | - | - | - | - | - | (1,388,982) |
| McAndrews | - | - | 5,000 | - | - | 5,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| A&G Realty Partners | 100,000 | - | - | - | - | - | - | - | - | 100,000 |
| JLL | 1,375,750 | 30,000 | 30,000 | 299,655 | - | - | - | - | - | 1,735,405 |
| D&T (BK) | 1,195,820 | 516,041 | 609,099 | 870,670 | 448,904 | 300,000 | 150,000 | - | - | 4,090,534 |
| D&T (Audit) | 315,000 | 2,270,201 | - | - | - | - | - | - | - | 2,585,201 |
| D&T (Tax) | 321,477 | 3,813,855 | 546,754 | 272,500 | 62,171 | - | - | - | - | 5,016,757 |
| Prime Clerk | 3,033,393 | 709,487 | 4,113,861 | 2,585,755 | 1,548,769 | 500,000 | 200,000 | 1,640,000 | 510,000 | 14,841,264 |
| Public Relations | 15,000 | - | - | - | - | - | - | - | - | 15,000 |
| Ballard Spahr | - | - | - | 400,000 | 200,000 | 400,000 | 400,000 | 400,000 | - | 1,800,000 |
| Litigation Legal Fees | - | - | - | - | - | - | - | 2,200,000 | 2,200,000 | 4,400,000 |
| Total Estate Professionals | 18,010,606 | 14,489,584 | 13,654,714 | 5,088,493 | 7,259,844 | 6,505,000 | 4,855,000 | 6,245,000 | 4,715,000 | 80,823,241 |
| **Restructuring Comm. Prof.** | | | | | | | | | | |
| Paul Weiss | 2,097,977 | 1,046,554 | 1,184,859 | 1,297,306 | 1,517,891 | 1,250,000 | 1,250,000 | - | - | 9,644,588 |
| Evercore | 216,667 | 200,000 | 200,000 | 200,000 | 162,500 | 50,000 | 50,000 | - | - | 1,079,167 |
| Alvarez & Marsal | 190,000 | 3,000 | 504,000 | 76,000 | 75,000 | 75,000 | 75,000 | - | - | 998,000 |
| Young Conaway | 16,500 | 5,500 | 30,000 | 139,934 | 8,600 | - | - | - | - | 200,534 |
| Stout Risius Ross | 2,056 | 2,000 | 10,500 | 178,915 | 10,828 | - | - | - | - | 204,298 |
| Total Restr. Comm. Prof. | 2,523,200 | 1,257,054 | 1,929,359 | 1,892,155 | 1,774,819 | 1,375,000 | 1,375,000 | - | - | 12,126,587 |
| **Creditor Committee Prof.** | | | | | | | | | | |
| Akin Gump | 3,250,000 | 1,450,000 | 1,400,000 | 3,002,845 | 1,475,000 | 1,475,000 | 1,250,000 | - | - | 13,302,845 |
| Houlihan Lokey | 500,000 | 500,000 | 275,000 | 275,000 | (423,381) | 125,500 | 125,500 | - | - | 1,377,619 |
| FTI Consulting | 461,667 | 561,000 | 284,000 | 584,000 | 136,000 | 275,000 | 275,000 | - | - | 2,576,667 |
| Herrick, Feinstein | - | - | - | - | 384,401 | - | - | - | - | 384,401 |
| Total Creditor Comm. Prof. | 4,211,667 | 2,511,000 | 1,959,000 | 3,861,845 | 1,572,020 | 1,875,500 | 1,650,500 | - | - | 17,641,532 |
| **Prof. Accrual Bef. Success Fees** | 24,745,472 | 18,257,638 | 17,543,073 | 10,842,493 | 10,606,683 | 9,755,500 | 7,880,500 | 6,245,000 | 4,715,000 | 110,591,360 |
| Success Fee Accrual | 29,000,000 | - | - | (1,650,000) | - | - | - | - | - | 27,350,000 |
| **Prof. Accrual Incl. Success Fees** | $53,745,472 | $18,257,638 | $17,543,073 | $9,192,493 | $10,606,683 | $9,755,500 | $7,880,500 | $6,245,000 | $4,715,000 | $137,941,360 |

(a) May 2019 Total column is net of overaccrual releases



(1)   Feb 2019 represents total accruals for February 2019
(2)   Professional Accrual Before Success Fees – see bridge to budget cash flow on page 3

**JX 136-5**

# Exhibit 97

**In The Matter Of:**

*In Re:*
*Sears Holdings Corporation*

---

*David M. Schulte*
*June 29, 2019*

---



*Min-U-Script® with Word Index*

**Page 1**

```
1
2              UNITED STATES BANKRUPTCY COURT
3              FOR THE DISTRICT OF NEW YORK
4
5
6    In Re:
7    SEARS HOLDINGS CORPORATION, et al.,
8              Debtors.
9    _____/
10
11
12        DEPOSITION OF DAVID M. SCHULTE
13            New York, New York
14           Saturday, June 29, 2019
15
16
17
18
19
20
21
22
23   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
24   JOB NO. 2019-73081
25
```

**Page 2**

```
1
2
3
4              June 29, 2019
5              8:00 a.m.
6
7
8         Deposition of DAVID M. SCHULTE,
9    held at the offices of WEIL GOTSHAL &
10   MANGES, LLP, 767 Fifth Avenue, New
11   York, New York, pursuant to Notice,
12   before Annette Arlequin, a Certified
13   Court Reporter, a Registered
14   Professional Reporter, a Certified
15   Realtime Reporter, and a Realtime
16   Systems Administrator and a Notary
17   Public of the State of New York and
18   New Jersey.
19
20
21
22
23
24
25
```

**Page 3**

```
1
2    A P P E A R A N C E S:
3
4    AKIN GUMP STRAUSS HAUER & FELD, LLP
5    Counsel for Unsecured Creditors
6        One Bryant Park
7        Bank of America Tower
8        New York, New York  10036
9    BY: JOSEPH L. SORKIN, ESQ.
10       Jsorkin@akingump.com
11
12   WEIL GOTSHAL & MANGES, LLP
13   Counsel for Debtors and
14   Debtors-in-Possession: Sears Holdings
15    Corporation, et al.,:
16       200 Crescent Court - Suite 300
17       Dallas, Texas  75201-6950
18   BY: PAUL GENENDER, ESQ.
19       Paul.genender@weil.com
20   BY: JAKE RUTHERFORD, ESQ.
21       Jake.rutherford@weil.com
22
23
24
25
```

**Page 4**

```
1
2     A P P E A R A N C E S(Cont'd.):
3
4  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
5  Counsel for ESL Investments, Inc.
6  One Liberty Plaza
7  New York, New York  10006
8     BY: THOMAS J. MOLONEY, ESQ.
9  Tmoloney@cgsh.com
10    BY: KATHERINE LYNCH, ESQ.
11 Kalynch@cgsh.com
12
13 MILBANK
14 Counsel for Cyrus Capital
15 2029 Century Park East, 33rd Floor
16 Los Angeles, California  90067-3019
17    BY: ROBERT J. LIUBICIC, ESQ.
18 Rliubicic@milbank.com
19    BY: SAM PAYNE, ESQ.
20 Spayne@milbank.com
21
22
23
24
25
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
In Re:
Sears Holdings Corporation
to 101    Pg 251 of 468
David M. Schulte
June 29, 2019

Page 5

```
 1
 2  A P P E A R A N C E S(Cont'd.):
 3
 4  SEYFARTH SHAW
 5  Counsel for Wilmington Trust, National
 6   Association, as Indenture Trustee and
 7   Collateral Agent
 8
 9
10  ALSO PRESENT:
11
12      Michael J. Kennedy, Chilmark Partners
13      Chris Kim, FTI Consulting
14      Brian Griffith, M-III Partners
15      Nicholas Weber, M-III Partners
16      Jonathan Boffi, M-III Partners
17
18          - o0o -
19
20
21
22
23
24
25
```

Page 6

1
2  D A V I D   S C H U L T E,  called as a
3  witness, having been duly sworn by a
4  Notary Public, was examined and
5  testified as follows:
6     THE WITNESS: Yes, I do.
7     David Schulte, S-c-h-u-l-t-e.
8  EXAMINATION BY
9     MR. GENENDER:
10  Q.  Could you please state your full
11   name for the record?
12  A.  I just did, David Schulte.
13  Q.  What is your middle initial?
14  A.  M for Michael.
15  Q.  Where do you live?
16  A.  I live in Chicago, Illinois.
17  Q.  How are you employed?
18  A.  I'm the managing partner of
19   Chilmark Partners.
20  Q.  And you understand your
21   deposition has been noticed for this time
22   in this matter?
23  A.  Yes.
24  Q.  Have you given depositions
25   before?

Page 7

1
2  A.  Yes.
3  Q.  On how many occasions?
4  A.  I don't know.  Several.
5  Q.  When was the last deposition you
6   gave?
7  A.  I don't remember.  Within the
8   last couple of years.  I don't remember.
9  Q.  Do you know which case it was in?
10  A.  I'm just trying to remember if it
11   got to deposition, the ambulance thing.
12     THE WITNESS: It never got to
13   deposition, did it, Michael?
14  A.  I don't recall.
15  Q.  Your expert report said you
16   provided expert testimony twice in the last
17   five years.
18     Do you recall that?
19  A.  In live court hearings or in
20   deposition?
21  Q.  Well, it's your expert report.
22  A.  Thank you.
23     I don't know which county.  Sure.
24   Some of these cases have settled and some
25   have gone to deposition and some have gone

Page 8

1
2   to trial, so I'm a little stuck for exactly
3   which ones.
4  Q.  Have you ever testified on 507(B)
5   issues before?
6  A.  No.
7  Q.  Have you ever testified on 506(C)
8   issues before?
9  A.  No.
10  Q.  Have you published any articles
11   or treatises on five oh --
12  A.  No.
13  Q.  What was my question?
14  A.  Have I published any articles or
15   treatises on those same two sections of the
16   code, no.
17  Q.  Let me take a step back because I
18   want to do this as --
19     MR. MOLONEY: Go slower.  Let him
20   ask the question and then answer.
21     BY MR. GENENDER:
22  Q.  I want to -- let me take a step
23   back.
24     If you don't hear a question that
25   I ask you, will you let me know?

Page 9

1
2  A.  Sure.
3  Q.  If you don't understand a
4  question that I ask you, will you let me
5  know?
6  A.  Yes.
7  Q.  Will you let me finish my
8  question before you start your answer?
9  A.  Probably.
10  Q.  Okay.  Otherwise, you might be
11  testifying to something that -- you might
12  be answering something that's not what I'm
13  asking you.
14      And we want to be accurate,
15  right?
16  A.  That is the risk.  I understand.
17  Q.  Fair enough.
18      And I'm going to do my level best
19  to be as efficient with your time as I
20  possibly can.
21  A.  Thank you.
22  Q.  You bet.
23      What did you do to prepare for
24  this deposition?
25  A.  Over the course of weeks I

Page 10

1
2  reviewed many documents in this case and I
3  discussed everything that's in the report
4  with colleagues in my office.
5  Q.  And which colleagues in your
6  office?
7  A.  Michael Kennedy and Jamie Ellis,
8  principally.
9  Q.  And they're here today?
10  A.  Michael Kennedy is here today.
11  Q.  Did you meet with counsel to
12  prepare for this deposition?
13  A.  Yes.
14  Q.  When did you meet with counsel to
15  prepare for this deposition?
16  A.  Yesterday.
17  Q.  For how long?
18  A.  Several hours, four hours maybe.
19  Q.  Who was present from -- as
20  counsel?
21  A.  Well, mainly Tom Moloney and
22  Katherine Lynch and then there were several
23  other Cleary people at various times.
24  Q.  Did you review any documents in
25  preparation for this deposition that

Page 11

2  refreshed your memory of anything?
3  A.  Yes.
4  Q.  Which ones?
5  A.  Oh my, dozens.
6  Q.  Well, when were you engaged in
7  this matter?
8  A.  I don't recall the actual date, a
9  few months ago.
10  Q.  So this is -- today's June 29th?
11  A.  Yes.
12  Q.  A few months ago.  Were you
13  engaged in April?
14  A.  I don't recall the date.  I told
15  you that.
16  Q.  You said you didn't recall the
17  exact date.
18      Do you recall an approximate
19  date?
20      MR. MOLONEY: He said he didn't
21  recall a date.
22      BY MR. GENENDER:
23  Q.  Do you recall approximately when
24  you were engaged?
25  A.  No.  The best I can do is a few

Page 12

1
2  months ago.
3  Q.  Okay.  A few.
4      When did you start work on this
5  matter?
6  A.  More than one, less than five.
7  Q.  When did you start work on this
8  matter?
9  A.  I don't have time sheets in front
10  of me, but I would suppose it would be the
11  same answer.
12  Q.  A few months ago?
13  A.  Yes.  Although mainly in the last
14  month or so.
15  Q.  When did you start preparing your
16  report in this matter?
17  A.  Well, that report is a product of
18  several drafts.  I don't know the precise
19  date of any of the drafts.  It would be the
20  same answer, which is a few months ago.
21      (Schulte Exhibit 1, Expert Report
22  of David M. Schulte, marked for
23  identification, as of this date.)
24      BY MR. GENENDER:
25  Q.  I'm handing you what's been

Page 13

1
2  marked as Exhibit 1.
3      Can you identify Exhibit 1 for
4  me, please?
5  A.  Yes, this is my report.
6      MR. MOLONEY: Without all the
7  exhibits or does it have all the
8  exhibits?
9      (Document review.)
10  MR. MOLONEY: Okay, it does.
11     BY MR. GENENDER:
12  Q.  Let me try to ask this one more
13  time.
14     Is Exhibit 1 a true and correct
15  copy of your report?
16     MR. FOX: Paul, can you speak up.
17  A.  Yes, this is a copy of the
18  report.
19  Q.  I'm asking questions today.
20     Is Exhibit 1 a true and correct
21  copy of your report in this matter?
22  A.  I believe so.
23  Q.  And what is the date on it?
24     (Document review.)
25  A.  There must be a date somewhere.

Page 14

1
2  Q.  Do you recall when you finalized
3  it?
4  A.  As I said to you, it's been
5  through several drafts and I cannot give
6  you a precise date.  It must appear here
7  somewhere.
8      (Document review.)
9      THE WITNESS: Can you find a
10  date?
11     MR. MOLONEY: Probably --
12     MR. GENENDER: Hang on, I really
13  just want --
14     MR. MOLONEY: He wants your
15  answer.
16     MR. GENENDER: Exactly.
17  A.  I don't see an exact date.  It
18  must be here somewhere, but I don't see
19  where.
20  Q.  Did you sign Exhibit 1?
21  A.  Yes.
22  Q.  Your counsel is pointing you to
23  page 24.
24     MR. MOLONEY: Page 24.  Your
25  signature.

Page 15

1
2      BY MR. GENENDER:
3  Q.  And that is your signature, your
4  electronic signature?
5  A.  That's a signature.  I don't see
6  a date.  Yes.
7  Q.  My question is: Is that your
8  electronic signature?
9  A.  I think there is an original
10  somewhere that I actually saw in my hand.
11  Q.  This is what I was provided, this
12  version, Exhibit 1.  I'll represent that to
13  you.
14  A.  I think that is the only version.
15  I mean apart from where he drafts.
16  Q.  Who drafted Exhibit 1?
17  A.  I did, and the same two
18  colleagues who I named before.
19  Q.  How many drafts were there?
20  A.  Oh, God, I don't remember.
21  Several.
22  Q.  Which portions did you draft?
23  A.  All of it.
24  Q.  You drafted all of it; is that
25  right?

Page 16

1
2  A.  I laid hands on all of it.  I
3  didn't do the first draft on any of it.
4  Q.  Who did the first draft?
5  A.  The two people I mentioned to you
6  before.
7      The way we work --
8  Q.  I'm not --
9      MR. MOLONEY: He's not asking
10  that.
11     MR. GENENDER: There is no
12  question on the floor.
13     THE WITNESS: He probably doesn't
14  really want to know.
15     MR. MOLONEY: No, he doesn't want
16  to know.
17     MR. GENENDER: Object to the
18  sidebar.
19     BY MR. GENENDER:
20  Q.  I just want you to ask -- answer
21  my questions, and this will go as smoothly
22  as possible.
23     Did you review any case law in
24  preparing Exhibit 1 to your report?
25  A.  Only the case law that's

Page 17

1
2  mentioned in the text.
3  Q.  Which case is that?
4  A.  I don't recall.
5  Q.  Can you find it?
6  A.  There are mentions of cases on
7  this section of the code.  There's case
8  law...
9     (Document review.)
10     MR. GENENDER: Hang on, hang on.
11  Tom, I'm going to object to you showing
12  him.  I'm asking him.
13     MR. MOLONEY: You want him to
14  read the whole report?  I thought you
15  said you wanted to be efficient.
16     MR. GENENDER: I am going to ask
17  you not to prompt him with any answers.
18     THE WITNESS: He's not prompting
19  me.
20     MR. MOLONEY: Just take your time
21  and read the whole report then.
22     BY MR. GENENDER:
23  Q.  If you can --
24     MR. MOLONEY: I wanted to
25  expedite it, but if you want --

Page 18

1
2     BY MR. GENENDER:
3  Q.  Can you identify case law that
4  you referred to in your report?  That's my
5  question.
6     (Document review.)
7  A.  I'm looking for a precise
8  reference and not finding it.  You want to
9  stay all day, we can keep looking.
10     MR. MOLONEY: Look at page 23.
11     MR. GENENDER: Okay.  Well,
12  Counsel, that is exactly what I asked
13  you not to do, which is to prompt his
14  answer, and I'm objecting to it and
15  moving to strike it.
16     MR. MOLONEY: Okay.  Good.
17     BY MR. GENENDER:
18  Q.  Mr. Schulte, as you sit here
19  today, can you without -- do you have any
20  memory of any case you cited in your
21  report?
22  A.  Yes, I quote the Sabine Oil case.
23  Q.  Did you review that entire
24  opinion --
25  A.  No.

Page 19

1
2  Q.  -- in your report?
3  A.  No.
4  Q.  You did not?
5  A.  I did not.
6  Q.  Okay.  Are you offering any legal
7  opinions in this case?
8  A.  I am not.
9  Q.  Have you ever offered any legal
10  opinions in your career as an expert?
11  A.  I am a member of the District of
12  Columbia bar, but I don't practice law.  So
13  any -- any legal opinions would be not --
14  not part of my normal work.
15  Q.  You're a licensed attorney?
16  A.  I'm a member of the District of
17  Columbia bar.
18  Q.  Are you a licensed -- do you have
19  a law license?
20  A.  That is a law license.
21  Q.  When was the last time you
22  practiced law?
23  A.  Never.
24  Q.  You never practiced law?
25  A.  Correct.

Page 20

1
2  Q.  Okay.  Did you practice law when
3  you clerked for the United States Supreme
4  Court?
5  A.  I wouldn't call that practicing
6  law, but yes.
7  Q.  What would you call it?
8  A.  Assisting a judge.  Research
9  assistant.  Whipping boy.
10  Q.  Did you speak to anyone at ESL in
11  connection with any of your work on this
12  case?
13  A.  I have not spoken to anyone,
14  except one conversation with Eddie Lampert
15  when we talked about everything but this
16  case.
17  Q.  When did that conversation occur?
18  A.  Within the last two weeks.
19  Q.  Did you call him?
20  A.  He telephoned me.
21  Q.  About what?
22  A.  It wasn't clear.  It was just a:
23  Hello, how are you.  I'd never talked to
24  the man.
25  Q.  Had you ever met him before?

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 255 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

**Page 21**

```
 1
 2   A.  Never.
 3   Q.  He called you?  Was he by himself
 4   when he called you?
 5   A.  I don't know.
 6   Q.  Did he say anyone else was on the
 7   phone?
 8   A.  We didn't -- no.  He was on his
 9   boat off the coast of Scotland.  I doubt he
10   was making his wife listen, so I assume he
11   was alone, but I don't know.
12   Q.  What did you talk about?
13   A.  We talked about his boat and we
14   talked about the coast of Scotland.  We did
15   not talk about this case.
16       I have been retained through
17   Cleary Gottlieb on behalf of ESL and I
18   think he simply wanted to administer a kind
19   of a saliva test.  I think he just wanted
20   to say hello.  I mean...
21   Q.  Did he ask you about any of your
22   work on this matter?
23   A.  No.
24   Q.  Had you already prepared your
25   report at this time?
```

**Page 22**

```
 1
 2   A.  In draft, yes.
 3   Q.  Do you know if he had seen it?
 4   A.  I do not know.
 5   Q.  Did he ask you about any of your
 6   opinions?
 7   A.  No.
 8   Q.  Did he discuss any aspect of this
 9   case with you?
10   A.  Not really, except the overall,
11   you know, 10 or 12 years of whatever and
12   what an ordeal it had been, but no, not
13   really.
14   Q.  You said he discussed what an
15   ordeal it had been.
16       Can you expand upon that?
17   A.  I offered sympathy.  I offered
18   sympathy.
19   Q.  What sympathy did you offer to
20   Mr. Lampert?
21   A.  It was a Rolling Stone song,
22   Sympathy For the Devil.
23       We had earlier in my business
24   life owned a department store chain in
25   California, and much like his involvement
```

**Page 23**

```
 1
 2   with Sears, we had tried to fix it, and in
 3   the end we were unsuccessful in doing that.
 4   And I offered sympathy based upon my own
 5   personal experience.
 6   Q.  What was his response to that?
 7   A.  He listened.
 8   Q.  How long did the conversation
 9   take?
10   A.  I didn't clock it.  I'm guessing
11   it took 20 minutes.
12   Q.  Your best estimate is 20 minutes?
13   A.  20 minutes, 30 minutes.
14   Q.  Did he call you in your office?
15   A.  No, I was at home.
16   Q.  He called you at home?
17   A.  Yes.  On my cellphone.
18   Q.  He called you on your cellphone?
19   A.  Yes.
20   Q.  Did anyone tell you he was going
21   to call you on your cellphone?
22   A.  Yes, it was sort of -- well, not
23   a precise time, but counsel told me that he
24   wanted to say hello, I gave my cellphone
25   number, and I expected a call.  It was not
```

**Page 24**

```
 1
 2   expected at any particular time.
 3   Q.  Did you ask any questions of him
 4   about his case?
 5   A.  No.
 6   Q.  Did you vet any of your draft
 7   opinions with him during that 20 or 30
 8   minute conversation?
 9   A.  No.
10   Q.  Have you spoken with anyone else
11   at ESL?
12   A.  I have never spoken with anyone
13   else at ESL.
14   Q.  Have you spoken with anyone who
15   works at Transform?
16   A.  No.
17   Q.  Do you know what Transform is?
18   A.  Yes.
19   Q.  Have you spoken with any advisers
20   for ESL or Transform as opposed to lawyers;
21   financial advisers?
22   A.  No.
23   Q.  When I'm saying you, you or your
24   team, same answers?
25       MR. MOLONEY: That is a different
```

Page 25

1
2  question.  What is your question?  What
3  is your question now?  Go ahead.
4      BY MR. GENENDER:
5  Q.  Has anyone on your team spoken
6  with anyone -- to your knowledge, spoken
7  with anyone at ESL?
8  A.  Not to my knowledge.
9  Q.  Has anyone on your team spoken
10  with anyone at Transform, to your
11  knowledge?
12  A.  Not to my knowledge.
13  Q.  Has anyone on your team spoken
14  with any of ESL or Transform's financial
15  advisers?
16  A.  Not to my knowledge.
17  Q.  I'm distinguishing, when I'm
18  saying advisers, I mean people other than
19  the lawyers.
20  A.  I understand.
21  Q.  Fair enough.
22      Same answer?
23  A.  Not to my knowledge.
24  Q.  Have you spoken with any of
25  the -- strike that.

Page 27

1
2  A.  Yes, sir.
3  Q.  I appreciate it.
4      To your knowledge, has anyone at
5  ESL seen your report?
6  A.  I am not aware of any such.
7  Q.  Did you show any of your -- did
8  you show any version of your report to
9  anyone at ESL prior to it being finalized
10  in the form that it's in in Exhibit 1?
11  A.  I did not.
12  Q.  Did you ask for anyone -- did you
13  ask for anyone at ESL to review and approve
14  any of your opinions prior to them being
15  finalized?
16  A.  I did not.
17  Q.  Did you ask ESL for any
18  information in connection with your
19  opinions in this case?
20  A.  I did not personally ask for
21  anything like that.
22  Q.  Did anyone on your team ask ESL
23  for any information in connection with
24  preparing your opinions in this case?
25  A.  Not that I'm specifically aware

Page 26

1
2      Who is your client in this
3  matter?
4  A.  My client is Cleary Gottlieb.
5  Q.  Okay.  Who do you understand
6  their client to be?
7  A.  Their client is ESL.
8  Q.  Is your report, Exhibit 1,
9  submitted on behalf of ESL?
10  A.  I don't think so.  They did not
11  approve it, pass upon it, or have anything
12  to do with its -- apart from document
13  production, along the way we've probably
14  got the documents from them, but to my
15  knowledge, if they've seen a draft, it's
16  news to me.
17  Q.  If ESL has seen a draft of your
18  report, it's --
19  A.  If ESL --
20  Q.  Hang on, Mr. Schulte, I'm going
21  to ask you to let me finish my question.  I
22  know.  It's for the record, so we're clear
23  on the record, okay?  I'm not trying to be
24  difficult, but I'm just going to ask you to
25  let me finish my question, okay?

Page 28

1
2  of.
3  Q.  Who is in charge of your team?
4  A.  Michael Kennedy.
5  Q.  He's in charge of your team or
6  you --
7  A.  No.  I'm in charge of the team.
8  Excuse me.  I'm in charge of the team, but
9  I did not direct anyone to ask anything of
10  ESL or to preview anything with ESL or gain
11  approval or comment or any such thing.
12  Q.  And to your knowledge, none of
13  those approvals or comments were obtained?
14  A.  Not to my knowledge.
15  Q.  How long have you worked with
16  Mr. Kennedy?
17  A.  Fifteen years, perhaps.
18  Q.  Would it surprise you if he -- if
19  he sought those approvals or comments
20  without you knowing?
21      MR. MOLONEY: Objection to the
22  form of the question.  You may answer.
23  A.  I'm not sure.  Would you --
24  between the two of you, would you tell me
25  what the question is?

Page 29

1
2  Q.  Would it surprise you if
3  Mr. Kennedy sought comment or approval from
4  ESL without you knowing?
5      MR. MOLONEY: Objection to the
6  form of the question.  You may answer.
7  A.  The answer to that one is yes, it
8  would surprise me.
9  Q.  Thank you.
10     Have you spoken with any of the
11  other second lienholders?
12  A.  No.
13  Q.  Do you know who the other second
14  lienholders are?
15  A.  I know the name Cyrus and I don't
16  know anyone else.
17  Q.  Have you reviewed any reports
18  submitted by the other second lienholders?
19  A.  I have reviewed expert reports
20  done on behalf of Wilmington Trust and done
21  on behalf of Cyrus.  I think those two.
22  And of course, Mr. Griffith, done on your
23  behalf.
24  Q.  Did you review the report
25  submitted on behalf of Cyrus and Wilmington

Page 30

1
2  Trust prior to them being finalized?
3  A.  No.
4  Q.  Did you coordinate with the
5  experts for Wilmington Trust or Cyrus prior
6  to finalizing your report?
7  A.  No.
8  Q.  Did you speak with them prior to
9  finalizing your report?
10  A.  No, not before and not since.
11  Q.  Thank you.
12     Have any of the opinions
13  contained in your report, which is
14  Exhibit 1, changed since you finalized it?
15  A.  No.
16  Q.  Do you have any expectation of
17  changing any of your opinions?
18  A.  I have no expectation, but if
19  facts change or if I became aware of
20  something that would occasion a change, I
21  reserve the right to change, but I'm not
22  expecting that.
23  Q.  In preparation for this
24  deposition, have you gone through the
25  materials cited in your report upon which

Page 31

1
2  your opinions are based?
3  A.  Yes.
4  Q.  Is it your testimony that those
5  documents provide an appropriate basis for
6  the opinions you're offering in this case?
7  A.  Well, they're raw materials,
8  they're relevant.  I don't recall anything
9  than I relied upon analytically in those
10  reports.
11  Q.  Have you reviewed the filings by
12  my client from two days ago?
13  A.  Apart from Mr. Griffith, I do not
14  think so.
15  Q.  Did you review Mr. Griffith's
16  supplemental declaration filed two days
17  ago?
18  A.  Yes.
19  Q.  When did you review that?
20  A.  Yesterday.
21  Q.  Does that cause you to change any
22  of your opinions?
23  A.  No.
24  Q.  Did it cause you to do any
25  additional work in connection with this

Page 32

1
2  case?
3  A.  Apart from preparation for this
4  deposition, no.
5  Q.  Your report contains background
6  information about you; is that correct?
7  A.  That is correct.
8  Q.  Do you stand by all of it?
9  A.  Yes, sir.
10  Q.  To your knowledge, is it complete
11  and accurate?
12  A.  Well, complete... it is
13  accurate.
14  Q.  Okay.  Who contacted you in
15  connection with working on this case?  Who
16  initially contacted you?
17  A.  I believe it was a Cleary partner
18  called Sean O'Neal.
19  Q.  And do you know Mr. O'Neal?
20  A.  Yes.
21  Q.  And how do you know Mr. O'Neal?
22  A.  I met him in the course of doing
23  business.  I can't pinpoint how I knew him
24  first.
25  Q.  Had he engaged you previously,

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

---

Page 33

1
2  you or your firm?
3  A.  Mr. O'Neal specifically?
4  Q.  Sure.
5  A.  I have done other work with
6  Cleary Gottlieb.  Whether he was the one or
7  not, I'm just not sure.
8  Q.  What other matters have you been
9  engaged on for Cleary Gottlieb?
10  A.  Well, most recently in connection
11  with the litigation over a leverage buyout
12  called Rural Metro.
13  Q.  What about other matters that you
14  can recall?
15  A.  Well, over 40 years there are
16  quite a few.
17  Q.  Over how many years have you been
18  providing expert opinions?
19  A.  I don't do very much of this.  So
20  I have done expert opinions here and there
21  over most of my professional life, but it's
22  not a product line that I specialize in.
23  Q.  Have you assisted in preparing
24  any of ESL's filings in this case?
25  A.  No.

---

Page 34

1
2  Q.  Have you -- I'm going to talk
3  about a couple things in specific.
4      There is an adversary pleading
5  that was filed in the last month by ESL.
6      Did you play any role in
7  preparing it?
8  A.  I did not.
9  Q.  There is briefing that was filed
10  contemporaneously with your report, which
11  is Exhibit 1, filed by ESL either on its
12  own or jointly.
13      Did you play any role in
14  preparing any of that briefing?
15  A.  I did not.
16  Q.  Did you review any of it prior to
17  it being filed?
18  A.  I did not.
19  Q.  Would it be fair to say that the
20  universe of your work in this case is
21  contained in Exhibit 1, your report?
22  A.  Yes.
23  Q.  Thank you.
24      Your report on page 5 references
25  previous restructuring experience.

---

Page 35

1
2      Do you see that?
3  A.  Yes.
4  Q.  All right.  Were any of these
5  liquidations?  If you know.
6  A.  I have to look.
7  Q.  I should say, if you remember.
8  I'm assuming at the time you would have
9  known, but if you recall as you sit here.
10  A.  Brooks Fashion Stores may have
11  been liquidation.
12  Q.  Okay.
13  A.  That was a long time ago.
14      (Document review.)
15  A.  The most recent would be
16  Toys-R-Us, which was a mixed picture.
17  There was some going-concern transactions
18  and then there were -- and there was
19  liquidation, both.
20  Q.  Okay.  Were those the ones
21  that -- and there are some -- there are a
22  couple at the top of page 6, in fairness.
23  I guess, four at the top of page 6.
24      Are those -- possibly Brooks and
25  Toys, are those the ones that jump out as

---

Page 36

1
2  potentially or actually liquidation
3  matters?
4  A.  With Brooks, I'm guessing.
5  Q.  Okay.
6  A.  It was a long time ago.
7      With Toys-R-Us, certainly.
8  Q.  What was your role -- any others
9  that you recall being liquidations?
10  A.  Tower Records.
11  Q.  What was your role in the
12  Toys-R-Us case?
13  A.  In the Toys-R-Us case I was the
14  sole independent director and chief
15  conflicts officer of a subsidiary of
16  Toys-R-Us called Geoffrey, spelled
17  G-E-O-F-F-R-E-Y, which was the intellectual
18  property subsidiary of Toys-R-Us.
19  Q.  What work did you do in that
20  capacity in the Toys-R-Us bankruptcy?
21  A.  The mission was to protect,
22  implicitly, the creditors of Geoffrey from
23  the theft of intellectual property by
24  various people who had designs on it.
25  Q.  Did you perform any analysis of

---

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 259 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 37

1
2  the valuation of any collateral in the
3  Toys-R-Us bankruptcy?
4  A.  I don't think so.
5  Q.  Did you --
6  A.  Geoffrey -- Geoffrey had nothing
7  in it.  Geoffrey's assets were solely the
8  trademarks.
9  Q.  All right.  I asked you this in a
10  different sense, but looking at the
11  matters, your previous restructuring
12  experience listed on page 5 and 6 of your
13  report, did your work in connection with
14  any of those matters involve analysis of
15  507(B) claims?
16  A.  No.
17  Q.  What about 506(C) surcharges?
18  A.  No.
19  Q.  Page 4 of your report lists your
20  opinions, correct?  The top half of the
21  page or middle of the page, I should say.
22     (Document review.)
23  A.  You're referring to the part
24  where I say "In summary, my conclusions
25  are..."

Page 38

1
2  Q.  Yes.
3  A.  Yes.
4  Q.  Have you prepared -- strike that.
5     Have you or your team prepared
6  any exhibits or demonstratives that would
7  support any of your opinions beyond that
8  which is contained in your report?
9  A.  I believe everything that
10  supports these conclusions is in the
11  report.
12  Q.  Have you all prepared anything
13  else to show any of your conclusions other
14  than what's in the report?
15  A.  Not to my knowledge.
16  Q.  Okay.  Do you recall when a first
17  draft of this report was prepared?
18  A.  I do not.
19  Q.  Was it done during the month of
20  May of 2019?
21  A.  Same answer, I do not know.
22  Q.  Could it have been done during
23  the month of May 2019?
24  A.  Remind me, could which have been
25  done?

Page 39

1
2  Q.  Could the first draft of this
3  report been prepared during the month of
4  May 2019?
5  A.  I don't remember.  That seems a
6  little recent, but it's possible.
7  Q.  A little recent, like you think
8  it would have been done earlier than that?
9  A.  Earlier.
10  Q.  Okay.
11  A.  I think as a first draft.  I
12  think.  I'm not positive, but I think.
13  Q.  So it's possible then that the
14  first draft could have been done in April
15  of 2019?
16  A.  It's possible.
17  Q.  Could it have been done in March
18  of 2019?
19  A.  As I -- earlier you asked me when
20  I commenced work on this and I told you I
21  wasn't sure.  So it's really the same
22  point.  I don't know.
23  Q.  Do you have an engagement letter
24  with Cleary Gottlieb for this matter?
25  A.  Yes, it's somewhere.

Page 40

1
2  Q.  Okay.  Does it have a date on it?
3  A.  Probably.
4  Q.  And are you charging hourly?
5  A.  Yes.
6  Q.  And your report reflects the
7  rates, correct?
8  A.  Yes.
9  Q.  So your time entries, you would
10  have time entries that would show when your
11  work started, yes?
12  A.  Yes.
13     MR. MOLONEY: We can tell you
14  that.  We'll tell you.
15     MR. GENENDER: Perfect.  I was
16  going to either leave a space in the
17  deposition, or Tom, you could --
18     MR. MOLONEY: We will tell you.
19     MR. GENENDER: You could tell me
20  that.  That would be great.
21     MR. MOLONEY: Thank you.
22     BY MR. GENENDER:
23  Q.  Lawyers get awfully efficient on
24  Saturday mornings.
25  A.  And they hold time charges dear

Page 41

1
2  to their hearts.
3  Q.  Who was the first person at
4  Cleary Gottlieb who talked to you about
5  what they were looking for in terms of your
6  work in this case?
7  A.  Probably Sean O'Neal.
8  Q.  And what did he tell you?
9  A.  I don't remember.
10 Q.  What about approximately, do you
11 have any vague idea?
12 A.  Well, when it came about, when
13 the inquiry was made about whether we would
14 take this on, the question was about a
15 diminution in the value of collateral.
16 Q.  Had you ever done a report --
17 strike that.
18    Have you ever offered an opinion
19 before on the diminution of the value of
20 collateral prior to this engagement?
21 A.  No.
22 Q.  And you've never offered an
23 opinion on the applicability of a 506(C)
24 surcharge before, correct?
25 A.  That is correct.

Page 42

1
2  Q.  So when Mr. O'Neal had this
3  conversation with you, which presumably led
4  to you being engaged; is that fair?
5  A.  Is which fair?
6  Q.  That his conversation with you
7  about an offering -- whether you'd be
8  interested in offering an opinion on
9  diminution in value of collateral, somehow
10 that led to you accepting the engagement,
11 correct?
12 A.  Yes.
13 Q.  What questions did you ask when
14 you had this conversation with him?
15 A.  I don't recall.
16 Q.  Who was with you when you had the
17 conversation with him?  The first
18 conversation.
19 A.  I don't recall.
20 Q.  Did you work with Mr. O'Neal
21 throughout preparing Exhibit 1, your
22 report?
23 A.  Well, I personally?
24 Q.  Yes, sir.
25 A.  Until recently, yes.

Page 43

1
2  Q.  Okay.  Did Mr. O'Neal provide
3  comments to you on drafts of your report?
4  A.  Not to me.
5  Q.  Did he provide them to your team?
6  A.  I don't know.
7  Q.  Who would know?
8  A.  The members of my team would
9  know.  Mr. O'Neal would know.
10 Q.  Were drafts of your reports
11 shared with the lawyers at Cleary Gottlieb?
12 A.  Yes.
13 Q.  Were portions of your report
14 drafted by Cleary Gottlieb?
15 A.  No.
16 Q.  Do you know that for certain?
17 A.  It's not what we do.
18 Q.  I'm just asking you a question.
19 I'm not asking what you do.
20 A.  You asked me for certain.
21 There's so many things in the world that I
22 don't know.  It is not customary and it was
23 not customary in this matter for any
24 sections of the report to be written by
25 anyone other than us.

Page 44

1
2  Q.  Do you know how much time you've
3  spent on this engagement, you personally?
4  A.  I don't have that in my head.  I
5  would say --
6  Q.  Best estimate.
7  A.  Somewhere between 20 and 50 hours
8  probably.
9  Q.  That's for you personally?
10 A.  Yes.
11 Q.  What about your team?
12 A.  I don't know.
13 Q.  Would it be more or less than
14 that?
15 A.  I don't know.  Probably more, but
16 I don't know.
17 Q.  And we talked about this, I
18 believe, but no one at ESL provided you any
19 information that you used in the report,
20 correct?
21 A.  Me personally, correct.
22 Q.  Or to your team personally, to
23 your knowledge?
24 A.  I don't know.  There are lots of
25 documents in this case, as you know, and I

Page 45

```
1
2   don't know where some of these came from,
3   whether they came from counsel or if they
4   came from ESL or Transform.  I don't know
5   the answer to that.
6       And in fact, we relied on the
7   general ledger quite a bit that probably
8   originated with either ESL or Transform,
9   but I had no particular connection to that.
10  Q.  Mr. Schulte, you raise a fair
11  point, and I want to refine my question,
12  and you made a fair distinction.
13  A.  Thank you.
14  Q.  You're welcome.
15      Certainly some of the underlying
16  information came from ESL.
17      My question is:  In terms of
18  someone from ESL, whether by email or
19  telephone or otherwise, providing you
20  information or guidance in connection with
21  your opinions, that didn't occur; is that
22  correct?
23  A.  That did not occur.
24  Q.  Thank you.
25      Were you asked to assume certain
```

Page 46

```
1
2   things in connection with your opinions in
3   this case?
4   A.  That's a very broad question.
5   Can you help me out a little?
6   Q.  Were you provided any assumptions
7   about the 2L collateral?
8   A.  No.
9   Q.  Have you reviewed the underlying
10  credit documents related to the second
11  lienholders?
12  A.  I probably glanced at them.
13  Q.  Have you studied them?
14  A.  No.
15  Q.  Would you agree they say what
16  they say?
17      MR. MOLONEY: Objection to the
18  form of the question.
19  A.  I believe most documents say what
20  they say.
21  Q.  But you didn't the study them?
22  A.  Right.
23  Q.  Did you study any intercreditor
24  documents?
25  A.  No.
```

Page 47

```
1
2   Q.  What did you do to verify that
3   every item that your report lists as second
4   lien collateral was actually second lien
5   collateral?
6   A.  I, in making judgments like that,
7   took the word of my colleagues who have
8   reviewed all this with counsel.
9   Q.  So you personally took the word
10  of your colleagues who spoke with the
11  lawyers at Cleary Gottlieb; is that
12  correct?
13  A.  Correct.
14  Q.  What did you do to independently
15  verify any of that information?
16  A.  Your question came is, what did I do
17  to independently verify the work of my
18  colleagues?
19  Q.  Sir, in connection with -- in
20  connection with determining whether the
21  items your report considered second lien
22  collateral were actually second lien
23  collateral?
24  A.  I took their word for it.
25  Q.  Thank you.
```

Page 48

```
1
2       If they made a mistake in
3   categorizing something as second lien
4   collateral when, in fact, it is not, that
5   would affect your opinion, wouldn't it?
6   A.  Depending upon what the something
7   is.
8   Q.  Okay.  Do you have any personal
9   knowledge as to whether pharmacy
10  receivables, pharmacy prescriptions, are
11  second lien collateral?
12      MR. MOLONEY: Objection to the
13  form of the question.  Calls for a
14  legal conclusion.
15      But you may answer.
16  A.  I did not do anything like that.
17  Q.  Fair enough, and I appreciate
18  your answer.
19      Would that also -- would it also
20  be true, therefore, that you don't have an
21  understanding, based on personal knowledge,
22  as to whether pharmacy receivables are
23  appropriate second lien collateral in this
24  case?
25      MR. MOLONEY: Objection to the
```

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 262 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 49

1
2    form of the question.
3    A.   I have no independent knowledge
4    about that.
5    Q.   And if I asked you the same
6    question about pharmacy scripts, would your
7    answer be the same?
8    A.   It was not my task.  I'll make
9    this a little easier in the interest of
10   efficiency.
11       It was not my task to go through
12   and either enumerate or include or exclude
13   items that the -- the counsel and my
14   colleagues review of documents indicated
15   were included in the collateral package.
16   Q.   Thank you.
17       Would it also be true you didn't
18   do anything to determine whether cash
19   should be included as appropriate second
20   lien collateral?
21       MR. MOLONEY: Same objection.
22       You may answer.
23   A.   Correct.
24   Q.   Do you know whether your opinions
25   as set forth in Exhibit 1 include cash as

Page 50

1
2    second lien debt collateral?
3    A.   The opinion touches on -- I know
4    we list cash as an item of second lien
5    collateral and evaluated collateral.  I
6    know there's been discussion on the point
7    and I know what the rationale is for
8    including it.  Whether we specifically in
9    the report say that cash was second lien
10   collateral or whether we say it was first
11   lien collateral and we had a second lien on
12   the collateral package, I'm not quite sure.
13   Q.   Can you turn to page 8 out of
14   Exhibit 1, please?
15       (Witness complies.)
16   Q.   Section B on that page is
17   entitled:  The value of non-inventory
18   collateral, correct?
19   A.   Yes.
20   Q.   And the first bullet point under
21   it is:  Cash, and it says $115.5 million,
22   correct?
23   A.   Yes.
24   Q.   Do you know where that figure
25   came from?

Page 51

1
2    A.   It was computed by my colleagues.
3    Q.   Okay.  Do you know where that
4    figure came from?
5        MR. MOLONEY: He can read the
6    report too.  It's not a memory test.
7        (Document review.)
8    A.   The origin of all of these
9    numbers was the general ledger of Sears.
10   Q.   Did you personally review the
11   general ledger of Sears?
12   A.   No.
13   Q.   Is it fair to say you've never
14   laid eyes on the general ledger of Sears?
15   A.   It is not fair to say that.
16   Q.   So have you laid eyes on it?
17   A.   Yes.  Parts of it.
18   Q.   Which parts of it?
19   A.   The parts that we recite.  My
20   colleagues have showed me what they were
21   pointing to.
22   Q.   I'm going to hand you what I've
23   marked Exhibit 2 to your deposition.
24       (Schulte Exhibit 2, Excel of
25   General Ledger, marked for

Page 52

1
2    identification, as of this date.)
3        BY MR. GENENDER:
4    Q.   Can you identify what Exhibit 2
5    is?
6    A.   These were portions of the
7    general ledger.
8    Q.   If you look at the first page of
9    Exhibit 2 and you go about two-thirds,
10   maybe three-fourths of the way down, do you
11   see where there is an entry:  Credit card
12   deposits in transit, $64,279,939?
13   A.   Yes.
14   Q.   And then below that it says:
15   Cash and cash equivalents?
16   A.   Yes.
17   Q.   $179,738,712?
18   A.   For the 2018 period.
19   Q.   Yes.
20       Does the delta between those
21   numbers, which is in the range of
22   $115,500,000, comprise the cash number
23   reflected on page 8 of your report?
24   A.   Probably.
25   Q.   Do you know that for certain?

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 263 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 53

1
2  A.  No.
3  Q.  Thank you.
4      Are you able to articulate for
5  this court the basis -- your basis for
6  including the $115.5 million of cash as
7  second lien debt collateral?
8  A.  Well, we know there is a certain
9  of amount of cash that was restricted for
10  the benefit of the Pension Benefit Guaranty
11  Corporation.
12      The inclusion is because in our
13  methodology we are subtracting from asset
14  values certain items by way of discerning
15  what the balance of the collateral accounts
16  was on the date of the petition, and in
17  doing that something that is an asset of
18  the first lien counts, because we take the
19  first lien and we subtract off the first
20  lien balance, and what's left falls to the
21  second lien.
22      If we excluded it, we'd be
23  undercounting the overall secured lender
24  collateral.
25  Q.  Are you saying that if something

Page 54

1
2  is collateral for the 1Ls, it's
3  automatically collateral for the 2Ls?
4  A.  I'm saying that what is left for
5  the 2Ls is the amount that belongs to the
6  1Ls, less what they're owed.
7  Q.  What's your basis for saying
8  that?
9  A.  My understanding of the Uniform
10  Commercial Code.
11  Q.  And where do you cite the UCC in
12  your report?
13  A.  I don't.  I take notice of it.
14  Q.  But do you reference it in your
15  report?
16  A.  No.
17  Q.  Okay.  Which provision of the UCC
18  would you be citing?
19  A.  Sir, this is common sense.
20  Q.  I'm just asking what provision of
21  the UCC --
22  A.  I'm not citing -- I'm not citing
23  provisions of the UCC.
24  Q.  Okay.  And your report doesn't
25  reference the UCC, does it?

Page 55

1
2  A.  No.
3  Q.  And we are in a bankruptcy
4  proceeding, so you are referring to the
5  Uniform Commercial Code as opposed to the
6  Unsecured Creditors' Committee, correct?
7  A.  Yes.
8  Q.  That was deposition humor.
9  A.  Sorry?
10      MR. MOLONEY: There is no
11  question pending.
12      BY MR. GENENDER:
13  Q.  I said that was a little
14  deposition humor.
15  A.  Ah.
16  Q.  You see in the second bullet
17  point on page 8 it refers to credit card
18  receivables of $64.2 million, correct?
19  A.  Yes, sir.
20  Q.  Credit card deposits in transit,
21  right?
22  A.  Yes, sir.
23  Q.  And those, as we just said, are
24  reflected on Tab 5 -- I'm sorry, on
25  Exhibit 2 to your deposition, correct?

Page 56

1
2  A.  Yes.
3  Q.  All right.
4      Have you reviewed any of the
5  borrowing base certificates in connection
6  with Sears?
7  A.  I know about them through
8  colleagues.  I have not independently
9  reviewed them.
10  Q.  And you know what a borrowing
11  base certificate is, don't you?
12  A.  I do.
13  Q.  And how would you explain it?
14  A.  A borrowing base certificate is a
15  representation by a borrower, to lenders,
16  of the value of whatever the borrowing
17  agreement declares to be elements of the
18  borrowing base.
19  Q.  Did you rely upon any of the
20  borrowing base certificates for Sears in
21  connection with any of your opinions in
22  your report?
23  A.  Rely on them?  We reviewed them,
24  in part, and some of the experts pay closer
25  attention to them than I did.

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 57

1
2  Q.  Which experts are you referring
3  to?  For the other lienholders?
4  A.  Yes.
5  Q.  Okay.  Not your team?
6  A.  Correct.
7  Q.  Thank you.
8      Do you think a borrowing base
9  certificate is a fair indicia of the value
10  of collateral?
11  A.  No.
12  Q.  Why not?
13  A.  Because a borrowing base is a
14  defined set of terms in the credit
15  agreement reflecting lender's willingness
16  to advance funds against certain categories
17  of assets.  It does not mean that it's a
18  full measure of the value of those assets,
19  not at all.
20  Q.  What is the full measure of the
21  value of the assets?
22  A.  Well, the company is responsible
23  for its financial statements.  And so one
24  would start with the book value that the
25  company recites.  But no lender will

Page 58

1
2  advance funds to 100 percent of the
3  categories of assets in a borrowing base.
4  A credit agreement will have advanced rates
5  applied to those values.
6  Q.  Same reason someone wouldn't give
7  you a mortgage on probably 100 percent
8  value of the house, correct?
9  A.  One could try, but one would not
10  be successful.
11  Q.  Same general principle?
12  A.  General -- it's a lender cushion.
13  Q.  Thank you.
14      Do lenders advance money based on
15  general ledger entries?
16  A.  In part.  I mean, the lenders
17  might audit as far back as the general
18  ledger, yes.  I'm not a lender, but that
19  would not surprise me.
20  Q.  To your knowledge, have you
21  relied on any figures from any borrowing
22  base certificate for Sears in offering any
23  of your opinions in Exhibit 1?
24  A.  Not to my knowledge.
25  Q.  I'm going to show you what's been

Page 59

1
2  marked as Exhibit 3.
3      (Schulte Exhibit 3, Sears Holding
4  Corp document entitled Exhibit A, 35
5  pages, not Bates-stamped, marked for
6  identification, as of this date.)
7      MR. MOLONEY: There are
8  highlights.  I assume they are your
9  highlights?
10      MR. RUTHERFORD: That is how the
11  document was produced to us.
12      THE WITNESS: I don't have
13  highlights on mine.  Oh, yes I do.  I
14  have some.
15  A.  I have it, what is your question?
16  Q.  Are you able to identify what
17  Exhibit 3 is?
18  A.  It says on its face that it's the
19  borrowing base certificate as of October
20  the 13th, 2018.
21  Q.  Is this a document that provided
22  the basis for any information in your
23  report, to your knowledge?
24  A.  Not directly, no.
25  Q.  What about indirectly?

Page 60

1
2  A.  Well, as I said to you, our
3  report, my report, does not value anything
4  on the borrowing base.  So it's not relied
5  upon in that sense.
6      I'd be astonished if it had not
7  been looked at, but it is not the basis of
8  the analysis.
9  Q.  You'd said you'd be astonished if
10  it had not been looked at, correct?
11  A.  I did say that.
12  Q.  And I presume that you're referring to
13  by your members of your team?
14  A.  That is correct.
15  Q.  Did you personally look at
16  Exhibit 3 in connection with doing your
17  work in this case?
18  A.  Only in the last 10 minutes.
19  Q.  Okay.  In the context of this
20  conversation?
21  A.  Yes.
22  Q.  If you will turn to page 3 of 35
23  of Exhibit 3, let me know when you have
24  that in front of you.
25  A.  Okay.

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 265 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

---

Page 61

```
 1
 2   Q.   And let me take a step back.
 3        The date October 13, 2018, how
 4   close in time is that to the petition date,
 5   if you know?
 6   A.   It's within a week or two.
 7   Q.   Within two days, isn't it?
 8   A.   (Nodding.)
 9   Q.   I'll represent to you it's within
10   two days.
11   A.   Yes, okay.
12   Q.   Pretty close in time, isn't it?
13   A.   Very.
14   Q.   Do you see in the middle of
15   page 3 of Exhibit 3, the entry for:
16   Eligible credit card receivables?
17   A.   I see it.
18   Q.   And it's 54.8 million, correct?
19   A.   Yes.
20   Q.   But your report uses the
21   64.2 million number from the general
22   ledger, which is Exhibit 2, correct?
23   A.   Yes.
24   Q.   Why?
25   A.   Well, the word "eligible" is why.
```

---

Page 62

```
 1
 2   Q.   Why is that?
 3   A.   Because lenders, in advancing
 4   funds against receivables, would typically
 5   have gone through a negotiation to define
 6   what's an eligible receivable and they
 7   would have taken out of creditworthiness,
 8   if you will, or out of the calculation of
 9   available funds, certain categories of
10   receivables that they chose not to lend
11   against.
12   Q.   Why wouldn't you want to do the
13   same sort of -- strike that.
14        Why wouldn't you perform the same
15   level of scrutiny in valuing second lien
16   debt that lenders would?
17        MR. MOLONEY: Objection to the
18   form of the question. Mischaracterizes
19   the testimony, and it's argumentative
20   and inaccurate, but if you can answer
21   the question you may.
22        THE WITNESS: I agree with all of
23   that.
24        BY MR. GENENDER:
25   Q.   Can you answer my question?
```

---

Page 63

```
 1
 2   A.   Yes.  You're being foolish.
 3        The value of an asset is not the
 4   same as the amount that a lender will
 5   advance against the asset.  Going back to
 6   your analogy about the mortgage, a lender
 7   will not extend full value but will have
 8   some rule of thumb or some negotiated
 9   amount or some policy that they will lend
10   only a specified percentage of the fair
11   market value.  It doesn't mean that they
12   wouldn't want to know what the fair market
13   value is, they would, but it doesn't mean
14   that they would advance the full measure of
15   that.
16   Q.   Okay.  I'll object to the
17   nonresponsive portion of the answer.
18        You used the higher of the two
19   numbers, correct?
20   A.   Yes.
21   Q.   What is the date of Exhibit 2, if
22   you know, the $64.2 million figure for
23   credit card debts in transit?
24        At Exhibit 2, sir.  The general
25   ledger.
```

---

Page 64

```
 1
 2        MR. MOLONEY: We'll tell you, you
 3   didn't use the one that we referred to.
 4   It doesn't have any Bates-stamp number.
 5   There was no date on it.
 6        MR. RUTHERFORD: It was produced
 7   in an Excel file, so it doesn't have
 8   Bates-stamps.
 9        MR. MOLONEY: The one we cited
10   has a Bates-stamp number on it.
11        MR. GENENDER: So does this.
12   This is from an Excel file.  I will
13   represent that to you.
14        MR. MOLONEY: So it's the same
15   document?
16        MR. GENENDER: It's a portion of
17   the document, yes, sir.
18        MR. MOLONEY: Okay.
19        BY MR. GENENDER:
20   Q.   Do you know the date of the
21   figure?
22   A.   It appears to be month end of
23   September 2018.
24   Q.   Okay.  And you'd agree with me,
25   sir, that October 13th, 2018, is closer in
```

Page 65

1
2  time to the petition date than month end
3  2018, correct?
4  A.  Yes, sir.
5      MR. MOLONEY: As I repeat, I
6  don't know if this is the document that
7  we relied on.  There is no Bates-stamp
8  number and I can't -- I'm not sure that
9  that's correct.
10      MR. GENENDER: Object to the
11  sidebar.
12      MR. MOLONEY: Well, no, it's not
13  an objection -- it's an objection to --
14  on the record to the fact that the
15  document that you produced does not
16  have a Bates-stamp number and we have
17  no way -- the witness doesn't know --
18  unless you -- whether this is the exact
19  same document that's referred to in the
20  footnote.
21      MR. GENENDER: The document in
22  the footnote speaks for itself.
23      MR. MOLONEY: I agree with that.
24      MR. GENENDER: And when compared
25  with this, it will speak for itself.

Page 66

1
2      MR. MOLONEY: It's the best
3  record.
4      BY MR. GENENDER:
5  Q.  Your report on page 9 references
6  pharmacy scripts at $72.8 million.
7      Do you see that?
8  A.  Yes.
9  Q.  And you rely in footnote 14 on a
10  schedule of estimated script asset value as
11  of October 15, 2018.
12      Do you see that?
13  A.  I do.
14  Q.  Have you personally reviewed that
15  document?
16  A.  I've seen it, but I have not
17  studied it.
18  Q.  Okay.
19      (Schulte Exhibit 4, Valuation,
20  not Bates-stamped, marked for
21  identification, as of this date.)
22      BY MR. GENENDER:
23  Q.  I'm handing you what's been
24  marked Exhibit 4.
25      Can you identify Exhibit 4 for

Page 67

1
2  me?
3  A.  Well, it purports to be the
4  valuation of prescriptions by store in the
5  pharmacy of Sears stores.
6  Q.  Is this the document from which
7  you derived $72.8 million?
8  A.  I see at the top of the first
9  page the same number, 72.8 million, and it
10  must therefore be that this is the
11  document.
12  Q.  Do you know the date of
13  Exhibit 4?
14  A.  It must be a period of time close
15  to the filing, but I don't have a precise
16  date.
17  Q.  You don't know the date, do you?
18  A.  Correct.
19  Q.  The date is not reflected on the
20  document, is it?
21  A.  It is not.
22  Q.  Have you reviewed any of the
23  Tiger reports?
24  A.  No, not personally.
25  Q.  Have you laid eyes on them?

Page 68

1
2  A.  Yes.  In passing, yes.
3  Q.  I show you what's been marked
4  Exhibit 5.
5      (Schulte Exhibit 5, Tiger Report
6  dated 9/28/18 on Sears Holdings
7  Corporation, Bates-stamped
8  SEARS_507B_00001287 through 1344,
9  marked for identification, as of this
10  date.)
11      BY MR. GENENDER:
12  Q.  Are you able to identify
13  Exhibit 5 for me?
14  A.  Well, on its face it is an
15  appraisal of Sears Holdings Inventory
16  Appraisal as of an inventory date of
17  October 6, 2018, and the basis of appraisal
18  is net orderly liquidation value.
19  Q.  Which is referred to often as
20  NOLV, correct?
21  A.  Constantly.
22  Q.  Okay.  Do you know whether
23  Exhibit 5, this Tiger report that you just
24  identified, values the scripts in it?
25  A.  I don't know.

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

---

Page 69

```
1
2   Q.   Did you rely on Exhibit 5 in any
3   way in assigning a value of the pharmacy
4   scripts that's reflected on page 9 of your
5   report, 72.8 million?
6   A.   If you read the report on page 9,
7   it tells you the answer to that.
8   Q.   And the answer is?
9   A.   "ESL's counsel requested the
10  debtors provide a calculation of value for
11  the pharmacy scripts as of the petition
12  date and received the file which appears to
13  compute a value of $72.8 million."
14  Q.   Okay.
15  A.   That's footnoted to footnote 14.
16       I'm making the wild guess that
17  it's not included in the Tiger report, but
18  that's just a guess based upon the clear
19  language in the report.
20  Q.   So my question is:  Did you rely
21  on Exhibit 5 in any way assigning a value
22  of the pharmacy scripts as reflected on
23  page 9 of your report, that being
24  $72.8 million?
25  A.   Probably not, because I doubt
```

Page 70

```
1
2   it's in there.
3   Q.   Okay.
4   A.   By the way, it is common
5   knowledge that pharmacy scripts are an
6   asset of pharmacies.  We owned a pharmacy
7   company at one point and there are
8   basically customers lists.
9        MR. GENENDER: I'm going to
10  object as nonresponsive.  There is no
11  question pending.
12       BY MR. GENENDER:
13  Q.   Can you turn to page 8 of
14  Exhibit 5, please?
15  A.   Yes.
16  Q.   Do you see the bottom right-hand
17  corner where this report says, "Based on an
18  estimated turn of $5 per prescription, the
19  script lists would have a value of up to
20  $27 million."
21       Do you see that?
22  A.   Hold on, you're in the Tiger
23  report?
24  Q.   Yes, sir, Exhibit 5.
25  A.   Sorry, I thought you were --
```

Page 71

```
1
2   Q.   Take your time.  Page 8 of
3   Exhibit 5.  Lower right-hand corner.
4        (Document review.)
5   Q.   I read the second sentence of
6   that paragraph in the lower right-hand
7   corner, "Based on an estimated return of $5
8   per prescription, the script lists have a
9   value of up to $27 million."
10       Do you see that?
11  A.   Yes.
12  Q.   Did you rely upon that statement
13  in preparing your report?
14  A.   It appears that we did not.
15  Q.   Thank you.
16       You relied upon the $72.8 million
17  number instead, which is contained in
18  Exhibit 4, correct?
19  A.   We relied upon your client's
20  representation.
21       MR. GENENDER: Objection.
22  Nonresponsive.  Move to strike.
23       BY MR. GENENDER:
24  Q.   Exhibit 14, sir -- I'm sorry.
25  Your report, page 9, footnote 14, cites the
```

Page 72

```
1
2   schedule, which is Exhibit 4 to your
3   deposition, correct?
4   A.   You've confused me.
5   Q.   Exhibit 4 to your -- to this
6   deposition is Exhibit 4 to the deposition,
7   sir.  I'm showing it to you.  That right
8   there (indicating).
9   A.   Got it.
10  Q.   That is the basis for
11  72.8 million?
12  A.   It is.  It appears to be.
13  Q.   And it doesn't have a date on it,
14  does it?
15  A.   It does not.
16  Q.   And you don't know the date, do
17  you?
18  A.   I do not.
19  Q.   Can you read for the record the
20  full text of footnote 14 in your report on
21  page 9.
22  A.   Footnote 14 reads:  "Schedule of
23  estimated script asset value as of
24  October 15, 2018."
25  Q.   What is your basis, as you sit
```

---

Page 73

1
2  here, for knowing --
3       MR. MOLONEY: Again. I have an
4  objection. That this is not --
5       MR. GENENDER: Excuse me. Excuse
6  me, Counsel. I'm asking --
7       MR. MOLONEY: This is not the
8  same document that's referenced here.
9  There is no Bates number. So we have
10 no idea.
11      MR. GENENDER: Counsel, I would
12 like to ask my question without
13 interruption.
14      BY MR. GENENDER:
15 Q.  Mr. Schulte, what is your basis
16 for saying in footnote 14 that the schedule
17 of estimated script value as of October --
18 is as of October 15, 2018?
19      MR. MOLONEY: I'm sorry?
20      THE WITNESS: Can I use my guide?
21 I have a guide here of all these
22 documents, which you don't have. Can
23 we give him one?
24      MR. MOLONEY: Yes, they can have
25 one.

Page 74

1
2       MR. GENENDER: I have no idea
3  what you're talking about. Do you want
4  to hand it to me?
5       MR. MOLONEY: Yes.
6       (Handing.)
7       THE WITNESS: In this case it
8  doesn't help.
9       MR. MOLONEY: No.
10      (Handing.)
11      MR. MOLONEY: It's just an
12 appendix to make it easy to figure out
13 if you showed him a document to speed
14 it up for us, so we wouldn't spend a
15 lot of time going through the --
16      MR. GENENDER: Who prepared --
17      MR. MOLONEY: It was prepared by
18 Cleary.
19      MR. GENENDER: I'm going to mark
20 this.
21      MR. MOLONEY: It's just based
22 on -- I can say for the record, all it
23 is, is it's just -- we took the
24 documents that were listed in the
25 appendix and we went to kind of cross

Page 75

1
2  reference it in a way to perhaps make
3  this morning more efficient.
4       MR. GENENDER: Terrific. Can I
5  have one more copy of it? Do you have
6  an extra copy?
7       MR. MOLONEY: Sure.
8       MR. GENENDER: Give that to me.
9       BY MR. GENENDER:
10 Q.  I'm handing you what's been
11 marked as Exhibit --
12 A.  I have it.
13 Q.  You may have it. I just marked
14 as Exhibit 6 the document that your counsel
15 just provided to me.
16 A.  Yes.
17      (Schulte Exhibit 6, Index to
18 Appendix B of Expert Report of David
19 Schulte, not Bates-stamped, marked for
20 identification, as of this date.)
21      BY MR. GENENDER:
22 Q.  Is that a document that you
23 personally prepared?
24 A.  Did I prepare this document? No,
25 sir.

Page 76

1
2  Q.  Okay. Who did?
3  A.  Cleary did.
4  Q.  What does it reflect?
5  A.  It is a way to move from the
6  documents that are recited or footnoted in
7  the report to their origin.
8  Q.  When was it prepared?
9  A.  This was prepared yesterday.
10      MR. MOLONEY: Yes, about
11 six o'clock yesterday.
12      BY MR. GENENDER:
13 Q.  Mr. Schulte, I'm deposing you,
14 not your lawyer.
15 A.  Yes, I answered yesterday.
16 Q.  Did you prepare -- did you have
17 any role in preparing Exhibit 6?
18 A.  No.
19 Q.  Can you swear to its accuracy?
20 A.  Can I swear to its accuracy? Of
21 course not.
22 Q.  Thank you.
23      What is your basis in footnote 14
24 for stating that the schedule referenced is
25 as of October 15, 2018? As you sit here

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 269 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

---

**Page 77**

1
2  today, do you have one?
3  A.  I don't know what Sears, with
4  this Bates number -- I don't know what that
5  is.  It's not on this cross-referencing
6  list, so I don't know.
7  Q.  I want to go back to page 9 of
8  your report, the first paragraph.
9  A.  The indented paragraph or the
10  first --
11  Q.  No, the first full paragraph
12  under the:  Value Of the Inventory
13  Collateral.
14      Do you see that?
15  A.  Yes, I do.
16  Q.  "The appropriate" -- you say,
17  "The appropriate methodology to value
18  inventory is on the basis of its intended
19  use."
20      Do you see that?
21  A.  Yes.
22  Q.  You say, "If a retailer is
23  operating in the normal course as a
24  going-concern, it would have ample time and
25  resource to sell most of its inventory?"

---

**Page 78**

1
2      Did I read that correctly?
3  A.  You did.  You're doing well.
4  Q.  Thank you.
5      Your next sentence is the one I
6  want to ask you a question about.
7  You say, "But if it is
8  liquidating, there may be the time and cost
9  pressures that require inventory to be sold
10  at a discount."
11      Correct?
12  A.  That's what it says.
13  Q.  And you agree with that, don't
14  you?
15  A.  Yes.
16  Q.  Would you agree that if Sears had
17  liquidated, it would have been an
18  unprecedented retail liquidation?  Would
19  you agree with that?
20  A.  I don't know that it would be
21  unprecedented.
22  Q.  Are you aware of a company larger
23  than Sears was in October of 2018 that had
24  liquidated that was a retailer?
25  A.  No.

---

**Page 79**

1
2  Q.  Thank you.  There would have been
3  uncertainty and risk associated with a
4  liquidation, correct?
5  A.  Depending on how the liquidation
6  was done.
7  Q.  Well --
8  A.  Well, I mean, yes, depending on
9  how the liquidation was done.
10  Q.  Sure.  It's possible that overall
11  recovery would have been reduced in a
12  liquidation, correct?
13  A.  Compared to what.
14  Q.  Compared to a going-concern sale?
15  A.  Yes, it's likely.
16  Q.  Thank you.
17      If there were a fire sale of
18  assets, recovery margins would be lower,
19  wouldn't they?
20  A.  It depends.
21  Q.  They could be lower, couldn't
22  they?
23  A.  They could be.  One would -- one
24  would expect, and that's what the text
25  says, that if there were time pressures and

---

**Page 80**

1
2  if there was a fire sale, which is your
3  hypothesis, that they would be lower.
4  Q.  And if it were -- there were a
5  day one liquidation of Sears, its inventory
6  would, quote, unquote, flood the market,
7  wouldn't it?
8  A.  I don't know that.
9  Q.  Okay.  But you're familiar with
10  the phrase "flood the market"?
11  A.  I've heard that.
12  Q.  Okay.  You know what it means?
13  A.  Yes.
14  Q.  Puts more supply than there would
15  be demand.
16  A.  I got that.
17  Q.  Which as a matter of basic
18  economics would lower the price, wouldn't
19  it?
20  A.  Depending upon how it was done.
21  Q.  Okay.  There could be an
22  increased -- if Sears liquidated, there
23  could be an increased risk of vendor
24  flight.
25      Would you agree?

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 270 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 81

```
 1
 2        MR. MOLONEY: Sorry.  What do you
 3   mean by vendor flight?
 4   A.  I don't know what you're talking
 5   about.
 6   Q.  Vendors --
 7   A.  I don't know what you're talking
 8   about.
 9   Q.  I understand -- and I asked you
10   to let me know when you don't understand a
11   question and we've gone over an hour and I
12   finally got one that you didn't understand,
13   so I feel very accomplished.
14        I'm going to ask it better.
15   A.  I am happy to make you feel
16   accomplished.
17   Q.  Well, I need all the help I can
18   get.
19   A.  Yes, sir.
20   Q.  In a liquidation, would you agree
21   that there is a risk that vendors who
22   supply product to a company could stop
23   doing business with the company?
24   A.  Yes.
25   Q.  And in a liquidation would you
```

Page 82

```
 1
 2   also agree that certain receivables can be
 3   harder to collect than they otherwise would
 4   be were the business a going-concern?
 5   A.  Depending on the nature of the
 6   receivables.  I would not think that as to
 7   credit card receivables.
 8   Q.  What about other kinds of --
 9   sorts of receivables; it could be?
10   A.  Sure.
11   Q.  Would you agree that in a
12   liquidation that there is a risk of losing
13   employees?
14   A.  Sure.
15   Q.  Would you agree that in a
16   liquidation there is a risk of losing
17   senior management?
18   A.  I would agree that in a
19   liquidation a lot of things would be
20   different and they would be on the whole
21   harmful to the company.
22   Q.  And one of the harms would be
23   inefficiencies in operating the company,
24   wouldn't they?
25   A.  Not necessarily.
```

Page 83

```
 1
 2   Q.  It could be, couldn't it?
 3        MR. MOLONEY: Objection to the
 4   form of the question.
 5   A.  It's pretty speculative.
 6   Q.  If you lose key employees and key
 7   senior management, that can create
 8   inefficiencies in how a business is run,
 9   couldn't it?
10   A.  When you're asking about "could,"
11   you're presuming a lot.  So I don't want to
12   answer that because -- except to say
13   perhaps.
14   Q.  It's a risk, isn't it?
15   A.  Perhaps.
16   Q.  Okay.  And in a liquidation there
17   are trustee -- liquidating trustees charge
18   fees, don't they?
19   A.  If there was a liquidating
20   trustee, yes.
21   Q.  Your report on page 10 references
22   three different methodologies for valuing
23   both the going-out-of-business and
24   Go-Forward stores, correct?
25   A.  Yes.
```

Page 84

```
 1
 2   Q.  And would you agree that to
 3   conduct your valuation you backed out the
 4   book value of inventory sold in the GOB
 5   stores, correct?
 6   A.  We backed it out from the
 7   petition date financial statement of the
 8   book value of the company's inventory.
 9   Q.  And the book value of inventory
10   on the petition date that you used was
11   2,690,800,000, correct?
12   A.  Yes.
13   Q.  Do you know where that number
14   came from?
15   A.  I assume it came from the court
16   filings.  Let me look.  There is a footnote
17   here.  Hold on.
18        (Document review.)
19   A.  It isn't separately footnoted.  I
20   assume that it came from the company's
21   filing, whether it was as of petition date
22   or a few days before, I'm not sure.
23   Q.  Do you know for certain?
24   A.  No.  The only thing that was
25   shown me is the -- October 15 was the date,
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 271 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 85

```
1
2    and as we established that was -- or 13 --
3    that was two days before the filing.  We
4    covered that before.
5    Q.  In terms of the borrowing base
6    certificate, which is Exhibit 3, correct?
7    A.  If that's where it came from.
8    Q.  Well, the borrowing base
9    certificate is marked as Exhibit 3 to your
10   deposition.  I'll tell you that.  That's
11   the October 13 document.
12   A.  I'm not quite sure where it came
13   from, whether it came from the filing or
14   whether it came from the chief financial
15   officer's declaration.  I'm not sure.
16   Q.  Did it come from the borrowing
17   base certificate, if you know?
18      Let me direct you to page 3 of 35
19   of the borrowing base certificate to see if
20   that refreshes your memory or provides you
21   new information.
22      MR. MOLONEY: Or different
23   information, correct?
24      MR. GENENDER: New information
25   could be different information.
```

Page 86

```
1
2    A.  Well, I can find on the exhibit
3    you directed me on page 3 an entry that
4    says, "Total stock ledger inventory" and
5    it's two billion, six ninety point eight.
6    Q.  The same number?
7    A.  That's in millions.
8    Q.  The same number that you used on
9    the top of page 10 of your report, book
10   value of inventory on petition date,
11   correct?
12   A.  Yes.
13   Q.  And that same number is used on
14   page 3 of 35 of the borrowing base
15   certificate which is Exhibit 3, correct?
16   A.  This is the borrowing base
17   certificate.  What is your question?
18   Q.  That is the same number that you
19   used -- in your report, is the same number
20   that's listed on page 3 of the borrowing
21   base certificate for total stock ledger
22   inventory, correct?
23   A.  Yes.
24   Q.  And you'd agree that the
25   borrowing base is a representation of the
```

Page 87

```
1
2    assets that lenders would be willing to
3    lend against, correct?
4    A.  Yes.
5    Q.  The general ledger does not
6    exclude ineligible inventory, does it?
7    A.  It does not exclude it, correct.
8    Q.  The borrowing base we're looking
9    at, which is Exhibit 3 to this deposition,
10   excludes roughly $300 million of ineligible
11   inventory, doesn't it?
12   A.  It's less than that.
13   Q.  Well, let's look.
14      Total stock ledger inventory on
15   the borrowing base certificate page 3,
16   Exhibit 3, 2.69 billion.
17      Do you see that?
18   A.  Yes.
19   Q.  And then if you go down about
20   half the page, it says, "Net eligible
21   inventory" and that number is
22   2.391 billion, correct?
23   A.  Yes.
24   Q.  That's a delta of pretty close to
25   $300 million, isn't it?
```

Page 88

```
1
2    A.  Yes, sir.
3    Q.  Okay.  Thank you.
4      And if you look between those two
5    numbers, the things that are excluded
6    include inventory paid for in advance of
7    shipment, 83.7 million, correct?
8    A.  Yes.
9    Q.  That excludes as ineligible
10   inventory that had already been sold,
11   correct?
12   A.  No, I don't think so.
13   Q.  Inventory paid in advance of
14   shipment, that is inventory that is already
15   sold, isn't it?
16   A.  No, it may be a C.O.D.  It may be
17   inventory that the company has ordered
18   where its vendor has required payment in
19   advance.  I don't know exactly what's in
20   it, but your supposition is something I
21   don't share.
22   Q.  Well, you didn't take into
23   account the delta between 2.69 million and
24   2.39 -- excuse me.  You didn't take into
25   account the delta between $2.69 billion and
```

Page 89

1
2    $2.391 billion reflected on page 3 of the
3    borrowing base certificate, correct?
4    A.   We took the general ledger number
5    for inventory and we did not adjust it
6    through the eyes of a lender or through any
7    particular credit agreement definitions.
8    Q.   Do you see on page 3 of the
9    borrowing base certificate where it says,
10   "Total imported in transit inventory"?
11   A.   I do see that.
12   Q.   Okay.  And then above it says,
13   "In transit reserved."
14       Do you see that?
15   A.   Yes.
16   Q.   Did you take into account those
17   figures in preparing any of your opinions
18   in this case?
19   A.   It's the same answer I just gave
20   you.  We did not take any lender reserves
21   and deductions into account.  Those are
22   defined for a different reason.
23   Q.   Are these C.O.D. -- are those --
24   are the -- do you know if the entries for
25   total imported in transit inventory are

Page 90

1
2    C.O.D.?
3    A.   I'm not sure.
4    Q.   The inventory paid for in advance
5    of shipment, the $83.7 million number
6    towards the top of page 3 of Exhibit 3, why
7    do you believe those were C.O.D.?
8        MR. MOLONEY: I don't think he
9    said they were C.O.D., but you can
10   re-answer the question again, but I
11   think you misstated his prior
12   testimony.  Object.
13       MR. GENENDER: Object to the
14   speaking objections.
15   A.   I'm speculating, but on the face
16   of it, it's inventory paid for in advance
17   of shipment.  It sounds suspiciously like
18   COD, but I'm speculating.
19   Q.   But by your own testimony in
20   saying you're speculating, you don't have
21   personal knowledge, correct?
22   A.   Personal knowledge?  I don't have
23   personal knowledge of anything on this
24   page.
25   Q.   And you don't have any certain --

Page 91

1
2    and you don't have a certain opinion if
3    you're speculating, correct?
4    A.   It's not something I ever
5    considered before your questions began.
6    Q.   Do you have any reason to doubt
7    the accuracy of the borrowing base
8    certificate, which is Exhibit 3?
9    A.   No.
10   Q.   Thank you.
11       Just to be clear, in performing
12   your calculations of valuing the inventory
13   on the petition date you did not take into
14   account the approximately $300 million
15   reduction of net eligible inventory
16   reflected on page 3 of the borrowing base
17   certificate, which is prepared as of
18   October 13, 2018, correct?
19   A.   Correct.
20   Q.   Thank you.
21       Your footnote 18, also on page
22   10, states that you rely on a document
23   called: Summary of GOB Recovery Rates Post
24   Chapter 11 Bankruptcy Filing?
25       Do you see that?

Page 92

1
2    A.   I do.
3    Q.   Is that a document that you
4    reviewed in preparing for today's
5    deposition?
6    A.   Other than in passing, no.
7        (Schulte Exhibit 7, GOB Inventory
8    Recovery Rates, Bates-stamped
9    ESL_507B00000002 through 3, marked for
10   identification, as of this date.)
11       BY MR. GENENDER:
12   Q.   Let me hand you what has been
13   marked as Exhibit 7, and it's a two-sided
14   document and your counsel will be happy to
15   know it has Bates labels printed on it as
16   opposed to from an Excel page.
17       MR. MOLONEY: Okay.  There is a
18   reason why I objected.  I mean, from
19   the metadata on the Excel page you may
20   be able to figure out dates, right.
21       MR. GENENDER: Tom, here is the
22   deal, we're going to -- we can go back
23   and after this deposition do a
24   side-by-side and we'll address any
25   potential issue you have about those --

Page 93

1  where those documents came from, and
2  probably better to do it that way than
3  on the record, fair enough?
4       MR. MOLONEY: Okay.
5       MR. GENENDER: Thank you.
6  BY MR. GENENDER:
7  Q.  You have Exhibit 7 in front of
8  you?
9       MR. MOLONEY: Well, that is not
10 the one we used.  It's okay.  This is
11 exactly the problem we had.  We
12 actually printed out the document and
13 it's not the same one you handed him.
14 This is the document that we used.  You
15 want to mark the document we used?
16      MR. GENENDER: Would you turn
17 over the back of the exhibit, turn it
18 over, please?
19      MR. MOLONEY: It's still not the
20 document we used.
21      BY MR. GENENDER:
22 Q.  Your Exhibit 18 states it refers
23 to ESL 507(B), a bunch of zeros and the
24 number 2?

Page 94

1       MR. MOLONEY: Yeah, and this is
2  the Excel sheet.  When we printed out
3  the Excel sheet.
4       MR. GENENDER: Excuse me.  I was
5  talking to the witness.
6       MR. MOLONEY: Okay.
7       BY MR. GENENDER:
8  Q.  Do you see that very Bates number
9  ESL 507(B), a bunch of zeros and 2 is what
10 is on the first page, lower right-hand
11 corner, of Exhibit 7, correct?
12 A.  I see that.
13 Q.  Is this not a document -- and
14 this document is -- entitled Exhibit 7, is
15 entitled:  GOB Inventory Recovery Rates,
16 correct?
17 A.  That is what it says.
18 Q.  It does not say post Chapter 11
19 bankruptcy filing, does it?
20 A.  Well, it starts with 2014 which
21 is distinctly pre-bankruptcy filing, yes.
22 Q.  All right.  And it goes through
23 2018 year-to-date.
24      Do you see that?

Page 95

1 A.  I do.
2 Q.  Do you know where -- what month
3  in 2018 year-to-date it goes through?
4 A.  I see no date here.  On the other
5  side.
6       MR. MOLONEY: The footnote
7  reference may just be wrong.  I can
8  give you the document which --
9       MR. GENENDER: I'd love to see it
10 because I don't -- I'd like to see if
11 it's something that we haven't seen.
12 If it's been produced.
13      MR. MOLONEY: I think you have
14 it.
15      (Handing.)
16      MR. GENENDER: Thank you.
17      (Document review.)
18      MR. GENENDER: In the interest of
19 time I'm going to show this to my
20 colleagues and then we'll come back to
21 it, okay?
22      MR. MOLONEY: Okay.
23      MR. GENENDER: Fair enough.
24      MR. MOLONEY: It could have been

Page 96

1  our error, in which case we apologize.
2       MR. GENENDER: No, the Bates
3  number is what it is, and I get that
4  mistakes happen.  I just want to keep
5  moving.
6       BY MR. GENENDER:
7  Q.  If you look at Exhibit 7, if you
8  turn it over, on the back page it's Bates
9  labeled:  3 ESL 507(b)3.
10 A.  I see it.
11 Q.  The last line it says, "June
12 through September, begins, ends."
13      You see September is the last
14 date?
15 A.  I see it.
16 Q.  All right.  And these are
17 historical numbers on Exhibit 7, aren't
18 they?
19 A.  That's what they seem to be, yes.
20 Q.  There is nothing about Exhibit 7
21 that reflects GOB recovery rates post
22 Chapter 11 bankruptcy filing, correct?
23 A.  Well, hold on.  Sears was closing
24 stores for years.  So this is their --

Page 97

```
 1
 2   appears to be their accounting of their
 3   experience in stores that they closed where
 4   they ran going-out-of-business sales.
 5       They were not Chapter 11 because
 6   this all preceded Chapter 11.
 7   Q.  That's my point.  I understand
 8   that.  It might be historical, but there
 9   was nothing about this document, Exhibit 7,
10   that reflects GOB recovery rates post
11   Chapter 11, correct?
12   A.  That's correct.
13   Q.  Thank you.
14       MR. GENENDER: Why don't we take
15   a break and I would like to look at
16   that the document.
17       MR. MOLONEY: Okay.  Take a
18   break.
19       (Recess is taken.)
20   BY MR. GENENDER:
21   Q.  Mr. Schulte, we're back on the
22   record.  You understand that you are still
23   under oath?
24   A.  Yes, sir.
25   Q.  Thank you.
```

Page 98

```
 1
 2       In your report, in your
 3   calculation of gross retail proceeds, you
 4   apply a 37.7 percent markup to the book
 5   value of 2.039 billion in Go-Forward store
 6   inventory, correct?
 7       I'm looking in the middle of the
 8   page on page 10 of your report?
 9   A.  All right.  I'm on page 10.  Tell
10   me again, please.
11   Q.  In your report, in your gross --
12   for gross retail proceeds you apply a 37.7
13   percent markup to the book value of
14   2.039 billion, book value of inventory?
15   A.  Yes.
16   Q.  Okay.
17   A.  Yes.
18   Q.  And in footnote 20 you cite to
19   the Tiger appraisal, correct?
20   A.  Yes.
21   Q.  And we've talked about that Tiger
22   appraisal and we've marked it already as an
23   exhibit to your deposition, correct?
24   A.  Yes.
25   Q.  And to be clear, it's Exhibit 5
```

Page 99

```
 1
 2   to your deposition, right?
 3   A.  Yes.
 4   Q.  Why did you rely on the Tiger
 5   appraisal in this instance but not in
 6   connection with the pharmacy scripts'
 7   valuation where it was capped at
 8   27 million?
 9   A.  The value of the scripts came
10   from the debtor.  It was specifically
11   requested and it came specifically from
12   them.
13   Q.  But you had --
14   A.  Tiger -- excuse me.  Let me
15   answer your question.
16   Q.  Please, please.  Of course.
17   A.  Tiger values it much more
18   globally based upon their general
19   experience of valuing pharmacy scripts.
20   Q.  But you relied -- but to be
21   clear, you relied on Tiger for certain
22   things and not for others, correct?
23   A.  Sure.
24   Q.  Thank you.
25       For Going-Concern stores, you
```

Page 100

```
 1
 2   used book value, correct?
 3   A.  Yes, we looked at three different
 4   approaches, and in the end we settled on
 5   book value.
 6   Q.  That book value does not include
 7   any four-wall costs of those stores,
 8   correct?
 9   A.  That is correct.
10   Q.  It does not include corporate
11   overhead, correct?
12   A.  Correct.
13   Q.  And using book value does not
14   account for the costs associated with
15   selling the inventory, correct?
16   A.  Correct.  The accounting
17   convention is that the inventory is
18   recorded at the lower of cost or realizable
19   value.
20   Q.  Okay.  But just to be clear, the
21   book value that you all used did not take
22   into account the costs associated with
23   selling the inventory, correct?
24   A.  Correct.
25   Q.  And last, the book value that you
```

Page 101

1
2   all used did not take into account the
3   costs associated with storing the inventory
4   until it sold, correct?
5   A.  I don't know how that's accounted
6   for.
7   Q.  You don't know whether that was
8   accounted for or not?
9   A.  Correct.  You may be right.  I
10  just don't know.
11  Q.  Okay.  I don't hear that are
12  enough, people telling me I may be right,
13  Mr. Schulte, so I appreciate that.
14  A.  I'll try not to make a habit of
15  it.
16  Q.  Most people don't make a habit of
17  it.
18      You offer an opinion on page 13
19  of your report that the second liens were
20  oversecured as of the petition date,
21  correct?
22  A.  That is correct.
23  Q.  Do you stand by that position, as
24  you sit here today?
25  A.  I do.

Page 102

1
2   Q.  That opinion is based in part on
3   a buildup that includes $115.5 million of
4   cash, correct?
5   A.  Yes.
6   Q.  It includes $72.8 million of
7   pharmacy scripts, correct?
8   A.  Yes.
9   Q.  And $11.9 million of pharmacy
10  receivables; is that also correct?
11  A.  Yes, that's all on page 13 of the
12  report.
13  Q.  Thank you.
14      And that opinion is based, at
15  least in part, on a buildup that includes
16  the book value of the inventory, correct?
17  A.  Correct.
18  Q.  And that book value of the
19  inventory includes 300 million worth of
20  assets that are not included in the
21  borrowing base certificate which we talked
22  about earlier, which is Exhibit 3, correct?
23  A.  Yes, sir.
24      MR. MOLONEY: Objection to the
25  form of the question.

Page 103

1
2       You have to go slower, okay, so I
3   can object.
4       THE WITNESS: I'm sorry.
5       BY MR. GENENDER:
6   Q.  And your opinion is based, at
7   least in part, on the assumption that the
8   letters of credit are not drawn against,
9   correct?
10  A.  On the fact; not the assumption.
11  On the fact that they were not drawn
12  against.
13  Q.  And there is $395 million of
14  letters of credit, correct?
15  A.  Correct.
16  Q.  You also contend that the 85
17  percent value that Mr. Griffith applies to
18  the inventory in his calculation is nothing
19  more than what you call, quote, deal lingo,
20  end quote; is that right?
21  A.  Well, you put a pejorative on it
22  when you say "nothing more than."  I yield
23  to no man in my respect for Mr. Griffith,
24  but yes.
25  Q.  But "deal lingo" is your term,

Page 104

1
2   right?
3   A.  Yes.
4   Q.  And to be fair, page 23 of your
5   report says, "Accordingly, the 'deal lingo'
6   of 85 percent to the inventory another
7   collateral does not necessarily mean that
8   it" -- "that was its value as of the
9   Transform transaction," correct?
10  A.  Well, not only that, it does not
11  necessarily mean that's the price paid.
12  Q.  But you, in your 24-page
13  single-spaced report, you -- in this
14  particular instance you used the words
15  "does not necessarily mean."
16  A.  Fine.
17  Q.  As opposed to you know how to
18  say, does not mean, correct?
19  A.  Well, the answer is seven.  There
20  are seven angels that dance on the head of
21  that pin.
22  Q.  But there is a difference between
23  "does not mean" and "does not necessarily
24  mean," isn't there?
25  A.  I'm not sure there is any

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 105

1
2  difference used in the way that this report
3  has used it.
4  Q.   Okay.  You acknowledge that --
5  strike that.
6      Have you reviewed the APA, the
7  Asset Purchase Agreement?
8  A.  Yes.
9  Q.  Have you studied it?
10  A.  No.
11  Q.  Have you reviewed the provisions
12  whereby the 85 percent value that
13  Mr. Griffith relies upon were derived?
14      MR. MOLONEY: Objection to the
15  form of the question.  We don't have
16  this report in front of us, so I don't
17  know there are provisions.  Are you
18  representing there are some provisions?
19      MR. GENENDER: We'll fix that,
20  Tom.
21      BY MR. GENENDER:
22  Q.  I'm handing you, Mr. Schulte,
23  what's been marked as Exhibit 8?
24  A.  Okay.
25      (Schulte Exhibit 8, Asset

Page 106

1
2  Purchase Agreement dated as of 1/17/19
3  by and among Transform Holdco LLC,
4  Sears Holdings Corporation and its
5  subsidiaries party hereto, not
6  Bates-stamped, marked for
7  identification, as of this date.)
8      BY MR. GENENDER:
9  Q.  Can you identify Exhibit 8 as the
10  Asset Purchase Agreement dated as of
11  January 17, 2019, by and among Transform
12  Holdco, Sears Holding Corporation and its
13  subsidiaries, parties hereto?
14  A.  Yes, sir.
15  Q.  And is this what is often
16  referred to as the APA?
17  A.  Yes, sir.
18  Q.  All right.
19      Now, how carefully have you
20  reviewed the APA?
21  A.  I looked at it.
22  Q.  Okay.
23  A.  I looked at the provisions that
24  we were relying on, more than the whole of
25  the document.

Page 107

1
2  Q.  Can you turn to page 51, please.
3  A.  Yes.
4  Q.  Do you see there is cash amount
5  equal to $1,408,450,000?
6  A.  Yes.
7  Q.  Little romanette (i)?
8  A.  Yes.
9  Q.  If you'll turn to page 102,
10  section 10.9, relating to inventory and
11  receivables.
12      Do you see that?
13      MR. MOLONEY: I'm sorry.  Where
14  are we now?
15      THE WITNESS: 102.
16  Q.  Page 102, section 10.9.
17      (Document review.)
18  A.  Yes.
19  Q.  Do you see there is a requirement
20  that the debtors -- strike that.
21      Do you see there is a requirement
22  on the debtors to deliver an aggregate of
23  $1,657,000 in aggregate inventory, credit
24  card accounts receivable, and pharmacy
25  receivables?

Page 108

1
2  A.  That is not what it says.  It
3  says "at least."
4  Q.  Okay.  That 1.657 billion of
5  those components, correct?
6  A.  Yes.
7  Q.  As a matter of math, would you
8  agree that 1,408,450,000 divided by
9  1.657 billion is 85 percent?
10  A.  You're asking me an arithmetic
11  question?
12      I have to take my calculator out,
13  but I'm willing to go with you on that.
14  Q.  It is what it is, right?
15  A.  It is what it is, but it's not
16  what you're trying to say --
17  Q.  The math is 85 percent, isn't it?
18  A.  As long as you let me recognize
19  the "at least," fine.
20  Q.  Okay.  Well, if it's more than
21  1.657 billion, then the percentage goes
22  down, right?  Because that is the
23  denominator number?
24  A.  No.  It looks like they moved
25  other inventory to other places, but --

Page 109

1
2    "sellers may reduce such amounts to be
3    equal to."
4    Q.   If it's more than 1.657 billion,
5    you understand that that surplus goes back
6    to the debtor, don't you, under the APA?
7    Or do you know that?
8    A.   Yes.
9    Q.   You do know that?  Okay.  Thank
10   you.
11       Your report on page 14 -- well,
12   let me take a step back.
13       What impact would your conclusion
14   be as to whether the second lienholders
15   were oversecured -- strike that.
16       Have you analyzed the impact on
17   your opinion that the second lienholders
18   were oversecured as of the petition date if
19   you had valued the inventory at 85 percent
20   instead of the valuation you used?
21   A.  I think we, somewhere, actually
22   calculated.  There is a big difference.
23   $300 million or something like that.
24   Q.   The inventory that was sold as of
25   the time of the APA, when the APA closed in

Page 110

1
2    February of 2019, was of a smaller
3    footprint of profitable stores, correct?
4    Is that your understanding?
5    A.   Compared to?
6    Q.   Petition date.
7    A.   Yes.
8    Q.   Thank you.
9        Would you agree as a general
10   proposition that if you have a
11   poor-performing store and it goes into
12   liquidation, that its inventory may not
13   return a wonderful return?
14   A.   No.
15   Q.   You don't agree with that?
16   A.   No.
17   Q.   You think a poor-performing store
18   is going to have -- when you liquidate the
19   inventory from a poorly performing store,
20   that it's going to do as well as when you
21   liquidate the inventory from a
22   strong-performing store?
23   A.   You haven't given me enough facts
24   to make that opinion.
25   Q.   Okay.  Your report on page 14

Page 111

1
2    addresses the calculation -- addresses how
3    the second lien creditors would have fared
4    if the collateral was liquidated on the
5    petition date.
6        Do you see that under Roman
7    numeral 4 on page 14?
8    A.  Yes.
9    Q.   And you considered four data
10   sources to estimate the hypothetical
11   recovery if the inventory liquidated on day
12   one, correct?
13   A.   There is a Tiger appraisal that
14   is recited.
15   Q.   Yes.  That's Exhibit 5, right?
16   A.   Yes.  And then there is the
17   debtors' own liquidation analysis.  And
18   then there are the bids of people in the
19   business of liquidating retailer
20   inventories.  And then there is the
21   company's historical experience.
22       So if that's what you're counting
23   up, then yes, I agree.
24   Q.   Okay.  Thank you.
25       If you look at the Tiger report,

Page 112

1
2    which is Exhibit 5 to your deposition, if
3    you go to the page of it that's numbered
4    1308 in the lower right-hand corner.
5        (Document review.)
6    A.  I'm sorry.  1308?
7    Q.   In the lower right-hand corner,
8    the tracking number.
9        (Document review.)
10   A.   Yes.
11   Q.   There is a line on the left,
12   "Estimated total company GOB net recovery
13   before other adjustments and corporate
14   expenses."  And then you go three -- three
15   columns over and that's 94.4 percent,
16   correct?
17   A.   You were reading correctly.  It's
18   the fourth line down.
19   Q.   Yes, sir.  Three columns over
20   from the left, four lines down, right?
21   A.   Yes, sir.
22   Q.   That is the 94.4 percent that you
23   reference in your report, isn't it?  The
24   last line of text on page 14 of your
25   report, correct?

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 278 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 113

1
2  A.  Yes, sir.
3  Q.  And your report, to be fair,
4  says, "94.4 percent of costs before taking
5  into account corporate" -- "account
6  corporate overhead," right?
7  A.  Correct.
8  Q.  And if you look at the Tiger
9  report, you go below there, and there are
10  deductions from the 94.4 percent for
11  royalty payments of .2 percent, right?
12  A.  I see it.
13  Q.  And there is another deduction
14  for estimated base liquidation fee of .8
15  percent, correct?
16  A.  Yes.
17  Q.  And there is another deduction
18  for corporate expenses of 2.1 percent,
19  correct?
20  A.  Yes.
21  Q.  Those deductions all come from
22  the 94.4 that your report references,
23  correct?
24  A.  Yeah, but you're deriving a
25  different number from the one that I was

Page 114

1
2  using.  I mean, yes, you've read the
3  exhibit correctly.
4  Q.  Yes.
5      To be fair, on top of page 15 you
6  make those same calculations in your
7  report, right?
8  A.  Yes.
9  Q.  Would you agree it as a general
10  proposition that the value of something is
11  what someone is willing to pay for it at a
12  given point in time?
13  A.  In general, that's what we call a
14  fair market value.
15  Q.  Yes, sir.
16      A willing buyer, a willing
17  seller, right?
18  A.  Yes, sir.
19  Q.  You understand that the Asset
20  Purchase Agreement and the ensuing sale
21  transaction was the result of a competitive
22  bidding process?
23  A.  Yes, sir.
24  Q.  And there was one bidder?
25  A.  In the end there was one bidder

Page 115

1
2  for the totality.
3  Q.  Yes.
4  A.  Yes.
5  Q.  For substantially all of the
6  assets, right?
7  A.  Yes.
8  Q.  Are you aware that at all times
9  the ESL favored a going-concern sale in
10  this case?
11  A.  ESL very much wanted to see a
12  going-concern sale.
13  Q.  And ESL very much did not want a
14  liquidation, correct?
15  A.  ESL tried very hard not to have a
16  liquidation, yes.  Of the entirety.
17  Q.  Yes.
18      I want to turn to 506(C)
19  surcharges.
20      Your client, as you said, was
21  Cleary, and Cleary represents ESL, correct?
22  A.  Correct.
23  Q.  Section 6 of your report refers
24  to 506(C) surcharges on behalf of the
25  second lien creditors, correct?

Page 116

1
2      MR. MOLONEY: On behalf of them?
3  Q.  In connection with the second
4  lien creditors.  Excuse me.
5      MR. GENENDER: Thank you, Tom.
6  A.  It raises the question of the
7  benefit for whom the expenses were
8  incurred.
9  Q.  And you don't draw a distinction
10  between ESL and, for example, Cyrus, do
11  you?
12  A.  Second lien creditors.
13  Q.  Yes.  You don't draw a
14  distinction by and between any of them,
15  correct?
16  A.  Correct.
17  Q.  It's your opinion that the
18  expenses incurred to preserve a
19  Going-Concern transaction were not for the
20  primary benefit of the second lien
21  creditors; is that your view?
22  A.  Not all.
23  Q.  Well, how much were for the
24  benefit of the second lien creditors?
25  A.  Well, what we fall back -- it's

Page 117

1
2  obviously a very tough thing to answer with
3  specificity.
4      We use the concept of four-wall
5  profitability, and basically treat as not
6  related to the primary benefit of the
7  collateral the central expenses.
8      You understand the distinction
9  between four-wall and central expense?
10  Q.  (Nodding affirmatively.)
11     Okay.  So your chart on page 20
12  of your report is designed to reflect
13  increased recovery from going-concern sale;
14  is that right?
15  A.  Well, this section reports on
16  what people have said about that.
17  Q.  Okay.  But your chart says,
18  "Increased recovery from going-concern
19  sale."
20     That is the heading, right?
21  A.  Yes.  It's summarizing
22  declarations of Meghji and Alan Carr.
23  Q.  Were you aware that ESL owns a
24  substantial portion of the Dove loan that's
25  referenced in this chart?

Page 118

1
2      MR. MOLONEY: The what loan?
3      MR. GENENDER: Dove loan.
4      BY MR. GENENDER:
5  Q.  Loans, I should say.
6  A.  I didn't know that.  I don't
7  think I care.
8  Q.  Were you aware that ESL owns a
9  substantial portion of the Ground Lease &
10  IP Loans?
11  A.  No, and I did not take that into
12  account, and I don't think I care.
13  Q.  You included:  "Protection
14  Agreement, SYW & Gift Cards."
15     Do you see that?
16  A.  Yes.
17  Q.  Those are contingent liabilities,
18  aren't they?
19  A.  It's a loyalty program and it's
20  money owed to customers.  So I suppose it
21  is... I don't know how much of it has been
22  asserted and how much of it is contingent.
23  I don't know the answer to that.
24  Q.  Fair enough.
25     Could you imagine a scenario in

Page 119

1
2  which ESL or Transform purchased Sears
3  without also agreeing to honor the
4  protection agreement in gift cards?
5  A.  Well, we did it in Toys-R-Us.
6  Q.  It was liquidation, though,
7  wasn't it?
8  A.  Yes.  Well, not in Britain, not
9  in Asia, not in Europe.
10  Q.  Okay.  Would you think it
11  reasonable or conceivable for ESL to
12  purchase Sears as it did without also
13  agreeing to honor the protection agreement
14  and gift cards?
15  A.  I would expect it would be a
16  routine business practice to want to
17  protect money owed to customers.
18  Q.  Okay.  The cure costs --
19  A.  I don't know exactly how that was
20  handled here.
21  Q.  Fair enough.
22     The cure costs referenced in this
23  chart benefit junior stakeholders by
24  increasing the recovery pool as compared to
25  a liquidation scenario; is that right?

Page 120

1
2  A.  I don't know what the cure costs
3  are.
4  Q.  Okay.  Do you know what they're
5  made up of?
6  A.  No.
7  Q.  You'd agree as a general
8  proposition that a retailer's relationships
9  with its vendors are important?
10  A.  Sure.
11  Q.  You'd agree as a general
12  proposition that a retailer's relationship
13  with its landlords are important?  If it
14  has -- if it actual stores?
15  A.  Less significant if -- than to
16  the vendors if they plan to stay in
17  business.
18  Q.  Okay.  Are you aware that the
19  $35 million reference on your chart on page
20  20 is the credit bid consideration?
21  A.  Is that -- I'm not sure quite
22  what that is.  Is that the money that ESL
23  agreed to pay in exchange for there being
24  no subordination challenge?
25     MR. MOLONEY: Agreed to be

18-23538-shl     Doc 5024-2     Filed 08/28/19     Entered 08/28/19 18:19:53     Exhibit 92
to 101     Pg 280 of 468

In Re:
Sears Holdings Corporation

David M. Schulte
June 29, 2019

Page 121

1
2  allowed to bid.
3       THE WITNESS: To be allowed to
4  bid.  Okay.
5       BY MR. GENENDER:
6  Q.  Because it was such an effective
7  answer that your counsel gave you, I'm not
8  going to object, because that was helpful.
9       In other words, you understand
10 that this payment was made to allow ESL and
11 the other second lienholders to credit bid
12 approximately $433 million in second lien
13 debt.
14      Is that your understanding?
15 A.  Yes.  That's my answer.
16 Q.  Thank you.
17      MR. GENENDER: One second.
18      (Counsel conferring.)
19      BY MR. GENENDER:
20 Q.  Have you calculated, Mr. Schulte,
21 the -- strike that.
22      Have you done any analysis of the
23 costs incurred by the debtors between the
24 date of the APA, January 17th, 2018, and
25 the date the sale closed, February 11th,

Page 122

1
2  2018, to preserve the ability of that
3  transaction to close?
4  A.  I don't think so.
5  Q.  Okay.  Have you done any analysis
6  of the costs incurred by the debtors
7  between December 28th, 2018, which is the
8  date ESL first submitted a bid, and
9  February 11th, the date the transaction
10 closed, to preserve the second lien --
11 A.  No.
12 Q.  -- claims?
13 A.  No.
14 Q.  Collateral, I should say.  You
15 did not.
16      And you're not aware of your team
17 doing that, are you?
18 A.  I am not.
19 Q.  You haven't been asked to do
20 that, have you?
21 A.  Correct.
22 Q.  Do you know if there are ordinary
23 course provisions in the Asset Purchase
24 Agreement?
25 A.  I don't know exactly what you're

Page 123

1
2  asking.
3  Q.  Have you -- do you have any
4  familiarity with the ordinary course
5  provisions in the Asset Purchase Agreement?
6  A.  No, not particularly.  I'm
7  familiar with the concept of ordinary
8  course of business.
9  Q.  Are you aware that as a condition
10 precedent to the APA, the debtor was
11 required to deliver -- the debtors were
12 required to deliver the threshold aggregate
13 amount of inventory credit card receivables
14 and pharmacy receivables?
15 A.  Yes, we talked about that.
16 Q.  The "at least"?
17 A.  Yes, the "at least."
18      MR. GENENDER: Let's take a short
19 break.
20      MR. MOLONEY: Okay.
21      (Recess is taken.)
22      MR. GENENDER: We will pass the
23 witness and reserve questions if
24 something new develops, but otherwise
25 we'll pass the witness.

Page 124

1
2       MR. MOLONEY: Fine.
3       MR. FOX: No questions.
4       MR. LIUBICIC: No questions.
5       MR. MOLONEY: We're done.
6       MR. SORKIN: We don't have
7  questions.  We reserve right to ask
8  questions.
9
10
11
12      _____.
13      DAVID M. SCHULTE
14
15
16 Subscribed and sworn to before me
17 this   day of      2019.
18
19 _____
20
21
22
23
24
25

Page 125

```
1
2          C E R T I F I C A T E

3

4   STATE OF NEW YORK        )

5                   : ss.

6   COUNTY OF WESTCHESTER    )

7

8          I, ANNETTE ARLEQUIN, a Notary

9   Public within and for the State of New

10  York, do hereby certify:

11         That DAVID M. SCHULTE, whose

12  deposition is hereinbefore set forth,

13  was duly sworn by me, and that the

14  transcript of such depositions is a

15  true record of the testimony given by

16  such witness.

17         I further certify that I am not

18  related to any of the parties to this

19  action by blood or marriage; and that I

20  am in no way interested in the outcome

21  of this matter.

22         IN WITNESS WHEREOF, I have hereunto

23  set my h            y of June, 2019.

24  _____ _____

25         ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA
```

Page 126

```
1
2              I N D E X

3

4   WITNESS                        PAGE

5

6   DAVID M. SCHULTE

7    MR. GENENDER                   6

8

9      I N D E X   O F   E X H I B I T S

10  DESCRIPTION                    PAGE

11
12  Schulte Exhibit 1, Expert Report    12
    of David M. Schulte
13
14  Schulte Exhibit 2, Excel of         51
    General Ledger
15
16  Schulte Exhibit 3, Sears Holding    59
    Corp document entitled Exhibit A,
17  35 pages, not Bates-stamped

18  Schulte Exhibit 4, Valuation, not   66
    Bates-stamped
19
20  Schulte Exhibit 5, Tiger Report     68
    dated 9/28/18 on Sears Holdings
21  Corporation, Bates-stamped
    SEARS_507B_00001287 through 1344
22
23  Schulte Exhibit 6, Index to         75
    Appendix B of Expert Report of
24  David Schulte, not Bates-stamped

25
```

Page 127

```
1
2    I N D E X   O F   E X H I B I T S(Cont'd.)

3   DESCRIPTION                          PAGE

4   Schulte Exhibit 7, GOB Inventory      92
    Recovery Rates, Bates-stamped
5   ESL_507B00000002 through 3

6
    Schulte Exhibit 8, Asset Purchase    105
7   Agreement dated as of 1/17/19 by
    and among Transform Holdco LLC,
8   Sears Holdings Corporation and
    its subsidiaries party hereto,
9   not Bates-stamped

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 128

```
1

2      ERRATA SHEET FOR THE TRANSCRIPT OF:

3    CASE NAME: SEARS HOLDINGS CORPORATION

4    DATE: SATURDAY, JUNE 29, 2019

5      DEPONENT: DAVID M. SCHULTE

6   Pg. Ln. Now Reads  Should Read  Reason

7   ___ ___ _____  _____  _____

8   ___ ___ _____  _____  _____

9   ___ ___ _____  _____  _____

10  ___ ___ _____  _____  _____

11  ___ ___ _____  _____  _____

12  ___ ___ _____  _____  _____

13  ___ ___ _____  _____  _____

14  ___ ___ _____  _____  _____

15  ___ ___ _____  _____  _____

16  ___ ___ _____  _____  _____

17

18  _____

19    DAVID M. SCHULTE

20  SUBSCRIBED AND SWORN BEFORE ME

21  THIS____DAY OF_____  2019.

22

23  _____

24  (Notary Public)

25    MY COMMISSION EXPIRES:_____
```

# Exhibit 98

**In The Matter Of:**

*In Re:*
*Sears Holdings Corporation*

*William H. Henrich*
*July 2, 2019*
*High Confidential*



*Min-U-Script® with Word Index*

Page 1

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3            FOR THE DISTRICT OF NEW YORK
 4
 5
 6    In Re:
 7    SEARS HOLDINGS CORPORATION, et al.,
 8              Debtors.
 9    _____/
10     * H I G H L Y   C O N F I D E N T I A L *
11        DEPOSITION OF WILLIAM H. HENRICH
12            New York, New York
13            Tuesday, July 2, 2019
14
15
16
17
18
19
20
21
22
23    Reported by:
      ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
24    JOB NO. 2019-73118
25
```

Page 2

```
 1
 2
 3
 4            June 29, 2019
 5            12:09 p.m.
 6
 7
 8        HIGHLY CONFIDENTIAL deposition of
 9    WILLIAM H. HENRICH, held at the offices
10    of WEIL GOTSHAL & MANGES, LLP, 767
11    Fifth Avenue, New York, New York,
12    pursuant to Notice, before Annette
13    Arlequin, a Certified Court Reporter, a
14    Registered Professional Reporter, a
15    Certified Realtime Reporter, and a
16    Realtime Systems Administrator and a
17    Notary Public of the State of New York
18    and New Jersey.
19
20
21
22
23
24
25
```

Page 3

```
 1
 2    A P P E A R A N C E S:
 3
 4    AKIN GUMP STRAUSS HAUER & FELD, LLP
 5    Counsel for Unsecured Creditors
 6        One Bryant Park
 7        Bank of America Tower
 8        New York, New York  10036
 9    BY: PATRICK J. GLACKIN, ESQ.
10        Pglackin@akingump.com
11
12    WEIL GOTSHAL & MANGES, LLP
13    Counsel for Debtors and
14    Debtors-in-Possession: Sears Holdings
15     Corporation, et al.,:
16        200 Crescent Court - Suite 300
17        Dallas, Texas  75201-6950
18    BY: PAUL GENENDER, ESQ.
19        Paul.genender@weil.com
20    BY: JAKE RUTHERFORD, ESQ.
21        Jake.rutherford@weil.com
22
23
24
25
```

Page 4

```
 1
 2     A P P E A R A N C E S(Cont'd.):
 3
 4  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
 5  Counsel for ESL Investments, Inc.
 6  One Liberty Plaza
 7  New York, New York  10006
 8      BY: KAL BLASSBERGER, ESQ.
 9  Kblassberger@cgsh.com
10
11  MILBANK
12  Counsel for Cyrus Capital
13  2029 Century Park East, 33rd Floor
14  Los Angeles, California  90067-3019
15      BY: ROBERT J. LIUBICIC, ESQ.
16  Rliubicic@milbank.com
17      BY: SAM PAYNE, ESQ.
18  Spayne@milbank.com
19      BY: TOM KRELLER, ESQ.
20  Tkreller@milbank.com - (Teleconference)
21      BY: ERIC REIMER, ESQ.
22  Ereimer@milbank.com - (Teleconference)
23      BY: Yelena Ambartsumian, ESQ.
24  Yambartsumian@milbank.com - (Teleconference)
25
```

---

Page 5

```
 1
 2   A P P E A R A N C E S(Cont'd.):
 3
 4   SEYFARTH SHAW
 5   Counsel for Wilmington Trust, National
 6     Association, as Indenture Trustee and
 7     Collateral Agent
 8         New York Times Building
 9         620 Eighth Avenue
10         New York, New York  10018-1405
11   BY:  EDWARD M. FOX.  ESQ.
12         Emfox@seyfarth.com
13   BY:  STEVEN PARADISE, ESQ.
14         Sparadise@seyfarth.com
15
16   ALSO PRESENT:
17
18   Luke Andrews, Getzler Henrich & Associates
19   Daniel Polsky, Getzler Henrich & Associates
20   Nicholas Weber, M-III Partners
21   Gihyun Kim, Seyfarth Shaw, Summer Associate
22
23
24               - o0o -
25
```

---

Page 6

```
 1
 2   W I L L I A M  H.  H E N R I C H,  called
 3   as a witness, having been duly sworn
 4   by a Notary Public, was examined and
 5   testified as follows:
 6      THE WITNESS: I do.
 7   EXAMINATION BY
 8      MR. GENENDER:
 9   Q.  Could you state your name for the
10     record.
11   A.  Sure.  William Howard Henrich.
12   Q.  And Mr. Henrich, how are you
13     employed?
14   A.  I am co-chairman of Getzler
15     Henrich & Associates.
16   Q.  And how long have you been
17     associated with that firm?
18   A.  16 years.
19   Q.  And walk me through your work
20     background prior to that, since you
21     finished your schooling.
22   A.  Sure.  1977 graduated Baruch
23     College, undergrad.
24      I joined Arthur Andersen in a
25     more traditional capacity, accounting
```

---

Page 7

```
 1
 2     auditing capacity, for three years.
 3      Left to attend Harvard Business
 4     School, earned my MBA at HBS.
 5      Upon graduating, rejoined Arthur
 6     Andersen to start their bankruptcy and
 7     restructuring practice in New York and I
 8     was part of the firm-wide core group of
 9     partners that ran it nationally.  I was
10     there for a period of time.  Left to join
11     Arrow Electronics for seven years in
12     various senior management capacities;
13     finance operations, sales marketing.
14      Was solicited to come back to
15     Arthur Andersen to bolster the group that I
16     originally started; did so in 1990 or '91.
17     I forget exactly which year.
18      And in late, mid-late 1996, left
19     Andersen to start the New York office of
20     Executive Sounding Board Associates, which
21     was a Philadelphia-based middle market
22     turnaround firm.  I was there for seven
23     years, grew that firm substantially, and in
24     early 2003, joined what was Getzler &
25     Company upon my joining became Getzler
```

---

Page 8

```
 1
 2     Henrich & Associates.
 3   Q.  Great.
 4      You mentioned that you have a
 5     business degree from Harvard, right?
 6   A.  Yes.
 7   Q.  Masters in business
 8     administration from Harvard?
 9   A.  Correct.
10   Q.  You do not have any legal
11     training; is that right?
12   A.  That is correct.
13   Q.  Do you feel as if you want to
14     remind the younger people in the room what
15     Arthur Andersen is?
16      (Laughter.)
17   A.  Would you like me to?
18   Q.  Because I'm old enough to know.
19     Fair enough.
20   A.  May it rest in piece.
21   Q.  Yes, exactly.
22      Have you given depositions
23     before?
24   A.  I have.
25   Q.  On a number of occasions?
```

---

Page 9

1
2  A.  Yes.
3  Q.  Let me go through a few brief
4  ground rules to allow this to go as
5  smoothly as possible, all right.
6      As you know, you are under oath,
7  correct?
8  A.  Yes.
9  Q.  You know everything is being
10 taken down?
11 A.  Yes.
12 Q.  So we need audible answers.
13 A.  Yes.
14 Q.  If you don't hear a question that
15 I ask you, will you let me know?
16 A.  I will.
17 Q.  If you don't understand a
18 question that I ask you, will you let me
19 know?
20 A.  Most definitely.
21 Q.  If you don't let me know, am I
22 safe to assume that you both heard and
23 understood my question?
24 A.  I understand.
25 Q.  Okay.  Is there anything

Page 10

1
2  preventing you from giving truthful and
3  accurate testimony here today?
4  A.  Nothing.
5  Q.  What did you do to prepare for
6  your deposition today, generally speaking?
7  A.  Generally speaking, I reviewed
8  our report.  I reviewed the source material
9  and did meet with counsel.
10 Q.  Counsel being Mr. Fox?
11 A.  Mr. Fox and Mr. Paradise.
12 Q.  Okay.  And have any of your
13 opinions in your report that was issued on
14 June 18th, have any of them changed?
15 A.  No.
16 Q.  Do you have any new opinions that
17 are not contained in the report?
18     MR. FOX: You mean about the
19 case?
20     MR. GENENDER: Yes.  Yes.
21 A.  There are no new opinions that
22 changed the conclusions in the report.
23 Q.  Okay.  Does the report still
24 contain all the opinions you intend to
25 offer in this proceeding?

Page 11

1
2  A.  Essentially, yes.  I mean we may
3  have been informed on certain items as a
4  result of the other declarations or the
5  other expert reports that were submitted,
6  and there may still be certain information
7  subject to verification that could cause us
8  to amend certain elements of our report but
9  not the overall conclusion.
10 Q.  Okay.  So you used the word
11 "could cause us to amend certain elements
12 of our report."
13     I want to move from "could" to
14 "have."
15     As we sit here today, have any of
16 the opinions in your June 18th report
17 changed?
18 A.  The opinions have not changed.
19 Q.  Have any of the conclusions you
20 reached changed?
21 A.  The conclusions have not changed.
22 Q.  I'm going to hand you what I've
23 marked as Exhibit 1.
24     (Henrich Exhibit 1, Exhibit J
25 containing the Expert Report of William

Page 12

1
2  Henrich in Connection with Assessment
3  of 507(b) Adequate Protection Claims
4  Asserted by Wilmington Trust, National
5  Association, marked for identification,
6  as of this date.)
7      BY MR. GENENDER:
8  Q.  This says Exhibit J on it because
9  that is how it was attached to the
10 Wilmington Trust filing.
11     Can you identify Exhibit 1 as a
12 true and correct copy of your expert report
13 dated June 18th, 2019?
14     MR. FOX: Let me just interrupt.
15 This is the unsigned that was attached,
16 but I think we circulated a signed copy
17 after that.
18     MR. GENENDER: Is there anything
19 different on it?  I note it unsigned.
20     MR. FOX: I think we have that
21 here.
22     MR. GENENDER: I don't remember
23 seeing it, but that's fine.  It may
24 have been.
25     MR. FOX: Or you can sign this

Page 13

```
 1
 2   one.
 3       BY MR. GENENDER:
 4   Q.  Is this a true and correct copy
 5   of your report?
 6   A.  Yes, it is.
 7   Q.  And you're welcome to sign it.  I
 8   have no issue --
 9       MR. PARADISE: We can send them
10   over to sign if we haven't done that
11   already.
12       MR. GENENDER: Okay.
13       BY MR. GENENDER:
14   Q.  Is this the same -- is this your
15   final report?
16   A.  Yes, it is.
17   Q.  Thank you.
18       Throughout your deposition when I
19   refer to your report, you're going to know
20   I'm referring to Exhibit 1?
21   A.  Yes.
22   Q.  Is there any aspect of Exhibit 1
23   aside from it missing your signature that
24   you would like to change as you sit here
25   today?
```

Page 15

```
 1
 2   we concluded upon.
 3   Q.  Okay.  Does it?
 4   A.  Well, there are two elements that
 5   are -- that we are considering.  One, is we
 6   were unaware whether or not the first lien
 7   LCs were drawn or undrawn.  The other
 8   expert reports indicate that they were
 9   undrawn, in which case we would eliminate
10   that from the debt stack that we had
11   utilized in our calculation.
12       Additionally, both -- all the
13   declarations or the declaration of Brian
14   Griffith as well as the expert reports of
15   Schulte and Marti Murray included the Sears
16   Home Services inventory in its calculation
17   of inventory.  We were uncertain and took a
18   conservative approach at the time whether
19   or not that was collateral issued by the
20   grantors, and therefore we did not include
21   it at the time.
22   Q.  Do you know if it should be
23   included?
24   A.  At this juncture, we're uncertain
25   and that's why I said we could be further
```

Page 14

```
 1
 2   A.  As aforementioned, there are no
 3   opinions or conclusions that I wish to
 4   change.
 5   Q.  Okay.  Is there anything that you
 6   currently have an intention of adding to
 7   Exhibit 1 to your report?
 8   A.  As of today, there is nothing
 9   that I am considering adding.  However, as
10   I mentioned previously, there may be a
11   couple of line items that we have
12   incorporated that we were further informed
13   by the expert reports or we may seek
14   further information that could change our
15   inclusion or exclusion of certain elements
16   in the calculation.
17   Q.  Have you arrived at any decision
18   as to whether the other expert reports
19   inform or change your opinions, as you sit
20   here today?
21   A.  It doesn't change the opinion,
22   no.
23   Q.  Does it change any aspect of your
24   report?
25   A.  It could enhance the cushion that
```

Page 16

```
 1
 2   informed.  You know, through this process
 3   that might add those line items or adjust
 4   those line items in the calculation.
 5   Q.  Have you read the testimony of
 6   David Schulte given three days ago?
 7   A.  Yes.
 8       MR. FOX: Have you read it?
 9       THE WITNESS: I'm sorry, excuse
10   me.
11   A.  The testimony?
12   Q.  Yes.
13   A.  I apologize.  No, I have not read
14   the testimony.
15   Q.  You understand he gave a
16   deposition three days ago?
17   A.  I do understand that.
18   Q.  You have not read the transcript?
19   A.  I have not read the transcript.
20   Q.  Have you received any sort of
21   report of what his testimony was?  This is
22   a yes or no at this point.
23   A.  A report as to his testimony?
24   Q.  An update or summary?
25   A.  No.
```

Page 17

1
2  Q.  Do you have any understanding as
3   to what he testified in his deposition
4   three days ago?
5  A.  No.
6  Q.  Have you spoken to him about this
7   case?
8  A.  Never.
9  Q.  Have you spoken to Marti Murray
10  about this case?
11 A.  Never.
12 Q.  Had you seen either of their
13  reports prior to their being issued in this
14  case?
15 A.  No.
16 Q.  Were you aware of what their
17  opinions might be or were prior to issuing
18  your opinions in this case?
19 A.  Absolutely not.
20 Q.  Your report indicates that you've
21  testified previously as a witness in
22  numerous bankruptcy matters more than 20
23  times; is that fair?
24 A.  That's fair.
25 Q.  How many times have you given

Page 18

1
2   live testimony in court, if you recall?
3  A.  Well, I don't know the exact
4   number, but the 20 was an approximation of
5   giving live testimony.
6  Q.  Thank you.
7    If you'll turn to Appendix A to
8   your report.  Yeah, Appendix A to your
9   report.
10   (Witness complies.)
11 Q.  That lists the documents
12  considered in connection with your report;
13  is that right?
14 A.  Yes.
15 Q.  Is that still accurate?
16 A.  Yes.
17 Q.  How much time have you spent in
18  connection with this engagement?
19 A.  I've spent a considerable amount
20  of time.  I don't know the exact amount.
21 Q.  When did you start your work?
22 A.  We were engaged in early April.
23  I believe the engagement letter is dated
24  approximately April 9th or thereabouts.
25 Q.  What were you engaged to do?

Page 19

1
2  A.  To evaluate a 507(b) claim of the
3   second lien noteholders.
4  Q.  Of all the second lien
5   noteholders?
6  A.  Well, we were hired by counsel to
7   Wilmington Trust as indentured trustee to
8   the junior secured -- the junior
9   second-lien noteholders.
10 Q.  And when did you start your work?
11 A.  Shortly thereafter.
12 Q.  When did you complete your work?
13  In effect, when did you reach the
14  conclusions that are reflected in
15  Exhibit 1?
16 A.  About two minutes to midnight on
17  June 18th.
18 Q.  Eastern time, to be specific.
19   (Laughter.)
20 A.  That would be accurate.
21 Q.  Who else worked with you on this
22  engagement?
23 A.  There were three individuals, two
24  who are with me today.  Dan Polsky, Luke
25  Andrews, and Ed Phillips.

Page 20

1
2  Q.  And do you have an approximation
3   about how much time you have spent on this
4   engagement?
5  A.  I have not looked at a summary.
6  Q.  What was your role on your team
7   as compared to your other team members?
8  A.  I was responsible for managing
9   the team and I was intimately involved in
10  the deliberation and assumption of
11  methodology.  I've also read through the
12  source material as well.
13 Q.  Have you reviewed all the
14  materials on Appendix A to your report?
15 A.  I have.
16 Q.  Is Appendix A a complete list of
17  documents considered by you in preparing
18  Exhibit 1?
19 A.  Yes.
20 Q.  Are you relying on any other
21  documents in providing your opinions in
22  this case other than those listed on
23  Appendix A to your report?
24 A.  These were the documents that
25  were considered in the preparation of the

Highly Confidential

Page 21

```
1
2    report that led to the conclusions outlined
3    therein.
4  Q.  Have you spoken with any
5    employees or representatives of Wilmington
6    Trust in connection with your work in this
7    matter?
8  A.  Never.
9  Q.  Have you spoken with any
10   financial advisors for Wilmington Trust in
11   connection with your work in this matter?
12 A.  No.
13 Q.  Have you spoken with any
14   representatives of the other second
15   lienholders in connection with your work in
16   this matter?
17 A.  No.
18 Q.  You hold a CPA license?
19 A.  I do.
20 Q.  And how long have you held that
21   license?
22 A.  Since 1979.
23 Q.  Who contacted you about this
24   engagement?
25 A.  Mr. Fox of Seyfarth Shaw.
```

Page 22

```
1
2  Q.  Have you worked with Mr. Fox
3    before?
4  A.  I don't believe that we've ever
5    worked together before in a matter.
6  Q.  Do you have an understanding as
7    to how he came to reach out to you?
8  A.  I actually learned that yesterday
9    when I asked.
10 Q.  And?
11 A.  And he thought I was a good
12   candidate and I would be, given my
13   experience, so he opted to pick up the
14   phone and call me.
15 Q.  Have you worked with his firm
16   before?
17 A.  I personally have not, but
18   some -- or select colleagues in my firm may
19   have, albeit, I don't believe necessarily
20   with the New York office of Seyfarth.
21 Q.  Have you viewed Wilmington
22   Trust's brief filed shortly before midnight
23   on June 18th in this case in connection
24   with this proceeding?
25 A.  Is that the supplemental
```

Page 23

```
1
2    memorandum?
3  A.  Yes, sir.  The legal filing that
4    your report was an exhibit to.
5  A.  Right.  I read that after the
6    report was issued.
7  Q.  Okay.  So you had no role in
8    preparing it?
9      MR. FOX: Preparing what?
10     MR. GENENDER: The briefing.
11 A.  The legal briefing?
12 Q.  Yes, sir.
13 A.  No.
14 Q.  And you had not reviewed it until
15   after you had already submitted your
16   report?
17 A.  I believe that to be correct.
18 Q.  Did you sign your report before
19   midnight on June 18th?
20 A.  Yes.
21 Q.  Okay.  And the signed version
22   didn't get filed?
23 A.  The signature page -- we prepared
24   and provided the report.  It was then
25   indicated to us that it needed to be
```

Page 24

```
1
2    signed.  We sent Seyfarth a separate signed
3    signature page.  What happened after that,
4    I can't tell you.  I can't share.
5  Q.  We might just call that a
6    disconnect of sorts and it didn't get
7    attached to what was filed; is that fair?
8  A.  It may not have gotten -- that is
9    fair.
10 Q.  When it was filed?
11 A.  But as indicated, we're happy to
12   provide a signed copy or I'm happy to sign
13   a copy here.
14 Q.  And your testimony is that
15   Exhibit 1 in front of you is the same
16   version that you have signed, and you have
17   a pen there and you would sign it if one of
18   your lawyers would let you?
19 A.  That is correct.
20 Q.  Great.
21     I think we have a split of
22   authority between your two lawyers here.
23   One seems inclined to let you sign it and
24   one doesn't.  That is okay.  You should
25   have brought an odd number of lawyers with
```

Page 25

1
2  you to break the tie.
3  A.  I will let them fight it out.
4  Q.  Yes.  Yes.
5     Who drafted the text of your
6  report?
7  A.  That was -- that was a combined
8  effort.
9  Q.  Okay.  Do you own the words in
10  the report?  You signed it, so you're
11  accountable.
12  A.  I'm responsible for those --
13  Q.  Yes, yes.  In terms of actually
14  drafting the eight pages of text, that was
15  a combined effort by you and your team?
16  A.  Yes.
17  Q.  How many drafts of the report
18  were there?
19  A.  I sincerely don't recall.
20  Q.  When was the first draft
21  prepared, if you know?
22  A.  I don't recollect when.
23  Q.  Was it a week before the
24  deadline, two weeks before the deadline?
25  A.  There was an early draft.  There

Page 26

1
2  was an early draft a week or two before,
3  but that was also prior to receipt of the
4  document production.  There certainly were
5  modifications to that draft.
6  Q.  Your bio, which is attached as
7  Exhibit 1 to your report, I'm assuming that
8  is a true and correct copy of your, in
9  effect, your CV?
10  A.  Yes.  And a much younger picture.
11  Q.  I'll take your word for it.
12     If I look at page 1, the first
13  page -- they're not numbered, which I'll
14  note.  The first page of text, it says,
15  "Qualifications."
16  A.  Yes.
17  Q.  You talked about you've been
18  involved in more than 400 engagements
19  during your career and have great
20  familiarity with the issues involved in
21  this matter.
22     Do you see that?
23  A.  Yes.
24  Q.  How do you have great familiarity
25  with the issues involved in this matter?

Page 27

1
2  Is that based on the work you've done since
3  April 9th?
4  A.  I have been involved in
5  bankruptcy matters throughout my career.
6  Q.  Okay.  But I'm just looking at
7  your statement:  "I have great familiarity
8  with the issues involved in this matter."
9     What does that mean?
10  A.  That means I understand the
11  premise of a 507(b) claim.
12  Q.  Okay.  How many of your 400
13  engagements involved liquidations?
14  A.  I don't know any exact count.  It
15  is -- presumably it would be a smaller
16  number of the 400 engagements though.
17  Q.  Can you identify any of your
18  prior engagements that involved
19  liquidations?
20  A.  As I sit here today?
21  Q.  Yes.
22  A.  You tend to forget the
23  liquidations.
24     (Laughter.)
25  A.  Well, one always stood out for

Page 28

1
2  different reasons, Hayes Modem, many years
3  ago.  Trying to think of more recently.
4  Q.  Any others come to mind?
5  A.  At this particular moment, no,
6  I'd have to think about it.
7  Q.  How many -- of your prior
8  engagements, on how many of them have you
9  offered an expert opinion on issues
10  relating to 507(b)?
11  A.  I have not issued expert opinions
12  on 507(b) previously.
13  Q.  In your prior engagements, on how
14  many occasions have you issued expert
15  opinions on issues related to 506(c)?
16  A.  I have testified in a 506(c)
17  matter.
18  Q.  In which matter?
19  A.  Flat Out Crazy.
20  Q.  Okay.  And where was that
21  pending?
22  A.  Southern District of New York.
23  Q.  When was that?
24  A.  I don't recall the exact date.  I
25  would suggest it was approximately seven

Page 29

```
 1
 2   years ago, plus or minus.
 3   Q.   Who retained you?
 4   A.   I was the CRO of the debtor.
 5   Q.   Okay.  Who was the debtors'
 6    counsel?
 7   A.   Stephen Lerner of Squire Sanders.
 8   Q.   Which court was it in?
 9   A.   Judge Drain.
10   Q.   And you provided testimony on
11    behalf of the debtor?
12   A.   Yes.
13   Q.   Did you provide testimony that
14    there was an applicable 506(c) surcharge?
15   A.   Yes.
16   Q.   And what was the result of that
17    proceeding?
18   A.   That there was a 506(c)
19    surcharge.
20   Q.   Do you know how much the court
21    determined there to be a 506F surcharge?
22   A.   I have no recollection.
23   Q.   Did the court accept your number?
24   A.   Judge Drain, after the hearing,
25    mediated a determination and I don't recall
```

Page 30

```
 1
 2    whether it was a formal mediation or he
 3    opted to inject himself, as he often can
 4    and show a little diplomacy.
 5   Q.   Was that in the context of a
 6    confirmation proceeding?
 7   A.   It was not part of a confirmation
 8    hearing proceeding.  It was the secured
 9    lender essentially wanted the process for
10    free and they were the successful bidder at
11    auction.  And so there was a hearing.
12   Q.   Did you issue a written report?
13   A.   No.
14   Q.   In connection with providing
15    those opinions?
16   A.   No.
17   Q.   Okay.  You gave testimony in open
18    court?
19   A.   I gave testimony in open court.
20   Q.   And who were the lawyers for the
21    secured lenders?
22   A.   I don't recall the name of the
23    attorney.  It was a law firm out of
24    Maryland, and not a well-recognized law
25    firm.
```

Page 31

```
 1
 2   Q.   And were they taking the position
 3    that this should be a 506(c) surcharge of
 4    zero?
 5   A.   I don't recall what their
 6    position was.
 7   Q.   The party that was opposing the
 8    506(c) surcharge was the successful bidder
 9    at an auction?
10   A.   Yes.
11   Q.   You as CRO of the debtor in that
12    case in Flat Out Crazy were taking the
13    position that there should be surcharges
14    according to Section 506(c) of the
15    Bankruptcy Code to reflect, what, expenses
16    incurred by the estate to preserve the
17    collateral?
18   A.   Yes.
19   Q.   What sorts of expenses did you
20    think were appropriate in that case that
21    would support a 506(c) surcharge?
22   A.   Essentially, it was over
23    professional fees.
24   Q.   Any other?  Administrative
25    expenses?  So administrative expenses?
```

Page 32

```
 1
 2      MR. FOX: Objection.  Asked and
 3    answered.
 4   A.   I appreciate the question.
 5    You're asking specifics from a case seven
 6    to nine years ago, and I don't recall.
 7   Q.   You'd refer to whatever your
 8    testimony was in that case, right?
 9   A.   I testified in the case, right.
10   Q.   Whatever your testimony was would
11    be a better reflection --
12   A.   Yes.
13   Q.   -- of what your opinions were
14    than what you can recall today?
15   A.   Yes.
16   Q.   Okay.  Is that the only instance
17    in which you've offered expert testimony on
18    506(c) issues prior to this proceeding?
19   A.   Yes.
20   Q.   And in this proceeding, you
21    believe that there are 506(c) surcharges,
22    don't you?
23   A.   Yes.
24   Q.   Okay.  And what's your basis for
25    believing that?
```

In Re:                                                                                                  William H. Henrich
Sears Holdings Corporation                                                                July 2, 2019

---

Page 33

1
2   A.  Because we do believe that a
3   certain allocation of professional fees
4   are -- in the pendency of the bankruptcy
5   case are applicable to providing primary
6   and direct benefit for the preservation of
7   the collateral for the secured lender.
8   Q.  And they're reasonable and
9   necessary, right?
10  A.  And reasonable and necessary.
11  Q.  Are you aware that Mr. Schulte
12  and Ms. Murray don't indicate -- their
13  reports don't reflect 506(c) surcharges?
14  A.  I am aware of that.
15  Q.  Do you agree with that?
16      MR. FOX: Objection to form.
17  A.  No.
18  Q.  You have a different view?
19  A.  I have a different view.
20  Q.  The first and second pages of
21  text of your report lists four enumerated
22  opinions, correct?
23  A.  Correct.
24  Q.  And those are your opinions in
25  this case, correct?

---

Page 34

1
2   A.  Correct.
3   Q.  And as we talked about probably
4   more than you enjoyed, you don't have
5   current plans to offer any other or
6   different opinions than those four,
7   correct?
8   A.  That is correct.
9   Q.  Thank you.
10      Have you prepared any exhibits or
11  demonstratives that would in any way depict
12  or reflect your opinions other than what's
13  attached to your report?
14  A.  No.
15  Q.  If you'll turn to the third page
16  of text of your report, and under the
17  second bullet it says, "The GOB stores
18  achieved a recovery of 96.4 percent of
19  inventory at cost net of all store
20  expenses."
21      Do you see that?
22  A.  I do.
23  Q.  And that information comes from
24  the GOB recovery rates post Chapter 11
25  produced by the debtors and provided to you

---

Page 35

1
2   by counsel, correct?
3   A.  Correct.
4   Q.  Okay. And that information is
5   also, I believe, Exhibit 5 to your report;
6   is that correct?
7   A.  That is correct.
8   Q.  Do you know who generated
9   Exhibit 5 to your report?
10  A.  I don't know with certainty.
11  Q.  Did you or your firm generate
12  Exhibit 5?
13  A.  No.
14  Q.  That you do know with certainty?
15  A.  That I know with certainty.
16  Q.  Fair enough.
17      (Henrich Exhibit 2, Document
18  entitled "GOB Store Performance
19  (Post-Ch. 11 Bankruptcy Filing),
20  Bates-stamped ESL_507B_00000001, marked
21  for identification, as of this date.)
22      BY MR. GENENDER:
23  Q.  I'm handing you what's been
24  marked as Exhibit 2. It is Bates-labeled
25  ESL507B000001. I may be missing a zero.

---

Page 36

1
2      Do you see that?
3   A.  I do.
4   Q.  Will you agree, sir, that the
5   first page of Exhibit 2 is identical to the
6   first page of your Exhibit 5 to your
7   report?
8      (Document review.)
9   A.  It looks identical.
10  Q.  It is identical, isn't it?
11  A.  Yes.
12  Q.  Okay. Now Exhibit 2 in the lower
13  right-hand corner has yesterday's date on
14  it.
15      Do you see that, July 1, 2019?
16  A.  I do.
17  Q.  And that could reflect that it
18  was printed yesterday.
19      Would that be a fair assumption?
20  A.  That is my assumption.
21  Q.  I'll actually have that
22  representation to you.
23  A.  Thank you.
24  Q.  Exhibit 5 to your report says
25  June 18th, 2019, correct?

---

Highly Confidential

Page 37

1
2  A.  Correct.
3  Q.  That would reflect that it was
4  printed on or before 11:58 Eastern time on
5  the June 18, 2019, correct?
6  A.  Correct.
7  Q.  And that you do know, right?
8  A.  That I do know.
9  Q.  The line on your Exhibit 5 to
10  your report, Exhibit 1 to this deposition,
11  it says "GOB recovery rates, post Chapter
12  11."
13      Do you see that?
14  A.  I do.
15  Q.  Where did that text come from?
16  A.  I believe that was on there as
17  received, but I can't say with certainty
18  whether that's a file name that we provided
19  or -- but I believe it was on the analysis
20  as received.
21  Q.  Okay.  But a difference between
22  the first page -- between your Exhibit 5 to
23  your report and first page of Exhibit 2 is
24  the first page of Exhibit 2 has an ESL
25  Bates number of Bates No. 1, correct?

Page 38

1
2  A.  Which is why I suggested it may
3  be a file name that we provided it.
4  Q.  Understood.
5      Looking at Exhibit 2, would that
6  indicate to you that ESL created this
7  document?
8  A.  I can't draw that conclusion.
9  ESL might have provided it.
10      Again, we made a request of the
11  debtors for -- to produce certain
12  documents, and we received this from
13  counsel.  So I can't suggest that ESL was
14  the origin or the debtors were the origin.
15  I would imagine that the debtor -- this is
16  the debtors' information.
17      So while ESL may or may not have
18  prepared the schedule, the data would
19  certainly come from the debtor.
20  Q.  Okay.  So you got it from -- you
21  got it from Mr. Fox and his firm, correct?
22  A.  Correct.
23  Q.  And do you have an understanding
24  as to who has control of Sears's financial
25  information as of February 11th, 2019?

Page 39

1
2  A.  That would be ESL.
3  Q.  Thank you.
4      Looking at Exhibit 2, where it
5  says, "Store format," the second column
6  from the left, FLS is Sears, right?
7  A.  Yes.
8  Q.  And Kmart is Kmart, right?
9  A.  Correct.
10  Q.  And FLS plus Kmart are those two
11  combined, correct?
12  A.  Correct.
13  Q.  The 96.4 percent net recovery
14  rate that we referred to in your report,
15  did that come from the lower-right or
16  middle-right percentage in the first page
17  of Exhibit 2, which is the same as the
18  figure on Exhibit 5 to your report?
19  A.  Visualizing where you're
20  pointing, it is the lower right-hand number
21  on the page.
22  Q.  The 96.4 that we first read on
23  the first page of text in your report
24  regarding net recovery rate of inventory at
25  cost net of all store expenses comes from

Page 40

1
2  that figure, correct?
3  A.  Correct.
4  Q.  Thank you.
5      MR. FOX: Just to clarify,
6  referring to the far-right column, it
7  says, "Net recovery percentage."
8      MR. GENENDER: Yes.
9      MR. FOX: And the bottom number
10  in that column, correct?
11      MR. GENENDER: Yes.  Lower
12  right of -- when I'm saying "lower
13  right," I mean, actually the printed
14  part of the page.
15      MR. FOX: Of the first page of
16  Exhibit 2.
17      MR. GENENDER: First page of
18  Exhibit 2 and the only page of
19  Exhibit 5 to his report.
20      BY MR. GENENDER:
21  Q.  Correct?
22  A.  Correct.
23  Q.  Thank you.
24      What did you do to verify the
25  accuracy of that figure?

In Re:    **High Confidential**    William H. Henrich
Sears Holdings Corporation    July 2, 2019

---

Page 41

```
 1
 2   A.   We did not verify the accuracy of
 3   the number.  We asked for the information.
 4   We received the information.  We assumed it
 5   was accurate.
 6   Q.   Okay.  So if there are
 7   inaccuracies in this information, that
 8   could affect your conclusions, correct?
 9       MR. FOX: Objection.  You can
10   answer.
11   A.   It would not change our
12   conclusion.
13   Q.   It would not?  I need an answer.
14   A.   If there were inaccuracies in
15   this table that changed certain numbers on
16   this table that we utilized in our
17   analysis, then it could change the
18   analysis.  There is a potential that it
19   might change a conclusion, but I can't
20   state that today.
21   Q.   Do you know who at ESL prepared
22   Exhibit 2?
23   A.   No.
24   Q.   Who at Sears prepared Exhibit 2,
25   I should say?
```

Page 42

```
 1
 2   A.   No.
 3   Q.   Did you ask?
 4   A.   No.
 5   Q.   Do you know how the net recovery
 6   percent was calculated that's reflected on
 7   the right-hand column of the first page of
 8   Exhibit 2 or the bottom number that comes
 9   out to 96.4 percent under the totals?
10   A.   Yes.
11   Q.   How was that done?
12   A.   It is -- the numerator is the --
13   the bottom number in the GOB sales column,
14   774,641,623 divided by the sum of the cost
15   of goods, which is the column entitled:
16   Goods available at cost, 651,558,383, plus
17   total GOB expenses, bottom number in that
18   column 152,314,273.
19   Q.   So simple math, if I just used
20   round rough numbers, 770 -- and if I just
21   did this in millions, numerator of
22   approximately 774 and a denominator of 803
23   or 804?
24   A.   Correct.
25   Q.   Using rough math?
```

Page 43

```
 1
 2   A.   Correct.
 3   Q.   That comes out to 96.4 percent?
 4   A.   Correct.
 5   Q.   The type of score my kids would
 6   like to get on any of their high school
 7   tests, right?
 8       These figures don't include
 9   corporate overhead, do they?
10   A.   They do not, to the best of our
11   knowledge.
12   Q.   And they do not include
13   bankruptcy expenses or administrative
14   expenses, right?
15   A.   Correct.
16   Q.   Thank you.
17       Now looking at Exhibit 2, the
18   first page of Exhibit 2, which, again, I'm
19   not going to keep saying this, is the same
20   as Exhibit 5 to your report.
21       The totals are set forth using
22   three different announce dates of GOB
23   stores, correct?
24   A.   Correct.
25   Q.   There is an announce date of
```

Page 44

```
 1
 2   October 15, 2018, and an announce date of
 3   November 8th, 2018, and an announce date of
 4   December 27, 2018, correct?
 5   A.   Correct.
 6   Q.   And there is a combined 142 Sears
 7   and Kmart stores announced on October 15th,
 8   2018; is that right?
 9   A.   Correct.
10   Q.   40 more on November 8th, 2018,
11   total.
12   A.   Correct.
13   Q.   And 80 more on December 27th,
14   2018, correct?
15   A.   Correct.
16   Q.   And the totals, below the three
17   enumerated announce dates, add up
18   accordingly, right?  Is it your
19   understanding they would add up the numbers
20   for Sears under each of those three dates,
21   Kmart for each of those three dates, and
22   the totals for each of those three dates,
23   correct?
24   A.   Correct.
25   Q.   Now you're a CPA, which means you
```

Page 45

1
2 have to be probably pretty decent at math;
3 do you agree?
4    MR. FOX: Objection.
5    BY MR. GENENDER:
6 Q.  Let me start over.
7    Are you decent at math?
8 A.  I believe so.
9 Q.  Do you see under the totals for
10 149 Sears stores, it says 390,050,700?
11 A.  In the column "GOB sales"?
12 Q.  Yes, sir.  Thank you.
13 A.  Yes.
14 Q.  Okay.  And that is the column
15 that comprises the numerator, correct?
16 A.  Correct.
17 Q.  That's made up of the FLS numbers
18 from the top three sections for
19 October 15th, November 8th, and
20 December 27th, correct?
21 A.  Correct.
22 Q.  Can you take a minute and tell me
23 if the Sears entries for the 77 GOB sales
24 announced on October 15th, the 29 Sears
25 GOBs announced on November 8th, and the 43

Page 46

1
2 GOBs announced on December 27th add up to
3 390 million?
4 A.  They add up to approximately 420.
5 Q.  Okay.  All right.  So the
6 Exhibit 2 that you relied upon is incorrect
7 at least in that respect; is that right?
8 Exhibit 2 to your deposition, Exhibit 5 to
9 your report is incorrect in that the 390
10 number is incorrect, right?
11 A.  I can't draw that conclusion
12 whether the total sales for the GOB for the
13 Sears stores or even the Kmart or the
14 combined is inaccurate or not.  There may
15 be other factors that were considered when
16 they prepared the schedule that brought the
17 gross numbers of the 420 down to the 390.
18    So I have no basis to draw the
19 conclusion that it's inaccurate.
20 Q.  Why don't you check the accuracy
21 and using the same methodology to see if
22 the Kmart total for the 113 Kmart GOB
23 stores of $384,590,923 is accurate?
24 A.  That would add up to
25 approximately 311.  But again, there may be

Page 47

1
2 other factors that were considered in the
3 preparation of the schedule.
4 Q.  Well, you don't know how
5 Exhibit 2 was prepared, do you?
6 A.  No.
7 Q.  You didn't even attach all of
8 Exhibit 2 to your report.  You just
9 attached the cover page, correct?
10 A.  Correct.
11 Q.  And the math that we just went
12 through to determine the accuracy of the
13 totals under GOB's sales, the first time
14 you've done that check is right now,
15 correct?
16 A.  The first time that I have added
17 those three numbers to determine whether or
18 not it equaled the total on the cover page,
19 this is the first time that I've done that,
20 yes.
21 Q.  Have you added up to see if the
22 goods available at -- strike that.
23    Those numbers, whatever they
24 would be for GOB sales, that comprises the
25 numerator in your fraction that creates the

Page 48

1
2 96.4 percent, right?
3 A.  Would you repeat the question,
4 please?
5 Q.  Under the fraction that you just
6 said as to how the 96.4 percent net
7 recovery percentages is calculated, the
8 numerator is GOB sales, correct?
9 A.  Correct.
10 Q.  We just went through how the --
11 how that numerator is reflected on
12 Exhibit 2 and how the math certainly
13 reflected on Exhibit 2 doesn't add up, does
14 it?
15 A.  What we determined is the
16 summation of those three numbers does not
17 equal the total number on the page.
18 Correct.
19 Q.  Did you do the same -- have you
20 done an analysis to determine --
21    I want to turn to the denominator
22 to see if the denominator numbers, which
23 are in the columns "Goods available at
24 cost" and "Total GOB expenses," if those
25 add up to the totals reflected on Exhibit 2

Page 49

```
 1
 2   to your deposition and Exhibit 5 to your
 3   report?
 4   A.  Which numbers would you like me
 5   to add up?
 6   Q.  Okay.  Let's go under "Goods
 7   available at cost."
 8       If you did just for Sears, if you
 9   add up the 205 million figure, the 58
10   million figure, and the 81 million dollar
11   figure, do those add up?
12   A.  Approximately 344.
13   Q.  344, not 321 reflected on
14   Exhibit 2 to your deposition, correct?
15   A.  Correct.
16   Q.  Or Exhibit 5 to your report; is
17   that right?
18   A.  Correct.
19   Q.  And if you add the numbers up for
20   Kmart under "Goods available at cost," 171
21   million, 34 million, 65 million, those
22   don't add up to 330 million, do they?
23   A.  Correct.
24   Q.  And therefore the total 651
25   million reflected on Exhibit 2 to your
```

Page 50

```
 1
 2   deposition, Exhibit 5 to your report, is
 3   likewise inaccurate, isn't it?
 4   A.  I can't draw that conclusion that
 5   it's inaccurate.
 6   Q.  It doesn't reflect the totals
 7   above it, does it?
 8   A.  It doesn't reflect the totals
 9   above it.  It's not to say that it was
10   supposed to either.
11   Q.  Well, is there anything on this
12   page that would suggest, where it says
13   totals, that it would reflect anything
14   other than a summation of the numbers above
15   it?
16   A.  But again, this is a summary
17   schedule that was provided.  There may be
18   other elements that were considered in the
19   preparation of the total rows that are not
20   exhibited on the page.  So I can't conclude
21   that it's inaccurate.
22   Q.  You want to testify as to its
23   accuracy, as you're sitting here today,
24   based on what you now know?
25       MR. FOX: Objection.
```

Page 51

```
 1
 2   A.  We asked the debtor for a summary
 3   of their GOB sales.  This is what was
 4   provided.  We assumed that the information
 5   was accurate and utilized it as such.
 6   Q.  Well, you got the information
 7   from ESL, correct?
 8   A.  ESL is indicated as the provider
 9   of the schedule.
10   Q.  Okay.  Did you do the same -- and
11   the cross-check of the math under the
12   column "Goods available at cost" that you
13   just did, that's the first time you've done
14   that analysis, sitting here today, to check
15   to see if it's accurate, correct?
16   A.  The first time that I've done the
17   math, yes.
18   Q.  Let's go to the other column, the
19   other column that comprises the denominator
20   of the fraction you were talking about,
21   "Total GOB expenses."
22       The components of the 152 million
23   total are 74 million for Sears and 74
24   million for Kmart.
25       Do you see that?
```

Page 52

```
 1
 2   A.  The totals?
 3   Q.  Yes, sir.  Comprising 252 million
 4   of GOB expenses on Exhibit 2 to your
 5   deposition, Exhibit 5 to your report,
 6   right?
 7   A.  I do see that.
 8   Q.  Can you likewise go through to
 9   see that those numbers are -- that that
10   math doesn't work either?
11       (Witness complies.)
12       MR. FOX: Objection to form.
13       BY MR. GENENDER:
14   Q.  For the Sears --
15   A.  Which rows did you want me to
16   add?
17   Q.  Well, total GOB expenses, the
18   three Sears components don't add up to
19   $78,280,763, do they?
20   A.  They add up to approximately 81.
21   Q.  Or 82.  They add up to whatever
22   they add up to, but it's more than that.
23   It's more than 78 million, isn't it?
24   A.  It's slightly higher than the 78.
25   Q.  Right.
```

In Re:
Sears Holdings Corporation

High Confidential

William H. Henrich
July 2, 2019

Page 53

1
2    And the three components for
3    Kmart don't add up to $74,025,510, do they?
4    A.   No.
5    Q.   What is the effect on your
6    opinions if the 96.4 percent net recovery
7    percentage is inaccurate?
8        MR. FOX: Objection.
9    A.   The question is not whether the
10   percentage is inaccurate.  The question is
11   whether the net recovery on inventory, as
12   part of the GOB sales, is accurate or not.
13   Q.   All right.  If the actual net
14   recovery percentage is lower than 96.4
15   percent, what impact does that have on any
16   of your conclusions, if you know?
17   A.   Well, I don't know because I
18   don't know if it's inaccurate and I don't
19   know how much it would reduce the 96.4 or
20   more importantly, the aggregate, the net
21   dollar level of recovery in the GOB sales.
22   Q.   I'm going to hand you what's been
23   marked as Exhibit 3.
24       (Henrich Exhibit 3, Document
25   entitled "GOB Store Performance

Page 54

1
2    (Post-Ch. 11 Bankruptcy Filing),
3    Bates-stamped ESL_507B_0000001, marked
4    for identification, as of this date.)
5        BY MR. GENENDER:
6    Q.   Even though it has an ESL Bates
7    label at the bottom, is not a document
8    produced by ESL, okay?  I will represent to
9    you that it is a corrected version of this
10   spreadsheet to correct the math, okay?
11       MR. FOX: Wait a minute.  Where
12   did this come from?
13       MR. GENENDER: I'm speaking.  I'm
14   in the process of telling him where
15   it's coming from.  Can I finish?
16       MR. FOX: I'm listening.
17       MR. GENENDER: Thank you.  Let me
18   proceed without interruption.
19       BY MR. GENENDER:
20   Q.   Exhibit 3 is a document that we
21   have prepared to correct the math in
22   Exhibit 2, which is also Exhibit 5 to your
23   report, okay?
24       Do you have that in front of you?
25   A.   I do.

Page 55

1
2    Q.   Do you have a calculator with
3    you?
4    A.   I do.
5    Q.   Okay.  I'd like you to check the
6    math on Exhibit 3, please.
7        MR. FOX: I'm going to object to
8    this.  You want to ask him questions,
9    you can ask him questions.  This is
10   not a -- it's not a math exercise.
11       BY MR. GENENDER:
12   Q.   Are you able to check the math on
13   Exhibit 3?
14   A.   Am I able to?
15   Q.   Yes, sir.
16   A.   I mean I could go through the
17   same exercise we went through before, if
18   that's what you're asking.
19   Q.   Sure.  You can do it however you
20   deem appropriate.
21       I'd like you to check the totals
22   to do what you need to do to get
23   comfortable that the numerator and the
24   denominator that you testified to from
25   Exhibit 2 to your deposition, Exhibit 5 of

Page 56

1
2    your report, that the correct totals are
3    actually on Exhibit 3 that I've handed you.
4        MR. FOX: Paul, I'm going to
5    object to this.
6        MR. GENENDER: Okay.
7        MR. FOX: The witness -- first of
8    all --
9        MR. GENENDER: No speaking
10   objections.
11       MR. FOX: No, because you're
12   asking about an exhibit that you
13   created that this witness has never
14   seen before, didn't rely on.
15       If you want to challenge the
16   math, go ahead, but you're not going to
17   put these words in this witness' mouth.
18       MR. GENENDER: I object to the
19   speaking objection.
20       BY MR. GENENDER:
21   Q.   Can you get your calculator out,
22   please?
23       MR. FOX: Well, I'm going to
24   object.
25       BY MR. GENENDER:

Page 57

1
2  Q.   You have Exhibit 3 in front of
3  you?  Can you hold it side by side to
4  Exhibit 2?  Can you hold them side by side?
5       MR. FOX: Paul, I'm going to
6  object to this.  Okay.  Excuse me.
7       MR. GENENDER: You're
8  interrupting --
9       MR. FOX: I understand.  You
10  can't create your own document.
11       MR. GENENDER: Ed, Ed, I can
12  do --
13       MR. FOX: Where did it come from?
14       MR. GENENDER: I just told you.
15  It's a corrected version because --
16       MR. FOX: You said it's
17  corrected.
18       MR. GENENDER: I'm trying to
19  establish that.
20       MR. FOX: But this witness can't
21  identify it.  He doesn't know what it
22  is.
23       BY MR. GENENDER:
24  Q.   Mr. Henrich, do you have
25  Exhibit 3 next to Exhibit 2?

Page 59

1
2  Exhibit 2 and Exhibit 3?
3       MR. FOX: Again, I'm just going
4  to object to the entire line of
5  questioning.  It's completely
6  inappropriate.
7       (Document review.)
8  A.   Those 27 numbers that you
9  referred to are identical.
10  Q.   Okay.  Now I'm going to ask you
11  to take your calculator and add up under
12  "GOB sales" the total for Sears, the total
13  for Kmart, and the total combined, and see
14  what they come to and see if they come to
15  the number reflected on Exhibit 3.
16       MR. FOX: Objection.
17       THE WITNESS: Should I proceed?
18       MR. FOX: If you want.  I think
19  this is inappropriate.
20       MR. GENENDER: You can think
21  whatever you want.  I think it's
22  inappropriate that your expert offered
23  opinions based on bad math, but I would
24  just like -- or you can stipulate to
25  the numbers however you want to do it.

Page 58

1
2  A.   I do.
3  Q.   Do you have them side by side?
4       Can you see that the columns for
5  "GOB sales, Goods available at cost" and
6  "Total GOB expenses" for each of the three
7  announced dates for Sears, Kmart, and the
8  totals for each of those as it relates to
9  Exhibit 2 and as it relates to Exhibit 3,
10  that those figures are identical?
11  A.   I beg your pardon?  Were you
12  pointing to the first row?
13  Q.   Do you see the "GOB sales"
14  column?
15  A.   I understand the column.
16       Which row were you referring to?
17  Q.   Nine figures below it.
18  A.   Okay.
19  Q.   And then "Goods available at
20  cost," the nine figures below it.
21  A.   Okay.
22  Q.   "Total GOB expenses" and the nine
23  figures below it.
24       Can you see that those total of
25  27 figures are identical as between

Page 60

1
2       MR. FOX: We are not going to
3  stipulate that a document that we
4  didn't prepare that this witness never
5  saw and that he didn't create and we
6  don't know who created it.
7       MR. GENENDER: And he didn't
8  check.  Please do the math.
9       MR. FOX: He's not here to do a
10  math exercise.
11       MR. GENENDER: Are you --
12       MR. FOX: You can ask him
13  questions.  You can't tell him to do
14  calculation.
15       MR. GENENDER: Do I need to get
16  Judge Drain on the phone?  I'm trying
17  to conduct a deposition efficiently
18  without interruption.
19       MR. FOX: Paul, I understand
20  that.
21       BY MR. GENENDER:
22  Q.   Can you please add the following
23  three numbers, Mr. Henrich:  251,199,766,
24  plus 71,762,679, plus 98,267,824?
25  A.   I have added those numbers.

Page 61

1
2  Q.  And what does that come out to?
3  A.  421,230,269.
4  Q.  The same number reflected under
5  Sears total on Exhibit 3, correct?
6  A.  Correct.
7  Q.  Can you do the same exercise for
8  the Kmart figures?
9      MR. FOX: Paul, I think we can
10  short-circuit this.
11      MR. GENENDER: Please.
12      MR. FOX: Okay.  Hang on one
13  second.
14      MR. GENENDER: I don't want to
15  hear from either one of you on the
16  record.
17      MR. FOX: I think we will be able
18  to stipulate to what you're trying to
19  get to.
20      MR. GENENDER: Thank you.  Fair.
21      MR. FOX: But hang on.  Give me a
22  minute.
23      MR. GENENDER: Absolutely.
24      MR. FOX: Can we take a break?
25  We don't have a question pending.

Page 62

1
2      MR. GENENDER: I can take a
3  break.  I just don't want you talking
4  to the witness.  Is that fair?
5      MR. FOX: I understand.
6      MR. GENENDER: Normally, you can
7  talk to the witness.  On this
8  particular --
9      MR. FOX: Yeah, I gotcha.
10      MR. GENENDER: If you're not
11  going to talk to the witness about this
12  line of questioning.
13      MR. FOX: We're going to see if
14  we can stipulate to what you want.
15      MR. GENENDER: I'm good with
16  that.
17      MR. FOX: And give us five
18  minutes.
19      MR. GENENDER: Okay.
20      (Recess is taken.)
21      MR. FOX: A couple of things.
22  First of all, I want it noted on the
23  record that what we're looking at in
24  both Exhibit 2 and Exhibit 3 are Excel
25  spreadsheets on paper, which means that

Page 63

1
2  data that is in the computerized
3  version, formulas, et cetera, is not
4  reflected on the paper copy that's been
5  marked as an exhibit.
6      We agree on that?
7      MR. GENENDER: Keep going.
8      MR. FOX: Well, that's -- that I
9  want to put on the record.
10      MR. GENENDER: You just did.
11      MR. FOX: Okay.  Secondly, to the
12  question you were asking, I think --
13      MR. GENENDER: Hang on, what are
14  you stipulating to?  I don't want a
15  speech.
16      MR. FOX: I just wanted to make
17  sure I'm going to the right columns.
18  So you were going to ask next about
19  "Goods available at cost" and the math
20  in that column.
21      MR. GENENDER: Yes.
22      MR. FOX: We'll stipulate that
23  the numbers under the column "Goods
24  available at cost" for FLS add up to
25  345,685,370, and for Kmart in that

Page 64

1
2  column add up to 271,514,681, and those
3  two numbers together total 617,200,051.
4      And with respect to, I think,
5  "Total GOB expense" is next?
6      MR. GENENDER: You didn't finish
7  "GOB sales."  You're going to stipulate
8  to those three numbers?
9      MR. FOX: I'm sorry, which?  Oh,
10  yes.  Sorry.  I thought we were
11  finished with that.
12      So under the column "GOB sales"
13  we'll stipulate that the numbers for
14  FLS total to 421,230,269.  The numbers
15  under "GOB sales" for Kmart total to
16  312,828,244, and this is all on
17  Exhibit 3, and that those two numbers
18  total to 734,058,513.
19      And then you want to go to "Total
20  GOB expense"?
21      MR. GENENDER: Yes.
22      MR. FOX: We'll stipulate on
23  "Total GOB expense" that the numbers
24  under that column for FLS total to
25  82,743,998 and that the numbers for

---

**Page 65**

```
 1
 2     Kmart under "Total GOB expense" on
 3     Exhibit 3 total to 61,289,175, and that
 4     those two numbers, totals for FLS and
 5     Kmart add to 144,033,173.
 6        MR. GENENDER: Thank you.
 7        BY MR. GENENDER:
 8  Q.  Mr. Henrich, would you also agree
 9     that taking, comparing Exhibits 2 and 3
10     side by side, that the difference between
11     GOB sales less GOB expenses, just those two
12     columns, as between Exhibits 2 and 3 are
13     different, aren't they?
14  A.  Yes.
15  Q.  Exhibit 2, we don't need to get
16     into, the exact math is what it is, but
17     rough math 774 million-plus less 152
18     million-plus is approximately 622 million,
19     correct?
20  A.  Correct.
21  Q.   That number in Exhibit 3 with the
22     corrected math that your counsel just
23     stipulated to yields -- math yields a
24     difference between 734 million-plus and 144
25     million-plus that is 590 million,
```

**Page 66**

```
 1
 2     approximately, correct?
 3  A.  Correct.
 4  Q.  Thank you.
 5        Now you said that the correct
 6     formula to determine net recovery
 7     percentage is to take the "GOB sales"
 8     divided by the "goods available at cost,"
 9     plus the "GOB expenses"; is that right?
10  A.  Yes.
11  Q.  And where do you come up with the
12     opinion that that's the correct formula to
13     use to determine net recovery percentage?
14  A.  Again, what we utilized from this
15     schedule or the schedule that was the
16     Exhibit 2, which was from our report, which
17     now presented me a modified version, was
18     the net recovery dollars. So the GOB
19     sales, less the total GOB expenses.
20  Q.  Okay. How did you come -- what
21     informs you that that is -- strike that.
22        What informs you that that is the
23     correct formula to use to determine net
24     recovery percentage?
25  A.   The formula that was used for the
```

**Page 67**

```
 1
 2     schedule of net recovery percentage was
 3     taking the cost of goods, adding the cost
 4     of selling those goods, the direct selling
 5     costs of selling those goods, and comparing
 6     that to the revenue that was achieved.
 7     That's the percentage that's on the
 8     schedule.
 9  Q.  Your report references the Tiger
10     reports, doesn't it?
11  A.  It does.
12  Q.  And in what capacity -- for what
13     purpose does your report rely upon the
14     Tiger reports?
15  A.  It informs us that, again in the
16     calculation of our value of the collateral
17     as of the petition date, we did not utilize
18     the net recovery percentage. We utilized
19     the net recovery from the GOB sales, which,
20     is, as I described previously, the 774,
21     less the 152. In Exhibit 3 would be the
22     734, less the 144.
23        But we also utilized the goods
24     available at cost as a reduction from the
25     total inventory to determine what the
```

**Page 68**

```
 1
 2     inventory that was to be sold in the
 3     ongoing stores would be as well. So that
 4     would then increase in our calculations
 5     based on, if we were to utilize Exhibit 3,
 6     the lesser amount of goods that were sold
 7     through the GOB Stores.
 8  Q.  Can you turn to the third page of
 9     the text of your report, Exhibit 1, where
10     we were, where the second bullet point
11     says, "Inventory is liquidated in the 262
12     GOB stores."
13        Do you see that?
14  A.  I beg your pardon? Which page.
15  Q.  The third page.
16        MR. FOX: Are we done with 2 and
17     3?
18        MR. GENENDER: No.
19        BY MR. GENENDER:
20  Q.  Do you have that in front of you?
21  A.  Yes.
22  Q.  Okay. I want to go through a
23     couple of things, now that you know what
24     you know.
25        Would you agree that in the first
```

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 301 of 468

High Confidential

In Re:
Sears Holdings Corporation

William H. Henrich
July 2, 2019

**Page 69**

```
 1
 2   sub-bullet where it says the GOB stores
 3   achieved a recovery of 96.4 percent of
 4   inventory at cost net of all store
 5   expenses.
 6       And then it goes on.
 7       Do you see that?  Would you agree
 8   that that percentage should be 95.6?
 9       MR. FOX: I'm going to object to
10   that.
11       BY MR. GENENDER:
12   Q.  You can answer.
13   A.  I don't know whether it's right
14   or wrong.  We were given a schedule to
15   utilize.  You've given me a modified
16   schedule to utilize.  In the modified
17   schedule, the number is 95.6.
18       The previous number, as we cited
19   in our report, was 96.4.
20       Not having prepared the data but
21   having been provided the data, I can't tell
22   you which one is accurate or not.  But if
23   the 95.6 is an accurate number, then the
24   96.4 in the report instead would be 95.6.
25   Q.  All right.  And you're referring
```

**Page 70**

```
 1
 2   to Exhibits 2 and 3 in front of you for
 3   those two figures?
 4   A.  Right.
 5   Q.  And in that same sub-bullet point
 6   you go on and say, "Produced by the debtors
 7   and provided to me by counsel for
 8   Wilmington Trust."
 9       Do you see that?
10   A.  Yes.
11   Q.  You really mean produced by ESL,
12   don't you?
13       MR. FOX: Objection.  Asked and
14   answered.
15       BY MR. GENENDER:
16   Q.  You can answer.
17   A.  It appears that the schedule was
18   produced by ESL.
19   Q.  Thank you.
20   A.  Right.
21   Q.  The last sub-bullet point, it
22   says, "The debtors generated approximately
23   622.3 million from the GOB stores
24   liquidations" as reflected in that same
25   document, which is Exhibit 5 to your report
```

**Page 71**

```
 2   and Exhibit 2 to your deposition, correct?
 3   A.  Correct.
 4   Q.  That number really, as a matter
 5   of math, should be approximately 590
 6   million, correct?
 7       MR. FOX: Objection.
 8   Q.  You can answer.
 9       MR. FOX: No, there --
10   Q.  You can answer.
11       MR. FOX: There is no basis for
12   your question.
13       BY MR. GENENDER:
14   Q.  You can answer the question.
15       MR. FOX: There's no foundation
16   for the question.
17       MR. GENENDER: You made your
18   objection.  Stop speaking.
19       BY MR. GENENDER:
20   Q.  Can you answer my question,
21   please?  Looking --
22   A.  Would you repeat the question
23   please?
24   Q.  Looking at Exhibits 2 and 3.
25   A.  Right.
```

**Page 72**

```
 1
 2   Q.  We just went through this.
 3   A.  Right.
 4   Q.  Looking at Exhibits 2 and 3, as a
 5   matter of math to which your counsel
 6   stipulated in Exhibit 3, would you agree,
 7   sir, that the difference between the total
 8   GOB sales of 734 million less 144 million
 9   of total GOB expenses is actually 590
10   million?
11       MR. FOX: Paul, just to be clear,
12   we stipulated to the calculation, not
13   to the veracity of the underlying
14   numbers.
15       BY MR. GENENDER:
16   Q.  Can you answer my question,
17   please?
18   A.  If Exhibit 3 is a more accurate
19   version of the Exhibit 2 that we utilized,
20   then your statement would be correct, the
21   622.3 would be 590 million and plus.
22   Q.  Thank you.
23       Your $622.3 million number comes
24   from Exhibit 2 to your deposition, which is
25   Exhibit 5 to the report, by subtracting
```

**Page 73**

1
2  774-plus -- by subtracting 152 million from
3  774-plus, correct?
4  A.  Correct.
5  Q.  Coming up with 622.3 million,
6  correct?
7  A.  Correct.
8  Q.  If you did the same math, same
9  math but subtracting 734 million -- sorry.
10      Taking 734 million and
11  subtracting 144 million, you'd come up with
12  590 million, that math coming from
13  Exhibit 3, correct?
14  A.  Correct.
15  Q.  Your report references the Tiger
16  reports, correct?
17  A.  Yes.
18  Q.  And did you review those
19  carefully?
20  A.  I have read the Tiger report.
21  Q.  Are you familiar with how Tiger
22  calculated net recovery values on retail
23  store GOB?
24  A.  Yes.
25  Q.  I'm handing you what's been

**Page 74**

1
2  marked Exhibit 4.
3      (Henrich Exhibit 4, Tiger Asset
4  Intelligent Report dated 9/28/2018,
5  Bates-stamped SEARS_507B_00001287
6  through 1344, marked for
7  identification, as of this date.)
8      BY MR. GENENDER:
9  Q.  Do you recognize that as the
10  Tiger Asset Intelligent Valuation Report
11  dated September 28th, 2018, inventory date
12  October 6th, 2018?
13  A.  Yes.
14  Q.  If you will turn to the page that
15  in the lower right-hand corner has a Bates
16  number SEARS507B_1309.  Tell me when you're
17  there.
18  A.  I am there.
19  Q.  This is called Exhibit A2 to this
20  report, right?
21  A.  Correct.
22  Q.  And do you see that there is a
23  blended net recovery for combined retail
24  store GOB inventory.  Towards the bottom of
25  the page, it says 91.3 percent?

**Page 75**

1
2  A.  I see that line item.
3  Q.  And do you see that that is
4  calculated by taking the $2.152 billion
5  number and dividing it by inventory at cost
6  of 2.358 billion and arriving by math at
7  91.3 percent?
8  A.  I didn't follow your numbers.  I
9  apologize.  Could can you repeat that
10  please?
11  Q.  Do you see that that 91.3 percent
12  is calculated by taking 2.152 billion, the
13  blended net recovery for combined retail
14  store, retail store GOB inventory, and
15  dividing it by the inventory at cost number
16  in the denominator, 2.358 billion at the
17  top-center column.
18  A.  Yes, I do.
19  Q.  And arriving at 91.3 percent?
20  A.  Yes, I do.
21  Q.  Can you turn to the second page
22  of your report?  Second page of text.
23      (Witness complies.)
24  Q.  The first heading is:  Analysis
25  and Methodologies.

**Page 76**

1
2  A.  I have that in front of me.
3  Q.  Your report has an Exhibit 2 to
4  it that has a buildup in collateral value;
5  is that correct?
6  A.  That is correct.
7  Q.  And that chart, which is
8  Exhibit 2, really, Exhibit 2A, to your
9  report, has a line item for total inventory
10  at cost of $2.576 billion.
11      Do you see that?
12  A.  I do.
13  Q.  And that figure comes from the
14  borrowing base certificate; is that right?
15  A.  That figure appears on the
16  borrowing base certificate, but I believe
17  we may have taken that as well from the
18  debtors' schedules.
19  Q.  Did you get it from the borrowing
20  base certificate?
21  A.  If I recall correctly, we took it
22  from the debtors' schedules.
23      (Henrich Exhibit 5, Borrowing
24  Base Certificate, beginning with
25  Bates-stamp SEARS_507B_00001430, marked

Page 77

```
 1
 2      for identification, as of this date.)
 3          BY MR. GENENDER:
 4   Q.  I've handed you what I've marked
 5   as Exhibit 5 to your deposition.
 6          Do you recognize that as a true
 7      and correct copy of the borrowing base
 8   certificate as of October 13, 2018?
 9          Do you have that in front of you?
10   A.  I do.
11   Q.  If you would turn to the fourth
12   page of the document.  The first line on
13   the left, upper left, is inventory per
14   stock ledger.
15          Do you see that?
16   A.  I do.
17   Q.  That has the same number we
18   referred to in Exhibit 2A of your report,
19   2.576 billion, correct?
20   A.  Correct.
21   Q.  It adds in Home Services.
22          Do you see that?
23   A.  I do.
24   Q.  And then it has a total stock
25   ledger inventory of 2.69 billion dollars.
```

Page 78

```
 1
 2          Do you see that?
 3   A.  I do.
 4   Q.  Your report uses 2.576 billion,
 5   correct?
 6   A.  Correct.
 7   Q.  And it reduces it by $651 million
 8   for inventory at cost, correct?  GOB
 9   liquidation inventory at cost, correct?
10   A.  To calculate the amount of
11   inventory in the Go-Forward stores,
12   correct.
13   Q.  And that uses the number, the
14   number from Exhibit 2 to your deposition,
15   Exhibit 5 to your report, correct?
16   A.  Correct.
17   Q.  That we determined on Exhibit 3
18   as a matter of math, it should be 617
19   million, correct?
20          MR. FOX: Objection to form.
21   A.  That Exhibit 3 reflects a
22   different number.
23   Q.  Of 617 million, correct?
24   A.  Correct.
25   Q.  All right.  Now looking at --
```

Page 79

```
 1
 2      going back to your total inventory at cost,
 3      you used 2.576 billion, which is referenced
 4      in the borrowing base certificate on the
 5      fourth page that is Exhibit 5 to your
 6      deposition.
 7          That's the number you used,
 8   right?
 9   A.  Right, as aforementioned, we were
10   uncertain whether the Home Services
11   inventory was collateral that should be
12   included in our calculations or not, so
13   conservatively we did not utilize it.
14   Q.  Conservatively, you did not
15   include 114.6 million of Home Services
16   inventory, correct?
17   A.  Correct.
18   Q.  But you also, not so
19   conservatively --
20          MR. FOX: Objection.
21   Q.  -- didn't use the net eligible
22   inventory figure from the borrowing base
23   certificate of 2.391 million, did you?
24          MR. FOX: Objection.
25   Q.  Do you see that figure in the
```

Page 80

```
 1
 2      borrowing base certificate?
 3   A.  I didn't hear over the objection
 4   what number you stated.
 5   Q.  Do you have the borrowing base
 6   certificate?
 7   A.  I do.  I have it in front of me.
 8      I didn't hear which number you stated.
 9   Q.  Do you see where it says "net
10   eligible inventory"?
11   A.  Yes.
12   Q.  $2.391 billion?
13   A.  Yes.
14   Q.  Actually, $2.391.5 billion?
15   A.  Yes.
16   Q.  You did not use that figure, did
17   you?
18   A.  No.
19   Q.  You'd agree that that number is
20   approximately $185 million less than the
21   number you actually used, correct?
22   A.  By math, yes.
23   Q.  Why did you not use that number?
24   A.  Because ineligible inventory
25   still has value -- still has value.  It's
```

Page 81

1
2  just a means by which a lender creates
3  reserves upon which to lend against, but it
4  doesn't detract from the value of the
5  inventory.
6  Q.   You include in Exhibit 2A to your
7  report, $72.8 million for pharmacy
8  prescription list asset value.
9      Do you see that?
10  A.  I do.
11  Q.   Prescription lists are not 2L
12  collateral, are they?
13      MR. FOX: Objection.
14  A.  Could you repeat the question.
15  Q.  Is it your testimony that those
16  pharmacy prescription lists assets are 2L
17  collateral?
18  A.  We believe that it is.  We
19  believe that it is.
20  Q.  What's your basis for that
21  belief?
22  A.  Because the collateral in the
23  security agreement for the second lien
24  lenders identifies all inventory and then
25  in addition it identifies that as

Page 82

1
2  collateral documents related to inventory
3  and books and records related to inventory.
4      So the pharmacy lists, pharmacy
5  inventory, is part of total inventory and
6  therefore the documents which would include
7  the scripts, related to it, would be
8  included.  That's in the first instance.
9      In the second instance, it is
10  specifically identified in the collateral
11  agreement for the first lien lenders as
12  being first lien collateral, and as we were
13  identifying the total or calculating the
14  total value of -- the value of the total
15  collateral, and as the report indicates, we
16  assumed that the first lienholders would
17  consume their collateral first, it was
18  appropriate to include the prescription
19  list asset value in the calculation.
20  Q.  Would you agree something can be
21  first lien collateral and not second lien
22  collateral, correct?
23  A.  Something can be.
24  Q.  Okay.  Do you have a document
25  that reflects that 72.8 million for

Page 83

1
2  pharmacy prescription list asset value
3  should be included?
4      MR. FOX: Objection to the form.
5  A.  Do I have a document that points
6  to whether it should be included?
7  Q.  Yes.
8  A.  No.  As I indicated, our
9  interpretation, our assumption with respect
10  to the second lien collateral was that it
11  incorporated all inventory and the
12  documents and books and records related to
13  it.  It was also specifically identified as
14  first lien collateral.  And given that we
15  were creating this valuation based on
16  collateral from both what was exclusive to
17  the first lienholders, as well as the
18  second lienholders, it was appropriate to
19  include it in the calculation.
20  Q.  Where did you get the
21  $72.8 million number from?
22  A.  That was a document that we
23  received from the debtors, that they
24  provided their value.
25  Q.  Do you recall the date of the

Page 84

1
2  document?
3  A.  I do not.
4      (Henrich Exhibit 6, Document with
5  Estimated Script Asset Value, beginning
6  with Bates-stamp SEARS_507B_00001508,
7  marked for identification, as of this
8  date.)
9      BY MR. GENENDER:
10  Q.  I'm handing you what I marked as
11  Exhibit 6 to your deposition, Bates labeled
12  Sears 507B1508.
13      Do you have that in front of you?
14  A.  I do.
15  Q.  Is that the document to which
16  you're referring?
17  A.  Yes.
18  Q.  Do you see a date on this
19  document?
20      MR. FOX: Paul, hold on one
21  second.  Let me just ask you to wait
22  one second while we check something.
23      MR. GENENDER: Okay.
24      MR. FOX: I just want to make
25  sure this document is the same as what

High Confidential

Page 85

1
2   he actually relied on.
3        MR. GENENDER: Okay.
4        (Document review.)
5        MR. PARADISE: I haven't second
6   chaired a deposition in a long time.
7   Sorry guys.
8        MR. GENENDER: Let's go off the
9   record for a second.
10       (Discussion off the record.)
11       MR. FOX: Paul, you can go ahead
12   but we want --
13       MR. GENENDER: You can reserve
14   your right.
15       MR. FOX: I don't want to hold
16   you up.
17       MR. GENENDER: It's the same
18   document I used on Saturday.
19       MR. FOX: I know and there were
20   some questions then.
21       MR. GENENDER: We put the
22   tracking pages on the front so that it
23   was clear.
24       MR. FOX: I just want to make
25   sure it's what the witness saw when

Page 86

1
2   they prepared the report.
3        MR. GENENDER: Fair enough.
4        MR. PARADISE: Keep going.  We'll
5   reserve.
6        BY MR. GENENDER:
7   Q.   Mr. Henrich, as you sit here, and
8   your counsel can confirm whether it's
9   actually something that is in their files
10   of what you reviewed, but at least your
11   base recollection, this is a document you
12   relied upon to come up with the
13   $72.8 million figure; is that right?
14   A.   It's in the same format of the
15   document that we utilized.  It looks
16   familiar, whether it is exactly the same, I
17   can't stipulate, but it looks very similar.
18   Q.   And is there a date on Exhibit 6
19   that you can see?
20   A.   I do not see a date on Exhibit 6.
21   Q.   Okay.  Let's go to the Tiger
22   report which we marked as Exhibit 5.
23   That's not true.  Let's go to the Tiger
24   report which we had marked as Exhibit 4,
25   please.

Page 87

1
2        (Witness complies.)
3   Q.   And let's go to page 8.
4        Do you see in the lower -- and
5   the Tiger report, you recall, is dated as
6   of October 6th, 2018, which is nine days
7   before the petition date, correct?
8   A.   Correct.
9   Q.   Okay.  Page 8, lower right-hand
10   corner, do you see it says in that
11   paragraph, in the middle of the paragraph,
12   second sentence it says, "Based on an
13   estimated return of $5 per prescription,
14   the script lists would have a value of up
15   to $27 millions.
16       Do you see that?
17   A.   I see that.  But --
18   Q.   That being said, the number you
19   used on your Exhibit 2A is a number of
20   72.8 million, which is 45.8 million, at
21   least $45.8 million more than what the
22   Tiger report refers to, correct?
23   A.   That's correct.  But you can't
24   read it in isolation without reading the
25   first paragraph above it as well.

Page 88

1
2   Q.   Okay.  Well, tell me how you
3   would get -- the first paragraph above it
4   would change the Tiger report's view that
5   the prescription script list would have a
6   value of up to $27 million?
7   A.   The first paragraph stipulates
8   the assumptions upon which they ascribed a
9   value.  They identify that the pharmacies
10   were located in the Go-Forward store
11   locations.  And then indicate, however, if
12   they had been part of a GOB scenario, which
13   this appraisal was on the basis that the
14   entire entity would be liquidated.  In a
15   liquidation they're suggesting that it
16   would have a $5 per prescription or
17   $27 million value.
18       But the Go-Forward collateral
19   should be valued at its fair market value
20   and the value that was ascribed to it by
21   the debtors was the $72.8 million number.
22   Q.   Recognizing you don't know the
23   date on -- you don't have a date of when
24   Exhibit 6 was prepared, correct?
25   A.   Correct.

Page 89

1
2   Q.   And --
3   A.   And our request was for the
4   valuation as of the petition date, and this
5   is what we received in return -- in
6   response.
7   Q.   And of course your number assumes
8   that the scripts, the pharmacy prescription
9   lists themselves are even 2L collateral,
10  correct?
11  A.   I'm sorry.  Can you repeat the
12  question?
13  Q.   Your inclusion of the
14  $72.8 million figure assumes that the
15  pharmacy prescription list assets are
16  appropriate 2L collateral, correct?
17       MR. FOX: Objection.  Asked and
18  answered.  You can answer.
19  A.   We assumed that it was 2L
20  collateral, but it was still appropriate to
21  include even if it was determined that it
22  would be exclusive to the first lien.
23       But, yes, we did assume it was
24  appropriate to include.
25  Q.   And if it's not appropriate to

Page 90

1
2   include, that would decrease your
3   collateral value by that amount, correct?
4   A.   Just by math?
5   Q.   Yes.
6   A.   Yes.
7   Q.   And by fact?
8   A.   By math.
9   Q.   And on that same page you have
10  $64.3 million of credit card deposits in
11  transit.
12       Do you see that?
13  A.   I do.
14  Q.   Now if you'll look, where does
15  that figure come from, $64.3 million for
16  credit card deposits in transit?
17  A.   The debtors' schedules.
18  Q.   Did you consider the borrowing
19  base certificate in including that number?
20  A.   The debtor identified that it had
21  cash equivalents of deposits in transit as
22  of the petition date of 64.3 and there is a
23  distinction between the petition date and
24  the date of the borrowing base certificate.
25       MR. GENENDER: I'm going to

Page 91

1
2   object to the answer as nonresponsive.
3       BY MR. GENENDER:
4   Q.   My question is, did you consider
5   the borrowing base certificate in including
6   $64.3 million of credit card deposits in
7   transit?
8   A.   Our source was the debtors'
9   schedule.  That's what we utilized.
10  Q.   The date of the borrowing base
11  certificate is October 13, 2018, correct?
12  A.   Yes.
13  Q.   The petition date was?
14  A.   October 15th.
15  Q.   Okay.  The borrowing base
16  certificate includes an eligible credit
17  card receivables figure of $54.8 million,
18  correct?
19  A.   I see that in the borrowing base,
20  yes.
21  Q.   Had you used that, your inventory
22  valuation would be $10 million lower,
23  correct?
24  A.   Again, by math, had we used that
25  number, but we used the amount identified

Page 92

1
2   in the debtors' schedules.
3       But if we had used a different
4   number, the 54.8, it would have been less.
5   Q.   And you include 14-and-a-half
6   million dollars of pharmacy accounts
7   receivable, correct?
8   A.   Correct.
9   Q.   In Exhibit 2A to your report?
10  A.   Correct.
11  Q.   And that number is contained in
12  the borrowing base certificate on the same
13  page, "Pharmacy accounts receivable,"
14  14.5 million.
15       Do you see that?
16  A.   I do.
17  Q.   What is the probability, based on
18  your experience, of collecting ineligible
19  receivables as reflected in the borrowing
20  base?
21       MR. FOX: Objection to form.
22       BY MR. GENENDER:
23  Q.   If you know.
24  A.   That's very subjective.
25  Q.   Do you have experience trying to

Page 93

```
1
2    collect what a borrowing base certificate
3    refers to as ineligible receivables?
4  A.  Yes.
5      MR. FOX: Objection.
6  Q.  What experience do you have in
7    that regard?
8  A.  I have worked with numerous
9    companies that have asset-based lending,
10   ABL loans, and that produce borrowing
11   bases, and their ineligible receivables are
12   often a reserve that lenders impose to
13   reduce the amount that they're going to
14   lend against.
15     But that certainly doesn't
16   preclude that the companies are able to
17   collect on those ineligibles.  Oftentimes
18   they are.  They may just have slow payers.
19 Q.  Exhibit 2A, you include
20   $116.2 million of cash in your collateral
21   build up, don't you?
22 A.  We do.
23 Q.  That assumes that cash is 2L
24   collateral, doesn't it?
25 A.  No.  It assumes, and I think we
```

Page 94

```
1
2    state in the report, that it is exclusive
3    collateral to the first lien lenders and we
4    assumed that they would consume that first,
5    and it was appropriate to include in the
6    entire collateral valuation.
7  Q.  If that cash was not available to
8    be consumed by the first lien lenders, then
9    it should not be included in the schedule
10   which is Exhibit 2A to your report,
11   correct?
12     MR. FOX: Objection to form.
13 A.  Cash is their collateral.
14 Q.  No.  That's not my question.
15     If the cash that is reflected on
16   Exhibit 2A were not available for the first
17   lienholders to collect against, then it
18   would not be appropriately reflected on
19   Exhibit 2A, correct?  As 2L collateral?
20     MR. FOX: Objection to form.
21 A.  If it was not -- if it was not
22   their collateral or if it was not available
23   to them because it was restricted, which we
24   did not include restricted amounts, then it
25   would not be -- if it was restricted, then
```

Page 95

```
1
2    it would not be included on the schedule.
3  Q.  Or if it just weren't available
4    to be collected upon by the 1Ls, then it
5    shouldn't be on this report -- on this
6    chart, correct?
7      MR. FOX: Objection to form.
8  A.  I don't -- I don't know what that
9    means, not available to be collected.  It's
10   cash.
11 Q.  You agree that the cash is not 2L
12   collateral, per se, correct?
13 A.  Correct.
14     MR. FOX: Objection to form.
15     BY MR. GENENDER:
16 Q.  Thank you.
17     The only reason you're including
18   it there is because you think that the 1Ls
19   would collect their loan against it and
20   therefore move the 2Ls up so there would be
21   an additional $116.2 million available for
22   the 2Ls to capture.
23     Is that your premise?
24 A.  Yes, they would collect their
25   exclusive collateral first and then share
```

Page 96

```
1
2    in the shared collateral.
3  Q.  Looking at Exhibit 2A, just to be
4    clear, where you add in in the middle of
5    the page a number for GOB liquidation
6    inventory at cost.
7      Do you see that, 651.6 million?
8  A.  I do.
9  Q.  And you get that from Exhibit 2
10   to your deposition, Exhibit 5 to your
11   report, correct?
12 A.  Correct.
13 Q.  Exhibit 3 to your deposition,
14   that number is 617,200,000, correct?
15     MR. FOX: Objection.
16     BY MR. GENENDER:
17 Q.  Corresponding number is
18   617.2 million, correct?
19     MR. FOX: Objection.
20 A.  The corresponding number on
21   Exhibit 3 is as you described.
22 Q.  617.2 million, correct?
23 A.  Correct.
24 Q.  As a matter of math, that's
25   $34.2 million difference, correct?
```

Page 97

```
1
2    A.  Correct.
3        Which would increase the
4    Going-Concern inventory at cost as well.
5    Q.  I want to talk about --
6        MR. GENENDER: I want to object
7    to everything after the word "correct"
8    in the last answer as nonresponsive.
9        BY MR. GENENDER:
10   Q.  I want to talk about your
11   Going-Concern valuation on pages 3 and 4 of
12   your report, third and fourth pages of
13   text.  I'd like a stipulation that if you
14   ever prepare a report again in a case in
15   which I'm involved, that you will number
16   the pages, please?  Is that fair?
17   A.  That is extraordinarily fair.
18   Q.  Can we have that go into
19   perpetuity?
20   A.  It was -- yes.
21   Q.  Good.  Fair enough.  We're all
22   saying that with smiles on our faces.
23       The third and fourth pages of
24   text, okay.
25       (Document review.)
```

Page 98

```
1
2    Q.  The top of page 4 of your report
3    you say, "Based upon my analysis I have
4    utilized the same store expense
5    relationship in the ongoing stores as was
6    reported for the GOBs or 23.4 percent of
7    inventory at cost."
8        Do you see that?
9    A.  I do.
10   Q.  Why is that reasonable to apply
11   that number to a Going-Concern value?
12   A.  So we recognized that there
13   needed to be recognition of direct selling
14   expenses associated with the sale of
15   inventory in the Go-Forward stores.
16       We recognized that the
17   relationship from Exhibit 2, direct selling
18   expenses to the inventory, was 23.4
19   percent.
20       We believed that the relationship
21   in terms of the occupancy, the staffing,
22   and all the expenses that are incorporated
23   by direct selling expenses would be
24   somewhat proportional to the amount of
25   inventory and space that inventory
```

Page 99

```
1
2    occupied.
3        And accordingly we applied the
4    same percentage to the Go-Forward
5    inventory.
6    Q.  Doesn't that imply an approximate
7    12.4 percent margin, if you know?
8    A.  I don't know where you're
9    calculating that number from.
10   Q.  Do you know what Sears's
11   historical margins were?
12   A.  In the Go-Forward stores, the
13   more recent sales, the margins that were
14   achieved were in excess 30 percent-plus.
15       In all the Go-Forward business
16   plans the debtor assumed, on average, a 29
17   percent gross margin.
18       And the 29 percent gross margin
19   is what we utilized to determine the
20   revenue related to the sales of the
21   Go-Forward inventory.
22   Q.  Are you familiar with what
23   Sears's historical EBITDA was on a retail
24   4-wall basis?
25       MR. FOX: Objection to form.
```

Page 100

```
1
2    What period of time are you talking
3    about?
4        MR. GENENDER: Historically.
5        MR. FOX: What does that mean?
6    They've been around for 100-something
7    years.
8        MR. GENENDER: You've made your
9    objection.
10   A.  The debtors, this was part of
11   declarations that were made by various
12   individuals as the -- as there were various
13   reporting -- reports, and the business
14   plans that were included as part of those
15   declarations certainly indicated that
16   historically, and this is over years which
17   the company was losing money, which
18   eventually contributed to the company
19   landing in bankruptcy, but it also
20   indicated that the recent performance of
21   the retail operations for the Go-Forward
22   stores were profitable.
23   Q.  Including --
24       MR. FOX: He's not finished with
25   his answer.  Let's let him finish.
```

In Re:                                                      Highly Confidential                                    William H. Henrich
Sears Holdings Corporation                                                                                        July 2, 2019

---

Page 101

1

2 A.  And, as indicated, that it

3 wasn't -- those plans indicated that -- or,

4 though, the expectation for the Go-Forward

5 stores that they would generate even EBITDA

6 in the -- potentially in the 5 to 6 percent

7 range.

8     We actually used a slightly more

9 conservative number and assumed it in the

10 4 percent range.

11 Q.  Does your calculation include

12 overhead costs?

13 A.  Yes.

14 Q.  Are you aware that in the recent

15 period of time retail 4-wall EBITDA was

16 flat to negative?

17     MR. FOX: Objection to form.

18 A.  I don't know what period of time

19 you're referring to.  I don't know whether

20 that refers to a subset of stores or not,

21 which stores that refers to.

22 Q.  Page four of your report, the

23 fourth sub-bullet point under your first

24 main bullet point, you state, "It is my

25 opinion that the overall result, 4 percent

---

Page 102

1

2 net operating income before debt service in

3 margin, is reasonable and reflects

4 normalized ongoing operations, 29 percent

5 margin, 20 percent store expense, and

6 5 percent corporate overhead.

7     Do you see that?

8 A.  I do.

9 Q.  And then you base that on Bill

10 Transier's declaration dated February 1,

11 2019; is that right?

12 A.  Correct.

13     (Henrich Exhibit 7, Declaration

14 of William L. Transier, marked for

15 identification, as of this date.)

16     BY MR. GENENDER:

17 Q.  I'm going to hand you the

18 declaration of William Transier marked as

19 Exhibit 7.

20     Is this the document to which

21 you're referring on page 4 of your report,

22 declaration dated February 1, 2019?

23 A.  I don't have mine to compare the

24 two.  I'm assuming it is one in the same.

25 Q.  Can you turn to page 37 that you

---

Page 103

1

2 cite in your report, 37 of Mr. Transier's

3 declaration, which is Exhibit 7.

4     (Witness complies.)

5 A.  I've turned to that page.

6 Q.  Show me where it says a 4 percent

7 net operating income before debt service

8 and profit, that's reflected or

9 supported by Mr. Transier?

10 A.  As I mentioned a minute ago, this

11 forecast indicates, on average, actually a

12 6 percent retail EBITDA margin for the

13 fiscal year.

14 Q.  It does.

15 A.  And as I indicated, we took a

16 more conservative approach.

17 Q.  Your bullet point reflects --

18 let's look at Mr. Transier's chart here,

19 the chart in his declaration.

20     He's got a margin percent of 29,

21 right?  Do you see that?

22 A.  I do.

23 Q.  And you referred to 20 percent

24 store expenses, right?

25 A.  Correct.

---

Page 104

1

2 Q.  And you refer to 5 percent

3 corporate overhead, right?

4 A.  Correct.

5 Q.  Show me where on page 37 of

6 Exhibit 7 that you cite in your report that

7 the 6 percent margin percentage in any way,

8 shape, or form takes into account

9 the corporate overhead?

10 A.  Well, it does not depict it on

11 this page.

12 Q.  Okay. Let's take your numbers

13 and then we can talk about Mr. Transier's

14 numbers, okay?  Your number is 29 percent

15 gross profit minus 20 percent store expense

16 minus 5 percent corporate overhead equals

17 4 percent net operating income; is that

18 correct?

19 A.  Correct.

20 Q.  Okay.  29 minus 20 minus five

21 equals four?

22 A.  Correct.

23 Q.  Do you believe the corporate

24 overhead number that you used is accurate?

25 A.  Again, that was an estimation

---

Page 105

```
1
2    that we utilized and we --
3    Q.  Go ahead.
4    A.  -- we saw that the corporate --
5    pursuant to the Tiger liquidation analysis,
6    that the corporate overhead was 3.1 percent
7    of inventory at cost.
8        We believed that for a
9    Going-Concern operation for the Go-Forward
10   stores, that there would be greater level
11   of overhead required to manage the
12   Go-Forward stores.
13       And based on general experience,
14   we then assumed not 3.1 percent of
15   inventory, but we assumed 5 percent of
16   revenue as a reasonable corporate overhead
17   allocation.
18   Q.  Do you see page 37 of
19   Mr. Transier's declaration, Exhibit 7?  It
20   has a figure for operating expenses just
21   like you do, right?  I mean, you have a 20
22   percent operating -- 20 percent store
23   expenses and he has it in terms of dollars,
24   correct?
25   A.  Correct.
```

Page 106

```
1
2    Q.  Which could be converted into a
3    percentage, correct?
4    A.  I'm sorry, could you repeat the
5    question, please?
6    Q.  Well, he has one -- he has store
7    operating expenses of 1.482?
8    A.  Correct.
9    Q.  Billion.  That could be converted
10   into a percentage, correct?
11   A.  It could, yes.
12   Q.  Just by the math, it would be
13   about 23 percent, wouldn't it?
14   A.  I have not calculated it.
15   Q.  But the difference between 29
16   percent and 6 percent, the only figure in
17   between is that operating expense number,
18   correct?
19   A.  Correct.
20   Q.  So he actually has 29 percent
21   less 23 percent equals 6 percent margin
22   without taking into effect corporate
23   overhead, correct?
24   A.  Well, we don't know exactly
25   what's included.
```

Page 107

```
1
2    Q.  But it's not --
3        MR. FOX: Objection.  You have to
4    let him answer, Paul.  You can't
5    interrupt.
6    A.  We don't know exactly what's
7    embedded in his line item of operating
8    expenses.
9        Again, we -- we looked at 20
10   percent of store expenses, which was
11   comparable to -- so 20 percent on revenue
12   for store expenses was comparable to the
13   percentage that we assumed -- that we
14   assumed as a percentage of inventory at
15   cost. And so that was for the direct
16   selling expenses related to the Go-Forward
17   stores.
18       And then we applied a corporate
19   overhead number.  So we don't have a direct
20   comparison as to what he's incorporating in
21   operating expenses versus the way that
22   we've approached it.
23   Q.  Well, you actually do.  Because
24   you're citing page 37 of Mr. Transier's
25   report in your report, correct?  You're
```

Page 108

```
1
2    citing this page?
3        MR. FOX: Objection to form.
4    BY MR. GENENDER:
5    Q.  Right?
6    A.  Well, yeah --
7    Q.  Are you citing this page of his
8    report?
9    A.  I am.  In the 29 percent margin
10   is --
11   Q.  Can you -- my question is, you
12   answered my question.  Thank you.
13       Can you read the top line in big
14   letters, the top of page 37 of
15   Mr. Transier's February 1st declaration,
16   which is Exhibit 7 to your deposition?
17   A.  "A smaller but balanced Sears and
18   Kmart footprint delivers 409 million of
19   4-wall EBITDA."
20   Q.  In 2019?
21   A.  "In 2019."
22   Q.  You'll agree, sir, that 4-wall
23   EBITDA does not include overhead expenses,
24   does it?
25   A.  Again, I can't -- I can't state
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 311 of 468    Highly Confidential

In Re:
Sears Holdings Corporation

William H. Henrich
July 2, 2019

## Page 109

1
2    their definition of how they calculated
3    4-wall EBITDA.
4    Q.   Do you see anywhere on page 37 of
5    the Transier declaration where there is a
6    line item accounting for corporate
7    overhead?
8    A.   I do not see a line item.
9    Q.   As a matter of math, if
10   your 5 percent corporate overhead number
11   held and it were applied to the 4-wall
12   EBITDA number margin that Mr. Transier has
13   referred to on page 37 of the Transier
14   declaration, that math would be 6 percent
15   minus 5 percent equals 1 percent, correct?
16   A.   That math is correct.
17   Q.   Thank you.
18   A.   Again, I can't talk to the
19   definition of what expenses were included
20   or not in their calculation.
21   Q.   Thank you.
22       The last bullet point on page 4
23   of your report, the last sub-bullet point,
24   refers to the letters of credit.
25       Do you see that?  $271.1 million

## Page 110

1
2    stand-alone Letter of Credit facility?
3    A.   I do.
4    Q.   Do you know how the letters of
5    credit were treated in the February 11th
6    sale transaction?
7    A.   I do not.
8    Q.   Do you know what underlying
9    liabilities the letters of credit were
10   supporting or are supporting?
11   A.   Potential workmen's comp.
12   Q.   Did you perform an analysis as to
13   what those liabilities would be?
14       MR. FOX: Objection to the form.
15   What period of time are you talking
16   about?
17       BY MR. GENENDER:
18       You can answer.
19   A.   Well, I actually have the same
20   question.
21   Q.   At any period of time.
22   A.   No, we did not.
23   Q.   So if I asked you whether you did
24   it as of yesterday or as of October 15th or
25   any time in between, the answer would be

## Page 111

1
2    the same, wouldn't it?
3    A.   Yes, it would.
4    Q.   That you didn't do one?
5    A.   Correct.
6    Q.   On page 5 of your report, under
7    number one, section 1A, you claim
8    Mr. Griffith erroneously excluded
9    approximately $64 million of credit card
10   deposits in transit.
11       Do you see that?
12   A.   I do.
13   Q.   Have you ever spoken with Brian
14   Griffith?
15   A.   I have not.
16       (Henrich Exhibit 8, Declaration
17   of Brian J. Griffith In Support of the
18   Debtors' Motion to Estimate Certain
19   507(b) Claims for Reserve Purposes,
20   marked for identification, as of this
21   date.)
22       BY MR. GENENDER:
23   Q.   I'm handing you what I've marked
24   as Exhibit 8.  Can you identify that as the
25   declaration of Brian Griffith filed

## Page 112

1
2    May 26th, 2019, to which you refer on the
3    fifth page of your report?
4       (Document review.)
5    Q.   Do you recognize it?
6    A.   Yes, I do.
7    Q.   This is the declaration to which
8    you refer on page 5 of your report?
9    A.   Yes.
10   Q.   And if you'll turn to the last
11   page of the report, it says 11 of 11 and
12   it's a 507(b) claim calculation heading.
13       Do you see that?
14   A.   I do.
15   Q.   Do you see there is $70 million
16   of account receivables listed as of
17   petition date?
18   A.   I do.
19   Q.   Do you know what those are?
20   A.   No.  There was no explanation in
21   the document that gave indication as to
22   what they were.
23   Q.   So you don't know what they are,
24   correct?
25   A.   Correct.

In Re:                                                                                    Highly Confidential                                                William H. Henrich
Sears Holdings Corporation                                                                                                                                   July 2, 2019

---

Page 113

1
2   Q.   If you can turn to Exhibit 5,
3   which is the borrowing base certificate, of
4   October 13, 2018, and you see there -- we
5   talked about earlier, an entry for eligible
6   credit card receivables in the amount
7   54.8 million, correct?
8   A.   Correct.
9   Q.   Do you know that credit card
10  receivables and credit card deposits in
11  transit are synonymous?  Are used
12  synonymously?
13  A.   Do I know if they're used
14  synonymously?
15  Q.   Yes, sir.
16  A.   No, I do not.
17  Q.   Could you please see how your adjustment
18  double counts by approximately $10 million?
19       MR. FOX: Objection to form.
20  A.   Would you take me through that,
21  please?
22  Q.   I'm just asking, do you think you
23  have any double counting in your
24  adjustments?
25  A.   In our table 2A to our report?

---

Page 114

1
2   Q.   Well, or on page 5 of your
3   report.
4   A.   No.  Again, as aforementioned,
5   there was no definition or explanation as
6   to what Mr. Griffith utilized in his chart.
7   We were unaware as to what he was referring
8   to.
9   Q.   You're saying on section 1A, on
10  the fifth page of your report, the credit
11  cards deposit in transit of $64,279,940
12  should have been included in his analysis,
13  correct?
14  A.   Correct.
15  Q.   But did you take into account
16  that he actually included 70 million of
17  account receivables book value?
18       MR. FOX: Objection to form.
19  A.   Again, we noted that he included
20  $70 million, but there was no explanation
21  as to what that was and it was a different
22  number than what was reported by the debtor
23  for credit card deposits in transit. So
24  there was no way of affirming whether or
25  not it was one in the same.

---

Page 115

1
2   Q.   And you would agree that the
3   $64.279 million number you say he should
4   have included is approximately $10 million
5   more than the eligible credit card
6   receivables reflected in the borrowing base
7   certificate, Exhibit 5, correct?
8   A.   When comparing those two numbers,
9   yes.
10  Q.   Thank you.
11       On the sixth page of your report
12  you assert that Mr. Griffith applies a,
13  "deeply discounted liquidation basis with
14  net recovery of 85 percent at cost."
15       Do you see that?
16  A.   I do.
17  Q.   Do you disagree that 85 percent
18  represents the fair market value of the
19  collateral?
20  A.   I disagree.
21  Q.   Do you think it has ever
22  represented the fair market value of the
23  collateral?
24       MR. FOX: Objection to form.
25  What period of time?

---

Page 116

1
2       MR. GENDER: Ever.
3   A.   I have -- has it ever reflected
4   the fair market value of the inventory?  I
5   have no basis to answer that question.
6   Q.   Have you reviewed the APA?
7   A.   I have not.
8   Q.   You do understand there is an
9   APA?
10  A.   I do.
11  Q.   Do you understand that in the APA
12  there was a requirement that ESL was to
13  deliver at closing an amount of cash that
14  was approximately $1.48 billion for
15  inventory, credit card accounts receivable,
16  and pharmacy receivables?
17       MR. FOX: Objection to form.  And
18  objection.  There is no foundation.
19  The document speaks for itself.  If you
20  want to ask him about the document, put
21  the document in front of him.
22       BY MR. GENDER:
23  Q.   Can you answer my question?
24  A.   I under -- what I did understand
25  was that there was a $1.408 billion cash

---

Page 117

1
2  payment as part of the currency to pay the
3  $5.2 billion sale price.
4      It is not my understanding that
5  that was attributed to any specific
6  collateral.
7  Q.  Are you aware that in the APA the
8  debtors were required to deliver an
9  aggregate of $1.657 billion in aggregate
10  inventory, credit card accounts receivable,
11  and pharmacy receivables?
12      MR. FOX: Objection to form.
13  BY MR. GENENDER:
14  Q.  Were you aware of that?
15      MR. FOX: Objection to form.  The
16  document speaks for itself.
17  A.  I am aware of that.
18  Q.  To the extent you don't enjoy the
19  next line of questioning, you can blame the
20  guy to your left -- your right, I should
21  say.  My left; your right.
22      (Henrich Exhibit 9, Asset
23  Purchase Agreement dated as of 1/17/19
24  by and among Transform Holdco LLC,
25  Sears Holdings Corporation and its

Page 118

1
2  subsidiaries party hereto, not
3  Bates-stamped, marked for
4  identification, as of this date.)
5      BY MR. GENENDER:
6  Q.  I'm handing you what's been
7  marked as Exhibit 9.
8      Is it your testimony you've never
9  seen the Asset Purchase Agreement dated as
10  of January 17, 2019, before?
11  A.  Correct.
12  Q.  Do you have any basis -- let me
13  try it this way.
14      Do you have any basis to disagree
15  that as a matter of math, the cash payment
16  of $1.408 billion under the APA, which is
17  Exhibit 9, equates to 85 percent of the
18  figure $1.657 billion that the debtors were
19  required to deliver in aggregate inventory,
20  credit card accounts receivables, and
21  pharmacy receivables?
22      MR. FOX: Objection to form.
23  There is absolutely no foundation for
24  that, and the document speaks for
25  itself.  This witness says he has never

Page 119

1
2  even seen this before.
3      BY MR. GENENDER:
4  Q.  You can answer the question.
5  A.  Apologies, I don't recall the
6  exact question.
7  Q.  That was the point of the speech.
8      MR. FOX: No, actually it wasn't.
9      MR. GENENDER: Yeah, it was.
10      MR. FOX: It was because the
11  question was objectionable in a variety
12  of ways.
13      MR. GENENDER: Just say objection
14  without interrupting the flow of the
15  deposition.  We're going to be here all
16  night if you do that.  It's okay.
17      MR. FOX: We can be here as long
18  as you want to be.
19      MR. GENENDER: Let's just object.
20  Let's limit the speaking objections and
21  let's have one person object.
22      MR. FOX: That's all we have,
23  Paul.
24      MR. GENENDER: No, you've got
25  multiple.

Page 120

1
2      MR. PARADISE: I have not
3  objected a single time on the record.
4      MR. FOX: Paul, don't go there.
5      MR. GENENDER: Well, I'm hearing
6  multiple people.
7      MR. FOX: Why don't we take a
8  break.
9      MR. GENENDER: No, actually I
10  would like to finish the question that
11  you interrupted.
12      MR. FOX: There is no question
13  pending.
14      MR. GENENDER: There was.  He
15  asked me to repeat the question.
16      MR. FOX: Okay.
17      BY MR. GENENDER:
18  Q.  Page 51 of Exhibit 9.  Tell me
19  when you're there.
20  A.  I have turned to page 51.
21  Q.  All right.  Do you see the
22  reference to the cash payment of
23  $1.408 billion?  $1,408,450,000, do you see
24  that reference in Section 3.1A?
25  A.  I do.

Page 121

```
 1
 2   Q.  Can you turn to page 102 of the
 3   document.
 4       (Witness complies.)
 5   Q.  Do you see section 10.9?
 6   A.  I do.
 7   Q.  Do you see that there is
 8   reference there to an obligation on the
 9   part of the seller, the debtors, to deliver
10   1.657 of acquired inventory, credit card
11   receivables, and pharmacy receivables?
12       MR. FOX: Objection to form.
13   A.  I do.
14   Q.  Thank you.
15       As a matter of math, would you
16   have any basis to disagree that
17   1.408 billion divided by 1.657 billion is
18   85 percent?
19       MR. FOX: Objection to form.
20   A.  I haven't done the math.  As a
21   matter of math it seems approximately
22   correct, but again, there is no attribution
23   of the cash to any specific collateral
24   that's to be transferred.  Nor does that
25   valuation inform what the value of the
```

Page 122

```
 1
 2   collateral was as of the petition date.
 3   And I also --
 4   Q.  So let me --
 5       MR. FOX: He's not done.
 6   A.  It also ignores that there was a
 7   credit bid of 433 million specifically for
 8   the inventory, in addition to whatever cash
 9   payment which does not have any attribution
10   to any specific collateral.
11       MR. GENENDER: I'm going to
12   object to everything after "as a matter
13   of math it seems approximately
14   correct."  Everything after that is
15   nonresponsive and I move to strike.
16       BY MR. GENENDER:
17   Q.  So Mr. Henrich, here is my
18   question: You've prepared your report in
19   this case without reviewing the APA, which
20   is Exhibit 9, correct?
21   A.  Correct.
22   Q.  And you've prepared your report
23   without relying upon the valuation, implied
24   or otherwise, of the inventory reflected in
25   Exhibit 9, correct?
```

Page 123

```
 1
 2       MR. FOX: Objection to form.
 3   There is absolutely no foundation for
 4   the question.
 5   A.  There's no valuation of the
 6   collateral as of the petition date and the
 7   sale document four months later.
 8   Q.  I didn't say there was a
 9   valuation as of the petition date.
10       You're offering your opinions in
11   this proceeding without considering any
12   implied valuation of the inventory as of
13   the sale date as may be determined from the
14   Asset Purchase Agreement, which is
15   Exhibit 9, correct?
16   A.  Correct.
17   Q.  Thank you.
18       Now would you agree as a general
19   proposition that inventory in Going-Concern
20   stores would be more valuable and yield
21   more of a return than inventory in
22   going-out-of-business stores?
23   A.  I would agree with that.
24   Q.  Thank you.
25       You understand that the stores
```

Page 124

```
 1
 2   that were purchased in connection with the
 3   APA, when substantially all the assets were
 4   purchased, were stores that were not GOB
 5   stores?
 6   A.  Correct.  I agree with that.
 7   Q.  They were Go-Forward stores?
 8   A.  Yes.
 9   Q.  The net recovery for inventory
10   that you computed, whether it's
11   96.4 percent or whether it might become
12   95.6 percent does not include corporate
13   overhead, correct?
14       MR. FOX: Objection to form.
15   A.  Correct.
16   Q.  It doesn't include bankruptcy
17   expenses or administrative claims, correct?
18   A.  You said "does it" and then you
19   said "correct" so -- is there another
20   question?  I didn't quite understand.
21   Q.  You misheard and I appreciate the
22   clarification.
23       It doesn't, does not, include
24   bankruptcy expenses or administrative
25   claims, correct?
```

Page 125

```
 1
 2        MR. FOX: Objection to form.
 3   A.   Correct.
 4   Q.   The sixth page of text of your
 5   report, sub letter C.
 6   A.   May I put this to the side?
 7   Q.   Sure.
 8        The third sentence, are you
 9   there?
10   A.   C.
11   Q.   Third sentence, it says, "The
12   debtors reported actual net recovery for
13   inventory of 96.4 percent cost."
14        Do you see that?
15   A.   I do.
16   Q.   That's not something the debtors
17   reported, did they?
18        That is a reference to Exhibit 5
19   to your report that we determined -- I
20   think you said you understood was provided
21   by ESL?
22   A.   Correct.
23   Q.   That same paragraph, going down,
24   you have a sentence that starts, "In my
25   opinion, based on the performance of the
```

Page 126

```
 1
 2   262 GOB stores, it is reasonable to assume
 3   that if all remaining stores were
 4   liquidated in the same time frame as the
 5   262 stores, they would have achieved
 6   comparable results."
 7        Do you see that?
 8   A.   I do.
 9   Q.   Did I read that correctly?
10   A.   You did.
11   Q.   So how many additional stores are
12   you referring to that would have been --
13   that could have been liquidated in the same
14   time frame as the 262 stores?
15   A.   I believe there were 425
16   Go-Forward stores.
17   Q.   If there were approximately 700
18   stores being liquidated instead of 262
19   stores being liquidated, couldn't that have
20   flooded the market and decreased the return
21   on the inventory?
22        MR. FOX: Objection to form.
23   Q.   Is that possible?
24   A.   I don't see it as flooding the
25   market.  It depends how you define the
```

Page 127

```
 1
 2   market.  Each individual store has its own
 3   market.  It serves a density of population
 4   and a specific geographic reach area.
 5        So to the effect that you
 6   liquidated stores in California, that's not
 7   going to -- or elsewhere in the west,
 8   that's not going to affect the stores and
 9   the liquidation results in the east.
10        I mean, there were 262 stores
11   around the country that were -- which are
12   obviously a considerable amount, that were
13   liquidated and achieved the results of
14   whether with it's 96.4 or 95.6.
15   Q.   Or those numbers less corporate
16   overhead, administrative expenses, and
17   bankruptcy expenses?
18        MR. FOX: Objection to form.
19   A.   Yes.
20   Q.   You understand that the 262 GOB
21   stores were actually -- those GOB sales
22   happened in a staggered manner, correct?
23   A.   Yes.
24   Q.   It's possible that the return --
25   the results could have been worse if more
```

Page 128

```
 1
 2   stores were liquidated, correct?  You don't
 3   know?
 4        MR. FOX: Objection to form.
 5   A.   Anything is possible.  The
 6   experience of the company was to achieve in
 7   the mid '90s and at all these different
 8   stages.  I think it's also equally
 9   reasonable to assume that you would have
10   comparable results.
11   Q.   Notwithstanding what ESL and
12   you offer your conclusion where you say,
13   "Accordingly, I have adjusted Griffith's
14   analysis on Exhibit 3 with an add-back
15   adjustment of $306.8 million."
16        Do you see that?
17   A.   I do.
18   Q.   And you did that without taking
19   into effect what ESL paid for the inventory
20   in the Go-Forward stores as reflected in
21   the APA, correct?
22        MR. FOX: Objection to form.
23   A.   Two disagreements with that.
24        One, is I disagree with the
25   premise that they paid 85 percent for the
```

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 316 of 468

High-Confidential

In Re:
Sears Holdings Corporation

William H. Henrich
July 2, 2019

Page 129

```
 1
 2   inventory.  Again, based on what we
 3   discussed before, the payment is not
 4   specifically attributable to the inventory,
 5   and even if it was, you should be adding
 6   the credit bid amount so it would be much
 7   higher than 85 percent.
 8       But beyond that, we actually --
 9   the calculation of the 306.8 is an
10   adjustment based off of the 85 percent.  So
11   it was the difference between the 96.4 and
12   the 85, multiplied by the inventory in
13   those stores.
14  Q.   So you're taking the view that
15   the difference between the 96.4 percent and
16   the 85 percent is $306.8 million?
17  A.   Again --
18  Q.   Is that what you're saying?
19  A.   Please repeat the question.
20  Q.   Are you saying the difference
21   between 96.4 percent recovery on the
22   inventory versus 85 percent recovery on the
23   inventory is $306.8 million?
24  A.   The 11 point -- the 11.4 percent
25   times -- multiplied by Griffith's book
```

Page 130

```
 1
 2   value of the inventory.
 3  Q.   If all those inventory would be
 4   liquidated, additional inventory were to be
 5   liquidated, wouldn't there be additional
 6   expenses incurred associated with the same?
 7  A.   Well, those recovery rates take
 8   into account the direct selling costs or
 9   the GOB expenses because the recovery rates
10   are net of those expenses.
11  Q.   But they're not net of corporate
12   overhead, correct?
13  A.   Correct.
14  Q.   They're not net of bankruptcy
15   expenses, correct?
16  A.   Correct.
17  Q.   And they're not net of
18   administrative claims, correct?
19  A.   Correct.
20  Q.   Could the 363 sale to ESL have
21   been consummated without the debtors
22   incurring bankruptcy or administrative
23   expenses?
24       MR. FOX: Objection to form.
25  A.   By definition, you wouldn't have
```

Page 131

```
 1
 2   a 363 sale outside of the context of a
 3   bankruptcy, so therefore bankruptcy
 4   expenses would be incurred.  It doesn't
 5   necessarily follow that all bankruptcy
 6   expenses are directly related to the
 7   collateral.
 8  Q.   Could the Going-Concern sale have
 9   been consummated without the company
10   incurring corporate overhead during the
11   pendency of the sale?
12  A.   It would have incurred corporate
13   overhead.
14  Q.   Thank you.
15       You can see that corporate
16   expenses have helped to preserve collateral
17   value are a component of 506(c) surcharges,
18   correct?
19       MR. FOX: Objection to form.
20  A.   We can see that corporate
21   overhead expenses are appropriate to
22   consider when determining what the net
23   value of the collateral is.
24       Whether they're 506(c) expenses
25   or not is a different issue.
```

Page 132

```
 1
 2  Q.   Page 4 of your report, under the
 3   first main bullet, second sentence.
 4  A.   I'm sorry, what page?
 5  Q.   Page 4.
 6       Under the first main bullet, do
 7   you see where you state, "Corporate
 8   expenses that help to preserve the
 9   collateral value are a component of 506(c)
10   expenses"?
11  A.   Yep.
12  Q.   Do you stand by that statement?
13  A.   I do.
14  Q.   And you include $206.7 million of
15   506(c) expenses in your analysis, correct?
16  A.   Of corporate overhead and
17   professional fees, right.
18  Q.   Which you view those as
19   comprising 506(c) expenses, correct?
20  A.   Correct.
21  Q.   Thank you.
22       You adopt the Tiger liquidation
23   number of 3.1 percent of inventory costs to
24   calculate liquidation expense of
25   $83.4 million; is that correct?
```

```
 1
 2       MR. FOX: Objection.
 3  A.  Would you repeat the question
 4  please.
 5  Q.  Let's look at your report.
 6  A.  I think that was off.  We applied
 7  the 3.1 percent.
 8       MR. FOX: Wait.  There is no
 9  question.
10       BY MR. GENENDER:
11  Q.  Go ahead.  Continue -- were you
12  answering my question?
13  A.  I asked you to repeat the
14  question first, please.
15  Q.  Do you use a Tiger liquidation
16  number of 3.1 percent of inventory costs?
17       MR. FOX: Objection to form.  For
18  what purpose?
19       BY MR. GENENDER:
20  Q.  Do you use a --
21  A.  Do we use it --
22  Q.  Yes.  Is it in your report?  Do
23  you use it?
24  A.  Yes.
25  Q.  Show me in your report where you
```

```
 1
 2  refer to it, please.
 3       (Document review.)
 4  A.  So it would be easiest to show
 5  you on Exhibit 2A.
 6  Q.  Yes.  Sure.  I'm there.
 7  A.  Okay.  Where we derive corporate
 8  expense for the liquidated stores, the GOB
 9  stores?
10  Q.  Yes.
11  A.  The 20.2 million is derived by
12  the 3.1 percent times the GOB liquidation
13  inventory at cost.  In this case that's the
14  651.6 number.
15  Q.  Okay.
16       (Document review.)
17  Q.  Have you done any analysis to
18  determine the expenses incurred by the
19  debtors net of GOB expenses and
20  professional fees between December 2nd when
21  ESL made its first bid and when the sale
22  closed on February 11th, 2019?
23  A.  No.
24  Q.  Have you done an analysis of what
25  the debtors spent between January 17th,
```

```
 1
 2  2019, the date of the APA, and February
 3  11th, the date when the sale closed net of
 4  GOB expenses and professional fees?
 5  A.  No.
 6  Q.  Do you have any understanding as
 7  to whether there are ordinary course
 8  provisions in the APA?
 9       MR. FOX: Objection to form.
10  A.  No.
11  Q.  Are you aware that as a condition
12  precedent to the APA, the debtor was
13  required to deliver a threshold amount of
14  inventory, credit card receivables, and
15  pharmacy receivables?
16       MR. FOX: Objection to form.  The
17  document speaks for itself.
18  A.  Yes.
19  Q.  Do you have -- as you sit here
20  today, do you have any basis to contest the
21  reasonableness of expenses incurred by the
22  debtors between February -- I'm sorry,
23  between January 17th, 2019, and
24  February 11th, 2019, net of GOB expenses
25  and professional fees?
```

```
 1
 2  A.  I haven't done an analysis.  I
 3  haven't seen any documents.  So as I sit
 4  here today, I don't have a basis to either
 5  affirm or contradict.
 6  Q.  Let me ask you the same question.
 7  Instead of asking you whether they were
 8  reasonable, I'm going to ask you if they
 9  were net -- to dispute the necessity of
10  those same expenses?
11       MR. FOX: Objection.
12       BY MR. GENENDER:
13  Q.  Any basis to refute the necessity
14  of those expenses?
15       MR. FOX: Objection to form.
16  A.  I would say is it reasonable to
17  expect that in the context of a bankruptcy
18  that there are expenses to be incurred?
19  Yes.
20       Can I opine on whether or not the
21  amount actually expended or incurred was
22  reasonable?  I have no basis to gauge that.
23  Q.  Have you reviewed the debtors'
24  filings from last Thursday, June 27th?
25  A.  Are you referring to the -- what
```

---

Page 137

1
2  are you referring to go?
3  Q.  The filings in connection with
4  the 507(b) motion.  In particular have you
5  reviewed the supplemental declaration of
6  Mr. Griffith?
7  A.  I have reviewed the supplemental
8  declaration.
9  Q.  Okay.  Have you done any work in
10  connection with responding to the
11  supplemental declaration of Mr. Griffith?
12  A.  No.
13  Q.  Do you intend to?
14      MR. FOX: Objection.
15  A.  I don't know whether I will or
16  won't.
17  Q.  Is it your opinion the 2Ls were
18  fully secured as of petition date?
19  A.  Yes.
20  Q.  And that opinion is based at
21  least in part on the fact that there was
22  $116.2 million of cash available to the
23  2Ls, correct?
24      MR. FOX: Objection to form.
25  A.  That the 116 -- that's incorrect

Page 138

1
2  the way it's stated.
3  Q.  That they would benefit from the
4  fact that there were $116.2 million cash
5  available to the 1Ls?
6  A.  Correct.
7  Q.  And that the 2Ls will benefit of
8  there being $72.8 million of pharmacy
9  scripts available, correct?
10  A.  Correct.
11  Q.  And that there would be
12  $14.9 million of pharmacy receivables
13  available, correct?
14      The numbers are from your
15  schedule 2A.  It's your testimony.  I'm
16  sorry, 14.5.
17  A.  I thought the number was slightly
18  different.  That's why I hesitated.
19  Q.  Absolutely.  You should.  It's
20  your testimony and that's why I'm happy --
21  it's 14.5, okay.  Is that correct?
22  A.  Correct.
23  Q.  And it's based on using an
24  inventory number that does not reflect
25  subtracting ineligible inventory as

Page 139

1
2  reflected in the borrowing base, correct?
3  A.  Correct.
4  Q.  And it's based on an assumption
5  that the letters of credit are not drawn,
6  correct?
7      MR. FOX: Objection to form.  You
8  already asked these questions.
9  A.  Correct.
10  Q.  And does your opinion take into
11  account the accrued interest to which the
12  first lienholders would be entitled through
13  the pendency of the case?
14  A.  It does not.
15  Q.  Have you done that calculation?
16  A.  I have not.
17  Q.  Are you aware that Mr. Griffith
18  did that calculation?
19  A.  I recall that it was a line item
20  or an element of his chart.
21  Q.  Of approximately $34 million?
22  Does that sound familiar?
23  A.  I don't recall whether it was 34
24  or 31, but approximately.
25  Q.  Fair enough.

Page 140

1
2      It is whatever he said in his
3  declaration, right?
4      MR. FOX: Objection.
5  A.  That's what he stated it was.
6  Q.  But that was the not something
7  you included in your number, is it?
8  A.  It is not.
9  Q.  Why don't we take a short
10  break -- or take a break.
11      (Recess is taken.)
12      BY MR. GENENDER:
13  Q.  I will pass the witness.
14      MR. FOX: Does anybody else have
15  any questions?
16      MR. LIUBICIC: No questions.
17  EXAMINATION BY
18      MR. FOX:
19  Q.  I do.  Very briefly.
20      Mr. Henrich, let's take a look at
21  Exhibits 2 and 3.  Now you said that in
22  order to calculate in Exhibit 2 the net
23  recovery percentage of 96.4 percent, you
24  divided the going-out-of-business sales
25  number total at the bottom of the page by

Page 141

```
 1
 2   the cost of goods -- the number at the
 3   bottom of the column "Cost of goods sold,"
 4   plus the "going-out-of-business expense"
 5   number at the bottom of that column,
 6   correct?
 7       MR. GENENDER: Objection to the
 8   form.
 9       BY MR. FOX:
10   Q.  Did I get that right?
11       MR. GENENDER: Objection.
12   Leading.  And objection to form.
13   A.  Answer?
14   Q.  Well, yeah, go ahead.  You can
15   answer.
16       MR. GENENDER: Same objections.
17   A.  The column headings are slightly
18   different but your concept was accurate.
19       What I described at the outset of
20   the deposition or somewhere near the
21   beginning is that the net recovery
22   percentage is -- the calculation is the GOB
23   sales total, as the numerator, divided by
24   the sum of the total in the column "Goods
25   available at cost," plus the total in the
```

Page 142

```
 1
 2   column entitled:  "Total GOB expenses."
 3   Q.  And when you calculated those
 4   amounts in Exhibit 2, the net recovery
 5   percentage, in total, was what?
 6       MR. GENENDER: Objection.
 7   Leading.  Misstates the evidence in a
 8   major -- he didn't calculate it.  It's
 9   really bad.
10       BY MR. FOX:
11   Q.  When you calculated it today.
12       MR. GENENDER: Objection.
13   Misstates the testimony.  Leading.
14       BY MR. FOX:
15   Q.  Mr. Henrich, did you calculate
16   the net recovery percentage today of 96.4
17   percent in your testimony?
18   A.  I don't recall whether I
19   calculated it today, but I have calculated
20   it previously and derived the 96.4.
21   Q.  Okay.  Now looking at Exhibit 3
22   and using -- doing the exact same
23   calculation on Exhibit 3 using the totals
24   for going-out-of-business sales, goods
25   available at cost, and total GOB expenses,
```

Page 143

```
 1
 2   using your calculator, please calculate the
 3   net recovery percentage for Exhibit 3 doing
 4   it the exact way you calculated it for
 5   Exhibit 2.
 6       MR. GENENDER: Objection.
 7   Misstates the testimony in a
 8   misleading -- intentionally misleading
 9   manner.
10       BY MR. FOX:
11   Q.  Go ahead.  You can --
12   A.  May I use a piece of paper also?
13   Just to jot down the denominator.  This is
14   not an HP.  So...
15       (Witness calculating.)
16   A.  It actually equates to
17   96.4 percent.
18   Q.  So when you calculate the net
19   recovery percentage using the numbers on
20   Exhibit 3 in the same way that the net
21   recovery percentage was calculated on
22   Exhibit 2, are you saying you get the exact
23   same net recovery percentage on Exhibit 3
24   as it is shown on Exhibit 2?
25       MR. GENENDER: Objection.
```

Page 144

```
 1
 2   Leading.  Move to strike.
 3   A.  When I calculated in the same
 4   manner, the net recovery percentage on
 5   Exhibit 3 as I did in Exhibit 2, I ended up
 6   with the same 96.4 percent net recovery,
 7   not the 95.6 percent that's depicted on the
 8   chart.
 9       MR. FOX: Thank you.  I have
10   nothing further.
11       MR. FOX: Anything else, Counsel?
12       MR. GENENDER: No.
13       MR. FOX: You don't?
14       (Continued on following page to
15   include jurat.)
16
17
18
19
20
21
22
23
24
25
```

Page 145

1
2      MR. GENENDER: No, I don't.
3      MR. FOX: Anybody else?
4      Thank you.
5      (Time noted:  3:26 p.m.)
6
7
8      _____.
9      WILLIAM H. HENRICH
10
11     Subscribed and sworn to before me
12     this    day of       2019.
13     _____
14
15
16     - o0o -
17
18
19
20
21
22
23
24
25

Page 146

1
2               C E R T I F I C A T E
3
4      STATE OF NEW YORK        )
5                              : ss.
6      COUNTY OF WESTCHESTER    )
7
8               I, ANNETTE ARLEQUIN, a Notary
9          Public within and for the State of New
10         York, do hereby certify:
11              That WILLIAM H. HENRICH, whose
12         deposition is hereinbefore set forth,
13         was duly sworn by me, and that the
14         transcript of such depositions is a
15         true record of the testimony given by
16         such witness.
17              I further certify that I am not
18         related to any of the parties to this
19         action by blood or marriage; and that I
20         am in no way interested in the outcome
21         of this matter.
22              IN WITNESS WHEREOF, I have hereunto
23         set my h              of July, 2019.
24         _____
25            ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

Page 147

1
2               I N D E X
3
4      WITNESS                          PAGE
5
6      WILLIAM H. HENRICH
7        MR. GENENDER                   7
8        MR. FOX                        140
9
10
11          I N D E X   O F   E X H I B I T S
12     DESCRIPTION                      PAGE
13
14     Henrich Exhibit 1, Exhibit J        11
       containing the Expert Report of
15     William Henrich in Connection
       with Assessment of 507(b)
16     Adequate Protection Claims
       Asserted by Wilmington Trust,
17     National Association
18     Henrich Exhibit 2, Document        35
       entitled "GOB Store Performance
19     (Post-Ch. 11 Bankruptcy Filing),
       Bates-stamped ESL_507B_00000001
20
21     Henrich Exhibit 3, Document        53
       entitled "GOB Store Performance
22     (Post-Ch. 11 Bankruptcy Filing),
       Bates-stamped ESL_507B_0000001
23
24
25

Page 148

1
2       I N D E X   O F   E X H I B I T S(Cont'd.)
3      DESCRIPTION                      PAGE
4      Henrich Exhibit 4, Tiger Asset     74
       Intelligent Report dated
5      9/28/2018, Bates-stamped
       SEARS_507B_00001287 through 1344
6
7      Henrich Exhibit 5, Borrowing Base  76
       Certificate, beginning with
8      Bates-stamp SEARS_507B_00001430
9
       Henrich Exhibit 6, Document with   84
10     Estimated Script Asset Value,
       beginning with Bates-stamp
11     SEARS_507B_00001508
12
       Henrich Exhibit 7, Declaration of  102
13     William L. Transier
14
       Henrich Exhibit 8, Declaration of  111
15     Brian J. Griffith In Support of
       the Debtors' Motion to Estimate
16     Certain 507(b) Claims for Reserve
       Purposes
17
18     Henrich Exhibit 9, Asset Purchase  117
       Agreement dated as of 1/17/19 by
19     and among Transform Holdco LLC,
       Sears Holdings Corporation and
20     its subsidiaries party hereto,
       not Bates-stamped
21
22
23
24
25

In Re:                                        Highly Confidential                        William H. Henrich
**Sears Holdings Corporation**                                                           **July 2, 2019**

Page 149

1
2      ERRATA SHEET FOR THE TRANSCRIPT OF:
3      CASE NAME: SEARS HOLDINGS
4      DATE: JULY 2, 2019
5      DEPONENT: WILLIAM H. HENRICH
6    Pg.  Ln.  Now Reads   Should Read   Reason
7     __   __  _____   _____   _____
8     __   __  _____   _____   _____
9     __   __  _____   _____   _____
10    __   __  _____   _____   _____
11    __   __  _____   _____   _____
12    __   __  _____   _____   _____
13    __   __  _____   _____   _____
14    __   __  _____   _____   _____
15    __   __  _____   _____   _____
16    __   __  _____   _____   _____
17
18       _____
19     WILLIAM H. HENRICH
20    SUBSCRIBED AND SWORN BEFORE ME
21    THIS____DAY OF_____  2019.
22
23    _____
24    (Notary Public)
25      MY COMMISSION EXPIRES:_____

# Exhibit 99

**In The Matter Of:**

*In Re Sears*
*Holdings*

---

*Marti Murray*
*July 3, 2019*
*Highly Confidential*

---



18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 324 of 468   Highly Confidential

In Re Sears
Holdings

Marti Murray
July 3, 2019

**Page 1**

```
1
2                UNITED STATES BANKRUPTCY COURT
3            FOR THE DISTRICT OF NEW YORK
4
5
6     In Re:
7     SEARS HOLDINGS CORPORATION, et al.,
8                     Debtors.
9     _____/
10      * H I G H L Y   C O N F I D E N T I A L *
11         DEPOSITION OF MARTI P. MURRAY
12            New York, New York
13          Wednesday, July 3, 2019
14
15
16
17
18
19
20
21
22
23    Reported by:
      ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
24    JOB NO. 2019-73082
25
```

**Page 2**

```
1
2
3
4
5
6                  July 3 2019
7                  12:09 p.m.
8
9          HIGHLY CONFIDENTIAL deposition of
10     MARTI P. MURRAY, held at the offices of
11     WEIL GOTSHAL & MANGES, LLP, 767 Fifth
12     Avenue, New York, New York, pursuant to
13     Notice, before Annette Arlequin, a
14     Certified Court Reporter, a Registered
15     Professional Reporter, a Certified
16     Realtime Reporter, and a Realtime
17     Systems Administrator and a Notary
18     Public of the State of New York and New
19     Jersey.
20
21
22
23
24
25
```

**Page 3**

```
1
2     A P P E A R A N C E S:
3
4     AKIN GUMP STRAUSS HAUER & FELD, LLP
5     Counsel for Unsecured Creditors
6        One Bryant Park
7        Bank of America Tower
8        New York, New York  10036
9     BY: PATRICK J. GLACKIN, ESQ.
10        Pglackin@akingump.com
11
12     WEIL GOTSHAL & MANGES, LLP
13     Counsel for Debtors and
14     Debtors-in-Possession: Sears Holdings
15      Corporation, et al.,:
16        200 Crescent Court - Suite 300
17        Dallas, Texas  75201-6950
18     BY: PAUL GENENDER, ESQ.
19        Paul.genender@weil.com
20
21
22
23
24
25
```

**Page 4**

```
1
2      A P P E A R A N C E S(Cont'd.):
3
4   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
5   Counsel for ESL Investments, Inc.
6   One Liberty Plaza
7   New York, New York  10006
8      BY: MORTON BAST, ESQ.
9   Mbast@@cgsh.com
10
11   MILBANK
12   Counsel for Cyrus Capital
13   2029 Century Park East, 33rd Floor
14   Los Angeles, California  90067-3019
15      BY: ROBERT J. LIUBICIC, ESQ.
16   Rliubicic@milbank.com
17      BY: SAM PAYNE, ESQ.
18   Spayne@milbank.com
19      BY: TOM KRELLER, ESQ.
20   Tkreller@milbank.com - (Teleconference)
21      BY: ERIC REIMER, ESQ.
22   Ereimer@milbank.com - (Teleconference)
23
24
25
```

Page 5

```
1
2   A P P E A R A N C E S(Cont'd.):
3
4   SEYFARTH SHAW
5   Counsel for Wilmington Trust, National
6    Association, as Indenture Trustee and
7    Collateral Agent
8        New York Times Building
9        620 Eighth Avenue
10       New York, New York  10018-1405
11  BY:   STEVEN PARADISE, ESQ.
12        Sparadise@seyfarth.com
13
14
15
16
17
18
19            - oOo -
20
21
22
23
24
25
```

Page 6

```
1
2   M A R T I  P.  M U R R A Y, called as a
3   witness, having been duly sworn
4   by a Notary Public, was examined
5   and testified as follows:
6     THE WITNESS: I do.
7     Marti P. Murray.
8     BY MR. GENENDER:
9   Q.  Ms. Murray, you understand you
10   are under oath?
11  A.  I do.
12  Q.  Have you given depositions
13   before?
14  A.  I have.
15  Q.  On a number of occasions?
16  A.  Yes.
17  Q.  And are you full-time now a
18   consultant in connection with restructuring
19   matters?
20  A.  I am principal with The Brattle
21   Group.
22  Q.  What do you do as a principal in
23   The Brattle Group?
24  A.  I lead teams of professionals on
25   various engagements that The Brattle Group
```

Page 7

```
1
2   has.
3   Q.  What kinds of engagements?
4   A.  They can be consulting or
5   testifying expert witness engagements or
6   other types of financial advisory
7   engagements.
8   Q.  In what areas?
9   A.  My areas of specialization are
10   valuation, solvency, fraudulent conveyance,
11   bankruptcy restructuring matters,
12   distressed debt investing, private equity,
13   and hedge funds primarily.
14     I'd also like to just state for
15   the record that I have some hearing loss,
16   and I am wearing hearing aids today, but I
17   may ask you to repeat a question if it's
18   not coming through clearly.
19  Q.  Terrific.  Thank you for raising
20   that.  And I'm actually just going to go
21   into some ground rules that are probably
22   things that you are familiar with, given
23   that you've been deposed a number of times,
24   but I think are worth stating.
25     As you just said, if you don't
```

Page 8

```
1
2   hear a question, let me know, okay?
3   A.  I will.
4   Q.  And I will try to keep my voice
5   up, okay?
6   A.  Thank you.
7   Q.  If you don't understand a
8   question that I ask you, will you let me
9   know?
10  A.  Yes.
11  Q.  If you don't let me know, am I
12   safe to assume that you have both heard and
13   understood my question?
14  A.  Okay.
15  Q.  Is that fair?
16  A.  Yes.
17  Q.  Okay.  What did you do to prepare
18   for today's deposition?
19  A.  I reviewed a number of documents.
20  Q.  Do you recall which ones you
21   reviewed?
22  A.  I reviewed my report, among other
23   things.
24  Q.  Okay.  What are the other things?
25  A.  I reviewed -- among other things,
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 326 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 9

1
2  I reviewed the Tiger appraisal.
3      I reviewed Mr. Griffith's
4  declaration.
5      I reviewed other documents as
6  well.
7  Q.  Do you recall what other
8  documents you reviewed besides the ones you
9  just enumerated?
10      MR. LIUBICIC: I'll let you
11  answer that if you reviewed other
12  documents outside the presence of
13  counsel.
14      THE WITNESS: Outside of?
15      MR. LIUBICIC: Outside of
16  presence of documents.  If you reviewed
17  other documents on your own.
18  A.  I reviewed portions of the Shulte
19  and Henrich expert reports.
20  Q.  Did you meet with counsel to
21  prepare for the deposition?
22  A.  Yes.
23  Q.  And when did you meet with
24  counsel to prepare for the deposition?
25  A.  I met with counsel in person on

Page 10

1
2  July 1st.
3  Q.  Monday of this week?
4  A.  Yes.
5  Q.  And how long did you meet?
6  A.  The day.
7  Q.  The whole day?
8  A.  Yes.  Normal workday.
9  Q.  Okay.  So eight hours?
10  A.  Approximately, yes.
11  Q.  Who was present?
12  A.  Mr. Liubicic, Mr. Payne were
13  present in person.  There were a Milbank
14  lawyer named Yelena.  There was another
15  Milbank lawyer who was present for part of
16  the time.  And then there were two Milbank
17  attorneys that were present from time to
18  time telephonically.
19  Q.  Okay.  Did you meet with your
20  lawyers other than on July 1st to prepare
21  for today's deposition?
22  A.  Telephonically.
23  Q.  And when did you do that?
24  A.  I believe it was last Friday.
25  Q.  Okay.  And how long did that

Page 11

1
2  take?
3  A.  A few hours.
4  Q.  And were you in the room with
5  anybody, any of the lawyers, or were you on
6  the phone?
7  A.  I was not in the room with the
8  lawyers.
9  Q.  Okay.  When you met with the
10  lawyers on July 1st, did you review any
11  documents that refreshed your recollection?
12  A.  Yes.
13  Q.  Which ones?
14  A.  My report, among others.
15  Q.  What are the other ones you
16  remember, if they're different than the
17  ones that you have already identified.
18  A.  I can't remember specifically.
19  Q.  When was the first time you saw
20  Mr. Schulte's report?
21  A.  After it was filed.
22  Q.  When was the first time you saw
23  Mr. Henrich's report?
24  A.  After it was filed.
25  Q.  Have you spoken to Mr. Schulte in

Page 12

1
2  connection with this case?
3  A.  No.
4  Q.  Have you spoken with Mr. Henrich
5  in connection with this case?
6  A.  No.
7  Q.  Do you know Mr. Schulte?
8  A.  No.
9  Q.  Do you know Mr. Henrich?
10  A.  I know who he is.  I don't
11  believe I've ever actually met him in
12  person.
13  Q.  When did your work in connection
14  with this case commence?
15  A.  In May.
16  Q.  Do you recall when in May?
17  A.  Mid May.
18  Q.  Are there other people at your
19  firm working on this engagement?
20  A.  Yes.
21  Q.  Who?
22  A.  Primarily Julia Zhu and Monish
23  Zaveri.
24  Q.  How much time have you spent on
25  this engagement?

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 327 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

**Page 13**

```
 1
 2   A.   Me personally?
 3   Q.   Yes.
 4   A.   Over 200 hours.
 5   Q.   Do you know how much time your
 6    colleagues have spent?
 7   A.   In total?
 8   Q.   Sure.
 9   A.   In total, we have spent in excess
10    of 750 hours.
11   Q.   Since the middle of May?
12   A.   Correct.
13   Q.   Is that between the three of you?
14   A.   There are other Brattle
15    professionals who are involved in the
16    engagement, but Julia and Monish are the
17    primary Brattle professionals.
18   Q.   Okay.  Have you testified in
19    court before?
20   A.   I have.
21   Q.   In bankruptcy court?
22   A.   Yes.
23   Q.   On how many occasions?
24   A.   In bankruptcy court?
25   Q.   Yes.
```

**Page 14**

```
 1
 2   A.   Twice.
 3   Q.   Which cases?
 4   A.   SW Boston.
 5   Q.   Okay.
 6   A.   And GSC.
 7   Q.   Which court was SW Boston?
 8   A.   Boston bankruptcy court.
 9   Q.   Do you know who the judge was?
10   A.   Judge Feeney.
11   Q.   F-e-e-n-e-y?
12   A.   I believe that's correct.
13   Q.   What about GSC?
14   A.   Judge Chapman.
15   Q.   Where?  Which court?
16   A.   Which court?
17   Q.   Yes.
18   A.   Southern -- in New York.
19   Q.   Okay.  What did you testify on in
20    SW Boston?  What was the subject matter of
21    your testimony?
22   A.   The subject matter involved the
23    claim of a secured creditor, including
24    calculation of post-petition interest due,
25    diminution in value of the secured
```

**Page 15**

```
 1
 2    creditor's collateral, and the appropriate
 3    rate of interest for a post-emergence debt
 4    security.
 5   Q.   Did you offer 507(b) testimony in
 6    SW Boston?
 7   A.   I offered an opinion about the
 8    diminution in value claim.
 9   Q.   Okay.  And what was the opinion?
10    That there was a diminution in value?
11   A.   Yes.
12   Q.   Who was your client this that
13    matter?
14   A.   Prudential.
15   Q.   Did you offer testimony in
16    connection with 506(c) in the SW Boston
17    case?
18   A.   I did not.
19   Q.   Have you ever -- prior to this
20    case, have you ever offered an opinion on
21    Section 506(c)?
22   A.   No.
23   Q.   What was the nature of your --
24    and did you prepare a report in SW Boston?
25   A.   I did.
```

**Page 16**

```
 1
 2   Q.   Was it filed?
 3   A.   Yes.
 4   Q.   And you testified live at a
 5    hearing?
 6   A.   I'm sorry?
 7   Q.   And you testified live at a
 8    hearing?
 9   A.   I did.
10   Q.   Do you recall when the hearing
11    was?
12   A.   I believe it was in 2011 or 2012,
13    that time frame.
14   Q.   And who were the lawyers
15    representing Prudential that presented you?
16   A.   Goodwin Procter.
17   Q.   Do you recall who the lead lawyer
18    was?
19   A.   Emanuel Grillo.
20   Q.   GSC, what your testimony in that
21    matter?
22   A.   The testimony had to do with --
23    it covered a few areas.  One was industry
24    custom and practice for fee rates that are
25    charged to manage a variety of investment
```

Highly Confidential

---

Page 17

1
2  products.  It also had to do with 363 asset
3  sales.
4  Q.  What in particular did it have to
5  deal with 363 asset sales?
6  A.  This was a while ago, so I'm
7  speaking about this to the best of my
8  recollection.
9  Q.  Understood.
10  A.  The issue had to do in part with
11  the rate that the -- the person who would
12  credit bid their debt to get ownership of
13  GSC, which was a money management firm, had
14  stepped into the shoes of GSC as the
15  manager, and there were issues around
16  consents that the investment clients were
17  required to give for that transaction and
18  how that all played into the 363 sale.
19  Q.  Okay.  Did any aspect of your
20  testimony in GSC have to do with 507(b),
21  diminution in value of secured collateral?
22  A.  I don't recall that.
23  Q.  Okay.  Have you ever, aside from
24  SW Boston and this engagement, have you
25  provided expert opinions on 507(b)

---

Page 18

1
2  diminution in value matters before?
3  A.  No, not as an expert.
4  Q.  So this is your second time
5  offering a diminution value opinion under
6  507(b)?
7  A.  Correct.
8  Q.  And you said not as an expert?
9  A.  Yes.
10  Q.  Have you offered opinions as a
11  fact witness on 507(b) before?
12  A.  I have been involved as an
13  investor in cases where diminution in value
14  was an issue.  And I have written articles
15  about diminution in value.
16  (Murray Exhibit 1, Expert Report
17  of Marti P. Murray dated 6/18/19,
18  marked for identification, as of this
19  date.)
20  BY MR. GENENDER:
21  Q.  I hand you what's been marked as
22  Exhibit 1 to your deposition.
23  I ask you to identify that as a
24  true and correct copy of your report in
25  this matter.

---

Page 19

1
2  A.  Yes, it appears to be my report.
3  Q.  Does your report include a
4  complete copy of your CV?
5  Does it has a complete listing of
6  your credentials and your background, to
7  your knowledge?
8  A.  Yes.
9  Q.  Does it have a complete listing
10  of your materials you've written?
11  A.  Materials I've written?
12  Q.  Yes.
13  (Document review.)
14  A.  Yes.
15  Q.  Thank you.
16  You're making your deposition
17  shorter by answering those questions that
18  way.
19  I understand there was an updated
20  list of materials reviewed.  So that might
21  be the only change that I'm aware of in
22  your report from what's in front of you as
23  Exhibit 1; is that correct?
24  A.  What are you referring to is the
25  only change?

---

Page 20

1
2  Q.  A listing of materials you
3  reviewed.  There was a -- I received a -- I
4  saw an amended list of that yesterday?
5  MR. LIUBICIC:  Correct.
6  A.  Yes.
7  Q.  Is that the only change?
8  A.  Yes.
9  Q.  So if I had that list from your
10  lawyer and put that with this report,
11  that's your entire report?
12  A.  Yes.
13  Q.  Okay.  But that changing of
14  listing of things you have reviewed,
15  doesn't change any of your opinions in this
16  case; is that correct?
17  A.  Correct.
18  Q.  Are all of your opinions
19  contained in Exhibit 1 that you intend to
20  offer in this case?
21  A.  Yes, with a qualification that
22  things may come up that I may discuss with
23  counsel that may cause me to seek to modify
24  or supplement my report.
25  Q.  Understood.

---

Page 21

1
2       As you sit here today, does
3    Exhibit 1 contain all the opinions that you
4    are offering in this case?
5    A.   As of today, yes.
6    Q.   Do you have any current plans to
7    change any of your opinions or to offer any
8    additional opinions?
9    A.   I don't have any plans as I sit
10   here today, but based on discussions with
11   counsel, I may seek to supplement or amend
12   the report.
13   Q.   Okay.  I understand that.
14       I'm just asking you, as you sit
15   here today, do you have any plans to do
16   that, if you're intending to do that?
17   A.   No, I don't have any plans as I
18   sit here today.
19   Q.   Thank you.
20       Have you spoken with anyone at
21   Cyrus in connection with your work in this
22   case?
23   A.   Yes.
24   Q.   Who have you spoken with?
25   A.   I have spoken with Svet Nikov.

---

Page 22

1
2    Q.   About what?
3    A.   About being engaged in the case.
4    Q.   What else?
5    A.   I can't recall specifically what
6    else I discussed with Svet.
7    Q.   Who engaged you in this matter?
8    A.   I was engaged by Milbank.
9    Q.   And who at Milbank was your
10   contact?
11   A.   Rob Liubicic primarily, Tom
12   Kreller and Eric Reimer.
13   Q.   Have you worked with them before?
14   A.   I have not.
15   Q.   Okay.  Do you know how they got
16   your name?
17   A.   I do not.
18   Q.   Did you ask them?
19   A.   No.
20   Q.   Are you curious?
21   A.   I spoke with Svet first, so I
22   don't know how they got my name.
23   Q.   Is Svet someone you've known for
24   a long time?
25   A.   No.

---

Page 23

1
2    Q.   Okay.  Who was the first person
3    to contact you in connection with this
4    engagement?
5    A.   Svet.
6    Q.   And do you know how he found
7    your -- how he came to contact you?
8    A.   A colleague at Cyrus.
9    Q.   Who is that colleague?
10   A.   Samir Grewal.
11   Q.   Say the last name again.
12   A.   G-r-e-w a-l.
13   Q.   Is that someone you know?
14   A.   I do.
15   Q.   And what in what context do you
16   know Samir Grewal?
17   A.   I worked with Samir in an
18   unrelated matter.
19   Q.   What matter was that?
20   A.   It's not in the public domain.
21   Q.   Okay.  It's something you don't
22   think you're allowed to talk about?
23   A.   I would be uncomfortable
24   disclosing it?  It's a matter that is
25   unrelated to Sears.

---

Page 24

1
2    Q.   Okay.  How long have you known
3    Mr. Grewal?
4    A.   A few months.
5    Q.   Okay.  So just since earlier this
6    year?
7    A.   Yes.
8    Q.   Is your other engagement with
9    Mr. Grewal still ongoing?
10   A.   It's not active at this time.
11   Q.   Is it a restructuring matter?
12   A.   It is.
13   Q.   Is it involving a filed case?
14   A.   Yes.
15   Q.   Has your retention been approved
16   by a court?
17   A.   I'm not aware that it has been
18   approved by a court.
19   Q.   Who is representing Cyrus in that
20   matter?
21   A.   Quinn Emanuel.
22   Q.   Who is the lawyer at Quinn
23   Emanuel?
24   A.   Corey Worcester.
25   Q.   How do you spell Worcester?

---

Page 25

```
1
2   A.  I believe it's W-o-r-c-e-s-t-e-r.
3   Q.  Okay.  Is it your understanding
4   that Mr. Grewal gave your name to
5   Mr. Nikov?
6   A.  That's my understanding.
7   Q.  Your other matter that you're
8   working on with Mr. Grewal, what's the --
9   what's the general nature of your work in
10  that matter?
11      Did it involve 507(b) or 506(c)?
12  A.  Just to clarify, it's not active
13  right now.
14  Q.  Okay.
15  A.  It's a valuation matter.
16  Q.  Have you spoken with any of the
17  other second lienholders in this case?
18  A.  No.
19  Q.  Do you know who they are?
20  A.  I know who one of them is.
21  Q.  Which one?
22  A.  ESL.
23  Q.  Have you read the deposition
24  transcripts of Mr. Schulte and Mr. Henrich
25  in this case?
```

Page 26

```
1
2   A.  No.
3   Q.  Do you have -- I'm just looking
4   for a "yes" or "no."
5       Do you have any understanding of
6   any matter to which either one of them
7   testified?
8   A.  No.
9   Q.  Do you hold any professional
10  licenses?
11  A.  I'm a credentialed valuation
12  analyst.
13  Q.  Do you believe you've done an
14  evaluation analysis in this case?
15  A.  Yes.
16      MR. LIUBICIC: Object to form.
17      BY MR. GENENDER:
18  Q.  Do you have any legal training?
19  A.  No.
20  Q.  Are you qualified to offer any
21  legal opinions?
22  A.  No.
23  Q.  In connection with Exhibit 1 to
24  your report, who prepared the text of the
25  report?
```

Page 27

```
1
2   A.  I did.
3   Q.  Did you write it all yourself?
4   A.  Yes.
5   Q.  And did you have help from your
6   colleagues?
7   A.  In what respect?
8   Q.  In terms of drafting the language
9   of the report.
10  A.  Minor grammatical corrections.
11  Q.  So if you look at pages 1 through
12  44 of the text, that was primarily drafted
13  by you, correct?
14  A.  Correct.
15  Q.  When did you start drafting it?
16  A.  I start drafting reports along
17  the way, so it's really hard to say.  But
18  it would have been within, I would say, in
19  terms of doing an outline and that kind of
20  thing, I would have started doing that
21  contemporaneously when I was doing my other
22  work.
23  Q.  Other work on this matter?
24  A.  On this matter, correct.
25  Q.  You've referenced that you
```

Page 28

```
1
2   reviewed Mr. Griffith's declaration in
3   connection with preparing for today,
4   correct?
5   A.  Correct.
6   Q.  Was that his declaration from
7   May 26th, 2019, that was filed in
8   connection --
9       MR. LIUBICIC: You want to put in
10  terms of the first one or the second
11  one?
12      BY MR. GENENDER:
13  Q.  Yeah, the one that was in
14  connection with the filing by the debtors
15  in May.
16  A.  I focused on the second
17  declaration.
18  Q.  The one filed on June 27th?
19  A.  The one that was filed a few days
20  ago.
21  Q.  I'll represent to you it was
22  filed on June 27th.
23      Does Mr. Griffith's declaration
24  that was filed, his supplemental
25  declaration that was filed on June 27th,
```

Page 29

1
2  does it cause you to change any of your
3  opinions that are set forth in Exhibit 1?
4  A.  No.
5  Q.  What did you focus on in that
6  declaration?
7  A.  Would you like me to go through
8  it?
9  Q.  No, I want you to go through what
10  you focused on, if anything?
11  A.  I focused on the views he
12  expressed in that declaration.
13  Q.  Which ones?
14  A.  There were a number of them.
15  Q.  Do you have any opinion -- do you
16  have any opinions to offer in response to
17  anything in Mr. Griffith's supplemental
18  declaration?
19  A.  Yes.
20  Q.  What are they?
21  A.  I would like to have the
22  declaration before me so I can go through
23  it and give you my opinions.
24  Q.  But are they opinions other than
25  what's in your Exhibit 1, your report?

Page 30

1
2  A.  No, they're responses to certain
3  statements that he made in his declaration.
4  Q.  Have you memorialized any of
5  those in writing?
6  A.  No.
7  Q.  Have you made any notes about
8  any -- in connection with reviewing
9  Mr. Griffith's supplemental declaration?
10  A.  I may have.
11  Q.  Well, I mean, it's only since
12  last Thursday.  I mean, do you know if you
13  have?
14  A.  Not for certain, no.
15  Q.  If you make notes, would you make
16  them on a piece of paper or on a computer
17  or how do you do that?
18  A.  They would be on a piece of
19  paper.
20  Q.  Have you reviewed Brandon
21  Aebersold's declaration that was filed last
22  week by the debtors?
23  A.  I looked at it, but I did not
24  study it in great detail.
25  Q.  Did you review the attachments to

Page 31

1
2  it?
3  A.  I don't recall.
4  Q.  Did you play any role in
5  preparing any briefing filed by Cyrus in
6  this proceeding, any of the legal briefs?
7  A.  No.
8  Q.  Have you reviewed any of them?
9  A.  No, not in any great detail.
10  Q.  But you had no input into the
11  briefing?
12  A.  I had no verbal or written input
13  into the briefing other than -- I mean, I
14  submitted a report.
15  Q.  Yes.
16  A.  So to the extent that my report
17  is noted in a briefing, then the report is
18  noted in a briefing.
19      But other than that, I did not --
20  Q.  Make any comments on the brief or
21  otherwise?
22  A.  No.
23  Q.  Thank you.
24      How many prior restructurings
25  have you worked on as a consultant or an

Page 32

1
2  expert, if you know?
3  A.  A number of them.
4  Q.  They're listed on pages 2 and 3
5  of your report?
6  A.  Not all of them.
7  Q.  Are there any that you're not
8  listing in paragraph 7 of your report?
9  A.  Yes.
10  Q.  Which ones?
11  A.  The ones that I feel are
12  confidential.
13  Q.  Have you worked on any
14  restructurings that were liquidations?
15  A.  As an expert?
16  Q.  Yes.  Or a consultant.
17  A.  I believe Encol was a
18  liquidation.
19  Q.  What was the nature of your work
20  in the Kmart bankruptcy?
21  A.  I was an investor in Kmart.  And
22  I can't recall whether that was a Kmart
23  bankruptcy or when it was just distressed.
24  Q.  So your report says, "I have
25  worked on matters relating to numerous

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 332 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 33

1
2  bankruptcy/insolvency proceedings including
3  but not limited to those of JSC Capital,
4  Encol, the Dolan Company, Fletcher
5  International and W Hotel and Residences."
6      Do you see that?
7  A.  Yes.
8  Q.  Have you worked as a consultant
9  or testified as an expert in any other
10  bankruptcy proceedings?
11  A.  Yes.
12  Q.  Which ones?
13  A.  The ones that I have not
14  disclosed due to confidentiality concerns.
15  Q.  Well, if it's a bankruptcy
16  proceeding, have you been retained through
17  a court-approved retention?
18  A.  No.  I've been retained as a
19  consulting expert.
20  Q.  Okay.  So these are the only
21  bankruptcy proceedings where you've been a
22  consultant or a testifying expert that,
23  where that retention is public.
24      Is that your testimony?
25  A.  No, that's not true.

Page 34

1
2  Q.  Okay.  Which other ones have you
3  been retained on where your retention is
4  public and therefore not confidential?
5  A.  The Petters bankruptcy.
6  Q.  Where is that pending?
7  A.  That is in Minnesota.
8  Q.  What else?
9  A.  What else?
10  Q.  What other bankruptcies have you
11  been retained on where the retention is
12  public, where you've been retained as a
13  consultant or as an expert?
14  A.  Where the retention is public?  I
15  can't think of any others.
16  Q.  So if you add the Petters
17  bankruptcy to the ones you listed, that is
18  a total of six bankruptcies, is that right,
19  where you served as a consultant or as an
20  expert?
21  A.  I don't think that's right.
22  Q.  Which ones am I missing?
23  A.  I'm sorry?
24  Q.  Which ones am I missing?
25  A.  You're missing a confidential

Page 35

1
2  matter.
3  Q.  But my question is of the ones
4  that are public.
5  A.  I'm sorry.  Okay.
6      Public -- you're asking me the
7  public ones?
8  Q.  Yes.
9  A.  Six.
10  Q.  Thank you.
11      How many non-public ones are
12  there?
13  A.  Three.
14  Q.  Thank you.
15      Have you prepared any exhibits in
16  connection with any of your opinions that
17  are not contained in Exhibit 1?
18  A.  No.
19  Q.  Pages 5 through 8 of your report
20  contain a summary of your opinions; is that
21  right?
22  A.  Yes.
23  Q.  Page 6, item C, you state, "The
24  2L debt collateral value as of the filing
25  date should at a minimum be valued based on

Page 36

1
2  the amount that Sears, an insolvent
3  retailer considering an orderly liquidation
4  of its business, could reasonably have
5  obtained for the collateral through
6  companywide going-out-of-business sales."
7      Did I read that correctly?
8  A.  Yes.
9  Q.  Did you consider Sears to be an
10  insolvent retailer as of the filing date?
11  A.  Yes.
12  Q.  Above that in Section B, this is
13  under paragraph 18 again, you state, "The
14  bulk of the collateral available to the 2L
15  debt was inventory.  The 2L debt collateral
16  also included cash, pharmacy prescription
17  lists, credit card receivables, and
18  pharmacy receivables."
19      Do you see that?
20  A.  Yes.
21  Q.  What is your basis for believing
22  that the 2L debt collateral, as you define
23  it there, included cash?
24  A.  It's based on my review of the
25  governing documents and discussions with

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

---

Page 37

```
1
2   counsel.
3   Q.  Which governing documents?
4   A.  The governing documents for the
5   2L debt.
6   Q.  Is it your view that the
7   governing documents for the 2L debt
8   indicate that cash is 2L debt collateral?
9   A.  Yes.
10  Q.  What is the basis for your
11  statement that pharmacy prescription lists
12  are 2L debt collateral?
13  A.  A review of the governing
14  documents for the 2L debt and discussions
15  with counsel.
16  Q.  What about for pharmacy
17  receivables, what is your basis for
18  believing that pharmacy receivables are 2L
19  debt collateral?
20  A.  A review of the governing
21  documents for the 2L debt and discussions
22  with counsel.
23  Q.  Do you have a memory of seeing in
24  any of the governing documents a reference
25  that cash, pharmacy prescription lists,
```

---

Page 38

```
1
2   pharmacy receivables are 2L debt
3   collateral?
4   A.  Yes.
5   Q.  You just flipped to a different
6   page.  What page did you flip to?
7   A.  I flipped to page 25.
8   Q.  And that's great.  If you look at
9   pages 24 and 25, I want to direct your
10  attention to paragraph 64 through 66, okay?
11      On page 24, paragraph 64 refers
12  to collateral for the prepetition ABL debt.
13      Do you see that?
14  A.  Yes.
15  Q.  Is that what is also called 1L
16  debt?
17  A.  Yes.
18  Q.  Thank you.
19      And you list -- you say, "The
20  prepetition ABL facility was secured by a
21  lien on the following categories of assets
22  belonging to the grantors."
23      Do you see that?
24  A.  Yes.
25  Q.  And you cite a Schedule 1 of a
```

---

Page 39

```
1
2   Third Amended and Restated Guaranty and
3   Collateral Agreement from July 21, 2015,
4   right?
5   A.  Right.
6   Q.  And you list a number of
7   categories as 1L, as collateral for the 1L
8   debt, correct?
9   A.  Correct.
10  Q.  Including pharmacy receivables?
11  The last line of text on page 24.
12  A.  Yes.
13  Q.  And then on page 25, you list
14  prescription lists?
15  A.  Yes.
16  Q.  Four items down.  And then six
17  items down, you list cash and cash
18  equivalents, correct?
19  A.  Yes.
20  Q.  Okay.  And then going to
21  paragraph 65 you said, "The 2L debt was
22  secured by a second lien after the
23  prepetition ABL facility in the following
24  categories of assets belonging to the
25  grantors."
```

---

Page 40

```
1
2      Did I read that correctly?
3   A.  Yes.
4   Q.  And you list five different
5   items, right?
6   A.  Yes.
7   Q.  And you cite an Amended and
8   Restated Security Agreement, page 9, dated
9   March 20, 2018, correct?
10  A.  Yes.
11  Q.  Those five items that you list as
12  security for the second lien debt do not
13  include prescription lists, do they?
14  A.  Yes, they do.
15  Q.  Where?
16  A.  Books and records relating to the
17  collateral.
18  Q.  You're referring to the fourth
19  item that says books and records related to
20  the collateral, the lower C.
21      What does that collateral refer
22  to?
23  A.  Pharmacy-related collateral.
24  Q.  Where is that shown in paragraph
25  65?
```

---

Page 41

1
2   A.   Inventory.
3   Q.   So you identify it... okay.
4        What about cash and cash
5   equivalents, where is that listed in
6   paragraph 65?
7   A.   "Proceeds, insurance claims
8   supporting obligation and products of any
9   of the above."
10  Q.   Okay.  And what about pharmacy
11  receivables?
12  A.   "Proceeds, insurance claims
13  supporting obligation and products of any
14  of the above."
15  Q.   So why did you specifically
16  enumerate pharmacy receivables,
17  prescription lists, cash and cash
18  equivalents under the 1L debt, but did not
19  specifically enumerate them under the 2L
20  debt?
21  A.   The governing documents for the
22  1L debt and the 2L debt are not drafted the
23  same.  But just because they're not drafted
24  the same does not mean that those
25  components are not included in collateral

Page 42

1
2   for the 2L debt.
3   Q.   And what is your basis for
4   believing that those three components that
5   I'm referring to -- pharmacy receivables,
6   prescription lists, and cash and cash
7   equivalents -- are actually included in the
8   2L credit agreements?
9        MR. LIUBICIC: Objection.  Asked
10  and answered.
11       BY MR. GENENDER:
12  Q.   You can answer.
13  A.   It's the same answer that I gave
14  before.
15  Q.   Are you saying -- is it your view
16  that the amended and restated security
17  agreement referenced in footnote 90 on page
18  25 of your report specifically enumerates
19  pharmacy receivables, prescription lists,
20  and cash and cash equivalents as 2L -- as
21  collateral for 2L debt?
22       MR. LIUBICIC: Objection.  Asked
23  and answered.
24  A.   My conclusion about what the
25  collateral for the 2L debt was, was based

Page 43

1
2   on my review of the governing documents and
3   discussions with counsel.
4   Q.   Were you told to assume that --
5   were you told to assume that pharmacy
6   receivables, prescription lists, and cash
7   and cash equivalents were 2L collateral?
8        (Document review.)
9   A.   I believe that I assumed that
10  cash was a product of the sale of inventory
11  and credit -- was a product of receivables
12  and inventory.  And I think that my
13  conclusion about the components of the 2L
14  collateral were based on my review of the
15  governing documents and discussions with
16  counsel.
17       I don't recall being told to
18  assume what the components were.  I had
19  discussions with counsel, and I did my own
20  work.
21  Q.   If your conclusion that cash and
22  cash equivalents, prescription lists, and
23  pharmacy receivables are not 2L collateral,
24  that would affect your opinions in this
25  case, wouldn't it?

Page 44

1
2   A.   Yes.
3   Q.   Are you aware that, by way of
4   example, Mr. Henrich testified that cash is
5   not 2L collateral?
6   A.   I don't know what Mr. Henrich
7   testified to.
8   Q.   You're not aware that he
9   testified that cash is not 2L collateral?
10       MR. PARADISE: Objection to the
11  form.
12       MR. LIUBICIC: Join.
13  A.   I'm aware of what he had -- what
14  he said in his report, but I'm not aware to
15  what he testified to.
16  Q.   Okay.  Looking at paragraph 65
17  and 66 on page 25 of your report, the last
18  two items you enumerate under 1L collateral
19  are -- refer to "all books and records
20  pertaining to the collateral and all
21  proceeds, insurance claims supporting
22  obligations and products of any of the
23  above."
24       Do you see that?
25  A.   You're in paragraph 64?

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 335 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 45

```
1
2   Q.   Yes.
3   A.   Yes.
4   Q.   Okay.  And you have similar
5   language in the last two of your enumerated
6   items under 2L debt collateral.
7       Do you see that?
8       You say "books and records
9   relating to the collateral."
10      Do you see that?
11  A.   Yes.
12  Q.   And then you say "proceeds,
13  insurance claims, supporting obligations
14  and products of any of the above."
15      Do you see that?
16  A.   Yes.
17  Q.   So you just testified that in
18  your view, pharmacy receivables,
19  prescription lists, and cash and cash
20  equivalents fall under the last two items
21  of 2L debt collateral that you list in
22  paragraph 65.
23      Is that your testimony?
24      MR. LIUBICIC: Objection.
25  Mischaracterizes testimony.  Compound.
```

Page 46

```
1
2   A.   Maybe you can break it down --
3   Q.   You want me to break it down?
4   A.   -- by category.
5   Q.   You want me to break it down?
6   A.   Yes, please.
7   Q.   Did you testify that prescription
8   lists are included in the last two items
9   that you identify in paragraph 65?
10  A.   Yes.
11  Q.   Is it your view that cash and
12  cash equivalents are included in those same
13  two categories in paragraph 65?
14  A.   Yes.
15  Q.   And what about pharmacy
16  receivables?
17  A.   Yes.
18  Q.   Do you think those three
19  categories, pharmacy receivables,
20  prescription lists, and cash and cash
21  equivalents, are also included in the last
22  two categories in paragraph 64?
23  A.   Can you repeat the question,
24  please?
25  Q.   Do you think those three
```

Page 47

```
1
2   categories, being pharmacy receivables,
3   prescription lists, and cash and cash
4   equivalents are also included in the last
5   two categories you delineate in paragraph
6   64?
7   A.   No, the language is drafted
8   differently in the two different governing
9   documents.
10  Q.   So is it your view -- but you're
11  testifying that the 2L collateral governing
12  documents specifically refer to credit
13  card, accounts receivable, inventory and
14  related documents and chattel paper?  Is
15  that what you're saying?
16  A.   I'm sorry, we're talking about
17  the 2L debt now?
18  Q.   Yes.
19  A.   So what was your question?
20  Q.   Is it your testimony that the 2L
21  Amended and Restated Security Agreement
22  that you referred to in paragraph -- in
23  footnote 90 specifically refers to credit
24  cards, credit card accounts receivables?
25      MR. LIUBICIC: Object to the
```

Page 48

```
1
2   form.
3   A.   Yes.
4   Q.   Does it specifically refer to
5   chattel paper?
6   A.   Yes.
7   Q.   Does it specifically use the
8   word --  refer to prescription lists?
9       MR. LIUBICIC: Object to form.
10  A.   It refers to books and records
11  relating to the collateral.
12  Q.   That's not my question.
13      Does it specifically refer to
14  prescription lists?
15  A.   It does not have the word -- as I
16  recall it, it does not have those words in
17  the language.
18  Q.   Does it specifically refer to
19  pharmacy receivables?
20  A.   No.
21  Q.   Does it specifically refer to
22  cash and cash equivalents?
23  A.   It refers to proceeds and
24  products of any of the above.
25  Q.   Does it specifically refer to
```

Page 49

1
2   cash and cash equivalents?
3   A.  It does not -- as I recall, it
4   does not use the words "cash and cash
5   equivalents," but that doesn't mean it
6   doesn't specifically refer to the proceeds
7   from the sale of collateral.
8        MR. GENENDER: I'm going to
9   object to everything after "cash
10  equivalents" as nonresponsive.
11       Thank you.
12       THE WITNESS: Could we take a
13  short break?
14       MR. GENENDER: Certainly.
15       THE WITNESS: Thank you.
16       (Recess is taken.)
17  BY MR. GENENDER:
18  Q.  Ms. Murray, you understand that
19  you're still under oath?
20  A.  I do.
21  Q.  Great.
22       Your report refers to a
23  declaration by Rob Riecker; is that right?
24  A.  Yes.
25  Q.  And you understand that's a

Page 50

1
2   declaration that's not referenced in any of
3   the debtors' papers in connection with
4   507(b) or the 506(c) surcharge claim,
5   correct?
6   A.  I'm not aware that I've seen the
7   debtor referenced them, but I don't know
8   that the debtor has not referenced them.
9   Q.  Okay.  Are you aware that there
10  were equity bids for the collateral at
11  issue in this case -- for some of the
12  collateral at issue in this case?
13  A.  Yes.
14  Q.  Do you know what percentage those
15  equity bids were?
16  A.  I believe -- I have some general
17  idea of the equity bids.
18  Q.  What is that?
19  A.  My understanding of the equity
20  bids is that there was a percentage number
21  that was guaranteed after which a fee was
22  paid to the bidder, the equity bidder.  And
23  then after that, there was a sharing
24  arrangement on proceeds in excess of the
25  guaranteed amount and the fee amount.

Page 51

1
2   Q.  What did the percentage come out
3   to, do you know?
4   A.  I can't recall the exact
5   percentage.  I think it's referenced
6   somewhere in the report or in the Griffith
7   declaration.
8   Q.  In the Griffith declaration, yes,
9   but it's not referenced in -- the
10  percentage isn't referenced in your report,
11  is it?
12       (Document review.)
13  Q.  Paragraph 18-J on page 7 of your
14  report does not refer to the equity bid,
15  does it?
16  A.  Let me look.
17  Q.  Please.
18  A.  18-J refers to the Tiger
19  appraisals.
20  Q.  It doesn't refer to the equity
21  bids, does it?
22  A.  Which equity bids are you
23  referring to?
24  Q.  The ones referred to in
25  Mr. Griffith -- that Mr. Griffith refers

Page 52

1
2   to.
3   A.  Okay.  So let me look through my
4   report.
5   Q.  Sure.
6        (Document review.)
7   A.  They are referenced in my report.
8   Q.  Where are you looking?
9   A.  The first -- well, one of the
10  references that I see is paragraph 57.
11  Q.  Okay.  What else?
12       (Document review.)
13  A.  I can't recall whether -- in
14  paragraphs... let's see.
15       (Document review.)
16  A.  In 85 and 86, I make reference to
17  wind down analyses that were done in
18  January of 2019.  And I can't recall
19  whether those wind down analyses also
20  included reference to those equity bids.
21       The debtor ultimately determined
22  that the best way to maximize the value of
23  the remaining inventory was to proceed on
24  an advisory basis, including with Abacus to
25  liquidate that inventory.

Page 53

1
2  Q.  For the GOB stores?
3  A.  For the GOB stores, but also for
4  the purpose of doing the companywide
5  orderly wind down business plan.
6  Q.  You understand that the
7  company -- that substantially -- all or
8  substantially all of the assets of Sears
9  were sold in a going-concern sale that
10  closed on February 11th, 2019, correct?
11  A.  Can you repeat that?
12  Q.  Have you reviewed the APA in this
13  case?
14  A.  Are you asking me the first one
15  or the second question?
16  Q.  I'm asking you that question.
17      Have you reviewed the APA, the
18  Asset Purchase Agreement?
19  A.  I recall that I looked at the
20  APA.
21  Q.  Have you relied upon it in
22  forming any of your opinions in this case?
23      (Document review.)
24  A.  I refer to it in paragraph 58 of
25  the report, and I talk about the assets

Page 54

1
2  that were acquired by Transform.
3  Q.  That wasn't my question, though.
4      My question is, have you relied
5  upon the APA in forming any of your
6  opinions in this case?
7  A.  Well, to the extent that my
8  report is my opinion, then, I have relied
9  on it.  And it is footnoted in the report
10  at footnote 81 and maybe at other places as
11  well.
12  Q.  Would you agree that you valued
13  the 2L collateral using an NOLV
14  methodology?
15  A.  I present the value of the
16  collateral using an NOLV methodology, as
17  well as relying on management's valuation
18  of the collateral as of the petition date.
19  Q.  That's the Riecker declaration
20  that you referred to?
21  A.  The Riecker declaration and the
22  supporting materials that we received.
23      (Murray Exhibit 2, Tiger Asset
24  Intelligent Sears Holdings Corporation
25  Inventory Appraisal, Bates-stamped

Page 55

1
2  SEARS_507b_00001287 through 1344,
3  marked for identification, as of this
4  date.)
5      BY MR. GENENDER:
6  Q.  Let me hand you what's been
7  marked as Exhibit 2.
8      Do you recognize that as the
9  Tiger appraisal effective as of an
10  inventory date of October 6th, 2018?
11  A.  Yes.
12  Q.  That is a document that you
13  relied upon in preparing your report?
14  A.  Yes.
15  Q.  You cite the Tiger appraisal in
16  your report.  On page 34, paragraph 91, you
17  say, "The Tiger inventory appraisals cited
18  Sears scripts as a potential source of
19  value."
20      Do you see that?
21  A.  Yes.
22  Q.  And this is under a section of
23  your report where you're talking about the
24  valuation of the 2L debt collateral as of
25  the filing date.

Page 56

1
2      That is the heading on page 27 of
3  your report, correct?
4  A.  Correct.
5  Q.  Tiger inventory appraisals do not
6  list Sears's scripts as second lien
7  collateral, does it?
8  A.  I'm sorry, I missed the end of
9  the question.
10  Q.  The Tiger appraisal, which is
11  Exhibit 2, does not cite or list Sears's
12  scripts as second lien collateral, does it?
13      MR. LIUBICIC: Objection.  Lack
14  of foundation.
15  A.  The Tiger inventory appraisal
16  doesn't, to my recollection, doesn't list
17  anything as specifically second lien
18  collateral.
19  Q.  Thank you.
20      So to answer my question, the
21  Tiger inventory appraisal does not list
22  Sears's scripts as second lien collateral,
23  does it?
24  A.  No --
25  Q.  Thank you.

In Re Sears
Holdings

Marti Murray
July 3, 2019

---

Page 57

1
2  A.   -- not specifically, because it
3  doesn't list any second lien collateral
4  specifically.
5       MR. GENENDER: I'm going to
6  object everything after "no" as
7  nonresponsive and move to strike it.
8       BY MR. GENENDER:
9  Q.   You cite the Tiger appraisal in
10  paragraph 91 under "Sears's scripts."
11      Do you see that?
12  A.   Yes.
13  Q.   And then you cite a different
14  document to support that, in your view,
15  "the debtors have represented that the
16  value of the scripts as of the filing date
17  is $72.8 million based 140 stores and
18  pharmacies."
19      Do you see that?
20  A.   Yes.
21      (Murray Exhibit 3, Document with
22  Estimated Script Asset Value, not
23  Bates-stamped, marked for
24  identification, as of this date.)
25      BY MR. GENENDER:

---

Page 58

1
2  Q.   And you cite what I'm handing you
3  as Exhibit 3, as support for that; is that
4  right?
5       (Document review.)
6  A.   Yes.
7  Q.   Is Exhibit 3 dated?
8  A.   No.
9  Q.   Does the Tiger appraisal report
10  speak to the value of the scripts?
11      MR. LIUBICIC: That was a
12  question?
13      MR. GENENDER: Yes.
14      MR. LIUBICIC: Asked and
15  answered.
16      (Document review.)
17  A.   Can you repeat the question?
18  Q.   Does the Tiger appraisal report
19  speak to the value of the scripts?
20  A.   As of what date?
21  Q.   As of any date.
22  A.   I don't think it really states to
23  a value.  I think it has an indicated
24  metric.
25  Q.   What is that?

---

Page 59

1
2  A.   The indicated metric in this
3  report is $5 a prescription, which they
4  later updated in other reports to a
5  significantly higher number.
6  Q.   I'm just asking about the report
7  that is in front of you, Tiger report
8  Exhibit 2 that you rely upon for your
9  opinions, correct?
10  A.   Correct.
11  Q.   Do you rely upon any other Tiger
12  appraisals in preparing your -- in offering
13  your opinions in this case?
14  A.   Yes.
15  Q.   Okay.  Which ones?
16  A.   They're cited in my report.
17  Q.   Can you identify any of them?
18  A.   There were four Tiger appraisals.
19  Q.   Well, actually, on -- under
20  paragraph 91, you only cite Exhibit 2,
21  correct?
22  A.   I cite Exhibit 2 --
23  Q.   Is that correct?
24  A.   In paragraph 91?
25  Q.   Yes.

---

Page 60

1
2  A.   I cite Exhibit 2.
3  Q.   Thank you.
4       Page 8 of Exhibit 2, the Tiger
5  report says, "Based on an estimated return
6  of $5 per prescription, the script list
7  would have a value of up to $27 million."
8       Do you see that?
9  A.   I do.
10  Q.   You don't cite that in paragraph
11  91, do you?
12  A.   No.
13  Q.   Thank you.
14      Paragraph 90, which has a heading
15  "Cash balances as of the filing date," do
16  you see that?
17  A.   Yes.
18  Q.   You don't cite any -- you don't
19  footnote to anything to support the cash
20  balances as of the filing date are second
21  lien collateral; is that correct?
22  A.   In that particular paragraph?
23  Q.   Correct.
24  A.   No, that is addressed in another
25  part of the report.

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 339 of 468
In Re Sears
Holdings
Highly Confidential
Marti Murray
July 3, 2019

Page 61

```
1
2      MR. GENENDER: Objection.  I'm
3  going to object to everything after the
4  word "no" as nonresponsive and move to
5  strike.
6      BY MR. GENENDER:
7  Q.  As a matter of fact, in paragraph
8  90, you say, "For purposes of my analysis,
9  I have assumed that this cash reflects
10  proceeds from the sale of inventory and the
11  collection of receivables.  As a result, I
12  have included it in 2L debt collateral as
13  of the filing date."
14      Is that right?
15  A.  That's what it says.
16  Q.  That's what you say, right?
17  A.  That's what the report says.
18  Q.  And who wrote the report?
19  A.  I did.
20  Q.  Those are your words, right?
21  A.  Yes.
22  Q.  And you stand by those?
23  A.  I do.
24  Q.  If the cash balance as of the
25  filing date reflected cash that arose from
```

Page 62

```
1
2  the sale of unencumbered assets, would that
3  change your opinion?
4  A.  Yes.
5  Q.  Do you know that it doesn't?
6  A.  I assumed that it was -- as I
7  wrote in the report, I assumed that it was
8  from inventory and receivables.
9  Q.  Can you answer my question?
10  A.  The question was?
11  Q.  Are you able to say with
12  certainty what the source of any cash
13  balances as of the filing date was?
14  A.  No.
15  Q.  Thank you.
16      Paragraph 93, which references
17  Sears pharmacy receivables, does not cite
18  or footnote anything to support that
19  pharmacy receivables are second lien
20  collateral in that paragraph; is that
21  correct?
22  A.  Correct.
23  Q.  Your last sentence states, "This
24  is based on the likelihood that the
25  eligible pharmacy receivables are
```

Page 63

```
1
2  collectible, the 85 percent advance rate
3  granted by the lenders against the pharmacy
4  receivables, and the Lazard 507(b)
5  analysis."
6      Did I read that correctly?
7  A.  Yes.
8  Q.  Now looking at your report, pages
9  38 and 39 have tables 5 and 6 on them,
10  which calculate your two different
11  scenarios for valuing the 2L debt; is that
12  correct?
13  A.  The tables show the amount of
14  funded debt as of the filing date, as of
15  the effective date, and then shows the
16  value of the collateral and subtracts out
17  the 1L funded debt to determine what the
18  value of the 2L debt collateral was as of
19  the filing date.
20  Q.  Okay.
21  A.  And then adjusted for the credit
22  bid and then takes that forward to
23  determine the diminution in value claim.
24  Q.  And those tables 5 and 6 on pages
25  38 and 39, do those correspond with
```

Page 64

```
1
2  Appendix C-1 and C-2 on pages 65 and 68 in
3  your report?
4  A.  Yes.
5  Q.  Would you agree that pages -- the
6  appendices on pages 65 to 68 have more
7  detail than the two tables in that they
8  show the sources?
9      MR. LIUBICIC: Object to the
10  form.
11      (Document review.)
12  A.  The Appendix C-1 and C-2 have
13  notes to Appendix C-1 and C-2 attached
14  which provides the sources.
15  Q.  Okay.  Is it okay if we work off
16  the Appendix C-1 and C-2 rather than tables
17  5 and 6?
18  A.  Sure.
19  Q.  There is more information on
20  Appendix C-1 and C-2, isn't there?
21  A.  Okay.
22  Q.  You agree?  Because it lists out
23  the sources, right?
24  A.  Yes.
25  Q.  Thank you.
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 340 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 65

1
2    So Appendix C-1, you calculate
3    the total 1L funded debt as $1.531 billion;
4    is that correct?
5    A.   Correct.
6    Q.   That does not include any figure
7    for letters of credit, does it?
8    A.   Correct.
9    Q.   And that figure, the letters of
10   credit were $395 million, correct?
11   A.   Approximately.
12   Q.   Yes.
13       Did you do a calculation for 1L
14   interest that they would be entitled to?
15   A.   What interest are you referring
16   to?
17   Q.   Interest on the 1L debt through
18   the pendency of the bankruptcy case.
19   A.   Prepetition?
20   Q.   No, postpetition.
21   A.   No, I did not include
22   postpetition interest.  It's not -- it is
23   not a claim as of the filing date.
24   Q.   Okay.
25   A.   Valuations are done as of a

Page 66

1
2    measurement date.
3    Q.   Okay.
4    A.   The measurement date is the
5    filing date.
6    Q.   So your answer is no?
7    A.   No.
8    Q.   Thank you.
9        MR. GENENDER: I'm going to
10   object everything other than "no" as
11   nonresponsive.
12       BY MR. GENENDER:
13   Q.   I didn't ask you why, okay?  Is
14   that okay?
15       MR. LIUBICIC: You don't need to
16   agree with his objection.
17       BY MR. GENENDER:
18   Q.   If you can just answer my
19   question, that would be great, okay?
20       MR. PARADISE: Paul, just to
21   clarify, you said, "So your answer is
22   no," and the witness said "no."  I
23   think she meant yes.
24       MR. GENENDER: Well, it would be
25   better if she just answered my

Page 67

1
2    question.
3        MR. PARADISE: I understood what
4    you said.  That is an obvious one.  You
5    said a negative question and she
6    answered no.  I think she meant yes.
7        MR. GENENDER: Well, her
8    testimony is what it is.
9        BY MR. GENENDER:
10   Q.   Did you calculate any 1L in the
11   interest to the first lienholders?
12   A.   No.
13   Q.   Thank you.
14       If the letters of credit were
15   included in your calculation for total 1L
16   funded debt, that number would increase by
17   $395 million; is that correct?
18   A.   Correct.
19   Q.   You used, going down to
20   collateral values, you used 2 million,
21   391 -- strike that.
22       You used $2.3915 billion as
23   inventory book value, correct?
24   A.   Correct.
25   Q.   And you got that from the

Page 68

1
2    borrowing base certificate, right?
3    A.   Correct.
4    Q.   Let me take a step back.
5        Did you compare any of your
6    methodologies to the methodologies
7    Mr. Schulte and Mr. Henrich used?
8    A.   I read their reports.  I reviewed
9    their reports.  I understand the broad
10   approach that they took.  I didn't do a
11   detailed comparative analysis.
12   Q.   Did you notice any differences in
13   the way you did things versus the way they
14   did things?
15   A.   Yes.
16       (Murray Exhibit 4, Sears Holdings
17   Corporation Borrowing Base Certificate
18   as of October 13, 2018, not
19   Bates-stamped, marked for
20   identification, as of this date.)
21       BY MR. GENENDER:
22   Q.   I've handed you what's been
23   marked as Exhibit 4.
24       Can you identify that as the
25   borrowing base certificate that you

Page 69

1
2  referred to in footnote 6 on page 66?
3  Although it might have a different Bates
4  number on it.
5  A.  It looks to be the borrowing base
6  certificate.
7      MR. LIUBICIC: I'm sorry, but
8  what explains the different Bates
9  number?
10     MR. GENENDER: I think just
11  produced by different parties.  I think
12  you produced it and I think Sears
13  produced it.
14     MR. LIUBICIC: Have you looked at
15  that?  Just make sure you agree with
16  him that that's what you were citing in
17  the report.
18     MR. GENENDER: Yeah, I
19  believe it --
20  A.  Yes, it would be better to
21  have the exact document --
22     MR. LIUBICIC: I don't doubt you.
23  I just want --
24     MR. GENENDER: It's the same one.
25  A.  It would be better to have the

Page 70

1
2  exact document I cited because there's a
3  lot of numbers on this page.
4  Q.  I'm going to direct you just to a
5  couple of pages, okay?
6      Let's just go to --
7  A.  Are you going to represent that
8  this is the same borrowing base certificate
9  that we cited?
10     MR. LIUBICIC: I think he is.
11     MR. GENENDER: I am.  Absolutely
12  I am.  It's a fair question.  It has a
13  different tracking number on it.  I
14  think it was produced by a different
15  party.
16     BY MR. GENENDER:
17  Q.  Can you turn -- if you go into
18  the document, if you will go in -- the
19  fourth page?
20     (Witness complies.)
21  Q.  In the upper left, it says --
22  A.  I'd really prefer to work off the
23  exact document that we cited because this
24  document has many pages --
25  Q.  Why don't we go off the record.

Page 71

1
2  A.  -- and I'm not sure it's the same
3  document.
4      MR. GENENDER: Can we go off the
5  record?
6      (Discussion off the record.)
7      (Recess is taken.)
8      BY MR. GENENDER:
9  Q.  Ms. Murray, you have Exhibit 4 in
10  front of you, the borrowing base
11  certificate?
12  A.  Yes.
13  Q.  And turn to the fourth page,
14  including the cover page, where at the top
15  left-hand side, it says, "inventory per
16  stock ledger"?
17  A.  Yes.
18  Q.  And you've got Appendix C-1 from
19  your report, page 65 in front of you as
20  well?
21  A.  Yes.
22  Q.  All right.  If you look at -- in
23  the middle of your Appendix C-1, inventory
24  book value, 2.3915 billion.
25      Do you see that?

Page 72

1
2  A.  Yes.
3  Q.  You get that number from page 4
4  of Exhibit 4, the borrowing base
5  certificate, net eligible inventory $2.3915
6  billion; is that correct?
7  A.  Correct.
8  Q.  And then there is an NOLV 88.7
9  percent percentage applied, correct?
10  A.  Correct.
11  Q.  And you use that number as well?
12  A.  Correct.
13  Q.  Okay.  And the number that you
14  start with 2.3915 billion has been adjusted
15  as reflected on the borrowing base above
16  that number, correct?
17  A.  Correct.
18  Q.  So it goes from total stock
19  ledger inventory of 2.69 billion down to
20  2.391 billion, correct?
21  A.  It's 2391.5.
22  Q.  Billion?
23  A.  2.392 billion rounded.
24  Q.  Thank you.
25      My question is, the number you

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
to 101   Pg 342 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 73

```
1
2   used $2.3915 billion has been adjusted
3   downward by approximately $300 million per
4   the borrowing certificate from what this
5   total stock ledger inventory figure was,
6   correct?
7   A.   Correct.
8   Q.   You start with the net eligible
9   inventory number, correct?
10  A.   Correct.
11  Q.   And you think that's the
12  appropriate place to start the analysis of
13  the value of the inventory, correct?
14  A.   When I'm using 88.7 percent, it
15  is appropriate.
16      Q.   Yes.
17  A.   Not necessarily for other
18  methodologies that other people may apply.
19  But in this case, when I'm using the 88.7
20  percent, that is the right number to times
21  by 88.7 percent.
22  Q.   Okay.  Are you aware that other
23  experts in this proceeding for the 2Ls have
24  started with a number other than $2.3915
25  billion in value in the inventory?  Have
```

Page 74

```
1
2   you noticed that?
3   A.   I'm aware they used a different
4   methodology --
5   Q.   Thank you.
6   A.   -- which may -- in which case it
7   may be appropriate to start with another
8   number.
9      MR. GENENDER: I'm going to
10  object to the entire answer as
11  nonresponsive and move to strike.
12     BY MR. GENENDER:
13  Q.   My question is, have you noticed
14  that they started with a different number
15  than you started with?
16  A.   And I can't really say because I
17  don't have their reports in front of me to
18  state what number they started with, but I
19  am aware that they used a different
20  methodology.
21  Q.   You take 2.3915 billion, multiply
22  it by 88.7 percent, and come up with
23  $2.1213 billion for inventory value.
24     Do you see that?
25  A.   I do.
```

Page 75

```
1
2      This is in the minimum claim
3   calculation, not in management's case.
4   Q.   Okay.  I'm on Appendix C-1 --
5   A.   Correct.
6   Q.   -- to your report, page 65.
7      Is that a "yes"?
8   A.   Yes.
9   Q.   Thank you.
10     You understand that the 88.7
11  percent number -- which also comes from the
12  borrowing base certificate, right?
13  A.   Yes.
14  Q.   And per your footnote 7, is
15  "derived from total company eligible
16  inventory blended net liquidation value
17  projected for October 6th, 2018, as per
18  Tiger inventory appraisal at page 2."
19     Do you see that?
20  A.   Yes.
21  Q.   And you understand that that
22  Tiger inventory appraisal includes
23  corporate overhead for a 12-week period of
24  time?
25     Do you understand that?
```

Page 76

```
1
2   A.   I understand that that appraisal
3   is done on the basis of net orderly
4   liquidation value, which would include all
5   expenses required to achieve the net
6   orderly liquidation value, including
7   corporate overhead for the liquidation
8   period.
9   Q.   And do you recall the liquidation
10  period being 12 weeks?
11     (Document review.)
12  A.   Page 5 of the Tiger appraisal
13  report, they refer to the sale period and
14  they show their sale period by banner for
15  the projected sale term for a GOB sale of
16  inventory.  And the sale term is for Kmart,
17  9.6 weeks; for Sears's full line, 11.1
18  weeks; and for auto centers, 11 weeks.
19  Q.   So it would only includes
20  corporate overhead for those periods of
21  time, correct?
22     (Document review.)
23  A.   Correct.
24  Q.   I want to skip down.
25     You get lower in that section,
```

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

---

Page 77

```
 1
 2    you then arrive at a total inventory value
 3    of $2.1959 billion?
 4       Do you see that?
 5  A.  Yes.
 6  Q.  And then you make four
 7    adjustments to that, upward adjustments,
 8    correct?
 9  A.  I wouldn't characterize those as
10    "adjustments to that."
11  Q.  You add numbers to that to come
12    up with your total 1L and 2L shared
13    collateral value; is that right?
14  A.  Yes, that's right.
15  Q.  Cash, we talked about
16    $123.2 million, right?  We talked about
17    that?
18  A.  Yes.
19  Q.  Scripts, we talked about that
20    came from Exhibit 3 that you testified to,
21    the $72.8 million number, correct?
22  A.  Correct.
23  Q.  The credit card receivable number
24    comes from the borrowing base certificate,
25    same page we're looking at, where it says,
```

Page 78

```
 1
 2    eligible credit card receivables, right in
 3    the middle of the page, 54.8 million.
 4       Do you see that?
 5  A.  Yes.
 6  Q.  And then pharmacy receivables
 7    comes from the borrowing base certificate
 8    as well, 14.5 million that you adjusted
 9    down to 10.5 million per your report; is
10    that correct?
11  A.  Yes.  It's a net eligible
12    pharmacy accounts receivable on the
13    borrowing base.
14  Q.  Okay.  You would agree with me
15    the adjustments, the collective figures
16    assigned to cash, scripts, and pharmacy
17    receivables in Appendix C-1, page 65 of
18    your report, add up to approximately $205
19    million; is that right?
20  A.  I'm sorry, which categories?
21  Q.  The three I just listed; cash,
22    scripts, and pharmacy receivables.
23       MR. LIUBICIC: And you said 205?
24       MR. GENENDER: Approximately,
25    205.  Actually, 206.
```

Page 79

```
 1
 2  A.  206-and-a-half, 207.
 3  Q.  Okay.
 4  A.  I'm not using a calculator here
 5    so...
 6  Q.  I understand.  I understand.
 7       So would you agree with me that
 8    if those three categories, cash, scripts
 9    and pharmacy receivables, were not
10    appropriate 2L collateral, that the number
11    would be -- that your number for total 1L
12    and 2L shared collateral would be less by
13    206 or 207 million dollars; is that right?
14       MR. LIUBICIC: Objection.  Lack
15    of foundation.
16  A.  Can you repeat that?
17  Q.  Would you agree with me that if those
18    three categories, being cash, scripts and
19    pharmacy receivables, were not appropriate
20    2L collateral, that your number for total
21    1L and 2L shared collateral would be less
22    by 206 or 207 million dollars?
23       MR. LIUBICIC: Same objection.
24  A.  Well, it would still be 1L
25    collateral.
```

Page 80

```
 1
 2  Q.  Okay.
 3  A.  So it would still be available to
 4    satisfy the 1L which would then reduces the
 5    1L that is in front of the 2L.
 6  Q.  Would it be 2L -- but you're
 7    assuming it's 2L collateral as well, right?
 8  A.  I am assuming it's 2L collateral,
 9    but it would still be 1L collateral so, in
10    essence, it's available for the 1L to
11    reduce the amount of 1L that is before the
12    2L.
13       MR. GENENDER: I'm going to
14    object to everything after "I'm
15    assuming it's 2L collateral" as
16    nonresponsive and move to strike it.
17       BY MR. GENENDER:
18  Q.  My question was, you're assuming
19    it's 2L collateral, right?
20       MR. LIUBICIC: Objection.  Asked
21    and answered.
22  A.  What was the question?  First you
23    asked me if it was IL --
24  Q.  There is no question -- I don't
25    have a question.  No question.
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 344 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 81

```
 1
 2      I just made an objection.
 3  Nonresponsive.  There is no question on the
 4  floor.
 5      Your calculation for total 1L
 6  funded debt, if the letters of credit were
 7  included, you would subtract more than
 8  1.5318 billion, correct?
 9      MR. LIUBICIC: Object to the
10  form.
11      MR. PARADISE: Same objection.
12  A.  I'm sorry, where are you on the
13  sheet?
14  Q.  Appendix C-1.
15  A.  Which line?
16  Q.  The line that says "less total 1L
17  funded debt."
18  A.  And you're asking me?
19  Q.  The question I just asked you:
20  Your calculation for total 1L funded debt
21  if letters of credit were included would be
22  more than 1.5318 billion, correct?
23      MR. PARADISE: That is a
24  different question.
25      Can we have one objection is an
```

Page 82

```
 1
 2  objection for all?
 3      MR. GENENDER: I don't think we
 4  agreed to that, but I think it makes
 5  sense.  We have been doing this for
 6  three days, yes.
 7      MR. PARADISE: Okay.
 8      MR. GENENDER: Thanks.
 9      MR. PARADISE: Relax, Paul.  I'm
10  asking a question.
11      MR. GENENDER: I'm very relaxed.
12  I'm trying to get an answer to my
13  question.
14  A.  I think that whole analysis would
15  change if the letters of credit were
16  included as funded debt.
17  Q.  Thank you.
18  A.  So I'm not sure that analysis
19  would even be appropriate.
20  Q.  1.5318 billion would not be the
21  correct number if the letters of credit
22  were included as 1L funded debt, correct?
23  A.  Well, this whole, the whole
24  analysis wouldn't be, so you just can't
25  change that in isolation.
```

Page 83

```
 1
 2      But, yes, if you were doing an
 3  analysis of collateral value versus funded
 4  debt, if your funded debt was deemed to be
 5  higher, then you would adjust it higher,
 6  but that may mean that you may have to
 7  adjust your collateral value.
 8  Q.  Okay.  You are certain aspects of
 9  the 2L collateral would not be 2L
10  collateral, that could bring that number
11  lower, correct?
12      MR. LIUBICIC: Objection to form.
13  Vague and ambiguous.
14  A.  Can you restate the question?
15  Q.  Never mind.
16  A.  Sorry.
17  Q.  Never mind.
18      You're aware that one of the
19  other experts included letters of credit as
20  part of the 1L funded debt?
21  A.  I am aware that one of the other
22  experts in his report provided a scenario
23  in which it was included, but I don't know
24  that the expert concluded that they should
25  be included in funded debt.
```

Page 84

```
 1
 2  Q.  Your 1L debt balances on page 65
 3  of your report did not include postpetition
 4  interest or prepetition accrued interest,
 5  correct?
 6  A.  Correct.
 7  Q.  You'd agree there is substantial
 8  corporate overhead required to liquidate
 9  collateral, correct?
10      MR. LIUBICIC: Objection.  Vague
11  and ambiguous.
12  A.  I'm aware that management
13  provided input to Tiger that the corporate
14  overhead would be approximately $49
15  million.
16  Q.  Did you include that?
17  A.  Yes.
18  Q.  Where?  Is it on page 65?
19  A.  The NOLV percentage that's
20  applied to the inventory already takes that
21  into account.
22  Q.  For up to 12 weeks, right?
23  A.  For the period of time that was
24  projected by Tiger.
25  Q.  Which is up to 12 weeks, right?
```

Page 85

1
2  A.  Correct.
3  Q.  Thank you.
4      The number $54.8 million for
5  eligible credit card receivables from the
6  borrowing base that you use on page 65 of
7  your report for -- and you call it credit
8  card receivables.
9      Do you see that figure?
10 A.  Yes.
11 Q.  Are you aware that the other two
12 experts for the other -- for the second
13 lienholders use a higher figure than that
14 which they derived from a general ledger?
15 A.  I'm not aware.
16 Q.  You think this is the appropriate
17 number to use, don't you, from the
18 borrowing base certificate, 54.8 million?
19 A.  I'd have to consider that,
20 reviewing the methodology as a whole.
21     If, for example, they had a
22 ledger that was as of the filing date, it
23 may be that in the context of the
24 methodology they applied, that their number
25 for credit card receivables is correct.

Page 86

1
2  Q.  Ms. Murray, my question was just,
3  you think this is the appropriate number to
4  use, the 54.8 million from the borrowing
5  base certificate for credit card
6  receivables; is that right?
7  A.  In the context of my methodology
8  and my approach, I think it's the correct
9  number to use.
10 Q.  Thank you.  That was all I was
11 asking.
12     Would you agree that the NOLV
13 percentage from the Tiger report excludes
14 certain corporate overhead -- corporate
15 expenses required to sell the inventory?
16     MR. LIUBICIC: Object to the
17 form.  Vague and ambiguous.
18 A.  No, I don't agree.
19 Q.  Are you aware that your client in
20 this case, Cyrus, favored a going-concern
21 sale rather than a liquidation?
22     MR. LIUBICIC: Objection.  Lack
23 of foundation.
24 A.  No, I'm not aware.
25 Q.  Have you reviewed any

Page 87

2  correspondence in connection with whether
3  the second lienholders, any second
4  lienholders were -- favored a going-concern
5  sale versus a liquidation?
6  A.  Correspondence?
7  Q.  Letters.
8  A.  I don't know that I reviewed any
9  actual letters.
10 Q.  Your client in this matter,
11 Cyrus, was also a junior DIP lender, wasn't
12 it?
13 A.  My client in this matter is
14 Milbank.
15 Q.  Who is Milbank's client in this
16 matter?
17 A.  Milbank's client is Cyrus.
18 Q.  Okay.  Do you know who Cyrus is?
19 A.  Yes.
20 Q.  Cyrus was the junior DIP lender
21 in this proceeding, correct?
22 A.  Yes, that's my understanding.
23 Q.  Do you know what happened to the
24 junior DIP loan in connection with the
25 sale, the 363 sale that closed on or about

Page 88

2  February 11th, 2019?
3  A.  As I recall, it was rolled.
4  Q.  That was Cyrus's choice to roll
5  the junior debt, correct?
6  A.  I don't know the answer to that.
7  Q.  What does it mean to roll a
8  junior debt?  Do you have an understanding
9  as to what that means?
10 A.  My understanding of what that
11 means is that the liability is assumed by
12 the new company.
13 Q.  Which would be something that a
14 lender would do if it favored the
15 transaction, correct?
16     MR. LIUBICIC: Objection.
17     MR. PARADISE: Objection.
18     MR. LIUBICIC: Lack of
19 foundation.  Calls for speculation.
20 A.  I can't really comment on that.
21 It's really outside the scope of my report.
22     (Murray Exhibit 5, Declaration of
23 Brandon Aebersold, marked for
24 identification, as of this date.)
25     BY MR. GENENDER:

Page 89

1
2   Q.   I show what's been marked as
3   Exhibit 5 to your deposition.
4       (Document review.)
5   Q.   Have you seen Exhibit 5 before?
6   A.   Yes, but I have not read it in
7   detail.
8   Q.   Have you seen any of the -- I
9   just want to ask you, there's four attached
10  letters to it.
11      Can you turn to what's, up at the
12  top, page 11 of 36?
13      (Witness complies.)
14  Q.   An October 31st letter to Ray
15  Schrock from Sean O'Neal?
16  A.   Yes.  I'm not familiar with this.
17  Q.   Did you rely upon it in preparing
18  your report?
19  A.   No.
20  Q.   Did you --
21  A.   This letter?
22  Q.   Yes.
23  A.   No.
24  Q.   Did you consider it in preparing
25  your report?

Page 90

1
2   A.   I don't recall.
3   Q.   You don't recall considering it
4   in preparing your report?
5   A.   No.
6   Q.   My question is, did you consider
7   it in preparing your report, yes or no?
8   A.   I don't recall.
9   Q.   Well, have you ever seen it
10  before right now?
11  A.   I can't say.  It's not ringing a
12  bell.
13  Q.   Okay.  Do you have a present
14  recollection of considering it in
15  connection with preparing your report?
16      (Document review.)
17  A.   No.
18  Q.   Okay.  Is it listed on the
19  materials that you reviewed in connection
20  with preparing your report?
21  A.   I don't know.
22  Q.   It's not, is it?
23  A.   I don't know.
24  Q.   Okay.  What about Exhibit B to
25  Exhibit 5, have you ever seen that before,

Page 91

1
2   November 2, 2018, letter to Ray Schrock
3   from Sean O'Neal?
4   A.   I'm just reviewing it.  I'm
5   sorry.
6       What was your question?
7   Q.   Have you ever seen it before?
8   A.   I may have, but I don't recall
9   it.
10  Q.   Did you rely upon it in preparing
11  your report?
12  A.   I don't recall having relied on
13  it.
14  Q.   Would you turn to Exhibit C to
15  Exhibit 5, a January 7th letter to the
16  board of directors at Sears from Jim
17  Bromley on behalf of ESL.
18      Have you seen that letter before?
19  A.   Let me review it.
20      (Document review.)
21  A.   It's not ringing a bell.
22  Q.   In preparing your report, were
23  you aware that ESL favored a going-concern
24  sale rather than liquidation?
25      MR. LIUBICIC: Objection.  Lack

Page 92

1
2   of foundation.
3   A.   I was generally aware that ESL
4   was trying to effectuate a going-concern
5   sale.
6   Q.   Are you aware that ESL, in trying
7   to effectuate a going-concern sale by
8   writing to the Sears board, referenced
9   Cyrus?
10  A.   No, I'm not.
11  Q.   Can you turn to page 5 of Exhibit
12  C to Exhibit 5, which is page 35 of 36?
13      (Witness complies.)
14  A.   Was there a section you wanted me
15  to read?
16  Q.   Are you on that page?
17  A.   I am.
18  Q.   Look at the bottom of the page,
19  you see it says, "The decision to reject
20  the going-concern proposal is simply not a
21  decision that is consistent with the
22  fiduciary duties that the members of the
23  subcommittee owe to the debtors' creditors,
24  including the debtors' largest creditors,
25  ESL and Cyrus."

Page 93

1
2    Do you see that?
3    A.   I do.
4    Q.   And then if you go up, under
5    fourth, it says "A rejection of the ESL
6    proposal violates the very detail duties that
7    the board and the subcommittee owed ESL and
8    to Cyrus, which is participating in the
9    bid, both of which are the debtors' largest
10   senior secured creditors."
11       Did I read that correctly?
12   A.   Yes.
13   Q.   Were you aware that Cyrus
14   participated in ESL's bid to purchase all
15   or substantially all the assets of Sears?
16       MR. LIUBICIC: Objection.  Lack
17   of foundation.
18   A.   What was your question?
19   Q.   Were you aware that Cyrus
20   participated in ESL's bid to purchase all
21   or substantially all the assets of Sears?
22       MR. LIUBICIC: Same objection.
23   A.   I'm aware they owned 2L debt,
24   which was part of the credit bid.
25   Q.   Can you answer my question:  Were

Page 94

1
2    you aware that Cyrus participated in ESL's
3    bid to purchase all or substantially all
4    the assets of Sears?
5    A.   Yes --
6        MR. LIUBICIC: Same objection.
7    A.   Yes, to the extent that Cyrus
8    owned 2L debt which was a credit bid, I was
9    aware of that.
10   Q.   Thank you.
11       In your report on pages 11
12   through 15, you speak about the letters of
13   credit, correct?
14   A.   Correct.
15   Q.   In paragraph 41 you state that
16   "These LCs did not represent funded debt or
17   an actual claim against collateral as of
18   filing date."
19       Do you see that?
20   A.   Yes.
21   Q.   Have you spoken to any of the
22   counterparties with respect to the letters
23   of credit?
24   A.   Counterparties, you mean...
25   Q.   The parties who would seek to

Page 95

1
2    have them paid.
3    A.   No, I have not.
4    Q.   Do you know whether those letters
5    of credit would ever been released?
6    A.   Released?
7    Q.   Yes.
8        MR. LIUBICIC: Object to the
9    form.
10   A.   What do you mean by "released"?
11   Q.   Do you know what claims could be
12   made against those letters of credit at any
13   point in the future?
14   A.   In certain cases, yes.
15   Q.   Which claims?
16   A.   About two-thirds of them related
17   to workers' compensation claims and states
18   where Kmart is self-insured.
19   Q.   Are you aware that lenders are
20   reluctant to let letters of credit go for
21   years into the future until they know that
22   there will be no claims made against them?
23       MR. PARADISE: Objection.
24       MR. LIUBICIC: Object to form.
25   A.   No, I'm not aware.

Page 96

1
2    Q.   Are you aware that insurers take
3    the same position?
4        MR. LIUBICIC: Object to form.
5    A.   And that position is?
6    Q.   That the letters of credit need
7    to stay in place into the future to insure
8    against claims being made against those
9    letters of credit?
10   A.   No, I'm not aware.
11   Q.   Do you have expertise in how
12   letters of credit work?
13   A.   Yes.
14   Q.   Have you talked with -- have you
15   done any -- have you consulted any
16   individuals who have experienced with how
17   long letters of credit stay in place into
18   the future in a bankruptcy in situations
19   such as this?
20   A.   Yes.
21   Q.   Who did you speak with?
22   A.   Counsel.
23   Q.   Who?
24   A.   Milbank.
25   Q.   Who at Milbank?

Page 97

```
 1
 2  A.   An attorney at Milbank who I
 3    don't recall his name.
 4  Q.   And you're relying upon that?
 5  A.   I'm relying on my own experience,
 6    and I'm relying on discussions with
 7    counsel.
 8  Q.   You'd agree it's just a matter of
 9    simple math that if the letters of credit
10    were to be included in 1L funded debt, it
11    would change your opinion as to the value,
12    as to the diminution in value represented
13    by your purported 507(b) figures, correct?
14  A.   Not necessarily.
15  Q.   So if they were included as 1L
16    funded debt, it wouldn't change any of your
17    numbers?
18  A.   Not necessarily.
19  Q.   So you could envision a situation
20    which $395 million letter of credit were
21    included as 1L debt, it wouldn't change
22    your ultimate figures on Appendix C-1 or
23    C-2?
24  A.   It would depend on why the
25    letters of credit were funded and whether
```

Page 98

```
 1
 2    or not there was actual liability relating
 3    to those letters of credit.  Because even
 4    if they were funded, it does not mean that
 5    there is a funded debt obligation with no
 6    offsetting asset.  There could very well be
 7    an offsetting asset.
 8  Q.   You've assumed there is not,
 9    correct?
10  A.   I'm sorry?
11  Q.   You've assumed that there is not
12    an offsetting asset, correct?
13  A.   I've assumed that the LCs are not
14    funded debt.
15  Q.   Correct.  That's your assumption,
16    right?
17  A.   Correct.
18  Q.   And the basis of it is speaking
19    with a lawyer at Milbank whose name you
20    don't remember as you sit here?
21        MR. LIUBICIC: Objection.
22    Mischaracterizes testimony.
23  A.   The basis of it is that the LCs
24    were not drawn as of the filing date, which
25    is the measurement date.  And given the
```

Page 99

```
 1
 2    nature of what the LCs were for and the
 3    fact that only 9 million of LCs were
 4    actually drawn over the course of the
 5    bankruptcy case, and given the fact that it
 6    was public knowledge that this company was
 7    in dire financial condition, and given the
 8    fact that there had been other large
 9    retailers that had been similarly situated,
10    and even with that knowledge, only 9
11    million of these LCs were funded over the
12    bankruptcy, and given my discussions with
13    counsel, I have concluded that it is
14    inappropriate to include them in funded
15    debt as of the filing date.
16        MR. GENENDER: I object to --
17  A.   And that even if they were to be
18    considered part of funded debt, that there
19    would mostly be an offsetting asset.
20        MR. GENENDER: I'm going to
21    object to the nonresponsive portion of
22    the answer.
23    BY MR. GENENDER:
24  Q.   Were the letters of credit that
25    you didn't include cash collateralized?
```

Page 100

```
 1
 2  A.   I don't know the answer to that.
 3  Q.   Are you aware there are claims
 4    being paid by these letters of credit on a
 5    daily basis?
 6  A.   I'm aware that 9 million has been
 7    drawn over the course of the bankruptcy.
 8  Q.   Is that a yes?
 9  A.   That 9 million may include claims
10    being paid, as you say, on a daily basis,
11    but I'm not aware that there is any other
12    liability other than that $9 million
13    associated with the letters of credit over
14    the course of the bankruptcy.
15  Q.   Okay.  Does your report offer an
16    opinion as to what an appropriate 506(c)
17    surcharge would be?
18  A.   Yes.  My opinion is that any
19    costs for liquidating or preserving the
20    collateral is already included in my
21    valuation of the collateral.
22  Q.   So is that your way of saying
23    there shouldn't be a 506(c) surcharge?
24  A.   It's my way of saying that's
25    already taken into account in coming to the
```

Highly Confidential

---

Page 101

1
2 value of the collateral.
3 Q. Do you have an opinion as to the
4 appropriate amount of a 506(c) surcharge to
5 which the debtors are entitled in this
6 case?
7 A. It's already incorporated into
8 the value of the collateral, so I can go in
9 and I can back out all of the expenses that
10 are assumed in the Tiger report and add
11 those all together, but that would be my
12 answer.
13 Q. Have you done that?
14 A. I can do it.
15 Q. I'm just asking if you've done it
16 in your report.
17 A. I have. It's already included in
18 the value of the collateral -- of the
19 collateral as described in the report.
20 Q. Can you show me the number where
21 in your report you include the 506(c)
22 surcharge number?
23 A. It's the 88.7 percent.
24    MR. PARADISE: Objection.
25 A. It's incorporated into the 88.7

---

Page 102

1
2 percent.
3 Q. So when you take the
4 2.391 billion and apply 88.7 percent to it,
5 are you saying that some portion of the
6 11.3 percent reduction in that inventory
7 number is what you consider to be a 506(c)
8 surcharge?
9    MR. LIUBICIC: Objection.
10 Mischaracterizes testimony. Calls for
11 a legal conclusion.
12 A. I'm not characterizing it as a
13 506(c) surcharge. What I'm saying is that
14 88.7 percent already takes into account all
15 the reasonable and necessary expenses of
16 preserving and monetizing the collateral,
17 which is based on information that
18 management provided to Tiger.
19 Q. That's in a liquidation analysis,
20 correct?
21 A. It's in a net orderly liquidation
22 value, assuming companywide
23 going-out-of-business sale.
24 Q. Have you done any analysis of
25 what an appropriate 506(c) surcharge would

---

Page 103

1
2 be in connection with what happened in the
3 case with respect to a going-concern sale?
4 A. I have not done a separate
5 analysis of that.
6 Q. Are you able to speak to the
7 reasonable and necessary expenses incurred
8 by the estate, for example, between
9 December 28, 2018, when ESL submitted its
10 first bid, and February 11th, 2019, when
11 the sale transaction closed as to expenses
12 reasonably and necessarily incurred by the
13 debtors for the primary benefit of
14 preservation of the collateral? Have you
15 calculated that amount?
16 A. Can you repeat that?
17    MR. GENENDER: Read it back.
18    (Question was read back as
19 follows:
20    "QUESTION: Are you able to speak
21 to the reasonable and necessary
22 expenses incurred by the estate, for
23 example, between December 28, 2018,
24 when ESL submitted its first bid, and
25 February 11th, 2019, when the sale

---

Page 104

1
2 transaction closed as to expenses
3 reasonably and necessarily incurred by
4 the debtors for the primary benefit of
5 preservation of the collateral? Have
6 you calculated that amount?")
7 A. No, I have not.
8 Q. Have you calculated any amount
9 incurred by the debtors reasonably and
10 necessary for the primary purpose of
11 preserving collateral value belonging to
12 the 2Ls in this case?
13    MR. LIUBICIC: Objection. Asked
14 and answered.
15 A. I haven't calculated it. I
16 relied on the information in the Tiger
17 report as to the reasonable and necessary
18 expenses of preserving and monetizing the
19 collateral based on information that Tiger
20 received from management.
21 Q. The Tiger report only speaks to a
22 scenario in which there would be a net
23 orderly liquidation, correct?
24 A. Yes, the premise of value is a
25 companywide going-out-of-business sale.

---

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 350 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

---

Page 105

1
2  Q.  Okay.  Have you done any analysis
3  or calculation of what an appropriate
4  506(c) surcharge would be in a
5  going-concern scenario, such as what
6  happened in this case?
7  A.  I have not done a separate
8  calculation.
9  Q.  You haven't done any calculation
10  in that scenario, correct?
11  A.  The companywide
12  going-out-of-business sale scenario was one
13  of two envisioned scenarios for the
14  company.  The other scenario being a sale
15  as a going-concern.  Some stores closed
16  with GOB sales completed and then the sale
17  of some other discreet assets.
18      So the entire analysis is
19  different if you're talking about a
20  going-concern sale because the value -- the
21  premise of value then for the collateral is
22  going to be different.
23      So to do an apples-to-apples
24  comparison, the whole analysis would have
25  to be different.

---

Page 106

1
2      MR. GENENDER: I'm going to
3  object to the nonresponsive portion,
4  nonresponsive answer in its entirety.
5  Move to strike.
6      BY MR. GENENDER:
7  Q.  So Ms. Murray, my question is,
8  have you done any calculations for 506(c)
9  surcharges in a going-concern sale
10  scenario, yes or no?
11  A.  No.
12  Q.  Thank you.
13      Your report, paragraph 47, can
14  you read the first line, please, the first
15  sentence?
16  A.  Yes.
17  Q.  Can you read it, please?
18  A.  "As of the filing date, the
19  debtors' stated objective was to preserve
20  Sears as a going-concern based on a viable
21  smaller store footprint."
22  Q.  Thank you.
23      That is a sentence you wrote,
24  correct?
25  A.  Correct.

---

Page 107

1
2  Q.  Thank you.
3      Are you aware Mr. Henrich
4  testified there should be a 506(c)
5  surcharge in this case?
6  A.  No.
7  Q.  Are you aware that his report
8  includes a number north of $200 million for
9  a 506(c) surcharge?
10  A.  I'm aware that he -- he used a
11  different methodology to come to his
12  conclusions, and his methodology may have
13  included a 506(c) surcharge, and his
14  methodology may also have included a higher
15  value of the inventory than what I had
16  because it did not take into account cost
17  and expenses necessary to preserve the
18  value of the collateral and monetize it.
19  Q.  Are you aware that there could be
20  costs and expenses to preserve the
21  collateral that would have occurred beyond
22  the 12-week period contemplated by the
23  Tiger report?
24      MR. PARADISE: Objection.
25      MR. LIUBICIC: Objection.  Lack

---

Page 108

1
2  of foundation.
3      MR. PARADISE: Calls for
4  speculation.
5  A.  Can you repeat it?
6  Q.  Are you aware that there could be
7  costs and expenses to preserve the
8  collateral that would have occurred beyond
9  the 12-week period contemplated by the
10  Tiger report?
11      MR. LIUBICIC: Same objection.
12      MR. PARADISE: Same.
13  A.  I mean, intuitively, that doesn't
14  make sense to me because the Tiger report
15  is based on selling the collateral within
16  12 weeks.  So I don't understand how you
17  would have expenses to preserve it if it
18  was all sold.
19  Q.  Because that's the assumption
20  that it makes for purposes of its
21  calculations, "it's" being the Tiger
22  report, correct?
23  A.  Correct.
24  Q.  Thank you.
25      THE WITNESS: Is this an okay

---

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 351 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

**Page 109**

```
 1
 2    time for a break?
 3        MR. GENENDER: If you need a
 4    break, that's fine.
 5        (Recess is taken.)
 6        BY MR. GENENDER:
 7    Q.   Ms. Murray, are you aware that
 8    the letters of credit were assumed as part
 9    of the Asset Purchase Agreement that closed
10    on February 11th, 2019?
11    A.   Yes, I'm aware that the 271
12    million facility was assumed.
13    Q.   Are you aware that it was counted
14    as part of the cash consideration in that
15    transaction?
16    A.   I'm not aware it was considered
17    part of the cash consideration.
18    Q.   Are you aware that the letters of
19    credit would be used if any payments were
20    missed by Sears down the road?
21        MR. LIUBICIC: Objection.  Vague
22    and ambiguous.
23    A.   I don't know what payments you're
24    referring to.
25    Q.   Are you aware that liabilities
```

**Page 110**

```
 1
 2    that could trigger the letters of credit
 3    could occur 10 to 15 years down the road?
 4        MR. PARADISE: Objection.
 5    A.   No.
 6    Q.   Are you aware that the letters of
 7    credit funded high deductible plans and
 8    that the estate funds these plans on a
 9    daily basis?
10        MR. LIUBICIC: Objection.  Vague
11    and ambiguous.
12        MR. PARADISE: Objection.
13    A.   I'm sorry, can you repeat that
14    question?
15    Q.   Are you aware that the letters of
16    credit funded high deductible plans that
17    the estate funds these plans on a daily
18    basis?
19        MR. LIUBICIC: Same objections.
20    A.   No.
21    Q.   You understand that there are
22    expenses that a Chapter 11 estate has to
23    incur to run the estate, correct?
24    A.   Yes.
25    Q.   Are you aware that the 1Ls
```

**Page 111**

```
 1
 2    negotiated a 506(c) waiver?
 3    A.   Yes.
 4    Q.   Do you know what that means?
 5    A.   I have a business understanding
 6    of what it means.
 7    Q.   Sure.
 8        What is that?
 9    A.   That they are exempt from a
10    506(c) surcharge.
11    Q.   What impact would that have on a
12    506(c) surcharge that the 2Ls could be
13    subject to, if you know?
14        MR. LIUBICIC: Objection to the
15    extent it calls for a legal conclusion.
16    A.   I think that's a legal question.
17    Q.   Going back to the letters of
18    credit, are you aware that ongoing payments
19    that the estate would have to make are
20    separate and apart from the $9 million of
21    monies that have been paid to date?
22    A.   Can you be more specific about
23    what payments you're referring to?
24    Q.   Against any future claims.
25        MR. LIUBICIC: Objection.  Vague
```

**Page 112**

```
 1
 2    and ambiguous.
 3    A.   Claims relating to -- can you be
 4    more specific about claims relating to
 5    what?
 6    Q.   Workers' comp, anything that
 7    would be referenced -- anything that could
 8    be subject to letters of credit.
 9    A.   Well, it appears to me that would
10    just be ordinary course of business
11    expenses that the company would incur to
12    the extent that the company was in
13    business.
14    Q.   You understand that the Tiger
15    report didn't take into account corporate
16    overhead as an expense?
17    A.   No, I don't understand it.
18        MR. LIUBICIC: Objection.  Lack
19    of foundation.
20        BY MR. GENENDER:
21    Q.   You don't understand that?
22    A.   No.
23    Q.   You don't know that one way or
24    the other or you disagree with it?
25    A.   I disagree with it.
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 352 of 468

In Re Sears
Holdings

Highly Confidential

Marti Murray
July 3, 2019

Page 113

1
2  Q.   You think it did take into
3  account corporate overhead?
4  A.   Yes.
5  Q.   Did your report take into account
6  claims that could be made by unsecured
7  creditors against collateral that was not
8  2L collateral?
9  A.   Can you be more specific about
10  what collateral you're referring to?
11  Q.   Cash, scripts and pharmacy
12  receivables that added up to -- remember we
13  went through the exercise and it added up
14  to 206 or 207 million dollars?
15  A.   Yes.  But that is 2L collateral.
16  Q.   That's your opinion, right?
17  A.   Yes.
18  Q.   Okay.
19  A.   And so your question is?
20  Q.   Can I ask it?
21  A.   Yes, please.
22  Q.   Thank you.
23       Did your report take into account
24  claims that could be made by unsecured
25  creditors against those assets where they

Page 114

1
2  determined not to be 2L collateral?
3  A.   No.
4       MR. PARADISE: Objection.
5       BY MR. GENENDER:
6  Q.   You understand the unsecured
7  creditors could have a claim against those
8  assets if they're not 2L collateral, don't
9  you?
10       MR. LIUBICIC: Objection.  Calls
11  for a legal conclusion.
12       BY MR. GENENDER:
13  Q.   Can you answer?
14  A.   What was the question?
15  Q.   The question remains, you
16  understand that the unsecured creditors
17  could have a claim against those assets if
18  those assets are determined not to be 2L
19  collateral, correct?
20       MR. LIUBICIC: Same objection.
21  A.   I don't know who would have a
22  claim to those assets.
23  Q.   Thank you.
24       The second lienholder's credit
25  bid to the amount of $433.5 million in

Page 115

1
2  connection with the sale transaction,
3  correct?
4  A.   Correct.
5  Q.   Do you believe that the
6  bankruptcy estate expended reasonable and
7  necessary monies to benefit the second
8  lienholder's ability to make that credit
9  bid?
10       MR. LIUBICIC: Object to the
11  extent it calls for a legal conclusion.
12  A.   That's really outside the scope
13  of my report.
14  Q.   So you're not offering an opinion
15  in that regard; is that correct?
16  A.   Correct.
17  Q.   Thank you.
18       MR. GENENDER: Why don't we take
19  a short break.
20       MR. LIUBICIC: Okay.
21       (Recess is taken.)
22       BY MR. GENENDER:
23  Q.   Ms. Murray, I asked you and you
24  said you were aware that the 1L has a
25  506(c) waiver in connection with the sale

Page 116

1
2  transaction, correct?
3  A.   Correct.
4  Q.   Are you aware that your client
5  Cyrus also requested and got a 506(c)
6  waiver in connection with rolling its
7  junior DIP into the transaction?
8  A.   No.
9  Q.   You did not know that?
10  A.   Not -- I'm not aware of it.  I
11  don't recall hearing about that.
12  Q.   Would it stand to reason that a
13  party would request a 506(c) waiver because
14  it thinks there otherwise might be -- it
15  might be subject to a 506(c) surcharge?
16       MR. LIUBICIC: Objection to the
17  extent it calls for a legal conclusion.
18  Speculation.  Outside the scope of the
19  report.
20  A.   I'm sorry, I think that is a
21  legal question.
22  Q.   Well, your lawyer said that, but
23  I'm going to focus on this.
24       Is that just outside anything you
25  considered in your report?

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
to 101    Pg 353 of 468    Highly Confidential

In Re Sears
Holdings

Marti Murray
July 3, 2019

Page 117

1
2 **A. Yes.**
3 Q. That's fair. Thank you.
4    MR. GENENDER: I'll pass the
5 witness. Thank you.
6    MR. LIUBICIC: Does anyone else
7 have questions?
8    MR. PARADISE: No questions.
9    MR. GLACKIN: No questions.
10    MR. LIUBICIC: And I have no
11 questions.
12    MR. GENENDER: Thank you.
13 Nice to meet you.
14    (Time noted: 12:02 p.m.)
15
16    _____.
17    MARTI P. MURRAY
18
19
20 Subscribed and sworn to before me
21 this    day of        2019.
22
23    _____
24
25

Page 118

1
2        C E R T I F I C A T E
3
4 STATE OF NEW YORK        )
5                          : ss.
6 COUNTY OF WESTCHESTER    )
7
8        I, ANNETTE ARLEQUIN, a Notary
9    Public within and for the State of New
10    York, do hereby certify:
11        That MARTI P. MURRAY, whose
12    deposition is hereinbefore set forth,
13    was duly sworn by me, and that the
14    transcript of such depositions is a
15    true record of the testimony given by
16    such witness.
17        I further certify that I am not
18    related to any of the parties to this
19    action by blood or marriage; and that I
20    am in no way interested in the outcome
21    of this matter.
22        IN WITNESS WHEREOF, I have hereunto
23    s            3rd day of July, 2019.
24    _____
25        ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

Page 119

1
2            I N D E X
3
4 WITNESS                          PAGE
5
6 MARTI P. MURRAY
7   MR. GENENDER                   6
8
9    I N D E X   O F   E X H I B I T S
10 DESCRIPTION                      PAGE
11
12 Murray Exhibit 1, Expert Report      18
   of Marti P. Murray dated 6/18/19
13
14 Murray Exhibit 2, Tiger Asset       54
   Intelligent Sears Holdings
15 Corporation Inventory Appraisal,
   Bates-stamped SEARS_507b_00001287
16 through 1344
17 Murray Exhibit 3, Document with      57
   Estimated Script Asset Value, not
18 Bates-stamped,
19
20 Murray Exhibit 4, Sears Holdings     68
   Corporation Borrowing Base
21 Certificate as of October 13,
   2018, not Bates-stamped
22
23 Murray Exhibit 5, Declaration of     88
   Brandon Aebersold
24
25

Page 120

1
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    CASE NAME: SEARS HOLDINGS
4    DATE: JULY 3, 2019
5    DEPONENT: MARTI P. MURRAY
6    Pg. Ln.  Now Reads  Should Read  Reason
7    __  __  _____  _____  _____
8    __  __  _____  _____  _____
9    __  __  _____  _____  _____
10   __  __  _____  _____  _____
11   __  __  _____  _____  _____
12   __  __  _____  _____  _____
13   __  __  _____  _____  _____
14   __  __  _____  _____  _____
15   __  __  _____  _____  _____
16   __  __  _____  _____  _____
17
18    _____
19    MARTI P. MURRAY
20 SUBSCRIBED AND SWORN BEFORE ME
21 THIS____DAY OF_____ 2019.
22
23    _____
24 (Notary Public)
25    MY COMMISSION EXPIRES:_____

# Exhibit 100

## Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
In Re:
SEARS HOLDINGS CORPORATION, et al.,
                                    Debtor.
Chapter 11 - Case No.: 18-23538 (RDD)
---------------------------------------X

                 450 Park Avenue
                 New York, New York

                 July 10, 2019
                 2:12 p.m.

        DEPOSITION of BRIAN GRIFFITH, before
Melissa Gilmore, a Shorthand Reporter and
Notary Public of the State of New York.

ELLEN GRAUER COURT REPORTING CO., LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 277378B

## Page 2

1   A P P E A R A N C E S :
2
3   CLEARY GOTTLIEB STEEN & HAMILTON LLP
4   Attorneys for ESL Investments, Inc.
5       One Liberty Plaza
6       New York, New York 10006
7   BY:  THOMAS J. MOLONEY, ESQ.
8        KAL BLASSBERGER, ESQ.
9        PHONE 212-225-2460
10       E-MAIL tmoloney@cgsh.com
11           kblassberger@cgsh.com
12
13
14   WEIL, GOTSHAL & MANGES, LLP
15   Attorneys for Debtors and Debtors-in-Possession,
16   Sears Holdings Corporation, et al.
17       200 Crescent Court, Suite 300
18       Dallas, Texas 75201-6950
19   BY:  PAUL GENENDER, ESQ.
20        ERIN CHOI, ESQ.
21        PHONE 214-746-7877
22        E-MAIL paul.genender@weil.com
23            erin.choi@weil.com
24
25

## Page 3

1   A P P E A R A N C E S :  (Cont'd)
2
3   WEIL GOTSHAL & MANGES, LLP
4   Attorneys for Debtors and Debtors-in-Possession,
5   Sears Holdings Corporation, et al.
6       767 Fifth Avenue
7       New York, New York 10153
8   BY:  NATASHA S. HWANGPO, ESQ.
9        PHONE 212-310-8715
10       E-MAIL natasha.hwangpo@weil.com
11
12
13   AKIN GUMP STRAUSS HAUER & FELD LLP
14   Attorneys for Unsecured Creditors
15       One Bryant Park
16       New York, New York 10036-6745
17   BY:  PATRICK J. GLACKIN, ESQ.
18        PHONE 212-872-8114
19        E-MAIL pglackin@akingump.com
20
21
22
23
24
25

## Page 4

1   A P P E A R A N C E S :  (Cont'd)
2
3   MILBANK LLP
4   Attorneys for Cyrus Capital Partners
5       2029 Century Park East, 33rd Floor
6       Los Angeles, California 90067-3019
7   BY:  ROBERT J. LIUBICIC, ESQ.
8        PHONE 424-386-4525
9        E-MAIL rliubicic@milbank.com
10
11
12   MILBANK LLP
13   Attorneys for Cyrus Capital Partners
14       55 Hudson Yards
15       New York, New York 10001
16   BY:  YELENA AMBARTSUMIAN, ESQ.
17        PHONE 212-530-5080
18        E-MAIL yambartsumian@milbank.com
19
20
21
22
23
24
25

## Page 5

```
1    A P P E A R A N C E S: (Cont'd)
2
3    SEYFARTH SHAW LLP
4    Attorneys for Wilmington Trust National
5    Association, as Indenture Trustee and Collateral
6    Agent
7        620 Eighth Avenue
8        New York, New York 10018-1405
9    BY:  EDWARD M. FOX, ESQ.
10        STEVEN PARADISE, ESQ.
11        PHONE 212-218-4646
12        E-MAIL emfox@seyfarth.com
13        sparadise@seyfarth.com
14
15
16    ALSO PRESENT:
17    WILLIAM HENRICH, Getzler Henrich
18    MARTI MURRAY, the Brattle Group
19    JAKUB MLECZKO, Perella Weinberg
20    LUKE ANDREWS, Getzler Henrich
21    JENN POLLAN, Cleary Summer Associates (Via Telephone)
22    TOM KRELLER, ESQ., Milbank (Via Telephone)
23    JACQUELINE ROSEN, ESQ., Milbank (Via Telephone)
24    SAM PAYNE, ESQ., Milbank (Via Telephone)
25    ERIC REIMER, ESQ., Milbank (Via Telephone)
```

## Page 6

```
1    ------------------ I N D E X ------------------
2    WITNESS      EXAMINATION BY        PAGE
3    BRIAN GRIFFITH    MR. MOLONEY          14
4                MR. LIUBICIC        163
5                MR. FOX          235
6
7    MOTIONS:  PAGES 41, 72, 120, 127, 131, 134, 138,
8    177, 183, 192, 226, 234, 257, 264, 274
9
10
11    -------------- DOCUMENT REQUESTS --------------
12    PAGE   139  We will just leave a blank here.
13            If you find something, you can
14            add it in when you review the
15            transcript
16
17
18    ---------------- E X H I B I T S ----------------
19    GRIFFITH      DESCRIPTION        FOR I.D.
20    Exhibit 1      Stipulation and Order      11
21            Concerning the Resolution
22            of Certain Section 501(b)
23            Claims, Dated June 21,
24            2019
25
```

## Page 7

```
1    ------------ E X H I B I T S (Cont'd) -----------
2    GRIFFITH        DESCRIPTION        FOR I.D.
3    Exhibit 2      Notice of Deposition of      11
4            Brian J. Griffith
5    Exhibit 3      Second Lien Parties'      11
6            First Consolidated
7            Request for Production of
8            Documents Directed to the
9            Debtors, June 4, 2019
10    Exhibit 4      Declaration of Brian J.      11
11            Griffith, dated May 26,
12            2019
13    Exhibit 5      Supplemental Declaration      11
14            of Brian J. Griffith,
15            Dated June 27, 2019
16    Exhibit 6      Expert Worksheet - Draft      12
17    Exhibit 7      Document, Bates Stamped      12
18            SEARS_507B_00001508
19    Exhibit 8      Letter to Transform      12
20            Holdco, Dated
21            February 10, 2019
22    Exhibit 9      Joint Exhibit 14        12
23
24
25
```

## Page 8

```
1    ------------ E X H I B I T S (Cont'd) -----------
2    GRIFFITH        DESCRIPTION        FOR I.D.
3    Exhibit 10      Tiger Inventory        12
4            Appraisal, Bates Stamped
5            SEARS_507B_00001213
6            through 1286
7    Exhibit 11      Tiger Inventory        12
8            Appraisal, Bates Stamped
9            SEARS_507B_00001287
10            through 1344
11    Exhibit 12      Letter to Lazard Frères &      12
12            Co. LLC, Dated December
13            28, 2018
14    Exhibit 13      Letter to Lazard Frères &      13
15            Co. LLC, Dated January 9,
16            2019
17    Exhibit 14      Asset Purchase Agreement,      13
18            Dated January 17, 2019
19    Exhibit 15      Form 10-K of Sears      13
20            Holdings Corporation
21    Exhibit 16      Expert Report of David M.      13
22            Schulte
23    Exhibit 17      Expert Report of Marti P.      13
24            Murray, Dated June 18,
25            2019
```

Page 9

------------ E X H I B I T S (Cont'd) -----------

GRIFFITH          DESCRIPTION          FOR I.D.

Exhibit 18    Declaration of Mohsin Y.      13
              Meghji, Dated October 15,
              2018

Exhibit 19    Final Order, Dated           13
              November 30, 2018

Exhibit 20    Declaration of Mohsin Y.      13
              Meghji, Dated February 1,
              2019

Exhibit 21    Declaration of Alan J.        14
              Carr, Dated February 1,
              2019

Exhibit 22    Declaration of Robert A.      14
              Riecker, Dated
              November 23, 2018

Exhibit 23    Project Blue -               203
              Liquidation Bids Review,
              Dated December 2018

Exhibit 24    Minutes of a Meeting of      208
              the Restructuring
              Committee, Dated
              January 5, 2019

Exhibit 25    Expert Report of William     248
              Henrich

Page 10

------------ E X H I B I T S (Cont'd) -----------

GRIFFITH          DESCRIPTION          FOR I.D.

Exhibit 26    Rolling 13-week Cash Flow    259
              Forecast for Week Six

Exhibit 27    Wind Down Recoveries,        269
              Dated January 12, 2019

Exhibit 28    Rolling Cash Flow Budget     270
              for Week 15

Exhibit 29    Project Blue Actuals from    287
              Week Ended January 26
              through February 9

Exhibit 30    ESL Bid Analysis, Bates      295
              Stamped Sears_507B_31
              through 60

Exhibit 31    Stock Ledger Detail          298


              (EXHIBITS TO BE PRODUCED)

Page 11

1    B R I A N   G R I F F I T H,   called as a
2    witness, having been duly sworn by a
3    Notary Public, was examined and testified
4    as follows:
5        (Griffith Exhibit 1, Stipulation and
6    Order Concerning the Resolution of Certain
7    Section 501(b) Claims, Dated June 21,
8    2019, marked for identification.)
9        (Griffith Exhibit 2, Notice of
10   Deposition of Brian J. Griffith, marked
11   for identification.)
12       (Griffith Exhibit 3, Second Lien
13   Parties' First Consolidated Request for
14   Production of Documents Directed to the
15   Debtors, June 4, 2019, marked for
16   identification.)
17       (Griffith Exhibit 4, Declaration of
18   Brian J. Griffith, dated May 26, 2019,
19   marked for identification.)
20       (Griffith Exhibit 5, Supplemental
21   Declaration of Brian J. Griffith, Dated
22   June 27, 2019, marked for identification.)
23       (Griffith Exhibit 6, Expert
24   Worksheet - Draft, marked for
25   identification.)

Page 12

1        (Griffith Exhibit 7, Document, Bates
2    Stamped SEARS_507B_00001508, marked for
3    identification.)
4        (Griffith Exhibit 8, Letter to
5    Transform Holdco, Dated February 10, 2019,
6    marked for identification.)
7        (Griffith Exhibit 9, Joint Exhibit
8    14, marked for identification.)
9        (Griffith Exhibit 10, Tiger
10   Inventory Appraisal, Bates Stamped
11   SEARS_507B_00001213 through 1286, marked
12   for identification.)
13       (Griffith Exhibit 11, Tiger
14   Inventory Appraisal, Bates Stamped
15   SEARS_507B_00001287 through 1344, marked
16   for identification.)
17       (Griffith Exhibit 12, Letter to
18   Lazard Frères & Co. LLC, Dated
19   December 28, 2018, marked for
20   identification.)
21       (Griffith Exhibit 13, Letter to
22   Lazard Frères & Co. LLC, Dated January 9,
23   2019, marked for identification.)

Page 13

```
 1          (Griffith Exhibit 14, Asset Purchase
 2      Agreement, Dated January 17, 2019, marked
 3      for identification.)
 4          (Griffith Exhibit 15, Form 10-K of
 5      Sears Holdings Corporation, marked for
 6      identification.)
 7          (Griffith Exhibit 16, Expert Report
 8      of David M. Schulte, marked for
 9      identification.)
10          (Griffith Exhibit 17, Expert Report
11      of Marti P. Murray, Dated June 18, 2019,
12      marked for identification.)
13          (Griffith Exhibit 18, Declaration of
14      Mohsin Y. Meghji, Dated October 15, 2018,
15      marked for identification.)
16          (Griffith Exhibit 19, Final Order,
17      Dated November 30, 2018, marked for
18      identification.)
19          (Griffith Exhibit 20, Declaration of
20      Mohsin Y. Meghji, Dated February 1, 2019,
21      marked for identification.)
22          (Griffith Exhibit 21, Declaration of
23      Alan J. Carr, Dated February 1, 2019,
24      marked for identification.)
25
```

Page 14

```
 1          (Griffith Exhibit 22, Declaration of
 2      Robert A. Riecker, Dated November 23,
 3      2018, marked for identification.)
 4
 5      EXAMINATION BY
 6      MR. MOLONEY:
 7          Q.   I have to ask you to speak up, given
 8      all the people here, so they can hear you,
 9      okay?
10          A.   Okay.
11          Q.   Okay.  Thanks.  So could you please
12      state your full name and address for the
13      record?
14          A.   Brian J. Griffith, 116 Manhasset
15      Woods Road, Manhasset, New York, 11030.
16          Q.   And can you tell us what your
17      current position and title is?
18          A.   I am a managing director at M-III
19      Partners.
20          Q.   And could you tell me generally what
21      you did to prepare for your deposition today?
22          A.   Reviewed documents and met with
23      counsel over the past two days.
24          Q.   Okay.  Did you meet with anyone
25      other than counsel to prepare for the
```

Page 15

```
 1              GRIFFITH
 2      deposition?
 3          A.   Just my personal team.
 4          Q.   And who is that?
 5          A.   John Boffi and Nick Weber.
 6          Q.   And did you meet with them with
 7      counsel present or separately?
 8          A.   Both.
 9          Q.   Okay.  And did you review any
10      documents?
11          A.   Yes.
12          Q.   And which ones?
13          A.   Both of my declarations, the expert
14      reports that were filed, the replies that were
15      filed and our motion for the 507(b).
16          Q.   Okay.  And you say you read the
17      expert reports.
18          Did you read the documents that
19      were -- the experts said that they relied on?
20          A.   I can't say for sure.  I don't
21      believe I did look at all documents.  And I'm
22      sure there were other documents I looked at,
23      but those were the ones I could recall.
24          Q.   And have you ever been qualified as
25      an expert to testify in court?
```

Page 16

```
 1              GRIFFITH
 2          A.   I served as a witness for a plan of
 3      reorganization once before.
 4          Q.   And what was your role as the
 5      witness?  What was the general topic of your
 6      testimony?
 7          A.   Plan feasibility.
 8          Q.   And that was the only time you ever
 9      testified in court --
10          A.   Yes.
11          MR. GENENDER:  Let him finish his
12      question.
13          A.   Yes.
14          Q.   So I take it you've never testified
15      or offered an opinion in a case where a section
16      507(b) claim is justified?
17          A.   I have not.
18          Q.   I take it you have never testified
19      or offered an opinion in a case as to whether a
20      surcharge under section 506 is justified; is
21      that correct?
22          A.   I have not.
23          Q.   Have you authored any publications
24      in the last ten years?
25          A.   No.
```

Page 17

```
               GRIFFITH
 1
 2      Q.   Do you have any professional
 3  licenses?
 4      A.   I do not.
 5      Q.   Do you have any legal training?
 6      A.   I do not.
 7      Q.   Do you have any accounting training?
 8      A.   I mean, I took accounting classes in
 9  college, but no technical training.
10      Q.   In what areas, if any, do you
11  consider yourself to be an expert?
12      MR. GENENDER:  Object to the form.
13      A.   I'm not sure I would call myself an
14  expert in any area.  I have been in the
15  financial field for 20 years, but I'm not sure
16  that I would qualify as an expert.
17      Q.   I would like to show you what's been
18  marked as Exhibit 1 for identification, which
19  you have before you, which is the stipulation
20  and order concerning the resolution of certain
21  section 507(b) claims.
22      A.   Okay.
23      Q.   And have you seen this document
24  before?
25      A.   (Document review.)
```

Page 18

```
               GRIFFITH
 1
 2  I have.
 3      Q.   Okay.  If you look at paragraph 1,
 4  you understand the debtors' request for
 5  estimation has been withdrawn?
 6      A.   I see that.
 7      Q.   You don't dispute that, do you?
 8      A.   I don't think I have a reason to.
 9      Q.   Okay.  And so you are here to
10  testify on the issues of the 507(b) claim and
11  the 506(c) surcharge; is that correct?
12      A.   Yes.
13      Q.   Anything else?
14      A.   Not that I'm aware of, no.
15      Q.   Okay.  I would like to show you the
16  notice of deposition which we have marked for
17  identification as Exhibit 2, and you are here
18  pursuant to this notice, correct?
19      A.   (Document review.)  Yes.
20      Q.   Now, you are here -- you're
21  appearing today on behalf of the debtors; is
22  that correct?
23      A.   Correct.
24      Q.   And what do you do for the debtors?
25      A.   We are the financial advisors to the
```

Page 19

```
               GRIFFITH
 1
 2  debtors.
 3      Q.   When you say "we," who do you mean
 4  by "we"?
 5      A.   We, as in M-III Partners.
 6      Q.   And what specifically do you do in
 7  that connection?
 8      A.   I have taken on various roles over
 9  the course of the engagement, mainly around
10  treasury and cash flow functions.
11      Q.   And who do you report to, if anyone?
12      A.   I report to Mo Meghji.
13      Q.   And who is he?
14      A.   He is the senior partner of M-III
15  Partners.
16      Q.   Does he have a title?  Is he the
17  chief restructuring officer of the debtor as
18  well?
19      A.   He is.
20      Q.   Now, are you appearing today as a
21  fact witness or an expert witness or both?
22      A.   I would say a fact witness.
23      Q.   Okay.  I would like to show you what
24  we have marked for identification as Exhibit 3.
25      Can you look at that document,
```

Page 20

```
               GRIFFITH
 1
 2  please?
 3      A.   (Document review.)
 4      Q.   And were you aware that there was a
 5  document request that was served on the company
 6  to produce certain documents in connection with
 7  this litigation?
 8      A.   Yes.
 9      Q.   Did you play any role in gathering
10  the documents in response to that request?
11      A.   My team gathered most of the
12  documents.  Not me specifically.
13      Q.   And did you review the documents
14  that were produced?
15      A.   I can't say with certainty that I
16  have looked at every document that was
17  produced.
18      Q.   But generally?
19      A.   I've looked at them, yes.
20      MR. MOLONEY:  Okay.  I would like to
21  mark for identification, as Exhibit 4,
22  your initial declaration in this matter,
23  and as Exhibit 5 your supplemental
24  declaration.
25      Q.   Do you have copies of those before
```

Page 21

GRIFFITH

1    you?
2        A.    I do.
3        Q.    And just looking at it, are these
4    true and correct copies of these declarations
5    on your behalf?
6        A.    (Document review.)
7            Yes, this appears to be both.
8        Q.    Okay.  Now, looking at Exhibit 5 for
9    identification, and looking specifically at
10   page 6, do you see a chart with certain
11   numbers?
12       A.    Yes.
13       Q.    As you sit here today, do you intend
14   to change any of those numbers in connection
15   with your testimony at the trial in this
16   matter?
17       A.    I don't believe so.
18       Q.    Okay.  And do these two declarations
19   contain all the opinions you intend to --
20   include all -- do you believe they contain any
21   opinions, these declarations?  Let me start
22   with that question.
23           MR. GENENDER:  Objection, form.
24       A.    I do believe we reached some

Page 22

GRIFFITH

1    opinions based on the facts, our assumptions.
2        Q.    Do they contain all the opinions you
3    intend to give in this case?
4            MR. GENENDER:  Objection, form.
5        A.    Not necessarily.
6        Q.    What additional opinions do you
7    expect to give?
8        A.    There is a potential, if necessary,
9    to provide a follow-on declaration related to
10   any type of potential diminution post closing
11   of the sale through a confirmation date.
12       Q.    Are you working on that document
13   now?
14       A.    Not currently, no.
15       Q.    Have you worked on a document that
16   would be a declaration on that topic?
17       A.    Not as of today, no.
18       Q.    Is your team working on that?
19       A.    Not currently, no.
20       Q.    Do you anticipate you will be
21   working on a document dealing with that topic?
22           MR. GENENDER:  Objection, form.
23       A.    It's possible.
24       Q.    Have you been told that you will be

Page 23

GRIFFITH

1    working on a declaration providing that
2    information?
3            MR. GENENDER:  I'm going to object
4        and instruct you not to reveal
5        communications with counsel.
6            You can answer it without
7        revealing --
8            MR. MOLONEY:  I think he's an
9        expert.  I don't think you can insert
10       that, but go ahead.
11           MR. GENENDER:  An expert?  That's my
12       objection.  That's my instruction.
13       A.    I will listen to counsel.
14       Q.    Okay.  So you are not answering the
15   question?
16       A.    I am not.
17       Q.    Is it because it would reveal
18   attorney/client communication?
19       A.    It could, yes.
20       Q.    Okay.  Besides potentially giving an
21   opinion on diminution that occurred post sale
22   closing, if any, were there any other opinions
23   that you expect you might give related to this
24   case?

Page 24

GRIFFITH

1        A.    As I sit here today, I'm not aware
2    of any.
3        Q.    Okay.  I would like you to take a
4    look at Exhibit 6 for identification.
5            Is this one of the documents you
6    looked at, our reply brief, you said?
7            MR. GENENDER:  Objection, form.
8        A.    Yes.
9        Q.    So did you see this chart in our
10   reply brief?
11       A.    I don't have that brief in front of
12   me, I don't believe.
13       Q.    Okay.  But you don't recall it?
14       A.    It may.  It may not.  I don't know.
15       Q.    Okay.  We will go through it
16   together.  This is just a demonstrative.  So
17   it's not a document that you produced.
18       A.    Uh-huh.
19       Q.    It's a document we created, just so
20   you know, okay?
21       A.    Yep.
22       Q.    Okay.  If you look at the -- it's
23   basically an attempt by us to compare where you
24   and ESL's expert, David Schulte --

## Page 25

GRIFFITH

1
2          (Phone interruption.)
3          Q.    -- might differ.  And I would like
4    to start by looking at the inventory book
5    value.  And the way we read your reports, you
6    and Mr. Schulte actually agree on that same
7    starting number; is that correct?
8               MR. GENENDER:  Objection, form.
9          A.    I'd have to go and compare to my
10   deposition, because this is not something I
11   prepared.
12         Q.    You can look at your report at any
13   time.  So look at your report to see whether
14   your number is right.
15              I will represent to you this is
16   Schulte's number.
17              MR. GENENDER:  Objection, form.
18         A.    And this is from which --
19         A.    It's from your second declaration or
20   your first declaration.  Your first
21   declaration, actually, I think would be easiest
22   for you to find it.  It will be Exhibit 4.
23         A.    I believe that was updated in --
24         Q.    That's why I'm saying look at either
25   declaration.

## Page 26

GRIFFITH

1
2          A.    So I'll look at the supplemental.
3          Q.    Look at page 6 of the supplemental.
4    That's where you have these numbers.
5          A.    (Document review.)
6               MR. GENENDER:  Who created
7    Exhibit 6?
8               MR. MOLONEY:  I did.
9               MR. GENENDER:  I thought you said
10   earlier -- you represented earlier it was
11   part of your brief.
12              MR. MOLONEY:  Correct.
13              MR. GENENDER:  This exact Exhibit 6
14   was an exhibit to your brief?
15              MR. MOLONEY:  It's in the brief.
16              MR. GENENDER:  It says, "Expert
17   worksheet draft."
18              MR. MOLONEY:  It's essentially --
19   the substance is in the brief.  It's not
20   relevant.  I just wanted the witness to
21   know that he didn't create it.
22              MR. GENENDER:  I just want to know
23   what it is.  I think that's fair, isn't
24   it?
25   BY MR. MOLONEY:

## Page 27

GRIFFITH

1
2          Q.    You can answer the question as to
3    can you not figure out what value you put on --
4    book value of opening inventory by looking at
5    your two reports?
6               MR. GENENDER:  Objection, form.
7          A.    Well, my report has it as total
8    gross collateral.  It does not show it as
9    inventory.
10         Q.    Okay.  That's your supplemental
11   report.  Your initial report, take a look at
12   Exhibit A of your initial report.
13              You see you have a separate line
14   item for inventory book value?
15         A.    Yep.
16         Q.    Did you change that number to come
17   up with the new total in your supplemental
18   report?
19              MR. GENENDER:  Object to the form.
20              You're referring to his
21   declarations?
22              MR. MOLONEY:  Yeah.
23              MR. GENENDER:  You keep saying
24   report.  I assume you mean his
25   declarations.

## Page 28

GRIFFITH

1
2               MR. MOLONEY:  Correct.
3               MR. GENENDER:  Thank you.
4          A.    I did not.
5          Q.    So it's correct that you and
6    Mr. Schulte both agree on the same starting
7    number for inventory book value; is that
8    correct?
9          A.    Yes.
10         Q.    Okay.  And can you tell me where you
11   got your number?
12         A.    From -- I believe it's the borrowing
13   base that was in place at the time.
14         Q.    Okay.  And is the number in the
15   borrowing base based on the schedule that the
16   debtor provided?
17              MR. GENENDER:  Objection, form.
18         A.    Yes.
19         Q.    Okay.  So the ultimate source of
20   that information is the schedule, correct?
21              MR. GENENDER:  Objection to form.
22         A.    Which schedule?
23         Q.    The schedule that was provided to
24   the debtors -- to the banks pursuant to the
25   borrowing base from the debtor, correct?

Page 29

```
            GRIFFITH
1
2      A.   I believe so.
3           MR. GENENDER:  Objection, form.
4      Q.   And you indicated -- there's a
5  difference, you can see, between the total
6  collateral value in your first declaration and
7  the total collateral value in your second
8  declaration, correct?
9           MR. GENENDER:  Objection, form.
10     A.   Yes.
11     Q.   So please explain to me, what
12 adjustment did you make to the total gross
13 collateral in your supplemental report to
14 produce a different number than you had for the
15 total gross collateral in your initial report?
16          MR. GENENDER:  Objection, form.
17          You mean declarations?
18          MR. MOLONEY:  Declarations.
19          MR. GENENDER:  Thank you.
20     A.   I believe we removed the pharmacy
21 receivables from the credit card receivables or
22 accounts receivable.
23     Q.   Okay.  Before you filed your initial
24 declaration, was this reviewed by counsel?
25          MR. GENENDER:  Objection.
```

Page 30

```
            GRIFFITH
1
2      Q.   Just answer yes or no.
3           MR. GENENDER:  Objection, form.
4      A.   The initial declaration?
5      Q.   Yes.
6      Q.   Did I file it without counsel?
7      Q.   Was it reviewed by counsel before it
8  was finalized?
9           MR. GENENDER:  Objection, form.
10     Q.   Just answer yes or no.
11     A.   Yes.
12     Q.   Okay.  And was it reviewed by your
13 team before it was finalized?
14     A.   Yes.
15     Q.   And did counsel make any changes to
16 the declaration or was everything in the
17 declaration your work product?  I'm talking
18 about the initial declaration.
19          MR. GENENDER:  Objection, form.  I'm
20          going to instruct you in answering not to
21          reveal any privileged communications.
22     Q.   Just say yes or no.
23     A.   Have there been changes from the
24 initial draft?
25     Q.   Was there changes dictated by
```

Page 31

```
            GRIFFITH
1
2  counsel to your initial declaration, yes or no?
3           MR. GENENDER:  Objection to the
4           form.
5      A.   Yes.
6      Q.   Were there changes to this
7  information that's contained in the box on
8  page 6 of your initial report based on
9  information -- or based on what you were told
10 by counsel, yes or no?
11 DI        MR. GENENDER:  Objection, form.  I'm
12          instructing you not to answer on the
13          ground of privilege.
14     Q.   Okay.  And where did you source the
15 $7 million number that you used in your initial
16 report?
17          MR. GENENDER:  Objection, form.
18     Q.   Initial declaration.
19          MR. GENENDER:  Objection, form.
20     A.   I don't recall off the top of my
21 head where it was from.  It may have been the
22 borrowing base.
23     Q.   Why did you initially include the
24 pharmacy receivables in your initial
25 declaration?
```

Page 32

```
            GRIFFITH
1
2      A.   They are part of the first lien
3  collateral package.  They would be in the
4  borrowing base.
5      Q.   Did you include all of the first
6  lien collateral package in your initial
7  declaration?
8      A.   I don't believe so.
9      Q.   How did you decide what portions of
10 the first lien collateral package to include
11 and what portions to omit in your initial
12 declaration?
13     A.   We were attempting to show
14 collateral here that would also be collateral
15 of the second lien.
16     Q.   Okay.  So you initially believed the
17 pharmacy receivables were collateral for the
18 second lien; is that correct?
19          MR. GENENDER:  Objection, misstates
20          the testimony.
21     A.   No, it's not correct.
22     Q.   Okay.  What explanation do you have
23 for why you initially included it?
24          MR. GENENDER:  Objection, asked and
25          answered.
```

Page 33

```
 1            GRIFFITH
 2      A.   It was included in accounts
 3  receivable, but it should have been broken out
 4  separately as credit card receivables.
 5      Q.   Do you feel qualified to determine
 6  on your own whether or not it's part of the
 7  second lien collateral?
 8      A.   I can offer my opinion.
 9      Q.   I know you could offer your opinion,
10  but do you feel qualified to make that legal
11  judgment?
12           MR. GENENDER:  Objection, form,
13      calls for legal conclusion.
14      A.   Yeah, I can't make a legal
15  conclusion.
16      Q.   Okay.  Have you ever had, as part of
17  your business, had to make judgments as to
18  whether certain assets qualified as collateral
19  under a security agreement?
20      A.   I can offer my opinions, yes.
21      Q.   And when you make those opinions, do
22  you consult with lawyers?
23      A.   It's possible.
24      Q.   Did you consult with lawyers in this
25  case before you offered your opinion as to what
```

Page 34

```
 1            GRIFFITH
 2  was first and second lien collateral in your
 3  initial declaration?
 4  DI      MR. GENENDER:  Objection, form.  I'm
 5      going to instruct you not to answer based
 6      on the grounds he is requesting privileged
 7      information again.
 8      Q.   At footnote 6 of your supplemental
 9  declaration -- could you look at footnote 6 of
10  your supplemental declaration, which is
11  Exhibit 5 for deposition?  And that appears on
12  page 5 of your supplemental declaration.
13           Are you with me?
14      A.   I am.
15      Q.   You refer to the fact that section
16  10.9 of APA requires delivery of an aggregate
17  of 1.65 billion of acquired inventory, credit
18  card accounts receivable and pharmacy
19  receivables (which includes the pharmacy
20  scripts.)
21           Did I read that correctly?
22           MR. GENENDER:  No.
23      Q.   You may answer.
24      A.   Could you restate that?
25      Q.   Let me save the reporter having to
```

Page 35

```
 1            GRIFFITH
 2  do this.
 3           Why did you not include pharmacy
 4  script along with pharmacy receivables in your
 5  initial declaration?
 6           MR. GENENDER:  Objection, form.
 7      A.   I don't believe they were part of
 8  the borrowing base, the pharmacy scripts.
 9      Q.   Exhibit A of your initial
10  declaration, is it fair to say that it
11  represents a snapshot of the first lien and
12  second lien collateral potentially available to
13  satisfy a second lien debt as of the petition
14  date?
15      A.   No.
16      Q.   In what sense does it not?
17      A.   Exhibit A still had the pharmacy
18  receivables in it.
19      Q.   Okay.  With that caveat would you
20  say this was a snapshot as of the petition date
21  of the first and second liens debt and of the
22  collateral that would be available to satisfy
23  the second lien debt?
24           MR. GENENDER:  Objection, form.
25      A.   I believe so, with that caveat.
```

Page 36

```
 1            GRIFFITH
 2      Q.   Okay.  Now, there's no inclusion of
 3  any post petition interest that night have
 4  accrued in the future to the first lien debt in
 5  your initial declaration; is that correct?
 6      A.   In the initial declaration, that's
 7  correct.
 8      Q.   And if you had felt it was
 9  appropriate to include that item in your
10  initial declaration, you would have included
11  it, correct?
12      A.   We state in the initial declaration
13  that we were using Cyrus values from the
14  initial Cyrus offer.  We reserve rights to make
15  changes.  We reviewed it and we made changes in
16  this supplemental.
17      Q.   As of the petition date, there was
18  no post petition interest that was due and
19  owing to any secured creditor, correct?
20      A.   That's correct.
21      Q.   Okay.  Let's look at the chart on
22  your supplemental declaration.
23           You're not going to blame Cyrus for
24  any of the inputs on this chart, are you?
25           MR. GENENDER:  Objection,
```

Page 37

GRIFFITH

1
2 argumentative.
3     You don't have to answer that.  It's
4 not a question.
5     MR. MOLONEY:  It is.
6     Q.   You may answer.
7     MR. GENENDER:  It's not a serious
8 question.
9     A.   No.  I'm not looking to blame
10 anybody.
11     Q.   Okay.  So whose idea was it to take
12 out the pharmacy receivables in the chart that
13 appears at page 6 of your supplemental
14 declaration?
15     A.   I don't recall.  It was probably a
16 member of my team.
17     Q.   You don't know who instructed you to
18 do that?
19     MR. GENENDER:  Objection, asked and
20 answered.
21     A.   I wasn't instructed.  It was upon
22 further diligence.
23     Q.   It wasn't your decision.  You didn't
24 come up with the idea, I take it?
25     MR. GENENDER:  Objection to form,

Page 38

GRIFFITH

1
2 misstates the evidence.
3     A.   We were reviewing all of the
4 figures, and this was one of the issues that
5 came up.
6     Q.   No, but it wasn't your idea to take
7 out that number.  You said it was a member of
8 your team.
9     Was that an incorrect statement?
10 You can correct the record if it was incorrect.
11     MR. GENENDER:  Objection, compound,
12 vague.
13     A.   Somebody may have identified it.  It
14 may have been my instruction to take it out.
15     Q.   And you don't know who that person
16 was?
17     A.   I can't recall, no.
18     Q.   Okay.  Before agreeing to that
19 change, what, if any, diligence did you
20 personally do to ensure your original inclusion
21 of the pharmacy receivable is not correct?
22     MR. GENENDER:  Objection, form.
23     He's going really fast.  So take
24 your time in answering.  He's speaking
25 really fast.

Page 39

GRIFFITH

1
2     Objection, form, assumes facts not
3 in evidence, and misstates the record.
4     A.   Could you restate the question?
5     Q.   Sure.  Before agreeing to the
6 change, which was the omission of the pharmacy
7 receivables from your revised chart that
8 appears at page 6 of your supplemental
9 declaration, I asked what, if any, diligence
10 did you do to ensure the original inclusion of
11 the pharmacy receivables was not actually the
12 correct treatment?
13     MR. GENENDER:  Objection, misstates
14 the record, assumes facts not in evidence.
15     A.   I'm still not sure I'm following the
16 question.
17     Are you asking about the original or
18 the adjustment?
19     Q.   When you made the change, what did
20 you do to make sure that the change was
21 correct, if anything?
22     A.   We reviewed the detail of the
23 accounts receivable and the credit card
24 receivable between -- the breakdown between
25 that and the pharmacy receivable from the

Page 40

GRIFFITH

1
2 detail provided by the company.
3     Q.   Did you look at the security
4 agreements for the second lien creditors?
5     A.   We have looked at the security
6 agreements for the second lien creditors, yes.
7     Q.   Do you know that they have a
8 security interest in inventory?
9     MR. GENENDER:  Objection, form.
10     A.   Yes.
11     Q.   And that inventory includes pharmacy
12 inventory, correct?
13     MR. GENENDER:  Objection, misstates
14 the record.
15     A.   I can't say for sure.
16     Q.   You don't know?
17     MR. GENENDER:  Objection to form.
18     A.   About the pharmacy receivable, I
19 don't know.
20     MR. GENENDER:  Document speaks for
21 itself.
22     A.   Or inventory, you're saying, I would
23 assume it does.
24     Q.   And assuming it does include
25 pharmacy inventory, why wouldn't pharmacy

Page 41

```
1              GRIFFITH
2    receivables be the proceeds of pharmacy
3    inventory?
4              MR. GENENDER:  Objection, assumes
5       facts not in evidence, misstates the
6       record.
7       Q.    You may answer.
8       A.    In the first lien credit agreement,
9    they lay out the fact that pharmacy receivables
10   are a piece of their collateral as a separate
11   item.  The second lien does not.  So we
12   excluded it.
13   MO        MR. MOLONEY:  Okay.  I move to
14      strike that.
15            Can you read back my question,
16      please?
17            (Record read.)
18            MR. GENENDER:  Same objection, asked
19      and answered.
20      A.    Yeah.  I did not see pharmacy
21   receivables listed as a piece of the
22   collateral.
23      Q.    Are you familiar with the concept of
24   what proceeds -- account proceeds are defined
25   under the Uniform Commercial Code of the State
```

Page 42

```
1              GRIFFITH
2    of New York?
3              MR. GENENDER:  Objection, form,
4       calls for a legal conclusion.
5       A.    Yeah.  And I would have to see it,
6    but I can't say that I do.
7       Q.    Okay.  So you really didn't -- this
8    was a judgment made by somebody else, not by
9    you or by your team, correct?
10            MR. GENENDER:  Objection, misstates
11      the record, misstates his testimony.
12      A.    Yeah, I would say no to that.
13      Q.    Okay.  You made it without knowing
14   whether or not our agreements actually covered
15   the collateral?  You just took it out?
16            MR. GENENDER:  Objection, compound,
17      misstates the record.
18      A.    I explained why we made the change.
19      Q.    Okay.  You attribute a value of
20   54 -- going back to Exhibit 6 again.
21            Do you have that in front of you
22   still?
23      A.    I do.
24      Q.    You attribute a value of
25   $54.8 million in receivables remaining a part
```

Page 43

```
1              GRIFFITH
2    of the second lien collateral in your second --
3    in your supplemental declaration, correct?
4              MR. GENENDER:  Objection, form.
5       What is footnote 1 on there?
6       A.    Yeah.  There is no footnote.  What's
7    the footnote for?
8       Q.    I didn't say a footnote.
9              MR. GENENDER:  Next to your
10      Exhibit 6, there's a footnote next to that
11      figure.
12            MR. MOLONEY:  I have no idea why it
13      is there.  And I apologize.  It shouldn't
14      be there, but, in any event, ignore the
15      footnote.
16      A.    Okay.  What was the question?
17      Q.    Let me ask it again.
18            You attribute a value of
19   $54.8 million there to receivables remaining a
20   part as the -- in your supplemental
21   declaration, correct?
22      A.    Yes.
23      Q.    And you see Mr. Schulte has a value
24   of 64.2?
25      A.    I do.
```

Page 44

```
1              GRIFFITH
2       Q.    Do you have an understanding as to
3    why you and Mr. Schulte might have come up with
4    different numbers?
5       A.    I don't know the source of his
6    number.
7       Q.    Okay.  Can you tell us what the
8    source is for your number?
9       A.    Like I said, I believe it was from
10   the borrowing base that was in effect at the
11   time.
12      Q.    And you are relying on a forecast
13   number, right?
14            MR. GENENDER:  Objection, form.
15      A.    Borrowing base is not a forecast.
16      Q.    But this particular number is based
17   on a forecast, isn't it?
18            MR. GENENDER:  Objection, form.
19      A.    I don't believe so.
20      Q.    How do you think -- you think this
21   number is based on a schedule from the debtors?
22      A.    I believe it's from the borrowing
23   base.
24      Q.    But where -- how do the lenders
25   compute this number under the borrowing base?
```

```
 1              GRIFFITH
 2      A.   The company computes the number
 3  under the borrowing base.
 4      Q.   And do you know how it's done?
 5      A.   They pull, from their general
 6  ledger, the balances.
 7      Q.   You think this is a general ledger
 8  number?
 9      A.   I can't say for sure.
10      Q.   Would you think that the general
11  ledger number would be the correct number?
12      A.   I would think the borrowing base
13  would be the correct number.
14      Q.   Why would the borrowing base be a
15  better number than the general ledger if the
16  borrowing base was based on the general ledger?
17          MR. GENENDER:  Objection, form.
18      A.   There may be adjustments that need
19  to be taken out of an accounting system.  I'm
20  not a hundred percent sure.
21      Q.   If that's the number that's in the
22  debtors' schedule, 64.2, if that's the number
23  in the debtors' schedule, is that the correct
24  number?
25          MR. GENENDER:  Objection, form,
```

```
 1  asked and answered.
 2      A.   I don't believe so.  I mean, like I
 3  said, it should be from the borrowing base.
 4      Q.   The borrowing base, by definition,
 5  could have certain assets that the lender is
 6  not going to be willing to lend against but
 7  could, nevertheless, qualify as our inventory,
 8  correct?
 9          MR. GENENDER:  Objection, form.
10      A.   I'm not sure I follow the question.
11      Q.   You understand that the borrowing
12  base is a contractual arrangement between the
13  banks and the debtor as to what terms they are
14  going to advance credit?
15      A.   Yes.
16      Q.   And they don't have to necessarily
17  advance credit on a hundred percent of the
18  value of the assets that are available to them
19  as collateral, correct?
20      A.   Yes.
21      Q.   So you don't know where this
22  $54.2 million number is, but I will tell you I
23  believe it could be a forecast, but you don't
24  know one way or the other; is that correct?
```

```
 1              GRIFFITH
 2          MR. GENENDER:  I'm going to object.
 3  There's no $54.2 million number.
 4      Q.   $54.8 million number.
 5          MR. GENENDER:  Object to the form of
 6  the question, misstates the record.
 7      Q.   You don't know where it comes from?
 8      A.   I don't believe it's a forecast.
 9      Q.   Okay.  But you don't have a source?
10          MR. GENENDER:  Objection, misstates
11  the record.
12      A.   Again, I believe it's from the
13  borrowing base.
14      Q.   If Schulte used the ledger, the
15  general ledger, and he used the debtors'
16  numbers from the debtors' own schedules filed
17  with the court, is it your view that that was
18  inappropriate by him?
19          MR. GENENDER:  Objection, assumes
20  facts not in evidence.
21      A.   I'm not sure if he's pulling the
22  right numbers if it's not coming from the
23  borrowing base.  There may be additional
24  accounting journal entries or accounts that
25  need to be contemplated.  I don't know.
```

```
 1              GRIFFITH
 2      Q.   Who suggested that you add in
 3  $34 million on page 6 of your chart in your
 4  supplemental declaration that was not contained
 5  in Exhibit A to your initial declaration?
 6          MR. GENENDER:  Objection, assumes
 7  facts not in evidence and instruct you not
 8  to reveal any communications with counsel
 9  on the grounds of privilege.
10      Q.   Can you answer the question?
11      A.   I'm agreeing with counsel.
12          MR. GENENDER:  Excuse me.  You can
13  answer -- you can answer the question if,
14  in doing so, you don't reveal
15  communications with counsel.
16          THE WITNESS:  Okay.
17      Q.   Can you answer the question?
18          MR. GENENDER:  Subject to that
19  instruction.
20      A.   As I said before, we went back and
21  did additional diligence.  And it was an issue
22  that was raised.  I don't recall who raised it,
23  but it was something that we decided did make
24  sense to include, given the fact that there
25  would be some level of post petition senior
```

Page 49

```
              GRIFFITH
 1
 2    interest that would be incurred.
 3        Q.   But by including that number, you no
 4    longer are showing a snapshot as of the
 5    petition date, right?
 6        A.   That's correct.
 7        Q.   You don't think you are mixing
 8    apples and oranges?
 9            MR. GENENDER:  Objection, form.
10        A.   This is our view of what we thought
11    the maximum amount would be available for
12    second lienholders.
13        Q.   That $34 million number is not an
14    actual -- it's not based on actual payments
15    made by the debtors, correct?
16        A.   That's correct.
17        Q.   What is the actual amount, if any,
18    that the debtors paid?
19        A.   I'm not sure I follow the question.
20        Q.   What amount, if any, did the debtors
21    actually pay in post petition interest in that
22    three-month period?
23        A.   Well in excess of 34 million.
24        Q.   What number?
25        A.   I don't have it off the top of my
```

Page 50

```
              GRIFFITH
 1
 2    head.
 3        Q.   Why did you pick this number rather
 4    than the actual number?
 5        A.   This was a hypothetical number based
 6    on the bare minimum we expected to incur.
 7        Q.   Okay.  In paragraph 6 of your
 8    supplemental declaration, you say, "Each of the
 9    reports rely on incorrect or misapplied data
10    taken from other sources," correct?
11        A.   Yes.
12        Q.   And when you say "from other
13    sources," what are you referring to?
14        A.   Saying other sources other than what
15    we had used.
16        Q.   And I take it, did you use any
17    source other than the borrowing base?
18        A.   For what figures?
19        Q.   For any figures.
20        A.   We have a lot of figures in our
21    analysis, including expenses, which would not
22    be considered part of the borrowing base.
23        Q.   Did you -- for some of your numbers,
24    did you look at the general ledger?
25        A.   I don't believe so.
```

Page 51

```
              GRIFFITH
 1
 2        Q.   Did you feel that was an unreliable
 3    accounting record of the debtors?
 4            MR. GENENDER:  Objection, form.
 5        A.   We rely on the borrowing base
 6    certificate.
 7        Q.   Other than the borrowing base, what
 8    other sources did you look at for the
 9    information contained either in your initial
10    declaration in Exhibit A or in your
11    supplemental declaration on page 6 in the
12    table?
13            MR. GENENDER:  Objection, asked and
14    answered.
15        A.   There's multiple sources for the
16    data analysis that we pulled together.
17        Q.   Okay.  Name them, please.
18        A.   The treasury systems would give us
19    the expenses.
20        Q.   Any others?
21        A.   Not that I can think of sitting here
22    today.
23        Q.   Okay.  The treasury system, does
24    that feed into the general ledger?
25        A.   I'm not -- I don't know a hundred
```

Page 52

```
              GRIFFITH
 1
 2    percent how they feed together.
 3        Q.   You wouldn't be surprised if the
 4    general ledger fed into the treasury system,
 5    would you?
 6            MR. GENENDER:  Objection, calls for
 7    speculation.
 8        Q.   As a financial person, wouldn't you
 9    expect that?
10        A.   It's quite possible, yes.
11        Q.   Okay.  Now, what, if any, misapplied
12    data do you claim Schulte relied on?
13        A.   I don't believe he should be using
14    book value, is one instance, for his collateral
15    value.
16        Q.   Any other?
17        A.   I would have to go through his
18    report, if we want to go take a look.  But,
19    also, he did not include the L/C facilities,
20    which we believe should be included.
21            I disagree with the 95.5 percent
22    book value of GOB inventory.  Those are the
23    couple I can think of sitting here, in addition
24    to the fact that he is including collateral
25    values that we do not believe are part of the
```

| Page 53 | Page 54 |
|---|---|

GRIFFITH

1
2  2L collateral.
3      Q.   Just to close the loop, specifically
4  as to Mr. Schulte, what, if any, inappropriate
5  sources do you claim that he relied on for his
6  conclusions?
7          MR. GENENDER:  Objection, asked and
8      answered.
9      A.   I mean, credit card receivables, I
10  don't recognize that number.  And the GOB
11  valuations, I'm not sure I understand those.
12     Q.   Okay.
13     A.   There may be more.
14         MR. GENENDER:  When you get to a
15     point we can take a break --
16         MR. MOLONEY:  I will ask one more
17     question about that last item, then we
18     will take a break.
19         MR. GENENDER:  You bet.  Thank you.
20     Q.   If you look at your supplemental
21  exhibit, look at Exhibit A, and you go to
22  page 5 of 35 of Exhibit A.
23         To be clear, Exhibit A is the
24  borrowing base, correct?
25         MR. GENENDER:  As of the date

GRIFFITH

1
2  reflected on it?
3          MR. MOLONEY:  Yes.
4      A.   (Document review.)  Yes.
5      Q.   If you look under credit card
6  receivables.
7          MR. GENENDER:  Which page are you
8      on?
9      Q.   It's that page.  It's the last of
10  the columns -- I'm sorry, the print is tiny --
11  but it's in red.  It says, "Credit card
12  receivables, treasury, cash flow, inflow
13  forecast."
14         MR. GENENDER:  I want to make sure
15     the witness is on the right page.
16         MR. MOLONEY:  It's page 5 of 35.
17     A.   I am on that page.  I see it.
18     Q.   Okay.  And the number you're relying
19  on, 54.6, is, in fact, based on a forecast; is
20  that not correct?
21         MR. GENENDER:  54.8?
22     Q.   54.8.
23         MR. GENENDER:  Objection, misstates
24     the record.
25     Q.   You may answer.

| Page 55 | Page 56 |
|---|---|

GRIFFITH

1
2      A.   (Document review.)
3          The date of the certificate is
4  October 13.  The dates and the totals of these
5  columns is also October 13.  I don't believe
6  that that's a forecast as of that date.
7      Q.   It says, doesn't it, credit card
8  forecast.
9          MR. GENENDER:  Hang on a second.
10     Tom, he needs to be able to finish
11     his answer.  You kind of cut him off.
12         MR. MOLONEY:  I didn't mean to.
13         MR. GENENDER:  I know.
14     A.   I'm saying that the date has
15  actually occurred.  I don't understand how that
16  would be a forecast.
17         I can't say, looking at this, that
18  the label is accurate.
19     Q.   It says, "Based on forecasted
20  totals."  Do you see that, where it says
21  millions on the third line under the red, which
22  is credit card receivables, treasury, cash
23  flow, inflow forecast?
24     A.   Okay.  I see it.
25     Q.   And that doesn't cause you to change

GRIFFITH

1
2  your opinion?
3      A.   I don't know of the accuracy of that
4  title.
5      Q.   Okay.  And if you go to page 16 of
6  35, if you look under the line credit card
7  deposits in transit.
8      A.   Okay.
9      Q.   And if you look at those numbers, if
10  you add them up, they represent the number that
11  Mr. Schulte is relying on.
12         MR. GENENDER:  Objection, form.
13     A.   Okay.
14     Q.   If he sourced his number from the
15  borrowing base document, the one that -- this
16  line, other than the other section, what
17  criticism, if any, do you have of his choice of
18  sources?
19         MR. GENENDER:  Objection, assumes
20     facts not in evidence, misstates the
21     record.
22     A.   This is as of October 6, which is a
23  full week before the borrowing base.
24         MR. MOLONEY:  We can take a break.
25         MR. GENENDER:  Thank you.

Page 57

```
 1              GRIFFITH
 2        (Recess taken at 2:59 p.m. to
 3     3:11 p.m.)
 4  BY MR. MOLONEY:
 5     Q.   Could you look at the document in
 6  front of you that's marked Exhibit 9 for
 7  identification?
 8        MR. FOX:  Which is 9?
 9        MR. MOLONEY:  For the record, it's
10     Exhibit G.  It's Joint Exhibit 14.  I
11     believe it was one of the joint exhibits
12     at the sale hearing.
13     Q.   It says -- under that, it says,
14  "Transform Transaction - Weekly Tracking."
15        Mr. Griffith, am I correct that you
16  are familiar with documents like this one,
17  which are administrative solvency trackers?
18        MR. GENENDER:  Objection, form.
19     A.   Yes.
20     Q.   And did you ever prepare documents
21  like this one?
22     A.   I have.
23     Q.   And if we look at this particular
24  document, there's a discussion on page 4 at the
25  top, about -- there's a category called "RX
```

Page 58

```
 1              GRIFFITH
 2  Scripts."
 3        Do you see that?
 4     A.   I do.
 5     Q.   And does that refer to pharmacy
 6  scripts?
 7     A.   It does.
 8     Q.   And there's a project, and you're
 9  listed as one of the responsible parties which
10  is script appraisal; is that correct?
11     A.   Yes.
12     Q.   And there's an identified
13  opportunity.
14        What does that represent?
15     A.   I believe a potential benefit to the
16  borrowing base.
17     Q.   And at that point in time, the
18  company was able to borrow, based on the
19  script, $7.50, is that correct, per script?
20     A.   No, no.
21     Q.   What is the comment, "Current
22  borrowing base of 7.50/script resulting in
23  $25 million of availability"?  What is that
24  based on?  What does that mean?
25        MR. GENENDER:  Objection, form,
```

Page 59

```
 1              GRIFFITH
 2     A.   I believe that was related to the
 3  credit agreement being negotiated for Transform
 4  that would allow them to borrow against the
 5  scripts.
 6     Q.   Okay.  And the idea was to try to
 7  come up with a better appraisal of the script;
 8  is that correct?
 9        MR. GENENDER:  Objection, form,
10     misstates the evidence.
11     A.   We were just running this down, I
12  believe.  Tiger was doing an appraisal for
13  NewCo.
14     Q.   And were you working with them?
15     A.   We were just waiting for the results
16  of it.
17     Q.   So when it says you're the
18  responsible party, all you were responsible for
19  was waiting for the results of somebody else's
20  work?  Is that what you're telling us?
21        MR. GENENDER:  Objection, misstates
22     his testimony.
23     A.   Yeah.  We were supposed to wait for
24  the results, review it and include it for
25  potential liquidity enhancement.
```

Page 60

```
 1              GRIFFITH
 2     Q.   Okay.  Could you look at what we
 3  have marked for identification as Exhibit 7?
 4  Can you identify for us what this document is?
 5     A.   (Document review.)
 6        It says it's an estimated script
 7  asset value.
 8     Q.   And who put this together?
 9     A.   I do not know.
10     Q.   Did you -- this is one of the
11  documents that was produced by your team,
12  right, in response to your document request; is
13  that correct?
14     A.   It is possible.
15     Q.   The Bates stamp numbers are numbers
16  that were put on by your client, in fact, when
17  they produced documents to us in response to
18  the document request; isn't that correct?
19     A.   I mean, I can't confirm it by just
20  looking at these numbers at the bottom, but --
21     Q.   I will represent to you it is one of
22  the documents produced by your team.
23        So did you not try to understand
24  what the document was that you were producing?
25        MR. GENENDER:  Objection, form,
```

Page 61

GRIFFITH

1
2  argumentative.
3      A.   I believe we were trying to provide
4  every document that we had that could
5  potentially be helpful or something that we
6  would have looked at at some point.
7      Q.   Okay.  And at the filing date, the
8  company had approximately 140 stores, is that
9  correct, that sold pharmacy script?
10         MR. GENENDER:  Objection, form.
11     A.   I don't know that off the top of my
12 head.
13     Q.   Even though you're responsible for
14 pharmacy script, that's not a number you know?
15         MR. GENENDER:  Objection, form,
16 misstates the record.
17     A.   I don't.
18     Q.   Do you have any reason to believe
19 that's not the correct number?
20     A.   I mean, this file doesn't have a
21 date or a title on it.  I'm not exactly sure
22 what this is supposed to be representing.
23     Q.   Well, it was produced to us in
24 response to a request for information about the
25 value of the pharmacy script as of petition

Page 62

GRIFFITH

1
2  date.  So you tell me what it's supposed to be
3  representing.
4          MR. GENENDER:  Objection, form,
5  misstates the evidence, assumes facts not
6  in evidence.
7      Q.   You may answer.
8      A.   Multiple documents were provided, I
9  think, to allow parties to understand what the
10 potential value was.
11     Q.   And this was one of them.  And
12 you're saying that you made no effort to find
13 out what it meant or who produced it?
14         MR. GENENDER:  Objection, compound,
15 misstates the record.
16     A.   It's not the document that we relied
17 on, no.
18     Q.   You also made no effort to find out
19 who produced it or what it meant?
20         MR. GENENDER:  Objection, misstates
21 the testimony.
22     A.   Given the level of detail included,
23 I don't think we put much reliance on this
24 document.
25     Q.   Well, the detail, it lists every

Page 63

GRIFFITH

1
2  single location with the store, right?
3          MR. GENENDER:  Objection, form.
4      A.   It appears to, yeah.
5      Q.   It has an estimated asset value for
6  each -- for the pharmacy script at each store,
7  correct?
8      A.   As of what date, I don't know.
9      Q.   Well, that's what I'm asking you.
10         MR. GENENDER:  Objection, form.
11         There's no question there.
12     Q.   As of the date when there was 140
13 stores still operating, which is as of the
14 petition date, right?
15         MR. GENENDER:  Objection, form,
16 assumes facts not in evidence.
17     A.   Yeah, I can't confirm that.
18     Q.   Assuming that we will be able to
19 prove at trial that there were 140 stores
20 selling pharmacy receivables at the petition
21 date, and I represent to you we will, do you
22 have any reason to believe this does not
23 represent the value of the pharmacy script as
24 of the petition date?
25         MR. GENENDER:  Objection, assumes

Page 64

GRIFFITH

1
2  facts not in evidence, lack of foundation,
3  calls for speculation.
4      A.   Given there is no date on here, I
5  can't tell you as of what date this would have
6  been.
7      Q.   Okay.  Putting aside -- assume, for
8  purposes of my question, that the date is as of
9  the filing date, petition date, can you tell me
10 any reason why the number, $72 million --
11 $72,804,891 is not an appropriate estimated
12 script asset value for pharmacy receivables?
13         MR. GENENDER:  Objection, lack of
14 foundation, calls for speculation and
15 assumes facts not in evidence.
16     A.   Yeah, I can't tell you from this
17 document that that's necessarily the case.
18     Q.   But you can't tell me it's not the
19 case either, right?
20         MR. GENENDER:  Same objections.
21     A.   We have a valuation done by
22 professionals that we have relied on, not this
23 spreadsheet.
24     Q.   And what document did -- is that the
25 one that you are looking to have redone as of

Page 65

```
           GRIFFITH
 1
 2   1/25/19?
 3          MR. GENENDER:  Objection to form.
 4      A.   We have the appraisal from Tiger,
 5   and Tiger was doing an update of the appraisal.
 6      Q.   Okay.  We've marked Exhibit Number
 7   10 for identification, if you look at that.
 8          Does this represent the updated
 9   appraisal?
10      A.   It's the appraisal as of February 4.
11      Q.   And, in fact, if you go to page 13,
12   you will see there's a valuation put of $10.08
13   per script; is that correct?
14          MR. GENENDER:  Objection, form.
15      A.   That's what it says.
16      Q.   Any reason to believe that that
17   number is not correct?
18      A.   No.
19      Q.   And that only deals with 89
20   pharmacies, correct?
21      A.   (Document review.)
22          Yes, that's what it says.
23      Q.   And are you aware that at or after
24   the filing, debtor closed 51 pharmacies?
25      A.   I'm sorry.  Can you repeat the
```

Page 66

```
           GRIFFITH
 1
 2   question?
 3      Q.   Are you aware that at or after the
 4   filing of the chapter 11 petition, the debtor
 5   closed 51 pharmacies?
 6      A.   It's possible.  I don't know for
 7   sure.
 8      Q.   If you look at Bates stamp number
 9   12 -- let's see.  Where is the first one --
10   okay.  1276 -- actually, you can start at 1275.
11      A.   Okay.
12      Q.   You see that's a summary of what we
13   have just been talking about, 89 pharmacies,
14   correct?
15      A.   I see that.
16      Q.   You have 3,640,000 scripts and the
17   price, estimated value is 36,690,000 for that
18   number of scripts; is that right?
19          MR. GENENDER:  Objection, form,
20      misstates the record.
21      A.   It appears to.
22      Q.   Okay.  And then you look at the
23   backup, and you see the backup has locations
24   which are the same -- some of which are the
25   same location numbers that appeared on
```

Page 67

```
           GRIFFITH
 1
 2   Exhibit 7, correct?
 3          MR. GENENDER:  Objection, form.
 4      Q.   So, for example, the first one, if
 5   you look at 3021, we can find that at the
 6   bottom of Exhibit 7, right?
 7      A.   What number are you referring to?
 8      Q.   It's the first number on 1276, which
 9   is 3021, location 1276.  If we look at the last
10   page of Exhibit 7, and we look at the one, two,
11   three, four, five, fifth entry from the bottom
12   you see the same store.
13          MR. GENENDER:  Fifth from the
14      bottom, 3317?
15          MR. MOLONEY:  3021.  One, two,
16      three, four, five, six.
17          MR. GENENDER:  Exactly.
18      Q.   Sixth one up from the bottom, you
19   see the same store, correct?
20          MR. GENENDER:  Objection to form.
21      A.   Uh-huh.
22      Q.   If you look at the valuation, the
23   valuation they have here for 3201 is a low
24   value of 200,000 and a high value of 225, and a
25   mid value of approximately 213 and 3021 has a
```

Page 68

```
           GRIFFITH
 1
 2   valuation of 224, which is closer to the high
 3   number, right?
 4          MR. GENENDER:  You said 3201 and
 5      3021 in that same question.  Object to the
 6      form.
 7      Q.   3021 has a value of -- looking
 8   across, has a value of 224,903 in Exhibit 7.
 9   And in Exhibit 10, it has valuations that range
10   from 202,000 to 225, right?
11      A.   (Document review.)
12          MR. GENENDER:  Objection, form.  The
13      document speaks for itself.
14      A.   I see it, yeah.
15      Q.   Did you study these documents at any
16   point in time?
17      A.   I reviewed the documents.  I
18   wouldn't say I've studied them.
19      Q.   Okay.  And this Tiger value, is this
20   the value at that time debtor used of $10.08
21   when it delivered pharmacy receivables to
22   satisfy its minimum delivery obligation under
23   the APA?
24          MR. GENENDER:  Objection, form.
25      A.   (Document review.)
```

GRIFFITH

1
2　Q.　If you look at Exhibit 8, which is
3　in your pile --
4　　　MR. GENENDER:  If you let him --
5　　　MR. MOLONEY:  If you look at
6　Exhibit 8, it will help him, but okay.
7　　　MR. GENENDER:  There's no question
8　on the floor.
9　　　Do you have a new question?
10　　　MR. MOLONEY:  I asked him to look at
11　Exhibit 8.  He looked at his own
12　declaration, but that doesn't help him.  I
13　knew it wouldn't.  I'm trying to help him
14　by looking at Exhibit 8.
15　　　MR. GENENDER:  How about if you ask
16　him questions instead of trying to help
17　him?
18　　　MR. MOLONEY:  I asked him to look at
19　Exhibit 8.
20　　　MR. GENENDER:  8?
21　　　MR. MOLONEY:  8.
22　　　MR. GENENDER:  Okay.  Look at
23　Exhibit 8 and wait for a question.
24　Q.　Have you seen this letter before?
25　A.　I'm sorry.  Exhibit 8.  This is 9.

GRIFFITH

1
2　Q.　Exhibit 8.
3　A.　(Document review.)  Yes.
4　Q.　Okay.  And if you look at the
5　document which is attached to the letter, which
6　is the satisfaction of conditions to close, do
7　you see that?
8　A.　I do.
9　Q.　Did your group prepare this?
10　A.　Yes.
11　Q.　Okay.  Now, looking at -- it says,
12　"Pharmacy receivables of $10 million and
13　pharmacy script value of $37 million per Tiger
14　appraisal issued 2/4/19."
15　　　Did I read that correctly?
16　A.　Yes.
17　Q.　Does that mean that you used the
18　price of $10.08 per pharmacy script in order to
19　satisfy your obligations -- the company's
20　obligations to meet the minimum delivery
21　requirements under the APA?
22　A.　It would appear so.
23　　　MR. GENENDER:  Objection, form,
24　calls for a legal conclusion.
25　Q.　You believe that's the correct

GRIFFITH

1
2　number to use for the value of the pharmacy
3　scripts as of petition date?
4　　　MR. GENENDER:  Objection, form,
5　misstates the evidence.
6　A.　As of the close date, I would say
7　yes.
8　Q.　But not as of the petition date,
9　because the close date is a different date and
10　time, right?
11　A.　That's right.
12　Q.　Now, going back again to Exhibit 6.
13　You did not include cash, unrestricted cash in
14　your collateral values, correct?
15　A.　Could you say that again?
16　Q.　You did not include the debtors'
17　unrestricted cash in your gross collateral
18　value, correct?
19　A.　That's correct.
20　Q.　And putting aside whether or not
21　that was a correct decision on your part, do
22　you agree that the amount of cash that was
23　unrestricted that the debtor had as of the
24　petition date was $115.5 million?
25　　　MR. GENENDER:  Objection, form.

GRIFFITH

1
2　A.　I don't know the source.  I can't
3　say I can confirm that.
4　Q.　Assume that the general ledger
5　reflects that amount.  Would you have any
6　quarrel?
7　　　MR. GENENDER:  Objection, form,
8　assumes facts not in evidence.
9　A.　What was the question about the
10　cash?
11　Q.　I said assuming the general ledger
12　reflected that there was $115.5 million of
13　unrestricted cash as of petition date, would
14　you have any quarrel with Mr. Schulte relying
15　on that source for that piece of information?
16　　　MR. GENENDER:  Objection to form,
17　assumes facts not in evidence.
18　A.　I would.  I would have a problem.
19　Q.　Which would be what?
20　A.　One, I don't believe it's part of
21　the collateral package for the 2Ls.
22　　　And, two, I don't know if that cash
23　relates to unencumbered assets or inventory and
24　accounts receivable monetizations.
25　MO　　MR. MOLONEY:  I move to strike that

Page 73

GRIFFITH

1
2  answer.
3      Q.   My question is, not asking about
4  whether or not it's part of the collateral
5  package.  I'm asking you about the number and
6  whether this represents unrestricted cash that
7  the debtor had as of petition date.
8          MR. GENENDER:  Objection.
9      Q.   And with that question in mind,
10  assuming Mr. Schulte sourced his information
11  from the general ledger, do you have any
12  quarrel with him using that source?
13          MR. GENENDER:  Objection, form.
14  Objection, form, asked and answered.
15      A.   I do.
16          MR. GENENDER:  You can answer one
17  more time.
18      Q.   You may answer.
19      A.   I would have a problem with that,
20  yes.
21      Q.   Which is what?
22          MR. GENENDER:  Objection, form,
23  asked and answered.
24      A.   I don't know if that's cash that's
25  related to unencumbered asset sales or

Page 74

GRIFFITH

1
2  potentially inventory and accounts receivable
3  monetization.
4      Q.   You understand I'm not asking you
5  that question as to whether or not it relates
6  to any of those things.  I'm asking you whether
7  there's unrestricted cash that the debtor had
8  as of the petition date in the amount of
9  $115.5 million.  I'm not asking you any
10  question at all whether somebody has a
11  collateral position or not.
12          I just want to know if the number is
13  correct.
14          MR. GENENDER:  Objection, form,
15  asked and answered.
16      A.   I can't tell you from this schedule
17  if that's correct.
18      Q.   And I'm asking if you wanted to just
19  get the number, do you have any quarrel with
20  looking at the general ledger as a source for
21  just the number?
22          MR. GENENDER:  Objection, form.
23      A.   I may, yes.
24      Q.   You may.  And why may you?
25      A.   In the general ledger, there are

Page 75

GRIFFITH

1
2  certain categories that may be treated as cash
3  that are not technically cash.  They are
4  treated as cash for an accounting perspective,
5  but may not actually be depository accounts.
6      Q.   Assuming they are depository
7  accounts, would you have any other quarrel?
8          MR. GENENDER:  Objection, form, lack
9  of foundation, calls for speculation.
10      A.   Yeah, I don't know.  I would still
11  have a problem.
12      Q.   How about if the debtor's statement
13  of affairs said that's the amount of cash they
14  had as of petition date, would you have a
15  problem with that, too?
16          MR. GENENDER:  Objection, form.
17      A.   I still would.
18      Q.   And why is that?
19      A.   I don't know if it relates to
20  encumbered assets or unencumbered assets in
21  terms of the monetizations.
22      Q.   I'm not talking about whether it's
23  encumbered or not.  I'm just talking about the
24  number.
25          Assuming the number that the debtor

Page 76

GRIFFITH

1
2  listed in their schedule for unrestricted cash
3  was 115.5, do you have a problem with accessing
4  that source for the number?
5          MR. GENENDER:  Objection, asked and
6  answered.
7      A.   I'm not sure.  It would seem
8  reasonable, but I would have to look at the
9  information.
10      Q.   Now, paragraph 16 of your
11  declaration.  Do you have it in front of you?
12          MR. GENENDER:  Which declaration?
13          MR. MOLONEY:  Supplemental
14  declaration, Exhibit 5 for identification.
15      A.   What page?
16      Q.   Page 10, paragraph 16.  Did you
17  write paragraph 16?
18      A.   (Document review.)  Yes.
19      Q.   And am I correct that, in paragraph
20  16, you say that the Murray report's assumption
21  that "cash reflects proceeds from the sale of
22  inventory and the collection of receivables"
23  may be a reasonable assumption.
24          Is that correct?
25          MR. GENENDER:  Objection, misstates

Page 77

```
 1            GRIFFITH
 2    the document.
 3       A.  (Document review.)
 4          I mean, I think they are two
 5    separate sentences with the punctuation, but
 6    it's not saying -- there's more to this second
 7    sentence that would put it in context.
 8       Q.  Didn't you say that it may be a
 9    reasonable assumption to assume that cash
10    reflects proceeds from the sale of inventory
11    and the collection of receivables?
12          MR. GENENDER:  Objection, misstates
13       the document, misstates the evidence.
14       A.  Yeah, that's not how those two
15    sentences read in whole.
16       Q.  Okay.  In what sense have I
17    misrepresented your sentence?
18       A.  The second sentence that starts,
19    "While that may be a reasonable assumption,
20    cash is not collateral of the second
21    lienholder."
22       Q.  Okay.  And if it is the proceeds
23    from the sale of inventory and the collection
24    of receivables, is it your view it doesn't
25    matter whether that's true or not or whether or
```

Page 78

```
 1    not it's our collateral?
 2          MR. GENENDER:  Objection, compound
 3       and lack of foundation.
 4       A.  I think the point is that once it is
 5    considered cash, there could be issues with the
 6    UCC.
 7       Q.  What issues?
 8       A.  They would argue that it's not your
 9    collateral at that point.
10       Q.  Why?
11       A.  Because the cash and deposit
12    accounts were not listed as 2L collateral.
13       Q.  Where?
14       A.  In the security agreement.
15       Q.  Any other reason?
16       A.  No.  I think that would be the
17    reason.  Nothing else I can think of.
18       Q.  Can you think of any other method
19    that cash would have been generated and be
20    available in that amount, $115.5 million, as of
21    the petition date in unrestricted debtor
22    accounts other than as a result of the sale of
23    inventory and the collection of receivables?
24          MR. GENENDER:  Objection, form, lack
```

Page 79

```
 1            GRIFFITH
 2    of foundation.
 3       A.  I would have to speculate on that.
 4    I don't know.
 5       Q.  Even if it's not the proceeds of
 6    second lien collateral, it would still be the
 7    first lien collateral, correct?
 8       A.  Yes.
 9       Q.  And you say in your report --
10       A.  Sorry.  Let me clarify that.  It
11    would be as long as the cash related to sale of
12    assets that are covered by their collateral
13    package.
14       Q.  You say in your report that the
15    "cash would likely be tied up in escrow by
16    request of the Official Committee of Unsecured
17    Creditors in a liquidation, making it
18    unavailable to satisfy second lien debt."
19          Do you see that sentence?
20       A.  Where are we?
21       Q.  Same paragraph, paragraph 16.
22       A.  Okay.
23       Q.  On what basis do you claim that the
24    UCC would be allowed to prevent first lien or
25    second lien creditors from accessing such
```

Page 80

```
 1            GRIFFITH
 2    collateral by requiring it be placed in escrow?
 3       A.  If the first lien debt was fully
 4    satisfied by inventory and accounts receivable
 5    proceeds, cash was left in a cash account, I
 6    think the UCC would have a problem not
 7    distributing that or assuming that that's 2L
 8    collateral.
 9       Q.  And what do you base that on?
10       A.  The fact that we don't believe that
11    the cash deposit accounts were part of the 2L
12    collateral.
13       Q.  Anything else?
14       A.  That's all I can think of as of now.
15       Q.  Is that what you had in mind when
16    you wrote that sentence?
17       A.  Yes.
18       Q.  Okay.  Let's talk about the
19    inventory receivable.
20          You value that at 85 percent of book
21    value, is that correct, looking at our
22    worksheet, Exhibit 6 again?
23          MR. GENENDER:  Object to the
24       characterization of our worksheet number.
25          MR. MOLONEY:  Looking at my
```

Page 81

GRIFFITH

1
2    worksheet.  I said our worksheet, which is
3    the good guys' worksheet.  Go ahead.
4        MR. GENENDER:  I agree that it
5    apparently is yours.  I don't know that I
6    agree with the second characterization.
7    A.   Yes, 85 percent of book.
8    Q.   And in your declaration -- I think
9    there's a footnote in your supplemental
10   declaration on page 5, footnote 6, which refers
11   to section 10.9 of the APA, right?
12   A.   Okay.
13   Q.   And then looking at the text, the
14   way I read paragraph 7, but you tell me if I'm
15   misreading it, you're basing your opinion based
16   on your reading of the APA, right, that the
17   85 percent value is the value assigned by the
18   APA; is that correct?
19   A.   Yes.
20   Q.   Okay.  Apart from your reading of
21   the APA, do you have any other basis to say
22   that the collateral is worth 85 percent of book
23   value?
24   A.   Yes.
25   Q.   And what is your other basis?

Page 82

GRIFFITH

1
2    A.   All of the deal negotiations that
3    had been taking place since accepting the ESL
4    bid contemplated 85 cents on the dollar for the
5    inventory and accounts receivable.
6    Q.   Apart from the APA and what you
7    claim the deal negotiations reveal, do you have
8    any other basis for relying on the 85 percent
9    number?
10   A.   Not that I can think of.  Those are
11   the main reasons that we are assuming the 85
12   percent.
13   Q.   Not that you can think of.  Not that
14   you put in your report, right?
15   A.   I did not put anything else in the
16   report, that's right.
17   Q.   And you didn't even mention the deal
18   negotiations in your report, correct?
19   A.   I assumed the APA was a little more
20   powerful.  But, yes, that's right.
21   Q.   Okay.  You're right about the APA
22   being more powerful, but would you look at
23   Exhibit 14 in your pile.
24       MR. GENENDER:  Object to the
25   sidebar.

Page 83

GRIFFITH

1
2    Q.   Would you look at -- is this the APA
3    that you're referring to?
4    A.   Yes.
5    Q.   And would you look at section 13.4?
6        MR. GENENDER:  What section?
7        MR. MOLONEY:  13.4.
8    Q.   It's on page 109.  Do you have it in
9    front of you?
10   A.   I do.
11   Q.   Do you see it's called "Entire
12   Agreement"?
13   A.   Yes.
14   Q.   Are you familiar with entire
15   agreement provisions?
16       MR. GENENDER:  Objection, form,
17   calls for legal conclusion.
18   A.   Yeah.  I wouldn't say that I have
19   a -- not extremely familiar, no.
20   Q.   It says that, "The agreement
21   (including the schedules any exhibits),
22   confidentiality agreement and the other
23   transaction documents contain all of the terms,
24   conditions and representations and warranties
25   agreed to by the parties related to the subject

Page 84

GRIFFITH

1
2    matter of this agreement and supersede all
3    prior and contemporaneous agreements,
4    understandings, negotiations, correspondence,
5    undertakings and communications of the parties
6    or the representatives, oral or written,
7    respecting such subject matter."
8        Do you see that?
9    A.   I do.
10   Q.   Do you have any -- putting aside the
11   APA, are you relying on anything that is not
12   picked up within the category of
13   understandings, negotiations, correspondence,
14   undertakings and communications of the parties
15   or their representatives, oral or written,
16   respecting the subject matter of this
17   agreement?
18       MR. GENENDER:  Objection, calls for
19   legal conclusion.
20   A.   I'm just relying on the fact that we
21   understand the buildup of the cash that's in
22   here, cash consideration, and how that relates
23   to the inventory and accounts receivable.
24   Q.   Based on what?
25   A.   Based on the components of the cash

Page 85

GRIFFITH

1
2    that's being offered of the 4085. Let me get
3    the exact number. (Document review.) The
4    billion four oh eight four hundred and fifty
5    thousand.
6    Q.    Okay. Now, looking at section 1 and
7    look particular at page 3, do you see the
8    definition of acquired assets, which is the
9    second item down?
10    A.    I do.
11    Q.    It says, "Shall have the meaning set
12    forth in section 2.1."
13        Do you see that?
14    A.    Yes.
15    Q.    Did I read that correctly?
16    A.    Yep.
17    Q.    And going ahead to purchase price,
18    which is on page 27. "Purchase price shall
19    have the meaning set forth in section 3.1,"
20    correct?
21    A.    Yes.
22    Q.    Let's turn to 3.1, please, which is
23    on page 51.
24    A.    Yes.
25    Q.    And are you there? It says, "The

Page 86

GRIFFITH

1
2    aggregate purchase price for the purchase,
3    sale, assignment and conveyance of seller's
4    right, title and interest in, to and under the
5    acquired assets," and that's capitalized, again
6    right?
7    A.    Yes.
8    Q.    "Shall consist of the following,"
9    and it says, in parens, "Collectively, the
10    purchase price," right?
11        Did I read that properly?
12    A.    You did.
13    Q.    And collectively there are seven
14    items of consideration listed under 3.1,
15    correct?
16    A.    Yes.
17    Q.    A to G, and only A is a cash number,
18    right?
19    A.    No.
20    Q.    No. You're right. There's more
21    than one cash number. C is a cash number, too,
22    right?
23    A.    Yes.
24    Q.    Two of them are cash numbers.
25    A.    I'm sorry. What number did you say?

Page 87

GRIFFITH

1
2    Q.    I was trying to figure out how many
3    of the eight categories are considerations of
4    cash, and you indicated that -- you corrected
5    me that there are two.
6    A.    There's more than two.
7    Q.    Okay. What else -- oh, yeah,
8    there's more.
9        What other ones are cash?
10    A.    In which section?
11    Q.    A is a cash calculation, right? You
12    start out with one number, and you add a
13    number, and you subtract a number, right? And
14    that gets you -- you end up with a final number
15    under A, right?
16    A.    (Document review.)
17    Q.    Come on. You're now telling me that
18    for A --
19        MR. GENENDER: Hang on a second.
20    You've got to let him answer your
21    questions without berating him. I don't
22    care what kind of hurry you're in. You've
23    got to let him answer the question. He's
24    under oath. I object.
25        MR. MOLONEY: This was the basis of

Page 88

GRIFFITH

1
2    his supposed opinion.
3        MR. GENENDER: There's no question.
4        MR. MOLONEY: I would have thought
5    he would have studied this provision
6    before.
7        MR. GENENDER: I would have thought
8    you would have asked better questions than
9    that.
10        There's no question on the floor.
11    Ask a question. It's outrageous.
12    BY MR. MOLONEY:
13    Q.    A is a calculation to come up with a
14    cash number. It starts out with one number,
15    plus another number, plus a third number, and
16    then minus some numbers, correct?
17        MR. GENENDER: Objection, the
18    document speaks for itself.
19    A.    (Document review.)
20        It says then less.
21    Q.    That's what I'm saying.
22    A.    So then you're reducing. (Document
23    review.)
24        I believe the cash consideration is
25    basically the first three under A, romanette i,

Page 89

```
 1            GRIFFITH
 2  romanette ii, romanette iii.
 3      Q.   And that cash number is then
 4  reduced --
 5          MR. GENENDER:  Are you done with
 6      your answer?
 7          THE WITNESS:  I believe so.
 8      Q.   Isn't that cash number reduced by
 9  Roman Numeral IV?
10          MR. GENENDER:  Objection, calls for
11      a legal conclusion, the document speaks
12      for itself.
13      A.   It appears that way.
14      Q.   Okay.  So the number -- the final
15  numbers could be less than 1408.  So how does
16  it relate to anything in terms of 10.9?
17      A.   The components of the billion four
18  oh eight four five oh were made up of the
19  850 million outstanding under the DIP,
20  125 million of the FILO term loan, which was
21  also a senior facility, as well as the
22  433.45 million credit bid.
23      Q.   Okay.  So you take that number and
24  then additional consideration is listed in
25  paragraph C, right?  Cash in the amount of the
```

Page 90

```
 1            GRIFFITH
 2  outstanding obligations owed to lenders other
 3  than the borrower or its affiliates.  It goes
 4  on to -- right?
 5          That's in addition to the purchase
 6  price includes, not only A, but also includes
 7  C, and also includes B, includes consideration
 8  in D, E, F and G, right?
 9          MR. GENENDER:  Objection, the
10      document speaks for itself, confusing --
11      and confusing.
12          MR. MOLONEY:  No, it isn't.
13          MR. GENENDER:  It's
14      incomprehensible.
15      A.   Section 3.1 is the purchase price.
16      Q.   And that total amount comes to
17  approximately $5.2 billion if you add up the
18  value under all these different items, correct?
19          MR. GENENDER:  Objection, form.
20      A.   I haven't added all of these up, but
21  I would presume that's the case.
22      Q.   Don't you know that -- didn't your
23  company provide an opinion to the court that
24  the total aggregate value was about
25  $5.2 billion?
```

Page 91

```
 1            GRIFFITH
 2          MR. GENENDER:  Objection to form.
 3      A.   I personally did not.  I mean, it
 4  sounds correct, but I can't sit here and say I
 5  know that for sure.
 6      Q.   You believe that that's
 7  approximately correct, if not exactly right,
 8  right?
 9      A.   It could be.
10      Q.   And that $5.2 billion in total is
11  the collective purchase price, right?
12          MR. GENENDER:  Objection, form,
13      document speaks for itself.
14      A.   Yeah.  Can you point me to that
15  number?
16      Q.   Well, the purchase price is the list
17  of all of these items.  And we know from the
18  sales hearing that you quantified them as a
19  total of $5.2 billion or someone on behalf of
20  M-III qualified it at that level.  I believe
21  Mr. Meghji may have.  I don't know.
22          MR. GENENDER:  Objection, compound.
23      A.   I just don't see a number in C that
24  I could actually compute to get there.
25      Q.   You don't need a number.
```

Page 92

```
 1            GRIFFITH
 2          You agree that the purchase price is
 3  collectively whatever number is garnered by
 4  adding the consideration provided in A, to the
 5  consideration provided in B, to the
 6  consideration provided in C, to the
 7  consideration provided in D, to the
 8  consideration provided in E, to the
 9  consideration provided in F, to the
10  consideration provided in G?
11      A.   If those are all the sections of
12  section 3.1 under purchase price, I would agree
13  with that.
14      Q.   So for all of that consideration,
15  what you get are the acquired assets, right?
16          MR. GENENDER:  Objection, form, the
17      document speaks for itself.
18      A.   Yes.
19      Q.   Look at --
20          MR. GENENDER:  Objection, form,
21      document speaks for itself.
22      Q.   Well, you recall that acquired
23  assets was a defined term in what appears in
24  2.1.  So can we look at 2.1?
25          MR. GENENDER:  Objection, asked and
```

Page 93

```
 1              GRIFFITH
 2   answered.
 3       Q.   It's on page 35.
 4          MR. GENENDER:  The definition of
 5   acquired assets is not on page 35.
 6          MR. MOLONEY:  No.  The definition of
 7   acquired assets is section 2.1, and
 8   section 2.1 is on page 35.
 9       Q.   Correct?
10       A.   Yes.
11       Q.   And looking at 2.1, 2.1 lists, by my
12   count, 29 categories of assets that are
13   acquired for the aggregate purchase price of
14   $5.2 billion or for aggregate purchase price of
15   whatever is put in -- whatever 3.1 provides,
16   right?
17          MR. GENENDER:  Objection, the
18   document speaks for itself, calls for a
19   legal conclusion.
20       A.   It appears that way, yes.
21       Q.   And among those 29 categories of
22   assets, there's one category, category D,
23   that's called "All Acquired Inventory, All
24   Acquired Receivables, All Acquired Equipment
25   and All Acquired Improvements."
```

Page 94

```
 1              GRIFFITH
 2       Do you see that category?
 3       A.   Yes.
 4       Q.   And within that category is the
 5   inventories and receivables that represents the
 6   2L collateral, correct?
 7          MR. GENENDER:  Objection, the
 8   document speaks for itself.
 9       A.   I'd have to read the definitions.
10       Q.   You can look at the definitions of
11   acquired inventory.  We will do it together.
12   It will be in the front, and it will be on
13   page 3.
14       A.   (Document review.)
15       I'm not sure I understand romanette
16   iii in acquired inventory.
17       Q.   Okay.  You tell me where, in 2.1,
18   you think that our collateral is picked up.
19          MR. GENENDER:  Objection, form, the
20   document --
21       Q.   Take your time and look at it.
22          MR. GENENDER:  Objection, form, the
23   document speaks for itself, calls for a
24   legal conclusion.
25       A.   Could you repeat the question?
```

Page 95

```
 1              GRIFFITH
 2       Q.   You tell me where, in section 2.1,
 3   you believe that the inventory and receivables
 4   that constitute our lien collateral are being
 5   purchased by Transform.
 6       A.   I would agree it's a portion of D.
 7       Q.   Okay.  So it's a portion.  So would
 8   you agree with me, looking at this agreement,
 9   that this agreement does not allocate any
10   separate price for the inventory?
11          MR. GENENDER:  Objection, the
12   document speaks for itself, calls for a
13   legal conclusion.
14       A.   (Document review.)
15       It does not appear to have something
16   specific just to inventory.
17       Q.   And it doesn't have anything
18   specific as to receivables either, right?
19          MR. GENENDER:  Objection to form,
20   the document speaks for itself, calls for
21   a legal conclusion.
22       A.   Yes, I would agree.
23       Q.   Now, would you look at Exhibit 12?
24   And this is -- for the record, it's a document
25   that was, I think, a joint Exhibit 46 at the
```

Page 96

```
 1              GRIFFITH
 2   sale hearing, and it's a copy of a document,
 3   the UCC, I believe, offered into evidence as
 4   Exhibit 2.
 5       Do you recognize this document?
 6       A.   I don't recall this one
 7   specifically.
 8       Q.   Do you recognize this as being the
 9   bid letter made by Transform?
10       A.   (Document review.)
11       It appears to be a bid letter from
12   Transform.
13       Q.   If you look at paragraph 5, you see
14   there's an allocation of the proposed
15   consideration in the bid letter?
16       A.   I see it.
17       Q.   And it says, "The allocation of
18   proposed consideration to each category of
19   purchased asset (including the inventory and
20   receivables, real estate, intellectual property
21   and ground lease collateral, and the
22   unencumbered assets) is set forth under item 2
23   above."
24       Is that correct?
25       A.   That's what it says, yes.
```

Page 97

```
           GRIFFITH
1
2      Q.   Again, look at item 2 above.  It
3   says, under "Consideration; Other Value," it
4   says, "The total purchase price for our going
5   concern proposal would provide approximately
6   $4.4 billion in total consideration to Sears
7   based on information provided by the debtors.
8   This consideration would comprise," and then it
9   lists various items.
10        Do you see that?
11     A.   I do.
12     Q.   Is there any specific separate
13  allocation of money for inventory in this
14  paragraph?
15        MR. GENENDER:  Objection, form, the
16  document speaks for itself.
17     A.   I mean, they talk about the credit
18  bid, the acquired inventory and receivables,
19  and they have cash amounts under an ABL that
20  would be secured against the inventory and
21  receivables.
22     Q.   There's nothing in paragraph 2 that
23  allocates a specific consideration to the
24  inventory or to the receivables, correct?
25        MR. GENENDER:  Objection, form, the
```

Page 98

```
           GRIFFITH
1
2   document speaks for itself.
3      A.   I don't see it there, no.
4      Q.   Okay.  Look at Exhibit 13.  Looking
5   at Exhibit 13, do you recognize this document?
6      A.   (Document review.)
7         I believe I've seen it, yes.
8      Q.   And this is the amended Transform
9   bid; is that correct?
10     A.   It appears to be, yes.
11     Q.   And do you see anything in this
12  document that constitutes an assignment of any
13  specific value for the inventory or
14  receivables?
15        MR. GENENDER:  Objection, the
16  document speaks for itself.
17     A.   (Document review.)
18        I wouldn't say directly, no.
19     Q.   And weren't these two bids by ESL
20  rejected as non-conforming because they did not
21  allocate value to specific collateral?
22        MR. GENENDER:  Objection, form.
23     A.   I don't recall why they were or were
24  not rejected.  There were multiple reasons for
25  multiple bids being rejected.  I don't know
```

Page 99

```
           GRIFFITH
1
2   what the reason was for these.
3      Q.   You really don't remember the reason
4   why the ESL bid was rejected?
5         MR. GENENDER:  Objection, form,
6   misstates the testimony.
7      A.   I don't know if their consideration
8   has changed during this period.  We would have
9   to go through it to look.
10     Q.   Are you telling us you don't
11  recall --
12        MR. GENENDER:  Did you finish your
13  answer?
14     Q.   Did you finish your answer?
15        MR. GENENDER:  Please don't cut the
16  witness off.
17        MR. MOLONEY:  I didn't mean to.
18        MR. GENENDER:  It has happened
19  several times.
20     Q.   Are you done?
21     A.   I am done with my answer, yes.
22     Q.   Are you telling us that you don't
23  know that the reason why the ESL bid was
24  originally rejected and why they were not
25  provided a stalking horse protection was
```

Page 100

```
           GRIFFITH
1
2   because they did not allocate the consideration
3   in their bid?
4         MR. GENENDER:  Objection, form, lack
5   of foundation.
6      A.   Initial bids were rejected because
7   they lacked enough value for the estate.  I
8   don't know why these were particularly.  That
9   could be the reason.
10     Q.   You don't know for a fact that
11  that's the reason?
12     A.   I don't know.
13     Q.   Do you know if someone told ESL that
14  was the reason their bid was being rejected?
15        MR. GENENDER:  Objection, calls for
16  speculation.
17     A.   I wasn't a part of the
18  conversations.  I don't know.
19     Q.   In any event, prior to the deal
20  being accepted, did Transform ever modify its
21  offer to allocate the consideration it was
22  offering?
23     A.   Could you repeat the question?
24        MR. GENENDER:  Objection, form, lack
25  of foundation.
```

## Page 101

GRIFFITH

1

2    Q.   Prior to the Transform deal being
3    accepted by the debtor and approved by the
4    court, did Transform ever modify these bid
5    letters, to your knowledge, to indicate that
6    they were specifically allocating values to
7    specific items of the debtors' property?
8        A.   I don't know for certain, no.
9        Q.   Are you aware that the debtors
10   waived the allocation requirement?
11       A.   Yes, I believe they did.
12       Q.   Why was that necessary?
13           MR. GENENDER:  Objection, form, lack
14       of foundation, calls for a legal
15       conclusion.
16       A.   Yeah, I'm not a hundred percent sure
17   on the legal part of it.
18       Q.   What was your understanding of why
19   they were waiving the allocation requirement?
20           MR. GENENDER:  Objection, lack of
21       foundation.
22       A.   Yeah, as I said, I don't know the
23   exact reason.
24       Q.   Were you aware the debtors
25   represented to the court that our bid was not,

## Page 102

GRIFFITH

1

2    "our" meaning Transform's bid, was not
3    allocated?
4            MR. GENENDER:  Objection, form.
5        A.   It sounds familiar, yes.
6        Q.   Do you think that they were lying?
7        A.   I would not think so.
8        Q.   Okay.  Didn't ESL make a number of
9    improvements in its offer as it moved up
10   through this process up until its final offer
11   being accepted?
12       A.   I believe so, yes.
13       Q.   And in connection with those
14   improvements, didn't it become difficult to try
15   to figure out an allocation between the
16   improved consideration and what was being
17   bought?
18           MR. GENENDER:  Objection, form.
19       A.   I mean, the components of the cash
20   piece, I think, were pretty straightforward.
21   The rest of it, I don't know.
22       Q.   Now, in any event, whatever value
23   ESL put on the property would have been as of
24   the closing date, not as of the petition date,
25   right?

## Page 103

GRIFFITH

1

2            MR. GENENDER:  Objection, form, lack
3        of foundation, vague.
4        A.   Could you say that again?
5        Q.   Well, whatever value Transform might
6    have placed on the collateral -- inventory
7    collateral, if any, in its offer under the bid
8    letters or under the APA, would have related to
9    the closing date, not the petition date, right?
10       A.   That's correct.
11       Q.   And based on your earlier testimony,
12   therefore, it's irrelevant to our dispute,
13   right?
14           MR. GENENDER:  Objection, form,
15       misstates the testimony.
16       A.   I don't understand the question.
17       Q.   Well, do you recall telling me that
18   the pharmacy script prices you used to close
19   the transaction were irrelevant because they
20   were done as of the closing date and not as of
21   petition date?
22           MR. GENENDER:  Objection, misstates
23       his testimony.
24           MR. MOLONEY:  Well, we have a
25       record.

## Page 104

GRIFFITH

1

2        Q.   Do you recall that testimony?
3            MR. GENENDER:  Objection, misstates
4        his testimony.
5        A.   You have to repeat it again.  I'm
6    confused.
7        Q.   Do you recall testifying that the
8    reason why you didn't think the $10.04 was an
9    appropriate valuation for the pharmacy script
10   because it was the date as of the closing date
11   of the APA transaction and not as of the
12   petition date?  Do you recall giving that
13   testimony?
14           MR. GENENDER:  Objection, misstates
15       the testimony.
16       A.   I think we have only looked at it as
17   of the closing date.
18       Q.   Okay.  There's a record.  We will
19   just leave it at that.
20           Suppose ESL determined not to bid at
21   all at this auction, what would be the value of
22   our collateral as of petition date?
23           MR. GENENDER:  Objection, form.
24       A.   As of the petition date?
25       Q.   Yeah.

Page 105

```
 1              GRIFFITH
 2      A.  So going back and doing a
 3  hypothetical valuation of the collateral?  It
 4  would be hard to say.  I don't know.
 5      Q.  Okay.  And suppose the Uniform
 6  Commercial -- unsecured creditors committee
 7  prevailed and our bid was rejected, and it was
 8  sold to one of the liquidators for, let's say,
 9  28 cents on the dollar, would you say that was
10  the value as of the petition date?
11          MR. GENENDER:  Objection, form.
12      A.  If that was the resulting bid that
13  was accepted, I would agree with whatever that
14  value is.
15      Q.  And suppose that ESL had allocated
16  120 percent of the book value as part of its
17  $5.2 billion collateral, $5.2 billion bid.
18  Suppose it said, okay, of this bid, we are
19  going to pay 120 percent of the value of the
20  inventory, would that mean that's what the
21  inventory was worth as of the petition date?
22          MR. GENENDER:  Objection, assumes
23  facts not in evidence, lack of foundation.
24      A.  It's a hypothetical.  As we've
25  stated, the fair market value that we received,
```

Page 106

```
 1              GRIFFITH
 2  ultimately, is how we think is the best way to
 3  look at similar collateral as of a separate
 4  date.
 5      Q.  Doesn't whatever value that results
 6  from a competitive bid provide potential
 7  different value than the asset provided to the
 8  debtor in a going concern business at a
 9  different point in time?
10          MR. GENENDER:  Objection, form.
11      A.  Yeah, I'm not sure.  You have to
12  restate that question.
13      Q.  Doesn't whatever value that resulted
14  from a competitive auction four months after
15  the petition date provide a potentially
16  different value than the assets were worth to
17  the debtor in its going concern business as of
18  the petition date?
19      A.  It's possible.
20      Q.  Okay.  Now, I would like to show you
21  Exhibit 16, which is the Schulte report.
22          Before I do this, you're aware that
23  the debtors' general business plan was to
24  reorganize around a number of stores that were
25  EBITDA positive at the store level; is that
```

Page 107

```
 1              GRIFFITH
 2  correct?
 3          MR. GENENDER:  Objection, form.
 4      A.  I don't believe they were all EBITDA
 5  positive, but they were their best performers.
 6      Q.  Wasn't the general business plan,
 7  from the start of the case, put together, I
 8  think in part with the help of Mr. Meghji, to
 9  basically identify stores that had a positive
10  EBITDA as a potential footprint for a going
11  concern sale?  Is that a fair description of
12  the plan going into the chapter 11 proceeding?
13          MR. GENENDER:  Objection to form.
14      A.  I don't believe so.  I think the
15  plan was to figure out the way to maximize
16  value.
17      Q.  Okay.  Was part of that plan to
18  identify the stores that are positive EBITDA on
19  a store level?
20          MR. GENENDER:  Objection, asked and
21  answered.
22      A.  It was one portion of it, I'm sure,
23  yes.
24      Q.  Were you involved in that analysis
25  at all?
```

Page 108

```
 1              GRIFFITH
 2      A.  I was involved in that analysis.
 3      Q.  Okay.  In determining whether a
 4  store had a positive EBITDA, what -- how did
 5  you go about doing that?
 6      A.  We would start with the four-wall
 7  data that we had available.
 8      Q.  Can you explain to me what that
 9  means?
10      A.  It basically means the revenue
11  generated by that store against its direct
12  expenses within that store base.
13      Q.  And the revenue would be basically
14  the gross profits from the sale of inventory?
15      A.  You said sales?
16      Q.  Yeah.
17      A.  Sales would be the revenue generated
18  by the sale of inventory.
19      Q.  Yeah.  I'm just saying you said
20  revenues.  I'm asking for the revenues.
21          You're talking about basically the
22  gross profits from the sale of inventory is the
23  revenue, right?
24      A.  That would be the gross profit.
25      Q.  Well, you're deducting from the
```

| Page 109 | Page 110 |
|---|---|

### Page 109

```
                GRIFFITH
 1
 2   revenue the direct expenses, right?
 3           MR. GENENDER:  Objection, form, lack
 4   of foundation.
 5       A.   In order to do what?
 6       Q.   To figure out whether there's a
 7   positive EBITDA, right?
 8       A.   It's part of the calculation, yes.
 9       Q.   Okay, what is the full calculation?
10   To figure out whether the store had a positive
11   EBITDA, what are the elements that go into that
12   equation?
13       A.   It's revenue less cost and expenses
14   of the store.
15       Q.   So the revenue is going to be the
16   gross revenue, right?
17       A.   Yes.
18       Q.   And that's going to be based on what
19   you made by selling the inventory, right?
20       A.   Yes.
21       Q.   And the costs and expenses, what
22   costs and expenses did, in fact, the company
23   include when making this analysis that certain
24   stores were positive EBITDA?
25       A.   Your typical store expenses,
```

### Page 110

```
                GRIFFITH
 1
 2   payroll, rent, utilities, security.  We'd have
 3   to look at the analysis, but those are some of
 4   the major categories.
 5       Q.   Advertising, too?
 6       A.   I believe so.
 7           MR. GENENDER:  Objection to form.
 8       Q.   Okay.  And, now, Mr. Schulte --
 9   let's look at his report.  He has, at
10   page 10 -- at page 10 of his report, which is
11   Exhibit 16 for identification, he lists three
12   valuation methodologies, correct?
13       A.   I see that.
14       Q.   And the first one is based on the
15   gross retail proceeds, right?
16       A.   That's what it says.
17       Q.   And the second is the net retail
18   proceeds, correct?
19       A.   That's what it says.
20       Q.   And the third is book value; is that
21   correct?
22       A.   That's what it says.
23       Q.   And the largest value, if you look
24   at his analysis, which continues on page 12,
25   you'll see the largest value is for the gross
```

| Page 111 | Page 112 |
|---|---|

### Page 111

```
                GRIFFITH
 1
 2   retail value, the net retail value is the
 3   middle value, and the book value is the smaller
 4   value, right?
 5       A.   That's what it shows.
 6       Q.   And he's doing this only for the 400
 7   stores that were -- stores that were basically
 8   identified as the EBITDA positive stores,
 9   correct?
10           MR. GENENDER:  Objection to form.
11       A.   I don't -- I don't believe it was
12   400 stores.
13       Q.   How many stores do you think were
14   EBITDA positive?
15       A.   I believe it was more, but I don't
16   know that number off the top of my head.
17       Q.   And then he has a different
18   methodology for the -- he follows a slightly
19   different methodology for stores that are going
20   out of business sales.
21           Do you see that?
22       A.   I do.
23       Q.   Okay.  Now, a significant amount of
24   inventory was, in fact, sold during the chapter
25   11 case, right?
```

### Page 112

```
                GRIFFITH
 1
 2       A.   Which inventory?
 3       Q.   Our collateral inventory.
 4       A.   Okay.
 5       Q.   Do you agree?
 6       A.   Was inventory sold?  Yes.
 7       Q.   Okay.  And the proceeds of that
 8   inventory was our collateral, right?
 9           MR. GENENDER:  Objection, form.
10       A.   Again, I think we have a
11   disagreement on the cash deposit accounts and
12   how that actually works, but what is the
13   question?
14       Q.   Are you disputing that the proceeds
15   of the sale of our inventory was our
16   collateral?
17           MR. GENENDER:  Objection, form, lack
18   of foundation.
19       A.   The inventory collateral was your
20   collateral, yes.
21       Q.   And what was sold, the proceeds were
22   our collateral, right?
23       A.   Potentially, yes.
24       Q.   You understand that we had a grant
25   of proceeds in our security document, correct?
```

## Page 113

GRIFFITH

1
2      MR. GENENDER: Objection, vague.
3      A.   I don't know the answer, no.
4      Q.   Okay.  And do you know the magnitude
5  of proceeds that were actually generated from
6  sale of inventory during the chapter 11 case?
7      A.   No, I don't know off the top of my
8  head.
9      Q.   Was it more than half a billion
10 dollars?
11     A.   Yes.
12     Q.   And you don't account for the use of
13 that money in your report, right?
14        MR. GENENDER: Objection, form.
15     A.   In what respect?
16     Q.   I don't see it in either your
17 initial declaration or in your second
18 declaration, any discussion of those funds.
19        MR. GENENDER: Objection, form,
20   misstates the record.
21     A.   I don't know why I would be showing
22 revenue.
23     Q.   Right.  You don't even acknowledge
24 that this money exists, right?
25        MR. GENENDER: Objection,

## Page 114

GRIFFITH

1
2   argumentative, misstates the record.
3      A.   We are showing collateral values,
4  amounts outstanding under the facilities and
5  the associated expenses that got us to the
6  transaction.
7      Q.   When Schulte uses the net retail
8  value, do you understand that he's using the
9  same methodology that M-III was using for its
10 EBITDA analysis at the store level?
11        MR. GENENDER: Objection, form.
12     A.   I don't know that.
13     Q.   Well, do you have a reason to
14 believe he did not use the same methodology?
15     A.   I don't have a reason to believe he
16 used the same or did not use the same.
17     Q.   Did you study his report and find
18 out what methodology he used?
19     A.   I did look at it when it was
20 published, yes.
21     Q.   And how do you understand he came
22 about the net retail proceeds --
23        MR. GENENDER: Objection,
24   foundation.
25     Q.   -- valuation?

## Page 115

GRIFFITH

1
2      MR. GENENDER: Objection,
3   foundation.  Objection, calls for
4   speculation.
5      A.   I mean, I had to go through three
6  reports.  They kind of run together.  I will
7  have to go back and look.
8      Q.   Well, it says --
9      MR. GENENDER: Are you going to let
10   him look or are you going to ask a new
11   question?
12        MR. MOLONEY: He can look.
13     A.   (Document review.)
14        It says he took retail inventory
15 value, less cost to sell it, but that does not
16 assume any corporate overhead.
17     Q.   Does the store EBITDA you referred
18 to earlier include corporate overhead?
19     A.   I don't believe so.
20     Q.   Okay.  Why wasn't that included in
21 the EBITDA analysis that M-III put together for
22 the company to identify whether or not stores
23 were profitable?
24        MR. GENENDER: Objection, asked and
25   answered.

## Page 116

GRIFFITH

1
2      A.   Because that's not necessarily part
3  of the store profitability.  The exercise was
4  done to determine how much cash a store network
5  could throw off and how much overhead it could
6  support to determine if you could make it a
7  profitable enterprise.
8      Q.   Now, in paragraph 20 of your first
9  declaration, which is Exhibit 4, you have a
10 number of category of expenses.
11        Do you see that?
12     A.   What page are we on?
13     Q.   Paragraph 20 of your first
14 declaration, Exhibit 4, page 7.
15     A.   Yes.
16     Q.   Are you claiming that all of these
17 expenses relate solely to store level costs?
18     A.   No.
19     Q.   Which one of these expenses don't
20 relate to store level costs?
21     A.   There would be a mix between almost
22 every category here between store and overhead.
23     Q.   Doesn't the EBITDA analysis, store
24 level EBITDA analysis withdraw all of the --
25 cover all the employee payroll compensation

## Page 117

GRIFFITH

1
2  expenses at a store level?
3      A.   At a store level, yes.
4      Q.   And it also covers the rent at a
5  store level?
6      A.   Yes.
7      Q.   Does it cover any of the logistics
8  and supply chain at the store level?
9      A.   I don't believe so.
10     Q.   Does it cover the utility and
11 telephone expenses at a store level?
12     A.   I believe it does.
13     Q.   It covers advertising, correct?
14     A.   A portion of it.
15     Q.   It covers equipment expense,
16 correct?
17     A.   I can't answer that one.  No, I
18 don't know.
19     Q.   It covers security services,
20 correct?
21     A.   A portion of it, I'm sure.
22     Q.   So to the extent that the -- in
23 EBITDA positive stores, there was over half a
24 billion dollars generated in revenues, which
25 were used to cover these expenses, did you

## Page 118

GRIFFITH

1
2  deduct that amount from the numbers that you
3  have included in the chart in paragraph 20?
4      MR. GENENDER:  Objection, form.
5      A.   That's not the valuation or approach
6  we had used.
7      Q.   So the answer to my question is no,
8  you did not make any of those deductions?
9      A.   Only for the stores that were in GOB
10 at the time.
11     Q.   You made the deductions for -- what
12 do you mean by only for the stores in GOB?
13     A.   Stores that were in a wind-down
14 mode.  We had removed the expenses because the
15 inventory would also be reserved against.  So
16 this was truly just the go-forward footprint,
17 plus overhead.
18     Q.   What was the reason for why you
19 included -- you removed the expenses for the
20 wind-down stores?
21     A.   Because the inventory is reserved in
22 the borrowing base and the expenses would be
23 captured as part of the NOLV on the GOBs that
24 were in process.
25     Q.   Right.  I understand the expenses,

## Page 119

GRIFFITH

1
2  but the expenses are also captured in a net
3  retail or EBITDA approach as well, aren't they?
4      A.   They may be.  I don't -- we didn't
5  take that approach.  I'm not sure what the --
6      Q.   You explained to me --
7      MR. GENENDER:  Hang on.  He's still
8  answering.  You keep cutting him off.
9      MR. MOLONEY:  I thought he finished.
10     MR. GENENDER:  You keep saying that.
11 You keep cutting him off.
12     Q.   Do you have anything to add?
13     MR. GENENDER:  There's a big dash
14 here.  Do you see it?
15     A.   Yeah, I kind of forget where the
16 train of thought was, but go ahead.
17     Q.   You explained to me that for the
18 store level EBITDA analysis, you took revenues,
19 you took gross revenues, right?
20     A.   Yes.
21     Q.   And you subtracted the cost and
22 expenses just like Mr. Schulte did in his net
23 retail analysis, correct?
24     MR. GENENDER:  Objection, form
25 misstates testimony.

## Page 120

GRIFFITH

1
2      A.   Yes.
3      Q.   And you said you subtracted payroll
4  and rent and security and advertising.
5      Do you recall giving that testimony?
6      A.   Yes.
7      Q.   Okay.  So I'm asking those -- the
8  gross revenues have already covered all of
9  these expenses, and to the extent the gross
10 revenues are our collateral, we've already paid
11 for all these expenses, right, at a store
12 level?
13     MR. GENENDER:  Objection, form,
14 misstates the evidence.
15     A.   That's not how I read or the
16 assumptions we have made around the 506(c)
17 numbers we have incorporated here.  We used a
18 different approach.
19     Q.   I know you used a different
20 approach, but I don't understand your approach.
21 So explain to me what your approach is.
22 MO     MR. GENENDER:  Object to the sidebar.
23 Move to strike.
24     A.   My understanding is the 506(c) was
25 all necessary, reasonable expenses that were

## Page 121

GRIFFITH

1
2    incurred to maximize the value.  And that's
3    what we have laid out here.
4        Q.    And do you feel it's fair for us to
5    use our collateral twice for that purpose?
6        MR. GENENDER:  Objection, form,
7    argumentative, assumes facts not in
8    evidence.
9        A.    I'm just reading what the definition
10    said, and that's what we have done here.  It's
11    all --
12    Q.    Do you --
13        MR. GENENDER:  He's still talking.
14        MR. MOLONEY:  Okay.
15        MR. GENENDER:  Let's take a break.
16    I'm tired of you cutting him off.  Let's
17    take a break.  Off the record.
18        (Recess taken at 2:26 p.m. to
19    2:37 p.m.)
20    BY MR. MOLONEY:
21        Q.    Before they filed for chapter 11,
22    Sears Holdings Corporation was a publicly
23    traded company and filed SEC financials; is
24    that correct?
25        A.    Yes.

## Page 122

GRIFFITH

1
2        Q.    And in those consolidated
3    financials, they represented the value of
4    inventory as basically the lower of cost or
5    market value -- or cost to market value; is
6    that correct?
7        MR. GENENDER:  Objection, documents
8    speak for themselves.
9        A.    I don't know for sure.  I have not
10    been through it.
11        Q.    Well, you criticize Mr. Schulte for
12    using book value for his methodology for
13    valuing the inventory and receivables, but
14    isn't that the value that the company itself
15    used in connection with its SEC financials that
16    were audited by external outside auditors?
17        MR. GENENDER:  Objection, form,
18    misstates the evidence.
19        A.    I don't know.
20        Q.    Assuming it was, why would it be
21    inappropriate for Mr. Schulte to use that same
22    methodology?
23        MR. GENENDER:  Objection to form,
24    lack of foundation.
25        A.    Could you restate the question?

## Page 123

GRIFFITH

1
2        Q.    Assuming that the methodology that
3    Mr. Schulte chose, book value, is the same
4    valuation the company used in its SEC financial
5    statements that were audited by its external
6    auditors, why would that be an inappropriate
7    methodology?
8        MR. GENENDER:  Objection, form.  You
9    are completely misstating his supplemental
10    declaration, paragraph 14, and it's
11    blatant.
12        MR. MOLONEY:  Objection to form is
13    enough.  Thank you.
14        MR. GENENDER:  Your question is not
15    founded on good faith.  It's not a good
16    faith question.
17        MR. MOLONEY:  That's enough.
18        MR. GENENDER:  I'm making my
19    objection.  It's not a good faith
20    question.
21        Q.    Answer the question.
22        A.    They are used for different
23    purposes.
24        Q.    Okay.  And in what sense is it
25    different?

## Page 124

GRIFFITH

1
2        MR. GENENDER:  Objection, lack of
3    foundation.
4        A.    One is being used for a 507(b)
5    calculation, and one is for public company
6    accounting.  I don't know how I would draw a
7    conclusion that they would be similar.
8        Q.    Why do you say the calculation for
9    507(b) purposes are different than the ones
10    done for public accounting?
11        MR. GENENDER:  Objection, calls for
12    legal conclusion, lack of foundation,
13    misstates his declaration.
14        A.    The company was in bankruptcy.  It's
15    not -- it's a different dynamic.
16        Q.    Okay.  To the extent he used book
17    value that was less than for the going concern
18    stores, that was less than the value he showed
19    as being net retail value; is that correct?
20        MR. GENENDER:  Objection, vague.
21        Q.    You can look at the report.  It's
22    not a memory test.  Go ahead.
23        MR. GENENDER:  Where do you want him
24    to look in the report?
25        Q.    You could look at page 12.

Page 125

```
           GRIFFITH
1
2      A.   (Document review.)
3           Yeah, I can't comment on his
4  underlying assumptions, but these numbers here
5  appear to show that.
6      Q.   Well, assuming he used, for his net
7  retail value, the same EBITDA analysis for the
8  425 profitable stores that were being used by
9  the debtor, that's how he came up with his net
10 retail value, by using book value, you're going
11 to necessarily use a lower number, right?
12          MR. GENENDER:  Objection, misstates
13 the evidence.
14     A.   I think that's incorrect.  It's an
15 incorrect way to look at it.  The EBITDA
16 analysis is not meant to represent net retail
17 value.
18     Q.   Actually -- are you saying that
19 EBITDA analysis doesn't show the net retail
20 value?
21     A.   It shows store level EBITDA.
22     Q.   Right.
23     A.   Which does not have any allocations.
24     Q.   It has allocations to all the store
25 level direct expenses, correct?
```

Page 126

```
           GRIFFITH
1
2      A.   It would not be allocations.  It
3  would be direct.
4      Q.   Okay.  It covers all the direct
5  store level expenses, right?
6      A.   The EBITDA analysis would.
7      Q.   Yes, it would, right?
8          MR. GENENDER:  Objection, asked and
9  answered.
10     Q.   You have to say yes.
11     A.   I did.  I said yes.
12          MR. GENENDER:  He did.
13          MR. MOLONEY:  I didn't hear it.
14 Sorry.
15          MR. GENENDER:  It says so right on
16 the screen.
17     Q.   And book value, by definition, is
18 going to be less for EBITDA positive stores
19 than the net retail value or value based on --
20 by definition, for positive EBITDA stores, the
21 book value of the inventory is going to be less
22 than the valuation that includes the net margin
23 that results in a positive EBITDA, right?
24          MR. GENENDER:  Objection, vague and
25 ambiguous and confusing.
```

Page 127

```
           GRIFFITH
1
2      A.   Again, it has no overhead
3  allocations, so it's not the right number.
4  MO     MR. MOLONEY:  I move to strike as
5  not being responsive.
6      Q.   Can you answer my question?
7          MR. GENENDER:  There is no question.
8  It's incomprehensible.  Objection, form.
9          MR. MOLONEY:  The fact that you
10 don't comprehend it, with all due respect,
11 is irrelevant.
12          If you could just say objection to
13 form rather than coach the witness as
14 you've decided to do since when you came
15 back into the office, it would be
16 appreciated.
17          MR. GENENDER:  I'm not in an office.
18 I'm in a conference room.  And I'm not
19 coaching the witness.  The questions are
20 really, really hard to understand and hard
21 to hear, actually.
22 BY MR. MOLONEY:
23     Q.   Do you have a problem hearing my
24 questions, Mr. Griffith?
25     A.   They are complicated to follow, yes.
```

Page 128

```
           GRIFFITH
1
2          I don't see the EBITDA analysis as
3  being something that would be relevant to this
4  exercise.
5      Q.   Take a look at Exhibit 17 for
6  identification, which is the Murray report.
7          Mr. Griffith, this is a report you
8  have reviewed; am I correct?
9      A.   Yes.
10     Q.   If you look at page 13, table 2?
11     A.   Okay.
12     Q.   You disagree with how Murray
13 generally categorizes the L/Cs in this table?
14          MR. GENENDER:  Objection, vague,
15 lack of foundation.
16     A.   I have to see the underlying data.
17 I can't really comment on it.
18     Q.   Well, for purposes of your
19 declaration, did you look at the underlying
20 data of what type of L/Cs were involved?
21     A.   We looked at the L/C facilities,
22 yes.
23     Q.   Did you look at what the specific
24 standby L/Cs were that were being covered by
25 the facilities?
```

Page 129

```
 1              GRIFFITH
 2      A.   Generally, we understand what they
 3  are, yes.
 4      Q.   And you generally understand that
 5  the bulk of them are workers' compensation and
 6  surety bonds and utility, standby L/Cs?
 7      A.   I don't think the utility is that
 8  large.  I think it's mainly the workers' comp
 9  and auto liability.
10      Q.   And that's about 90 percent?
11      A.   I can't comment based on this, but
12  that's what her table shows.
13      Q.   Do you have any reason to believe
14  it's inaccurate?
15          MR. GENENDER:  Objection, lack of
16  foundation.
17      A.   I don't have a basis to say it's
18  accurate or not accurate.
19      Q.   In any event, all the L/Cs were
20  standby L/Cs, right?
21          MR. GENENDER:  Objection, asked and
22  answered.
23      A.   Yes, I believe so.
24      Q.   And they were essentially guarantees
25  of financial -- performance of financial
```

Page 130

```
 1              GRIFFITH
 2  obligations, correct?
 3      A.   Yes.
 4      Q.   And when they were put in place,
 5  they were not expected to be drawn, correct?
 6          MR. GENENDER:  Objection, assumes
 7  facts not in evidence.
 8      A.   Yeah.  I can't say whether or not I
 9  think that they were meant to be drawn or not.
10  They were put in place for a reason to handle
11  the potential liabilities.
12      Q.   They would be put in place in the
13  event that they failed to pay for the utilities
14  or failed to pay their auto insurance or failed
15  to pay their workers' compensation, right?
16      A.   Yes.
17      Q.   And in order -- a company in -- a
18  company that's a going concern, in the ordinary
19  course of business, will pay those bills,
20  correct?
21          MR. GENENDER:  Objection, lack of
22  foundation.
23      A.   Could you resay the question?
24      Q.   A company that's a going concern, in
25  the ordinary course of its business, will pay
```

Page 131

```
 1              GRIFFITH
 2  its worker compensation, auto insurance and
 3  utility bills, correct?
 4      A.   Yes.
 5      Q.   And under those circumstances, these
 6  L/Cs would not be drawn, correct?
 7          MR. GENENDER:  Objection, calls for
 8  speculation.
 9      A.   The liabilities would still exist.
10      Q.   Can you answer my question?
11  MO      MR. MOLONEY:  Move to strike that
12  answer.
13      Q.   Can you answer my question?
14          MR. GENENDER:  Asked and answered.
15      A.   Can you repeat the question?
16      Q.   I'm sorry?
17      A.   Could you repeat the question?
18          MR. MOLONEY:  Could you read it
19  back?
20          (Record read.)
21      A.   If they were meeting their
22  obligations related to these liabilities, yes.
23      Q.   Okay.  And, in fact, if you look at
24  table 4 of the Murray report, which is on
25  page 15, in the course of the chapter 11 case,
```

Page 132

```
 1              GRIFFITH
 2  approximately $9 million of L/Cs were, in fact,
 3  drawn; is that correct?
 4      A.   That's what the table shows.
 5      Q.   Do you have any reason to believe
 6  that's not the correct number?
 7      A.   Again, I don't have a reason to
 8  believe or disbelieve.
 9      Q.   Did you not investigate to see
10  whether she's right?
11      A.   No, I was not looking into this
12  table.
13      Q.   You didn't have your team look to
14  see whether or not the source was correct?
15          MR. GENENDER:  Objection, asked and
16  answered.
17      A.   It wasn't a material part of our
18  argument, no.
19      Q.   Okay.  Would you agree that if the
20  L/Cs were separately collateralized, there
21  would be no real risk that an issuing bank --
22  separately cash collateralized, there would be
23  no real risk that an issuing bank would make a
24  draw against the inventory and receivables
25  collateral in this case?
```

Page 133

```
 1                GRIFFITH
 2          MR. GENENDER:  Objection, calls for
 3    a legal conclusion.
 4          A.   Can you restate the question as
 5    well?
 6          Q.   If the L/Cs were collateralized in
 7    cash by someone other than the debtor, and
 8    there were no draws on the L/Cs, do you have
 9    any reason to believe that the L/C -- lender
10    would take any action against the inventory and
11    receivables?
12          MR. GENENDER:  Objection, lack of
13    foundation, calls for speculation and
14    assumes facts.
15          A.   A hypothetical third party putting
16    up cash to collateralize Sears' L/Cs?
17    Q.   Yes.  Assume that happened.
18          MR. GENENDER:  Objection, lack of
19    foundation.
20          A.   It just didn't make sense to me.
21          Q.   It doesn't make sense to you?
22          A.   No.
23          Q.   Were you aware that $271 million of
24    the L/Cs are separately cash collateralized by
25    my client and Sears?
```

Page 134

```
 1                GRIFFITH
 2          A.   But they have a first lien on the
 3    collateral.
 4          Q.   The bank has cash collateral for
 5    $271 million of the L/Cs that's not part of the
 6    first lien collateral, correct?
 7          A.   Still an obligation of the company.
 8    MO    MR. MOLONEY:  Move to strike.
 9          Q.   Can you answer the question?
10          MR. GENENDER:  Objection, asked and
11    answered.  He has.
12          A.   Could you restate the question?
13          MR. MOLONEY:  Could you read back
14    the question?
15          (Record read.)
16          A.   I'm not sure I follow the question.
17          Q.   Let me rephrase it.
18          Citibank has $271 million in cash
19    it's holding as collateral for the L/Cs that it
20    issued.  That $271 million of cash is not part
21    of the first lien collateral, correct?
22          MR. GENENDER:  Objection, assumes
23    facts.
24          A.   The cash is not.
25          Q.   Okay.  So why would Citibank,
```

Page 135

```
 1                GRIFFITH
 2    sitting there with $271 million in cash for
 3    standby L/Cs, where there's been no draw, take
 4    any action against the shared collateral?
 5          A.   I can't comment on what Citibank
 6    would do.
 7          Q.   Do you think any lender in that
 8    circumstance would take such action?
 9          A.   I can't comment on what I think a
10    lender would do in terms of that.
11          Q.   Okay.  Now, in fact, in paragraph 13
12    of your affidavit, you say --
13          MR. GENENDER:  Which document?
14          MR. MOLONEY:  Supplemental
15    affidavit, Exhibit 5, page 9.
16          MR. GENENDER:  Thank you.
17          Q.   Go to paragraph 13.  You say in
18    paragraph 13 of your supplemental report that,
19    "In a liquidation scenario, L/Cs would be drawn
20    or cash collateralized."
21          MR. GENENDER:  Supplemental
22    declaration?
23          MR. MOLONEY:  Yes.
24          Q.   But you do not say the result is
25    likely to occur in a going concern scenario,
```

Page 136

```
 1                GRIFFITH
 2    correct?
 3          MR. GENENDER:  Objection, the
 4    document speaks for itself.
 5          Q.   Answer the question.
 6          A.   Will they be fully drawn in a --
 7          Q.   Let me rephrase the question.
 8          You say in paragraph 13 of your
 9    supplemental declaration, which is right in
10    front of you, right?
11          A.   Yes.
12          Q.   That, "In a liquidation scenario,
13    L/Cs would be drawn or cash collateralized,"
14    correct?
15          A.   Yes.
16          Q.   Nowhere in that paragraph or
17    elsewhere in either of your declarations do you
18    give any opinion as to what would occur in a
19    going concern scenario concerning the L/Cs; is
20    that correct?
21          A.   It would be assumed as part of the
22    sale.  They were assumed, I should say.
23          Q.   Am I correct that, in neither
24    declaration, you give any opinion as to what
25    would occur in a going concern scenario
```

Page 137

GRIFFITH

1          GRIFFITH
2    concerning the L/Cs?
3          MR. GENENDER:  Objection, asked and
4    answered.
5          A.   I think we show them being assumed
6    in our analysis.
7          Q.   Where is that?
8          A.   (Document review.)
9          Exhibit A of the initial
10   declaration.
11         Q.   Right.
12         A.   Exhibit 4, Exhibit A.
13         Q.   Page 4 and where?
14         A.   In the section where -- on the top,
15   where it talks about the first lien debt, we
16   show the standalone L/C facility of 271 and the
17   letters of credit under the ABL of 118
18   outstanding and assumed as of the effective
19   date of the closing of the sale.
20         Q.   Okay.  So if they are assumed,
21   they're not drawn, correct?
22         A.   They remain an obligation, yes.
23         Q.   I couldn't follow exactly.  What are
24   you looking at exactly, so I make sure I look
25   at the same page?

Page 138

GRIFFITH

1          A.   Exhibit A, top left box that
2    describes the --
3          Q.   Top left box?
4          A.   Top left, first lien debt.
5          Q.   Where does it say assumed?
6          A.   It remains outstanding as of the
7    effective date of the close.
8          Q.   The words "assumed" are not there,
9    right?
10         A.   The 118 is part of the 850 million
11   DIP that's rolled over, which is the sum of the
12   732 --
13         Q.   I'm just --
14         MR. GENENDER:  Hang on.  He's still
15   answering his question, Tom.
16         MR. MOLONEY:  Fine, fine.
17         MR. GENENDER:  Correct?  Let him
18   finish.
19         Q.   Go ahead.
20         A.   They are assumed.  That's the whole
21   purpose of showing them here as still
22   outstanding.
23   MO    MR. MOLONEY:  Move to strike that
24         answer.
25

Page 139

GRIFFITH

1          GRIFFITH
2          Q.   And now the words "assume" don't
3    appear on this page, right?
4          A.   The balances are shown in that
5    column, so.
6          Q.   Those numbers show up, right, in the
7    effective eight number?
8          A.   Yes.
9          Q.   The effective eight number, you're
10   showing those balances?
11         A.   Yes.
12         Q.   But there's no text associated with
13   those balances in your report, correct?
14         A.   We state that the L/Cs would -- let
15   me find it.  (Document review.)
16         Q.   We will just leave a blank here.  If
17   you find something, you can add it in when you
18   review the transcript.  So I will move on to
19   another question.
20         A.   Okay.
21   TO BE SUPPLIED_____
22   _____
23         Q.   Okay.  And would you look at
24   Exhibit 22 for identification, please?  This is
25   a first day declaration filed by Robert

Page 140

GRIFFITH

1          GRIFFITH
2    Riecker.
3          Do you know who he is?
4          MR. GENENDER:  It's not a first day
5    declaration.  That's not true.
6          MR. MOLONEY:  I'm sorry.  It's not a
7    first day.  It's a November 23, 2018,
8    declaration by Mr. Robert A. Riecker,
9    R-I-E-C-K-E-R.
10         Q.   Can you tell me who he is?
11         A.   Mr. Riecker is the CFO of Sears.
12         Q.   Did you review this document before
13   it was filed with the court?
14         A.   I don't believe I did.
15         Q.   Do you know whether any member of
16   the M-III team would have reviewed the
17   document?
18         A.   Somebody most likely did.
19         Q.   And looking at paragraph 8, the
20   third sentence down, it says, "Around the
21   commencement date, the pre-petition ABL
22   facility collateral was valued at approximately
23   $2.8 billion."
24         Do you see that?
25         A.   Yes.

Page 141

GRIFFITH

1
2    Q.   That's book value, right?
3        MR. GENENDER:  Objection, form.
4    A.   I don't know from looking at this.
5    Q.   And then it says, "of which the net
6    orderly liquidation value," and it says NOLV in
7    parens, in quotations, "of the debtors'
8    inventory was valued at about $2.74 billion."
9        That was -- those numbers would have
10   been reviewed by M-III before they were put
11   into this declaration by the CFO, correct?
12       MR. GENENDER:  Objection, calls for
13   speculation, lack of foundation.
14   A.   That, I can't say.  I don't know
15   that.
16   Q.   You believe they were, though,
17   right?
18       MR. GENENDER:  Objection, asked and
19   answered.
20   A.   I mean, I just don't know.
21   Q.   And then you see, "With
22   approximately 1.53 billion borrowed against it
23   under the pre-petition ABL facility."
24       Do you see that?
25   A.   Uh-huh.  Yes.

Page 142

GRIFFITH

1
2    Q.   That does not -- that $1.53 billion
3    number does not include any of the unfunded
4    L/Cs, either the Citibank facility or the ABL
5    facility, correct?
6        MR. GENENDER:  Objection, lack of
7    foundation.
8    A.   That, I don't know.  I can't tell
9    from looking at this.
10   Q.   You can't tell from the math that
11   the $1.53 million does not include the unfunded
12   L/Cs?
13       MR. GENENDER:  Objection, lack of
14   foundation.
15   A.   What math?
16   Q.   The math of adding on to the
17   $1.53 billion number the amount of the two L/C
18   numbers.
19   A.   Yeah, I'm not sure what you're
20   comparing against.
21   Q.   Why don't you look at your Exhibit A
22   of Exhibit 4?
23   A.   (Document review.)  Okay.
24   Q.   If you subtract 271 and 124 from
25   1927, don't you get 1.53?

Page 143

GRIFFITH

1
2    A.   Yes.
3    Q.   So does that -- looking at that,
4    does that -- does that confirm that, in fact,
5    when Mr. Riecker was putting a declaration in
6    support of the cash collateral and DIP order in
7    this case, he did not include the unfunded L/Cs
8    in the amount he viewed as being outstanding?
9        MR. GENENDER:  Objection, lack of
10   foundation.
11   A.   I can't comment on what he did or
12   his motivation in his declaration.
13   Q.   We know what he did, right?  You're
14   looking at the number.  You know what he did,
15   right?
16       MR. GENENDER:  Objection, lack of
17   foundation.
18   Q.   You can answer.
19   A.   I see the number here, yes.
20   Q.   The number is, he did not include
21   those values in his declaration?
22       MR. GENENDER:  Objection, asked and
23   answered.
24   A.   It's for different purposes.  I
25   don't know.

Page 144

GRIFFITH

1
2    Q.   What purpose was he doing it?  He
3    was telling the court how much debt there was
4    outstanding for purposes of getting approval of
5    additional debt, right?
6        MR. GENENDER:  Objection, lack of
7    foundation and calls for speculation.
8    A.   I was not involved in that
9    declaration.  I don't know what the purpose
10   was.  Ours was for the 507(b) analysis.
11   Q.   You weren't involved at all in
12   connection with the adequate protection order
13   that basically started this whole dispute?
14       MR. GENENDER:  Objection, form,
15   misstates the record.
16   A.   I was not.  It was not part of my
17   responsibilities.
18   Q.   So does that mean that you didn't
19   look at -- who was the person who would have
20   been involved helping analyze the proposed DIP
21   financings and proposed use of cash collateral
22   and proposed adequate protection within M-III?
23   A.   I don't know, sitting here, who was
24   responsible for that part of it.
25   Q.   You would expect the CRO to be

Page 145

```
GRIFFITH
1
2   looking at that, right?
3       A.   I don't know.  I'd be speculating.
4       Q.   You think it's speculation that
5   Mr. Meghji would not be looking at that issue
6   at the beginning of the case as to whether or
7   not you're going to have DIP financing?
8           MR. GENENDER:  Objection to form.
9       A.   I can't answer that.  I don't know
10  who looked at this.
11      Q.   Would you take a look at Exhibit 18
12  in your pile?
13          MR. GENENDER:  18?
14          MR. MOLONEY:  Yes, please.
15          MR. GENENDER:  You bet.  Thank you.
16      Q.   This is a declaration of Mohsin J.
17  Meghji, dated October 15, 2018, okay?
18          MR. GENENDER:  That is the first day
19  of the case.  We agree on that.
20          MR. MOLONEY:  That's good.
21      Q.   Is this a document you would have
22  looked at before it was filed by Mr. Meghji?
23      A.   I don't recall specifically looking
24  at this, no.
25      Q.   Looking at paragraph 10, Mr. Meghji
```

Page 146

```
GRIFFITH
1
2   says, "The debtors decided to seek chapter 11
3   protection to take advantage of the relief
4   afforded by the automatic stay and obtain
5   debtor-in-possession financing as to seek to
6   execute their restructuring objectives, namely,
7   one, execute GOB sales and non-core asset
8   sales; two, evaluate the bubble stores; and,
9   three, try to secure a going concern sale or a
10  reorganization involving a core group of
11  stores."
12          Do you agree that those were the
13  debtors' objectives going into the chapter 11
14  case?
15          MR. GENENDER:  Objection, form.
16      A.   Those were strategies to achieve the
17  goal, which would be to maximize value.
18      Q.   But you disagree with Mr. Meghji's
19  choice of words to call these restructuring
20  objectives?
21          MR. GENENDER:  objection, misstates
22  the testimony.
23      A.   They're paths to achieving the
24  objective of maximizing value.
25      Q.   Did these remain the paths that the
```

Page 147

```
GRIFFITH
1
2   debtor continued to follow throughout the case?
3       A.   Could you restate that question?
4           MR. MOLONEY:  Could you read it
5   back?
6           (Record read.)
7       A.   Yes.
8       Q.   And weren't all the expenditures in
9   this case directed to achieving these three
10  objectives except for those used -- the money
11  used to spend -- spend to investigate potential
12  claims against my client, ESL?
13          MR. GENENDER:  Objection, form.
14      A.   Again, the goal was to maximize
15  value, and these were ways to achieve it.  I
16  don't know what else you want to say on that --
17  want me to say on that.
18      Q.   So all the money that was spent in
19  this case was for that goal of maximizing
20  value, right?
21          MR. GENENDER:  Objection, lack of
22  foundation and misstates the testimony.
23      A.   Yes.  Our job was to maximize the
24  value of the estate.
25      Q.   And neither ESL nor any of the
```

Page 148

```
GRIFFITH
1
2   second lien creditors had the ability to cause
3   the debtors to make any of the expenditures
4   incurred in this case, correct?
5           MR. GENENDER:  Objection, form.
6       A.   I don't understand the question.
7       Q.   Did people who were governing the
8   debtor, the governance body of the debtor did
9   not include ESL or any of the other second lien
10  creditors who are sitting here in this
11  deposition, correct?
12          MR. GENENDER:  Objection, misstates
13  the record.
14      A.   There was a restructuring committee
15  and management team in place, yes.
16      Q.   And that did not include ESL or any
17  representative of ESL, that did not include any
18  representative of the other second lien
19  creditors who are sitting here today, correct?
20          MR. GENENDER:  Objection, form,
21  misstates the record.
22      A.   I believe Mr. Lambert is still
23  associated with the board, but not part of the
24  restructuring committee.
25      Q.   Okay.  And the decision whether to
```

Page 149

GRIFFITH

1
2    liquidate the entire enterprise was one that
3    was an issue from day one in this case,
4    correct?
5        A.   I'm sorry.  Can you say that again?
6        Q.   The decision whether or not to do an
7    orderly liquidation of the entire enterprise
8    was an issue from day one in this case,
9    correct?
10       A.   It was an option.
11       Q.   Wasn't that something the unsecured
12   creditors committee advocated almost from the
13   outset of these cases?
14       A.   I don't recall how their position
15   changed over time, but I -- I don't know.  I'm
16   not part of that committee.
17       Q.   Are you aware that they publicly
18   advocated that position from almost the outset
19   of this case up until and including through the
20   sale hearing, correct?
21       A.   At points in time, I believe they
22   did, yes.  I can't say what points.
23       Q.   To the extent the debtor chose not
24   to liquidate, you're not telling us they did it
25   out of loyalty to ESL, are you?

Page 150

GRIFFITH

1
2        A.   I was not involved in the
3    decision-making process at that level, so I
4    don't know.
5        Q.   And, in fact, ESL was never chosen
6    as a stalking horse bidder or given any of the
7    benefits when a company being given that
8    status, correct?
9        MR. GENENDER:  Objection, form,
10   compound.
11       A.   Again, I wasn't involved in that
12   part of the process.
13       Q.   From day one, if the debtors wanted
14   to preserve the option of selling the business
15   with 425 profitable stores at its core, they
16   had no choice but to operate those stores that
17   they wanted to sell in the ordinary course,
18   correct?
19       MR. GENENDER:  Objection, misstates
20   the record.
21       A.   If you want to sell the stores, you
22   have to operate the stores, yes.
23       Q.   Right.  And so that was a decision
24   point every day in the case until the final
25   sale to ESL, right, as to whether or not to

Page 151

GRIFFITH

1
2    operate the stores or liquidate the stores,
3    right?
4        A.   I wouldn't say it was an everyday
5    decision, no.
6        Q.   At any day, they could have decided
7    to do one or the other, right?
8        MR. GENENDER:  Objection, form.
9        A.   I mean, at certain points, you could
10   pivot your strategic direction, yes, but --
11       Q.   And that decision could have been
12   made at any day from the day of October 15
13   right through the day they sold the stores to
14   ESL, right?
15       A.   I don't know the answer to that.  I
16   wasn't involved at that level in terms of
17   strategic decision making.
18       Q.   So what changed on December 28 from
19   October 15 or November 1 or November 30?  Why
20   is December 28 of any more relevance?
21       MR. GENENDER:  Objection, vague.
22       A.   I don't know.
23       Q.   Okay.
24       A.   I wasn't involved.
25       Q.   And what changed on January 17, if

Page 152

GRIFFITH

1
2    anything?
3        MR. GENENDER:  Objection, vague.
4        A.   Again, I don't know the answer to
5    that.
6        Q.   I want to show you Exhibit 21.  You
7    mentioned a restructuring committee.
8            Is Mr. Carr involved with the
9    restructuring committee?
10       A.   Yes.
11       Q.   Have you seen this declaration
12   before?
13       A.   It's possible.  I don't -- can't say
14   I remember.
15       Q.   What was Mr. Carr's position in
16   connection with the restructuring committee?
17       A.   He was a member of the restructuring
18   committee.
19       Q.   And it had two members; is that
20   right?
21       A.   It was a subcommittee.
22       MR. GENENDER:  Misstates the record.
23       Q.   I'm just asking.  I don't know what
24   the answer is.
25           So how many members?  Do you know

Page 153

GRIFFITH

1
2  how many members there were?
3      A.   There were at least four.
4      Q.   Okay.  And they had their own
5  counsel, Paul Weiss?
6      A.   The restructuring committee did not
7  have their own counsel.
8      Q.   If you look at paragraph 5 --
9  page 5, rather, paragraph 10.
10     A.   Okay.
11     Q.   Do you see where it says, "The
12 subcommittee has engaged experienced legal and
13 financial advisors to assist in its
14 investigation, Paul, Weiss, Rifkind, Wharton &
15 Garrison LLP and conflicts counsel, Young
16 Conaway Stargatt & Taylor"?
17         MR. GENENDER:  Subcommittee is
18     different than the restructuring
19     committee.
20         MR. MOLONEY:  Okay.
21     Q.   What's the difference between a
22 subcommittee and a restructuring committee,
23 then?
24     A.   I was not involved with the
25 restructuring subcommittee at any real level.

Page 154

GRIFFITH

1
2  So I couldn't tell you exactly what the
3  difference was.
4      Q.   It says -- in paragraph 7, he refers
5  to restructuring subcommittee as the
6  subcommittee.
7          Do you know if there's any
8  difference between a restructuring committee
9  and the so-called subcommittee as suggested by
10 your counsel?
11     A.   Yes, there is a difference.
12     Q.   What is the difference?
13     A.   A subcommittee is made up of a
14 smaller group of the committee.
15     Q.   Smaller group of the restructuring
16 committee?
17     A.   Yes.
18     Q.   Okay.  And the subcommittee had its
19 own -- the subcommittee is the restructuring
20 subcommittee, right?
21     A.   I believe it's defined as the
22 subcommittee.
23     Q.   Paragraph 7 says, "Restructuring
24 subcommittee is defined as the subcommittee,"
25 right?

Page 155

GRIFFITH

1
2      A.   Okay.
3      Q.   They had their own counsel, right?
4      A.   That's my understanding, yes.
5      Q.   Two sets of counsel, actually?
6      A.   That's what it says.
7      Q.   And it looks like three sets of
8  financial advisors?
9      A.   That's what it says.
10     Q.   And their focus was to investigate
11 my client, right?
12         MR. GENENDER:  Objection, form, lack
13     of foundation.
14     A.   I don't know what their specific
15 task was for.
16     Q.   Do you see, in paragraph 14, they
17 are referring to our investigation?
18         MR. GENENDER:  Objection, lack of
19     foundation.
20     Q.   Well, this is part of the expenses
21 of this subcommittee and these three sets of
22 advisors that you're trying to surcharge my
23 client for, right?
24         MR. GENENDER:  Objection, misstates
25     the record.

Page 156

GRIFFITH

1
2      Q.   Is that not correct?
3      A.   I do not believe that is correct.
4      Q.   They aren't included within the
5  professional expenses that you list at
6  $51 million?
7      A.   I do not believe so.
8      Q.   So you have excluded them?
9      A.   Yes.
10     Q.   What else did you exclude?
11     A.   There were a significant number of
12 professional fees that were excluded.
13     Q.   Which ones?
14     A.   The professional fees that we have
15 in here were developed by reviewing each
16 professional firm and looking at the billing
17 tasks to come up with a subset of total
18 professional fees that related strictly to the
19 M&A and sale transactions associated with
20 selling the stores.
21     Q.   So you're saying that the
22 $51 million solely was the M&A team?
23         MR. GENENDER:  Objection, misstates
24     the testimony.
25     A.   It was related by firm to task codes

GRIFFITH

1
2  that made sense as part of the transaction to
3  sell the store base.
4      Q.   Okay.  Now, looking at paragraph
5  29 -- 30, rather.
6          MR. GENENDER:  Of?
7          MR. MOLONEY:  31 of the same
8  document.
9      Q.   He lists some of the people who
10 benefited from the going concern bid, right?
11         And under A, he lists the non-ESL
12 third-party secured creditors will receive an
13 additional $152 million, right?
14         MR. GENENDER:  Objection, misstates
15 the document.
16         MR. MOLONEY:  I don't believe I
17 misstated.
18     Q.   But go ahead.  You may answer.
19         MR. GENENDER:  It's not what it
20 says.
21     A.   Could you say it again?
22     Q.   Under point A, he says, "Non-ESL
23 third-party secured creditors will receive an
24 additional $152 million," correct?
25     A.   That's part of the sentence, yes.

GRIFFITH

1
2      Q.   Okay.  The rest of it just indicates
3  how the money is being divided up between the
4  two -- between Cyrus and other third-party
5  creditors, right?
6      A.   That's what it appears to show.
7      Q.   Right.  And then below that, it
8  shows all of the other claims that are being
9  satisfied in full by the ESL bid, right?  The
10 senior DIP satisfied in full, the junior DIP
11 satisfied in full, the final DIP was satisfied
12 in full, and the Citi L/C facility is satisfied
13 in full, right?
14     A.   Under which scenario?
15     Q.   Under recovery.
16     A.   But under which scenario?  You're
17 saying under --
18     Q.   ESL bid.
19     A.   Yes, then I agree.
20     Q.   Then, in addition, the Dove loans
21 are getting paid 65 percent?
22     A.   That's what it says.
23     Q.   And the GL/IP loans are being paid a
24 hundred percent, right?
25     A.   That's what it says.

GRIFFITH

1
2      Q.   And then turning the page, it says,
3  "In addition, unsecured creditors will receive
4  an additional $534 million," right?
5          MR. GENENDER:  Objection.  It
6  misstates the document.
7          MR. MOLONEY:  Noted.
8      Q.   You may answer.
9      A.   Could you restate it?
10     Q.   B, it says, "Pre-petition unsecured
11 creditors will receive an additional
12 $534 million," correct?
13     A.   That's what it says.
14     Q.   And it says, "This excludes
15 additional recoveries on account of cure
16 claims," right?
17     A.   That's what it says.
18     Q.   And it says, "ESL will pay for
19 material administrative claims of the debtors'
20 estates," under C, "and the debtors will occur
21 materially less administrative claims under the
22 ESL sale versus liquidation (an aggregate
23 $621 million benefit to debtors' estates) as
24 illustrated in the chart below," correct?
25     A.   That's what it says.

GRIFFITH

1
2      Q.   And then it says, "As result of the
3  terms of the limited release, nearly all
4  proceeds of the debtors' preserved litigation
5  claims will inure to the benefit of non-insider
6  creditors," right?
7      A.   That's what it says.
8      Q.   And E says the debtors will receive
9  an additional 35 million.
10         MR. GENENDER:  Objection, form,
11 misstates the document.
12     Q.   Right?  In exchange for limited
13 release, right?
14     A.   That's what it says.
15     Q.   And "NewCo will extend offers of
16 employment to at least 45,000 of debtors'
17 employees," right?
18     A.   That's what it says.
19     Q.   Now, so the benefits of this
20 transaction went far beyond the benefits to the
21 second lienholders, right?
22     A.   According to this, there were other
23 parties that had benefit.
24     Q.   Now, you're not saying that the
25 $5.2 billion transaction was done primarily to

Page 161

```
 1          GRIFFITH
 2  provide $433 million of benefit to the second
 3  lien collateral, right?
 4      A.  I think it was one of the major
 5  considerations.
 6      Q.  Okay.  And you're not really
 7  claiming the debtor spent $1.4 billion to
 8  preserve $433 million of second lien
 9  collateral, are you?
10      MR. GENENDER:  Objection, form,
11  misstates the evidence.
12      A.  Those were the costs associated that
13  were required to get this to an ultimate sale.
14      Q.  Right.  But you would never, as an
15  economic matter, right, you're a
16  businessperson, you would never spend
17  $1.4 billion to get $433 million of value,
18  right?
19      MR. GENENDER:  Objection, misstates
20  the evidence.
21      A.  My alternative was getting zero and
22  I could net 433, I would.
23      Q.  You would spend $1.4 billion to get
24  to 433?
25      A.  In an immediate liquidation, it
```

Page 162

```
 1          GRIFFITH
 2  would have been a zero recovery or close to a
 3  zero recovery.  So for the debtors to expend
 4  the money and run the operations and have it
 5  result in a material recovery to the 2Ls, I
 6  don't see how that's not economic.
 7      Q.  Are you claiming that this was
 8  really done for the benefit of the 2Ls?
 9      A.  It was certainly part of the reason.
10      MR. MOLONEY:  Okay.  No more
11  questions.  Pass the witness.
12      MR. LIUBICIC:  Why don't we take
13  five minutes and I can streamline some of
14  my outline based on Mr. Moloney's
15  questioning.
16      (Recess taken at 5:25 p.m. to
17  5:39 p.m.)
18      MR. GENENDER:  I think Mr. Griffith
19  has to clarify one answer he gave in the
20  prior testimony, if he can do that before
21  you start, Bob.
22      THE WITNESS:  The one clarification
23  from the last set of questions, I stated
24  that Paul Weiss and the other subcommittee
25  professionals would have been excluded
```

Page 163

```
 1          GRIFFITH
 2  from that 51 million we have included.
 3      The clarification would be any time
 4  they had spent related to the sale process
 5  in their billing descriptions would
 6  potentially be included in the 51, but not
 7  the entire amount of Paul Weiss bills,
 8  just the portion of them and their
 9  advisors that would be related to the
10  sale.
11      MR. MOLONEY:  Fine.  Thank you for
12  the clarification.
13      MR. GENENDER:  You bet.  Thank you.
14  EXAMINATION BY
15  MR. LIUBICIC:
16      Q.  Mr. Griffith, I'm Rob Liubicic.  We
17  met before.  I represent Cyrus Capital in this
18  case.
19      A.  Yes.
20      Q.  Why don't we first have a look at
21  your original declaration.  And for the record
22  that's Exhibit --
23      MR. GENENDER:  4.
24      Q.  -- 4.
25      A.  Okay.
```

Page 164

```
 1          GRIFFITH
 2      Q.  So let's look at paragraph 8,
 3  please.  Are you there?
 4      A.  I am.
 5      Q.  Okay.  Do you see the last sentence
 6  starts out, "Based on M-III's prior liquidation
 7  analyses, had the debtors liquidated as of the
 8  petition date, the second lienholders would
 9  have received a few cents on the dollar," and
10  it goes on from there?
11      A.  Yes.
12      Q.  What are the prior liquidation
13  analyses you are referring to?
14      A.  There were certain liquidation
15  analyses that were done during the case that we
16  had used.
17      Q.  Okay.  How many?
18      A.  We had done several, I think, over
19  the course of the case.
20      Q.  And "we" meaning M-III or someone
21  else?
22      A.  M-III and the professionals from the
23  debtors.
24      Q.  Okay.  Did you work on those
25  analyses?
```

Page 165

1              GRIFFITH
2      A.   I did not.
3      Q.   Okay.  Do you know if those analyses
4   have been produced in this case?
5      A.   I can't say for certain.  I don't
6   know.
7      Q.   All right.  Now, let's look at
8   paragraph 13, which is on the next page.
9      A.   Okay.
10     Q.   And do you see you said, in
11  paragraph 13, "Taking many of Cyrus'
12  assumptions as true," and it goes on from
13  there?
14     A.   Yes.
15     Q.   I believe you testified earlier
16  today that, and I wrote it down, "We were using
17  Cyrus values from the initial Cyrus offer."
18         Do you recall giving that testimony?
19     A.   I do.
20     Q.   What offer is that that you're
21  referring to?
22     A.   There were discussions that were
23  begun, I forget if it was back in maybe March,
24  April time frame, to discuss potential 507(b)
25  claims and settlement discussions.

Page 166

1              GRIFFITH
2      Q.   It was a settlement discussion,
3   right?
4      A.   Yes, I believe so.
5      Q.   Were you present for that settlement
6   discussion?
7      A.   I was present for one meeting.
8      Q.   Okay.  What was your purpose in
9   using Cyrus values from the initial Cyrus offer
10  in your original declaration?
11     A.   Just to show it as a
12  apples-to-apples comparison.
13     Q.   Just to show what as an
14  apples-to-apples comparison?
15     A.   The things we list here in terms of
16  the total amount of first lien, the total
17  second lien debt and total gross collateral.
18     Q.   So you used Cyrus values from the
19  initial Cyrus offer to come up with an alleged
20  amount of diminution value of 2L collateral,
21  correct?
22     A.   That was the -- yes, that was what
23  we did.
24     Q.   And you see you said that the
25  assumptions you take as true include total

Page 167

1              GRIFFITH
2   first lien debt, second lien debt and total
3   gross collateral?
4      A.   Yes, that's what I just said.
5      Q.   Okay.  What Cyrus assumptions did
6   you not take as true?
7      A.   We used the fair market value of
8   85 percent as we calculate.
9      Q.   And then could we look at Exhibit A
10  to your original declaration, please?
11         So you would agree with me that, for
12  purposes of your Exhibit A, you did not take
13  all of Cyrus' assumptions as true, correct?
14     A.   Not all of them, no.
15     Q.   Did you take as true Cyrus'
16  assumption of whether the L/Cs should be
17  treated as funded debt?
18     A.   I don't recall what their assumption
19  was.
20     Q.   Where do you recall those
21  assumptions being laid out?  Is it a document?
22     A.   It was discussions and a document, I
23  believe.
24     Q.   Do you remember what that document
25  looked like?

Page 168

1              GRIFFITH
2      A.   Yes.
3      Q.   Do you remember that document
4   referencing settlement?
5      A.   It may have.
6      Q.   You reviewed the Murray report prior
7   to submitting your supplemental declaration,
8   correct?
9      A.   Yes.
10     Q.   And you respond to it in your
11  supplemental declaration?
12     A.   I do.
13         MR. GENENDER:  Object to form.
14     Q.   Is your supplemental declaration a
15  complete statement of your criticisms of
16  Ms. Murray's report?
17     A.   It's hard to say.  I don't know.  I
18  think we touched on the most important ones.
19     Q.   As you sit here today, do you have
20  any criticisms of Ms. Murray's report that you
21  believe are not contained in your supplemental
22  declaration?
23         MR. GENENDER:  Objection, form.
24     A.   I believe the material problems we
25  had with it, we have identified.

Page 169

GRIFFITH

1
2      Q.   Do you presently intend to testify
3   about any aspect of Ms. Murray's analysis other
4   than what's in your supplemental declaration?
5      MR. GENENDER:  Objection, form.
6      A.   Not that I'm aware of.
7      Q.   Now, let's look at your supplemental
8   declaration, please.  And for the record that
9   is exhibit --
10     MR. FOX:  It's 5.
11     MR. LIUBICIC:  Thank you.
12     Q.   Let's turn to paragraph 6,
13  Mr. Griffith.
14          And do you see, down near the bottom
15  of that paragraph on page 4, you have, in
16  bolded type, first, second and third?
17     A.   Yes.
18     Q.   Okay.  So looking at first, you
19  said, "Each of the reports rely on incorrect or
20  misapplied data taken from other sources."
21          Do you see that?
22     A.   I do.
23     Q.   What incorrect or misapplied data do
24  you believe Ms. Murray relied on?
25     A.   I have to go to the report to

Page 170

GRIFFITH

1
2   refresh my memory.
3      Q.   That's the Murray report?
4      A.   Yes.
5      Q.   I believe that's Exhibit 17.
6      A.   (Document review.)
7          I think the first was similar to
8   what we previously discussed, the collateral of
9   the 2L debt.
10     Q.   And are you referring to your
11  position that Ms. Murray includes items that
12  she believes are 2L collateral that you believe
13  are not?
14     A.   That's correct.
15     Q.   What else?
16     A.   (Document review.)
17          I think, as we mentioned as well,
18  the treatment of the L/Cs.
19     Q.   And are you referring to the fact
20  that Ms. Murray did not include the L/Cs as
21  funded debt?
22     A.   Yes.
23     Q.   Okay.  What else?
24     A.   (Document review.)
25          In the high case scenario, inventory

Page 171

GRIFFITH

1
2   value appears to be at the gross book value,
3   which I wouldn't think would be the correct
4   starting point.
5      Q.   By the high case, do you mean
6   Ms. Murray's analysis based on the numbers in
7   Mr. Riecker's declaration?
8      A.   That might be right, yes.
9      Q.   Anything else?
10     A.   I think those were the major points,
11  as I'm sitting here, that I can recall.
12     Q.   Okay.  Going back to paragraph 6 of
13  your supplemental declaration, you say,
14  "Second, each uses a different and incorrect
15  methodology to calculate the value of the
16  debtors' inventory."
17          Do you believe Ms. Murray used an
18  incorrect methodology to calculate the value of
19  inventory?
20     A.   As I just mentioned, I do.  I
21  believe that two billion seven forty of
22  inventory is a gross book value.
23     Q.   Okay.  And what about in
24  Ms. Murray's minimum case, do you believe she
25  used an incorrect methodology?

Page 172

GRIFFITH

1
2      A.   I don't believe so.
3      Q.   I would like to get on the same page
4   with you on some terminology.
5          First off, what's your understanding
6   of what an NOLV is?
7      A.   It's a net orderly liquidation
8   value.
9      Q.   What does that mean to you?
10     A.   It's an estimation of what you would
11  expect to recover on inventory in a liquidation
12  after accounting for certain expenses.
13     Q.   In an orderly liquidation, correct?
14     A.   I think you can apply it to any type
15  of liquidation.  It would depend on the
16  severity of the discount to depart or a hundred
17  percent.
18     Q.   How would you define an orderly
19  liquidation?
20     A.   I would say it's not a full-blown
21  fire sale, where you're shutting every store.
22  You have proper planning, likely up to four
23  weeks prior to starting a liquidation sale at a
24  store to properly inventory it, then have the
25  proper amount of time to sell the inventory in

Page 173

GRIFFITH

1
2 the stores, and then the ultimate winding down
3 of the location and transferring whatever
4 remaining inventory was there.
5     Q.   And can you point me to any
6 authority supporting that definition?
7     A.   You asked me to provide an
8 understanding of it.  I don't think I can point
9 you to an authority.
10     Q.   Okay.  Let's look at paragraph 8 of
11 your supplemental declaration, please.
12         So, again, I'm just focused on
13 terminology at this point.  In the first
14 sentence of paragraph 8, you talk about -- you
15 use the phrase "either a wind-down or a
16 liquidation scenario."
17         Do you see that?
18     A.   Yes.
19     Q.   What do you mean by a wind-down?
20     A.   Shutting down the operations of the
21 estate or the stores.
22     Q.   And what do you mean by a
23 liquidation scenario?
24     A.   I mean, I would say they're similar.
25     Q.   Are they the same?

Page 174

GRIFFITH

1
2     A.   They would be pretty close.
3     Q.   Okay.  You wrote this, right?
4     A.   I did.
5     Q.   So I'm just trying to understand
6 what you mean, because you use -- you use --
7 you appear to use a number of different terms
8 in your declaration.  So I want to understand.
9         What's the difference, if there is
10 one, between wind-down and liquidation
11 scenario?
12     A.   I'd say they're pretty similar.
13     Q.   As you sit here right now, can you
14 name any difference for me?
15     A.   Not off the top of my head.
16     Q.   Okay.  Now, let's go to paragraph 9
17 of your supplemental declaration.
18         So here, in the first sentence, do
19 you see you talk about -- you use the phrase "a
20 wind-down or, more drastically, a full retail
21 liquidation."
22         Do you see that?
23     A.   Yes.
24     Q.   What do you mean by a full retail
25 liquidation?

Page 175

GRIFFITH

1
2     A.   Shutting all the stores at the same
3 time and pushing all the inventory into those
4 locations.
5     Q.   And then do you see in the next
6 sentence you reference the margins in a fire
7 sale?
8     A.   Yes.
9     Q.   What do you mean by a fire sale?
10     A.   The full retail liquidation where
11 you're doing everything at once in a very fast
12 manner.
13     Q.   So a full retail liquidation and a
14 fire sale are interchangeable for purposes of
15 your supplemental declaration?
16     A.   They would approximate each other,
17 yes.
18     Q.   Is a fire sale not orderly, in your
19 mind?
20         Actually, let me rephrase it.
21         Is a fire sale something other than
22 an orderly liquidation, in your mind?
23     A.   I think the pace is faster, but
24 along the same lines in terms of what would
25 need to be accomplished.

Page 176

GRIFFITH

1
2     Q.   Okay.  Let's go to paragraph 13 of
3 your supplemental declaration, please.
4         So you recall you were asked some
5 questions earlier about L/Cs?
6     A.   Yes.
7     Q.   And do you see, in the middle of
8 paragraph 13, you said, "In a liquidation
9 scenario, letters of credit are almost always
10 fully drawn or fully cash collateralized
11 because leaving undrawn amounts exposes the
12 counterparties"?
13     A.   Yes.
14     Q.   In your view, are letters of credit
15 almost always fully drawn in an orderly
16 liquidation scenario?
17     A.   They potentially would be, yes.
18     Q.   But they would potentially not be,
19 correct?
20         MR. GENENDER:  Objection, form.
21     A.   I would assume that they would be
22 drawn if you're in a liquidation and maybe not
23 able to perform under the obligations that are
24 associated with those L/Cs.
25     Q.   So is it your testimony that, in an

Page 177

GRIFFITH

1
2 orderly chapter 11 liquidation scenario,
3 letters of credit are almost always fully
4 drawn?
5    A.   At some point, they may be. It
6 would depend on -- it would depend on if the
7 estate is administratively solvent or not, and
8 if they are able to continue to perform their
9 duties under the obligations of those L/Cs.
10    Q.   Okay. So in an orderly chapter 11
11 scenario, letters of credit may be fully drawn,
12 correct?
13       MR. GENENDER: Objection, form,
14 misstates.
15    A.   Yes.
16    Q.   And what's the basis of your view
17 that, in an orderly chapter 11 scenario,
18 letters of credit may be fully drawn?
19    A.   They represent obligations that are
20 real and would need to be funded at some point
21 by somebody, and in that scenario, if the
22 estate is running out of money, the L/Cs may be
23 drawn by the lenders -- I'm sorry -- by the
24 counterparties to cover those liabilities.
25 MO    MR. LIUBICIC: I move to strike.

Page 178

GRIFFITH

1
2    Q.   Again, I'm asking for the basis of
3 your view.
4       What's your basis, experience,
5 education, something else?
6    A.   My understanding is Circuit City
7 still has litigation going on around their
8 L/Cs, and it's been a while. It's part of it.
9 Discussions with colleagues. That's kind of
10 the basis.
11    Q.   You are a fact witness, right?
12    A.   I am.
13    Q.   Are you personally involved in the
14 Circuit City case?
15    A.   I am not.
16    Q.   And discussions with colleagues,
17 who's that?
18    A.   People within the firm.
19    Q.   Within M-III?
20    A.   Yes.
21    Q.   And who's that?
22    A.   Bill Murphy, Colin Adams. They are
23 the two I would note.
24    Q.   Can you point me to any instance, in
25 an orderly chapter 11 liquidation, of a

Page 179

GRIFFITH

1
2 retailer where letters of credit were fully
3 drawn?
4    A.   I can't say, sitting here, that I
5 can.
6    Q.   Are you aware of chapter 11
7 liquidations where substantial letters of
8 credit remained outstanding and undrawn?
9    A.   I'm not aware. I'm not sure.
10    Q.   Any familiarity with the wind-down
11 in the Linens & Things case?
12    A.   No.
13    Q.   How much of the L/Cs were drawn as
14 of the petition date in the aggregate?
15    A.   I am not exactly sure.
16    Q.   You would agree with me that it was
17 public knowledge, at certain points in this
18 chapter 11 case, that the debtors were taking
19 the position that they might have to pivot to a
20 liquidation?
21    A.   Could you restate the question?
22    Q.   Sure. You would agree with me that
23 it was public knowledge, at certain points in
24 this chapter 11 case, that the debtors were
25 taking the position that they might have to

Page 180

GRIFFITH

1
2 pivot to a liquidation?
3    A.   That -- yes, that sounds correct.
4    Q.   Would you agree that, in the three
5 years prior to the filing, approximately 985
6 Sears stores were closed?
7    A.   I don't know that number.
8    Q.   Would you agree that, in the three
9 years prior to the filing, hundreds of Sears
10 stores were closed?
11    A.   It's possible.
12    Q.   You don't know?
13    A.   I don't know the number.
14    Q.   Would you agree that, as of the
15 filing date, Sears had approximately 687
16 stores? Does that sound about right?
17    A.   Approximately.
18    Q.   And would you agree that during this
19 case, there have been approximately 262 GOB
20 sales at Sears stores?
21    A.   That sounds right, yes.
22    Q.   From the petition date to the date
23 of the closing of the sale to ESL, how much was
24 drawn under the L/Cs in the aggregate, do you
25 know?

Page 181

GRIFFITH

1
2    A.  I don't know that number.
3    Q.  Does 9 million sound about right?
4    A.  I don't have a basis for it.
5    Q.  If a letter of credit is drawn to
6  cover a contingent liability, but the liability
7  doesn't ultimately occur, would you expect that
8  the proceeds of the letter of credit would be
9  returned?
10   A.  At the end of any period, where the
11 liability could actually be recognized, then
12 yes.
13   Q.  Are you familiar with the letter of
14 credit and reimbursement agreement for the
15 $273 million standalone L/C facility?
16   A.  Could you say that again?
17   Q.  Sure.  Are you familiar with the
18 letter of credit and reimbursement agreement
19 for the $273 million standalone L/C facility?
20   A.  I'm aware of it.  I'm not versed in
21 it.
22   Q.  Have you ever read it?
23   A.  I have not.
24   Q.  Are debtors paying claims on L/Cs
25 currently?

Page 182

GRIFFITH

1
2    A.  The debtors are not.
3    Q.  Were the letters of credit assumed
4  as part of the APA that closed on February 11?
5    A.  They were.
6    Q.  And does that fact have significance
7  to you when it comes to the question of whether
8  the L/Cs should be considered funded debt?
9    A.  It does.
10   Q.  And why is that?
11   A.  Because Transform is paying
12 liabilities or obligations that are due under
13 those L/Cs on behalf of the debtors.
14   Q.  How much in liabilities or
15 obligations is due under those L/Cs that
16 Transform is paying?
17   A.  A significant amount.
18   Q.  Do you know the amount?
19   A.  The L/Cs are typically based or
20 sized on actuarial reports that tell you, for
21 workers' comp and auto, what is likely to
22 occur.  So I would say it must be in the
23 neighborhood of what the L/C balances are.
24   Q.  And your basis for saying that is
25 what?

Page 183

GRIFFITH

1
2    A.  My general understanding of how the
3  workers' comp and auto liability claims have
4  been handled by the estate in the past.
5    Q.  Do you have personal knowledge of
6  any amounts that Transform is actually paying
7  as you sit here today?
8    A.  We were involved post closing when
9  claims started to arise, and there was
10 discussions that maybe the L/Cs would be drawn.
11      We then worked with Transform to
12 understand if they were going to be paying
13 those obligations.
14 MO    MR. LIUBICIC:  I will move to strike
15   as non-responsive.
16   Q.  Do you have personal knowledge of
17 any amounts that Transform is actually paying
18 as you sit here today?
19   A.  There were discussions of amounts
20 that they were picking up, yes.
21   Q.  Do you have any detail beyond that?
22   A.  I don't have it on the top of my
23 head as I sit here.
24   Q.  Do you recall being asked some
25 questions about post-petition interest?

Page 184

GRIFFITH

1
2    A.  Yes.
3    Q.  Can you point me to any authority
4  supporting the idea that you can include
5  post-petition interest when measuring the
6  amount of a claim as of the petition date?
7       MR. GENENDER:  Objection, form,
8  misstates the evidence.
9    A.  I don't think that was the purpose.
10   Q.  Do you understand my question?
11   A.  In order to calculate diminution,
12 there has to be a change in time, and this is
13 the bare minimum amount of time we're assuming
14 to do liquidation, which is why there's a claim
15 there.  It's not meant to be as of the petition
16 date.
17   Q.  What's not meant to be as of the
18 petition date?
19   A.  The post-petition interest.
20   Q.  So understanding that your view is
21 it's not supposed to be as of the petition
22 date, I want to ask you my question again.
23      Are you aware of any authority in
24 the literature supporting the idea that you can
25 include post-petition interest when measuring

| Page 185 | Page 186 |
|---|---|

**Page 185**

GRIFFITH

2 the amount of a claim as of the petition date?
3    MR. GENENDER:  Objection, misstates
4 the evidence.
5    A.   And I am not aware.
6    Q.   Mr. Griffith, one of your
7 disagreements with Ms. Murray, as I understand
8 it from your supplemental declaration, is her
9 use of an 88.77 percent of NOLV for valuing
10 Sears inventory; is that correct?
11    A.   That's correct.
12    Q.   And you understand that that
13 88.7 percent NOLV percentage comes from a Tiger
14 appraisal dated September 28, 2018?
15    A.   That sounds correct.
16    Q.   I'm going to ask you this way just
17 to shortcut it.  I can show you the declaration
18 if you want.
19       Do you recall saying, in your
20 supplemental declaration, that the 88.7 percent
21 is not an appropriate metric?
22    A.   Yes.
23    Q.   Now, do you recall a few minutes ago
24 you made some points about Ms. Murray's
25 analysis based on using numbers contained in

**Page 186**

GRIFFITH

2 the Riecker declaration of November 23?
3    A.   Yes.
4    Q.   Okay.  As far as I can tell, your
5 supplemental declaration doesn't say anything
6 about that analysis.  Am I right about that?
7    A.   We just mentioned that there was
8 incorrect or misapplied data taken from other
9 sources.
10    Q.   Okay.  And where are you reading
11 from when you said that?
12    A.   Page 4, paragraph 6.
13    Q.   Okay.  So your statement about
14 incorrect or misapplied data taken from other
15 sources is meant to capture Ms. Murray's
16 analysis based on the Riecker declaration?
17       MR. GENENDER:  Asked and answered.
18    A.   Yes.
19    Q.   Do you say anything else in your
20 supplemental declaration about that analysis?
21       MR. GENENDER:  Object to form,
22 speaks for itself.
23    A.   I'm not sure if I do or not.
24    Q.   Let's take a look at the Murray
25 report, which is Exhibit 17.  And if you go to

**Page 187**

GRIFFITH

2 paragraph 84, please, it's on page 32.
3    A.   Okay.
4    Q.   So do you recognize this discussion
5 in paragraph 84?
6    A.   Could you state that, restate that?
7    Q.   Yeah.  Do you recognize the
8 discussion in paragraph 84?  Have you read it?
9    A.   I have read this report, yes.
10    Q.   And did you read paragraph 84 before
11 submitting your supplemental declaration?
12    A.   I did.
13    Q.   And could you go to the appendices
14 for the report, specifically appendix C2, which
15 would be on page 67?
16    A.   Okay.
17    Q.   And do you understand that appendix
18 C2 is the -- is Ms. Murray's calculation using
19 the number from the Riecker declaration?
20    A.   I see that.
21    Q.   Okay.  And you reviewed appendix C2
22 prior to submitting your supplemental
23 declaration?
24    A.   I have.
25    Q.   Okay.  And now could you please

**Page 188**

GRIFFITH

2 restate for me what you told me earlier about
3 this analysis?  I think you -- I think you
4 mentioned perhaps something was misapprehended
5 about the gross book value or -- could you fill
6 me in on that?
7       MR. GENENDER:  Objection, asked and
8 answered.
9    A.   Yeah.  I believe that the amount
10 here is the gross book value or an
11 approximation for it.
12    Q.   And when you say the amount, you
13 mean what?
14    A.   The inventory value as it's listed
15 here appears to approximate the gross book
16 value.
17    Q.   So you are looking at appendix C2;
18 am I right?
19    A.   I am.
20    Q.   Okay.  And you're looking at the
21 inventory value of 2.74 billion?
22    A.   Yes.
23    Q.   And you believe that's gross book
24 value and not an NOLV?
25    A.   That's my understanding, yes.

| | |
|---|---|
| Page 189 | Page 190 |

**Page 189**

GRIFFITH

1
2     Q.   Why don't we look at the Riecker
3   declaration?  And that's been previously marked
4   as Exhibit 22.
5         And in the Riecker declaration, we
6   can go to paragraph 8, please.
7     A.   Okay.
8     Q.   Do you see several lines up from the
9   bottom of page 4, it says, "Around the
10  commencement date, the pre-petition ABL
11  facility collateral was valued at approximately
12  2.8 billion, of which the net orderly
13  liquidation value, NOLV, of the debtors'
14  inventory was valued at about 2.74 billion,"
15  and it goes on?
16    A.   I see that.
17    Q.   Okay.  Is there anything inaccurate
18  about this statement from Mr. Riecker that was
19  filed with the court?
20    A.   It would appear that 2.74 billion is
21  not accurate.
22    Q.   And your basis for that is?
23    A.   Number one, the value of the estate
24  above it, 2.8 billion, to have an NOLV that's
25  only reduced by less than a point or two

**Page 190**

GRIFFITH

1
2   wouldn't really make sense to me, and the fact
3   that I think, as I mentioned in our -- my
4   supplemental declaration, the gross book value
5   of the collateral as of the petition date was
6   2.746 billion.
7     Q.   So is it your testimony that you
8   believe Mr. Riecker simply submitted an
9   inaccurate declaration to the court?
10        MR. GENENDER:  Objection, form.
11    A.   I'm not sure what -- I was not part
12  of this declaration, but I know, as a fact,
13  what the gross book value was as of the
14  petition date, and that's 2.746, approximate.
15    Q.   Prior to your involvement with this
16  current 507(b) and 506(c) dispute, did you ever
17  read this declaration?
18    A.   I can't say that I did.
19    Q.   Did you ever hear any of your
20  colleagues along, you know, since November of
21  2018, mention that Mr. Riecker had submitted a
22  declaration that had an incorrect figure in?
23    A.   Not to my knowledge, no.
24    Q.   Turning back to paragraph 84 of
25  Ms. Murray's report, Exhibit 17.

| | |
|---|---|
| Page 191 | Page 192 |

**Page 191**

GRIFFITH

1
2         MR. GENENDER:  Put Riecker away for
3   a minute?
4         MR. LIUBICIC:  Yeah.
5     A.   I'm sorry.  What page?
6         MR. GENENDER:  It's paragraph 84.
7     Q.   That's page 32.
8         Mr. Griffith, before I ask about
9   paragraph 84, this discussion we've had about
10  your claimed error in Mr. Riecker's
11  declaration, why didn't you say anything about
12  that in your supplemental declaration?
13    A.   We do mention that there was -- the
14  reports rely on incorrect or misapplied data
15  taken from other sources.  That's -- we weren't
16  part of this declaration.  I don't want to
17  speak for it, so.
18    Q.   Why didn't you say, in your
19  supplemental declaration, that you believe
20  Ms. Murray's analysis, based on Mr. Riecker's
21  number, was flawed, because you believe
22  Mr. Riecker's number itself was incorrect, why
23  didn't you say that?
24    A.   I'm not sure we found it necessary
25  to, but I don't know.

**Page 192**

GRIFFITH

1
2     Q.   You wrote your supplemental
3   declaration, right?
4     A.   I did.
5     Q.   Okay.  So you -- and you were aware
6   at the time that you wrote your supplemental
7   declaration that Mr. Riecker's number was
8   allegedly in error?
9     A.   When I -- when I referenced it, when
10  I did look at it, I wasn't sure that I could
11  figure out how you would ever get to that
12  number.  I don't know what his source was, so I
13  don't know.
14  MO        MR. LIUBICIC:  Move to strike.
15    Q.   Were you aware, at the time that you
16  wrote your supplemental declaration, that
17  Mr. Riecker's number was allegedly in error?
18    A.   It appeared inaccurate, yes.
19    Q.   So you made a choice not to say
20  anything about it in your supplemental
21  declaration, right?
22        MR. GENENDER:  Objection,
23  argumentative, asked and answered.
24    A.   It's not part of our analysis.
25    Q.   That's not my question.

Page 193

GRIFFITH

2  You made a choice not to put it in
3  your supplemental declaration, right?
4      MR. GENENDER:  Objection, asked and
5  answered.
6      A.  Yes, we did not reference that in
7  the supplemental.
8      Q.  And now looking at paragraph 84 of
9  Ms. Murray's report, do you see the -- starting
10  in the second sentence of that paragraph,
11  Ms. Murray said she requested supporting
12  documentation for the $2.74 billion figure?
13      A.  Okay.
14      Q.  And then she discusses a nine-page
15  collection of documents dated October 17, 2018,
16  and a calculation she made based on those?
17      A.  Okay.
18      Q.  Do you see that?
19      A.  I do see it.
20      Q.  Did you review those documents --
21  those documents that Ms. Murray is discussing
22  here, the nine-page collection of documents?
23      A.  I'm not sure what that is.
24      Q.  So you haven't reviewed it, if
25  you're not sure what it is, right?

Page 194

GRIFFITH

2      A.  I think that's possible.
3      Q.  You have no recollection of
4  reviewing it, right?
5      A.  I don't know what it is.
6      Q.  Well, you understand she cited it in
7  her report, right?
8      MR. GENENDER:  Objection, misstates
9  the record.
10      A.  I don't see the cite in that
11  sentence.
12      Q.  If you can turn to appendix C3.  You
13  see footnote 146?
14      A.  I do.
15      Q.  Do you recall reviewing that
16  document?
17      A.  I can't say that I did.
18      Q.  Were you familiar with Tiger prior
19  to this case?
20      A.  Prior to this case?
21      Q.  Yeah.
22      A.  I knew who they were.
23      Q.  Would you agree that Tiger is
24  knowledgeable about the inventory value of
25  Sears inventory?

Page 195

GRIFFITH

2      A.  Yes.
3      Q.  Did debtors ever rely on Tiger data
4  during this chapter 11 case?
5      A.  Yes.
6      Q.  In what context?
7      A.  It was used for the borrowing base
8  advance rates.
9      Q.  And in any other context?
10      A.  Not that I can think of sitting
11  here.
12      Q.  Do you understand that Tiger was
13  hired to prepare its appraisals for the first
14  lien ABL lenders to appraise the inventory that
15  was their collateral?
16      A.  Yes.
17      Q.  Did you review any Tiger appraisals
18  prior to the debtors' decision to seek approval
19  of a going concern sale with ESL?
20      A.  I have reviewed Tiger reports in the
21  past, yes.
22      Q.  And prior to the debtors' decision
23  to seek approval of a going concern sale with
24  ESL, did you ever have discussions with the ABL
25  lenders or their advisors?

Page 196

GRIFFITH

2      A.  Can you restate that question?
3      Q.  Yeah.  So prior to the debtors'
4  decision to seek approval of the going concern
5  sale with ESL, did you ever have discussions
6  with the ABL lenders or any of their advisors?
7      A.  We had spoken with the ABL lenders
8  in the past, and their advisors, yes.
9      Q.  And did you ever tell the ABL
10  lenders or their advisors that any of Tiger's
11  NOLV projections were wrong?
12      A.  We may have disagreed with them and
13  we did tell them that, yes.
14      Q.  Okay.  When did you tell them that?
15      A.  Over the course of the case and
16  prior to the case commencing.
17      Q.  Which NOLV -- which Tiger NOLV
18  projections did you tell the ABL lenders were
19  wrong?
20      A.  I don't recall, but I believe it was
21  leading up to the filing, as they were reducing
22  the value.
23      Q.  And did you tell the ABL lenders
24  that they were overstated or understated?
25      A.  Our opinion was, at the time and

Page 197

```
         GRIFFITH
1
2   prior to the filing, that the NOLVs were
3   conservative.
4        Q.   And then post petition, did you ever
5   tell the ABL lenders or their advisors that you
6   disagreed with any of Tiger's NOLVs?
7        A.   Not that I can recall.
8        Q.   You would agree with me Tiger valued
9   only inventory that was designated as eligible?
10       A.   I believe that's correct.
11       Q.   Would you agree that Tiger didn't
12  ascribe value to certain categories of
13  inventory that were deemed ineligible?
14       A.   Could you give me an example?
15       Q.   Live plants.
16       A.   Sounds reasonable.  I'm not
17  positive.
18       Q.   Are you familiar with the concept of
19  ineligible inventory and eligible inventory?
20       A.   Yes.
21       Q.   Do you believe, as a general matter,
22  that ineligible inventory is worth zero?
23       A.   It's hard to say.
24       Q.   Would you agree that -- would you
25  agree with me that, depending on the
```

Page 198

```
         GRIFFITH
1
2   circumstances, ineligible inventory can be
3   worth more than zero?
4        A.   I think it's possible.
5        Q.   Are you familiar with the
6   January 2019 wind-down analysis prepared by the
7   debtors and their advisors?
8        A.   I'd have to see it.  I don't know if
9   I could say that.
10       Q.   Do you recall a wind-down analysis
11  that was discussed at the sale hearing?
12       A.   I'm sure there was.  I'm not -- I
13  can't say that I'm familiar with the document.
14       Q.   Okay.  Do you recall Ms. Murray
15  discussing the January 2019 wind-down analysis
16  in her report?
17       A.   I'm not positive.
18       Q.   Okay.  In the Murray report,
19  Exhibit 17, let's go to paragraph 85.
20            And do you see, in the second
21  sentence, Ms. Murray said, "The January 14,
22  2019, wind-down analysis prepared by Mr. Meghji
23  indicated that the debtors believe that the
24  NOLV of the inventory at that time was
25  approximately 90 percent after taking into
```

Page 199

```
         GRIFFITH
1
2   account selling costs"?
3        A.   I see that.
4        Q.   Okay.  When you read this discussion
5   in Ms. Murray's report, did you go and take a
6   look at the wind-down analysis?
7        A.   I believe I did.
8        Q.   Would that 90 percent NOLV from the
9   wind-down analysis be an appropriate metric to
10  use in the 507(b) exercise we're engaged in?
11       A.   I don't believe so.
12       Q.   And why is that?
13       A.   I'm not sure that takes all the
14  costs associated with the full liquidation and
15  bankruptcy into account.
16       Q.   And what diligence did you do to
17  look into whether the wind-down analysis does
18  or does not take all of the costs into account?
19       A.   I would say we did.  We believed in
20  the methodology we've been using.
21       Q.   You would say we did what, due
22  diligence?
23       A.   No.  I'm saying that we maintained
24  that the fair market value of 85 percent is the
25  appropriate level.
```

Page 200

```
         GRIFFITH
1
2        Q.   I understand.  But my question was,
3   what diligence did you do to look into whether
4   the wind-down analysis does or does not take
5   all of the costs into account?
6        A.   I'm not -- I'm not sure we did an
7   extremely diligenced review of that based on
8   this.
9        Q.   Did you personally do any diligence
10  into that?
11       A.   I believe we looked at it.  I looked
12  at it.  But I didn't dig very deep on it.
13       Q.   Are you familiar with the
14  January 2019 UCC presentation titled
15  "Illustrative Recovery Considerations" that was
16  presented at the sale hearing?
17       A.   Do you have a copy of it?
18       Q.   I'm trying to short circuit this.
19  It's late.
20            MR. GENENDER:  Answer his question,
21  if you can.
22       A.   I don't know.
23       Q.   You testified at the sale hearing,
24  right?
25            MR. GENENDER:  He did not.
```

## Page 201

GRIFFITH

1
2    MR. LIUBICIC:  No?  Okay.
3    MR. GENENDER:  Sorry for
4    interrupting.
5    Q.   Let's look in the Murray report at
6    paragraph 87 on page 33.
7         Do you see that Ms. Murray is
8    discussing a January UCC presentation titled
9    "Illustrative Recovery Considerations"?
10    A.   I see that.
11    Q.   And do you see she said that, "In
12    building up the recoveries in a liquidation
13    analysis, the UCC advisors assumed that 425 of
14    the debtors' stores would conduct GOB sales
15    with the assistance of Abacus and SB306, and
16    that the debtors would achieve NOLVs of
17    approximately 90 percent with upside."
18         Do you see that?
19    A.   I see that.
20    Q.   Did you go and look at that UCC
21    analysis after reading Ms. Murray's report?
22    A.   I don't believe I did.
23    Q.   Okay.  Let's go back to your
24    supplemental declaration, please, and
25    specifically paragraph 9, which is on page 7.

## Page 202

GRIFFITH

1
2    A.   Okay.
3    Q.   So do you see here, in paragraph 9,
4    Mr. Griffith, you discuss a number of risks and
5    then you say, in the middle of the paragraph,
6    "The market's view of such risks is reflected
7    in the equity bids' guaranteed rates received
8    by the debtors during the sale, suggesting a
9    collateral value of 79 to 82 percent?
10    A.   I do.
11    Q.   Who submitted equity bids to the
12    debtors?
13    A.   I believe it's Tiger, and I don't
14    know who else.  I guess we can go to the
15    exhibit.
16    Q.   Were fee-based bids submitted to the
17    debtors?
18    A.   I believe there may have been.
19    Q.   Who submitted fee-based bids?
20    A.   I don't know the answer to that.
21    Q.   What's the difference between a
22    fee-based bid and an equity bid?
23    A.   The equity, they're guaranteeing the
24    recovery level.
25    MR. LIUBICIC:  Could we mark this?

## Page 203

GRIFFITH

1
2    (Griffith Exhibit 23, Project Blue -
3    Liquidation Bids Review, Dated December
4    2018, marked for identification.)
5    Q.   And how is that different from
6    what's going on in a fee-based bid?
7    A.   If the recoveries come in lower,
8    that's the problem for the company as opposed
9    to the liquidator.
10    Q.   I'm handing you what's been marked
11    as Exhibit 23, which is a deck titled "Project
12    Blue - Liquidation Bids Review," dated
13    December 2018.
14    A.   Okay.
15    Q.   Are you familiar with this document?
16    A.   I can't say that I really have spent
17    time with it, no.
18    Q.   Have you ever seen it?  You can take
19    a minute to look at it if you want, obviously.
20    A.   (Document review.)  Okay.
21    Q.   Have you ever seen this document?
22    A.   I may have.
23    Q.   Okay.  Let's look at slide 2.  So do
24    you see, in the first bullet, it says, "The
25    company received bids to GOB liquidate its

## Page 204

GRIFFITH

1
2    remaining 425-store footprint on a guarantee of
3    proceeds or equity bid basis and an advisory
4    basis"?
5    A.   Yes.
6    Q.   Do you know if advisory basis is the
7    same thing as a fee-based basis?
8    A.   I can't say that I know that.
9    Q.   Then do you see it says, "The
10    presentation evaluates the liquidation bids in
11    the following order," and the bullet below that
12    says, "Company self-run liquidation with Abacus
13    continuing to serve as liquidation advisor"?
14    A.   I see that.
15    Q.   Were you aware that Abacus had been
16    Sears' liquidation advisor up to this point?
17    A.   Yes.
18    Q.   Were you aware that Abacus had
19    historically liquidated hundreds of Sears and
20    Kmart locations prior to the petition date?
21    A.   Yes.
22    Q.   Was it Abacus that handled the
23    liquidation of 200 plus GOB stores during this
24    case?
25    A.   Yes.

Page 205

GRIFFITH

1
2    Q.   You would agree that Abacus was
3    highly experienced in running GOB sales for
4    Sears?
5    A.   Yes.
6    Q.   Okay.  Let's go to slide 3.
7         Do you see the first bullet says,
8    "Abacus and the company project a final net
9    orderly liquidation value for remaining
10   merchandise of 90.2 percent and 90.3 percent
11   before liquidation fees based on most recently
12   available inventory data"?
13   A.   I think you misspoke on the second
14   number.
15   Q.   The second number should be
16   93.7 percent.
17   A.   I see that.
18   Q.   Did M-III have any involvement in
19   this project?  Because -- I ask because it says
20   "Abacus and the company project."
21   A.   I don't know.
22   Q.   Can you go to slide 4, please?
23        Do you see slide 4 appears to lay
24   out two equity bids?
25   A.   Yes.

Page 206

GRIFFITH

1
2    Q.   And do you see the first bullet
3    says, "Both equity bids are conditioned on
4    working with the other liquidators and include
5    cost factor adjustment which the company
6    specifically requested not be included in the
7    agreements"?
8         Do you see that?
9    A.   I do.
10   Q.   What's a cost factor adjustment?
11   A.   I don't think I can answer that.
12   Q.   If you go to the last slide of the
13   deck, please.
14        I'm sorry, Mr. Griffith, just one
15   more thing on slide 4.
16        Do you see the two equity bids are
17   from, one, Hilco/Gordon Brothers and the other
18   from Tiger/Great American?
19   A.   Yes.
20   Q.   Now let's go to the last slide of
21   the deck.
22        And do you see it says, in the first
23   bullet, "Hilco/Gordon Brothers and Tiger/Great
24   American submitted bids that do not meet the
25   definition of a performing bid because both

Page 207

GRIFFITH

1    bids have cost factor adjustment language"?
2    Q.   Okay.
3    A.   Do you see that?
4    Q.   Do you see that?
5    A.   I see that.
6    Q.   Were you aware that the equity bids
7    did not meet the company's definition of a
8    conforming bid?
9    A.   I know that that's what they
10   believed the market to be.  That's why they bid
11   the way they bid.  I was not aware of that
12   non-conforming language.
13   Q.   So you were not aware that the
14   equity bids were non-conforming?
15   A.   That's right.
16   Q.   Okay.  And then you see in the third
17   bullet -- I'm sorry -- in the dashed bullet
18   immediately below the first bullet, do you see
19   it says, "Both equity bids provide a guaranteed
20   payout that is significantly lower than the net
21   recovery before liquidator fees projected to be
22   achieved in a self-liquidation/final GOB
23   process"?
24   A.   I see that.
25   Q.   Okay.  I think we're done with that

Page 208

GRIFFITH

1    document.
2    MR. GENENDER:  For the record, we
3    need to replace 23.  The witness
4    inadvertently wrote on it.
5         (Griffith Exhibit 24, Minutes of a
6    Meeting of the Restructuring Committee,
7    Dated January 5, 2019, marked for
8    identification.)
9    Q.   I have handed you what's been marked
10   as Exhibit 24.
11        Do you recognize these as minutes of
12   a meeting of the restructuring committee, dated
13   January 5, 2019?
14   A.   Yes.
15   Q.   And if you look in the paragraph
16   under the heading "Materials Provided," the
17   text paragraph, do you see this references your
18   attendance at this meeting?
19   A.   Yes, I see that.
20   Q.   Do you recall attending this meeting
21   of the restructuring committee?
22   A.   There's been a lot of meetings.  I'm
23   not sure I can recall this one specifically.
24   Q.   Do you see the bottom paragraph, it

```
        GRIFFITH
1
2   says, "Mr. Schrock reported on the status of
3   the liquidator proposals"?
4       A.  I see that.
5       Q.  And do you see it says, "He
6   recommended that the committee proceed with a
7   liquidation advisory team consisting of Abacus
8   advisors and SB360 Capital Partners in the
9   event of a wind-down"?
10      A.  I do.
11      Q.  Okay.  Do you recall attending a
12  meeting where this was discussed?
13      A.  It's possible.  We had a lot of
14  these meetings.
15      Q.  Do you have any specific
16  recollection of attending this meeting where
17  this was discussed?
18      A.  I don't have a specific
19  recollection.
20      Q.  And you would agree with me that
21  Abacus and SB360 did not submit equity bids?
22      MR. GENENDER:  Objection, form.
23      A.  Not that I'm aware of.
24      Q.  Did this recommendation from
25  Mr. Schrock ever change, to your knowledge?
```

```
        GRIFFITH
1
2       A.  Once we got to a going concern sale.
3       Q.  What I mean is, to your knowledge,
4   did Mr. Schrock's recommendation that, in the
5   event of a wind-down of the company, go with
6   Abacus and SB360, did that recommendation ever
7   change?
8       A.  I don't know the answer to that.
9       Q.  You are not aware of it changing,
10  correct?
11      A.  I am not.
12      Q.  And the wind-down that was being
13  discussed at this point, that was an orderly
14  wind-down in a chapter 11, correct?
15      A.  I'm not positive.
16      Q.  In January of 2019, before the
17  debtors made the decision to go with a going
18  concern sale to ESL, the wind-down that was
19  being discussed was going to be an orderly
20  wind-down, correct?
21      MR. GENENDER:  Objection, asked and
22  answered.
23      A.  I'm not sure.  I mean, if you wound
24  up administratively insolvent, I don't know if
25  you have a choice.
```

```
        GRIFFITH
1
2       Q.  Okay.  In January of 2019, do you
3   believe the estates were administratively
4   insolvent?
5       A.  I don't believe so, but I don't know
6   that for a fact.  I don't.
7       Q.  The wind-down analysis that was
8   prepared in January of 2019, do you know if
9   that assumed an orderly liquidation in a
10  chapter 11?
11      MR. GENENDER:  Objection, lack of
12  foundation.
13      A.  I don't know.
14      Q.  The UCC analysis we talked about,
15  January 2019, discussed at the sale hearing,
16  didn't that assume an orderly liquidation in
17  the chapter 11?
18      MR. GENENDER:  Objection, lack of
19  foundation.
20      A.  I would need to see the document.  I
21  don't know.
22      Q.  Now, the equity bids that you
23  discuss in paragraph 9 of your supplemental
24  declaration that you say suggest a collateral
25  value of 79 to 82 percent --
```

```
        GRIFFITH
1
2       A.  Yes.
3       Q.  -- do you know if those bids had a
4   potential upside embedded in them beyond the
5   guarantee recoveries?
6       A.  It potentially did.
7       Q.  There would be 50/50 sharing with
8   the debtors of any recoveries beyond a certain
9   level, correct?
10      A.  After they recover their fee as
11  well, there would be some split, yes.
12      Q.  In your experience, how common is it
13  for equity bids to have that type of upside
14  sharing component?
15      A.  I don't have a point of view on
16  that.
17      Q.  Okay.  Because you don't have enough
18  experience to know the answer to that, correct?
19      A.  I don't know the answer to that,
20  yes.
21      Q.  Because you don't have enough
22  experience with these kinds of bids to know the
23  answer to that, correct?
24      MR. GENENDER:  Objection, form.
25      A.  Yeah, I think that's -- yes.
```

Page 213

GRIFFITH

1
2    Q.   You would agree that, if those
3    sharing levels were achieved, debtors' recovery
4    would be greater than the 79 to 82 percent you
5    lay out in paragraph 9?
6        MR. GENENDER:  Objection, calls for
7    speculation.
8        A.   Yeah, I don't know.  I can't answer
9    that.
10   Q.   And you don't have the experience to
11   know when a retailer engages a liquidator on an
12   equity bid basis, how common it is for sharing
13   levels to be hit, right?
14       A.   I don't personally, no.
15   Q.   And you are not able to say under
16   oath today that if debtors pivoted to a
17   liquidation and selected one of those equity
18   bids, that sharing levels would not have been
19   achieved, correct?
20       A.   I can't say for certain one way or
21   the other, no.
22   Q.   Are you aware of any recent retail
23   businesses that have done liquidations?
24       A.   I am aware.
25   Q.   Okay.  Which ones?

Page 214

GRIFFITH

1
2        A.   Toys 'R Us comes to mind.
3        Q.   Any others?
4        A.   Not off the top of my head, no.
5        Q.   Okay.  Toys 'R Us, was their
6    liquidator engaged on an equity bid basis or on
7    a fee basis, do you know?
8        A.   I don't know.
9        Q.   And in the world of retailer
10   liquidations, is it more typical to see a
11   liquidator engaged on an equity bid basis or
12   fee basis?  You don't know, right?
13       MR. GENENDER:  Which question are
14   you asking?  Compound.
15   Q.   Is it more typical to see a
16   liquidator engaged on an equity bid basis or on
17   a fee basis?
18       A.   Under what scenario?
19       Q.   In a liquidation of a retailer.
20       A.   I'm not positive.
21       Q.   Okay.  Let's look at paragraph 8 of
22   your supplemental declaration.  And I'm looking
23   at the third sentence.
24       Do you see it says, "The Tiger
25   appraisal only deducts direct sale expenses and

Page 215

GRIFFITH

1
2    a limited subset of non-direct sale expenses,
3    including royalty payments, base liquidation
4    fees and corporate overhead required to support
5    the retail GOB sales"?
6        A.   Yes.
7        Q.   Mr. Griffith, you have got in front
8    of you the Tiger appraisal dated September 28,
9    2018, which on the cover page says it's as
10   inventory date of October 6, 2018, and it's
11   been previously marked as Exhibit 11.  And
12   could you go to page 6, please?
13       Do you see the heading "Sale
14   Expenses"?
15       A.   I do.
16       Q.   And it says, "Expenses for the
17   retail GOB inventory sale included in this
18   analysis consists of two categories, and the
19   first is direct sale expenses."
20       Do you see that?
21       A.   I do.
22       Q.   It says, "Those expenses directly
23   related to the store locations," right?
24       A.   Yes.
25       Q.   Okay.  Has Tiger excluded any

Page 216

GRIFFITH

1
2    expenses directly related to the store
3    locations that you're aware of?
4        A.   I don't know.  I don't have any
5    direct knowledge of that.
6        Q.   And then if we look at the next
7    line, non-direct sale expenses," do you see
8    that?
9        A.   I do.
10       Q.   Are you aware of anything inaccurate
11   about the explanation of non-direct sale
12   expenses?
13       A.   Based on what we have seen, I don't
14   understand that they have all the corporate
15   overhead included in these numbers.
16       Q.   Right.  So you say, in paragraph 8
17   of your supplemental declaration that the Tiger
18   appraisal doesn't include what you call full
19   corporate overhead costs, right?
20       A.   That's right.
21       Q.   What do you mean by full corporate
22   overhead?
23       A.   Sears is a large organization that
24   has a lot of corporate overhead.  I think it
25   far exceeds what they have included in their

Page 217

1           GRIFFITH
2      analysis.
3           Q.   Okay.  And when you say -- well, is
4      it your view that full corporate overhead needs
5      to be included in an NOLV analysis of the
6      inventory?
7           A.   I think a lot more needs to be
8      included, yes.
9           Q.   Is there any corporate overhead that
10     you believe is not properly included in an NOLV
11     analysis?  Would you carve anything out from
12     corporate overhead?
13              MR. GENENDER:  Objection, compound.
14           A.   I'd have to review the categories.
15     I don't know.
16           Q.   So when you wrote full corporate
17     overhead in paragraph 8 of your supplemental
18     declaration, was there any old corporate
19     overhead of Sears that you did not have in
20     mind?
21           A.   Obviously, certain of the
22     professional fees that were not related to the
23     sale.
24           Q.   That's not corporate overhead,
25     right?

Page 218

1           GRIFFITH
2           A.   That's right.
3           Q.   Was there any corporate overhead you
4      did not have in mind?
5           A.   I'd have to go back and look at the
6      categories.
7           Q.   Do you recall testifying earlier
8      that you took the position with the ABL lenders
9      pre-petition that the Tiger NOLVs were
10     conservative?
11           A.   Yes.
12           Q.   If you felt they were conservative,
13     how is it that you're now saying that they
14     should include more corporate overhead?
15           A.   When we were talking to them
16     initially was when we were as a going concern.
17     This is in a liquidation scenario.
18           Q.   But what you told the ABL lenders
19     was the NOLVs in the Tiger appraisals were
20     conservative, right?
21           A.   At that point in time, yes.
22           Q.   And at that point in time,
23     pre-petition, the NOLVs did not include any
24     more overhead than they include on page 6 of
25     Exhibit 11, correct?

Page 219

1           GRIFFITH
2           A.   I don't know the answer to that.
3           Q.   Let's look at paragraph 9 of your
4      supplemental declaration.
5              Do you see you said, "A wind-down or
6      a full retail liquidation would inject
7      additional uncertainty and risk and reduce
8      overall recoveries"?
9           A.   Yes.
10           Q.   By how much would a wind-down reduce
11     overall recoveries?
12           A.   It's hard to say.  I don't have that
13     quantified.
14           Q.   You haven't attempted to quantify
15     it, right?
16           A.   No, I have not.
17           Q.   Then you say in the next sentence,
18     "The margins in a fire sale would be lower."
19              Do you see that?
20           A.   Yes.
21           Q.   How much lower?
22           A.   I don't have that quantified.
23           Q.   Have you ever personally been
24     engaged in a fire sale liquidation of a
25     retailer?

Page 220

1           GRIFFITH
2           A.   No.
3           Q.   Have you ever personally been
4      engaged in a chapter 11 orderly liquidation of
5      a retailer?
6           A.   I have not.
7           Q.   Have you ever been engaged in a
8      chapter 7 liquidation of a retailer?
9           A.   No.
10           Q.   What analysis did you do to write
11     what you wrote in paragraph 9?
12           A.   It's just a general understanding of
13     how these work and the shorter the time frame
14     and the faster you want to blow through
15     incremental inventory, the fire sale
16     environment margins will be lower, recoveries
17     will be lower.
18           Q.   So just a general understanding of
19     how liquidations of retailers work?
20           A.   Yes.
21           Q.   And then just above that, at the end
22     of paragraph 8, you talk about WARN Act
23     obligations.
24              What analysis did you do to write
25     that portion of paragraph 8?

Page 221

```
1              GRIFFITH
2      A.   We just understood.  We knew, from
3  working with the company, that there was a
4  material amount of WARN Act-related severance
5  liabilities that would be incurred.
6      Q.   How much WARN Act liability would be
7  incurred in an orderly liquidation of Sears?
8      A.   I don't have that number here.
9      Q.   Then the last sentence of paragraph
10 9 you say, "The contemporaneous Tiger report
11 projected an 85.4 percent NOLV."
12      Do you see that?
13      A.   I do.
14      Q.   That's from a December 2018 Tiger
15 report, correct?
16      A.   (Document review.)  Yes.
17      Q.   Okay.  How is a December 2018 Tiger
18 report relevant to measuring NOLV as of the
19 petition date?
20      A.   (Document review.)
21          I think it was just another data
22 point.
23      Q.   Okay.  So is it relevant to
24 measuring NOLV as of petition date?
25      A.   It's another data point that you
```

Page 222

```
1  could use.
2      Q.   To measure NOLV as of the petition
3  date?
4      A.   It's possible, yes.
5      Q.   You would agree with me that it
6  would make more sense to use a projected NOLV
7  closer in time to the petition date if we had a
8  Tiger NOLV closer in time to the petition date?
9      A.   We could use that, yes.
10      Q.   You would agree with me that would
11 make more sense to use that, if we want to
12 measure value as of the petition date, right?
13      A.   If we are going to use NOLV, it's
14 reasonable to do that.
15      Q.   Paragraph 10, you talk about a
16 chapter 7 liquidation scenario.
17          Do you see that?
18      A.   I do.
19      Q.   So is this analysis in paragraph 10
20 also based on your general understanding of
21 liquidations of retailers?
22      A.   Yes.
23      Q.   Are you aware of any retailers who
24 have converted their cases to a chapter 7?
```

Page 223

```
1              GRIFFITH
2      A.   Not off the top of my head, no.
3      Q.   In the practice of valuation, what
4  is a premise of value?  Do you know what that
5  means?
6      A.   What are you referring to?  I'm not
7  sure.
8      Q.   Are you familiar with the concept of
9  a premise of value when it comes to valuation
10 work?
11      A.   I don't know the technical term.
12      Q.   Can you point me to any authority
13 suggesting it's appropriate to value collateral
14 as of the petition date based on what someone
15 might have paid for that collateral about four
16 months later?
17      A.   No, I can't, not off the top of my
18 head, no.
19      Q.   Would you agree with me that
20 collateral values expressed as a percentage of
21 book value can vary over time?
22          MR. GENENDER:  Objection, form.
23      A.   Can you repeat the question?
24      Q.   Sure.  Would you agree with me that
25 collateral values expressed as a percentage of
```

Page 224

```
1              GRIFFITH
2  book value can vary over time?
3      A.   Yes.
4      Q.   Okay.  Lets go to paragraph 6 of
5  your supplemental declaration -- I'm sorry --
6  page 6 and footnote 2.
7          MR. GENENDER:  There is no footnote
8  2 on page 6?
9          MR. LIUBICIC:  I'm sorry, guys.
10 It's late.  Footnote 8.
11          MR. GENENDER:  It is late.
12      Q.   You see you said, in footnote 8,
13 "The 88.7 percent NOLV determined in the Tiger
14 appraisal is a percentage of net eligible
15 inventory, which does not include certain
16 inventory in transit and categories of
17 inventory that have lower recoveries than
18 retail store merchandise."
19          Do you see that?
20      A.   I do.
21      Q.   Are you aware that Ms. Murray took
22 into account in-transit inventory using a
23 separate NOLV?
24      A.   I was aware that she was making a
25 calculation, yes.
```

Page 225

```
1              GRIFFITH
2       Q.   And then, in the next sentence, you
3   say, "The net inventory liquidation value of
4   approximately 2.2 billion in the Cyrus report
5   is approximately 82 percent of total stock
6   ledger inventory."
7            Do you see that?
8       A.   I do.
9       Q.   And you say that, "Approximately
10  82 percent compares on a like-for-like basis to
11  the 85 percent used by the debtors."
12           Do you see that?
13      A.   I do.
14      Q.   So how did you get to the
15  82 percent?
16      A.   (Document review.)
17           I would have to do the calculation,
18  but I believe it's the two billion one
19  ninety-six over the total gross collateral or
20  total gross inventory balance.
21      Q.   Okay.  And do you understand that
22  Ms. Murray's position is that her 88.7 percent
23  is net of all costs necessary to monetize and
24  preserve the inventory?
25           MR. GENENDER:  Object to the form.
```

Page 226

```
1              GRIFFITH
2       A.   Yeah, I'm not positive what it
3   entailed.
4       Q.   Okay.  You understand Ms. Murray
5   believes the 88.7 percent NOLV includes the
6   costs of maintaining and preserving the
7   inventory.
8            Do you understand that?
9            MR. GENENDER:  Objection, form.
10      A.   That might be her assumption.
11      Q.   That's all I'm asking you.
12      A.   That is her assumption.
13      Q.   Okay.  And your 85 percent figure
14  that you use is not net of all costs necessary
15  to preserve and monetize the collateral, right?
16      A.   It's the fair market value that was
17  realized as part of the going concern.
18  MO      MR. LIUBICIC:  Move to strike.
19      Q.   The value you derived using the
20  85 percent figure, that is not net of all costs
21  necessary to preserve and monetize the
22  collateral, right?
23      A.   It's not done on that basis.
24      Q.   Right.  You believe $1.4 billion of
25  costs need to be subtracted from that value,
```

Page 227

```
1              GRIFFITH
2   right?
3            MR. GENENDER:  Objection, form.
4       A.   It's not, I think, how that works.
5       Q.   Okay.  How does it work?
6            MR. GENENDER:  Objection, form.
7       A.   You need to re-ask the question.  I
8   don't know what the point is.
9       Q.   Okay.
10           MR. LIUBICIC:  Our awesome court
11  reporter needs a break.
12           (Recess taken at 7:02 p.m. to
13  7:16 p.m.)
14  BY MR. LIUBICIC:
15      Q.   Okay.  Mr. Griffith, let's look at
16  paragraph 17 in your supplemental declaration,
17  please.
18           Do you see paragraph 17 is what you
19  call your adjusted Cyrus valuation?
20      A.   I do.
21      Q.   And you say that, "An analysis which
22  largely adopts the NOLV valuation used in the
23  reports, after certain necessary corrections
24  are made, leads to the conclusion that there
25  was no diminution in value."
```

Page 228

```
1              GRIFFITH
2            Do you see that?
3       A.   Yes.
4       Q.   And then you go on to make a number
5   of adjustments to Ms. Murray's minimum 507(b)
6   calculation, correct?
7       A.   Yes.
8       Q.   Okay.  So you include $395 million
9   of L/Cs, right?
10      A.   That's right.
11      Q.   And you exclude cash, pharmacy
12  scripts and pharmacy receivables from the 2L
13  collateral package, right?
14      A.   Yes.
15      Q.   Would you agree with me that the --
16  your addition of the L/Cs and your exclusion of
17  those collateral items is an approximately
18  $600 million swing?
19      A.   Yes, that's about right.
20      Q.   What qualifies you to provide
21  testimony on valuation?
22           MR. GENENDER:  Objection, form,
23  misstates the evidence.
24      A.   Could you say that again?
25      Q.   Yeah.  What qualifies you to provide
```

## Page 229

1          GRIFFITH
2  testimony on valuation?
3          MR. GENENDER:  Same objections.
4      A.   I'm a fact witness and I'm here
5  based on my understanding of the case with my
6  three years of involvement.
7      Q.   And do you believe you are qualified
8  to provide testimony on valuation?
9          MR. GENENDER:  Objection, form,
10  misstates the testimony.
11      A.   I'm a fact witness, and I'm basing
12  my adjustments and my conclusions based on the
13  information I have and collective work with the
14  team and counsel.
15      Q.   Okay.  Let's go to paragraph 18 of
16  your supplemental declaration.  And this is the
17  section of your report where you are discussing
18  506(c) surcharges.
19          Do you see that?
20      A.   I do.
21      Q.   If we look a few sentences in, in
22  paragraph 18, at the top of page 11, do you see
23  you said if an NOLV approach is used, however,
24  certain reductions to the 506(c) surcharges
25  would need to be made, and I paraphrased.

## Page 230

1          GRIFFITH
2      Q.   Do you see that?
3      A.   Yes.
4      Q.   What amount of reductions to the
5  506(c) surcharges would need to be made if an
6  NOLV evaluation approach is used?
7      A.   Would take out the store level
8  expenses and any corporate overhead allocations
9  that may have been included in an NOLV
10  approach.
11      Q.   Have you done any analysis of what
12  those store level expenses and corporate
13  overhead allocations amount to?
14      A.   No.  We've been focused on the fair
15  market value approach.
16      Q.   Okay.  Let's look earlier in
17  paragraph 18.
18          Do you see in the first sentence you
19  say, "The debtors incurred approximately
20  1.4 billion in admin expenses in their efforts
21  to preserve the value of the second
22  lienholders' collateral"?
23      A.   Yes.
24      Q.   And do you see you say, two
25  sentences later, "That calculation reflects the

## Page 231

1          GRIFFITH
2  debtors' rigorous sale process and efforts to
3  sell the company as a going concern"?
4      A.   Yes.
5      Q.   The 2L collateral is inventory and
6  receivables, correct?
7      A.   It is.
8      Q.   Could the company have sold the 2L
9  collateral without engaging in a going concern
10  sale?
11          MR. GENENDER:  Objection, form.
12      A.   It's possible.
13      Q.   What else was sold in the going
14  concern sale to ESL beyond the 2L collateral?
15      A.   The majority of the remaining
16  assets.
17      Q.   And that included real estate?
18      A.   It did.
19      Q.   Intellectual property?
20      A.   Yes.
21      Q.   And the warranty services business?
22      A.   Yes.
23      Q.   So when you say here in paragraph 18
24  that the debtors incurred 1.451 billion in
25  expenses to preserve the 2L collateral, what

## Page 232

1          GRIFFITH
2  you really mean is that the debtors incurred
3  1.451 billion in expenses to conduct the going
4  concern sale process, correct?
5          MR. GENENDER:  Objection, form,
6  misstates the evidence.
7      A.   It's a portion of the amount that
8  was incurred, yes.
9      Q.   What's a portion?
10      A.   The 1.451 billion.
11      Q.   The 1.451 billion is a portion of
12  the amount that was incurred to conduct the
13  going concern process?
14      A.   Over the course of the bankruptcy
15  till closing.  That's not the entire amount.
16      Q.   Then if we look at paragraph 20, do
17  you see you said, "In particular, all
18  expenditures made by the debtors after the
19  decision was made to pursue a going concern
20  sale were made to preserve the value of the
21  collateral eventually sold to ESL pursuant to
22  the APA."
23          Do you see that?
24      A.   I do.
25      Q.   As we just discussed, ESL purchased

## Page 233

GRIFFITH

2  assets under the APA beyond the 2L collateral,
3  correct?
4      A.  Yes.
5      Q.  All right.  Then if we go to page 6
6  of your supplemental declaration, do you see in
7  the chart there that you value the assets that
8  comprise the 2L collateral as of the petition
9  date at 2.334 billion?
10     A.  Yes.
11     Q.  And you're taking the position that
12 the debtor should be permitted to surcharge
13 that collateral with expenses totaling
14 1.451 billion, correct?
15         MR. GENENDER:  Objection, form,
16     misstates the evidence.
17     A.  Yeah, I think it's a different
18 concept.
19     Q.  How would you describe the concept?
20     A.  Those were the expenses incurred to
21 get us to a going concern sale that realized
22 value to the 2Ls from where we believe, if we
23 went to a straight liquidation, would have been
24 a zero.  So the expenses that were incurred got
25 us to a point where we could actually increase

## Page 234

GRIFFITH

2  the value so there would be some recovery to
3  the 2Ls.
4      Q.  But you believe a surcharge of
5  1.451 billion should be applied to whatever the
6  diminution in value of the 2L collateral is,
7  correct?
8      A.  They were the necessary and
9  reasonable expenses that were incurred to get
10 us to the point of the sale.
11         MR. LIUBICIC:  Move to strike.
12     Q.  My question was, you believe a
13 surcharge of 1.451 billion should be applied to
14 whatever the diminution in value of the 2L
15 collateral is, correct?
16     A.  Yes.
17     Q.  Do you believe it would be
18 reasonable for a debtor to spend nearly
19 $1.5 billion to preserve collateral consisting
20 of inventory and receivables having a value of
21 about 2.3 billion?
22         MR. GENENDER:  Objection, misstates
23     the evidence.
24     A.  Again, I don't think we can look at
25 it that way.

## Page 235

GRIFFITH

2      Q.  But do you believe -- if the court
3  looks at it that way, do you believe that would
4  be reasonable?
5          MR. GENENDER:  Objection, misstates
6      the record.
7      A.  I will defer to the court on what's
8  reasonable.
9      Q.  Okay.  You are not offering a view?
10     A.  I'm a fact witness, and this is what
11 I have put forward.
12         MR. LIUBICIC:  I will pass the
13     witness.
14 EXAMINATION BY
15 MR. FOX:
16     Q.  Mr. Griffith, take a look at -- my
17 name is Edward Fox.  I'm with Seyfarth Shaw,
18 and I represent Wilmington Trust National
19 Association as indenture trustee and collateral
20 agent.
21         I'm going to stay over here.  If you
22 can't hear me, tell me and I will speak up
23 and -- you'll tell me.  I think it's quicker if
24 I stay here.
25         Turn to Exhibit 5, which is your

## Page 236

GRIFFITH

2  supplemental declaration.
3      A.  Okay.
4      Q.  And can you turn to Exhibit A of
5  that declaration starting at page 1 of 35?
6      A.  Okay.
7      Q.  It lists here at the top of page 1
8  of 35, inventory per stock ledger of
9  2,576,000,000; is that correct?
10     A.  That's what it says, yes.
11     Q.  Is that correct?
12     A.  It's what their statement says.
13     Q.  Do you believe it's correct?
14     A.  I don't have a reason not to.
15     Q.  Do you have a reason to believe it's
16 correct?
17     A.  It was part of the borrowing base
18 certificate, so I would assume it's correct.
19     Q.  Okay.  Now, in the next line there's
20 a line that says, "Home services."
21         Do you know what that's referring
22 to?
23     A.  Yes.
24     Q.  What is that?
25     A.  Parts inventory associated with the

Page 237

GRIFFITH

1  service technicians going to the houses.
2  Q.   And is home services a separate
3  entity?
4  A.   There's multiple entities.  I don't
5  know exactly where that sits.
6  Q.   Okay.  Now, across from home
7  services, under the Sears column, it lists
8  $114.6 million.
9  Do you see that?
10  A.   I do.
11  Q.   Okay.  Is that inventory that's at
12  home services?
13  A.   That's what it appear to be, yes.
14  Q.   Do you know for sure?
15  A.   That's my understanding.
16  Q.   Okay.
17  MR. GENENDER:  He asked if you knew
18  for sure.
19  A.   I don't know it for sure.  It's my
20  understanding.
21  Q.   And that 114 million of inventory is
22  in addition to the 2.576 billion.  Is that your
23  understanding?
24  A.   That's my understanding, yes.

Page 238

GRIFFITH

1  Q.   Okay.  So when you add those two
2  together, you get the total stock ledger
3  inventory of 2.690 billion.
4  Is that your understanding?
5  A.   Yes.
6  Q.   Okay.  Thank you.
7  Would you turn to the same Exhibit
8  5, Exhibit A, page 5 of 35?
9  Do you have that page in front of
10  you?
11  A.   I do.
12  Q.   Okay.  And this is still part of the
13  borrowing base certificate as of October 13,
14  2018?
15  A.   Yes.
16  Q.   Okay.  Now, in the top box on the
17  left, where it says in red, "Input from stock
18  ledger reports," do you see that?
19  A.   Say that part again.  Which part?
20  Q.   The top left.  It says, "Input from
21  stock ledger reports."
22  A.   Yes, I see it.
23  Q.   Now, under that it says, "Domestic
24  total stock ledger inventory," and it says

Page 239

GRIFFITH

1  $2.686 billion, correct?
2  A.   Yes, that's what it appears to say.
3  Q.   And do you know where this number
4  comes from?
5  A.   I don't know.
6  Q.   Do you know why the stock ledger
7  inventory on page 1 of 35, the 2.576 billion,
8  is lower than this number?
9  A.   I don't.
10  Q.   Now, there are, under that,
11  deductions for accounting adjustment stock
12  ledger inventory of 4,018,000.
13  Do you see that?
14  A.   I see the adjustments.
15  Q.   There's an adjustment for other for
16  397,000.
17  Do you see that?
18  A.   Yes.
19  Q.   Okay.  There's an addition for net
20  layaway of 1.869 million.
21  Do you see that?
22  A.   Yes.
23  Q.   Okay.  And there's a deduction for
24  trailer reserve/L/C adjustment of 1,238,000.

Page 240

GRIFFITH

1  Do you see that?
2  A.   I see it.
3  Q.   Do you know what that trailer
4  reserve/L/C adjustment, what that means?
5  A.   I can't say that I do.
6  Q.   Okay.  Now, if you add or subtract
7  these numbers we just referred to from the
8  2,000,686,000, do you get total stock ledger
9  inventory of 2,690,810,504?
10  A.   I'd need a calculator, but if I look
11  at it, I believe the signs are working in
12  reverse.  So the negatives, you would actually
13  add, the positive you would subtract.  I
14  believe you would get to the 2.690, but I'm
15  just estimating based on this.  I don't have a
16  calculator.
17  Q.   Okay.  Now it then -- after that,
18  moving down the column, there's then the home
19  services of 114,592,000 we talked about.
20  Do you see that?
21  A.   I see that.
22  Q.   And then there's another item,
23  restaurant, for 339,000.
24  Do you see that?

Page 241

```
                    GRIFFITH
 1
 2          A.   I see it.
 3          Q.   Okay.  And then there's in-transit
 4   inventory aggregating 169 million.
 5          Do you see that?
 6          A.   Okay.
 7          Q.   Now, do those items get added to the
 8   2.690 billion of total stock ledger inventory?
 9   Are those in addition to that amount?
10          MR. GENENDER:  Objection, lack of
11      foundation.
12          A.   I don't know the answer to that.  I
13   don't know.
14          Q.   Then underneath that box there is
15   another one that's with the heading "Input from
16   EIS."
17          A.   Okay.
18          Q.   And then there's -- it lists live
19   plants of 1,201,000.
20          Do you see that?
21          A.   I do.
22          Q.   And decorative flowers of 61,838?
23          A.   Okay.
24          Q.   And reader's market of 1,584,461.
25          Do you see those items?
```

Page 242

```
                    GRIFFITH
 1
 2          A.   I do.
 3          Q.   Are those additional inventory
 4   that's not included in the stock ledger
 5   inventory in the box above, do you know?
 6          MR. GENENDER:  Objection, lack of
 7      foundation.
 8          A.   I do not know.
 9          Q.   Is there any reason, in particular,
10   why you use the inventory number on page 1 of
11   35 rather than the inventory numbers on page 5
12   of 35 when you prepared your supplemental
13   declaration?
14          MR. GENENDER:  Objection, misstates
15      the evidence.
16          A.   I believe I used the numbers from
17   page 3, which are similar or the same as those
18   from page 1, but this is the summary borrowing
19   base certificate that includes the various --
20   all the various pieces of collateral for the
21   first lien.
22          Q.   Well, so let me ask it again.
23          Is there a reason why you used the
24   inventory numbers from page 3 of 35 rather than
25   from page 5 of 35?
```

Page 243

```
                    GRIFFITH
 1
 2          MR. GENENDER:  Objection, form.
 3          A.   Page 5 appears to be a worksheet
 4   that is used to calculate the numbers that are
 5   actually in the borrowing base certificate.  So
 6   I'm using the borrowing base.
 7          Q.   Do you know -- do you think page 5
 8   of 35 has the same information as page 3 of
 9   35 --
10          MR. GENENDER:  Objection, misstates
11      the testimony.
12          Q.   -- in terms of inventory?
13          A.   I can't say for certain that every
14   number on each page is the same, but they do
15   have the deductions that you just went through
16   in terms of live plants, seafood, restaurant,
17   readers.
18          I can't tell you exactly how page 5
19   feeds in, but it does appear that they have a
20   lot of the same categories.  Page 5 looks like
21   a worksheet.
22          Q.   In paragraph 6 of Exhibit 5, you
23   state that, "Second lienholders recovered
24   significantly more from the debtors' chapter 11
25   process, including from the successful going
```

Page 244

```
                    GRIFFITH
 1
 2   concern sale and the attendant expenses
 3   required to secure the same than they would
 4   have recovered in a liquidation."
 5          Do you see that?
 6          A.   What paragraph?
 7          Q.   Paragraph 6.
 8          A.   I see that.
 9          Q.   Can you tell me why a comparison to
10   a recovery in a liquidation was relevant to
11   this motion?
12          A.   Could you restate the question?
13          Q.   Yeah.  Can you tell me why a
14   comparison of the recovery second lienholders
15   would receive in liquidation is relevant to the
16   507(b) motion?
17          A.   Our analysis is based on the fair
18   market value at the ultimate sale date.  This
19   was just to show the other alternative would
20   have been immediate liquidation, and we believe
21   there would have been much lower recoveries, if
22   any, in that scenario.
23          Q.   At the sale date or at the petition
24   date?
25          A.   Petition date.
```

Page 245

GRIFFITH

1
2    Q.   Why would the -- why are you saying
3    at the petition date?
4         MR. GENENDER:  Objection, form.
5    A.   If we're saying that the liquidation
6    here is as of the sale date, we would come to
7    the same conclusion, that the second liens did
8    better in a going concern transaction.
9    Q.   Okay.  You say further down in
10   paragraph 6 of Exhibit 5 that -- you say,
11   "First, each of the reports rely on incorrect
12   or misapplied data taken from other sources."
13        Do you see that?
14   A.   I do.
15   Q.   Okay.  With respect to the report by
16   William Henrich, does this statement apply to
17   that report?
18   A.   I believe it does.  We say it was
19   for each.  And there were some miscalculations
20   and data, I think, that we disagreed with?
21   Q.   Can you tell me what incorrect or
22   misapplied data Henrich relied on?
23   A.   I need a copy of the report.
24   Q.   Which report?
25   A.   Henrich report.

Page 246

GRIFFITH

1
2    Q.   Before we get to that, turn to
3    paragraph 12 of Exhibit 5.
4    A.   Okay.
5    Q.   And from Exhibit 12 to Exhibit 16.
6         MR. GENENDER:  Paragraph?
7    Q.   You are right.  From paragraphs 12
8    through 16, is that your discussion of how the
9    reports rely on incorrect or misapplied data?
10   A.   It's a portion of it.
11   Q.   And there's more that's not listed
12   here?
13   A.   I would have to go back and look at
14   the report.
15   Q.   What report?
16   A.   The Henrich report.
17   Q.   As you sit here today, can you think
18   of anything else that's not in your report
19   specifically that -- where you believe Henrich
20   relied on incorrect or misapplied data?
21   A.   I would imagine that he has a lot of
22   the same issues, but we would -- I would need
23   to look through the report.  I would assume
24   he's not treating the L/Cs as we would treat
25   them, which we believe are true obligations

Page 247

GRIFFITH

1
2    that survive the contract or survive the sale
3    and were assumed by Transform Co.
4         I would assume he's also potentially
5    taking the wrong collateral, but I would need
6    to look at the report.
7         I don't have it in front of me.
8    Q.   Anything else that you can think of?
9    A.   I would have to look at the report.
10        MR. GENENDER:  Objection to form.
11   Q.   When you say wrong collateral, what
12   do you mean?
13   A.   Pharmacy scripts, pharmacy accounts
14   receivable, cash deposits, cash accounts.
15   Q.   With respect to the letters of
16   credit, there are two separate letter of credit
17   facilities.  One was in the amount of
18   271 million.  The other was, I believe,
19   125 million.
20        Do you recall that?
21   A.   Yes.
22   Q.   And they total 395 million?
23   A.   Yes.
24   Q.   And do you recall that Henrich
25   excluded the $271 million facility and not the

Page 248

GRIFFITH

1
2    125 million?
3    A.   He included the 125, which we agreed
4    with, but we disagree with excluding the 271.
5    Q.   Okay.  Of the $125 million facility,
6    how much of that had been drawn, if any, at the
7    petition date, to your knowledge?
8    A.   I can't say for certain, but the
9    obligations are still there.
10   Q.   Okay.  But do you have any sense of
11   how much may have been drawn at the petition
12   date?
13        MR. GENENDER:  Objection, asked and
14   answered.
15   A.   Yeah, not off the top of my head,
16   no.
17        (Griffith Exhibit 25, Expert Report
18   of William Henrich, marked for
19   identification.)
20   Q.   Let me show you what's been marked
21   as Exhibit 25.
22        So Exhibit 25 is the Henrich report.
23   Have you seen this before?
24   A.   I have.
25   Q.   You said you need to look through it

Page 249

GRIFFITH

1
2    to see if there are other things that you
3    thought Henrich -- where Henrich relied on
4    incorrect or misapplied data.
5        Can you take a look and tell me what
6    else you find, if anything?
7        A.    (Document review.)
8        He is using the total cash as
9    collateral.  He is using the pharmacy accounts
10   receivable as collateral.  He is using the
11   pharmacy prescription list as collateral.
12       He's excluding the 271 million of
13   L/Cs that are assumed by the buyer and remain
14   obligations.
15       Q.    Anything else?
16       A.    The way the inventory is calculated.
17       Q.    When you say the way the inventory
18   is calculated, what do you mean?
19       A.    He has various approaches for a
20   going concern, total inventory at cost.  None
21   of it appears to show potential discount either
22   to the fair market value or as others have done
23   in NOLV.
24       Q.    With respect to pharmacy
25   receivables, it's your view, I take it, that

Page 250

GRIFFITH

1
2    those are not second lienholders' collateral;
3    is that correct?
4        A.    Yes.
5        Q.    What's the basis for your view on
6    that?
7        MR. GENENDER:  Objection, asked and
8    answered.
9        A.    We looked at the security agreements
10   for the first lien and the second lien.  First
11   lien clearly carve out all of the major pieces
12   of the collateral.  The second liens take
13   certain categories, but not others, and claim
14   that they are covered by a catch-all at the
15   bottom, which doesn't make a lot of sense to
16   us.
17       They appear to be excluded
18   collateral.
19       Q.    When you say "we" looked at it, who
20   is "we"?
21       A.    My team.
22       Q.    Who is your team again?
23       A.    M-III Partners.
24       Q.    It's all people internally at M-III?
25       A.    M-III and counsel.

Page 251

GRIFFITH

1
2        Q.    And counsel.
3        Did you make this decision based on
4    the advice of counsel?
5        A.    No.
6        Q.    You are not a lawyer, are you?
7        MR. GENENDER:  Objection, asked and
8    answered.
9        A.    I am not a lawyer.
10       MR. GENENDER:  He has not gotten a
11   law degree over the course of the day.
12       Q.    Anybody on your M-III team a lawyer?
13       A.    Members of the firm are lawyers, but
14   not on the team that was working on this.
15       MR. GENENDER:  Ed, hang on a second.
16       Mr. Griffith, you said in the 1L
17   piece that it carved out certain pieces
18   from the 1L listed inventory.
19       Did you mean carve out or include?
20       THE WITNESS:  I meant to say broke
21   out or included.  Sorry.  Good
22   clarification.
23       MR. GENENDER:  Thank you for
24   allowing me.  I think in the context, it
25   was clear he misspoke.

Page 252

GRIFFITH

1
2        Q.    Do you believe that pharmacy
3    inventory is part of inventory that is second
4    lien collateral?
5        A.    I don't have a view on that.  I
6    would assume, if it's in the inventory, it was
7    not specifically called out in the first lien.
8    We're treating it the same way.
9        Q.    And that's your opinion?
10       A.    Yes.
11       Q.    You say, "Second, each of the,"
12   again, in paragraph 6 of Exhibit 5 that, "Each
13   of the reports uses a different and incorrect
14   methodology to calculate the value of the
15   debtors' inventory."
16       With respect to the Henrich report,
17   do you believe that Henrich uses an incorrect
18   methodology to calculate the value of the
19   debtors' inventory?
20       A.    (Document review.)
21       Which inventory valuation was he
22   using, inventory at cost or going concern?
23       Q.    You have his report in front of you,
24   right?
25       A.    I do.

Page 253

GRIFFITH

1
2    Q.    So if you're saying that he used an
3    incorrect methodology, I'm just asking you to
4    explain it with reference to his report.
5    A.    He's using a grossed-up value of
6    inventory, which we disagree with, for the
7    going concern stores.
8    Q.    And the grossed-up value you are
9    referring to, his use of gross margin of
10    29 percent?
11    A.    He is doing a calculation, yes,
12    that's showing the value as higher than the
13    book value.
14    Q.    Is the margin, the gross margin that
15    he uses 29 percent?
16    A.    If you can point me to it, I can
17    tell you.
18    Q.    Where are you referring to that he
19    uses a margin that's incorrect?
20    A.    Exhibit 2A, he's grossing up his
21    inventory value.
22    Q.    Take a look at -- sorry, there's no
23    page numbers.
24    MR. GENENDER:  We established that
25    during his deposition.

Page 254

GRIFFITH

1
2    MR. FOX:  It hasn't changed.
3    Q.    The fourth text page, do you have
4    that page?
5    A.    I do.
6    Q.    The second bullet point from the
7    bottom, in the second line, refers to a
8    29 percent gross margin?
9    A.    Okay.
10    Q.    Do you disagree with the 29 percent
11    gross margin?
12    A.    I don't have a basis to confirm it
13    or deny it.
14    Q.    Well, but you're saying that he used
15    an incorrect methodology, so.
16    A.    I don't believe he should be
17    grossing anything up.  I think it's the
18    liquidation value or the fair market value is
19    the two more common approaches.
20    I don't understand why he's taking
21    this approach.
22    Q.    What's the basis for your belief?
23    A.    From the APA, we understand it to be
24    85 percent purchase price, which is kind of the
25    going fair market value of that inventory and

Page 255

GRIFFITH

1
2    collateral or, conversely, if you use a Tiger
3    NOLV, it's also significantly less than
4    90 percent, somewhere in the 80s.  So I don't
5    know why we would gross up the inventory value.
6    Q.    What's the date of the Asset
7    Purchase Agreement?
8    A.    I'd have to have a copy of it.
9    Q.    It's in front of you.
10    MR. GENENDER:  The date of the APA
11    or the date of the sale?
12    Q.    Let's start with the date of the
13    APA.  It's Exhibit 14.  It's dated as of
14    January 17, 2019.
15    A.    Okay.
16    Q.    Do you accept my representation on
17    that?
18    A.    I do.
19    Q.    And the sale closed on February 11,
20    2019?
21    A.    It sounds right, yes.
22    Q.    The petition date was October 15,
23    2018; is that right?
24    A.    Yes.
25    Q.    And aside from the

Page 256

GRIFFITH

1
2    going-out-of-business stores, from October 15,
3    2018, through February 11, 2019, what did the
4    debtors do with their going concern stores?
5    MR. GENENDER:  Objection, form.
6    A.    Could you restate the question?
7    Q.    Yeah.  Between October 15, 2018, and
8    the closing of the sale on February 11, 2019,
9    what were the debtors doing at their going
10    concern stores?  Were they open for business to
11    sell at retail?
12    A.    Yes.
13    Q.    And do you have a view as to the
14    fair market value of the inventory that was
15    being sold at retail in those stores during
16    that period of time?
17    A.    Yes.
18    Q.    And what's that view?
19    A.    85 percent.
20    Q.    What do you base that on?
21    A.    The fair market value when it was
22    purchased.
23    Q.    In February of 2019?
24    A.    Yes.  That's the proxy that I'm
25    using.

64 (Pages 253 to 256)

Page 257

GRIFFITH

1
2       Q.   By ESL or Transform Holdco in a bulk
3   sale?
4       A.   Yes.
5       Q.   And you think that's the same as
6   selling at retail to customers in stores on
7   October 15, 2018?  Is that your testimony?
8           MR. GENENDER:  Objection, misstates
9   the testimony.
10      A.   Sears operates at a loss.  So to
11  mark up the inventory and say that there is a
12  increase in the value associated with the sale
13  just doesn't make sense to me.
14  MO      MR. FOX:  Well, that's fine, but I'm
15  going to move to strike that because you
16  didn't answer my question.
17      Q.   Would you like me to ask the
18  reporter to read the question back?
19      A.   Please.
20          MR. FOX:  Would you read the
21  question back, please?
22          (Record read.)
23          MR. GENENDER:  Same objection.
24      A.   I don't think I understand the
25  question.

Page 258

GRIFFITH

1
2       Q.   What don't you understand?
3       A.   I need you to try to restate it.
4       Q.   Do you know the difference between
5   selling in stores to retail customers and
6   selling an entire business in bulk to a buyer?
7           Do you think there's a difference
8   between those two things?
9       A.   A very large difference.
10      Q.   Okay.  And do you think the fact
11  that there's a very large difference between
12  those things might affect the valuations of the
13  things that are being sold in those two
14  different situations?
15      A.   I'm still -- I don't understand the
16  question.  You're saying just take the gross
17  margin and that's --
18      Q.   No.  I'm just asking you if there's
19  a difference between those two sales methods,
20  one at retail --
21      A.   I answered that as yes.
22      Q.   You think there is a difference?
23      A.   Yes.
24      Q.   Okay.  Are you aware that the
25  debtors prepared weekly financial reports as

Page 259

GRIFFITH

1
2   required under the final debtor-in-possession
3   financing order?
4       A.   Yes.
5       Q.   Did you have any involvement in
6   preparing any of those reports?
7       A.   I believe I did.
8       Q.   Did those reports include a forecast
9   of the future as well as actual results from
10  the past?
11      A.   I'd have to see a copy of one of
12  these.
13          (Griffith Exhibit 26, Rolling
14      13-Week Cash Flow Forecast for Week Six,
15      marked for identification.)
16      Q.   Let me show you what's been marked
17  as Exhibit 26.  Do you have Exhibit 26 in front
18  of you?
19      A.   I do.
20      Q.   Do you know what Exhibit 26 is?
21      A.   I do.
22      Q.   What is it?
23      A.   It's a rolling 13-week cash flow
24  forecast for week six.
25      Q.   And week six is the week ending

Page 260

GRIFFITH

1
2   November 24, 2018; is that right?
3       A.   (Document review.)
4           It appears that way, yes.
5       Q.   Okay.  And this, on the first page
6   of Exhibit 26 at the bottom left, it says M-III
7   Partners, correct?
8       A.   It does.
9       Q.   And that's your firm?
10      A.   It is.
11      Q.   Is that an indication that M-III
12  Partners had something to do with preparing
13  Exhibit 26?
14      A.   It does.
15      Q.   Can you tell me what M-III Partners
16  had to do with preparing Exhibit 26?
17      A.   We would update the future period
18  forecasts.  We would grab the actual data when
19  the weeks were completed, put it into the
20  format and update the assumptions and
21  commentary.
22      Q.   Turn to page 4 of Exhibit 26, if you
23  will.
24          And looking at the top of the
25  headings of Exhibit 26 on page 4, it shows both

Page 261

GRIFFITH

1
2  actual results and forecast results for the
3  time periods indicated; is that correct?
4      A.   It does.
5      Q.   Okay.  And for the forecast periods,
6  the second line under key assumptions on the
7  left-hand side says, "Forecast gross margin."
8          Do you see that?
9      A.   I see that.
10     Q.   And looking across, for each of the
11 forecast weeks, what is the forecast gross
12 margin that M-III used for the forecast gross
13 margin?
14     A.   It says 29 percent.
15     Q.   Thank you.
16         Now, given that M-III used
17 29 percent as a forecast gross margin, do you
18 still believe that Henrich was wrong in using
19 29 percent as a gross margin in his report?
20     MR. GENENDER:  Objection, misstates
21 the evidence.
22     A.   I don't think it's the correct way
23 to do it.  It's not a question of what margin
24 you are using.  It's the methodology.
25     Q.   Well, the question is, do you

Page 262

GRIFFITH

1
2  believe Henrich was wrong to use a 29 percent
3  gross margin, which is the same gross margin
4  that M-III used?
5      MR. GENENDER:  Objection, misstates
6  the evidence.
7      A.   I said I disagree with his
8  methodology.  I don't have a problem with the
9  29 percent margin.
10     Q.   Okay.  That's all I'm asking about.
11         Now -- bear with me.  I want to make
12 sure I don't ask questions that have already
13 been asked.
14         Okay.  Turn to -- take a look at
15 Exhibit 4, which is your May 26, 2019
16 declaration, if you would.
17     A.   Okay.
18     Q.   Turn to paragraph 14 of Exhibit 4.
19     A.   Amount of cash.
20     Q.   And it says in paragraph 14, "As
21 shown in the debtors' valuation, M-III valued
22 the collateral at 85 percent."
23         Do you see that?
24     A.   I do.
25     Q.   Okay.  When you say M-III valued,

Page 263

GRIFFITH

1
2  who at M-III?
3      A.   It's the assumption we were using.
4  So it would be myself and the team that was
5  working with me.
6      Q.   You say that's the assumption you
7  were using.  Is that your opinion?
8      A.   It's the assumption we were using,
9  was the 85 percent.
10     Q.   So it's not your opinion?
11     MR. GENENDER:  Objection to form,
12 asked and answered.
13     A.   It's one of the assumptions we have
14 used in this document, yes.  So it's my
15 declaration.  So if you want to call it my
16 opinion, but it's the 85 percent.
17     Q.   It's not what I want to call it.
18 It's what you are calling it.
19     A.   I'm calling it an assumption.
20     Q.   Not an opinion?
21     MR. GENENDER:  Objection, form.
22     A.   I -- honestly, I would like to know
23 the difference.
24     Q.   You don't know the difference?
25     MR. GENENDER:  Objection, form.

Page 264

GRIFFITH

1
2      Q.   Well, will you agree with me that
3  the 85 percent value is not a fact?
4      MR. GENENDER:  Objection, form,
5  misstates the evidence.
6      A.   I believe it is a fact.  It's the
7  cash value that was paid under the APA.
8      Q.   But you say, at both the petition
9  date and the effective date, the only time that
10 you claim the 85 percent was paid was at the
11 effective date or the sale date, right?
12     A.   Yes.
13     Q.   So there's no 85 percent paid at the
14 petition date, correct?
15     A.   It's a way to show this on a
16 consistent basis.
17 MO     MR. FOX:  I'm going to move to
18 strike.
19     Q.   You're not answering my question.
20     MR. GENENDER:  Hang on a second.
21         You can object to his answer as
22 non-responsive, but you can't prevent him
23 from answering the question, which you
24 just did.  That's not okay.
25         You may not be getting the answer

Page 265

GRIFFITH

1
2      you want, but he's entitled to give an
3      answer.
4           MR. FOX:  He is supposed to answer
5      the question I ask, not the question he
6      wants to.
7           MR. GENENDER:  But if he doesn't,
8      then you can move to strike, but you can't
9      stop him from answering.  That's improper.
10          MR. FOX:  You want to finish your
11     answer?
12          MR. GENENDER:  No.  Ask a question
13     again, because you cut him off.
14          MR. FOX:  Can you read the question
15     back?
16          (Record read.)
17     A.   There is no 85 percent paid at the
18     petition date.
19     Q.   Thank you.
20          Looking at paragraph 8 of Exhibit 5.
21     Do you have that?
22     A.   I do.
23     Q.   You say, "The implied value of
24     85 percent, as applied to the gross book value
25     of the second lienholders' collateral, far

Page 266

GRIFFITH

1
2      exceeds the value that would have otherwise
3      been obtained in either a wind-down or a
4      liquidation scenario."
5           Is that right?
6      A.   Yes.
7      Q.   Can you tell me, if you know, what
8      the recovery at going-out-of-business stores
9      was as a percentage of book value of inventory?
10     A.   Before or after corporate
11     allocations?
12     Q.   Isn't your going out of business a
13     percentage valuation on a net basis?
14     A.   Not necessarily.
15     Q.   Let's -- without your corporate
16     overhead allocation.
17     A.   What's the question?
18     Q.   The question is, what was the
19     recovery as a percentage of book value on
20     inventory at going-out-of-business stores?
21     A.   Without any allocations, I can't
22     tell you.
23     Q.   You have no idea?
24     A.   There are certain allocations that
25     are made that are sometimes used in certain

Page 267

GRIFFITH

1
2      reports, internally developed ones by the Sears
3      team and Tiger takes a certain view as well,
4      but they're not based on actual total overhead.
5      Q.   I'm asking what the debtors' actual
6      experience was, not about Tiger's estimates.
7           Do you know what the debtors' actual
8      experience was?
9      A.   It would depend how much corporate
10     allocations you were putting on the stores.
11     Q.   If you allocated no corporate
12     overhead, what would the result be?
13     A.   I can't answer that.  I don't know.
14     Q.   You don't know.
15          How much overhead do you believe
16     should be allocated to the
17     going-out-of-business store sales?
18          MR. GENENDER:  Objection,
19     foundation.
20     A.   It's hard to say.
21     Q.   So you don't know how much corporate
22     overhead should be allocated to the
23     going-out-of-business sale stores' results?
24     A.   It would depend on the situation.
25     Q.   Well, we are talking about the

Page 268

GRIFFITH

1
2      debtors' situation, the 242
3      going-out-of-business stores.
4           MR. GENENDER:  262.
5           MR. FOX:  262.  Thank you.
6      A.   There should be more allocations
7      than what they currently have in the model.
8      Q.   How much?
9           MR. GENENDER:  He is still talking.
10     A.   I don't have that quantified.
11     Q.   Did you ever quantify it?
12     A.   We have done full-scale wind-down
13     analysis, which would -- is the only version we
14     have done.  We have not done a fully burdened
15     262-store number.  It just hasn't been
16     something we focused on.
17     Q.   You said you did do wind-down
18     analyses, correct?
19     A.   We have.
20     Q.   Okay.  And do you recall what the
21     percentage recovery on going-out-of-business
22     sales was estimated at in those analyses?
23     A.   I can't -- I mean, it would depend,
24     again, on how the corporate allocations are
25     done.

GRIFFITH

1
2    Q.   Well, I'm talking about analyses
3  that the debtors or M-III actually did.
4    A.   I don't have one of those in front
5  of me.
6        (Griffith Exhibit 27, Wind Down
7    Recoveries, Dated January 12, 2019, marked
8    for identification.)
9    Q.   I show you what's been marked as
10  Exhibit 27.
11       Do you have that in front of you,
12  Mr. Griffith?
13    A.   I have that, yes.
14    Q.   Look at page 2 of Exhibit 27, if you
15  would.
16       Do you have that page?
17    A.   I do.
18    Q.   Under the fourth indented bullet
19  point from the bottom of the page that starts
20  "The gross proceeds from GOB sales of
21  merchandise inventory."
22    A.   Okay.
23    Q.   It says, "As this inventory is sold,
24  expenses related to the inventory liquidation
25  are deducted from proceeds, resulting in an

GRIFFITH

1
2  assumed net orderly liquidation inventory value
3  to the estate of approximately 90 percent."
4        Do you see that?
5    A.   I don't believe that's fully
6  burdened, though, with overhead.
7    Q.   Do you see that on the printed page
8  of Exhibit 27?
9    A.   I see that.
10    Q.   Okay.  Do you know who prepared
11  Exhibit 27?
12    A.   I don't know.
13    Q.   Was it M-III?
14    A.   It may have been a member of the
15  M-III team, possibly, yes.
16    Q.   And this is a document that the
17  debtors produced; is that correct?
18    A.   I believe that's correct.
19        (Griffith Exhibit 28, Rolling Cash
20    Flow Budget for Week 15, marked for
21    identification.)
22    Q.   Let me show you what's been marked
23  as Exhibit 28.
24        Do you have that in front of you,
25  Mr. Griffith?

GRIFFITH

1
2    A.   I do.
3    Q.   Do you know what Exhibit 28 is?
4    A.   It's a rolling cash flow budget for
5  week 15.
6    Q.   And that's dated January 30, 2019?
7    A.   It is.
8    Q.   Do you know who prepared this?
9    A.   I believe it's the M-III team.
10    Q.   Take a look at page 3 of Exhibit 28
11  if you would.
12    A.   Okay.
13    Q.   Do you see a series of sort of
14  numbered notes, if you would, down the
15  left-hand side of the page?
16    A.   I do.
17    Q.   Look at number two, please.  It
18  says, "GOB sales receipts."
19        Do you see that?
20    A.   I do.
21    Q.   The last sentence in that section
22  says, "Total NOLV for the wave three closing
23  stores is assumed at approximately 92 percent
24  on a preliminary basis."
25        Do you see that?

GRIFFITH

1
2        MR. GENENDER:  Objection, form.
3    Q.   I'm sorry?
4    A.   Yes.
5    Q.   And was that M-III assumption with
6  respect to the wave three; GOB stores?
7        MR. GENENDER:  Objection, form.
8    A.   I don't believe it was our
9  assumption.
10    Q.   It's the debtors' assumption?
11        MR. GENENDER:  Objection, form.
12    A.   I'm not sure, but it doesn't have
13  all of our corporate allocations that would be
14  required.
15    Q.   How do you know that?
16        MR. GENENDER:  You only read part of
17    the phrase.
18        MR. FOX:  Maybe he can answer.
19        MR. GENENDER:  You also only read
20    part of the phrase.
21    A.   (Document review.)
22        92 percent, that doesn't sound
23  correct.  I think that the overhead is still
24  down in the operating disbursements.
25    Q.   Can you tell me why M-III would

Page 273

GRIFFITH

1  assume that a total NOLV for the wave three
2  closing stores would be assumed at
3  approximately 92 percent if that number is
4  incorrect?
5       MR. GENENDER:  Objection, misstates
6    his testimony.
7       A.   Because in the operating
8  disbursements, we back out the actual GOB rent
9  and the GOB additional expense benefit, but we
10 do not back out, I believe, corporate overhead
11 because it's not part of the store level GOB
12 expenses.
13      Q.   Can you show me where that occurs on
14 Exhibit 28?
15      A.   It's in the assumptions on page 3.
16      Q.   Where?
17      A.   Operating disbursements, line 11 and
18 12, GOB rent, GOB additional expenses/benefit.
19      Q.   Turn to page 4, if you would, and
20 look at line 11 for GOB rent.
21      Do you see that?
22      A.   I see that.
23      Q.   What's the total number?
24      A.   It says 22.

Page 274

GRIFFITH

1       Q.   No, no, the actual number.
2       A.   I don't know what you are referring
3  to.
4       Q.   Well, there's both the actual and
5  forecast amounts, correct?
6       MR. GENENDER:  The document speaks
7    for itself.
8       MR. FOX:  Not according to the
9    witness.
10 MO     MR. GENENDER:  Objection, move to
11   strike.  I mean, come on.
12      A.   You are asking for what?
13      Q.   I'm asking you, what's the actual
14 GOB rent number in line 11?
15      A.   It appears to be about 20 million.
16      Q.   Is GOB rent a direct expense or a
17 corporate overhead expense?
18      A.   It would be a direct expense.
19      Q.   And then line 12, GOB additional
20 expense/benefit, what's the amount on that line
21 for the actual number?
22      A.   I think it's a zero.
23      Q.   Yes.  Thank you.
24      In paragraph nine of Exhibit 5 you

Page 275

GRIFFITH

1  say that, "The margins in a fire sale would be
2  lower, as among other things, inventory floods
3  the market."
4       What do you mean by inventory
5  flooding the market?
6       A.   We are running fast sales across all
7  of the remaining stores.  So there will be
8  plenty of inventory available, which you will
9  have to discount faster, at a faster cadence in
10 order to move it through the stores.
11      Q.   Is that your opinion or is that a
12 fact?
13      A.   It's my assumption that that's what
14 we would have to do.
15      Q.   And how many stores are you talking
16 about here?
17      A.   At what period?
18      Q.   Whatever period you're talking about
19 here with inventory flooding the market.
20      A.   If you assume it's the petition
21 date, it's over 600 stores.
22      Q.   And those are geographically
23 dispersed throughout the United States; is that
24 right?

Page 276

GRIFFITH

1       A.   There are concentration areas of
2  them, yeah.  They are not perfectly dispersed.
3       Q.   But they are dispersed throughout
4  the United States, correct?
5       A.   They are.
6       Q.   And that includes Puerto Rico and
7  places outside the continental United States,
8  correct?
9       A.   It does.
10      Q.   Okay.  And the total was 600 and how
11 many stores at the petition date?
12      A.   600 plus.  I don't recall exactly.
13      Q.   You also talk about the debtors
14 facing complications with vendor flight.
15      What do you mean by vendor flight?
16      A.   GOBs, you still do want to
17 replenish, especially with certain high
18 turning, high margin goods you would not be
19 able to do.  So it would potentially impact
20 your overall results.
21      Q.   So you're telling me that, even in a
22 fire sale, you are going to be buying new
23 inventory?
24      A.   It's possible.

Page 277

```
 1                GRIFFITH
 2      Q.   Have you ever seen that before?
 3      A.   I can't say for certain, no.
 4      Q.   You also say in paragraph 9 of
 5  Exhibit 5 that, "The debtors would be unable to
 6  collect on certain receivables."
 7          Do you see that?
 8      A.   I see that.
 9      Q.   Okay.  What receivables are you
10  referring to?
11      A.   Potentially, credit card
12  receivables.  If the processors continue to
13  have holdbacks and customers are returning
14  goods.
15      Q.   Well, in going-out-of-business
16  sales, aren't customers not permitted to return
17  goods?  Aren't those sales final?
18      A.   You still would have receivables
19  outstanding prior to that, that may become
20  difficult to collect.
21      Q.   Credit card receivables?
22      A.   Certain receivables.
23      Q.   Do you mean credit card receivables
24  or other kinds of receivables?
25      A.   Receivables in general.
```

Page 278

```
 1                GRIFFITH
 2      Q.   What kind of receivables would there
 3  be besides credit card receivables?
 4      A.   We had a whole list of specified
 5  receivables that were part of the transaction.
 6  They could potentially be at issue.
 7      Q.   But you can't, sitting here today,
 8  tell me what those other receivables are?
 9      A.   Vendor credits, vendor deposit --
10  vendor rebates.  Those would ultimately,
11  potentially, not be considered an asset, so.
12      Q.   Do you believe those would be
13  collateral of the second lien notes?
14      A.   No.
15      Q.   Going back to Exhibit 4, if you
16  would, paragraph 20 -- actually, let's go to
17  paragraph 19 of Exhibit 4 first.
18          You talk about -- you say, "To
19  calculate the applicable 506(c) surcharges,
20  M-III included only those charges which were
21  reasonable and necessary and of direct and
22  primary benefit to the second lienholders."
23          Again, who at M-III?
24      A.   Myself and the team that was working
25  on this.
```

Page 279

```
 1                GRIFFITH
 2      Q.   Then you say, "To do so, M-III
 3  included only the actual expenses directly
 4  related to the collateral and paid through the
 5  sale date."
 6          Again, M-III is you; is that right?
 7      A.   Yes.
 8      Q.   And your team?
 9      A.   Yes.
10      Q.   Okay.  Now, paragraph 20, you have a
11  list of what you believe the surcharges should
12  be; is that correct?
13      A.   Yes.
14      Q.   Okay.  And are these facts or your
15  opinion in paragraph 20?
16      A.   These are actual expenses.
17          MR. GENENDER:  Objection to form.
18          Go ahead.
19      A.   These are actual expenses that were
20  incurred.
21      Q.   What did you base your decision on
22  to decide to list these particular expenses?
23      A.   They appear to directly relate to
24  store operations and monetization of the
25  collateral.
```

Page 280

```
 1                GRIFFITH
 2      Q.   And how did you derive the amounts
 3  that are set forth here in the chart in
 4  paragraph 20?
 5      A.   You use certain portions of the
 6  actual expenses that were incurred from the
 7  petition date to the close date.
 8      Q.   And how did you calculate those
 9  certain portions?
10      A.   By using several of the files that
11  we received from the Sears treasury team, and
12  would have been the basis for the weekly cash
13  forecast and actual results.
14      Q.   And these files, are these files
15  limited to the amounts listed here or are they
16  covering all of the expenses?
17      A.   They are covering additional
18  expenses as well.
19      Q.   So did you -- where did you isolate
20  these particular amounts of expenses that are
21  listed here?
22      A.   It's an analysis that we did as part
23  of this to come up with these categories and
24  these amounts.
25      Q.   Is that analysis in writing?
```

Page 281

GRIFFITH

1
2     A.   I'm sorry?
3     Q.   Is that analysis in writing?
4          MR. GENENDER:  Objection, form.
5     A.   Yeah.  This is it.  We have the
6  purpose and the use, the category and the
7  amounts.
8     Q.   This is the entire written analysis
9  of the amounts that you assume from the total
10 should be 506(c) surcharges in paragraph 20 of
11 Exhibit 4?
12    A.   Yes.
13    Q.   So if our expert wanted to recreate
14 your analysis, how would they be able to do it?
15         MR. GENENDER:  Objection, form.
16    A.   We provided the data files.  We have
17 to have them take a look at it and see if they
18 can come up with something similar.
19    Q.   Well, the data files, though, I
20 think you just said, encompass all of these
21 expenses, not just the ones that are listed,
22 not just the amounts that are listed here; is
23 that correct?
24    A.   Yes, that's right.
25    Q.   So what's the methodology by which

Page 282

GRIFFITH

1
2  you came to these particular numbers and where
3  is that determination made?
4          MR. GENENDER:  Objection, compound,
5  form.
6     A.   This was our basis.  This was based
7  on our assumptions.  This is the summary output
8  of it.
9     Q.   This is your entire output to
10 calculate these numbers?
11         MR. GENENDER:  Objection, asked and
12 answered.
13    A.   These are the categories that we
14 have identified that we believe directly
15 related to the monetization.
16         MR. GENENDER:  Let's take a break.
17 We have been going for an hour.  Actually,
18 we have been going for way more than an
19 hour, unless you are close to being done.
20         MR. FOX:  I'm getting there, but --
21         MR. GENENDER:  What does getting
22 there mean?
23         MR. FOX:  Probably another half
24 hour.  Maybe less.
25         (Recess taken at 8:30 p.m. to

Page 283

GRIFFITH

1
2  8:37 p.m.)
3          MR. FOX:  Can you read back the last
4  question and answer, please?
5          (Record read.)
6  BY MR. FOX:
7     Q.   Mr. Griffith, my question was about
8  the dollar amounts.
9          So could you answer my question with
10 respect to the dollar amounts, please, not the
11 categories?
12    A.   Yeah.  These are the dollar amounts
13 we believe are associated with the
14 monetization.
15    Q.   And this is -- paragraph 20 of
16 Exhibit 4 is your entire output concerning that
17 determination; is that right?
18         MR. GENENDER:  Objection, form asked
19 and answered.
20    A.   That is the output, yes.
21    Q.   With respect to the 51 million of
22 professional fees, I believe your testimony was
23 that you went through the total professional
24 fees and pulled out task codes or fees relating
25 to task codes relating to M&A transaction; is

Page 284

GRIFFITH

1
2  that right?
3     A.   I didn't personally do it.  But,
4  yes, that's what was done.
5     Q.   Who did it?
6     A.   Counsel had done this part of it.
7     Q.   Counsel did it.
8          Do you know which professionals were
9  included in this 51 million?
10    A.   It was the professionals that had
11 time codes associated with the sales
12 transaction, is my understanding.
13    Q.   Did that include Akin Gump?
14    A.   I don't know the answer to that.
15    Q.   Did it include Houlihan Lokey?
16    A.   I don't know the answer to that.
17    Q.   Well, if they had time and the
18 correct task codes, would they have been
19 included?
20    A.   I don't know.  I don't know the
21 answer.
22    Q.   So you don't really, sitting here
23 today, have any idea what makes up this
24 51 million except to the extent you've
25 described?

GRIFFITH

1
2      A.    That's right.
3      Q.    And is there any writing anywhere,
4  anything in written form that indicates which
5  line items of the professional fees were
6  included in this 51 million?
7      A.    I'm sure there's something that
8  exists.
9      Q.    Has it been produced?
10     A.    I'm not sure.
11     Q.    Are you familiar with something
12  called the "Professional Fee Carve-out
13  Account"?
14     A.    I am.
15     Q.    Okay.  And can you tell me what your
16  understanding is of that?
17     A.    It was set up to fund accrued
18  professional fees of the professionals of the
19  estate, the restructuring committee and the
20  UCC.
21     Q.    And where do the funds come from to
22  fund the professional fee carve-out account as
23  far as you know?
24     A.    From operations from the wind-down
25  account, general cash.

GRIFFITH

1
2      Q.    Well, prior to the closing of the
3  sale to Transform, where did the funds come
4  from that were being used to fund the
5  professional fee carve-out account, if you
6  know?
7      A.    I don't recall specifically.
8      Q.    Did they come out of the second
9  lienholders' collateral?
10     A.    I can't say for sure.  I don't know.
11     Q.    Do you know whether or not this
12  51 million of professional fees has been paid
13  out of the professional fee carve-out account?
14          MR. GENENDER:  Objection,
15  foundation.
16     A.    To the extent it relates to company
17  professionals, restructuring committee
18  professionals or UCC advisors, it would come
19  out of the carve-out account.
20     Q.    And has the 51 million already been
21  paid out of the professional fee carve-out?
22          MR. GENENDER:  Objection,
23  foundation.
24     Q.    If you know.
25     A.    It's unclear.  I think we have said

GRIFFITH

1
2  that these were the accrued amounts, not
3  necessarily paid in cash.
4      Q.    Is it safe to say, though, that they
5  have been reserved for the professional fee
6  carve-out account?
7      A.    If they relate to professionals from
8  the company, the restructuring committee or the
9  UCC, I think that's a fair assumption.
10          (Griffith Exhibit 29, Project Blue
11     Actuals from Week Ended January 26 through
12     February 9, marked for identification.)
13     Q.    Mr. Griffith, let me show you what's
14  been marked as Exhibit 29.
15          Take a look first at Exhibit 28
16  again.  That's the Project Blue rolling cash
17  flow budget, January 30, 2019.
18          Do you have that in front of you?
19     A.    I do.
20     Q.    And turn to page 4 of Exhibit 28.
21     A.    Okay.
22     Q.    Take a look at the -- page 4.  Am I
23  correct that this shows the 13-week DIP budget
24  actuals from October 20 to -- the week ending
25  October 20, 2018, through the week ending

GRIFFITH

1
2  January 26, 2019?
3      A.    What was the ending date you said?
4      Q.    Week 15, ending January 26, 2019.
5      A.    Yeah.  Yes.
6      Q.    Now, can you tell me, was a rolling
7  cash flow budget in the form of Exhibit 28
8  prepared that covered the weeks of --
9  additionally covered the weeks of February 2,
10  2019, the week ending February 9, 2019, and the
11  week ending February 16, 2019, in the same
12  format as Exhibit 28?
13     A.    I can't say for certain.
14     Q.    Take a look at Exhibit 29.
15          And have you seen this before?  Do
16  you know what this is?
17     A.    Yes, it looks familiar.
18     Q.    Tell me what it is.
19     A.    It's the actual results for weeks 15
20  through 17.
21     Q.    That's the weeks ending January 26,
22  February 2 and February 9, 2019?
23     A.    Yes.
24     Q.    And that picks up the last three
25  weeks before the closing of the sale that were

Page 289

GRIFFITH

1  not included in Exhibit 28; is that correct?
2      A.  Well, there's an actual week across
3  both of them.
4      Q.  I'm sorry?
5      A.  It picks up the last two weeks, yes.
6      Q.  Now, take a look, if you would, at
7  the line item under operating disbursements for
8  occupancy.
9          Do you have that?
10     A.  I do.
11     Q.  In Exhibit 28, the line item
12  occupancy, through January 26, 2019, the total
13  amount was 103 million; is that correct?
14     A.  Where are you?
15     Q.  Line item for occupancy under
16  operating disbursements.
17     A.  Okay.
18     Q.  If you total that across through the
19  week of January 26, 2019, the total is
20  $103 million; is that correct?
21     A.  Did you say 103?
22     Q.  Yes.
23     A.  Through what period?
24     Q.  Through the week ending January 26,

Page 290

GRIFFITH

1  2019, week 15.
2      A.  It seems light to me.
3      Q.  Well, add it across.
4      A.  26, 27, 28.  I mean, the weeks of
5  the 12th and the 19th are 51 on their own.  I'm
6  sorry.  How much did you say it was again?
7      Q.  I added it up at 103 million.
8          MR. GENENDER:  Are we really doing a
9  math test right now?
10         MR. FOX:  Yeah.  I learned it from
11  you.  No, it's important.
12     A.  I will say it seems fine.
13     Q.  Okay.  Now, if you look at
14  Exhibit 29, on page 2, there is also a line
15  item for occupancy that includes an additional
16  27 million.
17         Do you see that?
18     A.  Yes.
19     Q.  So if we add 103 million and
20  27 million, we get 130 million, correct?
21     A.  Okay.
22     Q.  Is that right?
23         MR. GENENDER:  He just said yes.
24     A.  I'm taking your math.

Page 291

GRIFFITH

1      Q.  Okay.  Now, let's go back to
2  Exhibit 4, paragraph 20.
3          Instead of 130 million for
4  occupancy, you've got 228 million.
5          Do you see that?
6          MR. GENENDER:  Objection, form.
7          Rent, occupancy, expenses, property
8  taxes and property maintenance, is that
9  what you're talking about?
10         MR. FOX:  That's the line item.
11     Q.  228 million.
12     A.  Yeah.  There's other categories
13  included in that 228 other than just the rent
14  or the occupancy.
15     Q.  Well, what else is included there
16  that is not included in the weekly DIP budget?
17     A.  I believe it would probably be the
18  property taxes, property and maintenance, other
19  expenses.
20     Q.  They're not listed anywhere in the
21  weekly DIP budget that we just looked at?
22     A.  They would be in other line items.
23     Q.  Where is it?
24     A.  Most likely in the other SG&A

Page 292

GRIFFITH

1  disbursements.
2      Q.  Do you know for sure or is that your
3  assumption?
4      A.  That's my assumption.
5      Q.  And you think property taxes are an
6  SG&A expense?
7      A.  Yeah, the occupancy line was just
8  meant to pick up the rent roll, not all other
9  expenses.
10     Q.  Take a look on page 3 of Exhibit 28,
11  item number 10, other SG&A disbursements.
12         Do you see that line?
13     A.  I'm sorry.  Say it again.
14     Q.  It's line 10, other SG&A
15  disbursements.
16         Do you see that?
17     A.  Okay.
18     Q.  And it says, "Corporate SG&A reduced
19  over time to reflect a decline in home office
20  expense associated with servicing the stores
21  and general reductions in force.  Major line
22  items include outside services, utilities,
23  outside contractors, marketing, equipment
24  expenses and other non-merchandising expenses."

Page 293

```
 1              GRIFFITH
 2        Do you see any reference there to
 3  property taxes?
 4        A.   Expenses associated with servicing
 5  the stores and other non-merch expenses could
 6  be potentially one of those categories.
 7        Q.   Where you read "expenses associated
 8  with servicing stores," it says, "Home office
 9  expense associated with servicing the stores."
10        A.   So I would say the other non-merch
11  expenses.
12        Q.   But you don't know for sure?
13        A.   I can't say for certain, no.
14        Q.   Turning to -- back to Exhibit 5,
15  paragraph 24, which is your June 27
16  supplemental declaration.
17        Do you have that?
18        A.   I do.
19        Q.   With respect to Mr. Henrich's
20  report, you say that, "The 506(c) surcharges he
21  applies are insufficient."
22        Do you see that?
23        A.   Yes.
24        Q.   And they're insufficient, given the
25  high fixed cost and overhead of Sears; is that
```

Page 294

```
 1              GRIFFITH
 2  right?
 3        A.   Yes.
 4        Q.   Was one of the problems Sears had
 5  was that it had overhead for a much larger
 6  store base than the number of stores it
 7  actually had?
 8        A.   I would assume that was part of
 9  their problem.
10        Q.   You assume it?  Do you know for
11  sure?
12        A.   I know they ran duplicative systems,
13  one for Sears and one for Kmart, which was
14  probably not the most efficient way to run your
15  store networks.
16        Q.   Did they have duplicative headcount?
17        A.   Potentially.
18        Q.   Did they have duplicative SG&A
19  expense?
20        A.   It's hard to say based on what --
21  you would have to give me an example.  I'm not
22  sure what you are trying to say.
23        Q.   Well, did they have it or not, do
24  you know?
25        A.   I would need an example.
```

Page 295

```
 1              GRIFFITH
 2        Q.   Well, pick any SG&A expense you'd
 3  like.
 4        A.   I can't think of any.
 5        Q.   Did M-III and the debtors'
 6  professionals propose a plan to reduce the
 7  debtors' corporate overhead by a significant
 8  amount?
 9        A.   I believe we did.
10        Q.   And that's -- and that plan assumed
11  that the debtors could operate their store base
12  with much lower corporate overhead, correct?
13        A.   We were working to make sure that
14  all expenses were necessary and reasonable.  So
15  we were evaluating opportunities, yes.
16        Q.   And the plan was to reduce the
17  corporate overhead to about -- a little under
18  600 million per annum, correct?
19        A.   I don't recall.  I was not part of
20  that work stream.
21        Q.   Okay.
22        (Griffith Exhibit 30, ESL Bid
23  Analysis, Bates Stamped Sears_507B_31
24  through 60, marked for identification.)
25        Q.   I show you what's been marked as
```

Page 296

```
 1              GRIFFITH
 2  Exhibit 30.
 3        For the record, Exhibit 30 bears the
 4  Bates numbers Sears_507B_31 through 60.
 5        Do you have that in front of you?
 6        A.   I do.
 7        Q.   Have you seen this before?
 8        A.   I may have.
 9        Q.   It says on the front that -- it's
10  got M-III Partners' name on it; is that
11  correct?
12        A.   It does.
13        Q.   Does that mean M-III Partners had a
14  hand in preparing this document?
15        A.   I would assume so.
16        Q.   Turn to page 19, if you would.
17        Do you have that page?
18        A.   I do.
19        Q.   And this is labeled "Unencumbered
20  Receivables."
21        And it says, "Unencumbered
22  receivables total approximately 285 million on
23  a net basis as of September 30, 2018."
24        Do you see that?
25        A.   Yes.
```

Page 297

GRIFFITH

1
2      Q.   Looking at the first line item under
3   the heading "Ledger Account Name," it says, "AP
4   vendor reclass post."
5           Do you see that?
6      A.  I see that.
7      Q.   And the description is "Kmart vendor
8   receivables (net debit reclassification i.e., a
9   positive receivable balance after all debits
10  netted against all credits for vendors) for
11  55,192,000."
12          Do you see that?
13     A.  I see that.
14     Q.  Do you know what that is?
15     A.  I don't know what that is.
16     Q.  Would it relate to returns of
17  inventory to vendors?
18          MR. GENENDER:  Objection, lack of
19  foundation.
20     A.  I don't know.
21     Q.   The next line item says, "Return
22  merchandise receivable.  Sears vendor
23  receivables," and then has the same
24  parenthetical for 52,644,000.
25          Do you see that?

Page 298

GRIFFITH

1
2      A.  I see that.
3      Q.   Okay.  To your understanding, would
4   that be receivables from a vendor for returned
5   inventory?
6      A.   I honestly don't know.
7      Q.   Okay.  Do you know how -- what any
8   of these particular line items of other
9   receivables are on page 19 of Exhibit 30 -- I'm
10  sorry -- page 19 and page 20 of Exhibit 30?
11          MR. GENENDER:  Object to the form.
12     A.  I'm not familiar enough with
13  these to be able to explain any of them.
14     Q.  Do you know who might be?
15          MR. GENENDER:  Objection, calls for
16  speculation.
17     A.  I don't know.
18          (Griffith Exhibit 31, Stock Ledger
19  Detail, marked for identification.)
20          MR. FOX:  Almost done.
21          MR. GENENDER:  Good.  Correct.
22     Q.  Let me show you Exhibit 31.
23          Mr. Griffith, take a look, if you
24  would, at Exhibit 31.
25     A.   Okay.

Page 299

GRIFFITH

1
2      Q.  Do you know what this document is?
3      A.  Stock ledger detail.  It says stock
4   ledger detail.
5      Q.   And do you know what that is?
6      A.   I assume it's detail from the stock
7   ledger.
8      Q.   This relates to inventory; is that
9   correct?
10     A.  I would think so.
11     Q.   Is this total cost number of
12  2,686,000,000 the same amount that was listed
13  on page 5 of 35 to Exhibit A of Exhibit 5, your
14  June 27 declaration?
15     A.   (Document review.)
16          It appears to be the same number.
17          MR. GENENDER:  Except it's missing
18  28 cents on the exhibit to his
19  declaration.
20          MR. FOX:  Thank you, Counsel.
21     Q.   Now, do you see the -- that's in the
22  column entitled "Cost" at the top, correct?
23     A.   Yes.
24     Q.   Okay.  Now, in the next column,
25  there's a column entitled "Selling Value."

Page 300

GRIFFITH

1
2      Do you see that?
3      A.  I do.
4      Q.   And what's the selling value for
5   that 2.686 billion of inventory listed here on
6   Exhibit 31?
7      A.   It says 5,029,306,792.91.
8      Q.   And this Exhibit 31, which has Bates
9   number Sears_507B_00001514 through 1522 is
10  produced by the debtors, correct?
11          MR. GENENDER:  Object to the
12  questioning.
13     A.   It would appear that way.
14     Q.   Just give me one minute.
15          MR. FOX:  I have nothing further.
16  Mr. Griffith, thank you very much.
17          MR. GENENDER:  We will reserve our
18  questions.
19          (Time noted:  9:05 p.m.)
20
21
22
23
24
25

Page 301

```
1              A C K N O W L E D G M E N T
2
3    STATE OF              )
4                     :ss
5    COUNTY OF            )
6
7         I, BRIAN GRIFFITH, hereby certify
8    that I have read the transcript of my testimony
9    taken under oath in my deposition; that the
10   transcript is a true, complete and correct
11   record of my testimony, and that the answers on
12   the record as given by me are true and correct.
13
14
15
16        _____
17              BRIAN GRIFFITH
18
19
20   Signed and subscribed to before me
21   this _____ day of _____, ____.
22
23
24   _____
25   Notary Public, State of _____
```

Page 302

```
1              C E R T I F I C A T E
2
3    STATE OF NEW YORK  )
4                     :ss
5    COUNTY OF RICHMOND )
6
7         I, MELISSA GILMORE, a Notary Public
8    within and for the State of New York, do hereby
9    certify:
10        That BRIAN GRIFFITH, the witness
11   whose deposition is hereinbefore set forth, was
12   duly sworn by me and that such deposition is a
13   true record of the testimony given by such
14   witness.
15        I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 12th day of July, 2019.
21
22
23
24   _____
25   MELISSA GILMORE
```

Page 303

```
1         *** ERRATA SHEET ***
2    ELLEN GRAUER COURT REPORTING CO., LLC
          126 East 56th Street, Fifth Floor
3         New York, New York 10022
             212-750-6434
4
5    NAME OF CASE: In Re: SEARS HOLDINGS CORPORATION
     DATE OF DEPOSITION: JULY 10, 2019
6    NAME OF WITNESS: BRIAN GRIFFITH
7
8    PAGE  LINE   FROM    TO    REASON
9    ___|_____|_____|_____|_____
10   ___|_____|_____|_____|_____
11   ___|_____|_____|_____|_____
12   ___|_____|_____|_____|_____
13   ___|_____|_____|_____|_____
14   ___|_____|_____|_____|_____
15   ___|_____|_____|_____|_____
16   ___|_____|_____|_____|_____
17   ___|_____|_____|_____|_____
18   ___|_____|_____|_____|_____
19
20        _____
21   Subscribed and sworn before me
22   this ____ day of_____,20__.
23
24   _____   _____
25   (Notary Public)    My Commission Expires:
```

# Exhibit 101

*IN RE: SEARS HOLDINGS CORPORATION, et al.*

---

*BRANDON AEBERSOLD*
*July 10, 2019*

---



*Original File 277378A.txt*
*Min-U-Script® with Word Index*

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION, et al., Pg 433 of 468

BRANDON AEBERSOLD
July 10, 2019

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  SOUTHERN DISTRICT OF NEW YORK
   ----------------------------------------X
3  In Re:
4  SEARS HOLDINGS CORPORATION, et al.,
5                          Debtor.
6  Chapter 11 - Case No.: 18-23538 (RDD)
   ----------------------------------------X
7
8                     450 Park Avenue
                      New York, New York
9
                      July 10, 2019
10                     8:08 a.m.
11
12            DEPOSITION of BRANDON AEBERSOLD,
13  before Melissa Gilmore, a Shorthand Reporter
14  and Notary Public of the State of New York.
15
16
17
18
19
20
21
22
23        ELLEN GRAUER COURT REPORTING CO., LLC
           126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                    REF: 277378A

Page 2

1  A P P E A R A N C E S :
2
3  CLEARY GOTTLIEB STEEN & HAMILTON LLP
4  Attorneys for ESL Investments, Inc.
5       One Liberty Plaza
6       New York, New York 10006
7  BY:  ANDREW WEAVER, ESQ.
8       KATHERINE LYNCH, ESQ.
9       PHONE 212-225-2354
10      E-MAIL aweaver@cgsh.com
11           kalynch@cgsh.com
12
13  WEIL, GOTSHAL & MANGES, LLP
14  Attorneys for Debtors and Debtors-in-Possession,
15  Sears Holdings Corporation, et al.
16      200 Crescent Court, Suite 300
17      Dallas, Texas 75201-6950
18  BY:  PAUL GENENDER, ESQ.
19       ERIN CHOI, ESQ.
20       PHONE 214-746-7877
21       E-MAIL paul.genender@weil.com
22            erin.choi@weil.com
23
24
25

Page 3

1  A P P E A R A N C E S :  (Cont'd)
2
3  WEIL GOTSHAL & MANGES, LLP
4  Attorneys for Debtors and Debtors-in-Possession,
5  Sears Holdings Corporation, et al.
6       767 Fifth Avenue
7       New York, New York 10153
8  BY: RAY SCHROCK, ESQ.
9       PHONE 212-310-8210
10      E-MAIL ray.schrock@weil.com
11
12
13  AKIN GUMP STRAUSS HAUER & FELD LLP
14  Attorneys for Unsecured Creditors
15      One Bryant Park
16      New York, New York 10036-6745
17  BY: PATRICK J. GLACKIN, ESQ.
18      PHONE 212-872-8114
19      E-MAIL pglackin@akingump.com
20
21
22
23
24
25

Page 4

1  A P P E A R A N C E S :  (Cont'd)
2
3  MILBANK LLP
4  Attorneys for Cyrus Capital Partners
5       2029 Century Park East, 33rd Floor
6       Los Angeles, California 90067-3019
7  BY:  ROBERT J. LIUBICIC, ESQ.
8       PHONE 424-386-4525
9       E-MAIL rliubicic@milbank.com
10
11
12  MILBANK LLP
13  Attorneys for Cyrus Capital Partners
14      55 Hudson Yards
15      New York, New York 10001
16  BY:  YELENA AMBARTSUMIAN, ESQ.
17      PHONE 212-530-5080
18      E-MAIL yambartsumian@milbank.com
19
20
21
22
23
24
25

Page 5

1  A P P E A R A N C E S : (Cont'd)

2

3  SEYFARTH SHAW LLP

4  Attorneys for Wilmington Trust National

5  Association, as Indenture Trustee and Collateral

6  Agent

7      620 Eighth Avenue

8      New York, New York 10018-1405

9  BY: EDWARD M. FOX, ESQ.

10     STEVEN PARADISE, ESQ.

11     PHONE 212-218-4646

12     E-MAIL emfox@seyfarth.com

13          sparadise@seyfarth.com

14

15

16  ALSO PRESENT:

17     BRIAN GRIFFITH, M-III

18     TOM KRELLER, ESQ., Milbank (Via Telephone)

19     TONY RUSSO, Cleary Summer Associate

20

21

22

23

24

25

Page 7

1  ------------ E X H I B I T S (Cont'd) -----------

2  AEBERSOLD          DESCRIPTION            FOR I.D.

3  Exhibit 4          Order Approving Amendment      78

4                     to Terms and Conditions

5                     of the Debtors'

6                     Employment and Retention

7                     of Lazard Frères and Co.,

8                     LLC, as Investment

9                     Banker, Dated January 23,

10                    2019

11

12

13         (EXHIBITS TO BE PRODUCED)

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1  ------------------- I N D E X -------------------

2  WITNESS              EXAMINATION BY          PAGE

3  BRANDON AEBERSOLD   MR. WEAVER                  8

4                      MR. LIUBICIC               41

5                      MR. FOX                    77

6

7

8  ---------------- E X H I B I T S ----------------

9  AEBERSOLD          DESCRIPTION            FOR I.D.

10 Exhibit 1          Declaration of Brandon       11

11                    Aebersold, Dated June 27,

12                    2019

13 Exhibit 2          Declaration of Brandon       34

14                    Aebersold, Dated

15                    February 1, 2019

16 Exhibit 3          Declaration of Robert A.     54

17                    Riecker, Dated

18                    November 23, 2018

19

20

21

22

23

24

25

Page 8

1  B R A N D O N   A E B E R S O L D,   called

2      as a witness, having been duly sworn by a

3      Notary Public, was examined and testified

4      as follows:

5

6  EXAMINATION BY

7  MR. WEAVER:

8      Q.   Good morning, Mr. Aebersold.

9      A.   Good morning.

10     Q.   My name is Andrew Weaver.  I'm with

11 Cleary Gottlieb Steen & Hamilton, counsel to

12 ESL in this matter.

13          I will remind you, which I'm sure

14 you know, that if I ask a question today that

15 you do not understand, please ask me to clarify

16 the question.  Okay?

17     A.   Yes.

18     Q.   I also need you to answer verbally.

19 Headshakes, et cetera, will not be recorded on

20 the record.  Is that okay?

21     A.   Yes.

22     Q.   If you answer a question, I will

23 assume that you understand it, okay?

24     A.   Yes.

25     Q.   What did you do to prepare for

Page 9

AEBERSOLD

1
2   today's deposition?
3       A.   I read a few pleadings.  I read the
4   debtors' motion, and I read excerpts of the
5   reply of certain of the second lien parties.  I
6   also reread my prior declarations in this
7   matter.
8       Q.   All of your prior declarations in
9   this matter?
10      A.   Two of them.  I think there was
11  three.  So I think I read two of the three.
12      Q.   And which two did you read?
13      A.   The second DIP hearing declaration
14  and the sale order declaration.
15      Q.   Did you meet with counsel?
16      A.   I had a telephone call with counsel.
17      Q.   When was that call?
18      A.   There was two calls of about 30
19  minutes, one on Monday evening and one last
20  evening.
21      Q.   And was there anyone else on the
22  call besides counsel and yourself?
23      A.   On one of the calls one of my
24  colleagues from Lazard joined and a member of
25  M-III joined one of the calls.

Page 10

AEBERSOLD

1
2       Q.   And who was the member of Lazard who
3   joined the call?
4       A.   Mr. Griffith.
5       Q.   And who from --
6            MR. GENENDER: He said Lazard.
7       A.   From Lazard, Levi Quaintance.
8       Q.   And who from M-III?
9       A.   Mr. Griffith.
10      Q.   And this was in preparation for your
11  deposition today?
12      A.   That was not -- that was the call on
13  Monday.  That was more of a general call.
14           In terms of preparation for this
15  deposition, that was last night and only
16  counsel was on.
17      Q.   Did you do anything else in
18  preparation for today's deposition?
19      A.   I don't believe so.
20           MR. WEAVER: I'm going to mark
21  Aebersold Exhibit Number 1, which is
22  entitled "Declaration of Brandon
23  Aebersold," and is dated June 27 of 2019.
24           (Aebersold Exhibit 1, Declaration of
25  Brandon Aebersold, Dated June 27, 2019,

Page 11

AEBERSOLD

1
2   marked for identification.)
3       Q.   Do you see this document?
4       A.   I do.
5       Q.   Do you recognize this document?
6       A.   I do.
7       Q.   And is this the declaration that you
8   have submitted as a part of the 507(b) dispute
9   that we are here today about?
10      A.   Yes, it is.
11      Q.   Mr. Aebersold, are you proffering
12  expert opinions in this dispute?
13      A.   Am I proffering expert opinions?  I
14  believe I'm a fact witness or I'm proffering
15  fact testimony.
16      Q.   Just to be clear, this declaration
17  that you've submitted is a fact declaration; is
18  that correct?
19           MR. GENENDER: Object to the form.
20      The document speaks for itself.
21      A.   I'm not sure.
22      Q.   You have a law degree; is that
23  correct, Mr. Aebersold?
24      A.   I do have a law degree.
25      Q.   Is your license still active?

Page 12

AEBERSOLD

1
2       A.   Certainly not.
3       Q.   You understand what a fact witness
4   is?
5       A.   At a very high level.
6       Q.   And is it your understanding today
7   that you are appearing as a fact witness?
8       A.   I believe so.
9       Q.   Okay.  So have you been asked to
10  provide any expert opinions in this 507(b)
11  dispute?
12      A.   I don't believe so.
13      Q.   Do you anticipate providing any
14  expert opinions in this 507(b) dispute?
15      A.   I'm not sure.  I don't believe so.
16      Q.   Are you offering any opinions
17  regarding the value of the second lien parties'
18  507(b) claims in this dispute?
19      A.   I am not.
20      Q.   Are you offering any opinions as to
21  the appropriateness of a 506(c) charge --
22  surcharge assigned to the second lien parties'
23  507(b) claims in this dispute?
24      A.   I am not.
25      Q.   Mr. Aebersold, if you could turn to

---

Page 13

AEBERSOLD

1    AEBERSOLD
2    paragraph 11 of your declaration.
3        It states at the beginning of that
4    paragraph, Based on my experience and
5    participation, and as reflected in further
6    detail in your sale declaration, the sale and
7    restructuring process led by Lazard with the
8    support of debtors' other advisors was
9    extensive.
10        Is that your opinion, Mr. Aebersold?
11        MR. GENENDER: Objection to form.
12        You're stopping there?
13        MR. WEAVER: The sentence does
14    continue, but for the record, I'm
15    asking -- I hope it was clear.  I was
16    asking whether or not his statement was
17    extensive.
18    Q.    Is that your opinion?
19    A.    Yeah.  My view is it was extensive,
20    but I think -- yes, that's my opinion.  It was
21    extensive.
22    Q.    And if you turn to paragraph 17, you
23    state, "In short, I believe that the sale and
24    restructuring process auction was the result of
25    robust and thorough efforts by the debtors and

---

Page 14

1    AEBERSOLD
2    their advisors."
3        Is that correct?  Is that your
4    testimony?
5    A.    Yes, it is.
6    Q.    And is that also your opinion?
7    A.    Yes, it is.
8    Q.    Further down in paragraph 17 you
9    say, "Based on my knowledge, observations and
10    experience, the debtors and their advisors
11    could not have performed the necessary and
12    multiple, simultaneous work streams that
13    comprised the sale and restructuring process
14    (including soliciting interest for everything
15    from liquidation bids, to bids for parts of the
16    debtors' businesses, real estate bids and going
17    concern bids in the related arm's length
18    negotiations that culminated in the auction and
19    successful bid) in a manner that was fair,
20    reasonable and diligent in a time frame
21    meaningfully more compressed than was available
22    in this case."
23        Is that your testimony,
24    Mr. Aebersold?
25    A.    Yes, it is.

---

Page 15

1    AEBERSOLD
2    Q.    And is that also your opinion?
3        MR. GENENDER: Objection to form.
4    A.    It is.
5    Q.    Looking at paragraph --
6        MR. FOX: I didn't hear the witness'
7    answer.
8        THE WITNESS: I said it is.
9        MR. FOX: Thank you.
10    Q.    Turning to paragraph 23, starting
11    with the second sentence, "If not for the
12    existence of ESL as a potential going concern
13    buyer, and the strong views expressed and
14    actions taken by the certain second lien
15    parties during the sale and restructuring
16    process in support of a going concern sale and
17    against liquidation, then the rationale for
18    maintaining the enterprise would have been
19    substantially removed and the only likely
20    viable option would have been the immediate
21    pursuit of a wind-down."
22        Is that your testimony,
23    Mr. Aebersold?
24    A.    Yes, it is.
25    Q.    Is that also your opinion?

---

Page 16

1    AEBERSOLD
2        MR. GENENDER: Objection to form.
3    A.    Yes, it is.
4    Q.    Turning back to your testimony in
5    paragraph 17, at the end, towards the end,
6    where you describe -- I believe you're
7    testifying that the sale and restructuring
8    process was fair, reasonable and diligent.
9        Is that your testimony?
10    A.    (Document review.)
11        I'm sorry.  Where are you?
12    Q.    Towards the end of that paragraph,
13    where you refer to a fair, reasonable and
14    diligent -- are you describing that you believe
15    that the restructuring sale process was fair,
16    reasonable and diligent?
17        MR. GENENDER: The sale and
18    restructuring process?
19        MR. WEAVER: Yes.
20    A.    Yes.
21    Q.    Fair to whom, Mr. Aebersold?
22    A.    Fair to all the parties that wanted
23    to participate as well as the company's
24    constituents.
25    Q.    Mr. Aebersold, as a managing

---

Page 17

AEBERSOLD

1  director of Lazard, your firm was retained by
2  the debtors at the beginning of the bankruptcy;
3  is that correct?
4      A.   That's correct.
5      Q.   And, at some point, your engagement
6  was amended, Lazard's engagement was amended;
7  is that correct?
8      A.   That's correct.
9      Q.   And in paragraph 7 of your
10 declaration, at the end the last sentence you
11 state that the -- "There was an amendment to
12 the engagement letter in light of additional
13 services provided by Lazard in connection with
14 potential sale transactions."
15      Is that correct?
16      MR. GENENDER: Which paragraph?
17      MR. WEAVER: The bottom of paragraph
18 5.
19      MR. GENENDER: You said 7.
20      MR. WEAVER: Did I?  I apologize.
21      MR. GENENDER: You're looking at
22 which sentence?
23      MR. WEAVER: The last sentence.
24      MR. GENENDER: Got it.  On
25

Page 18

AEBERSOLD

1  January 18?
2      MR. WEAVER: Correct.
3      MR. GENENDER: Got it.
4      A.   (Document review.) Okay.
5      Q.   Is that correct, that the engagement
6  letter was amended in light of additional
7  services?
8      A.   Yes, it was.
9      Q.   What were those additional services?
10      A.   It was additional services related
11 to sales and marketing.
12      Q.   What does that mean?
13      A.   It means running additional M&A
14 efforts.
15      Q.   What does that mean?
16      A.   I think the scope of what we were
17 doing expanded to market each individual asset
18 within the company specifically, as opposed to
19 just the company as a going concern.  And so
20 that required additional resources from the
21 firm.
22      Q.   So under your original engagement,
23 you were endeavoring to market the company as a
24 whole; is that correct?
25

Page 19

AEBERSOLD

1      A.   Not specifically.  We were -- our
2  initial letter, if I remember correctly, and I
3  don't have it here in front of me, it provided
4  for a sale transaction, and we had the option,
5  if requested, to provide those services broadly
6  speaking.
7      But from our perspective, what we
8  were concerned about is if we got requested to
9  sell a $10 million asset, so to speak, and our
10 sale transaction fee was 55 basis points, it's
11 an onerous exercise on the firm and for us to
12 get paid 55 basis points on a $10 million fee
13 may not be worthwhile.
14      And so our letter provided that, if
15 requested to run those sort of processes, we
16 had to agree to do so.  And around that time
17 in -- not that time -- around the time of as
18 early as late October and early November, the
19 company requested not only for us to run a
20 potential going concern sale of the entire
21 company, but to also run isolated processes for
22 each of the business units.
23      And so it was the increase M&A
24 activity around those individual processes on
25

Page 20

AEBERSOLD

1  the specific assets that we requested an
2  increase to the fee, and that was what the
3  amendment was for.
4      Q.   Did the amendment increase the fee
5  or did it increase the cap on your fee?
6      A.   It increased the cap on our fee.
7      Q.   It was still the same fee structure;
8  is that correct?
9      A.   Yes, I believe so.
10      Q.   And at the beginning of the
11 bankruptcy, ESL expressed a desire to be a
12 going concern purchaser; is that correct?
13      A.   That's correct.
14      Q.   And at the time of the auction, in
15 January of 2019, ESL was the only bidder for a
16 complete going sale concern, correct?
17      A.   You mean going concern sale?
18      Q.   Going concern sale.
19      A.   Yes, correct.
20      Q.   What additional value add did Lazard
21 provide in -- resulting from this additional
22 M&A activities that you were providing?
23      A.   Additional benefits to whom?
24      Q.   To the estate.
25

Page 21

AEBERSOLD

1
2    A.    To the estate.  I think from -- one
3    piece of this is enabling that sale transaction
4    to go through.  Our goal was to make sure that
5    we had a value maximizing transaction.  And it
6    was certainly helpful to have run down those
7    other processes to know what proceeds those
8    assets could yield to be able to compare to a
9    going concern sale which, ultimately, was
10    helpful in effectuating the sale.
11    Q.    And did that, in fact, add value to
12    the estate?
13    A.    Well, I don't quite understand the
14    question, say, like our service is adding value
15    to an estate.  Was it an endeavor to maximize
16    the value of the estate?  Yes.
17        Whether or not it quantitatively and
18    specifically added value, I can't comment on
19    that.  I don't have a view.
20    Q.    Did the restructuring committee, in
21    consultation with Lazard and other advisors,
22    determine that a sale to ESL was the
23    maximizing -- value maximizing transaction for
24    the estate?
25    A.    It did.

Page 22

AEBERSOLD

1
2    Q.    Did the restructuring committee, in
3    consultation with Lazard and other advisors,
4    determine that the going concern sale maximized
5    value for ESL?
6    A.    I can't recall that ever being a
7    determination.  We were trying to maximize
8    value for the estate.  However, and related to
9    that, I mean, the analysis consistently showed,
10    as we were comparing other alternatives to a
11    sale, the second lienholders were a significant
12    beneficiary of that increase of value, because
13    we're comparing the two, and one was value
14    maximizing.  A substantial portion of that
15    value was accruing to the second lienholders.
16    Q.    What do you mean by "substantial"?
17    A.    If A is greater than B, that delta,
18    let's call it C, a significant portion of C was
19    going to the second lienholders.
20    Q.    Have you quantified that value?
21    A.    We did a number of times throughout
22    the pendency of the case.
23    Q.    But, ultimately, the restructuring
24    committee was tasked with maximizing the value
25    of the estate as a whole, correct?

Page 23

AEBERSOLD

1
2        MR. GENENDER: Objection to form.
3    A.    Lazard was focused on --
4        MR. GENENDER: Calls for a legal
5    conclusion.
6    A.    Lazard was maximizing value for the
7    estate, and that's what we were seeking.
8    Q.    If you turn to paragraph 23 of your
9    declaration.  We looked at the second sentence
10    prior.  Going over this again, the first part
11    where you say that, "If not for the existence
12    of ESL as a potential going concern buyer and
13    the strong views expressed and actions taken by
14    certain second lien parties," it goes on to
15    say, "then the rationale for maintaining the
16    enterprise would have been substantially
17    removed."
18        What do you mean by "strong views
19    expressed"?
20    A.    I think I'm speaking to the
21    willingness of certain of these second
22    lienholders to support a going concern
23    transaction, which, in my opinion, decreased
24    execution risk and increased the likelihood of
25    success.

Page 24

AEBERSOLD

1
2    Q.    Any other strong views that you're
3    referring to?
4    A.    Not specifically.
5    Q.    What about actions taken by certain
6    second lien parties, what do you mean by that?
7    A.    In terms of actions, it's really
8    with respect to actions to support the company
9    in respect of a going concern sale.
10    Q.    Anything else?
11    A.    Not specifically.
12    Q.    Is it your view that all three of
13    these were needed to -- for the rationale of
14    maintaining the enterprise to continue?
15        MR. GENENDER: Objection, form,
16    vague.
17    A.    Can you repeat the question?
18    Q.    Sure.  Is it your view that all
19    three of these items that you list in paragraph
20    23 needed to exist in order for the rationale
21    of maintaining the enterprise to continue?
22        MR. GENENDER: Objection, form,
23    vague.
24    A.    Not necessarily.  I can say that the
25    fact that those three did exist were important

Page 25

AEBERSOLD

1    AEBERSOLD
2  to us maintaining the going concern.  They were
3  all factors.
4           Whether or not if one were
5  diminished, that's a hypothetical I can't
6  answer.
7    Q.   Was it the restructuring committee's
8  view throughout this process that a going
9  concern sale would result in a value maximizing
10  transaction for the estate?
11           MR. GENENDER: Objection, foundation
12    and calls for speculation.
13    A.   Your question states it as if it
14  were a fact throughout, and I wouldn't say that
15  necessarily was the case.
16           I think there was optimism that a
17  going concern sale could and had a decent
18  likelihood of being value maximizing.
19    Q.   And in all of your discussions with
20  the restructuring committee when you were
21  analyzing potential transactions, did the
22  restructuring committee ever consider, as a
23  driving factor of their deliberations, the
24  benefit to ESL from a going concern
25  transaction?

Page 26

AEBERSOLD

1    AEBERSOLD
2    A.   I don't think we ever specified it
3  as it's a benefit to ESL, but there were
4  certainly times at which the benefit to the
5  second lienholders was a driving consideration.
6    Q.   Why was it a driving consideration?
7    A.   It's the same as my answer
8  previously, which is if the going concern sale
9  was value maximizing, we analyzed where was
10  that value flowing, and potentially all of the
11  analysis, it would show that all the other
12  secured creditors, but the creditors, generally
13  speaking, were no worse off in a going concern
14  sale, but it was a material benefit to the
15  second lienholders.
16    Q.   Is that the only increased benefit?
17    A.   Not the only.  Certainly not
18  exclusive benefit.
19    Q.   What other benefits were there?
20    A.   Well, as you see in a prior
21  declaration, I list out the benefits to the
22  estate. We're on record saying there's a
23  number of benefits.
24    Q.   And in those prior declarations, did
25  you ever state one of the benefits was

Page 27

AEBERSOLD

1    AEBERSOLD
2  increased value for ESL?
3           MR. GENENDER: Objection to form.
4    The document speaks for itself.
5    A.   I don't believe that sentence is in
6  my prior declaration.
7    Q.   The --
8    A.   Can I correct that?
9    Q.   Of course, you can.
10    A.   Because I don't know what's
11  incorporated into my declaration and what's
12  not, but in Exhibit 3, I believe, or 4 to my
13  most recent declaration, in a letter from
14  Cleary to the board of directors, it references
15  that statement, that the second lienholders
16  are, in fact, the only significant beneficiary
17  amongst the secured creditors of a going
18  concern sale.
19           And so that was based on
20  conversations I have had with advisors to second
21  lien parties, and so I guess, in a way, it is
22  in my declaration, but I just want to be clear
23  that that's referenced.
24    Q.   Sure.  Exhibit 3 is attached to your
25  declaration we have marked as Exhibit 1.

Page 28

AEBERSOLD

1    AEBERSOLD
2           MR. GENENDER: I think we are
3  talking Exhibit A, B and C.
4    A.   Sorry.  It's Exhibit C.
5    Q.   Can you direct me to the language
6  that you're referring to in that document?
7    A.   Yes, it may take a second.
8    Q.   That's fine.
9    A.   (Document review.) I found it.
10    Q.   Where were you looking?
11    A.   Page 5 of the letter, which is
12  page 35 of 36 of the declaration, second full
13  paragraph, the sentence beginning in the middle
14  of the third line, "Based on extensive
15  conversations with advisors to the debtors and
16  the subcommittee, all senior creditors, other
17  than ESL and Cyrus, will be treated virtually
18  the same and are, thus, indifferent to the form
19  of a resolution under a liquidation or a going
20  concern proposal.  Moreover, the liquidation
21  scenarios shared with ESL are hopelessly
22  wrong."
23           That's it.  It's the fourth line
24  there.
25    Q.   Just to finish the line that you



**Page 29**

AEBERSOLD

1          AEBERSOLD
2  were reading --
3      A.   "Moreover, the liquidation scenarios
4  shared with ESL are hopelessly wrong, ignoring
5  the hundreds of millions of dollars owed to ESL
6  and Cyrus in respect of adequate protection,
7  replacement liens and super-priority claims
8  under 507(b), which must be paid before general
9  administrative claims."
10     Q.   Did you agree with the sentence that
11  you just read regarding the liquidation
12  scenarios shared with ESL are hopelessly wrong?
13     A.   I don't have an opinion on the
14  letter from Cleary.
15     Q.   So is it your testimony you have no
16  opinion as to this letter?
17     A.   No.  I'm just saying I haven't done
18  an analysis in terms of the comment about
19  507(b) claims.  I was raising the paragraph
20  because this is reflecting conversations that
21  professionals had had with me regarding the
22  impact on secured creditors or the senior
23  creditors.
24     Q.   What about the impact on
25  administrative claims?

**Page 30**

1          AEBERSOLD
2      A.   What do you mean, with respect to --
3      Q.   Whether or not a going concern sale
4  would be more beneficial to administrative
5  claims than a liquidation.
6      A.   I think a going concern sale, just
7  generally speaking, it was beneficial to them
8  to have a going concern sale.
9      Q.   Why was it beneficial?
10     A.   Because there were fewer of them and
11  the recovery was higher.
12     Q.   Why was the recovery higher?
13         MR. GENENDER: Objection, form.
14     A.   Because there were less of them.  A
15  liquidation would have generated significant
16  additional administrative claims.
17     Q.   Would a liquidation also have
18  generated larger super-priority claims by
19  second lienholders?
20         MR. GENENDER: Objection, calls for
21     legal conclusion.
22     A.   Yeah, I don't know.
23     Q.   So as an advisor to the debtors, the
24  restructuring committee of the debtors, you
25  have no opinion as to whether a liquidation

**Page 31**

1          AEBERSOLD
2  would have increased the size and volume of
3  adequate protection and super-priority claims
4  of the second lien creditors?
5          MR. GENENDER: Objection, misstates
6      testimony and assumes facts not in
7      evidence.
8      A.   I did not perform a liquidation
9  analysis.
10     Q.   Did Lazard do anything to solicit
11  ESL's bid for a going concern sale?
12     A.   Yes.
13     Q.   What did it do?
14     A.   It prepared marketing materials.  It
15  provided access to diligence.  It answered
16  diligence questions.  It negotiated terms of a
17  potential bid.  It gave guidance on how to
18  improve its bid.
19         There were a host of other
20  activities related to generating bids in an
21  ultimately successful bid from ESL.
22     Q.   In your view, did ESL's bids, as you
23  describe, improve?
24     A.   It did improve over the course of
25  the case.

**Page 32**

1          AEBERSOLD
2      Q.   Did those improved bids increase the
3  value to the estate?
4      A.   Yes.
5      Q.   Did that increased value benefit
6  ESL?
7      A.   Did their increase of a bid increase
8  value to ESL?
9      Q.   Did the increase in value that you
10  said the estate received from the improved
11  bids, did that increase in value provide a
12  benefit to ESL?
13     A.   Well, I think it did because it's
14  not as if there were other going concern
15  bidders that ESL was bidding against, right?
16  Because if that was the only outcome here, the
17  sale of a going concern, and there were
18  multiple bids, probably more of zero sum game
19  at that point, but that's not what this process
20  was.
21         It was a going concern sale with one
22  potential buyer versus other alternatives that
23  were not a going concern sale.
24         And so their increase in value in
25  the bid enabled them to be successful.

Page 33

AEBERSOLD

1
2  Whereas, had they not improved the bid, we
3  would have pivoted to an orderly wind-down.  So
4  I could argue, yes, they were benefited.
5      Q.   ESL as a whole or ESL as a second
6  lien party?
7      A.   Both.
8      Q.   And the value of the credit bid
9  under the ESL bid was approximately
10  433 million; is that correct?
11     A.   That's correct.
12     Q.   Total consideration for the going
13  concern bid at the end of the day was
14  approximately 5.2 billion; is that correct?
15     A.   That was ESL's number.
16     Q.   Do you have a different number?
17     A.   The issue with that number is it
18  takes certain liabilities at their notional
19  amount, which I think, if you were viewing a
20  typical M&A bid, there are arguably pieces of
21  working capital that wouldn't be part of the
22  bid.
23     Q.   So do you have a different number?
24         MR. GENENDER: Objection, form,
25     asked and answered.

Page 34

AEBERSOLD

1
2      Q.   I didn't hear yes or no.
3      A.   Not sitting here today, no.
4      Q.   You would agree that the total
5  consideration paid was significantly more than
6  the 433 million of the credit bid, correct?
7      A.   Yes.
8         (Aebersold Exhibit 2, Declaration of
9      Brandon Aebersold, Dated February 1, 2019,
10     marked for identification.)
11     Q.   Mr. Aebersold, the court reporter
12  has handed you what's been marked as Exhibit
13  Number 2, a document also entitled "Declaration
14  of Brandon Aebersold," this one dated
15  February 1, 2019.
16         Do you see that?
17     A.   Yes.
18     Q.   Is this your declaration in support
19  of the sale hearing?
20     A.   Yes.
21     Q.   This is also your sworn testimony
22  before the court; is that correct?
23     A.   Yes.
24     Q.   If you could turn to paragraph 11,
25  I'm looking at the second to last sentence in

Page 35

AEBERSOLD

1
2  this paragraph, where you stated, "Ultimately,
3  the restructuring committee, in consultation
4  with Lazard and its other advisors, determined
5  that a single going concern transaction for all
6  or substantially all of the debtors' businesses
7  provided the best opportunity to maximize value
8  for the debtors, preserve jobs and mitigate the
9  creation of additional claims against the
10  debtors.  Other alternatives, including a
11  potential orderly wind-down of the business
12  were considered throughout the process."
13         Was that your testimony then?
14     A.   Yes.
15     Q.   Is it still your testimony today?
16     A.   Yes.
17     Q.   You state, "Mitigate the creation of
18  additional claims against the debtors."
19         What do you mean by that?
20     A.   That if we had liquidated, certain
21  additional claims would have arose.
22     Q.   For example?
23     A.   For example, terminating employees.
24  If we were to terminate all the employees of
25  the company, that would certainly give rise to

Page 36

AEBERSOLD

1
2  additional claims.
3      Q.   Would there also be additional
4  claims by secured creditors?
5      A.   I'm not sure.
6      Q.   You're not sure.
7         Sitting here today, you're not sure
8  if liquidation would have led to larger 507(b)
9  claims by the second lien parties, for example?
10     A.   I didn't analyze that.  Again, I
11  didn't do a liquidation analysis.  I don't
12  believe that, when I made this comment about
13  the creation of additional claims, I was
14  talking about that.  I think I was talking
15  about more of the tangible claims that would
16  have arose.
17     Q.   So, at any point, did you think
18  about the possibility of claims by second lien
19  parties in a liquidation?
20         MR. GENENDER: Objection, vague.
21     A.   I'm sure I did, but sitting here
22  today, I can't recall specifically.
23     Q.   The decision to enter into a going
24  concern sale was made by the restructuring
25  committee, correct?

AEBERSOLD

1
2    A.   The decision?  They agreed to pursue
3    that path.  I don't know if a decision was --
4    so I'm taking issue for the decision.
5    Q.   That's fine.  I asked you to ask me
6    to clarify if you don't understand.
7         MR. GENENDER: Let's let him finish
8         his answer, though.
9    A.   What do you mean by "decision"?
10   Q.   During the auction, at the end of
11   the auction, it was decided to accept ESL's
12   bid, correct?
13   A.   That's correct.
14   Q.   Who made that decision?
15   A.   The company made that decision, and
16   it was the special committee or the
17   restructuring committee, whatever the name is,
18   as a subset of the board that authorized it.
19   Q.   ESL did not decide, on behalf of the
20   debtors, to enter into this transaction,
21   correct?
22   A.   They did not.
23        MR. WEAVER: Let's take a quick
24        break.  I'm just going to go through
25        notes.

AEBERSOLD

1
2         (Recess taken.)
3    BY MR. WEAVER:
4    Q.   Mr. Aebersold, if you could look at
5    Exhibit 1, which is your declaration here in
6    this 507(b) matter.  If you look at paragraph
7    1, which I think is on the second page --
8    actually, there's two number ones.  Fair
9    enough.  The second number one.
10        MR. GENENDER: That was our trick,
11        Andrew.  We had two number ones.
12        MR. WEAVER: Almost fell for it.
13        MR. GENENDER: Sorry about that.
14   Q.   You testify, at the top of page 2,
15   that you submit this declaration in support of
16   entry of the 507(b) response by the debtors.
17        Do you see that?
18   A.   I do.
19   Q.   How is this declaration in support
20   of that response?
21        MR. GENENDER: Objection, calls for
22        legal conclusion.
23   A.   I think, as evidenced by the fact
24   that this is cited in our motion, that it is in
25   support of it.

AEBERSOLD

1
2    Q.   Were you asked to prepare this
3    declaration?
4    A.   Yes.
5    Q.   And were you given instructions as
6    to what the declaration should cover?
7    A.   Not specifically.
8    Q.   So how did you determine what to put
9    in this declaration?
10        MR. GENENDER: I'm going to object
11        and instruct you, in answering that
12        question, not to reveal any communications
13        with counsel.  If you can answer that
14        question without doing so, go ahead.  He
15        is not asking you for your communications
16        with us.
17   A.   I can't answer that without
18   discussing communications with counsel.
19   Q.   But your testimony was that no one
20   instructed you to prepare this declaration,
21   correct?
22        MR. GENENDER: Objection,
23        mischaracterizes testimony.
24   A.   I would say -- I was not instructed
25   to prepare this as in someone is directing me

AEBERSOLD

1
2    to do so.
3    Q.   Okay.  So why did you prepare it?
4         MR. GENENDER: Same objection as to
5         privilege.
6    A.   I can't answer that without
7    disclosing conversations with counsel.
8    Q.   This is a declaration of you as a
9    fact witness, correct?
10   A.   That's correct.
11   Q.   So this is your testimony as to the
12   facts in relation to this 507 dispute, correct?
13        MR. GENENDER: What is?
14   Q.   The testimony in this declaration.
15   A.   Let me rephrase that.
16        I am a fact witness and this
17   declaration is in support of that 507(b)
18   response.
19   Q.   Okay.  Did you decide which facts to
20   place in this declaration?  It's a yes-or-no
21   question.
22        MR. GENENDER: Object to the form of
23        the question.
24   A.   It's not necessarily a yes-or-no
25   question.

Page 41

AEBERSOLD

1
2       I wrote the substantial majority of
3   this.  And in terms of topics to cover, well,
4   that would be based on conversations with
5   counsel.
6       Q.   Okay.  I have no further questions
7   at this point, but I think some other folks at
8   the table do have questions for you.
9       A.   Okay.  Thank you.
10  EXAMINATION BY
11  MR. LIUBICIC:
12      Q.   Good morning, Mr. Aebersold.  I'm
13  Rob Liubicic.  I represent Cyrus Capital
14  Partners in this case.
15          If we can turn to your declaration,
16  which is Exhibit 1, please.  Do you have that?
17      A.   Yes, I do.
18      Q.   Okay.  And let's look at paragraph
19  8, which is on page 5.
20          So you see, here in paragraph 8,
21  you define the term "process" as, "A broad
22  array of strategic alternatives and options
23  including a possible sale, recapitalization,
24  reorganization, or orderly wind-down of all or
25  substantially all of the debtors' businesses"?

Page 42

AEBERSOLD

1
2       A.   I see that.
3       Q.   And you said "including."
4           As part of the process, did debtors
5   explore any strategic alternatives or options
6   that don't fall within the buckets of a
7   possible sale, a recapitalization, a
8   reorganization or an orderly wind-down?
9       A.   I think it depends on how broadly
10  you define each of those terms, but you can
11  define recapitalization and reorganization and
12  sale broadly enough that I think would cover
13  almost all the options that were explored.
14      Q.   Did debtors ever explore chapter 7
15  liquidation?
16      A.   Proactively explore?
17      Q.   Correct.
18      A.   I think we evaluated a chapter 7
19  liquidation.
20      Q.   And when did that happen?
21      A.   Pretty much throughout the entire
22  process.
23          Again, our concern with
24  administrative insolvency throughout, the
25  reason that was such a concern is because what

Page 43

AEBERSOLD

1   a chapter 7 liquidation would look like.
2           So I don't think a chapter -- well,
3   that's enough.
4       Q.   Are there documents memorializing
5   any evaluation of a chapter 7 liquidation?
6       A.   I'm not sure.  There could be.  I
7   just can't recall specifically.
8       Q.   As you sit here today, you can't
9   recall any?
10      A.   Well, in fairness to me, that would
11  have been seven, eight, nine months ago.  So I
12  can't specifically recall a document.
13          I can remember statistics being
14  cited from a chapter 7 liquidation.  So I
15  assume that some of that analysis had been
16  done.
17      Q.   Who do you remember reciting
18  statistics?
19      A.   Other advisors for the company.
20      Q.   Do you remember anyone specifically?
21      A.   No.
22      Q.   Do you remember what entities those
23  advisors were employed by?
24      A.   The company's advisors.

Page 44

AEBERSOLD

1
2       Q.   So which advisors?  I'm asking,
3   Weil, M-III, Lazard?
4       A.   Not specifically.
5       Q.   And in paragraph 8 of your
6   declaration, when you use the phrase "orderly
7   wind-down," that's a wind-down in a chapter 11
8   proceeding, correct?
9       A.   Yes, presumably.
10      Q.   Let's go to paragraph 19 of your
11  declaration.  And you see in paragraph 19, you
12  say, "The company and its advisors also had
13  extensive discussions with Cyrus."
14          Do you see that?
15      A.   I do.
16      Q.   Okay.  And then you say, "Cyrus was
17  actively involved throughout the process,
18  including in pre-filing discussions regarding
19  the DIP financing, as the ultimate arranger and
20  funding party to the junior DIP financing, and
21  in the negotiations regarding the going concern
22  sale (as a provider of financing to effectuate
23  the ESL bid)."
24          Do you see that?
25      A.   Yes, I do.

AEBERSOLD

1
2  Q.   Okay.  So let's unpack this a bit.
3       If we focus on your phrase
4  "pre-filing discussions regarding the DIP
5  financing," what pre-filing discussions with
6  Cyrus are you referring to?
7  A.   Discussions before filing regarding
8  financing.
9  Q.   And who had those discussions with
10 Cyrus?
11 A.   I had financing discussions with
12 them a couple weeks before filing, and then
13 immediately preceding the filing, they were
14 working alongside ESL with respect to the
15 junior DIP.
16 Q.   And who at Cyrus did you have
17 financing discussions with pre-filing?
18 A.   I apologize for not having the last
19 name correctly or I would mispronounce, if I
20 did, but it was Svet.
21 Q.   Svet Nikov?
22 A.   Yes.
23 Q.   Did you have those discussions with
24 anyone else from Cyrus pre-filing?
25 A.   I had discussions with Mr. Freidheim

AEBERSOLD

1
2  leading up to the filing.  Again, it would have
3  been a couple weeks pre-filing and certainly
4  financing -- financing was discussed, not
5  necessarily -- I can't recall specifically if
6  we talked about DIP financing, but we were
7  talking about a financing.
8  Q.   Okay.  And what did you discuss with
9  Mr. Nikov about DIP financing pre-filing?
10 A.   I can't recall specifically.
11 Q.   Is there anything you recall about
12 your discussions with Mr. Nikov about DIP
13 financing pre-filing?
14 A.   Not specifically.  That was going on
15 eight or nine months ago.
16 Q.   And you mentioned a discussion with
17 Mr. Freidheim pre-filing about financing,
18 generally; am I right?
19 A.   Yes.
20 Q.   What do you recall about that
21 discussion?
22 A.   Nothing specifically.  However, I
23 can remember it was in the context of how to
24 deal with the upcoming maturity and their
25 willingness to extend their debt or help the

AEBERSOLD

1
2  company deal with that upcoming maturity.
3       That's the context of the
4  conversation, but I can't remember anything
5  specifically about it.
6  Q.   Okay.  Have I exhausted your
7  recollection of that conversation?
8  A.   Potentially.  I can't remember a
9  whole lot else, other than the location.
10 Q.   Do you remember anything else?
11 A.   The one with Mr. Freidheim and Nikov
12 was at the law firm of Wachtell Lipton Rosen &
13 Katz, and discussions pre-filing were at Weil
14 Gotshal through ESL, but I can't remember the
15 specifics.
16 Q.   Anything else you remember?
17 A.   Not specifically.
18 Q.   And what, if anything, did the
19 pre-filing discussions that you've testified
20 about have to do with a going concern sale?
21 A.   Well, keep in mind the only reason
22 that we needed or sought the junior DIP, of
23 which Cyrus was ultimately the provider, but
24 even in the early phases, the reason we needed
25 it is because that liquidity was required to

AEBERSOLD

1
2  bridge us to a going concern sale.  Whereas, if
3  we had immediately pivoted to an orderly
4  wind-down or liquidation, we didn't need that
5  capital.
6       So it was all in the context of
7  getting to a going concern sale.
8  Q.   Now, the DIP financing discussions
9  that occurred pre-filing, which DIP financing
10 are you referring to?
11 A.   The junior DIP financing.  Again,
12 through ESL, as ESL was the only likely
13 provider of that capital pre-petition, and they
14 were working alongside Cyrus at the time, or so
15 it was represented to me.
16 Q.   The DIP financing that was being
17 discussed with Cyrus pre-filing was not the
18 same junior DIP that was ultimately approved by
19 the court in November, correct?
20 A.   Not precisely, but that same general
21 structure, yes.
22 Q.   ESL was not involved with the junior
23 DIP that was approved by the court in November,
24 correct?
25 A.   Sorry.  Just to get the timeline

Page 49

AEBERSOLD

1
2  correct so that we're clear when I talk about
3  which DIP and when.
4          Pre-petition discussions with ESL,
5  of which it was represented to us that Cyrus
6  was a party of getting this together, they put
7  a term sheet and a structure together on the
8  junior DIP.
9          When we filed, we only sought
10 authorization of what I call the ABL DIP or the
11 senior DIP.  However, we filed the term sheet
12 with respect to the junior DIP financing, as it
13 wasn't ready to be funded and negotiations
14 weren't completed, and also gave us the
15 opportunity to have a structure to market.
16         That same structure, generally
17 speaking, is what ultimately was put in front
18 of the court and funded, with Cyrus arranging
19 that financing.  There were modifications, but,
20 generally speaking, it was directionally the
21 same structure.
22     Q.   Okay.  So the term sheet -- the ESL
23 Cyrus term sheet was never put to the court for
24 approval, correct?
25     A.   That specific term sheet, I don't

Page 50

AEBERSOLD

1
2  believe we ever sought approval for.  However,
3  we did file it.
4      Q.   And if we were to compare the terms
5  of the proposed ESL Cyrus junior DIP, that you
6  testified to, against the terms of the
7  Cyrus-led junior DIP that the court actually
8  approved, we put those terms side by side, they
9  are not the same, correct?
10     A.   They are not the same, correct.
11     Q.   Do you recall that, in or about
12 early November of 2018, you indicated to
13 Mr. Nikov that Cyrus should submit a proposal
14 for a DIP that didn't include ESL as a funder?
15     A.   What was the date again?  I'm sorry.
16     Q.   In or about early November of 2018.
17     A.   Generally, yes.  I remember
18 expressing that there was a way to do one
19 without it, and it would actually be helpful if
20 the largest, quote/unquote, insider of the
21 company wasn't a part of that financing.
22     Q.   And you put Mr. Nikov in touch with
23 Mudrick and Fir Tree to discuss potentially
24 working on a DIP; is that right?
25     A.   I can't recall specifically the

Page 51

AEBERSOLD

1
2  timing of that or if those were, in fact, the
3  parties.  I do know that we made efforts to put
4  them in touch with other potential lenders to
5  fill out a DIP financing.
6      Q.   Do you recall any other potential
7  lenders that you made efforts to put Cyrus in
8  touch with?
9      A.   Not specifically, but it's very
10 possible that we had either allowed them to
11 speak with other holders by releasing them from
12 a provision under their NDA with respect to
13 certain lenders, or directly put them in touch,
14 I can't be sure, but there is a decent chance
15 of that.
16     Q.   Fair to say you saw benefit to Cyrus
17 doing a junior DIP with someone other than ESL?
18     A.   Sure.
19     Q.   The company ultimately made a
20 decision to enter into a junior DIP financing
21 with Great American, correct?
22     A.   That's correct.
23     Q.   And Great American had negotiated
24 the terms of that proposed DIP financing
25 agreement with the debtors; is that right?

Page 52

AEBERSOLD

1
2      A.   Well, they had negotiated with the
3  company, sure.
4      Q.   And debtors filed a motion for
5  approval of that proposed Great American DIP,
6  correct?
7      A.   I believe so.
8      Q.   On the day of the hearing on that
9  motion, Cyrus agreed to provide junior DIP
10 financing on substantially similar terms as
11 Great American, plus some enhancements, right?
12     A.   They agreed to provide the junior
13 DIP financing on more beneficial terms to the
14 company.
15     Q.   And I understand you were involved
16 in negotiating that deal with Cyrus in the
17 courthouse; is that right?
18     A.   I was involved, yes.
19     Q.   If Cyrus didn't provide the junior
20 DIP financing and Great American did, Cyrus
21 would have been primed by Great American;
22 correct?
23     A.   Help me with that.  In which way?
24     Q.   Great American would have had
25 priority over Cyrus as a result of providing

Page 53

AEBERSOLD

1    junior DIP financing.
2       A.   Priority where?
3       Q.   Priority in a payment waterfall.
4       A.   Not necessarily.
5       Q.   And why do you say that?
6       A.   I can't recall specifically, but I
7    don't believe the Great American DIP financing,
8    nor the ultimate Cyrus DIP financing, primed
9    the second lien lenders.
10      Q.   Great American is a liquidator,
11   correct?
12      A.   I believe so.
13      Q.   Were you of the view that one of the
14   reasons Great American may have wanted to
15   provide DIP financing was so that it would have
16   a leg up on being engaged as the debtors'
17   liquidator if the debtors ultimately decided to
18   go in that direction?
19      A.   Sorry.  What was the first part your
20   question?
21      Q.   Were you of the view that one of the
22   reasons Great American may have wanted to
23   provide DIP financing was so that it would have
24   a leg up on being engaged as the debtors'

Page 54

AEBERSOLD

1    liquidator if the debtors ultimately decided to
2    go in that direction?
3       A.   I don't know if it's fair to say
4    that that was my view.  It certainly crossed my
5    mind.  And if I'm not mistaken, I even asked
6    the question of them, and I was given
7    explanation about how the two businesses are
8    totally siloed.
9          So I'm not sure it's fair to say
10   that was my view at the time we went for
11   approval of it, but it's fair to say it crossed
12   my mind.
13         (Aebersold Exhibit 3, Declaration of
14         Robert A. Riecker, Dated November 23,
15         2018, marked for identification.)
16      Q.   Mr. Aebersold, I'm showing you
17   what's been marked as Exhibit 3, which is
18   titled "Declaration of Robert A. Riecker," and
19   it's dated November 23, 2018.
20         So, Mr. Aebersold, have you ever
21   seen this declaration?
22      A.   (Document review.)
23         I'm not sure I have.
24      Q.   Okay.  So as I read this

Page 55

AEBERSOLD

1    declaration, it was submitted in support of a
2    DIP motion and the junior financing package,
3    for what that's worth.
4          Let's take a look at paragraph 14.
5    So do you see in paragraph 14, Mr. Riecker
6    said, starting with the second sentence, "Based
7    on knowledge of the company's projected cash
8    needs, even if the debtors pivot to a
9    liquidation, the $350 million in incremental
10   liquidity to be provided by the junior DIP
11   financing is critical to see the debtors
12   through liquidation, fund going-out-of-business
13   sales and send a message to the market that
14   debtors have sufficient capital."
15         Do you see that?
16      A.   I do.
17      Q.   Do you believe there was anything
18   inaccurate about that statement by Mr. Riecker
19   that was filed with the court?
20      A.   I haven't done any analysis on what
21   it would cost to liquidate the company.  So I
22   don't have any reason to disagree with him.
23      Q.   So would you agree that, at the time
24   the junior DIP was being approved, debtors were

Page 56

AEBERSOLD

1    not entering into the junior DIP solely as a
2    means of financing to get to a sale to ESL?
3          MR. GENENDER: Objection, form.
4       A.   That's not necessarily true, because
5    this was filed on November 23.  If you rewind
6    to October -- if we were liquidating then, I'm
7    actually not sure we needed the $350 million
8    junior DIP.
9       Q.   Okay.  But do you disagree that, in
10   November of 2018, you did need the $350 million
11   junior DIP, even if the company were to pivot
12   to a liquidation?
13         MR. GENENDER: Objection, asked and
14         answered.
15      A.   Yeah.  I have no reason to disagree
16   with Mr. Riecker, but there's several reasons
17   stated in this sentence why we need the junior
18   DIP.
19         And also when you say liquidation,
20   that can take a number of different forms.  If
21   we were going to do it -- depends on how we
22   were going to do it.  If we -- obviously, we're
23   going to liquidate through chapter 7, we don't
24   need it.  I think there's varying degrees of

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION, et al.        Pg 447 of 468

BRANDON AEBERSOLD
July 10, 2019



Page 57

AEBERSOLD

1    AEBERSOLD
2   how much you would need of it.
3       Q.   Okay.  So I want to make sure I
4   understand your testimony.
5           Is it your testimony here today
6   that, in November of 2018, debtors did not need
7   $350 million of liquidity being provided by a
8   junior DIP in the event debtors were to pivot
9   to a liquidation?
10      A.   I don't think that's what I
11  testified to.  I said that there were a number
12  of reasons providing the 350.  I have no reason
13  to disagree with Mr. Riecker.
14          However, I'm not sure what that
15  number is, if it was a immediate pivot to
16  certain types of liquidation.
17      Q.   Okay.  So now let's turn back to
18  paragraph 19 of your declaration, Exhibit 1.
19          MR. GENENDER: Exhibit 1.
20      Q.   So you say that Cyrus was actively
21  involved throughout the process, and we've
22  discussed some of the phraseology that follows
23  that.  Then I want to focus on the negotiations
24  regarding the going concern sale.
25          Do you see that?

Page 58

1    AEBERSOLD
2       A.   Yes.
3       Q.   Okay.  So as I read this paragraph,
4   you're saying that the company and its advisors
5   had extensive discussions with Cyrus, including
6   in negotiations regarding the going concern
7   sale.
8           Were there negotiations with Cyrus
9   regarding the going concern sale?
10      A.   There were discussions regarding a
11  going concern sale.  Yeah, in terms of the
12  economics, as the economics had more of an
13  impact to the ultimate buyer, that was handled,
14  you know, through ESL, but we certainly had
15  discussions with him on the going concern sale.
16      Q.   What substantive discussions did
17  debtors or its advisors have with Cyrus, as far
18  as you're aware, regarding any aspect of the
19  going concern sale other than discussions about
20  rolling the junior DIP?
21      A.   That was the primary discussion, was
22  around rolling their existing financing into
23  the new structure and supporting -- overall
24  supporting the going concern sale.
25      Q.   What do you mean by "overall

Page 59

1    AEBERSOLD
2   supporting the going concern sale"?
3       A.   I can't remember if there's -- their
4   treatment of other debt, other than the junior
5   DIP, but if there were other pieces of debt,
6   how they were dealing with that.
7           If I'm not mistaken, another
8   facility, which they were a part, may have been
9   rolled into the new structure, but I can't --
10      Q.   But you're not sure?
11      A.   I'm not sure sitting here today.
12      Q.   Can you recall any other discussions
13  with Cyrus that you would put under the heading
14  of overall supporting the going concern sale,
15  other than what you've already testified about?
16      A.   Not specifically.  Again, we were
17  having a tremendous number of discussions with
18  a lot of parties.  I can remember quite a
19  number of telephone conversations with people
20  at Cyrus.  I just can't remember the specifics.
21      Q.   So other than rolling the junior DIP
22  and what you've already testified to about
23  overall supporting the going concern sale, do
24  you have any recollection of discussions with
25  Cyrus about the going concern sale?

Page 60

1    AEBERSOLD
2       A.   About the going concern sale?  Not
3   specifically.
4       Q.   You were actively involved in the
5   auction that resulted in the sale to ESL,
6   correct?
7       A.   Correct.
8       Q.   Okay.  About how many days or hours
9   did the auction last?
10      A.   It was a few days.  If you want a
11  specific answer, I can do the math from my
12  declarations, but I don't know specifically.
13      Q.   Two to three days does that sound
14  about right?
15      A.   Two to four days.
16      Q.   Okay.  And over -- over those two to
17  four days, about how many discussions did you
18  personally have with ESL or its advisors about
19  substantive aspects of ESL's bid?
20      A.   I can't recall specifically, but
21  there were a number of conversations.
22      Q.   Would it be over a dozen?
23      A.   I can't be specific.
24      Q.   Would you say there were numerous?
25      A.   There were numerous.

Page 61

AEBERSOLD

1
2    Q.   And over that same time period, how
3    many discussions did you personally have with
4    Cyrus or its advisors about substantive aspects
5    of ESL's bid?
6    A.   I can't recall specifically.  I can
7    remember one telephone conversation during that
8    time period, but I can't be specific.
9    Q.   Do you remember what was discussed
10   on that one telephone conversation?
11   A.   Not specifically.
12   Q.   Do you remember any discussions
13   other than that one telephone conversation
14   during that period?
15   A.   Not specifically.
16   Q.   The auction took place at Weil,
17   correct?
18   A.   That's correct.
19   Q.   Was anyone from Cyrus present at the
20   auction?
21   A.   I'm not sure.
22   Q.   ESL had its own room at Weil during
23   the auction, correct?
24   A.   Correct.  Yes.
25   Q.   Do you know if anyone from Cyrus was

Page 62

AEBERSOLD

1
2    ever in that room during the auction?  And when
3    I say "from Cyrus," I mean from Cyrus or its
4    advisors.
5    A.   Meaning its law firm or investment
6    bank?
7    Q.   Correct.
8    A.   I can't recall specifically.
9    Q.   Do you know how much time during the
10   auction Cyrus and its advisors spent with ESL
11   and its advisors?
12   A.   You're asking me if I know how much
13   time two parties other than mine spent
14   together?
15   Q.   Correct.
16   A.   Yeah.  No.
17   Q.   During this time period, the two to
18   four days, did you have any discussions with
19   Cyrus' advisors about substantive aspects of
20   ESL's bid?
21   A.   Substantive aspects of ESL's bid?
22   Q.   Correct.
23   A.   I can't recall specifically.
24   Q.   Do you recall having any discussions
25   with any of Cyrus' advisors during that two to

Page 63

AEBERSOLD

1
2    four-day period about anything?
3    A.   I can't recall specifically.  I do
4    know that, at certain points in time, Cyrus'
5    role in a going concern bid was an important
6    issue.  Whether I spoke directly to Cyrus
7    advisors or it was through ESL's advisors, I
8    can't recall specifically.
9    Q.   You would agree ESL's advisors don't
10   represent Cyrus, correct?
11   A.   Sure.
12        MR. GENENDER: Objection, form.
13   Q.   And are you aware of anyone at the
14   debtors or any of its advisors having
15   substantive discussions with Cyrus or its
16   advisors during this two to four-day period of
17   the auction?
18   A.   I can't recall specifically.
19   Q.   And you are familiar with the credit
20   bid piece of the going concern sale?
21   A.   Generally speaking.
22   Q.   Was it your understanding that Cyrus
23   had the ability to not participate in the
24   credit bid if that's what it preferred?
25   A.   Is it my understanding that they had

Page 64

AEBERSOLD

1
2    the ability not to participate?  Is that your
3    question?
4    Q.   Correct.
5    A.   I'm just not sure exactly what the
6    intercreditor agreement says in that regard.
7    Q.   Would it surprise you if ESL held
8    enough of the debt that was being credit bid,
9    that ESL had the ability to drag Cyrus along on
10   the credit bid?
11        MR. GENENDER: Objection, assumes
12   facts not in evidence.
13   Q.   I'm just asking if you know.
14   A.   I think you asked if I would be
15   surprised?  I don't think I would be surprised.
16   Q.   And you personally were not involved
17   in any discussions with Cyrus about rolling the
18   junior DIP, correct?
19   A.   No.  I had conversations over the
20   course of the case regarding that with Cyrus, I
21   believe.  I remember it coming up on a phone
22   conversation that I had with -- I think it was
23   with Cyrus or Cyrus advisors.  I just remember
24   because I was on the FDR going to the airport,
25   and I remember that conversation and thinking,

Page 65

AEBERSOLD

1
2  for this bid to be successful, we're going to
3  need some help with that junior DIP.
4      Q.  And do you know approximately when
5  that conversation happened?
6      A.  No clue.
7      Q.  I take it that was not during the
8  period of the auction?
9      A.  Unlikely so.
10     Q.  So it would have been before the
11  auction at some point?
12     A.  Yes.
13     Q.  Do you know for a fact what Cyrus'
14  motivation was in agreeing to roll the junior
15  DIP?
16     A.  As a matter of fact?  I do not know
17  as a matter of fact someone else's motivation.
18     Q.  Would you agree with me that it was
19  debtors who asked Cyrus to roll the junior DIP?
20     A.  The request was out there.  Whether
21  that directly came from the debtors or from the
22  ultimate purchaser, I can't recall
23  specifically.
24     Q.  Okay.  So as far as you recall,
25  there was a request made to Cyrus, either by

Page 66

AEBERSOLD

1
2  the debtors or the ultimate purchaser?
3         MR. GENENDER:  Objection, calls for
4      speculation.
5      A.  Yeah.  Sorry.  I don't know the
6  genesis of those conversations.  I know, from
7  the debtors' perspective, we thought it would
8  be helpful.  I'm sure ESL, as the purchaser,
9  appreciated it as well, but the genesis of that
10  conversation, I can't recall specifically.
11     Q.  Has anyone at Cyrus or its advisors
12  ever stated to you that Cyrus favored a going
13  concern sale?
14     A.  I can't recall the specifics.  It
15  could have actually been after the sale, but I
16  can remember having a discussion on that topic.
17     Q.  What's the general discussion that
18  you think you remember?
19     A.  Generally speaking, that the second
20  lienholders would have done worse if the going
21  concern sale had not gone through.  And I
22  think, to the point on the junior DIP, that the
23  junior DIP potentially was at risk if it had
24  not been handled in the going concern sale.
25     Q.  And who was that discussion with?

Page 67

AEBERSOLD

1
2      A.  I can't recall specifically, but it
3  would either have been with their investment
4  banking advisor or with a member of Cyrus and
5  it would have been Svett.
6      Q.  So you can't recall, but it could
7  have been Svett or Cyrus' investment banking
8  advisor?
9      A.  I can't recall specifically.
10     Q.  When you say Cyrus' investment
11  banking advisor, who are you referring to?
12     A.  The team at Perella Weinberg.
13     Q.  And who at Perella Weinberg?
14     A.  It would have been Bruce Mendelsohn.
15     Q.  So you can't remember who this
16  conversation was with.
17         Do you remember when it was?
18     A.  Like I said, I couldn't remember if
19  it was before the auction or immediately after.
20  So, no, I can't recall specifically.
21     Q.  And do you recall anything specific
22  that this person whom you can't remember
23  actually said?
24     A.  Not specifically.
25     Q.  Have I exhausted your recollection

Page 68

AEBERSOLD

1
2  of that conversation?
3      A.  Not necessarily.
4      Q.  What else do you remember about that
5  conversation?
6      A.  That, in general, they were in
7  agreement that a going concern sale was credit
8  enhancing to them as opposed to if we had done
9  an orderly liquidation with respect to the
10  junior DIP and the collateral underlying that
11  loan.
12     Q.  But you're not changing any of the
13  testimony you've just given me in the last few
14  minutes about this conversation, right, and
15  your recollection of it?
16         MR. GENENDER:  Objection, form.
17     A.  Yeah, not sitting here today.  I
18  would need to put some more thought and look
19  back at records, maybe, with respect to timing.
20  But, no, I think that's pretty exhaustive
21  sitting here today.
22     Q.  Okay.  Let's look in your
23  declaration at paragraph 21, please.  It's on
24  page 8.
25         And do you see there you said -- you

---

Page 69

AEBERSOLD

1 
2 make reference to the second lien parties with
3 whom Lazard was engaged, and you state that
4 they consistently took the position that a
5 liquidation would be inferior to a going
6 concern sale.
7         Do you see that?
8     A.   Yes.
9     Q.   Okay.  Does the second lien parties
10 with whom Lazard was engaged, as you use it in
11 that sentence, include Cyrus?
12     A.   At a high level, yes.
13     Q.   What does that mean?
14     A.   Yeah, in that Cyrus never took a
15 position contrary to that, and we certainly
16 received, through ESL, who represented that
17 their position was consistent.
18     Q.   Okay.  So let me start with the
19 first part of that.
20         I believe you said Cyrus never took
21 a position inconsistent with the idea that a
22 liquidation would be inferior to a going
23 concern sale?  Is that what you said?
24     A.   Yes.
25     Q.   Did anyone at Cyrus or its advisors

---

Page 70

AEBERSOLD

1 
2 ever say to you that a liquidation would be
3 inferior to a going concern sale?
4     A.   Not directly from Cyrus, but it was
5 represented to us that that was Cyrus' view,
6 and I certainly didn't have any reason to
7 believe that wasn't the case.
8     Q.   And I think you said it was ESL who
9 represented it?
10     A.   The specific reference I made to was
11 a letter from Cleary Gottlieb on behalf of ESL.
12     Q.   And is that the letter attached to
13 your declaration as Exhibit C?
14     A.   Yes.  When I was referencing the
15 comment earlier, yes, that's the letter.
16     Q.   Okay.  Were -- are there any other
17 communications from ESL or anyone else other
18 than Cyrus that led you to believe that Cyrus
19 may have felt that a liquidation would be
20 inferior to a going concern sale?
21     A.   I can't recall specifically.
22     Q.   Do you recall anything generally?
23     A.   Yeah.  I had conversations with
24 members of Cyrus about the going concern sale
25 and never in those conversations did it come up

---

Page 71

AEBERSOLD

1 
2 that they preferred a liquidation.
3     Q.   And in those conversations, did
4 anyone from Cyrus say that they preferred a
5 going concern sale?
6     A.   No, they didn't need to, because
7 that was the context of the conversation.  But,
8 no, not specifically.
9     Q.   Okay.  Turning to page 22 --
10 sorry -- paragraph 22 of your declaration.  You
11 describe the three letters attached as Exhibits
12 A, B and C to your declaration.
13         Do you see that?
14     A.   Yes, I do.
15     Q.   And those letters are from Cleary
16 Gottlieb, correct?
17     A.   (Document review.)
18         They are on Cleary Gottlieb
19 letterhead.
20     Q.   And Cleary is counsel to ESL, not
21 Cyrus, correct?
22     A.   I believe so.
23     Q.   Would you agree that Cyrus is not
24 copied on any of those three letters?
25     A.   (Document review.)

---

Page 72

AEBERSOLD

1 
2         I agree they are not listed on the
3 CC line of those letters.
4     Q.   And would you agree that, of the
5 three letters, Cyrus is mentioned only in the
6 January 7, 2019, letter that's attached as
7 Exhibit C?
8         MR. GENENDER: Objection, form.  The
9 document speaks for itself.
10     A.   I'd prefer not to sit here and read
11 these letters to be able to answer that.  If
12 you represent that, that's likely the case.
13     Q.   Yeah, I will represent that.
14         Do you know whether anyone at Cyrus
15 or its advisors saw drafts of these letters
16 before they were sent?
17     A.   I have no clue.
18     Q.   And do you know whether anyone at
19 Cyrus or its advisors authorized the sending of
20 these letters?
21     A.   I do not.
22     Q.   Turning back to your declaration,
23 which is Exhibit 1.  If we look at paragraph
24 23, do you see you stated, "If not for the
25 existence of ESL as a potential going concern

Page 73

```
 1            AEBERSOLD
 2  buyer and the strong views expressed and
 3  actions taken by certain second lien parties,"
 4  and then it goes on to say, "The rationale for
 5  maintaining the enterprise would have been
 6  substantially removed."
 7       Do you see that sentence?
 8   A.  I do.
 9   Q.  Okay.  When you say "certain second
10  lien parties expressed strong views," which
11  second lien parties are you referring to?
12   A.  Certainly ESL falls into that camp.
13   Q.  Did Cyrus express strong views in
14  support of a going concern sale?
15   A.  (Document review.)
16       To take the other side of that, had
17  they -- I'm talking about certain second lien
18  parties -- if they had expressed strong views
19  in opposition, I think that that would have --
20  that would have been pretty detrimental to that
21  enterprise.
22   Q.  Okay.  My question was, did Cyrus
23  express strong views in support of a going
24  concern sale?  What's your answer to that
25  question?
```

Page 74

```
 1            AEBERSOLD
 2   A.  Yeah.  I think probably more with
 3  respect to their actions than with respect to
 4  directly expressing strong views orally.
 5   Q.  Okay.  So Cyrus did not express
 6  strong views orally in support of a going
 7  concern sale, correct?
 8   A.  I think is fair to say that either
 9  Cyrus or its advisors expressed views in
10  support of a going concern sale.
11   Q.  And would you characterize those
12  views as strong?
13   A.  Sure.
14   Q.  And when did Cyrus or its advisors
15  express strong views in support of a going
16  concern sale?
17   A.  Well, take for example the support
18  of the DIP financing, which was a prerequisite
19  to working towards a going concern sale, they
20  certainly expressed strong views with respect
21  to that.
22   Q.  Okay.  And this is the DIP financing
23  that we saw in Mr. Riecker's November 2018
24  declaration was not necessarily earmarked to
25  bridge to a going concern sale, correct?
```

Page 75

```
 1            AEBERSOLD
 2       MR. GENENDER: Objection, misstates
 3   the evidence.
 4   Q.  The DIP -- withdrawn.
 5       The DIP financing you're talking
 6  about, it's the same DIP financing Mr. Riecker
 7  is discussing in the passage of his declaration
 8  that I showed you, right?
 9       MR. GENENDER: Objection, misstates
10   testimony.
11   A.  I'm just talking about the junior
12  DIP financing that's referenced throughout all
13  of these documents.
14   Q.  And that's the junior DIP financing
15  that Mr. Riecker is discussing in his
16  declaration, correct?
17   A.  He does discuss the junior DIP
18  financing.
19   Q.  Any other strong views expressed in
20  support of a going concern sale by Cyrus or its
21  advisors?
22   A.  I can't recall specifically.
23   Q.  Do you recall, generally?
24   A.  I just went through one generally,
25  that being in support of the DIP, which was a
```

Page 76

```
 1            AEBERSOLD
 2  prerequisite to the going concern sale.  I
 3  could characterize those views as strong, and I
 4  also think the absence of any view contrary to
 5  a going concern sale was certainly a piece of
 6  this.
 7   Q.  Okay.  Is there anything else you
 8  would add?  I just want to make sure I have the
 9  whole story.  Anything else you would add in
10  support of Cyrus or its advisors expressing
11  strong views in support of a going concern
12  sale?
13   A.  I can't recall.
14   Q.  Okay.  Switching topics.  Would you
15  agree with me that the 2L collateral was
16  comprised of inventory and receivables?
17       MR. GENENDER: Objection, form,
18   calls for a legal conclusion.
19   A.  Generally speaking.  I've not
20  reviewed the collateral documents in detail.
21   Q.  Would you agree that a going concern
22  sale was not the only way for the company to
23  dispose of inventory?
24   A.  I would agree with that.
25   Q.  Would you agree that a going concern
```

AEBERSOLD

1
2   sale was not the only way to dispose of
3   receivables?
4       A.   A going concern sale wasn't the only
5   alternative.
6       MR. LIUBICIC: I will pass the
7   witness.
8       THE WITNESS: Thank you.
9   EXAMINATION BY
10  MR. FOX:
11      Q.   Mr. Aebersold, my name is Edward
12  Fox.  I'm with the firm of Seyfarth Shaw, and I
13  represent Wilmington Trust National Association
14  as indenture trustee and collateral agent.
15      Mr. Aebersold, do you recall the
16  amendment to your retention -- to Lazard's
17  retention with respect to assisting in debtors'
18  asset sales?
19      A.   Generally, yes.
20      Q.   Do you recall whether it was limited
21  to going concern sale transactions?
22      A.   Our amended engagement letter?
23      Q.   The court order amending your
24  engagement.
25      A.   I would need to review my amended

AEBERSOLD

1
2   engagement letter to answer that.  But,
3   generally speaking, a sale transaction can take
4   many forms, and I believe it will still trigger
5   the fee.  So I'm not sure, but I don't think it
6   would be isolated to a going concern sale.
7       (Aebersold Exhibit 4, Order
8       Approving Amendment to Terms and
9       Conditions of the Debtors' Employment and
10      Retention of Lazard Frères and Co., LLC,
11      as Investment Banker, Dated January 23,
12      2019, marked for identification.)
13      Q.   Mr. Aebersold, take a look, if you
14  would, at what's been marked as Exhibit 4.
15      Do you have that in front of you?
16      A.   Yes, I do.
17      Q.   Take a look, if you would, at --
18  just for the record, Exhibit 4 is the order
19  approving amendment to terms and conditions of
20  the debtors' employment and retention of Lazard
21  Frères and Co., LLC, as investment banker.
22  It's Docket Number 1775, dated 1/24/19.
23      Do you have that in front of you?
24      A.   Yes, I do.
25      Q.   Okay.  Take a look at the second

AEBERSOLD

1
2   page, paragraph 2, if you would.
3       Do you see that?
4       A.   (Document review.)
5       Yes, I do.
6       Q.   Okay.  Now, it says that "Section
7   1(k) of the engagement letter shall be amended
8   and restated as follows."
9       And then it says, "Assisting the
10  company in identifying and evaluating
11  candidates for potential going concern sale
12  transactions involving material assets of the
13  company and advising the company in connection
14  with negotiations and aiding in a consummation
15  of any such sale transactions."
16      Do you see that?
17      A.   I do.
18      Q.   Did I read it correctly?
19      A.   I believe so.
20      Q.   Okay.  And it specifically uses the
21  words "going concern sale transactions;" is
22  that correct?
23      A.   That's correct.
24      Q.   Okay.
25      A.   So -- go ahead.

AEBERSOLD

1
2       Q.   Mr. Aebersold, let's take a look
3   back at Exhibit 1, which I think you have in
4   front of you, and look at paragraph 20.
5       You state there that, "No member of
6   the second lien parties or their respective
7   advisors advocated to Lazard that the debtors
8   should liquidate instead of engaging in
9   potential sale transactions."
10      Is that correct?
11      A.   That's correct.
12      Q.   Are you suggesting that second lien
13  parties should have advocated to Lazard for a
14  liquidation instead of a potential sale
15  transaction?
16      A.   No.  This is just a statement that
17  no one did.  So whether or not they should
18  have, that's absent from this comment.
19      Q.   Okay.  Why is this statement
20  relevant at all to the proceedings?
21      MR. GENENDER: Objection, form,
22      calls for legal conclusion.
23      Q.   You can answer.
24      A.   I'm just stating a fact.
25      Q.   Why did you state this fact?

Page 81

AEBERSOLD

1
2  A.  Because I'm putting the auction into
3  context of conversations that we had along the
4  way.
5  Q.  Did somebody ask you to state this
6  fact in paragraph 20?
7      MR. GENENDER: I'm going to object.
8  Same instruction on privilege issues.
9      You can answer subject to that.
10 A.  I can't answer.
11 Q.  Well, you can answer yes or no.
12     MR. GENENDER: Actually, he can't.
13 Excuse me.  He can't because if the answer
14 "yes or no" reveals a privileged
15 communication, then that would invade the
16 privilege.
17     MR. FOX: Okay.
18 Q.  Mr. Aebersold, are you personally
19 represented by Weil Gotshal?
20 A.  I am not personally represented by
21 Weil Gotshal.
22 Q.  So let me ask you my question again.
23     Why did you include paragraph 20,
24 the statement in paragraph 20 in your
25 declaration?

Page 82

AEBERSOLD

1
2      MR. GENENDER: Objection, asked and
3  answered.
4      MR. FOX: No, it was not answered
5  because you objected and said it was
6  privileged.
7      MR. GENENDER: Ask your questions.
8  I'm not going to debate you.  Just ask
9  your questions.  Just try and ask them
10 once.
11 A.  At the advice of counsel, I'm not
12 going to answer due to privilege.
13 Q.  The advice of which counsel?
14 A.  Weil Gotshal.
15 Q.  They're not representing you.
16 A.  But I certainly have --
17     MR. GENENDER: Hang on a second.
18 You don't need to answer that.
19     MR. FOX: You can't direct him what
20 to do if you're not his lawyer.
21     MR. GENENDER: Excuse me.  We are
22 representing him for purposes of
23 deposition.  There's a privilege in place.
24 Move on.  It belongs to the company.  Come
25 on.  Move on.

Page 83

AEBERSOLD

1
2      MR. FOX: This is a fact witness,
3  Paul.
4      MR. GENENDER: Okay.  There's a
5  privilege attached to conversations with
6  fact witnesses, too.
7      MR. FOX: That aren't your client?
8      MR. GENENDER: Ed, go ahead.  I'm
9  not debating you.  Ask another question.
10     MR. FOX: Are you directing the
11 witness not to answer?
12     MR. GENENDER: I already did.  I
13 gave him an instruction about privilege
14 and he is following it.
15 BY MR. FOX:
16 Q.  Mr. Aebersold, are you going to
17 follow Mr. Genender's direction with respect to
18 privilege?
19 A.  I am.
20 Q.  Okay.
21     MR. GENENDER: Great.
22 Q.  Mr. Aebersold, did the ESL bid or
23 the Transform bid provide a greater recovery
24 for the debtors' estates and creditors than any
25 other practically available alternative,

Page 84

AEBERSOLD

1
2  including specifically a wind-down or
3  liquidation of the debtors' business?
4  A.  I believe so.
5  Q.  Take a look, if you would, at
6  paragraph 21 of Exhibit 1.
7      Do you have that in front of you?
8  A.  I do.
9  Q.  Okay.  You say, "To the contrary
10 from nearly the beginning of these chapter 11
11 cases, to the extent they advocated for any
12 course of action, the second lien parties with
13 whom Lazard was engaged consistently took the
14 position that a liquidation would be inferior
15 to a going concern sale."
16     Which second lien parties are you
17 referring to in this paragraph 21?
18 A.  I can't be certain, but it's --
19 there could be others, but primarily ESL and
20 Cyrus.
21 Q.  What's the basis of your knowledge
22 for the statements in paragraph 21?
23 A.  (Document review.)
24     Discussions with parties with whom
25 Lazard was engaged.

Page 85

AEBERSOLD

1
2     Q.    Well, when you say "with whom Lazard
3  was engaged," does that mean you personally?
4     A.    It includes me personally.
5     Q.    Okay.  Does it include anybody else
6  other than you?
7     A.    It includes other members of Lazard.
8     Q.    Okay.  Were you present when other
9  members of Lazard had -- were engaged with
10  second lien parties?
11     A.    I will rephrase it for you.
12     Q.    No.  Answer my question.
13        MR. GENEDER: Hang on a second.
14     Don't answer a question you don't
15     understand.
16        MR. FOX: That's not what he said.
17     A.    Could you -- slow -- could you just
18  re-ask the question again?
19     Q.    Sure.
20        MR. GENENDER: The reason he asked
21     you to rephrase your question is he didn't
22     understand it.
23        MR. FOX: He didn't ask me to
24     rephrase, but okay, fine.
25        MR. GENENDER: Go ahead.  Just ask a

Page 86

AEBERSOLD

1
2  question.
3  BY MR. FOX:
4     Q.    You said the second lien parties
5  with whom Lazard was engaged.
6        Are there other people at Lazard who
7  were engaged with second lien parties other
8  than you?
9     A.    Yes.
10     Q.    And were you present when those
11  other people at Lazard were engaged with the
12  second lien parties?
13     A.    I was not present in every
14  interaction between members of Lazard and
15  representatives from second lien parties.
16     Q.    Okay.  So to the extent that you
17  were present when Lazard was engaged with
18  second lien parties, who were the second lien
19  parties with whom you were engaged that you
20  reference in paragraph 21?
21     A.    I think my prior answer was I can't
22  be certain specifically if there were others,
23  but it was primarily representatives from ESL
24  and Cyrus.
25     Q.    Anybody else that you can recall?

Page 87

AEBERSOLD

1
2     A.    I can't recall specifically if there
3  was anyone else.  I just can remember the
4  primary parties.
5     Q.    Which was Cyrus and ESL?
6     A.    I think that's what I said.
7     Q.    And you cannot remember being
8  engaged with any other second lien parties
9  besides them; is that correct?
10        MR. GENENDER: Objection, asked and
11     answered five times.
12     Q.    You can answer.
13     A.    I will just repeat my prior answer.
14     Q.    Do you recall personally being
15  involved -- being engaged with Wilmington
16  Trust?
17     A.    Not specifically, but I don't know
18  who the representatives from Wilmington Trust
19  would be.  So I can't categorically say I never
20  had interactions with them.  I have had
21  interactions with numerous people.  I didn't
22  know who they represented or what institution.
23     Q.    Let's turn to paragraph 23 of
24  Exhibit 1.  You refer to "the strong views
25  expressed and actions taken by certain second

Page 88

AEBERSOLD

1
2  lien parties during the sale and restructuring
3  process."
4        Do you see that language?
5     A.    I do.
6     Q.    What second lien parties are you
7  referring to here in paragraph 23?
8     A.    Certainly, ESL is one of those
9  parties.  I think I had a conversation before
10  with prior counsel regarding Cyrus.  I'm not
11  sure if I had direct conversations with any
12  other second lien holder.
13     Q.    So can you recall any other
14  conversations with second lienholders other
15  than Cyrus and ESL?
16        MR. GENENDER: Objection, asked and
17     answered.
18     A.    I cannot recall specifically.
19     Q.    Do you recall generally?
20     A.    Maybe ask it in a different way for
21  me.  I'm having trouble -- I feel like I'm
22  giving a pretty detect answer.  I'm not trying
23  to be coy.
24        I can't remember categorically which
25  party represents which firm.  I wouldn't be

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION, et al.   Pg 455 of 468

BRANDON AEBERSOLD
July 10, 2019

---

Page 89

AEBERSOLD

1
2 able to recognize someone from Wilmington
3 Trust's face, whether I've talked to them on
4 the phone, they've been part of a call, they
5 were in meetings with 50 to 100 people.  I
6 can't categorically say I haven't had
7 conversations with other second lienholders.
8        So when I answer "not specifically,"
9 that's what I'm speaking to.  I don't know what
10 else I can do for you.
11    Q.   Do you recall any strong views ever
12 expressed by Wilmington Trust?
13    A.   I can't recall specifically.
14    Q.   Okay.  Are you familiar with
15 something called Sears Home Services?
16    A.   Generally, yes.
17    Q.   And can you describe what Sears Home
18 Services is?
19    A.   At a high level.
20    Q.   Tell me what you can in terms of a
21 description of Sears Home Services.
22    A.   It wouldn't go much past what's in
23 my prior declaration, but it's an
24 umbrella-operating company within the larger
25 Sears that has the home repair and warranty

---

Page 90

AEBERSOLD

1
2 business, SHIP, and one other ancillary
3 business.  I can't recall the name of it.
4    Q.   When you said SHIP, do you mean
5 Sears Home Improvement.
6    A.   Yes.
7    Q.   To your knowledge, is Sears Home
8 Services a separate legal entity?
9        MR. GENENDER: Objection, calls for
10     legal conclusion.
11    A.   I can't recall specifically, but I
12 do think it touches a number of legal entities
13 within the organizational structure.  But,
14 again, I haven't looked at anything regarding
15 that business in several months.  So I can't
16 be -- I can't be certain.
17    Q.   Do you have any recollection of what
18 entity owns Sears Home Services?
19    A.   Not specifically.
20    Q.   When you said it touches several
21 entities, what did you mean by that?
22    A.   I mean that there's a vast
23 organizational structure to Sears, the parent
24 company, Sears Holding Company, and that
25 business is a part of a number of the

---

Page 91

AEBERSOLD

1
2 subsidiaries.
3    Q.   Do you recall which subsidiaries
4 it's a part of?
5    A.   No, not specifically.
6    Q.   Turning to paragraph 8 of Exhibit 1.
7    A.   Before that, quickly, Parts Direct
8 was the third one.
9        Which document?
10    Q.   Exhibit 1, turn to paragraph 8, if
11 you would.
12        You say, "Since filing the chapter
13 11 cases, the debtors have explored a broad
14 array of strategic alternatives."
15        What's the basis of your knowledge
16 of this paragraph 8?
17    A.   The basis of my knowledge is working
18 to explore different avenues the company could
19 pursue, working directly with management and
20 other advisors.
21    Q.   So when you say "the debtors have
22 explored," you mean the debtors have explored
23 with Lazard's assistance?
24        MR. GENENDER: Objection to form,
25     misstates the testimony, the document

---

Page 92

AEBERSOLD

1
2 speaks for itself.
3    A.   The debtors had a number of advisors
4 that I think assisted them through that
5 process.
6    Q.   Other than Lazard?
7    A.   There are other advisors in addition
8 to Lazard.
9    Q.   Okay.  And so when you say, "The
10 debtors have explored a broad array of
11 strategic alternatives and options," I'm trying
12 to understand the basis for your knowledge to
13 the extent that Lazard was not involved in
14 that.
15    A.   Can you re-ask the question, please?
16    Q.   Sure.  Let me ask it this way.
17        So when you say, "The debtors," in
18 paragraph 8, "have explored a broad array of
19 strategic alternatives and options," are you
20 referring to the debtors' exploration with
21 Lazard?
22    A.   I don't exactly understand the
23 question.  I think it's a bit more broadly in
24 that we've had a number of meetings and
25 discussions with company management, and

---

Page 93

AEBERSOLD

1
2  whether it's the board or special committee of
3  the board discussing what the company's options
4  could be, and we have been a part of quite a
5  few of those conversations.
6      Q.   So is it fair to say the basis for
7  your statement in paragraph 8 is based on your
8  meetings and discussions with the company and
9  its officers and directors?
10     A.   Not exclusively, but that's
11 certainly an aspect of it.
12     Q.   What else would be a basis for this
13 statement beyond that?
14     A.   It's not exhaustive, but work done
15 by Lazard independently, Lazard's work in
16 conjunction with M-III, with Weil, work that
17 Weil and M-III have done independently, work
18 that management team has done independently.
19     Q.   How do you know about work that Weil
20 and M-III have done independently?
21     A.   Because we were -- we worked in
22 conjunction with them and had meetings in
23 conjunction with them where they would also
24 present analysis.
25     Q.   So you would know that Weil and

Page 94

AEBERSOLD

1
2  M-III did work independently with respect to
3  paragraph 8 because they told you?  Is that
4  what you're saying?
5      MR. GENENDER: Objection to the
6      extent you're trying to, again, invade
7      privileged communications.
8          You can answer that without
9      revealing anything privileged.
10     A.   Each advisory firm does work on its
11 own at times because questions are asked of
12 them, they are asked to create a deliverable,
13 and those firms have provided deliverables, at
14 times, without input directly from Lazard.
15         We have also put together materials
16 or thought through issues collectively.
17     Q.   So when other professionals have
18 done work independently, how did you become
19 aware of it?
20     MR. GENENDER: Objection, asked and
21     answered.
22     A.   Because they either presented it or
23 we discussed it.
24     Q.   Okay.  Now, in paragraph 10 of
25 Exhibit 1, you say, "The debtors and their

Page 95

AEBERSOLD

1
2  restructuring committee, with the advice and
3  assistance of their advisors, ran a thorough
4  and competitive sale and restructuring
5  process."
6          What's the basis for that -- for
7  your knowledge of that statement?
8      A.   It's similar to my prior answer.
9      Q.   How is it similar?
10     A.   You asked me, what's the basis for
11 me making this?
12     Q.   Yes.  What's the basis for your
13 knowledge that allows you to make this
14 statement?
15     A.   Because I was directly involved with
16 the company and its other advisors throughout
17 the entire period.
18     Q.   Okay.
19         MR. FOX: I don't have anything
20     further.
21         THE WITNESS: Okay.  Thank you.
22         MR. GENENDER: We reserve questions
23     to the time of trial.  We're done.
24         (Time noted:  10:12 a.m.)
25

Page 96

A C K N O W L E D G M E N T

1
2
3  STATE OF              )
4                        :ss
5  COUNTY OF             )
6
7      I, BRANDON AEBERSOLD, hereby certify
8  that I have read the transcript of my testimony
9  taken under oath in my deposition; that the
10 transcript is a true, complete and correct
11 record of my testimony, and that the answers on
12 the record as given by me are true and correct.
13
14
15
16      _____
17      BRANDON AEBERSOLD
18
19
20 Signed and subscribed to before me
21 this _____ day of _____, ____.
22
23
24 _____
25 Notary Public, State of _____

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION, et al.   Pg 457 of 468

BRANDON AEBERSOLD
July 10, 2019

Page 97

```
1              C E R T I F I C A T E
2
3  STATE OF NEW YORK  )
4                          :ss
5  COUNTY OF RICHMOND )
6
7          I, MELISSA GILMORE, a Notary Public
8  within and for the State of New York, do hereby
9  certify:
10          That BRANDON AEBERSOLD, the witness
11  whose deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is a
13  true record of the testimony given by such
14  witness.
15          I further certify that I am not
16  related to any of the parties to this action by
17  blood or marriage; and that I am in no way
18  interested in the outcome of this matter.
19          IN WITNESS WHEREOF, I have hereunto
20  set my hand this 12th day of July, 2019.
21
22
23
24  _____
25  MELISSA GILMORE
```

Page 98

```
1              *** ERRATA SHEET ***
2          ELLEN GRAUER COURT REPORTING CO, LLC
3            126 East 56th Street, Fifth Floor
               New York, New York 10022
4                   212-750-6434
5  NAME OF CASE: In Re: SEARS HOLDINGS CORPORATION
   DATE OF DEPOSITION: JULY 10, 2019
6  NAME OF WITNESS: BRANDON AEBERSOLD
7
8  PAGE  LINE    FROM       TO        REASON
9  ____|____|_____|_____|_____
10 ____|____|_____|_____|_____
11 ____|____|_____|_____|_____
12 ____|____|_____|_____|_____
13 ____|____|_____|_____|_____
14 ____|____|_____|_____|_____
15 ____|____|_____|_____|_____
16 ____|____|_____|_____|_____
17 ____|____|_____|_____|_____
18 ____|____|_____|_____|_____
19
20              _____
21 Subscribed and sworn before me
22 this____day of_____,20__.
23
24 _____    _____
25 (Notary Public)       My Commission Expires:
```

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION, et al.    Pg 458 of 468

BRANDON AEBERSOLD
July 10, 2019

**$**

**$10 (2)**
19:10,13
**$350 (4)**
55:10;56:8,11;57:7

**A**

**ability (3)**
63:23;64:2,9
**ABL (1)**
49:10
**able (3)**
21:8;72:11;89:2
**absence (1)**
76:4
**absent (1)**
80:18
**accept (1)**
37:11
**access (1)**
31:15
**accruing (1)**
22:15
**action (1)**
84:12
**actions (8)**
15:14;23:13;24:5,7,
8;73:3;74:3;87:25
**active (1)**
11:25
**actively (3)**
44:17;57:20;60:4
**activities (2)**
20:23;31:20
**activity (1)**
19:25
**actually (7)**
38:8;50:7,19;56:8;
66:15;67:23;81:12
**add (4)**
20:21;21:11;76:8,9
**added (1)**
21:18
**adding (1)**
21:14
**addition (1)**
92:7
**additional (16)**
17:13;18:7,10,11,14,
21;20:21,22,24;30:16;
35:9,18,21;36:2,3,13
**adequate (2)**
29:6;31:3
**administrative (5)**
29:9,25;30:4,16;
42:24
**advice (3)**
82:11,13;95:2
**advising (1)**
79:13

**advisor (4)**
30:23;67:4,8,11
**advisors (42)**
13:8;14:2,10;21:21;
22:3;27:20;28:15;35:4;
43:20,24,25;44:2,12;
58:4,17;60:18;61:4;
62:4,10,11,19,25;63:5,7,
7,9,14,16;64:23;66:11;
69:25;72:15,19;74:9,
14;75:21;76:10;80:7;
91:20;92:3,7;95:3,16
**advisory (1)**
94:10
**advocated (3)**
80:7,13;84:11
**Aebersold (119)**
8:8;9:1;10:1,21,23,
24,25;11:1,11,23;12:1,
25;13:1,10;14:1,24;
15:1,23;16:1,21,25;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1,8,9,11,14;
35:1;36:1;37:1;38:1,4;
39:1;40:1;41:1,12;
42:1;43:1;44:1;45:1;
46:1;47:1;48:1;49:1;
50:1;51:1;52:1;53:1;
54:1,14,17,21;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1,11,15;78:1,7,
13;79:1;80:1,2;81:1,
18;82:1;83:1,16,22;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:7,17
**again (11)**
23:10;36:10;42:23;
46:2;48:11;50:15;
59:16;81:22;85:18;
90:14;94:6
**against (5)**
15:17;32:15;35:9,18;
50:6
**Agent (2)**
5:6;77:14
**ago (2)**
43:12;46:15
**agree (13)**
19:17;29:10;34:4;
55:24;63:9;65:18;
71:23;72:2,4;76:15,21,
24,25
**agreed (3)**
37:2;52:9,12

**agreeing (1)**
65:14
**agreement (3)**
51:25;64:6;68:7
**ahead (4)**
39:14;79:25;83:8;
85:25
**aiding (1)**
79:14
**airport (1)**
64:24
**AKIN (1)**
3:13
**al (1)**
3:5
**allowed (1)**
51:10
**allows (1)**
95:13
**Almost (2)**
38:12;42:13
**along (2)**
64:9;81:3
**alongside (2)**
45:14;48:14
**alternative (2)**
77:5;83:25
**alternatives (8)**
22:10;32:22;35:10;
41:22;42:5;91:14;
92:11,19
**amended (6)**
17:7,7;18:7;77:22,
25;79:7
**amending (1)**
77:23
**amendment (6)**
17:12;20:4,5;77:16;
78:8,19
**American (11)**
51:21,23;52:5,11,20,
21,24;53:8,11,15,23
**amongst (1)**
27:17
**amount (1)**
33:19
**analysis (8)**
22:9;26:11;29:18;
31:9;36:11;43:16;
55:21;93:24
**analyze (1)**
36:10
**analyzed (1)**
26:9
**analyzing (1)**
25:21
**ancillary (1)**
90:2
**Andrew (2)**
8:10;38:11
**answered (8)**
31:15;33:25;56:15;
82:3,4;87:11;88:17;

94:21
**anticipate (1)**
12:13
**apologize (2)**
17:21;45:18
**appearing (1)**
12:7
**appreciated (1)**
66:9
**appropriateness (1)**
12:21
**approval (4)**
49:24;50:2;52:5;
54:12
**approved (4)**
48:18,23;50:8;55:25
**Approving (2)**
78:8,19
**approximately (3)**
33:9,14;65:4
**arguably (1)**
33:20
**argue (1)**
33:4
**arm's (1)**
14:17
**arose (2)**
35:21;36:16
**around (4)**
19:17,18,25;58:22
**arranger (1)**
44:19
**arranging (1)**
49:18
**array (4)**
41:22;91:14;92:10,
18
**aspect (2)**
58:18;93:11
**aspects (4)**
60:19;61:4;62:19,21
**asset (3)**
18:18;19:10;77:18
**assets (3)**
20:2;21:8;79:12
**assigned (1)**
12:22
**assistance (2)**
91:23;95:3
**assisted (1)**
92:4
**assisting (2)**
77:17;79:9
**Associate (1)**
5:19
**Association (2)**
5:5;77:13
**assume (2)**
8:23;43:16
**assumes (2)**
31:6;64:11
**attached (5)**
27:24;70:12;71:11;

72:6;83:5
**Attorneys (2)**
3:4,14;5:4
**auction (17)**
13:24;14:18;20:15;
37:10,11;60:5,9;61:16,
20,23;62:2,10;63:17;
65:8;11;67:19;81:2
**authorization (1)**
49:10
**authorized (2)**
37:18;72:19
**available (2)**
14:21;83:25
**Avenue (2)**
3:6;5:7
**avenues (1)**
91:18
**aware (3)**
58:18;63:13;94:19

**B**

**back (5)**
16:4;57:17;68:19;
72:22;80:3
**bank (1)**
62:6
**Banker (2)**
78:11,21
**banking (3)**
67:4,7,11
**bankruptcy (2)**
17:3;20:12
**Based (7)**
13:4;14:9;27:19;
28:14;41:4;55:7;93:7
**basis (11)**
19:11,13;84:21;
91:15,17;92:12;93:6,
12;95:6,10,12
**become (1)**
94:18
**beginning (5)**
13:3;17:3;20:11;
28:13;84:10
**behalf (2)**
37:19;70:11
**belongs (1)**
82:24
**beneficial (4)**
30:4,7,9;52:13
**beneficiary (2)**
22:12;27:16
**benefit (9)**
25:24;26:3,4,14,16,
18;32:5,12;51:16
**benefited (1)**
33:4
**benefits (5)**
20:24;26:19,21,23,
25
**besides (2)**

9:22;87:9

**best (1)**
35:7

**beyond (1)**
93:13

**bid (28)**
14:19;31:11,17,18,
21;32:7,25;33:2,8,9,13,
20,22;34:6;37:12;
44:23;60:19;61:5;
62:20,21;63:5,20,24;
64:8,10;65:2;83:22,23

**bidder (1)**
20:16

**bidders (1)**
32:15

**bidding (1)**
32:15

**bids (9)**
14:15,15,16,17;
31:20,22;32:2,11,18

**billion (1)**
33:14

**bit (2)**
45:2;92:23

**board (4)**
27:14;37:18;93:2,3

**Both (1)**
33:7

**bottom (1)**
17:18

**Brandon (6)**
10:22,25;34:9,14;
96:7,17

**break (1)**
37:24

**BRIAN (1)**
5:17

**bridge (2)**
48:2;74:25

**broad (4)**
41:21;91:13;92:10,
18

**broadly (4)**
19:6;42:9,12;92:23

**Bruce (1)**
67:14

**Bryant (1)**
3:15

**buckets (1)**
42:6

**business (7)**
19:23;35:11;84:3;
90:2,3,15,25

**businesses (4)**
14:16;35:6;41:25;
54:8

**buyer (5)**
15:13;23:12;32:22;
58:13;73:2

---

**C**

---

**call (9)**
9:16,17,22;10:3,12,
13;22:18;49:10;89:4

**called (2)**
8:1;89:15

**calls (11)**
9:18,23,25;23:4;
25:12;30:20;38:21;
66:3;76:18;80:22;90:9

**came (1)**
65:21

**camp (1)**
73:12

**Can (29)**
24:17,24;27:8,9;
28:5;39:13;41:15;
42:10;43:14;46:23;
56:21;59:12,18;60:11;
61:6;66:16;78:3;80:23;
81:9,11;86:25;87:3,12;
88:13;89:10,17,20;
92:15;94:8

**candidates (1)**
79:11

**cap (2)**
20:6,7

**capital (5)**
33:21;41:13;48:5,13;
55:15

**case (8)**
14:22;22:22;25:15;
31:25;41:14;64:20;
70:7;72:12

**cases (2)**
84:11;91:13

**cash (1)**
55:8

**categorically (3)**
87:19;88:24;89:6

**CC (1)**
72:3

**certain (17)**
9:5;15:14;23:14,21;
24:5;33:18;35:20;
51:13;57:16;63:4;73:3,
9,17;84:18;86:22;
87:25;90:16

**Certainly (16)**
12:2;21:6;26:4,17;
35:25;46:3;54:5;58:14;
69:15;70:6;73:12;
74:20;76:5;82:16;88:8;
93:11

**certify (1)**
96:7

**cetera (1)**
8:19

**chance (1)**
51:14

**changing (1)**
68:12

**chapter (10)**
42:14,18;43:2,3,6,

---

15;44:7;56:24;84:10;
91:12

**characterize (2)**
74:11;76:3

**charge (1)**
12:21

**cited (2)**
38:24;43:15

**claims (19)**
12:18,23;29:7,9,19,
25;30:5,16,18;31:3;
35:9,18,21;36:2,4,9,13,
15,18

**clarify (2)**
8:15;37:6

**clear (4)**
11:16;13:15;27:22;
49:2

**Cleary (8)**
5:19;8:11;27:14;
29:14;70:11;71:15,18,
20

**client (1)**
83:7

**clue (2)**
65:6;72:17

**Co (2)**
78:10,21

**Collateral (5)**
5:5;68:10;76:15,20;
77:14

**colleagues (1)**
9:24

**collectively (1)**
94:16

**coming (1)**
64:21

**comment (5)**
21:18;29:18;36:12;
70:15;80:18

**committee (12)**
21:20;22:2,24;25:20,
22;30:24;35:3;36:25;
37:16,17;93:2;95:2

**committee's (1)**
25:7

**communication (1)**
81:15

**communications (5)**
39:12,15,18;70:17;
94:7

**company (30)**
18:19,20,24;19:20,
22;24:8;35:25;37:15;
43:20;44:12;47:2;
50:21;51:19;52:3,14;
55:22;56:12;58:4;
76:22;79:10,13,13;
82:24;89:24;90:24,24;
91:18;92:25;93:8;
95:16

**company's (4)**
16:23;43:25;55:8;

---

93:3

**compare (2)**
21:8;50:4

**comparing (2)**
22:10,13

**competitive (1)**
95:4

**complete (2)**
20:17;96:10

**completed (1)**
49:14

**compressed (1)**
14:21

**comprised (2)**
14:13;76:16

**concern (83)**
14:17;15:12,16;
18:20;19:21;20:13,17,
18,19;21:9;22:4;23:12,
22;24:9;25:2,9,17,24;
26:8,13;27:18;28:20;
30:3,6,8;31:11;32:14,
17,21,23;33:13;35:5;
36:24;42:23,25;44:21;
47:20;48:2,7;57:24;
58:6,9,11,15,19,24;
59:2,14,23,25;60:2;
63:5,20;66:13,21,24;
68:7;69:6,23;70:3,20,
24;71:5;72:25;73:14,
24;74:7,10,16,19,25;
75:20;76:2,5,11,21,25;
77:4,21;78:6;79:11,21;
84:15

**concerned (1)**
19:9

**conclusion (6)**
23:5;30:21;38:22;
76:18;80:22;90:10

**Conditions (2)**
78:9,19

**conjunction (3)**
93:16,22,23

**connection (2)**
17:14;79:13

**consider (1)**
25:22

**consideration (4)**
26:5,6;33:12;34:5

**considered (1)**
35:12

**consistent (1)**
69:17

**consistently (3)**
22:9;69:4;84:13

**constituents (1)**
16:24

**consultation (3)**
21:21;22:3;35:3

**consummation (1)**
79:14

**Cont'd (2)**
3:1;5:1

---

**context (3)**
46:23;47:3;48:6;
71:7;81:3

**continue (3)**
13:14;24:14,21

**contrary (3)**
69:15;76:4;84:9

**conversation (5)**
47:4,7;61:7,10,13;
64:22,25;65:5;66:10;
67:16;68:2,5,14;71:7;
88:9

**conversations (18)**
27:20;28:15;29:20;
40:7;41:4;59:19;60:21;
64:19;66:6;70:23,25;
71:3;81:3;83:5;88:11,
14;89:7;93:5

**copied (1)**
71:24

**Corporation (1)**
3:5

**correctly (3)**
19:3;45:19;79:18

**cost (1)**
55:22

**counsel (13)**
8:11;9:15,16,22;
10:16;39:13,18;40:7;
41:5;71:20;82:11,13;
88:10

**COUNTY (1)**
96:5

**couple (2)**
45:12;46:3

**course (4)**
27:9;31:24;64:20;
84:12

**court (9)**
34:11,22;48:19,23;
49:18,23;50:7;55:20;
77:23

**courthouse (1)**
52:17

**cover (3)**
39:6;41:3;42:12

**coy (1)**
88:23

**create (1)**
94:12

**creation (3)**
35:9,17;36:13

**credit (7)**
33:8;34:6;63:19,24;
64:8,10;68:7

**Creditors (10)**
3:14;26:12,12;27:17;
28:16;29:22,23;31:4;
36:4;83:24

**critical (1)**
55:12

**crossed (2)**
54:5,12

---

culminated (1)
14:18
Cyrus (78)
28:17;29:6;41:13;
44:13,16;45:6,10,16,
24;47:23;48:14,17;
49:5,18,23;50:5,13;
51:7,16;52:9,16,19,20,
25;53:9;57:20;58:5,8,
17;59:13,20,25;61:4,
19,25;62:3,3,10;63:6,
10,15,22;64:9,17,20,
23,23;65:19,25;66:11,
12;67:4;69:11,14,20,
25;70:4,18,18,24;71:4,
21,23;72:5,14,19;
73:13,22;74:5,9,14;
75:20;76:10;84:20;
86:24;87:5;88:10,15
Cyrus' (7)
62:19,25;63:4;65:13;
67:7,10;70:5
Cyrus-led (1)
50:7

**D**

date (1)
50:15
dated (8)
10:23,25;34:9,14;
54:15,20;78:11,22
day (3)
33:13;52:8;96:21
days (6)
60:8,10,13,15,17;
62:18
deal (3)
46:24;47:2;52:16
dealing (1)
59:6
debate (1)
82:8
debating (1)
83:9
debt (4)
46:25;59:4,5;64:8
Debtors (37)
3:4;13:25;14:10;
17:3;28:15;30:23,24;
35:8,10,18;37:20;
38:16;42:4,14;51:25;
52:4;53:18;54:2;55:9,
12,15,25;57:6,8;58:17;
63:14;65:19,21;66:2;
80:7;91:13,21,22;92:3,
10,17;94:25
debtors' (14)
9:4;13:8;14:16;35:6;
41:25;53:17,25;66:7;
77:17;78:9,20;83:24;
84:3;92:20
Debtors-in-Possession (1)

3:4
decent (2)
25:17;51:14
decide (1)
37:19;40:19
decided (3)
37:11;53:18;54:2
decision (8)
36:23;37:2,3,4,9,14,
15;51:20
declaration (50)
9:13,14;10:22,24;
11:7,16,17;13:2,6;
17:11;23:9;26:21;27:6,
11,13,22,25;28:12;
34:8,13,18;38:5,15,19;
39:3,6,9,20;40:8,14,17,
20;41:15;44:6,11;
54:14,19,22;55:2;
57:18;68:23;70:13;
71:10,12;72:22;74:24;
75:7,16;81:25;89:23
declarations (4)
9:6,8;26:24;60:12
decreased (1)
23:23
define (3)
41:21;42:10,11
degree (2)
11:22,24
degrees (1)
56:25
deliberations (1)
25:23
deliverable (1)
94:12
deliverables (1)
94:13
delta (1)
22:17
depends (2)
42:9;56:22
deposition (6)
9:2;10:11,15,18;
82:23;96:9
describe (4)
16:6;31:23;71:11;
89:17
describing (1)
16:14
description (1)
89:21
desire (1)
20:12
detail (2)
13:6;76:20
detect (1)
88:22
determination (1)
22:7
determine (3)
21:22;22:4;39:8
determined (1)

35:4
detrimental (1)
73:20
different (5)
33:16,23;56:21;
88:20;91:18
diligence (2)
31:15,16
diligent (4)
14:20;16:8,14,16
diminished (1)
25:5
DIP (64)
9:13;44:19,20;45:4,
15;46:6,9,12;47:22;
48:8,9,11,16,18,23;
49:3,8,10,11,12;50:5,7,
14,24;51:5,17,20,24;
52:5,9,13,20;53:2,8,9,
16,24;55:3,11,25;56:2,
9,12,19;57:8;58:20;
59:5,21;64:18;65:3,15,
19;66:22,23;68:10;
74:18,22;75:4,5,6,12,
14,17,18
direct (4)
28:5;82:19;88:11;
91:7
directing (2)
39:25;83:10
direction (3)
53:19;54:3;83:17
directionally (1)
49:20
directly (8)
51:13;63:6;65:21;
70:4;74:4;91:19;94:14;
95:15
director (1)
17:2
directors (2)
27:14;93:9
disagree (4)
55:23;56:10,16;
57:13
disclosing (1)
40:7
discuss (3)
46:8;50:23;75:17
discussed (5)
46:4;48:17;57:22;
61:9;94:23
discussing (4)
39:18;75:7,15;93:3
discussion (6)
46:16,21;58:21;
66:16,17,25
discussions (34)
25:19;44:13,18;45:4,
5,7,9,11,17,23,25;
46:12;47:13,19;48:8;
49:4;58:5,10,15,16,19;
59:12,17,24;60:17;

61:3,12;62:18,24;
63:15;64:17;84:24;
92:25;93:8
dispose (2)
76:23;77:2
dispute (7)
11:8,12;12:11,14,18,
23;40:12
Docket (1)
78:22
document (19)
11:3,5,20;16:10;
18:5;27:4;28:6,9;
34:13;43:13;54:23;
71:17,25;72:9;73:15;
79:4;84:23;91:9,25
documents (3)
43:5;75:13;76:20
dollars (1)
29:5
done (11)
29:17;43:17;55:21;
66:20;68:8;93:14,17,
18,20;94:18;95:23
down (2)
14:8;21:6
dozen (1)
60:22
drafts (1)
72:15
drag (1)
64:9
driving (3)
25:23;26:5,6
due (1)
82:12
duly (1)
8:2
during (12)
15:15;37:10;61:7,14,
22;62:2,9,17,25;63:16;
65:7;88:2

**E**

earlier (1)
70:15
early (5)
19:19,19;47:24;
50:12,16
earmarked (1)
74:24
economics (2)
12:8,12
Ed (1)
83:8
EDWARD (2)
5:9;77:11
effectuate (1)
44:22
effectuating (1)
21:10
efforts (4)

13:25;18:15;51:3,7
eight (2)
43:12;46:15
Eighth (1)
5:7
either (6)
51:10;65:25;67:3;
74:8;94:22
else (16)
9:21;10:17;24:10;
45:24;47:9,10,16;68:4;
70:17;76:7,9;85:5;
86:25;87:3;89:10;
93:12
else's (1)
65:17
E-MAIL (3)
3:10,19;5:12
emfox@seyfarthcom (1)
5:12
employed (1)
43:24
employees (2)
35:23,24
Employment (2)
78:9,20
enabled (1)
32:25
enabling (1)
21:3
end (6)
16:5,5,12;17:11;
33:13;37:10
endeavor (1)
21:15
endeavoring (1)
18:24
engaged (15)
53:17,25;69:3,10;
84:13,25;85:3,9;86:5,7,
11,17,19;87:8,15
engagement (9)
17:6,7,13;18:6,23;
77:22,24;78:2;79:7
engaging (1)
80:8
enhancements (1)
52:11
enhancing (1)
68:8
enough (4)
38:9;42:12;43:4;
64:8
enter (3)
36:23;37:20;51:20
entering (1)
56:2
enterprise (6)
15:18;23:16;24:14,
21;73:5,21
entire (3)
19:21;42:21;95:17
entities (3)

43:23;90:12,21
**entitled (2)**
10:22;34:13
**entity (2)**
90:8,18
**entry (1)**
38:16
**ESL (57)**
8:12;15:12;20:12,16;
21:22;22:5;23:12;
25:24;26:3;27:2;28:17,
21;29:4,5,12;31:21;
32:6,8,12,15;33:5,5,9;
37:19;44:23;45:14;
47:14;48:12,12,22;
49:4,22;50:5,14;51:17;
56:3;58:14;60:5,18;
61:22;62:10;64:7,9;
66:8;69:16;70:8,11,17;
71:20;72:25;73:12;
83:22;84:19;86:23;
87:5;88:8,15
**ESL's (10)**
31:11,22;33:15;
37:11;60:19;61:5;
62:20,21;63:7,9
**ESQ (5)**
3:8,17;5:9,10,18
**estate (14)**
14:16;20:25;21:2,12,
15,16,24;22:8,25;23:7;
25:10;26:22;32:3,10
**estates (1)**
83:24
**et (2)**
3:5;8:19
**evaluated (1)**
42:18
**evaluating (1)**
79:10
**evaluation (1)**
43:6
**even (4)**
47:24;54:6;55:9;
56:12
**evening (1)**
9:19,20
**event (1)**
57:8
**evidence (3)**
31:7;64:12;75:3
**evidenced (1)**
38:23
**exactly (2)**
64:5;92:22
**EXAMINATION (3)**
8:6;41:10;77:9
**examined (1)**
8:3
**example (4)**
35:22,23;36:9;74:17
**excerpts (1)**
9:4

**exclusive (1)**
26:18
**exclusively (1)**
93:10
**Excuse (2)**
81:13;82:21
**execution (1)**
23:24
**exercise (1)**
19:12
**exhausted (2)**
47:6;67:25
**exhaustive (1)**
68:20;93:14
**Exhibit (27)**
10:21,24;27:12,24,
25;28:3,4;34:8,12;
38:5;41:16;54:14,18;
57:18,19;70:13;72:7,
23;78:7,14,18;80:3;
84:6;87:24;91:6,10;
94:25
**Exhibits (1)**
71:11
**exist (2)**
24:20,25
**existence (3)**
15:12;23:11;72:25
**existing (1)**
58:22
**expanded (1)**
18:18
**experience (2)**
13:4;14:10
**expert (4)**
11:12,13;12:10,14
**explanation (1)**
54:8
**exploration (1)**
92:20
**explore (4)**
42:5,14,16;91:18
**explored (6)**
42:13;91:13,22,22;
92:10,18
**express (4)**
73:13,23;74:5,15
**expressed (12)**
15:13;20:12;23:13,
19;73:2,10,18;74:9,20;
75:19;87:25;89:12
**expressing (3)**
50:18;74:4;76:10
**extend (1)**
46:25
**extensive (7)**
13:9,17,19,21;28:14;
44:13;58:5
**extent (4)**
84:11;86:16;92:13;
94:6

**F**

**face (1)**
89:3
**facility (1)**
59:8
**fact (21)**
11:14,15,17;12:3,7;
21:11;24:25;25:14;
27:16;38:23;40:9,16;
51:2;65:13,16,17;
80:24,25;81:6;83:2,6
**factor (1)**
25:23
**factors (1)**
25:3
**facts (4)**
31:6;40:12,19;64:12
**fair (13)**
14:19;16:8,13,15,21,
22;38:8;51:16;54:4,10,
12;74:8;93:6
**fairness (1)**
43:11
**fall (1)**
42:6
**falls (1)**
73:12
**familiar (2)**
63:19;89:14
**far (2)**
58:17;65:24
**favored (1)**
66:12
**FDR (1)**
64:24
**February (2)**
34:9,15
**fee (8)**
19:11,13;20:3,5,6,7,
8;78:5
**feel (1)**
88:21
**FELD (1)**
3:13
**fell (1)**
38:12
**felt (1)**
70:19
**few (4)**
9:3;60:10;68:13;
93:5
**fewer (1)**
30:10
**Fifth (1)**
3:6
**file (1)**
50:3
**filed (5)**
49:9,11;52:4;55:20;
56:6
**filing (5)**

45:7,12,13;46:2;
91:12
**fill (1)**
51:5
**financing (43)**
44:19,20,22;45:5,8,
11,17;46:4,4,6,7,9,13,
17;48:8,9,11,16;49:12,
19;50:21;51:5,20,24;
52:10,13,20;53:2,8,9,
16,24;55:3,12;56:3;
58:22;74:18,22;75:5,6,
12,14,18
**fine (3)**
28:8;37:5;85:24
**finish (2)**
28:25;37:7
**Fir (1)**
50:23
**firm (8)**
17:2;18:22;19:12;
47:12;62:5;77:12;
88:25;94:10
**firms (1)**
94:13
**first (3)**
23:10;53:20;69:19
**five (1)**
87:11
**flowing (1)**
26:10
**focus (2)**
45:3;57:23
**focused (1)**
23:3
**folks (1)**
41:7
**follow (1)**
83:17
**following (1)**
83:14
**follows (3)**
8:4;57:22;79:8
**form (9)**
11:19;13:11;15:3;
16:2;23:2;24:15,22;
27:3;28:18;30:13;
33:24;40:22;56:4;
63:12;68:16;72:8;
76:17;80:21;91:24
**forms (2)**
56:21;78:4
**found (1)**
28:9
**foundation (1)**
25:11
**four (3)**
60:15,17;62:18
**four-day (2)**
63:2,16
**fourth (1)**
28:23
**FOX (16)**

5:9;15:6,9;77:10,12;
81:17;82:4,19;83:2,7,
10,15;85:16,23;86:3;
95:19
**frame (1)**
14:20
**Freidheim (3)**
45:25;46:17;47:11
**Frères (2)**
78:10,21
**front (6)**
19:4;49:17;78:15,23;
80:4;84:7
**full (1)**
28:12
**fund (1)**
55:13
**funded (2)**
49:13,18
**funder (1)**
50:14
**funding (1)**
44:20
**further (4)**
13:5;14:8;41:6;
95:20

**G**

**game (1)**
32:18
**gave (3)**
31:17;49:14;83:13
**GENENDER (64)**
10:6;11:19;13:11;
15:3;16:2,17;17:17,20,
22,25;18:4;23:2,4;
24:15,22;25:11;27:3;
28:2;30:13;39:10,22;
33:24;36:20;37:7;
38:10,13,21;39:10,22;
40:4,13,22;56:4,14;
57:19;63:12;64:11;
66:3;68:16;72:8;75:2,
9;76:17;80:21;81:7,12;
82:2,7,17,21;83:4,8,12,
21;85:13,20,25;87:10;
88:16;90:9;91:24;94:5,
20;95:22
**Genender's (1)**
83:17
**general (5)**
10:13;29:8;48:20;
66:17;68:6
**generally (16)**
26:12;30:7;46:18;
49:16,20;50:17;63:21;
66:19;70:22;75:23,24;
76:19;77:19;78:3;
88:19;89:16
**generated (2)**
30:15,18
**generating (1)**

18-23538-shl   Doc 5024-2   Filed 08/28/19   Entered 08/28/19 18:19:53   Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION, et al.   Pg 462 of 468

BRANDON AEBERSOLD
July 10, 2019

31:20
**genesis (2)**
66:6,9
**given (4)**
39:5;54:7;68:13;
96:12
**giving (1)**
88:22
**GLACKIN (1)**
3:17
**goal (1)**
21:4
**goes (2)**
23:14;73:4
**going-out-of-business (1)**
55:13
**Good (3)**
8:8;9;41:12
**GOTSHAL (5)**
3:3;47:14;81:19,21;
82:14
**Gottlieb (4)**
8:11;70:11;71:16,18
**Great (12)**
51:23;52:5,11,20,
21,24;53:8,11,15,23;
83:21
**greater (2)**
22:17;83:23
**GRIFFITH (3)**
5:17;10:4,9
**guess (1)**
27:21
**guidance (1)**
31:17
**GUMP (1)**
3:13

**H**

**Hamilton (1)**
8:11
**handed (1)**
34:12
**handled (2)**
58:13;66:24
**Hang (2)**
82:17;85:13
**happen (1)**
42:20
**happened (1)**
65:5
**HAUER (1)**
3:13
**heading (1)**
59:13
**Headshakes (1)**
8:19
**hear (2)**
15:6;34:2
**hearing (3)**
9:13;34:19;52:8
**held (1)**

64:7
**help (3)**
46:25;52:23;65:3
**helpful (1)**
21:6,10;50:19;66:8
**hereby (1)**
96:7
**high (3)**
12:5;69:12;89:19
**higher (2)**
30:11,12
**holder (1)**
88:12
**holders (1)**
51:11
**Holding (1)**
90:24
**Holdings (1)**
3:5
**Home (7)**
89:15,17,21,25;90:5,
7,18
**hope (1)**
13:15
**hopelessly (3)**
28:21;29:4,12
**host (1)**
31:19
**hours (1)**
60:8
**hundreds (1)**
29:5
**hypothetical (1)**
25:5

**I**

**idea (1)**
69:21
**identification (4)**
11:2;34:10;54:16;
78:12
**identifying (1)**
79:10
**ignoring (1)**
29:4
**immediate (2)**
15:20;57:15
**immediately (3)**
45:13;48:3;67:19
**impact (3)**
29:22,24;58:13
**important (2)**
24:25;63:5
**improve (3)**
31:18,23,24
**improved (3)**
32:2,10;33:2
**Improvement (1)**
90:5
**inaccurate (1)**
55:19
**include (4)**

50:14;69:11;81:23;
85:5
**includes (2)**
85:4,7
**including (7)**
14:14;35:10;41:23;
42:3;44:18;58:5;84:2
**inconsistent (1)**
69:21
**incorporated (1)**
27:11
**increase (11)**
19:24;20:3,5,6;
22:12;32:2,7,7,9,11,24
**increased (6)**
20:7;23:24;26:16;
27:2;31:2;32:5
**incremental (1)**
55:10
**Indenture (2)**
5:5;77:14
**independently (6)**
93:15,17,18,20;94:2,
18
**indicated (1)**
50:12
**indifferent (1)**
28:18
**individual (2)**
18:18;19:25
**inferior (5)**
69:5,22;70:3,20;
84:14
**initial (1)**
19:3
**input (1)**
94:14
**insider (1)**
50:20
**insolvency (1)**
42:24
**instead (2)**
80:8,14
**institution (1)**
87:22
**instruct (1)**
39:11
**instructed (2)**
39:20,24
**instruction (2)**
81:8;83:13
**instructions (1)**
39:5
**interaction (1)**
86:14
**interactions (2)**
87:20,21
**intercreditor (1)**
64:6
**interest (1)**
14:14
**into (9)**
27:11;36:23;37:20;

51:20;56:2;58:22;59:9;
73:12;81:2
**invade (2)**
81:15;94:6
**inventory (2)**
76:16,23
**investment (6)**
62:5;67:3,7,10;
78:11,21
**involved (10)**
44:17;48:22;52:15,
18;57:21;60:4;64:16;
87:15;92:13;95:15
**involving (1)**
79:12
**isolated (2)**
19:22;78:6
**issue (3)**
33:17;37:4;63:6
**issues (2)**
81:8;94:16
**items (1)**
24:19

**J**

**January (4)**
18:2;20:16;72:6;
78:11
**jobs (1)**
35:8
**joined (3)**
9:24,25;10:3
**June (2)**
10:23,25
**junior (37)**
44:20;45:15;47:22;
48:11,18,22;49:8,12;
50:5,7;51:17,20;52:9,
12,19;53:2;55:3,11,25;
56:2,9,12,18;57:8;
58:20;59:4,21;64:18;
65:3,14,19;66:22,23;
68:10;75:11,14,17

**K**

**Katz (1)**
47:13
**keep (1)**
47:21
**knowledge (9)**
14:9;55:8;84:21;
90:7;91:15,17;92:12;
95:7,13
**KRELLER (1)**
5:18

**L**

**language (2)**
28:5;88:4
**larger (3)**

30:18;36:8;89:24
**largest (1)**
50:20
**last (8)**
9:19;10:15;17:11,24;
34:25;45:18;60:9;
68:13
**late (1)**
19:19
**law (4)**
11:22,24;47:12;62:5
**lawyer (1)**
82:20
**Lazard (37)**
9:24;10:2,6,7;13:7;
17:2,14;20:21;21:21;
22:3;23:3,3,6;31:10;
35:4;44:3;69:3,10;
78:10,20;80:7,13;
84:13,25;85:2,7,9;86:5,
6,11,14,17;92:6,8,13,
21;93:15;94:14
**Lazard's (4)**
17:7;77:16;91:23;
93:15
**leading (1)**
46:2
**led (3)**
13:7;36:8;70:18
**leg (2)**
53:17,25
**legal (8)**
23:4;30:21;38:22;
76:18;80:22;90:8,10,
12
**lenders (4)**
51:4,7,13;53:10
**length (1)**
14:17
**less (1)**
30:14
**letter (15)**
17:13;18:7;19:3,15;
27:13;28:11;29:14,16;
70:11,12,15;72:6;
77:22;78:2;79:7
**letterhead (1)**
71:19
**letters (8)**
71:11,15,24;72:3,5,
11,15,20
**level (3)**
12:5;69:12;89:19
**Levi (1)**
10:7
**liabilities (1)**
33:18
**license (1)**
11:25
**lien (33)**
9:5;12:17,22;15:14;
23:14;24:6;27:21;31:4;
33:6;36:9,18;53:10;

69:2,9;73:3,10,11,17;
80:6,12;84:12,16;
85:10;86:4,7,12,15,18,
18;87:8;88:2,6,12
**lienholders (11)**
22:11,15,19;23:22;
26:5,15;27:15;30:19;
66:20;88:14;89:7
**liens (1)**
29:7
**light (2)**
17:13;18:7
**likelihood (2)**
23:24;25:18
**likely (3)**
15:19;48:12;72:12
**limited (1)**
77:20
**line (4)**
28:14,23,25;72:3
**Lipton (1)**
47:12
**liquidate (1)**
55:22;56:24;80:8
**liquidated (1)**
35:20
**liquidating (1)**
56:7
**liquidation (35)**
14:15;15:17;28:19,
20;29:3,11;30:5,15,17,
25;31:8;36:8,11,19;
42:15;19;43:2,6,15;
48:4;55:10,13;56:13,
20;57:9,16;68:9;69:5,
22;70:2,19;71:2;80:14;
84:3,14
**liquidator (3)**
53:11,18;54:2
**liquidity (3)**
47:25;55:11;57:7
**list (2)**
24:19;26:21
**listed (1)**
72:2
**LIUBICIC (3)**
41:11,13;77:6
**LLC (2)**
78:10,21
**LLP (3)**
3:3,13;5:3
**loan (1)**
68:11
**location (1)**
47:9
**look (14)**
38:4,6;41:18;43:2;
55:5;68:18,22;72:23;
78:13,17,25;80:2,4;
84:5
**looked (2)**
23:9;90:14
**Looking (4)**

15:5;17:22;28:10;
34:25
**lot (2)**
47:9;59:18

**M**

**M&A (4)**
18:14;19:24;20:23;
33:20
**maintaining (6)**
15:18;23:15;24:14,
21;25:2;73:5
**majority (1)**
41:2
**making (1)**
95:11
**management (3)**
91:19;92:25;93:18
**managing (1)**
16:25
**MANGES (1)**
3:3
**manner (1)**
14:19
**many (4)**
60:8;17;61:3;78:4
**mark (1)**
10:20
**marked (8)**
11:2;27:25;34:10,12;
54:16,18;78:12,14
**market (4)**
18:18,24;49:15;
55:14
**marketing (2)**
18:12;31:14
**material (2)**
26:14;79:12
**materials (1)**
31:14;94:15
**math (1)**
60:11
**matter (6)**
8:12;9:7,9;38:6;
65:16,17
**maturity (2)**
46:24;47:2
**maximize (3)**
21:15;22:7;35:7
**maximized (1)**
22:4
**maximizing (9)**
21:5,23,23;22:14,24;
23:6;25:9,18;26:9
**may (6)**
19:14;28:7;53:15,23;
59:8;70:19
**maybe (2)**
68:19;88:20
**mean (18)**
18:13,16;20:18;22:9,
16;23:18;24:6;30:2;

35:19;37:9;58:25;62:3;
69:13;85:3;90:4,21,22;
91:22
**Meaning (1)**
62:5
**meaningfully (1)**
14:21
**means (2)**
18:14;56:3
**meet (1)**
9:15
**meetings (4)**
89:5;92:24;93:8,22
**member (4)**
9:24;10:2;67:4;80:5
**members (4)**
70:24;85:7,9;86:14
**memorializing (1)**
43:5
**Mendelsohn (1)**
67:14
**mentioned (2)**
46:16;72:5
**message (1)**
55:14
**middle (1)**
28:13
**M-III (8)**
5:17;9:25;10:8;44:3;
93:16,17,20;94:2
**Milbank (1)**
5:18
**million (8)**
19:10,13;33:10;34:6;
55:10;56:8,11;57:7
**millions (1)**
29:5
**mind (3)**
47:21;54:6,13
**mine (1)**
62:13
**minutes (2)**
9:19;68:14
**mischaracterizes (1)**
39:23
**mispronounce (1)**
45:19
**misstates (4)**
31:5;75:2,9;91:25
**mistaken (2)**
54:6;59:7
**mitigate (2)**
35:8,17
**modifications (1)**
49:19
**Monday (2)**
9:19;10:13
**months (3)**
43:12;46:15;90:15
**more (11)**
10:13;14:21;30:4;
32:18;34:5;36:15;
52:13;58:12;68:18;

74:2;92:23
**Moreover (2)**
28:20;29:3
**morning (2)**
8:8,9;41:12
**most (1)**
27:13
**motion (5)**
9:4;38:24;52:4,9;
55:3
**motivation (2)**
65:14,17
**Move (2)**
82:24,25
**much (5)**
42:21;57:2;62:9,12;
89:22
**Mudrick (1)**
50:23
**multiple (2)**
14:12;32:18
**must (1)**
29:8

**N**

**name (5)**
8:10;37:17;45:19;
77:11;90:3
**National (2)**
5:4;77:13
**NDA (1)**
51:12
**nearly (1)**
84:10
**necessarily (8)**
24:24;25:15;40:24;
46:5;53:5;56:5;68:3;
74:24
**necessary (1)**
14:11
**need (12)**
8:18;48:4;56:11,18,
25;57:2,6;65:3;68:18;
71:6;77:25;82:18
**needed (5)**
24:13,20;47:22,24;
56:8
**needs (1)**
55:9
**negotiated (3)**
31:16;51:23;52:2
**negotiating (1)**
52:16
**negotiations (7)**
14:18;44:21;49:13;
57:23;58:6,8;79:14
**New (8)**
3:7,7,16,16;5:8,8;
58:23;59:9
**night (1)**
10:15
**Nikov (6)**

45:21;46:9,12;47:11;
50:13,22
**nine (2)**
43:12;46:15
**nor (1)**
53:9
**Notary (2)**
8:3;96:25
**noted (1)**
95:24
**notes (1)**
37:25
**notional (1)**
33:18
**November (11)**
19:19;48:19,23;
50:12,16;54:15,20;
56:6,11;57:6;74:23
**Number (22)**
10:21;22:21;26:23;
33:15,16,17,23;34:13;
38:8,9,11;56:21;57:11,
15;59:17,19;60:21;
78:22;90:12,25;92:3,
24
**numerous (3)**
60:24,25;87:21

**O**

**oath (1)**
96:9
**Object (4)**
11:19;39:10;40:22;
81:7
**objected (1)**
82:5
**Objection (34)**
13:11;15:3;16:2;
23:2;24:15,22;25:11;
27:3;30:13,20;31:5;
33:24;36:20;38:21;
39:22;40:4;56:4,14;
63:12;64:11;66:3;
68:16;72:8;75:2,9;
76:17;80:21;82:2;
87:10;88:16;90:9;
91:24;94:5,20
**observations (1)**
14:9
**obviously (1)**
56:23
**occurred (1)**
48:9
**October (2)**
19:19;56:7
**off (1)**
26:13
**offering (2)**
12:16,20
**officers (1)**
93:9
**once (1)**

82:10
**One (26)**
    3:15;9:19,19,23,23,
    25;21:2;22:13;25:4;
    26:25;32:21;34:14;
    38:9;39:19;47:11;
    50:18;53:14,22;61:7,
    10,13;75:24;80:17;
    88:8;90:2;91:8
**onerous (1)**
    19:12
**ones (2)**
    38:8,11
**only (15)**
    10:15;15:19;19:20;
    20:16;26:16,17;27:16;
    32:16;47:21;48:12;
    49:9;72:5;76:22;77:2,4
**opinion (10)**
    13:10,18;20:14:6;
    15:2,25;23:23;29:13,
    16;30:25
**opinions (6)**
    11:12,13;12:10,14,
    16,20
**opportunity (2)**
    35:7;49:15
**opposed (2)**
    18:19;68:8
**opposition (1)**
    73:19
**optimism (1)**
    25:16
**option (2)**
    15:20;19:5
**options (6)**
    41:22;42:5,13;92:11,
    19;93:3
**orally (2)**
    74:4,6
**order (5)**
    9:14;24:20;77:23;
    78:7,18
**orderly (7)**
    33:3;35:11;41:24;
    42:8;44:6;48:3;68:9
**organizational (2)**
    90:13,23
**original (1)**
    18:23
**others (2)**
    84:19;86:22
**out (3)**
    26:21;51:5;65:20
**outcome (1)**
    32:16
**over (8)**
    23:10;31:24;52:25;
    60:16,16,22;61:2;
    64:19
**overall (4)**
    58:23,25;59:14,23
**owed (1)**

29:5
**own (2)**
    61:22;94:11
**owns (1)**
    90:18

## P

**package (1)**
    55:3
**Page (8)**
    28:11,12;38:7,14;
    41:19;68:24;71:9;79:2
**paid (3)**
    19:13;29:8;34:5
**PARADISE (1)**
    5:10
**paragraph (48)**
    13:2,4,22;14:8;15:5,
    10;16:5,12;17:10,17,
    18;23:8;24:19;28:13;
    29:19;34:24;35:2;38:6;
    41:18,20;44:5,10,11;
    55:5,6;57:18;58:3;
    68:23;71:10;72:23;
    79:2;80:4;81:6,23,24;
    84:6,17,22;86:20;
    87:23;88:7;91:6,10,16;
    92:18;93:7;94:3,24
**parent (1)**
    90:23
**Park (1)**
    3:15
**part (12)**
    11:8;23:10;33:21;
    42:4;50:21;53:20;59:8;
    69:19;89:4;90:25;91:4;
    93:4
**participate (3)**
    16:23;63:23;64:2
**participation (1)**
    13:5
**parties (34)**
    9:5;15:15;16:22;
    23:14;24:6;27:21;36:9,
    19;51:3;59:18;62:13;
    69:2,9;73:3,10,11,18;
    80:6,13;84:12,16,24;
    85:10;86:4,7,12,15,18,
    19;87:4,8;88:2,6,9
**parties' (2)**
    12:17,22
**Partners (1)**
    41:14
**parts (2)**
    14:15;91:7
**party (4)**
    33:6;44:20;49:6;
    88:25
**pass (1)**
    77:6
**passage (1)**
    75:7

past (1)
    89:22
**path (1)**
    37:3
**PATRICK (1)**
    3:17
**Paul (1)**
    83:3
**payment (1)**
    53:4
**pendency (1)**
    22:22
**people (3)**
    59:19;86:6,11;87:21;
    89:5
**Perella (2)**
    67:12,13
**perform (1)**
    31:8
**performed (1)**
    14:11
**period (8)**
    61:2,8,14;62:17;
    63:2,16;65:8;95:17
**person (1)**
    67:22
**personally (8)**
    60:18;61:3;64:16;
    81:18,20;85:3,4;87:14
**perspective (2)**
    19:8;66:7
**pglackin@akingumpcom (1)**
    3:19
**phases (1)**
    47:24
**PHONE (5)**
    3:9,18;5:11;64:21;
    89:4
**phrase (1)**
    44:6;45:3
**phraseology (1)**
    57:22
**piece (3)**
    21:3;63:20;76:5
**pieces (2)**
    33:20;59:5
**pivot (4)**
    55:9;56:12;57:8,15
**pivoted (2)**
    33:3;48:3
**place (3)**
    40:20;61:16;82:23
**pleadings (1)**
    9:3
**please (4)**
    8:15;41:16;68:23;
    92:15
**plus (1)**
    52:11
**point (6)**
    17:6;32:19;36:17;
    41:7;65:11;66:22
**points (3)**

19:11,13;63:4
**portion (2)**
    22:14,18
**position (5)**
    69:4,15,17,21;84:14
**possibility (1)**
    36:18
**possible (5)**
    41:23;42:7;51:10
**potential (14)**
    15:12;17:15;19:21;
    23:12;25:21;31:17;
    32:22;35:11;51:4,6;
    72:25;79:11;80:9,14
**potentially (4)**
    26:10;47:8;50:23;
    66:23
**practically (1)**
    83:25
**preceding (1)**
    45:13
**precisely (1)**
    48:20
**prefer (1)**
    72:10
**preferred (1)**
    63:24;71:2,4
**pre-filing (13)**
    44:18;45:4,5,17,24;
    46:3,9,13,17;47:13,19;
    48:9,17
**preparation (3)**
    10:10,14,18
**prepare (5)**
    8:25;39:2,20,25;40:3
**prepared (1)**
    31:14
**pre-petition (2)**
    48:13;49:4
**prerequisite (2)**
    74:18;76:2
**PRESENT (7)**
    5:16;61:19;85:8;
    86:10,13,17;93:24
**presented (1)**
    94:22
**preserve (1)**
    35:8
**presumably (1)**
    44:9
**Pretty (4)**
    42:21;68:20;73:20;
    88:22
**previously (1)**
    26:8
**primarily (2)**
    84:19;86:23
**primary (2)**
    58:21;87:4
**primed (2)**
    52:21;53:9
**prior (11)**
    9:6,8;23:10;26:20,

24;27:6;86:21;87:13;
    88:10;89:23;95:8
**priority (3)**
    52:25;53:3,4
**privilege (8)**
    40:5;81:8,16;82:12,
    23;83:5,13,18
**privileged (4)**
    81:14;82:6;94:7,9
**Proactively (1)**
    42:16
**probably (3)**
    32:18;74:2
**proceeding (1)**
    44:8
**proceedings (1)**
    80:20
**proceeds (1)**
    21:7
**process (18)**
    13:7,24;14:13;15:16;
    16:8,15,18;25:8;32:19;
    35:12;41:21;42:4,22;
    44:17;57:21;88:3;92:5;
    95:5
**processes (4)**
    19:16,22,25;21:7
**professionals (2)**
    29:21;94:17
**proffering (3)**
    11:11,13,14
**projected (1)**
    55:8
**proposal (2)**
    28:20;50:13
**proposed (3)**
    50:5;51:24;52:5
**protection (2)**
    29:6;31:3
**provide (10)**
    12:10;19:6;20:22;
    32:11;52:9,12,19;
    53:16,24;83:23
**provided (8)**
    17:14;19:4,15;31:15;
    35:7;55:11;57:7;94:13
**provider (1)**
    44:22;47:23;48:13
**providing (4)**
    12:13;20:23;52:25;
    57:12
**provision (1)**
    51:12
**Public (2)**
    8:3;96:25
**purchaser (4)**
    20:13;65:22;66:2,8
**purposes (1)**
    82:22
**pursue (2)**
    37:2;91:19
**pursuit (1)**
    15:21

**put (12)**
  39:8;49:6,17,23;
  50:8,22;51:3,7,13;
  59:13;68:18;94:15
**putting (1)**
  81:2

## Q

**Quaintance (1)**
  10:7
**quantified (1)**
  22:20
**quantitatively (1)**
  21:17
**quick (1)**
  37:23
**quickly (1)**
  91:7
**quite (3)**
  21:13;59:18;93:4
**quote/unquote (1)**
  50:20

## R

**raising (1)**
  29:19
**ran (1)**
  95:3
**rationale (5)**
  15:17;23:15;24:13,
  20;73:4
**RAY (1)**
  3:8
**rayschrock@weilcom (1)**
  3:10
**read (11)**
  9:3,3,4,11,12;29:11;
  54:25;58:3;72:10;
  79:18;96:8
**reading (1)**
  29:2
**ready (1)**
  49:13
**real (1)**
  14:16
**really (1)**
  24:7
**re-ask (2)**
  85:18;92:15
**reason (8)**
  42:25;47:21,24;
  55:23;56:16;57:12;
  70:6;85:20
**reasonable (4)**
  14:20;16:8,13,16
**reasons (4)**
  53:15,23;56:17;
  57:12
**recall (4)**
  22:6;36:22;43:8,10,
  13;46:5,10,11,20;

  50:11,25;51:6;53:7;
  59:12;60:20;61:6;62:8,
  23,24;63:3,8,18;65:22,
  24;66:10,14;67:2,6,9,
  20,21;70:21,22;75:22,
  23;76:13;77:15,20;
  86:25;87:2,14;88:13,
  18,19;89:11,13;90:3,
  11;91:3
**recapitalization (3)**
  41:23;42:7,11
**receivables (2)**
  76:16;77:3
**received (2)**
  32:10;69:16
**recent (1)**
  27:13
**Recess (1)**
  38:2
**reciting (1)**
  43:18
**recognize (2)**
  11:5;89:2
**recollection (5)**
  47:7;59:24;67:25;
  68:15;90:17
**record (6)**
  8:20;13:14;26:22;
  78:18;96:11,12
**recorded (1)**
  8:19
**records (1)**
  68:19
**recovery (3)**
  30:11,12;83:23
**refer (2)**
  16:13;87:24
**reference (3)**
  69:2;70:10;86:20
**referenced (2)**
  27:23;75:12
**references (1)**
  27:14
**referencing (1)**
  70:14
**referring (9)**
  24:3;28:6;45:6;
  48:10;67:11;73:11;
  84:17;88:7;92:20
**reflected (1)**
  13:5
**reflecting (1)**
  29:20
**regard (1)**
  64:6
**regarding (15)**
  12:17;29:11,21;
  44:18,21;45:4,7;57:24;
  58:6,9,10,18;64:20;
  88:10;90:14
**related (4)**
  14:17;18:11;22:8;
  31:20

**relation (1)**
  40:12
**releasing (1)**
  51:11
**relevant (1)**
  80:20
**remember (31)**
  19:3;43:14,18,21,23;
  46:23;47:4,8,10,14,16;
  50:17;59:3,18,20;61:7,
  9,12;64:21,23,25;
  66:16,18;67:15,17,18,
  22;68:4;87:3,7;88:24
**remind (1)**
  8:13
**removed (3)**
  15:19;23:17;73:6
**reorganization (3)**
  41:24;42:8,11
**repair (1)**
  89:25
**repeat (2)**
  24:17;87:13
**rephrase (4)**
  40:15;85:11,21,24
**replacement (1)**
  29:7
**reply (1)**
  9:5
**reporter (1)**
  34:11
**represent (5)**
  41:13;63:10;72:12,
  13;77:13
**representatives (3)**
  86:15,23;87:18
**represented (8)**
  48:15;49:5;69:16;
  70:5,9;81:19,20;87:22
**representing (2)**
  82:15,22
**represents (1)**
  88:25
**request (2)**
  65:20,25
**requested (5)**
  19:6,9,16,20;20:2
**required (2)**
  18:21;47:25
**reread (1)**
  9:6
**reserve (1)**
  95:22
**resolution (1)**
  28:19
**resources (1)**
  18:21
**respect (15)**
  24:8,9;29:6;30:2;
  45:14;49:12;51:12;
  68:9,19;74:3,3,20;
  77:17;83:17;94:2
**respective (1)**

  80:6
**response (3)**
  38:16,20;40:18
**restated (1)**
  79:8
**restructuring (20)**
  13:7,24;14:13;15:15;
  17:5,15,18;21:20;22:2,
  23;25:7,20,22;30:24;
  35:3;36:24;37:17;88:2;
  95:2,4
**result (3)**
  13:24;25:9;52:25
**resulted (1)**
  60:5
**resulting (1)**
  20:22
**retained (1)**
  17:2
**retention (4)**
  77:16,17;78:10,20
**reveal (1)**
  39:12
**revealing (1)**
  94:9
**reveals (1)**
  81:14
**review (10)**
  16:10;18:5;28:9;
  54:23;71:17,25;73:15;
  77:25;79:4;84:23
**reviewed (1)**
  76:20
**rewind (1)**
  56:6
**Riecker (8)**
  54:15,19;55:6,19;
  56:17;57:13;75:6,15
**Riecker's (1)**
  74:23
**right (9)**
  32:15;46:18;50:24;
  51:25;52:11,17;60:14;
  68:14;75:8
**rise (1)**
  35:25
**risk (2)**
  23:24;66:23
**Rob (1)**
  41:13
**Robert (2)**
  54:15,19
**robust (1)**
  13:25
**role (1)**
  63:5
**roll (2)**
  65:14,19
**rolled (1)**
  59:9
**rolling (4)**
  58:20,22;59:21;
  64:17

**room (2)**
  61:22;62:2
**Rosen (1)**
  47:12
**run (4)**
  19:16,20,22;21:6
**running (1)**
  18:14
**RUSSO (1)**
  5:19

## S

**sale (96)**
  9:14;13:6,6,23;
  14:13;15:15,16;16:7,
  15,17;17:15;19:5,11,
  21;20:17,18,19;21:3,9,
  10,22;22:4,11;24:9;
  25:9,17;26:8,14;27:18;
  30:3,6,8;31:11;32:17,
  21,23;34:19;36:24;
  41:23;42:7,12;44:22;
  47:20;48:2,7;56:3;
  57:24;58:7,9,11,15,19,
  24;59:2,14,23,25;60:2,
  5;63:20;66:13,15,21,
  24;68:7;69:6,23;70:3,
  20,24;71:5;73:14,24;
  74:7,10,16,19,25;
  75:20;76:2,5,12,22;
  77:2,4,21;78:3,6;79:11,
  15,21;80:9,14;84:15;
  88:2;95:4
**sales (3)**
  18:12;55:14;77:18
**same (13)**
  20:8;26:7;28:18;
  40:4;48:18,20;49:16,
  21;50:9,10;61:2;75:6;
  81:8
**saw (3)**
  51:16;72:15;74:23
**saying (5)**
  26:22;29:17;58:4;
  94:4
**scenarios (3)**
  28:21;29:3,12
**SCHROCK (1)**
  3:8
**scope (1)**
  18:17
**Sears (10)**
  3:5;89:15,17,21,25;
  90:5,7,18,23,24
**second (56)**
  9:5,13;12:17,22;
  15:11,14;22:11,15,19;
  23:9,14,21;24:6;26:5,
  15;27:15,20;28:7,12;
  30:19;31:4;33:5;34:25;
  36:9,18;38:7,9;53:10;
  55:7;66:19;69:2,9;

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92
IN RE: SEARS HOLDINGS CORPORATION et al    Pg 466 of 468

BRANDON AEBERSOLD
July 10, 2019

73:3,9,11,17;78:25;
80:6,12;82:17;84:12,
16;85:10,13;86:4,7,12,
15,18,18;87:8,25;88:6,
12,14;89:7
**Section (1)**
79:6
**secured (4)**
26:12;27:17;29:22;
36:4
**seeking (1)**
23:7
**sell (1)**
19:10
**send (1)**
55:14
**sending (1)**
72:19
**senior (3)**
28:16;29:22;49:11
**sent (1)**
72:16
**sentence (14)**
13:13;15:11;17:11,
23,24;23:9;27:5;28:13;
29:10;34:25;55:7;
56:18;69:11;73:7
**separate (1)**
90:8
**service (1)**
21:14
**services (10)**
17:14;18:8,10,11;
19:6;89:15,18,21;90:8,
18
**seven (1)**
43:12
**several (3)**
56:17;90:15,20
**SEYFARTH (2)**
5:3;77:12
**shall (1)**
79:7
**shared (3)**
28:21;29:4,12
**SHAW (2)**
5:3;77:12
**sheet (5)**
49:7,11,22,23,25
**SHIP (2)**
90:2,4
**short (1)**
13:23
**show (1)**
26:11
**showed (2)**
22:9;75:8
**showing (1)**
54:17
**side (3)**
50:8,8;73:16
**Signed (1)**
96:20

**significant (4)**
22:11,18;27:16;
30:15
**significantly (1)**
34:5
**siloed (1)**
54:9
**similar (3)**
52:10;95:8,9
**simultaneous (1)**
14:12
**single (1)**
35:5
**sit (2)**
43:9;72:10
**sitting (6)**
34:3;36:7,21;59:11;
68:17,21
**size (1)**
31:2
**slow (1)**
85:17
**solely (1)**
56:2
**solicit (1)**
31:10
**soliciting (1)**
14:14
**somebody (1)**
81:5
**someone (4)**
39:25;51:17;65:17;
89:2
**sorry (8)**
16:11;28:4;38:13;
48:25;50:15;53:20;
66:5;71:10
**sort (1)**
19:16
**sought (3)**
47:22;49:9;50:2
**sound (1)**
60:13
**sparadise@seyfarthcom (1)**
5:13
**speak (2)**
19:10;51:11
**speaking (11)**
19:7;23:20;26:13;
30:7;49:17,20;63:21;
66:19;76:19;78:3;89:9
**speaks (4)**
11:20;27:4;72:9;
92:2
**special (2)**
37:16;93:2
**specific (7)**
20:2;49:25;60:11,23;
61:8;67:21;70:10
**specifically (52)**
18:19;19:2;21:18;
24:4,11;36:22;39:7;
43:8,13,21;44:4;46:5,

10,14,22;47:5,17;
50:25;51:9;53:7;59:16;
60:3,12,20;61:6,11,15;
62:8,23;63:3,8,18;
65:23;66:10;67:2,9,20,
24;70:21;71:8;75:22;
79:20;84:2;86:22;87:2,
17;88:18;89:8,13;
90:11,19;91:5
**specifics (3)**
47:15;59:20;66:14
**specified (1)**
26:2
**speculation (2)**
25:12;66:4
**spent (2)**
62:10,13
**spoke (1)**
63:6
**ss (1)**
96:4
**start (1)**
69:18
**starting (2)**
15:10;55:7
**state (10)**
13:23;17:12;26:25;
35:17;69:3;80:5,25;
81:5;96:3,25
**stated (4)**
35:2;56:18;66:12;
72:24
**statement (10)**
13:16;27:15;55:19;
80:16,19;81:24;93:7,
13;95:7,14
**statements (1)**
84:22
**states (2)**
13:3;25:13
**stating (1)**
80:24
**statistics (2)**
43:14,19
**Steen (1)**
8:11
**STEVEN (1)**
5:10
**still (4)**
11:25;20:8;35:15;
78:4
**stopping (1)**
13:12
**story (1)**
76:9
**strategic (5)**
41:22;42:5;91:14;
92:11,19
**STRAUSS (1)**
3:13
**streams (1)**
14:12
**strong (19)**

15:13;23:13,18;24:2;
73:2,10,13,18,23;74:4,
6,12,15,20;75:19;76:3,
11;87:24;89:11
**structure (10)**
20:8;48:21;49:7,15,
16,21;58:23;59:9;
90:13,23
**subcommittee (1)**
28:16
**subject (1)**
81:9
**submit (2)**
38:15;50:13
**submitted (3)**
11:8,17;55:2
**subscribed (1)**
96:20
**subset (1)**
37:18
**subsidiaries (2)**
91:2,3
**substantial (3)**
22:14,16;41:2
**substantially (6)**
15:19;23:16;35:6;
41:25;52:10;73:6
**substantive (6)**
58:16;60:19;61:4;
62:19,21;63:15
**success (1)**
23:25
**successful (4)**
14:19;31:21;32:25;
65:2
**sufficient (1)**
55:15
**suggesting (1)**
80:12
**sum (1)**
32:18
**Summer (1)**
5:19
**super-priority (3)**
29:7;30:18;31:3
**support (20)**
13:8;15:16;23:22;
24:8;34:18;38:15,19,
25;40:17;55:2;73:14,
23;74:6,10,15,17;
75:20,25;76:10,11
**supporting (5)**
58:23,24;59:2,14,23
**surcharge (1)**
12:22
**sure (31)**
8:13;11:21;12:15;
21:4;24:18;27:24;36:5,
6,7,21;43:7;51:14,18;
52:3;54:10,24;56:8;
57:3,14;59:10,11;
61:21;63:11;64:5;66:8;
74:13;76:8;78:5;85:19;

88:11;92:16
**surprise (1)**
64:7
**surprised (2)**
64:15,15
**Svet (2)**
45:20,21
**Svett (2)**
67:5,7
**Switching (1)**
76:14
**sworn (2)**
8:2;34:21

---

**T**

**table (1)**
41:8
**talk (1)**
49:2
**talked (2)**
46:6;89:3
**talking (7)**
28:3;36:14,14;46:7;
73:17;75:5,11
**tangible (1)**
36:15
**tasked (1)**
22:24
**team (2)**
67:12;93:18
**Telephone (6)**
5:18;9:16;59:19;
61:7,10,13
**term (6)**
41:21;49:7,11,22,23,
25
**terminate (1)**
35:24
**terminating (1)**
35:23
**terms (16)**
10:14;24:7;29:18;
31:16;41:3;42:10;50:4,
6,8;51:24;52:10,13;
58:11;78:8,19;89:20
**testified (6)**
8:3;47:19;50:6;
57:11;59:15,22
**testify (1)**
38:14
**testifying (1)**
16:7
**testimony (22)**
11:15;14:4,23;15:22;
16:4,9;29:15;31:6;
34:21;35:13,15;39:19,
23;40:11,14;57:4,5;
68:13;75:10;91:25;
96:8,11
**thinking (1)**
64:25
**third (2)**

28:14;91:8

**thorough (2)**
13:25;95:3

**though (1)**
37:8

**thought (3)**
66:7;68:18;94:16

**three (9)**
9:11,11;24:12,19,25;
60:13;71:11,24;72:5

**throughout (10)**
22:21;25:8,14;35:12;
42:21,24;44:17;57:21;
75:12;95:16

**thus (1)**
28:18

**timeline (1)**
48:25

**times (5)**
22:21;26:4;87:11;
94:11,14

**timing (2)**
51:2;68:19

**titled (1)**
54:19

**today (13)**
8:14;10:11;11:9;
12:6;34:3;35:15;36:7,
22;43:9;57:5;59:11;
68:17,21

**today's (2)**
9:2;10:18

**together (4)**
49:6;7;62:14;94:15

**told (1)**
94:3

**TOM (1)**
5:18

**TONY (1)**
5:19

**took (5)**
61:16;69:4,14,20;
84:13

**top (1)**
38:14

**topic (1)**
66:16

**topics (2)**
41:3;76:14

**Total (2)**
33:12;34:4

**totally (1)**
54:9

**touch (4)**
50:22;51:4,8,13

**touches (2)**
90:12,20

**towards (3)**
16:5,12;74:19

**transaction (12)**
19:5,11;21:3,5,23;
23:23;25:10,25;35:5;
37:20;78:3;80:15

**transactions (7)**
17:15;25:21;77:21;
79:12,15,21;80:9

**transcript (2)**
96:8,10

**Transform (1)**
83:23

**treated (1)**
28:17

**treatment (1)**
59:4

**Tree (1)**
50:23

**tremendous (1)**
59:17

**trial (1)**
95:23

**trick (1)**
38:10

**trigger (1)**
78:4

**trouble (1)**
88:21

**true (3)**
56:5;96:10,12

**Trust (5)**
5:4;77:13;87:16,18;
89:12

**Trustee (2)**
5:5;77:14

**Trust's (1)**
89:3

**try (1)**
82:9

**trying (4)**
22:7;88:22;92:11;
94:6

**turn (8)**
12:25;13:22;23:8;
34:24;41:15;57:17;
87:23;91:10

**Turning (5)**
15:10;16:4;71:9;
72:22;91:6

**Two (15)**
9:10,11,12,18;22:13;
38:8,11;54:8;60:13,15,
16;62:13,17,25;63:16

**types (1)**
57:16

**typical (1)**
33:20

**U**

**ultimate (5)**
44:19;53:9;58:13;
65:22;66:2

**ultimately (10)**
21:9;22:23;31:21;
35:2;47:23;48:18;
49:17;51:19;53:18;
54:2

**umbrella-operating (1)**
89:24

**under (7)**
18:23;28:19;29:8;
33:9;51:12;59:13;96:9

**underlying (1)**
68:10

**units (1)**
19:23

**Unlikely (1)**
65:9

**unpack (1)**
45:2

**Unsecured (1)**
3:14

**up (5)**
46:2;53:17,25;64:21;
70:25

**upcoming (2)**
46:24;47:2

**use (1)**
44:6;69:10

**uses (1)**
79:20

**V**

**vague (3)**
24:16,23;36:20

**value (29)**
12:17;20:21;21:5,11,
14,16,18,23;22:5,8,12,
13,15,20,24;23:6;25:9,
18;26:9,10;27:2;32:3,
5,8,9,11,24;33:8;35:7

**varying (1)**
56:25

**vast (1)**
90:22

**verbally (1)**
8:18

**versus (1)**
32:22

**Via (1)**
5:18

**viable (1)**
15:20

**view (12)**
13:19;21:19;24:12,
18;25:8;31:22;53:14,
22;54:5,11;70:5;76:4

**viewing (1)**
33:19

**views (20)**
15:13;23:13,18;24:2;
73:2,10,13,18,23;74:4,
6,9,12,15,20;75:19;
76:3,11;87:24;89:11

**virtually (1)**
28:17

**volume (1)**
31:2

**W**

**Wachtell (1)**
47:12

**warranty (1)**
89:25

**waterfall (1)**
53:4

**way (8)**
27:21;50:18;52:23;
76:22;77:2;81:4;88:20;
92:16

**WEAVER (12)**
8:7,10;10:20;13:13;
16:19;17:18,21,24;
18:3;37:23;38:3,12

**weeks (2)**
45:12;46:3

**WEIL (12)**
3:3;44:3;47:13;
61:16,22;81:19,21;
82:14;93:16,17,19,25

**Weinberg (2)**
67:12,13

**weren't (1)**
49:14

**what's (13)**
27:10,11;34:12;
54:18;66:17;73:24;
78:14;84:21;89:22;
91:15;95:6,10,12

**Whereas (2)**
33:2;48:2

**whole (5)**
18:25;22:25;33:5;
47:9;76:9

**willingness (2)**
23:21;46:25

**Wilmington (6)**
5:4;77:13;87:15,18;
89:2,12

**wind-down (9)**
15:21;33:3;35:11;
41:24;42:8;44:7,7;
48:4;84:2

**withdrawn (1)**
75:4

**within (4)**
18:19;42:6;89:24;
90:13

**without (6)**
39:14,17;40:6;50:19;
94:8,14

**witness (12)**
8:2;11:14;12:3,7;
15:8;40:9,16;77:7,8;
83:2,11;95:21

**witness' (1)**
15:6

**witnesses (1)**
83:6

**words (1)**

**work (9)**
14:12;93:14,15,16,
17,19;94:2,10,18

**worked (1)**
93:21

**working (7)**
33:21;45:14;48:14;
50:24;74:19;91:17,19

**worse (2)**
26:13;66:20

**worth (1)**
55:4

**worthwhile (1)**
19:14

**wrong (3)**
28:22;29:4,12

**wrote (1)**
41:2

**Y**

**yes-or-no (2)**
40:20,24

**yield (1)**
21:8

**York (6)**
3:7,7,16,16;5:8,8

**Z**

**zero (1)**
32:18

**1**

**1 (17)**
10:21,24;27:25;34:9,
15;38:5,7;41:16;57:18,
19;72:23;80:3;84:6;
87:24;91:6,10;94:25

**1/24/19 (1)**
78:22

**10 (1)**
94:24

**10:12 (1)**
95:24

**100 (1)**
89:5

**10018-1405 (1)**
5:8

**10036-6745 (1)**
3:16

**10153 (1)**
3:7

**11 (5)**
13:2;34:24;44:7;
84:10;91:13

**14 (2)**
55:5,6

**17 (3)**
13:22;14:8;16:5

**1775 (1)**

79:21

18-23538-shl    Doc 5024-2    Filed 08/28/19    Entered 08/28/19 18:19:53    Exhibit 92

IN RE: SEARS HOLDINGS CORPORATION, et al.    Pg 468 of 468    BRANDON AEBERSOLD
July 10, 2019

78:22
**18 (1)**
 18:2
**19 (3)**
 44:10,11;57:18
**1k (1)**
 79:7

---

## 2

**2 (4)**
 34:8,13;38:14;79:2
**20 (4)**
 80:4;81:6,23,24
**2018 (7)**
 50:12,16;54:16,20;
 56:11;57:6;74:23
**2019 (7)**
 10:23,25;20:16;34:9,
 15;72:6;78:12
**21 (5)**
 68:23;84:6,17,22;
 86:20
**212-218-4646 (1)**
 5:11
**212-310-8210 (1)**
 3:9
**212-872-8114 (1)**
 3:18
**22 (2)**
 71:9,10
**23 (10)**
 15:10;23:8;24:20;
 54:15,20;56:6;72:24;
 78:11;87:23;88:7
**27 (2)**
 10:23,25
**2L (1)**
 76:15

---

## 3

**3 (4)**
 27:12,24;54:14,18
**30 (1)**
 9:18
**35 (1)**
 28:12
**350 (1)**
 57:12
**36 (1)**
 28:12

---

## 4

**4 (4)**
 27:12;78:7,14,18
**433 (2)**
 33:10;34:6

---

## 5

**5 (3)**

17:19;28:11;41:19
**5.2 (1)**
 33:14
**50 (1)**
 89:5
**506c (1)**
 12:21
**507 (1)**
 40:12
**507b (11)**
 11:8;12:10,14,18,23;
 29:8,19;36:8;38:6,16;
 40:17
**55 (2)**
 19:11,13

---

## 6

**620 (1)**
 5:7

---

## 7

**7 (9)**
 17:10,20;42:14,18;
 43:2,6,15;56:24;72:6
**767 (1)**
 3:6

---

## 8

**8 (10)**
 41:19,20;44:5;68:24;
 91:6,10,16;92:18;93:7;
 94:3