**Presentment Date and Time: September 10, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: September 9, 2019 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objections Filed): October 23, 2019 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
In re                                     :         **Chapter 11**
                                          :
**SEARS HOLDINGS CORPORATION,** *et al.*, :         **Case No. 18-23538 (RDD)**
                                          :
          **Debtors.**[1]                 :         **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## NOTICE OF PRESENTMENT OF STIPULATION,
## AGREEMENT, AND ORDER APPROVING
## <u>SETTLEMENT AGREEMENT AND MUTUAL RELEASE</u>

**PLEASE TAKE NOTICE** that Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), will present the *Stipulation, Agreement, and Order Approving Settlement Agreement and Mutual Release* (the "**Proposed Stipulation**") to the Honorable Robert D. Drain, United States Bankruptcy Judge, for signature on **September 10, 2019 at 10:00 a.m.(Eastern Time)**.  A copy of the Proposed Stipulation is attached hereto as **<u>Exhibit 1</u>**.

**PLEASE TAKE FURTHER NOTICE** that, unless a written objection to the Proposed Stipulation is served and filed with proof of service with the Clerk of the Court, and a courtesy copy is delivered to the undersigned and to the chambers of the Honorable Robert D. Drain, so as to be received by **September 9, 2019 at 4:00 p.m. (Eastern Time)**, there will not be a hearing to consider the Proposed Stipulation, and the Proposed Stipulation may be signed and entered by the Court.

**PLEASE TAKE FURTHER NOTICE** that, if a written objection is timely filed and served with respect to the Proposed Stipulation, a hearing (the "**Hearing**") will be held to consider such Proposed Stipulation before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **October 23, 2019 at 10:00 a.m. (Eastern Time)**.

2

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing and failure to appear may result in relief being granted upon default.

Dated:  September 3, 2019
      New York, New York

                      /s/ Jacqueline Marcus
                      WEIL, GOTSHAL & MANGES LLP
                      767 Fifth Avenue
                      New York, New York  10153
                      Telephone:  (212) 310-8000
                      Facsimile:  (212) 310-8007
                      Ray C. Schrock, P.C.
                      Jacqueline Marcus
                      Garrett A. Fail
                      Sunny Singh

                      *Attorneys for Debtors*
                      *and Debtors in Possession*

WEIL:\97056033\6\73217.0004

**<u>Exhibit 1</u>**

**Proposed Stipulation**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                        :
In re                                   :        **Chapter 11**
                                        :
**SEARS HOLDINGS CORPORATION**, *et al.*,  :        **Case No. 18-23538 (RDD)**
                                        :
        Debtors.[1]                     :        **(Jointly Administered)**
                                        :
---------------------------------------------------------------x

### STIPULATION, AGREEMENT, AND ORDER APPROVING
### SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This stipulation, agreement, and proposed order (the "**Stipulation, Agreement, and Order**") is entered into by and among Sears Holdings Corporation ("**Sears Holdings**"), Sears, Roebuck and Co. (together with Sears Holdings, "**Sears**"), BRE 312 Owner LLC ("**BRE 312**"), and 233 S. Wacker LLC ("**233**"). Sears, BRE 312, and 233 collectively are referred to in this Stipulation, Agreement, and Order as the "**Parties**," and each as a "**Party**." The Parties hereby stipulate and agree as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**RECITALS**

A.      Beginning on October 15, 2018, Sears Holdings, and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      BRE 312 is the owner of that certain building located at 233 S. Wacker Drive, Chicago, Illinois and commonly known as Willis Tower ("**Tower**"), which BRE 312 or its affiliate acquired from 233 through a Sale-Purchase Agreement, dated March 13, 2015.

C.      On or about July 1, 2013, Sears and 233 entered into a Settlement Agreement and Mutual Release (as amended) in settlement of a dispute between Sears and 233 regarding their respective ownership interests and rights in a mechanical, three-dimensional sculptural work of art created by Alexander Calder, entitled and commonly known as "The Universe" (the "**Calder Sculpture**"), which was then located in the entrance lobby of the Tower.

D.      In or about April 2017, BRE 312 caused the Calder Sculpture to be disassembled, removed from the Tower lobby, transported to a storage facility operated by US Art Co., and stored at said storage facility, where the Calder Sculpture currently remains.   In furtherance thereof, BRE 312 entered into certain contracts with third-parties (the "**Contracts**").

E.      On April 30, 2019, BRE 312 filed the *Motion of BRE 312 Owner LLC for Relief from Automatic Stay* (ECF No. 3435) (the "**BRE 312 Motion**"), seeking entry of an order modifying the automatic stay extant in the Debtors' chapter 11 cases pursuant to section 362 of

2

the Bankruptcy Code (the "**Automatic Stay**") to allow BRE 312 to conduct a public auction of the

Calder Sculpture without the Debtors' or 233's consent.

       F.      On May 16, 2019, the Debtors filed the *Objection of Debtors to Motion of*

*BRE 312 Owner LLC for Relief from Automatic Stay* (ECF No. 3917) opposing the BRE 312

Motion.  On May 16, 2019, 233 filed *233 S. Wacker's Objection to Motion of BRE 312 Owner*

*LLC for Relief from Automatic Stay* (ECF No. 3906) opposing the BRE 312 Motion.

       G.      The Parties have agreed, subject to approval by the Bankruptcy Court, to

resolve the BRE 312 Motion by entering into the Settlement Agreement and Mutual Release

Agreement, dated August 28, 2019 (the "**Settlement Agreement**") which provides for, *inter*

*alia*, the assignment of the Contracts from BRE 312 to 233 in exchange for certain releases.

A copy of the Settlement Agreement is attached hereto as **Exhibit A**.

       **NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE
INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT HEREBY IS
STIPULATED AND AGREED, BY AND AMONG THE PARTIES, THROUGH THE
UNDERSIGNED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED
THAT:**

       1.      This Stipulation, Agreement, and Order shall have no force or effect unless

and until it is approved by the Bankruptcy Court (the date of such approval shall be the "**Effective**

**Date**").

       2.      The Debtors are authorized to enter into the Settlement Agreement and

perform the obligations contained therein.

       3.      Upon the Effective Date, the Settlement Agreement shall be deemed

approved and shall become binding upon and enforceable against the Parties.

       4.      Upon the Effective Date, the BRE 312 Motion shall be deemed withdrawn

and all potential arguments set forth therein shall be deemed resolved.

5.      Each person who executes this Stipulation, Agreement, and Order on behalf of a Party hereto represents that he or she is duly authorized to execute this Stipulation, Agreement, and Order on behalf of such Party.

6.      This Stipulation, Agreement and Order may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation, Agreement and Order to present any copies, electronic copies, or facsimiles signed by the Parties.

7.      Notwithstanding the applicability of Bankruptcy Rule 4001(a)(3), the terms and provisions of this Stipulation, Agreement, and Order shall be effective and enforceable immediately upon the Effective Date, and shall thereafter be binding upon the Parties hereto and their respective affiliates, successors, and assigns.

8.      The Bankruptcy Court shall retain jurisdiction to resolve any disputes or controversies arising from this Stipulation, Agreement, and Order.

*[Remainder of Page Intentionally Left Blank]*

4

IN WITNESS WHEREOF, this Stipulation, Agreement and Order has been executed and delivered as of the day and year first below written.

Dated: September 3, 2019

WEIL, GOTSHAL & MANGES LLP


By: /s/ Jacqueline Marcus
Jacqueline Marcus
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Debtors and Debtors in Possession*

Dated: September 3, 2019

GOULD & RATNER LLP


By: /s/ Matthew Olins
Matthew A. Olins
222 North LaSalle Street, Suite 300
Chicago, Illinois  60601
(312) 236-3003

*Attorneys for 233 S. Wacker LLC*

Dated: September 3, 2019

HAHN LOESER & PARKS LLP


By: /s/ Ian Fisher
Ian Fisher
125 S. Wacker Ave., Suite 2900
Chicago, Illinois 60606
(312) 637-3000

*Attorneys for BRE 312 Owner LLC*

**SO ORDERED:**


Dated: _____, 2019
        White Plains, New York


_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

5

## Exhibit A

**Settlement Agreement**

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE ("Agreement") is made as of this 28th day of August, 2019 ("Execution Date"), by and among BRE 312 OWNER LLC, a Delaware limited liability company ("Assignor"), SEARS, ROEBUCK and CO., a New York corporation ("Roebuck"), SEARS HOLDINGS CORPORATION, a Delaware corporation ("Holdings," and together with Roebuck, "Sears"), and 233 S. WACKER LLC, a Delaware limited liability company ("Assignee") (each, individually, a "Party," and, collectively, the "Parties").

RECITALS:

WHEREAS, Assignor is the owner of that certain building located at 233 S. Wacker Drive, Chicago, Illinois and commonly known as Willis Tower ("Tower"), which Assignor or its affiliate acquired from Assignee through a Sale-Purchase Agreement dated March 13, 2015 (the "Sale-Purchase Agreement"); and

WHEREAS, on or about July 1, 2013, Sears and Assignee entered into a Settlement Agreement and Mutual Release (as amended, the "Settlement Agreement") in settlement of a dispute between Sears and Assignee regarding their respective ownership interests and rights in a mechanical, three-dimensional sculptural work of art created by Alexander Calder, entitled and commonly known as "The Universe" (the "Calder Sculpture"), which was then located in the entrance lobby of the Tower; the Calder Sculpture, as installed prior to its removal from the eastern wall of the Wacker Street entrance of the Tower and prior to its dismantlement by Assignor as described below is pictorially shown on Exhibit A attached hereto; and

WHEREAS, Sears and Assignee are presently in a further dispute with respect to their respective rights and obligations under the Settlement Agreement, and are parties to that certain lawsuit filed by Sears in the Circuit Court of Cook County, Illinois on August 4, 2016 styled Case No. 2016-CH-10308, which concerns the Settlement Agreement (the "Pending Lawsuit"); and

WHEREAS, in or about April 2017, Assignor, with prior notice to each of Assignee and Sears, caused the Calder Sculpture to be dismantled, removed from the Tower lobby, transported to a storage facility operated by US Art Co., and to be stored at said storage facility, where the Calder Sculpture currently remains; in furtherance thereof, Assignor entered into certain contracts with third-parties including, without limitation, US Art Co. and Methods & Materials Inc. (the "Contracts"); and

WHEREAS, Assignee has insured the Calder Sculpture pursuant to certain policies of insurance issued by JT Specialty Limited ("Insurer") for the policy years (1) March, 27 2017 - March 27, 2018; (2) March 27, 2018 – March 27, 2019; (3) March 27, 2019 – March 27, 2020; and

WHEREAS, Assignor now desires to assign all of its rights in and obligations under, and the benefits of, the Contracts to Assignee, provided that Assignor receives certain releases; and

WHEREAS, Assignee is willing to so accept such assignment of the Contracts, and provide the releases of Assignor contained herein, provided that Sears consents to such assignment, Sears agrees to certain terms set forth herein, and Insurer has separately indicated to Assignee that it does not object to the releases contained herein; and

WHEREAS, Sears is willing to consent to the assignment of the Contracts to Assignee, provided that, among other terms, Assignee agrees to certain terms set forth herein; and

NOW, THEREFORE, in consideration of the foregoing, the mutual promises, covenants, representations and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Parties hereto, Assignor, Assignee and Sears hereby agree as follows:

1.    **Assignments of Contracts.**

a.    **M&M Contract.**  Assignor hereby assigns to Assignee all of its rights and benefits to and/or under that certain Independent Services Contract dated as of March 14, 2017 (the "M&M Contract") between Assignor and Methods and Materials, Inc. ("M&M"), including but not limited to any claims Assignor has, may have or may hereafter acquire as a result of damage to the Calder Sculpture, and/or the failure of performance of M&M, under or by reason of the M&M Contract. A copy of the M&M Contract is attached hereto as Exhibit B.  For sake of clarity and without limitation, Assignor assigns to Assignee any claims and rights of action against M&M, whether or not Assignor has such claims or rights for damage it suffered or has a right to seek contribution from M&M for damage claims asserted, or that ever could have been asserted, against Assignor. Assignor represents and warrants that all performance required by Assignor pursuant to the M&M Contract including, without limitation, any payment obligations, has been fully performed and completed, and Assignor has not received any written notice alleging the failure of Assignor to perform any of its obligations, agreements and/or covenants under the M&M Contract nor any claims M&M has against Assignor pursuant to the M&M Contract.  Provided that no additional liability nor cost is imposed upon Assignor by reason thereof, Assignor will reasonably cooperate with Assignee and will execute such reasonable documents (provided same are not inconsistent with the terms hereof), as may be reasonably necessary to effectuate the foregoing transfer of the rights and benefits assigned herein.  In addition, and without limiting the generality of the foregoing, within three (3) days after the Effective Date (defined herein), Assignor will provide to Assignee and Sears a true and correct copy of the initial full written report and all periodic written updates received from M&M pursuant to Section 4 of the M&M Contract.  Assignee hereby accepts the foregoing assignment and, to the extent same accrue from and after the date hereof, agrees to perform the obligations of Assignor under the M&M Contract as if Assignee had been the original counterparty thereto.

b.    **Storage Agreement.**  Assignor hereby assigns all of its rights and benefits to and/or under that certain Storage Agreement dated March 21, 2017 (the "Storage Agreement") between Assignor and U.S. Art CO. ("US Art").  A copy of the Storage Agreement is attached hereto as Exhibit C.  For sake of clarity and without limitation, Assignor assigns to Assignee any claims and rights of action against US Art Co. whether or not Assignor has such claims or rights for damage it suffered or has a right to seek contribution from US Art Co. for damage claims asserted, or that

ever could have been asserted, against Assignor.  Assignor represents and warrants that it has paid current monthly rent under the Storage Agreement through August 31, 2019, that it has fully performed all of its obligations, agreements and/or covenants under the Storage Agreement, and that it has not received any written notice alleging the failure of Assignor to perform any of the foregoing.  Assignee hereby accepts the foregoing assignment and, to the extent same accrue from and after the date hereof, agrees to perform the obligations of the Assignor under the Storage Agreement as if Assignee had been the original counterparty thereto.

     c.     Notwithstanding anything in this Agreement to the contrary, if:

     (i)     Sears hereafter acquires the Calder Sculpture (by reason of any court order or settlement in the Pending Lawsuit, or by reason of any assignment, conveyance or purchase from Assignee); and

     (ii)     Assignee assigns the M&M Contract, the Storage Agreement, or both, to Sears; and

     (iii)     Sears thereafter (A) alleges that it has a claim against Assignor arising out of or relating to damage to the Calder Sculpture that occurred while Assignor was in possession thereof that was not released under this Agreement, or (B) attempts to assert such an alleged claim; then

     (iv)     Sears shall immediately assign to Assignor any and all claims it may have for any and all breaches of the M&M Contract and the Storage Agreement that occurred during Assignor's possession of the Calder Sculpture (the "Contract Claims") and Sears shall have no right to assert or pursue the Contract Claims.

Assignee further agrees not to otherwise assign the Contract Claims during the pendency of the Pending Lawsuit.

2.     **Reconciliation of Amounts Payable to Assignor.**  As reimbursement to Assignor for certain amounts expended by Assignor under the M&M Contract, the Storage Agreement and for certain other costs and expenses incurred by Assignor in respect of the Calder Sculpture, there shall be paid by Assignee to Assignor the sum of $600,000, which amount shall be paid as follows:

     a.     concurrently with the execution and delivery hereof, Assignee shall pay to Assignor the sum of $50,000 by wire transfer of good funds to an account or accounts as directed by Assignor; and

     b.     the balance, being an amount of $550,000 (the "Holdback Amount"), shall be credited to Assignor by reason of prior release to Assignor of such $550,000 amount from certain holdback funds held by Assignor (or its affiliates) for the Final Apportionments pursuant to Article 7 of that certain Purchase Agreement dated as of March 13, 2015 (the "Tower Purchase Agreement") by and between Assignee and affiliates, as Seller, and BRE 312 Holdco LLC (an affiliate of Assignor), as Purchaser of the Tower.  In consideration for the assignments provided herein, Assignee, for and on behalf of itself and its affiliates referenced above,  hereby waives and releases any and all rights and/or claims (whether legal, equitable, known, unknown and/or absolute or contingent) in and to the Holdback Amount, and further hereby expressly releases Assignor and its affiliates referenced above from and against any obligation (whether express or

implied) for the return of and/or accounting of and/or for any and/or all claims for the Holdback Amount whatsoever.

3.    **Release of Assignor.**

(a)    **By Assignee.**  In addition to and not by way of limitation of the provisions of subparagraph b. below, Assignee, for itself and for any and all of its predecessors, officers, directors, employees, owners, successors, parents, subsidiaries, members, shareholders, beneficiaries, assigns, legal representatives, affiliates and any and all persons or entities claiming under any of the foregoing persons or entities, hereby fully, forever, irrevocably, and unconditionally remises, releases, forever discharges, and covenants not to sue Assignor, and any and all of its respective insurers, predecessors, successors, assigns, legal representatives, parent companies, affiliates, subsidiaries, holding companies, members, managers, directors, officers, shareholders, stockholders, attorneys, partners, employees, representatives, agents, trustees, subrogees, transferees, and individuals or entities subject to potential liability by or through the actions or conduct of any of the foregoing released persons or entities and/or individuals or entities who, by or through their actions or conduct, potentially subject any of the foregoing released persons or entities to liability, and any and all of their respective predecessors, successors, and assigns, individually and collectively, of, from, on account of, or in connection with any and all events, actions, causes, causes of action, suits, debts, sums of money, accounts, reconcilings, bonds, bills, specialties, covenants, promises, variances, trespasses, damages, judgments, executions, claims, demands, credit memoranda and charges whatsoever, at law or in equity, whether presently known or unknown, whether matured, unmatured, potential or contingent, and whether in tort, in contract, or otherwise, which Assignee ever had, now has, or hereafter may have, from the beginning of time until the Effective Date (defined in paragraph 8 (p) below) which are related to or arise from Assignor's care, custody, control, conduct in possessing, displaying, removing, dismantling or causing to be dismantled, moved removed and/or stored, the Calder Sculpture, including, without limitation, any diminution of value by reason or in connection with or arising from, whether directly or indirectly, any such dismantling, removing moving, storing of the Calder Sculpture; provided, however, that the provisions of this paragraph:  (i) do not extend or apply to, or in any way limit or affect any rights or obligations under this Agreement; (ii) are not intended to release any third-parties against whom Assignor might assert claims for contribution in the event that Assignor were held liable for damage to the Calder Sculpture; and (iii) are not intended to release any claims Assignor has or may have against third parties – including, without limitation, US Art Co. and M&M – relating to the Calder Sculpture including, without limitation, any and all claims which are assigned pursuant to this Agreement (including, without limitation, any claims asserted for contribution in the event that Assignor were held liable for claims relating to the Calder Sculpture).  The release in this paragraph (a) is a condition precedent of all rights and obligations of Assignor under this Agreement and if such release is not given, this Agreement is null and void.

(b)    **By Sears.**  In addition to and not by way of limitation of the provisions of subparagraph (a) above, Sears, for itself and for any and all of its predecessors, officers, directors, employees, owners, successors, parents, subsidiaries, members, shareholders, beneficiaries, assigns, legal representatives, affiliates, and any and all persons or entities claiming under any of the foregoing persons or entities, hereby fully, forever, irrevocably, and unconditionally remises,

releases, forever discharges, and covenants not to sue Assignor, and any and all of its respective insurers, predecessors, successors, assigns, legal representatives, parent companies, affiliates, subsidiaries, holding companies, members, managers, directors, officers, shareholders, stockholders, attorneys, partners, employees, representatives, agents, trustees, subrogees, transferees, and individuals or entities subject to potential liability by or through the actions or conduct of any of the foregoing released persons or entities and/or individuals or entities who, by or through their actions or conduct, potentially subject any of the foregoing released persons or entities to liability, and any and all of their respective predecessors, successors, and assigns, individually and collectively, of, from, on account of, or in connection with any and all events, actions, causes, causes of action, suits, debts, sums of money, accounts, reconcilings, bonds, bills, specialties, covenants, promises, variances, trespasses, damages, judgments, executions, claims, demands, credit memoranda and charges whatsoever, at law or in equity, whether presently known or unknown, whether matured, unmatured, potential or contingent, and whether in tort, in contract, or otherwise, which Sears ever had, now has, or hereafter may have, from the beginning of time until the Effective Date arising from any diminution in value of the Calder Sculpture caused by the fact that it is no longer assembled and on display in the Tower, but is disassembled and in storage; provided, however, that the provisions of this paragraph: (i) do not extend or apply to, or in any way limit or affect any rights or obligations under this Agreement; (ii) are not intended to, and do not, release any claims Sears has or may have against third parties – including, without limitation, US Art Co. and M&M – relating to the Calder Sculpture; and (iii) are not intended to, and do not, release any claims that Sears has or may have against Assignee including, without limitation, those it has asserted in the Pending Lawsuit.

4.    **Release by Assignor**.  In addition to and not by way of limitation of the provisions of paragraph 3(a) above, Assignor, for itself and for any and all of its predecessors, officers, directors, employees, owners, successors, parents, subsidiaries, members, shareholders, beneficiaries, assigns, legal representatives, affiliates,  and any and all persons or entities claiming under any of the foregoing persons or entities, hereby fully, forever, irrevocably, and unconditionally remises, releases, forever discharges, and covenants not to sue Assignee, Sears, and any and all of their respective insurers, predecessors, successors, assigns, legal representatives, parent companies, affiliates, subsidiaries, holding companies, members, managers, directors, officers, shareholders, stockholders, attorneys, partners, employees, representatives, agents, trustees, subrogees, transferees, and individuals or entities subject to potential liability by or through the actions or conduct of any of the foregoing released persons or entities and/or individuals or entities who, by or through their actions or conduct, potentially subject any of the foregoing released persons or entities to liability, and any and all of their respective predecessors, successors, and assigns, individually and collectively, of, from, on account of, or in connection with any and all events, actions, causes, causes of action, suits, debts, sums of money, accounts, reconcilings, bonds, bills, specialties, covenants, promises, variances, trespasses, damages, judgments, executions, claims, demands, credit memoranda, liens in or to the Calder Sculpture and charges whatsoever, at law or in equity, whether presently known or unknown, whether matured, unmatured, potential or contingent, and whether in tort, in contract, or otherwise, which Assignor ever had, now has, or hereafter may have, from the beginning of time until the Effective Date arising from or related to the Calder Sculpture and any claims arising from Assignor's care, custody, control, conduct in possessing, displaying, removing, dismantling or causing to be dismantled, moving or causing to be removed and/or storing or causing to be stored, the Calder Sculpture; provided, however, that

the provisions of this paragraph do not extend or apply to, or in any way limit or affect any rights or obligations under this Agreement.

5.    **Complete Defense.**  If any of the releasors hereafter sues any releasee for the purpose of enforcing any claims that are released under this Agreement, this Agreement, when pleaded, shall be and constitute a complete defense and bar thereto, and such releasee(s) shall be entitled to recover damages from such releasor(s) (which shall include but not be limited to reasonable attorneys' expenses and attorneys' fees) and/or to receive a declaratory judgment and/or an injunction against conduct or litigation that violates or threatens to violate this Agreement.

6.    **Withdrawal of Assignor's Motion/Claims.**  Within three (3) business days after the Effective Date, Assignor shall:  (a) withdraw any proofs of claim it has filed in the Sears bankruptcy proceeding, captioned *In Re: Sears Holding Corp., et al.*, Case No. 18-23538 (RDD) (the "Bankruptcy Proceeding"), pending in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), arising from or relating to the Calder Sculpture; and (b) withdraw its Motion for Relief From Automatic Stay that it filed in said Bankruptcy Proceeding, with prejudice.  Assignor agrees to indemnify and hold harmless Assignee and Sears from any claims arising out of any and all liens asserted and/or recorded by Assignor in relation to the Calder Sculpture.  Assignor represents and warrants that it has not filed any UCC financing statements in any jurisdiction with respect to the Calder Sculpture.

7.    **Agreements by and between Sears and Assignee.**

    (a)    Sears consents to the assignments provided for herein and the transfer of possession of the Calder Sculpture to Assignee subject to the following conditions and covenants, which are agreed to and acknowledged by Assignee: (i) Assignee will not remove, cause to be removed, or acquiesce in the removal of, the Calder Sculpture from its present location  pending the full and final resolution of the Pending Lawsuit without an order from a court of competent jurisdiction (which the Parties agree shall include the Circuit Court of Cook County, Illinois) or further written agreement with Sears; (ii) Assignee will fully and timely perform all of its obligations under the Storage Agreement; (iii) Assignee will notify Sears as soon as practicable after Assignee becomes aware of an actual, claimed or threatened breach of the Storage Agreement; (iv) Assignee will continue to insure the Calder Sculpture, will provide proof thereof to Sears upon demand, and will notify Sears as soon as practicable after Assignee because aware of an actual, claimed or threatened lapse in coverage, or breach or default thereunder, or actual or suspected damage to the Calder Sculpture, or an insurance claim made; (v) Assignee will use reasonable efforts to prevent any liens or other encumbrances on the Calder Sculpture, and will notify Sears as soon as practicable upon learning of same; (vi) Assignee will pay all expenses associated with storage, subject to Assignee's right to seek reimbursement from Sears, claim some or all of those amounts as damages against Sears in the Pending Lawsuit, and Sears's right to dispute same; and (vii) Assignee and Sears may visually inspect the Calder Sculpture while it is in storage, but only on a mutually agreed dates and times, consented to in writing, and only if both Assignee and Sears, or their respective agents, can be present for the inspection or otherwise agree in writing.

    (b)    Sears and Assignee agree that Assignee is entitled to seek reimbursement from Sears, or claim as damages against Sears, the amounts paid to Assignor described herein in the

Pending Lawsuit, and that Sears will not assert a defense under the voluntary payment doctrine; provided, however, that (i) any such claims, and the enforcement or collection of any judgment thereon, shall be subject to that certain Stipulation, Agreement, And Order Granting Limited Relief From The Automatic Stay (233 S. Wacker, LLC) entered by the Bankruptcy Court on April 2, 2019 (Doc. 3019); and (ii) Sears is entitled, and reserves its right, to assert any and all other arguments and defenses that Assignee is not entitled to such damages from Sears.  Nothing shall be deemed to limit Assignee's right to seek payment in the Bankruptcy Proceeding of amounts it is awarded in the Pending Lawsuit, nor the Bankruptcy Proceeding debtors' right to object to same on any grounds.

8.      **Miscellaneous.**

a.      Binding Effect.  The Parties acknowledge that the assignments hereby granted and the conditions herein contained shall inure to the benefit of and be binding upon the Parties hereto and their successors and assigns.  For the avoidance of doubt, this agreement (and any claims arising hereunder) shall be binding on any debtor, reorganized entity, trust, trustee, or any other entity that is, or is formed as, a successor to Sears in its Bankruptcy Proceeding.

b.      Authority; No Conflict.  Subject to the Bankruptcy Court approval required by paragraph 8p. hereof, Assignor, Assignee and Sears represent and warrant to each other that each has full authority to grant the rights provided hereunder and that this Agreement and such rights do not violate and are otherwise not prohibited by any covenant, condition, restriction, license, obligation, permit, dedication or other obligation of any kind applicable to such party.

c.      No Reliance.  Each Party hereto represents and warrants that, in entering into this Agreement, it has not relied on any representations by or on behalf of any other Party, other than those representations expressly set forth in writing in this Agreement

d.      Complete Agreement.  This Agreement contains the entire agreement of the Parties with respect to this subject matter and supersedes all prior or contemporaneous writings or discussions relating to the subject matter hereof.  This Agreement may not be amended except by a written document executed after the date hereof by Assignor, Assignee and Sears. Notwithstanding anything herein to the contrary: (i) Assignor and Assignee may modify the terms of paragraphs 2, and (3(a)) without the agreement of Sears; and (ii) Assignee and Sears may modify the terms of paragraph 7 without the agreement of Assignor.

e.      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The Parties agree that the use of facsimile or ".pdf" signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

f.      Headings.  The headings contained herein shall not be used to interpret the provisions hereof.

g.      Choice of Law/Choice of Forum.  This Agreement shall be construed under and governed by the laws of the State of Illinois without regard to its choice of law principles and any

action to enforce the terms and provisions of this Agreement shall be brought only in a federal or state court having jurisdiction over such matters in Cook County, Illinois, and the parties hereto submit to the jurisdiction of any such court, provided however any action or proceeding may also be brought before the Bankruptcy Court if necessary to effectuate the intent of the Parties under this Agreement.

     h.    <u>Waiver</u>.  Any Party's failure to enforce any provision hereof shall not constitute waiver thereof in any future instance. If any provision hereof is held to be unenforceable, the remaining provisions shall continue in full force and effect.

     i.    <u>Construction</u>.  This Agreement shall be deemed to have been jointly drafted by the Parties and any rule that an agreement shall be construed against the drafter shall not apply to this Agreement.  All Parties were represented by counsel of their choice in connection with the drafting of this Agreement.

     j.    <u>Attorneys' Fees – this Agreement</u>.  Each Party hereto shall be responsible for its own attorneys' fees and expenses related to the negotiation, drafting and execution of this Agreement.

     k.    <u>Attorneys' Fees -- Prevailing Party</u>.  In the event that there is any litigation arising out of or relating to this Agreement, the prevailing Party or Parties shall, in addition to any and all other relief, recover its attorneys' fees and costs.

     l.    <u>Ownership of Claims</u>.  Each Party hereto represents and warrants that it is the sole owner of any and all claims released hereunder, and that it has not sold, assigned, or in any way encumbered any such claims, in whole or in part, to any person or Party.

     m.    <u>No Admission</u>.  By execution of this Agreement or otherwise, no Party hereto is admitting that it did anything wrong or improper or that it has any legal liability to any other Party (other than liabilities arising under this Agreement), and no inference of wrong or improper conduct or legal liability shall be drawn against any Party by reason of its execution of this Agreement or otherwise.

     n.    <u>Intent to be Bound</u>.  Each Party represents and warrants that it has read and understands this Agreement; that he or it has consulted with and had advice of legal counsel with respect thereto; that this Agreement is executed and delivered as its free and voluntary act; and that it intends to be legally bound thereby

     o.    <u>Notice</u>.  All notices or other communications required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be effective upon transmission and may be transmitted only by e-mail, personal delivery, overnight delivery or certified mail, return receipt requested, as follows:

     If to Sears, to:

     Brian J. Griffith
     M-III Partners, LP
     130 West 42nd Street, 17th Floor

New York, NY 10036
*bgriffith@miiipartners.com*

With a copy to their lawyers:

Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
*jacqueline.marcus@weil.com*

Eric N. Macey
Courtney D. Tedrowe
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
*cdt@novackmacey.com*
*emacey@novackmacey.com*


If to Assignor, to:

Revantage Corporate Services
222 South Riverside Plaza, Suite 2000
Chicago, IL  60606
Attn:   David Moore
          Alec Rubenstein
*Moore@equityoffice.com*
ARubenstein@revantage.com

With a copy to their lawyers:

Joel T. Cooper
Ian H. Fisher
HAHN, LOESER & PARKS LLP
125 S. Wacker Dr., Ste. 2900
Chicago, IL 60606
*JCooper@hahnlaw.com*
*IFisher@hahnlaw.com*


If to Assignee, to:

Joseph Chetrit
The Chetrit Group, LLC
512 Seventh Avenue

9

15th Floor
New York, NY  10018

Steve Bederman
Moinian
3 Columbus Circle
26th Floor
New York, NY  10019

With a copy to their lawyers:

David Arnburg
GOULD & RATNER LLP
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601

Any Party may at any time change the addresses for notices to such Party by providing a notice in the manner set forth above in this paragraph.

p.      Bankruptcy Court Approval.  **This Agreement shall not have any force or effect unless it is approved by the Bankruptcy Court after appropriate notice and a hearing and the date of approval shall be the "Effective Date" of this Agreement**.  The Parties agree to use reasonable commercial efforts to seek Bankruptcy Court approval at the next available omnibus hearing date scheduled in the Bankruptcy Proceeding.

9.      **Nominal Defendant Release Exception.**    Notwithstanding any provision of this Agreement to the contrary, Assignor may be sued by Assignee as a nominal defendant if necessary for Assignee to pursue or collect any claims assigned under this Agreement, provided that Assignee does not attempt to collect or enforce any judgment against Assignor for any claims released under this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Execution Date.

[Signature page follows]

ASSIGNOR:

BRE 312 OWNER LLC,
a Delaware limited liability company


By: _____
Name: David Moore
Title: Senior Vice President—Portfolio Director

ASSIGNEE:

233 S. WACKER LLC, a Delaware limited liability company

By:_____
Name:  Meyer Chetrit
Title:  Vice President and Secretary

SEARS:

SEARS, ROEBUCK AND CO., a New York
corporation

By: _____
Name: Moshin Meghji
Title:   Chief Restructuring Officer

SEARS HOLDINGS CORPORATION, a Delaware
corporation

By: _____
Name: Moshin Meghji
Title:   Chief Restructuring Officer

ASSIGNOR:

BRE 312 OWNER LLC,
a Delaware limited liability company

By: _____
Name: David Moore
Title: Senior Vice President—Portfolio Director

ASSIGNEE:

233 S. WACKER LLC, a Delaware limited liability company

By: _____
Name:  Meyer Chetrit
Title:  Vice President and Secretary

SEARS:

SEARS, ROEBUCK AND CO., a New York
corporation

By: _____
Name: Moshin Meghji
Title:   Chief Restructuring Officer

SEARS HOLDINGS CORPORATION, a Delaware
corporation

By: _____
Name: Moshin Meghji
Title:   Chief Restructuring Officer

ASSIGNOR:

BRE 312 OWNER LLC,
a Delaware limited liability company

By: _Joseph Valace_

Name: ~~David Moore~~  Joseph Valane

Title: ~~Senior Vice President - Portfolio Director~~  Vice President and Associate GC

ASSIGNEE:

233 S. WACKER LLC, a Delaware limited liability company

By:_____
Name:  Meyer Chetrit
Title:  Vice President and Secretary

SEARS:

SEARS, ROEBUCK AND CO., a New York
corporation

By: _____
Name: Moshin Meghji
Title:   Chief Restructuring Officer

SEARS HOLDINGS CORPORATION, a Delaware
corporation

By: _____
Name: Moshin Meghji
Title:   Chief Restructuring Officer

EXHIBIT A
THE CALDER SCULPTURE



Alexander Calder (1898 – 1976) • The Universe, 1974

EXHIBIT B

<u>M&M AGREEMENT</u>

[SEE ATTACHED]

ORIGINAL

## INDEPENDENT SERVICES CONTRACT

This Independent Services Contract ("**Contract**") is made as of the Effective Date set forth in Article II below.  In consideration of the mutual promises made herein, the parties agree as follows:

### I.        PARTIES

BRE 312 Owner LLC, a Delaware limited
liability company, HEREINAFTER
REFERRED TO AS "**BRE Owner**"
CONTACT NAME:  Gary Michon
ADDRESS 1:  233 S. Wacker Dr.,
Suite 3530
ADDRESS 2:  Chicago, IL 60606
TELEPHONE: (312) 875-3679
FAX: (312) 906-1118
EMAIL:  gary_michon@equityoffice.com

FULL   LEGAL   NAME   OF   CONTRACTOR:
Methods  &  Materials,  Inc.,   HEREINAFTER
REFERRED TO AS "**CONTRACTOR**"
TYPE OF BUSINESS: Art Rigging and Installation
STATE OF BUSINESS REGISTRATION: IL
CONTACT NAME:  Roger Machin
ADDRESS 1: 1749 N. Harding
ADDRESS 2: Chicago, IL 60647
FEIN or TAX ID#: 36-3797648
TELEPHONE: (773) 772-2100
FAX: (773)772-2121
EMAIL:  office@methodsandmaterials.com

### II. TERMS AND CONDITIONS OF THE CONTRACT

1.    Services to be Performed by Contractor; Duties and Obligations.

   a.    **Specific Services**.  Contractor's duties (the "**Services**") are set forth in the attached <u>Exhibit A</u>.

   b.    **Payment Terms**.  The amount and terms of payment for the Services.  Unless otherwise stated in <u>Exhibit B</u>, a lump sum payment shall be due within sixty (60) days after full and satisfactory completion of the Services, provided that BRE Owner has received or has on file a valid United States Internal Revenue Service Form W-8 or W-9, as appropriate, completed by the Contractor as well as any and all lien releases.

   c.    **Method of Performing Services**.  Contractor will determine the method, details, and means of performing the Services.  Contractor accepts the relationship of trust and confidence established with BRE Owner by this Contract and covenants with BRE Owner to exercise the highest degree of skill, care and judgment in furthering the interest of BRE Owner and in performance of the Services.    Contractor shall use the Contractor's best efforts to perform the Services in an expeditious and economical manner consistent with the interests of the Owner.

   d.    **Additional Terms and Conditions.** The additional terms and conditions set forth in <u>Exhibit C</u> hereto are hereby incorporated by reference as if fully set forth herein.

   e.    **Tools and Instrumentalities; Warranty**

      i.    Except as may be specifically stated in <u>Exhibit A</u>, Contractor will supply all labor, tools, materials, products, goods, and equipment required to perform the Services.  Contractor warrants to BRE Owner that all materials, products, goods and equipment furnished under this Contract will be of good quality, free from defects and deficiencies and in accordance with the highest applicable industry standards, suitable for their intended purposes.

      ii.    In the event that Contractor uses any equipment owned by BRE Owner in the performance of the Services, including, but not limited to any equipment specifically stated in <u>Exhibit A</u>, Contractor does so at its own risk, taking the equipment "AS IS" WITH NO REPRESENTATION OR WARRANTY OF ANY KIND FROM BRE OWNER. Contractor represents and warrants to BRE Owner that Contractor, any subcontractors, representatives or agents, have examined such equipment and determined that it is in proper working order as well as appropriate and suitable to the use that Contractor, any subcontractors, representatives or agents seek to make of it. Contractor further represents and warrants to BRE Owner that Contractor, any subcontractors, representatives or agents are trained in the proper use of such equipment.  Any such use of any BRE Owner

1

equipment shall not in any way modify or limit the responsibility of the Contractor pursuant to other provisions of the Contract.

f.    **Compliance with Laws; Obtaining Permits**.  In performing the Services under this Contract, Contractor shall comply with all applicable laws, rules, regulations, ordinances, codes and/or orders, judgments or decrees of Federal, State, Department, City or local government, court or tribunal and any other governmental entity having jurisdiction over such services or this Contract. Contractor shall, with all due diligence, secure and pay for all permits, licenses and inspections necessary for proper execution and completion of the Services.

g.    **BRE Owner Procedures and Operations**.  Contractor shall perform the Services in accordance with all rules, procedures and protocols of BRE Owner and in a manner that will not unreasonably interfere with BRE Owner's normal operations.  If required by BRE Owner, Contractor (including any and all employees) shall submit to a background check and the completion of such check to the satisfaction of BRE Owner shall be a necessary precondition of this Contract.

h.    **Confidentiality**.  Contractor may have access to and become acquainted with confidential information, consisting of management, financial, security and operational materials, and methods and processes, and compilations of information, records and specifications of BRE Owner, which are owned by BRE Owner and which are regularly used in BRE Owner' operations.  Contractor may also learn of or participate in discussions or decisions of BRE Owner.  Contractor acknowledges and agreed with Owner that all such information is secret and confidential.  Contractor shall not disclose any such information, directly or indirectly, or use it in any manner during the term of its engagement with BRE Owner or at any time thereafter, except as required for the performance of the Services in accordance with this Contract.  All files, records, documents, drawings, specifications, equipment and similar items relating to BRE Owner or its operations shall remain the property of BRE Owner, shall be treated in a confidential manner by Contractor so as to safeguard its confidential and proprietary nature, and shall be returned to Owner upon termination of the engagement of Contractor by BRE Owner or upon earlier request of BRE Owner.  This provision shall not apply to court orders or other legal requirements to disclose information nor shall Contractor have obligations with respect to information that has otherwise become public.

i.    **Insurance**.

During the term of the Contract, Contractor shall provide and maintain at its own expense the insurance coverages and requirements specified below insuring all operations related to this Contract:

1.  Commercial General Liability: $1,000,000 each occurrence bodily injury and property damage; $1,000,000 personal and advertising injury, $2,000,000 products and completed operations aggregate; $2,000,000 general aggregate, on a per project basis:

a.    Completed operations coverage shall be maintained for a period of not less than 2 years following final completion of the Services; and

b.    Such policy must be further endorsed to:

(i)    Name BRE Owner, 233 S. Wacker LLC ("Former Owner") and Sears, Roebuck and Co. ("Sears") and as additional insureds using ISO forms CG 20 10 10 01 and CG 20 37 10 01;

(ii)    Contain a separation of insureds clause and shall not exclude or preclude coverage for claims brought by an additional insured against a named insured, and

(iii)    Delete any exclusions for explosion, collapse, or underground hazards.

2.  Automobile Liability and Mobile Equipment Coverage, if applicable: $1,000,000 combined single limit per accident for bodily injury and property damage.

3.  Workers Compensation: Coverage as required by law.

4.  Employer's Liability: $500,000 bodily injury by accident; $500,000 Disease-Each Employee; $500,000 Disease Aggregate.

2

5.  Rigger's Liability Insurance: $8,000,000 combined single limit per accident for bodily injury and property damage, which may be met through a combination of primary and excess Rigger's Liability coverage.

6.  Umbrella Liability Insurance:

(i)    Umbrella liability insurance in the Contractor's name with limits no less than Five Million Dollars ($5,000,000).

(ii)   The umbrella liability policy shall follow the form of the underlying insurance and provide coverage at least as broad as the coverage furnished under the underlying policies.

In the event any insurance coverage herein is in force with limits higher than, and coverage broader than, the minimum requirements stated above, such coverage shall apply and be made available to the Insured Parties (defined below).

i.    Contractor will furnish BRE Owner with original Certificates of Insurance evidencing the required overage to be in force during the term of this Contract, and Renewal Certificates of Insurance, or such similar evidence, if the coverages have an expiration or renewal date occurring during the term of this Contract.  The parties specified on Exhibit C hereto (collectively, the "**Insured Parties**") are to be specifically named as an additional insured on a primary, non-contributory basis, in the Commercial General Liability Policy, Automobile Liability Policy and Rigger's Liability Policy.  The certificates shall provide for 30 days' prior written notice to be given to BRE Owner in the event coverage is substantially changed, canceled, or non-renewed.

ii.   Any and all deductibles or self-insured retentions on such insurance shall be borne by Contractor, and Contractor shall cause its insurers to endorse all -policies of insurance to waive their rights of subrogation against the Insured Parties.  Unless otherwise agreed to in writing, insurance is to be placed with insurers who have a Best Insurance Reports rating of no less than A- and a financial size of no less than Class VIII, and who are authorized as an admitted insurance company in the State of Illinois.

iii.  Contractor shall require its subcontractors to purchase and maintain insurance of the same kind, terms and conditions as required of the Contractor under this Contract, with the exception that the amounts for the Commercial General Liability and Umbrella Liability shall be modified as follows:

Commercial General Liability:  $1,000,000 per occurrence, $2,000,000 products and completed operations, and $2,000,000 aggregate; and
Umbrella Liability:  $2,000,000 per occurrence.

If Contractor's subcontractor(s) provides professional services, subcontractor(s) shall maintain professional liability coverage with limits of not less than $2,000,000 for a period of no less than 3 years after completion of the Services.  The Contractor agrees that it will promptly advise BRE Owner in the event that any subcontractor which it wishes to retain is unable to obtain such requisite insurance coverages and will obtain BRE Owner prior written approval of any deviations in such insurance coverages prior to entering into an agreement with such subcontractor which approval shall not be unreasonably withheld or delayed. The Contractor agrees that it will contractually obligate subcontractors to promptly advise the Contractor of any changes or lapses of the requisite insurance coverages and the Contractor agrees to promptly advise BRE Owner of same.

iv.   BRE Owner shall not insure nor be responsible for any loss or damage to tools, equipment or other property of any kind owned, rented or leased by Contractor, subcontractors, or their respective employees or agents.  Contractor shall be responsible for any loss or damage to any such property owned, rented or leased by Contractor, subcontractors, or their respective employees or agents.  If Contractor, or its subcontractors, purchase insurance to cover loss or damage to such property, it shall contain a waiver of subrogation in favor of BRE Owner.

3

     v.     Non-conforming insurance shall not relieve Contractor of the obligation to provide insurance as specified herein and the existence of coverage shall in no way limit Contractor's liabilities and responsibilities specified within this Contract or by law.

j.     **Filming**. BRE Owner or, with BRE Owner's consent, Sears and/or Former Owner, and their agents may film the de-installation of the sculpture in the Willis Tower, and the movement, unloading and installation of the sculpture. Contractor hereby consents to such filming and use and performance of such film and further agrees to assist BRE Owner, Sears and/or Former Owner to obtain permission to film its employees and contractors involved in such process. Contractor hereby waives and relinquishes all rights and interests in any such film and any derivative work thereof, and acknowledges that all such rights shall vest solely in BRE Owner, Sears and/or Former Owner, as applicable.

2.    **Effective Date, Time for Performance of Work, Term and Termination**.

a.     **Effective Date**. This Contract shall be effective as of the date it is signed by BRE Owner and Contractor.

b.     **Time for Performance of Work**. The Services will be performed and, if applicable, the equipment delivered, on a schedule as directed by BRE Owner (the "**Approved Project Schedule**"). The parties acknowledge that the project performance dates and milestones set forth in Exhibit A hereto shall constitute the initial Approved Project Schedule. The Approved Project Schedule shall not be subject to further modification without the written direction or consent of BRE Owner, in BRE Owners' sole discretion.

c.     **Term**. The Services shall be completed within and by: March 27, 2017 – April 5, 2017. The Term of this Contract shall be from the Effective Date until the satisfactory completion of the Services.

d.     **Termination; BRE Owner Delay in Service Implementation**. BRE Owner may terminate this Contract immediately in the event that Contractor breaches any term of this Contract or, in the opinion of BRE Owner, is unable or fails to adequately provide the Services and/or, if applicable, deliver the equipment. If the contract is terminated by BRE Owner, the Contractor will be paid an amount which bears the same ratio to the total compensation as the Services satisfactorily performed bear to the total Services of the Contractor covered by this Contract, less compensation previously paid for such Services. In addition, if BRE Owner terminates this Contract or materially delays the implementation of the Contractor's services (which shall mean and include any modification in the commencement of on-site activities as provided in the Approved Project Schedule) other than due to receipt by BRE Owner of a court order prohibiting the removal of the Calder Sculpture, then Contractor shall be entitled to recover Contractor's actual costs related to such termination or delay (including without limitation termination costs or non-refundable costs under approved subcontracts, termination costs or non-refundable costs related to travel, and expended materials and site preparation costs). In the case of such termination or delay, Contractor shall not, however, be entitled to claim or receive any lost profits, lost opportunity costs or other consequential, special, incidental or indirect damages.

3.    **General Provisions**.

a.     **Indemnification and Release**.

     i.     To the extent permitted by law, Contractor agrees to indemnify, defend, and hold harmless the Insured Parties from and against all liabilities, claims, damages, costs (including court costs and reasonable attorney fees), and expenses of any nature whatsoever, whether known or unknown and whether direct or indirect, arising out of this Contract or the breach thereof by Contractor, its subcontractors, or their respective employees or agents, or in any way relating to the Services, including but not limited to any, claims for personal injury or death, error, omission, negligent act or intentional wrongdoing of any of them, or of anyone for whose acts they may be liable in the performance of the Services; provided, however, that the provisions of this section shall not be construed to require any indemnification which would make the provisions of this section void or unenforceable. The Contractor shall not be obligated to indemnify any

4

particular Insured Party if the liability, claim, demand, cost, loss, damage or expense was actually caused by such Insured Party's own gross negligence or willful misconduct.

ii.    To the extent permitted by law, Contractor hereby releases and discharges the Insured Parties from any and all liability, claims, losses, damages, or injuries (including personal injury or death) arising out of this Contract, its actions or the actions of Contractor, its subcontractors, or their respective employees or agents, or in any way relating to the Services.  Contractor acknowledges and agrees that Contractor bears the sole risk of any loss, claim, damage, or injury (including death) arising out of this Contract, its actions or the actions of its employees, subcontractors or agents, or in any way relating to the Services; provided, however, that the provisions of this section shall not be construed to require any release which would make the provisions of this section void or unenforceable.

iii.    In claims against any person or entity indemnified under this Contract by an employee of the Contractor, a subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

b.    **No Joint Venture or Employment Relationship**. This Contract shall not render Contractor or any of its employees, subcontractors or agents an employee, partner, agent of, or joint venturer with BRE Owner for any purpose.  Contractor is and will remain an independent contractor in its relationship to BRE Owner.  BRE Owner shall not be responsible for withholding taxes with respect to Contractor's compensation hereunder.  Contractor shall have no claim against BRE Owner hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.  Contractor shall not bind nor attempt to bind BRE Owner to any other contract and shall not hold itself out or claim to be acting as a servant, agent or employee of BRE Owner.  Contractor is not authorized to and shall not make or undertake any agreement, understanding, waiver or representation on behalf of BRE Owner.

c.    **Miscellaneous**. (i) This Contract sets forth the entire understanding of the parties hereto and supersedes all prior agreements, whether written or oral, regarding the subject matter hereof; (ii) this Contract may not be amended or modified except in a writing signed by each of the parties hereto; (iii) neither party shall assign this Contract or its rights and duties hereunder, or any interest herein, without prior written consent of the other party, and any such attempted assignment or delegation shall be void and shall automatically be deemed a material breach of this Contract; (iv) this Contract shall be construed according to the laws of the State of Illinois, without regard to its conflict of law provisions; (v) if any term or provision of this Contract shall be found to be void or contrary to law, such term or provision shall, but only to the extent necessary to bring this Contract within the requirements of law, be deemed to be severed from the other terms and provisions hereof and the remainder of this Contract shall be given effect as if the parties had not included the severed term; (vi) this Contract shall be binding on each party's heirs, successors-in-interest, and permitted assigns; (vii) any notices to be given hereunder by either party to the other shall be in writing and shall be delivered personally; or by a nationally recognized overnight express courier, postage prepaid; or by United States registered or certified mail, return receipt requested, postage prepaid; and addressed to the parties at the addresses appearing in the introductory paragraph of this Contract, but each party may change that address by written notice in accordance with this paragraph.  Notices delivered personally or by overnight courier service shall be deemed communicated as of the date of actual receipt; mailed notices shall be deemed communicated as of three (3) days after the date of mailing; and (viii) this Contract may be executed with any number of counterparts, each of which, when executed and delivered will constitute an original, but all such counterparts will constitute one and the same instrument.

[Signatures appear on the following page.]

5

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be duly executed as of the day and year indicated below.

BRE 312 OWNER LLC, a
Delaware limited liability company

METHODS AND MATERIALS, INC.

By: _____

By: _____

Name:  David Moore

Name:  CARMELLA SARACENO

Title:  Senior Vice President – Porfolio Director

Title:  President

Date:  March 14, 2017

Date:  March 14, 2017

EXHIBIT A
SCOPE OF WORK

**Project**: Deinstallation of Alexander Calder's *The Universe* sculpture (the **"Calder Sculpture"**) at its present location at Willis Tower, 233 S. Wacker Drive, Chicago, Illinois (the **"Property"**), and transportation to and safe and secure unloading and placement of the Calder Sculpture in a storage facility located at 4400 West Ohio Street, Chicago, IL and owned by the U.S. Art Co, or such other storage facility as may be identified by BRE Owner.

**Location and Dates**:  Willis Tower lobby deinstallation, transport and storage. Project dates:  March 27, 2017 – April 5, 2017.

**Project Dates**: (subject to adjustments requested and agreed to by BRE Owner in accordance with the Contract) Contractor will have all crate bases made in advance; some sides and lids will be pre-made and some made from scratch.  If there is a note in the below description of work indicating that a particular work item is to be completed by "others", Contractor will be responsible to coordinate that work in advance with BRE Owner.

Most of the sculpture sections will be wrapped and set on A-frames; Contractor will disassemble as needed to fit the sculpture sections into the freight elevator.

All Calder Sculpture components will go through the freight elevator except for the fiber glass helix component of Calder Sculpture that can be "screwed" out of the doors on Wacker Drive.

Monday 3/27:  Walk through with BRE Owner and BRE Owner representatives. Receive lift and mini crane; machines have non-marking tires, drive in from Franklin Street.  Deliver oversized crates via Franklin Street and tools to dock.  Begin work on Helix with gantry.  Crates go into restaurant (crate shop).  Standard Cartage delivers equipment.

Tuesday 3/28: Complete de-installation of Helix; wrap and store in crate shop until removal from building on Saturday (crate will be completed at Methods & Materials then delivered to U.S. Art).  Glass side panel at restaurant entrance to be removed in advance by others.

Wednesday 3/29:  Begin work on Hanging Sun.

Thursday 3/30:  Complete work on Hanging Sun and move into crate shop.  Bring motor components down for palletizing.

Friday 3/31:  Removal of pendulum component of Calder Sculpture; move into crate shop.

Prior to 8 AM on Saturday 4/1: Mantrap will be built by others at Franklin Street entrance and doors removed to accommodate removal of Helix element.

Saturday/Sunday 4/1 – 4/2: Contractor's crews collaborate to take down flags component of Calder Sculpture. Remove Helix from building on dollies through door on Franklin Street (Franklin Street doors and security bollards to be removed by others).  Remove oversized crates via Franklin Street door, load onto Contractor's trailer. Standard Cartage may continue to remove motors and deliver to crate shop for palletizing.

Monday 4/3: Remove 3 flowers; move into crate shop.  Lift and mini crane to be picked up.

Tuesday 4/4: Complete crating and start delivering to U.S. Art.

Wednesday 4/5: Complete deliveries to U.S. Art Co. Final cleanup.

9153343.1

**Description of work**: Contractor will disassemble, hoist, pack and load onto transport trucks the Calder Sculpture and associated parts at Willis Tower, and transport, unload, and secure the Calder Sculpture at the U.S. Art Co. storage facility. Contractor will perform the work in accordance with the above Project Dates schedule.

Photo Documentation of de-installation process and condition reporting to be done by Conservator approved by Calder Foundation (Litas Liparni Restoration Studio) and under the direction of Contractor. Litas Liparni Restoration Studio shall be responsible for all measuring, documentation, and other work described in its report attached hereto as <u>Schedule 1</u>. All work product of the Conservator shall be owned by BRE Owner, and Contractor shall provide for same in its agreements with the Conservator.

The Calder Sculpture's motors will brought to the crate shop by Standard Cartage. Contractor will bolt them to pallets and stack them as reasonable depending on how much steel comes with them.

Electrical shut off boxes will also be removed; this to be coordinated between Standard Cartage and Building Owner's Building Engineer.

All slat crates will be either covered in plastic or shrink wrapped.

- Motors and drives for three (3) flowers:

    All three (3) drive motors and accessories will be unbolted and removed from their respective mounting bases, then hoisted approx. 6'-16' to the floor of the "mechanical" space behind the lobby wall. Then hoisted or moved up a flight of eight (8) steps to access the actual staircase, then moved down the 14 steps to the 1st floor (restaurant level), where Contractor will access the freight elevators and move to the lobby level. Then move the motors and other drive equipment to the southwest "crating and packaging area".

- Motor and drive for the pendulum:

    The motor and drive for the pendulum are located in an "attic" in the stairway. Contractor will unbolt the motor, air cushion cylinders and accessories and lower through the small hatch to access the stairway. Then all parts and pieces will be moved down the 14 steps to the 1st floor (restaurant level), where Contractor will access the freight elevators and move to the lobby level. Then move the motors and other drive equipment to the southwest "crating and packaging area".

- Motor and drive for the flag:

    The motor and drive for the rotating flag are located directly below the display, mounted to the concrete ceiling. All parts and pieces will be lowered to the floor of the dock area, then to the freight elevators and move to the lobby level. Then move the motors and other drive equipment to the southwest "crating and packaging area". The top bearing for the flag is located above the lobby ceiling and will be evaluated with the entire crew to verify the best and safest methods as they will depend on the way it was assembled in place. These methods could not be evaluated while the flag is still in operation. Once the best method has been determined and taken place all of the pieces will be moved across the small catwalk and hoisted 20' to the floor of the area behind the lobby, then to the stairway, to the elevator, to the lobby and to the "crating and packaging area".

- Motor and drive for the rotating sphere (sun):

    The motor and drive for the rotating sphere located above the lobby ceiling and will be evaluated with the entire crew to verify the best and safest methods as they will depend on the way it was assembled in place. These methods could not be evaluated while the flag is still in operation. Once the best method has been determined and taken place all of the pieces will be moved across the small catwalk and hoisted 20' to the floor of the area behind the lobby, then to the stairway, to the elevator, to the lobby and to the "crating and packaging area".

- Motor and drive for the corkscrew (helix):

Exhibit A - 2

9153343.1

The motor and drive for the corkscrew (helix) is all located on the floor of the main lobby.  It will be dismantled and moved to the "crating and packaging area" where it will be securely stored until removal via Franklin Street on Saturday, April 1, 2017.

Contractor will unload from transport trucks, store and secure the Calder Sculpture in the storage facility designated by U.S. Art Co, which is expected to be within Row S, Section 6-10 of the U.S. Art Co. climate controlled storage area.  Contractor will place the Calder Sculpture in the storage area so that it is stable.

Contractor will handle and place the Calder Sculpture at the storage facility in accordance with the designs and specifications provided by BRE Owner, Richard Raymond Alasko, and/or any Calder Foundation representatives.

Contractor will provide the necessary crew, subcontractors, and equipment to perform the above work.

**Equipment**:

Contractor will provide all necessary equipment, including, but not limited to:

- Contractor equipment truck, trailer, gantries and rigging equipment for deinstallation, storage of the Calder Sculpture
- Transport of all associated parts of the Calder Sculpture
- Spyder Crane
- Crates and pallets for transport and storage
- The crate bases will be constructed in Contractor's shop and sculpture elements packed on site. Most of the sections will be in slat crates, except for Flower 1, which does not break down.
- Shafts and any other odd size components will be wrapped in plastic and foam.
- There will be a total of 8 crates for the sculpture sections, SUN (1), PENDULUM (1), FLOWERS (2), SPINE (2), and HELIX ENDS (2).

The motors can be palletized on to a number of 40" x 48" skids.

**Subcontractors**:
- Litas Liparini Restoration Studio
- Standard Cartage

**Materials Included in Services**:
All materials and consumables including, but not limited to, those that are required for transport, packing/unpacking, disassembly/assembly of the Calder Sculpture.

**Storage**:
Transport and storage of the Calder Sculpture packing and crating material.  Packing/crating material must be stored in a dry indoor environment.

**Permits:**
Contractor is responsible for obtaining and paying for all permits, including any permit acquisition fees, for crane, trucks and street and sidewalk closures.  Start time partially determined by permits (subject to adjustments requested and agreed to by BRE Owner); Contractor will advise BRE Owner on those dates.  Contractor will clean and remove all equipment after the deinstallation and storage.

# Litas Liparini Restoration Studio
## 823 Main Street Evanston, IL 60202
## 1 847 491 0110

Megan Rader

Project Coordinator

Methods and Materials

1749 N Harding

Chicago 60647                                             11/09/2016

**Conservation Reporting: Deinstallation The Universe by Alexander Calder**

**Schedule of works**

Introduction

Liparini Studio (LS) is to monitor and report on the deinstallation by Methods and Materials (M&M) of the artwork known as 'The Universe', by Alexander Calder, in March 2017.  The staff will include one full time conservator and one part time assistant appointed by LS to carry out work as specified on November 9, 2016 during full examination with M&M. That work will include condition and procedural notes with photo-documentation of all elements of the artwork including mechanical elements inside the ceiling and below the main ground floor. LS will undertake to digitally copy drawings of the artwork in the possession of M&M (Methods and Materials).  The reporting will include reference to the digital copies of the drawings and of images taken by LS with a full summary report of the process and all references and illustrations.  The reporting procedure shall include the following:

1.  Monitor and report on all aspects of the deinstallation process including:

    - Name and take accurate measurements (height, length/depth and width), of each mechanical element such as motors, with small element detail as necessary, prior to, during and after deinstallation, including prior to final packing and of the packed pallet. Make condition notes and additional reference markings on images and copy drawings. Take digital images at each of the three points with additional notes if hitherto unseen condition elements become apparent

    - Name and take measurements (height, length/depth and width), of each connective element (cables, steel bars, or other connecting parts), prior to, during and after deinstallation including prior to packing and of the packed crate or pallet. Make condition notes and additional reference markings on images and drawing copies. Take

digital images at each of the three points with additional notes if hitherto unseen condition elements become apparent

- Note and differentiate between (with assistance from in house electricians), the RPM (revolutions per minute), of existing electrically instigated movements for individual mobile elements. Take digital images of and label the relevant defining mechanism for each movement (pendulum, flower rotation, spine rotation etc.), where accessible. If inaccessible name and make notes of the location

- Name and take accurate measurements (height, diameter/depth and width), of each sculptural/decorative element, prior to, during and after deinstallation, including just prior to packing and of the packed crate. Make condition notes with additional reference markings on images and drawing copies. Take digital images at each of the three points with additional notes if hitherto unseen condition elements become apparent
  *Schedule for the procedure:    14 days*

  *Staff one full time and one part time conservator*


***Time must be allowed by Methods and Materials for the conservator to perform each element of condition reporting (note, digital image, reference marking) prior to continuation of the deinstallation process***


2. Compose and provide a full written report compiling the results, with photo-documentation and recommendations for future conservation treatment and installation requirements relating to conservation, where necessary




Jane Foley MA, ACR

November 9th 2016

9153343.1

EXHIBIT B
PAYMENT SCHEDULE

In consideration for the satisfactory performance of the Services, BRE Owner shall pay to Contractor up to a total fee of $222,515.00 as set forth below ("**Total Fee**"). In no event shall BRE Owner be responsible for any amount in excess of the Total Fee unless BRE Owner has agreed to such excess amount prior to such amount being incurred. Furthermore, in the event that the parties can reduce certain charges, the Total Fee will be reduced accordingly.

The details on component costs comprising this Total Fee are set forth below:

| Description | Estimated Cost |
| --- | --- |
| Labor for Deinstallation and transport of Calder Sculpture | $113,565.00 |
| On-site conservator for duration of project | $11,570.00 |
| Airfare, accommodations, and per diem for crew leader | $3,180.00 |
| Equipment truck for 10 days | $2,000.00 |
| Additional Equipment Subcontractors: Spyder Crane and Atrium Lift | $10,300.00 |
| Wrapping materials | $1,000.00 |
| Crating and transport to U.S. Art Co. | $57,500.00 |
| Insurance Premium for Excess Riggers Policy | $23,400.00 |
| TOTAL: | $222,515.00 |

Except as expressly provided above, all expenses incurred by the parties shall be the sole responsibility of the party who ordered the service or incurred the particular expense. Within one (1) business day after the Effective Date, BRE Owner agrees to provide Contractor with a partial payment of $74,171.67 (one-third of the total estimated costs) which shall be applied towards the amount of the Total Fee.

9153343.1

EXHIBIT C
ADDITIONAL TERMS AND CONDITIONS

1.      Insured Parties.  The "Insured Parties", where referred to in the Contract, shall mean and include all of the following:  Sears, Roebuck and Co., Sears Holdings Corporation, BRE 312 Owner LLC; BRE 312 Holdco LLC; Equity Office Management L.L.C.; 233 S. Wacker, LLC and their respective parent companies, corporations and/or partnerships and their owned, controlled, affiliated, associated, and subsidiary companies, companies, corporations, and/or partnerships and their respective agents, consultants, principles, partners, servants, officers, stockholders, directors, and employees.

2.      Additional Payment Terms.  BRE Owner's payment of the Total Fee, as set forth herein, shall be conditioned on Contractor's submission of a final invoice or pay application that shall include (i) Contractor's certification of the amount of the Total Fee, and (ii) such reasonable detail and supporting documentation as Owner may reasonably require, including without limitation copies of all invoices, bills and statements for the amounts requested, and carrier's and mechanic's lien waiver and release forms that conform to the requirements of the State of Illinois, signed by Contractor and all other parties who have provided labor, materials or services in connection herewith for whom payment is being requested and shall otherwise be in a form reasonably acceptable to BRE Owner.  The Total Fee includes all work Contractor has performed in removing the Calder Sculpture, including prior to entering this Contract and Contractor represents for the benefit of BRE Owner that it is not owed any further payment from BRE Owner. BRE Owner further acknowledges that the additional amount of $19,855.75 remains due and owing as full and complete compensation to Contractor for all costs, expenses and damages incurred by Contractor related to BRE Owner's rescheduling of the Work from January, 2017 to the current date.  Such additional amount shall be paid and remitted in full to Contractor with or prior to BRE Owner's first payment due hereunder.

3.      Care and Custody of Calder Sculpture.  Contractor acknowledges BRE Owner's intent that there be no gap in the legal control and custody of the Calder Sculpture during the period of Contractor's services hereunder.   Accordingly, Contractor agrees that Contractor's obligations with respect to care and safekeeping of the Calder Sculpture during its removal and transport shall not terminate until the Calder Sculpture has been delivered and securely stored, in its entirety, within the applicable storage facility to which the Calder Sculpture has been delivered.  Contractor shall be responsible for confirming and certifying, in form reasonably acceptable to BRE Owner, that all separately crated portions of the Calder Sculpture, if any, have been so delivered and stored, for providing BRE Owner with a detailed inventory carried out at such storage facility, and for obtaining suitable proof and receipt of such storage by the applicable storage provider.  In the event that Contractor's services include the reinstallation of the Calder Sculpture, Contractor shall be responsible for obtaining necessary certification (including without limitation any required certification from a party named in Paragraph 4 below) that such reinstallation has been performed and completed in accordance with all applicable requirements.

4.      Cooperation with Third Parties.  Contractor further acknowledges that, given the nature and location of the Calder Sculpture, its removal and transport under the Contract may be subject to additional rules and procedures, including without limitation (i) review of the disassembly, transport and storage of the Calder Sculpture by the Alexander Calder Foundation or other entities responsible for documenting its removal and condition, and (ii) Department of Homeland Security requirements for secure access and entry to the Willis Tower.  Contractor shall carry its services hereunder in strict compliance with all such rules and procedures as identified to Contractor by BRE Owner.

5.      Additional Provisions Regarding Subcontractors.

        a.      A "subcontractor" or "Subcontractor" is a person or entity (other than Contractor, an employee or officer of Contractor, or any affiliate of any of the foregoing) who has a direct

Exhibit C-1

contract or other arrangement with Contractor to perform a portion of the Services. Contractor may not enter into a contract or subcontract with itself, an employee or officer of Contractor, or any affiliate of any of such persons or entities to perform any portion of the Services. Any portion of the Services performed by any such person or entity shall be deemed for all purposes under this Contract to be performed by Contractor directly for BRE Owner under the Contract.

b.    Unless otherwise stated herein, the Contractor shall furnish in writing to BRE Owner the names of the Subcontractors for each of the principal portions of the Services. The Contractor shall not contract with any Subcontractor to whom the BRE Owner has made reasonable and timely objection. Contracts between the Contractor and Subcontractors shall require each Subcontractor, to the extent of the Services to be performed by the Subcontractor, to be bound to the Contractor by the applicable terms of this Contract, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by this Contract, assumes toward BRE Owner.

6.    Liens.

a.    Contractor shall make prompt payment for all labor, material and services used by Contractor in the performance of the Services. If a lien is filed against the Calder Sculpture or the Property, Contractor shall, at its expense, upon demand of BRE Owner, take all reasonable action to cause such lien to be released or discharged. If requested by BRE Owner, in addition to Contractor's other obligations hereunder, Contractor shall furnish all necessary lien waivers, affidavits or other documents required to keep the Property free from liens or claims for liens arising out of the furnishing of the Services, as payments are made from time to time or at any time under the Contract.

b.    Contractor, at its expense, shall indemnify, defend and hold the Insured Parties harmless from and against any claim, liability, action, lawsuit, proceeding, damage, loss or expense (including, without limitation, reasonable attorney's fees) asserted against or incurred by such Insured Party as a result of the filing of any lien or the service of any stop notice against or relating to the Services, the Property or any improvement thereon, any payment owing to the Contractor, or any funds or other property of such Insured Party.

7.    Time. Time limits stated in the Contract are of the essence of the Contract. By executing the Contract, the Contractor confirms that the Project Schedule, as provided in Exhibit A above, is a reasonable period for performing the Services, considering reasonably anticipated hindrances and delays, including, but not limited to, space constraints, the weather, and tenant concerns. The Project Schedule shall be kept updated to indicate and integrate proposed activity sequences and durations, milestone dates for receipt and approval of pertinent information and other relevant information. The Contractor shall promptly and continuously notify BRE Owner and shall keep all parties and activities on schedule. If the Contractor is delayed at any time in the commencement or progress of the Services by changes ordered in the Services made by BRE Owner or caused by labor disputes, fire, unusual delay in deliveries, abnormal adverse weather conditions not reasonably anticipatable, unavoidable casualties or any causes beyond the Contractor's control or by other causes which BRE Owner determines may justify delay, then the time for performance as set forth in the Project Schedule shall be extended by change order as reasonably required.

8.    Limitation of Liability. No general or limited partner, officer, director, principal, employee, agent, affiliate, subsidiary or shareholder of BRE Owner shall be personally liable for the performance of BRE Owner's obligations under this Contract. The liability of BRE Owner under the Contract shall be limited to BRE Owner's interest in the Calder Sculpture, and Contractor shall not look to any of BRE Owner's other assets for enforcement or satisfaction of any such obligation, nor shall Contractor seek recourse for such enforcement or satisfaction against any general or limited partner, officer, director, principal, employee, agent, affiliate, subsidiary or shareholder of BRE Owner.

Exhibit C-2

9.      <u>Additional Assignment Rights</u>. In addition to, and not in lieu of, any right of BRE Owner hereunder, BRE Owner shall have the right, at any time and in BRE Owner's sole and absolute discretion, to assign the Contract to either of (i) Sears Roebuck & Co, Sears Holding Corporation, or their designees (any of them a "Sears Assignee"), or (ii) 233 S. Wacker LLC, or its designee (a "233 Assignee"), upon the written acceptance of such assignment by the Sears Assignee or 233 Assignee, as the case may be.  In the event of any such assignment, BRE Owner shall be relieved of all obligations arising from and after the date of such assignment and Contractor shall render its services thereafter to Sears Assignee or 233 Assignee, as the case may be.  Notwithstanding any such assignment, (x) the Insured Parties shall continue to include all parties named in Paragraph 1 of this Exhibit C, for purposes of Contractor's insurance and indemnity obligations under the Contract, and (y), BRE Owner shall retain the right to enforce, as an intended third party beneficiary hereto, Contractor's obligations under Paragraphs 1(f), 1(g) 1(h) and 3(a) of the Contract.

Exhibit C-3

9153343.1

EXHIBIT C

<u>U.S. ART AGREEMENT</u>

[SEE ATTACHED]

# STORAGE AGREEMENT

This STORAGE AGREEMENT ("**Agreement**") is entered into on this ⎣ᴛ⎦ day of March, 2017 to be effective as of the 27ᵗʰ day of March, 2017 (the "**Effective Date**") among BRE 312 OWNER LLC, a Delaware limited liability company with its principal address at c/o Equity Office, 222 S. Riverside Plaza, Suite 2000, Chicago, IL 60606, Attention: General Counsel ("**BRE Owner**") and U.S. ART CO., a Massachusetts corporation with its principal address at 66 Pacella Park Drive, Randolph, MA 02368 ("**Contractor**") (each a "party" and collectively the "parties").

WHEREAS, BRE Owner has possession and control of that certain Alexander Calder sculpture which is more particularly illustrated on Exhibit A and currently located in the Willis Tower (the "**Calder Sculpture**");

WHEREAS, Contractor is engaged in the business of storing fine art; and

WHEREAS, BRE Owner is desirous of entering into an agreement with Contractor for the acceptance and storage of the Calder Sculpture, and Contractor is willing to undertake and perform said services for BRE Owner as more particularly described below.

NOW, THEREFORE, in consideration of the mutual terms and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.    SCOPE OF SERVICES

Contractor shall provide a storage area, commonly known as Row S, Section 6-10, for BRE Owner's continuous and uninterrupted use in storing the Calder Sculpture within a portion of its climate-controlled art storage facility ("**Services**") located at 4400 W. Ohio Street, Chicago IL (the "**Storage Facility**"). The Storage Facility shall be available from and after the Effective Date. Contractor will ensure as part of the Services that the Storage Facility is climate controlled and secure at all times. Further, Contractor and its employees and agents shall not handle or move the Calder Sculpture once it has been initially stored and stabilized in the storage area described above within the Storage Facility.

2.    FEES AND EXPENSES

The fee to receive the Calder Sculpture into storage is $8,350.00. Additional labor for packing/rigging for storage is $5,440.00, though this cost is optional and at BRE Owner's sole discretion. It is anticipated that the monthly storage fee for the first year is $1,963.20 and the total annual storage fee for the first year is $23,558.40. The final storage fee for the first year will be reasonably and promptly determined by Contractor and BRE Owner after delivery of the Calder Sculpture and will based on the actual cubic footage of the Calder Sculpture multiplied by $1.20 per cubic foot. Thereafter and if applicable, the total annual storage fee shall increase annually by three percent (3%) at the beginning of each year during any renewal period. BRE Owner shall pay the monthly storage fee to Contractor for the term of this Agreement. There shall be no other fees and expenses associated with this Agreement.

1

3.    RISK OF LOSS

Contractor shall have sole responsibility for insuring its storage facility, materials, vehicles, equipment and other property against damage or loss from any cause, and BRE Owner shall have no obligations in this regard. Risk of loss or damage to its storage facility, and any materials, equipment, vehicles or anything else utilized by Contractor to perform the Services shall at all times remain solely with Contractor.

4.    OPERATIONS

Contractor shall at all times be solely responsible for security and climate control at the Storage Facility. Contractor shall maintain ambient conditions to protect the Calder Sculpture from deterioration or damage. BRE Owner shall not be liable or responsible for any damages as a result of Contractor's actions, whatsoever.

Contractor shall provide BRE Owner with (a) an initial full written accounting of the Calder Sculpture inventory delivered into the Storage Facility and (b) thereafter periodic written updates regarding any changes to the initial written accounting of the Calder Sculpture inventory as well updates regarding the Calder Sculpture, Services and Storage Facility, including without limitation, information about any power outages at the Storage Facility, disruptions in Services, or damage or destruction to the Calder Sculpture or Storage Facility.

Contractor shall not release the Calder Sculpture to any party except (a) with the prior, written permission from BRE Owner or (b) to comply with a valid order of a court of competent jurisdiction, but only after providing sufficient notice to BRE Owner to permit it to challenge such order.

5.    TERM; TERMINATION

The term of this Agreement commences on the Effective Date above and remains in effect for one (1) year, subject to:

(a) Automatic renewal for four (4) additional one (1) year terms.

(b) Early termination of this Agreement by BRE Owner after the first year, without cause, effective at any time upon thirty (30) days written notice to Contractor delivered by overnight courier or Certified U.S. Mail, return receipt requested, which notice shall specify the date of termination of the Agreement.

(c) Immediate termination by BRE Owner, at BRE Owner's sole election, if Contractor violates any law, rule or regulation, breaches or fails to perform any of its obligations in any material respect, or if Contractor becomes insolvent or proceedings are instituted by or against it under any provision of any federal or state bankruptcy or insolvency laws.

(d) Further extension of the term by mutual agreement of the parties.

Upon termination, the parties are relieved of any further obligations contained in this Agreement except for those of Contractor that by their nature survive or may require performance after termination (e.g., indemnification under Section 7 and confidentiality under Section 11).

2

6.     COMPLIANCE WITH LAWS

Contractor shall, at all times, comply with Illinois statutes, Cook County and City of Chicago ordinances, and any other statute, ordinance, rule or regulation governing the Services under this Agreement. Contractor shall obtain, and keep current throughout the performance of this Agreement, any and all required certificates, permits and licenses as may be required to perform the Services. Contractor shall also assume all responsibilities and obligations in the notifying BRE Owner and law enforcement agencies in reporting any theft or vandalism affecting the Calder Sculpture.

7.     INDEMNIFICATION

To the fullest extent permitted by law, Contractor shall defend, indemnify and hold harmless BRE Owner, Sears Roebuck & Company, 233 S. Wacker L.L.C., and their respective affiliates, officers, directors, shareholders, distributors, agents, employees, successors and assigns (collectively, the "**Indemnified Parties**"), from and against any and all claims, demands, actions, causes of action, liabilities, damages, losses, fines, penalties and expenses, including, without limitation, attorneys' fees and expenses, resulting from or arising out of, in whole or in part: (i) the Services; (ii) any acts, errors or omissions of Contractor, its employees, agents, or subcontractors, whether or not lawful or within the scope of their employment, (iii) the failure of Contractor, its employees, agents or subcontractors to comply with any law, statute, ordinance, code, rule, regulation or requirement of a public authority, (iv) an inquiry, investigation, or charges of any public authority relating to the Services; (v) claims by Contractor's employees, agents or subcontractors, relating to the Services, (vi) assertions under workers' compensation or similar employee benefit acts by Contractor or its, agents, employees or subcontractors, or (vii) any breach by Contractor of any obligation of Contractor under this Agreement (items (i)-(vii) are collectively the "**Claims**"). The obligations of Contractor under this Section 7 shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 7. The foregoing provisions shall apply irrespective of whether Claims are asserted by a party, its employees, subcontractors, or by unrelated third parties.

8.     INSURANCE

Contractor shall, during the performance and term of this Agreement, maintain the following insurance coverage as indicated or as required by law, whichever is greater, with insurers in good standing, possessing an A.M. Best rating of not less than A, and authorized to do business under the laws of the State where performance occurs, and each policy must be written on an occurrence basis and be primary, non-contributory over all other insurance maintained by Contractor or any Indemnified Party:

(a)     Commercial General Liability Insurance, including premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of at least $1,000,000 per occurrence, $2,000,000 (products/completed operations), and $2,000,000 aggregate for bodily injury and property damage combined, naming the Indemnified Parties as additional insureds.

(b)     General Liability Warehousemen's Legal Liability Insurance or the equivalent in the amount of $5,000,000. Failure to maintain such insurance policy shall be grounds for termination of this Agreement. Notwithstanding the foregoing, unless liability insurance

3

is extended by Contractor by mutual agreement of the parties and subject to BRE Owner's payment of any required premiums, the limits of liability under the insurance coverage in this subparagraph (b) shall be $.60/LBS.

(c)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles, with combined single limits of not less than $1,000,000 per occurrence for bodily injury and property damage combined. If no vehicles are owned or leased, the Commercial General Liability Insurance shall be extended to provide insurance for non-owned and hired automobiles. Limits of liability requirements may be satisfied by a combination of motor vehicle liability and umbrella excess liability policies.

(d)    Workers' Compensation insurance, including coverage for all costs, benefits and liabilities under Workers' Compensation and similar laws, for all states in which this Agreement is performed, and Employers' Liability insurance with limits of liability of at least $100,000 per accident or disease and $500,000 aggregate by disease. Such insurance must contain a waiver of subrogation in favor of BRE Owner where permitted by law.

Contractor shall provide to BRE Owner a certificate of insurance evidencing the insurance coverage required in this Agreement, showing the Indemnified Parties as additional insureds, and showing the coverage as primary over any and all other coverage applicable.

9.    INDEPENDENT CONTRACTOR

It is clearly understood and agreed, that Contractor's status shall be that of an independent contractor and not that of a partner, joint venture, servant, agent or employee of BRE Owner. Contractor is not authorized to, and shall not, make or undertake any agreement, understanding, waiver or representation on behalf of BRE Owner.

10.    NO ASSIGNMENT

Contractor shall not assign or otherwise transfer its rights, obligations and/or duties under this Agreement without the prior written consent of BRE Owner. Notwithstanding anything herein to the contrary, BRE Owner shall have the right to assign its rights, obligations or duties under this Agreement without the consent of Contractor.

11.    CONFIDENTIALITY

Contractor agrees that all information (including the provisions of this Agreement) of or relating to BRE Owner, its parents, subsidiaries or affiliates, regardless of the manner or medium in which it is furnished to or otherwise obtained by Contractor or any Contractor representative, is provided to and received by Contractor in confidence. Contractor must at all times preserve and protect the confidentiality of this information and any other proprietary and non-public information relating to BRE Owner, its parents, subsidiaries or affiliates that Contractor or any Contractor representative becomes aware of or acquires during the performance of this Agreement.

12.    SEVERABILITY

If any provision of this Agreement is held to be void or unenforceable by any judicial or administrative authority, or is unlawful or unenforceable under any applicable law, the remaining

4

provisions are considered to be severable and their enforceability is not to be affected or impaired in any way by reason of such law or holding.

13.    NOTICES

Any notice, request, demand, instruction or other document to be given or served hereunder or under any document or instrument executed pursuant hereto shall be in writing and shall be (i) delivered personally with a receipt requested therefor, or (ii) sent by a nationally recognized overnight courier service, or (iii) sent by United States registered or certified mail, return receipt requested, postage prepaid and addressed to the parties at their respective addresses set forth below, and the same shall be effective (a) upon receipt or refusal if delivered personally, (b) one (1) business day after depositing with an overnight courier service, or (c) three (3) business days after deposit in the mails if mailed.  A party may change its address for receipt of notices by service of a notice of such change in accordance herewith.

(i)    If to Contractor:

U.S. Art Co.
66 Pacella Park Drive
Randolph, MA 02368
Attn: Mark Silverman, Chief Operating Officer

(ii)    If to BRE Owner:

BRE 312 Owner LLC
c/o Equity Office
222 S. Riverside Plaza, Suite 2000
Chicago, IL 60606
Attn: Matthew Koritz, General Counsel

14.    GOVERNING LAW

This Agreement shall be construed, interpreted, and enforced under and in accordance with the laws of the State of Illinois without regard to choice of law provisions.

15.    SUBCONTRACTING

Contractor shall not use subcontractors to perform Services hereunder unless BRE Owner agrees to such subcontracting in writing. In all cases, use of such subcontractors shall in no way absolve Contractor of its obligations under this Agreement and Contractor shall be responsible for subcontractor's performance of services and acts and omissions.  For purposes of determining liability hereunder, any time "Contractor" is used in this Agreement it shall be deemed to include all subcontractors or other persons and entities performing any part of the Services under this Agreement with or on behalf of Contractor, including suppliers and agents.

16.    REPRESENTATIONS AND WARRANTIES

Contractor hereby represents and warrants that all Services shall be performed in a good and workmanlike manner; that the Services and Storage Facility shall, at all times, comply with all applicable laws, ordinances, and regulations; that the Services and Storage Facility shall conform

5

to this Agreement; that the Services and Storage Facility shall be free from defects as determined by BRE Owner; and that the Services shall be performed by only licensed, qualified, trained, careful and efficient employees or subcontractors, to the extent subcontractors approved herein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first set forth above.

**U.S. ART CO.**

Signature

Name    Chris Maravich

Title    General Manager
         Chicago

**BRE 312 OWNER LLC**
**a Delaware limited liability company**

Signature

Name    David E. Moore    /Auth

Title    SVP - Portfolio Director

6