David S. Kupetz
Claire K. Wu
**SulmeyerKupetz**
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Tel:  (213) 626-2311
Fax: (213) 629-4520

*Counsel for Izek Shomof and Aline Shomof Irrevocable
Children's Trust Dated February 11, 1999,
Vegas Group, LLC, and East River Group, LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDING CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## IZEK SHOMOF AND ALINE SHOMOF IRREVOCABLE CHILDREN'S TRUST DATED FEBRUARY 11, 1999, VEGAS GROUP, LLC, AND EAST RIVER GROUP, LLC'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Appellant Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February

11, 1999, Vegas Group, LLC, and East River Group, LLC (collectively, "Landlord" or

"Appellant"), hereby respectfully submits, pursuant to Rule 8009 of the Federal Rules of

Bankruptcy Procedure and Rule 8009-1 of the Local Bankruptcy Rules for the Southern District

of New York, this statement of issues to be presented and designation of items to be included in

the record on appeal with respect to its appeal of this Court's *Order (I) Authorizing Assumption*

*and Assignment of Lease of Nonresidential Real Property at 2650 East Olympic Boulevard, Los*

*Angeles and (II) Granting Related Relief* (the "Order")[2] (Dkt. No. 4779) before the United States

District Court for the Southern District of New York (the "District Court").

## STATEMENT OF ISSUES ON APPEAL

1.      Whether the Bankruptcy Court erred in approving the assumption and assignment

of Appellant's lease with Debtor Sears, Roebuck and Co. ("Debtor") for store number 1008,

located at 2650 East Olympic Boulevard, Los Angeles, California (the "Designated Lease") to

Transform Holdco, LLC ("Buyer") or Buyer's assignee under sections 365(a) and 365(f) of the

Bankruptcy Code?

2.      Whether the Bankruptcy Court erred when it determined that all defaults under the

Designated Lease had been cured, or adequate assurance of the cure of such defaults had been

provided, under section 365(b)(1) of the Bankruptcy Code in connection with the assumption and

assignment of the Designated Lease to Buyer or Buyer's assignee?

3.      Whether the Bankruptcy Court erred when it determined that no default existed

under the Designated Lease related to Debtor's failure to reimburse Appellant for any amounts

Appellant incurred related to the Construction Obligations (as such term is defined in the Order)?

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms
in the Order.

4.      Whether the Bankruptcy Court erred when it determined that Debtor had no obligation under the Designated Lease to reimburse Appellant from the Construction Estimate Deposit (as such term is defined in the Order) for any work performed by Appellant prior to the assumption and assignment of the Designated Lease?

5.      Whether the Bankruptcy Court erred when it determined that no default existed that was required to be cured under the Designated Lease related to the Debtor's failure to cooperate and provide access to the premises subject to the Designated Lease in connection with construction at the Appellant's building?

6.      Whether the Bankruptcy Court erred when it determined that the April 1, 2017, deadline to complete the Construction Obligations had not been extended?

7.      Whether the Bankruptcy Court erred when it determined that Debtor did not breach the covenant of good faith and fair dealing in the Designated Lease by failing to cooperate with Appellant in the renovation and rehabilitation of Appellant's building?

8.      Whether the Bankruptcy court erred when it determined Appellant was not entitled to any cure or compensation related to the $5,696,046.02 in costs for architects, engineers, consultants, permit fees and contractors, Appellant identified in its supplemental cure objection?

9.      Whether the Bankruptcy Court erred when it determined that Buyer or Buyer's assignee had provided Appellant with adequate assurance of future performance of Appellant's lease as required by sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code in connection with the assumption and assignment of Appellant's lease?

10.     Whether the Bankruptcy Court erred when it determined that Appellant's lease could not be modified by the course of performance of the parties and other post-lease execution conduct of the parties under applicable California law?

11.    Whether the Bankruptcy Court erred when it determined that the Debtor and Appellant were in dispute with regard to the April 1, 2017 deadline?

12.    Whether the Bankruptcy Court erred when it determined that Appellant's lease was not modified by the course of performance of the parties and other post-lease execution conduct of the parties under applicable California law?

13.    Whether the Bankruptcy Court erred when it determined that under California law the lease could only be modified by a writing signed by the parties?

14.    Whether the Bankruptcy Court erred when it found that section 363(m) of the Bankruptcy Code applied to the assumption and assignment of the Designated Lease?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Landlord designates the following items for inclusion in the record on appeal. Each designated item shall also include any and all exhibits and documents annexed to and referenced within such items.

### DOCUMENTS FILED IN BANKRUPTCY COURT

| Date | Docket No. | Title of Document |
|---|---|---|
| 10/15/2018 | 1 | Voluntary Chapter 11 Petition (Sears Holding Corporation) |
| 10/15/2018 | 4 | Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases |
| 10/16/2018 | 118 | Order Directing Joint Administration of Related Chapter 11 Cases |
| 11/1/2018 | 429 | Debtors' Motion for Approval of Global Bidding Procedures |
| 11/16/2018 | 776 | Order Extending Time to Assume or Reject Unexpired Leases and Subleases of Nonresidential Real Property |
| 11/19/2018 | 816 | Order Approving Global Bidding Procedures and Granting Related Relief |
| 11/21/2018 | 862 | Notice of Filing of Global Bidding Procedures Process Letter |
| 1/18/2019 | 1730 | Notice of Successful Bidder and Sale Hearing |

| Date | Docket No. | Title of Document |
|------|-----------|-------------------|
| 1/18/2019 | 1731 | Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction |
| 1/25/2019 | 1837 | Objection to Cure Amount for Store #1008 Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC |
| 2/8/2019 | 2507 | Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief |
| 4/2/2019 | 3008 | Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief |
| 4/12/2019 | 3171 | Notice of Amendment to Asset Purchase Agreement Extending Certain Deadlines |
| 4/19/2019 | 3298 | Notice of Assumption and Assignment of Additional Designatable Leases |
| 5/1/2019 | 3477 | Supplemental Cure Objection and Reservation of Rights (Store #1008) Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC |
| 5/1/2019 | 3478 | Declaration of Izek Shomof in Support of Supplemental Cure Objection and Reservation of Rights (Store #1008) Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC |
| 5/4/2019 | 3625 | Notice of Presentment of Stipulation and Order by and Among Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River Group, LLC Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property |
| 5/7/2019 | 3654 | Transform Holdco LLC's Omnibus Reply in Support of |

| Date | Docket No. | Title of Document |
|------|-----------|-------------------|
| | | Assumption and Assignment of Designated Leases |
| 5/13/2019 | 3817 | Stipulation and Order by and Among Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River Group, LLC (I) Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property |
| 5/13/2019 | 3850 | Order (I) Authorizing Assumption and Assignment of Certain Leases and (II) Granting Related Relief |
| 5/29/2019 | 4066 | Notice of Presentment of Stipulation and Order by and Among Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River Group, LLC (I) Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property and (II) Setting Briefing Schedule |
| 6/11/2019 | 4186 | Stipulation and Order by and Among Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC and East River Group, LLC (I) Extending Time Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of Lease of Nonresidential Real Property and (II) Setting Briefing Schedule |
| 7/9/2019 | 4489 | Transform Holdco LLC's Reply in Support of Assumption and Assignment of Designated Lease for Store Located at 2650 East Olympic Boulevard, Los Angeles, California |
| 7/26/2019 | 4624 | Landlord's Reply to "Transform Holdco LLC's Reply in Support of Assumption and Assignment of Designated Lease for Store Located at 2650 East Olympic Boulevard, Los Angeles, California" |
| 7/26/2019 | 4625 | Declaration of Izek Shomof in Support of Landlord's Reply to "Transform Holdco LLC's Reply in Support of Assumption and Assignment of Designated Lease for Store Located at 2650 East Olympic Boulevard, Los Angeles, California" |

| Date | Docket No. | Title of Document |
|------|-----------|-------------------|
| 8/1/2019 | 4677 | Notice of Agenda of Matters Scheduled for Hearing on August 2, 2019 at 10:00 a.m. |
| N/A | N/A | Transcript of Hearing Held on August 2, 2019 at 10:00 a.m. (ET), attached hereto as **Exhibit A** in accordance with Rule 8009-1(a) of the Local Bankruptcy Rules for the Southern District of New York |
| 8/7/2019 | 4779 | Order (I) Authorizing Assumption and Assignment of Lease of Nonresidential Real Property at 2650 East Olympic Boulevard, Los Angeles, and (II) Granting Related Relief |
| 8/20/2019 | 4916 | Notice of Appeal |

## JOINT EXHIBITS ("JX") FROM THE AUGUST 2, 2019 HEARING

| JX No. | Document |
|--------|----------|
| 1 | Amended and Restated Building Lease by and Between 10309 Folsom Blvd., LP and Sears, Roebuck and Co. [Dkt. No. 3477, Ex. A] |
| 2 | Amendment to Amended and Restated Building Lease by and Between Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group LLC and Sears, Roebuck and Co. [Dkt. No. 1837, Ex. C] |
| 3 | Letter to Steven Velkei, Counsel to Sears, Roebuck and Co., from Jonathan Shomof [Dkt. No. 4489, Ex. B; Dkt. No. 4625-5, Ex. 22] |
| 4 | Invoice from East River Group LLC to Sears Holdings Management Corporation [Dkt. No. 4625-1, Ex. 2] |
| 5 | Check from Sears Holdings Corporation; 2017 Form 1099; Invoices from East River Group LLC to Sears Holdings Management Corporation [Dkt. No. 4625-1, Ex. 3] |
| 6 | Invoice from East River Group LLC to Sears Holdings Management Corporation [Dkt. No. 4625-1, Ex. 4] |
| 7 | Invoice from East River Group LLC to Sears Holdings Management Corporation [Dkt. No. 4625-1, Ex. 6] |
| 8 | Invoice from East River Group LLC to Sears Holdings Management Corporation |

| JX No. | Document |
|--------|----------|
|        | [Dkt. No. 4625-3, Ex. 7] |
| 9      | Invoice from East River Group LLC to Sears Holdings Management Corporation [Dkt. No. 4625-3, Ex. 9] |
| 10     | Invoice from East River Group LLC to Sears Holdings Management Corporation [Dkt. No. 1837, Ex. D; Dkt. No. 4625-4, Ex. 17] |
| 11     | Email Chain with Subject Line "Sears Store time line" [Dkt. No. 4625-5, Ex. 24] |
| 12     | Letter from David S. Kupetz to Weil, Gotshal & Manges [Dkt. No. 4625-5, Ex. 25] |
| 13     | Request for Modification of Building Ordinances by East River Group, LLC [Dkt. No. 4625-5, Ex. 27] |
| 14     | Los Angeles Mail Order District Promotional Brochure [Dkt. No. 4625-6, Ex. 28] |
| 15     | Invoice from East River Group LLC to Sears Holdings [Dkt. No. 1837, Ex. A] |
| 16     | Invoice from East River Group LLC to Sears Holdings Management Corporation; Annual Secured Property Tax Bill [Dkt. No. 1837, Ex. B] |

## LANDLORD EXHIBITS ("LL") FROM THE AUGUST 2, 2019 HEARING

| LL No. | Document |
|--------|----------|
| 1      | Spreadsheet entitled "Reimbursement Request" [Dkt. No. 4625-1, Ex. 1] |
| 2      | Invoices from East River Group LLC to Sears Holdings Management Corporation; Invoices from Vendors to East River Group LLC; Checks from East River Group LLC; Gmail Receipts from Valley Concrete Coring [Dkt. No. 4625-2, Ex. 5] |
| 3      | Invoices from East River Group LLC to Sears Holdings Management Corporation; Invoices from Vendors to East River Group LLC; Checks from East River Group LLC [Dkt. No. 4625-3, Ex. 8] |
| 4      | Invoices from East River Group LLC to Sears Holdings Management Corporation; Invoices from Vendors to East River Group LLC; Checks from East River Group LLC [Dkt. No. 4625-3, Ex. 10] |
| 5      | Email Chain Between Leo Pustilnikov, Dolores Guarnaccia, Others Re: "Sears Retail AC installation" [Dkt. No. 4625-4, Ex. 11] |

| LL No. | Document |
|--------|----------|
| 6 | Email Chains Between Jonathan Shomof, Dolores Guarnaccia, Leo Pustilnikov, Others [Dkt. No. 4625-4, Ex. 12] |
| 7 | Email Chain Between Jonathan Shomof, Izek Shomof, Leo Pustilnikov, Others Re: "La Boyle, CA – Status Update" [Dkt. No. 4625-4, Ex. 13] |
| 8 | Email Chain Between Jonathan Shomof, Dolores Guarnaccia, Leo Pustilnikov, Others Re: "LA Boyle Visit" [Dkt. No. 4625-4, Ex. 14] |
| 9 | Email Chain Between Jonathan Shomof, Dolores Guarnaccia Re: "1008 Historical Pic – Window Openings on Olympia" [Dkt. No. 4625-4, Ex. 15] |
| 10 | Email Chain Between Jonathan Shomof, Leo Pustilnikov, Dolores Guarnaccia, Damon Guy, Others Re: "1008 Sears Boyle Heights, CA – Air Conditioning" [Dkt. No. 4625-4, Ex. 16] |
| 11 | Photographs labeled "Server Room" [Dkt. No. 4625-4, Ex. 18] |
| 12 | Photographs labeled "Facade and Signage" [Dkt. No. 4625-4, Ex. 19] |
| 13 | Photographs labeled "HVAC Equipment Installed on the Roof" [Dkt. No. 4625-4, Ex. 20] |
| 14 | Photographs labeled "HVAC Equipment Installed on the Roof" and "HVAC Equipment Stored on Premises Waiting to be Installed" [Dkt. No. 4625-5, Ex. 21] |
| 15 | Chart Re: Reimbursement Balance for Sears TI Construction Expenses [Dkt. No. 1837, Ex. C] |
| 16 | Chart re: Sears Project Cost Breakdown [Dkt. No. 3477, Ex. B] |

## DEPOSITION TRANSCRIPTS

| Document |
|----------|
| Transcript of the Deposition of Izek Shomof, taken on June 24, 2019, with Transform's designations and Landlord's counter-designations, attached hereto as **Exhibit B** in accordance with Rule 8009-1(a) of the Local Bankruptcy Rules for the Southern District of New York |

## RESERVATION OF RIGHTS

Appellant expressly reserves its right to amend or supplement this Designation and/or to

object, or otherwise supplement or move to strike or modify, some or all of any designation filed

by any other party to this appeal.  This filing is made expressly subject to, and without waiver of,

any and all rights, remedies, challenges and objections.

Dated: September 3, 2019          By: */s/ David S. Kupetz*
     Los Angeles, California          David S. Kupetz
                                                **Sulmeyer**Kupetz
                                                A Professional Corporation
                                                333 South Grand Avenue, Suite 3400
                                                Los Angeles, California 90071
                                                Tel:  (213) 626-2311
                                                Email: dkupetz@sulmeyerlaw.com

                                                *Counsel for Izek Shomof and Aline Shomof Irrevocable*
                                                *Children's Trust Dated February 11, 1999,*
                                                *Vegas Group, LLC, and East River Group, LLC*

# EXHIBIT A

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 18-23538-rdd

5

6   - - - - - - - - - - - - - - - - - - - - -x

7

8   In the Matter of:

9

10   SEARS HOLDINGS CORPORATION, et al.,

11

12            Debtors.

13

14   - - - - - - - - - - - - - - - - - - - - -x

15

16            United States Bankruptcy Court

17            300 Quarropas Street, Room 248

18            White Plains, New York 10601

19

20            August 2, 2019

21            10:08 AM

22

23   B E F O R E :

24   HON. ROBERT D. DRAIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    18-23538-rdd Sears Holdings Corporation, et al.

2    Ch 11

3

4    HEARING re Statement/Notice of Assumption and Assignment of

5    Additional Designatable Leases [ECF No. 3298]

6

7    HEARING re Objection to Cure Amount for Store #1008 Filed by

8    Izek Shomof and Aline Shomof Irrevocable Children's Trust

9    Dated February 11, 1999, Vegas Group, LLC, and East River

10   Group, LLC [ECF No. 1837]

11

12   HEARING re Supplemental Cure Objection and Reservation of

13   Rights (Store #1008) Filed by Izek Shomof and Aline Shomof

14   Irrevocable Children's Trust Dated February 11, 1999, Vegas

15   Group, LLC, and East River Group, LLC [ECF No. 3477]

16

17   HEARING re Declaration of Izek Shomof in Support of

18   Supplemental Cure Objection and Reservation of Rights (Store

19   #1008) Filed by Izek Shomof and Aline Shomof Irrevocable

20   Children's Trust Dated February 11, 1999, Vegas Group, LLC,

21   and East River Group, LLC [ECF No. 3478]

22

23

24

25

Page 3

1   HEARING re So Ordered Stipulation and Order By and Among

2   Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof

3   Irrevocable Children's Trust Dated February 11, 1999, Vegas

4   Group, LLC, and East River Group, LLC (I) Extending Time

5   Under 11 U.S.C. § 365(d)(4) for Assumption or Rejection of

6   Lease of Nonresidential Real Property [ECF No. 3817]

7

8   HEARING re So Ordered Stipulation and Order By and Among

9   Sellers, Buyer, and Landlord Izek Shomof and Aline Shomof

10  Irrevocable Children's Trust Dated February 11, 1999, Vegas

11  Group, LLC and East River Group, LLC (I) Extending Time for

12  Assumption or Rejection of Lease of Nonresidential Real

13  Property and Setting Briefing Schedule [ECF No. 4186]

14

15  HEARING re Transform Holdco LLC's Reply in Support of

16  Assumption and Assignment of Designated Lease for Store

17  Located at 2650 East Olympic Boulevard, Los Angeles,

18  California [ECF No. 4489]

19

20  HEARING re Landlord's Reply to Transform Holdco LLC's Reply

21  in Support of Assumption and Assignment of Designated Lease

22  for Store Located at 2650 East Olympic Boulevard, Los

23  Angeles, California" [ECF No. 4624]

24

25

Page 4

1    HEARING re Declaration of Izek Shomof in Support of

2    Landlord's Reply to Transform Holdco LLC's Reply in Support

3    of Assumption and Assignment of Designated Lease for Store

4    Located at 2650 East Olympic Boulevard, Los Angeles,

5    California [ECF No. 4625]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Beck, Jamie Gallagher and Pamela Skaw

Page 5

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Debtors and Debtors in Possession

4          767 Fifth Avenue

5          New York, NY 10153

6

7    BY:  JACQUELINE MARCUS, ESQ. (TELEPHONICALLY)

8

9    SULMEYER KUPETZ P.C.

10         Attorneys for the Landlord

11         333 South Grand Avenue

12         Suite 3400

13         Los Angeles, CA 90071

14

15   BY:  DAVID S. KUPETZ, ESQ.

16

17   CLEARY GOTTLIEB STEEN & HAMILTON LLP

18         Attorneys for Transform Holdco LLC and Its Affiliates

19         One Liberty Plaza

20         New York, NY 10006

21

22   BY:  ANDREW WEAVER, ESQ.

23         KATE MASSEY, ESQ.

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  All right.  Good morning.  In re Sears

3    Holdings Corp.

4              MR. WEAVER:  Good morning, Your Honor.  Andrew

5    Weaver, Cleary Gottlieb, on behalf of Transform.

6              THE COURT:  Good morning.

7              MR. WEAVER:  This morning we have a lease

8    assumption cure objection matter before Your Honor.  The

9    landlord does have a declarant who will be crossed in the

10   courtroom.  And then the parties will have argument.

11             There is a little evidentiary issue with some of

12   the exhibits.  We're happy to address now, Your Honor, or

13   after the cross of the witness, whatever your preference.

14             THE COURT:  Well, I have two binders, one of which

15   is the parties' joint exhibits.

16             MR. WEAVER:  Correct, Your Honor.

17             THE COURT:  So the admissibility of those is

18   agreed?

19             MR. WEAVER:  Correct, Your Honor.

20             THE COURT:  Okay.

21        (Joint Exhibits received in evidence)

22             MR. WEAVER:  And then I have a binder labeled

23   "Landlord's Exhibit List".  I don't know whether all of

24   these are objected to or just some of them?

25             MR. WEAVER:  They are.  They're buckets, Your

Page 7

1    Honor, which I can quickly summarize for you.

2              THE COURT:  Okay.

3              MR. WEAVER:  So, Your Honor, looking at Landlord's

4    Exhibits -- 1, in particular, is a summary document.  And

5    presumably, it's being submitted under Rule 1006.  Just by a

6    quick glance at the document, there are some errors in the

7    document based upon the evidence that the party -- landlord

8    had submitted.  And so, we just don't think the document is

9    necessarily reliable.

10             The second bucket, Your Honor, relates to --

11             THE COURT:  Well, on that point --

12             MR. WEAVER:  Yeah.

13             THE COURT:  -- if you correct the errors, is it

14   then reliable --

15             MR. WEAVER:  Well --

16             THE COURT:  -- or you just haven't had the chance

17   to do the due diligence and therefore it's --

18             MR. WEAVER:  You know, we got this on Friday, Your

19   Honor, so it's been a week.  But -- so we really haven't

20   done a thorough due diligence.  Look, obviously, Your Honor

21   can -- capable of looking at the evidence.  We appreciate

22   that and can disregard what you deem to be not liable.  But

23   we just found not having really -- it tied out to anything

24   in particular, we found to be a little bit problematic.

25             THE COURT:  Okay.

Page 8

1              MR. WEAVER:  That relates, Your Honor, to the

2    second bucket which is Landlord Exhibit 2, 3 and 4.  These

3    are invoices and checks which presumably are the backup for

4    number 1.  And these documents, Your Honor, were provided

5    for the first time on Friday as part of the surreply and

6    attached to the declaration.  We served discovery in May in

7    this case.  We deposed their declarant in June in this case.

8    And we just now, a week ago, received the materials.

9              Again, as a general matter, we find this to be

10   parol evidence that you don't need to get to because the

11   contracts, we think, are clear, Your Honor.  But we just

12   believe that, as a procedural matter, that's improper when

13   they were clearly called for in discovery.  We had a

14   deposition and then we get these documents at the eleventh

15   hour.

16             THE COURT:  Okay.

17             MR. WEAVER:  The next bucket, Your Honor, is

18   Landlord Exhibit 5, 6, 7, 8, 9 and 10.  These are e-mails,

19   Your Honor, that, if you look at them all, they are all

20   e-mails that were forwarded by the landlord to his counsel

21   that has a commentary at the beginning of each -- of the

22   forward chains.  But the timing is also the issue, Your

23   Honor.  The deposition took place on June 24th in L.A.  All

24   of these e-mail chains were sent either during the

25   deposition or after the deposition to counsel.  So we did

Page 9

1    receive them.  They were produced a couple days later to us.

2    But the point of the deposition, Your Honor, was to ask

3    questions about the evidence they're relying upon.  And a

4    significant portion of the evidence they want to rely upon

5    now are documents that they found during and after the

6    deposition and forwarded it along.  So we think, again,

7    procedurally, Your Honor, that is improper beyond the parol

8    evidence issue.  And the mere fact that there is commentary

9    at the start of many of these chains, Your Honor, would not

10   make these appropriate exhibits for evidence in this matter.

11            THE COURT:  Well, I can always disregard the

12   commentary.

13            MR. WEAVER:  Absolutely, Your Honor.  Your choice.

14            THE COURT:  Okay.

15            MR. WEAVER:  And then the next bucket, Your Honor,

16   is Exhibits -- Landlord's Exhibits 11, 12, 13, 14 and 15 --

17   I'm sorry -- through 14.  These are photographs that, again,

18   we were just given on Friday.  The only backup for these

19   photographs is that the declarant said they were taken at

20   his direction.  Again, these would be clearly responsive to

21   discovery.  We didn't get a chance to depose the witness on

22   this information.  Again, I don't think it's probative at

23   all in any way, Your Honor, but, again, this seems

24   procedurally improper.

25            THE COURT:  Okay.

Page 10

1            MR. WEAVER:  And I believe Landlord Exhibit 15 is

2     another summary document.  This relates to certain wire

3     transfers.  I don't think the wire transfers are in dispute

4     here, Your Honor.  We just don't know where this document

5     really is sourced from.  Frankly, if this were admitted, we

6     don't think we would have a serious concern but, again, it's

7     just from a procedural standpoint.

8            And then finally, Exhibit 16 is also a summary

9     document.  This was attached earlier to a supplemental cure

10    objection in May.  There was no backup.  Presumably this

11    ties to Exhibit 1 as well and presumably ties to the

12    invoices we've just received.  But again, I'm just not sure

13    without much more sourcing than that that it's reliable

14    under the rules, Your Honor.

15            THE COURT:  Okay.  All right.  Was there an

16    agreement on discovery just to when it would be provided?

17    When was the discovery request made?

18            MR. WEAVER:  Your Honor, the discovery request was

19    made on May 17th.  And there was an agreement to produce on

20    June 17th, a week before the deposition.  I can read you the

21    discovery request, Your Honor, but they are as you would

22    imagine, the documents they relied upon to support their

23    cure claim.

24            THE COURT:  Okay.

25            MR. KUPETZ:  Good morning, Your Honor.  David

Page 11

1      Kupetz with SulmeyerKupetz, appearing on behalf of landlord

2      which is the Shomof trust, Vegas Group and East River Group.

3              THE COURT:  Good morning.

4              MR. KUPETZ:  Your Honor, with respect to these

5      evidentiary objections, I'd like to first, if the Court will

6      allow, address Landlord's Exhibits 5 through 10 because that

7      has some carryover with respects to some of the other

8      issues.

9              Those requests were not covered in any way by

10     Transform's discovery documents and -- request document

11     which I have if the Court would like to look at it.  I have

12     copies of Transform's discovery requests.  It became only

13     apparent during Mr. Shomof's deposition on June 24th.  And,

14     of course, Mr. Shomof is present in the courtroom, Your

15     Honor, because he's the declarant and can be cross-examined.

16             It became only apparent for the first time that

17     these e-mails were relevant to show, of course, the

18     performance.  Certainly, that was never an issue raised by

19     Sears.  The landlord had been working with Sears.  Part of

20     the argument here is --

21             THE COURT:  Can I see the discovery request?

22             MR. KUPETZ:  Yes, Your Honor.  May I approach?

23             THE COURT:  Sure.

24         (Pause)

25             THE COURT:  Okay.  You can go ahead.

Page 12

1             MR. KUPETZ:  So these e-mails were produced in

2      real time, a good portion of them, actually during the

3      deposition because during the deposition for the first time

4      it became apparent to myself and to the landlord that

5      Transform was taking a position different from Sears that

6      this April 1st, 2017 completion deadline was the real

7      deadline date that hadn't been modified by the course of

8      performance by the parties.  And therefore, we had these

9      messages forwarded immediately.  And we handed what we could

10     during the deposition.  Given the timing -- I think the

11     deposition ended at 3:15 p.m. or something like that.  A

12     number of these messages were located very quickly by my

13     client's representatives who weren't at the deposition.

14     There were several that were at the deposition besides Mr.

15     Shomof.  And there were then subsequent messages that were

16     discovered in the next couple of days were then uploaded to

17     ShareFile.  And they were used in the declaration as

18     exhibits in the same form as they were produced to

19     Transform.  And the Court can disregard the forwarding

20     message.  I'd ask the Court to disregard that forwarding

21     message.  There's no real substance there.  We're not

22     intending -- it's not like a jury or something where there's

23     going to be some influence.

24             Also, the parol evidence rule does not apply as

25     set forth in the reply, which is ECF number 4624 at page 5.

Page 13

1    Under California law, which the parties concede is the

2    governing law here, "Course of performance can supplement,

3    qualify or modify contrary terms in a contract."  And as the

4    district court said in the Facebook case, and that's cited

5    at page 5 of the reply:  "California case law recognizes

6    that course of performance evidence is allowed to explain or

7    supplement integrated contracts" --

8              THE COURT:  Right.  Not modify.

9              MR. KUPETZ:  No.  It does talk about modify as

10   well.  But it explains supplement or modified.  The quote

11   there, though, is "explain or supplement integrated

12   contracts" --

13             THE COURT:  Right.  Exactly.

14             MR. KUPETZ:  -- "even when the contract" --

15             THE COURT:  Listen, I will hear from the other

16   side where their course of performance issue as far as the

17   rights to the money and the deposit was raised at any time

18   before the June cut off --

19             MR. KUPETZ:  Understood.

20             THE COURT:  -- date.

21             MR. KUPETZ:  Understood, Your Honor.  Just in

22   terms of procedurally, how this worked, as the Court, I

23   think, is aware, all that -- when the landlord filed its

24   original cure objection and the supplemental cure objection,

25   all we saw was the amount set forth --

1           THE COURT:  Which was zero.

2           MR. KUPETZ:  -- for the cure was zero.

3           THE COURT:  I understand.  But I don't know if

4    there were discussions about -- or if people just went right

5    to discovery.  So were there discussions about the escrow --

6    the deposit?  It's actually not held in escrow, right?  Is

7    there an escrow agent?

8           MR. KUPETZ:  There is not, Your Honor.

9           THE COURT:  So it's just a deposit.

10          MR. KUPETZ:  The agreement --

11          MR. WEAVER:  A deposit, Your Honor.

12          MR. KUPETZ:  -- contemplated an escrow agent but

13   then the parties between themselves agreed never to use an

14   escrow agent.

15          THE COURT:  All right.

16          MR. KUPETZ:  So the --

17          THE COURT:  So was there a discussion about the --

18   what happened to the escrow -- the timing issue, et cetera,

19   before the June 17 cutoff date?

20          MR. WEAVER:  Your Honor, there was not really

21   substantive discussions amongst the parties --

22          THE COURT:  Right.

23          MR. WEAVER:  -- as to the legal matters.  No,

24   there weren't.

25          THE COURT:  So I'll admit those documents over the

Page 15

1   objection that they were produced late.  As far as their use

2   and their admissibility, I'll wait to hear the rest of the

3   evidence --

4           MR. KUPETZ:  Okay.  Thank you, Your Honor.

5           THE COURT:  -- as far as how they might be used if

6   at all.

7           MR. KUPETZ:  Understood, Your Honor.

8           THE COURT:  Okay.

9           MR. KUPETZ:  With respect to Landlord's Exhibit 1,

10  it's really presented as an illustrative summary.  It's

11  referenced in paragraph 16 of the Shomof declaration, ECF

12  number 4625.  The invoices and checks are referenced in

13  paragraphs 30 and 31 of the declaration.

14          THE COURT:  All right.  But if it doesn't foot,

15  it's really not helpful.  It's actually not -- to the

16  opposite.  It's potentially prejudicial.  So you tell me

17  that the underlying documents are in evidence.  We'll just

18  rely on those.

19          MR. KUPETZ:  And with respect to Exhibits 2, 3 and

20  4, those are copies of the underlying documents that are

21  referenced in Exhibit 1 and are also referenced in paragraph

22  16 of the Shomof declaration, ECF 4625.

23          THE COURT:  Right.  But I think this was a post-

24  discovery cutoff date objection, too.  So were other

25  invoices produced and not these?

Page 16

1           MR. KUPETZ:  I think the other invoices were

2    produced.  It was not any intent to omit any.  There may

3    have been a couple that weren't produced previously.  It

4    wasn't by -- it certainly wasn't by design.

5           THE COURT:  Okay.  Well, I've not reviewed these

6    three exhibits.  If they are not admitted -- I mean, they're

7    part of the cure claim, right?  They serve a base for the

8    cure claim?  What is the --

9           MR. KUPETZ:  There are some underlying --

10          THE COURT:  What are the invoices for?

11          MR. KUPETZ:  They're underlying backup material

12   that shows -- may not be necessary but underlying backup

13   material that shows the work that was done and then billed

14   to the landlord for which the landlord seeks reimbursement

15   from --

16          THE COURT:  But work done in connection with what?

17          MR. WEAVER:  Your Honor, I think to that

18   question's very clear.  This is for work that was done,

19   invoiced and paid by the tenant.  That's what the

20   declaration says.  And if you want, Your Honor, we can cross

21   on this and you can decide whether or not they're

22   admissible.

23          THE COURT:  I'll decide when I hear --

24          MR. WEAVER:  Okay.  It's based --

25          MR. KUPETZ:  Your Honor, just --

Page 17

1          THE COURT:  No.  I'm not going to rule on this

2     now.  I'll decide when we have the examination.

3          MR. WEAVER:  Thank you, Your Honor.

4          MR. KUPETZ:  I think the only additional ones --

5          THE COURT:  Photographs --

6          MR. KUPETZ:  Yeah.

7          THE COURT:  -- and the two charts.

8          MR. KUPETZ:  Right.  So the photographs are really

9     just -- they're illustrative of the testimony that appears

10    in paragraphs 33 and 34 of the declaration.  And just shows

11    the Court exactly what the declarant is speaking of there.

12    He had these photographs taken under his direction.

13         THE COURT:  I don't think I need them.  I think

14    they're irrelevant.

15         MR. KUPETZ:  Okay.

16         THE COURT:  So I'll exclude those.

17         MR. KUPETZ:  And then with respect -- I think the

18    remaining ones, Your Honor, Exhibit 15, I believe --

19         THE COURT:  Right.  To the extent it's relevant,

20    I'll admit this.

21         MR. KUPETZ:  I mean, I think I heard counsel they

22    didn't really have an objection but I may have misheard.

23         THE COURT:  Yeah.  Well --

24         MR. WEAVER:  There's no debate, I think, Your

25    Honor, that money came in, some money came out.  I don't

1    think --

2            THE COURT:  And there are no issues about

3    inaccuracy on this one, right?

4            MR. WEAVER:  Correct.

5            THE COURT:  All right.

6            MR. WEAVER:  Yeah.  I just don't know the source

7    of it, et cetera.  I just think to the extent the parties

8    are not debating the fact that money came in and some money

9    came out, I don't think it's necessarily --

10           THE COURT:  Well, this has a specific dollar

11   figure attached to it, right?

12           MR. WEAVER:  Correct, Your Honor.  I don't think

13   the dollar amount is in dispute.  I think --

14           THE COURT:  It's not.  Okay.

15           MR. WEAVER:  For what was deposited and what has

16   been paid to the landlord by the tenant, there's no debate

17   about that, Your Honor.

18           THE COURT:  All right.  So that's fine.  So this

19   is admitted now.

20           MR. KUPETZ:  And, Your Honor, the final one is

21   Exhibit 16 which is a document that came from the

22   supplemental cure objection which is ECF 3477.  And what it

23   does is it just provides a detail breakdown of the

24   supplemental cure amount of 5,696,000 which is set forth as

25   well in the declaration in less detail.  This provides a

Page 19

1    breakdown of the various categories.

2            THE COURT:  But I don't have the actual invoices

3    or checks or anything like that.

4            MR. KUPETZ:  I'm not sure.  I think that's right

5    but I have to --

6            THE COURT:  So I can't admit a summary of

7    something that's not in the record.  So that one's out.

8            So just to summarize then, Exhibit 1 in this

9    landlord exhibit list is not admitted.  The Exhibits 2

10   through 4 I'll determine as far as how they'll be used, if

11   at all, but otherwise would be admitted.

12       (Landlord's Exhibits 2 through 4 conditionally received

13   in evidence)

14           THE COURT:  The e-mails in 5 through 9 are

15   admitted except for the commentary which I'll disregard.

16   I'm sorry.  5 through 10.  Excuse me.

17       (Landlord's Exhibits 5 through 10 received in evidence)

18           THE COURT:  And then 11 through 14 are not

19   admitted.  15 is admitted and 16 is not admitted.

20       (Landlord's Exhibit 15 received in evidence)

21           MR. KUPETZ:  Thank you, Your Honor.

22           THE COURT:  Okay.

23           MR. WEAVER:  Thank you, Your Honor.

24           MR. KUPETZ:  Your Honor, if the Court will allow,

25   I'm prepared to present Mr. Shomof and -- again, if the

Page 20

1    Court will allow, have his declarations admitted as his --

2    or adopted as his direct testimony.

3              THE COURT:  Okay.  That's fine.  And just to be

4    clear, those are the May 1, 2019 declaration and the July

5    26, 2019 declaration?  Are those the two?  They're in my

6    binder.  It's not an exhibit binder but it's the hearing

7    binder.  They're tabs --

8              MR. KUPETZ:  Yes.

9              THE COURT:  -- 2 and 6.

10             MR. KUPETZ:  Definitely the July 26th.

11             THE COURT:  I'm sorry.  3 and 6.  Excuse me.  Not

12   2.  3 and 6.

13             MR. KUPETZ:  Yeah.  That's correct, Your Honor.

14             THE COURT:  Okay.  So do you want to cross-examine

15   Mr. Shomof?

16             MR. WEAVER:  I do, Your Honor.

17             THE COURT:  All right.  So can you take the stand?

18        (Pause)

19             THE COURT:  Would you raise your right hand,

20   please?

21                  IZEK SHOMOF, WITNESS, SWORN

22             THE COURT:  And would you please spell your name

23   for the record?

24             THE WITNESS:  Good morning, Your Honor.  My name

25   is Izek Shomof, I-Z-E-K, Shomof, S-H-O-M-O-F.

1           THE COURT:  Okay.  Now, Mr. Shomof, you submitted

2    two declarations in support of what I'll refer to as the

3    landlord's objection.  It's the Izek Shomof/Aline Shomof

4    Irrevocable Children's Trust, Vegas Group, LLC and East

5    River Group, LLC but I'll refer to them as the landlord.

6           So you submitted two declarations in support of

7    the cure objection to -- in connection with the motion to

8    assume and assign the lease of the store in Los Angeles.

9           The first declaration is dated May 1, 2019 and the

10   second is dated July 26, 2019.  You recall both of those

11   declarations?

12          THE WITNESS:  I do.

13          THE COURT:  Sitting here today knowing that they

14   would constitute your direct testimony in this contested

15   matter, do you still want that to be your direct testimony?

16          THE WITNESS:  Yes.

17          THE COURT:  And is there anything that you would

18   change in them knowing that it would be your direct

19   testimony?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  And what would that be?

22          THE WITNESS:  What --

23          THE COURT:  What would you change?

24          THE WITNESS:  No.  I do not need to change.

25          THE COURT:  There's nothing that you would --

Page 22

1            THE WITNESS:  No change.

2            THE COURT:  -- change --

3            THE WITNESS:  No.

4            THE COURT:  -- as your direct testimony.

5            THE WITNESS:  So --

6            THE COURT:  Okay.  All right. So I will admit each

7    of them as Mr. Shomof's direct testimony.

8        (Declaration of Izek Shomof dated May 1, 2019 received

9    in evidence)

10       (Supplemental declaration of Izek Shomof dated July 26,

11    2019 received in evidence)

12           MR. WEAVER:  Your Honor, I have a cross binder for

13    the witness and Your Honor, if I may approach?

14           THE COURT:  Okay.

15           MR. WEAVER:  Thank you, Your Honor.

16           THE COURT:  Uh-huh.

17                   CROSS-EXAMINATION

18    BY MR. WEAVER:

19    Q    Good morning, Mr. Shomof.

20    A    Good morning.

21    Q    I want to start with the construction estimate deposit.

22    And so this is tab 6 in your binder.  This is the 2015

23    amendment.  And looking just in general on pages 3 and 4 and

24    5, under this amendment, you agreed, Mr. Shomof, to perform

25    work related to low voltage services, HVAC, plumbing,

Page 23

```
 1    façade, signage and freight elevators.  Correct?

 2    A    Now let's go back for a second.  You said page --

 3    Q    I'm sorry, Mr. Shomof.  In tab 6, if you look -- you

 4    know, it's a little easier if we use the ECF pages.  So at

 5    the top of the page, you'll see page 16 of 135.  You see

 6    that?

 7    A    Page 16?

 8    Q    Of 135 at the top.

 9    A    Okay.

10    Q    And you'll see that there's page 17 of 135 at the top

11    and page 18 of 135 at the top.  Do you see that?

12             MR. WEAVER:  Your Honor, may I just --

13             THE COURT:  So it's paragraphs 3 through --

14             MR. WEAVER:  3 through 10.

15             THE WITNESS:  16 of 135.  Yeah, I do see it.

16             THE COURT:  3 through 10.

17             MR. WEAVER:  Okay.

18             THE COURT:  Okay.

19    BY MR. WEAVER:

20    Q    So under this 2015 amendment, Mr. Shomof, you as a

21    landlord agree to do work related to low voltage, HVAC,

22    plumbing, façade, signage, seismic work and freight

23    elevators.  Correct?

24    A    Correct.

25    Q    And under this agreement, you as a landlord agreed to
```

Page 24

1    complete this work by April 1st, 2017, correct?

2    A    Yes.

3    Q    And you did not complete all of that work by April 1st,

4    2017, correct?

5    A    We did not due to the agreement that we had with Sears

6    that it should continue.

7    Q    Mr. Shomof, my question is you did not complete the

8    work by April 1st, 2017.  Correct?

9    A    Correct.

10   Q    Now if you turn to paragraph 25, Mr. Shomof, and this

11   is found on page 28 of 135, again, still in tab 6, and under

12   this agreement, you as a landlord provided the tenant with a

13   $3.25 million construction estimate deposit.  Correct?

14   A    Yes.

15   Q    And that was to "partially secure Landlord's design,

16   repair, construction and completion obligations under [the]

17   amendment".  Correct?

18   A    Correct.

19   Q    Now if you turn the page to subparagraph (d), Mr.

20   Shomof, also under this agreement, you agreed, under Section

21   (d), "In the event Landlord does not complete the work

22   contemplated in Sections 3, 4, 6 and 7" -- so that relates

23   to low voltage, HVAC, façade and signage -- "by April 1,

24   2017, the remainder of [the] funds in the Construction Fund

25   Escrow shall be released to [the] Tenant, at Tenant's

Page 25

1    election, so that [the] Tenant [may] cause...work to be

2    completed and [that] Tenant [may] be entitled to payment[s]

3    by [the] Landlord [of] any additional amounts necessary to

4    complete the work."

5        You agreed to that.  Correct, Mr. Shomof?

6    A    We agreed to the tenant election but tenant did not

7    elect for me to stop work and they will continue the work.

8    Q    Mr. Shomof --

9    A    The tenant election was to ask to proceed with the work

10   after April 1st.

11   Q    My question is, Mr. Shomof, you agreed to this

12   provision, correct?

13   A    Yes.

14   Q    And also you agreed that, under this provision, to the

15   extent that you the landlord timely complete the work in a

16   manner that's acceptable to the tenant "any remaining

17   Construction Estimate Deposit[s]" will be dispersed to you

18   subject to review and approval.  Correct?

19   A    Correct.

20   Q    Now, Mr. Shomof, the parties -- that is, the landlord

21   and the tenant -- did not enter into a written agreement to

22   adjust the April 1st deadline, correct?

23   A    Not exactly correct, no.

24   Q    Is there a written agreement between the landlord and

25   the tenant to adjust the April 1st deadline?  Yes or no, Mr.

1   Shomof?

2   A    It's not a yes or a no question.  There is an e-mail

3   from Delores allowing us to proceed with the work after

4   April 1.

5   Q    We're going to come to that e-mail.  I think it's in

6   May of 2017.  But what I'm asking, Mr. Shomof, is there a

7   document --

8   A    Yeah.  It's a month later.

9   Q    Is there a document signed by you the landlord or your

10  representative and the tenant that adjusts the April 1st

11  deadline?  Yes or no?

12  A    A signed agreement, no, but there is an e-mail that's

13  allowing us --

14  Q    Thank you, Mr. Shomof.

15       Now, Mr. Shomof, you attached to your declaration a

16  number of invoices that you claim that you as the landlord

17  sent to the tenant and that the tenant then subsequently

18  paid.  Is that correct?

19  A    Correct.

20  Q    Okay.  We'll look at a few of those if we could.  So if

21  you'd turn to tab 7, Mr. Shomof -- I'm sorry.  Not tab 7.

22  If you look to tab 8 -- I apologize.  Tab 8, Mr. Shomof.

23  This is Joint Exhibit number 4 which was the Exhibit number

24  2 to your declaration.  Now this, Mr. Shomof, is an invoice

25  dated August 16th, 2017, invoice number 08001PR, in an

Page 27

```
 1   amount of just north of 1.5 million.  Correct?

 2   A    Correct.

 3   Q    Okay.  If you turn to tab 9, Mr. Shomof, this is Joint

 4   Exhibit 5, number 3 to your declaration.  This here is

 5   another invoice also dated April (sic) 16th, 2017.  It's

 6   also invoice number 08001PR.  But this is in the amount of

 7   478,000, correct?

 8   A    Correct.

 9   Q    And on this document is a paid stamp of 8/12/17,

10   correct?

11   A    Correct.

12   Q    If you turn the page, Mr. Shomof -- this is still

13   within that tab -- you'll see yet another invoice also dated

14   August 16th, 2017, also numbered 08001PR, again in the

15   amount of 478,000 but this has a paid stamp of 8/18/17.

16   Correct, Mr. Shomof?

17   A    Are we looking at the same invoice copied twice?

18   Q    Mr. Shomof, this is attached to your declaration.  I'm

19   just asking you if this is the evidence that you've

20   submitted to the Court.

21   A    Yes.  Yes.

22   Q    Now, Mr. Shomof, if you turn to tab 10, tab 10 is Joint

23   Exhibit 6, number 4 to your declaration.  This is another

24   invoice dated August 16th, 2017.  This one is invoice number

25   08002PR.  And this has a number -- amount just north of one
```

Page 28

1    million dollars.  Correct?

2    A    Correct.

3    Q    If you turn to tab 11, Mr. Shomof, this is Landlord

4    Exhibit number 2, another invoice dated August 16th, 2017.

5    Again, the number 08002PR, but this one's in the amount of

6    983,000.  Correct?

7    A    Correct.

8    Q    And finally, Mr. Shomof, if you look at tab 12, this is

9    Joint Exhibit 7, number 6 to your declaration, another

10   invoice from August 16th, 2017.  This one is numbered

11   08002A.  And this is in the amount of $18,853, correct?

12   A    Correct.

13   Q    Okay.  Now in addition to these invoices, Mr. Shomof,

14   you also attach to your declaration a set of backup invoices

15   and checks, correct?

16   A    Correct.

17   Q    And this is a backup, the invoices and checks, that

18   went to you or paid by you that were the backup for invoices

19   you sent to Sears that Sears then paid, correct?

20   A    Correct.

21   Q    Now, Mr. Shomof, they were Exhibits 5, 8 and 10 to your

22   declaration.  They're Landlord Exhibits 2, 3 and 4.  There's

23   approximately 300 pages here, Mr. Shomof.  You're familiar

24   with these documents, correct?

25   A    I am -- I have not reviewed every -- each of the

Page 29

1    document.

2    Q    You attached this to your declaration, did you, Mr.

3    Shomof?

4    A    Yes, but not in detail.  Yes.

5    Q    And you swore under oath that this was the backup for

6    those invoices, correct?

7    A    Correct, yes.

8    Q    Mr. Shomof, how many of these invoices and checks are

9    dated after April 1st, 2017?

10   A    I am not sure.

11   Q    You're not sure.

12   A    No.

13   Q    Well, I just received these on Friday but we've gone

14   through these, Mr. Shomof.  And I can represent to you that

15   only 14 of these invoices are dated after April 1st, 2017.

16   Do you have any reason to doubt that representation?

17   A    I just don't remember it but I shall review it again.

18   Q    And those 18 add up to less than $80,000.  Again, any

19   reason to doubt that representation?

20   A    Could very much be.

21   Q    Okay.  And some of these invoices, Mr. Shomof, date

22   back to 2014, correct?

23   A    Yes.

24   Q    And some of them date back to 2015, correct?

25   A    Correct.

1    Q    And there are no invoices in the backup you provide to

2    this Court dated after 2017, correct?

3    A    There are.

4    Q    Invoices within these three exhibits, Mr. Shomof?

5    A    Invoices from my company to Sears.

6    Q    Understood.  I'm not asking about the single-page

7    invoices that you sent to Sears.  I'm talking about the

8    backup, the work that was actually done.  There are no

9    invoices submitted to this Court dated after 2017, correct?

10   A    The work that we have done and a third party that have

11   done work, but there is other work that we have done that

12   our labor worked and we billed Sears for it.

13   Q    Mr. Shomof, you testified -- in your declaration, you

14   wrote that this is the backup for the invoices that you

15   submitted to Sears that Sears has paid.  Correct?

16   A    Correct.

17   Q    Thank you.

18        Now let's look at that e-mail that we were talking

19   about.  It's tab 15 in your binder, Mr. Shomof.  Now this is

20   the e-mail you were referencing earlier, correct, with

21   Dolores from Sears?

22   A    Yes.

23   Q    Okay.  And if you go to the end of the e-mail chain --

24   just for reference, it begins in May of 2017.  Correct?

25   A    It's such a small print I cannot see it.

Page 31

1   Q    I'm sorry, Mr. Shomof.  This is what was produced

2   attached to your declaration.  So I apologize for that.  I

3   can represent to you, Mr. Shomof, that the e-mail's dated

4   May 11th, 2017.  Are you okay with that representation?

5   A    Yes.

6   Q    Okay.  So this e-mail that you've pointed to was after

7   the April 1st, 2017, correct?

8   A    Correct.

9   Q    And in the e-mail on the first page -- right?  Again, I

10  apologize that the font is small.  It's May 11th at 2:17.

11  This is an e-mail from Dolores.  Dolores acknowledges in the

12  e-mail that you've missed the deadline of April 1st, 2017.

13  Correct?

14  A    Yes.

15  Q    And then she goes on to say, "With that being said" --

16  or "that being the case, I'm asking that the HVAC and the

17  seismic work be done at the same time.  The expense of

18  moving product and fixtures will be double if we need to do

19  it twice.  This is a great store for Sears and we do not

20  want to affect the customers or associates more than

21  needed."  Correct?

22  A    Yes.  But I think you missed the paragraph when she

23  said speak to legal and legal will -- and then she said

24  after -- legal will approve it.

25  Q    Well, let's look at her words, Mr. Shomof.  It says "I

Page 32

1    have spoken to legal" --

2    A    If you don't mind, yeah.  It sounds --

3    Q    -- "and here are my remarks."

4    A    -- like -- now what -- sorry.

5    Q    "I've spoken to legal and here are my remarks."  That's

6    what Dolores wrote, correct?

7    A    Yeah.

8    Q    Okay.  And so she acknowledged in the e-mail that you

9    had missed the deadline.  Correct?

10   A    Yes.

11   Q    And she said, in light of that, they want you to do the

12   HVAC and the seismic together, correct?

13   A    Yes.

14   Q    Okay.  And her assumption, if you look down in the next

15   paragraph, was the seismic work -- the permits we pulled

16   later that year, 2017, and the work will begin in January

17   2018.  Correct?

18   A    Yes.

19   Q    Okay.  And above your associate, Leo, writes as it

20   relates to the seismic -- it's number 2 in the top e-mail:

21   We "anticipate having permits around September of this year

22   and the goal beginning early 2018."  Is that right?

23   A    Correct.

24   Q    Okay.  Now I want to turn to the latest invoice, Mr.

25   Shomof, that you had provided, which is tab 17 in your

1    binder.  Now this, Mr. Shomof, is Joint Exhibit number 10.

2    It was attached as Exhibit 17 to your declaration.  But it's

3    also the invoice that was attached in January in support of

4    your original cure objection.  Do you see that?

5    A    Yes.

6    Q    And this is in the amount -- it's dated January 23rd,

7    2019.  It's in the amount of just over 322,000, correct?

8    A    Correct.

9    Q    And this invoice has an assumption in it, doesn't it?

10   A    What do you mean by --

11   Q    If you look in the middle, there's an asterisk.  And

12   there's a note halfway down that says "Assuming Sears" --

13            THE COURT:  I'm sorry.  What exhibit is this?

14            MR. WEAVER:  I'm sorry.  We're in tab 17, Your

15   Honor --

16            THE COURT:  Of the witness binder?

17            MR. WEAVER:  -- of the cross binder but it's also

18   Joint Exhibit number 10.

19            THE COURT:  Okay.  Fine.

20            MR. WEAVER:  Apologize, Your Honor.

21            THE COURT:  Okay.

22   BY MR. WEAVER:

23   Q    So there's an assumption in the middle of this invoice,

24   correct?

25   A    Yes.  Correct.

1   Q    And that assumption is that Sears did not pay for the

2   equipment, correct?

3   A    Yes.  We will bill that amount -- we had the invoices

4   sitting on the table and we were trying to clarify Sears

5   paid for it or not.  We have not gotten no answer.  So we

6   said assuming Sears did not pay that amount, 322,649 is

7   owed.

8   Q    You didn't know whether or not you'd been paid,

9   correct, Mr. Shomof?

10  A    We did not know if Sears paid it to the third party.

11  Q    Ahh.  So they could have paid it to the third party,

12  Mr. Shomof.  But you're seeking to recover it here, correct?

13  A    Assuming -- if you look at what it says in the middle,

14  assuming that Sears did not pay for it.  Yes.

15  Q    Mr. Shomof, you provided absolutely no backup for this

16  invoice, correct?

17  A    What -- the backup that we provided, that 75 percent --

18  the actual fact of the (indiscernible) that 75 percent of

19  the work is completed.  And we showed it in the pictures.

20  And the pictures -- you asked for the judge to basically

21  omit it.

22  Q    Mr. Shomof, you provided absolutely no backup to this

23  invoice, correct?

24  A    No backup for the $205,000 if it was paid or not, we

25  didn't know.

1   Q    No backup for the 322,000 you're claiming through this

2   invoice.  Correct, Mr. Shomof?

3   A    Backup to you or backup to Sears?

4   Q    In this case.  Backup in this case.

5   A    I have to look into it.  No, I'm not sure.

6   Q    It's not attached to your declaration, correct, Mr.

7   Shomof?

8   A    If it's not then it's not --

9   Q    It's not.

10        Now let's turn to the seismic retrofit, Mr. Shomof.

11   And for this, we'll probably go back to tab 6, which is the

12   2015 amendment.  And Mr. Shomof, under the 2015 amendment,

13   you as the landlord agreed to be responsible for all the

14   costs, correct?

15   A    Responsible of all the -- which costs?

16   Q    All the costs associated with the construction called

17   for in the amendment.  Correct?

18   A    Yes.

19   Q    Okay.  And if you look at paragraph 8, which is page 17

20   of 135.  We're still in tab 6.  This is Joint Exhibit number

21   2.

22   A    Yes.

23   Q    Under "Seismic Work", you agreed that you were

24   responsible for all necessary seismic repairs and

25   improvements, correct?

Page 36

1   A     Yes.

2   Q     And you also agreed that you would take best efforts to

3   pull the permits 12 months after the city of Los Angeles

4   approved, correct?

5   A     Correct.

6   Q     And then 12 months after that to complete the work.

7   Correct?

8   A     Correct.

9   Q     You also agreed that the plans and specifications,

10  schedules, authorized hours of construction activity and

11  remediation plan for the seismic work would be pre-approved

12  by the tenant pursuant to the demolition and construction

13  protocol attached to the amendment.  Correct?

14  A     Correct.

15  Q     And you also agreed that you would conduct this work in

16  a manner that creates the minimum possible visual and noise

17  inconvenience to the tenant and the customers.  Correct?

18  A     Correct.

19  Q     Now, Mr. Shomof, you pulled the permits for the seismic

20  retrofit in February of this year, correct?

21  A     Correct.

22  Q     Now your son, Jonathan, sent a letter to counsel for

23  Sears, for the tenant, in September of 2018, correct?

24  A     Correct.

25  Q     And this is tab number 18 in your binder.  It is Joint

Page 37

```
1    Exhibit number 3.  Let me know when you're there, Mr.

2    Shomof.

3    A    I'm here.  I've seen it.

4    Q    And in this letter, Jonathan says, "Hopefully, Sears

5    will agree to close from February 1st, 2019 to August 15,

6    2019."  Correct?

7    A    Correct.

8    Q    Now nowhere in this letter, that's tab 18, is there a

9    detailed scope of work or detailed set of construction

10   plans, correct?

11   A    Yes.  What scope of work there is attached.  If you

12   look at Exhibit 3 --

13   Q    Well --

14   A    -- it basically detail how we're going to -- how we're

15   going to be -- start the job and setting up what is --

16   Q    Is that the picture, Mr. Shomof?  I'm sorry.  This one

17   doesn't have page numbers.  I apologize.

18   A    Picture of detail of how will it be.  And with

19   timeline.  Again, on Exhibit 3, the page after that --

20   Q    And we'll come back to the timeline in a second.  But

21   there's no construction plans here, correct, Mr. Shomof?

22   A    Assuming Sears will want to proceed with continuing,

23   plans will be submitted.  The plan is the size of -- we have

24   plans this size of my stand where I'm sitting.

25   Q    So you were looking for a negotiation.  Correct, Mr.
```

1    Shomof?

2    A    I was not looking for negotiation.  I was looking to

3    agree on strategy how we're going to start construction.

4    Q    So this related to strategy, not the actual

5    construction plans.  Correct, Mr. Shomof?

6    A    Can you repeat it?

7    Q    This related to a strategy issue not the actual

8    construction specifics.  Correct, Mr. Shomof?

9    A    Actual construct -- we were planning to start

10    construction in February.

11    Q    But there's no plans in this letter, correct?

12    A    Well --

13    Q    Yes or no, Mr. Shomof?

14    A    Well, there is not, no.

15    Q    Okay.

16    A    There is not.

17    Q    Right.  And there is a timeline you said, Mr. Shomof,

18    in here.  And this timeline assumes, does it not, that Sears

19    would shut down for six months.  Correct?

20    A    Yes.

21    Q    There's no other timeline in this letter, correct?

22    A    In that letter, no.

23    Q    Okay.

24    A    But probably other ones, yes.

25    Q    But this is the only letter you've attached to your

Page 39

1   declaration, correct, Mr. --

2   A    Yes.

3   Q    -- Shomof?

4   A    This is what we -- we have to seal.

5   Q    Okay.  And if you look at tab 19, Mr. Shomof, this is

6   the e-mail that Jonathan sent to counsel for tenant that

7   attached the letter at the top.  And below there's a

8   response from counsel for the tenant.  Correct?

9   A    Yes.

10  Q    And in that response, counsel says, "To be clear, this

11  letter does not appear to be offered in the spirit in which

12  we discussed it last week.  It comes across more as a

13  direction from you as opposed to offering a proposed

14  timeline and outlining some issues that remain to be

15  negotiated before the process begins."

16  A    Yes.

17  Q    "The history of this project is riddled with errors

18  that have put our employees and patrons at risk and reach

19  negotiated protocols, not to mention broken promises about

20  timing.  Just two months ago, you notified us that you would

21  likely not pursue this project."

22       This was the response you got from your letter,

23  correct?

24  A    Yes.

25  Q    And if you turn the page, Mr. Shomof, at the end of

1    counsel's response to you, he states:  "I have offered to

2    meet with your lawyer so we can start to work through these

3    issues.  And I renew this offer."  That's what he told you.

4    Correct, Ms. Shomof?

5    A    Yes.

6    Q    And below that, your son forwards the letter to you and

7    said, "Just want to confirm that you saw this e-mail.  Let

8    me know if you want to respond."  Correct?

9    A    Yes.

10   Q    And there is no written response to that e-mail,

11   correct, Mr. Shomof?

12   A    It's probably written response from my attorney to him.

13   Q    You didn't attach any written response to your

14   declaration, correct, Mr. Shomof?

15   A    So you're asking me if I attached a written response or

16   you're asking me if there was a written response to --

17   Q    Well --

18   A    -- Steve?

19   Q    -- Mr. Shomof, all I can do is talk about the evidence

20   that you've tried to put before the Court.  And I'm asking,

21   is there any evidence in the record before this Court of a

22   written response to this e-mail.  Yes or no?

23   A    If you don't have it here then it's not.

24   Q    Mr. Shomof, the entitlements issued by the city of Los

25   Angeles, they have not expired yet, correct?

Page 41

```
1    A    Not yet.  We have another probably a lifetime --

2              THE COURT:  I'm sorry?

3    A    -- or another month.

4              THE COURT:  How many --

5              THE WITNESS:  Maybe another 30 days before it

6    expiring.

7    BY MR. WEAVER:

8    Q    You testified in your declaration that September 16th

9    is the date you provided.  Correct, Mr. Shomof?

10   A    I testified to what?

11   Q    September 16th is in your declaration, correct?

12   A    Yes.

13   Q    Okay.

14   A    It's -- I think it's a little bit before September

15   16th.

16   Q    So your declaration isn't correct, Mr. Shomof?

17   A    I am not sure.  I think it's before.  It's -- my

18   deadline was six months from February 16th.  So whatever it

19   comes.

20   Q    Understood, Mr. Shomof.  And on June 24th, Mr. Shomof,

21   when I deposed you, you testified under oath that the

22   project that we're discussing was not dead, correct?

23   A    You asked me if the project is dead and I answered back

24   to you I put my lifetime into this project.  I want to

25   believe not to.  The reason is because I was negotiating
```

Page 42

1   with someone to JB and that negotiation fell through.

2   Q   Mr. Shomof, if you turn to tab 1 in your binder, that's

3   a copy of your deposition transcript.  You remember being

4   deposed on June 24th, Mr. Shomof?

5   A   I do, yes.

6   Q   Your counsel was there, correct?

7   A   Yes.

8   Q   Court reporter was there, correct?

9   A   Yes, I know.

10  Q   You swore to tell the truth at that time?

11  A   Absolutely.

12  Q   If you would turn with me, Mr. Shomof, to page 146 of

13  your deposition --

14  A   What page again?

15  Q   146, Mr. Shomof.  And starting on line 20, I'm going to

16  read the question and answer.  If you could read along with

17  me, please.

18  "Q   Mr. Shomof, is the development plan for Boyle Heights

19  that we've been discussing today dead?

20  "A   I hate to say, I literally hate to say even maybe.  I'm

21  trying.  This is something that is my flux sheet on my

22  projects.  I've done 25 other projects.  This is the biggest

23  one.  This is a -- I put my heart and soul into it.  I want

24  to get it to happen and developed.  I've been through hell

25  with the financing.  I've been through hell with a lot of

Page 43

1    getting permits.  It was hard.  The answer is I hope that it

2    is in some way I can maybe salvage it.

3    "Q   So the answer is no, it is not dead?

4    "A   Yes.  The answer is no, it is not dead."

5        Did I read that correctly, Mr. Shomof?

6    A    Yes, you did.

7    Q    Okay.  And in your declaration of July 26th, Mr.

8    Shomof, you testified the first time that during the

9    deposition, you were in discussion with investors for a

10   joint endeavor, correct?

11   A    Correct.

12   Q    And during the deposition when I asked you about

13   whether or not the project was dead, you didn't say a word

14   about those investors.  Correct?  Yes or no?

15   A    The answer that you -- you've received here I chose the

16   person with hope.

17   Q    Understood.

18   A    I hoped that the project would not die.

19   Q    But you didn't say anything about other investors.

20   Correct, Mr. Shomof?

21   A    I was not asked if I have other investors.  So I did

22   not say that.

23   Q    So you didn't say a single word about other investors

24   when we were talking about whether the project was dead.

25   Correct, Mr. Shomof?

Page 44

1   A    Did you ask me if there was other investors?

2   Q    It's a yes or no question, Mr. Shomof.

3   A    No.  It doesn't say that -- it doesn't say at my

4   deposition what I conduct.

5            THE COURT:  I can read the deposition.

6            MR. WEAVER:  Understood, Your Honor.  I'll move

7   on.

8   BY MR. WEAVER:

9   Q    Mr. Shomof, to keep the entitlements valid, you need to

10  begin construction, correct?

11  A    Correct.

12  Q    And to begin construction, you need to call in an

13  inspector to show that you've started construction, correct?

14  A    Correct.

15           MR. WEAVER:  No further questions at this time,

16  Your Honor.

17           THE COURT:  Okay.

18       (Pause)

19           THE COURT:  Any redirect?

20           MR. KUPETZ:  Yes.  Thank you, Your Honor.

21           THE WITNESS:  Your Honor, if you don't mind, can

22  you give me a bottle of water?

23           THE COURT:  Sure.

24           THE WITNESS:  Thank you.

25           THE COURT:  That's fine.

1          THE WITNESS:  Thank you very much.

2                    REDIRECT EXAMINATION

3    BY MR. KUPETZ:

4    Q    Mr. Shomof, I'd like to ask you some questions first

5    with regard to the construction estimate deposit.  Prior to

6    the commencement of Sears' Chapter 11 case, what sort of

7    communications were going on with representatives at Sears

8    and the landlord with regard to construction estimate

9    deposit?

10   A    Rephrase your question.

11   Q    Well --

12   A    And if you can speak louder.

13   Q    Okay.  I'm sorry.  I'm sorry.  Let me rephrase it.

14   It's too broad a question, I think.

15         After April 1 of 2017 and prior to the commencement of

16   Sears' Chapter 11 case, with respect to the construction

17   estimate deposit, did the landlord and representatives of

18   Sears have ongoing regular communications?

19   A    Yes.

20   Q    And what was the substance of those communications?

21   A    On the continuous work that is happening way after

22   April 1.

23   Q    And was Sears' representatives asking the landlord to

24   do certain work covered by the construction estimate deposit

25   after April 1, 2017?

Page 46

1    A    We were doing what was agreed on to do.  It may not be

2    completed on April -- before April 1 of 2017.  So we were

3    continuing -- continue to finish what left to be done.

4    Q    And was --

5    A    As of now, it's not 100 percent completed.

6    Q    And after April 1st of 2017, was Sears asking you to do

7    that work?

8    A    Yes.

9    Q    And were the communications between landlord and Sears

10   to the effect that landlord would be reimbursed from the

11   construction estimate deposit for that work?

12            MR. WEAVER:  Objection, Your Honor.  It's leading,

13   that question, Your Honor.

14            THE COURT:  You should rephrase it.

15   BY MR. KUPETZ:

16   Q    That work that was being done after April 1, 2017, with

17   respect to the categories covered by the construction -- by

18   the construction estimate deposit --

19            THE COURT:  Who was to pay for it?  Or how was it

20   to be paid for?

21            THE WITNESS:  As agreed on the agreement, as

22   construction proceeding and completing, they would pay us.

23   And they continued paying us after April 1 of 2017.  They

24   paid us a year later in 2018, April of 2018.  They continued

25   paying us.

Page 47

```
 1    BY MR. KUPETZ:

 2    Q    And that payment came from the construction estimate

 3    deposit as you understand it?

 4    A    The payment was coming from the payment -- from the

 5    deposits, yes.

 6    Q    And that was for work done after April 1, 2017.

 7    A    Correct.

 8    Q    Now in doing work after April 1, 2017, was Landlord

 9    relying on representations of Sears about getting paid?

10           MR. WEAVER:  Again, Your Honor.  He's testifying

11    here.

12           THE COURT:  You have to stop leading.

13           MR. KUPETZ:  I'll rephrase it.

14    BY MR. KUPETZ:

15    Q    Why did you -- why did Landlord do work after April 1,

16    2017?

17    A    Because we owed it as agreed.  Job needs to be

18    completed.  So we continued doing it after April 1 and -- of

19    2017 and we were getting paid, just like I said before.

20    Q    Now is it your understanding -- did Sears make any

21    requests to Landlord with regard to the timing of the work?

22    A    Repeat it again.

23    Q    With respect, for example, to the HVAC work, was there

24    a request made by Sears?

25    A    Yes.  They preferred to do it together with the seismic
```

Page 48

1    retrofit.  That's her recommendation.  Dolores -- we wanted

2    to do it before and get paid, the HVAC.  She said we rather

3    -- after she's basically specifying "I spoke to legal and we

4    prefer doing it together with the seismic."

5    Q    Now what is the status of the completion of the work

6    covered by the construction estimate deposit?

7    A    All the HVAC units which I have pictures -- and I would

8    love to share it with the judge -- Your Honor here, all the

9    HVAC, the compressor on the outside of Sears space, it's

10   already been installed and connected.  All the IT room, all

11   the electronics of their computers and everything has been

12   relocated into the Sears space.  HVA -- a big portion of the

13   HVAC was done in the IT room.  All the façade was completed.

14   All the signage were completed and installed.  The majority

15   of the work was done.  What got left to do is put the HVAC

16   condensers inside Sears' space.  And the condensers, it's

17   already been paid for, installed on Sears' property in a

18   containers which I attached pictures to show that the

19   condensers are there.  We were ready to do it.  But they

20   asked us to do it at the later time.  When I say they, I

21   mean Sears.  Dolores from Sears.

22   Q    Now after the commencement of Sears' Chapter 11 case,

23   did Landlord receive any substantive communications or

24   response from Sears with regard to any type of construction

25   at the property?

1   A     After what date?

2   Q     The commencement of the Chapter 11 case which was mid-

3   October of last year.

4   A     When Sears went into bankruptcy and that was shocking

5   for us, no communication whatsoever with Sears.  Everything

6   just died.

7   Q     Now is it correct -- I know counsel for Transform asked

8   you about communications with Mr. Velkei.  Is it correct

9   that with respect to the renovation of the project that

10   Landlord was in communications with Sears' counsel, Mr.

11   Velkei?

12   A     I was continuously meeting with Steve Velkei and Alan

13   Shaw from Sears.  Steve Velkei is Sears' attorney.  Alan

14   Shaw is Sears' representative in regards to construction.

15   We met few times and we were talking about how we were going

16   to be proceeding with the construction of Sears.

17   Q     And what did Mr. Velkei tell you in terms of further

18   communications once Sears commenced its Chapter 11 case?

19   A     Again, Steve is the only contact that I had.  I tried

20   getting a hold of Alan Shaw.  Alan Shaw was either fired or

21   quit or laid off.  So there was no -- nowhere to be found.

22   Alan Shaw was nowhere to be found, no reply whatsoever from

23   Sears.  I kept on going back to Steve.  And up until I would

24   say a month through later when Steve says let me Izek, I'm

25   in limbo myself.  I don't know where he's going.  At one

1    time, Steve was get -- got laid off and rehired again.  So

2    Steve says, Izek, the best thing for you I recommend you get

3    yourself a bankruptcy attorney to help you here.

4    Q    And is that what you did?

5    A    And that's what exactly I did.

6    Q    And then did you continue on behalf of the landlord to

7    try to reach out to Sears?

8    A    Repeatedly.

9    Q    And did you get any substantive response from Sears?

10   A    Nothing.  Even Steve himself, attorney for Sears, could

11   -- couldn't get a hold of no one.

12   Q    With respect to the current status of the project and

13   whether or not it's dead and the questioning that you were

14   receiving, what is your view of the current status of the

15   project?

16   A    Can you repeat it again, please?  You were asking me a

17   question?

18   Q    Yes.  What is the current status of the project, the

19   renovation and rehabilitation of the property, the big

20   project, not --

21   A    For the overall project?

22   Q    Yes.

23   A    What is the status of it?  It just died out.  I mean,

24   the lender pulled away.  Once the lender pulled away, I have

25   no funds to basically start construction.  So died out.

Page 51

1    Q    And why did that occur?

2    A    Because there was a condition -- one -- there was a

3    condition with the lender that they want to see an agreement

4    with Sears that they will allow us to go in and do the

5    seismic retrofit.  They were afraid -- they knew that Sears'

6    bankruptcy, it's an issue.  They were afraid to finalize the

7    loan and start funding.  And then I have no access to Sears

8    which I told them Sears are occupying 70 percent of the

9    ground floor.  I have another 30 percent of the ground floor

10   that I can start construction in the 70 per -- in the 30

11   percent.  And they said what happened if Sears would go in

12   bankrupt for another year and they're not going to give you

13   access to their space.  So that's why I was reaching out to

14   Sears repeatedly to try to some kind of an agreement from

15   them to give my lender to assure the loan or to fund the

16   loan but to know if they're back in April of 2019 -- March

17   or April.  They just send us a letter and say we are pulling

18   off, pulling away.

19                  MR. KUPETZ:  Thank you.

20                  THE COURT:  Any recross?

21                  MR. WEAVER:  I'll be brief, Your Honor.

22                          RECROSS-EXAMINATION

23   BY MR. WEAVER:

24   Q    Mr. Shomof, the evidence that you've submitted in this

25   case in support of the work that you've done is contained in

Page 52

1    the three exhibits that we've been talking about, the

2    invoices, correct?  That's the evidence you submitted.

3    A    I submitted more than that.  I don't know what you're

4    showing.  I submitted bunch of invoices here that were paid

5    after -- all the way up to April of 2018.  And it seems like

6    you're not talking about it.

7    Q    Well, Mr. Shomof --

8    A    And I'm wondering why.

9    Q    Mr. Shomof, you testified before that some of the

10   invoices are from 2014, correct?  That you incurred.  2014,

11   correct?

12   A    I testified because you mention.  I said could be, yes.

13   Q    And the first invoice from you to Sears is in 2017,

14   correct?

15   A    Wait a minute.  I am little confused.  The agreement

16   occurred with Sears on 2015.

17   Q    Correct.

18   A    And you're saying --

19   Q    The first invoice --

20   A    The amended -- hold on.

21   Q    -- that you sent --

22   A    Hold on.

23   Q    -- in to Sears --

24   A    I'm a little confused here.  If you don't mind, let me

25   ask you a question.  What you're saying here is work was

Page 53

1    done prior to the amendment of the agreement with Sears?

2    Q    By looking at the calendar, that would seem to be the

3    case.  But that's not my question, Mr. Shomof.  My question

4    is, you've submitted evidence that says there was -- part of

5    the backup is from 2014/2015.  The first invoice that you

6    sent to Sears is dated August 16th, 2017.  Correct?

7    A    The first invoice?

8    Q    That you sent to Sears.

9    A    Was when?

10   Q    August 2017.  Correct?

11   A    Hold on.  I have it here.  Before I answer, let me just

12   see it and make sure.

13        Yes.  I have August 16 --

14   Q    2017.  Correct, Mr. Shomof?

15   A    Correct.

16   Q    Okay.  Now, Mr. Shomof, you also testified about having

17   possession of 30 percent of the ground floor of the

18   building, correct?

19   A    Correct.

20   Q    You could go tomorrow and begin construction on that 30

21   percent.  Correct, Mr. Shomof?

22   A    I cannot go tomorrow and start construction because I

23   have no financing.

24   Q    But for financing, Mr. Shomof, you could tomorrow -- on

25   Saturday, perhaps not -- on Monday to the 30 percent and

Page 54

1    begin construction.  Correct, Mr. Shomof?

2    A    Except for funding, yes.

3           MR. WEAVER:  No further questions, Your Honor.

4           THE COURT:  Okay.  Any redirect on that?

5           MR. KUPETZ:  No, Your Honor.

6           THE COURT:  Okay.  You can step down, sir.

7           THE WITNESS:  Step down?

8           THE COURT:  Yeah.

9        (Witness excused)

10           MR. WEAVER:  Your Honor, are you prepared to hear

11   argument at this time?

12           THE COURT:  Well, let me just make sure.  Is there

13   any other evidence other than what's in the record and the

14   testimony that I've just heard?

15           MR. WEAVER:  Nothing from Transform, Your Honor.

16           THE COURT:  Okay.

17           MR. KUPETZ:  Just the declarations.

18           THE COURT:  Right.  Those are already in evidence.

19   Okay.

20           Just going back to the evidentiary rulings at the

21   start of the hearing, I will admit the invoices in Landlord

22   2 through 4 in that evidence binder.

23       (Landlord's Exhibits 2 through 4 received in evidence)

24           THE COURT:  Okay.  So then I will hear brief oral

25   argument.

1          MR. WEAVER:  I will try to be brief, Your Honor.

2     Again, Andrew Weaver, Cleary Gottlieb, on behalf of

3     Transform.

4          Your Honor, as you know, on May 13, 2019, the

5     debtors assumed and assigned the vast majority of its leases

6     to Transform.  Since then, Transform has worked to resolve

7     any outstanding landlord objections and continues to make

8     good progress on that front.  Unfortunately, we were not

9     able to reach consensual resolution as to this property,

10    Your Honor, which is why we're here today.

11          The store at issue, Your Honor, occupied the

12    portion of the building on East Olympic Boulevard in Los

13    Angeles and was subject to a sale lease back in 2004.  The

14    building and the property are also the subject of certain

15    tax entitlements in favor of the landlord that are tied to

16    the redevelopment project.  Now this store is a key part of

17    Transform's go forward plan, Your Honor.  And it's actually

18    one of the best performing stores in the Sears portfolio.

19          There are two disputes at issue here before Your

20    Honor.  And both of them are improper attempts by the

21    landlord to benefit from the Sears bankruptcy and present no

22    actual contract of fault that would be the basis of a proper

23    cure objection.

24          The first, Your Honor, the landlord seeks the

25    return of a construction estimate deposit when there is no

Page 56

1    dispute to the fact that the landlord failed to meet an

2    unambiguous deadline.  And more importantly, Your Honor, the

3    work covered by that deposit is not yet complete.  So

4    there's nothing, in fact, for us to be deciding until that

5    work is done.

6           The second, Your Honor, the landlord invokes the

7    covenant of good faith and fair dealing in order to try and

8    collect speculative consequential damages due to the fact

9    the landlord has not moved forward with the project and is

10   at risk of losing those tax entitlements.

11          Just briefly in background, Your Honor, the

12   operative lease here is Joint Exhibit 1.  It's from 2011.

13   This is before the landlord had bought the building.  And

14   it's very clear in paragraph 2 that the parties acknowledge,

15   most critical, the successful operation of the business at

16   the premise that the tenant have access, use and enjoyment

17   of the building.

18          Now following the landlord's purchase of the

19   building, Your Honor, the parties entered into a 2015

20   amendment whereby the 2011 lease still controls the parties'

21   responsibilities and obligations except to the extent the

22   2015 amendment conflicts and the amendment would then, Your

23   Honor, control.

24          Now, Your Honor, we're here on a cure dispute.

25   And Your Honor, of course, is well familiar with U.S.C.

Page 57

1    365(b) which basically provides that if there's a default

2    under an unexpired lease, the trustee, or here that are in

3    possession are here Transform, must cure that default and

4    compensate for any actual pecuniary loss to such party

5    resulting from such default.  Now, Your Honor, there's no

6    dispute as to the effectiveness of the leases.  The leases

7    are in effect and have not expired.

8              There are two categories, Your Honor, of what we

9    call proper cure objections.  The first is for CAM charges.

10   In the original cure objection filed in January, the

11   landlord sought over $5,000 in CAM charges.  Those charges

12   weren't actually due until February.  In February, the

13   tenant did, in fact, pay those CAM charges with check number

14   183116.  For some reason, the landlord did not cash that

15   check, Your Honor.

16             Arguably, they're fair to cash a check with way

17   unique basis for claim there but Transform is prepared, Your

18   Honor, to resubmit a check for that CAM amount if they

19   assume and assign the lease.

20             THE COURT:  Okay.

21             MR. WEAVER:  The second, Your Honor, is for

22   property taxes, again, just south of $44,000.  There's no

23   dispute as to that amount and it's typical of all of our

24   orders, within five business days of entry of the order,

25   Transform will provide those funds to the landlord.

Page 58

1              THE COURT:  Okay.

2              MR. WEAVER:  So those are proper cure objections,

3     Your Honor.  But what is happening -- what we're arguing

4     about today, Your Honor, is quite a big stretch from that.

5              First, let's talk about the construction estimate

6     deposit.  And here, Your Honor, of course, we have to start

7     with the agreement.  And this is, again, Joint Exhibit

8     number 2.  And this, Your Honor, provides clearly for a list

9     of construction projects that the landlord has to perform.

10    And, Your Honor, if we look to paragraph 25 -- I won't

11    belabor the point.  You just heard it read during cross.

12    But here is where the deposit is put in to 3.25 million.

13    There's a list that must be completed by April 1st.  And to

14    the extent that the landlord timely completes the work and

15    it's acceptable, they will get any that's left over.  But it

16    is clear that if they don't meet the deadline, the funds

17    "shall be released to the Tenant, at Tenant's election".  So

18    the tenant can cause the work to be completed and seek more

19    money for the landlord if necessary.

20              But, Your Honor, that's not the only relevant

21    portion of the contract.

22              THE COURT:  Well, can we just walk through this?

23              MR. WEAVER:  Sure.  Happily, Your Honor.

24              THE COURT:  First of all, the introductory

25    paragraph in paragraph 25 sets up the three and a quarter

Page 59

1  million construction estimate deposit "to partially secure

2  Landlord's design, repair, construction and completion

3  obligations under this agreement".  We've already

4  established that those obligations are introduced by

5  paragraph 2 and they go through paragraph 10.

6          MR. WEAVER:  Correct, Your Honor.

7          THE COURT:  And it includes seismic work.

8          MR. WEAVER:  It does.

9          THE COURT:  But only -- but we'll go back to that

10  in a second.

11          The paragraph then says that "Tenant shall in turn

12  within a reasonable time thereafter, but in any event within

13  thirty (30) days of Landlord's written request, deposit the

14  Construction Estimate Deposit with either First American

15  Title Insurance Company or another title insurance company

16  acceptable to Tenant ('The Construction Fund Escrow') to

17  enable Landlord to be able to draw upon those funds in the

18  Construction Fund Escrow to pay for Landlord's design,

19  repair, construction and completion work as required per

20  this [Agreement] on terms acceptable to the Tenant upon

21  joint written instruction given to the escrowee".

22          The escrow wasn't done, right?

23          MR. WEAVER:  Correct, Your Honor.  The parties

24  agreed not to put it in the escrow.

25          THE COURT:  But that agreement didn't vary

Page 60

1      anything else about the payment of the construction -- of

2      the landlord's design, repair, construction and completion

3      work for this agreement?

4                  MR. WEAVER:  Correct.

5                  THE COURT:  You're clear on that, right?  There's

6      no agreement changing that paragraph in writing.

7                  MR. KUPETZ:  Right.  Just as there was no

8      agreement with respect to the deposit not being held by a

9      third party.

10                 THE COURT:  Well, I mean, it says within a

11     reasonable time.  I gather the parties decided there was no

12     reasonable time.  And there was no request by the landlord

13     to put it in.

14                 MR. KUPETZ:  Correct.

15                 THE COURT:  Okay.  So then paragraph (d) says:

16     "In the event Landlord does not complete the work

17     contemplated in Sections 3, 4, 6 and 7 by April 1, 2017".

18     Now, 3, 4, 6 and 7 deal with HVAC -- I'm actually going out

19     of order here.  Low voltage service, HVAC, plumbing --

20                 MR. WEAVER:  Signage and façade, Your Honor.

21                 THE COURT:  Right.

22                 MR. WEAVER:  Not plumbing, technically.

23                 THE COURT:  Not plumbing.

24                 MR. WEAVER:  Technically, not plumbing.

25                 THE COURT:  Façade and signage.  Okay.  "[B]y

Page 61

1    April 1, 2007 (sic), the remainder of funds in the

2    Construction Fund Escrow shall be released to Tenant, at

3    Tenant's election, so that Tenant can cause the work to be

4    completed and Tenant shall be entitled to payment by

5    Landlord [of] any additional amounts necessary to complete

6    the work" which is consistent with paragraph 2 which says

7    the landlord shall bill all the costs.

8              So I believe it's undisputed, but I just want to

9    confirm this, that the work covered by Sections 3, 4, 6 and

10   7, none of that work was completed by April 1?

11             MR. WEAVER:  I don't think it's none of the work,

12   Your Honor, but it was not completed.

13             THE COURT:  Some of it.  Some of it was completed.

14             MR. WEAVER:  Some of it was.  And --

15             THE COURT:  No.  But it's a different -- I didn't

16   ask that question correctly.

17             MR. WEAVER:  No one objected, Your Honor.

18             THE COURT:  Each one of those sections

19   contemplated a project.  Is it understood that none of those

20   four projects was completed by April 1?  It was worked on, I

21   understand that.  But none of them was completed by April 1?

22             MR. KUPETZ:  That's correct.

23             THE COURT:  Okay.  So the contract provides then

24   that if that work, the project, isn't done by April 1, 2007

25   (sic), "the remainder of funds shall be released to Tenant,

Page 62

1    at Tenant's election".  Now here, the tenant was still

2    holding it, right?

3           MR. WEAVER:  Correct, Your Honor.

4           THE COURT:  But it's also agreed that Tenant

5    didn't make any election so that it could cause the work to

6    be completed, right?

7           MR. WEAVER:  Well, Your Honor, I don't think there

8    is anything -- there's really nothing in the record about a

9    formal election.

10          THE COURT:  Right.

11          MR. WEAVER:  And I think part of this, Your Honor,

12   is that this dispute isn't ripe for a cure objection.  If

13   there was a dispute in the future, I believe Sears would be

14   able to put forward evidence that --

15          THE COURT:  Well, I'm just walking through this.

16          MR. WEAVER:  No.

17          THE COURT:  I'm just trying --

18          MR. WEAVER:  Understood.

19          THE COURT:  -- to get the facts down.

20          MR. WEAVER:  Fair.  My essential --

21          THE COURT:  I understand the argument.  I just --

22          MR. WEAVER:  Well, it's not the argument.  It's a

23   fact -- I don't want to testify, Your Honor, but I

24   understand Sears did spend money, Your Honor.  I just --

25          THE COURT:  Well, that's my question is, "at

Page 63

1   Tenant's election, so that Tenant could cause the work to be

2   completed".  So, you know, that clause seems to contemplate

3   the reasonable agreement between the parties that if the

4   landlord couldn't do it, at tenant's election, that tenant

5   would do it -- have someone do it for the tenant.  I mean,

6   Sears doesn't do its own work, I'm assuming --

7           MR. WEAVER:  Correct, Your Honor.

8           THE COURT:  -- for all of these things.

9           Now there is a little bit in evidence just based

10  on what I heard from the testimony that there was perhaps

11  some assumption that Sears might be paying for something

12  already.  That was the invoice that had the asterisk on it

13  for the 250 something thousand.

14          MR. WEAVER:  Correct, Your Honor.

15          THE COURT:  Is there any other evidence in the

16  record that Sears was doing some of this work or subcontract

17  -- contracting it out to someone else?

18          MR. WEAVER:  Your Honor, there's not.  There was

19  not evidence put in.  Again, well, to answer your question,

20  no, Your Honor.  I can explain if you'd like.  The answer is

21  no, Your Honor.

22          THE COURT:  Okay.

23          MR. KUPETZ:  Your Honor, as far as the landlord

24  knows, Sears hasn't paid for anything --

25          THE COURT:  Well, all right.  But that's neither

Page 64

1    here nor there.

2                MR. KUPETZ:  There's no evidence in the record

3    that Sears paid for anything.

4                THE COURT:  Except the disastrous bill.  But

5    that's -- there's no evidence that that actually was the

6    case, right?

7                MR. WEAVER:  Well, I'd note, Your Honor, there's

8    no evidence of anything about that bill.  But --

9                THE COURT:  No.  That's fine.  I agree with that.

10               MR. WEAVER:  But nothing about the actual --

11   correct, Your Honor.

12               THE COURT:  Okay.  So, in any event, it seems that

13   the agreement did provide that, you know, if the landlord

14   didn't meet its deadline then Sears could basically take

15   over the work how ever it wanted to --

16               MR. WEAVER:  Correct.

17               THE COURT:  -- subject to the landlord being

18   liable for it.

19               Then the next sentence says:  "Upon Landlord's

20   completion of the work described in Sections 3, 4, 5, 6 and

21   7 in a timely manner, and its inspection and acceptance by

22   Tenant, any remaining Construction Estimate Deposit funds

23   shall be dispersed to Landlord subject to review and

24   approval of the parties regarding the amount in question."

25               So we have some testimony from the witness that

Page 65

1    most of the work was completed.  And he also says that the

2    HVAC condensers -- well, it had been ready to be installed

3    but that "Sears asked to put that off".  Do we have -- is

4    there anything in the record that says that work hasn't been

5    completed?  I mean, there's testimony that says 75 -- I

6    mean, the declaration says 75 --

7              MR. WEAVER:  Declaration itself, Your Honor, says

8    the work isn't done.

9              THE COURT:  Right.  That's correct, right?  The

10   declaration says 50 percent, 75 percent --

11             MR. KUPETZ:  Well --

12             THE COURT:  -- parts of it --

13             MR. KUPETZ:  -- it says the work --

14             THE COURT:  It goes through -- let me turn to it.

15             MR. KUPETZ:  Yeah.  We should probably look --

16             MR. WEAVER:  Paragraph --

17             MR. KUPETZ:  -- at the declaration.

18             MR. WEAVER:  -- 33 --

19             THE COURT:  Right.

20             MR. WEAVER:  -- I think, or so, Your Honor.

21             THE COURT:  Right.  So I'm looking at Mr. Shomof's

22   declaration in support of the reply.

23             MR. WEAVER:  34, Your Honor.

24             THE COURT:  Paragraph 34?  "The HVAC work is

25   approximately 75% complete.  The remaining approximate 25%

Page 66

1   of the job includes labor to install condensers".  He

2   doesn't really refer -- well, I'm sorry.  Let me go back.

3           And then 35 says, "Other than the HVAC work, the

4   only remaining work to be done" is plumbing.  But that's not

5   -- that's a different time frame.

6           MR. WEAVER:  Correct, Your Honor.  Well, it's the

7   same time frame.  It's just not covered by the subsection --

8           THE COURT:  Right.

9           MR. WEAVER:  -- (d).

10          THE COURT:  Right.  Exactly.  So -- and obviously,

11   that work was not done -- based on the declaration and the

12   invoices, that work was not done by April 1, 2017.

13          MR. WEAVER:  It's not disputed, Your Honor.

14          THE COURT:  So, I guess, to me, and I'd like the

15   parties to address this, the dispute as to any right to get

16   the remainder of the tenant escrow depends on the meaning of

17   the word "timely" in that second sentence.  Right?  Because

18   that -- it doesn't say in the second sentence, "Upon

19   Landlord's completion of the work described in Sections 3,

20   4, 5 and 6 by April 1".  It says in a "timely manner" --

21          MR. WEAVER:  Correct, Your Honor.

22          THE COURT:  -- "and its inspection and acceptance

23   by Tenant".  Now you're saying that "timely" must refer back

24   to April 1.

25          MR. WEAVER:  I don't know how it wouldn't, Your

1   Honor.  In addition to the acceptance by the landlord -- by

2   the tenant.  I'm sorry, Your Honor.

3              THE COURT:  Right.

4              MR. KUPETZ:  And, Your Honor, of course, the

5   landlord would say when we're in ongoing discussions with

6   Sears and among other -- prior to the bankruptcy and among

7   other things, they ask us to delay some of the work and

8   they're aware that we're doing the work and saying we're

9   going to get reimbursed, that "timely" was certainly after

10  April 1 is understood to still be outstanding 'cause they'd

11  finish the work if they had access to the premises right

12  now.  But Sears was nonresponsive.

13             MR. WEAVER:  Your Honor, if I --

14             THE COURT:  Well, so I think that frames the

15  issue.  So that's what I'd like you to address.  Those

16  arguments which you probably weren't going to address but I

17  wanted to go through the --

18             MR. WEAVER:  I'm going to cut right to the chase.

19             THE COURT:  -- facts first --

20             MR. WEAVER:  Fair enough.  No problem, Your Honor.

21             THE COURT:  -- to get to that area of

22  disagreement --

23             MR. WEAVER:  Right.

24             THE COURT:  -- on the return of the money in the

25  account.

Page 68

1           MR. WEAVER:   Right.   Well, Your Honor, if I may, I

2    think -- first of all, the only evidence we have to talk

3    about, really, the true evidence, is this one e-mail.   I

4    want to talk about that e-mail, about what the request was.

5    I think it all relates, Your Honor, because when we go

6    through that e-mail, there was a discussion about doing --

7    the deadline had passed.   April 1st had passed and they had

8    not met their deadline.   But the tenant made a decision

9    under the assumption that the seismic work was about to get

10   started that they should do it together.   And the tenant can

11   keep that decision and optionality, Your Honor.   And it's

12   provided for specifically in the agreement.   This is

13   something I think we have to look at.   We can't look at this

14   provision in isolation.   We have to also look on the page

15   previous on paragraph 23 of the amendment, Your Honor.   And

16   that is the extension of time express waiver provision.

17          And that provides:   "The parties hereto may, only

18   by an instrument in writing, extend the time for or waive

19   the performance of any obligation of the parties hereto."

20          And I think the important language is:   "Failure

21   on the part of either of the parties to enforce any rights

22   which they may have against the other for the other's breach

23   of this [Agreement] shall not constitute a waiver of the

24   said right, nor shall any written waiver given by a party

25   pursuant [t]hereto be deemed to constitute a waiver of any

Page 69

1    other right not expressly waived therein."

2             Your Honor, that language has to be read with this

3    provision.

4             Now, as a practical matter, Your Honor, as a

5    tenant and a landlord, do they have to work these things

6    out?  Does the tenant want this work to happen?  Absolutely,

7    Your Honor.  But we're here about a cure objection, about a

8    default under the agreement.  And when you take that

9    language with the provision, I think it, frankly, takes away

10   a lot of the factual discussion that we have to have.  It's

11   not in dispute that the work wasn't done.  It is in --

12   they've raised a course of conduct, Your Honor.  But the

13   California case law they cite is clear, course of conduct

14   cannot contradict the express terms and they can't get

15   around paragraph 23, Your Honor.  They just can't.

16            THE COURT:  Well, let me lay something out to you.

17            MR. WEAVER:  Sure, Your Honor.

18            THE COURT:  I understand that there's a deadline

19   in the first sentence.  And it talks about the funds being

20   released to the tenant at tenant's election.  There's no

21   formal election.  But the tenant had the funds already.

22            MR. WEAVER:  They wouldn't have to elect because

23   it wasn't with escrow, Your Honor.

24            THE COURT:  Right.  So the tenant then, it appears

25   to me, did, in fact, cause the work to be completed.  It

1    used --

2              MR. WEAVER:  It -- I was coming to that point,

3    Your Honor.

4              THE COURT:  It used the landlord's subcontractors

5    to do that through the landlord and perhaps argue --

6    although the record is -- really doesn't support this --

7    perhaps it spent of its own money, too.

8              I believe what you're saying is that that's fine.

9    That's why it did what it did.  And then -- but that doesn't

10   change the operation of the second sentence which says that

11   you got to complete it in a timely manner as a condition to

12   getting the money back.

13             MR. WEAVER:  If you rely upon that provision, yes,

14   Your Honor.

15             THE COURT:  Right.

16             MR. WEAVER:  As you --

17             THE COURT:  Well, that's the provision that says

18   the money comes back.

19             MR. WEAVER:  Correct, Your Honor.  But as you just

20   outlined --

21             THE COURT:  'Cause there was no formal election.

22             MR. WEAVER:  Correct.  But as you just outlined,

23   Your Honor, they had the option to use the landlord work.

24   They had that option.  And that wouldn't be -- they wouldn't

25   be entitled to return the funds if they elected to go that

1    route.  The reason you have paragraph 23, Your Honor, is so

2    the tenant can make its decision that things are most

3    economical.  And it would be one thing, Your Honor, if they

4    had any backup for this one-page invoice that they've

5    submitted.  Then maybe we could even talk about it.  But we

6    have nothing.  Your Honor, we literally have nothing other

7    than one page.  And --

8               THE COURT:  Well, can we go to that?

9               MR. WEAVER:  We can.  And their deadline, Your

10   Honor, was May 1st.

11              THE COURT:  I guess this is -- I'm a little

12   confused about this.  Is the -- this is as much a question

13   for you as counsel for Transform.

14              Is the claim by the landlord for, you know, in

15   excess of a million dollars based on this deposit?  Is it

16   premised on work it did or that it paid for that hasn't yet

17   been paid?  That's one.

18              Or is it simply for the return of the remaining

19   amount of the deposit because it didn't actually have to pay

20   for the work beyond what it's already been paid for and

21   therefore, it's entitled to a refund?

22              Which one of those two is it?

23              MR. KUPETZ:  It's both.

24              THE COURT:  It's both.

25              MR. KUPETZ:  There's 322 --

Page 72

1          THE COURT:  You can stand up.  I know in

2    California they do it differently but in New York --

3          MR. KUPETZ:  I'm sorry.

4          THE COURT:  --  they stand up.

5          MR. KUPETZ:  I'm sorry, Your Honor.  Should I go

6    to the --

7          THE COURT:  No, no.  The microphone will pick you

8    up.  It's just that they (indiscernible).  Okay.

9          MR. KUPETZ:  The 322,000 is for work that's been

10   done and hasn't been paid for.

11         THE COURT:  Okay.

12         MR. KUPETZ:  There would then be additional work

13   that the landlord is prepared to do to finish completely

14   that the landlord estimates at 375,000.  Completely.  And

15   that would leave approximately 727,000.  The landlord's

16   view, as set forth in the declaration, is that the deposit

17   was always set up with an intended buffer --

18         THE COURT:  Right.

19         MR. KUPETZ:  -- in there.

20         THE COURT:  Okay.  So do you agree with that that

21   there's an amount that it's claimed 322,000 that's been done

22   and not paid -- for work that's been done and not paid for

23   and the rest is just for the return of the

24   overcollaterization?

25         MR. WEAVER:  I agree, Your Honor, that their --

1           THE COURT:  That's their claim.

2           MR. WEAVER:  -- their objection was --

3           THE COURT:  All right.

4           MR. WEAVER:  -- 322 for work done, return of the

5     rest.

6           THE COURT:  So as far as the 322 --

7           MR. WEAVER:  Yes.

8           THE COURT:  -- I believe you're contending that

9     the bill just doesn't support -- there's no backup for that

10    bill except for a relatively small amount?

11          MR. WEAVER:  Well, I have -- well, I have two

12    arguments.  As a fundamental evidentiary matter, yes, Your

13    Honor.  When they submitted their cure objection on May 1st,

14    they submitted a one-page invoice with nothing else.

15          THE COURT:  Right.

16          MR. WEAVER:  Today we're now a few months later.

17    There's still nothing else for that invoice.  Nothing.  So

18    that's what we have.

19          But it's a technical reading in the agreement,

20    Your Honor, but I think it's the correct reading, which is

21    to the extent the tenant decided to use -- to do this, how

22    did the landlord do this work.  It's no longer operating

23    under the provision of Section (d).  If they want to claim

24    they've done work and they haven't been paid for it, Your

25    Honor, it's not a breach of this provision, it's not a

Page 74

1    breach of this agreement.  It's -- the tenant has elected to

2    complete the work itself.  And it may be using them.  But

3    it's not a breach of --

4              THE COURT:  But it would have to pay for it.

5              MR. WEAVER:  Correct, Your Honor.  And they could

6    bring a breach action.  But it's not a cure --

7              THE COURT:  All right.

8              MR. WEAVER:  -- under this lease, Your Honor.

9    That's what we're arguing.

10             THE COURT:  Okay.

11             MR. WEAVER:  This is not a proper --

12             THE COURT:  All right.

13             MR. WEAVER:  -- cure objection.

14             THE COURT:  I understand that point.

15             MR. WEAVER:  Okay.

16             THE COURT:  All right.

17             MR. WEAVER:  If there's nothing else on that, Your

18   Honor, I'll move on.

19             Again, though, emphasize -- well, I don't want to

20   move on, Your Honor.  I'm sorry.  I feel like I do have to

21   address it.

22             You know, the course of conduct that they want to

23   rely upon here, Your Honor, again, we really -- in the

24   record, we have one --

25             THE COURT:  Can --I'm sorry to interrupt you.

Page 75

```
 1                MR. WEAVER:  No.  Of course.

 2                THE COURT:  But it actually -- and I don't want to

 3     get you in trouble with your client but I think this -- and

 4     I actually think what you said was the correct legal

 5     response.  But --

 6                MR. WEAVER:  Thank you, Your Honor.

 7                THE COURT:  -- I just want to point out to the

 8     landlord that if the 322,000 were a cure objection, it

 9     wouldn't be sustained on this record.  What counsel just

10     said is, it's not a cure objection.  It's a right either

11     under quantum meruit or based on the parties' actual

12     dealings with each other as to the work that was done post-

13     April 1.  So it preserves the right to get paid for that

14     which if it were a cure objection, you probably have --

15     well, you haven't sustained unless you can show me the

16     backup.  But go ahead.

17                MR. WEAVER:  Well, in that case, Your Honor, I'm

18     going to not deal with course of conduct unless --

19                THE COURT:  Right.

20                MR. WEAVER:  -- you want to hear more about it

21     later, Your Honor.  I -- for efficiency purposes, I'm happy

22     to move on to the seismic --

23                THE COURT:  Well, I mean -- why don't you cover

24     it?

25                MR. WEAVER:  Okay.
```

1          THE COURT:  I mean, the parties have addressed it

2     in their papers.  So --

3          MR. WEAVER:  They have, Your Honor.  I just think

4     that it's really important that the language of paragraph 23

5     -- because course of conduct -- first of all, I don't think

6     we have course of conduct here.  But even if there was a

7     course of conduct, you cannot go contrary to an express

8     provision.  You can't.  California law is clear on that.

9     The cases they cite are clear on that, Your Honor.  You

10    can't go against an express provision.  23 is express.

11         THE COURT:  Which is the no-waiver provision.

12         MR. WEAVER:  No-waiver provision.  The fact that

13    we don't enforce our right on April 2nd doesn't mean we've

14    waived it.  That's -- I should say the tenant's right, Your

15    Honor.

16         THE COURT:  It could go to explain the word

17    "timely".

18         MR. WEAVER:  It could, Your Honor.

19         THE COURT:  But --

20         MR. WEAVER:  It could, Your Honor.  And if we want

21    to limit it to that, Your Honor, I'm very happy to look at

22    the e-mail from May 11th.

23         THE COURT:  Right.

24         MR. WEAVER:  This is Landlord Exhibit 5.  And this

25    is the e-mail from Dolores -- and no one can pronounce her

1    last name, Your Honor so we keep calling her Dolores.  So I

2    apologize for that.

3              THE COURT:  Okay.

4              MR. WEAVER:  And in the discussion -- and again,

5    this is after the deadline has passed.  She acknowledges the

6    deadline has passed and says, in light of that, what we'd

7    like you to do, we're making the decision, we want you to do

8    this with the seismic work because that's more efficient for

9    us.  And there's an assumption belongs to that.  The

10   assumption is the seismic work's about to get started.

11   We're going to pull the permits that year; we're going to

12   start in January 2018.

13             The record's clear, Your Honor.  They didn't pull

14   the permits of this year.  So the idea of "timely", Your

15   Honor, the course of conduct there is irrelevant.  There was

16   a discussion about doing the work together.  But that --

17   even deciding to make that offer doesn't waive their rights

18   under the provision.

19             THE COURT:  And, in fact, it really wasn't done

20   together, right?

21             MR. WEAVER:  It hasn't been done.  The seismic

22   work hasn't been done at all.

23             THE COURT:  No, no.  The HVAC work was done

24   separately.  It wasn't timed to the seismic work.

25             MR. WEAVER:  Apparently.  Correct.  Correct, Your

Page 78

1    Honor.  Correct, Your Honor.

2              And then the other e-mails, Your Honor, just to

3    touch on them briefly, they're frankly all about having

4    meetings in Los Angeles amongst landlord and tenant.  If you

5    look at Landlord's Exhibit 6, there's this discussion we've

6    talked about.  There's talk about landscaping and building

7    security, pulling aside the permits.  Exhibit 7, Your Honor,

8    frankly, is the same communication that was in Exhibit 12 so

9    they've repeated themselves.

10             Exhibit 14 has to do more about meetings.  Exhibit

11   -- I'm sorry -- Exhibit 8.  Exhibit 9, more about meetings.

12             THE COURT:  I'm sorry.  When you're referring to

13   these exhibits, these are the exhibits in the witness

14   binder?

15             MR. WEAVER:  No, no.  The landlord exhibits.  I'm

16   sorry, Your Honor.  The landlord exhibits.  I can --

17             THE COURT:  Fine.

18             MR. WEAVER:  We didn't catch them all.

19             But the point is, Your Honor, the discussion in

20   the e-mails that's relevant here is this discussion about

21   doing the seismic work together.  That's the only discussion

22   that's relevant.  And I would argue, Your Honor, that the

23   only course of conduct that's been demonstrated today is

24   that the landlord took forever to bill the tenant.  They

25   submit -- they want to argue because the tenant paid them

Page 79

1    after the deadline that that somehow indicates their

2    acquiescence.  But they didn't even bill them until after

3    the deadline, Your Honor.  And we looked at the invoices

4    today.  Almost all of the invoices are before the deadline.

5    But the ultimate invoices to Sears came after the deadline.

6    So that's the course of conduct.  They bill late and they

7    were paid.

8              THE COURT:  Well, bill late for services when?

9              MR. WEAVER:  Before April 1st except for the 14

10   invoices that we've identified.  And many of them are from

11   the month of April 2017, Your Honor.  That's what the record

12   provides.

13        (Pause)

14             THE COURT:  Okay.

15             MR. WEAVER:  Then, Your Honor, turning then to the

16   seismic retrofit issue, Your Honor, here we look to first

17   Joint Exhibit number 1, which is the 2011 lease.  So at

18   paragraph 2(a)(3), Your Honor, it says that, "Without

19   tenant's prior approval, which may be withheld for any or no

20   reason in its sole discretion, Landlord shall not construct

21   or install any improvements or make any changes to Tenant's

22   Control Area or interfere with or obstruct Tenant's use

23   thereof in any manner whatsoever."

24             Now the point of that section, Your Honor, isn't

25   to argue that Sears can simply put their head in the sand

Page 80

1    and say you can't do any work.  But that's the starting

2    point.  That is where we start from.  And from there, we

3    then move to the 2015 amendment, Your Honor.

4              So if we go to Joint Exhibit 2, which is the 2015

5    amendment, Your Honor, you already identified yourself that

6    paragraph 2 lays out at the beginning that the landlord

7    shall be responsible for the costs and expense related to

8    these projects.  And if we go to paragraph 8, Your Honor,

9    which is the seismic work paragraph, again, it makes clear

10   the landlord's responsible for all of the seismic repairs.

11   They're to pull the permits within 12 months of when LA

12   approves.  They're then also to complete the work within 12

13   months after pulling the permits.

14             It also provides in that section, Your Honor, that

15   "The plans and specifications, schedule, authorized hour of

16   construction activity and remediation plan for said seismic

17   work shall be pre-approved by Tenant pursuant to Demolition

18   and Construction Protocol attached hereto as Exhibit C, and

19   conducted in a manner that creates the minimal possible

20   visual and noise inconvenience to Tenant and its customers."

21             So that's the work, Your Honor, that needs to be

22   done and how it needs to be done.

23             So to look at Exhibit C, Your Honor, to this

24   agreement which is --

25             THE COURT:  The construction protocol.

 1              MR. WEAVER:  Yeah.  And that is found -- if you

 2     look at the ECF pages at the top, I think it's page 48 of

 3     135.

 4              THE COURT:  Right.

 5              MR. WEAVER:  And here, Your Honor, we're dealing

 6     with paragraph 2(b) which is the non-hazardous materials.

 7              THE COURT:  Right.

 8              MR. WEAVER:  So it says, "Landlord shall provide

 9     two weeks notice."  And it states that such notice "shall

10     include the scope of work contemplated, a detailed set of

11     plans and specifications for the same together with a

12     schedule, authorized hours of construction activity and

13     remediation plan for the same".  And this provides that if

14     the tenant doesn't respond in 10 days, that's considered to

15     be approval of those plans.

16              So, Your Honor, the landlord simply did not meet

17     their obligation under the agreement.  So there's nothing to

18     be arguing that there was any breach under the 2015

19     amendment, Your Honor.  The thing they point to is Joint

20     Exhibit number 3 which is September 25th letter.  And, Your

21     Honor, that letter does not have any detailed plans, no

22     floor plans, no specifications.  The testimony's been that

23     it was a negotiating document, Your Honor.  The idea was

24     there'd be a back-and-forth.  The only timeline included in

25     that was that Sears would shut down for six months.  And,

Page 82

1    Your Honor, I could point to all the provisions in the two

2    contracts that make very clear that it was important that

3    the store continue to operate.  And the idea that Sears

4    would shut down particularly on the eve of bankruptcy for

5    six months, there's no offer of compensation for that, Your

6    Honor, frankly, is absurd.  It may have been a condition of

7    the construction financing they were looking for but that's

8    not on the tenant, Your Honor.  The landlord assumed all the

9    risks for the costs for this project.

10          And importantly, Your Honor, the person to whom

11   that letter was addressed responded.  And this is Joint

12   Exhibit 11, Your Honor.  And I don't need to read the entire

13   paragraph to you again, Your Honor, but it's clear in that

14   response not only that this was not what the parties had

15   been talking about but that there were concerns on the side

16   of the tenant about missing deadlines and that they stated

17   just two months prior that they may not go forward with the

18   project, Your Honor.  That was the response.

19          And the response further was an offer from counsel

20   to meet with the lawyer.  Now we heard a lot on the stand

21   today about verbal conversations, Your Honor.  But to the

22   extent anyone thinks something in writing is inconsistent

23   with the facts, usually they respond in writing to keep the

24   record clear.  And there's no written response to counsel's

25   communication, Your Honor.  There's none.  And I think that

Page 83

1    speaks volumes, Your Honor.

2            So they want to invoke, Your Honor, the covenant

3    of good faith and fair dealing.  They don't want us to point

4    to any provision of the agreement that was in default.  They

5    want to apply an obligation onto the tenant.  But the law,

6    Your Honor, again, here in California and everywhere is

7    clear.  You cannot invoke the covenant of good faith and

8    fair dealing to contradict express terms of the contract.

9    And I think, Your Honor, just the case that we cite, the

10   Storek case -- Storek & Storek case in our papers, cites to

11   the California Supreme Court and says very clearly the scope

12   of conduct prohibited by the covenant of good faith is

13   circumscribed by the purpose and express terms of the

14   contract.

15           We're aware of no reported case in which a Court

16   has held that the covenant of good faith may be read to

17   prohibit a party from doing that which is expressly

18   permitted by an agreement.

19           On the contrary, the general matter implied terms

20   should have to be read "shall never be read to vary express

21   terms".  What are the express terms here, Your Honor?  The

22   tenant has complete autonomy over its space.  There's no

23   question about that.  And the landlord has an obligation to

24   develop the plan -- a plan -- that's minimally invasive.

25   That's on the landlord, Your Honor.  And there's a provision

Page 84

1    with the agreement that says how you do that.  It's the

2    construction protocol.  It's cited within Section 8.

3           The landlord's one and only proposal, Your Honor,

4    is the September letter which was an ask that Sears shut

5    down for six months.  Now even assuming that the landlord's

6    argument to be true that there was no formal response on

7    Sear's letterhead, Your Honor -- and I think the Sears'

8    counsel's response speaks volumes -- they didn't get

9    anywhere near to meet their obligations under the protocol.

10   And if they can't meet their obligations, they cannot then

11   somehow create an obligation not even in the contract for

12   the tenant.  Yes, Your Honor, Sears went into bankruptcy in

13   October.  No one in this room is more familiar with how busy

14   and crazy that was, Your Honor.  But that does not give them

15   a hook to try to argue that their failure to do anything

16   under the contract provides a burden on the tenant.

17          And more importantly, Your Honor, the idea that

18   they were ready, willing and able to do this, the contract,

19   the amendment, was signed at the end of 2015.  The testimony

20   in the deposition record, Your Honor, is that the landlord

21   didn't even begin to look for construction financing until

22   June of 2018.  They didn't pull the permits until February

23   2019.  Your Honor, if this project doesn't go forward, it's

24   not because they didn't get a letter back on Sears'

25   letterhead that says we're not shutting for six months, Your

Page 85

1    Honor.

2             The landlord can't use its lack of prosecuting the

3    program as a way to try to recover these costs because Sears

4    went into bankruptcy.

5             And I think overarching all of this, Your Honor,

6    is the idea that these are just speculative damages.  They

7    are.  They're speculative.  We've talked about the

8    construction advance.  And Your Honor's already said that --

9    I think made clear your view, but I would just state that

10   how can we argue about the return of a construction estimate

11   deposit and the work's not done?  We can't.  There's -- we

12   can't.  Who knows what may happen?  Maybe they do some more

13   work and there's a pipe burst and there's more dam -- we

14   don't know, Your Honor.  We can't return money until the

15   work is done.  And they admit the work is not done.  And as

16   you've already held, on the basis of the record, they

17   certainly have not supported their claim for $322,000.

18             But as it relates to the seismic retrofit, Your

19   Honor, the permits are active; they're valid.  They're

20   active today.  You heard testimony from the landlord that

21   they have control over 30 percent of the ground floor.  You

22   also heard testimony today that all they have to do is begin

23   construction and call an inspector.  That's all.  That was

24   in the deposition and it was repeated today.  That's what

25   they have to do to keep those entitlements going.  So if

Page 86

1    Your Honor, for example, will rule today in their favor and

2    provide for a ruling, and Transform then took the lease and

3    made that payment, nothing would stop them, Your Honor, from

4    beginning construction on the 30 percent that they own the

5    next day.  And then those entitlements would still be valid.

6            THE COURT:  Is there -- I saw easements from the

7    landlord to Sears in the lease.  Is there any issue as to

8    access to the 30 percent to start construction is more of

9    the question for -- no.  For counsel.

10           MR. WEAVER:  Certainly not in the record, Your

11   Honor.  I don't believe there is.  Actually, I did ask the

12   question on the stand, Your Honor, and the only issue was

13   financing.  That was the witness' testimony.

14           THE COURT:  That's true.

15           MR. WEAVER:  So, Your Honor, I don't see how you

16   can satisfy, I think, legal arguments which are very -- I

17   think, Your Honor, are very strong and I hope you agree.

18   But how in the world -- and particularly, Your Honor, their

19   deadline for cure objection was May 1st.  That was the

20   deadline of their cure objection.  And there's nothing in

21   their cure objection about the fact the project is dead.

22   They've lost a --

23           THE COURT:  Well, they reserved their rights to

24   supplement it.

25           MR. WEAVER:  They did, Your Honor.

1              THE COURT:  And they supplemented it within two

2     days before the final deadline.  So --

3              MR. WEAVER:  Correct, Your Honor.  Fair enough.

4              So, Your Honor, happy to answer any more questions

5     you may have.  But that is the argument that I'm trying to

6     present to Your Honor this morning.

7              THE COURT:  Okay.

8              MR. SHOMOF:  Can I stand?

9              MR. KUPETZ:  Your Honor --

10             THE COURT:  No.  Only the lawyers get to speak.

11             MR. SHOMOF:  No?  Okay.

12             THE COURT:  You could whisper something to him now

13     if you want him to think about something.

14        (Pause)

15             MR. KUPETZ:  Your Honor, I would indicate that

16     while counsel said they had tried to resolve consensually

17     cure objections, we just didn't have any discussions in

18     terms of whether it was with Sears or Transform, there were

19     no substantive discussions once the filing occurred although

20     we reached out.

21             With respect to the construction estimate deposit,

22     Transform incorrectly contends that the landlord has

23     forfeited its right to that deposit.  The landlord deposited

24     $3,250,000 with Sears.  The understanding was and is that

25     that was strictly to be used for reimbursement of specified

Page 88

1    tenant improvement construction expenses.  So the evidence

2    shows --

3            THE COURT:  But where is that in the agreement?

4            MR. KUPETZ:  Well, even when you look at the

5    agreement, Your Honor, there's nothing that says --

6        (Pause)

7            MR. KUPETZ:  Even in Section 25(d), Your Honor, it

8    doesn't say what happens to the deposit if the work isn't

9    completed.  It doesn't say that it's forfeited to Sears.

10           THE COURT:  Well, it says that the -- the second

11   sentence says that any remaining construction estimate

12   deposit shall be dispersed to the landlord if the landlord

13   has done it.  But --

14           MR. KUPETZ:  Right.  I'm saying if it's done, they

15   have to disburse it to the landlord.

16           THE COURT:  Well --

17           MR. KUPETZ:  But it doesn't say that if it's not

18   done, Sears -- and Sears doesn't spend the money to do the

19   work, that they somehow get to keep the money and have some

20   kind of windfall.

21           THE COURT:  Well, they have the money.

22           MR. KUPETZ:  Right.  Of course, the agreement

23   didn't contemplate that specifically and the parties

24   modified that approach.  But it was --

25           THE COURT:  I mean, I can understand an argument,

Page 89

1   although this wouldn't be a cure argument, that keeping the

2   deposit and not using it to complete the construction might

3   be an unenforceable penalty, something like that, or

4   unenforceable liquidated damages.  But that's not really a

5   cure issue.  I mean, that's how you'd normally deal with

6   forfeit.

7          MR. KUPETZ:  Right.  But the agreement granted, in

8   terms of the way it's written, has some ambiguities is what

9   we would say.  But it doesn't -- it's not saying that this

10  deposit is forfeited --

11         THE COURT:  Well --

12         MR. KUPETZ:  -- if this work isn't done.

13  Certainly, as set forth in the witness' direct testimony,

14  the declaration, the understanding certainly of the landlord

15  was that these funds were to be strictly used for the

16  specified work.

17         THE COURT:  Well, it says that this is -- 25, the

18  introductory paragraph, describes the 3.25 million deposit

19  as "to partially secure Landlord's design, repair,

20  construction and completion obligations under this

21  Amendment" which includes not only the four paragraphs but

22  the whole thing including the seismic.  So --

23         MR. KUPETZ:  Well --

24         THE COURT:  You know, it's securing it, all that

25  work.  That work -- it's clear the seismic work hasn't been

Page 90

1    done yet.  So --

2            MR. KUPETZ:  Right.  But --

3            THE COURT:  -- to say that he would go back

4    because it's a forfeiture seems to be contradictory to its

5    purpose which is to secure the deposit.

6            MR. KUPETZ:  I don't think that's really what it

7    says because --

8            THE COURT:  I just read it to you.

9            MR. KUPETZ:  No.  But --

10           THE COURT:  That's exactly what it says.  That's a

11   quote.  That's the purpose of the deposit.

12           MR. KUPETZ:  But then --

13           THE COURT:  It's a separate point you're making --

14           MR. KUPETZ:  Okay.

15           THE COURT:  -- I think, which is that it's unfair

16   for the landlord to say that because their work in 3, 4, 5,

17   6 and 7 isn't timely done that they get to keep the deposit

18   and they can do with it whatever they want to.  But that's

19   not a cure issue.  That's potentially a liquidated damages

20   issue.  But clearly, it seems to me if they apply it to the

21   work that should have been done and hasn't been done which

22   includes 8, then there's no forfeiture.  It secured all that

23   work.

24           MR. KUPETZ:  But 8 isn't covered by 25(d).

25           THE COURT:  No.  I know.  But you're saying that

1    the landlord has a claim to the deposit.  And we're not

2    talking about the 322,000.  We're talking about a claim to

3    the deposit.  And that's just not -- anyway, why would the

4    landlord be entitled to it unless there was some sort of

5    agreement that the deadline was waived.

6              MR. KUPETZ:  Well, and that's certainly the

7    landlord's --

8              THE COURT:  I understand that.

9              MR. KUPETZ:  And I can discuss that --

10             THE COURT:  That's a separate point.

11             MR. KUPETZ:  That's --

12             THE COURT:  But when you're talking about

13   forfeiture, it's a different issue.

14             MR. KUPETZ:  Yeah.  But that is the landlord's

15   position that --

16             THE COURT:  I understand.

17             MR. KUPETZ:  -- the deadline was waived.

18             THE COURT:  Right.

19             MR. KUPETZ:  And it's the landlord's position that

20   upon completion of the work, which the landlord is prepared

21   to do, the remainder of the deposit is to be returned to the

22   landlord.

23             THE COURT:  Right.

24             MR. KUPETZ:  Your Honor, in the direct testimony

25   of Mr. Shomof, it's stated that prior to the commencement of

1    the case, Sears communicated with the landlord on a regular

2    and continual basis.  It wasn't just by e-mail.  It's

3    e-mail, telephone, in-person meetings -- to coordinate and

4    request that the landlord do construction work at the

5    premises for which the landlord was and/or would be

6    reimbursed from this deposit.  This occurred after the April

7    1 deadline.  The testimony shows that, and states, in

8    reliance on tenant's representations and the requests and

9    the conduct and the performance, the landlord performed this

10   work at the premises --

11              THE COURT:  So you're saying it is a cure

12   objection knowing what I've already told you that you don't

13   have proof of the 322,000?

14              MR. KUPETZ:  No.  Well, we're saying we have a

15   legitimate claim to get paid.

16              THE COURT:  But you haven't given me a backup for

17   the amount.

18              MR. KUPETZ:  Well, they're all -- there isn't

19   evidence that that amount wasn't incurred.  I mean, the

20   amount has been stated the landlord --

21              THE COURT:  That's not how you prove a claim.

22              MR. KUPETZ:  Well, the landlord's testified that

23   this was incurred.

24              THE COURT:  He hasn't reviewed any of the

25   underlying documents.  He doesn't know the invoices.  He

1    didn't attach the invoices to his declaration.

2         MR. KUPETZ:  Well, you're referring to the 322?

3         THE COURT:  Yeah.

4         MR. KUPETZ:  He attached the invoice presented to

5    Sears.

6         THE COURT:  But nothing to support it.  It may

7    well be that he could do that but he hasn't as far as a cure

8    claim to me today.

9         MR. KUPETZ:  No.  His testimony talks about the

10   point person at Sears, as counsel's referred to, or Dolores.

11   Obviously, her e-mails -- they went back and forth.  They

12   continued to be involved.  She was going to legal.  She did

13   talk to legal.  In our view, waived any deadline.  That was

14   the understanding.

15        THE COURT:  How is that a waiver, that e-mail?

16        MR. KUPETZ:  Well, it's not -- we're not trying to

17   rely just on that e-mail but that e-mail and other conduct

18   including other e-mails that showed that work was being done

19   and that she, on behalf of Sears, was in approval of that

20   work and ongoing work.  Shows a course of performance that,

21   under California law, does supplement and does qualify and

22   can modify contrary terms in a contract.  And that's what

23   occurred here.

24        In the legal discussion, they included it, pages 5

25   through 7 of the reply, if you go through that, there's the

Page 94

```
 1    California Civil Code provision that talks about it and then

 2    cites to the commercial code history.  And in there, it

 3    talks -- in the quoted language that we have from the

 4    California Court of Appeals decision is the lengthy block

 5    quote that we put at page 6.  And there's a reference in the

 6    last paragraph on that page that "Course of performance is

 7    relevant in ascertaining the meaning of the parties'

 8    Agreement and it may supplement or qualify the terms of the

 9    Agreement or show a waiver or modification of any term

10    inconsistent with the course of performance."  And that's

11    what --

12              THE COURT:  But the parties have already stated in

13    their Agreement that there's a no-waiver -- spelled out how

14    you waive.  It just doesn't -- I don't see that.  I don't

15    see the basis of that point.

16              MR. KUPETZ:  Well, Your Honor, I won't belabor it

17    then but in our papers, and in our view, the parties did

18    modify by course of performance --

19              THE COURT:  Let me just go to the -- this

20    argument.

21         (Pause)

22              THE COURT:  The e-mail from Dolores acknowledges

23    or states the fact that the deadline was not met.  Right?

24              MR. KUPETZ:  Right.  And she continues on.

25              THE COURT:  Right.  So wouldn't that, at that
```

1   point -- wouldn't that point which that's obvious and she

2   states it, be the point where there's a dispute as to what

3   happens next?

4           MR. KUPETZ:  No.  Because they were in agreement

5   as to what would happen next.

6           THE COURT:  But there's a dispute as to how to go

7   ahead because --

8           MR. KUPETZ:  Not with respect to the construction

9   estimate deposit, where it goes.  With respect to the

10  seismic work and other work, they didn't come to an

11  agreement.  But with --

12          THE COURT:  But she just said you missed the

13  deadline.

14          MR. KUPETZ:  Right.  But we -- but we're going to

15  continue to work with you.  And there's other e-mails.

16  Here's what -- that works looks good.  Keep doing it.  And

17  they came out and met in person after that, Dolores and

18  another representative of Sears both in June and November of

19  that year and, you know, continued to make payments

20  following that time and to request that work be done on

21  these elements.  It was -- they only didn't finish up the

22  ultimate work on the construction deposit portion when two

23  things happened.  First, Sears had asked to delay the HVAC.

24  And they did delay the HVAC --

25          THE COURT:  But --

Page 96

1           MR. KUPETZ:  -- work inside the store.  They --

2           THE COURT:  But she expresses that you've missed

3    the deadline.

4           MR. KUPETZ:  Right, but it's --

5           THE COURT:  And now she's --

6           MR. KUPETZ:  -- but she then says, "It's fine with

7    us" --

8           THE COURT:  I know, but --

9           MR. KUPETZ:  -- "to go forward and" --

10          THE COURT:  But that -- my understanding, at

11    least, of -- any application of this doctrine is precluded

12    if the parties are already in a dispute, because, in

13    essence, that would force a party who wants to make the best

14    of a bad situation to somehow have acquiesced in -- you

15    don't want to be deemed to have acquiesced in the breach.

16    It's antithetical to cover, in other words.

17          MR. KUPETZ:  Well, I hear what Your Honor is

18    saying, but I don't believe that's the way the parties were

19    dealing with it.  She never communicated to them that they

20    were in a dispute.

21          THE COURT:  Well, she just said you -- but she

22    says in that email, you missed the deadline.

23          MR. KUPETZ:  Right.  But that's fine.  We're going

24    to continue to work this way.

25          THE COURT:  Well, but that's what people do when

Page 97

1    there's cover.  You know, it doesn't mean that you've waived

2    a breach.  You could -- particularly with an agreement like

3    this that, in essence, gives the tenant a backup, which is

4    to direct the work yourself.  Why isn't that what she was

5    doing?

6            MR. KUPETZ:  Well, that wasn't how the landlord

7    understood it, but maybe that --

8            THE COURT:  Well --

9            MR. KUPETZ:  It could be what she was doing.

10           THE COURT:  All right.  So --

11           MR. KUPETZ:  The landlord understood we're not in

12   dispute.  We're continuing to work on this and --

13           THE COURT:  Well, I --

14           MR. KUPETZ:  -- that basically the terms had been

15   modified voluntarily by the parties.

16           THE COURT:  Okay.

17           MR. KUPETZ:  So it sounds like Your Honor has

18   heard as much as you're -- besides the papers, in

19   considering --

20           THE COURT:  Well, I mean, the papers laid this

21   out.

22           MR. KUPETZ:  Yeah.  So I think you've --

23           THE COURT:  I think it's clear under California

24   law that you can use course of dealing to explain or

25   construe a provision of an agreement beyond parol evidence.

1            MR. KUPETZ:  Right, and --

2            THE COURT:  And I've -- we've discussed that in

3     terms of the word timely.  But I think that the California

4     courts are actually quite careful in limiting course of

5     dealing where there are contradictory provisions in the

6     agreement, and where there's -- where those provisions have

7     been breached.  At that point, I just -- you know, to read

8     it to say that if the parties continue to try to work out of

9     a bad situation, the one party has waved its rights under

10    the agreement just doesn't -- I think you need more than

11    that.

12            And it -- let's go to the fundamental point, which

13    is the proposal that she made was to tie the HVAC work to

14    the seismic work, so they're all done together.  That

15    actually wasn't done.

16            MR. KUPETZ:  Well, it was, in part, because part

17    of the HVAC work didn't affect -- she was really concerned

18    with in-store interference.  Part of the HVAC work is on the

19    roof -- that rooftop, and that's been done.  That doesn't

20    affect the store.  That wasn't what she was concerned about.

21    She was concerned about in-store access and interference.

22    And that work hasn't been completed.  That's the remaining

23    portion --

24            THE COURT:  Right.

25            MR. KUPETZ:  -- because Sears hasn't allowed

1    access as of this point.

2            THE COURT:  But the agreement, if you're saying

3    there was a waiver, was to do it in connection with the

4    seismic work, so you wouldn't have to do it twice, right?

5    And --

6            MR. KUPETZ:  Well, it was beyond that --

7            THE COURT:  -- your argument is, "Well, Sears is

8    preventing us from finishing the HVAC work, and then we'll

9    do the seismic work."

10           MR. KUPETZ:  But the agreement, as the landlord

11   understood it, covered other work that was ongoing.  It

12   wasn't just that work, and there's even --

13           THE COURT:  We're really talking about two

14   different things.  We're talking about the right to get paid

15   for the work that was done.  Okay?

16           MR. KUPETZ:  Right.

17           THE COURT:  I think we have an acknowledgment from

18   the tenant that it's fair to get paid for the work that's

19   done.  It's just not under the terms of this contract, but

20   still work that was done.  On the other hand, to say that

21   one has a right to the return of the deposit, when the

22   remaining work hasn't been done, is a real stretch.  If

23   you're relying upon one email in May of 2017 that says,

24   "We'd like to have the HVAC work done with the seismic

25   work," and in fact, the HVAC work hasn't been done yet.

Page 100

1            MR. KUPETZ:  Well --

2            THE COURT:  And the seismic work, it doesn't look

3    like it's going to be done, ever, as far as I can tell.

4            MR. KUPETZ:  Right.

5            THE COURT:  Certainly not within the timeframes

6    contemplated by paragraph 8.  So her -- even if you take her

7    email as a waiver, which I don't, the conditions of the

8    waiver haven't been satisfied.

9            MR. KUPETZ:  Right.  But the landlord also isn't

10   saying, and as I read our papers and as we presented them,

11   isn't saying, "And return the full deposit to us that

12   remains right now."  It's saying --

13           THE COURT:  That's what their claim is, it's for

14   the full amount.

15           MR. KUPETZ:  Well, we're saying it has to be

16   maintained.  And when we finish the work, which if you give

17   -- if whoever is the tenant allows access, the landlord can

18   finish the work.

19           THE COURT:  Well, the -- one thing is crystal

20   clear, to me at least, under the language of 25(d), the

21   tenant has the right tomorrow to elect to take the deposit.

22   There's no time limit on the tenant's election.

23           MR. KUPETZ:  But it has to be devoted to doing the

24   work for the property.  I don't think they have the right to

25   just take the deposit --

1          THE COURT:  Again, but that's not a cure issue.

2     That's not a cure issue.  They're not proposing to just keep

3     it?  Logically, they apply it to the property, but that's

4     not a cure issue.  But it doesn't say that they have to

5     segregate it.  It just says they take the money.  They can

6     have it.

7          You can argue in the future that it would be a

8     windfall, or an improper liquidated damages provision, or

9     putative damages if they don't apply it to the -- finishing

10    the work, but you know, a) you'd have to win that; and b)

11    it's not a cure objection today.

12         MR. KUPETZ:  And is it a claim against --

13         THE COURT:  No, it's not a claim.  There's no

14    claim.  They have -- look, I mean, paragraph 25, your

15    client's main point is that they didn't elect to keep the

16    money.  Well, but they can elect tomorrow.  There's no time

17    limit on it.

18         MR. KUPETZ:  But meanwhile, they had the client do

19    --

20         THE COURT:  Well, all right, but that's -- again,

21    that's not a -- I don't view that -- I view that as they

22    could've hired, I don't know, some other HVAC person to do

23    that work.  And in fact, the landlord hired an HVAC person,

24    right?  He didn't do the work himself.  So yes, you have to

25    pay for the work you do.  I have no idea whether -- what

Page 102

1    that amount is.  It may be considerably less than 322,000.

2    It may be 322,000.  We don't know.  But you know, it's hard

3    for me to imagine that some Court would dispute that if, in

4    fact, the landlord can show that it paid valid invoices by

5    people who did valid work, and after it's completed, and

6    specified, and approved, such approval not to be

7    unreasonably withheld, they wouldn't be paid for.

8             MR. KUPETZ:  But --

9             THE COURT:  But that's not a cure objection.

10            MR. KUPETZ:  But is that claim against old Sears?

11            THE COURT:  No.  No.  Because it's -- well, I

12    don't know.  That's a good question.  That's a very good

13    question.

14            MR. KUPETZ:  Because otherwise, we're allowing a

15    windfall.

16            THE COURT:  Yeah, well, all right.  But it may not

17    be a cure objection.  But again, I don't have any proof of

18    it today.  So I think you're better off having it be a cure

19    objection -- I mean, a quantum meruit claim for the work

20    that was done.

21            MR. KUPETZ:  Does Your Honor want to hear any

22    other arguments in terms of the failure of the project, or

23    does the Court want to just --

24            THE COURT:  Well, I mean, I don't -- I mean,

25    that's the step -- that's the other issue.  We've been

Page 103

1    talking about the deposits so far.  But as far as the

2    consequential damages claim for the apparent, or the

3    asserted inability to get the financing to do the work to

4    complete the project, it's agreed, right, that there's no

5    obligation -- express obligation under the contract to

6    comply with that, right?  To do that?

7            MR. KUPETZ:  That's correct, Your Honor.

8            THE COURT:  So when Mr. Shomof testified that the

9    financing was pulled because there was a condition that

10   there be an agreement with Sears, the agreement was the

11   lease, the 2015 lease.  There was an agreement.

12           MR. KUPETZ:  Not --

13           THE COURT:  Right?

14           MR. KUPETZ:  What he was talking about was there

15   need -- and I can run through this, if it's helpful.

16           THE COURT:  Okay.  But that's how I'm looking at

17   it.  I mean, it's hard to see --

18           MR. KUPETZ:  There needed to be --

19           THE COURT:  I'm getting -- I'm ultimately getting

20   to what I think a business person might understand, which is

21   I don't -- we could walk through all the terms of the

22   agreement, but ultimately, if those terms don't permit what

23   the landlord proposed, it's clear to me that when the bank

24   put a condition that there be an agreement with Sears, it

25   meant a new agreement, because the existing agreement didn't

1     provide for it.

2              MR. KUPETZ:  Right, they were --

3              THE COURT:  And there's no obligation on Sears'

4     part to provide a new agreement.  So I don't see how there

5     could be any damages for Sears in terms of pulling -- you

6     know, in terms of the bank financing being pulled.  So we

7     have to look at the agreement.

8              MR. KUPETZ:  Well, and we're seeing it's not --

9     it's really based on an implied covenant of good faith and

10    fair dealing.

11             THE COURT:  Well, I understand.  But if the

12    agreement itself -- the implied terms cannot vary the terms

13    of the agreement, of the contract.  So the part -- I mean,

14    this contract -- the 2015 contract is very clearly

15    contemplating this work to be done, and it has a whole

16    section, the construction protocol.  It lays it all out what

17    needs to be done, as well as the operative paragraphs that

18    incorporate the protocol.

19             MR. KUPETZ:  And in our papers, we tried to

20    address some of that.  I don't know if the Court wants me to

21    summarize that and go through it.

22             THE COURT:  Go ahead.  I mean, I don't see how

23    this letter from September of 2018 came close to satisfying

24    those conditions.

25             MR. KUPETZ:  Well, let me -- maybe -- if the Court

Page 105

1    will allow, I'll walk through it.

2                THE COURT:  Okay.

3                MR. KUPETZ:  And hopefully, it advances the cause.

4                THE COURT:  Okay.

5                MR. KUPETZ:  Prior to Sears entering Chapter 11,

6    the landlord was in the discussions with Sears regarding

7    plan rehabilitation and redevelopment of the building.

8                THE COURT:  Right.

9                MR. KUPETZ:  And that's set forth in paragraphs 39

10   through 50 of Ms. Shomof's declaration, ECF 4625.

11               THE COURT:  Right.

12               MR. KUPETZ:  There were communications with Mr.

13   Velkei, who was one contact, a lawyer out in California that

14   the landlord had for Sears.  There's the letter that the

15   Court referred to, the 9/25/2018 letter, which did propose

16   closing the store for six months.  That was in the

17   landlord's -- neither a requirement nor a demand.

18               They didn't get a substantive response refusing

19   it, and they just couldn't get any engagement from Sears at

20   all after the Chapter 11 filing.  Page 45 -- paragraph 45 in

21   the Velkei -- or in the Shomof declaration referred to --

22   talks about how Mr. Velkei advised him to contact Sears

23   bankruptcy counsel.  There was a letter actually from myself

24   to the Debtor's counsel, which was Joint Exhibit 12.

25               THE COURT:  But -- could I interrupt you?

1              MR. KUPETZ:  Uh-huh.

2              THE COURT:  Because this goes through what's in

3      your pleadings.  And let's assume all of that is true, the

4      lease amendment has a specific section dealing with seismic

5      work.  It has certain deadlines in it.  And then it says,

6      "The plans and specifications schedule authorized hours of

7      construction activity and remediation plan for set seismic

8      work shall be preapproved by tenant, pursuant to the

9      demolition and construction protocol attached hereto as

10     Exhibit C, and conducted," that's the next step, "conducted

11     in a manner that creates the minimum possible visual and

12     noise inconvenience to tenant and its customers."

13             So then you go to Exhibit C, the demolition and

14     construction protocol, and 2(b) -- Section 2(b) states,

15     "Landlord shall provide two weeks' notice for any demolition

16     or construction work not involving remediation or removal of

17     hazardous materials of the building parcel, and shall

18     include in that notice the scope of work contemplated, a

19     detailed set of plans and specifications for the same,

20     together with the schedule of authorized hours of

21     construction activity and remediation plan for the same.

22     Tenant shall have ten business days from receipt of

23     landlord's both notice and complete detailed plans of

24     specifications to provide any comments and/or objections.

25     No reply from tenant within that period shall constitute

1   approval.  Landlord may proceed with the work in question

2   after complying with the aforesaid procedures, provided the

3   work in question is approved by tenant or deemed approved by

4   tenant as aforesaid."

5          And then (c) deals with if tenant lodges timely

6   objections, "The parties hereto must agree upon the scope

7   and course of the work, together with the schedule,

8   authorized hours of construction activity, and remediation

9   plan for the same before it may proceed.  Such consent by

10  tenant may not be unreasonably withheld."

11         So it appears quite clear to me that A) the

12  landlord did not provide the type of proposal -- details,

13  set of plans, specifications, et cetera, that would -- in

14  the September letter, that would start the ten day clock

15  ticking.  And it may have been, as a business person,

16  reasonable to assume that he could ignore that and just

17  discuss things, and try to work from a baseline, which he

18  knew was clearly unacceptable, to something that would be

19  acceptable.  But that didn't happen.

20         So I think it would then be incumbent upon him

21  when he wasn't getting any more response than the initial

22  response he got back, which was arguably a no, although it

23  was a no to something that didn't really need to be

24  responded to under this Section 2(b), because it was

25  responding to something other than a 2(b) type of proposal.

1    But if he wanted to bind Sears in the face of silence, he

2    had a means to do so.  He could make that type of proposal.

3    And if there was no response within ten days, it's deemed

4    accepted.  The affidavit says that never happened, and it's

5    not really Sears' fault.

6            MR. KUPETZ:  It's correct that didn't happen.

7    Realistically, as the reply does discuss, it's really an

8    illusory kind of provision, because --

9            THE COURT:  It's a highly detailed provision.

10           MR. KUPETZ:  But without --

11           THE COURT:  The parties entered into a separate

12   multi-page -- I mean, a 36 page amendment to their lease,

13   contemplating all of these things, with then a lengthy

14   Exhibit C protocol.  It couldn't be more detailed.  And when

15   you compare it to the provision in a lease that basically

16   gives the landlord to terminate for any reason, including

17   its own financial gain, which the California courts say is

18   perfectly acceptable and rules out any breach of the implied

19   covenant of good faith and fair dealing, it's hard to see

20   how you could somehow say, "Oh, no.  The parties did specify

21   all of this, but we can just make a proposal and then

22   somehow bind the debtor to having to front all of our

23   financing and construction costs."  This just doesn't really

24   fly.

25           MR. KUPETZ:  But in the real world, as Mr. Velkei

Page 109

1    said in his response, the very last line of his response.

2    "In order for this project to move forward, there's got to

3    be collaboration."  And there's --

4                 THE COURT:  In the real world, parties write

5    agreements that they live up to.  This agreement spelled out

6    what was to happen.  If there's a non-cooperating party, you

7    give it your best shot to comply with the requirements of

8    2(a).  And frankly, at that point, the non-responding party

9    is at real risk.  You know?

10                I mean, if there are details that they could have

11   negotiated, but the non-responding party, Sears, lets it go,

12   they're stuck with it.  There's an implementation feature.

13   You know, that's 2(c), but they're stuck.  Didn't happen.

14   You know, it's -- I appreciate business people think

15   differently sometimes than their agreements, but the

16   agreements governed, unless they're waived.  And there's no

17   waiver here, this issue.

18                MR. KUPETZ:  It sounds like the Court has seen the

19   papers and doesn't want to hear argument.

20                THE COURT:  Yeah.  Your papers are pretty clear on

21   this at this point.

22                MR. KUPETZ:  Any other questions, Your Honor?

23                THE COURT:  No, I don't think so.

24                MR. KUPETZ:  Thank you, Your Honor.

25                THE COURT:  Okay.

Page 110

1              MR. WEAVER:  Sorry, Your Honor.  I just need to

2     make clear, and forgive me -- indulge me for one moment.

3     Just so we're -- I know Your Honor wasn't ruling on this

4     point, and it's not before Your Honor, but to be clear that

5     my client, Transform, is responsible for the cure

6     obligations of any contract that it assumes and assigns --

7              THE COURT:  Right.

8              MR. KUPETZ:  -- there's not -- that was agreed to

9     as part of the APA, there's nothing before the Court today,

10    Your Honor, about any other type of damages that might be

11    owed to this landlord --

12             THE COURT:  No, I agree.

13             MR. WEAVER:  -- and who would be responsible for

14    that.

15             THE COURT:  Well, that's fair.  But I think, to be

16    clear, I'm also not authorizing in a ruling here that denies

17    the landlord's cure objection as to return of the deposit,

18    that shouldn't be taken to mean that Transform is authorized

19    to just take that deposit and put it to general uses.

20             MR. WEAVER:  Understood, Your Honor.  That was not

21    at all how I understood Your Honor to speak, but I just

22    wanted to make clear that that Transform's obligations are

23    limited here, Your Honor, to cure amounts that we're

24    discussing.

25             THE COURT:  That's right.

Page 111

1                MR. WEAVER:  Nothing further from Transform, Your

2      Honor.

3                THE COURT:  Okay.  All right.  Sears Roebuck was

4      party to a 2011 lease, which was amended and restated in a

5      December 30, 2015 lease of an interest in real property

6      located at 10309 Folsom Boulevard.  No, I'm sorry.  Is that

7      the location?  Well, let me just say in Los Angeles.

8                MR. WEAVER:  Olympic Boulevard, Your Honor.

9                THE COURT:  Olympic Boulevard.  In Los Angeles.

10     Consistent with prior orders that I have issued in this

11     case, Sears sent out a notice of proposed assumption and

12     assignment of the lease to Transform Holdco.  That notice --

13     that set of notice procedures gave the landlord the

14     opportunity to object to the assumption and assignment,

15     and/or to assert that there were outstanding obligations

16     under the lease, i.e. that there were defaults under the

17     lease, that created a monetary obligation on behalf of the

18     tenant to be cured under Section 365 of the Bankruptcy Code.

19               The agreement between Sears and Transform lays out

20     who's responsible for that cure.  But the key point for my

21     ruling today is that cure is only owed in respect of

22     monetary obligations for defaults before the assignment of

23     the lease, including prepetition defaults.

24               The landlord here asserted three sets of defaults,

25     two of which the assignee, Transform, has agreed are, in

Page 112

1    fact, properly owed cure amounts, or that will be properly

2    owed in the case of tax reimbursements, in the amounts

3    asserted.  So there's no remaining dispute between the

4    landlord and Transform, which under the agreement with

5    Sears, would be responsible to pay such cure with respect to

6    the common area maintenance or property tax reimbursement

7    cure amounts asserted in the landlord's objection.

8           In addition, the landlord's cure objection raised

9    two other cure issues.  And I find that both of the cure

10   claims or both of those cure claims, although one was

11   asserted in a supplemental cure claim, were timely made.

12          First, the landlord refers to the remaining

13   amounts in a so-called construction estimate deposit,

14   established under Section 25 of the 2015 amended and

15   restated lease, which was established originally in the

16   amount of $3,250,000.

17          And parties agree that substantial amount -- a

18   substantial amount of that sum has already been paid out of

19   such deposit.  The landlord contends that in respect of work

20   that it did, or its contractors or subcontractors did, in

21   the sum of $322,649.80 is due and owing to the tenant to be

22   paid from the remaining amount in the construction estimate

23   deposit.

24          Secondly, it contends that it would be a breach of

25   the lease if the landlord did not use the remaining amount

1    in the construction estimate -- I'm sorry, if the tenant did

2    not use the remaining amount in the construction estimate

3    deposit to reimburse landlord for construction expenses at

4    the premises, presumably in the future.

5              Secondly, the landlord stated in its original cure

6    objection that there was an immediate need to make extensive

7    renovations at the property as part of an overall

8    rehabilitation plan to develop the property, which is only

9    70 percent occupied by Sears.

10             And to conclude, work that under paragraph or

11   Section 8 of the 2015 lease, with respect to seismic work,

12   needed to be work in a supplemental -- a timely supplemental

13   objection.  The landlord asserted a multi-million dollar

14   claim based on the alleged breach by the debtor tenant of

15   its implied covenant of good faith and fair dealing under

16   the lease, allegedly because the tenant did not reasonably

17   respond to or cooperate with the landlord in permitting the

18   landlord to do such work.

19             That multi-million dollar figure was comprised of

20   cost that the landlord stated it had incurred to lay the

21   groundwork for that work, and/or the failure allegedly

22   attributable to the debtor of the landlord's financing to

23   commence such work.

24             The first set of issues depends upon, in the first

25   instance, a construction of the 2015 amended and restated

1    lease, which was entered into, as stated in the recitals, in

2    part because additional work was contemplated on the

3    building and the -- I'm sorry, the parties "had a number of

4    issues to dispute," with respect to the terms of the 2011

5    lease.  That prompted the parties to enter into the amended

6    restatement.

7         The 2011 lease provides in Section 2(a)(3), "The

8    parties acknowledge that it is most critical to the

9    successful operation of tenant's business at the premises,

10   the tenant has access, use, and enjoyment of those portions

11   of the building parcel shown on the site plan as 'tenants

12   control the area,'" including such rights as are set forth

13   below.

14        "Without tenants' prior approval, which may be

15   withheld for any or no reason in its sole discretion,

16   landlords shall not construct or install any improvements,

17   or make any changes to tenants' control area, or interfere

18   with, or obstruct tenants' use thereof in any manner

19   whatsoever, including without limitation by reconfiguring

20   the parking spaces."

21        The 2015 amendment and restatement acknowledges

22   that additional work will be done and sets forth the

23   parties' agreement in connection with that work.  Section 2

24   of the document begins with an unlettered paragraph by

25   stating that, "Landlord at landlord's sole cost and expense

1    shall design, construct, and complete all work contained

2    within this agreement in compliance with the demolition and

3    construction protocols attached hereto, and made a part

4    hereof as Exhibit C, including without limitation, work

5    described below in Sections 3, 4, 5, 6, 7, 8, 10, and 11,

6    subject to the terms of Section 9 below, on or before April

7    1, 2017, unless a different completion date is explicitly

8    set forth below, in which case the different completion date

9    set forth below shall govern, or unless the date is

10   otherwise amended in writing by means of a further amendment

11   to this agreement.

12           "Final plans and specifications shall be reviewed

13   and approved by tenant pursuant to the demolition and

14   construction protocol, even if the work in question is

15   addressed in the exhibits attached hereto."

16           Paragraphs 3 through 8 and 10 all lay out work

17   with respect to specific projects.  In order: low voltage

18   service, HVAC, plumbing, façade, signage, seismic work, and

19   freight elevator work, which are all, as I noted, referenced

20   in this section that I quoted.

21           The agreement not only has an integration

22   provision in Section 19, but also has a no waiver provision,

23   Section 17, which states, "Unless expressly waived or

24   released in either the building lease, or in this amendment,

25   or in a separate writing signed by the waiving party, no

Page 116

1    provision of either the building lease or this amendment

2    shall be deemed to be a waiver by either party of any rights

3    or claims against the other, either arising out of the

4    building lease as amended, or out of any other agreement or

5    circumstances."

6         It is undisputed that the specific work to be done

7    or completed under paragraph 2 was not done -- to be done by

8    April 1st, 2017, was not in fact completed by April 1st,

9    2017.  This is relevant to the claim for the $322,000, as

10   well as to the assertion that the money currently being held

11   as part of the construction estimate deposit needs to remain

12   to be held in that deposit and paid to the landlord under

13   the terms of the agreement.

14        Paragraph 25, as I noted, provides for the

15   establishment of the construction estimate deposit.  It is

16   -- it was funded by the landlord as set forth in that

17   provision, "To partially secure landlord's design repair

18   construction and completion obligations under this

19   amendment," i.e. that landlord's obligation to complete the

20   work.

21        The agreement went on to establish -- to provide

22   that tenants shall, in turn, within a reasonable time

23   thereafter, but in any event within 30 days of landlord's

24   written request, deposit that money in escrow "to enable

25   able landlord to be able to draw upon those funds in the

Page 117

1    construction fund escrow to pay for landlord's design repair

2    construction and completion work, as required per this

3    amendment."

4           However, the parties have agreed that the funds

5    would be held by the landlord.  In other words, the escrow

6    was never set up -- I'm sorry, held by the tenant.  In other

7    words, the escrow was never set up by the tenant and the

8    landlord never requested the establishment of an escrow.

9           And it is agreed that a substantial amount of

10   those funds were, in fact, used to pay or reimburse the

11   landlord for work that it did under Section 2 through 10.

12   Of particular relevance to the first remaining dispute is

13   Section 25(d) of the lease, which states, "In the event

14   landlord does not complete the work contemplated in Sections

15   3, 4, 6, and 7 by April 1, 2017, the remainder of the funds

16   in construction escrow shall be released to tenant at

17   tenant's election, so that tenant can cause the work to be

18   completed, and tenant shall be entitled to payment by

19   landlord any additional amounts necessary to complete the

20   work."

21          Paragraph 25(d) then goes on to state, "Upon

22   landlord's completion of the work described in Sections 3,

23   4, 5, 6, and 7 in a timely manner, and its inspection and

24   acceptance by tenant, any remaining construction and

25   estimate deposit fund shall be disbursed to landlord,

Page 118

1    subject to the review and approval of the parties regarding

2    the amount in question."

3             As I noted, it's undisputed that the work required

4    by Sections 3, 4, 6, and 7 was not completed by April 1,

5    2017.

6             It's also disputed that, as of today, the landlord

7    has not made an election to have the remainder of the funds

8    released -- I'm sorry -- the tenant has not made an election

9    to have the remaining funds released to the tenant so that

10   the tenant can cause the work to be completed.

11       (Pause)

12            THE COURT:  There is no time limitation, in the

13   agreement, on when the tenant may make such an election,

14   however.  So, conceivably, the tenant could make the

15   election tomorrow given the landlord's failure to complete

16   the work in Section 346 and 7 by April 1, 2017.

17            The landlord contends, however, that the parties

18   modified the deadline set forth in the first sentence of

19   Section 25(d) by its course of dealing or their course of

20   dealing.

21            The facts to support that contention are two-fold.

22   First, there are some invoices with backup in the record

23   showing 14 payments for work done by the landlord after

24   April 1, 2017, apparently on these -- one or more of these

25   four projects. Those required to be completed by the

Page 119

1    landlord under Section 346 and 7 of the 2015 amended and

2    restated lease.

3          Secondly, there is a May 2017 e-mail from a Sears

4    real estate employee to the landlord which states or points

5    out to the landlord that the landlord has not met its

6    deadline to complete that work by April 1, 2017 and then

7    goes on to state that Sears would be prepared to have the

8    remaining A track work done later in tandem with the seismic

9    work required under paragraph -- or Section 8 of the

10   agreement to avoid two sets of disruption of Sears's

11   operations.

12       (Pause)

13          THE COURT:  It is reasonably clear to me that

14   Sears and the landlord were aware of -- that the landlord

15   continued work after April 1 and that Sears was aware of it.

16   What we do not have is a signed written waiver as required

17   by Section 17 of the 2015 amended and restated lease.

18       (Pause)

19          THE COURT:  The landlord contends that the cure

20   claim for the 322,000 and change is not a default under the

21   lease and it's not being paid out of the construction fund

22   escrow because of the release feature of the first sentence

23   of paragraph 25(d) and the fact that the landlord doesn't

24   have the right to the release of any remaining funds in the

25   construction fund escrow because there would not a

Page 120

1    construction fund escrow and/or because the work has not

2    been completed in a timely manner as required in the second

3    sentence of that section.

4          I construe the first sentence of Section 25(d) to

5    provide that the funds in the construction escrow fund could

6    be released to tenant upon the tenant's election given the

7    failure to complete the work.

8          The election, in fact, has not occurred but in

9    equal amount the work was not completed by the dates

10   required; not only in paragraph 2(d) but also in paragraph

11   25 and Section 2.

12      (Pause)

13          THE COURT:  Given the failure to complete the work

14   by the time required, I believe that there is no contract

15   right to its payment.

16          On the other hand, there may be a quantum meruit

17   right to its payment and there may be well a right as a

18   quantum meruit matter to be paid out of the construction

19   fund given paragraph 25's statement that the fund was

20   required to partially secure the landlord's completion of

21   the work albeit that it was to be completed under the terms

22   of the agreement.

23          But it is clear to me that there is no cure claim

24   per se for the 322,000 because the work was not, in fact,

25   completed by the time that Section 2(a) requires it to be

Page 121

1     completed.

2          Again, this doesn't preclude a quantum meruit

3     claim and it doesn't preclude a claim that the funds that

4     were held in escrow should be devoted to pay the amount.

5          But, as far as a cure objection is concerned,

6     there is not cure obligation.

7          There is no present monetary default under the

8     contract.

9          As pertains to Section 25(d) that leaves the

10    landlord's other contention which is that there is a breach

11    of the contract that needs to be cured if the tenant does

12    not apply the construction estimate deposit to the work, not

13    only done, but to be done by the landlord under the

14    agreement.

15        (Pause)

16          THE COURT:  I will note that the landlord does not

17    say that he's entitled to a refund of the remaining deposit

18    today nor could it because the work has not been completed

19    as required by the second sentence of paragraph -- or

20    Section 25(d).

21          The contention as a cure objection really doesn't

22    apply.  It assumes a hypothetical that clearly hasn't

23    occurred at this point.

24          The landlord must accept that, because it's a

25    premise of its own argument, that the tenant has not yet

Page 122

1    elected, under the first sentence of Section 25(d), to have

2    the construction fund released to it, to the tenant.  It is

3    still, therefore, being held and, as provided in that first

4    sentence, if such an election is made, it shall be made "so

5    the tenant can cause the work to be completed to whoever the

6    tenant chooses to have complete the work."

7          The dispute as to what happens to any residual

8    amount is not a cure dispute.  It's a dispute for the

9    future.  Consequently, that aspect of the landlord's cure

10   objections also should be denied.

11         (Pause)

12         THE COURT:  In summary, then, let me be clear.  In

13   addition to denying both of those aspects of the landlord's

14   cure objection, the record should be clear that I have not

15   decided what, if anything, the landlord's entitled to be

16   paid for work it has already done.  It has not set forth

17   sufficient evidence in the form of backup to support its

18   invoice of 322,000 for that work.  Moreover, it has not

19   completed the work by the deadlines stated.

20      (Pause)

21         THE COURT:  So, I could not, even if there were a

22   quantum meruit issue before which there isn't since that

23   would not be an issue under the contract, determine what on

24   a quantum meruit basis the landlord might be owed.

25         Secondly, I have not determined whether if such a

1    claim is ever fixed the construction fund escrow can be a

2    source of payment for it.  I just noted the possibility as

3    it may exist either under the introductory paragraph to

4    Section 25 or the operation of the first sentence of

5    Section 25(d).

6                The landlord has contended that the May 2017

7    e-mail and the fact that a relatively small amount of money

8    was paid for work done after April 1, 2017 by it or its

9    subcontractors should, as a matter of course of performance

10   or course of dealing under California law, which the parties

11   agree controls this dispute as far as contract

12   interpretation is concerned, meaning that the tenant waived

13   its rights to completion by April 1 and, therefore, that it

14   has a cure claim.

15               California generally follows the plain meaning

16   rule and excludes the admission of parole evidence

17   particularly for only -- excuse me, but that is the case

18   here, where there is an integrated written agreement which,

19   as I noted before, this agreement is.

20               And the parol evidence rule itself can be used

21   only to resolve an ambiguity in an agreement and this

22   agreement is not ambiguous as far as the deadlines that it

23   sets for performance.

24        (Pause)

25               THE COURT:  The California courts, however, will,

Page 124

1    under certain circumstances, permit consideration of the

2    parties' course of performance of an agreement which is with

3    respect to a transaction that involves repeated occasions

4    for performance by a party and the other party with

5    knowledge of the nature of the performance and an

6    opportunity for objection to it accepts the performance or

7    acquiesces in it without objection.

8           Clearly, evidence of a course of performance is

9    admissible if it does not directly contradict the terms of a

10   written agreement but merely explains or supplements them.

11      (Pause)

12          THE COURT:  A more difficult issue is whether the

13   course of performance actually permits modification or

14   alteration of the plain terms of agreement, of an agreement,

15   if an actual waiver is not shown.

16          And, here, no waiver would be shown given the

17   express no waiver provision term or the express term

18   limiting the nature of a waiver in paragraph 17 of the

19   agreement.

20      (Pause)

21          THE COURT:  As far as the deadlines are concerned,

22   I do not believe that the parties' course of -- the evidence

23   of the parties' course of performance is sufficient to

24   overcome the plain terms of the agreement as to when the

25   work was to be completed.

Page 125

1          The payment of a relatively small number of post-

2    April 1 work invoices, or invoices for work done

3    post-April 1, to me also does not reflect more conceivably

4    then the tenant causing work to be completed after the

5    deadline passed which Section 25(d) specifically permits the

6    tenant to choose any party to use to complete such work,

7    including, without limitation, the landlord.

8          That leaves the May e-mail which acknowledged the

9    default to not acquiesce in it but did request, in the light

10   of the default, completion of the HVAC work in connection

11   with the seismic work to avoid additional disruption.   That

12   was in May of 2017.

13         The seismic work has yet to start.  To me, that is

14   not sufficient evidence of the course of performance to show

15   that the parties agreed to waive the April 1 deadline.

16     (Pause)

17         THE COURT:  The second dispute, as I noted,

18   pertains to the landlord's contention that the tenant

19   breached the implied covenant of good faith and fair dealing

20   that exists in every contract governed by California law,

21   including lease agreements.

22         I guess before I go to that, let me cite Lennar

23   Mare, M-A-R-E, Island v. Steadfast Insurance Company, 176

24   F.Supp 3d. 949, Ed. CA 2016, as the source for my summary of

25   California law on contract interpretation, use of parol

Page 126

1    evidence, resolution of ambiguities and course of

2    performance.

3            That case has an extensive discussion of all of

4    those issues citing substantial California law opinion.

5        (Pause)

6            THE COURT:  So, the implied covenant of good faith

7    and fair dealing clearly exists in all contracts governed by

8    California law including leases, Wolf v. Walt Disney

9    Pictures and Television, 162 Cal App 4th, 1107, Cal App

10    2008.

11            There are serious limitations on it, however, as

12    noted by the Wolf Court "the implied covenant will only be

13    recognized to further the contract's purpose.  It will not

14    be read into a contract to prohibit a party from doing that

15    which is expressly permitted by the agreement itself."

16            The general rule regarding the covenant of good

17    faith is plainly subject to the exception that the parties

18    made by express provisions of the contract, grant the right

19    to engage in the very acts and conduct which would otherwise

20    have been forbidden by an implied covenant of good faith and

21    fair dealing.

22            This principle is consistent with the general rule

23    that implied terms cannot vary the express terms of a

24    contract.

25            If the defendant did what it was expressly given

1    the right to do, there could be no breach.

2            Thus, although it has been said, the implied

3    covenant finds particular application in situations where

4    one party is invested with a discretionary power affecting

5    the rights of another if the express purpose of the contract

6    is to grant unfettered discretion and the contract is

7    otherwise supported by adequate consideration that the

8    conduct is, by definition, within the reasonable expectation

9    of the parties and can never violate an implied covenant of

10   good faith and fair dealing.

11           The reference to reasonable expectations is

12   important.  I'm sorry.  See, also, Storek & Storek v. Citi

13   Corp Real Estate, Inc., 100 Cal App 4th 44, Court of Appeals

14   Cal 2002.

15           The requirement of reasonableness or reasonable

16   expectations is important to the implication of the implied

17   covenant in the context where there is no express agreement

18   governing the parties' expectations.

19           Even there, the burden that the implied covenant

20   would place on the party against which it is being asserted

21   must be reasonable.  See Sachs v. Exxon Co., U.S.A., 9 Cal

22   App 4th 1491, Cal App 1992.

23           Here, as I noted, the 2015 amended and restated

24   lease was entered into by the parties in light of

25   anticipated substantial work to be done on the building

Page 128

1    including, without limitation, as set forth in paragraph 8

2    of the agreement, seismic work.

3              That paragraph says landlord is responsible for

4    all necessary seismic repairs and improvements within and in

5    the vicinity of the premises and the overall building.

6              The landlord shall use best efforts to obtain

7    necessary government approvals to perform such seismic

8    repairs and improvements within 12 months after the City of

9    Los Angeles's approval of administrator's determination of

10   the city applications described in Recital D of this

11   amendment and complete such seismic repairs and improvements

12   within 12 months of when said permits are issued subject to

13   the terms of Section 9 below.

14             As an aside, that Section 9 prohibits work over

15   the specifically laid out Christmas sale season.

16             Section 8 then continues; notwithstanding anything

17   contained herein to the contrary, all seismic permits and

18   seismic repairs and replacements shall be applied for,

19   installed and completed within such time as required by law

20   of by governmental authorities.

21             The plans and specification schedule, authorized

22   hours of construction activity and remediation plan for such

23   seismic work shall be pre-approved by tenant pursuant to the

24   demolition and construction protocol attached hereto as

25   Exhibit C; which also, of course, was referred to in

Page 129

1    Section 2 of the agreement.

2            And, then, Section 8 continues; and conducted in a

3    manner that creates the minimum possible visual and noise

4    inconvenience to tenant and its customers.

5            Turning to Exhibit P -- C, excuse me, the

6    demolition and construction control protocol.  It provides,

7    in Section 2(b), a mechanism for the landlord to make its

8    proposal and contemplated by Section 8, that I just quoted.

9            Section 2(b) of Exhibit C states landlord shall

10   provide two weeks' notice for any demolition or construction

11   work not involving remediation or removal of hazardous

12   materials at the building parcel and shall include in that

13   notice the scope of work contemplated, a detailed set of

14   plans and specifications for the same, together with the

15   schedule, authorized hours of construction activity and

16   remediation plan for the same.

17           Tenant shall have ten business days from receipt

18   of landlord's both notice and complete detailed plans and

19   specifications to provide any comments and/or objections.

20           No reply from tenant within that period shall

21   constitute approval.

22           Landlord may proceed with the work in question

23   after complying with the aforesaid procedures provided the

24   work in question is approved by tenant or deemed approved by

25   tenant as aforesaid.

Page 130

1          The landlord, I believe, acknowledges that the one

2     written communication that is in the record, the September

3     28, 2018 email to Sears in-house counsel working on

4     building-related matters with respect to this real property,

5     did not comply with Section 2(b) that I've just quoted.

6          Even if that wasn't conceded, it's clear from

7     reading the email and the attachments that it does not

8     include a detailed set of plans and specifications together

9     with a scheduled authorized hours of construction activity

10    and remediation plan as required by Section 2(b) of

11    Exhibit C.

12         There's nothing in the record to suggest that such

13    a proposal was ever made.

14         What the landlord contends instead is that it was

15    understood by the parties that the September 28 e-mail was a

16    negotiating start and that Sears did not thereafter

17    negotiate with the landlord or even after the -- even after

18    the start of the bankruptcy case respond to the landlord

19    when it sought to negotiate.  That, the landlord contends,

20    constitutes a breach of the implied covenant of good faith

21    and fair dealing.  I conclude to the contrary that it does

22    not constitute such a breach.  The parties have very

23    carefully laid out, as was evidently reasonable for them to

24    do given the nature of the 2015 amended and restated lease,

25    how such a proposal would be made, when it would be deemed

Page 131

1    accepted, when it would be treated as rejected and what the

2    parties were supposed to do thereafter.

3            Here, there was no such proposal made in the first

4    place.  If, when faced with no response from the tenant, the

5    landlord wished to proceed, the agreement actually gave the

6    landlord a mechanism in which to do so and spelled out the

7    tenant's rights and duties with respect to such a mechanism.

8            The landlord would make a proposal compliant with

9    Section 2(a).  The tenant would have ten days to object.

10   And if no reply from the tenant within that period was

11   received, the tenant would be deemed to have approved and

12   the landlord could proceed with the work in question.

13           The landlord did not follow that protocol.

14           It's clear, further, although unnecessary for my

15   ruling, that in response to the September 28 proposal, which

16   clearly was not in compliance with Section 2(b) of

17   Exhibit C, Sears responded negatively as set forth in

18   Mr. Velkei's e-mail in the email chain.

19       (Pause)

20           THE COURT:  It should be clear though, but I'll

21   state that, that negative response did not trigger an

22   obligation by Sears under Section 2(c) of Exhibit C which

23   states, if tenant lodges timely objections to any notice

24   hereunder, the parties hereto must agree upon the scope and

25   course of the work together with the schedule authorized

Page 132

1   hours of construction activity and remediation plan for the

2   same before it may proceed.

3          Such consent by tenant may not be unreasonably

4   withheld.

5          But, again, since no such proposal was made in the

6   first place, the rejection by Sears indicates that merely

7   the non-compliant proposal was unacceptable.  It doesn't

8   trigger an obligation, on the tenant's part, to proceed to

9   work on a proposal with the consent not to be unreasonably

10  withheld.

11         Indeed, the rejection beyond rejecting something

12  that was non-compliant itself refers to the fact that the

13  proposal had significant holes in it as far as laying out a

14  detailed set of plans and specifications and timing.

15         So, given that fact or set of facts as laid out in

16  the agreement between the parties, there is no implied

17  covenant that could be breached given that the parties

18  actually specified how to deal with this set of potential

19  facts.

20         I'll also note that the contention that the tenant

21  was responsible for the termination of prospective financing

22  for the renovation or remediation, by the terms of the

23  landlord's own argument, is not tenable.

24         The testimony was to the effect that the bank's

25  condition was that there be an agreement with Sears as far

Page 133

1    as the access for the seismic work and remediation.

2         The parties, indeed, had an agreement.  The

3    landlord didn't follow it.  Consequently, what the condition

4    required was a new agreement which Sears was under no

5    obligation to provide either under the plain terms of the

6    parties' existing agreements or any sort of implied covenant

7    of good faith and fair dealing.

8         So, I will deny that aspect of the cure objection

9    as well.  So, I'll enter an order granting the objection as

10   far as the first two points, CAM and tax reimbursement and

11   deny it in all other respects.

12        You don't need to refer --

13        MS. MARCUS:  Your Honor --

14        THE COURT:  I'm sorry.  I don't -- let me just

15   finish.

16        You don't need to do anything more than refer to

17   my bench ruling.

18        Okay.  That's someone on the phone?

19        MS. MARCUS:  Yes.  Sorry, Your Honor.  This is

20   Jacqueline Marcus on behalf of Sears Holdings Corporation.

21        THE COURT:  Yes.

22        MS. MARCUS:  I'm reluctant to venture into this

23   after you've spent so much time on it this morning.  But I

24   just wanted one clarification.

25        THE COURT:  Okay.

Page 134

1          MS. MARCUS:  You said a little bit earlier that

2    you haven't decided whether the landlord is entitled to be

3    paid for the work it had already done and that there might

4    be a claim for quantum meruit.

5          THE COURT:  Right.

6          MS. MARCUS:  On behalf of Sears, what I want to

7    make sure of is that there's nothing in your order today

8    that basically transfers what might have been an unsecured

9    claim against Sears into a post-petition administrative

10   claim because the lease is being assumed and assigned.  But,

11   from our perspective, any amounts that would be owed to the

12   landlord would really be attributable to Transform not to

13   the debtors.

14         THE COURT:  Well, that issue isn't really before

15   me.  The benefit obviously has to be for the debtor, for the

16   estate, as far as the administrative claim is concerned.

17   So, you know -- but that issue really isn't before me.  I'm

18   not allowing any claim.  In fact, I don't have any real

19   evidence to support a claim.

20         And, again, although I'm not ruling on this, it

21   does appear to me that the purpose of the agreement is to

22   secure whatever amounts are owing.  I'm not talking about

23   the 3.25 million agreement.  It's to secure whatever amounts

24   are owing in respect to the construction.  So, all of the

25   issues would have to be sorted out.

Page 135

1              MR. MARCUS:  I -- yes.  I guess from the debtor's

2     point of view if it -- if it were going to be in a worse

3     position as a result of the assumption than it would have

4     been as a result of rejection --

5              THE COURT:  Right.

6              MS. MARCUS:  -- that would obviously be of concern

7     to us.

8              THE COURT:  Well, I find that -- I understand it

9     would be a concern but I find it -- that that state of

10    affairs would be highly unlikely given (a) the purpose of

11    the construction fund and (b) the requirement for any

12    administrative expense that it be for the benefit of the

13    debtor's estate.

14             MS. MARCUS:  Okay.  Thank you.

15             THE COURT:  You know, here this is --

16             MS. MARCUS:  That --

17             THE COURT:  It's construction work that benefits

18    the building but not really Sears except, you know, to the

19    extent that the -- it's new Sears, the landlord -- the

20    landlord's new tenant, Transform.

21             MS. MARCUS:  Okay.  Thank you, Your Honor.

22             THE COURT:  But I'm not ruling on that either.  I

23    mean, that's really not before me.

24             MS. MARCUS:  I know.  I know.

25             THE COURT:  What's before me now is a cure

1   objection and that requires defaults under a contract given

2   the default by the tenant in providing the services under

3   the contract -- I'm sorry, given the default by the landlord

4   to provide the services under the contract, I don't see a

5   default under the contract to be paid for.  Although, you

6   know, again, that --

7             MS. MARCUS:  Okay.

8             THE COURT:  -- doesn't necessary mean that there

9   isn't some other right to payment from some source.

10            Okay.  So, you don't have to --

11            MS. MARCUS:  Thank you.

12            THE COURT:  -- settle that order formally but you

13  should circulate it to counsel for the landlord as well as

14  counsel for the debtor.

15            MR. WEAVER:  We'll do that, Your Honor.  We'll get

16  that e-mail to you as soon as we can.

17            THE COURT:  Okay.

18            MR. WEAVER:  And Your Honor should note our

19  deadline, I believe, is a week from today.  So, we'll work

20  to get the order to you --

21            THE COURT:  Okay.

22            MR. WEAVER:  -- before then.

23            THE COURT:  That's fine.  I -- you know, frankly,

24  I don't know if there's any hope in doing this but I still

25  urge the parties to try to work with each other to get the

1    construction going.  That might be a no brainer for each

2    side.

3              MR. WEAVER:  Your Honor, my understanding is that

4    the parties have reached -- Transform has reached out, Your

5    Honor.

6              THE COURT:  All right.  Okay.

7              MR. WEAVER:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. KUPETZ:  Thank you.

10         (Whereupon, these proceedings were concluded at 1:36

11    p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 138

```
 1                          I N D E X

 2

 3                        R U L I N G S

 4

 5     DESCRIPTION                              PAGE      LINE

 6     Court will enter an order granting       133        9

 7       Landlord's cure objection as far as CAM

 8       and tax reimbursement are concerned but

 9       denied as to all other aspects

10

11                      E X H I B I T S

12     NO.        DESCRIPTION                   ID.      EVID.

13     JOINT EXHIBITS:

14     ---                                      ---        6

15     FOR THE LANDLORD:

16     5-10       Various e-mail exchanges between

17                Landlord and his counsel      ---       19

18     15         Summary document relating to wire ---   19

19                transfers

20     2-4        Various invoices and checks   ---       54

21     ---        Declaration of Izek Shomof dated ---    22

22                May 1, 2019

23     ---        Supplemental declaration of Izek ---    22

24                Shomof dated July 26, 2019

25
```

Page 139

1                    C E R T I F I C A T I O N

2

3    We, Lisa Beck, Jamie Gallagher and Pamela Skaw certify that

4    the foregoing transcript is a true and accurate record of

5    the proceedings.

6

7    _____

8    Lisa Beck

9

10   _____

11   Jamie Gallagher

12

13   _____

14   Pamela Skaw

15

16

17

18   Date:  August 5, 2019

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25

[& - 25]                                                                 Page 1

| **&** | 48:22 49:2,18 | **183116** 57:14 | 52:16 56:19,22 |
|---|---|---|---|
| **&** 5:2,17 83:10 | 82:12 105:5,20 | **1837** 2:10 | 80:3,4 81:18 |
| 127:12 | 115:5 | **19** 39:5 115:22 | 84:19 103:11 |
| **0** | **1107** 126:9 | 138:17,18 | 104:14 111:5 |
| | **11501** 139:23 | **1992** 127:22 | 112:14 113:11,25 |
| **08001pr** 26:25 | **11th** 31:4,10 | **1999** 2:9,14,20 3:3 | 114:21 119:1,17 |
| 27:6,14 | 76:22 | 3:10 | 127:23 130:24 |
| **08002a** 28:11 | **12** 9:16 28:8 36:3 | **1st** 12:6 24:1,3,8 | **2016** 125:24 |
| **08002pr** 27:25 | 36:6 78:8 80:11 | 25:10,22,25 26:10 | **2017** 12:6 24:1,4,8 |
| 28:5 | 80:12 105:24 | 29:9,15 31:7,12 | 24:24 26:6,25 |
| **1** | 128:8,12 | 37:5 46:6 58:13 | 27:5,14,24 28:4 |
| **1** 7:4 8:4 10:11 | **13** 9:16 55:4 | 68:7 71:10 73:13 | 28:10 29:9,15 |
| 15:9,21 19:8 20:4 | **133** 138:6 | 79:9 86:19 116:8 | 30:2,9,24 31:4,7 |
| 21:9 22:8 24:23 | **135** 23:5,8,10,11 | 116:8 | 31:12 32:16 45:15 |
| 26:4 42:2 45:15 | 23:15 24:11 35:20 | **2** | 45:25 46:2,6,16 |
| 45:22,25 46:2,16 | 81:3 | **2** 1:20 8:2 15:19 | 46:23 47:6,8,16 |
| 46:23 47:6,8,15 | **14** 9:16,17 19:18 | 19:9,12 20:9,12 | 47:19 52:13 53:6 |
| 47:18 56:12 60:17 | 29:15 78:10 79:9 | 26:24 28:4,22 | 53:10,14 60:17 |
| 61:1,10,20,21,24 | 118:23 | 32:20 35:21 54:22 | 66:12 79:11 99:23 |
| 66:12,20,24 67:10 | **146** 42:12,15 | 54:23 56:14 58:8 | 115:7 116:8,9 |
| 75:13 79:17 92:7 | **1491** 127:22 | 59:5 61:6 79:18 | 117:15 118:5,16 |
| 115:7 117:15 | **15** 9:16 10:1 17:18 | 80:4,6 81:6 | 118:24 119:3,6 |
| 118:4,16,24 119:6 | 19:19,20 30:19 | 106:14,14 107:24 | 123:6,8 125:12 |
| 119:15 123:8,13 | 37:5 138:18 | 107:25 109:8,13 | **2018** 32:17,22 |
| 125:2,3,15 138:22 | **16** 10:8 15:11,22 | 114:7,23 116:7 | 36:23 46:24,24 |
| **1.5** 27:1 | 18:21 19:19 23:5 | 117:11 120:10,11 | 52:5 77:12 84:22 |
| **10** 8:18 11:6 19:16 | 23:7,15 53:13 | 120:25 129:1,7,9 | 104:23 130:3 |
| 19:17 23:14,16 | **162** 126:9 | 130:5,10 131:9,16 | **2019** 1:20 20:4,5 |
| 27:22,22 28:21 | **16th** 26:25 27:5 | 131:22 | 21:9,10 22:8,11 |
| 33:1,18 59:5 | 27:14,24 28:4,10 | **2-4** 138:20 | 33:7 37:5,6 51:16 |
| 81:14 115:5,16 | 41:8,11,15,18 | **20** 42:15 | 55:4 84:23 138:22 |
| 117:11 | 53:6 | **2002** 127:14 | 138:24 139:18 |
| **100** 46:5 127:13 | **17** 14:19 23:10 | **2004** 55:13 | **205,000** 34:24 |
| **10006** 5:20 | 32:25 33:2,14 | **2007** 61:1,24 | **22** 138:21,23 |
| **1006** 7:5 | 35:19 115:23 | **2008** 126:10 | **23** 68:15 69:15 |
| **1008** 2:7,13,19 | 119:17 124:18 | **2011** 56:12,20 | 71:1 76:4,10 |
| **10153** 5:5 | **176** 125:23 | 79:17 111:4 114:4 | **23rd** 33:6 |
| **10309** 111:6 | **17th** 10:19,20 | 114:7 | **248** 1:17 |
| **10601** 1:18 | **18** 23:11 29:18 | **2014** 29:22 52:10 | **24th** 8:23 11:13 |
| **10:08** 1:21 | 36:25 37:8 | 52:10 | 41:20 42:4 |
| **11** 2:2,9,14,20 3:3 | **18,853** 28:11 | **2014/2015** 53:5 | **25** 24:10 42:22 |
| 3:5,10 9:16 19:18 | **18-23538** 1:4 2:1 | **2015** 22:22 23:20 | 58:10,25 65:25 |
| 28:3 45:6,16 | | 29:24 35:12,12 | 88:7 89:17 90:24 |

100:20 101:14
112:14 116:14
117:13,21 118:19
119:23 120:4,11
121:9,20 122:1
123:4,5 125:5
**25's**   120:19
**250**   63:13
**25th**   81:20
**26**   20:5 21:10
22:10 138:24
**2650**   3:17,22 4:4
**26th**   20:10 43:7
**28**   24:11 130:3,15
131:15
**2:17**   31:10
**2nd**   76:13

**3**

**3**   8:2 15:19 20:11
20:12 22:23 23:13
23:14,16 24:22
27:4 28:22 37:1
37:12,19 60:17,18
61:9 64:20 66:19
79:18 81:20 90:16
114:7 115:5,16
117:15,22 118:4
**3,250,000**   87:24
112:16
**3.25**   24:13 58:12
89:18 134:23
**30**   15:13 41:5 51:9
51:10 53:17,20,25
59:13 85:21 86:4
86:8 111:5 116:23
**300**   1:17 28:23
139:22
**31**   15:13
**322**   71:25 73:4,6
93:2
**322,000**   33:7 35:1
72:9,21 75:8
85:17 91:2 92:13

102:1,2 116:9
119:20 120:24
122:18
**322,649**   34:6
**322,649.80**   112:21
**3298**   2:5
**33**   17:10 65:18
**330**   139:21
**333**   5:11
**34**   17:10 65:23,24
**3400**   5:12
**346**   118:16 119:1
**3477**   2:15 18:22
**3478**   2:21
**35**   66:3
**36**   108:12
**365**   3:5 57:1
111:18
**375,000**   72:14
**3817**   3:6
**39**   105:9
**3:15**   12:11
**3d**   125:24

**4**

**4**   3:5 8:2 15:20
19:10,12 22:23
24:22 26:23 27:23
28:22 54:22,23
60:17,18 61:9
64:20 66:20 90:16
115:5 117:15,23
118:4
**4186**   3:13
**44**   127:13
**44,000**   57:22
**4489**   3:18
**45**   105:20,20
**4624**   3:23 12:25
**4625**   4:5 15:12,22
105:10
**478,000**   27:7,15
**48**   81:2

**4th**   126:9 127:13
127:22

**5**

**5**   8:18 11:6 12:25
13:5 19:14,16,17
22:24 27:4 28:21
64:20 66:20 76:24
90:16 93:24 115:5
117:23 139:18
**5,000**   57:11
**5,696,000**   18:24
**5-10**   138:16
**50**   65:10 105:10
**54**   138:20

**6**

**6**   8:18 20:9,11,12
22:22 23:3 24:11
24:22 27:23 28:9
35:11,20 60:17,18
61:9 64:20 66:20
78:5 90:17 94:5
115:5 117:15,23
118:4 138:14

**7**

**7**   8:18 24:22 26:21
26:21 28:9 60:17
60:18 61:10 64:21
78:7 90:17 93:25
115:5 117:15,23
118:4,16 119:1
**70**   51:8,10 113:9
**727,000**   72:15
**75**   34:17,18 65:5,6
65:10,25
**767**   5:4

**8**

**8**   8:18 26:22,22
28:21 35:19 78:11
80:8 84:2 90:22
90:24 100:6
113:11 115:5,16
119:9 128:1,16

129:2,8
**8/12/17**   27:9
**8/18/17**   27:15
**80,000**   29:18

**9**

**9**   8:18 19:14 27:3
78:11 115:6
127:21 128:13,14
138:6
**9/25/2018**   105:15
**90071**   5:13
**949**   125:24
**983,000**   28:6

**a**

**able**   55:9 59:17
62:14 84:18
116:25,25
**absolutely**   9:13
34:15,22 42:11
69:6
**absurd**   82:6
**accept**   121:24
**acceptable**   25:16
58:15 59:16,20
107:19 108:18
**acceptance**   64:21
66:22 67:1 117:24
**accepted**   108:4
131:1
**accepts**   124:6
**access**   51:7,13
56:16 67:11 86:8
98:21 99:1 100:17
114:10 133:1
**account**   67:25
**accurate**   139:4
**acknowledge**
56:14 114:8
**acknowledged**
32:8 125:8
**acknowledges**
31:11 77:5 94:22
114:21 130:1

**acknowledgment**
99:17
**acquiesce** 125:9
**acquiesced** 96:14
96:15
**acquiescence** 79:2
**acquiesces** 124:7
**action** 74:6
**active** 85:19,20
**activity** 36:10
80:16 81:12 106:7
106:21 107:8
128:22 129:15
130:9 132:1
**acts** 126:19
**actual** 19:2 34:18
38:4,7,9 55:22
57:4 64:10 75:11
124:15
**add** 29:18
**addition** 28:13
67:1 112:8 122:13
**additional** 2:5
17:4 25:3 61:5
72:12 114:2,22
117:19 125:11
**address** 6:12 11:6
66:15 67:15,16
74:21 104:20
**addressed** 76:1
82:11 115:15
**adequate** 127:7
**adjust** 25:22,25
**adjusts** 26:10
**administrative**
134:9,16 135:12
**administrator's**
128:9
**admissibility** 6:17
15:2
**admissible** 16:22
124:9

**admission** 123:16
**admit** 14:25 17:20
19:6 22:6 54:21
85:15
**admitted** 10:5
16:6 18:19 19:9
19:11,15,19,19,19
20:1
**adopted** 20:2
**advance** 85:8
**advances** 105:3
**advised** 105:22
**affairs** 135:10
**affect** 31:20 98:17
98:20
**affidavit** 108:4
**affiliates** 5:18
**aforesaid** 107:2,4
129:23,25
**afraid** 51:5,6
**agent** 14:7,12,14
**ago** 8:8 39:20
**agree** 23:21 37:5
38:3 64:9 72:20
72:25 86:17 107:6
110:12 112:17
123:11 131:24
**agreed** 6:18 14:13
22:24 23:25 24:20
25:5,6,11,14
35:13,23 36:2,9
36:15 46:1,21
47:17 59:24 62:4
103:4 110:8
111:25 117:4,9
125:15
**agreement** 10:16
10:19 14:10 23:25
24:5,12,20 25:21
25:24 26:12 46:21
51:3,14 52:15
53:1 58:7 59:3,20
59:25 60:3,6,8

63:3 64:13 68:12
68:23 69:8 73:19
74:1 80:24 81:17
83:4,18 84:1 88:3
88:5,22 89:7 91:5
94:8,9,13 95:4,11
97:2,25 98:6,10
99:2,10 103:10,10
103:11,22,24,25
103:25 104:4,7,12
104:13 109:5
111:19 112:4
114:23 115:2,11
115:21 116:4,13
116:21 118:13
119:10 120:22
121:14 123:18,19
123:21,22 124:2
124:10,14,14,19
124:24 126:15
127:17 128:2
129:1 131:5
132:16,25 133:2,4
134:21,23
**agreements** 109:5
109:15,16 125:21
133:6
**ahead** 11:25 75:16
95:7 104:22
**ahh** 34:11
**al** 1:10 2:1
**alan** 49:12,13,20
49:20,22
**albeit** 120:21
**aline** 2:8,13,19 3:2
3:9 21:3
**alleged** 113:14
**allegedly** 113:16
113:21
**allow** 11:6 19:24
20:1 51:4 105:1
**allowed** 13:6
98:25

**allowing** 26:3,13
102:14 134:18
**allows** 100:17
**alteration** 124:14
**ambiguities** 89:8
126:1
**ambiguity** 123:21
**ambiguous**
123:22
**amended** 52:20
111:4 112:14
113:25 114:5
115:10 116:4
119:1,17 127:23
130:24
**amendment** 22:23
22:24 23:20 24:17
35:12,12,17 36:13
53:1 56:20,22,22
68:15 80:3,5
81:19 84:19 89:21
106:4 108:12
114:21 115:10,24
116:1,19 117:3
128:11
**american** 59:14
**amount** 2:7 13:25
18:13,24 27:1,6
27:15,25 28:5,11
33:6,7 34:3,6
57:18,23 64:24
71:19 72:21 73:10
92:17,19,20
100:14 102:1
112:16,17,18,22
112:25 113:2
117:9 118:2 120:9
121:4 122:8 123:7
**amounts** 25:3
61:5 110:23 112:1
112:2,7,13 117:19
134:11,22,23

[andrew - august]                                                    Page 4

andrew  5:22 6:4
  55:2
angeles  3:17,23
  4:4 5:13 21:8 36:3
  40:25 55:13 78:4
  111:7,9
angeles's  128:9
answer  34:5 42:16
  43:1,3,4,15 53:11
  63:19,20 87:4
answered  41:23
anticipate  32:21
anticipated
  127:25
antithetical  96:16
anyway  91:3
apa  110:9
apologize  26:22
  31:2,10 33:20
  37:17 77:2
app  126:9,9
  127:13,22,22
apparent  11:13
  11:16 12:4 103:2
apparently  77:25
  118:24
appeals  94:4
  127:13
appear  39:11
  134:21
appearing  11:1
appears  17:9
  69:24 107:11
application  96:11
  127:3
applications
  128:10
applied  128:18
apply  12:24 83:5
  90:20 101:3,9
  121:12,22
appreciate  7:21
  109:14

approach  11:22
  22:13 88:24
appropriate  9:10
approval  25:18
  64:24 79:19 81:15
  93:19 102:6 107:1
  114:14 118:1
  128:9 129:21
approvals  128:7
approve  31:24
approved  36:4,11
  80:17 102:6 107:3
  107:3 115:13
  128:23 129:24,24
  131:11
approves  80:12
approximate
  65:25
approximately
  28:23 65:25 72:15
april  12:6 24:1,3,8
  24:23 25:10,22,25
  26:4,10 27:5 29:9
  29:15 31:7,12
  45:15,22,25 46:2
  46:2,6,16,23,24
  47:6,8,15,18
  51:16,17 52:5
  58:13 60:17 61:1
  61:10,20,21,24
  66:12,20,24 67:10
  68:7 75:13 76:13
  79:9,11 92:6
  115:6 116:8,8
  117:15 118:4,16
  118:24 119:6,15
  123:8,13 125:2,3
  125:15
area  67:21 79:22
  112:6 114:12,17
arguably  57:16
  107:22

argue  70:5 78:22
  78:25 79:25 84:15
  85:10 101:7
arguing  58:3 74:9
  81:18
argument  6:10
  11:20 54:11,25
  62:21,22 84:6
  87:5 88:25 89:1
  94:20 99:7 109:19
  121:25 132:23
arguments  67:16
  73:12 86:16
  102:22
arising  116:3
ascertaining  94:7
aside  78:7 128:14
asked  34:20 41:23
  43:12,21 48:20
  49:7 65:3 95:23
asking  26:6 27:19
  30:6 31:16 40:15
  40:16,20 45:23
  46:6 50:16
aspect  122:9
  133:8
aspects  122:13
  138:9
assert  111:15
asserted  103:3
  111:24 112:3,7,11
  113:13 127:20
assertion  116:10
assign  21:8 57:19
assigned  55:5
  134:10
assignee  111:25
assignment  2:4
  3:16,21 4:3
  111:12,14,22
assigns  110:6
associate  32:19

associated  35:16
associates  31:20
assume  21:8
  57:19 106:3
  107:16
assumed  55:5
  82:8 134:10
assumes  38:18
  110:6 121:22
assuming  33:12
  34:6,13,14 37:22
  63:6 84:5
assumption  2:4
  3:5,12,16,21 4:3
  6:8 32:14 33:9,23
  34:1 63:11 68:9
  77:9,10 111:11,14
  135:3
assure  51:15
asterisk  33:11
  63:12
attach  28:14
  40:13 93:1
attached  8:6 10:9
  18:11 26:15 27:18
  29:2 31:2 33:2,3
  35:6 36:13 37:11
  38:25 39:7 40:15
  48:18 80:18 93:4
  106:9 115:3,15
  128:24
attachments
  130:7
attempts  55:20
attorney  40:12
  49:13 50:3,10
attorneys  5:3,10
  5:18
attributable
  113:22 134:12
august  1:20 26:25
  27:14,24 28:4,10
  37:5 53:6,10,13

139:18
**authorities**
  128:20
**authorized**  36:10
  80:15 81:12 106:6
  106:20 107:8
  110:18 128:21
  129:15 130:9
  131:25
**authorizing**
  110:16
**autonomy**  83:22
**avenue**  5:4,11
**avoid**  119:10
  125:11
**aware**  13:23 67:8
  83:15 119:14,15

**b**

**b**  1:23 57:1 60:25
  81:6 101:10
  106:14,14 107:24
  107:25 129:7,9
  130:5,10 131:16
  135:11 138:11
**back**  23:2 29:22
  29:24 35:11 37:20
  41:23 49:23 51:16
  54:20 55:13 59:9
  66:2,23 70:12,18
  81:24 84:24 90:3
  93:11 107:22
**background**
  56:11
**backup**  8:3 9:18
  10:10 16:11,12
  28:14,17,18 29:5
  30:1,8,14 34:15
  34:17,22,24 35:1
  35:3,3,4 53:5 71:4
  73:9 75:16 92:16
  97:3 118:22
  122:17

**bad**  96:14 98:9
**bank**  103:23
  104:6
**bank's**  132:24
**bankrupt**  51:12
**bankruptcy**  1:2
  1:16,25 49:4 50:3
  51:6 55:21 67:6
  82:4 84:12 85:4
  105:23 111:18
  130:18
**base**  16:7
**based**  7:7 16:24
  63:9 66:11 71:15
  75:11 104:9
  113:14
**baseline**  107:17
**basically**  34:20
  37:14 48:3 50:25
  57:1 64:14 97:14
  108:15 134:8
**basis**  55:22 57:17
  85:16 92:2 94:15
  122:24
**beck**  4:25 139:3,8
**beginning**  8:21
  32:22 80:6 86:4
**begins**  30:24
  39:15 114:24
**behalf**  6:5 11:1
  50:6 55:2 93:19
  111:17 133:20
  134:6
**belabor**  58:11
  94:16
**believe**  8:12 10:1
  17:18 41:25 61:8
  62:13 70:8 73:8
  86:11 96:18
  120:14 124:22
  130:1 136:19
**belongs**  77:9

**bench**  133:17
**benefit**  55:21
  134:15 135:12
**benefits**  135:17
**best**  36:2 50:2
  55:18 96:13 109:7
  128:6
**better**  102:18
**beyond**  9:7 71:20
  97:25 99:6 132:11
**big**  48:12 50:19
  58:4
**biggest**  42:22
**bill**  34:3 61:7 64:4
  64:8 73:9,10
  78:24 79:2,6,8
**billed**  16:13 30:12
**bind**  108:1,22
**binder**  6:22 20:6
  20:6,7 22:12,22
  30:19 33:1,16,17
  36:25 42:2 54:22
  78:14
**binders**  6:14
**bit**  7:24 41:14
  63:9 134:1
**block**  94:4
**bottle**  44:22
**bought**  56:13
**boulevard**  3:17,22
  4:4 55:12 111:6,8
  111:9
**boyle**  42:18
**brainer**  137:1
**breach**  68:22
  73:25 74:1,3,6
  81:18 96:15 97:2
  108:18 112:24
  113:14 121:10
  127:1 130:20,22
**breached**  98:7
  125:19 132:17

**breakdown**  18:23
  19:1
**brief**  51:21 54:24
  55:1
**briefing**  3:13
**briefly**  56:11 78:3
**bring**  74:6
**broad**  45:14
**broken**  39:19
**bucket**  7:10 8:2
  8:17 9:15
**buckets**  6:25
**buffer**  72:17
**building**  53:18
  55:12,14 56:13,17
  56:19 78:6 105:7
  106:17 114:3,11
  115:24 116:1,4
  127:25 128:5
  129:12 130:4
  135:18
**bunch**  52:4
**burden**  84:16
  127:19
**burst**  85:13
**business**  56:15
  57:24 103:20
  106:22 107:15
  109:14 114:9
  129:17
**busy**  84:13
**buyer**  3:2,9

**c**

**c**  5:1 6:1 80:18,23
  106:10,13 107:5
  108:14 109:13
  115:4 128:25
  129:5,9 130:11
  131:17,22,22
  139:1,1
**ca**  5:13 125:24
**cal**  126:9,9 127:13
  127:14,21,22

[calendar - communications] Page 6

calendar 53:2
california 3:18,23
  4:5 13:1,5 69:13
  72:2 76:8 83:6,11
  93:21 94:1,4
  97:23 98:3 105:13
  108:17 123:10,15
  123:25 125:20,25
  126:4,8
call 44:12 57:9
  85:23
called 8:13 35:16
  112:13
calling 77:1
cam 57:9,11,13,18
  133:10 138:7
capable 7:21
careful 98:4
carefully 130:23
carryover 11:7
case 1:4 8:7,7 13:4
  13:5 31:16 35:4,4
  45:6,16 48:22
  49:2,18 51:25
  53:3 64:6 69:13
  75:17 83:9,10,10
  83:15 92:1 111:11
  112:2 115:8
  123:17 126:3
  130:18
cases 76:9
cash 57:14,16
catch 78:18
categories 19:1
  46:17 57:8
cause 25:1 58:18
  61:3 62:5 63:1
  67:10 69:25 70:21
  105:3 117:17
  118:10 122:5
causing 125:4
certain 10:2 45:24
  55:14 106:5 124:1

certainly 11:18
  16:4 67:9 85:17
  86:10 89:13,14
  91:6 100:5
certify 139:3
cetera 14:18 18:7
  107:13
ch 2:2
chain 30:23
  131:18
chains 8:22,24 9:9
chance 7:16 9:21
change 21:18,23
  21:24 22:1,2
  70:10 119:20
changes 79:21
  114:17
changing 60:6
chapter 45:6,16
  48:22 49:2,18
  105:5,20
charges 57:9,11
  57:11,13
charts 17:7
chase 67:18
check 57:13,15,16
  57:18
checks 8:3 15:12
  19:3 28:15,17
  29:8 138:20
children's 21:4
children's 2:8,14
  2:20 3:3,10
choice 9:13
choose 125:6
chooses 122:6
chose 43:15
christmas 128:15
circulate 136:13
circumscribed
  83:13
circumstances
  116:5 124:1

cite 69:13 76:9
  83:9 125:22
cited 13:4 84:2
cites 83:10 94:2
citi 127:12
citing 126:4
city 36:3 40:24
  128:8,10
civil 94:1
claim 10:23 16:7,8
  26:16 57:17 71:14
  73:1,23 85:17
  91:1,2 92:15,21
  93:8 100:13
  101:12,13,14
  102:10,19 103:2
  112:11 113:14
  116:9 119:20
  120:23 121:3,3
  123:1,14 134:4,9
  134:10,16,18,19
claimed 72:21
claiming 35:1
claims 112:10,10
  116:3
clarification
  133:24
clarify 34:4
clause 63:2
clear 8:11 16:18
  20:4 39:10 56:14
  58:16 60:5 69:13
  76:8,9 77:13 80:9
  82:2,13,24 83:7
  85:9 89:25 97:23
  100:20 103:23
  107:11 109:20
  110:2,4,16,22
  119:13 120:23
  122:12,14 130:6
  131:14,20
clearly 8:13 9:20
  58:8 83:11 90:20

104:14 107:18
  121:22 124:8
  126:7 131:16
cleary 5:17 6:5
  55:2
client 75:3 101:18
  110:5
client's 12:13
  101:15
clock 107:14
close 37:5 104:23
closing 105:16
code 94:1,2
  111:18
collaboration
  109:3
collect 56:8
come 26:5 37:20
  95:10
comes 39:12
  41:19 70:18
coming 47:4 70:2
commence 113:23
commenced 49:18
commencement
  45:6,15 48:22
  49:2 91:25
commentary 8:21
  9:8,12 19:15
comments 106:24
  129:19
commercial 94:2
common 112:6
communicated
  92:1 96:19
communication
  49:5 78:8 82:25
  130:2
communications
  45:7,18,20 46:9
  48:23 49:8,10,18
  105:12

**company** 30:5
59:15,15 125:23
**compare** 108:15
**compensate** 57:4
**compensation**
82:5
**complete** 24:1,3,7
24:21 25:4,15
36:6 56:3 60:16
61:5 65:25 70:11
74:2 80:12 83:22
89:2 103:4 106:23
115:1 116:19
117:14,19 118:15
119:6 120:7,13
122:6 125:6
128:11 129:18
**completed** 25:2
34:19 46:2,5
47:18 48:13,14
58:13,18 61:4,10
61:12,13,20,21
62:6 63:2 65:1,5
69:25 88:9 98:22
102:5 116:7,8
117:18 118:4,10
118:25 120:2,9,21
120:25 121:1,18
122:5,19 124:25
125:4 128:19
**completely** 72:13
72:14
**completes** 58:14
**completing** 46:22
**completion** 12:6
24:16 48:5 59:2
59:19 60:2 64:20
66:19 89:20 91:20
115:7,8 116:18
117:2,22 120:20
123:13 125:10
**compliance** 115:2
131:16

**compliant** 131:8
132:7,12
**comply** 103:6
109:7 130:5
**complying** 107:2
129:23
**compressor** 48:9
**comprised** 113:19
**computers** 48:11
**concede** 13:1
**conceded** 130:6
**conceivably**
118:14 125:3
**concern** 10:6
135:6,9
**concerned** 98:17
98:20,21 121:5
123:12 124:21
134:16 138:8
**concerns** 82:15
**conclude** 113:10
130:21
**concluded** 137:10
**condensers** 48:16
48:16,19 65:2
66:1
**condition** 51:2,3
70:11 82:6 103:9
103:24 132:25
133:3
**conditionally**
19:12
**conditions** 100:7
104:24
**conduct** 36:15
44:4 69:12,13
74:22 75:18 76:5
76:6,7 77:15
78:23 79:6 83:12
92:9 93:17 126:19
127:8
**conducted** 80:19
106:10,10 129:2

**confirm** 40:7 61:9
**conflicts** 56:22
**confused** 52:15,24
71:12
**connected** 48:10
**connection** 16:16
21:7 99:3 114:23
125:10
**consensual** 55:9
**consensually**
87:16
**consent** 107:9
132:3,9
**consequential**
56:8 103:2
**consequently**
122:9 133:3
**considerably**
102:1
**consideration**
124:1 127:7
**considered** 81:14
**considering** 97:19
**consistent** 61:6
111:10 126:22
**constitute** 21:14
68:23,25 106:25
129:21 130:22
**constitutes** 130:20
**construct** 38:9
79:20 114:16
115:1
**construction**
22:21 24:13,16,24
25:17 35:16 36:10
36:12 37:9,21
38:3,5,8,10 44:10
44:12,13 45:5,8
45:16,24 46:11,17
46:18,22 47:2
48:6,24 49:14,16
50:25 51:10 53:20
53:22 54:1 55:25

58:5,9 59:1,2,14
59:16,18,19 60:1
60:2 61:2 64:22
80:16,18,25 81:12
82:7 84:2,21 85:8
85:10,23 86:4,8
87:21 88:1,11
89:2,20 92:4 95:8
95:22 104:16
106:7,9,14,16,21
107:8 108:23
112:13,22 113:1,2
113:3,25 115:3,14
116:11,15,18
117:1,2,16,24
119:21,25 120:1,5
120:18 121:12
122:2 123:1
128:22,24 129:6
129:10,15 130:9
132:1 134:24
135:11,17 137:1
**construe** 97:25
120:4
**contact** 49:19
105:13,22
**contained** 51:25
115:1 128:17
**containers** 48:18
**contemplate** 63:2
88:23
**contemplated**
14:12 24:22 60:17
61:19 81:10 100:6
106:18 114:2
117:14 129:8,13
**contemplating**
104:15 108:13
**contended** 123:6
**contending** 73:8
**contends** 87:22
112:19,24 118:17
119:19 130:14,19

**contention** 118:21
121:10,21 125:18
132:20
**contested** 21:14
**context** 127:17
**continual** 92:2
**continue** 24:6
25:7 46:3 50:6
82:3 95:15 96:24
98:8
**continued** 46:23
46:24 47:18 93:12
95:19 119:15
**continues** 55:7
94:24 128:16
129:2
**continuing** 37:22
46:3 97:12
**continuous** 45:21
**continuously**
49:12
**contract** 13:3,14
55:22 58:21 61:23
83:8,14 84:11,16
84:18 93:22 99:19
103:5 104:13,14
104:14 110:6
120:14 121:8,11
122:23 123:11
125:20,25 126:14
126:18,24 127:5,6
136:1,3,4,5
**contract's** 126:13
**contracting** 63:17
**contractors**
112:20
**contracts** 8:11
13:7,12 82:2
126:7
**contradict** 69:14
83:8 124:9
**contradictory**
90:4 98:5

**contrary** 13:3
76:7 83:19 93:22
128:17 130:21
**control** 56:23
79:22 85:21
114:12,17 129:6
**controls** 56:20
123:11
**conversations**
82:21
**cooperate** 113:17
**cooperating** 109:6
**coordinate** 92:3
**copied** 27:17
**copies** 11:12
15:20
**copy** 42:3
**corp** 6:3 127:13
**corporation** 1:10
2:1 133:20
**correct** 6:16,19
7:13 18:4,12
20:13 23:1,23,24
24:1,4,8,9,13,17
24:18 25:5,12,18
25:19,22,23 26:18
26:19 27:1,2,7,8
27:10,11,16 28:1
28:2,6,7,11,12,15
28:16,19,20,24
29:6,7,22,24,25
30:2,9,15,16,20
30:24 31:7,8,13
31:21 32:6,9,12
32:17,23 33:7,8
33:24,25 34:2,9
34:12,16,23 35:2
35:6,14,17,25
36:4,5,7,8,13,14
36:17,18,20,21,23
36:24 37:6,7,10
37:21,25 38:5,8
38:11,19,21 39:1

39:8,23 40:4,8,11
40:14,25 41:9,11
41:16,22 42:6,8
43:10,11,14,20,25
44:10,11,13,14
47:7 49:7,8 52:2
52:10,11,14,17
53:6,10,14,15,18
53:19,21 54:1
59:6,23 60:4,14
61:22 62:3 63:7
63:14 64:11,16
65:9 66:6,21
70:19,22 73:20
74:5 75:4 77:25
77:25 78:1 87:3
103:7 108:6
**correctly** 43:5
61:16
**cost** 113:20
114:25
**costs** 35:14,15,16
61:7 80:7 82:9
85:3 108:23
**could've** 101:22
**counsel** 8:20,25
17:21 36:22 39:6
39:8,10 42:6 49:7
49:10 71:13 75:9
82:19 86:9 87:16
105:23,24 130:3
136:13,14 138:17
**counsel's** 40:1
82:24 84:8 93:10
**country** 139:21
**couple** 9:1 12:16
16:3
**course** 11:14,17
12:7 13:2,6,16
56:25 58:6 67:4
69:12,13 74:22
75:1,18 76:5,6,7
77:15 78:23 79:6

88:22 93:20 94:6
94:10,18 97:24
98:4 107:7 118:19
118:19 123:9,10
124:2,8,13,22,23
125:14 126:1
128:25 131:25
**court** 1:2,16 6:2,6
6:14,17,20 7:2,11
7:13,16,25 8:16
9:11,14,25 10:15
10:24 11:3,5,11
11:21,23,25 12:19
12:20 13:4,8,13
13:15,20,22 14:1
14:3,9,15,17,22
14:25 15:5,8,14
15:23 16:5,10,16
16:23 17:1,5,7,11
17:13,16,19,23
18:2,5,10,14,18
19:2,6,14,18,22
19:24 20:1,3,9,11
20:14,17,19,22
21:1,13,17,21,23
21:25 22:2,4,6,14
22:16 23:13,16,18
27:20 30:2,9
33:13,16,19,21
40:20,21 41:2,4
42:8 44:5,17,19
44:23,25 46:14,19
47:12 51:20 54:4
54:6,8,12,16,18
54:24 57:20 58:1
58:22,24 59:7,9
59:25 60:5,10,15
60:21,23,25 61:13
61:15,18,23 62:4
62:10,15,17,19,21
62:25 63:8,15,22
63:25 64:4,9,12
64:17 65:9,12,14

65:19,21,24 66:8
66:10,14,22 67:3
67:14,19,21,24
69:16,18,24 70:4
70:15,17,21 71:8
71:11,24 72:1,4,7
72:11,18,20 73:1
73:3,6,8,15 74:4,7
74:10,12,14,16,25
75:2,7,19,23 76:1
76:11,16,19,23
77:3,19,23 78:12
78:17 79:8,14
80:25 81:4,7
83:11,15 86:6,14
86:23 87:1,7,10
87:12 88:3,10,16
88:21,25 89:11,17
89:24 90:3,8,10
90:13,15,25 91:8
91:10,12,16,18,23
92:11,16,21,24
93:3,6,15 94:4,12
94:19,22,25 95:6
95:12,25 96:2,5,8
96:10,21,25 97:8
97:10,13,16,20,23
98:2,24 99:2,7,13
99:17 100:2,5,13
100:19 101:1,13
101:20 102:3,9,11
102:16,23,24
103:8,13,16,19
104:3,11,20,22,25
105:2,4,8,11,15
105:25 106:2
108:9,11 109:4,18
109:20,23,25
110:7,9,12,15,25
111:3,9 118:12
119:13,19 120:13
121:16 122:12,21
123:25 124:12,21

125:17 126:6,12
127:13 131:20
133:14,21,25
134:5,14 135:5,8
135:15,17,22,25
136:8,12,17,21,23
137:6,8 138:6
**courtroom** 6:10
11:14
**courts** 98:4
108:17 123:25
**covenant** 56:7
83:2,7,12,16
104:9 108:19
113:15 125:19
126:6,12,16,20
127:3,9,17,19
130:20 132:17
133:6
**cover** 75:23 96:16
97:1
**covered** 11:9
45:24 46:17 48:6
56:3 61:9 66:7
90:24 99:11
**crazy** 84:14
**create** 84:11
**created** 111:17
**creates** 36:16
80:19 106:11
129:3
**critical** 56:15
114:8
**cross** 6:13 11:15
16:20 20:14 22:12
22:17 33:17 58:11
**crossed** 6:9
**crystal** 100:19
**cure** 2:7,12,18 6:8
10:9,23 13:24,24
14:2 16:7,8 18:22
18:24 21:7 33:4
55:23 56:24 57:3

57:9,10 58:2
62:12 69:7 73:13
74:6,13 75:8,10
75:14 86:19,20,21
87:17 89:1,5
90:19 92:11 93:7
101:1,2,4,11
102:9,17,18 110:5
110:17,23 111:20
111:21 112:1,5,7
112:8,9,9,10,11
113:5 119:19
120:23 121:5,6,21
122:8,9,14 123:14
133:8 135:25
138:7
**cured** 111:18
121:11
**current** 50:12,14
50:18
**currently** 116:10
**customers** 31:20
36:17 80:20
106:12 129:4
**cut** 13:18 67:18
**cutoff** 14:19 15:24

---

**d**

**d** 1:24 3:5 6:1
24:19,21 60:15
66:9 73:23 88:7
90:24 100:20
117:13,21 118:19
119:23 120:4,10
121:9,20 122:1
123:5 125:5
128:10 138:1
**dam** 85:13
**damages** 56:8
85:6 89:4 90:19
101:8,9 103:2
104:5 110:10
**date** 12:7 13:20
14:19 15:24 29:21

29:24 41:9 49:1
115:7,8,9 139:18
**dated** 2:9,14,20
3:3,10 21:9,10
22:8,10 26:25
27:5,13,24 28:4
29:9,15 30:2,9
31:3 33:6 53:6
138:21,24
**dates** 120:9
**david** 5:15 10:25
**day** 86:5 107:14
**days** 9:1 12:16
41:5 57:24 59:13
81:14 87:2 106:22
108:3 116:23
129:17 131:9
**dead** 41:22,23
42:19 43:3,4,13
43:24 50:13 86:21
**deadline** 12:6,7
25:22,25 26:11
31:12 32:9 41:18
56:2 58:16 64:14
68:7,8 69:18 71:9
77:5,6 79:1,3,4,5
86:19,20 87:2
91:5,17 92:7
93:13 94:23 95:13
96:3,22 118:18
119:6 125:5,15
136:19
**deadlines** 82:16
106:5 122:19
123:22 124:21
**deal** 60:18 75:18
89:5 132:18
**dealing** 56:7 81:5
83:3,8 96:19
97:24 98:5 104:10
106:4 108:19
113:15 118:19,20
123:10 125:19

126:7,21 127:10
130:21 133:7
**dealings** 75:12
**deals** 107:5
**debate** 17:24
18:16
**debating** 18:8
**debtor** 108:22
113:14,22 134:15
136:14
**debtor's** 105:24
135:1,13
**debtors** 1:12 5:3,3
55:5 134:13
**december** 111:5
**decide** 16:21,23
17:2
**decided** 60:11
73:21 122:15
134:2
**deciding** 56:4
77:17
**decision** 68:8,11
71:2 77:7 94:4
**declarant** 6:9 8:7
9:19 11:15 17:11
**declaration** 2:17
4:1 8:6 12:17
15:11,13,22 16:20
17:10 18:25 20:4
20:5 21:9 22:8,10
26:15,24 27:4,18
27:23 28:9,14,22
29:2 30:13 31:2
33:2 35:6 39:1
40:14 41:8,11,16
43:7 65:6,7,10,17
65:22 66:11 72:16
89:14 93:1 105:10
105:21 138:21,23
**declarations** 20:1
21:2,6,11 54:17

**deem** 7:22
**deemed** 68:25
96:15 107:3 108:3
116:2 129:24
130:25 131:11
**default** 57:1,3,5
69:8 83:4 119:20
121:7 125:9,10
136:2,3,5
**defaults** 111:16
111:22,23,24
136:1
**defendant** 126:25
**definitely** 20:10
**definition** 127:8
**delay** 67:7 95:23
95:24
**delores** 26:3
**demand** 105:17
**demolition** 36:12
80:17 106:9,13,15
115:2,13 128:24
129:6,10
**demonstrated**
78:23
**denied** 122:10
138:9
**denies** 110:16
**deny** 133:8,11
**denying** 122:13
**depends** 66:16
113:24
**depose** 9:21
**deposed** 8:7 41:21
42:4
**deposit** 13:17 14:6
14:9,11 22:21
24:13 25:17 45:5
45:9,17,24 46:11
46:18 47:3 48:6
55:25 56:3 58:6
58:12 59:1,13,14
60:8 64:22 71:15

71:19 72:16 85:11
87:21,23 88:8,12
89:2,10,18 90:5
90:11,17 91:1,3
91:21 92:6 95:9
95:22 99:21
100:11,21,25
110:17,19 112:13
112:19,23 113:3
116:11,12,15,24
117:25 121:12,17
**deposited** 18:15
87:23
**deposition** 8:14
8:23,25,25 9:2,6
10:20 11:13 12:3
12:3,10,11,13,14
42:3,13 43:9,12
44:4,5 84:20
85:24
**deposits** 47:5
103:1
**described** 64:20
66:19 115:5
117:22 128:10
**describes** 89:18
**description** 138:5
138:12
**design** 16:4 24:15
59:2,18 60:2
89:19 115:1
116:17 117:1
**designatable** 2:5
**designated** 3:16
3:21 4:3
**detail** 18:23,25
29:4 37:14,18
**detailed** 37:9,9
81:10,21 106:19
106:23 108:9,14
129:13,18 130:8
132:14

**details** 107:12
109:10
**determination**
128:9
**determine** 19:10
122:23
**determined**
122:25
**develop** 83:24
113:8
**developed** 42:24
**development**
42:18
**devoted** 100:23
121:4
**die** 43:18
**died** 49:6 50:23
50:25
**different** 12:5
61:15 66:5 91:13
99:14 115:7,8
**differently** 72:2
109:15
**difficult** 124:12
**diligence** 7:17,20
**direct** 20:2 21:14
21:15,18 22:4,7
89:13 91:24 97:4
**direction** 9:20
17:12 39:13
**directly** 124:9
**disagreement**
67:22
**disastrous** 64:4
**disburse** 88:15
**disbursed** 117:25
**discovered** 12:16
**discovery** 8:6,13
9:21 10:16,17,18
10:21 11:10,12,21
14:5 15:24
**discretion** 79:20
114:15 127:6

**discretionary** 127:4
**discuss** 91:9 107:17 108:7
**discussed** 39:12 98:2
**discussing** 41:22 42:19 110:24
**discussion** 14:17 43:9 68:6 69:10 77:4,16 78:5,19 78:20,21 93:24 126:3
**discussions** 14:4,5 14:21 67:5 87:17 87:19 105:6
**disney** 126:8
**dispersed** 25:17 64:23 88:12
**dispute** 10:3 18:13 56:1,24 57:6,23 62:12,13 66:15 69:11 95:2 95:6 96:12,20 97:12 102:3 112:3 114:4 117:12 122:7,8,8 123:11 125:17
**disputed** 66:13 118:6
**disputes** 55:19
**disregard** 7:22 9:11 12:19,20 19:15
**disruption** 119:10 125:11
**district** 1:3 13:4
**doctrine** 96:11
**document** 7:4,6,7 7:8 10:2,4,9 11:10 18:21 26:7,9 27:9 29:1 81:23 114:24 138:18

**documents** 8:4,14 9:5 10:22 11:10 14:25 15:17,20 28:24 92:25
**doesn't** 119:23
**doing** 46:1 47:8 47:18 48:4 63:16 67:8 68:6 77:16 78:21 83:17 95:16 97:5,9 100:23 126:14 136:24
**dollar** 18:10,13 113:13,19
**dollars** 28:1 71:15
**dolores** 30:21 31:11,11 32:6 48:1,21 76:25 77:1 93:10 94:22 95:17
**double** 31:18
**doubt** 29:16,19
**drain** 1:24
**draw** 59:17 116:25
**due** 7:17,20 24:5 56:8 57:12 112:21
**duties** 131:7

**e**

**e** 1:23,23 5:1,1 6:1 6:1 8:18,20,24 11:17 12:1 19:14 20:25 26:2,5,12 30:18,20,23 31:3 31:6,9,11,12 32:8 32:20 39:6 40:7 40:10,22 68:3,4,6 76:22,25 78:2,20 92:2,3 93:11,15 93:17,17,18 94:22 95:15 119:3 123:7 125:8,23 130:15 131:18 136:16 138:1,11,16 139:1

**earlier** 10:9 30:20 134:1
**early** 32:22
**easements** 86:6
**easier** 23:4
**east** 2:9,15,21 3:4 3:11,17,22 4:4 11:2 21:4 55:12
**ecf** 2:5,10,15,21 3:6,13,18,23 4:5 12:25 15:11,22 18:22 23:4 81:2 105:10
**economical** 71:3
**ed** 125:24
**effect** 46:10 57:7 132:24
**effectiveness** 57:6
**efficiency** 75:21
**efficient** 77:8
**efforts** 36:2 128:6
**either** 8:24 49:20 59:14 68:21 75:10 115:24 116:1,2,3 123:3 133:5 135:22
**elect** 25:7 69:22 100:21 101:15,16
**elected** 70:25 74:1 122:1
**election** 25:1,6,9 58:17 61:3 62:1,5 62:9 63:1,4 69:20 69:21 70:21 100:22 117:17 118:7,8,13,15 120:6,8 122:4
**electronics** 48:11
**elements** 95:21
**elevator** 115:19
**elevators** 23:1,23
**eleventh** 8:14

**email** 96:22 99:23 100:7 130:3,7 131:18
**emphasize** 74:19
**employee** 119:4
**employees** 39:18
**enable** 59:17 116:24
**endeavor** 43:10
**ended** 12:11
**enforce** 68:21 76:13
**engage** 126:19
**engagement** 105:19
**enjoyment** 56:16 114:10
**enter** 25:21 114:5 133:9 138:6
**entered** 56:19 108:11 114:1 127:24
**entering** 105:5
**entire** 82:12
**entitled** 25:2 61:4 70:25 71:21 91:4 117:18 121:17 122:15 134:2
**entitlements** 40:24 44:9 55:15 56:10 85:25 86:5
**entry** 57:24
**equal** 120:9
**equipment** 34:2
**errors** 7:6,13 39:17
**escrow** 14:5,6,7 14:12,14,18 24:25 59:16,18,22,24 61:2 66:16 69:23 116:24 117:1,5,7 117:8,16 119:22 119:25 120:1,5

121:4 123:1
escrowee 59:21
esq 5:7,15,22,23
essence 96:13
97:3
essential 62:20
establish 116:21
established 59:4
112:14,15
establishment
116:15 117:8
estate 119:4
127:13 134:16
135:13
estimate 22:21
24:13 25:17 45:5
45:8,17,24 46:11
46:18 47:2 48:6
55:25 58:5 59:1
59:14 64:22 85:10
87:21 88:11 95:9
112:13,22 113:1,2
116:11,15 117:25
121:12
estimates 72:14
et 1:10 2:1 14:18
18:7 107:13
eve 82:4
event 24:21 59:12
60:16 64:12
116:23 117:13
evid 138:12
evidence 6:21 7:7
7:21 8:10 9:3,4,8
9:10 12:24 13:6
15:3,17 19:13,17
19:20 22:9,11
27:19 40:19,21
51:24 52:2 53:4
54:13,18,22,23
62:14 63:9,15,19
64:2,5,8 68:2,3
88:1 92:19 97:25

122:17 123:16,20
124:8,22 125:14
126:1 134:19
evidentiary 6:11
11:5 54:20 73:12
evidently 130:23
exactly 13:13
17:11 25:23 50:5
66:10 90:10
examination 17:2
22:17 45:2 51:22
examine 20:14
examined 11:15
example 47:23
86:1
exception 126:17
excess 71:15
exchanges 138:16
exclude 17:16
excludes 123:16
excuse 19:16
20:11 123:17
129:5
excused 54:9
exhibit 6:23 8:2
8:18 10:1,8,11
15:9,21 17:18
18:21 19:8,9,20
20:6 26:23,23
27:4,23 28:4,9
33:1,2,13,18
35:20 37:1,12,19
56:12 58:7 76:24
78:5,7,8,10,10,11
78:11 79:17 80:4
80:18,23 81:20
82:12 105:24
106:10,13 108:14
115:4 128:25
129:5,9 130:11
131:17,22
exhibits 6:12,15
6:21 7:4 9:10,16

9:16 11:6 12:18
15:19 16:6 19:9
19:12,17 28:21,22
30:4 52:1 54:23
78:13,13,15,16
115:15 138:13
exist 123:3
existing 103:25
133:6
exists 125:20
126:7
expectation 127:8
expectations
127:11,16,18
expense 31:17
80:7 114:25
135:12
expenses 88:1
113:3
expired 40:25
57:7
expiring 41:6
explain 13:6,11
63:20 76:16 97:24
explains 13:10
124:10
explicitly 115:7
express 68:16
69:14 76:7,10,10
83:8,13,20,21
103:5 124:17,17
126:18,23 127:5
127:17
expresses 96:2
expressly 69:1
83:17 115:23
126:15,25
extend 68:18
extending 3:4,11
extension 68:16
extensive 113:6
126:3

extent 17:19 18:7
25:15 56:21 58:14
73:21 82:22
135:19
exxon 127:21

f

f 1:23 20:25 139:1
f.supp 125:24
face 108:1
facebook 13:4
faced 131:4
fact 9:8 18:8
34:18 56:1,4,8
57:13 62:23 69:25
76:12 77:19 86:21
94:23 99:25
101:23 102:4
112:1 116:8
117:10 119:23
120:8,24 123:7
132:12,15 134:18
facts 62:19 67:19
82:23 118:21
132:15,19
factual 69:10
failed 56:1
failure 68:20
84:15 102:22
113:21 118:15
120:7,13
fair 56:7 57:16
62:20 67:20 83:3
83:8 87:3 99:18
104:10 108:19
110:15 113:15
125:19 126:7,21
127:10 130:21
133:7
faith 56:7 83:3,7
83:12,16 104:9
108:19 113:15
125:19 126:6,17
126:20 127:10

130:20 133:7
**familiar** 28:23
  56:25 84:13
**far** 13:16 15:1,5
  19:10 63:23 73:6
  93:7 100:3 103:1
  103:1 121:5
  123:11,22 124:21
  132:13,25 133:10
  134:16 138:7
**fault** 55:22 108:5
**favor** 55:15 86:1
**façade** 23:1,22
  24:23 48:13 60:20
  60:25 115:18
**feature** 109:12
  119:22
**february** 2:9,14
  2:20 3:3,10 36:20
  37:5 38:10 41:18
  57:12,12 84:22
**feel** 74:20
**fell** 42:1
**fifth** 5:4
**figure** 18:11
  113:19
**filed** 2:7,13,19
  13:23 57:10
**filing** 87:19
  105:20
**final** 18:20 87:2
  115:12
**finalize** 51:6
**finally** 10:8 28:8
**financial** 108:17
**financing** 42:25
  53:23,24 82:7
  84:21 86:13 103:3
  103:9 104:6
  108:23 113:22
  132:21
**find** 8:9 112:9
  135:8,9

**finds** 127:3
**fine** 18:18 20:3
  33:19 44:25 64:9
  70:8 78:17 96:6
  96:23 136:23
**finish** 46:3 67:11
  72:13 95:21
  100:16,18 133:15
**finishing** 99:8
  101:9
**fired** 49:20
**first** 8:5 11:5,16
  12:3 21:9 31:9
  43:8 45:4 52:13
  52:19 53:5,7
  55:24 57:9 58:5
  58:24 59:14 67:19
  68:2 69:19 76:5
  79:16 95:23
  112:12 113:24,24
  117:12 118:18,22
  119:22 120:4
  122:1,3 123:4
  131:3 132:6
  133:10
**five** 57:24
**fixed** 123:1
**fixtures** 31:18
**floor** 51:9,9 53:17
  81:22 85:21
**flux** 42:21
**fly** 108:24
**fold** 118:21
**follow** 131:13
  133:3
**following** 56:18
  95:20
**follows** 123:15
**folsom** 111:6
**font** 31:10
**foot** 15:14
**forbidden** 126:20

**force** 96:13
**foregoing** 139:4
**forever** 78:24
**forfeit** 89:6
**forfeited** 87:23
  88:9 89:10
**forfeiture** 90:4,22
  91:13
**forgive** 110:2
**form** 12:18
  122:17
**formal** 62:9 69:21
  70:21 84:6
**formally** 136:12
**forth** 12:25 13:25
  18:24 72:16 81:24
  89:13 93:11 105:9
  114:12,22 115:8,9
  116:16 118:18
  122:16 128:1
  131:17
**forward** 8:22
  55:17 56:9 62:14
  82:17 84:23 96:9
  109:2
**forwarded** 8:20
  9:6 12:9
**forwarding** 12:19
  12:20
**forwards** 40:6
**found** 7:23,24 9:5
  24:11 49:21,22
  81:1
**four** 61:20 89:21
  118:25
**frame** 66:5,7
**frames** 67:14
**frankly** 10:5 69:9
  78:3,8 82:6 109:8
  136:23
**freight** 23:1,22
  115:19

**friday** 7:18 8:5
  9:18 29:13
**front** 55:8 108:22
**full** 100:11,14
**fund** 24:24 51:15
  59:16,18 61:2
  117:1,25 119:21
  119:25 120:1,5,19
  120:19 122:2
  123:1 135:11
**fundamental**
  73:12 98:12
**funded** 116:16
**funding** 51:7 54:2
**funds** 24:24 50:25
  57:25 58:16 59:17
  61:1,25 64:22
  69:19,21 70:25
  89:15 116:25
  117:4,10,15 118:7
  118:9 119:24
  120:5 121:3
**further** 44:15
  49:17 54:3 82:19
  111:1 115:10
  126:13 131:14
**future** 62:13
  101:7 113:4 122:9

**g**

**g** 6:1 138:3
**gain** 108:17
**gallagher** 4:25
  139:3,11
**gather** 60:11
**general** 8:9 22:23
  83:19 110:19
  126:16,22
**generally** 123:15
**getting** 43:1 47:9
  47:19 49:20 70:12
  103:19,19 107:21
**give** 44:22 51:12
  51:15 84:14

100:16 109:7
**given** 9:18 12:10
  59:21 68:24 92:16
  118:15 120:6,13
  120:19 124:16
  126:25 130:24
  132:15,17 135:10
  136:1,3
**gives** 97:3 108:16
**glance** 7:6
**go** 11:25 23:2
  30:23 35:11 51:4
  51:11 53:20,22
  55:17 59:5,9 66:2
  67:17 68:5 70:25
  71:8 72:5 75:16
  76:7,10,16 80:4,8
  82:17 84:23 90:3
  93:25 94:19 95:6
  96:9 98:12 104:21
  104:22 106:13
  109:11 125:22
**goal** 32:22
**goes** 31:15 65:14
  95:9 106:2 117:21
  119:7
**going** 12:23 17:1
  26:5 37:14,15
  38:3 42:15 45:7
  49:15,23,25 51:12
  54:20 60:18 67:9
  67:16,18 75:18
  77:11,11 85:25
  93:12 95:14 96:23
  100:3 135:2 137:1
**good** 6:2,4,6 10:25
  11:3 12:2 20:24
  22:19,20 55:8
  56:7 83:3,7,12,16
  95:16 102:12,12
  104:9 108:19
  113:15 125:19
  126:6,16,20

127:10 130:20
  133:7
**gotshal** 5:2
**gotten** 34:5
**gottlieb** 5:17 6:5
  55:2
**govern** 115:9
**governed** 109:16
  125:20 126:7
**governing** 13:2
  127:18
**government** 128:7
**governmental**
  128:20
**grand** 5:11
**grant** 126:18
  127:6
**granted** 89:7
**granting** 133:9
  138:6
**great** 31:19
**ground** 51:9,9
  53:17 85:21
**groundwork**
  113:21
**group** 2:9,10,15
  2:15,20,21 3:4,4
  3:11,11 11:2,2
  21:4,5
**guess** 66:14 71:11
  125:22 135:1

**h**

**h** 20:25 138:11
**halfway** 33:12
**hamilton** 5:17
**hand** 20:19 99:20
  120:16
**handed** 12:9
**happen** 42:24
  69:6 85:12 95:5
  107:19 108:6
  109:6,13

**happened** 14:18
  51:11 95:23 108:4
**happening** 45:21
  58:3
**happens** 88:8 95:3
  122:7
**happily** 58:23
**happy** 6:12 75:21
  76:21 87:4
**hard** 43:1 102:2
  103:17 108:19
**hate** 42:20,20
**hazardous** 81:6
  106:17 129:11
**head** 79:25
**hear** 13:15 15:2
  16:23 54:10,24
  75:20 96:17
  102:21 109:19
**heard** 17:21 54:14
  58:11 63:10 82:20
  85:20,22 97:18
**hearing** 2:4,7,12
  2:17 3:1,8,15,20
  4:1 20:6 54:21
**heart** 42:23
**heights** 42:18
**held** 14:6 60:8
  83:16 85:16
  116:10,12 117:5,6
  121:4 122:3
**hell** 42:24,25
**help** 50:3
**helpful** 15:15
  103:15
**hereof** 115:4
**hereto** 68:17,19
  68:25 80:18 106:9
  107:6 115:3,15
  128:24 131:24
**hereunder** 131:24
**highly** 108:9
  135:10

**hired** 101:22,23
**history** 39:17 94:2
**hold** 49:20 50:11
  52:20,22 53:11
**holdco** 3:15,20
  4:2 5:18 111:12
**holding** 62:2
**holdings** 1:10 2:1
  6:3 133:20
**holes** 132:13
**hon** 1:24
**honor** 6:4,8,12,16
  6:19 7:1,3,10,19
  7:20 8:1,4,11,17
  8:19,23 9:2,7,9,13
  9:15,23 10:4,14
  10:18,21,25 11:4
  11:15,22 13:21
  14:8,11,20 15:4,7
  16:17,20,25 17:3
  17:18,25 18:12,17
  18:20 19:21,23,24
  20:13,16,24 22:12
  22:13,15 23:12
  33:15,20 44:6,16
  44:20,21 46:12,13
  47:10 48:8 51:21
  54:3,5,10,15 55:1
  55:4,10,11,17,20
  55:24 56:2,6,11
  56:19,23,24,25
  57:5,8,15,18,21
  58:3,4,6,8,10,20
  58:23 59:6,23
  60:20 61:12,17
  62:3,7,11,23,24
  63:7,14,18,20,21
  63:23 64:7,11
  65:7,20,23 66:6
  66:13,21 67:1,2,4
  67:13,20 68:1,5
  68:11,15 69:2,4,7
  69:12,15,17,23

70:3,14,19,23
71:1,3,6,10 72:5
72:25 73:13,20,25
74:5,8,18,20,23
75:6,17,21 76:3,9
76:15,18,20,21
77:1,13,15 78:1,1
78:2,7,16,19,22
79:3,11,15,16,18
79:24 80:3,5,8,14
80:21,23 81:5,16
81:19,21,23 82:1
82:6,8,10,12,13
82:18,21,25 83:1
83:2,6,9,21,25
84:3,7,12,14,17
84:20,23 85:1,5
85:14,19 86:1,3
86:11,12,15,17,18
86:25 87:3,4,6,9
87:15 88:5,7
91:24 94:16 96:17
97:17 102:21
103:7 109:22,24
110:1,3,4,10,20
110:21,23 111:2,8
133:13,19 135:21
136:15,18 137:3,5
137:7

**honor's** 85:8
**hook** 84:15
**hope** 43:1,16
86:17 136:24
**hoped** 43:18
**hopefully** 37:4
105:3
**hour** 8:15 80:15
**hours** 36:10 81:12
106:6,20 107:8
128:22 129:15
130:9 132:1
**house** 130:3

**huh** 22:16 106:1
**hva** 48:12
**hvac** 22:25 23:21
24:23 31:16 32:12
47:23 48:2,7,9,13
48:15 60:18,19
65:2,24 66:3
77:23 95:23,24
98:13,17,18 99:8
99:24,25 101:22
101:23 115:18
125:10
**hypothetical**
121:22

**i**

**i.e.** 111:16 116:19
**idea** 77:14 81:23
82:3 84:17 85:6
101:25
**identified** 79:10
80:5
**ignore** 107:16
**illusory** 108:8
**illustrative** 15:10
17:9
**imagine** 10:22
102:3
**immediate** 113:6
**immediately** 12:9
**implementation**
109:12
**implication**
127:16
**implied** 83:19
104:9,12 108:18
113:15 125:19
126:6,12,20,23
127:2,9,16,19
130:20 132:16
133:6
**important** 68:20
76:4 82:2 127:12
127:16

**importantly** 56:2
82:10 84:17
**improper** 8:12 9:7
9:24 55:20 101:8
**improvement**
88:1
**improvements**
35:25 79:21
114:16 128:4,8,11
**inability** 103:3
**inaccuracy** 18:3
**include** 81:10
106:18 129:12
130:8
**included** 81:24
93:24
**includes** 59:7 66:1
89:21 90:22
**including** 89:22
93:18 108:16
111:23 114:12,19
115:4 125:7,21
126:8 128:1
**inconsistent** 82:22
94:10
**inconvenience**
36:17 80:20
106:12 129:4
**incorporate**
104:18
**incorrectly** 87:22
**incumbent** 107:20
**incurred** 52:10
92:19,23 113:20
**indicate** 87:15
**indicates** 79:1
132:6
**indiscernible**
34:18 72:8
**indulge** 110:2
**influence** 12:23
**information** 9:22

**initial** 107:21
**inside** 48:16 96:1
**inspection** 64:21
66:22 117:23
**inspector** 44:13
85:23
**install** 66:1 79:21
114:16
**installed** 48:10,14
48:17 65:2 128:19
**instance** 113:25
**instruction** 59:21
**instrument** 68:18
**insurance** 59:15
59:15 125:23
**integrated** 13:7
13:11 123:18
**integration**
115:21
**intended** 72:17
**intending** 12:22
**intent** 16:2
**interest** 111:5
**interfere** 79:22
114:17
**interference**
98:18,21
**interpretation**
123:12 125:25
**interrupt** 74:25
105:25
**introduced** 59:4
**introductory**
58:24 89:18 123:3
**invasive** 83:24
**invested** 127:4
**investors** 43:9,14
43:19,21,23 44:1
**invoice** 26:24,25
27:5,6,13,17,24
27:24 28:4,10
32:24 33:3,9,23
34:16,23 35:2

[invoice - landlord]                                                              Page 16

52:13,19 53:5,7
63:12 71:4 73:14
73:17 93:4 122:18
**invoiced** 16:19
**invoices** 8:3 10:12
15:12,25 16:1,10
19:2 26:16 28:13
28:14,17,18 29:6
29:8,15,21 30:1,4
30:5,7,9,14 34:3
52:2,4,10 54:21
66:12 79:3,4,5,10
92:25 93:1 102:4
118:22 125:2,2
138:20
**invoke** 83:2,7
**invokes** 56:6
**involved** 93:12
**involves** 124:3
**involving** 106:16
129:11
**irrelevant** 17:14
77:15
**irrevocable** 2:8,14
2:19 3:3,10 21:4
**island** 125:23
**isolation** 68:14
**issue** 6:11 8:22
9:8 11:18 13:16
14:18 38:7 51:6
55:11,19 67:15
79:16 86:7,12
89:5 90:19,20
91:13 101:1,2,4
102:25 109:17
122:22,23 124:12
134:14,17
**issued** 40:24
111:10 128:12
**issues** 11:8 18:2
39:14 40:3 112:9
113:24 114:4
126:4 134:25

**izek** 2:8,13,17,19
3:2,9 4:1 20:21,25
21:3 22:8,10
49:24 50:2 138:21
138:23

**j**

**jacqueline** 5:7
133:20
**jamie** 4:25 139:3
139:11
**january** 32:16
33:3,6 57:10
77:12
**jb** 42:1
**job** 37:15 47:17
66:1
**joint** 6:15,21
26:23 27:3,22
28:9 33:1,18
35:20 36:25 43:10
56:12 58:7 59:21
79:17 80:4 81:19
82:11 105:24
138:13
**jonathan** 36:22
37:4 39:6
**judge** 1:25 34:20
48:8
**july** 20:4,10 21:10
22:10 43:7 138:24
**june** 8:7,23 10:20
11:13 13:18 14:19
41:20 42:4 84:22
95:18
**jury** 12:22

**k**

**k** 20:25
**kate** 5:23
**keep** 44:9 68:11
77:1 82:23 85:25
88:19 90:17 95:16
101:2,15

**keeping** 89:1
**kept** 49:23
**key** 55:16 111:20
**kind** 51:14 88:20
108:8
**knew** 51:5 107:18
**know** 6:23 7:18
10:4 14:3 18:6
23:4 34:8,10,25
37:1 40:8 42:9
49:7,25 51:16
52:3 55:4 63:2
64:13 66:25 71:14
72:1 74:22 85:14
89:24 90:25 92:25
95:19 96:8 97:1
98:7 101:10,22
102:2,2,12 104:6
104:20 109:9,13
109:14 110:3
134:17 135:15,18
135:24,24 136:6
136:23,24
**knowing** 21:13,18
92:12
**knowledge** 124:5
**knows** 63:24
85:12
**kupetz** 5:9,15
10:25 11:1,4,22
12:1 13:9,14,19
13:21 14:2,8,10
14:12,16 15:4,7,9
15:19 16:1,9,11
16:25 17:4,6,8,15
17:17,21 18:20
19:4,21,24 20:8
20:10,13 44:20
45:3 46:15 47:1
47:13,14 51:19
54:5,17 60:7,14
61:22 63:23 64:2
65:11,13,15,17

67:4 71:23,25
72:3,5,9,12,19
87:9,15 88:4,7,14
88:17,22 89:7,12
89:23 90:2,6,9,12
90:14,24 91:6,9
91:11,14,17,19,24
92:14,18,22 93:2
93:4,9,16 94:16
94:24 95:4,8,14
96:1,4,6,9,17,23
97:6,9,11,14,17
97:22 98:1,16,25
99:6,10,16 100:1
100:4,9,15,23
101:12,18 102:8
102:10,14,21
103:7,12,14,18
104:2,8,19,25
105:3,5,9,12
106:1 108:6,10,25
109:18,22,24
110:8 137:9

**l**

**l** 138:3
**l.a.** 8:23
**la** 80:11
**labeled** 6:22
**labor** 30:12 66:1
**lack** 85:2
**laid** 49:21 50:1
97:20 128:15
130:23 132:15
**landlord** 3:2,9
5:10 6:9 7:7 8:2
8:18,20 10:1 11:1
11:19 12:4 13:23
16:14,14 18:16
19:9 21:5 23:21
23:25 24:12,21
25:3,15,20,24
26:9,16 28:3,22
35:13 45:8,17,23

46:9,10 47:8,15
47:21 48:23 49:10
50:6 54:21 55:7
55:15,21,24 56:1
56:6,9,13 57:11
57:14,25 58:9,14
58:19 59:17 60:12
60:16 61:5,7 63:4
63:23 64:13,17,23
67:1,5 69:5 70:5
70:23 71:14 72:13
72:14 73:22 75:8
76:24 78:4,15,16
78:24 79:20 80:6
81:8,16 82:8
83:23,25 84:20
85:2,20 86:7
87:22,23 88:12,12
88:15 89:14 90:16
91:1,4,20,22 92:1
92:4,5,9,20 97:6
97:11 99:10 100:9
100:17 101:23
102:4 103:23
105:6,14 106:15
107:1,12 108:16
110:11 111:13,24
112:4,12,19,25
113:3,5,13,17,18
113:20 114:25
116:12,16,25
117:5,8,11,14,19
117:25 118:6,17
118:23 119:1,4,5
119:5,14,14,19,23
121:13,16,24
122:24 123:6
125:7 128:3,6
129:7,9,22 130:1
130:14,17,18,19
131:5,6,8,12,13
133:3 134:2,12
135:19 136:3,13

138:15,17
**landlord's** 6:23
7:3 9:16 11:6 15:9
19:12,17,20 21:3
24:15 54:23 56:18
59:2,13,18 60:2
64:19 66:19 70:4
72:15 78:5 80:10
84:3,5 89:19 91:7
91:14,19 92:22
105:17 106:23
110:17 112:7,8
113:22 114:25
116:17,19,23
117:1,22 118:15
120:20 121:10
122:9,13,15
125:18 129:18
132:23 135:20
138:7
**landlords** 114:16
**landlord's** 3:20
4:2
**landscaping** 78:6
**language** 68:20
69:2,9 76:4 94:3
100:20
**late** 15:1 79:6,8
**latest** 32:24
**law** 13:1,2,5 69:13
76:8 83:5 93:21
97:24 123:10
125:20,25 126:4,8
128:19
**lawyer** 40:2 82:20
105:13
**lawyers** 87:10
**lay** 69:16 113:20
115:16
**laying** 132:13
**lays** 80:6 104:16
111:19

**leading** 46:12
47:12
**lease** 3:6,12,16,21
4:3 6:7 21:8 55:13
56:12,20 57:2,19
74:8 79:17 86:2,7
103:11,11 106:4
108:12,15 111:4,5
111:12,16,17,23
112:15,25 113:11
113:16 114:1,5,7
115:24 116:1,4
117:13 119:2,17
119:21 125:21
127:24 130:24
134:10
**leases** 2:5 55:5
57:6,6 126:8
**leave** 72:15
**leaves** 121:9 125:8
**left** 46:3 48:15
58:15
**legal** 14:23 31:23
31:23,24 32:1,5
48:3 75:4 86:16
93:12,13,24
139:20
**legitimate** 92:15
**lender** 50:24,24
51:3,15
**lengthy** 94:4
108:13
**lennar** 125:22
**leo** 32:19
**letter** 36:22 37:4,8
38:11,21,22,25
39:7,11,22 40:6
51:17 81:20,21
82:11 84:4,24
104:23 105:14,15
105:23 107:14
**letterhead** 84:7,25

**liable** 7:22 64:18
**liberty** 5:19
**lifetime** 41:1,24
**light** 32:11 77:16
125:9 127:24
**limbo** 49:25
**limit** 76:21 100:22
101:17
**limitation** 114:19
115:4 118:12
125:7 128:1
**limitations** 126:11
**limited** 110:23
**limiting** 98:4
124:18
**line** 42:15 109:1
138:5
**liquidated** 89:4
90:19 101:8
**lisa** 4:25 139:3,8
**list** 6:23 19:9 58:8
58:13
**listen** 13:15
**literally** 42:20
71:6
**little** 6:11 7:24
23:4 41:14 52:15
52:24 63:9 71:11
134:1
**live** 109:5
**llc** 2:9,10,15,15,20
2:21 3:4,4,11,11
5:18 21:4,5
**llc's** 3:15,20 4:2
**llp** 5:2,17
**loan** 51:7,15,16
**located** 3:17,22
4:4 12:12 111:6
**location** 111:7
**lodges** 107:5
131:23
**logically** 101:3

**longer** 73:22
**look** 7:20 8:19
    11:11 23:3 26:20
    26:22 28:8 30:18
    31:25 32:14 33:11
    34:13 35:5,19
    37:12 39:5 58:10
    65:15 68:13,13,14
    76:21 78:5 79:16
    80:23 81:2 84:21
    88:4 100:2 101:14
    104:7
**looked** 79:3
**looking** 7:3,21
    22:23 27:17 37:25
    38:2,2 53:2 65:21
    82:7 103:16
**looks** 95:16
**los** 3:17,22 4:4
    5:13 21:8 36:3
    40:24 55:12 78:4
    111:7,9 128:9
**losing** 56:10
**loss** 57:4
**lost** 86:22
**lot** 42:25 69:10
    82:20
**louder** 45:12
**love** 48:8
**low** 22:25 23:21
    24:23 60:19
    115:17

**m**

**m** 20:25 125:23
**mail** 8:24 26:2,5
    26:12 30:18,20,23
    31:6,9,11,12 32:8
    32:20 39:6 40:7
    40:10,22 68:3,4,6
    76:22,25 92:2,3
    93:15,17,17 94:22
    119:3 123:7 125:8
    130:15 131:18

136:16 138:16
**mail's** 31:3
**mails** 8:18,20
    11:17 12:1 19:14
    78:2,20 93:11,18
    95:15
**main** 101:15
**maintained**
    100:16
**maintenance**
    112:6
**majority** 48:14
    55:5
**making** 77:7
    90:13
**manges** 5:2
**manner** 25:16
    36:16 64:21 66:20
    70:11 79:23 80:19
    106:11 114:18
    117:23 120:2
    129:3
**march** 51:16
**marcus** 5:7
    133:13,19,20,22
    134:1,6 135:1,6
    135:14,16,21,24
    136:7,11
**mare** 125:23
**massey** 5:23
**material** 16:11,13
**materials** 8:8 81:6
    106:17 129:12
**matter** 1:8 6:8 8:9
    8:12 9:10 21:15
    69:4 73:12 83:19
    120:18 123:9
**matters** 14:23
    130:4
**mean** 16:6 17:21
    33:10 48:21 50:23
    60:10 63:5 65:5,6
    75:23 76:1,13

88:25 89:5 92:19
    97:1,20 101:14
    102:19,24,24
    103:17 104:13,22
    108:12 109:10
    110:18 135:23
    136:8
**meaning** 66:16
    94:7 123:12,15
**means** 108:2
    115:10
**meant** 103:25
**mechanism** 129:7
    131:6,7
**meet** 40:2 56:1
    58:16 64:14 81:16
    82:20 84:9,10
**meeting** 49:12
**meetings** 78:4,10
    78:11 92:3
**mention** 39:19
    52:12
**mere** 9:8
**merely** 124:10
    132:6
**meruit** 75:11
    102:19 120:16,18
    121:2 122:22,24
    134:4
**message** 12:20,21
**messages** 12:9,12
    12:15
**met** 49:15 68:8
    94:23 95:17 119:5
**microphone** 72:7
**mid** 49:2
**middle** 33:11,23
    34:13
**million** 24:13 27:1
    28:1 58:12 59:1
    71:15 89:18
    113:13,19 134:23

**mind** 32:2 44:21
    52:24
**mineola** 139:23
**minimal** 80:19
**minimally** 83:24
**minimum** 36:16
    106:11 129:3
**minute** 52:15
**misheard** 17:22
**missed** 31:12,22
    32:9 95:12 96:2
    96:22
**missing** 82:16
**modification** 94:9
    124:13
**modified** 12:7
    13:10 88:24 97:15
    118:18
**modify** 13:3,8,9
    93:22 94:18
**moment** 110:2
**monday** 53:25
**monetary** 111:17
    111:22 121:7
**money** 13:17
    17:25,25 18:8,8
    58:19 62:24 67:24
    70:7,12,18 85:14
    88:18,19,21 101:5
    101:16 116:10,24
    123:7
**month** 26:8 41:3
    49:24 79:11
**months** 36:3,6
    38:19 39:20 41:18
    73:16 80:11,13
    81:25 82:5,17
    84:5,25 105:16
    128:8,12
**morning** 6:2,4,6,7
    10:25 11:3 20:24
    22:19,20 87:6
    133:23

motion  21:7
move  44:6 74:18
  74:20 75:22 80:3
  109:2
moved  56:9
moving  31:18
multi  108:12
  113:13,19

**n**

n  5:1 6:1 138:1,3
  139:1
name  20:22,24
  77:1
nature  124:5,18
  130:24
near  84:9
necessarily  7:9
  18:9
necessary  16:12
  25:3 35:24 58:19
  61:5 117:19 128:4
  128:7 136:8
need  8:10 17:13
  21:24 31:18 44:9
  44:12 82:12 98:10
  103:15 107:23
  110:1 113:6
  133:12,16
needed  31:21
  103:18 113:12
needs  47:17 80:21
  80:22 104:17
  116:11 121:11
negative  131:21
negatively  131:17
negotiate  130:17
  130:19
negotiated  39:15
  39:19 109:11
negotiating  41:25
  81:23 130:16
negotiation  37:25
  38:2 42:1

neither  63:25
  105:17
never  11:18 14:13
  83:20 96:19 108:4
  117:6,7,8 127:9
new  1:3,18 5:5,20
  72:2 103:25 104:4
  133:4 135:19,20
noise  36:16 80:20
  106:12 129:3
non  81:6 109:6,8
  109:11 132:7,12
nonresidential
  3:6,12
nonresponsive
  67:12
normally  89:5
north  27:1,25
note  33:12 64:7
  121:16 132:20
  136:18
noted  115:19
  116:14 118:3
  123:2,19 125:17
  126:12 127:23
notice  2:4 81:9,9
  106:15,18,23
  111:11,12,13
  129:10,13,18
  131:23
notified  39:20
notwithstanding
  128:16
november  95:18
number  8:4 12:12
  12:25 15:12 26:16
  26:23,23,25 27:4
  27:6,23,24,25
  28:4,5,9 32:20
  33:1,18 35:20
  36:25 37:1 57:13
  58:8 79:17 81:20
  114:3 125:1

numbered  27:14
  28:10
numbers  37:17
ny  5:5,20 139:23

**o**

o  1:23 6:1 20:25
  20:25 139:1
oath  29:5 41:21
object  111:14
  131:9
objected  6:24
  61:17
objection  2:7,12
  2:18 6:8 10:10
  13:24,24 15:1,24
  17:22 18:22 21:3
  21:7 33:4 46:12
  55:23 57:10 62:12
  69:7 73:2,13
  74:13 75:8,10,14
  86:19,20,21 92:12
  101:11 102:9,17
  102:19 110:17
  112:7,8 113:6,13
  121:5,21 122:14
  124:6,7 133:8,9
  136:1 138:7
objections  11:5
  55:7 57:9 58:2
  87:17 106:24
  107:6 122:10
  129:19 131:23
obligation  68:19
  81:17 83:5,23
  84:11 103:5,5
  104:3 111:17
  116:19 121:6
  131:22 132:8
  133:5
obligations  24:16
  56:21 59:3,4 84:9
  84:10 89:20 110:6
  110:22 111:15,22

116:18
obstruct  79:22
  114:18
obtain  128:6
obvious  95:1
obviously  7:20
  66:10 93:11
  134:15 135:6
occasions  124:3
occupied  55:11
  113:9
occupying  51:8
occur  51:1
occurred  52:16
  87:19 92:6 93:23
  120:8 121:23
october  49:3
  84:13
offer  40:3 77:17
  82:5,19
offered  39:11 40:1
offering  39:13
oh  108:20
okay  6:20 7:2,25
  8:16 9:14,25
  10:15,24 11:25
  15:4,8 16:5,24
  17:15 18:14 19:22
  20:3,14 21:1,21
  22:6,14 23:9,17
  23:18 26:20 27:3
  28:13 29:21 30:23
  31:4,6 32:8,14,19
  32:24 33:19,21
  35:19 38:15,23
  39:5 41:13 43:7
  44:17 45:13 53:16
  54:4,6,16,19,24
  57:20 58:1 60:15
  60:25 61:23 63:22
  64:12 72:8,11,20
  74:10,15 75:25
  77:3 79:14 87:7

87:11 90:14 97:16
99:15 103:16
105:2,4 109:25
111:3 133:18,25
135:14,21 136:7
136:10,17,21
137:6
**old** 102:10 139:21
**olympic** 3:17,22
4:4 55:12 111:8,9
**omit** 16:2 34:21
**once** 49:18 50:24
87:19
**one's** 19:7 28:5
**ones** 17:4,18
38:24
**ongoing** 45:18
67:5 93:20 99:11
**operate** 82:3
**operating** 73:22
**operation** 56:15
70:10 114:9 123:4
**operations** 119:11
**operative** 56:12
104:17
**opinion** 126:4
**opportunity**
111:14 124:6
**opposed** 39:13
**opposite** 15:16
**option** 70:23,24
**optionality** 68:11
**oral** 54:24
**order** 3:1,8 56:7
57:24 60:19 109:2
115:17 133:9
134:7 136:12,20
138:6
**ordered** 3:1,8
**orders** 57:24
111:10
**original** 13:24
33:4 57:10 113:5

**originally** 112:15
**outlined** 70:20,22
**outlining** 39:14
**outside** 48:9
**outstanding** 55:7
67:10 111:15
**overall** 50:21
113:7 128:5
**overarching** 85:5
**overcollaterizati...**
72:24
**overcome** 124:24
**owed** 34:7 47:17
110:11 111:21
112:1,2 122:24
134:11
**owing** 112:21
134:22,24

## p

**p** 5:1,1 6:1 129:5
**p.c.** 5:9
**p.m.** 12:11 137:11
**page** 12:25 13:5
23:2,5,5,7,10,11
24:11,19 27:12
30:6 31:9 35:19
37:17,19 39:25
42:12,14 68:14
71:4,7 73:14 81:2
94:5,6 105:20
108:12,12 138:5
**pages** 22:23 23:4
28:23 81:2 93:24
**paid** 16:19 18:16
26:18 27:9,15
28:18,19 30:15
34:5,8,10,11,24
46:20,24 47:9,19
48:2,17 52:4
63:24 64:3 71:16
71:17,20 72:10,22
72:22 73:24 75:13
78:25 79:7 92:15

99:14,18 102:4,7
112:18,22 116:12
119:21 120:18
122:16 123:8
134:3 136:5
**pamela** 4:25
139:3,14
**papers** 76:2 83:10
94:17 97:18,20
100:10 104:19
109:19,20
**paragraph** 15:11
15:21 24:10 31:22
32:15 35:19 56:14
58:10,25,25 59:5
59:5,11 60:6,15
61:6 65:16,24
68:15 69:15 71:1
76:4 79:18 80:6,8
80:9 81:6 82:13
89:18 94:6 100:6
101:14 105:20
113:10 114:24
116:7,14 117:21
119:9,23 120:10
120:10,19 121:19
123:3 124:18
128:1,3
**paragraphs** 15:13
17:10 23:13 89:21
104:17 105:9
115:16
**parcel** 106:17
114:11 129:12
**parking** 114:20
**parol** 8:10 9:7
12:24 97:25
123:20 125:25
**parole** 123:16
**part** 8:5 11:19
16:7 53:4 55:16
62:11 68:21 98:16
98:16,18 104:4,13

110:9 113:7 114:2
115:3 116:11
132:8
**partially** 24:15
59:1 89:19 116:17
120:20
**particular** 7:4,24
117:12 127:3
**particularly** 82:4
86:18 97:2 123:17
**parties** 6:10,15
12:8 13:1 14:13
14:21 18:7 25:20
56:14,19,20 59:23
60:11 63:3 64:24
66:15 68:17,19,21
75:11 76:1 82:14
88:23 94:7,12,17
96:12,18 97:15
98:8 107:6 108:11
108:20 109:4
112:17 114:3,5,8
114:23 117:4
118:1,17 123:10
124:2,22,23
125:15 126:17
127:9,18,24
130:15,22 131:2
131:24 132:16,17
133:2,6 136:25
137:4
**parts** 65:12
**party** 7:7 30:10
34:10,11 57:4
60:9 68:24 83:17
96:13 98:9 109:6
109:8,11 111:4
115:25 116:2
124:4,4 125:6
126:14 127:4,20
**passed** 68:7,7
77:5,6 125:5

patrons 39:18
pause 11:24 20:18
  44:18 79:13 87:14
  88:6 94:21 118:11
  119:12,18 120:12
  121:15 122:11,20
  123:24 124:11,20
  125:16 126:5
  131:19
pay 34:1,6,14
  46:19,22 57:13
  59:18 71:19 74:4
  101:25 112:5
  117:1,10 121:4
paying 46:23,25
  63:11
payment 25:2
  47:2,4,4 60:1 61:4
  86:3 117:18
  120:15,17 123:2
  125:1 136:9
payments 95:19
  118:23
pecuniary 57:4
penalty 89:3
people 14:4 96:25
  102:5 109:14
percent 34:17,18
  46:5 51:8,9,11
  53:17,21,25 65:10
  65:10 85:21 86:4
  86:8 113:9
perfectly 108:18
perform 22:24
  58:9 128:7
performance
  11:18 12:8 13:2,6
  13:16 68:19 92:9
  93:20 94:6,10,18
  123:9,23 124:2,4
  124:5,6,8,13,23
  125:14 126:2

performed 92:9
performing 55:18
period 106:25
  129:20 131:10
permit 103:22
  124:1
permits 32:15,21
  36:3,19 43:1
  77:11,14 78:7
  80:11,13 84:22
  85:19 124:13
  125:5 128:12,17
permitted 83:18
  126:15
permitting 113:17
person 43:16
  82:10 92:3 93:10
  95:17 101:22,23
  103:20 107:15
perspective
  134:11
pertains 121:9
  125:18
petition 134:9
phone 133:18
photographs 9:17
  9:19 17:5,8,12
pick 72:7
picture 37:16,18
pictures 34:19,20
  48:7,18 126:9
pipe 85:13
place 8:23 127:20
  131:4 132:6
plain 123:15
  124:14,24 133:5
plainly 126:17
plains 1:18
plan 36:11 37:23
  42:18 55:17 80:16
  81:13 83:24,24
  105:7 106:7,21
  107:9 113:8

114:11 128:22
  129:16 130:10
  132:1
planning 38:9
plans 36:9 37:10
  37:21,23,24 38:5
  38:11 80:15 81:11
  81:15,21,22 106:6
  106:19,23 107:13
  115:12 128:21
  129:14,18 130:8
  132:14
plaza 5:19
pleadings 106:3
please 20:20,22
  42:17 50:16
plumbing 22:25
  23:22 60:19,22,23
  60:24 66:4 115:18
point 7:11 9:2
  58:11 70:2 74:14
  75:7 78:19 79:24
  80:2 81:19 82:1
  83:3 90:13 91:10
  93:10 94:15 95:1
  95:1,2 98:7,12
  99:1 101:15 109:8
  109:21 110:4
  111:20 121:23
  135:2
pointed 31:6
points 119:4
  133:10
portfolio 55:18
portion 9:4 12:2
  48:12 55:12 58:21
  95:22 98:23
portions 114:10
position 12:5
  91:15,19 135:3
possession 5:3
  53:17 57:3

possibility 123:2
possible 36:16
  80:19 106:11
  129:3
post 15:23 75:12
  125:1,3 134:9
potential 132:18
potentially 15:16
  90:19
power 127:4
practical 69:4
pre 36:11 80:17
  128:23
preapproved
  106:8
preclude 121:2,3
precluded 96:11
prefer 48:4
preference 6:13
preferred 47:25
prejudicial 15:16
premise 56:16
  121:25
premised 71:16
premises 67:11
  92:5,10 113:4
  114:9 128:5
prepared 19:25
  54:10 57:17 72:13
  91:20 119:7
prepetition
  111:23
present 11:14
  19:25 55:21 87:6
  121:7
presented 15:10
  93:4 100:10
preserves 75:13
presumably 7:5
  8:3 10:10,11
  113:4
pretty 109:20

**preventing** 99:8
**previous** 68:15
**previously** 16:3
**principle** 126:22
**print** 30:25
**prior** 45:5,15 53:1
  67:6 79:19 82:17
  91:25 105:5
  111:10 114:14
**probably** 35:11
  38:24 40:12 41:1
  65:15 67:16 75:14
**probative** 9:22
**problem** 67:20
**problematic** 7:24
**procedural** 8:12
  10:7
**procedurally** 9:7
  9:24 13:22
**procedures** 107:2
  111:13 129:23
**proceed** 25:9 26:3
  37:22 107:1,9
  129:22 131:5,12
  132:2,8
**proceeding** 46:22
  49:16
**proceedings**
  137:10 139:5
**process** 39:15
**produce** 10:19
**produced** 9:1 12:1
  12:18 15:1,25
  16:2,3 31:1
**product** 31:18
**program** 85:3
**progress** 55:8
**prohibit** 83:17
  126:14
**prohibited** 83:12
**prohibits** 128:14
**project** 39:17,21
  41:22,23,24 43:13

43:18,24 49:9
  50:12,15,18,20,21
  55:16 56:9 61:19
  61:24 82:9,18
  84:23 86:21
  102:22 103:4
  109:2
**projects** 42:22,22
  58:9 61:20 80:8
  115:17 118:25
**promises** 39:19
**prompted** 114:5
**pronounce** 76:25
**proof** 92:13
  102:17
**proper** 55:22 57:9
  58:2 74:11
**properly** 112:1,1
**property** 3:6,13
  48:17,25 50:19
  55:9,14 57:22
  100:24 101:3
  111:5 112:6 113:7
  113:8 130:4
**proposal** 84:3
  98:13 107:12,25
  108:2,21 129:8
  130:13,25 131:3,8
  131:15 132:5,7,9
  132:13
**propose** 105:15
**proposed** 39:13
  103:23 111:11
**proposing** 101:2
**prosecuting** 85:2
**prospective**
  132:21
**protocol** 36:13
  80:18,25 84:2,9
  104:16,18 106:9
  106:14 108:14
  115:14 128:24
  129:6 131:13

**protocols** 39:19
  115:3
**prove** 92:21
**provide** 30:1
  57:25 64:13 81:8
  86:2 104:1,4
  106:15,24 107:12
  116:21 120:5
  129:10,19 133:5
  136:4
**provided** 8:4
  10:16 24:12 32:25
  34:15,17,22 41:9
  68:12 107:2 122:3
  129:23
**provides** 18:23,25
  57:1 58:8 61:23
  68:17 79:12 80:14
  81:13 84:16 114:7
  116:14 129:6
**providing** 136:2
**provision** 25:12
  25:14 68:14,16
  69:3,9 70:13,17
  73:23,25 76:8,10
  76:11,12 77:18
  83:4,25 94:1
  97:25 101:8 108:8
  108:9,15 115:22
  115:22 116:1,17
  124:17
**provisions** 82:1
  98:5,6 126:18
**pull** 36:3 77:11,13
  80:11 84:22
**pulled** 32:15
  36:19 50:24,24
  103:9 104:6
**pulling** 51:17,18
  78:7 80:13 104:5
**purchase** 56:18
**purpose** 83:13
  90:5,11 126:13

127:5 134:21
  135:10
**purposes** 75:21
**pursuant** 36:12
  68:25 80:17 106:8
  115:13 128:23
**pursue** 39:21
**put** 39:18 40:20
  41:24 42:23 48:15
  58:12 59:24 60:13
  62:14 63:19 65:3
  79:25 94:5 103:24
  110:19
**putative** 101:9

## q

**qualify** 13:3 93:21
  94:8
**quantum** 75:11
  102:19 120:16,18
  121:2 122:22,24
  134:4
**quarropas** 1:17
**quarter** 58:25
**question** 24:7
  25:11 26:2 42:16
  44:2 45:10,14
  46:13 50:17 52:25
  53:3,3 61:16
  62:25 63:19 64:24
  71:12 83:23 86:9
  86:12 102:12,13
  107:1,3 115:14
  118:2 129:22,24
  131:12
**question's** 16:18
**questioning** 50:13
**questions** 9:3
  44:15 45:4 54:3
  87:4 109:22
**quick** 7:6
**quickly** 7:1 12:12
**quit** 49:21

**quite**  58:4 98:4
  107:11
**quote**  13:10 90:11
  94:5
**quoted**  94:3
  115:20 129:8
  130:5

---

**r**

**r**  1:23 5:1 6:1
  125:23 138:3
  139:1
**raise**  20:19
**raised**  11:18
  13:17 69:12 112:8
**rdd**  1:4 2:1
**reach**  39:18 50:7
  55:9
**reached**  87:20
  137:4,4
**reaching**  51:13
**read**  10:20 42:16
  42:16 43:5 44:5
  58:11 69:2 82:12
  83:16,20,20 90:8
  98:7 100:10
  126:14
**reading**  73:19,20
  130:7
**ready**  48:19 65:2
  84:18
**real**  3:6,12 12:2,6
  12:21 99:22
  108:25 109:4,9
  111:5 119:4
  127:13 130:4
  134:18
**realistically**  108:7
**really**  7:19,23
  10:5 14:20 15:10
  15:15 17:8,22
  62:8 66:2 68:3
  70:6 74:23 76:4
  77:19 89:4 90:6

98:17 99:13 104:9
  107:23 108:5,7,23
  121:21 134:12,14
  134:17 135:18,23
**reason**  29:16,19
  41:25 57:14 71:1
  79:20 108:16
  114:15
**reasonable**  59:12
  60:11,12 63:3
  107:16 116:22
  127:8,11,15,21
  130:23
**reasonableness**
  127:15
**reasonably**
  113:16 119:13
**recall**  21:10
**receipt**  106:22
  129:17
**receive**  9:1 48:23
**received**  6:21 8:8
  10:12 19:12,17,20
  22:8,11 29:13
  43:15 54:23
  131:11
**receiving**  50:14
**recital**  128:10
**recitals**  114:1
**recognized**
  126:13
**recognizes**  13:5
**recommend**  50:2
**recommendation**
  48:1
**reconfiguring**
  114:19
**record**  19:7 20:23
  40:21 54:13 62:8
  63:16 64:2 65:4
  70:6 74:24 75:9
  79:11 82:24 84:20
  85:16 86:10

118:22 122:14
  130:2,12 139:4
**record's**  77:13
**recover**  34:12
  85:3
**recross**  51:20,22
**redevelopment**
  55:16 105:7
**redirect**  44:19
  45:2 54:4
**refer**  21:2,5 66:2
  66:23 133:12,16
**reference**  30:24
  94:5 127:11
**referenced**  15:11
  15:12,21,21
  115:19
**referencing**  30:20
**referred**  93:10
  105:15,21 128:25
**referring**  78:12
  93:2
**refers**  112:12
  132:12
**reflect**  125:3
**refund**  71:21
  121:17
**refusing**  105:18
**regard**  45:5,8
  47:21 48:24
**regarding**  64:24
  105:6 118:1
  126:16
**regards**  49:14
**regular**  45:18
  92:1
**rehabilitation**
  50:19 105:7 113:8
**rehired**  50:1
**reimburse**  113:3
  117:10
**reimbursed**  46:10
  67:9 92:6

**reimbursement**
  16:14 87:25 112:6
  133:10 138:8
**reimbursements**
  112:2
**rejected**  131:1
**rejecting**  132:11
**rejection**  3:5,12
  132:6,11 135:4
**related**  22:25
  23:21 38:4,7 80:7
  130:4
**relates**  7:10 8:1
  10:2 24:22 32:20
  68:5 85:18
**relating**  138:18
**relatively**  73:10
  123:7 125:1
**release**  119:22,24
**released**  24:25
  58:17 61:2,25
  69:20 115:24
  117:16 118:8,9
  120:6 122:2
**relevance**  117:12
**relevant**  11:17
  17:19 58:20 78:20
  78:22 94:7 116:9
**reliable**  7:9,14
  10:13
**reliance**  92:8
**relied**  10:22
**relocated**  48:12
**reluctant**  133:22
**rely**  9:4 15:18
  70:13 74:23 93:17
**relying**  9:3 47:9
  99:23
**remain**  39:14
  116:11
**remainder**  24:24
  61:1,25 66:16
  91:21 117:15

118:7
**remaining** 17:18
25:16 64:22 65:25
66:4 71:18 88:11
98:22 99:22 112:3
112:12,22,25
113:2 117:12,24
118:9 119:8,24
121:17
**remains** 100:12
**remarks** 32:3,5
**remediation**
36:11 80:16 81:13
106:7,16,21 107:8
128:22 129:11,16
130:10 132:1,22
133:1
**remember** 29:17
42:3
**removal** 106:16
129:11
**renew** 40:3
**renovation** 49:9
50:19 132:22
**renovations** 113:7
**repair** 24:16 59:2
59:19 60:2 89:19
116:17 117:1
**repairs** 35:24
80:10 128:4,8,11
128:18
**repeat** 38:6 47:22
50:16
**repeated** 78:9
85:24 124:3
**repeatedly** 50:8
51:14
**rephrase** 45:10,13
46:14 47:13
**replacements**
128:18
**reply** 3:15,20,20
4:2,2 12:25 13:5

49:22 65:22 93:25
106:25 108:7
129:20 131:10
**reported** 83:15
**reporter** 42:8
**represent** 29:14
31:3
**representation**
29:16,19 31:4
**representations**
47:9 92:8
**representative**
26:10 49:14 95:18
**representatives**
12:13 45:7,17,23
**request** 10:17,18
10:21 11:10,21
47:24 59:13 60:12
68:4 92:4 95:20
116:24 125:9
**requested** 117:8
**requests** 11:9,12
47:21 92:8
**required** 59:19
117:2 118:3,25
119:9,16 120:2,10
120:14,20 121:19
128:19 130:10
133:4
**requirement**
105:17 127:15
135:11
**requirements**
109:7
**requires** 120:25
136:1
**reservation** 2:12
2:18
**reserved** 86:23
**residual** 122:7
**resolution** 55:9
126:1

**resolve** 55:6 87:16
123:21
**respect** 11:4 15:9
15:19 17:17 45:16
46:17 47:23 49:9
50:12 60:8 87:21
95:8,9 111:21
112:5,19 113:11
114:4 115:17
124:3 130:4 131:7
134:24
**respects** 11:7
133:11
**respond** 40:8
81:14 82:23
113:17 130:18
**responded** 82:11
107:24 131:17
**responding**
107:25 109:8,11
**response** 39:8,10
39:22 40:1,10,12
40:13,15,16,22
48:24 50:9 75:5
82:14,18,19,24
84:6,8 105:18
107:21,22 108:3
109:1,1 131:4,15
131:21
**responsibilities**
56:21
**responsible** 35:13
35:15,24 80:7,10
110:5,13 111:20
112:5 128:3
132:21
**responsive** 9:20
**rest** 15:2 72:23
73:5
**restated** 111:4
112:15 113:25
119:2,17 127:23
130:24

**restatement** 114:6
114:21
**resubmit** 57:18
**result** 135:3,4
**resulting** 57:5
**retrofit** 35:10
36:20 48:1 51:5
79:16 85:18
**return** 55:25
67:24 70:25 71:18
72:23 73:4 85:10
85:14 99:21
100:11 110:17
**returned** 91:21
**review** 25:18
29:17 64:23 118:1
**reviewed** 16:5
28:25 92:24
115:12
**riddled** 39:17
**right** 6:2 10:15
13:8,13 14:4,6,15
14:22 15:14,23
16:7 17:8,19 18:3
18:5,11,18 19:4
20:17,19 22:6
31:9 32:22 38:17
54:18 59:22 60:5
60:7,21 62:2,6,10
63:25 64:6 65:9,9
65:19,21 66:8,10
66:15,17 67:3,11
67:18,23 68:1,24
69:1,24 70:15
72:18 73:3,15
74:7,12,16 75:10
75:13,19 76:13,14
76:23 77:20 81:4
81:7 87:23 88:14
88:22 89:7 90:2
91:18,23 94:23,24
94:25 95:14 96:4
96:23 97:10 98:1

98:24 99:4,14,16
99:21 100:4,9,12
100:21,24 101:20
101:24 102:16
103:4,6,13 104:2
105:8,11 110:7,25
111:3 119:24
120:15,17,17
126:18 127:1
134:5 135:5 136:9
137:6
**rights** 2:13,18
13:17 68:21 77:17
86:23 98:9 114:12
116:2 123:13
127:5 131:7
**ripe** 62:12
**risk** 39:18 56:10
109:9
**risks** 82:9
**river** 2:9,15,21
3:4,11 11:2 21:5
**road** 139:21
**robert** 1:24
**roebuck** 111:3
**roof** 98:19
**rooftop** 98:19
**room** 1:17 48:10
48:13 84:13
**route** 71:1
**rule** 7:5 12:24
17:1 86:1 123:16
123:20 126:16,22
**rules** 10:14
108:18
**ruling** 86:2 110:3
110:16 111:21
131:15 133:17
134:20 135:22
**rulings** 54:20
**run** 103:15

**s**

**s** 5:1,15 6:1 20:25
25:2,17 138:3,11
**sachs** 127:21
**sale** 55:13 128:15
**salvage** 43:2
**sand** 79:25
**satisfied** 100:8
**satisfy** 86:16
**satisfying** 104:23
**saturday** 53:25
**saw** 13:25 40:7
86:6
**saying** 52:18,25
66:23 67:8 70:8
88:14 89:9 90:25
92:11,14 96:18
99:2 100:10,11,12
100:15
**says** 16:20 31:25
33:12 34:13 37:4
39:10 49:24 50:2
53:4 59:11 60:10
60:15 61:6 64:19
65:1,4,5,6,7,10,13
66:3,20 70:10,17
77:6 79:18 81:8
83:11 84:1,25
88:5,10,11 89:17
90:7,10 96:6,22
99:23 101:5 106:5
108:4 128:3
**schedule** 3:13
80:15 81:12 106:6
106:20 107:7
128:21 129:15
131:25
**scheduled** 130:9
**schedules** 36:10
**scope** 37:9,11
81:10 83:11
106:18 107:6
129:13 131:24

**se** 120:24
**seal** 39:4
**sear's** 84:7
**sears** 1:10 2:1 6:2
11:19,19 12:5
24:5 28:19,19
30:5,7,12,15,15
30:21 31:19 33:12
34:1,4,6,10,14
35:3 36:23 37:4
37:22 38:18 45:6
45:7,16,18,23
46:6,9 47:9,20,24
48:9,12,16,17,21
48:21,22,24 49:4
49:5,10,13,13,14
49:16,18,23 50:7
50:9,10 51:4,5,7,8
51:11,14 52:13,16
52:23 53:1,6,8
55:18,21 62:13,24
63:6,11,16,24
64:3,14 65:3 67:6
67:12 79:5,25
81:25 82:3 84:4,7
84:12,24 85:3
86:7 87:18,24
88:9,18,18 92:1
93:5,10,19 95:18
95:23 98:25 99:7
102:10 103:10,24
104:3,5 105:5,6
105:14,19,22
108:1,5 109:11
111:3,11,19 112:5
113:9 119:3,7,14
119:15 130:3,16
131:17,22 132:6
132:25 133:4,20
134:6,9 135:18,19
**sears's** 119:10
**season** 128:15

**second** 7:10 8:2
21:10 23:2 37:20
56:6 57:21 59:10
66:17,18 70:10
88:10 120:2
121:19 125:17
**secondly** 112:24
113:5 119:3
122:25
**section** 24:20
73:23 79:24 80:14
84:2 88:7 104:16
106:4,14 107:24
111:18 112:14
113:11 114:7,23
115:6,20,22,23
117:11,13 118:16
118:19 119:1,9,17
120:3,4,11,25
121:9,20 122:1
123:4,5 125:5
128:13,14,16
129:1,2,7,8,9
130:5,10 131:9,16
131:22
**sections** 24:22
60:17 61:9,18
64:20 66:19 115:5
117:14,22 118:4
**secure** 24:15 59:1
89:19 90:5 116:17
120:20 134:22,23
**secured** 90:22
**securing** 89:24
**security** 78:7
**see** 11:21 23:5,5
23:10,11,15 27:13
30:25 33:4 51:3
53:12 86:15 94:14
94:15 103:17
104:4,22 108:19
127:12,21 136:4

**seeing** 104:8
**seek** 58:18
**seeking** 34:12
**seeks** 16:14 55:24
**seen** 37:3 109:18
**segregate** 101:5
**seismic** 23:22
  31:17 32:12,15,20
  35:10,23,24 36:11
  36:19 47:25 48:4
  51:5 59:7 68:9
  75:22 77:8,10,21
  77:24 78:21 79:16
  80:9,10,16 85:18
  89:22,25 95:10
  98:14 99:4,9,24
  100:2 106:4,7
  113:11 115:18
  119:8 125:11,13
  128:2,4,7,11,17
  128:18,23 133:1
**sellers** 3:2,9
**send** 51:17
**sent** 8:24 26:17
  28:19 30:7 36:22
  39:6 52:21 53:6,8
  111:11
**sentence** 64:19
  66:17,18 69:19
  70:10 88:11
  118:18 119:22
  120:3,4 121:19
  122:1,4 123:4
**separate** 90:13
  91:10 108:11
  115:25
**separately** 77:24
**september** 32:21
  36:23 41:8,11,14
  81:20 84:4 104:23
  107:14 130:2,15
  131:15

**serious** 10:6
  126:11
**serve** 16:7
**served** 8:6
**service** 60:19
  115:18
**services** 22:25
  79:8 136:2,4
**set** 12:25 13:25
  18:24 28:14 37:9
  72:16,17 81:10
  89:13 105:9 106:7
  106:19 107:13
  111:13 113:24
  114:12 115:8,9
  116:16 117:6,7
  118:18 122:16
  128:1 129:13
  130:8 131:17
  132:14,15,18
**sets** 58:25 111:24
  114:22 119:10
  123:23
**setting** 3:13 37:15
**settle** 136:12
**share** 48:8
**sharefile** 12:17
**shaw** 49:13,14,20
  49:20,22
**sheet** 42:21
**shocking** 49:4
**shomof** 2:8,8,13
  2:13,17,19,19 3:2
  3:2,9,9 4:1 11:2
  11:14 12:15 15:11
  15:22 19:25 20:15
  20:21,25,25 21:1
  21:3,3 22:8,10,19
  22:24 23:3,20
  24:7,10,20 25:5,8
  25:11,20 26:1,6
  26:14,15,21,22,24
  27:3,12,16,18,22

28:3,8,13,21,23
  29:3,8,14,21 30:4
  30:13,19 31:1,3
  31:25 32:25 33:1
  34:9,12,15,22
  35:2,7,10,12
  36:19 37:2,16,21
  38:1,5,8,13,17
  39:3,5,25 40:4,11
  40:14,19,24 41:9
  41:16,20,20 42:2
  42:4,12,15,18
  43:5,8,20,25 44:2
  44:9 45:4 51:24
  52:7,9 53:3,14,16
  53:21,24 54:1
  87:8,11 91:25
  103:8 105:21
  138:21,24
**shomof's** 11:13
  22:7 65:21 105:10
**shot** 109:7
**show** 11:17 44:13
  48:18 75:15 94:9
  102:4 125:14
**showed** 34:19
  93:18
**showing** 52:4
  118:23
**shown** 114:11
  124:15,16
**shows** 16:12,13
  17:10 88:2 92:7
  93:20
**shut** 38:19 81:25
  82:4 84:4
**shutting** 84:25
**sic** 27:5 61:1,25
**side** 13:16 82:15
  137:2
**signage** 23:1,22
  24:23 48:14 60:20
  60:25 115:18

**signed** 26:9,12
  84:19 115:25
  119:16
**significant** 9:4
  132:13
**silence** 108:1
**simply** 71:18
  79:25 81:16
**single** 30:6 43:23
**sir** 54:6
**site** 114:11
**sitting** 21:13 34:4
  37:24
**situation** 96:14
  98:9
**situations** 127:3
**six** 38:19 41:18
  81:25 82:5 84:5
  84:25 105:16
**size** 37:23,24
**skaw** 4:25 139:3
  139:14
**small** 30:25 31:10
  73:10 123:7 125:1
**sole** 79:20 114:15
  114:25
**solutions** 139:20
**son** 36:22 40:6
**soon** 136:16
**sorry** 9:17 19:16
  20:11 23:3 26:21
  31:1 32:4 33:13
  33:14 37:16 41:2
  45:13,13 66:2
  67:2 72:3,5 74:20
  74:25 78:11,12,16
  110:1 111:6 113:1
  114:3 117:6 118:8
  127:12 133:14,19
  136:3
**sort** 45:6 91:4
  133:6

sorted  134:25
sought  57:11
  130:19
soul  42:23
sounds  32:2 97:17
  109:18
source  18:6 123:2
  125:24 136:9
sourced  10:5
sourcing  10:13
south  5:11 57:22
southern  1:3
space  48:9,12,16
  51:13 83:22
spaces  114:20
speak  31:23 45:12
  87:10 110:21
speaking  17:11
speaks  83:1 84:8
specific  18:10
  106:4 115:17
  116:6
specifically  68:12
  88:23 125:5
  128:15
specification
  128:21
specifications
  36:9 80:15 81:11
  81:22 106:6,19,24
  107:13 115:12
  129:14,19 130:8
  132:14
specifics  38:8
specified  87:25
  89:16 102:6
  132:18
specify  108:20
specifying  48:3
speculative  56:8
  85:6,7
spell  20:22

spelled  94:13
  109:5 131:6
spend  62:24 88:18
spent  70:7 133:23
spirit  39:11
spoke  48:3
spoken  32:1,5
stamp  27:9,15
stand  20:17 37:24
  72:1,4 82:20
  86:12 87:8
standpoint  10:7
start  9:9 22:21
  37:15 38:3,9 40:2
  50:25 51:7,10
  53:22 54:21 58:6
  77:12 80:2 86:8
  107:14 125:13
  130:16,18
started  44:13
  68:10 77:10
starting  42:15
  80:1
state  85:9 117:21
  119:7 131:21
  135:9
stated  82:16 91:25
  92:20 94:12 113:5
  113:20 114:1
  122:19
statement  2:4
  120:19
states  1:2,16 40:1
  81:9 92:7 94:23
  95:2 106:14
  115:23 117:13
  119:4 129:9
  131:23
stating  114:25
status  48:5 50:12
  50:14,18,23
steadfast  125:23

steen  5:17
step  54:6,7 102:25
  106:10
steve  40:18 49:12
  49:13,19,23,24
  50:1,2,10
stipulation  3:1,8
stop  25:7 47:12
  86:3
store  2:7,13,18
  3:16,22 4:3 21:8
  31:19 55:11,16
  82:3 96:1 98:18
  98:20,21 105:16
storek  83:10,10
  83:10 127:12,12
stores  55:18
strategy  38:3,4,7
street  1:17
stretch  58:4 99:22
strictly  87:25
  89:15
strong  86:17
stuck  109:12,13
subcontract  63:16
subcontractors
  70:4 112:20 123:9
subject  25:18
  55:13,14 64:17,23
  115:6 118:1
  126:17 128:12
submit  78:25
submitted  7:5,8
  21:1,6 27:20 30:9
  30:15 37:23 51:24
  52:2,3,4 53:4 71:5
  73:13,14
subparagraph
  24:19
subsection  66:7
subsequent  12:15
subsequently
  26:17

substance  12:21
  45:20
substantial
  112:17,18 117:9
  126:4 127:25
substantive  14:21
  48:23 50:9 87:19
  105:18
successful  56:15
  114:9
sufficient  122:17
  124:23 125:14
suggest  130:12
suite  5:12 139:22
sulmeyer  5:9
sulmeyerkupetz
  11:1
sum  112:18,21
summarize  7:1
  19:8 104:21
summary  7:4 10:2
  10:8 15:10 19:6
  122:12 125:24
  138:18
supplement  13:2
  13:7,10,11 86:24
  93:21 94:8
supplemental
  2:12,18 10:9
  13:24 18:22,24
  22:10 112:11
  113:12,12 138:23
supplemented
  87:1
supplements
  124:10
support  2:17 3:15
  3:21 4:1,2 10:22
  21:2,6 33:3 51:25
  65:22 70:6 73:9
  93:6 118:21
  122:17 134:19

**supported** 85:17 127:7

**supposed** 131:2

**supreme** 83:11

**sure** 10:12 11:23 19:4 29:10,11 35:5 41:17 44:23 53:12 54:12 58:23 69:17 134:7

**surreply** 8:5

**sustained** 75:9,15

**swore** 29:5 42:10

**sworn** 20:21

**t**

**t** 68:25 138:11 139:1,1

**tab** 22:22 23:3 24:11 26:21,21,22 26:22 27:3,13,22 27:22 28:3,8 30:19 32:25 33:14 35:11,20 36:25 37:8 39:5 42:2

**table** 34:4

**tabs** 20:7

**take** 20:17 36:2 64:14 69:8 100:6 100:21,25 101:5 110:19

**taken** 9:19 17:12 110:18

**takes** 69:9

**talk** 13:9 40:19 58:5 68:2,4 71:5 78:6 93:13

**talked** 78:6 85:7

**talking** 30:7,18 43:24 49:15 52:1 52:6 82:15 91:2,2 91:12 99:13,14 103:1,14 134:22

**talks** 69:19 93:9 94:1,3 105:22

**tandem** 119:8

**tax** 55:15 56:10 112:2,6 133:10 138:8

**taxes** 57:22

**technical** 73:19

**technically** 60:22 60:24

**telephone** 92:3

**telephonically** 5:7

**television** 126:9

**tell** 15:16 42:10 49:17 100:3

**ten** 106:22 107:14 108:3 129:17 131:9

**tenable** 132:23

**tenant** 16:19 18:16 24:12,25 25:1,2,6,6,9,16,21 25:25 26:10,17,17 36:12,17,23 39:6 39:8 56:16 57:13 58:17,18 59:11,16 59:20 61:2,3,4,25 62:1,4 63:1,4,5 64:22 66:16,23 67:2 68:8,10 69:5 69:6,20,21,24 71:2 73:21 74:1 78:4,24,25 80:17 80:20 81:14 82:8 82:16 83:5,22 84:12,16 88:1 97:3 99:18 100:17 100:21 106:8,12 106:22,25 107:3,4 107:5,10 111:18 112:21 113:1,14 113:16 114:10 115:13 117:6,7,16 117:17,18,24 118:8,9,10,13,14

120:6 121:11,25 122:2,5,6 123:12 125:4,6,18 128:23 129:4,17,20,24,25 131:4,9,10,11,23 132:3,20 135:20 136:2

**tenant's** 24:25 58:17 61:3 62:1 63:1,4 69:20 76:14 79:19,21,22 92:8 100:22 114:9 117:17 120:6 131:7 132:8

**tenants** 114:11,14 114:17,18 116:22

**term** 94:9 124:17 124:17

**terminate** 108:16

**termination** 132:21

**terms** 13:3,22 49:17 59:20 69:14 83:8,13,19,21,21 87:18 89:8 93:22 94:8 97:14 98:3 99:19 102:22 103:21,22 104:5,6 104:12,12 114:4 115:6 116:13 120:21 124:9,14 124:24 126:23,23 128:13 132:22 133:5

**testified** 30:13 41:8,10,21 43:8 52:9,12 53:16 92:22 103:8

**testify** 62:23

**testifying** 47:10

**testimony** 17:9 20:2 21:14,15,19 22:4,7 54:14

63:10 64:25 65:5 84:19 85:20,22 86:13 89:13 91:24 92:7 93:9 132:24

**testimony's** 81:22

**thank** 15:4 17:3 19:21,23 22:15 26:14 30:17 44:20 44:24 45:1 51:19 75:6 109:24 135:14,21 136:11 137:7,8,9

**thereof** 79:23 114:18

**thing** 50:2 71:3 81:19 89:22 100:19

**things** 63:8 67:7 69:5 71:2 95:23 99:14 107:17 108:13

**think** 7:8 8:11 9:6 9:22 10:3,6 12:10 13:23 15:23 16:1 16:17 17:4,13,13 17:17,21,24 18:1 18:7,9,12,13 19:4 26:5 31:22 41:14 41:17 45:14 61:11 62:7,11 65:20 67:14 68:2,5,13 68:20 69:9 73:20 75:3,4 76:3,5 81:2 82:25 83:9 84:7 85:5,9 86:16,17 87:13 90:6,15 97:22,23 98:3,10 99:17 100:24 102:18 103:20 107:20 109:14,23 110:15

**thinks** 82:22

**third**  30:10 34:10
  34:11 60:9
**thirty**  59:13
**thorough**  7:20
**thousand**  63:13
**three**  16:6 30:4
  52:1 58:25 111:24
**ticking**  107:15
**tie**  98:13
**tied**  7:23 55:15
**ties**  10:11,11
**time**  3:4,11 8:5
  11:16 12:2,3
  13:17 31:17 42:10
  43:8 44:15 48:20
  50:1 54:11 59:12
  60:11,12 66:5,7
  68:16,18 95:20
  100:22 101:16
  116:22 118:12
  120:14,25 128:19
  133:23
**timed**  77:24
**timeframes**  100:5
**timeline**  37:19,20
  38:17,18,21 39:14
  81:24
**timely**  25:15
  58:14 64:21 66:17
  66:20,23 67:9
  70:11 76:17 77:14
  90:17 98:3 107:5
  112:11 113:12
  117:23 120:2
  131:23
**times**  49:15
**timing**  8:22 12:10
  14:18 39:20 47:21
  132:14
**title**  59:15,15
**today**  21:13 42:19
  55:10 58:4 73:16
  78:23 79:4 82:21

85:20,22,24 86:1
  93:8 101:11
  102:18 110:9
  111:21 118:6
  121:18 134:7
  136:19
**told**  40:3 51:8
  92:12
**tomorrow**  53:20
  53:22,24 100:21
  101:16 118:15
**top**  23:5,8,10,11
  32:20 39:7 81:2
**touch**  78:3
**track**  119:8
**transaction**  124:3
**transcribed**  4:25
**transcript**  42:3
  139:4
**transfers**  10:3,3
  134:8 138:19
**transform**  3:15,20
  4:2 5:18 6:5 12:5
  12:19 49:7 54:15
  55:3,6,6 57:3,17
  57:25 71:13 86:2
  87:18,22 110:5,18
  111:1,12,19,25
  112:4 134:12
  135:20 137:4
**transform's**  11:10
  11:12 55:17
  110:22
**treated**  131:1
**tried**  40:20 49:19
  87:16 104:19
**trigger**  131:21
  132:8
**trouble**  75:3
**true**  68:3 84:6
  86:14 106:3 139:4
**trust**  2:8,14,20 3:3
  3:10 11:2 21:4

**trustee**  57:2
**truth**  42:10
**try**  50:7 51:14
  55:1 56:7 84:15
  85:3 98:8 107:17
  136:25
**trying**  34:4 42:21
  62:17 87:5 93:16
**turn**  24:10,19
  26:21 27:3,12,22
  28:3 32:24 35:10
  39:25 42:2,12
  59:11 65:14
  116:22
**turning**  79:15
  129:5
**twice**  27:17 31:19
  99:4
**two**  6:14 17:7
  20:5 21:2,6 39:20
  55:19 57:8 71:22
  73:11 81:9 82:1
  82:17 87:1 95:22
  99:13 106:15
  111:25 112:9
  118:21 119:10
  129:10 133:10
**type**  48:24 107:12
  107:25 108:2
  110:10
**typical**  57:23

## u

**u**  138:3
**u.s.**  1:25
**u.s.a.**  127:21
**u.s.c.**  3:5 56:25
**uh**  22:16 106:1
**ultimate**  79:5
  95:22
**ultimately**  103:19
  103:22
**unacceptable**
  107:18 132:7

**unambiguous**
  56:2
**underlying**  15:17
  15:20 16:9,11,12
  92:25
**understand**  14:3
  47:3 61:21 62:21
  62:24 69:18 74:14
  88:25 91:8,16
  103:20 104:11
  135:8
**understanding**
  47:20 87:24 89:14
  93:14 96:10 137:3
**understood**  13:19
  13:21 15:7 30:6
  41:20 43:17 44:6
  61:19 62:18 67:10
  97:7,11 99:11
  110:20,21 130:15
**undisputed**  61:8
  116:6 118:3
**unenforceable**
  89:3,4
**unexpired**  57:2
**unfair**  90:15
**unfettered**  127:6
**unfortunately**
  55:8
**unique**  57:17
**united**  1:2,16
**units**  48:7
**unlettered**  114:24
**unnecessary**
  131:14
**unreasonably**
  102:7 107:10
  132:3,9
**unsecured**  134:8
**uploaded**  12:16
**urge**  136:25
**use**  14:13 15:1
  23:4 56:16 70:23

0177

73:21 79:22 85:2
97:24 112:25
113:2 114:10,18
125:6,25 128:6
**uses**  110:19
**usually**  82:23

**v**

**v**  125:23 126:8
127:12,21
**valid**  44:9 85:19
86:5 102:4,5
**various**  19:1
138:16,20
**vary**  59:25 83:20
104:12 126:23
**vast**  55:5
**vegas**  2:9,14,20
3:3,10 11:2 21:4
**velkei**  49:8,11,12
49:13,17 105:13
105:21,22 108:25
**velkei's**  131:18
**venture**  133:22
**verbal**  82:21
**veritext**  139:20
**vicinity**  128:5
**view**  50:14 72:16
85:9 93:13 94:17
101:21,21 135:2
**violate**  127:9
**visual**  36:16 80:20
106:11 129:3
**voltage**  22:25
23:21 24:23 60:19
115:17
**volumes**  83:1 84:8
**voluntarily**  97:15

**w**

**wait**  15:2 52:15
**waive**  68:18 77:17
94:14 125:15
**waived**  69:1 76:14
91:5,17 93:13

97:1 109:16
115:23 123:12
**waiver**  68:16,23
68:24,25 76:11,12
93:15 94:9,13
99:3 100:7,8
109:17 115:22
116:2 119:16
124:15,16,17,18
**waiving**  115:25
**walk**  58:22 103:21
105:1
**walking**  62:15
**walt**  126:8
**want**  9:4 16:20
20:14 21:15 22:21
31:20 32:11,24
37:22 40:7,8
41:24 42:23 51:3
61:8 62:23 68:4
69:6 73:23 74:19
74:22 75:2,7,20
76:20 77:7 78:25
83:2,3,5 87:13
90:18 96:15
102:21,23 109:19
134:6
**wanted**  48:1
64:15 67:17 108:1
110:22 133:24
**wants**  96:13
104:20
**water**  44:22
**waved**  98:9
**way**  9:23 11:9
43:2 45:21 52:5
57:16 85:3 89:8
96:18,24
**we've**  10:12 29:13
42:19 52:1 59:3
76:13 78:5 79:10
85:7 98:2 102:25

**weaver**  5:22 6:4,5
6:7,16,19,22,25
7:3,12,15,18 8:1
8:17 9:13,15 10:1
10:18 14:11,20,23
16:17,24 17:3,24
18:4,6,12,15
19:23 20:16 22:12
22:15,18 23:12,14
23:17,19 33:14,17
33:20,22 41:7
44:6,8,15 46:12
47:10 51:21,23
54:3,10,15 55:1,2
57:21 58:2,23
59:6,8,23 60:4,20
60:22,24 61:11,14
61:17 62:3,7,11
62:16,18,20,22
63:7,14,18 64:7
64:10,16 65:7,16
65:18,20,23 66:6
66:9,13,21,25
67:13,18,20,23
68:1 69:17,22
70:2,13,16,19,22
71:9 72:25 73:2,4
73:7,11,16 74:5,8
74:11,13,15,17
75:1,6,17,20,25
76:3,12,18,20,24
77:4,21,25 78:15
78:18 79:9,15
81:1,5,8 86:10,15
86:25 87:3 110:1
110:13,20 111:1,8
136:15,18,22
137:3,7
**week**  7:19 8:8
10:20 39:12
136:19
**weeks**  81:9 106:15
129:10

**weil**  5:2
**went**  14:4 28:18
49:4 84:12 85:4
93:11 116:21
**whatsoever**  49:5
49:22 79:23
114:19
**whisper**  87:12
**white**  1:18
**willing**  84:18
**win**  101:10
**windfall**  88:20
101:8 102:15
**wire**  10:2,3
138:18
**wished**  131:5
**withheld**  79:19
102:7 107:10
114:15 132:4,10
**witness**  6:13 9:21
20:21,24 21:12,16
21:20,22,24 22:1
22:3,5,13 23:15
33:16 41:5 44:21
44:24 45:1 46:21
54:7,9 64:25
78:13 86:13 89:13
**wolf**  126:8,12
**wondering**  52:8
**word**  43:13,23
66:17 76:16 98:3
**words**  31:25
96:16 117:5,7
**work**  16:13,16,18
22:25 23:21,22
24:1,3,8,21 25:1,4
25:7,7,9,15 26:3
30:8,10,11,11
31:17 32:15,16
34:19 35:23 36:6
36:11,15 37:9,11
40:2 45:21,24
46:7,11,16 47:6,8

47:15,21,23 48:5
48:15 51:25 52:25
56:3,5 58:14,18
59:7,19 60:3,16
61:3,6,9,10,11,24
62:5 63:1,6,16
64:15,20 65:1,4,8
65:13,24 66:3,4
66:11,12,19 67:7
67:8,11 68:9 69:5
69:6,11,25 70:23
71:16,20 72:9,12
72:22 73:4,22,24
74:2 75:12 77:8
77:16,22,23,24
78:21 80:1,9,12
80:17,21 81:10
85:13,15,15 88:8
88:19 89:12,16,25
89:25,25 90:16,21
90:23 91:20 92:4
92:10 93:18,20,20
95:10,10,15,20,22
96:1,24 97:4,12
98:8,13,14,17,18
98:22 99:4,8,9,11
99:12,15,18,20,22
99:24,25,25 100:2
100:16,18,24
101:10,23,24,25
102:5,19 103:3
104:15 106:5,8,16
106:18 107:1,3,7
107:17 112:19
113:10,11,12,18
113:21,23 114:2
114:22,23 115:1,4
115:14,16,18,19
116:6,20 117:2,11
117:14,17,20,22
118:3,10,16,23
119:6,8,9,15
120:1,7,9,13,21

120:24 121:12,18
122:5,6,16,18,19
123:8 124:25
125:2,2,4,6,10,11
125:13 127:25
128:2,14,23
129:11,13,22,24
131:12,25 132:9
133:1 134:3
135:17 136:19,25
**work's** 77:10
85:11
**worked** 13:22
30:12 55:6 61:20
**working** 11:19
130:3
**works** 95:16
**world** 86:18
108:25 109:4
**worse** 135:2
**write** 109:4
**writes** 32:19
**writing** 60:6
68:18 82:22,23
115:10,25
**written** 25:21,24
40:10,12,13,15,16
40:22 59:13,21
68:24 82:24 89:8
116:24 119:16
123:18 124:10
130:2
**wrote** 30:14 32:6

**x**

**x** 1:6,14 138:1,11

**y**

**y** 60:25
**yeah** 7:12 17:6,23
18:6 20:13 23:15
26:8 32:2,7 54:8
65:15 81:1 91:14
93:3 97:22 102:16
109:20

**year** 32:16,21
36:20 46:24 49:3
51:12 77:11,14
95:19
**york** 1:3,18 5:5,20
72:2

**z**

**z** 20:25
**zero** 14:1,2

# EXHIBIT B

*IN RE: SEARS HOLDING CORPORATION, et al.*

---

*IZEK SHOMOF*
*June 24, 2019*

---



*Original File 275743.txt*
*Min-U-Script® with Word Index*

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  -------------------------------------------------x
   In re:
4  SEARS HOLDING CORPORATION, et al.,
5          Debtors.
6  Chapter 11
7  Case No. 18-23538(RDD)
8  (Jointly Administered)
9  -------------------------------------------------x
10                  333 South Grand Avenue
                    Los Angeles, California
11
                    June 24, 2019
12                  11:08 a.m.
13
14          DEPOSITION OF IZEK SHOMOF, taken before
15  Donna J. Rudolph, RPR, Certified Shorthand Reporter,
16  in and for the State of California.
17
18
19
20
21
22
23      ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                REF:  275743

Page 2

1  A P P E A R A N C E S :
2
3  CLEARY GOTTLIEB STEEN & HAMILTON LLP
4  For SEARS HOLDING CORPORATION
5      One Liberty Plaza
6      New York, New York  10006
7  BY:  ANDREW WEAVER, ESQ.
8       KATE MASSEY
9       (212)225-2354
10      aweaver@cgsh.com
11      kmassey@cgsh.com
12
13  SULMEYER KUPETZ
14  For IZEK SHOMOF
15      333 South Grand Avenue, Suite 3400
16      Los Angeles, California  90071
17  BY:  DAVID S. KUPETZ, ESQ.
18       CLAIRE K. WU, ESQ.
19       (213)626-2311
20       dkupetz@sulmeyerlaw.com
21       ckwu@sulmeyerlaw.com
22
23  Also Present:
24      Jonathan Shomof
25      Ericson Alviz

Page 3

1  ------------------- I N D E X -------------------
2  WITNESS              EXAMINATION BY           PAGE
3  IZEK SHOMOF          MR. WEAVER            5, 119
4
5
6  --------------- E X H I B I T S ----------------
7  SHOMOF       DESCRIPTION                 FOR I.D.
8  Exhibit 1    Original Cure Objection          10
9  Exhibit 2    Supplemental Cure Objection and  12
10             Reservation of Rights (Store No.
11             1008)
12  Exhibit 3    Amended and Restated Building    16
13             Lease
14  Exhibit 4    Amended to Amended and Restated  19
15             Building Lease
16
17  Exhibit 5    Exhibit A to Original Cure       30
18             Objection
19  Exhibit 6    Exhibit D to Original Cure       34
20             Objection
21  Exhibit 7    Declaration of Izek Shomof       51
22  Exhibit 8    Email chain, Bates numbered      81
23             SK 6708 - 6784
24  Exhibit 9    Email chain, Bates numbered      87
25             SK 68008 - 6817

Page 4

1  ----------- E X H I B I T S (Cont'd) -----------
2  SHOMOF       DESCRIPTION                 FOR I.D.
3  Exhibit 10   Email chain, Bates numbered      93
4             SK 6818 - 6835
5  Exhibit 11   Jonathan Shomof letter, dated   102
6             9-25-18
7  Exhibit 12   E-mail, Bates numbered SK       105
8             6801 - 6802
9  Exhibit 13   Letter from Mark Cohen, dated   119
10             4-12-19
11  Exhibit 14   E-mail chain, Bates numbered    124
12             SK 6728 - 6731
13  Exhibit 15   E-mail chain, Bates numbered    127
14             SK 6905 - 6923
15  Exhibit 16   Letter from Balboa Financial    129
16             to Izek Shomof, dated 5-22-19
17  Exhibit 17   Bank OZK Closing Checklist,     133
18             revised 10-3-18
19  Exhibit 18   Letter entitled Bank of Ozarks, 139
20             Bates numbered SK 3117 - -397
21
22
23             (EXHIBITS TO BE PRODUCED)
24
25

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 185 of 238

IZEK SHOMOF
June 24, 2019

Page 5

1   LOS ANGELES, CALIFORNIA; MONDAY, JUNE 24, 2019
2                    11:08 A.M.
3
4              IZEK SHOMOF,
5   called as a witness, being first duly sworn to tell the
6     truth, the whole truth, and nothing but the truth,
7              testified as follows:
8
9              EXAMINATION
10  BY MR. WEAVER:
11     Q    Good morning, Mr. Shomof.
12     A    Good morning.
13     Q    My name is Andrew Weaver.  I'm with the law
14  firm Cleary Gottlieb Steen & Hamilton.  We are counsel
15  to Transform Holdco, the purchaser of certain assets of
16  Sears corporation out of Sears' bankruptcy.
17        Have you been deposed before?
18     A    Yes.
19     Q    How many times?
20     A    Few times.
21     Q    More than five?
22     A    I would say more than five, yeah.
23     Q    More than ten?
24     A    No.
25     Q    When was the last time you were deposed?

Page 6

1     A    Maybe five years ago.
2     Q    Just a reminder of some of the processes and
3   procedures for today.  It's important that you provide
4   verbal responses to my questions.  Head nods or verbal
5   sounds won't be reflected on the transcript.
6        It's important that we allow each other to
7   speak, so I will endeavor not to speak over you or
8   interrupt you.  And if you could wait until my questions
9   are done before answering, it will make our court
10  reporter's life much easier today.
11        Is there any reason today that you cannot
12  provide truthful testimony?
13     A    No.
14     Q    And, Mr. Shomof, I note that there are, in
15  addition to your counsel, additional folks in the room
16  today.  Can you please identify who those folks are and
17  their role.
18     A    Jonathan Shomof.  He's my son, but he works in
19  my office.  And Eric Alvarez is one of the associate in
20  our office.
21     Q    Mr. Shomof, today I'll be speaking about the
22  Boyle Heights property location in the Sears store and
23  referring just generally to this matter as "the
24  dispute," which is the cure objection that the landlords
25  have filed as part of the Sears bankruptcy.

Page 7

1        Is that okay if I just refer to it as "the
2   dispute"?
3     A    Yes.
4     Q    And it's a little bit complicated about who is
5   Sears in this instance.  There is pre-sale Sears, the
6   estate, the bankruptcy estate.  There is post-sale
7   Transform, the owner of Sears' assets.  But I think for
8   purposes of today's deposition, I can refer just to the
9   tenant as "Sears" for purposes of this discussion.  If
10  for any reason I need to differentiate, I will, as long
11  as that's okay with you.
12     A    So what you're saying is the overall
13  conversation, if you mention it, you're saying "Sears,"
14  it means --
15     Q    The tenant at the Boyle Heights property
16  location.
17     A    Got it.
18     Q    Whoever the actual owner of that --
19     A    That's it.  I understand.
20     Q    -- isn't necessarily relevant.
21     A    I understand.
22     Q    Unless it is, and I will clarify, if that
23  makes sense.
24     A    Got it.
25     Q    Okay.  And you are familiar, I assume, with

Page 8

1   the cure objections that have been filed in this dispute
2   as it relates to the -- the Boyle Heights property; is
3   that correct?
4     A    Yes.
5     Q    Okay.  And just so I'm clear, those cure
6   objections were filed on behalf of the Izek Shomof and
7   Eileen Shomof irrevocable children's trust dated
8   February 11, 1999; the Vegas Group, LLC; and East River
9   Group, LLC; is that correct?
10     A    Correct.
11     Q    Okay.  And those three comprise the landlord
12  for this property; is that correct?
13     A    Correct.
14     Q    So today when I refer to "landlord," I'm
15  referring to those three collectively, again, unless
16  there's a reason to differentiate.  Is that okay?
17     A    Sounds good.
18     Q    Okay.  Can you just briefly at a high level
19  explain interaction amongst those three entities, the
20  trust, the Vegas Group, and East River Group, and how
21  they relate to each other?
22     A    Vegas Group and East River Group are my other
23  companies.
24     Q    Okay.
25     A    The irrevocable trust is my family irrevocable

Page 9

1  trust.
2    Q   I see.
3        So the Vegas Group is one of your companies?
4    A   Yes, correct.
5    Q   What role do you have in the Vegas Group?
6    A   Maybe either secretary or president.  I'm not
7  sure exactly.
8    Q   Okay.  But is it a group that you control in
9  some way?
10   A   Yes.
11   Q   Okay.  And the East River Group, LLC, what
12  role do you have in that organization?
13   A   Same thing, either secretary or president or
14  one of them or maybe even two of them.  I'm not sure,
15  but yes, I do control it.
16   Q   Okay.  And then the -- the children's trust,
17  is that a personal trust, I assume, for your children?
18   A   Correct.
19   Q   Okay.  Are there any other landlords related
20  to the Boyle Heights property at issue today?
21   A   Not that I could think of.  I don't think so,
22  but I'm not 100 percent sure.
23   Q   And as part of the -- there -- there
24  were two objections filed in this bankruptcy, one an
25  original cure objection and then a supplemental cure

Page 10

1  objection.  Are you aware of that?
2    A   Yes.
3    Q   And you submitted a declaration in support of
4  the supplemental objection; is that correct?
5    A   Correct.
6    Q   And you did so as a representative of the
7  landlord; is that correct?
8    A   Correct.
9        MR. WEAVER: I want to start and mark as an
10  exhibit right away, which is the original cure
11  objection.  So we'll mark -- we'll mark this as Shomof
12  Number 1.
13       (Exhibit 1 marked.)
14  BY MR. WEAVER:
15   Q   Mr. Shomof, I have handed you a document
16  entitled "Objection to Cure Amount" for Store
17  Number 1008 filed by the landlords that we were just
18  discussing.
19       Do you see that?
20   A   Yes, I do.
21   Q   And are you familiar with this document?
22   A   Yes.
23   Q   If I could direct your attention to paragraph
24  six of this objection.
25   A   Yes.

Page 11

1    Q   Do you see there that it states the cure
2  amount currently due under the terms of the lease --
3    A   Yes.
4    Q   -- is an amount not less than $1,474,940.61?
5    A   Yes.
6    Q   And you see that's comprised of three
7  categories.  The first, CAM charges in the amount of
8  $5,270.31; property tax reimbursement in the amount of
9  $44,868.68; and remaining reimbursement balance for
10  Sears TI construction expense in the amount of
11  $1,424,801.62.
12       Do you see that?
13   A   Yes.
14   Q   And that is the total -- those three items
15  added together are the total amounts of cure in the
16  original objection filed by the landlords; correct?
17   A   Yes.
18   Q   Okay.
19       MR. KUPETZ: I would just note so that the
20  record is clear that there's a footnote right there.
21       MR. WEAVER: We're going to get to the second
22  objection right now.
23       MR. KUPETZ: Okay.
24       MR. WEAVER: I don't think there's any dispute
25  that there's a footnote, but thank you for pointing it

Page 12

1  out for the record.
2        MR. KUPETZ: Okay.
3        MR. WEAVER: I'm going to mark as Shomof 2
4  this document.
5        (Exhibit 2 marked.)
6  BY MR. WEAVER:
7    Q   Now, Mr. Shomof, I've handed you a document
8  entitled "Supplemental Cure Objection and Reservation Of
9  Rights (Store Number 1008)" filed, again, by the
10  landlords that we've been discussing.
11       Do you see that?
12   A   Yes.
13   Q   And are you familiar with this document?
14   A   Yes.
15   Q   And if I could turn your attention to
16  paragraph nine, you'll see that it states "Landlord
17  asserts there are additional cure claim amounts in the
18  sum of $5,696,046.02."
19       Do you see that?
20   A   Yes.
21   Q   And if you look over on paragraph 13, you'll
22  see a chart.  And that chart breaks down the
23  supplemental cure amount into three categories, one of
24  which is architects, engineers, and consultants in the
25  amount of $4,559,194.82; permit fees of $121,851.20; and

Page 13

1  contractors in the amount of $1,015,000.
2       Do you see that?
3    A   Yes.
4    Q   Looking at both the original and the
5  supplemental cure objection, the amounts that we've just
6  covered, are those the total amounts of cure that the
7  landlords are seeking in this dispute?
8    A   As of now, yes.
9    Q   Okay.  Are you aware of any other cure amounts
10  that the landlords may seek in this dispute?
11   A   Yes.
12   Q   What are the other cure amounts that they may
13  seek in this dispute?
14   A   Potentially huge losses that future profits
15  that it could have done if this thing would have gone
16  forward without -- without the negligent of Sears
17  refusing to negotiate -- or not refusing, not negotiated
18  at the time of their bankruptcy.
19   Q   Is there any other additional cure that the
20  landlords may consider seeking?
21   A   Not that come across my mind as of now.
22   Q   Do you have any -- have you quantified the
23  amount of potential future cure amounts that you just
24  described?
25   A   It's into the hundreds of millions of dollars.

Page 14

1    Q   Do you have anything more specific?
2    A   Not in -- not exactly, no.
3    Q   Generally?
4    A   750- maybe.
5    Q   Under the supplemental cure objection for the
6  supplemental cure amounts that the landlords are
7  seeking, what specifically has Sears not done that has
8  caused what you claim to be the 5 million-plus in cure
9  damages?
10   A   What they have not done.  Up until a week
11  before Sears filing for bankruptcy, we were negotiating
12  and talking about us starting construction and the
13  cooperation of Sears allowing construction to happen in
14  this space.
15   Q   Uh-huh.
16   A   And from that point on, at the time that they
17  declare for bankruptcy, all negotiation, all
18  conversation ceased.
19   Q   And by all conversations ceased, are you
20  referring to communications with Sears or a
21  representative regarding a construction timeline?
22   A   Construction timeline, allowing us to get into
23  Sears space to do what needs to be done in Sears space.
24  For example, we have done the HVAC.  Some of Sears'
25  equipment are located on the upper floor of Sears, the

Page 15

1  building, our building, and we were replacing the HVAC
2  units with a brand-new HVAC unit for Sears in order to
3  take out the old HVAC units from inside our building,
4  not where Sears' locations are, which Sears have
5  approximately 200,000 square feet.  It's above the
6  million 6,000 square feet that we own.
7       Their -- all -- all the equipment is situated
8  all along -- scattered all along the building.  We
9  started installing new HVAC units, all the exterior HVAC
10  units, the compressors, condenser, and all that stuff.
11  It's already been placed on the roof of the building.
12  But going inside to put the unit itself inside the
13  Sears, we are -- everything basically ceased of us going
14  in there and getting it done.
15   Q   Is there anything else Sears has failed to do
16  that has resulted in the cure amount that you're
17  claiming?
18   A   Beside ceased all negotiation?  I don't --
19  nothing can come across my mind as of now.
20   Q   We're going to come back to these, but we can
21  put those aside for the moment.
22   A   No problem.
23   Q   I want to go to -- which was Exhibit A to the
24  supplemental cure, which is The Amended and Restated
25  Building Lease from 2011, if I can show you that

Page 16

1  document.
2       MR. KUPETZ: And I -- I apologize, but is the
3  record clear that the two exhibits that have been
4  presented so far at -- for this deposition had exhibits
5  to them but those weren't included?
6       MR. WEAVER: You can clarify for the record.
7  We'll be looking at some of those exhibits today, but
8  we're not saying this is the entire submission.  It's
9  just the narrative part of the objections.
10      MR. KUPETZ: I apologize if you already went
11  through that, but I --
12      MR. WEAVER: It's not a problem.
13      MR. KUPETZ: But, you know, these were
14  understandably relatively thick documents, and now what
15  is being attached so far are the inversions that don't
16  include the exhibits.
17      MR. WEAVER: Trying to make it as workable as
18  possible with paper volume today.  But we are going to
19  talk about some of those exhibits.  But yes, you are
20  correct that the cure objection and supplemental cure
21  objection did have exhibits attached to them.
22      Mark this as Number 3.
23      (Exhibit 3 marked.)
24  BY MR. WEAVER:
25   Q   I'm handing you what's been marked as Exhibit

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al. Pg 188 of 238

IZEK SHOMOF
June 24, 2019

**Page 17**

1 Number 3, which is entitled the Amended and Restated
2 Building Lease by and between 1039 -- I'm sorry.
3 Repeat -- 10309 Folsom, F-o-l-s-o-m, Boulevard, LP, and
4 Sears, Roebuck and Co.
5        And if you turn to the page after the table of
6 contents, you'll see that the agreement is dated as of
7 May 5th, 2011.
8        Do you see that?
9    A   Yes.
10   Q   Are you familiar with this document?
11   A   Probably seen it in the past.
12   Q   Do you understand this document to be the
13 building lease between the landlords and Sears?
14   A   Yes.
15   Q   Understanding that there was a 2015 amendment
16 that we'll come to.
17   A   Correct.
18   Q   But this is the governing lease document --
19   A   Yes.
20   Q   -- to the extent it does not conflict with the
21 2015 amendment; is that correct?
22   A   Yes.
23   Q   Okay.  And this is still in effect today
24 subject to the amendment; is that correct?
25   A   Correct.

**Page 18**

1    Q   I just want to turn your attention to
2 section 2, little a3, which is on page 6 of the lease.
3        And looking at -- again, obviously, you can
4 look at any part of this document that you need to, but
5 I'm focusing particularly on paragraph -- subparagraph 3
6 in the middle of this page --
7    A   Uh-huh.
8    Q   -- which states "The parties acknowledge that
9 it is most critical to the successful operation of
10 tenant's building at the premise that tenant have
11 access, use, and enjoyment of those portions of the
12 building parcel shown on the site map as, quote,
13 'tenant's control area,' including such rights as set
14 forth below without tenant's prior approval, which may
15 be withheld for any or no reason in its sole discretion.
16        "Landlord shall not construct or install any
17 improvements or make any changes to tenant's control
18 area or interfere with or obstruct tenant's use thereof
19 in any manner whatsoever, including without limitation
20 the reconfiguration of parking spaces."
21        Do you see that provision of the lease?
22   A   Yes.
23   Q   Do you understand that that provision of the
24 lease is still active?
25   A   Yes.

**Page 19**

1        MR. WEAVER: I'd like to go now to -- again,
2 we're going to come back to all of them, but I want to
3 make sure we're all on the same page -- the -- what
4 would have been Exhibit C to the original cure, which is
5 the 2015 amendment.
6        We're up to Number 4?
7        THE REPORTER: Yes.
8        (Exhibit 4 marked.)
9 BY MR. WEAVER:
10   Q   I've handed you a document, Exhibit Number 4,
11 entitled "Amendment to Amended and Restated Building
12 Lease," and it notes in the preamble that it is made as
13 of December 30th, 2015.
14        Do you see that?
15   A   Uh-huh.
16   Q   Are you familiar with this document?
17   A   Probably have seen it.
18   Q   And is this the amendment entered into between
19 the landlord and Sears concerning the building lease we
20 just discussed?
21   A   Yes.
22   Q   Okay.  And I just want to make sure again
23 we're on the same page.  If you can turn to paragraph
24 15, which is on page 13 of the document, Bates Number
25 0023, you see a section entitled "Existing Agreements"?

**Page 20**

1    A   Yes.
2    Q   And you can read this full paragraph, but do
3 you agree that this paragraph states that the building
4 lease, which is Exhibit 3, still governs the
5 relationship of the parties, meaning the landlord and
6 Sears, provided that any rights or obligations under the
7 amendment, Exhibit 4, shall control the building lease
8 in the event of an expressed conflict?
9        Do you see that?
10   A   Yes.
11   Q   Okay.  So this makes clear that the building
12 lease, which was the Exhibit 3 we just looked at, is
13 still controlling as to amongst the parties unless
14 there's a conflict; correct?
15   A   I understand that.
16        MR. KUPETZ: Just an objection to the extent
17 you're asking for a legal conclusion.
18        MR. WEAVER: Understood.  I'm asking for his
19 understanding of what he understands governs the rights
20 of the parties.
21        THE WITNESS: Yes.
22 BY MR. WEAVER:
23   Q   But taking a look -- and we'll just turn back
24 to page 2 of this document, Exhibit Number 4.  And
25 you'll see on pages 2, 3, 4, and 5, there's a listing of

IN RE: SEARS HOLDING CORPORATION, et al.

IZEK SHOMOF
June 24, 2019

---

Page 21

1 different construction projects, replacement and
2 relocation of building systems, HVAC, plumbing,
3 et cetera.
4       Do you see that?
5    A   Yes.
6    Q   Okay.  And looking at Number 2, which is on
7 page 2, it states at the beginning of that paragraph
8 "Landlord shall at landlord's sole cost and expense
9 design, construct, and complete all work contained
10 within this agreement in compliance with the demolition
11 and construction protocols attached hereto as made part
12 hereof as Exhibit C (including without limitation the
13 work described below in sections 3, 4, 5, 6, 7, 8, 10,
14 and 11, subject to the terms of section 9 below) on or
15 before April 1st, 2017, unless a different completion
16 date is explicitly set forth below, in which case a
17 different completion date set forth shall govern, or
18 unless a date is otherwise amended in writing by means
19 of a further amendment to this agreement."
20       Do you see that?
21    A   Yes.
22    Q   Did you understand that the work set forth in
23 sections 3, 4, 5, 6, 7, 8, 10, and 11, subject to
24 section 9, needed to be completed on or before
25 April 1st, 2017?

---

Page 22

1    A   Yes.
2    Q   Was all of the work in those sections
3 completed by April 1st, 2017?
4    A   No.
5    Q   Was there any amendment in writing to change
6 the date beyond April 1st, 2017?
7    A   I -- should be.  And if it's not, probably was
8 verbal conversation with Steve or Alan.
9    Q   By "Steve" who are you referring to?
10    A   Steve Velkei.
11    Q   And who is Steve Velkei, for the record?
12    A   He's Sears' attorney.
13    Q   Okay.  And who's Alan?
14    A   Alan Shaw, as far as I remember his name, is
15 someone that we met a few times.  And he was, I think,
16 Sears' real estate or construction team, if I'm not
17 mistaken.  100 percent.
18    Q   Okay.  And -- and are you saying that there
19 was a written amendment to this amendment?
20    A   Should be and, if not, definitely was a verbal
21 conversation among many conversation that I had with
22 Steve himself and few conversation we had with Alan
23 Shaw, Mr. Shaw.
24    Q   And what were the natures of those
25 conversations?

---

Page 23

1    A   Among -- if we're talking about this paragraph
2 here --
3    Q   Uh-huh.
4    A   -- probably among many conversation that this
5 not happening in the -- in 2017 due to us not able to
6 pull permit in time.  So we -- we delayed it to 2018 or
7 2019.
8    Q   Do you recall a specific conversation where
9 this was discussed?
10    A   We had many conversations.
11    Q   Do you recall a specific conversation where
12 this was discussed?
13    A   As of now, no, I don't recall.
14    Q   Did you document these discussions in any way?
15    A   Most likely, yeah.  I would have -- if you
16 have not received those document, we have to dig them
17 out.
18    Q   And how would you have documented these
19 conversations?
20    A   Probably writing notes of our -- what happened
21 in our -- just like my assistant here doing now, writing
22 notes of what happened in the conversation.
23    Q   But you're not aware of an actual amendment to
24 this agreement to change the timeline; is that correct?
25    A   Amendment?  I don't remember.  I'll be honest

---

Page 24

1 with you.
2    Q   Okay.  And you mentioned the need to pull
3 permits.  We're not talking, obviously, about the
4 seismic work here.  To be fair, it is -- Number 8 is one
5 of those items.  But for each of these items that are
6 listed, did permits need to be pulled for all of these?
7    A   Yes.
8    Q   Okay.  And why couldn't the permits be pulled
9 before April 1st, 2017?
10    A   Remember, it's a thousand units with 200,000
11 square foot of creative office and about a hundred
12 thousand square feet of retail.  And that takes time,
13 more time than we anticipated.  So if we exceeded the
14 time -- the time -- the 2017 time period, we most likely
15 asked for extension or made it clear that it's not
16 happening that date and it would be behind that date.
17    Q   But to be clear, sitting here today, you
18 cannot identify a specific conversation where that
19 agreement was reached?
20    A   As of right now at this moment?
21    Q   Correct.
22    A   No.
23    Q   And sitting here today, you cannot point to
24 any amendment to this document?
25    A   I did not look into it.  I'll be honest with

---

18-23538-shl  Doc 5049  Filed 09/03/19  Entered 09/03/19 15:16:07  Main Document
IN RE: SEARS HOLDING CORPORATION, et al.  Pg 190 of 238

IZEK SHOMOF
June 24, 2019

**Page 25**

1  you.  I have to dig further to see.
2     Q    Are you aware of an amendment?
3     A    Amendment?  I'm not sure.
4     Q    If you can look at paragraph 17, which is on
5  page 13.  And section 17 is entitled "No Waiver."  And
6  do you see, sir, it says "Unless expressly waived or
7  released in either the building lease or this
8  amendment or in a separate writing signed by the waiving
9  party, no provision of either the building lease or this
10  amendment shall be deemed to be a waiver by either party
11  of any rights or claims against the other rising out of
12  the building lease as amended or out of any other
13  agreement or circumstances, including without limitation
14  those arising out of either the TBA lease or including
15  without limitation any pending City applications or
16  other zoning and/or entitlement petition requests or
17  applications initiated by the landlord."
18        Do you see that language?
19     A    Yes.
20     Q    Did you understand that under the terms of the
21  2015 amendment, the parties had to put into writing any
22  waiver of rights under the agreement and the amendment?
23        MR. KUPETZ: Objection to the extent you're
24  asking for any kind of legal conclusion.
25        MR. WEAVER: Asking for his understanding as a

**Page 27**

1  writing.
2     Q    Okay.  If you could turn the page to page 15,
3  section 23, which is entitled "Extensions of Time
4  Express Waiver," it states "The parties hereto may only
5  by instrument in writing extend the time for or waive
6  the performance of any obligation of the parties hereto.
7  Failure on the part of either of the parties to enforce
8  any rights which it may have against the other for the
9  other's breach of this amendment shall not constitute a
10  waiver of the said right nor shall any written waiver
11  given by a party pursuant hereto be deemed to constitute
12  a waiver of any other right not expressly waived
13  therein."
14        Did you understand under the provision of this
15  part of the amendment that the parties had to enter into
16  a written agreement to extend the times, deadlines
17  within this document?
18     A    Look, I understand what it says here.
19     Q    Uh-huh.
20     A    But my understanding, if it happened to be,
21  which I'm not saying that it did -- if there was no
22  written extension or written agreement doesn't mean that
23  Sears or any other party's home free if it was not
24  negotiated.  We were talking constantly verbal
25  conversation on how we need more time behind 2017.

**Page 26**

1  landlord.
2        THE WITNESS: I was under the understanding if
3  we are negotiating verbally and continuously negotiating
4  verbally that it's clear enough to understand that we
5  are still bound to one another because we are
6  negotiating.
7        If it happened to be that it was not signed on
8  an amendment, I don't think it would -- it should clear
9  Sears of all responsibilities.  If they knew about it,
10  they should have asked, put it in writing.  But they
11  didn't.  I mean, all negotiation, that was me without my
12  attorney negotiating with Steve, which he's an attorney,
13  including Alan, that at no time it was mentioned that
14  that thing needs to be in writing.
15  BY MR. WEAVER:
16     Q    So as you're -- my apologies.
17     A    I was under -- I was under the understanding
18  that our negotiation is valid enough.
19     Q    So what you're saying is that sitting here
20  today, you don't believe there was a writing since it
21  was never raised during those negotiations?
22     A    I am not saying that.  I have to look into it.
23  If there is no writing, I have to dig out why.  And --
24  and that's what I believe, that me understanding that
25  it's a verbal conversation is good enough, as good as

**Page 28**

1        So my belief and answer is that if there was
2  no written -- if there was no written amendment, I was
3  taking it as under the understanding that our verbal
4  conversation is good enough.
5     Q    And the specific question I have for you,
6  though, is:  Do you know if there was a written
7  amendment?
8     A    I said I will have to dig into it and see.  If
9  you guys have not received it, maybe not.  But if you
10  don't have it and I don't have it, I took it as a verbal
11  agreement.  It's good enough -- good enough as an
12  amendment.
13     Q    There's a couple more sections of this
14  amendment to look at, Mr. Shomof.  If you could turn
15  back to section 8, which is on page 4 of the document.
16  This is entitled "Seismic Work."
17        Do you see that?
18     A    Yes.
19     Q    Okay.  And you see here that it states that
20  the landlord is responsible for all necessary seismic
21  repairs and improvements within and in the vicinity of
22  the premise in the overall building.  Landlord shall use
23  best efforts to obtain necessary government permits to
24  perform such seismic repairs and improvements within 12
25  months after the City of Los Angeles's approval of

Page 29

1  administrators' determination of the City applications
2  described in recital D of this amendment and complete
3  such seismic repairs and improvements within 12 months
4  of when said and complete such seismic repairs -- I'm
5  sorry -- within 12 months of when said permits are
6  issued subject to the terms of section 9 below.
7      And if you go down to the last sentence of
8  this section, it says "The plans and specifications
9  schedule, authorized hour of construction activity, and
10 remediation plan for said seismic work shall be
11 preapproved by tenant pursuant to demolition and
12 construction protocol attached hereto as Exhibit C and
13 conducted in the manner that creates the minimum
14 possible visual and noise inconvenience to tenants and
15 its customers."
16     Do you see that?
17     A   Yes.
18     Q   Did you understand that one of the objectives
19 of this lease was to try to minimize the impact on
20 Sears' business while this work was being done?
21     A   Yes.
22     Q   Okay.  So let's turn back -- sorry for the
23 pile of documents there, but let's turn to back what I
24 believe is Exhibit 1, which is the original objection.
25 Let me know when you have that in front of you.

Page 30

1      A   I've got it.
2          MR. WEAVER: And, actually, can we do
3  Exhibit A.  Mark that as well.
4          Just a moment.  Mark this as Exhibit 5.
5          (Exhibit 5 marked.)
6  BY MR. WEAVER:
7      Q   So, Mr. Shomof, I've handed you what is
8  Exhibit A to the original cure objection, which is
9  Exhibit 1 for our purposes today.
10     A   This is Exhibit A or Exhibit 5?  Oh,
11 Exhibit A.
12     Q   Well, it's Exhibit A to the cure objection but
13 Exhibit 5 for our purposes today.
14     A   Got it.
15     Q   So this is an invoice from East River Group,
16 LLC, to Sears dated January 1 -- or January 24, 2019, in
17 the amount of $5,270.31 for the February 2019 CAM
18 charges.
19     Do you see that?
20     A   Yes.
21     Q   Okay.  And we need to go back and forth with
22 this and the objection.  So if you'd look on -- on the
23 objection, which was Exhibit Number 1, as well.  So hold
24 the -- the invoice together with going back to
25 paragraph 7 of the objection.  See that chart which

Page 31

1  lists the CAM charges?
2      A   Yes.
3      Q   Okay.  That number there is the same as the
4  invoice; is that correct?
5      A   Yes.
6      Q   And that invoice is the backup for that
7  charge; is that correct?
8      A   Correct.
9      Q   Okay.  So this invoice is dated January 24th,
10 but the description is for the February 2019 CAM
11 charges.  So the date of this invoice, were the CAM
12 charges due from Sears yet?
13     A   Repeat your question again.
14     Q   On January 24th, which is the date of this
15 invoice, 2019, were the February 2019 CAM charges due
16 and owed by Sears at that point?
17     A   I'll be honest with you.  I cannot answer that
18 question.  That's internal.  My office, they know.  I've
19 never seen those invoices before.
20     Q   So sitting here today, you don't know whether
21 on the date of this objection, in fact, those CAM
22 charges were due from Sears; is that correct?
23         MR. KUPETZ: I'd object in terms of vague and
24 ambiguous.  I'm not sure what "due" means.
25         But go ahead.

Page 32

1  BY MR. WEAVER:
2      Q   You can answer the question.
3      A   That's internal.  My office, they know -- they
4  can answer that question.  I -- if they were due at the
5  time of the objection, I'm not sure.
6      Q   But you understand the objection states that
7  they're due.  Do you understand that?
8      A   Okay.  Yeah, I understand that.
9      Q   Okay.  Mr. Shomof, are you aware that Sears
10 did, in fact, pay the February 2019 CAM charges in
11 February 2019?
12     A   They did?
13     Q   Are you aware?
14     A   No, I was not aware.
15     Q   So you're not aware if Sears provided Check
16 Number 183116 to the landlords in February 2019 in
17 payment of the CAM charges?
18     A   Could very much be.  No, I was not aware.  No.
19     Q   It could very much be.  How would --
20     A   That they paid it.
21     Q   Right.
22     A   That could very much be that I was aware.  The
23 answer is no, I was not aware.
24     Q   Okay.  Are the landlords still seeking the
25 February 2019 CAM charges as part of their cure demand?

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 192 of 238

IZEK SHOMOF
June 24, 2019

Page 33

1    A   The landlord is only seeking what he's owed.
2  If that was paid, he's not seeking it.
3    Q   So if you submitted the supplemental objection
4  after the date of payment, you would have removed that
5  amount from the cure demand?
6    A   If it was paid, I believe so.
7    Q   And -- thank you.  You can put the invoice
8  away.  I think we're done with that.
9       Still on paragraph 7 of the cure objection,
10  Exhibit 1, you see the third category, the reimbursement
11  balance for Sears TI construction expense?
12    A   Uh-huh.
13    Q   What is that?
14    A   Okay.  So initially, we put, I think, as far
15  as I remember, around $5 million witness shields.  Out
16  of the $5 million, $2 million was for the bind of the
17  lease land.  A remaining of, I think, $3 million is for
18  TI that needed to be done.  Part of it it's the HVAC and
19  on and on.
20       We have done a lot of the stuff, and some of
21  the money did come back to us.  Sears reimbursed us.
22  Remaining balance for 1,000,424 we have not received.
23  That is our money that we deposited to Sears' escrow
24  account that once we complete, we get that money back.
25       MR. WEAVER: Okay.  Exhibit D.  We are up to

Page 34

1  six?
2       THE REPORTER: Yes.
3       (Exhibit 6 marked.)
4  BY MR. WEAVER:
5    Q   Mr. Shomof, we are handing you our Exhibit
6  Number 6, which was Exhibit D to the original cure
7  objection.  And you see this is another invoice from
8  January 23rd, 2019, from East River Group, LLC, to Sears
9  Holding.
10    A   Yes.
11    Q   Do you see this invoice?
12    A   Yes.
13    Q   Do you recognize this invoice?
14    A   Yes.
15    Q   What is this invoice reflecting?
16    A   Stuff that we have already completed.  Part of
17  the $1.4 million need to be reimbursed.
18    Q   Okay.  And so looking at the categories here
19  and the invoice, you've got the server room, which has
20  equipment, and IT room construction in the amount of
21  2- -- little north of $275,000.  Do you know when that
22  work was completed?
23    A   I'll be honest with you.  You have to ask
24  them.
25    Q   Was it completed within the past year?

Page 35

1    A   It should be.  Yeah.  Exactly, no.
2    Q   Fair.  Not asking for an exact date.  Within
3  the past 12 months, is it your understanding that this
4  work was completed?
5    A   Maybe before.  Maybe after.
6    Q   But you understand the invoice is from
7  January 23rd, 2019 --
8    A   Yes.
9    Q   -- correct?
10    A   So it was completed before January 23rd.
11    Q   Had you invoiced for that work previously?
12    A   I have to ask my office.
13    Q   Okay.  You see there's an HVAC element for
14  2,600.  Do you know when that work was completed?
15  Again, not precise date, but within the past year?
16    A   I see HVAC for what?  $69,000?
17    Q   2,600.  You see HVAC there?
18    A   Oh, okay.  Yeah.
19    Q   Do you know when that work was completed?
20    A   Don't remember.
21    Q   You see Sears facade glass for 12,000.  Do you
22  know when that work was completed?
23    A   Within that time.  Within the two years'
24  period or maybe when -- the month before that.  I'm not
25  sure.

Page 36

1    Q   And you saw -- you also have a consultant line
2  for 30- -- just south of 33,000.  Do you know when those
3  fees were incurred?
4    A   I'll just give an example.
5    Q   If you don't know, that's fine.  I just want
6  to know if you know.
7    A   No, I don't.  But just I'd like -- I'd like to
8  give you an example.
9    Q   Sure.
10    A   We just received a $16,000 fee from AT&T that
11  they asking us to pay.  Just received it.  It's not
12  included here because we didn't have it.  We just
13  received it two, three days ago.  A week ago?
14    Q   I'm sorry, Mr. Shomof.  But you've got to
15  testify.  They're not on the record.  I'm happy to put
16  them on the record if we want to do that after this.
17    A   No.  I'm just using that as --
18    Q   I came all the way from New York.  I'm happy
19  to do so.  But right now, it's you and me.
20    A   I'm just asking you -- I'm just giving you an
21  example.  So the -- to answer your question, things do
22  pop up.
23    Q   Uh-huh.
24    A   So I would say to that one point -- $322,000,
25  if we paid it $16,000, that due too.

IN RE: SEARS HOLDING CORPORATION, et al.

IZEK SHOMOF
June 24, 2019

Page 37

1    Q   Let me ask this:  Of the work that's reflected
2  in the $32,000 on this invoice, was any of it completed
3  before April 1st, 2017?
4    A   I'm not sure.
5    Q   You're not sure.
6    A   It could be after that.  Could be before that.
7  I'm not sure.
8    Q   And you had testified earlier that Sears had,
9  in fact, reimbursed you from this account previously; is
10  that correct?
11    A   They did, yeah.
12    Q   Okay.  Sitting here today, you have -- let me
13  take a step back.
14      Are there invoices that would demonstrate the
15  date of when these services were rendered or the cost
16  incurred by the landlords?
17    A   I'm not sure.
18    Q   So you don't know if you have a invoice for
19  this work?
20    A   If we invoiced Sears?
21    Q   No.  If you have invoice for the work that you
22  incurred, the cost that you incurred.
23    A   Oh, I bet we do in the office.
24      MR. WEAVER: I would ask those invoices be
25  produced in this matter since I believe those are

Page 38

1  responsive to our discovery requests.  And we can talk
2  about that later today.  I'm just noting it for the
3  record.
4    Q   But you do have an understanding under the
5  2015 amendment the work that is covered here under the
6  terms of the amendment needed to be completed by
7  April 1st, 2017?
8    A   Okay.  So?
9    Q   Making sure that's --
10    A   If I'm -- what was your question again?
11    Q   You understand that the work that's reflected
12  here --
13    A   Was supposed to be done before 2017?
14    Q   April 1st, 2017.  Is that your understanding
15  of what the amendment states?
16    A   Again, the amendment may say that -- that I
17  have to reply in writing.  Maybe I overlooked it, but we
18  definitely replied verbally and asked for extension.
19    Q   Let -- I apologize.  I didn't mean to cut you
20  off.
21      Let's look, then, at the amendment one more
22  time. So this is --
23    A   Exhibit A again?
24    Q   It would be Exhibit A.  And it's --
25    A   Page 13?

Page 39

1    Q   -- our Exhibit -- Number 4.  Sorry.  Our
2  yellow sticker Number 4.  So it'd be this big one.  Is
3  that the amendment?
4    A   Yeah, that's Number 4.
5    Q   Yeah, that's the one we want.
6    A   What page number you want?
7    Q   Let's go to -- I believe it's paragraph 25,
8  page 15.
9      You see paragraph 25?  This is the -- I
10  believe you were describing before the $2 million for
11  the termination fee for the TBA lease and then the
12  3,250,000 for the construction estimate deposit; is that
13  right?
14    A   Yes.
15    Q   Okay.  And you can read the whole entire
16  section.  I would like to focus you on the next page, on
17  subsection D.  But read as much of this as you'd like.
18    A   Just go to section D?
19    Q   Yeah.
20    A   Okay.
21    Q   It says "In the event landlord does not
22  complete the work contemplated in sections 3, 4, 6, and
23  7 by April 1st, 2017, the remainder of the funds in the
24  construction fund escrow shall be released to tenant at
25  tenant's election so that tenant can cause the work to

Page 40

1  be completed, and tenant shall be entitled to payment by
2  landlord any amounts necessary to complete the work.
3      "Upon landlord's completion of the work
4  described in section 3, 4, 5, 6, 7 in a timely manner
5  and its inspection and acceptance by tenant, any
6  remaining construction estimate in the deposit funds
7  shall be dispersed to landlord subject to the review and
8  approval of the parties regarding the amount in
9  question."
10      Do you understand this provision of the
11  amendment states if the work isn't done by April 1st,
12  2017, Sears gets the money to do with --
13    A   I would -- I would agree to that only if Sears
14  would cooperate with us doing it.  But if Sears is not
15  cooperating with us doing such work where we had verbal
16  agreement that we are going to do it at a later time,
17  it's not applicable.
18    Q   I -- I understand that's your view.  I just
19  want to make sure we're talking about the same thing,
20  that the agreement between the parties provides that if
21  the work isn't done by April 1st, 2017, any balance of
22  funds is then Sears'.
23      MR. KUPETZ: I'd object to the extent you're
24  asking for a legal conclusion.
25      MR. WEAVER: Asking for his understanding as a

Page 41

1  landlord.
2       THE WITNESS: Understand it, and we made it
3  clear to Sears that if it did not happen, we made it
4  clear to Sears that it would happen at a later time.  We
5  were not in a position of forfeiting $1,425,000 if Sears
6  will not cooperating with us doing the repair that needs
7  to be done.  If someone delay you to do what needs to be
8  done in the agreement, it doesn't mean that the money
9  goes to them automatically.
10 BY MR. WEAVER:
11      Q   I understand that's your perspective.  I'm
12 just asking what the agreement provides --
13      A   I hope you agree with me too.
14      Q   I hope that you understand my question, which
15 is that the agreement --
16      A   I understand the question, yeah.
17      Q   Again, we can't talk over each other.  She's
18 having a rough enough day as it is.
19      A   I apologize.
20      Q   I just want to make sure you understand that
21 as the landlord, you signed an agreement that states
22 that if the work is not completed by April 1st, 2017,
23 then the money goes to Sears, the balance.  That's the
24 agreement that was signed; correct?
25      A   That -- the agreement was signed.  It's

Page 42

1  obviously that it was signed.  But in addition to that,
2  I'm telling you that we basically straight the record by
3  clarifying with Sears that if it did not happen by
4  April 1st, 2017, we made it clear with Sears, with Steve
5  Velkei and Alan and the rest of the team, that it will
6  happen at a later time.  That was agreed on.
7       Q   And you testified earlier that -- I know it
8  relates to the supplemental cure amount, but you
9  testified earlier that when Sears filed for bankruptcy
10 is when there was a breakdown in negotiation and
11 cooperation.
12      A   That was October of 2018, yes.
13      Q   So that's more than three years after the --
14 the -- April 1st --
15      A   No.  It's been a year.
16      Q   I'm sorry.  A year -- a year and three months.
17 I apologize.
18      A   No problem.
19      Q   I'm a lawyer, not a mathematician.
20      A   I'm a high school dropout.
21      Q   Okay.  So, again, just so the record is clear,
22 your testimony is that the breakdown in negotiations
23 began in October of 2018; is that correct?
24      A   Correct.
25      Q   Prior to October 2018, did Sears do anything

Page 43

1  to prevent you from doing the work that was due by
2  April 1st, 2017?
3       A   If we have not done it, they probably did.
4       Q   I'm not asking did they probably.  Did they do
5  something to prevent it?
6       A   Obviously, if it's not -- if it was not done.
7       Q   What did they do?
8       A   If we didn't do it, they ask us to do it at a
9  later time.
10      Q   How -- how did they ask you?  Was there
11 e-mails?  Letters?  Phone conversations?
12      A   If it's not in e-mails, it's verbal
13 conversation.  I am -- again, I am more -- if you look
14 at my e-mails, I don't -- I don't talk in e-mails as
15 much as I talk on conversation.  With Steve, we had
16 repeatedly verbal conversations.  So if it not -- if it
17 did not happen, which I'm not saying that it did not --
18 if it did not happen, it's only because we agreed that
19 it would happen at a later time.
20      Q   Okay.  And, again, is that agreement
21 documented anywhere?
22      A   Again, like I said, I will on notes we
23 definitely wrote after conversation.  That's what I do
24 just to keep my memory going.  I have to go and search
25 for notes.

Page 44

1       Q   Do you have anything signed by Sears
2  representative of Sears to that effect?
3       A   Again, I will have to go search it.
4       Q   I've not seen it, sir.  I will tell you that.
5       A   If you've not seen it, because we provide
6  everything, maybe not.  We don't have it.  But I will
7  double-check.
8       Q   I just also want to be clear.  You talked
9  about agreeing to timelines, but did Sears do anything
10 that prevented you from doing the work that was due by
11 April 1st, 2017?
12      A   If it did not -- and I repeat again.  If it
13 did not happen, most likely that they ask for delays.
14 They ask to do it at a later time.
15      Q   I understand, sir.  I'm asking you as a
16 representative of the landlord in this dispute, did
17 Sears do anything to prevent the landlord from
18 satisfying its obligations under the 2015 amendment?
19      A   Now, how can I be more clear than what I am
20 saying?  If it did not happen, most likely Sears ask us
21 to do it at a later time.
22      Q   Sitting here today, though, you cannot
23 articulate a specific thing that Sears did to prevent
24 you from doing the work by April 1st, 2017?
25      A   Well, Sears did a lot of things specifically

Page 45

1  that were not right --
2      Q    I'm looking --
3      A    -- that I -- it can't come across my mind.
4  But, I mean, we're not here to clear Sears that they've
5  not done anything.  They've done a lot of things not
6  correctly.  That's why we sitting here over.
7      Q    And that's what I'm asking for, sir.  Those
8  things.  We can't just say "those things."
9      A    Again, like I said --
10     Q    Let me finish the question, sir.
11     A    Apologize.
12     Q    I need to know -- this is a deposition.  I
13 need to know the specific things that you're claiming
14 they did.
15     A    If you are sitting over here and asking me to
16 give it to you right now, as it is now, it cannot come
17 across my mind.  I have to go and dig it out.
18     Q    You understand you are testifying today as a
19 representative of the landlord; is that correct?
20     A    Most definitely, yes.
21     Q    And you understand one of the disputes in this
22 case is whether or not the landlord performed under the
23 lease and whether or not Sears performed under the
24 lease; is that correct?
25     A    Correct, yes.

Page 46

1      Q    Mr. Shomof, what did you do to prepare for
2  today's deposition?
3      A    Not much.
4      Q    Did you look at any documents?
5      A    Oh, browsing through them.
6      Q    Did you meet with anyone?
7      A    No.
8      Q    You did not meet with counsel?
9      A    Fifteen minutes before you -- before this.  I
10 just met with him.
11     Q    Prior to today, did you meet with counsel to
12 prepare for the deposition?
13     A    No.  I just met him today, my beautiful
14 attorney here.
15     Q    I'm sure he appreciates that.
16         Did you meet with your office, personnel from
17 your office, in preparation for today's deposition?
18     A    This morning, I met -- for five minutes, I met
19 with Ericson.  And I drove Jonathan here.
20     Q    Okay.  And your five minutes with Ericson this
21 morning, what did you guys talk about?
22     A    I told him go get dressed because you're going
23 to be attending.
24     Q    Okay.  What else did you talk about?
25     A    That's all.

Page 47

1      Q    Nothing in substance about this deposition?
2      A    Not at all.
3      Q    In the car ride over, what did you talk about?
4      A    With Jonathan?
5      Q    Yes.
6      A    We talked about -- he's -- he's building a
7  house, so probably his house development.
8      Q    If I wasn't clear, I'm sorry.  Specific to
9  this deposition, what did you speak about?
10     A    I don't -- I don't remember speaking about
11 that much at all.
12     Q    Okay.  It was only a few hours ago.  So
13 what -- what specifically do you remember speaking about
14 with Jonathan on the car ride here about the deposition?
15     A    Telling him you should attend and write notes.
16 And if there's any document that I'm missing, maybe you
17 can pull it out.  That's what I probably told him.
18         MR. WEAVER:  We've been going about an hour
19 and 15.  You want to take a quick break?
20         MR. KUPETZ:  You want a break?
21         THE WITNESS:  I'm okay to continue, but --
22         MR. KUPETZ:  Whatever you --
23         THE WITNESS:  -- if you're asking for a break,
24 I don't mind.
25         MR. WEAVER:  I didn't note at the beginning

Page 48

1  that any time you want a break, so I thought --
2          THE WITNESS:  I'm cool.
3          MR. WEAVER:  But if you're fine, I'm happy to
4  keep going.
5          Okay.  Let's let the most important person in
6  the room have a quick break.  We're off the record.
7          (Brief recess.)
8          MR. WEAVER:  Back on the record.
9      Q    Mr. Shomof, during our break, did you look at
10 any documents, either electronic or hard copy?
11     A    Yes.
12     Q    Okay.  Did any of those documents refresh your
13 recollection about the topics we were discussing this
14 morning?
15     A    Yes.
16     Q    What were those documents?
17     A    So speaking about the paragraph that says if
18 after April 1, 2017, the money get wiped out if the job
19 is not going to completed, just to show that there was
20 many, many verbal conversation, the payment that we
21 got -- big amount of the payment that we got out of the
22 three-something million dollars owed to us leaving us
23 with a $1.4 million occurred after April 1st, 2017.  Did
24 you know that?
25     Q    And which document were you looking at to

Page 49

1  refresh your recollection of that?
2      A   I -- we called the office, and we asked our
3  office when was the payment made.
4      Q   Do you know when the -- those costs were
5  submitted to Sears?
6      A   No.  I did not look into that --
7      Q   I'll submit to you that those costs were
8  submitted to Sears prior to April 1st, 2017.
9      A   So all costs -- so took them four, five months
10 to pay us back the money?
11     Q   My understanding is the cost that you're
12 referring to.  But, again, I wasn't on the phone call,
13 so I can't understand --
14     A   Well, then we have to -- we have to find out
15 exactly when it was submitted.
16     Q   And you understand also, Mr. Shomof, when we
17 discussed earlier the nonwaiver clause of the agreement
18 which states that none of the parties waive a right they
19 have under the agreement unless in writing, do you
20 remember that as well?
21     A   Yes, you did mention that.
22     Q   Not just mentioned it.  It's in the agreement
23 that you signed; correct?
24     A   Okay.
25     Q   Any other documents that you saw that

Page 50

1  refreshed your recollection?
2      A   No.  That's what we talked about.
3      Q   Okay.  If you could pull -- you can put away
4  the -- the -- for a moment or for now the lease and the
5  amendment.  I want to go back to the supplemental
6  objection, which is Sticker Number 2.
7      A   Okay.
8      Q   And, again, if you'd turn to page 4,
9  paragraph 9, we talked before about these numbers --
10     A   Uh-huh.
11     Q   -- the 5.7 and the 7.1 total; correct?
12     A   Yes.
13     Q   Okay.  I'll represent to you -- you can do the
14 math if you want -- if we take the supplemental cure
15 amount, the 5.7, out of the total, 7.1, it equals the
16 amount of the original cure amount that you submitted.
17 So --
18     A   I didn't get it.
19     Q   The supplement plus the original equals 7.1.
20     A   Okay.
21     Q   Okay.  So I understand that to mean that the
22 landlord is still seeking cure payment for the
23 February 2019 CAM charges because the number didn't
24 change.  Is that the landlord's position?
25     A   If it was paid, it should be subtracted.

Page 51

1      Q   It should have been subtracted.
2      A   (Witness nods head.)
3          MR. WEAVER: Let's mark your declaration.
4      Up to seven?
5          THE REPORTER: Seven.
6          (Exhibit 7 marked.)
7  BY MR. WEAVER:
8      Q   Mr. Shomof, I've handed you what we've marked
9  as Exhibit Number 7, which is your declaration in this
10 matter.  Do you recognize this document?
11     A   Yes.
12     Q   Okay.  And this is the document you submitted
13 as a representative of the landlord; is that correct?
14     A   Yes.
15     Q   If you can turn to paragraph 6 on page 2, here
16 you discuss how prior to the commencement of the
17 bankruptcy cases that the landlord was in discussion
18 with tenant for the planned rehabilitation.
19         Do you see that?
20     A   Yes.
21     Q   What were the nature of those discussions
22 prior to commencement of the bankruptcy case?
23     A   Us doing the repair.  The TI needs to be -- to
24 get done at Sears space and the seismic retrofit.
25     Q   Okay.  When did the discussions begin with

Page 52

1  Sears about those topics?
2      A   I don't remember the exact dates.
3      Q   Was it a year before the bankruptcy case was
4  filed?
5      A   Probably before.  I mean, all along, we were
6  negotiat- -- I was negotiating and talking to Steve.
7      Q   And specific about the seismic retrofit, when
8  did those discussions begin?
9      A   I don't remember exactly, but I would say
10 probably sometime -- started probably 2018.
11     Q   Okay.
12     A   Maybe even 2017.  I'm not sure.
13     Q   Okay.  And at the time of the commencement --
14     A   I'll go back.
15     Q   Please.
16     A   It should have been prior to April 1, 2017.
17 So yes, the reason is I'm saying that it's prior, it's
18 because we did not complete the work because the deal
19 was with the negotiation that occurred with Sears that
20 why finish up the HVAC now.  Why don't you do it when
21 you guys are going to be doing the seismic retrofit so
22 you going to be there all at one time.
23     Q   And who was that discussion with?
24     A   In particular, I'm not sure.  Maybe Steve.
25 Most likely Steve because I think most of the stuff was

Page 53

1   going through Steve.
2       Q    And when did that conversation occur?
3       A    Should be prior to 2017.
4       Q    But you don't -- sitting here today, you don't
5   recall when?
6       A    Not exactly.  Pinpoint exactly, no.
7       Q    Okay.  What else was discussed as part of
8   those negotiations?
9       A    The overall -- the overall project.  The
10  seismic retrofit, the HVAC, all the work that needs to
11  be done.
12      Q    Prior to the commencement of the bankruptcy,
13  what was the status of those discussions?  Where did
14  things stand?
15      A    Where did it stand.  The last conversation
16  that we had with Sears prior -- prior to the bankruptcy
17  is us asking Sears -- asking Sears to basically allow us
18  to work in the space for a period of six months.
19      Q    And by work in their space, you mean for Sears
20  to close for those six months?
21      A    Correct.
22      Q    And we'll get to that.  There's a letter we'll
23  get to today, but that was in September of 2018 I'll
24  represent to you.  I'll show you the letter today.
25      A    Well, no.  It's not only in the letter.  We

Page 54

1   had few meetings with Steve and Alan Shaw at Steve's
2   office talking about it verbally.  And then we had other
3   meetings with Steve and the -- I forgot the other guy's
4   name.  You mind if I ask?
5       Q    I'm sorry.
6       A    No?  That's no problem.
7       Q    Again, I'm happy to depose them if they want
8   to sit --
9       A    There was another guy with them -- I don't
10  recall his name -- at Sears department store itself.
11  They had a conference room in there that we were sitting
12  down in a conference room.  That's prior -- that's prior
13  to the bankruptcy.
14      Q    All right.  Was that meeting also in September
15  before the letter was sent?
16      A    Before the letter was sent, I believe.
17      Q    Right.  And during -- and I want to come again
18  back to that meeting, but prior to September of 2018,
19  when did you begin discussing a schedule for the seismic
20  retrofit, if at all?
21      A    We did definitely discuss prior to September.
22      Q    And I want to know what those discussions
23  were, the details, the specifics.  What was discussed?
24  What was proposed?  What were the issues?
25      A    We put it in writing at a later time.

Page 55

1       Q    Uh-huh.
2       A    That's what was discussed.
3       Q    I understand that you have the letter in
4   September.
5       A    Yes.
6       Q    I'm asking prior to that --
7       A    We summarized the conversation in that letter.
8       Q    Okay.
9       A    The conversation occurred prior to September
10  talking about what we -- what was mentioned in the
11  letter.
12      Q    Okay.  So prior to September 2013, you had
13  requested that Sears shut down for six months?
14          MR. KUPETZ: I don't think you mean 2013.
15          MR. WEAVER: I'm sorry.  2016.  Thank you.
16      Q    September 2018, you had requested that --
17  start again so it's clear.
18          Prior to September of 2018, you had requested
19  that Sears shut down --
20      A    Yes.
21      Q    -- for six months?
22      A    Yes.
23      Q    When?
24      A    Months before.
25      Q    Months before?

Page 56

1       A    Yes.
2       Q    And that was never put in writing until
3   September 2018?
4       A    There was twice.  One time at Steve's
5   office --
6       Q    Uh-huh.
7       A    -- with Alan.  And the second time it was with
8   the other guy's name, which I don't recall his name --
9       Q    Okay.
10      A    -- at Sears department store.
11      Q    And what I'm trying to get a sense of,
12  Mr. Shomof, is when those discussions took place.  It's
13  different if it took place --
14      A    I would say --
15      Q    Let me -- let me finish the question, please,
16  sir.
17          It's different if the conversation took place
18  a month or two before the letter or a year before the
19  letter.
20      A    No.
21      Q    I'm trying to understand the timing of these
22  conversations.
23      A    I wouldn't say a year before the letter.  I
24  would say probably two, three months prior to the
25  letter.

Page 57

1    Q    Okay.  And the request from the landlord was
2  for Sears to close for six months?
3    A    Yes.  Well, my recollection came back.  The
4  one meeting with Alan Shaw at Sears -- at Steve's office
5  occurred maybe a couple months before --
6    Q    Okay.
7    A    -- the letter.  And the second meeting with
8  the name that I don't remember, Steve and the other
9  guy's name, the letter came within a couple of days
10  after the -- after the meeting.
11    Q    Okay.  And regarding the meeting at Steve's
12  office, what was the reaction to the proposal of Sears
13  closing for six months?
14    A    It's doable, but it may cost you.  That's what
15  they said.
16    Q    Okay.  And that was the end of the
17  conversation?
18    A    He says why don't you put it in writing in
19  detail, specify exactly what you're looking for --
20    Q    Okay.
21    A    -- and we'll reply.  And that's what we did.
22    Q    And that request was made in the meeting in
23  Steve's office?
24    A    The first time -- the first time I mention
25  about closing the whole place during the work at one

Page 58

1  time within six months is with Alan at Steve's office,
2  as far as I remember.
3    Q    Okay.  And I want to know about that
4  conversation.  I want to know the reaction, what was
5  said to you, and what came out of that meeting.
6    A    Again, it's doable.  I don't remember in
7  detail what happened in that particular meeting.  But we
8  talked about it.  The details, I just don't remember.
9    Q    And your recollection is that that meeting
10  took place a few months prior to the letter being
11  drafted?
12    A    Probably a month or two before.
13    Q    A month or two before.
14        And there was a second meeting?
15    A    We asked for Steve -- for Alan Shaw to come,
16  and Alan Shaw was laid off or quit from the company, as
17  far as my recollection.
18    Q    But there was a second meeting at the
19  conference room at the Sears location?
20    A    Correct.
21    Q    And what happened during that meeting?
22    A    So we said we are getting closer.  We need to
23  finalize the agreement of us going to Sears' space.  And
24  we said that we needed Sears to be shut down for that
25  period of time over that period, that that's what needs

Page 59

1  to be done.  So the other guy which I don't remember his
2  name said it's doable, but it will cost.
3    Q    So someone who you don't remember who it was
4  said it's doable, but it will cost?
5    A    Yes.
6    Q    Did you offer any compensation during that
7  meeting?
8    A    I did say the amount of me contributing to
9  doing the seismic retrofit, it's a great -- it's a great
10  cost that costing me over 30 million -- no.  Wait a
11  minute.  30 million for concrete, $20 million for steel.
12  $50 million that will enhance Sears' lease.  I explained
13  that to them in detail.  I said that is the compensation
14  that I'm willing to give you guys is seismic retrofit.
15  You guys need to realize the benefit that Sears is going
16  to be getting out of that seismic retrofit.
17    Q    And, Mr. -- I apologize.
18    A    If you guys will not allow me to do that
19  seismic now, it's a loss for us and future loss for
20  Sears because eventually, we have to get it done.
21    Q    Mr. Shomof, you understand that you signed an
22  agreement that said it was your cost and expense to do
23  the seismic retrofit; correct?
24    A    Correct.  Yes.
25    Q    So it was your cost, it was your obligation

Page 60

1  under the amendment to do the seismic retrofit; correct?
2    A    Right.  Correct.
3    Q    And you also understand under that very same
4  agreement that you were to endeavor to do the
5  construction in the least disruptive manner to Sears; is
6  that correct?
7    A    Correct.  Yes.
8    Q    And is shutting down for six months the least
9  disruptive manner for Sears without any compensation?
10    A    And then again, that's how I explained it.  If
11  you guys prevent me from doing so, it will be a loss for
12  Sears.
13    Q    Okay.
14    A    What would be the loss for Sears -- and that's
15  what I was trying to clarify to them.  I'm not going to
16  doing the seismic retrofit.  The value of Sears' lease
17  will diminish.
18    Q    I understand that that's your view,
19  Mr. Shomof.
20    A    That's --
21    Q    I'm asking about the obligations under the
22  lease and the amendment.  Under the lease and the
23  amendment, you have an obligation to do the seismic
24  retrofit; correct?
25    A    Correct.  And I already admit -- agreeing to

Page 61

1  what I said.
2    Q   And under the lease and amendment, there's no
3  obligation for Sears to close for six months; correct?
4    A   Absolutely not.
5    Q   Okay.  So I understand that you believe
6  there's value for Sears.  Fine.
7        But what I'm trying to understand is what
8  Sears has done that is in breach of the amendment or the
9  lease by not shutting down for six months.  That's what
10 I'm trying to understand.
11   A   All they could have done is continue
12 negotiating with me and says, Izek, work around us.
13 We're allowing to give you the space what the lease
14 says.  We are not going to shut down.  And if they would
15 have said that, I would have maneuvered the whole
16 situation and tried to work with my general contractor
17 that is going to be doing the job to work within Sears'
18 space and not asking them to shut down.  The problem
19 with it occurred that they just stopped negotiating,
20 stopped talking to us due to Sears' bankruptcy.
21   Q   I understand that's your view.  I'm just
22 asking specifically as it relates to the obligations
23 under the lease and the amendment.  And as I understand
24 it, you made one proposal, as you testified today, that
25 Sears shut down for six months without any compensation;

Page 62

1  is that correct?
2    A   I asked Sears to shut down, and they asked
3  me -- they said it will cost you.  And I says I'm
4  already contributing a lot to this.  And if they would
5  have said definitely it will cost you "X" amount of
6  dollar, I would -- may say okay.  I have no choice.  I
7  need to get it done.
8        But the point -- the whole point here, it's
9  not about Sears wanting money and I said no and that's
10 when it fell apart.  It's that Sears did not say it will
11 only need to be with money.  Sears did not say you can
12 only do it partially or otherwise do it partially.  I
13 would -- I would revisit the whole situation and just do
14 it partially, if needed.
15   Q   Did you make any proposal other than Sears
16 shutting down for six months without compensation?
17   A   There was no one to talk to.  I mean, it's
18 basically Sears.  I spoke to Steve repeatedly, and Steve
19 says, Izek, I have no one to talk to.
20   Q   I understand that your view is that there was
21 no one to talk to and Steve told you there was no one to
22 talk to.  My question is whether or not when talking to
23 Steve or talking to anyone, you proposed any other
24 solutions rather than shutting down for six months
25 without any compensation.  "Yes" or "no," did that

Page 63

1  happen?
2    A   Propose to who?
3    Q   To Steve.
4        Did --
5    A   When Steve's telling me no one to talk to --
6    Q   Mr. Shomof, can you please answer my question.
7  Did you at any time provide an alternative proposal
8  other than shutting down for six months without
9  compensation?  It's a yes-or-no question.
10   A   I was trying to, and Steve told me flat out no
11 one to talk to.
12   Q   I'm not asking you what Steve told you.  I'm
13 asking whether you and the landlord made any other
14 proposals.  It's a yes-or-no question, sir.
15   A   Proposal, no.  Attempt to make proposal, yes.
16   Q   Okay.  And what was the proposal you wanted to
17 make?
18   A   Let's talk about how we going to get it done,
19 if it needs to be partially doing it or you guys willing
20 to close down.
21   Q   Was it a condition for your construction
22 financing that Sears close down for six months?
23   A   It was a -- they want to see some kind of an
24 agreement.
25   Q   Was it a condition of your proposed

Page 64

1  construction financing that Sears shut down for six
2  months?
3    A   The answer is they wanted to see some kind of
4  an agreement.
5    Q   And what was the condition of that agreement?
6  What did it need to say?
7    A   You need to provide us an agreement with Sears
8  that they will allow you to do the seismic retrofit.
9  And at the same time, we want to see from the general
10 contractor if it going to be partially, we want to see
11 the general contractor can get the job done, the overall
12 job done, because it was a 36-months construction.
13       So if we would have known that it's a
14 definitely no, no with Sears shutting down for six
15 months, we would go the route of doing it partially.  We
16 will talk to the general contractor that this job needs
17 to be done partially.  And I would ask for Sears to
18 let's make a -- the agreement stating that we are going
19 to go in with -- eight months in and out or a year in
20 and out.  But when Sears refuse to talk and no one to
21 talk to, that's where the whole thing fell apart.
22   Q   Mr. Shomof, did you ever tell your contractor
23 to develop a plan that would --
24   A   Yes.
25   Q   -- require -- let me finish the question,

Page 65

1 please.
2        Develop a plan to be able to do the seismic
3 retrofit without Sears closing down?
4    A    Yes.
5    Q    Okay.  When did you ask your contractor to do
6 that?
7    A    Way before us talking to Sears doing it --
8 shutting down.
9    Q    Okay.
10    A    So we have a plan for shutting it partially --
11 for working partially.
12    Q    Have you ever provided that plan to Sears?
13    A    I believe -- I believe we did.
14    Q    You did?  When?
15    A    I believe.  I'm not sure.
16    Q    Okay.
17    A    If we didn't, it's -- we have to look for it.
18    Q    This plan was done prior to your discussion
19 about shutting down for six months?
20    A    Yes.
21    Q    So at the time when you had the discussion
22 with Sears about shutting down for six months, you had
23 an alternative plan prepared?
24    A    Yes, but the alternative plan would be costly.
25    Q    Costly to whom, sir?

Page 66

1    A    Time-wise costly.
2    Q    Understood.
3    A    To the development.
4    Q    To the development.  Understood.
5        That cost would have been borne by you;
6 correct?
7    A    Yes.
8    Q    So when Sears during those meetings that you
9 referenced said it's doable but will cost you, you did
10 not counter with the proposal of a more limited shutdown
11 that would have included more costs for the landlord;
12 correct?
13    A    Well, if I heard -- if I heard the price of
14 what costly, I would probably counter back.  But it just
15 went.  It ceased.  All conversation ceased right there
16 and then.
17    Q    I understand.
18    A    Because Sears did go into bankruptcy within a
19 week or two after we had that meeting.
20    Q    Correct.
21        I just want to make sure I understand the
22 facts, which is that at the time you asked Sears to shut
23 down for six months with no compensation, you had
24 supposedly an alternative construction plan in place;
25 correct?

Page 67

1    A    Yeah.  We had that all along because that's
2 what the lease says.  The lease says that we are
3 entitled to go into Sears' space in partial.  So we
4 approached Sears to save time.  We told Sears instead of
5 it taking 12 months being in Sears, let us shut down --
6 18 months.  Shut down for 6 months, and let us finish it
7 up within 6 months.
8    Q    I understand.
9        And just so I understand your testimony, it's
10 that you were asking for something that you were not
11 entitled to under the lease; correct?
12    A    Yes.
13    Q    Okay.  In paragraph eight of your declaration,
14 it says that as of March 16, 2019, and prior thereto, as
15 communicated by the landlord to tenant, landlord has
16 been ready, willing, and able to commence the necessary
17 renovation construction at the building.
18    A    Okay.
19    Q    In what ways was the landlord ready, willing,
20 and able?  And I assume you're focused here on the
21 seismic retrofit.
22    A    Yes.
23    Q    In what ways was the landlord ready, willing,
24 and able?
25    A    As far as I remember, at that date the

Page 68

1 landlord did not pull out.  So we were ready and willing
2 to go forward.  And I believe by that time, we already
3 had our seismic retrofit permits on hand.
4    Q    You did?  As of what date?
5    A    I believe maybe a week or two prior to that
6 date.
7    Q    Of which -- March 16?
8    A    March 16.
9    Q    Okay.
10    A    The reason is as far as my recollection, the
11 expiration of our entitlement would have been March 16.
12 And we were able to salvage our entitlement by us
13 pulling the permits.  So probably a couple weeks before
14 that.
15    Q    So prior to -- let's just say into February,
16 early March of 2019, you had not pulled the permits for
17 the seismic retrofit; correct?
18    A    Sometime in February, we pulled the permits.
19    Q    In February.  Prior to that, you had not
20 pulled the permits?
21    A    No, we had not.
22    Q    And the amendment was signed in 2015; correct?
23    A    If it says that, yes.
24    Q    Okay.  Did you have as of March 16, 2019,
25 construction financing in place?

Page 69

1    A   Repeat your question again.
2    Q   As of March 16, 2019, did you have
3  construction financing in place?
4    A   As of March, they did not pull out on that
5  date or before.  I don't remember exactly when they
6  pulled out.
7    Q   The answer's no, you did not have construction
8  financing in place?
9    A   That's not what I -- my answer is, no.
10   Q   Did you ever have construction financing in
11 place for this project?
12   A   What do you mean by "in place"?  Completely
13 done, ready to be funded?
14   Q   Committed financing.
15   A   Committed, yes.
16   Q   "Committed" meaning you could draw upon the
17 financing?
18   A   No.  That's not -- we had condition that we
19 had to meet.  And one of the last condition, it was us
20 getting some kind of an agreement with Sears.
21   Q   We'll come back to the checklist and the open
22 conditions that existed in October 2018.
23      But when did you first begin to seek
24 construction financing for this project?
25   A   Probably six months prior.  Maybe even before.

Page 70

1    Q   And how long, in your experience, does it take
2  to obtain construction financing for a project like
3  this?
4    A   Six months.
5    Q   So you began seeking construction financing
6  six months prior to when you thought that your
7  entitlements may expire; is that correct?
8    A   I have to look at the document exactly when we
9  reached out for construction financing.
10   Q   Okay.
11   A   We talked to many lenders, but that particular
12 lender, that's the one we chose to go forward with.  I
13 think it's six or seven months prior -- no.  Even more.
14 Even longer.  I have to look into the document the exact
15 dates.
16   Q   Is there a reason you didn't begin to seek
17 construction financing in 2017?
18   A   Yeah.  We had issue with -- with the plans.
19 We were ready and then the plan checker came up with
20 comments in regard to the entitlement with regards to
21 the seismic retrofitting.  And the engineer needed to
22 redesign the whole -- reengineer the whole situation.
23 So that's what delayed the whole project.
24 Architecturally, it was already done, but the engineer
25 was not 100 percent.

Page 71

1    Q   And when was the engineering finalized?
2    A   Probably a week before, two weeks before we
3  got the permits.
4    Q   So were you -- was the landlord ready,
5  willing, and able to begin construction for the seismic
6  retrofitting in October of 2018 when Sears filed for
7  bankruptcy?
8    A   No.
9    Q   Okay.
10   A   If you don't mind, I will -- I pull out the --
11 I want to retrieve the answer no.  And repeat the
12 question again.  I want to make sure I understood it.
13      MR. WEAVER:  May you please repeat the
14 question.
15      (Record read.)
16      THE WITNESS:  No.  No.  As far as I remember,
17 we had some minor issue with the seismic, but we were
18 able to finalize it with that time, more or less.
19 BY MR. WEAVER:
20   Q   You said that the permits were pulled in
21 February of 2019?
22   A   Yeah, right at that time, we were waiting
23 for --
24   Q   Is that when the landlord, in your mind, was
25 ready, willing, and able to begin the construction?

Page 72

1    A   Well, then -- no.  We were willing -- well,
2  let me correct it here again.  We could have started
3  staging.  We were not able to pull the permit up until
4  late January or so.  Sometime mid-January.  So we could
5  have -- we were ready to stage, and everybody was lined
6  up to stage the project, put out the cranes, and
7  basically break ground in a way.  But, actually -- I
8  have to check the record.  Early 2019, we were done.
9    Q   That's my question.  So early 2019, your view
10 is that the landlord was ready, willing, and able to do
11 the seismic retrofitting work?
12   A   I would say probably, yeah.  Probably January,
13 everything done.
14   Q   Okay.  Was the only outstanding item --
15 condition -- was the only outstanding condition for your
16 construction financing an agreement with Sears in early
17 2019?
18   A   No.  Under conditions which were very minor
19 and addressable, that's not 2019.  That occurred way
20 prior on the condition of the construction loan.  The
21 construction loan could have been done probably
22 September, October of 2019 -- '18.
23   Q   I understand.  But I'm asking you --
24   A   That was -- the only conditions was -- there
25 was couple of other minor conditions that it was doable

Page 73

1 and not an issue.
2    Q   So, Mr. Shomof, your answer is that an
3 agreement with Sears was not the only condition at the
4 beginning of 2019 to you closing your construction
5 financing; correct?
6    A   No.  There was other conditions but very
7 minor.  It's -- I would even not consider it as a big
8 deal at all.
9    Q   They were conditions you had not satisfied;
10 correct?
11    A   Satisfied the lender?
12    Q   Correct.
13    A   We were in the process of satisfying him.
14    Q   But you had not satisfied them at the
15 beginning of 2019; is that correct?
16    A   No.  Not -- don't go 2019.  I'm talking about
17 September of 2018.
18    Q   I'm asking the question, Mr. Shomof.  You said
19 in response to your answer [sic], which was that you
20 were ready, willing, and able to do the seismic retrofit
21 at the start of 2019.  That was your testimony; correct?
22    A   Yes.
23    Q   My question is:  At that very time, did you
24 have open conditions to close on your construction
25 financing other than an agreement with Sears?  It's a

Page 74

1 yes-or-no question.
2    A   I have to revisit it again.
3    Q   You just testified a few moments ago that you
4 did have open -- you called them minor, but you said
5 there were open conditions.
6    A   If anything, there was one minor thing.  I
7 think the general contractor -- which I already signed
8 up another general contractor, which is -- that's not a
9 condition.  It's a done deal.  The only thing that was
10 holding us is basically Sears' agreement.
11    Q   Okay.  Just I want to be -- your testimony
12 today under oath is that the only condition to you
13 closing your construction financing at the start of 2019
14 was an agreement with Sears.  That's it?
15    A   If there was any other condition, it was very
16 minor.
17    Q   That wasn't my question, Mr. Shomof.
18        My question was:  Is it your testimony today
19 under oath that the only condition to you closing your
20 construction financing at the start of 2019 was an
21 agreement with Sears?  It's a yes-or-no question.  If
22 you don't understand the question, I will try to make it
23 more simple.
24    A   No.  I understand the question.  I just don't
25 remember it exactly in detail.  Most likely there was

Page 75

1 another, one minor one.
2    Q   Mr. Shomof, in paragraph 9 of your
3 declaration, you see the chart of the supplemental cure
4 amounts; correct?
5    A   Yes.
6    Q   From the category of architects, engineers,
7 and consultants, when did that -- when did you incur --
8 over what time period did you incur those $4.5 million
9 charges and expenses?
10    A   From the day we started with architectural
11 engineering.
12    Q   And when was that?
13    A   I don't remember the exact date.  Sometime
14 2015 maybe.
15    Q   For the permit fees of 121,000, over what time
16 period did you incur those expenses?
17    A   Along the way.  From 2000- -- there was some
18 demolition permitting.  There is other permits.  And the
19 seismic retrofit permit, I think it was sometime in
20 February of 2019.
21    Q   And the contractors, the million that you have
22 there, what time period did you incur those expenses?
23    A   From 2015 on.  Demolition and all that kind of
24 stuff.
25    Q   So did -- did -- let me step back.

Page 76

1        Is the -- the 5 million that you're seeking as
2 a supplemental cure amount related to the seismic
3 retrofitting project or overall construction?
4    A   It's not overall construction.  It's demoing.
5 It's mostly abatement of all the asbestos and all that
6 kind of stuff.
7    Q   So you began working on the project in 2015?
8    A   Yes.
9    Q   Okay.  And were there any issues that occurred
10 resulting from your construction work that interrupted
11 Sears' business during that time period?
12    A   I think once or twice.
13    Q   Once or twice.
14        Mr. Shomof, we discussed this condition as to
15 an agreement with Sears related to your construction
16 financing.
17        What was the specific condition that you
18 needed to satisfy as it related to an agreement with
19 Sears?
20    A   We -- they wanted to see -- they were afraid
21 that this job will take behind three years.  And they
22 understood, which I raised that issue, telling them that
23 with our general contractor, the guy that was going to
24 be doing the seismic retrofitting and all that stuff, he
25 want to do it within six months, be in Sears and out.

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 203 of 238

IZEK SHOMOF
June 24, 2019

Page 77

1    And they said do you have an agreement with
2  Sears.  And I said the agreement that we do have with
3  Sears and which they've seen the lease, it state that
4  they -- we can do it in partial.  And they said can you
5  obtain an agreement from them on doing the whole thing
6  at one time within six months.  And I said I am working
7  on it with Sears.
8    And at the time, when we got closer, when we
9  was told the final of September or October of 2018 --
10  that's when Sears filed for bankruptcy -- we just told
11  them that Sears filed for bankruptcy, which they knew,
12  and I said I have no one to negotiate it with.
13    So every conversation with repeatedly meeting,
14  like, once-a-week conference call, in that conference
15  call, they kept on asking any agreement with Sears yet.
16   Q   Okay.  Mr. Shomof, I want to be very precise,
17  though.  Was it any agreement with Sears or was it an
18  agreement that Sears would close for six months?  What
19  was the condition that the lenders were placing upon the
20  financing?
21   A   Any agreement with Sears.
22   Q   Any at all?
23   A   Yeah.
24   Q   You had an agreement with Sears; correct?
25   A   No.  Any -- no.  They have the agreement that

Page 78

1  I had with Sears.
2   Q   Correct?
3   A   Any agreement, if they -- if they say no for
4  six months, if I'm going to be changing it from me doing
5  in partial.
6   Q   But you had that agreement with Sears under
7  the amendment; correct?
8   A   They had that.  They had that.
9   Q   Okay.
10   A   So they were waiting to see if Sears are
11  cooperating to be able to allow us to do it.  If not
12  shut down the whole Sears, maybe half of it.  Maybe
13  quarter of it.  But once we had no cooperation with
14  Sears, so that's why they kept on holding up until they
15  pulled way.
16   Q   I understand, Mr. Shomof.
17    What I'm asking is:  What was the condition?
18  Was the condition any agreement with Sears or was it a
19  specific agreement with Sears?
20   A   I have to revisit it.  Maybe it's about
21  looking at Sears, if they're willing to close for six
22  months.
23   Q   So you're saying it's possible that the
24  condition to your construction financing was that Sears
25  agreed to close for six months?  That was a condition of

Page 79

1  your financing?
2   A   I don't believe that was a condition.
3   Q   I'm asking then, sir, what was the condition?
4   A   If I have an agreement with Sears on us doing
5  the seismic retrofit in that space.
6   Q   Which you had under the amendment; correct?
7   A   If it is closed for six months, the whole
8  space or partial of it, I don't remember.
9   Q   Okay.  This was an important aspect of getting
10  the deal done; correct?  This agreement with Sears?
11   A   Yes.  For us, yes.
12   Q   And getting your construction financing was a
13  big deal; correct?
14   A   Correct.
15   Q   So sitting here today, you cannot remember the
16  specific requirement and condition of financing as it
17  relates to an agreement with Sears?
18   A   Like I said, yes, I do remember.  There was an
19  agreement with Sears.
20   Q   However defined?
21   A   If it was partially or the whole of Sears
22  willing to close -- shut down for the whole time or if
23  there is a fee, what would be the fee for the period of
24  six months.  And -- and we going little bit further by
25  repeatedly we see articles that Sears shutting down

Page 80

1  stores after stores, and we get the list of stores that
2  Sears are shutting.  We were hoping that maybe this
3  store would be one of them for us to be able to do the
4  seismic retrofit.
5    But it happened to be that that store did not
6  happen, which I understand.  In a way, we were happy
7  because place keep -- there's going to be still people
8  running around there.  But the issue here is that if we
9  would know from Sears that the answer is Izek, we are
10  not shutting down unless you pay us 2 million or
11  10 million or 1 million -- doesn't make a difference --
12  or we are not shutting down at all, you have to work
13  with what the lease says, we will basically addressing
14  at that route.  But we had no one to talk to.
15   Q   Mr. Shomof, if you were concerned about not
16  having anyone to talk to, why didn't you just proceed
17  under the terms of the amended lease?
18   A   There was no one to talk to.  That's why I
19  spoke to Steve.
20   Q   But you said you had an agreement under the
21  amended lease.  You had the agreement already worked
22  out.  The bank had that agreement.  Why not proceed
23  under those terms?
24   A   Hoping that Sears will negotiate.
25   Q   Maybe not forever, but you can put these

Page 81

1  aside.
2     A    Definitely not forever.
3         MR. WEAVER: We up to eight?
4         THE REPORTER: Yes.
5         (Exhibit 8 marked.)
6  BY MR. WEAVER:
7     Q    Mr. Shomof, I'm handing you a document we've
8  identified as Exhibit 8. It's a e-mail chain that the
9  landlord produced in this dispute Bates stamped SK 6778
10 through 6784. And you can look at the entire chain, but
11 there are specific e-mails I'm going to reference and
12 point you to. So when you're ready, I can point you to
13 where I'm specifically focused.
14    A    Yeah. Go ahead.
15    Q    Okay. So if you turn all the way to the end,
16 this chain goes in reverse order. Some of the chains go
17 in the other order. But going towards the end --
18    A    You talking about the end? The last page?
19    Q    Technically, the second-to-last page. So you
20 see the Bates numbering at the bottom? There are
21 stamped numbers at the bottom of each page.
22        Do you see that?
23    A    Okay. Yes.
24    Q    I'm on page 6783.
25    A    Okay.

Page 82

1     Q    Is that where you are?
2     A    I am, yes.
3     Q    Okay. Do you see an e-mail from June 20th,
4  2018, at 11:59 P.M. toward the top of the page?
5     A    Yes.
6     Q    This is from Steve that we've been discussing.
7     A    Yes.
8     Q    And it seems to be -- it has a -- a weird kind
9  of formation of who's receiving the e-mail. But I will
10 say at the top of the e-mail chain, you are for sure
11 copied. So at least you received this chain. I don't
12 know if you specifically received this e-mail on
13 June 20th, but I want to ask you a couple questions
14 about it.
15    A    Yes.
16    Q    So this is on June 20th where Steve writes
17 "From what I hear, you are gearing up the construction
18 of the Sears site. I understand there have been some
19 issues that we need" -- "that we should discuss,
20 including smoke damage to the air quality of the Sears
21 store. But I also" -- "but I think we also need to have
22 a broader conversation about the project, including
23 structure and scope of the project, timing, the protocol
24 for construction, and agreed-upon improvements for the
25 Sears portion."

Page 83

1         Do you see that?
2     A    Yes.
3     Q    Do you recall in June 2018 that there was an
4  issue with smoke damage and air quality within the Sears
5  store resulting from the construction?
6     A    Well, like I -- I don't remember it in detail.
7     Q    Uh-huh.
8     A    But, like I said, Sears equipment, it was
9  scattered all over the building.
10    Q    Uh-huh.
11    A    That's why we were trying to minimize it by
12 installing the HVAC units. But most likely, when the
13 contractors were working up there through the vents,
14 maybe smoke got into Sears. I don't remember it in
15 detail exactly what happened.
16    Q    You don't remember there being a smoke --
17 smoke damage in the Sears store?
18    A    More or less, I do. But in detail, I don't.
19    Q    If you go to the -- the first page of this
20 e-mail chain in 6778. So, again, the top -- the very
21 top e-mail, which is August 31st, 2018. So a month and
22 a half since the e-mail we just looked at. And you're
23 copied on this e-mail.
24        First of all, do you recall getting this
25 e-mail, the one at the top that begins "Guys"?

Page 84

1     A    Maybe, yeah.
2     Q    Do you recall it?
3     A    I don't recall, no.
4     Q    You were copied. I'm just asking if you
5  recall it.
6     A    No.
7     Q    Okay. Steve writes "We're having more
8  problems at the Sears store because of the work of your
9  demo contractors. We had flooding in the storage room
10 and have lost electrical. Please stop further work
11 until we meet. This is not sustainable, and we'll need
12 to start enforcing our rights more aggressively unless
13 we iron out a game plan that actually works."
14        Do you recall an issue where Sears raised
15 complaints about the disruption to their business from
16 your construction work?
17    A    No. I'll tell you -- I'll tell you --
18    Q    It's a yes-or-no question, sir. Do you
19 recall?
20    A    As far as I remember, more or less, yes, I do.
21    Q    You do recall that? Okay.
22    A    Yes.
23    Q    My next question is: What did you do to
24 address these concerns?
25    A    That's what I'm saying. Sears' building is

Page 85

1  1.6 million square feet with about 20 different
2  entrances. And homelesses repeatedly were breaking into
3  Sears, breaking copper pipes, breaking sprinkler pipes,
4  stealing them. And in many occasion, when they do so,
5  water leaks downstairs.
6      And Steve just understanding that there is a
7  water issue, so he send it to us. Right away, we send
8  people to check. And we find that homelesses again
9  breaking into the place. At the end of the day,
10 homelesses or not, we immediately trying to address any
11 issues. What did we do in that particular time? Send
12 people to address the problem. And the problem was
13 addressed immediately.
14     Q   So your testimony is that the interruption and
15 damage to the Sears store was not caused by the
16 construction demolition work that your contractors were
17 performing?
18     A   In this particular one, I'm not going to be
19 sitting over here and swearing that it did not. But
20 90 percent of the time that what happened, it's
21 homelessness issue. And it's still happening as we
22 speak with homelesses breaking into the space. We have
23 two live security guard throughout the building to try
24 to avoid them. They still getting in.
25     Q   I just want to make sure I'm clear. Is your

Page 86

1  testimony that there were no disruptions to Sears caused
2  by the construction work that you were doing at the
3  project?
4      A   No. I -- just before that question, I
5  admitted that due to the construction, smoke got into
6  Sears because of the HVAC.
7      Q   Is that the only issue that happened during
8  the course of construction?
9      A   No. If you remind me other one. If I
10 remember it, I'll tell you. If it's -- that particular
11 one, if it was due to homeless or construction, I'm not
12 going to sit over here and say, no, it's 100 percent
13 with the homeless. But I know that we have a lot of
14 issues by the homelesses.
15     Q   During the construction, did your contractors
16 disable the fire sprinkler alarm system within the
17 building?
18     A   No. That was homelesses.
19     Q   The homeless?
20     A   (Witness nods head.)
21         Not disable it in Sears' space. But broke
22 pipe upstairs.
23     Q   I understand. And -- and did you immediately
24 fix that -- address that problem as well?
25     A   For Sears' space or the upper floor?

Page 87

1      Q   For -- for the fire system within the building
2  itself. Obviously, you understand that fire can spread.
3      A   The fire sprinklers -- fire sprinklers, no,
4  because they've been gut out by the homelesses. They
5  sell it as metal and copper. But within Sears' space,
6  100 percent yes.
7      Q   Do you agree that if the building caught fire,
8  that could be disruptive to the Sears business even if
9  Sears has sprinklers in their own space? Correct?
10     A   If the building got fire up there in the upper
11 floor?
12     Q   Anywhere.
13     A   Could very much be, yes.
14         MR. WEAVER: Okay. Thank you. You can set
15 that one aside.
16         (Exhibit 9 marked.)
17 BY MR. WEAVER:
18     Q   Hand you another e-mail chain that we've
19 marked as Exhibit 9 bearing Bates Number SK 68008
20 through 6817.
21         Now, this one goes in chronological order. So
22 the oldest e-mail is in the front, and the newest
23 e-mail, I believe, is in the back.
24         Again, you can look at the entire chain, but
25 there are specific e-mails I want to point you to. Let

Page 88

1  me know when you're ready.
2      A   I'm ready.
3      Q   So a few pages in, at page 6812 --
4      A   Okay.
5      Q   -- September 19, 2018, at 5:45 P.M.
6      A   Okay.
7      Q   Do you see this e-mail?
8      A   Yes.
9      Q   It's an e-mail from Steve to you; correct?
10     A   Uh-huh.
11     Q   (Reading:)
12         "Guys, attached is a letter that Sears CEO
13 Eddie Lampert received from the city attorney's office
14 notifying him he's being criminally charged with
15 violations of fire code arising on a citations issue for
16 deficient fire inspection systems for the entire
17 development. Citations also attached.
18         "This is a real problem and promises to be a
19 big distraction from our meeting on Friday. I need to
20 understand what the plan is to fix this before we meet
21 on Friday."
22         Now, I don't have the attachments because I
23 have an e-mail chain. But do you recall receiving this
24 e-mail?
25     A   Yes.

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 206 of 238

IZEK SHOMOF
June 24, 2019

Page 89

1   Q   Okay.  And was this a distraction during your
2   discussions with Sears that you were having the
3   following Monday -- or following Friday?
4   A   It's a very long answer.
5   Q   Okay.  Well, you've given lots of those today,
6   so we --
7   A   Would you like to hear another one?
8   Q   I would.
9   A   I'm glad.  And I'm very much glad that you
10  mentioned it.  Steve knew better than that.  Steve knew
11  that this is 100 percent the fault of Sears.  And Steve
12  himself was trying to paint it in a way that this is our
13  fault.
14          Now, along the way, we were falling for it
15  because we didn't realize what's going on because we
16  were named on the complaint, too, from the city
17  attorney.  Took me some time to get ahold of the city
18  attorney.  Finally, the city attorney said that the
19  fault is not yours.  You'll find a lot of e-mail along
20  the way that we are working on fixing the problem and
21  trying to find out what is the problem.
22  Q   Uh-huh.
23  A   But Sears themself negligently -- negligently
24  did not fix up the -- they disconnected the fire alarm.
25  They disconnected -- they stop paying for the fee for

Page 90

1   the fire -- for the monitoring.  Sears themself had a
2   lot of notices that they should have exit signs which
3   were out, which they've not done that.  Sears themself
4   went and put chains on exiting doors which they have
5   notices to remove, which they have not done that.  Sears
6   themself not only had that complaint on that location,
7   Sears themself had location -- had the same notification
8   on five different locations.
9           Finally, after I and my attorney, Mark Cohen,
10  went to the city attorney, and the city attorney said,
11  Izek, it's not your fault.  It's Sears' fault
12  100 percent.  And that's when -- that's when Steve
13  himself pleaded guilty.
14  Q   And for the record, I don't think Steve
15  himself pleaded guilty to anything on this case.  But --
16  A   Well, Steve on behalf of Sears, he pleaded
17  guilty.
18  Q   And was that plea an accommodation to you as a
19  landlord because of your construction financing?
20  A   I -- like I said before, I was under the
21  understanding in the very beginning because Sears
22  painted it that way that it is because I got the
23  notification, too, and as -- in good faith, I forwarded
24  to my lender.  And I said I'm working on clarifying it.
25  And I asked Sears clear me out of it.  In the beginning,

Page 91

1   Sears made me try to clear them out of it.  When I found
2   out that it's not our fault, I asked Sears to clear me
3   out of it.
4           He was willing to plead guilty in other
5   location but not this one, but at the end, he agreed.
6   And then he try to negotiate with us.  Okay.  You pay
7   for the fees.  And I said I just don't mind.  Clear us
8   from it.  And then at the end, he says I'll pay for the
9   fees.
10  Q   Again, Mr. Shomof, you had requested that
11  Sears enter the plea in this matter as an accommodation
12  related to --
13  A   I requested?
14  Q   Let me finish the question.
15          You asked Sears to plead to this violation
16  because it would have obstructed your ability to receive
17  construction financing; correct?
18  A   It's funny.
19  Q   It's a yes-or-no question.  If the answer's
20  no, then tell me no.
21  A   If Sears are not guilty, why would he plea?
22  Q   I'm asking whether you --
23  A   When I found out --
24  Q   Mr. Shomof, unfortunately, you don't get to
25  ask the questions today.

Page 92

1   A   When I found out it's Sears' fault, I said
2   please clarify that because I may lose my financing due
3   to this nonsense stuff.
4   Q   I understand you may want to ask questions
5   today, but the way this works is I ask the questions and
6   you have to answer the questions.
7   A   That is my answer.
8   Q   And my question to you is:  Did you ask Sears
9   to take the plea as an accommodation because of your
10  construction financing?  If the answer's no, then tell
11  me no.  But it's a yes-or-no question.
12  A   It's a no because --
13  Q   Okay.
14  A   -- I did not say due to my accommodation.  I
15  said plead guilty because you guys are guilty.  I did
16  not ask.  I insisted that he plead guilty because they
17  were guilty.  And we have tons of pictures of showing
18  negligent of Sears covering up exit signs and tying
19  up -- chain up exiting doors.  And at the end of the
20  day, on the fire alarm -- on the fire alarm, we end up
21  paying for monitoring company -- for monitoring company
22  because they have not done that.
23          MR. WEAVER:  We're marking as
24  Exhibit 9 [sic] --
25          THE REPORTER:  Ten.

Page 93

1    MR. WEAVER: Thank you.
2    (Exhibit 10 marked.)
3  BY MR. WEAVER:
4    Q  Handing Mr. Shomof another e-mail chain again
5  bearing Bates stamp SK 6818 through 6835.  Again, it's
6  another e-mail chain.  You can look at as much as you'd
7  like.  There are specific areas I will point you to.
8  Let me know when you're ready.
9    A  I'm ready.
10   Q  Bearing on page -- I think it's the second
11 page, 6819.  September 27, 2018, at 10:59 A.M.
12    Do you see that?
13   A  Yes.
14   Q  Okay.  This is an e-mail from you to Steve and
15 others.  And you can read the entire e-mail.
16    First of all, do you remember sending this
17 e-mail?
18   A  If it's from me, I don't remember in detail,
19 yes, but most likely.
20   Q  Okay.  I'm just asking if you recall sending
21 it.
22   A  No, I don't recall it.
23   Q  Okay.  The fourth line down, the sentence
24 begins with "What."  And you write "What the city
25 attorney is doing doesn't help.  And I'm working on

Page 94

1  getting it cleared.  Let's work together on getting this
2  project started."
3    You see that?
4    A  Yes.
5    Q  Okay.  Did -- here, you're not telling Steve
6  that it's -- the city attorney was -- what you just
7  testified and were telling me you didn't relate to Steve
8  in this e-mail; is that correct?
9    A  That's when I told you and from my previous
10 answer, at the beginning, Steve was making it sound like
11 it's our fault.
12   Q  Okay.
13   A  We were working very hard to try to clarify
14 the situation up until I found out from the city
15 attorney himself that it's not our fault.  It's
16 definitely the Sears' fault.
17   Q  Had you spoken to the city attorney by the
18 time you sent this e-mail on September 27, 2018?
19   A  I don't -- I don't think I did.  Maybe after
20 that I did.
21   Q  Maybe?  But you don't know?
22   A  No.
23   Q  Okay.  A few pages into the chain, at 6823, an
24 e-mail November 20, 2018, at 4:55.
25    You see that?

Page 95

1    A  Uh-huh.  Yes.
2    Q  This is from your attorney, Mark --
3    A  Yes.
4    Q  -- to Steve and to yourself?
5    A  Yes.
6    Q  This is November 20th.  So this is two months
7  from the e-mails we were just looking at; correct?
8    A  Yes.
9    Q  Okay.  It says "Unfortunately, Izek entity
10 will not be able to take the plea, and the original
11 offer for your client to take the plea on the third
12 Boyle properties are the only option.  The lender will
13 not finance a project if the landlord pleads no
14 contest."
15   A  Uh-huh.
16   Q  (Reading:)
17    "Izek will gladly pay for the carpet and the
18 paint for the fire inspectors."
19   A  Yes.
20   Q  So was this your attorney asking Sears to take
21 the plea on the Boyle property?
22   A  That's when we start finding out that it's not
23 our fault at all.  So Steve take the plea.
24   Q  All right.  Does that -- is that what this
25 e-mail says?  It's not our fault.  Steve, take the plea.

Page 96

1  Is that -- is that what your attorney wrote?
2    A  If he did not write it down on this one here,
3  at a later time, that was the conversation.  Steve, it's
4  not our fault.  Steve take the plea.
5    Q  Okay.  Here I see your attorney -- all -- all
6  I can deal with are facts, and documents are a set of
7  facts.  So those are things I can ask questions about.
8  So I've got an e-mail here from your attorney that says
9  that you can't take the plea because you won't get the
10 financing.
11   A  Okay.
12   Q  It's asking Sears to take the plea.  I don't
13 see anything here about it being Sears' fault or
14 anything along those lines.
15    So my question is:  Does this e-mail reflect
16 the request that you as a landlord made to Sears to take
17 the plea?  It's a "yes" or "no."  If the answer's no,
18 tell me no.
19   A  No.  Here, we were still under the impression
20 that it was -- that it was our fault.  The bottom line
21 here, Sears pleaded guilty.  Sears would not plead
22 guilty to do me no favor.  Sears pleaded guilty because
23 they knew that they were in fault.
24   Q  Well, Mr. Shomof --
25   A  If you're talking about facts, that is the

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 208 of 238

IZEK SHOMOF
June 24, 2019

Page 97

1  fact of the matter.
2      Q   All I have is, again, the documents.  That's
3  what I'm asking you about.  Okay?
4      A   I know.  The document -- the document does
5  show it.
6      Q   Let me finish.
7      A   The document does show that Steve pleaded
8  guilty.
9      Q   I -- I understand that.  And I have a document
10 here that -- where your attorney asks Sears to do so;
11 correct?
12     A   My attorney asked him to do what?
13     Q   To plead guilty, to take the plea.
14     A   If they were not guilty, would they plead
15 guilty?
16     Q   Well --
17     A   If I asked you to plead guilty on a murder
18 that just occurred, would you plead guilty?
19     Q   Mr. Shomof, again, you don't get to ask the
20 questions.
21     A   Let's be -- let's be realistic here.
22     Q   Well, Mr. Shomof, was it important to get this
23 project financed?
24     A   Very important.
25     Q   Okay.

Page 98

1      A   We did everything possible in our power to get
2  this project going.
3      Q   Do you think it was important to Sears to have
4  this project going?
5      A   I don't think it did.  I don't think they
6  cared.
7      Q   You don't think it -- you don't think they
8  cared?
9      A   No, I don't think they cared.  That's why we
10 are sitting over here.
11     Q   Okay.  So you think that Sears is happy to
12 have the -- no development at the project.  Is that --
13 was that your testimony today?
14     A   The fact of the matter is it shows that they
15 just didn't care.  I pleaded along the way.  If you're
16 pulling e-mails, what -- and I'll pull you tons of other
17 e-mails that you're not concentrating on --
18     Q   I only have so much time.
19     A   -- that show -- that shows how much I pleaded
20 with them to cooperate.
21     Q   Mr. Shomof, this is -- this e-mail chain is
22 taking place November of 2018; correct?
23     A   That's what it looks like, yes.
24     Q   Yeah, so this is after Sears filed for
25 bankruptcy; correct?

Page 99

1      A   Yes.
2      Q   Okay.  And this is at the time you said Steve
3  had no one to speak to at Sears; correct?
4      A   Yes.
5      Q   This is the time when you had no one to speak
6  to at Sears; correct?
7      A   Yes.
8      Q   This was resolved.  Was it not?
9      A   Because --
10     Q   "Yes" or "no," Mr. Shomof?
11     A   It -- Mr. Shomof.  Yes.  Yes, it was
12 resolve --
13     Q   Thank you.
14     A   -- due to Mr. Lampert himself was named on
15 that complaint.  That's why it was resolve.
16     Q   Mr. Shomof, we've talked today about a meeting
17 that took place at the conference room at Sears in
18 September of 2018 where a discussion was held regarding
19 scheduling a plan for the seismic retrofit; correct?
20     A   Yes.
21     Q   And you also testified there was a meeting a
22 few weeks or so before that meeting at Steve's office;
23 correct?
24     A   Correct.
25     Q   Okay.  And I just want to make sure that the

Page 100

1  record's clear.  The meeting at Steve's office, can you
2  name everyone that was in attendance at that meeting?
3      A   I don't -- no.  I remember Steve was there and
4  Alan Shaw was there.  Out of my people, I don't remember
5  who was there.
6      Q   Was there anyone else there on behalf of
7  Sears?
8      A   Maybe.
9      Q   Was there anyone else there representing the
10 landlord?
11     A   Could very much be.  Yes.  I don't remember
12 exactly.  Probably Jonathan was there too.
13     Q   Is it your normal practice to go to a meeting
14 like this by yourself?
15     A   Yes.
16     Q   Okay.  So it's possible you were the only one
17 there?
18     A   Could be.
19     Q   Okay.  Sitting here today, you can't recall?
20     A   No, I cannot.
21     Q   And then the second meeting that took place, I
22 believe, was September 21st at Sears' conference room.
23 Can you tell me everyone who was at that meeting?
24     A   Steve again.  The guy that I don't remember
25 his name.  There was another guy that, again, I don't

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document

IN RE: SEARS HOLDING CORPORATION, et al.   Pg 209 of 238

IZEK SHOMOF
June 24, 2019

Page 101

1 remember his name too. Jonathan Shomof was there, and I
2 believe Jimmy, too, Jimmy Shomof.
3    Q   Okay. Was the sole purpose of this meeting to
4 discuss the seismic retrofit construction schedule?
5    A   That's as far as my recollection, yes.
6    Q   Okay. Do you recall anything else being
7 discussed at that meeting?
8    A   I don't remember if the fire issue or the fire
9 department issue was discussed too. I don't remember
10 that.
11    Q   Okay. Anything else that was discussed?
12    A   No, I don't remember.
13    Q   Okay. And during this meeting in the Sears
14 office -- Sears' office conference room, at that meeting
15 you had requested that Sears close for more than six
16 months; is that correct?
17    A   This meeting and the meeting before that with
18 Alan Shaw too.
19    Q   And can you tell me everything you recall that
20 representatives of Sears said in response to that
21 proposal?
22    A   Everything, I don't remember. I remember that
23 other person saying it will cost for Sears to shut down.
24 That's what I remember.
25    Q   Do you remember anything else about the

Page 102

1 conversation?
2    A   No.
3    Q   Okay. How did you leave things at the end of
4 that meeting?
5    A   We have to do a plan, and we'll send it to
6 you.
7    Q   Who's the "we"? Sorry.
8    A   Us.
9    Q   Okay.
10    A   The landlord. We have to do a plan, and we'll
11 send it to you to detail, one we are looking for.
12    Q   Okay. Did you ever prepare that plan?
13    A   I believe Jonathan did.
14    Q   Okay. Did you ever send it to Sears?
15    A   I believe he did.
16       MR. WEAVER: Mark this next.
17       (Exhibit 11 marked.)
18       MR. WEAVER: Thank you.
19    Q   Mr. Shomof, I'm handing you a document we've
20 marked as Exhibit 11, which is a letter dated
21 September 25th, 2018, on East River Group, LLC,
22 letterhead from Jonathan Shomof.
23       Do you see this?
24    A   Yes.
25    Q   This -- do you remember seeing this document

Page 103

1 at the time it was sent?
2    A   When?
3    Q   Do you remember seeing this when it was sent?
4 Do you recall seeing this?
5    A   Probably, yes.
6    Q   Did you review it before it was sent?
7    A   Most likely I did.
8    Q   Okay. Do you recall if you ever had any
9 comments on the draft?
10    A   If -- I don't remember exactly, but maybe.
11    Q   Is this the plan that you discussed that you
12 needed -- is this the plan that you sent to Sears
13 following the September 21st meeting?
14    A   Yes. I mean, that -- that what it says here,
15 we talked to them in that meeting and talked to them in
16 the previous meeting.
17    Q   Okay.
18    A   And then we put it in writing.
19    Q   Right.
20    A   This -- what was put in writing.
21    Q   And you state -- I'm sorry. You don't state.
22       Joseph [sic] states in the first paragraph
23 that hopefully, the permits will be pulled
24 November 2018.
25       You see that?

Page 104

1    A   You mean Jonathan?
2    Q   Jonathan, sorry.
3    A   Yes.
4    Q   Was it your expectation that the permits be
5 pulled in November 2018?
6    A   Yes.
7    Q   Why'd you expect them to be able to pull the
8 permits?
9    A   Why --
10    Q   Yeah.
11    A   -- did we expect it? Because that's what our
12 architect was saying. Our engineer was saying by that
13 date, we will.
14    Q   And you see in the paragraph underneath the
15 numbered paragraphs, it says "Hopefully, Sears will
16 agree to close from February 1st, 2019, to August 15th,
17 2019."
18       You see that?
19    A   Yes, I do.
20    Q   Okay. Then he says that construction for the
21 Sears store will begin immediately during that time
22 frame.
23    A   Yes.
24    Q   Okay. Mr. Shomof, had the permits for the
25 work been pulled by February 1st, 2019?

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document

IN RE: SEARS HOLDING CORPORATION, et al.   Pg 210 of 238

IZEK SHOMOF
June 24, 2019

Page 105

1    A    It could have been pulled.
2    Q    What do you mean "could have been pulled"?
3    A    Well, we pulled the permit, I think,
4    February 5th or 10th.
5    Q    Okay.
6    A    The reason we decided to do that, just to
7    preserve our entitlement.  We didn't want to pull that
8    if it wouldn't be the issue with the entitlement because
9    we were waiting for financing to pay for the permit fee.
10    But the end of the day, we pull it out of pocket just to
11    preserve our entitlement.  But it could have been pulled
12    a month prior or a week prior.
13    Q    To be clear, on the date of this letter was
14    written on December 25th, 2018, you had not finalized or
15    closed on your construction financing; correct?
16    A    Finalized our construction financing?  Like I
17    said before and I'm saying it again, our construction
18    financing had a few conditions that the majority of the
19    conditions were very, very, very minor.  Could have been
20    done with no -- no issue.  The one major issue was the
21    Sears issue, the Sears agreement issue.
22         MR. WEAVER: Let's use tab 13.
23         Let's make this Exhibit Number 12.
24         (Exhibit 12 marked.)
25    ////

Page 106

1    BY MR. WEAVER:
2    Q    Mr. Shomof, we've handed you exhibit marked
3    Number 12, another e-mail chain bearing Bates Number
4    SK 6801 to 6802.
5         Do you see at the bottom of this first page,
6    there appears to be a e-mail from Steve to Jonathan,
7    you, and others?
8    A    Yes.
9    Q    Okay.  And this is dated February -- I'm
10    sorry -- Friday, September 28th.
11         You see that?
12    A    Yes.
13    Q    Okay.  So he's confirmed receipt of your
14    letter; is that right?
15    A    Yes.
16    Q    And he states "To be clear, this letter does
17    not appear to be offered in the spirit in which we
18    discussed it last week."
19         What did you understand him to mean by "not in
20    the spirit"?
21    A    I don't know.
22    Q    He states that it comes across more as a
23    direction from you as opposed to offering a proposed
24    timeline outlining some of the issues that remain to be
25    negotiated.

Page 107

1    A    So he understood it that way.  That was not
2    our intention direction.  We told him that's what we
3    talked about.  That's how we spelled it out in the
4    letter.
5    Q    And so your understanding was that the letter
6    itself had spelled out the timeline necessary --
7    A    Yes.
8    Q    -- to complete the project?
9         And that it resolved all the issues that you
10    discussed during the meeting prior to sending the
11    letter?
12    A    To preserve all the issue.  There's always
13    other issue comes along.  But I don't know.  Most likely
14    it was.  It's a very vague question, you know?  From
15    minute to minute, issues can occur.  What issues are you
16    talking about?
17    Q    Well, I don't know.  You were in the meeting.
18    I wasn't, sir.  That's why I'm asking.
19    A    Oh, you talking about the issues of the
20    meeting?
21    Q    Correct.
22    A    Oh, I'm sorry.
23    Q    That Steve seems to be referring to.
24    A    Okay.  Well, the issues -- we spelled out the
25    summary of the conversation.  We send him that e-mail.

Page 108

1    He understood it differently.  So the answer is no, I
2    don't understand what exactly he mean by the spirit of
3    the issue.
4    Q    In the third paragraph, he states "The history
5    of the project is riddled with errors that have put our
6    employees and patrons at risk and breached negotiated
7    protocols, not to mention broken promises about timing.
8    Just two months ago, you notified us that you would
9    likely not pursue this project."
10         Did you ever communicate in sum or substance
11    to Steve or anyone representing Sears that you were not
12    likely to pursue the redevelopment project?
13    A    That's not the way he spelled it out, not at
14    all.  When I was sitting down at Steve's office with
15    Alan Shaw, I said it's getting costly because Alan said
16    it may cost you for us to shut down.  I said the project
17    is getting costly.  Don't bring it to a situation, come
18    with a number that I'm not going to be able to do it.
19    Q    Okay.  Well, let's go back because I thought
20    I'd asked you about all the details of that conversation
21    in that meeting.  So let's go back to that meeting
22    because I want to make sure I have the complete picture.
23         So during that meeting, did you -- what did
24    you say about the project becoming costly?
25    A    It's for them, you know.  When we are talking

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 211 of 238

IZEK SHOMOF
June 24, 2019

**Page 109**

1  to them about us taking the place for six months --
2      Q   Uh-huh.
3      A   -- they said it may be costly.  So I said our
4  project is getting to be too costly.
5      Q   Uh-huh.
6      A   So don't come back with a number that may not
7  allowing us to do the project.  That was a -- that was
8  something that we were negotiating in a way, talking.
9  It's not -- he understood it, oh, you may not do the
10  project.  I called him verbally right after that.  And I
11  said, Steve, I never said at no time that I may not do
12  the project.  We're very passionate with the project.
13  We have done -- we spent millions of dollars into this
14  project to pull away.  Our intention is not pulling
15  away.  And he knows that.
16      Q   But you didn't send him an e-mail to that
17  effect or a letter; correct?
18      A   Maybe I did.  I don't remember.  I have to
19  look into it.  Did you receive anything like that?
20      Q   Do you recall seeing a letter to that effect
21  to Steve or an e-mail?
22      A   No.
23      Q   You mentioned and testified earlier that if
24  Sears did not close for six months and this project had
25  to be done in stages, that, too, would also increase the

**Page 110**

1  expense to you.
2      A   Could very much be, yes.
3      Q   Could or would?
4      A   Could.  Most likely would.
5      Q   Mr. Shomof, if Sears did not close for six
6  months, would the project be more expensive for you to
7  complete?
8      A   Maybe lengthier.  It would be lengthier, take
9  longer time.  If we would have finished it in three
10  years, no.  If it would drag behind three years, yes.
11      Q   So my question is you've said that it would
12  take longer to do the project.  By taking longer, would
13  that have been more expensive to the landlord?
14      A   If we pass three years because our
15  construction loan is three years.  If we would pass the
16  three years, it would be.
17      Q   Did you need Sears to close for six months to
18  be able to pass in three years?
19      A   Guaranteed that we are not going to pass in
20  three years if Sears would shut down for six months.  If
21  they would not have shut in six months, it probably
22  would have -- probably would have finish it, but maybe
23  it would exceed the three years, and that's where it'd
24  be more costly.
25      Q   So just to be clear, Mr. Shomof, are you

**Page 111**

1  saying today that you can't say whether, one way or the
2  other, it would have been more expensive for you to
3  complete the project if Sears didn't shut down for six
4  months?
5      A   No, I'm not in a position to say it definitely
6  would cost us more money.
7      Q   So then -- so if you didn't know it would
8  definitely cost you more money, why not just move ahead
9  with the original agreement?
10      A   You know, you're doing negotiation with Sears.
11  You're working on getting them to shut down, if
12  possible, for three months -- for six months.  All they
13  had to say, sorry, Mr. Shomof, we are not closing for
14  six months.  We are not able unless we are getting "X"
15  amount of dollar.  I would do -- I would go different
16  routes.
17      Q   So what you're saying is this extremely
18  important, very expensive project that you've committed
19  so much to, you simply sat there waiting for five months
20  for Sears to come back and say we're not shutting down
21  for six months without doing anything else?
22          MR. KUPETZ: Objection.  Mischaracterizes the
23  testimony.
24  BY MR. WEAVER:
25      Q   You can answer the question.

**Page 112**

1      A   Either/or.
2      Q   So you just sat there, waiting?
3      A   We are just sitting there to just hear from
4  them.  We -- we are just waiting for them.  Are we --
5  are we going to be able to get the space?  If they say
6  no, we'll go different route.  In the meanwhile, while
7  we were waiting, we lost our construction loan.
8      Q   Getting back to what I was attempting to
9  ask -- and I -- hopefully, it is clear -- my question's
10  clear -- you're unable to say today whether or not Sears
11  did not close for six months, the project would have
12  cost you more money?
13      A   My answer is we were hoping and it would be
14  preferably if Sears would close for six months for us to
15  be able to finish the job 100 percent within three
16  years.
17      Q   I understand your preference.  But I'm asking
18  whether or not at the time of these negotiations, you
19  had a view of whether or not it would be more expensive
20  for you if Sears did not close for six months.
21      A   It would be more expensive if we -- if we will
22  go over the three years.
23      Q   Okay.  And by not -- by Sears not closing for
24  six months, did it make it a real concern that you would
25  go over three years?

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.  Pg 212 of 238

IZEK SHOMOF
June 24, 2019

Page 113

1    A   It would be -- yeah, it was a concern.
2    Q   And you had -- and you had said during this
3  earlier meeting in Steve's office that the project was
4  becoming more expensive?
5    A   If I have to pay you millions of dollars to
6  shut down, it will be very expensive.  And yes, the job
7  was getting more expensive.
8    Q   Did you have a number in your head of at what
9  point the project would become so expensive it would not
10 make sense to complete?
11   A   Sense to complete it makes.  But there is no
12 reason why not to build it.
13   Q   Okay.
14   A   If you go behind the three years of
15 completing, the lender can call off the loan.  There is
16 other issue that may be affiliated with that.
17   Q   Uh-huh.
18   A   We didn't want to -- we wanted to be sure that
19 we are going to be able to finish it up within three
20 years, and we were 100 percent sure if Sears would shut
21 down for six months, 100 percent sure we can complete
22 that job in three years.  Our general contractor said,
23 yes, we can finish it up in three years, but I'm not
24 guaranteeing it 100 percent that I will finish it up in
25 three years.

Page 114

1    Q   And the risk of you not finishing it up in
2  three years is a risk that you, the landlord, took on
3  under the 2015 amendment; correct?
4    A   Repeat that.
5    Q   The risk that it would take more than three
6  years to complete and increase your cost was a risk that
7  you bore under the 2015 amendment; correct?
8         MR. KUPETZ: Objection to the extent you're
9  asking for a legal conclusion.
10        MR. WEAVER: I'm asking for his understanding
11 as a landlord who signed the agreement.
12        THE WITNESS: I do not understand your -- if
13 you don't mind, repeat it again.
14 BY MR. WEAVER:
15   Q   I do not.  I'm glad.  If you don't understand,
16 you should ask me to clarify.
17   A   Yes.
18   Q   Under the 2015 amendment, the seismic retrofit
19 and all of the construction was to be done solely at the
20 landlord's cost and expense; correct?
21   A   Yes.
22   Q   Sears was not to share in that cost and
23 expense in any way; correct?
24   A   Correct.
25   Q   So there was no obligation for Sears to do

Page 115

1  anything to make sure that the loan -- that the
2  construction project would be completed in three years;
3  correct?
4         MR. KUPETZ: Objection to the extent you're
5  asking for a legal conclusion.
6  BY MR. WEAVER:
7    Q   I'm asking for your understanding as the
8  landlord who signed the lease.
9    A   No obligation of Sears.  I don't see it that
10 way.
11   Q   Well, how do you see it?
12   A   Maybe legally you may be correct, which I
13 don't know.
14   Q   I'm not asking as a lawyer.
15   A   I may ask my attorney to see legally if it's
16 "yes" or "no."  But logically, I don't see it that way.
17   Q   Why not?
18   A   Why don't I see it that way?
19   Q   Yes.
20   A   Because I see that Sears should cooperate
21 because they have huge benefits for us completing this
22 project.  Huge benefits.
23   Q   Can you point to anywhere in the 2015
24 amendment or the 2011 lease the basis of that belief?
25   A   Again, talking about legally, I am not sure.

Page 116

1  I let my attorney answer that question.  Legally.  If it
2  is legally.  I'm not 100 percent sure.  You may be
3  correct.  But I'm saying logically, I believe personally
4  that Sears should have cooperated, should have.  It
5  would benefit them much more than if they were not --
6  than what it is now.
7    Q   And your basis for saying they did not
8  cooperate was the fact they never responded to your
9  offer for them to shut down for six months without
10 cooperation -- without compensation?
11   A   No.  They could -- they should have -- they
12 should have respond.  Not exactly responding saying,
13 yes, Izek, we agree with you.  We will shut down for six
14 months.  They should cooperate by answering back.  No,
15 we are not agreeing.  We are not shutting down for six
16 months.
17   Q   And that is the precise issue that you state
18 is a reason why they did not cooperate, thus costing you
19 over $5 million in cure costs?
20   A   Not only that.
21   Q   Well, that's -- I asked you earlier today what
22 are the bases.
23   A   They should have -- the bases are that Sears
24 drugged us.  When they went silence due to the
25 bankruptcy, it cost us damages.  That is why we're

Page 117

1 sitting over here, and that is to be determined in the
2 court of law.
3    Q   Correct.
4    A   So legally, I'm not here to answer any
5 question.
6    Q   Of course.
7    A   Again, that's why I'm presenting -- I'm hiring
8 an attorney to take it to a court of law and let the
9 jury decide if I'm at fault or Sears at fault.
10    Q   And as a landlord who signed the 2015
11 amendment, are you aware of anything that you as the
12 landlord believe that Sears did that was contrary to
13 their obligations under the lease?  Is there something
14 you think they did wrong under the lease and amendment?
15    A   I said -- I answered that question three
16 times.  And I will answer it one more time.
17    Q   It's a "yes" or "no."
18    A   Legally --
19    Q   If you give me "yes" or "no."
20    A   That's not true.  But logically, they have
21 done wrong, yes.
22    Q   Okay.  Logically.  Point to me in either the
23 lease or the 2015 amendment what they logically did
24 wrong.
25    A   If you ask me to point to the lease, I let my

Page 118

1 attorney point to the lease if there is anything there.
2    Q   You do understand, though, regardless, not as
3 a lawyer, but as a landlord, that your rights and
4 obligations of the parties is governed by the lease and
5 the amendment?
6    A   I do understand that.
7        MR. KUPETZ: Objection to the extent you're
8 asking for a legal conclusion.
9        MR. WEAVER: I'm asking for his understanding
10 as the landlord who signed the agreement.
11    Q   Do you understand that that was the agreement
12 that you signed to govern your relationship with Sears?
13    A   If my attorney will agree to it.
14    Q   I'm asking your understanding.
15    A   Most likely, yes.
16    Q   Why do you sign leases as a landlord?
17    A   To govern agreements.
18        MR. WEAVER: Let's take a break.
19        (Lunch recess.)
20 ////
21 ////
22 ////
23 ////
24 ////
25 ////

Page 119

1        LOS ANGELES, CALIFORNIA; MONDAY, JUNE 24, 2019
2                2:17 P.M.
3
4        (Exhibit 13 marked.)
5
6        EXAMINATION (Continued)
7 BY MR. WEAVER:
8    Q   Mr. Shomof, we've handed you a document that's
9 been marked Exhibit 13, which is an April [sic] 12,
10 2019, letter from Mark Cohen, who, I believe, is your
11 counsel to -- to Steve.
12        MR. KUPETZ: Did you mean to say "February"?
13        MR. WEAVER: I did.
14        MR. KUPETZ: I thought I heard you say
15 "April," but I'm not sure.
16        MR. WEAVER: I did.  It's February 12th, 2019.
17        MR. KUPETZ: Okay.
18 BY MR. WEAVER:
19    Q   Okay.  And it says cc to client.  I assume is
20 you.  Do you recall receiving or seeing this letter?
21        (Reporter seeks clarification.)
22        THE WITNESS: Yes.  I said I do.
23 BY MR. WEAVER:
24    Q   Do you -- the -- last paragraph -- I guess
25 second-to-last paragraph technically -- it says

Page 120

1 East River's entitlements will expire unless
2 construction begins prior to March 16, 2019.
3        Do you see that?
4    A   Yes.
5    Q   At this point, February 12th, 2019, was the
6 landlord doing any construction at the building
7 location?
8    A   I think minor finishing up the demoing,
9 removing of the asbestos and -- if anything.
10    Q   Okay.  So there was no construction taking
11 place at this time?
12    A   Oh, it all depend if you consider it
13 construction or not.
14    Q   Well, this letter says unless construction
15 begins.  That implies to me that construction had not
16 been --
17    A   Construction with permits what he means.
18    Q   Okay.  Did the construction begin prior to
19 March 16, 2019?
20    A   Construction with permits?
21    Q   Whatever's meant by this letter.
22    A   No.
23    Q   Did not?
24    A   No.
25    Q   Okay.  Did the entitlements expire?

Page 121

1  A  We were able to salvage it.
2  Q  And how were you able to salvage it?
3  A  By pulling structural permits.
4  Q  Okay.  What does "salvage it" mean?  What does
5  that mean now?
6  A  If something was -- was wrecked and you are
7  able to recycle it or salvage it or -- before you trash
8  it, you --
9  Q  Okay.  As it relates to your entitlements,
10  what is the current status?
11  A  We are -- we went and pulled seismic retrofit
12  permit.  And the -- by the time -- from the day that we
13  pulled the seismic retrofit permit, we have six months
14  to start construction.
15  Q  And not to be technical, what does it mean by
16  "start construction"?  Like, what do you have to do
17  within six months?
18  A  Call for inspection.  Call for the inspector
19  to come in and inspect that there we are, started
20  construction.
21  Q  And you stated that the -- the permits were
22  pulled in February; is that correct?
23  A  Yes.
24  Q  One document that's been produced in the case
25  says -- is a permit from February 21st, 2019.  Does that

Page 122

1  sound --
2  A  Could be.
3  Q  Okay.  So does that mean from six months from
4  February 21st, 2019, you needed to begin construction
5  for the entitlements?
6  A  I believe so.  Yes.
7  Q  So that would be --
8  A  September, I think.
9  Q  August?
10  A  August or September.  All depend if you
11  counting February into March --
12  Q  August 21st?
13  A  No.  I said September 21st, if I'm not
14  mistaken.
15  Q  So you said you have six months from the date
16  the permit was pulled?
17  A  Six months from August -- from February 21st,
18  so it should be September 21st, if I do the number
19  correctly.
20  Q  To March, April, to May, to June, July, to
21  August --
22  A  That six?
23  Q  -- would be six.
24  A  To August, then.  When did we -- somewhere I
25  was told September.

Page 123

1  Q  Do you have plans to begin construction before
2  August?
3  A  We have no loan.  We lost the loan.
4  Q  Okay.  Is that the only reason you're not
5  beginning -- did not have plans to begin construction by
6  August 2019?
7  A  That is the major reason.  I mean, we are --
8  I'm fascinated.  I'll be honest with you.  I lost the
9  loan after the whole aggravation.  So yes, that is --
10  that is the major issue.  We don't have the financing.
11  Q  Could you begin the construction without the
12  financing loan?
13  A  I can if I want to bring -- if I have the
14  money available in my pocket to do it, find people.
15  Q  And when did you lose the financing as you
16  describe it?
17  A  I don't remember.  Sometime at that time, the
18  bank sent us a letter stating that pulling away, and we
19  had some money with them because we gave them about half
20  a million dollar to fees.  So they says we have some
21  money and send us where we should send the money to you.
22  Q  So they sent you a letter?
23  A  They send us -- I believe a letter or e-mail,
24  yeah.
25  Q  Terminating the -- the application?

Page 124

1  A  Cutting off the loan, yeah.
2  Q  Okay.  I don't believe we've seen that
3  communication.  So, again, that would be another request
4  we would make.
5  A  I had my lender -- my loan broker send a
6  summary.
7  Q  We're going to get to that in a moment.
8  A  Yeah.
9  MR. WEAVER: Let's mark 18.
10  (Exhibit 14 marked.)
11  BY MR. WEAVER:
12  Q  Mr. Shomof, we're handing you an exhibit
13  marked Number 14, which is another e-mail chain bearing
14  Bates Number SK 6728 through 6731.
15  Focused specifically on the second e-mail,
16  which is February 14, 2019, at 4:14 P.M. from Steve to
17  Mark.  You are not copied on the e-mail, but then Mark
18  forwards it to you as an FYI.
19  Do you see that?
20  A  Yes.
21  Q  Do you remember receiving this e-mail
22  forwarded by Mark?
23  A  Most likely, yes.
24  Q  Do you remember it, sitting here today?
25  A  Not -- not 100 percent.  But yes, most likely

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 215 of 238

IZEK SHOMOF
June 24, 2019

Page 125

1  I've seen it, yes.
2      Q   So in this e-mail from Steve, it seems to be
3  inviting you to meet to start to discuss in greater
4  detail assertions made in a prior letter.  Do you
5  remember getting that invitation from -- I'm sorry --
6  your counsel getting that invitation?
7      A   I remember something like that, it's true.  I
8  think we -- as far as I remember, we ask him to meet
9  with us to allow us to do the HVAC to complete what was
10  left off because Sears asked us to do the
11  construction -- completing the HVAC together when we do
12  the seismic.
13      Now we are not doing the seismic, so we wanted
14  to finish up the HVAC to be able to get back our
15  $1.4 million, whatever left of it.  And he says let's
16  meet, and nothing came out of that meeting.  Nothing
17  came -- that meeting never -- never came across.
18      Q   Okay.  In that e-mail, Steve also states that
19  Sears has been very unhappy with the progress and
20  development to date, as you and your client know.
21      Did you know that Sears was unhappy with the
22  progress of the development to date of this e-mail?
23      A   Not happy -- that Sears are not happy with us?
24      Q   Yes.  With the progress of the work and the
25  development.  Were you aware of that?

Page 126

1      A   Not at all.  This is something that --
2      Q   So you disagree with Steve's comment in the
3  letter?
4      A   I do disagree with Steve.
5      Q   Okay.  He also says "Just last week, I need to
6  send a lawyer from my firm to stop activity during
7  working hours by your client's demolition team putting
8  our customers and employees at risk."
9      Were you still having issues in
10  February 14th, 2019, of disrupting business at Sears
11  through your demolition crew?
12      A   Like I mentioned very earlier in this
13  deposition, homelesses continuously breaking in.  And
14  the easiest thing for Steve to do is blame us.  And we
15  explain Steve repeatedly homelesses are breaking in.  As
16  we speak, I bet the homeless is running along the
17  building.  It's 1.6 million-square-feet building with 20
18  different entrances.  Every -- even though everything is
19  locked, they keep on breaking in.
20      Q   But his note specifically is about stopping
21  activity during work hours by the demolition team.
22      A   He -- he thinks that it's work hour, but it's
23  not.  He making it up by thinking that it's work, our
24  employees, but none of our employees were there.
25      Q   So you have no employees there during work

Page 127

1  hours?
2      A   (Witness shakes head.)
3      As far as I remember, no.  Not at all.
4      Q   So you think his statement that he sent a
5  lawyer over during work hours is just not true?
6      A   I believe that that's what he believed.  I
7  cleared it to him that there was -- the homeless is
8  breaking in.
9      MR. WEAVER: Let's do -- let's do Number 23.
10  Up to Number 15.
11      (Exhibit 15 marked.)
12  BY MR. WEAVER:
13      Q   Mr. Shomof, I've handed you an exhibit which
14  is marked Exhibit Number 15.  It's another e-mail chain
15  bearing Bates Number SK 6904 through SK 6923.  It's a
16  very long e-mail exchange.  Obviously, you're welcome to
17  look at the entire chain, but I'm really going to focus
18  just on the beginning at the top here.  Let me know when
19  you are ready.
20      A   I am ready.
21      Q   So looking at the second e-mail on the first
22  page, it's an e-mail dated August 29th, 2018, from
23  someone at OZK.com, which, I presume, is Ozark bank?
24      A   Bank of the Ozark [sic], yeah.
25      Q   To someone at Balboa Financial?

Page 128

1      A   Yes.
2      Q   Okay.  And who is Balboa Financial?
3      A   He's my loan broker.
4      Q   Okay.  And is Bank of Ozark [sic] the bank
5  that you were discussing construction financing with?
6      A   Yes.
7      Q   Okay.  The top e-mail is from April 29, 2019,
8  where Scott Duntley at Balboa forwards this long e-mail
9  chain along with a summary to you and other members of
10  your -- of your group.
11      Do you see that?
12      A   Yes.
13      Q   Do you remember receiving this e-mail in
14  April?
15      A   Yeah, I remember something like that.
16      Q   Okay.  Do you know why in April 2019, Scott
17  Duntley is forwarding this e-mail chain to you and your
18  colleagues?
19      A   I asked him to write down the point -- our
20  point of exactly what happened during the time period of
21  us dealing with Bank of the Ozark.
22      Q   Okay.  So this is a summary prepared by your
23  loan broker at your request?
24      A   I asked him to please summarize of what
25  happened, yes.

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 216 of 238

IZEK SHOMOF
June 24, 2019

Page 129

1    MR. WEAVER: Okay.  Now, I'm going to come
2  back to -- there's the idea of the closing checklist
3  from October 4th, but before I do that, I want to also
4  mark one more document because I think it's all the
5  same.  Tab 24.  Exhibit 16.
6    (Exhibit 16 marked.)
7  BY MR. WEAVER:
8    Q   Mr. Shomof, I've handed you an exhibit that's
9  been marked Exhibit 16.  It appears to be a letter from
10  May 22nd, 2019, from Balboa Financial to you regarding
11  Bank of the Ozark loan for Sears Boyle Heights project.
12    Do you see this?
13    A   Yes.
14    Q   Do you recognize this letter?
15    A   Yes.
16    Q   Okay.  Did you ask Balboa Financial to provide
17  this summary to you?
18    A   Yes.
19    Q   Okay.  What discussions did you have with
20  Balboa Financial for the preparation of this letter?
21    A   I said can you please provide me the summary
22  of detail of what exactly happened.
23    Q   And on the bullet point at 7/3/2018 in the
24  middle of the letter --
25    A   Where?

Page 130

1    Q   I'm sorry.  June the 3rd, 2018 -- I'm sorry.
2  July.  July the 3rd, 2018.
3    A   Okay.
4    Q   It says "Bank's counsel asks is there a
5  current amendment that speaks to their relocation of
6  Sears during construction" --
7    A   Okay.
8    Q   (Reading:)
9    -- "or is that in process of being drafted?"
10    That was Mr. -- I actually don't know who this
11  is from.  It's from the president of Balboa.  I can't
12  read the signature.  The author of this letter has put
13  that statement in quotes.  Do you know the source of
14  that quotation?
15    A   That's what we been talking most the day today
16  that we have an agreement with Sears of us entering and
17  doing the seismic.
18    Q   No, I understand.  I'm asking specifically the
19  author of this letter seems to be quoting something from
20  July 3rd --
21    A   That's what I'm trying to say.  That's what
22  happened in July 3rd, 2018.
23    Q   It says the bank's counsel asked.  Is that
24  from an e-mail?  From a meeting?  I'm trying to
25  understand where the source of the quotation comes from.

Page 131

1    A   Either from an e-mail or we had a weekly
2  conference call for maybe two or three hours.  So --
3    Q   So this could just be someone's recollection
4  of what was said on a conference call?
5    A   Could be.  Could be with a conference call.
6  Could be with an e-mail to him or conversation that he
7  had with them.  I don't know.
8    Q   And this seems to imply that the amendment has
9  to be for the relocation of Sears during construction.
10  And we were discussing earlier today whether or not the
11  closing condition was that Sears had to close for six
12  months or if there would be some other amendment.  This,
13  would you agree, suggests that the condition was the
14  relocation of Sears; is that correct?
15    MR. KUPETZ: Objection.  Objection.
16  Mischaracterizes.
17  BY MR. WEAVER:
18    Q   You can answer.
19    A   That is something that, like I mentioned
20  before, I mentioned to Bank of the Ozark that I'm trying
21  to negotiate with Sears to allow us to get into Sears'
22  space and complete the project within six months versus
23  doing it in portion.  So they keep on asking if you have
24  that agreement with them.
25    Q   So this was raised, according to this letter

Page 132

1  prepared by Balboa at your request, in early July.  And
2  the letter that we saw earlier today was from late
3  September where you set forth the request that Sears
4  close for six months.  Is that the correct timeline?
5    A   No.  What was your answer -- what was your
6  question again?
7    Q   That this indicates that the issue arose in
8  early July --
9    A   Okay.
10    Q   -- and the letter that we discussed earlier
11  where you set forth the proposal for Sears to close for
12  six months was late September; is that correct?
13    A   I sent the proposal, but I was verbally
14  negotiating with Sears, I think, even before July 3rd.
15    Q   But the -- the proposal that you sent was in
16  late September; correct?
17    A   Reading from our proposal, yes.
18    Q   Okay.
19    A   But verbally conversation repeatedly, it was
20  prior.
21    Q   And the last bullet says "Approximately six
22  months after last all-hands status call, Bank OZK
23  terminated the application due to lack of activity."
24    Again, is it your testimony today that they
25  provided you some written termination?

Page 133

1   A   I -- as far as I remember, yes.
2       (Exhibit 17 marked.)
3   BY MR. WEAVER:
4   Q   Mr. Shomof, I've handed you what has been
5   marked as Exhibit 17, which is Bank OZK closing
6   checklist --
7   A   Yes.
8   Q   -- last revised October 3rd, 2018. Do you
9   recognize this document?
10  A   Looks very familiar, yes. I've seen it
11  before. I believe I've seen it before.
12  Q   Based upon my reviews of the document, this
13  seems to be the last version of this and was attached, I
14  believe, to the one summary e-mail that we looked at
15  before.
16  A   Okay.
17  Q   So if you think there's a later version, let
18  me know, but my understanding is this is probably the
19  latest version of this document.
20  A   Yes.
21  Q   And if you will -- I should have noted for the
22  record that the Bates number here is SK 1129 through
23  SK 1140.
24      And if you turn to page 1135 -- and you'll see
25  section 8 is a tenant lease, leases, and related

Page 134

1   information.
2   A   Uh-huh. What -- Number C?
3   Q   On Number 8.
4   A   Eight, okay.
5   Q   And then you see subsection C is the Sears
6   lease and agreements.
7       Do you see that?
8   A   Yes.
9   Q   Okay. Item Number 1 is lease amendment on
10  construction relocation.
11  A   Yes.
12  Q   Is that a condition that you have been
13  discussing today?
14  A   Yes.
15  Q   Okay. And you describe this as a closing
16  condition; is that right?
17  A   Yes.
18  Q   Okay. Is it your understanding that every
19  item listed on this checklist is a closing condition?
20  A   Oh, you talking about closing condition --
21  Q   For the loan.
22  A   -- in regards to the loan?
23  Q   Yes.
24  A   Most likely, yes.
25  Q   Okay. So -- so this 11-page document is -- is

Page 135

1   charting out the various closing conditions; is that
2   correct?
3   A   Correct.
4   Q   Okay. And was the lease amendment on
5   construction relocation the only open closing condition
6   from this list?
7   A   The only closure open condition. All the rest
8   are very, very minor. Could have got done within a
9   week.
10  Q   Well, if you turn the page to Number 1136,
11  you'll see section 8, which is construction.
12  A   Section 8. I don't see section 8.
13      MR. KUPETZ: In -- in red.
14      THE WITNESS: Okay. Sorry.
15  BY MR. WEAVER:
16  Q   And you'll see that there are construction
17  contracts.
18  A   Yes.
19  Q   With general contract, et cetera.
20  A   Yes.
21  Q   One of which says the general contract is due
22  October 1st?
23  A   Yes.
24  Q   Do you know if the general contract was
25  obtained by October 1st?

Page 136

1   A   I had general contract, which it was Big Stuff
2   construction. Big Stuff construction have done over a
3   thousand units for me before. But they were not big
4   enough for Bank of the Ozark, so they ask us for another
5   general contractor.
6   Q   Okay.
7   A   And they -- I asked them if Suffix general
8   contractors are good enough for them, and they
9   recommended that Suffix are the one that -- that are
10  doing projects with Bank of the Ozark in Seattle
11  somewhere. So we were negotiating with Suffix, and they
12  finalized. We were told finalizing an agreement to do
13  Suffix would be the general contractor on the job.
14  Q   Was that ever finalized?
15  A   No. Finalizing mean signed contract. It was
16  not signed contract, but we were in the process of
17  getting it done. We decided not to do it.
18  Q   When did you decide not to do it?
19  A   When things start falling apart.
20  Q   So by the time Sears filed for bankruptcy
21  October 15th, 2018, you did not have a general
22  contractor; is that correct?
23  A   I did have a general contract but not signed
24  an agreement with a general contract.
25  Q   Okay. So that was a closing condition that

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al. Pg 218 of 238

IZEK SHOMOF
June 24, 2019

---

Page 137

1 had not been met by the date of the bankruptcy; is that
2 correct?
3    A   It could have been met with one signature.
4    Q   Why wasn't it signed, then?
5    A   Because I chose not to sign.  Once I sign, I
6 am bonded to it.  I didn't want to sign it before I know
7 where I'm at with Sears.  That's why I did not sign it.
8    Q   But you needed a general contractor to be able
9 to do the project; correct?
10    A   I needed and I have a general contractor.
11 We've been with many, many meeting with general
12 contractor.  They give us the agreement.  And we were
13 going through the agreement.  It's about just signing
14 it.  And we decided not to sign it before we know
15 exactly where we are.
16    Q   I see.
17        I don't want to go through and take their time
18 to go through this entire document.  But --
19    A   I have the time if you want to take the time.
20    Q   Well, you'll notice under the checklist under
21 "Party," if "B" is indicated there, that's the borrow's
22 responsibility.  Would you agree with that?
23    A   Okay.
24    Q   And would you agree that as you flip through
25 this -- this document, there's a significant number of

Page 138

1 "B" items that are not completed as of the date of this
2 draft?  Would you agree with that?
3    A   Yeah.  Those are very -- if you look -- if you
4 want to go through one by one, I'll go with you one by
5 one.  It's very minor.  I know it sounds a lot of "Bs,"
6 like a lot of conditions, but that's not the case.  So
7 if you -- I have the time if you have the time to go on
8 every each one of them one by one, and I have an answer
9 for you.
10    Q   Well, as much as I would enjoy going one by
11 one, my question for you is again what I asked you
12 earlier today that as of October 15th, the date of the
13 bankruptcy, filing of the bankruptcy, the Sears
14 amendment for relocation was not the only closing
15 condition you had not satisfied; correct?
16    A   Again, like I said twice before -- this again
17 the same question that you asking.  The only crucial
18 issue was Sears.  All the rest was very minor, could
19 have got done in two days, a week max.  For example, as
20 I'm reading over here, insurance.  We had all the
21 insurance lined up.  We just did not start paying fees.
22    Q   And all the permits pulled?
23    A   Permits could have been pulled if I have the
24 contract to go pay for them.  And I end up paying for
25 the permits myself seismic retrofit out of my own cash.

Page 139

1    Q   What is the current status of the Bank of
2 Ozark's loan?
3    A   As of now?
4    Q   As of today.
5    A   They called it off.  I'm half a million dollar
6 in attorney's fees with them and tens of thousands of
7 dollars with appraisals and many other studies that was
8 provided to them.
9    Q   Did -- in June of 2019, so earlier this month,
10 did they offer you a new indication of interest for
11 construction financing?
12    A   June of 2000- --
13    Q   '19.
14    A   Not that I know of, no.
15        MR. WEAVER:  Let's mark 18.
16        (Exhibit 18 marked.)
17 BY MR. WEAVER:
18    Q   Well, let me ask you.  We've marked -- for the
19 record, we've marked a document Exhibit Number 18
20 entitled "Bank of the Ozarks."  Seems to be a letter to
21 you Bates numbered SK 3117 through -397.
22    A   So what is the question?
23    Q   Well, this is a letter dated June 14, 2019.
24 Is this a letter you received from Bank of the Ozarks?
25    A   That must be typo.  First of all, June 14 --

Page 140

1 most of June.  That's what I was trying -- I start
2 saying.  Most of June I was in Europe.  I was not here.
3    I got back.  I delayed, I think, the
4 deposition because I just got back recently.  But first
5 time I'm seeing that.  Maybe a typo in the date.
6        MR. KUPETZ:  I think what it probably was --
7        THE WITNESS:  I don't know where it came from.
8        MR. KUPETZ:  -- an automated date updating of
9 a date.  You know how documents -- whether it was in
10 Word or whatever, I think it probably -- when it was
11 forwarded or printed, probably self-automated.  That's
12 our guess.
13        THE WITNESS:  You guys?
14        MR. KUPETZ:  I think that was probably the
15 date where your office may have sent it to us.
16        THE WITNESS:  Could be.
17        MR. KUPETZ:  So when they forwarded -- again,
18 I'm not sure.
19        THE WITNESS:  That's the first time I've seen
20 that June 14 of 2019.
21 BY MR. WEAVER:
22    Q   Okay.  So they're not in current discussions
23 with the Bank of Ozark regarding construction financing?
24    A   No, they're not.
25        MR. KUPETZ:  Claire's pointing out on that

Page 141

1  document that you were just looking at, if you go to the
2  signature on page 23 of 27, it was -- has a 2018 date
3  there.
4        MR. WEAVER: Okay.  Thank you.
5     Q   Mr. Shomof, how many -- how many properties
6  are you and your groups landlords over?
7     A   How many individual properties?
8     Q   Yeah.  Ballpark, if necessary.  Are you a
9  landlord on 20 properties?  A hundred properties?  A
10 thousand properties?
11    A   Probably 25, 30.
12    Q   Do any of those involve retail tenants?
13    A   Yes.
14    Q   And in your experience as a landlord with
15 retail tenants, have you ever experienced a situation
16 where a retail tenant has closed for six months or more?
17    A   My tenants --
18    Q   Yeah.
19    A   -- or other tenants?
20    Q   Your tenants.
21    A   My tenants, if they close for six months?  No.
22 And I have an explanation for it.
23    Q   Please.
24    A   I've done a very similar project at
25 609 South Grand with a seismic retrofit with retail

Page 142

1  spaces on the ground floor.  We were negotiating with
2  Carl's Juniors [sic] for them to close for six months.
3  They said, no, we cannot.  We found other routes, and we
4  got it done, completed.  All we need is for them to just
5  say unlivable, not just put us on ice.
6     Q   But my question is:  Are you familiar with any
7  of your tenants ever agreeing to close for six months?
8  Is the answer to that no?
9     A   I did not approach -- except Carl's Jr., I did
10 not approach no other ones before Grand.
11    Q   In your experience as a landlord, are you
12 familiar with retail establishments that are not your
13 tenants that have closed for six months or more?
14    A   Yes.
15    Q   Do you have an example?
16    A   Am I familiar with people that shut down for a
17 period of time?  Yes.  I need to think for a second.  I
18 think it even happened to us.  I may take it back.  I
19 cannot recall immediately, but I can come back with
20 few -- a few of them at a later time.
21    Q   When asking Sears to shut down for six or more
22 months, what did you think would happen to the
23 employees?
24    A   What happened to the employees when they shut
25 down thousands of stores?  Did they have concern about

Page 143

1  those employees?
2     Q   I'm asking --
3     A   They just decided to shut down?
4     Q   Let's take a step back, Mr. Shomof.  Your
5  suggestion was they close for six months --
6     A   No.  You asking me a very technical -- trying
7  to put me on the spot in a way of worrying about
8  employees.
9     Q   Mr. Shomof --
10    A   By Sears not allowing me to do the seismic
11 retrofit and having a thousand employees working and
12 doing the renovation, what happened to those employees
13 for heaven's sake?
14    Q   Mr. Shomof, my question is:  Your proposal is
15 that Sears shut down for six months or more and
16 presumably then re-open; is that correct?
17    A   Yes.
18    Q   So what did you think was going to happen to
19 employees for that six-month time period?
20    A   Relocate them to other Sears department store
21 that are still open.
22    Q   Do you know the closest Sears locations to
23 Boyle Heights?
24    A   No, not offhand.  But I've seen many Sears
25 around still open or unless they shut down.

Page 144

1     Q   Did it seem reasonable to you that Sears would
2  be able to shut down for six or more months and then
3  re-open with the same customer base and same sales
4  force?
5     A   Absolutely yes.  And I can explain why.
6     Q   Please do.
7     A   Sears have not put a coat of paint on that
8  location for the past 25 years.  Sears are not in
9  compliance with ADA on that project for many, many
10 years.  I offered to do all that stuff for them.  I
11 offered to renovate.  I offered to replace the ceiling,
12 to replace the carpet.  I offered a lot of things to
13 them in exchange for that, putting a new HVAC system.
14        So -- and the most important one is for them
15 to have a lease, a 99-year lease, with a seismic
16 retrofit building.  And that will give them a bigger and
17 better -- a bigger and better value to the lease.  I
18 pleaded with them in every which way I can.  And they
19 just ignore us big time.
20    Q   I understand, Mr. Shomof, that you feel that
21 it would be in Sears' interest to shut down for six or
22 more months without any form of compensation.  I'm
23 guessing what I'm asking, though, is from this practical
24 matter --
25        MR. KUPETZ: I would just object in terms of

Page 145

1  when you say "without any form of compensation," I think
2  that's mischaracterizing what he said.
3  BY MR. WEAVER:
4     Q   In your offer, Mr. Shomof, for Sears to shut
5  down, did you offer any financial compensation to Sears
6  for the lack of sales or other costs incurred for those
7  six-plus months?
8        MR. KUPETZ: Objection.  Vague and ambiguous.
9  BY MR. WEAVER:
10    Q   You can answer the question.
11    A   I did not offer cash, but I offer them gain on
12  the lease, which should have been into the millions of
13  dollars.
14    Q   That gain, Mr. Shomof, they were entitled to
15  under the terms of the 2015 amendment; correct?
16    A   That gain they're entitled to of the 2015
17  amendment.
18    Q   The value you say that they will get from a
19  retrofitted building is what they bargained for in the
20  2015 amendment where you promised to retrofit the
21  building; correct?
22    A   Yes.
23    Q   So what is the additional value to Sears
24  beyond what they've already obtained from the 2015
25  amendment?

Page 146

1     A   All they could have said is no.  We want
2  5 million, 1 million, 10 million or we don't want
3  nothing.  We are not closing down.  We would have
4  rerouted our other option or exercised our other option.
5     Q   And you waited for six months instead of
6  effectuation your other option; correct?
7     A   I waited for four and a half months, hoping to
8  get some kind of an answer from them.
9     Q   While your construction financing lay in the
10  balance?
11    A   And I kept on asking the construction
12  financing to just hold off another week, another two
13  weeks, another month, but it end up not happening.
14        MR. WEAVER: Take a break and check our notes.
15        MR. KUPETZ: How much time do you want?
16        MR. WEAVER: Well, it depends -- of the break,
17  five, ten minutes.  Thank you.
18        (Brief recess.)
19        MR. WEAVER: Back on the record.
20    Q   Mr. Shomof, is the development plan for Boyle
21  Heights that we've been discussing today dead?
22    A   I hate to say -- I literally hate to say even
23  maybe.  I'm trying -- this is something that is -- my
24  flux sheet of my projects, I've done 25 other projects.
25  This is the biggest one.  This is a -- I put my heart

Page 147

1  and soul into it.  I want to get it happen and
2  developed.  I've been through hell with the financing.
3  I've been through hell with a lot of -- getting permits.
4  It was hard.  The answer is I hope that in some way, I
5  can maybe salvage it.
6     Q   So is the answer no, it's not dead?
7     A   Yes, the answer is no, it's not dead.
8        MR. WEAVER: That's all we have.  We greatly
9  appreciate your time today, Mr. Shomof.  I don't know if
10  your counsel has anything.
11        THE WITNESS: Thank you very much.
12        Do you want to give him the other stuff?
13        MR. KUPETZ: Let's go off the record, take a
14  break.
15        MR. WEAVER: We can go off the record.
16        (The deposition concluded at 3:15 P.M.)
17
18
19
20
21
22
23
24
25

Page 148

1        A C K N O W L E D G M E N T
2
3  STATE OF          )
4                    ) ss.:
5  COUNTY OF         )
6
7        I, IZEK SHOMOF, hereby
8  certify that I have read the transcript of my
9  testimony taken under oath in my deposition;
10  that the transcript is a true, complete and
11  correct record of my testimony, and that the
12  answers on the record as given by me are true
13  and correct.
14
15
16
17    _____
18        IZEK SHOMOF
19
20  Signed and subscribed to before
21  me, this _____ day of _____, ____.
22
23  _____
24  Notary Public, State of _____
25

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 221 of 238

IZEK SHOMOF
June 24, 2019

```
                                              Page 149
 1              C E R T I F I C A T E

 2

 3   STATE OF CALIFORNIA       )

 4                             ) ss

 5   COUNTY OF LOS ANGELES     )

 6

 7          I, DONNA J. RUDOLPH, a Certified Court

 8   Reporter, do hereby certify:

 9          That prior to being examined, the witness in

10   the foregoing proceedings was by me duly sworn to

11   testify to the truth, the whole truth, and nothing but

12   the truth;

13          That said proceedings were taken before me at

14   the time and place therein set forth and were taken down

15   by me in shorthand and thereafter transcribed into

16   typewriting under my direction and supervision;

17          I further certify that I am neither counsel

18   for, nor related to any party to said proceedings, not

19   in anywise interested in the outcome thereof.

20          In witness whereof, I have hereunto subscribed

21   my name.

22   Dated:  July 1, 2019

23

24   _____
     DONNA J. RUDOLPH, RPR
25   CA CSR NO. 9652, NV CCR NO. 420
```

```
                                              Page 150
 1                    ***ERRATA***

 2         ELLEN GRAUER COURT REPORTING  CO. LLC
              126 East 56th Street, Fifth Floor
 3              New York, New York 10022
                     212-750-6434
 4

 5   NAME OF CASE: IN RE: SEARS HOLDING CORPORATION
     DATE OF DEPOSITION: JUNE 24, 2019
 6   NAME OF WITNESS: IZEK SHOMOF

 7   PAGE  LINE  FROM      TO       REASON

 8   ____|___|_____|_____|_____

 9   ____|___|_____|_____|_____

10   ____|___|_____|_____|_____

11   ____|___|_____|_____|_____

12   ____|___|_____|_____|_____

13   ____|___|_____|_____|_____

14   ____|___|_____|_____|_____

15   ____|___|_____|_____|_____

16   ____|___|_____|_____|_____

17   ____|___|_____|_____|_____

18   ____|___|_____|_____|_____

19   ____|___|_____|_____|_____

20   ____|___|_____|_____|_____

21                     _____

22   Subscribed and sworn before me

23   this_____day of _____, 20__.

24   _____    _____

25   (Notary Public)          My Commission Expires:
```

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document

IN RE: SEARS HOLDING CORPORATION, et al.    Pg 222 of 238

IZEK SHOMOF
June 24, 2019

**$**

**$1,015,000 (1)**
13:1
**$1,424,801.62 (1)**
11:11
**$1,425,000 (1)**
41:5
**$1,474,940.61 (1)**
11:4
**$1.4 (3)**
34:17;48:23;125:15
**$121,851.20 (1)**
12:25
**$16,000 (2)**
36:10,25
**$2 (2)**
33:16;39:10
**$20 (1)**
59:11
**$275,000 (1)**
34:21
**$3 (1)**
33:17
**$32,000 (1)**
37:2
**$322,000 (1)**
36:24
**$4,559,194.82 (1)**
12:25
**$4.5 (1)**
75:8
**$44,868.68 (1)**
11:9
**$5 (3)**
33:15,16;116:19
**$5,270.31 (2)**
11:8;30:17
**$5,696,046.02 (1)**
12:18
**$50 (1)**
59:12
**$69,000 (1)**
35:16

**[**

**[sic] (7)**
73:19;92:24;103:22;
119:9;127:24;128:4;
142:2

**A**

**a3 (1)**
18:2
**abatement (1)**
76:5
**ability (1)**
91:16
**able (28)**
23:5;65:2;67:16,20,

24;68:12;71:5,18,25;
72:3,10;73:20;78:11;
80:3;95:10;104:7;
108:18;110:18;111:14;
112:5,15;113:19;
121:1,2,7;125:14;
137:8;144:2
**above (1)**
15:5
**Absolutely (2)**
61:4;144:5
**acceptance (1)**
40:5
**access (1)**
18:11
**accommodation (4)**
90:18;91:11;92:9,14
**according (1)**
131:25
**account (2)**
33:24;37:9
**acknowledge (1)**
18:8
**across (6)**
13:21;15:19;45:3,17;
106:22;125:17
**active (1)**
18:24
**activity (4)**
29:9;126:6,21;
132:23
**actual (2)**
7:18;23:23
**actually (4)**
30:2;72:7;84:13;
130:10
**ADA (1)**
144:9
**added (1)**
11:15
**addition (2)**
6:15;42:1
**additional (4)**
6:15;12:17;13:19;
145:23
**address (4)**
84:24;85:10,12;
86:24
**addressable (1)**
72:19
**addressed (1)**
85:13
**addressing (1)**
80:13
**administrators' (1)**
29:1
**admit (1)**
60:25
**admitted (1)**
86:5
**affiliated (1)**
113:16
**afraid (1)**

76:20
**again (50)**
8:15;12:9;18:3;19:1,
22;31:13;35:15;38:10,
16,23;41:17;42:21;
43:13,20,22;44:3,12;
45:9;49:12;50:8;54:7,
17;55:17;58:6;60:10;
69:1;71:12;72:2;74:2;
83:20;85:8;87:24;
91:10;93:4,5;97:2,19;
100:24,25;105:17;
114:13;115:25;117:7;
124:3;132:6,24;
138:11,16,16;140:17
**against (2)**
25:11;27:8
**aggravation (1)**
123:9
**aggressively (1)**
84:12
**ago (6)**
6:1;36:13,13;47:12;
74:3;108:8
**agree (11)**
20:3;40:13;41:13;
87:7;104:16;116:13;
118:13;131:13;137:22,
24;138:2
**agreed (4)**
42:6;43:18;78:25;
91:5
**agreed-upon (1)**
82:24
**agreeing (4)**
44:9;60:25;116:15;
142:7
**agreement (70)**
17:6;21:10,19;23:24;
24:19;25:13,22;27:16,
22;28:11;40:16,20;
41:8,12,15,21,24,25;
43:20;49:17,19,22;
58:23;59:22;60:4;
63:24;64:4,5,7,18;
69:20;72:16;73:3,25;
74:10,14,21;76:15,18;
77:1,2,5,15,17,18,21,
24,25;78:3,6,18,19;
79:4,10,17,19;80:20,
21,22;105:21;111:9;
114:11;118:10,11;
130:16;131:24;136:12,
24;137:12,13
**Agreements (3)**
19:25;118:17;134:6
**ahead (3)**
31:25;81:14;111:8
**ahold (1)**
89:17
**air (2)**
82:20;83:4
**Alan (16)**

22:8,13,14,22;26:13;
42:5;54:1;56:7;57:4;
58:1,15,16;100:4;
101:18;108:15,15
**alarm (4)**
86:16;89:24;92:20,
20
**all-hands (1)**
132:22
**allow (7)**
6:6;53:17;59:18;
64:8;78:11;125:9;
131:21
**allowing (5)**
14:13,22;61:13;
109:7;143:10
**along (12)**
15:8,8;52:5;67:1;
75:17;89:14,19;96:14;
98:15;107:13;126:16;
128:9
**alternative (4)**
63:7;65:23,24;66:24
**Alvarez (1)**
6:19
**always (1)**
107:12
**ambiguous (2)**
31:24;145:8
**Amended (7)**
15:24;17:1;19:11;
21:18;25:12;80:17,21
**amendment (64)**
17:15,21,24;19:5,11,
18;20:7;21:19;22:5,19,
19;23:23,25;24:24;
25:2,3,8,10,21,22;26:8;
27:9,15;28:2,7,12,14;
29:2;38:5,6,15,16,21;
39:3;40:11;44:18;50:5;
60:1,22,23;61:2,8,23;
68:22;78:7;79:6;114:3,
7,18;115:24;117:11,14,
23;118:5;130:5;131:8,
12;134:9;135:4;
138:14;145:15,17,20,
25
**among (3)**
22:21;23:1,4
**amongst (2)**
8:19;20:13
**Amount (24)**
10:16;11:2,4,7,8,10;
12:23,25;13:1,23;
15:16;30:17;33:5;
34:20;40:8;42:8;48:21;
50:15,16,16;59:8;62:5;
76:2;111:15
**amounts (10)**
11:15;12:17;13:5,6,
9,12,23;14:6;40:2;75:4
**and/or (1)**
25:16

**Andrew (1)**
5:13
**ANGELES (2)**
5:1;119:1
**Angeles's (1)**
28:25
**answered (1)**
117:15
**answer's (4)**
69:7;91:19;92:10;
96:17
**anticipated (1)**
24:13
**apart (1)**
62:10;64:21;136:19
**apologies (1)**
26:16
**apologize (7)**
16:2,10;38:19;41:19;
42:17;45:11;59:17
**appear (1)**
106:17
**appears (2)**
106:6;129:9
**applicable (1)**
40:17
**application (2)**
123:25;132:23
**applications (3)**
25:15,17;29:1
**appraisals (1)**
139:7
**appreciate (1)**
147:9
**appreciates (1)**
46:15
**approach (2)**
142:9,10
**approached (1)**
67:4
**approval (3)**
18:14;28:25;40:8
**approximately (2)**
15:5;132:21
**April (27)**
21:15,25;22:3,6;
24:9;37:3;38:7,14;
39:23;40:11,21;41:22;
42:4,14;43:2;44:11,24;
48:18,23;49:8;52:16;
119:9,15;122:20;
128:7,14,16
**architect (1)**
104:12
**architects (2)**
12:24;75:6
**architectural (1)**
75:10
**Architecturally (1)**
70:24
**area (1)**
18:18
**area' (1)**

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 223 of 238

IZEK SHOMOF
June 24, 2019

18:13
**areas (1)**
93:7
**arising (2)**
25:14;88:15
**arose (1)**
132:7
**around (4)**
33:15;61:12;80:8;
143:25
**articles (1)**
79:25
**articulate (1)**
44:23
**asbestos (2)**
76:5;120:9
**aside (3)**
15:21;81:1;87:15
**aspect (1)**
79:9
**assertions (1)**
125:4
**asserts (1)**
12:17
**assets (2)**
5:15;7:7
**assistant (1)**
23:21
**associate (1)**
6:19
**assume (4)**
7:25;9:17;67:20;
119:19
**AT&T (1)**
36:10
**attached (7)**
16:15,21;21:11;
29:12;88:12,17;133:13
**attachments (1)**
88:22
**Attempt (1)**
63:15
**attempting (1)**
112:8
**attend (1)**
47:15
**attendance (1)**
100:2
**attending (1)**
46:23
**attention (3)**
10:23;12:15;18:1
**attorney (26)**
22:12;26:12,12;
46:14;89:17,18,18;
90:9,10,10;93:25;94:6,
15,17;95:2,20;96:1,5,8;
97:10,12;115:15;
116:1;117:8;118:1,13
**attorney's (2)**
88:13;139:6
**August (11)**
83:21;104:16;122:9,

10,12,17,21,24;123:2,
6;127:22
**author (2)**
130:12,19
**authorized (1)**
29:9
**automated (1)**
140:8
**automatically (1)**
41:9
**available (1)**
123:14
**avoid (1)**
85:24
**aware (13)**
10:1;13:9;23:23;
25:2;32:9,13,14,15,18,
22,23;117:11;125:25
**away (7)**
10:10;33:8;50:3;
85:7;109:14,15;123:18

**B**

**back (35)**
15:20;19:2;20:23;
28:15;29:22,23;30:21,
24;33:21,24;37:13;
48:8;49:10;50:5;52:14;
54:18;57:3;66:14;
69:21;75:25;87:23;
108:19,21;109:6;
111:20;112:8;116:14;
125:14;129:2;140:3,4;
142:18,19;143:4;
146:19
**backup (1)**
31:6
**balance (6)**
11:9;33:11,22;40:21;
41:23;146:10
**Balboa (8)**
127:25;128:2,8;
129:10,16,20;130:11;
132:1
**Ballpark (1)**
141:8
**bank (17)**
80:22;123:18;
127:23,24;128:4,4,21;
129:11;131:20;132:22;
133:5;136:4,10;139:1,
20,24;140:23
**bankruptcy (25)**
5:16;6:25;7:6;9:24;
13:18;14:11,17;42:9;
51:17,22;52:3;53:12,
16;54:13;61:20;66:18;
71:7;77:10,11;98:25;
116:25;136:20;137:1;
138:13,13
**Bank's (2)**
130:4,23

**bargained (1)**
145:19
**base (1)**
144:3
**Based (1)**
133:12
**bases (2)**
116:22,23
**basically (7)**
15:13;42:2;53:17;
62:18;72:7;74:10;
80:13
**basis (2)**
115:24;116:7
**Bates (10)**
19:24;81:9,20;87:19;
93:5;106:3;124:14;
127:15;133:22;139:21
**bearing (6)**
87:19;93:5,10;106:3;
124:13;127:15
**beautiful (1)**
46:13
**become (1)**
113:9
**becoming (2)**
108:24;113:4
**began (3)**
42:23;70:5;76:7
**begin (13)**
51:25;52:8;54:19;
69:23;70:16;71:5,25;
104:21;120:18;122:4;
123:1,5,11
**beginning (9)**
21:7;47:25;73:4,15;
90:21,25;94:10;123:5;
127:18
**begins (4)**
83:25;93:24;120:2,
15
**behalf (3)**
8:6;90:16;100:6
**behind (5)**
24:16;27:25;76:21;
110:10;113:14
**belief (2)**
28:1;115:24
**below (5)**
18:14;21:13,14,16;
29:6
**benefit (2)**
59:15;116:5
**benefits (2)**
115:21,22
**Beside (1)**
15:18
**best (1)**
28:23
**bet (2)**
37:23;126:16
**better (3)**
89:10;144:17,17

**beyond (2)**
22:6;145:24
**big (9)**
39:2;48:21;73:7;
79:13;88:19;136:1,2,3;
144:19
**bigger (2)**
144:16,17
**biggest (1)**
146:25
**bind (1)**
33:16
**bit (2)**
7:4;79:24
**blame (1)**
126:14
**bonded (1)**
137:6
**bore (1)**
114:7
**borne (1)**
66:5
**borrow's (1)**
137:21
**both (1)**
13:4
**bottom (4)**
81:20,21;96:20;
106:5
**Boulevard (1)**
17:3
**bound (1)**
26:5
**Boyle (9)**
6:22;7:15;8:2;9:20;
95:12,21;129:11;
143:23;146:20
**brand-new (1)**
15:2
**breach (2)**
27:9;61:8
**breached (1)**
108:6
**break (11)**
47:19,20,23;48:1,6,
9;72:7;118:18;146:14,
16;147:14
**breakdown (2)**
42:10,22
**breaking (9)**
85:2,3,3,9,22;126:13,
15,19;127:8
**breaks (1)**
12:22
**Brief (2)**
48:7;146:18
**briefly (1)**
8:18
**bring (2)**
108:17;123:13
**broader (1)**
82:22
**broke (1)**

86:21
**broken (1)**
108:7
**broker (3)**
124:5;128:3,23
**browsing (1)**
46:5
**Bs (1)**
138:5
**build (1)**
113:12
**building (35)**
15:1,1,3,8,11,25;
17:2,13;18:10,12;
19:11,19;20:3,7,11;
21:2;25:7,9,12;28:22;
47:6;67:17;83:9;84:25;
85:23;86:17;87:1,7,10;
120:6;126:17,17;
144:16;145:19,21
**bullet (2)**
129:23;132:21
**business (5)**
29:20;76:11;84:15;
87:8;126:10

**C**

**CALIFORNIA (2)**
5:1;119:1
**call (11)**
49:12;77:14,15;
113:15;121:18,18;
131:2,4,5;132:22
**called (5)**
5:5;49:2;74:4;
109:10;139:5
**CAM (11)**
11:7;30:17;31:1,10,
11,15,21;32:10,17,25;
50:23
**came (9)**
36:18;57:3,9;58:5;
70:19;125:16,17,17;
140:7
**Can (56)**
6:16;7:8;8:18;15:19,
20,25;16:6;18:3;19:23;
20:2;25:4;30:2;32:2,4;
33:7;38:1;39:15,25;
44:19;47:17;50:3,13;
51:15;62:11;63:6;
64:11;77:4,4;80:25;
81:10,12;87:2,14,24;
93:6,15;96:6,7;100:1,
23;101:19;107:15;
111:25;113:15,21,23;
115:23;123:13;129:21;
131:18;142:19;144:5,
18;145:10;147:5,15
**car (2)**
47:3,14
**care (1)**

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.    Pg 224 of 238

IZEK SHOMOF
June 24, 2019

98:15
cared (3)
98:6,8,9
Carl's (2)
142:2,9
carpet (2)
95:17;144:12
case (7)
21:16;45:22;51:22;
52:3;90:15;121:24;
138:6
cases (1)
51:17
cash (2)
138:25;145:11
categories (1)
11:7;12:23;34:18
category (2)
33:10;75:6
caught (1)
87:7
cause (1)
39:25
caused (3)
14:8;85:15;86:1
cc (1)
119:19
ceased (6)
14:18,19;15:13,18;
66:15,15
ceiling (1)
144:11
CEO (1)
88:12
certain (1)
5:15
certify (1)
148:8
cetera (2)
21:3;135:19
chain (20)
81:8,10,16;82:10,11;
83:20;87:18,24;88:23;
92:19;93:4,6;94:23;
98:21;106:3;124:13;
127:14,17;128:9,17
chains (2)
81:16;90:4
change (3)
22:5;23:24;50:24
changes (1)
18:17
changing (1)
78:4
charge (1)
31:7
charged (1)
88:14
charges (12)
11:7;30:18;31:1,11,
12,15,22;32:10,17,25;
50:23;75:9
chart (4)

12:22,22;30:25;75:3
charting (1)
135:1
Check (4)
32:15;72:8;85:8;
146:14
checker (1)
70:19
checklist (5)
69:21;129:2;133:6;
134:19;137:20
children (1)
9:17
children's (2)
8:7;9:16
choice (1)
62:6
chose (2)
70:12;137:5
chronological (1)
87:21
circumstances (1)
25:13
citations (2)
88:15,17
City (13)
25:15;28:25;29:1;
88:13;89:16,17,18;
90:10,10;93:24;94:6,
14,17
claim (2)
12:17;14:8
claiming (2)
15:17;45:13
claims (1)
25:11
Claire's (1)
140:25
clarification (1)
119:21
clarify (6)
7:22;16:6;60:15;
92:2;94:13;114:16
clarifying (1)
42:3;90:24
clause (1)
49:17
clear (28)
8:5;11:20;16:3;
20:11;24:15,17;26:4,8;
41:3,4;42:4,21;44:8,
19;45:4;47:8;55:17;
85:25;90:25;91:1,2,7;
100:1;105:13;106:16;
110:25;112:9,10
cleared (2)
94:1;127:7
Cleary (1)
5:14
client (3)
95:11;119:19;125:20
client's (1)
126:7

close (25)
53:20;57:2;61:3;
63:20,22;73:24;77:18;
78:21,25;79:22;
101:15;104:16;109:24;
110:5,17;112:11,14,20;
131:11;132:4,11;
141:21;142:2,7;143:5
closed (4)
79:7;105:15;141:16;
142:13
closer (2)
58:22;77:8
closest (1)
143:22
closing (19)
57:13,25;65:3;73:4;
74:13,19;111:13;
112:23;129:2;131:11;
133:5;134:15,19,20;
135:1,5;136:25;
138:14;146:3
closure (1)
135:7
Co (1)
17:4
coat (1)
144:7
code (1)
88:15
Cohen (2)
90:9;119:10
colleagues (1)
128:18
collectively (1)
8:15
commence (1)
67:16
commencement (4)
51:16,22;52:13;
53:12
comment (1)
126:2
comments (2)
70:20;103:9
Committed (4)
69:14,15,16;111:18
communicate (1)
108:10
communicated (1)
67:15
communication (1)
124:3
communications (1)
14:20
companies (2)
8:23;9:3
company (3)
58:16;92:21,21
compensation (12)
59:6,13;60:9;61:25;
62:16,25;63:9;66:23;
116:10;144:22;145:1,5

complaint (3)
89:16;90:6;99:15
complaints (1)
84:15
complete (18)
21:9;29:2,4;33:24;
39:22;40:2;52:18;
107:8;108:22;110:7;
111:3;113:10,11,21;
114:6;125:9;131:22;
148:10
completed (18)
21:24;22:3;34:16,22,
25;35:4,10,14,19,22;
37:2;38:6;40:1;41:22;
48:19;115:2;138:1;
142:4
Completely (1)
69:12
completing (3)
113:15;115:21;
125:11
completion (3)
21:15,17;40:3
compliance (2)
21:10;144:9
complicated (1)
7:4
compressors (1)
15:10
comprise (1)
8:11
comprised (1)
11:6
concentrating (1)
98:17
concern (3)
112:24;113:1;142:25
concerned (1)
80:15
concerning (1)
19:19
concerns (1)
84:24
concluded (1)
147:16
conclusion (6)
20:17;25:24;40:24;
114:9;115:5;118:8
concrete (1)
59:11
condenser (1)
15:10
condition (33)
63:21,25;64:5;69:18,
19;72:15,15,20;73:3;
74:9,12,15,19;76:14,
17;77:19;78:17,18,24,
25;79:2,3,16;131:11,
13;134:12,16,19,20;
135:5,7;136:25;138:15
conditions (12)
69:22;72:18,24,25;

73:6,9,24;74:5;105:18,
19;135:1;138:6
conducted (1)
29:13
conference (11)
54:11,12;58:19;
77:14,14;99:17;
100:22;101:14;131:2,
4,5
confirmed (1)
106:13
conflict (3)
17:20;20:8,14
consider (2)
13:20;73:7;120:12
constantly (1)
27:24
constitute (2)
27:9,11
construct (2)
18:16;21:9
construction (97)
11:10;14:12,13,21,
22;21:1,11;22:16;29:9,
12;33:11;34:20;39:12,
24;40:6;60:5;63:21;
64:1,12;66:24;67:17;
68:25;69:3,7,10,24;
70:2,5,9,17;71:5,25;
72:16,20,21;73:4,24;
74:13,20;76:3,4,10,15;
78:24;79:12;82:17,24;
83:5;84:16;85:16;86:2,
5,8,11,15;90:19;91:17;
92:10;101:4;104:20;
105:15,16,17;110:15;
112:7;114:19;115:2;
120:2,6,10,13,14,15,17,
18,20;121:14,16,20;
122:4;123:1,5,11;
125:11;128:5;130:6;
131:9;134:10;135:5,
11,16;136:2,2;139:11;
140:23;146:9,11
consultant (1)
36:1
consultants (2)
12:24;75:7
contained (1)
21:9
contemplated (1)
39:22
contents (1)
17:6
contest (1)
95:14
continue (2)
47:21;61:11
Continued (1)
119:6
continuously (2)
26:3;126:13
contract (9)

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.    Pg 225 of 238

IZEK SHOMOF
June 24, 2019

135:19,21,24;136:1,
15,16,23,24;138:24
**contractor (16)**
61:16;64:10,11,16,
22;65:5;74:7,8;76:23;
113:22;136:5,13,22;
137:8,10,12
**contractors (7)**
13:1;75:21;83:13;
84:9;85:16;86:15;
136:8
**contracts (1)**
135:17
**contrary (1)**
117:12
**contributing (2)**
59:8;62:4
**control (5)**
9:8,15;18:13,17;20:7
**controlling (1)**
20:13
**conversation (34)**
7:13;14:18;22:8,21,
21,22;23:4,8,11,22;
24:18;26:25;27:25;
28:4;43:13,15,23;
48:20;53:2,15;55:7,9;
56:17;57:17;58:4;
66:15;77:13;82:22;
96:3;102:1;107:25;
108:20;131:6;132:19
**conversations (7)**
14:19;22:25;23:10,
19;43:11,16;56:22
**cool (1)**
48:2
**cooperate (6)**
40:14;98:20;115:20;
116:8,14,18
**cooperated (1)**
116:4
**cooperating (3)**
40:15;41:6;78:11
**cooperation (4)**
14:13;42:11;78:13;
116:10
**copied (4)**
82:11;83:23;84:4;
124:17
**copper (2)**
85:3;87:5
**copy (1)**
48:10
**corporation (1)**
5:16
**correctly (2)**
45:6;122:19
**cost (23)**
21:8;37:15,22;49:11;
57:14;59:2,4,10,22,25;
62:3,5;66:5,9;101:23;
108:16;111:6,8;
112:12;114:6,20,22;

116:25
**costing (2)**
59:10;116:18
**costly (10)**
65:24,25;66:1,14;
108:15,17,24;109:3,4;
110:24
**costs (6)**
49:4,7,9;66:11;
116:19;145:6
**counsel (9)**
5:14;6:15;46:8,11;
119:11;125:6;130:4,
23;147:10
**counter (2)**
66:10,14
**counting (1)**
122:11
**COUNTY (1)**
148:5
**couple (6)**
28:13;57:5,9;68:13;
72:25;82:13
**course (2)**
86:8;117:6
**court (2)**
6:9;117:2,8
**covered (2)**
13:6;38:5
**covering (1)**
92:18
**cranes (1)**
72:6
**creates (1)**
29:13
**creative (1)**
24:11
**crew (1)**
126:11
**criminally (1)**
88:14
**critical (1)**
18:9
**crucial (1)**
138:17
**cure (39)**
6:24;8:1,5;9:25,25;
10:10,16;11:1,15;12:8,
17,23;13:5,6,9,12,19,
23;14:5,6,8;15:16,24;
16:20,20;19:4;30:8,12;
32:25;33:5,9;34:6;
42:8;50:14,16,22;75:3;
76:2;116:19
**current (4)**
121:10;130:5;139:1;
140:22
**currently (1)**
11:2
**customer (1)**
144:3
**customers (2)**
29:15;126:8

**cut (1)**
38:19
**Cutting (1)**
124:1

**D**

**damage (4)**
82:20;83:4,17;85:15
**damages (2)**
14:9;116:25
**date (31)**
21:16,17,18;22:6;
24:16,16;31:11,14,21;
33:4;35:2,15;37:15;
67:25;68:4,6;69:5;
75:13;104:13;105:13;
122:15;125:20,22;
137:1;138:1,12;140:5,
8,9,15;141:2
**dated (8)**
8:7;17:6;30:16;31:9;
102:20;106:9;127:22;
139:23
**dates (2)**
52:2;70:15
**day (8)**
41:18;75:10;85:9;
92:20;105:10;121:12;
130:15;148:21
**days (3)**
36:13;57:9;138:19
**dead (3)**
146:21;147:6,7
**deadlines (1)**
27:16
**deal (6)**
52:18;73:8;74:9;
79:10,13;96:6
**dealing (1)**
128:21
**December (2)**
19:13;105:14
**decide (2)**
117:9;136:18
**decided (4)**
105:6;136:17;
137:14;143:3
**declaration (5)**
10:3;51:3,9;67:13;
75:3
**declare (1)**
14:17
**deemed (2)**
25:10;27:11
**deficient (1)**
88:16
**defined (1)**
79:20
**definitely (11)**
22:20;38:18;43:23;
45:20;54:21;62:5;
64:14;81:2;94:16;

111:5,8
**delay (1)**
41:7
**delayed (3)**
23:6;70:23;140:3
**delays (1)**
44:13
**demand (2)**
32:25;33:5
**demo (1)**
84:9
**demoing (2)**
76:4;120:8
**demolition (8)**
21:10;29:11;75:18,
23;85:16;126:7,11,21
**demonstrate (1)**
37:14
**department (4)**
54:10;56:10;101:9;
143:20
**depend (2)**
120:12;122:10
**depends (1)**
146:16
**depose (1)**
54:7
**deposed (2)**
5:17,25
**deposit (2)**
39:12;40:6
**deposited (1)**
33:23
**deposition (13)**
7:8;16:4;45:12;46:2,
12,17;47:1,9,14;
126:13;140:4;147:16;
148:9
**describe (2)**
123:16;134:15
**described (4)**
13:24;21:13;29:2;
40:4
**describing (1)**
39:10
**description (1)**
31:10
**design (1)**
21:9
**detail (11)**
57:19;58:7;59:13;
74:25;83:6,15,18;
93:18;102:11;125:4;
129:22
**details (3)**
54:23;58:8;108:20
**determination (1)**
29:1
**determined (1)**
117:1
**develop (2)**
64:23;65:2
**developed (1)**

147:2
**development (9)**
47:7;66:3,4;88:17;
98:12;125:20,22,25;
146:20
**difference (1)**
80:11
**different (10)**
21:1,15,17;56:13,17;
85:1;90:8;111:15;
112:6;126:18
**differentiate (2)**
7:10;8:16
**differently (1)**
108:1
**dig (5)**
23:16;25:1;26:23;
28:8;45:17
**diminish (1)**
60:17
**direct (1)**
10:23
**direction (2)**
106:23;107:2
**disable (2)**
86:16,21
**disagree (2)**
126:2,4
**disconnected (2)**
89:24,25
**discovery (1)**
38:1
**discretion (1)**
18:15
**discuss (5)**
51:16;54:21;82:19;
101:4;125:3
**discussed (15)**
19:20;23:9,12;49:17;
53:7;54:23;55:2;76:14;
101:7,9,11;103:11;
106:18;107:10;132:10
**discussing (9)**
10:18;12:10;48:13;
54:19;82:6;128:5;
131:10;134:13;146:21
**discussion (6)**
7:9;51:17;52:23;
65:18,21;99:18
**discussions (10)**
23:14;51:21,25;52:8;
53:13;54:22;56:12;
89:2;129:19;140:22
**dispersed (1)**
40:7
**dispute (7)**
6:24;7:2;8:1;11:24;
13:7,10,13;44:16;81:9
**disputes (1)**
45:21
**disrupting (1)**
126:10
**disruption (1)**

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.  Pg 226 of 238

IZEK SHOMOF
June 24, 2019

84:15
**disruptions (1)**
86:1
**disruptive (3)**
60:5;9;87:8
**distraction (2)**
88:19;89:1
**doable (6)**
57:14;58:6;59:2,4;
66:9;72:25
**document (43)**
10:15,21;12:4,7,13;
16:1;17:10,12,18;18:4;
19:10,16,24;20:24;
23:14,16;24:24;27:17;
28:15;47:16;48:25;
51:10,12;70:8,14;81:7;
97:4,4,7,9;102:19,25;
119:8;121:24;129:4;
133:9,12,19;134:25;
137:18,25;139:19;
141:1
**documented (2)**
23:18;43:21
**documents (10)**
16:14;29:23;46:4;
48:10,12,16;49:25;
96:6;97:2;140:9
**dollar (4)**
62:6;111:15;123:20;
139:5
**dollars (6)**
13:25;48:22;109:13;
113:5;139:7;145:13
**done (54)**
6:9;13:15;14:7,10,
23,24;15:14;29:20;
33:8,18,20;38:13;
40:11,21;41:7,8;43:3,
6;45:5,5;51:24;53:11;
59:1,20;61:8,11;62:7;
63:18;64:11,12,17;
65:18;69:13;70:24;
72:8,13,21;74:9;79:10;
90:3,5;92:22;105:20;
109:13,25;114:19;
117:21;135:8;136:2,
17;138:19;141:24;
142:4;146:24
**doors (2)**
90:4;92:19
**double-check (1)**
44:7
**down (56)**
12:22;29:7;54:12;
55:13,19;58:24;60:8;
61:9,14,18,25;62:2,16,
24;63:8,20,22;64:1,14;
65:3,8,19,22;66:23;
67:5,6;78:12;79:22,25;
80:10,12;93:23;96:2;
101:23;108:14,16;
110:20;111:3,11,20;

113:6,21;116:9,13,15;
128:19;142:16,21,25;
143:3,15,25;144:2,21;
145:5;146:3
**downstairs (1)**
85:5
**draft (2)**
103:9;138:2
**drafted (2)**
58:11;130:9
**drag (1)**
110:10
**draw (1)**
69:16
**dressed (1)**
46:22
**dropout (1)**
42:20
**drove (1)**
46:19
**drugged (1)**
116:24
**due (20)**
11:2;23:5;31:12,15,
22,24;32:4,7;36:25;
43:1;44:10;61:20;86:5,
11;92:2,14;99:14;
116:24;132:23;135:21
**duly (1)**
5:5
**Duntley (2)**
128:8,17
**during (23)**
26:21;48:9;54:17;
57:25;58:21;59:6;66:8;
76:11;86:7,15;89:1;
101:13;104:21;107:10;
108:23;113:2;126:6,
21,25;127:5;128:20;
130:6;131:9

## E

**earlier (13)**
37:8;42:7,9;49:17;
109:23;113:3;116:21;
126:12;131:10;132:2,
10;138:12;139:9
**early (6)**
68:16;72:8,9,16;
132:1,8
**easier (1)**
6:10
**easiest (1)**
126:14
**East (8)**
8:8,20,22;9:11;
30:15;34:8;102:21;
120:1
**Eddie (1)**
88:13
**effect (4)**
17:23;44:2;109:17,

20
**effectuation (1)**
146:6
**efforts (1)**
28:23
**eight (4)**
64:19;67:13;81:3;
134:4
**Eileen (1)**
8:7
**either (10)**
9:6,13;25:7,9,10,14;
27:7;48:10;117:22;
131:1
**Either/or (1)**
112:1
**election (1)**
39:25
**electrical (1)**
84:10
**electronic (1)**
48:10
**element (1)**
35:13
**else (9)**
15:15;46:24;53:7;
100:6,9;101:6,11,25;
111:21
**e-mail (55)**
81:8;82:3,9,10,12;
83:20,21,22,23,25;
87:18,22,23;88:7,9,23,
24;89:19;93:4,6,14,15,
17;94:8,18,24;95:25;
96:8,15;98:21;106:3,6;
107:25;109:16,21;
123:23;124:13,15,17,
21;125:2,18,22;127:14,
16,21,22;128:7,8,13,
17;130:24;131:1,6;
133:14
**e-mails (9)**
43:11,12,14,14;
81:11;87:25;95:7;
98:16,17
**employees (12)**
108:6;126:8,24,24,
25;142:23,24;143:1,8,
11,12,19
**end (13)**
57:16;81:15,17,18;
85:9;91:5,8;92:19,20;
102:3;105:10;138:24;
146:13
**endeavor (2)**
6:7;60:4
**enforce (1)**
27:7
**enforcing (1)**
84:12
**engineer (3)**
70:21,24;104:12
**engineering (2)**

71:1;75:11
**engineers (2)**
12:24;75:6
**enhance (1)**
59:12
**enjoy (1)**
138:10
**enjoyment (1)**
18:11
**enough (9)**
26:4,18,25;28:4,11,
11;41:18;136:4,8
**enter (2)**
27:15;91:11
**entered (1)**
19:18
**entering (1)**
130:16
**entire (8)**
16:8;39:15;81:10;
87:24;88:16;93:15;
127:17;137:18
**entities (1)**
8:19
**entitled (14)**
10:16;12:8;17:1;
19:11,25;25:5;27:3;
28:16;40:1;67:3,11;
139:20;145:14,16
**entitlement (7)**
25:16;68:11,12;
70:20;105:7,8,11
**entitlements (5)**
70:7;120:1,25;121:9;
122:5
**entity (1)**
95:9
**entrances (2)**
85:2;126:18
**equals (2)**
50:15,19
**equipment (4)**
14:25;15:7;34:20;
83:8
**Eric (1)**
6:19
**Ericson (2)**
46:19,20
**errors (1)**
108:5
**escrow (2)**
33:23;39:24
**establishments (1)**
142:12
**estate (3)**
7:6,6;22:16
**estimate (2)**
39:12;40:6
**et (2)**
21:3;135:19
**Europe (1)**
140:2
**even (11)**

9:14;52:12;69:25;
70:13,14;73:7;87:8;
126:18;132:14;142:18;
146:22
**event (2)**
20:8;39:21
**eventually (1)**
59:20
**everybody (1)**
72:5
**everyone (2)**
100:2,23
**exact (4)**
35:2;52:2;70:14;
75:13
**exactly (19)**
9:7;14:2;35:1;49:15;
52:9;53:6,6;57:19;
69:5;70:8;74:25;83:15;
100:12;103:10;108:2;
116:12;128:20;129:22;
137:15
**EXAMINATION (2)**
5:9;119:6
**example (6)**
14:24;36:4,8,21;
138:19;142:15
**exceed (1)**
110:23
**exceeded (1)**
24:13
**except (1)**
142:9
**exchange (2)**
127:16;144:13
**exercised (1)**
146:4
**exhibit (63)**
10:10,13;12:5;15:23;
16:23,25;19:4,8,10;
20:4,7,12,24;21:12;
29:12,24;30:3,4,5,8,9,
10,10,11,12,13,23;
33:10,25;34:3,5,6;
38:23,24;39:1;51:6,9;
81:5,8;87:16,19;92:24;
93:2;102:17,20;
105:23,24;106:2;
119:4,9;124:10,12;
127:11,13,14;129:5,6,
8,9;133:2,5;139:16,19
**exhibits (6)**
16:3,4,7,16,19,21
**existed (1)**
69:22
**Existing (1)**
19:25
**exit (2)**
90:2;92:18
**exiting (2)**
90:4;92:19
**expect (2)**
104:7,11

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.  Pg 227 of 238

IZEK SHOMOF
June 24, 2019

**expectation (1)**
104:4
**expense (7)**
11:10;21:8;33:11;
59:22;110:1;114:20,23
**expenses (3)**
75:9,16,22
**expensive (10)**
110:6,13;111:2,18;
112:19,21;113:4,6,7,9
**experience (3)**
70:1;141:14;142:11
**experienced (1)**
141:15
**expiration (1)**
68:11
**expire (3)**
70:7;120:1,25
**explain (3)**
8:19;126:15;144:5
**explained (2)**
59:12;60:10
**explanation (1)**
141:22
**explicitly (1)**
21:16
**Express (1)**
27:4
**expressed (1)**
20:8
**expressly (2)**
25:6;27:12
**extend (2)**
27:5,16
**extension (3)**
24:15;27:22;38:18
**Extensions (1)**
27:3
**extent (7)**
17:20;20:16;25:23;
40:23;114:8;115:4;
118:7
**exterior (1)**
15:9
**extremely (1)**
111:17

**F**

**facade (1)**
35:21
**fact (6)**
31:21;32:10;37:9;
97:1;98:14;116:8
**facts (4)**
66:22;96:6,7,25
**failed (1)**
15:15
**Failure (1)**
27:7
**fair (2)**
24:4;35:2
**faith (1)**

90:23
**falling (2)**
89:14;136:19
**familiar (9)**
7:25;10:21;12:13;
17:10;19:16;133:10;
142:6,12,16
**family (1)**
8:25
**far (14)**
16:4,15;22:14;33:14;
58:2,17;67:25;68:10;
71:16;84:20;101:5;
125:8;127:3;133:1
**fascinated (1)**
123:8
**fault (18)**
89:11,13,19;90:11,
11;91:2;92:1;94:11,15,
16;95:23,25;96:4,13,
20,23;117:9,9
**favor (1)**
96:22
**February (28)**
8:8;30:17;31:10,15;
32:10,11,16,25;50:23;
68:15,18,19;71:21;
75:20;104:16,25;
105:4;106:9;119:12,
16;120:5;121:22,25;
122:4,11,17;124:16;
126:10
**fee (6)**
36:10;39:11;79:23,
23;89:25;105:9
**feel (1)**
144:20
**fees (8)**
12:25;36:3;75:15;
91:7,9;123:20;138:21;
139:6
**feet (4)**
15:5,6;24:12;85:1
**fell (2)**
62:10;64:21
**Few (13)**
5:20;22:15,22;47:12;
54:1;58:10;74:3;88:3;
94:23;99:22;105:18;
142:20,20
**Fifteen (1)**
46:9
**filed (14)**
6:25;8:1,6;9:24;
10:17;11:16;12:9;42:9;
52:4;71:6;77:10,11;
98:24;136:20
**filing (2)**
14:11;138:13
**final (1)**
77:9
**finalize (2)**
58:23;71:18

**finalized (5)**
71:1;105:14,16;
136:12,14
**finalizing (2)**
136:12,15
**Finally (2)**
89:18;90:9
**finance (1)**
95:13
**financed (1)**
97:23
**Financial (6)**
127:25;128:2;
129:10,16,20;145:5
**financing (42)**
63:22;64:1;68:25;
69:3,8,10,14,17,24;
70:2,5,9,17;72:16;73:5,
25;74:13,20;76:16;
77:20;78:24;79:1,12,
16;90:19;91:17;92:2,
10;96:10;105:9,15,16,
18;123:10,12,15;
128:5;139:11;140:23;
146:9,12;147:2
**find (5)**
49:14;85:8;89:19,21;
123:14
**finding (1)**
95:22
**fine (3)**
36:5;48:3;61:6
**finish (13)**
45:10;52:20;56:15;
64:25;67:6;91:14;97:6;
110:22;112:15;113:19,
23,24;125:14
**finished (1)**
110:9
**finishing (2)**
114:1;120:8
**fire (16)**
86:16;87:1,2,3,3,7,
10;88:15,16;89:24;
90:1;92:20,20;95:18;
101:8,8
**firm (2)**
5:14;126:6
**first (14)**
5:5;11:7;57:24,24;
69:23;83:19,24;93:16;
103:22;106:5;127:21;
139:25;140:4,19
**five (9)**
5:21,22;6:1;46:18,
20;49:9;90:8;111:19;
146:17
**fix (3)**
86:24;88:20;89:24
**fixing (1)**
89:20
**flat (1)**
63:10

**flip (1)**
137:24
**flooding (1)**
84:9
**floor (4)**
14:25;86:25;87:11;
142:1
**flux (1)**
146:24
**focus (2)**
39:16;127:17
**focused (3)**
67:20;81:13;124:15
**focusing (1)**
18:5
**folks (2)**
6:15,16
**following (3)**
89:3,3;103:13
**follows (1)**
5:7
**Folsom (1)**
17:3
**F-o-l-s-o-m (1)**
17:3
**foot (1)**
24:11
**footnote (2)**
11:20,25
**force (1)**
144:4
**forever (2)**
80:25;81:2
**forfeiting (1)**
41:5
**forgot (1)**
54:3
**form (2)**
144:22;145:1
**formation (1)**
82:9
**forth (7)**
18:14;21:16,17,22;
30:21;132:3,11
**forward (3)**
13:16;68:2;70:12
**forwarded (2)**
90:23;124:22;
140:11,17
**forwarding (1)**
128:17
**forwards (2)**
124:18;128:8
**found (5)**
91:1,23;92:1;94:14;
142:3
**four (2)**
49:9;146:7
**fourth (1)**
93:23
**frame (1)**
104:22
**free (1)**

27:23
**Friday (4)**
88:19,21;89:3;
106:10
**front (2)**
29:25;87:22
**full (1)**
20:2
**fund (1)**
39:24
**funded (1)**
69:13
**funds (3)**
39:23;40:6,22
**funny (1)**
91:18
**further (4)**
21:19;25:1;79:24;
84:10
**future (3)**
13:14,23;59:19
**FYI (1)**
124:18

**G**

**gain (3)**
145:11,14,16
**game (1)**
84:13
**gave (1)**
123:19
**gearing (1)**
82:17
**general (21)**
61:16;64:9,11,16;
74:7,8;76:23;113:22;
135:19,21,24;136:1,5,
7,13,21,23,24;137:8,
10,11
**generally (2)**
6:23;14:3
**gets (1)**
40:12
**given (3)**
27:11;89:5;148:12
**giving (1)**
36:20
**glad (3)**
89:9,9;114:15
**gladly (1)**
95:17
**glass (1)**
35:21
**goes (4)**
41:9,23;81:16;87:21
**Good (10)**
5:11,12;8:17;26:25,
25;28:4,11,11;90:23;
136:8
**Gottlieb (1)**
5:14
**govern (3)**

21:17;118:12,17
**governed (1)**
118:4
**governing (1)**
17:18
**government (1)**
28:23
**governs (2)**
20:4,19
**Grand (2)**
141:25;142:10
**great (2)**
59:9,9
**greater (1)**
125:3
**greatly (1)**
147:8
**ground (2)**
72:7;142:1
**Group (14)**
8:8,9,20,20,22,22;
9:3,5,8,11;30:15;34:8;
102:21;128:10
**groups (1)**
141:6
**Guaranteed (1)**
110:19
**guaranteeing (1)**
113:24
**guard (1)**
85:23
**guess (2)**
119:24;140:12
**guessing (1)**
144:23
**guilty (18)**
90:13,15,17;91:4,21;
92:15,15,16,17;96:21,
22,22;97:8,13,14,15,
17,18
**gut (1)**
87:4
**guy (5)**
54:9;59:1;76:23;
100:24,25
**guys (12)**
28:9;46:21;52:21;
59:14,15,18;60:11;
63:19;83:25;88:12;
92:15;140:13
**guy's (3)**
54:3;56:8;57:9

**H**

**half (5)**
78:12;83:22;123:19;
139:5;146:7
**Hamilton (1)**
5:14
**hand (2)**
68:3;87:18
**handed (10)**

10:15;12:7;19:10;
30:7;51:8;106:2;119:8;
127:13;129:8;133:4
**handing (6)**
16:25;34:5;81:7;
93:4;102:19;124:12
**happen (15)**
14:13;41:3,4;42:3,6;
43:17,18,19;44:13,20;
63:1;80:6;142:22;
143:18;147:1
**happened (17)**
23:20,22;26:7;27:20;
58:7,21;80:5;83:15;
85:20;86:7;128:20,25;
129:22;130:22;142:18,
24;143:12
**happening (4)**
23:5;24:16;85:21;
146:13
**happy (8)**
36:15,18;48:3;54:7;
80:6;98:11;125:23,23
**hard (3)**
48:10;94:13;147:4
**hate (2)**
146:22,22
**Head (3)**
6:4;51:2;86:20;
113:8;127:2
**hear (3)**
82:17;89:7;112:3
**heard (3)**
66:13,13;119:14
**heart (1)**
146:25
**heaven's (1)**
143:13
**Heights (7)**
6:22;7:15;8:2;9:20;
129:11;143:23;146:21
**held (1)**
99:18
**hell (2)**
147:2,3
**help (1)**
93:25
**hereby (1)**
148:7
**hereof (1)**
21:12
**hereto (5)**
21:11;27:4,6,11;
29:12
**high (2)**
8:18;42:20
**himself (6)**
22:22;89:12;90:13,
15;94:15;99:14
**hiring (1)**
117:7
**history (1)**
108:4

**hold (2)**
30:23;146:12
**Holdco (1)**
5:15
**Holding (3)**
34:9;74:10;78:14
**home (1)**
27:23
**homeless (5)**
86:11,13,19;126:16;
127:7
**homelesses (9)**
85:2,8,10,22;86:14,
18;87:4;126:13,15
**homelessness (1)**
85:21
**honest (5)**
23:25;24:25;31:17;
34:23;123:8
**hope (3)**
41:13,14;147:4
**hopefully (3)**
103:23;104:15;112:9
**hoping (4)**
80:2,24;112:13;
146:7
**hour (3)**
29:9;47:18;126:22
**hours (6)**
47:12;126:7,21;
127:1,5;131:2
**house (2)**
47:7,7
**huge (3)**
13:14;115:21,22
**hundred (2)**
24:11;141:9
**hundreds (1)**
13:25
**HVAC (19)**
14:24;15:1,2,3,9,9;
21:2;33:18;35:13,16,
17;52:20;53:10;83:12;
86:6;125:9,11,14;
144:13

**I**

**ice (1)**
142:5
**idea (1)**
129:2
**identified (1)**
81:8
**identify (2)**
6:16;24:18
**ignore (1)**
144:19
**immediately (5)**
85:10,13;86:23;
104:21;142:19
**impact (1)**
29:19

**implies (1)**
120:15
**imply (1)**
131:8
**important (9)**
6:3,6;48:5;79:9;
97:22,24;98:3;111:18;
144:14
**impression (1)**
96:19
**improvements (5)**
18:17;28:21,24;29:3;
82:24
**include (1)**
16:16
**included (3)**
16:5;36:12;66:11
**including (8)**
18:13,19;21:12;
25:13,14;26:13;82:20,
22
**inconvenience (1)**
29:14
**increase (2)**
109:25;114:6
**incur (4)**
75:7,8,16,22
**incurred (5)**
36:3;37:16,22,22;
145:6
**indicated (1)**
137:21
**indicates (1)**
132:7
**indication (1)**
139:10
**individual (1)**
141:7
**information (1)**
134:1
**initially (1)**
33:14
**initiated (1)**
25:17
**inside (3)**
15:3,12,12
**insisted (1)**
92:16
**inspect (1)**
121:19
**inspection (3)**
40:5;88:16;121:18
**inspector (1)**
121:18
**inspectors (1)**
95:18
**install (1)**
18:16
**installing (1)**
15:9;83:12
**instance (1)**
7:5
**instead (2)**

67:4;146:5
**instrument (1)**
27:5
**insurance (2)**
138:20,21
**intention (2)**
107:2;109:14
**interaction (1)**
8:19
**interest (2)**
139:10;144:21
**interfere (1)**
18:18
**internal (2)**
31:18;32:3
**interrupt (1)**
6:8
**interrupted (1)**
76:10
**interruption (1)**
85:14
**into (26)**
12:23;13:25;14:22;
19:18;24:25;25:21;
26:22;27:15;28:8;49:6;
66:18;67:3;68:15;
70:14;83:14;85:2,9,22;
86:5;94:23;109:13,19;
122:11;131:21;145:12;
147:1
**inversions (1)**
16:15
**invitation (2)**
125:5,6
**inviting (1)**
125:3
**invoice (17)**
30:15,24;31:4,6,9,11,
15;33:7;34:7,11,13,15,
19;35:6;37:2,18,21
**invoiced (2)**
35:11;37:20
**invoices (3)**
31:19;37:14,24
**involve (1)**
141:12
**iron (1)**
84:13
**irrevocable (3)**
8:7,25,25
**issue (27)**
9:20;70:18;71:17;
73:1;76:22;80:8;83:4;
84:14;85:7,21;86:7;
88:15;101:8,9;105:8,
20,20,21,21;107:12,13;
108:3;113:16;116:17;
123:10;132:7;138:18
**issued (1)**
29:6
**issues (12)**
54:24;76:9;82:19;
85:11;86:14;106:24;

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al. Pg 229 of 238

IZEK SHOMOF
June 24, 2019

107:9,15,15,19,24;
126:9
**item (3)**
72:14;134:9,19
**items (4)**
11:14;24:5,5;138:1
**IZEK (11)**
5:4;8:6;61:12;62:19;
80:9;90:11;95:9,17;
116:13;148:7,18

## J

**January (9)**
30:16,16;31:9,14;
34:8;35:7,10;72:4,12
**Jimmy (2)**
101:2,2
**job (10)**
48:18;61:17;64:11,
12,16;76:21;112:15;
113:6,22;136:13
**Jonathan (11)**
6:18;46:19;47:4,14;
100:12;101:1;102:13,
22;104:1,2;106:6
**Joseph (1)**
103:22
**Jr (1)**
142:9
**July (8)**
122:20;130:2,2,20,
22;132:1,8,14
**JUNE (15)**
5:1;82:3,13,16;83:3;
119:1;122:20;130:1;
139:9,12,23,25;140:1,
2,20
**Juniors (1)**
142:2
**jury (1)**
117:9

## K

**keep (5)**
43:24;48:4;80:7;
126:19;131:23
**kept (3)**
77:15;78:14;146:11
**kind (8)**
25:24;63:23;64:3;
69:20;75:23;76:6;82:8;
146:8
**knew (5)**
26:9;77:11;89:10,10;
96:23
**known (1)**
64:13
**knows (1)**
109:15
**KUPETZ (31)**
11:19,23;12:2;16:2,

10,13;20:16;25:23;
31:23;40:23;47:20,22;
55:14;111:22;114:8;
115:4;118:7;119:12,
14,17;131:15;135:13;
140:6,8,14,17,25;
144:25;145:8;146:15;
147:13

## L

**lack (2)**
132:23;145:6
**laid (1)**
58:16
**Lampert (2)**
88:13;99:14
**land (1)**
33:17
**landlord (55)**
8:11,14;10:7;12:16;
18:16;19:19;20:5;21:8;
25:17;26:1;28:20,22;
33:1;39:21;40:2,7;
41:1,21;44:16,17;
45:19,22;50:22;51:13,
17;57:1;63:13;66:11;
67:15,15,19,23;68:1;
71:4,24;72:10;81:9;
90:19;95:13;96:16;
100:10;102:10;110:13;
114:2,11;115:8;
117:10,12;118:3,10,16;
120:6;141:9,14;142:11
**landlords (14)**
6:24;9:19;10:17;
11:16;12:10;13:7,10,
20;14:6;17:13;32:16,
24;37:16;141:6
**landlord's (4)**
21:8;40:3;50:24;
114:20
**language (1)**
25:18
**last (12)**
5:25;29:7;53:15;
69:19;81:18;106:18;
119:24;126:5;132:21,
22;133:8,13
**late (4)**
72:4;132:2,12,16
**later (12)**
38:2;40:16;41:4;
42:6;43:9,19;44:14,21;
54:25;96:3;133:17;
142:20
**latest (1)**
133:19
**law (3)**
5:13;117:2,8
**lawyer (5)**
42:19;115:14;118:3;
126:6;127:5

lay (1)
146:9
**leaks (1)**
85:5
**lease (54)**
11:2;15:25;17:2,13,
18;18:2,21,24;19:12,
19;20:4,7,12;25:7;9,12,
14;29:19;33:17;39:11;
45:23,24;50:4;59:12;
60:16,22,22;61:2,9,13,
23;67:2,2,11;77:3;
80:13,17,21;115:8,24;
117:13,14,23,25;118:1,
4;133:25;134:6,9;
145:12
**leases (2)**
118:16;133:25
**least (3)**
60:5,8;82:11
**leave (1)**
102:3
**leaving (1)**
48:22
**left (2)**
125:10,15
**legal (6)**
20:17;25:24;40:24;
114:9;115:5;118:8
**legally (7)**
115:12,15,25;116:1,
2;117:4,18
**lender (6)**
70:12;73:11;90:24;
95:12;113:15;124:5
**lenders (2)**
70:11;77:19
**lengthier (2)**
110:8,8
**less (4)**
11:4;71:18;83:18;
84:20
**letter (46)**
53:22,24,25;54:15,
16;55:3,7,11;56:18,19,
23,25;57:7,9;58:10;
88:12;102:20;105:13;
106:14,16;107:4,5,11;
109:17,20;119:10,20;
120:14,21;123:18,22,
23;125:4;126:3;129:9,
14,20,24;130:12,19;
131:25;132:2,10;
139:20,23,24
**letterhead (1)**
102:22
**Letters (1)**
43:11
**level (1)**
8:18
**life (1)**
6:10

likely (17)
23:15;24:14;44:13,
20;52:25;74:25;83:12;
93:19;103:7;107:13;
108:9,12;110:4;
118:15;124:23,25;
134:24
**limitation (4)**
18:19;21:12;25:13,
15
**limited (1)**
66:10
**line (3)**
36:1;93:23;96:20
**lined (2)**
72:5;138:21
**lines (1)**
96:14
**list (2)**
80:1;135:6
**listed (2)**
24:6;134:19
**listing (1)**
20:25
**lists (1)**
31:1
**literally (1)**
146:22
**little (4)**
7:4;18:2;34:21;
79:24
**live (1)**
85:23
**LLC (6)**
8:8,9;9:11;30:16;
34:8;102:21
**loan (18)**
72:20,21;110:15;
112:7;113:15;115:1;
123:3,3,9,12;124:1,5;
128:3,23;129:11;
134:21,22;139:2
**located (1)**
14:25
**location (8)**
6:22;7:16;58:19;
90:6,7;91:5;120:7;
144:8
**locations (3)**
15:4;90:8;143:22
**locked (1)**
126:19
**logically (5)**
115:16;116:3;
117:20,22,23
**long (5)**
7:10;70:1;89:4;
127:16;128:8
**longer (4)**
70:14;110:9,12,12
**look (23)**
12:21;18:4;20:23;
24:25;25:4;26:22;

27:18;28:14;30:22;
38:21;43:13;46:4;48:9;
49:6;65:17;70:8,14;
81:10;87:24;93:6;
109:19;127:17;138:3
**looked (3)**
20:12;83:22;133:14
**Looking (13)**
13:4;16:7;18:3;21:6;
34:18;45:2;48:25;
57:19;78:21;95:7;
102:11;127:21;141:1
**looks (2)**
98:23;133:10
**LOS (3)**
5:1;28:25;119:1
**lose (2)**
92:2;123:15
**loss (4)**
59:19,19;60:11,14
**losses (1)**
13:14
**lost (2)**
84:10;112:7;123:3,8
**lot (11)**
33:20;44:25;45:5;
62:4;86:13;89:19;90:2;
138:5,6;144:12;147:3
**lots (1)**
89:5
**LP (1)**
17:3
**Lunch (1)**
118:19

## M

**major (3)**
105:20;123:7,10
**majority (1)**
105:18
**makes (3)**
7:23;20:11;113:11
**Making (3)**
38:9;94:10;126:23
**maneuvered (1)**
61:15
**manner (5)**
18:19;29:13;40:4;
60:5,9
**many (17)**
5:19;22:21;23:4,10;
48:20,20;70:11;85:4;
137:11,11;139:7;
141:5,5,7;143:24;
144:9,9
**map (1)**
18:12
**March (12)**
67:14;68:7,8,11,16,
24;69:2,4;120:2,19;
122:11,20
**mark (18)**

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 230 of 238

IZEK SHOMOF
June 24, 2019

10:9,11,11;12:3;
16:22;30:3,4;51:3;
90:9;95:2;102:16;
119:10;124:9,17,17,22;
129:4;139:15
**marked (30)**
  10:13;12:5;16:23,25;
  19:8;30:5;34:3;51:6,8;
  81:5;87:16,19;93:2;
  102:17,20;105:24;
  106:2;119:4,9;124:10,
  13;127:11,14;129:6,9;
  133:2,5;139:16,18,19
**marking (1)**
  92:23
**math (1)**
  50:14
**mathematician (1)**
  42:19
**matter (7)**
  6:23;37:25;51:10;
  91:11;97:1;98:14;
  144:24
**max (1)**
  138:19
**may (27)**
  13:10,12,20;17:7;
  18:14;27:4,8;38:16;
  57:14;62:6;70:7;71:13;
  92:2,4;108:16;109:3,6,
  9,11;113:16;115:12,
  15;116:2;122:20;
  129:10;140:15;142:18
**Maybe (36)**
  6:1;9:6,14;14:4;
  28:9;35:5,5,24;38:17;
  44:6;47:16;52:12,24;
  57:5;68:5;69:25;75:14;
  78:12,12,20;80:2,25;
  83:14;84:1;94:19,21;
  100:8;103:10;109:18;
  110:8,22;115:12;
  131:2;140:5;146:23;
  147:5
**mean (23)**
  26:11;27:22;38:19;
  41:8;45:4;50:21;52:5;
  53:19;55:14;62:17;
  69:12;103:14;104:1;
  105:2;106:19;108:2;
  119:12;121:4,5,15;
  122:3;123:7;136:15
**meaning (2)**
  20:5;69:16
**means (4)**
  7:14;21:18;31:24;
  120:17
**meant (1)**
  120:21
**meanwhile (1)**
  112:6
**meet (10)**
  46:6,8,11,16;69:19;

84:11;88:20;125:3,8,
16
**meeting (46)**
  54:14,18;57:4,7,10,
  11,22;58:5,7,9,14,18,
  21;59:7;66:19;77:13;
  88:19;99:16,21,22;
  100:1,2,13,21,23;
  101:3,7,13,14,17,17;
  102:4;103:13,15,16;
  107:10,17,20;108:21,
  21,23;113:3;125:16,
  17;130:24;137:11
**meetings (3)**
  54:1,3;66:8
**members (1)**
  128:9
**memory (1)**
  43:24
**mention (4)**
  7:13;49:21;57:24;
  108:7
**mentioned (9)**
  24:2;26:13;49:22;
  55:10;89:10;109:23;
  126:12;131:19,20
**met (7)**
  22:15;46:10,13,18,
  18;137:1,3
**metal (1)**
  87:5
**middle (2)**
  18:6;129:24
**mid-January (1)**
  72:4
**million (27)**
  15:6;33:15,16,16,17;
  34:17;39:10;48:22,23;
  59:10,11,11,12;75:8,
  21;76:1;80:10,11,11;
  85:1;116:19;123:20;
  125:15;139:5;146:2,2,
  2
**million-plus (1)**
  14:8
**millions (4)**
  13:25;109:13;113:5;
  145:12
**million-square-feet (1)**
  126:17
**mind (10)**
  13:21;15:19;45:3,17;
  47:24;54:4;71:10,24;
  91:7;114:13
**minimize (2)**
  29:19;83:11
**minimum (1)**
  29:13
**minor (13)**
  71:17;72:18,25;73:7;
  74:4,6,16;75:1;105:19;
  120:8;135:8;138:5,18
**minute (3)**

59:11;107:15,15
**minutes (4)**
  46:9,18,20;146:17
**Mischaracterizes (2)**
  111:22;131:16
**mischaracterizing (1)**
  145:2
**missing (1)**
  47:16
**mistaken (2)**
  22:17;122:14
**moment (5)**
  15:21;24:20;30:4;
  50:4;124:7
**moments (1)**
  74:3
**MONDAY (3)**
  5:1;89:3;119:1
**money (17)**
  33:21,23,24;40:12;
  41:8,23;48:18;49:10;
  62:9,11;111:6,8;
  112:12;123:14,19,21,
  21
**monitoring (3)**
  90:1;92:21,21
**month (8)**
  35:24;56:18;58:12,
  13;83:21;105:12;
  139:9;146:13
**months (94)**
  28:25;29:3,5;35:3;
  42:16;49:9;53:18,20;
  55:13,21,24,25;56:24;
  57:2,5,13;58:1,10;
  60:8;61:3,9,25;62:16,
  24;63:8,22;64:2,15,19;
  65:19,22;66:23;67:5,6,
  6,7;69:25;70:4,6,13;
  76:25;77:6,18;78:4,22,
  25;79:7,24;95:6;
  101:16;108:8;109:1,
  24;110:6,17,20,21;
  111:4,12,14,20,24;
  112:11,14,20,24;
  113:21;116:9,14,16;
  121:13,17;122:3,15,17;
  131:12,22;132:4,12,22;
  141:16,21;142:2,7,13,
  22;143:5,15;144:2,22;
  145:7;146:5,7
**More (43)**
  5:21,22,23;14:1;
  24:13;27:25;28:13;
  38:21;42:13;43:13;
  44:19;66:10,11;70:13;
  71:18;74:23;83:18;
  84:7,12,20;101:15;
  106:22;110:6,13,24;
  111:2,6,8;112:12,19,
  21;113:4,7;114:5;
  116:5;117:16;129:4;
  141:16;142:13,21;

143:15;144:2,22
**morning (5)**
  5:11,12;46:18,21;
  48:14
**most (23)**
  18:9;23:15;24:14;
  44:13,20;45:20;48:5;
  52:25,25;74:25;83:12;
  93:19;103:7;107:13;
  110:4;118:15;124:23,
  25;130:15;134:24;
  140:1,2;144:14
**mostly (1)**
  76:5
**move (1)**
  111:8
**much (20)**
  6:10;32:18,19,22;
  39:17;43:15;46:3;
  47:11;87:13;89:9;93:6;
  98:18,19;100:11;
  110:2;111:19;116:5;
  138:10;146:15;147:11
**murder (1)**
  97:17
**must (1)**
  139:25
**myself (1)**
  138:25

# N

**name (12)**
  5:13;22:14;54:4,10;
  56:8,8;57:8,9;59:2;
  100:2,25;101:1
**named (2)**
  89:16;99:14
**narrative (1)**
  16:9
**nature (1)**
  51:21
**natures (1)**
  22:24
**necessarily (1)**
  7:20
**necessary (6)**
  28:20,23;40:2;67:16;
  107:6;141:8
**need (23)**
  7:10;18:4;24:2,6;
  27:25;30:21;34:17;
  45:12,13;58:22;59:15;
  62:7,11;64:6,7;82:19,
  21;84:11;88:19;
  110:17;126:5;142:4,17
**needed (11)**
  21:24;33:18;38:6;
  58:24;62:14;70:21;
  76:18;103:12;122:4;
  137:8,10
**needs (9)**
  14:23;26:14;41:6,7;

51:23;53:10;58:25;
63:19;64:16
**negligent (2)**
  13:16;92:18
**negligently (2)**
  89:23,23
**negotiat- (1)**
  52:6
**negotiate (5)**
  13:17;77:12;80:24;
  91:6;131:21
**negotiated (4)**
  13:17;27:24;106:25;
  108:6
**negotiating (12)**
  14:11;26:3,3,6,12;
  52:6;61:12,19;109:8;
  132:14;136:11;142:1
**negotiation (7)**
  14:17;15:18;26:11,
  18;42:10;52:19;111:10
**negotiations (4)**
  26:21;42:22;53:8;
  112:18
**new (4)**
  15:9;36:18;139:10;
  144:13
**newest (1)**
  87:22
**next (3)**
  39:16;84:23;102:16
**nine (1)**
  12:16
**nods (3)**
  6:4;51:2;86:20
**noise (1)**
  29:14
**none (2)**
  49:18;126:24
**nonsense (1)**
  92:3
**nonwaiver (1)**
  49:17
**nor (1)**
  27:10
**normal (1)**
  100:13
**north (1)**
  34:21
**Notary (1)**
  148:24
**note (4)**
  6:14;11:19;47:25;
  126:20
**noted (1)**
  133:21
**notes (7)**
  19:12;23:20,22;
  43:22,25;47:15;146:14
**notice (1)**
  137:20
**notices (2)**
  90:2,5

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.    Pg 231 of 238

IZEK SHOMOF
June 24, 2019

**notification (2)**
90:7,23
**notified (1)**
108:8
**notifying (1)**
88:14
**noting (1)**
38:2
**November (5)**
94:24;95:6;98:22;
103:24;104:5
**Number (43)**
10:12,17;12:9;16:22;
17:1;19:6,10,24;20:24;
21:6;24:4;30:23;31:3;
32:16;34:6;39:1,2,4,6;
50:6,23;51:9;87:19;
105:23;106:3,3;
108:18;109:6;113:8;
122:18;124:13,14;
127:9,10,14,15;133:22;
134:2,3,9;135:10;
137:25;139:19
**numbered (2)**
104:15;139:21
**numbering (1)**
81:20
**numbers (2)**
50:9;81:21

## O

**oath (3)**
74:12,19;148:9
**object (3)**
31:23;40:23;144:25
**objection (36)**
6:24;9:25;10:1,4,11,
16,24;11:16,22;12:8;
13:5;14:5;16:20,21;
20:16;25:23;29:24;
30:8,12,22,23,25;
31:21;32:5,6;33:3,9;
34:7;50:6;111:22;
114:8;115:4;118:7;
131:15,15;145:8
**objections (4)**
8:1,6;9:24;16:9
**objectives (1)**
29:18
**obligation (6)**
27:6;59:25;60:23;
61:3;114:25;115:9
**obligations (6)**
20:6;44:18;60:21;
61:22;117:13;118:4
**obstruct (1)**
18:18
**obstructed (1)**
91:16
**obtain (3)**
28:23;70:2;77:5
**obtained (2)**

135:25;145:24
**obviously (6)**
18:3;24:3;42:1;43:6;
87:2;127:16
**occasion (1)**
85:4
**occur (2)**
53:2;107:15
**occurred (8)**
48:23;52:19;55:9;
57:5;61:19;72:19;76:9;
97:18
**October (13)**
42:12,23,25;69:22;
71:6;72:22;77:9;129:3;
133:8;135:22,25;
136:21;138:12
**off (10)**
38:20;48:6;58:16;
113:15;124:1;125:10;
139:5;146:12;147:13,
15
**offer (8)**
59:6;95:11;116:9;
139:10;145:4,5,11,11
**offered (5)**
106:17;144:10,11,
11,12
**offering (1)**
106:23
**offhand (1)**
143:24
**office (25)**
6:19,20;24:11;31:18;
32:3;35:12;37:23;
46:16,17;49:2,3;54:2;
56:5;57:4,12,23;58:1;
88:13;99:22;100:1;
101:14,14;108:14;
113:3;140:15
**old (1)**
15:3
**oldest (1)**
87:22
**once (5)**
33:24;76:12,13;
78:13;137:5
**once-a-week (1)**
77:14
**one (68)**
6:19;9:3,14,24;
12:23;24:4;26:5;29:18;
36:24;38:21;39:2,5;
45:21;52:22;56:4;57:4,
25;61:24;62:17,19,21,
21;63:5,11;64:20;
69:19;70:12;74:6;75:1,
1;77:6,12;80:3,14,18;
83:25;85:18;86:9,11;
87:15,21;89:7;91:5;
96:2;99:3,5;100:16;
102:11;105:20;111:1;
117:16;121:24;129:4;

133:14;135:21;136:9;
137:3;138:4,4,4,5,8,8,
8,10,11;144:14;146:25
**ones (1)**
142:10
**only (26)**
27:4;33:1;40:13;
43:18;47:12;53:25;
62:11,12;72:14,15,24;
73:3;74:9,12,19;86:7;
90:6;95:12;98:18;
100:16;116:20;123:4;
135:5,7;138:14,17
**open (8)**
69:21;73:24;74:4,5;
135:5,7;143:21,25
**operation (1)**
18:9
**opposed (1)**
106:23
**option (4)**
95:12;146:4,4,6
**order (7)**
15:2;81:16,17;87:21
**organization (1)**
9:12
**original (12)**
9:25;10:10;11:16;
13:4;19:4;29:24;30:8;
34:6;50:16,19;95:10;
111:9
**others (2)**
93:15;106:7
**other's (1)**
27:9
**otherwise (2)**
21:18;62:12
**out (50)**
5:16;12:1;15:3;
23:17;25:11,12,14;
26:23;33:15;45:17;
47:17;48:18,21;49:14;
50:15;58:5;59:16;
63:10;64:19,20;68:1;
69:4,6;70:9;71:10;
72:6;76:25;80:22;
84:13;87:4;89:21;90:3,
25;91:1,2,3,23;92:1;
94:14;95:22;100:4;
105:10;107:3,6,24;
108:13;125:16;135:1;
138:25;140:25
**outlining (1)**
106:24
**outstanding (2)**
72:14,15
**over (22)**
6:7;12:21;41:17;
45:6,15;47:3;58:25;
59:10;75:8,15;83:9;
85:19;86:12;98:10;
112:22,25;116:19;
117:1;127:5;136:2;

138:20;141:6
**overall (7)**
7:12;28:22;53:9,9;
64:11;76:3,4
**overlooked (1)**
38:17
**owed (3)**
31:16;33:1;48:22
**own (3)**
15:6;87:9;138:25
**owner (2)**
7:7,18
**Ozark (9)**
127:23,24;128:4,21;
129:11;131:20;136:4,
10;140:23
**Ozarks (2)**
139:20,24
**Ozark's (1)**
139:2
**OZK (2)**
132:22;133:5
**OZKcom (1)**
127:23

## P

**page (32)**
17:5;18:2,6;19:3,23,
24;20:24;21:7;25:5;
27:2,2;28:15;38:25;
39:6,8,16;50:8;51:15;
81:18,19,21,24;82:4;
83:19;88:3;93:10,11;
106:5;127:22;133:24;
135:10;141:2
**pages (3)**
20:25;88:3;94:23
**paid (5)**
32:20;33:2,6;36:25;
50:25
**paint (3)**
89:12;95:18;144:7
**painted (1)**
90:22
**paper (1)**
16:18
**paragraph (24)**
10:23;12:16,21;18:5;
19:23;20:2,3;21:7;
23:1;25:4;30:25;33:9;
39:7,9;48:17;50:9;
51:15;67:13;75:2;
103:22;104:14;108:4;
119:24,25
**paragraphs (1)**
104:15
**parcel (1)**
18:12
**parking (1)**
18:20
**part (11)**
6:25;9:23;16:9;18:4;

21:11;27:7,15;32:25;
33:18;34:16;53:7
**partial (4)**
67:3;77:4;78:5;79:8
**partially (10)**
62:12,12,14;63:19;
64:10,15,17;65:10,11;
79:21
**particular (6)**
52:24;58:7;70:11;
85:11,18;86:10
**particularly (1)**
18:5
**parties (13)**
18:8;20:5,13,20;
25:21;27:4,6,7,15;40:8,
20;49:18;118:4
**party (4)**
25:9,10;27:11;
137:21
**party's (1)**
27:23
**pass (4)**
110:14,15,18,19
**passionate (1)**
109:12
**past (5)**
17:11;34:25;35:3,15;
144:8
**patrons (1)**
108:6
**pay (10)**
32:10;36:11;49:10;
80:10;91:6,8;95:17;
105:9;113:5;138:24
**paying (4)**
89:25;92:21;138:21,
24
**payment (7)**
32:17;33:4;40:1;
48:20,21;49:3;50:22
**pending (1)**
25:15
**people (6)**
80:7;85:8,12;100:4;
123:14;142:16
**percent (14)**
9:22;22:17;70:25;
85:20;86:12;87:6;
89:11;90:12;112:15;
113:20,21,24;116:2;
124:25
**perform (1)**
28:24
**performance (1)**
27:6
**performed (2)**
45:22,23
**performing (1)**
85:17
**period (13)**
24:14;35:24;53:18;
58:25,25;75:8,16,22;

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.  Pg 232 of 238

IZEK SHOMOF
June 24, 2019

76:11;79:23;128:20;
142:17;143:19
**permit (11)**
12:25;23:6;72:3;
75:15,19;105:3,9;
121:12,13,25;122:16
**permits (25)**
24:3,6,8;28:23;29:5;
68:3,13,16,18,20;71:3,
20;75:18;103:23;
104:4,8,24;120:17,20;
121:3,21;138:22,23,25;
147:3
**permitting (1)**
75:18
**person (2)**
48:5;101:23
**personal (1)**
9:17
**personally (1)**
116:3
**personnel (1)**
46:16
**perspective (1)**
41:11
**petition (1)**
25:16
**Phone (2)**
43:11;49:12
**picture (1)**
108:22
**pictures (1)**
92:17
**pile (1)**
29:23
**Pinpoint (1)**
53:6
**pipe (1)**
86:22
**pipes (2)**
85:3,3
**place (18)**
56:12,13,17;57:25;
58:10;66:24;68:25;
69:3,8,11,12;80:7;
85:9;98:22;99:17;
100:21;109:1;120:11
**placed (1)**
15:11
**placing (1)**
77:19
**plan (19)**
29:10;64:23;65:2,10,
12,18,23,24;66:24;
70:19;84:13;88:20;
99:19;102:5,10,12;
103:11,12;146:20
**planned (1)**
51:18
**plans (4)**
29:8;70:18;123:1,5
**plea (14)**
90:18;91:11,21;92:9;

95:10,11,21,23,25;
96:4,9,12,17;97:13
**plead (9)**
91:4,15;92:15,16;
96:21;97:13,14,17,18
**pleaded (9)**
90:13,15,16;96:21,
22;97:7;98:15,19;
144:18
**pleads (1)**
95:13
**please (12)**
6:16;52:15;56:15;
63:6;65:1;71:13;84:10;
92:2;128:24;129:21;
141:23;144:6
**plumbing (1)**
21:2
**plus (1)**
50:19
**PM (5)**
82:4;88:5;119:2;
124:16;147:16
**pocket (2)**
105:10;123:14
**point (19)**
14:16;24:23;31:16;
36:24;62:8,8;81:12,12;
87:25;93:7;113:9;
115:23;117:22,25;
118:1;120:5;128:19,
20;129:23
**pointing (2)**
11:25;140:25
**pop (1)**
36:22
**portion (2)**
82:25;131:23
**portions (1)**
18:11
**position (3)**
41:5;50:24;111:5
**possible (6)**
16:18;29:14;78:23;
98:1;100:16;111:12
**post-sale (1)**
7:6
**potential (1)**
13:23
**Potentially (1)**
13:14
**power (1)**
98:1
**practical (1)**
144:23
**practice (1)**
100:13
**preamble (1)**
19:12
**preapproved (1)**
29:11
**precise (3)**
35:15;77:16;116:17

**preferably (1)**
112:14
**preference (1)**
112:17
**premise (2)**
18:10;28:22
**preparation (2)**
46:17;129:20
**prepare (3)**
46:1,12;102:12
**prepared (3)**
65:23;128:22;132:1
**pre-sale (1)**
7:5
**presented (1)**
16:4
**presenting (1)**
117:7
**preserve (3)**
105:7,11;107:12
**president (3)**
9:6,13;130:11
**presumably (1)**
143:16
**presume (1)**
127:23
**prevent (5)**
43:1,5;44:17,23;
60:11
**prevented (1)**
44:10
**previous (2)**
94:9;103:16
**previously (2)**
35:11;37:9
**price (1)**
66:13
**printed (1)**
140:11
**prior (38)**
18:14;42:25;46:11;
49:8;51:16,22;52:16,
17;53:3,12,16,16;
54:12,12,18,21;55:6,9,
12,18;56:24;58:10;
65:18;67:14;68:5,15,
19;69:25;70:6,13;
72:20;105:12,12;
107:10;120:2,18;
125:4;132:20
**Probably (31)**
17:11;19:17;22:7;
23:4,20;43:3,4;47:7,
17;52:5,10,10;56:24;
58:12;66:14;68:13;
69:25;71:2;72:12,12,
21;100:12;103:5;
110:21,22;133:18;
140:6,10,11,14;141:11
**problem (11)**
15:22;16:12;42:18;
54:6;61:18;85:12,12;
86:24;88:18;89:20,21

**problems (1)**
84:8
**procedures (1)**
6:3
**proceed (2)**
80:16,22
**process (3)**
73:13;130:9;136:16
**processes (1)**
6:2
**produced (3)**
37:25;81:9;121:24
**profits (1)**
13:14
**progress (3)**
125:19,22,24
**project (44)**
53:9;69:11,24;70:2,
23;72:6;76:3,7;82:22,
23;86:3;94:2;95:13;
97:23;98:2,4,12;107:8;
108:5,9,12,16,24;
109:4,7,10,12,12,14,
24;110:6,12;111:3,18;
112:11;113:3,9;115:2,
22;129:11;131:22;
137:9;141:24;144:9
**projects (4)**
21:1;136:10;146:24,
24
**promised (1)**
145:20
**promises (2)**
88:18;108:7
**properties (6)**
95:12;141:5,7,9,9,10
**property (7)**
6:22;7:15;8:2,12;
9:20;11:8;95:21
**proposal (14)**
57:12;61:24;62:15;
63:7,15,15,16;66:10;
101:21;132:11,13,15,
17;143:14
**proposals (1)**
63:14
**Propose (1)**
63:2
**proposed (4)**
54:24;62:23;63:25;
106:23
**protocol (2)**
29:12;82:23
**protocols (2)**
21:11;108:7
**provide (5)**
6:3,12;44:5;63:7;
64:7;129:16,21
**provided (5)**
20:6;32:15;65:12;
132:25;139:8
**provides (2)**
40:20;41:12

**provision (3)**
18:21,23;25:9;27:14;
40:10
**Public (1)**
148:24
**pull (13)**
23:6;24:2;47:17;
50:3;68:1;69:4;71:10;
72:3;98:16;104:7;
105:7,10;109:14
**pulled (21)**
24:6,8;68:16,18,20;
69:6;71:20;78:15;
103:23;104:5,25;
105:1,2,3,11;121:11,
13,22;122:16;138:22,
23
**pulling (5)**
68:13;98:16;109:14;
121:3;123:18
**purchaser (1)**
5:15
**purpose (1)**
101:3
**purposes (4)**
7:8,9;30:9,13
**pursuant (2)**
27:11;29:11
**pursue (2)**
108:9,12
**put (22)**
15:12,21;25:21;
26:10;33:7,14;36:15;
50:3;54:25;56:2;57:18;
72:6;80:25;90:4;
103:18,20;108:5;
130:12;142:5;143:7;
144:7;146:25
**putting (2)**
126:7;144:13

## Q

**quality (2)**
82:20;83:4
**quantified (1)**
13:22
**quarter (1)**
78:13
**question's (1)**
112:9
**quick (2)**
47:19;48:6
**quit (1)**
58:16
**quotation (2)**
130:14,25
**quote (1)**
18:12
**quotes (1)**
130:13
**quoting (1)**
130:19

18-23538-shl   Doc 5049   Filed 09/03/19   Entered 09/03/19 15:16:07   Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 233 of 238

IZEK SHOMOF
June 24, 2019

# R

**raised (4)**
26:21;76:22;84:14;
131:25
**rather (1)**
62:24
**reached (2)**
24:19;70:9
**reaction (2)**
57:12;58:4
**read (7)**
20:2;39:15,17;71:15;
93:15;130:12;148:8
**Reading (5)**
88:11;95:16;130:8;
132:17;138:20
**ready (18)**
67:16,19,23;68:1;
69:13;70:19;71:4,25;
72:5,10;73:20;81:12;
88:1,2;93:8,9;127:19,
20
**real (3)**
22:16;88:18;112:24
**realistic (1)**
97:21
**realize (2)**
59:15;89:15
**really (1)**
127:17
**reason (12)**
6:11;7:10;8:16;
18:15;52:17;68:10;
70:16;105:6;113:12;
116:18;123:4,7
**reasonable (1)**
144:1
**recall (25)**
23:8,11,13;53:5;
54:10;56:8;83:3,24;
84:2,3,5,14,19,21;
88:23;93:20,22;
100:19;101:6,19;
103:4,8;109:20;
119:20;142:19
**receipt (1)**
106:13
**receive (2)**
91:16;109:19
**received (10)**
23:16;28:9;33:22;
36:10,11,13;82:11,12;
88:13;139:24
**receiving (5)**
82:9;88:23;119:20;
124:21;128:13
**recently (1)**
140:4
**recess (3)**
48:7;118:19;146:18
**recital (1)**

29:2
**recognize (4)**
34:13;51:10;129:14;
133:9
**recollection (9)**
48:13;49:1;50:1;
57:3;58:9,17;68:10;
101:5;131:3
**recommended (1)**
136:9
**reconfiguration (1)**
18:20
**record (22)**
11:20;12:1;16:3,6;
22:11;36:15,16;38:3;
42:2,21;48:6,8;71:15;
72:8;90:14;133:22;
139:19;146:19;147:13,
15;148:11,12
**record's (1)**
100:1
**recycle (1)**
121:7
**red (1)**
135:13
**redesign (1)**
70:22
**redevelopment (1)**
108:12
**reengineer (1)**
70:22
**refer (3)**
7:1,8;8:14
**reference (1)**
81:11
**referenced (1)**
66:9
**referring (6)**
6:23;8:15;14:20;
22:9;49:12;107:23
**reflect (1)**
96:15
**reflected (2)**
6:5;37:1;38:11
**reflecting (1)**
34:15
**refresh (2)**
48:12;49:1
**refreshed (1)**
50:1
**refuse (1)**
64:20
**refusing (2)**
13:17,17
**regard (1)**
70:20
**regarding (6)**
14:21;40:8;57:11;
99:18;129:10;140:23
**regardless (1)**
118:2
**regards (2)**
70:20;134:22

**rehabilitation (1)**
51:18
**reimbursed (3)**
33:21;34:17;37:9
**reimbursement (3)**
11:8,9;33:10
**relate (2)**
8:21;94:7
**related (6)**
9:19;76:2,15,18;
91:12;133:25
**relates (5)**
8:2;42:8;61:22;
79:17;121:9
**relationship (2)**
20:5;118:12
**relatively (1)**
16:14
**released (2)**
25:7;39:24
**relevant (1)**
7:20
**Relocate (1)**
143:20
**relocation (7)**
21:2;130:5;131:9,14;
134:10;135:5;138:14
**remain (1)**
106:24
**remainder (1)**
39:23
**remaining (4)**
11:9;33:17,22;40:6
**remediation (1)**
29:10
**remember (57)**
22:14;23:25;24:10;
33:15;35:20;47:10,13;
49:20;52:2,9;57:8;
58:2,6,8;59:1,3;67:25;
69:5;71:16;74:25;
75:13;79:8,15,18;83:6,
14,16;84:20;86:10;
93:16,18;100:3,4,11,
24;101:1,8,9,12,22,22,
24,25;102:25;103:3,
10;109:18;123:17;
124:21,24;125:5,7,8;
127:3;128:13,15;133:1
**remind (1)**
86:9
**reminder (1)**
6:2
**remove (1)**
90:5
**removed (1)**
33:4
**removing (1)**
120:9
**rendered (1)**
37:15
**renovate (1)**
144:11

**renovation (2)**
67:17;143:12
**re-open (2)**
143:16;144:3
**repair (2)**
41:6;51:23
**repairs (4)**
28:21,24;29:3,4
**Repeat (8)**
17:3;31:13;44:12;
69:1;71:11,13;114:4,
13
**repeatedly (7)**
43:16;62:18;77:13;
79:25;85:2;126:15;
132:19
**replace (2)**
144:11,12
**replacement (1)**
21:1
**replacing (1)**
15:1
**replied (1)**
38:18
**reply (2)**
38:17;57:21
**REPORTER (6)**
19:7;34:2;51:5;81:4;
92:25;119:21
**reporter's (1)**
6:10
**represent (2)**
50:13;53:24
**representative (6)**
10:6;14:21;44:2,16;
45:19;51:13
**representatives (1)**
101:20
**representing (2)**
100:9;108:11
**request (7)**
57:1,22;96:16;124:3;
128:23;132:1,3
**requested (6)**
55:13,16,18;91:10,
13;101:15
**requests (2)**
25:16;38:1
**require (1)**
64:25
**requirement (1)**
79:16
**rerouted (1)**
146:4
**Reservation (1)**
12:8
**resolve (2)**
99:12,15
**resolved (2)**
99:8;107:9
**respond (1)**
116:12
**responded (1)**

116:8
**responding (1)**
116:12
**response (2)**
73:19;101:20
**responses (1)**
6:4
**responsibilities (1)**
26:9
**responsibility (1)**
137:22
**responsible (1)**
28:20
**responsive (1)**
38:1
**rest (6)**
42:5;135:7;138:18
**Restated (3)**
15:24;17:1;19:11
**resulted (1)**
15:16
**resulting (2)**
76:10;83:5
**retail (6)**
24:12;141:12,15,16,
25;142:12
**retrieve (1)**
71:11
**retrofit (31)**
51:24;52:7,21;53:10;
54:20;59:9,14,16,23;
60:1,16,24;64:8;65:3;
67:21;68:3,17;73:20;
75:19;79:5;80:4;99:19;
101:4;114:18;121:11,
13;138:25;141:25;
143:11;144:16;145:20
**retrofitted (1)**
145:19
**retrofitting (5)**
70:21;71:6;72:11;
76:3,24
**reverse (1)**
81:16
**review (2)**
40:7;103:6
**reviews (1)**
133:12
**revised (1)**
133:8
**revisit (3)**
62:13;74:2;78:20
**riddled (1)**
108:5
**ride (2)**
47:3,14
**right (23)**
10:10;11:20,22;
24:20;27:10,12;32:21;
36:19;39:13;45:1,16;
49:18;54:14,17;60:2;
66:15;71:22;85:7;
95:24;103:19;106:14;

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.    Pg 234 of 238

IZEK SHOMOF
June 24, 2019

109:10;134:16
**Rights (9)**
12:9;18:13;20:6,19;
25:11,22;27:8;84:12;
118:3
**rising (1)**
25:11
**risk (6)**
108:6;114:1,2,5,6;
126:8
**River (7)**
8:8,20,22;9:11;
30:15;34:8;102:21
**River's (1)**
120:1
**Roebuck (1)**
17:4
**role (3)**
6:17;9:5,12
**roof (1)**
15:11
**room (11)**
6:15;34:19,20;48:6;
54:11,12;58:19;84:9;
99:17;100:22;101:14
**rough (1)**
41:18
**route (3)**
64:15;80:14;112:6
**routes (2)**
111:16;142:3
**running (1)**
80:8;126:16

**S**

**sake (1)**
143:13
**sales (2)**
144:3;145:6
**salvage (6)**
68:12;121:1,2,4,7;
147:5
**Same (12)**
9:13;19:3,23;31:3;
40:19;60:3;64:9;90:7;
129:5;138:17;144:3,3
**sat (2)**
111:19;112:2
**satisfied (4)**
73:9,11,14;138:15
**satisfy (1)**
76:18
**satisfying (2)**
44:18;73:13
**save (1)**
67:4
**saw (3)**
36:1;49:25;132:2
**saying (22)**
7:12,13;16:8;22:18;
26:19,22;27:21;43:17;
44:20;52:17;78:23;

84:25;101:23;104:12,
12;105:17;111:1,17;
116:3,7,12;140:2
**scattered (2)**
15:8;83:9
**schedule (3)**
29:9;54:19;101:4
**scheduling (1)**
99:19
**school (1)**
42:20
**scope (1)**
82:23
**Scott (2)**
128:8,16
**search (2)**
43:24;44:3
**Sears (257)**
5:16;6:22,25;7:5,5,9,
13;11:10;13:16;14:7,
11,13,20,23,23,25;
15:2,4,13,15;17:4,13;
19:19;20:6;26:9;27:23;
30:16;31:12,16,22;
32:9,15;33:11,21;34:8;
35:21;37:8,20;40:12,
13,14;41:3,4,5,23;42:3,
4,9,25;44:1,2,9,17,20,
23,25;45:4,23;49:5,8;
51:24;52:1,19;53:16,
17,17,19;54:10;55:13,
19;56:10;57:2,4,12;
58:19,24;59:15,20;
60:5,9,12,14;61:3,6,8,
25;62:2,9,10,11,15,18;
63:22;64:1,7,14,17,20;
65:3,7,12,22;66:8,18,
22;67:4,4,5;69:20;
71:6;72:16;73:3,25;
74:14,21;76:15,19,25;
77:2,3,7,10,11,15,17,
18,21,24;78:1,6,10,12,
14,18,19,21,24;79:4,
10,17,19,21,25;80:2,9,
24;82:18,20,25;83:4,8,
14,17;84:8,14;85:3,15;
86:1,6;87:8,9;88:12;
89:2,11,23;90:1,3,5,7,
16,21,25;91:1,2,11,15,
21;92:8,18;95:20;
96:12,16,21,22;
97:10;98:3,11,24;99:3,
6,17;100:7;101:13,15,
20,23;102:14;103:12;
104:15,21;105:21,21;
108:11;109:24;110:5,
17,20;111:3,10,20;
112:10,14,20,23;
113:20;114:22,25;
115:9,20;116:4,23;
117:9,12;118:12;
125:10,19,21,23;
126:10;129:11;130:6,

16;131:9,11,14,21;
132:3,11,14;134:5;
136:20;137:7;138:13,
18;142:21;143:10,15,
20,22,24;144:1,7,8;
145:4,5,23
**Sears' (29)**
5:16;7:7;14:24;15:4;
22:12,16;29:20;33:23;
40:22;58:23;59:12;
60:16;61:17,20;67:3;
74:10;76:11;84:25;
86:21,25;87:5;90:11;
92:1;94:16;96:13;
100:22;101:14;131:21;
144:21
**Seattle (1)**
136:10
**second (10)**
11:21;56:7;57:7;
58:14,18;93:10;
100:21;124:15;127:21;
142:17
**second-to-last (2)**
81:19;119:25
**secretary (2)**
9:6,13
**section (16)**
18:2;19:25;21:14,24;
25:5;27:3;28:15;29:6,
8;39:16,18;40:4;
133:25;135:11,12,12
**sections (5)**
21:13,23;22:2;28:13;
39:22
**security (1)**
85:23
**seeing (6)**
102:25;103:3,4;
109:20;119:20;140:5
**seek (4)**
13:10,13;69:23;
70:16
**seeking (9)**
13:7,20;14:7;32:24;
33:1,2;50:22;70:5;76:1
**seeks (1)**
119:21
**seem (1)**
144:1
**seems (7)**
82:8;107:23;125:2;
130:19;131:8;133:13;
139:20
**seismic (47)**
24:4;28:16,20,24;
29:3,4,10;51:24;52:7,
21;53:10;54:19;59:9,
14,16,19,23;60:1,16,
23;64:8;65:2;67:21;
68:3,17;70:21;71:5,17;
72:11;73:20;75:19;
76:2,24;79:5;80:4;

99:19;101:4;114:18;
121:11,13;125:12,13;
130:17;138:25;141:25;
143:10;144:15
**self-automated (1)**
140:11
**sell (1)**
87:5
**send (13)**
85:7,7,11;102:5,11,
14;107:25;109:16;
123:21,21,23;124:5;
126:6
**sending (3)**
93:16,20;107:10
**sense (4)**
7:23;56:11;113:10,
11
**sent (13)**
54:15,16;94:18;
103:1,3,6,12;123:18,
22;127:4;132:13,15;
140:15
**sentence (2)**
29:7;93:23
**separate (1)**
25:8
**September (29)**
53:23;54:14,18,21;
55:4,9,12,16,18;56:3;
72:22;73:17;77:9;88:5;
93:11;94:18;99:18;
100:22;102:21;103:13;
106:10;122:8,10,13,18,
25;132:3,12,16
**server (1)**
34:19
**services (1)**
37:15
**set (8)**
18:13;21:16,17,22;
87:14;96:6;132:3,11
**seven (3)**
51:4,5;70:13
**shakes (1)**
127:2
**shall (12)**
18:16;20:7;21:8,17;
25:10;27:9,10;28:22;
29:10;39:24;40:1,7
**share (1)**
114:22
**Shaw (10)**
22:14,23,23;54:1;
57:4;58:15,16;100:4;
101:18;108:15
**sheet (1)**
146:24
**shields (1)**
33:15
**SHOMOF (69)**
5:4,11;6:14,18,21;
8:6,7;10:11,15;12:3,7;

28:14;30:7;32:9;34:5;
36:14;46:1;48:9;49:16;
51:8;56:12;59:21;
60:19;63:6;64:22;73:2,
18;74:17;75:2;76:14;
77:16;78:16;80:15;
81:7;91:10,24;93:4;
96:24;97:19,22;98:21;
99:10,11,16;101:1,2;
102:19,22;104:24;
106:2;110:5,25;
111:13;119:8;124:12;
127:13;129:8;133:4;
141:5;143:4,9,14;
144:20;145:4,14;
146:20;147:9;148:7,18
**show (6)**
15:25;48:19;53:24;
97:5,7;98:19
**showing (1)**
92:17
**shown (1)**
18:12
**shows (2)**
98:14,19
**shut (32)**
55:13,19;58:24;
61:14,18,25;62:2;64:1;
66:22;67:5,6;78:12;
79:22;101:23;108:16;
110:20,21;111:3,11;
113:6,20;116:9,13;
142:16,21,24;143:3,15,
25;144:2,2,21;145:4
**shutdown (1)**
66:10
**shutting (16)**
60:8;61:9;62:16,24;
63:8;64:14;65:8,10,19,
22;79:25;80:2,10,12;
111:20;116:15
**sign (6)**
118:16;137:5,5,6,7,
14
**signature (3)**
130:12;137:3;141:2
**signed (21)**
25:8;26:7;41:21,24,
25;42:1;44:1;49:23;
59:21;68:22;74:7;
114:11;115:8;117:10;
118:10,12;136:15,16,
23;137:4;148:20
**significant (1)**
137:25
**signing (1)**
137:13
**signs (2)**
90:2;92:18
**silence (1)**
116:24
**similar (1)**
141:24

Ellen Grauer Court Reporting Co. LLC

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document

IN RE: SEARS HOLDING CORPORATION, et al.   Pg 235 of 238

IZEK SHOMOF
June 24, 2019

**simple (1)**
74:23
**simply (1)**
111:19
**sit (2)**
54:8;86:12
**site (2)**
18:12;82:18
**sitting (18)**
24:17,23;26:19;
31:20;37:12;44:22;
45:6,15;53:4;54:11;
79:15;85:19;98:10;
100:19;108:14;112:3;
117:1;124:24
**situated (1)**
15:7
**situation (6)**
61:16;62:13;70:22;
94:14;108:17;141:15
**six (76)**
10:24;34:1;53:18,20;
55:13,21;57:2,13;58:1;
60:8;61:3,9,25;62:16,
24;63:8,22;64:1,14;
65:19,22;66:23;69:25;
70:4,6,13;76:25;77:6,
18;78:4,21,25;79:7,24;
101:15;109:1,24;
110:5,17,20,21;111:3,
12,14,21;112:11,14,20,
24;113:21;116:9,13,
15;121:13,17;122:3,15,
17,22,23;131:11,22;
132:4,12,21;141:16,21;
142:2,7,13,21;143:5,
15;144:2,21;146:5
**six-month (1)**
143:19
**six-plus (1)**
145:7
**SK (10)**
81:9;87:19;93:5;
106:4;124:14;127:15,
15;133:22,23;139:21
**smoke (6)**
82:20;83:4,14,16,17;
86:5
**sole (1)**
18:15;21:8;101:3
**solely (1)**
114:19
**solutions (1)**
62:24
**someone (5)**
22:15;41:7;59:3;
127:23,25
**someone's (1)**
131:3
**sometime (6)**
52:10;68:18;72:4;
75:13,19;123:17
**somewhere (2)**

122:24;136:11
**son (1)**
6:18
**sorry (19)**
17:2;29:5,22;36:14;
39:1;42:16;47:8;54:5;
55:15;102:7;103:21;
104:2;106:10;107:22;
111:13;125:5;130:1,1;
135:14
**soul (1)**
147:1
**sound (2)**
94:10;122:1
**sounds (3)**
6:5;8:17;138:5
**source (2)**
130:13,25
**south (2)**
36:2;141:25
**space (19)**
14:14,23,23;51:24;
53:18,19;58:23;61:13,
18;67:3;79:5,8;85:22;
86:21,25;87:5,9;112:5;
131:22
**spaces (2)**
18:20;142:1
**speak (7)**
6:7,7;47:9;85:22;
99:3,5;126:16
**speaking (4)**
6:21;47:10,13;48:17
**speaks (1)**
130:5
**specific (15)**
14:1;23:8,11;24:18;
28:5;44:23;45:13;47:8;
52:7;76:17;78:19;
79:16;81:11;87:25;
93:7
**specifically (9)**
14:7;44:25;47:13;
61:22;81:13;82:12;
124:15;126:20;130:18
**specifications (1)**
29:8
**specifics (1)**
54:23
**specify (1)**
57:19
**spelled (4)**
107:3,6,24;108:13
**spent (1)**
109:13
**spirit (3)**
106:17,20;108:2
**spoke (2)**
62:18;80:19
**spoken (1)**
94:17
**spot (1)**
143:7

**spread (1)**
87:2
**sprinkler (2)**
85:3;86:16
**sprinklers (3)**
87:3,3,9
**square (5)**
15:5,6;24:11,12;85:1
**ss (1)**
148:4
**stage (2)**
72:5,6
**stages (1)**
109:25
**staging (1)**
72:3
**stamp (1)**
93:5
**stamped (2)**
81:9,21
**stand (2)**
53:14,15
**start (13)**
10:9;55:17;73:21;
74:13,20;84:12;95:22;
121:14,16;125:3;
136:19;138:21;140:1
**started (6)**
15:9;52:10;72:2;
75:10;94:2;121:19
**starting (1)**
14:12
**state (6)**
77:3;103:21,21;
116:17;148:3,24
**stated (1)**
121:21
**statement (2)**
127:4;130:13
**states (17)**
11:1;12:16;18:8;
20:3;21:7;27:4;28:19;
32:6;38:15;40:11;
41:21;49:18;103:22;
106:16,22;108:4;
125:18
**stating (2)**
64:18;123:18
**status (4)**
53:13;121:10;
132:22;139:1
**stealing (1)**
85:4
**steel (1)**
59:11
**Steen (1)**
5:14
**step (3)**
37:13;75:25;143:4
**Steve (59)**
22:8,9,10,11,22;
26:12;42:4;43:15;52:6,
24,25;53:1;54:1,3;

57:8;58:15;62:18,18,
21,23;63:3,10,12;
80:19;82:6,16;84:7;
85:6;88:9;89:10,10,11;
90:12,14,16;93:14;
94:5,7,10;95:4,23,25;
96:3;97:7;99:2;100:3,
24;106:6;107:23;
108:11;109:11,21;
119:11;124:16;125:2,
18;126:4,14,15
**Steve's (12)**
54:1;56:4;57:4,11,
23;58:1;63:5;99:22;
100:1;108:14;113:3;
126:2
**sticker (2)**
39:2;50:6
**still (15)**
17:23;18:24;20:4,13;
26:5;32:24;33:9;50:22;
80:7;85:21,24;96:19;
126:9;143:21,25
**stop (3)**
84:10;89:25;126:6
**stopped (2)**
61:19,20
**stopping (1)**
126:20
**storage (1)**
84:9
**store (14)**
6:22;10:16;12:9;
54:10;56:10;80:3,5;
82:21;83:5,17;84:8;
85:15;104:21;143:20
**stores (4)**
80:1,1,1;142:25
**straight (1)**
42:2
**structural (1)**
121:3
**structure (1)**
82:23
**studies (1)**
139:7
**stuff (12)**
15:10;33:20;34:16;
52:25;75:24;76:6,24;
92:3;136:1,2;144:10;
147:12
**subject (5)**
17:24;21:14,23;29:6;
40:7
**submission (1)**
16:8
**submit (1)**
49:7
**submitted (7)**
10:3;33:3;49:5,8,15;
50:16;51:12
**subparagraph (1)**
18:5

**subscribed (1)**
148:20
**subsection (2)**
39:17;134:5
**substance (2)**
47:1;108:10
**subtracted (2)**
50:25;51:1
**successful (1)**
18:9
**Suffix (4)**
136:7,9,11,13
**suggestion (1)**
143:5
**suggests (1)**
131:13
**sum (2)**
12:18;108:10
**summarize (1)**
128:24
**summarized (1)**
55:7
**summary (7)**
107:25;124:6;128:9,
22;129:17,21;133:14
**supplement (1)**
50:19
**supplemental (15)**
9:25;10:4;12:8,23;
13:5;14:5,6;15:24;
16:20;33:3;42:8;50:5,
14;75:3;76:2
**support (1)**
10:3
**supposed (1)**
38:13
**supposedly (1)**
66:24
**sure (35)**
9:7,14,22;19:3,22;
25:3;31:24;32:5;35:25;
36:9;37:4,5,7,17;38:9;
40:19;41:20;46:15;
52:12,24;65:15;66:21;
71:12;82:10;85:25;
99:25;108:22;113:18,
20,21;115:1,25;116:2;
119:15;140:18
**sustainable (1)**
84:11
**swearing (1)**
85:19
**sworn (1)**
5:5
**system (3)**
86:16;87:1;144:13
**systems (2)**
21:2;88:16

---

**T**

**tab (2)**
105:22;129:5

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.   Pg 236 of 238

IZEK SHOMOF
June 24, 2019

**table (1)**
17:5
**talk (21)**
16:19;38:1;41:17;
43:14,15;46:21,24;
47:3;62:17,19,21,22;
63:5,11,18;64:16,20,
21;80:14,16,18
**talked (10)**
44:8;47:6;50:2,9;
58:8;70:11;99:16;
103:15,15;107:3
**talking (22)**
14:12;23:1;24:3;
27:24;40:19;52:6;54:2;
55:10;61:20;62:22,23;
65:7;73:16;81:18;
96:25;107:16,19;
108:25;109:8;115:25;
130:15;134:20
**tax (1)**
11:8
**TBA (2)**
25:14;39:11
**team (4)**
22:16;42:5;126:7,21
**technical (2)**
121:15;143:6
**Technically (2)**
81:19;119:25
**telling (6)**
42:2;47:15;63:5;
76:22;94:5,7
**ten (3)**
5:23;92:25;146:17
**tenant (12)**
7:9,15;18:10;29:11;
39:24,25;40:1,5;51:18;
67:15;133:25;141:16
**tenants (9)**
29:14;141:12,15,17,
19,20,21;142:7,13
**tenant's (6)**
18:10,13,14,17,18;
39:25
**tens (1)**
139:6
**terminated (1)**
132:23
**Terminating (1)**
123:25
**termination (2)**
39:11;132:25
**terms (10)**
11:2;21:14;25:20;
29:6;31:23;38:6;80:17,
23;144:25;145:15
**testified (9)**
5:7;37:8;42:7,9;
61:24;74:3;94:7;99:21;
109:23
**testify (1)**
36:15

**testifying (1)**
45:18
**testimony (13)**
6:12;42:22;67:9;
73:21;74:11,18;85:14;
86:1;98:13;111:23;
132:24;148:9,11
**therein (1)**
27:13
**thereof (1)**
18:18
**thereto (1)**
67:14
**thick (1)**
16:14
**thinking (1)**
126:23
**third (3)**
33:10;95:11;108:4
**though (6)**
28:6;44:22;77:17;
118:2;126:18;144:23
**thought (4)**
48:1;70:6;108:19;
119:14
**thousand (5)**
24:10,12;136:3;
141:10;143:11
**thousands (2)**
139:6;142:25
**three (33)**
8:11,15,19;11:6,14;
12:23;36:13;42:13,16;
56:24;76:21;110:9,10,
14,15,16,18,20,23;
111:12;112:15,22,25;
113:14,19,22,23,25;
114:2,5;115:2;117:15;
131:2
**three-something (1)**
48:22
**throughout (1)**
85:23
**thus (1)**
116:18
**TI (4)**
11:10;33:11,18;
51:23
**timeline (6)**
14:21,22;23:24;
106:24;107:6;132:4
**timelines (1)**
44:9
**timely (1)**
40:4
**times (5)**
5:19,20;22:15;27:16;
117:16
**Time-wise (1)**
66:1
**timing (3)**
56:21;82:23;108:7
**today (48)**

6:3,10,11,16,21;
8:14;9:20;16:7,18;
17:23;24:17,23;26:20;
30:9,13;31:20;37:12;
38:2;44:22;45:18;
46:11,13;53:4,23,24;
61:24;74:12,18;79:15;
89:5;91:25;92:5;98:13;
99:16;100:19;111:1;
112:10;116:21;124:24;
130:15;131:10;132:2,
24;134:13;138:12;
139:4;146:21;147:9
**today's (3)**
7:8;46:2,17
**together (5)**
11:15;30:24;94:1;
125:11
**told (12)**
46:22;47:17;62:21;
63:10,12;67:4;77:9,10;
94:9;107:2;122:25;
136:12
**tons (2)**
92:17;98:16
**took (10)**
28:10;49:9;56:12,13,
17;58:10;89:17;99:17;
100:21;114:2
**top (7)**
82:4,10;83:20,21,25;
127:18;128:7
**topics (2)**
48:13;52:1
**total (5)**
11:14,15;13:6;50:11,
15
**toward (1)**
82:4
**towards (1)**
81:17
**transcript (3)**
6:5;148:8,10
**Transform (2)**
5:15;7:7
**trash (1)**
121:7
**tried (1)**
61:16
**true (5)**
117:20;125:7;127:5;
148:10,12
**trust (6)**
8:7,20,25;9:1,16,17
**truth (3)**
5:6,6,6
**truthful (1)**
6:12
**try (6)**
29:19;74:22;85:23;
91:1,6;94:13
**Trying (17)**
16:17;56:11,21;

60:15;61:7,10;63:10;
83:11;85:10;89:12,21;
130:21,24;131:20;
140:1;143:6;146:23
**turn (14)**
12:15;17:5;18:1;
19:23;20:23;27:2;
28:14;29:22,23;50:8;
51:15;81:15;133:24;
135:10
**twice (4)**
56:4;76:12,13;
138:16
**two (18)**
9:14,24;16:3;35:23;
36:13;56:18,24;58:12,
13;66:19;68:5;71:2;
85:23;95:6;108:8;
131:2;138:19;146:12
**tying (1)**
92:18
**typo (2)**
139:25;140:5

**U**

**unable (1)**
112:10
**under (42)**
11:2;14:5;20:6;
25:20,22;26:2,17,17;
27:14;28:3;38:4,5;
44:18;45:22,23;49:19;
60:1,3,21,22;61:2,23;
67:11;72:18;74:12,19;
78:6;79:6;80:17,20,23;
90:20;96:19;114:3,7,
18;117:13,14;137:20,
20;145:15;148:9
**underneath (1)**
104:14
**understandably (1)**
16:14
**understands (1)**
20:19
**Understood (8)**
20:18;66:2,4;71:12;
76:22;107:1;108:1;
109:9
**undoable (1)**
142:5
**unfortunately (2)**
91:24;95:9
**unhappy (2)**
125:19,21
**unit (2)**
15:2,12
**units (7)**
15:2,3,9,10;24:10;
83:12;136:3
**Unless (13)**
7:22;8:15;20:13;
21:15,18;25:6;49:19;

80:10;84:12;111:14;
120:1,14;143:25
**Up (33)**
14:10;19:6;33:25;
36:22;51:4;52:20;67:7;
70:19;72:3,6;74:8;
78:14;81:3;82:17;
83:13;87:10;89:24;
92:18,19,19,20;94:14;
113:19,23,24;114:1;
120:8;125:14;126:23;
127:10;138:21,24;
146:13
**updating (1)**
140:8
**Upon (4)**
40:3;69:16;77:19;
133:12
**upper (3)**
14:25;86:25;87:10
**upstairs (1)**
86:22
**use (5)**
18:11,18;28:22;
105:22
**using (1)**
36:17

**V**

**vague (3)**
31:23;107:14;145:8
**valid (1)**
26:18
**value (5)**
60:16;61:6;144:17;
145:18,23
**various (1)**
135:1
**Vegas (5)**
8:8,20,22;9:3,5
**Velkei (3)**
22:10,11;42:5
**vents (1)**
83:13
**verbal (12)**
6:4,4;22:8,20;26:25;
27:24;28:3,10;40:15;
43:12,16;48:20
**verbally (7)**
26:3,4;38:18;54:2;
109:10;132:13,19
**version (3)**
133:13,17,19
**versus (1)**
131:22
**vicinity (1)**
28:21
**view (6)**
40:18;60:18;61:21;
62:20;72:9;112:19
**violation (1)**
91:15

18-23538-shl    Doc 5049    Filed 09/03/19    Entered 09/03/19 15:16:07    Main Document
IN RE: SEARS HOLDING CORPORATION, et al.    Pg 237 of 238

IZEK SHOMOF
June 24, 2019

**violations (1)**
88:15
**visual (1)**
29:14
**volume (1)**
16:18

**W**

**wait (2)**
6:8;59:10
**waited (2)**
146:5,7
**waiting (7)**
71:22;78:10;105:9;
111:19;112:2,4,7
**waive (2)**
27:5;49:18
**waived (2)**
25:6;27:12
**Waiver (7)**
25:5,10,22;27:4,10,
10,12
**waiving (1)**
25:8
**water (2)**
85:5,7
**way (27)**
9:9;23:14;36:18;
65:7;72:7,19;75:17;
78:15;80:6;81:15;
89:12,14,20;90:22;
92:5;98:15;107:1;
108:13;109:8;111:1;
114:23;115:10,16,18;
143:7;144:18;147:4
**ways (2)**
67:19,23
**WEAVER (77)**
5:10,13;10:9,14;
11:21,24;12:3,6;16:6,
12,17,24;19:1,9;20:18,
22;25:25;26:15;30:2,6;
32:1;33:25;34:4;37:24;
40:25;41:10;47:18,25;
48:3,8;51:3,7;55:15;
71:13,19;81:3,6;87:14,
17;92:23;93:1,3;
102:16,18;105:22;
106:1;111:24;114:10,
14;115:6;118:9,18;
119:7,13,16,18,23;
124:9,11;127:9,12;
129:1,7;131:17;133:3;
135:15;139:15,17;
140:21;141:4;145:3,9;
146:14,16,19;147:8,15
**week (11)**
14:10;36:13;66:19;
68:5;71:2;105:12;
106:18;126:5;135:9;
138:19;146:12
**weekly (1)**

**131:1**
**weeks (4)**
68:13;71:2;99:22;
146:13
**weird (1)**
82:8
**welcome (1)**
127:16
**weren't (1)**
16:5
**Whatever's (1)**
120:21
**what's (2)**
16:25;89:15
**whatsoever (1)**
18:19
**whole (16)**
5:6;39:15;57:25;
61:15;62:8,13;64:21;
70:22,22,23;77:5;
78:12;79:7,21,22;
123:9
**who's (3)**
22:13;82:9;102:7
**Why'd (1)**
104:7
**willing (14)**
59:14;63:19;67:16,
19,23;68:1;71:5,25;
72:1,10;73:20;78:21;
79:22;91:4
**wiped (1)**
48:18
**withheld (1)**
18:15
**within (27)**
21:10;27:17;28:21,
24;29:3,5;34:25;35:2,
15,23,23;57:9;58:1;
61:17;66:18;67:7;
76:25;77:6;83:4;86:16;
87:1,5;112:15;113:19;
121:17;131:22;135:8
**without (20)**
13:16,16;18:14,19;
21:12;25:13,15;26:11;
60:9;61:25;62:16,25;
63:8;65:3;111:21;
116:9,10;123:11;
144:22;145:1
**witness (24)**
5:5;20:21;26:2;
33:15;41:2;47:21,23;
48:2;51:2;71:16;86:20;
114:12;119:22;127:2;
135:14;140:7,13,16,19;
147:11
**Word (1)**
140:10
**work (54)**
21:9,13,22;22:2;
24:4;28:16;29:10,20;
34:22;35:4,11,14,19,

22;37:1,19,21;38:5,11;
39:22,25;40:2,3,11,15,
21;41:22;43:1;44:10,
24;52:18;53:10,18,19;
57:25;61:12,16,17;
72:11;76:10;80:12;
84:8,10,16;85:16;86:2;
94:1;104:25;125:24;
126:21,22,23,25;127:5
**workable (1)**
16:17
**worked (1)**
80:21
**working (11)**
65:11;76:7;77:6;
83:13;89:20;90:24;
93:25;94:13;111:11;
126:7;143:11
**works (3)**
6:18;84:13;92:5
**worrying (1)**
143:7
**wrecked (1)**
121:6
**write (4)**
47:15;93:24;96:2;
128:19
**writes (2)**
82:16;84:7
**writing (19)**
21:18;22:5;23:20,21;
25:8,21;26:10,14,20,
23;27:1,5;38:17;49:19;
54:25;56:2;57:18;
103:18,20
**written (10)**
22:19;27:10,16,22,
22;28:2,2,6;105:14;
132:25
**wrong (3)**
117:14,21,24
**wrote (2)**
43:23;96:1

**Y**

**year (9)**
34:25;35:15;42:15,
16,16;52:3;56:18,23;
64:19
**years (24)**
6:1;42:13;76:21;
110:10,10,14,15,16,18,
20,23;112:16,22,25;
113:14,20,22,23,25;
114:2,6;115:2;144:8,
10
**years' (1)**
35:23
**yellow (1)**
39:2
**yes-or-no (7)**
63:9,14;74:1,21;

84:18;91:19;92:11
**York (1)**
36:18

**Z**

**zoning (1)**
25:16

**0**

**0023 (1)**
19:25

**1**

**1 (12)**
10:12,13;29:24;30:9,
16,23;33:10;48:18;
52:16;80:11;134:9;
146:2
**1,000,424 (1)**
33:22
**1.6 (2)**
85:1;126:17
**10 (5)**
21:13,23;80:11;93:2;
146:2
**10:59 (1)**
93:11
**100 (13)**
9:22;22:17;70:25;
86:12;87:6;89:11;
90:12;112:15;113:20,
21,24;116:2;124:25
**1008 (2)**
10:17;12:9
**10309 (1)**
17:3
**1039 (1)**
17:2
**10th (1)**
105:4
**11 (5)**
8:8;21:14,23;102:17,
20
**11:08 (1)**
5:2
**11:59 (1)**
82:4
**1129 (1)**
133:22
**1135 (1)**
133:24
**1136 (1)**
135:10
**1140 (1)**
133:23
**11-page (1)**
134:25
**12 (9)**
28:24;29:3,5;35:3;
67:5;105:23,24;106:3;

119:9
**12,000 (1)**
35:21
**121,000 (1)**
75:15
**12th (2)**
119:16;120:5
**13 (7)**
12:21;19:24;25:5;
38:25;105:22;119:4,9
**14 (6)**
124:10,13,16;
139:23,25;140:20
**14th (1)**
126:10
**15 (7)**
19:24;27:2;39:8;
47:19;127:10,11,14
**15th (3)**
104:16;136:21;
138:12
**16 (11)**
67:14;68:7,8,11,24;
69:2;120:2,19;129:5,6,
9
**17 (4)**
25:4,5;133:2,5
**18 (6)**
67:6;72:22;124:9;
139:15,16,19
**183116 (1)**
32:16
**19 (2)**
88:5;139:13
**1999 (1)**
8:8
**1st (23)**
21:15,25;22:3,6;
24:9;37:3;38:7,14;
39:23;40:11,21;41:22;
42:4,14;43:2;44:11,24;
48:23;49:8;104:16,25;
135:22,25

**2**

**2 (10)**
12:3,5;18:2;20:24,
25;21:6,7;50:6;51:15;
80:10
**2- (1)**
34:21
**2,600 (2)**
35:14,17
**2:17 (1)**
119:2
**20 (4)**
85:1;94:24;126:17;
141:9
**200,000 (2)**
15:5;24:10
**2000- (2)**
75:17;139:12

**2011 (3)**
  15:25;17:7;115:24
**2013 (2)**
  55:12,14
**2015 (21)**
  17:15,21;19:5,13;
  25:21;38:5;44:18;
  68:22;75:14,23;76:7;
  114:3,7,18;115:23;
  117:10,23;145:15,16,
  20,24
**2016 (1)**
  55:15
**2017 (27)**
  21:15,25;22:3,6;
  23:5;24:9,14;27:25;
  37:3;38:7,13,14;39:23;
  40:12,21;41:22;42:4;
  43:2;44:11,24;48:18,
  23;49:8;52:12,16;53:3;
  70:17
**2018 (34)**
  23:6;42:12,23,25;
  52:10;53:23;54:18;
  55:16,18;56:3;69:22;
  71:6;73:17;77:9;82:4;
  83:3,21;88:5;93:11;
  94:18,24;98:22;99:18;
  102:21;103:24;104:5;
  105:14;127:22;130:1,
  2,22;133:8;136:21;
  141:2
**2019 (51)**
  5:1;23:7;30:16,17;
  31:10,15,15;32:10,11,
  16,25;34:8;35:7;50:23;
  67:14;68:16,24;69:2;
  71:21;72:8,9,17,19,22;
  73:4,15,16,21;74:13,
  20;75:20;104:16,17,
  25;119:1,10,16;120:2,
  5,19;121:25;122:4;
  123:6;124:16;126:10;
  128:7,16;129:10;
  139:9,23;140:20
**20th (4)**
  82:3,13,16;95:6
**21st (8)**
  100:22;103:13;
  121:25;122:4,12,13,17,
  18
**22nd (1)**
  129:10
**23 (3)**
  27:3;127:9;141:2
**23rd (3)**
  34:8;35:7,10
**24 (4)**
  5:1;30:16;119:1;
  129:5
**24th (2)**
  31:9,14
**25 (5)**

  39:7,9;141:11;144:8;
  146:24
**25th (2)**
  102:21;105:14
**27 (3)**
  93:11;94:18;141:2
**28th (1)**
  106:10
**29 (1)**
  128:7
**29th (1)**
  127:22

---

**3**

**3 (11)**
  16:22,23;17:1;18:5;
  20:4,12,25;21:13,23;
  39:22;40:4
**3,250,000 (1)**
  39:12
**3:15 (1)**
  147:16
**30 (3)**
  59:10,11;141:11
**30- (1)**
  36:2
**30th (1)**
  19:13
**3117 (1)**
  139:21
**31st (1)**
  83:21
**33,000 (1)**
  36:2
**36-months (1)**
  64:12
**397 (1)**
  139:21
**3rd (6)**
  130:1,2,20,22;
  132:14;133:8

---

**4**

**4 (15)**
  19:6,8,10;20:7,24,
  25;21:13,23;28:15;
  39:1,2,4,22;40:4;50:8
**4:14 (1)**
  124:16
**4:55 (1)**
  94:24
**4th (1)**
  129:3

---

**5**

**5 (11)**
  14:8;20:25;21:13,23;
  30:4,5,10,13;40:4;
  76:1;146:2
**5.7 (2)**

  50:11,15
**5:45 (1)**
  88:5
**5th (2)**
  17:7;105:4

---

**6**

**6 (10)**
  18:2;21:13,23;34:3,
  6;39:22;40:4;51:15;
  67:6,7
**6,000 (1)**
  15:6
**609 (1)**
  141:25
**6728 (1)**
  124:14
**6731 (1)**
  124:14
**6778 (2)**
  81:9;83:20
**6783 (1)**
  81:24
**6784 (1)**
  81:10
**68008 (1)**
  87:19
**6801 (1)**
  106:4
**6802 (1)**
  106:4
**6812 (1)**
  88:3
**6817 (1)**
  87:20
**6818 (1)**
  93:5
**6819 (1)**
  93:11
**6823 (1)**
  94:23
**6835 (1)**
  93:5
**6904 (1)**
  127:15
**6923 (1)**
  127:15

---

**7**

**7 (8)**
  21:13,23;30:25;33:9;
  39:23;40:4;51:6,9
**7.1 (3)**
  50:11,15,19
**7/3/2018 (1)**
  129:23
**750- (1)**
  14:4

---

**8**

**8 (11)**
  21:13,23;24:4;28:15;
  81:5,8;133:25;134:3;
  135:11,12,12

---

**9**

**9 (8)**
  21:14,24;29:6;50:9;
  75:2;87:16,19;92:24
**90 (1)**
  85:20
**99-year (1)**
  144:15