UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                               :

In re:                           :        Chapter 11
                                 :

SEARS HOLDINGS CORPORATION, *et al.*,[1]   :

                               :        Case No. 18-23538-rdd
           Debtors.          :

                               :        (Jointly Administered)
                               :
                               :
-------------------------------------------------------------X

## DECLARATION OF ABENA A. MAINOO IN SUPPORT OF TRANSFORM HOLDCO LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE ADVERSARY COMPLAINT

I, Abena A. Mainoo, declare under penalty of perjury as follows:

1.      I am an attorney duly admitted to practice before this Court, and I am a partner of the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel for Transform Holdco LLC ("Transform"). I respectfully submit this declaration (the "Mainoo Declaration") in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

connection with Transform's *Reply Memorandum of Law in Further Support of Transform Holdco LLC's Adversary Complaint.*

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 7)," dated December 5, 2018.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 8)," dated December 12, 2018.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 9)," dated December 19, 2018.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 10)," dated December 26, 2018.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 11)," dated January 2, 2019.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of a presentation titled "Project Blue Rolling Cash Flow Budget (Week 11)," dated January 2, 2019.

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of email correspondence with the subject line "Sears: Restructuring Committee Meeting Materials" from Natasha Hwangpo to Ann Reese et al., dated January 4, 2019, attaching a presentation titled "Discussion Materials: Project Blue," dated January 3, 2019.

9.      Attached hereto as <u>Exhibit H</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 12)," dated January 9, 2019.

10.     Attached hereto as <u>Exhibit I</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 13)," dated January 16, 2019.

11.        Attached hereto as <u>Exhibit J</u> is a true and correct copy of email correspondence with the subject line "RE: Project Blue: Restructuring Committee Call" from Paloma Van Groll to Ann Reese et al., dated January 16, 2019, attaching a presentation titled "Discussion Materials: Project Blue," dated January 16, 2019.

12.        Attached hereto as <u>Exhibit K</u> is a true and correct copy of email correspondence with the subject line "Armored Car Pickups" between Rajat Prakash, Aziz Khan, Jodie Quinn, Jennifer Joye, and David Acquaviva, dated January 16, 2019.

13.        Attached hereto as <u>Exhibit L</u> is a true and correct copy of the Minutes of a Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corporation, dated January 16, 2019 (6:30 p.m.).

14.        Attached hereto as <u>Exhibit M</u> is a true and correct copy of the Minutes of a Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corporation, dated January 16, 2019 (9:45 p.m.).

15.        Attached hereto as <u>Exhibit N</u> is a true and correct copy of the Minutes of a Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corporation, dated January 16, 2019 (11:30 p.m.).

16.        Attached hereto as <u>Exhibit O</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 14)," dated January 23, 2019.

17.        Attached hereto as <u>Exhibit P</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 15)," dated January 30, 2019.

18.        Attached hereto as <u>Exhibit Q</u> is a true and correct copy of a presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 16)," dated February 6, 2019.

19.     Attached hereto as <u>Exhibit R</u> is a true and correct copy of email correspondence with the subject line "RE: Cash Receipts Tomorrow" from Brian Griffith to Rajat Prakash et al., dated February 7, 2019.

20.     Attached hereto as <u>Exhibit S</u> is a true and correct copy of a letter from Sean A. O'Neal of Cleary Gottlieb to Weil, Gotshal & Manges LLP, dated February 11, 2019.

21.     Attached hereto as <u>Exhibit T</u> is a true and correct copy of excerpts from the transcript of the deposition of Kunal Kamlani taken on August 15, 2019.

22.     Attached hereto as <u>Exhibit U</u> is a true and correct copy of excerpts from the transcript of the deposition of Rajat Prakash taken on August 20, 2019.

23.     Attached hereto as <u>Exhibit V</u> is a true and correct copy of the transcript of the deposition of Christopher Good taken on August 28, 2019.

24.     Attached hereto as <u>Exhibit W</u> is a true and correct copy of excerpts from the transcript of the deposition of Mohsin Meghji taken on August 29, 2019.

25.     Attached hereto as <u>Exhibit X</u> is a true and correct copy of a document titled "Sears Holdings Corp. Professional Fee Carve Out Reporting," dated the week of January 31, 2019.


Executed on September 6, 2019 in New York, New York.




                                        Respectfully submitted,


                                        <u>/s/ Abena A. Mainoo</u>
                                        Abena A. Mainoo

# Exhibit A

# SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 7)

## December 5, 2018



sears    kmart    SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 7 – Actuals For Rolling 2 Weeks

*(Units in millions)*

| Cash Variance to Budget | Week 42 - Budget Week 6 11/18/18 - 11/24/18 | | | Week 43 - Budget Week 7 11/25/18 - 12/1/18 | | | Weeks 42 - 43 11/18/18 - 12/1/18 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| **Total Operating Receipts** | $180 | $187 | $7 | $286 | $338 | $52 | $466 | $525 | $59 |
| Merch Vendors | (119) | (80) | 39 | (91) | (75) | 16 | (210) | (155) | 55 |
| Rent/Occupancy | (1) | 0 | 1 | (1) | 0 | 1 | (2) | 0 | 2 |
| Payroll/Bens/Taxes | (30) | (32) | (2) | (68) | (61) | 7 | (98) | (93) | 5 |
| Other SG&A Disbursements | (65) | (50) | 15 | (83) | (68) | 15 | (149) | (118) | 30 |
| **Total Operating Disbursements** | (215) | (161) | 54 | (243) | (204) | 39 | (459) | (366) | 93 |
| CapEx | (1) | 0 | 1 | (1) | (0) | 1 | (2) | (0) | 2 |
| **Total Operating Cash Flow** | ($37) | $26 | $62 | $41 | $133 | $91 | $5 | $158 | $154 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | |
| Day 1 Utility Motion | ($10) | $0 | $10 | $0 | ($10) | ($10) | ($10) | ($10) | $0 |
| Day 1 Critical Vendor Motion | (10) | (11) | (1) | (15) | (7) | 8 | (25) | (19) | 6 |
| Insurance | 0 | 0 | 0 | (4) | 0 | 4 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | | 1 | (1) | | 1 | (2) | | 2 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | | 0 | 0 | | 0 | 0 | | 0 |
| PTO | 0 | 0 | 0 | (1) | 0 | 1 | (1) | 0 | 1 |
| Post-Petition TSA/CSA | (1) | | 1 | 0 | | 0 | (1) | | 1 |
| **Bankruptcy Related Disbursements** | ($22) | ($11) | $11 | ($21) | ($17) | $4 | ($44) | ($29) | $15 |
| Cash Interest | ($4) | $0 | $4 | ($4) | ($10) | ($6) | ($8) | ($10) | ($3) |
| Financing Fees | 0 | 0 | 0 | (4) | (15) | (10) | (4) | (15) | (10) |
| Professional Fees | 0 | 0 | 0 | 0 | (1) | (1) | 0 | (1) | (1) |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 3 | 3 |
| **Total Other Non-Operating Disbursements** | ($4) | $0 | $4 | ($8) | ($23) | ($15) | ($12) | ($23) | ($12) |
| **Net Cash Flows before Financing** | ($63) | $15 | $77 | $12 | $92 | $80 | ($51) | $106 | $157 |
| Financing | $0 | $0 | $0 | ($173) | ($272) | ($99) | (173) | (272) | ($99) |
| **Net Cash Flow** | ($63) | $15 | $77 | ($161) | ($180) | ($19) | ($224) | ($166) | $58 |
| Beginning Cash | $224 | $224 | $0 | $161 | $239 | $78 | $224 | $224 | $0 |
| Cash Flow Before Financing | (63) | 15 | 77 | 12 | 92 | 80 | (51) | 106 | 157 |
| Financing | 0 | 0 | 0 | (173) | (272) | (99) | (173) | (272) | (99) |
| Change In Carveout Account | 0 | 0 | 0 | 0 | (58) | (58) | 0 | (58) | (58) |
| **Ending Available Cash Balance** | $161 | $239 | $77 | $0 | $0 | $0 | $0 | $0 | $0 |

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY

2

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 7 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 7 same store sales (go-forward stores) were negative (10.3%) for FLS and negative (10.4%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (10.3%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Net proceeds from the SRAC MTNs of $81mm are not included in the receipts because the cash was segregated in the wind-down reserve account

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 7

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made $7.5mm in aggregate critical vendor payments for the week

- Other SG&A Disbursements of $68mm was below the weekly budgeted amount of $83mm

  - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

  - The $68mm of the Other SG&A Disbursements includes $7.2mm of payments for Home Services and builder distributors customer orders, $9.8mm in transportation and logistics vendor payments, $3.4mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company paid $10.2mm in interest during the week, and paid $8.4mm of Jr. DIP fees and $6.3mm of Sr. DIP fees

- With the final approval of the Sr. DIP and interim approval of the Jr. DIP, the Company paid down $446mm on the rolled-up ABL revolver, drew $100mm on the Sr. DIP term loan, and drew $75mm on the multiple-draw Jr. DIP term loan

**Net Cash Flow**

- Net cash flow before financing for the rolling two week period of weeks 6-7 of the proceeding equaled $106mm, which is well above the budgeted ($51mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 6 Budget Variance Report - Commentary

- Going forward, the rolling budget variance report will not include weeks prior to week 42 per conversation with BRG on 11/26/18

**Receipts**

- Week 6 same store sales (go-forward stores) were negative (24.4%) for FLS and negative (7.8%) for Kmart versus prior year for a total combined adjusted same store sales comp of (19.5%)

- The Company had higher than anticipated receipts because of outperformance at GOB stores

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $80mm on post-petition merchandise disbursements in week 6

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 2-3 weeks with higher spending

- The Company made $11.0mm in critical vendor payments including the third and final pre-petition payment to Whirlpool

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $65mm

  - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

  - The $50mm of the Other SG&A Disbursements includes $5.0mm of payments for Home Services and builder distributors customer and franchisee orders, $14.2mm in transportation and logistics vendor payments, $2.2mm in advertising payments, and $1.3mm to fund Sears Home Improvement

- The Company paid no interest or financing fees during the week

- The Company had not made any repayments on the ABL revolver through the end of week 6, since it is required to wait until the final order date to roll up the facility

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 3-6 of the proceeding equaled $38mm, well above the budgeted ($178mm)

- Net cash flow before financing for week 6 of $15mm was $77mm greater than the budgeted ($63mm)

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 6-7 | |
| --- | --- |
| **Vendor** | **Disbursements** |
| LG HA | $20.4 |
| EMA | 18.6 |
| Home Services | 9.9 |
| Cardinal Health | 8.7 |
| Whirlpool | 8.0 |
| Samsung | 6.2 |
| Icon | 4.5 |
| MTD | 4.4 |
| Dart | 3.5 |
| Serta Simmons | 2.3 |
| P&G | 2.2 |
| Winiadaewoo | 1.9 |
| Timberland | 1.0 |
| Church&Dwight | 1.0 |
| Hasbro | 0.9 |
| McLane Company | 0.9 |
| Heartland | 0.9 |
| Michelin | 0.8 |
| Nestle Purina | 0.7 |
| MSRF INC | 0.7 |
| Top 20 Post-petition Vendors | $97.5 |
| (+) Other | 57.3 |
| **Total Post-petition Merchandise Disbursements** | $154.8 |

- The Company made ~$155mm in payments for post-petition merchandise during budget weeks 6-7
  - The majority of merchandise vendor spend continues on CIA terms
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $73mm at the end of the week

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY®

5

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | Week 6 | Week 7 | Total | Notes |
|---|---|---|---|---|
| | | | **Other SG&A Disbursements Detail** | |
| BofA Checks | $ (3.3) | $ (9.7) | $ (13.0) | Issued checks, primarily tax payments |
| Internal / Other Margin | (4.2) | (3.0) | (7.2) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (2.4) | (1.2) | (3.6) | |
| Outside/Associate/Consulting | (1.6) | (1.2) | (2.8) | Temporary labor |
| Advertising Expense | (2.2) | (3.4) | (5.6) | |
| Non-Merch COGS | (2.3) | (1.7) | (4.0) | Licensed businesses including Sears Optical |
| Equipment Expenses | (0.6) | (3.5) | (4.1) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (5.0) | (7.2) | (12.2) | Franchise and builder distributor appliance network funding |
| Logistics | (4.4) | (3.6) | (8.0) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (2.1) | (22.1) | (24.2) | Week 7 includes monthly customs payment |
| SHP Checks | (1.3) | (2.2) | (3.5) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.1) | (0.3) | (0.4) | Building maintenance expense |
| CheckFreePay | (0.7) | (0.6) | (1.3) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.3) | (1.4) | (2.7) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | - | - | - | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.2) | (0.6) | Shipping expenses |
| Insurance Exp | (0.0) | (0.1) | (0.1) | |
| BS Adjustment - AP | (0.1) | (0.5) | (0.6) | Cash received or paid for reconciliation of vendor inventory receipts |
| CARPACH | (9.8) | (6.2) | (16.0) | Payments to intermodal logistics vendors |
| P-Card | (5.0) | - | (5.0) | Employee procurement credit card payments |
| India/Israel/GS | (3.4) | - | (3.4) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (50.1)** | **$ (68.1)** | **$ (118.1)** | |

Sears HOLDINGS    sears    kmart    SHOP YOUR WAY®

6

# Exhibit B

SEARS HOLDINGS

**DRAFT – FOR DISCUSSION PURPOSES ONLY**
**PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408**

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 8)

## December 12, 2018



PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 8 – Actuals For Rolling 3 Weeks

*(Units in millions)*

| Cash Variance to Budget | Week 42 - Budget Week 6 11/18/18 - 11/24/18 | | | Week 43 - Budget Week 7 11/25/18 - 12/1/18 | | | Week 44 - Budget Week 8 12/2/18 - 12/8/18 | | | Weeks 42 - 44 11/18/18 - 12/8/18 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| **Total Operating Receipts** | **$180** | **$187** | **$7** | **$286** | **$338** | **$52** | **$184** | **$220** | **$36** | **$650** | **$745** | **$95** |
| Merch Vendors | (119) | (80) | 39 | (91) | (75) | 16 | (85) | (75) | 11 | (295) | (230) | 65 |
| Rent/Occupancy | (1) | 0 | 1 | (1) | 0 | 1 | (27) | (1) | 25 | (29) | (1) | 28 |
| Payroll/Bens/Taxes | (30) | (32) | (2) | (68) | (61) | 7 | (38) | (38) | 0 | (136) | (131) | 5 |
| Other SG&A Disbursements | (65) | (50) | 15 | (83) | (68) | 15 | (87) | (53) | 33 | (235) | (172) | 64 |
| **Total Operating Disbursements** | **(215)** | **(161)** | **54** | **(243)** | **(204)** | **39** | **(237)** | **(167)** | **69** | **(695)** | **(533)** | **162** |
| CapEx | (1) | 0 | 1 | (1) | (0) | 1 | (1) | (0) | 1 | (3) | (1) | 2 |
| **Total Operating Cash Flow** | **($37)** | **$26** | **$62** | **$41** | **$133** | **$91** | **($54)** | **$53** | **$106** | **($49)** | **$211** | **$260** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | |
| Day 1 Utility Motion | ($10) | $0 | $10 | $0 | ($10) | ($10) | $0 | $0 | $0 | ($10) | ($10) | $0 |
| Day 1 Critical Vendor Motion | (10) | (11) | (1) | (15) | (7) | 8 | (15) | 0 | 15 | (40) | (19) | 21 |
| Insurance | 0 | 0 | 0 | (4) | 0 | 4 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | | 1 | (1) | | 1 | (1) | | 1 | (3) | | 3 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | 0 | 0 | 0 | (1) | 0 | 1 | (1) | 0 | 1 | (2) | 0 | 2 |
| Post-Petition TSA/CSA | (1) | | 1 | 0 | | 0 | 0 | | 0 | (1) | | 1 |
| **Bankruptcy Related Disbursements** | **($22)** | **($11)** | **$11** | **($21)** | **($17)** | **$4** | **($17)** | **$0** | **$17** | **($61)** | **($29)** | **$32** |
| Cash Interest | ($4) | $0 | $4 | ($4) | ($10) | ($6) | ($4) | ($6) | ($2) | ($11) | ($16) | ($5) |
| Financing Fees | 0 | 0 | 0 | (4) | (15) | (10) | (4) | (0) | 4 | (8) | (15) | (7) |
| Professional Fees | 0 | 0 | 0 | 0 | (1) | (1) | (14) | 0 | 14 | (14) | (1) | 12 |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 3 | 3 |
| **Total Other Non-Operating Disbursements** | **($4)** | **$0** | **$4** | **($8)** | **($23)** | **($15)** | **($21)** | **($6)** | **$15** | **($33)** | **($29)** | **$3** |
| **Net Cash Flows before Financing** | **($63)** | **$15** | **$77** | **$12** | **$92** | **$80** | **($92)** | **$46** | **$138** | **($142)** | **$153** | **$295** |
| Financing | $0 | $0 | $0 | ($173) | ($272) | ($99) | $92 | ($41) | ($133) | (81) | (313) | ($232) |
| **Net Cash Flow** | **($63)** | **$15** | **$77** | **($161)** | **($180)** | **($19)** | **$0** | **$6** | **$6** | **($224)** | **($160)** | **$64** |
| **Beginning Cash** | **$224** | **$224** | **$0** | **$161** | **$239** | **$78** | **$0** | **$0** | **($0)** | **$224** | **$224** | **$0** |
| Cash Flow Before Financing | (63) | 15 | 77 | 12 | 92 | 80 | (92) | 46 | 138 | (142) | 153 | 295 |
| Financing | 0 | 0 | 0 | (173) | (272) | (99) | 92 | (41) | (133) | (81) | (313) | (232) |
| Change in Carveout Account | 0 | 0 | 0 | 0 | (58) | (58) | 0 | 0 | 0 | 0 | (58) | (58) |
| **Ending Available Cash Balance** | **$161** | **$239** | **$77** | **$0** | **$0** | **$0** | **$0** | **$6** | **$6** | **$0** | **$6** | **$6** |

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY®

2

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 8 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 8 same store sales (go-forward stores) were negative (13.4%) for FLS and negative (12.9%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.1%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 8

    - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made no critical vendor payments for the week

- A small amount of rent checks were cashed during week 8 and the budgeted Rent/Occupancy expense is expected to clear in the next week

- Other SG&A Disbursements of $53mm was below the weekly budgeted amount of $87mm

    - The $53mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $13.7mm in transportation and logistics vendor payments, $2.0mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company paid $6mm in interest during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling three week period of weeks 6-8 of the proceeding equaled $153mm, which is well above the budgeted ($142mm)

- The company ended the week with a $6mm cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The $6mm was swept to Bank of America the next business day.

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 7 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 7 same store sales (go-forward stores) were negative (10.3%) for FLS and negative (10.4%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (10.3%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Net proceeds from the SRAC MTNs of $81mm are not included in the receipts because the cash was segregated in the wind-down reserve account

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 7

    - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made $7.5mm in aggregate critical vendor payments for the week

- Other SG&A Disbursements of $68mm was below the weekly budgeted amount of $83mm

    - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

    - The $68mm of the Other SG&A Disbursements includes $7.2mm of payments for Home Services and builder distributors customer orders, $9.8mm in transportation and logistics vendor payments, $3.4mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company paid $10.2mm in interest during the week, and paid $8.4mm of Jr. DIP fees and $6.3mm of Sr. DIP fees

- With the final approval of the Sr. DIP and interim approval of the Jr. DIP, the Company paid down $446mm on the rolled-up ABL revolver, drew $100mm on the Sr. DIP term loan, and drew $75mm on the multiple-draw Jr. DIP term loan

**Net Cash Flow**

- Net cash flow before financing for the rolling two week period of weeks 6-7 of the proceeding equaled $106mm, which is well above the budgeted ($51mm)

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    4

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 6 Budget Variance Report - Commentary

- Going forward, the rolling budget variance report will not include weeks prior to week 42 per conversation with BRG on 11/26/18

**Receipts**

- Week 6 same store sales (go-forward stores) were negative (24.4%) for FLS and negative (7.8%) for Kmart versus prior year for a total combined adjusted same store sales comp of (19.5%)

- The Company had higher than anticipated receipts because of outperformance at GOB stores

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $80mm on post-petition merchandise disbursements in week 6

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 2-3 weeks with higher spending

- The Company made $11.0mm in critical vendor payments including the third and final pre-petition payment to Whirlpool

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $65mm

  - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

  - The $50mm of the Other SG&A Disbursements includes $5.0mm of payments for Home Services and builder distributors customer and franchisee orders, $14.2mm in transportation and logistics vendor payments, $2.2mm in advertising payments, and $1.3mm to fund Sears Home Improvement

- The Company paid no interest or financing fees during the week

- The Company had not made any repayments on the ABL revolver through the end of week 6, since it is required to wait until the final order date to roll up the facility

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 3-6 of the proceeding equaled $38mm, well above the budgeted ($178mm)

- Net cash flow before financing for week 6 of $15mm was $77mm greater than the budgeted ($63mm)

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    5

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

*($ in million)*

| Post-petition Merchandise Disbursements Weeks 6-8 | |
|---|---|
| **Vendor** | **Disbursements** |
| EMA | $28.7 |
| LG HA | 27.3 |
| Home Services | 15.3 |
| Whirlpool | 14.9 |
| Cardinal Health | 12.6 |
| Samsung | 8.1 |
| Icon | 6.8 |
| Winiadaewoo | 6.2 |
| MTD | 5.9 |
| Dart | 3.5 |
| P&G | 3.4 |
| Serta Simmons | 3.1 |
| Hanesbrands | 1.9 |
| Timberland | 1.9 |
| Jordache Limited | 1.8 |
| Waterloo Industries | 1.5 |
| Chamberlain Manufacturing | 1.5 |
| Moret SK LLC | 1.2 |
| Michelin | 1.1 |
| Nestle Purina | 1.1 |
| Top 20 Post-petition Vendors | $147.8 |
| (+) Other | 81.9 |
| **Total Post-petition Merchandise Disbursements** | $229.7 |

- The Company made ~$230mm in payments for post-petition merchandise during budget weeks 6-8
  - The majority of merchandise vendor spend continues on CIA terms
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $81mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | Week 6 | Week 7 | Week 8 | Total | Notes |
|---|---|---|---|---|---|
| | | | | Other SG&A Disbursements Detail | |
| BofA Checks | $ (3.3) | $ (9.7) | $ (7.5) | $ (20.6) | Issued checks, primarily tax payments |
| Internal / Other Margin | (4.2) | (3.0) | (2.2) | (9.4) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (2.4) | (1.2) | (2.5) | (6.2) | |
| Outside/Associate/Consulting | (1.6) | (1.2) | (5.5) | (8.3) | Temporary labor |
| Advertising Expense | (2.2) | (3.4) | (2.0) | (7.6) | |
| Non-Merch COGS | (2.3) | (1.7) | (2.0) | (5.9) | Licensed businesses including Sears Optical |
| Equipment Expenses | (0.6) | (3.5) | (1.2) | (5.2) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (5.0) | (7.2) | (3.5) | (15.7) | Franchise and builder distributor appliance network funding |
| Logistics | (4.4) | (3.6) | (6.2) | (14.2) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (2.1) | (22.1) | (1.9) | (26.1) | Week 8 primarily consists of cleaning service expenses |
| SHP Checks | (1.3) | (2.2) | (2.4) | (5.8) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.1) | (0.3) | (0.4) | (0.8) | Building maintenance expense |
| CheckFreePay | (0.7) | (0.6) | (1.8) | (3.1) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.3) | (1.4) | (1.4) | (4.1) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | - | - | (0.1) | (0.1) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.2) | (0.4) | (0.9) | Shipping expenses |
| Insurance Exp | (0.0) | (0.1) | (0.0) | (0.1) | |
| BS Adjustment - AP | (0.1) | (0.5) | (0.5) | (1.1) | Cash received or paid for reconciliation of vendor inventory receipts |
| CARPACH | (9.8) | (6.2) | (7.5) | (23.5) | Payments to intermodal logistics vendors |
| P-Card | (5.0) | - | (4.2) | (9.2) | Employee procurement credit card payments |
| India/Israel/GS | (3.4) | - | - | (3.4) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (50.1)** | **$ (68.1)** | **$ (53.3)** | **$ (171.5)** | |

# Exhibit C

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 9)

December 19, 2018



PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 9 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 42 - Budget Week 6 11/18/18 - 11/24/18 | | | Week 43 - Budget Week 7 11/25/18 - 12/1/18 | | | Week 44 - Budget Week 8 12/2/18 - 12/8/18 | | | Week 45 - Budget Week 9 12/9/18 - 12/15/18 | | | Weeks 42 - 45 11/18/18 - 12/8/18 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| **Total Operating Receipts** | **$180** | **$187** | **$7** | **$286** | **$338** | **$52** | **$184** | **$220** | **$36** | **$200** | **$251** | **$51** | **$849** | **$996** | **$146** |
| Merch Vendors | (119) | (80) | 39 | (91) | (75) | 16 | (85) | (75) | 11 | (95) | (96) | (2) | (390) | (326) | 64 |
| Rent/Occupancy | (1) | 0 | 1 | (1) | 0 | 1 | (27) | (1) | 25 | (10) | (33) | (24) | (39) | (35) | 4 |
| Payroll/Bens/Taxes | (30) | (32) | (2) | (68) | (61) | 7 | (38) | (38) | 0 | (60) | (56) | 5 | (196) | (186) | 10 |
| Other SG&A Disbursements | (65) | (50) | 15 | (83) | (68) | 15 | (87) | (53) | 33 | (64) | (50) | 13 | (299) | (222) | 77 |
| **Total Operating Disbursements** | **(215)** | **(161)** | **54** | **(243)** | **(204)** | **39** | **(237)** | **(167)** | **69** | **(228)** | **(236)** | **(7)** | **(924)** | **(769)** | **155** |
| CapEx | (1) | 0 | 1 | (1) | (0) | 1 | (1) | (0) | 1 | (1) | (2) | (1) | (4) | (3) | 1 |
| **Total Operating Cash Flow** | **($37)** | **$26** | **$62** | **$41** | **$133** | **$91** | **($54)** | **$53** | **$106** | **($30)** | **$13** | **$43** | **($79)** | **$224** | **$303** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | ($10) | $0 | $10 | $0 | ($10) | ($10) | $0 | $0 | $0 | $0 | $0 | $0 | ($10) | ($10) | $0 |
| Day 1 Critical Vendor Motion | (10) | (11) | (1) | (15) | (7) | 8 | (15) | 0 | 15 | (10) | 0 | 10 | (50) | (19) | 31 |
| Insurance | 0 | 0 | 0 | (4) | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (4) | 0 | 4 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | 0 | 0 | 0 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (3) | 0 | 3 |
| Post-Petition TSA/CSA | (1) | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | (1) | 0 | 1 | (2) | 0 | 2 |
| **Bankruptcy Related Disbursements** | **($22)** | **($11)** | **$11** | **($21)** | **($17)** | **$4** | **($17)** | **$0** | **$17** | **($13)** | **$0** | **$13** | **($73)** | **($29)** | **$45** |
| Cash Interest | ($4) | $0 | $4 | ($4) | ($10) | ($6) | ($4) | ($6) | ($2) | ($3) | $0 | $3 | ($11) | ($16) | ($5) |
| Financing Fees | 0 | 0 | 0 | (4) | (15) | (10) | (4) | (0) | 4 | (4) | (0) | 3 | (8) | (15) | (7) |
| Professional Fees | 0 | 0 | 0 | 0 | (1) | (1) | (14) | 0 | 14 | 0 | (1) | (1) | (14) | (1) | 12 |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| **Total Other Non-Operating Disbursements** | **($4)** | **$0** | **$4** | **($8)** | **($23)** | **($15)** | **($21)** | **($6)** | **$15** | **($7)** | **($1)** | **$6** | **($33)** | **($29)** | **$3** |
| **Net Cash Flows before Financing** | **($63)** | **$15** | **$77** | **$12** | **$92** | **$80** | **($92)** | **$46** | **$138** | **($50)** | **$12** | **$62** | **($192)** | **$165** | **$357** |
| Financing | $0 | $0 | $0 | ($173) | ($272) | ($99) | $92 | ($41) | ($133) | $50 | ($1) | ($51) | (32) | (314) | ($282) |
| **Net Cash Flow** | **($63)** | **$15** | **$77** | **($161)** | **($180)** | **($19)** | **$0** | **$6** | **$6** | **$0** | **$11** | **$11** | **($224)** | **($149)** | **$75** |
| **Beginning Cash** | **$224** | **$224** | **$0** | **$161** | **$239** | **$78** | **$0** | **$0** | **($0)** | **$0** | **$6** | **$5** | **$224** | **$224** | **$0** |
| Cash Flow Before Financing | (63) | 15 | 77 | 12 | 92 | 80 | (92) | 46 | 138 | (50) | 12 | 62 | (192) | 165 | 357 |
| Financing | 0 | 0 | 0 | (173) | (272) | (99) | 92 | (41) | (133) | 50 | (1) | (51) | (173) | (314) | (140) |
| Change in Carveout Account | 0 | 0 | 0 | 0 | (58) | (58) | 0 | 0 | 0 | 0 | (16) | (16) | 0 | (74) | (74) |
| **Ending Available Cash Balance** | **$161** | **$239** | **$77** | **$0** | **$0** | **$0** | **$0** | **$6** | **$6** | **$0** | **$0** | **$0** | **($142)** | **$0** | **$142** |

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 9 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 9 same store sales (go-forward stores) were negative (24.1%) for FLS and negative (22.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (23.4%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $96mm on post-petition merchandise disbursements in week 9 which is slightly higher than the forecast disbursement

- The Company made no critical vendor payments in this week

- The Rent/Occupancy expense negative variance is due to timing as an insignificant amount of rent was disbursed in week 8

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $64mm

  - The $50mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $14.6mm in transportation and logistics vendor payments, $2.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- $0.8mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 6-9 of the proceeding equaled $165mm, which is well above the budgeted ($192mm)

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY

3

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 8 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 8 same store sales (go-forward stores) were negative (13.4%) for FLS and negative (12.9%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.1%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 8

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made no critical vendor payments for the week

- A small amount of rent checks were cashed during week 8 and the budgeted Rent/Occupancy expense is expected to clear in the next week

- Other SG&A Disbursements of $53mm was below the weekly budgeted amount of $87mm

  - The $53mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $13.7mm in transportation and logistics vendor payments, $2.0mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company paid $6mm in interest during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling three week period of weeks 6-8 of the proceeding equaled $153mm, which is well above the budgeted ($142mm)

- The company ended the week with a $6mm cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The $6mm was swept to Bank of America the next business day.

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 7 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 7 same store sales (go-forward stores) were negative (10.3%) for FLS and negative (10.4%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (10.3%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Net proceeds from the SRAC MTNs of $81mm are not included in the receipts because the cash was segregated in the wind-down reserve account

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 7

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made $7.5mm in aggregate critical vendor payments for the week

- Other SG&A Disbursements of $68mm was below the weekly budgeted amount of $83mm

  - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

  - The $68mm of the Other SG&A Disbursements includes $7.2mm of payments for Home Services and builder distributors customer orders, $9.8mm in transportation and logistics vendor payments, $3.4mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company paid $10.2mm in interest during the week, and paid $8.4mm of Jr. DIP fees and $6.3mm of Sr. DIP fees

- With the final approval of the Sr. DIP and interim approval of the Jr. DIP, the Company paid down $446mm on the rolled-up ABL revolver, drew $100mm on the Sr. DIP term loan, and drew $75mm on the multiple-draw Jr. DIP term loan

**Net Cash Flow**

- Net cash flow before financing for the rolling two week period of weeks 6-7 of the proceeding equaled $106mm, which is well above the budgeted ($51mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 6 Budget Variance Report - Commentary

- Going forward, the rolling budget variance report will not include weeks prior to week 42 per conversation with BRG on 11/26/18

**Receipts**

- Week 6 same store sales (go-forward stores) were negative (24.4%) for FLS and negative (7.8%) for Kmart versus prior year for a total combined adjusted same store sales comp of (19.5%)

- The Company had higher than anticipated receipts because of outperformance at GOB stores

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $80mm on post-petition merchandise disbursements in week 6

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 2-3 weeks with higher spending

- The Company made $11.0mm in critical vendor payments including the third and final pre-petition payment to Whirlpool

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $65mm

  - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

  - The $50mm of the Other SG&A Disbursements includes $5.0mm of payments for Home Services and builder distributors customer and franchisee orders, $14.2mm in transportation and logistics vendor payments, $2.2mm in advertising payments, and $1.3mm to fund Sears Home Improvement

- The Company paid no interest or financing fees during the week

- The Company had not made any repayments on the ABL revolver through the end of week 6, since it is required to wait until the final order date to roll up the facility

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 3-6 of the proceeding equaled $38mm, well above the budgeted ($178mm)

- Net cash flow before financing for week 6 of $15mm was $77mm greater than the budgeted ($63mm)

SEARS HOLDINGS          sears    kmart    SHOP YOUR WAY®          6

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 6-9 | |
|---|---|
| **Vendor** | **Disbursements** |
| EMA | $36.8 |
| LG HA | 35.6 |
| Whirlpool | 29.9 |
| Home Services | 23.0 |
| Cardinal Health | 16.0 |
| Winiadaewoo Electron | 12.3 |
| Icon | 10.8 |
| Samsung | 10.6 |
| Hanesbrands | 7.9 |
| MTD | 7.9 |
| Wolverine | 6.4 |
| P&G | 4.5 |
| Dart | 4.2 |
| Serta Simmons | 3.7 |
| Timberland | 3.4 |
| Waterloo Industries | 2.7 |
| Kimberly Clark | 2.2 |
| Jordache Limited | 2.1 |
| Chamberlain Manufacturing | 1.9 |
| L'Oreal | 1.5 |
| Top 20 Post-petition Vendors | $223.3 |
| (+) Other | 102.8 |
| **Total Post-petition Merchandise Disbursements** | $326.1 |

- The Company made ~$326mm in payments for post-petition merchandise during budget weeks 6-9
  - The majority of merchandise vendor spend continues on CIA terms
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $72mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | Other SG&A Disbursements Detail | | | | | |
|---|---|---|---|---|---|---|
| | Week 6 | Week 7 | Week 8 | Week 9 | Total | Notes |
| BofA Checks | $ (3.3) | $ (9.7) | $ (7.5) | $ (7.4) | $ (28.0) | Issued checks, primarily tax payments |
| Internal / Other Margin | (4.2) | (3.0) | (2.2) | (6.6) | (16.0) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (2.4) | (1.2) | (2.5) | (3.7) | (9.9) | |
| Outside/Associate/Consulting | (1.6) | (1.2) | (5.5) | (3.0) | (11.3) | Temporary labor |
| Advertising Expense | (2.2) | (3.4) | (2.0) | (2.6) | (10.2) | |
| Non-Merch COGS | (2.3) | (1.7) | (2.0) | (1.7) | (7.6) | Licensed businesses including Sears Optical |
| Equipment Expenses | (0.6) | (3.5) | (1.2) | (1.4) | (6.6) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (5.0) | (7.2) | (3.5) | (3.5) | (19.2) | Franchise and builder distributor appliance network funding |
| Logistics | (4.4) | (3.6) | (6.2) | (7.4) | (21.6) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (2.1) | (22.1) | (1.9) | (0.0) | (26.1) | |
| SHP Checks | (1.3) | (2.2) | (2.4) | (2.2) | (8.0) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.1) | (0.3) | (0.4) | (0.8) | (1.6) | Building maintenance expense |
| CheckFreePay | (0.7) | (0.6) | (1.8) | (0.9) | (4.0) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.3) | (1.4) | (1.4) | (1.5) | (5.5) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | - | - | (0.1) | (0.5) | (0.6) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.2) | (0.4) | (0.3) | (1.2) | Shipping expenses |
| Insurance Exp | (0.0) | (0.1) | (0.0) | (0.0) | (0.1) | |
| BS Adjustment - AP | (0.1) | (0.5) | (0.5) | 0.3 | (0.8) | Cash received or paid for reconciliation of vendor inventory receipts |
| CARPACH | (9.8) | (6.2) | (7.5) | (7.2) | (30.7) | Payments to intermodal logistics vendors |
| P-Card | (5.0) | - | (4.2) | - | (9.2) | Employee procurement credit card payments |
| India/Israel/GS | (3.4) | - | - | - | (3.4) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (50.1)** | **$ (68.1)** | **$ (53.3)** | **$ (50.4)** | **$ (221.9)** | |

# Exhibit D

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 10)

### December 26, 2018



sears    kmart    SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 10 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 43 - Budget Week 7 | | | Week 44 - Budget Week 8 | | | Week 45 - Budget Week 9 | | | Week 46 - Budget Week 10 | | | Weeks 43 - 46 | | |
| | 11/25/18 - 12/1/18 | | | 12/2/18 - 12/8/18 | | | 12/9/18 - 12/15/18 | | | 12/17/18 - 12/22/18 | | | 11/25/18 - 12/22/18 | | |
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Operating Receipts** | $286 | $338 | $52 | $184 | $220 | $36 | $200 | $251 | $51 | $193 | $249 | $56 | $862 | $1,057 | $195 |
| Merch Vendors | (91) | (75) | 16 | (85) | (75) | 11 | (95) | (96) | (2) | (85) | (72) | 14 | (356) | (318) | 38 |
| Rent/Occupancy | (1) | 0 | 1 | (27) | (1) | 25 | (10) | (33) | (24) | (1) | (1) | (0) | (39) | (36) | 3 |
| Payroll/Bens/Taxes | (68) | (61) | 7 | (38) | (38) | 0 | (60) | (56) | 5 | (32) | (33) | (2) | (197) | (188) | 10 |
| Other SG&A Disbursements | (83) | (68) | 15 | (87) | (53) | 33 | (64) | (50) | 13 | (76) | (57) | 19 | (310) | (229) | 81 |
| **Total Operating Disbursements** | **(243)** | **(204)** | **39** | **(237)** | **(167)** | **69** | **(228)** | **(236)** | **(7)** | **(194)** | **(163)** | **31** | **(903)** | **(771)** | **132** |
| CapEx | (1) | (0) | 1 | (1) | (0) | 1 | (1) | (2) | (1) | (1) | (1) | (0) | (4) | (4) | (0) |
| **Total Operating Cash Flow** | **$41** | **$133** | **$91** | **($54)** | **$53** | **$106** | **($30)** | **$13** | **$43** | **($2)** | **$84** | **$87** | **($45)** | **$283** | **$327** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | ($10) | ($10) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($10) | ($10) |
| Day 1 Critical Vendor Motion | (15) | (7) | 8 | (15) | 0 | 15 | (10) | 0 | 10 | (10) | (5) | 6 | (50) | (12) | 38 |
| Insurance | (4) | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 | (9) | 0 | 9 |
| Gift Card Redemptions | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (4) | 0 | 4 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (3) | 0 | 3 |
| Post-Petition TSA/CSA | 0 | 0 | 0 | 0 | 0 | 0 | (1) | 0 | 1 | 0 | 0 | 0 | (1) | 0 | 1 |
| **Bankruptcy Related Disbursements** | **($21)** | **($17)** | **$4** | **($17)** | **$0** | **$17** | **($13)** | **$0** | **$13** | **($16)** | **($5)** | **$12** | **($67)** | **($22)** | **$45** |
| Cash Interest | (4) | (10) | (6) | (4) | (6) | (2) | (3) | 0 | 3 | (4) | 0 | 4 | (15) | (16) | (1) |
| Financing Fees | (4) | (15) | (10) | (4) | (0) | 4 | (4) | (0) | 3 | (3) | (0) | 3 | (15) | (15) | (0) |
| Professional Fees | 0 | (1) | (1) | (14) | 0 | 14 | 0 | (1) | (1) | 0 | (2) | (2) | (14) | 4 | 10 |
| Intercompany Inflows | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| **Total Other Non-Operating Disbursements** | **($8)** | **($23)** | **($15)** | **($21)** | **($6)** | **$15** | **($7)** | **($1)** | **$6** | **($7)** | **($2)** | **$5** | **($43)** | **($32)** | **$11** |
| **Net Cash Flows before Financing** | **$12** | **$92** | **$80** | **($92)** | **$46** | **$138** | **($50)** | **$12** | **$62** | **($25)** | **$78** | **$104** | **($155)** | **$228** | **$383** |
| Financing | ($173) | ($272) | ($99) | $92 | ($41) | ($133) | $50 | ($1) | ($51) | $25 | ($72) | ($98) | (6) | (386) | ($380) |
| **Net Cash Flow** | **($161)** | **($180)** | **($19)** | **$0** | **$6** | **$6** | **$0** | **$11** | **$11** | **($0)** | **$6** | **$6** | **($161)** | **($157)** | **$4** |
| **Beginning Cash** | **$161** | **$239** | **$78** | **$0** | **$0** | **($0)** | **$0** | **$6** | **$5** | **$0** | **$0** | **$0** | **$161** | **$239** | **$78** |
| Cash Flow Before Financing | 12 | 92 | 80 | (92) | 46 | 138 | (50) | 12 | 62 | (25) | 78 | 104 | (155) | 228 | 383 |
| Financing | (173) | (272) | (99) | 92 | (41) | (133) | 50 | (1) | (51) | 25 | (72) | (98) | (6) | (386) | (380) |
| Change in Carveout Account | 0 | (58) | (58) | 0 | 0 | 0 | 0 | (16) | (16) | 0 | (7) | (7) | 0 | (81) | (81) |
| **Ending Available Cash Balance** | **$0** | **$0** | **$0** | **$0** | **$6** | **$6** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    2

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 10 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 10 same store sales (go-forward stores) were negative (26.9%) for FLS and negative (26.6%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (26.8%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $72mm on post-petition merchandise disbursements in week 10 which is below the forecast disbursement by ~$14mm

- The Company paid $4.5mm in critical vendor payments during the week

- Other SG&A Disbursements of $57mm was below the weekly budgeted amount of $76mm

  - The $57mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $11.1mm in transportation and logistics vendor payments, $3.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.1mm of financing fees

- $1.5mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 7-10 of the proceeding equaled $228mm, which is well above the budgeted ($155mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 9 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 9 same store sales (go-forward stores) were negative (24.1%) for FLS and negative (22.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (23.4%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $96mm on post-petition merchandise disbursements in week 9 which is slightly higher than the forecast disbursement

- The Company made no critical vendor payments in this week

- The Rent/Occupancy expense negative variance is due to timing as an insignificant amount of rent was disbursed in week 8

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $64mm

  - The $50mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $14.6mm in transportation and logistics vendor payments, $2.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- $0.8mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 6-9 of the proceeding equaled $165mm, which is well above the budgeted ($192mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 8 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 8 same store sales (go-forward stores) were negative (13.4%) for FLS and negative (12.9%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.1%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 8

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made no critical vendor payments for the week

- A small amount of rent checks were cashed during week 8 and the budgeted Rent/Occupancy expense is expected to clear in the next week

- Other SG&A Disbursements of $53mm was below the weekly budgeted amount of $87mm

  - The $53mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $13.7mm in transportation and logistics vendor payments, $2.0mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company paid $6mm in interest during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling three week period of weeks 6-8 of the proceeding equaled $153mm, which is well above the budgeted ($142mm)

- The company ended the week with a $6mm cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The $6mm was swept to Bank of America the next business day.

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 7 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 7 same store sales (go-forward stores) were negative (10.3%) for FLS and negative (10.4%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (10.3%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Net proceeds from the SRAC MTNs of $81mm are not included in the receipts because the cash was segregated in the wind-down reserve account

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 7

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made $7.5mm in aggregate critical vendor payments for the week

- Other SG&A Disbursements of $68mm was below the weekly budgeted amount of $83mm

  - The revised budget submitted on 11/21/18 includes lower Other SG&A Disbursements than the Initial Approved Budget because of the lower rate of spending that has actualized

  - The $68mm of the Other SG&A Disbursements includes $7.2mm of payments for Home Services and builder distributors customer orders, $9.8mm in transportation and logistics vendor payments, $3.4mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company paid $10.2mm in interest during the week, and paid $8.4mm of Jr. DIP fees and $6.3mm of Sr. DIP fees

- With the final approval of the Sr. DIP and interim approval of the Jr. DIP, the Company paid down $446mm on the rolled-up ABL revolver, drew $100mm on the Sr. DIP term loan, and drew $75mm on the multiple-draw Jr. DIP term loan

**Net Cash Flow**

- Net cash flow before financing for the rolling two week period of weeks 6-7 of the proceeding equaled $106mm, which is well above the budgeted ($51mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 7-10 | |
|---|---|
| Vendor | Disbursements |
| Whirlpool | $35.1 |
| Home Services | 30.5 |
| LG HA | 28.7 |
| EMA | 26.6 |
| Cardinal Health | 16.3 |
| Winiadaewoo Electronics | 15.3 |
| Hanesbrands | 10.8 |
| Samsung | 8.6 |
| Icon | 7.9 |
| MTD | 7.3 |
| P&G | 5.4 |
| Serta Simmons | 3.5 |
| Waterloo Industries | 3.0 |
| Wolverine | 2.5 |
| Timberland | 2.4 |
| Chamberlain Manfacturing | 2.3 |
| Sealy Mattress Compa | 2.2 |
| Kimberly Clark | 2.2 |
| Jordache Limited | 2.2 |
| VF Jeanswear Limited | 1.8 |
| Top 20 Post-petition Vendors | $214.4 |
| (+) Other | 103.6 |
| **Total Post-petition Merchandise Disbursements** | $318.0 |

- The Company made ~$318mm in payments for post-petition merchandise during budget weeks 7-10
  - The majority of merchandise vendor spend continues on CIA terms
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $70mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| Other SG&A Disbursements Detail | | | | | | |
|---|---|---|---|---|---|---|
| | Week 7 | Week 8 | Week 9 | Week 10 | Total | Notes |
| BofA Checks | $ (9.7) | $ (7.5) | $ (7.4) | $ (5.9) | $ (30.6) | Issued checks, primarily tax payments |
| Internal / Other Margin | (3.0) | (2.2) | (6.6) | (3.3) | (15.1) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (1.2) | (2.5) | (3.7) | (4.4) | (11.9) | |
| Outside/Associate/Consulting | (1.2) | (5.5) | (3.0) | (4.6) | (14.3) | Temporary labor |
| Advertising Expense | (3.4) | (2.0) | (2.6) | (3.6) | (11.6) | |
| Non-Merch COGS | (1.7) | (2.0) | (1.7) | (2.2) | (7.6) | Licensed businesses including Sears Optical |
| Equipment Expenses | (3.5) | (1.2) | (1.4) | (5.2) | (11.2) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (7.2) | (3.5) | (3.5) | (2.8) | (17.0) | Franchise and builder distributor appliance network funding |
| Logistics | (3.6) | (6.2) | (7.4) | (4.7) | (21.9) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (22.1) | (1.9) | (0.0) | (3.2) | (27.2) | |
| SHP Checks | (2.2) | (2.4) | (2.2) | (2.2) | (9.0) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.3) | (0.4) | (0.8) | (0.8) | (2.3) | Building maintenance expense |
| CheckFreePay | (0.6) | (1.8) | (0.9) | (0.8) | (4.1) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.4) | (1.4) | (1.5) | (1.4) | (5.6) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | - | (0.1) | (0.5) | (0.4) | (1.1) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.2) | (0.4) | (0.3) | (0.4) | (1.3) | Shipping expenses |
| Insurance Exp | (0.1) | (0.0) | (0.0) | (0.1) | (0.2) | |
| BS Adjustment - AP | (0.5) | (0.5) | 0.3 | (0.0) | (0.7) | Cash received or paid for reconciliation of vendor inventory receipts |
| CARPACH | (6.2) | (7.5) | (7.2) | (6.4) | (27.3) | Payments to intermodal logistics vendors |
| P-Card | - | (4.2) | - | (5.0) | (9.2) | Employee procurement credit card payments |
| India/Israel/GS | - | - | - | (0.2) | (0.2) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (68.1)** | **$ (53.3)** | **$ (50.4)** | **$ (57.4)** | **$ (229.2)** | |

# Exhibit E

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 11)

January 2, 2019



sears    kmart    SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 44 - Budget Week 8 12/2/18 - 12/8/18 | | | Week 45 - Budget Week 9 12/9/18 - 12/15/18 | | | Week 46 - Budget Week 10 12/17/18 - 12/22/18 | | | Week 47 - Budget Week 11 12/23/18 - 12/29/18 | | | Weeks 44 - 47 12/2/18 - 12/29/18 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| Total Operating Receipts | $184 | $220 | $36 | $200 | $251 | $51 | $193 | $249 | $56 | $215 | $229 | $14 | $791 | $948 | $157 |
| Merch Vendors | (85) | (75) | 11 | (95) | (96) | (2) | (85) | (72) | 14 | (51) | (55) | (4) | (316) | (297) | 19 |
| Rent/Occupancy | (27) | (1) | 25 | (10) | (33) | (24) | (1) | (1) | (0) | (1) | 0 | 1 | (39) | (36) | 3 |
| Payroll/Bens/Taxes | (38) | (38) | 0 | (60) | (56) | 5 | (32) | (33) | (2) | (58) | (53) | 5 | (187) | (180) | 8 |
| Other SG&A Disbursements | (87) | (53) | 33 | (64) | (50) | 13 | (76) | (57) | 19 | (76) | (45) | 31 | (302) | (206) | 97 |
| Total Operating Disbursements | (237) | (167) | 69 | (228) | (236) | (7) | (194) | (163) | 31 | (185) | (152) | 33 | (845) | (719) | 126 |
| CapEx | (1) | (0) | 1 | (1) | (2) | (1) | (1) | (1) | (0) | (1) | (0) | 1 | (4) | (4) | 0 |
| Total Operating Cash Flow | ($54) | $53 | $106 | ($30) | $13 | $43 | ($2) | $84 | $87 | $29 | $76 | $48 | ($58) | $226 | $284 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Day 1 Critical Vendor Motion | (15) | 0 | 15 | (10) | 0 | 10 | (10) | (5) | 6 | (10) | 0 | 10 | (45) | (5) | 41 |
| Insurance | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (4) | 0 | 4 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (3) | 0 | 3 |
| Post-Petition TSA/CSA | 0 | 0 | 0 | (1) | 0 | 1 | 0 | 0 | 0 | (1) | 0 | 1 | (1) | 0 | 1 |
| Bankruptcy Related Disbursements | ($17) | $0 | $17 | ($13) | $0 | $13 | ($16) | ($5) | $12 | ($13) | $0 | $13 | ($58) | ($5) | $53 |
| Cash Interest | ($4) | ($6) | ($2) | ($3) | $0 | $3 | ($4) | $0 | $4 | ($4) | $0 | $4 | ($15) | ($6) | $9 |
| Financing Fees | (4) | (0) | 4 | (4) | (0) | 3 | (3) | (0) | 3 | 0 | (0) | (0) | (11) | (1) | 10 |
| Professional Fees | (14) | 0 | 14 | 0 | (1) | (1) | 0 | (2) | (2) | 0 | 0 | 0 | (14) | (2) | 11 |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Non-Operating Disbursements | ($21) | ($6) | $15 | ($7) | ($1) | $6 | ($7) | ($2) | $5 | ($4) | ($0) | $4 | ($40) | ($9) | $30 |
| Net Cash Flows before Financing | ($92) | $46 | $138 | ($50) | $12 | $62 | ($25) | $78 | $104 | $11 | $76 | $65 | ($156) | $212 | $368 |
| Financing | $92 | ($41) | ($133) | $50 | ($1) | ($51) | $25 | ($72) | ($98) | ($11) | ($35) | ($24) | 156 | (149) | ($305) |
| Net Cash Flow | $0 | $6 | $6 | $0 | $11 | $11 | $0 | $6 | $6 | $0 | $41 | $41 | $0 | $63 | $63 |
| Beginning Cash | $0 | $0 | ($0) | $0 | $6 | $5 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Flow Before Financing | (92) | 46 | 138 | (50) | 12 | 62 | (25) | 78 | 104 | 11 | 76 | 65 | (156) | 212 | 368 |
| Financing | 92 | (41) | (133) | 50 | (1) | (51) | 25 | (72) | (98) | (11) | (35) | (24) | 156 | (149) | (305) |
| Change in Carveout Account | 0 | 0 | 0 | 0 | (16) | (16) | 0 | (7) | (7) | 0 | (6) | (6) | 0 | (29) | (29) |
| Ending Available Cash Balance | $0 | $6 | $6 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $35 | $0 | $0 | $35 | $35 |

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY

2

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 11 same store sales (go-forward stores) were negative (7.4%) for FLS and 4.0% for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (2.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $55mm on post-petition merchandise disbursements in week 11 which is above the forecast disbursements by ~$4mm

- The Company made no critical vendor payments during the week

- Other SG&A Disbursements of $45mm was below the weekly budgeted amount of $76mm

    - The $45mm of the Other SG&A Disbursements includes $2.3mm of payments for Home Services and builder distributors customer orders, $8.6mm in transportation and logistics vendor payments, $1.7mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- No professional fees were paid during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 8-11 of the proceeding equaled $212mm, which is well above the budgeted ($156mm)

- The Company ended the week with a $35mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday and the Company borrowed $24mm for an insurance payment it did not pay on Friday

    - The Company made the insurance payment and all remaining cash was swept to Bank of America the next business day

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    3

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 10 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 10 same store sales (go-forward stores) were negative (26.9%) for FLS and negative (26.6%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (26.8%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $72mm on post-petition merchandise disbursements in week 10 which is below the forecast disbursements by ~$14mm

- The Company paid $4.5mm in critical vendor payments during the week

- Other SG&A Disbursements of $57mm was below the weekly budgeted amount of $76mm

  - The $57mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $11.1mm in transportation and logistics vendor payments, $3.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.1mm of financing fees

- $1.5mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 7-10 of the proceeding equaled $228mm, which is well above the budgeted ($155mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 9 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 9 same store sales (go-forward stores) were negative (24.1%) for FLS and negative (22.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (23.4%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $96mm on post-petition merchandise disbursements in week 9 which is slightly higher than the forecast disbursement

- The Company made no critical vendor payments in this week

- The Rent/Occupancy expense negative variance is due to timing as an insignificant amount of rent was disbursed in week 8

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $64mm

    - The $50mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $14.6mm in transportation and logistics vendor payments, $2.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- $0.8mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 6-9 of the proceeding equaled $165mm, which is well above the budgeted ($192mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 8 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 8 same store sales (go-forward stores) were negative (13.4%) for FLS and negative (12.9%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.1%), and cash receipts outperformance is due to same store sales decreasing less than the budgeted negative (15.0%) decline

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $75mm on post-petition merchandise disbursements in week 8

  - The inventory management team expects to net out the positive variance for merchandise disbursement in the next 1-4 weeks with higher spending

- The Company made no critical vendor payments for the week

- A small amount of rent checks were cashed during week 8 and the budgeted Rent/Occupancy expense is expected to clear in the next week

- Other SG&A Disbursements of $53mm was below the weekly budgeted amount of $87mm

  - The $53mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $13.7mm in transportation and logistics vendor payments, $2.0mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company paid $6mm in interest during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling three week period of weeks 6-8 of the proceeding equaled $153mm, which is well above the budgeted ($142mm)

- The company ended the week with a $6mm cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The $6mm was swept to Bank of America the next business day.

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY

6

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 8-11 | |
| --- | --- |
| **Vendor** | **Disbursements** |
| Whirlpool | $35.3 |
| Home Services | 32.6 |
| EMA | 21.9 |
| LG HA | 19.6 |
| Winiadaewoo Electronics | 16.5 |
| Cardinal Health | 16.1 |
| Samsung | 8.2 |
| P&G | 5.4 |
| Hanesbrands | 5.5 |
| Icon | 4.6 |
| VF Jeanswear Limited | 3.5 |
| MTD | 3.5 |
| Sealy Mattress Compa | 3.4 |
| Waterloo Industries | 3.3 |
| Wolverine World Wide | 3.2 |
| Chamberlain Manufacturing | 2.9 |
| Timberland | 2.6 |
| Serta Simmons | 2.4 |
| Kimberly Clark | 2.2 |
| Union Underwear | 1.7 |
| Top 20 Post-petition Vendors | $193.9 |
| (+) Other | 103.4 |
| **Total Post-petition Merchandise Disbursements** | $297.3 |

- The Company made ~$297mm in payments for post-petition merchandise during budget weeks 8-11
  - The majority of merchandise vendor spend continues on CIA terms
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $76mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| Other SG&A Disbursements Detail | | | | | | |
|---|---|---|---|---|---|---|
| | Week 8 | Week 9 | Week 10 | Week 11 | Total | Notes |
| BofA Checks | $ (7.5) | $ (7.4) | $ (5.9) | $ (4.9) | $ (25.8) | Issued checks, primarily tax payments |
| Internal / Other Margin | (2.2) | (6.6) | (3.3) | (3.5) | (15.6) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (2.5) | (3.7) | (4.4) | (3.9) | (14.6) | |
| Outside/Associate/Consulting | (5.5) | (3.0) | (4.6) | (4.4) | (17.6) | Temporary labor |
| Advertising Expense | (2.0) | (2.6) | (3.6) | (1.7) | (9.9) | |
| Non-Merch COGS | (2.0) | (1.7) | (2.2) | (2.0) | (7.9) | Licensed businesses including Sears Optical |
| Equipment Expenses | (1.2) | (1.4) | (5.2) | (3.1) | (10.8) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (3.5) | (3.5) | (2.8) | (2.3) | (12.1) | Franchise and builder distributor appliance network funding |
| Logistics | (6.2) | (7.4) | (4.7) | (3.6) | (21.9) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (1.9) | (0.0) | (3.2) | (4.7) | (9.8) | |
| SHP Checks | (2.4) | (2.2) | (2.2) | (2.4) | (9.2) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.4) | (0.8) | (0.8) | (0.9) | (2.9) | Building maintenance expense |
| CheckFreePay | (1.8) | (0.9) | (0.8) | (0.6) | (4.1) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.4) | (1.5) | (1.4) | (1.0) | (5.2) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | (0.1) | (0.5) | (0.4) | - | (1.1) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.3) | (0.4) | (0.4) | (1.4) | Shipping expenses |
| Insurance Exp | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | |
| BS Adjustment - AP | (0.5) | 0.3 | (0.0) | (0.3) | (0.6) | Cash received or paid for reconciliation of vendor inventory receipts |
| CARPACH | (7.5) | (7.2) | (6.4) | (5.0) | (26.1) | Payments to intermodal logistics vendors |
| P-Card | (4.2) | - | (5.0) | - | (9.2) | Employee procurement credit card payments |
| India/Israel/GS | - | - | (0.2) | - | (0.2) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (53.3)** | **$ (50.4)** | **$ (57.4)** | **$ (44.8)** | **$ (205.9)** | |

# Exhibit F



# Project Blue
# Rolling Cash Flow Budget (Week 11)

January 2, 2019



Good

Exhibit No. 3
Date: 8/28/19
Melissa Gilmore

SEARS HOLDINGS

# Executive Summary

- The Revised DIP Budget contained herein reflects the preliminary go-forward business plan of 425 stores. The 1st GOB wave of 142 stores ends in week 49, the 2nd GOB wave of 40 stores ends in week 52 and the 3rd wave of 80 stores ends in week 6 of 2019 (the "Rolling 13-Week DIP Budget")

    - Wave 3 GOB Modeling is preliminary and the Company is currently working with Abacus and the inventory management to finalize its plan for internal augment and store performance; the

    - During week 43, the Company filed its Final DIP ABL Order and Interim Junior DIP Order:

        o This Company rolled certain pre-petition 1L credit facilities into the post-petition DIP ABL, and also repaid the ABL revolver with available cash and draws from both the Senior and Junior DIP facilities.

        o The Company drew $100mm on the Senior DIP term loan and $75mm on the multiple-draw Junior DIP term loan.

    - Through week 47, the company funded a net ~$85mm into a carve-out reserve and $10mm into a utility deposit account.

    - Certain adjustments were incorporated into the Rolling 13-Week DIP Budget to adjust for timing and expectations:

        o Normal Course Net Merchandise Receipts was updated for timing of the holiday season sales for TY vs. LY (52 vs. 53 weeks).

        o $50mm of positive merchandise disbursements variance is spread across weeks 48-52 to adjust for low inventory "in-stock" levels at the stores. SG&A positive variances are assumed to be permanent.

- Please refer to the Weekly Flash Report for a more detailed budget vs. actuals reporting

- All other financial assumptions are listed on the following Cash Flow Assumptions page



PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 Rolling Cash Flow Assumptions

**Cash Receipts**

| | | |
|---|---|---|
| [1] | Normal Course Merchandise Receipts | Includes ongoing sales for 687 stores until the 142 GOB Wave began in Week 38, 545 stores until the 40 GOB Wave began in Week 42, and 505 stores thereafter |
| | | Same-store sales comps assumes (15.0%) for Kmart and (15.0%) for Sears. Prior year Puerto Rico and Virgin Island stores adjusted for Hurricane Maria |
| [2] | GOB Sales Receipts | Wave 1 of GOBs includes 142 stores which commenced around October 26 and Wave 2 includes 40 around November 16. Both waves end in 11 weeks |
| | | Wave 3 of GOBs includes 80 stores which commence on or around January 6 and also ends in 11 weeks. Total NOLV for the Wave 3 closing stores is assumed |
| | | at ~92% on a preliminary basis and the sales cadence is commensurate with the historical GOLV spread across the 11-week GOB period |
| | | Liquidator expenses assume assumption of the Abacus contract and continuation of the same business terms |
| [3] | PA Sales | PA Sales reflect new agreement with Assurant that allows sales to continue under different terms; actuals are estimated |
| [4] | Other Cash Receipts | Other ancillary business trended down in line with historical trends and seasonally adjusted |
| | | Other Revenues is further adjusted down to assume a negative "halo effect" adjustment to other services / merchandise sales from to a smaller store footprint. |
| [5] | Non-Operating Receipts | Citibank payments and insurance proceeds |
| [6] | TSA & CSA Receipts | Assumes no TSA & CSA receipts through 18 weeks after the Petition Date |

**Operating Disbursements**

| | | |
|---|---|---|
| [7] | Merchandise Vendors | Based on detailed store level build of COGS and assumes a majority of CiA payments for merchandise with a 1-week lead time |
| | | Assumes the current AP terms remains constant |
| [8] | Occupancy | Assumes all dark store leases are rejected and GOB leases are rejected at the end of the GOB sales period. Ongoing occupancy assumes go-forward rent, CAM, and tax roll |
| | | DC rent is included in Occupancy |
| [9] | Payroll, Taxes, and Benefits | The Company's detailed Payroll, Taxes, and Benefits build as provided by HR. GOB store payroll is removed at the end of the GOB period. |
| | | November headcount reduction has been incorporated |
| [10] | Other SG&A Disbursements | Corporate SG&A reduced over time to reflect a decline in home office expense associated with servicing the stores and general reductions in force |
| | | Major line items include outside services, utilities, outside contractors, marketing, equipment expenses, and other non-merch expenses |
| [11] | GOB Rent | Contractual rent paid and per diem rent paid in the final month of the GOB sales |
| [12] | GOB Additional Expenses / Benefit | Includes additional GOB related expenses, net of isolated store expense add-backs |
| [13] | Capital Expenditures | Capex assumes historical levels with reductions in line with store closures |

**Non-Operating Disbursements**

| | | |
|---|---|---|
| [14] | Utility Deposits | $10.0mm was disbursed from the SHC cash account during week 43 and into a Utility Deposit account. Deposits will be paid from this restricted cash account. |
| [15] | Professional Fees | Professional Fees assumed to be paid from the SHC account and refunded by the Carve-Out restricted cash account. SHC is expected to fund weekly accrual amounts. |
| [16] | Critical Vendor Payments | $98mm of spend on critical vendor payments during the post-petition period |
| [17] | Insurance Payments | $8.6mm of additional health insurance claims filed over the run-rate through December |
| [18] | Gift Card Redemptions | Assumes an additional $1mm of weekly gift card redemptions through December. Actual results will net out of cash inflows. |
| [19] | KEIP / KERP | $20mm of total KEIP / KERP modeled based on proposed plan filed with Court on 11/15/18 ($6mm through the projection period). Under review as of week 44. |
| [24] | Cash Interest | Cash interest assumed to be paid on the 1L and Cascade facilities |
| | | L + 700 assumed on the $112mm Senior DIP term loan and L + 350 assumed on the post-petition ABL |
| | | L + 950 assumed on the $350mm Junior DIP term loan |
| | | 10% assumed interest rate on Buyer Financing |
| [25] | Financing Fee | Financing fee of 4% on the total capacity of the Senior DIP $300mm facility plus a $1.5mm agent fee |
| | | Financing fee of 3% on the Junior DIP facility, and Financing fee of 2% on Buyer Financing |

**Net Cash Flow & Liquidity**

| | | |
|---|---|---|
| [26] | Financing | Includes Sr. DIP/ABL Revolver draws / paydowns, and Junior DIP multi-draw financing facility |
| | | The 1L facilities were rolled-up with the DIP ABL facility concurrent with the Final Order hearing in Week 43 |
| [27] | Buyer Financing | Assumed loan that bridges the Company's net availability needs through the close of going concern sale by 2/9/19 |
| [28] | Memo: Total Liquidity | Total net availability under the new contemplated borrowing base agreement, including Buyer Financing |
| [29] | Memo: Wind-down Account - Restricted Cash | Includes proceeds from MTN sales, real estate sales, and sale of SHIP for $60mm in Week 46 (all proceeds from SHIP sale allocated to the Wind-down reserve in week 47) |
| [30] | Memo: Carve-Out Account - Restricted Cash | During week 43, the Company funded ~$58mm in the Carve-Out Restricted Cash account. Prior to week 43, the majority was net against the Borrowing Base |
| | | Beyond week 43, the component of the carve-out reserve netted against the Borrowing Base includes the post-trigger notice fee cap plus trustee fees |
| [33] | Memo: GOB NOLV | Weekly NOLV based on GOB proceeds (not including pharmacy assets), less GOB expenses as a percentage of weekly COGS. Does not include GOB expense add back. |

  



PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 Rolling Cash Flow Budget

| Retail Month | October | | | November | | | | December | | | | | January | | | | February | | | | March | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | Total |
| Forecast / Actual | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
| Week Ending | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 | 3/16/19 |
| Retail Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 | 1-22 |
| **KEY ASSUMPTIONS** | | | | | | | | | | | | | | | | | | | | | | | |
| Go-Forward Same Store Sales Comps | -6% | -11% | -17% | -26% | -14% | -20% | -10% | -13% | -23% | -27% | -3% | -15% | -15% | -15% | -15% | -15% | -15% | -15% | -15% | -15% | -15% | -15% | |
| Forecast Gross Margin | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | |
| Other Inflows Store Sales Comps | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | -10% | -10% | -10% | -10% | -10% | -10% | -10% | -10% | -10% | -10% | -10% | |
| Other Inflows Store Size Halo Impact | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |
| Keep Stores | 687 | 687 | 545 | 545 | 545 | 505 | 505 | 505 | 505 | 505 | 505 | 505 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | 425 | |
| Wave 1 Stores | 0 | 0 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Wave 2 Stores | 0 | 0 | 0 | 0 | 0 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Wave 3 Stores | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | | | | |
| Total Cash Receipts | $192 | $169 | $197 | $215 | $213 | $187 | $341 | $220 | $251 | $249 | $229 | $168 | $161 | $137 | $133 | $129 | $120 | $124 | $131 | $124 | $112 | $110 | $3,910 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | | |
| [7] Merchandise Vendors | ($21) | ($71) | ($52) | ($87) | ($83) | ($80) | ($75) | ($75) | ($96) | ($72) | ($55) | ($58) | ($65) | ($62) | ($60) | ($61) | ($55) | ($56) | ($54) | ($55) | ($56) | ($59) | ($1,408) |
| [8] Occupancy | 0 | 0 | 0 | (24) | (2) | 0 | 0 | (1) | (24) | (1) | 0 | (1) | (21) | (1) | (1) | (1) | (16) | (15) | (1) | (1) | (16) | (6) | (136) |
| [9] Payroll, Taxes, and Benefits | (44) | (28) | (65) | (31) | (58) | (32) | (61) | (38) | (56) | (33) | (53) | (34) | (43) | (29) | (29) | (44) | (31) | (39) | (25) | (46) | (30) | (41) | (888) |
| [10] Other SG&A Disbursements | (15) | (55) | (46) | (45) | (65) | (50) | (68) | (53) | (50) | (57) | (45) | (65) | (96) | (60) | (72) | (57) | (63) | (54) | (59) | (53) | (59) | (56) | (1,215) |
| [11] GOB Rent | 0 | 0 | 0 | (9) | (9) | (1) | 0 | 0 | 0 | (9) | 0 | 0 | (9) | 0 | 0 | 0 | (2) | (1) | 0 | 0 | 0 | 0 | (31) |
| [12] GOB Additional Expenses / Benefit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (5) | (8) | 1 | 1 | 1 | 3 | 3 | 3 | 3 | 3 | 3 | 7 |
| Total Operating Disbursements | ($80) | ($154) | ($163) | ($196) | ($209) | ($161) | ($204) | ($167) | ($236) | ($163) | ($152) | ($163) | ($213) | ($152) | ($161) | ($162) | ($164) | ($161) | ($136) | ($153) | ($160) | ($159) | ($3,672) |
| [13] CapEx | 0 | 0 | 0 | (1) | (0) | (0) | (0) | (0) | (2) | (1) | (0) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (16) |
| Net Operating Cash Flow | $111 | $15 | $34 | $18 | $3 | $26 | $136 | $53 | $13 | $84 | $76 | $4 | ($53) | ($16) | ($30) | ($35) | ($45) | ($38) | ($6) | ($30) | ($49) | ($50) | $222 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | | | | | |
| [14] Utility Deposits | $0 | $0 | $0 | $0 | $0 | $0 | ($10) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($10) |
| [15] Professional Fees | 0 | 0 | 0 | 0 | 0 | 0 | (1) | 0 | (1) | (2) | 0 | (12) | 0 | 0 | (18) | 0 | 0 | 0 | (27) | 0 | 0 | 0 | (61) |
| [16] Critical Vendor Payments | 0 | (9) | 0 | (8) | (8) | (11) | (7) | 0 | 0 | (5) | 0 | (10) | (10) | (10) | (10) | (10) | 0 | 0 | 0 | 0 | 0 | 0 | (98) |
| [17] Insurance Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (4) |
| [18] Gift Card Redemptions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1) |
| [19] KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (6) |
| [20] Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [21] Store PTO / Severance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | (1) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (5) |
| [22] Corporate PTO / Severance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1) | (1) | (1) | (0) | (0) | 0 | 0 | 0 | 0 | 0 | 0 | (3) |
| [23] Post-Petition TSA/CSA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chapter 11 Related Disbursements | $0 | ($9) | $0 | ($8) | ($8) | ($11) | ($19) | $0 | ($1) | ($6) | $0 | ($24) | ($19) | ($17) | ($29) | ($12) | $0 | $0 | ($27) | $0 | $0 | $0 | ($189) |
| [24] Cash Interest | ($1) | ($1) | ($1) | ($13) | ($1) | $0 | ($10) | ($6) | $0 | $0 | $0 | ($3) | ($3) | ($4) | ($4) | ($4) | ($4) | ($4) | ($4) | ($5) | ($5) | ($5) | ($80) |
| [25] Financing Fees | (10) | 0 | 0 | (1) | 0 | 0 | (15) | (0) | (0) | 0 | (0) | (3) | (0) | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 0 | 0 | (33) |
| Other Non-Operating Disbursements | ($11) | ($1) | ($1) | ($14) | ($1) | $0 | ($25) | ($6) | ($0) | $0 | ($0) | ($6) | ($3) | ($4) | ($4) | ($4) | ($4) | ($4) | ($8) | ($5) | ($5) | ($5) | ($113) |
| Net Cash Flow Before Financing | $100 | $5 | $33 | ($4) | ($6) | $15 | $92 | $46 | $12 | $78 | $76 | ($26) | ($75) | ($36) | ($62) | ($51) | ($49) | ($43) | ($42) | ($34) | ($54) | ($55) | ($79) |
| [26] Financing | 112 | 0 | 0 | (100) | 0 | 0 | (330) | (46) | (12) | (78) | (41) | (9) | 75 | 36 | 62 | 51 | 49 | 43 | 42 | 34 | 54 | 55 | (4) |
| Net Cash Flow | $212 | $5 | $33 | ($104) | ($6) | $15 | ($239) | $0 | $0 | $0 | $35 | ($35) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($84) |
| Available Cash | $296 | $300 | $333 | $229 | $224 | $239 | $0 | $0 | $0 | $0 | $0 | $35 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Availability Before Buyer Financing | 165 | 118 | 35 | 85 | 55 | 50 | 322 | 229 | 212 | 211 | 173 | 173 | 142 | 205 | 174 | 142 | 48 | 0 | (29) | (79) | (146) | (193) | (193) |
| [27] Buyer Financing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 79 | 146 | 193 | 193 |
| [28] Memo: Total Liquidity (Availability + Cash) | $461 | $419 | $369 | $314 | $279 | $288 | $322 | $229 | $212 | $212 | $208 | $174 | $143 | $205 | $174 | $142 | $48 | $1 | $0 | $0 | $0 | $0 | $0 |
| [29] Memo: Wind-down Account - Restricted Cash | $0 | $0 | $0 | $0 | $0 | $0 | $81 | $81 | $81 | $81 | $81 | $81 | $145 | $154 | $163 | $172 | $181 | $189 | $198 | $207 | $216 | $226 | $226 |
| [30] Memo: Carve-Out Account - Restricted Cash | NA | NA | NA | NA | NA | NA | $58 | $58 | $74 | $79 | $85 | $85 | $91 | $98 | $86 | $92 | $95 | $99 | $75 | $78 | $82 | $85 | $85 |
| [34] Memo: Borrowing Base | $1,805 | $1,758 | $1,675 | $1,625 | $1,595 | $1,590 | $1,515 | $1,375 | $1,362 | $1,288 | $1,215 | $1,108 | $1,086 | $1,090 | $1,107 | $1,131 | $1,092 | $1,091 | $1,081 | $1,070 | $1,061 | $1,071 | $1,071 |
| [35] Memo: Loan to Value % | 79.9% | 82.0% | 85.8% | 83.2% | 84.7% | 85.0% | 69.9% | 73.8% | 74.6% | 73.9% | 75.8% | 74.5% | 76.5% | 71.9% | 74.6% | 77.2% | 83.7% | 87.2% | 87.2% | 87.1% | 87.0% | 87.1% | NA |
| [36] Memo: Sr. DIP & TL Balance | $1,540 | $1,640 | $1,640 | $1,540 | $1,540 | $1,540 | $1,193 | $1,147 | $1,150 | $1,077 | $1,042 | $935 | $944 | $885 | $933 | $989 | $1,044 | $1,090 | $1,081 | $1,070 | $1,061 | $1,071 | $1,071 |
| [37] Memo: Jr DIP Balance | $0 | $0 | $0 | $0 | $0 | $0 | $75 | $75 | $75 | $75 | $75 | $175 | $250 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 |
| Memo: Merch AP Balance | $11 | $29 | $30 | $34 | $63 | $59 | $73 | $81 | $72 | $70 | $76 | $86 | $91 | $103 | $105 | $104 | $101 | $101 | $102 | $101 | $100 | $98 | $98 |




# Supporting Schedules

 

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Summary Borrowing Base

| Retail Month | October | | | November | | | | December | | | | January | | | | February | | | | March | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| Actual / Estimate / Forecast | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | EST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
| Week Ending | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 |
| Retail Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 |
| Borrowing Base Forecast Week | | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 |
| **Inventory Roll** | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Inventory | $2,745 | $2,691 | $2,610 | $2,519 | $2,458 | $2,403 | $2,358 | $2,254 | $2,188 | $2,151 | $1,999 | $1,899 | $1,829 | $1,799 | $1,769 | $1,767 | $1,757 | $1,744 | $1,725 | $1,703 | $1,687 | $1,677 |
| Plus: Normal Course Merchandise Receipts | 85 | 54 | 42 | 61 | 82 | 99 | 75 | 90 | 88 | 75 | 84 | 76 | 59 | 60 | 65 | 62 | 60 | 52 | 55 | 55 | 54 | 55 |
| Plus: Timing for Delayed Merchandise Receipts | | | | | | | | | | | | | 10 | 10 | 10 | | | | | | | |
| Less: GOB Merchandise COGS | 0 | 0 | (20) | (28) | (29) | (35) | (43) | (38) | (53) | (55) | (50) | (50) | (36) | (45) | (23) | (22) | (23) | (18) | (19) | (17) | (16) | (14) |
| Less: Go-Forward Merchandise COGS | (98) | (98) | (78) | (78) | (81) | (80) | (164) | (99) | (86) | (99) | (124) | (96) | (57) | (49) | (47) | (43) | (43) | (45) | (51) | (46) | (41) | (42) |
| Less: Accounting Adjustments / Other | (41) | (37) | (35) | (16) | (27) | (30) | 29 | (19) | 14 | (73) | (10) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Seasonal Adjustment for CMD | | | | | | | | | | | | | (6) | (4) | (6) | (6) | (8) | (8) | (8) | (8) | (8) | (8) |
| Adjusted Stock Level Ending Inventory (BBC) | $2,691 | $2,610 | $2,519 | $2,458 | $2,403 | $2,358 | $2,254 | $2,188 | $2,151 | $1,999 | $1,899 | $1,829 | $1,799 | $1,769 | $1,767 | $1,757 | $1,744 | $1,725 | $1,703 | $1,687 | $1,677 | $1,668 |
| **BB Calculation** | | | | | | | | | | | | | | | | | | | | | | |
| In-transit Reserve | ($145) | ($140) | ($127) | ($119) | ($85) | ($63) | ($77) | ($61) | ($99) | ($45) | ($44) | ($45) | ($83) | ($81) | ($81) | ($81) | ($80) | ($79) | ($78) | ($77) | ($77) | ($77) |
| Ineligible Reserve | (165) | (139) | (132) | (168) | (150) | (149) | (173) | (170) | (142) | (142) | (132) | (118) | (126) | (88) | (88) | (79) | (82) | (78) | (77) | (76) | (76) | (75) |
| GOB Reserve | 0 | (16) | (24) | (21) | (20) | (20) | (84) | (84) | (74) | (74) | (115) | (87) | (45) | (40) | (10) | (9) | (42) | (31) | (28) | (25) | (23) | 0 |
| Decon to DC | 0 | 0 | 0 | 13 | 14 | 12 | 8 | 8 | 5 | 3 | 6 | 3 | 3 | 5 | 3 | 4 | 3 | 3 | 3 | 3 | 3 | 3 |
| SRAC LC In-Transit | 10 | 10 | 9 | 8 | 7 | 5 | 6 | 6 | 8 | 4 | 5 | 4 | 4 | 4 | 4 | 6 | 5 | 6 | 6 | 6 | 6 | 6 |
| Total Ineligible Inventory | ($299) | ($285) | ($274) | ($286) | ($233) | ($215) | ($320) | ($300) | ($301) | ($259) | ($281) | ($243) | ($246) | ($200) | ($172) | ($159) | ($196) | ($179) | ($175) | ($171) | ($167) | ($144) |
| **Net Eligible Inventory** | $2,392 | $2,325 | $2,245 | $2,172 | $2,170 | $2,143 | $1,934 | $1,888 | $1,850 | $1,740 | $1,618 | $1,585 | $1,553 | $1,569 | $1,595 | $1,598 | $1,548 | $1,546 | $1,529 | $1,517 | $1,509 | $1,524 |
| Adj. NOLV % | 88.7% | 88.7% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 84.7% | 84.7% | 84.7% | 84.7% | 81.4% | 81.4% | 81.4% | 81.4% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% | 83.0% |
| NOLV of Net Eligible Inventory | $2,121 | $2,062 | $1,964 | $1,900 | $1,899 | $1,875 | $1,692 | $1,599 | $1,567 | $1,473 | $1,370 | $1,291 | $1,264 | $1,277 | $1,298 | $1,327 | $1,285 | $1,283 | $1,269 | $1,259 | $1,253 | $1,265 |
| 87.5% Advance Rate | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% | 87.5% |
| NOLV of Net Eligible Inv. Multiplied by 87.5% Advance Rate | $1,856 | $1,804 | $1,719 | $1,663 | $1,661 | $1,641 | $1,480 | $1,400 | $1,371 | $1,289 | $1,199 | $1,129 | $1,106 | $1,117 | $1,136 | $1,161 | $1,124 | $1,123 | $1,110 | $1,101 | $1,096 | $1,107 |
| **Inventory Contribution to Borrowing Base** | $1,856 | $1,804 | $1,719 | $1,663 | $1,661 | $1,641 | $1,480 | $1,400 | $1,371 | $1,289 | $1,199 | $1,129 | $1,106 | $1,117 | $1,136 | $1,161 | $1,124 | $1,123 | $1,110 | $1,101 | $1,096 | $1,107 |
| **Other Borrowing Base Components** | | | | | | | | | | | | | | | | | | | | | | |
| Credit Card Receivables (87.5% Advance Rate) | 47 | 49 | 51 | 72 | 47 | 60 | 112 | 51 | 61 | 68 | 82 | 50 | 52 | 44 | 43 | 41 | 39 | 40 | 42 | 40 | 36 | 35 |
| Pharmacy Receivables (87.5% Advance Rate) | 9 | 9 | 9 | 8 | 9 | 9 | 9 | 9 | 7 | 7 | 7 | 7 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Availability Reserve | (61) | (59) | (58) | (57) | (60) | (59) | (65) | (63) | (56) | (55) | (53) | (56) | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (59) |
| Carveout Reserve | (46) | (46) | (46) | (62) | (62) | (62) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) | (22) |
| **Borrowing Base** | $1,805 | $1,758 | $1,675 | $1,625 | $1,595 | $1,590 | $1,515 | $1,375 | $1,362 | $1,288 | $1,215 | $1,108 | $1,086 | $1,090 | $1,107 | $1,131 | $1,092 | $1,091 | $1,081 | $1,070 | $1,061 | $1,071 |
| Loan to Value % | 79.9% | 82.0% | 85.8% | 83.2% | 84.7% | 85.0% | 69.9% | 73.8% | 74.6% | 73.9% | 75.8% | 74.5% | 76.4% | 71.9% | 74.5% | 77.2% | 83.7% | 87.2% | 87.2% | 87.1% | 87.0% | 87.1% |
| GOLV (Includes CC and Pharmacy Receivables) | 2,185 | 2,129 | 2,033 | 1,992 | 1,962 | 1,954 | 1,830 | 1,668 | 1,646 | 1,559 | 1,473 | 1,356 | 1,333 | 1,338 | 1,357 | 1,384 | 1,339 | 1,339 | 1,327 | 1,315 | 1,304 | 1,316 |
| Total 1L Borrowings (Includes Buyer Financing) | 1,746 | 1,745 | 1,743 | 1,658 | 1,661 | 1,660 | 1,279 | 1,231 | 1,228 | 1,153 | 1,116 | 1,010 | 1,019 | 962 | 1,012 | 1,069 | 1,121 | 1,168 | 1,157 | 1,145 | 1,135 | 1,147 |
| **PF 1L Debt Outstanding** | | | | | | | | | | | | | | | | | | | | | | |
| DIP / ABL | ($1,640) | ($1,640) | ($1,640) | ($1,540) | ($1,540) | ($1,540) | ($1,193) | ($1,147) | ($1,150) | ($1,077) | ($1,042) | ($932) | ($939) | ($881) | ($931) | ($988) | ($1,041) | ($1,087) | ($1,105) | ($1,143) | ($1,200) | ($1,259) |
| Holdback | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Buyer Financing | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 29 | 79 | 146 | 192 |
| FILO Pushdown | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (2) | (5) | (4) | (1) | -- | (3) | (3) | (4) | (5) | (6) | (5) |
| **Pro Forma Available to Borrow under ABL** | $165 | $118 | $35 | $85 | $55 | $50 | $322 | $229 | $212 | $211 | $173 | $174 | $143 | $205 | $174 | $142 | $48 | $1 | $0 | $0 | $0 | $0 |
| PF 1L Debt Outstanding | ($1,640) | ($1,640) | ($1,640) | ($1,540) | ($1,540) | ($1,540) | ($1,193) | ($1,147) | ($1,150) | ($1,077) | ($1,042) | ($935) | ($944) | ($885) | ($933) | ($988) | ($1,044) | ($1,090) | ($1,081) | ($1,070) | ($1,061) | ($1,071) |



PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Summary Debt Schedule

| Retail Month | October | | | November | | | | December | | | | | January | | | | February | | | | March | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Budget Week** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| **Actual / Estimate / Forecast** | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | EST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
| **Week Ending** | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 |
| **Retail Week** | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 201903 | 201904 | 201905 | 201906 |
| ***Total Senior DIP*** | | | | | | | | | | | | | | | | | | | | | | |
| Senior DIP Term Loan | $112 | $112 | $112 | $12 | $12 | $12 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Senior DIP Revolver | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Senior DIP** | $112 | $112 | $112 | $12 | $12 | $12 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ***Junior DIP*** | | | | | | | | | | | | | | | | | | | | | | |
| Junior DIP Multiple-Draw Term Loan | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 75 | 75 | 75 | 75 | 175 | 250 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| **Total Junior DIP** | $0 | $0 | $0 | $0 | $0 | $0 | $75 | $75 | $75 | $75 | $75 | $175 | $250 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 |
| ***Total 1L ABL*** | | | | | | | | | | | | | | | | | | | | | | |
| Pre-petition ABL Revolver | $836 | $836 | $836 | $836 | $836 | $836 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Post-petition ABL Revolver | 0 | 0 | 0 | 0 | 0 | 0 | 389 | 343 | 346 | 351 | 316 | 206 | 213 | 155 | 205 | 262 | 315 | 361 | 379 | 417 | 474 | 533 |
| Pre-petition Term Loan B | 571 | 571 | 571 | 571 | 571 | 571 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Post-petition Term Loan B | 0 | 0 | 0 | 0 | 0 | 0 | 683 | 683 | 683 | 605 | 605 | 605 | 605 | 605 | 605 | 605 | 605 | 605 | 605 | 605 | 605 | 605 |
| ABL Normal Course LC | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 | 121 |
| **Total ABL 1L Credit Outstanding** | $1,528 | $1,528 | $1,528 | $1,528 | $1,528 | $1,528 | $1,193 | $1,147 | $1,150 | $1,077 | $1,042 | $932 | $939 | $881 | $931 | $988 | $1,041 | $1,087 | $1,105 | $1,143 | $1,200 | $1,259 |
| Buyer Financing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $29 | $79 | $146 | $192 |
| ***Other 1L & 1.5L Credit*** | | | | | | | | | | | | | | | | | | | | | | |
| ESL/Citi LC | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 | $271 |
| FILO | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| **Total Other 1L Credit Outstanding** | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 | $396 |
| ***Senior Real Estate Debt*** | | | | | | | | | | | | | | | | | | | | | | |
| Cascade Loan | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 | $108 |
| UBS REMIC | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 |
| ESL Real Estate Loan | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 | 723 |
| **Total 1L Real Estate Debt Outstanding** | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 | $933 |

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Inventory and Merch AP Roll-Forward

| Retail Month | October | | | November | | | | December | | | | | January | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| Actual / Estimate / Forecast | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST |
| Week Ending | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 |
| Retail Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 |
| **INVENTORY ROLL-FORWARD** | | | | | | | | | | | | | | | | |
| Inventory Receipts (Actuals / Forecast) | $54 | $42 | $61 | $82 | $99 | $75 | $90 | $88 | $75 | $84 | $76 | $69 | $70 | $75 | $62 | $60 |
| LD03000 APPAREL | $17 | $14 | $14 | $14 | $11 | $8 | $15 | $18 | $11 | $27 | $17 | $20 | $15 | $15 | $13 | $19 |
| LD03020 APPLIANCES | 11 | 8 | 24 | 38 | 48 | 34 | 38 | 28 | 28 | 25 | 24 | 14 | 20 | 21 | 16 | 15 |
| LD03030 ELECTRONICS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LD03040 SPORTING GOODS | 3 | 2 | 3 | 1 | 2 | 2 | 2 | 4 | 4 | 4 | 4 | 2 | 2 | 3 | 2 | 1 |
| LD03050 FOOTWEAR | 4 | 2 | 3 | 5 | 3 | 1 | 4 | 4 | 2 | 2 | 3 | 4 | 4 | 6 | 3 | 3 |
| LD03060 JEWELRY | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LD03070 LAWN & GARDEN | 1 | 0 | 0 | 0 | 4 | 3 | 1 | 4 | 2 | 2 | 2 | 1 | 1 | 2 | 2 | 3 |
| LD03080 TOOLS & PAINT | 4 | 3 | 3 | 6 | 9 | 6 | 10 | 7 | 4 | 3 | 5 | 4 | 5 | 6 | 5 | 4 |
| LD03090 HOME | 2 | 2 | 2 | 3 | 4 | 4 | 4 | 2 | 3 | 1 | 1 | 2 | 1 | 2 | 1 | 1 |
| LD03095 MATTRESS / HOME BIG TICKET | 0 | 0 | 1 | 1 | 3 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| LD03097 SEASONAL | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| LD03100 OUTDOOR LIVING | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 7 | 2 | 7 | 1 |
| LD03110 TOYS | 3 | 2 | 2 | 2 | 6 | 3 | 2 | 3 | 2 | 3 | 2 | 3 | 2 | 3 | 2 | 2 |
| LD03120 GROCERY & HOUSEHOLD | 1 | 2 | 2 | 4 | 2 | 3 | 2 | 6 | 7 | 6 | 7 | 6 | 4 | 5 | 4 | 3 |
| LD03121 DRUG STORE | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 3 | 4 | 5 | 5 | 4 | 2 | 2 | 2 | 3 |
| LD03130 PHARMACY | 6 | 5 | 5 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 2 | 3 | 4 | 3 | 3 |
| LD03140 AUTO | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 |
| LD03380 STRATEGIC MERCHANDISING | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTSU TOTAL SUPPORT UNIT DIVISIONS | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTVFS TOTAL VFS MERCHANT DIVISIONS | $54 | $42 | $61 | $82 | $99 | $75 | $90 | $88 | $75 | $84 | $76 | $69 | $70 | $75 | $62 | $60 |

| Retail Month | October | | | November | | | | December | | | | | January | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| Forecast / Actual | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST |
| Week Ending | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 |
| Retail Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 |
| **MERCH AP** | | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | | | 76 | 86 | 91 | 103 | 105 |
| Receipts | | | | | | | | | | | | 69 | 70 | 75 | 62 | 60 |
| Disbursements | (21) | (71) | (52) | (87) | (83) | (80) | (75) | (75) | (96) | (70) | (76) | (58) | (65) | (62) | (60) | (61) |
| Ending Balance | 11 | 29 | 30 | 34 | 63 | 59 | 73 | 81 | 72 | 70 | 76 | 86 | 91 | 103 | 105 | 104 |
| Implied Merch AP Terms | | | | | 6 days | 6 days | 7 days | 8 days | 6 days | 6 days | 7 days | 8 days | 9 days | 10 days | 10 days | 10 days |

 

# Exhibit G

| | |
|---|---|
| **From:** | Hwangpo, Natasha <Natasha.Hwangpo@weil.com> |
| **Sent:** | Friday, January 4, 2019 10:52 AM |
| **To:** | Ann Reese; Fail, Garrett; bgriffith@miiipartners.com; Descovich, Kaitlin; Danilow, Greg; mmeghji@miiipartners.com; Paul DePodesta; DePodesta, Paul; Basta, Paul M.; bill@transieradvisors.com; Riecker, Rob; Aronson, Daniel; Alan Carr; Dahl, Ryan; Odoner, Ellen; Marcus, Jacqueline; Aebersold, Brandon; levi.quaintance@lazard.com; cgood@miiipartners.com; jboffi@miiipartners.com; Goldinstein, Arkady; Singh, Sunny; Schrock, Ray; Liou, Jessica; Munz, Naomi; cadams@miiipartners.com; Westerman, Gavin; project.blue.rx@lazard.com; Weinberger, Jack; de Gosztonyi, Daniel; Gorbaty, Vladimir; Leblanc, Thibaud; Kaneko, Erika; Sitley, Stephen; Wessel, Paul; Margolis, Steven; Wooten, Jason; Van Groll, Paloma; Lewitt, Alex; Miller, Jeri Leigh; DiDonato, Phil; Yiu, Vincent; Robert Britton (rbritton@paulweiss.com); Cornish, Kelley A; Valentino, Luke; ktanaka@miiipartners.com; Grossi, Nick; Sukumar, Ajith; Kamel, Jonathan; Matican, Jeremy; miiipartners.com,sima; jfrantz@miiipartners.com; nzatzkin@miiipartners.com; wgallagher@miiipartners.com; Borden, Jane; nweber@miiipartners.com; Stogsdill, Dennis; Patkar, Sid |
| **Subject:** | Sears: Restructuring Committee Meeting Materials |
| **Attachments:** | 2019.01.03 ESL Updated Bid_Sources & Uses_v6.pdf |

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

Members of the Restructuring Committee,

In advance of this afternoon's meeting, please see the attached an updated sources & uses.

Please let us know if you have any questions.

Regards,

**Weil**

Natasha S. Hwangpo

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
natasha.hwangpo@weil.com
+1 212 310 8715 Direct
+1 702 501 8088 Mobile
+1 212 310 8007 Fax

GOOD
Exhibit No. 6
Date: 8 28 19
Melissa Gilmore

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended

HIGHLY CONFIDENTIAL

recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

HIGHLY CONFIDENTIAL

SEARS_507B_00000475

PRIVILEGED AND CONFIDENTIAL
PREPARED AT THE REQUEST OF COUNSEL – SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

3 JANUARY 2019

## DISCUSSION MATERIALS

# Project Blue

SEARS_507B_00000476




PRIVILEGED AND CONFIDENTIAL - PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT SUBJECT TO MATERIAL CHANGE

HIGHLY CONFIDENTIAL

SEARS_507B_00000477

PROJECT BLUE

# Illustrative Company Sources and Uses Under ESL Bid – Updated 1/3/19
($ in millions)

The following illustrates sources and uses for the Debtors in the event they were to effectuate the sale as structured, including proposed ESL concessions made on 1/3/19 and additional feedback from the Restructuring Committee and professionals

- **Assumes $150 million of cure costs**
- **Assumes no minimum distribution to GUCs**
- **A bridge comparing the updated shortfall to the previous analysis (presented on 1/2/2019) is provided on the following page**

## Sources and Uses - ESL Going Concern Bid

| Sources | | | Note | Uses | | | Note |
|---|---|---|---|---|---|---|---|
| New Debt | New ABL Facility | $900 | | Debt Repayment/ Credit Bid | Senior DIP & ABL Balance at Close | $950 | (5) |
| | Incremental Real Estate Debt | 175 | | | FILO Repayment | 125 | |
| Debt Repayment/ Credit Bid | Dove Credit Bid | 544 | | | Second Lien Line of Credit Loans Credit Bid | 390 | (6) |
| | IP/GL Credit Bid | 231 | | | Other Second Lien Credit Bid | 47 | |
| | FILO/Second Lien Credit Bid | 562 | | | IP/GL Credit Bid | 231 | |
| Assumption of Debt/Liabilities | Junior DIP Roll-over | 230 | | | Dove Credit Bid | 544 | |
| | L/C Facility Roll-over | 271 | | | Junior DIP Roll-over | 230 | |
| | Sparrow Debt | 592 | | Debt/Liability Assumption | L/C Facility Roll-over | 271 | |
| | Assumption of Other Liabililites | 1,100 | (1) | | Sparrow Debt | 592 | |
| Assumed Admin Claims | Assumed Accounts Payable | 125 | (2) | | Assumption of Other Liabilities | 1,100 | (7) |
| | Assumed Property Taxes | 100 | | | Remaining Junior DIP | 120 | (8) |
| Cash | Cash Contribution | 35 | | | 503(b)(9) | 139 | (8) |
| **Sub-total ESL Sources** | | **$4,865** | | | Merchandise AP | 111 | (8) |
| | | | | | Non-Merchandise AP | 55 | (8) |
| Other Cash | | $89 | (3) | Admin Claims | Severance and Employee Claims | 43 | (8) |
| Segregated Professional Fee Carve Out Account | | 95 | (4) | | WARN | 18 | (8) |
| Wind Down Reserve Estimate | | 160 | | | Franchise Taxes | 3 | (8) |
| *MTN Sale* | | *81* | | | Property Taxes | 135 | (8) |
| *SHIP Sale* | | *45* | | | RemainCo Winddown Costs | 80 | (8) |
| *CC Tort* | | *34* | | | Professional Fees Payable at Close | 102 | (8) |
| Other Sources | | 300 | | | Distributable Value to GUCs (Minimum) | – | |
| *RemainCo Real Estate* | | *150* | | | New ABL Fees | 50 | (9) |
| *Unencumbered Receivables* | | *150* | | Other | New ABL Paydown with RE Debt Proceeds | 175 | (10) |
| **Shortfall** | | **$151** | | | Funding Required Through Close | – | (11) |
| | | | | | Cure Costs | 150 | (12) |
| **Total Sources** | | **$5,660** | | **Total Uses** | | **$5,660** | |

 

Note:   See appendix for footnotes.

1

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

HIGHLY CONFIDENTIAL

PROJECT BLUE

# Shortfall Bridge

($ in millions)

The following table outlines revisions to the sources and uses analysis incorporating the revised ESL offer as well as other feedback from the Committee and its advisors

| Shortfall Bridge | | Notes |
|---|---|---|
| **Starting Shortfall (1/2/2019)** | **($284)** | Estimated shortfall as of 1/2/19 excluding required cure cost payments and recovery for unsecureds |
| **Adjustments to Sources** | | |
| Assumed AP | $125 | Increased sources based on ESL offer to assume up to $125 million of AP |
| Assumed Property Taxes | 100 | Increased sources based on ESL offer to assume property tax liability related to acquired properties (estimated to be $100 million) |
| Carve-out Account | 95 | Includes projected balance in segregated account for payment of professional fees at closing. |
| Deposit Cash | 10 | Includes expected release of $10 million utility deposits at closing |
| Other Adjustments | (18) | Reflects reduction in estimated proceeds to account for fees, NWC adjustments and allocation to secured lenders |
| **Total Adjustments to Sources** | **$312** | |
| **Adjustments to Uses** | | |
| Reduced Expected DIP Balance | $74 | Assumes Company is able to manage DIP balance to $950 million (level expected by ESL) vs. $1,023 million in DIP budget |
| Expected Professional Fees | (102) | Includes expected professional fees payable at emergence (netted against professional fee carve-out in prior iterations) |
| **Total Adjustments to Uses** | **($29)** | |
| **Shortfall (1/3/2019)** | **($1)** | Estimated shortfall incorporating adjustments, but excluding required cure cost payments and minimum recovery for unsecureds |
| **Cure Adjustments** | | |
| Cure Costs Estimate | ($150) | Illustrative cure costs (compares to $180 million cure costs net of 503(b)(9) claims assuming all contracts assumed) |
| **Revised Shortfall (1/3/2019)** | **($151)** | Revised shortfall including ESL bid adjustments and including required cure cost payments; excludes GUC recovery |

SEARS_507B_00000478

 

2

PRIVILEGED AND CONFIDENTIAL
PREPARED AT THE REQUEST OF COUNSEL – SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

PROJECT BLUE

HIGHLY CONFIDENTIAL

 Appendix

SEARS_507B_00000479

LAZARD

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

PROJECT BLUE                                                                                                   APPENDIX

## Footnotes to Sources & Uses

1. ESL APA draft contemplates that protection agreements will not be assumed unless reaffirmed by customers. We have assumed that this restriction is dropped by ESL for purposes of this analysis.

2. Under ESL proposal, assumed accounts payable requires agreement to new extended terms by vendors. We have assumed this restriction is dropped by ESL for purposes of this analysis.

3. Based on Company projections of available cash in regional banks at 2/1/19 close; amount fluctuates. Also assumes ESL contractually agrees to leave balance with estate. Also includes $10 million utility deposits expected to be released at emergence.

4. As required by the DIP order, the Company maintains a segregated account sufficient to cover accrued professional fees and the pipeline of expected fees. Current projected balance at close is $95 million.

5. Assumes Company is able to manage down its ABL balance to be in line with ~$950 assumed by ESL (balance before paydown from cash in regional banks).

6. Per ESL break out of FILO/Second lien credit bid.

7. Assumes NewCo takes all protection agreements; for purposes of this analysis we have assumed that ESL drops its requirement that protection agreement counterparties reaffirm their claim within a certain time period.

8. Per Company analysis of administrative claims.

9. Estimate based on prior ESL discussions.

10. NewCo real estate debt assumed to pay down new ABL facility.

11. Per Company analysis.

12. $150 million cure cost based on Deloitte net cure cost estimate of $180 million, which amount is net of 503(b)(9) claims already included in admin cost analysis. Assumes that ESL only assumes a subset of the contracts.

 

HIGHLY CONFIDENTIAL

SEARS_507B_00000480

3

# Exhibit H

SEARS HOLDINGS

**DRAFT – FOR DISCUSSION PURPOSES ONLY**
**PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408**

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 12)

## January 9, 2019



sears        kmart        SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 12 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 45 - Budget Week 9 12/9/18 - 12/15/18 | | | Week 46 - Budget Week 10 12/17/18 - 12/22/18 | | | Week 47 - Budget Week 11 12/23/18 - 12/29/18 | | | Week 48 - Budget Week 12 12/30/18 - 1/5/19 | | | Weeks 45 - 48 12/9/18 - 1/5/19 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| **Total Operating Receipts** | $200 | $251 | $51 | $193 | $249 | $56 | $215 | $229 | $14 | $259 | $186 | ($73) | $867 | $914 | $48 |
| Merch Vendors | (95) | (96) | (2) | (85) | (72) | 14 | (51) | (55) | (4) | (53) | (58) | (5) | (284) | (281) | 3 |
| Rent/Occupancy | (10) | (33) | (24) | (1) | (1) | (0) | (1) | 0 | 1 | (1) | 0 | 1 | (13) | (35) | (21) |
| Payroll/Bens/Taxes | (60) | (56) | 5 | (32) | (33) | (2) | (58) | (53) | 5 | (31) | (59) | (28) | (180) | (201) | (21) |
| Other SG&A Disbursements | (64) | (50) | 13 | (76) | (57) | 19 | (76) | (45) | 31 | (72) | (38) | 34 | (288) | (191) | 97 |
| **Total Operating Disbursements** | **(228)** | **(236)** | **(7)** | **(194)** | **(163)** | **31** | **(185)** | **(152)** | **33** | **(157)** | **(156)** | **1** | **(766)** | **(707)** | **58** |
| CapEx | (1) | (2) | (1) | (1) | (1) | (0) | (1) | (0) | 1 | (1) | (1) | 0 | (4) | (4) | (0) |
| **Total Operating Cash Flow** | **($30)** | **$13** | **$43** | **($2)** | **$84** | **$87** | **$29** | **$76** | **$48** | **$101** | **$30** | **($71)** | **$97** | **$203** | **$106** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Day 1 Critical Vendor Motion | (10) | 0 | 10 | (10) | (5) | 6 | (10) | 0 | 10 | (3) | (3) | 0 | (33) | (7) | 26 |
| Insurance | 0 | 0 | 0 | (4) | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (4) | 0 | 4 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 |
| PTO | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (3) | 0 | 3 |
| Post-Petition TSA/CSA | (1) | 0 | 1 | 0 | | 0 | (1) | 0 | 1 | 0 | | 0 | (2) | 0 | 2 |
| **Bankruptcy Related Disbursements** | **($13)** | **$0** | **$13** | **($16)** | **($5)** | **$12** | **($13)** | **$0** | **$13** | **($5)** | **($3)** | **$2** | **($46)** | **($7)** | **$39** |
| Cash Interest | ($3) | $0 | $3 | ($4) | $0 | $4 | ($4) | $0 | $4 | ($5) | ($3) | $1 | ($16) | ($3) | $13 |
| Financing Fees | (4) | (0) | 3 | (3) | (0) | 3 | 0 | (0) | (0) | (1) | (3) | (3) | (7) | (4) | 3 |
| Professional Fees | 0 | (1) | (1) | 0 | (2) | (2) | 0 | 0 | 0 | (14) | (10) | 3 | (14) | (13) | (1) |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Non-Operating Disbursements** | **($7)** | **($1)** | **$6** | **($7)** | **($2)** | **$5** | **($4)** | **($0)** | **$4** | **($18)** | **($17)** | **$2** | **($37)** | **($20)** | **$17** |
| **Net Cash Flows before Financing** | **($50)** | **$12** | **$62** | **($25)** | **$78** | **$104** | **$11** | **$76** | **$65** | **$78** | **$10** | **($67)** | **$14** | **$176** | **$163** |
| Financing | $50 | ($1) | ($51) | $25 | ($72) | ($98) | ($11) | ($35) | ($24) | ($78) | ($49) | $29 | (14) | (157) | ($143) |
| **Net Cash Flow** | **$0** | **$11** | **$11** | **$0** | **$6** | **$6** | **$0** | **$41** | **$41** | **$0** | **($38)** | **($38)** | **($0)** | **$19** | **$19** |
| **Beginning Cash** | **$0** | **$6** | **$5** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$35** | **$34** | **$0** | **$6** | **$6** |
| Cash Flow Before Financing | (50) | 12 | 62 | (25) | 78 | 104 | 11 | 76 | 65 | 78 | 10 | (67) | 14 | 176 | 163 |
| Financing | 50 | (1) | (51) | 25 | (72) | (98) | (11) | (35) | (24) | (78) | (49) | 29 | (14) | (157) | (143) |
| Change in Carveout Account | 0 | (16) | (16) | 0 | (7) | (7) | 0 | (6) | (6) | 0 | 4 | 4 | 0 | (25) | (25) |
| **Ending Available Cash Balance** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$35** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 12 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 12 same store sales (go-forward stores) were negative (15.8%) for FLS and (10.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.6%)

- Receipts had a large negative variance because the budget attributed Holiday related inflows to the week which actualized in the previous week

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $58mm on post-petition merchandise disbursements in week 12 which is above the forecast disbursements by ~$5mm

- The Company made $3mm in critical vendor payments during the week

- Other SG&A Disbursements of $38mm was below the weekly budgeted amount of $72mm

    - The $38mm of the Other SG&A Disbursements includes $1.9mm of payments for Home Services and builder distributors customer orders, $8.1mm in transportation and logistics vendor payments, $3.1mm in advertising payments, and $1.2mm to fund Sears Home Improvement

- The Company paid $3mm of interest during the week and $3mm of financing fees

- The Company paid 14 professional firms an aggregate of $10mm during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 9-12 of the proceeding equaled $176mm, which is well above the budgeted ($14mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

## Receipts

- Week 11 same store sales (go-forward stores) were negative (7.4%) for FLS and 4.0% for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (2.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

## Disbursements

- The Company spent $55mm on post-petition merchandise disbursements in week 11 which is above the forecast disbursements by ~$4mm

- The Company made no critical vendor payments during the week

- Other SG&A Disbursements of $45mm was below the weekly budgeted amount of $76mm

    - The $45mm of the Other SG&A Disbursements includes $2.3mm of payments for Home Services and builder distributors customer orders, $8.6mm in transportation and logistics vendor payments, $1.7mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- No professional fees were paid during the week

## Net Cash Flow

- Net cash flow before financing for the rolling four week period of weeks 8-11 of the proceeding equaled $212mm, which is well above the budgeted ($156mm)

- The Company ended the week with a $35mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday and the Company borrowed $24mm for an insurance payment it did not pay on Friday

    - The Company made the insurance payment and all remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 10 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 10 same store sales (go-forward stores) were negative (26.9%) for FLS and negative (26.6%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (26.8%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $72mm on post-petition merchandise disbursements in week 10 which is below the forecast disbursements by ~$14mm

- The Company paid $4.5mm in critical vendor payments during the week

- Other SG&A Disbursements of $57mm was below the weekly budgeted amount of $76mm

    - The $57mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $11.1mm in transportation and logistics vendor payments, $3.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.1mm of financing fees

- $1.5mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 7-10 of the proceeding equaled $228mm, which is well above the budgeted ($155mm)

 

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 9 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18 and the report does not include weeks that were compared against the Initial Approved Budget (week 41 and prior weeks)

**Receipts**

- Week 9 same store sales (go-forward stores) were negative (24.1%) for FLS and negative (22.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (23.4%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $96mm on post-petition merchandise disbursements in week 9 which is slightly higher than the forecast disbursement

- The Company made no critical vendor payments in this week

- The Rent/Occupancy expense negative variance is due to timing as an insignificant amount of rent was disbursed in week 8

- Other SG&A Disbursements of $50mm was below the weekly budgeted amount of $64mm

    - The $50mm of the Other SG&A Disbursements includes $3.5mm of payments for Home Services and builder distributors customer orders, $14.6mm in transportation and logistics vendor payments, $2.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- $0.8mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 6-9 of the proceeding equaled $165mm, which is well above the budgeted ($192mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 9-12 | |
|---|---|
| Vendor | Disbursements |
| Home Services | $35.0 |
| Whirlpool | 31.9 |
| LG HA | 18.8 |
| EMA | 15.7 |
| Cardinal Health | 15.2 |
| Winiadaewoo Electronics | 14.6 |
| Samsung | 7.8 |
| P&G | 5.7 |
| MTD | 5.0 |
| Wolverine Worldwide | 4.1 |
| Sealy Mattress Company | 4.1 |
| VF Jeanswear Limited | 4.0 |
| Hanesbrands | 3.9 |
| Icon | 2.9 |
| Waterloo Industries | 2.5 |
| Serta Simmons | 2.1 |
| Kimberly Clark | 1.9 |
| Chamberlain Manufacturing | 1.8 |
| Timberland | 1.7 |
| American Greeting Co | 1.7 |
| Top 20 Post-petition Vendors | $180.5 |
| (+) Other | 100.2 |
| **Total Post-petition Merchandise Disbursements** | $280.7 |

- The Company made ~$281mm in payments for post-petition merchandise during budget weeks 9-12
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $135mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | Week 9 | Week 10 | Week 11 | Week 12 | Total | Notes |
|---|---|---|---|---|---|---|
| | | | | Other SG&A Disbursements Detail | | |
| BofA Checks | $ (7.4) | $ (5.9) | $ (4.9) | $ (6.9) | $ (25.0) | Issued checks, primarily tax payments |
| Internal / Other Margin | (6.6) | (3.3) | (3.5) | (3.2) | (16.6) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (3.7) | (4.4) | (3.9) | (3.6) | (15.5) | |
| Outside/Associate/Consulting | (3.0) | (4.6) | (4.4) | (2.0) | (14.0) | Temporary labor |
| Advertising Expense | (2.6) | (3.6) | (1.7) | (3.1) | (10.9) | |
| Non-Merch COGS | (1.7) | (2.2) | (2.0) | (2.2) | (8.0) | Licensed businesses including Sears Optical |
| Equipment Expenses | (1.4) | (5.2) | (3.1) | (3.2) | (12.8) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (3.5) | (2.8) | (2.3) | (1.9) | (10.4) | Franchise and builder distributor appliance network funding |
| Logistics | (7.4) | (4.7) | (3.6) | (3.9) | (19.6) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (0.0) | (3.2) | (4.7) | (1.5) | (9.4) | |
| SHP Checks | (2.2) | (2.2) | (2.4) | (1.2) | (7.9) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.8) | (0.8) | (0.9) | (1.1) | (3.5) | Building maintenance expense |
| CheckFreePay | (0.9) | (0.8) | (0.6) | (0.9) | (3.2) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.5) | (1.4) | (1.0) | (1.1) | (4.9) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | (0.5) | (0.4) | - | - | (0.9) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.3) | (0.4) | (0.4) | (0.3) | (1.3) | Shipping expenses |
| Insurance Exp | (0.0) | (0.1) | (0.1) | (0.1) | (0.2) | |
| BS Adjustment - AP | 0.3 | (0.0) | (0.3) | 1.1 | 1.1 | Cash received or paid for reconciliation of vendor inventory receipts |
| Display Expense | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | |
| CARPACH | (7.2) | (6.4) | (5.0) | (4.2) | (22.8) | Payments to intermodal logistics vendors |
| P-Card | - | (5.0) | - | - | (5.0) | Employee procurement credit card payments |
| India/Israel/GS | - | (0.2) | - | - | (0.2) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (50.4)** | **$ (57.4)** | **$ (44.8)** | **$ (38.5)** | **$ (191.1)** | |

# Exhibit I

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 13)

January 16, 2019



sears    kmart    SHOP YOUR WAY

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 13 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 46 - Budget Week 10 Budget: 11/21 DIP Budget 12/16/18 - 12/22/18 | | | Week 47 - Budget Week 11 Budget: 11/21 DIP Budget 12/23/18 - 12/29/18 | | | Week 48 - Budget Week 12 Budget: 11/21 DIP Budget 12/30/18 - 1/5/19 | | | Week 49 - Budget Week 13 Budget: 1/11 DIP Budget 1/6/19 - 1/12/19 | | | Weeks 46 - 49 12/17/18 - 1/13/19 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| Total Operating Receipts | $193 | $249 | $56 | $215 | $229 | $14 | $259 | $186 | ($73) | $153 | $175 | $22 | $820 | $839 | $19 |
| Merch Vendors | (85) | (72) | 14 | (51) | (55) | (4) | (53) | (58) | (5) | (67) | (64) | 3 | (256) | (248) | 8 |
| Rent/Occupancy | (1) | (1) | (0) | (1) | 0 | 1 | (1) | 0 | 1 | (30) | (34) | (4) | (34) | (36) | (2) |
| Payroll/Bens/Taxes | (32) | (33) | (2) | (58) | (53) | 5 | (31) | (59) | (28) | (48) | (49) | (1) | (169) | (195) | (26) |
| Other SG&A Disbursements | (76) | (57) | 19 | (76) | (45) | 31 | (72) | (38) | 34 | (44) | (54) | (9) | (268) | (194) | 74 |
| Total Operating Disbursements | (194) | (163) | 31 | (185) | (152) | 33 | (157) | (156) | 1 | (190) | (202) | (11) | (728) | (673) | 55 |
| CapEx | (1) | (1) | (0) | (1) | (0) | 1 | (1) | (1) | 0 | (1) | (0) | 1 | (4) | (2) | 2 |
| Total Operating Cash Flow | ($2) | $84 | $87 | $29 | $76 | $48 | $101 | $30 | ($71) | ($38) | ($27) | $12 | $89 | $164 | $75 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Day 1 Critical Vendor Motion | (10) | (5) | 6 | (10) | 0 | 10 | (3) | (3) | 0 | (10) | 0 | 10 | (33) | (7) | 26 |
| Insurance | (4) | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 | (9) | 0 | 9 |
| Gift Card Redemptions | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | 0 | 0 | 0 | (3) | 0 | 3 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | (1) | 0 | 1 | (1) | 0 | 1 | (1) | 0 | 1 | (5) | 0 | 5 | (7) | 0 | 7 |
| Post-Petition TSA/CSA | 0 | 0 | 0 | (1) | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | (1) | | 1 |
| Bankruptcy Related Disbursements | ($16) | ($5) | $12 | ($13) | $0 | $13 | ($5) | ($3) | $2 | ($19) | $0 | $19 | ($53) | ($7) | $46 |
| Cash Interest | ($4) | $0 | $4 | ($4) | $0 | $4 | ($5) | ($3) | $1 | ($3) | ($13) | ($10) | ($16) | ($16) | $0 |
| Financing Fees | (3) | (0) | 3 | 0 | (0) | (0) | 0 | (3) | (3) | (0) | (2) | (2) | (3) | (6) | (3) |
| Professional Fees | 0 | (2) | (2) | 0 | 0 | 0 | (14) | (10) | 3 | 0 | 0 | 0 | (14) | (12) | 2 |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Non-Operating Disbursements | ($7) | ($2) | $5 | ($4) | ($0) | $4 | ($18) | ($17) | $2 | ($3) | ($15) | ($12) | ($33) | ($33) | ($1) |
| Net Cash Flows before Financing | ($25) | $78 | $104 | $11 | $76 | $65 | $78 | $10 | ($67) | ($61) | ($41) | $19 | $3 | $123 | $120 |
| Financing | $25 | ($72) | ($98) | ($11) | ($35) | ($24) | ($78) | ($49) | $29 | $61 | $60 | ($1) | (3) | (96) | ($93) |
| Net Cash Flow | $0 | $6 | $6 | $0 | $41 | $41 | $0 | ($38) | ($38) | $0 | $18 | $18 | $0 | $27 | $27 |
| Beginning Cash | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $35 | $34 | $0 | $0 | ($0) | $0 | $0 | $0 |
| Cash Flow Before Financing | (25) | 78 | 104 | 11 | 76 | 65 | 78 | 10 | (67) | (61) | ($41) | 19 | 3 | 123 | 120 |
| Financing | 25 | (72) | (98) | (11) | (35) | (24) | (78) | (49) | 29 | 61 | $60 | (1) | (3) | (96) | (93) |
| Change in Carveout Account | 0 | (7) | (7) | 0 | (6) | (6) | 0 | 4 | 4 | 0 | (12) | (12) | 0 | (21) | (21) |
| Ending Available Cash Balance | $0 | $0 | $0 | $0 | $35 | $0 | $0 | $0 | $0 | $0 | $7 | $0 | $0 | $7 | $7 |

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 13 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

**Receipts**

- Week 13 same store sales (go-forward stores) were negative (16.6%) for FLS and (12.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (14.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $64mm on post-petition merchandise disbursements in week 13 which is below the forecast disbursements by ~$3mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $54mm was above the weekly budgeted amount of $44mm

    - The $54mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $6.7mm in transportation and logistics vendor payments, $2.5mm in advertising payments, and $1.9mm to fund Sears Home Improvement

- The Company paid $13mm of interest during the week and $2mm of financing fees

- The Company paid no professional fees during the week

**Financing**

- The Company drew $100mm on the Jr. DIP to fund operations and pay down $40mm of the outstanding Sr. DIP ABL Revolver

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 10-13 of the proceeding equaled $123mm, which is well above the budgeted $3mm

- The Company ended the week with a $7mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    3

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 12 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 12 same store sales (go-forward stores) were negative (15.8%) for FLS and (10.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.6%)

- Receipts had a large negative variance because the budget attributed Holiday related inflows to the week which actualized in the previous week

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $58mm on post-petition merchandise disbursements in week 12 which is above the forecast disbursements by ~$5mm

- The Company made $3mm in critical vendor payments during the week

- Other SG&A Disbursements of $38mm was below the weekly budgeted amount of $72mm

    - The $38mm of the Other SG&A Disbursements includes $1.9mm of payments for Home Services and builder distributors customer orders, $8.1mm in transportation and logistics vendor payments, $3.1mm in advertising payments, and $1.2mm to fund Sears Home Improvement

- The Company paid $3mm of interest during the week and $3mm of financing fees

- The Company paid 14 professional firms an aggregate of $10mm during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 9-12 of the proceeding equaled $176mm, which is well above the budgeted ($14mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 11 same store sales (go-forward stores) were negative (7.4%) for FLS and 4.0% for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (2.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $55mm on post-petition merchandise disbursements in week 11 which is above the forecast disbursements by ~$4mm

- The Company made no critical vendor payments during the week

- Other SG&A Disbursements of $45mm was below the weekly budgeted amount of $76mm

    - The $45mm of the Other SG&A Disbursements includes $2.3mm of payments for Home Services and builder distributors customer orders, $8.6mm in transportation and logistics vendor payments, $1.7mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- No professional fees were paid during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 8-11 of the proceeding equaled $212mm, which is well above the budgeted ($156mm)

- The Company ended the week with a $35mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday and the Company borrowed $24mm for an insurance payment it did not pay on Friday

    - The Company made the insurance payment and all remaining cash was swept to Bank of America the next business day

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY    5

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 10 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 10 same store sales (go-forward stores) were negative (26.9%) for FLS and negative (26.6%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (26.8%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $72mm on post-petition merchandise disbursements in week 10 which is below the forecast disbursements by ~$14mm

- The Company paid $4.5mm in critical vendor payments during the week

- Other SG&A Disbursements of $57mm was below the weekly budgeted amount of $76mm

  - The $57mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $11.1mm in transportation and logistics vendor payments, $3.6mm in advertising payments, and $2.2mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.1mm of financing fees

- $1.5mm was paid to M-III for professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 7-10 of the proceeding equaled $228mm, which is well above the budgeted ($155mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 10-13 | |
| --- | --- |
| **Vendor** | **Disbursements** |
| Home Services | $33.5 |
| Whirlpool | 22.7 |
| Cardinal Health | 16.6 |
| LG HA | 16.0 |
| EMA | 14.2 |
| Winiadaewoo Electronics | 10.6 |
| Samsung | 6.3 |
| P&G | 5.0 |
| VF Jeanswear Limited | 4.0 |
| Hanesbrands | 3.9 |
| MTD | 3.8 |
| Sealy Mattress Company | 3.8 |
| Wolverine Worldwide | 3.3 |
| Waterloo Industries | 2.8 |
| Icon | 2.7 |
| Serta Simmons | 1.9 |
| Levi | 1.6 |
| Combine International | 1.5 |
| American Greeting Co | 1.4 |
| Chamberlain Manufacturing | 1.4 |
| Top 20 Post-petition Vendors | $156.9 |
| (+) Other | 91.4 |
| **Total Post-petition Merchandise Disbursements** | **$248.3** |

- The Company made ~$248mm in payments for post-petition merchandise during budget weeks 10-13
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $124mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| Other SG&A Disbursements Detail | | | | | | |
|---|---|---|---|---|---|---|
| | Week 10 | Week 11 | Week 12 | Week 13 | Total | Notes |
| BofA Checks | $ (5.9) | $ (4.9) | $ (6.9) | $ (7.1) | $ (24.7) | Issued checks, primarily tax payments |
| Internal / Other Margin | (3.3) | (3.5) | (3.2) | (2.7) | (12.6) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (4.4) | (3.9) | (3.6) | (6.1) | (17.9) | |
| Outside/Associate/Consulting | (4.6) | (4.4) | (2.0) | (6.7) | (17.7) | Temporary labor |
| Advertising Expense | (3.6) | (1.7) | (3.1) | (2.5) | (10.8) | |
| Non-Merch COGS | (2.2) | (2.0) | (2.2) | (2.1) | (8.4) | Licensed businesses including Sears Optical |
| Equipment Expenses | (5.2) | (3.1) | (3.2) | (4.2) | (15.6) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (2.8) | (2.3) | (1.9) | (2.8) | (9.8) | Franchise and builder distributor appliance network funding |
| Logistics | (4.7) | (3.6) | (3.9) | (2.0) | (14.2) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (3.2) | (4.7) | (1.5) | (2.6) | (12.0) | |
| SHP Checks | (2.2) | (2.4) | (1.2) | (1.9) | (7.7) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.8) | (0.9) | (1.1) | (0.9) | (3.6) | Building maintenance expense |
| CheckFreePay | (0.8) | (0.6) | (0.9) | (1.4) | (3.7) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.4) | (1.0) | (1.1) | (1.1) | (4.5) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | (0.4) | - | - | (0.5) | (0.9) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.4) | (0.3) | (0.4) | (1.5) | Shipping expenses |
| Insurance Exp | (0.1) | (0.1) | (0.1) | (0.3) | (0.5) | |
| BS Adjustment - AP | (0.0) | (0.3) | 1.1 | 0.1 | 0.9 | Cash received or paid for reconciliation of vendor inventory receipts |
| Display Expense | (0.0) | (0.0) | (0.1) | - | (0.1) | |
| CARPACH | (6.4) | (5.0) | (4.2) | (4.7) | (20.3) | Payments to intermodal logistics vendors |
| P-Card | (5.0) | - | - | (3.9) | (8.9) | Employee procurement credit card payments |
| India/Israel/GS | (0.2) | - | - | - | (0.2) | Funding for foreign offices |
| Other SG&A Disbursements | $ (57.4) | $ (44.8) | $ (38.5) | $ (53.7) | $ (194.3) | |

# Exhibit J

| | |
|---|---|
| **From:** | Van Groll, Paloma <Paloma.VanGroll@weil.com> |
| **Sent:** | Wednesday, January 16, 2019 3:55 PM |
| **To:** | Ann Reese; Alan Carr; DePodesta, Paul; Paul DePodesta; bill@transieradvisors.com |
| **Cc:** | Baker, Devin; Skrzynski, Matthew; Matican, Jeremy; Goldinstein, Arkady; DiDonato, Phil; mmeghji@miiipartners.com; levi.quaintance@lazard.com; jboffi@miiipartners.com; Schrock, Ray; Kaneko, Erika; Weinberger, Jack; miiipartners.com,sima; Stogsdill, Dennis; Lewitt, Alex; nzatzkin@miiipartners.com; Fail, Garrett; Patkar, Sid; Singh, Sunny; Margolis, Steven; Basta, Paul M.; Aronson, Daniel; Danilow, Greg; Valentino, Luke; Sukumar, Ajith; Leblanc, Thibaud; nweber@miiipartners.com; Cornish, Kelley A; Wessel, Paul; Wooten, Jason; Yiu, Vincent; Marcus, Jacqueline; wgallagher@miiipartners.com; Aebersold, Brandon; Dahl, Ryan; Gorbaty, Vladimir; Westerman, Gavin; Miller, Jeri Leigh; Hwangpo, Natasha; Sitley, Stephen; de Gosztonyi, Daniel; Robert Britton (rbritton@paulweiss.com); ktanaka@miiipartners.com; project.blue.rx@lazard.com; Liou, Jessica; cadams@miiipartners.com; Munz, Naomi; Riecker, Rob; Kamel, Jonathan; eacevedo@miiipartners.com; Grossi, Nick; bgriffith@miiipartners.com; cgood@miiipartners.com; Odoner, Ellen; jfrantz@miiipartners.com; Borden, Jane; Descovich, Kaitlin; Daniel Allan; Friedmann, Jared; Mishkin, Jessie; Genender, Paul |
| **Subject:** | RE: Project Blue: Restructuring Committee Call |
| **Attachments:** | 2019.01.15 ESL Bid_Value Required.pdf |

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

Members of the Restructuring Committee,

Please find attached a revised draft of the ESL deal analysis deck.

Thank you,

**Weil**

Paloma van Groll

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Paloma.VanGroll@weil.com
+1 212 310 8668 Direct



------Original Appointment------
**From:** Skrzynski, Matthew <Matthew.Skrzynski@weil.com>
**Sent:** Thursday, January 3, 2019 7:54 PM
**To:** Skrzynski, Matthew; Matican, Jeremy; Goldinstein, Arkady; DiDonato, Phil; mmeghji@miiipartners.com; levi.quaintance@lazard.com; jboffi@miiipartners.com; Schrock, Ray; Kaneko, Erika; Weinberger, Jack; wsima@miiipartners.com; Ann Reese; Stogsdill, Dennis; Alan Carr; Lewitt, Alex; nzatzkin@miiipartners.com; Fail, Garrett; DePodesta, Paul; Patkar, Sid; Singh, Sunny; Margolis, Steven; Basta, Paul M.; Aronson, Daniel; Danilow, Greg;

Valentino, Luke; Sukumar, Ajith; Leblanc, Thibaud; Nicholas Weber; bill@transieradvisors.com; Cornish, Kelley A; Wessel, Paul; Wooten, Jason; Yiu, Vincent; Marcus, Jacqueline; wgallagher@miiipartners.com; Aebersold, Brandon; Dahl, Ryan; Gorbaty, Vladimir; Westerman, Gavin; Miller, Jeri Leigh; Hwangpo, Natasha; Sitley, Stephen; de Gosztonyi, Daniel; Van Groll, Paloma; Robert Britton (rbritton@paulweiss.com); ktanaka@miiipartners.com; Paul DePodesta; project.blue.rx@lazard.com; Liou, Jessica; cadams@miiipartners.com; Munz, Naomi; Riecker, Rob; Kamel, Jonathan; Eacevedo@miiipartners.com; Grossi, Nick; bgriffith@miiipartners.com; cgood@miiipartners.com; Odoner, Ellen; jfrantz@miiipartners.com; Jane S. Borden; Descovich, Kaitlin; Daniel Allan

**Cc:** Baker, Devin
**Subject:** Project Blue: Restructuring Committee Call
**When:** Wednesday, January 16, 2019 6:00 PM-7:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Dial-in 888.235.7501,,2123108639#

Domestic
Dial in: 1-888-235-7501
Passcode: 212-310-8639#

International
Dial in: 1-206-445-0084
Passcode: 212-310-8639#

Mobile  888.235.7501,,2123108639#

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

HIGHLY CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL

16 JANUARY 2019

HIGHLY CONFIDENTIAL

SEARS_507B_00000005

## DISCUSSION MATERIALS

# Project Blue

 

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

HIGHLY CONFIDENTIAL

PROJECT BLUE

# Additional Value Required
($ in millions)

The following summarizes the administrative and other priority claims based on M-III claim schedule and the proposed ask of ESL, sources of value available to address these claims and the incremental value required (other than for settlement and release)

| Admin & Other Priority Claims Uses of Value | | Less: ESL Value [1] | Remaining Claims | Additional Value Required after Application of Other Sources of Value | |
|---|---|---|---|---|---|
| **Admin** | | | | | |
| 503(b)(9) | $173 | ($139) | $34 | **Additional Value Required** | **$356** |
| Accounts Payable | 196 | (166) | 30 | Less: Company Cash Available at Close [5] | (50) |
| Severance & WARN | 20 | (20) | -- | Less: Company Cash Available Post Close [5] | (29) |
| Employee Claims | 8 | (8) | -- | Less: Professional Fee Carve-out Account | (108) |
| Franchise Taxes | 3 | -- | 3 | Less: MTN Sale Proceeds | (81) |
| Property Taxes [4] | 135 | (134) | 1 | Less: U-Haul Sale Proceeds | (7) |
| RemainCo Winddown Costs | 80 | -- | 80 | Less: Insurance Proceeds | (13) |
| **Total Admin** | **$615** | **($467)** | **$148** | Less: SHIP Security Deposit | (6) |
| | | | | **Pro Forma Additional Value Required [2]** | **$62** |
| **Other** | | | | | |
| ABL DIP | $950 | ($850) | $100 | **Memo:** | |
| Junior DIP | 350 | (350) | -- | KCD Royalties [3] | $112 |
| Professional Fees | 108 | -- | 108 | **Adjusted Pro Forma Additional Value Required** | **$173** |
| Cure Costs | 200 | (200) | -- | | |
| Transfer Taxes (Purchase Price Deduction) | 19 | (19) | -- | | |
| Mechanics' Liens (Purchase Price Deduction) | 4 | (4) | -- | **Memo: Required Deposit** | **$120** |
| Expense Reimbursement (Purchase Price Deduction) | -- | -- | -- | | |
| DIP Floor Adjustment (Purchase Price Deduction) | -- | -- | -- | | |
| UCC Release Cash Consideration | 35 | (35) | -- | | |
| **Total Other** | **$1,665** | **($1,458)** | **$207** | | |
| **Total** | **$2,281** | **($1,925)** | **$356** | | |

  Weil

Source: M-III projection of administrative and other priority claims; ESL proposal.
Note: Does not include any required payments on account of releases other than for credit bid.
1. Includes value provided by ESL via assumption of liabilities and/or debt paydown.
2. Requested Administrative Claim Backstop does not include amounts necessary for settlement and release but is inclusive of Restructuring Subcommittee support for Court order to allow ESL to credit bid claims included in ESL bid.
3. Assumes $112 million of post-petition royalties owed to KCD based on preliminary and ongoing analysis conducted by M-III; figures subject to change.
4. Property Taxes estimate is preliminary and subject to further review.
5. Company cash assumed to include $50 million available at close and $29 million available post close. Additional detail in appendix.

1

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

HIGHLY CONFIDENTIAL

PROJECT BLUE

## Additional Value Required – Illustrative Allocation
($ in millions)

The following summarizes the administrative and other priority claims based on the M-III claim schedule and the ESL bid, sources of value available to address these claims and the incremental value required (other than for settlement and release)

- **For illustrative purposes, the schedule below allocates available sources of value to specific claims based on restrictions on the use of each asset**
  - Allocation of cash and winddown reserve amounts is purely illustrative

| Admin & Other Priority Claims | Less: ESL Value [1] | Remaining Claims | Allocation of Other Sources [2] | | | Remaining Claims / (Surplus) |
|---|---|---|---|---|---|---|
| | | | Cash at Close [6] | Carve Out | Winddown & Other [3] | |
| **Admin** | | | | | | |
| 503(b)(9) | $173 | ($139) | $34 | $-- | $-- | ($34) | $-- |
| Accounts Payable | 196 | (166) | 30 | -- | -- | (30) | -- |
| Severance & WARN | 20 | (20) | -- | -- | -- | -- | -- |
| Employee Claims | 8 | (8) | -- | -- | -- | -- | -- |
| Franchise Taxes | 3 | -- | 3 | -- | -- | (3) | -- |
| Property Taxes [4] | 135 | (134) | 1 | -- | -- | (1) | -- |
| RemainCo Winddown Costs | 80 | -- | 80 | -- | -- | (68) | 12 |
| **Total Admin** | **$615** | **($467)** | **$148** | **$--** | **$--** | **($136)** | **$12** |
| | | | | | | |
| **Other** | | | | | | |
| ABL DIP [2] | $950 | ($850) | $100 | ($50) | $-- | $-- | $50 |
| Junior DIP | 350 | (350) | -- | -- | -- | -- | -- |
| Professional Fees | 108 | -- | 108 | -- | (108) | -- | -- |
| Cure Costs | 200 | (200) | -- | -- | -- | -- | -- |
| Transfer Taxes (Purchase Price Deduction) | -- | -- | -- | -- | -- | -- | -- |
| Mechanics' Liens (Purchase Price Deduction) | -- | -- | -- | -- | -- | -- | -- |
| Expense Reimbursement (Purchase Price Deduction) | -- | -- | -- | -- | -- | -- | -- |
| DIP Floor Adjustment (Purchase Price Deduction) | -- | -- | -- | -- | -- | -- | -- |
| UCC Release Cash Consideration | 35 | (35) | -- | -- | -- | -- | -- |
| **Total Other** | **$1,642** | **($1,435)** | **$207** | **($50)** | **($108)** | **$--** | **$50** |
| | | | | | | |
| **Total** | **$2,258** | **($1,902)** | **$356** | **($50)** | **($108)** | **($136)** | **$62** |
| Memo: Total Incl. KCD Claim ($112 mm) [5] | $2,369 | ($1,902) | $467 | ($50) | ($108) | ($136) | $173 |

Source: M-III projection of administrative and other priority claims; ESL proposal.
Note:   Does not include any required payments on account of releases other than for credit bid.
1.   Includes value provided by ESL via assumption of liabilities and/or debt paydown.
2.   ABL DIP balance assumed to be $950 at close.
3.   Allocation of Winddown Reserve amount is illustrative. Other includes sources of value available post-closing; e.g., utility deposit release.
4.   Property Taxes estimate is preliminary and subject to further review.
5.   Assumes $112 million of post-petition royalties owed to KCD based on preliminary and ongoing analysis conducted by M-III; figures subject to change.
6.   Company cash assumed to include $50 million available at close and $29 million available post close. Additional detail in appendix.

LAZARD   M-III PARTNERS   Weil

2

SEARS_507B_00000007

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

PROJECT BLUE

# Incremental Sources of Value & Risks

($ in millions)

The following provides an analysis of incremental sources of value the Company and ESL could potentially contribute to cover the administrative claim shortfall; as well as risks to the proceeds assumed to be received by the Company

| | Incremental Sources of Value and Risks to Realization | | | | |
|---|---|---|---|---|---|
| | | Availability | | | |
| | Incremental Sources of Value | At Close | Post-Close | Total | Notes |
| Potential Incremental Sources | Residual Value in GOB | $ -- | $43 | $43 | Based on M-III analysis |
| | Additional Budget Savings | 8 | -- | 8 | Based on M-III analysis |
| | Reduction in Winddown Cost | [20] | -- | [20] | Reduction due to inclusion of additional assets in ESL bid |
| | First Data | 28 | -- | 28 | Reserve established prior to bankruptcy to offset customer returns |
| | Disputed Accounts Payable | 15 | -- | 15 | Assumes 50% of disputed accounts payable |
| | Total | $71 | $43 | $114 | |
| | Additional ABL Reduction | $39 | $ -- | $39 | Based on 2/16/19 Close; excludes $8 million of outperformance accounted for above |
| | Total at Low ABL Estimate | $110 | $43 | $153 | Assumes incremental value of ~$47 million through operational adjustments and budget variance |
| Risks to Proceeds | Cash | (25) | (15) | (40) | Assumes company is only able to recover 50% of projected cash |
| | SHIP Deposit | -- | (6) | (6) | Reflects risk that estate does not recover SHIP deposit |
| | Other | TBD | TBD | TBD | |
| | Total | ($25) | ($21) | ($46) | |
| Net Total | | $46 | $23 | $69 | |
| Net Total at Low ABL Estimate | | $85 | $23 | $108 | Assumes incremental value of ~$47 million through operational adjustments and budget variance |

See appendix for additional detail on potential actions and savings which could reduce the DIP balance at close vis-à-vis baseline estimate

Source: M-III projections; company estimates; 3rd party bids.

 

HIGHLY CONFIDENTIAL

SEARS_507B_00000008

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

CONFIDENTIAL



# Appendix



PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

PROJECT BLUE

APPENDIX

# Additional Value Required Detail

($ in millions)

The following provides supporting schedules for the ABL DIP balance and other sources of value assumed in the analysis on the prior page

- **Based on M-III estimates and projections**

| ABL DIP Detail | | Notes |
|---|---|---|
| Projected ABL DIP Balance (2/9/19) | $992 | Company / M-III projected DIP balance per latest forecast |
| Adjustment for Week 49 Actuals | (20) | Update to include Week 49 positive variance |
| Reduction in Critical Vendor Payments | (20) | Assumed reduction in critical vendor payments vs. budget |
| KEIP / KERP | (10) | ~$25 million is forecasted through closing. Acceleration of the remaining payments is TBD |
| Other | 8 | Adjustment |
| PF ABL DIP Balance (2/9/19) | $950 | Pro forma ABL DIP balance |

| Other Sources of Value Detail | | |
|---|---|---|
| **Carve Out** | | |
| Professional Fee Carve Out Account | $108 | Projected Carve Out at closing |
| | | |
| **Winddown Reserve** | | |
| MTN Sale | $81 | |
| Insurance Proceeds | 13 | |
| U-Haul Proceeds | 7 | |
| SHIP Security Deposit | 6 | Assumes close of SHIP sale prior to close of ESL transaction. |
| **Total Winddown Reserve** | $107 | |

*Source: M-III projections; company estimates; 3rd party bids.*

 

4

HIGHLY CONFIDENTIAL

SEARS_507B_00000010

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

PROJECT BLUE

APPENDIX

HIGHLY CONFIDENTIAL

# Additional Value Required Detail – Company Cash

($ in millions)

The following provides further detail into the Company's projected cash balance at close identified by M-III

| | Company Cash Schedule | | | |
|---|---|---|---|---|
| | Available: | | | |
| Source | At Close | Post-Close | Total | Notes |
| Store Cash [1] | $15.0 | $ -- | $15.0 | Cash in registers based on M-III expectations; (excludes assumed $2 million for GOB stores) |
| Cash in Transit | 15.0 | 15.0 | 30.0 | $33 million total, assumes $15 million available at close and $15 million post close |
| Regional Bank Cash | 10.0 | 4.0 | 14.0 | $14 million in regional banks; assumes $10 million available at close |
| Subsidiary Businesses | 3.0 | -- | 3.0 | Cash in Monark, Innovel, SHS and other subsidiary businesses |
| Israel Cash | 7.0 | -- | 7.0 | Based on M-III estimate of $8.5 million of cash in Israeli Banks; assumes $1.5 million trapped |
| Utility Deposit | -- | 10.0 | 10.0 | Assumes Utility deposit released 45 days after close |
| **Estimated Total Available** | **$50.0** | **$29.0** | **$79.0** | |
| Trapped / Unavailable Cash | $15.0 | $ -- | $15.0 | Includes cash in India, trapped cash, accounting adjustments and other cushion |
| **Total Avail. & Unavail. Cash** | **$65.0** | **$29.0** | **$94.0** | |

*Source: M-III analysis.*
1.    *Company cash in registers to be purchased by buyer.*

 

SEARS_507B_00000011

5

PRIVILEGED AND CONFIDENTIAL – PREPARED AT THE REQUEST OF COUNSEL
PRELIMINARY DRAFT – SUBJECT TO MATERIAL CHANGE

PROJECT BLUE                                                                                               APPENDIX

# Incremental Sources of Value & Risks – ABL Detail
($ in millions)

The following provides further detail into the ABL projections and potential avenues to reduce the balance at close identified by M-III

| Closing Senior DIP and 1L Balance Sensitivity | | | | |
|---|---|---|---|---|
| Case | Low | Mid | Low | Mid |
| Date | 2/8/2019 | 2/8/2019 | 2/16/2019 | 2/16/2019 |
| **Senior DIP & 1L Balance at Closing** | **$992** | **$992** | **$1,027** | **$1,027** |
| | | | | |
| *Adjustments / (Risks)* | | | | |
| Week Ending 1/12/19 Positive Cash Variance | $20 | $20 | $20 | $20 |
| Disbursements - Critical Vendor Payments | 20 | 20 | 20 | 20 |
| Inflows - Normal Course Net Merchandise Receipts | – | 18 | – | 22 |
| Inflows - Other Cash Receipts | – | 15 | – | 20 |
| Disbursements - Other SG&A | – | 10 | – | 12 |
| Disbursements - Merchandise Disbursements | – | 15 | – | 20 |
| Disbursements - KEIP / KERP | 10 | 10 | 10 | 10 |
| **Total Adjustments / (Risks)** | **$50** | **$108** | **$50** | **$124** |
| **Adjusted Senior DIP & 1L Balance at Closing** | **$942** | **$884** | **$977** | **$903** |
| **Variance from Assumed Senior DIP Balance of $950mm** | **$8** | **$66** | **($27)** | **$47** |

*Source: M-III analysis.*




HIGHLY CONFIDENTIAL

SEARS_507B_00000012

6

# Exhibit K

| | |
|---|---|
| **From:** | Prakash, Rajat <Rajat.Prakash@searshc.com> |
| **Sent:** | Wednesday, January 16, 2019 5:02 PM |
| **To:** | Khan, Aziz; Quinn, Jodie; Joye, Jennifer |
| **Cc:** | Acquaviva, David |
| **Subject:** | Armored Car Pickups |

As we try to maximize cash in company's concentration accounts by moving from non-BAML local banks to local BAMLs, please also think about armored car pickup schedules.

Would altering the pickup schedules (Mon, Wed) instead of (Tue, Thu) increase/accelerate the cash reaching BAML concentration accounts.

Please broach this with the armored cars while discussing.

Let me know of any questions

Thanks,

Rajat Prakash
Sears Holdings Corporation
Treasury
847.286.2288

# Exhibit L

**Minutes of a Meeting of the**
**Restructuring Committee of the Board of Directors of**
**Sears Holdings Corporation**

**January 16, 2019**

A meeting of the Restructuring Committee (the "Committee") of the Board of Directors (the "Board") of Sears Holdings Corporation (the "Company") was held telephonically on January 16, 2019, beginning at 6:30 p.m. (Eastern).

**Committee Members Present**

- Alan J. Carr
- Paul G. DePodesta
- Ann N. Reese
- William L. Transier

**Materials Presented (attached as Exhibits)**

- Material Issues List (see Exhibit A)
- Bid Value Required (see Exhibit B)
- Communications Materials (see Exhibit C)

All of the directors being present and the meeting having been duly noticed and convened, the Committee was ready to proceed with business.  Also present by invitation were Rob Riecker, Chief Financial Officer and member of the Office of the Chief Executive of the Company; Stephen Sitley, Senior Vice President, General Counsel and Chief Compliance Officer of the Company (by telephone); Luke Valentino, Vice President, Deputy General Counsel and Corporate Secretary of the Company; Jacqueline Avitia-Guzman, Director, Corporate Development and Treasury of the Company; Mohsin Meghji, Chief Restructuring Officer of the Company; Ray Schrock, Jacqueline Marcus, Ellen Odoner, Sunny Singh, Garrett Fail, Gavin Westerman, Paul Genender, Jared Friedmann, Naomi Munz, Jessie Mishkin, Natasha Hwangpo, Kaitlin Descovich, Hayden Guthrie, Paloma van Groll and Sam Hulsey of Weil, Gotshal & Manges LLP, attorneys for the Company ("Weil"); Chris Good, Colin Adams, Brian Griffith and Bill Gallagher of M-III Partners, LP, restructuring advisor to the Company ("M-III"); Brandon Aebersold, Levi Quaintance and Conor Mackie of Lazard Frères & Co. LLC, the Company's investment banker ("Lazard"); Paul Basta and Kelley Cornish of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to the Subcommittee of the Committee (the "Subcommittee"); Dennis Stogsdill of Alvarez & Marsal, restructuring advisor to the Subcommittee ("A&M"); and Dan Aronson and Jonathan Kamel of Evercore Partners, LP, financial advisor to the Subcommittee.

Mr. Schrock reported that a revised draft of the proposed asset purchase agreement (the "APA") between the Company and ESL Investments, Inc. ("ESL") had been received from Cleary, Gottlieb, Steen & Hamilton LLP, counsel to ESL ("Cleary"), and Weil had communicated about the APA with the Committee of Unsecured Creditors (the "UCC") as required by the Bankruptcy Court.

CONFIDENTIAL

SEARS_UCC00413796

**JOINT EX. 118**

Ms. Odoner reviewed for the Committee the key outstanding issues on the APA. She stated that ESL's lenders were insisting on a marketing period of 14 business days that would commence on the receipt of "required information" that had not yet been provided, although significant efforts had been and were continuing to be made. She stated that ESL had indicated that it was unwilling to sign unless the lenders confirmed to it that they had the required information, in which event ESL would represent the same to the Company. She also stated ██████████████████████ ███████████████████████████████████ Ms. Odoner stated further, that ESL was unwilling to extend protection periods for employees for their compensation, benefits and severance through the end of 2020, but rather only through the end of the fiscal year ending on February 1, 2020. She also stated that ESL was not willing to put its deposit at risk if the Company was unable to meet the maximum Senior DIP, maximum Junior DIP and minimum inventory and receivables tests necessary to satisfy ESL's closing conditions.

Mr. Singh noted that ESL had moved on one point in that they would allow excess inventory to offset a deficiency in receivables for purposes of determining minimum amount.

Mr. Schrock noted ████████████████████████████████ ████████████████████████████

Ms. Odoner stated that ESL had also rejected the Company's request to eliminate the "DIP Shortfall" provision. Mr. Aebersold explained that this provision would give ESL the benefit if the Company exceeded expectations and a total of less than $1.2 billion was outstanding under the Senior DIP and Junior DIP at closing. The Committee and the advisors noted that if the Company performed $1 better than expected, the benefit would accrue to ESL while if the Company performed $1 less well than expected, ESL would not be required to close.

Mr. Singh reported that Weil continued to press Cleary on this point and that Cleary continued to state that it was a "hard no" from Mr. Lampert.

Ms. Odoner addressed ████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████

The Committee and the advisors discussed how to approach ESL on the material open points.

Mr. Aebersold reviewed with the Committee the bid value materials that memorialized the discussions of the night before. He discussed the incremental value that would be required to pay administrative claims and the risks to some of the sources of value.

The Committee and the advisors further discussed the DIP shortfall issue and potential resolutions to present to ESL. Mr. Schrock stated ████████████████████████ █████████████████████████████████

CONFIDENTIAL                                                    SEARS_UCC00413797

███████████████████████████████  A discussion among the Committee and its advisors ensued.

Mr. Schrock stated ████████████████████████████████████████████████████████ Mr. Aebersold confirmed that this had always been an issue in the APA that was not acceptable, but Lazard had always gotten strong push back from ESL.

Mr. Stogsdill presented a solution for managing cash flow in the ordinary course such that any benefit of better than anticipated performance could be applied to paying down administrative claims and reducing the risk of administrative insolvency rather than triggering the DIP shortfall provision. The advisors discussed and confirmed along with Mr. Riecker that there were ways to manage the budget in the ordinary course.

Mr. Singh raised █████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████

Mr. Riecker reported that Skadden should be confirming that the lenders have all of the information required to begin the marketing period the following morning.

The advisors stated that the Committee would be reconvened following discussion with ESL's advisors on the points raised.

There being no further business before the Committee, the meeting adjourned at approximately 7:40 p.m.

CONFIDENTIAL                                                    SEARS_UCC00413798

## Exhibit A

### Material Issues List

See attached.

CONFIDENTIAL

SEARS_UCC00413799

**Exhibit B**

**Bid Value Required**

See attached.

SEARS_UCC00413800

**Exhibit C**

**Communications Materials**

See attached.

CONFIDENTIAL

SEARS_UCC00413801

# Exhibit M

**Minutes of a Meeting of the**
**Restructuring Committee of the Board of Directors of**
**Sears Holdings Corporation**

**January 16, 2019**

A meeting of the Restructuring Committee (the "<u>Committee</u>") of the Board of Directors (the "<u>Board</u>") of Sears Holdings Corporation (the "<u>Company</u>") was held telephonically on January 16, 2019, beginning at 9:45 p.m. (Eastern).

**<u>Committee Members Present</u>**

- Alan J. Carr
- Paul G. DePodesta
- Ann N. Reese
- William L. Transier

All of the directors being present and the meeting having been duly noticed and convened, the Committee was ready to proceed with business. Also present by invitation were Rob Riecker, Chief Financial Officer and member of the Office of the Chief Executive of the Company; Stephen Sitley, Senior Vice President, General Counsel and Chief Compliance Officer of the Company; Luke Valentino, Vice President, Deputy General Counsel and Corporate Secretary of the Company; Jacqueline Avitia-Guzman, Director, Corporate Development and Treasury of the Company; Jane Borden, President of Real Estate of the Company; Mohsin Meghji, Chief Restructuring Officer of the Company; Jacqueline Marcus, Greg Danilow, Ellen Odoner, Sunny Singh, Garrett Fail, Gavin Westerman, Paul Genender, Jared Friedmann, Naomi Munz, Jessie Mishkin, Natasha Hwangpo, Kaitlin Descovich, Hayden Guthrie, Paloma van Groll and Sam Hulsey of Weil, Gotshal & Manges, LLP, attorneys for the Company ("<u>Weil</u>"); Chris Good, Colin Adams, Brian Griffith and Bill Gallagher of M-III Partners, LP, restructuring advisor to the Company ("<u>M-III</u>"); Brandon Aebersold, Levi Quaintance and Conor Mackie of Lazard Frères & Co. LLC, the Company's investment banker ("<u>Lazard</u>"); and Kelley Cornish of Paul, Weiss, Rifkind, Wharton and Garrison LLP ("<u>Paul Weiss</u>"), counsel to the Subcommittee of the Committee (the "<u>Subcommittee</u>"); Dennis Stogsdill of Alvarez & Marsal, restructuring advisor to the Subcommittee ("<u>A&M</u>"); and Dan Aronson and Jonathan Kamel of Evercore Partners, LP, financial advisor to the Subcommittee.

Mr. Singh reported that Cleary, Gottlieb, Steen & Hamilton, LLP ("<u>Cleary</u>") had responded to Weil that the "DIP shortfall" provision was part of the final bid made at the auction by ESL Investments, Inc. ("<u>ESL</u>") and was not a documentation point open for further negotiation.

Mr. Quaintance quantified the Company's maximum exposure at $25 million (assuming all opportunities for cost savings were realized) and reviewed ways in which the Company could manage its budget to minimize the risk of triggering the "DIP shortfall" provision.

CONFIDENTIAL

SEARS_UCC00413802

**JOINT EX. 119**

Ms.  Odoner

The advisors responded to questions from the Committee.  Following discussion, the Committee requested that Lazard prepare updated materials that reflected the calculations discussed and to promptly reconvene for with all of the advisors.

There being no further business before the Committee, the meeting was adjourned at approximately 10:15 p.m.

# Exhibit N

**Minutes of a Meeting of the**
**Restructuring Committee of the Board of Directors of**
**Sears Holdings Corporation**

**January 16, 2019**

A meeting of the Restructuring Committee (the "Committee") of the Board of Directors (the "Board") of Sears Holdings Corporation (the "Company") was held telephonically on January 16, 2019, beginning at 11:30 p.m. (Eastern).

**Committee Members Present**

- Alan J. Carr
- Paul G. DePodesta
- Ann N. Reese
- William L. Transier

**Materials Presented (attached as Exhibits)**

- Presentation (see Exhibit A)

With a quorum being present and the meeting having been duly noticed and convened, the Committee was ready to proceed with business. Also present by invitation were Rob Riecker, Chief Financial Officer and member of the Office of the Chief Executive of the Company; Stephen Sitley, Senior Vice President, General Counsel and Chief Compliance Officer of the Company; Luke Valentino, Vice President, Deputy General Counsel & Corporate Secretary of the Company; Jacqueline Avitia-Guzman, Director, Corporate Development and Treasury of the Company; Mohsin Meghji, Chief Restructuring Officer of the Company; Ray Schrock, Jacqueline Marcus, Ellen Odoner, Sunny Singh, Garrett Fail, Gavin Westerman, Paul Genender, Jared Friedmann, Naomi Munz, Jessie Mishkin, Natasha Hwangpo, Kaitlin Descovich, Hayden Guthrie, Paloma van Groll and Sam Hulsey of Weil, Gotshal & Manges, LLP, attorneys for the Company ("Weil"); Chris Good, Colin Adams, Brian Griffith and Bill Gallagher of M-III Partners, LP, restructuring advisor to the Company ("M-III"); Brandon Aebersold, Levi Quaintance and Conor Mackie of Lazard Frères & Co. LLC, the Company's investment banker ("Lazard"); and Paul Basta and Kelley Cornish of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to the Subcommittee of the Committee (the "Subcommittee"); Dennis Stogsdill of Alvarez & Marsal, restructuring advisor to the Subcommittee; and Dan Aronson and Jonathan Kamel of Evercore Partners, LP, financial advisor to the Subcommittee.

Mr. Schrock stated that the meeting had been convened at the request of the Committee to review an analysis that Lazard prepared regarding the potential impact of the "DIP shortfall" provision if the Company were to outperform the debtor-in-possession financing budget prior to closing.

Mr. Quaintance reviewed the presentation, which showed that the maximum amount of "overperformance", if all opportunities were achieved, was $25 million and that the Company had

SEARS_UCC00413804

**JOINT EX. 120**

levers to avoid triggering the "DIP shortfall" provision by paying administrative claims in the ordinary course. Mr. Quaintance also noted that there could be no assurance that all opportunities would be achieved.

The advisors responded to questions from the Committee.

Mr. Schrock confirmed ███████████████████████████████████████
███████████████████████████

Mr. Aebersold confirmed that the presentation demonstrated that there were ways to manage the "risk" that the Company would generate more cash than needed to reduce the Senior DIP to a maximum of $850 million at closing and trigger the "DIP shortfall" provision. He stated that, from Lazard's perspective, ESL's revised bid represented the best alternative for the Company.  Mr. Meghji agreed.

Mr. Transier made a motion to approve accepting the ESL bid, agreeing on the transaction documentation and closing the auction based on the recommendations of the advisors.  The motion was seconded by Ms. Reese and approved by Mr. DePodesta and Mr. Carr.

Mr. Schrock stated that the auction should be resumed and the parties should go back on the record as soon as practicable.

There being no further business for the Committee, the meeting was adjourned at approximately 12:00 a.m.

SEARS_UCC00413805

## Exhibit A

**Presentation**

See attached.)

CONFIDENTIAL                                                    SEARS_UCC00413806

# Exhibit O

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 14)

January 23, 2019



sears    kmart    SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 14 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 47 - Budget Week 11 Budget: 11/21 DIP Budget 12/23/18 - 12/29/18 | | | Week 48 - Budget Week 12 Budget: 11/21 DIP Budget 12/30/18 - 1/5/19 | | | Week 49 - Budget Week 13 Budget: 1/11 DIP Budget 1/6/19 - 1/12/19 | | | Week 50 - Budget Week 14 Budget: 1/11 DIP Budget 1/13/19 - 1/19/19 | | | Weeks 47 - 50 12/23/18 - 1/19/19 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| **Total Operating Receipts** | $215 | $229 | $14 | $259 | $186 | ($73) | $153 | $175 | $22 | $141 | 143 | $3 | $768 | $734 | ($34) |
| Merch Vendors | (51) | (55) | (4) | (53) | (58) | (5) | (67) | (64) | 3 | (62) | (60) | 3 | (233) | (236) | (3) |
| Rent/Occupancy | (1) | 0 | 1 | (1) | 0 | 1 | (30) | (34) | (4) | (1) | (17) | (15) | (34) | (51) | (17) |
| Payroll/Bens/Taxes | (58) | (53) | 5 | (31) | (59) | (28) | (48) | (49) | (1) | (34) | (34) | 0 | (171) | (195) | (24) |
| Other SG&A Disbursements | (76) | (45) | 31 | (72) | (38) | 34 | (44) | (54) | (9) | (45) | (47) | (1) | (238) | (184) | 54 |
| **Total Operating Disbursements** | **(185)** | **(152)** | **33** | **(157)** | **(156)** | **1** | **(190)** | **(202)** | **(11)** | **(143)** | **(156)** | **(14)** | **(676)** | **(666)** | **10** |
| CapEx | (1) | (0) | 1 | (1) | (1) | 0 | (1) | (0) | 1 | (1) | (0) | 1 | (4) | (1) | 2 |
| **Total Operating Cash Flow** | **$29** | **$76** | **$48** | **$101** | **$30** | **($71)** | **($38)** | **($27)** | **$12** | **($3)** | **($13)** | **($11)** | **$88** | **$66** | **($22)** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0 | $0 | $0 | $0 | $0 |
| Day 1 Critical Vendor Motion | (10) | 0 | 10 | (3) | (3) | 0 | (10) | 0 | 10 | (10) | 0 | 10 | (33) | (3) | 30 |
| Insurance | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | | 1 | (1) | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | (2) | | 2 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (6) | 0 | 6 | (6) | 0 | 6 |
| Credit Card Holdbacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | (1) | 0 | 1 | (1) | 0 | 1 | (5) | 0 | 5 | (1) | 0 | 1 | (7) | 0 | 7 |
| TSA/CSA and IP Royalty Payments | (1) | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | (16) | | 16 | (17) | | 17 |
| **Bankruptcy Related Disbursements** | **($13)** | **$0** | **$13** | **($5)** | **($3)** | **$2** | **($19)** | **$0** | **$19** | **($33)** | **0** | **$33** | **($70)** | **($3)** | **$67** |
| Cash Interest | ($4) | $0 | $4 | ($5) | ($3) | $1 | ($3) | ($13) | ($10) | ($3) | (2) | $1 | ($15) | ($18) | ($3) |
| Financing Fees | 0 | (0) | (0) | 0 | (3) | (3) | (0) | (2) | (2) | (0) | 0 | 0 | (0) | (6) | (5) |
| Professional Fees | 0 | 0 | 0 | (14) | (10) | 3 | 0 | 0 | 0 | 0 | (4) | (4) | (14) | (15) | (1) |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Non-Operating Disbursements** | **($4)** | **($0)** | **$4** | **($18)** | **($17)** | **$2** | **($3)** | **($15)** | **($12)** | **($3)** | **(6)** | **($3)** | **($29)** | **($38)** | **($9)** |
| **Net Cash Flows before Financing** | **$11** | **$76** | **$65** | **$78** | **$10** | **($67)** | **($61)** | **($41)** | **$19** | **($39)** | **(20)** | **$19** | **($10)** | **$25** | **$36** |
| Financing | ($11) | ($35) | ($24) | ($78) | ($49) | $29 | $61 | $60 | ($1) | $39 | 199 | $160 | 10 | 174 | $164 |
| **Net Cash Flow** | **$0** | **$41** | **$41** | **$0** | **($38)** | **($38)** | **$0** | **$18** | **$18** | **$0** | **179** | **$179** | **$0** | **$199** | **$199** |
| **Beginning Cash** | **$0** | **$0** | **$0** | **$0** | **$35** | **$34** | **$0** | **$0** | **($0)** | **$0** | **7** | **$6** | **$0** | **$0** | **$0** |
| Cash Flow Before Financing | 11 | 76 | 65 | 78 | 10 | (67) | (61) | (41) | 19 | (39) | (20) | 19 | (10) | 25 | 36 |
| Financing | (11) | (35) | (24) | (78) | (49) | 29 | 61 | $60 | (1) | 39 | 199 | 160 | 10 | 174 | 164 |
| Change in Carveout Account | 0 | (6) | (6) | 0 | 4 | 4 | 0 | (12) | (12) | 0 | (4) | (4) | 0 | (18) | (18) |
| **Ending Available Cash Balance** | **$0** | **$35** | **$35** | **$0** | **$0** | **$0** | **$0** | **$7** | **$7** | **$0** | **182** | **182** | **$0** | **$182** | **$182** |

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY®

2

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 14 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 and 14 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

**Receipts**

- Week 14 same store sales (go-forward stores) were negative (18.9%) for FLS and (11.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (15.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $60mm on post-petition merchandise disbursements in week 14 which is below the forecast disbursements by ~$2mm

- The Company made no critical vendor payments this week

- $15mm payments for accrued post-petition Sparrow rent through January were made during the week

- Other SG&A Disbursements of $47mm was above the weekly budgeted amount of $45mm

    - The $47mm of the Other SG&A Disbursements includes $2.1mm of payments for Home Services and builder distributors customer orders, $7.4mm in transportation and logistics vendor payments, $2.1mm in advertising payments, and $1.6mm to fund Sears Home Improvement

- The Company paid $2mm of interest and $4mm of professional fees during the week

**Financing**

- The Company drew $175mm on the Jr. DIP to fund operations and pay down portions of the outstanding Sr. DIP ABL Revolver

- The DIP Term Loan was paid down $10mm with a Sr. DIP ABL Revolver draw in accordance with the rebalancing provision of the Sr. DIP credit agreement

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 11-14 of the proceeding equaled $25mm, which is above the budgeted ($10mm) from the composite of the 11/21/18 DIP budget and 1/11/19 DIP budget for the 4 week period

- The Company ended the week with a $182mm ending cash balance because proceeds from the Jr. DIP draw and Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 13 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

## Receipts

- Week 13 same store sales (go-forward stores) were negative (16.6%) for FLS and (12.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (14.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

## Disbursements

- The Company spent $64mm on post-petition merchandise disbursements in week 13 which is below the forecast disbursements by ~$3mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $54mm was above the weekly budgeted amount of $44mm

  - The $54mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $6.7mm in transportation and logistics vendor payments, $2.5mm in advertising payments, and $1.9mm to fund Sears Home Improvement

- The Company paid $13mm of interest during the week and $2mm of financing fees

- The Company paid no professional fees during the week

## Financing

- The Company drew $100mm on the Jr. DIP to fund operations and pay down $40mm of the outstanding Sr. DIP ABL Revolver

## Net Cash Flow

- Net cash flow before financing for the rolling four week period of weeks 10-13 of the proceeding equaled $123mm, which is well above the budgeted $3mm

- The Company ended the week with a $7mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 12 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 12 same store sales (go-forward stores) were negative (15.8%) for FLS and (10.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.6%)

- Receipts had a large negative variance because the budget attributed Holiday related inflows to the week which actualized in the previous week

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $58mm on post-petition merchandise disbursements in week 12 which is above the forecast disbursements by ~$5mm

- The Company made $3mm in critical vendor payments during the week

- Other SG&A Disbursements of $38mm was below the weekly budgeted amount of $72mm

  - The $38mm of the Other SG&A Disbursements includes $1.9mm of payments for Home Services and builder distributors customer orders, $8.1mm in transportation and logistics vendor payments, $3.1mm in advertising payments, and $1.2mm to fund Sears Home Improvement

- The Company paid $3mm of interest during the week and $3mm of financing fees

- The Company paid 14 professional firms an aggregate of $10mm during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 9-12 of the proceeding equaled $176mm, which is well above the budgeted ($14mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 11 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 11 same store sales (go-forward stores) were negative (7.4%) for FLS and 4.0% for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (2.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $55mm on post-petition merchandise disbursements in week 11 which is above the forecast disbursements by ~$4mm

- The Company made no critical vendor payments during the week

- Other SG&A Disbursements of $45mm was below the weekly budgeted amount of $76mm

    - The $45mm of the Other SG&A Disbursements includes $2.3mm of payments for Home Services and builder distributors customer orders, $8.6mm in transportation and logistics vendor payments, $1.7mm in advertising payments, and $2.4mm to fund Sears Home Improvement

- The Company did not pay interest during the week and paid $0.3mm of financing fees

- No professional fees were paid during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 8-11 of the proceeding equaled $212mm, which is well above the budgeted ($156mm)

- The Company ended the week with a $35mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday and the Company borrowed $24mm for an insurance payment it did not pay on Friday

    - The Company made the insurance payment and all remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

*($ in million)*

| Post-petition Merchandise Disbursements Weeks 11-14 | |
| --- | --- |
| **Vendor** | **Disbursements** |
| Home Services | $32.2 |
| Whirlpool | 20.5 |
| LG HA | 20.0 |
| EMA | 17.8 |
| Cardinal Health | 11.9 |
| Winiadaewoo Electronics | 7.1 |
| Samsung | 6.1 |
| P&G | 4.8 |
| MTD | 3.8 |
| Waterloo Industries | 3.6 |
| Wolverine Worldwide | 3.5 |
| Sealy Mattress Company | 2.8 |
| Global Brands Group | 2.4 |
| VF Jeanswear Limited | 2.2 |
| Icon | 1.9 |
| Michelin | 1.4 |
| Kimberly Clark | 1.3 |
| Henkel | 1.2 |
| Serta Simmons | 1.2 |
| Combine International | 1.2 |
| Top 20 Post-petition Vendors | $147.0 |
| (+) Other | 89.3 |
| **Total Post-petition Merchandise Disbursements** | $236.3 |

- The Company made ~$236mm in payments for post-petition merchandise during budget weeks 11-14
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $123mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | | Other SG&A Disbursements Detail | | | | |
|---|---|---|---|---|---|---|
| | Week 11 | Week 12 | Week 13 | Week 14 | Total | Notes |
| BofA Checks | $ (4.9) | $ (6.9) | $ (7.1) | $ (3.6) | $ (22.5) | Issued checks, primarily tax payments |
| Internal / Other Margin | (3.5) | (3.2) | (2.7) | (6.6) | (16.0) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (3.9) | (3.6) | (6.1) | (4.5) | (18.1) | |
| Outside/Associate/Consulting | (4.4) | (2.0) | (6.7) | (3.9) | (17.0) | Temporary labor |
| Advertising Expense | (1.7) | (3.1) | (2.5) | (2.1) | (9.3) | |
| Non-Merch COGS | (2.0) | (2.2) | (2.1) | (1.9) | (8.1) | Licensed businesses including Sears Optical |
| Equipment Expenses | (3.1) | (3.2) | (4.2) | (4.7) | (15.2) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (2.3) | (1.9) | (2.8) | (2.1) | (9.1) | Franchise and builder distributor appliance network funding |
| Logistics | (3.6) | (3.9) | (2.0) | (2.7) | (12.2) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (4.7) | (1.5) | (2.6) | (2.5) | (11.2) | |
| SHP Checks | (2.4) | (1.2) | (1.9) | (1.6) | (7.1) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.9) | (1.1) | (0.9) | (1.3) | (4.1) | Building maintenance expense |
| CheckFreePay | (0.6) | (0.9) | (1.4) | (0.8) | (3.7) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.0) | (1.1) | (1.1) | (1.3) | (4.4) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | - | - | (0.5) | (0.7) | (1.2) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.3) | (0.4) | (0.4) | (1.5) | Shipping expenses |
| Insurance Exp | (0.1) | (0.1) | (0.3) | - | (0.4) | |
| BS Adjustment - AP | (0.3) | 1.1 | 0.1 | - | 0.4 | Cash received or paid for reconciliation of vendor inventory receipts |
| Display Expense | (0.0) | (0.1) | - | - | (0.1) | |
| CARPACH | (5.0) | (4.2) | (4.7) | (4.7) | (18.6) | Payments to intermodal logistics vendors |
| P-Card | - | - | (3.9) | - | (3.9) | Employee procurement credit card payments |
| India/Israel/GS | - | - | - | (0.6) | (0.6) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (44.8)** | **$ (38.5)** | **$ (53.7)** | **$ (46.5)** | **$ (183.5)** | |

# Exhibit P

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 15)

January 30, 2019



sears    kmart    SHOP YOUR WAY®

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 15 – Actuals For Rolling 4 Weeks

| Cash Variance to Budget | Week 48 - Budget Week 12 Budget: 11/21 DIP Budget 12/30/18 - 1/5/19 | | | Week 49 - Budget Week 13 Budget: 1/11 DIP Budget 1/6/19 - 1/12/19 | | | Week 50 - Budget Week 14 Budget: 1/11 DIP Budget 1/13/19 - 1/19/19 | | | Week 51 - Budget Week 15 Budget: 1/11 DIP Budget 1/20/19 - 1/26/19 | | | Weeks 48 - 51 12/30/18 - 1/26/19 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| **Total Operating Receipts** | $259 | $186 | ($73) | $153 | $175 | $22 | $141 | 143 | $3 | $124 | 116 | ($8) | $677 | $621 | ($56) |
| Merch Vendors | (53) | (58) | (5) | (67) | (64) | 3 | (62) | (60) | 3 | (60) | (61) | (1) | (243) | (243) | (1) |
| Rent/Occupancy | (1) | 0 | 1 | (30) | (34) | (4) | (1) | (17) | (15) | (1) | 0 | 1 | (34) | (51) | (17) |
| Payroll/Bens/Taxes | (31) | (59) | (28) | (48) | (49) | (1) | (34) | (34) | 0 | (33) | (32) | 1 | (146) | (174) | (28) |
| Other SG&A Disbursements | (72) | (38) | 34 | (44) | (54) | (9) | (45) | (47) | (1) | (57) | (57) | (0) | (219) | (196) | 23 |
| **Total Operating Disbursements** | **(157)** | **(156)** | **1** | **(190)** | **(202)** | **(11)** | **(143)** | **(156)** | **(14)** | **(151)** | **(150)** | **0** | **(641)** | **(664)** | **(23)** |
| CapEx | (1) | (1) | 0 | (1) | (0) | 1 | (1) | (0) | 1 | (1) | (1) | 1 | (4) | (2) | 2 |
| **Total Operating Cash Flow** | **$101** | **$30** | **($71)** | **($38)** | **($27)** | **$12** | **($3)** | **(13)** | **($11)** | **($28)** | **(35)** | **($7)** | **$32** | **($45)** | **($77)** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 | $0 | $0 | $0 |
| Day 1 Critical Vendor Motion | (3) | (3) | 0 | (10) | 0 | 10 | (10) | 0 | 10 | (10) | 0 | 10 | (33) | (3) | 30 |
| Insurance | 0 | 0 | 0 | (4) | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | (1) | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1) | | 1 |
| KEIP / KERP | 0 | 0 | 0 | 0 | 0 | 0 | (6) | 0 | 6 | 0 | 0 | 0 | (6) | 0 | 6 |
| Credit Card Holdbacks | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PTO | (1) | 0 | 1 | (5) | 0 | 5 | (1) | 0 | 1 | (0) | 0 | 0 | (7) | 0 | 7 |
| IP Royalty Payments | 0 | | 0 | 0 | 0 | 0 | (16) | | 16 | 0 | 0 | 0 | (16) | | 16 |
| **Bankruptcy Related Disbursements** | **($5)** | **($3)** | **$2** | **($19)** | **$0** | **$19** | **($33)** | **0** | **$33** | **($10)** | **0** | **$10** | **($67)** | **($3)** | **$65** |
| Cash Interest | ($5) | ($3) | $1 | ($3) | ($13) | ($10) | ($3) | (2) | $1 | ($3) | (2) | $1 | ($14) | ($20) | ($6) |
| Financing Fees | 0 | (3) | (3) | (0) | (2) | (2) | (0) | 0 | 0 | 0 | 0 | 0 | (0) | (5) | (5) |
| Professional Fees | (14) | (10) | 3 | 0 | 0 | 0 | 0 | (4) | (4) | (18) | (1) | 17 | (32) | (16) | 16 |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Non-Operating Disbursements** | **($18)** | **($17)** | **$2** | **($3)** | **($15)** | **($12)** | **($3)** | **(6)** | **($3)** | **($22)** | **(3)** | **$18** | **($46)** | **($41)** | **$5** |
| **Net Cash Flows before Financing** | **$78** | **$10** | **($67)** | **($61)** | **($41)** | **$19** | **($39)** | **(20)** | **$19** | **($60)** | **(38)** | **$22** | **($82)** | **($89)** | **($7)** |
| Financing | ($78) | ($49) | $29 | $61 | $60 | ($1) | $39 | 199 | $160 | $60 | (137) | ($197) | 82 | 72 | ($10) |
| **Net Cash Flow** | **$0** | **($38)** | **($38)** | **$0** | **$18** | **$18** | **$0** | **179** | **$179** | **$0** | **(175)** | **($175)** | **$0** | **($16)** | **($16)** |
| **Beginning Cash** | $0 | $35 | $35 | $0 | $0 | $0 | $0 | $7 | $7 | $0 | $182 | $182 | $0 | $35 | $34 |
| Cash Flow Before Financing | 78 | 10 | (67) | (61) | ($41) | 19 | (39) | (20) | 19 | (60) | (38) | 22 | (82) | (89) | (7) |
| Financing | (78) | (49) | 29 | 61 | $60 | (1) | 39 | 199 | 160 | 60 | (137) | (197) | 82 | 72 | (10) |
| Change in Carveout Account | 0 | 4 | 4 | 0 | (12) | (12) | 0 | (4) | (4) | 0 | (7) | (7) | 0 | (19) | (19) |
| **Ending Available Cash Balance** | **$0** | **$0** | **$0** | **$0** | **$7** | **$7** | **$0** | **$182** | **$182** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 15 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13, 14, and 15 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

**Receipts**

- Week 15 same store sales (go-forward stores) were negative (9.4%) for FLS and (16.8%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (12.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $61mm on post-petition merchandise disbursements in week 15 which is higher than the forecast disbursements by ~$1mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $57mm is aligned with the weekly budgeted amount of $57mm

  - The $57mm of the Other SG&A Disbursements includes $2.7mm of payments for Home Services and builder distributors customer orders, $6.9mm in transportation and logistics vendor payments, $2.1mm in advertising payments, and $1.6mm to fund Sears Home Improvement

- The Company paid $2mm of interest and $1mm of professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 12-15 of the proceeding equaled ($89mm), which is below the budgeted ($82mm) from the composite of the 11/21/18 DIP budget and 1/11/19 DIP budget for the 4 week period

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 14 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 and 14 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

## Receipts

- Week 14 same store sales (go-forward stores) were negative (18.9%) for FLS and (11.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (15.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

## Disbursements

- The Company spent $60mm on post-petition merchandise disbursements in week 14 which is below the forecast disbursements by ~$2mm

- The Company made no critical vendor payments this week

- $15mm payments for accrued post-petition Sparrow rent through January were made during the week

- Other SG&A Disbursements of $47mm was above the weekly budgeted amount of $45mm

    - The $47mm of the Other SG&A Disbursements includes $2.1mm of payments for Home Services and builder distributors customer orders, $7.4mm in transportation and logistics vendor payments, $2.1mm in advertising payments, and $1.6mm to fund Sears Home Improvement

- The Company paid $2mm of interest and $4mm of professional fees during the week

## Financing

- The Company drew $175mm on the Jr. DIP to fund operations and pay down portions of the outstanding Sr. DIP ABL Revolver

- The DIP Term Loan was paid down $10mm with a Sr. DIP ABL Revolver draw in accordance with the rebalancing provision of the Sr. DIP credit agreement

## Net Cash Flow

- Net cash flow before financing for the rolling four week period of weeks 11-14 of the proceeding equaled $25mm, which is above the budgeted ($10mm) from the composite of the 11/21/18 DIP budget and 1/11/19 DIP budget for the 4 week period

- The Company ended the week with a $182mm ending cash balance because proceeds from the Jr. DIP draw and Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 13 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

## Receipts

- Week 13 same store sales (go-forward stores) were negative (16.6%) for FLS and (12.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (14.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

## Disbursements

- The Company spent $64mm on post-petition merchandise disbursements in week 13 which is below the forecast disbursements by ~$3mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $54mm was above the weekly budgeted amount of $44mm

  - The $54mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $6.7mm in transportation and logistics vendor payments, $2.5mm in advertising payments, and $1.9mm to fund Sears Home Improvement

- The Company paid $13mm of interest during the week and $2mm of financing fees

- The Company paid no professional fees during the week

## Financing

- The Company drew $100mm on the Jr. DIP to fund operations and pay down $40mm of the outstanding Sr. DIP ABL Revolver

## Net Cash Flow

- Net cash flow before financing for the rolling four week period of weeks 10-13 of the proceeding equaled $123mm, which is well above the budgeted $3mm

- The Company ended the week with a $7mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 12 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

**Receipts**

- Week 12 same store sales (go-forward stores) were negative (15.8%) for FLS and (10.5%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (13.6%)

- Receipts had a large negative variance because the budget attributed Holiday related inflows to the week which actualized in the previous week

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $58mm on post-petition merchandise disbursements in week 12 which is above the forecast disbursements by ~$5mm

- The Company made $3mm in critical vendor payments during the week

- Other SG&A Disbursements of $38mm was below the weekly budgeted amount of $72mm

    - The $38mm of the Other SG&A Disbursements includes $1.9mm of payments for Home Services and builder distributors customer orders, $8.1mm in transportation and logistics vendor payments, $3.1mm in advertising payments, and $1.2mm to fund Sears Home Improvement

- The Company paid $3mm of interest during the week and $3mm of financing fees

- The Company paid 14 professional firms an aggregate of $10mm during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 9-12 of the proceeding equaled $176mm, which is well above the budgeted ($14mm)

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

*($ in million)*

| Post-petition Merchandise Disbursements Weeks 12-15 | |
|---|---|
| **Vendor** | **Disbursements** |
| Home Services | $28.2 |
| LG HA | 24.7 |
| Whirlpool | 21.1 |
| EMA | 19.4 |
| Cardinal Health | 11.8 |
| Winiadaewoo Electronics | 5.7 |
| Samsung | 5.1 |
| MTD | 4.8 |
| Waterloo Industries | 3.9 |
| Cardinal Industries | 3.6 |
| P&G | 3.1 |
| Wolverine Worldwide | 3.0 |
| Global Brands Group | 2.5 |
| Levi | 2.1 |
| Michelin | 1.8 |
| Kimberly Clark | 1.8 |
| Sealy Mattress Company | 1.6 |
| Combine International | 1.2 |
| Children's Apparel Network | 1.1 |
| Serta Simmons | 1.0 |
| Top 20 Post-petition Vendors | $147.6 |
| (+) Other | 95.7 |
| **Total Post-petition Merchandise Disbursements** | $243.3 |

- The Company made ~$243mm in payments for post-petition merchandise during budget weeks 12-15
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $83mm at the end of the week

SEARS HOLDINGS        sears    kmart    SHOP YOUR WAY®

7

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | Week 12 | Week 13 | Week 14 | Week 15 | Total | Notes |
|---|---|---|---|---|---|---|
| | | | Other SG&A Disbursements Detail | | | |
| BofA Checks | $ (6.9) | $ (7.1) | $ (3.6) | $ (7.3) | $ (24.9) | Issued checks, primarily tax payments |
| Internal / Other Margin | (3.2) | (2.7) | (6.6) | (3.2) | (15.6) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (3.6) | (6.1) | (4.5) | (4.4) | (18.6) | |
| Outside/Associate/Consulting | (2.0) | (6.7) | (3.9) | (4.4) | (16.9) | Temporary labor |
| Advertising Expense | (3.1) | (2.5) | (2.1) | (2.1) | (9.7) | |
| Non-Merch COGS | (2.2) | (2.1) | (1.9) | (1.6) | (7.7) | Licensed businesses including Sears Optical |
| Equipment Expenses | (3.2) | (4.2) | (4.7) | (3.4) | (15.5) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (1.9) | (2.8) | (2.1) | (2.7) | (9.5) | Franchise and builder distributor appliance network funding |
| Logistics | (3.9) | (2.0) | (2.7) | (3.2) | (11.7) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (1.5) | (2.6) | (2.5) | (5.6) | (12.1) | |
| SHP Checks | (1.2) | (1.9) | (1.6) | (1.6) | (6.3) | Funding for Sear Home Improvement |
| Occupancy Repairs | (1.1) | (0.9) | (1.3) | (1.0) | (4.2) | Building maintenance expense |
| CheckFreePay | (0.9) | (1.4) | (0.8) | (0.6) | (3.6) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.1) | (1.1) | (1.3) | (1.3) | (4.7) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | - | (0.5) | (0.7) | (4.9) | (6.1) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.3) | (0.4) | (0.4) | (0.2) | (1.4) | Shipping expenses |
| Insurance Exp | (0.1) | (0.3) | - | (0.2) | (0.6) | |
| BS Adjustment - AP | 1.1 | 0.1 | (0.5) | (0.8) | (0.1) | Cash received or paid for reconciliation of vendor inventory receipts |
| Display Expense | (0.1) | - | - | - | (0.1) | |
| CARPACH | (4.2) | (4.7) | (4.7) | (3.7) | (17.3) | Payments to intermodal logistics vendors |
| P-Card | - | (3.9) | - | (5.0) | (8.9) | Employee procurement credit card payments |
| India/Israel/GS | - | - | (0.6) | - | (0.6) | Funding for foreign offices |
| **Other SG&A Disbursements** | **$ (38.5)** | **$ (53.7)** | **$ (46.5)** | **$ (56.9)** | **$ (195.6)** | |

# Exhibit Q

SEARS HOLDINGS

DRAFT – FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL- SUBJECT TO FRE 408

# Project Blue
# Weekly Flash Report
# (DIP Budget Week 16)

## February 6, 2019



PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 16 – Actuals For Rolling 4 Weeks

| | Week 49 - Budget Week 13 Budget: 1/11 DIP Budget 1/6/19 - 1/12/19 | | | Week 50 - Budget Week 14 Budget: 1/11 DIP Budget 1/13/19 - 1/19/19 | | | Week 51 - Budget Week 15 Budget: 1/11 DIP Budget 1/20/19 - 1/26/19 | | | Week 52 - Budget Week 16 Budget: 1/11 DIP Budget 1/27/19 - 2/2/19 | | | Weeks 49 - 52 1/6/19 - 2/2/19 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance | Budget | Actual | Variance |
| Total Operating Receipts | $153 | $175 | $22 | $141 | 143 | $3 | $124 | 116 | ($8) | $130 | 133 | $3 | $547 | $567 | $20 |
| Merch Vendors | (67) | (64) | 3 | (62) | (60) | 3 | (60) | (61) | (1) | (61) | (54) | 7 | (251) | (239) | 12 |
| Rent/Occupancy | (30) | (34) | (4) | (1) | (17) | (15) | (1) | 0 | 1 | (1) | 0 | 1 | (34) | (51) | (17) |
| Payroll/Bens/Taxes | (48) | (49) | (1) | (34) | (34) | 0 | (33) | (32) | 1 | (50) | (49) | 1 | (165) | (164) | 1 |
| Other SG&A Disbursements | (44) | (54) | (9) | (45) | (47) | (1) | (57) | (57) | (0) | (43) | (57) | (14) | (189) | (214) | (26) |
| Total Operating Disbursements | (190) | (202) | (11) | (143) | (156) | (14) | (151) | (150) | 0 | (155) | (160) | (6) | (638) | (669) | (30) |
| CapEx | (1) | (0) | 1 | (1) | (0) | 1 | (1) | (1) | 1 | (1) | (0) | 1 | (4) | (2) | 2 |
| Total Operating Cash Flow | ($38) | ($27) | $12 | ($3) | (13) | ($11) | ($28) | (35) | ($7) | ($26) | (28) | ($2) | ($95) | ($103) | ($8) |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | |
| Day 1 Utility Motion | $0 | $0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 | $0 | 0 | $0 | $0 | $0 | $0 |
| Day 1 Critical Vendor Motion | (10) | 0 | 10 | (10) | 0 | 10 | (10) | 0 | 10 | (10) | 0 | 10 | (40) | 0 | 40 |
| Insurance | (4) | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (4) | 0 | 4 |
| Gift Card Redemptions | 0 | | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | (1) | | 1 |
| KEIP / KERP | 0 | 0 | 0 | (6) | 0 | 6 | 0 | 0 | 0 | 0 | (3) | (3) | (6) | (3) | 3 |
| Credit Card Holdbacks | 0 | | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 |
| PTO | (5) | 0 | 5 | (1) | 0 | 1 | 0 | | 0 | (2) | 0 | 2 | (8) | 0 | 8 |
| IP Royalty Payments | 0 | | 0 | (16) | | 16 | 0 | | 0 | 0 | | 0 | (16) | | 16 |
| Bankruptcy Related Disbursements | ($19) | $0 | $19 | ($33) | 0 | $33 | ($10) | 0 | $10 | ($12) | (3) | $9 | ($75) | ($3) | $72 |
| Cash Interest | ($3) | ($13) | ($10) | ($3) | (2) | $1 | ($3) | (2) | $1 | ($3) | (4) | ($1) | ($13) | ($21) | ($8) |
| Financing Fees | (0) | (2) | (2) | (0) | 0 | 0 | (0) | 0 | 0 | (0) | 0 | 0 | (0) | (2) | (2) |
| Professional Fees | 0 | 0 | 0 | 0 | (4) | (4) | (18) | (1) | 17 | 0 | (6) | (6) | (18) | (11) | 7 |
| Intercompany Inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Non-Operating Disbursements | ($3) | ($15) | ($12) | ($3) | (6) | ($3) | ($22) | (3) | $18 | ($3) | (10) | ($6) | ($31) | ($34) | ($3) |
| Net Cash Flows before Financing | ($61) | ($41) | $19 | ($39) | (20) | $19 | ($60) | (38) | $22 | ($41) | (41) | $0 | ($201) | ($140) | $61 |
| Financing | $61 | $60 | ($1) | $39 | 199 | $160 | $60 | (137) | ($197) | $41 | 51 | $10 | 201 | 172 | ($29) |
| **Net Cash Flow** | $0 | $18 | $18 | $0 | 179 | $179 | $0 | (175) | ($175) | $0 | 10 | $10 | $0 | $32 | $32 |
| Beginning Cash | $0 | $0 | $0 | $0 | $7 | $7 | $0 | $182 | $182 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Flow Before Financing | (61) | ($41) | 19 | (39) | (20) | 19 | (60) | (38) | 22 | (41) | (41) | 0 | (201) | (140) | 61 |
| Financing | 61 | $60 | (1) | 39 | 199 | 160 | 60 | (137) | (197) | 41 | 51 | 10 | 201 | 172 | (29) |
| Change in Carveout Account | 0 | (12) | (12) | 0 | (4) | (4) | 0 | (7) | (7) | 0 | (2) | (2) | 0 | (25) | (25) |
| Ending Available Cash Balance | $0 | $7 | $7 | $0 | $182 | $182 | $0 | $0 | $0 | $0 | $8 | $8 | $0 | $8 | $8 |

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 16 Budget Variance Report - Commentary

- Actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

**Receipts**

- Week 16 same store sales (go-forward stores) were negative (12.7%) for FLS and (12.2%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (12.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $54mm on post-petition merchandise disbursements in week 16 which is lower than the forecast disbursements by ~$7mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $57mm is higher than the weekly budgeted amount of $43mm

    - The $57mm of the Other SG&A Disbursements includes $3.4mm of payments for Home Services and builder distributors customer orders, $6.1mm in transportation and logistics vendor payments, $4.8mm in advertising payments, and $2.5mm to fund Sears Home Improvement

- The Company paid $4mm of interest and $6mm of professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 13-16 of the proceeding equaled ($140mm), which is above the budgeted ($201mm) for the 4 week period in the 1/11/19 DIP budget

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 15 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13, 14, and 15 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

**Receipts**

- Week 15 same store sales (go-forward stores) were negative (9.4%) for FLS and (16.8%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (12.5%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

**Disbursements**

- The Company spent $61mm on post-petition merchandise disbursements in week 15 which is higher than the forecast disbursements by ~$1mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $57mm is aligned with the weekly budgeted amount of $57mm

  - The $57mm of the Other SG&A Disbursements includes $2.7mm of payments for Home Services and builder distributors customer orders, $6.9mm in transportation and logistics vendor payments, $2.1mm in advertising payments, and $1.6mm to fund Sears Home Improvement

- The Company paid $2mm of interest and $1mm of professional fees during the week

**Net Cash Flow**

- Net cash flow before financing for the rolling four week period of weeks 12-15 of the proceeding equaled ($89mm), which is below the budgeted ($82mm) from the composite of the 11/21/18 DIP budget and 1/11/19 DIP budget for the 4 week period

SEARS HOLDINGS          sears   kmart   SHOP YOUR WAY                    4

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 14 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 and 14 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

### Receipts

- Week 14 same store sales (go-forward stores) were negative (18.9%) for FLS and (11.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (15.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

### Disbursements

- The Company spent $60mm on post-petition merchandise disbursements in week 14 which is below the forecast disbursements by ~$2mm

- The Company made no critical vendor payments this week

- $15mm payments for accrued post-petition Sparrow rent through January were made during the week

- Other SG&A Disbursements of $47mm was above the weekly budgeted amount of $45mm

    - The $47mm of the Other SG&A Disbursements includes $2.1mm of payments for Home Services and builder distributors customer orders, $7.4mm in transportation and logistics vendor payments, $2.1mm in advertising payments, and $1.6mm to fund Sears Home Improvement

- The Company paid $2mm of interest and $4mm of professional fees during the week

### Financing

- The Company drew $175mm on the Jr. DIP to fund operations and pay down portions of the outstanding Sr. DIP ABL Revolver

- The DIP Term Loan was paid down $10mm with a Sr. DIP ABL Revolver draw in accordance with the rebalancing provision of the Sr. DIP credit agreement

### Net Cash Flow

- Net cash flow before financing for the rolling four week period of weeks 11-14 of the proceeding equaled $25mm, which is above the budgeted ($10mm) from the composite of the 11/21/18 DIP budget and 1/11/19 DIP budget for the 4 week period

- The Company ended the week with a $182mm ending cash balance because proceeds from the Jr. DIP draw and Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Week 13 Budget Variance Report - Commentary

- The weekly budgeted amounts in the rolling budget variance report through Week 12 are measured against the revised budget submitted to the DIP lenders' financial advisors on 11/21/18

- Week 13 actuals are compared to the DIP budget submitted to the Sr. DIP lenders' financial advisors on 1/11/19

### Receipts

- Week 13 same store sales (go-forward stores) were negative (16.6%) for FLS and (12.1%) for Kmart versus adjusted prior year sales for a total combined adjusted same store sales comp of negative (14.9%)

- Additionally, total receipts exclude pass-through items such as: Western Union, Sales Tax, and Royalties

### Disbursements

- The Company spent $64mm on post-petition merchandise disbursements in week 13 which is below the forecast disbursements by ~$3mm

- The Company made no critical vendor payments this week

- Other SG&A Disbursements of $54mm was above the weekly budgeted amount of $44mm

  - The $54mm of the Other SG&A Disbursements includes $2.8mm of payments for Home Services and builder distributors customer orders, $6.7mm in transportation and logistics vendor payments, $2.5mm in advertising payments, and $1.9mm to fund Sears Home Improvement

- The Company paid $13mm of interest during the week and $2mm of financing fees

- The Company paid no professional fees during the week

### Financing

- The Company drew $100mm on the Jr. DIP to fund operations and pay down $40mm of the outstanding Sr. DIP ABL Revolver

### Net Cash Flow

- Net cash flow before financing for the rolling four week period of weeks 10-13 of the proceeding equaled $123mm, which is well above the budgeted $3mm

- The Company ended the week with a $7mm ending cash balance because proceeds from Sears Hometown & Outlets were received after the daily cash sweep on Friday. The remaining cash was swept to Bank of America the next business day

SEARS HOLDINGS    sears    kmart    SHOP YOUR WAY

6

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Merchandise Vendor Schedule

($ in million)

| Post-petition Merchandise Disbursements Weeks 13-16 | |
|---|---|
| **Vendor** | **Disbursements** |
| Home Services | $25.2 |
| Whirlpool | 22.7 |
| LG HA | 22.4 |
| EMA | 21.0 |
| Cardinal Health | 11.9 |
| Samsung | 5.1 |
| Winiadaewoo Electronics | 3.8 |
| Waterloo Industries | 3.8 |
| Cardinal Industries | 3.6 |
| MTD | 2.9 |
| MKK Enterprises | 2.4 |
| Wolverine Worldwide | 2.3 |
| Levi | 2.1 |
| P&G | 2.0 |
| Michelin | 1.9 |
| Global Brands Group | 1.6 |
| Children's Apparel Network | 1.5 |
| Lavish | 1.2 |
| Kimberly Clark | 1.1 |
| Nestle Purina | 1.1 |
| Top 20 Post-petition Vendors | $139.8 |
| (+) Other | 99.3 |
| **Total Post-petition Merchandise Disbursements** | $239.1 |

- The Company made ~$239mm in payments for post-petition merchandise during budget weeks 13-16
  - Home appliance vendors continue to receive a significant portion of disbursements
  - Post-petition merchandise payables equaled $76mm at the end of the week

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR DISCUSSION PURPOSES ONLY AND SUBJECT TO CHANGE

# Non-Merchandise Category Schedule

($ in millions)

| | Week 13 | Week 14 | Week 15 | Week 16 | Total | Notes |
|---|---|---|---|---|---|---|
| | | | | | **Other SG&A Disbursements Detail** | |
| BofA Checks | $ (7.1) | $ (3.6) | $ (7.3) | $ (17.7) | $ (35.7) | Issued checks, primarily tax payments |
| Internal / Other Margin | (2.7) | (6.6) | (3.2) | (3.0) | (15.5) | Home Services logistics and certain contractor payments |
| Utilities & Telephone | (6.1) | (4.5) | (4.4) | (3.4) | (18.5) | |
| Outside/Associate/Consulting | (6.7) | (3.9) | (4.4) | (1.5) | (16.5) | Temporary labor |
| Advertising Expense | (2.5) | (2.1) | (2.1) | (4.8) | (11.4) | |
| Non-Merch COGS | (2.1) | (1.9) | (1.6) | (1.9) | (7.5) | Licensed businesses including Sears Optical |
| Equipment Expenses | (4.2) | (4.7) | (3.4) | (2.1) | (14.4) | Payments primarily for truck fuel and truck maintenance |
| ABD Payments | (2.8) | (2.1) | (2.7) | (3.4) | (11.0) | Franchise and builder distributor appliance network funding |
| Logistics | (2.0) | (2.7) | (3.2) | (2.4) | (10.3) | Last mile transportation and certain international shipping vendors for delivery of goods |
| Miscellaneous Exp / (Inc) | (2.6) | (2.5) | (5.6) | (1.3) | (12.0) | |
| SHP Checks | (1.9) | (1.6) | (1.6) | (2.5) | (7.7) | Funding for Sear Home Improvement |
| Occupancy Repairs | (0.9) | (1.3) | (1.0) | (1.5) | (4.7) | Building maintenance expense |
| CheckFreePay | (1.4) | (0.8) | (0.6) | (0.6) | (3.4) | Payments for hunting/fishing licenses, beer & liquor, and lottery |
| Service Live | (1.1) | (1.3) | (1.3) | (1.1) | (4.8) | Funding for third party Home Services contractors booked through Service Live online platform |
| Other Disbursements | (0.5) | (0.7) | (4.9) | (3.8) | (9.9) | Miscellaneous expenses such as security services, fire protection maintenance, waste services |
| Supplies & Postage | (0.4) | (0.4) | (0.2) | (0.3) | (1.3) | Shipping expenses |
| Insurance Exp | (0.3) | - | (0.2) | (0.3) | (0.8) | |
| BS Adjustment - AP | 0.1 | (0.5) | (0.8) | (1.8) | (3.0) | Cash received or paid for reconciliation of vendor inventory receipts |
| Display Expense | - | - | - | - | - | |
| CARPACH | (4.7) | (4.7) | (3.7) | (3.7) | (16.8) | Payments to intermodal logistics vendors |
| P-Card | (3.9) | - | (5.0) | | (8.9) | Employee procurement credit card payments |
| India/Israel/GS | - | (0.6) | - | - | (0.6) | Funding for foreign offices |
| **Other SG&A Disbursements** | $ (53.7) | $ (46.5) | $ (56.9) | $ (57.0) | $ (214.2) | |

# Exhibit R

| | |
|---|---|
| **From:** | bgriffith@miiipartners.com |
| **To:** | Prakash, Rajat; Riecker, Rob; Joye, Jennifer; Phelan, Robert; mmeghji@miiipartners.com; Trenton Bonnell; cgood@miiipartners.com; eacevedo@miiipartners.com; nweber@miiipartners.com; Avitia-Guzman, Jaqueline; Valentino, Luke |
| **Subject:** | RE: Cash Receipts Tomorrow |
| **Date:** | Thursday, February 7, 2019 5:18:50 PM |

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

Trent – can you confirm that the cash in the accounts tomorrow will be transferred to the estate accounts based on the cash management protocol that has been developed with EY?

Jenny / Jackie – can you provide the bank account information we will need to start moving money to estate accounts tomorrow?

Thanks

Brian J. Griffith
M-III Partners, LP
212-716-1494

---

**From:** Prakash, Rajat <Rajat.Prakash@searshc.com>
**Sent:** Thursday, February 7, 2019 5:16 PM
**To:** Brian Griffith <bgriffith@miiipartners.com>; rob.riecker <rob.riecker@searshc.com>; Joye, Jennifer <Jenny.Joye@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; Mohsin Meghji <mmeghji@miiipartners.com>; Trenton Bonnell <tbonnell@miiipartners.com>; Chris Good <cgood@miiipartners.com>; Enrique Acevedo <eacevedo@miiipartners.com>; Nicholas Weber <nweber@miiipartners.com>; Avitia-Guzman, Jaqueline <Jaqueline.Avitia-Guzman@searshc.com>; Valentino, Luke <Luke.Valentino@searshc.com>
**Subject:** RE: Cash Receipts Tomorrow

Talked to BAML.

They were planning on paying down OldCo DIP $849.36 M with tomorrow morning's manual sweep. Sine it is a manual sweep, asked them to not sweep.

Ideally that cash could be moved to OldCo bank accounts.

Otherwise, if that cash has to go to NewCo (for reasons unknown to me), NewCo will have to reimburse OldCo.

Thanks,

Rajat Prakash
Sears Holdings Corporation

Treasury
847.286.2288

---

**From:** Brian Griffith [mailto:bgriffith@miiipartners.com]
**Sent:** Thursday, February 07, 2019 4:09 PM
**To:** Prakash, Rajat <Rajat.Prakash@searshc.com>; Riecker, Rob <Rob.Riecker@searshc.com>; Joye, Jennifer <Jenny.Joye@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; mmeghji@miiipartners.com; Trenton Bonnell <tbonnell@miiipartners.com>; cgood@miiipartners.com; eacevedo@miiipartners.com; nweber@miiipartners.com; Avitia-Guzman, Jaqueline <Jaqueline.Avitia-Guzman@searshc.com>; Valentino, Luke <Luke.Valentino@searshc.com>
**Subject:** RE: Cash Receipts Tomorrow


**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

---

Thanks Rajat

Brian J. Griffith
M-III Partners, LP
212-716-1494

---

**From:** Prakash, Rajat <Rajat.Prakash@searshc.com>
**Sent:** Thursday, February 7, 2019 5:07 PM
**To:** Brian Griffith <bgriffith@miiipartners.com>; rob.riecker <rob.riecker@searshc.com>; Joye, Jennifer <Jenny.Joye@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; Mohsin Meghji <mmeghji@miiipartners.com>; Trenton Bonnell <tbonnell@miiipartners.com>; Chris Good <cgood@miiipartners.com>; Enrique Acevedo <eacevedo@miiipartners.com>; Nicholas Weber <nweber@miiipartners.com>; Avitia-Guzman, Jaqueline <Jaqueline.Avitia-Guzman@searshc.com>; Valentino, Luke <Luke.Valentino@searshc.com>
**Subject:** RE: Cash Receipts Tomorrow

Let me check with BAML. Will get back

Rajat Prakash
Sears Holdings Corporation
Treasury
847.286.2288

---

**From:** Brian Griffith [mailto:bgriffith@miiipartners.com]
**Sent:** Thursday, February 07, 2019 4:06 PM
**To:** Prakash, Rajat <Rajat.Prakash@searshc.com>; Riecker, Rob <Rob.Riecker@searshc.com>; Joye, Jennifer <Jenny.Joye@searshc.com>; mmeghji@miiipartners.com; Trenton Bonnell <tbonnell@miiipartners.com>;

cgood@miiipartners.com; eacevedo@miiipartners.com; nweber@miiipartners.com; Avitia-Guzman, Jaqueline <Jaqueline.Avitia-Guzman@searshc.com>; Valentino, Luke <Luke.Valentino@searshc.com>
**Subject:** RE: Cash Receipts Tomorrow

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

---

We have delivered the >$850M on the DIP.  We should not have anymore payments made.  I thought the manual sweeps were referring to manual sweeps of the regional accounts to get them into a concentration account.  From there, we would move them into one of the new operating accounts for the estate.

Please let me know if I am missing something, but it will be post-closing (midnight tonight) and the cash coming in should be to the estate.  Let's make sure we have turned off any possible sweeps to the DIP.  That would be a major problem.

Should we hop on a call?

Brian J. Griffith
M-III Partners, LP
212-716-1494

---

**From:** Prakash, Rajat <Rajat.Prakash@searshc.com>
**Sent:** Thursday, February 7, 2019 5:03 PM
**To:** Brian Griffith <bgriffith@miiipartners.com>; rob.riecker <rob.riecker@searshc.com>; Joye, Jennifer <Jenny.Joye@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; Mohsin Meghji <mmeghji@miiipartners.com>; Trenton Bonnell <tbonnell@miiipartners.com>; Chris Good <cgood@miiipartners.com>; Enrique Acevedo <eacevedo@miiipartners.com>; Nicholas Weber <nweber@miiipartners.com>; Avitia-Guzman, Jaqueline <Jaqueline.Avitia-Guzman@searshc.com>; Valentino, Luke <Luke.Valentino@searshc.com>
**Subject:** RE: Cash Receipts Tomorrow
**Importance:** High

With regards to the highlighted item below, I thought BAML were doing a manual sweep tomorrow morning with the cash that will show up in the concentration accounts. E&Y had set this up.

What is that paying, if not DIP?

Rajat Prakash
Sears Holdings Corporation
Treasury
847.286.2288

**From:** Brian Griffith [mailto:bgriffith@miiipartners.com]
**Sent:** Thursday, February 07, 2019 3:59 PM
**To:** Prakash, Rajat <Rajat.Prakash@searshc.com>; Riecker, Rob <Rob.Riecker@searshc.com>; Joye, Jennifer <Jenny.Joye@searshc.com>; Phelan, Robert <Robert.Phelan@searshc.com>; mmeghji@miiipartners.com; Trenton Bonnell <tbonnell@miiipartners.com>; cgood@miiipartners.com; eacevedo@miiipartners.com; nweber@miiipartners.com; Avitia-Guzman, Jaqueline <Jaqueline.Avitia-Guzman@searshc.com>; Valentino, Luke <Luke.Valentino@searshc.com>
**Subject:** Cash Receipts Tomorrow

**Enterprise Security Team Alert:** This email originated from outside of the organization. Please use caution when opening messages from external sources.

Tomorrow the estate should be expecting several large amounts of cash receipts:

1. $35mm from ESL sale
2. $[10-12mm] from credit card sales
3. $[10?mm] from the manual sweeps of the regional banks
4. $[12mm] from the payment for the cash in stores
5. Did I miss anything?

***We need to ensure none of this cash makes it way to paying down the DIP.*** All of these proceeds need to be moved into one of the new accounts that have been setup by Jackie/Luke and Treasury team.

Can we confirm we have a process to get every dollar available out of the accounts going with NewCo by maybe 2pm CT tomorrow? Who will be managing this process?

Happy to have a call this evening if necessary.

Best Regards,

**Brian J. Griffith**
M III Partners, LP
Managing Director
130 West 42nd Street, 17th Floor
New York, NY 10036
O: 212 716 1494
M: 917 887 4411
www.miiipartners.com

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

This message contains information which may be confidential and privileged. Unless you are the intended addressee (or authorized to receive for the intended addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or by calling 212-716-1491 and delete the message.

# Exhibit S

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

VICTOR I. LEWKOW
LEE C. BUCHHEIT
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
YARON Z. REICH
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY

SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE

DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
HUMAYUN KHALID
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

D: +1 212-225-2416
soneal@cgsh.com

February 11, 2019

BY E-MAIL

Ellen Odoner, Esq.
Sunny Singh, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Re:  Asset Purchase Agreement (as it may be amended, modified or
supplemented, the "APA"), dated January 17, 2019, by and among Transform
Holdco LLC,  Sears Holdings and Sellers

Dear Ellen and Sunny:

On behalf of Transform Holdco LLC ("Buyer"), I write in response to the letter signed by Mohsin Meghji, Chief Restructuring Officer of Sears Holdings, dated February 10, 2019, relating to the timing of the Closing of Buyer's acquisition of substantially all of the assets of Sears Holdings pursuant to the APA.  Capitalized terms used but not defined in this letter are used as defined in the APA.

Mr. Meghji's letter refers to various discussions among the advisors to Sears Holdings and the Buyer on Friday, February 8, 2019 concerning Sellers' desire to have closed the transaction on such date.  As you know, the APA provides that, unless otherwise agreed by the parties, the Closing shall occur on the third Business Day following satisfaction of the various conditions to Closing (other than those to be satisfied at the Closing itself) – *i.e.,* February 13, 2019.  Buyer nonetheless has worked tirelessly to close the transaction prior to the date provided in the APA and shared your disappointment that the Closing was not able to occur last Friday.  This was attributable, among other things, to the Approval Order authorizing the transaction not being entered until approximately 3:15 p.m. on Friday afternoon and the need for further discussions with Buyer's lenders.  As you know, the lenders have the right to consent to any decision by Buyer to close earlier than the date provided by the APA.

Odoner, Singh, p. 2

Buyer and its advisors worked diligently through the weekend to be in position to proceed with an early Closing and, as you know, Buyer now expects to be able to do so today.

Please be advised that Buyer, by proceeding with an early Closing, is not waiving any rights under the APA, including, without limitation, any claims for breach by Sellers of their pre-closing covenants and improperly classifying certain reserves of credit card processors as Credit Card Receivables, all of which rights are fully preserved.

Sincerely,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
Sean A. O'Neal, a partner

# Exhibit T

**In The Matter Of:**

*IN RE Sears*
*Holdings*

---

*Kunal Kamlani*
*August 15, 2019*
*HIGHLY CONFIDENTIAL*

---



*Min-U-Script® with Word Index*

**HIGHLY CONFIDENTIAL**

1

1          UNITED STATES BANKRUPTCY COURT

2          SOUTHERN DISTRICT OF NEW YORK

3          Chapter 11 - Case No. 18-23538 (RDD)

4

5

6    -----------------------------------x

7    In Re:

8    SEARS HOLDINGS CORPORATION, et al.,

9                    Debtor.

10   -----------------------------------x

11

12

13          HIGHLY CONFIDENTIAL

14          DEPOSITION OF KUNAL KAMLANI

15          NEW YORK, NEW YORK

16          THURSDAY, AUGUST 15, 2019

17

18

19

20

21

22

23   Reported by:

24   S. ARIELLE SANTOS, CCR, CLR

25   JOB NO:  2019-75105

**HIGHLY CONFIDENTIAL**

2

1

2                New York, New York

3                AUGUST 15, 2019

4                8:30 A.M.

5

6         DEPOSITION of KUNAL KAMLANI, held at the

7    offices of WEIL, GOTSHAL & MANGES LLP, 767 Fifth

8    Avenue, New York, New York, before S. ARIELLE

9    SANTOS, a Certified Court Reporter, Certified

10   Livenote Reporter and Notary Public.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLY CONFIDENTIAL**

3

1

2                    APPEARANCES:

3

4    Attorneys for Unsecured Creditors:

5           AKIN GUMP STRAUSS HAUER & FELD LLP

6           One Bryant Park

7           Bank of America Tower

8           New York, New York 10036

9           212-872-1000

10          BY - JOHN P. KANE, ESQ.

11          Jkane@akingump

12

13   Attorneys for Debtors and Debtors-in-Possession:

14   Sears Holdings Corporation, et al.

15          WEIL, GOTSHAL & MANGES LLP

16          767 Fifth Avenue

17          New York, New York 10153

18          BY - JESSIE B. MISHKIN, ESQ.

19          Jessie.mishkin@weil.com

20          BY - JARED FRIEDMAN, ESQ.

21          Jared.friedman@weil.com

22

23

24

25

4

1                    APPEARANCES (Cont.)

2

3            WEIL, GOTSHAL & MANGES LLP

4            200 Crescent Court, Suite 300

5            Dallas, Texas  75201-6950

6            BY - JAKE RUTHERFORD, ESQ.

7            Jake.rutherford@weil.com

8

9   Attorneys for ESL Investments, Inc.:

10  CLEARY GOTTLIEB STEEN & HAMILTON LLP

11            One Liberty Plaza

12            New York, New York 10006

13            212-225-2094

14            BY - LEWIS J. LIMAN, ESQ.

15            Lliman@cgsh.com

16            BY - BRIAN P. GIUNTA, ESQ.

17            Bgiunta@cgsh.com

18

19  ATTORNEYS FOR WITNESS:

20            HOLWELL SHUSTER & GOLDBERG LLP

21            425 Lexington Avenue

22            New York, New York  10017

23            BY - MATTHEW GURGEL, ESQ.

24            Mgurgel@hsgllp.com

25

5

1

2   ALSO PRESENT:

3   NICK WEBER, M-III Partners, LP

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLY CONFIDENTIAL**

6

1

2

3                    INDEX

4   KUNAL S. KAMLANI                        7

5

6        BY MS. MISHKIN                     7

7        BY MR. LIMAN                       111

8        BY MS. MISHKIN                     120

9

10

11

12    KAMLANI EXHIBITS MARKED - ATTACHED

13

14   Exhibit 1, declaration                 9

15

16   Exhibit 2, asset purchase agreement    12

17

18   Exhibit 3, e-mail, November 2, 2018    28

19

20   Exhibit 4, e-mail, January 3, 2019     83

21

22   Exhibit 5, e-mail, October 22, 2018    95

23

24

25

18-23538-shl   Doc 5084   Filed 09/06/19   Entered 09/06/19 16:09:02   Main Document
Kunal Kamlani - August 15, 2019
Pg 153 of 344
HIGHLY CONFIDENTIAL

26

1         KUNAL KAMLANI - HIGHLY CONFIDENTIAL

2              Q     So was it your

3    understanding that the phrase "to pay

4    down such amounts" referred to the DIP

5    facility amounts?

6              A     The phrase "to pay down

7    such amounts" within the context of

8    the sentence refers to any cash within

9    the estate that was not restricted --

10   said another way, legally available --

11   they could be applied to the ABL or

12   junior DIP.

13             Q    I am not trying to drive

14   you crazy, but I am going to flip back

15   and forth, so we may come back to

16   this.

17             A    Sure.

18             Q    Can we take a look back at

19   paragraph 23 of your declaration,

20   which is on page 10 of 46?

21             A    You said paragraph 23?

22             Q    Yes.

23             A    Yes.  Okay.

24                  (Reviewing.)

25             Q    And your first sentence

64

    1            KUNAL KAMLANI - HIGHLY CONFIDENTIAL

    2            Q    Is that a -- it's a Mr.

    3       Kamlani term; is that right?

    4                 MR. LIMAN:  Objection to

    5            form.

    6                 THE WITNESS:  I am sure

    7            other people have used it as

    8            well.  I am doing my best to

    9            describe what available cash

   10            meant certainly to me and in my

   11            conversations with M-III, and

   12            likely Lazard, as to what the

   13            spirit of available cash was in

   14            this context.

   15                 The spirit of what

   16            available cash meant in this

   17            context would be cash available

   18            to pay down liabilities.  If

   19            cash was available to pay down

   20            liabilities, it was available.

   21            If cash is not available to pay

   22            down liabilities, then it wasn't

   23            available to anybody, and we

   24            shouldn't be entitled to a

   25            dollar-for-dollar offset.

**Kunal Kamlani - August 15, 2019**
**HIGHLY CONFIDENTIAL**

65

1                KUNAL KAMLANI - HIGHLY CONFIDENTIAL

2                     If it is available to pay

3                down liabilities, then we should

4                be entitled to a

5                dollar-for-dollar offset.

6      BY MS. MISHKIN:

7                Q    And by "liabilities" in

8      that answer, you mean to pay down the

9      DIP facilities, right?

10               A    No.  I am referring to the

11     liabilities that the debtors asked us

12     to assume to qualify our bid,

13     specifically 503(b)(9) claims,

14     severance.  There may be one other

15     category in there that I am not

16     recollecting at the moment.

17                    But those are liabilities

18     that had we not assumed them and

19     somehow a deal had gotten done --

20     which it probably wouldn't, but in

21     this hypothetical, had we not assumed

22     them and a deal had gotten done, if

23     the estate had cash available to them

24     to pay down those liabilities, which

25     they kept because we didn't assume

18-23538-shl   Doc 5084   Filed 09/06/19   Entered 09/06/19 16:09:02   Main Document
Pg 156 of 344
Kunal Kamlani - August 15, 2019
HIGHLY CONFIDENTIAL

88

1        KUNAL KAMLANI - HIGHLY CONFIDENTIAL

2    January 3rd.  I don't have the

3    chronology of when the unavailable

4    cash was -- the attribution of that

5    unavailable cash was shared with us.

6    But I suspect it was before this

7    e-mail -- suspect it was before this

8    e-mail.

9              And that allowed us to

10   make the assumption that a hundred

11   million dollars of that 357 million

12   would become available.

13        Q    And based on -- your

14   assumption was that a hundred million

15   dollars would become available at some

16   point to pay down the DIP facility,

17   correct?

18        A    Yeah.  I believe at this

19   time, to put this e-mail in context,

20   there was a discussion between myself

21   and M-III where they maintained that

22   they would not be able to get the DIP

23   balance below $1.3 billion.

24              As we know sitting here

25   today, we were of the view, based on

89

1        KUNAL KAMLANI - HIGHLY CONFIDENTIAL

2      information we were looking at, that

3      the DIP balance should be able to get

4      to $1.2 billion at closing.

5                There were a lot of

6      discussions around the 1.3 and the

7      1.2.  It's no coincidence that this

8      hundred million dollars is that

9      differential between the 1.3 and the

10     1.2 we were discussing.

11               The additional part of

12     that conversation was informed by

13     the -- the DIP budgets that came out

14     periodically after October 15th and

15     the variances to those DIP budgets

16     that showed that cash flow before

17     financing activities was consistently

18     ahead -- the actuals were consistently

19     ahead of the budget by tens of

20     millions of dollars, if not well in

21     excess of a hundred million dollars.

22               And so there were multiple

23     data points that we were looking at:

24     The unavailable cash bucket, the fact

25     that the DIP budget was being beaten

18-23538-shl   Doc 5084   Filed 09/06/19   Entered 09/06/19 16:09:02   Main Document
Kunal Kamlani - August 15, 2019
Pg 158 of 344
HIGHLY CONFIDENTIAL

90

1      KUNAL KAMLANI - HIGHLY CONFIDENTIAL

2      by well over a hundred million

3      dollars, and the trend lines in the

4      daily cash flow report that gave us

5      the confidence that the DIP balance,

6      aggregate DIP balance of the closing

7      was probably going to be 1.2 and not

8      1.3.

9                 Again, the end result of

10     all of that conversation was, rather

11     than continue to spar over whose

12     forecast was right, was this aggregate

13     DIP shortfall concept.

14                We now know sitting here

15     today, because the closing has

16     occurred, that the DIP balance did, in

17     fact, get down to approximately

18     1.2 billion.

19          Q    Let me ask you what would

20     have to happen for that hundred

21     million of cash in unavailable cash

22     bucket to be available to pay down the

23     DIP?

24                MR. LIMAN:  Objection to

25          form.  Foundation.

# Exhibit U

**In The Matter Of:**

*IN RE Sears*
*Holdings*

---

*Rajat Prakash*
*August 20, 2019*

---



*Min-U-Script® with Word Index*

1

1        IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2
           Chapter 11 - Case No. 18-23538 (RDD)
3

4    _____x
5    IN RE: SEARS HOLDINGS
6    CORPORATION, et al.,
7
8            Debtor.
9    _____x
10
11
12        The deposition of RAJAT PRAKASH, called by
13   the Debtors and Debtors-In-Possession for
14   examination, pursuant to the Rules of Civil
15   Procedure for the United States District Courts,
16   taken stenographically by Sandra L. Rocca, CSR, CRR,
17   at 3333 Beverly Road, Hoffman Estates, Illinois, on
18   the 20th of August, 2019, at the hour of 10:00 a.m.
19
20
21
22
23
24   Job No. 2019-75180
25   Certification No. 084-003435

2

1    APPEARANCES:

2         WEIL GOTSHAL & MANGES LLP
          By:  MR. JAKE RUTHERFORD
3         200 Crescent Court, Suite 300
          Dallas, Texas  75201
4         214.746.8119
          jake.rutherford@weil.com
5
              -and-
6
          WEIL GOTSHAL & MANGES LLP
7         By: MR. JARED R. FRIEDMANN
          767 Fifth Avenue
8         New York, New York  10153
          212.310.8000
9         jared.friedmann@weil.com

10            appeared on behalf of the
          Debtors and Debtors-in-Possession,
11        Sears Holdings Corporation;

12
          AKIN GUMP STRAUSS HAUER & FELD, LLP
13        By: MR. JOHN KANE
          One Bryant Park
14        New York, New York  10036
          212.872.1000
15        jkane@akingump.com

16            appeared via telephone on behalf of the
          Unsecured Creditors;
17

18        CLEARY GOTTLIEB STEEN & HAMILTON LLP
          By: MS. ABENA MAINOO
19            MR. BRIAN P. GIUNTA
          One Liberty Plaza
20        New York, New York  10006
          212.225.2785
21        amainoo@cgsh.com
          bgiunta@cgsh.com
22
              appeared on behalf of Transform Holdco.
23

24    Also Present:

25        Mr. Nick Webber, M-III

3

1                              **I N D E X**

2    **WITNESS**                                        **PAGE**

3    **RAJAT PRAKASH**

4    **EXAMINED BY**

5         Mr. Rutherford                              5
          Ms. Mainoo                                 48
6         Mr. Rutherford                             53

7

8                        **EXHIBITS**

9    **NUMBER**                                **MARKED FOR ID**

10   Prakash

11   **Exhibit 1**   2/8/19 email string with
                     daily cash flow                 14
12
     **Exhibit 2**   SEARS_ENFORCE0000771 to 786      22
13
     **Exhibit 3**   email string 1/15/19 from
14                   R. Prakash                       27

15   **Exhibit 4**   email string 11/2/18 from
                     M. Meghji                        29
16
     **Exhibit 5**   email string 10/19/18 from
17                   R. Prakash                       30

18   **Exhibit 6**   email string 2/11/19 from
                     R. Riecker                       38
19
     **Exhibit 7**   email string 2/12/19 from
20                   J. Joye                          42

21

22

23

24

25

**Rajat Prakash - August 20, 2019**

51

1    That's a regular process.  Is that what you meant by

2    discussion?

3        Q   Do you remember speaking with anyone about

4    the information to include in the daily cash

5    forecast between the signing of the APA and the

6    closing of the APA?

7            MR. RUTHERFORD:  Objection, form.

8        A   Yes.

9        Q   Who do you remember speaking with about

10   this?

11       A   Mo Meghji.

12       Q   Tell me about your conversation with

13   Mr. Meghji.

14           MR. RUTHERFORD:  Objection, form.

15       A   So it was a long time ago.  I don't recall

16   the exact conversation, but he had called me and

17   expressed some concern about including the vendor

18   payment delay to meet the first lien requirement,

19   the first bullet.

20       Q   What did he say to your recollection?

21       A   Yeah, I don't exactly recall the words, but

22   I think it was something along the lines of, we

23   should be careful when putting this in this daily

24   cash flow email because then they might walk away

25   from the deal.

**Rajat Prakash - August 20, 2019**

52

1    Q  Do you remember Mr. Meghji saying anything

2    else in that conversation?

3    A  I don't recall the exact words, but I think

4    he gave some interesting -- used some interesting

5    phrases like "that's like putting red meat" or

6    something like that.

7    Q  Do you remember exactly what he said with

8    respect to putting red meat?

9        MR. RUTHERFORD:  Objection, form.

10   A  I don't exactly recall, but I think it was

11   around the same lines.  It was like putting red meat

12   and I think they might walk away from the deal,

13   something like that.

14   Q  Do you remember when this conversation took

15   place?

16   A  It was February 8th, most likely afternoon

17   Central time.

18   Q  And why do you think it was on February 8th?

19   A  Why do I think?  He called me, so I'm not

20   sure.  I think the deal wasn't closed, if I were to

21   speculate.  It was because the deal had not closed

22   yet.

23   Q  And how did this conversation take place?

24   A  He called me at my desk.

25   Q  So over the phone?

# Exhibit V

*IN RE: SEARS HOLDINGS CORPORATION, et al.*

---

*CHRISTOPHER GOOD*
*August 28, 2019*

---



*Original File 281289.txt*
*Min-U-Script® with Word Index*

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ----------------------------------------X
3   In Re:

4   SEARS HOLDINGS CORPORATION, et al.,

5                     Debtor.

6   Chapter 11 - Case No.: 18-23538 (RDD)
    ----------------------------------------X
7

8                     450 Park Avenue
                      New York, New York
9
                      August 28, 2019
10                    9:34 a.m.

11

12          DEPOSITION of CHRISTOPHER GOOD,

13   before Melissa Gilmore, a Shorthand Reporter

14   and Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO., LLC
            126 East 56th Street, Fifth Floor
24             New York, New York 10022
                      212-750-6434
25                    REF:  281289

2

```
 1   A P P E A R A N C E S:

 2

 3   WEIL GOTSHAL & MANGES, LLP

 4   Attorneys for Debtors and Debtors-in-Possession,

 5   Sears Holdings Corporation, et al.

 6        767 Fifth Avenue

 7        New York, New York 10153

 8   BY:  JESSIE B. MISHKIN, ESQ.

 9        PHONE 212-310-8707

10        E-MAIL jessie.mishkin@weil.com

11

12

13   WEIL, GOTSHAL & MANGES, LLP

14   Attorneys for Debtors and Debtors-in-Possession,

15   Sears Holdings Corporation, et al.

16        200 Crescent Court, Suite 300

17        Dallas, Texas 75201-6950

18   BY:  PAUL GENENDER, ESQ.

19        JAKE RUTHERFORD, ESQ.

20        PHONE 214-746-7877

21        E-MAIL paul.genender@weil.com

22             jake.rutherford@weil.com

23

24

25
```

3

```
 1  A P P E A R A N C E S:  (Cont'd)

 2

 3  CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4  Attorneys for ESL Investments, Inc.

 5       One Liberty Plaza

 6       New York, New York 10006

 7  BY:  LEWIS J. LIMAN, ESQ.

 8       BENJAMIN D. BRIGHT, ESQ.

 9       PASCALE BIBI, ESQ.

10       PHONE 212-225-2550

11       E-MAIL lliman@cgsh.com

12            bbright@cgsh.com

13            pbibi@cgsh.com

14

15

16  AKIN GUMP STRAUSS HAUER & FELD LLP

17  Attorneys for Unsecured Creditors

18       One Bryant Park

19       New York, New York 10036-6745

20  BY:  JOHN P. KANE, ESQ.

21       PHONE 212-872-1006

22       E-MAIL jkane@akingump.com

23

24  ALSO PRESENT:

25       NICK WEBER, M-III
```

```
 1   ------------------ I N D E X ------------------

 2   WITNESS                EXAMINATION BY         PAGE

 3   CHRISTOPHER GOOD     MR. LIMAN                  7

 4

 5

 6   --------------- E X H I B I T S ---------------

 7   GOOD                DESCRIPTION           FOR I.D.

 8   Exhibit 1           Project Blue Weekly Flash    7

 9                       Report (DIP Budget Week

10                       11), January 2, 2019

11   Exhibit 2           Project Blue Weekly Flash    7

12                       Report (DIP Budget Week

13                       12), January 9, 2019

14   Exhibit 3           Project Blue Rolling Cash    35

15                       Flow Budget (Week 11),

16                       January 2, 2019

17   Exhibit 4           E-Mail, dated January 6,     38

18                       2019, with attachment

19   Exhibit 5           January 9, 2019 Bid          52

20                       Letter from Transform

21   Exhibit 6           E-Mail, dated January 4,     54

22                       2019, with attached

23                       presentation, dated

24                       January 3, 2019

25
```

```
 1   ----------- E X H I B I T S (Cont'd) -----------
 2   GOOD                 DESCRIPTION              FOR I.D.
 3   Exhibit 7            Second Supplemental          56
 4                        Declaration of
 5                        Christopher A. Good
 6   Exhibit 8            E-Mail, dated January 16,    62
 7                        2019, with attachment
 8   Exhibit 9            E-Mail, dated January 21,    67
 9                        2019, with attachment
10   Exhibit 10           E-Mail, dated January 24,    86
11                        2019, with attachment
12   Exhibit 11           E-Mail, dated January 29,    86
13                        2019, with attachment
14   Exhibit 12           E-Mail, dated January 30,    87
15                        2019, with attachment
16   Exhibit 13           E-Mail, dated February 4,    87
17                        2019, with attachment
18   Exhibit 14           E-Mail from Rajat           119
19                        Prakash, dated
20                        February 4, 2019
21   Exhibit 15           E-Mail from Jennifer Joye   122
22                        dated February 5, 2019
23   Exhibit 16           E-Mail from Cullen Murphy   124
24                        dated December 15, 2018,
25                        with attachment
```

```
 1    ------------ E X H I B I T S (Cont'd) -----------

 2   GOOD              DESCRIPTION              FOR I.D.

 3   Exhibit 17        E-Mail from Sasha            124

 4                     Shulzhenko dated

 5                     November 16, 2018, with

 6                     attachment

 7

 8

 9           (EXHIBITS TO BE PRODUCED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             (Good Exhibit 1, Project Blue Weekly

2        Flash Report (DIP Budget Week 11),

3        January 2, 2019, marked for

4        identification.)

5             (Good Exhibit 2, Project Blue Weekly

6        Flash Report (DIP Budget Week 12),

7        January 9, 2019, marked for

8        identification.)

9  C H R I S T O P H E R   G O O D,   called as

10        a witness, having been duly sworn by a

11        Notary Public, was examined and testified

12        as follows:

13

14  EXAMINATION BY

15  MR. LIMAN:

16        Q.    Good morning, Mr. Good.  How are

17  you?

18        A.    Well.  How are you?

19        Q.    Good.  So you and I have met before.

20  I've taken your deposition before, correct?

21        A.    Yes.

22        Q.    And at the beginning of that

23  deposition, I went through a series of rules

24  with respect to a deposition.

25             Do you need me to repeat them?

```
 1                         GOOD
 2        A.    Yes, that would be helpful.
 3        Q.    Sure.  So I'm going to ask questions
 4   during the deposition today.  I would ask you
 5   to just answer the questions that I ask of you.
 6              Is that okay?
 7        A.    Yes.
 8        Q.    If at any time you don't understand
 9   one of my questions, I would ask you just to
10   tell me that you don't understand.
11              Will you do so?
12        A.    Yes.
13        Q.    If you need a break at any time,
14   just tell me you need a break and I will give
15   you a break as long as there's not a question
16   that's pending.
17              You understand that?
18        A.    Yes.
19        Q.    Is there any reason why you cannot
20   testify truthfully today?
21        A.    No.
22        Q.    Now, I'm going to ask the court
23   reporter to -- I'm going to hand to you two
24   exhibits I have asked the court reporter to
25   premark.  They are marked Good Exhibit Number 1
```

```
1                         GOOD

2    and Good Exhibit Number 2.

3              Good Exhibit Number 1 is titled

4    "Project Blue Weekly Flash Report (DIP Budget

5    Week 11)."  Good Exhibit Number 2 is titled

6    "Project Blue Weekly Flash Report (DIP Budget

7    Week 12)."  Both documents were produced in the

8    course of this litigation.

9              Do you have Good Exhibit Number 1

10   and Good Exhibit Number 2 in front of you?

11        A.   Yes.

12        Q.   Do you recognize those documents?

13             MS. MISHKIN:  Can you just give us a

14        minute to get the copies?

15             MR. LIMAN:  Sure.  Apologies.

16        A.   (Document review.)

17        Q.   Why don't I start again.

18             Do you recognize Good Exhibit Number

19   1?

20        A.   I recognize the form of the

21   document.  I don't recall each week.  But,

22   generally, I understand what this is.

23        Q.   Okay.  And would the same be so with

24   respect to Good Exhibit Number 2?

25        A.   Yes.
```

1                              GOOD

2          Q.    Can you tell me your general

3    understanding of what Good Exhibit Number 1 and

4    Good Exhibit Number 2 are?

5          A.    These are weekly flash reports

6    and/or variance reports as required under the

7    DIP order.

8          Q.    And were these documents used by

9    debtors?

10                MS. MISHKIN:   Object to form.

11         A.    They are produced by the debtors.

12         Q.    Okay.  For what purpose were they

13   produced?

14         A.    They were required under the DIP

15   order.

16         Q.    And who were they delivered to?

17         A.    The DIP lenders.

18         Q.    Did you have an involvement in the

19   production of the documents of the type that

20   are Good Exhibit Number 1 and Good Exhibit

21   Number 2?

22         A.    I had very limited involvement in

23   these.  There was another team responsible for

24   that.

25         Q.    What was your limited involvement?

1                           GOOD

2       A.    Occasional questions, just given I

3   had spent years on the Sears case.

4       Q.    And what other team was involved

5   with the production of these?

6       A.    There were around five individuals,

7   give or take a few, but there are around five

8   individuals at M-III who worked also with the

9   company to help produce these reports.

10      Q.    Did you have an understanding of the

11  purpose for which these reports were generated?

12          MS. MISHKIN:   Objection.

13      A.    As I stated earlier, they were

14  required under the DIP order.

15      Q.    For what reason?

16      A.    The primary reason would be covenant

17  testing.

18      Q.    Now, I would ask you to turn to DIP

19  Exhibit Number -- withdrawn -- Good Exhibit

20  Number 1.  Would you turn to slide 2 of the

21  document?

22          Let me ask you generally whether you

23  had an understanding that there were

24  discussions with Transform or its

25  representatives about the DIP budget?

1                        GOOD

2              MS. MISHKIN:  Objection.

3              Are you asking about generally, at

4        the time of this weekly?

5              MR. LIMAN:  That's a fair objection.

6        Q.    Generally, sir, were there

7    discussions with Transform or its advisors

8    about the DIP budget?

9        A.    Yes.

10       Q.    Was one of the subjects of the

11   discussions the forecasted level of the DIP at

12   the anticipated time of the closing of a

13   transaction?

14       A.    Yes.

15       Q.    Were you involved in those

16   discussions?

17             MS. MISHKIN:  Object to form.

18       A.    I was one of a multitude of people

19   involved in those discussions.

20       Q.    Can you tell me generally whether,

21   on the debtors' side, there was an effort made

22   to forecast the anticipated level of the ABL

23   DIP at the time of a closing?

24       A.    Can you rephrase the question?

25       Q.    Sure.  Generally, sir, did the

1               GOOD

2     debtors engage in efforts to forecast the

3     anticipated level of the ABL DIP at the time of

4     a closing of a transaction?

5               MS. MISHKIN:  Object to form.

6          A.    Generally, we produced a DIP budget,

7     which contained the DIP balance.

8          Q.    Okay.  And was the -- were the

9     figures that were in Good Exhibit 1 the types

10    of figures that were relevant to forecasting

11    the DIP balance?

12              MS. MISHKIN:  Objection.

13              Which figures are we looking at?

14         Q.    Why don't you look at slide 2?

15         A.    (Document review.)

16              No, not really.  This was just the

17    weekly flash.  This is not the full DIP budget

18    that had all of the DIP balances.

19         Q.    Let me ask you about some of the

20    lines within slide 2 of Good Exhibit Number 1.

21    You see the top says, "Cash variance to

22    budget," in the upper left quadrant?

23              Do you see that?

24         A.    Yes.  I see that written.

25         Q.    Okay.  And then below that --

14

1                        GOOD

2    withdrawn.

3              Along the side, next to cash

4    variance to budget, there is a series of

5    columns for different weeks.  The first one

6    says week 44.

7              Do you see that?

8         A.    Yes, I see week 44.

9         Q.    And within that, there's figures for

10   the budget and then actual and variance.

11             Do you see that?

12        A.    I see the headers for budget, actual

13   and variance, yes.

14        Q.    And do you see that there are then

15   columns after that for week 45, week 46, week

16   47.

17             Do you see that?

18        A.    Yes.

19        Q.    Is it fair to say what this flash is

20   measuring is the variance of the actual

21   performance to budget with respect to a number

22   of different metrics?

23        A.    It compares actual to budget for the

24   metrics listed on the page, yes.

25        Q.    The first metric under cash variance

GOOD

1

2      to budget is total operating receipts.

3              What does that represent?

4          A.    Represents cash inflows received by

5      the company.

6          Q.    And do you know where those figures

7      were drawn from with respect to the actuals for

8      each week?

9          A.    They were provided by the treasury

10     team at the company.

11         Q.    And then I want to ask you about

12     total operating disbursements, which is a

13     little bit further down.

14             What does that number represent?

15         A.    As it says on the page,

16     disbursements to vendors, rent, payroll and

17     other operating disbursements.

18         Q.    Where were the actual figures for

19     the total operating disbursements drawn from?

20         A.    They were also provided by the

21     treasury team.

22         Q.    Okay.  Then a little bit further

23     down it says, "Total operating cash flow."

24             Do you see that?

25         A.    Yes.

GOOD

1
2      Q.    And am I correct that that's just a
3  calculated figure that represents the
4  difference between operating receipts --
5  withdrawn.
6          Is that a figure that represents the
7  difference between total operating receipts,
8  minus total operating disbursements, minus cap
9  ex?
10     A.    I didn't compile this.  But, yes,
11  that seems fair based upon what I'm seeing on
12  the page.
13     Q.    Okay.  And then total -- a little
14  bit further down, there's a figure for total
15  non-operating disbursements.
16          Do you know what that reflects?
17     A.    Which line again?
18     Q.    It's right before net cash flows,
19  before financing.
20     A.    Total other non-operating
21  disbursements?
22     Q.    Yes.
23     A.    Yes, I see the line.
24     Q.    What does the total non -- total
25  other non-operating disbursements reflect?

```
 1                          GOOD
 2        A.    It appears to be the four lines
 3   above this, from what I'm seeing, even though I
 4   did not compile this.
 5        Q.    Okay.  Do you know where those
 6   numbers were drawn from?
 7        A.    I can't be a hundred percent
 8   certain.
 9        Q.    Okay.  A little bit below that,
10   there's a line for financing.
11              Do you see that?
12        A.    Yes, I do.
13        Q.    And does the financing reflect
14   either drawdowns on the -- on the DIP or
15   paydowns of the DIP?
16              MS. MISHKIN:  Object to form.
17        A.    Once again, I didn't compile the
18   report, but that's what it appears to be, based
19   on what I'm seeing on the page.
20        Q.    Okay.  Now, sir, if you look at the
21   top of the page, is it fair to say that, with
22   respect to the operating receipts for each of
23   the weeks 44, 45, 46 and 47, the actuals beat
24   the budget for each of those weeks?
25              MS. MISHKIN:  Object to form.
```

```
 1                         GOOD
 2              MR. LIMAN:  I will withdraw and
 3        rephrase it.
 4        Q.    Is it fair to say -- withdrawn.
 5              Is it accurate to say that, for each
 6   of the weeks, 44, 45, 46 and 47, the actuals
 7   were better than the budget?
 8              MS. MISHKIN:  Object to form.
 9        A.    Based upon what I'm seeing on the
10   page, that appears to be correct.
11        Q.    And would it also be the case, sir,
12   that for each of the weeks, 44, 45, 46 and 47,
13   there was a positive variance for total
14   operating cash flow of actuals over the
15   budgeted amounts?
16        A.    Yes, that's what the line says.
17        Q.    Now, I want to ask you about the
18   calculation at the bottom of the ending
19   available cash balance.
20              Do you see that?
21        A.    Yes, I see the line, yes.
22        Q.    It's the very last line on the
23   table, correct?
24        A.    Yes, it's the last line on the
25   table.
```

1                          GOOD

2        Q.    And is it -- can you just explain to

3    us how the ending available cash balance on

4    this document is calculated?

5        A.    I didn't compile the calculation,

6    but it appears to take beginning cash, then the

7    line four lines up, net cash flows before

8    financing, that line, plus beginning cash, plus

9    the financing line above net cash flow, plus

10   the change in the carve-out account, which

11   doesn't appear to be anywhere else on the page.

12       Q.    So if we were to look, for example,

13   at week 44, there is -- for both the budgeted

14   amount and for the actual amount, there's a

15   zero beginning cash figure.

16             Do you see that?

17       A.    Yes.

18       Q.    And then below that there is a

19   figure for cash flow before financing.

20             Do you see that?

21       A.    Yes.

22       Q.    And for the actuals, the figure is

23   46, correct?

24       A.    Yes.

25       Q.    And that corresponds with the figure

```
 1                          GOOD
 2   for net cash flows before financing up above,
 3   which is 46?
 4        A.    It appears to, yes.
 5        Q.    And that net cash flows before
 6   financing is just the difference between the
 7   total operating cash flow of 53 and the total
 8   non-operating disbursements of 6?
 9              MS. MISHKIN:  Object to form.
10        Q.    Give or take.
11        A.    They don't add up exactly, but based
12   upon what I'm seeing on the page, having not
13   compiled the report, that appears to be how it
14   is calculated.
15        Q.    And then in order to arrive at the
16   ending available cash balance of $6 for week
17   44, a figure of 41 is deducted from the figure
18   46.
19              Do you see that?
20              MS. MISHKIN:  Object to form.
21        A.    It appears to roughly calculate
22   that.
23        Q.    That would reflect that the $6
24   ending available cash balance is a net figure
25   representing the sum of the beginning cash and
```

1                           GOOD

2    cash flow before financing, less what was used

3    to pay down the DIP, correct?

4          A.    In that specific instance, that

5    appears to be how it's calculated.

6          Q.    Okay.  And then just to understand

7    these, in week 45, there is a figure of -- for

8    the actuals, beginning cash of $6.

9                Do you see that?

10               MS. MISHKIN:  Object to form.

11         Q.    Withdrawn.

12               What is the beginning cash actual

13   figure for week 45?

14         A.    It appears to be 6.

15         Q.    And the way this works is that 6 is

16   a carryover from the ending available cash

17   balance for week 44?

18         A.    That seems to make sense.

19         Q.    And then that beginning cash figure

20   of 6 is applied to the cash flow before

21   financing of 12, and then reduced by 1 million

22   for financing, correct?

23         A.    That appears to be what it says,

24   yeah.

25         Q.    And then 16 million is paid out to

1                          GOOD

2    the carve-out account resulting in an ending

3    cash balance of zero, correct?

4              MS. MISHKIN:  Object to form.

5         A.    That's what it says, yes.

6         Q.    And is it accurate, sir, to say that

7    the figure for the ending available cash

8    balance is a mathematical calculation based

9    upon the figures in these charts -- in this

10   chart?

11             MS. MISHKIN:  Object to form.

12        A.    It appears to be a calculated cash

13   balance role.

14        Q.    The ending available cash balance is

15   not based on the balance in the concentration

16   accounts at a particular moment in time; is

17   that correct?

18             MS. MISHKIN:  Object to form.

19        A.    I think that's a very broad

20   statement.

21             Can you be more specific?

22        Q.    Sir, do you know whether -- is it

23   correct, sir, in putting this chart together,

24   the ending available cash balance, that figure

25   was not drawn from the account statements for

1                        GOOD

2    the concentration accounts?

3              MS. MISHKIN:  Objection.

4        A.    I didn't compile this.  I can't be a

5    hundred percent certain or speculate as to

6    where those figures came from.

7        Q.    Sir, is it your understanding today

8    that those figures were drawn from the bank

9    statements for the concentration accounts?

10       A.    They were provided by the treasury

11   team.

12       Q.    Can you answer my question?

13       A.    I can't speculate as to how the

14   treasury team did things that we were not privy

15   to.

16       Q.    Sir, do you know what I'm referring

17   to when I'm referring to the concentration

18   accounts?

19       A.    Yes, I know what the concentration

20   accounts are.

21       Q.    What are the concentration accounts?

22       A.    They were two bank accounts that

23   Bank of America provided us.

24       Q.    Okay.  And how were they used?

25              MS. MISHKIN:  Object to form.

GOOD

1

2      A.     Money came in and out of those

3   accounts.

4      Q.     How would money come out of the

5   accounts?

6      A.     If we were to disburse cash for,

7   say, payroll.

8      Q.     Okay.  And how would money go into

9   the accounts?

10      A.     If the company collected cash from

11   customers or credit card payments, a multitude

12   of ways.

13      Q.     And the debtors had discretion in

14   terms of how much to put into the concentration

15   accounts; is that right?

16         MS. MISHKIN:  Objection.

17      A.     No.

18      Q.     The debtors could pay out

19   obligations to the carve-out account before

20   putting money into the concentration accounts;

21   is that right?

22      A.     Can you rephrase the question?

23      Q.     Sure.  Were the debtors required to

24   put all of their cash flow into the

25   concentration accounts before paying the

```
 1                      GOOD
 2   carve-out accounts?
 3        A.    All the cash flow -- all of the
 4   incoming cash receipts initially flow into the
 5   concentration accounts.
 6        Q.    That's not completely -- ultimately,
 7   it goes into the concentration accounts; is
 8   that right?
 9             MS. MISHKIN:  Objection.
10        A.    Ultimately, cash receipts go into
11   the concentration accounts.
12        Q.    The way the flow of money works is
13   that cash comes into stores, correct?
14        A.    Yes, that's -- well, there is a
15   multitude of ways that money comes into the
16   company.
17        Q.    Well, one way is that cash comes
18   into stores?
19        A.    One way is the customer pays cash
20   for goods or services in the store.
21        Q.    Another way is there might be credit
22   card receipts, correct?
23        A.    That is another way.
24        Q.    Another way might be there are
25   vendors who pay monies in or people who are
```

```
 1                          GOOD
 2    renting properties might pay money into the
 3    company, correct?
 4         A.    Yes, a vendor may pay an allowance.
 5    That is one way.
 6         Q.    Now, with respect to the money that
 7    comes in from customers paying cash in stores,
 8    do you refer to that as store cash?
 9         A.    Store cash is typically referred --
10    is cash in the stores.
11         Q.    And is there a flow of funds from
12    cash in the stores ultimately to the
13    concentration accounts?
14         A.    Some of it, yes.
15         Q.    Can you describe for us how that
16    flow of funds works for some of the cash in the
17    stores?
18              MS. MISHKIN:  Object to form.
19         A.    A customer buys a good with cash.
20    At the end of the day, a couple days a week, a
21    truck from, say, Brinks, picks up the cash.
22    They deposit it in a local bank.  The local
23    bank then transfers it to the concentration
24    account.
25              Generally, that's how it works.
```

GOOD

1

2     Q.     Are there exceptions to that flow?

3     A.     Sometimes a store might hold some of

4  the cash, depending on how much cash they have.

5  There can be exceptions.

6     Q.     Now, if there is -- if a store wants

7  to hold on to cash, how is that decision made?

8     A.     I'm not a hundred percent sure how

9  that's made.

10    Q.     Do you know, sir, how often there

11 are -- how often trucks will go to a store to

12 pick up cash?

13    A.     There's various schedules for

14 various stores.

15    Q.     And how do those schedules vary?

16           MS. MISHKIN:  Object to form.

17    A.     I didn't create the schedules for

18 store cash pickup, but generally could be the

19 volume of cash the store receives.

20    Q.     Who determines how often a truck

21 will go to a store in order to pick up cash?

22    A.     The treasury team.

23    Q.     And then, sir, you said after the

24 trucks will pick up the cash, they are

25 deposited in a local bank; is that correct?

1                        GOOD

2        A.     I think some of them, yes.

3        Q.     Why do you say with respect to some

4    of them, yes?

5        A.     There could be a local -- or there

6    could be a Bank of America, for example.

7        Q.     Okay.  And who determines which bank

8    the armored truck goes to?

9        A.     I'm assuming some combination of the

10   pickup company and the treasury team, but I

11   can't be for certain, and I don't really know.

12   I would be speculating.

13       Q.     Is there a process by -- withdrawn.

14              Was there a process by which the

15   cash was swept from the local banks into the

16   concentration accounts?

17       A.     Can you repeat the question?

18       Q.     I'll rephrase it.

19              Was there a process by which cash

20   was moved from the local banks into the

21   concentration accounts?

22       A.     They transferred the money to the

23   concentration account.

24       Q.     How often would the local banks

25   transfer cash to the concentration accounts?

```
1                        GOOD
2        A.    I'm not sure.
3        Q.    Was that also up to the treasury
4   department?
5        A.    I'm not sure.
6        Q.    Do you know who made the decision of
7   how often cash would be transferred from the
8   local banks to the concentration accounts?
9        A.    I'm not sure who makes that
10  decision.
11       Q.    Did the debtors have the discretion
12  to tell the local banks when to make the
13  transfers to the concentration accounts?
14             MS. MISHKIN:  Object to form.
15       A.    I'm not sure.
16       Q.    Now, sir, with respect to what the
17  ending available cash balance reflects on Good
18  Exhibit Number 1, can I ask you to turn, for
19  example, to week 47?
20             Do you see that?
21       A.    Sorry.  One more time?
22       Q.    Week 47.
23       A.    Uh-huh.
24       Q.    You see, sir, that there is a figure
25  there under the actuals of $76 million of cash
```

1                        GOOD

2     flow before financing for week 47?

3          A.    Yes.

4          Q.    Okay.  And then to derive the figure

5     of -- withdrawn.

6                And do you see that, ultimately, the

7     ending available cash balance at the end of

8     week 47 is 35 million?

9                Do you see that?

10         A.    That's what it says, yes.

11         Q.    Okay.  And that figure is derived by

12    taking -- by reducing the 76 million of cash

13    flow for week 47 and reducing it by 35 million

14    that was deposited into the concentration

15    accounts, correct?

16         A.    I don't think that's what it says.

17         Q.    It's reduced by the -- what do you

18    think that 35 million next to financing

19    reflects?

20         A.    The negative 35 million is a paydown

21    of the loan.

22         Q.    Into the DIP -- paydown of the DIP;

23    is that right?

24         A.    Yes, that appears to be right.

25         Q.    Okay.  And then after that, there's

```
 1                         GOOD
 2    a negative change in the carve-out account of
 3    6.
 4             Do you see that?
 5         A.    Yes.  The line says negative 6 next
 6    to change in the carve-out account for week 47.
 7         Q.    Okay.  And what does that reflect?
 8         A.    A transfer of funds to the carve-out
 9    account.
10         Q.    And so is it accurate, sir, to say
11    that the ending available cash balance reflects
12    the remainder of cash was available to debtors
13    after paying down the loan by 35 million and
14    transferring 6 million to the carve-out
15    account?
16         A.    On this page, it says, yes, 76 minus
17    35, minus 6 is roughly 35.
18         Q.    Okay.  And if you look on to
19    page 3 -- slide 3, there is a figure for net
20    cash flow.
21             Do you see that?
22         A.    I see a section called "Net Cash
23    Flow."
24         Q.    And the last line of that, the last
25    two lines say, "The company ended the week with
```

1                        GOOD

2      a 35 million ending cash balance because

3      proceeds from Sears Hometown and Outlets were

4      received after the daily cash sweep on Friday,

5      and the company borrowed 24 million for an

6      insurance payment it did not pay on Friday.

7      The company made the insurance payment and all

8      remaining cash was swept to Bank of America the

9      next day."

10               Do you see that?

11        A.    I see that on the page, yes.

12        Q.    Can you describe for us what that

13     transaction reflects?

14               MS. MISHKIN:  Object to form.

15        A.    Which specific transaction?

16        Q.    Well, let me ask whether that

17     reflects the fact that the company made a

18     insurance payment of 24 million, and only after

19     making the insurance payment was the remaining

20     cash swept to Bank of America?

21        A.    It says, "The company made the

22     insurance payment and all remaining cash was

23     swept to Bank of America."

24        Q.    Is it fair to say that reports of

25     these types were generated on a weekly basis by

```
 1                         GOOD
 2   the debtors and the finance team?
 3         A.    The debtors produced weekly variance
 4   reports.
 5         Q.    Okay.  And I'm just going to have
 6   the court reporter mark a number of these and
 7   just ask you to identify them for the record.
 8   I'm not going to ask you about the contents of
 9   them, but we have the -- I will first ask you
10   to identify what is Good Exhibit Number 2 for
11   the record.
12               What is Good Exhibit Number 2?
13         A.    Project Blue Weekly Flash Report
14   (DIP budget Week 12), dated February 9, 2019.
15               MR. LIMAN:  Hold off on those.  We
16         will do those at the end of the
17         deposition.
18               Let me ask the court reporter to
19         mark, as Good Exhibit Number 3, a document
20         entitled "Project Blue Rolling Cash Flow
21         Budget (Week 11)."
22         Q.    While my colleague is pulling the
23   document, do you recall, at a previous
24   deposition, I asked you about the debtors'
25   concern about administrative insolvency?
```

```
 1                         GOOD
 2               MS. MISHKIN:  Objection to form.
 3       A.    Can I see the transcript?
 4       Q.    Do you need to see the transcript
 5   for me -- to answer that question?
 6       A.    No.  I remember.
 7       Q.    And do you recall telling me that
 8   the debtors were very concerned about
 9   administrative solvency?
10               MS. MISHKIN:  Objection.
11       A.    We were concerned about
12   administrative solvency.
13       Q.    And is it correct that the debtors
14   wanted to negotiate a deal that rendered the
15   estate administratively solvent?
16               MS. MISHKIN:  Objection to form.
17       A.    Yes.
18       Q.    Okay.  And part of that had to do
19   with a balance on the ABL DIP, correct?
20       A.    The balance of the ABL DIP was a
21   closing condition.
22       Q.    Okay.
23               (Good Exhibit 3, Project Blue
24         Rolling Cash Flow Budget (Week 11),
25         January 2, 2019, marked for
```

```
 1                          GOOD

 2        identification.)

 3        Q.     Do you recognize Good Exhibit Number

 4   3?

 5        A.     (Document review.)

 6               I don't recall it specifically.

 7        Q.     Was this document shared with

 8   Transform?

 9               MS. MISHKIN:  Object to form.

10        A.     I'm not sure.

11        Q.     Do you recall, sir, that the debtors

12   were -- you can put that aside.  I will refer

13   you to it if need be.

14               Do you recall what DIP balance the

15   debtors were projecting at the time of closing?

16               MS. MISHKIN:  Objection.

17               At what time are you asking?

18        Q.     Do you recall that -- withdrawn.

19               Do you recall that Transform made a

20   original bid for -- going concern bid for the

21   assets of Sears?

22               MS. MISHKIN:  Objection.

23        A.     Transform made a bid for the assets

24   of Sears.

25        Q.     And the bid that Transform made in
```

                           GOOD

1

2    late December was not accepted.

3              Is that accurate?

4         A.    As I recall, yes.

5         Q.    Okay.  And one of the conditions

6    that the debtors insisted on was that, for the

7    bid to be qualified and for ESL to be able to

8    credit bid, the bid would have to leave the

9    estate's position where it could be

10   administratively solvent; is that correct?

11        A.    The debtors were very concerned with

12   administrative solvency.

13        Q.    And one of the conditions of closing

14   that the buyer insisted on was that the DIP be

15   paid down to a particular level; is that

16   correct?

17        A.    It was a closing condition.

18        Q.    And when I mention the DIP there,

19   there actually was a senior DIP and a junior

20   DIP; is that right?

21        A.    There was a senior and junior DIP.

22        Q.    Can you tell me what the difference

23   was between the two of them?

24              MS. MISHKIN:  Objection.

25        A.    There was a senior DIP provided by

GOOD

1
2   the existing lenders and there was a junior DIP
3   provided by Cyrus.
4       Q.    And as part of the -- well,
5   withdrawn.
6           In anticipation of the negotiations
7   with buyers, did debtors try to calculate what
8   the senior DIP balance would be expected to be
9   on the date of an anticipated closing?
10      A.    The debtors produced a weekly
11  forecast that included the DIP balances.
12      Q.    Okay.  And do you recall that, at
13  the time of the negotiations with the sellers,
14  debtors anticipated that the DIP balance on the
15  senior DIP would be approximately 950 million?
16          MS. MISHKIN:  Objection to form.
17      A.    Can you rephrase the question?
18          MS. MISHKIN:  I think you mixed up
19      some of the terms in there.
20      Q.    Do you recall what level the debtors
21  forecast that the DIP would be at at the time
22  of an anticipated closing of a transaction with
23  the buyers?
24          MS. MISHKIN:  Objection.
25      A.    At what time period?  The various

```
 1                        GOOD

 2    forecasts had different balances at different

 3    dates.

 4         Q.    Do you recall a figure of

 5    950 million?

 6              MS. MISHKIN:  Objection.

 7         A.    From the debtors?  From the buyer?

 8    From who?

 9         Q.    From the debtors.

10         A.    No.

11         Q.    Okay.  We can move on from that

12    document.

13              MR. LIMAN:  I'm asking the court

14         reporter to mark as -- let's go off the

15         record for a moment.

16              (Discussion off the record.)

17              (Good Exhibit 4, E-Mail, dated

18         January 6, 2019, with attachment, marked

19         for identification.)

20    BY MR. LIMAN:

21         Q.    Mr. Good, the court reporter has

22    handed you a document marked Good Exhibit

23    Number 4.

24              Do you recognize that?

25         A.    (Document review.)
```

```
 1                        GOOD

 2              Yes, I recognize this document.

 3       Q.    And this was a schedule prepared for

 4   discussion with Transform and its

 5   representatives; is that right?

 6       A.    Yes.

 7       Q.    And the bottom of the cover e-mail

 8   refers to a conference call scheduled for

 9   Sunday, January 6.

10              Do you see that?

11       A.    Yes.

12       Q.    And I think you previously told me

13   that you participated in that call.

14              Do you recall participating in that

15   call?

16       A.    Yes.

17       Q.    Now, what I want to do is direct

18   your attention to the very last two slides in

19   that exhibit, Good Exhibit 4.  They are headed

20   "Discussion Materials, Project Blue," and then

21   there's a chart on the following slide which is

22   numbered slide number 1.

23              Do you see those?

24       A.    I see slide number 1.

25       Q.    Okay.  Great.  That's exactly where
```

```
 1                       GOOD
 2   I want you to be.
 3             And what I wanted to ask you is just
 4   to -- I want to walk you through the different
 5   columns on this table and have you explain
 6   them.
 7             The first column is listed
 8   "Administrative and Other Priority Claims Uses
 9   of Value."
10             Do you see that?  It's actually
11   "Admin and Other Priority Claims Uses of
12   Value."
13        A.    Yes, I see the column header.
14        Q.    Okay.  And what does that represent?
15   What do the items under that represent?
16             MS. MISHKIN:  Objection to form.
17        A.    Below it, it shows admin claims and
18   other claims on the page.
19        Q.    Is it accurate to say that those
20   represented the claims that would have to be
21   satisfied as part of -- as part of a deal that
22   would result in the debtors being
23   administratively solvent?
24             MS. MISHKIN:  Objection to form.
25        A.    We didn't prepare this analysis.
```

```
 1                        GOOD
 2    M-III did not.
 3         Q.     Who prepared it?
 4         A.     This was prepared by Lazard.
 5         Q.     Do you have an understanding as
 6    to -- that the items under the uses of value
 7    included the total anticipated administrative
 8    claims?  Is that right?
 9         A.     At this point in time, this was an
10    estimate of what administrative and other
11    priority claims would be, as it says on the
12    page.
13         Q.     And then the next column that says,
14    "Last ESL value," do you see that?
15         A.     Yes.  The second column says, "Last
16    ESL value."
17         Q.     And do you recall that, prior to the
18    date of this slide, ESL suggested terms of a
19    potential offer it might be willing to make?
20              MS. MISHKIN:  Objection.
21         A.     ESL had made an offer.
22         Q.     And that included, for example, the
23    assumption of 125 million of accounts payable
24    as reflected in the slide?
25         A.     I can't recall every specific, but
```

GOOD

1
2  the slide says they were assuming 125 million
3  of accounts payable at this point in time.
4      Q.    And then the next column, "Remaining
5  Claims," it's just the sum of what's left once
6  you subtract the ESL value from the uses of
7  value column, correct?
8      A.    I haven't checked all the math, but
9  that appears to be the calculation.
10     Q.    Okay.  From that, a figure of
11 680 million is derived; is that right?
12     A.    We didn't compile this, but the
13 bottom right corner says 680.
14     Q.    And then if you look to the last
15 column, it says, "Additional Value Required
16 After Application of Other Sources of Value."
17          Do you see that?
18     A.    I see the right-most header that
19 says that.
20     Q.    Do you know, sir, what the value was
21 required for?
22          MS. MISHKIN:  Object to form.
23     Q.    I can rephrase the question if you
24 want.
25     A.    Yes, please.

GOOD

1

2     Q.    Does that last column reflect the

3  additional value that would be required in

4  order for a bid to satisfy the remaining claims

5  figure of $680 million?

6     A.    That's what it appears to do.

7     Q.    Okay.  And then there is, under

8  additional value required, there's a series of

9  items.

10        Do you see that it starts with last

11  ESL proposed cash contribution, and it ends

12  with less ship sale proceeds?

13        Do you see that?

14     A.    I see those two rows, yes.

15     Q.    What do the five items that are

16  listed under additional value required

17  represent as a whole?  Can you tell us?

18        MS. MISHKIN:  Objection.

19     A.    As the page says, it's other sources

20  of potential value.

21     Q.    And is it correct those represent

22  other sources of potential value that the

23  debtors would be able to use to meet the

24  administrative and other priority claims,

25  correct?

```
 1                        GOOD
 2        A.    These were estimates of what the
 3   debtors may potentially use to satisfy the 680,
 4   as it says on the page.
 5        Q.    Okay.  Now, there is a figure there
 6   of company cash.
 7              You see it says 89 million?
 8        A.    I see a row that says 89 million,
 9   yes.
10        Q.    And does that reflect an estimate
11   that the company -- withdrawn.
12              Does that reflect the debtors'
13   estimate that it would have 89 million of
14   company cash that could be used to satisfy the
15   administrative and other priority claims that
16   were anticipated?
17              MS. MISHKIN:  Objection.
18        A.    Can you rephrase the question?
19        Q.    Does the 89 -- withdrawn.
20              Does the 89 million of company cash
21   reflect the sum of cash that the company
22   anticipated it would have that could be used to
23   meet the administrative and other priority
24   claims?
25              MS. MISHKIN:  Objection.
```

1                       GOOD

2        A.    No.

3        Q.    What does the 89 million of company

4   cash reflect?

5        A.    A potential source of cash to pay

6   down the DIP, just like the ship sale proceeds,

7   which never came to fruition.  It was an

8   estimate based upon an assumption provided to

9   us by ESL.  But, unfortunately, that number did

10  not come to fruition, just like the ship sale

11  proceeds never did.

12       Q.    You said that the 89 million figure

13  was provided to you by ESL?

14       A.    Both ESL and the debtors relied upon

15  a similar source of information for that data

16  point.

17       Q.    Well, actually, this is kind of an

18  important point to me.

19             Is it your testimony that somebody

20  from ESL gave the debtors that figure of

21  89 million?

22       A.    ESL's estimate was 100 million.  The

23  company reviewed their estimate and we went

24  with 89 million.

25       Q.    Okay.  And how did the company come

```
 1                          GOOD
 2    up with a figure of 89 million?
 3         A.    It was provided by the treasury
 4    team.
 5         Q.    Okay.  And who from ESL provided the
 6    figure of 100 million?
 7         A.    Kunal Kamlani.
 8         Q.    Do you have an understanding of what
 9    that figure of 100 million was based on?
10         A.    His estimate of unavailable cash
11    that he thought could be used to pay down the
12    DIP.
13         Q.    And did he give that information
14    directly to you?
15         A.    Kunal and some combination of Moelis
16    gave me that information directly.
17         Q.    What do you recollect them
18    expressing about how that 100 million could be
19    used?  Who said what to you?
20              MS. MISHKIN:  Objection to form.
21         A.    There was an e-mail between Kunal
22    and I where he suggested that 100 million of
23    unavailable cash could be used to pay down the
24    DIP.  But, unfortunately, that ended up not
25    being true.
```

```
 1                        GOOD
 2        Q.    And when you say 100 million of
 3   unavailable cash, was that cash that was in
 4   transit and -- do you recall what the source
 5   was of that 100 million?
 6        A.    The primary source of unavailable
 7   cash that he suggested was cash in regional
 8   banks.
 9        Q.    Okay.  Now, do you see that the sum
10   of the -- of all of the items that are below
11   additional value required leads to an
12   administrative claim backstop requested of
13   335 million.
14             Do you see that?
15        A.    I see the line, yes.
16        Q.    Okay.  Would you agree with me, sir,
17   as to the math that the 680 million represents
18   the sum of all of the remaining claims,
19   including the ABL DIP, and not just the ABL
20   DIP?
21             MS. MISHKIN:  Object to form.
22        A.    Can you rephrase the question?
23        Q.    Sure.  I'm happy to.
24             The 689 million figure, do you see
25   that?
```

1                          GOOD

2        A.    Yes.

3        Q.    And that's -- the chart reflects

4   that the 89 million can be used to offset that

5   680 million.

6              Do you see that?

7              MS. MISHKIN:  Objection to form.

8        A.    My testimony is based upon context

9   from the deal that I think this takes out of

10  context.

11       Q.    I'm just asking about the document.

12  You will have time to talk about conversations.

13  And I am interested in the conversations.

14  Right now, I'm interested in the chart.

15             The chart reflects that the

16  89 million can offset the 680 million; is that

17  right?

18             MS. MISHKIN:  Objection to form.

19       A.    The numbers on the right-hand side

20  show a positive 680 million and a negative

21  89 million.

22       Q.    With the 89 million offsetting a

23  portion of the 680 million, correct?

24       A.    The 680 plus the five negative

25  numbers add up to 335 million.

```
1                              GOOD
2          Q.     So is the answer to that, yes, that
3     the chart reflects the 89 million offsetting a
4     portion of the 680 million?
5                 MS. MISHKIN:  Objection to form.
6          A.     That is what the chart says.
7          Q.     Okay.  And the 680 million is
8     comprised, in part, of 100 million with respect
9     to the ABL DIP.
10                Do you see that?
11         A.     Yes, it's one of the numbers that
12    sums to the 680.
13         Q.     Okay.  But it's also comprised of
14    139 million of 503(b)(9) claims, correct?
15         A.     I didn't compile the chart, but that
16    is what it shows.
17         Q.     And 43 million of severance and
18    employee claims?
19         A.     That is what the chart says.
20         Q.     With respect to who compiled the
21    chart, would you look down at the legend that
22    says, "source"?
23         A.     Yes.
24         Q.     And is it accurate that the chart
25    reflects that the source of this was the M-III
```

1                          GOOD

2    projection of administrative and other priority

3    claims?

4              MS. MISHKIN:  Objection to the

5         extent you're not going to finish the

6         sentence that you're reading from.

7              MR. LIMAN:  Fair enough.

8         Q.   It says, "Source, M-III projection

9    of administrative priority claims; ESL

10   proposal."

11             Do you see that?

12        A.   Yes, that appears to be what the

13   Lazard team wrote.

14        Q.   Okay.  And the ESL proposal would

15   reflect the ESL proposal that's reflected in

16   the document, right?

17             MS. MISHKIN:  Objection to form.

18        A.   It's one of the sources listed.

19        Q.   And is it your testimony, sir, that

20   M-III was not the source of the projection of

21   administrative and other priority claims?

22             MS. MISHKIN:  Object to form.

23        A.   No, that's not my testimony.

24        Q.   Is it correct that M-III was the

25   source of the projection of administrative and

                              GOOD
1
2    other priority claims?
3        A.    As I testified, I didn't compile the
4    chart.  We helped provide information so Lazard
5    can compile the chart in combination with the
6    company.
7        Q.    And did M-III provide the estimate
8    with respect to the administrative and other
9    priority claims?
10            MS. MISHKIN:  Objection to form.
11       A.    Members of my team did, yes.
12       Q.    Okay.  Thank you.
13            Now, do you know, sir, what the
14   89 million of company cash, as reflected in
15   this document, was comprised of?
16       A.    I don't remember the exact
17   components, but as I testified before, cash in
18   regional banks was the largest component.
19       Q.    I take it you have got a memory of
20   the call where this chart was discussed?
21            MS. MISHKIN:  Object to form.
22       Q.    Withdrawn.
23            Was this chart discussed during the
24   call on January 6?
25       A.    Yes.

```
1                        GOOD

2        Q.    Okay.  And what was discussed about

3   it?

4        A.    I didn't personally do the

5   walk-through of this chart, but as I remember,

6   the main point was that we were requesting

7   335 million of value to bridge the

8   administrative claim gap, as it says on the

9   page.

10       Q.    Okay.

11             MR. LIMAN:  Now, I want to have the

12       court reporter mark, as Good Exhibit 5,

13       the January 9 bid letter from Transform.

14             (Good Exhibit 5, January 9, 2019 Bid

15       Letter from Transform, marked for

16       identification.)

17       Q.    Do you recognize Good Exhibit 5?

18       A.    (Document review.)

19             Yes, I do.

20       Q.    Okay.  I direct your attention to

21   page 2 of Good Exhibit Number 5.

22             You see, at the first full sentence

23   of Good Exhibit 5, page 2, it says, "In a

24   schedule shared with buyer's representatives on

25   January 6, 2019, the debtors' estimated cash
```

GOOD

1

2    available to pay down such outstanding amounts

3    was 89 million."

4           Do you see it says that?

5       A.    This sentence refers to amounts that

6    are before the sentence in the paragraph.

7       Q.    Correct.  But you do see that it

8    says that?  I read it correctly?

9       A.    Can you read it one more time?

10      Q.    Sure.  It says, "In a schedule

11   shared with buyer's representatives on

12   January 6, 2019, the debtors' estimated cash

13   available to pay down such outstanding amounts

14   was $89 million," correct?

15      A.    That is what the last sentence of

16   that paragraph says.

17      Q.    And then when it refers to "such

18   outstanding amounts," I take it your

19   understanding is that the outstanding amounts

20   refer to the amounts necessary to pay down the

21   first lien, ABL DIP facility, and the debtors'

22   junior DIP facility as reflected in the earlier

23   sentence.

24      A.    (Document review.)

25           Can you repeat the question?

```
1                        GOOD

2        Q.    What do you believe "such

3   outstanding amounts" refers to?

4        A.    The ABL DIP facility and the junior

5   DIP facility.

6        Q.    Okay.  Now, the schedule shared with

7   buyer's representatives on January 6, 2019, is

8   that the schedule that we were looking at that

9   refers to -- that was marked as Good Exhibit 4?

10       A.    (Document review.)

11             The 89 million is the same number.

12       Q.    Okay.  Thank you.

13             MR. LIMAN:  I'm now going to ask you

14       to -- I'm going to ask the court reporter

15       to mark, as Good Exhibit Number 6, a

16       presentation dated January 3.  It's

17       attached to an e-mail dated January 4 from

18       Weil Gotshal, headed "Restructuring

19       Committee Meeting Materials."

20             (Good Exhibit 6, E-Mail, dated

21       January 4, 2019, with attached

22       presentation, dated January 3, 2019,

23       marked for identification.)

24       A.    I just wanted to clarify my

25   testimony before, that it said the amounts were
```

```
 1                      GOOD

 2   net of any cash available to pay down such

 3   amounts, and the actual amount ended up being

 4   significantly less than that, so...

 5        Q.    You have got Good Exhibit 6 in front

 6   of you.

 7              Do you recognize it?

 8        A.    (Document review.)

 9        Q.    Do you recognize Good Exhibit 6?

10        A.    (Document review.)

11              I recognize the form of this

12   exhibit, but it was updated countless times.

13        Q.    I'm going to ask you a couple more

14   questions in a moment, but let me just ask you,

15   with respect to the January 6 call, do you

16   recall anything on that January 6 call telling

17   the representatives from Transform or ESL that

18   the -- that it was debtors' view that the

19   notion of company cash was limited to the

20   amount that was in the concentration accounts?

21        A.    No, I don't recall.

22        Q.    Okay.  And do you recall, at any

23   time, you saying to Transform or any of its

24   representatives that the purpose of the

25   available cash clause in the aggregate DIP
```

```
 1                            GOOD
 2   shortfall amount was limited to protecting the
 3   buyer in the event the debtors had paid down
 4   the senior DIP below 850 million and Bank of
 5   America agreed to stop the automatic sweeps and
 6   additional cash was swept into the
 7   concentration accounts from the regional banks?
 8            MS. MISHKIN:  Objection to form.
 9       A.    Can you just break that down?
10            MR. LIMAN:  I think there's a
11       probably an easier way to do this.  Let me
12       just ask the court reporter to mark, as
13       Good Exhibit Number 7, your declaration in
14       this case.
15            (Good Exhibit 7, Second Supplemental
16       Declaration of Christopher A. Good, marked
17       for identification.)
18       Q.    Would you turn to paragraph 5 of
19   Good Exhibit 7?
20       A.    Yes.
21       Q.    Okay.  And do you see that paragraph
22   5 of Good Exhibit 7 refers to your
23   understanding of the function of the available
24   cash clause in the aggregate DIP shortfall
25   amount provision?
```

```
1                           GOOD
2         A.     Yes.
3         Q.     My question to you is whether you
4    ever told anybody from Transform or its
5    representatives, prior to January 16, that that
6    was your understanding of the available cash
7    clause in the aggregate DIP shortfall amount
8    provision?
9         A.     (Document review.)
10               I can't recall discussing the
11   provision specifically.
12        Q.     Do you know of anybody from the
13   debtors or its representatives who told
14   Transform or its representatives that the
15   understanding reflected in paragraph 5 was
16   debtors' understanding?
17               MS. MISHKIN:   Objection to form.
18        A.     As I remember now, I believe there
19   were conversations where all available cash was
20   to be -- to pay down the DIP, and that's what
21   calculated the shortfall.
22        Q.     My question is a little bit
23   different.
24               My question is whether you're aware
25   of any conversations by Transform's --
```

1                           GOOD

2     withdrawn.

3               Are you aware of any conversations,

4     prior to January 16, by debtors'

5     representatives where they said what was

6     reflected in paragraph 5 to debtors --

7     withdrawn.  It was a bad question.

8               Are you aware of any conversations,

9     prior to January 16, where debtors'

10    representatives told Transform or its

11    representatives that the function of the

12    available cash clause in the aggregate DIP

13    shortfall amount provision was limited to

14    protecting buyer in the event of one of the two

15    possibilities listed in paragraph 5?

16              MS. MISHKIN:  Objection to form.

17         A.    I'm unaware.

18         Q.    Okay.  Now, let me turn you back to

19    Good Exhibit Number 6.

20              These are -- is it correct that the

21    attachment to Good Exhibit 6 is a deck that was

22    presented to members of the restructuring

23    committee?

24         A.    Yes, that's what it says.

25         Q.    And as reflected in the cover e-mail

```
1                          GOOD
2    dated January 4 at 10:52 a.m., you were a
3    recipient of these slides, correct?
4        A.    I was a recipient, yes.
5        Q.    Okay.  Now, if you turn to slide 1
6    of the attachment, do you see that it is headed
7    "Illustrative Company Sources and Uses Under
8    ESL Bid - Updated January 3, 2019"?
9        A.    That is what the header says.
10       Q.    Okay.  And this deck was prepared a
11   couple days before the deck that we just looked
12   at that was Good Exhibit Number 4, the
13   January 6 remaining value presentation,
14   correct?
15       A.    According to the dates of the
16   e-mails, yes, that is correct.
17       Q.    And do you see there is a figure
18   with respect to 89 million of other cash that's
19   reflected in the left column of slide 1 of Good
20   Exhibit 6?
21       A.    (Document review.)
22             The row labeled "Other Cash"?
23       Q.    Yes.
24       A.    Yes, I see an 89.
25       Q.    Okay.  And is that 89 million the
```

```
 1                         GOOD

 2    same 89 million as the company cash that was

 3    reflected in Good Exhibit Number 4?

 4         A.    (Document review.)

 5              The 89 million appears to be the

 6    same figure.

 7         Q.    And there's a note 3 next to the

 8    89 million, correct?

 9         A.    (Document review.)

10              Yes, there is a note 3.

11         Q.    Okay.  And the note 3 indicates that

12    the 89 million was based on the company

13    projections of available cash in regional banks

14    at February 1, '19 close.

15              MS. MISHKIN:  Objection.

16         Q.    Is that correct?

17         A.    That's what the footnote says, but

18    that appears to be wrong.

19         Q.    Did you know that was wrong at the

20    time this was presented to the restructuring

21    committee?

22         A.    The number is correct, but the

23    nomenclature is wrong, as that cash wasn't

24    available to pay down the DIP as we

25    anticipated.
```

```
 1                          GOOD
 2        Q.    So my question is, at the time that
 3   this was presented to the restructuring
 4   committee, did you believe that note 3 was
 5   wrong?
 6        A.    I think it's being taken out of
 7   context.  It could be available in the regional
 8   banks, but it wasn't available to pay down the
 9   DIP.
10        Q.    So when did you -- at the time of
11   the presentation to the restructuring
12   committee, was it your understanding that the
13   89 million in available cash in regional banks
14   was not available to pay down the DIP?
15        A.    At the time, it was unclear.  We
16   were working tirelessly to make the cash that
17   was unavailable available, but, unfortunately,
18   it didn't come to fruition.
19        Q.    And that was something that you came
20   to a realization of at a later point in time;
21   is that correct?
22        A.    It was a multi-month process.  As
23   the process continued, we realized that that
24   cash was not available to pay down the DIP as
25   Kunal had initially suggested.
```

```
 1                      GOOD
 2        Q.    And is it correct that you became
 3   aware of the fact that that cash would not be
 4   available to pay down the DIP after January 16?
 5        A.    It's hard to recall that
 6   specificity.
 7        Q.    Okay.  Now, my question with respect
 8   to note 3 is whether the 89 million was a
 9   calculation of projections of available cash in
10   regional banks at the February 1 close.
11        A.    Can you rephrase the question?
12        Q.    I will leave it.
13              So was this chart shared with
14   Transform?
15        A.    I can't recall.
16        Q.    Okay.
17              MR. LIMAN:  I'm going to ask the
18         court reporter to mark, as Good Exhibit 8,
19         a e-mail to Mr. Good, among others, dated
20         January 16, 2019, at 3:55 p.m.
21              (Good Exhibit 8, E-Mail, dated
22         January 16, 2019, with attachment, marked
23         for identification.)
24        Q.    Do you recognize Good Exhibit 8?
25        A.    (Document review.)
```

GOOD

1

2        I recognize the form of this deck.

3   I'm not sure if I recognize this specific

4   version.

5        Q.   Okay.  Do you recognize this as a

6   presentation that was made to the Project Blue

7   restructuring committee?

8        A.   That is what the e-mail says.

9        Q.   Do you have any reason to doubt that

10  this was presented to the restructuring

11  committee?

12       A.   I have no reason to doubt that this

13  was not presented to the restructuring

14  committee.

15       Q.   In other words, sitting here today,

16  there is no reason to doubt that the

17  restructuring committee saw this?

18       A.   The e-mail went to them, so they

19  must have seen it.

20       Q.   Okay.  Now, would you turn to slide

21  1 of the presentation?  It's headed "Additional

22  Value Required."

23            Can I direct your attention to the

24  column on the right side?  Do you see that?

25  And there's figures for company cash available

```
 1                    GOOD
 2   at close and company cash available post close.
 3            Do you see that?
 4       A.   (Document review.)
 5            I do see.  I see the two rows.
 6       Q.   And they sum to 79 million, correct?
 7       A.   The two amounts add up to
 8   79 million.
 9       Q.   And that's 50 million available at
10   close and 29 million available post close,
11   correct?
12       A.   That's what the labels say, but
13   these are estimates, and it was not actually
14   available.
15       Q.   Okay.  And this 79 million
16   corresponds, correct, to the 89 million that we
17   saw in Good Exhibit Number 4 and Good Exhibit
18   Number 6?
19            MS. MISHKIN:  Object to form.
20       A.   (Document review.)
21            I'm not sure that it corresponds
22   exactly.
23       Q.   There's a change in the projections
24   of available cash between the earlier
25   presentations and this presentation on
```

1                       GOOD

2    January 16, is that fair, from 89 million to

3    79 million?

4        A.     (Document review.)

5               You're using the term "available

6    cash."  That's not what this represents.

7        Q.     There was a change in the

8    projections for company cash from 89 million to

9    79 million by January 16, correct?

10       A.     (Document review.)

11              It's unclear, because the prior one

12   said 79 million of regional bank cash and

13   10 million of utility deposits, but then this

14   one has -- the newer version has the utility

15   deposits in the 79.

16              So it's unclear.  It's hard for me,

17   sitting here today, to trace these two because

18   there's inconsistencies between the two.

19       Q.     Okay.  But, as a general matter,

20   what's reflected in Good Exhibit 8 is the

21   projections of company cash, correct?

22       A.     (Document review.)

23              They both say company cash.

24       Q.     Okay.  And there's a projection of

25   50 million of company cash available at close,

```
 1                       GOOD
 2   correct, on Good Exhibit 8?
 3        A.    The row says "Company cash available
 4   at close," and the number 50.
 5        Q.    Okay.  And if you look to slide 5,
 6   there's a breakdown of the company cash; is
 7   that right?
 8        A.    Yes.  I didn't compile this, but
 9   that is what this slide of the deck says.
10        Q.    Who compiled it?
11        A.    Lazard put together the actual
12   presentation.
13        Q.    It says, "The following provides
14   further detail into the company's projected
15   cash balance at close identified by M-III."
16             Do you see that at the top of slide
17   5?
18        A.    Yes, I see that sentence.
19        Q.    Who at M-III?
20        A.    It's hard to recall specifically,
21   but several members of the team worked with the
22   treasury team to compile this information.
23   Those members were also working to try to make
24   the unavailable cash available.
25        Q.    Slide 5 contains a breakdown of the
```

```
 1                         GOOD
 2   50 million, right?
 3        A.    There is a breakdown of 50 million
 4   on this slide, yes.
 5        Q.    And it includes regional bank cash
 6   and cash in transit and other items, right?
 7   I'm just asking about the chart.
 8        A.    Yeah, the chart says that.
 9        Q.    And also, for the post closing
10   amounts, it includes cash in transit and some
11   regional bank cash, correct?
12        A.    That's what the chart says, yes.
13        Q.    Okay.  You can put that down.
14             MR. LIMAN:  I'm going to ask the
15        court reporter now to mark, as Good
16        Exhibit 9, an e-mail to you, among others,
17        from a Leena Munjal, M-U-N-J-A-L, dated
18        January 17.  The subject is "Daily
19        Touchbase on Close Metrics."
20             (Good Exhibit 9, E-Mail, dated
21        January 21, 2019, with attachment, marked
22        for identification.)
23        Q.    While my colleague is pulling the
24   document, do you know what the daily touchbase
25   on close metrics was?
```

```
 1                          GOOD
 2              MS. MISHKIN:  Object to form.
 3       A.    Can I get the document?
 4       Q.    (Handing.)  I withdraw my prior
 5  question.
 6              What is Good Exhibit 9?
 7       A.    (Document review.)
 8              It's a reply to a meeting invite for
 9  a call on Thursday, January 17.
10       Q.    And the subject is "Daily Touchbase
11  on Close Metrics," correct?
12       A.    Yes.
13       Q.    What was the daily --
14              MS. MISHKIN:  I'm sorry.  Do I have
15          the right -- no, I do have the right one.
16          I was confused.  Thanks.
17       Q.    What was the daily touchbase on
18  close metrics?
19       A.    It was a call with M-III and the
20  company to track the closing conditions.
21       Q.    Did the calls occur on a regular
22  basis?
23              MS. MISHKIN:  Objection.
24       A.    Yes.
25       Q.    Do you recall when the calls first
```

```
 1                         GOOD
 2   started?
 3        A.    Sometime after we signed the APA.
 4        Q.    And did they continue till the APA
 5   was closed, the transaction was closed?
 6        A.    My memory is a little fuzzy, but,
 7   yes, I believe so.
 8        Q.    How often were the calls?
 9        A.    I don't know exactly how often the
10   calls took place.  The idea was to do it daily.
11        Q.    Did you participate in the calls?
12        A.    Sometimes.  Not all the time.
13        Q.    Did representatives of the finance
14   team attend?
15        A.    Yes.
16        Q.    Did that include Mr. Riecker?
17        A.    Yes.
18        Q.    Did Mr. Meghji attend?
19        A.    I'm not sure.
20        Q.    Did anybody from Transform or ESL
21   attend these meetings?
22        A.    Not that I'm aware of.
23        Q.    And do you see that there is,
24   attached to Good Exhibit 9, a document labeled
25   "Transform Transaction Weekly Tracking,
```

1                          GOOD

2    January 18, 2019"?

3         A.    That's what the slide says, yes.

4         Q.    Were there similar tracking

5    documents prepared for these calls to what's

6    behind Good Exhibit 9?

7              MS. MISHKIN:  Object to form.

8         A.    Can you rephrase the question?

9         Q.    Sure.  I will ask you a different

10   question.

11              Were there materials prepared for

12   the calls to track the closing conditions?

13        A.    Yes, materials were prepared.

14        Q.    And is the document behind Good

15   Exhibit 9 one of those materials?

16        A.    Yes.

17        Q.    And do you know whether those

18   materials were sent to Transform or ESL or the

19   representatives at the time of the meetings?

20        A.    It's unclear.

21        Q.    Who prepared the materials for the

22   meetings on the tracking of closing conditions?

23        A.    Members of M-III and employees of

24   the debtors.

25        Q.    Did you have an involvement in the

```
 1                        GOOD
 2    preparation of the materials for the daily
 3    calls?
 4         A.    I would sometimes have input, yes.
 5         Q.    Do you know how far in advance of
 6    the call the materials were prepared?
 7         A.    I can't recall.
 8         Q.    Okay.  Would you turn to page 2 of
 9    the weekly tracking meeting materials behind
10    Good Exhibit Number 9?  It says, "Weekly
11    dashboard," if that helps you.
12         A.    Yes, I see the weekly dashboard.
13         Q.    Okay.  And is it correct that the
14    items in -- on the left column include some of
15    the -- include closing conditions that M-III
16    was tracking?
17              MS. MISHKIN:  Objection to form.
18         A.    Can you repeat the question?
19         Q.    Does the left column include closing
20    conditions that M-III was tracking?
21         A.    (Document review.)
22              It includes tracking of two of the
23    closing conditions.
24         Q.    Which ones?
25         A.    The heading "New BB Collateral" and
```

1                          GOOD

2    "DIP".

3         Q.    Okay.  And under "NWC Assets," was

4    M-III also tracking store cash?

5         A.    We were tracking store cash.

6         Q.    And specified receivables?

7         A.    That is what the page says, yes.

8         Q.    And prepaid inventory also?

9         A.    Yes.

10        Q.    Okay.  Were you also tracking

11   accounts payable?

12        A.    That is what the page says, yes.

13        Q.    Okay.  Now, under DIP, you see that

14   there is a reference to the senior DIP being at

15   a level as of January 18 of 946 million.

16             Do you see that?

17        A.    That is what it says, yes.

18        Q.    Okay.  And then it says that the DIP

19   budget, as of February 9, '19, is 970 million.

20             Do you see that?

21        A.    The estimate at that point in time

22   for February 9 was 970 million.

23        Q.    By the way, what is the significance

24   of the February 9 date?

25        A.    The closest week end -- week ended

```
 1                          GOOD
 2    Saturday per the company's fiscal weeks to
 3    where we thought the close would be.
 4         Q.    Okay.  And the delivery target is
 5    850 million, and that corresponds to the target
 6    as reflected in the APA as of the closing
 7    condition, right?
 8         A.    Implied is what -- closing condition
 9    was 1.2 billion.
10         Q.    The 1.2 billion was comprised of
11    850 million for the senior DIP and 350 million
12    for the junior DIP; is that right?
13         A.    That is what we anticipated.
14         Q.    Okay.  And is that what you
15    understood also, was the closing condition was
16    850 million for the senior and 350 for the
17    junior DIP?
18         A.    Assuming the junior DIP was fully
19    drawn, yes.
20         Q.    Okay.  Now, there's a footnote 13 on
21    the next slide after the weekly dashboard.
22              Do you see that?
23         A.    (Document review.)
24              I see a note 13, yeah.
25         Q.    Okay.  And that reflects the
```

1                          GOOD

2      understanding that the senior DIP balance of

3      850 million would be required to close based on

4      the assumption of a junior DIP balance of

5      350 million assumed at close.

6                Do you see that?

7          A.    That's what it says, yes.

8          Q.    It indicates that the balance under

9      850 million will not receive a purchase price

10     adjustment.

11               Do you see that?

12         A.    That is what it says, yes.

13         Q.    And I take it that was your

14     understanding as well?

15         A.    Yes, that was my understanding.

16         Q.    Okay.  Now, if you flip back to the

17     weekly dashboard, it reflects, with respect to

18     the senior DIP, a shortfall of 120 million; is

19     that right?

20         A.    That is what it says in the cushion

21     shortfall column.

22         Q.    Okay.  And that would represent the

23     difference between the projected senior DIP

24     amount, as of February 9, and the delivery

25     target under the APA of 850 million, correct?

1                        GOOD

2        A.    Correct.

3        Q.    And if I flip to the following page,

4    it says, "Opportunity and actions."

5            Do you see that page?

6        A.    Yes, I do.

7        Q.    Is it correct that there are pages

8    for opportunities and actions in the materials

9    that were distributed as part of the call on

10   closing metrics?

11           MS. MISHKIN:   Object to form.

12       A.    It was in this version, yes.

13       Q.    Do you know whether it was in other

14   versions as well?

15       A.    Some others.

16       Q.    Okay.  What was the process of

17   preparing the page for opportunity and actions?

18       A.    What was the process?

19       Q.    Yes.

20       A.    Members of my team compiled the

21   different opportunity -- opportunities and

22   actions around the various items we were

23   tracking.

24       Q.    Do you know how far in advance of

25   the distribution of the opportunity and actions

1                        GOOD

2    that the slide was prepared?

3         A.    How far in advance of what?

4         Q.    Let me ask you this question.

5    That's a fair criticism.

6               This was distributed on January 17

7    at 10:14 a.m., correct?  That's what the e-mail

8    reflects?

9         A.    What are you saying?

10        Q.    The charts and the materials were

11   disseminated on January 7 and sent out on

12   January 17 at 10:14 in the morning.

13        A.    No, that's incorrect.

14        Q.    When were the materials distributed?

15        A.    Per the timestamp at the top of the

16   e-mail.

17        Q.    January 21 at 10:47 -- at 11:47; is

18   that right?

19        A.    January 21 at 11:47 a.m.

20        Q.    Do you know how far in advance of

21   that this would have been prepared?  At least

22   by January 18, correct?  I withdraw the

23   question.

24        A.    Yeah, that's --

25        Q.    Take a look at the opportunity and

1                         GOOD

2    actions.  There's a row with respect to the

3    senior DIP balance.

4         A.    There's three rows, yeah.

5         Q.    Okay.  And those three rows

6    collectively represent opportunities and

7    actions that could be taken to help bridge the

8    120 million gap that we just looked at; is that

9    right?

10              MS. MISHKIN:  Object to form.

11        A.    That is what it appears to

12   represent, yes.

13        Q.    And there's a reference with respect

14   to 50 million of company cash as one of the

15   actions with respect to bridging the gap of

16   120 million for the senior DIP?

17        A.    It is a row listed on the page with

18   the header "Opportunity and Actions."

19        Q.    And you are listed as one of the

20   responsible parties, right?

21        A.    Yes, I am.

22        Q.    What was your responsibility with

23   respect to company cash?

24        A.    I oversaw a group of individuals at

25   my firm that worked with the treasury team to

```
 1                         GOOD
 2    try to sweep cash in regional banks and other
 3    sources of cash into the concentration accounts
 4    to pay down the DIP.
 5         Q.    And that 50 million figure does that
 6    correspond with the 50 million figure in the
 7    January 16 presentation to the restructuring
 8    committee?
 9              MS. MISHKIN:  Object to form.
10         A.    That's unclear.
11         Q.    Is that where the 50 million figure
12    was drawn from, through this opportunity and
13    actions?
14              MS. MISHKIN:  Object to form.
15         A.    I can't recall.
16         Q.    Do you know of a different source
17    than what's reflected as 50 million in the
18    restructuring committee presentation?
19              MS. MISHKIN:  Objection.
20         A.    I can't recall of a different
21    source.
22         Q.    Okay.  And if I could flip back to
23    the restructuring committee presentation.  It's
24    Good Exhibit 8.  Just take a look at that for a
25    second.
```

```
 1                         GOOD
 2        A.    Which page?
 3        Q.    I'm looking at slide 5.
 4        A.    Okay.
 5        Q.    There's a reference to
 6   trapped/unavailable cash.
 7              Do you see that?
 8        A.    I see a row "Trapped/Unavailable
 9   Cash."
10        Q.    Do you know what that represented?
11        A.    It represented cash that we did not
12   think we could use to pay down or that we would
13   never be able to receive at any point in time,
14   ever.
15        Q.    Why?
16        A.    It had already been spent.  It was
17   an accounting adjustment.  It just wasn't real.
18        Q.    Is it correct that it also included
19   funds that were committed contractually for
20   other purposes, deposits and the like?
21        A.    I'm not sure I understand the
22   question.
23        Q.    Did the unavailable cash include
24   cash that would not be available to debtors to
25   use because it was contractually committed to a
```

```
 1                          GOOD
 2    third party?
 3         A.    No, that's not my understanding.
 4               Unavailable cash was any cash that
 5    was not in the concentration account and able
 6    to pay down the DIP.
 7         Q.    Okay.  Is that your reading of that
 8    chart, that the unavailable cash, as reflected
 9    in Good Exhibit 8, consists of cash that is not
10    in the concentration account?
11               MS. MISHKIN:  Objection to form.
12         A.    Can you repeat the question?
13         Q.    So you just said that unavailable
14    cash, as reflected in Good Exhibit 8,
15    constitutes cash that's not in the
16    concentration accounts.
17               MS. MISHKIN:  Objection, misstates
18         his testimony.
19         A.    All of this is not in the
20    concentration account, including the available,
21    as it says on this page.
22         Q.    Okay.  Thank you.
23               Now, if you turn back to Good
24    Exhibit Number 9, was it your intention, at the
25    time of this tracking meeting, to attempt to
```

                    GOOD

1
2    collect the cash in regional banks and stores
3    in order to use it to pay down the DIP?
4         A.    Can you repeat the question?  I'm
5    sorry.
6         Q.    I will ask it a different way.
7              In what respect was the company cash
8    a potential action with respect to the DIP
9    balance?
10             MS. MISHKIN:  Object to form.
11        A.    The cash was unavailable because it
12   was not in the company concentration accounts,
13   and we put significant effort in trying to make
14   the cash available to pay down the DIP.
15        Q.    Okay.  And, sir, now I'm going to
16   direct your attention to the line for accounts
17   payable.  If you flip back to the weekly
18   dashboard, you see that there is a level of
19   177 million as of January 18?
20        A.    (Document review.)
21             Yes, I see it on the page.
22        Q.    And then a DIP budget of
23   196 million.
24             Do you see that?
25        A.    Yes, I see that.

```
 1                         GOOD
 2         Q.    And a delivery target of
 3    166 million, correct?
 4         A.    Yes, I see that.
 5         Q.    Does that 166 million reflect what
 6    you understood would be the amounts of accounts
 7    payable, that under the APA, at close,
 8    Transform would be required to satisfy?
 9         A.    Yes, Transform was assuming
10    166 million of accounts payable.
11         Q.    And the DIP budget of 196 million,
12    what does that represent?
13         A.    The DIP budget forecast of what
14    accounts payable would be at February 9.
15         Q.    Okay.  And there's a shortfall
16    reflected there of 30 million.
17               What does that reflect?
18         A.    Since we were projecting 30 million
19    over 166 million, if that estimate proved to be
20    true, the debtors would have to satisfy
21    30 million of the 196 million as administrative
22    claims.
23         Q.    And you are listed as one of the
24    responsible parties with respect to the
25    accounts payable also?
```

```
 1                        GOOD
 2        A.    I am listed here on the page, yes.
 3        Q.    And then if you flip to the
 4   opportunities and actions, you see that there
 5   are -- there's a identified opportunity for the
 6   accounts payable of 15 to 30 million; is that
 7   right?
 8        A.    That is what it says, yes.
 9        Q.    And then the potential actions
10   include decreasing the operating expense; is
11   that right?
12        A.    That is what it says.
13        Q.    And what was that action?  What did
14   that entail?
15        A.    Reducing the amount of payables
16   generated by cutting expenses that generate
17   payables.
18        Q.    Okay.  And it says, "Manage down
19   disputed payables."
20              Do you see that?
21        A.    Yes.
22        Q.    And it's fair to say what that
23   represented was trying to negotiate down
24   payables they might not actually owe?
25        A.    That is a fair assessment.
```

1                          GOOD

2        Q.    Okay.  And then, just quickly, the

3    next page after the opportunities and actions,

4    there's a reference to the DIP budget.

5              Do you see that?

6        A.    On the next page?

7        Q.    Yes.

8        A.    Yes, I see a reference to the DIP

9    budget.

10       Q.    And that has a line item for total

11   liquidity, meaning availability plus cash?

12       A.    Row 29?

13       Q.    Exactly right.

14       A.    Yes, I see the row.

15       Q.    And that reflects, it looks like a

16   positive number all the way through?

17             MS. MISHKIN:  Object to form.

18       A.    At this date, this is what the

19   report says, but it did end up being negative

20   in the second week of -- or the third week of

21   February -- or the second week of fiscal

22   February, as we got closer, yeah.

23       Q.    Yeah.  And the liquidity is a

24   function of the available cash plus financing

25   that would be available either from the buyer

1                          GOOD

2    or otherwise?

3              MS. MISHKIN:  Object to form.

4        A.    I wasn't very close to this report

5    at the time.  It's a little bit difficult for

6    me to opine on it.

7        Q.    Okay.  And just quickly, the

8    available cash, that, again, is a function of

9    the cash receipts, less operating

10   disbursements, less non-operating disbursements

11   adjusted for financing?

12             MS. MISHKIN:  Object to form.

13       A.    Are you referring to the exhibit we

14   referred to earlier or --

15       Q.    No.  I'm just referring to this

16   document.

17       A.    Can you repeat the question?

18       Q.    My question is whether the

19   calculation for available cash is just a

20   function of your cash receipts plus any

21   carryover available cash, less operating

22   disbursements, less non-operating

23   disbursements, adjusted for financing, either

24   paydowns or drawdowns?

25       A.    It's a little hard to follow you, so

1                              GOOD

2    I will just read my interpretation.

3              Total cash receipts, minus operating

4    disbursements and cap ex, minus other

5    non-operating disbursements, plus or minus the

6    financing line gets you to net cash flow.

7              What else were you asking about?

8        Q.    And then what gets you to the

9    available cash?

10       A.    I'm not seeing a row.  So there's

11   nothing on this page that shows how you

12   calculate to get to available cash.

13       Q.    Okay.  I will do it another way.

14             MR. LIMAN:  Let me ask the court

15        reporter to mark, as Good Exhibit 10 --

16             THE WITNESS:  Can I take a break?

17             MR. LIMAN:  Yeah.

18             (Recess taken.)

19             (Good Exhibit 10, E-Mail, dated

20        January 24, 2019, with attachment, marked

21        for identification.)

22             (Good Exhibit 11, E-Mail, dated

23        January 29, 2019, with attachment, marked

24        for identification.)

25             (Good Exhibit 12, E-Mail, dated

|    |                                                            |
|----|------------------------------------------------------------|
| 1  |                     GOOD                                   |
| 2  |       January 30, 2019, with attachment, marked            |
| 3  |       for identification.)                                 |
| 4  |              (Good Exhibit 13, E-Mail, dated               |
| 5  |       February 4, 2019, with attachment, marked            |
| 6  |       for identification.)                                 |
| 7  | BY MR. LIMAN:                                              |
| 8  |       Q.    Would you turn back very quickly                |
| 9  | just to Good Exhibit Number 9, and the page                |
| 10 | that we were looking at on opportunity and                 |
| 11 | actions with respect to the senior DIP balance?            |
| 12 |       A.    I'm on the opportunity and actions              |
| 13 | page.                                                      |
| 14 |       Q.    I think you recall that there was a             |
| 15 | gap of 120 million with respect to the senior              |
| 16 | DIP balance that was reflected on an earlier               |
| 17 | page, correct?                                             |
| 18 |       A.    Yes.                                            |
| 19 |       Q.    Okay.  And my question just is, on              |
| 20 | the assumption that the initiatives listed for             |
| 21 | 118 million, and then for 14 million to                    |
| 22 | 28 million under the senior DIP balance, on the            |
| 23 | assumption that those had been successful, is              |
| 24 | it correct that you would have been able to                |
| 25 | bridge the gap without needing the company                 |

```
 1                        GOOD
 2    cash?
 3              MS. MISHKIN:  Objection to form.
 4        Q.    You want me to ask the question
 5    again?
 6        A.    Can you rephrase it?
 7        Q.    Yeah, absolutely.
 8              There is a $118 million opportunity
 9    listed under the senior DIP balance, correct?
10        A.    Yes, there is.
11        Q.    And a number of different potential
12    actions that could be taken to generate that
13    $118 million opportunity, correct?
14        A.    Yes, there is a variety of actions.
15        Q.    And with respect to all of those,
16    there is risk, correct?
17              MS. MISHKIN:  Object to form.
18        A.    These are opportunities and actions.
19    There is risk associated with achieving these,
20    as they wouldn't be listed as an opportunity,
21    it would be an actual.
22        Q.    Okay.  And then there is a further
23    identified opportunity of 14 to 28 million
24    associated with a potential action related to
25    First Data proceeds, correct?
```

1                          GOOD

2        A.    Yes, that's what it says.

3        Q.    Okay.  And my question, sir, is had

4    the debtors been able to realize all of the

5    opportunities and actions associated with

6    118 million and with the 14 to 28 million, that

7    would have been sufficient to bridge the gap of

8    120 million without resorting to company cash?

9        A.    Mathematically, those numbers add up

10   to over 120 million, but, practically, that's

11   very unreasonable.

12       Q.    Okay.  What I would like to do is

13   turn -- or ask the court reporter to hand you a

14   document we premarked as Good Exhibit 10.  It's

15   a e-mail from Brian Griffith to you, among

16   others, dated January 24.

17       A.    (Document review.)

18       Q.    Good Exhibit Number 10 is a -- an

19   e-mail attaching weekly tracking materials for

20   the daily touchbase on close metrics, correct?

21       A.    (Document review.)

22             It's an attachment that was sent to

23   the same group for the daily touchbase on close

24   metrics.  There might be a few more people

25   added, but...

```
 1                          GOOD
 2        Q.    Okay.  And this is dated just five
 3   days later, January 23, as opposed to
 4   January 18, correct?
 5        A.    (Document review.)
 6              Yeah, 18 versus 23, yeah.
 7        Q.    And if you turn to page 2 of the
 8   deck that's headed "Administrative Solvency
 9   Tracker," do you see that?
10        A.    I see the header "Admin Solvency
11   Tracker."
12        Q.    Okay.  And there is a revised gap
13   for the ABL DIP of 90 million.
14              Do you see that?
15        A.    (Document review.)
16              The header "Revised Gap" shows
17   90 million, yes.
18        Q.    Okay.
19        A.    For the ABL DIP.
20        Q.    Got it.  So the gap has gone down
21   from about 120 million to 90 million over that
22   time period.
23              Is that what the records reflect?
24        A.    It reflects 90 million here, but the
25   original gap says 100 million.
```

1                          GOOD

2          Q.    100 million being the difference

3    between the 950 of the original estimate and

4    the 850 of ESL's assumed liabilities?

5          A.    Yes.

6          Q.    Okay.  And then it indicates

7    potential mitigating items of 102 million for

8    the -- next to the revised gap of 90 million?

9          A.    The potential mitigating items of

10   102 million, yes, I see it.

11         Q.    Those are mitigating items that

12   could be used, if you're successful, to close

13   the $90 million gap.

14         A.    That is what it implies.

15         Q.    Okay.  And then it refers to

16   footnote 3.  And then if you look to the page

17   under opportunity and actions, you see -- do

18   you see that page?  Flip to that page, if you

19   would for me.

20         A.    Page 4?

21         Q.    Yep.  You see that there are a set

22   of opportunities under the senior DIP balance?

23         A.    (Document review.)

24               It shows 88 million of opportunity

25   in one row and 14 to 28 million of opportunity

```
 1                       GOOD
 2   on another.
 3        Q.    Okay.  And if you take the low end
 4   of the -- of the other row, the 14 to 28, that
 5   would sum to the 102 million?
 6        A.    Yes.
 7        Q.    Okay.  And those two items, the
 8   88 million and the 14 to 28 million, are
 9   similar to the items that we saw in Good
10   Exhibit Number 9; is that right?
11              MS. MISHKIN:  Object to form.
12        A.    They are presented slightly
13   differently.
14        Q.    Okay.  There's no reference to
15   company cash as a mitigating item for the
16   senior DIP balance; is that right?
17        A.    That is what the page shows.
18        Q.    Do you know what happened to the
19   50 million of the opportunity for company cash?
20        A.    I do not, but I personally always
21   anticipated the unavailable cash that we were
22   working on moving into the concentration
23   account being used to pay down the senior DIP.
24        Q.    Could you turn to page 2, back to 2?
25   That's the administrative solvency tracker,
```

```
 1                          GOOD
 2    just for the record, correct?
 3         A.    The header is "Admin Solvency
 4    Tracker."
 5         Q.    Okay.  And if you look under
 6    additional value identified, you see there's a
 7    reference to an original estimate of
 8    50 million?
 9              MS. MISHKIN:  Objection to form.
10              I was not clear.
11         A.    It's a header for labels that aren't
12    numbers.
13         Q.    You see there's a header that says
14    "Additional Value Identified"?
15         A.    Yes.
16         Q.    And there's a figure of 50 million
17    for company cash available at close under
18    additional value identified, correct?
19         A.    Yes.
20         Q.    Okay.  And am I understanding this
21    chart correctly to indicate the view that the
22    50 million could be applied against the --
23    against the admin and other priority claims to
24    address administrative solvency issues?
25              MS. MISHKIN:  Object to form.
```

1                          GOOD

2        A.    That's out of context.  Cash is

3    fungible.  It doesn't really matter where it

4    comes from.  It just needs to be available at

5    close to pay down the DIP, and every dollar we

6    had on the Friday before close paid down the

7    DIP.

8              So it doesn't matter what line item

9    goes to what.  One dollar is a dollar here,

10   dollar there.  It's all fungible.

11       Q.    So, for example, if you were able to

12   close the gap and bring down the DIP to

13   865 million without the company cash, you would

14   only need 15 million of company cash to achieve

15   the target of 850 million, correct?

16             Is that what you mean by cash being

17   fungible?

18       A.    Just a theoretical situation?

19       Q.    Yes.

20       A.    Mathematically, if there were

21   865 million senior DIP balance and we had

22   15 million of some other source of cash, then

23   that's what we would use it for.

24       Q.    You would be able to use it to

25   satisfy the other administrative obligations?

1                        GOOD

2               MS. MISHKIN:  Objection to form.

3       A.    No, because we, unfortunately,

4    weren't able to.

5       Q.    Had you been able to -- withdrawn.

6               At the time that this chart was

7    generated listing an identified opportunity of

8    88 million for a series of items ranging from

9    operating receipts to pro rata February rent,

10   do you see that on page 4?

11      A.    I see operating receipts and prorate

12   February rent.

13      Q.    Okay.  In fact, 88 million is

14   comprised of operating receipts, operating

15   disbursements, critical vendors, KCD

16   nonpayment, hurricane proceeds and prorate

17   February rent, correct?

18      A.    Those are the six items.

19      Q.    Okay.  And had you or somebody on

20   your team identified those as potential actions

21   that could generate 88 million of cash?

22      A.    I haven't checked the math, but I'm

23   assuming the potential actions you listed add

24   up to 88 million.

25      Q.    And had somebody on your team

GOOD

1

2    identified those as potential actions that

3    could be generated to -- to generate 88 million

4    in cash?

5        A.    Our team, in combination with

6    employees of the debtors, like Rob Riecker, you

7    know, listed on the responsible parties.

8        Q.    Those were items that the debtors

9    and M-III and debtors' representatives were

10   working to achieve, correct?

11       A.    The debtors and its representatives

12   were working to achieve all of these actions.

13       Q.    Okay.  And if they had those -- now,

14   as it turns out, not all of those actions were

15   successful, correct?

16       A.    Yes.  Which is very reasonable that

17   not everything would be successful.  That's why

18   they are opportunities.

19       Q.    Right.  But if they had been

20   achieved, then the company cash could have been

21   used, in part, to satisfy other administrative

22   obligations, correct?

23            MS. MISHKIN:  Objection.

24       A.    Had that action have been

25   successful, but it wasn't, just like a lot of

                              GOOD

2    these others weren't successful.

3         Q.    Now, is it fair to say, sir, that

4    the reason why company cash is no longer listed

5    as an opportunity with respect to the senior

6    DIP balance was because M-III did not think

7    that, as of January 23, company cash would be

8    necessary to satisfy the gap in the senior DIP

9    balance?

10        A.    I can't really opine why it was

11   moved in or out.

12             In my mind, it was always going to

13   be used to pay down the senior DIP, and as you

14   know, we were very close to not making it and

15   needed every dollar.

16        Q.    Now, I want to ask the court

17   reporter to show you an exhibit I have marked

18   as Exhibit 11.

19             Exhibit 11 attaches the

20   transaction -- Transform transaction weekly

21   tracking materials for January 25, 2019,

22   correct?

23        A.    (Document review.)

24             It says, "Transform Transaction

25   Weekly Tracking as of January 25," yes.

```
 1                        GOOD
 2        Q.    Okay.  And if you turn to page 2,
 3   the ABL DIP reflects a gap of now 104 million;
 4   is that right?
 5        A.    (Document review.)
 6              The revised gap number under ABL DIP
 7   on page 2 says 104.
 8        Q.    Okay.  And that was what, at that
 9   time, M-III was estimating the gap was that
10   would have to be closed in order to meet the
11   closing condition for the ABL DIP, correct?
12        A.    Yes, that appears to be the gap to
13   meet the ABL DIP.
14        Q.    Okay.  If you look at the same
15   118 -- this 118 million of potential mitigating
16   items for the ABL DIP, correct?
17        A.    Yes, I see the 118.
18        Q.    On slide 2.
19              And if you look to slide 4, at the
20   bottom of slide 4, there are a series of
21   potential actions that sum up to a range of
22   118 million to -- to 132?
23        A.    132.
24        Q.    And listed in those -- in the
25   104 million, you see the line for -- that has a
```

```
 1                      GOOD
 2    25 million favorable variance, and then a
 3    identified opportunity of 104 million?
 4              Do you see that?
 5        A.   Sorry.  Are you on --
 6        Q.   Under the senior DIP balance.
 7        A.   Uh-huh.
 8        Q.   The first row has a identified
 9    favorable variance of 25 million and an
10    opportunity of 104 million.
11              Do you see that?
12        A.   Yes.
13        Q.   Do you know how the 25 million
14    favorable variance was achieved?
15        A.   I don't recall the exact breakdown.
16        Q.   Okay.  Do you have a general
17    understanding of how the 25 million favorable
18    variance was achieved?
19        A.   It was more likely than just an
20    opportunity.
21        Q.   I don't understand.  I'm sorry.
22        A.   It was more likely to occur than
23    something that was still in the opportunity
24    bucket.
25        Q.   Okay.  Do you know what actions
```

GOOD

1       

2    caused the identified favorable variance of

3    25 million?

4        A.    I can't recall.

5        Q.    Okay.  Do you see, under the

6    potential actions associated with 104 million

7    identified opportunity, an accounts payable

8    build of 15 million?

9        A.    I see that row, yes.

10       Q.    Okay.  Do you know, sir, what that

11   represents?

12       A.    (Document review.)

13             It's hard to say without having the

14   accounts payable number estimated at this point

15   in time.

16       Q.    Let's see if we can figure it out.

17             You see that there is, on the

18   opportunities and actions page, there is a line

19   for accounts payable?

20             Do you see that?

21       A.    Yeah, I see an accounts payable

22   line.

23       Q.    And there's a figure for an

24   identified favorable variance of 30 million,

25   correct?

1                          GOOD

2        A.    That's correct.

3        Q.    And would that represent that, as of

4   the date of this tracker, January 25, the

5   debtors had already achieved a favorable

6   variance of 30 million, not just an

7   opportunity?

8        A.    That is what the document says.

9        Q.    Okay.  And is it fair to assume that

10  that 30 million was achieved in the ways that

11  the previous deck indicated, which would be to

12  decrease your expenses and to manage disputed

13  payables?

14       A.    I'm not sure exactly how that

15  occurred.

16       Q.    Do you know of any other way,

17  besides decreasing expenses and managing

18  disputed payables, that the 30 million was

19  achieved?

20       A.    Merchandise.

21       Q.    Ordering less merchandise?  You have

22  to answer verbally and not with a gesture.

23            Is the answer to that, yes, ordering

24  less merchandise?

25       A.    (Document review.)

1                                    GOOD

2              Not necessarily ordering less

3      merchandise, but just for whatever reason, the

4      forecasting numbers, things move around,

5      balances change.  I don't know exactly how the

6      balance became lower.

7          Q.    So you might forecast fewer

8      purchases in the future, bring down the

9      expenses that way.  Is that what you're saying?

10         A.    Yeah, there's a litany of reasons

11     why accounts payable moves around.

12         Q.    Then there is an additional

13     identified opportunity, 15 million.

14              Do you see that?

15         A.    Identified opportunity, 15 million,

16     yes.

17         Q.    And that's additional to the

18     30 million of identified favorable variance,

19     correct?

20         A.    I'm not sure if they're additive.

21         Q.    Well, isn't that how this chart

22     works, that they are additive?

23              MS. MISHKIN:  Object to form.

24         A.    (Document review.)

25         Q.    Look at page 2.

```
 1                      GOOD
 2        A.     (Document review.)
 3               Yes, they appear to be additive.
 4        Q.     Okay.  In the potential action
 5   associated with that 15 million identified
 6   opportunity is manage AP balance based on
 7   deliverable under the APA.
 8               Do you see that?
 9        A.     That is the potential action listed.
10        Q.     And then it lists, under comments,
11   increase payables to offset the DIP.
12               Do you see that?
13        A.     I see that comment, yes.
14        Q.     Can you tell me, first of all, how
15   you could manage the AP balance based on
16   deliverable under the APA?
17        A.     Can you rephrase the question?
18        Q.     What did you understand the
19   commentary, manage AP balance based on
20   deliverable under the APA to mean?
21        A.     Transform was assuming 166 million.
22   So we were managing based upon knowing the fact
23   that that's how much they were assuming.
24        Q.     Does that mean that you would --
25   withdrawn.
```

```
 1                         GOOD
 2               Is it correct that the accounts
 3     payable were paid out of the -- out of the DIP?
 4          A.    Not necessarily.
 5          Q.    How were the accounts payable paid?
 6          A.    From the disbursements account.
 7          Q.    Was the disbursements account part
 8     of the concentration account?
 9          A.    I'm trying to recall if that had one
10     step or two step, but it would either come from
11     the concentration or you'd move it to one
12     account and then it would go out.
13          Q.    How was the disbursements account
14     funded?
15          A.    Either from cash already sitting in
16     the concentration account or from a drawdown of
17     the DIP.
18          Q.    Okay.  And so is it accurate to say,
19     sir, that if you -- if you cease paying
20     payables, then the impact would be that you're
21     going to need fewer draws from the DIP, and
22     that you'll be able to put more money into the
23     DIP?  It's math.
24               MS. MISHKIN:  Object to form.
25          A.    If we disburse less, then the DIP
```

1                              GOOD

2    balance would be lower.

3         Q.    Okay.  And so when it says,

4    "Increase payable to offset DIP," does that

5    mean that if you pay fewer payables, the impact

6    will be that you would have more money

7    available to bridge the gap for the DIP?

8         A.    As was guided by Mr. Kamlani, he

9    said to manage working capital into the close

10   to ensure that we hit the closing condition of

11   the DIP balance.

12        Q.    Okay.  So is the answer to my

13   question yes, or do you need the question

14   again?  I will ask the question again, sir.

15             When it says, "Increase payable to

16   offset the DIP," does that mean that if you pay

17   fewer payables, the impact will be that you

18   will have more money available to bridge the

19   gap for the DIP?

20        A.    Yes, but we might be on the hook for

21   any overages over the 166 million.

22        Q.    And if you are able to decrease

23   the -- withdrawn.

24             If you're able to increase the

25   payables just up to the 166 level, the impact

```
 1                          GOOD
 2   will be that you'll have more money to bridge
 3   the gap for the DIP without assuming any
 4   additional liabilities for the debtors?
 5        A.    In conjunction with guidance with
 6   the buyer, that was our viewpoint.
 7        Q.    Okay.  And I'm assuming, sir, that
 8   you personally did not think that you were
 9   doing anything wrong by increasing payables to
10   offset the DIP?
11             MS. MISHKIN:  Object to form.
12        A.    I personally was not the one making
13   every decision.  That was in conjunction with
14   my team, the debtors, the buyer.
15        Q.    Okay.  Now, sir, you mentioned
16   Mr. Kamlani a couple of times.  I'm going to
17   ask you a specific question, which is whether
18   Mr. Kamlani ever told you that you should stop
19   paying payables in order to be able to meet the
20   closing condition with respect to the DIP.
21             Did he ever tell you that
22   specifically?
23             MS. MISHKIN:  Object to form.
24        A.    He specifically said to manage
25   working capital around the close to meet the
```

1                            GOOD

2  DIP, of which accounts payable is a portion of

3  working capital.

4        Q.    Of which accounts payable is a

5  portion of working capital.

6              Did he make any statements to you

7  about accounts payable?

8              MS. MISHKIN:  Objection to form.

9        A.    In his e-mail, no, but in

10  conversations with Rob, we talked about working

11  capital generally.

12        Q.    Mr. Riecker?

13        A.    Yes.

14        Q.    My question to you is, the

15  conversations you reference with Mr. Kamlani,

16  where -- when did Mr. Kamlani say to you to

17  manage working capital around the close to meet

18  the DIP?

19        A.    It's hard to recall the exact

20  timing, but I believe December.

21        Q.    And what precisely do you remember

22  him saying to you?

23        A.    I told him, which we voiced

24  consistently, that the DIP balance ESL was

25  assuming that we would hit was too aggressive.

1                          GOOD

2    We never -- we had serious concerns about being

3    able to hit the level that Eddie and Kunal and

4    ESL were pushing us towards.

5              And in our conversation, which

6    partially talked about unavailable cash, had

7    been followed up and said, by the way, have you

8    seen the company's daily cash forecast, the DIP

9    balance went up significantly.  It was a large

10   number.

11             And he responded, yes, I did see

12   that, acknowledging it was a problem because

13   that may mean managing working capital into the

14   close to make sure that we hit the balance, as

15   we all advocated and wanted to close the

16   transaction.  We had worked with Eddie and

17   Kunal for years.  And, three, supportive in

18   trying to get there.

19             And we were concerned about our

20   ability to close, and we worked very closely

21   with ESL to make sure we could meet them there

22   on the closing conditions.

23        Q.   Is it fair to say that in that

24   conversation -- withdrawn.

25             Was Mr. Lampert present for the

```
 1                         GOOD
 2   conversation you're remembering?
 3        A.     No.
 4        Q.     Just Mr. Kamlani?
 5        A.     For that conversation, yes.
 6        Q.     Do you recall Mr. Kamlani, in that
 7   conversation, saying I and we think that you
 8   can do better than what you are expected to do?
 9        A.     It was very clear that, at least
10   Eddie expected us to do better than the DIP
11   budget and relied on the company's daily cash
12   forecast, which ended up being a major pitfall
13   of their assumed DIP level.
14        Q.     Among other things, what Mr. Kamlani
15   indicated was, because you were beating the
16   budgets with respect to the DIP, he thought
17   that the forecasts were not -- withdrawn.
18             Mr. Kamlani indicated that, because
19   you were beating the budgets with respect to
20   the DIP, that you could -- your forecast for
21   where you would end up was unduly conservative?
22             MS. MISHKIN:  Object to form.
23        Q.     That's what he indicated, correct?
24             MS. MISHKIN:  Object to form.
25        Q.     In words or substance?
```

1                          GOOD

2          A.     I'm not sure I agree with the word

3     "unduly."

4          Q.     How would you put it?

5          A.     He thought we were conservative,

6     but, in hindsight, I think we were closer to

7     the truth.

8          Q.     Now, sir, how did you -- going back

9     to Exhibit 11.

10              How did you manage the AP balance

11     based on the deliverable under the APA?

12          A.     I did not personally manage the AP

13     balance.  So it was a group effort.

14          Q.     And what did the group do to manage

15     the AP balance?

16          A.     Like the comments say on the page,

17     decrease operating expense and I guess these

18     two counteract, but increase payables as well.

19          Q.     Okay.  And how did the group

20     increase payables?

21              MS. MISHKIN:  Object to form.

22          A.     The debtors could increase payables

23     by holding payments.

24          Q.     Now, I want to direct your attention

25     to Good -- hand you Good Exhibit Number 12.

1                          GOOD

2               Good Exhibit Number 12 attaches the

3     weekly tracker for January 30; is that right?

4          A.    Yeah, Transform transaction weekly

5     tracker, January 30.

6          Q.    And if you turn to the identified --

7     the opportunities and actions, that's page 4,

8     there's a reflection there under accounts

9     payable, the same identified favorable variance

10    of 30 million.

11              Do you see that?

12         A.    Yeah, I see 30 million of identified

13    favorable variance under accounts payable.

14         Q.    And then there's an opportunity --

15    under identified opportunity for accounts

16    payable, it says "in DIP."

17              Do you see that?

18         A.    That's correct.

19         Q.    And if you look down to the senior

20    DIP balance, do you see there's a reference to

21    an AP build of 15 million, correct?

22         A.    Yes, I see that.

23         Q.    Okay.  Is it your understanding that

24    the opportunity with respect to the accounts

25    payable is reflected by that AP build of

```
 1                        GOOD

 2    15 million?

 3        A.    That is what it appears to say.

 4        Q.    Okay.  Now, I think that's all I've

 5    got with respect to this one.

 6              I want to now have the court

 7    reporter hand you what's been marked as Good

 8    Exhibit 13.

 9              Good Exhibit 13 has an e-mail, the

10    subject of which is "Daily Touchbase on Close

11    Metrics."

12        A.    Are you referring to the document

13    itself?

14        Q.    No.  The e-mail -- the daily

15    touchbase on close metrics.

16        A.    Yeah.  The subject?

17        Q.    Yeah.  And then if you turn to the

18    weekly tracking document, it's dated

19    February 3; is that right?

20        A.    The document says February 3, yes.

21        Q.    And if we turn to the page 2, the

22    administrative solvency tracker, for the ABL

23    DIP, you see there's a box?

24        A.    There is a box around ABL DIP and

25    two other line items.
```

GOOD

1

2      Q.    And am I reading that correctly to

3    indicate that there is a gap of $33 million for

4    the projected -- net projected DIP balance?

5      A.    (Document review.)

6            Did you say a gap?

7      Q.    Yes, a gap of 33 million.

8      A.    The revised gap was 33 million for

9    net projected DIP balance on this report.

10     Q.    And that's after applying 37 million

11   of company cash available at close, correct?

12           MS. MISHKIN:  Object to form.

13     A.    That is what numbers add up to.

14     Q.    Okay.  And you see that there is a

15   figure of 60 million in terms of the revised

16   gap for the ABL DIP comprised of 10 million of

17   change and estimates and 30 million of

18   identified variance?

19     A.    I see a 10 and a 30, yes.

20     Q.    Do you know how the company achieved

21   that 10 and 30, the debtors achieved that?

22     A.    I can't recall.

23     Q.    Did it achieve it by increasing the

24   payables by holding payments?

25     A.    I don't know.

```
 1                         GOOD
 2         Q.    Now, if you look with respect to the
 3   accounts payable, do you see that there is now,
 4   on page 2, a identified gap of 3 million?
 5         A.    I see a revised gap of three, yes.
 6         Q.    Okay.  And does that reflect that
 7   the projected AP balance at close will be
 8   169 million?
 9         A.    (Document review.)
10               Yes, it appears to have dropped from
11   the original estimate of 196 to 169.
12         Q.    Okay.  And that means that there's
13   going to be a -- if that balance holds at
14   close, there will be 166 million essentially on
15   Transform's account and 3 million on debtors'
16   account based on your understanding of the APA?
17         A.    As Transform agreed to assume 166,
18   we would be on the hook for 3.
19         Q.    Okay.  And if you turn to the
20   opportunities and actions, there's a reference
21   to --
22         A.    This document?
23         Q.    Page 5.
24         A.    Is this in there?  I'm not sure if I
25   have the right page.
```

```
 1                      GOOD
 2              MR. LIMAN:  Let's go off the record
 3        for a second.  Make sure we have the right
 4        document.
 5              (Discussion off the record.)
 6        Q.    Okay.  Do you see there's a
 7   reference to maintain current AP?
 8        A.    Yes.
 9        Q.    Okay.  How was that action going to
10   be achieved?
11        A.    You know, only spending what you add
12   to accounts payable.
13        Q.    Okay.  Now, I want to ask you, back
14   on Exhibit 12, Good Exhibit 12, the action
15   of -- it's on page 4, the action of increasing
16   payables to offset the DIP.
17              Do you see that again?
18        A.    Yes.
19        Q.    Do you know whether anybody -- did
20   you call up Mr. Kamlani when this action was
21   reflected in the opportunities and actions, and
22   ask him whether that would be permissible?
23              MS. MISHKIN:  Objection.
24        A.    I know Mr. Meghji and Mr. Kamlani
25   had conversations.  We had an e-mail about
```

1                        GOOD

2     network and capital.  We sent daily reports

3     talking about how we were managing working

4     capital.

5              There were a significant number of

6     conversations and/or e-mails or reports that

7     were sent reflecting these types of actions.

8        Q.    Did you understand my question, what

9     I asked you?

10             MS. MISHKIN:  Objection to form.

11       A.    I think you're trying to understand

12    if Mr. Kamlani knew that we were managing

13    working capital.

14       Q.    No.  My question is just, did you

15    have a conversation with Mr. Kamlani where you

16    said to him, we're going to increase payables

17    to offset the DIP?

18             MS. MISHKIN:  Objection.

19       A.    Mr. Kamlani and I did a -- countless

20    conversations leading up to the close.  I can't

21    recall if specifically these exact words were

22    uttered to him, but in so many words, he

23    understood.

24       Q.    So my question -- you understand we

25    are taking Mr. Meghji's deposition tomorrow,

1                      GOOD

2     correct?  Do you understand that?

3          A.    Yes.

4          Q.    Okay.  Now, I'm just asking about

5     you.

6              In the conversations that you had

7     with Mr. Kamlani, did you tell him, we're

8     stopping paying payables that are due in order

9     to meet the DIP closing condition?

10             MS. MISHKIN:  Objection, asked and

11         answered.

12         A.    As I said before, I can't recall

13    specifically, but there were numerous

14    conversations had, and I'm sure he was aware.

15         Q.    But do you recall you personally

16    providing that information to him?

17             MS. MISHKIN:  Objection, asked and

18         answered twice.

19         A.    As I said, I can't recall

20    specifically.

21         Q.    Okay.  Thank you.

22             Now, I want to ask the court

23    reporter to mark as -- withdrawn.

24             Do you know, sir, whether this

25    meeting on January 30, was there any discussion

```
 1                      GOOD
 2   at that meeting about the company's liquidity
 3   position on February 14?
 4        A.    I have no ability to recall that.
 5        Q.    Okay.  And, in fact, do you recall,
 6   sir, at the meeting on February -- the
 7   meeting -- withdrawn.
 8              Was there a meeting on February 3?
 9   That's the Sunday.
10        A.    A daily touchbase on close metrics?
11        Q.    Yes.
12        A.    I can't recall.
13        Q.    I ask because Exhibit 13 has a date
14   of February 3 attached to it, but the call, it
15   looks like, is February 4 at 11 o'clock.
16              Do you recall whether there was a
17   discussion on the Sunday?
18        A.    (Document review.)
19              I can't recall, but the e-mail went
20   out after the 3rd, so...
21        Q.    And on the 4th, the call on the 4th,
22   was there any discussion of what the company's
23   cash position would look like on February 14?
24        A.    I can't recall specifics from a
25   daily call.
```

1                              GOOD

2          Q.    Okay.

3                 MR. LIMAN:  Now, I'm going to ask

4          the court reporter to mark, as Good

5          Exhibit 14, the e-mail from Rajat Prakash

6          to you, among others, dated Monday

7          February 4.

8                 (Good Exhibit 14, E-Mail from Rajat

9          Prakash, dated February 4, 2019, marked

10         for identification.)

11         Q.    Did you get this e-mail, sir?

12         A.    I'm listed on the e-mail.  So, yes,

13   I did receive it.

14         Q.    Okay.  And Mr. Prakash says, "In

15   order to manage 1L outstanding on February 8,

16   we are delaying certain payments contractually

17   due on February 5, 6, 7 by three business

18   days."

19                Do you see that?

20         A.    Yes, under key callouts.

21         Q.    What was the significance of the

22   February 8 date?

23         A.    That was the anticipated close at

24   that point in time.

25         Q.    Okay.  And if the payments that were

GOOD

1
2   contractually due -- withdrawn.  Payments were
3   made prior to the 8th.
4           Do you have an understanding as to
5   from what account those payments would be made?
6       A.    From the disbursement or
7   concentration accounts.
8       Q.    With the effect of reducing the
9   monies available to satisfy the DIP, correct?
10          MS. MISHKIN:  Objection to form.
11      A.    It would increase net availability
12  or reduce the balance of the DIP.
13      Q.    Okay.  And if you delay by three
14  business days, at that point, am I correct in
15  understanding that your understanding was that
16  the -- that the AP would then be on the account
17  of the -- of Transform?
18          MS. MISHKIN:  Object to form.
19      A.    That's unclear.
20      Q.    That's unclear because it's unclear
21  whether the AP would be above 166 or below?
22      A.    Yes.
23      Q.    If it's below 166, it would have hit
24  the account of Transform simply because it was
25  being delayed by those couple of days, correct?

GOOD

2          MS. MISHKIN:   Object to form.

3      A.    Yes.   And we thought it was above

4   166.   So we assumed the estate was going to

5   have to honor these payments.

6      Q.    And does it refresh your

7   recollection that by managing the 1L

8   outstanding -- withdrawn.

9          Does it refresh your recollection

10  that one way of managing AP at 169 was to delay

11  the payments contractually due on February 5,

12  6, 7?

13     A.    I don't think this action had

14  anything to do with the other one you

15  reference.

16     Q.    Do you have a reason to think, sir,

17  that if the AP balance was 169 on February 3,

18  that if you had paid down the accounts

19  payable -- withdrawn.

20         Do you have a reason to think that

21  there was -- that there was less than 3 million

22  in AP contractually due for February 5, 6 and

23  7?

24     A.    I don't think that the company or

25  our team was considering the AP balance when it

```
 1                         GOOD
 2    came to managing the DIP balance or future net
 3    availability.
 4              The company regularly delayed
 5    contractual payments to increase net
 6    availability which also means reducing your
 7    debt.
 8         Q.   My question, sir, was, was there
 9    less than 3 million in AP contractually due for
10    February 5, 6 and 7?
11              MS. MISHKIN:  Objection to form.
12         A.   I don't know.
13         Q.   Okay.  And, in fact --
14              MR. LIMAN:  Let me ask the court
15         reporter to mark, as Exhibit 15, a e-mail
16         from Jennifer Joye to Brian Griffith and
17         others, including you, dated February 5,
18         2019.
19              (Good Exhibit 15, E-Mail from
20         Jennifer Joye dated February 5, 2019,
21         marked for identification.)
22         A.   Okay.
23         Q.   Do you see -- do you know who
24    Ms. Joye is?
25         A.   Yes.
```

1                          GOOD

2          Q.    Is she finance at what was then

3     Sears?

4          A.    She works in cash management.

5          Q.    Right.  And she indicates to you

6     that the February 4 true-up indicates that

7     there was 9.149 million of AP ACH not

8     processed.

9               Do you see that?

10         A.    (Document review.)

11              I'm not super close to this process,

12    as you don't see me replying in this e-mail

13    chain, but I see the sentence or phrase AP ACH

14    not processed for approximately 9 million.

15         Q.    Doesn't that indicate to you that

16    just for February 4 alone, that there was

17    9 million of AP that was contractually due that

18    was not processed and paid?

19              MS. MISHKIN:  Objection.

20         A.    I'm not sure that all of it was

21    contractually due.

22         Q.    Okay.

23              MR. MOLONEY:  Why don't we take a

24         five-minute break?  I think we're just

25         about at the end.

```
 1                          GOOD
 2                MS. MISHKIN:  I was going to say I
 3         have you at three hours.  I may be off by
 4         a couple of minutes, if you want to check.
 5                MR. LIMAN:  Okay.
 6                (Recess taken.)
 7                (Good Exhibit 16, E-Mail from Cullen
 8         Murphy dated December 15, 2018, with
 9         attachment, marked for identification.)
10                (Good Exhibit 17, E-Mail from Sasha
11         Shulzhenko dated November 16, 2018, with
12         attachment, marked for identification.)
13    BY MR. LIMAN:
14         Q.    I just have approximately two or
15    three questions.
16                First question, sir, is, did you
17    have any conversations with Mr. Kamlani or any
18    representative of Transform about the meaning
19    of the aggregate DIP shortfall amount?
20         A.    One night, during the auction, there
21    was a dispute over that item and there were
22    pretty heated discussions with Cleary and
23    Moelis and our side around that amount.
24         Q.    And that discussion did not have to
25    do with the definition of available cash; is
```

```
1                         GOOD
2   that correct?
3         A.    It was more about the general
4   provision.
5         Q.    And, sir, did you ever have any
6   conversation with Mr. Kamlani or any
7   representative of Transform where you said the
8   only cash that would reduce the aggregate DIP
9   shortfall amount would be cash that, at the
10  moment of closing, physically could be
11  transferred to the DIP lenders?
12             MS. MISHKIN:  Objection to form.
13        A.    There were conversations, I believe
14  it was around similar to what you said that
15  all -- all available cash would be swept to the
16  DIP balance.
17        Q.    No, I'm asking something different.
18  I'm asking about the interpretation of the
19  contractual language.
20             My question is, did you have any
21  conversations with Mr. Kamlani where you said
22  that the only net available cash that would
23  reduce the aggregate DIP shortfall amount would
24  be cash that, at the moment of closing,
25  physically could be transferred to the DIP
```

```
 1                      GOOD
 2   lenders?
 3              MS. MISHKIN:  Objection to form.
 4       A.    The wording of that is a little
 5   tricky.
 6       Q.    You want me to try it again?
 7       A.    Yeah.
 8       Q.    I'll do it in two parts.
 9              Did you have any conversations with
10   Mr. Kamlani where you told him what you thought
11   the words "available cash" meant within the
12   context of the DIP shortfall provision?
13       A.    I don't believe so with Mr. Kamlani
14   directly.
15       Q.    Okay.
16              MR. LIMAN:  All I have got, Jessie,
17          is two documents to authenticate,
18          Exhibit 16 and 17.  They are both
19          premarked.
20       Q.    My only question to you is whether
21   those represent documents that were sent by
22   M-III or debtors' representatives to
23   Mr. Kamlani, 16 and 17?
24       A.    (Document review.)
25              So which one are we looking at?
```

```
 1                         GOOD
 2        Q.    We can look at either one.
 3              16, does that reflect a document
 4    that you sent to Mr. Gruenbaum at Moelis?
 5        A.    It appears to be that way.  It seems
 6    that we're also missing a lot of the e-mail
 7    chain.
 8              I mean, are you telling me that this
 9    document was attached to this e-mail?
10        Q.    I am.
11        A.    Okay.
12        Q.    And in Exhibit 17, is this a
13    document that was sent, to your knowledge, by
14    Weil Gotshal to Mr. Kamlani at M-III's request?
15        A.    Yeah, this is from Sasha at Weil to
16    Kunal, et al., yeah.
17              MR. LIMAN:  I appreciate your time,
18        sir.  Thank you very much.
19              MS. MISHKIN:  No questions.  Thank
20        you.
21              (Time noted:  1:27 p.m.)
22
23
24
25
```

```
 1          A C K N O W L E D G M E N T

 2

 3    STATE OF                )

 4                            :ss

 5    COUNTY OF               )

 6

 7            I, CHRISTOPHER GOOD, hereby certify

 8    that I have read the transcript of my testimony

 9    taken under oath in my deposition; that the

10    transcript is a true, complete and correct

11    record of my testimony, and that the answers on

12    the record as given by me are true and correct.

13

14                    _____

15                    CHRISTOPHER GOOD

16

17

18    Signed and subscribed to before me

19    this _____ day of _____, ____.

20

21    _____

22    Notary Public, State of _____

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3    STATE OF NEW YORK   )

 4                          :ss

 5    COUNTY OF RICHMOND )

 6

 7              I, MELISSA GILMORE, a Notary Public

 8    within and for the State of New York, do hereby

 9    certify:

10              That CHRISTOPHER GOOD, the witness

11    whose deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition is a

13    true record of the testimony given by such

14    witness.

15              I further certify that I am not

16    related to any of the parties to this action by

17    blood or marriage; and that I am in no way

18    interested in the outcome of this matter.

19              IN WITNESS WHEREOF, I have hereunto

20    set my hand this 30th day of August, 2019.

21

22

23

24    _____

25    MELISSA GILMORE
```

```
1              *** ERRATA SHEET ***

2          ELLEN GRAUER COURT REPORTING CO., LLC
            126 East 56th Street, Fifth Floor
3                New York, New York 10022
                      212-750-6434
4

5    NAME OF CASE:In Re: SEARS HOLDINGS CORPORATION
     DATE OF DEPOSITION: AUGUST 28, 2019
6    NAME OF WITNESS: CHRISTOPHER GOOD

7

8    PAGE   LINE      FROM          TO         REASON

9    ____|_____|_____|_____|_____

10   ____|_____|_____|_____|_____

11   ____|_____|_____|_____|_____

12   ____|_____|_____|_____|_____

13   ____|_____|_____|_____|_____

14   ____|_____|_____|_____|_____

15   ____|_____|_____|_____|_____

16   ____|_____|_____|_____|_____

17   ____|_____|_____|_____|_____

18   ____|_____|_____|_____|_____

19

20                        _____

21   Subscribed and sworn before me

22   this____day of_____,20__.

23

24   _____    _____

25   (Notary Public)             My Commission Expires:
```

## $

**$118 (2)**
88:8,13
**$33 (1)**
113:3
**$6 (3)**
20:16,23;21:8
**$680 (1)**
43:5
**$76 (1)**
29:25
**$89 (1)**
53:14
**$90 (1)**
91:13

## A

**ability (2)**
108:20;118:4
**ABL (19)**
12:22;13:3;34:19,
20;47:19,19;49:9;
53:21;54:4;90:13,19;
98:3,6,11,13,16;
112:22,24;113:16
**able (15)**
36:7;43:23;79:13;
80:5;87:24;89:4;
94:11,24;95:4,5;
104:22;105:22,24;
106:19;108:3
**above (5)**
17:3;19:9;20:2;
120:21;121:3
**absolutely (1)**
88:7
**accepted (1)**
36:2
**According (1)**
59:15
**account (25)**
19:10;22:2,25;
24:19;26:24;28:23;
31:2,6,9,15;80:5,10,
20;92:23;104:6,7,8,
12,13,16;114:15,16;
120:5,16,24
**accounting (1)**
79:17
**accounts (56)**
22:16;23:2,9,18,20,
21,22;24:3,5,9,15,20,
25;25:2,5,7,11;26:13;
28:16,21,25;29:8,13;
30:15;41:23;42:3;
55:20;56:7;72:11;
78:3;80:16;81:12,16;
82:6,10,14,25;83:6;
100:7,14,19,21;
102:11;104:2,5;

**107:2,4,7;111:8,13,
15,24;114:3;115:12;
120:7;121:18**
**accurate (7)**
18:5;22:6;31:10;
36:3;40:19;49:24;
104:18
**ACH (2)**
123:7,13
**achieve (4)**
94:14;96:10,12;
113:23
**achieved (9)**
96:20;99:14,18;
101:5,10,19;113:20,
21;115:10
**achieving (1)**
88:19
**acknowledging (1)**
108:12
**action (11)**
81:8;83:13;88:24;
96:24;103:4,9;115:9,
14,15,20;121:13
**actions (33)**
75:4,8,17,22,25;
77:2,7,15,18;78:13;
83:4,9;84:3;87:11,12;
88:12,14,18;89:5;
91:17;95:20,23;96:2,
12,14;98:21;99:25;
100:6,18;111:7;
114:20;115:21;116:7
**actual (10)**
14:10,12,20,23;
15:18;19:14;21:12;
55:3;66:11;88:21
**actually (5)**
36:19;40:10;45:17;
64:13;83:24
**actuals (7)**
15:7;17:23;18:6,14;
19:22;21:8;29:25
**add (7)**
20:11;48:25;64:7;
89:9;95:23;113:13;
115:11
**added (1)**
89:25
**Additional (13)**
42:15;43:3,8,16;
47:11;56:6;63:21;
93:6,14,18;102:12,17;
106:4
**additive (3)**
102:20,22;103:3
**address (1)**
93:24
**adjusted (2)**
85:11,23
**adjustment (2)**
74:10;79:17
**Admin (5)**

**40:11,17;90:10;
93:3,23**
**administrative (24)**
33:25;34:9,12;
36:12;40:8;41:7,10;
43:24;44:15,23;
47:12;50:2,9,21,25;
51:8;52:8;82:21;90:8;
92:25;93:24;94:25;
96:21;112:22
**administratively (3)**
34:15;36:10;40:23
**advance (4)**
71:5;75:24;76:3,20
**advisors (1)**
12:7
**advocated (1)**
108:15
**again (9)**
9:17;16:17;17:17;
85:8;88:5;105:14,14;
115:17;126:6
**against (2)**
93:22,23
**aggregate (7)**
55:25;56:24;57:7;
58:12;124:19;125:8,
23
**aggressive (1)**
107:25
**agree (2)**
47:16;110:2
**agreed (2)**
56:5;114:17
**AKIN (1)**
3:16
**al (1)**
127:16
**allowance (1)**
26:4
**alone (1)**
123:16
**Along (1)**
14:3
**always (2)**
92:20;97:12
**America (6)**
23:23;28:6;32:8,20,
23;56:5
**among (5)**
62:19;67:16;89:15;
109:14;119:6
**amount (14)**
19:14,14;55:3,20;
56:2,25;57:7;58:13;
74:24;83:15;124:19,
23;125:9,23
**amounts (13)**
18:15;53:2,5,13,18,
19,20;54:3,25;55:3;
64:7;67:10;82:6
**analysis (1)**
40:25

**and/or (2)**
10:6;116:6
**answered (2)**
117:11,18
**anticipated (13)**
12:12,22;13:3;37:9,
14,22;41:7;44:16,22;
60:25;73:13;92:21;
119:23
**anticipation (1)**
37:6
**AP (20)**
103:6,15,19;
110:10,12,15;111:21,
25;114:7;115:7;
120:16,21;121:10,17,
22,25;122:9;123:7,13,
17
**APA (10)**
69:3,4;73:6;74:25;
82:7;103:7,16,20;
110:11;114:16
**Apologies (1)**
9:15
**appear (2)**
19:11;103:3
**appears (22)**
17:2,18;18:10;19:6;
20:4,13,21;21:5,14,
23;22:12;30:24;42:9;
43:6;50:12;60:5,18;
77:11;98:12;112:3;
114:10;127:5
**Application (1)**
42:16
**applied (2)**
21:20;93:22
**applying (1)**
113:10
**appreciate (1)**
127:17
**approximately (3)**
37:15;123:14;
124:14
**armored (1)**
28:8
**around (10)**
11:6,7;75:22;102:4,
11;106:25;107:17;
112:24;124:23;
125:14
**arrive (1)**
20:15
**aside (1)**
35:12
**assessment (1)**
83:25
**assets (3)**
35:21,23;72:3
**associated (5)**
88:19,24;89:5;
100:6;103:5
**assume (2)**

**101:9;114:17**
**assumed (4)**
74:5;91:4;109:13;
121:4
**assuming (10)**
28:9;42:2;73:18;
82:9;95:23;103:21,
23;106:3,7;107:25
**assumption (5)**
41:23;45:8;74:4;
87:20,23
**attached (5)**
54:17,21;69:24;
118:14;127:9
**attaches (2)**
97:19;111:2
**attaching (1)**
89:19
**attachment (12)**
38:18;58:21;59:6;
62:22;67:21;86:20,
23;87:2,5;89:22;
124:9,12
**attempt (1)**
80:25
**attend (3)**
69:14,18,21
**attention (5)**
39:18;52:20;63:23;
81:16;110:24
**Attorneys (2)**
3:4,17
**auction (1)**
124:20
**authenticate (1)**
126:17
**automatic (1)**
56:5
**availability (4)**
84:11;120:11;
122:3,6
**available (60)**
18:19;19:3;20:16,
24;21:16;22:7,14,24;
29:17;30:7;31:11,12;
53:2,13;55:2,25;
56:23;57:6,19;58:12;
60:13,24;61:7,8,13,
14,17,24;62:4,9;
63:25;64:2,9,10,14,
24;65:5,25;66:3,24;
79:24;80:20;81:14;
84:24,25;85:8,19,21;
86:9,12;93:17;94:4;
105:7,18;113:11;
120:9;124:25;125:15,
22;126:11
**aware (6)**
57:24;58:3,8;62:3;
69:22;117:14

## B

IN RE: SEARS HOLDINGS CORPORATION, et al.

CHRISTOPHER GOOD
August 28, 2019

**back (9)**
58:18;74:16;78:22;
80:23;81:17;87:8;
92:24;110:8;115:13
**backstop (1)**
47:12
**bad (1)**
58:7
**balance (60)**
13:7,11;18:19;19:3;
20:16,24;21:17;22:3,
8,13,14,15,24;29:17;
30:7;31:11;32:2;
34:19,20;35:14;37:8,
14;66:15;74:2,4,8;
77:3;81:9;87:11,16,
22;88:9;91:22;92:16;
94:21;97:6,9;99:6;
102:6;103:6,15,19;
105:2,11;107:24;
108:9,14;110:10,13,
15;111:20;113:4,9;
114:7,13;120:12;
121:17,25;122:2;
125:16
**balances (4)**
13:18;37:11;38:2;
102:5
**bank (15)**
23:8,22,23;26:22,
23;27:25;28:6,7;32:8,
20,23;56:4;65:12;
67:5,11
**banks (14)**
28:15,20,24;29:8,
12;47:8;51:18;56:7;
60:13;61:8,13;62:10;
78:2;81:2
**based (17)**
16:11;17:18;18:9;
20:11;22:8,15;45:8;
46:9;48:8;60:12;74:3;
103:6,15,19,22;
110:11;114:16
**basis (2)**
32:25;68:22
**BB (1)**
71:25
**bbright@cgshcom (1)**
3:12
**beat (1)**
17:23
**beating (2)**
109:15,19
**became (2)**
62:2;102:6
**beginning (8)**
7:22;19:6,8,15;
20:25;21:8,12,19
**behind (3)**
70:6,14;71:9
**below (8)**
13:25;17:9;19:18;

40:17;47:10;56:4;
120:21,23
**BENJAMIN (1)**
3:8
**besides (1)**
101:17
**better (3)**
18:7;109:8,10
**BIBI (1)**
3:9
**bid (11)**
35:20,20,23,25;
36:7,8,8;43:4;52:13,
14;59:8
**billion (2)**
73:9,10
**bit (6)**
15:13,22;16:14;
17:9;57:22;85:5
**Blue (9)**
7:1,5;9:4,6;33:13,
20;34:23;39:20;63:6
**borrowed (1)**
32:5
**Both (5)**
9:7;19:13;45:14;
65:23;126:18
**bottom (4)**
18:18;39:7;42:13;
98:20
**box (2)**
112:23,24
**break (6)**
8:13,14,15;56:9;
86:16;123:24
**breakdown (4)**
66:6,25;67:3;99:15
**Brian (2)**
89:15;122:16
**bridge (7)**
52:7;77:7;87:25;
89:7;105:7,18;106:2
**bridging (1)**
77:15
**BRIGHT (1)**
3:8
**bring (2)**
94:12;102:8
**Brinks (1)**
26:21
**broad (1)**
22:19
**Bryant (1)**
3:18
**bucket (1)**
99:24
**Budget (27)**
7:2,6;9:4,6;11:25;
12:8;13:6,17,22;14:4,
10,12,21,23;15:2;
17:24;18:7;33:14,21;
34:24;72:19;81:22;
82:11,13;84:4,9;

109:11
**budgeted (2)**
18:15;19:13
**budgets (2)**
109:16,19
**build (3)**
100:8;111:21,25
**business (2)**
119:17;120:14
**buyer (7)**
36:14;38:7;56:3;
58:14;84:25;106:6,14
**buyers (2)**
37:7,23
**buyer's (3)**
52:24;53:11;54:7
**buys (1)**
26:19

## C

**calculate (3)**
20:21;37:7;86:12
**calculated (6)**
16:3;19:4;20:14;
21:5;22:12;57:21
**calculation (6)**
18:18;19:5;22:8;
42:9;62:9;85:19
**call (15)**
39:8,13,15;51:20,
24;55:15,16;68:9,19;
71:6;75:9;115:20;
118:14,21,25
**called (2)**
7:9;31:22
**callouts (1)**
119:20
**calls (8)**
68:21,25;69:8,10,
11;70:5,12;71:3
**came (5)**
23:6;24:2;45:7;
61:19;122:2
**Can (44)**
9:13;10:2;12:20,24;
19:2;22:21;23:12;
24:22;26:15;27:5;
28:17;29:18;32:12;
34:3;35:12;36:22;
37:17;38:11;42:23;
43:17;44:18;47:22;
48:4,16;51:5;53:9,25;
56:9;62:11;63:23;
67:13;68:3;70:8;
71:18;80:12;81:4;
85:17;86:16;88:6;
100:16;103:14,17;
109:8;127:2
**cap (2)**
16:8;86:4
**capital (10)**
105:9;106:25;

107:3,5,11,17;108:13;
116:2,4,13
**card (2)**
24:11;25:22
**carryover (2)**
21:16;85:21
**carve-out (8)**
19:10;22:2;24:19;
25:2;31:2,6,8,14
**case (3)**
11:3;18:11;56:14
**Cash (190)**
13:21;14:3,25;15:4,
23;16:18;18:14,19;
19:3,6,7,8,9,15,19;
20:2,5,7,16,24,25;
21:2,8,12,16,19,20;
22:3,7,12,14,24;24:6,
10,24;25:3,4,10,13,
17,19;26:7,8,9,10,12,
16,19,21;27:4,4,7,12,
18,19,21,24;28:15,19,
25;29:7,17,25;30:7,
12;31:11,12,20,22;
32:2,4,8,20,22;33:20;
34:24;43:11;44:6,14,
20,21;45:4,5;46:10,
23;47:3,3,7,7;51:14,
17;52:25;53:12;55:2,
19,25;56:6,24;57:6,
19;58:12;59:18,22;
60:2,13,23;61:13,16,
24;62:3,9;63:25;64:2,
24;65:6,8,12,21,23,
25;66:3,6,15,24;67:5,
6,10,11;72:4,5;77:14,
23;78:2,3;79:6,9,11,
23,24;80:4,4,8,9,14,
15;81:2,7,11,14;
84:11,24;85:8,9,19,
20,21;86:3,6,9,12;
88:2;89:8;92:15,19,
21;93:17;94:2,13,14,
16,22;95:21;96:4,20;
97:4,7;104:15;108:6,
8;109:11;113:11;
118:23;123:4;124:25;
125:8,9,15,22,24;
126:11
**caused (1)**
100:2
**cease (1)**
104:19
**certain (4)**
17:8;23:5;28:11;
119:16
**certify (1)**
128:7
**chain (2)**
123:13;127:7
**change (7)**
19:10;31:2,6;64:23;
65:7;102:5;113:17

**chart (25)**
22:10,23;39:21;
48:3,14,15;49:3,6,15,
19,21,24;51:4,5,20,
23;52:5;62:13;67:7,8,
12;80:8;93:21;95:6;
102:21
**charts (2)**
22:9;76:10
**check (1)**
124:4
**checked (2)**
42:8;95:22
**Christopher (3)**
56:16;128:7,15
**claim (2)**
47:12;52:8
**Claims (22)**
40:8,11,17,18,20;
41:8,11;42:5;43:4,24;
44:15,24;47:18;
49:14,18;50:3,9,21;
51:2,9;82:22;93:23
**clarify (1)**
54:24
**clause (4)**
55:25;56:24;57:7;
58:12
**clear (2)**
93:10;109:9
**CLEARY (2)**
3:3;124:22
**close (41)**
60:14;62:10;64:2,2,
10,10;65:25;66:4,15;
67:19,25;68:11,18;
73:3;74:3,5;82:7;
85:4;89:20,23;91:12;
93:17;94:5,6,12;
97:14;105:9;106:25;
107:17;108:14,15,20;
112:10,15;113:11;
114:7,14;116:20;
118:10;119:23;
123:11
**closed (3)**
69:5,5;98:10
**closely (1)**
108:20
**closer (2)**
84:22;110:6
**closest (1)**
72:25
**closing (27)**
12:12,23;13:4;
34:21;35:15;36:13,
17;37:9,22;67:9;
68:20;70:12,22;
71:15,19,23;73:6,8,
15;75:10;98:11;
105:10;106:20;
108:22;117:9;125:10,
24

**Collateral (1)**
71:25
**colleague (2)**
33:22;67:23
**collect (1)**
81:2
**collected (1)**
24:10
**collectively (1)**
77:6
**column (13)**
40:7,13;41:13,15;
42:4,7,15;43:2;59:19;
63:24;71:14,19;74:21
**columns (3)**
14:5,15;40:5
**combination (4)**
28:9;46:15;51:5;
96:5
**comment (1)**
103:13
**commentary (1)**
103:19
**comments (2)**
103:10;110:16
**committed (2)**
79:19,25
**Committee (12)**
54:19;58:23;60:21;
61:4,12;63:7,11,14,
17;78:8,18,23
**company (53)**
11:9;15:5,10;24:10;
25:16;26:3;28:10;
31:25;32:5,7,17,21;
44:6,11,14,20,21;
45:3,23,25;51:6,14;
55:19;59:7;60:2,12;
63:25;64:2;65:8,21,
23,25;66:3,6;68:20;
77:14,23;81:7,12;
87:25;89:8;92:15,19;
93:17;94:13,14;
96:20;97:4,7;113:11,
20;121:24;122:4
**company's (6)**
66:14;73:2;108:8;
109:11;118:2,22
**compares (1)**
14:23
**compile (11)**
16:10;17:4,17;19:5;
23:4;42:12;49:15;
51:3,5;66:8,22
**compiled (4)**
20:13;49:20;66:10;
75:20
**complete (1)**
128:10
**completely (1)**
25:6
**component (1)**
51:18

**components (1)**
51:17
**comprised (6)**
49:8,13;51:15;
73:10;95:14;113:16
**concentration (34)**
22:15;23:2,9,17,19,
21;24:14,20,25;25:5,
7,11;26:13,23;28:16,
21,23,25;29:8,13;
30:14;55:20;56:7;
78:3;80:5,10,16,20;
81:12;92:22;104:8,
11,16;120:7
**concern (2)**
33:25;35:20
**concerned (4)**
34:8,11;36:11;
108:19
**concerns (1)**
108:2
**condition (9)**
34:21;36:17;73:7,8,
15;98:11;105:10;
106:20;117:9
**conditions (9)**
36:5,13;68:20;
70:12,22;71:15,20,23;
108:22
**conference (1)**
39:8
**confused (1)**
68:16
**conjunction (2)**
106:5,13
**conservative (2)**
109:21;110:5
**considering (1)**
121:25
**consistently (1)**
107:24
**consists (1)**
80:9
**constitutes (1)**
80:15
**contained (1)**
13:7
**contains (1)**
66:25
**Cont'd (1)**
3:1
**contents (1)**
33:8
**context (5)**
48:8,10;61:7;94:2;
126:12
**continue (1)**
69:4
**continued (1)**
61:23
**contractual (2)**
122:5;125:19
**contractually (9)**

79:19,25;119:16;
120:2;121:11,22;
122:9;123:17,21
**contribution (1)**
43:11
**conversation (7)**
108:5,24;109:2,5,7;
116:15;125:6
**conversations (17)**
48:12,13;57:19,25;
58:3,8;107:10,15;
115:25;116:6,20;
117:6,14;124:17;
125:13,21;126:9
**copies (1)**
9:14
**corner (1)**
42:13
**correctly (3)**
53:8;93:21;113:2
**correspond (1)**
78:6
**corresponds (4)**
19:25;64:16,21;
73:5
**counteract (1)**
110:18
**countless (2)**
55:12;116:19
**COUNTY (1)**
128:5
**couple (6)**
26:20;55:13;59:11;
106:16;120:25;124:4
**course (1)**
9:8
**court (18)**
8:22,24;33:6,18;
38:13,21;52:12;
54:14;56:12;62:18;
67:15;86:14;89:13;
97:16;112:6;117:22;
119:4;122:14
**covenant (1)**
11:16
**cover (2)**
39:7;58:25
**create (1)**
27:17
**credit (3)**
24:11;25:21;36:8
**Creditors (1)**
3:17
**critical (1)**
95:15
**criticism (1)**
76:5
**Cullen (1)**
124:7
**current (1)**
115:7
**cushion (1)**
74:20

**customer (2)**
25:19;26:19
**customers (2)**
24:11;26:7
**cutting (1)**
83:16
**Cyrus (1)**
37:3

**D**

**daily (17)**
32:4;67:18,24;
68:10,13,17;69:10;
71:2;89:20,23;108:8;
109:11;112:10,14;
116:2;118:10,25
**dashboard (5)**
71:11,12;73:21;
74:17;81:18
**data (2)**
45:15;88:25
**date (7)**
37:9;41:18;72:24;
84:18;101:4;118:13;
119:22
**dated (24)**
33:14;38:17;54:16,
17,20,22;59:2;62:19,
21;67:17,20;86:19,22,
25;87:4;89:16;90:2;
112:18;119:6,9;
122:17,20;124:8,11
**dates (2)**
38:3;59:15
**day (3)**
26:20;32:9;128:19
**days (6)**
26:20;59:11;90:3;
119:18;120:14,25
**deal (3)**
34:14;40:21;48:9
**debt (1)**
122:7
**debtors (42)**
10:9,11;13:2;24:13,
18,23;29:11;31:12;
33:2,3;34:8,13;35:11,
15;36:6,11;37:7,10,
14,20;38:7,9;40:22;
43:23;44:3;45:14,20;
56:3;57:13;58:6;
70:24;79:24;82:20;
89:4;96:6,8,11;101:5;
106:4,14;110:22;
113:21
**debtors' (13)**
12:21;33:24;44:12;
52:25;53:12,21;
55:18;57:16;58:4,9;
96:9;114:15;126:22
**December (3)**
36:2;107:20;124:8

**decision (4)**
27:7;29:6,10;
106:13
**deck (7)**
58:21;59:10,11;
63:2;66:9;90:8;
101:11
**declaration (2)**
56:13,16
**decrease (3)**
101:12;105:22;
110:17
**decreasing (2)**
83:10;101:17
**deducted (1)**
20:17
**definition (1)**
124:25
**delay (2)**
120:13;121:10
**delayed (2)**
120:25;122:4
**delaying (1)**
119:16
**deliverable (4)**
103:7,16,20;110:11
**delivered (1)**
10:16
**delivery (3)**
73:4;74:24;82:2
**department (1)**
29:4
**depending (1)**
27:4
**deposit (1)**
26:22
**deposited (2)**
27:25;30:14
**deposition (8)**
7:20,23,24;8:4;
33:17,24;116:25;
128:9
**deposits (3)**
65:13,15;79:20
**derive (1)**
30:4
**derived (2)**
30:11;42:11
**describe (2)**
26:15;32:12
**detail (1)**
66:14
**determines (2)**
27:20;28:7
**difference (6)**
16:4,7;20:6;36:22;
74:23;91:2
**different (13)**
14:5,22;38:2,2;
40:4;57:23;70:9;
75:21;78:16,20;81:6;
88:11;125:17
**differently (1)**

92:13
**difficult (1)**
85:5
**DIP (149)**
7:2,6;9:4,6;10:7,14,
17;11:14,18,25;12:8,
11,23;13:3,6,7,11,17,
18;17:14,15;21:3;
30:22,22;33:14;
34:19,20;35:14;
36:14,18,19,20,21,25;
37:2,8,11,14,15,21;
45:6;46:12,24;47:19,
20;49:9;53:21,22;
54:4,5;55:25;56:4,24;
57:7,20;58:12;60:24;
61:9,14,24;62:4;72:2,
13,14,18;73:11,12,17,
18;74:2,4,18,23;77:3,
16;78:4;80:6;81:3,8,
14,22;82:11,13;84:4,
8;87:11,16,22;88:9;
90:13,19;91:22;
92:16,23;94:5,7,12,
21;97:6,8,13;98:3,6,
11,13,16;99:6;
103:11;104:3,17,21,
23,25;105:4,7,11,16,
19;106:3,10,20;107:2,
18,24;108:8;109:10,
13,16,20;111:16,20;
112:23,24;113:4,9,16;
115:16;116:17;117:9;
120:9,12;122:2;
124:19;125:8,11,16,
23,25;126:12
**direct (5)**
39:17;52:20;63:23;
81:16;110:24
**directly (3)**
46:14,16;126:14
**disburse (2)**
24:6;104:25
**disbursement (1)**
120:6
**disbursements (19)**
15:12,16,17,19;
16:8,15,21,25;20:8;
85:10,10,22,23;86:4,
5;95:15;104:6,7,13
**discretion (2)**
24:13;29:11
**discussed (3)**
51:20,23;52:2
**discussing (1)**
57:10
**Discussion (8)**
38:16;39:4,20;
115:5;117:25;118:17,
22;124:24
**discussions (6)**
11:24;12:7,11,16,
19;124:22

**dispute (1)**
124:21
**disputed (3)**
83:19;101:12,18
**disseminated (1)**
76:11
**distributed (3)**
75:9;76:6,14
**distribution (1)**
75:25
**Document (66)**
9:16,21;11:21;
13:15;19:4;33:19,23;
35:5,7;38:12,22,25;
39:2;48:11;50:16;
51:15;52:18;53:24;
54:10;55:8,10;57:9;
59:21;60:4,9;62:25;
64:4,20;65:4,10,22;
67:24;68:3,7;69:24;
70:14;71:21;73:23;
81:20;85:16;89:14,
17,21;90:5,15;91:23;
97:23;98:5;100:12;
101:8,25;102:24;
103:2;112:12,18,20;
113:5;114:9,22;
115:4;118:18;123:10;
126:24;127:3,9,13
**documents (7)**
9:7,12;10:8,19;
70:5;126:17,21
**dollar (5)**
94:5,9,9,10;97:15
**doubt (3)**
63:9,12,16
**down (39)**
15:13,23;16:14;
21:3;31:13;36:15;
45:6;46:11,23;49:21;
53:2,13,20;55:2;56:3,
9;57:20;60:24;61:8,
14,24;62:4;67:13;
78:4;79:12;80:6;81:3,
14;83:18,23;90:20;
92:23;94:5,6,12;
97:13;102:8;111:19;
121:18
**drawdown (1)**
104:16
**drawdowns (2)**
17:14;85:24
**drawn (7)**
15:7,19;17:6;22:25;
23:8;73:19;78:12
**draws (1)**
104:21
**dropped (1)**
114:10
**due (8)**
117:8;119:17;
120:12;121:11,22;
122:9;123:17,21

**duly (1)**
7:10
**during (3)**
8:4;51:23;124:20

**E**

**earlier (5)**
11:13;53:22;64:24;
85:14;87:16
**easier (1)**
56:11
**Eddie (3)**
108:3,16;109:10
**effect (1)**
120:8
**effort (3)**
12:21;81:13;110:13
**efforts (1)**
13:2
**either (6)**
17:14;84:25;85:23;
104:10,15;127:2
**else (2)**
19:11;86:7
**E-MAIL (38)**
3:11,22;38:17;39:7;
46:21;54:17,20;
58:25;62:19,21;63:8,
18;67:16,20;76:7,16;
86:19,22,25;87:4;
89:15,19;107:9;
112:9,14;115:25;
118:19;119:5,8,11,12;
122:15,19;123:12;
124:7,10;127:6,9
**e-mails (2)**
59:16;116:6
**employee (1)**
49:18
**employees (2)**
70:23;96:6
**end (8)**
26:20;30:7;33:16;
72:25;84:19;92:3;
109:21;123:25
**ended (5)**
31:25;46:24;55:3;
72:25;109:12
**ending (13)**
18:18;19:3;20:16,
24;21:16;22:2,7,14,
24;29:17;30:7;31:11;
32:2
**ends (1)**
43:11
**engage (1)**
13:2
**enough (1)**
50:7
**ensure (1)**
105:10
**entail (1)**

83:14
**entitled (1)**
33:20
**ESL (23)**
3:4;36:7;41:14,16,
18,21;42:6;43:11;
45:9,13,14,20;46:5;
50:9,14,15;55:17;
59:8;69:20;70:18;
107:24;108:4,21
**ESL's (2)**
45:22;91:4
**ESQ (4)**
3:7,8,9,20
**essentially (1)**
114:14
**estate (2)**
34:15;121:4
**estate's (1)**
36:9
**estimate (13)**
41:10;44:10,13;
45:8,22,23;46:10;
51:7;72:21;82:19;
91:3;93:7;114:11
**estimated (3)**
52:25;53:12;100:14
**estimates (3)**
44:2;64:13;113:17
**estimating (1)**
98:9
**et (2)**
127:16
**even (1)**
17:3
**event (2)**
56:3;58:14
**ex (2)**
16:9;86:4
**exact (4)**
51:16;99:15;
107:19;116:21
**exactly (7)**
20:11;39:25;64:22;
69:9;84:13;101:14;
102:5
**EXAMINATION (1)**
7:14
**examined (1)**
7:11
**example (5)**
19:12;28:6;29:19;
41:22;94:11
**exceptions (2)**
27:2,5
**Exhibit (95)**
7:1,5;8:25;9:2,3,5,
9,10,18,24;10:3,4,20,
20;11:19,19;13:9,20;
29:18;33:10,12,19;
34:23;35:3;38:17,22;
39:19,19;52:12,14,17,
21,23;54:9,15,20;

55:5,9,12;56:13,15,
19,22;58:19,21;59:12,
20;60:3,6;62:18,21,24;
64:17,17;65:20;66:2;
67:16,20;68:6;69:24;
70:6,15;71:10;78:24;
80:9,14,24;85:13;
86:15,19,22,25;87:4,
9;89:14,18;92:10;
97:17,18,19;110:9,25;
111:2;112:8,9;
115:14,14;118:13;
119:5,8;122:15,19;
124:7,10;126:18;
127:12
**exhibits (1)**
8:24
**existing (1)**
37:2
**expected (3)**
37:8;109:8,10
**expense (2)**
83:10;110:17
**expenses (4)**
83:16;101:12,17;
102:9
**explain (2)**
19:2;40:5
**expressing (1)**
46:18
**extent (1)**
50:5

**F**

**facility (4)**
53:21,22;54:4,5
**fact (6)**
32:17;62:3;95:13;
103:22;118:5;122:13
**fair (14)**
12:5;14:19;16:11;
17:21;18:4;32:24;
50:7;65:2;76:5;83:22,
25;97:3;101:9;108:23
**far (4)**
71:5;75:24;76:3,20
**favorable (10)**
99:2,9,14,17;100:2,
24;101:5;102:18;
111:9,13
**February (35)**
33:14;60:14;62:10;
72:19,22,24;74:24;
82:14;84:21,22;87:5;
95:9,12,17;112:19,20;
118:3,6,8,14,15,23;
119:7,9,15,17,22;
121:11,17,22;122:10,
17,20;123:6,16
**FELD (1)**
3:16
**few (2)**

11:7;89:24
**fewer (4)**
102:7;104:21;
105:5,17
**figure (38)**
16:3,6,14;19:15,19,
22,25;20:17,17,24;
21:7,13,19;22:7,24;
29:24;30:4,11;31:19;
38:4;42:10;43:5;44:5;
45:12,20;46:2,6,9;
47:24;59:17;60:6;
78:5,6,11;93:16;
100:16,23;113:15
**figures (10)**
13:9,10,13;14:9;
15:6,18;22:9;23:6,8;
63:25
**finance (3)**
33:2;69:13;123:2
**financing (17)**
16:19;17:10,13;
19:8,9,19;20:2,6;21:2,
21,22;30:2,18;84:24;
85:11,23;86:6
**finish (1)**
50:5
**firm (1)**
77:25
**first (11)**
14:5,25;33:9;40:7;
52:22;53:21;68:25;
88:25;99:8;103:14;
124:16
**fiscal (2)**
73:2;84:21
**five (5)**
11:6,7;43:15;48:24;
90:2
**five-minute (1)**
123:24
**Flash (8)**
7:2,6;9:4,6;10:5;
13:17;14:19;33:13
**flip (6)**
74:16;75:3;78:22;
81:17;83:3;91:18
**flow (21)**
15:23;18:14;19:9,
19;20:7;21:2,20;
24:24;25:3,4,12;
26:11,16;27:2;30:2,
13;31:20,23;33:20;
34:24;86:6
**flows (4)**
16:18;19:7;20:2,5
**follow (1)**
85:25
**followed (1)**
108:7
**following (3)**
39:21;66:13;75:3
**follows (1)**

7:12
**footnote (3)**
60:17;73:20;91:16
**forecast (9)**
12:22;13:2;37:11,
21;82:13;102:7;
108:8;109:12,20
**forecasted (1)**
12:11
**forecasting (2)**
13:10;102:4
**forecasts (2)**
38:2;109:17
**form (74)**
9:20;10:10;12:17;
13:5;17:16,25;18:8;
20:9,20;21:10;22:4,
11,18;23:25;26:18;
27:16;29:14;32:14;
34:2,16;35:9;37:16;
40:16,24;42:22;
46:20;47:21;48:7,18;
49:5;50:17,22;51:10,
21;55:11;56:8;57:17;
58:16;63:2;64:19;
68:2;70:7;71:17;
75:11;77:10;78:9,14;
80:11;81:10;84:17;
85:3,12;88:3,17;
92:11;93:9,25;95:2;
102:23;104:24;
106:11,23;107:8;
109:22,24;110:21;
113:12;116:10;
120:10,18;121:2;
122:11;125:12;126:3
**four (2)**
17:2;19:7
**Friday (3)**
32:4,6;94:6
**front (2)**
9:10;55:5
**fruition (3)**
45:7,10;61:18
**full (2)**
13:17;52:22
**fully (1)**
73:18
**function (5)**
56:23;58:11;84:24;
85:8,20
**funded (1)**
104:14
**funds (4)**
26:11,16;31:8;
79:19
**fungible (3)**
94:3,10,17
**further (5)**
15:13,22;16:14;
66:14;88:22
**future (2)**
102:8;122:2

**fuzzy (1)**
69:6

## G

**gap (28)**
52:8;77:8,15;87:15,
25;89:7;90:12,16,20,
25;91:8,13;94:12;
97:8;98:3,6,9,12;
105:7,19;106:3;
113:3,6,7,8,16;114:4,
12
**gave (2)**
45:20;46:16
**general (4)**
10:2;65:19;99:16;
125:3
**generally (10)**
9:22;11:22;12:3,6,
20,25;13:6;26:25;
27:18;107:11
**generate (4)**
83:16;88:12;95:21;
96:3
**generated (5)**
11:11;32:25;83:16;
95:7;96:3
**gesture (1)**
101:22
**gets (2)**
86:6,8
**given (2)**
11:2;128:12
**goes (3)**
25:7;28:8;94:9
**Good (212)**
7:1,5,16,16,19;8:1,
25;9:1,2,3,5,9,10,18,
24;10:1,3,4,20,20;
11:1,19;12:1;13:1,9,
20;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1,19;27:1;
28:1;29:1,17;30:1;
31:1;32:1;33:1,10,12,
19;34:1,23;35:1,3;
36:1;37:1;38:1,17,21,
22;39:1,19;40:1;41:1;
42:1;43:1;44:1;45:1;
46:1;47:1;48:1;49:1;
50:1;51:1;52:1,12,14,
17,21,23;53:1;54:1,9,
15,20;55:1,5,9;56:1,
13,15,16,19,22;57:1;
58:1,19,21;59:1,12,
19;60:1,3;61:1;62:1,
18,19,21,24;63:1;
64:1,17,17;65:1,20;
66:1,2;67:1,15,20;
68:1,6;69:1,24;70:1,6,
14;71:1,10;72:1;73:1;

74:1;75:1;76:1;77:1;
78:1,24;79:1;80:1,9,
14,23;81:1;82:1;83:1;
84:1;85:1;86:1,15,19,
22,25;87:1,4,9;88:1;
89:1,14,18;90:1;91:1;
92:1,9;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
25,25;111:1,2;112:1,
7,9;113:1;114:1;
115:1,14;116:1;
117:1;118:1;119:1,4,
8;120:1;121:1;122:1;
19;123:1;124:1,7,10;
125:1;126:1;127:1;
128:7,15
**goods (1)**
25:20
**Gotshal (2)**
54:18;127:14
**GOTTLIEB (1)**
3:3
**Great (1)**
39:25
**Griffith (2)**
89:15;122:16
**group (5)**
77:24;89:23;
110:13,14,19
**Gruenbaum (1)**
127:4
**guess (1)**
110:17
**guidance (1)**
106:5
**guided (1)**
105:8
**GUMP (1)**
3:16

## H

**HAMILTON (1)**
3:3
**hand (4)**
8:23;89:13;110:25;
112:7
**handed (1)**
38:22
**Handing (1)**
68:4
**happened (1)**
92:18
**happy (1)**
47:23
**hard (6)**
62:5;65:16;66:20;
85:25;100:13;107:19
**HAUER (1)**

3:16
**headed (5)**
39:19;54:18;59:6;
63:21;90:8
**header (9)**
40:13;42:18;59:9;
77:18;90:10,16;93:3,
11,13
**headers (1)**
14:12
**heading (1)**
71:25
**heated (1)**
124:22
**help (2)**
11:9;77:7
**helped (1)**
51:4
**helpful (1)**
8:2
**helps (1)**
71:11
**hereby (1)**
128:7
**hindsight (1)**
110:6
**hit (5)**
105:10;107:25;
108:3,14;120:23
**hold (3)**
27:3,7;33:15
**holding (2)**
110:23;113:24
**holds (1)**
114:13
**Hometown (1)**
32:3
**honor (1)**
121:5
**hook (2)**
105:20;114:18
**hours (1)**
124:3
**hundred (3)**
17:7;23:5;27:8
**hurricane (1)**
95:16

## I

**idea (1)**
69:10
**identification (17)**
7:4,8;35:2;38:19;
52:16;54:23;56:17;
62:23;67:22;86:21,
24;87:3,6;119:10;
122:21;124:9,12
**identified (24)**
66:15;83:5;88:23;
93:6,14,18;95:7,20;
96:2;99:3,8;100:2,7,
24;102:13,15,18;

103:5;111:6,9,12,15;
113:18;114:4
**identify (2)**
  33:7,10
**Illustrative (1)**
  59:7
**impact (4)**
  104:20;105:5,17,25
**Implied (1)**
  73:8
**implies (1)**
  91:14
**important (1)**
  45:18
**Inc (1)**
  3:4
**include (6)**
  69:16;71:14,15,19;
  79:23;83:10
**included (4)**
  37:11;41:7,22;
  79:18
**includes (3)**
  67:5,10;71:22
**including (3)**
  47:19;80:20;122:17
**incoming (1)**
  25:4
**inconsistencies (1)**
  65:18
**incorrect (1)**
  76:13
**increase (10)**
  103:11;105:4,15,
  24;110:18,20,22;
  116:16;120:11;122:5
**increasing (3)**
  106:9;113:23;
  115:15
**indicate (3)**
  93:21;113:3;123:15
**indicated (4)**
  101:11;109:15,18,
  23
**indicates (5)**
  60:11;74:8;91:6;
  123:5,6
**individuals (3)**
  11:6,8;77:24
**inflows (1)**
  15:4
**information (6)**
  45:15;46:13,16;
  51:4;66:22;117:16
**initially (2)**
  25:4;61:25
**initiatives (1)**
  87:20
**input (1)**
  71:4
**insisted (2)**
  36:6,14
**insolvency (1)**

33:25
**instance (1)**
  21:4
**insurance (5)**
  32:6,7,18,19,22
**intention (1)**
  80:24
**interested (2)**
  48:13,14
**interpretation (2)**
  86:2;125:18
**into (22)**
  24:8,14,20,24;25:4,
  7,10,13,15,18;26:2;
  28:15,20;30:14,22;
  56:6;66:14;78:3;
  92:22;104:22;105:9;
  108:13
**inventory (1)**
  72:8
**Investments (1)**
  3:4
**invite (1)**
  68:8
**involved (3)**
  11:4;12:15,19
**involvement (4)**
  10:18,22,25;70:25
**issues (1)**
  93:24
**item (4)**
  84:10;92:15;94:8;
  124:21
**items (18)**
  40:15;41:6;43:9,15;
  47:10;67:6;71:14;
  75:22;91:7,9,11;92:7,
  9;95:8,18;96:8;98:16;
  112:25

**J**

**January (54)**
  7:3,7;34:25;38:18;
  39:9;51:24;52:13,14,
  25;53:12;54:7,16,17,
  21,22;55:15,16;57:5;
  58:4,9;59:2,8,13;62:4,
  20,22;65:2,9;67:18,
  21;68:9;70:2;72:15;
  76:6,11,12,17,19,22;
  78:7;81:19;86:20,23;
  87:2;89:16;90:3,4;
  97:7,21,25;101:4;
  111:3,5;117:25
**Jennifer (2)**
  122:16,20
**Jessie (1)**
  126:16
**jkane@akingumpcom (1)**
  3:22
**JOHN (1)**
  3:20

**Joye (3)**
  122:16,20,24
**junior (9)**
  36:19,21;37:2;
  53:22;54:4;73:12,17,
  18;74:4

**K**

**Kamlani (23)**
  46:7;105:8;106:16,
  18;107:15,16;109:4,6,
  14,18;115:20,24;
  116:12,15,19;117:7;
  124:17;125:6,21;
  126:10,13,23;127:14
**KANE (1)**
  3:20
**KCD (1)**
  95:15
**key (1)**
  119:20
**kind (1)**
  45:17
**knew (1)**
  116:12
**knowing (1)**
  103:22
**knowledge (1)**
  127:13
**Kunal (7)**
  46:7,15,21;61:25;
  108:3,17;127:16

**L**

**labeled (2)**
  59:22;69:24
**labels (2)**
  64:12;93:11
**Lampert (1)**
  108:25
**language (1)**
  125:19
**large (1)**
  108:9
**largest (1)**
  51:18
**last (11)**
  18:22,24;31:24,24;
  39:18;41:14,15;
  42:14;43:2,10;53:15
**late (1)**
  36:2
**later (2)**
  61:20;90:3
**Lazard (4)**
  41:4;50:13;51:4;
  66:11
**leading (1)**
  116:20
**leads (1)**
  47:11

**least (2)**
  76:21;109:9
**leave (2)**
  36:8;62:12
**Leena (1)**
  67:17
**left (5)**
  13:22;42:5;59:19;
  71:14,19
**legend (1)**
  49:21
**lenders (4)**
  10:17;37:2;125:11;
  126:2
**less (13)**
  21:2;43:12;55:4;
  85:9,10,21,22;101:21,
  24;102:2;104:25;
  121:21;122:9
**letter (2)**
  52:13,15
**level (10)**
  12:11,22;13:3;
  36:15;37:20;72:15;
  81:18;105:25;108:3;
  109:13
**LEWIS (1)**
  3:7
**liabilities (2)**
  91:4;106:4
**Liberty (1)**
  3:5
**lien (1)**
  53:21
**likely (2)**
  99:19,22
**LIMAN (24)**
  3:7;7:15;9:15;12:5;
  18:2;33:15;38:13,20;
  50:7;52:11;54:13;
  56:10;62:17;67:14;
  86:14,17;87:7;115:2;
  119:3;122:14;124:5,
  13;126:16;127:17
**limited (5)**
  10:22,25;55:19;
  56:2;58:13
**line (21)**
  16:17,23;17:10;
  18:16,21,22,24;19:7,
  8,9;31:5,24;47:15;
  81:16;84:10;86:6;
  94:8;98:25;100:18,
  22;112:25
**lines (4)**
  13:20;17:2;19:7;
  31:25
**liquidity (3)**
  84:11,23;118:2
**listed (18)**
  14:24;40:7;43:16;
  50:18;58:15;77:17,
  19;82:23;83:2;87:20;

88:9,20;95:23;96:7;
97:4;98:24;103:9;
119:12
**listing (1)**
  95:7
**lists (1)**
  103:10
**litany (1)**
  102:10
**litigation (1)**
  9:8
**little (9)**
  15:13,22;16:13;
  17:9;57:22;69:6;85:5,
  25;126:4
**lliman@cgshcom (1)**
  3:11
**LLP (2)**
  3:3,16
**loan (2)**
  30:21;31:13
**local (9)**
  26:22,22;27:25;
  28:5,15,20,24;29:8,12
**long (1)**
  8:15
**longer (1)**
  97:4
**look (18)**
  13:14;17:20;19:12;
  31:18;42:14;49:21;
  66:5;76:25;78:24;
  91:16;93:5;98:14,19;
  102:25;111:19;114:2;
  118:23;127:2
**looked (2)**
  59:11;77:8
**looking (5)**
  13:13;54:8;79:3;
  87:10;126:25
**looks (2)**
  84:15;118:15
**lot (2)**
  96:25;127:6
**low (1)**
  92:3
**lower (2)**
  102:6;105:2

**M**

**main (1)**
  52:6
**maintain (1)**
  115:7
**major (1)**
  109:12
**makes (1)**
  29:9
**making (3)**
  32:19;97:14;106:12
**Manage (12)**
  83:18;101:12;

103:6,15,19;105:9;
106:24;107:17;
110:10,12,14;119:15
**management (1)**
123:4
**managing (8)**
101:17;103:22;
108:13;116:3,12;
121:7,10;122:2
**many (1)**
116:22
**mark (12)**
33:6,19;38:14;
52:12;54:15;56:12;
62:18;67:15;86:15;
117:23;119:4;122:15
**marked (22)**
7:3,7;8:25;34:25;
38:18,22;52:15;54:9,
23;56:16;62:22;
67:21;86:20,23;87:2,
5;97:17;112:7;119:9;
122:21;124:9,12
**Materials (15)**
39:20;54:19;70:11,
13,15,18,21;71:2,6,9;
75:8;76:10,14;89:19;
97:21
**math (4)**
42:8;47:17;95:22;
104:23
**mathematical (1)**
22:8
**Mathematically (2)**
89:9;94:20
**matter (3)**
65:19;94:3,8
**may (4)**
26:4;44:3;108:13;
124:3
**mean (7)**
94:16;103:20,24;
105:5,16;108:13;
127:8
**meaning (2)**
84:11;124:18
**means (2)**
114:12;122:6
**meant (1)**
126:11
**measuring (1)**
14:20
**meet (9)**
43:23;44:23;98:10,
13;106:19,25;107:17;
108:21;117:9
**Meeting (9)**
54:19;68:8;71:9;
80:25;117:25;118:2,
6,7,8
**meetings (3)**
69:21;70:19,22
**Meghji (2)**

69:18;115:24
**Meghji's (1)**
116:25
**Members (6)**
51:11;58:22;66:21,
23;70:23;75:20
**memory (2)**
51:19;69:6
**mention (1)**
36:18
**mentioned (1)**
106:15
**Merchandise (4)**
101:20,21,24;102:3
**met (1)**
7:19
**metric (1)**
14:25
**metrics (12)**
14:22,24;67:19,25;
68:11,18;75:10;
89:20,24;112:11,15;
118:10
**might (9)**
25:21,24;26:2;27:3;
41:19;83:24;89:24;
102:7;105:20
**M-III (19)**
3:25;11:8;41:2;
49:25;50:8,20,24;
51:7;66:15,19;68:19;
70:23;71:15,20;72:4;
96:9;97:6;98:9;
126:22
**M-III's (1)**
127:14
**million (197)**
21:21,25;29:25;
30:8,12,13,18,20;
31:13,14;32:2,5,18;
37:15;38:5;41:23;
42:2,11;43:5;44:7,8,
13,20;45:3,12,21,22,
24;46:2,6,9,18,22;
47:2,5,13,17,24;48:4,
5,16,16,20,21,22,23,
25;49:3,4,7,8,14,17;
51:14;52:7;53:3,14;
54:11;56:4;59:18,25;
60:2,5,8,12;61:13;
62:8;64:6,8,9,10,15,
16;65:2,3,8,9,12,13,
25;67:2,3;72:15,19,
22;73:5,11,11,16;
74:3,5,9,18,25;77:8,
14,16;78:5,6,11,17;
81:19,23;82:3,5,10,
11,16,18,19,21,21;
83:6;87:15,21,21,22;
88:8,13,23;89:6,6,8,
10;90:13,17,21,21,24,
25;91:2,7,8,10,13,24,
25;92:5,8,8,19;93:8,

16,22;94:13,14,15,21,
22;95:8,13,21,24;
96:3;98:3,15,22,25;
99:2,3,9,10,13,17;
100:3,6,8,24;101:6,
10,18;102:13,15,18;
103:5,21;105:21;
111:10,12,21;112:2;
113:3,7,8,10,15,16,
17;114:4,8,14,15;
121:21;122:9;123:7,
14,17
**mind (1)**
97:12
**minus (7)**
16:8,8;31:16,17;
86:3,4,5
**minute (1)**
9:14
**minutes (1)**
124:4
**MISHKIN (103)**
9:13;10:10;11:12;
12:2,17;13:5,12;
17:16,25;18:8;20:9,
20;21:10;22:4,11,18;
23:3,25;24:16;25:9;
26:18;27:16;29:14;
32:14;34:2,10,16;
35:9,16,22;36:24;
37:16,18,24;38:6;
40:16,24;41:20;
42:22;43:18;44:17,
25;46:20;47:21;48:7,
18;49:5;50:4,17,22;
51:10,21;56:8;57:17;
58:16;60:15;64:19;
68:2,14,23;70:7;
71:17;75:11;77:10;
78:9,14,19;80:11,17;
81:10;84:17;85:3,12;
88:3,17;92:11;93:9,
25;95:2;96:23;
102:23;104:24;
106:11,23;107:8;
109:22,24;110:21;
113:12;115:23;
116:10,18;117:10,17;
120:10,18;121:2;
122:11;123:19;124:2;
125:12;126:3;127:19
**missing (1)**
127:6
**misstates (1)**
80:17
**mitigating (5)**
91:7,9,11;92:15;
98:15
**mixed (1)**
37:18
**Moelis (3)**
46:15;124:23;127:4
**MOLONEY (1)**

123:23
**moment (5)**
22:16;38:15;55:14;
125:10,24
**Monday (1)**
119:6
**Money (13)**
24:2,4,8,20;25:12,
15;26:2,6;28:22;
104:22;105:6,18;
106:2
**monies (2)**
25:25;120:9
**more (12)**
22:21;29:21;53:9;
55:13;89:24;99:19,
22;104:22;105:6,18;
106:2;125:3
**morning (2)**
7:16;76:12
**move (3)**
38:11;102:4;104:11
**moved (2)**
28:20;97:11
**moves (1)**
102:11
**moving (1)**
92:22
**much (4)**
24:14;27:4;103:23;
127:18
**multi-month (1)**
61:22
**multitude (3)**
12:18;24:11;25:15
**Munjal (1)**
67:17
**M-U-N-J-A-L (1)**
67:17
**Murphy (1)**
124:8
**must (1)**
63:19

**N**

**necessarily (2)**
102:2;104:4
**necessary (2)**
53:20;97:8
**need (8)**
7:25;8:13,14;34:4;
35:13;94:14;104:21;
105:13
**needed (1)**
97:15
**needing (1)**
87:25
**needs (1)**
94:4
**negative (6)**
30:20;31:2,5;48:20,
24;84:19

**negotiate (2)**
34:14;83:23
**negotiations (2)**
37:6,13
**net (16)**
16:18;19:7,9;20:2,
5,24;31:19,22;55:2;
86:6;113:4,9;120:11;
122:2,5;125:22
**network (1)**
116:2
**New (5)**
3:6,6,19,19;71:25
**newer (1)**
65:14
**next (11)**
14:3;30:18;31:5;
32:9;41:13;42:4;60:7;
73:21;84:3,6;91:8
**NICK (1)**
3:25
**night (1)**
124:20
**nomenclature (1)**
60:23
**non (1)**
16:24
**non-operating (7)**
16:15,20,25;20:8;
85:10,22;86:5
**nonpayment (1)**
95:18
**Notary (2)**
7:11;128:22
**note (6)**
60:7,10,11;61:4;
62:8;73:24
**noted (1)**
127:21
**notion (1)**
55:19
**November (1)**
124:11
**Number (51)**
8:25;9:2,3,5,9,10,
18,24;10:3,4,20,21;
11:19,20;13:20;
14:21;15:14;29:18;
33:6,10,12,19;35:3;
38:23;39:22,24;45:9;
52:21;54:11,15;
56:13;58:19;59:12;
60:3,22;64:17,18;
66:4;71:10;80:24;
84:16;87:9;88:11;
89:18;92:10;98:6;
100:14;108:10;
110:25;111:2;116:5
**numbered (1)**
39:22
**numbers (8)**
17:6;48:19,25;
49:11;89:9;93:12;

102:4;113:13
**numerous (1)**
117:13
**NWC (1)**
72:3

## O

**oath (1)**
128:9
**Object (46)**
10:10;12:17;13:5;
17:16,25;18:8;20:9,
20;21:10;22:4,11,18;
23:25;26:18;27:16;
29:14;32:14;35:9;
42:22;47:21;50:22;
51:21;64:19;68:2;
70:7;75:11;77:10;
78:9,14;81:10;84:17;
85:3,12;88:17;92:11;
93:25;102:23;104:24;
106:11,23;109:22,24;
110:21;113:12;
120:18;121:2
**Objection (53)**
11:12;12:2,5;13:12;
23:3;24:16;25:9;34:2,
10,16;35:16,22;
36:24;37:16,24;38:6;
40:16,24;41:20;
43:18;44:17,25;
46:20;48:7,18;49:5;
50:4,17;51:10;56:8;
57:17;58:16;60:15;
68:23;71:17;78:19;
80:11,17;88:3;93:9;
95:2;96:23;107:8;
115:23;116:10,18;
117:10,17;120:10;
122:11;123:19;
125:12;126:3
**obligations (3)**
24:19;94:25;96:22
**Occasional (1)**
11:2
**occur (2)**
68:21;99:22
**occurred (1)**
101:15
**o'clock (1)**
118:15
**off (6)**
33:15;38:14,16;
115:2,5;124:3
**offer (2)**
41:19,21
**offset (8)**
48:4,16;103:11;
105:4,16;106:10;
115:16;116:17
**offsetting (2)**
48:22;49:3

**often (7)**
27:10,11,20;28:24;
29:7;69:8,9
**Once (2)**
17:17;42:5
**One (34)**
3:5,18;8:9;12:10,
18;14:5;25:17,19;
26:5;29:21;36:5,13;
49:11;50:18;53:9;
58:14;65:11,14;
68:15;70:15;77:14,
19;82:23;91:25;94:9;
104:9,11;106:12;
112:5;121:10,14;
124:20;126:25;127:2
**ones (1)**
71:24
**only (6)**
32:18;94:14;
115:11;125:8,22;
126:20
**operating (20)**
15:2,12,17,19,23;
16:4,7,8;17:22;18:14;
20:7;83:10;85:9,21;
86:3;95:9,11,14,14;
110:17
**opine (2)**
85:6;97:10
**opportunities (13)**
75:8,21;77:6;83:4;
84:3;88:18;89:5;
91:22;96:18;100:18;
111:7;114:20;115:21
**Opportunity (32)**
75:4,17,21,25;
76:25;77:18;78:12;
83:5;87:10,12;88:8,
13,20,23;91:17,24,25;
92:19;95:7;97:5;99:3,
10,20,23;100:7;
101:7;102:13,15;
103:6;111:14,15,24
**opposed (1)**
90:3
**order (11)**
10:7,15;11:14;
20:15;27:21;43:4;
81:3;98:10;106:19;
117:8;119:15
**Ordering (3)**
101:21,23;102:2
**original (5)**
35:20;90:25;91:3;
93:7;114:11
**others (7)**
62:19;67:16;75:15;
89:16;97:2;119:6;
122:17
**otherwise (1)**
85:2
**out (15)**

21:25;24:2,4,18;
48:9;61:6;76:11;94:2;
96:14;97:11;100:16;
104:3,3,12;118:20
**Outlets (1)**
32:3
**outstanding (7)**
53:2,13,18,19;54:3;
119:15;121:8
**over (6)**
18:14;82:19;89:10;
90:21;105:21;124:21
**overages (1)**
105:21
**oversaw (1)**
77:24
**owe (1)**
83:24

## P

**page (54)**
14:24;15:15;16:12;
17:19,21;18:10;
19:11;20:12;31:16,
19;32:11;40:18;
41:12;43:19;44:4;
52:9,21,23;71:8;72:7,
12;75:3,5,17;77:17;
79:2;80:21;81:21;
83:2;84:3,6;86:11;
87:9,13,17;90:7;
91:16,18,20;92:17,
24;95:10;98:2,7;
100:18;102:25;
110:16;111:7;112:21;
114:4,23,25;115:15
**pages (1)**
75:7
**paid (8)**
21:25;36:15;56:3;
94:6;104:3,5;121:18;
123:18
**paragraph (7)**
53:6,16;56:18,21;
57:15;58:6,15
**Park (1)**
3:18
**part (8)**
34:18;37:4;40:21,
21;49:8;75:9;96:21;
104:7
**partially (1)**
108:6
**participate (1)**
69:11
**participated (1)**
39:13
**participating (1)**
39:14
**particular (2)**
22:16;36:15
**parties (3)**

77:20;82:24;96:7
**parts (1)**
126:8
**party (1)**
80:2
**PASCALE (1)**
3:9
**pay (29)**
21:3;24:18;25:25;
26:2,4;32:6;45:5;
46:11,23;53:2,13,20;
55:2;57:20;60:24;
61:8,14,24;62:4;78:4;
79:12;80:6;81:3,14;
92:23;94:5;97:13;
105:5,16
**payable (28)**
41:23;42:3;72:11;
81:17;82:7,10,14,25;
83:6;100:7,14,19,21;
102:11;104:3,5;
105:4,15;107:2,4,7;
111:9,13,16,25;114:3;
115:12;121:19
**payables (20)**
83:15,17,19,24;
101:13,18;103:11;
104:20;105:5,17,25;
106:9,19;110:18,20,
22;113:24;115:16;
116:16;117:8
**paydown (2)**
30:20,22
**paydowns (2)**
17:15;85:24
**paying (6)**
24:25;26:7;31:13;
104:19;106:19;117:8
**payment (5)**
32:6,7,18,19,22
**payments (10)**
24:11;110:23;
113:24;119:16,25;
120:2,5;121:5,11;
122:5
**payroll (2)**
15:16;24:7
**pays (1)**
25:19
**pbibi@cgshcom (1)**
3:13
**pending (1)**
8:16
**people (3)**
12:18;25:25;89:24
**per (2)**
73:2;76:15
**percent (3)**
17:7;23:5;27:8
**performance (1)**
14:21
**period (2)**
37:25;90:22

**permissible (1)**
115:22
**personally (6)**
52:4;92:20;106:8,
12;110:12;117:15
**PHONE (2)**
3:10,21
**phrase (1)**
123:13
**physically (2)**
125:10,25
**pick (3)**
27:12,21,24
**picks (1)**
26:21
**pickup (2)**
27:18;28:10
**pitfall (1)**
109:12
**place (1)**
69:10
**Plaza (1)**
3:5
**please (1)**
42:25
**plus (5)**
19:8,8,9;48:24;
84:11,24;85:20;86:5
**pm (2)**
62:20;127:21
**point (11)**
41:9;42:3;45:16,18;
52:6;61:20;72:21;
79:13;100:14;119:24;
120:14
**portion (4)**
48:23;49:4;107:2,5
**position (3)**
36:9;118:3,23
**positive (3)**
18:13;48:20;84:16
**possibilities (1)**
58:15
**post (3)**
64:2,10;67:9
**potential (18)**
41:19;43:20,22;
45:5;81:8;83:9;88:11,
24;91:7,9;95:20,23;
96:2;98:15,21;100:6;
103:4,9
**potentially (1)**
44:3
**practically (1)**
89:10
**Prakash (3)**
119:5,9,14
**precisely (1)**
107:21
**premark (1)**
8:25
**premarked (2)**
89:14;126:19

**prepaid (1)**
72:8
**preparation (1)**
71:2
**prepare (1)**
40:25
**prepared (11)**
39:3;41:3,4;59:10;
70:5,11,13,21;71:6;
76:2,21
**preparing (1)**
75:17
**PRESENT (2)**
3:24;108:25
**presentation (11)**
54:16,22;59:13;
61:11;63:6,21;64:25;
66:12;78:7,18,23
**presentations (1)**
64:25
**presented (6)**
58:22;60:20;61:3;
63:10,13;92:12
**pretty (1)**
124:22
**previous (2)**
33:23;101:11
**previously (1)**
39:12
**price (1)**
74:9
**primary (2)**
11:16;47:6
**prior (7)**
41:17;57:5;58:4,9;
65:11;68:4;120:3
**Priority (12)**
40:8,11;41:11;
43:24;44:15,23;50:2,
9,21;51:2,9;93:23
**privy (1)**
23:14
**pro (1)**
95:9
**probably (1)**
56:11
**problem (1)**
108:12
**proceeds (6)**
32:3;43:12;45:6,11;
88:25;95:16
**process (8)**
28:13,14,19;61:22,
23;75:16,18;123:11
**processed (3)**
123:8,14,18
**produce (1)**
11:9
**produced (6)**
9:7;10:11,13;13:6;
33:3;37:10
**production (2)**
10:19;11:5

**Project (9)**
7:1,5;9:4,6;33:13,
20;34:23;39:20;63:6
**projected (6)**
66:14;74:23;113:4,
4,9;114:7
**projecting (2)**
35:15;82:18
**projection (5)**
50:2,8,20,25;65:24
**projections (5)**
60:13;62:9;64:23;
65:8,21
**properties (1)**
26:2
**proposal (3)**
50:10,14,15
**proposed (1)**
43:11
**prorate (2)**
95:11,16
**protecting (2)**
56:2;58:14
**proved (1)**
82:19
**provide (2)**
51:4,7
**provided (10)**
15:9,20;23:10,23;
36:25;37:3;45:8,13;
46:3,5
**provides (1)**
66:13
**providing (1)**
117:16
**provision (6)**
56:25;57:8,11;
58:13;125:4;126:12
**Public (2)**
7:11;128:22
**pulling (1)**
33:22;67:23
**purchase (1)**
74:9
**purchases (1)**
102:8
**purpose (3)**
10:12;11:11;55:24
**purposes (1)**
79:20
**pushing (1)**
108:4
**put (8)**
24:14,24;35:12;
66:11;67:13;81:13;
104:22;110:4
**putting (2)**
22:23;24:20

**Q**

**quadrant (1)**
13:22

**qualified (1)**
36:7
**quickly (3)**
84:2;85:7;87:8

**R**

**Rajat (2)**
119:5,8
**range (1)**
98:21
**ranging (1)**
95:8
**rata (1)**
95:9
**read (4)**
53:8,9;86:2;128:8
**reading (3)**
50:6;80:7;113:2
**real (1)**
79:17
**realization (1)**
61:20
**realize (1)**
89:4
**realized (1)**
61:23
**really (4)**
13:16;28:11;94:3;
97:10
**reason (10)**
8:19;11:15,16;63:9,
12,16;97:4;102:3;
121:16,20
**reasonable (1)**
96:16
**reasons (1)**
102:10
**recall (44)**
9:21;33:23;34:7;
35:6,11,14,18,19;
36:4;37:12,20;38:4;
39:14;41:17,25;47:4;
55:16,21,22;57:10;
62:5,15;66:20;68:25;
71:7;78:15,20;87:14;
99:15;100:4;104:9;
107:19;109:6;113:22;
116:21;117:12,15,19;
118:4,5,12,16,19,24
**receipts (13)**
15:2;16:4,7;17:22;
25:4,10,22;85:9,20;
86:3;95:9,11,14
**receivables (1)**
72:6
**receive (3)**
74:9;79:13;119:13
**received (2)**
15:4;32:4
**receives (1)**
27:19
**Recess (2)**

86:18;124:6
**recipient (2)**
59:3,4
**recognize (14)**
9:12,18,20;35:3;
38:24;39:2;52:17;
55:7;9,11;62:24;63:2,
3,5
**recollect (1)**
46:17
**recollection (2)**
121:7,9
**record (9)**
33:7,11;38:15,16;
93:2;115:2,5;128:11,
12
**records (1)**
90:23
**reduce (3)**
120:12;125:8,23
**reduced (2)**
21:21;30:17
**reducing (5)**
30:12,13;83:15;
120:8;122:6
**refer (3)**
26:8;35:12;53:20
**reference (12)**
72:14;77:13;79:5;
84:4,8;92:14;93:7;
107:15;111:20;
114:20;115:7;121:15
**referred (2)**
26:9;85:14
**referring (5)**
23:16,17;85:13,15;
112:12
**refers (7)**
39:8;53:5,17;54:3,
9;56:22;91:15
**reflect (15)**
16:25;17:13;20:23;
31:7;43:2;44:10,12,
21;45:4;50:15;82:5,
17;90:23;114:6;127:3
**reflected (18)**
41:24;50:15;51:14;
53:22;57:15;58:6,25;
59:19;60:3;65:20;
73:6;78:17;80:8,14;
82:16;87:16;111:25;
115:21
**reflecting (1)**
116:7
**reflection (1)**
111:8
**reflects (16)**
16:16;29:17;30:19;
31:11;32:13,17;48:3,
15;49:3,25;73:25;
74:17;76:8;84:15;
90:24;98:3
**refresh (2)**

121:6,9
**regional (12)**
47:7;51:18;56:7;
60:13;61:7,13;62:10;
65:12;67:5,11;78:2;
81:2
**regular (1)**
68:21
**regularly (1)**
122:4
**related (1)**
88:24
**relevant (1)**
13:10
**relied (2)**
45:14;109:11
**remainder (1)**
31:12
**remaining (7)**
32:8,19,22;42:4;
43:4;47:18;59:13
**remember (5)**
34:6;51:16;52:5;
57:18;107:21
**remembering (1)**
109:2
**rendered (1)**
34:14
**rent (4)**
15:16;95:9,12,17
**renting (1)**
26:2
**repeat (7)**
7:25;28:17;53:25;
71:18;80:12;81:4;
85:17
**rephrase (12)**
12:24;18:3;24:22;
28:18;37:17;42:23;
44:18;47:22;62:11;
70:8;88:6;103:17
**reply (1)**
68:8
**replying (1)**
123:12
**Report (10)**
7:2,6;9:4,6;17:18;
20:13;33:13;84:19;
85:4;113:9
**reporter (18)**
8:23;24:33:6,18;
38:14,21;52:12;
54:14;56:12;62:18;
67:15;86:15;89:13;
97:17;112:7;117:23;
119:4;122:15
**reports (8)**
10:5,6;11:9,11;
32:24;33:4;116:2,6
**represent (12)**
15:3,14;40:14,15;
43:17,21;74:22;77:6,
12;82:12;101:3;

126:21
**representative (2)**
124:18;125:7
**representatives (18)**
11:25;39:5;52:24;
53:11;54:7;55:17,24;
57:5,13,14;58:5,10,
11;69:13;70:19;96:9,
11;126:22
**represented (4)**
40:20;79:10,11;
83:23
**representing (1)**
20:25
**Represents (6)**
15:4;16:3,6;47:17;
65:6;100:11
**request (1)**
127:14
**requested (1)**
47:12
**requesting (1)**
52:6
**required (13)**
10:6,14;11:14;
24:23;42:15,21;43:3,
8,16;47:11;63:22;
74:3;82:8
**resorting (1)**
89:8
**respect (32)**
7:24;9:24;14:21;
15:7;17:22;26:6;28:3;
29:16;49:8,20;51:8;
55:15;59:18;62:7;
74:17;77:2,13,15,23;
81:7,8;82:24;87:11,
15;88:15;97:5;
106:20;109:16,19;
111:24;112:5;114:2
**responded (1)**
108:11
**responsibility (1)**
77:22
**responsible (4)**
10:23;77:20;82:24;
96:7
**Restructuring (12)**
54:18;58:22;60:20;
61:3,11;63:7,10,13,
17;78:7,18,23
**result (1)**
40:22
**resulting (1)**
22:2
**review (39)**
9:16;13:15;35:5;
38:25;52:18;53:24;
54:10;55:8,10;57:9;
59:21;60:4,9;62:25;
64:4,20;65:4,10,22;
68:7;71:21;73:23;
81:20;89:17,21;90:5,

15;91:23;97:23;98:5;
100:12;101:25;
102:24;103:2;113:5;
114:9;118:18;123:10;
126:24
**reviewed (1)**
45:23
**revised (7)**
90:12,16;91:8;98:6;
113:8,15;114:5
**Riecker (3)**
69:16;96:6;107:12
**right (38)**
16:18;24:15,21;
25:8;30:23,24;36:20;
39:5;41:8;42:11,13;
48:14,17;50:16;
63:24;66:7;67:2,6;
68:15,15;73:7,12;
74:19;76:18;77:9,20;
83:7,11;84:13;92:10,
16;96:19;98:4;111:3;
112:19;114:25;115:3;
123:5
**right-hand (1)**
48:19
**right-most (1)**
42:18
**risk (2)**
88:16,19
**Rob (2)**
96:6;107:10
**role (1)**
22:13
**Rolling (2)**
33:20;34:24
**roughly (2)**
20:21;31:17
**row (13)**
44:8;59:22;66:3;
77:2,17;79:8;84:12,
14;86:10;91:25;92:4;
99:8;100:9
**rows (4)**
43:14;64:5;77:4,5
**rules (1)**
7:23

## S

**sale (3)**
43:12;45:6,10
**same (7)**
9:23;54:11;60:2,6;
89:23;98:14;111:9
**Sasha (2)**
124:10;127:15
**satisfied (1)**
40:21
**satisfy (9)**
43:4;44:3,14;82:8,
20;94:25;96:21;97:8;
120:9

**Saturday (1)**
73:2
**saw (3)**
63:17;64:17;92:9
**saying (5)**
55:23;76:9;102:9;
107:22;109:7
**schedule (5)**
39:3;52:24;53:10;
54:6,8
**scheduled (1)**
39:8
**schedules (3)**
27:13,15,17
**Sears (5)**
11:3;32:3;35:21,24;
123:3
**second (6)**
41:15;56:15;78:25;
84:20,21;115:3
**section (1)**
31:22
**seeing (6)**
16:11;17:3,19;18:9;
20:12;86:10
**seems (3)**
16:11;21:18;127:5
**sellers (1)**
37:13
**senior (27)**
36:19,21,25;37:8,
15;56:4;72:14;73:11,
16;74:2,18,23;77:3,
16;87:11,15,22;88:9;
91:22;92:16,23;
94:21;97:5,8,13;99:6;
111:19
**sense (1)**
21:18
**sent (8)**
70:18;76:11;89:22;
116:2,7;126:21;
127:4,13
**sentence (8)**
50:6;52:22;53:5,6,
15,23;66:18;123:13
**series (5)**
7:23;14:4;43:8;
95:8;98:20
**serious (1)**
108:2
**services (1)**
25:20
**set (1)**
91:21
**several (1)**
66:21
**severance (1)**
49:17
**shared (5)**
35:7;52:24;53:11;
54:6;62:13
**ship (3)**

43:12;45:6,10
**shortfall (12)**
56:2,24;57:7,21;
58:13;74:18,21;
82:15;124:19;125:9,
23;126:12
**show (2)**
48:20;97:17
**shows (6)**
40:17;49:16;86:11;
90:16;91:24;92:17
**Shulzhenko (1)**
124:11
**side (5)**
12:21;14:3;48:19;
63:24;124:23
**signed (2)**
69:3;128:18
**significance (2)**
72:23;119:21
**significant (2)**
81:13;116:5
**significantly (2)**
55:4;108:9
**similar (4)**
45:15;70:4;92:9;
125:14
**simply (1)**
120:24
**sitting (3)**
63:15;65:17;104:15
**situation (1)**
94:18
**six (1)**
95:18
**slide (25)**
11:20;13:14,20;
31:19;39:21,22,24;
41:18,24;42:2;59:5,
19;63:20;66:5,9,16,
25;67:4;70:3;73:21;
76:2;79:3;98:18,19,
20
**slides (2)**
39:18;59:3
**slightly (1)**
92:12
**solvency (9)**
34:9,12;36:12;90:8,
10;92:25;93:3,24;
112:22
**solvent (3)**
34:15;36:10;40:23
**somebody (3)**
45:19;95:19,25
**Sometime (1)**
69:3
**Sometimes (3)**
27:3;69:12;71:4
**Sorry (5)**
29:21;68:14;81:5;
99:5,21
**source (12)**

43:12;45:6,10
**Sources (6)**
42:16;43:19,22;
50:18;59:7;78:3
**specific (6)**
21:4;22:21;32:15;
41:25;63:3;106:17
**specifically (8)**
35:6;57:11;66:20;
106:22,24;116:21;
117:13,20
**specificity (1)**
62:6
**specifics (1)**
118:24
**specified (1)**
72:6
**speculate (2)**
23:5,13
**speculating (1)**
28:12
**spending (1)**
115:11
**spent (2)**
11:3;79:16
**ss (1)**
128:4
**start (1)**
9:17
**started (1)**
69:2
**starts (1)**
43:10
**STATE (2)**
128:3,22
**stated (1)**
11:13
**statement (1)**
22:20
**statements (3)**
22:25;23:9;107:6
**STEEN (1)**
3:3
**step (2)**
104:10,10
**still (1)**
99:23
**stop (2)**
56:5;106:18
**stopping (1)**
117:8
**store (11)**
25:20;26:8,9;27:3,
6,11,18,19,21;72:4,5
**stores (8)**
25:13,18;26:7,10,
12,17;27:14;81:2
**STRAUSS (1)**
3:16
**subject (4)**
67:18;68:10;

18-23538-shl    Doc 5084    Filed 09/06/19    Entered 09/06/19 16:09:02    Main Document
IN RE: SEARS HOLDINGS CORPORATION, et al.    Pg 308 of 344

CHRISTOPHER GOOD
August 28, 2019

112:10,16
**subjects (1)**
12:10
**subscribed (1)**
128:18
**substance (1)**
109:25
**subtract (1)**
42:6
**successful (6)**
87:23;91:12;96:15,
17,25;97:2
**sufficient (1)**
89:7
**suggested (4)**
41:18;46:22;47:7;
61:25
**sum (8)**
20:25;42:5;44:21;
47:9,18;64:6;92:5;
98:21
**sums (1)**
49:12
**Sunday (3)**
39:9;118:9,17
**super (1)**
123:11
**Supplemental (1)**
56:15
**supportive (1)**
108:17
**Sure (26)**
8:3;9:15;12:25;
24:23;27:8;29:2,5,9,
15;35:10;47:23;
53:10;63:3;64:21;
69:19;70:9;79:21;
101:14;102:20;
108:14,21;110:2;
114:24;115:3;117:14;
123:20
**sweep (2)**
32:4;78:2
**sweeps (1)**
56:5
**swept (6)**
28:15;32:8,20,23;
56:6;125:15
**sworn (1)**
7:10

**T**

**table (3)**
18:23,25;40:5
**talk (1)**
48:12
**talked (2)**
107:10;108:6
**talking (1)**
116:3
**target (5)**
73:4,5;74:25;82:2;

94:15
**team (22)**
10:23;11:4;15:10,
21;23:11,14;27:22;
28:10;33:2;46:4;
50:13;51:11;66:21,
22;69:14;75:20;
77:25;95:20,25;96:5;
106:14;121:25
**telling (3)**
34:7;55:16;127:8
**term (1)**
65:5
**terms (4)**
24:14;37:19;41:18;
113:15
**testified (3)**
7:11;51:3,17
**testify (1)**
8:20
**testimony (8)**
45:19;48:8;50:19,
23;54:25;80:18;
128:8,11
**testing (1)**
11:17
**Thanks (1)**
68:16
**theoretical (1)**
94:18
**third (2)**
80:2;84:20
**though (1)**
17:3
**thought (6)**
46:11;73:3;109:16;
110:5;121:3;126:10
**three (8)**
77:4,5;108:17;
114:5;119:17;120:13;
124:3,15
**Thursday (1)**
68:9
**till (1)**
69:4
**times (2)**
55:12;106:16
**timestamp (1)**
76:15
**timing (1)**
107:20
**tirelessly (1)**
61:16
**titled (2)**
9:3,5
**today (5)**
8:4,20;23:7;63:15;
65:17
**together (2)**
22:23;66:11
**told (7)**
39:12;57:4,13;
58:10;106:18;107:23;

126:10
**tomorrow (1)**
116:25
**took (1)**
69:10
**top (4)**
13:21;17:21;66:16;
76:15
**total (17)**
15:2,12,19,23;16:7,
8,13,14,20,24,24;
18:13;20:7,7;41:7;
84:10;86:3
**Touchbase (9)**
67:19,24;68:10,17;
89:20,23;112:10,15;
118:10
**towards (1)**
108:4
**trace (1)**
65:17
**track (2)**
68:20;70:12
**Tracker (8)**
90:9,11;92:25;93:4;
101:4;111:3,5;112:22
**Tracking (16)**
69:25;70:4,22;71:9,
16,20,22;72:4,5,10;
75:23;80:25;89:19;
97:21,25;112:18
**transaction (12)**
12:13;13:4;32:13,
15;37:22;69:5,25;
97:20,20,24;108:16;
111:4
**transcript (4)**
34:3,4;128:8,10
**transfer (2)**
28:25;31:8
**transferred (4)**
28:22;29:7;125:11,
25
**transferring (1)**
31:14
**transfers (2)**
26:23;29:13
**Transform (29)**
11:24;12:7;35:8,19,
23,25;39:4;52:13,15;
55:17,23;57:4,14;
58:10;62:14;69:20,
25;70:18;82:8,9;
97:20,24;103:21;
111:4;114:17;120:17,
24;124:18;125:7
**Transform's (2)**
57:25;114:15
**transit (3)**
47:4;67:6,10
**trapped/unavailable (2)**
79:6,8
**treasury (10)**

15:9,21;23:10,14;
27:22;28:10;29:3;
46:3;66:22;77:25
**tricky (1)**
126:5
**truck (3)**
26:21;27:20;28:8
**trucks (2)**
27:11,24
**true (4)**
46:25;82:20;
128:10,12
**true-up (1)**
123:6
**truth (1)**
110:7
**truthfully (1)**
8:20
**try (4)**
37:7;66:23;78:2;
126:6
**trying (5)**
81:13;83:23;104:9;
108:18;116:11
**turn (18)**
11:18,20;29:18;
56:18;58:18;59:5;
63:20;71:8;80:23;
87:8;89:13;90:7;
92:24;98:2;111:6;
112:17,21;114:19
**turns (1)**
96:14
**twice (1)**
117:18
**two (19)**
8:23;23:22;31:25;
36:23;39:18;43:14;
58:14;64:5,7;65:17,
18;71:22;92:7;
104:10;110:18;
112:25;124:14;126:8,
17
**type (1)**
10:19
**types (3)**
13:9;32:25;116:7
**typically (1)**
26:9

**U**

**ultimately (4)**
25:6,10;26:12;30:6
**unavailable (13)**
46:10,23;47:3,6;
61:17;66:24;79:23;
80:4,8,13;81:11;
92:21;108:6
**unaware (1)**
58:17
**unclear (8)**
61:15;65:11,16;

70:20;78:10;120:19,
20,20
**under (34)**
10:6,14;11:14;
14:25;29:25;40:15;
41:6;43:7,16;59:7;
72:3,13;74:8,25;82:7;
87:22;88:9;91:17,22;
93:5,17;98:6;99:6;
100:5;103:7,10,16,20;
110:11;111:8,13,15;
119:20;128:9
**understood (3)**
73:15;82:6;116:23
**unduly (2)**
109:21;110:3
**unfortunately (4)**
45:9;46:24;61:17;
95:3
**unreasonable (1)**
89:11
**Unsecured (1)**
3:17
**up (26)**
19:7;20:2,11;26:21;
27:12,21,24;29:3;
37:18;46:2,24;48:25;
55:3;64:7;84:19;89:9;
95:24;98:21;105:25;
108:7,9;109:12,21;
113:13;115:20;
116:20
**updated (2)**
55:12;59:8
**upon (8)**
16:11;18:9;20:12;
22:9;45:8,14;48:8;
103:22
**upper (1)**
13:22
**use (7)**
43:23;44:3;79:12,
25;81:3;94:23,24
**used (13)**
10:8;21:2;23:24;
44:14,22;46:11,19,23;
48:4;91:12;92:23;
96:21;97:13
**Uses (5)**
40:8,11;41:6;42:6;
59:7
**using (1)**
65:5
**utility (2)**
65:13,14
**uttered (1)**
116:22

**V**

**Value (22)**
40:9,12;41:6,14,16;
42:6,7,15,16,20;43:3,

8,16,20,22;47:11;
52:7;59:13;63:22;
93:6,14,18
**variance (20)**
10:6;13:21;14:4,10,
13,20,25;18:13;33:3;
99:2,9,14,18;100:2,
24;101:6;102:18;
111:9,13;113:18
**variety (1)**
88:14
**various (4)**
27:13,14;37:25;
75:22
**vary (1)**
27:15
**vendor (1)**
26:4
**vendors (3)**
15:16;25:25;95:15
**verbally (1)**
101:22
**version (3)**
63:4;65:14;75:12
**versions (1)**
75:14
**versus (1)**
90:6
**view (2)**
55:18;93:21
**viewpoint (1)**
106:6
**voiced (1)**
107:23
**volume (1)**
27:19

### W

**walk (1)**
40:4
**walk-through (1)**
52:5
**wants (1)**
27:6
**way (18)**
21:15;25:12,17,19,
21,23,24;26:5;56:11;
72:23;81:6;84:16;
86:13;101:16;102:9;
108:7;121:10;127:5
**ways (3)**
24:12;25:15;101:10
**WEBER (1)**
3:25
**Week (32)**
7:2,6;9:5,7,21;14:6,
8,15,15,15;15:8;
19:13;20:16;21:7,13,
17;26:20;29:19,22;
30:2,8,13;31:6,25;
33:14,21;34:24;
72:25,25;84:20,20,21

**Weekly (24)**
7:1,5;9:4,6;10:5;
12:4;13:17;32:25;
33:3,13;37:10;69:25;
71:9,10,12;73:21;
74:17;81:17;89:19;
97:20,25;111:3,4;
112:18
**weeks (6)**
14:5;17:23,24;18:6,
12;73:2
**Weil (3)**
54:18;127:14,15
**weren't (2)**
95:4;97:2
**what's (5)**
42:5;65:20;70:5;
78:17;112:7
**whole (1)**
43:17
**willing (1)**
41:19
**withdraw (3)**
18:2;68:4;76:22
**withdrawn (24)**
11:19;14:2;16:5;
18:4;21:11;28:13;
30:5;35:18;37:5;
44:11,19;51:22;58:2,
7;95:5;103:25;
105:23;108:24;
109:17;117:23;118:7;
120:2;121:8,19
**within (3)**
13:20;14:9;126:11
**without (5)**
87:25;89:8;94:13;
100:13;106:3
**witness (2)**
7:10;86:16
**word (1)**
110:2
**wording (1)**
126:4
**words (5)**
63:15;109:25;
116:21,22;126:11
**worked (5)**
11:8;66:21;77:25;
108:16,20
**working (14)**
61:16;66:23;92:22;
96:10,12;105:9;
106:25;107:3,5,10,17;
108:13;116:3,13
**works (6)**
21:15;25:12;26:16,
25;102:22;123:4
**written (1)**
13:24
**wrong (5)**
60:18,19,23;61:5;
106:9

**wrote (1)**
50:13

### Y

**years (2)**
11:3;108:17
**Yep (1)**
91:21
**York (4)**
3:6,6,19,19

### Z

**zero (2)**
19:15;22:3

### 1

**1 (19)**
7:1;8:25;9:3,9,19;
10:3,20;11:20;13:9,
20;21:21;29:18;
39:22,24;59:5,19;
60:14;62:10;63:21
**1.2 (2)**
73:9,10
**1:27 (1)**
127:21
**10 (9)**
10:1;65:13;86:15,
19;89:14,18;113:16,
19,21
**10:14 (2)**
76:7,12
**10:47 (1)**
76:17
**10:52 (1)**
59:2
**100 (11)**
45:22;46:6,9,18,22;
47:2,5;49:8;90:25;
91:2;100:1
**10006 (1)**
3:6
**10036-6745 (1)**
3:19
**101 (1)**
101:1
**102 (4)**
91:7,10;92:5;102:1
**103 (1)**
103:1
**104 (7)**
98:3,7,25;99:3,10;
100:6;104:1
**105 (1)**
105:1
**106 (1)**
106:1
**107 (1)**
107:1
**108 (1)**

108:1
**109 (1)**
109:1
**11 (10)**
7:2;9:5;11:1;33:21;
34:24;86:22;97:18,
19;110:9;118:15
**11:47 (2)**
76:17,19
**110 (1)**
110:1
**111 (1)**
111:1
**112 (1)**
112:1
**113 (1)**
113:1
**114 (1)**
114:1
**115 (1)**
115:1
**116 (1)**
116:1
**117 (1)**
117:1
**118 (7)**
87:21;89:6;98:15,
15,17,22;118:1
**119 (1)**
119:1
**12 (10)**
7:6;9:7;12:1;21:21;
33:14;86:25;110:25;
111:2;115:14,14
**120 (8)**
74:18;77:8,16;
87:15;89:8,10;90:21;
120:1
**121 (1)**
121:1
**122 (1)**
122:1
**123 (1)**
123:1
**124 (1)**
124:1
**125 (3)**
41:23;42:2;125:1
**126 (1)**
126:1
**127 (1)**
127:1
**13 (7)**
13:1;73:20,24;87:4;
112:8,9;118:13
**132 (2)**
98:22,23
**139 (1)**
49:14
**14 (11)**
14:1;87:21;88:23;
89:6;91:25;92:4,8;
118:3,23;119:5,8

**15 (13)**
15:1;83:6;94:14,22;
100:8;102:13,15;
103:5;111:21;112:2;
122:15,19;124:8
**16 (16)**
16:1;21:25;57:5;
58:4,9;62:4,20,22;
65:2,9;78:7;124:7,11;
126:18,23;127:3
**166 (12)**
82:3,5,10,19;
103:21;105:21,25;
114:14,17;120:21,23;
121:4
**169 (4)**
114:8,11;121:10,17
**17 (9)**
17:1;67:18;68:9;
76:6,12;124:10;
126:18,23;127:12
**177 (1)**
81:19
**18 (7)**
18:1;70:2;72:15;
76:22;81:19;90:4,6
**19 (3)**
19:1;60:14;72:19
**196 (4)**
81:23;82:11,21;
114:11
**1L (2)**
119:15;121:7

### 2

**2 (26)**
7:3,5;9:2,5,10,24;
10:4,21;11:20;13:14,
20;33:10,12;34:25;
52:21,23;71:8;90:7;
92:24,24;98:2,7,18;
102:25;112:21;114:4
**20 (1)**
20:1
**2018 (2)**
124:8,11
**2019 (24)**
7:3,7;33:14;34:25;
38:18;52:14,25;
53:12;54:7,21,22;
59:8;62:20,22;67:21;
70:2;86:20,23;87:2,5;
97:21;119:9;122:18,
20
**21 (4)**
21:1;67:21;76:17,
19
**212-225-2550 (1)**
3:10
**212-872-1006 (1)**
3:21
**22 (1)**

22:1
**23 (4)**
　23:1;90:3,6;97:7
**24 (5)**
　24:1;32:5,18;86:20;
　89:16
**25 (9)**
　25:1;97:21,25;99:2,
　9,13,17;100:3;101:4
**26 (1)**
　26:1
**27 (1)**
　27:1
**28 (7)**
　28:1;87:22;88:23;
　89:6;91:25;92:4,8
**29 (4)**
　29:1;64:10;84:12;
　86:23

**3**

**3 (24)**
　31:19,19;33:19;
　34:23;35:4;54:16,22;
　59:8;60:7,10,11;61:4;
　62:8;91:16;112:19,
　20;114:4,15,18;118:8,
　14;121:17,21;122:9
**3:55 (1)**
　62:20
**30 (19)**
　30:1;82:16,18,21;
　83:6;87:2;100:24;
　101:6,10,18;102:18;
　111:3,5,10,12;113:17,
　19,21;117:25
**31 (1)**
　31:1
**32 (1)**
　32:1
**33 (3)**
　33:1;113:7,8
**335 (3)**
　47:13;48:25;52:7
**34 (1)**
　34:1
**35 (9)**
　30:8,13,18,20;
　31:13,17,17;32:2;
　35:1
**350 (3)**
　73:11,16;74:5
**36 (1)**
　36:1
**37 (2)**
　37:1;113:10
**38 (1)**
　38:1
**39 (1)**
　39:1
**3rd (1)**
　118:20

**4**

**4 (22)**
　38:17,23;39:19;
　54:9,17,21;59:2,12;
　60:3;64:17;87:5;
　91:20;95:10;98:19,
　20;111:7;115:15;
　118:15;119:7,9;
　123:6,16
**40 (1)**
　40:1
**41 (2)**
　20:17;41:1
**42 (1)**
　42:1
**43 (2)**
　43:1;49:17
**44 (9)**
　14:6,8;17:23;18:6,
　12;19:13;20:17;
　21:17;44:1
**45 (7)**
　14:15;17:23;18:6,
　12;21:7,13;45:1
**46 (8)**
　14:15;17:23;18:6,
　12;19:23;20:3,18;
　46:1
**47 (11)**
　14:16;17:23;18:6,
　12;29:19,22;30:2,8,
　13;31:6;47:1
**48 (1)**
　48:1
**49 (1)**
　49:1
**4th (2)**
　118:21,21

**5**

**5 (21)**
　52:12,14,17,21,23;
　56:18,22;57:15;58:6,
　15;66:5,17,25;79:3;
　114:23;119:17;
　121:11,22;122:10,17,
　20
**50 (15)**
　50:1;64:9;65:25;
　66:4;67:2,3;77:14;
　78:5,6,11,17;92:19;
　93:8,16,22
**503b9 (1)**
　49:14
**51 (1)**
　51:1
**52 (1)**
　52:1
**53 (2)**
　20:7;53:1

**54 (1)**
　54:1
**55 (1)**
　55:1
**56 (1)**
　56:1
**57 (1)**
　57:1
**58 (1)**
　58:1
**59 (1)**
　59:1

**6**

**6 (29)**
　20:8;21:14,15,20;
　31:3,5,14,17;38:18;
　39:9;51:24;52:25;
　53:12;54:7,15,20;
　55:5,9,15,16;58:19,
　21;59:13,20;64:18;
　119:17;121:12,22;
　122:10
**60 (2)**
　60:1;113:15
**61 (1)**
　61:1
**62 (1)**
　62:1
**63 (1)**
　63:1
**64 (1)**
　64:1
**65 (1)**
　65:1
**66 (1)**
　66:1
**67 (1)**
　67:1
**68 (1)**
　68:1
**680 (12)**
　42:11,13;44:3;
　47:17;48:5,16,20,23,
　24;49:4,7,12
**689 (1)**
　47:24
**69 (1)**
　69:1

**7**

**7 (9)**
　56:13,15,19,22;
　76:11;119:17;121:12,
　23;122:10
**70 (1)**
　70:1
**71 (1)**
　71:1
**72 (1)**
　72:1

**73 (1)**
　73:1
**74 (1)**
　74:1
**75 (1)**
　75:1
**76 (3)**
　30:12;31:16;76:1
**77 (1)**
　77:1
**78 (1)**
　78:1
**79 (8)**
　64:6,8,15;65:3,9,12,
　15;79:1

**8**

**8 (11)**
　8:1;62:18,21,24;
　65:20;66:2;78:24;
　80:9,14;119:15,22
**80 (1)**
　80:1
**81 (1)**
　81:1
**82 (1)**
　82:1
**83 (1)**
　83:1
**84 (1)**
　84:1
**85 (1)**
　85:1
**850 (9)**
　56:4;73:5,11,16;
　74:3,9,25;91:4;94:15
**86 (1)**
　86:1
**865 (2)**
　94:13,21
**87 (1)**
　87:1
**88 (8)**
　88:1;91:24;92:8;
　95:8,13,21,24;96:3
**89 (31)**
　44:7,8,13,19,20;
　45:3,12,21,24;46:2;
　48:4,16,21,22;49:3;
　51:14;53:3;54:11;
　59:18,24,25;60:2,5,8,
　12;61:13;62:8;64:16;
　65:2,8;89:1
**8th (1)**
　120:3

**9**

**9 (22)**
　7:7;9:1;33:14;
　52:13,14;67:16,20;
　68:6;69:24;70:6,15;

71:10;72:19,22,24;
74:24;80:24;82:14;
87:9;92:10;123:14,17
**9.149 (1)**
　123:7
**90 (6)**
　90:1,13,17,21,24;
　91:8
**91 (1)**
　91:1
**92 (1)**
　92:1
**93 (1)**
　93:1
**94 (1)**
　94:1
**946 (1)**
　72:15
**95 (1)**
　95:1
**950 (3)**
　37:15;38:5;91:3
**96 (1)**
　96:1
**97 (1)**
　97:1
**970 (2)**
　72:19,22
**98 (1)**
　98:1
**99 (1)**
　99:1

# Exhibit W

*IN RE: SEARS HOLDINGS CORPORATION, et al.*

---

*MOHSIN MEGHJI*
*August 29, 2019*

---



*Original File 281291.txt*
*Min-U-Script® with Word Index*

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     ----------------------------------------X
 3   In Re:

 4   SEARS HOLDINGS CORPORATION, et al.,

 5                      Debtor.

 6   Chapter 11 - Case No.: 18-23538 (RDD)
     ----------------------------------------X
 7

 8                      450 Park Avenue
                        New York, New York
 9
                        August 29, 2019
10                      8:06 a.m.

11

12             DEPOSITION of MOHSIN MEGHJI, before

13   Melissa Gilmore, a Shorthand Reporter and

14   Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO., LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                    REF:  281291
```

```
 1  A P P E A R A N C E S:

 2  WEIL, GOTSHAL & MANGES, LLP

 3  Attorneys for Debtors and Debtors-in-Possession,

 4  Sears Holdings Corporation, et al.

 5       200 Crescent Court, Suite 300

 6       Dallas, Texas 75201-6950

 7  BY:  PAUL GENENDER, ESQ.

 8       JAKE RUTHERFORD, ESQ.

 9       PHONE 214-746-7877

10       E-MAIL paul.genender@weil.com

11            jake.rutherford@weil.com

12

13  CLEARY GOTTLIEB STEEN & HAMILTON LLP

14  Attorneys for ESL Investments, Inc.

15       One Liberty Plaza

16       New York, New York 10006

17  BY:  ABENA MAINOO, ESQ.

18       BENJAMIN BRIGHT, ESQ.

19       PASCALE BIBI, ESQ.

20       LEWIS J. LIMAN, ESQ.

21       PHONE 212-225-2785

22       E-MAIL amainoo@cgsh.com

23            bbright@cgsh.com

24            pbibi@cgsh.com

25            lliman@cgsh.com
```

3

```
 1   A P P E A R A N C E S:  (Cont'd)

 2

 3   AKIN GUMP STRAUSS HAUER & FELD LLP

 4   Attorneys for Unsecured Creditors

 5        One Bryant Park

 6        New York, New York 10036-6745

 7   BY:  JOHN P. KANE, ESQ.

 8        PHONE 212-872-1006

 9        E-MAIL jkane@akingump.com

10

11

12   ALSO PRESENT:

13        BRIAN GRIFFITH, M-III

14        CHRISTOPHER GOOD, M-III

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   ------------------ I N D E X ------------------

 2   WITNESS                 EXAMINATION BY          PAGE

 3   MOHSIN MEGHJI       MS. MAINOO                     7

 4

 5

 6   --------------- E X H I B I T S ---------------

 7   MEGHJI              DESCRIPTION              FOR I.D.

 8   Exhibit 1           E-Mail, Bates Stamped          9

 9                       SEARS_507B_00000474

10                       through 480

11   Exhibit 2           E-Mail, dated January 6,      12

12                       2019, with attachment

13   Exhibit 3           January 9, 2019 letter        16

14                       from Transform

15   Exhibit 4           E-Mail, Bates Stamped         19

16                       SEARS_507B_0000003

17                       through 12

18   Exhibit 5           Minutes of a Meeting,         28

19                       January 16, 2019, Bates

20                       Stamped SEARS_UCC00413796

21                       through 413801

22   Exhibit 6           Minutes of a Meeting,         44

23                       January 16, 2019, Bates

24                       Stamped SEARS_UCC00413802

25                       through 413803
```

```
 1    ------------ E X H I B I T S (Cont'd) -----------
 2   MEGHJI              DESCRIPTION               FOR I.D.
 3   Exhibit 7           Minutes of a Meeting,        45
 4                       January 16, 2019, Bates
 5                       Stamped SEARS_UCC00413804
 6                       through 413806
 7   Exhibit 8           E-Mail, dated January 21,    50
 8                       2019, with attachment
 9   Exhibit 9           E-Mail, dated January 24,    58
10                       2019, with attachment
11   Exhibit 10          E-Mail, dated January 29,    59
12                       2019, with attachment
13   Exhibit 11          E-Mail, dated January 30,    79
14                       2019, with attachment
15   Exhibit 12          Declaration of Mohsin Y.     88
16                       Meghji, dated February 1,
17                       2019
18   Exhibit 13          E-Mail, dated February 3,    95
19                       2019, with attachment
20   Exhibit 14          Bank of America Bank        101
21                       Statement, dated 2/28/19
22
23
24
25
```

```
 1   ----------- E X H I B I T S (Cont'd) -----------

 2   MEGHJI              DESCRIPTION              FOR I.D.

 3   Exhibit 15          Sears Holdings Corp.,        102

 4                       Weekly Estimated

 5                       Professional Fees for

 6                       Debtor and UCC Advisors,

 7                       Week of 1/31/19

 8   Exhibit 16          Declaration of Mohsin Y.     107

 9                       Meghji, dated October 15,

10                       2018

11

12

13              (EXHIBITS TO BE PRODUCED)

14

15

16

17

18

19

20

21

22

23

24

25
```

MEGHJI

1

2   accounts payable was estimated to be

3   $196 million?

4          MR. GENENDER:  Objection, form,

5       asked and answered.

6       A.    It doesn't say usual.  It just says

7   accounts payable.

8       Q.    And what -- what is your

9   understanding of what the $196 million listed

10  on slide 1, what did that represent?

11      A.    It was the estimate of the company's

12  accounts payable as of that date.

13      Q.    And looking a few rows down, under

14  the heading "Other," slide 1 shows the ABL DIP

15  as listed as $950 million, right?

16      A.    Yes.

17      Q.    And going to the next column over,

18  slide 1 shows that $850 million was available

19  from Transform to satisfy the ABL DIP, correct?

20      A.    Yes.  The ABL DIP balance as of

21  January 16 was projected to be 950, and only

22  850 was going to be available from ESL.

23      Q.    And that would leave 100 million of

24  the ABL balance for debtors to satisfy?

25      A.    Correct.

1                        **MEGHJI**

2        Q.    Is that an answer?

3        A.    I'm asking you the question.

4              Debtors' cash -- is it a general

5    question that -- whether the debtors' cash

6    could be used to pay down its ongoing

7    liabilities?  The answer is yes, obviously.

8        Q.    And looking at the right-hand

9    column, the right-most column, the last row

10   lists pro-forma additional value required of

11   $62 million.

12             Do you see that?

13       A.    Yes.

14       Q.    So the debtors assumed that -- and

15   debtors assumed that they would be able to -- I

16   will start again.

17             Debtors assumed that they would be

18   able to get that $62 million to satisfy their

19   claims, correct?

20       A.    So let me just read footnote 2.  It

21   says, "Requested administrative claim backstop

22   does not include amounts necessary for

23   settlement and release, but is inclusive of

24   restructuring subcommittee support for court

25   order to allow ESL to credit bid claims

```
 1                        MEGHJI
 2       Q.    This is because a provision would
 3   give ESL the benefit if debtors exceeded
 4   expectations?
 5       A.    Correct.
 6       Q.    If debtors performed a dollar better
 7   than expected, ESL would realize a benefit?
 8       A.    We did a lot better than a dollar
 9   better.
10       Q.    The DIP shortfall provision was a
11   heavily negotiated issue, right?
12       A.    Like many things.
13       Q.    The DIP shortfall provision was a
14   particularly heavily negotiated provision?
15            MR. GENENDER:  Objection, form.
16       A.    It was one of the last heavily
17   negotiated items.
18       Q.    It was one of the most heavily
19   negotiated items?
20            MR. GENENDER:  Objection, form.
21       A.    That's your view.
22       Q.    Do you disagree?
23       A.    No.  I think everything with ESL was
24   heavily negotiated and continues to be in a
25   revisionist form.
```

```
1                         MEGHJI
2        A.     Yes.  We talked about that.  I don't
3   know how that counts as several times.  I think
4   that's where it's mentioned.
5        Q.     And at the bottom of the page it
6   says, "The committee and the advisors further
7   discussed the DIP shortfall issue."
8        A.     Yes.  I'm not sure what to make of
9   this.
10            It was discussed.  It was a material
11   provision, and it was negotiated.  I don't know
12   what else I can tell you.
13        Q.     Debtors did not get Transform's --
14   withdrawn.
15            Debtors did not get agreement from
16   Transform to eliminate the DIP shortfall
17   provision from the APA, right?
18            MR. GENENDER:  Objection, form.
19        A.     The APA speaks for itself.
20        Q.     And my question was, did Transform
21   agree to debtors' request to eliminate the DIP
22   shortfall provision?
23            MR. GENENDER:  Objection, form.
24        A.     It did not.
25        Q.     Page 2 of Exhibit 5 includes a
```

```
 1                         MEGHJI
 2   target, correct?
 3              MR. GENENDER:  Objection to form.
 4        A.     Sorry.  That the debtors were
 5   worried that they might generate more cash than
 6   needed.
 7              No, I think most of the concern was
 8   around whether we would have a DIP balance that
 9   was higher than 850.  If you look back at the
10   projections we talked about and, again, our
11   projections were that the DIP balance would be
12   $950 million a few weeks before.
13              Do you remember that?
14        Q.     I do.
15        A.     So the risk that the restructuring
16   committee and the debtors were worried about
17   was that the balance would be higher than 850,
18   and so we were working to make sure we could
19   meet that closing condition of staying at 850
20   or below.
21        Q.     But at this meeting, on January 16
22   at 11:30 p.m., Mr. Aebersold from Lazard was
23   talking about the risk that debtors would
24   generate more cash than needed to reduce the
25   senior DIP to a maximum of $850 million at
```

```
 1                        MEGHJI
 2   closing and, therefore, trigger the DIP
 3   shortfall provision, right?
 4        A.    Yes.  Obviously, because it was not
 5   a sort of binary provision, ESL only benefited
 6   one way and refused to agree to benefiting the
 7   other way.
 8             The restructuring committee was
 9   concerned to make sure that this would not hurt
10   us.  And given the, in my view, the
11   preponderance of the risk was whether we could
12   even get to 850, it wasn't about how much we
13   were going to exceed the 850 by.
14             We explained to them that, really,
15   the most critical issue was getting to the 850
16   and staying below that, not the other way
17   around.
18        Q.    But at this meeting, debtors were
19   focused on the risk that they would get the DIP
20   balance below the 850 and, therefore, Transform
21   would realize the benefit.
22        A.    And we got over that and the
23   restructuring committee approved it.  So there
24   you are.
25        Q.    And just to confirm that we are on
```

1              **MEGHJI**

2    actions slide, again, looking at the accounts

3    payable item, the potential action is listed as

4    manage AP balance based on deliverable under

5    the APA.

6              What does that refer to?

7              MR. GENENDER:  Objection, form.

8         A.   Basically, again, I don't think I

9    wrote this myself but my understanding of this

10   is that there was an accounts payable

11   assumption number under the contract, and so it

12   was to be focused on making sure that we were

13   cognizant of that as we manage payables.

14        Q.   What do you mean when you say we

15   wanted to be focused on making sure we were

16   cognizant of that as we managed payables?

17        A.    Essentially, there was a payable

18   balance.  So if you step back and look at the

19   DIP balance, the levers here for cash were you

20   need to hit the DIP balance, and you want to

21   make sure that you're not sort of way offside

22   in terms of how much liabilities are going to

23   be assumed.

24              So really keeping those two -- the

25   most kind of direct impact from cash going out

```
 1                      MEGHJI
 2    was that it would -- in a period as tight as
 3    this was, the DIP balance is affected by what
 4    you pay in terms of payables.
 5                 So those were the two things you had
 6    to make sure you were focused on in terms of
 7    hitting those two targets or being as close to
 8    those two targets to allow the transaction to
 9    close, because we were -- ESL was only assuming
10    a set number.
11        Q.    And, specifically, how is the DIP
12    balance affected by what you pay?
13        A.    Anything you pay hits the DIP
14    balance.  If you pay a dollar in accounts
15    payable, it increases the DIP balance by a
16    dollar.
17        Q.    And looking at the comments, there
18    is a reference to increase payables to offset
19    DIP.
20                 What do you understand by that?
21        A.    Increase payables to offset DIP.
22    Basically, if your payables are higher, DIP is
23    lower.  If you make a payment, then it reduces
24    accounts payable and increases your DIP
25    balance, and vice versa.
```

1                          MEGHJI
2        Q.     And vice versa.  Specifically --
3    what do you mean when you say and vice versa?
4        A.     If you settle a payable, then it
5    increases your DIP balance.
6        Q.     And if you don't make a payable,
7    what happens to your DIP balance?
8        A.     You're not using your DIP loan.
9        Q.     And how would payables be increased
10   to offset the DIP?
11              MR. GENENDER:  Objection.
12       A.     I don't know that the word "offset"
13   makes sense to me here, you know, if you're
14   being technical about it, but the DIP was the
15   source of funding, was the only source of
16   funding we had.
17       Q.     Well, what is your understanding of
18   increase payables?
19       A.     Not pay them.
20       Q.     I think you referred to Transform
21   assuming a certain amount of payables.
22              Do you remember how much of the
23   payables Transform was assuming under the APA?
24       A.     I believe it was the 166 million,
25   which they also then tried to not assume.

```
 1                         MEGHJI
 2    trying to twist the facts here.  This was a
 3    process that a large number of people -- if you
 4    count this, there's a significant number of
 5    people on this list.
 6              What we were trying to do, frankly,
 7    with the full understanding of how this process
 8    was going to be done by the debtors, the
 9    restructuring committee and the buyers, you
10    know, this was not done in some sort of secret
11    place with proposals and decisions like you
12    seem to be implying.
13              This was a process to ensure that,
14    collectively, we were able to hit the targets
15    as set out in the APA where possible.
16        Q.    Were you involved in discussions
17    about the process to increase payables to
18    offset the DIP?
19              MR. GENENDER:  Objection, form.
20        A.    Not that I can recall specifically
21    any discussions around let's go increase
22    payables.
23              My big focus, as a CRO of the
24    company, was first and foremost to hit the two
25    main closing conditions that I recall.
```

```
 1                         MEGHJI

 2              One was the DIP balance needs to be

 3    below 850 and as close to 850 as possible

 4    without triggering anything else.

 5              And the second one was hitting

 6    the -- this number, even today, is how focused

 7    I was on it, 1.553 billion was the inventory

 8    number, and there was receivables on top of

 9    that.

10              Those were the two critical closing

11    conditions.  The buyers were as focused on

12    ensuring that we were focused on that as we

13    were, because, at that point, they were really

14    interested in ensuring that we worked together

15    to get the APA done, consummated and the

16    transaction closed.  So that was a key issue.

17              And then beyond that, there were a

18    bunch of other metrics, specified receivables,

19    payables, 503(b)(9) claims, a few other ones,

20    which were, in my mind, secondary because while

21    they would affect our administrative solvency

22    or insolvency, which we were also trying to do,

23    the first and foremost target was let's keep

24    the company as a going concern.

25                   Everybody, including the court, had
```

MEGHJI

1  
2  agreed that maximizing value, and for a variety  
3  of other reasons, the best and highest option  
4  for the company was keep it as a going concern.  
5  So that's what we were focused on.  
6        I think your characterization that  
7  somehow there was a focus on managing payables  
8  solely is just wrong.  
9  Q.   And you were focused on hitting the  
10 closing conditions because you wanted the sale  
11 to Transform to close?  
12 A.   I was focused on hitting the closing  
13 conditions because that's what the debtors had  
14 signed an agreement.  It wasn't about my  
15 emotional need for anything.  
16       It was about we had signed a  
17 contract, which had been blessed by the court,  
18 and so we were, as fiduciaries for the estate,  
19 striving to our utmost best to go and close it.  
20 Q.   And there is a risk that if debtors  
21 did not meet the closing conditions, the sale  
22 would not close?  
23 A.   Yes, there was a significant risk  
24 that either ESL would demand concessions that  
25 we would have to give or we would be unable to

**MEGHJI**

1
2    close, and on top of that, I think there was --
3    there was -- the company's liquidity was tight,
4    so it would have basically flipped into
5    liquidation if we didn't close.
6        Q.    Do you remember, generally, any
7    discussions about the process of increasing
8    payables to offset the DIP?
9        A.    Do I remember generally about the
10   process?  No, I don't recall anything more than
11   as we went through and we had meetings almost
12   daily to track these targets, and the levers
13   were, let's hit the closing conditions and make
14   sure we get as close to the other metrics as
15   possible.
16           So I don't think there was -- it
17   seems like you are highly focused on accounts
18   payable.  For me, it was just one of the
19   other -- one of the bunch of other metrics we
20   had to do.
21           We didn't spend extra time focusing
22   on that.  It just happened to be the one that
23   had the most direct correlation to the DIP
24   balance because when you make payments, it
25   affected the DIP balance most directly.

```
 1                         MEGHJI

 2        question.

 3        Q.    You did not speak with Mr. Kamlani

 4   about debtors identifying, as an action,

 5   increasing payables to offset DIP, correct?

 6              MR. GENENDER:  Objection, form and

 7        misstates testimony.

 8        A.    Mr. Kamlani received a daily e-mail

 9   from the debtors' treasury department showing

10   exactly what payments were going to who and who

11   was getting delayed on a daily basis, and that

12   process never got interrupted.  So he was fully

13   aware of what was going on, as did Mr. Lampert.

14              So your client was fully aware of

15   exactly what -- what payables were getting paid

16   and not getting paid and how much was getting

17   paid.

18        Q.    And you never discussed with

19   Mr. Kamlani what payables were not getting

20   paid?

21        A.    It was not my job to do that.  There

22   was a process in place to communicate that.

23   And in the three and a half, four years that I

24   have known Mr. Kamlani, we have talked about a

25   lot of things, but payables hasn't featured in
```

```
 1                        MEGHJI
 2    that.
 3              So there was no reason to do so,
 4    especially when the company had a process for
 5    commun- -- an established process, which he was
 6    a part of, for communicating that.
 7         Q.    And you did not speak with
 8    Mr. Lampert about what payables were not being
 9    paid between the signing of the APA and the
10    closing?
11         A.    I did not -- I did not need to speak
12    to them because they were -- they were -- I was
13    fully aware of the fact that they were
14    receiving daily e-mails.  There was no need to
15    speak to them.  They were getting that
16    information.
17              They did not come to me and said
18    they had a problem.  So let's -- just so we're
19    clear, you seem to be alleging that we did not
20    convey that information to them.  We did.
21              They never came back and told us
22    there was an issue.
23         Q.    So my question was, you never spoke
24    with Mr. Kamlani or Mr. Lampert about
25    withholding payables between the signing of the
```

```
 1                       MEGHJI
 2    APA and the closing?
 3              MR. GENENDER:  Objection, form and
 4         repetitious.
 5         A.    Since I did not withhold payables,
 6    there was no reason to speak to them about it.
 7    I did not personally withhold any payables, as
 8    you allege.
 9         Q.    In response to my question, you,
10    Mr. Meghji, did not discuss with Mr. Kamlani or
11    Mr. Lampert the withholding of payments by
12    debtors between the signing of the APA and the
13    closing, correct?
14         A.    I think I have answered that.  I had
15    no discussions about payables with Mr. Kamlani
16    or Mr. Lampert.  They were getting information
17    directly from the company.
18         Q.    To your knowledge, did anyone --
19    withdrawn.
20              To your knowledge, did any of
21    debtors' representatives speak with Mr. Kamlani
22    about withholding payables between the signing
23    of the APA and the closing?
24              MR. GENENDER:  Objection, misstates
25         the evidence and to the form.  Assumes
```

```
 1                        MEGHJI
 2        A.    If there were any consequences?
 3   Again, I don't follow the question about what
 4   type of consequences you expect.
 5        Q.    However you understand it.
 6              The question was, did you discuss
 7   with Mr. Kamlani whether there would be any
 8   consequences if debtors failed to make payments
 9   on accounts payable?
10        A.    I don't believe so.  I don't recall
11   that.  We may have, but I just don't recall
12   that.
13        Q.    Earlier, you referred to e-mails
14   that were sent by the company relating to which
15   payments debtors would and would not make,
16   right?
17        A.    Correct.
18        Q.    Did those e-mails ask Transform --
19   did those e-mails ask Transform's
20   representatives to provide input regarding
21   debtors' payment or nonpayment on accounts
22   payable?
23        A.    No, I don't think so, because they
24   were not -- they didn't own the company at that
25   point, but...
```

```
 1                         MEGHJI
 2        Q.    And if debtors -- withdrawn.
 3              If Transform had told debtors --
 4   withdrawn.
 5              If Transform's representatives had
 6   objected to debtors' nonpayment on accounts
 7   payable, would debtors have reversed their
 8   decision?
 9              MR. GENENDER:  Objection, form.
10        A.    It's a hypothetical question.  You
11   know, I don't know -- look, the bottom line is
12   they never objected.  I don't know of a single
13   instance where I got a call from either
14   Mr. Lampert or Mr. Kamlani saying that they
15   objected.
16        Q.    And if they had objected, would
17   debtors then have reversed course and made the
18   payments on the accounts payable?
19              MR. GENENDER:  Objection, form.
20        A.    If they had objected, we would
21   certainly have had a discussion about what to
22   do.  I can't predict what their objection was
23   or would have been and how we would have dealt
24   with it, so -- but I think there was sort of a
25   fairly clear, normal, you know, sort of
```

```
 1                        MEGHJI
 2   dialogue with Transform on all issues around
 3   the company during that period.
 4              So we would have addressed any
 5   concerns they had.  I can't predicatively tell
 6   you what we would have done when I don't know
 7   the issue.
 8        Q.    Transform has objected now.
 9              Will debtors agree to make the
10   payments on the accounts payable?
11              MR. GENENDER:  Objection, form.
12        A.    No.
13              MS. MAINOO:  Let's take a break.
14              (Recess taken.)
15              (Meghji Exhibit 13, E-Mail, dated
16         February 3, 2019, with attachment, marked
17         for identification.)
18   BY MS. MAINOO:
19        Q.    Mr. Meghji, you have been handed
20   Exhibit 13.  It includes a cover e-mail.  The
21   top e-mail is from Brian Griffith to yourself
22   and Rob Riecker, Rajat Prakash, Rob Phelan,
23   cc'ing some other folks, dated February 3.
24              MR. GENENDER:  You gave me the wrong
25         one.  You gave me one with Joseph Frantz.
```

1

2      A.     So as you can see, this was targeted

3   to Rob Riecker and the treasury team.  I was

4   obviously copied on it or it's addressed to me

5   as part of it.

6              Like I said, the levers were

7   ensuring that we were issuing disbursements.

8   This was February 3.  Over the ensuing week, as

9   we were leading up to closing, which was

10  originally going to happen on the Friday, to

11  ensure that we were able to hit the targets.

12     Q.     And does managing -- does carefully

13  manage disbursements in this context refer to

14  delaying payments on accounts payable so that

15  debtors could hit the closing conditions?

16     A.     If required.

17     Q.     And as it turned out, in the week of

18  February 4, debtors delayed payments on

19  accounts payable to hit the closing condition?

20             MR. GENENDER:  Objection, form.

21     A.     Yes.

22     Q.     Mr. Meghji, I understand that, as

23  the debtors' chief restructuring officer, and

24  the term you used earlier as a fiduciary, it

25  was your objective to close the sale to

```
 1                        MEGHJI
 2   incurred by the estate after filing for Chapter
 3   11.
 4              I want to understand how that --
 5              MR. GENENDER:  Objection, form.
 6       A.   Just like any other administrative
 7   claim, they would need to be paid.
 8              (Meghji Exhibit 14, Bank of America
 9          Bank Statement, dated 2/28/19, marked for
10          identification.)
11       Q.   Mr. Meghji, you have been handed
12   Exhibit 14.  It's a bank statement from Bank of
13   America, dated February 28, 2019.
14              It shows, on the first page, a
15   payment posted on February 8 for $11,078,141.
16              Do you see that?
17       A.   Yes.  The second payment in that
18   first sequence, yes.
19       Q.   That's correct.  Are you able -- do
20   you know the purpose of the payment on
21   February 8 for $11,078,141?
22       A.   No.  I've never seen this before.  I
23   don't recall that number.
24              (Meghji Exhibit 15, Sears Holdings
25          Corp., Weekly Estimated Professional Fees
```

```
 1                       MEGHJI

 2        for Debtor and UCC Advisors, Week of

 3        1/31/19, marked for identification.)

 4        Q.    Mr. Meghji, you have been handed

 5   Exhibit 15.  The heading says "Sears Holdings

 6   Corp. Professional Fee Carve-Out Reporting,

 7   Week of January 31, 2019."

 8             Are you familiar with this chart?

 9        A.    I don't know if I've seen it before,

10   but I understand what it is.

11        Q.    What is it?

12        A.    Weekly estimated professional fees

13   for debtor and UCC advisors.

14        Q.    And what does it show?

15        A.    It shows a breakdown of the weekly

16   fees, presumably put in the carve-out account.

17        Q.    And looking at the fourth column

18   from the right for 31st January, the total

19   amount is 11,078,141.

20             Do you see that?

21        A.    Correct, yes.

22        Q.    And just going back to Exhibit 14.

23   That's the same amount that's listed in the

24   Bank of America bank statement for February 8,

25   correct?
```

```
 1                         MEGHJI
 2        A.    Correct.  A remarkable coincidence.
 3        Q.    How would you explain it?
 4        A.    I presume it's the same amount.
 5        Q.    Okay.  So, in other words, the
 6   payment posted on February 8, as reflected on
 7   Exhibit 14, was to fund the professional fee
 8   carve-out account?
 9              MR. GENENDER:  Objection, form.
10        A.    I assume so.
11        Q.    Is it the case that if the
12   $11 million payment to the professional fee
13   carve-out account had not been made on
14   February 8, that the $11 million could have
15   been used to pay other claims of the debtors?
16              MR. GENENDER:  Objection, form.
17        A.    Could have been, sure.
18        Q.    Going back to Exhibit 15 -- and is
19   it the case that the $11 million that was used
20   for the professional fee carve-out account --
21   withdrawn.
22              Let's look at Exhibit 15.  Again, in
23   the column for 31st January, there is an amount
24   of $4.6 million for -- and the row is Weil
25   Gotshal.
```

1                        **MEGHJI**

2    pre-petition ABL financing.

3         Q.    And when you say this is referring

4    to the cash availability under the pre-petition

5    ABL financing, what do you mean by that?

6         A.    Just what I said.

7         Q.    What does cash availability mean?

8         A.    Under the asset-based lending

9    facility, there are metrics of what is

10   available to borrow for the company.  And,

11   again, I don't recall the projections or where

12   we were, but the company filed for Chapter 11

13   because it had a liquidity crisis.

14             So it was running out of cash.  And

15   that's why it needed to seek protection from

16   its creditors, and that's what it did.

17        Q.    And so what the declaration is

18   referring to in the first sentence of paragraph

19   13 is that -- the cash that debtors could

20   access to meet their obligations?

21        A.    My understanding of what this is, is

22   it refers not to physical cash or cash sitting

23   in an account, but availability of liquidity to

24   keep running the business.

25        Q.    So the next sentence in that

# Exhibit X

**Sears Holdings Corp.**
Professional Fee Carve Out Reporting
Week of: 1/31/19

Weekly Estimated Professional Fees for Debtor and UCC Advisors

| Week Ending: | 20-Oct | 27-Oct | 3-Nov | 10-Nov | 17-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | Total Accrued | Fees & Expenses Paid | Outstanding Professional Fee Accrual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debtor Advisors** | | | | | | | | | | | | | | | | | | | |
| Weil, Gotshal & Manges | $1,400,000 | $2,000,000 | $2,200,000 | $2,300,000 | $2,800,000 | $2,300,000 | $3,000,000 | $2,400,000 | $2,500,000 | $1,700,000 | $1,300,000 | $1,900,000 | $3,000,000 | $2,100,000 | $3,000,000 | $4,600,000 | $38,500,000 | $4,146,941 | $34,353,059 |
| Lazard | 1,650,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,725,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 4,275,000 | 1,644,335 | 2,630,665 |
| M-III Partners | 336,873 | 306,100 | 305,000 | 356,466 | 360,000 | 335,240 | 326,908 | 375,000 | 450,000 | 500,000 | 500,000 | 390,500 | 475,000 | 415,000 | 440,000 | 450,000 | 6,322,086 | 3,778,954 | 2,543,132 |
| Wachtell - Standard Services | 225,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,000 | 75,000 | 75,000 | 50,000 | 50,000 | 100,000 | 50,000 | 75,000 | 50,000 | 1,125,000 | - | 1,125,000 |
| Wachtell - Document Production | - | 200,000 | 200,000 | 200,000 | 200,000 | 150,000 | 200,000 | - | - | - | - | - | - | - | - | - | 1,150,000 | - | 1,150,000 |
| Paul Weiss | 609,765 | 573,472 | 654,902 | 750,581 | 867,271 | 695,450 | 1,235,214 | 1,521,382 | 1,500,118 | 1,366,307 | 301,755 | 499,015 | 1,098,289 | 1,039,360 | 1,013,821 | 1,470,062 | 15,196,765 | 3,346,296 | 11,850,469 |
| Evercore | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 2,750,000 | - | - | - | - | - | - | - | 120,000 | 40,000 | 40,000 | 3,200,000 | - | 3,200,000 |
| Alvarez & Marsal | 75,580 | 142,970 | 246,125 | 290,244 | 258,350 | 185,000 | 427,400 | 470,400 | 475,000 | 196,815 | 76,300 | 154,000 | 198,000 | 225,000 | 220,000 | 220,000 | 3,861,184 | 1,809,209 | 2,051,975 |
| Deloitte & Touche | - | - | - | - | - | - | - | 1,183,952 | 318,713 | 417,230 | 455,822 | 44,975 | 327,626 | 526,869 | 502,338 | 293,466 | 4,520,192 | - | 4,520,192 |
| Young Conaway | - | 17,500 | 30,000 | 25,000 | 15,000 | 15,000 | 40,000 | 40,000 | 30,000 | 15,000 | 5,000 | 5,000 | 6,500 | 10,000 | 10,500 | 20,000 | 284,500 | 90,946 | 193,554 |
| Prime Clerk | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 193,750 | 193,750 | 193,750 | 193,750 | 175,000 | 125,679 | 498,021 | 170,178 | 148,127 | 2,417,005 | 2,113,453 | 303,552 |
| A&G Realty Partners | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 | - | - | - | 100,000 | 100,000 | - |
| JLL | - | - | 21,956 | 21,956 | 21,956 | 21,956 | 21,956 | 21,956 | 21,956 | 21,956 | 21,956 | 13,750 | 13,750 | 1,234,500 | 13,750 | 13,750 | 1,487,106 | 193,636 | 1,293,470 |
| Stout Risius Ross | - | - | - | - | - | - | - | - | - | - | - | - | - | 13,500 | - | 2,000 | 15,500 | - | 15,500 |
| Willis Tower Watson | - | 31,250 | 31,250 | 31,250 | 31,250 | - | - | - | - | - | - | - | - | - | - | - | 125,000 | - | 125,000 |
| Public Relations | 5,000 | - | - | - | - | - | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | | 140,000 | - | 140,000 |
| Total Debtor | 4,427,218 | 3,546,292 | 3,964,233 | 4,250,497 | 4,828,827 | 8,302,646 | 6,610,430 | 5,481,201 | 5,728,054 | 4,589,650 | 2,558,736 | 3,579,891 | 5,709,086 | 6,272,719 | 5,341,715 | 7,528,141 | 82,719,338 | 17,223,771 | 65,495,568 |
| | | | | | | | | | | | | | | | | | | | |
| **UCC Advisors** | | | | | | | | | | | | | | | | | | | |
| Akin Gump | - | 400,000 | 1,300,000 | 820,000 | 1,350,000 | 550,000 | 1,350,000 | 1,200,000 | 1,100,000 | 1,000,000 | 800,000 | 1,000,000 | 1,400,000 | 1,300,000 | 1,650,000 | 3,000,000 | 18,220,000 | - | 18,220,000 |
| Houlihan Lokey | - | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 1,875,000 | - | 1,875,000 |
| FTI Consuling | - | 91,000 | 550,000 | 530,000 | 535,000 | 350,000 | 635,000 | 635,000 | 412,300 | 550,000 | 150,000 | 285,000 | 490,000 | 675,000 | 615,000 | 425,000 | 6,928,300 | - | 6,928,300 |
| Total UCC | - | 616,000 | 1,975,000 | 1,475,000 | 2,010,000 | 1,025,000 | 2,110,000 | 1,960,000 | 1,637,300 | 1,675,000 | 1,075,000 | 1,410,000 | 2,015,000 | 2,100,000 | 2,390,000 | 3,550,000 | 27,023,300 | - | 27,023,300 |
| | | | | | | | | | | | | | | | | | | | |
| Total | $4,427,218 | $4,162,292 | $5,939,233 | $5,725,497 | $6,838,827 | $9,327,646 | $8,720,430 | $7,441,201 | $7,365,354 | $6,264,650 | $3,633,736 | $4,989,891 | $7,724,086 | $8,372,719 | $7,731,715 | $11,078,141 | $109,742,638 | $17,223,771 | $92,518,868 |