UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                       :

In re                                :               Chapter 11 Case No.

SEARS HOLDINGS CORPORATION, *et al.*,   :             18-23538 (RDD)

Debtors.[1]                       :               **(Jointly Administered)**

                                         :

                                         :
-------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TRANSFORM HOLDCO LLC'S ADVERSARY COMPLAINT

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# Table of Contents

Page

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ..............................................................................................................................3

   I.    Transform Is Entitled To The Benefit of The Available Cash Debtors Had at Closing..........3

      A.   The Parol Evidence Supports Transform's Interpretation ...........................................6

      B.   Debtors' Interpretation Is Not Supported By the Parol Evidence .....................................19

   II.   Debtors Breached Their Obligations Under the APA By Failing to Make Timely
        Payments of Accounts Payable and Manage Payables in the Ordinary Course .................27

      A.   Debtors Failed to Make Timely Payments .................................................................31

         1.   Debtors Were Obliged to Make "Timely" Payments .............................................32

         2.   The Court Should Reject Debtors' Interpretation of Materiality ...........................33

         3.   Debtors Distort the Meaning of "Otherwise" ........................................................37

         4.   Debtors Failed to Act in the Ordinary Course........................................................39

      B.   Transform Did Not Waive Its Claim Regarding Debtors' Breaches .........................43

   III.  Transform is not Liable for Mechanics' Liens Related to Lease Premises and Sparrow
        Properties ...................................................................................................................46

CONCLUSION...........................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Axis Reinsurance Co. v. HLTH Corp.,
993 A.2d 1057 (Del. 2010) .......................................................................... 20

Branch v. Smith,
538 U.S. 254 (2003) (plurality opinion) ....................................................... 49

Circuit City Stores, Inc. v. Adams,
532 U.S. 105 (2001) .................................................................................... 39

CorVel Enter. Comp, Inc. v. Schaffer,
C.A. No. 4896-VCN, 2010 WL 2091212 (Del. Ch. May 19, 2010) ................. 36

DCV Holdings, Inc. v. ConAgra, Inc.,
889 A.2d 954 (Del. 2005) ............................................................................ 38

Eagle Force Holdings, LLC v. Campbell,
187 A.3d 1209 (Del. 2018) .......................................................................... 35

Engelhard Corp. v. N.L.R.B.,
437 F.3d 374 (3d Cir. 2006) ........................................................................ 39

GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.,
36 A.3d 776 (Del. 2012) ............................................................................... 5

Greenwich Capital Fin. Prods. v. Negrin,
74 A.D.3d 413 (N.Y. App. Div. 2010) ........................................................... 20

Henry v. Phixios Holding, Inc.,
2017 WL 2928034 (Del. Ch. July 10, 2017) .................................................. 45

Huatuco v. Satellite Healthcare,
Civil Action No. 8465-VCG, 2013 WL 6460898 (Del. Ch. Dec. 9, 2013), aff'd, 93 A.3d
654 (Del. 2014) ........................................................................................... 33

iBio, Inc. v. Fraunhofer USA, Inc.,
C.A. No. 10256-VCMR, 2016 WL 4059257 (Del. Ch. July 29, 2016) ............. 47

In re Explorer Pipeline Co.,
781 A.2d 705 (Del. Ch. 2001) ......................................................................... 23

In re Woodbridge Grp. of Cos., LLC,
590 B.R. 99 (Bankr. D. Del. 2018) ................................................................... 44

Khan v. Del. State Univ.,
C.A. No.: N14C-05-148 AML, 2017 WL 815257 (Del. Super. Ct. Feb. 28, 2017) ........... 23

Klaassen v. Allegro Dev. Corp.,
106 A.3d 1035 (Del. 2014) ............................................................................... 44

Knott v. McDonald's Corp.,
147 F.3d 1065 (9th Cir. 1998) .......................................................................... 34

Koninklijke Philips N.V. v. Cinram Int'l., Inc.,
Civil Action Nos. 08-0515, 08-4068, 08-4070, 08-4071, 2013 WL 2301955 (S.D.N.Y.
May 24, 2013) .................................................................................................. 46

Lehman Bros. Holdings, Inc. v. Spanish Broad. Sys. Inc.,
2014 WL 718430 (Del. Ch. Feb. 25, 2014) .................................................. 44, 45

Motorola, Inc. v. Amkor Tech., Inc.,
849 A.2d 931 (Del. 2004) ................................................................................. 35

Osborn ex rel. Osborn v. Kemp,
991 A.2d 1153 (Del. 2010) ........................................................................ passim

PaineWebber Inc. v. Bybyk,
81 F.3d 1193 (2d Cir. 1996) ............................................................................. 34

Parker Grp., Inc. v. Bryan,
C.A. No. 5:05-CV-230-C, 2006 WL 8438719 (N.D. Tex. Aug. 11, 2006) ...................... 6

Pine River Master Fund Ltd. v. Amur Fin. Co., Inc.,
C.A. No. 2017-0145-JRS, 2017 WL 4548143 (Del. Ch. Oct. 12, 2017) .......................... 46

Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.,
No. CA 19209, 2002 WL 1558382 (Del. Ch. July 9, 2002) ................................................ 33

Ross v. Blake,
136 S. Ct. 1850 (2016) ........................................................................................ 7

Salamone v. Gorman,
106 A.3d 354 (Del. 2014).................................................................................. 6

Sassano v. CIBC World Markets Corp.,
948 A.2d 453 (Del. Ch. 2008) ........................................................................ 5

Shafer v. Reo Motors, Inc.,
205 F.2d 685 (3d Cir. 1953)............................................................................ 34

Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.,
206 A.3d 836 (Del. 2019)................................................................................ 33

Trustees of Iron Workers Local 473 Pension Tr. v. Allied Prod. Corp.,
872 F.2d 208 (7th Cir. 1989)........................................................................... 34

U.S. Bank v. ILDA, LLC,
No. 13-CV-3082, 2014 WL 4290543 (S.D.N.Y. Aug. 29, 2014)..................... 43

United Rentals, Inc. v. RAM Holdings, Inc.,
937 A.2d 810 (Del. Ch. 2007) ........................................................................ 18

United States v. Gabinskaya,
829 F.3d 127 (2d Cir. 2016) ........................................................................... 29

United States v. Thorn,
317 F.3d 107 (2d Cir. 2003) ........................................................................... 11

## **Other Authorities**

Alicia Tuovila, Restricted Cash, Investopedia (May 23, 2019),
https://www.investopedia.com/terms/r/restricted-cash.asp ............................... 7

Oxford English Dictionary (3d ed. 2012)........................................................ 34, 38

Black's Law Dictionary (11th ed. 2019)......................................................... 38

Restatement of Contracts § 236(c) (1932) ...................................................... 38

Restatement (Second) of Contracts § 203 ...................................................... 33

Transform, [2] by and through its attorneys, Cleary Gottlieb Steen & Hamilton LLP, respectfully submits this reply to Debtors' *Supplemental Memorandum of Law in Support of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4973] ("Debtors' Supp. Opp."), and in further support of the Adversary Complaint.

## PRELIMINARY STATEMENT

1.      Once again, Debtors seek to excuse their failure to perform their contractual obligations under the APA by invoking the specter of administrative insolvency. But the APA does not permit Debtors to seek to address the administrative claims of other creditors on the back of Transform or to rewrite the terms of the heavily negotiated contract between the parties. The APA provides Transform a credit against the liabilities Transform had agreed to assume—in the form of the Aggregate DIP Shortfall Amount—if Debtors had cash available to pay those liabilities after satisfying the DIP Closing Condition. It also required Debtors in the 16 business days from signing to Closing to pay their accounts payable on a timely basis. Debtors failed to do so. Their breaches entitle Transform to relief.

2.      Debtors' Opposition does nothing to justify Debtors' behavior. They do not deny that at Closing they had $22.5 million in Cash-in-Transit, which was on its way from the cash registers to the Concentration Accounts. That cash was available to satisfy their liabilities. They now take the post-hoc litigation position that the only cash that was "available cash" was that which they chose to deposit into the Concentration Accounts. *Second Supplemental Declaration of Christopher A. Good in Support of the Debtors' Supplemental Memorandum of Law in Support*

---

[2]      All capitalized terms shall have the definitions ascribed to them in the *Supplemental Memorandum of Law in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 4767] ("Transform's Supp. Br.").

*of Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further*
*Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 5 [Docket
No. 4977] ("Second Supp. Good Decl.").  This revisionist rewriting of the provision would make
it so narrow that it would render the Aggregate DIP Shortfall Amount provision a nullity:  Debtors
could control the cash deposited into the Concentration Accounts and thus make every effort to
ensure that the balance was as close as possible to nothing at the time of Closing.  Allowing
Debtors to retain this Cash-in-Transit would give them a windfall that they did not bargain for in
the APA.  Before the execution of the APA, Debtors never conveyed this illogical, self-serving
position to Transform, and it is not reflected in any of Debtors' contemporaneous documents
(which contradict Debtors' argument).  It is not parol evidence.

3.      Debtors also do not deny that in the week before Closing they refused to make
payments that were due and that they did so to ensure that Transform would reimburse the Debtors
for a capped amount of accounts payable at Closing of $166 million.  Indeed, they appear to take
the extraordinary position that because Sears—at points before the petition date—delayed paying
accounts payable for up to 14 days, Debtors were free simply to cease paying any payables for the
same period, which would be virtually the entire time period between signing and Closing.  That
position too would defeat the whole purpose of the "timely" payment covenant and read it out of
the APA.  If Debtors could simply opt not to pay their debts from the few days after signing the
APA until the date of Closing, then there would have been no reason to include a provision
requiring them to pay those debts at all.  Debtors had an obligation to act in the best interests of
the Estate and its creditors; they did not have the liberty to do so at the expense of Transform and
its contractual rights.

4.     The record shows that Transform's obligations were reduced by "available cash" at Closing, which included Cash-in-Transit, and that Debtors failed to make timely payments of accounts payable and to manage payables in the ordinary course.

## ARGUMENT

### I.  Transform Is Entitled To The Benefit of The Available Cash Debtors Had at Closing

5.     Debtors do not deny that, at Closing, and after paying down their senior DIP loan to $850 million and their junior DIP loan to $350 million, they still had $22.5 million in cash that was in transit from Debtors' stores to their regional bank accounts or their Concentration Accounts. See *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* ¶ 48 [Docket No. 4430] ("Debtors' Opp.") ("Debtors do not dispute Buyer's assertion that as of 12:01 a.m. on the Closing Date there was approximately $22.5 million in Cash-in-Transit . . ."). They also do not deny that such moneys were available to satisfy Debtors' liabilities, including their severance reimbursement obligations, their accounts payable, and their 503(b)(9) claims. Accordingly, under Section 2.3(k)(vi), that available cash reduces Transform's obligations under Section 2.3 of the APA.

6.     The concept behind Sections 2.3(k) and 10.10 of the APA and the Aggregate DIP Shortfall Amount is simple. Under Section 10.10 of the APA, Debtors were required, as a condition of Closing, to pay down the aggregate balance under the DIP Credit Agreement to $850 million and to pay down the Junior DIP Term Loan to $350 million. APA § 10.10. In partial exchange for that agreement, Transform agreed to reimburse the Debtors for payments of certain Severance Reimbursement Obligations, Other Payables, and Assumed 503(b)(9) Claims, subject to certain qualifiers. Id. § 2.3(k).

7.      One of those qualifiers was that the amount of Severance Reimbursement Obligations, Other Payables, and Assumed 503(b)(9) Claims to be reimbursed was capped. Transform agreed to reimburse the Debtors for Severance Reimbursement Obligations in an amount not to exceed $43 million, Assumed 503(b)(9) Claims in an amount not to exceed $139 million, and Other Payables in an amount not to exceed $166 million.

8.      The other qualifier related to the Aggregate DIP Shortfall Amount and Section 2.3(k)(vi).  Under those provisions, if Debtors paid down the two DIP loans below $1.2 billion, Transform's obligations with respect to Severance Reimbursement Obligations, Other Payables, and Assumed 503(b)(9) Claims were reduced, dollar-for-dollar.  APA § 1.1.  In addition, if—after paying down the two loans to $1.2 billion—Debtors had cash left over that could be used to satisfy the obligations Transform was assuming, that cash would be used for that purpose, reducing Transform's obligations, again dollar-for-dollar, rather than be retained by Debtors to meet their other administrative obligations.[3]  In effect, Debtors were guaranteeing Transform that if Debtors' estimates proved wrong and Debtors had more funds available to satisfy those obligations, Debtors would do so rather than enjoy the windfall of the excess cash.

9.      Given this basic bargain between the parties, it would have been utterly illogical for "available cash" to be limited to that cash that happened to be in Debtors' Concentration Accounts at the instant of Closing and not also include cash that was at the time the Debtors'

---

[3]      Section 2.3(k)(vi) provides in full:

In the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: first, the Severance Reimbursement Obligations, second, the Other Payables and third, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of (A) the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims and (B) the amount of the Other Payables among any specific Other Payables shall be determined by Buyer in its sole discretion.

property, in the Debtors' possession, and not subject to any restriction, but that happened to be temporarily in transit or housed at a regional bank. That cash was just as available to Debtors to satisfy their liabilities, and if Debtors could simply retain it because of the happenstance that the cash had not yet hit the Concentration Accounts (or, worse, because Debtors had deliberately taken steps to delay the transmission of the funds to the Concentration Accounts) and then foist the liability on Transform, Debtors would obtain a windfall.

10.    The APA reflects this basic, common-sense notion. It does not define "available cash" narrowly as only cash that had hit the Concentration Account at the moment of Closing. Rather, it uses the term without definition, and it is settled law that when parties to a contract use terms without defining them, the terms must be given their ordinary meaning in common parlance or in the industry in which the parties participate. See, e.g., GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 780 (Del. 2012) ("The Court will interpret clear and unambiguous terms according to their ordinary meaning."); Sassano v. CIBC World Markets Corp., 948 A.2d 453, 462 (Del. Ch. 2008) (holding that the "plain, common, and ordinary meaning" of words control). As discussed below, in ordinary English, cash that is the property of a party and is not subject to a restriction barring that party from using it is "available" to that party.

11.    If there were any doubt that cash that was the Debtors' property on the Closing Date and was not subject to any restriction on the Closing Date, but that had not yet hit the Concentration Accounts was available, Section 2.3(k)(vi) and the Aggregate DIP Shortfall Amount end that doubt. They refer to available cash "as of" the Closing Date, not cash "on" the Closing Date, evidencing that the parties did not limit the notion of available cash to be any sum that actually needed to have been physically in a particular account at the precise moment of closing.

5

12.     Debtors have argued that the function of the Aggregate DIP Shortfall Amount was to ensure that all available cash was used to pay down the DIP loans to satisfy Debtors' closing conditions. Hr'g Tr. at 273:22-274:3, July 11, 2019. But Transform did not need Section 2.3(k)(vi) and the Aggregate DIP Shortfall Amount provision to ensure that Debtors used all of their available cash to satisfy the DIP Closing Conditions. That objective was entirely satisfied by the provision making the paydown of the ABL DIP and Junior DIP a condition of closing. APA § 10.10. If Debtors failed to use all their available cash to pay down the ABL DIP to $850 million and the Junior DIP to $350 million, Transform had the right to walk away from the deal. If Debtors did not pay down the DIP, there would be no Assumed Liabilities.

### A.     The Parol Evidence Supports Transform's Interpretation

13.     Transform's interpretation is consistent with all of the relevant parol evidence. Salamone v. Gorman, 106 A.3d 354, 374–75 (Del. 2014) (holding that extrinsic evidence that qualifies as parol evidence includes "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry.'" (quoting In re Mobilactive Media, LLC, C.A. No. 5725-VCP, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)).

14.     In the first instance, industry usage establishes that available cash is cash that is not restricted and that is free to be used for the purposes for which it is intended to be available. That is the ordinary and common meaning of the term. See, e.g., Parker Grp., Inc. v. Bryan, C.A. No. 5:05-CV-230-C, 2006 WL 8438719, at *4 (N.D. Tex. Aug. 11, 2006) ("Such funds are reflected on Parker Group's financial statements as 'Restricted Cash.' This is not cash that belongs to Parker Group and thus is not available to Parker Group to pay its obligations."); see also Roget's 21st Century Thesaurus (3d Ed. 2005) (listing "free" as synonymous with "available"). It is thus the

opposite of "[r]estricted cash," which is defined by Sears in its financial statements as cash that is "legally restricted pursuant to contractual arrangements." Sears Holdings Corporation, Annual Report (Form 10-K), at 42 (Mar. 23, 2018); see also Alicia Tuovila, Restricted Cash, Investopedia (May 23, 2019), https://www.investopedia.com/terms/r/restricted-cash.asp (defining "restricted cash" as "held for a specific purpose and therefore not available to the company for immediate or general business use."). As the Supreme Court has put it, "available" is something that is "capable of use for the accomplishment of a purpose," and that which "is accessible or may be obtained." See Ross v. Blake, 136 S. Ct. 1850, 185–859 (2016). Available cash is cash that is not legally restricted pursuant to contractual arrangements.[4]

15.    Prior to Closing, Sears used the phrase "available cash" in exactly this manner to describe the difference between receipts and expenses in its Weekly Flash Reports to track the DIP budget. Each Weekly Flash Report included a schedule that calculated net cash flow by subtracting total operating disbursements and total non-operating disbursements from total operating receipts. Each schedule included an "Ending Available Cash Balance" that was calculated by summing cash at the beginning of the week, cash flow before financing from the DIP, financing from the DIP, and any changes in the carveout account. *Declaration of Abena A. Mainoo in Support of Transform Holdco LLC's Reply Memorandum of Law in Further Support of the Adversary Complaint* ("Mainoo Decl."), Ex. A (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 7)," dated December 5, 2018); id., Ex. B (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 8)," dated December 12, 2018); id., Ex. C (presentation titled "Project

---

[4]    Debtors argue in a footnote that Mr. Kamlani impermissibly added a qualifier of "legally" to his definition of available cash. Debtors' Opp. ¶ 17 n.6. He did no such thing. Mr. Kamlani explained that available cash is "cash available to pay down liabilities." Kamlani Dep. Tr. 64:15-65:5. In other words, it "was not restricted," and there was no law or contract that prevented it from being used. Id. 26:6-12. In so doing, he adopted precisely the meaning of available cash used by Debtors in their Weekly Flash Reports and in the APA itself.

Blue Weekly Flash Report (DIP Budget Week 9)," dated December 19, 2018); id., Ex. D (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 10)," dated December 26, 2018); id., Ex. E (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 11)," dated January 2, 2019); id., Ex. H (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 12)," dated January 9, 2019); id., Ex. I (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 13)," dated January 16, 2019); id., Ex. O (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 14)," dated January 23, 2019); id., Ex. P (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 15)," dated January 30, 2019); id., Ex. Q (presentation titled "Project Blue Weekly Flash Report (DIP Budget Week 16)," dated February 6, 2019); id., Ex. V (deposition of Christopher Good, dated August 28, 2019 ("Good Dep.") at 13:21-22:13 (agreeing to the calculation of available cash in the Weekly Flash Reports). The weekly "Available Cash Balance" represented cash that was available to Debtors to meet their obligations. It was not based off of and did not track the amount of cash in Debtors' Concentration Accounts.

16.     Second, the history of the negotiations between the parties demonstrates that, as common sense would suggest, the parties intended "available cash" to be all cash that was available to Debtors to meet the obligations Transform otherwise agreed to assume.

17.     In particular, the Aggregate DIP Shortfall Amount provision and the notion that Transform would be given credit in the event that Debtors had cash remaining after paying down the DIP had their origins in the negotiations that followed the rejection of Transform's initial going-concern bid. On December 28, 2018, Transform submitted a definitive going concern bid to acquire substantially all of Sears' assets in exchange for approximately $4.4 billion in total consideration. The Debtors rejected that bid as non-qualified because they contended that it would

8

have left them administratively insolvent.  See, e.g., *Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction* ¶ 4 [Docket No. 2328].

18.    In the wake of that rejection and in the lead-up to Transform's revised going-concern bid, Debtors and Transform had extensive discussions about the value that Debtors anticipated would be necessary to address Debtors' administrative solvency concerns, subject to caps and the value Transform would provide to help them bridge a portion of that gap in exchange for additional value delivered by Debtors.

19.    Debtors expected that at Closing they would have administrative and other priority claims of $2.135 billion, including $139 million of 503(b)(9) claims, $166 million of certain Accounts Payable, $43 million of severance and employee claims, $950 million on the ABL DIP facility and $350 million on the Junior DIP facility.  *Supplemental Declaration of Kunal S. Kamlani in Support of Transform Holdco LLC's Adversary* Complaint [Docket No. 4770] ("Supp. Kamlani Decl."), Ex. A at 23.  ESL already had agreed to provide $1.455 billion in value, including assumption of $850 million of the balance outstanding on the ABL DIP facility and $230 million on the Junior DIP facility and Debtors projected that they would be able to contribute an additional $345 million from various proceeds, leaving a shortfall of $335 million that ESL would have to fill or Debtors would have to fill from other sources.[5]  Id.  That estimate, including the estimate with respect to the ABL DIP facility, in turn, was based on Debtors' projections with respect to the amount of cash Debtors would be able to generate based on Debtors'  performance up to late December and their projected performance to the date of anticipated closing.  Based on that performance, Debtors estimated that they would be able to pay down the Senior DIP only to

---

[5]    In a January 16, 2019 presentation, Debtors listed several potential incremental sources of value Debtors could use to cover the remaining administrative solvency shortfall, including "Residual Value in GOB," "Additional Budget Savings," "Reduction in Winddown Cost," "First Data," and Disputed Accounts Payable."  Mainoo Decl., Ex. J (email attaching presentation titled "Discussion Materials: Project Blue," dated January 16, 2019) at 3.

approximately $950 million.  See Mainoo Decl., Ex. F (presentation titled "Project Blue Rolling Cash Flow Budget (Week 11)," dated January 2, 2019) at 4 (forecasting a Senior DIP balance of $933 million on January 26, 2019 and $989 million on February 2, 2019).

20.    Transform, on the other hand, had more optimistic expectations with respect to the performance of Debtors' business.  It observed that Debtors had been performing better than had been budgeted or forecast for the weeks up to January 2, and believed that Debtors would be able to perform better than their forecasts suggested.  Mainoo Decl., Ex. T (deposition of Kunal Kamlani, dated August 15, 2019 ("Kamlani Dep.") at 88:19-90:18; id., Ex. W (deposition of Mohsin Meghji, dated August 29, 2019) ("Meghji Dep.") at 21:13-22; Good Dep. at 91:2-5.[6]  On that view, Debtors would be able to pay more of their liabilities than they expected, and an offer based on Debtors' projections would result in a windfall for Debtors.  Supp. Kamlani Decl. ¶ 19.

21.    The resulting compromise was Section 2.3(k)(vi) and the Aggregate DIP Shortfall Amount provision.  Transform agreed to accept Debtors' assumptions (rather than make its own), but only on the condition that if Debtors had cash remaining after satisfaction of the DIP Closing Condition and that cash could be used to satisfy any of the other remaining liabilities, it would be used as a dollar-for-dollar reduction of the liabilities Transform had to assume.

22.    Transform has offered evidence—which is not contradicted by Debtors—that on or about January 4, 2019, Mr. Kamlani and Mr. Lampert had a telephone call with Mr. Meghji where they proposed that Transform would assume the requested additional liabilities of Debtors necessary, based on Debtors' estimates, to avoid administrative insolvency, but only if its assumption of those liabilities would be reduced dollar for dollar if the estimates upon which the

---

[6]    In the four weeks prior to January 2, 2019, Debtors' cash flow exceeded Debtors' forecasts every single week.  Over this time period, Debtors had a total net cash flow before financing from the DIP of $212 million rather than the negative $156 million that Debtors had anticipated—a positive variance of $368 million.  Mainoo Decl., Ex. E at 2.

agreement to assume those liabilities turned out to be too conservative and Debtors had more cash

than expected to meet those liabilities. Id. ¶ 11. As Mr. Kamlani has explained, the provision was

designed to ensure that Transform was not overpaying for Debtors' assets: If Debtors were wrong

about the amount of cash available to pay down administrative claims at Closing and in fact had

more than anticipated, Debtors would not gain the windfall of that mistake after insisting that

Transform assume additional liabilities. Id. ¶ 19. Rather, Transform's obligations to assume

liabilities would be reduced dollar-for-dollar by the cash available to satisfy those liabilities. Id.

23.     Tellingly, neither Debtors' Opposition nor Mr. Meghji's testimony even attempts

to refute Mr. Kamlani's unequivocal testimony about this call. Cf. United States v. Thorn, 317

F.3d 107, 119 (2d Cir. 2003) (holding that it was clear error to reject witness's clear, undisputed

testimony). Mr. Meghji failed in his declaration to even mention the telephone call on or about

January 4, 2019 with Transform's principals, let alone dispute that the parties reached an

agreement on the purpose of available cash and the Aggregate DIP Shortfall Amount provision.

See generally Declaration of Mohsin Y. Meghji in Support of the Debtors' Supplemental Motion

to Enforce the Asset Purchase Agreement [Docket No. 4976] ("Supp. Meghji Decl.").

24.     Moreover, all of the documentary evidence is consistent with that conversation and

mutual understanding, including documents shared by the parties and internal documents of both

Debtors and of Transform. In particular, Transform has exhibited a schedule entitled "Discussion

Materials: Project Blue" that Debtors provided to it on January 6, 2019, and formed the basis of

Transform's revised bid proposal that was delivered only days later. Supp. Kamlani Decl., Ex. A

at 23. That schedule shows that Debtors both viewed the available cash (reflected as "Company

Cash") as a source of value that would be available to offset any of Debtors' administrative and

other priority claims as a collective whole (and not just the ABL DIP), and understood "available

cash" to be all cash that could be used to satisfy those claims and not just cash that was in the Concentration Accounts. Id. The presentation includes in the left column a list estimating the amount of Debtors' anticipated administrative and other priority claims at close of $2.135 billion, including the anticipated remaining balance on the ABL DIP and Junior DIP, 503(b)(9) claims, Accounts Payable, and Severance and Employee Claims. Id. The second column lists the value ESL had agreed to provide based on the negotiations to date of $1.455 billion, resulting in a difference reflected in the third column of $680 million. Id. The key column is the right-hand column, entitled "Additional Value Required after Application of Other Sources of Value." Id. It lists the "Other Sources of Value" that Debtors anticipated they would have in order to meet the anticipated administrative and other priority claims listed in the first column and sums to the additional value that Debtors would need to generate either from an improved ESL bid or from Debtors' own performance to bridge the gap. Id. One of those key items of "Other Sources of Value" was represented to be "Company Cash." Id. Debtors represented that they would have $89 million (and anticipated having only $89 million) at Closing in order to meet those administrative and other priority claims. Id. After applying those "Other Sources of Value," Debtors represented they would need $335 million of additional value from ESL, or from their own performance. Id. In other words, Debtors asked Transform to help fill an anticipated hole that would be left after Debtors applied the remaining anticipated Company Cash at Closing to all of Debtors' anticipated administrative liabilities.[7]

25.    The January 6 presentation contains no reference to the Concentration Accounts; furthermore, the $89 million was not tied to the ABL DIP or the Junior DIP balance, but rather

---

[7]    Along with this schedule, Debtors sent Transform a related presentation, entitled "Remaining Value at SHC Estate in an ESL Transaction," which offered Transform value in the form of real estate, unencumbered accounts receivable, cash-in-advance prepaid inventory, and a credit card tort claim in exchange for assuming Debtors' anticipated administrative liabilities. Supp. Kamlani Decl., Ex. A at 15.

was provided as a value that would offset Debtors' administrative and priority claims generally.

26.     That January 6 presentation by Debtors, in turn, informed Transform's revised bid letter on January 9, 2019 (the "Revised Proposal") and the APA that followed.  Supp. Kamlani Decl. ¶¶ 16-17, 23.  In short, Transform agreed to fill a portion of the hole that Debtors expected would be left after they applied Company Cash and the Other Sources of Value to the administrative claims.  Thus, the Revised Proposal tracked the January 6 presentation, providing additional value for the claims Debtors represented needed to be satisfied.  Supp. Kamlani Decl., Ex. C at 34.  For example, Transform offered to reimburse the Debtors for up to $166 million in certain Accounts Payable, $139 million in 503(b)(9) administrative priority claims, and $43 million of severance claims, among other liabilities, which matched the outstanding liabilities that Debtors asserted in the January 6 presentation.  Id.

27.     The Revised Proposal also contained the offer that "[i]n the event that the sum of the amounts outstanding under Debtors' first lien ABL DIP facility and Debtors' junior DIP facility (net of any cash available to pay down such amounts) is less than $1.2 billion at the time of closing the proposed transactions, Buyer's obligation to assume the foregoing liabilities shall be reduced dollar-for-dollar to the extent of such shortfall, with such reduction allocated in accordance with the Revised Asset Purchase Agreement."  Id. at 34-35.  *In other words, if Debtors had "cash available" to pay down the DIP balance below $1.2 billion, that "cash available" would serve to decrease the liabilities Transform was obligated to assume.*  And, lest there be any confusion regarding what was meant by "cash available," the Revised Proposal referred to the January 6 presentation and the figure of estimated cash in that presentation of $89 million.[8]

---

[8]     The Revised Proposal noted that "[i]n a schedule shared with Buyer's representatives on January 6, 2019, the Debtors estimated cash available to pay down such outstanding amounts was $89 million."  Supp. Kamlani Decl., Ex. C at 35.

28.     In short, the notion that Debtors viewed available cash as a source of value that could be used to pay down the anticipated administrative claims and that available cash included all of the money that could satisfy those administrative claims was the critical assumption upon which Transform built its bid. Transform would agree to reimburse the Debtors for up to $166 million of certain Accounts Payable, up to $139 million of 503(b)(9) claims, and up to $43 million of additional severance costs on the understanding that those would be the liabilities that would remain after Debtors applied all their available cash and other sources of value to paying their other administrative claims (including paying down the DIP loans). If, contrary to their expectations, Debtors had excess cash available after paying down the DIP loans, that cash would not go to Debtors to use as they see fit, but would rather be applied by them to the remaining anticipated administrative costs, reducing Transform's Assumed Liabilities.

29.     The understanding that Debtors viewed available cash as a source of value that could be used to fill the anticipated administrative claims and that available cash included all of the money that could satisfy those administrative claims was also the critical assumption upon which Debtors accepted Transform's bid. That notion was confirmed in Debtors' internal documents that Debtors presented to the Restructuring Committee and that formed the basis for Debtors' acceptance of Transform's offer. In particular, on January 3, 2019, Debtors e-mailed a "sources and uses" presentation to the Restructuring Committee, reflecting the precise problem that Debtors were trying to solve for—ensuring that they obtained sufficient value from an ESL bid and could generate enough additional value of their own to meet their anticipated administrative and other priority claims. Mainoo Decl., Ex. G (email attaching presentation titled "Discussion Materials: Project Blue," dated January 3, 2019). The document is similar in form to that presented to ESL just three days later, reflecting that Debtors thought of "available cash" as a

sum that would be used to offset any of the anticipated administrative claims (and not just used to pay down the DIP loans), and that it was not limited to what was in the Concentration Accounts. *Id.* It also includes the same $89 million figure as the January 6 presentation.  Id.

30.    The January 3 presentation also includes another key piece of parol evidence.  Id. It calls the $89 million "Other Cash," and a footnote reflects that "Other Cash" was "[b]ased on Company projections of *available cash* in regional banks at 2/1/19 close."  Id. (emphasis added); Good Dep. at 59:25-60:6 (confirming that the $89 million figures in the January 3 and January 6 presentations were the same).  *In other words, Debtors' conception of available cash was not merely what was in the Concentration Accounts, but included any cash that offset their administrative claims.*

31.    This is made even more clear by the presentation that Debtors made to the Restructuring Committee on January 16, 2019 that formed the basis of Debtors' acceptance of Transform's bid.  Mainoo Decl., Ex. J (email attaching presentation titled "Discussion Materials: Project Blue," dated January 16, 2019).   That presentation takes the form of a revised Administrative Claims Schedule and it is similar to both the January 3 and January 9 presentations. The January 16 schedule, however, contains yet another key piece of parol evidence.   The "Company Cash"—now estimated to be $79 million—is once again reflected as a sum that Debtors would use to offset their administrative claims generally (and not just used to pay down the DIP Loans).  Id. at 5.  However, it is now further broken down to reflect that *Debtors understood that cash to be available whether it was available in the Concentration Account precisely at the moment of close or would be available post-close when the obligation to satisfy many of the administrative liabilities identified in the presentation would arise.*  Id.  Specifically, it reflects Debtors' understanding that the Company Cash or available cash – upon which the entire deal was built –

included both "Company Cash Available at Close" of $50 million and "Company Cash Available Post Close" of $29 million.  Id.  Furthermore, Mr. Good admitted that Company Cash could be applied generally from anywhere to satisfy Debtors' administrative liabilities:  "It doesn't really matter where [cash] comes from . . . it doesn't matter what line item goes to what. One dollar is a dollar here, dollar there.  It's all fungible."  Good Dep. at 94:3-10.

32.     That same slide on "Company Cash" also includes details on the Company's projected cash balance as of Closing; notably, the schedule indicated that "available" cash at close and post-close included Store Cash, *Cash-in-Transit*, *Regional Bank Cash*, Subsidiary Businesses, Israel Cash, and Utility Deposit, with "Trapped / Unavailable Cash" noted separately on the schedule.  Id. (emphasis added); Good Dep. at 79:5-14 (explaining that Trapped / Unavailable Cash "represented cash that we did not think we could use to pay down [the DIP] or that we would never be able to receive at any point in time, ever.").  In short, Debtors' current position that "available cash" as used in the APA meant only that cash that was in the Concentration Accounts at the instance of Closing is an entirely illogical, after-the-fact contrivance, manufactured for purposes of this litigation.  *At the time the Restructuring Committee approved the deal, it and Transform understood available cash to include both cash that was in the Concentration Accounts at close and cash that hit those Accounts post-close.*

33.     The Debtors agreed to the APA on January 17, 2019.  They did so, understanding that if they outperformed their expectations and had cash that would be available to pay down the Assumed Liabilities, they would be obligated to use the cash for that purpose and that would reduce Transform's obligations for those same liabilities.  Specifically, at a 6:30 p.m. meeting on January 16, 2019, Debtors' counsel from Weil, Gotshal & Manges LLP ("Weil") explained to the Restructuring Committee that the Aggregate DIP Shortfall Amount provision meant that "if the

Company performed $1 better than expected, the benefit would accrue to ESL while if the Company performed $1 less well than expected, ESL would not be required to close." Mainoo Decl., Ex. L (minutes of a meeting of the Restructuring Committee of the Board of Directors of Sears Holding Corporation, dated January 16, 2019 (6:30 p.m.)). In short, if the Company performed better than expected and had cash left over after paying down the DIP loans, Transform's obligations with respect to the Assumed Liabilities would be reduced dollar-for-dollar, whereas if the Company performed worse than expected, the risk would be entirely on Debtors—Transform could walk from the deal. See Meghji Dep. at 47:21-48:7.

34. This was not a matter of insignificance to Debtors. The minutes reflect that they repeatedly asked to eliminate the Aggregate DIP Shortfall Amount provision from the APA because of their concern about administrative solvency, but that Transform refused. See id. at 33:4-6 (Question: "Cleary continued to state that it was a 'hard no' from Mr. Lampert, right" Answer: "You read that correctly"); id. at 32:10-11 ("[The DIP Shortfall provision] was a material provision, and it was negotiated."), 30:16-17 ("[The DIP Shortfall provision] was one of the last heavily negotiated items."). At a 9:45 p.m. meeting that same day, Debtors reported that Transform again refused to eliminate the Aggregate DIP Shortfall Amount provision, asserting that "the DIP Shortfall provision was part of the final bid . . . and was not a documentation point open for further negotiation." Mainoo Decl., Ex. M (minutes of a meeting of the Restructuring Committee of the Board of Directors of Sears Holding Corporation, dated January 16, 2019 (9:45 p.m.)).

35. Debtors were not happy. On the eve of signing the APA, the Restructuring Committee met one last time to consider ESL's final going-concern bid. During the meeting, Lazard Freres & Co., Debtors' financial advisor, told the Committee that "there were ways to

manage the 'risk' that the Company would generate more cash than needed to reduce the Senior DIP to a maximum of $850 million at closing and trigger the 'DIP shortfall' provision." Mainoo Decl., Ex. N (minutes of a meeting of the Restructuring Committee of the Board of Directors of Sears Holding Corporation, dated January 16, 2019 (11:30 p.m.)). In other words, Debtors could use the cash to pay off some of the administrative claims that Transform was not assuming and thereby improve their position with respect to administrative solvency post-Close. See Meghji Dep. at 25:5-7 (agreeing that Debtors' cash "obviously" could be used to pay down ongoing liabilities). Leaving aside whether such conduct would be consistent with the contract, the minutes clearly reflect an understanding of the reciprocal—if the Company did not "manage the risk" and did not use all of its available cash to satisfy other administrative claims by the time of Closing, that cash would reduce the administrative claims Transform had to assume dollar-for-dollar.

36.    Transform's internal documents lead to a consistent conclusion. See United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 836 (Del. Ch. 2007) ("[T]he forthright negotiator principle provides that . . . a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party."). On January 17, 2019, contemporaneously with the signing of the APA, Mr. Kamlani e-mailed his advisors at Moelis & Co. to explain the purpose of the Aggregate DIP Shortfall Amount provision: "[W]e said [to Debtors] that's fine we will take [additional liabilities] but if you end up with more cash tha[n] you expect we should get the credit b/c that is cash that you otherwise would have had to deal with the liabilities that we took." Supp. Kamlani Decl., Ex. D (email correspondence between Kunal Kamlani and Cullen Murphy, dated January 17, 2019). This document memorializes, at a time when Transform had no incentive to fabricate evidence, the parties' mutual understanding that if Debtors had more cash on hand than necessary to pay down the Senior and

Junior DIP to $1.2 billion, then that cash would be applied to Debtors' Severance Reimbursement Obligations, Other Payables, or 503(b)(9) Liabilities.

37.     Debtors' internal documents support the same conclusion.  After signing the APA on January 17, 2019, Debtors prepared a daily tracker of Closing metrics.  The January 18 presentation included an "Opportunity and Actions" slide that identified potential actions that Debtors could take to bridge shortfalls in Debtors' various liabilities, including Pharmacy Scripts, Inventory, and 503(b)(9) Claims.  Under the Senior DIP Balance closing condition, Debtors referred to "Company Cash" as "Cash in regional banks and stores." *Declaration of Robert A. Riecker in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 4772] ("Riecker Decl."), Ex. A (email attaching presentation titled "Transform Transaction – Weekly Tracking," dated January 18, 2019) at 23.  In the January 25 presentation, "Cash" is listed in a row separate from Senior DIP Balance, indicating that Debtors understood that cash could be applied to liabilities other than the DIP closing condition.  Id., Ex. B (email attaching presentation titled "Transform Transaction – Weekly Tracking," dated January 25, 2019).  In addition, on the "Admin Solvency Tracker" slide, Debtors identified "Company Cash Available at Close" and "Company Cash Available Post Close" as among the sources of value that could be applied to Debtors' "Admin & Other Priority Claims," without any indication that Company Cash would be applied solely to the DIP.  Id. at 21.

38.     Debtors try to write off these presentations because "opportunities are not certainties," Debtors' Supp. Opp. ¶ 20 (internal quotations omitted), but Debtors miss the point. The pertinent question is what the parties understood "available cash" to mean, and Debtors' own documents decisively show that Debtors did not understand the term to refer only to Cash in Concentration Accounts that would be applied to the DIP at Closing, but also to Cash-in-Transit

and Cash in Regional Banks.

**B.    Debtors' Interpretation Is Not Supported By the Parol Evidence**

39.    In the face of all of this evidence, Debtors nonetheless argue that the parol evidence establishes that "available cash" was limited to cash that was currently in the Concentration Accounts at any given time.  Debtors' Supp. Opp. ¶¶ 6-10.  That argument, however, misconstrues the APA, makes no commercial sense, and is not supported by any parol evidence.

40.    Debtors' position is untenable as a matter of plain English.  The Aggregate DIP Shortfall Amount provision refers to "available cash."   It does not refer to cash that was in the concentration accounts or merely require Debtors to pay down the DIP Loans with all available cash to an amount not to exceed $1.2 billion.  It would have been easy enough for the parties to have drafted such language if that was all they intended Section 2.3(k)(vi) and the Aggregate DIP Shortfall Amount to do.  They did not draft it that way because they expected it to do something more and different.

41.    Debtors' position also defies common sense, and it therefore violates a basic rule of contract construction—commercial agreements between sophisticated parties should be read to reach sensible, not insensible, results.  There is no logical reason why cash that Debtors could use to pay their administrative liabilities, but that happened to be in the Regional Banks or in transit at the moment of closing would not be viewed as available, such that Debtors could simply keep it without any reduction in Transform's liabilities.  Debtors' interpretation would thus force the Court to assume that Transform agreed to a nonsensical result, in violation of the canon of contract construction that commercial agreements should be read to "produc[e] a commercially reasonable and practical result."  Greenwich Capital Fin. Prods. v. Negrin, 74 A.D.3d 413, 415 (N.Y. App. Div. 2010); see also Axis Reinsurance Co. v. HLTH Corp., 993 A.2d 1057, 1063 (Del. 2010), as

corrected (2010) ("[T]he controlling rule of construction is that where a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."); Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

42.     According to Debtors, the only cash that would offset the Assumed Liabilities in Section 2.3(k)(vi) was cash that was remaining in the concentration accounts and not swept to pay down the DIP Loans after the twice daily sweeps.  But if that is all that Section 2.3(k)(vi) was intended to do, the provision would have been a nullity and the benefits it provided Transform illusory.  Debtors need not even have resorted to the various ways of "managing the risk" referred to in the January 16 Restructuring Committee minutes.[9]  They could simply have kept the cash away from the Concentration Accounts entirely and thus unilaterally have prevented it from ever being considered "available cash."   It defies logic that Debtors believed at the time that they could so easily avoid the "risk" of triggering the shortfall, given their persistent attempts to remove the provision from the APA during negotiations on January 16.

43.     Under the Debtors' cash management system, cash would flow from (1) the store

---

[9]     Debtors' "available cash" was also diminished by substantial contributions to the Professional Fee Carve Out Account in the week before Closing that far exceeded prior deposits. On February 8, 2019, the last business day before Closing, Debtors deposited $11,078,141 into the Professional Fee Carve Out Account, retaining that sum for the Debtors' professionals while increasing the liabilities Transform would have to assume. See Meghji Dep. at 101:11-103:17. In the eight weeks prior to closing, Debtors' weekly estimated professional fees averaged $6,690,419, and never exceeded $8,372,719. See Mainoo Decl., Ex. X (" Sears Holdings Corp. Professional Fee Carve Out Reporting," dated the week of January 31, 2019). Debtors' $11,078,141 deposit on the eve of Closing, which had the effect of reducing available cash, was of a different level of magnitude than every other deposit to the Professional Fee Carve Out Account in the weeks before Closing.

        Transform has repeatedly requested documents supporting the amounts deposited into the Professional Fee Carve Out Account, including the weekly estimates prepared by the estates' professionals, but the Debtors have rebuffed such requests and not yet produced these documents.

where a customer bought a good with cash and where the cash was stored in the cash register ("Store Cash"), to (2) armored trucks which would pick up the cash from the registers to transport it to local or regional banks ("Cash-in-Transit"), to (3) local or regional banks where it would be held pending transfer to a concentration account ("Cash in Regional Banks"), to (4) the concentration accounts from which it would be swept to pay down the DIP ("Cash in Concentration Accounts").  See Good Dep. at 26:19-25; see also *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* § 6.01(m)(ii) [Docket No. 955] ("Final DIP Order").  It is undisputed that Transform acquired both Store Cash and Cash in Concentration Accounts as of the Closing Date. APA §§ 1.1 (definitions of "Store Cash" and "Aggregate DIP Shortfall Amount"), 2.1(aa) (listing "Store Cash" as an acquired asset), 2.3(k)(vi) (Aggregate DIP Shortfall Amount provision); see Debtors' Supp. Opp. ¶ 3 (equating "available cash" to "any cash in the Debtors' Concentration Accounts").

**Figure 1:  Available Cash – Flow of Funds**



44.    Debtors admit that at each step in this process (except for the last one), Debtors had extensive control over whether and how any cash was moved.  Debtors had the ability to hold cash

at the stores without moving it to armored trucks. Good Dep. at 27:3-5. Debtors further could determine whether and how fast cash was transmitted to regional banks by adding and subtracting armored car pick-ups as they desired. Id. at 27:10-22; see also Mainoo Decl., Ex. K (email with the subject line "Armored Car Pickups" between Rajat Prakash, Aziz Khan, Jodie Quinn, Jennifer Joye, and David Acquaviva, dated January 16, 2019). Debtors controlled whether cash was placed in the concentration accounts. See Mainoo Decl., Ex. R (email with the subject line "RE: Cash Receipts Tomorrow" between Brian Griffith to Rajat Prakash et al., dated February 7, 2019). Under the cash dominion policy, the only obligation of Debtors with respect to cash in regional accounts was the vague one that depending on the particular account in which they chose to place cash—if they chose to move it into an account at all—they transmit it either daily or periodically, consistent with past practice. Final DIP Order § 6.01(m)(ii).

45.    Thus, accepting Debtors' argument that available cash was limited to what was in the concentration accounts or could physically be moved at the moment of Closing would render the reference to "available cash" and the provision that the DIP Shortfall Amount be calculated "net of available cash" illusory. That too violates a basic rule of contract construction. See Osborn, 991 A.2d at 1159 ("We will not read a contract to render a provision or term 'meaningless or illusory.'") (citation omitted); In re Explorer Pipeline Co., 781 A.2d 705, 716 (Del. Ch. 2001) (declining interpretation that would "violate the mandate to attempt to give meaning to all pertinent contractual language"); Khan v. Del. State Univ., C.A. No.: N14C-05-148 AML, 2017 WL 815257, at *4 (Del. Super. Ct. Feb. 28, 2017) ("[T]his Court construes the contract as a whole, 'gives meaning to every word in the agreement[,] and avoids interpretations that would result in 'superfluous verbiage.'" (citations and internal quotations omitted)). Debtors had complete discretion to control the amount of cash that ended up in the Concentration Accounts and thus was

"available"[10]—simply by turning on and off the cash spigot.

46.     Debtors' interpretation is also not supported by any parol evidence.

47.     Debtors argue that Mr. Good understood that the only "available cash" that could reduce the Assumed Liabilities in Section 2.3(k)(vi) was that which would arise if (1) Bank of America Merrill Lynch ("BAML") agreed to stop automatic sweeps and additional cash was subsequently swept into the Concentration Accounts; or (2) cash was swept into the Concentration Accounts between the last sweep and Closing, and provide a declaration to that effect. Debtors' Supp. Opp. ¶ 3 n. 3 (citing Second Supp. Good Decl. ¶ 6). But, at his deposition, Mr. Good could not say whether he or any other of Debtors' representatives communicated this "understanding" to the Buyer, Good Dep. at 57:3-11, 58:8-17, and Debtors have not even submitted any evidence that this was the contemporaneous understanding of Mr. Good or any of Debtors' representatives.

48.     Debtors' silence is revealing. There is not a single document—either internal or shared between the parties—that reflects that understanding. To the contrary, as demonstrated above and below, the internal documents are all to the contrary.

49.     Lacking anything more, Debtors argue that because in discussing the cash that would be available each day to pay down the DIP Loans, Debtors used the term "available cash" to pay down those loans, the only available cash that would reduce the Assumed Liabilities was that which Debtors also would have been in a position to use to pay down the DIP Loans at the moment of Closing. Debtors' Supp. Opp. ¶ 6. Debtors thus point to testimony by Mr. Riecker, Mr. Prakash, and Mr. Kamlani explaining that the term "available cash" *as used in the context of the Daily Cash Forecasts* referred to cash that was available to pay down the DIP. Debtors' Supp.

---

[10]     Indeed, Debtors' logic is defeated by the same cash dominion policy upon which they so heavily (and misleadingly) rely. Under the cash dominion policy, the only cash that is not available to Debtors is that which is in the Concentration Accounts. Once placed in those Accounts, it is restricted to paying down the DIP. Debtors have no rights to it.

Opp. ¶ 10. But that argument is a truism. It does not advance Debtors' argument—it simply restates it. Transform does not dispute that in determining what cash was available to pay down the DIP on a particular day, it would make sense to ask the question whether that cash was "available" to pay down the DIP. But that does not answer the question whether the only "available cash" that would reduce the Assumed Liabilities was also that which at the moment of Closing was available to pay down the DIP.[11]

50.     Finally, Debtors point to a June 14, 2019 Ernst & Young presentation that purportedly "describ[es] unavailability of 'Cash-in-Transit'" because of a 4-6 business day lag before cash is deposited in bank accounts, *Declaration of Jessie B. Mishkin in Support of Debtors' Supplemental Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [Docket No. 4975], Ex. E (Ernst & Young presentation, dated June 14, 2019), but that presentation nowhere mentions the words "available" or "unavailable." It is Debtors who self-servingly characterize Cash-In-Transit as unavailable, so as to suit their present litigation position.

51.     In fact, the evidence demonstrates that there was no consistent, uniform use of the term "available cash" by Debtors. Debtors used the term "available cash" in the Daily Forecasts to refer to cash that was available to pay down the DIP on that day when the question was what was available pay down the DIP that day. But, in its Weekly Flash Reports, Debtors used the same term "available cash" to mean something quite different when determining the ending balance that remained as a financial matter after deducting operating and non-operating

---

[11]     Indeed, the testimony from Mr. Kamlani that Debtors so heavily quote at paragraph 10 of their brief undermines their argument. Leaving aside that Mr. Kamlani was answering questions about the cash that was available on a given day to pay down the DIP as reflected in the Daily Cash Forecasts, he drew a distinction between cash that was not in the Concentration Accounts and therefore was available and cash that was in the Concentration Accounts and not available. See Debtors' Supp. Opp. ¶ 10.

disbursements *and* adjusting for increases or decreases in the DIP balance.  Mainoo Decl., Ex. A, B, C, D, E, H, I, O, P, R.  Mr. Good admitted that these calculations were based on the weekly receipts and disbursements as reported by the finance team.  Good Dep. at 13:21-22-13 (agreeing to the calculation of available cash in the Weekly Flash Reports).  They were not limited to cash located in the Concentration Accounts.

52.    Mr. Meghji offered yet another definition of "available cash."  Having submitted a declaration to this Court prior to this dispute that stated "Debtors' available cash will be substantially negative without access to the proceeds under the proposed DIP ABL facility," he testified in that context that available cash "refers not to physical cash or cash sitting in an account, but availability of liquidity [under the pre-petition ABL facility] to keep running the business."  See Meghji Dep. at 111:21-24; *Declaration of Mohsin Y. Meghji in Support of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties and (D) Schedule Second Interim Hearing and Final Hearing* ¶ 13 [Docket No. 10] ("Meghji Decl.") ¶ 13.  Mr. Meghji's testimony is inconsistent with the Debtors' position that "available cash" equates to cash that was located at the exact time of Closing in the Concentration Accounts, and shows that even the Debtors' representatives could not internally agree on how to define this term.  See, e.g., *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* ¶ 67 [Docket No. 3].

53.    In the context that matters here—what did the parties mean in the APA by the cash that was "available" to the Debtors to pay their administrative expenses—it is clear that they meant, not surprisingly, all cash that would be available to the Debtors to pay those expenses, regardless of where that cash sat at the instance of Closing.  And, as noted above, the January 9 bid letter

referenced the January 6 Administrative Claims Schedule and noted that "Debtors estimated cash available to pay down such outstanding amounts [under the Debtors' first lien ABL DIP facility and Debtors' junior DIP facility] was $89 million."  Supp. Kamlani Decl., Ex. C.  That schedule, which set out the liabilities that would remain with the estates under the December 28 bid, included $89 million of "Company Cash" that was not tied to the ABL DIP or the Junior DIP, but rather provided a value that would offset the administrative and priority claims generally.  Supp. Kamlani Decl., Ex. A.

54.    If "available cash" in the context of the Weekly Flash Reports meant receipts minus disbursements adjusted for financing, and "available cash" in the context of Mr. Meghji's declaration meant "liquidity," and available cash in the Administrative Claims Schedule meant cash that could be used to satisfy the administrative claims, there is no reason that "available cash" in the APA should be given a more cribbed definition.  Indeed, the only consistent definition of available cash is that it is not "Trapped" or  "Unavailable Cash."

55.    In sum, the plain meaning of the APA, the Parties' mutual understanding, and parol evidence all lead to the only commercially reasonable conclusion—that "available cash" did not refer only to Cash in Concentration Accounts that would be applied to the DIP at Closing, but also to Cash-in-Transit and Cash in Regional Banks.

## II.  Debtors Breached Their Obligations Under the APA By Failing to Make Timely Payments of Accounts Payable and Manage Payables in the Ordinary Course

56.    Debtors do not deny that they unilaterally decided to delay paying tens of millions of dollars in trade liabilities that were contractually due from February 4, 2019 until closing.  See Riecker Decl., Ex. E (email from Rajat Prakash, dated February 4, 2019).  The effect of Debtors' actions was that they disbursed approximately **$101 million** less in payments than they had projected, including **$89 million** less in accounts payable, leaving Transform holding the bag for

approximately **$50 million** in payments to affected vendors.   See *Second Supplemental Declaration of Andrew D. Hede in Support of Transform Holdco LLC's Adversary Complaint* [Docket No. 4769] ("Second Supp. Hede Decl."), Ex. A (Ernst & Young presentation, dated August 5, 2019).   These numbers derive from Ernst & Young's detailed analysis of the company's disbursements as represented in its Daily Cash Forecasts.   See Second Supp. Hede Decl. ¶ 6. Debtors in no way questioned the reliability of Ernst & Young's methodology or the accuracy of these numbers.   Mr. Hede's unrebutted testimony alone is sufficient to resolve this issue in Transform's favor.

57.    Moreover, Debtors' own witnesses admitted that they intentionally held back payments pre-Closing in order to increase payables because doing so would shift responsibility for those payments from Debtors to Transform.[12]

58.    Debtors knew that their actions would constitute a breach of the APA and give rise at a minimum to a right by ESL not to close on the transaction.   When Sears' employee Rajat Prakash drafted the Daily Cash Forecast to reflect Debtors delayed payment of payables, Mr. Meghji contacted Mr. Prakash to express concern.   The testimony with respect to this conversation is telling:

Q: What did [Mr. Meghji] say to your recollection?

A: Yeah, I don't exactly recall the words, but I think it was something along the

---

[12]    *See* Good Dep. at 105:15-21 (Question:  "When it says, 'Increase payable to offset the DIP,' does that mean that if you pay fewer payables, the impact will be that you will have more money available to bridge the gap for the DIP?"  Answer:  "Yes, but we might be on the hook for any overages over the 166 million."), 110:19-23 (Question: "[H]ow did the group increase payables?"  Answer:  "The debtors could increase payables by holding payments."), 115:6-12 (Question:  "Okay.  Do you see there's a reference to maintain current AP?"  Answer:  "Yes."  Question: "Okay.  How was that action going to be achieved?"  Answer:  "You know, only spending what you add to accounts payable."); Meghji Dep. at 60:19-61:25 ("you need to hit the DIP balance . . . you had to make sure you were focused on in terms of hitting those two targets or being as close to those two targets to allow the transaction to close, because we were—ESL was only assuming a set number. . . .  Increase payables to offset DIP.  Basically, if your payables are higher, DIP is lower.  If you make a payment, then it reduces accounts payable and increases your DIP balance, and vice versa."); Supp. Meghji Decl. ¶ 14 (openly admitting that "Debtors were planning to delay certain vendor payments before the Closing Date").

> lines of, we should be careful when putting this in this daily cash flow email because then they might walk away from the deal.
>
> Q: Do you remember Mr. Meghji saying anything else in that conversation?
>
> A. I don't recall the exact words, but I think he gave some interesting -- used some interesting phrases like 'that's like putting red meat' or something like that.

Mainoo Decl., Ex. U (deposition of Rajat Prakash, dated August 20, 2019 ("Prakash Dep.")) at 51:12-52:13. It does not matter that Mr. Prakash ultimately prevailed and the Forecast was sent as drafted; what is telling is Mr. Meghji's reaction and expression of concern. Cf., e.g., United States v. Gabinskaya, 829 F.3d 127, 132 (2d Cir. 2016) (holding that attempting to conceal facts permits the factfinder to infer consciousness of wrongdoing).

59.     Debtors sought to explain that decision as being based on their desire both to close the transaction—an outcome they believed Transform desired—and to maximize the remaining value for creditors and stave off the risk of administrative insolvency. Meghji Dep. at 68:23-70:5. Mr. Meghji conceded that other concerns were "secondary." Id. at 69:20. Debtors understood that every dollar that was not used to pay a payable (subject to the caps described in the APA) would reduce the DIP balance and assure Debtors would be able to meet that condition; once Debtors met that condition any additional dollar Debtors could retain could be used to pay Debtors' other creditors, including their professionals. See Debtors' Supp. Opp. ¶ 42 (admitting that Debtors "undertook an extraordinary effort to manage cash flow in a way that allowed them to meet the conditions necessary to close"); Meghji Dep. at 71:22-25 (acknowledging that accounts payable "had the most direct correlation to the DIP balance because when you make payments, it affected the DIP balance most directly"); Good Dep. at 97:12-15 (conceding that company cash "was always going to be used to pay down the senior DIP" and because Debtors were close to "not making it," they "needed every dollar").

60.   The record is also clear that Debtors were motivated to withhold timely payments and fail to make payments in the Ordinary Course based on their concerns about administrative solvency.  See Good Dep. at 36:11-12 (the Debtors were "very concerned with administrative solvency"); Hr'g Tr. at 199:3-9, dated February 6, 2019 (Question:  "Mr. Meghji, let's move now to administrative solvency.  Since the beginning of this case it was very important for the company that the estates remained administratively solvent, correct?"  Answer:  "Yes.").  Indeed, Debtors have been concerned with being administratively solvent since the day they filed their Chapter 11 petition.  See Hr'g Tr. at 23:16-18, October 15, 2018 ("SCHROCK:  And it's there so that the debtors have a cushion to make sure that we're always going to be administratively solvent in these cases."); see also Hr'g Tr. at 21:21-23, November 15, 2018 ("SCHROCK:  As to liquidity, the Debtors have been at all times focused and maintained due care on being administratively solvent.").

61.   Indeed, in his declaration for the Sale Hearing, Mr. Meghji described several different actions that Debtors could lawfully take and that he believed would generate additional value that would achieve administrative solvency and more.  *Declaration of Mohsin Y. Meghji* ¶ 55 [Docket No. 2336].  Mr. Meghji listed a number of examples, including   "using critical vendor payments and accounts receivable credits to reduce Section 503(b)(9) liability" and "managing down disputed payables and reducing non-essential spend."  Id.  While Mr. Meghji mentioned *reducing* payables by determining which payables were monies not actually owed (by "managing down disputed payables"),tellingly, he did not include failing to make payments that were otherwise due so that Transform would have to pay them.

62.   Debtors, however, did not have the liberty in trying to maximize value for one set of creditors to breach Transform's contract rights and thereby unlawfully take value from another.

Debtors no longer argue that they were permitted to manage their accounts payable to satisfy the closing conditions set forth in Section 10.10, to pay down the DIP balance to $850 million. Compare Debtors' Supp. Opp., with Debtors' Opp. ¶¶ 37-39. This argument was untenable as a matter of law. Another provision of the APA—but not the covenant with respect to accounts payable—expressly permits Debtors to "reasonably manage the amount of Inventory in consultation with Buyer in order to satisfy the condition set forth in . . . Section 10.10." APA § 8.1(a). The accounts payable covenant conspicuously does not contain that qualifier, and a party cannot violate one obligation as part of an effort to satisfy another separate, independent obligation.

63.    Here, Debtors' course of action violated Section 8.6 of the APA in two independent ways. *First*, by delaying payment of these tens of millions of dollars in payables until after Closing, Debtors did not fulfill their obligation to pay payables until the Closing Date in all material respects on a timely basis. *Second*, because Debtors deliberately missed their projected payments for a single week by more than $101 million, they failed to otherwise manage the accounts payable of the business in accordance with their cash management policies and practices in the Ordinary Course of Business.

### A. Debtors Failed to Make Timely Payments

64.    Debtors do not contest that they delayed tens of millions of dollars of payments in the week before Closing, and Ernst & Young's unrebutted analysis is that these delays affected more than $100 million of payments. Debtors thus indisputably violated their contractual obligation to make all payments in respect of payables on a timely basis. Debtors attempt to avoid this conclusion by misinterpreting the contractual language of the APA.

65.    The APA states in pertinent part:

*The Sellers shall make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement*

*until the Closing Date in all material respects on a timely basis* and shall otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business; provided that Seller's obligations pursuant to this <u>Section 8.6</u> with respect to taxes are limited to taxes that are not Assumed Liabilities.

APA § 8.6 (emphasis added).

66.     Debtors' response is to read the word "timely" out of this provision, and to try to twist the meaning of "material," "otherwise," and "including," all in an effort to somehow argue that when they decided not to pay more than $100 million in payables when due, they nevertheless complied with their contractual obligation to make these payments "on a timely basis." But that effort does not work. The entire purpose of Section 8.6 was to make sure that Debtors paid their bills on time so that the only payables Transform would assume were those that had accrued but were not yet due at Closing. Debtors' efforts to argue otherwise are not only inconsistent with the language of the APA, but—if accepted—would defeat its very purpose.

### 1.  Debtors Were Obliged to Make "Timely" Payments

67.     Under the express terms of the APA, Debtors were obligated, "on a timely basis," to "make all payments in respect of payables." APA § 8.6. One of the most fundamental tenets of contract interpretation is that, where a "contract is clear and unambiguous," courts must "give effect to the plain-meaning of the contract's terms and provisions." <u>Osborn ex rel. Osborn v. Kemp</u>, 991 A.2d 1153, 1159-60 (Del. 2010). As Transform has previously argued, "timely" simply means "on time."[13] Transform's Supp. Br. ¶ 13. Debtors do not dispute this meaning—nor could they. Under the APA, Debtors were obligated to make all payments on payables on time as they became due.

_____

[13]     Debtors insinuate that this argument is "new," <u>see</u> Debtors' Supp. Opp. ¶¶ 22-25, but Transform has consistently made this "timely" payments argument dating back to its Adversary Complaint, <u>see</u> *Adversary Complaint* ¶ 46 [Docket No. 4033].

68.     Instead, Debtors attempt to read the word "timely" out of the APA entirely.  But as the case law cited by the Debtors themselves explains, sophisticated parties "are presumed to understand the consequences of the language they have chosen, and are bound thereby . . . ." Huatuco v. Satellite Healthcare, Civil Action No. 8465-VCG, 2013 WL 6460898, at *5 (Del. Ch. Dec. 9, 2013), aff'd, 93 A.3d 654 (Del. 2014); see also Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co., No. CA 19209, 2002 WL 1558382, at *1 (Del. Ch. July 9, 2002) ("Sophisticated parties are bound by the unambiguous language of the contracts they sign.").  Under Delaware law, a contract must "be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'" Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp., 206 A.3d 836, 846 (Del. 2019); see also Restatement (Second) of Contracts § 203 ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").  Debtors' interpretation of Section 8.6 of the APA would effectively delete or otherwise render meaningless the term "timely," in violation of Delaware law. See Osborn, 991 A.2d at 1159 ("We will not read a contract to render a provision or term 'meaningless or illusory.'").

69.     There were only sixteen business days between signing and closing.  Allowing Debtors to delay payments of tens of millions of dollars for up to fourteen days would effectively negate any requirement of "timely" payments during the relevant time period.  See Transform's Supp. Br. ¶ 12.

## 2.  The Court Should Reject Debtors' Interpretation of Materiality

70.     Debtors argue that the materiality qualifier to the obligation to make timely

payments "permitted the Debtors to pay payables between execution and Closing in a manner that took into account the Debtors' status as debtors-in-possession and the recognition that the Debtors would need to determine which payments were most critical to pay on time (and which could be delayed)." Debtors' Supp. Opp. ¶ 28. According to Debtors, the only obligations they were required to satisfy were for items such as "rent payments" and "sales taxes," which, if they failed to satisfy, would give rise to liens or penalties, and therefore would be material. See id. Debtors observe that the "including" clause refers to one example where if a payable is not satisfied a lien could be placed on the property (rent payments) and to another example where a penalty could be imposed for failure to pay on time (sales taxes). That argument fundamentally reads the "timely payments" obligation out of the APA and renders Section 8.6 surplusage and its protections illusory in violation of basic contract principles. See Osborn, 991 A.2d at 1159.

71.    Section 8.6 requires Debtors to timely make "*all* payments in respect of payables," not just some payments. APA § 8.6 (emphasis added). Under the plain meaning of that word, "all" means "[t]he whole amount, quantity, extent, or compass of; the whole of." All, Oxford English Dictionary (3d ed. 2012); see also Shafer v. Reo Motors, Inc., 205 F.2d 685, 688 (3d Cir. 1953) ("[T]he word 'all' needs no definition; it includes everything, and excludes nothing. There is no more comprehensive word in the language."); Knott v. McDonald's Corp., 147 F.3d 1065, 1067 (9th Cir. 1998) ("'[A]ll' is an all-encompassing term . . . In short, 'all' means all."); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) ("[Any and all] is inclusive, categorical, unconditional and unlimited."); Trustees of Iron Workers Local 473 Pension Tr. v. Allied Prod. Corp., 872 F.2d 208, 213 (7th Cir. 1989) ("The common meaning of 'all' is 100 percent."). All means all. Debtors had to make all payments – not some payments, or only payments on certain types of payables, but *all* payments. Indeed, if payments in Section 8.6 were only limited to the

types of payments that gave rise to penalties and liens, the mandatory directive to make all payments would be surplusage.

72.     Section 8.6 thus parallels and has to be read in conjunction with Section 2.3(k)(v) of the APA.  Under the latter provision, Transform agreed to assume certain accounts payable as of the Closing Date in an amount "not exceeding" $166 million.[14]  See APA § 2.3(k)(v).  And, under the former provision, Debtors agreed to pay their payables on a timely basis so that the obligations that would be transferred to Transform would be payables that Debtors were creating and that they were expecting to continue to create in the ordinary course of their business in the time period between signing and Closing but were not yet due.  Transform did not agree that Debtors could simply take old payables that were long due and simply transfer the obligation for them to Transform.  That would defeat the whole purpose of the "timely payments" provision.  If that were what the Parties intended, they could have simply required Transform to make a lump sum payment of an additional $166 million—which Transform never would have agreed to do.

73.     So understood, Debtors' decision halfway between signing and Closing to simply stop paying payables in order to meet the DIP closing condition was unquestionably "material." See Eagle Force Holdings, LLC v. Campbell, 187 A.3d 1209, 1230 (Del. 2018) ("What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential."); Motorola, Inc. v. Amkor Tech., Inc., 849 A.2d 931, 937-38 (Del. 2004) ("A provision is 'key' or 'material' if a reasonable person would 'attach importance to [it] . . . in determining his choice of action in the transaction in question.") (alteration in original).  Debtors transferred tens of millions of dollars to Transform that Transform otherwise would not have had to satisfy.  While Debtors had projected

---

[14]     Transform does not waive and expressly preserves its argument that the only accounts payable covered by this provision are related to inventory.

disbursements of up to $158 million in payments for the week ending February 8, 2019, they only actually disbursed $57 million, *a difference of more than $100 million*. <u>See</u> Second Supp. Hede Decl., Ex. A.  That is "material" under any conceivable definition of the term.  Likewise, after removing non-disbursements for forecasted cash-in-advance inventory payments, Debtors failed to make disbursements for *$89 million* in accounts payable, approximately $50 million of which Transform has had to satisfy since Closing to maintain business relationships with the affected vendors, placing an enormous strain on Transform.  <u>Id.</u>

74.    Debtors get no support from the fact that the drafters made clear that the payables in Section 8.6 includeed "rent payments" and "sales taxes."  <u>See</u> Debtors' Supp. Opp. ¶ 28.  "Including" is not a word of limitation.  It "suggest[s] that the drafter had something more expansive in mind."  <u>CorVel Enter. Comp, Inc. v. Schaffer</u>, C.A. No. 4896-VCN, 2010 WL 2091212, at *2 (Del. Ch. May 19, 2010)  (construing the use of the word "including" in a contract provision).  Indeed, that is the precise interpretation explicitly required by Section 1.2(a)(viii) of the APA, which provides that "[t]he word 'including' or any variation thereof means 'including, without limitation,' and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it."

75.    The reason the parties made sure to include "rent payments" and "sales taxes" as among the types of payables covered by Section 8.6 is evident from context.  Section 8.6 bears the title of "Trade Payables" and is addressed to trade payables.  Absent the reference to "rent payments" and "sales taxes," it might not otherwise be clear that those were "trade" payables and were among those Debtors had to timely pay under Section 8.6.  But even if rent payments and sales taxes were among the important types of payables Transform wanted to make sure were paid, it simply does not follow that the inclusion of those payables in Section 8.6 gave Debtors license

to delay those and other payables for nearly half of the time from signing to Closing.

76.    Indeed, if—as Debtors suggest—the only purpose of Section 8.6 was to ensure that Debtors made those payments, which—if not paid—would result in a lien on property that was to be delivered to Transform or a penalty that was to be assumed by Transform, see Debtors' Supp. Opp. ¶ 28, they need not have included Section 8.6 at all.  It would have been surplusage.  Section 2.1 of the APA already required Debtors to deliver the Acquired Assets free and clear of any and all Encumbrances of any kind.  APA § 2.1.  And, under Section 2.4(h), the obligation for any penalties related to sales taxes—including "stiff penalties"—remained Debtors' responsibility and was not an Assumed Liability.  Id. § 2.4(h).

### 3.  Debtors Distort the Meaning of "Otherwise"

77.    Debtors' further argument that the "timely payment" covenant is of no independent force also fails.  They argue that the use of the word "otherwise" in Section 8.6 "indicates that the obligation set forth in the first clause is merely ***an example of*** the obligation set forth in the second," and that the first clause is "***thus limited by***" the second.  Debtors' Supp. Opp. ¶ 29 (emphasis in original).  According to Debtors, the only payments that would be untimely would be those outside of the Ordinary Course.  This argument distorts both the plain meaning of the contractual term and the way that word is used in the APA.  It too would read the first clause out of the APA.

78.    When looking to dictionaries for aid in interpreting a word according to its common meaning, courts "should assume the contextually appropriate ordinary meaning."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012).  "Otherwise" does not—as Debtors posit—ordinarily signify "merely an example"; it more frequently means

"differently" or "in another way."[15]

79.     Here, the use of "otherwise" to separate the two clauses does not serve to import limitations from the second clause to the first.  The two clauses cover related, but different, things.  The "timely payments" clause unambiguously requires Debtors to make payments on their payables on a timely basis.  It does not have any "ordinary course" qualifier.  The "accounts payable management clause" requires Debtors to manage their accounts payable account (including amounts that were not yet due) consistent with their cash management policies and as they had in the past in the ordinary course.  That Debtors were separately and additionally required to manage the account in the ordinary course did not give them license not to pay those payables that were due when they became due on a timely basis.  That would make the first clause surplusage.

80.     Contrary to Debtors' argument, the "cardinal rule of contract interpretation that the specific governs over the general" does not dictate a different conclusion.  Debtors' Supp. Opp. ¶ 30.  This rule applies only where one term is general and the other specific, and "where specific and general provisions *conflict*." DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. 2005) (emphasis added); see Restatement of Contracts § 236(c) (1932) ("Where there is an *inconsistency* between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.") (emphasis added).

81.     The first clause here is not any more general than the second.  It refers to timely payments; the other refers to ordinary course.  Moreover, the two obligations in Section 8.6 are

---

[15]     See Otherwise, Oxford English Dictionary (3d ed. 2012) (defining "otherwise" as "another way," "in another way or ways; in a different manner; by other means; in other words; differently"); Black's Law Dictionary (11th ed. 2019) (defining "otherwise" as "1. In a different way; in another manner"; "2. By other causes or means"; "3. In other conditions or circumstances"; "4. Except for what has just been mentioned"; "5. Busy doing something else"; and "6. To the contrary; differently").

distinct and independent—there is no apparent conflict between them.  Not even Debtors argue

that a timely payment would be outside the ordinary course.  Debtors were required both to make

payments that were timely and to manage the accounts payable system in the ordinary course.

Debtors' attempts to read conflict into these provisions violates the principle that different

provisions in a contract should not be read to contradict each other.  See, e.g., Antonin Scalia &

Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("there can be no

justification for needlessly rendering provisions in conflict if they can be interpreted

harmoniously."); Engelhard Corp. v. N.L.R.B., 437 F.3d 374, 381 (3d Cir. 2006) (explaining that

it is a "well established principle[] of contract construction []to read, if possible, all provisions of

a contract together as a harmonious whole").

82.     Debtors' invocation of *ejusdem generis* is similarly misplaced.  See Debtors' Supp.

Opp. ¶ 30 ("[W]hen a general word or phrase is qualified by a list of specific examples, the general

will be interpreted to include only items of the same type as those listed.").  This canon typically

applies in situations where a catch-all phrase or residual term follows an enumeration of specific

items, not where a contractual provision contains two independent clauses that create two separate

obligations.  See, e.g., Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15 (2001) ("[W]here

general words follow specific words in a[n] [] enumeration, the general words are construed to

embrace only objects similar in nature to those objects enumerated by the preceding specific

words.") (citation omitted); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation

of Legal Texts 199 (2012) (explaining that *ejusdem generis* applies to a list of two or more things,

*e.g.* "when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as

in *dogs, cats, horses, cattle, and other animals*.").

83.     In sum, the plain text and grammar of Section 8.6 make clear that it includes two

separate, independent clauses, both of which were binding on Debtors: "Sellers ***shall make*** all payments . . . on a timely basis and ***shall otherwise manage*** the accounts payable . . . in the Ordinary Course of Business." APA § 8.6 (emphasis added).

### 4. Debtors Failed to Act in the Ordinary Course

84.    Even assuming *arguendo* that the phrase "Ordinary Course of Business" applied to modify the timely payments clause of Section 8.6, Debtors failed to make payments "in the Ordinary Course of Business." APA § 8.6.

85.    Inventing history, Debtors now argue that the APA gave them the freedom to achieve the DIP closing condition by simply not making tens of millions of dollars of payments that were due because on occasion in the pre-petition period the Company had delayed payments when necessary to avoid a default under the ABL revolver and in the period before Closing they delayed payments because they "projected a default under the DIP Facility within a day or two of Closing." Debtors' Supp. Opp. ¶¶ 32-35.

86.    That is pure fabrication. Debtors did not delay payments beginning at least as early as February 4 because they "were projecting negative Net Availability by February 14," nor did they "delay[] payments to vendors until the following week to maintain positive Net Availability and avoid a default," as Mr. Good claimed in his declaration before this Court. See Good Decl. ¶ 7. That was the least of Debtors' concerns. Debtors delayed payments to meet the DIP Closing Condition and to transfer to Transform obligations that Debtors otherwise would have had to assume.

87.    Debtors effectively admit as such. Mr. Meghji, in his declaration, does not so much as mention a purported concern with availability as the basis for the decision to stop payments. *See* Meghji Decl. At deposition, he gave the following testimony:

Q.  Do you understand what [carefully managing disbursements for the next four days refers to?

A. As it says. "If we want to hit the 850 on Thursday, we will have to carefully manage disbursements for the next four days."

Q. What does it mean to carefully manage disbursements?

A. To ensure that we are budgeting properly and managing our disbursements to be able to hit the DIP target, which is a closing condition.

Meghji Dep. Tr. 97:12-21.

88.     Mr. Good failed to identify a single meeting at which Debtors had discussed the Company's liquidity position on February 14.  See Good Dep. at 117:24-118:25 (stating that he cannot recall discussion of the Company's liquidity position at the Debtors' January 30, February 3, or February 4 meetings).

89.     Debtors' internal daily tracker identified the reason for delaying payables as to meet the DIP closing condition and transfer liabilities to Transform.  As far back as January 25, Debtors' internal daily tracker of Closing metrics identified that Debtors could "manage AP balance based on deliverable under the APA," including by "increas[ing] payables to offset [the] DIP."  Riecker Decl., Ex. B (email from Joseph Franz to Leena Munjal et al., dated January 29, 2019).  The tracker nowhere identifies negative net availability post-Close as a reason to stop paying payables as they became due.  Similarly, Rajat Prakash made no mention of the Company's post-close liquidity position when he announced via email on February 4, 2019 and February 8, 2019 that Debtors were delaying payments of accounts payable—instead, he wrote that Debtors were doing so in order to pay down the DIP.  Riecker Decl., Ex. E ("In order to manage 1L outstanding on Feb 8th, we are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days"); Riecker Decl., Ex. G (email from Rajat Prakash et al., dated February 8, 2019) ("In order

to maintain $850 1L outstanding balance, certain payments contractually due this week have been delayed until next week").[16]

90.    Even if this explanation were not pre-textual, Debtors' argument relies on a false premise.  Assuming Debtors really were concerned that they would not have sufficient liquidity after paying down the DIP to meet their other obligations, that is not an excuse to violate the Ordinary Course covenant in Section 8.6 of the APA.  The two covenants imposed separate obligations.  The DIP closing condition covenant required Debtors to pay down the DIP to $1.2 billion.  The Ordinary Course covenant required Debtors to do so while also managing the accounts payable in the Ordinary Course.  The obligation to satisfy one does not provide the liberty to violate the other.  Indeed, another provision of the APA, Section 8.1(a), explicitly permitted Debtors to manage the purchase of inventory—activity that creates accounts payable—taking into account the DIP closing condition.  Section 8.6 does not.

91.    Debtors chose to satisfy the DIP closing condition by not making payments on a timely basis and by acting outside the Ordinary Course.  Debtor did so knowing the potential outcome.  They did so because, in their mind, if they did not satisfy the DIP Closing Condition, "there was a significant risk that either ESL would demand concessions that we would have to give or we would be unable to close . . ."  See Meghji Dep. at 70:23-71:2.  In the end, Debtors satisfied the DIP Closing Condition—albeit at Transform's expense—and Transform chose to close.  Leaving aside contractual rights, under those circumstances, where Debtors did so by violating the "timely payments" and "Ordinary Course" covenants, it is not unfair to grant relief

---

[16]    Debtors argue in a footnote that their delaying payments to vendors should be excused because they had $189 million of accounts payable at Closing, and therefore exceeded the $166 million cap.  Debtors' Supp. Opp. ¶ 34 n.12.  The fact that Debtors exceeded $166 million in accounts payable does not mitigate their conduct up to the amount of the cap.

to Transform for the damages Debtors caused Transform and its investors and creditors by that conduct.

92.     In the end, Debtors concede that their obligations to make payments in the Ordinary Course were only relevant during the three-week period between signing and Closing under the APA.  Debtors' failure to adhere to its Ordinary Course obligations during the week before Closing covered one-third of the entire time when this provision applied.  Transform would never have agreed to such an important provision of the APA if it understood that Debtors intended to flaunt it in this manner.

**B.  Transform Did Not Waive Its Claim Regarding Debtors' Breaches**

93.     Finally, Debtors argue that Transform acquiesced to their delay of payments and thus has waived or should be estopped from asserting that Debtors breached the ordinary course provision in Section 8.6.  That argument is meritless.[17]

94.     Even under Debtors' interpretation, acquiescence occurs only where "(1) the plaintiff remained silent (2) with knowledge of her rights (3) and with the knowledge or expectation that the defendant would likely rely on her silence, (4) the defendant knew of the

---

[17]     Debtors' Supplemental Opposition effectively concedes that their violation of the timely payments and Ordinary Course obligations with respect to accounts payable cannot be excused by consultation.  Debtors' Supp. Opp. ¶ 36.  As they acknowledge, the only provision of the APA that gives Debtors license to avoid a covenant by consultation is that under Section 8.1(a) with regard to managing the amount of Inventory.  Section 8.6, governing trade payables, explicitly states that Debtors were obligated to "make all payments with respect to payables."  See U.S. Bank v. ILDA, LLC, No. 13-CV-3082, 2014 WL 4290543, at *3 (S.D.N.Y. Aug. 29, 2014) ("When a contract includes a phrase in one provision but not in another parallel provision, the court presumes that the drafters acted intentionally and intended a difference in meaning.").

In any event, Transform was not consulted about this decision, nor were its principals involved in the decision-making.  See Supp. Kamlani Decl. ¶ 24; Riecker Decl. ¶ 13; see also Meghji Dep. at 75:9-16.  Instead, Transform discovered this decision had been made after the fact—when it received the February 4, 2019 Daily Cash Flow Forecast report.  See Riecker Decl., Ex. E.  Indeed, in his deposition, Mr. Meghji admitted freely that Debtors did not consult Transform before making this decision.  Meghji Dep. at 93:18-25 (Question:  "[D]id those e-mails ask Transform's representatives to provide input regarding debtors' payment or nonpayment on accounts payable?"  Answer:  "No, I don't think so, because they were not—they didn't own the company at that point . . . .").

plaintiff's silence, and (5) the defendant in fact relied to her detriment on the plaintiff's silence."
See Debtors' Supp. Opp. ¶ 38 (quoting Lehman Bros. Holdings, Inc. v. Spanish Broad. Sys. Inc.,
2014 WL 718430, at *10 (Del. Ch. Feb. 25, 2014)).    Moreover, to prove acquiescence, the
defendant must prove that the plaintiff remained inactive "for a considerable time." Klaassen v.
Allegro Dev. Corp., 106 A.3d 1035, 1047 (Del. 2014).

95.    Debtors' argument fails for at least three reasons. *First*, Transform did not remain
inactive "for a considerable time."    Transform put Debtors on notice of its claim within days of
Debtors' action, even before it knew the full scale of Debtors' breach.    Transform was informed
by email on February 4, 2019 that Debtors were "delaying certain payments contractually due on
Feb 5th, Feb 6th, Feb 7th, by 3 business days."    Riecker Decl., Ex. E; see Debtors' Supp. Opp. ¶
39.    Transform raised this specific breach in open court at the Sale Hearing, Hr'g Tr. at 870:2-
872:14, February 7, 2019, and then wrote a letter to the Debtors on February 11, advising them
that by "proceeding with an early Closing," Transform "is not waiving any rights under the APA,
including, without limitation, any claims for breach" by Debtors of their "pre-closing covenants."
Mainoo Decl. Ex. S (letter from Sean O'Neal to Weil, Gotshal & Manges, dated February 11,
2019).    Transform did not remain inactive, but rather explicitly opposed Debtors' unilateral
decision to delay payments just a few days after learning that such a decision had been made.

96.    Once Transform became aware of Debtors' decision to delay payments, it did not
have to back out of Closing or risk waiving its contractual rights.    Under well-established Delaware
law, Transform had the right to close and then file suit for breach of contract.    In re Woodbridge
Grp. of Cos., LLC, 590 B.R. 99, 105 (Bankr. D. Del. 2018) ("Under basic contract principles,
when one party to a contract feels that the other contracting party has breached its agreement, the
non-breaching party may either stop performance and assume the contract is avoided, or continue

its performance and sue for damages.") (quoting S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992)).

97.    *Second*, the doctrine of acquiescence only applies where one party relies to its detriment on another's silence.  See Lehman Bros. Holdings, Inc. v. Spanish Broad. Sys. Inc., Civil Action No. 8321-VCG, 2014 WL 718430, at *9.  That is plainly not the case.  The only harm that Debtors allegedly have suffered as a consequence of Transform's purported acquiescence is having to defend against the present suit.  Debtors Supp. Opp. ¶ 41 ("The Debtors . . . did so to their detriment as they had no expectation whatsoever that Buyer would later sue them for doing so."). The Delaware law of estoppel "requires that a 'party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct to change position to his detriment,'" Henry v. Phixios Holding, Inc., 2017 WL 2928034, at *10 n.109 (Del. Ch. July 10, 2017) (citation omitted), and Debtors cannot and do not point to any way in which they have "change[d] position" based on Transform's conduct.  Indeed, Mr. Meghji testified that he did not know what Debtors would have done differently if Transform's representatives had immediately objected to Debtors' nonpayment on accounts payable.  Meghji Dep. at 94:5-95:12.[18]

98.    Debtors' reliance on *Lehman Bros.* in support of their estoppel argument is misguided.  The court there found acquiescence where plaintiffs had "three months" of notice of defendants' intent to take action, the notice was in "publically-available documents," and plaintiffs delayed bringing the relevant claim until years after the alleged breach occurred.  Lehman Bros., 2014 WL 718430, at *10-12.  There was also detrimental reliance because the defendants could

---

[18]    Mr. Meghji also testified that Mr. Kamlani told him that the Debtors "should focus on paying down the DIP, and do whatever was necessary to achieve that goal."  Meghji Decl. ¶ 12.  But Debtors present no evidence that Mr. Kamlani or any other representative of Transform ever told them to delay payables or that they were relieved from their contract obligations.  In fact, Mr. Meghji testified that he did not speak to either Mr. Kamlani or Mr. Lampert.  See Meghji Dep. at 73:19-74:2, 75:10-16.

have obtained a consent from their shareholders, restructured, taken on additional debt, or litigated a declaratory judgment action had they known of plaintiffs' objections in the three months they remained silent.  Id. at *11.  Here, Transform objected to Debtors' actions within days of receiving notice, and made clear that it would pursue available remedies for breaches of the APA, including Debtors' failure to make payments that were timely and made in the ordinary course.  And there was no detrimental reliance.

99.     *Finally*, acquiescence cannot constitute waiver where the clear language of a contract indicates that parties cannot waive their rights by failing to assert them.  See Pine River Master Fund Ltd. v. Amur Fin. Co., Inc., C.A. No. 2017-0145-JRS, 2017 WL 4548143, at *18 (Del. Ch. Oct. 12, 2017); Koninklijke Philips N.V. v. Cinram Int'l., Inc., Civil Action Nos. 08-0515, 08-4068, 08-4070, 08-4071, 2013 WL 2301955, at *6 (S.D.N.Y. May 24, 2013) ("The non-waiver clause provides that 'neither the failure nor the delay . . . to enforce any provision of this Agreement shall constitute a waiver of such a provision or of the right…to enforce each and every provision of this Agreement.' . . . Thus, [plaintiff's] failure to object cannot be deemed as acquiescence.") (citation omitted).  Section 13.3 of the APA does not permit amendment or waiver unless in writing.  APA § 13.3.  This non-waiver provision closely tracks the relevant contractual provisions in *Pine River* and *Koninklijke*, and should have the same effect here. Thus, even if Transform had been silent—which it was not—that silence could not constitute a waiver under the express terms of the APA and controlling law.

### III.  Transform is not Liable for Mechanics' Liens Related to Lease Premises and Sparrow Properties[19]

100.     Debtors' latest submission on mechanics' liens adds nothing new to their previous

---

[19]     In addition to mechanics' liens, Transform relies on its prior briefing with respect to the issue of the disputed EDA Funds.  Transform will not submit any further briefing on the EDA Funds here.

briefing – it merely repeats and summarizes their previous submissions.  Compare *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* [D.I. 4430] ("Debtors' Opp.") ¶¶ 136-42, with Debtors' Supp. Opp. ¶¶ 44-49.  The Court's preliminary ruling should therefore stand:  The Debtors assumed responsibility for all pre-Closing mechanics' liens other than the 36 specifically enumerated in the APA.  See Hr'g Tr. at 299:4-7, dated July 11, 2019.

101.    The APA specifically apportioned liability for mechanics' liens.  Transform assumed liability for 36 enumerated mechanics' liens listed in section 2 of Schedule 6.5 to the APA, and Debtors assumed liability for the rest.  See iBio, Inc. v. Fraunhofer USA, Inc., C.A. No. 10256-VCMR, 2016 WL 4059257, at *6 n.59 (Del. Ch. July 29, 2016) (applying the canon of *expressio unius est exclusio alterius*).

102.    Section 2.3 of the APA lists specific enumerated liabilities that Transform assumed.  Liabilities other than the assumed liabilities are excluded under Section 2.4, which also contains a non-exclusive list of certain specific excluded liabilities.  Under Section 2.3(p) of the APA, as amended on February 11, 2019, Transform assumed liability for "the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5," which lists 36 specific mechanics' liens.  The parties do not dispute that Transform assumed liability for these 36 mechanics' liens.  However, Debtors insist that this Schedule is incomplete, and that Transform assumed liability for additional mechanics' liens not listed on the Schedule.

103.    Debtors' argument contradicts the plain terms of the APA.  Section 2.4 of the APA provides that all liabilities not assumed in Section 2.3 are excluded.  Section 2.4 of the APA expressly provides that "[n]one of Buyer, any Affiliate of Buyer or any Assignee shall assume, [or] be deemed to assume . . . any Liabilities of any Sellers or any of their respective Affiliates . .

. other than the Assumed Liabilities." The "Excluded Liabilities" include "all Liabilities of the Seller . . . arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date," APA § 2.4(a), and "all Liabilities relating to the payment or performance of obligations arising solely out of facts or circumstances in existence prior to the Closing Date." APA § 2.4(b). The excluded liabilities thus indisputably include the mechanics' liens related to the Lease Premises and Sparrow Properties.

104.    In their latest submission on mechanics' liens, Debtors abandon all of their arguments but one—that the prorations provisions in Sections 9.11(a) and 9.11(a)(vi) of the APA somehow change this calculus.   The prorations sections of the APA have a limited purpose—they identify a mechanism to true up liabilities for the period immediately after Closing for a defined period of time.  Sections 9.11(a) and 9.11(a)(vi), in establishing guidelines for certain prorations, do not silently change the apportionment of liabilities for mechanics' liens under Section 2.3 and 2.4 of the APA.

105.    Section 9.11(a) provides that "[t]he Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises . . . and the Sparrow Properties as of the Closing Date with the Sellers being . . . responsible for all fees, costs and expenses accrued or apportioned up to but not including the Closing Date." It does not address Transform's obligations with respect to mechanics' liens; indeed, it contains no mention of mechanics' liens at all.

106.    Debtors further invoke Section 9.11(a)(vi), which provides that "Sellers shall be charged for the amount of any underlying mechanics' liens with respect to any Owned Real Property (other than those identified in Section 2 of Schedule 6.5) that are not paid, discharged by order of the Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer." APA

§ 9.11(a)(vi);  See also Debtors' Supp. Opp. ¶ 45.  Section 9.11(a)(vi) refers to only one set of expenses with respect to mechanics' liens—those pertaining to the Owned Real Property (which under Amended Section 2.3(p) were split between Debtors and Transform).  It is completely silent as to the apportionment of mechanics' liens related to the Lease Premises or the Sparrow Properties. And it says nothing about Transform's responsibilities.  By its terms, the provision nowhere shifts liability for mechanics' liens with respect to any Lease Premises or Sparrow Properties from the Debtors to Transform that the APA elsewhere assigns to Debtors.

107.    Moreover, the Debtors' proffered interpretation of Section 9.11(a) would render the entirety of 2.3(p) and Schedule 6.5 a meaningless nullity without repealing these sections.  See Osborn, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'") (citation omitted).  Moreover, the law disfavors repeals by implication.  See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 327 (2012) ("Repeals by Implication are disfavored—'very much disfavored.'") (quoting James Kent, Commentaries on American Law *467 n.(y1) (Charles M. Barnes ed., 13th ed. 1884)); Branch v. Smith, 538 U.S. 254, 273 (2003) (plurality opinion) ("We have repeatedly stated . . . that absent a clearly expressed . . . intention, repeals by implication are not favored. An implied repeal will only be found where provisions . . . are in irreconcilable conflict.") (citation omitted).  Debtors' argument also defies logic:  If the Parties wanted to assign liability for additional mechanics' liens to Transform, they could have added them to Schedule 6.5, or they could have repealed or amended Section 2.3(p).  If they specifically wanted to shift liability for mechanics' liens for the Lease Premises or Sparrow Properties, they would have mentioned those categories when doing so.

108.    Transform posits that the text of the APA plainly provides that Transform assumed

liability for only the 36 mechanics' liens listed in Section 2 of Schedule 6.5. To the extent that the Court finds it necessary to rely on parol evidence, Debtors' proffered parol evidence does not help them. Debtors argue that because an earlier draft of the amendment provided that Debtors would be charged for any amount underlying mechanics' liens with respect to "any Potential Acquired Assets,"—defined in the APA as "all assets of Seller of any kind that either (i) constitute an Acquired Asset (other than Leases or Contracts) or (ii) constitute Potential Transferred Agreements"—the later adoption of "Owned Real Property" in the final version signaled the conscious decision of the Parties to narrow Seller's responsibilities with respect to the mechanics' liens. Debtors' Opp. ¶ 142 (citation omitted). Besides being inadmissible extrinsic evidence, the Parties' acquiescence around the adopted language of "Owned Real Property" does not affect the settled understanding from the inclusion of Amended Section 2.3(p) that Transform was to assume solely the liabilities for the mechanics' liens listed in Section 2 of Schedule 6.5.

## **CONCLUSION**

109.    For the foregoing reasons, Transform requests that the Court award the relief requested in its Adversary Complaint and such other and further relief as is justified under the circumstances.

Dated: September 6, 2019  **CLEARY GOTTLIEB STEEN &**
   New York, New York  **HAMILTON LLP**

       _/s/ Lewis J. Liman_
       Lewis J. Liman
       Sean A. O'Neal
       Luke A. Barefoot
       Abena A. Mainoo
       One Liberty Plaza
       New York, New York 10006
       Telephone:  (212) 225-2000
       Facsimile:  (212) 225-3999

       _Counsel for Transform Holdco LLC_