UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

---------------------------------------------------------------- x

### DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors and*          Dated:  September 13, 2019
*Debtors in Possession*              New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................2

FACTS ...................................................................................................................9

    **A.**    General Background .............................................................................9

    **B.**    Post-Closing Disputes ........................................................................11

          **1.**    Asset Purchase Agreement Disputes with Transform ............ 11

          **2.**    Section 507(b) Claims Dispute and Section 506(c) Surcharges .............. 13

    **C.**    Plan Solicitation ................................................................................14

ARGUMENT ........................................................................................................17

I.    Global Settlement ..........................................................................................18

    **A.**    Overview of the Global Settlement....................................................18

    **B.**    The 9019 Standard Governs the Global Settlement............................24

          **1.**    The 9019 Standard and the *Iridium* Factors........................ 24

          **2.**    Standard for Approving Substantive Consolidation ................ 26

          **3.**    The Plan Settlement and Substantive Consolidation Issues Are Appropriately Settled Under the 9019 Standard ....................... 29

    **C.**    The Global Settlement Meets the 9019 Standard .................................30

          **1.**    The Creditors' Committee Settlement Satisfies the Bankruptcy Rule 9019 Standard Under the *Iridium* Factors ........................ 31

          **2.**    The PBGC Settlement Satisfies the 9019 Standard Under the *Iridium* Factors........................................................................ 33

          **3.**    The Plan Settlement Satisfies the 9019 Standard Under the *Iridium* Factors40

II.    THE PLAN SATISFIES BANKRUPTCY CODE SECTION 1129 AND SHOULD BE APPROVED ..........................................................................48

    **A.**    The Plan Satisfies Bankruptcy Code Section 1129(a)(1) .....................49

    **B.**    Classification of Claims and Interests Is Appropriate and Complies with Bankruptcy Code Section 1122 ........................................................49

    **C.**    Plan Complies with the Mandatory Plan Requirements of  Section 1123(a) of the Bankruptcy Code ........................................................................53

    **D.**    Plan Complies with Bankruptcy Code Section 1123(b) ........................55

          **1.**    Plan Permissive Provisions ..................................................... 55

          **2.**    Plan Releases are Appropriate and Should Be Approved......................... 56

          **3.**    Plan Exculpation Provision Should Be Approved .................... 69

WEIL:\97183319\1\73217.0004

|  |  | **4.** | The Injunction is Narrowly Tailored and Should Be Approved | 70 |
|---|---|---|---|---|
|  | **E.** |  | Plan Satisfies Bankruptcy Code Section 1129(a)(2) | 72 |
|  | **F.** |  | Plan Has Been Proposed in Good Faith in Compliance with Bankruptcy Code Section 1129(a)(3) | 73 |
|  | **G.** |  | Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments and Complies with Bankruptcy Code Section 1129(a)(4) | 75 |
|  | **H.** |  | Debtors Have Disclosed Liquidating Trust Board Members, Liquidating Trustee, and Primary Trust Litigation Counsel in Compliance with Bankruptcy Code Section 1129(a)(5) | 76 |
|  | **I.** |  | Plan Does Not Require Governmental Regulatory Approval of Rate Change | 77 |
|  | **J.** |  | Plan is in Best Interests of All Creditors of the Debtors | 77 |
|  | **K.** |  | Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8) | 80 |
|  | **L.** |  | Plan Provides for Payment in Full of All Allowed Administrative and Priority Claims | 82 |
|  | **M.** |  | Plan Was Accepted By at Least One Impaired Class and Satisfies Bankruptcy Code Section 1129(a)(10) | 83 |
|  | **N.** |  | Plan Is Feasible Satisfying Section 1129(a)(11) | 84 |
|  |  | **1.** | Feasibility Standard | 84 |
|  |  | **2.** | The Plan is Feasible | 87 |
|  | **O.** |  | Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 and Complies with Bankruptcy Code Section 1129(a)(12) | 109 |
|  | **P.** |  | Plan Complies with Bankruptcy Code Section 1129(a)(13) | 110 |
|  | **Q.** |  | Section 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code are Inapplicable to the Debtors | 111 |
|  | **R.** |  | Principal Purpose of the Plan Is Not Avoidance of Taxes | 112 |
|  | **S.** |  | Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes | 112 |
|  |  | **1.** | Plan Does Not Discriminate Unfairly | 114 |
|  |  | **2.** | Plan Is Fair and Equitable. | 122 |
| **III.** |  |  | Remaining Objections Should be Overruled and Plan Confirmed | 123 |
|  | **A.** |  | Objections Asserted on Account of Section 1129(a)(9) and Section 1129(a)(11) Should be Overruled | 124 |
|  |  | **1.** | The Express Terms of the Plan Provide for Payment of Administrative Expense Claims in Satisfaction of Section 1129(a)(9) | 124 |

ii

2.    Objections to Debtors' Ability to Pay Administrative Expense
Claims Pursuant to Section 1129(a)(9) Should be Overruled.................. 126

3.    Objections to Debtors' Estimation of Administrative Expense
Claims Should be Overruled................................................................ 129

4.    Objections to Debtors' Reliance on Litigation Proceeds to Satisfy
Administrative Expense Claims Should be Overruled ........................... 132

B.    Objections Alleging Improper Gerrymandering Should be Overruled................134

C.    Objections to the PBGC Settlement and Plan Settlement Should be
Overruled .........................................................................................................134

1.    Objections to the Standard Used to Evaluate the Plan Settlement
Should be Overruled; the 9019 Standard is the Correct Standard to
Evaluate the Plan Settlement ................................................................. 134

2.    The Plan Settlement fairly reflects the arguments for (and against)
substantive consolidation on the merits under Augie/Restivo ............... 135

3.    The PBGC Settlement Meets the 9019 Standard .................................... 141

D.    Treatment of Fee Claims under the Plan is Valid and Reasonable.....................144

1.    Provisions of the DIP Order Control ....................................................... 145

2.    The Carve-Out Was Specifically Negotiated and Approved by the
DIP Order............................................................................................... 145

E.    Objections to the Third Party Releases Should be Overruled.............................148

1.    Third Party Releases are Consensual and can be Approved
Pursuant to Section 1141(a)................................................................... 148

2.    The Court has Subject Matter Jurisdiction to Approve the Third
Party Releases ........................................................................................ 148

F.    Objections to the Plan Injunction Provision Should be Overruled.....................153

CONCLUSION................................................................................................................156

WEIL:\97183319\1\73217.0004

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*In re 20 Bayard Views, LLC,*
445 B.R. 83 (Bankr. E.D.N.Y. 2011) ...................................................................83

*In re 599 Consumer Elecs., Inc.,*
195 B.R. 244 (S.D.N.Y. 1996) ...........................................................................137

*Ad Hoc. Comm. Of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.),*
412 B.R. 53 (Bankr. S.D.N.Y. 2008) ..................................................................38

*In re Adelphia Commc'sn Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007), *dismissing appeal,* 371 B.R. 660 (S.D.N.Y. 2007),
*aff'd,* 54 F.3d 420 (2d Cir. 2008) ................................................................. *passim*

*In re Advance Watch Co., Ltd.,*
2016 Bankr. LEXIS 229 (Bankr. S.D.N.Y. Jan. 25, 2016) ..................................85

*Aetna Cas. & Sur. Co. v. Chateaugay Corp.* (*In re Chateaugay Corp.*),
89 F.3d 942 (2d Cir. 1996) .................................................................................50

*In re Affiliated Foods, Inc.,*
249 B.R. 770 (Bankr. W.D. Mo. 2000) ...............................................................78

*In re Alpha Natural Res.,*
552 B.R. 314 (Bankr. E.D. Va. 2016) ...............................................................110

*In re Am. Capital Equip., LLC,*
688 F. 3d 145 (3d Cir. 2012) .............................................................................133

*In re Am. HomePatient, Inc.,*
298 B.R. 152 (Bankr. M.D. Tenn. 2003) .............................................................28

*In re Amanat,*
338 B.R. 574 (Bankr. S.D.N.Y. 2005) ..............................................................153

*In re Ambac. Fin. Group, Inc.,*
457 B.R. 299 (Bankr. S.D.N.Y. 2011) ................................................................38

*In re Ames Dep't Stores, Inc.,*
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ................................................................146

*In re Apex Oil Co.,*
118 B.R. 683 (Bankr. E.D. Mo. 1990) ................................................................48

WEIL:\97183319\1\73217.0004

*In re Applied Safety, Inc.*,
   200 B.R. 576 (Bankr. E.D. Pa. 1996) ......................................................................86

*In re Bally Total Fitness of Greater N.Y., Inc.*,
   Case No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ....59, 70, 72

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)........................................................................................78, 122

*In re BearingPoint, Inc.*,
   453 B.R. 486 (Bankr. S.D.N.Y. 2011)....................................................................70

*Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*,
   195 B.R. 294 (D.N.J. 1996) ...................................................................................86

*In re Best Prods. Co.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994), *dismissing appeal*, 177 B.R. 791 (S.D.N.Y.), *aff'd*., 68
   F.3d 26 (2d Cir. 1995)...........................................................................................25

*In re Bigler LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) .................................................................154

*Bond St. Assocs. v. Ames Dep't Stores, Inc.*,
   174 B.R. 28 (S.D.N.Y. 1994)...............................................................................153

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990)....................................................................116

*In re Calpine Corp.*,
   Case No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007), *appeal denied*, 390 B.R. 508 (S.D.N.Y. 2008) *aff'd*, 354 F. App'x 479 (2d Cir. 2009) ....................62

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995).......................................................................149, 150, 152

*In re Chassix Holdings, Inc.*,
   533 B.R. 64 (Bankr. S.D.N.Y. 2015)......................................................................62

*In re Chateaugay Corp.*,
   213 B.R. 633 (S.D.N.Y. 1997)..............................................................................151

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................49, 70, 75

*CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*,
   406 F.3d 229 (4th Cir. 2005) ..................................................................106, 127, 128

v

*In re Coldwater Creek Inc.*,
  No. 14-10867-BLS, 2014 WL 11429340 (Bankr. D. Del. Sept. 17, 2014) ...........................48

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983) .............................................................................................25

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) . ....................................................................86, 127

*Davidson Kempner Capital Mgmt. LP v. Official Comm. of Unsecured Creditors (In re Motors
  Liquidation Co.)*,
  Case No. 16 Civ. 6927 (PKC), 2017 WL 3491970 (S.D.N.Y. Aug. 14, 2017) ......................26

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am.,
  Inc. (In re DBSD N. Am., Inc.)*, Case No. 90–13061 (REG), 2010 WL 1223109 (S.D.N.Y.
  Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. DISH Network Corp. v. DBSD N. Am.
  Inc. (In re DBSD N. Am.)*, 634 F.3d 79 (2d Cir. 2011) ..........................................59, 70, 71, 86

*In re Delphi Corp.*,
  No. 05-44481, 2009 WL 973130 (Bankr. S.D.N.Y. Apr. 2, 2009) .........................................26

*In re DeLuca*,
  1996 WL 910908 (Bankr. E.D. Va. Apr. 12, 1996) ...............................................................85

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005) ....................................................................................... *passim*

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 714 (Bankr. S.D.N.Y. 1992), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992) .....................115

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) .......................................................................... *passim*

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992) .............................................................................................24

*In re Enron Corp.*,
  Case No. 01–16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) .......... *passim*

*In re Evanston Beuaty Supply, Inc.*,
  136 B.R. 171 (Bankr. N.D. Ill. 1992) .................................................................................146

*In re FairPoint Commc'ns, Inc.*,
  452 B.R. 21 (Bankr. S.D.N.Y. 2011) ..................................................................................152

*FDIC v. Colonial Realty Co.*,
  966 F.2d 57 (2d Cir. 1992) ........................................................................................28, 29

WEIL:\97183319\1\73217.0004

*In re Finlay Enterprises, Inc.*,
No. 09–14873 (JMP), 2010 WL 6580629 (Bankr. S.D.N.Y. May 18, 2010)................87, 123

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ........................................................................ *passim*

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
994 F.2d 1160 (5th Cir. 1993) ............................................................................................48

*In re Hibbard Brown & Co.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) ................................................................................25

*Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.)*,
190 B.R. 157 (S.D.N.Y. 1995)........................................................................................153

*In re ie Corp.*,
No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867 (Bankr. D. Del. Oct. 27, 2010) .................86

*In re Indianapolis Downs, LLC.*,
486 B.R. 286 (Bankr. D. Del. 2013) ...............................................................................103

*In re Ionosphere Clubs, Inc.*,
134 B.R. 515 (Bankr. S.D.N.Y. 1991)...............................................................................111

*In re Jennifer Convertibles, Inc.*,
447 B.R. 713 (Bankr. S.D.N.Y. 2011)................................................................................29

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3rd Cir. 1987) .........................................................................................113

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R.
407 (S.D.N.Y. 1987), *aff'd sub nom, Kane v. Johns-Manville Corp. (In re Johns-Manville
Corp.)*, 843 F.2d 636 (2d Cir. 1988) ...............................................................................115

*In re Johnson*,
Case No. 14-57104, 2016 WL 8853601 (Bankr. S.D. Ohio Nov. 10, 2016)........................132

*In re Journal Register Co.*,
407 B.R. 520 (Bankr. S.D.N.Y 2009),
*appeal dismissed*, 452 B.R. 367 (S.D.NY. 2010) ............................................................75, 85

*JPMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*,
691 F.3d 476 (2d Cir. 2012)........................................................................................ *passim*

*JPMorgan Chase Bank v. U.S. Nat'l Bank Ass'n (In re Oakwood Homes Corp.)*,
329 B.R. 19 (D. Del. 2005)..............................................................................................132

WEIL:\97183319\1\73217.0004

*In re Kaiser Aluminum Corp.*,
  Case No. 02-10429 (JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R.
  88 (D. Del. 2006) ................................................................................................................119

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
  843 F.2d 636 (2d Cir. 1988)....................................................................49, 85, 113

*In re Kent Terminal Corp.*,
  166 B.R. 555 (Bankr. S.D.N.Y. 1994).......................................................................49

*In re Kirwan Offices S.À R.L.*,
  2018 WL 5095675 (S.D.N.Y. Oct. 10, 2018) ............................................151, 152

*In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*,
  149 B.R. 306 (Bankr. E.D.N.Y. 1992)......................................................................118

*Koelbl v. Glessing* (*In re Koelbl*),
  751 F.2d 137 (2d Cir. 1984)...........................................................................................74

*In re Korea Chosun Daily Times*,
  337 B.R. 773 (Bankr. E.D.N.Y. 2005).....................................................................106

*Lawski v. Frontier Ins. Grp., LLC* (*In re Frontier Ins. Grp., Inc.*),
  585 B.R. 685 (Bankr. S.D.N.Y. 2018), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019) .................64, 149

*In re Lear Corp.*,
  Case No. 09-14326 (ALG), 2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009) .................61

*In re Leslie Fay Cos.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997).......................................................................27

*MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville*) (*Manville I*),
  837 F.2d 89 (2d Cir. 1988).............................................................................................58

*In re MCorp Fin., Inc.*,
  160 B.R. 941 (S.D. Tex. 1993) ...................................................................................132

*In re Madison Hotel Assocs.*,
  749 F.2d 410 (7th Cir. 1984) .........................................................................................74

*In re Masterwear Corp.*,
  241 B.R. 511 (Bankr. S.D.N.Y. 1999)......................................................................150

*In re MF Glob. Inc.*,
  No. 11–2790, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) .......................25

*In re Midway Gold US, Inc.*,
  575 B.R. 475 (Bankr. D. Colo. 2017) .......................................................................155

WEIL:\97183319\1\73217.0004

*In re Millennium Lab Holdings II, LLC*,
    575 B.R. 252 (Bankr. D. Del. 2017) ..................................................................151

*Motorola Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ..................................................................... *passim*

*In re Motors Liquidation Co*.,
    447 B.R. 198 (Bankr. S.D.N.Y. 2011) ...............................................................59

*In re MPM Silicones, LLC*,
    Case No. 14-22503, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321
    (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds*, 847 F.3d 787 (2d Cir.
    2017) ..................................................................................................... *passim*

*In re Nailite Int'l*,
    No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878 (Bankr. D. Del. Dec. 8, 2009) .................87

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) ............................................................................24

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ..........................................................35, 144

*O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*,
    Case No. 08–12547, 2013 WL 1821592 (Bankr. S.D.N.Y. Apr. 30, 2013) ...................68, 153

*In re One Times Square Assocs. Ltd. P'ship*,
    159 B.R. 695 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 73 (S.D.N.Y. 1994), *aff'd*, 41 F.3d
    1502 (2d Cir. 1994) (unpublished table decision) ..................................................52

*In re Owen Corning*,
    419 F.3d 195 (3d. Cir. 2005) .....................................................................139, 140

*Pan Am Corp. v. Delta Air Lines*,
    175 B.R. 438 (S.D.N.Y. 1994) .........................................................................128

*In re PC Liquidation Corp.*,
    No. 05-89022-288, 2006 Bankr. LEXIS 4638 (Bankr. E.D.N.Y. Nov. 13, 2006) ..........87, 127

*Pizza of Haw., Inc. v. Shakey's, Inc*. (*In re Pizza of Haw., Inc.*),
    761 F.2d 1374 (9th Cir. 1985) ...........................................................................85

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ..............................................................................73

*Quarles v. Miller*,
    193 B.R. 779 (W.D. Va. 1996) .........................................................................133

WEIL:\97183319\1\73217.0004

*Quarles v. U.S. Trustee*,
  194 B.R. 94 (W.D. Va. 1996) ...................................................................................133, 134

*In re Quigley Co.*,
  377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...................................................................................116

*In re Quigley Co., Inc.*,
  676 F.3d 45 (2d Cir. 2012).......................................................................................116, 150

*In re Remsen Partners, Ltd.*,
  294 B.R. 557 (Bankr. S.D.N.Y. 2002) (Drain, J.)....................................................................25

*In re Republic Airways Holdings, Inc.*,
  565 B.R. 710 (Bankr. S.D.N.Y. 2017).............................................................................27, 28

*In re Republic Airways Holdings Inc.*,
  Case No. 16-10429 (SHL), 2016 WL 2616717
  (Bankr. S.D.N.Y. May 3, 2016)....................................................................24, 25, 139, 144

*Republic Supply v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ..............................................................................................64

*In re Residential Capital, LLC*,
  497 B.R. 720 (Bankr. S.D.N.Y. 2013)............................................................................ *passim*

*In re Resorts Int'l, Inc.*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ......................................................................................48

*In re Richton Int'l Corp.*,
  12 B.R. 555 (Bankr. S.D.N.Y. 1981).....................................................................................27

*In re Riggel*,
  142 B.R. 199 (Bankr. S.D. Ohio, 1992).................................................................................53

*In re River Center Holdings, LLC*,
  288 B.R. 59 (Bankr. S.D.N.Y. 2003)...................................................................................153

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*,
  330 B.R. 394 (Bankr. S.D.N.Y. 2005)....................................................................................66

*In re S. Edge LLC*,
  478 B.R. 403 (D. Nev. 2012).............................................................................................155

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016)............................................................................ *passim*

*In re Sagewood Manor Assocs. Ltd. P'ship*,
  223 B.R. 756 (Bankr. D. Nev. 1998) .....................................................................................86

x

*In re SAI Holdings Ltd.*,
   No. 06-33227, 2007 Bankr. LEXIS 1051 (Bankr. N.D. Ohio March 26, 2007)...................110

*In re SPC Seller*,
   No. 09-12647, 2010 Bankr. LEXIS 5321 (Bankr. D. Del. Dec. 8, 2010)...............................86

*In re Scott Cable Commc'ns, Inc.*,
   227 B.R. 596 (Bankr. D. Conn. 1998) .........................................................................127, 128

*In re Spielfogel*,
   211 B.R. 133 (Bankr. E.D.N.Y. 1997).................................................................................25

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)...............................................................................................149

*In re SunEdison, Inc.*,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017)..........................................................................62, 150

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) .............................................................................................154

*In re Teligent, Inc.*,
   282 B.R. 765 (Bankr. S.D. N.Y. 2002).......................................................................108, 129

*In re Texaco Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y.),
   *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988) ...................................................................75

*In re U.S. Flow Corp.*,
   332 B.R. 792 (Bankr. W.D. Mich. 2005)............................................................................147

*In re U.S. Truck Co.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ....................................85

*Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Banking Co.)*,
   860 F. 2d 515 (2d Cir. 1988), and (iii)............................................................................ *passim*

*In re United Marine Inc.*,
   197 B.R. 942 (Bankr. S.D. Fla. 1996) ...............................................................................113

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990)............................................................................................................85

*In re Verestar*,
   343 B.R. 444 (Bankr. S.D.N.Y. 2006)................................................................28, 29, 137

*In re Winn-Dixie Stores*,
   356 B.R. 239 (Bankr. M.D. Fla. 2006) ........................................................................... *passim*

xi

*Winstar Holdings, LLC v. Blackstone Grp. L.P.*,
    No. 07 Civ. 4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007)..........................................150

*In re Wood Family Interests, Ltd.*,
    135 B.R. 407 (Bankr. D. Colo. 1989) ................................................................................154

*In re Woodbridge Grp. of Cos., LLC*,
    592 B.R. 761 (Bankr. D. Del. 2018) ....................................................................................48

*In re WorldCom Inc.*,
    Case No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ................... *passim*

*In re WorldCom, Inc. Sec. Litig.*,
    293 B.R. 308 (S.D.N.Y. 2003)............................................................................................153

*In re Young Broad. Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010) ...................................................................................49

**Docketed Orders and Transcripts**

*In re 21st Century Oncology Holdings, Inc.*,
    Case No. 17-22770 (RDD), Hr'g Tr. 43:6-11 (Bankr. S.D.N.Y. Jan. 9, 2018) (ECF No.
    926) .......................................................................................................................................61

*In re Ambac Financial Group, Inc.*,
    Case No. 10-15973 (SCC) (Bankr. S.D.N.Y. Mar. 14, 2012) (ECF No. 938) .................9, 103

*In re Ambac Financial Group, Inc.*,
    Case No. 10-15973 (SCC) (Bankr. S.D.N.Y. May 1, 2013) (ECF No. 1308).......................104

*In re Angelica Corp.*,
    Case No. 17-10870 (JLG), Hr'g Tr. (Bankr. S.D.N.Y. Aug. 29, 2017) ..................................58

*In re Angelica Corp.*,
    Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Aug. 31. 2017) (ECF No. 544)........................72

*In re ARO Liquidation, Inc., et al.*,
    Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. Mar. 30, 2018) (ECF No. 1732) ...................126

*In re Avaya Inc.*,
    Case No. 17-10089 (SMB), (Bankr. S.D.N.Y. Nov. 28, 2017) (ECF No. 1579) .................119

*In re BCBG Max Azria Glob. Holdings, LLC*,
    Case No. 17-10466 (SCC) (SCC) (Bankr. S.D.N.Y. July 25, 2017) (ECF No. 624) ..............68

*In re Caesars Entertainment Operating Company, Inc.*,
    Case No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 17, 2017) (ECF No. 6334) .....................103

WEIL:\97183319\1\73217.0004

*In re Caesars Entertainment Operating Company, Inc.*,
   Case No. 15-01145 (ABG) (Bankr. N.D. Ill. Oct. 6, 2017) (ECF No. 7482) .......................105

*In re Cenveo, Inc.*,
   Case No. 18-22178 (RDD), Hr'g Tr. (Bankr. S.D.N.Y. Jan. 9, 2018) (ECF No. 926)............61

*In re Delphi Corporation, et al.*,
   Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2007) (ECF No. 11386).................102

*In re Delphi Corporation, et al.*,
   Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Jan. 25, 2008) (ECF No. 12359)...........102, 126

*In re Delphi Corporation, et al.*,
   Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Mar. 11, 2009) (ECF No. 13081).................102

*In re Delphi Corporation, et al.*,
   Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (ECF No. 18958) ...............8, 103

*In re Ditech Holding Corp.*,
   Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Aug. 28, 2019) (ECF No. 1240).......................62

*In re Ezra Holdings Limited, et al.*,
   Case No. 17-22405 (RDD) (Bankr. S.D.N.Y. Oct. 18, 2018) (ECF No. 504) .....................126

*In re The Great Atl. & Pac. Tea Co., Inc.*,
   Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (ECF No. 1240)....................146

*In re The Great Atl. & Pac. Tea Co., Inc.*,
   Case No. 10-24549 (RDD)
   (Bankr. S.D.N.Y. Feb. 28, 2012) (ECF No. 3477) ......................................29, 45, 47, 126, 135

*In re The Great Atl. & Pac. Tea Co., Inc.*,
   Case No. 10-24549 (RDD), Hr'g Tr.
   (Bankr. S.D.N.Y. Feb. 27, 2012) (ECF No. 3505) .................................30, 118, 119, 120, 121

*In re iHeartMedia, Inc.*,
   Case No. 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) (ECF No. 2525).......................103

*In re J & B Partners Management LLC, et al.*,
   Case No. 15-22017 (RDD) (Bankr. S.D.N.Y. June 26, 2015) (ECF No. 212).....................126

*In re LBI Media, Inc.*,
   Case No. 18-12655 (CSS) (Bankr.D. Del. Apr. 17, 2019) (ECF No. 839)...........................103

*In re Lehman Bro. Holdings Inc.*,
   Case No. 08-13555 (Bankr. S.D.N.Y. Dec. 6, 2011) (ECF No. 23023)....................30, 48, 135

WEIL:\97183319\1\73217.0004

*In re Lightsquared Inc.*,
   Case No. 12-12080 (SCC) (Bankr. S.D.N.Y Mar. 27, 2015) (ECF No. 2276) ................9, 103

*In re Lightsquared Inc.*,
   Case No. 12-12080 (SCC) (Bankr. S.D.N.Y Dec. 7, 2015) (ECF No. 2433)........................104

*In re MPM Silicones, LLC, et al.*,
   Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. Sept. 11, 2014) (ECF No. 1001) .............66, 126

*In re RDA Holding Co., et al.*,
   Case No. 13-22233 (RDD) (Bankr. S.D.N.Y. June 28, 2013) (ECF No. 478).....................126

*In re Reader's Digest Ass'n, Inc.*,
   Case No. 09-23529, Hr'g Tr. (Bankr. S.D.N.Y. Jan. 15, 2010) (ECF No. 758)....................116

*In re Relativity Fashion, LLC*,
   Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 8, 2016) (ECF No. 1573)................8, 103

*In re Residential Capital, LLC*,
   Case No. 12-12020 (MG), (Bankr. S.D.N.Y. Dec. 11, 2013)(ECF No. 6066).................66, 70

*In re SunEdison, Inc.*,
   Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Jul. 28, 2017) (ECF No. 3735).................9, 103

*In re Sungard Availability Services Capital, Inc, et al.*,
   Case No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 3, 2019) (ECF No. 48).........................118

*In re Teligent, Inc.*,
   Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. Sept. 6, 2002) (ECF No. 1228) ....................129

*In re Tops Holding II Corp., ,*
   Case No. 18-22279 (RDD), Hr'g Tr.
   (Bankr. S.D.N.Y. Sept. 27, 2018) (ECF No. 760) ....................................................63, 64, 149

*In re Tops Holding II Corp.*,
   Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018) (ECF No. 765) ......................126

*In re Toys "R" Us Property Company I, LLC*,
   Case No. 18-31429 (KLP) (Bankr. E.D. Va. Mar. 5, 2019) (ECF No. 1280) ......................108

*In re W.R. Grace & Company*,
   Case No. 01-01139 (JKF) (Bankr. D. Del. Jan. 31, 2011) (ECF No. 26155).................8, 103

*In re W.R. Grace & Company*,
   Case No. 01-01139 (JKF) (Bankr. D. Del. Feb. 3, 2014) (ECF No. 31732) ........................103

**Statutes**

11 U.S.C. § 365.......................................................................................................................52

11 U.S.C. § 503 ........................................................................................................ *passim*

11 U.S.C. § 506 .............................................................................................................13, 14

11 U.S.C. § 507 ........................................................................................................ *passim*

11 U.S.C. § 541 ................................................................................................................. 54

11 U.S.C. § 547 ................................................................................................................... 4

11 U.S.C. § 1114 ........................................................................................102, 103, 105

11 U.S.C. § 1122 ...................................................................................................... *passim*

11 U.S.C. § 1123 ...................................................................................................... *passim*

11 U.S.C. § 1124 ............................................................................................................... 52

11 U.S.C. § 1125 ............................................................................................................... 72

11 U.S.C. § 1126 ........................................................................................................72, 81

11 U.S.C. § 1129 ...................................................................................................... *passim*

11 U.S.C. § 1129(a)(1) ..............................................................................................46, 70

11 U.S.C. § 1129(a)(2) ..................................................................................................... 72

11 U.S.C. § 1129(a)(3) ..............................................................................................73, 74

11 U.S.C. § 1129(a)(4) ..............................................................................................74, 75

11 U.S.C. § 1129(a)(5) ..............................................................................................75, 76

11 U.S.C. § 1129(a)(6) ..................................................................................................... 76

11 U.S.C. § 1129(a)(7) ......................................................................................76, 77, 80

11 U.S.C. § 1129(a)(8) ..........................................................................................80, 106

11 U.S.C. § 1129(a)(9) ............................................................................................ *passim*

11 U.S.C. § 1129(a)(10) ..................................................................................83, 84, 127

11 U.S.C. § 1129(a)(11) .......................................................................................... *passim*

11 U.S.C. § 1129(a)(12) ....................................................................................101, 102

11 U.S.C. § 1129(a)(13) ....................................................................................102, 105

WEIL:\97183319\1\73217.0004

11 U.S.C. § 1129(a)(14) ................................................................................................... 105

11 U.S.C. § 1129(a)(15) ................................................................................................... 105

11 U.S.C. § 1129(a)(16) ........................................................................................... 105, 106

11 U.S.C. § 1129(b) ..................................................................................................... *passim*

11 U.S.C. § 1129(d) ........................................................................................................ 106

11 U.S.C. § 1141 ......................................................................................................... *passim*

28 U.S.C. § 1334 .............................................................................................................. 139

28 U.S.C. § 1930 ...................................................................................................... 101, 102

31 U.S.C. § 3717 ............................................................................................................. 102

Fed. R. Bankr. P. 3012 ..................................................................................................... 14

Fed. R. Bankr. P. 3017 ..................................................................................................... 72

Fed. R. Bankr. P. 3018 ..................................................................................................... 72

Fed. R. Bankr. P. 9019 ............................................................................................... *passim*

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ...................................................................................... 46, 72

S. Rep. No. 95-989 (1978) ............................................................................................... 46

*James S. Cole, The "Carve Out" from Liens and Priorities to Guarantee Payment of Professional Fees in Chapter 11,* 1993 Det. C. L. Rev. 1499 (1993) .................................... 137

*Richard Levin, Almost All You Ever Wanted to Know About Carve-Out,* 76 Am. Bankr. L.J. 445 (2002) ............................................................................................................................ 137

WEIL:\97183319\1\73217.0004

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] submit this Memorandum of Law (the "**Memorandum**"), the *Declaration of Brian J. Griffith in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Liquidation of Sears Holdings Corporation and its Affiliated Debtors* (the "**Griffith Declaration**"), *Declaration of William Murphy in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Liquidation of Sears Holdings Corporation and its Affiliated Debtors* (the "**Murphy Declaration**"), *Declaration of William L. Transier in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Liquidation of Sears Holdings Corporation and its Affiliated Debtors* (the "**Transier Declaration**"), and the *Declaration of Craig E. Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (the "**Voting Certification**"), each as filed contemporaneously herewith in support of confirmation of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated September 13, 2019 (ECF No. 5139) (as may be further modified, amended, or supplemented, the "**Plan**"), including the Plan Supplement, dated July 26, 2019 and August 2, 2019 (ECF Nos. 4632, 4703) (as the same may be amended, modified, supplemented, or restated, the "**Plan Supplement**"), pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement (each as defined herein), as applicable.

WEIL:\97183319\1\73217.0004

## PRELIMINARY STATEMENT

1.     Less than twelve months since the commencement of these immensely complex and massive chapter 11 cases, the Debtors are seeking confirmation of a chapter 11 plan to wind down the Estates with support of the Creditors' Committee and the Debtors' largest unsecured creditor at each Debtor, PBGC.  *See* PBGC Statement in Support; Creditors' Committee Statement in Support.[3]  Confirmation and consummation of the Plan is in the best interests of the Debtors' stakeholders and far better than the alternative of a chapter 7 liquidation.  The Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Court should overrule any Objections to the Plan and confirm the Plan.

2.     Throughout these chapter 11 cases, the Debtors have worked tirelessly on a Court-approved path to maximize the value of the Debtors' Estates.  Shortly after filing under chapter 11, the Debtors commenced a robust global bidding and auction process that ultimately resulted in the sale of substantially all of the Debtors' assets to Transform Holdco LLC ("**Transform**") in February of this year (the "**Sale Transaction**")—following approximately eight (8) weeks of intense negotiations and a heavily contested three-day trial.  Pursuant to the Sale Transaction, the Debtors were able to preserve tens of thousands of jobs and the continuation of the historic Sears and Kmart businesses on a smaller, more-efficient footprint for the benefit of many of the Debtors' stakeholders, including employees, landlords, utilities, vendors, and taxing-authorities.

---

[3] *Pension Benefit Guaranty Corporation's Statement in Support of Confirmation of the Modified Second Amended Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 5138) ("**PBGC Statement in Support**"); *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* ("**Creditors' Committee Statement of Support**").

3.      Following approval of the Sale Transaction, two disputes arose each with an ability to significantly impact the Debtors' cases: certain disputes (i) between the Debtors and Wilmington Trust, N.A., as collateral agent for certain prepetition second-lien debt on its own behalf and on behalf of all other Prepetition Second Lien Credit Parties (as defined in the DIP Order) ("**Wilmington Trust**"), Cyrus Capital Partners, L.P. ("**Cyrus**"), and ESL Investments, Inc. ("**ESL**," collectively with Wilmington Trust and Cyrus, the "**Second Lien Holders**") with respect to the value of certain alleged postpetition administrative claims under section 507 (b) of the Bankruptcy Code (the "**507(b) Priority Claims**"), if any, and (ii) between the Debtors and Transform in connection with the Asset Purchase Agreement (the "**APA Disputes**").  The Debtors have prioritized the resolution of such disputes prior to the Confirmation Hearing.  At the hearing on July 31, 2019, the Court ruled in the Debtors' favor regarding 507(b) Priority Claims, determining that the value of the Second Lien Holders' 507(b) Priority Claims is $0.  As a result, the Debtors have no liability or obligations with regard to the Second Lien Holders' 507(b) Priority Claims.  Moreover, after the conclusion of several hearings on the APA Disputes and multiple settlement negotiations throughout, many of the APA Disputes have been resolved or adjudicated by the Court in the Debtors' favor.

4.      Of the 1.2 million parties who received notice of the Plan and Confirmation Hearing, there are thirty-one (31) outstanding objections to the Plan, with six (6) joinders (the "**Objections**").  Substantially all of the Objections focus on the Debtors' ability to satisfy Administrative Expense Claims in accordance with section 1129(a)(9) of the Bankruptcy Code or the Plan's feasibility in accordance with section 1129(a)(11) of the Bankruptcy Code.  As the Debtors will prove, allegations of administrative insolvency are incorrect.  The Objecting parties fail to recognize that the Debtors have sufficient assets to satisfy Administrative Expense Claims,

WEIL:\97183319\1\73217.0004

including significant litigation assets, and at most could require additional time to monetize their assets to satisfy administrative claims. Conversely, conversion or a failure to confirm the Plan would be devastating for administrative and other creditors. The Debtors' assets include:

- Approximately $50.1 million in unrestricted cash available for distribution on September 21, 2019. *See* Griffith Decl., ¶ 55.

- A total of approximately $33.4 million in the aggregate of projected proceeds from the sale of the Calder Statue sculpture (the "**Calder Net Proceeds**"), the sale of the Debtors' remaining real estate (the "**Real Estate Proceeds**"), the receipt of certain 2017 EDA Funds if the School District dispute is settled (the "**2017 EDA Funds**"), and certain other claims (the "**De Minimis Assets**"). *See* Griffith Decl., ¶ 56.

- Approximately $40.5 million in additional cash proceeds that Transform owes the Debtors in connection with the APA Disputes. *See* Griffith Decl., ¶ 73.

- Approximately $97 million owed by Transform for the assumptions of 503(b)(9) Claims. *See* Asset Purchase Agreement, § 2.3(k)(iv); Murphy Decl., ¶ 33; Griffith Decl., ¶ 61.

- Significant litigation assets including (i) proceeds from avoidance action arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law (collectively, the "**Preference Actions**"), (ii) proceeds from litigation in connection with certain prepetition related party transactions, including recoveries on account of the Specified Causes of Action claims against ESL and related parties (the "**ESL Litigation**") and (iii) proceeds from litigation and/or settlements against available D&O Policies on account of Preserved Causes of Action (the "**D&O Litigation**"). *See* Griffith Decl., ¶¶ 62-71; Transier Decl., ¶¶ 26-29.

5.    In the aggregate, the Debtors sources above amount to approximately $173.5 million plus proceeds from the Preference Actions, ESL Litigation, and D&O Litigation, which the Debtors believe will be more than enough to satisfy the Debtors' estimate of outstanding Claims by the Effective Date:[4]

---

[4] The Debtors believe that pursuant to section 2.3(k)(ix) of the Asset Purchase Agreement, Transform is obligated to assume approximately $97 million on account of 503(b)(9) Claims. The $90 million reflected herein ties to the $90

| Sources | | |
|---|---|---|
| Cash on Hand at 9/18/19 | $ | 50.1 |
| Calder Net Proceeds | | 10.0 |
| Real Estate Proceeds | | 13.1 |
| De Minimis Assets | | 5.3 |
| 2017 EDA Funds | | 5.0 |
| Transform 503(b)(9) Obligations | | 90.0 |
| **Total Sources** | **$** | **173.5** |

| Uses | Low Claims | | High Claims | |
|---|---|---|---|---|
| Liquidating Trust funding | $ | (25.0) | $ | (25.0) |
| Remaining estate professional fees | | (9.0) | | (9.0) |
| 503(b)(9) | | (90.0) | | (155.0) |
| Other Admin Claims | | (50.0) | | (50.0) |
| Secured | | (18.0) | | (18.0) |
| Priority Tax | | (15.0) | | (18.0) |
| Priority Non-Tax | | (3.0) | | (3.0) |
| **Total Uses** | **$** | **(210.0)** | **$** | **(278.0)** |
| | | | | |
| **Total Potential Shortfall** | **$** | **(36.5)** | **$** | **(104.5)** |

6.      To address the timing mismatch of the Debtors' assets and administrative claims, the Debtors intend to proceed with confirmation now and prosecute litigation with the oversight of the Litigation Designees who will be appointed effectively immediately upon entry of the Confirmation Order (and, on the Effective Date, will become the initial members of the Liquidating Trust Board), but intend to go effective once the Debtors either reconcile or settle with certain Administrative Expense Claimants.   But the Debtors believe and will prove at the Confirmation Hearing that they have been and remain administratively solvent.  The Debtors have met with certain Administrative Expense Claim creditors and proposed a settlement to such creditors in exchange for accepting a reduced but accelerated recovery on their Administrative

---

million of estimated 503(b)(9) Claims; to the extent the 503(b)(9) Claims are in excess of $90 million, Transform shall be liable to assume up to $97 million on account of 503(b)(9) Claims pursuant to the Asset Purchase Agreement.

WEIL:\97183319\1\73217.0004

Expense Claims.  A construct for Administrative Claim settlements is attached hereto as **Exhibit B**

(the "**Administrative Expense Claims Settlement Proposal**").  Negotiations among the Debtors

and a group of ad hoc administrative creditors holding certain asserted Administrative Expense

Claims are ongoing.  In the Debtors' view, and as the evidence demonstrates, such a settlement is

"nice to have"—not a "must have."

      7.    To be clear, the Debtors are not seeking confirmation dependent on

settlements with Administrative Expense Claimants.  The Debtors are presenting evidence in

support of confirmation and have constructed a plan structure that will allow the Debtors to pay

Administrative Expense Claims in full when their assets are monetized, including preference

recoveries, potential settlements with insurers with respect to claims against the D&O Policy, and

certain prepetition related party transaction claims against ESL.  The Debtors firmly believe that

confirming these cases and allowing litigation to proceed under the oversight of the Liquidating

Trust Board[5] and at most delaying the Effective Date for a short period, will benefit all stakeholders

and maximize recoveries.  The Debtors believe that they will begin receiving proceeds of certain

Assets immediately following confirmation, and will keep the Court apprised of developments and

progress towards the Effective Date to ensure transparency and no undue delay between

confirmation and the Effective Date.  In the meantime, reconciliation and other winddown efforts

will continue.

      8.    Specifically, the Debtors are now seeking confirmation of the Plan, which

contemplates an orderly wind down of the Debtors' remaining assets and distribution in

---

[5] As set forth in the proposed Confirmation Order, the Debtors intend to grant joint standing to the Creditors' Committee to prosecute certain litigation (the Jointly Asserted Causes of Action, defined below), subject to the oversight of Litigation Designees (defined below) appointed by the Debtors and the Creditors' Committee.  The Litigation Designees will serve as fiduciaries for the purposes of overseeing the investigation, prosecution and/or settlement of the Jointly Asserted Causes of Action and on the Effective Date will become the initial members of the Liquidating Trust Board.

WEIL:\97183319\1\73217.0004

accordance with the hard-fought Global Settlement, which is a series of separate but interdependent settlements described in Section 9.2 of the Plan—the PBGC Settlement, the Plan Settlement, and the Creditors' Committee Settlement—a cornerstone of the Plan. Pursuant to the Global Settlement, the Plan provides for, among other things, (i) the settlement of issues surrounding substantive consolidation; (ii) settlement of the PBGC Claims and any corresponding litigation; and (iii) settlement of governance issues relating to the Liquidating Trust Board. The settlements maximize value to all creditors by preserving the Debtors' economic resources and avoiding costly and time-consuming litigation that would unnecessarily delay confirmation of the Plan. Put differently, if the Global Settlement is not approved, the Debtors' remaining Estate funds will be unnecessarily drained by protracted litigation and put at significant risk, reducing overall recoveries to creditors, and resulting in a worse alternative for all stakeholders, as evidenced by the Debtors' Liquidation Analysis. As the Debtors will demonstrate at the Confirmation Hearing, confirmation of the Debtors' chapter 11 plan is the most efficient path forward for the Debtors and will maximize value for all creditors.

9. The Plan satisfies all the necessary requirements for confirmation. As reflected in the Voting Certification, the Plan has been accepted by Class 3 (PBGC Claims) (at all Debtors), Class 4 (General Unsecured Claims) (at certain Debtors[6]), Class 4(a) (General Unsecured Claims) (at Kmart Stores of Illinois LLC and Kmart of Washington LLC), and Secured Claims (at all Debtors except Sears Protection Company (Florida), L.L.C. and Sears, Roebuck de Puerto Rico, Inc.). Pursuant to section 1129(b) of the Bankruptcy Code, the Debtors can "cram

---

[6] Big Beaver of Florida Development, LLC, Big Beaver of Florida Development, LLC, Innovel Solutions, Inc., KBL Holding Inc., MaxServ, Inc., Sears Brands Business Unit Corporation, Sears Buying Services, Inc., Sears Development Co., Sears Holdings Publishing Company, LLC., Sears Home & Business Franchises, Inc., Sears Insurance Services, L.L.C., Sears Procurement Services, Inc., Sears Protection Company, Sears Protection Company (PR) Inc., ServiceLive Inc., SHC Desert Springs, LLC, SHC Licensed Business LLC, SHC Promotions LLC, SRe Holding Corporation, STI Merchandising, Inc., SYW Relay LLC, Troy Coolidge No.13, LLC, and Wally Labs LLC.

WEIL:\97183319\1\73217.0004

down" any non-accepting classes.  Importantly, the Voting Certification establishes that nearly all of the unsecured creditors at each Debtor classes accept the Plan in numerosity—89.94% of the General Unsecured Claimants voted to accept the Plan at Kmart Corporation, 85.5% of the General Unsecured Claimants voted to accept the Plan at Sears Holdings Corporation, 100% of the General Unsecured Claimants (other than Guarantee Claims) at Kmart of Illinois LLC and Kmart of Washington LLC, and 89.29% of the General Unsecured Claimants voted to accept the Plan at all other Debtors ("**All Other Debtors**").  *See* Voting Certification, Exhibit A.

10.    While the unsecured creditor classes at Kmart Corporation, Sears Holdings Corporation, and "All Other Debtors" do not meet the "value" requirement and are not "accepting" classes, this is solely because the percentage in value accepting each class is overwhelmed by unsecured notes and second lien deficiency claims that are largely owned by the Second Lien Holders, who are litigating with the Debtors and their main objective is to get a second bite at the apple on the Court's ruling against their 507(b) Priority Claims.  *See* Voting Certification, ¶ 10.

11.    Other than the objections that focus on the payment of Administrative Expense Claims, there are few substantive Objections to the Plan.  Only one Objection[7] relates to the PBGC Settlement, only three (3) parties[8] object to the Plan Settlement (and none take issue with the Plan Settlement Premiums), and not a single Objection takes issue with the Creditors' Committee Settlement.  The other Objections largely relate to the release and injunction provisions in the Plan, or certain other one-off issues.  A summary of the Objections and the Debtors'

---

[7] *Objection to Confirmation of Plan Objection of Wilmington Trust, National Association, as Indenture Trustee to Confirmation of Debtors' Joint Modified Second Amended Chapter 11 Plan of Liquidation* (ECF No. 4724) ("**Wilmington Trust Objection**").

[8] *Objection of Community Unit School District 300 to Confirmation of the Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 4713) ("**School District Objection**")]; Wilmington Trust Objection; and *Cyrus Capital Partners, L.P.'s Limited Objection to Confirmation of Modified Second Amended Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 4731) ("**Cyrus Objection**").

WEIL:\97183319\1\73217.0004

responses is attached hereto as **Exhibit A** (the "**Objection Response Chart**").   All other components of the Plan are uncontested.

12.     As described more fully herein, and as will be demonstrated at the Confirmation Hearing, the Objections are without basis and should be summarily overruled.   The Debtors will demonstrate at the Confirmation Hearing that the Plan should be confirmed, that the Debtors will be able to pay Administrative Expense Claims in accordance with section 1129(a)(9) of the Bankruptcy Code, and that the Plan is feasible in accordance with section 1129(a)(11) of the Bankruptcy Code.

## FACTS[9]

### A.    General Background

13.     At the outset of these chapter 11 cases and in the wake of other large retail bankruptcies, the Debtors were acutely aware that liquidation was a real possibility.   To prevent a value-destructive, full-scale liquidation, the Debtors determined that the best way to maximize value was to conduct GOB Sales (defined below) while evaluating possible paths forward.   To allow the Debtors to operate their businesses in chapter 11 and evaluate their store base while simultaneously running a sale and auction process, the Debtors obtained approval for the debtor-in-possession financing consisting of: (i) a $1.83 billion DIP ABL Facility with $300 million of new incremental capacity, and (ii) a $350 million new money Junior DIP Facility.   Understanding the inherent risk of administrative insolvency, the Debtors also specifically negotiated with their DIP and secured lenders for a first-of-its-kind reserve of up to $240 million funded from

---

[9] The pertinent facts set forth in the Disclosure Statement, the Plan, and the other pleadings and declarations filed by the Debtors are also incorporated herein as if fully set forth herein.

Prepetition Unencumbered Collateral dedicated for payment of estate wind down costs at the Debtors' discretion. *See* DIP Order, ¶ 23.

14.    Shortly after the commencement date, on October 26, 2018, the Debtors obtained approval of procedures for store closing "going out of business" sales ("**GOB Sales**") and immediately commenced GOB Sales at 142 stores to generate liquidity needed to sustain the business long enough to allow for a sale process.  On November 19, 2018, the Debtors obtained approval of global bidding and auction procedures (ECF No. 816).  In late November, the Debtors, with the assistance of their advisors, commenced the sale process, dual tracking a going concern sale process and a real estate sale process for both core and non-core properties, while simultaneously soliciting liquidator bids and preparing for wholesale liquidation in the event a going concern sale could not be achieved.

15.    Over the span of three months, the Debtors engaged in a public, transparent, and thorough sale process, led by Lazard Frères & Co., the Debtors' investment banker.  Although numerous indications of interest were submitted and reviewed, Transform provided the only going-concern bid for the entire enterprise.  After extensive negotiations, the Restructuring Committee's rejection of Transform's bid on three separate occasions (due to various insufficiencies in the bid), and three days of a public auction, the Debtors executed an Asset Purchase Agreement with Transform on January 17, 2019.  After three (3) days of trial, on February 8, 2019, this Court approved Asset Purchase Agreement and the sale of substantially all of the Debtors' assets to Transform (ECF No. 2507).  On February 11, 2019, the Debtors consummated the Sale Transaction (the "**Closing**").

WEIL:\97183319\1\73217.0004

B.      **Post-Closing Disputes**

1.      **Asset Purchase Agreement Disputes with Transform**

16.      The APA Disputes led to the filing of multiple pleadings by both the Debtors and Transform following the Sale Transaction.  Certain of the issues were resolved, in whole or in part, by settlement as well as by the Court's ruling on April 18, 2019.  On June 18, 2019, the Court entered a stipulation between the Debtors and Transform setting a briefing schedule to address all of the outstanding APA Disputes (ECF No. 4258).

17.      On July 11, 2019, the Court made additional rulings on certain of those disputes, including a ruling that Transform assumed both (i) $166 million in "Other Payables" and (ii) all payment obligations with respect to "Ordered Inventory."  As part of the ongoing negotiations, the parties met in person on July 18, 2019 and August 5, 2019 to negotiate, and continued to negotiate the outstanding issues in the ensuing weeks.  On September 12, 2019, the Court ruled that (i) Transform was ***not*** entitled to a dollar-for-dollar reduction of $22.5 million from Aggregate DIP Shortfall Amount because there was no "available cash" at close to pay down the DIP as that term is used in the definition of Aggregate DIP Shortfall, (ii) that the Debtors did not violate the ordinary course covenant when it delayed certain accounts payable in the week prior to Closing, and (iii) that any mechanics' liens that arose pre-closing are the Debtors' responsibility.  The following remaining three (3) issues are currently unresolved:

- Prepaid Inventory Shortfall Amount.  The Debtors argued that they delivered an approximately $63 million Prepaid Inventory Shortfall Amount.  Transform argued that the Debtors delivered at least a $71 million Prepaid Inventory Shortfall Amount.  Accordingly, approximately $8 million is in dispute between the parties.

  At the July 11, 2019 hearing, the Court rejected Debtors' methodology of applying a GAAP accounting methodology to determine the value of Prepaid Inventory at the Closing and held that the APA requires an actual valuation methodology.  The Court

further held that the parties should apply that approach, including giving Debtors' credit for any actual Prepaid Inventory that was not accounted for using Debtors' GAAP approach, and if the parties are unable to resolve this issue, an examiner will be appointed.

- Specified Receivables Shortfall Amount.  The Debtors argued that the Asset Purchase Agreement obligation to deliver $255.2 million was satisfied by delivery of approximately $292 million of Specified Receivables at Closing, and that Transform's valuation and validation of the Specified Receivables does not adhere to Sears's accounting practices in the periods up to and including the Closing. Transform argued that the Debtors did not deliver the agreed portfolio of Specified Receivables, arguing the Debtors were short on Specified Receivables delivered by approximately $77 million. Accordingly, approximately $77 million in dispute between the parties.

  At the July 11, 2019 hearing, the Court found that the Asset Purchase Agreement required the delivery of *actual* account receivables and that Specified Receivables that had already been paid should not be included in the analysis, and that the same methodology for calculating the amount of Specified Receivables should be used both at execution and closing.  At the parties request, the Court will appoint an examiner to investigate and determine the amount of "actual accounts receivables" delivered at Closing.

- Cash Held by Transform.  Transform argued that all of the remaining approximately $40.5 million in cash held by Transform are set off by obligations owed by the Debtors to Transform.  The Debtors argued that there are likely appropriate setoffs within Transform's analysis, but the amounts are ever-changing and Transform has not provided sufficient information to substantiate its claims.  Accordingly, approximately $40.5 million remains in dispute.

  At the July 11, 2019 hearing, the Court directed the parties to resolve the issue.  The Court further ordered that an examiner would be appointed if the parties are unable to resolve this issue, with both sides paying for half and 9 percent interest being applied from April 15, 2019 on the obligations that run either way.

18.    Overall, the Debtors' estimate that Transform owes the Debtor approximately $40.5 million in cash and is liable for an additional $108 million on account of 503(b)(9) Claims and Other Administrative Expense Claims (defined below) under the Asset

Purchase Agreement. *See* Griffith Decl., ¶ 73; Murphy Decl., ¶ 60. But, as further described herein, even in a "worse case scenario" where Transform refuses to pay the Debtors remaining amounts owed or assume liabilities they are required to assume under the Asset Purchase Agreement, the Debtors believe there will be sufficient funds (including proceeds from valuable litigation claims) to pay Administrative Expense Claims over time. *See* Griffith Decl., ¶¶ 77-78; Murphy Decl., ¶ 60;Transier Decl., ¶ 29.

### 2.     Section 507(b) Claims Dispute and Section 506(c) Surcharges

19.     Pursuant to the DIP Order entered on November 30, 2019 (ECF No. 955), certain 507(b) Priority Claims were granted to second lien holders—including Cyrus, ESL, and Wilmington Trust, N.A.. The Second Lien Holders contended that the 507(b) Priority Claims totaled over $680 million.[10] On May 26, 2019, the Debtors' filed the *Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* (ECF No. 4034) (the "**507(b) Estimation Motion**"), asserting that the Second-Lien Holders' 507(b) Priority Claims are $0, and in the event that the Court found any 507(b) Priority Claims had value, they were eclipsed by surcharges pursuant to section 506(c) of the Bankruptcy Code (the "**506(c) Surcharge**").

20.     On July 31, 2019, the Court (i) ruled that the value of the Second-Lien Holders' 507(b) Priority Claims is $0, and (ii) a denied the imposition of the requested 506(c) Surcharges (as defined above) on the Second-Lien Holders' collateral. On August 5, 2019, the Court entered the *Order Determining the Amount of Second-Lien Holders' Section 507(b)*

---

[10] ESL asserted approximately $509.7 million of 507(b) Priority Claims, *see* ECF No. 4273. Wilmington Trust asserted approximately $91.9 million of 507(b) Priority Claims on behalf of itself and all other Prepetition Second Lien Credit Parties, *see* ECF No. 4280. Cyrus asserted approximately $78.9 million of 507(b) Priority Claims, *see* ECF No. 4313.

WEIL:\97183319\1\73217.0004

*Administrative Claims Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure* (ECF No. 4740) the "**507(b) Order**").

21.    The Second-Lien Holders subsequently appealed the 507(b) ruling to the district court, and that appeal is pending (the "**507(b) Appeal**").  To preserve their rights, the Debtors also appealed the 506(c) Order and the rulings contained therein to the District Court, but in the interest of preserving Estate resources, the Debtors intend to seek a stay of the 506(c) appeal pending a determination of the 507(b) Appeal.

**C.    Plan Solicitation**

22.    On June 28, 2019, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4389) and the *Disclosure Statement to the Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4390).

23.    On the same day, the Court entered the *Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan, and (V) Granting Related Relief* (ECF No. 4392) (together with any schedules and exhibits thereto, the "**Disclosure Statement Order**").

24.    Following the Court's entry of the Disclosure Statement Order, Prime Clerk LLC, the Debtors' claims and noticing agent ("**Prime Clerk**"), distributed the solicitation packages and notices of the hearing on confirmation of the Plan.  *See* Affidavit of Service (ECF No. 4545).  On July 3, 2019, the Debtors filed the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4476) and the *Disclosure Statement to the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings*

14

*Corporation and Its Affiliated Debtors* (ECF No. 4478) (the "**Disclosure Statement**"), reflecting

certain minor non-substantive modifications.  On August 2, 2019, the Debtors filed the *Modified*

*Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*

(ECF No. 4704) Plan, reflecting additional non-substantive technical modifications.

Contemporaneously herewith, the Debtors filed the Plan.  In addition, the Debtors published a

notice substantially similar to the Confirmation Hearing Notice (the "**Publication Notice**") in the

national edition of *The New York Times*, on July 10, 2019.  *See* Affidavit of Publication (ECF No.

4534).

       25.     On July 26, 2019, the Debtors filed the Plan Supplement, consisting of (i) a

schedule listing individual or Entities who are not "Released Parties" or "Related Parties" as

defined and/or used in section 1.134, 1.135, 15.9(a), and 15.9(b) under the Plan; (ii) a schedule of

assumed executory contracts; (iii) disclosure of the Toggle Plan Intercompany Loan Interest Rate;

(iv) disclosure of the process for selecting the Liquidating Trustee; and (v) disclosure of the

Primary Trust Litigation Counsel (ECF No. 4632).  On August 2, 2019, the Debtors filed the

substantially final form of the Liquidating Trust Agreement (ECF No. 4703).  The Plan

Supplement and Liquidating Trust Agreement were served on the Master Service List.  *See*

Affidavits of Service (ECF Nos. 4670, 4782).

       26.     Pursuant to the Disclosure Statement Order, the voting deadline for the Plan

was August 2, 2019 at 5:00 p.m. (prevailing Eastern Time).  On August 9, 2019, the Debtors filed

a notice that provided that the Debtors would continue to accept properly executed and completed

Ballots until September 3, 2019 at 5:00 p.m. (prevailing Eastern Time) (ECF No. 4807).  The

WEIL:\97183319\1\73217.0004

voting results, as reflected in the Voting Certification, are summarized for the following four (4)

Debtors as follows:[11]

Kmart Corporation ("**Kmart Corp.**")

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| 2 (Secured Claims) | 85% | 82% | 15% | 18% |
| 3 (PBGC Claims) | 100% | 100% | 0% | 0% |
| 4 (General Unsecured Claims) | 21.55% | 89.94% | 78.45% | 10.06% |
| 5 (ESL Unsecured Claims) | *None of the Creditors in Class 5 voted on the Plan. Accordingly, the Debtors will request to cram down the Plan on Class 5.* | | | |

Kmart Stores of Illinois LLC ("**Kmart IL**")

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| 2 (Secured Claims) | 100% | 100% | 0% | 0% |
| 3 (PBGC Claims) | 100% | 100% | 0% | 0% |
| 4(A) (General Unsecured Claims (other than Guarantee Claims)) | 100% | 100% | 0% | 0% |
| 4(B) (Guarantee Claims) | 0% | 0% | 100% | 100% |
| 5 (ESL Unsecured Claims) | *None of the Creditors in Class 5 voted on the Plan. Accordingly, the Debtors will request to cram down the Plan on Class 5.* | | | |

Kmart of Washington LLC ("**Kmart of Washington**")

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|

---

[11] The voting details for all 53 Debtors can be found in the Voting Declaration.

| | | | |
|---|---|---|---|
| 2<br>(Secured Claims) | 100% | 100% | 0% | 0% |
| 3<br>(PBGC Claims) | 100% | 100% | 0% | 0% |
| 4(A)<br>(General Unsecured Claims<br>(other than Guarantee<br>Claims)) | 100% | 100% | 0% | 0% |
| 4(B)<br>(Guarantee Claims) | 0% | 0% | 100% | 100% |
| 5<br>(ESL Unsecured Claims) | *None of the Creditors in Class 5 voted on the Plan. Accordingly, the Debtors will request to cram down the Plan on Class 5.* | | | |

Sears Holdings Corporation ("**Sears Holdings**" or "**SHC**")

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| 2<br>(Secured Claims) | 86% | 85% | 14% | 15% |
| 3<br>(PBGC Claims) | 100% | 100% | 0% | 0% |
| 4<br>(General Unsecured Claims) | 25.70% | 85.50% | 74.30% | 14.50% |
| 5<br>(ESL Unsecured Claims) | *None of the Creditors in Class 5 voted on the Plan. Accordingly, the Debtors will request to cram down the Plan on Class 5.* | | | |

## **ARGUMENT**

27.     The remainder of this Memorandum is divided into three (3) parts. Part I describes and demonstrates satisfaction of the standard for approval of the PBGC Settlement, Plan Settlement, and the Creditors' Committee Settlement (collectively, the "**Global Settlement**"), contained in the Plan. Part II addresses the applicable requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each such requirement and achievement of the objectives of chapter 11. Part III addresses the Debtors' response to Objections, demonstrating why they should be overruled.

## I.    GLOBAL SETTLEMENT

28.    <u>Part I</u> of this memorandum is divided into three (3) subsections. <u>Subsection A</u> provides an overview of the Global Settlement.  <u>Subsection B</u> addresses (i) the standard under Bankruptcy Rule 9019 for approval of a settlement under a chapter 11 plan (the "**9019 Standard**"), (ii) the standard governing substantive consolidation under the Second Circuit's opinion in *Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Banking Co.)*, 860 F. 2d 515 (2d Cir. 1988) ("***Augie/Restivo***"), and (iii) why the 9019 Standard is the appropriate legal standard to be applied for approval of the Plan Settlement.  <u>Subsection C</u> demonstrates satisfaction of the 9019 Standard and *Iridium* factors with respect to each settlement.

29.    The prompt, efficient conclusion of the Debtors' chapter 11 cases is premised on the proposed comprehensive resolution and settlement of difficult and diverse issues proposed in the Global Settlement, comprised of the separate but interdependent PBGC Settlement, the Plan Settlement, and Creditors' Committee Settlement.  Importantly, the Global Settlement is supported by both the fiduciary appointed to represent all unsecured creditors—the Creditors' Committee and one of the largest creditors in these chapter 11 cases—PBGC.  The Global Settlement seeks to resolve all aspects of these chapter 11 cases without any unnecessary litigation.  As detailed below, the Debtors respectfully submit that this global resolution fairly resolves material and complex issues without potentially protracted and costly litigation and, in turn, provides improved recoveries to creditors as a result.  It should be approved in its entirety.

### A.    Overview of the Global Settlement

30.    The Global Settlement includes compromises made by and between the Debtors, PBGC, and the Creditors' Committee.  At a high level, the PBGC Settlement resolves issues surrounding the complex relationship between PBGC and the Debtors, including the termination of Pension Plans, various assertable claims by PBGC, PBGC's role at KCD, and the

WEIL:\97183319\1\73217.0004

significant joint and several liabilities against each Debtor, in order to maximize value for all

creditors.    The Plan Settlement resolves potentially extremely costly efforts related to

intercompany claims and issues of substantive consolidation.    And the Creditors' Committee

Settlement resolves the Debtors' issues with the Creditors' Committee, namely regarding post-

Effective Date governance and consent issues, and achieves consensus with and support of the

Debtors' major creditor constituency.    Below are summaries of the key terms of the each

settlement:[12]

      i.    ***PBGC Settlement.***

      31.    The key terms of the PBGC Settlement by and among the Debtors and

PBGC are as follows:

    a.    PBGC agrees to support and vote in favor of the Plan.

    b.    The Debtors and PBGC agreed to a consensual termination of the Pension Plans, effective January 31, 2019.

    c.    PBGC will receive an Allowed General Unsecured Claim in the amount of $800 million in satisfaction of the PBGC UBL Claim, reduced from the approximately $1.4 billion that could be asserted by PBGC at each Debtor.

    d.    On the Effective Date, PBGC will receive the PBGC Liquidating Trust Priority Interest, which shall entitle PBGC to and be secured by the first $97.5 million of Net Proceeds of: (i) Specified Causes of Action, after payment in full satisfaction of all senior Claims (or maintenance of amounts in the Disputed Claims Reserve on account of any Disputed Claims); and (ii) Other Causes of Actions arising under Chapter 5 of the Bankruptcy Code, after payment in full satisfaction of all senior Claims (or maintenance of amounts in the Disputed Claims Reserve on account of any Disputed Claims).

    e.    PBGC will grant a full release of all pension funding and unfunded benefit liability claims against all Debtors, other than the agreed PBGC Claims.

---

[12] This overview is qualified in its entirety by reference to the Plan and Disclosure Statement, as applicable.

f.      PBGC will not assert the Termination Premiums claims pursuant to ERISA section 4006(a)(7) against any Debtor, including a claim in bankruptcy.

g.      PBGC agreed to all reasonably requested action by the Debtors to ensure that any claim of KCD against the Debtors is waived in full and to waive the assertion of any administrative claim in these chapter 11 cases.

h.      Mutual releases of any and all Claims or Causes of Action against PBGC and/or the Pension Plans, and the Debtors, respectively, other than PBGC's and the Debtors' rights to enforce the rights and obligations under the PBGC Settlement.

*See* Murphy Decl., ¶ 9.

| Estate / Creditor Benefits of the PBGC Settlement | | |
| --- | --- | --- |
| | **No PBGC Settlement** | **PBGC Settlement** |
| PBGC claims | • $1.4 billion of joint and several liability<br><br>• $340 million of Termination Premium Claims | • $97.5 million PBGC Liquidating Trust Priority Interest<br>• $800 million General Unsecured Claim (to be asserted on a consolidated basis) |
| KCD Administrative Expense Claim | • $146 million | • PBGC agrees to take all reasonable action requested by the Debtors to cause KCD waive all of the $146 million |
| General Unsecured Creditor Recovery (at all Debtors aside from Kmart Corp.) | • $0 | • $53.5 million |
| Settlement of Issues | • Potential costly and protracted litigation | • Settlement |

32.     Originally, pursuant to the PBGC Settlement, PBGC in exchange for an $80 million priority interest and $800 million General Unsecured Claim, would agree to withdraw all objections to the Sale and support the Debtors' Sale Transaction and eventual chapter 11 plan. *See* Murphy Decl., ¶ 7.  In addition, the PBGC Settlement contemplated the resolution of multiple complex and intertwined issues that would have likely complicated and prolonged confirmation of the Debtors' Plan.  Negotiations were again resumed in advance of the Disclosure Statement

WEIL:\97183319\1\73217.0004

hearing, when the PBGC Settlement was amended to allow for, among other things, the settlement

of substantive consolidation (as reflected in the Disclosure Statement). As a result of such

negotiations, the PBGC Liquidating Trust Priority Interest was increased to $97.5 million and

PBGC agreed to receive one single recovery on account of the joint and several general unsecured

claim—rather than seeking a recovery at each individual Debtor and agree to the Plan Settlement.

*See* Murphy Decl., ¶ 8.  This consensual amendment finalized the PBGC Settlement and secured

PBGC's support of the Plan Settlement and the Plan Settlement Premium.

### ii.    *Plan Settlement.*

33.    The Plan Settlement seeks to resolve inter-estate and inter-creditor issues in

relation to intercompany claims.  The key terms of the Plan Settlement are as follows:

a.    All Assets of the Debtors shall be consolidated and treated as Liquidating Trust Assets irrespective of which Debtor owns such Asset.

b.    All guarantee Claims will not be entitled to Distributions from the Liquidating Trust (other than for Kmart IL Guarantee Claims, Kmart WA Guarantee Claims, ESL Unsecured Claims against Kmart, ESL Unsecured Claims against Kmart Stores of Illinois LLC and ESL Unsecured Claims against Kmart of Washington LLC).

c.    All Claims against any Debtors on account of joint obligations of two or more Debtors other than Kmart IL Guarantee Claims, Kmart WA Guarantee Claims, ESL Unsecured Claims against Kmart, ESL Unsecured Claims against Kmart Stores of Illinois LLC and ESL Unsecured Claims against Kmart of Washington LLC) shall be treated as a single Claim entitled to a single recovery against the Liquidating Trust Assets.

d.    Each holder of a Secured Claim shall only receive a recovery from the Debtor against which the Secured Claim is Allowed.

e.    Pre- and post-petition Intercompany Claims shall be disregarded and not participate in Distributions from the Liquidating Trust.

f.    Each holder of an Administrative Expense Claim, Priority Tax Claim, ESL 507(b) Priority Claim, subject to the limitations contained herein, Other 507(b) Priority Claim, or Priority Non-Tax

21

Claim, shall receive its Distributions from the consolidated Liquidating Trust Assets, irrespective of the Debtor against which such Claim was filed or is Allowed.

g.  In response to objections of parties in interest arguing that certain creditors would be uniquely disadvantaged by the consolidation for the Debtors' Assets, such creditors will receive a "Plan Settlement Premium" (as defined in the Disclosure Statement) which proposes to "bridge the gap" by providing incremental recoveries to affected creditors. Specifically, a percentage of Total Assets amongst the Debtors will be available only for creditors of Kmart Corp., Kmart IL, and Kmart of Washington. The Plan Settlement Premium is calculated by comparing recoveries of the Affected Creditors in a de-consolidated chapter 11 scenario an a substantively consolidated (for Distribution purposes) chapter 11 scenario.

After applying the appropriate Plan Settlement Premium to each Affected Creditors' recoveries, holders of Allowed PBGC Claims, General Unsecured Claims, Kmart IL Guarantee Claims, Kmart WA Guarantee Claims, ESL Unsecured Claims against Kmart, ESL Unsecured Claims against Kmart Stores of Illinois LLC, ESL Unsecured Claims against Kmart of Washington LLC, and ESL Unsecured Claims share in Total Assets (as applicable) as follows, in accordance with the Plan:

  i.  7.60% of Net Proceeds of General Assets for holders of Allowed General Unsecured Claims, the Allowed PBGC Unsecured Claim, and Allowed ESL Unsecured Claims against Kmart Corp.;

  ii.  1.19% of Net Proceeds of General Assets for holders of Allowed Kmart IL Guarantee Claims, the Allowed PBGC Unsecured Claim against Kmart Stores of Illinois LLC and Allowed ESL Unsecured Claims against Kmart Stores of Illinois LLC;

  iii.  0.16% of Net Proceeds of General Assets for holders of Allowed Kmart WA Guarantee Claims, the Allowed PBGC Unsecured Claim against Kmart of Washington LLC, and Allowed ESL Unsecured Claims against Kmart of Washington LLC;

  iv.  91.05% of Net Proceeds of General Assets for the following classes of claims, against all Debtors: Allowed General Unsecured Claims, the Allowed PBGC Unsecured Claim, and Allowed ESL Unsecured Claims;

v.   7.60% of Net Proceeds of Specified Causes of Action and the Credit Bid Release Consideration for holders of Allowed General Unsecured Claims and the Allowed PBGC Unsecured Claim against Kmart Corp.;

vi.  1.19% of Net Proceeds of Specified Causes of Action and the Credit Bid Release Consideration for holders of Allowed Kmart IL Guarantee Claims and the Allowed PBGC Unsecured Claim against Kmart Stores of Illinois LLC;

vii. 0.16% of Net Proceeds of Specified Causes of Action and the Credit Bid Release Consideration for holders of Allowed Kmart WA Guarantee Claims and the Allowed PBGC Unsecured Claim against Kmart of Washington LLC; and

viii. 91.05% of Net Proceeds of Specified Causes of Action and the Credit Bid Release Consideration for the following classes of claims, against all Debtors: Allowed General Unsecured Claims and the Allowed PBGC Unsecured Claim.

Importantly, PBGC will not participate in any distributions in excess of amounts PBGC would have received under the Plan absent the Plan Settlement Premium. Further, PBGC will not participate in any Distributions of Excess PBGC Amounts (to the extent any such excess amounts are received).

*See* Murphy Decl., ¶ 18.

iii.   ***Creditors' Committee Settlement.***

34.   This settlement is by and among the Debtors and the Creditors' Committee, securing the Creditors' Committee's commitment to support the Plan, and the key terms are as follows:

a.   The Creditors' Committee agrees to support the Plan, including the PBGC Settlement and the Plan Settlement.

b.   Issues regarding post-Effective Date corporate governance are settled as between the Debtors and the Creditors' Committee, mainly that the composition of the Liquidating Trust Board shall be established as reflected in Section 10.6 of the Plan, and the selection

process for the Liquidating Trustee and the Primary Trust Litigation Counsel shall be established as reflected in Section 10.7 of the Plan.

c.  Pursuant to the Creditors' Committee Settlement, the Creditors' Committee will have certain consultation and consent rights with regard to various settlements of various disputes and issues. *See* Plan § 9.3.

*See* Griffith Decl., ¶ 37.

### B.    The 9019 Standard Governs the Global Settlement

#### 1.    The 9019 Standard and the *Iridium* Factors

35.    Section 1123(b)(3) of the Bankruptcy Code provides that a "plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3).  Courts have broad authority to approve compromises and settlements as they allow the estate to avoid the expenses and burdens associated with litigating claims. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992). The decision to approve a particular compromise lies within the sound discretion of the Court. *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256-57 (Bankr. S.D.N.Y. 2016); *In re Republic Airways Holdings Inc.*, Case No. 16-10429 (SHL), 2016 WL 2616717, at *3 (Bankr. S.D.N.Y. May 3, 2016); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992)).  The Court's discretion must be exercised "in light of the general public policy favoring settlements." *Republic Airways*, 2016 WL 2616717, at *3 (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)).  A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and . . . in the best interests of the [debtor's] estate." *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (citations and internal quotation marks omitted), *dismissing appeal*, 177 B.R. 791 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

24

36.    A settlement need not result in the best possible outcome for the debtor, but must not fall beneath "the lowest point in the range of reasonableness." *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (citations omitted); *In re Adelphia Commc'sn Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007) ("A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'"), *dismissing appeal*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 54 F.3d 420 (2d Cir. 2008); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997) (citing *In re W.T. Grant Co.*, 699 F.2d at 608).  It is a "rare case" that a settlement will not meet this standard.  *In re Remsen Partners, Ltd.*, 294 B.R. 557, 571 (Bankr. S.D.N.Y. 2002) (Drain, J.); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. at 257 ("Indeed, '[i]f courts required settlements to be perfect, they would seldom be approved.'").  Said differently, a debtor is not required to have obtained the best possible outcome before a settlement may be approved.  Furthermore, the business judgment of the debtor in recommending the settlement should factor into the court's analysis.  *Republic Airways*, 2016 WL 2616717, at *3; *In re Residential Capital, LLC*, 497 B.R. 720, 750 (Bankr. S.D.N.Y. 2013); *In re MF Glob. Inc.*, No. 11–2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (citing J*PMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012)), *appeal dismissed*, No. 11–2790, 2013 WL 652421 (S.D.N.Y. Feb. 22, 2013); *see also In re Delphi Corp.*, No. 05-44481, 2009 WL 973130, at *2 (Bankr. S.D.N.Y. Apr. 2, 2009).

37.    Courts in the Second Circuit consider the so-called "*Iridium* factors" to evaluate if a settlement is fair and equitable, including: (1) the balance between the litigation's

25

possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) the paramount interests of creditors, including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) "the extent to which the settlement is the product of arm's-length bargaining." *Motorola Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).  Courts conduct a balancing test of the *Iridium* factors in its review of a settlement.  *See In re Residential Capital, LLC*, 497 B.R. at 750 ("In the Second Circuit, *Iridium* directs courts to balance seven interrelated factors in determining whether a settlement is fair and equitable."); *see also Davidson Kempner Capital Mgmt. LP v. Official Comm. of Unsecured Creditors (In re Motors Liquidation Co.)*, Case No. 16 Civ. 6927 (PKC), 2017 WL 3491970, at *9 (S.D.N.Y. Aug. 14, 2017) ("Balancing all of these factors, the bankruptcy court found that the Settlement was 'within the range of reasonableness and should be approved.'").  As discussed more fully below, each individual settlement is a fair and equitable and achieves the best resolution of the issues at hand, and as a whole, the Global Settlement provides the best path forward in these chapter 11 cases for the benefit of all creditors.

## 2.    Standard for Approving Substantive Consolidation

38.    Courts in this jurisdiction may substantively consolidate one or more jointly-administered debtor's estates pursuant to section 1123(a)(5)(C) of the Bankruptcy Code and the Court's equitable power.  *See In re Republic Airways Holdings, Inc.*, 565 B.R. 710, 716 (Bankr. S.D.N.Y. 2017); *In re Leslie Fay Cos.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997).  As a

doctrine, substantive consolidation recognizes that "economic realities must not be ignored merely to preserve the legal form of corporate entities, most particularly where such legal formalism will disadvantage the vast majority of creditors and endanger the Debtors' reorganization." *Drexel*, 138 B.R. at 766.

39.    Substantive consolidation should be ordered if jointly administered debtors' operational affairs are so entangled that "it would impossible for [the] Debtor companies to operate on a stand alone basis without the aid of the other operations," *In re Richton Int'l Corp.*, 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981),[13] such as where "[a]ll support functions, including finance, legal, [and] administrative" functions are undertaken by the debtor-parent. *Drexel*, 138 B.R. at 741; *see also Leslie Fay Cos.*, 207 B.R. at 780 ("[T]he Debtors' operations, cash, and decision-making process were all shared such that it would be detrimental to the estates to attempt to disentangle those operations."). Substantive consolidation has also been ordered where "the debtor believes, in its best business judgement, that substantive consolidation will return the most to all creditors by pooling the assets and liabilities." *In re Am. HomePatient, Inc.*, 298 B.R. 152, 166 (Bankr. M.D. Tenn. 2003); *see also Republic Airways Holdings*, 565 B.R. at 719-21.

40.    Under the Second Circuit's opinion in *Augie/Restivo*, substantive consolidation should be specifically ordered where either:

- the affairs of a corporate parent and its subsidiaries are so "hopelessly entangled" that the time and expense required to unwind the debtors' books and records could threaten creditor recoveries or the debtors' reorganization as a whole (the "hopeless entanglement" test); or

- creditors did not rely upon the corporate separateness of individual debtors or generally relied on the credit of the debtors' overall enterprise when extending credit (the "creditor reliance" test).

---

[13] *See also Republic Airways Holdings*, 565 B.R. at 717 ("[C]ourts typically analyze whether the debtors have demonstrated either an operational or financial entanglement of business affairs.").

WEIL:\97183319\1\73217.0004

*See Augie/Restivo*, 860 F.2d at 518.  Because *Augie/Restivo* sets forth these tests in the disjunctive,

satisfying either the hopeless entanglement test or the creditor reliance test justifies substantive

consolidation.  *In re Verestar*, 343 B.R. 444, 462-63 (Bankr. S.D.N.Y. 2006).

41.     Under *Augie/Restivo*, substantive consolidation requires a fact-intensive

inquiry by the Court.  *See FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).  Thus, a

number of factors may be relevant to determine whether substantive consolidation is appropriate,

including:

- The presence (or absence) of consolidated financial statements filed by jointly administered debtors;

- The unity of interest and ownership among debtor affiliates;

- The degree of difficulty in ascertaining individual assets and liabilities among debtors;

- The observance of corporate formalities among debtors;

- The commingling of assets or liabilities among debtors; and

- The sharing of corporate overhead, management, accounting, and other related expenses among affiliated entities.

*See, e.g.*, *Drexel*, 138 B.R. at 764 (identifying fifteen factors "that Courts consider in ascertaining

whether the interrelationship between the entities warrant consolidation"); *see also WorldCom*,

2003 WL 23861928, at *35 (identifying multiple factors relevant to substantial consolidation

analysis); *Verestar*, 343 B.R. at 462 (same).

42.     These factors are not exclusive.  Substantive consolidation is "a flexible

concept," and "a principal question is whether creditors are adversely affected by consolidation

and, if so, whether the adverse effects can be eliminated."  *In re Jennifer Convertibles, Inc.*, 447

B.R. 713, 723024 (Bankr. S.D.N.Y. 2011).  "When deciding whether to order substantive

consolidation, the courts in this circuit also use a balancing test to determine whether the relief

WEIL:\97183319\1\73217.0004

achieves the best results for all creditors." *In re WorldCom Inc.*, 2003 WL 23861928, at \*36 (*citing*

*Colonial Realty Co.*, 966 F.2d at 60).  Further, to ensure fair treatment of all creditors, "a searching

review of the record, on a case-by-case basis" must be conducted.  *Colonial Realty Co.*, 966 F.2d

at 61.

### 3.    The Plan Settlement and Substantive Consolidation Issues Are Appropriately Settled Under the 9019 Standard

43.    Given the complexities and risks associated with litigating substantive

consolidation, such issues and causes of action may be appropriately settled under the 9019

Standard.  "It is well established that debtors may properly reach a settlement regarding whether

the estates should be substantively consolidated." *In re Enron Corp.*, Case No. 01–16034, 2004

Bankr. LEXIS 2549, at \*195 (Bankr. S.D.N.Y. July 15, 2004); *see Winn-Dixie Stores*, 356 B.R.

239, 249–50 (Bankr. M.D. Fla. 2006) (approving substantive consolidation settlement pursuant to

Bankruptcy Rule 9019).  Settlements of substantive consolidation issues have been approved under

the 9019 Standard pursuant to chapter 11 plans confirmed by courts in this and other jurisdictions.

*See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD), at 21 (Bankr.

S.D.N.Y. Feb. 28, 2012) (ECF No. 3477) (same); *In re Lehman Bro. Holdings Inc.*, Case No. 08-

13555, at 13–14 (Bankr. S.D.N.Y. Dec. 6, 2011) (ECF No. 23023) (approving substantive

consolidation settlement under Bankruptcy Rule 9019); *Enron*, Bankr. LEXIS 2549, at \*2–4

(same); *In re WorldCom, Inc.*, Case No. 02-13533, 2003 WL 23861928, at \*38, \*44–48 (Bankr.

S.D.N.Y. Oct. 31, 2003) (same); *Winn-Dixie Stores*, 356 B.R. at 250-51 (same).  Similarly, the

Plan Settlement is a settlement of substantive consolidation rather than actual substantive

consolidation of the Debtors, and thus, the Debtors believe that the *Augie/Restivo* standard does

not apply here.  *See In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD), Hr'g

Tr. 43:7-21 (Bankr. S.D.N.Y. Feb. 27, 2012) (ECF No. 3505) ("**A&P I Confirmation Hr'g Tr.**")

("As I noted in my original ruling, there are cases that treat a partial substantive consolidation as a settlement and I think do so appropriately . . . .").

### C.     The Global Settlement Meets the 9019 Standard

44.     The Global Settlement, seeks to provide the Debtors' creditors with a recovery without the substantial risk, delay, and expense that would be associated with protracted litigation.  Since the beginning of these chapter 11 cases, the Debtors were cognizant of the myriad of issues that would need to be resolved in order to obtain a timely resolution of these cases, and continuously engaged with various parties in interest to ensure a timely exit with a largely consensual and confirmable plan.  The Global Settlement incorporates the support of two of their primary constituencies: PBGC through the PBGC Settlement and the Creditors' Committee through the Creditors' Committee Settlement.   And through the third element of the Global Settlement—the settlement of substantive consolidation via the Plan Settlement—the Debtors propose consolidating the remaining assets and liabilities for the purposes of distributions from the Liquidating Trust, thereby eliminating the arduous (and potentially impossible) process of disentangling the Debtors' prepetition Intercompany Claims.   The Plan Settlement takes into consideration the risks and rewards of pursuing fully consolidated or deconsolidated plans, structuring the Plan to avoid any potential protracted litigation between and among the Debtors and various parties in interest.  With consensus reached with the two largest stakeholders in these chapter 11 cases, the Debtors, PBGC, and the Creditors' Committee each believe that confirmation and ultimately consummation of the Plan under the current circumstances and at this time is the best way to maximize value for all creditors.  Further, each of them agrees that approval of the PBGC Settlement, Plan Settlement, and Creditors' Committee Settlement is a far better outcome than unnecessary (and costly) litigation.  *See* PBGC Statement in Support; Creditors' Committee Statement in Support.  Undoubtedly, each of the settlements that comprise the Global Settlement

WEIL:\97183319\1\73217.0004

is fair and equitable, a valid exercise of the Debtors' business judgment, and in the best interests of the Debtors' Estates.

1.      **The Creditors' Committee Settlement Satisfies the Bankruptcy Rule 9019 Standard Under the *Iridium* Factors**

45.      Throughout these chapter 11 cases, the Debtors have worked collaboratively to resolve issues with the Creditors' Committee, and agree to a path forward with their largest constituency.  Through the Creditors' Committee Settlement, the Debtors gain the support of the Creditors' Committee and are able to provide a consensual framework for the post-Effective Date process.  Without the Creditors' Committee Settlement and the compromises contained therein, the Debtors would most likely face a litigious confirmation process, which would inevitably prolong the confirmation process and substantially increase administrative costs, to the detriment of creditors.  As set forth below, the Creditors' Committee Settlement satisfies the requirements set forth in the 9019 Standard under the *Iridium* factors and should be approved.

46.      *First*, the Creditors' Committee Settlement results from the Debtors' and the Creditors' Committee's careful examination and negotiation of the Plan issues.  Following the hearing to approve the Disclosure Statement on May 29, 2019, the Debtors continued negotiations with the Creditors' Committee in the hopes of reaching a settlement.  The negotiations were lengthy and rigorous—including multiple telephonic and in-person meetings with the Debtors' advisors, including a mediation session overseen by Judge Shelley C. Chapman of the United States Bankruptcy Court for the Southern District of New York, and the exchange of multiple drafts of the Disclosure Statement and Plan.  The rigor of these negotiations is evidence of the complexity of the issues at hand, the potentially contentious litigation on the issues at confirmation, and the attendant uncertainty of success.  The Debtors appropriately balanced the uncertainty of success with the enormous benefit of obtaining the Creditors' Committee's support for the Plan.

31

47.     ***Second***, the Creditors' Committee Settlement permits the Debtors to forego complex and time-consuming litigation including discovery, depositions, and motion practice, around confirmation garnering the Creditors' Committee's support of the Plan.  The costs and delays associated with a contested confirmation would have significantly and negatively impacted the Debtors' ability to confirm a Plan, and eliminating such risk is a compelling justification to approve the Creditors' Committee Settlement under *Iridium*.  Put simply, the limited Estate resources are better maximized by a settlement with the Creditors' Committee and the Estates are better served by not wasting fees on protracted litigation but rather allocating funds for distributions to creditors.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 306 ("The evidence demonstrates that litigation of the . . . [claims] would likely be lengthy and protracted and would entail significant costs and risks to the Company with little reward."); *Residential Capital*, 497 B.R. at 734 ("Absent the Settlement Agreement, the Debtors would face complex and lengthy litigation . . . .").

48.     ***Third***, the Creditors' Committee Settlement is in the best interests of the creditors as a whole.  The Creditors' Committee Settlement ensures the Creditors' Committee's support of the PBGC Settlement and the Plan Settlement, and provides for a consensual post-Effective Date framework for the Liquidating Trust.  Further, there was not much benefit to the Debtors in litigating the issues settled in the Creditors' Committee Settlement, and the Debtors do not have to find additional cash or waste previous resources to settle these issues.  Significantly, obtaining the support of the Creditors' Committee for the Plan Settlement ensured that the Debtors could settle the issues of substantive consolidation without the inevitably time consuming, expensive, and likely impossible task of reconciling intercompany claims, and/or litigating with the Creditors' Committee regarding substantive consolidation issues.

WEIL:\97183319\1\73217.0004

49.     **Fourth**, both the Debtors and the Creditors' Committee are represented by competent and experienced professionals who were involved throughout the lengthy negotiation process.   As noted, the dispute was ultimately mediated by Judge Shelley C. Chapman of the United States Bankruptcy Court for the Southern District of New York, an experienced bankruptcy judge well versed in the outstanding issues between the Debtors and the Creditors' Committee, which concluded the with the Creditors' Committee Settlement.  Such factor weighs in favor of the Creditors' Committee Settlement.

50.     **Fifth**, the Creditors' Committee Settlement was the product of extensive arm's-length negotiations.  Since the early stages of these chapter 11 cases, the Debtors and the Creditors' Committee have engaged in continuous discussions regarding a viable path to exit chapter 11, and such discussions increased in frequency following the closing of the Sale Transaction.  The facts are clear, there is no doubt that the Creditors' Committee Settlement is a result of extensive, good faith, arm's-length negotiation.

51.     On this record, the Creditors' Committee Settlement easily falls above the lowest point in the range of reasonableness and should be approved.

### 2.     The PBGC Settlement Satisfies the 9019 Standard Under the *Iridium* Factors

52.     By virtue of the PBGC Settlement, the Debtors were able to resolve PBGC's significant objections to the Sale Transaction and consummate the Sale Transaction.  Additionally, the PBGC Settlement provides for the resolution of multiple complex and intertwined issues that would have likely complicated and prolonged confirmation of the Debtors' Plan.  As discussed below, the Debtors respectfully submit that the PBGC Settlement satisfies the requirements set forth in the 9019 Standard under the *Iridium* factors and should be approved.

33

53.    ***First***, the PBGC Settlement provides for the compromise and settlement of various claims that can be asserted by PBGC, and it is uncertain that if the Debtors were to litigate such claims whether the Debtors would succeed.  PBGC asserts that the PBGC UBL Claim could be as high as $1.4 billion against each member of the Debtors' control group and that its Termination Premium Claim total approximately $340 million, both of which can be asserted jointly and severally against all Debtors.  *See* PBGC Proofs of Claim[14]; PBGC Statement in Support, ¶ 4-5.  The amount of the PBGC UBL Claim would be significant given the size of the Pension Plans and the level of funding; absent the PBGC Settlement, the Debtors would certainly litigate the value of this claim.  Important benefits of the PBGC Settlement, also include (i) the reduction of the UBL Claim by half to $800 million (to be asserted on a consolidated basis) and the direct corresponding benefit of General Unsecured Creditors and (ii) the benefit of a waiver of $340 million of PBGC's potential Termination Premium Claim, and (iii) PBGC's commitment to take all reasonable action requested by the Debtors to cause KCD to waive any of KCD's alleged Administrative Expense Claims against the Debtors, which could be in excess of $146 million.  *See* KCD Proofs of Claim.[15]  Ensuring $0 for a potentially $146 million claim via the PBGC Settlement alone demonstrates the substantial benefit of the PBGC Settlement, even without considering all of the other benefits of the PBGC Settlement.  The settlement of PBGC's claims

---

[14] Pursuant to the *Stipulation and Order Permitting Pension Benefit Guaranty Corporation to File Consolidated Proofs of Claim Under a Single Case Number* (ECF No. 3015), the PBGC submitted proofs of claim on a consolidated basis at each of the Debtors in a total amount of $1,739,195,985: Proof of Claim No. 14597 (asserted amount of $115,012,500); Proof of Claim No. 14861 (asserted amount of $8,760,985); Proof of Claim No. 14683 (asserted amount of $222,022,500); Proof of Claim No. 14925 (asserted amount of $931,400,000); Proof of Claim No. 14741 (asserted amount of $462,000,000) (collectively, the "**PBGC Proofs of Claim**").

[15] Pursuant to the *Stipulation and Order Permitting the KCD Trustee to File Consolidated Proofs of Claim Under a Single Case Number* (ECF No. 3180), the KCD Indenture Trustee filed three proofs of claim, each asserting an unliquidated claim against each of the Debtors: Proof of Claim No. 16527; Proof of Claim No. 16933; Proof of Claim No. 14824 (collectively, the "**KCD Proofs of Claim**")

WEIL:\97183319\1\73217.0004

and obtaining certainty on the amount of such claims is a significant benefit to the Debtors. Pursuant to the PBGC Settlement, PBGC has also agreed to a full release of pension funding and unfunded benefit liability claims against all Debtors a full waiver of any administrative or superpriority administrative expense claim in the Debtors' chapter 11 cases, among others. *See* Murphy Decl., ¶ 9.

54.     ***Second***, pursuant to the PBGC Settlement, PBGC has agreed to remove all remaining roadblocks that PBGC could interpose to confirmation of the Plan.  Absent the PBGC Settlement, PBGC Claims could be asserted jointly and severally against each Debtor thereby causing the overwhelming dilution of recoveries for other General Unsecured Claims (to the extent received).  With regard to KCD's Administrative Expense Claim, absent the PBGC Settlement, the PBGC could direct KCD to assert the Claim and monopolize the limited estate resources.  The costly and lengthy litigation that would likely have ensued without the compromises provided in the PBGC Settlement would have severely hindered the Debtors' ability to exit these chapter 11 cases on a timely basis and prevent the most economic use of the Debtors' remaining assets for the benefit of their creditors.  *See* Murphy Decl., ¶ 10.

55.     ***Third***, pursuant to the PBGC Settlement, PBGC is (i) waiving approximately $600 million in General Unsecured Claims ***against each Debtor***, (ii) waiving their $340 million Termination Premium Claim, and (iii) causing KCD to waive an $146 million of Administrative Expense Claim against the Debtors.  These Claims waivers should particularly benefit General Unsecured Claimants.  The PBGC Settlement vastly improves recoveries for general unsecured creditors.  Indeed, as demonstrated in the chart below, using the projected Claim and recovery numbers from the Liquidation Analysis (which assumes that approximately $132 million is available for distribution to holders of General Unsecured Claims), even accounting for

the PBGC Liquidating Trust Priority Interest, overall, holders of General Unsecured Claims are projected to receive 2.31% recoveries—under the PBGC Settlement as compared to 0% for holders of General Unsecured Claims—if there were no PBGC Settlement (assuming a deconsolidated plan scenario).  Put simply, General Unsecured Creditors as a whole receive 2.31% greater recoveries under the PBGC Settlement.  *See* Murphy Decl., ¶ 11.

**Comparison of Unsecured Creditor Recoveries between a "Risk Adjusted" Deconsolidated Plan and the Plan Settlement**

| | Distributable Assets | PBGC - Priority Interest | | General Unsecured Claims (PBGC) | | General Unsecured Claims (Kmart Corp) | | General Unsecured Claims (All Other) | | Non- ESL Guarantee Claims | | ESL 2nd Lien Claims | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Deconsolidated Plan** | ($) | ($) | (%) | ($) | (%) | ($) | (%) | ($) | (%) | ($) | (%) | ($) | (%) |
| Sears Holding | - | - | | - | | - | | | | - | | - | |
| Sears Roebuck | - | - | | - | | - | | | | - | | - | |
| Kmart | 257.1 | 55.7 | 6.96% | 56.1 | 7.02% | 84.9 | 7.02% | - | - | 29.3 | 0.1 | 30.9 | 1.97% |
| Kmart of Illinois | 17.6 | 12.3 | | 2.7 | | - | - | 0.0 | | 1.4 | | 1.2 | |
| Kmart of Washington | 1.9 | 1.4 | | 0.3 | | - | | 0.0 | | 0.2 | | 0.1 | |
| Sears Insurance Services, LLC | 15.3 | 10.6 | | 4.6 | | - | | - | | | | - | |
| **Totals from Deconsolidated Plan** | 292.0 | 80.0 | 10.00% | 63.8 | 7.98% | 84.9 | 7.02% | 0.0 | - | 30.9 | 7.02% | 32.2 | 1.97% |
| | | | | | | | | | | | | | |
| **Application of Risk Factors utilized in Plan Settlement** | | 100% | | 100% | | 25% | | N/A | N/A | 25% | | 25% | |
| **Risk adjusted recoveries in the Deconsolidated Plan** | 180.9 | 80.0 | 10.00% | 63.8 | 7.98% | 21.2 | 1.75% | - | - | 7.7 | 1.85% | 8.0 | 0.51% |
| | | | | | | | | | | | | | |
| **Plan Settlement** | 230.0 | 97.5 | 12.19% | 20.0 | 2.50% | 32.6 | 2.69% | 53.5 | 2.31% | 11.6 | 2.77% | 14.7 | 0.84% |
| **Comparison (1)** | 49.1 | 17.5 | 2.19% | (43.8) | -5.48% | 11.4 | 0.94% | 11.4 | 2.31% | 3.9 | 0.92% | 6.7 | 0.32% |

(1) Comparison of the Risk adjusted Deconsolidated Plan recoveries to the Plan Settlement  -  Increase (Decrease)

56.    In a deconsolidated plan scenario *without* taking into account any litigation risk (the "**Deconsolidated Plan**"): (a) PBGC is projected to recover approximately $63.8 million on its General Unsecured Claim, (b) general unsecured creditors of Kmart Corp. are projected to recover approximately $84.9 million in the aggregate, (c) general unsecured creditors for all other Debtors besides Kmart Corp. are projected to recover zero, (d) Guarantee claimants are projected to recover $30.9 million in aggregate, and (e) ESL (on account of its Guarantee Claims) is projected to recover approximately $32.2 million on account of its General Unsecured Claim.[16] *See* Murphy Decl., ¶ 12.

---

[16] By necessity, the Debtors disregarded prepetition intercompany claims in this analysis. *See* Section I.C.3.i(a) below.

WEIL:\97183319\1\73217.0004

57.     However, in order to accurately compare the recoveries of the general unsecured creditors in the Deconsolidated Plan versus under the Plan Settlement, the risk factors that were taken into account in calculating the Plan Settlement Premium—*i.e.*, 75% risk of inter-estate and inter-creditor litigation and risk of substantive consolidation in a Deconsolidated Plan scenario—should be applied to the projected recoveries of the unsecured creditors that will be receiving the Plan Settlement Premium: Kmart Corp. general unsecured creditors, and the Guarantee claimants (including ESL).   Application of the risk factors results in the following adjusted recoveries: (i) approximately $21.2 million for Kmart Corp. general unsecured creditors, (ii) approximately $7.7 million for Guarantee claimants, and (iii) approximately $14.7 million for ESL on account of its Guarantee Claims.  *See* Murphy Decl., ¶ 13.

58.     In comparing such recoveries to the projected recoveries in a Plan Settlement scenario that takes into account the PBGC Settlement and the increase ($17.5 million) of the PBGC Liquidating Trust Priority Interest, creditors do better in a Plan Settlement and PBGC Settlement scenario, with increased recoveries (approximately $4.4 million) across the board: (a) the Kmart Corp. general unsecured creditors would still improve their recovery by $11.4 million (with a total projected recovery of $32.6 million), (b) the Guarantee claimants improve their recovery by $3.9 million (with a total projected recovery of $11.6 million), (c) ESL improves its recovery by $6.7 million (with a total projected recovery of $14.7 million), and (d) general unsecured creditors for all other Debtors besides Kmart Corp. improve their recovery by $11.4 million (with a total project recovery of $53.5 million).  *See* Murphy Decl., ¶ 14.

59.     By comparison, PBGC's recovery on its General Unsecured Claim is drastically reduced by $43.8 million, more than two thirds of what it would recover in the Deconsolidated Plan.  Put differently, although PBGC is entitled to an additional $17.5 million

from the PBGC Liquidating Trust Priority Interest under the Plan Settlement, PBGC is taking a much larger reduction in recovery on account of its General Unsecured Claim (from $63.8 million in the Deconsolidated Plan to only $20 million under the Plan Settlement) while the other general unsecured creditors will receive benefit directly from that reduction.  As a result of PBGC's compromise, all other general unsecured creditors are getting an increased recovery.  *See* Murphy Decl., ¶ 15.

60.     ***Fourth***, the Creditors' Committee—the estate fiduciary charged with representing the interests of all unsecured creditors including those impacted by the PBGC Settlement—supports the PBGC Settlement.  Such factor significantly weighs in favor of the PBGC Settlement.  *See In re Ambac. Fin. Group, Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011) (concluding that "the support of the Creditors' Committee . . . weighs heavily in favor of approval of the proposed settlement."); *see also Ad Hoc. Comm. Of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*, 412 B.R. 53, 61 (Bankr. S.D.N.Y. 2008) (finding that third and fourth *Iridium* factors were addressed because the official committee of unsecured creditors and an ad hoc committee of bondholders supported the settlement agreements).

61.     ***Fifth*** and ***sixth***, the Debtors and PBGC are represented by competent and experienced professionals, and the nature and breadth of the releases being obtained as a result of the PBGC Settlement is reasonable and narrow in scope, as the releases are being provided solely to (i) the Debtors, their Estates, and successors, the Liquidating Trustee, the Liquidating Trust, any Estate representative appointed or selected pursuant to section 1123(b)(3), but only for Debtors for which a Plan is being confirmed, and (ii) to the Debtors' professionals, employees, officers, directors, attorneys, and financial advisors, but only at Debtors for which the Plan is confirmed

and "solely in their capacity as acting by, through, or in any way on behalf of" the Debtors and only with respect to specific categories of Causes of Action. *See* Plan, § 15.9(c)(i).

62.    ***Seventh***, starting well before the PBGC filed its objection to the Sale Transaction, the Debtors and the PBGC took part in multiple discussions to reach a consensual agreement to resolve the objection and obtain PBGC's support for the Sale Transaction and the Debtors' Plan.  When it became apparent that an incremental resolution of the various Plan issues was necessary, including issues regarding settlement of substantive consolidation, the Debtors reengaged in negotiations with PBGC to amend the PBGC Settlement to allow for the Plan Settlement and the Plan Settlement Premium.  The vigorous negotiations between Debtors and PBGC continued until immediately prior to the entry of the Disclosure Statement Order.  The PBGC Settlement is the result of months of good faith, arm's-length negotiation between the Debtors and PBGC, the culmination of which achieves a compromise in the best interest of the Debtors' Estates.

63.    Taken as a whole, the PBGC Settlement provides a reasonable settlement of various litigable issues and is a sound exercise of the Debtors' business judgment, which is supported by the Creditors' Committee.  This Court should not allow the objectors to replace the business judgment of the estate fiduciary with their own self-interested views.  *See Republic Airways*, 2016 WL 2616717, at *8 (overruling objection of the ad hoc equity committee, finding that "[i]n seeking to replace the debtors' business judgment with its own views, the [ad hoc equity group's] objection improperly [sought] to turn both the business judgment rule and the standard for settlement under [Bankruptcy] Rule 9019 on their heads.").

64.    On this record, the PBGC Settlement easily falls above the lowest point in the range of reasonableness and should be approved.

3.     **The Plan Settlement Satisfies the 9019 Standard Under the *Iridium* Factors**

65.     The Plan Settlement also clearly satisfies the requirements set forth in the 9019 Standard and the Second Circuit's direction from *Iridium* and should be approved.

i.     **The Plan Settlement Fairly Reflects the Arguments for (and Against) Substantive Consolidation on the Merits**

66.     *First*, the Plan Settlement results from the Debtors' careful examination of the factors that support (and weigh against) the substantive consolidation of their Estates under the *Augie/Restivo* standard. Although the Debtors believe substantive consolidation could be justified, particularly under a "hopeless entanglement" theory, the Debtors recognize that certain creditors could have raised objections to substantive consolidation as demonstrated by the Objections filed to date. Therefore, although the Debtors believe that they would be successful in such a litigation, the possibility of success remains uncertain, and the value maximizing alternative is to settle the complex issues surrounding substantive consolidation.

(a)     **The Debtors' Operations and Accounts are Hopelessly Entangled**

67.     In deciding to pursue the Plan Settlement and ultimately the Global Settlement, the Debtors and their advisors undertook an extensive analysis of the Debtors' prepetition books and records, in particular their intercompany transactions, to evaluate whether intercompany liabilities between the Debtor entities could be accurately determined or if substantive consolidation would be appropriate. Specifically, the Debtors and their professionals conducted an analysis and examination of, among other things, the Debtors' bookkeeping and record keeping practices, their accounting systems, their corporate structure and its history, their public securities filings, and their major contracts and leases. Among other things, the Debtors' advisors found that: historical intercompany data was incomplete and at times inaccurate, creating

40

a possibility of inaccurate results by orders of magnitude; antiquated accounting systems (reflecting billions of lines of data) complicated the analysis of historical intercompany transaction data;[17] and significant adjustments would have to be considered in light of spin-offs and dozens of other transactions over the years.

68.    Further, because the Debtors' financial statements were historically prepared with the view to creating one consolidated report for all Debtors, the Debtors' intercompany balances were consolidated for all Intercompany Transactions recorded for each Debtor over time, aggregated into one net balance of either a receivable or payable for each Debtor that it had collectively with all of the other entities and either reported as a net receivable or payable.  Effectively, each existing intercompany balance is a consolidated intercompany balance for each Debtor.  Because of this netting, it is difficult to analyze each individual Intercompany Transaction that comprises the netted, recorded, Intercompany Claim number for each Debtor.[18]

69.    Therefore, the Debtors believe that determining an accurate accounting of prepetition Intercompany Claims among the Debtors would be extremely challenging, cost-prohibitive, and time consuming, with no guarantee that the analysis, even if completed, would be sufficiently accurate.  For example, while the Debtors' accounting systems identify the entities to which intercompany payables are due or from which intercompany receivables are due in the

---

[17] Historically, the Debtors maintained their financial books and records in multiple legacy accounting systems utilized by the Sears and Kmart entities prior to the merger of Kmart and Sears Roebuck in 2005.  These systems utilize equipment that in some cases was purchased more than 20 years ago and were used to capture the daily and periodic transactions for reporting sales, purchases, and receipt of merchandise, etc.  These systems are old, difficult to use, and crash on a regular basis.

[18] The Debtors' current accounting information is captured and recorded in the Peoplesoft (ORACLE) General Ledger system.  The information is recorded on a consolidated basis because the Debtors' typically prepare financial statements on a consolidated basis.  While, all accounting entries in ORACLE are coded with certain searchable attributes, to analyze the data on an entity-by-entity basis, a search for a particular attribute must be made in the ORACLE system.  The data must then be extracted and analyzed manually in Excel.  This process is cumbersome and extremely time-consuming.

WEIL:\97183319\1\73217.0004

ordinary course, the millions of entries are netted automatically by the accounting system and are not summarized by Debtor. The intercompany balances are consolidated for all intercompany transactions recorded for each Debtor over time, aggregated into one net balance of either a receivable or payable for each Debtor that it has collectively with all of the other entities and either reported as a net receivable or payable. Because the Debtors' financial statements were historically prepared with the view to creating one consolidated report for all Debtors, the Debtors cannot readily identify the particular Debtor entity to which intercompany balances are owed, and vice versa. Effectively, each existing intercompany balance is a consolidated intercompany balance for each Debtor.

70.    Aside from the highly intensive forensic accounting analysis required for potentially decades of data, the Debtors would still be required to resolve the legal implications of among other things, potential claims or causes of actions arising from the intercompany transfers, the potential recharacterization of intercompany accounts, and intercompany asset ownership. The Sears enterprise, generally, kept books and records and intended to record the enterprise's transactions. Accordingly, the Debtors believe there would be significant difficulties and enormous costs that would be borne by the Estates to disentangle the prepetition Intercompany Claims on a Debtor-by-Debtor basis, which would deplete the Estate's resources and reduce available recoveries for all creditors.

71.    Factors that were considered by the court in *Drexel* to decide whether substantive consolidation was appropriate are applicable in these chapter 11 cases:

| Drexel | Sears Holdings |
|---|---|
| "Drexel operated as a single enterprise, for the benefit of the entire Drexel Burnham Lambert firm. … Drexel was managed with an eye to profit maximization for the entire enterprise rather than its various subsidiary components." *Id.* at 741. | Although the Debtors utilized two major brand names, Sears and Kmart, for their retail stores, the Debtors operated as a single enterprise with a goal of profit maximization for the entire enterprise, rather than maximization at each component entity. |

42

| | Moreover, many creditors conducted business primarily with three Debtors—Sears Holdings, Sears Roebuck and Kmart Corporation—and, in each case, the purchases by the Debtor entities were on behalf of all the Debtors. For example, Kmart Corporation purchased the majority of the non-merchandise related needs for all of the Debtors, and Sears Roebuck purchased a significant amount of the store merchandise sold in both Sears and Kmart stores. |
|---|---|
| Drexel had interlocking directors and one or more of three named individuals served as directors and, in most cases, officers of each of the Drexel debtors. *Id.* | A combination of three individuals serve on the vast majority of the Debtors' boards, and for those entities for which these individuals do not serve as directors, a combination of the three individuals serve as officers. |
| Except for one entity, all of Drexel was headquartered and controlled from two of its offices in New York City. "All the space was leased in the name of DBL Group and paid for by DBL Inc. Through various intercompany accounts, rent was charged back to DBL Group and reallocated to the various Debtors." *Id.* | The Debtors maintained a centralized office location in Hoffman Estates, Illinois where a significant percentage of the management and support staff directing all aspects of the debtors operations were located, including the Debtors' corporate officers. |
| "All support functions, including finance, legal, administrative, operations, clearing systems, communications, mailroom, internal audit, and, external audit were provided by DBL Inc." *Id.* | Essentially all services and operations were centralized so that one entity (or group of entities) was responsible for each major function including the following:<br>• Financial reporting<br>• Treasury operations (i.e. cash management)<br>• Human resources and payroll<br>• Tax planning and compliance<br>• Real estate management<br>• Internal audit<br>• Merchandise purchasing<br>• Non-merchandise purchasing<br>• Logistics and distribution center management |
| There was an intricate network of intercompany accounts, including "equity accounts, tax accounts, operating accounts and, in some instances, loan balances . . . . Some of the account balances represented years of transactions." *Id.* | As a result of centralized services and treasury functions there were thousands of intercompany journal entries a week to account for the daily, weekly, monthly and other periodic activity between the Debtors. Because the Debtors' focus was reporting on a consolidated basis and the volume of transactions was astronomical, the Debtors—except for certain statutory, tax or legal reasons—did not settle monthly intercompany transactions at the end of each period. The Debtors would proceed to each new reporting period as long as the intercompany transactions recorded ultimately netted to "zero" on a consolidated basis. |
| "With respect to the Drexel Operating Companies, other than DBL Inc., it was customary for their customers, creditors, and counterparties to seek guarantees from DBL Group." *Id.* | Financing was provided principally through Sears Holdings or Sears, Roebuck Acceptance Corp. with the majority of the remaining Debtors providing guarantees of the debt. Funds were centralized and available for all entities. |

### (b) Creditors Did Not Generally Rely on the Separateness of Debtor Entities

72.     Substantive consolidation should be ordered where creditors as a whole did

not rely on corporate separateness in their prepetition course of dealing with jointly administered

Debtors.  *See Augie/Restivo*, 860 F.2d at 518.  Here, the Debtors conducted their operations and presented themselves to the business world as a consolidated financial enterprise for all practical purposes:

- The Debtors' public financial statements were filed on a "consolidated only" basis—third party creditors were not provided with entity-by-entity balance sheets in the ordinary course.

- The Debtors' first lien and second lien creditors loaned approximately $5 billion in funded prepetition debt issued, borrowed, or guaranteed by a significant number of the Debtors.

- Payments for services rendered, goods delivered, or other obligations owed to vendors for all Debtors were primarily made through disbursements from either Sears Holdings, Sears Roebuck or Kmart Corp.

- The Debtors' senior executives were each identified as "Sears Holdings" executives and utilized business cards, email addresses, letterhead, and mailing addresses establishing their status as Sears Holdings personnel.

### (c)    Certain Factors Weigh Against Substantive Consolidation and Favor Deconsolidation

73.    Despite the above, there are also certain factors in favor of deconsolidation: Kmart and Sears maintained separate stores and brands; many creditors could have relied on the separateness of Debtors; funded indebtedness was typically guaranteed by certain, but not all, entities; forensic accounting and dis-entanglement of intercompany transactions is theoretically possible; certain creditors benefit from controlled group liability in a "deconsolidated" scenario (*e.g.*, PBGC).  In that context, understanding that there are significant risks associated with substantive consolidation, a settlement to obviate the risks and costs of litigation of such complex issues is reasonable and appropriate.

74.    The Plan Settlement seeks to resolve the most significant inter-case disputes and intercompany issues without unnecessarily expensive and protracted litigation found in all substantive consolidation disputes.  Absent the Plan Settlement, prosecution of extraordinarily

complex, fact-specific difficult litigation relating to substantive consolidation and related issues would ensue. Fundamentally, the outcome of such litigation is not easily predicted and is unlikely to benefit these estates or the stakeholders. "It is well established that debtors may properly reach a settlement regarding whether the estates should be substantively consolidated." *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *195. Given the relevant facts that weigh for, and certain facts that may weigh against substantive consolidation, the Debtors concluded that the Plan Settlement is a fair resolution in light of the legal and economic risks to parties in interest. *See, e.g.*, *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012) (ECF No. 3477) (approving the substantive consolidation settlement).

### ii.  The Plan Settlement Allows the Debtors to Forego Complex, Expensive, Litigation

75.  ***Second***, the Plan Settlement allows the Debtors to forego complex, time-consuming, and ultimately uncertain litigation around substantive consolidation, including considerable inter-estate and inter-creditor litigation. As the court in *In re Winn-Dixie Stores*, 356 B.R. 239 (Bankr. M.D. Fla. 2006), recognized in the context of a similar substantive consolidation settlement:

> [I]f the Court were forced to decide substantive consolidation, the Court would have to consider much testimony from the individual creditors to determine whether they obtained their guarantees from the subsidiaries or the parent company, and if the parent company, which one. After days, possibly weeks, of testimony and other evidence, the Court would also have to consider the possibility that the Debtors' operations may be so hopelessly intermingled that substantive consolidation would be the only choice. Again, this would have to be proven with extensive evidence.

356 B.R. at 250 (internal citation omitted). Even if successful, the substantial costs and delays associated with litigation of substantive consolidation could significantly and negatively impact the Debtors' Estates. The Debtors' measured and informed decision to forego "potentially massive

and protracted litigation" though the Plan Settlement—supported by the Creditors' Committee—is a compelling justification to approve the Plan Settlement under *Iridium. WorldCom*, 2003 WL 23861928, at *32 ("[T]he Debtors would be mired in litigation for an indefinite period of time if substantive consolidation were contested and, undoubtedly, appealed. Resolution of these disputes by virtue of the differing treatment of differently situated classes of unsecured creditors, as provided in the Plan, avoids potentially massive and protracted litigation."); *see also Sabine Oil*, 555 B.R. at 306 ("The evidence demonstrates that litigation of the . . . [claims] would likely be lengthy and protracted and would entail significant costs and risks to the Company with little reward."); *Residential Capital*, 497 B.R. at 734 ("Absent the Settlement Agreement, the Debtors would face complex and lengthy litigation . . . .").

> iii.    **The Plan Settlement is In the Best Interests of Creditors and Comports with Similar Settlements Approved in the Second Circuit**

76.    ***Third***, the Plan Settlement is in the best interests of the creditors as a whole. The Plan Settlement is one of the foundations for the Debtors' Plan and seeks to provide the stakeholders with certainty, as well as prompt and maximized distributions. Pursuant to the Plan Settlement, including the Plan Settlement Premiums where applicable, unsecured creditors will receive recoveries in excess of those available under a deconsolidated chapter 11 plan (see paragraphs 55 to 58 above). The Plan Settlement also maximizes value because it resolves significant Intercompany Claims, and in conjunction with the PBGC Settlement, caps the amount of Claims that PBGC could assert against every Debtor and provides that the PBGC will not share in the upside of Plan Settlement Premiums. *See Residential Capital*, 497 B.R. at 751 (holding that the settlement was "clearly in the best interest of the creditors—it will resolve significant claims against the estates for far less than the amounts asserted"); *Enron*, 2004 Bankr. LEXIS 2549, at *191 ("The global compromise provides Creditors an assurance of recovery that inter-estate

WEIL:\97183319\1\73217.0004

litigation does not provide."). Without the Plan Settlement, the Debtors' path to exit chapter 11 would be more uncertain and fraught with potentially crippling litigation, which would almost certainly lead to decreased recoveries for unsecured creditors.

77.    *Fourth*, the Plan Settlement is supported by major stakeholders in these chapter 11 cases—including PBGC and the Creditors' Committee. As described in paragraph 60 above, support from the Creditors' Committee is a significant factor in support of the Plan Settlement. In addition, 5,138 creditors in number have voted to accept the Plan. In fact, of the nearly 1.2 million parties who received notice of the Plan and Confirmation Hearing, only three (3) parties have objected to the Plan Settlement—namely Wilmington Trust, Cyrus, and the School District, all of whom are in active litigation with the Debtors.

78.    *Fifth*, and *Sixth*, as noted above, the Debtors and PBGC are represented by competent and experienced professionals and the improvements to the PBGC Settlement exchanged for the Plan Settlement were the product of good-faith arm's-length bargaining.

79.    Further, the Plan Settlement is in line with other settlements of substantive consolidation approved in this and other circuits under the 9019 Standard. *See In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012), at 21 (ECF No. 3477) (approving the substantive consolidation settlement); *In re Lehman Brothers Holdings Inc.,* No. 08-13555 (JMP), at 25 (Bankr. S.D.N.Y. Dec. 6, 2011) (approving the global settlement, which incorporated a substantive consolidation settlement); *In re Enron Corp.*, No. 01-16034 AJG, 2004 WL 6075307, at *64 (Bankr. S.D.N.Y. July 15, 2004) (approving debtors' plan of reorganization on the basis that the terms of the settlement of substantive consolidation issues were supported by an assessment of the likelihood of successful litigation in light of the doctrine); *In re Coldwater Creek Inc.,* No. 14-10867-BLS, 2014 WL 11429340, at *11 (Bankr. D. Del. Sept.

17, 2014) (approving the substantive consolidation settlement provided for in debtors' plan because it was in the best interests of the debtors, their estates and claimholders); *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 778–79 (Bankr. D. Del. 2018) (approving substantive consolidation as part of a consensual plan settlement); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 418, 459, 484 (Bankr. D.N.J. 1990) (confirming a plan based, in part, on a settlement of potential litigation claims relating to substantive consolidation of the debtors' estates); *In re Apex Oil Co.*, 118 B.R. 683, 688, 693, 712 (Bankr. E.D. Mo. 1990) (confirming the debtors' plan in light of consensual settlement of substantive consolidation of the debtors' estates).

80.     On this record, the Plan Settlement easily falls above the lowest point in the range of reasonableness and should be approved.

## II.    THE PLAN SATISFIES BANKRUPTCY CODE SECTION 1129 AND SHOULD BE APPROVED

81.     To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence.  As the United States Court of Appeals for the Fifth Circuit stated in *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd. II* (*In re Briscoe Enters., Ltd. II*):  "The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof . . . under § 1129(a)."  994 F.2d 1160, 1165 (5th Cir. 1993); *see also In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010); *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010); *In re Charter Commc'ns*, 419 B.R. at 243–44; *In re Kent Terminal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) (holding that "the final burden of proof at . . . confirmation hearings remains a preponderance of the evidence").  The Debtors will demonstrate, by a preponderance of

the evidence, that all of the subsections of section 1129 of the Bankruptcy Code have been satisfied

with respect to the Plan.  *See* Griffith Decl., Transier Decl., Murphy Decl..

### A.    The Plan Satisfies Bankruptcy Code Section 1129(a)(1)

82.    The Plan fully complies with the requirements of the Bankruptcy Code.

Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable

provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(1) explains that this

provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code

governing classification of claims and contents of the plan, respectively.  *See* H.R. Rep. No. 95-

595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also Kane v. Johns-Manville Corp.* (*In

re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988); *In re Drexel Burnham Lambert

Grp., Inc.*, 138 B.R. at 757.

### B.    Classification of Claims and Interests Is Appropriate and Complies with Bankruptcy Code Section 1122

83.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a

claim or an interest in a particular class only if such claim or interest is substantially similar to the

other claims or interests of such class."  11 U.S.C. § 1122(a).  Under this section, a plan may

provide for multiple classes of claims or interests as long as each claim or interest within a class

is substantially similar to other claims or interests in that class.  In addition, substantially similar

claims may not be classified separately when it is done for an illegitimate reason.  *See Aetna Cas.

& Sur. Co. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996)

("[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be

classified together; similar claims may be classified separately only for a legitimate reason."); *see

also In re Adelphia Commc'ns Corp.*, 368 B.R. at 246-47 (explaining law on classification of

claims as interpreted within the Second Circuit).

84.    Each of the Claims or Interests in each particular Class at a particular Debtor is substantially similar to other Claims or Interests in such Class.  And as laid out in Articles IV, V, VI, VII, and VIII of the Plan, the Debtors reasonably provide for the separate classification of Claims against and Interests in the Debtors into distinct Classes based on:  (a) the security position of such Claim or Interest, if any; (b) its legal priority against the applicable Debtor's assets; and (c) other relevant criteria, including the implementation of the plan settlements.

85.    In total, there are nine (9) Classes of Claims against and Interests in SHC, Kmart of IL, and Kmart of Washington, and eight (8) Classes of Claims against and Interest in each of the other Debtors, based upon differences in the legal nature and/or priority of such Claims and Interests and based on the applicable Debtors:

  i. <u>Kmart IL and Kmart of Washington</u>.  With respect to Kmart IL and Kmart of Washington, the Plan separately classifies Claims against or Interests in Kmart IL or Kmart of Washington, as applicable, into nine (9) Classes as follows:

    a. **Class 1** provides for the separate classification of all Priority Non-Tax Claims that are entitled to priority in payment;

    b. **Class 2** provides the separate classification of Secured Claims, which are technically impaired on account of the releases provided in the Plan;

    c. **Class 3** provides for the separate classification of PBGC Claims;

    d. **Class 4(A)** provides for the separate classification of General Unsecured Claims (other than Guarantee Claims);

    e. **Class 4(B)** provides for the separate classification of Guarantee Claims;

    f. **Class 5** provides for the separate classification of ESL Unsecured Claims;

    g. **Class 6** provides for the separate classification of Intercompany Claims;

WEIL:\97183319\1\73217.0004

h.      **Class 7** provides for the separate classification of Intercompany Interests; and

i.      **Class 8** provides for the separate classification of Subordinated Securities Claims.

ii.     <u>SHC</u>.   With respect SHC, the Plan separately classifies Claims against or Interests in SHC into nine (9) Classes as follows:

a.      **Class 1** provides for the separate classification of all Priority Non-Tax Claims that are entitled to priority in payment;

b.      **Class 2** provides the separate classification of Secured Claims, which are technically impaired on account of the releases provided in the Plan;

c.      **Class 3** provides for the separate classification of PBGC Claims;

d.      **Class 4** provides for the separate classification of General Unsecured Claims;

e.      **Class 5** provides for the separate classification of ESL Unsecured Claims;

f.      **Class 6** provides for the separate classification of Intercompany Claims;

g.      **Class 7** provides for the separate classification of Intercompany Interests;

h.      **Class 8** provides for the separate classification of Subordinated Securities Claims; and

i.      **Class 9** provides for the separate classification of Existing SHC Equity Interests.

iii.    <u>Kmart Corp. and All Other Debtors</u>.   With respect to Kmart Corp. and all other Debtors, the Plan separately classifies Claims against or Interests in Kmart Corp. and all other Debtors, as applicable, into eight (8) Classes as follows:

a.      **Class 1** provides for the separate classification of all Priority Non-Tax Claims that are entitled to priority in payment;

WEIL:\97183319\1\73217.0004

b.      **Class 2** provides the separate classification of Secured Claims, which are technically impaired on account of the releases provided in the Plan;

c.      **Class 3** provides for the separate classification of PBGC Claims;

d.      **Class 4** provides for the separate classification of General Unsecured Claims;

e.      **Class 5** provides for the separate classification of ESL Unsecured Claims;

f.      **Class 6** provides for the separate classification of Intercompany Claims;

g.      **Class 7** provides for the separate classification of Intercompany Interests; and

h.      **Class 8** provides for the separate classification of Subordinated Securities Claims.

86.     The Debtors' classification reflects valid business, factual, and legal distinctions that warranted separate classification on the record here. The classification scheme here generally follows the Debtors' capital structure and the Debtors can establish a legitimate basis for the classification scheme under the Plan that "does not offend one's sensibility of due process and fair play." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 247 (quoting *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 73 (S.D.N.Y. 1994), *aff'd*, 41 F.3d 1502 (2d Cir. 1994) (unpublished table decision)). *See In re Charter Commc'ns*, 419 B.R. at 264 n.35 (explaining that debtors "enjoy considerable discretion when classifying similar claims in different classes"). Debt and equity are classified separately, and secured debt is generally classified separately from unsecured debt. Likewise, other aspects of the classification scheme are related to the different legal or factual nature of each Class—for example, Priority Non-Tax Claims (Class 1) are classified separately due to their required treatment under the Bankruptcy Code. *See, e.g., In re Riggel*, 142 B.R. 199, 203 (Bankr. S.D.

WEIL:\97183319\1\73217.0004

Ohio, 1992) (approving classification based on special treatment of certain claims under the

Bankruptcy Code); Intercompany Claims (Class 6) are classified separately since they do not

involve third party creditors; and Interests are classified separately between interests held by third

parties (Class 9) and those held by other Debtors (Class 7).  The Debtors' separate classification

of the PBGC Claims, the General Unsecured Claims, and the guarantee Claims (where applicable)

are necessary to implement the settlement and compromise of issues related to the PBGC

Settlement and Plan Settlement and the similarly disparate treatment of such claims is appropriate,

as discussed in further detail in Section S.1 below.  Accordingly, the classification of Claims and

Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## C.   Plan Complies with the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code

87.   The Plan fully complies with each requirement in section 1123(a) of the

Bankruptcy Code, which sets forth applicable requirements that the proponent of a chapter 11 plan

must satisfy.  *See* 11 U.S.C. § 1123(a).

> i.   The Plan designates Classes of Claims and Classes of Interests as required by section 1123(a)(1).  *See* Plan, Art. III, IV, V, VI, VII, and VIII.

> ii.   The Plan specifies whether each Class of Claims and Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.  *See* Plan, Arts. III, IV, V, VI, VII, and VIII.

> iii.   The Plan, except as otherwise agreed to by a holder of a particular Claim or Interest, provides that the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4).  *See* Plan, Art. IV, V, VI, VII, and VIII.

> iv.   The Plan and related documents (including the Plan Supplement) provide "adequate means for the plan's implementation" as required by section 1123(a)(5).  The Plan provides adequate means of implementation of the Plan through, among other things: (i) the

establishment of the Liquidating Trust and the appointment of the Liquidating Trustee and Primary Trust Litigation Counsel with the duties and responsibilities to administer and monetize the Liquidating Trust Assets for the benefit of all Liquidating Trust Beneficiaries, *see* Plan, Art. X; (ii) the Plan Settlement, PBGC Settlement, and the Creditors' Committee Settlement, *see* Plan §9.2; (iii) the provisions governing Distributions under Plan, *see* Plan, Art. XI; and (v) the procedures for resolution of Disputed Claims, *see* Plan, Art. XII.

The Debtors may require the proceeds of, among other things, the ESL Litigation (defined below) to fund payments under the Plan. However, prosecuting the ESL Litigation will be the mandate of the Liquidating Trust Board, and will be prosecuted by the Primary Trust Litigation Counsel, which has already been selected as Akin Gump Strauss Hauer and Feld ("**Akin**").  Therefore, to satisfy section 1129 of the Bankruptcy Code and emerge from chapter 11, the Debtors will grant joint standing to the Creditors' Committee with the Debtors to prosecute (i) the Specified Causes of Action, (ii) Other Preserved Causes of Action against the ESL Parties, (iii) all Claims and Causes of Action asserted in the Subcommittee Adversary Complaint, and/or any other Claims or causes of Action ancillary thereto, and (iv) Claims or Causes of Action against insurance carriers related to coverage for claims asserted in Subcommittee Adversary Complaint or a related proceeding (collectively, the "**Jointly Asserted Causes of Action**").

The investigation, prosecution and/or settlement or other disposal of the Jointly Asserted Causes of Action shall be subject to the oversight of designees appointed by the Debtors and the Creditors' Committee (the "**Litigation Designees**").  Specifically, the Litigation Designees shall comprise Patrick J. Bartels, Eugene I. Davis and Raphael T. Wallander, as the Creditors' Committee's designees, and Alan J. Carr and William L. Transier, as the Debtors' designees.  The authority of the Litigation Designees shall be effective immediately upon entry of the Confirmation Order and shall remain and continue in full force and effect until the Effective Date.  The Litigation Designees will serve as fiduciaries for the purpose of overseeing the investigation, prosecution and/or settlement of the Jointly Asserted Causes of Action and, on the Effective Date, will become the initial members of the Liquidating Trust Board pursuant to Section 10.7(a) of the Plan.  Akin shall be retained as primary litigation counsel to act on behalf of the Litigation Designees to investigate, commence, prosecute, and otherwise litigate the Jointly Asserted Causes of Action.

WEIL:\97183319\1\73217.0004

v.      Section 1123(a)(6) does not apply because the Plan provides for the dissolution of the Debtors.

vi.     Sections 10.6 and 10.7 of the Plan provide for the composition of the Liquidating Trust Board and the appointment of the Liquidating Trustee and Primary Trust Litigation Counsel, as required by section 1123(a)(7).[19]   The initial members of the Liquidating Trust Board were selected by the Debtors and the Creditors' Committee in accordance with the Creditors' Committee Settlement under the Plan, and the manner of selection of the Liquidating Trust Board, the Liquidating Trustee, and the Primary Trust Litigation Counsel is consistent with the interest of holders of Claims and Interests and consistent with public policy.   The Debtors have disclosed the identities of the Liquidating Trust Board and Primary Trust Litigation Counsel, each appointed in line with the mechanics agreed to under the Creditors' Committee Settlement.

vii.    Finally, section 1123(a)(8) does not apply because the Debtors are not individuals.

88.    Moreover, *no party has objected to confirmation on the basis that the Debtors have failed to satisfy section 1123(a) of the Bankruptcy Code*.  In light of the foregoing, the Debtors respectfully submit that the Plan satisfies section 1123(a) of the Bankruptcy Code.

### D.    Plan Complies with Bankruptcy Code Section 1123(b)

### 1.    Plan Permissive Provisions

89.    Section 1123(b) of the Bankruptcy Code sets forth the discretionary provisions that may be incorporated into a chapter 11 plan.  As demonstrated below, the Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan are appropriate given the circumstances of these chapter 11 cases and is consistent with section 1123(b):

i.      As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, Classes of Claims

---

[19] The School District argues that the Plan violated section 1123(a)(7) due to certain provisions associated with the Toggle Plan, however, the Debtors are not at this time prosecuting the Toggle Plan.  In the event the Plan Settlement is not approved and the Debtors are required to seek separate approval, the Debtors will do so before the Court at a later time on notice to parties in interest.

and Interests impaired under the Plan and subject to appropriate treatment are described in Articles IV, V, VI, VII, and VIII of the Plan.

ii.      As contemplated by section 1123(a)(2) of the Bankruptcy Code, the Plan provides for the rejection of executory contracts and unexpired leases that have not been previously assumed or rejected under section 365 of the Bankruptcy Code. *See* Plan, Art. XIII.

iii.     Pursuant to section 1123(b)(3) of the Bankruptcy Code, and as described above, the Plan is premised on the Plan Settlement, PBGC Settlement, and the Creditors' Committee Settlement by and among the Debtors, PBGC, and the Creditors' Committee. *See* Plan, Art. IX. And as discussed further above, each of the settlements satisfy the standard for approval under Bankruptcy Rule 9019.

iv.      As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan "may include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan contains certain provisions for (i) distributions to holders of Claims and Interests, (ii) resolution of Disputed Claims, (iii) allowance of certain Claims, (iv) the releases, injunction, and exculpation provisions set forth in Section 15 of the Plan, and (v) retention of Court jurisdiction, in each case consistent with the applicable provisions of the Bankruptcy Code and Second Circuit law. Releases, injunction, and exculpation are discussed *infra*.

## 2.    Plan Releases are Appropriate and Should Be Approved

90.      The Plan provides for the limited releases of claims held by: (i) the Debtors and their Estates against the Released Parties, [20] *see* Plan, § 15.9(a) (the "**Debtor Release**"), and §15.9(c)(ii) (the "**Debtor PBGC Release**," and together with the Debtor Release, the "**Debtor**

---

[20] "**Released Parties**" means in each case, solely in their capacities as such: (a) the Debtors; (b) the Creditors' Committee and each of its members; (c) the Liquidating Trustee; (d) the Liquidating Trust Board; (e) with respect to each of the foregoing entities in clauses (a) through (d), all Related Parties; provided, that, with respect to each of the foregoing entities in clause (c) and (d), each shall not be released for any post-Effective Date conduct; provided, further, that the following entities shall not be "Released Parties" under the Plan: (i) the ESL Parties; (ii) any person or Entity against which any action has been commenced on behalf of the Debtors or their Estates, in this Bankruptcy Court or any court of competent jurisdiction prior to the Confirmation Hearing; (iii) any Entity identified as a defendant or a potential defendant of an Estate Cause of Action in the Plan Supplement; and (iv) any subsequent transferee of any of the foregoing with respect to any Assets of the Debtors; provided, further, that recovery on account of any Causes of Action against the Specified Directors and Officers, solely with respect to D&O Claims, shall be subject to the limitations set forth in Section 15.11. Plan, § 1.135.

WEIL:\97183319\1\73217.0004

Releases"); (ii) certain creditors of the Debtors against the Released Parties (the "**Third Party Release**"), *see* Plan, § 15.9(b); and (iii) PBGC against the Debtors, the Liquidating Trustee, Liquidating Trust, the Estates and certain other affiliated parties (subject to certain limitations) (the "**PBGC Release**," and together with the Third Party Release and the Debtor Releases, the "**Plan Releases**"), *see* Plan, § 15.9(c)(i).  As further described below, the Plan Releases are integral components of the Plan and the settlements embodied therein, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law. Accordingly, the Plan Releases should be approved.

<b>i.       The Debtor Releases are Appropriate and Should Be Approved</b>

91.      The Debtor Releases are contemplated in (a) Section 15.9(a) of the Plan which contains a release of certain Claims or Causes of Action of the Debtors, the Liquidating Trust, and their Estates against the Released Parties and (b) Section 15.9(c) of the Plan which contains mutual releases of certain Claims or Causes of Action between the Debtors, the Liquidating Trustee, the Liquidating Trust, and the Debtors' Estates and PBGC.   The Debtor Releases are limited in that they (i) seek only to release Claims or Causes of Action arising before the Effective Date and against any party and (ii) do not affect the rights under the Plan to enforce the terms of the Plan or any Definitive Documents.  To be clear, the following parties are not being released by the Debtors: (i) the ESL Parties, (ii) any person or Entity against which any action has been commenced on behalf of the Debtors or their Estates, in this Bankruptcy Court or any court of competent jurisdiction prior to the Confirmation Hearing (i.e. the parties named in the Subcommittee Adversary Complaint (defined below)), (iii)  the parties identified as a defendant or a potential defendant of an Estate Cause of Action in the Plan Supplement and (iv) any subsequent transferee of any of the foregoing with respect to any Assets of the Debtors.  The Debtors' Causes of Action that do have substantial value, *i.e.*, Preserved Causes of Action, are *not* being released

57

by the Debtors under the Plan, and such Causes of Actions are specifically preserved and will be pursued by the Liquidating Trustee pursuant to the Plan for the benefit of Liquidating Trust Beneficiaries.  Furthermore, the Debtor PBGC Release and the PBGC Release are mutual releases being provided as part of the PBGC Settlement and does not release third parties.  The Debtor Releases should be approved as they represent an appropriate exercise of the Debtors' business judgment and are in the best interests of the Debtors' Estates.  Significantly, ***no party has objected to the Debtor Releases under the Plan***.

92.    When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A), the appropriate standard is whether the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate.  Claims held by a debtor against third parties are property of the estate and may be released in exchange for settlement.  *See* 11 U.S.C. § 541(a)(1); *see also MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville) (Manville I)*, 837 F.2d 89, 91-92 (2d Cir. 1988).  *See In re Angelica Corp.*, Case No. 17-10870 (JLG), Hr'g Tr. 12:23-13:11 (Bankr. S.D.N.Y. Aug. 29, 2017) ("In cases like this one where there are no known claims against a party to receive a Release, Courts in this district approved Debtor Releases when they represent a valid exercise of the Debtor's business judgement and are in the best interest of the estate."); *see also In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, Case No. 90–13061 (REG), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. DISH Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am.)*, 634 F.3d 79 (2d Cir. 2011); *In re Charter Commc'ns*, 419 B.R. at 257–60; *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (BRL), 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007).  Debtors have

WEIL:\97183319\1\73217.0004

considerable leeway in issuing releases of their own claims, and such releases are considered "uncontroversial." *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 263 n.289 (Bankr. S.D.N.Y. 2007).

93.     The Debtor Releases are an essential component of the Plan and the settlements contemplated therein and constitute a sound exercise of the Debtors' business judgment.  The Debtor Releases are narrowly tailored and the Debtors and their Estates will receive reciprocal releases from potential Claims and Causes of Action of the Released Parties.  Without the Debtor PBGC Release, the Debtors and its stakeholders would not have been able to secure the substantial benefits provided by the PBGC Settlement.  With respect to the Debtor PBGC Release, the PBGC is providing substantial consideration in exchange, including a mutual release under section 15.9(c)(i), and the Debtors would not have been able to proceed with confirmation of their Plan without the PBGC Settlement.  Accordingly, there is ample justification for providing the Debtor Releases and they should be approved.

### ii.    The PBGC Release is Appropriate and Should Be Approved

94.     Pursuant to Section 15.9(c)(i) of the Plan, PBGC is providing a release to "the Debtors for which the Plan is confirmed, the Liquidating Trustee, the Liquidating Trust, and the Estates for any Debtors for which a Plan is confirmed or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code" and any successor or related parties.  Plan, § 15.9(c)(i).  The PBGC Release should be approved because it is fully consensual— PBGC consented to the mutual release as part of the PBGC Settlement.  *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136, 142 (2d Cir. 2005) (holding that third party releases can be approved where the releasing party consents to such release]).   Moreover, ***no party has objected to the PBGC Release under the Plan***. Accordingly, the PBGC Release is appropriate and should be approved.

WEIL:\97183319\1\73217.0004

### iii. The Third Party Release is Appropriate and Should Be Approved

95. Section 15.9(b) of the Plan contains the Third Party Release that applies to the following parties:

i      holders of all Claims who voted to accept the Plan;

ii     holders of Claims who are entitled to vote on the Plan but who reject the Plan or abstain from voting on the Plan and do not opt out of these releases on the Ballots;

iii    each of the Released Parties (other than the Debtors); and

iv    with respect to any entity in the foregoing clauses (i) through (iii), (x) such entity's predecessors, successors, and assigns, and (y) all persons entitled to assert Claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases.

96. To make it absolutely clear, the Third Party Release does ***not*** apply to, nor will there be any attempt to impose them on, those parties not entitled to vote on the Plan nor those rejecting or abstaining creditors that have expressly opted out on the Ballot or objected to the Plan.

97. The Third Party Release can be approved under applicable law because (i) the Third Party Release provided in the Plan is consensual, as voting creditors were afforded the opportunity to opt out of the Third Party Release, (ii) pursuant to section 1141 of the Bankruptcy Code, the Third Party Release is binding on creditors that have not objected to the Plan, and (iii) the Third Party Release, in any event, satisfies the requirements articulated by the Second Circuit in *Metromedia* for the approval of non-consensual third party releases.

### a. The Third Party Release is Consensual

98. Courts generally approve releases of third-party claims against non-debtors where there is consent of the releasing party. *In re Metromedia,* 416 F.3d at 142. Here, the Third Party Release is consensual. **First**, it is well-established that as to those voting to accept a plan that provides for third-party releases, that vote constitutes consent. *See e.g.*, *In re Adelphia*

*Commc'ns Corp.*, 368 B.R. at 268 (if, as here, third party release is appropriately disclosed, consent is established by a vote to accept the plan); *In re Lear Corp.*, Case No. 09-14326 (ALG), 2009 WL 6677995, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept plan were permissible).   Moreover, the Creditors' Committee and each of its representatives indicated their consent to the Third Party Release by virtue of the Creditors' Committee Settlement.

99.    **Second**, this Court and several others in this district have approved third-party releases as consensual where, as here, parties entitled to vote on the Plan are provided with an "opt out" mechanism that includes proper notice of the consequences of not opting out. *See, e.g.* Class 4 (General Unsecured Claim) Ballot, at p.3, subsection c; *see also, e.g.*, *In re Cenveo, Inc.*, Case No. 18-22178 (RDD), Hr'g Tr. 94:13-17, 96:8-15, 140:20-22 (Bankr. S.D.N.Y. Aug. 16, 2018) (ECF No. 687) (approving third-party releases as consensual where abstaining or rejecting creditors were required to opt out of such releases); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD), Hr'g Tr. 43:6-11 (Bankr. S.D.N.Y. Jan. 9, 2018) (ECF No. 926) (confirming plan and approving third-party releases on a consensual basis from creditors that abstained from voting or voted to reject the plan but did not opt out of the releases on their ballots); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Aug. 28, 2019) (ECF No. 1240) (finding consent to third party releases where abstaining parties did not opt out of third party releases on the ballot); *Genco Shipping*, 513 B.R. at 271 ("First, the Court will permit releases with respect to any affected party that consented to grant the releases or may be deemed to have done so through its ability to 'check the box' on the Plan ballots.  That includes those parties who voted in favor of the Plan and those who voted to reject the Plan but failed to opt out from granting the release provisions.") (citations omitted); *In re Calpine Corp.*, 2007 WL 4565223,

61

at *10 (approving third party releases on a consensual basis where "[s]uch releases by Holders of

Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor

of the Plan, who abstain from voting and choose not to opt out of the releases" and finding that

such releases are consensual).[21]

100.    Accordingly, the Third Party Release is consensual and should be approved.

Consistent with established precedent, the Releasing Parties have either (i) voted in favor of the

Plan, or (ii) rejected or abstained from voting on the Plan but did not opt out of granting the Third

Party Release.  As stated, the Third Party Release was conspicuously disclosed in boldface type in

the Plan, and the Disclosure Statement, and included as an annex to the Notice of Confirmation

Hearing and the Ballots.  Of the holders of Claims in Voting Classes who submitted a Ballot, 443

parties voted to reject the Plan and in doing so opted out of granting the Third Party Release, and

153 parties abstained from voting on the Plan and also opted out of granting the Third Party

Releases.  Only 994 parties out of 7,347 total voting parties abstained from voting but did not opt

out.

### b.    The Court Should Approve the Third Party Release Pursuant to Section 1141(a) of the Bankruptcy Code

101.    As this Court held in *In re Tops Holding II Corp.*, even if the Court were to

determine that the opt-out mechanism is insufficient to render the Third Party Release consensual

as to those creditors abstaining or those rejecting and not opting out, for those creditors who have

not objected to confirmation of the Plan, the Plan—including the Third Party Release—is

---

[21] *But see In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) (finding that failure to object to or reject the plan is insufficient to constitute consent to third-party releases for abstaining creditors); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (holding that "inaction" by abstaining creditors was insufficient to constitute consent to third-party releases).

nevertheless binding under section 1141(a) of the Bankruptcy Code.[22]   Section 1141(a) of the

Bankruptcy Code provides that "[e]xcept as provided in subsections (d)(2) and (d)(3) of this

section, the provisions of a confirmed plan bind the debtor . . .  and any creditor . . . whether or not

the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor

. . . has accepted the plan."  11 U.S.C. §1141(a).  As this Court noted in *In re Tops Holding II*

*Corp.*, even if a creditor is not deemed to have consented to plan releases as a matter of contract

law, section 1141(a) of the Bankruptcy Code binds creditors to a plan's provisions—including

third-party releases contained therein—if creditors receive proper notice but fail to object to

confirmation of the plan:

> But I firmly believe that Congress intended Chapter 11 plans to be
> broader than [a contract] and the effect of a Chapter 11 plan to be
> broader than that one-on-one agreement.  And that's clearly laid out
> in [section] 1141 of the Bankruptcy Code.  It gives people a last
> chance to object to a plan.  And if they don't object and the plan is
> confirmed, it's binding on them, its terms are.  And that's in one
> section of [section] 1141, and that's separate and [a]part from
> dealing with their claims.  The whole plan is binding on them.
>
> * * *
>
> So I think as long as you had – let's assume you only had the
> injunction and not the release, which is kind of belt and suspenders,
> actual consensual release. In my view if someone doesn't object to
> that injunction and it's clearly described to them and its effect is
> clearly described to them, it's binding. And frankly, I think they've
> consented to it because they didn't object in terms of the Bankruptcy
> Code.  And I think Congress looked at it this way. Because all they
> do is require those types of provisions to be put in bold so people
> know what its consequence is.
>
> So I think the law is clear, and it was reaffirmed by the Supreme
> Court in *Travelers*.  But it goes back to the Fifth Circuit in *Republic*

---

[22] Only five (5) objecting creditors, Alpine Creations Ltd. (ECF No. 4700), Aspen Marketing Services, Inc. (ECF No. 5041), GroupBy USA, Inc. (ECF No. 5048), PeopleReady, Inc. (ECF No. 4709), and Mien Co. Ltd., et al (ECF Nos. 4716 & 4726), who were eligible to vote on the plan, rejected or abstained from voting and did not opt out of the Plan. The Debtors have treated these objections as an intent to opt out of the Third Party Release.

> *Supply v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987), where, you know, if
> you don't object and the plan is confirmed, you have to live with it.

* * *

> [I]f [the Debtors] want to bind people who don't vote, I think [they
> are] perfectly within [their] rights to tell them, if you don't vote, you
> will be bound by this plan under 1141(a) unless you object and
> defeat the plan on that basis. And I think that's perfectly – I think
> Congress understood that.  Because Chapter 11 plans are collective;
> they're broader than a contract. They have more force than a
> contract.

*See In re Tops Holding II Corp.*, Case No. 18-22279 (RDD), Hr'g Tr. at 33:25-34:8, 34:9-24, 35:6-

13 (Bankr. S.D.N.Y. Sept. 27, 2018) (ECF No. 760) ("**Tops Disclosure Statement Hr'g Tr.**")

(hearing for the approval of the disclosure statement).  *See also Lawski v. Frontier Ins. Grp., LLC*

*(In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018) ("References to chapter

11 plans as contracts or agreements – while useful for purposes of interpreting plans . . . – are only

by analogy, however.  The binding effect of a chapter 11 plan is in fact premised on statutory and

common law claim preclusion. . . . First, in addition to providing for the discharge of a reorganizing

debtor under a chapter 11 plan, section 1141 of the Bankruptcy Code prescribes the binding nature

of a confirmed plan.") (citations omitted), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019).[23]

---

[23] This Court's analysis in *MPM Silicones* considered virtually the same circumstances that exist here with respect to
Third-Party Releases, supporting their approval:

> While it is true that third-party releases and related injunctions in Chapter 11 plans
> and confirmation orders are, under the law of the Second Circuit, proper only in
> rare cases, see [*Metromedia*], if they are consensual or are not objected to after
> proper notice, courts generally approve them unless they are truly overreaching
> on their face. I do not find anything truly offensive in these releases and, thus, to
> the extent that they have not been objected to or a party voted in favor of the plan
> or did not opt out notwithstanding the clear notice in the ballot that stated, in
> upper-case letters, 'If you voted to reject the plan and you did not opt out of the
> release provisions by checking the box below, or if you voted to accept the plan
> regardless of whether you checked the box below, you will be deemed to have
> conclusively, absolutely, unconditionally, irrevocably and forever released and
> discharged the Released Parties from any and all claims and causes of action to
> the extent provided in Section 12.5 of the plan,' the plan may be confirmed
> consistent with both Metromedia and the case law interpreting it, as summarized

102.    Here, it is abundantly clear that all voting creditors were given comprehensive and detailed notice of the Third Party Release, the impact of such releases on creditors and the creditors' corresponding rights, the opportunity and need to opt out, and creditors' right to object to confirmation of the Plan.  *See* Disclosure Statement at 10-13, 160-163; Ballots; Affidavits of Service (ECF Nos. 4543, 4545, 4592).  Accordingly, under the above authority, those provisions are fully enforceable and binding on the Releasing Parties who have not opted out and not rejected to the Plan as specified in Section 15.9(b) of the Plan.

        c.    **The Third Party Release Satisfies the *Metromedia* Requirements for Non-Consensual Releases**

103.    Assuming the Third Party Release is deemed neither consensual nor binding by reason of section 1141(a) of the Bankruptcy Code, the Third Party Releases are nevertheless entirely consistent with the requirements for the approval of non-consensual releases as articulated by the Second Circuit.

104.    Courts generally approve releases of third-party claims against non-debtors when circumstances in the case justify granting the release.  *In re Metromedia*, 416 F.3d at 142. In determining whether the circumstances of a case justify the approval of third-party releases, courts will consider a variety of factors, including:

    a.    whether the estate received substantial consideration;

    b.    whether the enjoined claims were channeled to a settlement fund rather than extinguished;

    c.    whether the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; and

---

by Judge Lane in *In re Genco Shipping & Trading, Ltd.*, 513 B.R. 233 (Bankr. S.D.N.Y. 2014).

*In re MPM Silicones*, LLC, 2014 WL 4436335, at *32.

> d.    whether the plan otherwise provided for the full payment of enjoined claims.

*Id.* at 142.

105.    Assessing third-party releases is not a "matter of factors and prongs."  *Id.* Rather, courts must examine the full set of circumstances when making its determination.  Courts have approved third-party releases where (i) the releases were essential to the debtor's plan and (ii) the released parties provided substantial contribution.  *See, e.g., Genco Shipping*, 513 B.R. at 271-72; *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD), at 18, 30-31 (Bankr. S.D.N.Y. Sep. 11, 2014) (ECF No. 1001); *In re Residential Capital, LLC*, Case No. 12-12020 (MG), at 27-30 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF No. 6065); *Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*, 330 B.R. 394, 437-38 (Bankr. S.D.N.Y. 2005).   The circumstances of these chapter 11 cases justify the Third Party Release.

106.    In this district, Courts have found substantial consideration or a substantial contribution to the estates and reorganization effort and have approved third-party releases where the released parties:

> a.    have made substantial concessions in plan negotiations, including converting secured claims to equity;
>
> b.    have provided exit financing;
>
> c.    forego distributions to which they would otherwise be entitled, in order to provide a recovery to junior classes; and
>
> d.    have settled adequate protection claims.

*See, e.g.*, *Genco Shipping*, 513 B.R. at 272; *In re Sabine Oil & Gas*, 555 B.R. at 291.

107.    Here, to the extent the Court determines that the Third Party Release is not consensual, they clearly satisfy the requirements for non-consensual releases.  **First**, as set forth

below, the Released Parties have provided substantial consideration in exchange for the Third

Party Release, including:

- Since the outset of these chapter 11 cases, the Released Parties have engaged in good-faith negotiations in order to facilitate the structuring, implementation, and execution of the sale of substantially all of the Debtors' assets and a consensual liquidation pursuant to a chapter 11 plan of the Estates.   In particular, the efforts of the Released Parties, including the Related Parties, facilitated the assumption and assignment of over 600 unexpired leases for nonresidential real property and over 3,000 executory contracts to Transform, allowing the continuation of the Sears and Kmart businesses and preservation of thousands of jobs.  These efforts have avoided substantial litigation and the significant costs, delay, and business disruption attendant thereto, and served to expedite the successful administration of these cases.  Importantly, these efforts have avoided a potential conversion to chapter 7 which would reduce recoveries for all stakeholders.

- The Creditors' Committee made significant compromises in connection with the Creditors' Committee Settlement.   Absent the Creditors' Committee Settlement, the Debtors would likely have had to engage in costly and protracted litigation with the Creditors' Committee concerning, among other things, the settlement of substantive consolidation and other plan-related issues. The Creditors' Committee Settlement was a critical element in achieving the largely consensual Plan and enabled the Debtors to proceed to confirmation and an orderly wind down of the Debtors' Estates.

*See, e.g.*, *In re BCBG Max Azria Glob. Holdings, LLC*, Case No. 17-10466 (SCC), Hr'g Tr. 137:21-

138:7 (Bankr. S.D.N.Y. Jul. 25, 2017) (ECF No. 624) (confirming nonconsensual third party

releases as appropriate because of substantial contribution by released parties, releases enjoined

claims that would impact debtors' reorganization, and releases are integral and necessary to the

chapter 11 plan); *In re Worldcom, Inc.*, 2003 WL 23861928, at *28 (finding that "[t]he inclusion

of the [release provisions] was an essential element of the [p]lan formulation process and

negotiations with respect to each of the settlements contained in the [p]lan [and] . . . [t]he inclusion

of the [release provisions] were vital to the successful negotiation of the terms of the [p]lan in that

without such provisions, the [released parties] would have been less likely to negotiate the terms

of the settlements and the [p]lan."); *O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, Case No.

67

08–12547, 2013 WL 1821592, at *6 (Bankr. S.D.N.Y. Apr. 30, 2013) (approving third party releases that are "integral to the global settlement" where the releases are relied upon by the released parties as a condition for the funding of the settlement).

108.    Moreover, the Third Party Release is narrowly tailored.  The Released Parties do not include (i) the ESL Parties, (ii) any person or Entity against which any action has been commenced on behalf of the Debtors or their Estates prior to the Confirmation Hearing, (iii) any Entity identified as a defendant or a potential defendant of an Estate Cause of Action in the Plan Supplement; and (iv) any subsequent transferee of any of the foregoing with respect to any Assets of the Debtors.  The Debtors also further narrowly tailed the definition of "Related Parties" in the Plan to make it clear that such parties are only released to the extent such Party acted on behalf of the Released Parties in connection with the matters as to which releases are provided in the Plan.  In addition, the releases do not extend to any Post-Effective Date conduct by the Liquidating Trustee and the Liquidating Trust Board.

109.    Moreover, under their articles of incorporation and bylaws, the Debtors have indemnification obligations to their current and former directors and officers.  The Third Party Release prevents third parties from seeking to collaterally attack the Plan and/or pursuing actions that would implicate the Debtors by virtue of their indemnification obligations.  The efforts of the directors and officers during the pendency of these chapter 11 cases culminated to the successful sale of substantially all of the Debtors' assets, the preservation of thousands of jobs and a Global Settlement to pave the way towards an exit from chapter 11.  The Third Party Release therefore enjoins Claims that would likely impact the Debtors' implementation of the Plan through indemnity obligations, "consistent with the teaching of *Metromedia*."  *Sabine*, 555 B.R. at 293.

110.    Accordingly, for the foregoing reasons, the Third Party Release satisfies the applicable standards in this Circuit and should be approved.

### 3.    Plan Exculpation Provision Should Be Approved

111.    Section 15.10 of the Plan contains an exculpation for the Exculpated Parties[24] limited to claims arising out of the administration of these chapter 11 cases, including the Asset Purchase Agreement, and the negotiation, formulation, preparation, and pursuit of, among other things, the Disclosure Statement, the Plan, and the solicitation of votes for or confirmation of the Plan (the "**Exculpation Provision**").   The Exculpation Provision carves out acts or omissions that are determined in a final order to have constituted willful misconduct, gross negligence, criminal misconduct, or fraud.

112.    Exculpation provisions are permissible when they are important to a debtor's plan or where the exculpated party has provided substantial consideration to a debtor's plan.  *See In re Chemtura Corp.*, 439 B.R. at 610-11 (citing *In re DBSD*, 419 B.R. at 217); *Adelphia Commc'ns Corp.*, 368 B.R. at 268*; Residential Capital*, Case No. 12-12020 (MG), at 26 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF No. 6065)*; In re Bally Total Fitness*, 2007 WL 2779438, at *8. Courts consider whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition.  *See In re Residential Capital, LLC*, Case No. 12-12020 (MG), at ¶ 291 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF No. 6066) (approving exculpation of certain prepetition lenders who "played a meaningful role. . . in the mediation process, and through the negotiation and implementation of the Global Settlement and Plan"); *In re*

---

[24] "**Exculpated Parties**" means collectively: (a) the Debtors; (b) the Creditors' Committee and each of its members in their official capacity; (c) with respect to each of the foregoing entities in clauses (a) through (b), all Related Parties; provided, that ESL Parties shall not be Exculpated Parties under the Plan. For the avoidance of doubt, each of the Debtors' post-Commencement Date directors, officers, and employees (other than the ESL Parties) shall be Exculpated Parties under the Plan.  Plan § 1.67.

*BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decisionmakers[.]").  The support of the Exculpated Parties was essential to the successful negotiations of the Plan and the Global Settlement, all of which were conducted in good faith and at arm's length.  Developing and executing the Debtor's chapter 11 strategy after the closing of the Sale Transaction were extremely time-intensive and labor-intensive.  Absent the protection afforded by the Exculpation Provision, good faith plan negotiations may not have occurred had the negotiating parties faced the risk of future collateral attacks.  Similarly, the Exculpated Parties would not have assumed burden-bearing prominent roles in the Debtors' bankruptcy and negotiated a plan that will inure to the benefit of all creditors if had they expected resultant litigation exposure.  *See In re DBSD N. Am., Inc.*, 419 B.R. at 217–18.  Accordingly, the Exculpation Provision is consistent with the Bankruptcy Code and complies with applicable case law.  Moreover, ***no party has objected to the Exculpation Provision***.  As such, the Exculpation Provision should be approved.

113.    Based on the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

### 4.    The Injunction is Narrowly Tailored and Should Be Approved

114.    Section 1141(d)(3) of the Bankruptcy Code provides that "[t]he confirmation of a plan does not discharge a debtor if . . . the plan provides for the liquidation of all or substantially all of the property of the estate."  11 U.S.C. § 1141(d)(3).  To be clear, Section 17.12 of the Plan provides that the Debtors are not being discharged under section 1141 of the Bankruptcy Code.  *See* Plan, § 17.12 ("For the avoidance of doubt, confirmation of the Plan

70

does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan."). Therefore, the Plan satisfies section 1141 of the Bankruptcy Code and does not improperly seek to discharge the Debtors.

115.    Under Section 15.8 of the Plan, all holders of Claims or Interest are enjoined from taking any of the following actions against or affecting the Debtors, the Liquidating Trust, or the property of any of the Debtors or the Liquidating Trust on or after the Effective Date:

- commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind including any proceeding in a judicial, arbitral, administrative or other forum);

- enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner and means, whether directly or indirectly, any judgment, award, decree, or order;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind;

- asserting any right of setoff, directly or indirectly, against any obligations due from the Debtors or the Liquidating Trust or against property or interest in property of any of the Debtors or the Liquidating Trust; and

- acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan (the "**Injunction**").

*See* Plan § 15.8.

116.    Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). The Injunction is necessary to effectuate the Plan's releases and to protect the Released Parties, including the Debtors, and the Liquidating Trust from potential litigation from prepetition creditors as they implement the provisions of the Plan after the Effective Date. Such litigation would hinder the efforts of the Liquidating Trust to effectively fulfill its responsibilities as contemplated in the Plan and thereby maximize value for all creditors.

WEIL:\97183319\1\73217.0004

*See, e.g.*, *Bally Total Fitness of Greater N.Y., Inc.*, 2007 WL 2779438, at *8 (finding injunction provisions appropriate where they were fair, equitable and important to the plan); *In re Angelica Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Aug. 31, 2017) (ECF No. 544) (finding the injunction provisions contained in the debtors' liquidating plan appropriate where they were essential to the implementation of the plan, key to the efficient wind down of the debtors' estates, and proposed in good faith following extensive arms'-length negotiations between the debtors and the released parties).

117.    The Injunction provision is integral to the Plan, is in the best interests of the Liquidating Trust and the Liquidating Trust Beneficiaries, is an appropriate exercise of the Debtors' business judgment, and is in accordance with section 1123(b)(6) of the Bankruptcy Code. The injunction replaces the automatic stay following the Effective Date of the Plan to ensure that parties in interest do not take actions inconsistent with the Plan to the detriment of, and in a manner unfair to, other parties in interest.  If necessary, parties can seek relief from the injunction from the Bankruptcy Court as they could today with respect to the automatic stay.

118.    Accordingly, the Debtors respectfully submit that the Injunction is proper, appropriate in scope, and necessary for the implementation of the Plan, and as such, Injunction set forth in Section 15.8 of the Plan should be approved.

### E.    Plan Satisfies Bankruptcy Code Section 1129(a)(2)

119.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of

chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 759.  The Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting votes on the Plan through their Voting Agent pursuant to the Disclosure Statement Order.  *See* Voting Certification. Moreover, only one party has objected to confirmation on the basis that the Debtors have failed to satisfy section 1129(a)(2) of the Bankruptcy Code, and the objection is not really an objection to section 1129(a)(2) of the Bankruptcy Code, but rather, an objection to the Debtors' allocation of certain costs on an entity by entity basis during the pendency of the Chapter 11 Cases.  *See* Objection Chart, Cyrus Objection (ECF No. 4731).  For the reasons stated, the Debtor has satisfied the requirement of section 1129(a)(2) of the Bankruptcy Code.

**F.    Plan Has Been Proposed in Good Faith in Compliance with Bankruptcy Code Section 1129(a)(3)**

120.    The Debtors have satisfied section 1129(a)(3) of the Bankruptcy Code, which requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The Second Circuit has defined the good faith standard as "requiring a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (citations omitted).  "Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Chemtura Corp.*, 439 B.R. at 608 (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).  "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection

1129(a)(3) speaks more to the process of plan development than to the content of the plan." *Id.*
(internal quotation marks omitted).

121.    In satisfaction of their fiduciary duties, the Debtors and their advisors have
sought to maximize the value of the Debtors' Estates through engagement with stakeholders and
achievement of consensus wherever reasonably possible.  The Plan seeks to maximize value while
efficiently and effectively winding down the remaining Estates post-Sale Transaction.   The
Debtors developed the Plan in close consultation with its primary stakeholders following months
of  diligence  and  negotiation.    Moreover,  throughout  such  periods,  the  Debtors  conducted
exhaustive review and analyses of Plan-related issues to ensure the chapter 11 plan was is in the
best interests of all stakeholders as evidenced by the public record.  The Plan is a product of an
intensive process – with each settlement gaining further consensus and buy-in.  The Plan and the
Global Settlement reflected therein is the ultimate result of hard fought negotiations between
parties  (represented  by  sophisticated  advisors)  and  seeking  to  maximize  recoveries  for
stakeholders.

122.    The Creditors' Committee and PBGC's support of the Plan reflects the
Plan's fairness and the good faith efforts of the parties to achieve the objectives of chapter 11.
Accordingly, the Debtors have acted with the best intentions for creditors in proposing the Plan
and have satisfied the good faith requirement of section 1129(a)(3).  *See In re Chemtura Corp.*,
439 B.R. at 608-09 (finding good faith requirement met because, among other things, debtor
negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan
which "in the aggregate…demonstrate a good faith effort on the part of the debtor to consider the
needs and concerns of all major constituencies in this case").

WEIL:\97183319\1\73217.0004

### G.   Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments and Complies with Bankruptcy Code Section 1129(a)(4)

123.   All payments for services provided to the Debtors during the Chapter 11 Cases have been approved, or are subject to approval, by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Section 1129(a)(4) requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court.  *See In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y 2009), *appeal dismissed*, 452 B.R. 367 (S.D.NY. 2010); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Texaco Inc.*, 84 B.R. 893, 907-08 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988).

124.   Section 2.2 of the Plan provides that all Fee Claims must be approved by the Court pursuant to final fee applications as reasonable.  Further, the Plan provides that the Court shall retain jurisdiction to "decide and resolve all matters related to the granting and denying . . . any applications for allowance of compensation or reimbursement of expenses of professionals authorized pursuant to the Bankruptcy Code or the Plan."  *See* Plan, § 16.1(c).  The Debtors submit that the professional fees contemplated by Section 2.2 of the Plan are fair, reasonable, and comparable to professional fees earned and paid in chapter 11 cases such as these.  Additionally, pursuant to Section 2.2(b) the Plan, only Allowed Fee Claims will be paid, and such Allowed Fee Claims will be paid first out of the Carve-Out Account.  Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

WEIL:\97183319\1\73217.0004

125.     Further, on January 3, 2019, the U.S. Trustee filed a motion to appoint an independent fee examiner in these Chapter 11 Cases (ECF No. 1470) (the "*Fee Examiner Motion*").  After consultation with the Debtors, the Creditors' Committee, and other parties in interest, the U.S. Trustee appointed Paul E. Harner as an independent fee examiner (the "*Fee Examiner*"), subject to the terms and conditions of the order authorizing the appointment of the Fee Examiner entered on April 22, 2019 (ECF No. 3307) ("**Fee Examiner Order**") and the Interim Compensation Order (as defined in the Fee Examiner Motion and as modified by the independent Fee Examiner Order).  Accordingly, Fee Claims are subject to another level of review by the Fee Examiner.

### H.   Debtors Have Disclosed Liquidating Trust Board Members, Liquidating Trustee, and Primary Trust Litigation Counsel in Compliance with Bankruptcy Code Section 1129(a)(5)

126.     The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code, which requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors proposed to serve after confirmation of the plan and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.  In addition, to the extent there are any insiders that will be retained or employed by the reorganized debtors, section 1129(a)(5)(B) requires that the plan proponent disclose the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5)(A)(i).

127.     The five (5) initial members of the Liquidating Trust Board that were selected by the Debtors and the Creditor's Committee have been disclosed in the Plan. *See* Plan § 10.6.  In addition, pursuant to the Plan Supplement, (a) the identities of the Primary Trust Litigation Counsel, as selected by the Liquidating Trust Board in accordance with the Creditors' Committee Settlement, (b) the mechanics for selecting a Liquidating Trustee, and (c) the

76

composition of the Liquidating Trust Board were also specifically disclosed.  *See* Plan Supplement.

All such appointment or continuance of such officers or directors in the Liquidating Trust are

consistent with the interest of creditors and equity security holders and public policy.  *See*

11 U.S.C. § 1129(a)(5)(A)(ii).  Moreover, ***no party has objected to confirmation on the basis that***

***the Debtors have failed to satisfy section 1129(a)(5) of the Bankruptcy Code***.  In light of the

aforementioned evidence, the Plan complies with section 1129(a)(5) of the Bankruptcy Code.

## I.    Plan Does Not Require Governmental Regulatory Approval of Rate Change

128.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any

regulatory commission that will have jurisdiction over the debtor after confirmation has approved

any rate change provided for in the plan.  The Plan does not provide for any rate change; therefore,

section 1129(a)(6) of the Bankruptcy Code is inapplicable here.

## J.    Plan is in Best Interests of All Creditors of the Debtors

129.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the

best interests of creditors and stockholders in the Debtors—commonly referred to as the "best

interests" test.  The best interests test focuses on potential individual dissenting creditors rather

than classes of claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526

U.S. 434, 441 n.13 (1999).  It requires that each holder of a claim or equity interest either accept

the plan, or receive or retain under the plan property having a present value—as of the effective

date of the plan—not less than the amount such holder would receive or retain if the debtor were

liquidated under chapter 7 of the Bankruptcy Code.

130.    Under the best interests test, "the court must measure what is to be received

by rejecting creditors . . . under the plan against what would be received by them in the event of

liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules

of distribution of the estate under chapter 7, as well as the probable costs incident to such

liquidation." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252.  The Court must evaluate the liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."  *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000).   As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

131.    The best interests test does not apply to the holders of Claims in Class 1 (Priority Non-Tax Claims) because each holder in Class 1 is unimpaired under the Plan, deemed to accept the Plan, and will either receive payment in full, in Cash, be reinstated and paid in the ordinary course, or otherwise its legal, equitable, or contractual rights will not be altered.  Accordingly, the holders of Claims in Class 1 are receiving or retaining under the Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

132.    As set forth in the Liquidation Analysis (as may be amended, supplemented, or modified), the best interests test is satisfied as to every single holder of a Claim against or Interest in the Debtors.  *See* Disclosure Statement, Ex. E-1, Liquidation Analysis (Plan Settlement).  Specifically, the Liquidation Analysis demonstrates that, in the Plan *all* Classes of Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.  Accordingly, based upon the foregoing, the Debtors submit that the best interest test is satisfied.  *See* Murphy Decl., ¶ 5.

133.    Further, the Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such that (i) the

WEIL:\97183319\1\73217.0004

additional costs and expenses that would be incurred by the Debtors as a result of fees for one or more chapter 7 trustee and retention of new professionals; (ii) the delay and erosion of value of the Debtors' assets that would be caused due to the need of the newly appointed chapter 7 trustee(s) and its professionals to familiarize themselves with the assets and liabilities of the Debtors; (iii) the reduced recoveries that would be caused by pressure on the chapter 7 trustee(s) to settle and expedite recoveries; (iv) PBGC would assert General Unsecured Claims of $1.4 billion and a Termination Premium Claim of approximately $340 million at every Debtor and would not direct KCD to waive its potential Administrative Expense Claims of $146 million; and (v) the chapter 7 trustee would have to assume the defense of this appeal, the trustee and its professionals will likely incur extensive costs to get up to speed on the substantial record of this dispute and there is a significantly higher likelihood that the trustee may not be successful on appeal as compared to the Debtors and their professionals.  If the chapter 7 trustee is not successful, any Allowed 507(b) Claim would reduce, on a dollar for dollar basis, recoveries for junior creditors.  The Debtors' Liquidation Analysis should be given deference. *See* Murphy Decl., ¶ 6.  s*ee also In re Charter Commc'ns*, 419 B.R. at 261-62 (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize.").  Moreover, only one party[25] has objected to confirmation on the basis that the Debtors have failed to satisfy section 1129(a)(7) of the Bankruptcy Code, which is actually just another challenge to the Debtors' administrative solvency and not a true "best interests test" objection.  *See* Objection Chart, Tannor Capital Advisors (ECF No. 4673).  Accordingly, the

---

[25] Tannor Capital Advisors (ECF No. 4673).

WEIL:\97183319\1\73217.0004

Debtors submit that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

### K.    Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8)

134.    As evidenced by the Voting Certification and as set forth above, the Plan has been accepted by in excess of two-thirds in amount and one-half in number in Class 2 (Secured Claims) (All Debtors except Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc.), Class 3 (PBGC Claims) (All Debtors), and Class 4(A) (General Unsecured Claims other than Guarantee Claims) (Kmart IL and Kmart of Washington), each an Impaired Class entitled to vote.

135.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan, as follows: "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).

- 100% of the voting creditors (in number and amount) in Class 2 – Secured Claims at forty-six (46) Debtors and in excess of two-thirds in amount and one-half in number at five (5) Debtors voted to accept the Plan;

- 100% of the voting creditors (in number and amount) in Class 3 – PBGC Claims at each Debtor voted to accept the Plan; and

- 100% of the voting creditors (in number and amount) in Class 4(A) (General Unsecured Claims other than Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC voted to accept the Plan.

136.    Thus, as to such Classes at such Debtors, the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied.

137.    Holders of Claims in Class 2 (Secured Claims) at Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc., Class 4 (General Unsecured Claims) at each Debtor other than Kmart Stores of Illinois LLC and Kmart of Washington LLC, and Class

WEIL:\97183319\1\73217.0004

4(B) (Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC have voted to reject the Plan. However, with respect to the two rejecting Class 2 (Secured Claims), only two holders voted at the respective Debtors, with one accepting and one rejecting, and all voting in the amount of one dollar, which resulted in both such Classes having only 50% in number and amount. The Debtors believe that the one rejecting voter at both Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc. do not have any secured claims, and the Debtors intend to object to their claims on that basis. Further, pursuant to the Plan, holders of all Secured Claims will be satisfied in full. Therefore, as discussed more fully below in paragraph 209 below, the Plan may be confirmed notwithstanding the rejection by Class 2 at Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc. pursuant to Section 1129(b)(2)(A) of the Bankruptcy Code.

138.    Furthermore, Holders of Claims or Interests in Class 6 (Intercompany Claims) (All Debtors), Class 7 (Intercompany Interests) (All Debtors), Class 8 (Subordinated Securities Claims) (All Debtors), and Class 9 (SHC Existing Equity Interests) (SHC) are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code. Class 5 (ESL Unsecured Claims) (All Debtors), an Impaired Class entitled to vote, abstained from voting at any of the Debtors. However, ESL objected to the Plan. *See* ESL Objection (ECF Nos. 4718, 4786). Under these circumstances, the Debtors are also requesting to "cram down" Class 5. As discussed more fully in paragraphs 206 to 226 below, the Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the rejection by Class 4 (General Unsecured Claims) at each Debtor other than Kmart Stores of Illinois LLC and Kmart of Washington LLC and Class 4(B) (Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC and deemed rejection by

Class 6 (Intercompany Claims) (All Debtors), Class 7 (Intercompany Interests) (All Debtors),

Class 8 (Subordinated Securities Claims) (All Debtors), and Class 9 (SHC Existing Equity

Interests) (SHC), and abstention in Class 5 (ESL Unsecured Claim).

**L.    Plan Provides for Payment in Full of All Allowed Administrative and Priority Claims**

139.    The Plan complies with section 1129(a)(9) of the Bankruptcy Code.

Specifically, section 1129(a)(9) requires that a plan provide for persons holding allowed claims

entitled to priority under section 507(a) to receive specified cash payments under the plan, unless

the holder of a particular claim agrees to a different treatment with respect to such claim.

11 U.S.C. § 1129(a)(9).    Consistent with section 1129(a)(9) of the Bankruptcy Code, the Plan

expressly provides, unless such holder agrees to less favorable treatment, that holders of Allowed

Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full,

in Cash, on the later of (i) the Effective Date, (ii) the first business day after the date that is thirty

(30) calendar days after the date such Claim becomes Allowed, and (iii) the next Distribution Date

after such Administrative Expense Claims becomes Allowed.  *See* Plan, § 2.1; *see also, e.g. In re*

*20 Bayard Views, LLC,* 445 B.R. 83, 99 (Bankr. E.D.N.Y. 2011) (holding that the debtors had

established by a preponderance of the evidence that the plan met the requirements of section

1129(a)(9)(A) because the plan provided that the administrative claims would be paid in full "on

(i) the [e]ffective [d]ate or (ii) the [d]istribution [d]ate immediately following the date on which

the [a]dministrative [c]laim becomes [allowed].").    A discussion detailing evidentiary support to

demonstrate belief that there will be sufficient funds and assets in the Debtors' Estates to pay

Administrative Expense Claims in full in accordance with the Plan is provided in Section N below.

140.    Moreover, the Plan provides that, unless a holder agrees to less favorable

treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the Bankruptcy

WEIL:\97183319\1\73217.0004

Code (excluding Priority Tax Claims under section 507(a)(8), as described below) will be paid in full, in Cash, on the later of (i) the Effective Date, (ii) the date that is ten (10) business days after the date on which such Claim becomes Allowed, or (iii) the next Distribution Date after such Claim becomes Allowed. *See* Plan, §§ 4.1, 5.1, 6.1, 7.1, 8.1, Art. XI and XII. The Plan, therefore, satisfies the requirements of section 1129(a)(9)(A) and (B).

141. The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of Allowed Priority Tax Claims under section 507(a)(8). Pursuant to Section 2.3 of the Plan, except as otherwise may be agreed, holders of Allowed Priority Tax Claims will be paid (a) Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is Allowed on the Effective Date, (ii) the first business day after the date that is thirty (30) calendar days after the date such Claim becomes Allowed, and (iii) the date such Claim is due and payable in the ordinary course as such obligation becomes due, or (b) equal annual Cash payments in an aggregate amount equal to the amount to such Claim together with interest at the applicable rate under section 11 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date. *See* Plan, § 2.3.

142. Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

### M.    Plan Was Accepted By at Least One Impaired Class and Satisfies Bankruptcy Code Section 1129(a)(10)

143. An Impaired Class entitled to vote to accept or reject the Plan has accepted the Plan for each Debtor, accordingly the Plan satisfies section 1129(a)(10) of the Bankruptcy Code, which requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."

11 U.S.C. § 1129(a)(10).  Here, certain of the Classes entitled to vote on the Plan—Class 3 (PBGC Claims) (All Debtors) and Class 4(A) (General Unsecured Claims other than Guarantee Claims) (Kmart IL and Kmart of Washington)—are Impaired and have accepted the Plan, without including the acceptance of the Plan by any insiders in such Class.  Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### N.    Plan Is Feasible Satisfying Section 1129(a)(11)

#### 1.    Feasibility Standard

144.    The Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code, which requires the Bankruptcy Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  The feasibility test generally requires the Court to determine whether the Plan may be implemented and has a reasonable likelihood of success.  *See In re Advance Watch Co., Ltd.*, 2016 Bankr. LEXIS 229 (Bankr. S.D.N.Y. Jan. 25, 2016); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 843 F.2d 636, 649 (2d Cir. 1988).  To be clear, feasibility ***does not require guaranteed success***.  *See Manville I*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed." (citation omitted)).  The key element of feasibility is whether there is a ***reasonable probability*** that the provisions of the plan can be performed.  *See e.g., In re Journal Register Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y. 2009) (explaining that the feasibility test is "whether the things which are to be done after confirmation can be done as a practical matter under the facts") (internal quotation and citations omitted), *appeal dismissed sub nom. Freeman v. Journal Register Co.*, 452 B.R. 367 (S.D.N.Y. 2010).  The purpose

of the feasibility test is to protect against visionary or speculative plans.  As noted by the United States Court of Appeals for the Ninth Circuit: "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted).

145.    The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.  *See In re U.S. Truck Co.,* 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).  "[T]he debtor must show more than a bare possibility of success the debtor must show at least *a reasonable likelihood of success*, that is, that success is more likely that failure." *In re DeLuca,* 1996 WL 910908, at *22 (Bankr. E.D. Va. Apr. 12, 1996) (emphasis added).

146.    Further, feasibility is a relatively low threshold. *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, Nos. 09 Civ. 10156, 09 Civ. 10372, 09 Civ. 10373 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds sub nom. DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79 (2d Cir. 2011); *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998) ("only 'a relatively low threshold of proof [is] necessary to satisfy the feasibility requirement'") (quoting *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996)); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (the feasibility requirement is generally not viewed as rigorous).

147.    Specifically, in the context of a liquidating plan, some Courts have interpreted section 1129(a)(11) of the Bankruptcy Code to mean that a plan that provides for

WEIL:\97183319\1\73217.0004

liquidation automatically satisfies §1129(a)(11), while other Courts still inquire whether the liquidation proposed by the plan is itself feasible, but as a greatly simplified standard. *In re Cypresswood Land Partners, I*, 409 B.R. 396, 432 (Bankr. S.D. Tex. 2009) (internal citations omitted). Following the first approach, certain Bankruptcy Courts in Delaware have found "automatic feasibility" in liquidating plans. *See, e.g. In re ie Corp.*, No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867, at *17 (Bankr. D. Del. Oct. 27, 2010) (finding that the debtor's liquidating plan satisfied section 1129(a)(11) of the Bankruptcy Code and was feasible because the plan provided for the liquidation and distribution of the debtors' assets); *In re SPC Seller*, No. 09-12647, 2010 Bankr. LEXIS 5321, at *22 (Bankr. D. Del. Dec. 8, 2010) (finding that "[b]ecause the [p]lan is a plan of liquidation, pursuant to 1129(a)(11), the [p]lan is feasible."). Other Courts have found feasibility is established where the debtor can demonstrate that the plan satisfies the conditions precedent to the effective date and otherwise has sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and consummating the Plan and closing the cases. *See In re Finlay Enters., Inc.*, No. 09–14873 (JMP), 2010 WL 6580629, at *2-6 (Bankr. S.D.N.Y. May 18, 2010) (observing that in the context of liquidating plans, "the feasibility standard is greatly simplified" and only requires a debtor to demonstrate the "debtor's ability to satisfy the conditions precedent to the [chapter 11 plan] [e]ffective [d]ate and otherwise have sufficient funds to pay for the costs of administering and fully consummating the [chapter 11 plan] and closing the [c]hapter 11 [c]ases."). Certain other Courts have evaluated feasibility under both approaches. *See, e.g., In re PC Liquidation Corp.*, No. 05-89022-288, 2006 Bankr. LEXIS 4638, at *9 (Bankr. E.D.N.Y. Nov. 13, 2006) (finding that the plan was feasible under section 1129(a)(11) because "the conditions precedent to confirmation have been or will be satisfied, and the estate otherwise will have sufficient funds to meet the obligations under the Plan

with respect to the payment of Allowed Claims pursuant to the terms of the Plan.  Further, the Plan is a plan of liquidation so feasibility is not an issue."); *In re Nailite Int'l*, No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878, at *12-13 (Bankr. D. Del. Dec. 8, 2009) (finding that, "[b]ecause the [plan] is a plan of liquidation, pursuant to section 1129(a)(11), the [plan] [was] feasible," and that because certain articles of the plan provided for "the means for implementing the [plan] and demonstrate[d] the [d]ebtor's ability to make the payments anticipated [under the plan], "the [plan] satisfie[d] the requirements of section 1129(a)(11) of the Bankruptcy Code.").

### 2.    The Plan is Feasible

148.    Under the "automatic" feasibility approach, the Plan is clearly a liquidating chapter 11 plan and should therefore automatically satisfy section 1129(a)(11).  Under the alternative approach, the Debtors will be able to satisfy the conditions precedent to the Effective Date and prove by a preponderance of the evidence that they will otherwise will have sufficient funds to meet its post-Confirmation Date obligations to pay for the ongoing costs of administering and consummating the Plan and ultimately closing the chapter 11 cases.

149.    The following section summarizes: (i) the Debtors' current estimate of Claims required to be paid by the Effective Date, (ii) the Debtors' estimate of funds available to administer and consummate the Plan, including current and expected available cash, Preference Actions proceeds, D&O Litigation proceeds, and ESL Litigation proceeds, (iv) why entry of the Confirmation Order prior to the monetization of distributable proceeds is appropriate and how the risks were properly disclosed, and (v) how an Administrative Expense Claims Settlement, if achieved, will further reduce the Debtors' claim burden and allow the Debtors' to consummate the Plan on a faster timeline.

### i.    Debtors' Estimate of Secured, Priority, and Administrative Expense Claims

150.    The Debtors have set the following bar dates, each of which has passed: (a) April 10, 2019 – the general bar date (the "**General Bar Date**") and (b) September 3, 2019 – the governmental unit bar date (ECF No. 2676).    To date, over 23,000 proofs of claim with a total value of approximately $85.7 billion have been filed.    Since February 2019, the Debtors and their advisors have been conducting a thorough claims reconciliation process.    As a result of this process (which is ongoing), the Debtors' believe as of the date hereof that the total amount of Claims required to be paid by the Effective Date is approximately $86 million.    *See* Murphy Decl., ¶¶ 28-31.    This estimated total includes approximately: (i) $0 in claims pursuant to section 503(b)(9) of the Bankruptcy Code ("**503(b)(9) Claims**") (when taking into account Transform's obligations under Section 2.3(i)(iv) of the APA[26]), (ii) $50 million in other administrative claims excluding 503(b)(9) Claims ("**Other Administrative Expense Claims**"), (iii) $18 million in Priority Tax Claims and Priority Non-Tax Claims (together, "**Priority Claims**"), and (iv) $18 million in  Secured Claims (collectively, the "**Outstanding Claims**").    *See* Murphy Decl., ¶¶ 29-30.

151.    To date, the Debtors have filed claims objections in the aggregate amount of approximately $700 million, reducing the total remaining Outstanding Claims from $6.6 billion to $5.9 billion.    The Debtors intend to file additional objections against approximately $5.8 billion in the aggregate of Claims.    In addition, the Plan, if confirmed, will extinguish approximately $58.6 billion of duplicate cross debtor claims and $1.9 billion of PBGC claims.    Accordingly, the

---

[26] Section 2.3(k)(iv) of the Asset Purchase Agreement provides that Transform is liable for up to $139 million in 503(b)(9) Claims.  However, Transform's liability for 503(b)(9) Claims is subject to a dollar-for-dollar reduction upon the occurrence of certain events, including if the Prepaid Inventory Shortfall Amount or Specified Receivables Shortfall Amount is a positive number under Section  2.3(k)(vii) and Section  2.3(k)(ix) of the APA.  Two of the remaining APA Disputes relate to the correct Prepaid Inventory Shortfall Amount and the Specified Receivables Shortfall Amount.

total remaining Outstanding Claims is approximately $176.7 million, resulting in a final estimated

total of $86 million when Transform's obligation to assume $90 million of 503(b)(9) Claims is

taken into account.  *See* Murphy Decl., ¶¶ 30-31.

### ii.    503(b)(9) Claims

152.    In approximately February 2019, around the Closing Date of the Sale

Transaction, the Debtors started a 503(b)(9) Claims reconciliation process ("**503(b)(9) Claims**

**Reconciliation Process**"), recognizing that it would be beneficial to the Estates to obtain an

accurate estimate of 503(b)(9) Claims.  As described in detail in the Murphy Declaration, the

503(b)(9) Claims reconciliation process has been extensive and ongoing.  *See* Murphy

Decl., ¶¶ 33-36.  As a result of this process, the Debtors and their advisors estimate that there are

approximately $90 million in 503(b)(9) Claims as follows:

| 503(b)(9) Claims | |
| --- | --- |
| 503(b)(9) Claims filed to date | $1.4 billion |
| *Minus* objections filed to date | $630 million |
| *Minus* additional objections anticipated | $105 million |
| *Minus* claims expunged upon Confirmation | $555 million |
| *Equals* resulting estimate | $90 million |
| *Total* after payment by Transform of $97 million pursuant to Section 2.3(k)(iv) of the APA (reduced for the Prepaid Inventory Shortfall Amount) | **$0** |

*See* Murphy Decl., ¶ 33.

153.    Since the General Bar Date passed on April 10, 2019, a total of 2,635 proofs

of claim asserting 503(b)(9) Claims in the amount of approximately $1.4 billion in the aggregate

have been filed.  The Debtors and their advisors reconciled the filed proofs of claim against the

Debtors' books and records over the course of a thorough, months-long process.  *See Murphy*
Decl., ¶ 34-36.

154.     The Debtors have already filed eight (8) objections to $630 million in the
aggregate amount of 503(b)(9) Claims (ECF Nos. 4775, 4776, 4914, 5030, 5031, 5075, 5100,
5101), and intend to file additional objections to $105 million in the aggregate of 503(b)(9) Claims.
*See* Murphy Decl., ¶ 37.  In addition, the Debtors have identified approximately $555 million in
the aggregate amount of 503(b)(9) Claims that will be expunged pursuant to Section 9.2(a)(iii) the
Plan, relating to, among other things, duplicate claims asserted multiple Debtors.  *See* Murphy
Decl., ¶¶ 37-39.

155.     Section 2.3(k)(iv) of the APA provides that Transform will be liable for up
to $139 million in 503(b)(9) Claims (subject to Transform's severance obligations and deductions
from any Prepaid Inventory Shortfall Amount).  As a result, the Debtors believe that the total
amount of 503(b)(9) Claims the Debtors are obligated to pay is $0.  But, in the event Transform
does not pay its obligations as required under the APA, the Debtors' 503(b)(9) Claim obligations
would be approximately $90 million.  *See* Murphy Decl., ¶ 39.

### iii.     Other Administrative Expense Claims

156.     The process of assessing non-503(b)(9) Claims has been ongoing since July
2019.  The primary focus of this effort has been to determine which of the Other Administrative
Claims, Priority Claims, and Secured Claims filed to date are valid.  The total amounts of these
claims were then calculated considering the objections filed to date, objections to be filed, and
expungements expected upon confirmation of the Plan.  *See* Murphy Decl., ¶ 40.

157.     As of September 5, 2019, the total number of Other Administrative Expense
Claims filed was $1.157 billion.  As reflected in the following table, the Debtors estimate Other
Administrative Expense Claims in the amount of approximately $50 million:

| Other Administrative Expense Claims | |
|---|---|
| Claims filed to date | $1.157 billion |
| *Minus* objections filed to date | $17.3 million |
| *Minus* additional anticipated objections | $44 million |
| *Minus* claims expunged upon Confirmation | $1.075 billion |
| *Plus* additional amounts related to post-petition pre-closing accounts payable | $30 million |
| *Equals* resulting estimate | $50 million |

See Murphy Decl., ¶ 41.

158.    The Debtors have already filed eight (8) objections to $17.3 million in the aggregate amount of Other Administrative Expense Claims (ECF Nos. 4775, 4776, 4914, 5030, 5031, 5075, 5100, 5101), and intend to file additional objections to $44 million in the aggregate of Other Administrative Expense Claims.  *See* Murphy Decl., ¶¶ 43-44.

159.    According to Transform, the Debtors' books and records show $41 million in post-petition and pre-close accounts payables that Transform claims the Debtors are responsible for pursuant to section 2.3(k)(iv) of the APA.  However, even if this were true, because the Court has already ruled that Transform is obligated to pay $166 million in post-petition pre-Closing accounts payable, and they have only paid $155 million to date,[27] an additional $30 million related to post-petition pre-Closing accounts payable has been added to the estimate.  This results in a total estimate of $50 million in Other Administrative Expense Claims.  *See* Murphy Decl., ¶ 45.

---

[27] Debtors have been provided detail from Transform supporting its claim to have made approximately $155 million of the payments against the $166 million, which remains subject to verification by the Debtors.

WEIL:\97183319\1\73217.0004

### iv.    Priority Claims

160.    To date, Priority Claims in the aggregate amount of $2.37 billion have been filed.  As reflected in the table below, the Debtors' estimated amount of Priority Claims is $18 million:

| Priority Claims | |
|---|---|
| Claims filed to date | $2.37 billion |
| *Minus* objections filed to date | $14.7 million |
| *Minus* additional anticipated objections | $1.55 billion |
| *Minus* claims expunged upon Confirmation | $787 million |
| *Equals* resulting estimate | $18 million |

*See* Murphy Decl., ¶¶ 46-47.

161.    The Debtors have already filed objections to $14.7 million in the aggregate amount of Priority Claims (ECF Nos. 4775, 4776, 5075, 5100, 5101), and intend to file Objections to all of the remaining Priority Claims, $1.55 billion in the aggregate.  *See* Murphy Decl., ¶¶ 50-51.  In addition, the Debtors have identified approximately $787 million in the aggregate amount of Priority Claims that will be expunged pursuant to Section 9.2(a)(iii) the Plan, relating to, among other things, duplicate claims asserted multiple Debtors.  *See* Murphy Decl., ¶¶ 52-53.

162.    The Debtors believe that the total estimate of Priority Claims is $18 million in the aggregate, including $15 million in Priority Tax Claims and $3 million in Priority Non-Tax Claims.  *See* Murphy Decl., ¶ 54.

### v.    Secured Claims

163.    As of September 5, 2019, Secured Claims of approximately $59.1 billion have been filed.  As reflected in the table below, the Debtors' estimated amount of Secured Claims is $18 million.

| Secured Claims | |
|---|---|
| Claims filed to date | $59.1 billion |
| *Minus* objections filed to date | $48.4 million |
| *Minus* additional anticipated objections | $4 billion |
| *Minus* claims expunged upon Confirmation | $54.9 billion |
| *Equals* resulting estimate | $18 million |

*See* Murphy Decl., ¶¶ 55-56.

164.    The Debtors have filed objections to date to $48.4 million of the Secured Claims and intend to objection to an additional $4 billion Claims in the aggregate.  An additional $54.9 billion will be expunged upon the confirmation of the Plan resulting in a total estimate of $18 million in Secured Claims.  *See* Murphy Decl., ¶¶ 56-59.

165.    Although the Debtors believe they have strong and credible arguments in connection with all of the APA disputes, given the ongoing nature of the disputes, the Debtors have assumed for purposes of the Claims calculations that all remaining Administrative Expense Claims, Secured Claims, Priority Tax Claims, and Priority-Non-Tax Claims will need to be satisfied by the Estates.  That said, the Debtors still believe that Transform is obligated to assume approximately $108 million on account of 503(b)(9) Claims and Other Administrative Expense Claims; the Debtors disagree with the assertion that they under-delivered on Specified Receivables by $66 million, and the Debtors further dispute the incremental $30 million of Accounts Payable that Transform contends are obligations of the Estates.  *See* Murphy Decl., ¶ 60.

**vi.    Funds Available to Administer and Consummate the Plan**

166.    The Debtors believe they have sufficient assets to satisfy secured, priority, and Administrative Expense Claims in accordance with the Plan.  Throughout these chapter 11 cases, the Debtors have been carefully tracking Administrative Expense Claims and the available assets to pay such claims, and the Debtors project that they will be able to satisfy Administrative

93

Expense Claims in full, taking into consideration certain litigation proceeds that will be monetized. *See* Griffith Decl., ¶ 75. The Debtors' active tracking of the cost of administration of these chapter 11 cases included producing weekly reports reflecting the Debtors' current estimates of Administrative Expense Claims and the status of assets available to satisfy such claims, which reports were regularly shared with the Creditors' Committee and second lien holders. *Ibid.*

167.    As demonstrated in the Griffith Declaration, the Debtors had approximately $58.9 million in unrestricted cash[28] available as of August 31, 2019, and are expected to have approximately $50.1 million in unrestricted cash available for distribution on September 21, 2019:

**Estate Bank Account Balances**

| ($'s) | Account # | Actual | | Forecast | |
|---|---|---|---|---|---|
| | | 8/31/19 | 9/7/19 | Disbursements | 9/21/19 |
| Unrestricted Cash | | | | | |
| Sears Account | ***7244 | 1,972,296 | 1,850,323 | | 1,850,323 |
| Kmart Account | ***7260 | 223,204 | 223,204 | | 223,204 |
| [1] Wind-Down Account | ***8965 | 52,053,734 | 50,902,357 | (7,555,429) | 43,346,927 |
| [2] Utilities Deposit Account | ***5450 | 4,700,000 | 4,700,000 | | 4,700,000 |
| Total Unrestricted Cash | | 58,949,235 | 57,675,883 | | 50,120,454 |

(1) Disbursements from the Wind-Down Account in the forecast period reflect two weeks of funding the Carve Out Account.
(2) Actual cash in the Utility Deposit Account is $10mm; however, $5.3mm is potentially property of Transform.

*See* Griffith Decl., ¶ 55.

168.    In addition to cash on hand, additional assets of the Estates include a total of approximately $123.4 million in the aggregate of projected net proceeds from the following sources: (i) $10 million from the sale of the Calder Statue sculpture, (ii) $13.3 million from the sale of the Debtors' remaining real estate, (iii) $5 million from the receipt of certain 2017 EDA Funds if the settlement of the School District dispute is finalized, (iv) $5.3 million from certain *de minimis* claims, and (v) up to $97 million from Transform's obligation to assume certain 503(b)(9)

---

[28] This excludes the Carve-Out Account, Consignment Account, Luxottica Account, or Sparrow Account.

WEIL:\97183319\1\73217.0004

Claims (collectively, the "**Additional Asset Proceeds**").  A detailed description of each of the Additional Asset Proceeds is provided in the Griffith Declaration.  *See* Griffith Decl., ¶¶ 56-61.

169.    Although the Debtors believe they have credible arguments in connection with all of the APA disputes, given the ongoing nature of the disputes, as noted above, the Debtors have not factored in any additional cash recoveries from Transform in the administrative solvency analysis.    That said, in connection with the APA Disputes, Transform owes the Debtors approximately $40.5 million on account of the following open issues: (i) $19.5 million in cash proceeds relating to customer sales that occurred prior to or shortly after the Transform transaction that were in transit around the time of closing, (ii) at least $16.1 million from Estate checks that were deposited by Transform that Transform has acknowledged are property of the Estates (additional reconciliation is ongoing), (iii) $4.4 million from credit card proceeds from GOB stores that were improperly routed to Transform post-closing, and (iv) $700,000 from proceeds from subtenants of properties where the Estate is the sublessor.    Accordingly, if the Court rules in the Debtors' favor on any of these issues or the Debtors are otherwise able to settle with Transform on these issues, up to an additional $40 million in proceeds may be available to the Debtors' Estates.    Transform asserts that the Debtors owe Transform money for various costs Transform has allegedly incurred on the Estate's behalf after the close of the sale transaction. The Debtors acknowledge that there may be expenses owed to Transform, but the dispute over such offsets is ongoing.    In addition, there are $7.3 million of checks deposited by Transform that have not been reviewed to determine whether the proceeds are owed to the Estate.  *See* Griffith Decl., ¶ 73-74.

170.    Additionally, following the Confirmation Date, the Debtors estimate that they will successfully monetize significant litigation assets including proceeds from the Preference

Actions, proceeds from the ESL Litigation and proceeds from the D&O Litigation.  *See* Transier Decl., ¶¶ 28-29; *See* Griffith Decl., ¶¶ 70-71.

(a)     <b>Preference Actions Proceeds</b>

171.    The Debtors' believe that estimated proceeds on account of Preference Actions to be realized in advance of the Effective Date are significant assets that will contribute substantial funds to the Debtors' Estates that will be available for distribution to the Debtors' creditors.

172.    After the Sale Transaction, the Debtors and their advisors solicited bids from reputable preference firms (the "**Preference Firms**") to provide the Debtors' with a preliminary analysis of the Debtors' potential proceeds from Preference Actions.  After reviewing the information provided by the Debtors, the Preference Firms submitted proposals to the Debtors regarding their estimated recovery range on account of the Preference Actions.  After rigorous good-faith negotiations regarding the terms of engagement, the Debtors executed engagement letters with two of the Preference Firms (ASK LLP and Acumen Recovery Services, LLC alongside Katten Muchin Rosenman LLP, collectively, the "**Retained Firms**") and their retention was approved by the Court on June 26, 2019 and June 27, 2019 (ECF Nos. 4362, 4363, 4413). The Retained Firms estimated $54.8 million to $100 million in recoveries, whereas another bidding firm estimated $100 million to $200 million in recoveries.  These initial estimates were based on a review of preliminary data and subject to adjustment once a full analysis could be completed. Since approximately April 30, 2019, the Retained Firms have sent out approximately 2,600 demand letters (an additional 1,000 are anticipated to be sent) and are in active discussions with parties in efforts to settle various preference claims.  *See* Griffith Decl., ¶¶ 64-65.

173.    The Retained Firms have identified in excess of $1.345 billion of transfers by the Debtors within the 90-day preference window that may be recoverable by the Debtors.

WEIL:\97183319\1\73217.0004

After netting subsequent new value, the amount is reduced to approximately $586 million.  The

Debtors estimate that the recoverable amounts of the preference claims ranges from a low of $53.8

million to a high of $200 million based on the percentages provided in the initial estimates

presented during the bidding process.  Following their engagement, the Retained Firms conducted

extensive diligence of close to 4,000 claims and refined their initial estimated recovery range of

$54.8 million to $100 million to reach their current estimated recovery range of $100 million to

$150 million.  The Debtors believe, based on estimates from the Retained Firms, that recovery net

of fees of more than $100 million is achievable with a reasonable degree of probability, which is

consistent with comparable transactions where the average range of recoveries is from 11.4% if

the gross total transfers pursued or, alternatively 23.7% of those transfers, net of subsequent new

value.  If those average recovery percentages are applied to this case, they would result in estimated

gross recoveries ranging from $138 million to $153 million and $118 million to $130 million.  *See*

Griffith Decl., ¶¶ 64-69.

174.    Accordingly, the Debtors believe that it is reasonable to expect recoveries

in excess of $100 million will be made available to the Debtors' Estates as a result of prosecution

of the Preference Actions. *See* Griffith Decl., ¶ 70.

### (b)    Recoveries from Prepetition Related Party Transactions

175.    The Debtors anticipate that they will maintain $25 million in funds available

pre- and post-Effective Date to ensure sufficient funds to continue the prosecution of all Estate

Causes of Action and for agents of the Liquidating Trustee to carry out their duties for the benefit

of the Liquidating Trust Beneficiaries.  *See* Griffith Decl., ¶ 72.  The Debtors believe that the

recoveries from the ESL Litigation and the D&O Obligations will result in significant proceeds

that will be available for distributions to the Debtors' creditors in accordance with the Plan and the

priority waterfall.

176.    The Restructuring Subcommittee and the Creditors' Committee have both conducted extensive investigations into the merits of the related-party prepetition transactions and concluded that the value of such claims was significant and realizable.  Prior to and continuing after the Commencement Date, the Restructuring Subcommittee and its advisors conducted extensive diligence and discovery in furtherance of the Restructuring Subcommittee's investigation into prepetition related party transactions and have served broad document requests on the Debtors, ESL, and certain of their former counsel and advisors (seven (7) in total).  The Restructuring Subcommittee's advisors received and reviewed millions of pages of discovery and conducted twelve (12) on-the-record interviews of key witnesses, including Edward Lampert, other senior Sears personnel, and representatives of certain of the aforementioned counsel and advisors and advisors.  Based on its findings, the Restructuring Subcommittee negotiated the limited release embodied in the Sale Transaction and approved by the Court.  As a result of its investigation, on April 17, 2019 the Restructuring Subcommittee, on behalf of certain of the Debtors, filed an adversary complaint against ESL Investments, Inc., its affiliates, various third parties, and certain of the Debtors' directors and officers (ECF No. 3278) (the "**Subcommittee Adversary Complaint**").  The Subcommittee Adversary Complaint seeks over $2 billion in damages arising from certain prepetition related party transactions.  *See* Transier Decl., ¶ 20.  A summary description of the nature of the Claims alleged in the Subcommittee Adversary Complaint is provided in the Transier Declaration.  *See* Transier Decl., ¶¶ 20-23.  At the auction for the sale of substantially all of the Debtors assets held on January 15, 2019, counsel to the Restructuring Subcommittee provided that as a result of its investigation, the Restructuring Subcommittee had concluded that "substantial claims exist against ESL and its affiliates, as well as other defendants relating to ESL's abuse of its control of the debtors and the transfer of hundreds

WEIL:\97183319\1\73217.0004

of million of dollars of assets to ESL and its affiliates for inadequate consideration."  Auction Tr.

63:12-20, (Bankr. S.D.N.Y. Jan. 15, 2019).  *See* Transier Decl., ¶ 24.

177.    Immediately upon its formation, the Creditors' Committee and its advisors

also commenced an investigation into various related-party prepetition transactions, including

(i) the 2012 spin-off of Sears Hometown and Outlet Stores, Inc., (ii) the spin-off of Sears Canada,

Inc. from 2012 to 2014, (iii) the 2014 spin-off of Lands' End, Inc., (iv) the 2015 Seritage

transaction, and (v) 20 separate financing transactions entered into during the years 2010 through

2018.  The Creditors' Committee served document requests and subpoenas on the Debtors, ESL,

certain of their former counsel and advisors, and other relevant third parties.  The Creditors'

Committee received over 240,000 documents amounting to over 4.8 million pages and conducted

twelve (12) separate interviews of key witnesses, including Edward Lampert, current and former

members of the Board of Directors of SHC, current and former senior personnel, and

representatives of SHC's outside advisors.  The Creditors' Committee also conducted extensive

legal research on potential claims, drafted multiple significant legal memoranda related to the

claims, and prepared many presentations analyzing the underlying transactions.  In the Creditors'

Committee's objection to approval of the Disclosure Statement (ECF No. 3995) ("**Committee DS**

**Objection**"), the Committee noted that the causes of action preserved under section 9.13 of the

Asset Purchase Agreement may be "significant," and also that the Debtors' estimate of $334

million in total distributable proceeds "may be low," suggesting that "the Preserved Causes of

Action may have greater value than such estimate." Committee DS Objection, ¶ 25, FN 12, ¶ 26,

FN 14.

178.    As described in the Transier Declaration, the claims set forth in the

Subcommittee Adversary Complaint were carefully investigated at the direction of the

Restructuring Subcommittee by its counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**"), and the Restructuring Subcommittee authorized the expenditure of more than $20 million to investigate these matters and eventually prepare and file the Subcommittee Adversary Complaint. *See* Transier Decl., ¶ 26. Notably, during the negotiations of the sale to ESL, it was critical to the Restructuring Subcommittee to retain these valuable claims. As this Court is aware, in January 2019, the Restructuring Committee twice voted in favor of liquidation of Sears rather than to accept a going concern sale in which ESL insisted on a full release for the matters at issue in the Subcommittee Adversary Complaint. In other words, the Restructuring Committee twice voted to liquidate the Company (and therefore jeopardize 45,000 jobs) rather than sell it to Transform Holdco with a complete release of the claims at issue. *Ibid*. The Debtors believe that this speaks volumes about the importance and value the Restructuring Committee placed on these claims. *Ibid*.

179.    The Restructuring Subcommittee has been advised at all relevant times by competent and skilled counsel in connection with the matters asserted in the Subcommittee Adversary Complaint. *See* Transier Decl., ¶ 27. The claims asserted in the Subcommittee Adversary Complaint are valuable assets belonging to the Debtors' Estate. The Debtors believe that the facts and allegations asserted in the Subcommittee Adversary Complaint are well founded and viable. The Restructuring Subcommittee has been updated regularly and in detail at all relevant times about the referenced investigation and the matters addressed in the Subcommittee Adversary Complaint by Paul Weiss and more recently by Akin Gump. Further, $25 million is set aside to prosecute the Subcommittee Adversary Complaint. *Ibid*.

180.    Lastly, the Debtors believe they may be able to receive significant recoveries against available D&O Policies on account of Preserved Causes of Action against the

WEIL:\97183319\1\73217.0004

Specified Directors and Officers.[29]   There at least $150 million of available directors and officers liability insurance that provides a source of recovery to the Debtor plaintiffs in the Subcommittee Adversary Complaint against parties (in their capacity as directors and/or officers) who are covered by such insurance.  *See* Transier Decl., ¶ 28.  Certain defendants (such as ESL, Lampert and the Seritage parties) in the Subcommittee Adversary Complaint would also be liable for sums separate and apart from any available insurance coverage.  *Ibid*.

181.    In conclusion, the Debtors believe that considering all of the substantial proceeds of Causes of Action described above, the Debtors have established by a preponderance of the evidence that they will have sufficient funds to pay all Allowed secured, administrative, and priority claims in accordance with the Plan.  This conclusion is not affected by the contemplation of a reasonable period of time post-Confirmation Date to allow these significant assets to be monetized.

> **vii.    Entry of the Confirmation Order Prior to the Monetization of Distributable Proceeds is Appropriate and the Risks Were Properly Disclosed**

182.    As demonstrated by the Debtors' evidence and as will be demonstrated by the Debtors at the Confirmation Hearing, the Plan satisfies all of the requirements of section 1129(a) of the Bankruptcy Code and, therefore, the Confirmation Order should be entered at this time.  The Debtors expect to have sufficient Assets to pay all Administrative Expense Claims.  The pendency of certain litigation outcomes and the monetization of such Causes of Action to procure distributable proceeds does not alter this conclusion.  As described above, the Debtors estimate

---

[29] Pursuant to Section 15.11 of the Plan, any recovery by or on behalf of the Liquidating Trust (and the beneficiaries thereof) on account of any Preserved Causes of Action against any of the Specified Officers and Directors, solely in his or her capacity a director of the Debtors prior to the Effective Date, or officer of the Debtors prior to the closing of the Sale Transaction, as applicable, including in each case by way of settlement or judgment, shall be limited to the Debtors' available D&O Policies' combined limits.  Plan, § 15.11.

WEIL:\97183319\1\73217.0004

that proceeds from the Preference Actions, ESL Litigation, and D&O to be substantial. The Debtors' estimate is founded in the months of thorough work completed by sophisticated professional advisors in investigating and evaluating the various Causes of Action. Additionally, confirmation of the Plan will lessen the administrative burden on these Chapter 11 Cases but still allow the Debtors to bring in the proceeds required to eventually emerge, which is in the best interests of all stakeholders.

(a)    **Courts Have Confirmed Plans With Contingences**

183.    This Court has previously approved chapter 11 plans containing substantial contingencies, including, the requirement that debtors secure necessary funding prior to the proposed effective date. In *In re Delphi Corp.*, for example, the debtors' chapter 11 plan included a condition precedent to the effective date that the reorganized debtors would enter into certain exit financing arrangements. *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2007) (ECF No. 11386). This Court confirmed the debtors' plan, "notwithstanding that a firm commitment for exit financing was not entered into as of the Confirmation Hearing." *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Jan. 25, 2008) (ECF No. 12359). Soon after confirmation, Court found the exit financing was not in compliance with certain agreements incorporated into the plan, ultimately forcing the debtors to seek alternative sources of funding. *See In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Mar. 11, 2009) (ECF No. 13081). The debtors' modified plan went effective over one year later once new financing had been secured and the condition precedent satisfied. *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (ECF No. 18958).

184.    Similarly, in *In re W.R. Grace & Company*, the Delaware Bankruptcy Court approved the debtors' chapter 11 plan, expressly conditioning the plan effective date on a number of material contingencies, including the establishment and funding of certain asbestos trusts

pursuant to section 524(g) of the Bankruptcy Code. *In re W.R. Grace & Co.*, Case No. 01-01139 (JKF) (Bankr. D. Del. Jan. 31, 2011) (ECF No. 26155). Certain documents essential to the funding of the trusts, such as an insurance transfer agreement and a warrant agreement that allowed the debtors to issue warrants to buy their common stock, were finalized and filed with the Court prior to the plan effective date, which occurred nearly three years following confirmation of the chapter 11 plan. *In re W.R. Grace & Co.*, Case No. 01-01139 (KJC) (Bankr. D. Del. Feb. 3, 2014) (ECF No. 31732).

185. Indeed, in cases in this and other circuits, Courts have approved chapter 11 plans where there was a significant contingency outstanding on the confirmation date that could impede consummation of a plan if it did not occur. For example, chapter 11 plans in this and other districts are routinely confirmed despite being conditioned on the attainment of certain regulatory approvals that would occur after confirmation date. *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (noting that "[i]t is not at all unusual for consummation of a [c]hapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."); *and see e.g., In re Lightsquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y Mar. 27, 2015) (ECF No. 2276) (court order confirming chapter 11 plan despite the debtors having not obtained certain regulatory approvals necessary for the plan to become effective); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr.D. Del. Apr. 17, 2019) (ECF No. 839) (same); *In re iHeartMedia, Inc.*, Case No. 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) (ECF No. 2525) (same); *In re Caesars Entm't Operating Co.*, Case No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 17, 2017) (ECF No. 6334) (same). Courts have also confirmed chapter 11 plans conditioned on the execution of an essential transaction post-confirmation, finalizing and the court

WEIL:\97183319\1\73217.0004

approving a settlement with a class of claimants, and the sale or disposal of certain equity interests. *See, e.g. In re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 8, 2016) (ECF No. 1573) (confirming the debtors' chapter 11 plan but holding that the plan would not go effective until the court made a confirmatory finding that documentation for exit funding and certain licensing and employment agreements had been executed and was sufficient to allow the Bankruptcy Court to make a determination that the feasibility requirements Bankruptcy Code § 1129(a)(11) had been satisfied); *In re Ambac Financial Group, Inc.*, Case No. 10-15973 (SCC) (Bankr. S.D.N.Y. Mar. 14, 2012) (ECF No. 938) (approving the debtors' chapter 11 plan subject to future approval of a settlement with the IRS by the Court and certain interested parties prior to the effective date); and *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Jul. 28, 2017) (ECF No. 3735) (confirming the debtors' chapter 11 plan but conditioning the effective date on the Debtors selling or otherwise disposing of some or all of their equity interests in certain non-debtor entities to a third party purchaser).

186.    In the aforementioned cases, the period between confirmation date and effective date was often months long, at times even years-long. *See e.g. In re Lightsquared Inc.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y Dec. 7, 2015) (ECF No. 2433*) (*approximately eight months between confirmation date and effective date); *In re Ambac Fin. Grp., Inc.*, Case No. 10-15973 (SCC) (Bankr. S.D.N.Y. May 1, 2013) (ECF No. 1308) (approximately fourteen months between confirmation date and effective date); *In re Caesars Entm't Operating Co.*, Case No. 15-01145 (ABG) (Bankr. N.D. Ill. Oct. 6, 2017) (ECF No. 7482) (approximately nine months between confirmation date and effective date).

**(b)     Confirming the Plan Now is Far Better for Creditors
Than Any Other Alternative**

187.    If the Court does not approve the Plan, and the Chapter 11 Cases are

converted to cases under chapter 7 of the Bankruptcy Code, Administrative Expense Claimants

would still have to wait for the proceeds of litigation to realize any recoveries, and, as demonstrated

by the Liquidation Analysis, Administrative Expense Claimants are worse off in a chapter 7

liquidation of the Debtors' Assets.  As described above, distributions could be even more delayed

and result in lower recoveries as a result of (i) the additional costs and expenses that would be

incurred by the Debtors as a result of fees for one or more chapter 7 trustee and retention of new

professionals (the existing professionals of the Debtors are not expected to continue to be retained

by a chapter 7 trustee), (ii) the delay and erosion of value of the Debtors' assets that would be

caused due to the need of the newly appointed chapter 7 trustee(s) and its professionals to

familiarize themselves with the assets and liabilities of the Debtors, and (iii) the reduced recoveries

that would be caused by pressure on the chapter 7 trustee(s) to settle and expedite recoveries, and

(iv) because the chapter 7 trustee would have to assume the defense of the 507(b) Appeal, the

trustee and its professionals will likely incur extensive costs to get up to speed on the substantial

record of this disputes and there is a significantly higher likelihood that the trustee may not be

successful on appeal as compared to the Debtors and their professionals.  If the chapter 7 trustee

is not successful, any Allowed 507(b) Claim would reduce, on a dollar for dollar basis, recoveries

for junior creditors.  Administrative Expense Claimants, therefore, fare better under the Plan.

**(c)     Payment of Administrative Expense Claims is
Appropriately an Effective Date Issue**

188.    Importantly, payment of all Administrative Expense Claims is an Effective

Date issue, not a Confirmation Date issue—by the plain language of the Bankruptcy Code.  Section

1129(a)(9)(A) of the Bankruptcy Code requires that Administrative Expense Claims must be paid

WEIL:\97183319\1\73217.0004

in full by the effective date of a plan (and not the confirmation date).  *See* 11 U.S.C.

§ 1129(a)(9)(A) ("on the effective date of the plan, the holder of [administrative expense claims]

will receive on account of such claim cash equal to the allowed amount of such claim.").  Debtors

are not required to prove that all administrative expense claims must be paid on the confirmation

date, but must only demonstrate by a preponderance of the evidence that administrative expense

claims will be paid by the effective date of the plan.  Cases in this and other districts have held that

administrative expense claims must be paid by the ***effective date*** of the plan.  *See, e.g. CIT*

*Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 242

(4th Cir. 2005) (noting that "an administrative expense under § 503(b) must be paid in cash on the

effective date of the plan in a chapter 11 proceeding") (emphasis added); *In re Korea Chosun Daily*

*Times, Inc.*, 337 B.R. 773, 784 (Bankr. E.D.N.Y. 2005) (noting that "the outside date by which

administrative expenses must be paid in a [c]hapter 11 case" is "the effective date of the plan"

pursuant to section 1129(a)(9) of the Plan and that "[t]he question of whether administrative

expenses should be paid sooner than the effective date of the plan is committed to the sound

discretion of the bankruptcy court").

(d)      **Risks of Non-Occurrence of the Effective Date Are
         Appropriately Disclosed**

189.    As Section 14.1 of the Plan makes clear, entry of the Confirmation Order

necessarily will precede the occurrence of the Effective Date, and there may be a period of time

thereafter before the conditions to the Effective Date of the Plan can be satisfied, or they may not

be capable of being satisfied at all.  And if all requisite conditions to the occurrence of the Effective

Date cannot be satisfied, then Section 14.3 of the Plan provides:

> If the Effective Date does not occur, the Plan shall be null and void
> in all respects and anything contained in the Plan or the Disclosure
> Statement shall not (a) constitute a waiver or release of any Claims
> by or against or any Interests in the Debtors, (b) prejudice in any

106

manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity.

(Plan, § 14.3)

190.     Moreover the risks that the Debtors may be unable to satisfy Administrative Expense Claims were properly disclosed in Section VIII.A.11 of the Disclosure Statement, entitled "Failure to Satisfy Administrative Claims or Otherwise Agree to Alternative Treatment, and Other Factors that May Impact Administrative Solvency."  Accordingly, it is clear that the construct of the Plan expressly contemplates the entry of the Confirmation Order with the actual Effective Date of the Plan occurring some time thereafter upon the satisfaction of certain conditions set forth therein—here, the payment of administrative Expense Claims in accordance with the Plan; and that construct and appurtenant risks were described and disclosed to parties in interest.  Under these circumstances, entry of the Confirmation Order at this time is entirely appropriate and there is no reason to delay its entry on the basis that the Debtors may or may not satisfy a condition to the occurrence of the Effective Date.  Put differently, the proper remedy for the Debtors not satisfying or waiving the conditions precedent is to not emerge from chapter 11 not to deny confirmation of the Plan.

191.     Accordingly, the Plan has more than a reasonable likelihood of success and satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

### viii.     Administrative Expense Claims Settlement Will Reduce the Claims Burden and Speed Up Distributions

192.     The Debtors' current estimate of Administrative Expense Claims does not yet reflect any negotiations with such claimholders whereby, the claimholders could consent to reduced recoveries in exchange for perhaps expedited recoveries.  The Debtors have proposed the Administrative Expense Claims Settlement Proposal, attached hereto as **Exhibit B**, to certain ad

hoc Administrative Expense Claim creditor groups (the "**Ad Hoc Vendor Groups**").  The Debtors propose that each claimant take a discount of their Allowed Administrative Expense Claims (as high as 50%) in exchange for an accelerated distribution (as long as the Debtors retain $35 million in minimum cash) and other benefits including the settlement of Preference Actions.  In exchange for the guarantee that upon the Estates receiving proceeds of litigation assets in excess of $35 million, distributions will be made to Administrative Expense Claimants who do not opt out of the settlement.   Therefore, the incentive is an accelerated payment for claimants and a reduced Administrative Expense Claims pool for the Debtors and junior creditors.

193.    Cases in this district and others have approved chapter 11 plans where administrative expense claimants have received less than 100 cents on the dollar on consent, as contemplated by the Debtors' proposal.  *See, e.g. In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D. N.Y. 2002) (confirming chapter 11 plan where administrative claimants that did not respond to solicitation by administratively insolvent debtors to agree to accept part payment on their claims would be deemed, by their silence, to have consented to treatment of less than 100% payment proposed by debtors); *In re Toys "R" Us Prop. Co. I, LLC*, Case No. 18-31429 (KLP) (Bankr. E.D. Va. Mar. 5, 2019) (ECF No. 1280) (confirming chapter 11 plan where administrative claimants agreed to reduced treatment of their claims pursuant to a court approved settlement agreement between the debtors and administrative claimants).

194.    Although the Debtors' are not relying on a settlement with administrative creditors to satisfy Administrative Expense Claims as required under the Plan, a successful Administrative Expense Claims Settlement will further reduce the Debtors' Administrative Expense Claim burden and accordingly accelerate the Debtors' ability to satisfy secured, priority,

WEIL:\97183319\1\73217.0004

and Administrative Expense Claims so as to allow consummation of the Plan to occur on a faster timeline.

195.    Pursuant to the Confirmation Order, all motions for allowance or payment of Administrative Expense Claims that are pending or filed after the entry of the Confirmation Order will be adjourned until a date to be determined by the Debtors (in consultation with the Creditors' Committee) or the Liquidating Trust (as applicable) and in consultation with the applicable claimant, subject to the Court's availability.  All such motions will be treated as a proof of an Administrative Expense Claim.  This will allow the Debtors to focus on finalizing the Administrative Expense Claims Settlement and its implementation, once approved by this Court, without unnecessarily draining the Estates' resources by having to address and individually adjudicate such motions.

### O.    Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 and Complies with Bankruptcy Code Section 1129(a)(12)

196.    Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]" 11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 17.1 of the Plan provides that on the Effective Date, and thereafter as may be required, such fees, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, shall be paid by the Liquidating Trustee.  Thus, the Plan complies with the requirements of section 1129(a)(12) of the Bankruptcy Code.  Moreover, *no party has objected to confirmation on the basis that the Debtors have failed to satisfy section 1129(a)(12) of the Bankruptcy Code*.

WEIL:\97183319\1\73217.0004

**P.    Plan Complies with Bankruptcy Code Section 1129(a)(13)**

197.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation, after the plan's effective date, of all "retiree benefits" (as such term is defined by section 1114(a) of the Bankruptcy Code) at the level established by agreement with the authorized representative of the retirees pursuant to subsections (e)(1)(B) of section 1114 of the Bankruptcy Code, or as  modified by court order pursuant to subsections (g) of section 1114, at any time prior to the confirmation of the plan, for the duration of the period that the debtors has obligated itself to provide such benefits.  11 U.S.C. 1129(a)(13).

198.    Section 1114 of the Bankruptcy Code provides procedures through which a Debtor may terminate a retiree benefits plan.  Though section 1114 of the Bankruptcy Code does not explicitly address the context of a debtor liquidating under chapter 11 of the Bankruptcy Code, courts have uniformly held that a debtor may terminate retiree benefits in a chapter 11 liquidation context.  See, e.g., *In re Alpha Natural Res.*, 552 B.R. 314, 326 (Bankr. E.D. Va. 2016) ("Likewise, courts have also granted relief under § 1114 when a debtor proposes to liquidate its assets.") (citations omitted); *In re SAI Holdings Ltd.*, No. 06-33227, 2007 Bankr. LEXIS 1051, at *14 (Bankr. N.D. Ohio March 26, 2007) ("Section 1114 itself does not distinguish between a liquidating plan and one in which the debtor seeks to rehabilitate its business—the plain language of the statute requires any debtor-in-possession or trustee to comply with its provisions before being entitled to modify or terminate retiree benefits.") (citations omitted); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 524 (Bankr. S.D.N.Y. 1991) (holding that section 1114 of the Bankruptcy Code applies in liquidating chapter 11 cases).

199.    On June 20, 2019, the Court approved the appointment of an official committee of retired employees (the "**Retiree Committee**") to represent the interest of certain retired employees of the Debtors with respect to the modification or termination of the Retiree

WEIL:\97183319\1\73217.0004

Plan (ECF No. 4357).   On July 9, 2019, the U.S. Trustee appointed the Retiree Committee consisting of five retirees (ECF No. 4470).

200.    The Debtors are following the procedures in section 1114 of the Bankruptcy Code for resolution of the retiree benefits issues.   On July 22, 2019, the Debtors sent a letter to the Retiree Committee (the "**Initial Proposal**") proposing to terminate the Retiree Plan effective March 15, 2019, and offering certain settlement terms.   On July 29, 2019, the Debtors filed the Motion of Debtors for Modification of Retiree Benefits (ECF No. 4635) (the "**Debtors' 1114 Motion**"), requesting authority to modify retiree benefits in accordance with the terms of the Initial Proposal.   On August 1, 2019, the Retiree Committee provided the Debtors with a counterproposal.   On August 15, 2019, the Debtors sent a second proposal (the "**Revised Proposal**") to the Retiree Committee, with the support of the Creditors' Committee, on August 15, 2019.

201.    The Debtors' 1114 Motion will be heard at the Confirmation Hearing.   The Debtors will comply with any obligations arising from such ruling with respect to termination of retiree benefits, and as required by section 1129(a)(13) of the Bankruptcy Code.   Therefore, the Plan will satisfy the requirement of section 1129(a)(13) of the Bankruptcy Code.

### Q.    Section 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code are Inapplicable to the Debtors

202.    Section 1129(a)(14) relates to the payment of domestic support obligations. *See* 11 U.S.C. §1129(a)(14).   The Debtors are not subject to any domestic support obligations and, as such, this section of the Bankruptcy Code is inapplicable.

203.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).   The Debtors are not an "individual," and, accordingly, section 1129(a)(15) is inapplicable.

204.   Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of non-bankruptcy law.   The Debtors are moneyed, business, or commercial corporations and, accordingly, section 1129(a)(16) is inapplicable.

### R.   Principal Purpose of the Plan Is Not Avoidance of Taxes

205.   The primary purpose of the Plan is to wind down the Debtors' remaining Estates and transfer all Liquidating Assets into the Liquidating Trust.  Put differently, the purpose of the Plan is not to avoid taxes or application of section 5 of the Securities Act of 1933, therefore the Debtors submit that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### S.   Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes

206.   Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

207.   By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors that rejects a plan.  *See* 11 U.S.C. § 1129(b) ("the court . . . shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan.") (emphasis added).  Accordingly, a dissenting

creditor in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority. *See In re Johns-Manville Corp.*, 843 F.2d at 650 (refusing to consider objection of dissenting creditor in accepting class because 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3rd Cir. 1987) (overruling cram down objection because objecting party was a member of an accepting class and therefore 1129(b)(1) afforded no protection to such party); *In re United Marine Inc.*, 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996) (overruling absolute priority objection of a dissenting creditor in an accepting class because "the absolute priority rule applies only in the context of cramdown of an impaired *rejecting* class") (emphasis in original). Cram down is relevant to those classes of Claims which are impaired and voted to reject the Plan:

- Class 2 (Secured Claims) at Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc.;

- Class 4 (General Unsecured Claims) at each Debtor other than Kmart Stores of Illinois LLC and Kmart of Washington LLC; and

- Class 4(B) (Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC which voted to reject the Plan.

208.    Cram down is also relevant to those classes of Claims which are which impaired and deemed to have rejected the Plan:

- Class 6 (Intercompany Claims) (All Debtors);

- Class 7 (Intercompany Interests) (All Debtors);

- Class 8 (Subordinated Securities Claims) (All Debtors); and

- Class 9 (SHC Existing Equity Interests) (SHC).

209.    As described above, Class 2 (Secured Claims) at Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc., an Impaired Class entitled to vote, voted to object the Plan. However, pursuant to the Plan, all Holders of Secured Claims will be satisfied

in full, either by receiving (i) cash in the amount equal to the Allowed amount of the Secured

Claim, (ii) transfer of the collateral securing such Secured Claim or the proceeds thereof, or

(iii) such other treatment sufficient to render such holder's Allowed Secured Claim Unimpaired.

*See* Plan, §§ 4.2, 5.2, 6.2, 7.2, and 8.2.  Therefore, confirmation of the Plan does not violate the

absolute priority rule as to Class 2 at such Debtors.

211.    Further, as described above, Class 5 (ESL Unsecured Claims) (All Debtors),

an Impaired Class entitled to vote, abstained from voting at any of the Debtors.  However, because

ESL objected to the Plan, the Debtors are also seeking to cram down Class 5.  The Plan may be

confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b)

of the Bankruptcy Code.

## 1.    Plan Does Not Discriminate Unfairly

211.    Section 1129(b)(1) does not prohibit discrimination between classes.

Rather, it prohibits discrimination that is unfair, and no unfair discrimination exists here.  Under

section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated

classes are treated differently without a reasonable basis for the disparate treatment.  *See In re*

*Sabine Oil & Gas Corp.*, 555 B.R. at 310–11 (Bankr. S.D.N.Y. 2016) ("Courts generally will

approve placement of similar claims in different classes provided there is a 'rational' or 'reasonable'

basis for doing so' and 'satisfies the flexible requirements of section 1122 because a valid business,

factual, and/or legal reason exists for separately classifying the various classes of claims and

interests created under the Plan. . . [W]here claims or interests of the same priority are separately

classified, such claims or interests are either dissimilar or another good business reason exists for

such classification.'"); *In re WorldCom Inc.*, 2003 WL 23861928, at *59 (citing *In re Buttonwood*

*Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Johns-Manville Corp.,* 68 B.R. 618,

636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y.

1987), *aff'd sub nom, Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 843 F.2d 636

(2d Cir. 1988)).  As between two classes of claims or two classes of equity interests, there is no

unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In

re Johns-Manville Corp.*, 68 B.R. at 636 (finding no unfair discrimination among common

shareholder class and all other eight classes comprised of both impaired and unimpaired classes

because the common shareholders "are not similar or comparable to those of any other classs"), or

(ii) taking into account the particular facts and circumstances of the case, there is a reasonable

basis for such disparate treatment, *see, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R.

714, 715 (Bankr. S.D.N.Y. 1992) (finding separate classification and treatment rational where

members of each class "possess[ed] different legal rights"), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992).

All similarly situated Claims and Interest are being treated similarly under the Plan.  Further, as

discussed in detail below, Class 3 (PBGC Claims), Class 4(B) (Guarantee Claims) (Kmart IL and

Kmart of Washington), and Class 5 (ESL Unsecured Claims) are fairly separately classified

because the Claims in such Classes are dissimilar from all other Class 4 General Unsecured Claims

and under the particular facts and circumstances of the case, there is a reasonable basis for the

separate classification.

> a.    **The Separate Classification for Certain General Unsecured Claimants Are Fair, Reasonable, and Consistent With Applicable Law**

212.    As noted above, courts generally examine whether the proposed

classification has a reasonable basis in determining whether a chapter 11 plan "unfairly

discriminates" against a class of creditors.  *See Adelphia Commc'ns Corp.*, 368 B.R. at 247; *In re

Reader's Digest Ass'n, Inc.*, Case No. 09-23529, Hr'g Tr. at 116:20-117:2 (Bankr. S.D.N.Y.

Jan. 15, 2010) (ECF No. 758) ("It appears to me that one should look at the notion of unfair

discrimination, 1129(b)(1), as the Seventh Circuit did in a global basis in In re: Crawford,

*i.e.*, 'This is one of those areas of the law in which it is not possible to do better than to instruct the first line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law,' in this case Chapter 11 of the Bankruptcy Code."). Debtors have "substantial flexibility" in classifying claims of creditors who benefit the Debtors separately from claims of creditors who no longer provide value to the Debtors as long as the separate classification is not intended to gerrymander voting on the plan. *See In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (holding that a plan proponent has "substantial flexibility" in classifying substantially similar claims separately where there is a reasonable basis behind the classification scheme) (citing *Drexel I*, 138 B.R. at 757). Although courts have propagated a variety of tests to determine if unfair discrimination exists, courts in the Southern District of New York have typically applied a four-part test, which considers whether: (i) there is a reasonable basis for discriminating; (ii) the debtor cannot consummate the plan without discrimination; (iii) the discrimination is proposed in good faith; and (iv) the degree of discrimination is in direct proportion to its rationale. *See, e.g.*, *In re Genco Shipping & Trade Ltd.*, 513 B.R. at 241; *WorldCom*, 2003 WL 23861928, at *59 (citing *Buttonwood*, 111 B.R. at 63).

213. Under the four-part test, the different treatment of the (i) PBGC Claims. (ii) Guarantee Claims, and (iii) ESL Unsecured Claims from other General Unsecured Claims under the Plan is fair and reasonable because such separate treatment is based on the different nature of the Claims and, in the Case of Class 3 and Class 4(B), is a result of good faith settlements and compromise of issues necessary to consummate the Plan, as set forth in the following table and discussed further below:

| Class | Rationale For Separate Classification |
|---|---|
| Class 3<br>(PBGC Claims) | ▪ Necessary to implement PBGC Settlement and Plan Settlement<br><br>▪ Entitled to recoveries not provided to Class 4/4(A) (General Unsecured Claims)<br><br>▪ Joint and several Claim against every Debtor |
| Class 4(B)<br>(Guarantee Claims against Kmart IL and Kmart of Washington) | ▪ Necessary to implement Plan Settlement<br><br>▪ Entitled to incremental recoveries not provided to Class 4/4(A) (General Unsecured Claims)<br><br>▪ Claims against multiple Debtors based on guarantees provided by such Debtors |
| Class 5<br>(ESL Unsecured Claims) | ▪ Entitled to recovery only from certain assets pursuant to Credit Bid Release approved in connection with Asset Purchase Agreement |

### b.    Class 3 (PBGC Claims)

214.    Taking each in turn, and as discussed further in <u>Part I</u> above, separate classification and different treatment of the PBGC Claims is required to implement the PBGC Settlement and Plan Settlement.  Pursuant to the PBGC Settlement, PBGC Claims are receiving different treatment to other General Unsecured Claims – namely the PBGC Liquidating Trust Priority Interest and $800 million of general unsecured claims in exchange for among other things, agreeing to reduce its $1.4 billion asserted joint and several claims to one $800 million general unsecured claim against the Estates.   Absent the PBGC Settlements, the PBGC's General Unsecured Claims would significantly dilute all recoveries (to the extent recoveries are had) for General Unsecured Creditors at each Debtor because of the sheer size of its joint and several claim.  Therefore, separate classification and different treatment is necessary to implement the PBGC Settlement.  Accordingly, and in accordance with section 1122(a) of the Bankruptcy Code, such claimants must be placed in separate classes.  11 U.S.C. § 1122(a).

215.   Moreover, Courts have approved separate classification and unequal treatment of similarly-situated creditors where a settlement with the separately classified class was necessary to implementation of the Plan.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD), Hr'g Tr. 44:24–46:17 (Bankr. S.D.N.Y. Feb. 27, 2012) (ECF No. 3505) (approving separate classification of unsecured claims over accusation of improper gerrymandering and finding discrimination fair where pension claimholders group and landlord guaranty group received increased recoveries pursuant to substantive consolidation settlement, where such groups had "holdup value . . . based on . . . their legal position of having claims against more than one debtor" and cost of "unscrambl[ing] the various subsidiaries" was prohibitive); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *92-98, *261-262 (Bankr. S.D.N.Y. July 15, 2004) (approving separate classification and treatment of intercompany and guarantee claims in plan in light of global settlement of issues including substantive consolidation embodied in the plan); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 244-54 (Bankr. M.D. Fla. 2006) (approving separate classification of general unsecured claims in order to implement settlement of substantive consolidation); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (allowing separate classification and finding discrimination fair where trade union received greater recovery than other general unsecured claimants pursuant to settlement and trade union's support of the plan was critical to the company's overall reorganization).

216.   Furthermore, the nature of PBGC's claims differ from other General Unsecured Claims—they are joint and several and thus each and every Debtor entity is individually liable for such PBGC Claims.   Absent the PBGC and Plan Settlements, the PBGC would undoubtedly dwarf all recoveries for creditors at each Debtor because of the sheer size of its joint

and several claim at every Debtor.  *See, e.g.*, A&P Confirmation Hr'g Tr. at 44:24-46:17
(approving separate classification of guarantee claims based on the legal position of holders of
such claims of having claims against more than one debtor); *Charter Commc'ns*, 419 B.R. at 264
(finding separate classification justified because of the members' "disparate legal right[.]").  As
discussed further below, the PBGC and Plan Settlements provide *better* recoveries for the general
unsecured creditors, not worse.

217.    PBGC's unsecured claims have been similarly classified separately from
other general unsecured claims in other cases.  *See, e.g.*, *In re Avaya Inc.*, Case No. 17-10089
(SMB), (Bankr. S.D.N.Y. Nov. 28, 2017), at 3, Plan ¶ 116 (ECF No. 1579) (confirming a chapter
11 plan including a PBGC settlement with separate classification of the PBGC's unsecured claims
from other general unsecured claims); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JKF),
2006 WL 616243, at *6 (Bankr. D. Del. Feb. 6, 2006) (classifying unsecured claims of the PBGC
separately from other general unsecured claims "based on the fact that the PBGC [c]laims are
allowed against each of the [reorganized debtors] and are receiving the treatment negotiated in the
[settlement agreement with the PBGC.].")*, aff'd*, 343 B.R. 88 (D. Del. 2006).

### c.    Class 4(B) (Guarantee Claims against Kmart IL and Kmart of Washington)

218.    Separate classification and different treatment is also justified as to Class
4(B) because such classification scheme is necessary to implement the Plan Settlement; the same
Plan Settlement which is supported by both PBGC and the Creditors' Committee and the
overwhelming majority of creditors.  Pursuant to the Plan Settlement, Guarantee Claimants are
receiving incremental recoveries that other General Unsecured Claimants are not entitled to—
specifically, Plan Settlement Premiums.  As set more fully in Part I, holders of the Guarantee
Claims are receiving increased recovery via the Plan Settlement.  *See* Plan, § 9.2.  But such

treatment is fair because such Claimants are providing consideration—namely, they are waiving their rights to pursue a non-consolidation plan for the Debtors that, if they are successful, would increase their recoveries to the detriment of other creditors.  In developing the Plan Settlement, the Debtors identified the Guarantee claimants as a creditor group that could be uniquely affected by implementing a settlement of substantively consolidated plan structure versus a de-consolidated plan structure, *i.e.*, creditors that may have relied on the corporate separateness of the Debtors and would otherwise receive lesser distributions because of the consolidation if not for the Plan Settlement.  As described above, if enough value flowed through the waterfall to provide General Unsecured Claims with a recovery, the Guarantee Claims would recover more in a de-consolidated plan, and, accordingly, the Plan Settlement compensates Guarantee Claimants with the Plan Settlement Premium.   The incremental recoveries provided to such creditors are equitable distributions directly related to the benefit the holders of Guarantee Claims are providing to the Debtors—a compromise and settlement of legitimate issues relating to the adverse impact the Plan Settlement might have on such holders' guarantee claims.  *See, e.g.*, A&P I Confirmation Hr'g Tr. at 44:24-46:17 (finding that discrimination in favor of guaranty claimants was fair, noting that "the debtor cannot consummate the plan without the discrimination," "[t]he discrimination is proposed in good faith," [t]he degree of discrimination is in direct proportion to its rationale," "[a]nd there's a reasonable basis for discriminating."); *Enron Corp.*, 2004 Bankr. LEXIS 2549, at *92-98, 261-262 (approving separate classification and treatment of guarantee claims in plan in light of global settlement of issues including substantive consolidation embodied in the plan).   Accordingly, and in accordance with section  1122(a) of the Bankruptcy Code, such claimants must be placed in separate classes.  11 U.S.C. § 1122(a).  Further, as described in paragraph 215 above, Courts have

approved separate classification and unequal treatment of similarly-situated creditors where a settlement with the separately classified class was necessary to implementation of the Plan.

219.    Guarantee Claims against Kmart IL and Kmart of Washington have also been separately classified from the General Unsecured Claims at those particular Debtors, based on the nature of such claims—such holders of Guarantee Claims have claims against multiple Debtors based on guarantees provided by such Debtors, e.g. guarantee obligations for certain of the Debtors' funded debt. *See, e.g.*, A&P I Confirmation Hr'g Tr. at 44:24-46:17 (finding that there was a reasonable basis for the separate classification of guarantee claims "based on simply their legal position of having claims against more than one debtor . . ."); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *92-98, 261-262 (Bankr. S.D.N.Y. July 15, 2004) (finding that the separate classification of guaranty claims was appropriate given the risk that such guaranty claims would not exist if there were substantive consolidation, and as such, [separate classification and adjustment of the recovery appropriately reflects that risk]).

### d.    Class 5 (ESL Unsecured Claims)

220.    ESL Unsecured Claims have been separately classified from other General Unsecured Claims due to the fact that holders of such Claims can recover from only certain assets pursuant to section 9.13 of the Asset Purchase Agreement as a result of the Credit Bid Release Consideration (as defined therein), and are not entitled to recovery from all assets available to other General Unsecured Claims.  As such, they are properly separately classified separately from other General Unsecured Claims.

221.    Accordingly, for the reasons discussed above, the Debtors have satisfied the four-part test for separate classification and treatment and the Plan does not "discriminate unfairly" with respect to any impaired Classes of Claims or Interests.

WEIL:\97183319\1\73217.0004

## 2. Plan Is Fair and Equitable.

222. Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest. *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii). This central tenant of bankruptcy law, known as the "absolute priority rule," requires that if the holders of claims in a particular class receives less than full value for their claims, no holders of claims or interests in a junior class may receive any property under the plan. *See 203 N. LaSalle*, 526 U.S. at 441-42. The corollary to the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims.

223. To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) that each holder of non-accepting class will receive or retain on account of such claim property of a value equal to the allowed amount of such claim, or (ii) that the holder of a claim or interest that is junior to the claims of the non-accepting class will not receive or retain any property under the plan.

224. To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) that a holder of an interest that is junior to a non-accepting class will not receive or retain any property under the plan.

225. Pursuant to the Plan, holders of Claims in Class 6 (Intercompany Claims) (All Debtors), Class 7 (Intercompany Interests) (All Debtors), Class 8 (Subordinated Securities Claims) (All Debtors), and Class 9 (Existing SHC Equity Interests) (SHC) are each deemed to

WEIL:\97183319\1\73217.0004

have rejected the Plan pursuant to 1129(g).  Furthermore, holders of Claims in Class 4/4(A) (General Unsecured Claims other than Guarantee Claims) at certain Debtors[30] voted to reject the Plan, and holders of Claims in Class 5 (ESL Unsecured Claims) (All Debtors) abstained from voting on the Plan.  Accordingly, the Plan must satisfy the absolute priority rule as to such Classes.  The "fair and equitable" rule is satisfied as to the holders of Claims in Class 4, Class 5, Class 6, Class 8 and Interests in Class 7 and Class 9 (SHC), as no Claims and Interests junior to each such class, as applicable, will receive or retain any property under the Plan on account of such junior Claims or Interests.  *See* Plan §§ 4.6, 4.7, 4.8, 5.6, 5.7, 5.8, 6.6, 6.7, 6.8, 7.6, 7.7, 7.8, 7.9, 8.6, 8.7, 8.8.  *See also In re Finlay Enters. Inc.*, 2010 WL 6580629, at *7 (holding that fair and equitable test was satisfied where no interest junior to the interest of the rejecting class received any property under the plan).  Moreover, no senior creditor will receive in excess of the full value of its Claims under the Plan.

226.    Thus, the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

## III.    Remaining Objections Should be Overruled and Plan Confirmed

227.    As set forth herein and as will be demonstrated at the Confirmation Hearing, the Plan satisfies all the requirements for confirmation set forth in the Bankruptcy Code.  The Objections are not supported by the facts nor applicable law and should be overruled.

---

[30] A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E Lawn & Garden, LLC, A&E Signature Service, LLC, California Builder Appliances, Inc., FBA Holdings Inc., Florida Builder Appliances, Inc., KLC, Inc., Kmart Corporation, Kmart Holding Corporation, Kmart of Michigan, Inc., Kmart Operations LLC, Kmart Stores of Texas LLC, Kmart.com LLC, MyGofer LLC, Private Brands, Ltd., Sears Brands Management Corporation, Sears Brands, L.L.C., Sears Holding Corporation, Sears Holdings Management Corporation, Sears Home Improvement Products, Inc., Sears Operations LLC, Sears Protection Company (Florida) , L.L.C., Sears Roebuck Acceptance Corp., Sears, Roebuck and Co., Sears, Roebuck de Puerto Rico, Inc., SOE, Inc., and StarWest, LLC.

WEIL:\97183319\1\73217.0004

**A.      Objections Asserted on Account of Section 1129(a)(9) and Section 1129(a)(11) Should be Overruled**

228.      Substantially all of the Objections focus on the Debtors' ability to pay Administrative Expense Claims in compliance with section 1129(a)(9) of the Bankruptcy Code ("**Section 1129(a)(9)**") or the Plan's feasibility in accordance with section 1129(a)(11) of the Bankruptcy Code ("**Section 1129(a)(11)**").   Some Objectors make their arguments under Section 1129(a)(9), others under Section 1129(a)(11), and some as an issue under both provisions.   The arguments all essentially raise one issue: that the Objectors believe the Debtors will not have enough money to fund payment of Administrative Expense Claimants under the Plan.   As demonstrated in paragraphs 150 to 188 above, the Debtors believe that, taking into consideration all of the Debtors' assets, including the Debtors' highly valuable litigation proceeds, the Debtors will receive enough proceeds to consummate the Plan and fund all Administrative Expense Claims. The Plan provides for payment of Administrative Expense Claims and satisfies Section 1129(a)(9), the Plan is feasible in accordance with Section 1129(a)(11), and the Objections should be overruled.

**1.      The Express Terms of the Plan Provide for Payment of Administrative Expense Claims in Satisfaction of Section 1129(a)(9)**

229.      Certain Objectors argue that the Plan does not comply with the Bankruptcy Code section 1129(a)(9) requirement that "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim, . . .on the effective date of the plan, the holder of an [Administrative Expense Claim] [must] receive . . .cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(A).  By the plain language of the Plan, such Objectors are wrong.  As described in paragraphs 139 to 142 above, the Plan explicitly provides that unless such holder agrees to less favorable treatment, holders of Allowed Administrative Expense Claims will be paid in full, in Cash, on the latest of (i) the Effective Date, (ii) the first Business Day after the

date that is thirty (30) calendar days after the date such Claim becomes Allowed, and (c) the next Distribution Date after such Claim becomes Allowed.  *See* Plan, § 2.1.

230.    Certain Objectors assert that, pursuant to Section 2.1 of the Plan, the Debtors impermissibly seek to delay payment of Administrative Expense Claims until after the Effective Date.  Whitebox Asymmetric Partners, LP, et al ("**Whitebox**") argues that as a result of Section 2.1 of the Plan and because the Debtors have 180 days after the Effective Date to object to Claims, the Plan impermissibly creates a "backdoor" mechanism wherein there is incentive to delay consideration of 503(b)(9) Claims.  Whitebox Obj., ¶ 24.  Weihai Lianqiao International Coop. Group Co., Ltd. ("**WLI**") asserts that WLI's Administrative Expense Claims "will likely not be paid until up to and possibly more than 180 days" following the Effective Date under the above provision.  WLI Obj., p. 15.  These Objectors ignore that the Plan's claims reconciliation mechanism is a necessary tool to allow the Debtors to orderly assess and reconcile claims and to ultimately make correct distributions under the plan.  Indeed, the timing of payment of Administrative Expense Claims pursuant to Section 2.1 of the Plan is standard and customary in chapter 11 cases of similar size; this Court and others across many jurisdictions have approved chapter 11 plans providing for payment of administrative claims on the later of the Effective Date or allowance of the Claim.  See, e.g., *In re Sungard Availability Services Capital, Inc, et al.*, Case No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 3, 2019) (ECF No. 48) (confirming the debtors' chapter 11 plan of reorganization providing for payment of an allowed administrative expense claim, in full, on the later of the effective date and the date that is thirty (30) calendar days after the date such administrative expense claim is deemed allowed); *In re Ezra Holdings Limited, et al.*, Case No. 17-22405 (RDD) (Bankr. S.D.N.Y. Oct. 18, 2018) (ECF No. 504) (same); *In re ARO Liquidation, Inc., et al.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. Mar. 30, 2018) (ECF No.

WEIL:\97183319\1\73217.0004

1732) (same); *In re MPM Silicones, LLC, et al.*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. Sept.

11, 2014) (ECF No. 1001) (same); *In re RDA Holding Co., et al.*, Case No. 13-22233 (RDD)

(Bankr. S.D.N.Y. June 28, 2013) (ECF No. 478) (same); *In re Great Atlantic & Pacific Tea*

*Company, Inc., et al.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012) (ECF No. 3477)

(same); *In re Tops Holding II Corporation, et al.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y.

Nov. 9, 2018) (ECF No. 765) (confirming the debtors' chapter 11 plan of reorganization providing

for payment of an allowed administrative claim, in full, on the later of the Effective Date and the

date that is ten (10) days after such administrative claim is deemed allowed); *In re J & B Partners*

*Management LLC, et al.*, Case No. 15-22017 (RDD) (Bankr. S.D.N.Y. June 26, 2015) (ECF No.

212) (same); and *In re Delphi Corporation, et al.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y.

Jan. 25, 2008) (ECF No. 12359) (same).  The alternative is to force the Debtors to accelerate their

claims reconciliation process or pay unverified and disputed claims, which makes no sense.

### 2.      Objections to Debtors' Ability to Pay Administrative Expense Claims Pursuant to Section 1129(a)(9) Should be Overruled

231.    Certain Objectors cite uncertainty as to a Debtors' ability to pay

Administrative Expense Claims as evidence that the Plan does not satisfy section 1129(a)(9)(A).

As described in paragraphs 139 to 142 above, the Plan satisfies the section 1129(a)(9)(A)

requirement that the plan terms provide for payment of Allowed Administrative Expense Claims

in full by the Effective Date, unless claimholders voluntarily accept different treatment.  In many

cases, a Court will find that section 1129(a)(9)(A) of the Bankruptcy Code is satisfied if the express

terms of the Plan comply with section 1129(a)(9)(A) of the Bankruptcy Code.  *See, e.g., In re*

*Cypresswood Land Partners, I,* 409 B.R. 396, 431 (Bankr. S.D. Tex 2009) (finding that the "[t]he

treatment of administrative expense claims under the Amended Plan satisfie[d] the requirements

of § 1129(a)(9) of the Bankruptcy Code" because "the Amended Plan provide[d] that each holder

of an administrative claim that becomes allowed shall receive the allowed amount of such claim, in accordance with the requirements of § 1129(a)(9)") (emphasis added); *In re PC Liquidation Corp.*, 2006 Bankr. LEXIS 4638, at *24-25 (finding in the confirmation order that because debtor's plan provided for payment of allowed administrative expense claims in full, in cash, on the Effective Date, that "the [p]lan satisfie[d] the requirements of section 1129(a)(9) of the Bankruptcy Code"). The Debtors believe because the Plan's express terms provide for payment of Administrative Expense Claims in satisfaction of section 1129(a)(9)(A), nothing further is required, and this section of the Bankruptcy Code is satisfied. However, the Debtors also have demonstrated by a preponderance of the evidence, as described in paragraphs 166 to 181 above, that they have sufficient Assets to pay all Administrative Expense Claims.

232. Additionally, the caselaw relied upon in the Objectors' arguments that the Debtors do not comply with section 1129(a)(9)(A) is easily distinguished. As an initial matter, a number of Objectors rely on *Midway* (defined below) for support that section 1129(a)(9) of the Bankruptcy Code provides for payment of § 503(b) must be paid in cash on the effective date of a plan, and/or on *Scott Cable* (defined below) for the assertion that administrative claims are a dominant priority such that unless the holders agree to a different treatment, a plan cannot be confirmed without full payment of those claims. *See* Tannor Obj., ¶ 26; WLI Obj., at 18; Pearl Obj., ¶ 23; Cyrus Obj., ¶ 8; Team Worldwide Obj., ¶ 40. The Debtors do not dispute that section 1129(a)(9) of the Bankruptcy Code governs timing and requirement of payment of allowed administrative claims, and that such allowed claims are to be paid in full by the effective date under a plan, as *Midway* and *Scott Cable* reiterate—and the Debtors comply with this requirement. *See Midway Airlines Corp.*, 406 F.3d at 242 ("***Midway***"); *In re Scott Cable Commc'ns, Inc.*, 227 B.R. 596, 599 (Bankr. D. Conn. 1998) ("***Scott Cable***").

WEIL:\97183319\1\73217.0004

233.    Certain Objectors also rely on *Pan Am* (defined below) for the proposition

that section 1129(a)(9) of the Bankruptcy Code is the "'administrative solvency' requirement" and

the Court's finding that "[b]y itself, administrative insolvency would have prevented confirmation

of the [chapter 11 plan]" in that case, as applicable.  Tannor Obj., ¶26; WLI Obj., at 17-18; Pearl

Obj., ¶ 23; Cyrus Obj., ¶ 8; Team Worldwide Obj., ¶40.    However, in *Pan Am*, an accountant

relied on by the debtors for his testimony and analysis regarding administrative solvency made

flagrant errors and arbitrary monetary adjustments in in his analysis that led the Court to find his

financial analysis and testimony unreliable.  As a result, the Court found that the plan could not be

confirmed because it was clear that the Debtors did not have sufficient assets to satisfy

administrative claims.  *See Pan Am Corp. v. Delta Air Lines,* 175 B.R. 438, 481–83 (S.D.N.Y.

1994) ("***Pan Am***").  In contrast, here, as evidenced in the Griffith and Murphy and Declarations,

the Debtors' financial advisors have been carefully tracking and reconciling the Debtors' available

Assets and estimated Claims and their estimates are based on months of analysis and work.  The

Debtors' ability to satisfy Allowed Administrative Expense Claims when taking into consideration

the Debtors' considerable litigation claim assets is reasonable and justified in the circumstances of

these cases—a far cry from the flagrantly fraudulent administrative solvency analysis in *Pan Am*.

Moreover, the Creditors' Committee has conducted its own independent analysis of the Debtors'

assets and liabilities and supports the Debtors' views.

234.    Objectors Tannor and Pearl also rely on *In re Teligent* for the assertion that

administrative creditors can prevent confirmation by refusing treatment of less than full payment.

Tannor Obj., ¶26; Pearl Obj., ¶ 23.  The Debtors agree with this statement—and the Plan clearly

does not attempt to circumvent section 1129(a)(9) of the Bankruptcy Code by forcing

Administrative Expense Claimants to accept less than full payment of their Claims.  In *In re*

*Teligent*, the Debtors had insufficient assets to pay administrative and priority claims in full, and proposed an administrative claims settlement in the plan, acknowledging that if administrative and priority claimants did not settle for a lesser amount the plan could not be confirmed. *See In re Teligent*, 282 B.R. 765, 768–69, 773 (Bankr. S.D.N.Y. 2002). In contrast, here, the Debtors believe that there will be enough Assets to fund all Administrative Expense Claims in full on the Effective Date. In any event, the settlements in *In re Teligent* were approved by the Court and the debtor's plan was confirmed. *In re Teligent, Inc.*, Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. Sept. 6, 2002) (ECF No. 1228).

### 3. Objections to Debtors' Estimation of Administrative Expense Claims Should be Overruled

235. Certain Objectors take issue with the Debtors' estimation of the Administrative Expense Claims that are or will be the obligation of the Debtors' Estates. As the Debtors will demonstrate herein, such Objections are misguided and should be overruled.

### i. Debtors' Reasonable Estimation of 503(b)(9) Claims is a Result of an Extensive Reconciliation Process

236. Certain Objectors question the Debtors' estimate of $181 million for 503(b)(9) Claims, citing that proofs of claim for 503(b)(9) Claims have been filed in the aggregate amount of $1.36 billion. *See, e.g.* Tannor Obj., ¶ 31, Pearl Obj., ¶ 25. However, as discussed herein, the Debtors have already objected to, or the Plan provides for elimination of, almost 85% in amount of the $1.36 billion in filed 503(b)(9) Claim. As noted above, the General Bar Date for 503(b)(9) claims passed on April 10, 2019, and since then the Debtors have diligently been reconciling claims (as described in greater detail in the Murphy Declaration). *See* Murphy Decl., ¶¶ 28-36. While the Debtors' initial estimate disclosed in the Disclosure Statement for 503(b)(9) Claims was $181 million, as the reconciliation process has continued, the Debtors now estimate the number of 503(b)(9) Claims is $0 subject to Transform funding such obligations as

required under the Asset Purchase Agreement, but at the most the Debtors believe the outstanding amount of such Claims is $90 million. *See* Murphy Decl., ¶ 33.  Moreover, the Debtors have already filed objections to approximately $630 million in the aggregate amount of 503(b)(9) Claims (ECF Nos. 4775, 4776, 4914, 5030, 5031, 5075, 5100, 5101), and anticipate filing additional objections to approximately $105 million in the aggregate of 503(b)(9) Claims.  In addition, the Debtors have identified approximately $555 million in the aggregate amount of 503(b)(9) Claims that will be expunged upon confirmation. *See* Murphy Decl., ¶¶ 38-39.  Clearly, the Debtors' estimation of 503(b)(9) Claims that will be the responsibility of the Debtor's Estates is reasonable.

237.    Pearl Global Industries, Ltd. ("**Pearl**") claims that the Debtors are not including in their calculations inducement claims under section 503(b)(1) of the Bankruptcy Code that could amount to as much as $50 million. *See* Pearl Obl., ¶ 26.  While Pearl claims there could be as much as $63 million in inducement claims; in actuality, very few vendors have affirmatively asserted that they were induced by the Debtors.  Those Objectors are not entitled to raise the rights of other claimants in connection with confirmation of the Debtors' Plan.  Moreover, the success of any inducement claim is wholly contingent on the resolution of multiple legal and factual issues in favor of the claimants who have the burden of proof to assert a claim under section 503(b)(1) of the Bankruptcy Code.  Not only are the asserted inducement claims only a fraction of the $63 million cited by the Objectors, each of the Objectors will need to overcome multiple legal and factual obstacles to succeed on their highly questionable claim—including but not limited to whether the claimants had a legal right to stop goods in transit and whether the relinquishment of a questionable legal right is even sufficient to support to support an actual and necessary benefit

WEIL:\97183319\1\73217.0004

to the estate.   Given, the limited amount of actual asserted inducement claims and the burden each claimant must overcome, the Debtors' estimation of 503(b)(1) claims is reasonable.

### ii.    Debtors' Estimation of Claims Appropriately Reflects Status of Relevant Disputes

238.    Certain Objectors cite to the uncertainty of the outcome of APA Disputes and the 507(b) Priority Claims disputes as evidence against the Debtors' ability to demonstrate administrative solvency.   However, the Debtors' estimation of Administrative Expense Claims appropriately reflects both disputes—the Debtors' analysis conservatively assumes no further wins against Transform in connection with the APA Disputes (despite the fact that there is still potential for significant upside in the APA Disputes), and the Debtors are appropriately relying on this Court's ruling that the Second Lien Holders' 507(b) Priority Claims are valued at $0.

239.    For example with respect to the APA Disputes, ESL questions certain of the Debtors' assumptions concerning the Debtors' administrative solvency relating to issues that are disputed in connection with the APA Disputes including the Prepaid Inventory Shortfall Amount, the Specified Receivables Shortfall Amount, ESL's allegations that the Debtors' breached the Asset Purchase Agreement, and with respect to certain ongoing cash reconciliations.  *See* ESL Obj. ¶¶ 7-11.   As evidenced in the Griffith Declaration, the Debtors have assumed a "worst case" scenario with respect to the APA Disputes, and as evidenced in the Transier Declaration, the Debtors will still have sufficient Assets to pay for the required Claims on the Effective Date to confirm the Plan.  *See* Griffith Decl., ¶ 73.

240.    As previously stated, the outcome of the 507(b) Priority Claims dispute had no negative impact on the Debtors' administrative solvency, and in fact allowed the Debtors to reallocate $10 million of funds that had been earmarked for resolution of those claims.   Although the Second Lien Holders have appealed the 507(b) ruling, there is no requirement to provide a

reserve of the alleged amounts on appeal.  *See JPMorgan Chase Bank v. U.S. Nat'l Bank Ass'n (In re Oakwood Homes Corp.)*, 329 B.R. 19 (D. Del. 2005) (affirming the bankruptcy court's order for no cash reserve for a disputed claim that was disallowed by the bankruptcy court but on appeal); *In re Johnson*, Case No. 14-57104, 2016 WL 8853601, at *11 (Bankr. S.D. Ohio Nov. 10, 2016) (holding that no reserve was required for an asserted secured claim that the bankruptcy court had disallowed, even if the bankruptcy court's decision was pending appeal).  Indeed, while Cyrus alleges a reserve for the 507(b) Priority Claims must be created, Cyrus does not cite any cases holding that that the Debtors must provide a reserve for a Claim that has been disallowed by the Court.

241.    Accordingly, the Debtors have already factored into their analysis any negative impact of the APA Disputes or 507(b) Priority Claims disputes and still believe all Administrative Expense Claims will be paid.

### 4.    Objections to Debtors' Reliance on Litigation Proceeds to Satisfy Administrative Expense Claims Should be Overruled

242.    Certain Objectors argue that Debtors cannot rely on recoveries from prospective litigation to satisfy the requirements of section 1129 of the Bankruptcy Code. However, the Debtors believe that in the circumstances of this case and the substantial record regarding the investigation of such Claims, depending on the proceeds of the proceeds of litigation is reasonable and warranted, as described in paragraphs 159 to 191 above.  Further, the cases cited by these Objectors are easily distinguishable.  *See, e.g.* Tannor Obj., ¶ 28; Winners Obj., ¶ 3; Alpine Obj., ¶ 11; Pearl Obj., ¶ 24, n.10.

243.    In *In re Am. Capital Equip., LLC*, 688 F. 3d 145, 156 (3d Cir. 2012), the claims in question were approximately a dozen asbestos claims, which were reinstated from the over 29,000 claims that initially existed when the debtors filed for chapter 11 relief and were

subsequently administratively dismissed. The dozen or so remaining claims were found to be "overwhelmingly unsuccessful" because, in part, of the fact that the claims were administratively dismissed, and that they had existed for roughly twenty years when the debtors filed for bankruptcy.

244.    In *Quarles v. U.S. Trustee*, the debtor was an individual and the litigation claims at issue were pending both in federal court and in South Carolina state courts and pertained to fraudulent conveyance transactions and contractual obligation disputes surrounding the financing of a real estate project in Hilton Head, South Carolina, respectively. *See Quarles v. Miller*, 193 B.R. 779, 780–81 (W.D. Va. 1996). The *Quarles* Court found the likelihood of the pending litigation's outcome being favorable for the debtor unlikely due to the fact that "the [debtor] ha[d] received an unfavorable ruling from this court on a related matter which [wa]s pending before the United States Court of Appeals for the Fourth Circuit." *Quarles v. U.S. Trustee*, 194 B.R. 94, 96 (W.D. Va. 1996). Thus, the court found proceeds from the debtor's litigation claims insufficient to pay creditors under a plan of reorganization and "pure speculation." *Id*. at 97. Here, the proceeds of the ESL Litigation, D&O Litigation, and the Preference Actions are not ephemeral or speculative; significant work has been done on each front by the respective sophisticated professionals and the Debtors have provided evidence supporting the Debtors' good faith estimates as to recovery values. *See* Transier Decl., ¶¶ 20-23; Griffith Decl., ¶ 71. As described in paragraphs 176 to 181 above, the Restructuring Subcommittee and the Creditors' Committee and their respective advisors have spent months investigating the Debtors' prepetition claims and have stated on the record that such claims are meritorious and valuable. Further, as to the Specified Directors and Officers who are named in the Subcommittee Adversary Complaint, the Debtors' Estates will very likely be able to reclaim up to $150 million through settlements and

WEIL:\97183319\1\73217.0004

for litigation against the D&O Policy.  Additionally, the thorough analysis undertaken by the Preference Firms, and the work already completed by ASK and Acumen to date demonstrate that the Debtors can reasonably expect to receive significant proceeds from prosecuting Preference Actions.

**B.      Objections Alleging Improper Gerrymandering Should be Overruled**

245.    Wilmington Trust alleges that the Debtors' classification structure reflects improper gerrymandering.  Wilmington Obj., ¶ 66-68.  This accusation is simply incorrect on the record.    The Debtors' separate classification of unsecured creditor classes (*e.g.*, separate classification of PBGC Claims from the General Unsecured Claims) was not intended to, and does not, gerrymander class approval.  Nor does classification somehow artificially create an impaired consenting class of creditors that would not have otherwise accepted the Plan pursuant to section 1129(a)(10) of the Bankruptcy Code.  The Voting Certification establishes that the unsecured creditor classes accept the Plan at each Debtor (other than Sears Brands, L.L.C.) in numerosity. *See* Voting Certification, Exhibit A.  The unsecured creditor classes are not "accepting" classes solely because the percentage in value accepting each class is overwhelmed by unsecured notes that are largely owned by the Second Lien Parties.  *See Id*, ¶ 13.  Further, the Debtors' classification reflects valid business, factual, and legal distinctions that warranted separate classification on the record here, as described in detail in paragraphs 83 to 86 above.  Therefore, the Debtors' classification scheme is appropriate and fully complies with section 1122 of the Bankruptcy Code.

**C.      Objections to the PBGC Settlement and Plan Settlement Should be Overruled**

**1.      Objections to the Standard Used to Evaluate the Plan Settlement
         Should be Overruled; the 9019 Standard is the Correct Standard to
         Evaluate the Plan Settlement**

246.    Cyrus, Wilmington Trust, and the School District argue that the Plan improperly seeks substantive consolidation through settlement and must actually still meet the

*Augie/Restivo* standard. *See* Cyrus Obj., ¶ 12; Wilmington Obj., ¶ 27; School District Obj., at 7-9. As discussed in detail in <u>Part I</u> above, because the Plan Settlement reflects a settlement of substantive consolidation issues and not an actual substantive consolidation, the correct standard for approval of the Plan Settlement is the 9019 Standard. *See, e.g.*, *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD), at 21 (Bankr. S.D.N.Y. Feb. 28, 2012) (ECF No. 3477) (approving substantive consolidation settlement under Bankruptcy Rule 9019); *In re Lehman Bro. Holdings Inc.*, Case No. 08-13555, at 12–14 (Bankr. S.D.N.Y. Dec. 6, 2011) (ECF No. 23023) (same); *Enron*, 2004 Bankr. LEXIS 2549, at *2–4 (same); *In re WorldCom, Inc.*, Case No. 02-13533, 2003 WL 23861928, at *38, *44–48 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); *Winn-Dixie Stores*, 356 B.R. at 250-51 (same).

> **2.      The Plan Settlement fairly reflects the arguments for (and against) substantive consolidation on the merits under Augie/Restivo**

247.    Section I.C above describes how the 9019 Standard is met and how the *Iridium* factors are satisfied with respect to each settlement, demonstrating that each settlement far exceeds the "lowest point in the range of reasonableness" as required by the 9019 Standard and section 1123(b)(3) of the Bankruptcy Code. The Plan Settlement meets this standard in part because the settlement fairly reflects the arguments for (and against) substantive consolidation on the merits under *Augie/Restivo*. While certain Objectors argue that the Debtors do not meet the "hopeless entanglement" or "creditor reliance" branch of *Augie/Restivo*, these objections are evidence that the Plan Settlement is reasonable—i.e., because arguments can be made for and against substantive consolidation in these cases, a settlement of the issues that fairly takes into account the risks of litigation (as reflected in the 75% discount embodied in the Plan Settlement Premium) and allows the Debtors to avoid complex and protracted litigation is therefore in the best interests of all creditors.

135

248.    For example, Wilmington Trust and the School District argue that the Debtors do not have strong evidence demonstrating the "creditor reliance" branch of *Augie/Restivo*. The School District incorrectly argues that there is "no evidence of corporate disregard creating contractual expectations of the creditors that they were dealing with the Debtors as one entity." *See* School District Obj., at 9. Wilmington Trust argues that the holders of the Second Lien Notes did not view all of the Debtors as a single entity because Wilmington Trust required guaranties of their obligations from other debtor-guarantors and creditors knowingly made loans to the Debtors' separate entities and no commingling of asserts occurred. *See* Wilmington Trust Obj. ¶¶ 36-39.  Although the insistence of guarantees from debtor affiliates by creditors is a factor that Courts may consider, Courts look at other factors as well, including financial reporting on a consolidated basis, whether separate accounts were set up for the different debtors, whether the invoices were sent to different debtors, whether the debtors separately paid their bills. *See In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996).  As described in paragraph 72 above and in the Murphy Declaration, the Debtors conducted their operations and presented themselves to the business world as a consolidated financial enterprise for all practical purposes—payments for services rendered, goods delivered, or other obligations owed to vendors for all Debtors were primarily made through disbursements from either Sears Holdings, Sears Roebuck or Kmart Corp.  *See* Murphy Decl., ¶ 24.  Therefore, there are factors under this theory of substantive consolidation that can be argued on either side, and a settlement of these complex, fact-intensive issues is the best outcome for the Debtors' Estates.

249.    The same Objectors cast doubt on the Debtors' ability to prove the other theory justifying substantive consolidation—that the Debtors' intercompany affairs are hopelessly

WEIL:\97183319\1\73217.0004

entangled.[31]  *See* Wilmington Trust Obj., ¶¶ 40-49; School District Obj., at 9.  As described in greater detail in paragraphs 67 to 71 above and in the Murphy Declaration, determining an accurate accounting of prepetition Intercompany Claims among the Debtors would be extremely challenging, cost-prohibitive, and time consuming, with no guarantee that the analysis, even if completed, would be sufficiently accurate:

- The Debtors and their professionals conducted an extensive analysis of the Debtors' financial records and accounting systems and found that historical intercompany data is incomplete and inaccurate and further complicated by the antiquated nature of numerous accounting systems and the numerous spin-offs and other transactions conducted over the years.

- Each existing intercompany balance is a consolidated/netted intercompany balance for each Debtor, making it extremely difficult to analyze each individual Intercompany Transaction that comprises the netted, recorded, Intercompany Claim number for each Debtor.

- Aside from the highly intensive forensic accounting analysis required for potentially decades of data, the Debtors would still be required to resolve the legal implications of among other things, potential claims or causes of actions arising from the intercompany transfers, the potential recharacterization of intercompany accounts, and intercompany asset ownership.

250.    In other words, the Debtors' intercompany affairs are so "hopelessly entangled" such that substantive consolidation would likely be justified.  The Debtors' discounting of the Plan Settlement Premium by only 25%, reflecting a 75% risk of substantive consolidation, demonstrates the Debtors' belief that there are strong arguments for substantive consolidation under the "hopeless entanglement" theory.  However, the objections lodged by the School District and Wilmington Trust are evidence that the issues would be hotly litigated, and demonstrate that discounting the premium by 25% is justified.  However, a number of their specific arguments

---

[31] As described above, *Augie/Restivo* is a disjunctive test, and satisfying either the hopeless entanglement test or the creditor reliance test justifies substantive consolidation.  *See Augie/Restivo*, 860 F.2d at 518; *In re Verestar*, 343 B.R. 444, 462-63 (Bankr. S.D.N.Y. 2006)

WEIL:\97183319\1\73217.0004

against the Debtors' justifications for the "hopeless entanglement" theory of substantive consolidation are incorrect and the Debtors address each in turn.

251.    The School District erroneously suggests that only evidence of "postpetition" intermingling is required and that no such evidence has been presented. *See* School District Obj., at 9. This is plainly not the test. The focus of the "hopeless entanglement" test is not whether *postpetition* data is hopelessly intermingled but whether the *prepetition* data is so hopelessly entangled that the time and resources necessary to disentangle such data would be cost-prohibitive and harmful to the estates and the creditors, and substantive consolidation would ensure timely and efficient administering of the cases and provide meaningful recoveries to creditors of their *prepetition* claims. *See Augie/Restivo*, 860 F.2d at 519 (analyzing prepetition records and facts in determining whether commingling of business functions and assets warranted consolidation). The School District's interpretation would defeat the purpose of the "hopeless entanglement" test, as any debtor that is able to prove postpetition intermingling would be able to satisfy the standard for substantive consolidation, regardless of prepetition intermingling, or the lack thereof, of various debtors' asset and liabilities and business functions. The result of the School District interpretation would mean that debtors would be able to easily substantially consolidate despite obvious harm to and inequitable treatment of creditors, and such a result would be antithetical to the purpose of substantive consolidation. *See, e.g.*, *Augie/Restivo*, 860 F.2d at 518. Therefore, the School District is incorrect to say that there is no evidence of intermingling of information.

252.    The School District and Wilmington Trust also note that substantive consolidation is only justified if *all* creditors would benefit from the consolidation. *See* School District Obj. at 8; Wilmington Obj., ¶ 54. This does not mean that all creditors must get an

increased *recovery* from the consolidation, but that all of the creditors are benefitting from the consolidation.   In this case, all creditors *do* benefit from the settlement of substantive consolidation, because it would take a highly forensic accounting analysis to try to disentangle the Debtors' affairs that likely would also require challenging intercompany transactions that may entail protracted litigation, which would cost the Debtors' Estates likely millions of dollars and delay distributions to creditors until the analysis was completed.   And due to the multiple significant challenges that such an accounting analysis would face (including analyzing data from multiple accounting systems that utilize archaic technology, some of which are no longer under the Debtors' control), there is high probability that such an undertaking is actually impossible.

253.     In its objection, the School District relies on *In re Owen Corning*, 419 F.3d 195 (3d. Cir. 2005), which found that "the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation."  419 F.3d at 214-15 (holding that the District Court's finding that intercompany cash transfers did not include interest and calculation of royalties due to affiliates were subject to question were mere imperfection and inaccuracies that were insufficient to support a finding of hopeless commingling).   However, the Debtors do not contend that perfect accounting is necessary, nor are the challenges presented by the disentangling the Debtors' intercompany accounting records "some inaccuracies" that could easily be corrected—the difficulties the Debtors face are of much greater magnitude than mere omission of interest or questionable calculation of a particular line item.  Further, the Debtors do not propose the Plan Settlement as an offensive measure to "[shift] assets to benefit one group of creditors at the expense of another" or "achieve advantage over one group in the plan negotiation process," but to make assets available for the benefit of all creditors rather than have such assets be unnecessarily depleted to in an effort to

complete a nearly impossible undertaking. *See Id.* at 214, 215. This is further evidenced by the proposed Plan Settlement Premium, which the Debtors proposed to further ensure that harm would be minimized and all creditors would benefit from the Plan Settlement. The Objectors also ignore that without the Plan Settlement and the PBGC Settlement, the PBGC would dwarf and significantly dilute recoveries to all other creditors.

254.    Wilmington Trust alleges that the Debtors have "acknowledged" that their estates are not hopelessly entangled. *See* Wilmington Trust Obj., ¶ 45. However, one of the quotations from Mr. Riecker cited by Wilmington Trust does nothing to prove its point, as it merely generally describes the Debtors' analysis of store-profitability. The Debtors' ability to analyze store-profitability and market impact has no bearing on the Debtors' intercompany affairs. Mr. Riecker's statements simply have nothing to do with the Debtors' intercompany affairs and how they are hopelessly entangled. The other quotation from Mr. Riecker cited by Wilmington Trust regarding the Debtor's centralized cash management system is actually a factor in support of substantive consolidation. See *In re Worldcom*, 2003 WL 23861928, at *36-37 (finding that the fact that the debtors had centralized administrative functions, such as cash management, is a supporting factor for substantive consolidation). Further, Mr. Riecker's comments do not negate the fact that the Debtors' millions of intercompany payables are automatically netted and consolidated for all intercompany transactions, making it extremely difficult to identify a particular Debtor entity to which a particular intercompany balance is owed.

255.    Wilmington Trust further argues that even if the Debtors are able to satisfy either of the prongs of *Augie/Restivo*, the Court should still deny substantive consolidation because it will cause undue prejudice on the Debtors' "remaining creditors." *See* Wilmington Trust Obj., ¶¶ 50-62. The Debtors disagree. As result of the settlement of substantive consolidation

pursuant to the Plan Settlement, guarantee claimants will only recover on account of their principal

claim and are not able to recover twice as a result of their guarantee claims.  However, the Debtors

have devised the Plan Settlement Premium to take into account the harm to guarantee claimants as

a result of the Plan Settlement, and the Debtors believe such treatment is fair and adequate in light

of the circumstances of these chapter 11 cases.  Wilmington Trust did not make any objection to

the Plan Settlement Premiums or suggest an alternative mechanism for reducing the alleged harm

to creditors.  Wilmington Trust also ignores the fact that the PBGC would likely eat up close to all

recoveries at all of the Debtors' in a non-consolidation scenario.

### 3.    The PBGC Settlement Meets the 9019 Standard

#### i.    The PBGC Has Significant Litigation Claims and Litigation of Such Claims Would be Complex and Protracted

256.    Wilmington Trust also argues that the PBGC Settlement does not meet the

9019 Standard because (i) the PBGC does not have significant litigation claims and (ii) there is a

low chance that litigation associated with PBGC's General Unsecured Claim and KCD's

Administrative Expense Claim will be complex and protracted.  Wilmington Trust Obj., ¶¶ 25-35.

As described in paragraphs 52 to 63 above and herein, the Debtors contend the opposite, and

Wilmington Trust's objection should be overruled.

257.    First, the PBGC clearly has significant claims against the Debtors; the

PBGC has asserted a General Unsecured Claim of $1.4 billion, and has the ability to influence

KCD's alleged Administrative Expense Claims against the Debtors, which could be in excess of

$146 million.  *See* PBGC Proofs of Claim.  By virtue of the PBGC settlement, the PBGC is

agreeing to reduce its General Unsecured Claim from an overwhelming $1.4 billion to $800

million, and has agreed to all reasonable action requested by the Debtors to cause KCD to waive

any of KCD's alleged Administrative Expense Claims against the Debtors, which could be in

excess of $146 million, each a significant concession. *See* PBGC Statement in Support.

258.    Second, Wilmington Trust provides no support evidencing that litigation

regarding these two claims would not be lengthy, complex, and protracted.  The PBGC's potential

$1.6 billion General Unsecured Claim *at each Debtor* is overwhelmingly large, and the $146

million is a sizable potential Claim and the facts around KCD's potential Administrative Expense

Claim are detailed and complex.  If either Claim were allowed against the Debtors, there could be

a significant negative impact on the Debtors' available assets.  With such large Claims at stake, all

parties would likely dig in and litigate aggressively.   The settlement of PBGC's claims and

obtaining certainty on the amount of such claims clearly demonstrates that the PBGC is fair and

equitable.    The costly and lengthy litigation that would likely have ensued without the

compromises provided in the PBGC Settlement would have severely hindered the Debtors' ability

to exit these chapter 11 cases on a timely basis and prevent the most economic use of the Debtors'

remaining assets for the benefit of their creditors.

> **ii.**    **The PBGC Liquidating Priority Interest Must be Evaluated in the Entire Context of the Plan Settlement**

259.    Wilmington Trust argues that the Debtors are improperly providing the

PBGC with a new claim on a secured basis through the PBGC Liquidating Trust Priority Interest,

thereby decreasing recoveries for other unsecured creditors.  Wilmington Obj., ¶ 66-68.  Further,

Wilmington Trust argues that the Plan Settlement is not adequately justified, and that the Debtors

must prove that the cost of analyzing intercompany claims must be greater than $17.5 million (the

increased amount of the PBGC Liquidating Trust Priority Interest on account of PBGC agreeing

to amend the PBGC Settlement to allow for the settlement of substantive consolidation).

Wilmington Trust Obj., ¶ 65.    These objections are without merit and fundamentally

WEIL:\97183319\1\73217.0004

misunderstand the effect of the Plan Settlement.  To reiterate, as described in paragraphs 65 to 80 above, the Plan Settlement meets the applicable 9019 Standard and the *Iridium* factors, is reasonable, and in the best interests of the Debtors and their Estates.

260.    First, the PBGC Liquidating Trust Priority Interest is not a secured prepetition claim being provided to the PBGC where none existed; rather, the PBGC Liquidating Trust Priority Interest entitles the PBGC to a recovery on account of their Claims in the form of $97.5 million of net proceeds from certain causes of action, such priority interest being provided on the Effective Date.  This treatment takes into account the significantly higher $146 million Administrative Expense Claim that PBGC will cause KCD to waive and the greater recoveries the PBGC would recover in a non-consolidation scenario if it had an allowed claim of $1.4 billion at every Debtor.

261.    Second, contrary to Wilmington Trust's assertion, the $17.5 million increase of the PBGC Liquidating Trust Priority Interest is not simply an offset of the potential cost to fully investigate, analyze and summarize the prepetition Intercompany Claims.  As described in 67 to 71 above and in the Murphy Declaration, the Debtors believe it will be extremely difficult, if not impossible, to reconcile Intercompany Claims, such that a settlement of substantive consolidation issues under the Plan is likely the Debtors only option.  Accordingly, the Debtors re-negotiated the terms of the settlement with the PBGC.  Pursuant to the Plan Settlement, the PBGC agreed to settle substantive consolidation issues under the Plan, agreeing to forgo approximately $800 million in General Unsecured Claims ***at each Debtor*** in exchange for only one $800 million claim against the consolidated Estates.  Evidently, an increase in $17.5 million of the PBGC Liquidating Trust Priority Interest is a fair settlement in exchange for the significant value the PBGC is giving up and for the additional benefits of the Plan Settlement.  Wilmington Trust's

143

argument here is too simplistic and ignores all of the other issues associated with 53 individual plans, including the likely protracted inter-estate litigation that would arise, the lack of coordination and competing interests among the Debtors' Estates over litigation claims, the resulting reduced recoveries available and a significant delay of distributions. The PBGC Liquidating Trust Priority Interest is just one component of the PBGC Settlement, and "[i]n complex settlements, it is appropriate for the court to not only consider each settled claim individually, but also to consider the reasonableness of the agreement as a whole." *Republic Airways Holdings Inc.*, 2016 WL 2616717, at *7 (citing *In re NII Holdings, Inc.*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015)).

### D.    Treatment of Fee Claims under the Plan is Valid and Reasonable[32]

262.    Certain Objectors allege that the Plan was not filed in good faith because it provides for the disparate treatment of Administrative Expense Claims, e.g. the payment in full of Fee Claims from the Carve-Out Account. Other Objectors have further argued that the Carve-Out is not a true carve out, but rather an agreement to use the DIP lenders' collateral, therefore the payment in full of Fee Claims ahead of Administrative Expense Claims is improper. The Debtors disagree; as stated above, the Debtors have proposed the Plan with the goal of maximizing value and providing recoveries to creditors. The treatment of Fee Claims contained in the Plan was approved by the Court as part of the DIP Order—which is final and non-appealable—and this treatment is merely being incorporated into the Plan.[33]

---

[32] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Order.

[33] Also, of note, pursuant to the *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 796), retained professionals have not been paid in full. Instead, retained professionals have only been paid 80% of fees and 100% of expenses pursuant to monthly fee statements; the remaining 20% holdback being paid only pursuant to the Court's approval of the respective interim fee applications.

WEIL:\97183319\1\73217.0004

### 1.    Provisions of the DIP Order Control

263.    Although the DIP ABL Secured Obligations, Junior DIP Secured Obligations, and Prepetition ABL Obligations were satisfied in full or rolled into new Transform facilities pursuant to the Sale Transaction,[34] the Postpetition Intercompany Obligations still remain outstanding.  Of note, pursuant to paragraph 39 of the DIP Order, all Postpetition Intercompany Obligations are "*secured* by an automatically perfected security interest in and lien on, as to any Debtor transferee, all DIP ABL Collateral including all Prepetition ABL Collateral, Prepetition Encumbered Collateral and Prepetition Unencumbered Collateral of the transferee for the benefit of the Debtor transferor" (emphasis added).  Moreover, no Termination Notice was delivered and no Termination Date has taken effect.  *See DIP Order ¶¶ 2, 34; Griffith Dec. ¶ 85.*  Put simply, the Debtors continue to use Cash Collateral pursuant to, and in accordance with, the DIP Order. And unlike other cases where the DIP financing order explicitly envisions a termination of rights and remedies under the DIP order upon the repayment in full of the DIP financing facility, no such provision can be found here.  *See In re The Great Atlantic & Pacific Tea Company, Inc.* (Case No. 10-24549) (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (ECF No. 1240) ¶ 18(e).

### 2.    The Carve-Out Was Specifically Negotiated and Approved by the DIP Order

264.    Carve outs are ordinary components to DIP financings in any large chapter 11 case and these chapter 11 cases are no different.  *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34 (Bankr. S.D.N.Y. 1990) (noting practice of district to insist on carve-out fees in order to preserve adversary system); *In re Evanston Beuaty Supply, Inc.,* 136 B.R. 171 (Bankr. N.D. Ill. 1992) (the court observed that such carve outs were essential to ensure that all parties in interest

---

[34] After the consummation of the Sale Transaction, the Debtors had approximately $95 million from proceeds of GOB sales, cash-in-transit, credit card receivables, and cash in stores.

were adequately represented).   A carve-out provides certain claimants (here, the Professional

Persons) priority in the DIP lender's collateral ahead of the DIP lenders and above other

administrative claimants.   *See generally Richard Levin, Almost All You Ever Wanted to Know*

*About Carve-Out,* 76 Am. Bankr. L.J. 445 (2002); *James S. Cole, The "Carve Out" from Liens*

*and Priorities to Guarantee Payment of Professional Fees in Chapter 11,* 1993 Det. C. L. Rev.

1499 (1993).

265.    The Carve-Out as reflected in the DIP Order was specifically negotiated for

in conjunction with the DIP financing negotiations and a crucial aspect of the overall deal.   *See*

Griffith Decl., ¶ 89.  *See ¶* 21(f) ("Upon the entry of the Interim Order, the Debtors established a

segregated account with the DIP ABL Administrative Agent (the "Carve Out Account"), ***which***

***was and shall continue to be funded*** in an amount up to the Carve-Out Reserve Amount . . .")

(emphasis added).  The Carve-Out ensures that if the "music stops" there will be sufficient funds

for the professionals to administer an orderly wind down of the estates.[35]   Importantly, the Debtors

have complied with, and continue to comply with the provisions of the DIP Order.   And as

required, each Professional Person continues to provide Weekly Statements to M-III Partners who

then transfers corresponding funds on a weekly basis into the Carve-Out Account.   *See* Griffith

Decl., ¶ 90.

266.    Further, the DIP Order carves out amounts deposited into the Carve-Out

Account from the collateral of secured creditors and no legal requirement bars secured creditors

from releasing their collateral to fund the Carve-Out Account.   The DIP Order also plainly states

that the "[a]mounts in the Carve-Out Account shall be ***held in trust*** to pay all amounts included in

---

[35] Here, the Carve-Out would be coupled with funds from the Winddown Account, which was another highly
negotiated aspect of the financing package.

the Carve-Out Account" (emphasis added).  *See* DIP Order ¶ 21(f).  Moreover, "[n]otwithstanding anything to the contrary in [the DIP Order], the Carve-Out Account and the amounts on deposit in the Carve-Out Account shall be ***available and used only to satisfy*** obligations of Professional Persons benefitting from the Carve-Out . . ." (emphasis added).  *Id.  See generally In re U.S. Flow Corp.*, 332 B.R. 792, 796–98 (Bankr. W.D. Mich. 2005) (professionals who benefitted from the carve-out would not be required to, upon determination that estate was administratively insolvent, disgorge the negotiated for and approved carve-out so that funds could be distributed pro rata among all administrative claimants; the carve-out did not constitute "property of the estate").

267.    To attack the Carve-Out Account now, in the context of Plan confirmation, after significant work has been completed, is inappropriate.  Parties-in-interest are well aware that the Carve-Out Account continues to be funded and that the Professional Persons continue to operate in accordance with, and reliance on, the DIP Order and the Carve-Out provisions therein. The Debtors' "Weekly Cash Flow Budget" has been filed publicly multiple times and the Second-Lien Holders receive weekly updates and are on notice that funds continue to be transferred into the Carve-Out Account pursuant to the DIP Order.  To shift the credit risk onto the Estate and Creditors' Committee professionals is unfair and contrary to the express provisions of the DIP Order.

268.    Had the Carve-Out not been originally permitted by the Court, the professionals would have had to make a decision: either continue to provide representation in these chapter 11 case or seek to withdraw from such representation.  To the extent the Carve-Out is disagreeable to the Objectors, the appropriate remedy was to have objected to entry of the DIP Order.  Further, if the Objectors had wanted to demand better treatment in exchange for postpetition services, they could have, but they did not.  And if the Objectors intend to amend the

provisions of the DIP Order regarding the Carve-Out, each of the Professional Persons will have to make a risk assessment on continued representation; the substitution of such professionals would undoubtedly cost these Estates substantial institutional knowledge and cannot be in the best interest of the stakeholders.

### E.    Objections to the Third Party Releases Should be Overruled

#### 1.    Third Party Releases are Consensual and can be Approved Pursuant to Section 1141(a)

269.    Certain Objectors assert that holders of Claims who are entitled to vote and vote to reject the Plan or abstain from voting but do not opt-out of the releases on their ballots should not be considered to have provided the Third Party Release. *See, e.g.* U.S. Trustee Obj., at 7-9. This objection should be overruled on the merits. As discussed in paragraphs 95 to 100 above, third party releases can be approved pursuant to section 1141(a) of the Bankruptcy Code, and this Court noted in *In re Tops Holding II Corp.*, Case No. 18-22279 (RDD) that even if a creditor is not deemed to have consented to plan releases as a matter of contract law, section 1141(a) of the Bankruptcy Code binds creditors to a plan's provision—including third party releases contained therein—if creditors receive proper notice but fail to object to confirmation of the plan. *See* Tops Disclosure Statement Hr'g Tr. at 33:25-34:8, 34:9-24, 35:6-13. *See also In re Frontier Ins. Grp., Inc.*, 585 B.R. at 693–97; *In re MPM Silicones, LLC,* 2014 WL 4436335, at *32. For the reasons set forth herein, the UST Objection should be overruled.

#### 2.    The Court has Subject Matter Jurisdiction to Approve the Third Party Releases

270.    Certain Objectors argue that the Debtors have not met their burden to prove that the Court has subject matter jurisdiction to over the Third Party Releases. *See* U.S. Trustee Obj., at 9; Whitebox Obj., ¶¶ 56-57. Such Objections, however, are unfounded. First, the Court plainly has subject matter jurisdiction to approve the Third Party Releases, at the very least, based

on "related to" jurisdiction.    A bankruptcy court has subject matter jurisdiction over "all civil

proceedings arising under title 11, or arising in or *related to* cases under title 11."

28 U.S.C. § 1334(b) (emphasis added).  As noted by the Second Circuit in *SPV Osus Ltd. v. UBS*

*AG* (citing to the United States Supreme Court's decision in *Celotex Corp. v. Edwards*, 514 U.S.

300, 307-08 (1995)), "related to" jurisdiction is extremely broad, encompassing any action that

could *conceivably have any effect on the estate*:

> In this Circuit, a civil proceeding is related to a title 11 case if the
> action's outcome might have *any conceivable effect* on the bankrupt
> estate.  If that question is answered affirmatively, the litigation falls
> within the 'related to' jurisdiction of the bankruptcy court.  Congress
> intended to grant comprehensive jurisdiction to the bankruptcy
> courts so that they might deal efficiently and expeditiously with all
> matters connected with the bankruptcy estate.  While 'related to'
> jurisdiction is not limitless, it is fairly capacious, and includes suits
> between third parties which have an effect on the bankruptcy estate.
> *An action is related to bankruptcy if the outcome could alter the
> debtor's rights, liabilities, options, or freedom of action (either
> positively or negatively) and which in any way impacts upon the
> handling and administration of the bankrupt estate.*
>
> ***
>
> A claim need not be certain to provide a federal court with
> jurisdiction: contingent outcomes can satisfy the 'conceivable
> effects' test, so long as there is the possibility of an effect on the
> estate.

882 F.3d 333, 339-40 (2d Cir. 2018) (emphasis added; internal citations and quotation marks

omitted).[36]  *See also In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) ("[T]he

touchstone for bankruptcy jurisdiction over a non-debtor's claim remains whether its outcome

might have any 'conceivable effect' on the bankruptcy estate"); *In re MPM Silicones, LLC*, No.

---

[36] Notably, in *SPV Osus*, the Second Circuit found subject matter jurisdiction in the context of a dispute as to the mere filing of a late claim, stating that "[a]ny attempt to file a late claim would result in the estate incurring costs."  *Id.* at 341.

WEIL:\97183319\1\73217.0004

14-22503 (RDD), 2014 WL 4436335, at *34 (Bankr. S.D.N.Y. Sept. 9, 2014) ("I firmly believe that I have jurisdiction" over third party releases); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 288 (Bankr. S.D.N.Y. 2016) ("In order to approve a non-debtor release included in a plan of reorganization, a bankruptcy court must have subject matter jurisdiction over the released claims, which turns on whether the claims might have "any conceivable effect" on the bankruptcy estate.") (citing *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012)); *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07 Civ. 4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007) (to have a "conceivable effect" on a bankruptcy estate, "certainty, or even likelihood, is not required."). In fact, "related to" jurisdiction can be exercised even when the debtor's liability has not yet ripened. *See In re Masterwear Corp.*, 241 B.R. 511, 516–17 (Bankr. S.D.N.Y. 1999) (finding that a "debtor's liability need not . . . be definite" for there to be "related to" subject matter jurisdiction and that there is subject matter jurisdiction where third party defendants articulated a "reasonable legal basis" to recover indemnification from the debtor); *In re Chateaugay Corp.*, 213 B.R. 633, 639–40 (S.D.N.Y. 1997) (holding that if the party seeking indemnification had a reasonable legal basis for its indemnification then "related to" jurisdiction exists).[37] Indeed, there can be no question that the claims to be released could have a "conceivable effect" on the Debtors' Estates, based on, among other things, rights to indemnification.

---

[37] Although not raised by any Objecting party, the Court also has constitutional authority to enter a final judgment approving the Third Party Releases given that the operative proceeding before the Court is plan confirmation. *See, e.g., In re MPM Silicones, LLC*, 2014 WL 4436335 at *34, *rev'd on other grounds*, 874 F.3d 787 (2d Cir. 2017) ("I firmly believe that I have jurisdiction over [the releases] . . . and that I can issue a final order on it . . . given that this is in the context of the confirmation of the plan . . . That would hold true, even post-confirmation or with regard to a post-confirmation effect on the estate"); *In re Kirwan Offices S.À R.L.*, 2018 WL 5095675, at *14 (S.D.N.Y. Oct. 10, 2018) (constitutional authority to approve injunction and exculpation provisions in plan where such "clauses 'deriv[e] from bankruptcy law' – they are embedded within a confirmed reorganization plan, the 'operative proceeding' for constitutional purposes); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 256 (Bankr. D. Del. 2017) (holding that the bankruptcy court has constitutional authority to enter a final judgment enjoining the assertion of a third party claim by a non-consenting creditor).

WEIL:\97183319\1\73217.0004

271.    A 2018 decision in this District is directly relevant here.  In *In re Kirwan Offices S.À R.L.*, 2018 WL 5095675 (S.D.N.Y. Oct. 10, 2018), the United States District Court for the Southern District of New York addressed an appeal of a bankruptcy court's order finding that the bankruptcy court did not have subject matter jurisdiction to consider and approve exculpation and injunction provisions in a chapter 11 plan precluding the appellant from pursuing claims against third parties.  In ruling on the appeal and finding that subject matter jurisdiction existed, the District Court noted that:

> A bankruptcy court acts pursuant to its core jurisdiction when it considers the involuntary release of claims against a third-party, non-debtor in connection with the confirmation of a proposed plan of reorganization, which is a statutorily-defined core proceeding.
>
> * * *
>
> That a bankruptcy court's decision may have a preclusive, incidental effect on claims beyond the scope of the immediate bankruptcy proceeding does not render the bankruptcy court's jurisdiction non-core.

*Id.* at \*9.  The District Court did note that a third party release must be sufficiently related to the issues before the bankruptcy court in order for core jurisdiction to exist, but, as is the case here, clearly found that to be the case where the exculpation and injunction provisions were narrowly tailored and necessary to the plan's operation.

272.    Consistent with the understanding "that Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate," *Celotex*, 514 U.S. at 309, courts in this District have regularly held that they have "related to" jurisdiction to approve third party releases where the claims to be released *may give rise* to indemnification or similar claims of reimbursement against the debtor.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. at 292–93 (concluding, despite the fact that the third party *had not yet asserted* any indemnification claims,

that the debtors "are obligated under the [third party's] Credit Agreement to indemnify the [third party releasees]; accordingly, absent the [third party release], claims against the [third party releasees] ***could*** result in indemnification claims against the estates") (emphasis added); *In re Adelphia Commcn's Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) ("Some people and entities (*e.g.*, by employment contracts, corporate bylaws, or retention or loan agreements) must be indemnified by the estate with respect to their services.  To the extent that the third party releases are congruent with the indemnification obligations, and the Debtors would be liable for any liability imposed on such persons, third party releases are acceptable."); *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (Bankr. S.D.N.Y. 2011) ("I believe that the Second Circuit, if directly confronted with the question, is more likely to decide that a bankruptcy court has 'related to' jurisdiction to enjoin non-debtor litigation if the bankruptcy estate may be obligated to indemnify or contribute to the losing party . . . I therefore conclude that Judge Lifland had subject matter jurisdiction to enter the [third party] injunctions . . . "); *In re Residential Capital, LLC,* 497 B.R. at 745–46 (holding that "related to" jurisdiction exists where it is premised on a contractual indemnification obligation by a bankrupt entity and finding that the court has such jurisdiction in this case because the third parties hold broad indemnification rights against the debtors).[38]

---

[38] *See also In re Amanat*, 338 B.R. 574, 579 (Bankr. S.D.N.Y. 2005) (holding that a bankruptcy court has "related to" jurisdiction over non-debtor litigation if the estate is obligated to indemnify or contribute to the losing party); *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 324 (S.D.N.Y. 2003) (holding that a bankruptcy court has "related to" jurisdiction over a disputed or conditional obligation to indemnify that has a "reasonable legal basis" and that the effect of contribution claims on the bankruptcy estate is at the very least 'conceivable' because such claims could alter the distribution of assets among creditors); *Bond St. Assocs. v. Ames Dep't Stores, Inc.*, 174 B.R. 28, 33 (S.D.N.Y. 1994) (finding reasonable basis for jurisdiction absent an indemnification agreement where the third-party defendant would "normally have a claim" for indemnification against the debtor); *Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.)*, 190 B.R. 157, 160–61 (S.D.N.Y. 1995) (holding that a court has "related to" jurisdiction over a contractual and absolute obligation to indemnify even if the debtor's liability is not definite); *In re Trinsum Grp., Inc.*, No. 08-12547 MG, 2013 WL 1821592, at *5 (finding that the bankruptcy court has subject matter jurisdiction to consider and approve non-debtor releases because certain third-party claims being released affect the *res* of the bankruptcy estate); *In re River Center Holdings, LLC*, 288 B.R. 59, 63–65 (Bankr. S.D.N.Y. 2003) (finding jurisdiction where the debtor was contractually obligated to indemnify guarantor who was third party defendant).

WEIL:\97183319\1\73217.0004

273.    In the Debtors' cases, it is clear that the claims that are the subject of the Third Party Releases could have a conceivable effect on the Debtors' Estates. For example, under the Debtors' organizational documents, the Debtors have obligations to indemnify their current and former directors and officers to the fullest extent permitted by law in connection with defending against claims and causes of action arising out of the performance of their duties as directors and officers and obligations to indemnify their current and former employees. *See, e.g.*, Hr'g Tr. 135:22-136:6, *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (ECF No. 624) (Bankr. S.D.N.Y. July 25, 2017) ("Many of the release parties have indemnification rights against the Debtors' estates pursuant to the terms of the term loan credit agreement, the DIP term loan credit agreement, the ABL credit agreement, the DIP ABL credit agreement, the plan support agreement, and the Debtors' organizational documents as applicable. Because such contingent indemnification obligations could have a conceivable effect on the [res] of the estate, the Court finds that it has subject matter jurisdiction over the third-party releases contained in the plan.").

274.    Accordingly, based upon the foregoing, including the applicable and well-settled authority in this Circuit, the Court has subject matter jurisdiction to approve the Third Party Releases.

### F.    Objections to the Plan Injunction Provision Should be Overruled

275.    Certain Objectors contend that Section 15.8 of the Plan (the injunction provision) has the effect of improperly discharging the Debtors in violation of section 1141(d)(3) and cite to two cases to support such argument: *In re Bigler LP* and *In re Wood Family Interests, Ltd. See* U.S. Trustee Obj., at 9-10; School District Obj., at 5-6. Section 1141(d)(3) provides that in a chapter 11 case the debtor may be denied discharge upon confirmation of the plan if the following three requirements are present: (1) the plan provides for the liquidation of all or

substantially all of the property of the estate (§ 1141(d)(3)(A)); (2) the debtor does not engage in business after consummation of the plan (§ 1141(d)(3)(B)); *and* (3) the debtor would be denied a discharge under § 727(a) of this title if the case were a case under chapter 7 of this title (§ 1141(d)(3)(C)). *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 803 (5th Cir. 1997).

276.    In *In re Bigler*, the Court held that an injunction provision contained in a liquidating chapter 11 plan impermissibly discharged the debtors in violation of section 1141(d)(1) of the Bankruptcy Code. *In re Bigler LP*, 442 B.R. 537, 541 (Bankr. S.D. Tex. 2010). *In re Wood Family Interests, Ltd.*, however, is not applicable because it does not even involve an injunction provision—the liquidating chapter 11 plan included express language discharging the debtor. *In re Wood Family Interests, Ltd.*, 135 B.R. 407, 410 (Bankr. D. Colo. 1989). As such, the *Wood Family* court held that a limited partner's liquidating chapter 11 plan impermissibly provided for a discharge of a deficiency claim against the debtor. Therefore, *In re Bigler* is the only case that could be relied upon by the Objectors.

277.    Other Courts, however, have confirmed chapter 11 liquidating plans that contained similar injunction provisions. For example, in *In re S. Edge LLC*, the court confirmed a chapter 11 liquidating plan that included the following post-confirmation injunction:

> Because the Debtor will be liquidating its Assets, the Debtor will not receive a discharge under this Plan. However, until all remaining Assets of the Reorganized Debtor and the Estate are administered, and except as otherwise provided in this Plan or the Confirmation Order, all Entities shall be barred from asserting against the Debtor or the Reorganized Debtor, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date.

*In re S. Edge LLC*, 478 B.R. 403, 408 (D. Nev. 2012). The Court expressly rejected the argument that such provision constituted a "de facto" discharge. *Id*. at 417. In another case—*In re Midway*

*Gold US, Inc.*—the Court confirmed a liquidating chapter 11 plan with the following injunction provision:

> Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of this Plan will not discharge the Debtors; *provided, however*, upon confirmation of the Plan, the occurrence of the Effective Date, and Distributions hereunder, Claimants may not seek payment or recourse against or otherwise be entitled to any Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement.

*In re Midway Gold US, Inc.*, 575 B.R. 475, 515 (Bankr. D. Colo. 2017).  The court held that the provision's "express limitation on any discharge awarded the Debtors" sufficiently overcame what would have otherwise rendered the plan unconfirmable.  *Id*. at 515.

278.    Here, the Objectors misconstrue the plain language of the Injunction provision of the Plan.  The Injunction provision does not violate section 1141(d)(3) of the Bankruptcy Code.  Rather than granting an improper discharge, the Injunction provision is essential to permit the Plan to be implemented in accordance with its terms and avoid adverse third party actions that could impair the ability for creditors to achieve the benefits of the Plan.  Indeed, Section 15.8 of the Plan ensures that whatever rights parties have against the Debtors and their estates are administered through the Plan, and not through satellite litigation.  And, unlike a permanent discharge, parties in interest can seek relief from the injunction—akin to the automatic stay—from the Bankruptcy Court.

WEIL:\97183319\1\73217.0004

## CONCLUSION

279.    The Plan complies with all of the requirements of section 1129 of the

Bankruptcy Code, the Objections should be overruled, and the Plan should be confirmed.

Dated: New York, New York
       September 13, 2019

/s/  Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett Fail
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Objection Chart**

**Objection Summary Chart[1]**

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| 1) Liberty Mutual Insurance Company ("**Liberty**")<br><br>(ECF No. 3989) | a. The Plan should include a provision describing the surety bond program of the Debtors' certain aspects of Liberty's continued rights of subrogation. | a. The Debtors have modified the Plan to resolve this objection (*See* Plan, Section 13.6). | a. **Resolved**. |
| 2) 223 S. Wacker, LLC ("**223**")<br><br>(ECF No. 4668) | a. 223 objects to the Plan enjoining, releasing, or otherwise preventing it from litigating its Counterclaim, fully defending itself, or liquidating its claims in the State Court Proceeding against Sears if the State Court Proceeding is continued after the Effective Date. Any denial of these rights would violate 223's due process rights, and section 1129(a)(3) of the Bankruptcy Code. | a. The Debtors have included the following language in the Confirmation Order to resolve this objection:<br><br>"Except as provided by the Stipulation, Agreement, and Order Granting Limited Relief from the Automatic Stay (233 S. Wacker, LLC) (ECF No. 2849), notwithstanding any provision of the Plan or this Confirmation Order to the contrary, 233 S. Wacker, LLC is permitted to continue to assert, prosecute, litigate, liquidate, and/or settle its counterclaim and its claims against the Debtors, their estates, and any successors thereto in Case No. 2016-CH-10308 pending in the Circuit Court of Cook County, Illinois, Chancery Division and reserves all rights in connection with such proceeding and any payment obligated to be made in connection therewith. For the avoidance of doubt, the Debtors, their estates and any successor in interest, including, without limitation, the Liquidating Trust, reserve all rights with respect to any claims or counterclaims asserted in connection with the action referenced in the preceding sentence, and any and all obligations in connection therewith." | a. **Resolved**. |
|  | b. 223 objects to the feasibility of the Plan to the extent the Debtors require a $4 million cash receipt during the month of August for the Alexander Calder Sculpture, as represented in *the Stipulation and Order Concerning Debtors'* | b. The $4 million was a projected recovery at the time the Debtors sought approval of the Disclosure Statement. Feasibility of the Plan and the Debtors' ability to satisfy Administrative Expense Claims are addressed in the Reply Brief. (*See* Reply Brief Section II.N.2.ii). | b. **Pending**. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Reply Brief, the applicable Objection, the Plan, or the Disclosure Statement, as applicable.

1

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | *Continuing Use of Cash Collateral*, dated June 18, 2019 (ECF No. 4287). | | |
| 3)  Tannor Capital Advisors LLC<br><br>(ECF No. 4673) | a.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a.  **Pending**. |
| 4)  Winners Industry Co., Ltd.<br><br>(ECF No. 4678) | a.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a.  **Pending**. |
| 5)  LBG Hilltop LLC<br><br>(ECF No. 4680) | a.  The Plan should not be deemed to reject the Construction, Operation, and Reciprocal Easement Agreement (as amended by the Supplemental Agreement) as it is a type of shopping center master agreement protected under section 365(b)(3)(C) of the Bankruptcy Code, and the free and clear provisions of the Sale Order remains subject to protections afforded by section 365(b)(3)(C). | a.  The Debtors have confirmed with Transform and to the landlord that the lease for Store No. 1788 was assigned to Transform subject to the Hilltop REA and any other applicable restrictive covenants.  This objection is moot. | a.  **Resolved**. |
| 6)  United States Trustee<br><br>(ECF No. 4681) | a.  Section 15.9(b) of the Plan improperly provides that Released Parties are released by creditors that vote to reject the Plan or abstain from voting on the Plan but do not opt-out of the releases on their ballots. | a.  This Court and several others in this district have approved third-party releases as consensual where, as here, parties entitled to vote on the Plan are provided with an "opt out" mechanism that includes proper notice of the consequences of not opting out.  *See, e.g.*, *In re Cenveo, Inc.*, Case No. 18-22178 (RDD), Hr'g Tr. 94:13-17, 96:8-15, 140:20-22 (Bankr. S.D.N.Y. Aug. 16, 2018) (ECF No. 687); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD), Hr'g Tr. 43:6-11 (Bankr. S.D.N.Y. Jan. 9, 2018) (ECF No. 926).  This objection is more fully addressed in the Reply Brief Section II.D.2.iii.a, and Section III.E. | a.  **Pending**. |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | b. The Debtors have not met their burden to prove that the Court has subject matter jurisdiction to release this multitude of persons who qualify as Released Parties from claims of the creditors who do not opt out of the third-party releases. | b. This Court has subject matter jurisdiction over the Released Parties based on "related to" jurisdiction under 28 U.S.C. § 1334(b). Courts in this District have held that "related to" jurisdiction is extremely broad, encompassing any action that could conceivably have any effect on the estate. *See In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017). This objection is more fully addressed in the Reply Brief Section III.E.2. | b. **Pending**. |
| | c. The Plan should not provide a release or injunction for the Debtors in violation of section 1141(d)(3) of the Bankruptcy Code. | c. The Plan does not provide a discharge to the Debtors. Rather, the injunction provision is essential to permit the Plan to be implemented in accordance with its terms and avoid adverse third party actions that could impair the ability for creditors to achieve the benefits of the Plan. Indeed, section 15.8 of the Plan ensures that whatever rights parties have against the Debtors and their estates are administered through the Plan, and not through satellite litigation, unless determined otherwise by the Court. (*See* Reply Brief Section II.D.4 ¶¶ 114-118). | c. **Pending**. |
| | d. The Debtors must demonstrate that the Plan complies with section 1129(a)(9) Bankruptcy Code. | d. The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | d. **Pending**. |
| 7) Acadia Reality Limited Partnership, et al. (the "**Landlords**") (ECF No. 4684) | a. The Plan impermissibly provides that the releases are effective against holders of claims that reject or abstain from voting on the Plan if they do not affirmatively opt out of the releases by returning a completed Ballot. | a. The Debtors will treat the Landlords' objection as an opt out of the release. | a. **Pending**. |
| | b. Certain of the Landlords did not receive Ballots to properly opt out. | b. The Debtors' Voting Agent has reached out to the Landlords to ensure that they properly receive Ballots to allow them the opportunity to opt out. | b. **Resolved**. |
| | c. The injunction provision of the Plan is overbroad in seeking to prohibit rights of setoff and recoupment, and potentially, defenses to actions | c. The Debtors have included the following language in the proposed Confirmation Order to address this objection: "Notwithstanding anything to the contrary in the Plan, the Definitive Documents, the Plan Supplement, any other | c. **Pending.** |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | brought by the Debtors or their professionals. | documents related to any of the foregoing, or this Confirmation Order, nothing shall modify the rights, if any, of any holder of Claims or any current or former party to an executory contract, whether currently or previously executory, or lease of non-residential real property to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (i) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease(s) with the Debtors, or any successors to the Debtors, under the Plan; (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Liquidating Trust, or any successors of the Debtors." | |
| 8)  Mario Aliano<br><br>(ECF No. 4690) | a.  If the Plan is approved, the movant's Illinois Appeal will remain stayed. | a.  This is not confirmation objection.  In the underlying action, there is an appeals bond posted as security for collection of the judgment.  The Debtors have determined that the appeals bond is fully collateralized by a letter of credit that was assumed by Transform.  Transform is currently in the process of preparing a stipulation to substitute itself as a party in the objector's underlying action.  Accordingly, any need to defend the objector's pending motion for relief from the automatic stay will become moot, and no further action in the bankruptcy court would be required from the Debtors. | a.  **Pending**. |

4

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| 10)  Alpine Creations Ltd. ("**Alpine**")<br><br>(ECF No. 4700)<br><br>*Joined By:*<br><br>• A.O. Smith Corporation (ECF No. 4712)<br><br>• Everlast World's Boxing Headquarters Corp. (ECF No. 4717)<br><br>• Aspen Marketing Services, Inc. (ECF No. 5041)<br><br>• GroupBy USA, Inc. (ECF No. 5048) | a.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility.<br><br>b.  Alpine objects to the Third Party Release and the opt-out mechanism.<br><br>c.  Alpine objects to the releases to the extent they are intended to impact any rights of setoff or recoupment. | a.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief.<br><br>b.  The Debtors will treat Alpine's objection (and the joiners) as an opt out of the release.<br><br>c.  The Debtors have included the language noted above at 7(b) to the proposed Confirmation Order to address this objection. | a.  **Pending**.<br><br>b.  **Pending**.<br><br>c.  **Pending**. |
| 11)  Official Committee of Retirees with life Insurance Benefits of the Sears Holdings Corporation, et al. (the "**Retiree Committee**")<br><br>(ECF No. 4702) | a.  The Retiree Committee objects to the Plan to the extent that the Debtors' 1114 Motion is not currently resolved and the Plan does not contemplate the continuation of any employee benefits post-Confirmation in compliance with section 1129(a)(13) of the Bankruptcy Code. | a.  The Debtors' 1114 Motion will be heard at the Confirmation Hearing.  The Debtors will comply with any obligations arising from such ruling with respect to termination of retiree benefits, as required by section 1129(a)(13) of the Bankruptcy Code. (*See* Reply Brief Section II.P). | a.  **Pending**. |
| 12)  Carl Ireland, Administrator of the Estate of James Garbe ("**Relator**")<br><br>(ECF No. 4707) | a.  Pursuant to Section 11.4 of the Plan and section 1129(a)(9) of the Bankruptcy Code, the Debtors must reserve no less than $18,190,144.82 pending resolution of Relator's secured claim to demonstrate the feasibility of the Plan. | a.  This secured claim is factored into the Debtors' analysis for projected Claims.  There is currently a motion pending seeking a determination of the value of the Relator's secured claim (ECF No. 4931).  Among other things, the Debtors may dispute the value of this claim.  Once the value of the Relator's secured claim is determined, if any, it will be treated in accordance with section 4.2 of the Plan.  Until such time, it will be treated as a Disputed Secured Claim against the Debtor Sears, Roebuck de Puerto Rico, Inc., or a 507(b) claim against each of the Debtors as provided for in the Sale Order.  No | a.  **Pending**. |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | | distribution will be made to junior Creditors unless such Claim is reserved for or paid, if Allowed. | |
| 13)  Weihai Lianqiao International Coop. Group Co., Ltd. ("**WLI**")<br><br>(ECF No. 4708) | a.  The Plan was not filed in good faith and does not satisfy section 1129(a)(3) because it provides for a more favorable treatment of Fee Claims as opposed to Administrative Expense Claims, including earlier payment and near guarantee of full payment. | a.  The Debtors have proposed the Plan with the goal of maximizing value and providing recoveries to creditors. The treatment of Fee Claims contained in the Plan was approved by the Court as part of the DIP Order—which is final and non-appealable—and this treatment is merely being incorporated into the Plan.  This objection is further addressed in the Reply Brief, Section III.D, ¶ 262. | a.  **Pending**. |
| | b.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | b.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | b.  **Pending**. |
| 14)  PeopleReady, Inc.<br><br>(ECF No. 4709) | a.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a.  **Pending**. |
| | b.  The Plan should not be confirmed unless it is clarified that PeopleReady, Inc.'s contract is not deemed rejected on the Effective Date since is it still subject to an assumption notice. | b.  The Debtors have included all five (5) contracts with PeopleReady, Inc. (f/k/a LaborReady) on notices of assumption and assignment to Transform.  (*See* ECF No's. 3123 and 3248). Transform is presently working with the objector to address their objection to the assumption and assignment notices.<br><br>Section 13.1 of the Plan has been revised to state that "any Executory Contract noticed for assumption and assignment with a pending objection that has not yet been resolved" will not be deemed rejected upon the Effective Date. (*See* Plan Section 13.1). | b.  **Pending**. |
| | c.  The Plan provides an improper Third Party Release for Transform that is inconsistent with the Sale Order; Transform is obligated to pay all outstanding post-closing amounts for services provided by PeopleReady, Inc. | c.  Transform is not a Released Party under the Plan.  (*See* Plan, Section I.A, 1.135). | c.  **Pending.** |

6

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| 15) McDonald's Corporation ("**McDonald's**")<br><br>(ECF No. 4711) | a. McDonald's is continuing discussions with Transform regarding outstanding cure amounts and assumption and assignment of its contracts and/or leases, and reserves its rights in respect to treatment of the its contracts and/or leases under the Plan. | a. No response is required. The Debtors reserve all rights. | a. **Pending**. |
| 16) Community Unit School District 300<br><br>(ECF No.'s 4713 & 5005)<br><br>(the "**School District Objection**") | a. The Debtors must show that the Plan complies with section 1123(a)(5), and provides for adequate means of implementation, namely with regards to the Court's Abstention Order at ECF No. 3362. | a. The injunction provision does not interfere with the Abstention Order.  Section 15.8(b) of the Plan provides that the injunction provision of the Plan is effective to certain Entities, "except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court."  Accordingly, the injunction provision will not interfere with the Abstention Order, and the Plan complies with section 1123(a)(5).  (*See* Plan Section 15.8(b)). | a. **Pending**. |
| | b. To the extent the School District is granted an allowed Secured Claim, and to the extent that payment is deferred for any reason, the School District's claim should be allowed to accrue interest from the confirmation date through the date of payment under section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code. | b. To the extent the School District asserts that it is entitled to postpetition interest, section 506(b) of the Bankruptcy Code and applicable case law are clear that postpetition interest, fees, costs, and charges will only be allowed as part of a secured claim to the extent the claim is "oversecured."  The creditor bears the burden of proving that it is oversecured.  *See In re Residential Capital, LLC*, 497 B.R. 403, 412 (Bankr. S.D.N.Y. 2013).<br><br> Further, The School District's reliance on section 1129(b)(2)(A)(i)(II) and *MPM Silicones* is misplaced.  Here, given that the Plan does not provide for a stream of future payments to the School District (to the extent it has an Allowed Secured Claim), section 1129(b)(2)(A)(i)(II) and *MPM Silicones* are not applicable.  Rather, Section 7.2 of the Plan provides that "on the latest of (x) the Effective Date, (y) the date that is ten (10) Business Days after the date such Secured Claim becomes an Allowed Claim, or (z) the next Distribution Date after such Secured Claim becomes an Allowed Secured Claim, each holder of an Allowed Secured Claim will receive from the Debtor against which its Secured Claim is Allowed… (i) Cash in an amount equal to the Allowed amount of such Secured Claim; (ii) transfer of | b. **Pending**. |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | | the collateral securing such Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or (iii) such other treatment sufficient to render such holder's Allowed Secured Claim Unimpaired." (*See* Plan Section 7.2). | |
| | c.   Section 15.8(b) of the Plan impermissibly provides for an injunction, which acts as a discharge in violation of section 1141(d)(3) of the Bankruptcy Code. | c.   The Plan does not provide a discharge to the Debtors.  Rather, the injunction provision is essential to permit the Plan to be implemented in accordance with its terms and avoid adverse third party actions that could impair the ability for creditors to achieve the benefits of the Plan.  Indeed, section 15.8 of the Plan ensures that whatever rights parties have against the Debtors and their estates are administered through the Plan, and not through satellite litigation, unless determined otherwise by the Court. (*See* Reply Brief Section II.D.4 ¶¶ 114-118). | c.   **Pending**. |
| | d.   The Plan improperly abrogates rights of setoff and recoupment; defenses | d.   The Debtors have included the language noted above at 7(b) to the proposed Confirmation Order to address this objection. | d.   **Pending**. |
| | e.   The Debtors must demonstrate that the settlement of substantive consolidation can be approved under the *Augie/Restivo* standard. | e.   See Section I.B.3 of the Reply Brief. | e.   **Pending**. |
| | f.   The Debtors must demonstrate how the Plan, in the "toggle" scenario, will comply with section 1129(a)(7) of the Bankruptcy Code, and must explain how the selected Liquidating Trustee and Liquidating Trust Board will resolve conflicts arising from intercompany claims, loans, rights, and causes of actions where the trustee and board will be acting as a fiduciary for both parties involved in the hypothetical intercompany dispute. | f.   The Debtors are not at this time prosecuting the Toggle Plan. In the event the Plan Settlement is not approved, the Debtors may seek approval of the Toggle Plan by the Court at a later date on notice to parties in interest. | f.   **Pending**. |
| | g.   Section 10.3 of the Plan impermissibly provides that secured | g.   The underlying dispute related to certain funds held by the Village of Hoffman Estates. The Debtors are not in | g.   **Pending.** |

WEIL:\97183186\1\73217.0004

Pg 183 of 198

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | creditors will not retain their security interests after confirmation of the Plan in violation of Sections 1129(b)(2)(A)(i) and (iii) of the Bankruptcy Code. | possession of the cash. A secured creditor's liens (if any) are only extinguished under the Plan after the creditor receives its distribution and its secured claim is satisfied. (*See* Plan Section 4.2). | |
| | h.  The reserve comprised of Liquidating Trust Interests, in lieu of cash, contemplated by Section 11.4(a) does not provide sufficient protection to holders of disputed claims that may be subsequently allowed, and thus violates Section 1123 of the Bankruptcy Code. | h.  The Disputed Claims Reserve under the Plan is a Cash reserve.  Accordingly, section 1123 of the Bankruptcy Code is satisfied. | h.  **Pending.** |
| | i.  The language in Section 11.4(c) of the Plan should be revised to clarify that, to the extent a Disputed Claim is disallowed, the reserve shall be cancelled *only in proportion to the amount in which a Disputed Claim is disallowed*. | i.  This change has been incorporated into the Plan: <br><br> "If a Disputed Claim is disallowed, in whole or in part, the Liquidating Trustee shall cancel the reserve Liquidating Trust Interests, if applicable, only in proportion to the amount in which a Disputed Claim is disallowed, and distribute the Cash held in the Disputed Claims Reserve with respect to such Claim to the holders of Allowed Claims."  (*See* Plan Section 11.4(c)). | i.  **Resolved.** |
| 17)  Santa Rosa Mall, LLC ("**Santa Rosa**")<br><br>(ECF No.'s. 4714 & 5088) | a.  Santa Rosa objects to the Third Party Release as improper. | a.  The Debtors will treat Santa Rosa's objections as an opt out of the release. | a.  **Pending.** |
| | b.  Santa Rosa objects to the Injunction provided in Section 15.8 of the Plan to the extent it either:<br><br>(1) interferes with the pending adversary proceeding; or<br><br>(2) interferes with Santa Rosa's rights to pursue any action against third-party non-debtors | b.  The Injunction is integral to implementing the Plan, as described in the Reply Brief, Section II.D.4 ¶ 116.<br><br>Further, the first point of this objection is resolved with the voluntary dismissal of the adversary complaint filed by Santa Rosa.  *See Stipulation of Voluntary Dismissal Without Prejudice*, Case No. 19-08266 (RDD), ECF No. 11. | b.  **Pending.** |

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | c.  The Plan was not proposed in good faith as required under section 1129(a)(3) because of the alleged conduct by the Debtors that is the focus of the adversary proceeding and the fact the Plan does not take into account the resolution of the adversary proceeding to Santa Rosa's favor. | c.  The Debtors have satisfied section 1129(a)(3). The Debtors developed the Plan in close consultation with its primary stakeholders following months of diligence and negotiation.  Moreover, throughout such periods, the Debtors conducted exhaustive review and analyses of Plan-related issues to ensure the chapter 11 plan was in the best interests of all stakeholders as evidenced by the public record. (*See* Reply Brief Section II.F ¶ 116).<br><br>This objection is moot with the voluntary dismissal of the adversary complaint filed by Santa Rosa.  *See Stipulation of Voluntary Dismissal Without Prejudice*, Case No. 19-08266 (RDD), ECF No. 11. | c.  **Pending.** |
| 18)  Mien Co. Ltd., et al ("**Objecting Vendors**")<br><br>(ECF Nos. 4716 & 4726) | a.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a.  **Pending**. |
| | b.  The Objecting Vendors object to the improperly broad third party releases and the opt-out mechanism. | b.  The Debtors will treat the Objecting Vendors' objections as an opt out of the release. | b.  **Pending**. |
| | c.  The Debtors should not receive a discharge under section 1141(d)(3) of the Bankruptcy Code because the Plan is a liquidating plan. | c.  The Plan does not provide a discharge to the Debtors.  Rather, the injunction provision is essential to permit the Plan to be implemented in accordance with its terms and avoid adverse third party actions that could impair the ability for creditors to achieve the benefits of the Plan.  Indeed, section 15.8 of the Plan ensures that whatever rights parties have against the Debtors and their estates are administered through the Plan, and not through satellite litigation, unless determined otherwise by the Court. (*See* Reply Brief Section II.D.4 ¶¶ 114-118). | c.  **Pending**. |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| 19) ESL Investments, Inc. ("**ESL**")<br><br>(ECF No.'s 4718 & 4786)<br><br>*Joined By:*<br><br>• Mien Co. et al. (ECF No. 4801) | a. This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a. The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a. **Pending**. |
| | b. The Plan should state that any recoveries on account of the ESL 507(b) Priority Claims will be entitled to sources of recovery in addition to the Other Causes of Action. | b. This objection was addressed in this Court's ruling on 507(b) claims, and the Plan has been revised to reflect the Court's ruling. (*See* Plan, §§ 1.61, 2.4).<br><br>Section 2.4 of the Plan now provides:<br><br>"Unless otherwise agreed by the holder of such Claims with the Debtors (subject to the consent of the Creditors' Committee, not to be unreasonably withheld) prior to the Effective Date, or the Liquidating Trust after the Effective Date, to the extent any ESL 507(b) Priority Claims are Allowed, ESL shall receive, from the Debtors or the Liquidating Trust, as applicable, and, in full and final satisfaction, settlement, release, and discharge of such Allowed ESL 507(b) Priority Claims, payment in Cash from Net Proceeds of Other Causes of Action and Other Assets, subject to the ~~limitations set forth in section 9.13(c)(ii) of the Asset Purchase Agreement, which provides as follows:~~ ESL 507(b) Cap." | b. |
| | c. Section 13.1 of the Plan should be revised to clarify that certain (i) specified Unexpired Leases and (ii) Executory Contracts subject to pending notices of assumption and assignment will not be deemed rejected on the Effective Date. | c. Section 13.1(1) of the Plan already provides that any unexpired lease or executory contract subject to a pending motion to assume will not be deemed rejected as of the Effective Date. (*See* Section 13.1 of the Plan). However, the Debtors have added the following language in bold to Section 13.1(1) of the Plan to provide additional clarify:<br><br>"On the Effective Date, except as otherwise provided in the Plan or Plan Supplement, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to Section 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract **(including, for the avoidance of doubt, (i) any Unexpired Lease subject to an extension of the deadline under section 365(d)(4) of the** | c. **Pending**. |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | | **Bankruptcy Code to assume or reject such lease, and (ii) any Executory Contract noticed for assumption and assignment with a pending objection that has not yet been resolved)…"** | |
| | d.  The Plan and Liquidating Trust Agreement improperly limit the distributions on account of a Disputed Claim to the Disputed Claims Reserve.  To the extent that a Disputed Claim ultimately becomes an Allowed Claim, recoveries should not be limited to only those assets available in the Disputed Claims Reserve. | d.  The Debtors have added language to section 11.4(b) of the Plan to address this objection.  Section 11.4(b) now provides:<br><br>"Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the Liquidating Trust Interests, Cash and its proportionate share of the proceeds from the investment of Cash, if any, held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to the Liquidating Trust or any assets previously distributed on account of any Allowed Claim, unless otherwise ordered by the Court." | d.  **Pending.** |
| 20)  Edgewell Personal Care PR Inc. ("**Edgewell**")<br><br>(ECF No. 4720) | a.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a.  **Pending.** |
| | b.  Edgewell supplies merchandise to K-Mart pursuant to a certain prepetition agreement titled "Universal Terms and Conditions With Direct to Customer Terms (DMLIB #205506 v5)."  To date, the Debtors have not filed a notice of assumption or assignment of the agreement.  The objection asserts that the Debtors have *de facto* assumed Edgewell's contract and as such, should be required to pay the cure amount on Edgewell's contract. Relatedly, Edgewell's claim was improperly classified as a General Unsecured Claim in Class 4. | b.  There has been no de facto assumption of their contract. Section 365(a) of the Bankruptcy Code requires Court approval of assumption or rejection of an executory contract.  *See In re Child World, Inc.*, 147 B.R. 847, 852 (Bankr. S.D.N.Y. 1992).<br><br>Further, Edgewell's contract is a "UTC contract"—*i.e.*, a contract based on "Universal Terms and Conditions." UTC contracts are not considered executory contracts because they do not impose immediate duty or obligation on either party, and only become binding if the Debtors further agree to purchase products from the UTC counterparties.  As such, there is no basis for a *de facto* assumption of Edgewell's contract. | b.  **Pending.** |

12

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| 21) Whitebox Asymmetric Partners, LP, et al. ("**Whitebox**")<br><br>(ECF No. 4721)<br><br>*Joined By*:<br><br>• Twentieth Century Fox Home Entertainment LLC (ECF No. 4780)<br><br>• Schumacher Electric Corporation (ECF No. 4861) | a.  The Plan improperly allows General Unsecured Claims to be paid ahead of Administrative Expense Claims in violation of section 507 of the Bankruptcy Code by allowing holders of General Unsecured Claims access to proceeds from the Liquidating Trust but not requiring a separate reserve for Disputed Administrative Expense Claims. | a.  This objection misreads the Plan.  The Plan provides that the Debtors will maintain a Disputed Claim reserve on account of any Disputed Claims.  *See* Plan Section 11.4.  In addition, Section 1.77 of the Plan makes clear that distributions to General Unsecured Creditors are net of reserves for senior claims that are disputed:<br><br>"***General Unsecured Trust Recovery***" means 91.05% of (a) Net Proceeds of General Assets, after payment in full satisfaction of all Allowed Secured Claims, ESL 507(b) Priority Claims (subject to the ESL 507(b) Cap), Other 507(b) Priority Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims (***or maintenance of amounts in the Disputed Claim Reserve on account of any of the foregoing claims that are Disputed***), and the PBGC Liquidating Trust Priority Interest; and (b) proceeds of the Wind Down Account, subject to the full satisfaction of all Allowed Administrative Expense Claims, Priority Non-Tax Claims, and Priority Tax Claims and the Other 507(b) Priority Claim of the Mortgagees (***or maintenance in the Disputed Claim Reserve on account of any of the foregoing Claims that are Disputed***)."<br><br>*See also* Plan Section 1.88 (same); Plan Section 1.93 (same); Plan Section 1.98 (same); Plan Section 1.119 (same). | a.  **Pending**. |
| | b.  The "carve-out" for professional fees under the DIP Order is not a true carve-out that sets aside money but is rather an agreement to use the DIP lenders' cash collateral subject to the Budget.  Thus, the treatment of Administrative Expense Claims in section 2.1 of the Plan impermissibly provides that the Debtors will pay Fee Claims ahead of Administrative Expense Claims. | b.  See Section III.D.2 of the Reply Brief. | b.  **Pending**. |

13

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | c.   This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | c.   The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | c.   **Pending**. |
| | d.   The Plan improperly deems consent to third party releases by abstaining creditors. | d.   The Debtors will treat Whitebox's objection (and the joinders) as an opt out of the release. | d.   **Pending**. |
| | e.   The releases are overly broad, and the Debtor have not shown that the Court has subject matter jurisdiction over the variety of persons who qualify as Released Parties. | e.   The Third Party Releases are integral components of the Plan and the settlements embodied therein, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law.  This Court has subject matter jurisdiction over the Released Parties based on "related to" jurisdiction under 28 U.S.C. § 1334(b).  Courts in this District have held that "related to" jurisdiction is extremely broad, encompassing any action that could conceivably have any effect on the estate. *See In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017). (*See* Reply Brief Section III.E.2). | e.   **Pending**. |
| | f.   The injunction provision improperly denies creditors the right of setoff and recoupment, especially as the Plan allows Debtors to assert such rights against creditors. | f.   The Debtors have included the language noted above at 7(b) to the proposed Confirmation Order to address this objection. | f.   **Pending.** |

14

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| 22)  Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent<br><br>(ECF No's. 4724 & 4785) | a.  The Debtors must demonstrate that the settlement of substantive consolidation can be approved under the *Augie/Restivo* standard. | a.  See Section I.B.3 of the Reply Brief. | a.  **Pending.** |
| | b.  Section 9.2(a)(ii) of the Plan provides that "all guarantee claims…will not be entitled to Distributions from the Liquidating Trust." Section 9.2(a)(vii) of the Plan provides that holders of General Unsecured Claims and Guarantee Claims "shall share in the applicable Total Assets as follows…" Finally, the Plan defines Liquidating Trust Assets to include "Total Assets."<br><br>Thus, General Unsecured and Guarantee Claims will never be able to receive distributions of Total Assets because, upon the Effective Date, the Total Assets become Liquidating Trust Assets, which, pursuant to Section 9.2(a)(ii) of the Plan, cannot be distributed to "all guarantee Claims" from the Liquidating Trust. | b.  The Debtors have added language to Section 9.2(a)(vii) of the Plan to address this objection:<br><br>"after satisfaction in full (or reserving for Disputed Claims) of Claims reflected in Section 9.2(a)(vi) in accordance with the Plan, holders of Allowed PBGC Claims, General Unsecured Claims, Kmart IL Guarantee Claims, Kmart WA Guarantee Claims, ESL Unsecured Claims against Kmart, ESL Unsecured Claims against Kmart Stores of Illinois LLC, ESL Unsecured Claims against Kmart of Washington LLC, and ESL Unsecured Claims shall share in the applicable Total Assets as follows (subject to Section 9.2(a)(viii) with regard to the Allowed PBGC Claim):" | b.  **Pending** |
| | c.  The Plan Settlement should not be approved because it is inequitable to holders of General Unsecured Claims and Guarantee Claims; Section 9.2(a)(vii) of the Plan does not adequately address the inequities stemming from the Plan Settlement. | c.  *See* Section III.C.2 of the Reply Brief. | c.  **Pending.** |

15

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | d. The Debtors must provide a legitimate reason for their separate classification of PBGC from other similar unsecured claims as required by section 1122 of the Bankruptcy Code. | d. See Section II.B of the Reply Brief. | d. **Pending**. |
| | e. The Debtors must demonstrate that the PBGC Settlement satisfies the Rule 9019 criteria. | e. The Debtors submit that the PBGC Settlement satisfies the requirements set forth in the 9019 Standard under the *Iridium* factors. (*See* Reply Section I.C.2). | e. **Pending**. |
| | f. To the extent Section 11.6 of the Plan violates Bankruptcy Rule 3021 and purports to interfere with the rights of indenture trustees and their respective noteholders under their respective indentures, the provision violates public policy. | f. Section 11.6 of the Plan is intended to be an additional means for payment of the indenture trustees, and does not supersede their ability to exercise their rights under their respective indentures. | f. **Pending**. |
| | g. Wilmington Trust objects to the Liquidating Trust Agreement to the extent it carries into effect provisions of the Plan addressed elsewhere in its objection. In particular, Section 4.2(c) of the Liquidating Trust Agreement violates public policy to the extent it precludes payment of the fees of Indenture Trustees. | g. See above at 22(f). | g. **Pending.** |
| | h. Section 11.4(b) of the Plan, which provides that holders of Disputed Claims that ultimately become Allowed Claims "will have recourse only to the Liquidating Trust Interest, Cash and its proportionate share of the proceeds from the investment of Cash, if any, held in the Disputed Claims Reserve" could adversely affect the rights of holders of Disputed Claims to have the allowance or disallowance of their Claims adjudicated, and to have | h. The Debtors have included the language noted above at 19(d) to the Plan to address this objection. | h. **Pending.** |

16

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | their Claims paid in full. This language is also incorporated into Section 4.2(e)(ii) of the Liquidating Trust Agreement. | | |
| 23) Vehicle Service Group, LLC d/b/a Rotary, a Dover Company ("**VSG**")<br><br>(ECF No. 4725) | a. This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a. The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a. **Pending**. |
| | b. VSG objects to the Third Party Release and the opt-out mechanism. | b. The Debtors will treat VSG's objection as an opt out of the release. | b. **Pending**. |
| | c. VSG objects to the releases to the extent they are intended to impact any rights of setoff or recoupment. | c. The Debtors have included the language noted above at 7(b) to the proposed Confirmation Order to address this objection. | c. **Pending.** |
| 24) Pearl Global Industries, Ltd.<br><br>(ECF No. 4730) | a. This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | a. The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | a. **Pending**. |
| 25) Cyrus Capital Partners, L.P. ("**Cyrus**")<br><br>(ECF No. 4731) | a. The Plan cannot meet the requirements of sections 1129(a)(2) and 1129(a)(3), as it ignores the Final DIP Order and MTN Sale Order requirements for allocation and tracking of intercompany claims by grouping all pre-petition and post-petition claims together. | a. The Debtors have provided Cyrus with a breakdown of postpetition assets and liabilities on a monthly, entity by entity basis in compliance with paragraph 39 of the Final DIP Order. In addition, the Disclosure Statement includes an Intercompany balance schedule, including the Debtors' cost allocations methodology (*See* Disclosure Statement, Exhibit D). These amounts are not relevant under the Plan Settlement, as prepetition and postpetition Intercompany Claims are not considered in that scenario. The Debtors do not believe that the MTN Sale Order allocation provision is relevant to the Plan. | a. **Pending**. Debtors do not believe that the MTN Sale Order allocation provision is relevant to the Plan. In addition, the Disclosure Statement now includes an Intercompany balance schedule, including the Debtors' costs allocations methodology, as provided for in Exhibit D to the Disclosure Statement. |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | b.  The Debtors must reserve the full asserted amount of Cyrus's 507(b) Priority Claims pending final determination of the allowance of such claims in order to satisfy their requirements under section 1129(a)(9). | b.  The Second Lien Holders' 507(b) Priority Claims were determined to be $0.00. (*See* ECF No. 4793) (the "**507(b) Order**"). The 507(b) Order has not been stayed pending Cyrus' appeal.  The Debtors submit no reserve on account of the Second Lien Holders' 507(b) Priority Claims is necessary pursuant to the appealed order of the Court. | b.  **Pending**. |
| | c.  Cyrus objects to any possibility that it (or its related parties) would be deemed a "Releasing Party" under the Plan.  Specifically, the definition of "Releasing Party" should be revised to expressly exclude any Entity or Individual that was expressly excluded from the definitions of "Released Party" or "Related Party" under the Plan and the Plan Supplement. | c.  Cyrus is not a "Releasing Party" under the Plan.  The definition of "Releasing Parties" in section 15.9(b) of the Plan presently excludes entities and individuals that are expressly excluded from the definition of "Released Party" and "Related Party." | c.  **Pending**. |
| | d.  The Substantive Consolidation Settlement fails to meet the *Augie/Restivo* standard. | d.  See Section I.B.3 of the Reply Brief. | d.  **Pending**. |
| 26)  Team Worldwide Corporation ("**Team Worldwide**")<br><br>(ECF No. 4773) | a.  The Debtors must demonstrate that the injunctions in the Plan do not prevent Team Worldwide from commencing an action against Sears Holdings Corporation and Sears Roebuck (the "Infringing Debtors") for the purpose of invoking the Infringing Debtors' indemnifications rights under the Sears Supply Agreements, as required under section 524(e) of the Bankruptcy Code. | a.  The Debtors have proposed adding the following language to the Confirmation Order to address this objection:<br><br>"Following the commencement of the Coverage Lawsuit, the Debtors and/or the Liquidating Trustee shall provide notice to the Indemnifying Parties of the Covered Claims and take such further action reasonably required under the Supply Agreements to have the Indemnifying Parties perform their Indemnity Obligations; provided, however, that (i) neither the Debtors nor the Liquidating Trust  shall be obligated to incur pay or be liable for any out-of-pocket costs or expenses in connection with such action, and/or (ii) neither the Debtors nor the Liquidating Trust shall be obligated to participate in the Coverage Lawsuit.  For the avoidance of doubt, and subject in all respects to (i) and (ii) in the preceding sentence, the Debtors or the Liquidation Trust, as applicable, may be named as a nominal defendant in the Coverage Lawsuit." | a.  **Pending.** |

WEIL:\97183186\1\73217.0004

| Objecting Party | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| | b.  The Debtors should not receive a discharge under section 1141(d)(3) of the Bankruptcy Code because the Plan is a liquidating plan. | b.  The Plan does not provide a discharge to the Debtors.  Rather, the injunction provision is essential to permit the Plan to be implemented in accordance with its terms and avoid adverse third party actions that could impair the ability for creditors to achieve the benefits of the Plan.  Indeed, section 15.8 of the Plan ensures that whatever rights parties have against the Debtors and their estates are administered through the Plan, and not through satellite litigation, unless determined otherwise by the Court. (*See* Reply Brief Section II.D.4 ¶¶ 114-118). | b.  **Pending.** |
| | c.  The Debtors have not in good faith attempted to address Team Worldwide's concerns regarding language in the Plan, and so the Plan was not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code. | c.  The Debtors disagree.  As Team Worldwide concedes in its objection, the Plan, as a whole, was proposed in good faith by the Debtors.  *See* Obj., ¶ 34.  The Debtors developed the Plan in close consultation with its primary stakeholders following months of diligence and negotiation.  Moreover, throughout such periods, the Debtors conducted exhaustive review and analyses of Plan-related issues to ensure the chapter 11 plan was is in the best interests of all stakeholders as evidenced by the public record. (*See* Reply Brief Section II.F ¶ 116).

Further, the Debtors are continuing to work with Worldwide with respect to the proposed language and believe this issue will be resolved prior to the Confirmation Hearing. | c.  **Pending.** |
| | d.  This objection addresses the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility. | d.  The Debtors have addressed this and other objections on the basis of the Debtors' ability to satisfy Administrative Expense Claims and the Plan's feasibility in Sections II.L and II.N of the Reply Brief. | d.  **Pending.** |

WEIL:\97183186\1\73217.0004

**Exhibit B**

**Administrative Expense Claims Settlement Proposal**

*WGM & AG Draft 09/08/19*
*Subject to FRE 408*
*For Settlement and Discussion Purposes Only*
*Confidential*

**SEARS HOLDINGS CORPORATION, *ET AL.***
**ADMINISTRATIVE EXPENSE CLAIMS SETTLEMENT TERM SHEET**

[__], 2019

This Settlement Term Sheet sets forth the material terms with respect to a proposed settlement of certain Administrative Expense Claims by and amongst Sears Holdings Corporation and each of its debtor affiliates (collectively, the "**Debtors**")[1] and certain holders of Administrative Expense Claims (the "**Settlement**"). Pursuant to the Creditors' Committee Settlement,[2] the Creditors' Committee maintains consent rights with regard to the treatment of Administrative Expense Claims under the Plan (as defined below), and are supportive of the terms provided by this Term Sheet. This Term Sheet is subject in all respects to the negotiation, execution and delivery of Definitive Documentation (as defined below).

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN, AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE DEBTORS AND CREDITORS' COMMITTEE. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES PROTECTING THE USE OR DISCLOSURE OF INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.**

---

[1]   The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

[2]   Capitalized terms used herein shall have the meaning ascribed to such terms in the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 4704] (the "**Plan**").

| OVERVIEW | |
|---|---|
| **Administrative Expense Claims Settlement** | As soon as reasonably practicable, the Debtors with the consent of the Creditors' Committee, and the members of various ad hoc groups of administrative expense claimants (the "**Ad Hoc Vendor Groups**") shall execute this term sheet (the "**Settlement Term Sheet**" and all parties thereto, the "**Settlement Parties**") with respect to the treatment of the claims of holders of Allowed Administrative Expenses Claims under the Plan. |
| **Condition Precedent** | Approval of this Settlement shall be a condition precedent to the occurrence of the Effective Date of the Plan. |
| **Modified Plan** | As soon as reasonably practicable, the Debtors shall file a modified Plan and 9019 Motion (as defined below) to effectuate the transactions contemplated by this Term Sheet. |
| **9019 Settlement Motion** | The 9019 settlement motion ("**9019 Motion**") shall be filed in advance of, or contemporaneously with the confirmation hearing.  The Settlement and Opt-Out Procedures (as defined below), including the Opt-Out Form shall be approved upon entry of the order authorizing the 9019 Motion. |
| **Recovery** | Pursuant to the terms of the Settlement Term Sheet, each holder of an Allowed Administrative Expense Claim against the Debtors that ***does not opt out*** (the "**Settled Admin Claims**") of the Settlement shall receive:  Cash in an amount equal to **[50]**% of (a) the Allowed Administrative Expense Claim, *minus* (b) **[80]**% of the  value of the Debtors' preference actions, if any, which value shall be agreed upon by the holder of such Allowed Administrative Expense Claim, the Debtors, and the Creditors' Committee, against the holder of such Allowed Administrative Expense Claim (each, a "**Settled Admin Amount**"), subject to the Expedited Reconciliation Procedures, on the earlier of:[3] |
|  |     (i) the date on which proceeds from (x) Total Assets, (y) Specified Unsecured Trust Recovery, and/or (z) General Unsecured Trust Recovery, after Distributions to Settled Admin Claims, shall exceed $**[35]** million (the "**Minimum Cash Threshold**"); and |
|  |     (ii) the Effective Date. |
|  | For the avoidance of doubt, if the Settled Admin Amount is a negative number, the holder of such Settled Admin Claim shall not be entitled to or receive any payment in respect of such claim. |
|  | Holders of Administrative Expense Claims who opt-out of the Settlement Agreement (the "**Non-Settled Admin Claims**") will ***not*** be entitled to participate in the Settlement (or any recoveries thereunder) under any circumstance. |

---

[3] Distributions may be delivered across multiple Distribution Dates and shall be subject to minimum cash Distribution requirements as provided by the Plan.

2

| Opt-Out Procedures | The Debtors propose the following procedures to solicit opt outs: |
|---|---|
| | 1. Upon entry of the Order, Prime Clerk LLC will: (a) send an opt-out form, (the "**Opt-Out Form**") to (i) all parties that have filed an administrative expense claim or filed an application for administrative expense in the Debtors' Chapter 11 Cases and (ii) any party that was exempted from filing an Administrative Expense Claim but the Debtors are aware of such Claim; and (b) publish a Settlement notice in the national edition of the *New York Times*. The form will be sent to the address provided on such Administrative Expense Claim form or application for Administrate expense or, if no such form exists, the address on the Debtors' books and records. The Opt-Out Form will clearly state that any party that exercises its right to opt out will not be entitled to any recovery from the Settlement and that any party that does not opt out of the Settlement will be bound by its terms, including to support a Plan. |
| | 1. Unless otherwise agreed to by the Settlement Parties, Holders of Administrative Expense Claims will have 14 days from the date of service to submit an Opt-Out Form in either electronic or paper form, in each case following the procedures set forth on the Opt-Out Form. |
| | 2. The Opt-Out Procedures may be modified with the consent of the Settlement Parties to facilitate the opt-out process. |
| **Benefits to Holders Not Opting Out of the Settlement** | Under the Settlement, the Debtors agree to the following with respect to Settled Admin Claims: |
| | 1. waive any and all remaining Claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including for the avoidance of doubt preference actions, against any non-insider pre- or postpetition creditors (other than any holders of Administrative Expense Claims who choose to opt-out); |
| | 2. consensual resolution of the Allowed amount of Settled Admin Claims (including consensual resolution on 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc.), subject to expedited reconciliation (the "**Expedited Reconciliation Procedures**"); and |
| | 3. payment priority from proceeds from (x) Total Assets, (y) Specified Unsecured Trust Recovery, and/or (z) General Unsecured Trust Recovery, subject to the Minimum Cash Threshold. |
| | For the avoidance of doubt, for all Non- Settled Admin Claims, the Debtors (a) shall prosecute all Claims and Causes of Action arising under chapter 5 to the fullest extent and (b) reserve all rights to object to any and all Non-Settled Admin Claims on any basis. |

| Support of the Debtors' Plan | Pursuant to the Settlement, the non-Debtor Settlement Parties shall (severally and not jointly): |
|---|---|
| | 1. use good faith efforts to implement this Settlement; |
| | 2. support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate confirmation of the Plan (including withdrawing any applicable objections); |
| | 3. support the confirmation of the Plan and not object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan; |
| | 4. vote all Claims to Accept the Plan; |
| | 5. not use, assign, convey, grant, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Settled Admin Claims; and |
| | 6. not object to or opt out of any release included in this Settlement. |
| Releases | The Settlement shall include certain consensual releases of Claims and Causes of Action amongst the Settlement Parties; for the avoidance of doubt, the Settlement shall not release any Specified Causes of Action. |
| Debtors' Termination Right | If holders of Administrative Expense Claims holding more than 5.0% in aggregate value of Allowed Administrative Expense Claims elect to opt out of the Settlement, the Debtors shall have the right to terminate the Settlement, with the consent of the Creditors' Committee, unless the Debtors waive such termination right with the consent of the Creditors' Committee. |

\*      \*      \*      \*      \*