**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re                                             :
                                                  :          **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*         :
                                                  :          **Case No. 18-23538 (RDD)**
                     **Debtors.**                 :          **(Jointly Administered)**
-------------------------------------------------------------x

## DECLARATION OF WILLIAM L. TRANSIER
## IN SUPPORT OF MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN
## OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS

I, William L. Transier, make this declaration under 28 U.S.C. § 1746:

1.      I submit this Declaration ("**Declaration**") in support of confirmation of the

*Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated*

*Debtors*, dated July 9, 2019 (ECF No. 4476) (as may be amended, modified, or supplemented, the

"**Plan**").[1]

2.      Except as otherwise indicated, all statements in this Declaration are based

on my personal experience and knowledge, my opinions based on my experience, my discussion

with the Debtors' management and professionals, and my review of the relevant documents.  If

called to testify, I could and would testify competently to each of the facts set forth in this

Declaration.  I am authorized to submit this Declaration on behalf of the Restructuring Committee

(defined below) for the Debtors.[2]

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Debtors' Memorandum of Law in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, filed contemporaneously herewith (the "**Confirmation Brief**").

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart

## I.  **Background and Qualifications**[3]

3.      I am the founder and CEO of Transier Advisors LLC, an independent

financial restructuring and advisory firm providing operational improvement, turnaround,

restructuring, and executive leadership services to distressed companies.   I have extensive

management and board leadership experience, including serving as the Chief Executive Officer or

the Chief Financial Officer of multiple publicly traded energy companies and as an independent

director in roles as both chairman and non-executive chairman, lead director, and audit and

compensation committee chairman, as well as on many special committees.

4.      I have held these management and leadership roles for a variety of

corporations, including debtors in large, complex chapter 11 cases.  These roles include, by way

of example, serving as an independent director of:  (a) Helix Energy Solutions Group, Inc. since

September 2000; (b) Westinghouse Electric Company, LLC since March 2017; (c) Sears Holding

Corporation since October 2018; (d) Endeavour International Corporation from February 2004 to

December 2015; (e) Teekay Offshore Partners L.P. from March 2019; (f) Waypoint Leasing

Holdings Ltd. since June 2018; (g) Emerge Energy Service from April 2019; (h) Exide

---

Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears
Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home
Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859);
Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp.
(0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870);
Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California
Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839);
Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart
Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business
Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida),
L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc.
(0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying
Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding
Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates,
Illinois 60179.

[3] Additional information regarding my background and qualifications can be found in my resume, which was attached
to my Prior Declaration (defined below).

Technologies, Inc. since April 2019; (i) Exco Resources, Inc. from June 2019; (j) Furie Operating Alaska, LLC from July 2019; (k) Gastar Exploration Inc. from August 2018 to January 2019; (l) Stonegate Production LLC since May 2016; (m) Brock Group Inc. from July 2017 to November 2017; (n) Cal Dive International Corporation from 2008 to December 2012; (o) Paragon Offshore PLC from 2014 to 2017; (p) Reliant Energy Inc. from 2002 to 2007; (q) CHC Group Ltd. from May 2016 to May 2017; and (r) Country Fresh Acquisition Corp. from January 2019 to the present.

## II.   The Restructuring Committee

### A.   Committee Appointments and Responsibilities

5.      On or about October 7, 2018, without disclosing the name of the company, Ray Schrock of Weil, Gotshal & Manges LLP ("**Weil**") asked whether I was interested in joining the board as an independent director of a retail company.  Soon after expressing my interest and sending him my updated background information, I was interviewed by Tom Tisch, the chairman of the nominating and governance committee for the board of directors (the "**Board**") of Sears Holdings Corporation ("**Sears**" or the "**Company**") and subsequently invited to join the Board and a Restructuring Committee comprised solely of independent directors ("**Restructuring Committee**") by one of its members, Alan Carr.

6.      On October 10, 2018, in anticipation of the need to file the Chapter 11 Cases, the Sears Board formed the Restructuring Committee.  I was appointed and formally joined the Board and the Restructuring Committee as an independent director on October 11, 2018, to help guide the Debtors' restructuring process.

7.      Prior to joining the Restructuring Committee, I did not have any association or interactions with Eddie Lampert ("**Lampert**"), Kunal Kamlani ("**Kamlani**"), President of ESL Investments, Inc. ("**ESL**"), or any other ESL management or leadership.

8.      The Restructuring Committee was charged with, among other things:
(a) considering, evaluating and, if it deemed it to be in the best interests of Sears, recommending
to the Board that Sears enter into a transaction not involving ESL, or authorizing and approving a
transaction involving ESL; (b) overseeing the provision of confidential information by or on behalf
of Sears and its subsidiaries to third parties under cover of an appropriate confidentiality
arrangement; (c) overseeing discussions and negotiations with Sears' stakeholders with respect to
a restructuring transaction and the implementation and execution of such a transaction;
(d) overseeing the work of the Chief Restructuring Officer[4] who reports to the Restructuring
Committee; and (e) such other actions considered by the Restructuring Committee to be necessary
or desirable to carry out its mandate, subject, as appropriate (where not exclusively delegated to
the Restructuring Subcommittee), to the approval of the Board.  The three other members of the
Restructuring Committee are Alan J. Carr, Paul G. DePodesta, and Ann N. Reese.

9.      In addition to my appointment to serve as an independent director of the
Board and the Restructuring Committee, I also was appointed to serve as a member of the
Subcommittee of the Restructuring Committee ("**Restructuring Subcommittee**").  The
Restructuring Subcommittee, comprised exclusively of Alan Carr and me, was formed and
specifically authorized to, among other things, investigate potential claims of the Debtors against
ESL and/or other related parties with respect to a restructuring transaction, determine any bidder's
(including ESL's) ability to credit bid and the Debtors' ability to provide releases in any such
transaction.  For further information regarding the Restructuring Subcommittee's role related to

---

[4] On October 10, 2018, the Board authorized the retention of M-III Advisory Partners, LP and, specifically, Mohsin Y. Meghji, as Chief Restructuring Officer ("**CRO**") to assist the Debtors with their reorganization efforts as authorized by the Bankruptcy Court.  *See Order Authorizing Debtors to Retain M-III Advisory Partners, LP to Provide a Chief Restructuring Officer and Certain Additional Personnel for Debtors Nunc Pro Tunc to Commencement Date*, entered on November 19, 2018 [ECF No. 814].

the Revised Proposed Sale Order, *see Declaration of Alan Carr*, filed with the Bankruptcy Court

on February 1, 2019 ("**Carr Declaration**") [ECF No. 2321].

**B.     Restructuring Committee Diligence**

10.    At all times since its formation, the Restructuring Committee has been and

remains actively engaged with the Debtors' advisors to preserve and maximize the value of the

Debtors' estates for the benefit of all creditors.  Since the Restructuring Committee was officially

formed in October 2018, it formally met no less than eighty-one (81) times:  (a) fifteen (15) times

during the month of October; (b) eleven (11) times in November; (c) thirteen (13) times in

December; (d) fifteen (15) times in January 2019; (e) three (3) times in February; (f) once in

March; (g) four (4) times in April; (h) five (5) times in May; (i) four (4) times in June; (j) four (4)

times in July; (k) four (4) times in August; and (l) two (2) times so far in September.  In addition,

there were numerous informal meetings and countless hours spent on conference calls and in-

person meetings discussing issues related to the Chapter 11 Cases.

11.    In my role as a member of the Restructuring Committee, I regularly received

Company financial information, cash forecasts, and business plans, as well as presentations

concerning proposed processes for the sale of substantially all of the Debtors' assets (including the

retail store footprint) as a going concern, analyses regarding an orderly wind-down, and related

analyses regarding liquidity, go-forward business plans, analyses of bid proposals, related

feedback and other detailed information.  My practice was to read the materials carefully, listen

and make inquiries to the financial advisors, legal advisors, and CRO regarding the information

provided to the Restructuring Committee.  These presentations and discussions occurred in various

contexts, including the Restructuring Committee's consideration of DIP financing, a potential go-

forward sale of the business, and an ongoing consideration of an orderly wind-down, as we analyzed what would be in the best interest of the Debtors' estates and its creditors.

12.    In connection with reviewing the various presentations provided by the Debtors' advisors related to, among other things, the Company's financials and the DIP budgets from October 12, 2018 into December of 2018, I learned a great deal about the Company's operations and history.    In addition, shortly after joining the Board and the Restructuring Committee, I traveled to Hoffman Estates, Illinois to meet with the members of the office of the CEO on October 22, 2018, to better understand the Company and get to know in person the key executives of the Company.    As a result, and through my general involvement as an independent director, I am knowledgeable and familiar with the Debtors' business and financial affairs, the circumstances leading to the commencement of these Chapter 11 Cases, the Sale and Restructuring Process (as defined below), and the analyses that the Restructuring Committee has undertaken to determine the best path forward for the estates and their creditors.

13.    Throughout the process, the Restructuring Committee has relied on the advice of the Debtors' advisors, including Lazard Frères & Co. LLC ("**Lazard**"), the investment banker to the Debtors; the Debtors' outside counsel, Weil; and the Debtors' financial advisors, M-III Advisory Partners, LP ("**M-III**").    The Restructuring Committee also engaged and relied upon information provided by a real estate advisor, Jones Lang Lasalle ("**JLL**"), to assist with the potential sales of real estate beginning as early as October 29, 2018.    Further, in light of my dual role as a member of both the Restructuring Committee and the Restructuring Subcommittee, I also received and relied upon advice from the Restructuring Subcommittee's advisors, including Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul, Weiss**"), Young Conaway Stargatt & Taylor, LLP, Alvarez & Marsal, Stout, and Evercore Partners, LP.

14.     During our meetings, the Restructuring Committee actively engaged in the discussions, provided instruction and direction to the Debtors' advisors and professionals, and asked and received answers to questions posed to the Debtors' advisors.   The Restructuring Committee was provided with a variety of material and presentations—often at its request—including, but not limited to, Board decks and related presentation materials.

### III.    Sale and Restructuring Process

15.     Since filing the Chapter 11 Cases, the Debtors and the Restructuring Committee have explored a broad array of strategic alternatives and options, including a possible sale, recapitalization, reorganization, or orderly wind-down of all or substantially all of the Debtors' businesses (the "**Sale and Restructuring Process**").[5]   Further details on the Sale and Restructuring Process are explained in my prior declaration, Declaration of William L. Transier [ECF No. 2341], which is incorporated by reference ("**Prior Declaration**").

### IV.    Asset Purchase Agreement

16.     With the approval of the Restructuring Committee, the Debtors completed their negotiations with ESL, memorializing the terms of the Successful Bid (the "**APA**").   At a meeting held on January 16, 2019, at 11:30 p.m. ET, the Restructuring Committee voted to approve accepting the Successful Bid, agreeing on finalizing the transaction documentation, and to close the Auction based on the recommendations of the advisors to the Restructuring Committee and the Restructuring Subcommittee.   Following the Restructuring Committee's meeting in the early hours of January 17, 2019, the parties executed the APA, our acceptance of the Successful Bid was put on the Auction record, and the Auction was closed at 3:10 a.m. ET.

---

[5] For additional information related to the Sale and Restructuring Process, selection of ESL as the Successful Bidder at the Auction, and terms of the ESL APA (as those terms are defined below), *see Declaration of Brandon Aebersold* [ECF No. 2335], filed with the Bankruptcy Court on February 1, 2019.

17.     In total, the Restructuring Committee formally met no less than twenty-two times between when we received the initial ESL Bid on December 28, 2018, and when the Auction was closed on January 17, 2019.  During that period, we twice concluded that the ESL bid at the time was not the "highest or otherwise better bid" and, therefore, were prepared to pivot to a liquidation.  It was only after intense negotiations at the Auction that we succeeded in getting ESL to significantly improve its bid, at which point we approved the Successful Bid because in our business judgment, it would maximize value for the estates and their creditors.[6]

18.     Based on my experience and observations, the Restructuring Committee operated diligently and in good faith when considering and ultimately accepting the Successful Bid, which it determined preserves and maximizes the value of the Debtors' estates for the benefit of all creditors and represents the highest or otherwise best offer for the Debtors' businesses.

19.     I firmly believe—and it is the view of the entire Restructuring Committee— that the ESL sale transaction described in the Revised Proposed Sale Order represented a higher and better offer than any alternative scenario presented, and that approval of the transaction is the best means to preserve and maximize the value of the Debtors' estates for the benefit of all creditors and interested parties.  The Proposed Sale was approved by the Court after a hearing conducted on February 4-7, 2019, and the transaction closed on February 11, 2019.

A.     **Investigation of Related Party Transactions and Filing of Complaint**

20.     The Restructuring Subcommittee and the Creditors' Committee have both conducted extensive investigations into the merits of the related-party prepetition transactions. Prior to and continuing after the Commencement Date, the Restructuring Subcommittee advisors

---

[6] It is also worth noting that the Restructuring Subcommittee also approved the Successful Bid, as discussed in more detail in the Carr Declaration.

conducted extensive diligence and discovery in furtherance of the Restructuring Subcommittee's investigation into prepetition related party transactions and have served broad document requests on the Debtors, ESL, and certain of their former counsel and advisors (including Centerview Partners, Cushman & Wakefield, Fairholme Capital Management, Seritage Growth Properties, Deloitte & Touche, Duff & Phelps, and Wachtell Lipton Rosen & Katz).   The Restructuring Subcommittee's advisors received and reviewed millions of pages of discovery and conducted twelve (12) on-the-record interviews of key witnesses, including Edward Lampert, other senior Sears personnel, and representatives of certain of the aforementioned counsel and advisors. Multiple meetings and presentations were used to brief the Restructuring Subcommittee on the findings from the advisors.   Based on its findings, the Restructuring Subcommittee negotiated the limited release embodied in the Sale Transaction and approved by the Bankruptcy Court.   As a result of its investigation, on April 17, 2019, the Subcommittee, on behalf of certain of the Debtors, filed an adversary complaint against ESL Investments, Inc., its affiliates, various third parties, and certain of the Debtors' directors and officers (ECF No. 3278) (the "**Subcommittee Adversary Complaint**," a true and correct copy of which is attached as **Exhibit A** and incorporated as if fully set forth).   The Restructuring Subcommittee authorized the filing of the Subcommittee Adversary Complaint and I voted in favor of the same.   The Subcommittee Adversary Complaint seeks over $2 billion in damages arising from certain prepetition related party transactions.

21.   The Subcommittee Adversary Complaint alleges that, in a series of transactions between 2011 and the Petition Date, Lampert and the other defendants caused Sears to transfer more than $2 billion of Sears assets to himself, ESL, and other Sears shareholders for grossly inadequate consideration or no consideration at all.

22.    The Subcommittee Adversary Complaint further alleges that these transactions were intended to hinder, delay, or defraud creditors, and/or that they occurred when the Company had insufficient capital or was insolvent.  As alleged in the Subcommittee Adversary Complaint, between FY 2011 and 2014, Sears had cumulative net losses of $7.1 billion, and that by at least FY 2014 through the Petition Date, the Company was insolvent or had insufficient capital to remain in business.  The Subcommittee Adversary Complaint also alleges that the Company had no realistic plan to return to profitability, and that, to conceal that fact, it repeatedly produced, at Lampert's direction, financial plans reflecting bad-faith predictions that the Company would experience an immediate and dramatic turnaround from deep losses to sudden profitability.

23.    The Subcommittee Adversary Complaint alleges that during this period, the defendants approved the following asset transfers to shareholders for inadequate or no consideration.  At all relevant times, the largest shareholders were Lampert and ESL, who held between 47.8% and 62% of Sears' outstanding stock.  The largest transactions were:

a.    In December 2011, Sears spun off its stake in its profitable subsidiary Orchard Supply Hardware Stores Corp. to its shareholders, including certain defendants, for no consideration. Orchard was worth at least $161 million.

b.    In October 2012, Sears held a rights offering for Sears Hometown and Outlet stores, Inc. ("SHO"), whereby it distributed to its shareholders, the right to purchase SHO, for no consideration.  This right was valued at $362 million.

c.    In November 2012, Sears spun off 44.5% of Sears Canada to its shareholders for no consideration.  This stake was worth at least $501 million.

d.    In 2014 Sears spun off Lands' End, one of Sears most profitable businesses, to shareholders for no consideration.   The spun-off shares were worth more than $1 billion.

e.    In July 2015, Sears sold 266 of its most profitable stores to a newly created real estate investment trust, Seritage, for consideration that undervalued the stores by at least $649 million.  This sale was

accompanied by a rights offering pursuant to which Sears shareholders received, for no consideration to Sears, the right to purchase Seritage's common stock, a right valued at $399 million.

f.     Finally, the Subcommittee Adversary Complaint alleges that the defendant Sears directors breached their fiduciary duties by approving $3.22 billion in related party loans by ESL and affiliates. Those loans were secured or over-secured and included excessive interest rates, resulting in cash and interest payments of over $377 million.

24.     On the transcribed record of the auction for the sale of substantially all of the Debtors' assets held on January 15, 2019, counsel to the Restructuring Subcommittee said that as a result of its investigation, the Restructuring Subcommittee had concluded that "substantial claims exist against ESL and its affiliates, as well as other defendants relating to ESL's abuse of its control of the debtors and the transfer of hundreds of millions of dollars of assets to ESL and its affiliates for inadequate consideration." Auction Tr. 63:12-20, a true and correct copy of which is attached here as **Exhibit B.**

25.     Immediately upon its formation, I am aware that the Creditors' Committee and its advisors also commenced an investigation into various related-party prepetition transactions, including (i) the 2012 spin-off of Sears Hometown and Outlet Stores, Inc.; (ii) the spin-off of Sears Canada, Inc. from 2012 to 2014; (iii) the 2014 spin-off of Lands' End, Inc.; (iv) the 2015 Seritage transaction; and (v) 20 separate financing transactions entered into during the years 2010 through 2018. I understand that the Creditors' Committee served document requests and subpoenas on the Debtors, ESL, certain of their former counsel and advisors, and other relevant third parties (including Centerview Partners LLC, Cushman & Wakefield, Fairholme Capital Management LLC, Seritage Growth Properties, Deloitte & Touche, Duff & Phelps LLC, and Wachtell Lipton Rosen & Katz). I also understand that the Creditors' Committee received over 240,000 documents amounting to over 4.8 million pages and conducted twelve (12)

separate interviews of key witnesses, including Edward Lampert, current and former members of

the Board of Directors of SHC, current and former senior personnel, and representatives of SHC's

outside advisors.  I learned that the Creditors' Committee also conducted extensive legal research

on potential claims, drafted multiple significant legal memoranda related to the claims, and

prepared many presentations analyzing the underlying transactions.  In the Creditors' Committee's

objection to approval of the Disclosure Statement [ECF No. 3995] ("**Committee DS Objection**"),

the Creditors' Committee noted that the causes of action preserved under section 9.13 of the Asset

Purchase Agreement may be "significant," and also that the Debtors' estimate of $334 million in

total distributable proceeds "may be low," suggesting that "the Preserved Causes of Action may

have greater value than such estimate."  Committee DS Objection, ¶ 25, FN 12, ¶ 26, FN 14.

26.     As a member of the Restructuring Subcommittee, I was intimately involved

with the investigation of the claims set forth in the Subcommittee Adversary Complaint.  As

described above, these claims were carefully investigated at the direction of the Restructuring

Subcommittee by its counsel, Paul Weiss.  The Restructuring Subcommittee authorized the

expenditure of more than $20 million to investigate these matters and eventually prepare and file

the Subcommittee Adversary Complaint.  Notably, during the negotiations of the Sale to ESL, it

was critical to the Restructuring Subcommittee to retain these valuable claims.  As this Court is

aware, in January 2019, the Restructuring Committee twice voted in favor of liquidation of the

Company rather than to accept a going concern sale in which ESL insisted on a full release for the

matters at issue in the Subcommittee Adversary Complaint.[7]  In other words, I twice voted to

---

[7] *See In re Sears Corporation*, Case No. 18-23538 (RDD), Hr'g Tr. 666-67:23-10, (Bankr. S.D.N.Y. Feb. 7 2019):

> MR. BASTA: So we had to figure out a way to facilitate a credit bid if we wanted to achieve the benefits of the going concern, and so we came up with the bifurcated structure. And the bifurcated structure is one where we retained the valuable causes of action while

liquidate the Company (and therefore jeopardize 45,000 jobs) rather than sell it to Transform Holdco with a complete release of the claims. I think that speaks volumes about the importance and value the Restructuring Committee placed on these claims.

27.    I am familiar with the significant transactions that are the subject of the Subcommittee Adversary Complaint. The Restructuring Subcommittee has been advised at all relevant times by competent and skilled counsel in connection with the matters asserted in the Subcommittee Adversary Complaint. The claims asserted in the Subcommittee Adversary Complaint are valuable assets belonging to the Debtors' estates. I believe that the facts and allegations asserted in the Subcommittee Adversary Complaint are well founded and viable. The Restructuring Subcommittee has been updated regularly and in detail at all relevant times about the referenced investigation and the matters addressed in the Subcommittee Adversary Complaint by Paul Weiss and more recently by Akin Gump Strauss Hauer and Feld. Further, as part of the Plan, $25 million is to be made available (pre- and post-Effective Date) to prosecute the Subcommittee Adversary Complaint. At the present time, as a member of the Liquidating Trust Board and a Litigation Designee, I continue to support the vigorous prosecution of the claims in the Subcommittee Adversary Complaint.

## B.    **Directors and Officers Insurance**

28.    I also understand that there is at least $150 million of available directors and officers liability insurance that provides a source of recovery to the Debtor plaintiffs in the Subcommittee Adversary Complaint against parties (in their capacity as directors and/or officers) who are covered by such insurance. I understand that certain defendants (such as ESL, Lampert

---

allowing the company to receive the benefits of a reorganization. We think that's the lynchpin of the case and the obvious benefit of moving forward.

and the Seritage parties) in the Subcommittee Adversary Complaint would also be liable for sums separate and apart from any available insurance coverage. *See* "Limitations on Executable Assets with Respect to the D&O Claims," Section 15.11 of the Plan.

## C.     Expected Value from the Proceeds of Litigation Will Satisfy the Claims Pool

29.     I have reviewed the confirmation declarations of Brian Griffith and William Murphy of M-III, including as they relate to any administrative, secured, and priority claims at the amounts identified in those declarations.  It is my view that the proceeds ultimately received from (a) prosecution of the Subcommittee Adversary Complaint (including proceeds from insurance referenced above) and (b) the preference claims referenced in Mr. Griffith's declaration will supplement the cash on hand and other proceeds identified by Mr. Griffith and are likely to comfortably satisfy the potential outstanding claims at the amounts identified by Mr. Murphy to the extent it is necessary to access such proceeds to pay administrative claims (understanding it may not be necessary to access any litigation proceeds based on the amounts set forth in the Griffith and Murphy declarations when taking into account Transform Holdco's obligation to assume up to $139 million of section 503(b)(9) claims under the APA).

Dated:      September 13, 2019
            Dallas, Texas


                                        */s/ William L. Transier*
                                        William L. Transier
                                        Independent Director and Member of
                                        Restructuring Committee and Restructuring
                                        Subcommittee of
                                        Sears Holdings Corporation

# *EXHIBIT A*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SEARS HOLDINGS CORPORATION, | ) Case No. 18-23538 (RDD) |
| *et al.*, | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| SEARS HOLDINGS CORPORATION; SEARS, | ) Adversary Proceeding |
| ROEBUCK AND CO.; SEARS DEVELOPMENT CO.; | ) Case No. 19-____ (RDD) |
| KMART CORPORATION; and KMART OF | ) |
| WASHINGTON, LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| EDWARD SCOTT "EDDIE" LAMPERT; ESL | ) |
| INVESTMENTS, INC.; RBS PARTNERS LP; CRK | ) |
| PARTNERS LLC; SPE MASTER I L.P.; ESL | ) |
| PARTNERS L.P.; SPE I PARTNERS L.P.; RBS | ) |
| INVESTMENT MANAGEMENT LLC; ESL | ) |
| INSTITUTIONAL PARTNERS L.P.; ESL INVESTORS, | ) |
| L.L.C.; JPP LLC; JPP II LLC; FAIRHOLME CAPITAL | ) |
| MANAGEMENT, L.L.C.; CESAR L. ALVAREZ; | ) **JURY TRIAL DEMANDED** |
| BRUCE BERKOWITZ; ALESIA HAAS; KUNAL | ) |
| KAMLANI; STEVEN MNUCHIN; THOMAS J. TISCH; | ) |
| SERITAGE GROWTH PROPERTIES, INC.; SERITAGE | ) |
| GROWTH PROPERTIES, L.P.; SERITAGE KMT | ) |
| MEZZANINE FINANCE LLC; SERITAGE SRC | ) |
| MEZZANINE FINANCE LLC; SERITAGE KMT | ) |
| FINANCE LLC; SERITAGE SRC FINANCE LLC; | ) |
| SERITAGE GS HOLDINGS LLC; SERITAGE SPS | ) |
| HOLDINGS LLC; and SERITAGE MS HOLDINGS LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT**

Sears Holdings Corporation ("Sears" or the "Company"); Sears, Roebuck & Co. ("Sears Roebuck"); and Sears Development Co., Kmart Corporation, and Kmart of Washington, LLC (together, with Sears Roebuck, the "Real Estate Transferors"; and together with Sears and Sears Roebuck, "Plaintiffs"), acting at the direction of the Restructuring Sub-Committee ("Subcommittee") of the Restructuring Committee of the Board of Directors ("Board") of Sears, file this Complaint against (i) Edward Scott "Eddie" Lampert; (ii) ESL Investments, Inc. ("ESL"); (iii) RBS Partners, L.P., CRK Partners, LLC, SPE Master I., L.P., ESL Partners L.P., SPE I Partners, L.P., RBS Investment Management, LLC, ESL Institutional Partners, L.P., and ESL Investors, L.L.C. (together, the "ESL Shareholders"); (iv) JPP LLC and JPP II LLC (together, the "ESL Lenders," and together with ESL and the ESL Shareholders, the "ESL Defendants"); (v) Fairholme Capital Management, L.L.C. ("Fairholme"); (vi) Cesar L. Alvarez, Bruce Berkowitz, Alesia Haas, Kunal Kamlani, Steven Mnuchin, and Thomas J. Tisch (together with Lampert, the "Directors"); (vii) Seritage Growth Properties, Inc. ("Seritage"), (viii) Seritage Growth Properties, L.P. (the "Seritage Operating Partnership"), Seritage KMT Mezzanine Finance LLC ("KMT Mezz"), Seritage SRC Mezzanine Finance LLC ("SRC Mezz"), Seritage KMT Finance LLC, Seritage SRC Finance LLC, Seritage GS Holdings LLC, Seritage SPS Holdings LLC, and Seritage MS Holdings LLC (together with Seritage, the "Seritage Defendants"); and, together with Lampert, the ESL Defendants, Fairholme, and the Directors, the "Defendants").

## **Introduction**

1.      As Sears was sliding into bankruptcy, Eddie Lampert—its long-time controlling shareholder, Chairman, and Chief Executive Officer—in concert with and assisted by other Defendants, transferred billions of dollars of the Company's assets to its shareholders for grossly inadequate consideration or no consideration at all.  By far the largest share of the value

siphoned from the Company went to Lampert himself, ESL, the hedge fund he controls, and other insider Defendants. These transfers were unmistakably intended to hinder, delay, and defraud creditors and/or occurred when the Company was insolvent and had insufficient capital to continue its operations and to repay its billions of dollars in debt.

2.     Had Defendants not taken these improper and illegal actions, Sears would have had billions of dollars more to pay its third-party creditors today and would not have endured the amount of disruption, expense, and job losses resulting from its recent bankruptcy filing. This Complaint is brought to make Sears whole for these thefts of its assets and for the breaches of fiduciary duty arising from certain related-party loans.

3.     As Lampert and the other Defendants stripped Sears of billions of dollars of assets and encumbered its remaining property with new liens, Sears was suffering billions of dollars of losses annually, and had not generated positive cash flow from operations for years—much less cash flow sufficient to pay principal and interest on its billions of dollars of debt. Sears, once one of the country's dominant retailers, was falling further and further behind its competitors in a rapidly declining retail market. Between fiscal years 2011 and 2014, Sears had a cumulative net loss of $7.1 billion. By at least FY 2014, and continuing through its bankruptcy filing in 2018, the Company was insolvent and had insufficient capital to remain in business, and Lampert and the other insider Defendants knew it.

4.     Lampert and the other insider Defendants also knew the Company had no plan to return to profitability. In an effort to create a false record to cover up their asset stripping, at Lampert's personal direction, Sears employees repeatedly produced financial plans reflecting fanciful, bad-faith predictions that the Company would experience an immediate and dramatic turn-around from deep and mounting losses to sudden profitability. Rather than attempt to

2

project Sears' financial results in good faith, Sears' annual plans were based on top-down orders

from Lampert, the controlling shareholder who benefited massively from asset stripping.

Without any legitimate reason and despite Sears' immense and consistent losses, these plans

simply assumed that profits would appear.  Often, hundreds of millions of dollars of Earnings

Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") were attributed to what

internal Sears documents called "*go-gets*"—unidentified initiatives that, the plans assumed,

somehow would be discovered, implemented, and profitable.  Sears continued to produce these

false projections year after year, even as baseless projections of huge profits were consistently

followed by the reality of huge losses.

5.      While these violations occurred, Lampert and ESL were Sears' largest

shareholders, holding between 47.8% and 62% of Sears' issued and outstanding stock.  Another

large shareholder, Fairholme, held between 15.1% and 25% of Sears' stock and had affiliated

directors on Sears' Board.  Thomas Tisch, another Sears director, held between 3.5% and 3.7%

of Sears' stock.  Together, these culpable insider shareholders—Lampert, the ESL Shareholders,

Fairholme, and Tisch (the "Culpable Shareholders")—received at least 80.1% of the value of the

2011 spinoff of Orchard Supply Hardware Stores Corp. ("Orchard"), 80.8% of the value of the

2012 Sears Hometown and Outlet Stores, Inc. ("SHO") rights distribution, 81.2% of the value of

the 2012 partial spinoff of Sears Canada Inc. ("Sears Canada"), 74.7% of the value of the 2014

spinoff of Lands' End, Inc. ("Lands' End"), and 76.3% of the value of the 2015 Seritage rights

distribution.  The Culpable Shareholders were aided and abetted by four directors affiliated with

the Culpable Shareholders who approved some or all of these transactions: Cesar L. Alvarez, a

director of Fairholme's parent company; Bruce Berkowitz, Fairholme's founder and president;

3

Kunal Kamlani, the president of ESL; and Steven Mnuchin, an investor in ESL and former vice

chairman of ESL (together with the Culpable Shareholders, the "Culpable Insiders").

6.      These five asset transfers were part of a single, years-long strategy of stripping

out Sears' most valuable assets for the benefit of Lampert, the ESL Defendants, and Sears' other

shareholders, to the great detriment of the Company and its creditors.  In 2012, Lampert formed

and chaired a management committee euphemistically called the "non-core asset committee"

(the "Non-Core Committee") to consider dispositions of major assets.  Beginning in 2011 and

2012, with transactions involving Orchard, SHO, and Sears Canada and continuing with 2014

and 2015 transactions involving Lands' End and Seritage, Sears—under Lampert's control and at

his direction—repeatedly spun off major assets to its shareholders, for no consideration or

grossly inadequate consideration.  As the Company's controlling shareholders, Lampert and the

ESL Shareholders were the primary beneficiaries of these transfers.

7.      Altogether, Lampert caused more than $2 billion of assets to be transferred to

himself and Sears' other shareholders and beyond the reach of Sears' creditors.  These assets

included (i) 80.1% of the common stock and 100.0% of the preferred stock of Orchard, together

worth at least $133 million, (ii) rights to purchase 100% of SHO, a profitable subsidiary, worth

at least $231 million, (iii) 44.5% of Sears Canada, worth at least $621 million, (iv) 100% of

Lands' End, a profitable subsidiary worth more than $1 billion, and (v) rights to purchase

Seritage, a new REIT to which Sears sold 100% and 50% ownership, respectively, in 235 and 31

of its premier properties (for at least $649 million below their fair value), worth at least $399

million.  These transactions were actual and/or constructive fraudulent transfers, and constituted

illegal dividends under Delaware law.

8.      **First**, between December 2011 and November 2012, Sears spun off its entire

stake in Orchard, rights to purchase all of SHO (a wholly owned subsidiary), and a significant

stake in Sears Canada to its shareholders for no consideration.  At the time the Culpable

Shareholders owned between 80.1% and 81.2% of Sears' stock, the Board was dominated by

Lampert, two other ESL investors (Tisch and Mnuchin), and a CEO (Louis D'Ambrosio)

beholden to the three of them, and ESL was facing crippling demands for redemptions from its

own investors.  When the transfers were made, Sears' cash flow from operations, operating

income, pre-tax income, and net income had already dropped first to *de minimis* levels

(FY 2010) and then to negative levels (FY 2011), from which the Culpable Insiders knew Sears

was unlikely ever to recover.  The Culpable Insiders and D'Ambrosio orchestrated these

transactions—which were part of a single years-long scheme—with the actual intent to hinder,

delay, and defraud Sears and its existing and future creditors.

9.      **Second**, in April 2014, after Sears' condition had deteriorated even further, after

Lampert had taken over as CEO and D'Ambrosio was replaced on the Board by Cesar Alvarez (a

director of Fairholme's parent company), Sears spun off Lands' End.  Prior to the spinoff, Lands'

End was a wholly owned subsidiary that operated one of Sears' few remaining profitable

businesses.  *The Wall Street Journal* described it as one of Sears' "crown jewels."  In transferring

Lands' End to Sears' shareholders, the Culpable Insiders refused to consider an unsolicited third-

party indication of interest that valued Lands' End at $1.6 billion (inclusive of net debt), failed

even to consider a sale to an unaffiliated third party or to undertake a meaningful marketing

process, and refused to increase Lands' End's borrowing to support a larger "pre-spin" dividend

from Lands' End to Sears (as recommended by the lead banker).  As a consequence of the

5

transaction, Sears' shareholders received Lands' End shares worth more than $1 billion for no

consideration.  Over $750 million of that amount went to the Culpable Shareholders.

10.    The Lands' End spinoff was patently designed to benefit Lampert and other Sears

shareholders at the expense of the enterprise and its creditors.  In the words of Sears' then-CFO

in a contemporaneous email, "[Lampert] was trying to optimize cash for [Sears] while

maximizing his (esl) equity stake . . . because he knows that [Lands' End] is worth a great deal

outside of [Sears]."  *The Wall Street Journal* presciently warned that "Lampert is carving out

some of the best pieces of [Sears] for its shareholders, moves that could leave bondholders at risk

if its remaining businesses continue to deteriorate."  In approving the spinoff, the Board willfully

ignored the interests of Sears' creditors.

11.    ***Third***, in July 2015, Sears closed the Seritage transaction, which included a rights

offering permitting shareholders to invest in Seritage, a newly created real estate investment trust

("REIT"), and a sale-and-lease-back agreement allowing Seritage to take ownership of 266 of

Sears' premier retail stores.

12.    The Seritage rights offering gave Sears shareholders (again, predominantly

Lampert, the ESL Shareholders, and the other Culpable Shareholders) the ability to purchase

Seritage's common stock for no consideration to Sears.  As reflected in the minutes of meetings

of the Sears Board, the subscription rights were intended to transfer value to Sears' shareholders

and therefore divert that value from creditors.  The Company achieved that goal: the trading

price of the rights confirms that at least $399 million of value was transferred from Sears to its

shareholders through the distribution of the rights for no consideration.  Even worse, the

transferred value exceeded that amount because Lampert, the ESL Shareholders, and

Fairholme—each of whom could not exercise all of his or its rights due to laws governing

6

ownership concentration of REITs—simultaneously traded their excess rights plus cash to
Seritage in exchange for interests in other, more valuable classes of Seritage stock and interests
in the Seritage Operating Partnership (which held title to the real estate).

13.    In the second step of the Seritage transaction, a sale-and-lease-back agreement
between Sears and Seritage, Sears transferred to Seritage its real estate interests in 266 of its
most profitable stores.

14.    The purchase price paid to Sears undervalued the transferred real estate by at least
$649 million.  The amount of the purchase price was not negotiated.  Instead, at the direction of
Lampert and the Sears Board, the purchase price for most of the stores was purportedly
established by appraisals conducted for Sears by Cushman & Wakefield ("C&W").  But (as the
Culpable Insiders knew or should have known) the C&W appraisals grossly undervalued the
stores, because the appraisals were fundamentally flawed and, among other things, intentionally
used under-market future lease rates as the sole basis for their valuations.

15.    Moreover, the Culpable Insiders arranged for Sears to lease the properties back
under blatantly unfair terms that, among other things: (i) permitted Seritage, at any time and at its
sole discretion, to "recapture" up to half of the square footage of each store, regardless of Sears'
plans for the store; (ii) permitted Seritage, again, at any time and at its sole discretion, to retake
the entirety of 21 specified stores upon the payment of a fee to Sears; and (iii) required Sears to
pay a hefty fee to Seritage if—as Lampert and the management team already intended—Sears
voluntarily terminated the lease on any of the remaining stores if they did not generate sufficient
cash flow to pay the rent owed to Seritage.  Like the purchase price for the Sears stores, the
terms of the leases between Seritage and Sears were not negotiated between the parties, but were
established unilaterally by Lampert and the other members of Sears' Board, in willful violation

of the interests of Sears' creditors.  According to Sears' own advisors, the value to Seritage of these admittedly unusual lease terms was between $204 and $409 million.

16.     The Seritage transaction saddled Sears with hundreds of millions of dollars of rent and termination fees ultimately paid to Seritage and resulted in the ouster of Sears from many of its most profitable locations.  As the Culpable Insiders intended, in the years since the transaction closed, Seritage thrived and paid handsome dividends to its investors—principally Lampert, the ESL Shareholders, and the other Culpable Shareholders—while Sears' financial condition continued to worsen.

17.     At the time of the Lands' End and Seritage transactions, Sears was in what Lampert would later call a "death spiral"—cannibalizing core assets to meet ordinary course obligations, without any realistic plan to return to profitability.  Its operating and financial performance were declining at a dizzying rate.  Its business did not generate anywhere near sufficient cash flow to pay its debts as they came due (including interest and principal on billions of dollars in debt, and obligations to fund the pension plans for approximately 100,000 retirees).  At the time of both transactions, Sears and other transferors (Sears Roebuck and the Real Estate Transferors, respectively) had unreasonably small capital and were unable to pay their debts as they came due.  At the time of the Seritage transaction, Sears and the other Real Estate Transferors were also insolvent under the balance-sheet test.

18.     To help conceal their fraud, the Culpable Insiders arranged for reviews of these transactions by committees of directors, first by the Sears audit committee in the case of Orchard and SHO and then by a newly-created Related-Party Transaction Sub-Committee (the "RPT Committee") in the case of Lands' End and Seritage.  These committees, however, failed to protect the interests of Sears and its creditors or provide any meaningful check on the asset-

stripping scheme.  For example, the members of the RPT Committee relied on purported

solvency opinions and appraisals based on false projections.  Despite Sears' dire financial results

and dismal prospects, the RPT Committee focused completely on the interests of Sears

shareholders—willfully ignoring the grievous injury the Lands' End and Seritage transactions

inflicted on Sears' creditors.  Indeed, in the Seritage transaction, the RPT Committee's mandate

was limited to a review of Lampert and the ESL Shareholders' equity ownership in Seritage, and

thus did not cover any of the other critical aspects of the transaction, including the price of the

rights offering, the value of the property itself, the one-sided lease terms, and the Company's

solvency.

19.     Beginning in 2016 and continuing through October 15, 2018 (the "Petition

Date"), Sears staved off collapse only by selling core assets (including its iconic Craftsman

brand and the related business) and entering into a series of costly emergency secured loans

totaling billions of dollars with Lampert, the ESL Lenders, and Fairholme.  Between April 2016

and the Petition Date, Lampert and the ESL Lenders made approximately $3.22 billion in

related-party loans to Sears, and Fairholme loaned the Company another $25 million

(the "Recent Related-Party Loans").  Although Sears was insolvent, these loans had minimal risk

to ESL and Fairholme because they were collateralized by Sears' remaining real estate, ground

leases, inventory, receivables, and intellectual property assets.  Lampert, the ESL Defendants,

and Fairholme breached their fiduciary duties by engaging in this self-dealing and the Directors

breached their fiduciary duties by approving these loans.

20.     As set forth below, Defendants are obligated to repay the billions of dollars of

value looted from Sears, return the real estate, rental payments, and termination fees they

received, and pay damages to compensate Sears fully for the enormous damage they have
caused.

**Jurisdiction**

21.     This Court has subject-matter jurisdiction over this Adversary Proceeding
pursuant to 28 U.S.C. §§ 157 and 1334.  This Adversary Proceeding is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O).

22.     This Court has personal jurisdiction over each of the Defendants under
Bankruptcy Rule 7004(f).

23.     This Court also has personal jurisdiction over each of the Defendants under N.Y.
C.P.L.R. §§ 301 and 302 because Plaintiffs' claims arise from acts by Defendants, in person or
through agents, transacting business within New York, committing tortious acts within New
York, and/or committing tortious acts causing injury to persons or property within New York.
At the relevant times, Sears (ticker symbol: SHLD) was traded on the NASDAQ Stock Market
("NASDAQ"), a securities exchange located in New York.  The shares of Orchard (ticker
symbol: OSH), SHO (ticker symbol: SHOS), and Lands' End (ticker symbol: LE), and the SHO
subscription rights, also traded on NASDAQ, and the shares of Seritage (ticker symbol: SRG)
and the Seritage subscription rights traded on the New York Stock Exchange ("NYSE"), another
securities exchange located in New York.  Each of the Orchard, Sears Canada, Lands' End, and
Seritage transactions involved transfers of property owned, directly or indirectly, by plaintiff
Sears Roebuck, a New York corporation, including (in the case of Lands' End and Seritage)
substantial interests in real property located in New York.  Each of these transactions was also
accomplished through the use of lawyers, financial advisors, and/or other financial institutions
located in New York.  Moreover, the Seritage Defendants, as well as defendants Haas and Tisch,
reside in New York.

10

24.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1409(a) and (c).

## The Parties

25.     Plaintiffs are Debtors in these Chapter 11 cases filed on October 15, 2018.

26.     Plaintiff Sears is and was the direct or indirect parent of the other plaintiffs.  Sears is a borrower or guarantor for certain debt outstanding as of the Petition Date.  At all relevant times, Sears was incorporated in Delaware.

27.     Plaintiff Sears Roebuck is and was a direct subsidiary of Sears and was the parent of Orchard until 2011, a shareholder in Sears Canada, and the parent of Lands' End until 2014.  Sears Roebuck also held title, directly or indirectly, to much of the real estate transferred in the Lands' End and Seritage transactions.  Sears Roebuck is a borrower or guarantor for certain debt outstanding as of the Petition Date.

28.     Plaintiff Sears Development Co. is and was a subsidiary of Sears (through Sears Roebuck).  Sears Development Co. held title to some of the real estate transferred in the Seritage transaction.  Sears Development Co. is a borrower or guarantor for certain debt outstanding as of the Petition Date.

29.      Plaintiff Kmart Corporation is and was an indirect subsidiary of Sears (through Kmart Holdings Corporation).  Kmart Corporation held title to some of the real estate transferred in the Seritage transaction.  Kmart Corporation is also the successor by merger to several other entities that held title to some of the real estate transferred in the Seritage transaction.[1]  Kmart Corporation is a borrower or guarantor for certain debt outstanding as of the Petition Date.

---

[1]     Those entities are: Troy CMBS Property, LLC; Troy Coolidge No. 3, LLC; Troy Coolidge No. 8, LLC; Troy Coolidge No. 9, LLC; Troy Coolidge No. 19, LLC; Troy Coolidge No. 20, LLC; Troy Coolidge No. 25, LLC; Troy Coolidge No. 26, LLC; Troy Coolidge No. 28, LLC; Troy Coolidge No. 33, LLC; Troy Coolidge No. 34, LLC; Troy Coolidge No. 36, LLC; Troy Coolidge No. 37, LLC; Troy Coolidge No. 41, LLC; Troy Coolidge No. 43, LLC; Troy Coolidge No. 45, LLC; Troy Coolidge No. 51, LLC; Troy Coolidge No. 54, LLC; and Troy Coolidge No. 58, LLC.

30.     Plaintiff Kmart of Washington, LLC is and was an indirect subsidiary of Sears (through Kmart Holdings Corporation and Kmart Corporation).  Kmart of Washington, LLC held title to some of the real estate transferred in the Seritage transaction.  Kmart of Washington, LLC is a borrower or guarantor for certain debt outstanding as of the Petition Date.

31.     Defendant Lampert was Chairman of the Board of Sears from the time of the 2005 Kmart/Sears merger until his resignation on February 12, 2019.  He was also the CEO of Sears from February 2013 until the day before the Petition Date.  In addition, Lampert is the sole founder, owner, Chairman, and CEO of ESL (as well as a limited partner in certain of the ESL Shareholders), and a chairman of the board of trustees of Seritage.  Lampert and ESL initially owned 43.5% of the Seritage Operating Partnership directly and 1.8% of the Operating Partnership through their ownership of Seritage Class A shares, which (directly or through subsidiaries) holds title to the Seritage real estate assets.  On information and belief, Lampert resides in Florida.

32.     Defendant ESL is an investment manager incorporated in Delaware, with its principal place of business in Florida.  ESL is controlled by Lampert, who is its sole owner.  On information and belief, ESL's principal investments during the relevant period were in Sears and companies spun off from Sears.

33.     Defendants RBS Partners, L.P., CRK Partners, LLC, SPE Master I, L.P., ESL Partners, L.P., SPE I Partners, LP, RBS Investment Management, L.L.C., ESL Institutional Partners, L.P., and ESL Investors, L.L.C. (together, the "ESL Shareholders") are investment funds controlled by Lampert and ESL that were shareholders of Sears at relevant times.  ESL was the general partner of RBS Partners, L.P. and ESL Investors, L.L.C., the manager of RBS Investment Management, L.L.C., and the sole member of CRK Partners, LLC.  RBS Partners,

12

L.P. was the general partner of SPE Master I, L.P., ESL Partners, L.P., and SPE I Partners, LP and the manager of ESL Investors, L.L.C. RBS Investment Management, L.L.C. was the general partner of ESL Institutional Partners, L.P. All of the ESL Shareholders are incorporated in Delaware.

34.     Together, Lampert and ESL held approximately 61.2% of Sears' stock at the time of the Orchard spinoff, approximately 62% of Sears' stock at the time of the SHO rights offering, approximately 61.8% of Sears' stock at the time of the Sears Canada partial spinoff, approximately 48.4% of Sears' stock at the time of the Lands' End spinoff, and approximately 47.8% of Sears' stock at the time of the Seritage rights offering. Throughout the relevant time period, Lampert and ESL's disclosures on Schedule 4 and Schedule 13D, as well as Sears' definitive proxy statements, attributed the entirety of Lampert and ESL's holdings to both Lampert and ESL.

35.     The ESL Lenders are investment funds controlled by Lampert and ESL that made related-party loans to Sears. The ESL Lenders and ESL Shareholders were jointly controlled by Lampert and ESL. Lampert was and is the sole member and sole owner of JPP LLC, and ESL Partners L.P. was and is the sole member and sole owner of JPP II LLC. RBS Partners, LP was and is the manager of JPP II LLC. The ESL Lenders are incorporated in Delaware.

36.     Defendant Fairholme is an investment advisor incorporated in Delaware, with its principal place of business in Miami, Florida. Fairholme was founded in 1997 by Bruce Berkowitz. Fairholme held approximately 15.2% of Sears' stock at the time of the Orchard spinoff, approximately 15.1% of Sears' stock at the time of the SHO rights offering, approximately 15.8% of Sears' stock at the time of the Sears Canada partial spinoff,

approximately 22.8% of Sears' stock at the time of the Lands' End spinoff, and approximately

25% of Sears' stock at the time of the Seritage rights offering.

37.     Fairholme's interests were represented on the Sears Board by Cesar L. Alvarez (a

director of Fairholme's parent company) from December 2013 to May 2017 and by Bruce

Berkowitz (Fairholme's founder and Chief Investment Officer and President of Fairholme's

parent company) from February 2016 to October 2017.

38.     Defendant Cesar L. Alvarez was a director of Sears from December 18, 2013 until

May 10, 2017.  As a director, Alvarez approved the Lands' End spinoff and the Seritage

transaction.  Alvarez also approved certain of the Recent Related-Party Loans, as defined and

discussed below.  Alvarez is also a director of Fairholme's parent company.  On information and

belief, Alvarez resides in Florida.

39.     Defendant Bruce Berkowitz was a director of Sears from February 24, 2016 to

October 31, 2017.  As a director, Berkowitz approved certain of the Recent Related-Party Loans.

Berkowitz is also the founder and President of Fairholme's parent company.  On information and

belief, Berkowitz resides in Florida.

40.     Defendant Alesia Haas was a director of Sears from February 24 to December 13,

2016.  As a director Haas approved certain of the Recent Related-Party Loans.  On information

and belief, Haas resides in New York.

41.     Defendant Kunal Kamlani was a director of Sears from December 3, 2014 to

February 12, 2019.  He was a member of the audit committee of the Board from 2014 to 2015

and a member of the RPT Committee from December 2014 to March 2016.  As a director of

Sears and a member of the RPT Committee, Kamlani approved the Seritage transaction.

Kamlani also approved the Recent Related-Party Loans, including approving certain of the

Recent Related-Party Loans as a member of the RPT Committee.  In March 2016, Lampert hired

Kamlani as the President of ESL.  On information and belief, Kamlani resides in Florida.

42.     Defendant Steven Mnuchin was a director of Sears from March 30, 2005 until

December 2, 2016 and a member of the audit committee from 2005 to 2009.  As a director,

Mnuchin approved the Orchard spinoff, the SHO rights offering, the Sears Canada partial

spinoff, the Lands' End spinoff, and the Seritage transaction.  Mnuchin also approved certain of

the Recent Related-Party Loans.  Mnuchin was an investor in ESL (as a limited partner in certain

of the ESL Shareholders), ESL's Vice-Chairman from December 2002 to August 2003, and a

member of ESL's board of directors at all relevant times.  Mnuchin is a longstanding personal

friend of Lampert's, having been his college roommate at Yale University and his colleague at

Goldman, Sachs & Co. in the 1980s.  On information and belief, Mnuchin resides in either

California, New York, or Washington D.C.

43.     Defendant Thomas J. Tisch has been a director of Sears since 2005 and a member,

at various times, of the audit, compensation, and nominating and governance committees of the

Board.  As a director, Tisch approved the Orchard spinoff, the SHO rights offering, the Sears

Canada partial spinoff, the Lands' End spinoff, and the Seritage transaction.  Tisch also approved

all of the Recent Related-Party Loans.  Tisch also is an investor in ESL (as a limited partner in

certain of the ESL Defendants).  Separately from ESL, Tisch also owned or controlled

approximately 3.7% of Sears' stock at the time of the Orchard spinoff, approximately 3.6% of

Sears' stock at the time of the SHO rights offering and Sears Canada partial spinoff, and

approximately 3.5% of Sears' stock at the time of the Lands' End spinoff and the Seritage rights

offering.  Tisch owned some shares personally and controlled other shares held by his brothers,

family trusts, and family foundations (including Tisch Foundation, Inc. and The Alice M. &

Thomas J. Tisch Foundation, Inc.). Tisch had sole voting power over certain shares held by trusts of which he and/or his brothers were trustees and/or beneficiaries. Tisch also had shared voting power over additional shares, including the shares held by two family foundations. On information and belief, Tisch resides in New York.

44.    Together, Alvarez, Lampert, Mnuchin, and Tisch are referred to as the "Lands' End Directors".

45.    Together, Alvarez, Kamlani, Lampert, Mnuchin, and Tisch are referred to as the "Seritage Directors".

46.    Together, Alvarez, Berkowitz, Haas, Kamlani, Lampert, Mnuchin, and Tisch are referred to as the "Recent Related-Party Loan Directors".

47.    Defendant Seritage is a publicly traded REIT (NYSE:SRG) incorporated in Maryland, with its principal place of business in New York.

48.    Defendant Seritage Operating Partnership is Seritage's operating partnership. The Seritage Operating Partnership is registered in Delaware and has its principal place of business in New York. Lampert, the ESL Defendants, and Seritage are the owners of the Seritage Operating Partnership.

49.    Defendant KMT Mezz was an indirect subsidiary of Sears (through Kmart Corporation) and, following the Seritage transaction, was and is an indirect subsidiary of Seritage (through Seritage Operating Partnership). KMT Mezz was the transferee of Seritage KMT Finance LLC (described below).

50.    Defendant SRC Mezz was an indirect subsidiary of Sears (through Sears Roebuck) and, following the Seritage transaction, was and is an indirect subsidiary of Seritage (through Seritage Operating Partnership). SRC Mezz was the transferee of Seritage SRC

Finance LLC, Seritage GS Holdings LLC, Seritage SPS Holdings LLC, and Seritage MS

Holdings LLC (described below).

51.     Defendant Seritage KMT Finance LLC was an indirect subsidiary of Sears

(through Kmart Corporation) and, following the Seritage transaction, was and is an indirect

subsidiary of Seritage (through Seritage Operating Partnership and KMT Mezz).  Seritage KMT

Finance LLC is incorporated in Delaware and has its principal place of business in New York.

Seritage KMT Finance LLC was an initial transferee of certain real estate assets transferred in

the Seritage transaction.

52.     Defendant Seritage SRC Finance LLC was an indirect subsidiary of Sears

(through Sears Roebuck) and, following the Seritage transaction, was and is an indirect

subsidiary of Seritage (through Seritage Operating Partnership and SRC Mezz).  Seritage SRC

Finance LLC is incorporated in Delaware and has its principal place of business in New York.

Seritage SRC Finance LLC was an initial transferee of certain real estate assets transferred in the

Seritage transaction.

53.     Defendants Seritage GS Holdings LLC, Seritage SPS Holdings LLC, and Seritage

MS Holdings LLC were indirect subsidiaries of Sears (through Sears Roebuck) and, following

the Seritage transaction, were and are indirect subsidiaries of Seritage (through Seritage

Operating Partnership and SRC Mezz).  Seritage GS Holdings LLC, Seritage SPS Holdings

LLC, and Seritage MS Holdings LLC are incorporated in Delaware and have their principal

places of business in New York.  They were initial transferees of certain joint venture interests in

real estate assets that were transferred in the Seritage transaction.

## Factual Background

### A.    Plaintiffs' Businesses

54.    Prior to the Petition Date, Sears was a holding company for two nationwide retail brands, "Sears" and "Kmart."  Sears Roebuck and Kmart once were the largest and second-largest retailers in the United States by sales (until the late 1980s).

55.    Sears Roebuck's department stores averaged 150,000 square feet and often served as anchor tenants in shopping malls.  Sears Roebuck sold a wide variety of products, including appliances, apparel, consumer electronics, outdoor furniture, and automotive tires, and batteries.

56.    Kmart's stores averaged 100,000 square feet and were primarily located in strip malls.  Kmart also sold a variety of products, including apparel, consumer electronics, children's toys, lawn items, and groceries.

57.    According to Sears' SEC filings, Sears' key competitors included, depending on the products, big-box stores like Target and Walmart, department stores like J.C. Penney, Kohl's and Macy's, home improvement stores like Home Depot and Lowe's, consumer electronics stores like Best Buy, and online retailers like Amazon.

### B.    Control of Sears by Lampert, the ESL Defendants, and Fairholme

58.    Lampert and ESL acquired control of Kmart after it filed for bankruptcy protection in January 2002, by purchasing Kmart bonds and bank debt with an aggregate face value of more than $1 billion at significant discounts.  Kmart emerged from bankruptcy in 2003 with Lampert and ESL owning approximately 52.6% of its stock, and with Lampert as chairman of its board of directors.  Lampert quickly packed the Kmart board with other directors loyal to him and ESL, including Mnuchin, Tisch, and William Crowley (the then-President and COO of ESL).

18

59.     As Chairman, Lampert led Kmart into a merger with Sears Roebuck.
Immediately prior to the merger, Lampert and ESL held approximately 53.7% of Kmart's stock
as well as 15% of Sears Roebuck's stock.  The merger was announced in November 2004 and
closed in March 2005.  After the merger, Sears was the parent company of both retailers;
Lampert and ESL held approximately 39% of Sears' stock; Lampert was Chairman of the Board;
and the Board also included three other ESL-affiliated directors:  Crowley, Mnuchin, and Tisch.
Given the fragmented ownership of the remainder of Sears' publicly traded shares, and the
presence of the ESL-affiliated directors, Lampert and ESL's collective 39% holdings were
sufficient to control the Company.

60.     After the merger, Lampert and ESL continued to acquire Sears shares and, by
August 2008 and at many times thereafter, Lampert and ESL together held an outright majority
of Sears' shares.

61.     Lampert used this control over the Company to become Sears' *de facto* CEO.
Following the Sears/Kmart merger, in the words of Alan Lacy (the pre-merger CEO of Sears
Roebuck): "Effectively, Eddie was CEO.  I didn't want to pretend to be the CEO.  I stayed
another nine months to help in the transition.  I stopped being CEO in '05, and left in '06."
Lampert replaced Lacy with Aylwin Lewis (whom he had previously hired as Kmart's CEO).
Though Lewis was CEO in title, in practice Lampert had that role.  The heads of several
important departments reported to Lampert directly.  In early 2008, Lampert orchestrated the
ouster of Lewis as CEO and the appointment of W. Bruce Johnson as "interim" CEO.  Lampert
also assumed the role of conducting the search for a permanent CEO.  Johnson remained as
interim CEO until early 2011, becoming, at the time, the longest then-serving temporary head of
a publicly traded U.S. company.

62.     Lampert replaced Johnson with Louis D'Ambrosio, a "permanent" CEO, who had previously served as a consultant to Sears.  Given Lampert and ESL's share ownership, and representation on the board by Lampert, Mnuchin, and Tisch, Lampert and ESL had the practical ability to fire D'Ambrosio (as they had fired Lewis) and to set his multi-million-dollar compensation.  Accordingly, D'Ambrosio acquiesced to Lampert and ESL's plans, including the spinoff of Orchard, the SHO rights offering, and the partial spinoff of Sears Canada.  These three ESL-affiliated directors (Lampert, Mnuchin, and Tisch), together with D'Ambrosio, constituted an outright majority of the seven-member board that approved the Orchard, SHO, and Sears Canada transactions in 2011 and 2012.

63.     In early 2013, Lampert orchestrated the ouster of D'Ambrosio and installed himself as CEO of Sears.

64.     Later that year, Fairholme also gained board representation.  By the second quarter of 2008, Fairholme owned more than 10% of Sears' stock; by the end of 2013, more than 20%; and at the time of the Lands' End and Seritage transactions, 23–25%.  Fairholme's principal, Bruce Berkowitz, was in frequent contact with Lampert, who supported the addition of Alvarez and then Berkowitz to Sears' Board.

65.     Fairholme's investment in Sears was based on the premise that shareholders would realize returns from Sears' valuable real estate assets, and not on Sears' ability to operate its business profitably.  As Berkowitz stated in a December 2008 interview (when Sears was trading at around $53 per share): "We didn't buy Sears based on the business.  There's too much retail in the U.S. . . .  We invested because of the company's real estate holdings.  It has some fabulous locations . . . .  The real estate alone is conservatively—and I mean conservatively—worth $90 per share."  Similarly, Berkowitz told *Fortune* magazine in November 2012 that

Sears' stock (which then traded near $60 per share) "would be over $160 a share if the land on the books was fully valued" because "today's standalone store can be tomorrow's multi-use hotel/residential-retail center."  Berkowitz said that he expected "gigantic cash flows from the closing of locations, [and] the pulling-out of the cash from inventory, work in process, and distribution centers."

66.     Lampert, ESL, and Fairholme's combined ownership of approximately 75% of Sears' stock, and the close coordination among them, gave them operational control of Sears.

67.     A majority (four of the seven) of the directors of Sears who approved the Lands' End spinoff—Alvarez, Lampert, Mnuchin, and Tisch—had substantial investments in the ESL Shareholders (Lampert, Mnuchin, and Tisch) or an affiliation with Fairholme (Alvarez). Lampert and Tisch also owned substantial Sears stock individually.

68.     A fifth director who approved the Seritage transaction (Kamlani), although not yet affiliated with ESL at the time of the transaction, became the President of ESL less than nine months later, in March 2016.  As Kamlani admitted, during his tenure as a director prior to joining ESL, it was "no secret that I was getting anxious and wanted to get back to work," which was "not lost on Eddie."  During this period, the position of President of ESL (filled by George L. Mikan III until December 2014) remained vacant.  His desire to fill this position gave Kamlani, who at the time sat on the RPT Committee, a strong personal incentive to acquiesce to Lampert's wishes and approve the Seritage transaction.

69.     From March 2016 (when Kamlani became President of ESL) until October 2017 (when Berkowitz resigned from the Board), the ESL and Fairholme affiliated directors comprised an outright majority of the Board.

## C.    <u>The Rapid Deterioration of Sears</u>

70.    After peaking in 2006, by every relevant measure, Sears began a rapid, inexorable decline.  Beginning in 2006, Sears' revenue declined every year; its operating income and net income fell to *de minimis* levels in FYs 2009–2010, and went negative thereafter; and its debt burden grew well beyond its capacity to pay.

71.    At the same time, in a vicious cycle, Sears was forced to close stores and reduce capital expenditures, undercutting its ability to generate revenue.  Sears was facing increased competition—both from more successful brick-and-mortar stores and online market places—and losing market share.  And Sears' Shop Your Way ("<u>SYW</u>") loyalty program—which Lampert claimed as his key initiative and proselytized as the savior of Sears' future and an essential source of potential future profitability—consistently failed to deliver results.

72.    As a result, key third parties raised serious concerns about Sears' solvency.  Sears' suppliers demanded shorter trade terms, resulting in an effective loss of hundreds of millions of dollars of trade credit.  And the Pension Benefit Guaranty Corporation ("<u>PBGC</u>") raised concerns about Sears' ability to honor its billions of dollars of liabilities to its unfunded, defined-benefit pension plans and threatened to terminate the plans, ultimately forcing Sears to "ring fence" collateral to protect the interests of the plans and the PBGC.

### 1.    **Sears' Deteriorating Financial Performance**

73.    Prior to the Lands' End spinoff and the Seritage transaction, multiple financial metrics showed clearly that Sears' performance was in a steep, multi-year free fall.  Between FY 2006 and FY 2014, Sears' revenue declined steadily from $53 billion to $31.2 billion, or approximately 41%.  Sears had operating losses (*i.e.*, losses before interest and taxes) in each

year beginning in FY 2011 of between $838 million and $1.5 billion.  Between FY 2011 and

FY 2014, Sears had incurred cumulative net losses of more than $7.1 billion.[2]

74.     ***Revenue***.  Since FY 2006, when Sears earned approximately $53.02 billion in

revenue, Sears' revenue has declined each and every year.  For FY 2013 and FY 2014, Sears

reported revenue of approximately $36.19 billion and $31.2 billion, respectively.  Sears' revenue

for FY 2014 was more than $20 billion (or 40%) below its FY 2006 peak, and more than $10

billion (or 25%) below its results in FY 2011, only three years earlier.



---

[2]     Sears used a retail fiscal year that ran approximately from February 1 to January 31.  Following this retail
convention, Sears refers to a fiscal year ("FY") by the calendar year in which it began.  For example, FY 2012
began January 29, 2012 and ended February 2, 2013.  Sears filed with the SEC its results for FY 2013 in March
2014 (just prior to the Lands' End spinoff) and the results for FY 2014 in March 2015 (a couple months prior to
the Seritage transaction).

18-23538-rdd    Doc 3278    Filed 04/17/19    Entered 04/18/19 00:26:55    Main Document
Pg 25 of 110

75.    ***Cash Flow from Operations***.  Sears achieved only marginal cash flow from

operations in FY 2010 followed by negative cash flow from operations each year thereafter.

Prior to the Orchard, SHO, and Sears Canada transactions, Sears had cash flow from operations

of just $123 million (FY 2010) and then, prior to the SHO and Sears Canada transactions,

negative $275 million (FY 2011).  Continuing up to and during the Lands' End and Seritage

transactions, Sears had cash flow from operations of negative $303 million (FY 2012), negative

$1.11 billion (FY 2013), and negative $1.39 billion (FY 2014).



76. ***Operating Income (Loss)***.  Sears achieved only marginal operating income in
FY 2008, FY 2009, and FY 2010, and since then it has reported *negative* operating income
(an operating loss) every year beginning in FY 2011.  Prior to the Orchard, SHO, and Sears
Canada transactions, Sears posted operating income of just $302 million to $667 million
(FYs 2008–2010) and then, prior to the SHO and Sears Canada transactions, an annual operating
loss of approximately $1.5 billion (FY 2011).  Continuing up to and during the Lands' End and
Seritage transactions, Sears posted annual operating losses of approximately $840 million
(FY 2012), $930 million (FY 2013), and $1.5 billion (FY 2014)—a total operating loss of $4.78
billion in only four years.  In the years reported immediately prior to the Seritage transaction,
FY 2013 and FY 2014, Sears' operating losses deepened by 11% and 62% year-over-year,
respectively.



77.    ***Pre-tax Income (Loss)***.  Sears earned modest pre-tax income in FY 2008,

FY 2009, and FY 2010, and since then it has reported negative pre-tax income (a pre-tax loss)

each and every year beginning in FY 2011.  Prior to the Orchard, SHO, and Sears Canada

transactions, Sears posted only marginal GAAP pre-tax income of $170 million to $390 million

(FYs 2008–2010) and then, prior to the SHO and Sears Canada transactions, a GAAP pre-tax

loss of approximately $1.8 billion (FY 2011).  Continuing and during the Lands' End and

Seritage transactions, Sears posted GAAP pre-tax losses of approximately $1 billion (FY 2012),

$972 million (FY 2013), and $1.7 billion (FY 2014).



78.    *Net Income*.  Sears barely achieved positive net income in FY 2008, FY 2009, and FY 2010, and since then it has reported deep net losses each and every year beginning in FY 2011.  Prior to the Orchard, SHO, and Sears Canada transactions, Sears had only marginal net income of $50 million to $240 million (FYs 2008–2010) and then, prior to the SHO and Sears Canada transactions, a net income loss of approximately $3.1 billion (FY 2011).  Continuing and during the Lands' End and Seritage transactions, Sears continued to have net income losses of approximately $930 million (FY 2012), $1.4 billion (FY 2013), and $1.7 billion (FY 2014), or an aggregate loss in four years of $7.1 billion.  In the two years reported immediately prior to the Seritage transaction, Sears' net income losses deepened by 47% and 23% year-over-year, respectively.



18-23538-rdd    Doc 3278    Filed 04/17/19    Entered 04/18/19 00:26:55    Main Document
Pg 44 of 138

79.    ***Adjusted EBITDA***.  Sears' reported Adjusted EBITDA was *de minimis* during FY

2011–2012 and then negative starting in FY 2013.  Prior to the SHO and Sears Canada

transactions, Sears posted Adjusted EBITDA of just $277 million (FY 2011)—down 80% year-

over-year.  Continuing up to and during the Lands' End and Seritage transactions, Sears posted

Adjusted EBITDA of approximately $626 million (FY 2012), negative $337 million (FY 2013),

and then negative $718 million (FY 2014).



80.   **Net Debt**.  At the same time that Sears' revenue, operating income, and net income were declining, Sears' net debt—its total debt minus its cash and cash equivalents—rose steadily.  Prior to the Orchard, SHO, and Sears Canada transactions, Sears' net debt grew to $1.83 billion (FY 2010) and then, prior to the SHO and Sears Canada transactions, net debt grew $2.7 billion (FY 2011)—up 123% and 50%, respectively.  Continuing up to and during the Lands' End and Seritage transactions, Sears' net debt remained at $2.5 billion (FY 2012) before growing to $3.2 billion (FY 2013) and then $3.5 billion (FY 2014).  In FY 2013 and FY 2014, net debt grew by 28% and 9% year-over-year, respectively.



81.   *Net Debt-to-Equity Ratio*.  Sears' increase in debt was even more dramatic in comparison to Sears' book equity.  Sears' ratio of net debt to equity had been rising exponentially since FY 2009: from 0.09 (FY 2009) to 0.21 (FY 2010), 0.63 (FY 2011), 0.79 (FY 2012), and then 1.48 (FY 2013).  This ratio reflects a material increase in Sears' effective debt in the period leading up to the transactions at issue, indicating a high degree of risk that Sears would be unable to pay its debts.  By FY 2014, Sears' book equity was negative, therefore rendering the ratio not meaningful.



### 2.   Sears' Deteriorating Operating Performance

82.      Sears' deteriorating condition also was reflected in several troubling operational trends: store closures; same-store sales declines; reduced investment in stores (capital expenditures); increased competition and decreased market share; and the failure of the SYW

loyalty/membership program to drive increased sales.  In view of these operating trends, it was abundantly clear that Sears had no viable path to service its debt, let alone return to profitability.

83.    ***Store closures***.  Immediately after the Sears/Kmart merger, the combined Company operated more than 3,433 stores in the United States, including 935 Sears-branded "broadline" (later referred to as "full-line") stores, 1,095 Sears-branded specialty stores, 1,388 Kmart-branded stores, and 15 Lands' End stores.  Lampert publicly denied at the time that he planned to close "tens of dozens" or even "hundreds" of stores, stating that only a few of the poorest performing stores would be closed.

84.    To the contrary, over the next decade, Sears in fact closed more and more stores. Even after controlling for the significant number of stores that were spun off in the Orchard, SHO, Sears Canada, and Lands' End transactions (by omitting those stores from the prior period numbers), Sears reduced its store count between 2011 and 2014 by 683 stores, or 28%.



85.    As Sears' losses began to mount, Lampert began to talk about a supposed strategy of closing Sears' worst stores to "right-size" the Company, decrease its operating expenses, and

increase its profitability.  But Sears' problems were the result of a prolonged lack of innovation, intense competition, failed management strategies, and under-investment at the corporate level, of which the store-level problems were only a symptom.  As Lampert knew at the time, the strategy of closing money-losing stores—which had been tried unsuccessfully by peers like Toys "R" Us and Sports Authority—could not return the Company to profitability.  Instead, it would result in a "death spiral."

86.    Closing stores created the temporary illusion of boosting Sears' balance sheet with revenue from the liquidation of inventory and/or the sale of real estate and with reduced operating expenses, but store closures also eroded Sears' long-term revenue base.  Despite Lampert's professed emphasis on online channels, in-store sales remained responsible for 97% or more of the Company's revenue at all relevant times.

87.    Sears' store closures cannot be explained as a good faith strategy of closing unprofitable stores to "right-size" the Company.  Sears was not just closing its unprofitable stores.  In 2012 and 2013, Sears sold at least a dozen *profitable* stores.  As *The Wall Street Journal* observed in October 2013, "selling off some of its best stores to raise cash" is "an unusual strategy that makes it harder for the struggling chain to improve its sales even as it helps shore up its financial position."[3]

88.    In addition to undercutting Sears' revenue base, store closures undercut the value of Sears' affiliated brands (such as Craftsman, DieHard, and Kenmore), whose reputations were linked to that of Sears and which relied upon Sears' in-store sales for much of their market share.

---

[3]    Suzanne Kapner, "Sears Cashes Out of Prime Stores; Several of Its Most-Profitable Locations Have Been Sold," *The Wall Street Journal*, Oct. 8, 2013.

89.    ***Reduced Capital Expenditures***.  Under Lampert's leadership, Sears' capital
expenditures drastically declined, reflecting lower investments in maintaining and upgrading its
stores.  Specifically, Sears' capital expenditures declined from $1.1 billion the year before the
Kmart/Sears merger (for both companies) to $432 million by FY 2011 and declined in the
subsequent years: $378 million (FY 2012), $329 million (FY 2013), and $270 million
(FY 2014).  Sears' capital expenditures during this period were far less than those of some of its
key competitors, such as Kohl's and J.C. Penney.

90.    As many analysts noted, Sears' failure to invest in its stores made its stores
increasingly unattractive to customers and further reduced the Company's chances for long-term
profitability.  In March 2014, an Albion analyst report stated that "[i]t is common knowledge that
Sears refuses to invest in its store base."  Similarly, Standard & Poor's ("S&P") noted in several
of its reports, published throughout 2014 and 2015, that "[a] lack of store upgrades has hurt the
company's ability to attract and retain talented merchants, to engage store employees, and to win
new customers."

91.    As Rob Schriesheim (who was hired shortly thereafter to serve as CFO) wrote to
D'Ambrosio and Lampert in June 2011: "it seems there has been less investment in store assets
and labor as compared to competitors and [same-store sales] trends have not been favorable."

92.    Schriesheim was right.  Sears' same-store sales had declined every year since the
Sears/Kmart merger, demonstrating that Sears' supposed effort to "right-size" the Company by
removing unprofitable stores was a failure:



93.    ***Increased competition and loss of market share***.  According to reports issued by
IBISWorld, Sears' market share in the department store industry—a declining and intensely
competitive industry—had been shrinking since at least 2008, from 24.0% in March 2008 to
17.4% in May 2013, 16.6% in February 2014, and 15.3% in May 2015.  Sears was losing market
share both to larger brick-and-mortar retailers (such as Walmart) and online sellers (such as
Amazon).  As an Imperial Capital analyst noted in January 2012, "Sears' retail operating
platforms have been hurt by underinvestment and poor execution while the competitive climate
has intensified."

94.    For example, appliances, such as washers, dryers, and refrigerators, have long
been an important product line for Sears.  Since World War I and until recently, Sears held a

dominant market share in appliances. Sears owned "Kenmore," a 100-year-old brand name, which for decades was the best-selling brand of appliances in the United States. Over the past few decades, appliances directly contributed approximately one-fifth of Sears' total revenue, while also driving sales in other product lines by bringing customers into the stores. As of 2002, Sears maintained a market share of 40% in appliances. But since the Kmart merger, Sears' market share for appliances steadily eroded. As of 2013, Sears' market share in appliances had declined to 29%, in the face of increased competition from Home Depot, Lowe's, and others. Kenmore has been surpassed in sales by Whirlpool—which Sears had terminated as the manufacturer of Kenmore—and by G.E.

95.     ***The failure of Shop Your Way***.  Since the merger, Lampert had promised to "transform" Sears. That transformation never materialized. As Imperial Capital noted in January 2012, Sears "still suffers from the lack of a clear definitive 'go to market' strategy and 'point of differentiation,' based on observations we made during store visits, phone calls made to the company, discussions with current employees, customers, investors, and industry participants."

96.     Lampert claimed that the centerpiece of the promised transformation was SYW, a no-cost (to customers) membership rewards program created in 2009 that was supposed to provide Sears with data about its customers that it could leverage to drive results. Specifically, the information obtained from SYW was supposed to enable Sears to increase margins with personalized pricing, while also reducing expenditures on traditional marketing. In exchange for their personal information, SYW members receive coupons, free shipping, and "points" that can be converted into cash. As explained by director Ann Reese, the goal of SYW was to have SYW members direct "more share of wallet" to Sears.

97.     While many customers (accounting for 75% of Sears' sales) signed up for SYW, Sears never succeeded in its goal of causing members to materially increase their purchases from Sears.

98.     SYW did not offer Sears a material competitive advantage.  Indeed, many of Sears' competitors had already launched similar (or superior) programs prior to SYW.  Amazon, for example, launched "Amazon Prime"—a paid membership program that offers members, among other benefits, two-day free shipping on eligible purchases—in 2005.  Best Buy launched "Reward Zone," a customer loyalty program, in 2004.  Macy's launched "Star Rewards," another customer loyalty program, in 2005.  And J.C. Penney also introduced a rewards program in 2008.

99.     In May 2017, Centerview (an advisor retained by the Strategic Planning Committee of the Board) advised that "SYW must result in significant margin and/or volume increases to be break even; Company analysis indicates program generates positive ROI, but absolute contribution levels have yet to achieve scale."  Centerview also noted that "SYW membership and activity levels have trended downward over the past four years."  Centerview concluded that, "given its limited penetration and user base, we view SYW as an incremental 'enabler' to help improve operating efficiency rather than a transformative 'game-changer' that alters the Company's near-term operating trajectory."

100.    As a senior Centerview banker told counsel for the Subcommittee: "There weren't enough active members buying enough stuff at high enough prices."  The "strategy, it wasn't working."  Contrary to their stated views, Lampert and other insiders clearly knew that SYW could not halt Sears' steep decline.

**3.      Third Parties Express Concerns About Sears' Solvency.**

101.    In light of the Company's declining financial and operating performance, Sears' solvency was increasingly called into doubt by third parties, including rating agencies (which

downgraded Sears' credit ratings), factors (which reduced their willingness to purchase accounts

receivable from Sears' suppliers), credit insurers (which demanded increased premiums to write

financial guaranties on Sears), suppliers (which reduced their trade credit to Sears), and the

PBGC (which demanded protection and threatened to terminate the Sears pension plans).

102.     *Rating agencies*.  In the years leading up to the Lands' End spinoff and Seritage

transaction, all three major rating agencies took notice of Sears' deteriorating financial and

operating performance and repeatedly downgraded Sears' credit ratings.

103.     Moody's Investors Service ("Moody's") downgraded Sears' issuer rating,

corporate family rating, and probability of default rating from Ba2 (which it had held since 2009)

to Ba3 in July 2011.  Moody's further downgraded Sears to B1 in December 2011 and then again

to B3 in January 2012.  In January 2014, Moody's again downgraded Sears to Caa1.  In

November 2014, Moody's revised its rating outlook to negative.  Moody's generally downgraded

Sears' senior secured debt to a rating one level above Sears' issuer rating.

104.     S&P downgraded Sears from BB- (which it had held since 2009) to B+ in May

2011.  S&P further downgraded Sears to B in November 2011 and CCC+ in January 2012.  S&P

revised its rating outlook to negative beginning in August 2012.

105.     Fitch Ratings ("Fitch") downgraded Sears' issuer rating to B in June 2011.  Fitch

further downgraded Sears to CCC in December 2011.  Fitch similarly downgraded Sears' senior

secured debt rating to BB in June 2011, to B+ in December 2011, to B in September 2012, to B-

in September 2013, and then CCC in September 2014.

106.     As Sears' CFO Rob Schriesheim conceded in a January 2012 email to other Sears

executives following the initial downgrades: "The rating agencies actually do have their facts

correct on our balance sheet and liquidity."  Schriesheim noted that Sears' year-end debt-to-

EBITDA ratio was at least 8x (even without counting billions of dollars of unfunded pension

obligations, which, Schriesheim admitted, "is debt" too).

107.    *Factors and credit insurers*.  As with other large retailers, Sears generally did not

pay its suppliers for goods on delivery.  Rather, it paid them a number of days later, giving Sears

an opportunity to sell the goods before paying for them.  Many suppliers rely on "factoring"—a

financial transaction in which the supplier sells its accounts receivable from Sears, at a discount,

to the third-party "factor"—in order to obtain prompt payment and transfer Sears' credit risk.

Alternatively, suppliers can purchase financial guaranties from credit insurers.

108.    Beginning in late 2011, factors and credit insurers began to raise serious concerns

about Sears' solvency, substantially increasing the fees or premiums they demanded from Sears'

suppliers, reducing or eliminating their willingness to take credit exposure to Sears, and/or

demanding pre-payment or collateral directly from Sears as a condition of continuing to work

with its suppliers.

109.    For example, in late 2011, CIT Group, Inc. ("CIT"), Sears' largest factor by

overall exposure and by the number of Sears suppliers as counterparties, began expressing

concerns about Sears' solvency and requested substantial non-public information about Sears'

financial and operating performance and its projections.  In December 2011, CIT's Chief Credit

Officer ("CCO") threatened Schriesheim that CIT would cease purchasing new Sears'

receivables entirely (unless Sears immediately paid down $70 million of CIT's existing

receivables).  In January 2012, CIT informed Sears that "we are withdrawing all credit lines

today and declining all existing orders currently on hold."  As Schriesheim explained, "CIT is

cutting us off."

38

110.    CIT was not alone.  Around the same time, Wells Fargo stopped its revolving credit line, Euler Hermes (a credit insurer used by important suppliers, such as Samsung) stopped taking up coverage of receivables from Sears, and ECIC (a credit insurer owned by the government of Hong Kong and used by important suppliers in Hong Kong as well as mainland China) greatly reduced its coverage.  In summarizing the various factor and credit insurer actions in January 2012, Schriesheim worried that Sears was facing a "run on the bank," noting that the cost of credit insurance to Sears' suppliers had risen to a level where it was "more expensive than the margins they derive from our business."

111.    Factors and credit insurers saw the Lands' End transaction for what it was.  For example, within hours of its announcement on October 29, 2013, CIT's CCO emailed Schriesheim as follows: "[A] spin-off of Land's End will clearly be viewed by unsecured creditors as a very negative event and I view this as confirmation that the core domestic business of Sears will be unable to ever generate positive cash flow from operation hence get it out before any fraudulent conveyance argument can be lodged in the future melt-down- I don't know how we can put any kind of positive spin on this when our Clients ask and they will."

112.    Following the Lands' End spinoff, other factors and credit insurers took negative action against Sears in the second half of 2014 and the first half of 2015.  By mid-2015, prior to the Seritage transaction, at least two credit insurers (Coface and Atradius) had cut their Sears coverage lines entirely, and—in Sears' own assessment—"most" U.S. and international credit insurers were "not responding to vendors' request[s]."

113.    These concerns from factors and credit insurers indicated not only a belief that there was a high risk that Sears was insolvent, but also a belief that Sears' insolvency could materialize so imminently as to result in a failure to pay trade receivables due within 60 days or

less.  Such concerns were closely monitored by Schriesheim and two of his direct reports and escalated by Schriesheim to Lampert and other members of the Board.

114.    ***Suppliers***.  As a result of the increasing costs of factoring and credit insurance, as well as independent suppliers' concerns about Sears' solvency, Sears' suppliers contracted their trade credit to Sears.  Since FY 2009, Sears' Days Payables Outstanding ("DPO")—an aggregate measure of the average number of days Sears was able to defer vendor payments—had been significantly below that of Sears' peer group and generally declining.  The decline in Sears' DPO from FY 2010 to FY 2014 represented a loss of more than $200 million of trade credit from suppliers of goods.  The decline in DPO was due to demands from suppliers for more favorable payment terms.  Other suppliers ceased taking orders from Sears, forcing Sears to find replacements or to discontinue certain product lines.

115.    In the words of former Sears executive Lynn Walsh: "The suppliers wanted to shorten payment terms as our credit and financial standing became less stable.  It got to the point of being absurd.  It was like, wink wink, nod nod.  Oh yeah, we're going to grow 2% next year.  Ha ha.  Given last year we decreased double digits.  I ended up leaving, because I had no integrity anymore.  I was trying to negotiate on the promise that we've got a plan to grow the business, knowing that was never going to happen."

116.    ***PBGC***.  Prior to the Lands' End and Seritage transactions, the PBGC—a federally chartered corporation that insures private defined-benefit pension plans—had serious concerns about Sears' solvency and ability to pay its unfunded pension obligations.

117.    Based on these concerns, by no later than March 2014, the PBGC sent Sears a set of detailed information requests for non-public information.  Among other things, the PBGC asked about Sears' "long-term business plan," the "spinoffs" and "dispositions" "currently under

consideration" (specifically including Lands' End), and the value of Sears' real estate. The

PBGC requested that Sears provide this information by April 2, 2014—which was prior to the

closing date of the Lands' End spinoff.

118.    By no later than July 30, 2014—well before the Seritage transaction—the PBGC

had communicated to Sears its view that "the risk of loss to PBGC is *great and increasing*"

(emphasis added). The PBGC explained that its view was based on "a number of factors,

including [Sears'] operating losses, the significant uncertainty around the Company's business

plan, and accelerating cash-burn rates, which could result in a near-term liquidity issue." As a

result, the PBGC said, "we believe we must act now."

119.    Under the Employee Retirement Income Security Act of 1974 (ERISA), the

PBGC is authorized to file litigation to terminate a pension plan if it expects to incur

unreasonable losses with respect to the plan. By no later than August 2014, the PBGC had

threatened Sears with litigation unless Sears agreed to begin negotiating the provision of

additional security to its pension plans. Sears initially asked the PBGC to detail its views in a

letter, but then reversed course and asked the PBGC *not* to put its position in writing.

120.    If the PBGC had sued, its concerns about Sears' solvency would have been made

public. Instead, while the PBGC and Sears negotiated, the PBGC's concerns were kept secret.

In September 2015—after the closing of the Seritage transaction—Sears disclosed that it had

signed a term sheet with the PBGC and in March 2016 the PBGC and Sears announced a

settlement that granted the pension plans rights with respect to certain of Sears' real estate, with

an appraised value of approximately $890 million, as well as the subsidiary holding the

Company's primary intellectual property assets (such as Kenmore, Craftsman, and DieHard).

This arrangement—ring-fencing valuable Sears assets for the protection of the plans and the

PBGC—reduced Sears' available collateral to borrow for general corporate purposes.

**D.    Sears' Unrealistic, Bad-Faith Projections of Future Performance**

121.    Despite Sears' declining financial performance, troubling trends in operating

performance, and third-party concerns about Sears' solvency, at Lampert's insistence, Sears

continued to produce financial projections assuming an immediate and dramatic turnaround in its

performance.  These projections were not adopted in good faith.  After years of missed

projections, by the time of the Lands' End and Seritage transactions, the Culpable Insiders knew

there was no chance that the projections upon which all analyses of the appropriateness of the

transactions were based could be achieved.

**1.    Sears' Top-Down, "Aspirational" Planning Process**

122.    Sears' fiscal year ends on or around January 31.  Prior to the beginning of each

fiscal year, Sears' management presented a "Plan" to Sears' Board with projections of future

performance.  From the merger through FY 2012 (the year beginning February 1, 2012),

management presented a "Three Year Plan."  Since Lampert became CEO in early 2013 (prior to

FY 2013), management stopped preparing three years of projections in the ordinary course,

limiting projections to an annual basis.  During Lampert's tenure, in or around January of each

year, Sears' management presented the Board with a "Plan Update" or "Plan Review"

(hereinafter referred to as the "Annual Plan") for the upcoming fiscal year.

123.    Those Annual Plans set top-down goals for annual financial performance

established directly by Lampert.  These top-down goals, or "targets," consistently bore no

relationship to Sears' past performance or any realistic prospect of future performance, and were

instead set arbitrarily based upon the amount of revenue and operating profits management

believed would be needed to cover operating costs, interest, and other expenses, and to achieve a

desired level of return on capital for the Company's shareholders.  In other words, the targets
were purely aspirational.

124.    Those top-down goals were then "allocated" to Sears' various business units, and
each business unit was tasked with developing or identifying "initiatives" that would allow the
business unit to achieve the goal allocated to it by the Annual Plan.  The identification of those
initiatives was driven by the need—indeed, the mandate—to achieve the top-down goals, rather
than by the business unit's realistic projection of what could be achieved in the upcoming year.

125.    The business units consistently fell short of identifying (or successfully
implementing) initiatives that would, even if successful, achieve their allocated goals.  As a
result, the Annual Plans were replete with "unidentified initiatives"—characterized by the
Annual Plans themselves as "go-gets"—and associated revenue and related goals that were
attributed to specific business units.  In addition, these business unit goals, in aggregate, often
fell far short of the corporate-level Annual Plan target, leaving an unallocated "gap."

126.    During FY 2012 through FY 2015, significant portions of the Annual Plan targets
were not supported by identified business unit initiatives (again, even assuming that the
initiatives would be successful).  In FY 2012, 19% of Sears' year-over-year Earnings Before
Interest, Taxes, Depreciation, Amortization, and Pension Expense ("EBITDAP") improvement
goal was based on these gaps or go-gets.  In FY 2013, 49% of the year-over-year EBITDAP
improvement goal was attributed to gaps or go-gets.  In FY 2014 (prior to the Lands' End
spinoff), 39% of the year-over-year EBITDAP improvement goal was attributed to go-gets or
other gaps.  And in FY 2015 (prior to the Seritage transaction), 49% of the year-over-year
EBITDAP improvement goal was attributed to gaps or go-gets.



127.    In the FY 2014 Annual Plan, for example, the combined business unit plans were $200 million below the $1.4 billion corporate target, and those business unit plans themselves included $480 million of go-gets or unidentified initiatives.  Thus, of the $1.4 billion target, $680 million—nearly 50%—was unsupported and unexplained by any identified business initiative. One slide in the FY 2014 Annual Plan summarized these facts as follows:

## 2014 Plan Submissions – Risks/Unidentified Initiatives/Go Gets

**2014 BU Submissions of $1.2B includes unidentified Initiatives/Go Gets of $480M:**

**2014 Member Plan of $1.4B:**

- Member Plan basis for non-members is the BU's submission decline of -1.2% to last year

- 2013 YOY non-member revenue decline of -33%

- Assuming a YOY non-member revenue decline of -20%, resulting in an EBITDA risk of approximately $400M

### 2.    The Consistent and Material Discrepancy Between Projections and Reality

128.    As a result of this bad-faith planning process, it is no surprise that, for the period FY 2012 to the Petition Date, Sears' actual performance never came close by any significant metric to meeting the projections set forth in its Annual Plans.  Every year, Sears' Annual Plan would project that its revenue and gross margins would increase; yet, every year, revenue and gross margins would continue to decrease.  Similarly, every year, Sears' Annual Plan would project that EBITDAP would turn from negative to positive, yet every year, Sears' EBITDAP not only remained negative, but worsened significantly from the previous year.

129.    The same is true of the multi-year projections provided to Duff & Phelps and used for the various "solvency analyses" that Duff & Phelps performed for the October 2012 SHO rights offering and November 2012 Sears Canada partial spinoff, the April 2014 Lands' End spinoff, and the July 2015 Seritage transaction, as discussed in greater detail below.  Those multi-year projections predicted that revenue, gross margins, and EBITDAP would grow and continue to grow, when in reality those metrics continued to decline and/or remain negative.

130.  **Revenue**.  From FY 2012 to FY 2017, Sears' actual annual revenue has consistently been $3–4 billion short of the projections in Sears' Annual Plans.  Almost every year, Sears projected that its revenue for the next year would be *higher* than its revenue for the prior year, yet, every year, Sears' revenue in fact was *lower*.  This is so even when the prior years include revenue from businesses that were spun off (and thus would no longer contribute to Sears' revenue).  And Sears' actual revenue has fallen even further short of Sears' even more optimistic multi-year projections that were provided to Duff & Phelps as support for its solvency opinions.



131.  **Gross Margin**.  Sears' actual gross margins also have consistently fallen $2–3 billion short of Sears' annual projections.  As with revenue, Sears projected every year that its gross margins for the next year would *grow* relative to the prior year, yet, every year, Sears' gross margins continued to *shrink*.  And, as with revenue, the multi-year projections given to Duff & Phelps were even more aggressive (and missed even more dramatically).



132. ***EBITDAP and EBITDAP margin***. Sears' EBITDAP and EBITDAP margin

projections also failed to reflect reality. For FY 2013 to FY 2017, Sears projected that it would

retain *positive* EBITDAP and *positive* EBITDAP margin. Yet, in each of those years, Sears'

EBITDAP and EBITDAP margin were *negative*. For example, in FY 2013, Sears projected that

it would have *positive* $1.4 billion of EBITDAP, when in reality it actually had *negative* $340

million of EBITDAP. And whereas the annual projections at least acknowledged that EBITDAP

and EBITDAP margin might decline (while remaining positive), the multi-year projections that

Sears provided to Duff & Phelps generally projected a continued *increase* in EBITDAP and

EBITDAP margin.





**3.** **The Culpable Insiders' Knowledge that the Projections Were Unachievable**

133. Sears' bad-faith Annual Plans failed to account for, among other things, (i) Sears'

declining financial performance, (ii) store closures and spinoffs of profitable businesses,

(iii) declining capital expenditures, (iv) increasing competition and declining market share,

47

(v) the abject failure of SYW, and (vi) solvency concerns from suppliers and the PBGC.  In light

of all these facts, as discussed above, it was grossly unrealistic to project that revenue, gross

margin, and EBITDAP would somehow suddenly improve.

134.    The materiality and consistency of the discrepancies between Sears' projections

and its actual results cannot be explained by random chance or unforeseen circumstances.  By the

time of the Lands' End and Seritage transactions in 2014 and 2015, Sears had fallen short of its

Annual Plan projections since at least FY 2010.  During those years, Sears had missed most of

the targets in its Annual Plans for (among other key performance indicators) revenue, gross

margin, and EBITDAP.  And not just by a hair: Sears had missed its revenue targets by between

9.9% and 12.9%; gross margin targets by between 12.4% and 21.7%; and EBITDAP targets by

between 52.6% and 152.2%, all material amounts.

135.    As a result, by the time of the relevant transactions, the Culpable Insiders could

not have reasonably or in good faith expected that Sears would achieve the performance levels

projected.  And, knowing that these unrealistic projections were the basis for Duff & Phelps'

solvency opinions, the Culpable Insiders could not have relied upon those opinions in good faith.

136.    In interviews with counsel for the Subcommittee, witness after witness admitted

that the Annual Plans reflected management's aspirations rather than what was realistically

anticipated.  For example, Robert Schriesheim, the CFO until May 2016, admitted the Annual

Plans had a "high degree of execution risk" and "were a pretty aggressive stretch."  According to

Schriesheim, the "philosophy" of the Annual Plans was "aspirational in nature to drive an

outcome."  Kamlani similarly admitted that "it was not lost on the [B]oard that the company was

in a pattern of constantly missing its forecasts."  In the words of the lead Duff & Phelps

representative, Sears' numbers were "woefully short of forecasted performance," and Sears "had

48

a terrible history of performing against projections"—in other words, a "history of not meeting

their projections." A representative from Centerview also noted that it "had formed a view that

[Sears] was consistently missing its projections." As Robert Riecker, who succeeded

Schriesheim as CFO, candidly explained, "you are not going to plan to lose money."

**E.    Lampert and ESL Face Increasing Redemption Pressure from ESL's Investors**

137.    In Q1 2005, following the Kmart/Sears merger, ESL had assets under

management ("AUM") of more than $11 billion. ESL's AUM peaked at more than $16 billion

in Q2 2007, primarily due to Sears' stock price increase. During that stock price rise—which

was driven, in large part, by stock buy-backs that cost Sears approximately $5 billion—ESL

pocketed more than $1.9 billion in "performance fees" from its investors (in addition to

"management fees" of 1% or 2% of AUM).[4] But those early returns did not last. According to

*Institutional Investor*, ESL has suffered annualized losses averaging 6% per year beginning in

2005.

138.    As its losses mounted, ESL faced increasing demands for redemptions from its

investors. According to news reports, notable redeeming investors include: billionaire Michael

Dell (the founder of Dell Technologies); billionaire entertainment mogul David Geffen, who

withdrew the last of his funds in 2007; and the heirs of the Ziff Davis Publishing Company, who

withdrew their funds between 2011 and 2013. After a five-year "lockup" expired at the end of

2012, ESL was forced to redeem nearly $3.5 billion in 2013 from investors advised by Goldman

Sachs. As a result, during 2011, 2012, and 2013, ESL made in-kind distributions of Sears'

shares (as well as AutoNation, Inc., Orchard, and SHO shares) to meet investor redemptions.

---

[4]    ESL also pocketed an additional $135 million in performance fees in 2013 as a result of Sears' 20.8% stock
price increase during that year.

139.    Due to the combined effect of redemptions and Sears' stock price drop, by the
time of the Lands' End spinoff (2Q 2014), ESL's AUM had fallen to $2.5 billion; by the time of
the Seritage transaction (3Q 2015), $1.6 billion.[5]  As a result of this drop, ESL's revenue from
fees declined substantially.



140.    These increasing demands for redemptions by ESL's investors put pressure on
Lampert to find ways to deliver returns to shareholders.  Because Lampert was unable to
improve Sears' performance, and because Sears was unable to fund further stock buy-backs,
Lampert's attention turned to spinoffs and rights offerings.

---

[5]    ESL's AUM follows a conventional fiscal year that is equal to the calendar year (*i.e.*, January 1 to December
31), unlike Sears' fiscal year (running from February 1 to January 31).

141.    By 2011 and 2012, having failed to return Sears to profitability, the Culpable
Insiders were looking for opportunities to spin off Sears' assets to shareholders.  Beginning in
2012, Lampert convened weekly meetings of Sears' high-level executives to discuss potential
dispositions of so-called "non-core" assets.  That group eventually oversaw each of the major
dispositions of assets that followed, including the transactions at issue.

### The Fraudulent Transfers

142.    In the face of Sears' rapidly deteriorating performance and increasing demands
for redemptions by ESL's investors, Lampert and the other Culpable Insiders began a scheme to
strip Sears of assets.  The scheme ultimately included five transactions that were consummated:
(i) the December 2011 Orchard spinoff; (ii) the October 2012 SHO rights offering; (iii) the
November 2012 Sears Canada partial spinoff; (iv) the April 2014 Lands' End spinoff; and (v) the
July 2015 Seritage transaction.

143.    Lampert and the other Culpable Insiders created a false record to conceal the
fraudulent nature of these transactions.  This included causing reviews of certain of these
transactions by committees of independent directors based on solvency opinions by Duff &
Phelps that were premised on the unrealistic projections.  These processes failed to protect, and
indeed ignored, the interests of creditors.

**A.**    **The December 2011 Orchard Spinoff Wrongfully Transferred
More Than $133 Million of Value from Sears to Its Shareholders.**

144.    The Orchard spinoff was the first step in Lampert's plan to strip Sears of assets.

145.    Orchard was a regional home improvement retailer with 89 stores, all located in
California.  Orchard was acquired by Sears Roebuck in 1996.  In 2005, Sears Roebuck sold a
19.9% stake in Orchard to Ares Capital Management ("Ares"), a hedge fund, retaining the
remaining 80.1%.

146.    At the time of the spinoff, Orchard was profitable, much more so than the rest of Sears.  Indeed, Orchard had posted positive EBITDA each and every year since its initial public offering in 1993.  Orchard had also posted an EBITDA margin of between 10.5% and 12.6% every year since the Kmart/Sears merger.  Orchard had earned profits of $8.7 million in FY 2010, the fiscal year prior to the spinoff.

147.    Sears had been planning a spinoff of Orchard since at least April 2010, when it made a formal request for a private letter ruling from the IRS that the spinoff would be tax free.  Yet, in that time, Sears never pursued a third-party sale of Orchard.

### 1.    Sears Received No Consideration for the Orchard Spinoff.

148.    In December 2011, Sears spun off its entire 80.1% common stock and 100% preferred stock stake in Orchard as a dividend to its shareholders for no consideration.  Each Sears shareholder received 0.045163493 Orchard common class A shares and 0.045163493 Orchard preferred shares per share of Sears held.  After the spinoff, Lampert and ESL held 48% of Orchard common stock; Ares, 19.9%; Fairholme, 12.2%; Tisch, 3%; and other public shareholders, 15.9%.  After the spinoff, Lampert and ESL also held 61.2% of Orchard preferred stock; Fairholme, 15.2%; Tisch, 3.7%; and other public shareholders, 19.9%.

149.    Based on its market capitalization after its first day of trading (December 31, 2011), including both common and preferred shares, Orchard was worth at least $161 million.

### 2.    The Culpable Insiders Acted with Fraudulent Intent.

150.    The Orchard spinoff was approved by a Board that included Lampert, Mnuchin, and Tisch.  These Culpable Insiders acted with the intent to hinder, delay, and defraud Sears' creditors through the Orchard spinoff.  This intent can be inferred from several traditional "badges of fraud."

52

151.    *First*, the transfer was to insiders.  The Culpable Shareholders owned approximately 80.1% of Sears' stock, and thus received nearly 64.2% of Orchard common stock, and 80.1% of Orchard preferred stock.  Specifically, Lampert and ESL owned 61.2% of Sears' stock, Fairholme owned 15.2% of Sears' stock, and Tisch owned 3.7% of Sears' stock.  Thus, Lampert and ESL received Orchard stock worth at least $81 million, Fairholme received Orchard stock worth at least $20 million, and Tisch received Orchard stock worth at least $5 million.  In total, the Culpable Shareholders received at least $106 million in value from the Orchard spinoff.

152.    *Second*, Lampert and ESL (and William Crowley of ESL) received special rights under a shareholders' agreement between ESL, Lampert, Crowley, Ares, and Orchard.  These rights included: (i) a right of first offer should Ares seek to sell its shares; (ii) a "tag-along" right should Ares sell its shares to a third party; (iii) a "drag-along" right should ESL arrange a sale of a large percentage of Orchard's shares to a third party; (iv) preemptive rights with respect to Orchard's future debt offerings; (v) registration rights with respect to certain unregistered securities that ESL might acquire; and (vi) the right, along with Ares, to approve the composition of the boards of Orchard's subsidiaries and its annual budget.  These rights were *not* enjoyed by the other shareholders of Sears who received shares of Orchard in the spinoff.

153.    *Third*, Sears received no consideration in the spinoff.  The shareholders paid nothing to Sears in exchange for the Orchard stock that they received.

154.    *Fourth*, the transfer was unusual and not in the ordinary course of business.

155.    *Fifth*, the Orchard spinoff was not an isolated transaction, but rather the first step in an ongoing scheme to transfer Sears' most valuable assets to the Culpable Shareholders at the expense of Sears' creditors.  At the time of the Orchard spinoff, the Culpable Insiders already intended to continue with future transactions (including the SHO rights offering, the Sears

Canada partial spinoff, the Lands' End spinoff, and the Seritage transaction) that would take

Sears past the point of insolvency. In the aggregate, the contemplated transactions that were part

of this scheme would result in the divestiture of a substantial percentage of Sears' assets.

**B.**     **The October 2012 SHO Rights Offering Wrongfully Transferred
At Least $231 Million of Value from Sears to Its Shareholders.**

156.    The Orchard spinoff was followed by the SHO rights offering. The SHO rights

offering was a further step in the same scheme to divest a declining Sears of its valuable assets.

157.    SHO was a wholly owned direct subsidiary of Sears. SHO operated stores that

sold appliances and tools under Sears' brands. SHO stores were generally smaller than Sears'

other stores and did not carry the full line of Sears products.

158.    At the time of the spinoff, SHO was profitable, much more so than the rest of

Sears. SHO had annual EBITDA of approximately $80 million. In mid-2012, Duff & Phelps

valued SHO in the range of $345 million to $435 million.

**1.**     **The SHO Subscription Rights Were Transferred
from Sears to Sears' Shareholders for No Consideration.**

159.    Sears filed a registration statement on Form S-1 for 23.1 million shares, or 100%,

of common stock of SHO on April 30, 2012. Sears also created 105,919,089 rights to purchase

shares of SHO (the "SHO Rights"). The SHO Rights gave their holders the option to purchase

0.22 shares of common stock of SHO at an exercise price payable to Sears of $15 per share.

160.    Sears distributed all 105,919,089 of the SHO Rights to its shareholders on

September 7, 2012, of which approximately 80.8% were given to the Culpable Shareholders.

The shareholders did not pay Sears any consideration in exchange for the SHO Rights.

161.    The SHO Rights were valuable securities. Between September 12 and October 2,

2012, the SHO Rights traded on NASDAQ. The volume-weighted average trading price of the

SHO Rights over this period was $2.18 per right. Based on this price, the 105,919,089 SHO

Rights were worth at least $231 million.  As reflected in contemporaneous Board minutes, the

SHO Rights were intended to have a substantial positive trading price.

162.    In fact, the value transferred was substantially higher.  After its first day of

trading, SHO had a market capitalization of $709 million.  The shareholders paid aggregate

consideration of $346.5 million to exercise the SHO Rights, implying a transfer of $362 million

from Sears to its shareholders.

### 2.    The Culpable Insiders Acted with Fraudulent Intent.

163.    The SHO rights offering was approved by a Board that included Lampert,

Mnuchin, and Tisch.  These Culpable Insiders acted with the intent to hinder, delay, and defraud

Sears' creditors through the SHO rights offering.  This intent can be inferred from several

traditional "badges of fraud."

164.    *First*, the transfer was to insiders.  The Culpable Shareholders owned nearly

80.8% of Sears' stock, and thus received nearly 80.8% of the SHO Rights.  Specifically, Lampert

and ESL owned 62% of Sears' stock, Fairholme owned 15.1% of Sears' stock, and Tisch owned

3.6% of Sears' stock.  Thus, based on the trading price of the rights (the more conservative

measure), Lampert and ESL received SHO Rights worth at least $144 million, Fairholme

received SHO Rights worth at least $35 million, and Tisch received SHO Rights worth at least

$8 million.  In total, the Culpable Shareholders received SHO Rights worth at least $187 million

(based on the trading price of the rights) or $226 million (based on the difference between the

stock price after the first day of trading and the subscription price).

165.    *Second*, Sears received no consideration for the distribution of the SHO Rights

and inadequate consideration for the exercise of the SHO Rights.  (Sears received a pre-spin

dividend of $100 million, but that dividend was paid with the proceeds of a draw on a $250

55

million Senior ABL Facility, collateralized by the assets of SHO.  The assets of SHO, as a
wholly owned subsidiary, already belonged to Sears.)

166.    *Third*, the transfer was unusual and not in the ordinary course of business.

167.    *Fourth*, the SHO rights offering was not an isolated transaction, but rather a
continued step in an ongoing scheme to transfer Sears' most valuable assets to the Culpable
Shareholders at the expense of Sears' creditors.  At the time of the SHO rights offering, the
Culpable Insiders had already completed the Orchard spinoff and intended to continue with
future transactions (including the Sears Canada partial spinoff, the Lands' End spinoff, and the
Seritage transaction) that would take Sears past the point of insolvency.  In the aggregate, the
contemplated transactions that were part of this scheme would result in the divestiture of a
substantial percentage of Sears' assets.

168.    *Fifth*, the SHO rights offering was premised on unrealistic, bad-faith projections
of Sears' future performance.  Sears retained Duff & Phelps to provide a solvency opinion to
support the transaction.  Duff & Phelps was provided with projections from management
regarding Sears' performance (the "2012 Solvency Projections").  These 2012 Solvency
Projections—which were not done in the ordinary course, but instead to justify the SHO
transaction—predicted, incredibly, that revenue, EBITDAP, and EBITDAP margin, which had
been declining, would instead begin to grow through 2017.

| SHO & Sears Canada Solvency Projections - Provided by Sears to D&P | | | |
|---|---|---|---|
| | **FY12** | **FY13** | **FY14** |
| Revenue | $ 34,225 | $ 34,678 | $ 36,066 |
| Gross Margin | $ 12,689 | $ 13,047 | $ 13,749 |
| EBITDAP | $    901 | $  1,400 | $  1,997 |
| EBITDAP Margin | 2.6% | 4.0% | 5.5% |

169.    Sears' actual results fell dramatically short of the projections.  Rather than turning

around, revenue steadily fell; and EBITDAP and EBITDAP margin fell and remained negative.

The material deviations of Sears' actual results from the 2012 Solvency Projections already were

known by the time of the Lands' End spinoff (with respect to FY 2012 and FY 2013) and by the

time of the Seritage transaction (with respect to FY 2012, FY 2013, and FY 2014).









170.    A Credit Suisse analyst concluded in February 2012 (after the SHO spinoff was announced) that Lampert was stripping valuable assets from a failing venture:

> The actions taken last week once again show the brilliance of Eddie Lampert, as he took control of what still may turn out to be an unwinnable situation. Effectively, we read his multiple announcements as saying: I now see that returning to positive operating cash flow levels is likely impossible, so let me keep the ship afloat while I dispose of the dinnerware and other valuable items before abandoning. (Our interpretation).  The company needs to portray an image of stability even as the assets leave through the back door as that is the best way to maximize asset values.  It will likely end badly, but by delaying that, the company can take out many of the valuable assets.

171.    The next month, Credit Suisse again remarked: "Over time, selling off the profitable assets is unlikely to be a winning strategy.  Sears already announced that it is spinning off 20% of its EBITDA later this year [with SHO], and if it sells Lands' End, that may represent a large part of its remaining US EBITDA.  Combined with selling some of its best locations, one has to wonder why they are digging the turnaround hole deeper before attempting to climb out, unless they are not planning that climb."

**C.    The November 2012 Sears Canada Spinoff Wrongfully Transferred More Than $500 Million of Value from Sears to Its Shareholders.**

172.    The Orchard spinoff and the SHO rights offering were followed by the Sears Canada partial spinoff.  The Sears Canada partial spinoff was yet another step in a continued scheme to divest a declining Sears of its valuable assets.

173.    Prior to the spinoff, Sears indirectly owned 95.5% of Sears Canada (through Sears Roebuck and certain of its subsidiaries).  The remaining 4.5% was publicly traded on the Toronto Stock Exchange (TSX:SRSCQ).

### 1.  Sears Received No Consideration for the Sears Canada Spinoff.

174.    In November 2012, Sears spun off 44.5% of Sears Canada, or 44,335,560 shares of Sears Canada, to its shareholders.  Sears' shareholders paid no consideration to Sears for the Sears Canada shares.  This reduced Sears' remaining stake in Sears Canada to just 51%.

175.    Based on the trading price of the minority stake on the day before the spinoff was announced (May 16, 2012), the 44.5% stake was worth at least $621 million.  Based on the trading price of the minority stake on the day before the final approval of the spinoff was obtained by the Sears' Board (October 21, 2012), the 44.5% stake was still worth at least $501 million.

176.    Despite analyses from Sears' tax advisors suggesting that a pre-spin dividend by Sears Canada would have significant tax benefits (including an opportunity to utilize either the foreign tax credit or Sears' net operating loss), Sears Canada did not pay *any* pre-spin dividend.  Instead, just two months *after* the spinoff, on December 31, 2012, Sears Canada paid a $102 million dividend.  If this dividend had been paid before the spinoff, 95.5% of it would have been paid to Sears (and 4.5% to Sears Canada's public shareholders).  Instead, because the dividend was paid after the spinoff, only 51% of the dividend was paid to Sears.  The value representing the difference between 51% and 95.5% was instead paid to Sears' shareholders (who became Sears Canada's shareholders as a result of the partial spinoff).  The primary beneficiaries were Lampert and ESL, followed by Fairholme and Tisch.

### 2.  The Culpable Insiders Acted with Fraudulent Intent.

177.    The Sears Canada partial spinoff was approved by a Board that included Lampert, Mnuchin, and Tisch.  These Culpable Insiders acted with the intent to hinder, delay, and defraud Sears' creditors through the Sears Canada partial spinoff.  This intent can be inferred from several traditional "badges of fraud."

178.     *First*, the transfer was to insiders.  The Culpable Shareholders owned 81.2% of

Sears' stock, and thus personally received 81.2% of the distribution, or nearly 36.3% of the

equity in Sears Canada.  Specifically, Lampert and ESL owned 61.8% of Sears' stock, Fairholme

owned 15.8% of Sears' stock, and Tisch owned 3.6% of Sears' stock.  Thus, Lampert and ESL

received stock in Sears Canada worth at least $385 million, Fairholme received stock in Sears

Canada worth at least $99 million, and Tisch received stock in Sears Canada worth at least $23

million.  In total, the Culpable Shareholders received at least $507 million in value from the

Sears Canada partial spinoff.

179.     *Second*, Sears received no consideration for the Sears Canada shares.

180.     *Third*, the transfer was unusual and not in the ordinary course of business.

181.     *Fourth*, the Sears Canada partial spinoff was not an isolated transaction, but rather

a continued step in an ongoing scheme to transfer Sears' most valuable assets to the Culpable

Shareholders at the expense of Sears' creditors.  At the time of the Sears Canada partial spinoff,

the Culpable Insiders had already completed the Orchard spinoff and the SHO rights offering and

intended to continue with future transactions (including the Lands' End spinoff and the Seritage

transaction) that would take Sears past the point of insolvency.  In the aggregate, the

contemplated transactions that were part of this scheme would result in the divestiture of a

substantial percentage of Sears' assets.

182.     *Fifth*, the Sears Canada partial spinoff was premised on unrealistic, bad-faith

projections of Sears' future performance.  For the Sears Canada partial spinoff, Duff & Phelps

undertook only minor updates to its solvency analysis for the SHO rights offering, essentially

updating the analysis to account for the SHO transaction.  As with the SHO rights offering, Duff

& Phelps continued to predict, unrealistically, that revenue, EBITDAP, and EBITDAP margin, which had been declining, would instead begin to grow through 2017.

**D.    The April 2014 Lands' End Spinoff Wrongfully Transferred More Than $1 Billion of Value from Sears to Its Shareholders.**

183.    The April 2014 Lands' End spinoff also constitutes a fraudulent transfer and an illegal dividend.  The Lands' End spinoff transferred the common stock of the Lands' End business (worth more than $1 billion at the time) from Sears to its shareholders, the largest of whom were the Culpable Shareholders.  The shareholders paid Sears no consideration for Lands' End.  The transaction left Sears unable to pay its debts and with unreasonably small capital.

184.    Lands' End is a multi-channel retailer of casual clothing, accessories, and home products.  Sears acquired Lands' End in June 2002 for $1.86 billion.  Sears owned Lands' End indirectly through Sears Roebuck, its wholly owned subsidiary.  Because of its strong cash flow and profitability (particularly in comparison to Sears' other business units), Lands' End was one of Sears' "crown jewels."[6]  In 2012, for example, Lands' End had revenue of $1.6 billion (including net debt) and gross margin of $704.1 million.

**1.    Lampert Insists on a Spinoff to Benefit Shareholders, Rather than Alternatives that Would Have Generated More Proceeds for Sears.**

185.    The Non-Core Committee began planning a potential spinoff of Lands' End in 2012.  Despite planning the Lands' End spinoff for at least two years, Sears never seriously pursued any alternatives, including a third-party sale of Lands' End, which would have maximized the proceeds to Sears and left such proceeds available to creditors.  Nor did Sears engage an investment banker to conduct a sale process or obtain an independent valuation.  As

---

[6]    Suzanne Kapner, "Sears Weighs Spinoff of Lands' End; Move Could Unlock Value as Company Struggles with Its Sears and Kmart Chains," *The Wall Street Journal*, Oct. 30, 2012.

Lampert told counsel for the Subcommittee, there was speculation "that [Sears was] shopping around Lands' End, which was never true."

186.    As Lampert and other insiders knew, prospective buyers existed.  On January 9, 2014, Sears received an unsolicited indication of interest from Leonard Green & Partners and the Tommy Hilfiger investment group ("LGP/TH").  LGP/TH stated that they were "highly interested" in investing in Lands' End, which they valued at $1.6 billion (including net debt). LGP/TH proposed a "sponsored spin" transaction that would give LGP/TH a 25% stake in Lands' End (alongside Sears' shareholders) and deliver proceeds of either $850 million or $1 billion (depending on the transaction structure) to Sears.

187.    Lampert summarily rejected this opportunity.  Just six days later, Lampert personally told LGP/TH that the proposed transaction was a "non-starter"—not because it failed to maximize proceeds to Sears, but because it would have diluted his and ESL's stake in Lands' End relative to a non-sponsored spin.  As Schriesheim (Sears' then-CFO) explained to another Sears employee at the time, "[Lampert] was trying to optimize cash for [Sears] *while maximizing his (esl) equity stake* . . . because he knows that [Lands' End] is worth a great deal outside of [Sears]" (emphasis added).

188.    Ultimately, Lands' End was distributed to Lampert, ESL, and Sears' other shareholders for no consideration, following a pre-spin dividend from Lands' End of $500 million.  Lands' End's stock price on its first day of trading confirms that the standalone company (after paying the pre-spin dividend) was worth more than $1 billion.  Lampert and ESL, as the largest Sears shareholders, were by far the largest beneficiaries of the transaction, receiving Lands' End stock then worth at least $490 million.

189.    When asked by counsel for the Subcommittee why alternatives that would have

resulted in greater proceeds to Sears were not pursued, Lampert said the spinoff was "just a way

of separating the two companies" (which, of course, also would have been accomplished by a

third-party sale).  When pressed on the alternative of a sale, Lampert said Lands' End was spun

off, rather than sold, because it was valuable, and he wanted shareholders—of which, of course,

he and ESL were by far the largest—to enjoy that value.  As intended, that benefit to the

shareholders, however, was accomplished at the expense of the Company and its creditors.  In

Lampert's own words, he "didn't think hard about the creditors in the Lands' End deal."

**2.      Lampert Limits the Pre-Spin Dividend to Benefit the New Shareholders
of Lands' End, Including ESL and Himself, at the Expense of Sears.**

190.    Lampert also rejected suggestions to increase Lands' End's new borrowings in

order to support a larger pre-spin dividend.  After the transaction was announced, the lead banker

at Bank of America Merrill Lynch (the lead arranger for the new debt) suggested to Schriesheim

and Lampert that the transaction could deliver "significantly more cash to Sears."  The lead

banker advised that Lands' End could borrow 4.5x of its full year 2013 EBITDA and dividend

that same amount to Sears before the spinoff.  He further stated that this level of debt "would

NOT be considered overly aggressive by the debt markets—particularly if [Lands' End's] full

year 2013 EBITDA showed nice improvement over full years 2012 levels" (which it did).

191.    Lands' End's 2013 EBITDA (according to the Duff & Phelps solvency analysis)

was $141 million.  Thus, according to the lead banker's initial advice, Lands' End could have

paid Sears a pre-spin dividend of approximately $635 million.  Indeed, once Lands' End's strong

results for full year 2013 became known, Bank of America suggested that Lands' End could in

fact borrow an amount equal to 5.3x its 2013 EBITDA, which would have resulted in a pre-spin

dividend to Sears of approximately $747 million.  Instead, at Lampert's direction, Lands' End

borrowed only $515 million and paid a pre-spin dividend of only $500 million.

192.    Lampert overruled the lead banker's advice because following it would have

interfered with his ongoing scheme to loot Sears and decreased the value improperly transferred

to shareholders, particularly ESL and himself.

### 3.    The Lands' End Spinoff Left Sears and Sears Roebuck Insolvent on a Cash-Flow Basis.

193.    Sears and Sears Roebuck were insolvent on a cash-flow basis after the Lands'

End spinoff.  At the time of the Lands' End spinoff, Sears had existing debt obligations with an

aggregate principal amount of more than $3.8 billion.  Together with interest, Sears required

more than $4.7 billion (and more than $4.3 billion by 3Q 2018 alone) to pay off its debt.  The

schedule under which these obligations would come due was as follows:



194.    Sears' total cash and cash equivalents immediately after the Lands' End spinoff

(including the pre-spin dividend) were approximately $842 million.  Even *assuming* that Sears

used *all* of these funds for principal and interest payments (rather than to fund continued

operating losses, as actually occurred), Sears *still* would have required more than $3.4 billion of
*additional* free cash flow by 3Q 2018. Indeed, Sears would have required $841 million by 1Q
2016, another $363 million between 2Q 2016 and 1Q 2018, then $976 million in 2Q 2018,
followed by another $1.286 billion in 3Q 2018:



195.    Sears had no basis to expect to earn anything close to what it needed. After the
Lands' End spinoff, it could not reasonably have expected to earn $841 million in free cash flow
by 1Q 2016 (when the asset-based loan ("<u>ABL</u>") came due). In reality, Sears ultimately saw free
cash flow of approximately *negative* $1.7 billion in FY 2014, *negative* $2.4 billion in FY 2015,
and *negative* $1.5 billion in FY 2016. After Lands' End, the only way Sears could have made
the ABL principal payment due in 1Q 2016 was by selling core assets. And that, of course, is
what Sears ultimately did, paying down the ABL with part of the proceeds of the Seritage
transaction (discussed in more detail below).

196.    But even with non-ordinary-course sales of core assets, after the Lands' End
spinoff, Sears could not reasonably have funded $4.3 billion in debt principal and interest
payments by 3Q 2018 (when the Second Lien Notes would come due). Not coincidentally, 3Q

2018 is when Sears ultimately filed for bankruptcy, with $89 million of the Second Lien Notes

outstanding (having repaid $946 million of Second Lien Notes—$936 million of which followed

the Seritage transaction—and exchanged $215 million of Second Lien Notes into other second

lien debt).

197.    In light of Sears' declining financial performance over the preceding years and the

numerous adverse qualitative trends, as detailed above, it was not reasonable to assume that

Sears could achieve the level of cash flow necessary for timely debt principal and interest

payment.  In the three immediately prior fiscal years to the Lands' End transaction, Sears had

failed to generate *any* cash flow from operations.  Nor did it generate *any* earnings to cover

interest expenses in the fiscal year immediately prior to the Lands' End transaction.  In that year,

Sears also had *negative* free cash flow of $1.4 billion and *negative* Adjusted EBITDA of $337

million.  And in the four immediately prior fiscal years, FYs 2010–2013, Sears had suffered a

cumulative net loss of $5.3 billion.

198.    Duff & Phelps, the valuation advisor hired to opine on Sears' solvency at the time

of the spinoff, opined that Sears was solvent only by adopting management's speculative top-

down projections about future performance.  Specifically, Duff & Phelps was provided with

three-year projections created by management for FY 2014 through FY 2016, which Duff &

Phelps extrapolated into five- and ten-year projections  (the "2014 Solvency Projections").  The

first projection year was prepared in accordance with the top-down planning process described

above.  The latter two years of projections were, as Duff & Phelps knew, prepared solely for

Duff & Phelps' opinion, rather than for any ordinary course business purpose.

| Lands' End Solvency Projections - Provided by Sears to D&P | | | |
|---|---|---|---|
| | **FY14** | **FY15** | **FY16** |
| Revenue | $ 33,420 | $ 34,927 | $ 36,041 |
| Gross Margin | $ 12,132 | $ 12,832 | $ 13,467 |
| EBITDAP | $ 1,237 | $ 1,884 | $ 2,410 |
| EBITDAP Margin | 3.7% | 5.4% | 6.7% |

199.    The 2014 Solvency Projections were unrealistic and unreasonable.  In the base case, Duff & Phelps assumed that revenue, gross margin, Earnings Before Interest, Taxes, Depreciation, Amortization, Rent Expense, and Pension Expense ("EBITDARP"), and EBITDAP would *increase* rather than continuing to *decrease* (and, in the case of EBITDAP, would turn *positive* instead of *negative*), and would continue to increase dramatically over the entire three-year projection period.





200.    Even in the sensitivity case, Duff & Phelps assumed that Sears' revenue decline would slow and then turn to growth and that EBITDAP and EBITDAP margin would become positive and increase (rather than remaining negative and continuing to decrease).





201.    In other words, even the "sensitivity" case assumed a substantial turnaround in Sears' profitability.  As detailed above, these optimistic assumptions were not supported by Sears' historical financial performance, by the initiatives included within Sears' FY 2014 Annual Plan, or by the prevailing conditions affecting Sears' operating performance.  Duff & Phelps did not consider the far more realistic likelihood that Sears' results would stay on the same downward track, or that they would, at best, stabilize at 2013 levels.

202.    Without these unwarrantedly optimistic assumptions, Sears would have had

*negative* free cash flow, and thus would be unable to make scheduled debt principal and interest

payments starting between 2014 and 2016.  Indeed, under Duff & Phelps' own sensitivity case at

the time of the Lands' End spinoff, Sears would have been unable to repay more than $2.2

billion of existing debt at maturity.  Duff & Phelps simply assumed, without explanation, that

Sears would be able to refinance that debt.

203.    Sears Roebuck was also insolvent on a cash-flow basis.  Sears Roebuck was a

guarantor for substantially all of Sears' debt, including $2.1 billion under the First Lien Credit

Agreement and $1.24 billion in Second Lien Notes.  And Sears Roebuck was also jointly and

severally liable for Sears' pension liabilities (on the order of $2 billion) as a member of a

"controlled group."  Sears Roebuck had less cash flow than Sears and many of the same

obligations as Sears.  Once Sears failed to pay its joint obligations with Sears Roebuck, Sears

Roebuck would also have also been unable to pay them.

**4.      The Lands' End Spinoff Left Sears and Sears
          Roebuck with Unreasonably Small Capital.**

204.    Sears and Sears Roebuck also had unreasonably small capital after the Lands' End

spinoff.

205.    As detailed above, Sears' multi-year performance leading up to the Lands' End

spinoff demonstrated that it was unable to generate sufficient profits to sustain operations or

adequately address existing liabilities.  Indeed, Sears could not generate *any* profits, and could

only temporarily sustain its operations by selling off core assets and falling further into debt.

206.    After the Lands' End spinoff, Sears had insufficient capital or reserves to account

for its normal business operations and to repay its existing debt load, much less sustain

operations through any difficulties likely to arise in its line of business, including general or

industry-wide economic downturn.  Sears was also left with insufficient capital or reserves even
to survive a continuation of established trends in its free cash flow, net sales, margins, and net
profits (losses).  Sears' projections that its performance would suddenly reverse in FY 2014—
just as Sears had incorrectly projected the year before (FY 2013), the year before that (FY 2012),
and the year before that (FY 2011)—were unreasonable.

207.    Indeed, if Duff & Phelps' sensitivity case performance projections were used in
Duff & Phelps' market multiples analysis, Sears would show an equity *deficit* of $3.1 billion.
Duff & Phelps calculated this equity deficit in the model within its work papers, but elected not
to present the result in its presentation.

208.    Sears Roebuck was also left with unreasonably small capital.  The CFO's
Certification to the board of directors of Sears Roebuck in support of the Lands' End transaction
showed that Sears Roebuck had total equity of $6.384 billion.  But that valuation relied upon an
$8.254 billion intercompany receivable due to Sears Roebuck, on information and belief, largely
or entirely from Sears.  Because Sears was insolvent and had unreasonably small capital, that
intercompany receivable was not collectable.  As a result, even this single correction reveals that
Sears Roebuck was also insolvent and also had unreasonably small capital.

**5.    The Culpable Insiders Acted with Fraudulent Intent.**

209.    The Lands' End spinoff was approved by a Board that included Lampert,
Mnuchin, Tisch, and Alvarez.  The Culpable Insiders acted with the intent to hinder, delay, and
defraud Sears and Sears Roebuck's creditors through the Lands' End spinoff.  This intent can be
inferred from several traditional "badges of fraud."

210.    *First*, the transfer was to insiders.  In Lampert's words, he wanted to give Lands'
End to "ourselves."  The Culpable Shareholders owned approximately 74.7% of Sears' stock,
and thus personally received approximately 74.7% of the equity of Lands' End.  Specifically,

70

Lampert and ESL owned 48.4% of Sears' stock, Fairholme owned 22.8% of Sears' stock, and Tisch owned 3.5% of Sears' stock. Thus, Lampert and ESL received Lands' End stock worth at least $490 million, Fairholme received Lands' End stock worth at least $231 million, and Tisch received Lands' End stock worth at least $36 million. In total, the Culpable Shareholders received at least $756 million in value from the Lands' End spinoff.

211.    *Second*, Lands' End comprised a significant percentage of Sears' EBITDA-producing assets. In FY 2012 (the last year in which Sears had positive EBITDA), Lands' End comprised 17.3% of Sears' EBITDA. The year before, FY 2011, Lands' End had comprised *a majority, 52.3%*, of Sears' EBITDA. Lands' End likely comprised an even higher percentage of Sears Roebuck's EBITDA-producing assets (assuming that Sears, Sears Roebuck, and Kmart all had positive EBITDA).

212.    *Third*, Sears and Sears Roebuck received no consideration in the spinoff. The shareholders paid nothing to Sears or Sears Roebuck in exchange for the Lands' End stock that they received. (As noted, the pre-spin dividend was paid with funds borrowed by Lands' End, which, as a wholly owned subsidiary, already belonged to Sears and Sears Roebuck.)

213.    *Fourth*, the transfer was unusual and not in the ordinary course of business.

214.    *Fifth*, as noted above, Sears and Sears Roebuck were insolvent prior to the transaction, or became insolvent as a result of the transaction, under the cash-flow test.

215.    *Finally*, the Culpable Insiders (and Duff & Phelps) knew or should have known that the 2014 Solvency Projections could not realistically be achieved. By this time, Sears had fallen short of the performance projections in its four immediately preceding Annual Plans, for fiscal years 2010 through 2013. Sears also had fallen short of the multi-year projections that had been submitted to Duff & Phelps in 2012 for its analysis of the SHO rights offering and Sears

Canada partial spinoff. These shortcomings were material. For example, Sears' actual

EBITDAP fell short of its Annual Plan projections by $900 million in FY 2012 and $1.7 billion

in FY 2013.

216. In the words of former Sears CEO Alan Lacy: "In 2014, with the Lands' End

spinoff, and then the Seritage spinoff . . . , that's when it seemed to shift into, [Lampert's]

managing for cash flow, or liquidation. Everybody knew how the movie was going to end. It

was just a question of how many minutes are left."

**E.    The July 2015 Seritage Transaction Wrongfully Transferred More Than
$649 Million to Seritage and More Than $399 Million to Sears' Shareholders.**

217. Ever since the Kmart/Sears merger, analysts and financial journalists have

speculated that Lampert's intentions for Sears involved some type of "real estate play." The

Seritage transaction, which closed in July 2015, proved them right.

218. The Seritage transaction constituted a fraudulent transfer and an illegal dividend.

The sale-and-lease-back agreement, and related agreements, between Sears and Seritage (the

"Sale-and-Lease-Back")[7] undervalued the real estate by hundreds of millions of dollars and

saddled Sears with grossly one-sided and costly lease terms, and the Seritage rights offering

transferred highly valuable subscription rights to Sears' shareholders (again, principally to the

benefit of the Culpable Shareholders) for no consideration.

219. *First*, Sears sold to the Seritage Defendants the title (or joint venture interests) for

the land under 266 of its most profitable stores for a purchase price of approximately $2.58

---

[7]    The Sale-and-Lease-Back comprises several related contracts (and amendments thereto), including:
(i) the Subscription, Distribution and Purchase and Sale Agreement by and between Sears and Seritage dated
June 8, 2015; (ii) the Contribution and Sale Agreement between Kmart Corporation, Marin Access LLC, Kmart
of Washington, LLC, Plaza Guaynabo Limited Partnership, S.E., Sears Roebuck, Sears, Roebuck de Puerto
Rico, Inc., Sears Development Co., Seritage KMT Finance LLC, and Seritage SRC Finance LLC dated July 7,
2015; and (iii) the Master Lease by and among Seritage SRC Finance LLC, Seritage KMT Finance LLC, Kmart
Operations LLC, and Sears Operations LLC dated July 7, 2015.

billion,[8] while simultaneously agreeing to lease those spaces back from the Seritage Defendants.

The purchase price was ostensibly based upon appraisals of the properties by C&W.  But the

appraisals were fundamentally flawed, and, as a result, the transferred real estate was

undervalued by approximately $649 to $749 million.

220.    *Second*, Sears transferred subscription rights to purchase shares in Seritage

common stock to the Culpable Shareholders and other Sears shareholders for no consideration.

The trading price of the subscription rights reflects that they were worth approximately $400

million.  And for Lampert, ESL, the ESL Shareholders, and Fairholme, the value of the

subscription rights was even greater.  Those insiders benefited from a side agreement pursuant to

which they exchanged some of their subscription rights plus cash for other classes of Seritage

stock and interests in the Seritage Operating Partnership, which were particularly valuable.

221.    Sears' financial condition was even worse in July 2015, when the Seritage

transaction closed, than it had been fourteen months earlier when Lands' End was spun off.  That

was due in part to Sears' continuing losses (it recorded a net loss of $1.68 billion in FY 2014)

and in part to the Lands' End spinoff itself, which divested Sears of one of its few profitable

subsidiaries.  Yet Sears transferred the Seritage subscription rights for no consideration and the

real estate for grossly inadequate consideration.  The inadequate consideration is confirmed by

Seritage's stock price increase on its first day of trading, closing at $37.73 (up 27.6% from

$29.58)—a one-day increase in Seritage's market capitalization of $453 million.

222.    By April 15, 2016, less than one year later, Seritage's stock price had increased

more than 50%, to $56.47, giving it a market capitalization of $3.2 billion.  Seritage also paid

---

[8]    Sears received cash consideration of $2,582,572,012.35.  Certain public disclosures inaccurately referred to a
purchase price of approximately $2.7 billion.  The higher figure was calculated by improperly counting the fees
paid to the third-party professionals who worked on the transaction and other amounts that were, in reality, paid
to Seritage rather than Sears.

quarterly dividends since December 2015 totaling approximately $209 million. On information and belief, the Culpable Shareholders have received approximately $131 million of dividends from Seritage.

223.    The terms of the Seritage transaction—including the price Seritage paid Sears for the properties, the rent and other terms of the leases between Sears and Seritage, and the terms of the rights offering—were established unilaterally by Lampert and others who reported to him, and without negotiation. Lampert, however, was grossly conflicted because, once the transaction went through, he and ESL would be by far the largest shareholders of Seritage. No consideration was given to the interests of creditors.

### 1.    Sears Fails to Give Meaningful Consideration to Value-Maximizing Alternatives.

224.    The Seritage transaction was developed and approved in the face of an approaching liquidity and operational crisis for Sears. In mid-2014, shortly after the Lands' End spinoff, Sears' managers began to predict a liquidity shortfall the following year. As set forth above, following the Lands' End spinoff, the PBGC expressed serious concerns about Sears' viability and threatened to terminate its pension plan—an event that would result in a violation of Sears' credit agreements, and thus a potential death knell for the Company—unless Sears provided substantial additional assurance to protect the PBGC's interest as the plan's insurer. Major suppliers, also concerned about the Company's viability, began tightening credit terms.

225.    Moreover, in Fall 2014, Sears' auditor, Deloitte & Touche ("Deloitte"), raised concerns about Sears' ability to continue as a going concern. Deloitte identified several facts indicating that Sears might not be able to continue as a going concern, including, among other things, negative operating cash flows, recurring losses from operations, consecutive years of declining margins, dependence on revolving credit arrangements with limited availability, and

74

small cushions on debt covenant ratios.  Given the Company's worsening financial situation,
Deloitte conducted the year-end audit assuming that Sears would earn negative $500 million in
EBITDA and need $1.6 billion in capital in FY 2015.  Deloitte ultimately concluded that Sears
could remain a going concern, *through FY 2015*, by monetizing its real estate portfolio.

226.    A potential real estate Sale-and-Lease-Back transaction was presented to Sears'
Board as early as September 9, 2014 (alongside alternatives such as a real estate loan, a REMIC
loan, and borrowing against treasury shares).

227.    Other alternatives—such as selling the real estate to third parties or creating a
business unit or subsidiary of Sears that could lease the real estate to other tenants, while
allowing Sears to retain the upside benefit of the real estate—were not presented or seriously
considered.

228.    Lampert was the driving force behind the Sale-and-Lease-Back transaction.  As a
result, the Sale-and-Lease-Back proposal was developed, while other alternatives were not
seriously considered.  By September 21, 2014, the Company was moving forward with the
creation of a REIT.  Because legal restrictions on ownership concentration in REITs would have
prevented Sears' largest shareholders—Lampert, the ESL Shareholders, and Fairholme—from
owning the same percentage of the REIT as they owned of Sears, substantial attention was
devoted to developing transaction features that would benefit these large shareholders.  By
October 2014, Sears' internal liquidity planning scenarios began to assume proceeds from a Sale-
and-Lease-Back transaction.  By November 2014, the principal elements of the transaction—
including the creation of a new REIT, an estimate of the number of properties to be sold to the
REIT, and the terms of the master lease whereby the REIT would lease back the properties to
Sears—were in place.

### 2. The Seritage Subscription Rights Were Transferred from Sears to Sears' Shareholders for No Consideration.

229.    Pursuant to a "Subscription, Distribution and Purchase and Sale Agreement" between Sears and Seritage dated June 8, 2015, the newly created REIT (Seritage) issued and delivered to Sears 106,597,798 unitized subscription rights ("Seritage Rights").  The Seritage Rights gave their holders the option to purchase new shares of common stock of Seritage at an exercise price payable to Seritage of $29.58 per share.  The balance of Seritage's capital structure consisted of third-party financing secured by the real estate to be acquired from Sears.

230.    Sears distributed all 106,597,798 of the Seritage Rights to its shareholders that same day, of which 81,359,794, or 76.3%, were given to the Culpable Shareholders.  The shareholders did not pay Sears any consideration in exchange for the Seritage Rights.

231.    The Seritage Rights were valuable securities.  Between June 9 and 26, 2015, the Seritage Rights traded on the NYSE.  The volume-weighted average trading price of the Seritage Rights over this period was $3.75 per right.  Based on this price, the 106,597,798 Seritage Rights were worth at least $399 million.  As Sears' CFO wrote in an email before the closing, "the market thinks [Sears] is selling something for about $600M less than it is worth."

232.    In fact, the Seritage Rights were worth materially more than this amount, because the trading price did not account for the more valuable interests that Lampert, the ESL Shareholders, and Fairholme were able to obtain by "exchanging" their excess rights (which they did not trade on the NYSE) plus cash with Seritage for Class B and Class C shares of Seritage and operating partnership interests.  These other interests were worth more than Seritage common stock because they gave Lampert, the ESL Defendants, and Fairholme the special ability to block a change of control.

233.    As reflected in Lampert's contemporaneous comments to Sears' Board, the
Seritage Rights were intended to have a substantial positive trading price.  Specifically, the
minutes reflect that Lampert told the Board that he wanted the Seritage Rights to "be attractive to
investors" and to provide "value to Sears' shareholders who chose to sell their rights."

**3.    In Preparation for the Sale-and-Lease-Back Transaction,
Real Estate and Joint Venture Interests Are Transferred
to KMT Mezz, SRC Mezz, and SPS Portfolio Holdings LLC
for No Consideration or for Inadequate Consideration.**

234.    As preparatory steps for the sale of KMT Mezz, SRC Mezz, and SPS Portfolio
Holdings LLC to Seritage, certain real estate assets were transferred from Sears Roebuck and
Kmart Corporation (and their subsidiaries) to KMT Mezz, SRC Mezz, and SPS Portfolio
Holdings LLC—either for no consideration or for inadequate consideration.

235.    *First*, various Kmart Corporation subsidiaries (including the entities listed in
footnote 1) contributed properties to Seritage KMT Finance LLC for no consideration (or
distributed the properties to Kmart Corporation for no consideration to contribute to Seritage
KMT Finance LLC for no consideration).  Certain other subsidiaries of Kmart Corporation
(including Kmart of Washington, LLC) also sold properties to Seritage KMT Finance LLC for
inadequate consideration (based on the appraisals described below).

236.    *Second*, Sears Roebuck and various Sears Roebuck subsidiaries contributed
properties to Seritage SRC Finance LLC for no consideration.  Certain other subsidiaries of
Sears Roebuck (including Sears Development Co.) also sold properties to Seritage SRC Finance
LLC for inadequate consideration (based on the appraisals described below).

237.    *Third*, Sears Roebuck contributed its joint venture interests in GS Portfolio
Holdings LLC and MS Portfolio LLC, for no consideration, to Seritage GS Holdings LLC and
Seritage MS Holdings LLC, respectively.

238.     *Fourth*, Kmart Corporation contributed Seritage KMT Finance LLC to KMT Mezz for no consideration.

239.     *Fifth*, Sears Roebuck contributed Seritage SRC Finance LLC, Seritage GS Holdings LLC, and Seritage MS Holdings LLC to SRC Mezz for no consideration.

### 4.     The Sale-and-Lease-Back Undervalued the Transferred Real Estate Assets and Joint Venture Interests.

240.     On or about July 7, 2015, Sears and Seritage closed on the Sale-and-Lease-Back of 266 Sears stores.  These 266 properties were selected to include only stores that generated sufficient EBITDA to be able to pay the assigned rent to Seritage, and thus represented Sears' most valuable available properties.

241.     Seritage paid Sears a total of $2.58 billion for the real estate assets and joint venture interests, a purchase price that was purportedly based in primary part on appraisals performed by C&W.  This purchase included: (i) the purchase of KMT Mezz from Kmart Corporation; (ii) the purchase of SRC Mezz and SPS Portfolio Holdings LLC from Sears Roebuck; and (iii) the purchase of certain other real estate assets from Kmart Corporation (and one of its subsidiaries) and Sears Roebuck.

242.     C&W's appraisals were fundamentally flawed and undervalued the properties by between $649 and $749 million, which in turn meant Seritage underpaid at least that much for the properties, for two principal reasons.

243.     *First*, as dictated by the terms of C&W's engagement agreement, in valuing the properties, C&W considered only the "income capitalization" approach, *i.e.*, the present value of the future rental payments that Sears would make to Seritage.

244.     *Second*, C&W improperly, and systematically, utilized lower than average market rents.  Overall, C&W's market rents, on a portfolio-wide basis, were *30.2% below* average

comparable market rents.  Since the $2.58 billion purchase price was determined based on a

"direct capitalization method" (*i.e.*, treating the rental income streams from these properties as

perpetuities and dividing the net operating income by a capitalization rate), the use of low rents

had the net effect of substantially lowering the price that Seritage paid Sears for the properties.

C&W employed different rationales to lower the rents for different properties, but the overall

result was a substantially below-market average rent, often below the low end of *all* other

comparables considered.

245.    *Third*, C&W further reduced the rent streams it used to value the properties by

between 20% and 35%.  This reduction in rent payable by Sears was purportedly intended to

offset the benefit to Seritage of the recapture and redevelopment rights and the other unusual

features of the planned master lease.  But by using this under-market rent as the basis for its

appraisals, C&W materially undervalued the properties.

246.    As some of the C&W appraisals acknowledged, because C&W valued the

property using the rental rate that Sears would pay Seritage, C&W should have adjusted the

capitalization rate downward (thereby increasing its valuations) to adjust for the effect of the

below-market rent.  However, instead of applying *lower* capitalization rates, C&W routinely

applied rates at the *high* end of its calculated range.  Indeed, C&W's average capitalization rate

of 8.16% was higher than the averages in both datasets that C&W consulted.  As C&W has

acknowledged, it is a matter of simple arithmetic that applying a *higher* capitalization rate to the

same expected cash flow results in *lowering* the resulting appraised value.

247.    That C&W's rents were systematically too low—and thus that the $2.58 billion

purchase price was too low—is confirmed by Seritage's subsequent ability to achieve a

staggering *3.5x to 4.5x* "rental uplift" upon re-leasing space formerly occupied by Sears.  Further

confirmation can be found in Sears' subsequent sales, through the Petition Date, of 36 properties

at prices that were, on average, 40% higher than C&W's valuation.

248.    After correcting for these and other errors, a fair valuation would have resulted in

a purchase price at least $649 to $749 million more than Seritage paid Sears.

### 5.    Onerous Master Lease Terms Further Benefited Seritage at Sears' Expense.

249.    The Sale-and-Lease-Back contained one-sided terms that benefited Seritage and

harmed Sears.  Two terms in particular were unfair to Sears: (i) Seritage's right to "recapture" up

to 50% of the space at most of the stores it purchased, and 100% of the space at the remaining

stores; and (ii) Sears' obligation to pay a punitive termination fee calculated as one year's rent if

Sears elected to terminate the lease with respect to individual stores.

250.    Seritage's recapture right harmed Sears because it left Sears' most profitable

stores vulnerable to eviction or having their footprint materially reduced.  Specifically, this

clause allowed Seritage to recapture up to 50% of the space at 224 properties, and 100% at 21

other properties (plus auto care centers).  Notably, the agreement imposed no limitation on

Seritage's right to lease the space to anyone, including competitors of Sears.

251.    Sears' liability to pay a punitive termination fee harmed Sears because it

increased the cost of Sears' stated strategy of closing unprofitable stores.  Moreover, Sears was

prohibited from exercising the termination right in such a way as to reduce aggregate rent under

the Sale-and-Lease-Back by more than 20% per year.

252.    Taken together, the Sale-and-Lease-Back terms ensured that Sears would continue

to pay Seritage rent, even for unprofitable stores, and that Seritage could invest those funds in

redevelopments that ousted Sears from its most profitable stores.  As noted, Duff & Phelps,

Sears' advisor on the transaction, estimated the value to Seritage of these unusual lease terms at

between $204 and $409 million.  To date, Sears has paid Seritage more than $570 million in rent, termination fees, or tenant reimbursements.

253.   The Sale-and-Lease-Back was not the product of an arm's-length negotiation process.  Since Seritage did not exist prior to the transaction, all decisions about Seritage were made by Sears personnel and—as Robert Schriesheim, former CFO of Sears, explained to counsel for the Subcommittee—mainly by Lampert himself.  Jeffrey Stollenwerck, Sears' head of real estate, similarly stated that he was not aware of any "negotiation" of the Sale-and-Lease-Back or of any person tasked with protecting Sears' interests.

254.   Nor did Sears allow a disinterested committee of the Board (such as the RPT Committee) to negotiate the terms.  The RPT Committee, in evaluating the transaction, did not have an independent real estate appraisal firm and never considered hiring one.  Indeed, the RPT Committee's sole focus in reviewing the transaction was whether Lampert and ESL were getting a better deal than other Sears shareholders.  The RPT Committee did not consider, and was not authorized to consider, any of the other key aspects of the transaction, including the price of the rights offering, the value of the property itself, the one-sided lease terms, and the Company's solvency.  The RPT Committee did not consider Sears' creditors and whether the transaction would harm them.

255.   The transaction's one-sided terms are the predictable result of this flawed process.

**6.      The Seritage Transaction Left Sears and the Real Estate
         Transferors Insolvent under the Balance-Sheet Test.**

256.   After the Seritage transaction, Sears had a negative net asset value and was thus insolvent under the balance-sheet test.  Due to Sears' prolonged negative earnings and the lack of any reasonable indication that the problems were temporary, Sears could not be valued under the income approach (discounted cash flow) or the market-multiples approach.

81

257.    Using the asset approach—*i.e.*, fair value of its net assets under the premise of an orderly (or disorderly) liquidation—the fair value of Sears' total assets at the time was no more than $13.3 billion in an orderly liquidation, which would have yielded net equity of *negative* approximately $1.5 billion (and a net asset value of negative approximately $2.3 billion after considering the estimated wind-down of corporate overhead).

258.    While Duff & Phelps opined that Sears was solvent and had adequate capital following the Seritage transaction, it managed to reach that conclusion only by committing fundamental errors, including relying on bad faith, unachievable projections provided to it by the Company's management.  Indeed, as noted, of the three years of management projections that Duff & Phelps cited, the projections for two years (all but the then-current year) were developed solely for the Duff & Phelps solvency and capital adequacy opinion itself.  Duff & Phelps also overvalued Sears' inventory, real estate, property, plant, equipment, and trade names by billions of dollars.

259.    Indeed, Duff & Phelps' solvency analysis for Seritage made assumptions even more favorable to Sears than had been made for Lands' End.  For Lands' End, Duff & Phelps had used EV/EBITDARP multiples of 6.5x to 7.5x, below the median of Sears' "peer" retailers.  Yet, just one year later, for Seritage, Duff & Phelps used multiples of 10.5x to 11.5x, exceeding the median of the "peer" retailers, despite Sears' diminished and declining performance and the inclusion of far more successful competitors such as Walmart, Target, and Home Depot.

260.    Duff & Phelps also improperly utilized inflated trademark valuations for the Kenmore, Craftsman, and Diehard (the "KCD") brands that did not represent the value Sears itself ascribed to those brands.  Instead, as stated by Myron Marcinkowski, the head of Duff & Phelps North American Valuation Practice, Duff & Phelps valued the brands using a

82

"hypothetical strategy" to "monetize and exploit the brands" that Sears "never implemented."
Notably, Duff & Phelps never conducted any study to determine whether Sears' "hypothetical strategy" would maximize the revenue associated with these brands. As a result of this "strategy," despite falling revenue at Sears, a declining number of Sears stores, and decreasing KCD brand revenue, Duff & Phelps noted a $2.8 billion valuation of the KCD brands. If Duff & Phelps had valued the KCD brands based on Sears' "given strategy," as Ernst & Young ("E&Y") did as part of its impairment analysis, the KCD brands would be valued at $1.096 billion, almost a *third* of the figure in the solvency analysis. If Duff & Phelps had used the more realistic figures that E&Y had, then, at the time of the Seritage transaction, Sears would have had a net equity of *negative* $1.8 billion and been insolvent.

261.    Duff & Phelps also lowered the variances used for its "sensitivity case." For Lands' End, Duff & Phelps had used a cumulative variance of 12.4% for revenue and 69.4% for EBITDAP. However, for Seritage, Duff & Phelps reduced the cumulative variance for revenue to 3.7% and the cumulative variance for EBITDAP to 40.8%.

262.    The other Real Estate Transferors were also insolvent on a balance-sheet basis.

263.    Sears Roebuck and Kmart Corporation were co-obligors or guarantors for most of Sears' debt, including $1.123 billion under the First Lien Credit Agreement, $1.24 billion of Second Lien Notes, and a $200 million Secured Short-Term Loan from ESL. Sears Development Co. was also a co-obligor for the Secured Short-Term Loan. And each of the Real Estate Transferors was jointly and severally liable for Sears' pension liabilities (on the order of $2.3 billion) as members of a "controlled group." Because Sears was insolvent, and thus unable to pay these massive joint obligations, the other Real Estate Transferors were also insolvent.

83

264.    For example, in support of the Seritage transaction, Duff & Phelps opined that Sears Roebuck had a net asset value of $3.959 billion as of April 4, 2015.  But Duff & Phelps' valuation relied upon a $6.59 billion intercompany receivable due to Sears Roebuck largely from Sears.  Because Sears was insolvent, that intercompany receivable was uncollectable.  Correcting even that single error reveals that Sears Roebuck was insolvent on a balance-sheet basis.  In fact, Sears Roebuck was even more deeply insolvent.  Duff & Phelps also overvalued Sears Roebuck's inventory, real estate, PP&E, and trade names, and undervalued its pension liabilities and corporate overhead, in the same manner (described above) as it had for Sears.

265.    Duff & Phelps did not even consider the solvency of Sears Development Co. or Kmart of Washington, LLC.

### 7.    The Seritage Transaction Left Sears and the Real Estate Transferors Insolvent under the Cash-Flow Test.

266.    Sears also was insolvent under the cash-flow test, both before and after the Seritage transaction.

267.    At the time of the Seritage transaction, Sears had existing debt obligations with an aggregate principal amount of more than $3.7 billion.  Together with interest, Sears required a total of more than $4.7 billion (and more than $4.2 billion by 4Q 2019) to pay off that debt.  The schedule under which these obligations would come due was as follows:



268.    Sears' total cash and cash equivalents immediately after the Seritage transaction (including the $2.58 billion purchase price) were approximately $3 billion.  By quarter end, after paying down the ABL due in 1Q 2016, Sears had just over $1.8 billion in cash and cash equivalents remaining.  Even *assuming* that Sears were to use *all* of these funds for debt principal and interest payment (rather than continued operating losses, as actually occurred), Sears would still require more than $1.2 billion of *additional* free cash flow by 4Q 2019, and more than $460 million of that by 3Q 2018:



269.    After the Seritage transaction, Sears could not reasonably have expected to earn $460 million in free cash flow by 3Q 2018 (when the Second Lien Notes, among other debts, came due).  Indeed, assuming that Sears' results merely stayed flat after the transaction, rather than continuing to decline as they had over the preceding years, Sears would have a cash balance of negative $1.1 billion—*i.e.*, it would be out of cash—by the end of FY 2016, less than 18 months later.

270.    In reality, Sears ultimately saw free cash flow of approximately *negative* $2.4 billion in FY 2015, *negative* $1.5 billion in FY 2016, and *negative* $1.9 billion in FY 2017.

Even with non-ordinary-course sales of Sears' core assets, after the Seritage transaction, Sears

could not reasonably have funded these debt principal and interest payments.  Not coincidentally,

3Q 2018 is when Sears ultimately filed for bankruptcy, $89 million of the Second Lien Notes

outstanding (having repaid $946 million of Second Lien Notes—$936 million of which followed

the Seritage transaction—and exchanged $215 million of Second Lien Notes into other second

lien debt).

271.    In light of Sears' declining financial performance over the preceding years and the

numerous adverse qualitative trends, as detailed above, there was no good-faith basis to assume

that Sears could achieve the required levels of cash flow.  In the four immediately prior fiscal

years, 2011–2014, Sears had failed to generate *any* cash flow from operations or *any* earnings to

cover interest expenses.  In the immediately prior year, FY 2014, Sears had *negative* free cash

flow of $1.7 billion and *negative* EBITDAP of approximately $750 million.  And in the four

immediately prior fiscal years, 2011–2014, Sears had suffered a cumulative net loss of

approximately $7 billion.

272.    As with Lands' End, Duff & Phelps' contrary cash-flow analysis was

fundamentally flawed because it relied upon overly optimistic projections of future performance

from management.  Duff & Phelps was provided with three-year projections for FYs 2015–2017

from management, and Duff & Phelps then extended these projections into five- and ten-year

projections (the "2015 Solvency Projections").

| Seritage Solvency Projections - Provided by Sears to D&P | | | |
|---|---|---|---|
| | **FY15** | **FY16** | **FY17** |
| Revenue | $ 28,085 | $ 29,149 | $ 29,617 |
| Gross Margin | $ 9,780 | $ 10,184 | $ 10,401 |
| EBITDAP | $ 316 | $ 573 | $ 771 |
| EBITDAP Margin | 1.1% | 2.0% | 2.6% |

273.    The 2015 Solvency Projections were unrealistic and unattainable. As in 2014, in the base case, Duff & Phelps assumed that revenue, gross margin, EBITDARP, and EBITDAP would begin to *increase* rather than continuing to *decrease* (and, in the case of EBITDAP, would turn *positive* instead of remaining *negative*). Sears' projections that its performance would suddenly reverse in FY 2015—just as Sears had incorrectly projected the year before (FY 2014), the year before that (FY 2013), the year before that (FY 2012), and the year before that (FY 2011)—had no good-faith basis.







274.    Even in the sensitivity case, Duff & Phelps assumed that Sears' revenue decline would slow and then turn to growth and that EBITDAP and EBITDAP margin would become positive and increase (rather than remaining negative and continuing to decrease).  In other words, even the "sensitivity" case assumed a dramatic and immediate turnaround in the Company's profitability.



275.    As detailed above, these optimistic assumptions were inconsistent with Sears' historical financial performance, by the initiatives included within Sears' FY 2015 Annual Plan, or by the prevailing conditions affecting Sears' operating performance.

276.    Even under Duff & Phelps' base case, Sears would not have been able to pay $959 million of debt that would come due in 2018 and $362 million more of debt that would come due in 2019.  And in Duff & Phelps' sensitivity case, Sears would have been unable to pay almost $959 million of debt that would come due in 2018 (44% of the debt maturing that year) and $362 million of debt that would come due in 2019.  Duff & Phelps simply assumed that

89

Sears would be able to refinance these amounts, which, under a more realistic view of expected future performance, was speculative.

277.    The other Real Estate Transferors were also insolvent on a cash-flow basis.

278.    As noted, Sears Roebuck, Kmart Corporation, and Sears Development Co. were co-obligors or guarantors for much of Sears' debt, including under the First Lien Credit Agreement, the Second Lien Notes, and the Secured Short-Term Loan.  And each of the Real Estate Transferors was jointly and severally liable for Sears' pension liabilities (on the order of $2.3 billion) as members of a "controlled group."  Because Sears was insolvent, and thus unable to pay these massive joint obligations, the other Real Estate Transferors were also insolvent.  The other Real Estate Transferors had less cash flow than Sears and many of the same obligations as Sears.  Once Sears failed to pay its joint obligations, the other Real Estate Transferors would also have also been unable to pay them.

279.    Duff & Phelps did not consider the cash-flow solvency of Sears Roebuck or Kmart Corporation and did not consider the solvency of Sears Development Co. or Kmart of Washington, LLC at all.

**8.      Sears and the Real Estate Transferors Had Unreasonably
Small Capital at the Time of the Seritage Transaction.**

280.    In addition, Sears, Sears Roebuck, and the Real Estate Transferors had unreasonably small capital after the Seritage transaction.

281.    Lampert himself acknowledged the Company's near-insolvent state by warning the Sears Board that, without the Seritage transaction, "management would be operated more in 'liquidation mode' than 'operating mode.'"

282.    As detailed above, Sears' multi-year performance history leading up to the Seritage transaction demonstrated that it was unable to generate sufficient profits to sustain

operations.  Indeed, Sears could not generate *any* profits, and could only temporarily stave off complete collapse by selling core assets and incurring further secured debt that it would be unable to generate sufficient cash flow to repay.

283.    Indeed, if Duff & Phelps' sensitivity case performance projections were used in Duff & Phelps' DCF analysis, Sears would show a much more narrow equity cushion of $431 million instead of $2.2 billion.  Duff & Phelps' valuation model was set up to run the sensitivity case projections through its DCF analysis, but Duff & Phelps elected either not to run this scenario or not to present the result in its presentation (contrary to its inclusion of such results in the prior year for its Lands' End solvency analysis).

284.    The same is true for the other Real Estate Transferors, for whom Duff & Phelps did not separately consider capital adequacy.  For example, as noted, Duff & Phelps' analysis in support of the transaction assigned total equity to Sears Roebuck in an amount less than the purported multi-billion-dollar intercompany receivable due to Sears Roebuck from Sears that was, in reality, not collectable.

### 9.    The Culpable Insiders Acted with Actual Fraudulent Intent.

285.    The Seritage transaction was approved by a Board that included Lampert, Mnuchin, Tisch, Alvarez, and Kamlani.  The Culpable Insiders had the actual intent to hinder, delay, and defraud Sears and the Real Estate Transferors' creditors with the Seritage transaction.  This intent can be inferred from the traditional "badges of fraud."

286.    *First*, the transfer was to insiders.  The Culpable Shareholders owned approximately 76.3% of Sears' stock, and thus personally received approximately 76.3% of the Seritage Rights.  Specifically, Lampert and ESL owned 47.8% of Sears' stock, Fairholme owned 25% of Sears' stock, and Tisch owned 3.5% of Sears' stock.  Thus, Lampert and ESL received Seritage Rights worth at least $191 million, Fairholme received Seritage Rights worth at least

$100 million, and Tisch received Seritage Rights worth at least $14 million. In total, the Culpable Shareholders received Seritage Rights worth at least $305 million (and likely far more due to the additional value of the exchange agreements between Lampert, ESL, and Fairholme and Seritage).

287.    The Sale-and-Lease-Back was made with a new entity controlled by these same insiders. Moreover, Lampert, ESL, the ESL Shareholders, and Fairholme also enjoyed a side agreement that exchanged their excess subscription rights plus cash for special controlling interests in Seritage. As the sole limited partners of the Seritage Operating Partnership, Lampert and ESL have the ability to veto any "change in control" (such as a merger, consolidation, conversion, or other combination). Lampert became the chairman of Seritage's board of trustees, and Thomas Steinberg, a long-time investor in ESL, became another trustee.

288.    *Second*, Sears received no consideration for the rights offering, and inadequate consideration for the Sale-and-Lease-Back.

289.    *Third*, the transfer was unusual and not in the ordinary course of business. The transaction sold Sears' crown jewels, putting its most profitable stores at risk of being "recaptured" and leased to its competitors.

290.    *Fourth*, as noted above, Sears was insolvent, or became insolvent, under both the balance-sheet and cash-flow tests.

291.    *Fifth*, Lampert, ESL, the ESL Defendants, and Fairholme also intended to use the proceeds of the transaction to repurchase debt held by themselves. Some of the proceeds of the Seritage transaction were used for an all-cash tender offer of Sears' Second Lien Notes—$205 million of which were held by Lampert and ESL—at near par (99 cents on the dollar).

292.    *Sixth*, Sears and the Culpable Shareholders (through their ownership and control of Seritage) maintained possession and control of the transferred real estate assets.

293.    Notably, prior to the transaction, the Culpable Insiders also were aware of analyst reports and financial journalism that opined that the transaction was unfair to Sears.  In the words of Evercore's analyst, Sears' strategy was to "[p]ut 250 of the best stores in the REIT, get $2B in cash and hope that this is sufficient to fund the business for 2 years to get past fraudulent conveyance statutes."

294.    An inquiry from a reporter of *The Wall Street Journal* prior to the transaction, raising concern about the harm to creditors from recent spinoffs, was elevated from Sears' public relations team to Lampert himself.  Sears never responded to the reporter.

### Recent Related-Party Loans with Lampert, ESL, and Fairholme

295.    Between April 2016 and September 2018, Lampert, ESL, and/or Fairholme made $3.22 billion in loans to Sears, all of them fully-secured or over-secured by collateral such as inventory, receivables, real estate, and intellectual property.

| Transaction | Date of Loan | New Money Loan Amount | Main Collateral | Lenders | ESL Affiliate Take-Up | Interest Rate |
|---|---|---|---|---|---|---|
| 2016 Term Loan Facility | 4/8/2016 | $750 | Domestic inventory, credit card, and pharmacy receivables | JPP, LLC, JPP II, LLC, Company Domestic Pension Plan | 20.0% | L + 750 |
| 2016 Secured Loan Facility | 4/8/2016 | 500 | 21 real properties | JPP, LLC, JPP II, LLC, Cascade Investment LLC | 50.0% | 8.000% |
| Second Lien Credit Agreement | 9/1/2016 | 300 | Inventory, receivables, and other related assets | JPP, LLC, JPP II, LLC | 100.0% | L + 750 |
| First Amendment to Second Lien Credit Agreement (re: New Line of Credit Facility) | 7/7/2017 | 500 | Inventory, receivables, and other related assets | JPP, LLC, JPP II, LLC | 78.7% | L + 750 |
| Third Amendment to Second Lien Credit Agreement (re: Incremental LOC Facility) | 2/7/2018 | 100 | Inventory, receivables, and other related assets | JPP, LLC, JPP II, LLC | 100.0% | L + 750 |
| Letter of Credit Facility | 12/28/2016 | 200 | Domestic inventory, credit card and pharmacy receivables, and certain real estate | JPP, LLC, JPP II, LLC | 100.0% | 5.750% |
| Letter of Credit Facility Incremental Commitments | 8/3/2017 | 71 | Domestic inventory, credit card and pharmacy receivables, and certain real estate | JPP, LLC, JPP II, LLC | 100.0% | 5.750% |
| 2017 Secured Loan Facility | 1/3/2017 | 500 | 69 real properties | JPP, LLC, JPP II, LLC | 100.0% | 8.000% |
| First Amendment to 2017 Secured Loan Facility (re: First Incremental Loan) | 10/28/2017 | 200 | 1L: 76 real properties (Original TL and Incremental TL) 2L: 16 real properties (Incremental TL Only) | JPP, LLC, JPP II, LLC | 100.0% | 11.000% |

| Second Amendment to 2017 Secured Loan Facility (re: Second Incremental Loan) | 3/8/2018 | 100 | 76 real properties | JPP, LLC, JPP II, LLC | 100.0% | L + 900 |
|---|---|---|---|---|---|---|
| 2018 Term Loan Facility | 1/4/2018 | 100 | Ground leases and unencumbered IP except Kenmore and DieHard brands | JPP, LLC, JPP II, LLC | 100.0% | L + 1,250 |
| Amendments to 2018 Term Loan Facility (re: Incremental Borrowings) | 1/29/2018 | 150 | Ground leases and unencumbered IP except Kenmore and DieHard brands | JPP, LLC, JPP II, LLC | 60.0% | L + 1,250 |
| Mezzanine Loan Facilities | 3/14/2018 | 384 | Equity of SRC O.P. LLC (parent of entities that own the 138 real properties securing the Secured Loan Facilities) | JPP, LLC, JPP II, LLC | 100.0% | L + 1,100 |
| Mezzanine Loan Facilities Amendment (re: Additional Loans) | 6/29/2018 | 129 | Equity of SRC O.P. LLC (parent of entities that own the 138 real properties securing the Secured Loan Facilities) | JPP, LLC, JPP II, LLC | 100.0% | L + 1,100 |
| FILO Loan Facility | 3/21/2018 | 125 | Domestic inventory, credit card and pharmacy receivables | JPP, LLC, JPP II, LLC | 56.0% | L + 850 |
| Consolidated Secured Loan Facility Note B | 6/4/2018 | 93 | 69 real properties | JPP, LLC, JPP II, LLC | 100.0% | L + 900 |
| Consolidated Secured Loan Facility Amendment (re: Additional Note B Loans) | 9/12/2018 | 38 | 20 real properties (in addition to the 68 of the original real properties) | JPP, LLC, JPP II, LLC | 100.0% | L + 900 |

296.     These loans are referred to as the "Recent Related-Party Loans."

297.     Because the Recent Related-Party Loans involved self-dealing between the Company and controlling shareholders, the Directors and controlling shareholders had a duty to ensure that their terms were entirely fair.  But the Recent Related-Party Loans were not entirely fair: Sears was charged excessive interest.  As a result of the Recent Related-Party Loans, Sears had already paid Lampert and ESL, prior to the Petition Date, more than $376 million in cash fees and interest payments, and it paid Fairholme approximately $1 million.

298.     Review by the RPT Committee failed to ensure the entire fairness of the Recent Related-Party Loans.  The RPT Committee was often asked to approve these transactions on an expedited basis and in circumstances in which failure to approve the transaction would result in Sears running out of cash, being unable to meet ordinary course obligations, defaulting on loan covenants (which would allow certain creditors to exercise their "cash dominion" rights), or other similarly dire consequences.  As a result, the RPT Committee had little opportunity to meaningfully negotiate the terms of these related-party loans.  A representative from Centerview (the financial advisor to the RPT Committee) confirmed to counsel for the Subcommittee that

94

these transactions "were presented to the special committee on short notice," which required Centerview to perform its work "on an expedited timeframe."

299.    For example, a December 29, 2016 email from Riecker to Sears' Board requested approval for a related-party loan in excess of $320 million by January 3, 2017—only three business days later.  Riecker warned that, without the loan, the Company would be out of cash (and overdrawn by $24 million) by January 3.

300.    In many instances, no "market check"—that is, a process by which the RPT Committee or Centerview would solicit competing proposals for third-party loans—was conducted.  And the market checks that were conducted were often flawed because the third parties contacted were not provided sufficient time to conduct due diligence.

301.    Sears had no internal plans reflecting the aggregate amount of additional financing it expected to need in order to turn around its operations.  Although Lampert and the members of the RPT Committee knew that the related-party loans being requested and approved would not be sufficient to meet the Company's long-term liquidity needs (as repeatedly reflected in Centerview's presentations to the RPT Committee), they took no action to attempt to obtain a comprehensive third-party financing solution sufficient to meet the Company's long-term liquidity needs.

**Sears Files for Bankruptcy**

302.    On October 15, 2018, Sears and certain affiliates filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

**Count 1**

**Avoidance of the Orchard Spinoff as an Actual Fraudulent Transfer
Against Lampert, ESL Defendants, Fairholme, and Tisch
(11 U.S.C. §§ 544(b), 550(a)(1), and (2), 1107; NY DCL § 276;
6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

303.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

304.    The Orchard Spinoff resulted in transfers of interests in the property of Sears and Sears Roebuck—namely, 80.1% of the common stock and 100% of the preferred stock of Orchard—to Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch (the "Orchard Transfers").  The transferred property was worth at least $133 million.

305.    Sears and Sears Roebuck made the Orchard Transfers to and for the benefit of Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

306.    The Orchard Transfers were made with an actual intent to hinder, delay, and/or defraud Sears and Sears Roebuck's creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Orchard Transfers.

307.    As a result of the Orchard Transfers, Sears and Sears Roebuck and their creditors have been harmed.

308.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, Sears and Sears Roebuck may avoid any transfer for an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Sears and Sears Roebuck exist who could avoid the Orchard Transfers under applicable non-bankruptcy law.

309.    The Orchard Transfers are avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

96

**Count 2**
**Avoidance of the SHO Rights Transfers as an Actual Fraudulent Transfer**
**Against Lampert, the ESL Defendants, Fairholme, and Tisch**
**(11 U.S.C. §§ 544(b), 550(a)(1), and (2), 1107; NY DCL § 276;**
**6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

310.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

311.    The SHO transaction resulted in transfers of interests in the property of Sears—namely, the SHO Rights and SHO shares—to Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch (the "SHO Rights Transfers").  The transferred rights were worth at least $231 million.

312.    Sears made the SHO Rights Transfers to and for the benefit of Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

313.    The SHO Rights Transfers were made with an actual intent to hinder, delay, and/or defraud Sears' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the SHO Rights Transfers.

314.    As a result of the SHO Rights Transfers, Sears and its creditors have been harmed.

315.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as a debtor in possession, Sears may avoid any transfer for an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of Sears exist who could avoid the SHO Rights Transfers under applicable non-bankruptcy law.

316.    The SHO Rights Transfers are avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

97

## Count 3
**Avoidance of the Sears Canada Spinoff as an Actual Fraudulent Transfer
Against Lampert, ESL Defendants, Fairholme, and Tisch
(11 U.S.C. §§ 544(b), 550(a)(1), and (2), 1107; NY DCL § 276;
6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

317.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

318.    The Sears Canada partial spinoff resulted in transfers of interests in the property of Sears and Sears Roebuck—namely, 44.5% of the stock of Sears Canada—to Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch (the "Sears Canada Transfers").  The transferred property was worth at least $621 million.

319.    Sears and Sears Roebuck made the Sears Canada Transfers to and for the benefit of Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

320.    The Sears Canada Transfers were made with an actual intent to hinder, delay, and/or defraud Sears and Sears Roebuck's creditors, to the detriment and harm of such creditors. Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Sears Canada Transfers.

321.    As a result of the Sears Canada Transfers, Sears and Sears Roebuck and their creditors have been harmed.

322.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, Sears and Sears Roebuck may avoid any transfer for an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Sears and Sears Roebuck exist who could avoid the Sears Canada Transfers under applicable non-bankruptcy law.

323.    The Sears Canada Transfers are avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

98

## Count 4
### Avoidance of the Lands' End Spinoff as an Actual Fraudulent Transfer
### Against Lampert, ESL Defendants, Fairholme, and Tisch
### (11 U.S.C. §§ 544(b), 550(a)(1), and (2), 1107; NY DCL § 276;
### 6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))

324.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

325.    The Lands' End Spinoff resulted in transfers of interests in the property of Sears and Sears Roebuck—namely, 100% of the stock of Lands' End—to Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch (the "Lands' End Transfers"). The transferred property was worth at least $1 billion.

326.    Sears and Sears Roebuck made the Lands' End Transfers to and for the benefit of Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

327.    The Lands' End Transfers were made with an actual intent to hinder, delay, and/or defraud Sears and Sears Roebuck's creditors, to the detriment and harm of such creditors. Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Lands' End Transfers.

328.    As a result of the Lands' End Transfers, Sears and Sears Roebuck and their creditors have been harmed.

329.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, Sears and Sears Roebuck may avoid any transfer for an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Creditors of Sears and Sears Roebuck exist who could avoid the Lands' End Transfers under applicable non-bankruptcy law.

330.    The Lands' End Transfers are avoidable as an actual fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

**Count 5**
**Avoidance of the Lands' End Spinoff as a Constructively Fraudulent Transfer**
**Against Lampert, the ESL Defendants, Fairholme, and Tisch**
**(11 U.S.C. §§ 544(b), 550(a)(1), and (2); NY DCL §§ 273, 274;**
**6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(2))**

331.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

332.    The Lands' End Transfers were transfers of interests in the property of Sears and Sears Roebuck made to and for the benefit of Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

333.    The Lands' End Transfers were made for no consideration; without fair consideration; or for less than reasonably equivalent value.

334.    The Lands' End Transfers were made (a) when Sears and Sears Roebuck were insolvent; (b) so as to render Sears and Sears Roebuck insolvent; or (c) so as to leave Sears and Sears Roebuck with unreasonably small capital.

335.    The Lands' End Transfers are avoidable as a constructively fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

**Count 6**
**Recovery of the Lands' End Illegal Dividend**
**Against the Lands' End Directors, the ESL Defendants, and Fairholme**
**(8 Del C. §§ 170–174 and Delaware Common Law)**

336.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

337.    The Lands' End Directors approved and directed the payment of a dividend or distribution of Lands' End shares (the "Lands' End Dividend") by Sears to its shareholders. The value of the Lands' End Dividend was at least $1 billion.

338.    The Lands' End Dividend was received by Sears' shareholders, including

Lampert, Tisch, the ESL Defendants, and Fairholme.

339.    At the time of the Lands' End Dividend, Sears' liabilities exceeded its assets and

Sears had no net profits in that fiscal year or in the preceding fiscal year.  As a result, the Lands'

End Dividend was illegal under Delaware law.

340.    The Lands' End Directors are jointly and severally liable for the full amount of

the Lands' End Dividend, which was declared and paid while they were directors of Sears.  None

of the Lands' End Directors dissented from the Lands' End Dividend.

341.    Lampert, Tisch, the ESL Defendants, and Fairholme are also liable for the portion

of the Lands' End Dividend each received because they had knowledge of facts indicating that

the Lands' End Dividend was unlawful.

<u>**Count 7**</u>
**Avoidance of the Seritage Rights Transfers as an Actual Fraudulent Transfer
Against Lampert, the ESL Defendants, Fairholme, and Tisch
(11 U.S.C. §§ 544(b), 550(a)(1), and (2), 1107; NY DCL § 276;
6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

342.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set

forth herein.

343.    The Seritage transaction resulted in transfers of interests in the property of

Sears—namely, the Seritage Rights—to Sears' shareholders, including Lampert, the ESL

Defendants, Fairholme, and Tisch (the "<u>Seritage Rights Transfers</u>").  The transferred rights were

worth at least $399 million.

344.    Sears made the Seritage Rights Transfers to and for the benefit of Sears'

shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

345.    The Seritage Rights Transfers were made with an actual intent to hinder, delay,

and/or defraud Sears' creditors, to the detriment and harm of such creditors.  Such intent can be

101

inferred from, among other things, the traditional badges of fraud surrounding the Seritage

Rights Transfers.

346.    As a result of the Seritage Rights Transfers, Sears and its creditors have been

harmed.

347.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as a debtor in

possession, Sears may avoid any transfer for an interest of the debtor in property that is voidable

under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

Creditors of Sears exist who could avoid the Seritage Rights Transfers under applicable non-

bankruptcy law.

348.    The Seritage Rights Transfers are avoidable as an actual fraudulent transfer under

Sections 544 and 550 of the Bankruptcy Code and applicable state law.

## <u>Count 8</u>
**Avoidance of the Seritage Rights Transfers as a Constructively Fraudulent Transfer
Against Lampert, the ESL Defendants, Fairholme, and Tisch
(11 U.S.C. §§ 544(b), 550(a)(1), and (2); NY DCL §§ 273, 274;
6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(2))**

349.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set

forth herein.

350.    The Seritage Rights Transfers were transfers of interests in the property of Sears

made to and for the benefit of Sears' shareholders, including Lampert, the ESL Defendants,

Fairholme, and Tisch.

351.    The Seritage Rights Transfers were made for no consideration; without fair

consideration; or for less than reasonably equivalent value.

352.    The Seritage Rights Transfers were made (a) when Sears was insolvent; (b) so as

to render Sears insolvent; or (c) so as to leave Sears with unreasonably small capital.

102

353.    The Seritage Rights Transfers are avoidable as a constructively fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

**Count 9**
**Recovery of the Seritage Illegal Dividend**
**Against the Seritage Directors, the ESL Defendants, and Fairholme**
**(8 Del. C. §§ 170–174 and Delaware Common Law)**

354.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

355.    The Seritage Directors approved and directed the payment of a dividend or distribution of the Seritage Rights (the "Seritage Dividend") by Sears to its shareholders.  The value of the Seritage Dividend was at least $399 million.

356.    The Seritage Dividend was received by Sears' shareholders, including Lampert, the ESL Defendants, Fairholme, and Tisch.

357.    At the time of the Seritage Dividend, Sears' liabilities exceeded its assets, and Sears had no net profits in that fiscal year or in the preceding fiscal year.  As a result, the Seritage Dividend was illegal under Delaware law.

358.    The Seritage Directors are jointly and severally liable for the full amount of the Seritage Dividend, which was declared and paid while they were directors of Sears.  None of the Seritage Directors dissented from the Seritage Dividend.

359.    Lampert, Tisch, the ESL Defendants, and Fairholme are also liable for the portion of the Seritage Dividend each received because they had knowledge of facts indicating that the Seritage Dividend was unlawful.

**Count 10**
**Avoidance of the Seritage Real Estate Transfers as an Actual Fraudulent Transfer
Against the Seritage Defendants
(11 U.S.C. §§ 544(b), 550(a)(1), and (2), 1107; NY DCL § 276;
6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

360.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

361.    The Seritage transaction resulted in transfers of interests in the property of Sears and the Real Estate Transferors—namely, title to 266 parcels of real estate and certain contractual rights under Sale-and-Lease-Back—to the Seritage Defendants (the "Seritage Real Estate Transfers").  The transferred property was worth at least $649 to $749 million more than the purchase price of $2.58 billion.

362.    Sears and the Real Estate Transferors made the Seritage Real Estate Transfers to and for the benefit of the Seritage Defendants.

363.    The Seritage Real Estate Transfers were made with an actual intent to hinder, delay, and/or defraud Sears and the Real Estate Transferors' creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Seritage Real Estate Transfers.

364.    As a result of the Seritage Real Estate Transfers, Sears and the Real Estate Transferors and each of their creditors have been harmed.

365.    Under Sections 544(b) and 1107(a) of the Bankruptcy Code, as debtors in possession, Sears and the Real Estate Transferors may avoid any transfer for an interest of the debtor in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Creditors of Sears and the Real Estate Transferors exist who could avoid the Seritage Real Estate Transfers under applicable non-bankruptcy law.

366.    The Seritage Real Estate Transfers are avoidable as an actual fraudulent transfer
under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

367.    The Sale-and-Lease-Back should be rescinded, and the Seritage Defendants
should turn over to Plaintiffs the real estate interests fraudulently transferred together with all
funds (more than $649 million) paid by Plaintiffs to the Seritage Defendants under color of the
Sale-and-Lease-Back.  In the alternative, the Seritage Defendants should pay Plaintiffs damages
at least equal to the value of the transferred property.

## Count 11
### Avoidance of the Seritage Real Estate Transfers as a Constructively Fraudulent Transfer Against the Seritage Defendants
### (11 U.S.C. §§ 544(b), 550(a)(1), and (2); NY DCL §§ 273, 274; 6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(2))

368.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set
forth herein.

369.    The Seritage Real Estate Transfers were transfers of interests in the property of
Sears and the Real Estate Transferors made to and for the benefit of the Seritage Defendants.

370.    The Seritage Real Estate Transfers were made for no consideration; without fair
consideration; or for less than reasonably equivalent value.

371.    The Seritage Real Estate Transfers were made (a) when Sears and the Real Estate
Transferors were insolvent; (b) so as to render Sears and the Real Estate Transferors insolvent; or
(c) so as to leave Sears and the Real Estate Transferors with unreasonably small capital.

372.    The Seritage Real Estate Transfers are avoidable as a constructively fraudulent
transfer under Sections 544 and 550 of the Bankruptcy Code and applicable state law.

373.    The Sale-and-Lease-Back should be rescinded, and the Seritage Defendants
should turn over to Plaintiffs the real estate interests fraudulently transferred together with all
funds (more than $649 million) paid by Plaintiffs to the Seritage Defendants under color of the

Sale-and-Lease-Back.  In the alternative, the Seritage Defendants should pay Plaintiffs damages at least equal to the value of the transferred property.

## Count 12
### Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty Against Lampert, the ESL Defendants, Fairholme, and the Recent Related-Party Loan Directors

374.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

375.    Lampert owed a fiduciary duty to Sears as a director, as the Chairman of the Board, and as the Chief Executive Officer.  The Recent Related-Party Loan Directors owed a fiduciary duty to Sears as directors.  Lampert, the ESL Shareholders, and Fairholme also owed a fiduciary duty to Sears because, as a control group, they owned a majority and/or controlling interest of Sears and exercised control over the business affairs of Sears.  ESL and the ESL Lenders owed a fiduciary duty to Sears because they are affiliates of the ESL Shareholders and, together with the other ESL Defendants, exercised actual control over Sears.

376.    These duties required Lampert, the ESL Defendants, Fairholme, and the Recent Related-Party Loan Directors at all times to act faithfully on behalf of Sears and to conduct themselves in a manner they reasonably believed to be in the best interests of the Company.

377.    Lampert, the ESL Defendants, and Fairholme breached their fiduciary duties when they engaged in acts of self-dealing in the Recent Related-Party Loans.  The Recent Related-Party Loan Directors breached their fiduciary duties when they approved the Recent Related-Party Loans.

378.    Each of Lampert, the ESL Defendants, Fairholme, and the Recent Related-Party Loan Directors aided and abetted the others' breaches of fiduciary duty by knowingly participating in the breaches of duty.

379.    As a result of these breaches, Lampert, the ESL Defendants, and Fairholme received monetary and other benefits at the expense of Sears.  Mnuchin and Tisch received indirect monetary benefits at the expense of Sears through their investments in ESL.

380.    As a direct and proximate result of Lampert, the ESL Defendants, Fairholme, and the Recent Related-Party Loan Directors' acts and omissions, Sears paid (and Lampert, the ESL Defendants, and Fairholme received) excessive interest and fees, and suffered other injury. Lampert, the ESL Defendants, Fairholme, and the Recent Related-Party Loan Directors are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment and grant the following relief to the extent consistent with the Plan:

a.    a judgment against Lampert, the ESL Defendants, Fairholme, and Tisch finding and declaring that the Orchard Transfers, the SHO Rights Transfers, and the Sears Canada Transfers constitute actual fraudulent transfers;

b.    a judgment against Lampert, the ESL Defendants, Fairholme, and Tisch finding and declaring that the Lands' End Transfers and the Seritage Rights Transfers constitute actual and constructive fraudulent transfers;

c.    a judgment against the Seritage Defendants finding and declaring that the Seritage Real Estate Transfers constitute actual and constructive fraudulent transfers;

d.    avoidance of the fraudulent transfers;

e.    recovery of the property fraudulently transferred, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees;

f.    a judgment against the Directors, Lampert, the ESL Defendants, Fairholme, and Tisch finding and declaring that the Lands' End Dividend and the Seritage Dividend were illegal dividends;

g.      compensatory damages in an amount to be determined at trial from the
        Directors for the full amount of the illegal dividends approved under their
        tenure as directors;

h.      compensatory damages in an amount to be determined at trial from
        Lampert, the ESL Defendants, Fairholme, and Tisch for the amounts of
        the Lands' End Dividend and Seritage Dividend that each received;

i.      a judgment against Lampert, the ESL Defendants, Fairholme, and the
        Recent Related-Party Loan Directors finding and declaring that Lampert,
        the ESL Defendants, Fairholme, and the Recent Related-Party Loan
        Directors breached their fiduciary duties and/or aided and abetted the same
        with respect to the Recent Related-Party Loans;

j.      compensatory damages in an amount to be determined at trial from
        Lampert, the ESL Defendants, Fairholme, and the Recent Related-Party
        Loan Directors for their breaches of their fiduciary duties and/or aided and
        abetted the same with respect to the Recent Related-Party Loans;

k.      disgorgement from Lampert, the ESL Defendants, Fairholme, and the
        Directors of their ill-gotten gains from their breaches of their fiduciary
        duties, including Lampert's compensation as CEO and the fees and
        interest received by the ESL Defendants and Fairholme;

l.      prejudgment interest;

m.      reasonable attorneys' fees, costs, and expenses incurred in this action; and

n.      any other and further relief as the Court deems just, proper, or equitable
        under the circumstances.

## **Jury Trial Demand**

Plaintiffs demand a jury trial on all issues so triable.

Dated:  April 17, 2019
New York, New York

     /s/ Lewis R. Clayton
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Kelley A. Cornish
Lewis R. Clayton
Susanna M. Buergel
Robert A. Britton

*Counsel to Plaintiffs Acting at the Direction
of the Restructuring Sub-Committee
(as to all Defendants except Thomas J. Tisch)*

*/s/ Pauline K. Morgan*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas, Suite 2201
New York, New York 10020
Tel: (212) 332-8840
Fax: (212) 332-8855
Pauline K. Morgan
Ryan M. Bartley
Michael S. Neiburg
Travis Buchanan

*Counsel to Plaintiffs Acting at the Direction
of the Restructuring Sub-Committee
(as to Defendant Thomas J. Tisch)*

# *EXHIBIT B*

Page 36

1

2                  UNITED STATES BANKRUPTCY COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4       --------------------------------X

5       In re:                          Chapter 11

6       SEARS HOLDINGS                      Case No:

7       CORPORATION, et al.,            18-23538 (RDD)

8                    Debtor.

9       --------------------------------X

10

11                     AUCTION PROCEEDING

12                   New York, New York

13                    January 15, 2019

14

15

16

17      Reported by:

18      MARY F. BOWMAN, RPR, CRR

19      JOB NO. 154062

20

21

22

23

24

25

1

2

3

4

5                                 January 15, 2019

6                                 10:05 a.m.

7

8

9              Proceedings, held at the offices

10   of Weil, Gotshal & Manges, LLP, 767 Fifth

11   Avenue, New York, New York, before Mary F.

12   Bowman, a Registered Professional Reporter,

13   Certified Realtime Reporter, and Notary

14   Public of the State of New Jersey.

15

16

17

18

19

20

21

22

23

24

25

Page 38

1

2                  APPEARANCES (Speakers):

3

4   WEIL, GOTSHAL & MANGES

5   Attorneys for Debtors, and

6   Debtors-in-Possession:   Sears Holdings

7   Corporation, et al.,

8        767 Fifth Avenue

9        New York, New York 10153

10  BY:  RAY SCHROCK, ESQ.

11

12  AKIN GUMP STRAUSS HAUER & FELD

13  Attorneys for Unsecured Creditors:

14        One Bryant Park

15        Bank of America Tower

16        New York, New York 10036

17  BY:  PHILIP DUBLIN, ESQ.

18

19  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

20  Attorneys for the Subcommittee of the

21  Board of Sears Holdings

22        1285 Avenue of the Americas

23        New York, NY 10019

24  BY:  PAUL BASTA, ESQ.

25

Page 39

1

2                      APPEARANCES (Speakers):

3

4    CLEARY GOTTLIEB STEEN & HAMILTON

5    Attorneys for Defendants

6         One Liberty Plaza

7         New York, NY 10006

8    BY:  SEAN O'NEAL, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

1                   Proceedings - 1/15/19

2         MR. SCHROCK:  Let's go back on

3    the record.  It is January 15, 2019 at

4    approximately 10:05 a.m.

5         First of all, thank you to

6    everyone for your patience and working

7    with the debtors yesterday.  There has

8    been a significant amount of

9    back-and-forth between ESL, as well as

10   with the debtors and their consultation

11   parties.  And we decided late last

12   night to allow ESL overnight to put

13   together a response to the proposal

14   from the debtors, and at this time, we

15   will have them put that proposal on the

16   record, after which time we are going

17   to take a break, go discuss it with the

18   restructuring committee and the

19   consultation parties.

20        We will go back on the record

21   with the debtors' decision as to

22   whether or not the offer is higher or

23   better or a successful bid, a/k/a

24   successful bid, and from that, we will

25   make a decision about whether or not

Page 41

Proceedings - 1/15/19

1
2    the auction will remain open or we will
3    close the action at that time.
4        Just a quick reminder, of course
5    the auction, as long as the auction
6    remains open, everyone remains bound by
7    the auction rules, especially the
8    duties of confidentiality that are
9    contained in the auction rules.
10       But thanks for your patience.
11   Shun.
12       MR. O'NEAL:  Good morning.  Sean
13   O'Neal, Cleary Gottlieb, on behalf of
14   ESL.
15       I do want to put some things on
16   the record because this is no ordinary
17   moment.  It's not an ordinary auction.
18   Really the fate of an American icon and
19   the fate of 45,000 employees hangs in
20   the balance.
21       Since December 28, ESL has
22   improved its bid, improved its offer in
23   response to an ever-increasing list of
24   demands.
25       Over the past few weeks, the

1           Proceedings - 1/15/19

2      debtors have been singularly focused on

3      one thing, which is requiring ESL to

4      guarantee that the debtors will not

5      become administratively insolvent,

6      without acknowledging that their own

7      liquidation analysis, their own

8      alternatives would also lead to

9      administrative insolvency.

10          On January 7, when we had our

11     chambers conference, the alleged

12     administrative claims gap was

13     approximately 77 million.  It's on that

14     basis that ESL deposited 120 million

15     dollars.  Of that amount, approximately

16     17.9 million was described as

17     nonrefundable.

18          After the wire hit, the demands

19     grew, and as of last night, the alleged

20     gap in administrative expense claims

21     was at least 225 million.

22          As we have told the debtors --

23     and none of the things that I'm saying

24     will be news to the debtors or the

25     subcommittee -- as we have told them,

1          Proceedings - 1/15/19

2      subcommittee received approximately 1.1

3      million documents from relevant

4      counterparties and we have also

5      received and reviewed confidential and

6      previously undisclosed evidence.

7          The restructuring committee

8      conducted on-the-record interviews with

9      the creditors committee with a key

10     players in this unfolding saga,

11     including Mr. Lampert of ESL.

12          The subcommittee has reached the

13     conclusion that substantial claims

14     exist against ESL and its affiliates,

15     as well as other defendants relating to

16     ESL's abuse of its control of the

17     debtors and the transfer of hundreds of

18     million of dollars of assets to ESL and

19     its affiliates for inadequate

20     consideration.  Those transfers hurt

21     Sears and its employees.

22          As a result of this conclusion,

23     we find ourselves in the unique

24     situation where the sole going concern

25     bidder for Sears is a party for which

Proceedings - 1/16/19

1  risks.  Those comments, whether the

2

3  debtors addressed that or not, we have

4  no idea because we haven't seen an

5  asset purchase agreement, but those

6  were issues that he made pretty clear

7  that should be addressed and should be

8  addressed to us.  We haven't seen that

9  yet.

10        As to the release, there is no

11  clarity in our mind what the terms of

12  the release are.  We think that there

13  is inadequate consideration for the

14  credit bid.  Per Judge Drain's explicit

15  instruction, there was supposed to be

16  an analysis.

17        But the value of the credit bid

18  under the ESL scenario versus the

19  wind-down scenario, we have not seen

20  that.  So we think that there is

21  inadequate consideration for that

22  credit bid.

23        Those are some of the highlights

24  of our concerns with this.  We reserve

25  all our rights to object to this

Page 81

1                    Proceedings - 1/16/19

2     proposal and the path forward and this

3     sale.  That is all I have to say.

4          MR. SCHROCK:  Again, Ray Schrock,

5     just briefly.

6          We were very aware of the

7     unsecured creditors committee's views

8     and we took those into account in

9     making a decision.  But we will let the

10    record stand for itself.  There is

11    going to be plenty of time if people

12    want to argue about this as we approach

13    the sale hearing, but we will keep the

14    auction adjourned at this time subject

15    to anyone else wanting -- everybody's

16    rights are reserved, just to be clear.

17    No rights, no rights lost.

18          Just very briefly.

19          MR. O'NEAL:  Thank you very much.

20    Sean O'Neal, Clearly Gottlieb Steen &

21    Hamilton on behalf of ESL.

22          I just wanted to confirm, as has

23    been discussed, that while we have

24    reached agreement on the key terms

25    described in the record, it does remain

1              Proceedings - 1/16/19

2      subject to full documentation and to be

3      agreed among the parties and also it

4      needs to be confirmed by the NewCo

5      financing sources which have been very

6      much involved in our discussions and we

7      anticipate occurring promptly.

8              Thank you.

9              MR. SCHROCK:  With that, we will

10     stand adjourned.

11             (Time noted:  2:26 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 83

1       Proceedings - 1/16/19

2

3               CERTIFICATE

4

5       I, MARY F. BOWMAN, a Registered

6    Professional Reporter, Certified

7    Realtime Reporter, and Notary Public do

8    hereby certify:

9       The foregoing is a true record of

10   the testimony given by in these

11   proceedings.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage and that I

15   am in no way interested in the outcome

16   of this matter.

17      In witness whereof, I have

18   hereunto set my hand this 16th day of

19   January, 2019.

20

21   _____

22       MARY F. BOWMAN, RPR, CRR

23

24

25