UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                        :
In re                                                   :         **Chapter 11**
                                                        :
**SEARS HOLDINGS CORPORATION**, *et al.*,               :         **Case No. 18-23538 (RDD)**
                                                        :
        **Debtors.[1]**                                 :         **(Jointly Administered)**
                                                        :
---------------------------------------------------------------x

## DECLARATION OF BRIAN J. GRIFFITH IN SUPPORT OF CONFIRMATION OF MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS

I, Brian J. Griffith, make this declaration under 28 U.S.C. § 1746:

1.      I have been a Managing Director of M-III Advisory Partners, LP

("**M-III**") for the past five years.  As Managing Director at M-III, I am responsible for leading

deal teams where we are retained by either creditors or debtors.  Assignments range from

operational improvement to distressed situations both in and out of court.  Depending on the

assignment, deal responsibilities range from short-term profit improvement roles to multi-year

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

turnaround advisory assignments in numerous industries, including: retail, financial services, real estate development, healthcare, energy, consumer products, manufacturing, automotive, and food services. Typical areas of focus on debtor engagements are treasury, cash forecasting, process improvement, cost reductions, development of strategic alternatives, and negotiations with creditors and parties-in-interest. Prior to my current role with M-III, I served in interim management roles, including as a chief financial officer and chief restructuring officer.

2.     I submit this Declaration in support of confirmation of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated July 9, 2019 (ECF No. 4476) (as may be amended, modified, or supplemented, the "**Plan**").[2] I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated July 9, 2019 (ECF No. 4478) (the "**Disclosure Statement**"), and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.

3.     Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management and advisors, including the employees of M-III who report to me, or my opinion based upon my experience and familiarity with the Debtors' business, operations, and financial condition and I am authorized by the Debtors to make this declaration in support of confirmation of the Plan. If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

---

[2]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Debtors' Memorandum of Law in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, filed contemporaneously herewith (the "**Confirmation Brief**").

### Solicitation of the Plan

4.      I understand that, by an Order, dated June 28, 2019 (ECF No. 4392) (the "**Disclosure Statement Order**"), the Bankruptcy Court approved the Disclosure Statement relating to the Plan, pursuant to section 1125 of the Bankruptcy Code, as containing adequate information of a kind and in sufficient detail to enable all parties in interest to make an informed judgment with respect to the Plan as required by the Bankruptcy Code and Bankruptcy Rules. The Solicitation Order, among other things, fixed August 16, 2019 as the date of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"),[3] and established certain deadlines for voting and filing objections to confirmation of the Plan.

5.      I am advised that, in accordance with the Disclosure Statement Order:

(a)      The notice of the Confirmation Hearing was timely served on all known holders of Claims against and Interests in the Debtors on July 11, 2019, as evidenced by the *Affidavit of Service of Arnold A. Jaglal*, sworn to on July 16, 2019 (ECF No. 4543);

(b)      Notice of the Confirmation Hearing was timely published in the national edition of *The New York Times* on July 10, 2019, as evidenced by the *Affidavit of Publication*, sworn to on July 12, 2019 (ECF No. 4534); and

(c)      The solicitation materials, including instructions detailing how to access electronic versions or request hard copies of the Disclosure Statement and Plan, ballots for eligible holders of Claims entitled to vote on the Plan, and notices of non-voting status for holders of Claims or Interests that are presumed to accept the Plan or deemed to reject the Plan, were timely served on July 5, 2019, as required by the Solicitation Order and evidenced by the *Affidavit of Service of Craig Johnson*, sworn to on July 16, 2019 (ECF No. 4545) (the "**Solicitation Affidavit**").

6.      The Plan Supplement was timely filed on August 26, 2019 (ECF No. 4632) and served on August 1, 2019 on the Master Service List (as defined in the *Amended*

---

[3]    The Confirmation Hearing, originally scheduled for August 16, 2019 was adjourned to September 18, 2019 by the *Notice of Adjournment of Hearing of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* filed on August 9, 2019 (ECF No. 4807).

*Order Implementing Certain Notice and Case Management Procedures* (ECF No. 405)), as evidenced by the *Affidavit of Service of James Mapplethorpe*, sworn to on August 1, 2019 (ECF No. 4696). Exhibit B to the Plan Supplement was filed on August 2, 2019 (ECF No. 4703) and served on the Master Service List, as evidenced by the *Affidavit of Service of Nuno Cardoso Regarding Notice of Filing of Plan Supplement in Connection with Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, sworn to on August 7, 2019 (ECF No. 4782) and served on the Master Service List. Based on section 3.1 of the Plan, I understand that the Debtors solicited votes for acceptance or rejection of the Plan from holders of Claims against the specified Debtors in each of the following Classes (each a "**Voting Class**," and collectively, the "**Voting Classes**"):

(a)  *Kmart Stores of Illinois LLC ("**Kmart IL**")*: Class 2 – Secured Claims, Class 3 – PBGC Claims, Class 4(A) – General Unsecured Claims (other than Guarantee Claims), Class 4(B) – Guarantee claims, Class 5 – ESL Unsecured Claims;

(b)  *Kmart of Washington LLC ("**Kmart of Washington**")*: Class 2 – Secured Claims, 3 – PBGC Claims, Class 4(A) – General Unsecured Claims (other than Guarantee Claims), 4(B) – Guarantee Claims, Class 5 – ESL Unsecured Claims;

(c)  *Sears Holdings Corporation ("**SHC**")*: Class 2 – Secured Claims, Class 3 – PBGC Claims, Class 4 – General Unsecured Claims, Class 5 – ESL Unsecured Claims; and

(d)  *All Other Debtors*: Class 2—Secured Claims, Class 3 – PBGC Claims, Class 4 – General Unsecured Claims, Class 5 – ESL Unsecured Claims.

7.      Based on section 3.3 of the Plan, it is also my understanding that the Debtors did not solicit votes from holders of Claims or Interests that are either unimpaired under the Plan, or impaired but receiving no property under the Plan. Furthermore, I understand that holders of Claims or Interests in K-Mart Corp. Class 1 – Priority Non-Tax Claims; Kmart IL Class 1 – Priority Non-Tax Claims; Kmart of Washington Class 1 – Priority Non-Tax Claims;

SHC Class 1 – Priority Non-Tax Claims; for all other Debtors Class 1 – Priority Non-Tax Claims, are unimpaired and are presumed to accept the Plan (collectively, the "**Unimpaired Non-Voting Classes**").  I also understand that holders of Claims or Interests in Kmart IL Class 6 – Intercompany Claims, Kmart IL Class 7 – Intercompany Interests, Kmart IL Class 8 – Subordinated Securities Claims; Kmart of Washington Class 6 – Intercompany Claims, Kmart of Washington Class 7 – Intercompany Interests, Kmart of Washington Class 8 – Subordinated Securities Claims; SHC Class 6 – Intercompany Claims, SHC Class 7 – Intercompany Interests, SHC Class 8 – Subordinated Securities Claims, SHC Class 9 – Existing SHC Equity Interests; for all other debtors Class 6 – Intercompany Claims, Class 7 – Intercompany Interests, and Class 8 – Subordinated Securities Claims, are not receiving any property under the Plan and are deemed to reject the Plan (collectively, the "**Impaired Non-Voting Classes**").

### The Plan Satisfies Section 1129 of the Bankruptcy Code

8.    Based on my understanding of the Plan, the events that have occurred prior to and during the Debtors' Chapter 11 Cases, and discussions I have had with the Debtors' legal advisors regarding the requirements set forth in the Bankruptcy Code, the Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code as I understand them.

9.    Section 1129(a)(1).  I understand based on discussions with the Debtors' legal advisors that the Plan satisfies section 1129(a)(1) of the Bankruptcy Code because it complies with sections 1122 and 1123 of the Bankruptcy Code.  In that regard, I understand that the Plan designates the classification of Claims and Interests in accordance with section 1122 of the Bankruptcy Code.  I also understand that the Plan provides for the separate classification of Claims against and Interests in the Debtors based upon the differences in legal nature and/or priority of such Claims and Interests.  I further believe that the Plan satisfies each requirement set forth in section 1123(a) of the Bankruptcy Code regarding the required contents of a

5

chapter 11 plan. Except for Administrative Expenses and Priority Tax Claims, which I am advised need not be designated as Classes under the Plan, Article III of the Plan designates the following Classes of Claims and Interests, as required under section 1123(a)(1) of the Bankruptcy Code:

**Kmart Stores of Illinois LLC**

| Class | Designation |
|-------|-------------|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Claims |
| 3 | PBGC Claims |
| 4(A) | General Unsecured Claims (other than Guarantee Claims) |
| 4(B) | Guarantee Claims |
| 5 | ESL Unsecured Claims |
| 6 | Intercompany Claims |
| 7 | Intercompany Interests |
| 8 | Subordinated Securities Claims |

**Kmart of Washington LLC**

| Class | Designation |
|-------|-------------|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Claims |
| 3 | PBGC Claims |
| 4(A) | General Unsecured Claims (other than Guarantee Claims) |
| 4(B) | Guarantee Claims |
| 5 | ESL Unsecured Claims |
| 6 | Intercompany Claims |
| 7 | Intercompany Interests |
| 8 | Subordinated Securities Claims |

**Sears Holdings Corp.**

| Class | Designation |
|-------|-------------|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Claims |
| 3 | PBGC Claims |

| Class | Designation |
|---|---|
| 4 | General Unsecured Claims |
| 5 | ESL Unsecured Claims |
| 6 | Intercompany Claims |
| 7 | Intercompany Interests |
| 8 | Subordinated Securities Claims |
| 9 | Existing SHC Equity Interests |

**All other Debtors**

| Class | Designation |
|---|---|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Claims |
| 3 | PBGC Claims |
| 4 | General Unsecured Claims |
| 5 | ESL Unsecured Claims |
| 6 | Intercompany Claims |
| 7 | Intercompany Interests |
| 8 | Subordinated Securities Claims |

10.     In total, there are nine (9) Classes of Claims against and Interests in SHC, Kmart of IL, and Kmart of Washington, and eight (8) Classes of Claims against and Interest in each of the other Debtors, based upon differences in the legal nature and/or priority of such Claims and Interests and based on the applicable Debtors.  I believe that the Plan's classification scheme was not proposed to create a consenting impaired Class and thereby manipulate voting. The classification scheme here generally follows the Debtors' capital structure and the Debtors can establish a legitimate basis for the classification scheme under the Plan.  I believe that valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Interests.  I also understand that all Claims and Interests within each Class have the same or substantially similar rights as the other Claims and Interests in that Class and

will receive the same treatment under the Plan for their respective Claims and Interests in the same Class.

11.    The Plan provides for separate classes of general unsecured claims against the Debtors with respect to (i) PBGC Claims, (ii) Guarantee Claims, and (iii) ESL Unsecured Claims. I believe that the separate classification of the PBGC Claims, Guarantee Claims (where applicable), and ESL Unsecured Claims is fair and reasonable because such separate treatment is a result of good faith settlements and compromise of issues necessary to consummate the Plan. Further, the PBGC Claims and the Guarantee Claims are dissimilar from all other Class 4 General Unsecured Claims and under the particular facts and circumstances of this case, there is a reasonable basis for separate classification.

| Class | Rationale For Separate Classification |
|---|---|
| Class 3 (PBGC Claims) | ▪ Necessary to implement PBGC Settlement and Plan Settlement<br><br>▪ Entitled to recoveries not provided to Class 4/4(A) (General Unsecured Claims)<br><br>▪ Joint and several Claim against every Debtor |
| Class 4(B) (Guarantee Claims against Kmart IL and Kmart of Washington) | ▪ Necessary to implement Plan Settlement<br><br>▪ Entitled to incremental recoveries not provided to Class 4/4(A) (General Unsecured Claims)<br><br>▪ Claims against multiple Debtors based on guarantees provided by such Debtors |
| Class 5 (ESL Unsecured Claims) | ▪ Entitled to recovery only from certain assets pursuant to Credit Bid Release approved in connection with Asset Purchase Agreement |

- PBGC Claims. Pursuant to the PBGC Settlement, PBGC Claims are receiving different treatment to other General Unsecured Claims – namely the PBGC Liquidating Trust Priority Interest and $800 million of general unsecured claims in exchange for, among other things, agreeing to reduce its $1.4 billion asserted joint and several claims to one $800 million general unsecured claim against the Estates. Absent the PBGC Settlements, the PBGC's General Unsecured Claims would significantly dilute all recoveries (to the extent recoveries are had) for General Unsecured Creditors at each Debtor because of the sheer size of its joint and several claim. Therefore, separate classification and different treatment is

necessary to implement the PBGC Settlement.  Further, the nature of the PBGC's claims differ from other General Unsecured Claims—these substantial claims are joint and several and thus each and every Debtor entity is individually liable for the PBGC Claims (absent the PBGC Settlement).

- <u>Guarantee Claims against Kmart IL and Kmart of Washington</u>.  Guarantee claimants are uniquely affected by the implementation of a settlement of substantive consolidation and therefore were provided incremental recoveries (the Plan Settlement Premium) pursuant to the Plan Settlement.  The incremental recoveries (the Plan Settlement Premium) provided to such creditors are equitable distributions directly related to the benefit the holders of Guarantee Claims are providing to the Debtors—a compromise and settlement of legitimate issues relating to the adverse impact the Plan Settlement might have on such holders' guarantee claims.  Therefore, separate classification and different treatment is necessary to implement the Plan Settlement.  Further, these Guarantee Claims have been separately classified from the General Unsecured Claims at the two particular Debtors, based on the nature of such claims—such holders of Guarantee Claims have claims against multiple Debtors based on guarantees provided by such Debtors.

- <u>ESL Unsecured Claims</u>.  Pursuant to section 9.13 of the Asset Purchase Agreement and as a result of the Credit Bid Release Consideration (as defined therein), ESL is only entitled to recover from certain assets, and is not entitled to recover from all assets available to other General Unsecured Claims.  As such, they are properly separately classified from other General Unsecured Claims.

12.     Furthermore, I understand that the Plan classification scheme is necessary to implement the Plan Settlement, and is supported by both the Pension Benefit Guarantee Corporation ("**PBGC**"), the Debtors' largest non-insider creditor in these chapter 11 cases, and the Creditors' Committee, the fiduciary of all of the Debtors' general unsecured creditors, including holders of the Guarantee Claims.

13.     It is my understanding, based on my discussions with the Debtors' legal advisors, that Articles IX, X, XI, XII, XIII, XV, XVII, and various other provisions of the Plan, as well as the exhibits thereto and the documents and agreements set forth in the Plan Supplement, satisfy the requirements of section 1123(a)(5) of the Bankruptcy Code by setting forth the means for implementation of the Plan.  Together, these provisions, documents, and agreements provide for, among other things:  (i) provisions governing Distributions under the

Plan to holders of Allowed Claims, (ii) establishment, funding and purpose of the Liquidating Trust, (iii) provisions governing treatment of Allowed Claims if the Plan Settlement is accepted and approved, (iv) provisions describing the effect of the Bankruptcy Court failing to approve the Plan Settlement, and the potential reversion to a separate chapter 11 plan of liquidation for each Debtor, (v) provisions governing the cancellation of existing securities and agreements, (vi) the rejection of certain unexpired leases and executory contracts, and (vii) procedures for disputed Claims.  In addition, the Plan Supplement includes, among other things, substantially final forms of the Schedule of Individuals or Entities Not Considered "Released Parties" or "Related Parties" under the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, the Toggle Plan Intercompany Loan Interest Rate, the identity of Primary Trust Litigation Counsel, mechanics for selecting a Liquidating Trustee, and the Liquidating Trust Agreement.

14.     Further, I understand the Debtors may require the proceeds of, among other things, the ESL Litigation (defined below) to fund payments under the Plan.  However, prosecuting the ESL Litigation will be the mandate of the Liquidating Trust Board, and will be prosecuted by the Primary Trust Litigation Counsel.  Therefore, to satisfy section 1129 of the Bankruptcy Code and emerge from chapter 11, the Debtors will grant joint standing to the Creditors' Committee with the Debtors to prosecute (i) the Specified Causes of Action, (ii) Other Preserved Causes of Action against the ESL Parties, (iii) all Claims and Causes of Action asserted in the Subcommittee Adversary Complaint, and/or any other Claims or causes of Action ancillary thereto, and (iv) Claims or Causes of Action against insurance carriers related to coverage for claims asserted in Subcommittee Adversary Complaint or a related proceeding (collectively, the "**Jointly Asserted Causes of Action**").  I understand the investigation,

prosecution and/or settlement or other disposal of the Jointly Asserted Causes of Action shall be subject to the oversight of designees appointed by the Debtors and the Creditors' Committee (the "**Litigation Designees**"). Specifically, the Litigation Designees shall comprise Patrick J. Bartels, Eugene I. Davis and Raphael T. Wallander, as the Creditors' Committee's designees, and Alan J. Carr and William L. Transier, as the Debtors' designees. The authority of the Litigation Designees shall be effective immediately upon entry of the Confirmation Order and shall remain and continue in full force and effect until the Effective Date. The Litigation Designees will serve as fiduciaries for the purpose of overseeing the investigation, prosecution and/or settlement of the Jointly Asserted Causes of Action and, on the Effective Date, will become the initial members of the Liquidating Trust Board.

15.    Because the Debtors are not reorganizing, I understand, based on my discussions with the Debtors' legal advisors, that the Debtors are not required to amend their organizational documents to prohibit the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code.

16.    It is my understanding, based on my discussions with the Debtors' legal advisors, that the Plan contains no provisions on the selection of directors, officers, or trustees that are contrary to the interests of holders of claims or equity interests or to public policy. Section 10.6 of the Plan describes the manner in which the Liquidating Trust Board will be appointed. To the extent known and determined, the Debtors have disclosed the identity of the persons who will serve as members of the Liquidating Trust Board. In particular, in Section 10.6 of the Plan, the Debtors disclosed that the initial members of the Liquidating Trust Board shall consist of: (i) Patrick J. Bartels, (ii) Alan J. Carr, (iii) Eugene I. Davis, (iv) William L. Transier, and (v) Raphael T. Wallander. The Debtors have also disclosed the identity of the proposed

Litigation Designees in the proposed confirmation order—similarly consisting of: (i) Patrick J. Bartels, (ii) Alan J. Carr, (iii) Eugene I. Davis, (iv) William L. Transier, and (v) Raphael T. Wallander.

17.    As contemplated by section 1123(b)(1) of the Bankruptcy Code, Articles IV, V, VI, VII, and VIII of the Plan describes the treatment for both the Unimpaired Non-Voting Classes and the Impaired Non-Voting Classes.

18.    With respect to section 1123(b)(2) of the Bankruptcy Code, Article XIII of the Plan provides for, among other things, the assumption or rejection of certain of the Debtors' remaining executory contracts and unexpired leases that have not been previously assumed or rejected under section 365 of the Bankruptcy Code in order to implement the Plan.    In accordance with the Plan, on July 26, 2019, the Debtors also filed the Schedule of Assumed Executory Contracts and Unexpired Leases as Exhibit C to the Plan Supplement.    The Debtors and their advisors conducted extensive review and analysis to determine which executory contracts to assume or reject based upon the terms and provisions thereof.    I believe the Debtors exercised sound business judgment in identifying the executory contracts included on the schedule of assumed Executory Contracts and Unexpired Leases as well as those to be rejected pursuant to the Plan.    On the Effective Date, except as otherwise provided in the Plan or Plan Supplement, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:    (1) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract (including, for the avoidance of doubt, (i) any Unexpired Lease subject to a consensual extension of the deadline with the applicable landlord under section 365(d)(4) of the Bankruptcy

Code to assume or reject such lease, and (ii) any Executory Contract noticed for assumption and assignment with a pending objection that has not yet been resolved); (2) is a contract, engagement letter that has been approved by an order of the Bankruptcy Court, release, or other agreement or document entered into in connection with the Plan; or (3) is a D&O Policy or an Insurance Contract.

19.     As I understand is permitted by section 1123(b)(3) of the Bankruptcy Code based on discussions with the Debtors' legal advisors, the Plan provides for the limited releases of claims held by:  (i) the Debtors and their Estates against the Released Parties described in § 15.9(a) (the "**Debtor Release**"), and § 15.9(c)(ii) of the Plan (the "**Debtor PBGC Release**," and together with the Debtor Release, the "**Debtor Releases**"); (ii) certain creditors of the Debtors against the Released Parties (the "**Third Party Release**"); and (iii) PBGC against the Debtors, the Liquidating Trustee, Liquidating Trust, the Estates and certain other affiliated parties (subject to certain limitations) (the "**PBGC Release**," and together with the Third Party Release and the Debtor Releases, the "**Plan Releases**").  The Plan Releases are integral components of the Plan and the settlements embodied therein, and are appropriate and necessary under the circumstances.

20.     The Debtor Releases are an essential component of the Plan and the settlements contemplated therein and, in my view, constitute a sound exercise of the Debtors' business judgment.  Without the Debtor PBGC Release, the Debtors and its stakeholders would not have been able to secure the substantial benefits provided by the PBGC Settlement.  With respect to the Debtor Releases, the Debtors and their Estates will receive reciprocal releases from potential Claims and Causes of Action of the Released Parties.  With respect to the Debtor PBGC Release, the PBGC is providing substantial consideration in exchange, including a mutual

release under section 15.9(c)(i) of the Plan.    Accordingly, I believe that there is ample

justification for providing the Debtor Releases and they should be approved.

21.    Under Section 15.9(c)(i) of the Plan, the PBGC is providing a release to

"the Debtors for which the Plan is confirmed, the Liquidating Trustee, the Liquidating Trust, and

the Estates for any Debtors for which a Plan is confirmed or any Estate representative appointed

or selected pursuant to section 1123(b)(3) of the Bankruptcy Code" and any successor or related

parties.  The PBGC Release is a consensual release because it is being provided with the consent

of PBGC as part of the PBGC Settlement between the Debtors and PBGC.  I understand that no

party has objected to the PBGC Release under the Plan.  Accordingly, I believe that the PBGC

Release is a sound exercise of the Debtors' business judgment and should be approved.

22.    As I understand is permitted by section 1123(b)(6) of the Bankruptcy

Code, the Plan includes an injunction provision in Section 15.8 (the "**Injunction Provision**"),

Third Party Releases in Section 15.9(b), and an exculpation provision in Section 15.10 (the

"**Exculpation Provision**").

23.    The Third Party Release applies to (i) holders of all Claims who voted to

accept the Plan; (ii) holders of Claims who are entitled to vote on the Plan but who reject the

Plan or abstain from voting on the Plan and do not opt out of these releases on the Ballots;

(iii) each of the Released Parties (other than the Debtors); and (iv) with respect to any entity in

the foregoing clauses (i) through (iii), (x) such entity's predecessors, successors, and assigns, and

(y) all persons entitled to assert Claims through or on behalf of such entities with respect to the

matters for which the releasing entities are providing releases.  I understand that the Third Party

Release does not apply to, nor will there be any attempt to impose them on, those parties not

entitled to vote on the Plan nor those rejecting or abstaining creditors that have expressly opted out on the Ballot or objected to the Plan.

24.     Moreover, the Third Party Release is narrowly tailored.   The Released Parties do not include (i) the ESL Parties; (ii) any person or Entity against which any action has been commenced on behalf of the Debtors or their Estates prior to the Confirmation Hearing; (iii) any Entity identified as a defendant or a potential defendant of an Estate Cause of Action in the Plan Supplement; and (iv) any subsequent transferee of any of the foregoing with respect to any Assets of the Debtors.   The Debtors also further narrowly tailed the definition of "Related Parties" in the Plan to make it clear that such parties are only released to the extent such Party acted on behalf of the Released Parties in connection with the matters as to which releases are provided in the Plan.   In addition, the releases do not extend to any Post-Effective Date conduct by the Liquidating Trustee and the Liquidating Trust Board.

25.     As I understand, based on discussions with the Debtors' legal advisors, the Court has subject matter jurisdiction to approve the Third-Party Releases because the claims to be released could have a "conceivable effect" on the Debtors' Estates.   Similarly, under the Debtors' organizational documents, the Debtors have obligations to indemnify their current and former directors and officers to the fullest extent permitted by law in connection with defending against claims and causes of action arising out of the performance of their duties as directors and officers.   In addition, the Third-Party Releases are an integral part of the Plan and the Released Parties have made substantial contributions to these Chapter 11 Cases.  I believe the Third-Party Releases allow the Debtors to avoid protracted litigation, thus maximizing value for all of the Debtors' economic stakeholders.  It is my belief that if the Third-Party Releases were eliminated

from the Plan, a key foundation of the Plan would be undermined, jeopardizing the success of the

Debtors' entire reorganization effort, to the detriment and prejudice of all parties in interest.

26.    Further, the Released Parties have made a substantial contribution to the

Estates, the successful prosecution of the Chapter 11 Cases and the Debtors' rehabilitation

efforts.  For example:

- Since the outset of these chapter 11 cases, the Released Parties have engaged in good-faith negotiations in order to facilitate the structuring, implementation, and execution of the sale of substantially all of the Debtors' assets and a consensual liquidation pursuant to a chapter 11 plan of the Estates.  These efforts have avoided substantial litigation and the significant costs, delay, and business disruption attendant thereto, and served to expedite the successful administration of these cases.  Importantly, these efforts have avoided a potential conversion to chapter 7 which would reduce recoveries for all stakeholders.

- The Creditors' Committee made significant compromises in connection with the Creditors' Committee Settlement.  Absent the Creditors' Committee Settlement, the Debtors would likely have had to engage in costly and protracted litigation with the Creditors' Committee concerning, among other things, the settlement of substantive consolidation and other plan-related issues.  The Creditors' Committee Settlement was a critical element in achieving the largely consensual Plan and enabled the Debtors to proceed to confirmation and an orderly wind down of the Debtors' Estates.

27.    The Exculpation Provision is limited to claims arising out of the

administration of these chapter 11 cases, including the Asset Purchase Agreement, and the

negotiation, formulation, preparation, and pursuit of, among other things, the Disclosure

Statement, the Plan, and the solicitation of votes for or confirmation of the Plan.    The

Exculpation Provision carves out acts or omissions that are determined in a final order to have

constituted willful misconduct, gross negligence, criminal misconduct, or fraud.  Each of the

Exculpated Parties has made a substantial contribution to the Debtors' Estates in chapter 11 and

played an integral role in working towards an expeditious resolution of these Chapter 11 Cases.

None of this would have been possible absent the good faith participation of, and compromises

and contributions made by, the Exculpated Parties.  The support of the Exculpated Parties was

essential to the successful negotiations of the Plan and the Global Settlement, all of which were conducted in good faith and at arm's length. Developing and executing the Debtor's chapter 11 strategy after the closing of the Sale Transaction were extremely time-intensive and labor-intensive. Absent the protection afforded by the Exculpation Provision, good faith plan negotiations may not have occurred had the negotiating parties faced the risk of future collateral attacks. Accordingly, I believe that the Exculpation Provision should be approved.

28.     The Injunction Provision is narrowly tailored and is necessary to effectuate the Plan's releases and to protect the Released Parties, including the Debtors, and the Liquidating Trust from potential litigation from prepetition creditors as they implement the provisions of the Plan after the Effective Date. Such litigation would hinder the efforts of the Liquidating Trust to effectively fulfill its responsibilities as contemplated in the Plan and thereby maximize value for all creditors. The Injunction Provision is integral to the Plan, is in the best interests of the Liquidating Trust and the Liquidating Trust Beneficiaries, and I believe it is an appropriate exercise of the Debtors' business judgment, and is in accordance with section 1123(b)(6) of the Bankruptcy Code. I understand the injunction replaces the automatic stay following the Effective Date of the Plan to ensure that parties in interest do not take actions inconsistent with the Plan to the detriment of, and in a manner unfair to, other parties in interest.

29.     <u>Section 1129(a)(2)</u>. To the best of my knowledge and belief, based on discussions with the Debtors' legal advisors, and as evidenced by the Disclosure Statement Order, prior orders of the Bankruptcy Court entered in the Debtors' Chapter 11 Cases, and the filings submitted by the Debtors, I believe that the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 regarding disclosure and solicitation of the Plan.

30.    As set forth in the Solicitation Affidavit, each known holder of a Claim in the Voting Classes was sent and should have received solicitation materials in accordance with the Disclosure Statement Order, including instructions detailing how to access electronic versions or request hard copies of the Disclosure Statement (with the Plan annexed thereto) and an appropriate form of ballot.  The Debtors solicited acceptances of the Plan in good faith and did not solicit acceptances of the Plan from any holder of a Claim or Interest prior to the transmission of the Disclosure Statement.  Based on the Solicitation Affidavit, I believe the Debtors properly solicited votes with respect to the Plan in accordance with the Solicitation Order.

31.    To the best of my knowledge and belief, good, sufficient, and timely notice of the Confirmation Hearing and all other hearings in these Chapter 11 Cases have been provided to all holders of Claims and Interests, and all other parties in interest to whom notice was required to have been provided.

32.    <u>Section 1129(a)(3)</u>.  I believe the Debtors have proposed the Plan in good faith.  The Plan and the Global Settlement (which includes the Creditors' Committee Settlement, Plan Settlement, and PBGC Settlement) are the result of extensive and robust negotiations and accommodations among the Debtors, the Creditors' Committee, and principal stakeholders and creditor constituencies, including the PBGC.

### The Plan Was Proposed in Good Faith

33.    Based on the Voting Certification, the acceptance of the Plan by the holders of Class 2 (Secured Claims) (All Debtors except Sears Protection Company (Florida), L.L.C. and Sears, Roebuck de Puerto Rico, Inc.), Class 3 (PBGC Claims) (All Debtors), Class 4 (General Unsecured Claims) (at Big Beaver of Florida Development, LLC, Big Beaver of Florida Development, LLC, Innovel Solutions, Inc., KBL Holding Inc., MaxServ, Inc., Sears Brands

Business Unit Corporation, Sears Buying Services, Inc., Sears Development Co., Sears Holdings Publishing Company, LLC., Sears Home & Business Franchises, Inc., Sears Insurance Services, L.L.C., Sears Procurement Services, Inc., Sears Protection Company, Sears Protection Company (PR) Inc., ServiceLive Inc., SHC Desert Springs, LLC, SHC Licensed Business LLC, SHC Promotions LLC, SRe Holding Corporation, STI Merchandising, Inc., SYW Relay LLC, Troy Coolidge No.13, LLC, and Wally Labs LLC), and Class 4(A) (General Unsecured Claims other than Guarantee Claims) (Kmart IL and Kmart of Washington), each an Impaired Class entitled to vote, coupled with the Creditors' Committee's and PBGC's support of the Plan reflects the Plan's fairness and the good faith efforts of the parties to achieve the objectives of chapter 11. The Global Settlement, which includes settlements among the Debtors and certain key creditor constituencies, is indicative of the genuine good faith efforts of the parties to reach consensual resolutions to attain the objectives of chapter 11.   Furthermore, the Debtors and their management team have upheld their fiduciary duties to stakeholders throughout these chapter 11 cases by seeking to maximize the value of the Debtors' Estates through engagement and consensus whenever reasonably possible.   I also believe that the Debtors included in the Disclosure Statement all information material to the decision whether to accept or reject the Plan. Accordingly, the Debtors have acted with the best intentions for creditors in proposing the Plan, particularly when viewing the Plan in the totality of the circumstances.

### The Creditors' Committee Settlement Was Proposed in Good Faith and Is in the Best Interests of These Estates

34.   The Creditors' Committee Settlement provides the Debtors with the support of a major constituency and a consensual framework for the post-Effective Date process. I believe the Creditors' Committee Settlement is fair, reasonable, and in the best interest of the

Estates.  And, for the reasons set forth below, I believe the Creditors' Committee Settlement does not fall beneath the "lowest point in the range of reasonableness."

35.     I was personally involved in the negotiations of the Creditors' Committee Settlement, which were iterative over several-weeks and conducted in good faith by the Debtors and the Creditors' Committee, each represented by sophisticated professionals.  In fact, the Creditors' Committee Settlement results from the Debtors' and the Creditors' Committee's careful examination and negotiation of Plan issues and is the direct by-product of hard-fought, arm's-length negotiations.

36.     Since the early stages of these chapter 11 cases, the Debtors and the Creditors' Committee have engaged in continuous discussions regarding a viable path to exit chapter 11, and such discussions increased in frequency following the closing of the Sale Transaction.  Following the hearing to approve the Disclosure Statement on May 29, 2019, the Debtors continued negotiations with the Creditors' Committee in the hopes of reaching a settlement.  The negotiations were lengthy and rigorous—including multiple telephonic and in-person meetings with the Debtors' advisors, and the exchange of multiple drafts of the Disclosure Statement and Plan.  I believe the rigor of these negotiations is evidence of the complexity of the issues at hand, the potentially contentious litigation on the issues at confirmation, and the attendant uncertainty of success.  In my view, the Debtors appropriately balanced the uncertainty of success with the enormous benefit of obtaining the Creditors' Committee's support for the Plan.

37.     The result of these extensive negotiations was the Creditors' Committee Settlement, which resolves outstanding issues with the Creditors' Committee.  The key terms are as follows:

a.    The Creditors' Committee agrees to support the Plan, including the PBGC Settlement and the Plan Settlement.

b.    Issues regarding post-Effective Date corporate governance are settled as between the Debtors and the Creditors' Committee, mainly that the composition of the Liquidating Trust Board shall be established as reflected in Section 10.6 of the Plan, and the selection process for the Liquidating Trustee and the Primary Trust Litigation Counsel shall be established as reflected in Section 10.7 of the Plan.

c.    Pursuant to the Creditors' Committee Settlement, the Creditors' Committee will have certain consultation and consent rights with regard to various settlements of various disputes and issues.

38.    Put simply, the Creditors' Committee Settlement provides the Estates with several benefits.  With the Creditors' Committee Settlement, the Debtors have a powerful ally and Plan proponent in their major creditor constituency.  Alternatively, absent the Creditors' Committee Settlement and the compromises contained therein, the Debtors would likely face a cost-prohibitively litigious confirmation process, which would inevitably prolong the process to the detriment of all stakeholders.  The Creditors' Committee Settlement permits the Debtors to forego complex and time-consuming litigation including discovery, depositions, and motion practice, around confirmation of the Debtors' Plan.  The costs and delays associated with a contested confirmation would inevitably have significantly and negatively impacted the Debtors' assets.  As a result, I believe the Creditors' Committee Settlement is fair, reasonable, and in the best interest of the Estates.

### The Plan Settlement Was Proposed in Good Faith and Is in the Best Interests of These Estates

39.    As detailed in the *Declaration of William Murphy in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Liquidation of Sears Holdings Corporation and its Affiliated Debtors* (the "**Murphy Declaration**") filed contemporaneously herewith, the Plan Settlement fairly resolves issues arising from the potential

substantive consolidation of the Debtors' Estates in light of, among other things, the limited value available for creditor distributions, the consequences that could result in a chapter 7 based on the Debtors' liquidation analysis, and the Debtors' urgent need to wind down the Debtors' Estates.   All parties to these negotiations acted in good faith and in the best interests of the Debtors' Estates.   As a result, I believe the Plan Settlement is fair, reasonable, and in the best interest of the Estates, and satisfies both the 9019 standard and the *Iridium* factors.   The Plan Settlement allows the Debtors to forego complex, time-consuming, and ultimately uncertain litigation around substantive consolidation, including considerable inter-estate and inter-creditor litigation.   Further, the Plan Settlement is in the best interests of the creditors as a whole—the settlement is one of the foundations for the Debtors' Plan and seeks to provide the stakeholders with certainty, as well as prompt and maximized distributions.   Pursuant to the Plan Settlement, including the Plan Settlement Premiums where applicable, to the extent value flows to unsecured creditors, they will receive recoveries in excess of those available under a deconsolidated chapter 11 plan.   The Plan Settlement also maximizes value because it resolves significant Intercompany Claims, and in conjunction with the PBGC Settlement, caps the amount of Claims that PBGC could assert against every Debtor and provides that the PBGC will not share in the upside of Plan Settlement Premiums.

### The PBGC Settlement Was Proposed in Good Faith and Is in the Best Interests of These Estates

40.   As also detailed in the Murphy Declaration, the PBGC Settlement was the result of a robust, arm's-length negotiation involving sophisticated counsel on both sides.   The resulting settlement resolved issues surrounding the complex relationship between PBGC and the Debtors, including the termination of Pension Plans, various assertable claims by PBGC, PBGC's claims against KCD, and the significant joint and several liabilities against each Debtor,

in order to maximize value for all creditors.  Overall, the PBGC Settlement provides numerous benefits to the Estates, as set forth in detail in the Murphy Declaration.  Thus, I believe the PBGC Settlement is fair, reasonable, and in the best interest of the Estates, and satisfies both the 9019 standard and the *Iridium* factors.

41.    Accordingly, I believe that the Plan and the Global Settlement as reflected therein are fundamentally fair and reasonable.

42.    <u>Section 1129(a)(4)</u>.  Pursuant to the interim compensation procedures established under section 331 of the Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses of professionals retained in these chapter 11 cases.  I understand that payments made or to be made by the Debtors for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases have been approved by, or are subject to the approval of, the Bankruptcy Court.  Pursuant to the Plan, all final requests for payment of Fee Claims must be filed no later than forty-five (45) days after the Effective Date for determination by the Bankruptcy Court.

43.    <u>Section 1129(a)(5)</u>.  It is my understanding, based on my discussions with the Debtors' legal advisors, that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.  In Section 10.6 of the Plan, the Debtors disclosed that (i) Patrick J. Bartels, (ii) Alan J. Carr, (iii) Eugene I. Davis, (iv) William L. Transier, and (v) Raphael T. Wallander will serve on the Liquidating Trust Board.  Furthermore, it is my understanding that the Plan contains no provisions regarding the selection of directors, officers, or trustees that are contrary to the interests of holders of claims or equity interests or to public policy.  No party in interest has objected to confirmation on the basis that the Debtors have failed to comply with

section 1129(a)(5) of the Bankruptcy Code, and I am not aware of any dispute as to whether the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

44.    <u>Section 1129(a)(6)</u>.  It is my understanding that section 1129(a)(6) of the Bankruptcy Code is inapplicable because the Plan does not provide for any rate changes by the Debtors.

45.    <u>Section 1129(a)(7)</u>.  I understand that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Interests, each holder of such Claim or Interest must either (a) accept the Plan or (b) receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

46.    As detailed in the Murphy Declaration, M-III professionals prepared the liquidation analysis of the Debtors (as may be amended, supplemented or otherwise modified from time to time, the "**Liquidation Analysis**") described herein and annexed to the Disclosure Statement.  The Liquidation Analysis, annexed as <u>Exhibit E-1</u> to the Disclosure Statement, was prepared by the M-III team under my and William Murphy's supervision.  As set forth more fully below and in the Murphy Declaration, the Liquidation Analysis demonstrates that each holder of an Allowed Claim and Allowed Interest will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; put simply, the Plan satisfies the "best interests" test as I understand it.

47.    <u>Section 1129(a)(8)</u>.    As set forth above, holders of Claims in the Unimpaired Non-Voting Classes are not impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, as evidenced by the Voting Certification, the Plan has been accepted by Claims in Class 2 (Secured Claims) (All Debtors except Sears Protection Company (Florida), L.L.C. and Sears, Roebuck de Puerto Rico, Inc.), Class 3 (PBGC Claims) (All Debtors), Class 4 (General Unsecured Claims) (at Big Beaver of Florida Development, LLC, Big Beaver of Florida Development, LLC, Innovel Solutions, Inc., KBL Holding Inc., MaxServ, Inc., Sears Brands Business Unit Corporation, Sears Buying Services, Inc., Sears Development Co., Sears Holdings Publishing Company, LLC., Sears Home & Business Franchises, Inc., Sears Insurance Services, L.L.C., Sears Procurement Services, Inc., Sears Protection Company, Sears Protection Company (PR) Inc., ServiceLive Inc., SHC Desert Springs, LLC, SHC Licensed Business LLC, SHC Promotions LLC, SRe Holding Corporation, STI Merchandising, Inc., SYW Relay LLC, Troy Coolidge No.13, LLC, and Wally Labs LLC) and Class 4(A) (General Unsecured Claims other than Guarantee Claims) (Kmart IL and Kmart of Washington), each an Impaired Class entitled to vote.  Thus, as to such Classes at such Debtors, the requirements of section 1129(a)(9) have been satisfied.

48.    Holders of Claims in Class 2 (Secured Claims) at Sears Protection Company (Florida), L.L.C. and Sears, Roebuck de Puerto Rico, Inc.,[4] Class 4 (General Unsecured Claims) (at A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E Lawn &

---

[4]    The Debtors believe that the one rejecting voter at both Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc. do not have any Secured Claims, and the Debtors intend to object to their claims on that basis.  Further, pursuant to the Plan, Holders of all Secured Claims will be satisfied in full.  Therefore, as discussed more fully in the Confirmation Brief, Class 2 at Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc. do not need to be "crammed down" and the Debtors may obtain confirmation of the Plan notwithstanding the rejection.

Garden, LLC, A&E Signature Service, LLC, California Builder Appliances, Inc., FBA Holdings

Inc., Florida Builder Appliances, Inc., KLC, Inc., Kmart Corporation, Kmart Holding

Corporation, Kmart of Michigan, Inc., Kmart Operations LLC, Kmart Stores of Texas LLC,

Kmart.com LLC, MyGofer LLC, Private Brands, Ltd., Sears Brands Management Corporation,

Sears Brands, L.L.C., Sears Holding Corporation, Sears Holdings Management Corporation,

Sears Home Improvement Products, Inc., Sears Operations LLC, Sears Protection Company

(Florida) , L.L.C., Sears Roebuck Acceptance Corp., Sears, Roebuck and Co., Sears, Roebuck de

Puerto Rico, Inc., SOE, Inc., and StarWest, LLC) and Class 4(B) (Guarantee Claims) at Kmart

Stores of Illinois LLC and Kmart of Washington LLC have voted to reject the Plan.[5]

Furthermore, Holders of Claims or Interests in Class 6 (Intercompany Claims) (All Debtors),

Class 7 (Intercompany Interests) (All Debtors), Class 8 (Subordinated Securities Claims) (All

Debtors), and Class 9 (SHC Existing Equity Interests) (SHC) are deemed to have rejected the

plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 5 (ESL Unsecured Claims) (All

Debtors), an Impaired Class entitled to vote, abstained from voting at any of the Debtors.

However, ESL objected to the Plan; under these circumstances, the Debtors are also requesting

to "cram down" Class 5.  It is my understanding, based on discussions with the Debtors' legal

advisors, that the Debtors have satisfied the "cram down" requirements under 1129(b) of the

Bankruptcy Code and may be confirmed notwithstanding the rejection by holders of Claims in

Class 2 (Secured Claims) at Sears Protection Company (Florida), L.L.C. and Sears, Roebuck de

Puerto Rico, Inc., Class 4 (General Unsecured Claims) at the Debtors listed above, Class 4(B)

(Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC and deemed

rejection by Class 6 (Intercompany Claims) (All Debtors), Class 7 (Intercompany Interests) (All

---

[5]

Debtors), Class 8 (Subordinated Securities Claims) (All Debtors), and Class 9 (SHC Existing

Equity Interests) (SHC), and abstention in Class 5 (ESL Unsecured Claim).

49.     Section 1129(a)(9).  I understand that, pursuant to Articles II, IV, V, VI,

VII, VIII of the Plan, all Allowed Administrative Expense Claims under section 503(b) of the

Bankruptcy Code and all Allowed Priority Non-Tax Claims under section 507(a) are treated in

compliance with section 1129(a)(9).  The Plan provides, unless such holder agrees to less

favorable treatment, that holders of Allowed Administrative Expense Claims under

section 503(b) of the Bankruptcy Code will be paid in full, in Cash, on the latest of (i) the

Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the

date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim,

and (iii) the next Distribution Date after such Administrative Expense Claim becomes an

Allowed Administrative Expense Claim.  *See* Plan, § 2.1.

50.     Moreover, the Plan provides that, unless a holder agrees to less favorable

treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the Bankruptcy

Code (excluding Priority Tax Claims under section 507(a)(8), as described below) will be paid in

full, in Cash, on the later of (i) the Effective Date, (ii) the date that is ten (10) business days after

the date on which such Claim becomes Allowed, or (iii) the next Distribution Date after such

Claim becomes Allowed.

51.     Regarding the treatment of Priority Tax Claims under section 507(a)(8),

pursuant to Section 2.3 of the Plan and except to the extent that a holder of an Allowed Priority

Tax Claim agrees with the Debtors prior to the Effective Date, or the Liquidating Trust after the

Effective Date, to less favorable treatment, each holder of an Allowed Priority Tax Claim shall

receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority

Tax Claim from the applicable Debtor(s) or the Liquidating Trust, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the latest of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (iii) the next Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iv) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

52.     <u>Section 1129(a)(10)</u>.    I understand that section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired Claims, without counting the votes of any insider.   As reflected in the Voting Certification, with respect to each Debtor, I understand that the Plan satisfies this requirement because Class 3 – PBGC Claims, are impaired and each such Class has accepted the Plan at each Debtor, without including the acceptance of the Plan by any insiders in each such Class.  Further I understand that Class 2 – Secured Claims at fifty-one (51) Debtors , Class 4 – General Unsecured Claims at Big Beaver of Florida Development, LLC, Big Beaver of Florida Development, LLC, Innovel Solutions, Inc., KBL Holding Inc., MaxServ, Inc., Sears Brands Business Unit Corporation, Sears Buying Services, Inc., Sears Development Co., Sears Holdings Publishing Company, LLC., Sears Home & Business Franchises, Inc., Sears Insurance Services, L.L.C., Sears Procurement Services, Inc., Sears Protection Company, Sears Protection Company (PR) Inc., ServiceLive Inc., SHC Desert Springs, LLC, SHC Licensed Business LLC, SHC

Promotions LLC, SRe Holding Corporation, STI Merchandising, Inc., SYW Relay LLC, Troy Coolidge No.13, LLC, and Wally Labs LLC, and Class (4)(A) – General Unsecured Claims (other than Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC are impaired and have accepted the Plan

53.    <u>Section 1129(a)(11)</u>. Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is feasible.  It is my understanding, based on my discussions with the Debtors' advisors, that the applicable feasibility test for a liquidating plan is to determine whether a Debtor will be able to make the payments required under the Plan, or whether the Plan may be implemented and has a reasonable likelihood of success.  I believe that the Plan embodies a rational plan for the orderly wind down of the Debtors' Estates after a sale of substantially all of its assets and delivery of any remaining assets to the Liquidating Trust for distribution to holders of Allowed Claims pursuant to the Plan.  Manifestly, the conditions precedent to the Plan can and will be done as a practical matter.

54.    I understand that for purposes of determining whether the Plan satisfies the feasibility requirement, the Debtors, with the assistance of their financial advisors, analyzed the ability of the Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors have analyzed their ability to fulfill their obligations under the Plan and taken into consideration their estimated costs of administration.

## **Cash On Hand**

55.    As shown in the table below, the Debtors had approximately $58.9 million in unrestricted cash[6] as of August 31, 2019, and are expected to have approximately $50.1 million in unrestricted cash on September 21, 2019:

---

[6]    This does not include the Carve-Out Account, Consignment Account, Luxottica Account, or Sparrow Account.

**Estate Bank Account Balances**

| ($'s) | Account # | Actual | | Forecast | |
|---|---|---|---|---|---|
| | | 8/31/19 | 9/7/19 | Disbursements | 9/21/19 |
| Unrestricted Cash | | | | | |
| Sears Account | ***7244 | 1,972,296 | 1,850,323 | | 1,850,323 |
| Kmart Account | ***7260 | 223,204 | 223,204 | | 223,204 |
| [1] Wind-Down Account | ***8965 | 52,053,734 | 50,902,357 | (7,555,429) | 43,346,927 |
| [2] Utilities Deposit Account | ***5450 | 4,700,000 | 4,700,000 | | 4,700,000 |
| Total Unrestricted Cash | | 58,949,235 | 57,675,883 | | 50,120,454 |

(1) Disbursements from the Wind-Down Account in the forecast period reflect two weeks of funding the Carve Out Account.
(2) Actual cash in the Utility Deposit Account is $10mm; however, $5.3mm is potentially property of Transform.

## Additional Asset Proceeds

56.     In addition to cash on hand, additional assets of the Estates include a total of $130.4 million in estimated net proceeds from sale of the Calder sculpture (the "**Calder Net Proceeds**"), proceeds from the sale of the Debtors' real estate (the "**Real Estate Proceeds**"), proceeds from certain *de minimis* claims (the "**De Minimis Claims**"), proceeds from the 2017 EDA recovery ("**2017 EDA Funds**"), and Transform's obligation of certain 503(b)(9) obligations (the "**Transform 503(b)(9) Obligations**," collectively, the "**Additional Asset Proceeds**"). A breakdown of the Additional Asset Proceeds is reflected in the chart below:

| Additional Asset Proceeds | |
|---|---|
| Calder Net Proceeds | 10.0 |
| Real Estate Proceeds | 13.1 |
| De Minimis Assets | 5.3 |
| 2017 EDA Funds | 5.0 |
| Transform 503(b)(9) Obligations | 97.0 |
| **Total Additional Proceeds** | $     130.4 |

57.     *Calder Net Proceeds*.    As shown above, the estimated Calder Net Proceeds to the Estates are approximately $10 million. The Debtors obtained a $15 million appraisal of the Calder from Gurr Johns, a true and correct copy of which is attached hereto as **Exhibit A**. Pursuant to the waterfall set forth in section 2(f) of the Settlement Agreement and Mutual Release, dated as of June 28, 2013 (the "**Calder Settlement Agreement**"), the Debtors'

share of a sale at the appraised value would be approximately $8 million. However, the Third Party Sale Period, as defined in the Calder Settlement Agreement, has expired and the sharing percentage waterfall is no longer applicable. The rights of the respective parties under the Calder Settlement Agreement are the subject of pending litigation in Cook County, Illinois. The Debtors expect to prevail in that litigation and expect to be able to sell the Calder for its appraised value of $15 million, in which case the Debtors would retain approximately $10 million of the sale proceeds. As stated above, however, in the event the Debtors did not prevail in the state court litigation and the sharing percentage waterfall were applicable, the Debtors' share of the net proceeds would be $8 million, based on the appraised value.

58. ***Real Estate Proceeds***. Additional Estate proceeds also include approximately $13.1 million in real estate proceeds. This amount relates to the remaining thirteen properties held by the Debtors, which are shown in the table below:

| Summary Real Estate Forecast | | | | | |
| Unit | Name | St | Format | Est. Gross Proceeds | Est Net Proceeds [(2)] |
|---|---|---|---|---|---|
| 1251 | Lithonia | GA | UUP FLS | $2,643,617 | $2,485,000 |
| 30901 | Lansing | IL | UUP Kmart | 1,500,000 | 1,410,000 |
| 446 | Memphis | TN | UUP DC | 5,000,000 | 4,700,000 |
| 6488 | Mayaguez | PR | UUP Vacant Land | 850,000 | 799,000 |
| 7309 | TEXARKANA | TX | UUP Expansion Area | 25,000 | 23,500 |
| 26588 | Salem | OH | UUP FLS | 70,000 | 65,800 |
| **Total Forecast** [(1)] | | | | **$10,088,617** | **$9,483,300** |
| 1065 | Glen Allen | VA | FLS | 2,123,600 | 1,996,184 |
| 3998 | Dinubi | CA | UUP Vacant Land | 125,000 | 117,500 |
| 7916 | Eureka | CA | UUP Vacant Land | 450,000 | 423,000 |
| 26985 | Chicago | IL | UUP Vacant Land | 665,379 | 625,456 |
| 30958 | EL CENTRO | CA | UUP Vacant Land | 250,000 | 235,000 |
| 31002 | MOUNTAIN HOME | ID | UUP Vacant Land | 131,600 | 123,704 |
| 37563 | Washington Courthouse | OH | UUP Vacant Land | 65,000 | 61,100 |
| **Est Potential Value Including Available BOVs** [(3)] | | | | **$3,810,579** | **$3,581,944** |
| **Total Estimated Value** | | | | **$13,899,196** | **$13,065,244** |

(1) Forecast based on property offers received
(2) Est Net Proceeds includes estimated 6% fee on sale
(3) Total includes available values per BOVs received

As reflected in this table, six of these thirteen properties currently have bids or are under contract. The remaining seven are valued based on a broker opinion of value ("BOV"), a true and correct copy of which is attached hereto as **Exhibit B**.

59.    *De Minimis Assets*.    I understand that there are a minimum of approximately $5.3 million in De Minimis Claims that the Estates have not previously prioritized in monetizing.    The types of claims vary from uncashed or undeliverable checks, escheatments, property tax overpayments, and/or refunds at the federal, state and municipal levels over multiple years at various debtor entities.    These claims range in size from approximately $10 up to and over $10,000.    There are thousands of these claims that will be pursued.    The Estates have engaged Orion Recovery Group ("**ORG**") to assist in the collection of these various claims across all fifty states of the United States of America.    Attached as **Exhibit C** is a true and correct copy of the initial list of identified claims that I understand ORG is currently in the process of collecting.    While the initial list of claims identified (and estimated for states that do not release amounts owed until identification is verified) totals approximately $5.3 million, I understand from continued discussions with ORG and their historical recovery rates, that total recoveries are likely to exceed $10 million over 12 to 24 months.    As of today, ORG has sent claim notices for approximately $3 million worth of De Minimis Claims which have been signed by M-III Partners for collection.    These recoveries are expected to be recovered in 90 to 120 days.

60.    *2017 EDA Funds*.    I understand that the Court made a preliminary ruling—which the Debtors and Transform accepted as final on the record at the September 12, 2019 hearing—that, as between the Debtors and Transform, the rights to the 2017 EDA Funds currently held by the Village of Hoffman Estates belong to the Debtors.    I also understand that the Court ordered that approximately $2.5 million of the 2017 EDA Funds be turned over to the Debtors; which have since been turned over to these Estates.    The remaining $7.1 million of 2017 EDA Funds are currently subject to litigation in Illinois state court, pursuant to the

Bankruptcy Court's Abstention Order (ECF No. 3362). Although the Debtors have strong arguments for why the Debtors are entitled to the full amount, we have reflected $5 million above to adjust for potential litigation risk.

61.     ***Transform 503(b)(9) Obligations.*** I understand that Section 2.3(k)(iv) of the APA provides that Transform will be liable for up to $139 million in 503(b)(9) Claims. Adding in approximately $13 million of Transform's severance obligations, Transform's obligations total approximately $152 million. From that amount, the Debtors have estimated a reduction of approximately $55 million on account of the prepaid inventory shortfall, for a total of $97 million. In conclusion, I understand that Transform is obligated to pay up to approximately $97 million on account of 503(b)(9) Claims, which may be offset depending on how the Specified Receivable and Prepaid Inventory issues are resolved.

## Additional Litigation Proceeds

62.     Further, the Estates will have access to additional litigation proceeds, including proceeds from any avoidance action arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law (collectively, the "**Preference Actions**"), recoveries from litigation in connection with certain prepetition related party transactions, including recoveries on account of the Specified Causes of Action (the "**ESL Litigation**"), and recoveries against available D&O Policies on account of Preserved Causes of Action against the Specified Directors and Officers (the "**D&O Litigation**") (collectively, the "**Additional Litigation Proceeds**").

63.     ***Preference Actions***. In connection with my role as a financial advisor to the Debtors, I actively participated in the process by which law firms were selected to prosecute preference claims belonging to the Debtors for the benefit of the Estates. M-III went out and

solicited bids from preference firms, and then provided the Restructuring Committee with detailed information from all prospective firms that submitted proposals.

64.     The process undertaken by the Restructuring Committee to vet and authorize retention of the preference firms was thorough, robust, and diligent. The Restructuring Committee carefully considered each of the potential firms, the amounts they identified in their proposal materials (which I discuss further below), and, after the firms were selected, the weekly updates, the work done thus far, and success to date. In their proposals, the Retained Firms (defined below) estimated $54.8 million to $100 million in recoveries, whereas another bidding firm estimated $100 million to $200 million in recoveries. These initial estimates were based on a review of preliminary data and subject to adjustment once a full analysis could be completed. Importantly, throughout the fee structure negotiations, the Debtors were focused on structuring the contingency fees such that the Retained Firms would share in the upside and would therefore be incentivized to seek the highest recoveries possible. Drawing from my professional experience, typically professionals agree to a structure where contingent fees are based upon unachievable results.

65.     After rigorous negotiations regarding the terms of engagement, the Debtors ultimately retained ASK LLP (ECF No. 4373), Acumen Recovery Services, LLC (ECF No. 4363), and Katten Muchin Rosenman LLP (ECF No. 4413) ("**Retained Firms**"). Since approximately April 30, 2019, each Restructuring Committee meeting has begun with an update by the Retained Firms—including an update on deliverables, open issues, the actions in process, and any settlements or value received by the Estates. I understand that the Retained Firms, pursuant to the Creditors' Committee Settlement, have maintained contact with the Creditors' Committee with regard to settlements—particularly the preference actions for which the net

preference is in excess of $500,000. I also understand that the Retained Firms have to date sent out approximately 2,600 demand letters (an additional 1,000 are anticipated to be sent) and are in active discussions with parties in efforts to settle various preference claims.

66.    As it relates to preferences, the Retained Firms have identified in excess of $1.345 billion of transfers by the Debtors within the 90-day preference window that may be recoverable by the Debtors. After netting subsequent new value, the amount is reduced to approximately $586 million. The projected gross, recoveries that the Debtors would receive, according to preference counsel vetted by the Restructuring Committee, ranged from a low of $53.8 million to a high of $200 million based on the percentages provided in the initial estimates presented during the bidding process.

67.    Following their engagement, the Retained Firms conducted extensive diligence of close to 4,0000 claims and refined their initial estimated recovery range of $54.8 million to $100 million to reach their current estimated recovery range of $100 million to $150 million. I also understand from the Retained Firms that a recovery, net of fees, of more than approximately $100 million is reasonable.

68.    As an additional reasonableness check on the estimated recoveries, I also considered recoveries in comparable cases[7] identified based on the Retained Firms' extensive experience, and the data set forth in the table below is what was provided:

---

[7]    As shown in the table above, the comparable cases identified were *Quebecor World (USA), Inc., et al.*, Bankr. No. 08-10152 (Bankr. S.D.NY.) (Peck (case); Lane (adversary proceedings)); *WP Steel Venture, LLC, et al.*, Bankr. No. 12-11661 (Bankr. D. Del.) (Carey); *Fresh & Easy, LLC*, Bankr. No. 15-12220 (Bankr. D. Del.) (Shannon); Ongoing case, Bankr. D. Del. (Shannon); and *SRC Liquidation LLC*, Bankr. No. 15-10541 (Bankr. D. Del.) (Shannon).

| Case | Total Transfers Pursued | New Value | Net of New Value | Gross Recovery Analysis | | | |
|---|---|---|---|---|---|---|---|
| | | | | Net of New Value | % | Total Transfers | % |
| Quebecor World (USA), Inc., et al. | $ 404,200,000 | $ 188,740,000 | $ 215,450,000 | $ 51,000,000 | 23.7% | $ 51,000,000 | 12.6% |
| WP Steel Venture, LLC | 418,725,000 | 246,475,000 | 172,250,000 | 46,100,000 | 26.8% | 46,100,000 | 11.0% |
| Confidential - Ongoing Case | 58,725,000 | 19,100,000 | 39,600,000 | 6,500,000 | 16.4% | 6,500,000 | 11.1% |
| SRC Liquidation Company | 96,765,000 | 52,631,000 | 44,133,000 | 6,114,557 | 13.9% | 6,114,557 | 6.3% |
| Fresh & Easy, LLC | 48,200,000 | 25,740,000 | 22,465,000 | 7,200,000 | 32.0% | 7,200,000 | 14.9% |
| **Total** | **$ 1,026,615,000** | **$ 532,686,000** | **$ 493,898,000** | **$ 116,914,557** | **23.7%** | **$ 116,914,557** | **11.4%** |
| Average | 205,323,000 | 106,537,200 | 98,779,600 | 23,382,911 | 23.7% | 23,382,911 | 11.4% |
| Sears Holding Corp | $ 1,345,000,000 | $ 759,600,000 | $ 585,400,000 | $ 138,574,730 | 23.7% | $ 153,173,370 | 11.4% |
| Estimated Contingency Fee | | | | 20,786,209 | 15.0% | 22,976,006 | 15.0% |
| **Net Recovery to the Estate** | | | | **$ 117,788,520** | | **$ 130,197,365** | |

69.    As shown above, the average range of recoveries for these comparable cases is 11.4% of the gross total transfers pursued or, alternatively, 23.7% of those transfers, net of subsequent new value.  If those average recovery percentages are applied in this case, they would result in estimated gross recoveries ranging from $138 million to $153 million, and $118 million to $130 million, net of estimated projected professional fees of 15%.

70.    Thus, I believe it is reasonable to conclude that there will be recoveries in excess of $100 million for the Preference Actions.

71.    ***ESL Litigation and D&O Litigation***.  As detailed in the *Declaration of William L. Transier in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Liquidation of Sears Holdings Corporation and its Affiliated Debtors* (the "**Transier Declaration**") filed contemporaneously herewith, following the Confirmation Date, the Debtors estimate that they will monetize significant litigation assets including the recoveries from litigation in connection with certain prepetition related party transactions, including recoveries on account of the ESL Litigation and recoveries against available D&O Policies on account of Preserved Causes of Action against the D&O Litigation.

**Additional Estate Expenses**

72.    A portion of the cash on hand will be used to fund the Liquidating Trust plus the remaining estate professional fees.  The Debtors anticipate having $25 million available for pre- and post-Effective Date for the prosecution of the ESL Litigation.  Further, the Debtors anticipate approximately $9 million on account of Debtor professional fees and U.S. Trustee fees from September through November 2019.

**Impact of APA Disputes on Cash**

73.    Although the Debtors believe they have credible arguments in connection with all of the APA disputes, given the ongoing nature of the disputes, the Debtors have not factored in any additional cash recoveries from Transform as a result of the same.  That said, we still believe that the Estate is holding approximately $40.5 million of Estate funds in the following amounts that are currently tied up in the ongoing APA disputes relating to the following categories:

(a)    Remaining Cash in Transit: $19.5 million

- Includes proceeds from customer sales that occurred prior or shortly after the Transform transaction that were in transit around the time of closing; the $19.5 is net of $3.0 million previously paid by Transform to the Debtors

(b)    Estate checks improperly deposited by Transform: $16.1 million

- Transform has deposited approximately $16.1 million of checks that Transform has acknowledged are property of the Estate and relate to tax refunds, insurance proceeds, and other proceeds related to operations pre-closing of the Sale Transaction; Transform disputes ownership of $6.0 million of certain property tax refund checks related to periods prior to the Transform transaction and properties assigned to Transform

(c)    Post-close GOB store credit card proceeds: $4.4 million

- Transform holds approximately $4.4 million of proceeds from credit card processors that were improperly routed to Transform's

accounts after the close of the Transform Sale Transaction related to sales made at GOB stores that were not included in the Transform Sale Transaction and belong to the Estate

(d)     Subtenant Proceeds: $0.7 million

- Transform deposited approximately $0.7 million of proceeds from subtenants of properties that the Estate is the leasee of and subleases to third parties, which were not part of the assets transferred under the APA

74.     Transform asserts that the Debtors owe Transform amounts for various costs Transform has allegedly incurred on the Estate's behalf, after the close of the Sale Transaction.  The Debtors acknowledge that there may be certain setoffs or expenses that it owes to Transform—which would reduce the amount Transform owes to the Estates—but the dispute over such offsets is ongoing.  In addition, there are approximately $7.3 million of checks deposited by Transform that have not yet been reviewed to determine whether those proceeds also are owed to the Estate.

**<u>Claims to Be Satisfied</u>**

75.     As detailed in the Murphy Declaration, the Debtors, with the assistance of their financial advisors, have been carefully tracking administrative expense claims (including 503(b)(9) claims), and secured and priority (tax and non-tax) claims, and the available assets to pay such claims.  The Debtors have taken into consideration all factors to ensure the Debtors' ability to effectuate the Plan and have actively tracked the cost of administration of these chapter 11 cases, including by, as stated previously, producing the "Admin Solvency Tracker" reflecting the Debtors' current estimates of Administrative Expense Claims and the status of assets available to satisfy such claims, which reports were regularly shared with the Creditors' Committee and second lien holders.

76.     Based on my understanding of the Murphy and Transier declarations and the projections formulated by M-III, I believe the Debtors will be able to satisfy Administrative Expense Claims, Secured Claims, Priority Tax Claims, and Priority Non-Tax Claims as set forth in the Plan.

### **Feasibility Conclusion**

77.     In view of the foregoing, I believe that the Debtors will be able to continue to administer their assets as required by the Plan and make all payments and distributions as contemplated by the Plan.  I believe the Debtors' have sufficient Assets to pay all Administrative Expense Claims as of the Effective Date and require at most a short delay of the Effective Date to allow for the monetization of significant assets does not negatively affect such conclusion. Further, I believe confirming the Plan now is in the interest of all stakeholders.  The alternative—a conversion to a chapter 7—will cause further delay in the realization of any litigation proceeds, will reduce recoveries, and cause erosion of value.  In conclusion, I believe, the Plan is feasible and that confirmation of the Plan is in the best interests of these Estates.

78.     While not necessary to consummate the chapter 11 Plan, the Debtors have proposed an Administrative Expense Claims Settlement, which they are currently negotiating with certain Administrative Expense Claimants.  The proposed incentive for Administrative Expense Claimants to not opt-out is a priority payment for any settled Administrative Expense Claims in exchange for a reduced Administrative Expense Claims pool (to satisfy) for the Debtors and junior creditors.  A successful Administrative Expense Claims Settlement will reduce the Debtors' Administrative Expense Claim burden.  But to reiterate, the Debtors are not relying on a settlement with administrative creditors to satisfy Administrative Expense Claims as required under the Plan.

79.     <u>Section 1129(a)(12)</u>.  I understand based on my discussions with the Debtors' advisors, that the Debtors have paid all chapter 11 statutory and operating fees required to be paid during these Chapter 11 Cases and filed all fee statements required to be filed. Pursuant to Section 17.1 of the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the Effective Date, and thereafter as may be required.

80.     <u>Section 1129(a)(13)</u>.  It is my understanding based on discussions with the Debtors' legal advisors that section 1129(a)(13) of the Bankruptcy Code requires that the Plan provide for the continuation after the Effective Date of payment of all retiree benefits at the level established under section 1114 of the Bankruptcy Code.  I understand that issues surrounding termination of retiree benefits shall be ruled on by the Bankruptcy Court contemporaneously with the Confirmation Hearing.  The Debtors will comply with any obligations arising from such ruling with respect to termination of retiree benefits and as required by 1129(a)(13) of the Bankruptcy Code.

81.     <u>Section 1129(a)(14-16)</u>. It is my understanding that sections 1129(a)(14) through (16) are inapplicable to these chapter 11 cases.

82.     <u>Section 1129(b)</u>.  It is my understanding that, pursuant to 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or equity interests so long as the plan is fair and equitable and does not discriminate unfairly as to such non-accepting class.  The Debtors submit that the Plan satisfies all applicable requirements of section 1129(b) necessary to "cram down" the Plan over rejecting Voting Classes.

83.     Cram down is relevant to those classes of Claims which are impaired and voted to reject the Plan:

- Class 2 (Secured Claims) at Sears Protection Company (Florida), L.L.C. and Sears, Roebuck de Puerto Rico, Inc.;

- Class 4 (General Unsecured Claims) at A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E Lawn & Garden, LLC, A&E Signature Service, LLC, California Builder Appliances, Inc., FBA Holdings Inc., Florida Builder Appliances, Inc., KLC, Inc., Kmart Corporation, Kmart Holding Corporation, Kmart of Michigan, Inc., Kmart Operations LLC, Kmart Stores of Texas LLC, Kmart.com LLC, MyGofer LLC, Private Brands, Ltd., Sears Brands Management Corporation, Sears Brands, L.L.C., Sears Holding Corporation, Sears Holdings Management Corporation, Sears Home Improvement Products, Inc., Sears Operations LLC, Sears Protection Company (Florida) , L.L.C., Sears Roebuck Acceptance Corp., Sears, Roebuck and Co., Sears, Roebuck de Puerto Rico, Inc., SOE, Inc., and StarWest, LLC; and

- Class 4(B) (Guarantee Claims) at Kmart Stores of Illinois LLC and Kmart of Washington LLC which voted to reject the Plan.

84.     Cram down is also relevant to those classes of Claims which are which impaired and deemed to have rejected the Plan:

- Class 6 (Intercompany Claims) (All Debtors);

- Class 7 (Intercompany Interests) (All Debtors);

- Class 8 (Subordinated Securities Claims) (All Debtors); and

- Class 9 (SHC Existing Equity Interests) (SHC).

85.     As described above, Class 2 (Secured Claims) at Sears Protection Company Florida, L.L.C. and Sears, Roebuck de Puerto Rico, Inc., an Impaired Class entitled to vote, voted to object the Plan.  However, pursuant to the Plan, all Holders of Secured Claims will be satisfied in full, either by receiving (i) cash in the amount equal to the Allowed amount of the Secured Claim, (ii) transfer of the collateral securing such Secured Claim or the proceeds thereof, or (iii) such other treatment sufficient to render such holder's Allowed Secured Claim Unimpaired.  See Plan, §§ 4.2, 5.2, 6.2, 7.2, and 8.2.  Therefore, confirmation of the Plan does not violate the absolute priority rule, as to Class 2 at such two Debtors.  Further, as described

above, Class 5 (ESL Unsecured Claims) (All Debtors), an Impaired Class entitled to vote, abstained from voting at any of the Debtors. However, because ESL objected to the Plan, the Debtors are also seeking to cram down Class 5. The Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

86.    I understand from discussions with counsel that the Plan does not "unfairly discriminate" and the "fair and equitable" requirement is satisfied as to the Impaired Non-Voting Classes, as well as the rejecting Classes under the Plan. It is my understanding that the distributions under the Plan are made in the order of priority proscribed by the Bankruptcy Code and in accordance with the rule of absolute priority. Pursuant to the Plan, holders of allowed Claims in a given class must be paid in full before a distribution is made to a more junior class. Interests in each Debtor are afforded the same treatment under the Plan, and with respect to each such Class, no holder of any junior Claim or Interest will receive or retain property under the plan on account of such junior Claim or Interest. Moreover, no senior creditor will receive in excess of the full value of its Claims under the Plan. Based on the foregoing, I do not believe that the Plan "discriminates unfairly" with respect to any Classes Interests.

87.    <u>Sections 1129(c)-(e)</u>. The Plan is the only plan filed in this case, and accordingly, it is my understanding that section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is inapplicable in these Chapter 11 Cases. I believe that the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and, thus, I believe that the Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code. Finally, none of the Chapter 11 Cases

is a "small business case," as I understand that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

### Response to Carve-Out Account Objections

88.    I understand that although the DIP ABL Secured Obligations, Junior DIP Secured Obligations, and Prepetition ABL Obligations were satisfied in full or rolled into new Transform facilities pursuant to the Sale Transaction,[8] the provisions of the DIP Order remain operative and controlling.  The Postpetition Intercompany Obligations remain outstanding and the Debtors have not received a Termination Notice at any time.

89.    The Carve-Out Account was specifically negotiated for the purpose of setting aside amounts (held in trust) for professionals.  If the Carve-Out were not present, I believe professionals would have had to decide whether to continue with their respective representations.  I believe shifting the credit risk now onto the professionals who relied on the Carve-Out and the DIP Order would be undoing a specifically and highly negotiated term of the deal that was approved by the Bankruptcy Court.

90.    Indeed, the Carve-Out Account was and continues to be funded as outlined and required under the DIP Order.  The Debtors have complied with, and continue to comply with, the provisions of the DIP Order.  The Carve-Out Account ending in 6570 is segregated account and all amounts therein are held in trust to pay Allowed Professional Fees of Professional Persons.  The Carve-Out Account was funded from proceeds held in both the Main Operating Accounts and, when necessary, the Winddown Account ending in 8965.  Specifically, each Professional Person provides M-III Partners with a Weekly Statement (every Wednesday) setting forth a good faith estimate of the amount of fees and expenses incurred during the

---

[8]    After the consummation of the Sale Transaction, the Debtors had approximately $95 million from proceeds of GOB sales, cash-in-transit, credit card receivables, and cash in stores.

preceding week.  Utilizing such estimates, M-III transfers (on a weekly basis, every Friday) into the Carve-Out Account corresponding funds.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 13, 2019
New York, New York

By:  /s/ *Brian Griffith*
     Brian J. Griffith
     Managing Director
     M-III Advisory Partners, LP

**EXHIBIT A**

GURR JOHNS
est.1914

FAIR MARKET VALUE APPRAISAL - ISSUED APRIL 11, 2019

Appraisal Report no. 27631
Value Date: March 29, 2019

NEW YORK          LONDON          LOS ANGELES          PALM BEACH          CHICAGO

# GURR JOHNS
est.1914

## APPRAISAL CERTIFICATION

On March 29, 2019, at the request of Jacqueline Marcus of Weil, Gotshal & Manges LLP, Christopher Gaillard, an appraiser of tangibles of the kind and character set down upon the annexed schedule who has been in the appraisal business for over 26 years, appraised from images and listings the Fair Market Value of the tangible personal property belonging to Sears Holding Corporation located at an undisclosed location.

A schedule of such property is hereto annexed. The appraiser has relied upon the client for any vital information including, but not limited to, provenance, condition, ownership, title, etc. The values given are for the same or comparable items. Acceptance of this report by the client constitutes acceptance that the information included is correct and reliable and that no vital information has been withheld. The client agrees to indemnify and hold Gurr Johns, Inc. harmless from and against any and all claims, actions, damages, losses, liabilities and expenses relating to this appraisal. The appraiser has assumed that all works are authentic.  The Fair Market Value is as of March 29, 2019.

The Fair Market Value is defined as the price that property would sell for on the open market between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. The appraiser has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. This appraisal represents his informed opinion but is not a warranty as to authenticity. This appraisal is based on the comparative market data approach. Comparables are attached and are maintained in the office work files if needed. The fees for this appraisal are based on time and are not contingent upon the values. The appraiser has no present or future contemplated interest in any of the appraised property.

This appraisal was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), 2018-2019.

The Fair Market Value is FIFTEEN MILLION and 00/100 DOLLARS ($15,000,000.00).

Christopher Gaillard, Appraiser

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 1 of 35

# G U R R J O H N S
est.1914

## SCOPE OF WORK

**Problem to Solve:** The appraiser was asked to appraise from images and listings tangible personal property located at an undisclosed location and prepare a Fair Market Value appraisal for litigation purposes. The assignment is to produce an Appraisal Report following the guidelines of the Uniform Standards of Professional Appraisal Practice (USPAP), 2018 - 2019. This appraisal will be sent to the client. This appraisal is not valid for any other purpose.

**Category of Items Examined:** Fine art.

**Client:** Weil, Gotshal & Manges LLP.

**Use of Appraisal:** Fair Market Value for litigation purposes.

**User(s) of Appraisal:** This Appraisal Report can be used and relied upon by the client or their designated representatives. Any other user is considered an unintended user.

**Valuation Date of Appraisal:** The value expressed in this Appraisal Report is effective as of March 29, 2019.

**Ownership Interest/Art Loss Register:** The question of title was not an issue. As such, the appraiser did not perform any Art Loss Register inquiries.

**Authenticity:** Although the appraiser does not authenticate works of art, the appraiser had no reason to doubt the authenticity of the works.

**General Assignment Conditions:** This appraisal is based on information supplied for the appraiser by the client, and through research. The appraiser was given adequate time to research the items.

Appraisal Report no. 27631
Value Date: March 29, 2019

# GURR JOHNS
est.1914

**Specific Assignment Conditions (Assumptions):** The appraiser assumes the mediums to be as reported. A scientific analysis of the chemical compounds of the materials was not conducted, as this was not an issue relating to valuation.

**Specific Assignment Conditions (Extraordinary Assumptions):** The appraiser assumes information provided by the client to be correct. The appraiser assumes some, if not all, authorship to be authentic. The appraiser assumes these works were previously traded in an appropriate market without any unusual market stimuli affecting their sale or transaction. The appraiser assumes that the client retains full title to the works.

**Specific Assignment Conditions (Limiting Conditions):** The appraiser was not given permission by the client to consult experts outside Gurr Johns for an opinion of value. The appraiser is not a conservator and as such did not prepare condition reports.

**Examination and Method of Examination:** As noted above, this appraisal is based on information supplied for the appraiser by the client, and through research.

**Method of Research:** Research was conducted at the offices of Gurr Johns, Inc., with access to the Gurr Johns reference library and to online databases, including, but not limited to, Artnet, Askart, and 1stdibs. Additional research was conducted on the Internet using standard search engines such as Google. Appropriate galleries and auction houses were contacted for information when necessary.

**Comparables:** Comparables are attached and are maintained in the office work files if needed.

**Confidentiality:** Specific comparable retail sales history is confidential according to the Gramm, Leach, Bliley Act* and cannot be disclosed without the client's permission. The appraiser will not disclose confidential information or assignment results to anyone other than: the client; persons specifically authorized by the client; state appraiser regulatory agencies; third parties as may be authorized by due process of law; or a duly authorized professional peer review committee except when such disclosure to a committee would violate applicable law or regulation. Appraisal assignment information will be kept by Gurr Johns, Inc. for a minimum of five (5) years after the date of issue or two (2) years after final disposition of any judicial proceedings involving the appraiser, whichever period expires last.

# GURR JOHNS
est.1914

*The Gramm, Leach, Bliley Act, passed in 1999 and fully effective in July, 2001, addressed overall financial industry reforms as well as emerging consumer privacy and security issues. Officially called the "Financial Modernization Act of 1999," it affects the technology and information system policies used by anyone engaged in providing financial services either directly or indirectly to consumers. Appraisers are specifically named as institutions required to follow the stipulations of the law.

**Approach to Value:** The appraiser named in the certification of this document employed the "market comparison" approach to arrive at the appraised Fair Market Value. The "income" approach and the "cost" approach are not applicable to this particular appraisal.

**Market Examined:** The "market comparison" approach analyzes recent sales of comparable articles at appropriate major international and regional fine art auctions, private and public sales, shows and exhibitions, as well as prevailing prices at retail shops and galleries where the article may normally be traded. Adjustments are then made for each article, which consider age, condition, rarity, artistic merit, technical workmanship, current trends and availability of an article as compared to such recent sales.

Gurr Johns Inc.
155 East 56th Street, 6th Floor
New York, NY 10022

Tax ID: 13-3407505

Fair Market Value



1. **ALEXANDER CALDER (American, b. 1898 - d. 1976)**          Fair Market Value:   **$15,000,000**

The Universe, 1974
Fabricated at Biemont foundry in Tours, France.
Commissioned by Skidmore, Owings & Merrill in cooperation
with Galerie Maeght, Paris.
Site-specific motorized installation (or moving mural) with
painted steel, aluminum and composite elements comprising a
twisting spine (33' high with ten pennants), three flowers (each
8' high), a pendulum (9' in diameter, attached to a 22' high
stem), a sun (7 1/2' in diameter) and a helix (7' high x 25' long).
Initialed and dated "AC 74" in raised welds on exterior of black
pennant-shaped extension on spine; stamped "© Alexander
Calder 1973" on back panel of proper right terminal box of helix
Painted steel, aluminum and composite elements
Overall 33' high x 55' wide x 22' deep
Weight approximately 16,000 pounds

CONDITION
The appraiser has reviewed the Conservation Assessment
prepared by Sabino Conservation, Chicago, dated March 26,
2013. The conservator, Rachel C. Sabino, writes in her
summary, "As designed, the installation is extremely stable from
a structural point of view. Visually, the object does show signs
of age-related deterioration such as abrasions, scratches, paint
chips and losses." She continues, "At the present time, the paint
chips and losses do not seem to warrant complete repainting of
the sculpture as the majority of the disfiguring elements are not
readily visible, especially those elements at height." The
appraiser did not examine the work first-hand and assumes the
work would be acceptable to the marketplace without any
discount due to condition.

**FINE ART**                    Appraisal Report no. 27631                    Page 5 of 35
                                Value Date: March 29, 2019

PROVENANCE
The artist
Sears, Roebuck and Company, Chicago, Illinois

LITERATURE
Albert Elsen, Alexander Calder: A Retrospective Exhibition,
Chicago, 1974, n.p., illustrated.
John Russell, "Calder's Universe," The New York Times,
October 14, 1976.
James L. Riedy, Chicago Sculpture, Champaign, Illinois, 1981,
no. C18, p. 83, illustrated.
Jean Lipman, Calder's Universe, Philadelphia, 1989, pp. 254
and 259, illustrated.
Marla Prather, Alexander Calder, New Haven, 1998, p. 294.

The appraiser has assigned value to the subject work based on
information and images provided by the client; the work was not
examined in person. The appraiser assumes the work would be
assigned a registration number by the Calder Foundation.

**FINE ART**

Appraisal Report no. 27631
Value Date: March 29, 2019



1.  **Additional Image**



1.  **Additional Image**



1.    **Additional Image**



1.    **Additional Image**

**FINE ART**

Appraisal Report no. 27631
Value Date: March 29, 2019



1.    **Additional Image**



1.    **Additional Image**

**FINE ART**                    Appraisal Report no. 27631                    Page 9 of 35
                                Value Date: March 29, 2019

1. 

**Comparable:**

ALEXANDER CALDER (American, b. 1898 - d. 1976)
Red Curlicue, 1973
Paint, sheet metal
192" high x 126" wide x 96" deep
Christie's New York, Post-War and Contemporary Evening Sale,
November 10, 2010, Lot 47 ·
Estimate: $4,000,000 - $6,000,000
Sold for: $6,354,500 (including buyer's premium)

Monumental sculptures by Alexander Calder are rare to find in
the marketplace. Motorized works are also rare, and a
combination of monumental scale and motorization is
exceptionally rare. The three most recent auction sales of
monumental sculptures by Calder are cited in this report and
underscore the subject work's desirability in the marketplace. ·

This comparable is a "stabile" and has no moving or motorized
elements. It is less than a third of the overall size of the subject
work. However, its sale illustrates the level of interest in the
marketplace for Calder's sculptural works of monumental scale.
While this market is more limited than others in the artist's
broader body of work (domestic-scaled hanging mobiles,
standing mobiles and gouaches, for example), it shows a clear
interest in the marketplace even for large-scale works that are
difficult to care for, move and install. According to Artnet's
Price Database, this sale is the 12th highest auction price ever
achieved for a work by Calder, and was the highest auction price
for a work by the artist from 2008 - 2011. Since the time of this
auction, the market for sculptures by Alexander Calder has
strengthened. Bearing these facts in mind, the appraiser values
the subject work higher.

**FINE ART**

1.  **Comparable:**



ALEXANDER CALDER (American, b. 1898 - d. 1976)
Flying Dragon, 1975
Sheet metal, bolts and paint
360" high x 672" wide x 258" deep
Sotheby's New York, Contemporary Art Evening Sale May 10,
2006, Lot 16
Estimate: $6,000,000 - $8,000,000
Sold for: $5,616,000 (including buyer's premium)

This comparable is a "stabile" and has no moving or motorized
elements. It is approximately the same size as the subject work.
Its sale illustrates the level of interest in the marketplace for
Calder's sculptural works of monumental scale. While this
market is more limited than others in the artist's broader body
of work (domestic-scaled hanging mobiles, standing mobiles and
gouaches, for example), it shows a clear interest in the
marketplace even for large-scale works that are difficult to care
for, move and install. According to Artnet's Price Database, this
sale is the 23rd highest auction price ever achieved for a work
by Calder, and was the highest auction price for a work by the
artist from 2005 - 2008. Since the time of this auction, the
market for sculptures by Alexander Calder has strenghtened
significantly. Bearing these facts in mind, the appraiser values
the subject work higher.

**FINE ART**



1. **Comparable:**

ALEXANDER CALDER (American, b. 1898 - d. 1976)
Untitled, 1968
Painted steel
193" x 248" x 130"
Christie's New York, Post-War and Contemporary Art Evening
Sale, November 11, 2003, Lot 58
Estimate: $4,000,000 - $5,000,000
Sold for: $5,831,500 (including buyer's premium)

This comparable is a "stabile" and has no moving or motorized
elements.  It is less than half the size of the subject work.  Its sale
illustrates the level of interest in the marketplace for Calder's
sculptural works of monumental scale.  While this market is
more limited than others in the artist's broader body of work
(domestic-scaled hanging mobiles, standing mobiles and
gouaches, for example), it shows a clear interest in the
marketplace even for large-scale works that are difficult to care
for, move and install.  According to Artnet's Price Database, this
sale is the 17th highest auction price ever achieved for a work by
Calder, and was the highest auction price for a work by the artist
from 2001 - 2005.  Since the time of this auction, the market for
sculptures by Alexander Calder has strenghtened significantly.
Bearing these facts in mind, the appraiser values the subject
work higher.

**FINE ART**

Appraisal Report no. 27631
Value Date: March 29, 2019



**Grand Total**                                                      Fair Market Value:    $15,000,000

Grand Total is the aggregate sum of all values applied to items listed in this appraisal.



GURRJOHNS
est.1914

## ART MARKET OVERVIEW

The early 2000s witnessed a transformation in the perception of art as an asset. As TEFAF reported in 2018, "The art market has evolved from a niche, connoisseur-driven collectibles market to a multi-billion global industry." This is in part is due to new collectors from the BRIC countries, the global crash of 2008-2009, the ever-expanding data available on art pricing, and by the sustained and increasing concentration of global wealth. The 2017 Art & Finance report by Deloitte and ArtTactic states that 50% of the collectors surveyed expressed that their motivation in buying art was for investment return. As art continues to be seen as an asset class, the art market has transformed itself into a sub-sector of the investment community; a trend that is unlikely to reverse itself in the near future.

The art market has seen several economic cycles over the past ten years. Fine art sales remained strong even as Lehman Brothers collapsed in September 2008; however, by the end of that year it was clear that the global financial crisis had precipitated an art market crash. In 2009, the art market contracted by 41% from its 2007 peak.

The market's recovery began in 2010, initiating another growth cycle that peaked in 2014 and established record price levels for Modern, Post-War and Contemporary Art. According to the TEFAF Art Market Report, the global art market generated sales of $68.2 billion in 2014. Works sold for over $1 million accounted for 48% of this value, and prices exceeding $100 million became a familiar feature of the evening sales. In a single week in May 2015, Christie's sold over $1 billion in art, led by Pablo Picasso's Les femmes d'Alger which achieved $179.4 million – an astonishing result that eclipsed the previous record for any work of art at auction by $37 million.

By mid-2015, turbulence in the financial markets eroded some confidence in the sustainability of soaring prices. Auction results that November were mixed. While some exceptional prices were achieved, including $170 million for Amedeo Modigliani's Nu couché at Christie's, other top lots failed to sell and results fell short of expectations, creating unease about the state of the market. The auction houses lost heavily on guarantees, particularly Sotheby's, which was reported to have offered $515 million—the highest guarantee in auction history—to secure the collection of A. Alfred Taubman after a bitter battle with Christie's, which performed below the auction house's expectations. Overall, the global auction market contracted 7% in 2015, with the biggest drop in sales coming from China.

Auctions were more restrained in 2016, and in most cases they performed respectably. Sell-through rates were high, exceeding 90% in most Contemporary Art Evening Sales. Important works by blue-chip artists remained highly desirable, particularly works that had been off the market for many years and had exceptional provenance. The sale of the estate of Steven and Ann Ames, the prominent collectors and philanthropists, achieved $131.3 million at Sotheby's in November 2016. In London, the summer auctions of Impressionist, Modern and Contemporary Art delivered positive results, buoyed by international bidders capitalizing on the weaker pound. In November 2016, Sotheby's London sold the collection of David Bowie,

G U R R J O H N S
est.1914

achieving £32.9 million ($41.1 million), more than tripling pre-sale expectations. The overall market for Old Masters continued to soften due to an aging collector base and a decreasing supply of high quality works. When masterpieces do appear in the marketplace, they deliver exceptional prices, such as the $58 million achieved by Christie's in July 2016 for Peter Paul Rubens' Lot and his Daughters.

In 2017, Post-War and Contemporary Art continued to dominate the market, with exceptional prices for the highest-quality works achieved. Jean-Michel Basquiat's Untitled (1982) achieved the highest price of the spring season when it sold at Sotheby's New York for $110.5 million. The Art Basel/UBS Art Market 2018 report focusing on the sale year 2017 indicated a continued upward trend, as the global art market grew for the first time since 2014, reaching $63.7 billion, up 12% from 2016. The United States, United Kingdom and China continued to dominate as the three largest markets globally, accounting for 83% of total global sales, with Post-War and Contemporary Art maintaining a foothold in regards to market dominance.

The first half of 2018 appears to show market growth and strength across the board. Sotheby's reported that their sales in the first half of 2018 increased by 22% to $3.5bn with an 80% sell-through on all lots. One-third of the buyers were new clients to Sotheby's, and 19% of the total hammer came from new buyers; up by five points from the previous three years. Christie's reported similar growth in sales in the first half of 2018, with an increase of 24% or $4bn, with a 84% sell-through rate. These positive figures were no doubt influenced by the $832.6m Rockefeller estate which sold every lot offered. Phillips reported their sales are up by 59% in the first half of 2018, or $511.8m from the same period in 2017.

According to the 2017 TEFAF Art Market Report, private dealers and private sales by auction houses accounted for approximately 50% of the global art and antiques trade by value. Christie's reported in the first half of 2018 that their private sale transactions reportedly have increased by 135%, or $390.3m, and Sotheby's reported their private sales transactions had increased by 63%, or $543m. The past decade has seen the rise of the 'super-dealers' such as Larry Gagosian and David Zwirner, among others. These dealers attract blue-chip artists, the most important collectors and a celebrity following. Their influence is also felt on the secondary market, where they can create demand for particular artists and prop up prices through their tremendous bidding power in the auction rooms.

The 2017 TEFAF Art Market Report also suggested that dealers no longer view physical galleries as the primary site of sales, and instead show preference to art fairs and the internet as the best means to meet new clients. The proliferation of international art fairs has been a major development over the past ten years, where private dealers reportedly conduct approximately 40% of their annual sales. Led by industry giants Art Basel in Basel, Miami Beach and Hong Kong; Frieze in London and New York; and TEFAF in Maastricht and New York, art fairs are now ubiquitous on the global art market calendar, numbering in excess of 180 annually. Art Basel Miami Beach alone has inspired nearly 20 satellite fairs that occur alongside the main fair.

GURRJOHNS
est.1914

Artnet reported in 2018 that gallery attendance has declined, though this may be tempered by the continuing growth in attendance at art fairs, as well as the use of the internet as a sales medium. Zwirner Gallery reportedly told The Wall Street Journal that 30% of its sold works were purchased by collectors who never came into the gallery to view the works in person. Christie's online sales continue to grow, up by 40% from 2017 to the first half of 2018. Live auction sales on the Invaluable platform have increased by 29% in 2018, with the number of sold lots increased by 25%.

In terms of the global art market, Asia continues to be a stronghold. The Taiwanese market continues to grow with a new art fair scheduled for January 2019. Art Basel's parent company, MCH, is developing a new art fair in Singapore scheduled to open Fall 2018. In the first half of 2018, Sotheby's reported that 28% of buyers were new to Sotheby's Asia, and there was also a 28% growth rate of Asian clients buying Western art. As Christie's Chief Executive Officer, Guillaume Cerutti, has explained, "In certain categories like Impressionist and Modern, the level and regularity of activity of the Asian buyers has been absolutely key to confirm the strength of these categories...and without the Asian spend, we would not have the same success and the same confidence in these categories. There is absolutely no doubt. Of course, for us one of the main priorities is to extend this outside the Impressionist and Modern category to as many categories as possible."

The art market saw two record-breaking highlights in late 2017 and early 2018, as Christie's New York delivered the most expensive painting ever sold at auction, as well as the highest single-owner collection sale to date. Leonardo Da Vinci's Salvator Mundi, sold during the Post-War and Contemporary Art Evening Sale in November 2017, achieved $450 million, and was purchased to hang in the Louvre Abu Dhabi, emphasizing the growing significance of collectors in the Middle East. In May 2018, The Collection of Peggy and David Rockefeller became the most significant charitable auction in history, with total sales of $832.6 million and 100% of the lots sold across a variety of categories, including Modern art, decorative objects, and jewelry.

While these two sales garnered worldwide recognition and drew a new level of global attention to the art market, they represent a new, somewhat thin market at the top end, consisting of a small fraction of volume of sales that disproportionately influence aggregate sales figures. In mid-2018, both Artelligence and The Wall Street Journal reported on the trending focus to the middle market. As Artelligence reported, "The so-called 'masterpiece market' peaked in 2015. Since then, art buyers have not left the market...they've shifted their focus toward discovering historical masters whose work they perceived to be undervalued."

Sources and Limitations
Information has been sourced from The Wall Street Journal, The Financial Times, The Art Newspaper, The New York Times, Bloomberg.com, artnet.com, Blouinartinfo.com, artmarketmonitor.com, artprice.com, Deloitte Art & Finance (ArtTactic), and TEFAF (Maastricht European Art Fair).

Appraisal Report no. 27631                                                            Page 16 of 35
Value Date: March 29, 2019

# GURR JOHNS
est.1914

## Christopher S. Gaillard, AAA, ISA AM

**Work Experience**

**2010 - Present**　**GURR JOHNS INTERNATIONAL**, New York, NY
*Deputy Chairman, Fine Art Appraiser and Advisor*
- Chief fine art appraiser, providing appraisals for estate tax, charitable donation and insurance. Advisor to private clients on acquiring and deaccessioning works of art.

**2008 - 2010**　**CHRISTOPHER S. GAILLARD FINE ART APPRAISAL**, New York, NY
- Provided appraisals for charitable donation, estate tax and insurance for various estates and institutions.
- Assisted private clients and institutions in buying and deaccessioning fine art.

**1999 - 2008**　**SOTHEBY'S**, New York, NY
*Vice President, Director of Contemporary Prints*
- Provided appraisals for charitable donation, estate tax and insurance for various estates, private and institutional clients.
- Actively solicited consignments for semi-annual print auctions totaling $7-10 million each season. Built and managed relationships with private clients, institutions and the art trade.
- Served as lead auctioneer for important auctions across collecting disciplines, including: Contemporary Art, prints, Twentieth Century Design, American Paintings, and silver. Served as charity auctioneer for various arts and educational organizations, including the DeYoung Museum, San Francisco; the Museum of Contemporary Art, Detroit; and the Drawing Center, New York.

**1993 - 1999**　**CHRISTIE'S**, New York, NY
*Vice President, Print Department*
- Secured consignments of Old Master, Modern and Contemporary Prints for semi-annual auctions. Researched and catalogued prints dating from 1400 - present. Evaluated prints for auctions and appraised prints for insurance, fair market and estate tax purposes. Regularly contributed articles to Christie's publications for promotion of prints in upcoming auctions.

Appraisal Report no. 27631　　　　　　　　　　　　　　Page 17 of 35
Value Date: March 29, 2019

# GURR JOHNS
est.1914

**Education**
**Colby College**, Waterville, ME
Bachelor of Arts, History of Art, with distinction, 1990

**Trusteeship**
International Print Center of New York since 2002
Momenta Art, Brooklyn, 2002 - 2010

**Certifications**
Appraisers Association of America, Certified Member
International Society of Appraisers, Accredited Member
Uniform Standards of Professional Appraisal Practice (USPAP) (Compliant through 2019)

# GURR JOHNS
### est.1914

## APPRAISAL TERMINOLOGY AND DEFINITIONS

**ACTUAL CASH VALUE (ACV):** This term refers to Market Value and is generally synonymous with payment restricted to cash. Some insurance policies also define ACV as the replacement cost minus any depreciation.

**ADMINISTRATOR:** This is someone appointed by the court if the decedent died without a will, if no executor is named in the will or if the person named cannot or will not serve.

**AFFIDAVIT:** An affidavit is a statement used in an appraisal which explains what was done in the appraisal. An affidavit is frequently called the appraiser's certification.

**ALTERNATE VALUATION DATE:** A term most frequently identified with estate appraisals. At present it is the date six months to the day after the date of death on which the fiduciaries of the estate can chose, legally, to have the estate valued rather than the date of death. In this manner, the IRS allows the estate the choice of a date which may be more advantageous in the event that the market or price for the objects in question has changed significantly, usually declining in value materially, from the date of death to the date six months after the death. if the alternate date of death is chosen, then all items in the estate must be value on that alternate date, not just the personal property.

**ANTIQUE:** As defined by the United States Customs Department, any object that is 100 years old or older is an antique. But the term is broadly interpreted with its definition varying from product to product and year to year. Generally speaking, the following are the most accepted definitions: 1.) An item collected or desirable due to its rarity, condition, utility or some other unique feature that is older than 100 years. Motor vehicles, in contrast, are considered antiques in the US if they are older than 25 years and some electronic gadgets of more recent vintage may be considered antiques; 2.) Ancient art such as sculptures, gems, medals, seals collected from Greek and Roman civilizations.

**APPOSITE VALUE:** This is a value that is fitting, suitable and appropriate for an object.

**APPRAISAL:** As defined by the Appraisal Standards Board (ASB) in the Uniform Standards of Professional Appraisal Practice (USPAP) is "the act or process of developing an opinion of value." According to the ASB, value can "be numerically expressed as a specific amount, as a range of numbers, or as a relationship (e.g., not more than, not less than) to a previous value opinion or numerical benchmark (e.g., assessed value, collateral value)." It should be noted that USPAP states that calling an appraisal something else such as "valuation" or "valuation estimate" does not remove it from being considered as an appraisal if an opinion of value is given. The document contains a valuation executed for a specific purpose and follows specified guidelines.

**THE APPRAISAL FOUNDATION:** This is an independent organization established in 1987 by the US government with members from various appraisal organizations. The Foundation now receives federal funds and is empowered by Congress to establish standards for all aspects of the appraisal profession.

**APPRAISAL METHODOLOGY:** This is the procedures and rules for executing properly prepared appraisal reports.

**APPRAISAL REPORT:** This is the actual document in which the opinion of value is stated. Appraisal reports can be written, which is always preferable, or oral. Both, according to US PAP, are subject to specific development and reporting requirements.

Appraisal Report no. 27631
Value Date: March 29, 2019

GURR JOHNS
est. 1914

APPRAISER: This is the individual who values the items and prepares the appraisal document.

APPRECIATION IN VALUE: This is an increase in value over time.

ARBITRATION: This is a way to settle a dispute. Arbitration is a proceeding in which a dispute is submitted to one or more impartial parties for a binding determination made by the arbitrator. Arbitration is usually quicker, simpler and cheaper than litigation but the perceived disadvantage is that there is no appeal. With a few narrow exceptions, like fraud, there is no way to appeal an arbitrator's decision.

ART ADVISORY PANEL: The IRS Art Advisory Panel is composed of several generic groups of professionals: IRS staff appraisers, museum directors and curators, art and antiques dealers, and auction house employees. The full panel generally meets twice a year, while the IRS staff appraisers work full time reviewing appraisals that are submitted to the IRS and preparing those appraisals deemed appropriate for submission to the whole panel. The IRS appraisers are full time government employees while the other members of the panel serve two year terms. Generally speaking, the Panel reviews objects valued individually above $20,000. However, the Panel has been known to review as well objects valued considerably under that amount.

ASSEMBLED, ASSOCIATED OR MARRIED PIECES: This term is used to describe a piece of furniture or other piece of decorative arts which has been composed of parts from various pieces of furniture or woods from the same or other periods, e.g., a dressing table or lowboy with a chest added to the top to make it into a tall chest or highboy; a refectory table with a 17th century base and an 18th century top from another table. This is beyond a mere restoration and is almost an attempt at deception unless the marriage is clearly identified as such when sold.

ASSUMPTIONS AND LIMITING CONDITONS: According to USPAP, the appraiser is required to identify and explain the circumstances and appropriateness of any assumptions, extraordinary assumptions, hypothetical and limiting condition that have been used in an appraisal assignment. These terms or concepts are generally linked together in most appraisals. They refer to the assignment conditions and how, if varied, they might alter the appraisal results. An ASSUMPTION is that which is taken to be true. Not all assumptions are extraordinary. An EXTRAORDINARY ASSUMPTION is an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. They must be clearly disclosed and the intended users must be informed if they have affected the valuation results. A LIMITING CONDITION refers to conditions that limit the appraiser's examination or research of the appraised items and the appraisal assignment.

HYPOTHETICAL CONDITIONS are those which are contrary to what exists but are supposed for the purpose of analysis. According to USPAP, all assumptions and conditions must be listed and qualified in every appraisal. (See also HYPOTHETICAL CONDITIONS)

AUCTION REPLACEMENT VALUE (ARV): This term, usually for insurance purposes, is defined as a reasonable amount in terms of US dollars which would be required to replace a property with another of similar age, quality, origin, appearance, provenance and condition within a reasonable length of time in an appropriate and relevant auction market. Since the client regularly and routinely buys at auctions, the appraiser rarely examines the retail market for this valuation. When applicable, sales and or import tax, commissions and or premiums are included in this amount.

AUTHENTIC: This term is used to describe pieces of furniture, decorative arts or fine arts which are of the period, right and have no restorations or alterations.

BLANKET POLICY: This term is used by insurance companies when articles of personal property are grouped together and given a total value. A blanket policy may be based upon an appraisal or it may be a value the insured requested. Typically a blanket policy is subject to limitations in values and carries a higher premium than one where items are scheduled individually.

Appraisal Report no. 27631                                          Page 20 of 35
Value Date: March 29, 2019

# GURR JOHNS
est.1914

**BLOCKAGE DISCOUNT:** This principle is applied to the valuation of large groups of similar and like items which, if sold during a limited period of time, would result in a depression of the prices one might expect if the items were sold separately in an ordinary market cycle. Consequently, blockage discount is narrowly defined as the percentage the appraiser would apply to reduce the total valuation to compensate for this situation. Blockage discounts are normally applied to estate valuations, especially in the case of artists' estates where large inventories of the art works of single artists must be valued. However, all appraisers should consider the applicability of blockage discounts when valuing large groups of similar and like items. Blockage is a discount or reduction in value necessary to allow a large group of similar objects to be absorbed by the market or sold at a specific date of valuation. Sometimes it may be necessary to offer an economic inducement in the form of a reduced price to stimulate the potential buyers in a given marketplace to purchase all the objects being offered for sale at one time. For example, one may have to offer two for the price of one, four for the price of one, one hundred for the price of one or whatever it may take to sell all the works. The term blockage discount comes from the world of finance where shares in publicly traded companies are frequently offered at discounted prices when the volume of the offering is too large for the market to absorb it at the full, undiscounted, price.

**BURNT:** When an item is presented at auction and fails to sell, it is said to be burnt.

**BUYER'S PREMIUM:** This is the percentage of the bid or "hammer" price paid by the buyer to the auction when purchasing an item. The fee ranges between 5 and 25%. See also Seller's Premium and Hammer Price. According to Frank Herrman, 10% buyer's premiums were instituted at Christie's and Sotheby's in London in 1975, influenced by European auction houses such as Mak Van Waay in Amsterdam. This was done to raise profits in a time of rising expenses and inflation. Hermann also notes "the general consensus was that to increase [sellers] commission rates beyond the average of fourteen percent would be punitive for sellers and would frighten them away from the auction room". (Herrman, "Sotheby's, Portrait of an Auction house," London, 1980, p. 423). According to Robert Lacey, buyer's premiums were instituted in the United States with Christie's opening of salesrooms in New York in 1977, bringing the 10% buyer's premium concept with them. Sotheby Parke Bernet (New York) followed suit in 1978, to keep up with the competitive vendor's commissions which Christie's was able to offer (Lacey, "Sotheby's, Bidding for Class", Boston, etc., 1998, p. 194). Over time, the buyer's premium has increased. The following illustration of this increase is based on buyer's premiums recorded in Sotheby's New York sales catalogues from 2003-2014. By March 26, 2003, buyer's premium was 20% of the hammer price up to and including $100,000, 12% on any excess of $100,000. By March 23, 2007, buyer's premium was 20% of the hammer price up to and including $500,000, and 12% on any amount in excess of $500,000. By March 18, 2014, buyer's premium was 25% of the hammer price up to and including $100,000, 20% in excess of $100,000 up to and including $2,000,000, and 12% of any amount in excess of $2,000,000.

**BUY IN (BI):** This occurs at auction when an object does not meet its reserve price and fails to sell.

**CAPITAL GAINS TAX:** This tax is assessed on profits realized from the sale of a capital asset such as stock, bonds or personal property.

**CATALOGUE RAISONNE:** This is a scholarly catalogue which should include all the known works or all the known works in a specific medium by the artist at the time of compilation of the book. Essential information identifying the works are included making this the definitive reference book.

**CAVEAT EMPTOR:** "Let the buyer beware." This term means that the seller is not held responsible for the quality or authenticity of the goods being sold.

**CERTIFICATE OF AUTHENTICATION/AUTHENTICITY:** This is an official document which certifies that the piece in question is right and of the period and by the artist designated. Some states including New York require specific information be included on a Certificate of Authentication.

**CIRCA:** "About" in reference to age; e.g. circa 1920 when describing the age of an object means that it was made around that time period give or take ten years.

**CLEAR TITLE:** Good ownership one free from encumbrance, obstruction, burden or limitation.

Appraisal Report no. 27631                                                    Page 21 of 35
Value Date: March 29, 2019

# GURR JOHNS
est.1914

**COLLECTIBLE:** This term usually describes any item that has been mass produced and usually machine manufactured. Today collectibles are typically manufactured items designed specifically for people to collect such as sports' cards and beanie babies.

**COMPARABLES:** Finding similar and like objects to the one being appraised is the most commonly applied approach to evaluation. An examination and analysis of the sales figures for similar works or comparable objects allows the appraiser to arrive at the appropriate appraised value for the one under consideration. These figures are mandatory for most donation appraisals and may be provided by the appraiser in other situations when the appraiser judges them to be necessary.

**COMPARABLE MARKET DATA APPROACH:** See VALUATION APPROACHES (Below)

**COMPARATIVE MARKET DATA APPROACH:** See VALUATION APPROACHES (Below)

**CONSERVATION:** This is the treatment and preventative care of an object so that its condition does not deteriorate and the object can remain stable. This is the preservation of a work of art involving careful maintenance and protection of the item using materials and procedures which will have no adverse effects on the piece. See PRESRVATION and RESTORATION also.

**CONSULTING EXPERT:** This person is an appraiser who provides technical expertise and background knowledge to the attorney and client in a litigious situation. Such expertise may be related to the quality of the object, the value of the object or the methodology of the opposing appraiser. The work of the consulting expert is considered privileged and is not discoverable in court because it falls under the Attorney Work Product Privilege.

**COST APPROACH:** See VALUATION APPROACHES (Below)

**COURT CASES:** When the taxpayer has been unable to negotiate a compromise with the IRS the taxpayer may choose to litigate. Taxpayer suits against the IRS have the right to be pursued in all parts of the judiciary system. They can be appealed up to the Supreme Court. While the decisions reached in these cases are specific to the individual cases, they may cause the IRS to modify its procedures and requirements. All appraisers would be well advised to study the relevant cases carefully since the decisions reached may cause the appraiser to modify the way IRS appraisals are formulated and appraisal reports are written. Court cases are also sometimes involved with divorce, insurance or damage and loss of value appraisals when the parties cannot agree on valuation or any other matters under discussion.

**COVER LETTER:** A cover letter is a letter accompanying the appraisal which does NOT include the value of the appraised items.

**CRAQUELURE:** This is the result of the uneven movements of canvas caused by the natural shrinking of the medium during the aging process. Craquelure usually appears on the surface in a spider web like series of cracks. The surface can be stabilized by relining the canvas and restoring the cracks.

**CRAZING:** This is the fine and random cracking extending only through the surface of pottery, porcelain, stone or concrete. The cracking can appear along or perpendicular to the length in polygonal shapes or as random spider webs. Crazing is due to differential contraction between the surface and interior sections often due to changes in temperature. Crazing has no structural or durability significance and does not by itself constitute a cause for rejections. It can, however, mark the beginnings of disintegration. All ceramic and concrete products and many natural stones under varying conditions of moisture and temperature are frequently subject to crazing. In some Asian potteries and porcelains crazing is produced in a foreseen, admired and regulated manner.

**CULTURAL PATRIMONY:** These are objects involved in the Holocaust, items from past and present wars which were pillaged or removed from their homeland or owners and those objects taken and robbed from underdeveloped and poor countries. Today there is an effort to prevent the continuous exploitation and exporting of these treasures.

Appraisal Report no. 27631
Value Date: March 29, 2019

# GURR JOHNS
est.1914

DEPRECIATION IN VALUE: This is a decrease in value over time.

DIMS: This is an abbreviation for dimensions.

DISCLAIMER: The disclaimer is an explanation of facts either contained in the appraisal for which the appraiser does or does not "disclaim" or deny responsibility. This is a listing of elements for which the appraiser does not accept responsibility.

DISCLOSURE/FULL DISCLOSURE: Disclosure is the passing of information that is secret, not previously known (i.e., revelation) or which is believed not to have been known previously. In an appraisal situation, this would include disclosing confidential information shared by the client with the appraiser. Full Disclosure, on the other hand, refers to the appraiser's obligation to state all the work that was done or not done in generating the appraisal report or any other factors which may, at a later date, alter the valuation conclusion in the report.

DROIT MORAL: French term for giving the authority to authenticate works of art, literally "moral right."

DUE DILIGENCE: A measure of prudence or activity that is properly expected from and ordinarily exercised by a reasonable and prudent person under the particular circumstances; not an absolute standard but dependent on the relative facts of the particular situation. In an appraisal situation, this refers to the amount of work one would expect an appraiser to perform in order to arrive at a credible conclusion.

ESCHEAT: This is the common law doctrine that operates to ensure that property is not left in limbo and ownerless upon the death of the owner. It can be the forfeiture of all property including bank accounts to the state treasury if it appears certain that there are no heirs, descendants or named beneficiaries to take the property upon the death of the last known owner.

EQUITABLE DISTRIBUTION: This term is generally used in a divorce situation or in the dissolution of a domestic partnership and is a fair division of assets between two or more people. It is the process through which the assets of the partners or family members are divided in a manner which is equitable based on several factors including the appraised values of the objects in question.

EXECUTOR OR EXECUTRIX: This is the person named in a decedent's will to administer the estate and distribute the properties as the decedent directed and in an equitable manner.

EXTRAORDINARY ASSUMPTION: See ASSUMPTIONS AND LIMITING CONDITIONS (Above)

FA (FINE ARTS): This is the acronym for Fine Arts and may be required by insurance companies to designate those objects on an insurance appraisal which include decorative art and antique objects such as furniture, metals, textiles, drawings, paintings, prints and sculpture as opposed to Fine Arts Breakable (FAB) or Sterling Silver (SS).

FAB (FINE ARTS BREAKABLE): This is the acronym for Fine Arts Breakable objects and may be required by insurance companies to designate those objects on an insurance appraisal such as glass, porcelain, marble and mirrors as opposed to Fine Arts (FA) or Sterling Silver (SS) objects which may be subject to a higher insurance premium.

FAIR MARKET VALUE (FMV): FMV is usually for IRS purposes and is defined by IRS Section 1.170 and 20.2031 (b) as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." According to Technical Advisory Memorandum 9235005 (May 27, 1992), fair market value should include the buyer's premium. IRS Section 20.2031 (b) continues "the fair market value of an item of

# GURR JOHNS

est.1914

property includible in the decedents' gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of that item in a market other than that in which such item is commonly appropriate. Thus, in the case of an item of property includible in the decedent's gross estate which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail." (Treasury Regulation Section 1.170A- 13) (3) ( 1988) it should be noted that the IRS has changed the definition slightly in various sections of the Revenue Code and other printed literature. In addition, Pamphlet 561 has also added the following to the definition: "If you put a restriction on the use of property you donate, the FMV must reflect that restriction."

FAKE: This is an object that has been made to deceive and is sold as something that it is not.

FEDERAL TAX REGULATIONS: These regulations are published by the Department of Treasury which has oversight authority over the Internal Revenue Service. The regulations are published from time to time to explain the tax law in the Internal Revenue Code. It offers explanation and examples illustrative of the principles stated in the revenue code.

FINE ARTS INSURANCE POLICY: An insurance policy which covers the fine arts contents of a home. Fine arts are generally defined broadly and can include not only two-dimensional art and sculpture but also decorative arts, furniture and collectibles. These policies may require individual scheduling of items or a blanket policy to cover all the items. Fine arts insurance policies generally vary from insurance carrier to carrier; one would be well advised to examine each policy closely.

FORCED LIQUIDATION VALUE (FLY): This is the lowest range "NET" value, usually for a quick and forced sale purpose. It is defined as "the most probable price in terms of cash, or other precisely revealed terms, for which the property would change hands if sold immediately, without regard to the relevant market place.

FORGERY: This is a copy executed by someone other than the original artist with the intent to present the object as the original. This is the generic term for both fakes and frauds.

FOXING: Brown spots caused by acid on paper or textiles.

FRAUD: This is a work of art which has been altered, misattributed or otherwise disguised or misrepresented to be what it is not.

FRENCH GRID SYSTEM: The name given to a system by which an object is divided into quadrants such as square inches or centimeters and a value is assigned to an individual quadrant. Presumably the value of the whole can then be determined by multiplying the number of quadrants by the value assigned to one unit. Appraisers of personal property are discouraged from using this methodology unless a clear and compelling rationale for its use can be established.

GOOD FAITH EXCLUSION: This is an IRS term. Under the law governing donation appraisals, an appraiser who writes an appraisal which is 150% above which the IRS determines as appropriate can be subject to sanctions. However, if the Director of Practice determines that the appraisal report in question was written in good faith, the Director has the right to exclude the appraiser from the specified sanctions.

HAMMER PRICE: This is the actual bid price at auction as the hammer falls and does not include the buyer's premium. (See also Buyer's Premium and Seller's Premium.)

HIGHEST AND BEST USE: The term is commonly used in real estate property appraising (See Sacramento Southern Railroad Company vs. Heilbron, 156 Cal 408) and has been carried over by some into the realm of personal property. Basically the term means that, when feasibly possible, one should evaluate personal property in the most appropriate marketplace where it will bring the highest price. The term typically is defined as the examination of the use of the property, which will result in its highest value. In an appraisal this cannot be merely theoretical but must be realistic in that the use must be legal, physically achievable and financially feasible. Oftentimes personal property appraisers refer to highest and best use as the highest attainable price for an object. Many personal property appraisers have trouble with this definition and object to the carry-over from real property. While the concept of use may be appropriate for depreciable personal property such as machinery and equipment, it has questionable relevance in the world of appreciable personal property

# GURR JOHNS
## est.1914

such as art, antiques and collectibles. While some appreciable personal property can be "used," the motivation of the majority of collectors is not structured by the object's functional purpose but rather its aesthetic appeal. With this in mind, it has been argued that one does not begin to apply a term which is relevant to exceptions but rather terms applicable to the majority of situations are more appropriate. It has been suggested that the term "highest attainable price" may be the better term for appreciable personal property.

HYPOTHETICAL APPRAISALS: This is the type of appraisal done when the item is no longer in the possession of the owner because of a fire, flood or other loss. When the appraiser cannot examine the object or is only given photographs of the non-existent object that the appraiser states that the appraisal is hypothetical or written on the basis of the information supplied usually by the client. The appraiser's report is based upon a supposed situation or group of assumptions.

HYPOTHETICAL CONDITIONS: According to USPAP, the definition of a hypothetical condition is that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal or economic characteristics of the subject property or about conditions external to the property such as market conditions or trends or about the integrity of data used in an analysis. Appraisals of damaged objects or appraisals done from a photograph used hypothetical conditions. A hypothetical condition may be used in an assignment only if 1) the use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis or for purposes of comparison; 2) the use of the hypothetical condition results in a credible analysis and 3) the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions. (See also ASSUMPTIONS AND LIMITING CONDITIONS)

IMPAIRED FAIR MARKETVALUE: Putting a restriction on the use of the property being donated implies that the fair market value is restricted and reduced.

INCOME APPROACH: See VALUATION APPROACHES (Below)

IN THE STYLE OF: Means that an item is not of the period in which it was supposed to have been made but rather was made at a later time as a copy of the earlier piece.

INPAINTING: Similar to overpainting, this is a technique commonly used by conservators to unify a painting which has suffered paint loss. Inpainting is paint applied over paint losses on a canvas or other media.

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 25 of 35

# G U R R J O H N S
est.1914

INTERNAL REVENUE CODE: This is the tax law which has been structured and passed by Congress and signed by the President of the United States and remains the ultimate authority on tax matters until it is changed or amended by Congress. Internal Revenue Regulation 1.170.A relates to Income Tax Charitable Deductions and allows as a deduction any charitable contribution which is made during the taxable year. Section I (c) (I) provides that if a charitable contribution is made in property other than money the amount of the contribution is generally the fair market value of the property at the time of the contribution. Section I ( c)(2) provides that the fair market value is the price at which the property would change hands between the willing buyer and the willing seller with neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Section 13 states information regarding the record keeping and return requirements for deductions for charitable contributions. For a deduction for a charitable contribution of property in excess of $5,000, Section 13(c) requires that a qualified appraisal be prepared. Internal Revenue Regulation 20.2031 relates to the Estate Tax. Section 2031 provides that the value of the gross estate of a decedent is determined by including the value at the time of death of all property wherever it is situated. Section 20.2031-1 (b) provides that the value of the property is includible in a decedent's gross estate is its fair market value at the time of the decedent's death. Section 2032(a) provides that the executor may elect to determine the value of all the property in the gross estate as of six months after the decedent's death. This is known as the Alternate Date of Valuation. Property distributed, sold, exchanged or otherwise disposed of within the six months after death must be valued as of the date of distribution, sale, exchange or other means. Section 20.2031-6(b) provides that if there are items among the personal effects or the household, articles with artistic or intrinsic value of a total in excess of $3,000, an appraisal, under oath, must be filed with the estate tax return. Section 20.2031-6(b) provides that if expert appraisers are employed, care must be taken to see that the appraises are reputable and of recognized competency to appraise the particular class of property involved.

JOINT AND FRACTIONAL GIFTS: On occasion a number of people with equal or unequal ownership may donate an object or a group of objects to a non-profit institution. Separate appraisal with separate values must be made for each of the donors.

LAUNDRY LIST: This refers to a listing of object, similar to an inventory with no description and no information regarding the object other than exactly what it is without any measurements. Listing objects in this cursory and seemingly off hand manner is inappropriate for a professional appraiser to use when preparing an appraisal report.

LETTER OF TRANSMITTAL: This letter, addressed to the client accompanying the appraisal, is a summary of the appraisal. This letter must include all of the elements of USPAP including the name of the client, the purpose of the appraisal, the date of the appraisal and the effective date of the appraisal, for whom the appraisal is being executed, where and when the property was seen, value and the definition of value used, the valuation methods and market analyses, the number of items appraised, the total value of those items, the number of pages in the report, the statement of disinterest on the part of the appraiser, the statement of the fee structure, the credentials of the appraiser, the statement of compliance with a given code of ethics, a statement that the report can only be presented in its entirety, a statement that the appraisal can only be used by the party or parties for whom it was written and only for the stated purpose and the appraiser's tax identification number (the latter only for IRS donation appraisals).In the instance of a charitable donation appraisal, the appraiser may include the name of the donee institution in the letter. All assumptions, extraordinary assumptions, hypothetical and limiting conditions must also be included in a transmittal letter.

LIMITING CONDITION: See ASSUMPTIONS AND LIMITING CONDITIONS (Above)

LINED: This term usually refers to a painting on canvas that has been supported by another layer of canvas due to the deterioration of the original support.

LIQUIDATION VALUE: This value is based on the price realized in a sale situation under moderately forced or limiting conditions and under time constraints. This action may be initiated by the owner or a crediting institution. It is implicit in this definition that Liquidation Value will generally be lower than other types of valuation.

LKQ (LIKE, KIND, QUALITY): This abbreviation stands for the insurance terms LIKE, KIND, QUALITY and is the equivalent of an object with comparable attributes.

# GURRJOHNS
est.1914

LONG TERM CAPITAL GAINS PROPERTY: This is an IRS concept used in conjunction with donation appraisals. It refers to property that has been held for a designated period of time, after which the owner, upon donation, is entitled to a tax deduction based on the object's fair market value on the specified dates of valuation.

MARGINAL UTILITY: In economics, under the mainstream assumptions, the marginal utility of a good or service is the increase in usefulness obtained by consuming or using one more unit of that good or service. The concept is derived from attempts by economists to explain the determination of price. The consumer's decision to buy is not all or nothing. Instead, it is a decision to buy or not to buy just one more unit. That means it is a mistake to look at the total utility of the two goods as the basis for demand. The total utility is irrelevant to the decision to buy or not to buy one more unit. What is relevant to any decision is what is gained or lost depending on how the decision is made and only a part of the total utility is gained or lost as a result of the decision to buy or not to buy one more unit of the good. Economists call the part of utility that is gained or lost in the decision to buy one more unit the marginal utility

MARITAL DEDUCTION: This is a tax provision which allows one spouse to transfer upon death an unlimited amount of property to his/her spouse without incurring estate or gift taxes.

MARKET DATA APPROACH: See VALUATION APPROACHES (Below)

MARKET VALUE (MV): This value is the most probable price at which a property would sell in a competitive and open marketplace where the sale needs to be consummated within a specified time frame and neither the buyer nor the seller are under a compulsion to buy or sell. In addition, the object to be sold needs to have had sufficient market exposure for a reasonable amount of time and payment is made in terms of cash in American dollars or comparable financial arrangements are made. This term is essentially the same as fair market value except this term does not have the provision stating that there is no compulsion to buy or sell within a specified period of time. USPAP cautions appraisers to identify the exact definition of market value and its authority applicable in each appraisal completed for the purpose of market value.

MARKETABLE CASH VALUE (MCV): This is a net value usually for equitable distribution, resale or estate planning purposes. The value realized, net of expenses, by a willing seller disposing of property in a competitive and open market to a willing buyer, both being reasonably knowledgeable of all relevant facts, and neither being under constraint to buy or sell. Marketable cash value takes into consideration insurance, dealer commissions, advertising, travel and shipping expenses that may be involved in the sale. Implicit in this definition is that a sale takes place within an agreed upon time period with a specified method of payment and that the sale take place in the best available marketplace and that sufficient time is allowed to advertise the property properly. This term is usually for equitable distribution, when tangible property may be exchanged for cash or other financial arrangements or resale or estate planning purposes.

MARRIED, ASSEMBLED OR ASSOCIATED PIECES: See ASSEMBLED (Above)

MEDIATION: This is a way to settle a dispute and is a process by which parties to a dispute voluntarily select an impartial third party to facilitate a resolution of the issues by the parties themselves. The need for mutual agreement is deemed by some to be the major weakness in the mediation process. If one of the parties is unreasonably stubborn, it will be difficult to reach an agreement.

MEDIUM: There are at least four definitions of this term: 1.) The material the item is made from or the art is produced upon and may include white or black paper, canvas, board, eel (acetate), sculptures; 2.) The specific tool and material used by an artist, e.g., brush and oil paint, chisel and stone; 3.) The mode of expression used by the artist, e.g., painting, sculpture, the graphic arts; 4.) A liquid that may be added to a paint to increase its manipulability without decreasing its adhesive, binding or film forming properties.

METHOD OF CONSTRUCTION: This describes the way or ways in which an object has been made.

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 27 of 35

G U R R J O H N S
est.1914

MICROSCOPY: This is the in-depth microscopic evaluation of an object to determine its age and/or authenticity.

MINT CONDITION: This term describes artwork or objects which are in the same condition as when they were originally finished, printed, made. A term taken from coinage, this is the same condition as when it was minted.

MOST APPROPRIATE MARKET OR MARKETPLACE: This is the venue in which the appraiser determines an object can be sold most easily and at the highest price. Frequently in the case of personal property, where comparables are scarce, the most appropriate market can be a combination of auction and private gallery sales.

NO COMMERCIAL VALUE: This usually refers to an object, a group of objects for which it is not reasonable to assign a monetary value, usually in estate situations and this might include the mattress and box spring.

OBJECT ID™ : A generic classification methodology codified by the Getty Information Institute (Getty Museum) which lists nine fields for the minimum description of all works of art.

OF THE PERIOD, RIGHT or CORRECT: An object which has been made at or during the time ascribed to it.

OPPORTUNITY COST: The advantageous price one would pay for purchasing in bulk.

ORDERLY LIQUIDATION VALUE (OLV): This term, a low range net value usually for quick sales purposes, is defined as the most probable price in terms of cash or other precisely revealed terms for which the property would change hands under required and limiting conditions in an orderly manner and generally advertised and with knowledgeable buyers advised.

ORPHAN: This term refers to a single piece left from a set or a pair.

OVERPAINTING: This explains when paint is applied to a painting over already dry areas of paint. Sometimes used to include the original artist's glazes and sometimes especially used in conservation, this term means only later restorers' work. Overpainting is similar to inpainting (see above) except only inpainting fills in lost areas without covering the original paint.

OXIDATION: This is the binding of oxygen to a metal to form rust or the binding of oxygen to wood to darken it.

PARTIAL APPRAISALS: This type of appraisal is an estimate of the value of the object or objects as requested by the client wherein the client does not want a written professional, thoroughly researched appraisal document. The appraisal is usually presented in a verbal form or the written document does not follow the proscribed proof of valuation or the necessary boiler plate language to protect the appraiser. If the appraiser has an Errors and Omission insurance policy, he/she may be in violation of that policy by presenting a partial appraisal. Using a POV, discussed herein, is advisable. N.B. This is in strict opposition to USPAP.

PATINA: This is the buildup of a film produced by oxidation on the surface of an object. This term also refers to the final coating that is applied to a bronze by the artist or the foundry crafting the bronze.

Appraisal Report no. 27631
Value Date: March 29, 2019

# GURR JOHNS
### est. 1914

PERSONAL PROPERTY: Defined by USPAP as "identifiable tangible objects that are considered by the general public as being "personal" for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate." USPAP does not mention that there are two general classifications of personal property: depreciable personal property or property that is expected to depreciate in value over time, and appreciable personal property or property that has the potential of increasing in value over time. Most machinery and equipment will depreciate in value once they are used, while art, antiques and collectibles have the potential of increasing in value as the demand in the collectors' marketplace increases as time goes by.

PREMIUM: See buyer's premium, seller's premium and hammer price.

PRESERVATION: Related to conservation and restoration, preservation actions are taken to prevent further changes or deterioration in objects, sites or structures. (See CONSERVATION and RESTORATION also.)

PRIMARY MARKET: The primary market is one created either by the maker or agent of the maker when an object is sold for the first time, usually in galleries or stores. The secondary market is the venue for the sale of an object between a seller and a buyer with neither of having participated in the creation or initial sale of the object. In the instance of multiples, a valid secondary market cannot exist while the maker or his agent retains a supply of the original offering.

PRIMARY SOURCE: This material, used in research and data comparisons, is from a firsthand witness and includes auctions attended, galleries, art fairs and stores visited and actual comparables witness by the appraiser.

PRIMARY WOOD: A piece of period furniture is usually made from two different types of woods, the first being the primary wood or the use of more of this wood which is seen on the outside as opposed to secondary wood, usually reserved for use in the interior of the case.

PRINCIPLE OF CHANGE: Change recognizes the shifting importance of other principles and explains the cycles of market development, stabilization, decline and renewal.

PRINCIPLE OF CONTRIBUTION: This term often relates to the "good, better, best" qualities of an item.

PRINCIPLE OF PROGRESSION: This term refers to the increase in interest/value that lower valued items may realize from their association with higher value items.

PRINCIPLE OF REGRESSION: This term states that higher valued items may suffer a decrease in value from association with lower-valued properties.

PRINCIPLE OF CONTRIBUTION: This term often relates to the "good, better, best" qualities of an item.

PRINCIPLE OF REVERSILITY: Whatever process is used to restore a painting or a piece of furniture, pottery or porcelain needs to be able to be reversed so that if, in time, what was done is shown not to be appropriate then that restoration can be removed and the object can be returned to the state in which it was prior to the restoration job.

PRISTINE/MINT/PROOF CONDITION: Excellent condition, as if new and usually in its original packaging or box

PRIVATE LETTER RULINGS: From time to time the IRS sets forth specific rulings in response to requests from individual tax payers. These rulings are specific to the case by case situations presented by the taxpayer. While these rulings cannot be used as vehicles for precedent setting, they do reflect the reasoning of the IRS and give clear indications of how the IRS will react if a similar situation in another case is brought to their attention. All taxpayers and appraisers would be well advised to study these rulings closely.

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 29 of 35

GURR JOHNS
est.1914

PRIVATE TREATY SALE: This is a sale which occurs following an auction where the object being sold did not sell at the event and sells privately thereafter.

QUALIFIED APPRAISAL: A Qualified Appraisal is an appraisal conducted by a qualified appraiser in accordance with generally accepted appraisal standards. The IRS further states that an appraisal will be treated as having been conducted in accordance with generally accepted appraisal standards if it is consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice also known as USPAP. For donation purposes the appraisal report must be prepared by a qualified appraiser not more than sixty days before the date of the contribution of the appraised property. The appraisal must be signed and dated by a qualified appraiser who charges an appraisal fee that is not based on a percentage of value and that contains the following information: a detailed description of the property; the physical condition of the property; the date or expected date of the contribution; the terms of any agreement or understanding entered into or expected to be entered into by or on behalf of the donor that relates to the use, sale or other disposition of the property contributed; the name, address and taxpayer identification number of the appraiser; a detailed description of the appraiser's background and qualifications a statement that the appraisal was prepared for income tax purposes; the date on which the property was valued; the appraised fair market value of the property; the method of valuation used to determine the fair market value; the specific basis for the valuation including any comparable sales transactions and a description of the fee arrangement between the donor and the appraiser.

QUALIFIED APPRAISER: A Qualified Appraiser Is an individual who has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum educational and experience requirements set forth in regulations prescribed by the IRS. The minimum education and requirements are met if the appraiser has successfully completed college or professional level course work that is relevant to the property being valued; obtained at least two years of experience in the trade or business of buying, selling or valuing the type of property being valued; regularly performs appraisals for which the individual receives compensation; and meets such other requirements as may be prescribed by the IRS in regulations or other guidance.

REAL PROPERTY: This refers to land and the buildings attached to the land. For a building to be part of real property, the land and the building must share the same title. If not, the building becomes part of personal property.

RECTO: This refers to the right hand page of a book or the front side of a leaf or picture, on the other side of VERSO.

REFINISHED CONDITION: This occurs when a piece has been stripped or skinned of its original patina and now sports a new finish.

REFRESHED CONDITION: This is a relatively new term which refers to the repainting of a piece of furniture.

RELATED USE RULE: This IRS rule is applied to charitable contributions and states that to receive the full allowable tax deduction a donor must donate property to an institution whose mission explicitly includes the acquisition and use of such property.

REPRODUCTION: This term refers to a piece made as an exact copy or in the mirror image of the original of a period piece but is not made to deceive.

RESALE VALUE: This is the price at which the item can be sold in the marketplace.

RESERVE: This term refers to the minimal amount for which a consignor agrees to sell a work for at auction. By law, the reserve must be at or below the low estimate. Typically a reserve is about 50 to 25% below the low estimate.

RESTORATION: This is the process whereby, if an object has lost a part and that missing part or piece is replaced or restored to simulate the original the object can be returned as closely as possible to its original condition. See CONSERVATION and PRESERVATION also.

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 30 of 35

GURR JOHNS

est.1914

RESTRICTED USE APPRAISAL REPORT: See APPRAISAL REPORT OPTIONS /TYPES (above)

RETAIL REPLACEMENT VALUE (RRV): This term is defined as the highest amount in terms of US dollars that would be required to replace a property with another of similar age, quality, origin, appearance, provenance and condition within a reasonable length of time in an appropriate and relevant marketplace. When applicable, sales and/or import tax, commissions and/or premiums are included in this report. Usually used for insurance purposes.

RETAIL VALUE: Used to establish a price guideline for retail pricing, the appraised retail value is derived from retail replacement value. It is defined as a reasonable amount in terms of US dollars that would be required to purchase a property of similar age, quality, origin, appearance, provenance and condition with a reasonable length of time in an appropriate and relevant market. Unlike retail replacement value, retail values do not include any fees or additional costs such as taxes, framing, conservation, restoration and additional commissions.

REVENUE PROCEDURES (REV. PROC.): Revenue Procedures are termed "guidelines" by the IRS. They set forth a methodology for dealing with general situations. The taxpayer and the appraiser would be well advised to take these guidelines seriously and to view them as IRS requirements rather than elective procedures which the term "guideline" may indicate to the inexperienced appraiser. The IRS expects these guidelines to be followed and the courts have indicated that this expectation is reasonable. In addition the IRS has been known to apply these guidelines to appraisal situations which may not be specifically addressed in the guidelines themselves. For example, Rev. Proc. 66-49 sets forth guidelines for donation appraisals; however, the IRS has been known to ask for the reporting elements stated in these guidelines to be followed for estate appraisals as well.

REVENUE RULINGS: These rulings complement the private letter rulings discussed above. While the private letter rulings are directed to specific cases brought to the attention of the IRS, the revenue rulings set forth the general principles addressed in specific private letter rulings. They also give tax consequences applicable to the general situations addressed in the rulings.

RIGHT, CORRECT or OF THE PERIOD: This term indicates that the object that is of the period, by the ascribed artist and is not a reproduction.

SALES COMPARISON APPROACH: See VALUATION APPROACHES (Below)

SALVAGE VALUE (SV): This is a valuation term implying abandonment by the rightful owner in which the person recovering the property may be entitled to a pre-agreed percentage of any net price realized in a future sale. Although there have been some exceptions, salvage is generally the lowest or rock bottom price realized in a sale situation. This is the net price in cash or other precisely revealed terms for which the property would change hands if sold immediately without regard to the relevant marketplace and appropriate use. In certain cases, this may be a negative value because labor and other costs may be required to disassemble and dispose of the property in a quick, forced and expedient manner.

SCHEDULED ARTICLES: This term is used by insurance companies when articles of personal property are individually listed, described and valued on an insurance policy. Although some insurance companies will accept a receipt of a recent purchase, the schedule is typically based on an appraisal. Typically scheduled items carry a lower insurance premium than items which are under a blanket insurance policy.

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 31 of 35

# GURR JOHNS
### est.1914

**SECONDARY MARKET:** This term refers to the marketplace where a used object is bought and sold. Once an item is no longer available from the original source, it is considered a secondary market item and usually refers to the auction market and is in no way associated with the value or the condition of the object. The secondary market is the venue for the sale of an object between a seller and a buyer with neither of them having participated in the creation or initial sale of the object, usually through auction but can also be in galleries. In the instance of multiples, a valid secondary market cannot exist while the maker or his agent retains a supply of the original offering.

**SECONDARY SOURCE:** Examples of secondary sources utilizing exact primary sources in research and data comparison are ArtNet,ArtFact, P4a, Gordonsart,Art-Sales-Index, newel.com and other Internet research tools.

**SELLER'S PREMIUM:** This is the percentage of the bid or "hammer" price paid by the seller to the auction when selling an item. The fee ranges from nothing to 35% and may be more negotiable than the Buyer's Premium. See also BUYER'S PREMIUM and HAMMER PRICE.

**SENTIMENTAL VALUE:** This is never a monetary value but rather an emotional valuation not based on market factors or aesthetics.

**SKINNED CONDITION:** This term refers to a piece of furniture which has been stripped of its original patina and also describes a paper condition where skinned paper indicates the paper has lost a layer of fibers.

**SS (STERLING SILVER):** This is the acronym for sterling silver objects and is often required by insurance companies to designate the objects on a written report which may be subject to a higher insurance premium.

**STEPPED UP BASIS:** This is a tax term and refers to a value that is used to determine profit or loss when property is sold. If someone inherits property that has increased in value since the deceased person acquired it, the tax basis of the new owner is stepped up to the market value of the property at the time of death. The stepped up basis means that when the property is eventually sold there will be less taxable gain.

**STYLE; IN THE STYLE OF:** This refers to a piece made after the original would have been made and has the same features as the original just made years later.

**SUMMARY APPRAISAL REPORT:** See APPRAISAL REPORT OPTIONS /TYPES (above)

**TAX IDENTIFICATION NUMBER (TAX I D):** The tax ID number is an IRS term and requirement. In most cases, this is the social security number of the appraiser which the IRS requires the appraiser to list in certain types of appraisals with the appraiser's signature. In this way, the IRS can impose sanctions on the appraiser should they be warranted.

**TERTIARY MARKET:** This marketplace occurs in a forced sale situation such as liquidation or salvage sales.

**TESTIFYING EXPERT:** This is an appraiser who not only provides technical expertise and background knowledge to the attorney and the client in a litigious situation but is also used on the witness stand to explain complex valuation issues and to express expert opinions and conclusions as they relate to the object or objects in dispute. Such expertise may be related to the quality of the object, the value or the object or the methodology of the opposing appraiser. The work of the testifying expert is discoverable in court.

Appraisal Report no. 27631
Value Date: March 29, 2019

# GURRJOHNS
### est.1914

THERMOLUMINESCENCE TEST: This has been the definitive way to tell the true age of pottery, stoneware, porcelain, bronze and terra cotta. There are a handful of thermoluminescent labs worldwide which perform the thermoluminescent test. The most prominent lab is in Oxfordshire, England.. To test an object's thermoluminescence, a small sample (about 100 milligrams) is heated to extreme temperatures. Most mineral materials store up increasing amounts of radioactive energy that is drawn from radioactive decay in and around the mineral. When heated (thermo), most minerals release the stored energy in the form of light (luminescence). By measuring the amount of light released from a material, one can calculate how many years have passed since the artifact was fired. Generally, the more light released the older the item is. More recently, concerns have been raised about results, based on suggestions that results could be skewed by irradiating objects to be tested.

ULTRAVIOLET LIGHT (UV): These are short, high energy invisible light waves beyond violet in the spectrum of light with a length of 250 to 400 nanometers.

UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP): These are the appraisal procedures and guidelines for conducting and writing appraisals published by the Appraisal Standards Board of The Appraisal Foundation. First codified in 1987, these standards apply to all disciplines of appraising and are predicated on the concept that there is common methodology which can be found in all aspects of appraisal practice including appraisal, appraisal review and appraisal consultancy.

VALUATION APPROACHES:

Comparative Market Data Approach: (alternately called: Market Data Approach, Comparable Market Data Approach and Sales Comparison Approach): This is the most commonly applied approach when appraising personal property in which appraised value is based upon past prices (close to the Effective Date) for similar works by the same artist/maker or of similar works by another artist/maker of equal standing and related reputation.

Cost Approach: This approach is used to determine the value of an object based upon the cost of duplicating or recreating the identical piece. This approach may be applied to the decorative arts when the methods of construction or materials used are replicable and of significant inherent value.

Income Approach: This approach is used to determine the value of a work of art or object which will be used to generate future income. This is most often done through leasing, rental or creating reproductions but not through a one-time only sale with transfer of title and/or copyright.

VALUE: This is a dollar amount dependent upon the type of appraisal report being written: insurance, IRS, equitable distribution for divorce proceedings or liquidation. The appraiser must state which value is being used and give a clear, concise definition of that value and cite the source for the definition.

VALUE IN EXCHANGE: This term refers to the ability to trade an item or asset, especially money, for other goods and services that can then be used to satisfy wants and needs. Value in exchange means that value that is satisfaction, is obtained indirectly through the acquisition of something else. For an item to have value in exchange, it need NOT have value in use. value obtained directly from the consumption of a good or service.

VALUE IN USE: This term refers to the satisfaction of wants and needs provided by the direct consumption of goods and services. Acquiring value from the use of goods and services is really the ultimate goal of economic activity. It is the final step in the production, allocation and consumption activities that are undertaken to address the fundamental problem of scarcity. Value in use should be contrasted with the similar phrase VALUE IN EXCHANGE.

VERSO: This term refers to the left hand page of a book or the back side of a leaf or a picture on the other side of RECTO.

VINTAGE: This is a widely used term referring to an object that was formerly in vogue but not more than 100 years old. This definition may vary by object, i.e., a vintage fountain pen is generally thought to be one manufactured pre-1965.

Appraisal Report no. 27631
Value Date: March 29, 2019

G U R R J O H N S
est.1914

**WATERMARK:** This is a design left in the paper by the paper manufacturer and is seen when the paper is held against the light. This mark is used to trace the origin of the paper. Special markings for an artist or publisher may incorporate a signature or a device and can be used to detect fakes although even watermarks can be faked. Watermarks on handmade papers are made by very low relief molds or designs of fine wire set on the screen on which the moist pulp collects.

**WORK SIZE:** This refers to the dimensions of works on panel or board. When the word "sight" is used in conjunction with work size, it refers to the dimensions of the visible image of the work.

Appraisal Report no. 27631                                        Page 34 of 35
Value Date: March 29, 2019



## TERMS AND CONDITIONS

This Appraisal is given subject to these Terms and Conditions, all of which are a part of this Appraisal, unless expressly set aside in writing.

1.    Unless otherwise stated herein, this Appraisal is based only on the readily apparent identity of the items appraised, and no further opinion or guarantee of authenticity, genuineness, attribution or authorship is made.

2.    Unless otherwise stated herein, the appraised values are based on the whole ownership and possessory interest undiminished by any liens, fractional interest or any other form of encumbrance or alienation.

3.    The Appraisal is made at the request of the parties for their sole use.  It is not an indication or certificate of title or ownership.  The identification of the interest of the requesting party is simply that represented to the Appraiser by such party and no inquiry or investigation has been made, nor is any opinion given as to the truth of such representation.

4.    The values expressed herein are based on the Appraiser's best judgment and opinion and are not a representation or warranty that the items will realize those values if offered for sale at auction or otherwise.  The values expressed are based on current information and no opinion is hereby expressed as to any future value, or unless otherwise expressly stated, to any past value.

5.    Unless expressly stated, the condition of the items is assumed to be good.  Functional obsolescence (damage as to render the item unusable for its essential purpose) or Economic obsolescence (lack of demand) of appraised items will only be noted if applicable.

6.    In conjunction with this Appraisal, should additional services of the Appraiser be requested by the client, his agent or attorney, or the Court (such as added time researching for other value purposes, pretrial conferences, Court appearances, Court preparations, etc.) compensation for same shall be at the customary hourly rate charged by the Appraiser at that time; and the availability of the Appraiser shall be subject to the Appraiser's schedule and reasonable notice by the client.  The client shall pay all such fees upon receipt of a statement.

7.    This Appraisal is prepared for the persons named on Page One herein and any use of or reliance on by third parties is prohibited unless authorized in writing by the Appraiser.

8.    Sales tax, excise tax, delivery costs, commissions, advertising, storage costs, marketing costs and costs or repairs have not been included in this Appraisal unless otherwise stated and should be added when applicable.

9.    Compensation for this appraisal is not contingent upon values found.

The Appraiser has no present or contemplated future interest in the appraised property, unless otherwise stated.

Appraisal Report no. 27631
Value Date: March 29, 2019

Page 35 of 35

**<u>EXHIBIT B</u>**



# PROPERTY INFORMATION FORM

## GENERAL INFO:

| | | | | | |
|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | K Mart Land | Store #: | 31002 or 7668 | Type: | Owned |
| Property Street Address: | Exit 95 Land, APN RPA3S07E301860A and RPA01060010070 | | | | |
| City: | Mountain Home | State: | ID | Zip: | 83647 | County: | Elmore |
| Metro Market: | Mountain Home/Boise | Nearest Crossroads: | American Legion Blvd and E 8th N | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall) | | Building Type: | Land |
| Roof Construction: | | Column Spacing: | NA |
| Building SF: | 102,000.00 | Number of Ramps: | NA |
| Parking Spaces: | NA | Number of Overhead Doors: | NA |
| Year Built: | NA | Number of Docks: | NA |
| Property Condition: | NA | Height of Docks: | NA |
| Signage Type: (i.e. monument, pylon, none) | NA | Location of Docks (rear, eastside, etc.): | NA |
| Building Dimensions(ft.): | NA | Current Tenant or Vacant: | Vacant |
| Interior Ceiling Height: | NA | | |
| Location of Subject Property (corner, Northside of street, etc.): | North of Grand Ave, West of 15th St, centrally located on the block | | |

## PARCEL DETAILS:

| | | | |
|---|---|---|---|
| Site Size in SF: | 660,979 & 70,132 | Frontage Footage:  1200 ft     On (Street): US Hwy 26  Frontage Footage:  210 ft     On (Street): American Legion Blvd | |
| Site Size in Acres: | 15.174 & 1.61 | Site Details: 459 ft. Wide   by 1007 ft. Deep | |
| | | Zoning Classification: | C3 General Business |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. (Example: "Curb cut on Frankford Street shared with property to east at hard corner. Secondary access is by median break and curb cut on east side of property that is a shared drive to the north. Both curb cuts allow for right out only.")

Two parcels: The larger parcel has no access to any streets but does connect to the parking lot of the Jeep dealership (Former K Mart), looks like a road could be developed to connect this piece to American Legion Blvd. The smaller piece fronts American legion Blvd and would have a curb cut on the northeast piece of the property. These pieces contain dozens of enormous boulders and are mostly solid rock.

Primary Access (name of street): through Jeep dealership parking lot
Secondary Access (name of street): curb cut to be developed onto American Legion Blvd, or a road to be built to the rear property.

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | The large piece is Highly visible from the interstate but hidden behind the Jeep dealership from American Legion Blvd. The smaller piece has frontage on American Legion and would have some visibility from the interstate but more limited than the larger piece. Both would benefit from a road being developed between the properties. |
|---|---|

## AREA INFO:

| Traffic Count: (Street Name & Vehicles Per Day) | American Legion Blvd or Interstate 84 |
|---|---|
| Area Description: | Site is located adjacent to the interstate however has difficult access and visibility from town. It is on the west side of the freeway, south of the main arterial in town. |
| Market Area Overview/Trends: | Major area tenants:  Lucky's Grocery, Red Robin |
| | Major points of interest (hospitals, universities, corporate headquarters, closest major city, etc.):  Jobs in trade, transportation and utilities account for the largest employment in the metro area. St Lukes Elmore, Walmart, veterans Affairs US Dept., US Dept of Air Force. |
| | Proximity of the subject location relative to the most active retail area within the market:  Right off the freeway, but located behind the former K Mart makes it tough. All the best retail is right off the freeway. |
| | Market area vacancy rate:  Unknown |
| | Mall vacancy (if applicable): NA |
| | Mall anchors (if applicable): NA |
| | Summarize development activity in the market area: Majority of new development is happening further west, however a floral shop recently took the old Hastings box at Westpark Shopping Center in 18,000 SF |
| Highest & Best Use: | Industrial development, multifamily, residential, storage land. |

| Highest & Best Use: | Industrial development, multifamily, residential, storage land. | Potential User Types: | Storage, Flex Space developed, large campus, residential development. |
|---|---|---|---|

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 2,737 | 16,010 | 18,093 |
| Median HH Income: | $45,858 | $48,864 | $49,359 |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| | |
|---|---|
| North: | Jeep Dealership |
| East: | None |
| South: | None |
| West: | None |

## TAXES FOR CURRENT YEAR:

**Assessed Value:** $ 520,015

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|
| $NA | 2018 | Elmore County |
| $11,580.92 | 2017 | Elmore County |
| $NA | 2016 | Elmore County |
| $NA | 2015 | Elmore County |



**MARKET ANALYSIS**

**Property Address:**
**Exit 95, off American Legion Blvd, Mountain Home, ID 83647**

Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.

Please include sales comps **and** properties listed for sale. Indicate which are listed properties by providing a note in the comment section.

### SALES COMPARABLES:

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Address, City and Zip Code | 2200 S State Rd, Springville,UT | 2787 N Mule Ranch Rd, Corinne, UT | Mountain Vista Pky, Provo, UT 84606 | 1062 W 1500 S, Marriott-Slatersville City, UT | 1000 S 1400 E, Vernal, UT |
| Buyer | Mont Jensen | Bear River valley Co Op | Tom Stuart Construction | Mark Perkes | |
| Date of Sale | 12/2015 | | 3/2016 | 3/2014 | 5/2016 |
| Building Size (SF) | | | | | |
| Site size (SF) | 315,810 SF | 240,887 SF | 1,573,019 | 309,276 | 292,723 |
| $ Total Price | $375,000 | $350,000 | $1,900,000 | $300,000 | $600,000 |
| $ Price per Building SF (divide total price by building | | | | | |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter than your direct use in connection with a contemplated transaction.

| | | | | | |
|---|---|---|---|---|---|
| size) | | | | | |
| **$ Price per Site SF** (divide total price by site size) | **$1.19** | **$1.45** | **$1.21** | **$0.97** | **$2.05** |
| **Distance & Direction from Subject** | | | | | |
| **Superior / Inferior** | **Superior** | **Superior** | **Superior** | **Superior** | **Superior** |
| **Comments (indicate listed properties)** | **Stronger Market, equal positioning** | **Stronger positioning than focus, smaller parcel** | **Much stronger market and located near more retail/development** | **Great industrial land outside of a major industrial corridor** | **Equal market and positioning within the market, but size and shape are superior** |

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:** Smaller site and located in a better market with more growth, this site is equal in positioning to the focus property.

 **Comp 2:** This property is located between two highways and not far from the interstate, smaller in size and a comparable market.

**Comp 3:** This land has much higher potential and multiple uses potentially in a much strong market.

**Comp 4:** This land is located in a stronger market with high demand for industrial.

**Comp 5:** This piece is smaller and has easier access, better shape, and located in slightly stronger market at the time.

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**Summary**

**Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:**    $ NA

**Recommended Asking Annual Rental Rate:**    $ NA


**Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:**

(divide Estimated Sales Price by building SF and Land SF respectively)

|  | | | |
|---|---|---|---|
| | **Low** | $109,666.65 | $0.15 |
| | **High** | $182,777.75 | $0.25 |
| **Recommended Ask Price:** | | $131,599.98 | $0.18 |

(divide Recommended List Price by building SF and land SF respectively)


**Provide detailed discussion to support valuation of:** ==**\*estimated rental price \*estimated sales price**== ==**\*determination of recommended List Price.**== **Be sure to mention pertinent market trends: This site is located adjacent to the interstate which gives it superior visibility and access to the freeway. However, it is located behind the former K Mart and thus is not retail land, it becomes destination-oriented land and will require roads to be built to the property. The property can be accessed through the Jeep Dealership Parking lot. This sale is also awkward with 2 parcels that are not adjacent to one another and thus they should be sold together. The market currently has several other similar size pieces available in the market, however none have the proximity to the interstate as described above, it is arguable this would be the best piece available for any industrial, flex space, or storage user.  It is worth noting that only a fraction of the larger piece is capable of being developed and that getting access to that portion will require moving several dozen boulders that are thousands of pounds each. There are piles of boulders stacked 10-15 feet high directly at what could be the only entrance to the site. These boulders were actually stacked here by K Mart when developing and were a part of the original K Mart Box site. The remainder of the land is likely filled with rock and will be very difficult to develop.**

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



# PROPERTY INFORMATION FORM

## GENERAL INFO:

| | | | | | |
|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | Kmart | Store #: | 37563 | Type: | Owned |
| Property Street Address: | 1650 Columbus Ave | | | | |
| City: | Washington Court House | State: | OH | Zip: | 43160 | County: | Fayette |
| Metro Market: | Columbus | Nearest Crossroads: | Columbus Ave & Glenn Ave | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall) | N/A (raw land) | Building Type: | ☒ Freestanding<br>☐ Inline (Shopping Center)<br>☐ Mall |
| Roof Construction: | N/A (raw land) | Column Spacing: | N/A (raw land) |
| Building SF: | N/A (raw land) | Number of Ramps: | N/A (raw land) |
| Parking Spaces: | N/A (raw land) | Number of Overhead Doors: | N/A (raw land) |
| Year Built: | N/A (raw land) | Number of Docks: | N/A (raw land) |
| Property Condition: | Poor | Height of Docks: | N/A (raw land) |
| Signage Type: (i.e., monument, pylon, none) | None | Location of Docks (rear, eastside, etc.): | N/A (raw land) |
| Building Dimensions(ft.): | width          depth | Current Tenant or Vacant: | Vacant land |
| Interior Ceiling Height: | N/A (raw land) | | |
| Location of Subject Property (corner, Northside of street, etc.): | North of Columbus Ave., immediately east of Tractor Supply | | |

## PARCEL DETAILS:

| | | | |
|---|---|---|---|
| Site Size in SF: | 60,112 (sf) | Frontage Footage:          ft     On (Street):<br>Frontage Footage:          ft     On (Street): | |
| Site Size in Acres: | 1.38 (Acres) | Site Details: 140 ft. Wide   by 400 ft. Deep | |
| | | Zoning Classification: | B-3 (General Business District) |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. (Example: "Curb cut on Frankford Street shared with property to east at hard corner. Secondary access is by median break and curb cut on east side of property that is a shared drive to the north.  Both curb cuts allow for right out only.")

Primary Access (name of street):  The site benefits from adjacency to Tractor Supply's parking lot.  No current curb cuts exist from Tractor Supply lot to subject site; however, it appears 1 or 2 curb cuts could easily be installed.  Two existing curb cuts exist from Columbus Ave. to the Tractor Supply lot.

Secondary Access (name of street):  Secondary access to the site only exists by foot through neighboring property.

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | Limited visibility from Columbus Ave.  Site lines are obstructed by Burger King, Tractor Supply, and mature trees along road. |
|---|---|

## AREA INFO:

| | |
|---|---|
| Traffic Count: (Street Name & Vehicles Per Day) | Columbus Ave 11,854 ADT (ODOT 2017) |
| Area Description: | Washington Court House |
| Market Area Overview/Trends: | Major area tenants:  Walmart, Peebles |
| | Major points of interest (hospitals, universities, corporate headquarters, closest major city, etc.):  Fayette County Memorial Hospital |
| | Proximity of the subject location relative to the most active retail area within the market:  Subject property is in one of two primary retail corridors within Washington Court House.  This corridor is at the northeast edge of town and draws more neighborhood cliente.  Site is 40 miles from Columbus, OH, and 50 miles from Dayton, OH. |
| | Market area vacancy rate:  5.8% retail vacancy |
| | Mall vacancy (if applicable):  N/A |
| | Mall anchors (if applicable):  N/A |
| | Summarize development activity in the market area:  Home Depot and various outlots (southwest of the site, built 2006-2016) |
| Highest & Best Use: | Office or Residential Land | Potential User Types: | Adjacent owners, developers |

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 6,506 | 16,588 | 19,389 |
| Median HH Income: | $38,815 | $43,024 | $44,189 |

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| | |
|---|---|
| North: | Residential |
| East: | Retail corridor with fast food |
| South: | Fayette County Memorial Hospital |
| West: | Residential |

## TAXES FOR CURRENT YEAR:

**Assessed Value:** $ 15,720

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|
| $696.14 | 2017 | Fayette County (Property tax) |
| $ | | |
| $ | | |
| $696.14 | | Total |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



**Property Address:**
**1650 Columbus Ave., Washington Court House, OH  43160**

Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.

Please include sales comps **and** properties listed for sale. Indicate which are listed properties by providing a note in the comment section.

**SALES COMPARABLES:**

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | **11577 Allen Rd., Jeffersonville, OH 43128** | **7.9 AC Kenskill Ave., Washington Court House, OH 43160** | **1260 Rawlings St., Washington Court House, OH 43160** | **2306 SE 753 SR Washington Court House, OH 43160** | **301 Glenn Ave Washington Court House, OH 43160** |
| **Buyer** | **Gitaben Jasani** | **Steven Simpson** | **N/A** | **N/A** | **N/A** |
| **Date of Sale** | **9/8/2017** | **7/2/2015** | **N/A** | **N/A** | **N/A** |
| **Building Size (SF)** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |
| **Site size (SF)** | **144,619** | **343,688** | **43,560** | **142,441** | **137,214** |
| **$ Total Price** | **175,000** | **90,667** | **69,900 (Asking)** | **300,000 (Asking)** | **283,743 (Asking)** |
| **$ Price per Building SF** (divide total price by building size) | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |
| **$ Price per Site SF** (divide total price by site size) | **1.21** | **0.26** | **1.60** | **2.11** | **2.07** |
| **Distance & Direction from Subject** | **12.3 miles northwest** | **2.4 miles southeast** | **0.3 miles west** | **4.0 miles south** | **200 feet northeast** |
| **Superior / Inferior** | **Superior** | **Inferior** | **Similar** | **Superior** | **Similar** |
| **Comments (indicate listed properties)** | **SOLD.** | **SOLD.** | **FOR SALE.** | **FOR SALE.** | **FOR SALE.** |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:**        This is the sale of excess land from the development of a Bob Evans restaurant in 1994.  The property has traded multiple times—most recently in 2017—but has never been developed.  It is in a superior location to subject, directly off Interstate 71.

**Comp 2:**        This is the sale of industrial land in Washington Court House.  It is inferior to subject property due to its location along an industrial corridor.

**Comp 3:**        This is a 1 acre land site listed for sale, with the same zoning as subject.  Like the subject property, it sits off Columbus Ave. and has limited retail potential.  It is thus deemed comparable.

**Comp 4:**        This is a 3.27 acre land site listed for sale, with the same zoning as subject.  Its location off U.S. Route 35, with road frontage and visibility, is superior to subject's.

**Comp 5:**        This is a 3.15 acre land site listed for sale, with the same zoning as subject.  Like the subject property, it sits off Columbus Ave. and has limited retail potential.  It is thus deemed comparable.

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



**Property Address:**
**1650 Columbus Ave., Washington Court House, OH  43160**

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps <u>and</u> properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**<u>LEASED COMPARABLES:</u>**

|  | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** |  |  |  |  |  |
| **Tenant** |  |  |  |  |  |
| **Date of Transaction** |  |  |  |  |  |
| **Size (SF)** |  |  |  |  |  |
| **Annual Rent/SF** |  |  |  |  |  |
| **Expenses paid by Landlord** |  |  |  |  |  |
| **Distance from Subject** |  |  |  |  |  |
| **Direction from Subject** |  |  |  |  |  |
| **Superior / Inferior** |  |  |  |  |  |
| **Comments** |  |  |  |  |  |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each lease comp listed above relates to the subject property:

**Comp 6:**        No comparable ground leases were identified in the Washington Court House or surrounding markets.  It is extremely unlikely that subject property could be ground leased, except as a short-term supplementary use to neighboring owners, and it is our recommendation that entertaining ground leases would not be advantageous to achieving value or disposing of this asset.

**Comp 7:**

**Comp 8:**

**Comp 9:**

**Comp 10:**

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**Summary**

**Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:**     $ <u>N/A</u> (psf)

**Recommended Asking Annual Rental Rate:**     $ <u>N/A</u> (psf)

| **Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:** | **Total** | **$/SF  Bldg** | **$/SF Land** |
|---|---|---|---|
| (divide Estimated Sales Price by building SF and Land SF respectively) | | | |
| **Low** | <u>$30,000</u> | <u>$N/A</u> | <u>$0.50</u> |
| **High** | <u>$60,000</u> | <u>$N/A</u> | <u>$1.00</u> |
| **Recommended Ask Price:** | <u>$65,000</u> | <u>$N/A</u> | <u>$1.08</u> |

(divide Recommended List Price by building SF and land SF respectively)


**Provide detailed discussion to support valuation of:** <mark>*estimated rental price *estimated sales price *determination of recommended List Price.</mark> Be sure to mention pertinent market trends:

     Subject property is unique, as a commercial-zoned raw land site in the neighborhood retail corridor of this small-market town, but with no frontage and limited visibility to the main road.  There are few comparable sales in this market, or surrounding market.  In fact, land sales in general are limited given the limited amount of recent development in the market.  The existence of one inferior land sale at $0.26/SF, and one superior land sale at $1.21/SF, indicates that subject property's selling price is to be in a range between those two prices.  Although there are some comparable land sites on market above this pricing range, the lack of recent sales indicates these sites may not be appropriately priced.  Our pricing recommendation places the subject property just below the sticker price of the most comparable on-market property.

     No comparable ground leases were identified in the Washington Court House or surrounding markets.  It is extremely unlikely that subject property could be ground leased, except as a short-term supplementary use to neighboring owners, and it is our recommendation that entertaining ground leases would not be advantageous to achieving value for or successfully disposing of this asset.

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



## PROPERTY INFORMATION FORM

## GENERAL INFO:

| | | | | | |
|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | Land Pads | Store #: | 3998 | Type: | Owned |
| Property Street Address: | 2770 E El Monte Way | | | | |
| City: | Dinuba | State: | CA | Zip: | 93618 | County: | Tulare |
| Metro Market: | | Nearest Crossroads: | El monte Way | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall) | n/a | Building Type: | ☐ Freestanding ☐ Inline (Shopping Center) ☐ Mall |
| Roof Construction: | | Column Spacing: | |
| Building SF: | | Number of Ramps: | |
| Parking Spaces: | | Number of Overhead Doors: | |
| Year Built: | | Number of Docks: | |
| Property Condition: | | Height of Docks: | |
| Signage Type: (i.e., monument, pylon, none) | | Location of Docks (rear, eastside, etc.): | |
| Building Dimensions(ft.): | width          depth | Current Tenant or Vacant: | |
| Interior Ceiling Height: | | | |
| Location of Subject Property (corner, Northside of street, etc.): | | | |

## PARCEL DETAILS:

| | | | | |
|---|---|---|---|---|
| Site Size in SF: | 20,900 (sf) 18,295 (sf) | Frontage Footage:          ft    On (Street): Frontage Footage:          ft    On (Street): | | |
| Site Size in Acres: | 0.48 (Acres) 0.42 (Acres) | Site Details:          ft. Wide   by          ft. Deep | | |
| | | Zoning Classification: | C3 | |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. (Example: "Curb cut on Frankford Street shared with property to east at hard corner. Secondary access is by median break and curb cut on east side of property that is a shared drive to the north.  Both curb cuts allow for right out only.")

Primary Access (name of street): El Monte Way

Secondary Access (name of street):

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | Direct and unobstructed visibility to the street. |
|---|---|

## AREA INFO:

| Traffic Count: (Street Name & Vehicles Per Day) | El Monte Way: 16,400 vpd |
|---|---|
| Area Description: | |

| Market Area Overview/Trends: | Major area tenants:  Walmart, Rite Aid, Big 5 |
|---|---|
| | Major points of interest (hospitals, universities, corporate headquarters, closest major city, etc.):  None |
| | Proximity of the subject location relative to the most active retail area within the market: |
| | Market area vacancy rate: |
| | Mall vacancy (if applicable): n/a |
| | Mall anchors (if applicable): |
| | Summarize development activity in the market area: None |

| Highest & Best Use: | | Potential User Types: | |
|---|---|---|---|

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 6,826 | 26,746 | 47,122 |
| Median HH Income: | $41,802 | $42,904 | $41,161 |

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| North: | Vacant Land |
|---|---|
| East: | Vacant Land |
| South: | Vacant former Kmart box |
| West: | Vacant supermarket/Rite Aid Center |

## TAXES FOR CURRENT YEAR:

| | Assessed Value: | $ 122,780 $97,137 |
|---|---|---|

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|
| $1,403.24 $1,110.08 | 2018 2018 | |
| $ | | |
| $ | | |
| $ | | Total |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**sears** **kmart** **MARKET ANALYSIS**

**Property Address:**

_____

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps and properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**SALES COMPARABLES:**

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | 1377 W El Monte Way 93618 | 2061 El Monte Way 93618 | 647 S Alta Drive 93618 | | |
| **Buyer** | | | | | |
| **Date of Sale** | | | | | |
| **Building Size (SF)** | | | | | |
| **Site size (SF)** | 0.59 acres | 3.5 acres | | | |
| **$ Total Price** | $185,000 | $1,368,000 | | | |
| **$ Price per Building SF** (divide total price by building size) | | | | | |
| **$ Price per Site SF** (divide total price by site size) | $7.14 | $8.97 | $2.30 | | |
| **Distance & Direction from Subject** | | | | | |
| **Superior / Inferior** | Comparable | Comparable | Inferior | | |
| **Comments (indicate listed properties)** | On market 10 years! | On market 7 years | Weaker traffic | | |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:**          Located on same street as subject. Similar size on west side of trade area.

  **Comp 2:**          Larger parcel located a few blocks from subject site.

          **Comp 3:**          Located on inferior street with much less traffic secondary subject site.

**Comp 4:**

**Comp 5:**

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



## MARKET ANALYSIS

**Property Address:**

_____

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps _and_ properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**LEASED COMPARABLES:**

|  | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| Address, City and Zip Code |  |  |  |  |  |
| Tenant |  |  |  |  |  |
| Date of Transaction |  |  |  |  |  |
| Size (SF) |  |  |  |  |  |
| Annual Rent/SF |  |  |  |  |  |
| Expenses paid by Landlord |  |  |  |  |  |
| Distance from Subject |  |  |  |  |  |
| Direction from Subject |  |  |  |  |  |
| Superior / Inferior |  |  |  |  |  |
| Comments |  |  |  |  |  |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each lease comp listed above relates to the subject property:

**Comp 6:** _____

_____

**Comp 7:** _____

_____

**Comp 8:** _____

_____

**Comp 9:** _____

_____

**Comp 10:** _____

_____

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**<u>Summary</u>**

**Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:**          $ _____ (psf)

**Recommended Asking Annual Rental Rate:**          $ _____ (psf)


| **Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:** | **Total** | **$/SF Bldg** | **$/SF Land** |
|---|---|---|---|

(divide Estimated Sales Price by building SF and Land SF respectively)

| | Total | $/SF Bldg |
|---|---|---|
| **Low** | $ 50,000 | $250,000 |
| **High** | $100,000 | $5.00 |

**Recommended Ask Price:**          $125,000     $7.00

(divide Recommended List Price by building SF and land SF respectively)


**Provide detailed discussion to support valuation of: ==*estimated rental price *estimated sales price *determination of recommended List Price.==** **Be sure to mention pertinent market trends:**

This area has limited to no demand for land. Kmart store and grocery store still sitting vacant in subject site. Take any offer that may be presented.

_____

_____

_____

_____

_____

_____

_____

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

 **PROPERTY INFORMATION FORM**

## GENERAL INFO:

| | | | | | |
|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | Land | Store #: | N/A | Type: | Owned |
| Property Street Address: | NWC S Stoney Island Ave & S Chicago Ave | | | | |
| City: | Chicago | State: | IL | Zip: | 60619 | County: | Cook |
| Metro Market: | Chicago | Nearest Crossroads: | NWC Stoney Island Ave & S Chicago Ave | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall) | | Building Type: | |
| Roof Construction: | | Column Spacing: | |
| Building SF: | | Number of Ramps: | |
| Parking Spaces: | | Number of Overhead Doors: | |
| Year Built: | | Number of Docks: | |
| Property Condition: | | Height of Docks: | |
| Signage Type: (i.e., monument, pylon, none) | | Location of Docks (rear, eastside, etc.): | |
| Building Dimensions(ft.): | width          depth | Current Tenant or Vacant: | |
| Interior Ceiling Height: | | | |
| Location of Subject Property (corner, Northside of street, etc.): | NWC Stoney Island Ave & S Chicago Ave | | |

## PARCEL DETAILS:

| | | | |
|---|---|---|---|
| Site Size in SF: | 266,151.60 | Frontage Footage:        ft    On (Street):<br>Frontage Footage:        ft    On (Street): | |
| Site Size in Acres: | 6.11 | Site Details:        ft. Wide   by        ft. Deep | |
| | | Zoning Classification: | C2 Commercial |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. Two existing full access points from S Chicago Ave (no signals); Right In/Right Out access point from Stoney Island Ave with significant median preventing full access.

Primary Access (name of street):  S Chicago Ave.

Secondary Access (name of street): Stoney Island Ave.

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | Multiple parcels of Vacant Land with varying visibility descriptions. Eight parcels fronting S Chicago Ave with excellent visibility, no obstruction. Seven parcels fronting Stoney Island Ave with obstruction due to high medians, median walls and elevated roads to the Chicago Skyway. Remaining parcels fronting side streets Blackstone Ave, Harper Ave and E 77th St. |
|---|---|

## AREA INFO:

| Traffic Count: (Street Name & Vehicles Per Day) | S Chicago Ave: 13,000 VPD<br>Stoney Island Ave: 42,000 VPD |
|---|---|
| Area Description: | South-Shore Chicago neighborhood with heavily trafficked Stoney Island Ave/160E and two major Metra Rail Lines running through it |
| Market Area Overview/Trends: | Major area tenants:  Jewel-Osco, ALDI, K&G Fashion Superstore, Citi Trends, Autozone |
| | Major points of interest: Jackson Park Hospital; Site is 3 miles South of The University of Chicago |
| | Proximity to other retail: Jewel-Osco anchored center with fashion co-tenancy E 75th St & Stoney Island Ave just to the North of the site. Across the street from the site on S Chicago Ave are ALDI, White Castle, and Taco Bell. |
| | Market area vacancy rate:  Over 50% |
| | Mall vacancy (if applicable): N/A |
| | Mall anchors (if applicable): N/A |
| | Summarize development activity in the market area: 3 miles to the North of the site, The University of Chicago has stimulated the renovation of Hyde Park into an upscale, urban retail area. 2 and 3 miles to the West of the site in the neighborhood of Chatham, there is significant big box retail including Lowe's, The Home Depot, Burlington, Target and Marshalls. South Shore (where the site is located) seems to be a retail void due to gang-related violence, the one-dimensionality of the market due to the natural cut-off of Lake Michigan, and the steal from these dense neighboring areas of Hyde Park and Chatham. |
| Highest & Best Use: | Retail or Industrial | Potential User Types: | Discount, Wholesale Club |

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 39,340 | 252,912 | 535,167 |
| Median HH Income: | $34,237 | $37,877 | $39,325 |

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| North: | Retail: Jewel-Osco with Fashion Retail co-tenants including K&G Fashion and Citi Trends; Jackson Park Hospital |
|---|---|
| East: | Chicago Skyway |
| South: | Retail: ALDI, Taco Bell, White Castle |
| West: | I-90 |

## TAXES FOR CURRENT YEAR: | Assessed Value: | $ 1,950,000.00

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

| $22,121.00 | 2016 | Cook County |
|------------|------|-------------|
| $22,121.00 | 2015 | Cook County |
| $33,174.00 | 2014 | Cook County |
| $33,174.00 | 2013 | Cook County |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

## sears | Kmart | MARKET ANALYSIS

**Property Address:**

NWC S Stoney Island Ave & S Chicago Ave, Chicago, IL 60619

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps and properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

## SALES COMPARABLES:

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | 1334 E. 79th Chicago, IL | 7555 S Ashland Ave, Chicago, IL | | | |
| **Buyer** | Farpoint Development | Walmart, Inc. | | | |
| **Date of Sale** | August 2018 | February 2015 | | | |
| **Building Size (SF)** | 144,736 | Land | | | |
| **Site size (SF)** | 7.80 AC 339,768 SF | 4.77 AC 207,781 SF | | | |
| **$ Total Price** | $804,044 | $3,000,000 | | | |
| **$ Price per Building SF** (divide total price by building size) | $5.50/sf | N/A | | | |
| **$ Price per Site SF** (divide total price by site size) | $2.30/sf | $14.44/sf | | | |
| **Distance & Direction from Subject** | 0.3 miles West | 4.7 miles West | | | |
| **Superior / Inferior** | Comparable | Comparable | | | |
| **Comments (indicate listed properties)** | Former Sears | Vacant Land | | | |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:** Former Sears store in the same South Shore neighborhood as subject property. Site is directly across I-90 from subject property. Comp 1 site was purchased by an industrial developer for an industrial use. The site has excellent visibility from the highway I-90. Same demographics as subject property.

**Comp 2:** Vacant Land purchased by Walmart for Walmart. Site is directly West of the subject property, further inland, but with similar neighboring co-tenancy including ALDI, Autozone, dollar stores and drive-thru QSRs. Very similar demographics to subject property.

**Comp 3:**

**Comp 4:**

**Comp 5:**

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

| sears | kmart | **MARKET ANALYSIS** |

**Property Address:**

NWC S Stoney Island Ave & S Chicago Ave, Chicago, IL 60619

Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.

Please include sales comps **and** properties listed for sale. Indicate which are listed properties by providing a note in the comment section.

**LEASED COMPARABLES: No Comps. Vacant Land**

|  | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | | | | | |
| **Tenant** | | | | | |
| **Date of Transaction** | | | | | |
| **Size (SF)** | | | | | |
| **Annual Rent/SF** | | | | | |
| **Expenses paid by Landlord** | | | | | |
| **Distance from Subject** | | | | | |
| **Direction from Subject** | | | | | |
| **Superior / Inferior** | | | | | |
| **Comments** | | | | | |

Provide detailed discussion on how each lease comp listed above relates to the subject property:

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**Comp 6:** _____

_____

**Comp 7:** _____

_____

**Comp 8:** _____

_____

**Comp 9:** _____

_____

**Comp 10:** _____

_____

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**Summary**

**Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:**          $ N/A

**Recommended Asking Annual Rental Rate:**                              $ N/A


|          | **Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:** | **Total** | **$ /SF Land** |
|---|---|---|---|
| | (divide Estimated Sales Price by building SF and Land SF respectively) | | |
| **Low** | | $266,151.60 | $1.00/sf Land |
| **High** | | $931,530.60 | $3.50/sf Land |
| **Recommended Ask Price** | | $665,379.00 | $2.50/sf Land |
| | (divide Recommended List Price by building SF and land SF respectively) | | |


**Provide detailed discussion to support valuation of:** ==**\*estimated rental price \*estimated sales price \*determination of recommended List Price.**== **Be sure to mention pertinent market trends:**

         This property is comprised of various land parcels that are not all congruent, meaning that there are a few separately owned buildings dispersed between some of the parcels. This market is plagued with gang-related violence and high crime rates. From a retailer's perspective, the proximity to I-90/Chicago Skyway is advantageous, but the high risk associated with opening and operating a retail storefront in this market is a deterrent.  The value of the land will need to reflect the nature of this market, as well as the comparable sales. Similar to Comp 1, this site may be a viable option for an industrial user, although unlike Comp 1, it does not have any visibility from I-90, and the site is not one neatly conjoined plot of land due to the separated parcels and side streets running through it. Therefore, the subject site is valued less than Comp 1. Comp 2 was vacant land purchased by Walmart, which is a company that can afford to pay a premium for the sites they desire, thus this comp is overpriced, but still similar to the subject site due to demographics and located in somewhat of a retail void. If a company like Walmart can be secured as a buyer for this land site, then the price will reflect that accordingly.

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

 **PROPERTY INFORMATION FORM**

## GENERAL INFO:

| | | | | | |
|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | Vacant Land | Store #: | 7916 | Type: | Owned |
| Property Street Address: | 4325 Broadway Street | | | | |
| City: | Eureka | State: | CA | Zip: | 95503 | County: | Humboldt County |
| Metro Market: | | Nearest Crossroads: | Sunset & Redwood Hwy | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall): | n/a | Building Type: | ☐ Freestanding<br>☐ Inline (Shopping Center)<br>☐ Mall |
| Roof Construction: | | Column Spacing: | |
| Building SF: | | Number of Ramps: | |
| Parking Spaces: | | Number of Overhead Doors: | |
| Year Built: | | Number of Docks: | |
| Property Condition: | | Height of Docks: | |
| Signage Type: (i.e., monument, pylon, none) | | Location of Docks (rear, eastside, etc.): | |
| Building Dimensions(ft.): | width          depth | Current Tenant or Vacant: | |
| Interior Ceiling Height: | | | |
| Location of Subject Property (corner, Northside of street, etc.): | | | |

## PARCEL DETAILS:

| | | | |
|---|---|---|---|
| Site Size in SF: | 24,393.60 (sf)<br>19,602 (sf) | Frontage Footage:  577 ft    On (Street): US HWY 101<br>Frontage Footage:  602 ft    On (Street): US HWY 101 | |
| Site Size in Acres: | 0.56 (Acres)<br>0.45 (Acres) | Site Details:        ft. Wide   by          ft. Deep | |
| | | Zoning Classification: | C5 |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. Direct access to both parcels from Highway 101 at signalized intersection. Main entry to former K Mart building.

Primary Access (name of street): US HWY 101

Secondary Access (name of street): Broadway St

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | Good visibility from highway 101, large parking lot with vacant K Mart store behind pads. |
|---|---|

## AREA INFO:

| Traffic Count: (Street Name & Vehicles Per Day) | Broadway Street: 30,500 vpd |
|---|---|
| Area Description: | |

| Market Area Overview/Trends: | Major area tenants:  Patriot gasoline, McDonalds, TJ MAXX, Big 5 Sporting Goods, Walmart, Carls Jr |
|---|---|
| | Major points of interest (hospitals, universities, corporate headquarters, closest major city, etc.):  Humboldt State University to the north. |
| | Proximity of the subject location relative to the most active retail area within the market: |
| | Market area vacancy rate: |
| | Mall vacancy (if applicable): n/a |
| | Mall anchors (if applicable): n/a |
| | Summarize development activity in the market area: |

| Highest & Best Use: | | Potential User Types: | |
|---|---|---|---|

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 4,755 | 35,530 | 48,268 |
| Median HH Income: | $39,920 | $40,082 | $40,763 |

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| North: | Sunset Memorial Park |
|---|---|
| East: | Vacant Land |
| South: | Great Western Clothing, Tile Center, Carpet Depot, Hersell Materials |
| West: | Vacant Land |

| TAXES FOR CURRENT YEAR: | | Assessed Value: | $ 184,658 $135,053 |
|---|---|---|---|

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|
| $1,947.96 $1,424.66 | 2018 2018 | |
| $ | | |
| $ | | |
| $ | | Total |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**sears** | **K** kmart | **MARKET ANALYSIS**

**Property Address:**

_____

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps _and_ properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**SALES COMPARABLES:**

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | 1601 Broadway 95501 | 1411 Broadway 95501 | 318 Harris St 95503 | | |
| **Buyer** | | | | | |
| **Date of Sale** | | | | | |
| **Building Size (SF)** | 4,000 sf | 900 sf | 3,990 sf | | |
| **Site size (SF)** | 11.761 | 17,860 | 3,500 | | |
| **$ Total Price** | $625,000 | $725,000 | $425,000 | | |
| **$ Price per Building SF** (divide total price by building size) | | | $105 | | |
| **$ Price per Site SF** (divide total price by site size) | $17 (land only) | $20 (land only) | $20 (land only) | | |
| **Distance & Direction from Subject** | ½ mile south | ½ mile north | within ½ mile east | | |
| **Superior / Inferior** | Comparable | Comparable | Inferior | | |
| **Comments (indicate listed properties)** | On market land only would be $225,000-$300,000 | Service station for sale | | | |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:**　　　Site located just south on 101 Highway, It included a 4,000 sf retail store so land residual is lower.

**Comp 2:**　　　Service Station with small C store and improvements.  Booking at building values leaves roughly $20/sq ft for land.

**Comp 3:**　　　Smaller parcel in inferior location with existing building.

**Comp 4:**

**Comp 5:**

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**sears**  **kmart**  **MARKET ANALYSIS**

**Property Address:**

_____

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps _and_ properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**LEASED COMPARABLES:**

|  | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | | | | | |
| **Tenant** | | | | | |
| **Date of Transaction** | | | | | |
| **Size (SF)** | | | | | |
| **Annual Rent/SF** | | | | | |
| **Expenses paid by Landlord** | | | | | |
| **Distance from Subject** | | | | | |
| **Direction from Subject** | | | | | |
| **Superior / Inferior** | | | | | |
| **Comments** | | | | | |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each lease comp listed above relates to the subject property:

**Comp 6:** _____

_____

**Comp 7:** _____

_____

**Comp 8:** _____

_____

**Comp 9:** _____

_____

**Comp 10:** _____

_____

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**Summary**

**Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:**  $ _____ (psf)

**Recommended Asking Annual Rental Rate:**  $ _____ (psf)

| **Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:** | **Total** | **$/SF  Bldg** | **$/SF Land** |
|---|---|---|---|
| 24,393 Land SF | 19,602 Land SF | | |
| **Low**  $$200,000  $8.00 | $15,600 | $8.00 | |
| **High** $$250,000 $10.00 | $196,000 | $10.00 | |

**Recommended Ask Price:**

   Both parcels combined $450,000 and separate $275,000.

**Provide detailed discussion to support valuation of:** ==*estimated rental price *estimated sales price *determination of recommended List Price.== **Be sure to mention pertinent market trends:**

_____

_____ Best to try to sell together if possible unless a specific user wishes to purchase only one site. Prepare a discount on pricing and remain flexible to adjust pricing. Vacant Kmart behind has not helped to attract interest as it remains dark. _____

_____

_____

_____

_____

_____

_____

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

 **PROPERTY INFORMATION FORM**

## GENERAL INFO:

| | | | | | | |
|---|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | | Store #: | 30958 | Type: | | (Owned, Ground Leased or Leased) |
| Property Street Address: | 1820 N Imperial Avenue | | | | | |
| City: | El Centro | State: | CA | Zip: | 92243 | County: | Imperial |
| Metro Market: | | Nearest Crossroads: | N Imperial Ave & W Dorado Ave | | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall) | | Building Type: | ☐ Freestanding<br>☐ Inline (Shopping Center)<br>☐ Mall |
| Roof Construction: | | Column Spacing: | |
| Building SF: | | Number of Ramps: | |
| Parking Spaces: | | Number of Overhead Doors: | |
| Year Built: | | Number of Docks: | |
| Property Condition: | | Height of Docks: | |
| Signage Type: (i.e., monument, pylon, none) | | Location of Docks (rear, eastside, etc.): | |
| Building Dimensions(ft.): | width        depth | Current Tenant or Vacant: | |
| Interior Ceiling Height: | | | |
| Location of Subject Property (corner, Northside of street, etc.): | | | |

## PARCEL DETAILS:

| | | | | |
|---|---|---|---|---|
| Site Size in SF: | 12,198  (sf) | Frontage Footage:          ft    On (Street):<br>Frontage Footage:          ft    On (Street): | | |
| Site Size in Acres: | 0.28 (Acres) | Site Details:          ft. Wide   by        ft. Deep | | |
| | | Zoning Classification: | | |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. (Example: "Curb cut on Frankford Street shared with property to east at hard corner. Secondary access is by median break and curb cut on east side of property that is a shared drive to the north.  Both curb cuts allow for right out only.")

Primary Access (name of street): N Imperial Avenue

Secondary Access (name of street): W Dorado Avenue

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | Corner pad building has unobstructed visibility to Imperial Avenue. |
|---|---|

## AREA INFO:

| Traffic Count: (Street Name & Vehicles Per Day) | Imperial Ave: 28,500 vpd |
|---|---|
| Area Description: | Lower/middle income blue collar farming community |

| Market Area Overview/Trends: | Major area tenants: |
|---|---|
| | Major points of interest (hospitals, universities, corporate headquarters, closest major city, etc.): |
| | Proximity of the subject location relative to the most active retail area within the market: |
| | Market area vacancy rate: |
| | Mall vacancy (if applicable): n/a |
| | Mall anchors (if applicable): n/a |
| | Summarize development activity in the market area: Limited new development |

| Highest & Best Use: | Commercial pad | Potential User Types: | |
|---|---|---|---|

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 10,157 | 56,633 | 69,825 |
| Median HH Income: | $35,735 | $41,124 | $44,376 |

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| North: | Costco, Target, Lowes located north of site |
|---|---|
| East: | |
| South: | Mixed commercial, residential and rural land |
| West: | Residential, rural vacant land |

## TAXES FOR CURRENT YEAR:

| | | Assessed Value: | $ |
|---|---|---|---|

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|
| $4,967.74 | 2018 | |
| $ | | |
| $ | | |
| $ | | Total |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**sears** **Kmart** **MARKET ANALYSIS**

**Property Address:**

_____

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps _and_ properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**SALES COMPARABLES:**

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | 1461 Pico Avenue El Centro, CA 92243 | 1455 Imperial Avenue El Centro, CA 92243 | S Dogwood Rd El Centro, CA 92243 | | |
| **Buyer** | | | | | |
| **Date of Sale** | | | | | |
| **Building Size (SF)** | | | | | |
| **Site size (SF)** | 55,000 SF | 26,000 SF | 54,000 SF | | |
| **$ Total Price** | $400,000.00 | $210,000.00 | $704,000.00 | | |
| **$ Price per Building SF (divide total price by building size)** | | | | | |
| **$ Price per Site SF (divide total price by site size)** | $7.27 | $8.07 | $10.99 | | |
| **Distance & Direction from Subject** | 4 blocks from street | 3 blocks | 2 miles Freeway frontage | | |
| **Superior / Inferior** | Inferior | Comparable | Superior | | |
| **Comments (indicate listed properties)** | Owner will carry on sale Doesn't front Imperial | Listed new | Multiple pad sites in Regional mall | | |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:** Similar Pad fronting Pico.  Inferior street.

**Comp 2:** Land parcel just off Imperial Avenue, On market for many years.

**Comp 3:** Multiple pads are available and have been on market for years.  Limited absorption.

**Comp 4:**

**Comp 5:**

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**sears**  **kmart**  **MARKET ANALYSIS**

**Property Address:**

_____

**Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.**

**Please include sales comps _and_ properties listed for sale. Indicate which are listed properties by providing a note in the comment section.**

**LEASED COMPARABLES:**

|  | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** |  |  |  |  |  |
| **Tenant** |  |  |  |  |  |
| **Date of Transaction** |  |  |  |  |  |
| **Size (SF)** |  |  |  |  |  |
| **Annual Rent/SF** |  |  |  |  |  |
| **Expenses paid by Landlord** |  |  |  |  |  |
| **Distance from Subject** |  |  |  |  |  |
| **Direction from Subject** |  |  |  |  |  |
| **Superior / Inferior** |  |  |  |  |  |
| **Comments** |  |  |  |  |  |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each lease comp listed above relates to the subject property:

**Comp 6:** _____

_____

**Comp 7:** _____

_____

**Comp 8:** _____

_____

**Comp 9:** _____

_____

**Comp 10:** _____

_____

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

## Summary

**Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:**          $ _____ (psf)

**Recommended Asking Annual Rental Rate:**          $ _____ (psf)


 **Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:**

| | Total | $/SF Bldg | $/SF Land |
|---|---|---|---|
| (divide Estimated Sales Price by building SF and Land SF respectively) | | | |
| **Low** | $180,000.00 | $_____ | $_____ |
| **High** | $250,000.00 | $_____ | $_____ |
| **Recommended Ask Price: $250,000.00** | $_____ | $_____ | $_____ |

(divide Recommended List Price by building SF and land SF respectively)


**Provide detailed discussion to support valuation of:** ==**\*estimated rental price \*estimated sales price \*determination of recommended List Price.**== **Be sure to mention pertinent market trends:**

_____**The trade area has many vacant land parcels and oversupply of pads and developable land. Many sitting for a number of years. There is good surrounding retail in the area and this site is in close proximity.**_____

_____

_____

_____

_____

_____

_____

_____

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

 **PROPERTY INFORMATION FORM**

## GENERAL INFO:

| | | | | | | |
|---|---|---|---|---|---|---|
| Former Use (Sears, Kmart, Auto): | Sears | Store #: | 1065 | Type: | Owned | |
| Property Street Address: | 10101 Brook Road | | | | | |
| City: | Glen Allen | State: | VA | Zip: | 23059 | County: | Henrico |
| Metro Market: | Richmond | Nearest Crossroads: | Brook Road & Lakeridge Pkwy/Telegraph Rd & Virginia Center Pkwy | | | |

## BUILDING SPECS:

| | | | |
|---|---|---|---|
| Type Construction: (i.e., tiltwall) | Split Face Block | Building Type: | ☐ Freestanding<br>☐ Inline (Shopping Center)<br>☒ Mall |
| Roof Construction: | Unknown/Flat | Column Spacing: | unknown |
| Building SF: | 132,638 SF (county records) **132,923 SF ALTA** | Number of Ramps: | 2 – Sears Auto |
| Parking Spaces: | 623 | Number of Overhead Doors: | 2 – Sears Auto |
| Year Built: | 1995 | Number of Docks: | 3 + compactor |
| Property Condition: | Fair | Height of Docks: | truck |
| Signage Type: (i.e., monument, pylon, none) | Building, directional | Location of Docks (rear, eastside, etc.): | 3 - Northside |
| Building Dimensions(ft.): | width 408   depth 386 (approx.. / irregular) | Current Tenant or Vacant: | Vacant – Closed Sears |
| Interior Ceiling Height: | 25' main | 23' auto | | |
| Location of Subject Property (corner, Northside of street, etc.): | "Rear/Side" of obsolete mall | | |

## PARCEL DETAILS:

| | | | |
|---|---|---|---|
| Site Size in SF: | 448,755 (sf) (county records) **449,642 SF ALTA** | Frontage Footage:  600 ft<br>Frontage Footage:  585 ft | On (Street): Telegraph Rd<br>On (Street): Ring Road |
| Site Size in Acres: | 10.302 (Acres) (county records **10.32 ALTA** | Site Details: 490 ft. Wide   by 975 ft. Deep | |
| | | Zoning Classification: | B3C |

Description of Access: (Be Specific about location of curb, cuts on medians, traffic signals, ingress and egress in all directions. (Example: "Curb cut on Frankford Street shared with property to east at hard corner. Secondary access is by median break and curb cut on east side of property that is a shared drive to the north.  Both curb cuts allow for right out only.")

Primary Access (name of street): Building sits on the ring road of the Virginia Center Commons mall.  There are many points of access to the ring road via the parking aisles.  The ring road circles the mall and provides two points of access to Brook Road, one via the primary mall entrance which is signalized and second means via a secondary signalized entrance at the northern boundary of the mall.

Secondary Access (name of street): Building also fronts Telegraph Road which is a feeder road to the freeway (I-95) access at Sliding Hill Road approximately ¾ mile north of the site.  Access to telegraph Road is via a median break at the mall entry, not signalized.

| Visibility Description: (i.e. is view obstructed from both directions, if obstructed, explain obstruction, visibility of signage and visibility of building) | There is no visibility of the building or building signage to any main road (Brook Road or I-95).  There is visibility to the mall ring road as you circle the property and get in close proximity of the building with similar visibility to Telegraph Road which is a small feeder road to other retail and a freeway access point.  There is a monument sign on Brook Road on which Sears has the top road front panel but which is minimal in size. |
|---|---|

## AREA INFO:

| Traffic Count: (Street Name & Vehicles Per Day) | 29,000 VPD – Brook Road<br>135,000 VPD – I-95<br>3,400 VPD – Lakeridge Pkwy (no count on Telegraph Rd)<br>3,600 VPD – Virginia Center Pkwy |
|---|---|
| Area Description: | Northern Suburb of Richmond - Growing |
| Market Area Overview/Trends: | Major area tenants:  American Family Fitness, Target, Publix, Burlington Coat |
| | Major points of interest (hospitals, universities, corporate headquarters, closest major city, etc.):  Hanover Airpark and Industrial Park is 1.5 miles NE, 5 miles to the nearest hospital, 3 miles to the Parham Road corridor office parks and it is 9 miles to the Richmond CBD – all as the crow flies. |
| | Proximity of the subject location relative to the most active retail area within the market: Virginia Center Commons mall and the subject property is in the hub of retail for this portion of the market.  The surrounding retail is very successful, but the mall is obsolete and has been purchased by a sub-grade ownership group with no plans to improve the property. |
| | Market area vacancy rate:  9% not including the mall. |
| | Mall vacancy (if applicable): Former Macy's and 60%+ of interior mall shops are vacant. |
| | Mall anchors (if applicable): American Family Fitness, JCPenney, Burlington Coat (rumor they are looking to relocate), Vacated Macy's |
| | Summarize development activity in the market area: New residential (over 1,000 new residential units) and retail developments (marketing in process) underway in the trade area. |
| Highest & Best Use: | Conversion | Potential User Types: | Storage, apartments |

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

## DEMOGRAPHICS:

| | 1-Mile | 3-Miles | 5-Miles |
|---|---|---|---|
| 2018 Population: | 4,300 | 37,272 | 104,832 |
| Median HH Income: | $75,000 | $80,154 | $67,523 |

## DESCRIPTION OF ADJACENT DEVELOPMENT – NAME SPECIFIC TENANTS/USERS:

| North: | Vacant Land |
|---|---|
| East: | I-95 Freeway/vacant Macy's |
| South: | Burlington |
| West: | JCPenney |

## TAXES FOR CURRENT YEAR: | Assessed Value: $ 2,123,600

| AMOUNT | YEAR | TAXING AUTHORITY – NAME SPECIFIC YEAR OF TAX AND PROVIDE A COPY OF TAX BILL (I.E., COUNTY, CITY, SCHOOL, ETC.) |
|---|---|---|
| $18,475.32 | 2019 | Henrico County - $1,000 value to building – down from $2.4m (2018) and $3.26m (2013-17) |
| $ | | |
| $ | | |
| $18,475.32 | | Total |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



**Property Address:**

**10101 Brook Road, Glen Allen, VA**

Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.

Please include sales comps **and** properties listed for sale. Indicate which are listed properties by providing a note in the comment section.

### SALES COMPARABLES:

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | 10101 Brook Rd – Macy's | 10101 Brook Rd | 10187 Brook Road | 10101 Brook Rd – Macy's | |
| **Buyer** | Impact Investment Group | VCC, LLC | IYS XX, LLC | | |
| **Date of Sale** | 7/27/18 | 1/12/17 | 10/31/2012 | On the market | |
| **Building Size (SF)** | 108,521 | 576,656 | 14,950 | 108,521 | |
| **Site size (SF)** | 395,394 SF 9.077 AC | 2,588,422 SF B3 & 368,802 SF – C1 2,956,896 67.881 AC | 355,885 SF usable, 435,600 SF total 10 Acres Flood Plain 1.83 acres | 395,394 SF 9.077 AC | |
| **$ Total Price** | $1,275,000 | $9,000,000 | $1,500,000 | $4.00 PSF or $2.5 million | |
| **$ Price per Building SF** (divide total price by building size) | $11.74 | $15.61 | $100.33 | | |
| **$ Price per Site SF** (divide total price by site size) | $3.22 | $3.04 | $34.44 | | |
| **Distance & Direction from Subject** | Adjacent East | Adjacent/ Adjoining | Adjacent/ Northwest | Adjacent East | |
| **Superior / Inferior** | Moderately Superior – glimpses of visibility to I-95 during winter | Superior in terms of visibility and outparcel options | Superior in visibility to Brook Road, Inferior in terms of use | Moderately Superior – glimpses of visibility to I-95 during winter | |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

| Comments (indicate listed properties) | Was assessed at $2,135,100 at time of sale | Assessed at $12,251,700 | Active Group Home assessed at $1,223,700 | Property is now on the market for sale or lease by the purchaser | |

Provide detailed discussion on how each comparable listed above relates to the subject property:

**Comp1:**  This is the former Macy's box.  A group of investors bought the property and has put it back on the market for sale or lease.  Building has similar attributes but has potential limited visibility to I-95 during winter months.

**Comp 2:**  This is the mall of which the subject Sears is a part.  This was bought by an opportunistic mall owner who has limited plans for any improvement or leasing except for low cost transactions.

**Comp 3:**  This is an adjacent parcel that is used as a group home.  The property was purchased with an existing "home" in place and has since been expanded.  A portion of the property is in the wetlands and cannot be developed.  It has good access (not signalized – not needed for current use) and visibility could be very good due to the frontage on Brook Road.

**Comp 4:**  This is the former Macy's box.  A group of investors bought the property and has put it back on the market for sale or lease.  Building has similar attributes but has potential limited visibility to I-95 during winter months.  Redevelopment is hindered due to the uncertainty with the mall.

**Comp 5:**

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.



**MARKET ANALYSIS**

**Property Address:**

**10101 Brook Road, Glen Allen, VA**

---

Owned and ground leased assets require sale and lease comp forms to be completed. Leased assets require lease comp form only.

Please include sales comps **and** properties listed for sale. Indicate which are listed properties by providing a note in the comment section.

**LEASED COMPARABLES:**

|  | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| **Address, City and Zip Code** | 10101 Brook Rd, Glen Allen, VA 23059 | 7101 Staples Mill Rd, Richmond, VA 23228 | Brook Rd & JEB Stuart |  |  |
| **Tenant** | Burlington Coat Factory | ADVANCE STORES, INC | HomeGoods |  |  |
| **Date of Transaction** | 2014 | 06/27/17 | Pending |  |  |
| **Size (SF)** | 75,000 SF | 31,496 SF | 22,000 SF |  |  |
| **Annual Rent/SF** | $7.00 | $6.00 | $11.00 |  |  |
| **Expenses paid by Landlord** | Subdivision | Subdivision and turnkey | Turnkey new construction |  |  |
| **Distance from Subject** | Adjacent | 5.7 miles – same submarket (extended) | ¾ mil – South |  |  |
| **Direction from Subject** | Southwest | Southwest | South |  |  |
| **Superior / Inferior** | Equal | Superior | Superior |  |  |
| **Comments** | Part of a subdivided former Dillard's box | Converted Martin's grocery box | New construction, needs co-tenancy to proceed |  |  |

Disclaimer

This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

Provide detailed discussion on how each lease comp listed above relates to the subject property:

**Comp 6:**  Burlington took over a portion of the former Dillard's box within the mall.  The box was subdivided to accommodate the use.  Rent was in the $7 PSF range and they are now in alternate rent due to co-tenancy violations.  This is in the same mall as the subject property but has better visibility to adjacent retail uses due to positioning at the center.

**Comp 7:**  Advance Auto leased the former Martin's grocery box at Dumbarton Square.  The landlord had to turnkey the space.  This location is on Staples Mill Road with similar traffic counts but closer into the city.  It is a community center with excellent unhindered visibility to Staples Mill Road.

**Comp 8:**  HomeGoods has come to terms on this location which is a to be constructed power center south of the mall.  It has a small retail strip anchored by Starbucks and a hotel in front of the parcel.  Visibility is limited northbound but is good southbound on Brook Road.  Co-tenancy is required to proceed with the transaction and the landlord has not been able to satisfy this requirement.  This is a full turn-key deal.

**Comp 9:**

**Comp 10:**

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**Summary**

| | | |
|---|---|---|
| **Estimated Annual Rental Price Per Square Foot (NNN)** *Vacant / Single Tenancy***:** | | $ <u>2.00</u> (psf) |
| **Recommended Asking Annual Rental Rate:** | | $ <u>3.00</u> (psf) |

| **Estimated Sales Price** *(vacant, no restrictions, single tenancy)***:** | **Total** | **$/SF  Bldg** | **$/SF Land** |
|---|---|---|---|
| (divide Estimated Sales Price by building SF and Land SF respectively) | | | |
| **Low** | <u>$1,525,000</u> | <u>$11.47</u> | <u>$3.39</u> |
| **High** | <u>$3,323,075</u> | <u>$25.00</u> | <u>$7.39</u> |
| **Recommended Ask Price:** | <u>$3,323,075</u> | $25.00 | <u>$7.39</u> |
| (divide Recommended List Price by building SF and land SF respectively) | | | |

**Provide detailed discussion to support valuation of:** ==**\*estimated rental price \*estimated sales price \*determination of recommended List Price.** Be sure to mention pertinent market trends:==

The most relevant comparable is the Macy's building that was sold this past year.  The comparable reflects a price slightly less than the Low range listed as this was an aggressive price to get it off of Macy's books.  It was on the market for +/-24 months at the time of the sale.  An overall rental of the property will be challenging and will most likely be to an industrial type user that can operate in retail zoning.  The most likely purchaser will be patient with the willingness to work with the mall and adjacent owners to pull off a redevelopment or plan of re-use.

The following write up is CoStar's analysis of the submarket.  Although I do not always agree with CoStar's findings, I thought the below write-up was very apropos for this analysis.

The Staples Mill, more than other shopping submarkets, was strongly impacted by the rise in e-commerce. Virginia Center Commons provides a solid case study on the impact that e-commerce is having on brick-and-mortar retail throughout the Richmond metro. The 924,000-SF mall was anchored by Sears and Macy's, which both shuttered locations nationwide. According to figures from the Henrico County finance department, the mall's sales fell by almost two-thirds from 2005–16. In 2017, the property sold to the Kohan Retail Investment group for $9 million. At the time, the building was more than 50% vacant, and new ownership acknowledged the difficulty and planned to bring some entertainment tenants in. However, it seems like the new ownership has not been successful in backfilling space; since purchasing the property, only one lease over 5,000 SF has been signed, and the city has fined the mall over zoning and building code violations. Since 2014, vacancies have risen consistently. This is despite little new supply: Nothing over 20,000 SF has delivered since 2014, and the pipeline currently has nothing under construction. Several years of negative demand, particularly in 2017, weighed heavily on fundamentals. One retail center (The Shoppes at Staples Mill and Glenside) is doing well, despite a

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

large vacancy. Martin's, a local grocery store, shuttered its 31,000-SF space in 2015, leaving the center only half full. After a few years of vacancy, the owner, Dumbarton Properties, successfully backfilled the space with two leases signed in 17Q4. The first space (20,000 SF) was leased out to Advance Auto Parts, and the other (10,000 SF) was leased to Family Dollar. With those two major tenants and a few smaller newly signed tenants, the building is now almost fully leased.

Disclaimer
This valuation analysis or broker price opinion is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice. Neither you, nor any third parties, may rely on this analysis for any tax purposes, estate work, litigation, lending or any other matter other than your direct use in connection with a contemplated transaction.

**<u>EXHIBIT C</u>**

**Sears Holdings Corp.**
**Remnant Asset Collection**
**10-Sep-19**

| | | |
|---|---:|---|
| Alabama | $ 20,646.73 | * |
| Alaska | $ 7,606.69 | * |
| Alberta CA | $ 7,606.69 | * |
| Arizona | $ 78,240.24 | * |
| Arkansas | $ 25,672.09 | |
| British Columbia (CA) | $ 55,420.17 | * |
| California | $ 97,175.57 | |
| City of Bakersfield | $ 728.57 | |
| City of Tulsa | $ 110.75 | |
| Colorado | $ 2,285.34 | |
| Connecticut | $ 9,780.03 | * |
| Cook County (IL) | $ 1,086.67 | * |
| County of Alemeda (CA) | $ 8,254.74 | |
| County of Dane (WI) | $ 2,173.34 | * |
| County of Franklin (OH) | $ 3,105.02 | |
| County of Lucas (OH) | $ 1,100.00 | |
| County of Milwaukee (WI) | $ 2,332.09 | |
| County of Riverside (CA) | $ 11,707.48 | |
| County of Sacramento (CA) | $ 12,731.41 | |
| County of Summit (OH) | $ 17,196.41 | |
| Delaware | $ 1,155,865.00 | * |
| Florida | $ 25,614.29 | |
| Georgia | $ 59,979.21 | |
| Hawaii | $ 3,835.77 | |
| Idaho | $ 2,613.38 | * |
| Illinois | $ 248,321.95 | |
| Illinois Comptroller | $ 230,835.37 | |
| Indiana | $ 6,525.70 | |
| Iowa | $ 7,588.31 | |
| Kansas | $ 47,813.48 | |
| Kenergy Coop | $ 125.00 | |
| Kentucky | $ 9,780.03 | * |
| Louisiana | $ 4,634.85 | |
| Maine | $ 7,873.16 | |
| Maryland | $ 9,708.03 | * |
| Massachusetts | $ 13,702.07 | |
| Michigan | $ 319,621.11 | |
| Minnesota | $ 9,162.99 | |
| Mississippi | $ 4,346.68 | * |
| Montana | $ 10,866.70 | * |
| Nebraska | $ 78,420.24 | * |
| Nevada | $ 5,396.48 | |
| New Jersey | $ 14,537.70 | |
| New Mexico | $ 21,733.40 | * |

| | | |
|---|---:|---|
| New York | $ 261,855.00 | * |
| North Carolina | $ 96,713.63 | * |
| North Dakota | $ 1,120.02 | * |
| Ohio | $ 36,498.22 | |
| Oklahoma | $ 28,253.40 | * |
| Oregon | $ 31,513.43 | * |
| Pennsylvania | $ 793,500.00 | |
| Puerto Rico | $ 76,066.90 | * |
| Quebec | $ 452.78 | |
| Rhode Island | $ 1,255.45 | |
| South Carolina | $ 6,491.60 | |
| South Carolina Treasury | $ 1,887.14 | |
| South Dakota | $ 11,953.37 | * |
| Tennessee | $ 28,683.85 | |
| Texas | $ 211,858.87 | |
| Uncashed Warrants/Taxes | $ 397,654.00 | |
| USBC - Alaska | $ 18,953.90 | |
| USBC - Southern Alabama | $ 738.87 | |
| USBC - Arizona | $ 2,340.42 | |
| USBC - Central California | $ 3,585.41 | |
| USBC - Central Illinois | $ 615.78 | |
| USBC - Central Louisiana | $ 1,773.33 | |
| USBC - Colorado | $ 205.93 | |
| USBC - Connecticut | $ 782.01 | |
| USBC - Easter North Carolina | $ 207.71 | |
| USBC - Eastern Arkansas | $ 312.93 | |
| USBC - Eastern California | $ 2,480.60 | |
| USBC - Eastern Louisiana | $ 1,047.07 | |
| USBC - Eastern Michigan | $ 1,070.38 | |
| USBC - Eastern Missouri | $ 339.70 | |
| USBC - Eastern Texas | $ 378.74 | |
| USBC - Eastern Virginia | $ 2,472.25 | |
| USBC - Eastern Wisconsin | $ 443.98 | |
| USBC - Hawaii | $ 332.79 | |
| USBC - Kansas | $ 1,274.15 | |
| USBC - Maryland | $ 3,748.20 | |
| USBC - Middle Louisiana | $ 320.59 | |
| USBC - Middle North Carolina | $ 1,559.12 | |
| USBC - Middle Tennessee | $ 2,125.88 | |
| USBC - Nevada | $ 1,613.92 | |
| USBC - New Mexico | $ 10,151.74 | |
| USBC - Northern Alabama | $ 2,295.22 | |
| USBC - Northern California | $ 2,795.11 | |
| USBC - Northern Florida | $ 27,600.99 | |
| USBC - Northern Georgia | $ 21,486.92 | |
| USBC - Northern Illinois | $ 5,853.17 | |
| USBC - Northern Indiana | $ 6,698.14 | |

| | | |
|---|---|---|
| USBC - Northern Mississippi | $ | 196.94 |
| USBC - Northern Ohio | $ | 194.00 |
| USBC - Northern Oklahoma | $ | 454.49 |
| USBC - Northern Texas | $ | 5,767.30 |
| USBC - Northern West Virginia | $ | 232.48 |
| USBC - Oregon | $ | 115.00 |
| USBC - Puerto Rico | $ | 16,450.94 |
| USBC - Sothern California | $ | 1,117.27 |
| USBC - South Carolina | $ | 1,217.48 |
| USBC - South Dakota | $ | 1,996.71 |
| USBC - Southern Florida | $ | 2,914.18 |
| USBC - Southern Iowa | $ | 1,705.20 |
| USBC - Southern NY | $ | 9,323.87 |
| USBC - Southern Ohio | $ | 7,019.33 |
| USBC - Southern West Virginia | $ | 4,612.90 |
| USBC - Utah | $ | 2,384.19 |
| USBC - Western Kentucky | $ | 1,242.08 |
| USBC - Western Louisiana | $ | 745.60 |
| USBC - Western Michigan | $ | 285.73 |
| USBC - Western Missouri | $ | 2,848.32 |
| USBC - Western North Carolina | $ | 201.11 |
| USBC - Western Oklahoma | $ | 1,364.57 |
| USBC - Western Pennsylvania | $ | 1,660.78 |
| USBC - Wyoming | $ | 593.10 |
| USBC- Nevada | $ | 241.04 |
| Utah | $ | 30,917.83 |
| Virginia | $ | 211,600.00 * |
| Washington | $ | 68,000.00 * |
| West Virginia | $ | 97,800.30 * |
| Wisconsin | $ | 8,519.94 |
| Wyoming | $ | 15,834.02 |
| (blank) | | |
| **Grand Total** | **$** | **5,272,780.24** |

*Estimated total on claims completed*