# Exhibit A

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION, et al.,

8

9           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  August 23, 2019

17                  10:16 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

1    HEARING re Continuance from 8/22/2019 and Evidentiary

2    Hearing on MOAC Mall Holding

3    LLCs Objections

4

5    MOAC Mall Holding LLC's Objection to Supplemental Notice of

6    Cure Costs and Potential Assumption and Assignment of

7    Executory Contracts and Unexpired Leases in Connection with

8    Global Sale Transaction (document #2199)

9

10   MOAC Mall Holding LLC's Second Supplemental and Amended: (I)

11   Objections to Debtor's Notice of Assumption and Assignment

12   of Additional Designatable Leases, and (II) Objection to

13   Debtor's Stated Cure Amount (document #3501)

14

15   MOAC Mall Holding LLC's Third Supplemental and Amended: (I)

16   Objections to Debtor's Notice of Assumption and Assignment

17   of Additional Designatable Leases (document #3926)

18

19   MOAC Mall Holding LLC's Fourth Supplemental (I) Objections

20   to Reply to Debtor's Notice of Assumption and Assignment of

21   Additional Designatable Leases, and (II) Objection to

22   Debtor's Stated Cure Amount (document #4450)

23

24

25

1    Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I)

2    Objection to Supplemental Notice of Cure Costs and Potential

3    Assumption and Assignment of Executory Contracts and

4    Unexpired Leases in Connection with Global Sale Transaction;

5    (II) Second Supplemental and Amended: (A) Objections to

6    Debtor's Notice of Assumption and Assignment of Additional

7    Designatable Leases, and (B) Objection to Debtor's Stated

8    Cure Amount; and (III) Third Supplemental and Amended

9    Objections to Debtor's Notice of Assumption and Assignment

10   of Additional Designatable Leases (document #4454)

11

12   So Ordered Stipulation Signed on 5/13/2019 By and Among

13   Sellers, Buyer, and Landlord (MOAC Mall Holding LLC) (I)

14   Extending Time Under Section 11 U.S.C. Section 365(d)(4) for

15   Lease of Nonresidential Real Property and (II) Setting

16   Briefing Schedule (document #3823)

17

18   Declaration of Rich Hoge Supporting MOAC Mall Holdings LLC's

19   Third Supplemental and Amended Objections to Debtor's Notice

20   of Assumption and Assignment of Additional Designatable

21   Leases (document #3927)

22

23   Stipulation and Order signed on 6/25/2019 By and Among

24   Sellers, Buyer, and MOAC Mall Holding LLC Extending Time

25   Under 11 U.S.C. § 365(d)(4) For Lease of Nonresidential Real

Page 4

1    Property(document #4354, 4687)

2

3    Declaration of Thomas J. Flynn in Support of 4450 Fourth

4    Supplemental Objection (document #4451)

5

6    Stipulation of Agreed Exhibits Regarding Assumption and

7    Assignment of the MOAC Lease Filed by Thomas J. Flynn

8    (document #4864)

9

10   Stipulation of Facts Not in Dispute Regarding Assumption and

11   Assignment of the MOAC Lease Filed by Thomas J. Flynn

12   (document #4865)

13

14   Transform Holdco LLCs Supplemental Reply and Cross-Motion

15   to; (A) Strike MOAC Mall Holdings LLCs Fourth Supplemental

16   (I) Objections and Reply to Debtors Notice of Assumption and

17   Assignment of Additional Designatable Leases, and (II)

18   Objection to Debtors Stated Cure Amount; and (B) Permit Late

19   Filed Responses to Requests for Admission (document #4867)

20

21   Declaration of Louis W. Frillman in Opposition to the

22   Proposed Assumption and Assignment of the MOAC Lease

23   (document #4874)

24

25

Page 5

1   Declaration of Raphael Ghermezian in Opposition to the

2   Proposed Assumption and Assignment of the MOAC Lease filed

3   by Thomas J. Flynn (document #4875)

4

5   Declaration of Richard Hoge in Opposition to the Proposed

6   Assumption and Assignment of the MOAC Lease filed by Thomas

7   J. Flyrui (document #4876)

8

9   Declaration - Evidentiary Hearing Declaration of Roger A.

10   Puerto In Support of Transform Holdco LLCs Reply to MOAC

11   Mall Holdings LLCs (I) Objection to Supplemental Notice of

12   Cure Costs and Potential Assumption and Assignment of

13   Executory Contracts and Unexpired Leases in Connection with

14   Global Sale Transaction; (II) Second Supplemental and

15   Amended: (A) Objections to Debtors Notice of Assumption and

16   Assignment of Additional Designatable Leases, and (B)

17   Objection to Debtors Stated Cure Amount; and (III) Third

18   Supplemental and Amended Objections to Debtors Notice of

19   Assignment of Additional Designatable Leases

20   (document #4879)

21

22

23

24

25

1   Declaration - Evidentiary Hearing Declaration of Michael

2   Jerbich In Support of Transform Holdco LLCs Reply to MOAC

3   Mall Holdings LLCs (I) Objection to Supplemental Notice of

4   Cure Costs and Potential Assumption and Assignment of

5   Executory Contracts and Unexpired Leases in Connection with

6   Global Sale Transaction; (II) Second Supplemental and

7   Amended: (A) Objections to Debtors Notice of Assumption and

8   Assignment of Additional Designatable Leases, and (B)

9   Objection to Debtors Stated Cure Amount; and (III) Third

10  Supplemental and Amended Objections to Debtors Notice of

11  Assumption and Assignment of Additional Designatable Leases

12  (document #4880)

13

14  Opposition Brief MOAC Mall Holdings LLC's Pre-Evidentiary

15  Hearing Brief Regarding the Proposed Assumption and

16  Assignment of the MOAC Lease filed by Thomas J. Flynn

17  (document #4889)

18

19  Transform Holdco LLC's Amended Supplemental Reply and Cross-

20  Motion to Strike MOAC Mall Holding LLC's Pre-Evidentiary

21  Hearing Brief Regarding The Proposed Assumption and

22  Assignment of the MOAC Lease (document #4903)

23

24

25

1    MOAC Mall Holdings LLC's Reply Objecting to Transform Holdco

2    LLC's Motion to (A) Strike MOAC's July 8 Supplemental

3    Objection and (B) Permit Late Responses to Requests for

4    Admissions (document #4915)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

**Page 8**

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for the Debtors

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  ANGELINE J. HWANG

 9

10   DLA PIPER LLP

11        Attorneys for Transform Holdco LLC

12        1251 Avenue of the Americas

13        New York, NY 10020

14

15   BY:  ALANA M. FRIEDBERG

16        RACHEL EHRLICH ALBANESE

17        RICHARD A. CHESLEY

18        R. CRAIG MARTIN

19

20   PATTERSON BELKNAP WEBB & TYLER LLP

21        1133 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  DAVID W. DYKHOUSE

25
```

Page 9

1   WITNESSES:

2   MICHAEL JERBICH

3   RAPHAEL GHERMEZIAN

4   LOUIS FRILLMAN

5   ROGER PUERTO

6

7   ALSO PRESENT TELEPHONICALLY:

8

9   ALIX BROZMAN

10   TAYLOR B. HARRISON

11   WILLIAM S. HOLSTE

12   HOC RI KIM

13   TERESA LII

14   SHIRIN MAHKAMOVA

15   CHRIS STAUBLE

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE COURT:  Okay, good morning.  In re Sears

3    Holdings Corp et al?

4           MR. CHESLEY:  Your Honor, Richard Chesley, Rachel

5    Albanese, Craig Martin, and Alana Friedberg on behalf of

6    Transform.  We're here on the only matter today, which is

7    the Mall of America assumption and assignment motion.  We've

8    spoken to Debtors' counsel in light of the nature of this

9    proceeding, discussed with Debtors' counsel just moving

10   forward, so.  Unless the Court has any procedural issues,

11   our position on this, Your Honor, in terms of how we would

12   like to proceed today, obviously, a substantial amount of

13   information has been presented to the Court.  There are

14   stipulated facts that are agreed exhibits.  We'll have five

15   witnesses whose directs have been submitted by declaration.

16          We believe the issues have been fully formed, and

17   with the Court's approval, we would like to simply proceed

18   with the evidentiary presentation.  At that point, we can

19   address argument or any other matters the Court would like.

20   At that point, we think we could do this much more

21   efficiently and effectively today, and again, I don't think

22   there's any surprises to the Court as to what the issues

23   are.

24          THE COURT:  Okay.  Well, I normally do not take

25   opening arguments, so my normal practice would be to do just

1   A     I'm aware of adequate assurance as far as

2   (indiscernible) of future performance.

3   Q     Just so we're clear, Transform Co. is not going to

4   operate a store at the Mall of America, is that right?

5   A     Correct.  It's an asset of Transform Co., correct.

6   Q     There will be no operations or operating performance by

7   Transform Co. at the Mall of America, is that right?

8   A     Our plan is not to operate.  That is correct.

9   Q     As you sit here today, do you know -- do you have a

10  tenant ready to take over that space and operate in it?

11  A     As I sit here today, I have interest from multiple

12  tenants, but it's a process that takes time.

13  Q     So, you have no tenant, at today's hearing, that would

14  take over and operate in that space?

15  A     Today?  Literally today?  No.

16  Q     Yes, literally today.  All right.  There's nothing in

17  your testimony submitted to the Court by declaration that

18  indicates any evidence or discussion how Transform Co. will

19  or a hypothetical tenant might operate from the premises, is

20  that correct?

21  A     Can you be more specific with your question?  I'm not

22  sure I'm understanding it.

23  Q     Well, you have nobody that's going to operate in the

24  premises as you sit here today.

25  A     You asked me that earlier if I have a tenant today and

1    I said no.

2    Q    You're unable to show today anybody that could be --

3    because you have no one.

4    A    I don't think that's an accurate characterization of

5    what I said at all.  The lease is significantly below

6    market, we're paying $10 (indiscernible).

7              THE COURT:  All right, just stop.  Sir, you don't

8    need to ask the same question three times.

9              MR. FLYNN:  You bet.  Yes, Your Honor.

10   Q    There's no one that -- you did say --

11             MR. FLYNN:  That's all I have, Your Honor.  Thank

12   you.

13             THE COURT:  Okay.  I would like to follow-up on

14   one of Mr. Flynn's question.

15             MR. JERBICH:  Sure.

16             THE COURT:  You're not an actual employee of

17   TransCo, right?  You work -- you're a consultant for them?

18             MR. JERBICH:  Correct.

19             THE COURT:  Has Transform, excuse me, placed any

20   limitations on you as far as the types of tenants that you

21   are soliciting?

22             MR. JERBICH:  No.

23             THE COURT:  None?  So, if --

24             MR. JERBICH:  I mean, to the extent, obviously,

25   within the parameters of the lease, the REA.

1   estate, that would be the process to undertake.

2   Q    If there was an anchor tenant available for de minimis

3   rent, that'd be an excellent fit for the mall, you wouldn't

4   agree to that, would you?

5   A    Not if it didn't maximize the value of the real estate.

6   Q    Yeah, right.  So, you're interested, primarily, in

7   getting money.  Not necessarily the mall, as I think it was

8   concluded.

9   A    Can you rephrase that?  Sorry.

10           MR. FLYNN:  Never mind.  I have no further

11   questions, Your Honor.

12           THE COURT:  Okay.  Any redirect?

13           MR. MARTIN:  No, Your Honor.

14           THE COURT:  Okay.  You can step down.

15           MR. PUERTO:  Thank you.

16           MR. CHESLEY:  That would conclude Transform's

17   evidence, Your Honor.

18           THE COURT:  Okay.  And obviously, I have the

19   agreed exhibit --

20           MR. CHESLEY:  Agreed exhibits which have been

21   admitted and stipulated as fact.  Yes, Your Honor.

22           THE COURT:  Okay.  You may proceed with your

23   witnesses.

24           MR. FLYNN:  Your Honor, we'd like to move, at this

25   time, under Rule 52, for partial findings against the

Page 51

1    Plaintiff -- against the Debtor.  They have failed in their

2    burden of proof; which they admit they have to prove

3    adequate assurance of future financial ability and adequate

4    assurance of future performance.  They -- performance means

5    not financial performance, it means operational performance.

6    Is the tenant able to drive tenants to the mall?  Do they

7    have a substantial advertising budget?  Do they -- and this

8    is all cited in the cases, which I'm sure you could read or

9    are well aware of.

10          THE COURT:  Actually, I have not seen that cited

11   in a case, so I'd like you to cite them to me.

12          MR. FLYNN:  Can I have the brief?  Well, I will

13   cite those.  I will -- we have filed a brief with the Court,

14   which has these cases in there.

15          THE COURT:  Well, then you better cite me to the

16   specific provisions in the cases, because I didn't see that.

17          MR. FLYNN:  Well, all right.

18          MAN:  You don't have to do it now.

19          MR. FLYNN:  All right.  There are a number of

20   cases that we've cited, and I can go quickly through them,

21   including the Third Circuit, which requires adequate -- that

22   performance drive -- to do a number of things to aid or fit

23   in with the harmony of the mall and the tenant mix.  They

24   have given no evidence that they're able to comply with

25   what's required for tenant mix.  They've given not -- that

Page 52

1    is a requirement under the code.  They are required to show

2    operating performance equal to -- similar to that Sears at

3    the time they entered into the lease.  We went into that

4    extensively in our briefs, operating performance, and they

5    have presented no operating performance because they don't

6    intend to operate.  They're going to try to find somebody to

7    operate, and all we can do is speculate on what operation

8    performance might be in the future.

9              However, I see nothing in the code that says they

10   can prove that at a future date.  They have to prove today

11   what the operating performance will be.  They can do certain

12   things at a future date.  If they are dark, they get some

13   reasonable time to reopen.  But they can't come into court

14   today and say, don't worry about operating performance or

15   tenant mix.  We'll fix that later.  And those are rights in

16   addition to the rights under any lease, because they don't

17   refer to the -- they're required to be in a lease or

18   (indiscernible).

19             THE COURT:  You're aware that there are several

20   cases in this District that disagree with that latter

21   proposition, including in re Ames Department Stores, 127

22   B.R. 744, (Bk. SDNY 1991)?

23             MR. FLYNN:  I'm aware that there's a mix in case

24   law on this, but there's no -- the operating performance is

25   a requirement of the code, and they presented nothing, and

Page 61

```
 1              THE COURT:  -- referring to his colleague to walk

 2    me through the lease and the REA.

 3              MR. FLYNN:  I would argue, too, for what it's

 4    worth, is the decode itself in I think a number of the

 5    cases, and we'll cite them, do not -- it doesn't say what's

 6    in the lease.  It doesn't say or require that it be

 7    protected by their lease.  It's an additional requirement

 8    put in by Congress, if you intend to use Chapter 11, to get

 9    these transactions done this way.  And they have chosen

10    Chapter 11 to get these transactions done this way.  They

11    are bound by the strict, reasonable readings of the law.

12    And whether or not it's in a lease, they are required to

13    show that they have adequate financial wherewithal and a

14    plan that makes some sense, and performance.  And they

15    simply can't do it, because there's nobody to be put in

16    there at this point and they don't know what will happen.

17              THE COURT:  Well, if the lease lets them operate

18    in a specific way, you're saying nevertheless, the Court

19    should provide some other gloss on operation?

20              MR. FLYNN:  Yes, and the thinking of that --

21              THE COURT:  Yeah?  Do you have any case that takes

22    that view?

23              MR. FLYNN:  Yeah, there's a number of them, but

24    they say --

25              THE COURT:  Okay, I just -- I'd be happy to be
```

Page 62

1    cited to one.

2              MR. FLYNN:  All right, yes, Your Honor.  I have it

3    marked up here on our brief.

4              THE COURT:  Okay.

5              MR. FLYNN:  The Casual Male, 120 B.R. 264 is one.

6    They require In Re Rikel, which was cited often, involved a

7    lease that allowed it to go dark.  I have the cite here, but

8    -- and the Court said, we're going to make you open within

9    six month, and you have to have a tenant that the landlord

10   will agree to.

11             THE COURT:  That's how you read Rikel?

12             MR. FLYNN:  Yes, I do.

13             THE COURT:  All right.  Okay.

14             MR. FLYNN:  Yes, I do.  In fact --

15             THE COURT:  So it's just the cases you cited in

16   your brief, no other cases for me?

17             MR. FLYNN:  I think there are other cases.  We

18   could come up with more, but that's a good start.  And

19   there's a Third Circuit case and -- so, yeah.

20             THE COURT:  Okay.

21             MR. FLYNN:  And others cited.  And Rikel, yeah,

22   involved a landlord that, the premises go dark, and the code

23   -- they sit under the -- because we think in the legislative

24   history, which we also supply to the Court, we have some

25   (indiscernible) cases in state that because landlords,

1    first-class operator, or an operator whose store would be

2    consistent for a first-class shopping center, that would

3    include some financial wherewithal.

4            MR. FLYNN:  Yes, yes.  And, but the point is, we

5    don't know who that is today.

6            THE COURT:  Well, no, but if they provide it, then

7    you could say, no, these people aren't -- they're not

8    consistent with the operation of a first-class shopping

9    center.

10           MR. FLYNN:  That's true, except I see nothing, and

11   our position would be that there's nothing in the code that

12   allows them to show (indiscernible) to that in the future.

13   They are required to show that today --

14           THE COURT:   Well, they're required under the

15   lease to show you in the future -- they would be.

16           MR. FLYNN:  There are many requirements in the

17   future under the lease.

18           THE COURT:  Right.

19           MR. FLYNN:  I'm referring to the code, and the

20   code doesn't say, don't worry about it, you can show later

21   whether they'll be adequate, there will be a proper mix.

22   Don't worry about it.

23           THE COURT:  Okay.

24           MR. FLYNN:  We'll leave that go.

25           THE COURT:  All right, but that just comes back to

Page 66

1    the issue as to whether 365(b)(3) requires the Court to

2    determine, separate and apart from the contract, pursuant to

3    which adequate assurance of performance has to be shown --

4    or under which adequate assurance of future performance has

5    to be shown, i.e. that contract, that you have to look into,

6    generally, issues as to what makes up a proper mix or

7    balance in a shopping center, for example.

8             MR. FLYNN:  Well, and you've got to do that today,

9    and --

10            THE COURT:  Well, that's where we have a dispute,

11   I guess.

12            MR. FLYNN:  Okay.

13            THE COURT:  Again, I have yet to see a case that

14   says that, and I've seen several that go the other way.

15            MR. FLYNN:  So there are many cases that say that

16   you have to show how the tenant will drive customers to the

17   mall.

18            THE COURT:  Show me one.

19            MR. FLYNN:  I'll quote from it.

20            THE COURT:  Okay.

21            MR. FLYNN:  Just a minute, Your Honor.  One of the

22   leading cases -- I apologize, Your Honor.

23            THE COURT:  Okay.

24            MR. FLYNN:  In Re Joshua Slocum, that's a 922 F.2d

25   1801, (Third Circuit 1990), Congress in 1978, and again in

Page 67

```
 1    '84, placed additional restrictions on assignment of

 2    shopping center leases in order to protect the rights of

 3    lessors and -- and here's the key phrase -- the center's

 4    tenants.  And then it says, Congress -- and it doesn't say,

 5    unless they (indiscernible) or didn't in the lease.

 6    Congress recognized that -- of the unusual situation where a

 7    lease assignment affects not only the lessor, but an

 8    assignment shopping center to lease to an outside party can

 9    have significant detrimental impact on others.  Okay?  So we

10    don't know what the impact will be unless we know --

11              THE COURT:  I read Joshua Slocum.

12              MR. FLYNN:  Okay.

13              THE COURT:  The issue that we're discussing is not

14    dealt with in Joshua Slocum.  Those are general statements

15    of the purpose of the law.

16              MR. FLYNN:  Okay.  All right, Your Honor.  And,

17    again, In Re Rikel, it says specifically that even though

18    there's no -- there's a go dark -- they're allowed to go

19    dark, they should -- they have to reopen within a reasonable

20    time and required them to do so within six months.

21              THE COURT:  But there was a specific prohibition

22    in the lease in Rikel about going dark.

23              MR. FLYNN:  Right.  Right.

24              THE COURT:  So, again, the issue (indiscernible)

25    there as to whether 365(b)(3) imposes conditions on the
```

Page 68

1    parties that they didn't already bargain for.

2           MR. FLYNN:  In Rikel, I believe it had -- the

3    tenant had the right to go dark and the Court there

4    specifically said, you've got to open up.  I'm sure that

5    that's the case.  It specifically said that.  And in fact,

6    it's been acknowledged by the other side, and they've

7    offered to open up within two years in their pleadings.

8           Again, Casual Male states, and I quote, "The

9    assignee should have similar operating and financial

10   performance when all factors, including advertising,

11   aggressiveness, profit margins, growth potential, and other

12   indicia are weighed."  It doesn't say, just look at can they

13   pay the rent.  We don't protect tenants when we just say,

14   well, all they got to do is pay the rent, and that's what

15   Congress was intending to protect.  And I believe -- I

16   believe -- the Third Circuit has also agreed to that.

17          But they also concerned in -- about whether or not

18   a tenant will go bankrupt in the space again, and that would

19   be inimical to the mall and cause -- and that's under the

20   Bankruptcy Code.  They require that you show that the tenant

21   not be likely to go bankrupt, the one operating there.  If

22   there's another bankruptcy of that tenant, we are going to

23   be in trouble again.  We have no evidence of what they

24   intend to do and what tenant they have.  They have none.

25   They're allowed to just skip by all that and just say, don't

Page 107

1    what they can and can't do because we disagree about those.

2    But I think -- I appreciate the court considering that our

3    rights today is important to us.  And --

4              THE COURT:  Sorry to interrupt.  In Mr.

5    Ghermezian's testimony, he did not know when the form of

6    Bloomingdale's space was fully sublet, but you did testify

7    that the store was closed in 2012.  Is there anything in the

8    record to show when the first subleasing or tenancy was?

9              MR. FLYNN:  No, Your Honor.

10             THE COURT:  Oh.

11             MR. FLYNN:  And just as an aside.  I don't think

12   it's controversial.  It isn't -- still isn't sold but

13   rented.

14             THE COURT:  Well, I'm more focusing on the --

15             MR. FLYNN:  Yeah.

16             THE COURT:  -- buyout provision.

17             MR. FLYNN:  Right.

18             THE COURT:  I mean, I -- let me pose this question

19   to the Debtor, all right, to Transform.  Is Transform

20   prepared to put some outside date on its first assignment of

21   the property or subletting of the property?  I mean, the

22   prospect of just standing there and torturing MOAC for 73

23   years is, you know, obviously not a welcome one.

24             MR. CHESLEY:  Well, it makes no economic sense for

25   us either at $1 million a year.  If I could talk really

1    briefly with Mr. (indiscernible), I can probably answer this

2    relatively quickly --

3              THE COURT:  Okay.

4              MR. CHESLEY:  -- Your Honor.  If I can.

5              Your Honor, I think it's consistent with the

6    declaration as well.  We could certainly live with the two-

7    year outside date provided that we don't get interference

8    from the landlord.  If we've got the ability to go out and

9    bring people in -- I'm not asking them to bend over

10   backwards but, again, not interfere with our ability to

11   sublet.

12             THE COURT:  Two years to sublet some -- or assign

13   some portion of this thing.

14             MR. CHESLEY:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. FLYNN:  Your Honor, may I address that?

17             THE COURT:  Sure.

18             MR. FLYNN:  That may be very little solace.

19   There's three huge floors there.  They could -- are they

20   going to sublet --

21             THE COURT:  No, I understand that, but I'm

22   focusing -- you don't have to -- I'm not asking you to agree

23   with me.  I'm focusing on 6.3.  If they sublet any, you

24   know, any other than, you know, on, you know, a tobacco

25   stand or something -- if they sublet anything, 6.3 kicks in,

Page 115

1     certain statutory safeguards, the value of a Debtor's leases

2     should go to the Debtor's creditors and that leases can be

3     sold to achieve that end, with or without landlord consent.

4     That theme runs throughout the caselaw, interpreting

5     Sections 365, including, as noted by the district court and

6     (indiscernible) LLC the A&P, In re A&P 472 B.R. 666, 679

7     (Bankr. S.D.N.Y. 2012).

8             It's also important to note that the four

9     protections specifically provided for in connection with

10    adequate assurance of future performance of a shopping

11    center lease is with respect to just that:  adequate

12    assurance of future performance of a lease of real property,

13    i.e. the focus is on performance of a lease in the future.

14            Before turning to those sections, I should note

15    the following.  Based on the record before me, it is clear

16    that Transform, the assignee, separate and apart from those

17    four sections has, in fact, provided adequate assurance of

18    future performance of the lease.

19            The caselaw is clear when dealing with adequate

20    assurance generally that the Court should employ a pragmatic

21    analysis as to whether sufficient assurance has been

22    provided that the lease will be performed in the non-

23    shopping-center context that focuses generally on the

24    ability to pay rent on a going-forward basis, both the

25    specific rent and other financial performance such as

Page 116

1    payment of taxes, common area maintenance charges, and the

2    like, which are either denominated as rent or a separate

3    financial obligation under the lease.

4           It is not an absolute guarantee but rather focuses

5    on whether performance is likely, i.e. more probable than

6    not.  See generally in re M. Fine Lumbar Co. 383 B.R. 565,

7    573 (Bankr. E.D.N.Y. 2008) and the cases cited therein.

8           And yet outside of the (b)(3) context, it is

9    routinely held that adequate assurance can be shown in large

10   measure simply by the fact that the lease itself is a

11   favorable lease, i.e. favorable to the tenant, and has

12   significant value.  The theory being that even if the tenant

13   defaults, the landlord will not be damaged because it will

14   be able to reap the value of the then-terminated lease, at

15   Page 573.

16          In addition, courts very typically look to some

17   form or other of security deposit, either in the form of a

18   letter of credit, escrow agreement, or deposit with the

19   landlord.  If necessary, they go further to examine the

20   assignees financial condition, although they are perfectly

21   willing to accept a newly formed entity as an assignee,

22   particularly where there is a sufficient security deposit or

23   escrow, and the newly formed assignee is run by a principle

24   that has substantial experience in whatever business the

25   assignee intends to conduct and has a financial stake in

Page 117

1    that business succeeding.

2         Here, it appears clear to me that this lease is a

3    very favorable lease.  The stated rent under the lease is

4    $10 a year.  Parties agree that the aggregate monetary

5    obligation of the tenant, which includes an obligation to

6    pay its share of taxes and other common charges and fees, is

7    somewhere between 1,000,001 and 1,000,002 annually.

8         The assignee has committed to put into escrow, and

9    it would obviously have to be an escrow that has no strings

10   attached to it other than the occurrence of nonpayment that

11   sum of money.

12        In addition, it's clear to me from the record and,

13   in addition, documents with which I can take -- of which is

14   could take judicial notice of the docket of this case that

15   the assignees' senior management has extensive experience in

16   marketing and selling Sears' real property, including

17   favorable leases.

18        In addition, although I don't believe under the

19   circumstances this would be necessary for finding adequate

20   assurance for future performance under Section 365(b)(1) and

21   (f)(2)(b), it appears to me that Transform has successfully

22   completed substantial financings with respect to both its

23   operating portfolio and its real estate portfolio.

24        While I do not believe I can accept as whole --

25   however wholly the statement in the draft consolidated

1    financial statement offered by Transform as part of its

2    showing of adequate assurance of future performance that it

3    has in excess of 250 million of equity.  I do believe that

4    it has substantial equity and that it's highly likely that

5    that equity exceeds $50 million.  I cannot believe that

6    third-party lenders would provide the level of financing

7    that they have to transform without at least that level of

8    solvency.

9          The legal support for all of the foregoing

10   discussion of the applicable standard, in addition to the M.

11   Fine Lumber case that I just cited can be found in numerous

12   cases which focus on the foregoing types of adequate

13   assurance, and the fundamental focus on the assignee's

14   ability to pay rent, as stated by the District Court in In

15   Re Sanshoe Worldwide Corp. 139 B.R. 585, 592  (S.D.N.Y.

16   1992). See also In Re Citrus Tower Boulevard Imaging Center,

17   LLC., 2012 Bankr. LEXIS 2208 at Pages 15 through 20, (Bankr.

18   N.D. Ga. Apr. 2, 2012), In Re Bygaph, Inc., 56 B.R. 596

19   (Bankr. S.D.N.Y), In Re Westview 74th Street Drug Corp., 59

20   B.R. 747, 755 (Bankr. S.D.N.Y. 1986), and In Re Casual Male

21   Corp, 120 B.R. 256, 264 (Bankr. D. Mass. 1990).

22         The party dispute therefore hinges on the meaning

23   and purpose of Section 365(b)(3) and how and/or whether it

24   adds additional requirements beyond those that I've already

25   found are met for adequate assurance of future performance.

Page 125

1    1991.

2          If -- and when I say Section 25, I'm referring to

3    the Rea, which is incorporated -- that particular section is

4    incorporated into the lease.  According to the proposed

5    assignee, Transform, I should look at the reference to

6    financial and operational performance, in light of what the

7    parties actually agreed to and determined was relevant to

8    the right to assign.  The landlord states that the contract

9    between the parties is essentially irrelevant.

10          I conclude, for purposes of this section, as well

11    as the other three subsections of 365(b)(3) that each

12    requires reference back to the party's actual agreement, and

13    that Congress did not create independent requirements that

14    would not go to actual assurance of future performance, but

15    rather wanted to focus the Court on, obviously still subject

16    to Section 365(e), taking into account the landlord's rights

17    under the lease, as implicated by these four subsections.

18          The case law in support of that view is extensive

19    and persuasive.  Perhaps the best analysis is again in the

20    Ames Department Stores bankruptcy case, this time appearing

21    at In Re Ames Department Stores 127 B.R. 744 (Bankr.

22    S.D.N.Y. 1991).  In that opinion, the Court was not

23    interpreting Section 365(b)(3)(A), but rather (b)(3)(D),

24    which states that adequate assurance of future performance

25    of a lease of real property, a shopping center, includes

Page 126

1    adequate assurance, that assumption or assignment of such

2    lease will not destroy any tenant mix or balance in such

3    shopping center.

4           In the Ames opinion, former Bankruptcy Judge

5    Bushman notes again that the entire section is prefaced by a

6    reference to adequate assurance of future performance of

7    such contract of the lease itself obviously with the focus

8    on the lease.  He then noted the purpose of the statute,

9    which was to protect the bargain between the parties, and

10   finally noted the general bankruptcy law principal that

11   unless specifically provided for in the Bankruptcy Code,

12   bankruptcy does not rewrite the parties' non-bankruptcy

13   bargained-for rights.

14          He concludes, "where there is no indication of any

15   intention by Congress to do anything other than hold a

16   shopping center Debtor-Tenant to its bargain with a landlord

17   and to leave intact the property interests of debtor and

18   landlord as set forth in that bargain, the Courts should not

19   imply an additional non-bargained-for term. To construe the

20   statute in the manner urged by," in that case the landlord,

21   "would be 'a flight of redistributive fancy.'"  That appears

22   at Page 753.

23          That case law has been followed rather uniformly

24   since then, including by the District Court in In Re A&P,

25   472 B.R. 678 through 679, again in connection with the

Page 127

1    tenant mix issue, and In Re Toys R Us Property Company, 2019

2    Bankr. LEXIS 440 at Page 13 (Bankr. E.D. Va., Feb. 11,

3    2019).  The landlord has contended that there are other

4    cases going in the opposite direction and imposing a

5    separate requirement that would not appear in the parties'

6    lease under Section 365(b)(3).

7            Namely, it asserts In Re Rickel Home Centers, 240

8    B.R. 826, appeal dismissed, 209 F. 3d. 291, 3rd Cir. 2000,

9    cert denied, 531 U.S. 873 2000.  And In Re Casual Male

10   Corp., 120 B.R. 256.  A close reading of those cases does

11   not really support that contention.  In Rickel Home Centers,

12   the primary purpose of the court throughout, in response to

13   various landlords' objections in a shopping center context,

14   to an assignment whereby the assignee would only occupy a

15   certain part of the store, the store would go dark for a

16   period of time, and the like, was as to the application of

17   365(e) to those contractual restrictions.  And the Court

18   concluded that, with limited exceptions, 365(e) should in

19   fact, apply to invalidate those contractual restrictions, as

20   a restraint based on the Debtor's financial condition of the

21   right to assign.

22           One of the three landlords raised an objection,

23   again under 365(b)(3)(d), based on not its contractual

24   provision, but the general notion that tenant mix must be

25   maintained, even if there is no such contract.  The Court

Page 128

1    concluded that under 365(e), the proposed assignee should be

2    given a reasonable time to sublet the premises, which the

3    subtenant agreed, in addition to stating that it would do so

4    as quickly as possible, would be the specific time period

5    that it stated it could do it in, which was, the assignee

6    proffered six months.  The Court accepted that commitment

7    and overruled the objection.

8           But it first noted, although it did not have to

9    rule on this basis, "The Court notes that the Bethlehem

10   lease does not contain any provision prohibiting going dark

11   to this extent.  Net cannot argue that the assignment from

12   the Debtor to Staples will interfere with any provision of

13   the Bethlehem lease."  It then went on to conclude that in

14   any event, that I'm by which the assignee would be taking to

15   sublet the premises was not unreasonable.

16          In Casual Male, the focus of the Court, as I

17   stated, was on Section 365(b)(3)(A), but given the deposit

18   of six months' rent in advance, and the support by the

19   newly-formed tenants' principal, as well as working capital

20   loan from its principal, that was sufficient similar

21   financial condition and operating performance.  One cannot

22   take away from that decision, which of course would not be

23   controlling precedent on me anyway, the belief that Congress

24   created a new standard in Section 365(b)(3), that would

25   override the parties' own agreement as a limitation on

1    assumption and assignment.

2         I will note one other case, In Re TSW Stores of

3    Nanuet, Inc., 34 B.R. 299 (Bankr. S.D.N.Y. 1983), in which

4    the Court again interpreted a restrictive use covenant and

5    then went on to hold that it appeared in this situation

6    there would be economic detriment to the landlord based on

7    the respective assignee's stated intention to vary that

8    covenant or breach it.

9         I conclude therefore that based on my general --

10   my findings with respect generally to adequate assurance of

11   future performance, the differences in financial condition

12   and operating performance are not such as to preclude the

13   assignment of this lease, which has its own limitations on

14   assignment in it, which I have found the Debtor and the

15   assignee have satisfied.

16        For the record, I also conclude that if that legal

17   determination is incorrect, and that the case law is cited

18   and follow on the grounds of stare decisis is incorrect,

19   then the financial condition and operating performance of

20   Transform is not similar to Sears in 1991.  Transform has

21   not carried its burden to show, for example, that the ratio

22   as far as its financial health, is the same, notwithstanding

23   that it has shown that it's sufficiently financially

24   healthy, when coupled with the favorable nature of the lease

25   and deposit of an amount equal to the annual projected

Page 130

1    monetary payment under the lease, that it is sufficiently

2    healthy.

3         There's no issue as to percentage rent under the

4    lease, and I believe I've already addressed the tenant mix

5    point.  But let me reiterate that there's no specific

6    provision in the lease, other than a broad provision in

7    Section 22(c) as to Sears and its assignee's right to use

8    and assign the property, limiting tenant mix.  Such broad

9    provisions are well-recognized as not precluding an

10   assignment generally in the shopping center context.  See

11   Ramco-Gershenson Properties L.P. v. Service Merchandise

12   Company, 293 B.R. 169, for example.  The lease also has very

13   broad rights pertaining to use restrictions after the major

14   operating period, or the tenant operating period, which the

15   parties agree has already expired.  And I do not believe

16   that given that Transform will be bound by those broad use

17   restrictions, and acknowledges it will be, that it's

18   violating them as an assignee.

19        My determination with respect to the effect of

20   365(b)(3) is guided with respect to this lease by one other

21   consideration.  Based on the testimony before me, it appears

22   to me that the landlord's main, if not primary, if not only,

23   rather, concern is not necessarily to affirmatively usurp

24   the value of the lease for its own benefit, as is the case

25   in most of the cases cited, where the lease is favorable,

Page 131

1    and the landlord has objected.

2           Rather, it appears to me that the landlord desires

3    to control the property for the aggregate benefit of itself,

4    which may mean that it would cut another very favorable

5    lease to an anchor tenant.  That does, in the abstract, fit

6    into or conform with Congress's overall concern when

7    enacting Section 365(b)(3), that the Court take into account

8    the overall effect of the assignment on the shopping center

9    and the landlord's interest in it.

10           However, consistent with my view and the Court's

11   view, generally, that 365(b)(3) is to be interpreted in

12   light of and limited by the parties' actual agreement, I

13   note that Section 6.3 of the lease provides that "in the

14   event that at any time, and from time to time after the

15   expiration of the Sears operating period," which again has

16   expired, "and until the term expires, the tenant decides to

17   cease, and ceases to operate a store in the tenant

18   building," which we know has occurred, "and further

19   determines to sell, exchange, or otherwise transfer its

20   interest in the leased premises," which we also know has

21   occurred, "tenants shall, by giving landlord notice, first

22   offer to landlord the right to purchase the same, one, at

23   the price offered to tenant pursuant to a bona fide offer in

24   a good faith, arms' length transaction, when a prospective

25   purhcaser-assingee, unrelated to tenant, and on the same

1          So it actually does, in fact, have the control

2     that it has stated, is its primary concern.  And the issue

3     then is simply, I believe, one where the parties are

4     fighting over who has the right to the fair market value of

5     the estate:  the Debtor, by selling it to Transform, that is

6     the leasehold estate:  the Debtor, by selling it to

7     Transform, or the landlord, by convincing the Court that its

8     interpretation of 365(b)(3) preclude such an assignment.

9     So, if Congress did, in fact, intend those provisions to, in

10    the balance, between giving value to a Debtor and its

11    creditors, and protecting the landlord, provide additional

12    requirements, the parties' contract in fact does protect the

13    landlord, while preserving the fair market value for the

14    Debtor through an assignment to Transform.

15          I also will note finally that transform has

16    represented on the record today that even if the landlord

17    does not take up the -- or not exercise its right, under

18    Section 6.3, it will not hold the landlord in suspense over

19    tis commencement of reletting the premises for the full term

20    of the lease, which has 73 more years to run, but rather

21    will cap the outside date by which it will at least commence

22    reletting the premises for two years on the condition that

23    the landlord will not interfere with its marketing process.

24          The testimony is certainly not ample on this

25    topic.  I have the declarations of Transform's witnesses, as