**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                          :
In re:                                                    :      Chapter 11
                                                          :
SEARS HOLDINGS CORPORATION, *et al.*,[1]                  :
                                                          :      Case No. 18-23538-rdd
                              Debtors.                    :
                                                          :      (Jointly Administered)
                                                          :
-------------------------------------------------------------X

<u>**NOTICE OF FILING OF PRELIMINARY MOTION WITH APPELLATE COURT**</u>

**PLEASE TAKE NOTICE**, pursuant to Local Bankruptcy Rule 8010-1, that ESL

Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC

(collectively "<u>ESL</u>")), in their capacities as second lien creditors in the above-captioned

bankruptcy proceedings, filed the Motion of ESL for Certification of Direct Appeal to the United

States Court of Appeals for the Second Circuit (the "<u>Motion</u>") in the United States District Court

for the Southern District of New York, No. 19-07660-VB, ECF No. 6.  The Motion is attached

hereto as Exhibit A.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR-Rover De Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Dated: New York, New York
September 18, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  _/s/ *Thomas J. Moloney*_____
Thomas J. Moloney
Sean A. O'Neal
Andrew Weaver
Katherine R. Lynch
Chelsey Rosenbloom

One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Attorneys for ESL*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

……………………………………………X
                              :

In re                         :          Case No.

SEARS HOLDINGS CORPORATION, et al., :         7:19-cv-07660 (VB)

Debtors.[1]            :

                              :
……………………………………………X

 

**MOTION OF ESL**
**FOR CERTIFICATION OF DIRECT APPEAL TO THE**
**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[AM_ACTIVE 401570666_36]

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ......................................................................... 1

JURISDICTION ................................................................................................ 4

BACKGROUND ............................................................................................... 4

    A.   Second Lien Debt, Adequate Protection and the Sale Transaction ..................... 4

    B.   The Bankruptcy Court's Ruling .......................................................... 6

QUESTIONS PRESENTED............................................................................... 11

ARGUMENT .................................................................................................... 11

I.  THE BANKRUPTCY COURT'S RULING IS MANIFESTLY ERRONEOUS,
AND IMMEDIATE REVIEW WOULD MATERIALLY ADVANCE THE
PROGRESS OF THE CHAPTER 11 CASE ..................................................... 13

    A.   The Order Failed to Apply Controlling Supreme Court Authority ..................... 14

    B.   The Order Also Contravenes Binding Second Circuit Authority by
        Imposing Surcharges that the Debtors Were Unable to Justify Under
        Section 506(c)..................................................................................... 18

    C.   Direct Certification Would Promote Judicial Efficiency and Finality ................ 20

II.  THE BANKRUPTCY COURT'S RULING INVOLVES MATTERS OF
PUBLIC IMPORTANCE ............................................................................... 21

CONCLUSION................................................................................................. 22

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                 **Page(s)**

*Assocs. Commercial Corp. v. Rash,*
520 U.S. 953 (1997) ..................................................................................................... *passim*

*First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron),*
412 B.R. 41 (Bankr. E.D.N.Y. 2009) ....................................................................... 19

*Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),*
739 F.2d 73 (2d Cir. 1984)........................................................................... 2, 18-19, 21

*Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.),*
762 F.2d 10 (2d Cir. 1985).......................................................................................... 2, 19

*In re AMR Corp.,*
730 F.3d 88 (2d Cir. 2013)......................................................................................... 11

*In re Nortel Networks Inc.,*
Misc. Action Nos. 15-196 (LPS), 15-197 (LPS), 2016 WL 2899225
(D. Del May 17, 2016)................................................................................................ 20

*In re Otero Cty. Hosp. Ass'n., Inc.,*
584 B.R. 783 (Bankr. D.N.M. 2018) ........................................................................ 12

*In re Qimonda AG,*
470 B.R. 374 (E.D. Va. 2012)................................................................................... 12, 21

*In re Rodriguez,*
513 B.R. 767 (Bankr. S.D. Fla 2014)....................................................................... 20

*In re Sunnyslope Hous. Ltd. P'ship,*
859 F.3d 637 (9th Cir. 2017) .................................................................................... 15-16

*Matter of Rash,*
90 F.3d 1036 (5th Cir. 1996) (Smith, J., dissenting) ....................................... 19-20, 22

*Weber v. United States Tr.,*
484 F.3d 154 (2d Cir. 2007)...................................................................................... 12, 13, 20

**Rules and Statutes**

11 U.S.C. § 101, et seq............................................................................................... 3

11 U.S.C. § 363(e) ............................................................................................... 4

28 U.S.C. § 158 .......................................................................................... 2, 11, 21

11 U.S.C. § 506(c) ............................................................................................... 8

**<u>Other Authorities</u>**

2 Collier on Bankruptcy ¶ 361.01 (15th Ed. 1984)........................................... 21

Adequate Protection, Norton Bankr. L. & Prac. 3d Dict. of Bankr. Terms § A50 ............ 21

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 339 (1977) ..................................... 21

ESL Investments, Inc. and certain affiliates ("ESL"), in their capacities as second lien creditors of Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), respectfully move for direct certification of their appeal to the Second Circuit (the "Motion").

### PRELIMINARY STATEMENT

This appeal concerns a question of extraordinary importance to secured lenders:  if their borrower files a petition for bankruptcy protection, how will their collateral be valued as of the petition date if the debtor chooses to keep and use their collateral rather than surrender it to the secured lenders.  The protections secured creditors are entitled to receive during their debtor's bankruptcy case against any deterioration in their secured positions, including "adequate protection" in the form of replacement liens and priority administrative claims, and the ultimate recovery on their secured claims, depend on this petition-date valuation.  Here, the bankruptcy court applied the wrong legal test and, as a result, undervalued ESL's and the other second lien creditors' (together, the "Second Lien Holders") collateral by hundreds of millions of dollars, causing it to conclude that their adequate protection liens and priority administrative claims were worthless.

First, the bankruptcy court disregarded the "replacement value" standard mandated by the U.S. Supreme Court in *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997) ("*Rash*"); instead, the court valued the Second Lien Holders' collateral under a hypothetical liquidation analysis of its own invention—an approach that led the court to conclude that, on the petition date, the collateral had been worth more than $500 million less than its replacement cost. Second, using the same hypothetical foreclosure methodology, the bankruptcy court concluded that approximately $395 million in contingent first-lien obligations in the form of unfunded letters of credit that would, at most, have been drawn (other than in a negligible amount) only in

1

a foreclosure should nevertheless be counted in their full face amount and must be deducted before determining the collateral value available to the Second Lien Holders as of the petition date. <u>Third</u>, the court compounded these errors by "surcharging" the Second Lien Holders' collateral for expenses the Debtors incurred other than in preserving the Second Lien Holders' collateral in violation of the Second Circuit's holdings in *Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73 (2d Cir. 1984) ("*Flagstaff I*"), and *Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10 (2d Cir. 1985) ("*Flagstaff II*"; together with *Flagstaff I*, "<u>*Flagstaff*</u>").

These were errors of law. This was not a case where the court resolved material issues of disputed fact or chose to credit the testimony of the Debtors' valuation expert over the expert valuation evidence provided by the other side. The facts were almost entirely undisputed, and the Debtors presented no expert testimony in support of their valuation thesis and their proposed surcharges (both of which the court rejected in favor of its own approach not advanced by any party). The court crafted its own valuation test and standard for surcharges, divorced from controlling law, and did not credit the expert valuation testimony presented on behalf of the Second Lien Holders predominantly on the grounds that they had supposedly not been properly instructed on the law.

 Direct certification of this appeal to resolve these legal issues is appropriate. Under the applicable statute, certification is mandatory if the order involves a matter that may materially advance the progress of the case or the order involves a matter of public importance. *See* 28 U.S.C. § 158(d)(2). Here, both reasons apply. <u>First</u>, the bankruptcy court's approach in valuing the Second Lien Holders' collateral departs from the binding precedents of *Rash* and *Flagstaff* and in any event involves questions of law that the Second Circuit will ultimately need to decide.

Direct review by the Second Circuit will allow both the Debtors and the Second Lien Holders to avoid having to spend their limited resources on an intermediate appeal and enable the parties, sooner rather than later, to obtain the definitive ruling that is needed for this bankruptcy case to reach a final resolution. Indeed, revealing their own doubts about the bankruptcy court's valuation approach, the Debtors have appealed the court's denial of their motion to surcharge the Second Lien Holders' collateral, No. 19-08002-NSR, ECF No. 1, but, in order to preserve the estate's limited resources, ask that their appeal be stayed unless and until it is needed to be heard. This is an unfair and impractical suggestion, but it accurately reflects the need for both sides to obtain a prompt and efficient resolution of the important legal issues presented by this appeal.

Second, the bankruptcy court's ruling, coming from one of the most significant districts for bankruptcy cases in the nation, imperils the protections afforded to secured creditors under the U.S. Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), and will create enormous legal uncertainty and risk for such creditors. It will have an impact not only on the willingness of such creditors to agree to the use of their collateral during a bankruptcy case, but also cause secured lenders to demand materially greater collateral cushions for their loans, thereby increasing the costs and diminishing the availability of credit to corporate borrowers generally. It is precisely these concerns that animated the *Rash* and *Flagstaff* decisions and that justify the immediate certification of this appeal to the Second Circuit. The Court should certify this appeal to the Second Circuit.

## JURISDICTION

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 158(a) and (d)(2).

The statutory basis for the relief requested is 28 U.S.C. § 158(d).  Relief also is warranted under

Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 8002, 8003 and 8006.

## BACKGROUND

### A.    Second Lien Debt, Adequate Protection and the Sale Transaction

When Sears filed for chapter 11 protection on October 15, 2018 (the "Petition Date"), the

Second Lien Holders held a substantial majority of $1.151 billion in Sears second-lien debt

("Second Lien Debt").  It was secured by, *inter alia*, inventory and receivables that had a book

value—a proxy for its replacement cost—sufficient to provide a significant cushion beyond the

value required to satisfy fully the first lien funded debt.[2]  *See* ECF No. 4035, ¶ 20; ECF No. 3,

¶¶ 34, 40.[3]

While the "automatic stay" in bankruptcy prevented the Second Lien Holders from

foreclosing on their collateral without the bankruptcy court's permission, the Debtors were also

unable to use the Second Lien Holders' collateral, and any proceeds generated from it, without

obtaining the Second Lien Holders' consent or providing them with court-approved adequate

protection.  11 U.S.C. § 363(e).  The Debtors and the Second Lien Holders agreed on a standard

form of adequate protection, which the bankruptcy court approved following notice to all other

parties in interest.  Specifically, the Second Lien Holders were granted replacement liens,

including on any new inventory the Debtors purchased (and any new receivables the Debtors

---

[2]      On the Petition Date, Sears had approximately $1.53 million of first lien debt ahead of its approximately
$1.151 billion in Second Lien Debt.  *See* ECF No. 3, ¶¶ 34, 40.  The Second Lien Debt was secured by, *inter alia*,
inventory and receivables (and the cash proceeds thereof), on a junior basis to the lien securing the first lien debt.
*Id.* ¶ 34(iii)-(v).  The parties agree that the book value of the inventory on the Petition Date was $2.691 billion.  *See*
ECF No. 4035.
[3]      Unless noted otherwise, references to ECF numbers herein refer to entries on the bankruptcy court docket
No. 18-23538 (RDD) (Bankr. S.D.N.Y.).

4

generated) post-petition, and super-priority administrative claims under Section 507(b) of the
Bankruptcy Code in the event that the replacement liens proved insufficient to maintain the full
value of the collateral securing the Second Lien Holders' claims as of the Petition Date.[4]  In their
application to the bankruptcy court for approval of this adequate protection bargain, the Debtors
confirmed that the book value on the Petition Date of the collateral available to satisfy the
Second Lien Debt well exceeded the first lien debt.  *See* ECF No. 866, ¶ 8.

　　　The Debtors entered into this Adequate Protection Stipulation, rather than simply
surrender the collateral, because they wanted to use that collateral, including to generate an
income stream that would support a plan of reorganization and/or a going concern sale.  ECF No.
10, ¶ 10.  The Debtors continued in bankruptcy to sell their inventory to consumers, mostly at
"Go-Forward" stores and also at some "going-out-of-business ("GOB") stores, and to collect
accounts receivable.  *See* ECF No. 952, ¶ 17 (approving use of inventory in exchange for
adequate protection); Deposition Transcript of Brian Griffith 111:23-113:11.[5]  Even the
inventory sales at the GOB stores yielded revenue of 95% of the inventory's book value or
replacement cost (after accounting for all direct costs attributable to the sales), consistent with
the long history of such sales that Sears had concluded during its significant multi-year
contraction in an ultimately unsuccessful attempt to avert bankruptcy.  And the inventory sales at
the Go-Forward stores, not surprisingly, produced even better results, generating proceeds that
exceeded their book value (again after accounting for all direct costs).  *See* ECF No. 4569.  The
Debtors used the proceeds from these sales and their collection of accounts receivable—more
than $2 billion in total—to, among other things, fund the administration of their bankruptcy

---

[4]　　　*See* ECF No. 955, ¶¶ 17(d), 18(d) (the "Adequate Protection Stipulation").
[5]　　　For the convenience of the Court, the relevant excerpts of the joint exhibits and transcripts cited herein are
attached as exhibits to the Declaration of Katherine R. Lynch filed herewith.

5

proceedings, including more than $100 million in fees paid to counsel and other professionals. See JX 94 (Project Blue – Rolling Cash Flow Budget (Week 16)).

The Debtors, were also able, through their use of the Second Lien Holders' collateral, ultimately to sell their operations on a going-concern basis to a newly-formed company owned principally by ESL.  That sale preserved some 45,000 jobs and provided $5.2 billion in value to satisfy creditors' claims, including all of the first lien debt.  *See* ECF No. 2328, ¶¶ 5, 6; ECF No. 2321, ¶ 31.  But, because the Debtors had used so much of their collateral proceeds to fund their continuing operations and the administration of their bankruptcy cases, the sale yielded only $433.5 million allocable to the Second Lien Debt through a court-approved "credit bid" under Section 363(k) of the Bankruptcy Code.[6]  The Second Lien Holders therefore asserted that they were entitled to enforce their adequate protection liens against the small amount of collateral that was left and to super-priority administrative claims, under Section 507(b) of the Bankruptcy Code and the court-approved Adequate Protection Stipulation, to compensate them for the diminution in the value of their collateral.

### B.    The Bankruptcy Court's Ruling

On May 26, 2019, the Debtors filed a motion to estimate the Second Lien Holders' claims.  *See* ECF No. 4034 (the "<u>Estimation Motion</u>").  After the Second Lien Holders objected to proceeding in a manner that would estimate their claims, they and the Debtors agreed to a stipulation providing that the Estimation Motion would be deemed a request pursuant to Bankruptcy Rule 3012 to determine the amount of the Second Lien Holders' secured claims and Section 507(b) super-priority administrative claims and, pursuant to Section 506(c) of the Bankruptcy Code, also to determine any surcharge upon the collateral securing the Second Lien

---

[6]      The bankruptcy court approved the going-concern sale, rejecting the argument made by the Unsecured Creditors' Committee that the Debtors should be liquidated.  *See* ECF No. 2507.

Holders' claims. *See* ECF No. 4102 (the "507(b) Stipulation"). The Bankruptcy Court so-ordered the 507(b) Stipulation, and the parties proceeded with an expedited briefing and trial schedule. *See* ECF No. 4316. Both sides needed a prompt determination of the issue—the Debtors needed to know the required treatment of the Second Lien Holders' claims under any Chapter 11 plan they might propose, and the Second Lien Holders needed to establish their super-priority claims before the Debtors used whatever assets they had remaining to pay lower-priority claims.

On July 31, 2019, following two days of trial and testimony from three expert witnesses for the Second Lien Holders and two fact witnesses for the Debtors, the bankruptcy court ruled from the bench (with the ruling later confirmed in a written order). It held that the Second Lien Holders were not entitled to ***any*** Section 507(b) super-priority claims because, in the court's view, the Second Lien Holders' interest in the collateral had been worth ***less*** on the Petition Date than the Second Lien Holders realized for it through their credit bid on the date of the going-concern sale. In reaching that startling conclusion, the bankruptcy court acknowledged that, under *Rash,* the appropriate methodology for determining the value of the collateral on the Petition Date was its replacement value in the hands of the Debtors, not its foreclosure value to the Second Lien Holders. Hr'g Tr. 225:14-19, July 31, 2019. But the court then, for all intents and purposes, disregarded that controlling Supreme Court decision. Although the Debtors had continued to sell the inventory for months post-petition largely in sales at Go-Forward and GOB stores, and although the Debtors had later consummated a going-concern sale of the entire business (something the bankruptcy court acknowledged had been a "realistic scenario" from the Petition Date, *id.* 228:12-18), the bankruptcy court used a liquidation analysis that supposedly

7

took into account what could have happened had there been "a short-term sale process, with the very real [possibility] of a potential liquidation." *Id.* 244:2-5.

Applying this valuation approach, the bankruptcy court discounted the value, as of the Petition Date, of so-called "eligible inventory" (the inventory that the Debtors' lenders had agreed could be included in determining the base against which the Debtors could borrow) to *88.7%* of its book value, and discounted the value, again as of the Petition Date, of some $300 million in so-called "ineligible inventory" to *zero*. *See* ECF No. 4740 ("507(b) Order"), at 4 n.3. The court applied these discounts even though the Debtors had sold both eligible and ineligible inventory post-petition at markedly higher valuations—*95%* of book value at the GOB stores and *more than 100%* of book value at the Go-Forward stores.[7]

But the court did not stop there. It also took an additional 1.3% discount for "corporate overhead" that it concluded was "attributable" to the eligible inventory. *Id.* The court did so notwithstanding that it denied the Debtors' motion to surcharge the collateral under Section 506(c) of the Bankruptcy Code, reasoning that the Debtors had not met their burden to show that the expenses to be surcharged had been incurred by Sears for the "primary and direct benefit" of the Second Lien Holders, as "Second Circuit case law requires." Hr'g Tr. 250:10-14, July 31, 2019.[8]

---

[7]    Although the bankruptcy court claimed *sua sponte* that there was a failure of proof whether the collateral that was ineligible for borrowing had actually been sold, there was no basis for that concern. The Debtors' own declarations acknowledged the sale of all the collateral. *See* ECF No. 4035, Ex. A; *see also* ECF 2507, § 10.9, Ex. B. And it is a matter of record that the Debtors returned no collateral (eligible or ineligible) to the Second Lien Holders.

[8]    Section 506(c) allows a bankruptcy estate to "recover from property securing an allowed secured claim the reasonable, necessary costs of preserving, or disposing of, such property," but only "to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). As discussed below (*see infra* Section II.B), in accordance with its plain language, the section has been narrowly construed by the Second Circuit only to apply where the expenses to be surcharged against the secured creditor's collateral were reasonable and necessary, were incurred to preserve the property, and directly benefitted the secured creditor.

The court's approach to valuation produced a staggering result.  The court concluded that the inventory was worth on the Petition Date only $2.090 billion, 507(b) Order at 4, a blended average of *77%* of book value for both the eligible and ineligible inventory.  *See* JX 3 (Sears Holdings Corp*., Borrowing Base Certificate*).  That was nearly ***$200 million less*** than even the Debtors had asserted—the Debtors had argued that the inventory should be valued as of the Petition Date at more than $2.287 billion[9]—and over half a billion dollars less than the valuations by the Second Lien Holders' experts who applied *Rash* and looked at the actual results the Debtors had obtained post-petition in selling the inventory at the Go-Forward and GOB stores.  The bankruptcy court then made similar substantial deductions in valuing the remaining collateral, mostly accounts receivable.  507(b) Order at 4.

After finishing its valuation of the Second Lien Holders' collateral, the bankruptcy court turned to determining the amount of first lien debt that had to be satisfied out of that collateral before assessing how much value remained for the Second Lien Holders as of the Petition Date.  *See* Hr'g Tr. 241:11-17, July 31, 2019.  Relying on the same erroneous notion that the value of the collateral to the Second Lien Holders should be analyzed based on a hypothetical foreclosure, the bankruptcy court concluded that approximately $395 million in entirely contingent obligations in the form of letters of credit issued by the first lien lenders and largely securing potential workers' compensation claims should be deducted in full before determining the collateral value remaining for the Second Lien Holders as of the Petition Date.  *Id.* 242:8-13, 243:17-245:19.  The court reached this conclusion even though there was no dispute that, in a

---

[9]        The Debtors argued that all the inventory, both eligible and ineligible, should be valued on the Petition Date at 85% of its book value.  The Debtors reasoned that the purchase price that the buyer paid months later in the going-concern sale had implicitly so valued the inventory that then remained.  The bankruptcy court rejected that argument.  The issue was the value of the collateral that existed on the Petition Date, not the value of the collateral that existed months later.  Moreover, the bankruptcy court found that there was "no binding agreement to show that the parties intended 85 percent discounted number to be allocable value for the collateral."  Hr'g Tr. 235:8-17, July 31, 2019.

going concern sale, the buyer of the business would be expected to pay any workers

compensation or similar claims (to the extent any materialized) in the ordinary course, rather

than default forcing the first lien lenders to satisfy the claims under their letters of credit.  In fact,

only $9 million of the approximately $395 million in contingent standby letters of credit were

actually drawn during the bankruptcy case; the underlying contingent liabilities secured by the

remaining undrawn letters of credit were assumed by the buyer in the going-concern sale.  JX 98

(Excel Spreadsheet of LC Draws).  Yet, the court deducted the entire $395 million in valuing the

Second Lien Holders' interest in the collateral.

As a result of all of this, the bankruptcy court determined that the value of the collateral

available to the Second Lien Holders on the Petition Date was only $186.57 million.  That was

over $1 billion less than what the Debtors had represented the value of that collateral was for the

Second Lien Holders in seeking and obtaining bankruptcy court approval of the Adequate

Protection Stipulation.  *See supra* Background, A.

When the bankruptcy court addressed the Debtors' related request to surcharge the

administrative costs of the proceeding against the Second Lien Collateral, the bankruptcy court

held that the Debtors did not meet their burden to establish a surcharge under Section 506(c) of

the Bankruptcy Code because the Debtors had "[n]ot ma[d]e the reasonable and necessary, let

alone primary and direct benefit analysis that the Second Circuit case law requires."  Hr'g Tr.

250:10-14, July 31, 2019.  But, as discussed above, the bankruptcy court nevertheless reduced its

valuation of the collateral as of the Petition Date by what it deemed its "belief as to proper costs

applied for corporate overhead attributable to the collateral, and legal fees and professional fees

directly attributable to the collateral."  *Id.* 249:9-16, 250:10-14.

## QUESTIONS PRESENTED[10]

Did the bankruptcy court err in failing to apply faithfully *Rash* and *Flagstaff* including by:

- applying its own hypothetical liquidation test to compute the value of the Second Lien Holders' collateral on the Petition Date rather than the replacement value of the collateral in the Go-Forward stores and the actual value obtained for the collateral in GOB sales, historically and in this Chapter 11 case, as required by *Rash*;

- deducting approximately $395 million from the Second Lien Holders' claims based on the assumption that, in a hypothetical liquidation, contingent unfunded first lien obligations pursuant to standby letters of credit could become funded, when in fact, there was no such liquidation, no significant draws under the letters of credit occurred and the underlying liabilities were assumed by the buyer as part of the going-concern sale of Sears' business that actually occurred; and

- deducting surcharges for indirect overhead costs and administrative expenses of the bankruptcy as part of its valuation process despite (correctly) ruling that the Debtors had failed to meet their burden to impose any such surcharges under Section 506(c) of the Bankruptcy Code?

## ARGUMENT

28 U.S.C. § 158(d)(2) authorizes the direct appeal of a bankruptcy court's final order to the Court of Appeals if any of the following criteria is met:

---

[10]  The questions presented in this Motion are limited to the principal issues warranting direct certification. Nothing herein shall be deemed a waiver of any of the questions presented in ESL's Statement of Issues on Appeal, No. 19-07660-VB, ECF. No. 4.

> (i) the judgment, order, or decree involves a question of law as to which there is no
> controlling decision of the court of appeals for the circuit or of the Supreme Court of the
> United States, or involves a matter of public importance;
> (ii) the judgment, order, or decree involves a question of law requiring resolution of
> conflicting decisions; or
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the
> progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A).  Certification is mandatory if one of these three factors is satisfied.

*See* 28 U.S.C. § 158(d)(2)(B); *see also In re AMR Corp.*, 730 F.3d 88, 92 (2d Cir. 2013).

Section 158(d)(2) aims to "provide a quicker and less costly means of resolving

significant issues that are inevitably bound for the court of appeals."  *In re Qimonda AG*, 470

B.R. 374, 382-83 (E.D. Va. 2012).  "The focus of the statute is explicit: on appeals that raise

controlling questions of law, concern matters of public importance, and arise under

circumstances where a prompt, determinative ruling might avoid needless litigation."  *Weber v.*

*United States Tr.*, 484 F.3d 154, 158 (2d Cir. 2007).  Even where questions of law "cannot be

decided in a vacuum," it may be that "factual considerations are not so prevalent as to preclude

certification for direct appeal."  *In re Otero Cty. Hosp. Ass'n., Inc.*, 584 B.R. 783, 792 (Bankr.

D.N.M. 2018).

Several factors warrant direct certification here.  The bankruptcy court committed clear

legal error, failing faithfully to apply controlling Supreme Court precedent in ruling that the

Second Lien Collateral had not diminished in value.  Given the current status of the bankruptcy

proceedings, with a final winddown of the Debtors' estates rapidly approaching and the

remaining funds draining quickly, a prompt and final resolution of these issues is essential.

Moreover, while this bankruptcy case is already among the most prominent pending in the

country, the issues at stake in this appeal extend beyond this one case.  The bankruptcy court's

ruling will be precedent for future cases, especially in this district, one of the most significant in

the nation for large Chapter 11 reorganizations.  The ruling, which effectively nullified the

12

"adequate protection" that the Debtors provided at the outset of the Chapter 11 case, will surely cause secured creditors in future reorganizations to question how a bankruptcy court may ultimately value their collateral and reduce their willingness to allow a debtor to use that collateral during the bankruptcy case and to support the debtor's reorganization efforts. The Court should certify this appeal to the Second Circuit.

## I.   THE BANKRUPTCY COURT'S RULING IS MANIFESTLY ERRONEOUS, AND IMMEDIATE REVIEW WOULD MATERIALLY ADVANCE THE PROGRESS OF THE CHAPTER 11 CASE

One circumstance in which the Second Circuit has stated it "will be most likely to exercise [its] discretion to permit a direct appeal" is where it is "patently obvious that the bankruptcy court's decision is either manifestly correct or incorrect, as in such cases [the Court would] benefit less from the case's prior consideration in the district court and we [would be] more likely to render a decision expeditiously, thereby advancing the progress of the case." *Weber*, 484 F.3d at 161. Such is the case here.

There is no dispute over the facts necessary for this appeal. The Second Lien Holders' collateral was comprised primarily of inventory and receivables. On the Petition Date, the inventory collateral had a book value of $2.9691 billion and the first lien debt ahead of the Second Lien Holders was only $1.530 billion (excluding unfunded entirely contingent liabilities that never materialized), leaving the Second Lien Holders with a cushion of more than $1 billion. But, over the course of the bankruptcy proceedings, the Debtors sold that collateral to fund their continued operations and the administrative expenses of the cases and replaced only a portion of it. As a result, when the Debtors ultimately concluded their going-concern sale of their business, the Second Lien Holders received only $433.5 million in value (through their credit bid) on their secured claims.

13

Nevertheless, the bankruptcy court ruled that there had been no diminution in value of the Second Lien Holders' collateral. The bankruptcy court was able to reach that entirely illogical result only by disregarding the book value of the collateral—a proxy for its replacement value, as the undisputed testimony at trial established, Hr'g Tr. 63:22-64:2, July 23, 2019—and by, instead, considering what the collateral might have been worth in a hypothetical liquidation that never occurred, contrary to the Supreme Court's holding in *Rash*; by further discounting the collateral value based on supposed expenses not directly related to the sale of the collateral, contrary to the Second Circuit's rulings in *Flagstaff*; and by deducting $395 million of contingent, unfunded letters of credit from the collateral available to satisfy the Second Lien Debt, even though only $9 million of these letters of credit were drawn during the case and the going-concern sale of the Debtors' business that actually occurred resulted in the buyer's assumption of the underlying liabilities. On all three points, the bankruptcy court misapplied controlling law that required it to make the valuation decision based, not on hypothetical liquidations or foreclosures that never occurred, but rather on how the Debtors actually used the collateral and what actually happened. Given the status of the Chapter 11 case, in which the Debtors hope soon to confirm a plan, immediate review by the Court of Appeals is the most efficient means by which to correct the bankruptcy court's manifest errors and bring finality to these disputes and to the bankruptcy case as a whole.

### A.    The Order Failed to Apply Controlling Supreme Court Authority

The bankruptcy court was bound by the Supreme Court's decision in *Rash* in determining the appropriate methodology by which to measure the value of the Second Lien Holders' collateral. The *Rash* Court interpreted Section 506(a) of the Bankruptcy Code, which provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to

14

the extent that the value of such creditor's interest . . . is less than the amount of
such allowed claim. *Such value shall be determined in light of the purpose of the
valuation and of the proposed disposition or use of such property.*

520 U.S. at 960 (internal quotations omitted) (citing 11 U.S.C. § 506(a)) (emphasis added).

Focusing on the second sentence of that statute, the Court explained that "the 'proposed

disposition or use' of the collateral is of paramount importance to the valuation question." *Id.* at

962. The Court accordingly ruled that when a debtor elects to retain and "use the collateral to

generate an income stream," the replacement cost to the debtor of the collateral, rather than its

foreclosure value to the secured creditor, is the appropriate standard by which to calculate the

value of the collateral. *Id.* at 963.

Here, just as in *Rash*, the Debtors did not surrender the collateral to the secured creditors,

but instead retained and used that collateral for their own benefit. The Debtors sold the Second

Lien Holders' collateral both in GOB sales and through ordinary course sales at the Go-Forward

stores to generate money to fund the operating expenses of the bankruptcy and an income stream

to support a plan of reorganization and/or a going-concern sale of the Debtors' entire business.

Accordingly, the bankruptcy court was bound under *Rash* to value the collateral according to this

actual use, rather than by conducting a hypothetical foreclosure valuation.

In declining to value the collateral based on its replacement cost, the bankruptcy court

suggested that such a valuation would not have been "tied to reality, *i.e.*, the normal realizable

value of this collateral . . . at the start of this case." Hr'g Tr. 231:19-21, July 31, 2019. But an

approach that focuses on how much the secured creditor could have realized on the collateral if it

had been surrendered to the secured creditor is precisely what the Supreme Court **rejected** in

*Rash*. The Court explained that "[i]f a debtor keeps the property and continues to use it, the

creditor obtains at once neither the property nor its value and is exposed to double risks: The

debtor may again default and the property may deteriorate from extended use." *Rash*, 520 U.S.

15

at 962-63.  As a result, "the secured creditor may receive far less in a failed reorganization than

in a prompt foreclosure."  *Id.* at 963 (citation omitted).  But, in any event, "[o]f prime

significance, the replacement-value standard accurately gauges the debtor's ongoing 'use' of the

property.  It values 'the creditor's interest in the property in light of the proposed . . . reality: no

foreclosure sale and economic benefit for the debtor derived from the collateral.'"  *Id.*; *see also*

*In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d 637, 645 (9th Cir. 2017), as amended (June 23,

2017) (en banc) (holding that *Rash* requires application of replacement value where the debtor

retains and uses the property, even if the foreclosure value would have been ***higher***:  "We cannot

depart from that standard without doing precisely what *Rash* instructed bankruptcy courts to

avoid—assuming a foreclosure that the Chapter 11 petition prevented.").

    The bankruptcy court attempted to justify its departure from *Rash* by suggesting that the

true expectations when Sears filed for bankruptcy was that there would be "either a going

concern sale in the context of competing liquidation bids, or no going concern bids acceptable

[and a] pivot to a liquidation."  Hr'g Tr. 228:12-18, July 31, 2019.  *Rash*'s replacement value

valuation standard, however, does not authorize and is not dependent on a bankruptcy court's

speculation as to whether the Debtors will succeed in their intended use of the secured creditors'

collateral.  Rather, under *Rash*, the fact that the Debtors intend to retain and use the collateral is

dispositive.  *Rash* was a Chapter 13 bankruptcy involving a consumer debtor who obtained

confirmation of a plan under which he proposed to retain his car and make payments to his car

lender and other creditors over time.  As the Supreme Court noted, a very high percentage of

Chapter 13 plans are unsuccessful; the debtor is unable to complete the payments.  *See Rash*, 520

U.S. at 963 ("The vast majority of reorganizations fail . . . leaving creditors with only a fraction

of the compensation due them.").  But that did not matter in the Court's analysis.  All that

16

mattered was that the debtor proposed to retain and use the collateral, just as Sears did here.

Thus, the bankruptcy court's prediction in this case as of the Petition Date of a potential

liquidation not only did not come true but, even if had, it would not have justified a valuation

approach that shifted the risk of failure to the secured creditors by valuing their collateral based

on a hypothetical liquidation when, in fact, the Debtors were proposing to, and did, use the

collateral.

Put simply, just as in *Rash*, the undisputed "reality" in this case was "no foreclosure sale

and economic benefit for the debtor derived from the collateral." *Id.* The Debtors continued for

months after filing for bankruptcy to sell their inventory mostly in the ordinary course in their

Go-Forward stores and to a lesser extent in GOB sales at the stores that the Debtors shuttered.

Those sales generated billions in proceeds—cash that was indisputably the collateral of the

Second Lien Holders and that the Debtors used, in substantial part, to fund the administrative

expenses of the bankruptcy proceedings. ESL's expert, David Schulte, valued the collateral

based on the Debtors' actual use of the collateral, just as *Rash* requires. For the inventory sold in

Go-Forward stores, Mr. Schulte used its book value, which in a retail business in which

inventory is constantly replaced, like Sears, closely approximates the inventory's replacement

cost. *See* ECF No. 4569 at 10-11. And for the inventory sold in the GOB stores, Mr. Schulte

used the *actual value* achieved in those sales (after deducting store-level costs), which, again,

follows the holding of *Rash* by taking into account the economic realities and actual disposition

of the collateral. *Id.* at 11-12.

The bankruptcy court likewise deviated from *Rash* and the Debtors' actual use of the

collateral in deducting the face amount of the standby letters of credit issued by the first lien

lenders. As long as they remained undrawn, the letters of credit could not give rise to any

17

payment obligations by the Debtors to the first lien lenders and they therefore would not diminish the value of the collateral available to the Second Lien Holders—a point the Debtors themselves acknowledged at the outset of their bankruptcy proceedings when they excluded the letters of credit from their analysis of the collateral cushion available to the Second Lien Holders supporting their proposed use of the Second Lien Holders' collateral. *See* ECF 866, ¶ 8.  The Debtors were right.  In the context of a going concern, there was no likelihood that the possible liabilities secured by the letters of credit—mainly potential workers compensation claims— would go unpaid by the Debtors or the buyer of their business, and there was therefore no likelihood that the letters of credit would be drawn in any meaningful amount.  Indeed, during the entire course of the bankruptcy proceedings, only $9 million of the $395 million in letters of credit were drawn.  *See* Hr'g Tr. 188:17-19, July 31, 2019.

Yet, in calculating the value of the collateral to the Second Lien Holders on the Petition Date, the bankruptcy court deducted the entire $395 million face amount of the letters of credit. The court did so based on its speculation that, as of the Petition Date, there was a "very real back draw [sic] of a potential liquidation in which the Sears Debtors would go out of business" and that in such an imagined event, "the letters of credit would be drawn, either immediately or upon their expiration date." *Id.* 244:2-8.  The simple answer is that this is not what happened—Sears sold its business as a going concern and the letters of credit were hardly drawn at all.  Under *Rash*, the bankruptcy court was required to look at the Debtors' intended and actual use of the collateral, and not how it might have used that collateral in a counter-factual, hypothetical world.

### B.    The Order Also Contravenes Binding Second Circuit Authority By Imposing Surcharges that the Debtors Were Unable to Justify Under Section 506(c)

The bankruptcy court also erred in taking an arbitrary deduction of an additional 1.3% from the value of the Second Lien Holders' collateral for corporate overhead despite ruling that

18

the Debtors had failed to meet their burden to charge any overhead costs to that collateral under

Section 506(c) of the Bankruptcy Code.  That section provides a limited exception to the general

rule that debtors are *not* entitled to saddle secured creditors with the administrative expenses of a

bankruptcy proceeding.  *Flagstaff I*, 739 F.2d at 77.  The Debtors bore "the burden of proving

that the administration expenses for which they [seek] recovery [are] covered by section 506(c)."

*Id.*  To do so, the Debtors had to show "that the expenses were necessary," "the amounts . . .

expended were reasonable," and "the expenses directly benefitted" the Second Lien Holders.

*First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*, 412 B.R. 41, 51 (Bankr.

E.D.N.Y. 2009); *see also Flagstaff II*, 762 F.2d at 12 (requiring that the debtor show that the

expenses were incurred "primarily for the benefit of the creditor").

The bankruptcy court properly concluded that the "506(c) evidence provided . . . by the

Debtors, which consists primarily of a one-page breakout of alleged costs that would fit 506(c),

itemized simply by category, adding up to over a billion, $400 million" failed to meet the

Debtors' burden.  Hr'g Tr. 250:3-9, July 31, 2019.  However, the court nevertheless applied an

"extra discount" as part of the valuation process based on its own "belief as to the proper costs

applied for corporate overhead attributable to the collateral, and legal fees and professional fees

directly attributable to the collateral."  *Id.* 249:9-23.

The bankruptcy court's backdoor 506(c) surcharge ignored the Second Circuit's holding

in *Flagstaff* that a court does *not* have discretion to charge administrative costs to a secured

creditor where, as here, the debtors "failed to sustain [their] burden."  *Flagstaff I*, 739 F.2d at 77.

Embedding this arbitrary surcharge in the valuation analysis under Section 507(b) did not make

the ruling any less erroneous, as overhead is not an appropriate consideration in determining

replacement value, which the Supreme Court has instructed is "the price a willing buyer in the

debtor's trade, business, or situation would pay a willing seller to obtain property of like age and

condition." *Rash*, 520 U.S. at 959.  Moreover, "[d]educting *purely hypothetical* costs of sale

from the collateral's value ignores both the purpose of the valuation and the property's proposed

disposition or use." *Matter of Rash*, 90 F.3d 1036, 1061 (5th Cir. 1996) (Smith, J., dissenting).[11]

### C.  Direct Certification Would Promote Judicial Efficiency and Finality

Direct appeal is particularly appropriate in a case such like this one in which speed is of

the essence.  This appeal cannot percolate slowly through two levels of appeal.  From the

Debtors' perspective, their resources are limited.  And from the Second Lien Holders'

standpoint, if the Debtors' pending Chapter 11 plan is confirmed, the Debtors' remaining assets

may be distributed to lower-ranking creditors and may no longer be available (absent claw-back

actions) as a source from which the Second Lien Holders can recover.  All parties would benefit

from a prompt and final ruling.

Courts have also held that direct appeal is appropriate where "the parties adversely

affected by the ruling might very well fold up their tents if convinced that the ruling has the

approval of the Court of Appeals, but will not give up until that becomes clear." *Weber*, 484

F.3d at 158; *see also In re Rodriguez*, 513 B.R. 767, 770 (Bankr. S.D. Fla 2014) (granting

certification where a party had "already demonstrated that he will not relent"); *accord In re*

*Nortel Networks Inc.*, Misc. Action Nos. 15-196 (LPS), 15-197 (LPS), 2016 WL 2899225, at *5

(D. Del May 17, 2016).  The Second Lien Holders are committed to ensuring the bankruptcy

court's errors are corrected, and direct certification is the most efficient and cost-effective means

of bringing this appeal and the entire bankruptcy case to a final resolution.

---

[11]    In reversing the Fifth Circuit's decision in *Rash*, the Supreme Court largely adopted the reasoning of Judge
Smith's dissent.

## II.      THE BANKRUPTCY COURT'S RULING INVOLVES MATTERS OF PUBLIC IMPORTANCE

The bankruptcy court's ruling also warrants direct review by the Second Circuit because it "involves . . . matter[s] of public importance."  28 U.S.C. § 158(d)(2)(A)(i).  Such matters include those that "transcend the litigants and involve a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case," *i.e.*, those questions that "impact[] [not just] the parties, [but] the public at large." *See In re Qimonda AG*, 470 B.R. at 387 (citations omitted).  This appeal presents a matter of public importance because the bankruptcy court's ruling threatens the protections guaranteed to secured creditors in bankruptcy.

Adequate protection is a fundamental right of secured creditors in bankruptcy proceedings.  "A secured creditor has the right to 'adequate protection' of its collateral, which means it is entitled to have the value of its collateral maintained at all times. . . ."  Adequate Protection, Norton Bankr. L. & Prac. 3d Dict. of Bankr. Terms § A50 (internal citations omitted). The purpose of adequate protection is to "insure that the secured creditor receives in value essentially what he bargained for."  *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977); 2 Collier on Bankruptcy ¶ 361.01, at 361-5 (15th Ed. 1984).  Adequate protection is not only "derived from the fifth amendment protection of property," but is "based as much on policy grounds as on constitutional grounds."  H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977). Vitiating the prior grants of adequate protection, like the bankruptcy court did here, will discourage secured creditors from consenting to the use of their collateral and, more broadly, from supporting debtors' reorganization efforts.  *Cf. Flagstaff I*, 739 F.2d at 77 ("Saddling unconsenting secured creditors with professional fees . . . would discourage those creditors from supporting debtors' reorganization efforts.").

21

The decision here "transcends the litigants" and threatens the basic notion that adequate protection should encourage secured creditors to allow those companies to continue using the creditors' collateral in bankruptcy. Equally importantly, the audience for this decision extends to lenders, including potential second lien lenders, that in deciding whether to extend credit and on what terms will need to assume that if their borrower ends up in bankruptcy the bankruptcy court may value their collateral based on hypothetical foreclosures, even if they do not materialize and do not correspond to reality. The result will be a decrease in the availability of credit or an increase in its costs. *See Matter of Rash*, 90 F.3d at 1064 (Smith, J. dissenting) (inconsistency in the courts regarding valuation methodology under Section 506(a) makes it difficult to "assess the cost and value of credit").

## CONCLUSION

For the foregoing reasons, ESL respectfully requests that this Court certify its direct appeal to the Second Circuit.

[*Signature Page Follows*]

Dated: New York, New York
           September 17, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  _/s/ Thomas J. Moloney_____
          Thomas J. Moloney
          Sean A. O'Neal
          Andrew Weaver
          Katherine R. Lynch
          Chelsey Rosenbloom

          One Liberty Plaza
          New York, NY 10006
          Telephone:  (212) 225-2000
          Facsimile:  (212) 225-3999

WILMER CUTLER PICKERING HALE & DORR LLP

By:  _/s/ Philip D. Anker_____
          Philip D. Anker

          7 World Trade Center
          250 Greenwich Street
          New York, NY 10007
          Telephone:  (212) 230-8800
          Facsimile:  (212) 230-8888

          *Attorneys for ESL*