# EXHIBIT 1

# MASTER TELECOMMUNICATIONS PROCUREMENT AGREEMENT

THIS MASTER TELECOMMUNICATIONS PROCUREMENT AGREEMENT ("*Agreement*") is made as of this 27th day of September, 2001 (the "*Effective Date*") by and between Wireless Matrix USA Inc. ("*Wireless Matrix*"), a Delaware corporation with offices at Sunrise Technology Park, 12369B Sunrise Valley Drive, Reston, Virginia 20191, and Sears, Roebuck and Co. ("*Sears*"), a New York corporation with offices at 3333 Beverly Road, Hoffman Estates, Illinois.

WHEREAS, Wireless Matrix is interested in providing certain Equipment, Software and Services to Sears from time-to-time;

WHEREAS, Sears is interested in purchasing certain Equipment, Software and Services from Wireless Matrix from time-to-time;

WHEREAS, the parties wish to set forth the terms and conditions under which Sears may order and Wireless Matrix may provide certain Equipment, Software and Services described in purchase orders and Statements of Work under this Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1.0    DEFINITIONS

Whenever used in this Agreement, any Schedules, Exhibits or Addenda to this Agreement, the following terms shall have the meanings ascribed to them below. Other capitalized terms used in this Agreement are defined in the context in which they are used and shall have the meanings described therein. The terms defined in this Schedule include the plural as well as the singular.

**1.1**    "*Additional Deposits*" shall have the meaning set forth in the Source Code Escrow Agreement.

**1.2**    "*Affiliate(s)*" shall mean any person, firm, corporation, partnership (including, without limitation, general partnerships, limited partnerships, and limited liability partnerships), limited liability company, joint venture, business trust, association or other entity that now or in the future, directly or indirectly:  (a) controls, is controlled with or by or is under common control with a party; or (b) with respect to Sears, is managed, operated or directed by Sears and for which Sears remains liable to Wireless Matrix for the purposes of this Agreement.  For purposes of the foregoing, "control" shall mean, with respect to:  (c) a corporation, the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors thereof or, for purposes of foreign corporations, if less than fifty percent (50%), the

amount allowed by applicable law; and (d) any other entity, power to direct the management of such entity.

**1.3**    *"Agreement"* shall mean this Master Telecommunications Procurement Agreement by and between Sears and Wireless Matrix, inclusive of all Schedules, Exhibits, Attachments, Addenda and other documents incorporated herein by reference.

**1.4**    *"API"* shall mean application programming interfaces, including, without limitation, any interfaces necessary to achieve interoperability between the System and any other Sears proprietary or Third Party software or systems.

**1.5**    *"Authorized User"* shall mean:    (a) Sears and its Affiliates; (b) employees, consultants and agents of Sears and its Affiliates; (c) Sears suppliers and other business partners; (d) Sears customers and their employees and agents; and (e) Third Party consultants and their employees and agents, and other independent contractors performing services for Sears or any Sears Affiliate all of whom are hereby subject to confidentiality obligations substantially similar to those set forth in this Agreement protecting Wireless Matrix's Confidential Business Information and/or Confidential Personal Information and for which Sears remains liable to Wireless Matrix for purposes of this Agreement.

**1.6**    *"Change Order"* shall have the meaning set forth in **Section 5.1.4** of the Agreement.

**1.7**    *"Change Request"* shall have the meaning set forth in **Section 5.1.4** of the Agreement.

**1.8**    *"Change Response"* shall have the meaning set forth in **Section 5.1.4** of the Agreement.

**1.9**    *"Claims"* shall have the meaning set forth in **Section 14.1.1** of the Agreement.

**1.10**    *"Code of Conduct"* shall mean the Sears Code of Business Conduct delivered to Wireless Matrix as of the Effective Date.

**1.11**    *"Compatible Products"* shall have the meaning set forth in **Section 5.6** of the Agreement.

**1.12**    *"Confidential Business Information"* shall have the meaning set forth in **Section 13.1** of the Agreement.

**1.13**    *"Confidential Personal Information"* shall have the meaning set forth in **Section 13.6.1** of the Agreement.

**1.14**    *"Consulting Services"* are those Custom Programming and other professional services that Wireless Matrix provides to Sears pursuant to a particular Statement of Work.

**1.15**    "*CPI*" shall mean the Consumer Price Index, as reported in the Wall Street Journal.

**1.16**    "*Critical Path Milestones*" shall have the meaning set forth in **Section 5.1.2** of the Agreement.

**1.17**    "*Custom Programming*" shall mean any Software programming developed, authored, written and/or created by Wireless Matrix or its agents or subcontractors for on behalf of Sears as provided in **Section 5.4** of the Agreement.

**1.18**    "*Custom Programming Materials*" shall have the meaning set forth in **Section 11.2** of the Agreement.

**1.19**    "*Custom Programming Order*" shall have the meaning set forth in **Section 5.4** of the Agreement.

**1.20**    "*Defects*" shall mean any failure of the Equipment or Software to operate in form, fit, and function in accordance with the Specifications or Documentation.

**1.21**    "*Deliverables*" shall mean any tangible product that must be provided by Wireless Matrix to Sears under this Agreement.

**1.22**    "*Deposit Materials and/or Additional Deposits*" shall have the meaning set forth in the Source Code Escrow Agreement.

**1.23**    "*Developments*" shall have the meaning set forth in **Section 11.2** of the Agreement.

**1.24**    "*Documentation*" shall mean, collectively: (a) all of the written, printed, electronic or other format materials published or otherwise made available by Wireless Matrix that relate to the functional, operational and/or performance capabilities of the Software; and (b) all user, operator, system administrator, technical, support and other manuals and all other written, printed, electronic or other format materials published or otherwise made available by Wireless Matrix that describe the functional, operational and/or performance capabilities of the Software.  Documentation does not include Source Code.

**1.25**    "*Effective Date*" shall have the meaning set forth in the introductory paragraph of the Agreement.

**1.26**    "*Efforts*" shall have the meaning set forth in **Section 6(a)** of **Schedule 9.1** of the Agreement.

**1.27** *"Embedded Third Party Software"* shall mean any Third Party Software provided by Wireless Matrix to Sears that constitutes an integral part of the Software license to Sears by Wireless Matrix pursuant to this Agreement.

**1.28** *"Enhancements"* shall mean any new Equipment, Software, releases, improvements, modifications, upgrades, updates, fixes and additions to the Software that Wireless Matrix or the applicable vendor markets or makes available to its customers who are eligible to receive maintenance or support services from time-to-time to correct deficiencies and/or improve or extend the capabilities, including, but not limited to, increases in the speed, efficiency or ease of operation of the Equipment or Software, and shall include, without limitation, any replatformed software, whether on different operating systems or equipment; provided, however, that Enhancements shall not include new, separate product offerings. Enhancements shall include all Web-based versions and any updated data, replacement, improvement, patch, major product upgrade (*e.g.*, version 1.0 to 2.0), minor product upgrade (*e.g.*, version 2.0 to 2.1) or maintenance upgrade (*e.g.*, version 2.1 to 2.1a or 2.1.1). Software shall be deemed to include Enhancements for purposes of this Agreement.

**1.29** *"Equipment"* shall mean the components of equipment, if any, identified in the Agreement and/or applicable Statement of Work.

**1.30** *"Events of Default"* shall have the meaning set forth in **Section 16.2** of the Agreement.

**1.31** *"Final Resolution"* shall have the meaning set forth in **Section 5(c) of Schedule 9.1** of the Agreement.

**1.32** *"Final Resolution Service Deficiency Credit"* shall have the meaning set forth in **Section 7 of Schedule 9.1** of the Agreement.

**1.33** *"Go Live"* shall have the meaning set forth in **Section 7.4**.

**1.34** *"Hours"* shall have the meaning set forth in **Section 6(b) of Schedule 9.1** of the Agreement.

**1.35** *"Implementation Workplan"* shall have the meaning set forth in **Section 5.1.2** of the Agreement.

**1.36** *"Indemnified Parties"* shall have the meaning set forth in **Section 14.1.1** of the Agreement.

**1.37** *"Initial Response"* is defined in **Section 5 of Schedule 9.1** of the Agreement.

**1.38** *"Initial Response Service Deficiency Credit"* shall have the meaning set forth in **Section 7 of Schedule 9.1** of the Agreement.

**1.39**    "*Integration Testing*" shall have the meaning set forth in **Section 7.3** of the Agreement.

**1.40**    "*Integration Testing Period*" shall have the meaning set forth in **Section 7.3** of the Agreement.

**1.41**    "*Interim Resolution*" shall have the meaning set forth in **Section 5 of Schedule 9.1** of the Agreement.

**1.42**    "*Key Personnel*" shall have the meaning set forth in **Section 12.4** of the Agreement.

**1.43**    "*Know-How*" shall have the meaning set forth in **Section 5.2** of the Agreement.

**1.44**    "*Maximum Monthly Final Resolution Service Deficiency Credit*" shall have the meaning set forth in **Section 7 of Schedule 9.1** of the Agreement.

**1.45**    "*Maximum Monthly Initial Response Service Deficiency Credit*" shall have the meaning set forth in **Section 7 of Schedule 9.1** of the Agreement.

**1.46**    "*NDA*" shall have the meaning set forth in **Section 21.10** of the Agreement.

**1.47**    "*Personnel*" shall have the meaning set forth in **Section 13.2** of the Agreement.

**1.48**    "*Procurement Document*" shall mean any Statement of Work or purchase order signed and issued by an authorized representative of Sears.

**1.49**    "*Project*" shall have the meaning set forth in **Section 2.1.**

**1.50**    "*Proprietary Rights*" shall have the meaning set forth in **Section 11.2** of the Agreement.

**1.51**    "*Provisional Acceptance*" shall have the meaning set forth in **Section 7.3** of the Agreement.

**1.52**    "*Sears*" shall mean Sears, Roebuck & Co., and its successors and assigns.

**1.53**    "*Sears Data*" shall have the meaning set forth in **Section 11.5** of the Agreement.

**1.54**    "*Sears-Supplied Product*" shall have the meaning set forth in **Section 5.6** of the Agreement.

**1.55**    "*Services*" shall mean, individually or collectively, any professional or other services that may be provided by Wireless Matrix to Sears including, without limitation,

installation, implementation, integration, testing, development, conversion, training, Support and Maintenance Services, Consulting Services, and Telecommunications Services.

**1.56** *"Service Deficiency Credits"* shall mean, as applicable, Initial Response Service Deficiency Credits and Final Resolution Service Deficiency Credits.

**1.57** *"Service Fee Payment Milestones"* shall have the meaning set forth in **Section 10.3** of the Agreement.

**1.58** *"Service Rates"* shall have the meaning set forth in **Section 10.3** of the Agreement.

**1.59** *"Severity 1 Defects"*, *"Severity 2 Defects"*, *"Severity 3 Defects"* and *"Severity 4 Defects"* shall have the meaning set forth in **Section 3 of Schedule 9.1** of the Agreement.

**1.60** *"Software"* shall mean all software that is supplied or made available to Sears by Wireless Matrix under this Agreement and/or applicable Statement of Work, including, without limitation, all software, APIs, and Third Party Software identified in the applicable Statement of Work, and all Enhancements thereto (including, without limitation, the Web-based versions of all Software).

**1.61** *"Software License Fee"* shall mean the license fees for the Software and shall be in such amount as shall be set forth in the applicable Statement of Work.

**1.62** *"Source Code"* shall mean computer software in the form of source statements for the Software (excluding Third Party Software), including printed and on-line descriptions of the design of such software, including, without limitation: (a) data definition models, indices, structured tables, system flowcharts, program flowcharts, defined terms, file layouts, program narratives, global documentation (including global variables) and program listings, available sub-programs, routines, program files, data files, file and data defined terms and relationships, data definition specifications, data models, program and system logic, interfaces, algorithms, program architecture, design concepts, system designs, program structures, sequence and organization, screen displays and report layouts related to interacting with or a part of the Software, whether in human-readable, electronic or machine-readable form, any of the foregoing only as are necessary to fully understand the source statements for the Software; (b) Wireless Matrix-developed maintenance and support tools, utilities, diagnostic programs, and supporting programs used or utilized by Wireless Matrix internally in the support or maintenance of the Software, or externally in connection with supporting other Sears locations, whether or not such items are made available to licensees generally or at an additional fee, whether in human-readable, electronic or machine-readable form; (c) available reference manuals, user and operating guides and manuals, design specifications, functional specifications, flowcharts, internal use listings or manuals relating to error corrections, fixes and workarounds, file and program cross-reference information (whether in manual, guide or other format), whether in human-readable, electronic or machine-readable form; and (d) a list of all of the names and business addresses and telephone numbers of each key programmer or author of any portion of the Software.

*1.63*   *"Source Code Escrow Agreement"* shall have the meaning set forth in **Section 4.4** of the Agreement.

*1.64*   *"Specifications"* shall have the meaning set forth in **Section 7.1** of the Agreement.

*1.65*   *"SSDM"* shall have the meaning set forth in **Section 5.4** of the Agreement.

*1.66*   *"Statement(s) of Work or SOW"* shall mean those agreed upon work orders for Equipment, Software, and/or Services that are incorporated into this Agreement as set forth in Section 2.3.

*1.67*   *"Successful Implementation"* shall have the meaning set forth in **Section 7.4** of the Agreement.

*1.68*   *"Successful Implementation Period"* shall have the meaning set forth in **Section 7.4** of the Agreement.

*1.69*   *"Support and Maintenance Services"* shall have the meaning set forth in **Schedule 9.1** of the Agreement.

*1.70*   *"Support Fee"* shall mean the fees for any Support and Maintenance Services and as defined in **Section 9.3** and as set forth in the applicable Statement of Work.

*1.71*   *"System"* shall mean the combination of Software, Equipment, and/or Telecommunication Services.

*1.72*   *"Test Plan"* shall have the meaning set forth in **Section 7.1** of the Agreement.

*1.73*   *"Third Party"* shall mean persons, corporations and entities other than Sears, Wireless Matrix or any of their Affiliates.

*1.74*   *"Third Party Software"* shall mean any Software that is proprietary to a Third Party, excluding all Embedded Third Party Software.

*1.75*   *"Transition Period"* shall have the meaning set forth in **Section 16.4.3** of the Agreement.

*1.76*   *"Telecommunications Services"* shall include network services that Wireless Matrix provides to Sears pursuant to a particular Statement of Work or Schedule.

*1.77*   *"Unauthorized Code"* shall mean any feature, routine or device that is intended or designed, either automatically, upon the occurrence of a certain event, upon the taking of or failure to take a certain action or under the control of a third person that is not an employee or

agent of Sears, (i) to disrupt the operation of the Software or the System as described in the applicable specifications for such Software, (ii) to cause Software or the System to be unintentionally destroyed, erased, damaged or otherwise made inoperable, or (iii) to permit a third person that is not an employee or agent of Sears to destroy, erase, damage or otherwise render inoperable the System or any Software, and shall include any computer virus, worm, trap door, back door, time bomb, malicious program, or any mechanism such as software locks password checking, CPU serial number checking or time dependency, introduced by the provider of the applicable Software, that could hinder Sears' freedom to fully exercise its license rights to such Software.

  **1.78** "*Unit Testing*" shall have the meaning set forth in **Section 7.2** of the Agreement.

  **1.79** "*Upgrades*" shall have the meaning set forth in **Section 4.1** of the Agreement.

  **1.80** "*Warranty Period*" shall have the meaning set forth in **Section 8.2** of the Agreement.

## 2.0 *MASTER AGREEMENT*

  **2.1** *Generally.* This Agreement represents the terms and conditions under which Wireless Matrix shall provide Equipment, Software and Services to Sears pursuant to applicable Statements of Work developed in accordance with the terms set forth in this Agreement (each a "*Project*"). Each Project will be implemented in accordance with a Statement of Work that is substantially similar in form and content to the draft Statement of Work set forth in **Schedule 1.1**. All Statements of Work shall be attached to the Agreement as Exhibits.

  **2.2** *Estimates; Forecasts.* The execution of this Agreement shall not give rise to any commitment on the part of Sears to purchase any Equipment, Software or Services from Wireless Matrix or, on the part of Wireless Matrix, to provide any such Equipment, Software or Services. Any estimates or forecasts of Sears future needs for Equipment, Software or Services that may be provided to Wireless Matrix by Sears are for Sears long range planning purposes only and shall not in any way represent a commitment of Sears or Wireless Matrix. Sears shall have no responsibility for any actions taken by Wireless Matrix and Wireless Matrix shall have no responsibility for any actions taken by Sears, based on such estimates or forecasts.

  **2.3** *Statements of Work.* Each Statement of Work: (a) shall be substantially similar in form and substance to the Statements of Work attached as Exhibit 1; (b) may include the items identified in Schedule 1.1; and (c) may be amended from time to time by agreement of the parties in accordance with the terms set forth in Section 2.5 to add, modify or delete Equipment and/or Services and other related terms. Additional Equipment and/or Services related to a signed Statement of Work may be procured pursuant to a Purchase Order in accordance with Section 2.4.

  **2.4** *Purchase Orders.* Sears may issue a Purchase Order for the procurement of Software, Equipment and/or Services that will be provided to Sears either in connection with a

Statement of Work or on a stand-alone basis pursuant to the terms and conditions of this Agreement (**"Purchase Order"**). Subject to the terms of this Section, a commitment to purchase Software, Equipment and/or Services pursuant to a Purchase Order shall arise only at such time or times as Sears issues a Purchase Order for Software and Equipment setting forth price, quantities and delivery terms. Sears obligation to procure Software, Equipment and/or Services shall be limited to the quantities contained in such Purchase Orders. When issued by Sears and accepted by Wireless Matrix, all Purchase Orders shall become part of and be subject to the terms of this Agreement and any applicable Statement(s) of Work. Any pre-printed terms or conditions included on a Purchase Order shall be void and of no force and effect. Should any items be purchased pursuant only to a Purchase Order, requiring no applicable Statement of Work for installation and/or implementation services provided by Wireless Matrix, said items shall be deemed accepted upon delivery.

   **2.5    Modifications.** This Agreement and any Statement of Work or Purchase Order may be modified only pursuant to an instrument in writing executed by authorized representatives of Sears and Wireless Matrix. The parties expressly disclaim the right to claim the enforceability or effectiveness of: (a) any oral modifications to this Agreement; and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory.

## 3.0    EQUIPMENT

   **3.1    Equipment and Equipment Configuration.** Each Statement of Work will include a list of the Equipment components recommended by Wireless Matrix to operate the Equipment that will be provided by Wireless Matrix to Sears under such Statement of Work. Sears shall retain the right to purchase Equipment directly from Third Party vendors.

   **3.2    Sale of Equipment.** If Sears purchases any components of Equipment from Wireless Matrix, then Wireless Matrix shall provide to Sears a bill of sale transferring title to such Equipment and any components thereof to Sears free of any liens or encumbrances. Wireless Matrix shall represent and warrant in such bill of sale that to the best of its knowledge, the Equipment and any components thereof are entirely new. Each Equipment component must be marked by a serialization process. Wireless Matrix shall maintain and update a single, integrated electronic list of Sears Equipment serial numbers and provide the initial list to Sears upon delivery of the Equipment. All Equipment purchased under this Agreement shall include the original manufacturer's warranty.

   **3.3    Delivery of Equipment.** Wireless Matrix shall cause the Equipment to be delivered to Sears designated destination location on the date specified by Sears. All costs associated with delivery of the Equipment including, without limitation, freight, rigging, warehousing, and insurance shall be prepaid add by Wireless Matrix.

   **3.4    Title, Risk of Loss; Payment Terms.** Title to any Equipment acquired by Sears from Wireless Matrix shall remain vested in Wireless Matrix until the Equipment has been certified to operate in accordance with the applicable manufacturer's specifications at a Sears

Authorized Users facility. Upon delivery to destination defined by Sears payment shall be made in 45 days to Wireless Matrix, Wireless Matrix shall issue the bill of sale referenced in **Section 3.2**, for the applicable Equipment components. Risk of damage or loss to the Equipment shall pass to Sears after possession transfers to Sears, provided, however, that Wireless Matrix shall remain responsible for damage or loss to Equipment caused by its employees, agents and subcontractors.

    *3.5*    *Site Preparation*. At least thirty (30) calendar days prior to delivery of Equipment to an installation site, Wireless Matrix shall provide to Sears the prescribed specifications and guidelines for proper installation and operation of the Equipment. At Sears election, Wireless Matrix shall either (i) consult with Sears so that Sears may prepare the installation or location; or (ii) prepare the installation location itself in accordance with such specifications and guidelines for the Equipment as Wireless Matrix or the applicable manufacturer may reasonably direct.

## 4.0    SOFTWARE

    *4.1*    *License Grant*. Wireless Matrix grants to Sears and its Affiliates a non-exclusive, worldwide, fully paid up, multi-site, perpetual and irrevocable (except as expressly provided herein) license to use and copy, subject to **Section 4.2** below, the Software identified in the applicable Statement of Work, which shall include, without limitation, all Software, Third Party Software, Documentation and, upon the delivery of the Deposit Materials and/or Additional Deposits in accordance with the terms set forth in the Source Code Escrow Agreement, all Source Code. No right of sublicense is granted to Sears, provided, however, that Sears may permit Authorized Users, Third Party vendors, outsourcers and other service providers to access and/or use, but not to copy the Software pursuant to the rights granted to Sears and its Affiliates hereunder on behalf, and for the benefit, of Sears as agreed to between Sears and such Third Parties. The applicable Statement of Work may be updated from time to time to reflect additional Software licensed by Sears. The license granted herein shall be for use of the Software in object code format only, and shall include (and the terms and conditions of this Agreement shall apply to) any upgrades, updates, bug fixes or modified versions (collectively **"Upgrades"**) or backup copies of the Software licensed or provided to Sears by Wireless Matrix.

    *4.2*    *Copies*. Sears may copy the Software, Documentation and, upon the delivery of the Deposit Materials and/or Additional Deposits in accordance with the terms set forth in the Source Code Escrow Agreement, the Source Code, as required for backup, archival, disaster recovery, testing, training, development and/or other similar purposes, and such copies may be stored off-site and shall not be included in determining the number of copies in use by Sears under any per-copy license or pricing arrangement. Sears shall not remove any copyright notices or other proprietary notices appearing in the Software, Source Code or Documentation. If Sears loses or damages the media containing the Software, Documentation or, upon the delivery of the Deposit Materials and/or Additional Deposits in accordance with the terms set forth in the Source Code Escrow Agreement, the Source Code, Wireless Matrix shall provide replacement copies of such Software, Documentation and, upon the delivery of the Deposit Materials and/or Additional Deposits in accordance with the terms set forth in the Source Code Escrow Agreement, the Source Code, at no additional charge. Sears shall maintain and reproduce all copyright and other

proprietary notices on all copies, in any form, of the Software in the same form and manner that such copyright and other proprietary notices are included on the Software

**4.3    No Reverse Engineering.**  Sears shall not reverse engineer the Software in any manner except as reasonably required to interface the Software and/or System with other software or systems used by Sears, or as otherwise permitted under applicable law including, without limitation, U.S. copyright laws; provided, however, that Sears shall have the right to change, alter, modify and adapt the Source Code (and compile such modified Source Code) if the Deposit Materials and/or Additional Deposits are released to Sears in accordance with the terms of the Source Code Escrow Agreement, attached as **Exhibit 4.4.**

**4.4    Source Code Escrow Agreement.**  Wireless Matrix, at the request of Sears or as otherwise set forth in the applicable Statement of Work, either shall: (a) provide directly to Sears Source Code and Deposit Materials and/or Additional Deposits to all Software licensed to Sears hereunder; or (b) deposit Source Code and Deposit Materials and/or Additional Deposits to all Software licensed to Sears hereunder pursuant to the terms of the Source Code Escrow Agreement attached as **Exhibit 4.4,** a copy of which shall be executed by the parties concurrently with the parties' execution of this Agreement.  In the event Wireless Matrix fails to provide to Sears or deposit in escrow all the Source Code and Deposit Materials and/or Additional Deposits within the time frames specified in the applicable Statement of Work or Source Code Escrow Agreement, in its sole discretion, Sears shall have the right, subject to Section 16.4.3, to terminate this Agreement and/or the applicable Statement(s) of Work in accordance with **Article 16** and/or withhold payment of any and all monies that may be owed to Wireless Matrix until such time as Wireless Matrix complies with the terms of this Section; provided, however, that Sears election of its right to withhold the payment of monies owed to Wireless Matrix as provided herein shall not constitute a waiver of Sears right to later, subject to Section 16.4.3, terminate this Agreement and/or the applicable Statement(s) of Work in accordance with the terms of **Article 16.**  In the event Sears elects to withhold payment of such monies, Wireless Matrix's obligations hereunder shall continue unabated during such period.

**4.5    New Locations.**  Sears shall have the right to transfer, at any time, without prior notice to or consent of Wireless Matrix, the Software, Documentation and, upon the delivery of the Deposit Materials and/or Additional Deposits in accordance with the terms set forth in the Source Code Escrow Agreement, the Source Code, to any location which is owned or controlled by Sears or by any Sears Affiliates, subsidiaries, divested entities, third party disaster recovery providers or outsourcers, so long as such transfer does not violate any restriction set forth in the Applicable Statement of Work.

**4.6    Sears Affiliates.**  Notwithstanding anything herein to the contrary, any of Sears Affiliates may access and utilize Sears CPU(s) and/or use the Software and/or System at no additional cost.  Furthermore, Affiliates of Sears may order additional copies of the Software at additional cost to Sears, provided that each Affiliate ordering hereunder agrees to be bound by the terms and conditions of this Agreement.  If any Affiliate of Sears orders additional copies of the Software, such order shall constitute a separate license agreement incorporating all the terms

and conditions hereof, and the ordering entity shall be considered *"Sears"* hereunder for the purpose of such order.

## 5.0   SERVICES

### 5.1   Implementation Services.

**5.1.1   Resources Commitment.**   From the Effective Date until Successful Implementation (as defined in Section 7.4 below) of each Project, Wireless Matrix shall make available sufficient Wireless Matrix personnel who are, in Sears reasonable discretion, qualified and competent, and such other resources as are necessary to complete the implementation of each Project in accordance with the applicable Statement of Work and the Implementation Workplan, as defined below. Wireless Matrix shall make such resources available during non-business hours as necessary to complete the implementation of each Project in accordance with the Implementation Workplan. All implementation Services performed by Wireless Matrix will be payable at the Service Rates (as defined in Section 10.3 below) in accordance with the payment provisions set forth in the applicable Statement of Work.

**5.1.2   Implementation Workplan.**   The parties shall develop a detailed workplan for the implementation of each Project ("*Implementation Workplan*") and shall attach such Implementation Workplan to the applicable Statement of Work. The Implementation Workplan shall include as applicable: (a) identification of all milestone events and interdependent milestone events; (b) identification of all critical path milestones ("*Critical Path Milestones*") and the commencement and completion dates for such Critical Path Milestones; (c) a detailed description of all activities to be performed by Wireless Matrix and Sears, including the party responsible for and the location of such activities; (d) the number of Wireless Matrix personnel-hours required to perform each activity; (e) a detailed description of all activities, if any, to be performed by Third Parties including task and sub-task activities; and (f) commencement and projected end dates for Unit and Integration Testing (as defined in Sections 7.2 and 7.3 below, respectively). The commencement and completion dates for Critical Path Milestones and any payment milestones shall not be changed except in accordance with **Section 5.1.4.**

**5.1.3**    ***Implementation Delays***.  If Sears reasonably determines that Wireless Matrix is likely to fail to meet a Critical Path Milestone, or if Wireless Matrix has failed to meet a Critical Path Milestone, and it is reasonably determined that the delays are attributable solely to Wireless Matrix or its third party provider, then in addition to any other rights and remedies that may be available to Sears as provided in this Agreement, at no additional cost to Sears and at Sears option, Wireless Matrix shall add additional Wireless Matrix personnel to the Project to accelerate performance as may be necessary to timely achieve the Critical Path Milestone or, if Wireless Matrix has already failed to meet one (1) or more Critical Path Milestones, to complete the Critical Path Milestone within a re-adjusted time frame established by Sears.  In addition, upon the failure of Wireless Matrix to meet one (1) or more Critical Path Milestones, Sears shall be entitled to receive late charges from Wireless Matrix in an amount equal to one (1) percent (1%) of the total fees for the Software, Equipment and Telecommunication Services under the applicable Statement of Work per week for each week to a maximum of 5 weeks a Critical Path Milestone has been missed; however, if Wireless Matrix continues to fail after five weeks, Sears will have the option to terminate this agreement; or if Wireless Matrix accelerates its performance and completes the implementation on schedule then no late charges will be assessed.  Such late charges shall be calculated upon, and paid by Wireless Matrix or credited to Sears within thirty (30) calendar days of Successful Implementation of the Software and Equipment.  In addition to the foregoing, Sears shall be entitled to withhold any and all payments due from Sears to Wireless Matrix until such Critical Path Milestone is achieved.  Notwithstanding any of the foregoing, Wireless Matrix shall not be obligated to provide additional personnel or to pay late charges to Sears as provided in this Section if and to the extent that, Wireless Matrix's failure to achieve a Critical Path Milestone is caused by Sears failure to perform any obligation that is identified in the Implementation Workplan as a precondition to Wireless Matrix's ability to timely achieve such Critical Path Milestone.

**5.1.4**    ***Change Order Procedure***.  If either party believes that a change in the Implementation Workplan or any Custom Programming Order (whether in time frames, costs or deliverables) is necessary or desirable, such party shall submit a written change request to the other (a "***Change Request***").  In the event of a Sears-initiated Change Request, within five (5) business days of Wireless Matrix's receipt of such Change Request, Wireless Matrix shall provide to Sears a written statement describing in detail:  (a) the estimated impact on performance, if any, and the modifications to the Software, Equipment or Sears computer system that will be required as a result of the Change Request including, without limitation, changes in Software, Equipment and Services; (b) the estimated effect of the Change

Request on the applicable Implementation Workplan including any impact on any Critical Path Milestone dates; and (c) an estimate of the cost to implement each Change Request (collectively, the *"Change Response"*). Should Wireless Matrix require more than five (5) business days to provide the written statement summarizing the estimated impact of the change, it shall immediately notify Sears of the delay and provide a firm date for delivery of the statement. If Wireless Matrix submits a Change Request to Sears, such Change Request shall include the information required for a Change Response. Sears shall accept or reject any Change Response or Wireless Matrix-initiated Change Request, as applicable, within five (5) business days after receipt of same from Wireless Matrix. If Sears accepts a Change Response or Wireless Matrix-initiated Change Request in writing, such Change Response, together with Sears Change Request, or such Wireless Matrix-initiated Change Request, shall be deemed to be a *"Change Order"* and shall become part of this Agreement and/or the applicable Statement of Work. If Sears rejects Wireless Matrix's Change Response or Wireless Matrix-initiated Change Request, then Sears and Wireless Matrix shall proceed to fulfill their respective obligations under this Agreement.

**5.2    *Know-How Transfer*.**  During the term of this Agreement, Wireless Matrix shall perform Services, at no additional cost to Sears, for the purpose of transferring knowledge, ideas, concepts, information and the like regarding the Software, Equipment, Documentation and the Source Code in order that Sears-identified employees will become self-reliant with respect to the day-to-day operation of the System and will be able to develop and implement all necessary interfaces with the System (*"Know-How"*).  As required or necessary, but not less frequently than quarterly, Wireless Matrix shall provide to Sears any and all updated, changed or revised policies, practices, procedures, processes and/or techniques with respect to any Know-How transferred hereunder.  The transfer of Know-How may include, but shall not be limited to, attendance by Sears-identified employees at Wireless Matrix's training programs that relate to the System.  Such training services, but not other Know-How transfer services, shall be payable at the applicable training rates set forth in the applicable Statement of Work.  In addition, Wireless Matrix's transfer of Know-How shall include information and/or programs, tools and other materials, which may include knowledge relating to the following:

5.2.1    Data files, file and data definitions and relationships, data definition specifications, data models, interfaces, program architecture, program structure, sequence and organization, screen displays, reference and user manuals, design and functional specifications relating to the System;

5.2.2    Maintenance, support utilities and tools relating to the System;

5.2.3    Security requirements and methodologies relating to the System; and

5.2.4    Such other material to which the parties mutually agree in writing.

**5.3    APIs.** Wireless Matrix acknowledges that Sears has multiple systems, equipment and software in use and that Sears use of the System may involve the use of one or more APIs between such software and systems and the System. Wireless Matrix agrees that it will cooperate and work with Sears and, if necessary, Third Parties, as reasonably required to interface the System with other systems, equipment and software used by Sears. Sears, Sears Affiliates, and any of Sears Authorized Users shall have the right to access the Documentation, data base structures, data models, data schema, table structures, object libraries and other data and other elements of the System and, upon the delivery of the Deposit Materials and/or Additional Deposits in accordance with the terms set forth in the Source Code Escrow Agreement, the Source Code as required for such purposes. In the event Wireless Matrix must program or develop an API, such API development shall be considered Custom Programming and shall be developed in accordance with the terms set forth in **Section 5.4.)**

**5.4    Custom Programming.** Sears may request that Wireless Matrix develop Custom Programming including, without limitation, additional APIs. Upon receipt of such request, Wireless Matrix shall prepare and submit to Sears a written proposal that includes the items required to be included in a Change Response, as set forth in **Section 5.1.4,** and that describes the functionality, interoperability and performance of the requested Custom Programming and one or more Critical Path Milestones for completion of the Custom Programming. If Sears accepts, in writing, Wireless Matrix's written response, such written response, together with Sears written request, shall be deemed a **"Custom Programming Order"** and shall become part of this Agreement or the applicable Statement of Work. Wireless Matrix shall perform the Custom Programming in accordance with the terms of each Custom Programming Order and this Agreement. Sears shall have the right, subject to Section 16.4.3, to terminate any Custom Programming Order upon written notice to Wireless Matrix. In such event: (a) Wireless Matrix shall discontinue Custom Programming Services and deliver the then-current Custom Programming; and (b) Sears shall pay to Wireless Matrix the cost of any such Services provided, pro-rated, as appropriate, for any fixed-fee Custom Programming Order, and the cost of the actual expenses incurred by Wireless Matrix as of the date of termination. Any Custom Programming shall be compliant with the Sears System Development Methodology (**"SSDM"**) and shall use SSDM templates where they are associated with any Custom Programming as required in support of the Statement of Work.

**5.5    Training.** Upon Sears request, Wireless Matrix shall provide Sears with training on the use and operation of the System at Sears facilities. Sears shall pay Wireless Matrix the fees set forth in the applicable Statement of Work for such training.

**5.6    Compatible Products.** Wireless Matrix shall provide Sears, to the extent available, a listing of all non-Wireless Matrix hardware and software components that may be used by Sears to operate with any Software or Equipment (**"Compatible Products"**) without adversely affecting the representations, warranties and covenants contained in **Article 8.** Such Compatible Products shall include new Third Party hardware and software components that Wireless Matrix may add or certify from time to time. In the event Sears wants to certify any Sears-supplied product (**"Sears-Supplied Product"**) as a Compatible Product, Sears shall submit

a Change Request to Wireless Matrix pursuant to **Section 5.1.4,** and submit such Sears-Supplied Product to Wireless Matrix for testing and certification. Wireless Matrix shall not unreasonably withhold its certification of any Sears-Supplied Product.

### 5.7    *Telecommunications Services.*

  *5.7.1    **Services.*** Wireless Matrix shall provide Sears the Services specified in the applicable Statement of Work (the "Telecommunications Services") in accordance with the mutually agreed upon service level requirements set forth in **Schedule 9.1.**

  *5.7.2    **Additional Services.*** If Sears desires to add locations or service options not listed in the applicable Statement of Work, the parties may amend the Statement of Work by executing an instrument in writing, signed by both parties, and attaching such amendment to the applicable Statement of Work.

  *5.7.3    **Regulatory Change.*** In the event changes in federal, state or local law, regulation or ordinance materially alter the rights of either party under this Agreement, or make any obligation under this Agreement impossible to perform, the parties will negotiate in good faith to amend this Agreement to achieve the parties' intent; provided, however, that failure to reach a new agreement will be grounds for either party to terminate this Agreement, in this instance, without penalty upon One Hundred Eighty (180) days notice to the other party, subject to Section 16.4.3.

## 6.0    *SHIPPING AND INSTALLATION*

  *6.1    Packaging, Labeling, Shipping and Billing and Applicable Laws.* Wireless Matrix shall provide packaging, labeling, packing, shipping and insurance for the products. Wireless Matrix shall obtain all licenses, permits and approvals required by any government and shall comply with all applicable laws, rules, policies and procedures including requirements applicable to shipping and to the use of products under telecommunications and other laws and regulations, of any government where the products are to be used (collectively *"Applicable Laws"*).

  *6.2    Shipping Dates.* Wireless Matrix and Sears shall establish ship dates in Statement Of Work. Shipping dates shall coincide with Sears' requested date. Wireless Matrix shall use commercially reasonable efforts via electronic posting, to publish then-current lead times for products. If the shipping date for a product is subsequent to the date that may be designated by Sears on the Purchase Order as the latest acceptable shipping date for such product, then Sears shall have the right to cancel the Purchase Order with respect to such product as defined in Section 16.2.1. Unless given written instruction by Sears, Wireless Matrix shall select the carrier.

  *6.3    Cancellation and Rescheduling of Shipping.* Sears has the right to defer product shipment for up to thirty (30) days from the scheduled shipping date, provided written notice is

received by Wireless Matrix at least thirty (30) days before the originally scheduled shipping date.

**6.4    *Risk of Loss*.** All risk of loss or damage to products shall remain with Wireless Matrix through transfer of title.

**6.5    *Installation*.** Sears, at its option, may order and Wireless Matrix may accept such order to provide Services for product installation all pursuant to the particular Statement of Work executed by the parties. Fees for such Services shall be set forth in the applicable Statement of Work.

## 7.0    *TESTING AND ACCEPTANCE*.

**7.1    *Test Plan*.** Wireless Matrix shall be responsible for testing the System in accordance with a test plan to be mutually developed and agreed to by the parties ("*Test Plan*"). The Test Plan will incorporate testing methodologies to confirm that the System operates in accordance with the Documentation and the technical specifications applicable to the System to be delivered by Wireless Matrix (collectively, the "*Specifications*"). The Test Plan will be developed in accordance with the time frame specified in the applicable Implementation Workplan, and the date to complete development of the Test Plan shall be, unless otherwise agreed to by the parties, a Critical Path Milestone. In addition to the above, each Test Plan shall describe the exact scope, methodologies and procedures (including expected performance results) for testing the System. When approved by Sears in writing, the Test Plan will be attached to and incorporated in the applicable Statement of Work.

**7.4    *Successful Implementation*.** Following Provisional Acceptance, Wireless Matrix shall cooperate with and assist Sears in preparing for the introduction of the System into a fully live, operational environment ("*Go Live*"). The Go Live period shall not begin until the System is fully installed and operational in accordance with the Documentation and Specifications. Unless otherwise specified in the applicable Statement of Work, Sears shall have a period of not less than sixty (60) calendar days following Go Live to determine, whether the System meets the Published Specifications and Sears needs ("*Successful Implementation Period*"). At any time during this Successful Implementation Period, if Sears desires to return the System, Sears may, at its option, return the System to Wireless Matrix and the applicable Statement of Work shall terminate. If Sears does not provide Wireless Matrix with a non-acceptance notice within the Successful Implementation Period, the System shall be deemed to have been accepted on the last day of the Successful Implementation Period ("*Successful Implementation*").

**7.5    *Post-Successful Implementation Correction of Defects*.** Wireless Matrix shall correct any Defects remaining to be corrected following Successful Implementation in accordance with the Support and Maintenance Services obligations set forth in **Schedule 9.1**.

**7.6    *Failure to Achieve Successful Implementation*.** In the event Wireless Matrix fails to achieve Successful Implementation within the Successful Implementation Period, Sears

shall be entitled to declare the occurrence of an Event of Default and to receive from Wireless Matrix a full refund for all amounts paid to Wireless Matrix including, without limitation, any Software License Fees, Services fees, Support Fees and training fees, and Sears shall have no further obligation to pay any amounts due hereunder.

### 8.0   *REPRESENTATIONS AND WARRANTIES.*

Wireless Matrix warrants and represents to Sears as follows:

**8.1**   *Authority.* That: (a) all materials and Services provided hereunder, including the Equipment and Software (including any Third Party Software), are either owned free and clear of any encumbrances or licensed to Wireless Matrix with the right to sublicense to Sears (in accordance with **Section 4.1**) or are in the public domain, and the lawful use thereof by Sears will not infringe or misappropriate any proprietary rights of any Third Party; (b) Wireless Matrix has full power and authority to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights and licenses granted to Sears in this Agreement; (c) there are no outstanding assignments, grants, licenses, encumbrances, obligations or agreements (whether written, oral or implied) that are inconsistent with this Agreement and the rights granted or transferred herein; and (d) Wireless Matrix's compliance with the terms and conditions of this Agreement, and Sears use of the Equipment, Software, and Services provided hereunder in the normal course of its business, will not violate any federal, state or local laws, regulations or ordinances or any Third Party agreements.   These representations and warranties shall survive the expiration or termination of this Agreement.

**8.2**   *Performance and Functionality.*   That, for the period of time specified in the applicable Statement of Work or, if no time frame for a warranty is specified therein, one (1) year from the date of Successful Implementation (the "*Warranty Period*") and for as long as Sears obtains Support and Maintenance Services in accordance with **Article 9**, the System, Equipment and Software shall contain the functionality, and shall operate in accordance with and conform to, the Documentation and Specifications set forth in the applicable Statement of Work. Such Specifications shall include, without limitation, maximum response times, minimum availability and uptime requirements, minimum system volume and scalability requirements.   Wireless Matrix shall correct any failure of any applicable System component to ensure the System operates in accordance with this warranty, within the warranty period by providing additional Software, Equipment and/or Services to Sears at no additional cost to Sears.   In the event Wireless Matrix is unable to correct such failure within thirty (30) calendar days, Wireless Matrix shall replace the defective Software and/or Equipment with Software and/or Equipment that functions properly, or, at Sears option, refund to Sears within thirty (30) days of the date that Sears notifies Wireless Matrix, all of the fees paid by Sears for the defective Software and/or prorated Equipment and

any related fees for Support and Maintenance Services, Services and/or training, in which case Sears shall have no obligation to pay any fees due to Wireless Matrix for any of the foregoing. If Sears rejects the replacement Software and/or Equipment or requests a refund, then an Event of Default shall be deemed to have occurred and Sears shall be entitled to exercise its other remedies under **Section 16.4.** Upon return of the fees set forth above, Sears shall return or destroy the Software and the applicable Statement of Work shall terminate. (

8.3     *Quality.*   That Wireless Matrix shall perform all Services:   (a) in a good, workmanlike and professional manner using people fully familiar with the System; (b) in accordance with the Implementation Workplan; and (c) in compliance with all applicable laws, regulations, orders and decrees.

8.4     *Infringement.*   That there is no action, suit, claim, investigation or proceeding pending, or to the best of Wireless Matrix's knowledge, threatened against, by or affecting Wireless Matrix or the System which, if adversely decided, might adversely affect:  (a) Wireless Matrix's ability to enter into this Agreement; (b) Wireless Matrix's performance of its obligations herein; or (c) Sears use of the System. Wireless Matrix further represents and warrants that it does not know of any basis for any such action, and that the System and the manner in which Wireless Matrix has conducted its business do not, and shall not, constitute an infringement or misappropriation of any patent, trademark, trade name, service mark, copyright, trade secret or other intellectual property or proprietary right of any Third Party.

8.5     *Century Compliance.*   That the century change is, and shall be, supported in the Software's logic and data, and that the System shall support the use, entry or creation of dates prior to, on, after or spanning January 1, 2000, so that when such a date is processed (including by way of calculation, comparison, sequencing, display, storage or otherwise), entered into, or is intended to be generated as a result of the operation of the System, the System shall not:  (a) fail or produce incorrect date results; or (b) cause any other programs, hardware or system to fail or to generate errors.

8.6     *No Unauthorized Code.*   That to the best of Wireless Matrix's knowledge, the System will be free, at the time of receipt by Sears, of any Unauthorized Code, and that Wireless Matrix shall not at any time knowingly or intentionally activate or permit the activation of, any Unauthorized Code.

8.7     *Documentation.*   That it will provide to Sears all Documentation required to operate and maintain the System and that such Documentation is detailed and complete and accurately describes the functional and operational characteristics of the System. Wireless Matrix further represents and warrants that it will provide to Sears updated versions of all such Documentation when it provides Sears with Enhancements or Upgrades to the System and/or Custom Programming and that

all such updated Documentation will be complete and accurate and will be at least as detailed as the Documentation issued to Sears with the initial version of the System.

**8.8**    *Pass-Through.*   Wireless Matrix hereby assigns to Sears all assignable warranties, representations and indemnities granted to Wireless Matrix by Third Parties in the Third Party Software and Embedded Third Party Software or any components thereof, and all remedies for breach of such warranties, representations and indemnities. To the extent that Wireless Matrix is not permitted to assign any of such warranties and indemnities to Sears, Wireless Matrix shall enforce such warranties and indemnities on behalf of Sears to the extent Wireless Matrix is permitted to do so under the terms of the applicable Third Party agreements.

**8.9**    *No Custom Programming Required.*   That the System is, as of the Effective Date, functionally and otherwise capable of meeting Sears business needs without the necessity of performing Custom Programming or otherwise enhancing or upgrading the System.

**8.10**    *Third Party Software Licenses.*   That no additional Third Party Software licenses or license fees other than those specifically itemized in the applicable Statement of Work(s) are required in order for Sears and its Authorized Users to operate the System, including, without limitation, the Web-based versions of the Software, in accordance with the Documentation and Specifications.

**8.11**    *Disclaimer.* **SUBJECT TO THE FOREGOING, WIRELESS MATRIX DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT.**

**8.12**    *Sears Representations and Warranties.*   Sears has full power and authority to enter into this Agreement and to carry out its obligations under this Agreement.

**9.0.**    *SYSTEM MAINTENANCE AND SUPPORT.*

     **9.1**    *General.*   During the Warranty Period and thereafter for as long as Sears desires to receive Support and Maintenance Services, Wireless Matrix shall provide the Support and Maintenance Services set forth in **Schedule 9.1** and the applicable Statement of Work.

     **9.2**    *Term and Termination.*   Support and Maintenance Services shall be provided for one (1) year terms. Sears shall have the right to renew the initial free support and maintenance period (*i.e.* the Warranty Period) for successive one-(1) year terms for a fee defined in the Statement of Work and activated upon written notice to Wireless Matrix prior to the expiration of the then-current term. Wireless Matrix shall not discontinue its Support and Maintenance Services for a period of five (5) years from Successful Implementation of the System (the "Support Period"). Sears shall have the right to discontinue receiving Support and Maintenance

Services at any time upon thirty-(30) calendar days' notice to Wireless Matrix. In the event of such termination by Sears, Sears shall receive a proportional refund of any prepaid but unused Support Fees. Subsequent to any such termination, but prior to the end of the Support Period, Sears may, at its option, reinstate the Support and Maintenance Services for a reinstatement fee defined in the Statement of Work and by providing notice to Wireless Matrix. Wireless Matrix shall be entitled to increase the Support Fees upon reinstatement over the Support Fees in effect at the time of Sears earlier termination by no more than the aggregate amount that Wireless Matrix would have been permitted to increase Sears Support Fees over the same period pursuant to the applicable Statement of Work had Sears not terminated Support and Maintenance Services as defined in the Statement of Work.

**9.3    Support Fees.** Support and Maintenance Services shall be provided at the rates set forth in the applicable Statement of Work ("*Support Fees*"). All warranty Support and Maintenance Services provided during the Warranty Period shall be provided at no cost or fees to Sears.

## 10.0    COMPENSATION; PAYMENT.

**10.1    Invoices, Time and Method of Payment.** All fees payable to Wireless Matrix under this Agreement shall be detailed, categorized and clearly stated on an invoice in a form provided by Sears and in accordance with the terms and conditions set forth in this **Section 10.1.** Except as provided in the applicable Statement of Work, Wireless Matrix shall invoice Sears, on a monthly basis and Sears will pay all undisputed and properly invoiced amounts set forth in such invoices within forty-five (45) calendar days after receipt of a proper and correct invoice. In the event of a dispute with regard to any portion of an invoice, the undisputed portion will be paid as provided herein. Sears agrees to identify in writing all disputed costs immediately upon notice and the parties agree to provide necessary support to resolve all disputed costs in a reasonable timeframe, which shall not exceed thirty (30) days from the date of notice. All amounts payable under this Agreement shall be payable in U.S. Dollars. Wireless Matrix shall submit all invoices to the following address:

> Sears, Roebuck and Co.
> 3333 Beverly Road, Mail Station E5-240B
> Hoffman Estates, Illinois 60179
> Attention: Project Director - Hand Held Terminal

or to such other address as may be specified by Sears upon notice to Wireless Matrix. Each invoice must reference the applicable purchase order number and, if available, the Project number identified in the applicable Procurement Document.

**10.2    License and Support Fees for Software.** Wireless Matrix shall invoice Sears for the Software license fees upon Successful Implementation unless otherwise set forth in the applicable Statement of Work. All Support Fees shall be separately stated in invoices sent by Wireless Matrix to Sears. Sears agrees to pay any undisputed and properly invoiced Software License Fees and Support Fees within forty-five (45) calendar days after receipt of a properly stated invoice. Sears agrees to identify in writing all disputed costs immediately upon notice and

the parties agree to provide necessary support to resolve all disputed costs in a reasonable timeframe, which shall not exceed thirty (30) days from the date of notice.

**10.3    *Time and Expenses for Consulting Services*.**  Sears shall pay Wireless Matrix for Services on a time-and-materials basis which shall not exceed the service rates set forth in the applicable Statement of Work (*"Service Rates"*) which sets forth the complete list of Wireless Matrix's Service Rates.    Wireless Matrix shall invoice Sears for Services fees only upon completion of each of the milestones set forth in the applicable Statement of Work (*"Service Fee Payment Milestones"*).    Upon the successful completion of a Service Fee Payment Milestone, Sears agrees to pay any undisputed and properly invoiced Service fees for any Services completed before such Service Fee Payment Milestone within forty-five (45) calendar days after receipt of a properly stated invoice.   Unless otherwise specified in the applicable Statement of Work, in addition to the rates described in the applicable Statement of Work, Sears shall reimburse Wireless Matrix for:

> **10.3.1** Reasonable travel and living expenses of Wireless Matrix incurred on approved travel authorized by Sears for which Sears has given its prior authorization; provided, however, that all travel expenses of Wireless Matrix are incurred in accordance with Sears travel expense policy in effect at the time such travel occurs.   Reasonable travel expenses means the amount per mile allowed by the United States Internal Revenue Service (**"IRS"**) when personal vehicles are used and tourist class rates when commercial air travel is used, unless otherwise authorized by Sears. Wireless Matrix shall maintain records of its expenses and reimbursable items pertaining to Services on a generally recognized accounting basis; these records shall be made available to Sears upon request.    Unless approved in advance by Sears, there shall be no reimbursement for the commuting expenses incurred by Wireless Matrix's employees, agents and contractors in commuting to Sears headquarters or other Sears locations to perform Services.

> **10.3.2** Subject to the prior written approval of Sears, purchase costs or license fees for any Third Party Software tools required to provide Services hereunder.    Such purchases and licenses shall become the property of Sears upon completion of Services rendered pursuant to this Agreement. Wireless Matrix shall submit to Sears an estimate of all expected Third Party costs prior to commencement of Services hereunder.

**10.4    *Fees and Charges for Telecommunication Services*.**  Sears shall pay for the Services according to the charges set forth in the applicable Statement of Work. Sears shall pay all undisputed charges owing under this Agreement within forty-five (45) days from the date Sears receives a written invoice from Wireless Matrix or such later date if testing and acceptance are performed.    The payment of any invoice by Sears shall not constitute a waiver of Sears' right to subsequently

dispute the validity of any charge under this Agreement. Sears agrees to identify in writing all disputed costs immediately upon notice and the parties agree to provide necessary support to resolve all disputed costs in a reasonable timeframe, which shall not exceed thirty (30) days from the date of notice.

***10.4.1 Rate Assurance.*** If Sears is offered a service proposal from a provider of Telecommunications Services otherwise acceptable to Sears that is (i) comparable to the Services provided under this Agreement, and (ii) priced at least five (5) percent less than the Services provided to Sears by Wireless Matrix under this Agreement (a "Qualifying Offer"), then Sears will give Wireless Matrix notice of the Qualifying Offer, including the rates and other terms of the Qualifying Offer, within the limits of confidentiality obligations arising from the third-party offer (the "Notice of Offer"), and Wireless Matrix shall have the option to respond to such Qualifying Offer as provided herein. If Wireless Matrix chooses to respond to a Qualifying Offer, it shall so notify Sears and shall deliver its responsive proposal (the "Counteroffer") to Sears within ten (10) business days from the date of the Notice of Offer. If Wireless Matrix's Counteroffer contains rates and terms that are equal or superior to those of the Qualifying Offer, this Agreement shall continue in effect at the new rates and terms until its expiration or termination. If Wireless Matrix does not make a Counteroffer, or Wireless Matrix's Counteroffer does not contain rates and terms equal or superior to the Qualifying Offer, Sears may terminate this Agreement with no termination liability at any time after ninety (90) days from the date of the Notice of Offer.

## 10.5 Taxes.

***10.5.1 Generally.*** Sears shall pay all sales and use taxes resulting from this Agreement.

***10.5.2 Taxes on Software.***

(a)    Sears has limited duplication rights with respect to the Software, although Sears can make a limited number of backup copies for its internal use. Furthermore, Sears is limited to the uses for the Software specified in this Agreement.

(b)    Sears is prohibited from licensing, sublicensing, or transferring the Software to a Third Party (other than a related Third Party).

(c)    Wireless Matrix will provide a new copy of the Software to Sears at minimal or no charge if Sears loses or damages the Software.

(d)    If the license granted under this Agreement is not a perpetual license, then Sears must destroy or return all copies of the Software

to Wireless Matrix upon the termination of or at the end of the license period.

(e)    Because the Software license and Equipment acquisition under this Agreement satisfies section 86 Illinois Administrative Code 130.1935(a)(1), no sales tax will be due on charges in connection with this Agreement for any software licensed for use in Illinois, , as this transaction is not considered a taxable retail sale. Furthermore, no sales tax will be shown on any invoice with respect to charges for the license of Software, as no sales tax is due.    Furthermore, all Services, including but not limited to maintenance, telephone support, training and implementation will be separately stated on any invoices sent by Wireless Matrix, specifying what the Services consist of, and in which state the Services will be performed.

**10.5.3 Taxes on Wireless Communications.**  All taxes assessed on wireless communication pursuant to this Agreement will be sourced to Sears place of primary use.  Sears place of primary use is defined to be 3333 Beverly Road, Hoffman Estates, IL 60179.  Because Sears place of primary use is located in an Illinois Enterprise Zone, and Sears has met the requisite criteria to qualify for the exemption of the state telecommunications excise tax, no state telecommunications excise tax shall be assessed against Sears with respect to charges for wireless communication.  If requested, Sears shall supply Wireless Matrix with the appropriate tax exemption certificate.

**10.6    Late Payments.**  All overdue invoices of Wireless Matrix shall bear interest thereon at the then current three (3) year treasury bill rate, not to exceed Sears cost of borrowing, until paid.

## 11.0    OWNERSHIP

**11.1    Software.**  Subject only to the license granted pursuant to this Agreement, title to the Software shall at all times remain with Wireless Matrix (or, with respect to Third Party Software, the applicable Third Party).

**11.2    Custom Programming and Developments.**  All Deliverables, Statements of Work for Consulting Services, concepts, works, information, data, computer programs, Custom Programming, program materials, flow charts, notes, outlines and other ideas and materials developed, invented, prepared or discovered by Wireless Matrix or any of its employees, agents or contractors, either alone or in collaboration with others, which relate to the actual or anticipated activities, business or research of Sears, which result from or are suggested by any work Wireless Matrix may do for Sears, or which result from use of Sears premises or property (collectively, the **"Custom Programming Materials"** or **"Developments"**) and any trademark, trade secret, copyright, patent, common law right, title or slogan or any other proprietary right

("*Proprietary Rights*") in such Custom Programming Materials or Developments shall be the sole property of Sears. Wireless Matrix shall assign to Sears Wireless Matrix's entire right and interest in any such Custom Programming Materials or Developments, and will execute any documents in connection therewith that Sears may reasonably request; provided that to the fullest extent permissible by applicable law, any and all copyrightable aspects of the Customer Programming Materials or Developments shall be considered "works made for hire." Wireless Matrix shall enter into agreements with all of its employees, agents and contractors necessary to establish and assign to Sears sole ownership in the Custom Programming Materials or Developments, and Wireless Matrix agrees to provide Sears with copies of such agreements as they are executed. Wireless Matrix hereby appoints Sears as its true and lawful attorney-in-fact with the right to execute assignments of and to register any and all rights to the Custom Programming Materials or Developments. This appointment is coupled with an interest and shall survive termination of this Agreement. The foregoing does not apply to any derivative works, or inventions that Wireless Matrix made prior to Wireless Matrix performing work for Sears, or to any inventions that Wireless Matrix develops without using any of Sears equipment, supplies, facilities or Confidential Business Information and/or Confidential Personal Information and that do not relate to Sears business or research, or the Services Wireless Matrix performs for Sears. Wireless Matrix hereby grants to Sears a perpetual, irrevocable, non-exclusive right and license, with the right to sublicense, to use all materials, software, technology, data or other goods or services, that are not Custom Programming Materials or Developments but that are required to use fully and completely the Services, Software, Equipment, Custom Programming and Developments. Wireless Matrix shall not provide to Sears any materials that are not Custom Programming Materials or Developments for which Wireless Matrix does not have the right to make the foregoing license.

**11.3    General Knowledge.**  This Agreement shall not preclude Wireless Matrix from using its general knowledge, skills and experience for its other clients, provided that Wireless Matrix does not use in connection therewith any Developments or Confidential Business Information and/or Confidential Personal Information.

**11.4    Incomplete Custom Programming and Developments.**  At all times during the term of this Agreement, upon request from Sears or upon termination or expiration of this Agreement, Wireless Matrix shall immediately provide to Sears the then-current version of any Custom Programming and Developments in Wireless Matrix's possession.

**11.5    Sears Data.**  Wireless Matrix understands and acknowledges that Sears shall have the right to, among other things: (a) manage, modify, maintain and update pre-existing data and information; and (b) generate, manage, modify, maintain and update additional data and information (collectively, "*Sears Data*") using the System. Sears Data shall be treated as Sears Confidential Business Information and/or Confidential Personal Information, as the case may be, and Sears shall retain all right, title and interest in and to all Sears Data.

**11.6    Sears Interfaces.**  Sears shall have the right to interface the System and to use it in conjunction with other software, programs, routines and subroutines developed or acquired by Sears. Wireless Matrix shall have no ownership interest in any other software, program, routine

or subroutine developed by Sears or acquired by Sears from a Third Party by virtue of its having been interfaced with or used in conjunction with the System.

**11.7    No Liens.** Wireless Matrix and its affiliates shall not file, or permit to be filed by any person or entity acting through Wireless Matrix, any mechanics' or other lien, or notice creating such lien, or claim or action thereon for Software, Equipment, Services or Custom Programming under this Agreement. Where applicable, Wireless Matrix shall, upon request of Sears, deliver to Sears, contemporaneously with any payment, recordable partial waivers of lien for any partial payments, and a recordable final waiver of lien for the final payment.

## 12.0    PERSONNEL.

**12.1    Independent Contractor.** The relationship of Wireless Matrix and its personnel to Sears shall be that of an independent contractors and nothing set forth in this Agreement shall be deemed or construed to render the parties as joint venturers, partners or employer and employee. All persons Wireless Matrix furnishes to provide Services to Sears shall be the employees or, subcontractors of Wireless Matrix and shall be neither the employees nor agents of Sears. Wireless Matrix and its personnel are not eligible to participate in any employment benefit plans or other benefits or conditions of employment available to Sears employees. Wireless Matrix shall have exclusive control over its personnel and over the labor and employee relations, and the policies relating to wages, hours, working conditions or other conditions of its personnel. Wireless Matrix shall have the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, discharge and adjust grievances with its personnel. At any time, however, Sears shall have the right to require Wireless Matrix to remove from any Sears project any personnel objectionable to Sears, acting reasonably, for any reason not prohibited by law.

**12.2    Employment.** Wireless Matrix will be solely responsible for all salaries and other compensation of its personnel who provide Services to Sears. Wireless Matrix will be solely responsible for making all deductions and withholdings from its employees' salaries and other compensation, and for the payment of all contributions, taxes and assessments and will comply with all other requirements of federal or state laws or regulations regarding conditions of employment, including, without limitation, federal or state laws or regulations regarding minimum compensation, unemployment compensation, Social Security, overtime, hours of work and equal opportunities for employment.

**12.3    Staffing.** Wireless Matrix will consult with Sears on all personnel decisions which relate to each Project, and will staff each Project with personnel possessing sufficient skill, experience and ability to perform the Services required to comply with the Implementation Workplan. Sears shall have the absolute right, acting reasonably and for any reason not prohibited by law, to approve or reject any personnel prior to assignment on a specific Project.

**12.4    Key Personnel.** If requested by Sears, Wireless Matrix shall identify its key individuals (including Wireless Matrix's employees, agents and subcontractors ("**Key Personnel**")) in the applicable Statement of Work or writing, which writing(s) shall be

incorporated as part of this Agreement and/or the applicable Statement of Work. Sears reserves the right to approve or reject the appointment of and replacements for all Key Personnel. Key Personnel shall not be removed from any Sears Project by Wireless Matrix without Sears consent. In the event that any of the Key Personnel leave the Project, and are not replaced within thirty (30) calendar days of such Key Personnel's departure by personnel acceptable to Sears, Sears shall have the right to replace such Key Personnel with a Sears employee or another Wireless Matrix employee, in which case Wireless Matrix shall reimburse Sears for all costs incurred in connection with procuring such replacement personnel, including, without limitation, such replacement personnel's salary or hourly rate plus expenses.

### 13.0    CONFIDENTIALITY.

   **13.1    Definition of Confidential Business Information.** "Confidential Business Information shall mean any information, whether disclosed in oral, written, visual, electronic or other form, which either party or its Affiliates disclose (the "*Disclosing Party*") or the other party (the "*Receiving Party*") observes in connection with its performance of the Services. Confidential Business Information includes, but is not limited to: Developments; Proprietary Rights; the Disclosing Party's or its Affiliates business plans, strategies, forecasts, projects and analyses; its or its Affiliates' financial information; its or its Affiliates' employee and the Receiving Party's information; the Disclosing Party or its Affiliates software (including all documentation, code and specifications); hardware and system designs, architectures, structure and protocols; or its product and service specifications, or; manufacturing, purchasing, logistics, sales, marketing and other business processes. In addition, Confidential Business Information shall include information disclosed by the Disclosing Party or its Affiliates to the Receiving Party prior to the Effective Date, during the discussions or negotiations relating to this Agreement or the project(s) which are the subject of this Agreement. The contents, terms and conditions of this Agreement shall constitute Confidential Business Information.

   **13.2    Treatment of Confidential Business Information.** The Receiving Party shall use Confidential Business Information only as necessary to perform the Services and its other obligations under this Agreement. The Receiving Party shall: (a) restrict disclosure of Confidential Business Information to its employees, agents and contractors (collectively, its "*Personnel*"), who have a need to know such information to perform the Services and who have first agreed to be bound by the terms of this **Article 13**; and (b) require its Personnel who are assigned to the Disclosing Party or its Affiliates matters to execute a document stating such agreement. In any case, the Receiving Party shall be liable for any unauthorized disclosure or use of Confidential Business Information by any of its Personnel. Within ten (10) days after receiving the Disclosing Party's written request, the Receiving Party shall destroy, in such a manner that it cannot be retrieved, or return to the Disclosing Party (as instructed by the Disclosing Party) any materials containing Confidential Business Information. The Receiving Party shall certify to the Disclosing Party that it has satisfied its obligations under this **Article 13**.

**13.3    *Exceptions to Confidential Treatment*.** The obligations under this **Article 13** do not apply to any Confidential Business Information that either party can demonstrate:

> **13.3.1** the Receiving Party possessed prior to disclosure by the Disclosing Party or its Affiliates without an obligation of confidentiality;

> **13.3.2** is or becomes publicly available without breach of this Agreement by the Receiving Party;

> **13.3.3** is independently developed by the Receiving Party without use of any Confidential Business Information; or

> **13.3.4** is received by the Receiving Party from a third party that does not have an obligation of confidentiality to the Disclosing Party or its Affiliates.

**13.4    *Disclosure*.** The Receiving Party may disclose Confidential Business Information to the extent that, in the reasonable opinion of the Receiving Party's legal counsel, it is legally required to be disclosed. The Receiving Party shall notify the Disclosing Party within a reasonable time prior to disclosure and allow the Disclosing Party and/or its Affiliates a reasonable opportunity to seek appropriate protective measures.

**13.5    *Burden of Proof*.** The Receiving Party shall have the burden of proving the applicability of any the exceptions in **Sections 13.3 or 13.4.**

**13.6    *Confidential Personal Information*.**

> **13.6.1    *Definition*.** Wireless Matrix agrees that all information about Sears or its Affiliates' individual customers provided by Sears or its Affiliates to Wireless Matrix, including but not limited to names, addresses, telephone numbers, account numbers, customer lists, and demographic, financial and transaction information ("*Confidential Personal Information*"), shall be deemed confidential. This **Section 13.6** shall not apply to information independently developed by Wireless Matrix, without the use of Confidential Personal Information, provided that Wireless Matrix is not using such information on Sears or its Affiliates behalf. In the event information may be deemed to be both Sears Business Information and Sears Confidential Personal Information, the provisions of this **Section 13.6** shall control.

> **13.6.2    *Wireless Matrix Use of Confidential Personal Information*.** Wireless Matrix shall use Confidential Personal Information only as necessary to perform the Services and its other obligations under

this Agreement. Wireless Matrix shall not duplicate or incorporate the Confidential Personal Information into its own records or databases. Wireless Matrix shall restrict disclosure of Confidential Personal Information to its employees who have a need to know such information to perform the Services and who have first agreed to be bound by the terms of **Section 13.6.** Wireless Matrix shall require its authorized agents and subcontractors who are assigned to any Sears matter to execute a document stating such agreement. Wireless Matrix is liable for any unauthorized disclosure or use of Confidential Personal Information by any of its Personnel.

**13.6.3** *Non-Disclosure of Confidential Personal Information.* Wireless Matrix shall not disclose the Confidential Personal Information to any third party, including an affiliate of Wireless Matrix or a permitted subcontractor, without prior written consent of Sears and the written agreement of such third party to be bound by the terms of this **Article 13.** Unless otherwise prohibited by law, Wireless Matrix shall: (a) immediately notify Sears of any legal process served on Wireless Matrix for the purpose of obtaining Confidential Personal Information; and (b) permit Sears or its Affiliates adequate time to exercise its legal options to prohibit or limit such disclosure.

**13.6.4** *Wireless Matrix Policies for Confidential Personal Information.* Wireless Matrix shall establish and maintain written policies and procedures, satisfactory to Sears, designed to ensure the confidentiality of the Confidential Personal Information. Copies of such policies and procedures shall be provided to Sears upon Sears request.

**13.6.5** *Wireless Matrix Removal of Confidential Personal Information.* Within ten (10) days following termination of this Agreement or ten (10) days following the completion of a project for which the Confidential Personal Information has been provided, whichever first occurs, Wireless Matrix shall, at the Sears discretion: (a) return the Confidential Personal Information to Sears; or (b) certify in writing to the Sears that such Confidential Personal Information has been destroyed in such a manner that it cannot be retrieved.

**13.6.6** *Wireless Matrix Notification for Confidential Personal Information.* Wireless Matrix shall notify Sears promptly upon the discovery of the loss, unauthorized disclosure or unauthorized use of the Confidential Personal Information and shall indemnify Sears and its Affiliates and hold Sears harmless for such loss,

unauthorized disclosure or unauthorized use, including attorney's fees.

**13.7   Audit Rights.** Either party shall permit the other party to audit its compliance with the provisions of **Article 13** at any time during regular business hours.

**13.8   Breach.** A breach of **Article 13** by either party shall be grounds for immediate termination of this Agreement.

**13.9   Removal of Documents.** Wireless Matrix shall not remove from Sears premises the original or any reproduction of any notes, memoranda, files, records, writings or other documents, whether on tangible or electronic media, containing any Confidential Business Information and/or Confidential Personal Information or any document prepared by or on behalf of Wireless Matrix which contains or is based on any Confidential Business Information and/or Confidential Personal Information, without the prior written consent of an authorized representative of Sears, and any such document(s) in Wireless Matrix's possession or under its custody or control shall be immediately turned over to Sears, or Wireless Matrix shall certify that such Confidential Business Information and/or Confidential Personal Information has been destroyed upon the request of Sears or upon the termination of this Agreement.

## 14.0   DEFENSE, INDEMNIFICATION AND INFRINGEMENT

**14.1   Defense and Indemnification.**

**14.1.1   Defense.** Wireless Matrix shall, at its own expense, defend Sears and its Affiliates, and their directors, officers, shareholders, employees, representatives, agents, attorneys, successors and assigns (collectively, the "**Indemnified Parties**") from and against any and all claims, demands, suits, or causes of action (hereinafter "**Claims**"), which result or are claimed to result in whole or in part from any act or omission of Wireless Matrix or its employees, agents or contractors, any breach of a representation or warranty made hereunder by Wireless Matrix, which are based upon or make the contention that any of the materials supplied by Wireless Matrix to Sears or used by Sears in the manner recommended by Wireless Matrix, in whole or in part, constitute infringement of any Third Party rights, unless the infringing material was furnished to Wireless Matrix by Sears or results from the combination of Wireless Matrix materials with Third Party materials as requested by Sears and not verified by Wireless Matrix, or which result from the actual violation by Wireless Matrix of any applicable law, statute or regulation. Notwithstanding the foregoing, Wireless Matrix shall not be liable for damage to Third Parties to the extent such damage was caused by the active and gross negligence or willful misconduct of Sears as determined in a final, non-appealable order of a court of competent jurisdiction.

**14.1.2   Wireless Matrix Indemnification.** Wireless Matrix shall, at its own expense, indemnify and hold harmless the Indemnified Parties from and against any and all Claims which result or are claimed to result in whole or in part from any act or omission of Wireless Matrix or its employees, agents or contractors, any breach of a representation or

warranty made hereunder by Wireless Matrix, which are based upon or make the contention that any of the materials supplied by Wireless Matrix to Sears or used by Sears in the manner recommended by Wireless Matrix, in whole or in part, constitute infringement of any Third Party rights, unless the infringing material was furnished to Wireless Matrix by Sears, or which result from the actual violation by Wireless Matrix of any applicable law, statute or regulation. Notwithstanding the foregoing, Wireless Matrix shall not be liable for damage to Third Parties to the extent such damage was caused solely by the active and gross negligence or willful misconduct of Sears as determined in a final, non-appealable order of a court of competent jurisdiction.

*14.1.3 Sears Indemnification.* Sears shall, at its own expense, indemnify and hold harmless Wireless Matrix from and against any and all Claims which result or are claimed to result in whole or in part from any act or omission of Sears or its employees, agents or contractors, by Sears, or which result from the actual violation by Sears of any applicable law, statute or regulation or which results from the combination by Sears of Wireless Matrix materials with Third Party materials not verified by Wireless Matrix. Notwithstanding the foregoing, Sears shall not be liable for damage to Third Parties to the extent such damage was caused solely by the active and gross negligence or willful misconduct of Wireless Matrix as determined in a final, non-appealable order of a court of competent jurisdiction.

*14.2 Infringement.* In the event the System is held or is likely to be held to infringe a Third Party right, then Wireless Matrix, at its own expense, shall first use reasonable and prompt efforts either: (a) to procure for Sears the right to continue to use the System; (b) to modify the System so that it is non-infringing and of at least equivalent performance and functionality; or (c) upon adequate showing to Sears that both of the foregoing options are not commercially feasible, to either (at Sears option) provide a functionally equivalent replacement System to Sears or reimburse Sears for all costs and expenses (including any Software License Fees and/or Support Fees, installation expenses and any consultant fees or expenses) of obtaining such replacement System.

*14.3    Procedures.* Wireless Matrix shall have the right to control the defense of any Claim; provided, however, that Sears shall have the right to participate in the defense. Upon Wireless Matrix's request, that Sears shall reasonably cooperate in such defense and Wireless Matrix shall reimburse Sears for its reasonable out-of-pocket expenses in providing such cooperation. Sears shall provide prompt notification of any Claim; provided, however, that any delay by Sears in giving such notice shall not relieve Wireless Matrix of its indemnity obligations pursuant to this **Article 14**, except to the extent that Wireless Matrix demonstrates actual damage caused by such delay. Wireless Matrix shall not, without first obtaining Sears prior written consent, which consent shall not be unreasonably withheld having regard to Wireless Matrix options for settlement and financial ability, settle any Claim in any manner that restricts or limits Sears ability to use the System or Documentation in the manner provided for in this Agreement.

*14.4    Independent Obligation.* The obligations of Wireless Matrix under this **Article 14** shall be independent of any other obligation of Wireless Matrix hereunder.

## 15.0  INSURANCE.

**15.1  *Required Insurance*.**  Wireless Matrix shall, at its own expense, obtain and maintain the following insurance:

15.1.1 Commercial General Liability, with coverage including premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of not less than One Million Dollars ($1,000,000) per occurrence for bodily injury and property damage combined.  Sears shall be named as an additional insured.  Limits of liability requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

15.1.2 Motor Vehicle Liability insurance for owned, non-owned and hired vehicles, with limits of not less than One Million Dollars ($1,000,000) per occurrence for bodily injury and property damage combined.  If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles.  Sears shall be named as an additional insured.  Limits of liability requirements may be satisfied by a combination of Automobile Liability and Umbrella Excess Liability policies.

15.1.3 Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Wireless Matrix, for all states in which the Project or work to be performed is located, and Employer's Liability insurance with limits of liability of not less than One Hundred Thousand Dollars ($100,000) per accident or disease and Five Hundred Thousand Dollars ($500,000) aggregate by disease.  Such insurance shall contain a waiver of subrogation in favor of Sears unless such waivers are not available in the state(s) where the Project or work to be performed is located.  Wireless Matrix warrants and represents that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Wireless Matrix further agrees to indemnify Sears for any loss, cost, liability, expense and/or damage suffered by Sears as a result of the failure of Wireless Matrix's subcontractors to maintain such insurance to those insurance limits therefore.

15.1.4 Fidelity Bond covering employee dishonesty with limits of not less than One Million Dollars ($1,000,000) per loss.  Sears shall be named as a loss payee.

15.1.5 Professional Liability or Errors & Omissions Insurance with limits of not less that One Million Dollars ($1,000,000) per claim.

*15.2   Policies.* Insurance shall be purchased from companies having a rating of A-VII or better in the current BEST'S INSURANCE REPORTS published by A.M. Best Company. Policies of insurance shall provide that they will not be cancelled or materially changed without at least thirty-(30) calendar days' prior written notice to Sears.   Certificates of insurance evidencing coverage shall be submitted in advance of or concurrent with the execution of this Agreement, and on each insurance policy renewal thereafter.  Wireless Matrix shall, at Sears request, provide copies of requested insurance policies.  If Wireless Matrix does not provide Sears with such certificates of insurance, or, in Sears opinion, such policies do not afford adequate protection for Sears, then Sears will so advise Wireless Matrix. Thereafter, if Wireless Matrix does not furnish evidence of acceptable coverage within fifteen (15) calendar days, then Sears shall have the right, in its sole discretion, to:  (a) withhold payments from Wireless Matrix until evidence of such acceptable coverage is provided; or (b) terminate this Agreement.  Failure to obtain and maintain required insurance shall not relieve Wireless Matrix of any obligation contained in this Agreement.  Additionally, any approval by Sears of any of Wireless Matrix's insurance policies shall not relieve Wireless Matrix of any obligation contained in this Agreement, including, without limitation, liability under **Article 14**, for claims in excess of described limits.

*15.3   Subcontractors.*  Wireless Matrix shall require that its subcontractors maintain insurance in accordance with this **Article 15**.

*15.4   Sears Insurance Obligations.*   Sears is self-insured and as such maintains insurance to cover risks associated with its business activities as detailed herein.

## 16.0   TERM AND TERMINATION.

*16.1   Agreement.*  This Agreement will become effective as of the Effective Date and shall continue in full force and effect thereafter until terminated as set forth herein.  Statements of Work shall remain in full force and effect until expiration of the term as specified in the applicable Statement of Work, as such may be amended by one or more change orders, or until otherwise terminated by either party in accordance with this Agreement.

*16.2   Events of Default.*  Wireless Matrix and Sears acknowledge and agree that the following shall constitute events of default (*"Events of Default"*) and that the occurrence of one (1) or more of such Events of Default shall constitute a material breach of this Agreement which shall allow the non-violating party to seek the rights and remedies set forth in this Article:

> *16.2.1* Wireless Matrix's failure to achieve a Critical Path Milestone or deliver a key deliverable to Sears within the time frame specified in the Implementation Workplan or otherwise specified in the Agreement, provided such failure was not caused by the material action or inaction of Sears or a Third Party contractor or consultant of Sears, and provided that such failure is not cured within thirty (30) calendar days following receipt of written notice of such failure;

**16.2.2** Failure of Wireless ·Matrix to successfully complete any testing or re-testing provided that such failure was not caused by the material action or inaction of Sears or a Third Party contractor or consultant of Sears, or failure of the System to achieve Successful Implementation, and provided that such failure is not cured within thirty (30) calendar days following receipt of written notice of such failure;

**16.2.3** Wireless Matrix's material breach of any Support and Maintenance Services obligation as provided in **Schedule 9.1**, provided that such breach is not cured within thirty (30) calendar days following receipt of written notice of such breach; ·

**16.2.4** Wireless Matrix's material breach of any representation or warranty set forth in this Agreement, provided that such breach, if curable, is not cured within the time frames specified in **Article 8**, if applicable, or if such **Article 8** does not apply to the breach, then within thirty (30) calendar days following receipt of written notice of such breach;

**16.2.5** Wireless Matrix's failure to maintain insurance coverage as specified in **Article 15** within fifteen (15) calendar days following receipt of written notice of such breach;

**16.2.6** Sears failure to timely pay any undisputed amount owed to Wireless Matrix, provided that such failure is not cured within thirty (30) calendar days following receipt of written notice of such failure;

**16.2.7** Either party's failure to perform any other material obligation under this Agreement, provided that such failure is not cured within thirty (30) calendar days following receipt of written notice of such failure;

**16.2.8** Wireless Matrix's failure to make any Deposit Materials and/or Additional Deposits required under a Source Code Escrow Agreement, as provided in **Section 4.4**, provided that such breach, if curable, is not cured within twenty (20) calendar days following receipt of written notice of such breach;

**16.2.9** The institution of bankruptcy, receivership, insolvency, reorganization or other similar proceedings by or against either party under any section or chapter of the United States Bankruptcy Code, as amended, or under any similar laws or statutes of the United States or any state thereof, if such proceedings have not been dismissed or discharged within thirty (30) calendar days after they are instituted; or the insolvency or making of an assignment for the benefit of creditors or the admittance by either party of any involuntary debts as they mature or the institution of any reorganization arrangement or other readjustment of debt plan of either

party not involving the United States Bankruptcy Code; or any corporate action taken by the Board of Directors of either party in furtherance of any of the above actions; or appointment of a receiver for all or substantially all of either party's assets or any corporate action taken by the Board of Directors of either party in furtherance of the above action.

**16.2.10** Wireless Matrix's failure to either make a Counteroffer or the Counteroffer is not competitive as provided in **Section 10.4.1**

**16.3** *Rights and Remedies of Wireless Matrix Upon Default of Sears.* Upon the occurrence of an Event of Default by or with respect to Sears, subject to Sears rights set forth in **Section 16.4.3**, Wireless Matrix shall be entitled to:

**16.3.1** discontinue performance of its obligations under this Agreement; and/or

**16.3.2** subject to the terms of **Section 16.5**, seek to recover damages from Sears.

Notwithstanding anything contained herein to the contrary, Wireless Matrix expressly waives and disclaims any right or remedy it may have to de-install, disable or repossess the System or any portion thereof without due process of law.

**16.4** *Rights and Remedies of Sears Upon Default of Wireless Matrix.*

**16.4.1** *General.* Upon the occurrence of an Event of Default by or with respect to Wireless Matrix, Sears shall be entitled to the following remedies:

**(a)** terminate, in whole or in part, this Agreement or any Statement of Work; and/or

**(b)** subject to the terms of **Section 16.5**, seek to recover damages from Wireless Matrix; and/or

**(c)** discontinue Support and Maintenance Services and receive a refund of any pre-paid but unearned Support and Maintenance Services fees, which refund shall be paid by Wireless Matrix to Sears within thirty (30) calendar days following Wireless Matrix's receipt of Sears notice of such discontinuation; and/or

**(d)** receive a prorated refund of all amounts paid to Wireless Matrix by Sears including, without limitation, any Software License fees, Equipment fees, in which case Sears shall not be obligated to pay any amounts due to Wireless Matrix under this Agreement; and/or

**(e)** if applicable, obtain the additional remedies described in **Section 16.4.3**; and/or

*(f)*     if applicable, seek to obtain equitable relief.

*16.4.2 Right to Set Off.*  Sears shall have the right to set off any undisputed amounts owed to Wireless Matrix against any damages or charges assessed by Sears against Wireless Matrix.

*16.4.3 Transition Rights.*  Upon expiration or termination of this Agreement by either party for any reason, Wireless Matrix shall provide Sears, at Wireless Matrix's then current contract rates, reasonable termination assistance for up to twelve (12) months after such termination (the *"Transition Period"*) relating to the transition from the System to another system, including Support and Maintenance Services and all other Services necessary for an orderly conversion of the system.  As the termination assistance may relate to Telecommunication Services, following expiration or termination of this Agreement, at Sears request, Wireless Matrix shall continue to provide the Telecommunication Services on a month-to-month basis (and subject to payment of charges as set forth in the applicable Statement of Work) during the Transition Period. Notwithstanding the foregoing, if Sears completely or partially terminates this Agreement due to a Wireless Matrix Event of Default, then Wireless Matrix shall provide Services to Sears during the Transition Period at the then current contract rate to Sears.  Notwithstanding anything to the contrary in this Agreement, termination of this Agreement shall not terminate any non-perpetual licenses granted under this Agreement prior to the expiration of the Transition Period.

**16.5    Limitation Upon Types of Recoverable Damages.  EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF DATA, LOST PROFITS, OR LOST OPPORTUNITY, REGARDLESS OF WHETHER THE CLAIM GIVING RISE TO SUCH DAMAGES IS BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT OR NEGLIGENCE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY THEREOF.**

**16.6 Cap on Damages.  EXCEPT AS OTHERWISE PROVIDED IN SECTION 16.7 BELOW, EACH PARTY'S LIABILITY TO THE OTHER FOR ANY CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL NOT EXCEED THE AGGREGATE AMOUNTS PAID UNDER THIS AGREEMENT AND/OR ANY APLICABLE STATEMENT OF WORK.**

*16.7    Exclusions from Limitations of Liability.*  Notwithstanding anything contained herein to the contrary, the limitations of liability contained in this Section shall not apply to:  (a) damages arising out of or relating to a party's failure to comply with its confidentiality obligations

under **Article 13**; (b) either party's defense and indemnification obligations under **Article 14**; (c) personal injury, including death, and damage to tangible property caused by the negligent or intentional acts of a party or its employees, agents or subcontractors; (d) amounts paid as late charges pursuant to **Article 5** or failure to timely achieve a Critical Path Milestone; and (f) either party's obligation to pay litigation costs and attorneys' fees incurred by the other party in enforcing the terms of this Agreement as set forth in **Section 16.8**.

16.8    *Attorneys' Fees.*   In the event of an alleged breach of this Agreement, the prevailing party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom.   For purposes of this Section, the determination of which party is to be considered the prevailing party shall be decided by the court of competent jurisdiction or independent party (*i.e.,* mediator or arbitrator) that resolves such dispute, claim or litigation.

16.9    *Termination Without Cause.*

16.9.1 *Agreement.*   Sears shall have the right to terminate this Agreement, without cause, by providing sixty (60) calendar days' written notice to Wireless Matrix and such termination shall be without obligation for further payment, liability or damage of any nature whatsoever, except as set forth in **Section 16.9.3**.

16.9.2 *Statement of Work.*   Sears shall have the right to terminate Services under any Statement of Work, without cause, penalty, obligation for future payment and without liability for damages of any nature whatsoever, except as set forth in **Section 16.9.3**, by giving written notice of termination to Wireless Matrix.

16.9.3 *Sears Obligations Upon Termination Without Cause.*   Upon termination of this Agreement and/or any Statement of Work without cause pursuant to **Section 16.9**, Sears only shall be liable for (as applicable):  (a) a pro-rata portion of the unpaid Software License Fees attributable to Sears production use of Software prior to the effective date of termination; (b) any Service fees earned for Services actually performed and/or Deliverables (including any partial versions thereof) actually delivered to Sears provided prior to the effective date of such termination, (c) any Equipment fees earned for Equipment actually delivered to and Accepted by Sears prior to the date of such termination and d) Equipment costs and labor fees for independently substantiated work in process. Title of all work in process equipment shall be delivered to Sears.

16.10 *Licenses Perpetual.*  Notwithstanding anything to the contrary in this Agreement, termination of this Agreement shall not terminate any licenses granted in this Agreement. For greater certainty, this provision shall not be construed as:

(a) granting any license to use the Source Code except as specifically set forth in **Section 4.4** of the Agreement and **Section 4.1** of the Source Code Escrow Agreement;

(b) implying that the Source Code Escrow Agreement is not terminable in accordance with its terms.

*16.11Regulatory Change.*  In the event changes in federal, state or local law, regulation or ordinance materially alter the rights of either party under this Agreement, or make any obligation under this Agreement impossible to perform, the parties will negotiate in good faith to amend this Agreement to achieve the parties' intent; provided, however, that failure to reach a new agreement will be grounds for either party to terminate this Agreement in this instance without penalty upon ninety (90) days notice to the other party, subject to **Section 16.4.3** above.

## 17.0    MOST FAVORED CUSTOMER.

Wireless Matrix shall treat Sears as its most favored customer.  Wireless Matrix represents that all of the prices, warranties, benefits and other terms being provided hereunder are equivalent to or better than the terms being offered by Wireless Matrix to its current customers of similar size and volume commitments and usage patterns.  If, during the term of this Agreement, Wireless Matrix enters into an agreement with any other customer providing such customer with more favorable terms, then, as and from the date such other agreement becomes effective, this Agreement shall be deemed appropriately amended to provide such terms to Sears.  Wireless Matrix shall promptly provide Sears with any refund or credits hereby created.

## 18.0    CODE OF CONDUCT

Wireless Matrix acknowledges that Wireless Matrix has been furnished a copy of the Code of Conduct and that Sears associates are required to follow the Code of Conduct. Wireless Matrix shall support the Code of Conduct and shall not take any action that may cause a Sears associate to violate the Code of Conduct. Wireless Matrix shall report to Sears any violation of or attempt to violate the Code of Conduct

## 19.0    ADVERTISING

Wireless Matrix agrees that without Sears prior written consent, or except as otherwise required by applicable law or regulatory policy, Wireless Matrix shall not use the names, service marks and/or trademarks of Sears or any of its Affiliates, or reveal the existence of this Agreement or its terms and conditions in any manner, including, without limitation, in any advertising, publicity release or sales presentation.

## 20.0    AUDITS

**20.1    Generally.** Wireless Matrix shall allow duly qualified independent accountants appointed by Sears to conduct audits and examinations of the operations of Wireless Matrix relating to the performance of the Services to verify:

**20.1.1** the accuracy of the application of Wireless Matrix's charges to Sears;

**20.1.2** that any Wireless Matrix invoices comply with the terms of this Agreement; and

**20.1.3** that the Services are being provided in accordance with this Agreement. Such access will require 72-hour notice to Wireless Matrix and will be provided at normal business hours, except as may be required on an emergency basis, provided that any audit does not interfere with Wireless Matrix's efforts to perform Services in accordance with this Agreement or compromise any reasonable security processes or procedures. All audits will be conducted in a reasonable manner and will occur no more than once per calendar year with respect to the Services provided under each Statement of Work, unless required pursuant to **Section 20.3** below to satisfy a governmental or regulatory agency demand.

**20.2    Audit Process.** Wireless Matrix shall provide access to the facilities, systems, books, records and information related to the provision of the Services as reasonably necessary to perform the audit. This shall include the review of Wireless Matrix practices, policies, procedures, and security (both physical and data) with respect to the Services. Wireless Matrix shall also allow Sears access to review documentation related to Service Levels and charges to determine if they are being adhered to. In addition, Wireless Matrix shall, from time to time, permit Sears to discuss the Services with Wireless Matrix employees. In the event Wireless Matrix reasonably believes that a request from Sears, its auditors or examiners would involve the disclosure of Wireless Matrix's confidential business information, Sears agrees that it and its auditors and examiners will be required to execute an appropriate confidentiality agreement before receiving such confidential business information. Wireless Matrix shall not allow Sears, its auditors, or examiners access to other Wireless Matrix customers' or Wireless Matrix proprietary data and systems other than the proprietary data and systems as they relate to Sears. Wireless Matrix shall also assist Sears' auditors or examiners in testing their data files, programs and procedures and operation of audit software. Any expense associated with the assistance provided pursuant to the preceding sentence will be at Sears' cost.

**20.3 Special Government Audit.** If at any time during the Term, Sears is required by a governmental or regulatory agency having jurisdiction over Sears to have an audit or inspection of the Services then being provided to Sears or information concerning Sears held by Wireless Matrix under this Agreement and such requirement is not satisfied by the audit provided for in **Section 20.1** above, then Wireless Matrix, upon reasonable advance notice will allow the governmental or regulatory agency exercising jurisdiction over the business of Sears to conduct such an audit or inspection as it relates to Wireless Matrix's provision of the Services under this Agreement. Wireless Matrix's cooperation in such an audit or inspection shall include providing access to facilities and records relevant to Sears as reasonably necessary to perform the audit. Wireless Matrix shall not allow access to data of other Wireless Matrix customers' or Wireless Matrix proprietary data and systems other than the proprietary data and systems as they relate to

Sears. Wireless Matrix shall also assist the governmental or regulatory agency in testing their data files, programs and procedures and operation of audit software. Any expense associated with the assistance provided pursuant to the preceding sentence will be at Sears' cost to the extent such audit results from an investigation of Sears business (rather than from an investigation of Wireless Matrix's business). Sears and Wireless Matrix each shall be provided with a copy of the results of the audit or inspection to the extent permitted by Applicable Laws.

**20.4  Remedial Obligations.**  If any audit or inspection reveals that Wireless Matrix has failed to comply with Applicable Laws applicable to Wireless Matrix or to perform the Services in accordance with this Agreement, then Wireless Matrix shall remedy such failures as soon as reasonably practical at Wireless Matrix's sole cost.  In particular, if an audit or examination reveals that Wireless Matrix invoices are not correct, and

> **20.4.1** the aggregate invoice amount in error under any individual Statement of Work is a net credit to Sears equal to or less than two percent (2%) of the amounts due under such Statement of Work in any twelve (12) month calendar year period, then Wireless Matrix shall promptly pay that net credit amount to Sears, without interest, and Sears shall pay the cost of the audit.

> **20.4.2** the aggregate invoice amount in error under any individual Statement of Work is a net credit to Sears of more than two percent (2%) of the amounts due under such Statement of Work in any twelve (12) month calendar year period, then Wireless Matrix shall promptly pay that net credit amount to Sears, and shall further reimburse the reasonable cost of the audit to Sears.  In addition, Wireless Matrix will pay interest at the rate of nine (9%) percent per annum accruing from the original date the error was made until the date the net credit is paid.

> **20.4.3** the aggregate invoice amount in error under any individual Exhibit is a net credit to Wireless Matrix due under such Statement of Work in any twelve (12) month calendar year period, then Sears shall promptly pay that net credit amount to Wireless Matrix, less the reasonable cost of the audit (not to exceed the amount of the net credit due Wireless Matrix).

**20.5  Records.**  Wireless Matrix shall:  (1) retain records to document the Services and fees paid or payable by Sears under this Agreement until the later of three (3) years after billing and final resolution of any actively pending disputes between the Parties relating to Wireless Matrix's charges; and (2) upon reasonable notice from Sears, provide Sears or its auditors or examiners with reasonable access to such records and documents.

## 21.0   MISCELLANEOUS

**21.1  Agreement Binding; Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns; provided, however, that

neither party may assign or delegate its rights or duties respectively under this Agreement without the prior written consent of the other party, not to be unreasonably withheld, conditioned, or delayed by the other party as it pertains to (a) liquidation of either party; (b) in connection with the sale of all or a substantial portion of the assets of either party; or (c) to any outsourcer or Third Party service provider.  Notwithstanding the foregoing, either party may unilaterally assign and/or delegate, upon written notice to the other party, its duties and rights hereunder, or any portion thereof:  (a) to any current or future Affiliate of either party; or (b) in connection with any merger or acquisition of either party.

   **21.2    *Governing Law*.** The rights and duties of the parties will be governed by the local law of the State of Illinois, excluding any choice-of-law rules that would require the application of the laws of any other jurisdiction.  **THE FEDERAL AND/OR STATE COURTS LOCATED IN COOK COUNTY, ILLINOIS SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION OVER, AND THE PARTIES SHALL EACH SUBMIT TO THE VENUE OF SUCH COURTS WITH RESPECT TO, ANY DISPUTE PURSUANT TO THIS AGREEMENT, AND ALL OBJECTIONS TO SUCH JURISDICTION AND VENUE ARE HEREBY WAIVED.**  Wireless Matrix consents to service of process permitted under Illinois law or as set forth in **Section 21.3** of this Agreement.

   **21.3    *Notices*.** All notices required or permitted to be given by one party to the other under this Agreement shall be sufficient if sent by:  (a) hand delivery; (b) certified mail, return receipt requested; (c) nationally recognized overnight courier service; or (d) facsimile with electronic confirmation to the sender, to the applicable party at its address(es) or facsimile number(s) set forth below:

| | |
|---|---|
| If to Sears: | Sears, Roebuck and Co.<br>3333 Beverly Road, Mail Station:  B6-157B<br>Hoffman Estates, Illinois 60179<br>Attn.:  Senior V.P. & C.I.O.<br>Facsimile:  (847) 286-1185 |
| With a copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road, Mail Station:  B6-234B<br>Hoffman Estates, Illinois 60179<br>Attn.:  Associate General Counsel, IT<br>Facsimile:  (847) 286-5421 |
| If to Wireless Matrix: | Wireless Matrix USA Inc.<br>Sunrise Technology Park<br>12369B Sunrise Valley Drive<br>Reston, Virginia 20191<br>Attn:  Vice President, Mobile Business Unit<br>Facsimile:  (703) 262-0380 |
| With a copy to: | Wireless Matrix USA Inc. |

Sunrise Technology Park
12369B Sunrise Valley Drive
Reston, Virginia 20191
Attn: Contracts Manager
Facsimile: (703) 262-0380

With a copy to:        Wireless Matrix Corporation
102, 1530-27[th] Avenue N.E.,
Calgary, Alberta T2E 7S6
Attn: Chief Financial Officer
Facsimile: (403) 250-8163

All notices shall be effective: (e) when delivered personally; (f) three (3) business days after being sent by certified mail; (g) the first business day after being sent by a nationally recognized courier; or (h) on the business day following which it is sent by facsimile; and is followed by notice under subsection (e), (f) or (g) above. Either party may change its notice information by giving proper notice of such change to the other party, provided that such notice shall only be effective upon receipt. If this Section states no notice information for Wireless Matrix, notice will be effective if given to Wireless Matrix at the address specified in this Agreement's introductory paragraph or Wireless Matrix's address last known to Sears.

   **21.4    *Online Access*.** If Wireless Matrix is given access, whether on-site or through remote facilities, to any Sears computer or electronic data storage system, in order for Wireless Matrix to, perform Services or implement the System pursuant to this Agreement, Wireless Matrix shall limit such access and use solely to performing such Services and/or implementing such System within the scope of this Agreement and shall not attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to accomplish the work required under this Agreement. Wireless Matrix shall limit such access to those of its employees who need to have such access in connection with this Agreement or the Schedule, shall advise Sears in writing of the name of each such employee who will be granted such access, and shall strictly follow all Sears security rules and procedures for use of Sears electronic resources. All user identification numbers and passwords disclosed to Wireless Matrix and any information obtained by Wireless Matrix as a result of Wireless Matrix's access to, and use of, Sears computer and electronic storage systems shall be deemed to be, and shall be treated as, Sears Confidential Business Information and/or Confidential Personal Information. Wireless Matrix shall cooperate with Sears in the investigation of any apparent unauthorized access by Wireless Matrix to Sears computer or electronic data storage systems or unauthorized release of Sears Confidential Business Information and/or Confidential Personal Information by Wireless Matrix.

   **21.5    *Security Policies*.** Wireless Matrix and Sears agree that their personnel, while working at or visiting the premises of the other party, shall comply with all the internal rules and regulations of the other party, including security procedures, and all applicable federal, state, and local laws and regulations applicable to the location where said employees are working or visiting.

**21.6  *Severability*.**  If any covenant set forth in this Agreement is determined by any court to be unenforceable by reason of its extending for too great a period of time or over too great a geographic area, or by reason of its being too extensive in any other respect, such covenant shall be interpreted to extend only for the longest period of time and over the greatest geographic area, and to otherwise have the broadest application as shall be enforceable. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, which shall continue in full force and effect.

**21.7  *Signatures*.**  This Agreement may be executed in counterparts, which together shall constitute one and the same agreement. Each party shall have the right to rely on a facsimile signature on this Agreement, and each party shall, if the other party so requests, provide an originally signed copy of this Agreement to the other party.

**21.8  *Subcontractors*.**  Wireless Matrix acknowledges that it is the commitment of Sears to successfully bring minorities and women into the American economic system by doing business with qualified minority and women sources. In furtherance of Sears aforesaid commitment, if Wireless Matrix utilizes the services of subcontractors, then Wireless Matrix shall use reasonable efforts to utilize subcontractors that are qualified minority-owned and/or women-owned sources. Except as to providers of Embedded Third Party Software, Wireless Matrix shall obtain Sears written consent, which shall not be unreasonably withheld, and which Sears shall have the right to withhold in its sole discretion, before entering into any agreement with any Third Party to supply any of the Services or System components to Sears.

**21.9  *No Waiver; Cumulative Remedies*.**  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right hereunder, shall not be construed as a waiver or relinquishment of the future performance of any rights, and the obligations of the party with respect to such future performance shall continue in full force and effect. All remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

**21.10  *Entire Agreement; Conflict*.**  This Agreement and the Schedules, together with all schedules, attachments and exhibits thereto, constitutes the complete, final and exclusive statement of the terms of the Agreement among the parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions of the parties. Furthermore, this Agreement shall supersede, and Sears shall not be bound by, any "shrink wrap license" which is bundled with the Software, or any "disclaimers" or "click to approve" terms or conditions now or hereafter contained in the Software. No modification or rescission of this Agreement shall be binding unless executed in writing by the party to be bound thereby. Each Schedule, Attachment and Exhibit shall be subject to the terms of this Agreement. In the event of any conflict or inconsistency between the terms of this Agreement and any Statement of Work, the terms of the Statement of Work will prevail. Notwithstanding the foregoing, if the parties have executed an agreement of confidentiality or nondisclosure agreement (the "*NDA*") prior to or contemporaneously with this Agreement, the provisions of the NDA shall remain in

force, except to the extent that the terms and conditions of this Agreement shall impose stricter requirements or standards, in which case the stricter terms and conditions of this Agreement shall control Wireless Matrix's duties and obligations to maintain and protect Sears Confidential Business Information and/or Confidential Personal Information.

     **21.11  Bankruptcy.**  In the event Wireless Matrix voluntarily or involuntarily becomes subject to the protection of the Bankruptcy Code and Wireless Matrix or the trustee in bankruptcy rejects this Agreement under Section 365 of the Bankruptcy Code, Sears shall have the right to:  (a) treat this Agreement as terminated; or (b) retain Sears rights under this Agreement, specifically including, without limitation, the right to exercise its rights granted herein to the System, Software, Equipment (and to all work-in-progress relating thereto) and to the Source Code as provided in the Source Code Escrow Agreement.  Failure by Sears to assert its right to retain its benefits to the intellectual property embodied in the System and the Source Code pursuant to Section 365(n)(1)(B) of the Bankruptcy Code with respect to an executory contract rejected by Wireless Matrix or the trustee in bankruptcy shall not be construed by the courts as a termination of such contract by Sears under Section 365(n)(1)(A) of the Bankruptcy Code.

     **21.12  Interpretation.**  The Article and Section headings of this Agreement and of any Schedules, Attachments and Exhibits under this Agreement are for convenience only and shall not be deemed part of this Agreement.  As used herein, "include" and its derivatives (including, "*e.g.*") shall be deemed to mean, "including but not limited to".  The parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

     **21.13  Time Of the Essence.**  Wireless Matrix acknowledges that time is of the essence in performing its obligations hereunder.

     **21.14  Export Controls.**  Wireless Matrix shall comply with all applicable export control laws of the United States with respect to the Software and/or Services.  Wireless Matrix represents and warrants that, to the best of its knowledge, the only export control restrictions that apply to the Software are identified in the applicable Statement of Work.  If these restrictions change in the future, Wireless Matrix shall promptly notify Sears and cooperate with Sears in obtaining any regulatory approvals, permits, or licenses that are necessary to enable the parties to perform their obligations under this Agreement.

     **21.15  Injunctive Relief.**  In addition to any other rights either party may have under this Agreement, or under applicable law, since unauthorized use or disclosure of Confidential Business Information and/or Confidential Personal Information may result in immediate and irreparable injury to the Disclosing Party and/or its Affiliates for which monetary damages may not be adequate, in the event the Receiving Party or any officer, director, employee, agent or subcontractor of the Receiving Party uses or discloses or in the Disclosing Party's sole opinion, any such party is likely to use or disclose Confidential Business Information and/or Confidential Personal Information in breach of its obligations under this Agreement, the Disclosing Party

and/or its Affiliates shall be entitled to equitable relief, including temporary and permanent injunctive relief and specific performance. The Disclosing Party and/or its Affiliates shall also be entitled to the recovery of any pecuniary gain realized by the Receiving Party from the unauthorized use or disclosure of Confidential Business Information and/or Confidential Personal Information.

*21.16 Survival.* Any terms of this Agreement that would, by their nature, survive the termination of this Agreement shall so survive including, without limitation, **Articles 4 (Software), 8 (Representations and Warranties), 10 (Compensation; Payment), 11 (Ownership), 13 (Confidentiality), 14 (Defense, Indemnification and Infringement), 15 (Insurance), 16 (Term and Termination), and 19 (Advertising).**

**IN WITNESS WHEREOF**, Wireless Matrix and Sears have caused this Agreement to be executed by persons duly authorized as of the date of first above stated.

**Sears, Roebuck and Co.**                    **Wireless Matrix USA Inc.**

By: _____            By: _____

Name: _Don M Zimmerman_              Name: _John W. Heaney_

Title: _VP, IT_                                      Title: _President_

APPROVED _D.M.D._ _D/7/66_ _TLAB_

## SCHEDULE 1.1

## DESCRIPTION OF STATEMENTS OF WORK

In connection with each Statement of Work, the parties will consider including terms and conditions relating to the following items:

\_\_\_\_\_    **Section 1.2:**    Identify any Project-specific definitions.

\_\_\_\_\_    **Section 2.1:**    A list of all Software that will be licensed by Wireless Matrix to Sears thereunder including APIs, Embedded Third Party Software, a list of all Third Party Software required to operate with the Software and the Equipment and an indication as to whether Sears will be sublicensing such Third Party Software from Wireless Matrix.  If Third Party Software is an integral part of Wireless Matrix's Software, explain why it is not classified as Embedded Third Party Software.

\_\_\_\_\_    **Section 2.1:**    Identify any Project-specific license terms.

\_\_\_\_\_    **Section 3.1:**    A list of the Equipment components recommended by Wireless Matrix to operate the Software.

\_\_\_\_\_    **Section 3.2:**    A list of any components of Equipment that will be purchased by Sears.

\_\_\_\_\_    **Section 3.5:**    A list of the equipment and software components required or necessary to operate the Software identified in the Statement of Work in accordance with the applicable Specifications.

\_\_\_\_\_    **Section 4.1.2:** An Implementation Workplan developed in accordance with this Agreement.

\_\_\_\_\_    **Section 4.1.4** Identify the individual(s) within Wireless Matrix's and Sears respective organizations who are authorized to sign a Change Order based on the dollar value of such Change Order.

\_\_\_\_\_    **Section 4.3:**    Identify terms and conditions for any APIs.

\_\_\_\_\_    **Section 4.4:**    A list of all Custom Programming, as defined herein, that will be developed by Wireless Matrix thereunder including, without limitation, custom APIs.

\_\_\_\_\_    **Section 4.5:**    Training services required for the Software.

\_\_\_\_\_    **Section 4.5:**    Specify the fees for training Services.

_____  **Section 4.6:**   Identify all Telecommunications Services being provided.

_____  **Section 4.6**    Specify fees and charges for Telecommunication Services.

_____  **Section 5.1:**   A listing of Project-specific Specifications.

_____  **Section 5.1:**   Specify whether Specifications include Source Code Specifications.

_____  **Section 5.1:**   A Test Plan developed in accordance with this Agreement.

_____  **Section 6.1.2**  Specify applicable Specifications.

_____  **Section 7.1:**   Specify the terms and conditions for Wireless Matrix to provide support and maintenance services for Equipment and any other items to be supported by Wireless Matrix including, if applicable, Custom Programming.

_____  **Section 7.3:**   If not payable quarterly, specify payment terms applicable to Support fees.

_____  **Section 8.1:**   Complete pricing information including all Software license fees, all Third Party Software license Fees, Custom Programming fees, Equipment fees, implementation and other Services fees, Support Fees and any call-out rate.

_____  **Section 8.1:**   Specify whether payment terms differ from those set forth in this Section.

_____  **Section 10.4:**  Identify Key Personnel.

_____  **Section 18.8:**  Specify whether approved subcontractors will be performing any work under the Agreement.

_____  **Schedule 6.1:**

    _____  **Section 4:**   Telephone support number.

    _____  **Section 8:**   Contact information for on-Site Support:

        _____  Name(s)

        _____  Telephone.

        _____  Pager.

_____    ·E-Mail.

_____    Fax.

_____    Web site address, if available.

## SCHEDULE 9.1

## SUPPORT AND MAINTENANCE SERVICES

*1.*      *General.*  During the term of any Statement of Work for Telecommunication Services and during the initial Warranty Period for any Equipment purchased from Wireless Matrix by Sears, and thereafter during all times Sears has engaged Wireless Matrix to provide extended warranty Support and Maintenance Services, Wireless Matrix shall provide the Services in accordance with this Schedule 9.1 ("*Support and Maintenance Services*").

*2.*      *Enhancements.*  Wireless Matrix shall provide to Sears, without additional charge, copies of the Software and Documentation revised to reflect any and all Enhancements to the Software, Equipment, and/or Telecommunication Services made by Wireless Matrix during the Warranty period as soon as such Enhancements are offered to any other Wireless Matrix customers.

*3.*      *Categories of Defects.*  Sears shall categorize all Defects according to the category definitions outlined below.    Equipment performance shall conform to the Documentation and/or Specifications as defined in the applicable Statement of Work.  In the event Wireless Matrix disagrees with Sears classification of any Defect, such dispute shall be resolved in accordance with a mutually agreed upon dispute resolution process.

*3.1*      *Severity 1 Defect.*  A Severity 1 Defect arises when the Software, Equipment, and/or Telecommunication Services is/are unable to function properly in a production environment due to a failure to conform to the Documentation and/or Specifications as defined in the applicable Statement of Work.

*3.2*      *Severity 2 Defect.*  A Severity 2 (production environment) Defect arises when a Software, Equipment, and/or Telecommunication Service problem exists which materially impacts Sears business operations, although the System is substantially operational.

*3.3*      *Severity 3 Defect.*  A Severity 3 Defect arises when in a production environment, a Software, Equipment, and/or Telecommunication Service problem exists which does not materially impact Sears business operation.

*3.4*      *Severity 4 Defect.*  A Severity 4 Defect arises when a Defect exists, but the impact on Sears business operations is *de minimis.*

*4.*      *Telephone Support.*  Wireless Matrix shall, at no additional cost, provide to Sears unlimited telephone support (via a toll-free telephone number) relating to the installation, implementation, configuration, use and operation of the Software, Equipment and/or Telecommunication Services or any problems therewith. Telephone support shall be available on

a continuous (twenty-four (24) hours per-day, seven (7) days per-week, three hundred sixty five (365) day basis.)

**5.      *Initial Response; Interim Resolution; Final Resolution*.**  For purposes of this Schedule, these defined timelines correlate to Software (excluding TraveRoute) and Telecommunication Services:

     **(a)      *"Initial Response"*** means the time it takes from Sears initial notification of the Defect until Wireless Matrix responds to the appropriate Sears personnel.

     **(b)      *"Interim Resolution"*** means the time it takes Wireless Matrix to apply a functional resolution to the reported Defect measured from the time at which the initial notification was made, meaning Wireless Matrix provides Sears with a temporary fix or workaround that solves a reported Defect and that can be used by Sears with minimal inconvenience and minimal impact on Sears business operations.

     **(c)      *"Final Resolution"*** means Wireless Matrix provides a final correction or modification of the Software, Equipment and/or Telecommunication service that corrects the Defect.

**6.      *Defect Response and Resolution Procedure*.**  For purposes of the table below:

     **(a)      *"Effort"*** means best, continuous and uninterrupted efforts, twenty-four (24) hours a day, seven (7) days a week, three hundred sixty five (365) days per year.

     **(b)      *"Hours"*** means consecutive calendar hours.

### SOFTWARE AND TELECOMMUNICATION SERVICES RESPONSE TIMES

| Severity Level | Initial Response | Interim Resolution | Final Resolution |
|---|---|---|---|
| Severity 1 Defect | Efforts to respond within 30 Minutes; not to exceed 1 Hour | 2 Hours | 4 Hours |
| Severity 2 Defect | Efforts to respond within 2 Hours; not to exceed 4 Hours | 8 Hours | 24 Hours |
| Severity 3 Defect | Efforts to respond within 6 Hours; not to exceed 8 Hours | N/A | 3 calendar days |

| Severity Level | Initial Response | Interim Resolution | Final Resolution |
|---|---|---|---|
| Severity 4 Defect | Efforts to Respond within 1 business day, not to exceed 2 business days | N/A | Within the next release, or as otherwise agreed to by the parties |

7.    **Service Deficiency Credits.**  The Service Deficiency Credits, if any, shall be credited by Wireless Matrix to Sears as set forth in the following tables:

| Severity Level | Initial Response Service Deficiency Credit | Maximum Monthly Initial Response Service Deficiency Credit | Final Resolution Service Deficiency Credit | Maximum Monthly Final Resolution Service Deficiency Credit |
|---|---|---|---|---|
| Severity 1 Defect | 2% of monthly Support Fees | 10% of monthly Support Fees | 10% of monthly Support Fees | 50% of monthly Support Fees |
| Severity 2 Defect | 1% of monthly Support Fees | 5% of monthly Support Fees | 5% of monthly Support Fees | 25% of monthly Support Fees |
| Severity 3 Defect | 0.5% of monthly Support Fees | 2.5% of monthly Support Fees | 5% of monthly Support Fees | 10% of monthly Support Fees |
| Severity 4 Defect | N/A | N/A | N/A | N/A |

For each hour after the expiration of the time periods set forth in the table above for which Wireless Matrix fails to provide an Initial Response for a Severity 1 Defect, Severity 2 Defect or Severity 3 Defect, Wireless Matrix shall grant Sears a credit in an amount equal to the percentage of Sears monthly Telecommunication Services Fee specified in the Initial Response Service Deficiency Credit column in the table above ("***Initial Response Service Deficiency Credit***"). Such Initial Response Service Deficiency Credit shall be in addition to any other applicable Final Resolution Service Deficiency Credit and to any other remedies available to Sears at law, in equity or under this Agreement. The maximum amount of Initial Response Service Deficiency Credits that Sears may accrue shall be limited to the percentage of monthly Telecommunication Services Fees identified in the Maximum Monthly Initial Response Service Deficiency Credit column in the table above ("***Maximum Monthly Initial Response Service Deficiency Credit***").

For each calendar day after the expiration of the time periods set forth in the table above for which Wireless Matrix fails to satisfactorily complete a Final Resolution for a Severity 1 Defect, Severity 2 Defect or a Severity 3 Defect, Wireless Matrix shall grant Sears a credit in an amount equal to the percentage of Sears monthly Telecommunication Services Fee specified in the Final Resolution Service Deficiency Credit column in the table above (*"Final Resolution Service Deficiency Credit"*). Such Final Resolution Service Deficiency Credit shall be in addition to any applicable Initial Response Service Deficiency Credit and any other remedies available to Sears at law, in equity or under this Agreement. The maximum amount of Final Resolution Service Deficiency Credits that Sears may accrue shall be limited to the percentage of monthly Telecommunication Services Fees identified in the Maximum Monthly Final Resolution Service Deficiency Credit column in the table above (*"Maximum Monthly Final Resolution Service Deficiency Credits"*) and all credits granted by Wireless Matrix to Sears shall be applied to the succeeding months invoice. The parties agree that any Service Deficiency Credits which have been agreed upon in Section 7 are liquidated damages and not a penalty.

**8.    *Equipment Warranty and Repair.*** In accordance with this Schedule, Wireless Matrix will repair and return the Equipment (Mobile Base Station units) to Sears within five (5) business days of receipt of the returned Equipment. Wireless Matrix will perform the repairs in accordance with their then standard warranty policies and procedures during the Warranty period.

**9.    *On-Site Support.*** Upon request of Sears, Wireless Matrix shall provide on-site support within twenty-four (24) hours or one (1) business day, where telephone support fails to correct any material error, malfunction or nonconformity within the time periods set forth in **Section 6** of this Schedule. Wireless Matrix shall provide qualified Wireless Matrix personnel to work exclusively to correct Defects until such Defects are corrected.

**10.    *Non-Exclusive Obligation.*** Wireless Matrix's obligation to provide Support and Maintenance Services shall not affect any other liability that it may have to Sears. Wireless Matrix shall not be responsible for correction of errors caused by modifications made to the Software and/or Equipment by Sears.

**11.    *Features and Functionality.*** If Wireless Matrix deletes features or functionality from the Software and/or Equipment and transfers the same (either directly or through an agreement with a Third Party) to other or new products, the portion of those other or new products that contains the features or functionality in question, or the entire product, if such features and functionality cannot be separated out, shall be: (a) provided to Sears under the terms of this Agreement at no cost to Sears; and (b) covered under the support and maintenance terms applicable to the Software and/or Equipment at no additional cost to Sears.

**12.    *Service Deficiency Credits.*** Wireless Matrix's failure to meet the requirements, including the timeframes, set forth in **Section 6** of this Schedule shall be subject to the Service Deficiency Credits, if any, set forth in **Section 7**.

***Maintenance Standards.*** Wireless Matrix shall perform the Support and Maintenance Services at least according to the quality standards set forth in the applicable Statement of Work.

### 13.    *Performance Criteria.*

**13.1**    Performance criteria for the Wireless Matrix Mobile Base Station (MBS) shall comply to these parameters and subject to the terms established in the Master Telecommunications Purchase Agreement, **Schedule 9.1** and the Deficiency Credits established in **Section 7**, as follows;

1) Terrestrial and/or Satellite communications (with an unobstructed view to source) Wide Area Network (WAN) shall provide 100% coverage across the Continental United States.
2) Wireless Local Area Network (WLAN) coverage shall be provided up to 300' from the vehicle with in-building penetration for all single-family dwellings above ground.
3) Latency shall not exceed current production parameters, which is <u>14</u> seconds round trip.
4) Availability of network services* shall exceed 99.50 % within the Continental United States.
5) Reliability of network services ** shall exceed 99.50 % for 256 byte data packets transmitted over Wireless Matrix network services in the Continental United States.

**13.2**    Availability of Network Services

For purposes of this Statement of Work #1, availability of network services will be calculated using the following formula:

a.    Joint Statement of Intent. Wireless Matrix and Sears objective is to maintain high availability of the total network known as the Sears Service. Sears and Wireless Matrix agree to work diligently together to maintain high network availability and to continue to improve the process and infrastructure related thereto.

b.    Scope. Availability covers Two-way (or Round Trip) communication segments for Sears Service from Sears ingress interface defined as the DTE interface at the MBS to the Sears egress interface at Wireless Matrix's data hub including all Wireless Matrix provided interface equipment ("Wireless Matrix network") and back to Sears ingress interface at the MBS.

b.    During the initial Term and each renewal Term thereafter, if any, the minimum availability rate of the Wireless Matrix network will be 99.5% during any measurement period as calculated in paragraph 1.d below.

d.    For the purposes of this Statement of Work #1, the availability rate shall mean the percentage of time that the Wireless Matrix network is in operation and available to Sears during the measurement period in question, calculated as a fraction as set out below:

$$100 \times \left\{ 1 - \frac{[\text{Downtime}]}{[(Mm \times Nb)]} \right\}\%$$

where:

"Downtime" means the aggregate period of time in minutes during which the affected beams on the Wireless Matrix network are unable to communicate with the Subscriber's MBSs (assuming such MBSs are properly functioning) except as a result of:

(i) maintenance scheduled by Wireless Matrix not less than twenty-four (24) hours in advance for the purpose of repair, maintenance, service, replacement, upgrade or other similar purposes;

(ii) any equipment, communication lines or software procured, provided or operated by Sears in connection with utilizing the Wireless Matrix network; and

(iii) any outage which does not materially disrupt the use of the Wireless Matrix network by Sears.


Note:

"Mm" means the number of minutes in the billing cycle for which the Downtime is being calculated.

"Nb" means the number of beams (3-East/Central, Mountain, and Western beams).

### 13.3   Reliability of Network Services

For purposes of this Statement of Work #1, reliability is the percentage of Data Packets (256 byte) delivered from any Sears MBS active ingress port to any Wireless Matrix active egress port. The transmission of Data packets from any Sears MBS ingress to any Wireless Matrix egress port shall be referred to as the data flow ("**Data Flow**"). For each Data Flow, reliability shall be collected continuously and averaged every month. The monthly reliability percentage averaged over all Data Flows shall be 99.50 % within the Continental United States.

# EXHIBIT 4.4

## SOURCE CODE ESCROW AGREEMENT

**[Document Consisting of _____ Pages Attached Hereto]**