David W. Dykhouse (dwdykhouse@pbwt.com)
Daniel A. Lowenthal (dalowenthal@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Tel:  (212) 336-2000
Fax:  9212) 336-2222

Thomas J. Flynn (tflynn@larkinhoffman.com)
Alexander J. Beeby (abeeby@larkinhoffman.com)
LARKIN HOFFMAN DALY & LINDGREN, LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Tel:  (952) 835-3800
Fax:  (952) 896-3333

*Attorneys for MOAC Mall Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) ) ) | (Jointly Administered) |
| Debtors.[1] | ) ) | |

**MOAC MALL HOLDINGS LLC'S**
**STATEMENT OF ISSUES TO BE PRESENTED AND**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD
## ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure, and Rule 8009-1 of the Local Rules of the Southern District of New York, MOAC Mall Holdings LLC ("**MOAC**"), respectfully submits this statement of issues to be presented and designation of items to be included in the record on appeal with respect to the appeal from the September 5, 2019 *Order (I) Authorizing Assumption and Assignment of Lease with MOAC Mall Holdings LLC and (II) Granting Related Relief* [ECF No. 5074] (the "**Assignment Order**"), before the United States District Court for the Southern District of New York at a case number to be determined once the *Notice of Appeal of Final Order Authorizing Assumption and Assignment of Lease with MOAC Mall Holdings LLC* [ECF No. 5133] is docketed in the District Court.

## I.    Statement of Issues to be Presented on Appeal

1. Whether the Bankruptcy Court erred in granting the assumption and assignment of the above-captioned debtors' (the "**debtors**") lease with MOAC (the "**Lease**")[2] to Transform Leaseco LLC (collectively with its affiliates, including Transform Holdco LLC, "**Transform**").

2. Whether the Bankruptcy Court erred in holding that, notwithstanding the unconditional nature of the rights and protections granted to shopping-center lessors by Congress in Section 365(b)(3)(A) and (D), such rights and protections may be abridged or denied as a result of provisions of a lease sought to be assumed and assigned.

---

[2] As used in this context, the Lease refers to the property lease itself, as well as a reciprocal easement agreement, and other related agreements included in the assignment.

11386626v.1

3.    Whether the Bankruptcy Court erred in its determination that, despite finding that

Transform does not have similar financial condition or operating performance as the

debtors' financial condition and operating performance at the time the debtors entered

into the Lease, Transform still satisfied 11 U.S.C. § 365(b)(3)(A).

4.    Whether the Bankruptcy Court erred in its determination that 11 U.S.C. §

365(b)(3)(D)'s requirement of adequate assurance that the assumption and

assignment "not disrupt any tenant mix or balance in such shopping center" does not

prevent the assumption and assignment of the Lease to Transform where there is *no*

proposed use or *any* proposed tenant or tenants for the leased premises.

## II.    Designation of Items to be Included in the Record on Appeal

MOAC designates the following items for inclusion in the record on appeal. Each

designated item shall also include any and all exhibits and documents annexed to and referenced

within such items.[3]

### A.    Documents Filed in Bankruptcy Court

| ECF Docket No. | Date | Description |
|---|---|---|
| 1774 | 01/23/19 | Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction |
| 2199 | 01/31/19 | MOAC Mall Holding [sic] LLC's Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction |

---

[3] Once a case number is assigned with the District Court, MOAC will file a motion with the District Court to accept documents filed under seal on the docket in the Bankruptcy Court, pursuant to Bankruptcy Rule 8009(f).  Pursuant to Local Bankruptcy Rule 8009-1(a), a copy of each designated item not already appearing on the Bankruptcy Court docket is attached and filed with this document.

11386626v.1

| ECF Docket No. | Date | Description |
|---|---|---|
| 2507 | 02/08/29 | Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief |
| 3008 | 04/02/19 | Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief |
| 3298 | 04/19/19 | Notice of Assumption and Assignment of Additional Designatable Leases |
| 3501 | 05/02/19 | MOAC Mall Holdings LLC's Second Supplemental and Amended: (I) Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (II) Objection to Debtor's [sic] Stated Cure Amount |
| 3651 | 05/06/19 | Debtors' Response and Reservation of Rights with Respect to Objections to Cure Amounts and/or Assumption and Assignment of Designatable Leases |
| 3654 | 05/07/19 | Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases (FILED UNDER SEAL) |
| 3926 | 05/17/19 | MOAC Mall Holdings LLC's Third Supplemental and Amended Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases |
| 3927 | 05/17/19 | Declaration of Rich Hoge Supporting MOAC Mall Holdings LLC's Third Supplemental and Amended Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases |
| 4450 | 07/08/19 | MOAC Mall Holdings LLC's Fourth Supplemental (I) Objections and Reply to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (II) Objection to Debtor's [sic] Stated Cure Amount |
| 4451 | 07/08/19 | Declaration of Thomas J. Flynn Supporting MOAC Mall Holdings LLC's Fourth Supplemental (I) Objections and Reply to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (II) Objection to Debtor's [sic] Stated Cure Amount |

4.

| ECF Docket No. | Date | Description |
|---|---|---|
| 4454 | 07/08/19 | Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I) Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; (II) Second Supplemental and Amended: (A) Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (B) Objection to Debtor's [sic] Stated Cure Amount; and (III) Third Supplemental and Amended Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases |
| 4864 | 08/19/19 | List of Agreed Exhibits Regarding Assumption and Assignment of the MOAC Lease |
| 4865 | 08/16/19 | Stipulation of Facts Not in Dispute Regarding Assumption and Assignment of the MOAC Lease |
| 4867 | 08/16/19 | Transform Holdco LLC's Supplemental Reply and Cross-Motion to: (A) Strike MOAC Mall Holdings LLC's Fourth Supplemental (I) Objections and Reply to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (II) Objection to Debtor's [sic] Stated Cure Amount; and (B) Permit Late Filed Responses to Requests for Admission |
| 4874 | 08/18/19 | Declaration of Louis W. Frillman in Opposition to the Proposed Assumption and Assignment of the MOAC Lease (FILED UNDER SEAL) |
| 4875 | 08/18/19 | Declaration of Raphael Ghermezian in Opposition to the Proposed Assumption and Assignment of the MOAC Lease |
| 4876 | 08/18/19 | Declaration of Rich Hoge in Opposition to the Proposed Assumption and Assignment of the MOAC Lease |
| 4879 | 08/19/19 | Evidentiary Hearing Declaration of Roger A. Puerto in Support of Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I) Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; (II) Second Supplemental and Amended: (A) Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (B) Objection to Debtor's [sic] Stated Cure Amount; and (III) Third Supplemental and Amended Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases (FILED UNDER SEAL) |

| ECF Docket No. | Date | Description |
|---|---|---|
| 4880 | 08/19/19 | Evidentiary Hearing Declaration of Michael Jerbich in Support of Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I) Objection to Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; (II) Second Supplemental and Amended: (A) Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases, and (B) Objection to Debtor's [sic] Stated Cure Amount; and (III) Third Supplemental and Amended Objections to Debtor's [sic] Notice of Assumption and Assignment of Additional Designatable Leases |
| 4889 | 08/19/19 | MOAC Mall Holdings LLC's Pre-Evidentiary Hearing Brief Regarding the Proposed Assumption and Assignment of the MOAC Lease |
| 4903 | 08/20/19 | Transform Holdco LLC's Amended Supplemental Reply and Cross-Motion to Strike MOAC Mall Holding [sic] LLC's Pre-Evidentiary Hearing Brief Regarding the Proposed Assumption and Assignment of the MOAC Lease |
| 4915 | 08/20/19 | MOAC Mall Holdings LLC's Reply Objecting to Transform Holdco LLC's Motion to (A) Strike MOAC's July 8 Supplemental Objection and (B) Permit Late Responses to Requests for Admissions |
| 5074 | 09/05/19 | Order (I) Authorizing Assumption and Assignment of Lease with MOAC Mall Holdings LLC and (II) Granting Related Relief |
| 5133 | 09/12/19 | Notice of Appeal of Final Order Authorizing Assumption and Assignment of Lease with MOAC Mall Holdings LLC |
| n/a | n/a | Copy of Bankruptcy Court Docket Report through September 25, 2019 |

## B.    Stipulated Exhibits for the August 23, 2019 hearing

| Exhibit No. | Date | Description |
|---|---|---|
| Buyer-A | | Mall of America: By the Numbers (Filed as Exhibit A to ECF No. 4454) |
| Buyer-B | | Spring 2017 Map + Directory (Filed as Exhibit B to ECF No. 4454) |

| Exhibit No. | Date | Description |
|---|---|---|
| Buyer-C | | Transform's Selected Portions of the Lease, REA, and Option Agreement (Filed as Exhibit C to ECF No. 4454) |
| Buyer-D | 07/08/19 | CPI Inflation Calculator, Bureau of Lab. Stats., https://www.bls.gov/data/inflation_calculator.htm (Filed as Exhibit D to ECF No. 4454) |
| 1-MOAC | 05/30/91 | MOAC Lease (Filed as Exhibit A to ECF No. 3927 at 8–88) |
| 2-MOAC | 05/30/91 | Option to Lease Third Floor ("Third Floor Addendum") (Filed as Exhibit B to ECF No. 3927 at 90–96) |
| 3-MOAC | 05/30/91 | Amended and Restated Reciprocal Easement and Operating Agreement ("MOAC REA") (Filed as Exhibit F to ECF No. 4451 at 59–309) |
| 4-MOAC | 04/09/19 | MOAC Proof of Claim, dated April 9, 2019 (Filed as a Proof of Claim on April 9, 2019) |
| 5-MOAC | 08/15/19 | MOAC Lease Cure Amount Summary ("MOAC Cure Summary") |
| 6-MOAC | 07/02/19 | Debtor's Objections and Responses to MOAC Mall Holding LLC's Interrogatories to the Debtor ("Debtor IROG Responses") (Filed as Exhibit B to ECF No. 4451 at 22–34.) |
| 7-MOAC | 03/27/92 | Form 10-K for Sears, Roebuck and Co., for 1991 (ending December 31, 1991) ("Sears 1991 10-K") |
| 8-MOAC | 08/13/91 | Form 10-Q for Sears, Roebuck and Co., for the second quarter of 1991 (ending June 30, 1991) ("Sears 10-Q 2Q1991") |
| 9-MOAC | 07/02/19 | Debtor's Objections and Responses to MOAC Mall Holding LLC's Requests for Admissions from the Debtor ("Debtor's Admissions") (Filed as Exhibit A to ECF No. 4451 at 5–20.) |
| 10-MOAC | 05/17/19 | MOAC Mall Holding LLC's Requests for Admission from Transform Holdco LLC (with service email) ("Transform RFA") |
| 11-MOAC | 07/26/19 | Letter from Transform, dated July 26, 2019, with objection and responses to MOAC's discovery requests ("Transform's Discovery Responses") |

11386626v.1

| Exhibit No. | Date | Description |
|---|---|---|
| 12-MOAC | 04/26/19 | CONFIDENTIAL Financials from Transform ("Transform Financials") (FILED UNDER SEAL, in substantially the same form with regard to relevant sections, as Exhibits B, E, F to ECF No. 3654-2 at 17–23, 33–36) |
| 13-MOAC | 06/03/19 | Selected email correspondence, dated May 30 to June 3, 2019 (Filed as Exhibit E to ECF No. 4451 at 56–57.) |
| 14-MOAC | 03/23/18 | Form 10-K for Sears Holdings Corporation for 2017 (ending February 3, 2018) ("Sears 2017 10-K") |
| 15-MOAC | 09/13/18 | Form 10-Q for Sears Holdings Corporation for the second quarter of 2018 (ending August 4, 2018) ("Sears 10-Q 2Q2018") |
| 16-MOAC | 05/06/19 | Transform Holdco LLC's [Confidential] Omnibus Reply in Support of Assumption and Assignment of Designated Leases (FILED UNDER SEAL as ECF No. 3654) |

C.    Transcripts

| Date | Description |
|---|---|
| 08/23/19 | Transcript from evidentiary hearing and oral rendering of Bankruptcy Court decision |

Dated:  September 26, 2019          Respectfully submitted,
        Minneapolis, Minnesota

                                 /e/Thomas J. Flynn
                                 Thomas J. Flynn
                                 Admitted *pro hac vice* on December 26, 2018
                                 Alexander J. Beeby
                                 Admitted *pro hac vice* on August 28, 2019
                                 Larkin Hoffman Daly & Lindgren, Ltd.
                                 8300 Norman Center Drive
                                 Suite 1000
                                 Minneapolis, Minnesota  55437-1060
                                 (952) 835-3800
                                 tflynn@larkinhoffman.com
                                 abeeby@larkinhoffman.com

11386626v.1

Dated:  September 26, 2019          _/e/David W. Dykhouse_____
                                    David W. Dykhouse
                                    Daniel A. Lowenthal
                                    Patterson Belknap Webb & Tyler LLP
                                    1133 Avenue of the Americas
                                    New York, New York 10036-6710
                                    (212) 336-2000
                                    dwdykhouse@pbwt.com
                                    dalowenthal@pbwt.com

                                    *Attorneys for MOAC Mall Holdings LLC*

# Exhibit 5 - MOAC

**Sears Balance Due – Cure Amount**
(Summary pursuant to Fed. R. Evid. 1006[1])

| Description | Amount | Comments |
|---|---|---|
| 2018 Year-End Tax Adjustment | $475,507.38 | |
| 2018 Year-End Electric Adjustment | $53,229.01 | Tenant has already paid post-petition portion; this amount is net remaining due |
| 2nd Quarter Electric Charge | $50,000.00 | |
| April Fixed CAM Charge | $0.00 | Tenant paid this charge on 4/29/19 |
| **Balance Due through 4/30/19** | **$578,736.39** | Transform sent a check on May 29, 2019 for this amount of $578,736.39, which the Landlord may deposit and apply towards the cure amount without prejudice to its rights or objections to the assumption and assignment of the Lease. |
| May Fixed CAM Charge | $0.00 | Tenant has paid the $31,133.20 CAM Charge |
| June Fixed CAM Charge | $0.00 | Tenant has paid the $31,133.20 CAM Charge |
| July Fixed CAM Charge | $0.00 | Tenant has paid the $31,133.20 CAM Charge |
| July Quarterly Electric Charge | $50,000.00 | |
| August Fixed CAM Charge | $0.00 | Tenant has paid the $31,133.20 CAM Charge |
| Attorneys' Fees and Expenses[2] | $72,063.52 | Only through 7/31/19 |
| **Balance as of 8/22/19** | **$699,570.11** | |

4820-0171-7663, v. 1

---

[1] All backup, original and duplicate information relating to the charges are available for inspection, examination and copying at any reasonable time by contacting attorney for MOAC.
[2] Attorneys' fees and expenses continue to accrue.

Exhibit
5-MOAC

MOAC000385

# Exhibit 7 - MOAC

*1004497*    **SIGNED COPY**

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## FORM 10-K

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1991

Commission file number 1-416

# SEARS, ROEBUCK AND CO.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **New York** | **36-1750680** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| **Sears Tower, Chicago, Illinois** | **60684** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (312) 875-2500

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Shares, par value $0.75 per share | New York Stock Exchange<br>Midwest Stock Exchange<br>Pacific Stock Exchange |
| Depositary Shares, each representing a one-fourth interest in an 8.88% Preferred Share, par value $1.00 per share | New York Stock Exchange |
| Depositary Shares, each representing a one-fourth interest in a Series A Mandatorily Exchangeable Preferred Share, par value $1.00 per share | New York Stock Exchange |
| 13-1/4% Notes due September 1, 1992 | New York Stock Exchange |
| 12% Notes due January 15, 1994 | New York Stock Exchange |
| Extendable Notes due April 15, 1999 | New York Stock Exchange |
| 9-1/2% Notes due June 1, 1999 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:  None

On January 31, 1992 Registrant had 344,126,727 common shares outstanding. Of these, 276,675,745 common shares, having an aggregate market value (based on the closing price of these shares as reported in a summary of composite transactions in *The Wall Street Journal* for stocks listed on the New York Stock Exchange on January 31, 1992) of approximately $11.3 billion, were owned by shareholders other than directors and executive officers of the Registrant, The Savings and Profit Sharing Fund of Sears Employees and beneficial holders of five percent or more of Registrant's outstanding common shares.

**Exhibit 7-MOAC**

MOAC000418

Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes _X_        No __

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    [   ]

Documents Incorporated By Reference

Portions of the following documents are incorporated by reference as follows:

| Documents Incorporated | Part of Form 10-K |
|---|---|
| Sears, Roebuck and Co. Annual Report - 1991 ("1991 Annual Report") | I and II |
| Sears, Roebuck and Co. Proxy Statement for the 1992 annual meeting ("1992 Proxy Statement") | III |

MOAC000419

PART I

*Item 1.    Business*

Sears, Roebuck and Co. ("Sears") originated from an enterprise established in 1886. It was incorporated under the laws of New York in 1906. Its general offices are located at Sears Tower, Chicago, Illinois, which it indirectly owns. The principal business groups of Sears and its consolidated subsidiaries (the "Company") are:

- Sears Merchandise Group, which conducts merchandising and credit operations in the United States, Canada and Mexico. It is among the largest retailers in the world, on the basis of sales of merchandise and services.

- Allstate Insurance Group, which includes property-liability insurance and life insurance.

- Dean Witter Financial Services Group, which includes: securities businesses engaging in securities and futures brokerage, asset management, investment banking, securities trading and securities lending; and credit services businesses engaging in credit card services and consumer finance services.

- Coldwell Banker Real Estate Group, which invests in, develops and manages real estate, performs residential real estate brokerage and related services, and engages in the formation and sale of mortgage-related securities and mortgage banking.

These business groups have been linked together to build a consumer network in merchandising, insurance, lending, asset management and real estate, able to call upon the Company's basic strengths, including business relationships with more than 70% of the households in the United States coupled with a strong reputation for trust and service, multiple consumer product and service distribution channels, a substantial financial base with total assets of $106.4 billion at December 31, 1991, and one of the nation's most sophisticated information processing and telecommunications networks. Information processing and telecommunications services are provided to the Company by Sears Technology Services, Inc. ("STS"), a wholly-owned subsidiary of Sears, and its subsidiaries.

A number of previously-announced actions have been accomplished or are well on their way to completion. In the Merchandise Group, a facility in the Chicago suburbs is under construction on a site acquired for the Group's headquarters. Implementation and refinement of the Group's merchandising strategies, including everyday competitive pricing, special sales events, an intense customer-focused emphasis on merchandising and quality service, and retrofitting of the Group's department stores into a series of in-store "power formats" featuring goods sold under other national brand names in addition to Sears own brand names, continued. Programs initiated in August 1990 resulted in significant cost reductions by year-end 1991. Cost reduction programs will continue. For further information, see "Sears Merchandise Group - Merchandising" and "Sears Merchandise Group - Cost Reduction Programs" below; and "Analysis of Consolidated Operations" and Sears Merchandise Group "Analysis of Operations," beginning on pages 14 and 29, respectively, of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 7 hereof. In November 1991 and early 1992, Sears issued $325 million of 8.88% Preferred Shares, First Series, and approximately $1.2 billion of Series A Mandatorily Exchangeable Preferred Shares. The issuance of these preferred shares is intended to bolster the Company's equity capital to sustain

-3-

MOAC000420

future growth. For further information, see Item 5 - "Market for Registrant's Common Equity and Related Stockholder Matters" below; and "Analysis of Consolidated Financial Condition" and note 14 of the Notes to Consolidated Financial Statements on pages 17 and 27, respectively, of the Company's 1991 Annual Report, incorporated herein by reference in response to Items 7 and 8 hereof.

Information regarding revenues, income before income taxes, minority interest and equity income, net income and assets of each of the Company's business groups for each of the five years ended December 31, 1991 is in the Five-Year Summary of Business Group Data on pages 12 and 13 of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 8 hereof. Information on the components of revenues is included in the analysis of operations of each of the Company's business groups beginning on pages 29, 34, 40 and 44, and in the summarized Group financial statements beginning on page 29, of the Company's 1991 Annual Report, incorporated herein by reference in response to Items 7 and 8 hereof.

The Company employs approximately 450,000 people worldwide, including its Corporate staff.

-4-

MOAC000421

SEARS MERCHANDISE GROUP

The Merchandise Group consists of Merchandising, Credit and International operations.

*Merchandising*

Merchandising sells a broad line of general merchandise and services through various types and sizes of retail facilities, catalogs and direct marketing in the United States. The retail facilities include department stores, which include large-size stores located principally in major metropolitan areas; medium-size stores, which also carry an extensive assortment of merchandise; and hard-line stores, which serve either neighborhoods of metropolitan areas or smaller communities and stock a limited selection of appliances, hardware, sporting goods and automotive supplies. In addition, Merchandising operates Sears Paint and Hardware stores, Western Auto Supply Company and its subsidiaries, including Tire America and NTW ("Western Auto"), and Sears Business Centers ("Business Centers"). Merchandising also sells through retail and catalog outlet stores.

Implementation and refinement of Merchandising's strategies, including its everyday competitive pricing policy, special sales events and intense customer-focused emphasis on merchandising and quality service, continued in 1991. Merchandising continues to expand the wide selection of national brand name goods offered to complement Sears own brand name goods.

Merchandising's "power format" strategy of converting its department stores by placing a series of "superstores" within a store is intended to create a dominant position in each of Merchandising's major departments, meet shoppers' needs for a mixture of national brands and high-quality private label merchandise at competitive prices, put the right products and styles (including brand names) in exciting, inviting departments throughout the stores, and, together with Sears credit and product services, offer a merchandising program which provides Merchandising with a competitive edge. Each power format is positioned against the strongest competitors (which are usually specialty stores focusing on one type of business) in its merchandising category and has its own distinct selling space and presentation. There are currently seven power formats: Brand Central for home appliances and home electronics; Sears Tire and Auto Centers for tires, batteries and other key automotive products and services; Kids & More, The Women's Store at Sears and The Men's Store at Sears for apparel; Craftsman Home and Yard Centers for hardware, home improvement products and services and lawn and patio items; and one for home fashions, which includes furniture, floorcoverings, and window, bed and bath fashions. The furniture power format is called Homelife by Sears and may either be free-standing or a part of a larger Sears store. Both Brand Central and Sears Tire and Auto Centers offer customers leading brand names backed by nationwide service, with Brand Central featuring over 80 national brands in addition to Sears Kenmore appliances and Series LXI home electronics and Sears Tire and Auto Centers featuring approximately 60 national brands of automotive products in addition to Sears RoadHandler and DieHard brands. The national roll-out of the Brand Central power format was completed in 1990, and the total number of locations was 905 as of December 31, 1991. The national roll-out of the Sears Tire and Auto Center power format was completed in 1991, with 789 in place at December 31, 1991. The other power formats are being implemented on a store-by store, market-by-market basis. The strategy for apparel, as well as the other power formats, also includes the offering of a wide selection of national brand goods at competitive prices to complement Sears own brand name goods. As of December 31, 1991, the number of these power formats in place was: Kids & More, 114 locations; The Women's Store at Sears, 105 locations; The Men's Store at Sears, 109 locations; Craftsman Home and Yard Centers, 119 locations; Homelife, 42 in-store and 22 freestanding locations; and other home fashions, 114 locations. Refinement of these power formats

-5-

MOAC000422

is continuing, and merchandise quality and selection will be consistent throughout Merchandising's department stores, including those which do not yet fully reflect Merchandising's strategies.

Western Auto is a leading retail and wholesale marketer of automotive supplies, tires, appliances and lawn and garden equipment. Western Auto operates through 548 company-owned retail stores in 29 states and in Puerto Rico and sells at wholesale to 1,021 independently owned and operated dealer stores nationwide.

The Business Centers, some of which are located in Merchandising's department stores and called "Office Centers", carry a broad line of computer equipment for both personal and business needs, including complete computer systems and software under leading brand names.

Sears Specialty Merchandising operates Eye Care Centers of America, Inc. ("Eye Care Centers") and Pinstripes Petites, Inc. ("Pinstripes Petites"). Eye Care Centers, an eye wear superstore chain, operates as EyeMasters in the Southwest and Binyon's in the Pacific Northwest. Pinstripes Petites is a women's specialty store chain.

Catalog operations include a broad distribution of general, seasonal, supplemental and specialty catalogs. Orders for merchandise in Sears catalogs are placed by customers in person, by mail or by telephone. These orders are received at catalog counters operated in retail stores, at 33 catalog sales offices, and at the offices of 2,178 independent sales merchants and agents. A nationwide toll-free number is available to order merchandise through ten telecatalog centers.

Merchandising's Product Services operations provide repair parts, consumer service and repair work on national brand name items in addition to Sears brand name products. Product Services also offers installation, repair, monitoring and other services for consumer and commercial programs.

*Sources of Merchandise*

Merchandising (including Sears Specialty Merchandising) purchases goods primarily from approximately 10,500 domestic suppliers, most of whom have been suppliers for many years.

*Seasonality*

Merchandising sales in the fourth quarter are traditionally higher than in other quarterly periods because of holiday buying patterns. This results in a lower ratio of fixed costs to sales and produces a higher ratio of operating income to sales in the fourth quarter. Traditional business patterns also generally result in the lowest sales in the first quarter, producing a relatively high ratio of fixed costs to sales and a lower ratio of operating income to sales, as compared with other periods.

*Employees*

Merchandising employs approximately 292,800 people, including part-time employees.

MOAC000423

*Properties*

A new facility for the Merchandise Group's headquarters offices is under construction in Hoffman Estates, Illinois. The phased relocation from Sears Tower is expected to begin in mid-1992.

The following table sets forth information concerning stores opened and closed by Merchandising during 1991:

| | Operating beginning of year | Opened(a) | Closed(a) | Reclassified | Operating end of year(b) |
|---|---|---|---|---|---|
| Large-Size stores | 410 | 8 | (3) | 1 | 416 |
| Medium-Size stores | 398 | 17 | (13) | (1) | 401 |
| Hard-Line stores | 55 | - | (4) | - | 51 |
| Department Stores subtotal | 863 | 25 | (20) | - | 868 |
| Free-standing Homelife stores | 5 | 17 | - | - | 22 |
| Paint and Hardware stores | 98 | 4 | (5) | - | 97 |
| Catalog outlet stores | 101 | 3 | (10) | - | 94 |
| Western Auto | 504 | 58 | (14) | - | 548 |
| Business Centers | 65 | 3 | (15) | - | 53 |
| Eye Care Centers | 94 | 19 | (11) | - | 102 |
| Pinstripes Petites | 40 | - | - | - | 40 |
| Specialty Stores subtotal | 907 | 104 | (55) | - | 956 |
| Total | 1,770 | 129 | (75) | - | 1,824 |

(a)    Of the 25 department stores opened and 20 department stores closed by Merchandising during 1991, 12 represented relocations of existing department stores. Excluding relocations, eight department stores were closed during the year.

(b)    Four of the Western Auto stores were located at department stores.

For Merchandising, Credit and Sears Specialty Merchandising, the capital expenditures for expansion and remodeling and other improvements (including capitalized financing leases but excluding amounts expended for administrative offices) amounted to $241.8 million for the year ended December 31, 1991. In 1992, Merchandising plans to open approximately 14 new department stores, consisting of approximately six in new markets and approximately eight relocations, and to continue the program of remerchandising existing units. In addition, Merchandising plans to continue opening new specialty stores.

-7-

MOAC000424

The following tabulation summarizes the stores owned or leased by Merchandising at December 31, 1991:

| | Owned | Gross and Net Leases(b) | Short-Term and Percentage Leases (c) | Capital Leases (d) | Total (e) |
|---|---|---|---|---|---|
| Large-Size stores | 341 | 47 | 2 | 26 | 416 |
| Medium-Size stores | 97 | 239 | 40 | 25 | 401 |
| Hard-Line stores | - | 45 | 4 | 2 | 51 |
| Department Stores subtotal | 438 | 331 | 46 | 53 | 868 |
| Free-standing Homelife stores | - | 22 | - | - | 22 |
| Paint and Hardware stores | - | 93 | - | 4 | 97 |
| Catalog outlet stores | 7 | 82 | - | 5 | 94 |
| Western Auto | 104 | 444 | - | - | 548 |
| Business Centers | 2 | 51 | - | - | 53 |
| Eye Care Centers | - | 94 | 8 | - | 102 |
| Pinstripes Petites | - | 40 | - | - | 40 |
| Specialty Stores subtotal | 113 | 826 | 8 | 9 | 956 |
| Total | 551 | 1,157 | 54 | 62 | 1,824 |

(The "Leased (a) / Operating Leases" heading spans the Gross and Net Leases, Short-Term and Percentage Leases columns.)

(a)     Many of the leases contain renewal options. With respect to 13 stores, leased prior to 1960 with lease terms ranging up to 45 years, Sears has the option to purchase the premises, terminate the lease or continue the terms at substantially reduced rentals.

(b)     Leased for terms ranging from one to 99 years. Rentals are either fixed or fixed at minimum rentals coupled with a percentage of sales, including some sale and leaseback arrangements.

(c)     Leased for a term, or with a remaining term, of less than one year or under leases providing for payments based only on a percentage of sales.

(d)     Leased for terms ranging from five to 99 years. The leases have been capitalized as assets of Merchandising.

(e)     Four of the Western Auto stores were located at department stores.

In addition, there were 1,112 other sales and service facilities and 33 catalog sales offices, most of which are occupied under short-term leases or are a part of other Sears facilities included in the above tabulation.

The following schedule shows department and specialty stores, store space and net sales per square foot generated in these stores (including certain catalog counter and service sales) for 1991, 1990 and 1989:

-8-

MOAC000425

*Stores in Operation at End of Year*

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Large-Size stores | 416 | 410 | 403 |
| Medium-Size stores | 401 | 398 | 388 |
| Hard-Line stores | 51 | 55 | 56 |
|   Department Stores subtotal | 868 | 863 | 847 |
| Free-standing Homelife stores | 22 | 5 | - |
| Paint and Hardware stores | 97 | 98 | 107 |
| Catalog outlet stores | 94 | 101 | 105 |
| Western Auto | 548 | 504 | 468 |
| Business Centers | 53 | 65 | 61 |
| Eye Care Centers | 102 | 94 | 104 |
| Pinstripes Petites | 40 | 40 | 39 |
|   Specialty Stores subtotal | 956 | 907 | 884 |
|   Total | 1,824 | 1,770 | 1,731 |

*Retail Space at Year End (Square Feet in Millions)*

*Gross Area*

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Large-Size stores | 82.4 | 81.6 | 81.2 |
| Medium-Size stores | 34.5 | 34.3 | 33.6 |
| Hard-Line stores | 1.2 | 1.3 | 1.3 |
|   Department Stores subtotal | 118.1 | 117.2 | 116.1 |
| Free-standing Homelife stores | .8 | .2 | |
| Paint and Hardware stores | .5 | .5 | .6 |
| Catalog outlet stores | 3.1 | 3.2 | 2.9 |
| Western Auto | 6.5 | 6.0 | 5.5 |
| Business Centers | .2 | .2 | .2 |
| Eye Care Centers | .5 | .5 | .6 |
| Pinstripes Petites | .1 | .1 | .1 |
|   Specialty Stores subtotal | 11.7 | 10.7 | 9.9 |
|   Total | 129.8 | 127.9 | 126.0 |

*Selling Area*

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Large-Size stores | 41.3 | 40.7 | 40.2 |
| Medium-Size stores | 19.0 | 18.8 | 18.1 |
| Hard-Line stores | .6 | .6 | .6 |
|   Department Stores subtotal | 60.9 | 60.1 | 58.9 |
| Free-standing Homelife stores | .7 | .1 | - |
| Paint and Hardware stores | .4 | .4 | .4 |
| Catalog outlet stores | 2.1 | 2.1 | 2.0 |
| Western Auto | 3.7 | 3.5 | 3.2 |
| Business Centers | .1 | .2 | .2 |
| Eye Care Centers | .3 | .3 | .4 |
| Pinstripes Petites | .1 | .1 | .1 |
|   Specialty Stores subtotal | 7.4 | 6.7 | 6.3 |
|   Total | 68.3 | 66.8 | 65.2 |

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| *Net Sales per Square Foot (Selling Area)* | $332 | $341 | $347 |

-9-

MOAC000426

To effectively implement Merchandising's logistics strategy, Terminal Freight Handling Company, a wholly-owned subsidiary of Sears doing business as Sears Logistics Services ("SLS"), provides specialized distribution, transportation and home delivery services, primarily for Merchandising and also for other customers. SLS' strategy includes expanded marketing to diversify and increase its current customer base through the range of logistics services as well as more efficient customer-oriented performance of existing services.

As of December 31, 1991, SLS owned and operated three catalog merchandise centers, three retail replenishment centers, two direct delivery centers and 35 other distribution facilities (cross dock centers and terminals). Three other catalog merchandise centers and two cross dock centers were operated and substantially owned (except for the most recent building additions which are leased) by SLS. An additional five retail replenishment centers, four direct delivery centers (operated by third parties), four furniture consolidation centers (operated by third parties), and 19 other distribution facilities (consisting of cross dock centers, four of which are operated by third parties, and terminals) were leased for terms ranging from one to 40 years. All of the terminals are scheduled to close by the summer of 1992.

One SLS retail replenishment center and additions to three catalog merchandise distribution centers were operated pursuant to sale and lease-back arrangements for primary terms of 25 years with renewal options for an additional 30 or 40 years and a fair market value purchase option at the end of the primary terms, and at certain other times. These facilities have been constructed on land owned by the Company which has been leased to the lessors of the facilities for initial terms of 25 years, with renewal options which extend 10 to 20 years beyond those in the leases to the Company.

To continue the restructuring of distribution operations begun in 1987, in 1991 the Washington, D.C. cross dock center was closed and the closing of the Los Angeles, California, catalog merchandise center in early 1992 was announced. Also announced were the openings of new retail replenishment centers in Delano, California and near Wilkes-Barre, Pennsylvania, which will replace retail replenishment centers in Los Angeles, California, and Philadelphia, Pennsylvania.

In addition to the SLS distribution facilities, as of December 31, 1991, Merchandising owned and operated 47 warehouses, including seven major distribution warehouses. An additional 131 warehouses, none of which were major distribution warehouses, were leased for terms ranging from one to 99 years.

### Trademarks

The name "SEARS" is used extensively in the Company's Merchandising and other businesses in the United States and throughout the world. The Company's right to the name "SEARS" continues so long as it uses the name. The name is also the subject of numerous renewable United States and foreign trademark and service mark registrations. This trade and service mark is material to the Company's Merchandising and other related businesses in the United States and throughout the world.

### Competition

The domestic retail merchandise business is highly competitive. Quality, price, style, customer service, brand names, credit availability, delivery time and repair service, as well as the convenience of shopping facilities to customers, are the principal means of competition in the

-10-

MOAC000427

industry. The Merchandise Group believes it is able to compete in every respect despite strong competitive pressures in recent years; however, on average, the Merchandise Group's ratio of selling, general and administrative expense to revenues is higher than that of its competitors. Cost reduction programs reduced the Merchandise Group's ratio of selling, general and administrative expenses to revenues for 1991 compared to 1990, and efforts to increase revenues and cut costs are continuing. See "Merchandising" above and "Cost Reduction Programs" below and "Analysis of Consolidated Operations" and Sears Merchandise Group "Analysis of Operations" beginning on pages 14 and 29, respectively, of the Company's 1991 Annual Report, incorporated herein by reference to Item 7 hereof.

*Credit*

Credit initiates and maintains, in the United States, customer credit accounts generated by Merchandising.

Sales made on a revolving and installment credit basis (excluding finance charges) amounted to 57.3%, 59.2% and 58.7% of gross sales of Merchandising for 1991, 1990 and 1989, respectively. Based on current experience, approximately 7.7% of the amount of total credit balances is liquidated each month.

As of December 31, 1991, Credit had approximately 27.5 million active customer credit accounts. These accounts had an average balance of $736, for a total of $20.25 billion of retail customer receivables before sales of account balances. Sears has an ongoing program pursuant to which a portion of such accounts receivable has been sold through Sears Receivables Financing Group, Inc., a wholly-owned subsidiary, to trusts that issue credit account pass-through certificates to public and private investors. Pursuant to contractual agreements, Sears remains the servicer on the accounts creating the receivables and receives a fee for the services performed. See Sears Merchandise Group "Analysis of Operations - Credit operations," beginning on page 30 of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 7 hereof.

From time to time, competitive conditions and federal and state legislation may affect credit card interest rates. While the Company cannot predict the effect of future competitive conditions and legislation or the measures which the Company might take in response thereto, a significant reduction in the interest rates charged by Credit could have an adverse effect on the Company.

Credit employs approximately 12,500 full and part-time employees.

*International*

*Canada and Mexico*

The Sears Merchandise Group conducts retail merchandise and credit operations in Canada through Sears Canada Inc., a consolidated, 62.6% owned subsidiary of Sears ("Sears Canada") and in Mexico through a consolidated, 75% owned subsidiary ("Sears Mexico"). Sears Mexico was a wholly-owned subsidiary until March 23, 1992, when Sears sold an aggregate of 16,500,000 shares of Sears Mexico's common stock in a public offering in Mexico, an offering in the United States to qualified institutional buyers and an offering outside the United States and Mexico for net proceeds of approximately $120 million, and Sears Mexico sold 2,250,000 shares of its common stock in the public offering in Mexico for net proceeds of approximately $16 million.

-11-

MOAC000428

Sears Canada operates 1,722 stores, including 106 department stores, 15 clearance centers, and six specialty stores, as well as 1,595 catalog sales offices, and has 49 warehouses. During 1991, Sears Canada opened 10 new retail stores, including 2 in new markets, seven in under-penetrated sectors of existing markets and one representing a relocation of an existing store. As a result of the relocation, one store was closed during the year. Sears Canada is the single largest national department store chain in Canada. A new Sears Canada catalog merchandise service center in Belleville, Ontario, with a modernized distribution system, will be fully operational in the spring of 1992 and replaces three smaller catalog service facilities. Sears Canada is continuing the development and implementation of an integrated catalog information system. Sears Canada also plans to open three full line department stores in 1992.

Sears Canada has an ongoing program pursuant to which an undivided co-ownership interest in its pool of credit card receivables is sold to a trust which issues senior debt, subordinated debt and trust units (representing the residual equity interest in the trust) to public and private investors. Pursuant to contractual relationships, Sears Canada remains the servicer on the accounts creating the receivables, but receives no separate fee from the investors for such servicing. See Sears Merchandise Group "Analysis of Financial Condition" on page 32 of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 7 hereof.

Approximately 48,500 full and part-time employees were employed by Sears Canada as of December 31, 1991.

Thirty-three department stores, seven satellite stores and 19 warehouses were operated by Sears Mexico. During 1991, five new retail stores were opened, including three in new locations. One store was remodeled in 1991, and no stores were closed. Sears Mexico plans to open three department stores in 1992.

Approximately 8,600 full and part-time employees were employed by Sears Mexico as of December 31, 1991.

*Tires Plus Co., Ltd.*

In January 1990, Sears entered into a joint venture with the Saison Group, a Japanese conglomerate, to form Tires Plus Co., Ltd. ("Tires Plus"), to provide automotive aftermarket goods and services in Japan. Sears owns approximately 50% of Tires Plus. As of December 31, 1991, Tires Plus operated three automotive service centers.

*Cost Reduction Programs*

The Company initiated cost reduction programs in 1990 intended to eliminate a total of approximately 33,000 full- and part-time positions. Major elements of the cost reduction programs included: the streamlining of support operations and the relocation of clerical activities in the stores into one area, with store space previously devoted to sales support reclaimed for selling activities; realignment of the regional service organization, improved productivity and closed facilities in Merchandising's Product Services; improved productivity and restructuring of the distribution and transportation network in Merchandising's logistics operations; the conversion of more than 223 company-owned catalog sales offices to independently-owned and operated catalog sales merchants and reductions in catalog home office activities; a reduction in the number of administrative and sales support positions at Sears Canada; the continued consolidation of Merchandising's retail accounting and processing centers; a reduction in the number of positions

-12-

MOAC000429

in Corporate and Merchandise Group headquarters activities, partially as a result of combining staff functions; closure of the 47 free-standing McKids stores; and implementation of a one-year salary freeze for salaried employees in the Merchandise Group and the Company's Corporate operations. These programs were completed by year-end 1991. For further information, see "Analysis of Consolidated Operations" and Sears Merchandise Group "Analysis of Operations," beginning on pages 14 and 29, respectively, of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 7 hereof.

During 1992, the Merchandise Group will continue its efforts to more properly align its organizational structure, improve responsiveness and customer service, increase revenues and cut costs. Custom-designed point-of-sale terminals and automated customer-service "mini" kiosks will be installed in Merchandising's department stores which will result in the elimination of about 1,000 full-time non-sales positions and 5,900 part-time clerical positions. A reorganization of the field management structure by closing Merchandising's ten regional offices and 26 of Merchandising's 72 district units by mid-April, 1992, with responsibilities of the remaining 46 districts strengthened to include customer service, revenue growth, teamwork, employee development and training, store presentation, inventory productivity and facilities management, will result in the elimination of about 600 positions. A transfer of the inventory replenishment function from the field organization to headquarters has begun, with completion scheduled for early 1993. Compensation programs for some of Merchandising's employees who sell merchandise on commission will be standardized, designed to be more in line with the competition, and costly and non-competitive policies in some areas, such as overtime, commission rates, and scheduling, will be changed. In addition, a benchmarking study of competitive practices to determine the best organizational structure for Merchandising's headquarters staff and various field staff offices has also been announced. Although the impact of the study cannot be estimated, it is expected that it will result in job reductions in 1992.

-13-

MOAC000430

ALLSTATE INSURANCE GROUP

The Allstate Insurance Group ("Allstate") is engaged (principally in the United States and Canada and primarily through agents working exclusively for Allstate) in property-liability insurance and life insurance. Allstate writes a broad range of insurance for individuals, businesses and other organizations, and is also a reinsurer.    Allstate has announced that it plans to sell its Canadian operations. See "Geographic Distribution of Insurance."

*Property-Liability Insurance*

For 1991, passenger auto insurance accounted for approximately 72.3% of property-liability insurance premiums earned, and homeowners' multiple peril insurance accounted for approximately 16.4%. All other property-liability insurance lines combined (none of which accounted for as much as 4% of insurance premiums earned) accounted for approximately 11.3% of property-liability insurance premiums earned.

Information regarding the general legislative and regulatory environment for property-liability insurers is set forth in the first two paragraphs on page 35 of the Allstate Insurance Group "Analysis of Operations" beginning on page 34 of the Company's 1991 Annual Report, incorporated herein by reference in response to Items 7 and 8 hereof.

The table on the following page illustrates the change through time of reserves established for property-liability claims and claims expense at the end of various calendar years. The first line shows the reserves as originally reported at the end of the stated year. The second section, reading down, shows the cumulative amounts paid as of the end of successive years with respect to that reserve liability. The third section, reading down, shows retroactive reestimates of the original recorded reserve as of the end of each successive year which is the result of Allstate's expanded awareness of additional facts and circumstances that pertain to the unsettled claims. The last section compares the latest reestimated reserve to the reserve amount as originally established and indicates whether or not the original recorded amount was adequate or inadequate to cover the estimated costs of unsettled claims.

The table on the following page is cumulative and, therefore, ending balances should not be added since the amount at the end of each calendar year includes activity for both the current and prior years. Information with respect to accident years may also be derived from the table on the following page.

The reserve for claims and claims expense is an accumulation of the estimated amounts necessary to settle all outstanding claims as of the date for which the reserve is stated. The data shown have been reduced for estimated subrogation and salvage recoveries. The reserve estimates are based upon the facts in each case and Allstate's experience with similar cases. Consideration is given to historical trends for such things as disposition patterns, loss payments, pending levels of unpaid claims and product mix. In addition, court decisions, economic conditions, and public attitudes impact the estimation of reserves and the ultimate cost of claims. No attempt is made to isolate the impact of inflation from the multitude of factors influencing the reserve estimates. Allstate continually updates its reserve forecasts by type of claim as new facts become known and events occur which impact unsettled claims. Allstate does not discount its reserves for unpaid claims and claims expense.

-14-

MOAC000431

($ millions)

|  | | | | | | December 31 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 |
| **Reserve for Unpaid Claims and Claims Expense** | $4,018 | $4,457 | $4,863 | $5,275 | $5,804 | $6,664 | $7,865 | $9,001 | $10,029 | $11,210 | $12,212 |
| **Paid (Cumulative) as of:** | | | | | | | | | | | |
| One Year Later | 1,515 | 1,707 | 1,915 | 1,839 | 2,445 | 2,758 | 3,184 | 3,611 | 4,349 | 4,594 | |
| Two Years Later | 2,298 | 2,531 | 2,852 | 3,180 | 3,644 | 4,110 | 4,727 | 5,361 | 6,404 | | |
| Three Years Later | 2,771 | 3,076 | 3,449 | 3,863 | 4,406 | 4,957 | 5,682 | 6,518 | | | |
| Four Years Later | 3,105 | 3,426 | 3,868 | 4,316 | 4,912 | 5,524 | 6,352 | | | | |
| Five Years Later | 3,326 | 3,697 | 4,151 | 4,642 | 5,269 | 5,930 | | | | | |
| Six Years Later | 3,511 | 3,888 | 4,386 | 4,890 | 5,544 | | | | | | |
| Seven Years Later | 3,652 | 4,064 | 4,569 | 5,096 | | | | | | | |
| Eight Years Later | 3,794 | 4,206 | 4,731 | | | | | | | | |
| Nine Years Later | 3,911 | 4,336 | | | | | | | | | |
| Ten Years Later | 4,027 | | | | | | | | | | |
| **Reserve Reestimated as of:** | | | | | | | | | | | |
| End of Year | 4,018 | 4,457 | 4,863 | 5,275 | 5,804 | 6,664 | 7,865 | 9,001 | 10,029 | 11,210 | 12,212 |
| One Year Later | 4,014 | 4,297 | 4,713 | 5,188 | 6,007 | 6,941 | 7,958 | 8,996 | 10,401 | 11,428 | |
| Two Years Later | 3,906 | 4,230 | 4,720 | 5,373 | 6,259 | 7,038 | 7,995 | 9,108 | 10,693 | | |
| Three Years Later | 3,857 | 4,265 | 4,893 | 5,611 | 6,387 | 7,120 | 8,115 | 9,414 | | | |
| Four Years Later | 3,931 | 4,427 | 5,133 | 5,778 | 6,480 | 7,235 | 8,423 | | | | |
| Five Years Later | 4,075 | 4,651 | 5,307 | 5,886 | 6,603 | 7,524 | | | | | |
| Six Years Later | 4,266 | 4,827 | 5,415 | 6,021 | 6,887 | | | | | | |
| Seven Years Later | 4,441 | 4,930 | 5,547 | 6,285 | | | | | | | |
| Eight Years Later | 4,553 | 5,049 | 5,785 | | | | | | | | |
| Nine Years Later | 4,664 | 5,279 | | | | | | | | | |
| Ten Years Later | 4,873 | | | | | | | | | | |
| **Initial reserve (less than) reestimated reserve:** | | | | | | | | | | | |
| Amount | $(855) | $(822) | $(922) | $(1,010) | $(1,083) | $(860) | $(558) | $(413) | $(664) | $(218) | |
| Percent | (21.3) | (18.4) | (19.0) | (19.1) | (18.7) | (12.9) | (7.1) | (4.6) | (6.6) | (1.9) | |

The 1989 and 1990 loss reserve developments have been restated to exclude the claims and claims expense incurred by the British reinsurance subsidiary. The required information is not consistently available from the subsidiary because of the accounting methods employed by the London reinsurance market.

As the table illustrates, Allstate's reserves for claims and claims expenses at the end of 1990 developed unfavorably in 1991 by $218 million, which represents 1.9% of the initial reserve balance. A significant portion of the development is from claims for accident years prior to 1980 and is predominantly related to environmental impairment, specifically asbestos and toxic waste. Allstate subsequently withdrew from these lines of business. The ultimate cost of these claims is difficult to predict, especially since claims may not be reported for several years after the policy year. Reserving in the early 1980's was influenced by double-digit increases in claim costs that at the time

-15-

MOAC000432

gave little indication of abatement. However, over time, Accident Years 1981 through 1988 have developed favorably.

The following table is a summary reconciliation of the beginning and ending property-liability insurance claims and claims expense reserve, displayed individually for each of the last three years. The total claims and claims expense figure and the end of year reserve balance are reflected on the Allstate Insurance Group Summarized Statements of Income and Statements of Financial Position, respectively, on pages 34 and 36 of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 8 hereof.

|  | Year ended December 31 | | |
|  | 1989 | 1990 | 1991 |
|  |  | (in millions) |  |
| Reserve for claims and claims expense, beginning of year | $9,110 | $10,162 | $11,376 |
| Claims and claims expense |  |  |  |
| Provision attributable to the current year | 10,794 | 11,727 | 12,252 |
| Increase (decrease) in provision attributable to prior years | (5) | 372 | 218 |
| British reinsurance subsidiary | 85 | 100 | 105 |
| Total claims and claims expense | 10,874 | 12,199 | 12,575 |
| Payments |  |  |  |
| Claims and claims expense attributable to current year | 6,150 | 6,569 | 6,874 |
| Claims and claims expense attributable to prior years | 3,611 | 4,349 | 4,594 |
| British reinsurance subsidiary | 61 | 67 | 57 |
| Total payments | 9,822 | 10,985 | 11,525 |
| Total reserve for claims and claims expense, end of year | 10,162 | 11,376 | 12,426 |
| Less: British reinsurance subsidiary, end of year reserves | 133 | 166 | 214 |
| Reserve for claims and claims expense, end of year - United States and Canada | $10,029 | $11,210 | $12,212 |

At year-end 1991, the reserve for property-liability insurance claims and claims expense shown in the above table was $167.2 million more than the reserve balance recorded on the basis of statutory accounting principles for reports provided to state regulatory authorities. The principal differences are the accrual for subrogation and salvage recoverable, which for state regulatory purposes is not recorded until it is received, and the reserves of the Canadian and British subsidiaries which are not

-16-

MOAC000433

included in the consolidated United States statutory statement.

*Life Insurance*

Life insurance in force was $109.7 billion at December 31, 1991 and $95.9 billion at December 31, 1990.  Allstate focuses on individual life insurance, annuity and pension products, and direct response marketing.

*Geographic Distribution of Insurance*

Except as noted below in regard to Massachusetts, the Allstate Insurance Group, through a variety of companies, is authorized to sell property-liability and life insurance in all 50 states, the District of Columbia, Puerto Rico and Canada.  To a limited extent, the Allstate Insurance Group is engaged, through affiliates, in the insurance business in Japan and the Republic of Korea and is a worldwide reinsurer.  The following tabulation reflects, in percentages, the principal geographic distribution of statutory premiums earned for the property-liability insurance business and statutory premium income for the life insurance business for the year ended December 31, 1991:

|  | CA | NY | FL | TX | IL | PA | NJ | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Property-Liability . . . . . . | 14.9 | 11.8 | 9.3 | 4.9 | 4.7 | 4.2 | 3.4 | 53.2 |
| Life . . . . . . . . . . . . . . | 15.1 | 2.5 | 6.6 | 5.5 | 5.5 | 5.1 | 13.1 | 53.4 |

No other jurisdiction accounted for as much as 3% of the combined statutory premiums for property-liability and life insurance.  For the year ended December 31, 1991, the jurisdictions listed above, together with Michigan, Canada and Georgia, accounted for 62.2% of property-liability statutory premiums earned and 60.4% of life insurance statutory premium income.

Except as to two companies which engage in mortgage insurance and reinsurance, the Allstate Insurance Group has not written or renewed any property-liability policies in Massachusetts since June 30, 1989 and has not taken any action to renew the related property-liability licenses, which expired by their terms on that date.  The Massachusetts Division of Insurance contends that the Allstate Insurance Group has not met certain unspecified obligations necessary to terminate the related property-liability licenses, and has indicated that it may initiate proceedings which could result in the revocation of the life licenses of the Allstate Insurance Group in Massachusetts.  The Allstate Insurance Group believes that it has substantially complied with all material obligations necessary to terminate such property-liability licenses.  See note 4 of the Allstate Insurance Group Notes to Summarized Financial Statements on page 39 of the Company's 1991 Annual Report, incorporated herein by reference to Item 8 hereof.

In September 1991, the Allstate Insurance Group filed with the New Jersey Insurance Commissioner a plan for the gradual and orderly withdrawal from the property-liability insurance market in New Jersey over a period of time that could extend beyond 1996. For further information, see the third paragraph on page 35 of the Allstate Insurance Group "Analysis of Operations" beginning on page 34 of the Company's 1991 Annual Report, incorporated herein by reference to Item 7 hereof.

In addition, in January 1992, the Allstate Insurance Group announced that it plans to sell its

-17-

MOAC000434

Canadian operations. The Canadian operations contributed less than 3% of the Allstate Insurance Group's total revenues for 1991.

### Seasonality

Although the insurance business generally is not seasonal, claims and claims expense for the property-liability insurance operations tend to be higher for periods of inclement weather.

### Employees

At December 31, 1991, the Allstate Insurance Group employed approximately 54,800 people, including approximately 15,400 full-time agents. In addition, approximately 56,000 non-employee producers represented the Allstate Insurance Group for certain of its insurance products in geographic areas or in market segments not served by full-time agents. Reinsurance is acquired largely through independent brokers. At December 31, 1991, there were approximately 39,400 employees who handled claim services, underwriting and policy services, investment management and administrative matters.

### Properties

The home office of Allstate Insurance Group is located in Northbrook, Illinois. The Allstate companies' business operations are conducted substantially from 49 property-liability offices and five life offices located principally in metropolitan areas throughout the United States and in Canada. The companies also have 325 claim service offices, sales facilities at approximately 9,580 locations (of which 470 are in Sears stores and sales offices), and 745 automobile damage inspection locations, most of which are located at claim service offices and sales facilities.

The home office of the Allstate Insurance Group and most major offices are owned. Other facilities (except those located at Sears stores and sales offices) are leased, in almost all cases for terms of not more than five years.

### Trademarks

The name "ALLSTATE" is used extensively in the Company's businesses, and is the subject of two renewable United States service mark registrations covering the word "Allstate" and the Allstate logotype. The slogan "You're in Good Hands With Allstate" and the graphic representation of the slogan, the "Good Hands" symbol, are also used extensively and are the subject of renewable United States service mark registrations. Allstate's rights in the United States to the name "ALLSTATE", the Allstate logotype, the "Good Hands" slogan and the "Good Hands" symbol continue so long as Allstate continues to exercise those rights. These service marks are material to the business of the Allstate Insurance Group.

### Competition

The Allstate Insurance Group is engaged in a highly competitive industry in which price competition continues to be very strong. Allstate's property-liability insurance operations rank second on the basis of statutory premiums earned among the nation's property-liability insurers. At year-end 1990, the last period for which figures were available, Allstate's life insurance operations ranked thirteenth among domestic life insurance companies based upon statutory premium income. Service, reputation and price are the principal methods of competition in the insurance industry.

-18-

MOAC000435

DEAN WITTER FINANCIAL SERVICES GROUP

The Dean Witter Financial Services Group ("DWFSG") provides a broad range of securities and credit products and services to individual and institutional customers. Dean Witter Financial Services Group Inc. ("DWFSGI") is a wholly-owned subsidiary of Sears, Roebuck and Co.

*Securities activities*

Securities activities are conducted through Dean Witter Reynolds Inc. ("DWR"), one of the largest registered broker-dealers in the United States, servicing approximately 2.3 million individual and institutional accounts, and other consolidated subsidiaries of DWFSGI. DWR is a member of every major securities, futures and options exchange in the United States. Securities activities consist of customer securities financing (including margin lending); securities, futures and options brokerage; asset management; investment banking and underwriting; and securities trading. DWR is a major broker-dealer in securities, options and futures and a distributor of mutual funds and annuity products, including a number of Allstate products.

*Interest Revenue.* Interest revenue accounted for 20.3% of 1991 Securities revenue. This revenue was derived primarily from interest on repurchase transactions, client margin accounts and owned securities. DWR's daily trading inventories of U.S. government and agency securities are financed through the use of repurchase agreements and other short-term borrowings. Customer securities transactions are effected either on a cash or margin basis. At December 31, 1991, DWR had approximately $1.5 billion of margin loans outstanding to its clients.

*Securities and Futures Brokerage Services.* Commissions from brokerage transactions for listed equity securities, listed options, commodities, mutual funds and over-the-counter securities accounted for 27.9% of 1991 Securities revenue. DWR acts as a broker and futures commission merchant in futures and options transactions for virtually all types of exchange traded futures. DWR also sponsors commodity fund limited partnerships. DWFSGI foreign subsidiaries also act as brokers in securities transactions and in transactions effected on foreign commodity futures exchanges.

*Asset Management.* DWR, through its InterCapital Division, acts as investment manager or administrator for a number of DWR sponsored registered investment companies. In addition, DWR renders investment advisory services to institutional and individual clients and to employee benefit plans and endowment funds. Revenue from asset management activities contributes a certain degree of stability to the earnings of DWR as it is based primarily on assets under management rather than the volume of securities transactions effected by DWR. As of December 31, 1991, the market value of assets under management by DWR's InterCapital Division, including 55 investment companies and other portfolios, was $49.0 billion. Asset management revenue constituted 20.6% of Securities revenue for 1991.

In early 1992, DWR and TCW Management Company, an affiliate of Trust Company of the West, entered into an agreement for the purpose of creating, managing, administering and distributing a family of investment companies and other managed pooled investment vehicles which will be offered on a retail basis within the United States. DWFSG will provide administrative and distribution services and affiliates of TCW Management Company will provide investment advisory services.

Dean Witter Trust Company, a wholly-owned subsidiary of DWFSGI organized as a New

-19-

Jersey trust company, acts as registrar and transfer agent for all DWR sponsored investment companies and offers various personal trust services.

*Investment Banking.* Investment banking revenue accounted for 7.9% of 1991 Securities revenue. DWR is an underwriter of corporate and municipal securities and also serves as a financial advisor to corporations, states and local governmental units regarding a wide range of financial transactions, including mergers and acquisitions, appraisals of fair value, leasing, special project financing and the issuance of securities.

Dean Witter Realty Inc., a wholly-owned subsidiary of DWFSGI, and its subsidiaries operate a diversified real estate investment and management business. Dean Witter Realty and its subsidiaries organize and manage both public and non-public limited partnerships.

Through Dean Witter Capital Corporation, a wholly-owned subsidiary of DWFSGI, DWFSG engages in merchant banking activities. Merchant banking involves acquiring equity interests in leveraged buy-out and other transactions and facilitating mergers and acquisitions by offering short-term financing and facilitating the underwriting or the refinancing of acquisition debt or equity securities.

*Securities Trading.* Securities trading revenue accounted for 18.4% of 1991 Securities revenue. DWR acts as a market-maker in fixed-income and equity securities. It buys and sells securities for its own account in transactions with institutional and individual customers as well as other dealers. DWR is a primary dealer in United States Government securities and makes secondary markets in Treasury and agency securities. At December 31, 1991, DWR was a market-maker in 1,047 over-the-counter equity securities traded on the National Association of Securities Dealers Automated Quotation System (NASDAQ). DWR also executes transactions in both listed and unlisted options and equity securities and often acts as principal to facilitate these transactions.

Dean Witter Puerto Rico Inc., a subsidiary of DWR organized under the laws of the Commonwealth of Puerto Rico, also acts as a dealer in fixed-income securities and engages in repurchase transactions and municipal finance activities in Puerto Rico.

*Credit Services activities*

Credit Services activities are conducted by Sears Consumer Financial Corporation ("SCFC"), a wholly-owned subsidiary of DWFSGI, and its subsidiaries. Revenues from Credit Services activities for 1991 (broken down by type of activity) were: credit card services, 93.7%; and consumer finance services, 6.3%.

Greenwood Trust Company ("Greenwood"), a wholly-owned subsidiary of SCFC, is a Delaware bank, the deposits of which are insured by the Federal Deposit Insurance Corporation ("FDIC"), and is not a member of the Federal Reserve System. It is engaged in the consumer banking business but does not engage in the business of making commercial loans.

Greenwood is the primary issuer of the Discover Card, which is a general-purpose credit and financial services card in competition with other bank credit cards and travel and entertainment cards and a vehicle for delivery of various financial services. As of December 31, 1991, there were approximately 26.5 million Discover Card accounts with approximately 41.2 million Cardmembers. Greenwood is also the issuer of the Discover Card Private Issue, an enhanced-feature version of the Discover Card for which there is an annual membership fee. Discover Services Corporation, a

MOAC000437

wholly-owned subsidiary of SCFC, issues a limited number of Discover Card Corporate Cards used exclusively by employees of Sears and its subsidiaries.

At December 31, 1991, Discover Card was accepted at approximately 1.4 million service establishment locations, including Sears. Discover Cardmembers can also use their cards to obtain cash advances at Sears stores, and through, at year-end, approximately 36,000 automated teller machines, and at certain other locations throughout the United States pursuant to contractual arrangements. Cash advances can also be obtained by means of checks drawn by Cardmembers against their accounts.

Discover Card is distinguished from other bank credit cards by a combination of features which, in general, include no annual membership fee (except in the states of North Carolina and Wisconsin, where the fee is $15 per year); a Cashback Bonus, which pays Cardmembers a percentage of their purchase amounts, ranging up to one percent, based on their annual purchases; the Discover Saver's Account, an FDIC-insured money market deposit account issued by Greenwood with a tiered interest rate structure that rewards higher balances with higher yields; Discover CD's, FDIC-insured certificates of deposit issued by Greenwood with maturities of three months to 5 years; and cash advances with a grace period for Cardmembers who repay their balance every month.

Greenwood has an ongoing program pursuant to which a portion of its Discover Card receivables has been sold through Discover Receivables Financing Corporation ("DRFC") and Discover Receivables Financing Group, Inc. ("DRFG") to trusts that issue credit card pass-through certificates to public and private investors. Pursuant to contractual arrangements, Greenwood remains the servicer on the accounts giving rise to the receivables and receives a fee for the services performed. DRFC and DRFG are Delaware corporations and wholly-owned subsidiaries of SCFC Receivables Corp. ("SRC"), a wholly-owned subsidiary of SCFC. DRFC's and DRFG's executive offices are located in New Castle, Delaware. See Dean Witter Financial Services Group "Analysis of Operations - Credit Services," beginning on page 41 of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 7 hereof.

Discover Card Services, Inc., a wholly-owned subsidiary of SCFC, performs on behalf of Greenwood and Discover Services Corporation various functions for the Discover Card, including contracting with merchants and service establishments to accept the Discover Card. Discover Card Services, Inc. has operations centers in Columbus, Ohio, Sandy, Utah, and Scottsdale, Arizona.

Discover Card Bank of New Castle ("Discover Card Bank"), a wholly-owned subsidiary of SCFC, is a Delaware bank, the deposits of which are insured by the FDIC, and is not a member of the Federal Reserve System. Discover Card Bank is engaged only in consumer credit card operations.

SPS Transaction Services, Inc., a consolidated, 74.3% owned subsidiary of SCFC organized in October 1991 to carry on the business of its two wholly-owned subsidiaries, SPS Payment Systems, Inc. and Hurley State Bank, was a wholly-owned subsidiary of SCFC until March 3, 1992, when SPS Transaction Services, Inc. sold 3,450,000 shares of its common stock in a public offering for net proceeds of approximately $50 million.

SPS Payment Systems, Inc. is engaged in the transaction processing business in which it provides network services, private label credit card processing, remittance processing and related financial services to commercial customers. SPS Payment Systems, Inc. has operations centers

-21-

in Gray, Tennessee, Sioux Falls, South Dakota and Layton, Utah.

Hurley State Bank is a South Dakota bank, the deposits of which are insured by the FDIC, and is not a member of the Federal Reserve System. Hurley State Bank is engaged only in consumer credit card operations. It issues private label credit cards pursuant to arrangements entered into with retailers. Hurley State Bank has an ongoing program pursuant to which a substantial portion of its private label credit card receivables has been sold to a private investor. Pursuant to contractual arrangements, SPS Payment Systems, Inc. acts as a recourse party for the sold interests and as the servicer on the accounts giving rise to the receivables and receives a fee for the services performed, and DWFSGI has guaranteed SPS Payment Systems, Inc.'s obligations as a recourse party.

SCFC ILC Inc., a wholly-owned subsidiary of SCFC doing business as MountainWest Financial ("MountainWest Financial"), is a Utah industrial loan corporation, the deposits of which are insured by the FDIC, and is not a member of the Federal Reserve System. On May 25, 1990, MountainWest Financial purchased the business, including the Visa U.S.A. Inc. membership, of MountainWest Savings and Loan Association, a federally-insured savings and loan located in Utah. MountainWest Financial engages primarily in the issuance of credit cards, including both VISA credit cards and private label credit cards pursuant to arrangements entered into with retailers. MountainWest Financial has plans to expand its existing VISA card program by introducing a new and widely-marketed VISA card, which would offer consumers innovative terms, to be marketed under the name "Prime Option." Visa U.S.A. Inc. has refused to authorize the production of additional VISA credit cards for the Prime Option program and asserted that Visa U.S.A. Inc.'s by-laws prohibit MountainWest Financial from issuing VISA cards. MountainWest Financial's plans to expand its VISA card program have been postponed pending the outcome of litigation originally initiated by it against VISA U.S.A. Inc.

The Lending Services Division of SCFC engages in the business of making various types of consumer loans, including auto, boat, recreational vehicle and home equity loans, and has operations centers in Irvine, California, Riverwoods, Illinois, Murray Hill, New Jersey and Sioux Falls, South Dakota.

SCFC Receivables Financing Corporation ("SCFCRFC") is a Delaware corporation and a wholly-owned subsidiary of SCFC. The principal executive offices of SCFCRFC are located in New Castle, Delaware. Through SCFCRFC, SCFC sells receivables originated by SCFC or its subsidiaries. SCFCRFC has sold receivables representing (i) home equity loans secured by second mortgages on one to four family residential properties, (ii) motor vehicle retail installment sales contracts and installment loans and (iii) recreational vehicle retail installment sales contracts and installment loans.

*Employees*

DWFSG companies employ approximately 24,700 people, including more than 6,600 account executives.

*Properties*

DWFSGI maintains executive offices in New York, New York. DWR maintains executive offices in New York, New York, 340 sales office locations throughout the United States, and 69 additional sales locations in Sears stores. Companies which are part of the Securities activities also

-22-

MOAC000439

maintain offices in five cities in four other countries around the world. All of these offices are leased for terms of one to 20 years.

Greenwood leases its main office location in New Castle, Delaware, and operates branches in owned premises in Greenwood, Delaware and leased premises in Dover, Delaware. Discover Card Bank operates from one location, which is leased, in New Castle, Delaware. Hurley State Bank operates from one location, which is leased, in Sioux Falls, South Dakota. SCFC owns, and operates from, an office building in Riverwoods, Illinois. Discover Card Services, Inc., Discover Services Corporation, SPS Transaction Services, Inc. and SPS Payment Systems, Inc. executive offices are also located in Riverwoods, Illinois. MountainWest Financial leases its main office location in Sandy, Utah.

*Trademarks*

The name "DEAN WITTER REYNOLDS" is used extensively in securities activities and is the subject of a renewable United States service mark registration. The rights of DWR in the United States to this name continue so long as it uses the name. The service mark "DISCOVER" is used extensively by the DWFSG Credit Services businesses, most significantly as the name of its financial services card. It is the subject of several United States and foreign trademark and service mark registrations and pending applications. The rights of DWFSG in the United States to this name continue so long as it uses the name. These service marks are material to the respective businesses of DWFSG to which they relate.

*Competition and Regulation*

DWFSG companies operate in highly competitive industries in which price, service and reputation are the principal means of competition.

DWR competes with other securities and futures brokers and investment banking firms in the financing and sale of securities and futures. DWFSG companies also compete with other financial services intermediaries, including banks, investment companies and insurance companies, in selling various investments and providing financial management services.

The business of DWR is subject to stringent regulation. DWR is registered with the Securities and Exchange Commission ("SEC"), each of the 50 states, the District of Columbia and the Commonwealth of Puerto Rico as a broker-dealer and is a member of the National Association of Securities Dealers, Inc., and all major United States securities, options and futures exchanges. DWR is registered with the Commodities Futures Trading Commission as a Futures Commission Merchant and is a member of the National Futures Association. DWR is also registered as an investment adviser under the Investment Advisers Act of 1940. Such regulation governs various matters, including but not limited to sales methods, record keeping and financial reporting requirements, regulatory capital requirements, trade practices and dealings with the public.

DWR is also a member of the Securities Investor Protection Corporation ("SIPC"), a federally chartered corporation created for the purpose of protecting clients of securities broker-dealers in the event of financial failure of an SIPC member firm.

Greenwood, Discover Card Bank, Hurley State Bank and MountainWest Financial compete with savings and loan associations and banks in deposit taking and lending. The Discover Card and the MountainWest Visa card compete directly with other bank-sponsored general purpose credit

-23-

MOAC000440

cards and with travel and entertainment cards.

The deposits of Greenwood, Discover Card Bank, Hurley State Bank and MountainWest Financial are insured by the FDIC, an instrumentality of the United States Government. Each institution is subject to comprehensive regulation, examination and supervision by the state banking commissioner of the state in which it is located and the FDIC.

From time to time, competitive conditions and federal and state legislation may affect credit card interest rates. While the Company cannot predict the effect of future competitive conditions and legislation or the measures which the Company might take in response thereto, a significant reduction in the interest rates charged by DWFSG's Credit Services operations could have an adverse effect on the Company.

The Lending Services Division of SCFC is qualified to do business in all 50 states and competes with banking institutions and finance companies. The Lending Services Division is subject to regulation by state regulatory agencies in states where it must be licensed to offer its loans.

SPS Payment Systems, Inc. competes with other providers of transaction processing services, including banks and bank service companies.

Under the Competitive Equality Banking Act of 1987, Sears is permitted to retain ownership of Greenwood provided Sears and its subsidiaries remain in compliance with certain provisions of the Act. The Act limits the growth of the average asset base of an existing limited-service bank, such as Greenwood, for each twelve-month period ending September 30, to 7% of the bank's average asset base for the preceding twelve-month period. Discover Card Bank and Hurley State Bank, which operate as credit card banks under the Act, are not subject to the 7% asset growth cap, but are limited to engaging solely in credit card operations and are subject to certain other restrictions applicable to credit card banks under the Act. MountainWest Financial, which operates as an industrial loan company under the Act, is also not subject to the 7% growth cap; it may not accept demand deposits and is subject to certain other restrictions applicable to industrial loan companies under the Act.

The provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 restructured the federal deposit insurance funds. This legislation also significantly increased assessment rates for deposit insurance premiums and prohibits undercapitalized banks from accepting deposits from third-party intermediaries.

Because of the many developments that have occurred, and continue to occur, in the financial services industry, and the possibility of industry changes resulting from legislative and regulatory action or judicial decisions, it is possible that changes will be necessary in the businesses conducted by DWFSG companies. The Company believes that viable alternatives are likely to exist for those DWFSG companies to continue to conduct their business in all material respects, regardless of the form of future developments.

-24-

MOAC000441

## COLDWELL BANKER REAL ESTATE GROUP

The Coldwell Banker Real Estate Group ("Coldwell Banker") acts as a broker in residential real estate, offers title, escrow and relocation services, conducts mortgage operations, originates, invests in and acts as a servicer of residential mortgage loans and develops, manages and invests in shopping centers, office buildings and community centers.

### The Residential Group

Through its Residential Group, Coldwell Banker acts as agent in residential real estate transactions, representing others in the purchase and sale of single and multi-family residences. Residential operations were served by 479 company-owned offices as of December 31, 1991.

Coldwell Banker's Residential Affiliate program, through which franchisees may use the Coldwell Banker name, is available to selected independent real estate brokers, and consisted of 1,057 franchisees operating 1,447 offices in 50 states, Canada and Puerto Rico as of December 31, 1991.

The Residential Group also provides a residential referral service through Relocation 1, Inc. for its owned and affiliated brokers. An affiliated company, Coldwell Banker Relocation Services, Inc., assists transferred employees of client businesses in relocating, selling their former residences and buying homes in their new locations. The Residential Group also furnishes title and escrow services in selected markets.

### The Mortgage Group

Sears Mortgage Corporation ("SMC"), a wholly-owned subsidiary, is a first mortgage lender on one to four unit residential real estate. SMC conducts lending operations out of 103 locations in 32 states, all of which are leased for periods of one month to seven years, with the average period being three years. SMC offers consumers a wide variety of mortgage products including fixed rate, adjustable rate and graduated payment mortgages. SMC is also involved in lending for local and state bond programs established to assist low income, first time home buyers. Generally, SMC sells the mortgage loans it originates in the secondary mortgage market, retaining the right, in a majority of cases, to service the loans for a fee.

Sears Mortgage Securities Corporation ("SMSC"), a wholly-owned subsidiary, is involved in the secondary mortgage market primarily through purchasing, pooling and selling mortgage loans. SMSC also acts as master servicer and originator of, and issues, mortgage pass-through certificates, collateralized mortgage obligations and loan participation pools. SMSC also has administrative responsibilities with respect to collateralized mortgage obligation securities and real estate mortgage investment conduit securities.

Sears Savings Bank ("SSB"), a wholly-owned subsidiary of Sears, Roebuck and Co., is a California chartered savings and loan which has a savings and loan operation in California and certain limited operations under an agency arrangement in Illinois. SSB's principal focus is the purchase of residential mortgages, primarily from SMC. SSB's deposits are insured by the FDIC's Savings Association Insurance Fund, an instrumentality of the United States Government. SSB had total assets of approximately $5.4 billion as of December 31, 1991.

MOAC000442

*Homart Development Co. and Homart Community Centers, Inc.*

Homart Development Co. ("Homart"), a wholly-owned subsidiary, develops and manages shopping centers and office buildings. Homart Community Centers, Inc., a wholly-owned subsidiary, develops community centers. At December 31, 1991, Homart owned and operated 15 regional shopping centers, was a partner in joint ventures and limited partnerships that owned and operated 12 other centers, and managed eight centers for other owners. Homart also owned and operated 19 office buildings and was a partner in joint ventures that owned and operated two office buildings. Homart Community Centers, Inc. was the sole general partner in a limited partnership that owned one community center. Other commercial properties, including multi-use developments and community centers, are being developed by Homart and Homart Community Centers, Inc., and by joint ventures and limited partnerships in which they are partners. See note 2 of the Coldwell Banker Real Estate Group Notes to Summarized Financial Statements on page 47 of the Company's 1991 Annual Report, incorporated herein by reference in response to Item 8 hereof.

### Seasonality

Residential real estate brokerage and mortgage operations are subject to irregular seasonal fluctuations. Historically, revenues from residential real estate brokerage are substantially greater in the spring and summer months.

### Employees

At December 31, 1991, Coldwell Banker was composed of approximately 24,400 people, including approximately 17,900 real estate brokers and sales associates who are independent contractors. In addition, there were approximately 22,100 real estate brokers and sales associates for Coldwell Banker Residential Affiliates franchisees.

### Properties

Coldwell Banker has executive offices in Chicago, Illinois and Los Angeles, California. Excluding Homart properties, independent franchised brokerage offices and residential referral offices, Coldwell Banker maintains approximately 580 offices (most of which are leased for terms ranging from one to 10 years).

### Trademarks

The name "COLDWELL BANKER" is used extensively in Coldwell Banker's real estate business, and is the subject of a renewable United States service mark registration. The rights in the United States to this name continue so long as Coldwell Banker uses it. The use of this service mark is material to Coldwell Banker.

### Competition and Regulation

The business of Coldwell Banker is highly competitive. Competition in the various real estate related services, including brokerage, mortgage services and property management, is based on price, reputation and service. Competition in the commercial property development business relates to securing of tenants, including major department stores for shopping centers (based primarily on location, rental rates and service) and site acquisition. Shopping center operation also involves competition for customers with other retail locations (based primarily on location, facilities, tenants

-26-

MOAC000443

and advertising).

SSB competes with savings and loan associations and banks in deposit taking and purchasing residential mortgage loans for its portfolio.  SSB is a member of the Federal Home Loan Bank System and is subject to comprehensive regulation, examination and supervision by the California Department of Savings and Loans, the Office of Thrift Supervision and the FDIC, including the regulatory capital requirements of the Office of Thrift Supervision and the FDIC.  Sears is a "savings and loan holding company" under Section 408 of the National Housing Act, as amended, and, as such, is subject to Office of Thrift Supervision and FDIC regulations.

MOAC000444

FINANCE SUBSIDIARIES

To meet certain capital requirements of its businesses, Sears borrows on a short-term basis through the issuance of notes to, and from time to time sells retail customer receivables balances to, Sears Roebuck Acceptance Corp. ("SRAC"), a wholly-owned finance subsidiary. SRAC obtains funds primarily from the issuance of commercial paper, demand basis borrowing agreements with bank trust departments, and the placement with bank trust departments of variable interest rate notes payable 13 months after demand. Sears and SRAC have also borrowed through Sears Overseas Finance N.V. ("SOFNV"), a wholly-owned international finance subsidiary, which has obtained funds from the issuance of long-term debt, primarily in Europe, in both dollars and foreign currencies.

The debt and related interest expense of SRAC and SOFNV is allocated to the business groups in the manner described in the sections entitled "Basis for assignment of debt" and "Debt and related interest expense," under "Summary of Significant Accounting Policies" in the Notes to Consolidated Financial Statements and the Sears Merchandise Group Notes to Summarized Financial Statements, respectively, and also in the Dean Witter Financial Services Group "Analysis of Financial Condition," on pages 21, 33, and 42, respectively, in the Company's 1991 Annual Report, incorporated herein by reference in response to Items 7 and 8 hereof.

Discover Credit Corp. ("DCC"), a wholly-owned finance subsidiary of Sears, borrows money and lends the proceeds of such borrowings to certain direct and indirect subsidiaries of Sears operating within DWFSG. DCC may also engage in financing certain direct and indirect subsidiaries of Coldwell Banker, and may also purchase accounts receivable from its borrowers from time to time. DCC obtains funds primarily from the issuance of commercial paper and medium-term notes, and may issue other debt instruments.

The debt and related interest expense of DCC is allocated primarily to DWFSG for the financing of Discover Card receivables and, in the first three quarters of 1991, to Coldwell Banker for funding of working capital requirements.

In addition, various direct and indirect subsidiaries of Sears have engaged in asset securitization or similar programs in which assets such as receivables and mortgage loans are sold in public or private transactions. See "Sears Merchandise Group - Credit," "Sears Merchandise Group - International - Canada and Mexico," "Dean Witter Financial Services Group - Credit Services activities," and "Coldwell Banker Real Estate Group - The Mortgage Group," beginning on pages 11, 11, 20, and 25, respectively.

-28-

MOAC000445

*Executive Officers of the Registrant*

The following tabulation sets forth the names of the executive officers of the Company, the positions and offices with the Company held by them, the date they first became officers of the Company or a subsidiary of the Company, and their current ages:

| | | | |
|---|---|---|---|
| Edward A. Brennan* | Chairman of the Board of Directors, President and Chief Executive Officer | 1978 | 58 |
| James M. Denny | Vice Chairman | 1986 | 59 |
| Edward M. Liddy | Senior Vice President and Chief Financial Officer and Acting Comptroller | 1989 | 46 |
| Charles F. Moran | Senior Vice President, Administration | 1980 | 62 |
| David Shute | Senior Vice President, General Counsel and Secretary | 1981 | 61 |
| Randolf H. Aires | Vice President, Governmental Affairs | 1981 | 57 |
| Charles A. Carlson | Vice President, Technology Services | 1981 | 59 |
| Edward J. Condon, Jr. | Vice President and Treasurer | 1985 | 51 |
| Warren F. Cooper | Vice President, Human Resources | 1987 | 47 |
| David P. Norum | Vice President, Taxes | 1980 | 60 |
| Richard T. Quinn | Vice President, Quality | 1992 | 45 |
| Charles J. Ruder | Vice President, Public Affairs | 1985 | 54 |
| Jane J. Thompson | Vice President, Planning | 1988 | 40 |
| Wayne E. Hedien | Chairman and Chief Executive Officer Allstate Insurance Group | 1980 | 58 |
| Arthur J. Hill | Chairman and Chief Executive Officer Coldwell Banker Real Estate Group | 1985 | 52 |
| Philip J. Purcell | Chairman and Chief Executive Officer Dean Witter Financial Services Group | 1978 | 48 |

---

\* Also a director of Sears, Roebuck and Co.

No family relationships exist among the above-named individuals.

Each of the officers named above was elected to serve in the office indicated until the first meeting of the Board of Directors following the annual meeting of shareholders in 1992 and until his or her successor is elected and qualified or until such officer reaches retirement age or resigns.

With the exception of Mr. Liddy and Ms. Thompson, these officers have held the positions set forth in the above tabulation for at least the last five years or have served the Company in various executive or administrative capacities for at least that length of time.

Mr. Liddy joined Sears Specialty Merchandising in April 1988. Prior to joining Sears he served from 1986 to 1988 as Executive Vice President and Chief Financial Officer of ADT, Inc.

Ms. Thompson joined Sears Specialty Merchandising in March 1988. Prior to joining Sears she was a partner with McKinsey & Company, Inc. (a management consulting firm) from 1978 to 1988.

MOAC000446

*Item 2.        Properties*

The Company owns Sears Tower in Chicago, Illinois, and Sears House in Washington, D.C. Sears Tower currently serves as corporate headquarters for Sears, Roebuck and Co. and as headquarters for the Merchandise Group.  A facility is under construction on a site acquired by the Company for the Merchandise Group's headquarters and other development in Hoffman Estates, Illinois.  The Company entered into a mortgage financing of, with separate options to purchase, Sears Tower and related properties, in 1990.  The options to purchase the properties are exercisable in 2005 at a price reflective of market values at that time.  The Company will continue to own the properties prior to the exercise of the options, and will share in any appreciation of the properties.

STS leases a facility which serves as its headquarters and a data processing and telecommunications center in Schaumburg, Illinois, and owns data processing centers in Dallas, Texas and Columbus, Ohio.

Information regarding other principal properties of the Company is incorporated herein by reference to the following portions of Item 1 hereof: Sears Merchandise Group (pages 7 - 10); Allstate Insurance Group (page 18); Dean Witter Financial Services Group (pages 22 and 23); and Coldwell Banker Real Estate Group (pages 25 and 26).

*Item 3.        Legal Proceedings*

Various legal actions and governmental proceedings are pending against Sears and its subsidiaries, many involving ordinary routine litigation incidental to the businesses.  Other matters contain allegations which are non-routine and involve compensatory, punitive or antitrust treble damage claims in very large amounts, as well as other types of relief.  The consequences of these matters are not presently determinable but, in the opinion of management of the Company, the ultimate liability of the Company in excess of reserves currently recorded will not have a material effect on the shareholders' equity of the Company.

*Item 4.        Submission of Matters to a Vote of Security Holders*

None

-30-

PART II

*Item 5.       Market for Registrant's Common Equity and Related Stockholder Matters*

DESCRIPTION OF SEARS COMMON SHARES

The summary contained herein of certain provisions of the Restated Certificate of Incorporation, as amended (the "Certificate of Incorporation"), of Sears does not purport to be complete and is qualified in its entirety by reference to the provisions of such Certificate of Incorporation filed as Exhibit 3.(a) hereto and incorporated by reference herein.

The Certificate of Incorporation authorizes the issuance of 1,000,000,000 shares, par value $0.75 per share, and 50,000,000 preferred shares, par value $1.00 per share. As of March 10, 1992, 3,250,000 8.88% Preferred Shares, First Series (the "8.88% Preferred Shares") and 7,187,500 Series A Mandatorily Exchangeable Preferred Shares (the "Series A Preferred Shares"), were outstanding. Additional preferred shares may be issued in series with rights and privileges as authorized by the Board of Directors.

Subject to the restrictions on dividends mentioned below and the rights of the holders of the 8.88% Preferred Shares, the Series A Preferred Shares and any preferred shares which may hereafter be issued, each holder of common shares is entitled to one vote per share, to vote cumulatively for the election of directors, to dividends declared by the Board of Directors, and upon liquidation to share in the assets of Sears pro rata in accordance with such holdings after payment of all liabilities and obligations. The holders of common shares have no preemptive, redemption, subscription or conversion rights. Sears Board of Directors is divided into three classes serving staggered three-year terms. Because the Board is classified, shareholders wishing to exercise cumulative voting rights to assure the election of one or more directors must own approximately three times as many shares as would be required if the Board were not classified. Directors may be removed only for cause upon the affirmative vote of at least 75% of the shares entitled to vote. Such a vote is also required to alter, amend or repeal, or to adopt any provision inconsistent with, Article 5 of the Certificate of Incorporation concerning directors, or to fix the number of directors by shareholder vote. There are no restrictions on repurchases or redemption of shares by Sears which do not impair its capital, except for limitations under the terms of outstanding preferred shares and except that the indentures relating to certain of Sears long-term debt and an agreement pursuant to which Sears has provided a credit facility in support of certain tax increment revenue bonds issued by the Village of Hoffman Estates, Illinois, in connection with the construction of the new headquarters facility for Sears Merchandise Group provide that Sears will not take certain actions, including the declaration of cash dividends and the repurchase of shares, which would cause unencumbered assets plus certain capitalized rentals to drop below 150% of liabilities plus such capitalized rentals (as such terms are defined in the indentures and the agreement).

The amount by which such unencumbered assets plus capitalized rentals exceeds 150% of such liabilities plus capitalized rentals, as computed under certain of the indenture provisions and those of the credit facility agreement referred to above, is set forth in note 14 of the Notes to Consolidated Financial Statements on page 27 of the Company's 1991 Annual Report.

The 8.88% Preferred Shares and the Series A Preferred Shares rank on a parity with respect to dividend rights and rights upon dissolution.

The 8.88% Preferred Shares were sold in the form of depositary shares, each representing

-31-

MOAC000448

a one-fourth interest in an 8.88% Preferred Share. In general, holders of the 8.88% Preferred Shares are entitled to (i) receive, when and as declared by the Board, cumulative cash dividends, payable quarterly, at a rate of 8.88% per annum on $100 per share, prior to payment of dividends on the common shares or the redemption, purchase or other acquisition for consideration of common shares by Sears and (ii) $100 per share, plus accrued and unpaid dividends, in the event of any dissolution of Sears, prior to any payment to the holders of the common shares. The 8.88% Preferred Shares may be redeemed, at Sears option, on or after November 9, 1996 or, in certain limited circumstances, prior to such date. Holders of the 8.88% Preferred Shares are not entitled to voting rights except in limited circumstances (generally voting together with the holders of the Series A Preferred Shares).

The Series A Preferred Shares were sold in the form of depositary shares, each representing a one-fourth interest in a Series A Preferred Share. In general, holders of the Series A Preferred Shares are entitled to (i) receive, when and as declared by the Board, cumulative cash dividends, payable quarterly, at a rate of $15.00 per annum, prior to payment of dividends on the common shares or the redemption, purchase or other acquisition for consideration of common shares by Sears and (ii) $172.00 per share, plus accrued and unpaid dividends, in the event of any dissolution of Sears, prior to any payment to the holders of the common shares. Prior to April 1, 1995, in general, (i) Sears may elect to exchange, in whole or in part, each outstanding Series A Preferred Share for (a) common shares having a market value initially equal to $257.00, and declining by $.018851 each day following February 27, 1992, to $237.13 on February 1, 1995, and equal to $236.00 thereafter, plus (b) accrued and unpaid dividends, and (ii) immediately prior to any merger or consolidation of Sears (other than with a wholly-owned subsidiary) that results in the conversion of the common shares into, exchange of the common shares for, or the right to receive, other securities or property, each outstanding Series A Preferred Share will be exchanged for (a) four common shares (subject to adjustment in certain circumstances), plus (b) accrued and unpaid dividends, plus (c) initially, $21.00, declining by $.018851 each day following February 27, 1992, to $1.13 on February 1, 1995, and zero thereafter. On April 1, 1995, each outstanding Series A Preferred Share will be required to be exchanged for four common shares (subject to adjustment in certain circumstances) plus accrued and unpaid dividends. Each holder of a Series A Preferred Share has the same voting rights as the holder of a common share (with the holders of the Series A Preferred Shares and the holders of the common shares generally voting together as one class). Holders of the Series A Preferred Shares also have certain additional voting rights (generally voting together with the holders of the 8.88% Preferred Shares) in limited circumstances.

Information regarding the principal market for Sears common shares, the number of shareholders, and the prices of, and dividends paid on, Sears common shares is incorporated herein by reference to the section headed "Common Stock Market Information and Dividend Highlights" on page 28 of the Company's 1991 Annual Report and to the information under the heading "Shareholders' equity - Dividend payments" contained in note 14 of the Notes to Consolidated Financial Statements on page 27 of the Company's 1991 Annual Report.

*Item 6.        Selected Financial Data*

The material under the caption "Ten-Year Summary of Consolidated Financial Data" on pages 10 - 11 of the Company's 1991 Annual Report is incorporated herein by reference.

-32-

MOAC000449

Item 7.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The information contained under the captions "Analysis of Consolidated Operations" on pages 14 and 15, "Analysis of Consolidated Financial Condition" on pages 17 and 19, Sears Merchandise Group - "Analysis of Operations" on pages 29 - 31, Sears Merchandise Group - "Analysis of Financial Condition" on page 32, Allstate Insurance Group - "Analysis of Operations" on pages 34 and 35, Allstate Insurance Group - "Analysis of Financial Condition" on pages 36 - 38, Dean Witter Financial Services Group - "Analysis of Operations" on pages 40 and 41, Dean Witter Financial Services Group - "Analysis of Financial Condition" on page 42, Coldwell Banker Real Estate Group - "Analysis of Operations" on pages 44 and 45, and Coldwell Banker Real Estate Group - "Analysis of Financial Condition" on page 46, of the Company's 1991 Annual Report is incorporated herein by reference.

Item 8.    *Financial Statements and Supplementary Data*

The consolidated financial statements of the Company and the summarized financial statements related to the Company's four business groups, including the notes to all such statements, and other information on pages 10 - 48 (other than that incorporated by reference to Item 7 hereof) of the Company's 1991 Annual Report is incorporated herein by reference.

Item 9.    *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

None

-33-

MOAC000450

PART III

*Item 10.*     *Directors and Executive Officers of the Registrant*

Certain information regarding directors of the Company (including certain information concerning their compliance with Section 16(a) of the Securities Exchange Act of 1934) is incorporated herein by reference to the descriptions under "Election of Directors" on pages 2 - 4 of the Company's 1992 Proxy Statement.

Information regarding executive officers of the Company (including certain information concerning their compliance with Section 16(a) of the Securities Exchange Act of 1934) is incorporated herein by reference to Item 1 of this Report under the caption "Executive Officers of the Registrant" on page 29 and to the description in note (b) on page 4 under "Election of Directors" in the Company's 1992 Proxy Statement.

*Item 11.*     *Executive Compensation*

Information regarding executive compensation is incorporated by reference to the material under the captions "Election of Directors," "Further Information Concerning the Board of Directors," "Executive Compensation," "Benefit Plans" and "Employees Stock Plans" on pages 2 - 13 of the Company's 1992 Proxy Statement.

*Item 12.*     *Security Ownership of Certain Beneficial Owners and Management*

Information regarding security ownership of certain beneficial owners and management is incorporated herein by reference to the material under the headings "Election of Directors" on pages 2 - 4 and "Benefit Plans - Security Ownership of Certain Beneficial Owners" on page 7, and in the first and third paragraphs under the heading "Benefit Plans - Profit Sharing, Stock Ownership and Savings Plans" on page 7, of the Company's 1992 Proxy Statement.

*Item 13.*     *Certain Relationships and Related Transactions*

Information regarding certain relationships and related transactions is incorporated herein by reference to the material under the heading "Certain Transactions" on page 19 of the Company's 1992 Proxy Statement.

-34-

MOAC000451

## PART IV

Item 14.    Exhibits, Financial Statement Schedules, and Reports on Form 8-K

(a)1 and 2 -   An "Index to Financial Statements and Financial Statement Schedules" has been filed as a part of this Report beginning on page S-1 hereof.

(a)3 -   Exhibits:

An "Exhibit Index" has been filed as a part of this Report beginning on page E-1 hereof.

(b) -   Reports on Form 8-K:

A Current Report on Form 8-K for October 16, 1991 was filed with the Securities and Exchange Commission (the "Commission") on October 21, 1991 to report, under Item 5, that the California Commissioner of Insurance had issued an order directing Allstate Insurance Company to refund certain sums to its customers pursuant to rollback regulations under California Proposition 103, certain other matters relating to California Proposition 103 and that, despite the Commissioner's order, the Company does not believe that Allstate Insurance Company will be required to refund any monies to its California policyholders. A Current Report on Form 8-K for October 23, 1991 was filed with the Commission on October 24, 1991 to report, under Item 5, that the Company issued a press release reporting results for the third quarter of 1991 and to file, under Item 7, a copy of such press release. A Current Report on Form 8-K for October 28, 1991 was filed with the Commission on October 29, 1991 to report, under Item 5, Allstate Insurance Company's estimate of its losses as a result of the Oakland, California fire during the weekend of October 17, 1991. A Current Report on Form 8-K for November 5, 1991 was filed with the Commission on November 26, 1991 to report, under Item 5, that Sears had executed an Underwriting Agreement with Dean Witter Reynolds Inc., Goldman, Sachs & Co. and Morgan Stanley & Co., Incorporated (the "Representatives") relating to debt securities and, pursuant thereto, a Pricing Agreement with the Representatives, as representatives of the several underwriters named in the Pricing Agreement, relating to $350,000,000, $250,000,000 and $300,000,000 aggregate principal amount of Sears 7.000% Notes due 1994, 8.450% Notes due 1998 and 9.375% Debentures due 2011, respectively, and to file, under Item 7, copies of such Underwriting and Pricing Agreements and the Indenture, forms of notes and debentures and opinion of counsel to Sears relating to such notes and debentures. A Current Report on Form 8-K for December 13, 1991 was filed with the

-35-

Commission on January 9, 1992 to report, under Item 5, that Sears entered into a Distribution Agreement with Dean Witter Reynolds Inc., Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated and Salomon Brothers Inc as agents, relating to $2,000,000,000 aggregate principal amount of Medium-Term Notes Series VI to be issued and sold from time to time pursuant to the Distribution Agreement, and to file, under Item 7: such Distribution Agreement; the Indenture, the forms of notes, an opinion of counsel to Sears, an opinion of special tax counsel to Sears, and a Letter of Representations between Sears, the trustee under the aforesaid Indenture and The Depository Trust Company relating thereto; and the By-Laws of Sears as amended to December 19, 1991.

MOAC000453

## SIGNATURES

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SEARS, ROEBUCK AND CO.
(Registrant)

*E. M. Liddy*

By:    Edward M. Liddy
        Senior Vice President and
        Chief Financial Officer and
        Acting Comptroller

March 27, 1992

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| Edward A. Brennan | Director, Chairman of the Board of Directors, President and Chief Executive Officer ) | |
| Edward M. Liddy | Senior Vice President and Chief Financial Officer and Acting Comptroller (Principal Financial Officer and Principal Accounting Officer) ) | |
| Warren L. Batts | Director ) | March 27, 1992 |
| E. Mandell de Windt | Director ) | |
| Sybil C. Mobley | Director ) | |
| Norma Pace | Director ) | |

| Signature | Title | Date |
|---|---|---|

Nancy C. Reynolds    Director

Clarence B. Rogers, Jr.    Director

Donald H. Rumsfeld    Director

Edgar B. Stern, Jr.    Director

March 27, 1992

MOAC000455

**SEARS, ROEBUCK AND CO.**
**INDEX TO FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES**
**Year Ended December 31, 1991**

The following consolidated financial statements, notes thereto and related information of Sears, Roebuck and Co. are incorporated herein by reference to the Company's 1991 Annual Report.

| | Page* |
|---|---|
| Consolidated Statements of Income ** | 14 |
| Consolidated Statements of Financial Position ** | 16 |
| Consolidated Statements of Cash Flows ** | 18 |
| Consolidated Statements of Shareholders' Equity ** | 20 |
| Notes to Consolidated Financial Statements ** | 21 |
| Quarterly Results ** | 28 |
| Common Stock Market Information and Dividend Highlights *** | 28 |
| Sears Merchandise Group | |
| Summarized Statements of Income ** | 29 |
| Summarized Statements of Financial Position ** | 31 |
| Summarized Statements of Cash Flows ** | 32 |
| Notes to Summarized Sears Merchandise Group Financial Statements ** | 33 |
| Allstate Insurance Group | |
| Summarized Statements of Income ** | 34 |
| Summarized Statements of Financial Position ** | 36 |
| Summarized Statements of Cash Flows ** | 37 |
| Notes to Summarized Allstate Insurance Group Financial Statements ** | 38 |
| Dean Witter Financial Services Group | |
| Summarized Statements of Income ** | 40 |
| Summarized Statements of Financial Position ** | 41 |
| Summarized Statements of Cash Flows ** | 42 |
| Notes to Summarized Dean Witter Financial Services Group Financial Statements ** | 43 |

\* Refers to page number in Company's 1991 Annual Report.
\*\* Incorporated by reference in Item 8 herein.
\*\*\* Incorporated by reference in Item 5 herein.

MOAC000456

Coldwell Banker Real Estate Group | Page*

Summarized Statements of Income ** | 44

Summarized Statements of Financial Position ** | 45

Summarized Statements of Cash Flows ** | 46

Notes to Summarized Coldwell Banker Real Estate Group Financial Statements ** | 47

The following additional financial statement schedules and report and consent of Independent Certified Public Accountants are furnished herewith pursuant to the requirements of Form 10-K.

Sears, Roebuck and Co. | Page

Schedules required to be filed under the provisions of Regulation S-X Article 5:

Schedule I | - Marketable Securities - Other Investments | S-3

Schedule II | - Amounts Receivable from Related Parties and Underwriters, Promoters and Employees Other than Related Parties | S-4

Schedule III | - Condensed Financial Information of Registrant | S-5

Schedule VIII | - Valuation and Qualifying Accounts | S-11

Schedule IX | - Short-term Borrowings | S-12

Schedules required to be filed under the provisions of Regulation S-X Article 7:

Schedule V | - Supplementary Insurance Information | S-13

Schedule VI | - Reinsurance | S-14

Schedule X | - Supplemental Insurance Information Concerning Property - Casualty Insurance Operations | S-15

Report of Independent Certified Public Accountants | S-16

Consent of Independent Certified Public Accountants | S-17

All other schedules are omitted because they are not applicable, or not required, or because the required information is included in the Consolidated Financial Statements or in notes thereto.

 * Refers to page number in Company's 1991 Annual Report.
** Incorporated by reference in Item 8 herein.

MOAC000457

**SEARS, ROEBUCK AND CO.**
**SCHEDULE I — MARKETABLE SECURITIES —**
**OTHER INVESTMENTS**
**YEAR ENDED DECEMBER 31, 1991**

(millions)

| Type of Investment | Cost of Each Issue | Market Value of Each Issue at Balance Sheet Date | Amount at which Each Portfolio of Equity Security Issues and Each Other Security Issue Carried in the Balance Sheet |
|---|---|---|---|
| **Bonds, mortgage—backed securities and redeemable preferred stocks:** | | | |
| United States government and government agencies and authorities | $    456.6 | $    500.3 | $    456.6 |
| States, municipalities and political subdivisions | 15,112.8 | 16,326.6 | 15,112.8 |
| Foreign governments | 291.7 | 315.7 | 291.7 |
| Public utilities | 2,818.5 | 2,970.0 | 2,818.5 |
| Convertible bonds and bonds with warrants attached | 1.7 | 1.7 | 1.7 |
| High—yield corporate bonds | 923.5 | 850.9 | 923.5 |
| All other corporate bonds | 5,255.3 | 5,761.6 | 5,255.3 |
| Redeemable preferred stocks | 495.1 | 497.0 | 495.1 |
| Mortgage—backed securities | 4,586.4 | 4,960.0 | 4,586.4 |
| Total | 29,941.6 | 32,183.8 | 29,941.6 |
| Preferred stocks | 176.4 | 177.2 | 177.2 |
| **Common stocks:** | | | |
| Public utilities | 299.5 | 335.4 | 335.4 |
| Industrial and miscellaneous | 2,179.0 | 2,645.8 | 2,645.8 |
| Banks, trusts and insurance companies | 225.7 | 261.8 | 261.8 |
| Total preferred and common stocks | 2,880.6 | 3,420.2 | 3,420.2 |
| Total bonds and stocks | 32,822.2 | $  35,604.0 | 33,361.8 |
| Mortgage loans | 10,293.7 | | 10,293.7 |
| Real estate | 2,911.3 | | 2,911.3 |
| Total investments | $  46,027.2 | | $  46,566.8 |

S—3

MOAC000458

**SEARS, ROEBUCK AND CO.**
**SCHEDULE II**
**AMOUNTS RECEIVABLE FROM RELATED PARTIES AND UNDERWRITERS,**
**PROMOTERS AND EMPLOYEES OTHER THAN RELATED PARTIES**

(millions)

| Name | Balance at Beginning of Period | Additions | Deductions | | Balance at End of Period | |
|---|---|---|---|---|---|---|
| | | | Amounts Collected | Amounts Written Off | Current | Not Current |
| **Year Ended December 31, 1991** | | | | | | |
| Homart Real Estate Joint Ventures — prime or prime + 1%, due upon arrangement of construction financing | $  118.6 | $  88.7 | $  36.9 | $  — | $  170.4 | $  — |
| **Year Ended December 31, 1990** | | | | | | |
| Homart Real Estate Joint Ventures — prime, 12% or prime + 1%, due upon arrangement of construction financing | $  28.2 | $  184.7 | $  94.3 | $  — | $  118.6 | $  — |
| **Year Ended December 31, 1989** | | | | | | |
| Homart Real Estate Joint Ventures — prime, 12% or prime + 1%, due upon arrangement of construction financing | $  45.3 | $  26.5 | $  43.6 | $  — | $  28.2 | $  — |
| Dean Witter Reynolds Inc. (Canada) Non interest bearing short—term loan (A) | 4.0 | .5 | 4.5 | — | — | — |

(A)  Dean Witter acquired 100% of Dean Witter Reynolds Inc. (Canada) during 1989.

S—4

MOAC000459

<u>SEARS, ROEBUCK AND CO.</u>
<u>SCHEDULE III</u>
<u>CONDENSED FINANCIAL INFORMATION OF REGISTRANT</u>
<u>STATEMENTS OF INCOME</u>

| (millions) | Year Ended December 31 | | |
| --- | --- | --- | --- |
| | 1991 | 1990 | 1989 |
| <u>Revenues</u> | | | |
| Net sales | $ 23,068.1 | $ 23,436.7 | $ 23,595.1 |
| Finance charge revenues | 1,639.4 | 2,157.7 | 2,118.3 |
| Total revenues | 24,707.5 | 25,594.4 | 25,713.4 |
| <u>Costs and Expenses</u> | | | |
| Cost of sales, buying and occupancy | 16,162.0 | 16,089.8 | 16,097.1 |
| Selling and administrative expenses | 7,326.1 | 7,754.5 | 7,524.2 |
| Provision for uncollectible accounts | 351.1 | 475.1 | 322.7 |
| Restructuring | — | 231.2 | — |
| Interest (after deduction of income before income taxes of financing subsidiaries of $219.7, $287.1 and $286.7) | 1,324.8 | 1,453.1 | 1,451.8 |
| Total costs and expenses | 25,164.0 | 26,003.7 | 25,395.8 |
| Operating income (loss) | (456.5) | (409.3) | 317.6 |
| Other loss | (34.7) | (85.2) | (96.6) |
| Income (loss) before income taxes and equity in net income (loss) of unconsolidated subsidiaries and companies | (491.2) | (494.5) | 221.0 |
| Income taxes (benefit) | (147.0) | (180.9) | 102.4 |
| Equity in net income (loss) of unconsolidated subsidiaries and companies | 1,623.1 | 1,215.8 | 1,389.9 |
| Net income | $ 1,278.9 | $ 902.2 | $ 1,508.5 |

See accompanying notes to condensed financial information and notes to Consolidated Financial Statements incorporated herein by reference.

MOAC000460

## SEARS, ROEBUCK AND CO.
### SCHEDULE III
### CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### STATEMENTS OF FINANCIAL POSITION

| (millions) | December 31 | |
| --- | --- | --- |
| | 1991 | 1990 |
| **Assets** | | |
| Current assets | | |
| Accounts and notes receivable | $ 8,822.0 | $ 12,106.1 |
| Less: Allowance for uncollectible accounts | 260.2 | 283.9 |
| | 8,561.8 | 11,822.2 |
| Notes due from affiliates | 2,307.4 | 155.0 |
| Merchandise inventories | 3,512.1 | 3,187.8 |
| Discount on accounts receivable sold | 146.3 | -- |
| Prepaid expenses and other assets | 731.3 | 537.0 |
| Deferred income taxes | 282.2 | 289.5 |
| Cash and invested cash | 1,545.5 | 724.9 |
| Total current assets | 17,086.6 | 16,716.4 |
| Investments in and advances to unconsolidated subsidiaries and companies (including goodwill of $527.5 million and $526.2 million) | 19,778.6 | 17,222.8 |
| Property and equipment | 6,173.2 | 5,963.0 |
| Less: Accumulated depreciation | 3,194.6 | 2,996.0 |
| | 2,978.6 | 2,967.0 |
| Total assets | $ 39,843.8 | $ 36,906.2 |
| **Liabilities** | | |
| Current liabilities | | |
| Short-term borrowings: | | |
| Notes due to Sears Roebuck Acceptance Corp. | $ 11,061.9 | $ 14,578.2 |
| Notes due to affiliates | 986.9 | 90.0 |
| Notes payable to banks | 113.9 | 130.8 |
| Current maturities of long-term debt | 926.2 | 553.9 |
| | 13,088.9 | 15,352.9 |
| Accounts payable and other liabilities | 3,649.6 | 3,444.9 |
| Unearned revenues | 1,073.6 | 1,062.3 |
| Total current liabilities | 17,812.1 | 19,860.1 |
| Long-term debt (note 4) | 7,788.6 | 4,163.5 |
| Deferred income taxes | 54.9 | 58.8 |
| Total liabilities | 25,655.6 | 24,082.4 |
| Commitments and contingent liabilities (notes 1, 4) | | |
| **Shareholders' equity  (note 2)** | | |
| Preferred shares ($1.00 par value) | 325.0 | -- |
| Common shares ($.75 par value) | 289.5 | 289.1 |
| Capital in excess of par value | 2,153.4 | 2,137.9 |
| Retained income | 13,514.3 | 12,927.1 |
| Treasury stock (at cost) | (1,746.4) | (1,765.8) |
| Deferred ESOP expense | (739.4) | (777.7) |
| Unrealized net capital gains (losses) on marketable equity securities | 365.5 | (12.9) |
| Cumulative translation adjustments | 26.3 | 26.1 |
| Total shareholders' equity | 14,188.2 | 12,823.8 |
| Total liabilities and shareholders' equity | $ 39,843.8 | $ 36,906.2 |

See accompanying notes to condensed financial information and notes to Consolidated Financial Statements incorporated herein by reference.

S-6

### SEARS, ROEBUCK AND CO.
### SCHEDULE III
### CONDENSED FINANCIAL INFORMATION OF REGISTRANT
### STATEMENTS OF CASH FLOWS

(millions)

| | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 1,278.9 | $ 902.2 | $ 1,508.5 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, amortization and other noncash items | 429.0 | 375.8 | 397.3 |
| Provisions for uncollectible accounts | 351.1 | 475.1 | 322.7 |
| Gains on sales of property and investments | (54.3) | (16.1) | (28.8) |
| Change in deferred taxes | 3.4 | (569.9) | (156.2) |
| Decrease (increase) in receivables | 3,583.2 | (1,969.0) | (574.3) |
| Decrease (increase) in merchandise inventories | (324.3) | 187.5 | (577.1) |
| Decrease (increase) in other operating assets | (237.1) | 48.6 | (137.8) |
| Increase (decrease) in other operating liabilities | 140.4 | (417.7) | 337.8 |
| Undistributed net income of unconsolidated subsidiaries | (1,435.0) | (1,082.3) | (750.1) |
| Net cash provided by (used in) operating activities | 3,735.3 | (2,065.8) | 342.0 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Proceeds from sales of investments | 71.2 | 2.3 | -- |
| Investments and advances | -- | -- | (19.2) |
| Proceeds from sales of property and equipment | 16.1 | 19.1 | 65.7 |
| Purchases of property and equipment | (421.3) | (476.6) | (488.7) |
| Increase in notes receivable from affiliates | (2,152.4) | -- | -- |
| Net capital contributions and advances to unconsolidated subsidiaries | (444.6) | (886.0) | (120.9) |
| Net cash used in investing activities | (2,931.0) | (1,341.2) | (563.1) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from long-term debt | 3,399.5 | 2,757.7 | 1,211.5 |
| Repayments of long-term debt | (639.5) | (529.1) | (1,101.6) |
| Net change in short-term borrowings, primarily 90 days or less | (2,423.2) | 2,979.5 | 2,158.3 |
| Repayments from (advances to) ESOP | 6.5 | (791.0) | (9.0) |
| Preferred shares issued | 315.1 | -- | -- |
| Common shares issued for employee stock plans | 45.2 | 10.4 | 54.6 |
| Dividends paid to shareholders, net of reinvested amounts | (687.3) | (680.5) | (685.6) |
| Common shares repurchased | -- | -- | (1,420.1) |
| Net cash provided by financing activities | 16.3 | 3,747.0 | 208.1 |
| Net increase (decrease) in cash and invested cash | $  820.6 | $  340.0 | $  (13.0) |
| Cash and invested cash at beginning of year | $  724.9 | $  384.9 | $  397.9 |
| Cash and invested cash at end of year | $ 1,545.5 | $  724.9 | $  384.9 |

See accompanying notes to condensed financial information and notes to Consolidated Financial Statements incorporated herein by reference.

MOAC000462

**SEARS, ROEBUCK AND CO.**
**SCHEDULE III**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**NOTES TO CONDENSED FINANCIAL INFORMATION**

(1) **Basis of Presentation**

The financial statements of the registrant should be read in conjunction with the Consolidated Financial Statements and notes thereto included in the Sears, Roebuck and Co. 1991 Annual Report to Shareholders.

The financial statements include only the accounts of the registrant (a New York corporation), which include the corporate operations of Sears, Roebuck and Co. Unconsolidated subsidiaries include primarily the companies comprising the Allstate Insurance Group, the Dean Witter Financial Services Group, the Coldwell Banker Real Estate Group and the wholly-owned financing subsidiaries. Debt and related interest expense of the registrant have not been allocated to the unconsolidated subsidiaries. Profit sharing expense and the provision for income taxes have been calculated on the basis described in the summary of significant accounting policies and notes to Consolidated Financial Statements in the Sears, Roebuck and Co. 1991 Annual Report to Shareholders incorporated herein by reference.

The registrant has established agreements with certain financing subsidiaries which ensure a minimum level of earnings at the subsidiaries in excess of interest and operating expenses.

Certain reclassifications have been made in the 1990 and 1989 financial statements of the registrant to conform to current accounting classifications.

(2) **Dividends to Shareholders**

Certain indentures relating to the long-term debt of Sears, Roebuck and Co., which represent the most restrictive contractual limitation on the payment of dividends, provide that the Company cannot take specified actions, including the declaration of cash dividends, which would cause its consolidated unencumbered assets, as defined, to fall below 150 percent of its consolidated liabilities, as defined. At December 31, 1991, $9.8 billion in retained income could be paid in dividends to shareholders under the most restrictive indentures.

(3) **Dividends From Subsidiaries**

Dividends paid to the registrant by unconsolidated subsidiaries were $343.9, $345.6 and $834.8 million for the years ended December 31, 1991, 1990 and 1989, respectively. Dividends paid to the registrant by 50% or less owned persons accounted for by the equity method were immaterial. Unconsolidated subsidiaries can transfer additional amounts to the registrant in the form of loans or advances.

MOAC000463

**SEARS, ROEBUCK AND CO.**
**SCHEDULE III**
**CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**NOTES TO CONDENSED FINANCIAL INFORMATION**

(4)  Long-term debt is comprised of the following:

| (millions) | December 31 | |
| --- | --- | --- |
| | 1991 | 1990 |
| 6-7/8% Yen Bonds, due 1991 | $       - | $     58.4 |
| 13-1/4% Notes, due 1992 | 231.0 | 231.0 |
| 9.35% Notes, due 1993 | 400.0 | 400.0 |
| 7% Notes, due 1994 | 350.0 | - |
| 12% Notes, due 1994 | 230.9 | 230.9 |
| 8.55% Notes, due 1996 | 200.0 | 200.0 |
| 9% Notes, due 1996 | 200.0 | 200.0 |
| 9-1/4% Notes, due 1997 | 300.0 | 300.0 |
| 8.45% Notes, due 1998 | 250.0 | - |
| 9-1/4% Notes, due 1998 | 500.0 | - |
| Extendable Notes, 7-1/2% to April 15, 1992, due 1999 | 49.2 | 49.2 |
| 9-1/2% Notes, due 1999 | 200.0 | 200.0 |
| 6% Debentures, $300 million face value, due 2000 (effective rate 14.8%) | 176.5 | 169.2 |
| 7% Debentures, $300 million face value, due 2001 (effective rate 14.6%) | 182.7 | 177.6 |
| 9.375% Debentures, due 2011 | 300.0 | - |
| Floating Commercial Paper Rate - Put Premium Option Notes, 4.95% at Dec. 31, 1991, due 2021 | 200.0 | - |
| 4.50% to 10.35% Medium-Term Notes, due 1991 to 2021 | 3,324.2 | 1,847.1 |
| Notes to Sears Roebuck Acceptance Corp. expected to be refinanced from sale of Series A Preferred Shares | 1,200.0 | - |
| Due to financing subsidiary: | | |
| 12-5/8% Note, due 1991 | - | 150.0 |
| 12.78% Note, due 1991 | - | 100.0 |
| 12-5/8% Note, due 1993 | 150.0 | 150.0 |
| Zero Coupon Note, $500 million face value, due 1998 (effective rate 13.39%) | 207.3 | 182.8 |
| Capitalized lease obligations and notes payable | 63.0 | 71.2 |
| | 8,714.8 | 4,717.4 |
| Less:  Current maturities | 926.2 | 553.9 |
| Total long-term debt | $ 7,788.6 | $ 4,163.5 |

As of December 31, 1991, long-term debt maturities for the next five years, excluding notes to Sears Roebuck Acceptance Corp. classified as long-term debt, are as follows:

| | |
| --- | --- |
| 1992 | $   926.2 |
| 1993 | 1,198.0 |
| 1994 | 1,044.3 |
| 1995 | 380.6 |
| 1996 | 833.5 |

MOAC000464

SEARS, ROEBUCK AND CO.
SCHEDULE III
CONDENSED FINANCIAL INFORMATION OF REGISTRANT
NOTES TO CONDENSED FINANCIAL INFORMATION

As detailed in note 9 of the 1991 Annual Report to Shareholders the registrant has guaranteed all of the borrowings and the related interest payments of Sears Overseas Finance N.V. (SOFNV), aggregating $1.1 billion (face value $1.5 billion) at December 31, 1991.

Under the terms of an agreement dated as of September 2, 1986, Sears, Roebuck and Co. agreed to make all payments required to be made by Sears Roebuck Acceptance Corp.(SRAC) to SOFNV in accordance with certain loan agreements between SRAC and SOFNV. SRAC remains liable to SOFNV pursuant to such loan agreements.

The registrant has issued a $450.0 million demand note payable, due on or before December 29, 1995, arising from a capital contribution to Allstate Insurance Company, which is reflected as a reduction in investments in and advances to unconsolidated subsidiaries and companies.

(5) Supplemental Cash Flow Information

The following is a summary of the significant noncash investing and financing activities:

| (millions) | December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Contribution of net retail customer receivables to unconsolidated subsidiary | $ 869.6 | $ 1,094.2 | $ 625.6 |
| Purchase of retail customer receivables from unconsolidated subsidiary for note payable | 986.9 | | |
| Contribution of property and equipment to unconsolidated subsidiaries | | 513.0 | |
| Assumption of debt by unconsolidated subsidiary | | 833.0 | |
| Contribution of note receivable to unconsolidated subsidiary | | 650.0 | |

MOAC000465

## SEARS, ROEBUCK AND CO.
### SCHEDULE VIII — VALUATION AND QUALIFYING ACCOUNTS
### THREE YEARS ENDED DECEMBER 31, 1991

(millions)

| Description | Balance at Beginning of Period | Additions: Charged to Costs and Expenses | Additions: Other Additions (Describe) (B) | Deductions (Describe) (B) | Balance at End of Period |
|---|---|---|---|---|---|
| **Year Ended December 31, 1991** | | | | | |
| Allowance for uncollectible accounts | $ 742.6 | $ 1,011.6 (A) | $ 101.2 (C) | $ 1,005.0 (E) | $ 850.4 |
| Allowance for estimated losses on loans and real estate | 66.4 | 147.8 | 7.5 (C) | 52.2 (F) | 169.5 |
| Total | $ 809.0 | $ 1,159.4 | $ 108.7 | $ 1,057.2 | $ 1,019.9 |
| **Year Ended December 31, 1990** | | | | | |
| Allowance for uncollectible accounts | $ 683.2 | $ 881.7 (A) | $ 80.8 (C) | $ 903.1 (G) | $ 742.6 |
| Allowance for estimated losses on loans and real estate | 21.7 | 98.3 | 1.9 (C) | 55.5 (F) | 66.4 |
| Total | $ 704.9 | $ 980.0 | $ 82.7 | $ 958.6 | $ 809.0 |
| **Year Ended December 31, 1989** | | | | | |
| Allowance for uncollectible accounts | $ 599.9 | $ 638.9 (A) | $ 84.1 (D) | $ 639.7 (H) | $ 683.2 |
| Allowance for estimated losses on loans and real estate | 25.6 | 31.1 | 3.6 (C) | 38.6 (F) | 21.7 |
| Total | $ 625.5 | $ 670.0 | $ 87.7 | $ 678.3 | $ 704.9 |

(A) Excludes provision related to Sears Merchandise Group recourse liability for sold accounts of $308.0, $168.3 and $49.8 million in 1991, 1990 and 1988, respectively.

(B) Excludes charge-offs and recoveries related to Sears Merchandise Group recourse liability for sold accounts.

(C) Recoveries of Accounts Charged Off

(D) Includes:
Recoveries of Accounts Charged Off $ 81.8
Purchase of Accounts 2.3
$ 84.1

(E) Includes:
Uncollectible Accounts Charged Off $ 864.2
Reclas to Recourse on Accounts Sold 140.8
$ 1,005.0

(F) Realized Losses

(G) Includes:
Uncollectible Accounts Charged Off $ 749.5
Reclas to Recourse on Accounts Sold 153.6
$ 903.1

(H) Includes:
Uncollectible Accounts Charged Off $ 594.6
Reclas to Recourse on Accounts Sold 45.1
$ 639.7

MOAC000466

## SEARS, ROEBUCK AND CO.
## SCHEDULE IX – SHORT–TERM BORROWINGS

(millions)

| Category of Aggregate Short–Term Borrowings | Balance at End of Period | Weighted Average Interest Rate | Maximum Amount Outstanding During the Period | Average Amount Outstanding During the Period (A) | Weighted Average Interest Rate During the Period (B) |
|---|---|---|---|---|---|
| **Year Ended December 31, 1991** | | | | | |
| Commercial Paper (C) | $ 12,271.3 | 5.19 % | $14,977.7 | $13,914.7 | 6.26 % |
| Agreements with Bank Trust Departments | 510.1 | 4.46 | 682.6 | 643.4 | 5.86 |
| Bank Loans | 2,947.9 | 5.02 | 3,414.4 | 3,032.8 | 5.97 |
| International | 183.9 | 10.75 | 896.3 | 565.7 | 12.39 |
| Total | $ 15,913.2 | | | | |
| **Year Ended December 31, 1990** | | | | | |
| Commercial Paper (C) | $ 13,935.2 | 8.23 % | $14,042.7 | $13,146.7 | 8.27 % |
| Agreements with Bank Trust Departments | 571.9 | 7.52 | 987.7 | 848.2 | 8.13 |
| Bank Loans | 3,948.7 | 7.68 | 4,221.4 | 3,442.4 | 8.19 |
| International | 558.2 | 13.44 | 670.8 | 597.1 | 15.27 |
| Total | $ 19,014.0 | | | | |
| **Year Ended December 31, 1989** | | | | | |
| Commercial Paper (C) | $ 12,163.1 | 8.71 % | $12,265.6 | $11,525.2 | 9.29 % |
| Agreements with Bank Trust Departments | 792.7 | 8.45 | 1,120.6 | 971.8 | 9.09 |
| Bank Loans | 2,810.6 | 8.83 | 3,226.4 | 2,426.1 | 8.98 |
| International | 647.3 | 15.26 | 722.9 | 598.5 | 16.14 |
| Total | $ 16,413.7 | | | | |

(A) The average amount outstanding during the period was calculated on a daily basis.

(B) The weighted average interest rate during the period was computed by dividing the actual interest expense by the average short–term borrowings outstanding.

(C) The balances include Commercial Paper classified as long–term debt of $6.1 billion at December 31, 1991 and $3.7 billion at December 31, 1990 and 1989.

S–12

MOAC000467

## SEARS, ROEBUCK AND CO.
### SCHEDULE V – SUPPLEMENTARY INSURANCE INFORMATION

(millions)

| Segment | Deferred Policy Acquisition Costs | Reserves for Claims, Claims Expense and Policy Benefits | Unearned Premiums | Premium Revenue and Contract Charges | Net Investment Income | Claims, Claims Expense and Policy Benefits | Policy Acquisition Costs | Other Operating Costs and Expenses | Premiums Written (Excluding Life) |
|---|---|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 1991** | | | | | | | | | |
| Property–Liability Insurance | $ 465.8 | $ 12,426.3 | $ 5,085.8 | $ 15,147.0 | $ 1,397.2 | $ 12,574.5 | $ 2,764.7 | $ 940.8 | $ 15,261.8 |
| Life Insurance | 956.5 | 17,787.7 | 8.4 | 1,196.9 | 1,604.2 | 2,121.6 | 276.4 | 133.4 | 138.0 |
| **Year Ended December 31, 1990** | | | | | | | | | |
| Property–Liability Insurance | $ 427.1 | $ 11,376.3 | $ 4,985.9 | $ 14,280.5 | $ 1,296.9 | $ 12,198.8 | $ 2,614.3 | $ 888.6 | $ 14,696.1 |
| Life Insurance | 808.3 | 14,367.9 | 20.1 | 1,166.1 | 1,274.4 | 1,827.2 | 256.0 | 110.7 | 130.9 |
| **Year Ended December 31, 1989** | | | | | | | | | |
| Property–Liability Insurance | $ 386.4 | $ 10,162.1 | $ 4,580.5 | $ 13,133.0 | $ 1,252.0 | $ 10,873.6 | $ 2,425.1 | $ 844.7 | $ 13,490.1 |
| Life Insurance | 686.5 | 10,679.7 | 27.3 | 1,211.5 | 983.2 | 1,653.7 | 253.7 | 67.5 | 152.9 |

S-13

MOAC000468

## SEARS, ROEBUCK AND CO.
## SCHEDULE VI — REINSURANCE

### (millions)

| | Gross Amount | Ceded to Other Companies | Assumed from Other Companies | Net Amount | Percent of Amount Assumed to Net |
|---|---|---|---|---|---|
| **Year Ended December 31, 1991** | | | | | |
| Life Insurance in Force | $ 110,135.7 | $ 6,777.7 | $ 6,284.9 | $ 109,642.9 | 5.7% |
| Premiums and Contract Charges: | | | | | |
| Life Insurance | $ 1,019.4 | $ 11.4 | $ 0.5 | $ 1,008.5 | 0.1% |
| Accident—Health Insurance | 195.4 | 16.6 | 9.6 | 188.4 | 5.1% |
| Property—Liability Insurance | 14,776.2 | 400.8 | 771.6 | 15,147.0 | 5.1% |
| Total Premiums and Contract Charges | $ 15,991.0 | $ 428.8 | $ 781.7 | $ 16,343.9 | 4.8% |
| **Year Ended December 31, 1990** | | | | | |
| Life Insurance in Force | $ 100,521.1 | $ 4,737.4 | $ 154.0 | $ 95,937.7 | 0.2% |
| Premiums and Contract Charges: | | | | | |
| Life Insurance | $ 1,021.2 | $ 9.3 | $ 0.5 | $ 1,012.4 | — % |
| Accident—Health Insurance | 155.9 | 11.5 | 9.3 | 153.7 | 6.1% |
| Property—Liability Insurance | 13,927.7 | 382.5 | 735.3 | 14,280.5 | 5.1% |
| Total Premiums and Contract Charges | $ 15,104.8 | $ 403.3 | $ 745.1 | $ 15,446.6 | 4.8% |
| **Year Ended December 31, 1989** | | | | | |
| Life Insurance in Force | $ 92,832.9 | $ 4,149.6 | $ 147.3 | $ 88,830.6 | 0.2% |
| Premiums and Contract Charges: | | | | | |
| Life Insurance | $ 1,061.9 | $ 6.4 | $ 0.4 | $ 1,055.9 | — % |
| Accident—Health Insurance | 155.0 | 8.7 | 9.3 | 155.6 | 6.0% |
| Property—Liability Insurance | 12,923.2 | 459.8 | 669.6 | 13,133.0 | 5.1% |
| Total Premiums and Contract Charges | $ 14,140.1 | $ 474.9 | $ 679.3 | $ 14,344.5 | 4.7% |

S-14

MOAC000469

## SEARS, ROEBUCK AND CO.
### SCHEDULE X – SUPPLEMENTAL INSURANCE INFORMATION CONCERNING PROPERTY—CASUALTY INSURANCE OPERATIONS

(millions)

| Affiliation with Registrant | Deferred Policy Acquisition Costs | Reserves for Claims and Claim Adjustment Expenses | Discount Deducted from Reserves | Unearned Premiums | Premiums Earned | Net Investment Income | Claims and Claim Adjustment Expenses Incurred Related to Current Year | Prior Years | Policy Acquisition Costs |
|---|---|---|---|---|---|---|---|---|---|
| **Year Ended December 31, 1991** | | | | | | | | | |
| Property—Liability Insurance Subsidiary | $ 465.8 | $ 12,426.3 | $ — | $ 5,085.8 | $ 15,147.0 | $ 1,397.2 | $ 12,357.1 | $ 217.5 | $ 2,764.7 |
| **Year Ended December 31, 1990** | | | | | | | | | |
| Property—Liability Insurance Subsidiary | $ 427.1 | $ 11,376.3 | $ — | $ 4,985.9 | $ 14,280.5 | $ 1,296.9 | $ 11,826.7 | $ 372.1 | $ 2,814.3 |
| **Year Ended December 31, 1989** | | | | | | | | | |
| Property—Liability Insurance Subsidiary | $ 386.4 | $ 10,162.1 | $ — | $ 4,580.5 | $ 13,133.0 | $ 1,252.0 | $ 10,878.6 | $ (5.0) | $ 2,425.1 |

S—15

MOAC000470

**Deloitte &
Touche**



Two Prudential Plaza          Telecopier (312) 946-2600
180 North Stetson Avenue
Chicago, Illinois 60601
Telephone: (312) 946-3000

To the Shareholders and Board of Directors of
Sears, Roebuck and Co.:

We have audited the consolidated financial statements of Sears, Roebuck and Co. as of December 31, 1991
and 1990, and for each of the three years in the period ended December 31, 1991, and have issued our report
thereon dated February 28, 1992, which report includes an explanatory paragraph as to the change in the
accounting for income taxes in 1991; such consolidated financial statements and report are included in your
1991 Annual Report to Shareholders and are incorporated herein by reference. Our audits also included the
financial statement schedules of Sears, Roebuck and Co., listed in the Index at Item 14(a)2. These financial
statement schedules are the responsibility of the Company's management. Our responsibility is to express an
opinion based on our audits. In our opinion, such financial statement schedules, when considered in relation
to the basic consolidated financial statements taken as a whole, present fairly in all material respects the
information set forth therein.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial
statements taken as a whole. The additional information set forth under "Operating results" and "Financial
position" and on the lines captioned "Book value per share (year-end)", "Average shares outstanding (millions)",
"Net income per share" and "Dividends per share" under "Shareholders' common stock investment" for each
of the ten years in the period ended December 31, 1991, appearing under the caption "Ten-Year Summary of
Consolidated Financial Data" on pages 10 and 11 of the Sears, Roebuck and Co. 1991 Annual Report to
Shareholders is presented for the purpose of additional analysis and is not a required part of the basic
consolidated financial statements. This additional information is the responsibility of the Company's
management. Such information has been subjected to the auditing procedures applied in our audits of the
basic consolidated financial statements and, in our opinion, is fairly stated in all material respects when
considered in relation to the basic consolidated financial statements taken as a whole.

We have also previously audited, in accordance with generally accepted auditing standards, the Consolidated
Statements of Financial Position of Sears, Roebuck and Co. as of December 31, 1982 through 1989, and the
related Consolidated Statements of Income and Shareholders' Equity for each of the seven years in the period
ended December 31, 1988 and the Consolidated Statements of Changes in Financial Position for each of the
four years in the period ended December 31, 1985 and the Consolidated Statements of Cash Flows for each
of the three years in the period ended December 31, 1988 (none of which are presented herein); and we
expressed unqualified opinions on those consolidated financial statements. Effective January 1, 1986, the
Company changed its method of accounting for the cost of pension plans and effective January 1, 1988 the
Company changed its accounting for income taxes.

*Deloitte & Touche*

February 28, 1992

S-16

MOAC000471

# Deloitte & Touche



Two Prudential Plaza          Telecopier: (312) 946-2600
180 North Stetson Avenue
Chicago, Illinois 60601
Telephone: (312) 946-3000

Exhibit 24

### CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

We consent to the incorporation by reference in Registration
Statement Nos. 2-64879, 2-80037, 33-18081, 33-23793, 33-29458,
33-32008, 33-32568, 33-35021, 33-37427, 33-39724, 33-41485,
33-43459, 33-44067 and 33-45479 of Sears, Roebuck and Co.,
Registration Statement Nos. 33-11100 and 33-32170 of Sears,
Roebuck and Co. and Dean Witter Reynolds Inc. Employee Retirement
Investment Plan, Registration Statement Nos. 33-36993 and 33-42825
of Sears, Roebuck and Co. and The Savings and Profit Sharing Fund
of Sears Employees, Registration Statement No. 33-46421 of Sears,
Roebuck and Co., SPS Transaction Services, Inc. and SPS
Transaction Services, Inc. Employee Retirement Investment Plan,
Registration Statement No. 33-30807 of Discover Credit Corp. and
Registration Statement Nos. 33-40056 and 33-44671 of Sears,
Roebuck and Co. and Discover Credit Corp., of our report dated
February 28, 1992, appearing in this Annual Report on Form 10-K of
Sears, Roebuck and Co. for the year ended December 31, 1991.

*Deloitte & Touche*

March 26, 1992

S-17

MOAC000472

EXHIBIT INDEX

Sears, Roebuck and Co. Form 10-K
For the Year Ended December 31, 1991

| | |
|---|---|
| 3.(a) | Restated Certificate of Incorporation, as amended to February 25, 1992. Incorporated by reference to Exhibit 4.5 to Registration Statement No. 33-46421. |
| 3.(b) | By-Laws as amended to March 11, 1992.  Incorporated by reference to Exhibit 4.6 to Registration Statement No. 33-46421. |
| 4. | Registrant hereby agrees to furnish to the Commission, upon request, with the instruments defining the rights of holders of each issue of long-term debt of the Registrant and its consolidated subsidiaries. |
| 10.(iii)(1) | Registrant's 1979 Incentive Compensation Plan.    Incorporated by reference to Exhibit 10.(iii)(1) to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 1985.* |
| 10.(iii)(2) | Registrant's 1978 Employes Stock Plan, as amended.  Incorporated by reference to Exhibit 10.(iii)(2) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1989.* |
| 10.(iii)(3) | Registrant's Deferred Compensation Plan for Directors, as amended and restated on February 14, 1989.  Incorporated by reference to Exhibit 10.(iii)(4) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1988.* |
| 10.(iii)(4) | Registrant's Annual Incentive Compensation Plan, amended as of March 18, 1985.    Incorporated by reference to Exhibit 10.(iii)(6) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1984.* |
| 10.(iii)(5) | Registrant's Long-Term Incentive Compensation Plan, amended as of March 18, 1985.  Incorporated by reference to Exhibit 10.(iii)(7) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1984.* |
| 10.(iii)(6) | Registrant's 1982 Employees Stock Plan.  Incorporated by reference to Exhibit 4(a)(1) to Registration Statement No. 2-80037 of the Registrant. |
| 10.(iii)(7) | Description of Registrant's Supplemental Life Insurance Plan, amended as of December 31, 1986.  Incorporated by reference to the second and third full paragraphs on page 10 of the Registrant's Proxy Statement dated March 26, 1987.* |

*SEC File No. 1-416
**Filed herewith

E-1

| | |
|---|---|
| 10.(iii)(8) | Registrant's Non-Employee Directors' Retirement Plan, as amended on November 14, 1990. Incorporated by reference to Exhibit 10.(iii)(9) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1990.* |
| 10.(iii)(9) | Description of Registrant's Non-Employee Director Life Insurance Plan. Incorporated by reference to the eighth paragraph on page 4 of the Registrant's Proxy Statement dated March 26, 1986.* |
| 10.(iii)(10) | Registrant's Supplemental Retirement Income Plan, amended as of November 11, 1986. Incorporated by reference to Exhibit 10.(iii)(12) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1986.* |
| 10.(iii)(11) | Registrant's 1986 Employees Stock Plan. Incorporated by reference to pages 13 through 17 of the Registrant's Proxy Statement dated March 26, 1986.* |
| 10.(iii)(12) | Registrant's Transferred Executives Pension Supplement. Incorporated by reference to Exhibit 10.(iii)(13) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1988.* |
| 10.(iii)(13) | Registrant's Supplemental Long-Term Disability Plan. Incorporated by reference to Exhibit 10.(iii)(17) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1987.* |
| 10.(iii)(14) | Registrant's Deferred Compensation Plan. Incorporated by reference to Exhibit 10.(iii)(14) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1986.* |
| 10.(iii)(15) | Amendment dated as of July 31, 1989 to the Registrant's Deferred Compensation Plan. Incorporated by reference to Exhibit 10 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 1989.* |
| **10.(iii)(16) | Allstate Supplemental Retirement Income Plan, amended as of May 28, 1991. |
| 10.(iii)(17) | Dean Witter Reynolds Financial Services Inc. Supplemental Pension Plan for Executives, amended and restated as of January 1, 1985. Incorporated by reference to Exhibit 10.(iii)(14) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1985.* |
| 10.(iii)(18) | Dean Witter Financial Services Inc. 1986 Capital Accumulation Plan, effective December 31, 1985. Incorporated by reference to Exhibit 10.(iii)(16) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1985.* |

*SEC File No. 1-416
**Filed herewith

E-2

MOAC000474

| | |
|---|---|
| 10.(iii)(19) | Stock Plan for Non-Employee Directors. Incorporated by reference to Appendix F of the Registrant's Proxy Statement dated March 25, 1988.* |
| 10.(iii)(20) | Registrant's 1990 Employees Stock Plan. Incorporated by reference to Appendix A to the Registrant's Proxy Statement dated March 22, 1990.* |
| 10.(iii)(21) | Amendment dated as of November 1, 1990 to the Registrant's Deferred Compensation Plan. Incorporated by reference to Exhibit 10.(iii)(22) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1990.* |
| 10.(iii)(22) | Amendment to the Registrant's Stock Plan for Non-Employee Directors, adopted on August 14, 1991. Incorporated by reference to Exhibit 10.(a) to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 1991.* |
| 10.(iii)(23) | Amendment to the Registrant's Deferred Compensation Plan for Directors, adopted on August 14, 1991. Incorporated by reference to Exhibit 10.(b) to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 1991.* |
| **10.(iii)(24) | SPS Transaction Services, Inc. 1992 Employees Stock Plan. |
| **11. | Computation of Earnings per Share. |
| **12.(a) | Computation of ratio of income to fixed charges (excluding interest on savings deposits) for Registrant and consolidated subsidiaries. |
| **12.(b) | Computation of ratio of income to fixed charges (including interest on savings deposits) for Registrant and consolidated subsidiaries. |
| **13. | Registrant's Annual Report - 1991. |
| **22. | Subsidiaries of the Registrant. |
| **24. | Consent of Deloitte & Touche. |
| **29. | Information from reports furnished to state insurance regulatory authorities (Schedule P of the Annual Statements, including information formerly included in Schedule O). |

*SEC File No. 1-416
**Filed herewith

E-3

MOAC000475

Exhibit 10(iii)(16)

## Supplemental Retirement Income Plan

This Supplemental Retirement Income Plan is established for the benefit of participants in the Allstate Retirement Plan who retire or die after December 31, 1977. The Corporation shall pay, from time to time out of its general funds, to such participants (or, in the case of the death of any such participant, to any person or persons to whom benefits are payable) benefits equal to the amount, if any, by which the benefits payable under the Allstate Retirement Plan were reduced in order to comply with the limits imposed by the Internal Revenue Code on the annual amount of retirement income, including limits on the maximum amount of annual compensation which maybe taken into account. The Corporation shall also pay, from time to time out of its general funds, to participants who are entitled to benefits under the preceding sentence (or, in the case of the death of any such participant, to any person or persons to whom such benefits are payable), a benefit equal to the portion, if any, of the Prior Service Element of the participant's retirement income under the Allstate Retirement Plan which is not payable to the participant because he/she is highly compensated within the meaning of Section 414(q) of the Internal Revenue Code. Compensation for purposes of the Supplemental Retirement Income Plan shall include any compensation deferred under the Sears, Roebuck and Co. Deferred Compensation Plan which is not included as compensation under the Allstate Retirement Plan.

The benefit, if any, payable from time to time to or on account of any person under the Supplemental Retirement Income Plan shall be paid commencing as of the same date, for the same period, based upon the same assumptions, and subject to the same terms and conditions as the benefit paid to or on account of such person under the Allstate Retirement Plan.

If a participant in the Allstate Retirement Plan elects to receive the retirement benefit payable under the Allstate Retirement Plan in the form of a lump sum, rather than in the form of monthly payments, such participant (with the consent of the Senior Vice President Corporate Human Resources and Administrative Operations) may elect to have the monthly retirement amount, if any, payable under the Supplemental Retirement Income Plan paid to him/her (commencing as of the date the lump sum payment is calculated) in an actuarially adjusted amount pursuant to one of the option forms set forth in Section 4.1 of the Allstate Retirement Plan.

The monthly retirement amount payable under the Supplemental Retirement Income Plan, or the unpaid balance thereof, may be paid (in the sole discretion of the Senior Vice President Corporate Human Resources and Administrative Operations) to the person or persons entitled thereto in a lump sum which is actuarially equivalent to the amount which would be payable under the Supplemental Retirement Income Plan to the participant had such amount been paid under the provisions of the Allstate Retirement Plan; provided that such lump sum payment shall not be made until the date the monthly payments to the participant or other person commence under the Allstate Retirement Plan or until the date a lump sum payment is made in lieu of such monthly payments.  In calculating the lump sum actuarial equivalent under the Supplemental Retirement Income Plan, the interest rates to be employed shall be the same interest rates that were used or would have been used for computing a lump sum under the Allstate Retirement Plan.

In the event a participant dies while employed by the Corporation, any benefit which would become payable pursuant to the terms of the Supplemental Retirement Income Plan shall be payable to the person or persons designated by him/her hereunder, from among the options provided for in Section 3.7(A) of the Allstate Retirement Plan as determined by the Senior Vice President Corporate Human Resources and Administrative Operations.  Any monthly retirement amount elected shall commence with the first day of the month following the month in which the participant's death occurs. If a lump sum payment is elected, such payment shall not be made until the date any monthly payment would commence under the provisions of the Allstate Retirement Plan or until the date a lump sum payment is made in lieu of such monthly payments.  A participant or his/her beneficiary may (with the consent of the Senior Vice President Corporate Human Resources and Administrative Operations) elect for any purpose under the Supplemental Retirement Income Plan an option or form of payment other than the one elected for the purposes of the Allstate Retirement Plan.  In the event a deceased participant had failed to designate a beneficiary hereunder, then payment shall be made to the participant's beneficiary under the Allstate Retirement Plan as determined pursuant to Section 3.7(D) of that plan.

* * *

2

MOAC000477

Exhibit 10(iii)(24)

## SPS TRANSACTION SERVICES, INC.

### AMENDED AND RESTATED[*]

### 1992 EMPLOYEES STOCK PLAN

This plan shall be designated as the "SPS Transaction Services, Inc. 1992 Employees Stock Plan" (the "Plan").

Pursuant to the Plan, SPS Transaction Services, Inc. (the "Company") may from time to time, on or before February 21, 2002, grant to key employees of the Company or any of its subsidiaries (as defined in Rule 405 under the Securities Act of 1933 as in effect on February 21, 1992), officers, Affiliate Directors and individuals who perform significant services for the benefit of the Company or its subsidiaries, options ("options") to purchase common shares of the Company ("shares"), performance units ("performance units") to acquire shares, rights ("recognition rights") to receive shares, and rights ("payment rights") to grants under the Plan in payment, or upon surrender, of benefits under other or additional compensation arrangements. In addition, the Company shall grant to Non-Affiliate Directors options to purchase shares pursuant to a Formula Plan as hereinafter set forth. As used herein, "Affiliate Director" shall mean any director other than a Non-Affiliate Director of the Company and "Non-Affiliate Director" shall mean any director of the Company who is not, and who was not during the previous year, (i) a director of the Company, Sears Roebuck and Co. ("Sears") or their affiliates who was granted or awarded equity securities pursuant to the Plan (other than Formula Options (as defined)) or any other plan of the Company, Sears or their affiliates or (ii) an officer or employee of the Company, Sears or their affiliates.

Shares under the Plan may be unrestricted ("unrestricted shares") or may be subject to automatic cancellation upon such terms and conditions as may be determined by the Company ("restricted shares"). Grants under the Plan may be subject to such other terms and conditions, not inconsistent with the Plan, as may be determined by the Company.

The Plan shall become effective on February 21, 1992. The Plan is subject to the approval of a majority of the outstanding shares of common stock the Company. If the Plan is not so approved within one year after adoption by the Company, the Plan shall not come into effect and all grants or awards thereunder shall terminate.

---

[*]   Amended and Restated as of February 25, 1992.

MOAC000478

## Options

Options granted under the Plan may be either options which are intended to be incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), or any successor provision ("incentive stock options") or options which are not intended to be incentive stock options ("non-qualified options"), provided however, that any options granted pursuant to the Formula Plan shall be non-qualified stock options. The Company may provide for the exercise of options in installments or otherwise and for such periods from the date of grant as it may in its discretion determine; provided, however, that any incentive stock option granted under the Plan shall be exercisable for a period of not more than ten years from the date of grant.

## Performance Units

Each performance unit under the Plan shall relate to a specified maximum number of shares, and shall be exchangeable for all or a portion of such shares, or cash (or such other form of consideration as may be determined by the Company equivalent in value thereto) in up to an amount equal to the fair market value of an equal number of unrestricted shares, at the end of such specified period (a "performance cycle") as may be established by the Company. The number of such shares which may be deliverable pursuant to such performance unit shall be based upon the degree of attainment over such performance cycle of such measures of the performance of the Company, its subsidiaries or the participant as may be established by the Company. The Company may provide for full or partial credit, prior to completion of such performance cycle or achievement of the degree of attainment of the measures of performance specified in connection with such performance unit, in the event of the participant's death, normal retirement, early retirement with Company approval, or total or permanent disability, or in such other circumstances as the Company may determine to be fair and equitable to the participant or in the interest of the Company.

## Recognition Rights

Recognition rights under the Plan shall relate to a specified maximum number of shares granted as, or in payment of, a bonus, or to provide incentives or recognize special achievements or contributions.

## Payment Rights

Payment rights under the Plan shall provide for the grant of a specified maximum number of shares or for the grant of options, performance units or recognition rights in payment of all or a portion of compensation under other or additional compensation arrangements of the Company or any of its subsidiaries or in

MOAC000479

consideration of the surrender of all or a portion of such compensation.

## Stock Appreciation Rights

The Company may, from time to time and upon such terms and conditions as it may in its discretion determine, grant any participant under the Plan, other than Non-Affiliate Directors, the right ("stock appreciation rights") to elect to surrender such participant's right to all or a portion of any restricted shares under the Plan, or to elect to surrender such participant's right to purchase, acquire or receive all or a portion of the shares subject to any option, performance unit, recognition right or payment right under the Plan, and receive, from the Company or any of its subsidiaries, with respect to each such share which is surrendered or as to which such participant's right to purchase, acquire or receive is surrendered, up to an amount in payment equal to the fair market value of such share on the date of surrender, less the unpaid portion of the price, if any, which such participant would be required to pay to purchase such share.

## Tax Benefit Rights

The Company may also, from time to time and upon such terms and conditions as it may in its discretion determine, grant any participant under the Plan, other than Non-Affiliate Directors, the right ("tax benefit rights") to receive, from the Company or any of its subsidiaries, as a result of the receipt or exercise of any restricted or unrestricted share, option or stock appreciation right (except an incentive stock option or a stock appreciation right with respect thereto), performance unit, recognition right or payment right under the Plan, up to an amount, in cash, equal to the then applicable maximum statutory federal income tax rate for corporations multiplied by the amount of compensation, if any, realized by the participant for federal income tax purposes.

## Tax Withholding Rights

The Company may also, from time to time and upon such terms and conditions as it may in its discretion determine, grant any participant, other than Non-Affiliate Directors, who is the holder of any restricted share, option, performance unit, recognition right, payment right, stock appreciation right or other right under the Plan the right ("tax withholding rights") to elect to have a portion of the unrestricted shares which such participant so holds or may so acquire withheld, or to deliver to the Company other shares, to satisfy all or a portion of the actual or estimated taxes payable by such participant, or to satisfy all or a portion of any tax withholding, as a result of the receipt or exercise of any restricted or unrestricted share, option or stock appreciation right (except an incentive stock option or a stock appreciation right with respect thereto), performance unit, recognition right or payment right under the Plan.

MOAC000480

**Formula Plan**

Without further action by the Committee (as defined) or the Board (as defined), non-qualified stock options to purchase a number of shares equal to the quotient obtained by dividing (a) $40,000 by (b) the fair market value of one share on the date of grant (rounded up to the nearest whole share) shall automatically be granted to each Non-Affiliate Director immediately following each annual meeting of the Company's stockholders; provided that such date is at least six months following any previous grant date (the "Formula Options").  The purchase price per share for the Formula Options shall be equal to the fair market value per share on the date such Formula Option is granted.  Any Formula Option shall not be exercisable until one year after the grant date of such option and shall terminate upon the earlier of (i) 90 days following the date on which the Non-Affiliate Director participant ceases to serve on the Board and (ii) five years after the grant date of such option.  Formula Options may be exercised (in full or in part) only by written notice to the Company at its principal office accompanied by payment, in cash, of the full consideration for the shares of which they are exercised. The aggregate number of shares which may be acquired pursuant to this Formula Plan shall not exceed 5% of the aggregate number of unrestricted shares which may be acquired pursuant to the Plan.

**Purchase Price**

Except as provided in the following sentence, the purchase price per share to be specified in any option granted under the Plan shall not be less than the fair market value of such share on the date such option is granted.  At its discretion, the Board or the Committee may issue options to a participant who has voluntarily surrendered and canceled a prior option at a price per share equal to or greater than the price per share of the prior option.  For this purpose "fair market value" of a share as of any date shall be determined in such manner as shall be prescribed in good faith by the Board or the Committee.  The Company may provide that such purchase price per share shall be paid to the Company by the participant in cash, shares, any other lawful form of consideration therefor, or a combination thereof, in full no later than the time of receipt of such share or in installments (which are payable not less than annually over a period of not more than five years from the date of purchase, provided that the aggregate amount of principal which has been repaid at any time shall not be less than one-fifth of such purchase price multiplied by the number of whole years since the date of purchase, and bear interest at a rate at least comparable to generally prevailing rates charged by lenders unaffiliated with the Company for loans of a similar nature and maturity) upon such terms and conditions (including the security, if any, therefor) as the Company may determine.  The fair market value on the date of grant of restricted or unrestricted shares granted pursuant to any payment right (including shares subject to any recognition right granted pursuant to such payment

DWR200P.SS2                              - 4 -

MOAC000481

right but excluding any shares subject to any option or performance unit granted pursuant thereto) shall not be more than the value of the compensation under the other or additional compensation arrangements of the Company or its subsidiaries for which the form of payment is such payment right, or which is surrendered in consideration of such payment right. No purchase price shall otherwise be required to be specified in connection with any recognition right or performance unit granted under the Plan.

## Payments to Participants

Payments to participants in connection with options, performance units, recognition rights, payment rights, stock appreciation rights or other rights under the Plan may be in the form of restricted or unrestricted shares, or in the form of cash (or such other form as may be determined by the Company equivalent in value thereto) in up to an amount equal to the fair market value of an equal number of unrestricted shares. In connection with cancellation or termination of any restricted share, option, performance unit, recognition right, payment right or other right of any participant under the Plan (whether pursuant to the terms of the Plan or any grant under the Plan, agreement between the Company and the participant, or otherwise), the Company may provide for payment to such participant of such amount as the Company may determine to be fair and equitable to the participant or in the interest of the Company.

## Participants' Rights

Restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights and other rights (other than unrestricted shares) under the Plan shall be exercisable during a participant's lifetime only by the participant or the participant's guardian or legal representative and may not be sold, transferred, pledged or otherwise assigned by the participant. Certificates for restricted shares or for shares for which the purchase price is being paid in installments shall not be delivered to participants, and such shares may be represented by certificates deposited with, or held in book-entry form by, such person or persons as may be determined by the Company. A holder of restricted shares or of shares for which the purchase price is being paid in installments shall otherwise be entitled to all the rights (including voting and dividend rights) of a holder of an equivalent number of unrestricted shares. Any restricted share, option, performance unit, recognition right, payment right, stock appreciation right or other right (other than unrestricted shares) under the Plan may be canceled at any time with the consent of the participant and replacement restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights or other rights may be granted to such participant.

DWR200P.SS2                        - 5 -

MOAC000482

## Plan Conditions

Each participant who is granted any restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights and other rights (other than unrestricted shares) may, at the discretion of the Company, be required to enter into a stock plan agreement ("Stock Plan Agreement") with the Company in a form provided by the Committee or the Board, including provisions that such participant shall abide by all of the terms and conditions of the Plan and such other terms and conditions as may be imposed by the Committee or the Board. The Plan shall not create any employment rights in any participant and the Company shall have no liability for terminating the employment of any participant before such participant becomes entitled to exercise any rights to which such participant may be entitled under the terms of the Plan. The Company, in its discretion, may postpone the issuance and/or delivery of shares under the Plan until the completion of such stock exchange listing, or registration, or other qualification of such shares under any state and/or federal law, rule or regulation as the Company may consider appropriate, and may require any participant to make such representations and furnish such information as it may consider appropriate in connection with the issuance or delivery of the shares in compliance with applicable laws, rules and regulations.

## Vesting

Restricted shares may be exchangeable for unrestricted shares at such time and upon such terms and conditions as the Company may determine if the participant remains in the employ of or a director of the Company or its subsidiaries not less than six months after the earliest of the issuance of such restricted shares, the grant of any related option, performance unit, recognition right, payment right or stock appreciation right under the Plan or, in the case of restricted shares related to any payment right, the grant of the compensation under the other or additional compensation arrangement in respect of which such payment right is granted. No option (or stock appreciation right with respect thereto) under the Plan shall be exercisable, and no payment shall be made pursuant to any tax benefit right payable as a result of exercise of any option (or stock appreciation right with respect thereto) under the Plan, unless the participant remains in the employ of or a director of the Company or its subsidiaries until at least six months after the date of its grant. No payment (including payment in the form of restricted or unrestricted shares) shall be made pursuant to any performance unit under the Plan, and no payment shall be made pursuant to any tax benefit right related to any performance unit under the Plan, unless the participant remains in the employ of or a director of the Company or its subsidiaries until at least six months after the date of its grant.

MOAC000483

**Termination of Employment and Death**

If a participant's employment is terminated for any reason whatsoever, any restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights and other rights (other than unrestricted shares) granted pursuant to the Plan outstanding at the time and all rights thereunder shall wholly and completely terminate except as provided below. All rights of a Non-Affiliate Director pursuant to Formula Options granted hereunder shall expire 90 days after the date of his termination as a director for any reason; provided, however, that the provisions below shall govern in the event of the normal retirement of a Non-Affiliate Director or the death or disability of such director. Upon the normal retirement of an employee or a director, any unvested portion of any outstanding restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights and other rights shall vest and expire in accordance with the terms of the Plan (and the related Stock Plan Agreement), notwithstanding such normal retirement. Upon the termination of an employee's employment or a director's tenure as a result of death or disability, all outstanding grants of restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights and other rights shall vest notwithstanding the original vesting schedule and shall expire upon the first anniversary of such termination.

**Number of Shares Subject to Plan**

The aggregate number of unrestricted shares which may be acquired pursuant to the Plan shall not exceed 600,000 (5% of which shall be allocated to the Formula Plan); provided, however, that if any options granted under this Plan expire unexercised or unpaid or are canceled, terminated or forfeited in any manner without the issuance of shares thereunder, the shares with respect to which such options were granted shall be available under this Plan provided that such shares have not afforded the forfeiting participants with benefits of ownership. Such shares may be either authorized and unissued shares, treasury shares or a combination thereof, as the Board or the Committee shall determine. The number of unrestricted shares acquired pursuant to the exercise of any stock appreciation right shall be deemed to be equal to the number of shares surrendered, or as to which such participant's right to purchase, acquire or receive is surrendered, in connection with such exercise, and, in the event that any portion of a payment to a participant upon exercise of any stock appreciation right is made in the form of restricted shares, the portion of the shares surrendered, or as to which such participant's right to receive, purchase or acquire is surrendered, which is related to payment in the form of restricted shares shall not be deemed to be unrestricted shares acquired pursuant to the Plan until such restricted shares become unrestricted. Upon unconditional vesting of the right of any participant to payment pursuant to any performance unit in cash or any other form (other than restricted

DWR200P.SS2                    - 7 -

MOAC000484

or unrestricted shares and other than payments pursuant to tax benefit rights), a number of unrestricted shares, equal to the portion of the shares subject to such performance unit to which such payment relates, shall be deemed to be acquired pursuant to the Plan in connection therewith. The number of shares delivered in full or partial payment of the purchase price specified in any option under the Plan shall be deducted from the number of shares delivered to the participant pursuant to such option for purposes of determining the number of unrestricted shares acquired pursuant to the Plan (provided, however, that in no event shall be aggregate number of shares issued or delivered pursuant to the exercise of incentive stock options under the Plan exceed 600,000).

**Adjustments in Connection with Certain Events**

The Company will make such provision with respect to the Plan, including without limitation adjustments in the number of shares which may thereafter be acquired under the Plan, the number of restricted shares outstanding under the Plan or the number of restricted or unrestricted shares subject to options, performance units, recognition rights, payment rights, stock appreciation rights or other rights outstanding under the Plan, or the purchase price specified in options, payment rights or other rights outstanding under the Plan, or for the termination or continuation of restricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights or other rights outstanding under the Plan, as it may determine to be appropriate and equitable, in connection with any stock dividend, stock split, or reverse stock split or combination or other reduction in the number of issued common shares of the Company or in connection with any merger, consolidation, reorganization, sale or exchange of substantially all assets, change of control, spin-off or other distribution of any assets of the Company or any subsidiary or all or any portion of the interest of the Company in any subsidiary to the stockholders, or dissolution of the Company.

**Cancellation of Options**

By express written agreement a participant and the Board or the Committee may agree that any previously granted option is thereby canceled as of the date of the agreement and, at its discretion, the Board or the Committee may subsequently grant to such a participant who has voluntarily surrendered and canceled a prior option one or more new or substitute similar or different options under the Plan.

**Administration**

The Plan shall be administered by the Board of Directors of the Company (the "Board") or a committee of the Board appointed thereby (the "Committee"). The Board or, to the extent authorized by the Board, the Committee, shall, to the extent not inconsistent with the Plan, have the power to select participants to whom

MOAC000485

options, performance units, recognition rights, payment rights, stock appreciation rights, tax benefit rights or tax withholding rights shall be granted; determine the purchase price, if any, in connection therewith or the basis for establishing such purchase price, whether such purchase price may be paid in installments, and the form of payment of such purchase price; determine the number of restricted or unrestricted shares to be granted or subject to options, performance units, recognition rights, payment rights, stock appreciation rights, tax benefit rights or tax withholding rights; determine the other terms and conditions, if any, to which any grant of shares, options, performance units, recognition rights, payment rights, stock appreciation rights, tax benefit rights or tax withholding rights under the Plan shall be subject and to amend, modify or waive any term or condition, including the vesting period, of any such grant (provided, however, that no such amendment or modification shall impair any outstanding right of any participant without the consent of such participant, except to the extent permitted under the terms and conditions of such grant as then in effect); and authorize any action of or make any determination by the Company and prescribe such provisions and interpretations in connection with the Plan as the Board or the Committee shall deem necessary or advisable for carrying out the purposes of the Plan. Each member of the Board or the Committee, and, to the extent provided by the Board or the Committee, any other person to whom duties or powers shall be delegated in connection with the Plan, shall incur no liability with respect to any action taken or omitted to be taken in connection with the Plan and shall be fully protected in relying in good faith upon the advice of counsel, to the fullest extent permitted under applicable law.

**Relationship to Other Plans**

Nothing in this Plan shall prevent the Company or any subsidiary from adopting or continuing other or additional compensation arrangements, including without limitation plans providing for the grant of restricted or unrestricted shares, options, performance units, recognition rights, payment rights, stock appreciation rights, tax benefit rights or tax withholding rights. Grants under the Plan may form a part of or otherwise be related to such other or additional compensation arrangements.

**Amendment**

The Board shall, in its discretion, have the power to amend the Plan from time to time, without stockholder approval to the fullest extent permitted under the Delaware General Corporation Law as in effect at the time of such amendment; provided, however, that stockholder approval shall be required for any amendment which (i) would materially increase the number of shares which may be acquired under the Plan, (ii) materially increase the benefits accruing to participants under the Plan or (iii) materially modify the requirements as to eligibility for participation in the Plan.

DWR200P.SS2                              - 9 -

MOAC000486

The Formula Plan shall not be amended more than once every six months, other than to comport with changes in the Internal Revenue Code, the Employee Retirement Income Security Act, or the rules thereunder.

MOAC000487

Exhibit 11

**SEARS, ROEBUCK AND CO.**
**AND CONSOLIDATED SUBSIDIARIES**
**COMPUTATION OF EARNINGS PER SHARE**

| | Year Ended December 31 | | |
|---|---|---|---|
| ($ in millions, except per common share data) | 1991 | 1990 | 1989 |
| **EARNINGS** | | | |
| Income from continuing operations | $ 1,278.9 | $ 891.7 | $ 1,445.8 |
| Discontinued operations | — | 10.5 | 62.7 |
| Net income | 1,278.9 | 902.2 | 1,508.5 |
| Preferred share dividends | (3.9) | — | — |
| Net income applicable to common shares | $ 1,275.0 | $ 902.2 | $ 1,508.5 |
| **WEIGHTED AVERAGE NUMBER OF COMMON SHARES** | | | |
| Primary (2) | 343.8 | 343.0 | 351.0 |
| Dilutive effect of stock options – after application of treasury stock method (1) | 1.5 | 0.1 | 1.8 |
| Maximum number of common and common share equivalents outstanding | 345.3 | 343.1 | 352.8 |
| **EARNINGS PER COMMON SHARE** | | | |
| **PRIMARY (2)** | | | |
| Income from continuing operations | $ 3.71 | $ 2.60 | $ 4.12 |
| Discontinued operations | — | 0.03 | 0.18 |
| Net income | $ 3.71 | $ 2.63 | $ 4.30 |
| **FULLY DILUTED (3)** | | | |
| Income from continuing operations | $ 3.69 | $ 2.60 | $ 4.10 |
| Discontinued operations | — | 0.03 | 0.18 |
| Net income | $ 3.69 | $ 2.63 | $ 4.28 |

(1) The maximum dilution of earnings per share assumes the exercise of all outstanding stock options. The treasury stock method has been applied based upon the higher of the closing price at fiscal year end or the average price of the common shares during the respective years.

(2) Primary earnings per common share is computed using the average number of shares outstanding since the maximum dilutive effect of all outstanding stock options is less than 3%.

(3) Fully diluted earnings per common share are not disclosed in the Company's financial statements in accordance with APB Opinion No. 15 since the maximum dilutive effect is less than 3%.

MOAC000488

Exhibit 12(a)

## COMPUTATION OF RATIO OF INCOME TO FIXED CHARGES
### (EXCLUDING INTEREST ON SAVINGS DEPOSITS)
### SEARS, ROEBUCK AND CO. AND CONSOLIDATED SUBSIDIARIES

| | Year Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 1991 | 1990 | 1989 | 1988 | 1987 |
| | (millions, except ratios) | | | | |
| **Fixed Charges** | | | | | |
| Interest and amortization of debt discount and expense on all indebtedness | $3,252.0 | $3,370.1 | $3,224.1 | $2,937.4 | $2,720.6 |
| Deduct interest on savings deposits | (734.4) | (718.7) | (717.3) | (544.5) | (471.5) |
| Add interest element implicit in rentals | 325.4 | 304.0 | 269.1 | 254.9 | 223.8 |
| | 2,843.0 | 2,955.4 | 2,775.9 | 2,647.8 | 2,472.9 |
| Interest capitalized | 57.7 | 43.1 | 38.8 | 40.6 | 39.4 |
| Total fixed charges | $2,900.7 | $2,998.5 | $2,814.7 | $2,688.4 | $2,512.3 |
| **Income** | | | | | |
| Income from continuing operations | $1,278.9 | $891.7 | $1,445.8 | $1,032.3 | $1,726.2 |
| Deduct undistributed net income of unconsolidated companies | (0.7) | 10.2 | (2.7) | 0.8 | (16.2) |
| | 1,278.2 | 901.9 | 1,443.1 | 1,033.1 | 1,710.0 |
| **Add** | | | | | |
| Fixed charges (excluding interest capitalized) | 2,843.0 | 2,955.4 | 2,775.9 | 2,647.8 | 2,472.9 |
| Income taxes (benefit) | 192.5 | (221.0) | 352.8 | 53.5 | 348.1 |
| Income before fixed charges and income taxes | $4,313.7 | $3,636.3 | $4,571.8 | $3,734.4 | $4,531.0 |
| Ratio of income to fixed charges | 1.49 | 1.21 | 1.62 | 1.39 | 1.80 |

MOAC000489

Exhibit 12(b)

## COMPUTATION OF RATIO OF INCOME TO FIXED CHARGES
### (INCLUDING INTEREST ON SAVINGS DEPOSITS)
### SEARS, ROEBUCK AND CO. AND CONSOLIDATED SUBSIDIARIES

| | Year Ended December 31 | | | | |
| | 1991 | 1990 | 1989 | 1988 | 1987 |
| --- | --- | --- | --- | --- | --- |
| | (millions, except ratios) | | | | |
| **Fixed Charges** | | | | | |
| Interest and amortization of debt discount and expense on all indebtedness | $3,252.0 | $3,370.1 | $3,224.1 | $2,937.4 | $2,720.6 |
| Add interest element implicit in rentals | 325.4 | 304.0 | 269.1 | 254.9 | 223.8 |
| | 3,577.4 | 3,674.1 | 3,493.2 | 3,192.3 | 2,944.4 |
| Interest capitalized | 57.7 | 43.1 | 38.8 | 40.6 | 39.4 |
| Total fixed charges (including interest on savings deposits) | $3,635.1 | $3,717.2 | $3,532.0 | $3,232.9 | $2,983.8 |
| **Income** | | | | | |
| Income from continuing operations | $1,278.9 | $891.7 | $1,445.8 | $1,032.3 | $1,726.2 |
| Deduct undistributed net income of unconsolidated companies | (0.7) | 10.2 | (2.7) | 0.8 | (16.2) |
| | 1,278.2 | 901.9 | 1,443.1 | 1,033.1 | 1,710.0 |
| Add | | | | | |
| Fixed charges (excluding interest capitalized) | 3,577.4 | 3,674.1 | 3,493.2 | 3,192.3 | 2,944.4 |
| Income taxes (benefit) | 192.5 | (221.0) | 352.8 | 53.5 | 348.1 |
| Income before fixed charges and income taxes | $5,048.1 | $4,355.0 | $5,289.1 | $4,278.9 | $5,002.5 |
| Ratio of income to fixed charges (including interest on savings deposits) | 1.39 | 1.17 | 1.50 | 1.32 | 1.68 |

MOAC000490

Exhibit 13.

# SEARS, ROEBUCK AND CO.

## 1991 ANNUAL REPORT

**SEARS**    **Allstate®**    **DEAN WITTER**    **COLDWELL BANKER**

MOAC000491

## DIRECTORS



**Edward A. Brennan**
Chairman of the
Board, President and
Chief Executive
Officer   1*,2,5



**Warren L. Batts**
Chairman and Chief
Executive Officer,
Premark International,
Inc.  1,3,4,5,6



**E. Mandell de Windt**
Former Chairman of
the Board and Chief
Executive Officer,
Eaton Corporation
1,3*,4,5



**Sybil Collins Mobley**
Dean, School of
Business and Industry,
Florida A & M
University
2,4,6



**Norma Pace**
President of Economic
Consulting and
Planning Inc.
4*,5,6



**Nancy Clark
Reynolds**
Vice Chairman of
The Wexler Group,
a unit of Hill and
Knowlton, Inc.
2,4,6*



**Clarence B.
Rogers, Jr.**
President and Chief
Executive Officer,
and a Director of
Equifax, Inc.
1,2*,3,6



**Donald H. Rumsfeld**
Chairman and Chief
Executive Officer,
General Instrument
Corporation
1,2,3,5*



**Edgar B. Stern, Jr.**
Chairman,
Royal Street
Corporation
1,2,3,5

**Committee Assignments Key:**
1. Member of Executive Committee   2. Member of Finance Committee   3. Member of Compensation Committee
4. Member of Audit Committee   5. Member of Nominating Committee   6. Member of Public Issues Committee
*Chairman of Committee

## CORPORATE OFFICERS

**Edward A. Brennan**
Chairman of the Board, President
and Chief Executive Officer

**James M. Denny**
Vice Chairman

**Edward M. Liddy**
Senior Vice President and
Chief Financial Officer
and Acting Comptroller

**Charles F. Moran**
Senior Vice President,
Administration

**David Shute**
Senior Vice President,
General Counsel and
Secretary

**Randolf H. Aires**
Vice President,
Governmental Affairs

**Charles A. Carlson**
Vice President,
Technology Services

**Edward J. Condon, Jr.**
Vice President and
Treasurer

**Warren F. Cooper**
Vice President,
Human Resources

**David P. Norum**
Vice President,
Taxes

**Charles J. Ruder**
Vice President,
Public Affairs

**Jane J. Thompson**
Vice President,
Planning

## CORPORATE MANAGEMENT COMMITTEE



**Arthur J. Hill**
Chairman and CEO,
Coldwell Banker Real
Estate Group

**Wayne E. Hedien**
Chairman and CEO,
Allstate Insurance Group

**Philip J. Purcell**
Chairman and CEO,
Dean Witter Financial
Services Group

**James M. Denny
David Shute**

**Edward A. Brennan**

**Jane J. Thompson
Charles F. Moran**

MOAC000492

# FINANCIAL HIGHLIGHTS

| Millions, except per common share data | 1991 | 1990 | 1989 | 1988 | 1987 |
|---|---|---|---|---|---|
| Revenues | $ 57,242 | $55,972 | $53,794 | $50,251 | $45,904 |
| Net income | 1,279 | 902 | 1,509 | 1,454 | 1,633 |
| Common share dividends | 688 | 686 | 702 | 758 | 756 |
| Per common share | | | | | |
| Net income | 3.71 | 2.63 | 4.30 | 3.84 | 4.30 |
| Dividends | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| Investments | 46,567 | 38,675 | 33,705 | 29,136 | 25,120 |
| Total assets | 106,435 | 96,253 | 86,972 | 77,952 | 75,014 |
| Shareholders' equity | 14,188 | 12,824 | 13,622 | 14,055 | 13,541 |







# CONTENTS

Chairman's Message to Shareholders ................... 2
Sears Merchandise Group .................... 4
Allstate Insurance Group .................... 5
Dean Witter Financial Services Group ................... 6
Coldwell Banker Real Estate Group .................... 7
Financial Objectives .................... 8
Financial Information .................... 10

MOAC000493

# CHAIRMAN'S MESSAGE TO SHAREHOLDERS



*Whether helping our customers shop for general merchandise and services; insure their autos, homes or lives; buy or sell their homes; trade securities; or use our credit services, Sears people worked harder than ever in 1991 to provide the best in quality, value and service.*

In a year which was noted for a tough economy and a low level of consumer confidence, all of our business groups had strong performance improvements over 1990.

1991 revenues were $57.2 billion, up 2.3% from 1990, while net income rose 42% to $1.3 billion or $3.71 per share, compared with $902 million or $2.63 per share in 1990.

Contributing significantly to the Company's earnings gains were improvements in underwriting results and investment income at Allstate, excellent performance of Dean Witter's Securities and Discover Card operations, the effect of cost-reduction programs in the Merchandise Group and improved operating performance by Coldwell Banker.

Major adverse factors, in addition to the U.S. recession, included a high level of catastrophe claims at Allstate and the impact of the depressed Canadian economy on the performance of the Merchandise Group's international operations.

## Sears Merchandise Group

The primary emphasis for Merchandise Group operations continues to be expense reduction and revenue growth through stronger, more focused merchandising and marketing techniques and the achievement of significantly higher levels of customer service. The Group's increase in earnings to $486 million for the year was largely due to the combination of exceeding a cost-reduction goal of $600 million and the strong profit performance of the credit segment. Low levels of consumer confidence dampened sales of durable and big-ticket merchandise throughout the year, resulting in an overall 1.7% decline of $553 million in revenues to $31.4 billion.

Merchandise Group performance is expected to benefit from improving sales trends that began at year-end, as well as from continued expense reductions.

## Allstate Insurance Group

Allstate's net income increased to $722 million in 1991. Improvements in underwriting results and investment income more than offset the planned decrease in realized capital gains and the absence of the nonrecurring tax benefit in 1990, despite the high level of catastrophe claims and a tough regulatory environment. Group revenues were up 6.3% to $19.4 billion.

## Dean Witter Financial Services Group

Both Securities and Credit Services contributed to the Group's continuation of strong profit performance, with a 48% increase to $345 million for 1991 on top of its 40% improvement the prior year. Revenues rose 7.3% to $4.9 billion. The Securities segment performance was bolstered by management's focus on operating cost controls throughout the year. Discover Card continued to perform exceedingly well in earnings, new accounts and receivables growth.

## Coldwell Banker Real Estate Group

The Group's 1991 earnings of $61 million, compared to $26 million in 1990, reflect greatly improved operating performance as well as record sales and income in the residential segment, despite the difficult housing market. Group revenues were up 17% to $1.6 billion. After-tax gains from the sale of properties were $101 million in 1991 compared with $118 million a year ago.

## Capital Investments

During the year we invested more than $6.4 billion in our businesses. The major investment categories were Discover Card receivables, insurance portfolio investments, new stores, retail inventories, fixtures and repairs, residential mortgages and new systems. Total assets reached $106.4 billion at year-end. In the last five years, assets have grown by more than $40 billion.

MOAC000494

The ability to fund this rate f growth represents one of 1e major strengths of the Comany with its current mix of usinesses. Approximately 10 ears ago, your Company idenfied financial services as growth area through the reainder of the century and mbarked upon a series of iitiatives designed to make ears, Roebuck and Co. a iajor provider of financial ervices to the American onsumer.

Today, we handle 11% of exting home sales, have the 3rd irgest retail brokerage sales orce, rank 6th in residential iortgage originations, insure ne of every eight homes and utomobiles and are the largst single provider of revolving onsumer credit.

These accomplishments vere made possible by drawig upon the consolidated ash flow of the Company. he ability to periodically raw cash from one or more f our businesses to fund the ccelerated growth of another ; a significant competitive adantage and a major benefit owing from the combination f our diverse businesses uner a single common ownerhip. We will continue to draw pon this strength in the fu1re, and expect that this abily to reallocate resources mong our businesses will ead to creation of value fornd delivery of better returns )–our shareholders.

## oard Actions

The Company instituted sevral measures that we believe vill benefit shareholders and trengthen the governance of he Company.

These include new policies nd procedures regarding: condential voting in the election f directors; intensifying the process of electing new directors to the board; maintaining the ratio of outside to inside directors at three (or more) to one; having an outside director serve as chairman of the nominating committee of the board; and excluding officers and directors of the Company as Trustees of the Savings and Profit Sharing Fund of Sears Employees.
● James M. Denny was elected vice chairman, with the Allstate Insurance and Coldwell Banker Real Estate Groups reporting to him, while the Sears Merchandise and Dean Witter Financial Services Groups will continue to report to me. Edward M. Liddy was elected senior vice president and chief financial officer, succeeding and reporting to Mr. Denny.
● Forrest R. Haselton was elected president of retail in Sears Merchandise Group, succeeding Laurence E. Cudmore, who has retired.
● We will all miss the counsel and friendship of John S. Vivian, a 39-year Sears veteran who passed away early this year. John was a Sears vice president and had been the Corporate Comptroller since 1985.

## Preferred Stock Offerings

The Company recently issued two new preferred stock securities. In November 1991, we issued $325 million of perpetual preferred shares and in early 1992, we issued approximately $1.2 billion of Mandatorily Exchangeable Preferred Shares (PERCS™), which will be exchanged for common shares in three years. Both issues enabled us to take advantage of attractive capital market conditions to reduce our debt, strengthen our balance sheet and provide new sources of funds for growth.

More background on these securities is provided in the Financial Objectives discussion which begins on page 8.

## Outlook

A number of factors indicate a general economic recovery and an upturn in consumer confidence as the year progresses. Among the most significant are improving levels of general merchandise and existing home sales, along with heightened stock market activity which usually precedes a recovery.

Regardless of economic conditions, however, each of our businesses is taking steps to become more competitive, to deliver exceptional customer service and to improve its return on equity.

The performance of each business group in the severe 1991 economic environment gives us a high degree of confidence that we're well positioned for continued profitable growth.

The members of the Sears family came through again this year with great sacrifice and dedication. They worked harder than ever at all levels, and I appreciate their efforts. Credit for the Company's improvement over 1990 belongs to each of them, and I look forward to the future with confidence.

Edward A. Brennan
Chairman, President and
Chief Executive Officer
March 11, 1992

# SEARS MERCHANDISE GROUP

*Customer satisfaction is the sum total of how well we can provide the quality products, value and service our customers have every right to expect. It defines our strength and character and is the key to our future.*

**Financial Highlights**
in millions

|  | 1991 | 1990 |
|---|---|---|
| Revenues | $31,432.9 | $31,985.7 |
| Assets | 24,829.1 | 25,539.0 |
| Receivables | 13,537.4 | 15,230.4 |
| Group Income | 486.3 | 257.4 |

**Along with enhanced merchandise selection, reformatted Sears stores are creating a more appealing shopping atmosphere through the use of softer lighting, wider aisles and improved levels of customer service.**

The Sears Merchandise Group made progress last year, but there is still much to be done. We are continuing to intensely focus on improving customer service and increasing revenues at an acceptable margin with a cost structure that generates an attractive shareholder return.

Our strategy is to position Sears as an integrated, powerful specialty merchant in each of our businesses: home appliances and electronics; home fashions; women's, men's and children's apparel; home improvements; and automotive.

As an integrated store, each of our businesses derives a significant benefit from the others, as well as from the Sears name and reputation for trust. For more than 100 years, Americans have had confidence in the quality of the goods and services that we have sold, and we will continue to leverage that great strength.

In today's highly competitive marketplace, each of our businesses stores within a store competes as a powerful specialty merchant market-by-market on product assortment, price, service and presentation. We know our competitors and customers better than ever before.

Our national and private label brands give us the ability to provide a wider assortment of products at competitive prices. We have improved the taste level of our apparel offering. We'll continue to add such trusted brands as Good-year tires in automotive and Levi's Dockers and OshKosh in apparel to build even larger market shares.

Our marketing strategy is designed to create excitement with more store-wide events. This was demonstrated last fall, when we announced our "You Can Count On Me" marketing and customer service initiative during the Sears sponsored national broadcast of "E.T., The Extra Terrestrial" on Thanksgiving night. Our "Best Buys of the Week" and other major event programs are geared to increase store traffic by offering extraordinary values to the consumer.

The retail store is the primary focal point of our strategy, and we have enough new and renovated stores in place that combine our new systems, presentation and marketing enhancements to confirm our direction through solid performance comparisons. Last year, we opened 25 stores, including the Salem, N.H., store pictured below, and renovated 20 others. We plan to build 14 new stores and renovate 72 existing stores in 1992.

In 1991, we reduced costs by $600 million. We will continue to simplify work processes and aggressively reduce expenses in every area of the company during 1992 and the years ahead. Reflecting this, we have implemented a new streamlined three-layer organization structure—home office, districts,



and stores with emphasis on developing teamwork top to bottom. The entire retail structure is designed to totally support our front-line managers and sales associates in better serving our customers.

The Catalog business remains an important, but challenging part of our overall strategy. To improve customer service and profitability, we are testing a new direct-to-home delivery program. We continue to refine our targeted marketing approach and reduce costs. While we expect an overall lower Catalog sales level, we anticipate improved profitability.

In our International businesses, Sears Mexico performed well, while Sears Canada's results were adversely affected by a depressed economic environment.

Our Credit operation had an excellent year, despite higher write-offs due to the economy. With more than 27 million active credit accounts, we continue to offer our customers a variety of credit alternatives.

We're confident that this strategy will result in a Sears that is responsive, highly competitive and a company the customer will perceive more than ever as delivering on its promise to provide excellence in service and value.

MOAC000496

# ALLSTATE INSURANCE GROUP

Allstate Insurance Company ended 1991 with higher revenues and significantly higher operating income than the previous year. Improvements in underwriting results, despite high catastrophe losses, and investment income more than offset the planned decrease in realized capital gains and unfavorable claims cost trends, particularly for automobile accident injury claims. Most of the underwriting improvement was due to favorable trends in the number of claims reported and increased average premiums.

In 1991, Allstate increased the linkage between the company's strategic intentions and customer-focused quality approach.

The decision to emphasize customer-focused quality was based upon the most comprehensive customer research in Allstate's history. The focus of these quality initiatives is to improve customer satisfaction, as measured by policy renewal rates, and expense reduction through higher agent productivity and lower employee turnover.

Capitalizing on the substantial systems enhancements made during the past five years, the Allstate Personal Property and Casualty operation plans to introduce processes and technology to further support agents in meeting customer expectations.

Focusing on the customer also means providing security, backed by financial strength. Allstate Life has statutory U.S. assets of more than $19 billion, statutory surplus and investment valuation reserves of more than $1 billion, solid earnings and excellent financial ratings.

Allstate Life is committed to offering superior value through a broad range of products, while maintaining a strong capital structure.

Allstate Business Insurance undertook a number of important initiatives during 1991. Northbrook Property and Casualty, a Business Insurance division servicing independent agents, has adopted an aggressive restructuring program to streamline its operation and to become a specialist in targeted markets.

For business insurance products sold by Allstate agents, a major priority was to enhance the quality of its cornerstone product—the *Customizer*. The *Customizer*, consisting of combined comprehensive property and liability coverage, is a package specifically tailored to the needs of the small-business owner.

These strategies are designed to enhance customer satisfaction and loyalty, to enable the company to achieve its growth objectives and to increase shareholder value as measured by improving profits and returns on equity.

*Auto crash survivors like these number in the tens of thousands, thanks to air bags. As a company long committed to managing our customers' risks, Allstate has been a supporter of air bag technology for more than two decades. Allstate has also advocated driver education and tough anti-drunk driving and state seat belt laws.*





*Forming lasting relationships with our customers is the ultimate test of everything we do. By focusing on what our customers value, we can build long-term relationships, create sustainable growth for each of our businesses, increase our capital base, reduce costs and enhance shareholder value.*

**Financial Highlights**
in millions

| | 1991 | 1990 |
|---|---|---|
| Revenues | $39,350.2 | $18,199.1 |
| Assets | 45,775.8 | 39,950.3 |
| Investments | 38,861.1 | 33,509.9 |
| Income from continuing operations before fresh start tax benefit | 722.5 | 551.8 |
| Group income | 722.5 | 701.3 |

MOAC000497

# DEAN WITTER FINANCIAL SERVICES GROUP

*Though change will sweep through our world and our industry in 1992 and beyond, some things will remain the same. At Dean Witter, we will continue to create the right products for the right clients at the right time. And we will measure success as we always have; one client at a time.*

### Financial Highlights
In millions

|  | 1991 | 1990 |
|---|---|---|
| Revenues | $4,942.0 | $4,606.8 |
| Group Income | 344.6 | 232.9 |
| Capital | 2,119.8 | 1,864.9 |

*Discover Card, which has emphasized value since its inception just six years ago, has secured a reputation in the 1990s as the credit card for value-conscious consumers.*

Dean Witter Financial Services Group posted its best year ever in 1991. Group revenues increased to $4.9 billion, up 7.3% from $4.6 billion in 1990. Net income rose to $345 million, up 48% from $233 million. Return on equity increased to 17.3% from 13.0% in 1990. Securities, Discover Card, Sears Payment Systems and the Lending Services Division all posted sharply higher profits.

### Securities

The Group's Securities business posted its third consecutive record year. Net income increased to $171 million, up 56.9% from $109 million in 1990. Among 1991's high-

lights: more Active Assets Accounts were opened in 1991 than in the previous four years combined and account executive productivity increased 20%.

Sharply lowered interest rates rekindled the market for equities in 1991. Accordingly, we implemented a highly focused investment banking strategy emphasizing asset management and equity public offerings. A strategic alliance forged at year-end with Trust Company of the West facilitates the creation of a second family of mutual funds to complement InterCapital's existing family.

### Credit Services

Despite an adverse economy, Credit Services earned a record $174 million, up 40.1% from $124 million in 1990.

Discover Card solidified its position as the value leader in the competitive credit card marketplace. Receivables increased from $11.6 billion to $14.7

billion. Merchant outlets increased to 1.4 million. Cardmembers rose from 37.8 million to 41.2 million, making it the leading domestic card issuer. Charge-offs worsened, but Discover Card risk management results were better than those of most of our competitors.

At year-end, we announced our intention to offer 26% of SPS Transaction Services to the public. This transaction was successfully completed on March 3, 1992. Common stock was offered at $16 per share, raising $50 million in growth capital.

In summary, 1991 was an excellent year for the Dean Witter Financial Services Group. Our strong results moved us well along toward our strategic goal of becoming one of the nation's leading providers of financial services.



# COLDWELL BANKER REAL ESTATE GROUP

## Coldwell Banker Residential Group

Overcoming a weak economic environment, Coldwell Banker Residential Group had a record year in income. Coldwell Banker Residential brokerage's presence grew in the Northeast with the acquisition of 99 offices of Schlott Realtors, based primarily in New Jersey, New York and Connecticut. Coldwell Banker Residential Affiliates, Inc. continued its expansion, growing from 142 offices in 1982 to more than 1,400 offices at the end of 1991. Coldwell Banker Relocation Services solidified its position as the second largest in the relocation industry and signed 55 major clients to relocation contracts.

Coldwell Banker Residential Group now has more than 1,900 offices and more than 40,000 sales associates, with operations in all 50 states, Puerto Rico and Canada.

## Sears Mortgage Group

Sears Mortgage Corporation's (SMC) home mortgage originations increased more than 80% during 1991, with fundings increasing to $8.2 billion from $4.5 billion in 1990. Nearly one third of SMC's total volume came from Coldwell Banker customers, and the percentage of home buyers from Coldwell Banker wholly-owned offices using SMC increased to more than 25%.

Sears Savings Bank (SSB) purchased $2.6 billion in mortgage loans from SMC, significantly adding to SSB's portfolio of single family residential loans.

SMC's mortgage servicing portfolio grew 37% in 1991 to $20.6 billion, and servicing costs per loan were reduced by 18%.

Sears Mortgage Securities Corporation issued $2.2 billion in private mortgage-backed securities and increased its master servicing portfolio 87% to $5.6 billion by year-end.

## Homart Development Co.

Homart continued to be a leading developer of commercial real estate through an active program of development for both regional malls and community centers.

At year-end, Homart owned and operated 27 regional malls, 12 with joint venture partners, and managed eight regional malls for others.

Construction continued toward the 1992 openings of two new malls: Moreno Valley Mall at TownGate, Moreno Valley, Calif., and Pembroke Lakes Mall, Pembroke Pines, Fla. The company also broke ground for North Point Mall, which is planned to open north of Atlanta in 1993

with Sears, Rich's and JCPenney as anchors. During 1991, Homart opened Bay City Mall, a regional shopping center in Bay City, Mich., with Sears, Prange's and Target as anchors.

Homart Community Centers, Inc. opened two centers: Pembroke Commons, Pembroke Pines, Fla., and Eastgate Mall Crossing, Cincinnati, Ohio.

Homart owns and operates 21 office buildings, two as joint ventures. These buildings are on average, 82% leased, excluding Glendale City Center, a joint venture in Glendale, Calif., which opened in 1991 ahead of schedule with better than planned occupancy.

Homart is currently assisting with the sales, leasing and overall coordination of the development and marketing of Prairie Stone, the new Sears Merchandise Group headquarters and office park in Hoffman Estates, Ill.

*1991 was productive and profitable for Coldwell Banker Real Estate Group with a continued focus on customer service, product growth, cost reductions and quality.*

### Financial Highlights
in millions

|  | 1991 | 1990 |
|---|---|---|
| Revenues | $1,613.3 | $1,377.4 |
| Assets | 9,925.0 | 7,852.4 |
| Investments | 8,838.8 | 6,890.6 |
| Group Income | 60.6 | 25.5 |

in billions

|  |  |  |
|---|---|---|
| Mortgage Production Volume | 8.2 | 4.5 |

Sears Mortgage Corporation and Coldwell Banker Residential Group have succeeded in developing a strong relationship that benefits home buyers and sellers.



THE WINNING COMBINATION

# FINANCIAL OBJECTIVES

This is the third year we have stated our financial objectives in the annual report. They remain unchanged but progress toward achieving them requires actions that vary from year to year in response to changes in the business environment.

Our goals are:
- To achieve above average returns on shareholders' equity;
- To borrow advantageously and to use leverage prudently; and
- To maintain a balanced dividend policy that makes our stock attractive for yield-oriented investors but also recognizes our potential to earn above average returns on our retained earnings.

Pursuit of these goals during the past year resulted in action designed to strengthen our balance sheet to fund the future growth of our businesses. In November 1991, we issued $325 million of perpetual preferred shares and early this year we issued approximately $1.2 billion of Mandatorily Exchangeable Preferred Shares (PERCS™). Issuance of these securities reflects our ability to productively use additional capital in our businesses and was a by-product of our goal to maintain a prudent balance between debt and equity funding. Although these security issues will dilute the earnings available to the common shareholder in the near term and will make improvement in our return on equity more difficult, we believe they are in the best long-term interest of our shareholders.

The issuance of the preferred shares reflects the following considerations:
- The rapid and profitable growth of our financial services businesses particularly Discover Card, Allstate Life Insurance and the Sears Mortgage business, each of which has grown at a compound rate in excess of 25% during the past three years–surpasses the ability of these businesses to fund that rate of growth.
- Our merchandising business, which funded much of the early growth of our financial services businesses, will warrant higher levels of capital investment than it has in the recent past.

The issue of preferred shares reflects our judgment that our equity capital needed bolstering both to sustain the future growth of our businesses and to ensure continued access to world debt markets at competitive costs.

We are continuing a program to generate capital internally to fund the growth of our core businesses by recapturing capital from activities which are not critical to our central direction. As part of this program, we have:
- Sold a minority interest in the Seiyu Saison Group which was acquired several years ago as a result of our long-stand-





Return on Average Common Equity



Return on Equity

ing, ongoing and productive relationship with that Group;

• Announced our intention to sell Allstate Canada, a $1.0 billion asset insurance company; and

• Sold a minority interest in SPS Transaction Services, Inc. in February 1992, raising $50 million for SPS's future growth as a public company.

We will continue to review each of our businesses under that program and expect to divest other non-core operations in the future as opportunities develop.

Our capital investment criteria also remain unchanged. They are:

• To pursue businesses and strategies that have the potential to provide returns in excess of our cost of capital and, therefore, to create value for our shareholders not available from comparable investments, and

• To strike a balance between the pursuit of value creation for our shareholders–which requires recognition by the financial markets of the competitive advantages we are creating and the potential future cash flows they will generate–and current annual profit performance as measured by return on shareholders' equity.

While we are making progress in eliminating unproductive and peripheral activities, we have been less successful in our attempt to deliver a competitive return on equity. The recession made 1991 a difficult year for American industry with the return on equity of the S & P 400 and the Dow Jones Industrial Average, adjusted to eliminate nonrecurring charges, falling to an estimated 13.2% and 9.5%, respectively, from 18.3% and 13.7% in 1990. Our return on equity rose to 9.6% in 1991 from 6.8% in 1990, but was still far short of our 15% target. Our improvement in 1991 reflects the contribution of the strong performance of our higher return, faster growing financial services businesses and the favorable effects of an aggressive expense reduction program in our merchandising business.

We are encouraged by our progress toward profitable revenue growth, expense reduction and asset management, and remain committed to achievement of a return on equity that compares favorably with the returns earned by businesses of comparable risk. Given our current mix of businesses, our return on equity goal remains in the 15% range, even though there has been a decline in the rate of return on risk free investments.

9



**Growth of Financial Assets and Leverage 1981-1991**
(billions)

Assets
- Financial Assets
- Inventory, Property & Other

Liabilities
- Other Liabilities
- Insurance Reserves
- Debt & Deposits
- Equity



**Revenue Growth**
(billions)

Coldwell Banker    Dean Witter    Allstate    Merchandise Group

MOAC000501

# SEARS, ROEBUCK AND CO.

### TEN-YEAR SUMMARY OF CONSOLIDATED FINANCIAL DATA

$ millions, except per common share data

| Operating results | 1991 | 1990 | 1989 |
|---|---|---|---|
| Revenues | $ 57,242 | $ 55,972 | $ 53,794 |
| Costs and expenses | 52,659 | 51,808 | 48,869 |
| Restructuring | — | 265 | — |
| Interest | 3,252 | 3,370 | 3,224 |
| Operating income | 1,331 | 529 | 1,701 |
| Other income | 127 | 144 | 129 |
| Income before income taxes, minority interest and equity income | 1,458 | 673 | 1,830 |
| Income taxes (benefit) | | | |
| Current operations | 192 | (82) | 353 |
| Fresh start and deferred tax benefits | — | (139) | — |
| Income from continuing operations | 1,279 | 892 | 1,446 |
| Income (loss) from discontinued operations | — | 10 | 63 |
| Cumulative effect of change in accounting for income taxes | — | — | — |
| Net income | 1,279 | 902 | 1,509 |
| Return on average common equity | 9.6% | 6.8% | 10.9% |

| Financial position | | | |
|---|---|---|---|
| Investments | $ 46,567 | $ 38,675 | $ 33,705 |
| Receivables | 32,218 | 33,816 | 32,141 |
| Property and equipment, net | 6,219 | 5,850 | 5,407 |
| Merchandise inventories | 4,459 | 4,074 | 4,358 |
| Total assets | 106,435 | 96,253 | 86,972 |
| Insurance reserves | 30,221 | 25,750 | 20,847 |
| Short-term borrowings | 9,788 | 15,314 | 12,714 |
| Long-term debt | 19,170 | 12,636 | 10,036 |
| Total debt | 28,958 | 27,950 | 22,750 |
| Percent of debt to equity | 204% | 218% | 167% |
| Shareholders' equity | $ 14,188 | $ 12,824 | $ 13,622 |

| Shareholders' common stock investment | | | |
|---|---|---|---|
| Book value per share (year-end) | $ 40.29 | $ 37.38 | $ 39.77 |
| Shareholders (Profit Sharing Fund counted as single shareholder) | 342,851 | 345,071 | 348,597 |
| Average shares outstanding (millions) | 344 | 343 | 351 |
| Net income per share | | | |
| Income from continuing operations | $3.71 | $2.60 | $4.12 |
| Income (loss) from discontinued operations | — | .03 | .18 |
| Cumulative effect of change in accounting for income taxes | — | — | — |
| Net income | 3.71 | 2.63 | 4.30 |
| Dividends per share | $2.00 | $2.00 | $2.00 |
| Dividend payout percent | 53.9% | 76.0% | 46.5% |
| Market price (high-low) | 43½–24⅜ | 41⅞–22 | 48⅛–36½ |
| Closing market price at year-end | 37⅞ | 25⅜ | 38⅛ |
| Price/earnings ratio (high-low) | 12–7 | 16–8 | 11–8 |

Operating results reflect the group life-health business of Allstate Insurance Group and the commercial division of Coldwell Banker Real Estate Group as discontinued operations. See note 1 to the consolidated financial statements.

MOAC000502

| | 1988 | 1987 | 1986 | 1985 | 1984 | 1983 | 1982 |
|---|---|---|---|---|---|---|---|
| $ | 50,251 | $ 45,904 | $ 42,303 | $ 39,349 | $ 37,898 | $ 35,257 | $ 29,559 |
| | 45,617 | 41,222 | 38,139 | 35,384 | 33,766 | 31,751 | 26,866 |
| | 751 | 105 | — | — | — | — | — |
| | 2,937 | 2,721 | 2,653 | 2,629 | 2,528 | 1,703 | 1,628 |
| | 946 | 1,856 | 1,511 | 1,336 | 1,604 | 1,803 | 1,065 |
| | 157 | 239 | 282 | 277 | 246 | 66 | 28 |
| | 1,103 | 2,095 | 1,793 | 1,613 | 1,850 | 1,869 | 1,093 |
| | 54 | 521 | 444 | 306 | 498 | 565 | 238 |
| | — | (172) | — | — | (60) | — | — |
| | 1,032 | 1,726 | 1,336 | 1,280 | 1,422 | 1,326 | 866 |
| | (122) | (93) | 3 | 14 | 30 | 11 | (5) |
| | 544 | — | — | — | — | — | — |
| | 1,454 | 1,633 | 1,339 | 1,294 | 1,452 | 1,337 | 861 |
| | 10.5% | 12.4% | 10.9% | 11.5% | 14.0% | 14.4% | 10.1% |

| | 1988 | 1987 | 1986 | 1985 | 1984 | 1983 | 1982 |
|---|---|---|---|---|---|---|---|
| $ | 29,136 | $ 25,120 | $ 22,183 | $ 19,249 | $ 17,203 | $ 15,434 | $ 13,497 |
| | 28,685 | 26,026 | 21,417 | 18,942 | 17,565 | 15,511 | 11,532 |
| | 5,179 | 4,790 | 4,593 | 4,541 | 4,361 | 3,938 | 3,396 |
| | 3,716 | 4,115 | 4,013 | 4,115 | 4,530 | 3,621 | 3,146 |
| | 77,952 | 75,014 | 66,009 | 66,426 | 57,073 | 46,177 | 36,541 |
| | 17,329 | 13,169 | 10,014 | 8,090 | 6,919 | 6,262 | 5,667 |
| | 8,978 | 7,055 | 4,306 | 3,996 | 3,887 | 4,596 | 2,820 |
| | 9,736 | 9,562 | 10,067 | 9,907 | 9,531 | 7,405 | 5,816 |
| | 18,714 | 16,617 | 14,373 | 13,903 | 13,418 | 12,001 | 8,636 |
| | 133% | 123% | 110% | 118% | 123% | 123% | 98% |
| $ | 14,055 | $ 13,541 | $ 13,017 | $ 11,776 | $ 10,903 | $ 9,782 | $ 8,812 |

| | 1988 | 1987 | 1986 | 1985 | 1984 | 1983 | 1982 |
|---|---|---|---|---|---|---|---|
| $ | 37.75 | $ 35.77 | $ 33.90 | $ 31.66 | $ 29.46 | $ 27.59 | $ 25.08 |
| | 351,999 | 328,446 | 319,686 | 326,201 | 340,831 | 339,644 | 350,292 |
| | 379 | 378 | 369 | 363 | 358 | 353 | 350 |
| | $2.72 | $4.55 | $3.57 | $3.47 | $3.92 | $3.76 | $2.47 |
| | (.32) | (.25) | .01 | .04 | .08 | .03 | (.01) |
| | 1.44 | | | | | | |
| | 3.84 | 4.30 | 3.58 | 3.51 | 4.00 | 3.79 | 2.46 |
| | $2.00 | $2.00 | $1.76 | $1.76 | $1.76 | $1.52 | $1.36 |
| | 52.1% | 46.5% | 49.2% | 50.1% | 44.0% | 40.1% | 55.3% |
| | 46 32¼ | 59½–29¾ | 50⅜–35⅞ | 41⅛–30⅞ | 40⅛–29½ | 45⅛–27 | 32–15¾ |
| | 40⅛ | 33½ | 39¾ | 39 | 31¼ | 37⅛ | 30⅛ |
| | 12–8 | 14–7 | 14–10 | 12–9 | 10–7 | 12–7 | 13–6 |

Operating results and financial position for 1986 and thereafter may not be comparable to prior years due to adoption of new pension accounting rules.
Operating results and financial position for 1982 include Sears Canada Inc. on the equity method of accounting. Due to the purchase of a majority interest during 1983, the financial statements subsequent to Dec. 31, 1982 present Sears Canada Inc. on a consolidated basis.

MOAC000503

# SEARS, ROEBUCK AND CO.

## FIVE-YEAR SUMMARY OF BUSINESS GROUP DATA

Sears, Roebuck and Co. is comprised of four principal business groups. Management believes that, while the consolidated financial statements reflect the total financial resources and operating results of the Company, analysis of the operations of the various industry components within the Company is facilitated by separate business group statements. Therefore, beginning on page 29 are supplemental summarized financial statements, including notes unique to the operations of each group, and analyses of operations and financial condition.

The following five-year summary of pertinent business group data, derived from the accompanying statements, includes a further refinement within industry segments. Corporate assets are principally intercompany receivables, Sears Tower, investments and subsidiaries not included in the business groups. Corporate operations include revenues and expenses of such subsidiaries, and items of an overall holding company nature including that portion of administrative costs and interest which is not allocated to the groups.

millions

| Revenues | 1991 | 1990 | 1989 | 1988 | 1987 |
|---|---|---|---|---|---|
| Sears Merchandise Group | | | | | |
| Merchandising | $24,757 | $25,093 | $25,002 | $24,252 | $22,894 |
| Credit | 2,735 | 2,672 | 2,462 | 2,260 | 2,011 |
| International | 3,941 | 4,221 | 4,135 | 3,744 | 3,180 |
| Sears Merchandise Group total | 31,433 | 31,986 | 31,599 | 30,256 | 28,085 |
| Allstate Insurance Group | | | | | |
| Property-liability | 16,582 | 15,744 | 14,585 | 13,268 | 11,794 |
| Life | 2,768 | 2,455 | 2,218 | 1,656 | 1,261 |
| Allstate Insurance Group total | 19,350 | 18,199 | 16,803 | 14,924 | 13,055 |
| Dean Witter Financial Services Group | | | | | |
| Securities | 2,501 | 2,476 | 2,350 | 2,481 | 2,747 |
| Credit Services | 2,441 | 2,131 | 1,715 | 1,277 | 699 |
| Dean Witter Financial Services Group total | 4,942 | 4,607 | 4,065 | 3,758 | 3,446 |
| Coldwell Banker Real Estate Group | 1,613 | 1,377 | 1,448 | 1,444 | 1,399 |
| Corporate | 226 | 152 | 146 | 198 | 176 |
| Intergroup transactions | (322) | (349) | (267) | (329) | (257) |
| Total | $57,242 | $55,972 | $53,794 | $50,251 | $45,904 |

| Income before income taxes, minority interest and equity income | | | | | |
|---|---|---|---|---|---|
| Sears Merchandise Group | | | | | |
| Merchandising | $ 163 | $ 77 | $ 483 | $ 400 | $ 912 |
| Credit | 634 | 532 | 464 | 517 | 463 |
| International | 14 | 101 | 189 | 167 | 132 |
| Restructuring | — | (265) | — | (751) | (105) |
| Sears Merchandise Group total | 811 | 445 | 1,136 | 333 | 1,402 |
| Allstate Insurance Group | | | | | |
| Property-liability | 302 | 42 | 441 | 674 | 701 |
| Life | 237 | 261 | 244 | 192 | 191 |
| Allstate Insurance Group total | 539 | 303 | 685 | 866 | 892 |
| Dean Witter Financial Services Group | | | | | |
| Securities | 282 | 208 | 191 | 105 | 148 |
| Credit Services | 274 | 196 | 106 | 45 | (192) |
| Dean Witter Financial Services Group total | 556 | 404 | 297 | 150 | (44) |
| Coldwell Banker Real Estate Group | 105 | 44 | 108 | 119 | 186 |
| Corporate and intergroup transactions | (553) | (523) | (396) | (365) | (341) |
| Total | $1,458 | $ 673 | $1,830 | $1,103 | $2,095 |

MOAC000504

millions

| Net income | 1991 | 1990 | 1989 | 1988 | 1987 |
|---|---|---|---|---|---|
| Sears Merchandise Group | | | | | |
| Merchandising | $ 90 | $ 37 | $ 292 | $ 240 | $ 503 |
| Credit | 394 | 330 | 288 | 325 | 263 |
| International | 2 | 45 | 67 | 66 | 36 |
| Restructuring | — | (155) | — | (458) | (59) |
| Deferred tax benefits | — | — | — | — | 44 |
| Income tax accounting change | — | — | — | 351 | |
| Sears Merchandise Group total | 486 | 257 | 647 | 524 | 787 |
| Allstate Insurance Group | | | | | |
| Property-liability | 557 | 378 | 654 | 787 | 800 |
| Life | 165 | 174 | 161 | 127 | 117 |
| Discontinued operations | — | 10 | — | (145) | (99) |
| Fresh start adjustment | — | 139 | — | — | 128 |
| Income tax accounting change | — | — | — | 184 | |
| Allstate Insurance Group total | 722 | 701 | 815 | 953 | 946 |
| Dean Witter Financial Services Group | | | | | |
| Securities | 171 | 109 | 100 | 59 | 76 |
| Credit Services | 174 | 124 | 66 | 29 | (116) |
| Income tax accounting change | — | — | — | (2) | |
| Dean Witter Financial Services Group total | 345 | 233 | 166 | 86 | (40) |
| Coldwell Banker Real Estate Group | | | | | |
| Continuing operations | 61 | 26 | 64 | 79 | 123 |
| Discontinued operations | — | — | 63 | 23 | 6 |
| Income tax accounting change | — | — | — | (12) | |
| Coldwell Banker Real Estate Group total | 61 | 26 | 127 | 90 | 129 |
| Corporate and intergroup transactions | (335) | (315) | (246) | (199) | (189) |
| Total | $1,279 | $ 902 | $1,509 | $1,454 | $1,633 |

| Assets | | | | | |
|---|---|---|---|---|---|
| Sears Merchandise Group | | | | | |
| Merchandising | $ 9,462 | $ 8,731 | $ 8,505 | $ 8,111 | $ 8,253 |
| Credit | 12,526 | 13,509 | 13,841 | 12,844 | 12,706 |
| International | 2,841 | 3,299 | 3,171 | 2,752 | 2,257 |
| Sears Merchandise Group total | 24,829 | 25,539 | 25,517 | 23,707 | 23,216 |
| Allstate Insurance Group | | | | | |
| Property-liability | 25,415 | 23,180 | 21,388 | 19,458 | 17,286 |
| Life | 20,361 | 16,770 | 12,622 | 10,250 | 7,234 |
| Allstate Insurance Group total | 45,776 | 39,950 | 34,010 | 29,708 | 24,520 |
| Dean Witter Financial Services Group | | | | | |
| Securities | 11,244 | 10,130 | 9,646 | 9,015 | 13,952 |
| Credit Services | 12,135 | 11,560 | 10,271 | 8,742 | 6,059 |
| Dean Witter Financial Services Group total | 23,379 | 21,690 | 19,917 | 17,757 | 20,011 |
| Coldwell Banker Real Estate Group | 9,925 | 7,852 | 7,228 | 6,780 | 6,551 |
| Corporate | 3,723 | 2,265 | 969 | 1,335 | 1,907 |
| Intergroup eliminations and reclassifications | (1,197) | (1,043) | (669) | (1,335) | (1,191) |
| Total | $106,435 | $96,253 | $86,972 | $77,952 | $75,014 |

13

MOAC000505

# SEARS, ROEBUCK AND CO.

## CONSOLIDATED STATEMENTS OF INCOME

millions, except per common share data                                                Year Ended December 31

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| **Revenues** | **$57,242.4** | $55,971.7 | $53,793.9 |
| **Expenses** | | | |
| Costs and expenses | 52,659.3 | 51,807.8 | 48,869.0 |
| Restructuring (note 2) | — | 264.4 | — |
| Interest | 3,252.0 | 3,370.1 | 3,224.1 |
| Total expenses | 55,911.3 | 55,442.3 | 52,093.1 |
| Operating income | 1,331.1 | 529.4 | 1,700.8 |
| Other income | 127.0 | 143.7 | 128.9 |
| Income before income taxes, minority interest and equity income | 1,458.1 | 673.1 | 1,829.7 |
| Income taxes (benefit) (note 5) | | | |
| Current operations | 192.5 | (82.0) | 352.8 |
| Fresh start adjustment | — | (139.0) | — |
| Minority interest and equity in net income of unconsolidated companies | 13.3 | (2.4) | (31.1) |
| **Income from continuing operations** | **1,278.9** | 891.7 | 1,445.8 |
| Discontinued operations (note 1) | | | |
| Operating income, less income tax expense of $2.2 | — | — | 2.8 |
| Gain on disposal, less income tax expense of $5.5 and $77.2 | — | 10.5 | 59.9 |
| **Net income** | **$ 1,278.9** | $ 902.2 | $ 1,508.5 |
| **Net income per common share,** after allowing for dividends on preferred shares (note 14) | | | |
| Income from continuing operations | **$3.71** | $2.60 | $4.12 |
| Discontinued operations | — | .03 | .18 |
| Net income | **$3.71** | $2.63 | $4.30 |
| Average common shares outstanding | **343.8** | 343.0 | 351.0 |

See accompanying notes and the summarized Group financial statements.

## ANALYSIS OF CONSOLIDATED OPERATIONS

The consolidated statements of income present the operating results of all the businesses of Sears, Roebuck and Co. The business groups' relative contributions to the consolidated results can be seen in the summary of business group data on pages 12 and 13. Further analysis is enhanced by referring to the four business groups' summarized financial results and discussions beginning on pages 29, 34, 40 and 44. The following discussion focuses on the effects of those business groups on the consolidated operating results.

Consolidated revenues increased $1.27 billion or 2.3% in 1991, compared with an increase of $2.18 billion or 4.0% in 1990. The largest revenue producer continued to be the Sears Merchandise Group at $31.43 billion or 55% of 1991 consolidated revenues. Merchandise Group revenues decreased $552.8 million in 1991 compared with an increase of $386.5 million in 1990. The 1991 decrease was due to the recessionary domestic and Canadian economies and the increasingly competitive retail environment. Domestic Merchandising revenues declined $335.9 million in 1991 compared to a $91.3 million increase in 1990, while International revenues were $280.8 million lower in 1991 compared with a 1990 increase of $86.0 million. Higher average premiums and unit sales of property-liability insurance, along with improved investment income, resulted in an increase of $1.15 billion in Allstate Insurance Group revenues in 1991 to $19.35 billion, or 34% of consolidated revenues. In 1990, Allstate revenues increased

$1.40 billion to $18.20 billion, or 33% of consolidated revenues. Dean Witter Financial Services Group revenues rose 7.3% in 1991 to $4.94 billion primarily from increased interest and fee revenues at Credit Services. Revenues at Dean Witter rose 13.3% in 1990, primarily from increased interest and fee revenues at Credit Services and higher trading and asset management revenues in Securities. Coldwell Banker Real Estate Group revenues increased 17.1% in 1991, primarily due to higher interest and mortgage servicing income, compared to a 4.9% revenue decline in 1990.

Operating income rose $801.7 million in 1991, with all business groups contributing to the increase. A $367.1 million increase in the Merchandise Group's operating income reflected lower selling and administrative expenses partially offset by lower revenues and gross margins at domestic Merchandising, improved operating income at Credit and a $264.4 million restructuring charge taken in 1990. Allstate's operating income increased $235.2 million as improvements in underwriting results and investment income more than offset a decrease in realized capital gains. Dean Witter's operating income rose 37.6% to $555.6 million on significantly higher results at both Credit Services and Securities. Coldwell Banker's operating loss, reflecting anticipated operating losses at Homart, was reduced to $52.7 million from $145.5 million due to improved results at Residential and Sears Mortgage Group.

## ANALYSIS OF CONSOLIDATED OPERATIONS continued

Operating income in 1990 declined $1.17 billion compared with 1989. The Merchandise Group declined $733.6 million, reflecting a $264.4 million restructuring charge related primarily to severance programs, higher selling price reductions induced by competitive pressures and a weak economy, and increased operating expenses. Allstate's operating income declined $381.3 million as underwriting losses increased due to higher claim costs and the upward development of prior year catastrophic losses. Coldwell Banker's operating loss increased to $145.5 million due largely to lower Residential results, partially offset by improvement at Sears Mortgage Group. Dean Witter's increase of $106.9 million, due to significantly higher results at Credit Services, partially offset the decline in operating income at the other business groups.

Interest expense declined $118.1 million in 1991 due to lower average interest rates, partially offset by increased borrowings primarily attributable to increased short-term investments. Interest expense rose $146.0 million in 1990 on increased borrowings attributable to the prior year stock repurchase program, higher Discover Card financing requirements, increased short-term investments and the Company's Employee Stock Ownership Plan, offset in part by lower interest rates.

As shown in the graph below, the cost of borrowings fell to an average 7.6% at year-end 1991 versus 9.1% and 9.7% at Dec. 31, 1990 and 1989. The 1991 decrease resulted from a drop in both short-term and long-term interest rates from 1990 levels. A portion of the fixed rate debt in each year was converted from variable rate debt through the use of interest rate swaps and caps. Swaps accounted for $4.8, $3.1 and $3.0 billion and caps accounted for $2.2, $1.6 and $1.7 billion of the fixed rate debt at Dec. 31, 1991, 1990 and 1989.

**Year-End Debt Levels and Interest Rates**
(billions)



| | 1989 | 1990 | 1991 |
| Fixed Rate Debt | | Variable Rate Debt | |

Other income decreased in 1991 due to lower gains from property sales, partially offset by lower joint venture losses and a gain on the sale of the Merchandise Group's investment in the Seiyu Saison Group. In 1990, other income was higher as increased gains from property sales and other miscellaneous income more than offset increased joint venture operating losses. A summary of other income by type follows:

| millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Sale of property | $ 174.6 | $ 247.5 | $ 231.9 |
| Sale of securities | 42.4 | — | — |
| Equity in joint ventures | (96.1) | (117.3) | (101.6) |
| Other gains and losses, net | 6.1 | 13.5 | (1.4) |
| Total | $ 127.0 | $ 143.7 | $ 128.9 |

Income tax expense was 13.2% of 1991 pretax earnings. The 1990 income tax benefit on operations was 12.2% of pretax earnings. In 1989, income tax expense was 19.3% of pretax earnings. These rates differed from the statutory rate mainly due to tax-exempt income and corporate dividends eligible for partial tax exclusion. The rates vary between years primarily due to the relative proportion of tax-exempt income included in pretax income. A fresh start tax benefit was also recognized in 1990 arising from a change in the tax treatment of salvage and subrogation reserves.

Income from continuing operations was $1.28 billion in 1991, a 43.4% increase, following a 38.3% decrease in 1990. The 1991 increase resulted from a $228.9 million improvement by the Merchandise Group, and increases at Dean Witter and Coldwell Banker of 48.0% and 137.6%, respectively. The 1990 decline resulted from reductions at all the groups except Dean Witter, which posted a $66.9 million, or 40.3%, increase.

Net income increased $376.7 million or 41.8% in 1991. The increase resulted primarily from a $228.9 million improvement in the Merchandise Group's net income, reflecting the $155.2 million after-tax restructuring charge taken in 1990, an increase in Dean Witter earnings of $111.7 million and a $35.1 million improvement in Coldwell Banker's earnings. Net income in 1990 declined $606.3 million mainly due to a $255.3 million drop in domestic Merchandising's net income before restructuring, the restructuring charge, unfavorable property-liability underwriting experience at Allstate mitigated in part by a $139.0 million fresh start tax benefit, and lower income from discontinued operations, partially offset by increased earnings at Dean Witter.

Net income per common share in 1991 was $3.71 compared with $2.63 and $4.30 in 1990 and 1989. In early 1992, the Company issued 28.75 million depositary shares, each representing one-fourth of a Series A Mandatorily Exchangeable Preferred Share. The Series A Preferred Shares will have a dilutive impact on net income per common share in 1992. Had these shares been issued on Jan. 1, 1991, with the proceeds used to retire short-term debt, 1991 net income per common share would have been reduced by approximately 5%.

Federal and state legislation and competitive conditions may affect the annual percentage rate imposed on credit card accounts. While the Company cannot predict the effect of future competitive conditions and legislation or the measures which the Company might take in response, a significant reduction in finance charge rates could reduce the yield on receivables, adversely impacting net income.

In December 1990, the Financial Accounting Standards Board issued SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions." The statement, which must be adopted no later than Jan. 1, 1993, will require the Company to accrue retiree health and life insurance benefits. See note 6 to the consolidated financial statements for the potential impact on the Company's operations.

Reported earnings have been impacted by inflation; however, there is no simple way of separating those effects. Competitive and regulatory conditions permitting, the Company modifies the prices charged for its goods and services in order to recognize cost changes as incurred or as anticipated. By also attempting to control costs and efficiently utilize resources, the Company strives to minimize the effects of inflation on its operations.

MOAC000507

# SEARS, ROEBUCK AND CO.

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

millions           December 31

|  | 1991 | 1990 |
|---|---|---|
| **Assets** | | |
| **Investments** | | |
| Bonds, mortgage-backed securities and redeemable preferred stocks, at amortized cost (market $32,183.8 and $26,749.9) (note 7) | $ 29,941.6 | $ 26,292.3 |
| Mortgage loans | 10,293.7 | 7,209.3 |
| Common and preferred stocks, at market (cost $2,880.6 and $2,433.7) | 3,420.2 | 2,386.3 |
| Real estate | 2,911.3 | 2,787.2 |
| Total investments | 46,566.8 | 38,675.1 |
| **Receivables** | | |
| Retail customer | 13,537.4 | 15,230.4 |
| Discover Card | 8,724.2 | 8,610.6 |
| Brokerage | 3,447.6 | 3,842.5 |
| Insurance premium installments | 1,793.3 | 1,726.3 |
| Consumer finance notes | 1,026.8 | 1,467.2 |
| Other | 3,688.9 | 2,939.0 |
| Total receivables | 32,218.2 | 33,816.0 |
| Property and equipment, net | 6,218.9 | 5,850.4 |
| Cash and invested cash | 4,650.3 | 3,967.3 |
| Merchandise inventories | 4,459.4 | 4,074.0 |
| Securities purchased under agreements to resell | 2,681.8 | 2,269.5 |
| Trading account securities, at market | 2,377.9 | 1,181.0 |
| Cash segregated under government regulations | 1,333.9 | 1,250.1 |
| Deferred income taxes (note 5) | 909.1 | 581.6 |
| Other assets | 5,018.5 | 4,587.8 |
| **Total assets** | **$106,434.8** | **$ 96,252.8** |
| **Liabilities** | | |
| Insurance reserves | $ 30,220.5 | $ 25,750.2 |
| Long-term debt (note 9) | 19,170.1 | 12,636.4 |
| Short-term borrowings (note 8) | 9,788.2 | 15,314.0 |
| Deposits and advances | 9,145.7 | 7,882.9 |
| Accounts payable and other liabilities | 9,081.9 | 7,882.3 |
| Unearned revenues | 6,321.6 | 6,227.8 |
| Brokerage payables | 4,168.2 | 4,579.1 |
| Securities sold under agreements to repurchase | 3,888.4 | 2,656.2 |
| Securities sold but not yet purchased, at market | 462.0 | 500.1 |
| **Total liabilities** | **92,246.6** | **83,429.0** |
| **Commitments and contingent liabilities** (notes 6, 10, 11, 13, 14) | | |
| **Shareholders' equity** (note 14) | | |
| Preferred shares ($1 par value, 3.25 shares outstanding in 1991) | 325.0 | — |
| Common shares ($.75 par value, 344.1 and 343.1 shares outstanding) | 289.5 | 289.1 |
| Capital in excess of par value | 2,153.4 | 2,137.9 |
| Retained income | 13,514.3 | 12,927.1 |
| Treasury stock (at cost) | (1,746.4) | (1,765.8) |
| Deferred ESOP expense (note 6) | (739.4) | (777.7) |
| Unrealized net capital gains (losses) on marketable equity securities | 365.5 | (12.9) |
| Cumulative translation adjustments | 26.3 | 26.1 |
| **Total shareholders' equity** | **14,188.2** | **12,823.8** |
| **Total liabilities and shareholders' equity** | **$106,434.8** | **$ 96,252.8** |

See accompanying notes and the summarized Group financial statements.

MOAC000508

## ANALYSIS OF CONSOLIDATED FINANCIAL CONDITION

The Company's significant financial capacity and flexibility is exemplified by the quality and liquidity of its assets, its ability to access multiple sources of capital and its diversified cash flows from operations. Below and on page 19 is a discussion of consolidated financial condition, liquidity and capital resources. Individual balance sheets, cash flow statements and supplemental analyses for the business groups can be found beginning on pages 31, 36, 41 and 45.

### Financial Condition

The Company's balance sheet is highly liquid, with over 71% of total assets in bonds, mortgage-backed securities, common and preferred stocks, receivables, cash and invested cash and broker-dealer security positions.

**Assets**
at Dec. 31, 1991



Over 95% of the $25.3 billion in bonds are rated investment grade. Nearly all of the $4.6 billion of mortgage-backed securities are secured by residential mortgages and backed by quasi-governmental agencies. The aggregate market value of the bond and mortgage-backed security portfolio exceeded its book value by $2.2 billion at Dec. 31, 1991. The $10.3 billion mortgage loan portfolio is geographically and economically diversified with 59% residential mortgage loans and 41% commercial mortgage loans. At Dec. 31, 1991, 1.8% of the mortgage loan portfolio was nonperforming. In addition, approximately 2.5% of the portfolio consisted of loans that are current, but which have been identified as possibly nonperforming in the future. Common and preferred stocks are recorded at market value and are invested in over 600 issues, with an unrealized gain of $539.6 million at Dec. 31, 1991.

The retail customer and Discover Card receivable portfolios are geographically diverse and have net charge-offs well below their respective industry averages. Receivables sold through asset-backed securities totaled $14.8 billion at Dec. 31, 1991. Brokerage receivables of $3.4 billion are nearly all collateralized.

Invested cash is comprised of high grade short-term instruments. Merchandise inventories are primarily valued on the LIFO basis. Inventories would be $756.8 million higher at Dec. 31, 1991 if valued on the FIFO basis. Broker-dealer security positions are highly liquid and fluctuate greatly depending on market strategies. Intangible assets comprise less than 1% of total assets.

### Liquidity and Capital Resources

The Company's financial flexibility was substantially enhanced by the issuance of two series of preferred shares. In November 1991, the Company issued 13 million depositary shares, each representing one-fourth of an 8.88% Preferred Share, First Series, at an offering price of $25 per share. This was followed in early 1992 with the issuance of 28.75 million depositary shares, each representing one-fourth of a Series A Preferred Share, at an offering price of $43 per share. The preferred share issuances serve to prudently manage our leverage and bolster equity capital needed both to sustain the rapid growth of our financial services businesses and ensure continued access to the world debt markets at competitive costs.

Maintaining access to various capital markets on a cost-effective basis continues to be an important factor in the Company's success. On Jan. 9, 1992, Moody's Investors Service placed the ratings of the Company's commercial paper, SearsCharge securitization transactions and short- and long-term obligations, as well as the rating of Allstate's insurance financial strength, under review with negative implications. Moody's current ratings for the Company are P-1 for commercial paper, Aaa for SearsCharge securitization transactions, A2 for long-term debt and Aa1 for Allstate's insurance financial strength. On Jan. 10, 1992, Standard & Poor's reaffirmed the Company's current ratings of A-1 for commercial paper, AAA for securitization transactions, A for long-term debt, AAA for Allstate Life and AA+ for Allstate Property-liability. In the event of an adverse determination by Moody's, earnings could be negatively impacted but the Company believes that its resources should continue to provide the flexibility to obtain sufficient funds on a competitive basis.

MOAC000509

# SEARS, ROEBUCK AND CO.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

millions

|  | Year Ended December 31 | | |
|---|---|---|---|
|  | **1991** | 1990 | 1989 |
| **Cash flows from operating activities** | | | |
| Net income | **$ 1,278.9** | $ 902.2 | $ 1,508.5 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation, amortization and other noncash items | **968.3** | 857.0 | 792.4 |
| Provisions for uncollectible accounts | **1,348.7** | 1,079.9 | 727.1 |
| Gain on sale of discontinued operation | **—** | — | (137.1) |
| Gains on sales of property and investments | **(213.6)** | (388.9) | (465.8) |
| Increase in insurance reserves | **4,470.3** | 4,903.0 | 3,406.7 |
| Change in deferred taxes | **(524.2)** | (871.0) | (149.2) |
| Decrease (increase) in retail customer receivables | **846.8** | (284.7) | (1,467.2) |
| Decrease (increase) in merchandise inventories | **(386.4)** | 278.1 | (629.1) |
| Change in net matched agreements to resell or repurchase securities | **1,206.8** | 10.8 | (77.2) |
| Increase in net trading account securities | **(1,235.0)** | (411.9) | (420.1) |
| Increase in other operating assets | **(613.9)** | (2,080.7) | (1,204.9) |
| Increase in other operating liabilities | **636.7** | 1,837.3 | 1,139.7 |
| **Net cash provided by operating activities** | **7,783.4** | 5,831.1 | 3,023.8 |
| **Cash flows from investing activities** | | | |
| Proceeds from sales and maturities of investments | **5,209.5** | 3,256.7 | 3,904.4 |
| Purchases of investments | **(8,906.5)** | (6,550.7) | (5,460.6) |
| Collections on and sales of mortgage-backed securities, mortgage loans and consumer finance notes | **2,267.9** | 1,344.0 | 2,113.5 |
| Purchases and originations of mortgage-backed securities, mortgage loans and consumer finance notes | **(5,377.9)** | (3,729.1) | (3,568.7) |
| Proceeds from sales of property and equipment | **84.0** | 58.4 | 139.2 |
| Purchases of property and equipment | **(1,227.9)** | (1,218.5) | (1,040.4) |
| Increase in Discover Card receivables | **(534.7)** | (725.8) | (2,654.0) |
| **Net cash used in investing activities** | **(8,485.6)** | (7,565.0) | (6,566.6) |
| **Cash flows from financing activities** | | | |
| Proceeds from long-term debt | **5,056.2** | 3,316.7 | 1,426.3 |
| Repayments of long-term debt | **(986.2)** | (828.2) | (1,412.3) |
| Proceeds from advances from FHLB | **1,318.0** | 1,091.0 | 480.0 |
| Repayments of advances from FHLB | **(1,311.0)** | (590.0) | (670.0) |
| Increase (decrease) in deposits | **1,255.8** | (804.2) | 1,020.2 |
| Change in net unmatched agreements to resell or repurchase securities | **(386.9)** | 56.5 | 552.3 |
| Net change in short-term borrowings, primarily 90 days or less | **(3,240.8)** | 2,608.7 | 3,751.4 |
| Repayments from (advances to) ESOP | **6.5** | (791.0) | (9.0) |
| Preferred shares issued | **315.1** | | |
| Common shares issued for employee stock plans | **45.2** | 10.4 | 54.6 |
| Common shares repurchased | **—** | — | (1,420.1) |
| Dividends paid to shareholders, net of reinvested amounts | **(687.3)** | (680.5) | (685.6) |
| **Net cash provided by financing activities** | **1,384.6** | 3,389.4 | 3,087.8 |
| **Effect of exchange rate changes on cash** | **.6** | (2.6) | (1.9) |
| **Net increase (decrease) in cash and invested cash** | **$ 683.0** | $ 1,652.9 | $ (456.9) |
| **Cash and invested cash at beginning of year** | **$ 3,967.3** | $ 2,314.4 | $ 2,771.3 |
| **Cash and invested cash at end of year** | **$ 4,650.3** | $ 3,967.3 | $ 2,314.4 |

See accompanying notes and the summarized Group financial statements.

ANALYSIS OF CONSOLIDATED FINANCIAL CONDITION continued

**Liquidity and Capital Resources** continued

**Major Funding Sources**
(billions)



The Company issues commercial paper through Sears Roebuck Acceptance Corp. and Discover Credit Corp. to satisfy a portion of the Company's working capital requirements. The Company had total commercial paper outstanding of $12.3 billion at year-end 1991, compared with $13.9 and $12.2 billion at Dec. 31, 1990 and 1989. Commercial paper totaling $6.1, $3.7 and $3.7 billion was reclassified as long-term at Dec. 31, 1991, 1990 and 1989, respectively, with the support of syndicated credit agreements and from the issuance of Series A Preferred Shares in early 1992. The facilities to support the commercial paper program were strengthened as the Company increased its syndicated credit agreements by $1.5 billion to a total of $5.9 billion. The Company also entered into uniform credit agreements with individual banks totaling $3.6 billion, resulting in total credit facilities under contract of $9.5 billion. An additional $5.5 billion of bank credit lines were available to provide for the Company's short-term funding needs and to support commercial paper.

The Company issues retail and institutional CDs through Greenwood Trust Company and Sears Savings Bank to fund the Discover Card operations and the acquisition of mortgage loans, respectively. As of Dec. 31, 1991 the balance of deposits and advances was $9.1 billion, compared to $7.9 and $8.2 billion in 1990 and 1989, respectively.

The Company has continued to place financing emphasis on the issuance of long-term, fixed rate debt to take advantage of a favorable long-term interest rate environment and reduce repricing and refunding risk. Long-term debt totaled $19.2, $12.6 and $10.0 billion at Dec. 31, 1991, 1990 and 1989, respectively.

The Company has further enhanced its financial flexibility through the continued securitization of certain receivables. In 1991, $6.4 billion of asset-backed securities related to retail customer and Discover Card receivables were issued. As of year-end 1991, there were $14.8 billion of asset-backed securities outstanding compared to $9.2 and $3.8 billion at Dec. 31, 1990 and 1989.

Interest rate swaps and caps have been used to convert floating rate to fixed rate debt and to limit interest costs. The fixed rate to total debt ratio, including swaps and caps but excluding the effect of asset securitization, was 63%, 45% and 47% at year-ends 1991, 1990 and 1989. A summary of fixed and variable debt is provided on page 15.

**Operating, Investing and Financing Activities**

Cash flows from operating activities consist primarily of net income adjusted for certain noncash expense items, including depreciation and the provision for uncollectible accounts, increases in insurance reserves and changes in receivables, inventories and deferred taxes. Cash provided by operations rose in 1991 due to a decrease in owned retail customer receivables, changes in deferred taxes and increases in net income adjusted by noncash items, partially offset by an increase in merchandise inventories. The decrease in retail customer receivables was attributable to an increase in balances securitized. The reduced growth in deferred tax assets resulted from the final payment in 1990 of the change in tax accounting for retail charge card receivables under the Tax Reform Act of 1986. The increase in inventory was influenced by the relatively low inventory position in 1990 and suppressed retail demand at year-end 1991. In 1990, cash from operations rose on increased Allstate insurance reserves, decreased merchandise inventories and reduced growth in owned retail customer receivables resulting from higher securitizations. These decreases were partially offset by the change in deferred taxes caused by the 1990 fresh start benefit and increased allowances for uncollectible accounts.

The Company's most significant investing activities were the growth of Allstate's investment portfolio, Discover Card receivables, purchases of property and equipment and, in 1991, Coldwell Banker's mortgage loan portfolio. Increases in Allstate's investments and mortgage loans were funded by insurance premium receipts and the sale of investment-oriented products. Growth in Discover Card receivables, funded by short-term and medium-term debt and deposits, was significantly reduced in 1991 and 1990 due to the sale of receivables through the use of asset-backed securities. The 1991 increase in Coldwell Banker's mortgage loans was primarily funded by deposits and short-term borrowings.

The change in cash flows from financing activities in 1991 primarily reflected the Company's emphasis placed on reducing the refunding and repricing risk on its debt. Cash required from financing activities decreased from 1990 due to the increase in cash provided by operations and the lower growth in invested cash. In 1990, the major financing emphasis was to lengthen the term of the Company's debt funding, including a 15-year $850 million mortgage on the Sears Tower and approximately $1.5 billion of intermediate-term debt. An increase in short-term borrowings was largely offset by the growth in invested cash and a decline in deposits. Invested cash in both years provided liability management flexibility for the Company's commercial paper programs and augmented back-up credit facilities. The Company loaned $800 million to the Employee Stock Ownership Plan of The Savings and Profit Sharing Fund of Sears Employees for the open market purchase of 21.9 million Sears common shares. In addition, 32.1 million common shares were repurchased directly by the Company during 1989.

The Company paid common dividends of $2.00 per common share in 1991, the 56th consecutive year of payout. The payment of common dividends is dependent upon the Company's earnings and internal investment opportunities.

19

MOAC000511

# SEARS, ROEBUCK AND CO.

## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

Year Ended December 31

| | 1991 | 1990 | 1989 | 1991 | 1990 | 1989 |
|---|---|---|---|---|---|---|
| | $ millions | | | shares in thousands | | |
| **Preferred shares–$1.00 par value, 50 million shares authorized** | | | | | | |
| Issued during year (note 14) | $ 325.0 | $ — | $ . | 3,250.0 | — | . |
| Balance, end of year | $ 325.0 | $ . | $ — | 3,250.0 | . . | — |
| **Common shares–$.75 par value, 1 billion shares authorized; issued as follows:** | | | | | | |
| Balance, beginning of year | $ 289.1 | $ 288.8 | $ 287.7 | 385,512.0 | 385,075.8 | 383,552.8 |
| Stock options exercised and other changes | .4 | .3 | 1.1 | 544.9 | 436.2 | 1,523.0 |
| Balance, end of year | 289.5 | 289.1 | 288.8 | 386,056.9 | 385,512.0 | 385,075.8 |
| **Capital in excess of par value** | | | | | | |
| Balance, beginning of year | 2,137.9 | 2,128.2 | 2,071.6 | | | |
| Stock options exercised and other changes | 15.5 | 9.7 | 56.6 | | | |
| Balance, end of year | 2,153.4 | 2,137.9 | 2,128.2 | | | |
| **Retained income** | | | | | | |
| Balance, beginning of year | 12,927.1 | 12,711.2 | 11,904.2 | | | |
| Net income | 1,278.9 | 902.2 | 1,508.5 | | | |
| Preferred share dividends | (3.9) | | | | | |
| Common share dividends ($2.00 per share) | (687.8) | (686.3) | (701.5) | | | |
| Balance, end of year | 13,514.3 | 12,927.1 | 12,711.2 | | | |
| **Treasury stock (at cost)** | | | | | | |
| Balance, beginning of year | (1,765.8) | (1,771.8) | (382.0) | (42,427.3) | (42,573.2) | (11,230.1) |
| Reissued under incentive compensation plans | 19.4 | — | | 465.9 | . | — |
| Reissued under dividend reinvestment plan and other | — | 6.0 | 30.3 | — | 145.9 | 769.8 |
| Purchased during year | — | . . | (1,420.1) | — | | (32,112.9) |
| Balance, end of year | (1,746.4) | (1,765.8) | (1,771.8) | (41,961.4) | (42,427.3) | (42,573.2) |
| **Deferred ESOP expense (note 6)** | | | | | | |
| Balance, beginning of year | (777.7) | (9.0) | .. | | | |
| Advances | — | (791.0) | (9.0) | | | |
| Reductions | 38.3 | 22.3 | | | | |
| Balance, end of year | (739.4) | (777.7) | (9.0) | | | |
| **Unrealized net capital gains (losses) on marketable equity securities** | | | | | | |
| Balance, beginning of year | (12.9) | 255.0 | 170.0 | | | |
| Net increase (decrease) | 378.4 | (267.9) | 85.0 | | | |
| Balance, end of year | 365.5 | (12.9) | 255.0 | | | |
| **Cumulative translation adjustments** | | | | | | |
| Balance, beginning of year | 26.1 | 19.7 | 3.4 | | | |
| Net unrealized gain during year | .2 | 6.4 | 16.3 | | | |
| Balance, end of year | 26.3 | 26.1 | 19.7 | | | |
| **Total common shareholders' equity and shares outstanding** | $13,863.2 | $12,823.8 | $13,622.1 | 344,095.5 | 343,084.7 | 342,502.6 |
| **Total shareholders' equity** | $14,188.2 | $12,823.8 | $13,622.1 | | | |

See accompanying notes and the summarized Group financial statements.

20

MOAC000512

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Summary of significant accounting policies

#### Basis of presentation

The consolidated financial statements include the accounts of Sears, Roebuck and Co. and all significant domestic and international companies in which the Company has more than a 50% equity ownership.

Included as an integral part of the consolidated financial statements on pages 12 and 13 are the summary of business group data and, beginning on page 29, separate summarized financial statements and notes for each of the Company's business groups as well as the significant accounting policies unique to each group. Although not a part of the financial statements, also included with the consolidated statements and the summarized group statements are unaudited analyses of results and financial condition and a ten-year summary of consolidated financial data.

Certain reclassifications have been made in the 1990 and 1989 financial statements to conform to current accounting classifications.

#### Basis for assignment of debt

Debt and the related interest expense have been assigned to the business groups as incurred by those groups. Corporate debt is legally the responsibility of Sears, Roebuck and Co., Sears Roebuck Acceptance Corp. (SRAC) or Sears Overseas Finance N.V. (SOFNV). A portion of the pooled Corporate debt is allocated to Sears Merchandise Group, principally to finance domestic customer receivables, to Dean Witter Financial Services Group to finance a portion of Discover Card receivables and to Coldwell Banker Real Estate Group, primarily to finance its mortgage banking operation. The remaining portion of Corporate debt has generally not been allocated to the business groups but has been combined with internally generated funds for Corporate operations and investments. The average cost of the pooled Corporate debt was 8.2%, 9.4% and 10.3% in 1991, 1990 and 1989, respectively. On a consolidated basis, the Company paid interest of $2.9, $3.4 and $3.3 billion in 1991, 1990 and 1989, respectively.

#### Income taxes

Effective Jan. 1, 1991 the Company adopted SFAS No. 109, "Accounting for Income Taxes." Adoption of this statement reduced income tax expense by $134.0 million in 1991, primarily due to the recognition of deferred tax assets previously not recorded under SFAS No. 96. No cumulative effect adjustment was required for the adoption of SFAS No. 109 due to the Company's previous use of the liability method.

The consolidated federal income tax return of Sears, Roebuck and Co. includes results of the domestic operations of the business groups. Tax liabilities and benefits are allocated as generated by the respective business groups, whether or not such benefits would be currently available on a separate return basis. U.S. income and foreign withholding taxes are not provided on unremitted earnings of international affiliates which the Company considers to be permanent investments. The cumulative amount of unremitted income and the taxes which would be paid upon remittance of those earnings totaled $534.9 and $216.8 million, respectively, at Dec. 31, 1991.

#### Cash and invested cash

Cash and invested cash is defined to include all highly liquid investments with maturities of three months or less.

#### Property and equipment

Property and equipment is stated at cost less accumulated depreciation. Depreciation is provided principally by the straight-line method over the estimated useful lives of the related assets.

#### Goodwill

Other assets include goodwill of $527.5 and $526.2 million at Dec. 31, 1991 and 1990, respectively. Goodwill represents the excess of purchase price over fair value of the net assets of businesses acquired and is amortized on a straight-line basis over a period not exceeding 40 years.

#### 1. Discontinued operations

During 1988, the Company adopted plans to discontinue the group life-health business of Allstate Insurance Group and the commercial division of Coldwell Banker Real Estate Group. The group life-health operation was terminated effective Jan. 1, 1989 and the Coldwell Banker commercial division was sold during 1989.

#### 2. Restructuring

During the fourth quarter of 1990, the Merchandise Group recorded a pretax charge of $264.4 million, net of profit sharing benefit, related primarily to severance programs in the domestic Merchandising and Sears Canada operations.

#### 3. Supplementary income statement information

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Advertising costs (excluding catalog) | $1,366.5 | $1,392.5 | $1,325.1 |
| Maintenance and repairs | 366.8 | 343.4 | 360.9 |
| Taxes, other than payroll and income: | | | |
| Property | 294.9 | 262.2 | 245.4 |
| Premium | 348.0 | 311.8 | 304.9 |
| Other | 228.1 | 198.1 | 219.0 |
| Provisions for uncollectible receivables | 1,319.6 | 1,050.0 | 688.7 |
| Realized foreign currency exchange gains (losses), net of profit sharing and income taxes | 1.1 | (3.3) | (2.3) |
| Interest capitalized | 56.8 | 43.1 | 38.8 |

#### 4. Corporate

Corporate operations include revenues and expenses which are of an overall holding company nature, including that portion of administrative costs and interest which is not allocated to the Company's business groups. The Corporate statements of income consisted of:

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Revenues | $ 226.2 | $ 151.9 | $ 146.1 |
| Interest expense | 565.0 | 433.9 | 290.5 |
| Operating expenses | 120.1 | 108.3 | 143.3 |
| Operating loss | (458.9) | (390.3) | (287.7) |
| Other loss | (78.8) | (112.7) | (99.8) |
| Income tax benefit | 211.5 | 200.4 | 146.4 |
| Net Corporate expense | (326.2) | (302.6) | (241.1) |
| Intergroup eliminations | (8.9) | (12.3) | (5.2) |
| Corporate and other | (335.1) | (314.9) | (246.3) |
| Equity in net income of business groups | 1,614.0 | 1,217.1 | 1,754.8 |
| Consolidated net income | $1,278.9 | $ 902.2 | $1,508.5 |

21

MOAC000513

# SEARS, ROEBUCK AND CO.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS continued

### 5. Income Taxes

Income before income taxes, minority interest and equity income follows:

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Domestic | $1,369.7 | $587.0 | $1,631.7 |
| Foreign | 88.4 | 86.1 | 198.0 |
| Total | $1,458.1 | $673.1 | $1,829.7 |

Federal, state and foreign taxes follows:

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Federal income tax | | | |
| Current | $ 596.5 | $ 538.1 | $ 464.0 |
| Deferred | (494.4) | (684.8) | (264.8) |
| State income tax | | | |
| Current | 92.4 | 108.6 | 50.5 |
| Deferred | (36.3) | (82.3) | 9.8 |
| Foreign income tax | | | |
| Current | 2.0 | 30.1 | 76.2 |
| Deferred | 32.3 | 8.3 | 17.1 |
| Financial statement income tax provision (benefit)–current operations | 192.5 | (82.0) | 352.8 |
| Fresh start | — | (139.0) | — |
| Financial statement income tax provision (benefit) | $ 192.5 | $(221.0) | $ 352.8 |

A reconciliation of the statutory federal income tax rate to the effective rate is as follows:

| | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Statutory federal income tax rate | 34.0 % | 34.0 % | 34.0 % |
| State income taxes, net of federal taxes | 2.5 | 2.6 | 2.2 |
| Tax exempt income | (26.0) | (53.4) | (18.6) |
| Dividends received exclusion | (1.5) | (3.1) | (1.3) |
| Other | 4.2 | 7.7 | 3.0 |
| Effective tax rate- current operations | 13.2 | (12.2) | 19.3 |
| Fresh start benefit | — | (20.6) | — |
| Effective income tax rate (benefit) | 13.2 % | (32.8)% | 19.3 % |

Deferred taxes are recorded based upon differences between the financial statement and tax bases of assets and liabilities and available tax credit carryforwards. The following deferred taxes are recorded:

| Assets/(Liabilities) in millions | December 31 | |
|---|---|---|
| | 1991 | 1990 |
| Insurance loss reserves | $ 765.0 | $ 645.4 |
| Unearned maintenance income | 321.8 | 330.4 |
| Loan loss reserves | 471.4 | 356.0 |
| Unearned insurance premiums | 337.3 | 271.2 |
| Alternative minimum tax credit | 157.4 | 54.7 |
| Other deferred tax assets | 1,086.0 | 984.4 |
| Fixed asset depreciation | (696.8) | (649.6) |
| Policy acquisition costs | (450.1) | (413.3) |
| Prepaid pension | (197.8) | (155.9) |
| Unrealized securities (gains)/losses | (183.6) | 15.8 |
| Other deferred tax liabilities | (701.5) | (857.5) |
| Total | $ 909.1 | $ 581.6 |

Income taxes of $595.8, $752.7 and $471.8 million were paid in 1991, 1990 and 1989, respectively. Payments in 1991 and 1990 include $77.0 and $80.4 million attributable to the alternative minimum tax. These payments generate tax credits which can be carried forward indefinitely. Tax expense of $16.0 million was recognized in 1991 for tax benefits allocated directly to capital.

### 6. Benefit plans

Expenses for retirement and savings-related benefit plans were as follows:

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Savings and Profit Sharing Fund of Sears Employees | | | |
| Defined Contribution | $ 60.5 | $ 28.1 | $ 88.6 |
| Additional ESOP | 29.6 | 29.3 | — |
| Pension plans | 90.2 | 105.1 | 88.0 |
| Retiree insurance benefits | 155.6 | 164.9 | 143.0 |
| Other plans | 28.9 | 23.7 | 27.1 |
| Total | $364.8 | $351.1 | $346.7 |

### Profit Sharing Fund

Most domestic employees, excluding primarily those of the Securities operations of Dean Witter Financial Services Group, the Residential operations of Coldwell Banker Real Estate Group and Western Auto Supply Company, are eligible to become members of The Savings and Profit Sharing Fund of Sears Employees (the Fund). Beginning in 1991, the Company contributes up to 35% of eligible deposits by Fund participants, and at the Company's discretion an additional contribution of up to 35% of eligible deposits. Total Company contributions cannot exceed 6% of consolidated income, as defined, before federal income taxes and profit sharing contributions. Prior to 1991, the Company contributed 6% of consolidated income, as defined, before federal income taxes and profit sharing contributions. The 1991 contribution was allocated to the business groups and Corporate based on eligible deposits made by employees of the participating companies. The 1990 and 1989 contributions were allocated based on 6% of the participating company's respective operating results.

The Fund includes an Employee Stock Ownership Plan (the ESOP) adopted in 1989 to prefund a portion of the Company's anticipated contribution through 2004. The Company loaned the ESOP $800 million which it used to purchase 21.9 million Sears common shares in the open market. The loan will be repaid with dividends on ESOP shares and Company contributions. The additional ESOP expense included in the benefit plan expense table above is computed as follows:

| millions | Year Ended December 31, | |
|---|---|---|
| | 1991 | 1990 |
| Interest expense recognized by ESOP | $ 73.0 | $ 50.5 |
| Less dividends accrued on ESOP shares | (46.9) | (31.1) |
| Cost of shares allocated to employees and plan expenses | 42.4 | 29.1 |
| ESOP expense | 68.5 | 48.5 |
| Less market value of shares allocated | (38.9) | (19.2) |
| Additional ESOP expense | $ 29.6 | $ 29.3 |

The Company contributed $32.6 and $12.8 million to the ESOP in 1991 and 1990, respectively.

## Notes to Consolidated Financial Statements continued

### Pension plans

Substantially all domestic full-time and certain part-time employees are eligible to participate in noncontributory defined benefit plans after meeting age and service requirements. Substantially all Canadian employees are eligible to participate in contributory defined benefit plans. Pension benefits are based on length of service, either average annual compensation or final average annual compensation and, in certain plans, Social Security or other benefits. Funding for the various plans of the Company is determined using various actuarial cost methods, and amounted to $117.0, $141.7 and $142.5 million for 1991, 1990 and 1989, respectively.

Pension expense was comprised of the following:

| millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Benefits earned during the period | $ 225.8 | $ 258.4 | $ 224.2 |
| Interest on projected benefit obligation | 422.1 | 416.0 | 387.6 |
| Actual return on plan assets | (1,130.4) | 120.2 | (862.8) |
| Net amortization and deferral | 572.7 | (689.5) | 339.0 |
| Pension expense | $ 90.2 | $ 105.1 | $ 88.0 |

The weighted average discount rate and rate of increase in compensation levels used in determining the actuarial present value of the projected benefit obligations were 8¼% and 5½% in 1991, 10% and 5¾% in 1990 and 9½% and 6% in 1989. The expected long-term rate of return on plan assets used in determining net periodic pension cost was 9½% in 1991, 1990 and 1989.

The plans' funded status was as follows:

| | 1991 | | 1990 | |
|---|---|---|---|---|
| millions | Assets exceed accumulated benefits | Accumulated benefits exceed assets | Assets exceed accumulated benefits | Accumulated benefits exceed assets |
| Actuarial present value of benefit obligations: | | | | |
| Vested benefit obligation | $3,004 | $ 725 | $2,951 | $ 278 |
| Accumulated benefit obligation | $3,252 | $ 922 | $3,344 | $ 293 |
| Projected benefit obligation (PBO) | $4,087 | $1,094 | $4,113 | $ 405 |
| Plan assets at fair value, primarily publicly traded stocks and bonds | 4,870 | 841 | 4,767 | 234 |
| PBO less than (in excess of) plan assets | 833 | (253) | 654 | (171) |
| Unrecognized net (gain) loss | (123) | 186 | 221 | 20 |
| Unrecognized prior service cost | 120 | (34) | 68 | 2 |
| Unrecognized transitional (asset) obligation | (271) | (77) | (455) | 28 |
| Adjustment required to recognize minimum liability | — | (18) | · | (24) |
| Prepaid (accrued) pension cost in the balance sheet at Dec. 31 | $ 559 | $ (196) | $ 488 | $(145) |

In 1991, the Company recognized a pension curtailment gain of $16.1 million arising from the 1990 Merchandise Group restructuring.

### Retiree insurance benefits

Sears, Roebuck and Co. and its subsidiaries provide certain health care and life insurance benefits for retired employees. Generally, qualified employees may become eligible for these benefits if they retire in accordance with the Company's established retirement policy and are continuously insured under the Company's group plans or other approved plans for 10 or more years prior to retirement. The Company has the right to modify or terminate these plans. Health care benefits are self-insured by the Company. The Company recognizes the costs of providing health care benefits by expensing the claim and administrative costs incurred (net of member contributions) during the year. Life insurance benefits are funded by insurance contracts for which premiums are based on the benefits paid during the year. The Company recognizes the costs of providing life insurance benefits by expensing the insurance premiums.

In December 1990, the Financial Accounting Standards Board issued SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions". The statement, which must be adopted by Jan. 1, 1993, will require the Company to accrue retiree health and life insurance benefits over the period in which employees become eligible for such benefits. Adoption of the statement will have no impact on cash flows.

The Company has the option of recognizing the transition obligation for the change in accounting immediately upon adoption or over a period of 20 years. If the Company recognizes the transition obligation as a one-time charge, net income and shareholders' equity would be reduced by an estimated $1.75 to $2.50 billion, and on an ongoing basis net income would be decreased annually by an estimated $50 to $150 million. If the Company elects to amortize the transition obligation, net income would be further decreased by the amortization of the transition obligation over 20 years. The financial statement impact of adopting SFAS No. 106 can fluctuate significantly depending on a number of factors, including: how the transition obligation is recognized; timing of adoption; potential plan changes; determination of the health care cost trend rate; and determination of a discount rate.

MOAC000515

# SEARS, ROEBUCK AND CO.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS continued

#### 7. Investment securities

The market values of investments carried at cost were as follows:

| millions | December 31, 1991 | | | |
|---|---|---|---|---|
| | | Gross Unrealized | | |
| | Cost | Gains | Losses | Market Value |
| U.S. Government and agency obligations | $ 456.6 | $ 43.8 | $ (.1) | $ 500.3 |
| State and municipal | 15,112.8 | 1,236.9 | (23.1) | 16,326.6 |
| Corporate bonds and obligations | 9,494.1 | 714.4 | (127.3) | 10,081.2 |
| Foreign government | 291.7 | 24.1 | (.1) | 315.7 |
| Mortgage-backed securities | 4,586.4 | 377.7 | (4.1) | 4,960.0 |
| | $29,941.6 | $2,396.9 | $(154.7) | $32,183.8 |

| millions | December 31, 1990 | | | |
|---|---|---|---|---|
| | | Gross Unrealized | | |
| | Cost | Gains | Losses | Market Value |
| U.S. Government and agency obligations | $ 223.2 | $ 9.7 | $ (2.3) | $ 230.6 |
| State and municipal | 13,606.3 | 835.4 | (83.8) | 14,357.9 |
| Corporate bonds and obligations | 7,819.5 | 86.9 | (469.9) | 7,436.5 |
| Foreign government | 372.8 | 11.4 | (11.6) | 372.6 |
| Mortgage-backed securities | 4,270.5 | 93.0 | (11.2) | 4,352.3 |
| | $26,292.3 | $1,036.4 | $(578.8) | $26,749.9 |

Investment securities carried at cost had scheduled maturities at Dec. 31, 1991 as follows:

| millions | Cost | Market Value |
|---|---|---|
| Within 1 year | $ 933.0 | $ 1,005.6 |
| After 1 year through 5 years | 7,224.5 | 7,824.1 |
| After 5 years through 10 years | 10,764.2 | 11,478.6 |
| After 10 years | 6,433.5 | 6,915.5 |
| | 25,355.2 | 27,223.8 |
| Mortgage-backed securities | 4,586.4 | 4,960.0 |
| | $29,941.6 | $32,183.8 |

The Company realized proceeds of $2.4 billion with resulting gains and losses of $73.2 and $39.3 million, respectively, from the sale prior to the maturity of investment securities carried at cost during the year ended Dec. 31, 1991.

#### 8. Short-term borrowings consisted of:

| millions | December 31 | |
|---|---|---|
| | 1991 | 1990 |
| Commercial paper | $6,146.3 | $10,235.2 |
| Bank loans | 2,947.9 | 3,948.7 |
| Agreements with bank trust departments | 510.1 | 571.9 |
| Other loans (principally foreign) | 183.9 | 558.2 |
| Total short-term borrowings | $9,788.2 | $15,314.0 |

At Dec. 31, 1991, the Company had syndicated credit agreements of $5.9 billion through SRAC and Discover Credit Corp. (DCC). The Company also had entered into uniform credit agreements with individual banks totaling $3.6 billion. These syndicated and uniform credit agreements provide for loans at prevailing interest rates and mature at various dates through October 1994. Additionally, the Company had $5.5 billion of unused lines of bank credit. These credit lines are renewable annually at various dates and provide for loans of varying maturities at prevailing interest rates. The Company pays commitment fees or maintains informal compensating balances in connection with these credit agreements and lines of credit.

At Dec. 31, 1991, the syndicated credit agreements not maturing within one year supported the long-term classification of $4.9 billion of commercial paper. This debt can be refinanced on a long-term basis using these agreements. The Company has reclassified an additional $1.2 billion of commercial paper as long-term as a result of the sale of Series A Preferred Shares in early 1992. See note 14 to the Consolidated Financial Statements.

The Company has utilized interest rate swaps, interest rate caps and other liability management techniques to reduce interest rate risk. The Company had interest rate swap agreements which established fixed rates on $4.8 and $3.1 billion of short-term variable rate debt at Dec. 31, 1991 and 1990, with weighted average interest rates of 8.82% and 9.53%, respectively. The average maturity of agreements in effect on Dec. 31, 1991 was approximately six years. Interest rate caps and other liability management products are used to lock in a maximum rate if rates rise, but enable the Company to otherwise pay lower market rates. The Company established a maximum rate on $2.2 and $1.6 billion of debt at Dec. 31, 1991 and 1990, with weighted average interest rates of 6.10% and 8.60%, respectively. The average maturity of agreements in effect on Dec. 31, 1991 was approximately three years.

MOAC000516

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS continued

**9. Long-term debt** was as follows:

| millions | | December 31 | |
|---|---|---|---|
| **Issue** | | 1991 | 1990 |
| **Sears, Roebuck and Co.** | | | |
| 6¾% Yen Bonds, due 1991 | $ | — | $ 58.4 |
| 13¼% Notes, due 1992 | | 231.0 | 231.0 |
| 9.35% Notes, due 1993 | | 400.0 | 400.0 |
| 7% Notes, due 1994 | | 350.0 | — |
| 12% Notes, due 1994 | | 230.9 | 230.9 |
| 8.55% Notes, due 1996 | | 200.0 | 200.0 |
| 9% Notes, due 1996 | | 200.0 | 200.0 |
| 9¼% Notes, due 1997 | | 300.0 | 300.0 |
| 8.45% Notes, due 1998 | | 250.0 | — |
| 9¼% Notes, due 1998 | | 500.0 | — |
| Extendable Notes, 7½% to April 15, 1992, due 1999 | | 49.2 | 49.2 |
| 9½% Notes, due 1999 | | 200.0 | 200.0 |
| 6% Debentures, $300 million face value, due 2000, effective rate 14.8% | | 176.5 | 169.2 |
| 7% Debentures, $300 million face value, due 2001, effective rate 14.6% | | 182.7 | 177.6 |
| 9.375% Debentures, due 2011 | | 300.0 | — |
| Floating Commercial Paper Rate—Put Premium Option Notes, 4.95% at Dec. 31, 1991, due 2021 | | 200.0 | — |
| 4.50% to 10.35% Medium-Term Notes, due 1991 to 2021 | | 3,324.2 | 1,847.1 |
| Capitalized lease obligations | | 63.0 | 71.2 |
| **Sears Roebuck Acceptance Corp.** | | | |
| Commercial paper backed by revolving credit, 5.2% and 8.2% at Dec. 31, 1991 and 1990 | | 4,925.0 | 3,450.0 |
| Commercial paper expected to be refinanced from sale of Series A Preferred Shares | | 1,200.0 | — |
| 4.56% Variable Interest Notes (7.62% at Dec. 31, 1990), due 1992 | | 204.0 | 271.0 |
| Other notes | | — | 4.0 |
| **Discover Credit Corp.** | | | |
| Commercial paper backed by revolving credit, 8.2% at Dec. 31, 1990 | | — | 250.0 |
| 7.57% to 9.10% Medium-Term Notes, due 1991 to 2001 | | 1,309.8 | 135.1 |
| **Sears Overseas Finance N.V. (guaranteed by Sears, Roebuck and Co.)** | | | |
| 11⅛% Notes, due 1991 | | — | 150.0 |
| 5¼% Swiss Franc Notes, due 1991 | | — | 100.1 |
| Zero Coupon Notes, $400 million face value, due 1992, effective rate 15.0% | | 393.2 | 341.9 |
| 11⅜% Notes, due 1993 | | 150.0 | 150.0 |
| Zero Coupon Bonds, $400 million face value, due 1994, effective rate 12.8% | | 299.9 | 265.8 |
| Zero Coupon Bonds, $500 million face value, due 1998, effective rate 12.0% | | 239.2 | 213.6 |
| **Homart Development Co.** | | | |
| 7¼% to 10% Notes, due 1991 to 2002 | | 62.0 | 63.0 |
| 8⅝% to 12¾% Mortgage Notes, due 1993 to 2000 | | 810.2 | 689.2 |
| Notes payable to banks | | 315.0 | 315.0 |
| **Sears Canada Inc.** | | | |
| 9¼% to 11¾% Debentures, due 1994 to 2000 | | 415.2 | 416.2 |
| Notes, mortgages, bonds and capitalized leases | | 321.0 | 333.4 |
| **Sears Acceptance Co. Ltd.** | | | |
| 9¼% to 15⅛% Secured Debentures, due 1991 to 2000 | | 299.0 | 346.4 |
| **Other subsidiaries** | | | |
| Participating mortgages, $850 million face value, due 2005, effective rate 8.7%, collateralized by Sears Tower and related properties | | 833.9 | 833.3 |
| Notes payable, mortgages and capitalized leases | | 235.2 | 173.8 |
| **Total long-term debt** | | $19,170.1 | $12,636.4 |

The mortgages of Sears Tower and related properties include purchase options exercisable in 2005 at a price reflective of market values at that time. The Company will share in any appreciation of the properties.

As of Dec. 31, 1991, long-term debt maturities for the next five years, excluding commercial paper classified as long-term debt, were as follows:

| Year Ended December 31 | millions |
|---|---|
| 1992 | $2,148.1 |
| 1993 | 1,871.1 |
| 1994 | 1,822.9 |
| 1995 | 837.4 |
| 1996 | 1,425.0 |

In 1990, the Company retired $69.2 million of long-term debt before its scheduled maturity.

### 10. Leases

The Company leases certain stores, office facilities, computers and automotive equipment.

Operating and capital lease obligations are based upon contractual minimum rates and, for certain stores, amounts in excess of these minimum rates are payable based upon specified percentages of sales. Certain leases include renewal or purchase options. Operating lease rentals were $959.3, $911.9, and $807.4 million, including contingent rentals of $32.0, $38.5 and $40.6 million, for the years ended Dec. 31, 1991, 1990 and 1989.

Minimum fixed lease obligations, excluding taxes, insurance and other expenses payable directly by the Company, for leases in effect as of Dec. 31, 1991 were:

| millions Year Ended December 31 | Capital leases | Operating leases |
|---|---|---|
| 1992 | $ 40.6 | $ 701.7 |
| 1993 | 37.3 | 588.7 |
| 1994 | 35.4 | 461.0 |
| 1995 | 34.5 | 375.4 |
| 1996 | 33.1 | 255.0 |
| After 1996 | 500.6 | 1,383.6 |
| Minimum payments | 681.5 | $3,765.4 |
| Executory costs (principally taxes) | 46.0 | |
| Implicit interest | 404.5 | |
| Present value of minimum lease payments, principally long-term | $231.0 | |

25

# SEARS, ROEBUCK AND CO.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS continued

#### 11. Financial instruments with off-balance-sheet risk

The Company is a party to financial instruments with off-balance-sheet risk in the normal course of business to meet the financing needs of its customers, to reduce its exposure to market and interest rate risk and in connection with the proprietary trading activities of its broker and dealer operation. Unless noted otherwise, the Company does not require collateral or other security to support financial instruments with credit risk. The Company had the following financial instruments with off-balance-sheet credit risk at Dec. 31, 1991:

| millions | Contract or Notional Amount |
|---|---|
| Financial instruments whose contract amounts represent credit risk | |
| Commitments to extend credit under revolving agreements | $149,794.0 |
| Commitments to extend mortgage loans | 2,498.3 |
| Mortgage loans sold with recourse | 3,531.7 |
| Financial guarantees written | 163.9 |
| Financial instruments whose notional or contract amounts exceed the amount of credit risk | |
| Securitized receivables with recourse | 14,824.6 |
| Interest rate swap agreements associated with | |
| Short-term debt | 4,760.8 |
| Deposits and other | 1,308.4 |
| Options written | 349.6 |
| Financial futures contracts | 292.9 |
| Forward foreign currency purchase contracts | 5,701.3 |
| Forward foreign currency sales contracts | 5,728.3 |
| Forward mortgage loan sales contracts | 607.7 |

Commitments to extend credit under revolving agreements relate primarily to the aggregate unused credit limits for SearsCharge and Discover Card accounts. These commitments generally have fixed expiration dates or other termination clauses. It is unlikely the total commitment amount will represent future cash requirements. The Company evaluates each customer's creditworthiness on a case-by-case basis. Commitments to extend mortgage loans represent future cash requirements and have fixed expiration dates. Risk from commitments arises from the possible movements in interest rates.

The mortgage loans sold with recourse, financial guarantees written and securitized receivables with recourse represent conditional commitments of the Company to guarantee performance to a third party. The mortgage loans sold with recourse and a portion of the securitized receivables with recourse are collateralized by real estate or personal property. At Dec. 31, 1991, receivables that were securitized and sold as pass-through certificates consisted of $8.3 billion of retail customer receivables, $5.7 billion of Discover Card receivables and $829.4 million of consumer finance and other notes. The Company's credit risk exposure on these securitized balances was contractually limited to $1.1 billion.

Interest rate swap transactions generally involve the exchange of fixed and floating rate interest payment obligations without the exchange of the underlying notional amounts. The differential to be paid or received is accrued as interest rates change and is recognized over the life of the agreements.

Options written, financial futures contracts and forward mortgage loan sales contracts are used by the Company to hedge its market or interest rate risk. Forward foreign currency purchase and sales contracts are used by the Company in its broker and dealer trading activities. Risks from options written and futures and forward contracts arise from the possible inability of counterparties to meet the terms of their contracts and from movements in currency values and interest rates. Realized and unrealized gains on options written and futures and forward contracts designated and effective as hedges of market or interest rate exposure are deferred and recognized in income over the lives of the hedged assets or liabilities.

As a securities broker and dealer, the Company is exposed to risk in the event that clients are unable to fulfill their financing and settlement obligations. The Company attempts to minimize this risk by establishing and monitoring credit limits and margin requirements.

#### 12. Significant group concentrations of credit risk

The Company invests in state and municipal bond holdings and grants credit to customers throughout the nation. As of Dec. 31, 1991, the five states in which the Company had the largest amount of credit card receivables and loans, including those sold with recourse, and state and municipal bond holdings were as follows:

| millions | |
|---|---|
| California | $9,187.9 |
| Texas | 4,579.6 |
| Florida | 3,957.6 |
| Illinois | 3,238.8 |
| New York | 3,035.3 |

In addition, the Company had $923.5 million of high-yield securities at Dec. 31, 1991, carried at amortized cost, with a market value of $850.9 million.

The Company conducts various securities trading and brokerage activities serving a diverse group of investors. The Company's exposure to credit risk, in fulfilling its contractual obligations pursuant to securities and commodities transactions, can be directly impacted by volatile trading markets which may impair the clients' ability to satisfy their obligations to the Company.

In connection with the Company's broker and dealer activities, the Company enters into collateralized reverse repurchase agreements. The Company limits its credit exposure associated with these agreements by monitoring client credit exposure and collateral values on a daily basis and requiring additional collateral to be deposited with or returned to the Company when deemed necessary.

#### 13. Pending legal proceedings

Various legal actions and governmental proceedings are pending against the Company, many involving ordinary routine litigation incidental to the businesses. Other matters contain allegations which are nonroutine and involve compensatory, punitive or antitrust treble damage claims in very large amounts, as well as other types of relief. See note 4 to the Allstate Insurance Group summarized financial statements on page 39 for a discussion of specific pending legal proceedings. The consequences of these matters are not presently determinable but, in the opinion of management, the ultimate liability in excess of reserves currently recorded will not have a material effect on the liquidity or capital resources of the Company.

MOAC000518

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS continued

## 14. Shareholders' equity

**Dividend payments** are restricted as follows:

Certain indentures relating to the long-term debt of Sears, Roebuck and Co., which represent the most restrictive contractual limitation on the payment of dividends, provide that the Company cannot take specified actions, including the declaration of cash dividends, which would cause its consolidated unencumbered assets, as defined, to fall below 150% of its consolidated liabilities, as defined. At Dec. 31, 1991, $9.8 billion in retained income could be paid in dividends to shareholders under the most restrictive indentures.

The capital of certain foreign operations, Allstate Life Insurance Company and Sears Savings Bank at Dec. 31, 1991 included approximately $753 million which, if distributed, would be subject to income taxes of approximately $291 million. It is not contemplated that distributions will be made in an amount which would require such tax payments.

The Illinois Insurance Holding Company Systems Act permits Allstate Insurance Company to pay, without regulatory approval, dividends to Sears, Roebuck and Co. during any 12-month period in an amount up to the greater of 10% of surplus (as regards policyholders) or its net income (as defined) as of the preceding Dec. 31. Approximately $542 million of Allstate's retained income at Dec. 31, 1991 had no restriction relating to distribution during 1992 which would require prior approval.

Dean Witter Reynolds Inc. is subject to the Securities and Exchange Commission's Uniform Net Capital Rule and the New York Stock Exchange's Growth and Business Capital Rule. Under these rules the declaration of dividends is restricted. At Dec. 31, 1991, approximately $526 million of Dean Witter Group's retained income was available for the declaration of dividends to Sears, Roebuck and Co.

As of Dec. 31, 1991, subsidiary companies could remit to Sears, Roebuck and Co. in the form of dividends approximately $4.0 billion, after payment of all related taxes, without prior approval of regulatory bodies or violation of contractual restrictions.

### Preferred Shares

In November 1991, Sears, Roebuck and Co. issued 3.25 million 8.88% Preferred Shares, First Series (8.88% Preferred Shares), in the form of 13 million depositary shares, each representing one-fourth of an 8.88% Preferred Share, at an offering price of $25 per depositary share. All shares were outstanding as of Dec. 31, 1991. Dividends of $3.9 million were accrued during 1991. The 8.88% Preferred Shares have cumulative dividends and a liquidation preference of $100 per share ($25 per depositary share), plus accrued and unpaid dividends. On or after Nov. 9, 1996, Sears may, at its option, redeem the 8.88% Preferred Shares, in whole or in part, at any time at a redemption price of $100 per share, plus accrued and unpaid dividends to the redemption date.

In early 1992, Sears, Roebuck and Co. sold 7,187,500 Series A Mandatorily Exchangeable Preferred Shares (Series A Preferred Shares) in the form of 28.75 million depositary shares, each representing one-fourth of a Series A Preferred Share, at a price of $43 per depositary share. The depositary shares have an annual, cumulative dividend rate of $3.75 per share. Each depositary share is required to be exchanged for one common share of the Company on April 1, 1995 (subject to adjustment in certain events). At any time prior to April 1, 1995, the Company may elect, at its option, to exchange the outstanding depositary shares for common shares, in whole or in part at an initial price of $64.25 per share declining ratably to $59.28 per share on Feb. 1, 1995, and equal to $59.00 thereafter, plus accrued and unpaid dividends. The Series A Preferred Shares have voting rights (equivalent to one-fourth of a vote for each depositary share) and a liquidation preference of $172 per share ($43 per depositary share).

In the event that dividends payable on either series of preferred stock are in arrears for six quarterly periods, holders of such stock together shall have the right to elect two additional directors of the Company until all cumulative dividends have been paid or set apart for payment. Additionally, dividends cannot be paid on the Company's common shares if dividends on either series of preferred shares are in arrears.

### Stock option plans

Options to purchase common stock of the Company have been granted to employees under various plans at prices equal to the fair market value of the stock on the dates the options were granted. Certain options include stock appreciation rights (SARs) which, upon surrender of the option, permit the optionee to receive the excess of the current market price over the option price in cash. In addition, the Company may pay to the optionee in connection with certain options or SARs an amount generally equal to the maximum statutory corporate federal income tax rate then in effect (not to exceed 46%) times the difference between the market price and the option price. Options and SARs are generally exercisable in not more than four equal, annual cumulative installments beginning one year after the date of grant, and generally expire in 10 or 12 years.

Changes in stock options were as follows:

| thousands of shares | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Beginning balance | 9,874.4 | 10,212.5 | 10,511.5 |
| Granted | 4,605.5 (a) | 839.1 | 1,482.5 |
| Exercised | (550.9)(b) | (498.8) | (1,207.5) |
| Canceled or expired | (624.4)(c) | (678.4) | (574.2) |
| Ending balance | 13,304.6 (d) | 9,874.4 | 10,212.5 |
| Reserved for future grant at year-end | 3,585.8 (e) | 8,104.2 | 1,341.4 |
| Exercisable | 7,716.5 | 7,024.2 | 6,404.8 |

(a) Consists of 755.7 thousand shares granted under the 1982 Plan at a price of $30.44, 371.7 thousand shares granted under the 1986 Plan at prices ranging from $25.94 to $42.88, and 3,478.1 thousand shares granted under the 1990 Plan at prices ranging from $30.44 to $42.88.

(b) Consists of 393.2 thousand shares under the 1972 Plan at a price from $15.94 to $18.38, 16.2 thousand shares under the 1978 Plan at a price of $32.88, 42.7 thousand shares under the 1982 Plan at a price from $29.38 to $40.19, 80.6 thousand shares under the 1986 Plan at a price from $34.10 to $44.75, 14.5 thousand SARs exercised under the 1982 Plan with an option price of $32.88 and 3.7 thousand SARs exercised under the 1986 Plan at an option price of $34.75.

(c) The options that expired or were canceled in 1991 were previously granted at prices ranging from $18.38 to $51.25.

(d) Consists of 350.3, 4,128.6, 5,460.0 and 3,365.7 thousand shares under the 1978, 1982, 1986 and 1990 Plans, respectively, at weighted average purchase prices per share of $39.71, $36.97, $34.47 and $30.58 for the respective plans. SARs were attached to 365.1 and 803.9 thousand shares under the 1982 and 1986 Plans, respectively.

(e) Shares reserved for future grant totaled 243.7, 180.5 and 3,161.6 thousand shares for the 1982, 1986 and 1990 Plans.

27

# SEARS, ROEBUCK AND CO.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS continued

### 15. Quarterly results (unaudited)

| millions, except per common share data | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 | 1991 | 1990 | 1991 | 1990 |
| Revenues | $12,883.8 | $12,605.8 | $14,090.0 | $13,851.7 | $14,300.2 | $13,957.0 | $15,968.4 | $15,557.2 |
| Operating income | 112.0 | 21.7 | 362.1 | 219.5 | 201.8 | 139.6 | 655.1 | 148.6 |
| Income from continuing operations, prior basis | 202.7 | 95.8 | 239.3 | 237.9 | 150.3 | 179.2 | 552.6 | 378.8 |
| Retroactive restatement for SFAS No. 109 | 34.5 | — | 60.1 | — | 78.9 | — | (39.5) | — |
| Income from continuing operations | 237.2 | 95.8 | 299.4 | 237.9 | 229.2 | 179.2 | 513.1 | 378.8 |
| Net income, prior basis | 202.7 | 106.3 | 239.3 | 237.9 | 150.3 | 179.2 | 552.6 | 378.8 |
| Retroactive restatement for SFAS No. 109 | 34.5 | — | 60.1 | — | 78.9 | — | (39.5) | — |
| Net income | 237.2 | 106.3 | 299.4 | 237.9 | 229.2 | 179.2 | 513.1 | 378.8 |
| Net income per common share, prior basis | $ .59 | $ .31 | $ .70 | $ .69 | $ .43 | $ .53 | $ 1.60 | $ 1.10 |
| Retroactive restatement for SFAS No. 109 | .10 | | .17 | | .24 | | (.12) | |
| Net income per common share | $ .69 | $ .31 | $ .87 | $ .69 | $ .67 | $ .53 | $ 1.48 | $ 1.10 |

Income from continuing operations, net income and related per common share amounts for 1991 have been restated to reflect adoption of SFAS No. 109 "Accounting for Income Taxes" effective Jan. 1, 1991.

The fourth quarter pretax LIFO adjustment was a charge of $6.7 million in 1991 and a credit of $39.7 million in 1990, compared with charges of $18.8 and $34.0 million for the first nine months of the respective years. Fourth quarter 1990 results include a pretax restructuring charge of $264.4 million.

### Common Stock Market Information and Dividend Highlights (unaudited)

| dollars | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | | Year | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 | 1991 | 1990 | 1991 | 1990 | 1991 | 1990 |
| Stock price range | | | | | | | | | | |
| High | 36¾ | 41⅛ | 40⅞ | 39⅛ | 43½ | 36¼ | 39⅛ | 27⅜ | 43½ | 41¼ |
| Low | 24⅜ | 36⅝ | 33½ | 34¾ | 35¾ | 24⅜ | 33 | 22 | 24⅜ | 22 |
| Close | 35 | 39¼ | 37¾ | 36½ | 38½ | 25⅜ | 37⅞ | 25⅜ | 37⅞ | 25⅜ |
| Dividends declared | .50 | .50 | .50 | .50 | .50 | .50 | .50 | .50 | 2.00 | 2.00 |

Stock price ranges are for transactions reported in a summary of composite transactions for stocks listed on the New York Stock Exchange (trading symbol—S), which is the principal market for the Company's common stock.

The number of registered common shareholders at Feb. 28, 1992 was 340,311.

In addition to the New York Stock Exchange, the Company's common stock is listed on the following exchanges: Midwest; Chicago; Pacific; San Francisco; London, England; Basel, Geneva, Lausanne and Zurich, Switzerland; Amsterdam, The Netherlands; Tokyo, Japan; Paris, France; and Frankfurt, Germany.

28

MOAC000520

# SEARS MERCHANDISE GROUP

## SUMMARIZED STATEMENTS OF INCOME

| millions | | | Year Ended December 31 |
|---|---|---|---|
| | **1991** | 1990 | 1989 |
| **Revenues** | | | |
| Merchandise sales and services | **$28,344.8** | $28,958.8 | $28,824.6 |
| Credit revenues | **3,088.1** | 3,026.9 | 2,774.6 |
| Total revenues | **31,432.9** | 31,985.7 | 31,599.2 |
| **Costs and expenses** | | | |
| Cost of sales, buying and occupancy | **19,976.6** | 20,181.4 | 19,854.7 |
| Selling and administrative | **8,819.8** | 9,281.2 | 8,887.2 |
| Provision for uncollectible accounts | **848.7** | 621.9 | 401.0 |
| Restructuring | **—** | 264.4 | |
| Interest | **1,022.4** | 1,238.5 | 1,324.4 |
| Total costs and expenses | **30,667.5** | 31,587.4 | 30,467.3 |
| Operating income | **765.4** | 398.3 | 1,131.9 |
| Other income | **45.8** | 46.8 | 4.4 |
| Income before income taxes, minority interest and equity income | **811.2** | 445.1 | 1,136.3 |
| Income taxes | **337.8** | 187.8 | 459.4 |
| | **473.4** | 257.3 | 676.9 |
| Minority interest and equity in net income of unconsolidated companies | **12.9** | .1 | (30.0) |
| **Group income** | **$    486.3** | $    257.4 | $    646.9 |

See notes to Consolidated and Sears Merchandise Group summarized financial statements.

## ANALYSIS OF OPERATIONS

Sears Merchandise Group revenues in 1991 decreased $552.8 million or 1.7%, reflecting the impact of the domestic and Canadian recessionary economies and the increasingly competitive retail environment. Domestic merchandising revenues decreased $335.9 million, 1.3% lower than 1990. Lower sales in home fashions and home appliances, areas particularly hard hit by the continuing recession, were partially offset by sales increases in automotive, women's apparel, home computers and office equipment. Revenues from domestic credit operations increased 2.4%. The increase was principally due to higher gross receivables, partially offset by the sale of credit accounts through the use of asset-backed securities. International revenues were 6.7% below last year. In 1990, Merchandise Group revenues improved $386.5 million or 1.2%, over 1989.

Merchandise Group net income increased $228.9 million in 1991. Excluding the restructuring charges taken in 1990, the improvement was $73.7 million. Merchandising net income increased $196.9 million, or $53.5 million excluding the 1990 restructuring charges. Lower selling and administrative expenses were partially offset by declines in sales and gross margins. Credit net income increased $63.4 million, primarily due to lower interest rates partially offset by an increase in the provision for uncollectible accounts. International net income decreased $43.2 million excluding the 1990 restructuring charge. Results were negatively impacted by the adverse Canadian economy.

In 1990, Merchandise Group income decreased $389.5 million. Credit reported an increase in net income, while both Merchandising and International reported decreases. Merchandising results reflected lower gross margins, higher operating expenses and a fourth quarter after-tax restructuring charge of $143.4 million. In Credit, the improvement resulted from higher revenues and lower interest expense, which were partially offset by an increase in the provision for uncollectible

accounts. International results were adversely impacted by the declining Canadian economy and an after tax charge of $11.8 million for Canadian restructuring.

**Merchandising operations** in the United States accounted for 78.8% of Group revenues in 1991.

| $ millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Merchandise sales and services | $24,757.3 | 25,093.2 | 25,001.9 |
| Cost of sales, buying and occupancy expenses | $17,344.2 | 17,355.8 | 17,132.0 |
| Ratio to sales and services | 70.1% | 69.2 | 68.5 |
| Selling and administrative expenses | $ 7,219.3 | 7,612.0 | 7,315.7 |
| Ratio to sales and services | 29.2% | 30.3 | 29.3 |
| Restructuring expenses (net of profit sharing benefit) | $     — | 231.2 | — |
| Ratio to sales and services | — | 0.9 % | — |
| Operating income before restructuring | $ 120.1 | 49.7 | 479.5 |
| Ratio to sales and services | 0.5% | 0.2 | 1.9 |
| Operating income (loss) | $ 120.1 | (181.5) | 479.5 |
| Merchandising income before restructuring | $ 90.4 | 36.9 | 292.2 |
| Ratio to sales and services | 0.4% | 0.1 | 1.2 |
| Merchandising income (loss) | $ 90.4 | (106.5) | 292.2 |
| Net sales per square foot (dollars) | $ 332 | 341 | 347 |
| Merchandise inventories—LIFO basis | $ 3,784.7 | 3,449.1 | 3,617.9 |
| Merchandise inventories—FIFO basis | $ 4,541.5 | 4,180.4 | 4,354.9 |

Merchandising sales and service revenues decreased $335.9 million or 1.3% in 1991, compared to an increase of $91.3 million or 0.4% in 1990. An analysis of net sales by category follows:

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Retail sales and services | 79.5% | 78.8% | 78.9% |
| Direct marketing (includes catalog) | 14.2 | 15.3 | 16.0 |
| Specialty | 6.3 | 5.9 | 5.1 |
| Total net sales | 100% | 100% | 100% |

29

MOAC000521

# SEARS MERCHANDISE GROUP

## ANALYSIS OF OPERATIONS continued

Retail revenues decreased .8% in 1991, compared with an increase of .3% in 1990. Sales decreases were reported in home appliances and home fashions, areas directly affected by the recessionary economy. Higher sales were reported in automotive, women's apparel, home computers and office equipment. Sales gains in automotive reflect the completion of the national rollout of the Tire and Auto Center power format which emphasizes improved product presentation and a broader assortment of national brands. Improved sales in women's apparel and home computers and office equipment were the result of the ongoing rollout of the Women's Store power format and Office Centers during 1991.

In 1992, Retail revenues will be enhanced by an intensely-focused emphasis on merchandising and quality service, including an accelerated rollout of power formats and special sales events to provide increased value to the customer.

Direct Marketing revenues decreased 8.4% in 1991, compared with a decrease of 4.0% in 1990. Direct Marketing revenues are planned to be lower in 1992 as well, as it pursues a more focused strategy to improve profitability.

Cost of sales, buying and occupancy expenses as a percentage to sales increased .9% and .7% in 1991 and 1990, respectively. The current year results reflected the impact of higher selling price reductions necessitated by heightened competition and a recessionary domestic economy, higher inventory shrinkage, and a $31.2 million increase in the LIFO charge, partially offset by lower transportation costs. The increase in these costs and expenses in 1990 was primarily the result of higher selling price reductions.

Selling and administrative expenses decreased $392.7 million in 1991, to 29.2% of revenues from 30.3% in 1990. Reductions in nonselling payroll and benefits, distribution costs, and advertising were the primary contributors to this improvement. Increased insurance costs were substantially offset by a change in maintenance agreement accounting, adopted Jan. 1, 1990, which resulted in decreases in both revenues and selling and administrative expenses in 1991.

Although cost reduction progress was made in 1991, management is committed to a continuing cost reduction program. Management recently announced a reorganization of the field management reporting structure, resulting in the elimination of 600 jobs and the closing and consolidation of several offices; the elimination of approximately 7,000 sales supporting positions in the retail stores as a result of new point-of-sale technology; and changes to commission sales associates compensation programs; all of which will contribute to reduced costs in 1992. Additionally, a benchmarking study is underway to optimize the organizational structure of the headquarters and various field staff offices, which will result in further cost reductions.

In 1990, the ratio of selling and administrative expenses to revenues increased 1.0% due to the combined effects of flat revenues and higher sales promotion and insurance costs, partially offset by reductions in retail sales support and administrative payroll.

Restructuring charges in 1990 of $231.2 million reflected the anticipated costs of severance programs in the retail sales support area and in headquarters, logistics, catalog and service operations. The restructuring charges were the result of a cost reduction program primarily designed to streamline support operations.

In 1991, Merchandising net income increased $196.9 million, or $53.5 million when compared with 1990 net income before restructuring. Results were positively impacted by reductions in operating costs partially offset by lower revenues and gross margins. A change in maintenance agreement accounting increased 1991 after-tax earnings by $42.0 million. This change had no material impact on 1990 earnings and no material impact is expected on 1992 operating results or in future years. In 1990, Merchandising income decreased by $398.7 million, the result of flat revenues, higher costs and expenses and the restructuring charge.

**Credit operations** in the United States contributed the following:

| $ millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Finance charge and other revenues | $ 2,735.2 | 2,671.3 | 2,462.1 |
| Interest expense | $ 755.4 | 964.3 | 1,050.3 |
| Provision for uncollectible accounts | $ 781.3 | 570.0 | 368.4 |
| Credit income | $ 393.5 | 330.1 | 288.1 |
| Credit sales as a percentage of gross sales | 57.3% | 59.2 | 58.7 |
| Discover Card sales as a percentage of gross sales | 6.7% | 6.3 | 5.9 |
| Gross customer receivables at Dec. 31 | $20,245.4 | 19,541.8 | 17,545.6 |
| Balances sold at Dec. 31 | $ 7,679.1 | 6,040.4 | 3,526.3 |
| Owned customer receivables at Dec. 31 | $12,566.3 | 13,501.4 | 14,019.3 |
| Average owned receivables | $12,271.7 | 13,165.5 | 13,188.4 |
| Average account balance (dollars) | $ 736 | 698 | 637 |
| Net charge-offs to average gross customer receivables | 3.09% | 2.42 | 1.94 |
| Gross customer receivables delinquent three months or more | 2.93% | 2.29 | 1.69 |

Credit revenues rose 2.4% in 1991 compared with an 8.5% increase in 1990. The improvement in both years was primarily due to higher gross customer receivables, partially offset by the sale of credit accounts through the use of asset-backed securities.

The provision for uncollectible accounts rose 37.1% in 1991 following an increase of 54.7% in 1990. The results for both years were adversely affected by a continuing increase in delinquent accounts and bankruptcies, along with higher gross customer receivables. Lower average interest rates and reduced borrowings due to a decrease in owned receivables were the key factors causing the 21.7% decrease in interest expense in 1991. Lower average interest rates resulted in an 8.2% decrease in interest expense in 1990.

Higher credit revenues and lower interest expense more than offset the rise in the provision for uncollectible accounts and resulted in increases in Credit income of 19.2% in 1991 and 14.6% in 1990.

MOAC000522

## SUMMARIZED STATEMENTS OF FINANCIAL POSITION

| millions | | December 31 |
|---|---|---|
| | 1991 | 1990 |
| **Assets** | | |
| Current assets | | |
| Cash | $    104.1 | $    268.3 |
| Retail customer receivables | 14,037.8 | 15,646.9 |
| Less: Allowance for uncollectible accounts and unearned finance charges | 500.4 | 416.5 |
| | 13,537.4 | 15,230.4 |
| Other receivables | 302.4 | 301.8 |
| Inventories | 4,459.4 | 4,074.0 |
| Prepaid expenses and deferred charges | 568.7 | 518.4 |
| Deferred taxes | 853.3 | 418.4 |
| Total current assets | 19,825.3 | 20,811.3 |
| Property and equipment | | |
| Land | 324.0 | 281.3 |
| Buildings and improvements | 3,899.2 | 3,658.3 |
| Furniture, fixtures and equipment | 4,082.5 | 3,843.3 |
| Capitalized leases | 312.9 | 343.9 |
| | 8,618.6 | 8,126.8 |
| Less accumulated depreciation | 4,254.4 | 3,967.8 |
| Total property and equipment, net | 4,364.2 | 4,159.0 |
| Investments in and advances to unconsolidated companies | 38.5 | 29.1 |
| Other assets | 601.1 | 539.6 |
| **Total assets** | **$24,829.1** | **$25,539.0** |
| **Liabilities** | | |
| Current liabilities | | |
| Short-term borrowings | $ 2,501.6 | $ 5,324.4 |
| Accounts payable and other liabilities | 4,263.7 | 4,007.7 |
| Unearned revenues | 1,147.6 | 1,133.8 |
| Other taxes | 411.7 | 372.6 |
| Total current liabilities | 8,324.6 | 10,838.5 |
| Long-term debt and capitalized lease obligations | 8,993.9 | 7,746.8 |
| Deferred income taxes | 658.5 | 246.9 |
| Minority interest and other | 332.6 | 317.0 |
| **Total liabilities** | **18,309.6** | **19,149.2** |
| **Capital** | **6,519.5** | **6,389.8** |
| **Total liabilities and capital** | **$24,829.1** | **$25,539.0** |

See notes to Consolidated and Sears Merchandise Group summarized financial statements.

## ANALYSIS OF OPERATIONS continued

**International operations** are conducted in Canada and Mexico. Revenues of International operations translated to U.S. dollars totaled $3.94 billion in 1991, compared with $4.22 billion in 1990. In Canadian dollars, Sears Canada revenues decreased 10.5% in 1991, compared with an increase of .1% in 1990. Current year Canadian sales were adversely affected by a recessionary economy and a value-added tax, enacted Jan. 1, 1991. The reduction of the selling price of merchandise affected by the value-added tax accounts for approximately one-third of the 1991 revenue decrease, resulting in a comparable decrease of 7.4%. Due to favorable foreign currency translation adjustments, Sears Canada revenues in U.S. dollars decreased 8.8% in 1991, compared with an increase of 1.3% in 1990. Revenues of Sears Mexico in U.S. dollars were $368.7 million in 1991, compared to $305.6 million in 1990, an increase of 20.6%.

Gross margins and selling and administrative expenses in 1991 were relatively flat although both Sears Canada and Sears Mexico experienced a significant increase in store reopening costs. Sears Canada opened 10 new stores including seven acquired from Hudson Bay. In Mexico five new stores were opened during the year.

International net income was $2.4 million in 1991, compared with $33.8 million in 1990. The decrease in net income was primarily the result of lower Canadian revenues. Net income for 1990 was $32.8 million lower than in 1989 reflecting Canadian pretax restructuring charges of $33.2 million for severance benefits, lower gross margins and higher operating costs.

MOAC000523

# SEARS MERCHANDISE GROUP

## SUMMARIZED STATEMENTS OF CASH FLOWS

millions — Year Ended December 31

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Group income | $ 486.3 | $ 257.4 | $ 646.9 |
| Adjustments to reconcile group income to net cash provided by operating activities | | | |
| Depreciation, amortization and other noncash items | 484.3 | 446.0 | 422.0 |
| Gains on sale of property and investments | (42.6) | (15.3) | (28.8) |
| Provision for uncollectible accounts | 848.7 | 621.9 | 401.0 |
| Change in deferred taxes | (20.4) | (537.1) | (92.9) |
| Decrease (increase) in retail customer receivables | 846.8 | (284.7) | (1,467.2) |
| Decrease (increase) in merchandise inventories | (386.4) | 278.1 | (629.1) |
| Change in net other operating assets and liabilities | 222.4 | 138.0 | 359.3 |
| **Net cash provided by (used in) operating activities** | **2,439.1** | **904.3** | **(388.8)** |
| **Cash flows from investing activities** | | | |
| Net purchases of property and equipment | (698.0) | (789.7) | (519.6) |
| Net sales of investments | 48.5 | 6.1 | 33.3 |
| **Net cash used in investing activities** | **(649.5)** | **(783.6)** | **(486.3)** |
| **Cash flows from financing activities** | | | |
| Net increase (decrease) in long-term debt | 675.8 | 584.3 | (477.6) |
| Net increase (decrease) in short-term borrowings, primarily 90 days or less | (2,271.8) | (770.8) | 1,226.6 |
| Dividends paid to Corporate | (199.3) | (238.5) | (137.5) |
| Net capital transfers (to) from Corporate | (159.1) | 234.8 | 213.5 |
| **Net cash provided by (used in) financing activities** | **(1,954.4)** | **(190.2)** | **825.0** |
| **Effect of exchange rate changes on cash** | .6 | (2.6) | (1.9) |
| **Net decrease in cash** | $ (164.2) | $ (72.1) | $ (52.0) |
| **Cash at beginning of year** | $ 268.3 | $ 340.4 | $ 392.4 |
| **Cash at end of year** | $ 104.1 | $ 268.3 | $ 340.4 |

See notes to Consolidated and Sears Merchandise Group summarized financial statements.

## ANALYSIS OF FINANCIAL CONDITION

Liquid assets consisting primarily of retail customer receivables and inventories comprised 76% of Merchandise Group's assets at Dec. 31, 1991. Gross customer receivables at Dec. 31, 1991 of $22.37 billion were geographically diversified throughout all 50 states, Canada and Mexico. An asset securitization program was undertaken in 1988 for domestic customer receivables under which $9.25 billion of credit account pass-through certificates have been issued. In December 1991, Sears Canada commenced an asset securitization program, under which $651.1 million of credit accounts were securitized.

Inventories are valued primarily using the last-in, first-out (LIFO) method. If inventories had been valued using the first-in, first-out (FIFO) method instead of LIFO, inventories would have been $756.8 million higher at Dec. 31, 1991.

Net cash generated from operating activities was $2.44 billion in 1991 compared with $904.3 million in 1990. The increase was primarily due to reductions in owned receivables and a smaller change in deferred taxes, partially offset by an increase in inventory levels. In 1990, the results reflected the impact of reduced inventory levels and owned receivables, partially offset by a reduction in deferred taxes.

Cash provided by current year operations was used primarily to purchase additional property and equipment and to reduce debt. During 1991, 25 department stores were opened, 13 in new markets and 12 relocations. In 1990, cash provided by operations was used primarily to purchase additional property and equipment and to reduce debt.

Domestic stores in operation at the end of the year are summarized below:

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Department stores | 868 | 863 | 847 |
| Paint and Hardware stores | 97 | 98 | 107 |
| Catalog outlet stores | 94 | 101 | 105 |
| Western Auto | 548 | 504 | 468 |
| Eye Care Centers of America | 102 | 94 | 104 |
| Business Centers | 53 | 65 | 61 |
| Pinstripes Petites | 40 | 40 | 39 |
| Homelife stores | 22 | 5 | – |
| Total | 1,824 | 1,770 | 1,731 |
| Gross square feet (millions) | 129.8 | 127.9 | 126.0 |

In addition to the units listed above, Direct Marketing operates 33 catalog sales offices, supervises 2,178 independent sales merchants and operates 10 telecatalog centers which offer nationwide toll-free service for incoming catalog orders. Furthermore, there are 1,102 other units in operation which perform miscellaneous sales and service functions.

Planned capital expenditures for 1992 for domestic operations are estimated at $515 million, excluding expenditures for the new Merchandise Group headquarters in Hoffman Estates. Approximately $53 million will be used for 14 new and relocated department stores. The balance of planned expenditures is for the upgrade of merchandise presentation, expansion of specialty stores, normal replacement of operating equipment, data processing equipment and distribution modernization. Planned capital expenditures will be financed primarily by cash from operating activities.

32

MOAC000524

## NOTES TO SUMMARIZED FINANCIAL STATEMENTS

### Summary of significant accounting policies

#### Basis of presentation

The summarized financial statements of Sears Merchandise Group include domestic and international merchandising and customer credit operations. The International operations consist of Sears Canada and Sears Mexico, which are 62.6% and 100% owned, respectively.

#### Allowance for uncollectible accounts and recourse liability for sold accounts

The allowance for uncollectible accounts is established through a provision charged to expense. Accounts are charged against the allowance when management believes that collectibility is unlikely. The allowance is management's estimate of the future uncollectibility of existing accounts. Factors such as prior account loss experience, changes in the volume of the account portfolio and overall portfolio quality are considered in determining the adequacy of the allowance.

When receivables are sold with limited recourse (as described further in note 11 to the consolidated financial statements), the portion of the allowance for uncollectible accounts pertaining to such receivables is transferred to a recourse liability at the date of sale. The adequacy of the recourse liability is analyzed in the same manner as the allowance for uncollectible accounts. Charges to expense for the recourse liability are made through the provision for uncollectible accounts.

#### Retail customer receivables

Retail customer receivables shown in the Dec. 31, 1991 Statement of Financial Position include approximately $5.4 billion of domestic accounts and $453.8 million of foreign accounts which will not become due within one year. These receivables are expected to earn finance charge revenue at annual percentage rates ranging from 8.5% to 21.0% for the domestic accounts and 28.8% for the Canadian accounts.

#### Maintenance agreements

In December 1990, the Financial Accounting Standards Board issued Technical Bulletin 90-1, "Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts." The Technical Bulletin requires revenue and acquisition costs for such contracts to be deferred and amortized into income over the contract period on a systematic basis.

#### Inventories

Inventories of domestic operations are valued primarily at the lower of cost (using the last-in, first-out-LIFO method) or market by application of internally developed price indices to estimate the effects of inflation in inventories at their cost value.

The LIFO adjustment to cost of sales was a charge of $25.5 million in 1991, compared with credits of $5.7 and $6.6 million in 1990 and 1989, respectively. Partial liquidation of inventories valued under the LIFO method in all three years resulted in credits of $13.3, $28.1 and $25.0 million in 1991, 1990 and 1989, respectively. If the first-in, first-out (FIFO) method of inventory valuation had been used instead of the LIFO method, inventories would have been $756.8 and $731.3 million higher at Dec. 31, 1991 and 1990, respectively.

Inventories of International operations, Western Auto and Puerto Rico, which represent approximately 18.1% of Group inventories, are stated at the lower of cost (FIFO basis) or market.

#### Debt and related interest expense

Group debt includes borrowings by International subsidiaries in their respective countries. The debt of the domestic operations used to fund customer receivables is legally the responsibility of Sears, Roebuck and Co., SRAC or SOFNV, and amounted to $9.3 and $10.6 billion at Dec. 31, 1991 and 1990, respectively. Allocation of short-term and long-term debt is based on the proportionate composition of the pooled Corporate debt, and interest expense on the average debt outstanding is charged at a rate equal to the average cost of all funds borrowed by Sears, Roebuck and Co., SRAC and SOFNV.

33

MOAC000525

# ALLSTATE INSURANCE GROUP

## SUMMARIZED STATEMENTS OF INCOME

millions — Year Ended December 31

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| **Revenues** | | | |
| Property-liability insurance premiums earned | **$15,147.0** | $14,280.5 | $13,133.0 |
| Life insurance premium income and contract charges | **1,196.9** | 1,166.1 | 1,211.5 |
| Investment income, less investment expense (note 1) | **3,001.4** | 2,571.3 | 2,235.2 |
| Realized capital gains | **4.9** | 181.2 | 223.4 |
| Total revenues | **19,350.2** | 18,199.1 | 16,803.1 |
| **Costs and expenses** | | | |
| Property-liability insurance claims and claims expense | **12,574.6** | 12,198.8 | 10,873.6 |
| Life insurance policy benefits | **2,121.6** | 1,827.2 | 1,653.7 |
| Policy acquisition costs (note 2) | **3,041.1** | 2,870.3 | 2,678.8 |
| Other operating costs and expenses | **1,074.2** | 999.3 | 912.2 |
| Total costs and expenses | **18,811.5** | 17,895.6 | 16,118.3 |
| Income before income taxes, equity income (loss) and minority interest | **538.7** | 303.5 | 684.8 |
| Income tax benefit | | | |
| Current operations | **(183.4)** | (250.8) | (131.5) |
| Fresh start adjustment from the Revenue Reconciliation Act of 1990 | **—** | (139.0) | — |
| | **722.1** | 693.3 | 816.3 |
| Equity in net income (loss) of unconsolidated companies and minority interest | **.4** | (2.5) | (1.1) |
| Income from continuing operations | **722.5** | 690.8 | 815.2 |
| Discontinued operations  gain on disposal, net of tax expense of $5.5 | **—** | 10.5 | — |
| **Group income** | **$   722.5** | $   701.3 | $   815.2 |

See notes to Consolidated and Allstate Insurance Group summarized financial statements.

## ANALYSIS OF OPERATIONS

Allstate Insurance Group revenues increased $1.15 billion or 6.3% in 1991 following a $1.40 billion increase in 1990. Group income increased 30.9% to $722.5 million compared with income from continuing operations of $551.8 million before a one-time tax benefit of $139 million for 1990. Improvements in property-liability underwriting results and investment income more than offset a decrease in realized capital gains. Income for 1990 of $701.3 million included the one-time tax benefit from the Revenue Reconciliation Act of 1990 and a $10.5 million adjustment of reserves from discontinued group life-health operations.

### Property-Liability Operations

Premiums written increased 3.8% in 1991 compared with an 8.9% increase in 1990. During 1991, Allstate changed its method of recording premiums written to be consistent with a change in regulatory accounting, causing a one-time reduction of $211.7 million for the year. If the former method had been continued, premiums written would have increased 5.3% for 1991. This change did not affect premiums earned or net income. Growth in average premiums generated approximately 60% of the increase in premiums written before the adjustment and higher unit sales contributed 40%. Premiums earned for the property-liability operations increased $866.5 million or 6.1% to $15.15 billion for 1991 compared with 1990. Personal lines accounted for 93% of Allstate's property-liability business in 1991.

### Supplementary income statement information:

| $ millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Premiums written | $15,261.8 | 14,696.1 | 13,490.1 |
| Premiums earned | $15,147.0 | 14,280.5 | 13,133.0 |
| Claims and claims expense | $12,574.6 | 12,198.8 | 10,873.6 |
| Claims and claims expense ratio | 83.0% | 85.4 | 82.8 |
| Underwriting expenses | $ 3,705.5 | 3,500.6 | 3,241.4 |
| Underwriting expense ratio | 24.5% | 24.5 | 24.7 |
| Underwriting loss | $(1,133.1) | (1,418.9) | (982.0) |
| Combined ratio | 107.5% | 109.9 | 107.5 |
| Investment income, less expense | $ 1,397.2 | 1,296.9 | 1,252.0 |
| Realized capital gains, after-tax | $ 24.9 | 109.8 | 131.8 |
| Income tax benefit on operations (excluding tax on realized capital gains) | $ (267.5) | (394.9) | (280.1) |
| Fresh start tax benefit | $ — | (139.0) | — |
| Net income | $ 556.9 | 516.9 | 653.9 |

**Property-liability premiums earned**
(millions)



| | Passenger Auto | Homeowners | Other |
|---|---|---|---|
| 91 | $10,946 | 2,484 | 1,717 |
| 90 | $10,294 | 2,304 | 1,602 |
| 89 | $9,371 | 2,134 | 1,628 |

MOAC000526

ANALYSIS OF OPERATIONS continued

Recently, the automobile insurance industry has been under pressure from certain state regulators and legislators to reduce, freeze or set premiums at levels that do not correspond with underlying costs. This activity has adversely affected profitability since the increased costs of litigation and medical treatment, combined with rising automobile repair costs, continue to drive up the price of providing automobile insurance coverage. Although the breadth of this activity has diminished, management expects adverse legislative and regulatory activity to continue in a limited number of states which threaten to place constraints on Allstate's ability to price automobile insurance coverage to reflect its underlying cost and to provide for reasonable levels of profitability.

Allstate believes that the law of the United States, and of essentially all states, generally assures that a regulated insurer must be granted the opportunity to earn a fair and reasonable return from its automobile insurance business. Allstate will continue to vigorously pursue relief from adverse government actions through the regulatory administrative processes and in the courts. As described in note 4, the financial impact of this changing environment on Allstate's future results of operations is not presently determinable but is not expected to have a material impact on liquidity or capital resources.

In September 1991, Allstate filed with the New Jersey Insurance Commissioner a plan for the gradual and orderly withdrawal from the property-liability insurance market in the state of New Jersey over a period of time that could extend beyond the next five years. The plan is subject to approval by the New Jersey Department of Insurance. Property-liability insurance premiums earned in New Jersey amounted to approximately 3.4% of total premiums earned for 1991. Allstate believes that implementation of the withdrawal plan will have a favorable impact on future underwriting results.

Property-liability insurance underwriting losses improved as Allstate's combined ratio returned to 107.5% in 1991 after the ratio rose to 109.9% in 1990 from 107.5% in 1989. Underwriting losses decreased to $1.13 billion in 1991 compared with $1.42 billion in 1990 which was a $436.9 million increase from 1989. Most of the underwriting improvement is due to favorable trends in the number of claims reported and increased average premiums which were partially offset by continuing increases in average claim costs for auto injury coverages and less favorable results in homeowners' coverages. Personal lines of business produced improved results despite extremely high catastrophe losses in 1991. Catastrophe losses for the last three years have been well in excess of historical trends. Improvements in current operations of commercial lines of business were more than offset by upward development of losses for prior years.

Pretax net investment income increased $100.3 million or 7.7% in 1991 compared with a $44.9 million increase in 1990. Improvement in investment income followed improved cash flow from insurance operations in spite of lower interest rates in the current period. Realized capital gains after-tax were $24.9 million in 1991 compared with $109.8 million in 1990.

Income increased to $556.9 million in 1991 compared with $377.9 million before the fresh start benefit in 1990, and $653.9 million in 1989. Underwriting losses stabilized in 1991 to levels consistent with 1989 and prior years, following unusually high underwriting losses in 1990. Also, prior years involved substantially more capital gains than the current year.

## Life Operations

Life insurance statutory premiums from continuing operations, which includes premiums and deposits received for all products, remained level in 1991 compared with 1990. Most lines of business increased during 1991, except for individual annuity product premiums which decreased from high levels in 1990 that were generated by rollovers of annuity funds from other companies. Under generally accepted accounting principles, premium income and contract charges, which are significantly influenced by the type of products sold, increased $30.8 million in 1991 following a $45.4 million decrease in 1990.

Supplementary income statement information:

| millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Statutory premiums from continuing operations | $4,221.5 | 4,251.9 | 3,275.7 |
| Premium income and contract charges | $1,196.9 | 1,166.1 | 1,211.5 |
| Investment income, less expense | $1,604.2 | 1,274.4 | 983.2 |
| Realized capital gains (losses), after-tax | $ (21.7) | 9.8 | 15.6 |
| Income taxes on operations (excluding tax on realized capital gains (losses)) | $ 82.4 | 82.5 | 72.6 |
| Income from continuing operations | $ 165.6 | 173.9 | 161.3 |
| Discontinued operations | $ — | 10.5 | — |
| Net income | $ 165.6 | 184.4 | 161.3 |

A principal measure of growth of the life operations is the increase in assets under management which are the investments Allstate has made with the proceeds from the sale of investment-oriented products. Assets under management grew 24.7% in 1991 and 39.6% in 1990 to reach $16.45 billion at Dec. 31, 1991. Continued strong growth of assets under management is the major factor which caused investment income to grow to $1.60 billion in 1991 or 25.9% after a 29.6% increase in 1990.

**Assets under management**
(millions)



| | |
|---|---|
| 91 | $16,450 |
| 90 | $13,191 |
| 89 | $9,451 |

Income from continuing operations was $165.6 million in 1991 compared with $173.9 million in 1990 and $161.3 million in 1989. The decrease in net income was caused by a reduced level of capital gains. Realized capital losses, after income taxes, were $21.7 million in 1991 compared with realized capital gains of $9.8 million in 1990. The change resulted from net losses on the high yield bond and commercial mortgage loan portfolios of $68.3 million in 1991 compared to $15.2 million in 1990.

35

MOAC000527

## SUMMARIZED STATEMENTS OF FINANCIAL POSITION

millions

| | December 31 | |
|---|---|---|
| | **1991** | 1990 |
| **Assets** | | |
| Investments (note 1) | | |
| Bonds and redeemable preferred stocks, at amortized cost (market $27,220.3 and $22,397.1) | | |
| State and municipal | **$15,112.3** | $13,576.8 |
| Other | **10,239.4** | 8,444.5 |
| | **25,351.7** | 22,021.3 |
| Mortgage-backed securities (market $4,905.8 and $3,712.1) | **4,534.0** | 3,631.4 |
| Mortgage loans | **3,862.8** | 3,217.3 |
| Common and preferred stocks, at market (cost $2,876.9 and $2,421.8) | **3,416.5** | 2,374.4 |
| Short-term | **860.6** | 1,495.8 |
| Other | **835.5** | 769.7 |
| Total investments | **38,861.1** | 33,509.9 |
| Premium installment receivables | **1,793.6** | 1,727.2 |
| Deferred policy acquisition costs (note 2) | **1,422.3** | 1,235.4 |
| Property and equipment, net | **948.0** | 842.5 |
| Accrued investment income | **669.2** | 613.0 |
| Investments in unconsolidated companies | **118.1** | 117.5 |
| Deferred income taxes | **618.3** | 494.8 |
| Cash | **217.4** | 96.8 |
| Other | **1,127.8** | 1,313.2 |
| **Total assets** | **$45,775.8** | $39,950.3 |
| **Liabilities** | | |
| Reserve for property-liability insurance claims and claims expense (note 3) | **$12,426.3** | $11,376.3 |
| Reserve for life insurance policy benefits | **17,787.7** | 14,367.9 |
| Unearned premiums | **5,094.2** | 5,006.0 |
| Claim payments outstanding | **373.7** | 342.9 |
| Other liabilities and accrued expenses | **1,942.9** | 1,730.5 |
| **Total liabilities** | **37,624.8** | 32,823.6 |
| **Capital** (note 1) | **8,151.0** | 7,126.7 |
| **Total liabilities and capital** | **$45,775.8** | $39,950.3 |

See notes to Consolidated and Allstate Insurance Group summarized financial statements.

## ANALYSIS OF FINANCIAL CONDITION

Allstate's investment strategy combines the elements of safety, stability, growth and liquidity in a manner which maximizes the benefits to the policyholder. Preservation of principal is safeguarded through quality and diversification of the portfolio. Such diversification provides the balance necessary to maintain predictability of income, growth of long-term capital and surplus and a strong liquidity position.

Total assets and investments both increased approximately 15%, in proportion to the increase in premiums and annuity deposits. As of Dec. 31, 1991 and 1990, Allstate's investments in bonds and redeemable preferred stocks were $25.4 and $22.0 billion, respectively, representing 65% and 66% of total investments. The market value of the bonds and redeemable preferred stocks rose $1.49 billion in 1991 increasing the unrealized gain to $1.87 billion at the end of 1991 from $375.8 million at the end of 1990.

Allstate's investment in common and nonredeemable preferred stocks at cost increased by $455.1 million or 18.8% in 1991, combined with an increase in unrealized capital gains of $587.0 million, resulting in net growth of 43.9%. The stock portfolio experienced the greatest rate of growth of any single type of investment during the year.

**Property-Liability Investments**

State and municipal tax-exempt bonds comprise 74% of the property-liability investment portfolio as shown in the

**Property-Liability Investments**

at Dec. 31, 1991 $20.4 billion



State and Municipal Bonds — 74%
Other Bonds — 4%
Real Estate and Mortgage Loans — 4%
Other — 4%
Common and Preferred Stocks — 14%

chart above. Approximately 98% of these state and municipal bonds are rated investment grade. These ratings are determined by Standard & Poor's or Moody's or, in the case of the nonrated issues (18% of the total), by comparable National Association of Insurance Commissioners Security Valuation Office ratings. At Dec. 31, 1991, the municipal bond portfolio includes nonperforming bonds approximating one-tenth of 1% of the total portfolio. The average quality rating of this bond portfolio was A+ at Dec. 31, 1991.

Property-liability funds are also invested in common stocks for their high potential for long-term growth and return. Because this portfolio has generated the highest overall return for the last nine years, more funds were committed to this sector in 1991. Most of the equity portfolio is devoted to blue chip stocks and a significant percentage is devoted to small and mid-capitalization stocks.

MOAC000528

## SUMMARIZED STATEMENTS OF CASH FLOWS

millions                                                     Year Ended December 31

|  | 1991 | 1990 | 1989 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Group income | $ 722.5 | $ 701.3 | $ 815.2 |
| Adjustments to reconcile group income to net cash provided by operating activities | | | |
| Depreciation, amortization and other noncash items | 76.4 | 69.5 | 106.3 |
| Gains on sales of property and investments | (4.8) | (181.2) | (223.4) |
| Increase in insurance reserves | 1,902.0 | 2,004.8 | 1,470.4 |
| Change in deferred taxes | (323.2) | (263.8) | (65.0) |
| Change in net other operating assets and liabilities | 178.4 | 243.4 | (177.4) |
| **Net cash provided by operating activities** | 2,551.3 | 2,574.0 | 1,926.1 |
| **Cash flows from investing activities** | | | |
| Proceeds from sales and maturities of investments | 4,754.1 | 2,974.1 | 2,990.8 |
| Purchases of investments | (8,459.0) | (6,054.6) | (5,161.5) |
| Collections on mortgage-backed securities and mortgage loans | 828.5 | 312.9 | 182.7 |
| Purchases and originations of mortgage-backed securities and mortgage loans | (2,390.9) | (1,993.3) | (1,749.5) |
| Net change in short-term investments | 635.2 | (354.7) | 303.6 |
| Net purchases of property and equipment | (256.5) | (224.2) | (181.1) |
| **Net cash used in investing activities** | (4,888.6) | (5,339.8) | (3,615.0) |
| **Cash flows from financing activities** | | | |
| Payments received under investment contracts | 2,914.9 | 2,898.1 | 1,924.0 |
| Interest credited to investment contracts | 911.0 | 707.9 | 512.3 |
| Payments on maturity of investment contracts and other charges | (1,258.1) | (708.4) | (500.0) |
| Dividends paid to Corporate | (109.9) | (108.4) | (330.0) |
| **Net cash provided by financing activities** | 2,457.9 | 2,789.2 | 1,606.3 |
| **Net increase (decrease) in cash** | $ 120.6 | $ 23.4 | $ (82.6) |
| **Cash at beginning of year** | $ 96.8 | $ 73.4 | $ 156.0 |
| **Cash at end of year** | $ 217.4 | $ 96.8 | $ 73.4 |

See notes to Consolidated and Allstate Insurance Group summarized financial statements.

## ANALYSIS OF FINANCIAL CONDITION continued

### Life Investments

Allstate Life's investment policy places an emphasis on the matching of assets with related liabilities while also maintaining a strong liquidity position. To achieve an economic balance between assets and liabilities, the investment portfolios are segmented by the type of insurance product.

This strategy places over 95% of the Life portfolio in fixed income securities which include publicly traded bonds, privately placed bonds, mortgage-backed securities, mortgage loans and high-yield bonds to support the investment-oriented product lines. Publicly traded investment grade corporate bonds are purchased to be held to maturity. The average quality rating is a solid A, and 40% are invested in utilities. In addition, Allstate's professional investment managers have the capability to evaluate and invest in private placement bonds which have comparable investment quality as public securities but offer higher yields. The overall quality rating of the private placement portfolio is A—.

### Life Investments
at Dec. 31, 1991 $18.5 billion



Publicly Traded Bonds 19%
Privately Placed Bonds 25%
High Yield Bonds 5%
Other 4%
Stocks 4%
Mortgage Loans 20%
Mortgage-Backed Securities 23%

During the last several years, mortgage-backed securities have grown to the second largest category of investment in the Life portfolio. Most of the issues are government agency securities and almost all are AAA credit quality. At the same time, Allstate's commitment to mortgage loans has also grown through commercial mortgages. These are investment grade first mortgages on completed commercial properties located in the top 50 major metropolitan areas. By adhering to strict underwriting guidelines, Allstate has limited nonaccrual and restructured loans to 3.1% of the portfolio at Dec. 31, 1991.

A portion of the portfolio is invested in high-yield bonds providing extra income and expected yield to offset the higher expected credit risk. Allstate has implemented a strategy to minimize the risk of these investments by spreading the portfolio over 30 industry categories and 150 different companies with no more than a $15 million exposure to a single issuer. Most importantly, an issuer's credit strength is monitored continuously while the investments are held. The high-yield bond holdings are expected to decline in the future.

### Cash Flow

Allstate generates substantial positive cash flows from operating activities. The primary sources of cash flow are insurance premiums, annuity deposits, investment income and the maturity and sale of investments. Most insurance premiums and deposits are received in advance of the time when claims and policyholders benefits are paid. The resulting cash flow is invested until required for operations.

# ALLSTATE INSURANCE GROUP

## ANALYSIS OF FINANCIAL CONDITION continued

Insurance operations typically do not require significant amounts of operating assets. As a result, Allstate has no debt or capital lease obligations. The long-term liquidity requirements of insurance companies are influenced by product mix and the interest rate environment.

New funds from operations and financing totaled $5.01 billion for 1991 compared with $5.36 billion in 1990. The property-liability share of the funds increased to $1.88 billion in 1991 from $1.45 billion for 1990. Cash from underwriting operations increased primarily because losses paid decreased in line with the decrease in the underwriting loss. Life operations continue to provide the largest portion of the funds with $3.13 billion in 1991, down from $3.91 billion in 1990 due primarily to reduced levels of individual annuity rollovers from other companies.

The net change in cash and short-term investments showed a decrease of $514.6 million in 1991 after a $378.1 million increase in 1990. Generally, Allstate kept available funds more fully invested in 1991 as potential growth opportunities arose in the securities markets and short-term yields became less attractive.

## NOTES TO SUMMARIZED FINANCIAL STATEMENTS

### Summary of significant accounting policies

**Basis of presentation**

The summarized financial statements of Allstate Insurance Group include property-liability insurance, life insurance and adjunct business operations such as Allstate Motor Club.

The financial statements have been prepared on the basis of generally accepted accounting principles which vary from statutory accounting principles prescribed or permitted by regulatory authorities. On a statutory basis, capital of the property-liability operations was $5.4 and $4.7 billion and capital of the life operations was $900.3 and $800.4 million at Dec. 31, 1991 and 1990, respectively. Statutory net income of the property-liability operations was $172.9 million and $19.6 million and statutory net income of the life operations was $139.6 million and $150.1 million in 1991 and 1990, respectively.

**Investments**

Bonds, redeemable preferred stocks and mortgage-backed securities are carried at amortized cost and are intended to be held to maturity; mortgage loans are carried at the outstanding principal balance, net of unamortized premium or discount; other preferred and common stocks are carried at quoted market values; short-term investments are carried at cost; other investments, which include real estate, are primarily accounted for by the equity method.

The difference between cost and market value of common and nonredeemable preferred stocks, less deferred income taxes and minority interest, is reflected in capital. Realized capital gains and losses are determined on a specific identification basis.

**Property-liability insurance**

Premiums are deferred and earned on a pro rata basis over the terms of the policies. Certain costs of acquiring insurance business, principally agents' compensation and premium taxes, are deferred and amortized to income as premiums are earned.

The reserve for claims and claims expense is an accumulation of the estimated amounts, net of estimated salvage and subrogation recoveries, necessary to settle outstanding claims, based upon the facts in each case and Allstate's experience with similar cases. These estimates are continually reviewed and updated. Any resulting adjustments are reflected in current operations.

**Life insurance**

Premiums for traditional life and disability insurance are recognized as revenue when due. Revenues on universal life-type contracts are comprised of contract charges and fees which are recognized when assessed against the policyholder account balance. Insurance contracts do not involve substantial risk of policyholder mortality and the payments received under such contracts are recorded as interest-bearing liabilities.

Policy benefit reserves for traditional life and disability are computed on the basis of assumptions as to future investment yields, mortality, morbidity and expenses. These assumptions, which for traditional life are applied using the net level premium method, include provisions for adverse deviation and generally vary by such characteristics as plan, year of issue and policy duration. Policy benefit reserves for universal life-type contracts are established using the retrospective deposit method. Under this method, liabilities are equal to the account balance that accrues to the benefit of the policyholder.

Certain costs of acquiring insurance business, principally agents' compensation, certain underwriting costs and direct mail solicitation expenses, are deferred and amortized to income in proportion to the estimated revenues on such business. For universal life-type and investment contracts, the costs are amortized in relation to the estimated profits on such business.

**Related party transactions**

Insurance premiums include transactions with Sears, Roebuck and Co. and other affiliates. The effect on Group revenues and income is not material.

### 1. Investments

Investment income by category of investment was as follows:

| millions | Year Ended December 31 | | |
| --- | --- | --- | --- |
| | 1991 | 1990 | 1989 |
| Bonds and redeemable preferred stocks | | | |
| State and municipal | $1,164.0 | $1,087.1 | $1,028.9 |
| Other | 891.5 | 740.2 | 595.4 |
| | 2,055.5 | 1,827.3 | 1,624.3 |
| Mortgage-backed securities | 398.9 | 298.2 | 226.3 |
| Mortgage loans | 358.2 | 277.9 | 200.8 |
| Common and preferred stocks | 80.7 | 73.5 | 84.9 |
| Short-term | 124.2 | 139.2 | 133.1 |
| Other | 24.3 | 9.2 | 17.2 |
| Investment income, before expense | 3,041.8 | 2,625.3 | 2,286.6 |
| Investment expense | 40.4 | 54.0 | 51.4 |
| Investment income, less investment expense | $3,001.4 | $2,571.3 | $2,235.2 |

38

MOAC000530

## Notes to Summarized Financial Statements continued

At Dec. 31, 1991, the carrying value of all investments, excluding common and preferred stocks, that were non-income producing during 1991 was $86.3 million.

Realized capital gains (losses), less income taxes, and changes in unrealized net capital gains, less applicable tax effect and minority interest, for bonds and stocks were as follows:

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| **Bonds and redeemable preferred stocks** | | | |
| Realized | $ 12.4 | $ (.4) | $ (2.7) |
| Change in unrealized | 985.3 | (245.3) | 355.7 |
| **Common and preferred stocks** | | | |
| Realized | 32.4 | 120.3 | 160.2 |
| Change in unrealized | 378.4 | (267.9) | 85.0 |

Unrealized capital gains and losses on common and preferred stocks included in capital at Dec. 31, 1991 were as follows:

| millions | Cost | Market Value | Gross Unrealized Gains | (Losses) | Net Unrealized Gains (Losses) |
|---|---|---|---|---|---|
| Common and preferred stocks | $2,876.9 | $3,416.5 | $656.6 | $(117.0) | $ 539.6 |
| Deferred income tax and other | | | | | (174.2) |
| Total | | | | | $ 365.4 |

### 2. Deferred policy acquisition costs

Policy acquisition costs deferred and amortized to income were as follows:

| millions | Year Ended December 31 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| **Costs deferred and amortized** | | | |
| Amount deferred | $2,006.7 | $1,908.6 | $1,726.7 |
| Amount amortized to income | 1,819.8 | 1,746.1 | 1,581.2 |

### 3. Reinsurance

Allstate assumes and cedes insurance to participate in the reinsurance market, limit maximum losses and minimize exposure on large risks. Reinsurance ceded arrangements do not discharge Allstate as the primary insurer.

Reserves for insurance claims and policy benefits are shown net of amounts recoverable from other insurers of $1.4 billion at Dec. 31, 1991 and 1990. Insurance premiums assumed totaled $781.7 and $906.3 million in 1991 and 1990, respectively. Insurance premiums ceded totaled $428.8 and $403.3 million for the same periods. Amounts recoverable from pools, associations and facilities on reported losses at Dec. 31, 1991 are $325.6 million. No amount recoverable from any one reinsurer is in excess of $105.8 million at Dec. 31, 1991.

### 4. Pending legal proceedings

Various regulatory and legal actions are currently pending involving Allstate and specific aspects of the conduct of business in certain states. The following is a summary of the more significant proceedings.

On Nov. 8, 1988 California voters approved Proposition 103, which called for certain changes in the insurance business in the state and for significant rate reductions ("rollback provision") on policies written from Nov. 8, 1988 through Nov. 7, 1989. In the more than three years that have followed, various aspects of this consumer initiative have been tested in the courts, all of which have failed to produce any legally mandated policyholder refunds.

The California Supreme Court upheld most of Proposition 103, however, the Court also ruled that insurers be permitted the opportunity to earn a fair and reasonable rate of return. During 1989 and 1990, the Insurance Commissioner of the State of California undertook a number of administrative actions aimed at facilitating the adjudication of refund liabilities, but no refund order ever was issued to Allstate from that process.

In January 1991, the newly elected Commissioner issued a set of regulations purportedly implementing the rollback provision of Proposition 103. These regulations are also being legally challenged by the insurance industry. On Oct. 16, 1991, the Commissioner issued an order pursuant to those regulations contending that Allstate be required to refund premiums and interest of $243.7 million.

The Superior Court of California ruled that, before any order requiring rollbacks to be paid may lawfully be finalized, each individual insurer must be granted its due process right to a company-specific hearing as to whether any rollback liability exists, given the circumstances of the particular insurer. Management believes that its rates and practices have been proper, that its position will ultimately be upheld by the courts, and that it will not be required to refund monies to California policyholders.

In North Carolina, Allstate is challenging regulatory actions that would result in refunds of auto premiums to policyholders under certain conditions. The matter is pending review of the North Carolina Supreme Court. In Massachusetts, Allstate is involved in litigation with the Commonwealth Automobile Reinsurers (the auto residual market authority) concerning Allstate's withdrawal from that state. In both cases, management believes its position will be upheld.

The Internal Revenue Service (IRS) has asserted a federal income tax deficiency on Allstate's mortgage insurance subsidiaries by deferring deductions for incurred losses to the time that the insured lender takes title to a mortgagor's property. On Jan. 24, 1991, the Tax Court, in conference proceedings, upheld the IRS position. Allstate is vigorously appealing the lower court decision to the U.S. Court of Appeals. Management believes that Allstate will prevail on this industry-wide issue.

While the aggregate dollar amounts involved in these regulatory and legal actions cannot be determined with certainty, the amounts at issue could have a significant impact on earnings. However, the excess of any liabilities over the amounts currently provided that might result from an adverse final determination in one or more of the above mentioned matters is not expected to have a material effect on liquidity or capital resources.

39

# DEAN WITTER FINANCIAL SERVICES GROUP

## SUMMARIZED STATEMENTS OF INCOME

| millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| **Revenues** | | | |
| Interest | **$2,168.0** | $2,254.3 | $2,044.4 |
| Commissions | 696.7 | 666.5 | 694.0 |
| Asset management | 515.8 | 491.7 | 435.3 |
| Trading | 460.5 | 362.7 | 277.1 |
| Investment banking | 197.4 | 206.4 | 236.3 |
| Other operating revenues | 903.6 | 625.2 | 377.5 |
| Total revenues | 4,942.0 | 4,606.8 | 4,064.6 |
| **Costs and expenses** | | | |
| Interest | 1,128.5 | 1,256.4 | 1,188.2 |
| Personnel | 1,371.2 | 1,278.4 | 1,198.6 |
| Provision for loan losses | 465.4 | 420.8 | 300.6 |
| Other operating costs and expenses | 1,421.3 | 1,247.5 | 1,080.4 |
| Total costs and expenses | 4,386.4 | 4,203.1 | 3,767.8 |
| Income before income taxes | 555.6 | 403.7 | 296.8 |
| Income taxes | 211.0 | 170.8 | 130.8 |
| **Group income** | $ 344.6 | $ 232.9 | $ 166.0 |

See notes to Consolidated and Dean Witter Financial Services Group summarized financial statements.

## ANALYSIS OF OPERATIONS

Revenues of Dean Witter Financial Services Group increased 7.3% in 1991 and 13.3% in 1990 over the respective prior years. The 1991 increase was primarily attributable to increased interest and fee revenues for Credit Services, and increased trading and commission revenues in Securities. The 1990 increase was primarily due to increased interest and fee revenues for Credit Services, and higher asset management and trading revenues in Securities.

Net income reported by the Group in 1991 represented a $111.7 million improvement over 1990, due to increased profitability for both Securities and Credit Services. Group income in 1990 increased $66.9 million over 1989, primarily due to higher profitability for Credit Services.

### Securities statements of income follow:

| millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Interest | $ 507.1 | $ 635.0 | $ 650.7 |
| Commissions | 696.7 | 666.5 | 694.0 |
| Asset management | 515.8 | 491.7 | 435.3 |
| Trading | 460.5 | 362.7 | 277.1 |
| Investment banking | 197.4 | 206.4 | 236.3 |
| Other | 123.9 | 113.6 | 56.0 |
| Total revenues | 2,501.4 | 2,475.9 | 2,349.4 |
| Personnel | 1,108.0 | 1,072.3 | 1,029.1 |
| Interest | 355.4 | 486.3 | 492.4 |
| Other | 756.3 | 709.4 | 637.5 |
| Total expenses | 2,219.7 | 2,268.0 | 2,159.0 |
| Operating income | 281.7 | 207.9 | 190.4 |
| Income taxes | 110.7 | 98.9 | 90.2 |
| Net income | $ 171.0 | $ 109.0 | $ 100.2 |
| Assets under management | $ 49,041 | $ 42,546 | $ 42,733 |

Net interest income increased 2.0% in 1991 due to improved spreads on repurchase and resell agreements, as well as customer margin lending. In 1990, net interest income decreased 6.1% due to the decision to exit program trading and because of lower interest rates.

Commission revenues increased 4.5% in 1991 and decreased 4.0% in 1990, primarily due to the fluctuation of activity in listed securities.

Asset management revenues increased 4.9% in 1991 due to increased levels of assets under management. In 1990, asset management revenues increased 13.0% primarily due to the full year results of the transfer agency function which was acquired during the fourth quarter of 1989.

Trading revenues increased 27.0% and 30.9% in 1991 and 1990, respectively. These increases were due to higher equity trading revenues and higher fixed income trading revenues from government securities.

Investment banking revenues decreased 4.4% and 12.7% in 1991 and 1990, respectively. These decreases were due to lower fees recorded in the various corporate finance activities.

Personnel expenses increased 3.3% in 1991 primarily due to the increase in variable compensation related to higher trading volume. Other operating expenses increased 6.6% in 1991 primarily reflecting the growth in operating revenue for the period. In 1990, personnel expenses increased 4.2% and other operating expenses increased 11.3%, primarily as a result of additional personnel and facilities from the acquisition of the transfer agency function and certain other business expansions during the fourth quarter of 1989.

Net income increased $62.0 million in 1991 as a result of higher trading and commission revenues and increased asset management fees. Net income increased $8.8 million in 1990 as a result of higher trading revenues and increased asset management fees.

MOAC000532

## SUMMARIZED STATEMENTS OF FINANCIAL POSITION

millions                                                                                    December 31

| | 1991 | 1990 |
|---|---|---|
| **Assets** | | |
| Cash and invested cash | $ 558.2 | $ 565.8 |
| Cash segregated under government regulations | 1,333.9 | 1,250.1 |
| Securities purchased under agreements to resell | 2,681.8 | 2,269.5 |
| Discover Card receivables (net of allowances of $294.4 and $280.6) | 8,724.2 | 8,610.6 |
| Receivables from clients and others–collateralized | 3,447.6 | 3,842.5 |
| Securities, at market value (note 2) | 2,377.9 | 1,181.0 |
| Consumer finance notes | 1,026.8 | 1,467.2 |
| Other assets | 3,229.0 | 2,503.5 |
| **Total assets** | **$23,379.4** | **$21,690.2** |
| **Liabilities** | | |
| Deposits (note 1) | $ 5,074.8 | $ 4,754.5 |
| Securities sold under agreements to repurchase (note 3) | 3,791.6 | 2,349.8 |
| Borrowings (note 3) | 6,388.1 | 6,540.3 |
| Payable to clients and others | 4,168.2 | 4,579.1 |
| Securities sold but not yet purchased, at market value (note 2) | 462.0 | 500.1 |
| Other liabilities | 1,374.9 | 1,101.5 |
| **Total liabilities** | **21,259.6** | **19,825.3** |
| **Capital** | **2,119.8** | **1,864.9** |
| **Total liabilities and capital** | **$23,379.4** | **$21,690.2** |

See notes to Consolidated and Dean Witter Financial Services Group summarized financial statements.

## ANALYSIS OF OPERATIONS continued

**Credit Services** statements of income follow:

| $ millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| Interest revenue | $ 1,660.9 | $1,619.3 | $1,393.7 |
| Interest expense | 773.1 | 770.1 | 695.8 |
| Net interest income | 887.8 | 849.2 | 697.9 |
| Servicing fee income | 247.0 | 81.2 | 3.3 |
| Provision for loan losses | 448.4 | 413.5 | 296.7 |
| Net credit income | 686.4 | 516.9 | 404.5 |
| Operating revenues | 532.7 | 430.4 | 318.2 |
| Operating expenses | 945.2 | 751.5 | 616.3 |
| Income before taxes | 273.9 | 195.8 | 106.4 |
| Income taxes | 100.3 | 71.9 | 40.6 |
| Net income | $ 173.6 | $ 123.9 | $ 65.8 |
| Discover Card: | | | |
| Gross receivables at Dec. 31 | $14,683.6 | 11,591.5 | 8,538.9 |
| Receivables sold at Dec. 31 | $ 5,665.0 | 2,700.3 | — |
| Average owned receivables | $ 8,504.8 | 8,367.1 | 6,712.6 |
| Cardmembers (thousands) | 41,162 | 37,773 | 32,722 |
| Merchant outlets (thousands) | 1,433 | 1,244 | 1,080 |
| Credit Services: | | | |
| Ratio of net charge-offs to average owned loans | 3.40% | 3.08 | 2.63 |
| Loans delinquent three months or more | 1.60% | 1.44 | 1.27 |
| Auto, home equity and other loan volume (principal) | $ 397 | 668 | 530 |

Net interest income increased 4.5% in 1991 primarily due to the continued growth of credit card receivables and lower average interest rates on borrowings. In 1990, net interest income increased 21.7% due to the significant growth in credit card receivables, partially offset by the initial sale of receivables through the use of asset-backed securities.

The provision for loan losses on owned receivables increased 8.4% in 1991 primarily due to higher net charge-offs. In 1990, the provision for loan losses on owned receivables increased 39.4%, primarily due to higher net charge-offs and the continued growth of credit card receivables.

Operating revenues increased significantly in both 1991 and 1990 due to continued growth in credit card activities. Additionally, in 1991 and 1990, servicing fees increased significantly due to the servicing of receivables sold through the use of asset-backed securities.

**Discover Cardmembers**
(thousands)



| 91 | 41,162 |
| 90 | 37,773 |
| 89 | 32,722 |

Operating expenses increased 25.8% in 1991 compared with 21.9% in 1990. For 1991 and 1990, increased personnel and promotional expenses reflect the increased credit card volume and the expansion of services to Cardmembers and merchants.

Net income for Credit Services increased $49.7 million in 1991 compared with an increase of $58.1 million in 1990. The improvement of earnings in 1991 and 1990 can be attributed to the growth of credit card activities.

MOAC000533

# DEAN WITTER FINANCIAL SERVICES GROUP

## SUMMARIZED STATEMENTS OF CASH FLOWS

| millions | 1991 | 1990 | 1989 |
|---|---|---|---|
| | | | Year Ended December 31 |
| **Cash flows from operating activities** | | | |
| Group income | $ 344.6 | $ 232.9 | $ 166.0 |
| Adjustments to reconcile group income to net cash provided by operating activities | | | |
| Depreciation, amortization and other noncash items | 50.1 | 44.4 | 48.2 |
| Provisions for uncollectible accounts | 465.4 | 425.8 | 304.3 |
| Change in deferred taxes | (91.0) | (71.4) | (66.8) |
| Change in net matched agreements to resell or repurchase securities | 1,206.8 | 10.8 | (77.2) |
| Increase in net trading account securities | (1,235.0) | (411.9) | (420.1) |
| Decrease (increase) in brokerage receivables | 377.9 | (639.4) | (173.2) |
| Increase (decrease) in brokerage payables | (410.9) | 899.2 | 537.4 |
| Increase in cash segregated under government regulations | (83.8) | (284.0) | (279.5) |
| Change in net other operating assets and liabilities | (363.2) | (563.6) | 239.6 |
| **Net cash provided by (used in) operating activities** | **260.9** | **(157.2)** | **278.9** |
| **Cash flows from investing activities** | | | |
| Proceeds from sales of investments | 6.3 | .6 | 289.2 |
| Purchases of investments | (14.1) | (7.7) | (8.6) |
| Collections on and sales of consumer finance notes | 842.4 | 459.0 | 1,395.3 |
| Originations of consumer finance notes | (408.6) | (662.3) | (1,022.5) |
| Net purchases of property and equipment | (60.7) | (38.1) | (64.9) |
| Increase in Discover Card receivables | (534.7) | (725.8) | (2,654.0) |
| **Net cash used in investing activities** | **(169.4)** | **(974.3)** | **(2,065.5)** |
| **Cash flows from financing activities** | | | |
| Net increase (decrease) in long-term debt | 1,187.8 | 252.3 | (4.6) |
| Change in net unmatched agreements to resell or repurchase securities | (177.3) | 334.5 | (93.3) |
| Increase (decrease) in deposits | 320.3 | (703.9) | 827.5 |
| Net increase (decrease) in short-term borrowings, primarily 90 days or less | (1,340.2) | 1,476.0 | 1,059.9 |
| Dividends paid to Corporate | (109.7) | (100.4) | (79.4) |
| Net capital transfers from Corporate | 20.0 | 20.3 | 13.9 |
| **Net cash provided by (used in) financing activities** | **(99.1)** | **1,278.8** | **1,724.0** |
| **Net increase (decrease) in cash and invested cash** | **$ (7.6)** | **$ 147.3** | **$ (62.6)** |
| **Cash and invested cash at beginning of year** | **$ 565.8** | **$ 418.5** | **$ 481.1** |
| **Cash and invested cash at end of year** | **$ 558.2** | **$ 565.8** | **$ 418.5** |

See notes to Consolidated and Dean Witter Financial Services Group summarized financial statements.

## ANALYSIS OF FINANCIAL CONDITION

**Securities** assets are extremely liquid and can be readily converted to cash. Cash and liquid assets, which consists principally of securities inventory, receivables from brokers, dealers and clients, and securities purchased under agreements to resell, represent more than 85% of total Securities assets at Dec. 31, 1991. Short-term borrowings are used to finance the purchase of securities by clients on margin, to facilitate the securities settlement process and to finance the trading account securities inventory. Letters of credit are utilized in lieu of cash or security margin deposits required by various clearing associations wherever possible. Portions of liabilities, such as credit balances of clients, certain payables to brokers on securities transactions and other liabilities are noninterest bearing and, therefore, an important source of funds.

**Credit Services** experienced continued growth in assets in 1991 and 1990. Owned assets increased 5.5% in 1991 and 12.6% in 1990. Assets, including securitized assets, increased 26.2% in 1991 and 38% in 1990. Consumer and institutional deposits, asset securitizations, Discover Credit Corp. commercial paper and intermediate-term financing and short-term bank related borrowings were the principal sources of funding. The Group has diversified access to cost-effective sources of short-term borrowings and maintains an appropriate mix of fixed and variable rate borrowings. Debt is allocated from Corporate to fund certain Discover Card receivables, as required by regulations, with interest charges allocated at a rate approximating the short-term cost of funds.

MOAC000534

## NOTES TO SUMMARIZED FINANCIAL STATEMENTS

### Summary of significant accounting policies

#### Basis of presentation

The summarized financial statements of Dean Witter Financial Services Group include Securities and Credit Services activities. Securities consists of securities and futures brokerage services, asset management, investment banking, securities trading and securities lending. Credit Services includes credit card services and consumer finance services.

#### Securities

Client transactions are recorded on settlement date with related commission revenues and expenses recorded on a trade date basis. Proprietary security transactions are recorded on the trade date. Securities are valued at market, and the unrealized gains and losses are reflected in income.

Transactions in forward contracts and futures are open contractual commitments until settlement date. Open contracts are valued at market and the resulting unrealized gains and losses are reflected in income.

Security transactions under agreements to resell and repurchase are carried at the contract amounts at which the securities will be resold or reacquired. Additionally, the Group takes possession of the securities under agreements to resell at the time such agreements are made. In the event the market value of such securities falls below the related agreement to resell, the Group will request additional collateral.

#### Credit card services

Interest on loans is credited to income as earned. Generally, interest is accrued on loans until the date of charge-off. The interest portion of the charge-off is written off against interest income. Merchant discount revenue is accrued as earned. Service fee income is recorded when billed.

The allowance for possible loan losses is established through a provision charged to expense. Loans are charged against the allowance when management believes that collectibility of the principal is unlikely. The allowance is management's estimate of the future uncollectibility of existing loans. Factors such as prior loan loss experience, changes in the volume of the loan portfolio, and overall portfolio quality are considered in determining the adequacy of the allowance.

#### Consumer finance

Revenues from consumer finance notes are deferred and amortized to income over the terms of the loans. Direct loan origination costs are deferred and amortized over the estimated lives of the loans using the level yield method.

### 1. Deposits by type follow:

| $ millions | December 31 | |
|---|---|---|
| | 1991 | 1990 |
| Demand accounts | $1,264.0 | $ 985.4 |
| Consumer certificate accounts | 422.4 | 308.5 |
| $100,000 minimum certificate accounts | 3,388.4 | 3,460.6 |
| Total | $5,074.8 | $4,754.5 |
| Weighted average interest rate at Dec. 31 | 8.00% | 8.55% |

A summary of deposits by year of maturity follows:

| millions | December 31, 1991 |
|---|---|
| Demand accounts | $1,264.0 |
| Certificate accounts maturing in | |
| 1992 | 1,220.4 |
| 1993 | 617.3 |
| 1994 | 425.2 |
| 1995 | 222.2 |
| 1996 and thereafter | 1,325.7 |
| Total | $5,074.8 |

### 2. Securities owned and securities sold but not yet purchased consist of the following:

| millions | December 31, 1991 | |
|---|---|---|
| | Owned | Sold but not yet purchased |
| Money market instruments | $ 314.9 | $ .4 |
| U. S. Government and agency obligations | 1,443.2 | 295.6 |
| Municipal bonds | 196.0 | 4.8 |
| Corporate bonds | 310.5 | 45.9 |
| Corporate stocks and options | 113.3 | 115.3 |
| Total | $2,377.9 | $462.0 |

### 3. Borrowings consisted of:

| $ millions | December 31 | |
|---|---|---|
| | 1991 | 1990 |
| Borrowings/allocations from Corporate | $1,346.9 | $1,116.3 |
| Bank loans | 1,800.1 | 2,197.8 |
| Commercial paper | 2,065.7 | 2,961.4 |
| Other | 1,175.4 | 264.8 |
| Total | $6,388.1 | $6,540.3 |
| Weighted average interest rate at Dec. 31 | 5.9% | 8.1% |

The weighted average interest rate on amounts borrowed on repurchase agreements was 4.6% and 7.6% at Dec. 31, 1991 and 1990, respectively.

MOAC000535

# COLDWELL BANKER REAL ESTATE GROUP

## SUMMARIZED STATEMENTS OF INCOME

| millions | | | Year Ended December 31 |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| **Revenues** | | | |
| Real estate commissions | $ 615.4 | $ 584.5 | $ 723.2 |
| Real estate operations | 189.0 | 170.0 | 115.1 |
| Interest | 572.5 | 445.4 | 452.2 |
| Ancillary fees and other | 236.4 | 177.5 | 157.5 |
| Total revenues | 1,613.3 | 1,377.4 | 1,448.0 |
| **Costs and expenses** | | | |
| Commissions and direct costs | 517.8 | 490.1 | 532.2 |
| Operating and administrative | 592.7 | 567.8 | 563.7 |
| Interest | 555.5 | 465.0 | 467.4 |
| Total costs and expenses | 1,666.0 | 1,522.9 | 1,563.3 |
| Operating loss | (52.7) | (145.5) | (115.3) |
| Gain on sale of property | 160.2 | 195.0 | 222.2 |
| Equity in income (loss) of real estate joint ventures (note 2) | (2.6) | (5.4) | .9 |
| Income before income taxes | 104.9 | 44.1 | 107.8 |
| Income taxes | 44.3 | 18.6 | 43.8 |
| Income from continuing operations | 60.6 | 25.5 | 64.0 |
| Discontinued operations | | | |
| Operating income, net of income tax expense of $2.2 | — | — | 2.8 |
| Gain on disposal, net of income tax expense of $77.2 | — | — | 59.9 |
| **Group income** | $ 60.6 | $ 25.5 | $ 126.7 |

See notes to Consolidated and Coldwell Banker Real Estate Group summarized financial statements.

## ANALYSIS OF OPERATIONS

After a difficult transition year in 1990, the growth and marketing strategies established in 1989 effectively positioned the Group to deal with the unique economic challenges of 1991. For the year, Group revenues increased 17.1% to $1.61 billion. This compares to a decline of 4.9% experienced in 1990.

Net income was $60.6 million in 1991, an increase of 137.6% over the prior year. Significant improvements in Residential and Mortgage income more than offset the reduced income of Homart which was caused mainly by a reduction in the gain on sale of properties. The improvement in Residential, in an unfavorable market, was attributable to aggressive cost takeouts over the last three years, increases in commission revenue retained and the successful acquisition of the assets of the residential brokerage operation of Schlott Realtors. Within Mortgage, the improvement resulted from higher servicing income and interest rate spreads on the growing mortgage warehouse of loans originated but not yet sold and loans held for investment. Income from continuing operations in 1990 declined 60.2% from the prior year due to increased operating losses and lower gains from the sale of properties. Net income for 1990 decreased by 79.9% because 1989 net income included income of $62.7 million from the sale of the discontinued Commercial division.

The cyclical downturn experienced by the residential real estate market in 1990 continued through 1991. Despite the fact that the housing affordability index reached its highest level in nearly fifteen years, sagging consumer confidence held home resale volume to a level below that of 1990 which was lower than the 1989 level. In 1991, the residential mortgage market benefited from a surge in origination volume as a result of a dramatic drop in mortgage interest rates. Refinancing

activity tended to offset seasonal drops in home resales and mortgage lending activity.

The residential real estate business, which accounted for approximately 45% of the Group's 1991 revenues, reported a 6.5% increase in revenues compared with a decrease of 16.7% in the prior year. The 1991 increase was due primarily to the successful Schlott acquisition in February 1991. With 99 offices located mainly in the Northeast, Schlott was the nation's second largest independent broker. The acquisition significantly enhanced Residential's market presence and profitability in the northeastern region. This region had been particularly hard hit by the 1990 downturn but its regional home sales improved during 1991. Affiliate operations and Residential's executive relocation operation both reported record levels of revenues.

Homart Development Co. revenues, primarily shopping center and office building rents, increased $17.6 million, or 8.6%, reflecting improved shopping center and office building occupancy and the first full year of operations of properties acquired or opened during the prior year. In 1990, revenues increased 46.6% due to improved office building rents, the conversion of joint venture properties to wholly-owned status in late 1989 and shopping center acquisitions.

Sears Mortgage Group revenues increased 33.4% in 1991 versus an increase of 3.1% in 1990. During 1991, the retained servicing portfolio of Sears Mortgage Corporation increased 37% to $20.6 billion, resulting in significantly higher servicing income and economies in servicing costs per loan. Higher origination volumes and warehouse balances at Sears Mortgage Corporation, combined with higher portfolio balances within Sears Savings Bank, also contributed to the 1991 revenue increase. The 1990 increase resulted from higher origination volumes and sales of servicing by Sears Mortgage Corporation.

MOAC000536

## Summarized Statements of Financial Position

| millions | 1991 | December 31 1990 |
|---|---|---|
| **Assets** | | |
| Investments | | |
| Real estate investments (note 1) | $2,000.7 | $1,926.9 |
| Mortgage loans held for investment | 4,669.9 | 3,084.0 |
| Mortgage-backed securities held for investment | 48.9 | 267.7 |
| Mortgage-backed securities and mortgage loans held for sale | 1,764.4 | 1,279.4 |
| Investments in and advances to real estate joint ventures (note 2) | 354.9 | 332.6 |
| Total investments | 8,838.8 | 6,890.6 |
| Cash and invested cash | 204.5 | 237.9 |
| Office properties and equipment, less accumulated depreciation of $110.5 and $98.8 | 115.8 | 118.3 |
| Prepaid expenses and other assets | 370.8 | 259.8 |
| Commissions and other receivables | 328.8 | 296.0 |
| Other assets | 66.3 | 49.8 |
| **Total assets** | **$9,925.0** | **$7,852.4** |
| **Liabilities** | | |
| Long-term debt | $1,189.3 | $1,071.1 |
| Loans payable | 2,936.3 | 1,986.3 |
| Deposits and advances (note 3) | 4,342.6 | 3,243.3 |
| Securities sold under agreements to repurchase | 96.8 | 306.4 |
| Deferred income taxes | 112.1 | 116.2 |
| Other liabilities | 440.8 | 382.5 |
| **Total liabilities** | **9,117.9** | **7,105.8** |
| **Capital** | **807.1** | **746.6** |
| **Total liabilities and capital** | **$9,925.0** | **$7,852.4** |

See notes to Consolidated and Coldwell Banker Real Estate Group summarized financial statements.

## Analysis of Operations continued

Commissions and direct costs increased 5.7% from 1990 primarily as a result of higher direct operating costs of Homart properties and in line with Residential commission revenue. Residential implemented a revision to its commission structure which improved the percentage of commission revenues retained by the Group. Operating and administrative expenses increased 4.4% as compared to 1990, reflecting higher costs incurred by Sears Mortgage Corporation as a result of a doubling in branch mortgage loan production from the prior year. Within Residential, operating and administrative expenses decreased 5.1% reflecting the impact of continuing aggressive cost control programs partially offset by increased operating expenses associated with the Schlott acquisition. Interest expense increased 19.5% for the year to support a larger mortgage portfolio and higher warehouse balances in the Mortgage Group, both of which produced favorable interest spread income. Sears Savings Bank continues to adhere to a policy of limiting loan acquisitions to products where acceptable mitigation of interest rate risk is achieved. In 1990, costs and expenses decreased 2.6% primarily as a result of a 17.9% drop in Residential commission expense and cost reduction programs, partially offset by higher operating costs at Homart due to the increase in the number of owned properties.

As expected, the Group's operating income continued to be impacted by operating losses at Homart. Homart's operating losses were $106.6 million in 1991, compared with losses of $88.5 and $79.1 million in 1990 and 1989, respectively. Sales of mature properties, continued project development and increased financial leverage accounted for these higher operating losses, which included noncash charges such as depreciation and amortization amounting to $66.7, $54.4 and $40.0 million in 1991, 1990 and 1989. All other business units within the Group experienced significant improvements in operating income.

Gains on sale of property declined 14.1% to $101.3 million on an after-tax basis. The 1991 gains resulted from the sale of a wholly-owned shopping center, a partial interest in another wholly-owned shopping center and the sale of a community center. The 1990 after-tax gain of $117.9 million resulted from the sale of one wholly-owned shopping center and partial interests in a shopping center and an office building. The 1989 after-tax gains of $131.4 million resulted from the sale of partial interests in three shopping centers.

45

MOAC000537

# COLDWELL BANKER REAL ESTATE GROUP

## SUMMARIZED STATEMENTS OF CASH FLOWS

| millions | | 1991 | 1990 | 1989 |
|---|---|---|---|---|
| **Cash flows from operating activities** | | | | |
| Group income | | $ 60.6 | $ 25.5 | $ 126.7 |
| Adjustments to reconcile group income to net cash provided by operating activities | | | | |
| Depreciation, amortization and other noncash items | | 92.8 | 118.8 | 85.2 |
| Gain on sale of discontinued operation | | — | — | (137.1) |
| Gains on sales of property and investments | | (158.6) | (193.1) | (213.9) |
| Increase (decrease) in deferred taxes | | (4.3) | (10.5) | 54.3 |
| Change in net other operating assets and liabilities | | 54.1 | 101.8 | (319.6) |
| **Net cash provided by (used in) operating activities** | | 44.6 | 42.5 | (404.4) |
| **Cash flows from investing activities** | | | | |
| Proceeds from sales of investments | | 391.4 | 265.0 | 575.7 |
| Purchases of investments | | (424.2) | (477.5) | (275.1) |
| Collections on mortgage-backed securities and mortgage loans | | 597.0 | 572.1 | 535.5 |
| Purchases and originations of mortgage-backed securities and mortgage loans | | (2,578.4) | (1,073.5) | (796.7) |
| Net purchases of property and equipment | | (21.7) | (16.9) | (16.8) |
| **Net cash provided by (used in) investing activities** | | (2,035.9) | (730.8) | 22.6 |
| **Cash flows from financing activities** | | | | |
| Net increase (decrease) in long-term debt | | 118.2 | 2.0 | (16.0) |
| Proceeds from advances from Federal Home Loan Bank | | 1,318.0 | 1,091.0 | 480.0 |
| Repayments of advances from Federal Home Loan Bank | | (1,311.0) | (590.0) | (670.0) |
| Increase (decrease) in deposits | | 1,092.3 | (31.9) | (482.7) |
| Change in net unmatched agreements to resell or repurchase securities | | (209.6) | (278.0) | 645.6 |
| Net increase in short-term borrowings, primarily 90 days or less | | 950.0 | 441.0 | 703.7 |
| Dividends paid to Corporate | | — | (12.8) | (220.6) |
| Net capital transfers from Corporate | | — | 32.4 | 6.1 |
| **Net cash provided by financing activities** | | 1,957.9 | 653.7 | 446.1 |
| **Net increase (decrease) in cash and invested cash** | | $ (33.4) | $ (34.6) | $ 64.3 |
| **Cash and invested cash at beginning of year** | | $ 237.9 | $ 272.5 | $ 208.2 |
| **Cash and invested cash at end of year** | | $ 204.5 | $ 237.9 | $ 272.5 |

See notes to Consolidated and Coldwell Banker Real Estate Group summarized financial statements.

## ANALYSIS OF FINANCIAL CONDITION

The Mortgage Group's investment loan portfolio is valued at cost. If this portfolio were valued at market, the resulting unrealized gains, which are related almost entirely to fixed rate loans, would amount to approximately 1% of mortgage loans held at Dec. 31, 1991. New additions to the portfolio have been limited in recent years to variable rate mortgage loans and fixed rate mortgages with expected short durations which are match funded.

Mortgage loans held for sale are carried at the lower of cost or market as determined in the aggregate. The increase in loans held for sale reflects the significant increase in origination volume during the fourth quarter of 1991. Nonaccrual loans (which are loans 90 days or more past due) and restructured loans were 1.1% of total mortgage loans at Dec. 31, 1991.

Net cash provided by operations was $44.6 million in 1991 and $42.5 million in 1990. The major source of cash in 1991 and 1990 was income adjusted for noncash items.

Cash used in investing activities was $2.04 billion in 1991 and $730.8 million in 1990. The major investment uses of cash were mortgage loans and real estate investments in both years.

Cash provided from financing activities was $1.96 billion in 1991 compared with $653.7 million in 1990. Beginning in 1991, the Group's short-term funding was provided by Corporate, with $2.05 billion of intercompany loans outstanding at Dec. 31, 1991. Interest is charged at a rate approximating the Company's short-term cost of funds.

Joint venture shopping centers and office buildings are developed primarily with borrowings related to those joint ventures and, therefore, are not reflected on the Group's Statements of Financial Position or Statements of Cash Flows.

## NOTES TO SUMMARIZED FINANCIAL STATEMENTS

### Summary of significant accounting policies

#### Basis of presentation

The summarized financial statements of Coldwell Banker Real Estate Group include real estate development, management, brokerage, mortgage banking and related financial services. The Group carries its investment in joint ventures at cost plus its undistributed share of earnings and losses since inception.

#### Real estate

Real estate commissions on sales are credited to income upon close of escrow or upon transfer of title. Sales commissions expense is recorded concurrently with the income transaction to which it relates. Percentage rental revenue is based on tenant sales and is recognized in the period in which the sales occur. Initial leasing costs applicable to company-owned real estate are deferred and amortized over the average life of the related leases on a straight-line basis.

#### Mortgage banking

Mortgage loans and mortgage-backed securities held for investment are carried at cost as it is management's intention to hold these loans to maturity. Mortgage loans and mortgage-backed securities held for sale are carried at the lower of cost or market as determined in the aggregate.

Fees for servicing loans for investors are recognized as income as the related mortgage payments are collected. For loans sold with servicing retained, excess servicing fees are recognized as an adjustment to the gain or loss on the sale of the loans. The costs of mortgage servicing purchased are deferred and amortized over the estimated average life of the related loans on a basis that approximates the estimated future stream of net servicing income.

Interest on loans is credited to income as earned to the extent considered collectible. Loan origination and commitment fees and certain direct loan origination costs are deferred and amortized to income over the estimated lives of the loans.

### 1. Real estate investments

| millions | December 31, 1991 | | | December 31, 1990 | | |
|---|---|---|---|---|---|---|
| | Operating | Held for or under development | Total | Operating | Held for or under development | Total |
| Land | $ 149.4 | $253.0 | $ 402.4 | $ 147.5 | $191.5 | $ 339.0 |
| Buildings, improvements and equipment | 1,366.3 | — | 1,366.3 | 1,227.6 | — | 1,227.6 |
| Construction and development costs | - | 233.8 | 233.8 | — | 181.2 | 181.2 |
| Residential relocation property held for clients | - | 214.1 | 214.1 | — | 235.7 | 235.7 |
| | 1,515.7 | 700.9 | 2,216.6 | 1,375.1 | 608.4 | 1,983.5 |
| Accumulated depreciation and amortization | 215.9 | — | 215.9 | 56.6 | — | 56.6 |
| Total | $1,299.8 | $700.9 | $2,000.7 | $1,318.5 | $608.4 | $1,926.9 |

The amount of interest and taxes capitalized in connection with property held for or under development was $23.1, $31.8 and $37.9 million for the years ended Dec. 31, 1991, 1990 and 1989, respectively. Residential relocation property is held on behalf of corporate clients who generally assume all holding costs and risks.

### 2. Real estate joint ventures

At year-end 1991, Homart was a partner in 33 joint ventures formed to develop and operate regional shopping centers and other commercial property. Homart, with its partners, has jointly and/or severally guaranteed $97.6 million in borrowings for joint ventures in which it is a partner.

At Dec. 31, 1991 and 1990, combined joint venture assets (primarily shopping centers and office buildings including property under development) totaled $1.19 and $1.25 billion, and liabilities (primarily long-term debt and construction loans) totaled $520.3 and $647.2 million, respectively. Joint venture revenues for the years ended Dec. 31, 1991, 1990 and 1989 were $127.6, $123.3 and $134.1 million, respectively. Operating income (loss) before gains on property sales was $1.5, ($1.1) and $5.2 million in 1991, 1990 and 1989. Homart's share of joint venture gains on property sales of $0.6, $0.4 and $0.1 million for the years 1991, 1990 and 1989 are included in the caption "Gain on sale of property" in the accompanying Statements of Income.

### 3. Deposits and advances by type follow:

| $ millions | December 31 | |
|---|---|---|
| | 1991 | 1990 |
| Demand and passbook accounts | $ 138.3 | $ 63.7 |
| Consumer certificate accounts | 2,363.1 | 1,710.5 |
| $100,000 minimum certificate accounts | 1,183.2 | 818.1 |
| FHLB advances | 658.0 | 651.0 |
| Total | $4,342.6 | $3,243.3 |
| Weighted average interest rate at Dec. 31 | 6.89% | 8.31% |

A summary of deposits and advances by year of maturity follows:

| millions | December 31, 1991 |
|---|---|
| Demand and passbook accounts | $ 138.3 |
| Certificate accounts and advances maturing in: | |
| 1992 | 1,968.9 |
| 1993 | 721.1 |
| 1994 | 468.3 |
| 1995 | 279.8 |
| 1996 and thereafter | 766.2 |
| Total | $4,342.6 |

MOAC000539

# SEARS, ROEBUCK AND CO.

## RESPONSIBILITY FOR FINANCIAL STATEMENTS

The financial statements, including the financial analysis and all other information in this annual report, were prepared by management which is responsible for their integrity and objectivity. Management believes the financial statements, which require the use of certain estimates and judgments, fairly and accurately reflect the Company's financial position and operating results, in accordance with generally accepted accounting principles. All financial information in this annual report is consistent with the financial statements.

Management maintains a system of internal controls which it believes provides reasonable assurance that, in all material respects, assets are maintained and accounted for in accordance with management's authorizations and transactions are recorded accurately in the books and records. The concept of reasonable assurance is based on the premise that the cost of internal controls should not exceed the benefits derived. To assure the effectiveness of the internal control system, the organizational structure provides for defined lines of responsibility and delegation of authority. The Company's formally stated and communicated policies demand of employees high ethical standards in their conduct of its business. These policies address, among other things, potential conflicts of interest; compliance with all domestic and foreign laws, including those related to financial disclosure; and the confidentiality of proprietary information. As a further enhancement of the above, the Company's comprehensive internal audit program is designed for continual evaluation of the adequacy and effectiveness of its internal controls and measures adherence to established policies and procedures.

Deloitte & Touche, independent certified public accountants, have audited the financial statements of the Company and their report is presented below. Their audit also includes a study and evaluation of the Company's control environment, accounting systems and control procedures. The independent accountants and internal auditors advise management of the results of their reviews, and make recommendations to improve the system of internal controls. Management evaluates the audit recommendations and takes appropriate action.

The Audit Committee of the Board of Directors is comprised entirely of directors who are not employees of the Company. The committee reviews audit plans, internal controls, financial reports and related matters and meets regularly with the Company's management, internal auditors and independent accountants. The independent accountants and the internal auditors advise the committee of any significant matters resulting from their audits of our financial statements and internal controls and have free access to the committee without management being present.

Edward A. Brennan
Chairman, President
and Chief Executive Officer

Edward M. Liddy
Senior Vice President and
Chief Financial Officer and
Acting Comptroller

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors
Sears, Roebuck and Co.

We have audited the accompanying Consolidated Statements of Financial Position of Sears, Roebuck and Co. as of December 31, 1991 and 1990, and the related Consolidated Statements of Income, Shareholders' Equity and Cash Flows for each of the three years in the period ended December 31, 1991. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Sears, Roebuck and Co. as of December 31, 1991 and 1990, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1991, in conformity with generally accepted accounting principles.

As discussed in the summary of significant accounting policies, the Company changed its accounting for income taxes in 1991.

*Deloitte & Touche*

February 28, 1992
Chicago, Illinois

MOAC000540

# CORPORATE RESPONSIBILITY

*Corporate responsibility continues to mean many things to us. It is the fair and equitable treatment of all our stakeholders including associates, shareholders, customers and suppliers. It is our sense of concern for the well-being of the public at large and for our environment. And it is the time and money that we contribute toward strengthening the communities where we do business.*

In 1991, The Sears-Roebuck Foundation and Sears business groups continued to work toward strengthening communities across the country through associate involvement and strategic grants totaling more than $19.8 million in cash contributions. These contributions included funding to support education, the arts and civic affairs and to address human services needs. In addition, Sears Merchandise Group donated a former retail store building valued at more than $7.5 million to Dade County, Florida to be used by the Performing Arts Center Trust as the Miami Arts Center.

Education was the cornerstone of The Sears-Roebuck Foundation programs. The Foundation provided more than $1.0 million to 700 private colleges and universities through its Teaching Excellence and Campus Leadership Awards program and through grants to the United Negro College Fund and the Hispanic Association of Colleges and Universities.

United Way continued to be a primary vehicle of Sears business groups' collective support of communities across the country. The corporation contributed $7.4 million and associates pledged more than $13.9 million to local United Ways.

In 1991, Sears business groups provided special support for U.S. military personnel participating in Operation Desert Shield/Desert Storm and their families. Sears Merchandise Group led the way, with Sears stores providing public collection points for the USO funds established to help ease the financial difficulties of military families. And Prodigy, the IBM/Sears joint venture, offered a free program allowing members to send letters to Operation Desert Shield/Desert Storm personnel. Additionally, the Merchandise Group contributed more than $6.9 million to local programs including the United Way.

Nationwide in 1991, The Allstate Foundation provided support totaling $6.0 million to the United Way and other human services organizations; to loss prevention programs addressing health issues and automotive safety; and to community revitalization programs. Two of its 1991 grant recipients were The National Center for Neighborhood Enterprise, a national organization that helps community leaders attack problems facing residents of low income neighborhoods; and the occupant safety and anti-drunk driving campaign of the General Federation of Women's Clubs.

In addition to its continuing participation in United Way campaigns, Dean Witter funded a wide range of national and local community-support programs. In 1991, Discover Card Services, Inc. introduced its Discover Card Tribute to

Young America program to recognize youth through financial education and scholarship programs. In addition, Discover Card continues to be a major sponsor of the Make-A-Wish Foundation, which grants the wishes of children with life-threatening illnesses. Discover Card helped the agency raise more than $992,000 in 1991 through a special Christmas promotion with toy merchants across the United States, the Discover Card Stars on Ice™ revue and Cardmember Cashback Bonus donations.

Coldwell Banker Residential continues to participate as a national co-sponsor of the U.S. Marine Corps annual Toys for Tots campaign with sales associates nationwide gathering gifts for needy children. Homart shopping centers' annual Spirit of Giving program raised over $262,000 for local charities through the sale of shopping bags and gift wrapping services. In addition, generous shoppers donated over $826,000 in gifts through "Giving Trees", which contained the wish lists of underprivileged children.

Through these and other initiatives, Sears, Roebuck and Co. will continue its commitment to upholding its reputation as a responsible corporate citizen. Additional information about our community involvement is provided in the Sears, Roebuck and Co. Corporate Responsibility Report. To obtain a copy, refer to the back cover of this annual report.

Sears has a policy designed to minimize the possibility of inadvertent importation into the United States by Sears of goods made by forced or convict labor in mainland China. Any shareholder interested in receiving a copy of the policy may write to the Secretary, Sears, Roebuck and Co., Sears Tower, 68th Floor, Chicago, Illinois 60684.

**Sears, Roebuck and Co. Principal Domestic Business Groups**
Percentages of Female and Minority Employees in each Job Category defined by the Equal Employment Opportunity Commission

| Job Categories | Female | Black | Hispanic | Asian/ Pacific Islander | American Indian/ Alaskan Native | Total Employees in thousands |
|---|---|---|---|---|---|---|
| Officials and Managers | 37.8 | 8.1 | 4.1 | 1.0 | 0.4 | 37.7 |
| Professionals | 47.9 | 12.5 | 5.1 | 3.4 | 0.3 | 18.8 |
| Technicians | 50.7 | 12.3 | 6.4 | 3.9 | 0.5 | 5.7 |
| Salesworkers | 52.2 | 14.4 | 6.9 | 1.7 | 0.7 | 159.3 |
| Office and Clerical | 85.3 | 16.3 | 6.7 | 2.3 | 0.6 | 98.9 |
| Craftworkers | 4.4 | 10.8 | 7.6 | 1.6 | 0.6 | 35.0 |
| Operatives | 5.2 | 18.4 | 10.3 | 1.5 | 0.9 | 11.0 |
| Laborers | 31.0 | 22.9 | 10.9 | 1.2 | 0.6 | 41.0 |
| Service Workers | 22.5 | 19.1 | 9.5 | 1.7 | 0.6 | 6.1 |
| Total, December 1991 | 50.7 | 14.9 | 7.1 | 1.8 | 0.6 | 413.5 |

**Sears Merchandise Group Purchases**
Goods and Services

| | 1991 |
|---|---|
| Minority owned* | $111,979,204 |
| Woman owned** | $152,587,562 |
| Total | $264,566,766 |

*Includes men and women
**Non minority women only.

Sears, Roebuck and Co., a New York corporation, is headquartered in Sears Tower, Chicago, Illinois.
© Sears, Roebuck and Co. 1992

MOAC000541

# CORPORATE INFORMATION

**Annual Meeting**

The Annual Meeting of Shareholders of Sears, Roebuck and Co. will be held in the Phoenix Ballroom at the JW Marriott Hotel at Lenox, 3300 Lenox Road, Atlanta, Georgia, on Thursday, May 14, 1992, at 10:00 a.m., Atlanta time.

**Investor Information**

Analysts and investment professionals should direct inquiries to:

Corporate Investor Relations
Sears, Roebuck and Co.
Sears Tower–Department 962
Chicago, IL 60684
312/875-1468

**General Information**

The following are available upon request without charge:

- a copy of the Form 10-K Annual Report filed with the Securities and Exchange Commission for the year ended December 31, 1991;
- an audio cassette tape of the company's 1991 Annual Report for use by the visually impaired;
- a copy of the Sears, Roebuck and Co. Corporate Responsibility Report which includes The Sears–Roebuck Foundation 1991 Report;
- interim financial information.

Requests for the above information should be addressed to:

Public Affairs
Sears, Roebuck and Co.
Sears Tower
Chicago, IL 60684
312/875-9785

**Transfer Agent/ Shareholder Records**

For information or assistance regarding individual stock records, transactions, dividend reinvestment accounts, dividend checks or stock certificates, contact:

First Chicago Trust Company of New York
P.O. Box 3931
Church Street Station
New York, NY 10008-3931
212/791-3357

**Registrar**

First Chicago Trust Company of New York

 Printed on Recycled Paper

MOAC000542

Exhibit 22

Subsidiaries

The significant subsidiaries of Sears, Roebuck and Co., the names under which such subsidiaries do business, and the states or countries in which each was organized, were as follows at December 31, 1991:

| Name | Place of Organization |
|---|---|
| **Consolidated Subsidiaries:** | |
| Allstate Insurance Company | Illinois |
|    Allstate Life Insurance Company | Illinois |
|    PMI Mortgage Insurance Co. | Arizona |
| Coldwell, Banker & Company | California |
|    Sears Mortgage Corporation | Ohio |
| Coldwell Banker Real Estate Group, Inc. | Delaware |
| Homart Holding Company of Delaware, Inc. | Delaware |
|    Homart Development Co. | Delaware |
| Dean Witter Financial Services Group Inc. | Delaware |
|    Dean Witter Reynolds Inc. | Delaware |
|    Dean Witter Reynolds International Incorporated | Delaware |
| Discover Credit Corp. | Delaware |
| Sears Canada Inc. | Canada |
|    Sears Acceptance Company Inc. | Canada |
| Sears Roebuck de Mexico, S.A. de C.V. | Mexico |
| Sears Consumer Financial Corporation | Delaware |
|    Greenwood Trust Company | Delaware |
|       Discover Card Services, Inc. | Delaware |
|    SCFC Receivables Financing Corporation | Delaware |
|    SCFC Receivables Corp. | Delaware |
|       Discover Receivables Financing Corporation | Delaware |
|       Discover Receivables Financing Group, Inc. | Delaware |
|    Sears Consumer Financial Corporation of Delaware | Delaware |
|    SPS Transaction Services, Inc. | Delaware |
| Sears Overseas Finance N.V. | Netherlands Antilles |
| Sears Receivables Financing Group, Inc. | Delaware |
| Sears Roebuck Acceptance Corp. | Delaware |
| Sears Savings Bank | California |
| Western Auto Supply Company | Delaware |
| 345 other companies | Various |

The Company owns 20% to 50% of the outstanding voting securities of 67 companies which are accounted for on an equity method.

The Company has investments in a number of other corporations representing substantial percentages (but not more than 20 percent) of their outstanding capital stock. The Company disclaims control of any such companies.

MOAC000543

Exhibit 29.

57
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
....................................................................
(Name)

57
Form 2

## SCHEDULE P - ANALYSIS OF LOSSES AND LOSS EXPENSES
Notes to Schedule P

(1) The Parts of Schedule P:
   Part 1 — detailed information on losses and loss expenses.
   Part 2 — history of incurred losses and allocated expenses.
   Part 3 — history of loss and allocated expense payments.
   Part 4 — Loss Portfolio Transfers.
   Part 5 — schedule for claims-made policies.
   Part 6 — history of bulk and incurred-but-not reported reserves.
   Schedule P interrogatories

(2) Lines of business A through N and R are groupings of the lines of business used on Page 14, the state page.

(3) Reinsurance A, B, C, and D (lines A to G) are:
   Reinsurance A = nonproportional property (1988 and subsequent)
   Reinsurance B = nonproportional liability (1988 and subsequent)
   Reinsurance C = Financial Lines (1988 and subsequent)
   Reinsurance D = old Schedule O line 30 (1987 and prior)

(4) The instructions to Schedule P contain direction necessary for filling out Schedule P.

## SCHEDULE P - PART 1 - SUMMARY
($000 omitted)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported — Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 + 8 - 9 + 10) | 12 |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | 136,424 | 37,143 | 41,814 | 26,704 | 2,377 | 6,385 | 120,230 | X X X X |
| 2. 1982 | 6,344,135 | 601,668 | 5,737,467 | 4,382,253 | 170,722 | 21,889 | 208,492 | 246,624 | 458,830 | 4,680,609 | X X X X |
| 3. 1983 | 6,616,637 | 663,656 | 6,142,383 | 5,038,807 | 698,204 | 218,178 | 20,340 | 295,984 | 498,380 | 5,006,323 | X X X X |
| 4. 1984 | 7,231,167 | 580,366 | 6,643,213 | 5,288,303 | 526,776 | 10,377 | 296,984 | 518,206 | 6,486,602 | | X X X X |
| 5. 1985 | 7,929,066 | 666,407 | 7,204,649 | 5,790,838 | 436,911 | 239,992 | 740 | 319,894 | 560,566 | 6,066,359 | X X X X |
| 6. 1986 | 9,220,623 | 557,087 | 8,482,536 | 6,282,880 | 603,205 | 740,116 | 6,983 | 349,383 | 616,604 | 6,666,772 | X X X X |
| 7. 1987 | 10,988,765 | 600,367 | 10,575,408 | 7,146,361 | 527,753 | 266,489 | 1,782 | 409,183 | 703,122 | 7,572,640 | X X X X |
| 8. 1988 | 12,462,115 | 807,744 | 11,653,372 | 8,195,662 | 698,002 | 244,589 | 3,836 | 479,836 | 804,283 | 8,694,606 | X X X X |
| 9. 1989 | 13,695,823 | 419,214 | 12,480,618 | 8,790,833 | 439,662 | 223,961 | 2,532 | 519,083 | 880,860 | 9,460,666 | X X X X |
| 10. 1990 | 14,068,486 | 327,478 | 13,256,788 | 8,664,926 | 325,606 | 327,077 | 700 | 686,266 | 834,334 | 9,998,022 | X X X X |
| 11. 1991 | 14,991,800 | 345,061 | 14,642,659 | 5,680,926 | 60,587 | 41,398 | 506 | 302,482 | 709,394 | 6,667,371 | X X X X |
| 12. Totals | X X X X | X X X X | X X X X | 63,788,643 | 4,436,436 | 1,989,002 | 98,668 | 3,618,214 | 6,530,822 | 60,790,606 | X X X X |

Note: For "prior" report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding — Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 660,951 | 213,567 | 485,982 | 174,398 | 89,225 | 33,066 | 99,861 | 41,470 | 50,819 | 575,632 | X X X X |
| 2. 1982 | 138,417 | 53,888 | 43,956 | 33,143 | 30,612 | 2,406 | 8,797 | 4,672 | 1,666 | 93,467 | X X X X |
| 3. 1983 | 106,792 | 42,730 | 17,750 | 9,160 | 12,466 | 3,399 | 10,587 | 2,009 | 1,636 | 102,864 | X X X X |
| 4. 1984 | 82,960 | 20,452 | 55,800 | 4,300 | 19,433 | 2,308 | 12,321 | 1,061 | 1,826 | 137,814 | X X X X |
| 5. 1985 | 155,342 | 24,630 | 31,830 | 7,011 | 29,106 | 1,644 | 3,612 | 106 | 3,382 | 149,227 | X X X X |
| 6. 1986 | 182,080 | 16,609 | 41,321 | 1,902 | 31,882 | 4,882 | 4,000 | 63 | 4,667 | 229,248 | X X X X |
| 7. 1987 | 304,688 | 25,612 | 73,797 | 2,618 | 50,633 | 3,289 | 8,793 | 121 | 13,384 | 466,227 | X X X X |
| 8. 1988 | 566,706 | 29,608 | 120,388 | 4,811 | 64,383 | 4,710 | 35,076 | 306 | 25,030 | 772,862 | X X X X |
| 9. 1989 | 906,071 | 57,432 | 208,422 | 6,908 | 150,318 | 6,643 | 22,887 | 767 | 53,318 | 1,368,283 | X X X X |
| 10. 1990 | 1,764,663 | 335,488 | 666,838 | 11,200 | 284,881 | 6,497 | 48,798 | 766 | 102,196 | 2,672,636 | X X X X |
| 11. 1991 | 3,609,196 | 61,896 | 1,231,413 | 43,436 | 324,993 | 5,180 | 102,789 | 1,302 | 324,077 | 5,530,346 | X X X X |
| 12. Totals | 8,012,790 | 587,182 | 2,812,608 | 272,804 | 1,088,436 | 67,340 | 380,060 | 73,343 | 542,309 | 12,289,091 | X X X X |

| Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentages (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 31 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | Loss Expense | | 33 Losses Unpaid | 34 Loss Expense Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 747,973 | 167,480 |
| 2. 1982 | 5,157,682 | 564,190 | 4,593,622 | 83.0 | 90.9 | 80.1 | | | | 79,409 | 13,848 |
| 3. 1983 | 5,901,806 | 783,342 | 5,118,347 | 109.9 | 83.1 | | | | | 92,667 | 20,267 |
| 4. 1984 | 6,390,860 | 573,261 | 5,823,368 | 85.7 | 97.4 | 84.6 | | | | 133,682 | 24,314 |
| 5. 1985 | 6,627,864 | 488,336 | 6,192,656 | 84.6 | 75.2 | 86.0 | | | | 306,896 | 25,368 |
| 6. 1986 | 7,376,818 | 508,486 | 6,870,320 | 79.6 | 90.7 | 79.1 | | | | 367,989 | 30,646 |
| 7. 1987 | 8,086,663 | 536,828 | 8,088,667 | 72.5 | 84.0 | 78.0 | | | | 371,786 | 74,442 |
| 8. 1988 | 10,030,866 | 744,373 | 9,286,577 | 80.3 | 92.1 | 79.6 | | | | 641,380 | 130,989 |
| 9. 1989 | 11,200,123 | 432,043 | 10,839,278 | 66.2 | 132.0 | 66.3 | | | | 1,341,366 | 278,896 |
| 10. 1990 | 11,863,666 | 376,730 | 11,476,936 | 82.7 | 83.9 | 83.4 | | | | 2,184,783 | 367,661 |
| 11. 1991 | 12,276,906 | 398,161 | 12,077,767 | 81.9 | 98.6 | 82.9 | | | | 4,766,886 | 745,331 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 10,466,786 | 1,793,308 |

*Net = (24 - 25) ** (11 + 22)

5B

Form P

**CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS**

(Name)

## SCHEDULE P - PART 2 - SUMMARY

| 1 Years in Which Losses Were Incurred | Incurred Losses and Allocated Expenses Reported At Year End (000 omitted) | | | | | | | | | | Development*** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 One Year | 13 Two Year |
| 1. Prior | 2,425,499 * | 2,315,804 | 2,278,036 | 2,351,354 | 2,435,504 | 2,655,655 | 2,673,266 | 2,965,285 | 3,101,637 | 3,311,806 | 209,602 | 326,224 |
| 2. 1982 | 4,110,321 | 4,118,923 | 4,066,480 | 4,063,630 | 4,041,393 | 4,116,667 | 4,121,338 | 4,130,176 | 4,137,066 | 4,133,366 | 16,271 | 23,392 |
| 3. 1983 | X X X X | 4,505,973 | 4,602,063 | 4,604,320 | 4,573,674 | 4,585,243 | 4,608,474 | 4,604,678 | 4,631,276 | 4,638,379 | 6,906 | 39,363 |
| 4. 1984 | X X X X | X X X X | 5,093,063 | 5,044,644 | 5,065,682 | 5,070,260 | 5,072,520 | 5,074,607 | 5,082,224 | 5,109,136 | 26,916 | 34,536 |
| 5. 1985 | X X X X | X X X X | X X X X | 5,660,362 | 5,630,531 | 5,863,944 | 5,829,340 | 5,913,506 | 5,601,628 | 5,623,579 | 21,951 | 30,673 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 6,365,043 | 6,347,386 | 6,294,043 | 6,360,327 | 6,247,311 | 6,249,329 | 2,028 | (10,562) |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 7,390,371 | 7,354,930 | 7,302,381 | 7,295,237 | 7,304,680 | 9,243 | 2,199 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 6,615,872 | 8,486,075 | 8,463,483 | 8,436,966 | (26,898) | (49,490) |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 9,774,680 | 9,923,863 | 9,664,455 | (30,093) | 109,866 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 10,634,462 | 20,540,466 | (93,804) | X X X X |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 31,060,282 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 133,997 | 464,344 |

*Reported reserves only. Subsequent development relates only to subsequent payments and reserves.

**Current year loss first or second prior year, showing (redundant) or adverse.

## SCHEDULE P - PART 3 - SUMMARY

| 1 Years in Which Losses Were Incurred | Cumulative Paid Losses and Allocated Expenses At Year End (000 omitted) | | | | | | | | | | 12 Number of Claims Closed With Loss Payment | 13 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | | |
| 1. Prior | 000 | 750,228 | 1,214,026 | 1,546,389 | 1,750,326 | 1,934,633 | 2,072,627 | 2,212,281 | 2,332,254 | 2,645,096 | X X X X | X X X X |
| 2. 1982 | 2,324,285 | 3,150,502 | 3,530,233 | 3,727,283 | 3,847,668 | 3,928,006 | 3,974,629 | 4,006,506 | 4,031,660 | 4,043,836 | X X X X | X X X X |
| 3. 1983 | X X X X | 2,492,064 | 3,534,466 | 3,916,061 | 4,155,052 | 4,251,600 | 4,339,237 | 4,436,524 | 4,475,013 | 4,504,003 | X X X X | X X X X |
| 4. 1984 | X X X X | X X X X | 2,784,800 | 3,897,990 | 4,162,540 | 4,618,392 | 4,785,633 | 4,869,173 | 4,931,327 | 4,973,146 | X X X X | X X X X |
| 5. 1985 | X X X X | X X X X | X X X X | 3,304,804 | 4,378,236 | 4,666,396 | 5,396,521 | 5,321,685 | 5,419,001 | 5,680,714 | X X X X | X X X X |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 3,603,547 | 4,643,636 | 5,405,363 | 5,718,095 | 5,910,319 | 6,030,388 | X X X X | X X X X |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 3,904,185 | 5,687,631 | 6,293,677 | 6,626,913 | 6,871,318 | X X X X | X X X X |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 4,615,194 | 6,475,828 | 7,252,324 | 7,690,387 | X X X X | X X X X |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 5,347,819 | 7,710,177 | 6,549,616 | X X X X | X X X X |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 5,878,957 | 6,070,358 | X X X X | X X X X |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 5,043,013 | X X X X | X X X X |

Note: Net of salvage and subrogation received.

## SCHEDULE P - PART 6 - SUMMARY

| 1 Years in Which Losses Were Incurred | Bulk and Incurred But Not Reported Reserves on Losses and Allocated Expenses at Year End (000 omitted) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 |
| 1. Prior | 509,127 | 356,715 | 209,637 | 103,846 | 192,030 | 256,763 | 306,956 | 292,634 | 284,968 | 353,970 |
| 2. 1982 | 453,331 | 133,123 | 32,648 | 43,936 | 56,168 | 76,307 | 61,445 | 35,832 | 34,447 | 34,929 |
| 3. 1983 | X X X X | 462,405 | 340,376 | 77,099 | 67,661 | 73,821 | 57,860 | 48,537 | 45,647 | 36,167 |
| 4. 1984 | X X X X | X X X X | 653,126 | 140,236 | 109,260 | 80,207 | 60,952 | 52,601 | 43,630 | 42,169 |
| 5. 1985 | X X X X | X X X X | X X X X | 550,673 | 191,957 | 320,960 | 72,797 | 60,923 | 35,006 | 31,327 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 648,456 | 244,936 | 144,714 | 83,863 | 50,200 | 44,648 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 644,627 | 331,868 | 177,062 | 104,086 | 81,949 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | 1,007,847 | 568,846 | 276,636 | 226,836 | 199,954 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,007,839 | 432,173 | 224,926 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,326,732 | 801,636 |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 2,299,974 |

59
Form 8

59
Form 8

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

........................................................
(Name)

## SCHEDULE P - PART 1A - HOMEOWNERS/FARMOWNERS

(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 9) - 8 + 10) | 12 Number of Claim Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | 1,794 | | 945 | 7 | 106 | 266 | 3,008 | X X X X |
| 2. 1982 | 1,326,361 | 8,786 | 1,317,575 | 724,187 | 16 | 28,240 | 7 | 7,464 | 75,821 | 815,286 | 816,671 |
| 3. 1983 | 1,187,432 | 9,274 | 1,178,158 | 806,438 | 33,562 | 33,290 | 27 | 11,534 | 66,806 | 891,338 | 884,245 |
| 4. 1984 | 1,238,332 | 10,334 | 1,227,998 | 787,894 | (2,458) | 35,404 | 6 | 9,566 | 83,872 | 909,338 | 835,840 |
| 5. 1985 | 1,322,834 | 12,807 | 1,309,707 | 826,890 | 7,209 | 37,096 | | 10,313 | 104,308 | 1,031,043 | 928,838 |
| 6. 1986 | 1,433,834 | 17,747 | 1,416,037 | 897,924 | 669 | 37,388 | 85 | 8,706 | 117,286 | 1,043,443 | 838,832 |
| 7. 1987 | 1,729,463 | 11,403 | 1,718,060 | 1,033,864 | 253 | 34,628 | 20 | 6,539 | 142,634 | 1,232,660 | 592,453 |
| 8. 1988 | 1,931,733 | 15,705 | 1,917,978 | 1,206,681 | 194 | 34,830 | 22 | 10,402 | 187,776 | 1,432,129 | 908,829 |
| 9. 1989 | 2,069,957 | 18,576 | 2,043,428 | 1,418,865 | 44,088 | 34,204 | 62 | 9,818 | 191,663 | 1,737,666 | 1,237,666 |
| 10. 1990 | 2,265,751 | 18,833 | 2,246,658 | 1,694,806 | | 25,199 | | 8,177 | 364,522 | 1,682,606 | 1,132,647 |
| 11. 1991 | 2,442,936 | 20,398 | 2,422,540 | 1,382,533 | | 13,066 | | 3,367 | 340,238 | 1,506,819 | 1,168,375 |
| 12. Totals | X X X X | X X X X | X X X X | 10,882,363 | 137,265 | 311,293 | 237 | 89,437 | 1,290,477 | 12,394,411 | X X X X |

Notes for "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expense Unpaid | 22 Total Losses and Expenses Unpaid | 23 Number of Claim Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 1,748 | | | | 312 | | | | | 2,060 | 308 |
| 2. 1982 | 702 | | | | 107 | | | | 75 | 884 | 83 |
| 3. 1983 | 1,830 | 13 | 3 | | 272 | | | | 21 | 1,600 | 92 |
| 4. 1984 | 2,695 | 23 | 3,216 | 8 | 512 | 146 | | 1 | 302 | 7,064 | 208 |
| 5. 1985 | 4,465 | 63 | 9,346 | 9 | 3,170 | 276 | | 1 | 611 | 13,823 | 339 |
| 6. 1986 | 21,464 | 109 | 7,332 | 5 | 8,278 | 367 | | 1 | 1,092 | 22,811 | 645 |
| 7. 1987 | 39,366 | 17 | 10,526 | 34 | 3,751 | 863 | | 3 | 1,390 | 47,956 | 995 |
| 8. 1988 | 37,344 | 4 | 37,043 | 55 | 7,496 | 603 | | 4 | 3,197 | 60,940 | 1,825 |
| 9. 1989 | 87,349 | 224 | 37,613 | 67 | 11,278 | 1,923 | | 6 | 8,466 | 119,864 | 3,230 |
| 10. 1990 | 105,688 | | 70,233 | 168 | 19,326 | 3,981 | | 20 | 10,177 | 260,655 | 6,867 |
| 11. 1991 | 348,569 | 29,317 | 208,738 | 21,519 | 20,816 | 10,507 | 850 | 24 | 64,722 | 600,398 | 65,360 |
| 12. Totals | 533,878 | 29,864 | 365,703 | 21,849 | 76,357 | 817 | | 16,566 | 62 | 77,608 | 1,678,728 | 84,464 |

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 1,748 | 312 |
| 2. 1982 | 816,192 | 22 | 816,170 | 72.8 | 0.3 | 73.0 | | | | 702 | 382 |
| 3. 1983 | 924,777 | 33,660 | 891,387 | 78.1 | 302.3 | 75.6 | | | | 1,822 | 367 |
| 4. 1984 | 923,483 | (2,937) | 918,378 | 73.0 | (28.2) | 74.6 | | | | 6,064 | 880 |
| 5. 1985 | 3,092,157 | 7,333 | 1,084,864 | 82.6 | 57.3 | 82.8 | | | | 31,248 | 2,056 |
| 6. 1986 | 1,079,727 | 7,075 | 1,069,652 | 71.7 | 6.0 | 72.6 | | | | 30,656 | 3,716 |
| 7. 1987 | 1,255,738 | 338 | 1,254,894 | 72.6 | 1.0 | 73.0 | | | | 55,857 | 6,309 |
| 8. 1988 | 1,498,132 | 243 | 1,498,000 | 77.6 | 1.9 | 78.1 | | | | 64,344 | 13,672 |
| 9. 1989 | 1,958,006 | 58,422 | 1,856,586 | 93.2 | 629.9 | 84.3 | | | | 94,809 | 18,679 |
| 10. 1990 | 1,881,658 | 150 | 1,883,441 | 83.8 | 0.6 | 84.2 | | | | 178,778 | 35,082 |
| 11. 1991 | 2,357,873 | 61,362 | 2,306,011 | 88.3 | 260.8 | 86.9 | | | | 506,689 | 83,829 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 907,976 | 370,882 |

*Net = (24 - 25) = (11 + 22)

MOAC000546

60
Form 2

60
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

......................................................
(Name)

## SCHEDULE P - PART 1B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

(000 omitted)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premium Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported — Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 - 8 + 10) | 12 |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | 37,195 | 6,746 | 2,866 | 77 | 227 | 1,102 | 27,392 | X X X X |
| 2. 1982 | 2,465,320 | 64,588 | 2,400,732 | 3,702,007 | 60,506 | 83,237 | 1,132 | 217,006 | 207,006 | 1,961,632 | 1,960,097 |
| 3. 1983 | 2,664,958 | 74,275 | 2,590,783 | 3,919,919 | 62,817 | 94,670 | 1,179 | 74,966 | 242,939 | 2,393,304 | 1,676,064 |
| 4. 1984 | 2,859,662 | 80,013 | 2,784,681 | 2,109,666 | 66,624 | 102,357 | 1,013 | 30,280 | 253,500 | 2,393,804 | 1,736,094 |
| 5. 1985 | 3,078,838 | 82,543 | 2,996,373 | 2,361,414 | 43,864 | 113,778 | 1,130 | 34,133 | 245,294 | 2,687,467 | 1,616,961 |
| 6. 1986 | 3,637,647 | 100,064 | 3,507,583 | 2,730,352 | 93,847 | 129,013 | 1,508 | 17,518 | 291,089 | 3,066,677 | 1,911,654 |
| 7. 1987 | 4,202,247 | 149,422 | 4,132,845 | 3,101,809 | 122,772 | 142,823 | 2,243 | 44,452 | 323,301 | 3,451,718 | 2,052,630 |
| 8. 1988 | 4,891,063 | 179,747 | 4,711,333 | 3,432,630 | 132,224 | 134,657 | 2,086 | 50,035 | 360,324 | 3,797,301 | 2,269,017 |
| 9. 1989 | 5,523,023 | 187,695 | 5,335,825 | 3,632,281 | 106,948 | 120,635 | 845 | 53,298 | 398,313 | 4,043,066 | 2,376,549 |
| 10. 1990 | 6,072,806 | 175,302 | 5,947,304 | 3,300,011 | 68,062 | 86,456 | 85 | 45,644 | 377,330 | 3,680,817 | 2,278,115 |
| 11. 1991 | 6,503,792 | 149,565 | 6,354,102 | 3,764,726 | 30,104 | 35,023 | | 24,130 | 251,845 | 2,073,043 | 2,300,192 |
| 12. Totals | X X X X | X X X X | X X X X | 26,336,947 | 621,066 | 1,008,460 | 11,289 | 267,956 | 3,026,413 | 29,343,465 | X X X X |

Note: For "Prior," report amounts paid or received in current year only.

Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding — Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | 8=13 + 17=19 | | Case Basis | | 8=16 + 23=0 | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 152,077 | 82,979 | 1,600 | 167 | 33,830 | 67 | 343 | 16 | | 83,290 | 860 |
| 2. 1982 | 42,300 | 27,619 | 425 | 49 | 3,438 | 39 | 37 | 5 | 176 | 18,368 | 325 |
| 3. 1983 | 43,192 | 20,126 | 711 | 65 | 3,882 | 55 | 65 | 6 | 274 | 27,965 | 473 |
| 4. 1984 | 29,780 | 13,373 | 8,184 | 164 | 3,644 | 600 | 290 | 14 | 869 | 24,971 | 835 |
| 5. 1985 | 42,965 | 17,730 | 2,225 | 64 | 6,838 | 1,000 | 866 | 9 | 1,442 | 40,367 | 1,384 |
| 6. 1986 | 73,227 | 18,243 | 4,926 | 90 | 17,662 | 1,000 | 366 | 9 | 3,343 | 85,412 | 3,064 |
| 7. 1987 | 150,477 | 21,152 | 10,250 | 172 | 24,048 | 2,067 | 736 | 16 | 7,387 | 179,490 | 6,217 |
| 8. 1988 | 237,059 | 26,002 | 30,641 | 644 | 53,047 | 3,730 | 541 | 50 | 16,340 | 388,323 | 13,844 |
| 9. 1989 | 662,461 | 32,945 | 66,942 | 1,638 | 101,738 | 4,056 | 4,966 | 313 | 32,316 | 833,833 | 29,843 |
| 10. 1990 | 1,259,827 | 28,273 | 155,817 | 4,735 | 171,956 | 3,179 | 37,049 | 340 | 70,302 | 1,738,347 | 66,703 |
| 11. 1991 | 2,587,620 | 35,176 | 614,138 | 17,826 | 242,623 | 3,356 | 45,631 | 841 | 101,342 | 3,639,016 | 256,634 |
| 12. Totals | 5,411,102 | 330,797 | 954,500 | 20,550 | 636,968 | 38,406 | 21,752 | 1,435 | 333,393 | 7,028,578 | 380,248 |

| Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expense Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 33 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 71,240 | 11,860 |
| 2. 1982 | 2,059,242 | 81,332 | 3,985,920 | 83.5 | 158.3 | 82.3 | | | | 14,644 | 3,544 |
| 3. 1983 | 2,305,183 | 84,266 | 2,270,895 | 84.6 | 113.6 | 85.7 | | | | 23,655 | 4,240 |
| 4. 1984 | 2,505,672 | 81,046 | 2,418,777 | 88.2 | 101.7 | 87.7 | | | | 20,817 | 6,264 |
| 5. 1985 | 2,794,453 | 97,625 | 2,817,634 | 90.6 | 120.3 | 90.1 | | | | 32,376 | 7,761 |
| 6. 1986 | 3,243,966 | 104,019 | 3,143,089 | 89.3 | 104.3 | 88.8 | | | | 89,829 | 39,802 |
| 7. 1987 | 3,799,497 | 138,327 | 3,611,176 | 88.0 | 92.6 | 87.9 | | | | 167,609 | 31,856 |
| 8. 1988 | 4,345,286 | 364,217 | 4,165,474 | 88.9 | 91.4 | 88.6 | | | | 320,464 | 47,136 |
| 9. 1989 | 5,038,249 | 345,656 | 4,802,095 | 91.2 | 77.7 | 91.7 | | | | 657,298 | 134,248 |
| 10. 1990 | 5,490,664 | 95,420 | 5,399,334 | 97.8 | 79.6 | 90.6 | | | | 1,462,130 | 256,250 |
| 11. 1991 | 8,791,054 | 82,895 | 6,710,789 | 89.8 | 55.9 | 89.9 | | | | 3,163,797 | 805,419 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 6,014,665 | 1,022,020 |

*Net = (24 - 25) = (11 + 22)

**61**

**61**

Form 2

Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
......................................................
(Name)

## SCHEDULE P - PART 1C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

(000 omitted)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premium Earned Direct and Assumed | Ceded | Net (2 − 3) | Loss Payments Direct and Assumed | Ceded | Allocated Loss Expense Payments Direct and Assumed | Ceded | Salvage and Subrogation Received | Unallocated Loss Expense Payments | Total Claim Paid (4 − 5 + 7 − 8 + 10) | Number of Claims Reported − Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | 184 | 2,370 | 866 | 104 | 16 | 2 | 196 | 1,663 | X X X X |
| 2. 1982 | 76,890 | 10,924 | 65,968 | 59,604 | 15,971 | 4,007 | 26 | 362 | 6,776 | 53,809 | 22,162 |
| 3. 1983 | 78,059 | 11,664 | 65,176 | 72,376 | 11,226 | 5,674 | (151) | 395 | 7,256 | 73,963 | 27,723 |
| 4. 1984 | 96,401 | 19,129 | 81,276 | 154,378 | 26,695 | 32,766 | 324 | 663 | 10,607 | 138,692 | 41,997 |
| 5. 1985 | 139,413 | 7,924 | 133,489 | 329,425 | 30,380 | 31,617 | (203) | 637 | 13,033 | 138,730 | 51,090 |
| 6. 1986 | 223,653 | 35,366 | 208,267 | 333,443 | 8,392 | 31,353 | 374 | 709 | 13,270 | 349,036 | 65,622 |
| 7. 1987 | 260,896 | 12,360 | 248,636 | 347,602 | 6,710 | 31,620 | 323 | 385 | 12,789 | 360,378 | 86,661 |
| 8. 1988 | 178,387 | 30,693 | 267,668 | 357,083 | 7,266 | 31,436 | 304 | 657 | 13,092 | 373,975 | 57,956 |
| 9. 1989 | 264,768 | 30,242 | 274,526 | 326,432 | 3,491 | 7,630 | 64 | 336 | 12,922 | 143,356 | 56,782 |
| 10. 1990 | 271,849 | 3,667 | 268,163 | 54,647 | 4,224 | 4,326 | 3 | 370 | 12,313 | 110,847 | 62,107 |
| 11. 1991 | 280,859 | 4,038 | 276,823 | 40,366 | 670 | 540 | | 450 | 10,566 | 51,039 | 61,766 |
| 12. Totals | X X X X | X X X X | X X X X | 1,072,293 | 82,877 | 79,362 | 1,136 | 5,256 | 112,762 | 1,360,206 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid Case Basis Direct and Assumed | Ceded | Bulk + IBNR Direct and Assumed | Ceded | Allocated Loss Expenses Unpaid Case Basis Direct and Assumed | Ceded | Bulk + IBNR Direct and Assumed | Ceded | Unallocated Loss Expenses Unpaid | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding − Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 8,070 | 138 | 500 | 62 | 696 | 18 | 48 | 4 | 3 | 8,845 | 65 |
| 2. 1982 | 1,230 | 328 | 127 | 16 | 116 | 7 | 32 | 2 | | 1,332 | 21 |
| 3. 1983 | 2,148 | 343 | 237 | 24 | 828 | 12 | 32 | 2 | 31 | 2,024 | 29 |
| 4. 1984 | 2,696 | 426 | 347 | 26 | 388 | 55 | 39 | 3 | 61 | 2,968 | 64 |
| 5. 1985 | 4,095 | 246 | 237 | 23 | 957 | 23 | 60 | 2 | 261 | 6,360 | 99 |
| 6. 1986 | 7,846 | 699 | 846 | 17 | 3,724 | 54 | 56 | 2 | 301 | 9,320 | 201 |
| 7. 1987 | 30,906 | 1,720 | 1,459 | 22 | 4,643 | 266 | 106 | 8 | 1,011 | 36,483 | 479 |
| 8. 1988 | 44,476 | 907 | 3,263 | 70 | 6,067 | 160 | 178 | 6 | 2,092 | 58,896 | 1,052 |
| 9. 1989 | 50,077 | 1,493 | 7,271 | 330 | 8,060 | 233 | 447 | 9 | 3,747 | 78,071 | 1,643 |
| 10. 1990 | 100,566 | 3,207 | 39,661 | 445 | 12,299 | 284 | 1,604 | 24 | 6,026 | 136,113 | 3,486 |
| 11. 1991 | 95,339 | 1,850 | 67,947 | 1,342 | 13,578 | 154 | 5,234 | 81 | 10,685 | 180,736 | 7,589 |
| 12. Totals | 357,345 | 11,377 | 91,394 | 2,201 | 46,148 | 1,252 | 7,417 | 143 | 24,082 | 512,303 | 14,854 |

| Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred Direct and Assumed | Ceded | Net * | Loss and Loss Expense Percentage (Incurred/Premiums Earned) Direct and Assumed | Ceded | Net | Discount for Time Value of Money Loss | Loss Expense | Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount Losses Unpaid | Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 8,320 | 725 |
| 2. 1982 | 71,896 | 16,143 | 55,143 | 93.6 | 149.3 | 84.3 | | | | 1,213 | 139 |
| 3. 1983 | 87,962 | 11,457 | 76,706 | 114.3 | 98.3 | 136.9 | | | | 1,984 | 242 |
| 4. 1984 | 139,107 | 17,630 | 123,657 | 144.3 | 113.0 | 146.1 | | | | 2,658 | 411 |
| 5. 1985 | 154,053 | 10,010 | 144,080 | 112.6 | 126.3 | 109.6 | | | | 4,223 | 1,127 |
| 6. 1986 | 107,836 | 9,530 | 154,438 | 76.3 | 42.1 | 94.7 | | | | 7,716 | 1,600 |
| 7. 1987 | 206,843 | 9,041 | 200,641 | 78.3 | 71.8 | 78.6 | | | | 30,003 | 5,446 |
| 8. 1988 | 237,038 | 8,707 | 228,071 | 85.4 | 63.0 | 85.6 | | | | 46,265 | 8,311 |
| 9. 1989 | 224,447 | 5,422 | 219,008 | 78.8 | 82.8 | 79.6 | | | | 63,606 | 32,004 |
| 10. 1990 | 251,667 | 5,388 | 246,378 | 92.6 | 340.7 | 91.9 | | | | 136,045 | 36,816 |
| 11. 1991 | 235,972 | 6,217 | 231,265 | 83.8 | 302.0 | 83.8 | | | | 193,064 | 37,382 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 435,904 | 76,482 |

*Net = (24 − 26) = (11 + 22)

62
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

.........................................................
(Name)

## SCHEDULE P - PART 1D - WORKERS' COMPENSATION

(000 omitted)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2 – 3) | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (4 – 6 + 7 – 8 + 10) | 12 Number of Claims Reported – Direct and Assumed |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | 6,065 | 2,015 | 526 | 30 | 398 | 95 | 4,641 | X X X X |
| 2. 1982 | 49,266 | 2,257 | 47,009 | 28,493 | 377 | 1,629 | 6 | 909 | 4,826 | 34,394 | 29,392 |
| 3. 1983 | 76,226 | 1,497 | 74,728 | 54,954 | (727) | 2,564 | (13) | 1,596 | 5,408 | 60,763 | 44,569 |
| 4. 1984 | 129,978 | 2,134 | 127,844 | 316,114 | (2,984) | 6,028 | (143) | 3,671 | 8,374 | 133,864 | 65,681 |
| 5. 1985 | 176,835 | 3,441 | 173,094 | 160,890 | (5,374) | 7,614 | (173) | 5,603 | 11,863 | 164,932 | 83,031 |
| 6. 1986 | 227,799 | 4,004 | 223,766 | 169,253 | | 8,995 | | 9,652 | 13,812 | 187,809 | 87,846 |
| 7. 1987 | 353,734 | 4,741 | 348,476 | 234,999 | | 13,635 | | 4,506 | 19,190 | 266,704 | 121,328 |
| 8. 1988 | 600,899 | 5,857 | 594,742 | 240,360 | | 11,215 | | 2,989 | 20,173 | 272,760 | 134,367 |
| 9. 1989 | 378,003 | 5,261 | 374,262 | 170,931 | | 8,213 | | 1,356 | 16,408 | 195,862 | 100,273 |
| 10. 1990 | 283,863 | 3,341 | 280,820 | 128,800 | | 4,663 | | 427 | 13,767 | 147,117 | 66,389 |
| 11. 1991 | 338,922 | 4,840 | 333,862 | 57,878 | 110 | 2,550 | | 61 | 10,447 | 69,762 | 62,174 |
| 12. Totals | X X X X | X X X X | X X X X | 1,345,327 | (6,645) | 64,239 | (320) | 26,187 | 123,945 | 1,545,062 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding – Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 58,016 | 5,670 | 17,252 | 2,189 | 1,324 | 166 | 455 | 57 | 590 | 69,213 | 670 |
| 2. 1982 | 2,902 | 440 | 2,799 | 349 | 43 | 6 | 74 | 9 | 84 | 5,076 | 56 |
| 3. 1983 | 7,707 | 1,247 | 9,042 | 257 | 138 | 2 | 54 | 7 | 92 | 8,466 | 209 |
| 4. 1984 | 13,173 | 1,247 | 2,764 | 218 | 683 | 28 | 134 | 6 | 145 | 16,225 | 644 |
| 5. 1985 | 23,856 | 201 | 4,445 | 315 | 515 | | 229 | 6 | 355 | 26,936 | 826 |
| 6. 1986 | 25,816 | 174 | 6,619 | 281 | 787 | 1 | 440 | 7 | 493 | 27,768 | 1,239 |
| 7. 1987 | 40,853 | 325 | 14,657 | 392 | 1,649 | | 874 | 30 | 3,728 | 46,043 | 2,806 |
| 8. 1988 | 61,040 | | 34,137 | 8 | 2,833 | | 3,171 | | 2,823 | 81,974 | 4,470 |
| 9. 1989 | 75,536 | | 39,204 | 350 | 3,235 | | 1,483 | 4 | 4,048 | 104,062 | 6,125 |
| 10. 1990 | 132,639 | | 60,300 | 430 | 6,009 | | 7,615 | 12 | 7,081 | 185,792 | 9,003 |
| 11. 1991 | 121,350 | 223 | 104,927 | 456 | 3,943 | | 6,477 | 12 | 14,043 | 281,902 | 16,909 |
| 12. Totals | 552,845 | 9,787 | 251,166 | 5,363 | 18,713 | 383 | 38,214 | 147 | 31,641 | 832,842 | 41,643 |

| Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 30 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 31 Loss | 32 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | | | | X X X X | 67,455 | 1,766 |
| 2. 1982 | 40,647 | 1,135 | 39,472 | 62.6 | 52.1 | 83.9 | | | | 8,932 | 144 |
| 3. 1983 | 74,990 | 735 | 74,735 | 98.9 | 47.6 | 99.5 | | | | 8,290 | 226 |
| 4. 1984 | 147,189 | (1,702) | 148,889 | 119.2 | (79.3) | 116.4 | | | | 14,664 | 733 |
| 5. 1985 | 188,813 | (5,288) | 193,848 | 106.7 | (152.3) | 111.8 | | | | 26,045 | 1,061 |
| 6. 1986 | 215,463 | 463 | 215,448 | 99.2 | 11.6 | 100.8 | | | | 30,870 | 1,930 |
| 7. 1987 | 333,837 | 1,090 | 332,587 | 94.6 | 23.0 | 95.6 | | | | 63,310 | 3,765 |
| 8. 1988 | 353,348 | 8 | 353,340 | 60.8 | 0.3 | 59.6 | | | | 78,349 | 6,028 |
| 9. 1989 | 291,758 | 156 | 291,604 | 79.0 | 2.9 | 80.1 | | | | 94,630 | 9,622 |
| 10. 1990 | 333,396 | 450 | 332,639 | 117.6 | 13.8 | 118.7 | | | | 171,241 | 14,581 |
| 11. 1991 | 322,325 | 851 | 321,664 | 101.1 | 17.2 | 107.4 | | | | 277,251 | 24,661 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 786,876 | 64,243 |

*Net = (24 – 25) = (11 + 22)

MOAC000549

63

63

Item 2

Item 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

------------------------------------------
(Name)

## SCHEDULE P - PART 1E - COMMERCIAL MULTIPLE PERIL

(000 omitted)

| | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | |
| Years in Which Premiums Were Earned and Losses Were Incurred | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 - 8 + 10) | 23 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXXX | XXXX | XXXX | 873 | 62 | 1,107 | | 1 | 6 | 1,922 | XXXX |
| 2. 1982 | 74,785 | 1,360 | 67,357 | 52,664 | 4,377 | 6,847 | 228 | 1,634 | 6,587 | 59,953 | 75,021 |
| 3. 1983 | 84,680 | 7,917 | 76,843 | 76,456 | 15,351 | 11,250 | (116) | 4,065 | 7,635 | 79,930 | 23,276 |
| 4. 1984 | 112,429 | 9,356 | 103,072 | 85,846 | 2,289 | 12,856 | (650) | 2,147 | 9,348 | 106,202 | 36,091 |
| 5. 1985 | 367,951 | 11,930 | 356,085 | 139,630 | 9,190 | 14,406 | (802) | 6,331 | 9,809 | 171,650 | 46,967 |
| 6. 1986 | 251,100 | 20,721 | 250,381 | 131,225 | 3,909 | 18,038 | 37 | 2,818 | 10,379 | 145,696 | 49,150 |
| 7. 1987 | 342,355 | 29,082 | 317,314 | 130,063 | 6,330 | 17,859 | 67 | 4,374 | 11,648 | 161,137 | 57,720 |
| 8. 1988 | 372,728 | 27,565 | 345,142 | 140,661 | 6,988 | 15,924 | 62 | 4,062 | 12,319 | 181,884 | 74,271 |
| 9. 1989 | 393,935 | 29,641 | 364,134 | 205,147 | 27,666 | 14,729 | 67 | 3,776 | 15,587 | 215,371 | 94,360 |
| 10. 1990 | 430,733 | 30,703 | 398,926 | 200,266 | 31,103 | 10,713 | 32 | 1,953 | 15,211 | 210,973 | 95,997 |
| 11. 1991 | 439,033 | 23,757 | 415,056 | 150,303 | 6,780 | 4,646 | | 1,050 | 13,204 | 163,539 | 92,629 |
| 12. Totals | XXXX | XXXX | XXXX | 1,311,344 | 87,663 | 130,458 | (1,071) | 37,047 | 110,633 | 1,485,823 | XXXX |

Note: For "prior," report amounts paid or received to current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| | Losses Unpaid | | | | Allocated Loss Expense Unpaid | | | | 21 | 22 | 23 |
| Years in Which Premiums Were Earned and Losses Were Incurred | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | Unallocated Loss Expense Unpaid | Total Net Losses and Expenses Unpaid | Number of Claims Outstanding - Direct and Assumed |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 1,861 | 551 | | | 3,236 | 16 | | | 7 | 2,765 | 54 |
| 2. 1982 | 673 | | | | 181 | | | | 19 | 567 | 19 |
| 3. 1983 | 2,207 | 30 | 33 | 2 | 2,074 | 3 | 29 | 8 | 84 | 3,366 | 61 |
| 4. 1984 | 3,115 | 160 | 3,286 | 5 | 2,121 | 229 | 3,267 | 3 | 377 | 9,582 | 91 |
| 5. 1985 | 6,740 | 3,781 | 2,762 | 17 | 3,780 | 224 | 992 | 4 | 320 | 9,036 | 119 |
| 6. 1986 | 9,031 | | 4,157 | 25 | 3,811 | | 1,444 | 2 | 538 | 18,994 | 223 |
| 7. 1987 | 16,369 | 101 | 7,297 | 67 | 6,660 | 471 | 2,470 | 6 | 880 | 32,732 | 418 |
| 8. 1988 | 27,500 | 64 | 10,356 | 86 | 6,931 | 650 | 1,568 | 6 | 1,279 | 45,417 | 751 |
| 9. 1989 | 40,352 | 202 | 17,735 | 130 | 14,690 | 1,090 | 5,775 | 0 | 1,936 | 78,650 | 3,265 |
| 10. 1990 | 63,733 | 689 | 31,977 | 213 | 16,633 | 1,290 | 10,042 | 15 | 2,405 | 135,837 | 2,493 |
| 11. 1991 | 74,132 | 2,743 | 64,296 | 172 | 16,883 | 937 | 16,635 | 8 | 9,248 | 177,845 | 9,016 |
| 12. Totals | 225,783 | 7,735 | 142,904 | 647 | 77,600 | 5,076 | 42,154 | 59 | 16,426 | 495,045 | 16,620 |

| | Total Losses and Loss Expense Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 32 | Net Balance Sheet Reserves After Discount | |
| Years in Which Premiums Were Earned and Losses Were Incurred | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | Inter-Company Pooling Participation Percentage | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | XXXX | 1,538 | 3,229 |
| 2. 1982 | 65,542 | 5,122 | 60,620 | 80.2 | 69.6 | 90.3 | | | | 673 | 194 |
| 3. 1983 | 93,470 | 15,194 | 83,274 | 116.0 | 191.9 | 108.2 | | | | 2,388 | 3,170 |
| 4. 1984 | 137,487 | 1,888 | 115,794 | 104.6 | 20.2 | 112.3 | | | | 6,219 | 3,333 |
| 5. 1985 | 152,438 | 11,918 | 142,491 | 90.7 | 100.3 | 90.0 | | | | 4,746 | 4,244 |
| 6. 1986 | 168,423 | 3,573 | 166,450 | 67.1 | 19.2 | 71.4 | | | | 13,163 | 6,391 |
| 7. 1987 | 204,190 | 7,323 | 193,960 | 58.7 | 24.8 | 61.1 | | | | 23,688 | 9,284 |
| 8. 1988 | 235,230 | 7,840 | 227,371 | 63.3 | 28.4 | 65.9 | | | | 32,775 | 12,742 |
| 9. 1989 | 338,334 | 24,103 | 314,231 | 85.9 | 80.6 | 86.3 | | | | 57,815 | 23,043 |
| 10. 1990 | 348,068 | 13,656 | 334,490 | 80.9 | 44.2 | 83.7 | | | | 85,602 | 29,866 |
| 11. 1991 | 349,487 | 8,153 | 341,384 | 79.6 | 34.3 | 82.1 | | | | 136,044 | 43,651 |
| 12. Totals | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | XXXX | 364,303 | 130,742 |

*Net = (24 - 25) = (33 + 22)

MOAC000550

**64**  Form 3

**64**  Form 3

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

··············································································
(Name)

## SCHEDULE P - PART 1F - MEDICAL MALPRACTICE

(000 omitted)

| Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | |
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 - 8 + 10) | 12 Number of Claims Reported - Direct and Assumed |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | 6,884 | 162 | 264 | 60 | 144 | 19 | 9,937 | X X X X |
| 2. 1982 | 21,620 | 19,034 | 2,394 | 26,663 | 23,196 | 6,681 | 4,267 | 3 | 264 | 6,686 | 617 |
| 3. 1983 | 27,320 | 22,034 | 6,306 | 44,064 | 32,430 | 7,932 | 5,076 | | 477 | 14,906 | 906 |
| 4. 1984 | 17,889 | 12,795 | 6,504 | 16,967 | 10,916 | 4,780 | 2,639 | | 708 | 6,900 | 646 |
| 5. 1985 | 3,715 | 1,363 | 2,332 | 2,053 | 1,464 | 143 | 18 | | 465 | 2,166 | 53 |
| 6. 1986 | 1,877 | 150 | 1,829 | | | | | | | | 13 |
| 7. 1987 | 850 | 17 | 613 | | | | | | | | 7 |
| 8. 1988 | (306) | | (305) | | | | | | | | 2 |
| 9. 1989 | 2 | | 2 | | | | | | | | |
| 10. 1990 | | | | | | | | | | | |
| 11. 1991 | | | | | | | | | | | 6 |
| 12. Totals | X X X X | X X X X | X X X X | 94,823 | 65,971 | 10,667 | 17,061 | 149 | 1,937 | 37,876 | X X X X |

Note: For "prior," report amount paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 14,846 | 6,050 | 25,222 | 3,151 | 1,113 | 762 | 672 | 21 | 250 | 34,067 | 56 |
| 2. 1982 | 13,000 | 6,782 | 3,630 | 434 | 717 | 287 | 759 | 378 | 264 | 13,668 | 41 |
| 3. 1983 | 8,835 | 5,953 | 4,184 | 1,002 | 2,329 | 49 | 4,577 | 648 | 72 | 18,420 | 60 |
| 4. 1984 | 3,024 | 1,855 | 1,542 | 161 | 772 | 106 | 3,934 | 606 | 160 | 8,900 | 34 |
| 5. 1985 | 115 | 32 | 928 | 66 | 86 | 60 | 61 | 2 | 3 | 966 | 1 |
| 6. 1986 | | | | | | | | | | | |
| 7. 1987 | | | | | | | | | | | |
| 8. 1988 | | | 2 | | | | | | | 2 | |
| 9. 1989 | | | | | | | | | | | |
| 10. 1990 | | | | | | | | | | | |
| 11. 1991 | | | | | | | | | | | |
| 12. Totals | 40,320 | 18,558 | 35,353 | 4,914 | 4,035 | 1,263 | 10,283 | 1,606 | 3,398 | 64,926 | 166 |

| Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 32 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
| | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 32,937 | 1,310 |
| 2. 1982 | 51,066 | 33,348 | 18,553 | 241.5 | 178.2 | 766.6 | | | | 10,034 | 1,664 |
| 3. 1983 | 71,570 | 45,351 | 24,228 | 263.0 | 206.0 | 513.6 | | | | 5,704 | 5,064 |
| 4. 1984 | 33,271 | 25,776 | 25,405 | 174.7 | 123.9 | 302.6 | | | | 2,572 | 4,219 |
| 5. 1985 | 3,622 | 1,681 | 2,181 | 102.0 | 121.6 | 91.4 | | | | 938 | 60 |
| 6. 1986 | | | | | | | | | | | |
| 7. 1987 | | | | | | | | | | | |
| 8. 1988 | 2 | | 2 | 100.0 | | 100.0 | | | | 2 | |
| 9. 1989 | | | | | | | | | | | |
| 10. 1990 | | | | | | | | | | | |
| 11. 1991 | | | | | | | | | | | |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 52,188 | 12,799 |

*Net = (24 - 25) = (31 + 22)

MOAC000551

65
Form 2

65
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
..............................................................
(Name)

## SCHEDULE P - PART 1G - SPECIAL LIABILITY (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)
(000 omitted)

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | Loss Payments 5 Direct and Assumed | 6 Ceded | Allocated Loss Expense Payments 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 - 8 + 10) | 12 Number of Claim Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | 370 | 6 | 58 | 19 | 114 | | 407 | X X X X |
| 2. 1982 | 16,849 | 3,848 | 13,041 | 34,387 | 1,524 | 81 | (1) | 360 | 178 | 33,060 | X X X X |
| 3. 1983 | 40,908 | 2,647 | 37,655 | 35,686 | 3,868 | 308 | 39 | 1,117 | 227 | 32,334 | X X X X |
| 4. 1984 | 44,364 | 5,236 | 39,128 | 27,911 | 1,637 | 213 | 8 | 542 | 187 | 26,424 | X X X X |
| 5. 1985 | 33,262 | 3,051 | 29,865 | 19,301 | 2,382 | 172 | (2) | 203 | 260 | 17,166 | X X X X |
| 6. 1986 | 30,947 | 5,379 | 25,074 | 18,451 | 501 | 467 | (1) | 339 | 310 | 18,446 | X X X X |
| 7. 1987 | 38,023 | 5,348 | 32,673 | 34,380 | 8,307 | 2,018 | 14 | 379 | 424 | 28,306 | X X X X |
| 8. 1988 | 39,250 | 5,425 | 33,825 | 30,234 | 7,618 | 1,732 | 17 | 215 | 630 | 24,370 | X X X X |
| 9. 1989 | 39,526 | 7,662 | 31,865 | 16,799 | 699 | 948 | 5 | 230 | 606 | 19,700 | X X X X |
| 10. 1990 | 31,250 | 6,632 | 24,678 | 9,426 | 686 | 428 | 1 | 142 | 821 | 9,790 | X X X X |
| 11. 1991 | 27,937 | 5,840 | 22,097 | 5,422 | 293 | 52 | | 72 | 484 | 5,711 | X X X X |
| 12. Totals | X X X X | X X X X | X X X X | 213,660 | 27,753 | 5,474 | 86 | 3,404 | 3,904 | 215,907 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid Case Basis 13 Direct and Assumed | 14 Ceded | Bulk + IBNR 15 Direct and Assumed | 16 Ceded | Allocated Loss Expenses Unpaid Case Basis 17 Direct and Assumed | 18 Ceded | Bulk + IBNR 19 Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses - Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 7,860 | 886 | 128 | 14 | 241 | 12 | 3 | | | 7,776 | X X X X |
| 2. 1982 | 1,508 | | 299 | 50 | 45 | | 10 | 3 | | 1,908 | X X X X |
| 3. 1983 | 2,869 | 313 | 1,064 | 331 | 122 | 9 | 27 | 3 | | 3,441 | X X X X |
| 4. 1984 | 5,867 | 39 | 763 | 93 | 108 | 8 | 24 | 3 | | 6,468 | X X X X |
| 5. 1985 | 1,639 | 82 | 962 | 70 | 73 | 3 | 24 | 2 | | 4,688 | X X X X |
| 6. 1986 | 1,700 | 124 | 1,470 | 390 | 63 | 3 | 42 | | | 2,956 | X X X X |
| 7. 1987 | 7,439 | 1,135 | 2,609 | 326 | 548 | 44 | 90 | 10 | | 8,973 | X X X X |
| 8. 1988 | 9,245 | 449 | 1,300 | 143 | 630 | 33 | 49 | 6 | | 10,452 | X X X X |
| 9. 1989 | 11,353 | 665 | 797 | 98 | 699 | 235 | 29 | 6 | | 11,896 | 3 |
| 10. 1990 | 5,685 | 413 | 1,941 | 263 | 309 | 26 | 62 | 6 | | 7,631 | 3 |
| 11. 1991 | 2,452 | 516 | 478 | 15 | 93 | 17 | 5 | | 66 | 2,561 | 63 |
| 12. Totals | 57,665 | 4,702 | 11,509 | 3,341 | 2,848 | 340 | 351 | 47 | 66 | 66,262 | 56 |

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred 24 Direct and Assumed | 25 Ceded | 26 Net * | Loss and Loss Expense Percentage (Incurred/Premiums Earned) 27 Direct and Assumed | 28 Ceded | 29 Net | Discount for Time Value of Money 30 Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount 33 Losses Unpaid | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 7,505 | 270 |
| 2. 1982 | 34,843 | 1,574 | 34,988 | 99.2 | 87.1 | 99.6 | | | | 3,666 | 56 |
| 3. 1983 | 63,111 | 4,396 | 56,757 | 99.0 | 164.6 | 96.6 | | | | 3,900 | 138 |
| 4. 1984 | 35,106 | 2,022 | 33,084 | 79.1 | 34.6 | 86.6 | | | | 6,468 | 190 |
| 5. 1985 | 21,604 | 2,516 | 19,293 | 69.6 | 66.1 | 65.3 | | | | 2,066 | 80 |
| 6. 1986 | 22,480 | 874 | 21,604 | 72.6 | 34.6 | 84.8 | | | | 2,873 | 85 |
| 7. 1987 | 47,092 | 9,814 | 37,278 | 123.9 | 183.6 | 134.1 | | | | 8,899 | 374 |
| 8. 1988 | 43,879 | 8,257 | 34,822 | 109.0 | 166.8 | 103.6 | | | | 9,560 | 490 |
| 9. 1989 | 33,291 | 1,684 | 31,606 | 84.2 | 22.0 | 99.2 | | | | 11,367 | 909 |
| 10. 1990 | 18,695 | 1,374 | 17,321 | 56.0 | 20.7 | 70.5 | | | | 7,392 | 329 |
| 11. 1991 | 9,045 | 757 | 8,252 | 32.4 | 13.0 | 37.3 | | | | 2,401 | 340 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 63,801 | 2,673 |

*Net = (24 - 25) = (11 + 22)

66
66

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
··································································
(Name)

## SCHEDULE P - PART 1H - OTHER LIABILITY

(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2-3) | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5-6+7 -8+10) | 12 Number of Claims Reported - Direct and Assumed |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | 31,411 | 9,743 | 34,447 | 9,118 | 242 | 1,667 | 28,089 | X X X X |
| 2. 1982 | 81,097 | 30,958 | 50,139 | 93,077 | 33,806 | 38,304 | 8,990 | 164 | 4,340 | 70,927 | 811,395 |
| 3. 1983 | 73,716 | 20,434 | 53,282 | 93,102 | 28,086 | 21,213 | 6,069 | 1,092 | 3,683 | 88,484 | 512,254 |
| 4. 1984 | 78,332 | 34,947 | 43,385 | 74,644 | 15,364 | 19,104 | 2,264 | 35 | 3,032 | 74,434 | 518,422 |
| 5. 1985 | 79,422 | 19,688 | 65,724 | 51,314 | 8,680 | 8,294 | (191) | 1,166 | 4,400 | 56,348 | 579,743 |
| 6. 1986 | 114,247 | 35,032 | 309,215 | 64,696 | 4,072 | 11,962 | 3,063 | 405 | 4,148 | 72,529 | 569,980 |
| 7. 1987 | 127,971 | 17,251 | 110,600 | 63,066 | 1,992 | 10,782 | 155 | 79 | 4,460 | 76,912 | 654,497 |
| 8. 1988 | 147,643 | 13,334 | 134,333 | 67,481 | 6,799 | 11,062 | 20 | 73 | 4,784 | 77,471 | 719,163 |
| 9. 1989 | 105,845 | 15,756 | 84,087 | 53,896 | 13,656 | 5,660 | 50 | 50 | 3,063 | 48,470 | 33,803 |
| 10. 1990 | 328,306 | 24,098 | 99,000 | 28,624 | 7,326 | 2,900 | | 47 | 3,453 | 27,263 | 24,640 |
| 11. 1991 | 86,887 | 22,814 | 64,873 | 7,385 | 117 | 415 | 4 | 24 | 3,191 | 10,879 | 21,849 |
| 12. Totals | X X X X | X X X X | X X X X | 629,391 | 318,776 | 152,322 | 36,403 | 3,300 | 63,670 | 626,806 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 Unallocated Loss Expense Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 355,806 | 29,560 | 174,237 | 78,287 | 30,982 | 12,054 | 47,437 | 29,317 | 3,998 | 263,746 | 2,013 |
| 2. 1982 | 17,348 | 8,832 | 19,747 | 6,187 | 2,586 | 937 | 3,909 | 2,072 | 356 | 29,045 | 137 |
| 3. 1983 | 22,648 | 8,849 | 19,560 | 4,143 | 2,830 | 343 | 8,682 | 3,063 | 702 | 33,930 | 75 |
| 4. 1984 | 9,493 | 1,876 | 20,638 | 2,342 | 2,406 | 443 | 4,266 | 209 | 64 | 40,880 | 62 |
| 5. 1985 | 16,811 | 8,000 | 11,656 | 3,227 | 4,604 | 230 | 592 | 56 | 80 | 32,962 | 75 |
| 6. 1986 | 18,904 | 3,112 | 50,376 | 702 | 9,664 | 3,439 | 1,304 | 39 | 163 | 23,882 | 154 |
| 7. 1987 | 24,513 | 319 | 34,815 | 650 | 7,371 | 3 | 2,353 | 24 | 450 | 49,346 | 333 |
| 8. 1988 | 24,362 | 66 | 38,706 | 662 | 9,328 | 1 | 3,348 | 30 | 797 | 57,926 | 648 |
| 9. 1989 | 28,367 | 14 | 19,100 | 664 | 8,693 | 1 | 3,603 | 24 | 1,710 | 60,702 | 932 |
| 10. 1990 | 32,978 | 732 | 23,596 | 492 | 9,299 | 310 | 4,684 | 20 | 3,056 | 72,954 | 1,566 |
| 11. 1991 | 34,275 | 169 | 34,827 | 352 | 9,734 | 24 | 4,806 | 7 | 5,430 | 92,761 | 5,158 |
| 12. Totals | 353,266 | 61,714 | 375,412 | 92,582 | 93,900 | 17,627 | 83,606 | 33,281 | 16,204 | 747,431 | 31,208 |

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 32 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net* | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 213,700 | 40,066 |
| 2. 1982 | 158,260 | 57,768 | 100,472 | 172.4 | 146.7 | 372.6 | | | | 25,721 | 3,824 |
| 3. 1983 | 147,057 | 65,263 | 122,894 | 227.7 | 221.6 | 230.3 | | | | 29,468 | 4,442 |
| 4. 1984 | 157,976 | 21,963 | 116,016 | 246.7 | 146.7 | 263.3 | | | | 34,493 | 4,087 |
| 5. 1985 | 97,271 | 6,151 | 92,070 | 322.4 | 37.6 | 340.1 | | | | 27,562 | 5,258 |
| 6. 1986 | 110,926 | 15,213 | 95,713 | 89.3 | 101.2 | 87.6 | | | | 19,825 | 3,657 |
| 7. 1987 | 128,561 | 2,909 | 125,698 | 100.8 | 16.8 | 113.6 | | | | 38,999 | 10,547 |
| 8. 1988 | 141,743 | 6,348 | 135,399 | 56.6 | 47.8 | 100.8 | | | | 44,674 | 13,254 |
| 9. 1989 | 173,395 | 14,223 | 109,172 | 312.3 | 55.2 | 329.8 | | | | 46,016 | 13,787 |
| 10. 1990 | 100,892 | 8,680 | 100,212 | 87.6 | 33.3 | 103.2 | | | | 55,390 | 17,609 |
| 11. 1991 | 103,968 | 328 | 103,640 | 119.7 | 3.6 | 149.8 | | | | 68,809 | 23,943 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 606,307 | 342,904 |

*Net = (24 - 25) = (33 + 32)

67    *Form 8*

67    *Form 8*

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

(None)

## SCHEDULE P - PART 1I - SPECIAL PROPERTY (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, GLASS, BURGLARY AND THEFT)
(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5-6+7-8+10) | 12 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2-3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | 40,354 | 28,290 | 6,133 | (725) | 2,196 | 194 | 36,504 | X X X X |
| 2. 1990 | 429,025 | 60,866 | 367,840 | 236,389 | 29,062 | 6,736 | 576 | 2,745 | 35,622 | 222,900 | X X X X |
| 3. 1991 | 479,259 | 69,808 | 429,993 | 304,636 | 32,332 | 3,339 | 503 | 1,442 | 34,158 | 189,312 | X X X X |
| 4. Totals | X X X X | X X X X | X X X X | 456,075 | 51,709 | 14,239 | 442 | 6,403 | 29,974 | 468,321 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid for specific years. Report loss payments net of salvage and subrogation received.

| Years In Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expense Unpaid | | | | 21 Unallocated Loss Expense Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 43,135 | 17,347 | 7,730 | 676 | 3,160 | 1,736 | 300 | 58 | 163 | 34,683 | 828 |
| 2. 1990 | 7,375 | 328 | 4,362 | 348 | 316 | 4 | 132 | 30 | 176 | 11,889 | 200 |
| 3. 1991 | 43,725 | 7,706 | 39,789 | 742 | 5,547 | 93 | 630 | 2 | 2,536 | 55,632 | 5,890 |
| 4. Totals | 96,633 | 24,565 | 27,601 | 1,768 | 9,069 | 1,633 | 642 | 70 | 2,845 | 103,838 | 6,847 |

| Years In Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 32 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 34,680 | 1,817 |
| 2. 1990 | 249,146 | 18,351 | 234,794 | 68.2 | 23.9 | 63.8 | | | | 11,369 | 630 |
| 3. 1991 | 266,628 | 23,442 | 244,884 | 55.4 | 30.7 | 59.7 | | | | 51,082 | 4,400 |
| 4. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 96,993 | 6,847 |

*Net = (24 - 25) = (11 + 22)*

## SCHEDULE P - PART 1J - AUTO PHYSICAL DAMAGE
(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss Payments | | Allocated Loss Expense Payments | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5-6+7-8+10) | 12 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2-3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | |
| 1. Prior | X X X X | X X X X | X X X X | (35,356) | (3,156) | 2,079 | 85 | 47,316 | 6 | (31,382) | X X X X |
| 2. 1990 | 3,649,944 | 60,789 | 3,849,155 | 2,463,155 | 23,665 | 9,086 | | 437,377 | 216,041 | 2,716,240 | X X X X |
| 3. 1991 | 4,113,993 | 38,416 | 4,078,577 | 2,374,667 | 10,403 | 4,780 | | 273,872 | 216,921 | 2,476,505 | X X X X |
| 4. Totals | X X X X | X X X X | X X X X | 4,630,466 | 30,890 | 16,337 | 56 | 716,965 | 432,953 | 5,099,970 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years In Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expense Unpaid | | | | 21 Unallocated Loss Expense Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | 7,914 | 344 | 12,886 | 231 | 179 | 14 | 127 | 13 | 3 | 16,453 | 377 |
| 2. 1990 | 6,805 | 32 | 34,733 | 350 | 316 | 7 | 234 | 23 | 3 | 23,758 | 351 |
| 3. 1991 | 270,664 | 2,916 | 65,798 | 863 | 7,326 | 70 | 349 | 20 | 21,318 | 369,296 | 74,761 |
| 4. Totals | 286,457 | 3,300 | 95,397 | 1,466 | 7,321 | 85 | 712 | 54 | 21,316 | 406,448 | 72,329 |

| Years In Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 32 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 16,378 | 262 |
| 2. 1990 | 2,709,974 | 24,102 | 2,676,672 | 69.4 | 50.1 | 69.6 | | | | 21,376 | 629 |
| 3. 1991 | 2,968,135 | 89,270 | 2,847,869 | 69.8 | 67.8 | 69.8 | | | | 340,085 | 28,599 |
| 4. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 377,836 | 29,410 |

*Net = (24 - 25) = (11 + 22)*

68
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

·······································(Name)·······································

68
Form 2

## SCHEDULE P - PART 1K - FIDELITY, SURETY, FINANCIAL GUARANTY, MORTGAGE GUARANTY

(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 2 Direct and Assumed | 3 Ceded | 4 Net (2-3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (4-6+7-8+10) | 12 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Premiums Earned | | Loss Payments | | Allocated Loss Expense Payments | | | |
| 1. Prior | X X X X | X X X X | X X X X | 23,027 | 1,412 | 2,763 | 301 | 6,376 | 374 | 22,470 | X X X X |
| 2. 1990 | 259,834 | 4,799 | 255,036 | 42,179 | 1,292 | 911 | | 724 | 2,389 | 44,948 | X X X X |
| 3. 1991 | 183,668 | 5,654 | 177,834 | 10,004 | 602 | 28 | | 38 | 2,406 | 12,327 | X X X X |
| 4. Totals | X X X X | X X X X | X X X X | 73,302 | 3,306 | 3,722 | 301 | 7,318 | 5,327 | 78,746 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expense Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | | | |
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| 1. Prior | 29,860 | 3,462 | 18,789 | 2,313 | 2,706 | 434 | 2,336 | 261 | 294 | 47,467 | 1,076 |
| 2. 1990 | 17,369 | 384 | 4,555 | 515 | 516 | | 536 | 64 | 314 | 21,866 | 2,390 |
| 3. 1991 | 58,734 | 1,633 | 7,285 | 328 | 14 | | 264 | 34 | 2,304 | 67,580 | 6,866 |
| 4. Totals | 105,763 | 5,477 | 31,629 | 3,156 | 3,016 | 434 | 3,152 | 369 | 2,902 | 136,813 | 10,332 |

| Years in Which Premiums Were Earned and Losses Were Incurred | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | | Net Balance Sheet Reserves After Discount | |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 42,846 | 4,611 |
| 2. 1990 | 68,268 | 2,236 | 66,016 | 42.7 | 47.0 | 42.6 | | | X X X X | 20,788 | 1,081 |
| 3. 1991 | 81,918 | 7,517 | 74,317 | 44.6 | 44.0 | 44.6 | | | | 64,668 | 2,662 |
| 4. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 128,299 | 8,354 |

*Net = (24 - 25) = (11 + 22)

## SCHEDULE P - PART 1L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 2 Direct and Assumed | 3 Ceded | 4 Net (2-3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (4-6+7-8+10) | 12 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Premiums Earned | | Loss Payments | | Allocated Loss Expense Payments | | | |
| 1. Prior | X X X X | X X X X | X X X X | 310 | | | | | | | X X X X |
| 2. 1990 | 668 | | 668 | 230 | | | | | | 273 | X X X X |
| 3. 1991 | 394 | | 394 | 328 | | | | | 63 | 328 | X X X X |
| 4. Totals | X X X X | X X X X | X X X X | 668 | | | | | 63 | 611 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expense Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | | | |
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| 1. Prior | 166 | | | | | | | | | 166 | |
| 2. 1990 | 20 | | 2 | | | | | | | 23 | |
| 3. 1991 | 82 | | 15 | | | | | | | 35 | 17 |
| 4. Totals | 266 | | 16 | | | | | | | 204 | 17 |

| Years in Which Premiums Were Earned and Losses Were Incurred | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | | Net Balance Sheet Reserves After Discount | |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 166 | |
| 2. 1990 | 294 | | 294 | 51.8 | | 53.9 | | | | 81 | |
| 3. 1991 | 363 | | 363 | 41.4 | | 41.4 | | | | 36 | |
| 4. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 204 | |

*Net = (24 - 25) = (11 + 22)

**69**                                                                                                          **69**

Form 2                                                                                                          Form 2
CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
.......................................................
(Name)

## SCHEDULE P - PART 1M - INTERNATIONAL

(000 omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | Premiums Earned | | | Loss and Loss Expense Payments | | | | | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 - 8 + 10) | 12 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | Loss Payments | | Allocated Loss Expense Payments | | | | | | |
| | | | | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | | | | | |
| 1. Prior | X X X X | X X X X | X X X X | | | | | | | | | X X X X |
| 2. 1982 | | | | | | | | | | | | X X X X |
| 3. 1983 | | | | | | | | | | | | X X X X |
| 4. 1984 | | | | | | | | | | | | X X X X |
| 5. 1985 | | | | | | | | | | | | X X X X |
| 6. 1986 | | | | | | | | | | | | X X X X |
| 7. 1987 | | | | | | | | | | | | X X X X |
| 8. 1988 | | | | | | | | | | | | X X X X |
| 9. 1989 | | | | | | | | | | | | X X X X |
| 10. 1990 | | | | | | | | | | | | X X X X |
| 11. 1991 | | | | | | | | | | | | X X X X |
| 12. Totals | X X X X | X X X X | X X X X | | | | | | | | | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years in Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | | | |
| | 13 Direct and Assumed | 14 Ceded | 15 Direct and Assumed | 16 Ceded | 17 Direct and Assumed | 18 Ceded | 19 Direct and Assumed | 20 Ceded | | | |
| 1. Prior | | | | | | | | | | | |
| 2. 1982 | | | | | | | | | | | |
| 3. 1983 | | | | | | | | | | | |
| 4. 1984 | | | | | | | | | | | |
| 5. 1985 | | | | | | | | | | | |
| 6. 1986 | | | | | | | | | | | |
| 7. 1987 | | | | | | | | | | | |
| 8. 1988 | | | | | | | | | | | |
| 9. 1989 | | | | | | | | | | | |
| 10. 1990 | | | | | | | | | | | |
| 11. 1991 | | | | | | | | | | | |
| 12. Totals | | | | | | | | | | | |

**NONE**

| Years in Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | 33 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 Direct and Assumed | 25 Ceded | 26 Net * | 27 Direct and Assumed | 28 Ceded | 29 Net | 30 Loss | 31 Loss Expense | | 33 Losses Unpaid | 34 Loss Expenses Unpaid |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | | |
| 2. 1982 | | | | | | | | | | | |
| 3. 1983 | | | | | | | | | | | |
| 4. 1984 | | | | | | | | | | | |
| 5. 1985 | | | | | | | | | | | |
| 6. 1986 | | | | | | | | | | | |
| 7. 1987 | | | | | | | | | | | |
| 8. 1988 | | | | | | | | | | | |
| 9. 1989 | | | | | | | | | | | |
| 10. 1990 | | | | | | | | | | | |
| 11. 1991 | | | | | | | | | | | |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | | |

*Net = (24 - 25) x (31 + 22)

MOAC000556

70
Item 2

70
Item 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

....................................................................
(Name)

## SCHEDULE P – PART 1N – REINSURANCE A
(000 Omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 2 Premiums Earned Direct and Assumed | 3 Ceded | 4 Net (2 – 3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 – 6 + 7 – 8 + 10) | 12 Number of Claim Reported – Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | 19,643 | 894 | 18,747 | 10,872 | 959 | 703 | | 24 | | 10,466 | X X X X |
| 2. 1989 | 35,250 | 2,429 | 32,863 | 43,267 | 26,066 | 311 | 55 | 2 | | 23,565 | X X X X |
| 3. 1990 | 39,836 | 3,762 | 35,654 | 81,868 | 664 | 68 | 6 | 392 | | 81,267 | X X X X |
| 4. 1991 | 18,416 | 4,124 | 14,290 | 3,679 | 299 | 15 | 5 | 4 | | 3,292 | X X X X |
| 5. Totals | X X X X | X X X X | X X X X | 139,687 | 21,860 | 1,367 | 66 | 151 | | 318,818 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 13 Losses Unpaid Case Basis Direct and Assumed | 14 Ceded | 15 Bulk + IBNR Direct and Assumed | 16 Ceded | 17 Allocated Loss Expense Unpaid Case Basis Direct and Assumed | 18 Ceded | 19 Bulk + IBNR Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expense Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claim Outstanding – Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | 822 | 65 | 896 | 352 | 22 | 8 | 28 | 3 | | 2,052 | X X X X |
| 2. 1989 | 3,646 | 950 | 829 | 383 | 92 | 24 | 28 | 4 | | 3,331 | X X X X |
| 3. 1990 | 1,606 | 33 | 5,399 | 672 | 67 | 1 | 352 | 14 | | 6,681 | X X X X |
| 4. 1991 | 1,432 | 314 | 6,413 | 801 | 64 | 9 | 194 | 24 | | 7,094 | X X X X |
| 5. Totals | 7,464 | 1,336 | 13,569 | 1,666 | 206 | 38 | 632 | 50 | | 18,699 | X X X X |

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 24 Total Losses and Loss Expenses Incurred Direct and Assumed | 25 Ceded | 26 Net * | 27 Loss and Loss Expense Percentage (Incurred/Premiums Earned) Direct and Assumed | 28 Ceded | 29 Net | 30 Discount for Time Value of Money Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | 33 Net Balance Sheet Reserves After Discount Losses Unpaid | 34 Losses Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | 13,424 | 1,337 | 12,099 | 66.4 | 326.9 | 65.6 | | | | 1,646 | 44 |
| 2. 1989 | 40,072 | 21,378 | 26,890 | 314.4 | 871.8 | 209.3 | | | | 3,240 | 91 |
| 3. 1990 | 89,321 | 1,373 | 87,948 | 694.6 | 38.5 | 641.3 | | | | 6,582 | 379 |
| 4. 1991 | 13,434 | 3,452 | 10,386 | 44.3 | 55.2 | 72.7 | | | | 6,809 | 206 |
| 5. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 18,179 | 529 |

*Net = (24 – 25) = (31 + 22)

## SCHEDULE P – PART 1O – REINSURANCE B
(000 Omitted)

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 2 Premiums Earned Direct and Assumed | 3 Ceded | 4 Net (2 – 3) | 5 Direct and Assumed | 6 Ceded | 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 – 6 + 7 – 8 + 10) | 12 Number of Claim Reported – Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | 44,547 | 1,270 | 43,037 | 6,700 | 406 | 251 | | 392 | | 6,045 | X X X X |
| 2. 1989 | 35,324 | 1,068 | 34,256 | 9,173 | 699 | 160 | | 7 | | 8,784 | X X X X |
| 3. 1990 | 42,846 | 3,329 | 37,729 | 10,033 | 80 | 70 | | | | 10,003 | X X X X |
| 4. 1991 | 44,365 | 678 | 43,687 | 2,352 | | 159 | | | | 2,533 | X X X X |
| 6. Totals | X X X X | X X X X | X X X X | 83,206 | 585 | 640 | | 395 | | 97,861 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 13 Losses Unpaid Case Basis Direct and Assumed | 14 Ceded | 15 Bulk + IBNR Direct and Assumed | 16 Ceded | 17 Allocated Loss Expenses Unpaid Case Basis Direct and Assumed | 18 Ceded | 19 Bulk + IBNR Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claim Outstanding – Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | 6,994 | 1,042 | 12,416 | 1,546 | 321 | 53 | 504 | 61 | | 17,429 | X X X X |
| 2. 1989 | 8,618 | 735 | 12,378 | 1,816 | 256 | 41 | 463 | 64 | | 18,563 | X X X X |
| 3. 1990 | 4,498 | 413 | 12,806 | 1,607 | 328 | 23 | 407 | 76 | | 18,217 | X X X X |
| 4. 1991 | 3,387 | 124 | 17,390 | 3,404 | 202 | 8 | 452 | 176 | | 24,630 | X X X X |
| 6. Totals | 23,793 | 2,314 | 54,824 | 8,073 | 1,110 | 329 | 2,976 | 372 | | 78,835 | X X X X |

| 1 Years in Which Premiums Were Earned and Losses Were Incurred | 24 Total Losses and Loss Expenses Incurred Direct and Assumed | 25 Ceded | 26 Net * | 27 Loss and Loss Expense Percentage (Incurred/Premiums Earned) Direct and Assumed | 28 Ceded | 29 Net | 30 Discount for Time Value of Money Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | 33 Net Balance Sheet Reserves After Discount Losses Unpaid | 34 Losses Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | 27,068 | 3,316 | 23,874 | 63.1 | 245.2 | 65.7 | | | | 16,722 | 707 |
| 2. 1989 | 27,196 | 2,849 | 24,367 | 77.0 | 266.8 | 71.1 | | | | 14,046 | 623 |
| 3. 1990 | 30,637 | 2,199 | 28,258 | 74.5 | 70.6 | 74.9 | | | | 17,303 | 836 |
| 4. 1991 | 34,837 | 3,713 | 31,123 | 78.5 | 667.3 | 71.7 | | | | 27,106 | 1,421 |
| 6. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 74,232 | 3,587 |

*Net = (24 – 25) = (31 + 22)

MOAC000557

71

71

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
(Name)

## SCHEDULE P - PART 1P - REINSURANCE C
(000 omitted)

| Years In Which Premiums Were Earned and Losses Were Incurred | Premium Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Direct and Assumed | Ceded | Net (2 - 3) | Loss Payments | | Allocated Loss Expense Payments | | Salvage and Subrogation Received | Unallocated Loss Expense Payments | Total Net Paid (5 - 6 + 7 - 8 + 10) | | |
| | 2 | 3 | 4 | Direct and Assumed 5 | Ceded 6 | Direct and Assumed 7 | Ceded 8 | 9 | 10 | 11 | | 12 |
| 1. 1988 | 16,852 | 724 | 16,128 | 12,344 | | | | | 2,163 | 13,377 | | X X X X |
| 2. 1989 | 20,407 | 1,031 | 19,576 | 2,349 | | 1,494 | 14 | 206 | 2,343 | | X X X X |
| 3. 1990 | 25,296 | 863 | 24,462 | 10,027 | | 206 | | 177 | 6,766 | | X X X X |
| 4. 1991 | 20,773 | 264 | 20,508 | 3,083 | | | | 65 | 4,388 | | X X X X |
| 5. Totals | X X X X | X X X X | X X X X | 27,035 | 1,494 | 250 | | 1,569 | 26,793 | | X X X X |

NOTE: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years In Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | | | Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis | | Bulk + IBNR | | Case Basis | | Bulk + IBNR | | Unallocated Loss Expenses Unpaid | Total Net Losses and Expenses Unpaid | |
| | Direct and Assumed 13 | Ceded 14 | Direct and Assumed 15 | Ceded 16 | Direct and Assumed 17 | Ceded 18 | Direct and Assumed 19 | Ceded 20 | 21 | 22 | 23 |
| 1. 1988 | 766 | | 4,749 | 501 | 103 | | 638 | 80 | | 5,683 | X X X X |
| 2. 1989 | 1,395 | | 3,653 | 430 | 104 | | 467 | 58 | | 4,959 | X X X X |
| 3. 1990 | 3,004 | 830 | 7,005 | 875 | 234 | 100 | 543 | 117 | | 9,509 | X X X X |
| 4. 1991 | 3,026 | 11 | 8,999 | 747 | 393 | 1 | 772 | 96 | | 9,336 | X X X X |
| 5. Totals | 8,157 | 819 | 21,227 | 2,643 | 936 | 101 | 2,826 | 351 | | 29,164 | X X X X |

| Years In Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Direct and Assumed 24 | Ceded 25 | Net * 26 | Direct and Assumed 27 | Ceded 28 | Net 29 | Loss 30 | Loss Expense 31 | Inter-Company Pooling Participation Percentage 32 | Losses Unpaid 33 | Loss Expenses Unpaid 34 |
| 1. 1988 | 19,653 | 671 | 18,980 | 116.9 | 93.3 | 117.8 | | | | 4,926 | 639 |
| 2. 1989 | 7,790 | 606 | 7,382 | 37.6 | 47.3 | 37.3 | | | | 4,367 | 567 |
| 3. 1990 | 23,683 | 3,394 | 18,090 | 83.5 | 420.4 | 72.5 | | | | 8,349 | 942 |
| 4. 1991 | 11,473 | 856 | 10,618 | 56.0 | 416.1 | 61.6 | | | | 8,097 | 1,040 |
| 5. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 28,902 | 3,784 |

*Net = (24 - 25) = (11 + 22)

## SCHEDULE P - PART 1Q - REINSURANCE D
(000 omitted)

| Years In Which Premiums Were Earned and Losses Were Incurred | Premium Earned | | | Loss and Loss Expense Payments | | | | | | | | Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Direct and Assumed 2 | Ceded 3 | Net (2 - 3) 4 | Direct and Assumed 5 | Ceded 6 | Direct and Assumed 7 | Ceded 8 | Salvage and Subrogation Received 9 | Unallocated Loss Expense Payments 10 | Total Net Paid (5 - 6 + 7 - 8 + 10) 11 | | 12 |
| 1. Prior | X X X X | X X X X | X X X X | | | | | | | | | X X X X |
| 2. 1982 | | | | | | | | | | | | X X X X |
| 3. 1983 | | | | | | | | | | | | X X X X |
| 4. 1984 | | | | | | | | | | | | X X X X |
| 5. 1985 | | | | | | | | | | | | X X X X |
| 6. 1986 | | | | | | | | | | | | X X X X |
| 7. 1987 | | | | | | | | | | | | X X X X |
| 8. Totals | X X X X | X X X X | X X X X | | | | | | | | | X X X X |

NOTE: For "prior," report amounts paid or received in current year only. Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years In Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid | | | | Allocated Loss Expenses Unpaid | | | | | | Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Case Basis 13 | Ceded 14 | Direct and Assumed 15 | Ceded 16 | Direct and Assumed 17 | Ceded 18 | Direct and Assumed 19 | Ceded 20 | Unallocated Loss Expenses Unpaid 21 | Total Net Losses and Expenses Unpaid 22 | 23 |
| 1. Prior | | | | | | | | | | | X X X X |
| 2. 1982 | | | | | | | | | | | X X X X |
| 3. 1983 | | | | | | | | | | | X X X X |
| 4. 1984 | | | **NONE** | | | | | | | | X X X X |
| 5. 1985 | | | | | | | | | | | X X X X |
| 6. 1986 | | | | | | | | | | | X X X X |
| 7. 1987 | | | | | | | | | | | X X X X |
| 8. Totals | | | | | | | | | | | X X X X |

| Years In Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred | | | Loss and Loss Expense Percentage (Incurred/Premiums Earned) | | | Discount for Time Value of Money | | | Net Balance Sheet Reserves After Discount | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Direct and Assumed 24 | Ceded 25 | Net * 26 | Direct and Assumed 27 | Ceded 28 | Net 29 | Loss 30 | Loss Expense 31 | Inter-Company Pooling Participation Percentage 32 | Losses Unpaid 33 | Loss Expenses Unpaid 34 |
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | | |
| 2. 1982 | | | | | | | | | | | |
| 3. 1983 | | | | | | | | | | | |
| 4. 1984 | | | | | | | | | | | |
| 5. 1985 | | | | | | | | | | | |
| 6. 1986 | | | | | | | | | | | |
| 7. 1987 | | | | | | | | | | | |
| 8. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | | |

*Net = (24 - 25) = (11 + 22)

MOAC000558

72
Form 8

72
Form 8

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
··········································
(Name)

## SCHEDULE P - PART 1R - PRODUCTS LIABILITY

(000 omitted)

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | Premiums Earned 2 Direct and Assumed | 3 Ceded | 4 Net (2 - 3) | Loss Payments 5 Direct and Assumed | 6 Ceded | Allocated Loss Expense Payments 7 Direct and Assumed | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 - 6 + 7 - 8 + 10) | 12 Number of Claims Reported - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | 54,391 | 15,867 | 20,892 | 17,071 | 697 | 2,064 | 44,609 | X X X X |
| 2. 1982 | 44,001 | 25,911 | 18,090 | 57,552 | 29,815 | 11,570 | 4,736 | 153 | 2,521 | 40,292 | 8,264 |
| 3. 1983 | 26,888 | 13,288 | 13,300 | 37,430 | 14,969 | 16,196 | 5,803 | 525 | 1,668 | 30,583 | 10,382 |
| 4. 1984 | 19,577 | 7,488 | 12,409 | 29,508 | 10,346 | 11,076 | 3,864 | 332 | 1,504 | 29,630 | 13,846 |
| 5. 1985 | 20,294 | 3,844 | 18,350 | 12,890 | (479) | 6,572 | (307) | 288 | 2,738 | 22,942 | 8,563 |
| 6. 1986 | 40,397 | 127 | 40,274 | 14,066 | 2 | 7,532 | (4) | 167 | 2,734 | 24,336 | 353 |
| 7. 1987 | 51,660 | 1,884 | 50,272 | 9,963 | (15) | 4,486 | | 92 | 2,152 | 16,520 | (787) |
| 8. 1988 | 43,276 | 560 | 48,718 | 11,888 | | 6,580 | | 93 | 1,670 | 19,146 | 510 |
| 9. 1989 | 46,801 | 66 | 46,735 | 7,436 | | 2,083 | | 80 | 1,781 | 11,790 | 8,511 |
| 10. 1990 | 39,924 | (901) | 39,914 | 2,176 | | 829 | | 26 | 1,321 | 5,186 | 3,576 |
| 11. 1991 | 31,847 | (613) | 31,930 | 954 | | 135 | | 4 | 979 | 2,067 | 1,673 |
| 12. Totals | X X X X | X X X X | X X X X | 239,327 | 69,809 | 93,244 | 31,203 | 2,437 | 20,070 | 248,929 | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | Losses Unpaid Case Basis 13 Direct and Assumed | 14 Ceded | Bulk + IBNR 15 Direct and Assumed | 16 Ceded | Allocated Loss Expenses Unpaid Case Basis 17 Direct and Assumed | 18 Ceded | Bulk + IBNR 19 Direct and Assumed | 20 Ceded | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding - Direct and Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 256,809 | 76,156 | 273,637 | 92,424 | 60,325 | 17,406 | 51,194 | 31,861 | 6,972 | 636,890 | 1,177 |
| 2. 1982 | 17,752 | 10,919 | 17,607 | 6,969 | 3,000 | 962 | 3,932 | 2,204 | 807 | 21,776 | 148 |
| 3. 1983 | 8,726 | 4,589 | 9,272 | 3,341 | 2,407 | 738 | 2,647 | 1,268 | 343 | 13,460 | 94 |
| 4. 1984 | 7,638 | 3,403 | 8,273 | 1,316 | 2,647 | 490 | 1,748 | 256 | 196 | 14,638 | 129 |
| 5. 1985 | 3,634 | 399 | 1,431 | 13 | 1,966 | 32 | 600 | 6 | 190 | 7,772 | 128 |
| 6. 1986 | 6,932 | 56 | 1,932 | 46 | 4,760 | 34 | 636 | 3 | 200 | 14,268 | 176 |
| 7. 1987 | 10,942 | | 3,468 | 157 | 4,623 | | 1,060 | 5 | 538 | 20,452 | 267 |
| 8. 1988 | 12,530 | | 6,799 | 96 | 4,220 | | 1,669 | 6 | 789 | 25,883 | 265 |
| 9. 1989 | 17,064 | | 6,888 | 85 | 8,464 | | 2,690 | 3 | 1,123 | 34,188 | 414 |
| 10. 1990 | 13,729 | | 11,949 | 156 | 6,589 | | 4,603 | 4 | 1,478 | 37,457 | 430 |
| 11. 1991 | 3,282 | | 15,938 | 144 | 1,932 | | 5,036 | 5 | 2,492 | 28,629 | 378 |
| 12. Totals | 359,873 | 95,318 | 353,079 | 121,833 | 82,486 | 19,660 | 76,552 | 35,362 | 16,623 | 830,255 | 3,532 |

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | Total Losses and Loss Expenses Incurred 24 Direct and Assumed | 25 Ceded | 26 Net * | Loss and Loss Expense Percentage (Incurred/Premiums Earned) 27 Direct and Assumed | 28 Ceded | 29 Net | Discount for Time Value of Money 30 Loss | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | Net Balance Sheet Reserves After Discount 33 Losses Unpaid | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 354,106 | 49,484 |
| 2. 1982 | 115,867 | 52,979 | 62,070 | 262.7 | 206.6 | 343.1 | | | | 17,745 | 4,039 |
| 3. 1983 | 74,345 | 30,702 | 44,043 | 281.1 | 272.0 | 287.9 | | | | 10,071 | 1,389 |
| 4. 1984 | 63,483 | 17,385 | 46,058 | 317.5 | 232.2 | 368.0 | | | | 12,772 | 1,866 |
| 5. 1985 | 30,256 | (680) | 30,936 | 148.1 | (84.7) | 166.7 | | | | 5,066 | 2,738 |
| 6. 1986 | 40,830 | 176 | 40,634 | 101.0 | 143.1 | 100.9 | | | | 10,132 | 5,566 |
| 7. 1987 | 39,303 | 361 | 38,942 | 75.6 | 10.9 | 77.5 | | | | 14,430 | 4,602 |
| 8. 1988 | 45,133 | 368 | 48,089 | 91.6 | 85.6 | 92.4 | | | | 17,830 | 6,673 |
| 9. 1989 | 48,044 | 58 | 47,946 | 102.7 | 87.6 | 102.7 | | | | 23,815 | 12,273 |
| 10. 1990 | 42,944 | 161 | 42,763 | 104.6 | (178.9) | 100.0 | | | | 28,823 | 12,436 |
| 11. 1991 | 30,876 | 151 | 30,725 | 97.0 | (239.3) | 96.3 | | | | 18,346 | 10,336 |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | 611,405 | 110,882 |

*Net = (24 - 25) = (33 + 22)

MOAC000559

73
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

(Name)

73
Form 2

## SCHEDULE P - PART 2A - HOMEOWNERS/FARMOWNERS

| Years in Which Losses Were Incurred | Incurred Losses and Allocated Expenses Reported at Year End (000 omitted) | | | | | | | | | | Development** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 One Year | 13 Two Year |
| 1. Prior | 322,423 * | 124,940 | 129,211 | 336,563 | 339,216 | 343,235 | 347,172 | 349,041 | 350,266 | 352,064 | 1,948 | 1,663 |
| 2. 1982 | 327,918 | 730,043 | 733,705 | 734,212 | 739,056 | 743,115 | 742,666 | 740,255 | 740,395 | 740,970 | 75 | 35 |
| 3. 1983 | X X X X | 765,437 | 790,585 | 797,809 | 799,294 | 801,042 | 801,249 | 805,266 | 806,006 | 806,408 | 1,520 | 1,340 |
| 4. 1984 | X X X X | X X X X | 823,691 | 822,623 | 821,150 | 823,993 | 826,882 | 827,023 | 829,423 | 829,423 | 2,781 | 5,151 |
| 5. 1985 | X X X X | X X X X | X X X X | 955,616 | 960,562 | 970,941 | 976,423 | 977,380 | 977,383 | 979,829 | 2,536 | 3,942 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 904,897 | 947,671 | 949,136 | 952,773 | 956,763 | 956,298 | (1,013) | 2,538 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 1,306,965 | 1,064,281 | 1,301,502 | 1,309,954 | 1,310,009 | 965 | 5,407 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,308,901 | 1,305,091 | 1,315,948 | 1,307,046 | (6,902) | 1,461 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,504,299 | 1,678,387 | 1,660,080 | (13,132) | 300,791 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,640,931 | 1,716,462 | 64,731 | X X X X |
| 11. 1992 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,911,063 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 42,980 | 132,672 |

## SCHEDULE P - PART 2B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 1,300,853 * | 3,326,450 | 3,150,370 | 3,183,015 | 3,186,130 | 3,211,250 | 3,226,353 | 1,249,621 | 1,269,843 | 19,822 | 22,823 |
| 2. 1982 | 1,855,591 | 1,829,864 | 1,766,345 | 1,790,432 | 1,742,830 | 1,735,580 | 1,942,445 | 1,737,270 | 1,741,016 | 4,101 | 4,614 |
| 3. 1983 | X X X X | 2,113,699 | 2,023,761 | 2,027,319 | 2,008,687 | 1,982,961 | 1,978,560 | 1,972,919 | 1,977,308 | 372 | 4,286 |
| 4. 1984 | X X X X | X X X X | 3,303,330 | 2,957,240 | 2,719,066 | 2,393,822 | 2,371,062 | 2,167,606 | 2,166,353 | 2,166,654 | (3,202) |
| 5. 1985 | X X X X | X X X X | X X X X | 2,457,312 | 2,506,207 | 2,461,074 | 2,442,541 | 2,429,450 | 2,422,641 | 2,430,706 | 6,075 | 1,316 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 2,884,281 | 2,900,683 | 2,849,349 | 2,845,349 | 2,837,633 | 2,845,249 | 8,216 | 400 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 3,327,654 | 3,316,934 | 3,283,190 | 3,300,717 | 25,046 | 17,547 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 3,016,320 | 3,826,624 | 3,826,473 | 3,830,368 | 6,686 | (16,363) |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 4,323,876 | 4,420,160 | 4,464,040 | 44,926 | 140,175 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 4,951,457 | 4,951,203 | (203) | X X X X |
| 11. 1993 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 5,217,562 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 132,703 | 174,304 |

## SCHEDULE P - PART 2C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 113,254 * | 53,315 | 53,413 | 100,830 | 103,950 | 58,000 | 99,388 | 97,396 | 102,099 | 104,434 | 1,715 | 7,038 |
| 2. 1982 | 46,513 | 48,596 | 47,560 | 49,006 | 56,329 | 69,056 | 40,065 | 40,879 | 40,366 | (165) | 83 |
| 3. 1983 | X X X X | 66,773 | 62,461 | 68,466 | 76,330 | 68,564 | 60,603 | 60,562 | 60,589 | (963) | 374 |
| 4. 1984 | X X X X | X X X X | 95,361 | 108,313 | 113,963 | 119,175 | 109,497 | 110,647 | 110,285 | 131,038 | (266) | 337 |
| 5. 1985 | X X X X | X X X X | X X X X | 125,562 | 340,922 | 344,624 | 337,029 | 332,437 | 132,847 | 131,997 | (1,320) | (56) |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 348,353 | 356,037 | 356,370 | 349,243 | 348,641 | 344,767 | (1,794) | (4,074) |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 379,902 | 387,666 | 388,346 | 387,081 | (730) | (1,320) |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 395,069 | 205,823 | 210,337 | 213,767 | 3,430 | 2,928 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 215,019 | 201,352 | 208,194 | (9,036) | (32,683) |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 216,736 | 227,636 | 20,298 | X X X X |
| 11. 1993 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 210,006 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 8,049 | (2,380) |

## SCHEDULE P - PART 2D - WORKERS' COMPENSATION

| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 156,570 * | 332,066 | 137,669 | 122,733 | 126,867 | 333,411 | 138,667 | 350,239 | 5,191 | 16,562 |
| 2. 1982 | 58,567 | 35,473 | 39,585 | 54,299 | 35,069 | 34,664 | 36,138 | 34,542 | 34,684 | (404) | 232 |
| 3. 1983 | X X X X | 62,664 | 60,230 | 63,787 | 67,870 | 66,924 | 72,061 | 69,633 | 69,260 | 68,735 | (435) | (646) |
| 4. 1984 | X X X X | X X X X | 109,234 | 134,346 | 337,064 | 341,662 | 346,002 | 344,843 | 341,696 | 340,847 | (669) | (4,094) |
| 5. 1985 | X X X X | X X X X | X X X X | 149,072 | 352,356 | 362,301 | 387,257 | 382,457 | 379,300 | 178,210 | (1,663) | (7,615) |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 346,366 | 212,943 | 204,763 | 220,063 | 204,737 | 211,060 | 1,360 | (8,996) |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 264,867 | 358,744 | 335,563 | 314,654 | 312,109 | (2,645) | (7,946) |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 347,414 | 362,360 | 347,284 | 390,945 | (16,662) | (22,360) |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 336,830 | 336,463 | 276,494 | (37,987) | (56,632) |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 269,193 | 333,361 | 22,383 | X X X X |
| 11. 1993 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 297,174 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | (79,290) | (58,021) |

## SCHEDULE P - PART 2E - COMMERCIAL MULTIPLE PERIL

| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 34,739 * | 28,099 | 25,277 | 21,191 | 25,507 | 28,849 | 28,693 | 28,693 | 30,194 | 1,801 | 2,118 |
| 2. 1982 | 59,421 | 57,874 | 56,616 | 54,026 | 64,085 | 57,848 | 57,295 | 56,570 | 56,820 | (366) | (1,071) |
| 3. 1983 | X X X X | 73,771 | 71,505 | 68,384 | 64,729 | 73,123 | 73,182 | 72,704 | 76,780 | 78,787 | (3,083) | 3,063 |
| 4. 1984 | X X X X | X X X X | 102,119 | 97,426 | 57,929 | 103,339 | 100,017 | 107,602 | 105,347 | 100,434 | 3,873 | 3,752 |
| 5. 1985 | X X X X | X X X X | X X X X | 102,490 | 120,951 | 133,752 | 130,584 | 130,560 | 130,562 | (2,149) | (500) |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 137,567 | 146,119 | 147,134 | 157,447 | 152,746 | 153,733 | 987 | 1,246 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 179,326 | 179,913 | 164,000 | 161,301 | (2,877) | (3,148) |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 210,469 | 206,663 | 234,823 | 230,607 | (3,116) | 8,370 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 254,643 | 293,690 | 246,608 | 7,936 | 41,967 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 304,719 | 316,704 | 12,065 | X X X X |
| 11. 1993 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 318,656 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 11,676 | 60,239 |

*Reported reserves only. Subsequent development relates only to subsequent payments and reserves.
**Current year less first or second prior year, showing (redundant) or adverse.

74
*Form 8*

74
*Form 8*

**CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS**

·············································

(Name)

## SCHEDULE P - PART 2F - MEDICAL MALPRACTICE

| 1 Years in Which Losses Were Incurred | Incurred Losses and Allocated Expenses Reported at Year-End (000 omitted) | | | | | | | | | | Development** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | 12 One Year | 13 Two Year |
| 1. Prior | 70,934 * | 70,385 | 68,706 | 66,346 | 69,586 | 70,878 | 69,095 | 87,290 | 90,764 | 107,819 | 3,066 | 14,620 |
| 2. 1982 | 1,630 | 2,065 | 6,345 | 7,476 | 17,048 | 9,387 | 13,644 | 14,611 | 17,258 | 28,678 | 2,668 | 5,659 |
| 3. 1983 | X X X X | 5,161 | 8,467 | 11,605 | 19,611 | 22,129 | 29,434 | 26,333 | 28,978 | | 1,348 | 266 |
| 4. 1984 | X X X X | X X X X | 6,640 | 7,662 | 30,784 | 13,399 | 13,707 | 13,827 | 14,226 | 14,683 | 427 | 826 |
| 5. 1985 | X X X X | X X X X | X X X X | 7,696 | 3,738 | 2,295 | 2,295 | 7,060 | 1,860 | 1,673 | 1 | (395) |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 1,550 | 1,466 | 1,417 | | | | | |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 623 | 453 | 651 | | | | (493) |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 300 | 213 | | | | (213) |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 7 | 2 | | 1 | (5) |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 2 | | | |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 7,994 | 20,324 |

## SCHEDULE P - PART 2G - SPECIAL LIABILITY (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)

| | | | | | | | | | | | Dev. One Year | Dev. Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 57,682 * | 66,611 | 56,470 | 54,461 | 54,600 | 52,624 | 54,502 | 54,588 | 54,684 | 54,736 | 2,090 | 2,685 |
| 2. 1982 | 15,133 | 29,246 | 32,840 | 35,191 | 33,849 | 30,964 | 35,891 | 36,068 | 35,927 | 34,364 | (3,230) | (1,275) |
| 3. 1983 | X X X X | 29,576 | 34,900 | 35,123 | 35,772 | 37,007 | 38,319 | 34,059 | 31,282 | 35,630 | (1,717) | (2,509) |
| 4. 1984 | X X X X | X X X X | 35,330 | 26,650 | 28,153 | 29,639 | 31,342 | 29,078 | 29,866 | 32,897 | 3,366 | 3,821 |
| 5. 1985 | X X X X | X X X X | X X X X | 22,928 | 19,863 | 22,660 | 29,412 | 38,338 | 18,856 | 19,049 | 186 | 305 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 21,964 | 24,977 | 29,630 | 22,263 | 20,709 | 21,256 | 697 | (963) |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 26,897 | 38,342 | 34,226 | 31,864 | 34,650 | 1,256 | 624 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 9,009 | 23,310 | 30,731 | 34,892 | 3,541 | 10,462 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 10,091 | 35,941 | 90,319 | 30,429 | 90,029 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 7,148 | 16,097 | 9,553 | |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 27,810 | 33,417 |

## SCHEDULE P - PART 2H - OTHER LIABILITY

| | | | | | | | | | | | Dev. One Year | Dev. Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 370,865 * | 363,639 | 361,680 | 276,906 | 258,886 | 445,072 | 474,683 | 464,730 | 492,392 | 565,006 | 92,867 | 160,278 |
| 2. 1982 | 61,724 | 69,052 | 65,993 | 66,290 | 60,060 | 101,338 | 95,093 | 85,717 | 80,512 | 95,776 | 8,866 | 8,069 |
| 3. 1983 | X X X X | 63,652 | 72,136 | 63,385 | 83,886 | 100,248 | 102,936 | 106,683 | 108,712 | 116,409 | 7,697 | 10,328 |
| 4. 1984 | X X X X | X X X X | 70,763 | 70,828 | 78,633 | 91,938 | 86,652 | 98,356 | 112,656 | 132,034 | 19,862 | 17,353 |
| 5. 1985 | X X X X | X X X X | X X X X | 74,834 | 64,697 | 70,624 | 72,940 | 74,284 | 76,520 | 87,806 | 12,870 | 13,306 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 71,195 | 300,656 | 300,989 | 96,060 | 93,761 | 91,412 | (2,343) | (4,666) |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 200,098 | 331,672 | 113,528 | 135,376 | 120,358 | 8,743 | 8,411 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 312,952 | 325,669 | 326,633 | 129,863 | 8,069 | 8,396 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 86,566 | 80,698 | 104,300 | 5,064 | 17,625 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 207,084 | 93,703 | (16,383) | X X X X |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 88,039 | X X X X | X X X X |
| 12. Totals | | | | | | | | | | | 131,107 | 213,085 |

## SCHEDULE P - PART 2I - SPECIAL PROPERTY (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, GLASS, BURGLARY AND THEFT)

| | | | | | | | | | | | Dev. One Year | Dev. Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | (41,634) * | 214,997 | 225,957 | 7,000 | 80,965 |
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 530,799 | 230,996 | 20,327 | X X X X |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 227,046 | X X X X | X X X X |
| 4. Totals | | | | | | | | | | 27,207 | 80,365 |

## SCHEDULE P - PART 2J - AUTO PHYSICAL DAMAGE

| | | | | | | | | | | | Dev. One Year | Dev. Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 379,819 * | 179,373 | 122,656 | (56,917) | (243,067) |
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 2,602,483 | 2,465,563 | (242,140) | X X X X |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 2,611,816 | X X X X | X X X X |
| 4. Totals | | | | | | | | | | (299,067) | (243,067) |

## SCHEDULE P - PART 2K - FIDELITY, SURETY, FINANCIAL GUARANTY, MORTGAGE GUARANTY

| | | | | | | | | | | | Dev. One Year | Dev. Two Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 182,760 * | 143,817 | 134,047 | (33,370) | (46,811) |
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 100,863 | 63,351 | (37,436) | X X X X |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 74,328 | X X X X | X X X X |
| 4. Totals | | | | | | | | | | (50,705) | (46,811) |

*Reported reserves only. Subsequent development relates only to subsequent payments and reserves.
**Current year loss first or second prior year, showing (redundant) or adverse.

MOAC000561

75
75

Form 2
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

·····························································
(Name)

## SCHEDULE P - PART 2L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

| 1 Years in Which Losses Were Incurred | Incurred Losses and Allocated Expenses Reported at Year End (000 omitted) | | | | | | | | | | | Development** | |
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | | 12 One Year | 13 Two Year |
| 1. Prior | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 254 * | 485 | 489 | | 4 | 235 |
| 2. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 194 | 171 | | 37 | |
| 3. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 163 | | | |
| 6. Totals | | | | | | | | | | | | 41 | 235 |

## SCHEDULE P - PART 2M - INTERNATIONAL

NONE

| 1. Prior | | | | | | | | | | | | | |
| 2. 1982 | | | | | | | | | | | | | |
| 3. 1983 | XXXX | XXXX | | | | | | | | | | | |
| 4. 1984 | XXXX | XXXX | XXXX | | | | | | | | | | |
| 5. 1985 | XXXX | XXXX | XXXX | XXXX | | | | | | | | | |
| 6. 1986 | XXXX | XXXX | XXXX | XXXX | | | | | | | | | |
| 7. 1987 | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | | | | |
| 8. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | | | |
| 9. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | | |
| 10. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | XXXX | |
| 11. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | XXXX | XXXX |
| 12. Totals | | | | | | | | | | | | | |

## SCHEDULE P - PART 2N - REINSURANCE A

| 1. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 14,319 | 13,823 | 14,856 | 37,208 | | (4,567) | (1,534) |
| 2. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 21,766 | 24,065 | 24,098 | | 1,831 | 3,330 |
| 3. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 32,645 | 67,948 | | 86,903 | XXXX |
| 4. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 30,388 | | XXXX | XXXX |
| 6. Totals | | | | | | | | | | | | 82,867 | 1,994 |

## SCHEDULE P - PART 2O - REINSURANCE B

| 1. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 30,095 | 31,820 | 21,795 | 23,376 | | 2,175 | (7,053) |
| 2. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 20,872 | 26,044 | 24,347 | | (4,487) | (1,804) |
| 3. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 24,068 | 20,238 | | 3,833 | XXXX |
| 4. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 31,121 | | XXXX | XXXX |
| 6. Totals | | | | | | | | | | | | (466) | (9,378) |

## SCHEDULE P - PART 2P - REINSURANCE C

| 1. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 12,253 | 16,903 | 20,028 | 30,990 | | (1,066) | 2,853 |
| 2. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 7,910 | 9,961 | 7,302 | | (2,059) | (656) |
| 3. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 11,412 | 18,067 | | 6,065 | XXXX |
| 4. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 32,638 | | XXXX | XXXX |
| 6. Totals | | | | | | | | | | | | 2,862 | 2,246 |

## SCHEDULE P - PART 2Q - REINSURANCE D

NONE

| 1. Prior | | | | | | | | | | | | | |
| 2. 1982 | | | | | | | | | | | | | |
| 3. 1983 | XXXX | | | | | | | | | | | | |
| 4. 1984 | XXXX | XXXX | | | | | | | | | | | |
| 5. 1985 | XXXX | XXXX | XXXX | | | | | | | | | | |
| 6. 1986 | XXXX | XXXX | XXXX | XXXX | | | | | | | | | |
| 7. 1987 | XXXX | XXXX | XXXX | XXXX | | | | | | | | | |
| 6. Totals | | | | | | | | | | | | | |

## SCHEDULE P - PART 2R - PRODUCTS LIABILITY

| 1. Prior | 320,279 * | 145,272 | 157,393 | 322,862 | 625,704 | 452,327 | 509,643 | 663,261 | 721,061 | 763,430 | | 80,739 | 316,569 |
| 2. 1982 | 10,564 | 12,304 | 15,845 | 24,837 | 34,067 | 51,004 | 85,307 | 51,923 | 54,308 | 59,342 | | 4,834 | 7,878 |
| 3. 1983 | XXXX | 10,064 | 12,483 | 16,437 | 30,978 | 39,303 | 42,834 | 62,928 | 64,200 | 62,034 | | (2,218) | (864) |
| 4. 1984 | XXXX | XXXX | 9,975 | 16,124 | 28,799 | 34,310 | 30,860 | 43,562 | 48,080 | 64,673 | | (247) | 1,041 |
| 5. 1985 | XXXX | XXXX | XXXX | 12,847 | 24,196 | 26,866 | 25,667 | 29,437 | 28,577 | 27,431 | | (748) | (2,006) |
| 6. 1986 | XXXX | XXXX | XXXX | XXXX | 26,439 | 29,377 | 24,638 | 31,238 | 35,875 | 37,421 | | 3,744 | 4,283 |
| 7. 1987 | XXXX | XXXX | XXXX | XXXX | XXXX | 29,696 | 31,326 | 33,006 | 35,067 | 36,876 | | 169 | 4,542 |
| 8. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 31,996 | 32,785 | 44,054 | 42,662 | | (2,292) | 9,747 |
| 9. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 34,666 | 42,665 | 45,582 | | 3,517 | 30,998 |
| 10. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 36,263 | 40,386 | | 3,523 | XXXX |
| 11. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 27,286 | | XXXX | XXXX |
| 12. Totals | | | | | | | | | | | | 89,828 | 149,706 |

*Reported reserves only. Subsequent development relates only to subsequent payments and reserves.
**Current year less first or second prior year, showing (redundant) or adverse.

MOAC000562

76

76

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

(Name)

## SCHEDULE P - PART 3A - HOMEOWNERS/FARMOWNERS

| | Years in Which Losses Were Incurred | Cumulative Paid Losses and Allocated Expenses at Year End ($000 omitted) | | | | | | | | | | 12 Number of Claims Closed With Loss Payment | 13 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | | |
| 1. | Prior | 0 | 67,863 | 74,746 | 103,515 | 120,902 | 131,309 | 139,556 | 144,385 | 147,266 | 152,004 | 329 | 184 |
| 2. | 1982 | 539,541 | 653,441 | 689,562 | 705,786 | 719,814 | 725,606 | 733,327 | 737,125 | 738,799 | 739,648 | 193 | 130 |
| 3. | 1983 | X X X X | 645,623 | 710,742 | 734,467 | 754,700 | 774,624 | 780,745 | 790,320 | 801,634 | 804,852 | 413 | 184 |
| 4. | 1984 | X X X X | X X X X | 570,068 | 721,056 | 766,626 | 790,276 | 806,633 | 819,381 | 820,654 | 825,642 | 878 | 330 |
| 5. | 1985 | X X X X | X X X X | X X X X | 605,178 | 666,907 | 909,667 | 932,464 | 951,637 | 950,702 | 916,317 | 1,843 | 608 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 660,640 | 842,674 | 884,063 | 907,355 | 924,266 | 934,396 | 2,746 | 1,115 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 784,623 | 979,261 | 1,001,022 | 1,053,041 | 1,070,182 | 4,512 | 1,800 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 920,747 | 1,166,362 | 1,219,040 | 1,244,563 | 42,581 | 23,066 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,112,109 | 1,456,301 | 1,650,940 | 938,346 | 256,282 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,170,640 | 1,517,764 | 853,040 | 273,426 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,366,697 | 840,932 | 262,583 |

## SCHEDULE P - PART 3B - PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 0 | 509,710 | 790,680 | 949,666 | 1,039,805 | 1,094,313 | 1,123,863 | 1,145,342 | 1,160,201 | 1,168,697 | 24,257 | 6,511 |
| 2. | 1982 | 447,360 | 1,165,397 | 1,414,120 | 1,543,658 | 1,639,203 | 1,679,238 | 1,701,929 | 1,712,447 | 1,739,650 | 1,725,623 | 23,561 | 4,447 |
| 3. | 1983 | X X X X | 723,349 | 1,250,367 | 1,623,094 | 1,746,332 | 3,864,384 | 1,906,566 | 1,927,950 | 1,940,676 | 1,953,189 | 23,698 | 3,254 |
| 4. | 1984 | X X X X | X X X X | 803,954 | 1,404,543 | 1,604,335 | 1,931,356 | 2,058,756 | 2,105,302 | 2,126,728 | 2,147,306 | 29,932 | 2,523 |
| 5. | 1985 | X X X X | X X X X | X X X X | 848,962 | 1,464,176 | 2,009,297 | 2,800,785 | 2,901,005 | 2,358,467 | 2,392,851 | 37,506 | 10,474 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 1,025,879 | 1,943,747 | 2,346,955 | 2,566,102 | 2,655,162 | 2,763,664 | 53,995 | 12,445 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 1,392,187 | 2,996,840 | 2,707,948 | 2,990,721 | 3,128,435 | 36,870 | 11,524 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,376,364 | 2,847,862 | 3,127,415 | 3,437,216 | 340,683 | 63,516 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,876,276 | 3,013,428 | 3,665,873 | 1,388,605 | 1,085,636 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,782,877 | 3,909,900 | 1,134,821 | 1,041,625 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 1,778,098 | 838,413 | 674,375 |

## SCHEDULE P - PART 3C - COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 0 | 21,573 | 53,610 | 67,066 | 60,329 | 67,040 | 84,964 | 88,122 | 93,867 | 95,832 | 1,370 | 336 |
| 2. | 1982 | 12,135 | 21,043 | 29,573 | 35,230 | 41,560 | 45,369 | 45,720 | 46,132 | 47,016 | 47,034 | 651 | 104 |
| 3. | 1983 | X X X X | 11,447 | 26,094 | 42,013 | 51,092 | 57,170 | 62,167 | 64,902 | 66,373 | 66,776 | 629 | 117 |
| 4. | 1984 | X X X X | X X X X | 21,685 | 48,742 | 74,669 | 93,464 | 95,392 | 102,061 | 105,800 | 108,066 | 821 | 204 |
| 5. | 1985 | X X X X | X X X X | X X X X | 25,823 | 56,997 | 80,661 | 103,677 | 112,320 | 122,666 | 126,713 | 1,647 | 605 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 28,060 | 65,019 | 53,068 | 112,844 | 123,573 | 135,828 | 3,345 | 1,772 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 32,760 | 74,183 | 105,704 | 131,926 | 152,609 | 6,580 | 1,974 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 33,830 | 75,328 | 125,477 | 140,563 | 12,877 | 6,700 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 37,462 | 84,436 | 130,632 | 30,806 | 22,293 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 40,600 | 98,548 | 27,637 | 20,730 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 42,476 | 16,436 | 15,284 |

## SCHEDULE P - PART 3D - WORKERS' COMPENSATION

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 0 | 26,330 | 30,493 | 43,167 | 53,684 | 62,195 | 66,833 | 76,624 | 81,646 | 86,232 | 810 | 337 |
| 2. | 1982 | 8,368 | 19,927 | 20,662 | 23,258 | 26,648 | 26,480 | 27,934 | 28,660 | 29,369 | 29,500 | 57 | 91 |
| 3. | 1983 | X X X X | 17,021 | 33,824 | 42,867 | 47,938 | 51,827 | 55,002 | 57,509 | 59,072 | 60,302 | 116 | 232 |
| 4. | 1984 | X X X X | X X X X | 33,083 | 64,009 | 87,000 | 308,197 | 113,354 | 117,309 | 121,844 | 125,476 | 390 | 469 |
| 5. | 1985 | X X X X | X X X X | X X X X | 36,873 | 79,801 | 309,401 | 129,279 | 140,435 | 168,247 | 168,366 | 745 | 1,180 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 43,742 | 95,020 | 135,807 | 153,696 | 185,850 | 173,568 | 1,637 | 2,781 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 61,650 | 136,829 | 193,963 | 227,900 | 246,604 | 5,617 | 6,472 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 70,373 | 163,060 | 203,346 | 251,049 | 24,099 | 23,680 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 64,647 | 136,447 | 179,342 | 21,326 | 20,714 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 52,233 | 139,370 | 87,705 | 19,791 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 90,519 | 39,208 | 11,559 |

## SCHEDULE P - PART 3E - COMMERCIAL MULTIPLE PERIL

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 0 | 4,772 | 10,928 | 16,456 | 16,688 | 22,068 | 23,530 | 23,784 | 26,522 | 27,438 | 38 | 17 |
| 2. | 1982 | 21,224 | 37,226 | 42,913 | 47,074 | 48,438 | 52,188 | 52,927 | 53,804 | 53,828 | 54,346 | 27 | 24 |
| 3. | 1983 | X X X X | 25,457 | 45,724 | 52,340 | 56,809 | 61,404 | 63,992 | 68,567 | 70,419 | 72,478 | 62 | 34 |
| 4. | 1984 | X X X X | X X X X | 40,740 | 65,103 | 74,009 | 81,238 | 88,652 | 93,004 | 93,607 | 93,009 | 174 | 109 |
| 5. | 1985 | X X X X | X X X X | X X X X | 60,871 | 88,649 | 300,126 | 107,953 | 112,256 | 117,741 | 121,660 | 268 | 248 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 46,422 | 94,367 | 109,286 | 119,289 | 128,233 | 135,317 | 800 | 417 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 74,903 | 112,937 | 126,990 | 137,837 | 149,409 | 1,347 | 894 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 99,049 | 158,456 | 203,246 | 249,626 | 5,384 | 3,462 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 123,227 | 254,936 | 310,386 | 57,544 | 35,069 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 136,302 | 203,742 | 99,300 | 24,116 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 150,856 | 53,833 | 29,782 |

Note: Net of salvage and subrogation received.

MOAC000563

77
77

Form 2
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

(Income)

## SCHEDULE P - PART 3F - MEDICAL MALPRACTICE

| 1 Years in Which Losses Were Incurred | Cumulative Paid Losses and Allocated Expenses at Year End (000 omitted) | | | | | | | | | | | 18 Number of Claims Closed With Loss Payment | 19 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 | | | |
| 1. Prior | 000 | 8,471 | 16,300 | 24,438 | 37,340 | 39,806 | 47,612 | 55,336 | 62,304 | 68,082 | | 57 | (13) |
| 2. 1982 | 8 | 347 | 1,016 | 1,343 | 1,844 | 3,962 | 6,349 | 4,678 | 6,062 | 6,631 | | 66 | 53 |
| 3. 1983 | XXXX | | 519 | 3,856 | 4,394 | 6,738 | 9,864 | 13,493 | 17,099 | 34,355 | | 161 | 96 |
| 4. 1984 | XXXX | XXXX | 44 | 603 | 1,802 | 2,628 | 4,779 | 5,289 | 6,476 | 7,988 | | 94 | 78 |
| 5. 1985 | XXXX | XXXX | XXXX | 35 | 21 | 142 | 665 | 473 | 843 | 990 | | 8 | 7 |
| 6. 1986 | XXXX | XXXX | XXXX | XXXX | | | | | | | | | 8 |
| 7. 1987 | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | | | | 6 |
| 8. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | | | |
| 9. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | 8 | 3 |
| 10. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | | |
| 11. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | | | | |

## SCHEDULE P - PART 3G - SPECIAL LIABILITY (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)

| 1. Prior | 000 | 21,906 | 30,730 | 34,866 | 49,385 | 44,861 | 46,024 | 47,684 | 48,652 | 68,696 | XXXX | XXXX |
| 2. 1982 | 6,397 | 36,353 | 22,520 | 26,581 | 28,714 | 31,645 | 32,578 | 33,789 | 33,404 | 37,685 | XXXX | XXXX |
| 3. 1983 | XXXX | 6,559 | 17,977 | 23,587 | 27,882 | 28,756 | 30,133 | 31,731 | 31,562 | 32,085 | XXXX | XXXX |
| 4. 1984 | XXXX | XXXX | 5,845 | 11,622 | 18,889 | 20,739 | 23,760 | 24,584 | 25,433 | 26,239 | XXXX | XXXX |
| 5. 1985 | XXXX | XXXX | XXXX | 3,627 | 8,790 | 13,667 | 14,647 | 15,774 | 16,432 | 16,915 | XXXX | XXXX |
| 6. 1986 | XXXX | XXXX | XXXX | XXXX | 6,430 | 10,666 | 14,738 | 16,630 | 17,631 | 18,356 | XXXX | XXXX |
| 7. 1987 | XXXX | XXXX | XXXX | XXXX | XXXX | 6,111 | 13,701 | 20,345 | 25,064 | 27,077 | XXXX | XXXX |
| 8. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 6,745 | 13,133 | 15,525 | 23,843 | XXXX | XXXX |
| 9. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 6,866 | 32,639 | 19,003 | XXXX | XXXX |
| 10. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 4,790 | 9,167 | XXXX | XXXX |
| 11. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 5,275 | XXXX | XXXX |

## SCHEDULE P - PART 3H - OTHER LIABILITY

| 1. Prior | 000 | 47,125 | 131,356 | 151,655 | 183,968 | 216,265 | 257,385 | 292,646 | 303,584 | 334,641 | 657 | 626 |
| 2. 1982 | 14,865 | 21,948 | 27,130 | 30,667 | 35,493 | 45,072 | 56,201 | 59,963 | 66,637 | 68,987 | 161 | 324 |
| 3. 1983 | XXXX | 14,924 | 24,824 | 30,329 | 47,695 | 54,503 | 63,206 | 69,832 | 74,192 | 83,851 | 207 | 47 |
| 4. 1984 | XXXX | XXXX | 15,823 | 25,487 | 35,364 | 40,293 | 55,048 | 61,362 | 68,895 | 71,902 | 366 | 366 |
| 5. 1985 | XXXX | XXXX | XXXX | 34,811 | 24,455 | 39,549 | 43,364 | 49,309 | 61,783 | 64,718 | 366 | 362 |
| 6. 1986 | XXXX | XXXX | XXXX | XXXX | 16,300 | 31,994 | 49,611 | 54,825 | 61,793 | 68,303 | 651 | 375 |
| 7. 1987 | XXXX | XXXX | XXXX | XXXX | XXXX | 22,200 | 38,462 | 61,570 | 61,966 | 73,643 | 3,437 | 770 |
| 8. 1988 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 26,347 | 47,760 | 56,893 | 72,732 | 4,765 | 4,002 |
| 9. 1989 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 11,594 | 74,257 | 95,495 | 13,165 | 19,256 |
| 10. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 7,972 | 29,634 | 8,964 | 15,926 |
| 11. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 7,663 | 5,767 | 17,043 |

## SCHEDULE P - PART 3I - SPECIAL PROPERTY (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, GLASS, BURGLARY AND THEFT)

| 1. Prior | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 000 | 165,171 | 185,681 | XXXX | XXXX |
| 2. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 165,106 | 257,781 | XXXX | XXXX |
| 3. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 174,554 | XXXX | XXXX |

## SCHEDULE P - PART 3J - AUTO PHYSICAL DAMAGE

| 1. Prior | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 162,760 | 107,600 | 2,711,825 | 742,839 |
| 2. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 2,316,657 | 2,428,641 | 2,907,054 | 639,355 |
| 3. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 2,262,964 | 2,316,281 | 644,005 |

## SCHEDULE P - PART 3K - FIDELITY, SURETY, FINANCIAL GUARANTY, MORTGAGE GUARANTY

| 1. Prior | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 000 | 47,287 | 89,384 | XXXX | XXXX |
| 2. 1990 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 9,349 | 41,799 | XXXX | XXXX |
| 3. 1991 | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | 9,522 | XXXX | XXXX |

Note: Net of salvage and subrogation received.

78

78

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

(Name)

## SCHEDULE P – PART 3L – OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

| Years In Which Losses Were Incurred | 2 1983 | 3 1984 | 4 1985 | 5 1986 | 6 1987 | 7 1988 | 8 1989 | 9 1990 | 10 1991 | 11 Number of Claims Closed With Loss Payment | 12 Number of Claims Closed Without Loss Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 000 | 233 | 612 | X X X X | X X X X |
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 333 | 353 | 210 | X X X X | X X X X |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 333 | 126 | X X X X | X X X X |

## SCHEDULE P – PART 3M – INTERNATIONAL

## NONE

## SCHEDULE P – PART 3N – REINSURANCE A

## SCHEDULE P – PART 3O – REINSURANCE B

## SCHEDULE P – PART 3P – REINSURANCE C

## SCHEDULE P – PART 3Q – REINSURANCE D

## NONE

## SCHEDULE P – PART 3R – PRODUCTS LIABILITY

Note: Net of salvage and subrogation received.

79           79

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

(None)

## SCHEDULE P - PART 4 - LOSS PORTFOLIO TRANSFERS

Portfolio reinsurance ceded or assumed during the current year to which premiums were already earned
(000 omitted)

| 1 Years In Which Premiums Were Earned and Losses Were Incurred | 2 Assumed (Premiums Earned) | 3 Ceded | 4 Net (2 – 3) | 5 Assumed (Loss Payments) | 6 Ceded | 7 Assumed (Allocated Loss Expense Payments) | 8 Ceded | 9 Salvage and Subrogation Received | 10 Unallocated Loss Expense Payments | 11 Total Net Paid (5 – 6 + 7 – 8 + 10) | 37 Number of Claims Reported Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | | | | | | | | X X X X |
| 2. 1982 | | | | | | | | | | | X X X X |
| 3. 1983 | | | | | | | | | | | X X X X |
| 4. 1984 | | | | | | | | | | | X X X X |
| 5. 1985 | | | | | | | | | | | X X X X |
| 6. 1986 | | | | | | | | | | | X X X X |
| 7. 1987 | | | | | | | | | | | X X X X |
| 8. 1988 | | | | | | | | | | | X X X X |
| 9. 1989 | | | | | | | | | | | X X X X |
| 10. 1990 | | | | | | | | | | | X X X X |
| 11. 1991 | | | | | | | | | | | X X X X |
| 12. Totals | X X X X | X X X X | X X X X | | | | | | | | X X X X |

Note: For "prior," report amounts paid or received in current year only.
Report cumulative amounts paid or received for specific years. Report loss payments net of salvage and subrogation received.

| Years In Which Premiums Were Earned and Losses Were Incurred | 13 Assumed (Losses Unpaid – Case Basis) | 14 Ceded | 15 Assumed (Bulk + IBNR) | 16 Ceded | 17 Assumed (Allocated Loss Expense Unpaid – Case Basis) | 18 Ceded | 19 Assumed (Bulk + IBNR) | 20 Ceded | 21 Unallocated Loss Expenses Unpaid | 22 Total Net Losses and Expenses Unpaid | 23 Number of Claims Outstanding Assumed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | | X X X X |
| 2. 1982 | | | | | | | | | | | X X X X |
| 3. 1983 | | | | | | | | | | | X X X X |
| 4. 1984 | | | | | | | | | | | X X X X |
| 5. 1985 | | | | NONE | | | | | | | X X X X |
| 6. 1986 | | | | | | | | | | | X X X X |
| 7. 1987 | | | | | | | | | | | X X X X |
| 8. 1988 | | | | | | | | | | | X X X X |
| 9. 1989 | | | | | | | | | | | X X X X |
| 10. 1990 | | | | | | | | | | | X X X X |
| 11. 1991 | | | | | | | | | | | X X X X |
| 12. Totals | | | | | | | | | | | X X X X |

| Years In Which Premiums Were Earned and Losses Were Incurred | 24 Assumed (Total Losses and Loss Expenses Incurred) | 25 Ceded | 26 Net * | 27 Assumed (Loss and Loss Expense Percentage – Incurred/Premium Earned) | 28 Ceded | 29 Net | 30 Loss (Discount for Time Value of Money) | 31 Loss Expense | 32 Inter-Company Pooling Participation Percentage | 33 Losses Unpaid (Net Balance Sheet Reserves After Discount) | 34 Loss Expenses Unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | | |
| 2. 1982 | | | | | | | | | | | |
| 3. 1983 | | | | | | | | | | | |
| 4. 1984 | | | | | | | | | | | |
| 5. 1985 | | | | | | | | | | | |
| 6. 1986 | | | | | | | | | | | |
| 7. 1987 | | | | | | | | | | | |
| 8. 1988 | | | | | | | | | | | |
| 9. 1989 | | | | | | | | | | | |
| 10. 1990 | | | | | | | | | | | |
| 11. 1991 | | | | | | | | | | | |
| 12. Totals | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | X X X X | | |

*Net = (24 – 25) = (11 + 22)

Note: Report all loss portfolio transfers, ceded or assumed, included in Schedule P and effected during the current year only, showing the status of the reserves and payments as of year end. Show the consideration paid for losses ceded or consideration received for losses assumed in the premiums earned (ceded or assumed, respectively) columns regardless of how the transaction was actually reported on Pages 2, 3, and 4.

MOAC000566

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

## SCHEDULE P - PART 5 CLAIMS - MADE
### (000 omitted)

**PART 5E - COMMERCIAL MULTIPLE PERIL**

*NOT REQUIRED*

**PART 5F - MEDICAL MALPRACTICE**

**NONE**

**PART 5H - OTHER LIABILITY**

*NOT REQUIRED*

**PART 5R - PRODUCTS LIABILITY**

**NONE**

81     *Form 2*            81    *Form 2*

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

.................................................
(Name)

### SCHEDULE P - PART 6A – HOMEOWNERS/FARMOWNERS

| | Years In Which Losses Were Incurred | 2<br>1982 | 3<br>1983 | 4<br>1984 | 5<br>1985 | 6<br>1986 | 7<br>1987 | 8<br>1988 | 9<br>1989 | 10<br>1990 | 11<br>1991 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 21,505 | 9,466 | 5,322 | 3,445 | 2,330 | 1,784 | 7 | 30 | | |
| 2. | 1982 | 54,765 | 34,470 | 8,948 | 4,737 | 3,184 | 2,680 | 3,506 | 43 | 2 | |
| 3. | 1983 | X X X X | 87,432 | 17,044 | 10,374 | 6,664 | 6,471 | 2,602 | 1,195 | 654 | |
| 4. | 1984 | X X X X | X X X X | 80,305 | 48,121 | 9,303 | 8,406 | 9,167 | 1,714 | 1,650 | 2,374 |
| 5. | 1985 | X X X X | X X X X | X X X X | 313,764 | 30,385 | 51,983 | 7,926 | 6,998 | 4,916 | 5,633 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 112,088 | 23,777 | 14,048 | 13,133 | 11,314 | 7,486 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 135,824 | 33,007 | 22,763 | 30,086 | 17,838 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 282,940 | 53,320 | 50,880 | 37,687 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 145,306 | 70,262 | 39,292 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 188,395 | 73,666 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 167,708 |

### SCHEDULE P - PART 6B – PRIVATE PASSENGER AUTO LIABILITY/MEDICAL

| | Years | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 84,721 | 35,024 | 22,866 | 15,916 | 23,956 | 15,323 | 9,841 | 4,518 | 4,414 | 1,438 |
| 2. | 1982 | 214,934 | 43,871 | 20,997 | 10,847 | 11,420 | 6,873 | 7,826 | 3,621 | 1,343 | 327 |
| 3. | 1983 | X X X X | 221,781 | 48,880 | 19,185 | 13,160 | 6,831 | 6,596 | 2,961 | 2,511 | 633 |
| 4. | 1984 | X X X X | X X X X | 218,072 | 43,394 | 24,264 | 13,304 | 8,224 | 3,399 | 2,665 | 5,374 |
| 5. | 1985 | X X X X | X X X X | X X X X | 223,061 | 67,707 | 29,330 | 34,634 | 6,616 | 3,066 | 2,340 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 310,926 | 82,926 | 60,067 | 13,679 | 6,747 | 6,397 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 342,917 | 107,812 | 100,342 | 36,305 | 30,802 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 439,770 | 130,840 | 55,290 | 37,110 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 475,783 | 146,370 | 77,006 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 607,373 | 207,683 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 644,382 |

### SCHEDULE P - PART 6C – COMMERCIAL AUTO/TRUCK LIABILITY/MEDICAL

| | Years | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 14,374 | 6,162 | 2,874 | 4,040 | 3,374 | 1,331 | 3,009 | 1,490 | 1,466 | 480 |
| 2. | 1982 | 12,350 | 4,628 | 2,323 | 2,379 | 2,643 | 1,077 | 1,246 | 493 | 370 | 121 |
| 3. | 1983 | X X X X | 13,048 | 4,348 | 3,746 | 3,438 | 1,929 | 1,528 | 866 | 879 | 258 |
| 4. | 1984 | X X X X | X X X X | 13,132 | 5,604 | 4,371 | 2,026 | 1,658 | 853 | 871 | 358 |
| 5. | 1985 | X X X X | X X X X | X X X X | 20,777 | 6,826 | 4,804 | 2,849 | 1,932 | 1,233 | 441 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 70,406 | 12,771 | 7,842 | 4,299 | 1,463 | 602 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 37,812 | 16,864 | 9,166 | 5,184 | 1,643 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 45,634 | 38,976 | 3,823 | 3,385 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 61,002 | 15,646 | 7,533 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 53,992 | 20,892 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 67,638 |

### SCHEDULE P - PART 6D – WORKERS' COMPENSATION

| | Years | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 33,470 | 23,314 | 13,012 | 15,243 | 32,345 | 11,574 | 33,130 | 11,045 | 16,488 | 35,503 |
| 2. | 1982 | 9,939 | 2,443 | 3,961 | 1,653 | 1,287 | 1,056 | 1,995 | 1,318 | 2,083 | 2,515 |
| 3. | 1983 | X X X X | 10,349 | 4,757 | 2,733 | 2,267 | 1,746 | 2,257 | 2,086 | 2,399 | 1,852 |
| 4. | 1984 | X X X X | X X X X | 20,445 | 10,973 | 9,438 | 9,985 | 5,060 | 2,440 | 1,904 | 2,696 |
| 5. | 1985 | X X X X | X X X X | X X X X | 31,723 | 29,329 | 11,482 | 13,211 | 7,766 | 4,330 | 4,375 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 50,541 | 40,035 | 21,152 | 12,870 | 5,498 | 4,996 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 92,640 | 54,150 | 31,002 | 37,350 | 14,761 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 177,737 | 46,373 | 27,763 | 15,780 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 154,172 | 62,298 | 20,543 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 308,459 | 62,683 |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 137,036 |

### SCHEDULE P - PART 6E – COMMERCIAL MULTIPLE PERIL

| | Years | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Prior | 18,383 | 4,067 | 3,903 | 806 | 998 | 1,540 | 380 | 38 | | |
| 2. | 1982 | 37,804 | 8,328 | 3,360 | 948 | 1,112 | 1,560 | 486 | 272 | 8 | 32 |
| 3. | 1983 | X X X X | 35,443 | 7,113 | 3,102 | 2,411 | 3,180 | 1,101 | 891 | 2,147 | 4,368 |
| 4. | 1984 | X X X X | X X X X | 20,500 | 7,068 | 3,428 | 3,031 | 1,604 | 1,979 | 2,003 | 3,357 |
| 5. | 1985 | X X X X | X X X X | X X X X | 20,248 | 5,530 | 4,438 | 2,836 | 3,486 | 3,238 | 6,574 |
| 6. | 1986 | X X X X | X X X X | X X X X | X X X X | 29,329 | 15,718 | 6,925 | 3,824 | 6,406 | 9,645 |
| 7. | 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 44,946 | 24,335 | 11,650 | 9,384 | 13,629 |
| 8. | 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 54,422 | 22,470 | 18,187 | 23,392 |
| 9. | 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 60,420 | 35,631 | 74,944 |
| 10. | 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 62,792 | |
| 11. | 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 80,804 |

MOAC000568

82
Form 2

82
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
------------------------------------------------------
(None)

## SCHEDULE P - PART 6F - MEDICAL MALPRACTICE

| 1 Years In Which Losses Were Incurred | BULK AND INCURRED BUT NOT REPORTED RESERVES ON LOSSES AND ALLOCATED EXPENSES AT YEAR END (000 OMITTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 |
| 1. Prior | 51,660 | 42,956 | 32,039 | 20,047 | 16,609 | 14,241 | 3,793 | 19,997 | 23,627 | 22,622 |
| 2. 1982 | 3,323 | 3,323 | 3,265 | 3,407 | 3,013 | 6,326 | 3,817 | 4,254 | 3,319 | 3,336 |
| 3. 1983 | X X X X | 4,363 | 5,053 | 2,490 | 2,306 | 6,719 | 7,145 | 6,445 | 7,414 |
| 4. 1984 | X X X X | X X X X | 2,909 | 2,555 | 2,766 | 4,281 | 6,602 | 5,908 | 6,329 | 6,827 |
| 5. 1985 | X X X X | X X X X | X X X X | 3,004 | 1,448 | 1,982 | 2,532 | 3,306 | 907 | 876 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 1,846 | 1,646 | 1,437 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 623 | 663 | 653 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 300 | 213 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 7 | 1 | 2 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X |

## SCHEDULE P - PART 6G - SPECIAL LIABILITY (OCEAN MARINE, AIRCRAFT (ALL PERILS), BOILER AND MACHINERY)

| 1. Prior | 15,228 | 8,335 | 4,446 | 808 | 564 | 307 | 1,560 | 955 | 321 | 112 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2. 1982 | 5,342 | 6,912 | 4,452 | 2,315 | 836 | 241 | 1,154 | 1,072 | 565 | 356 |
| 3. 1983 | X X X X | 9,347 | 8,732 | 6,266 | 2,022 | 1,063 | 2,858 | 1,471 | 1,325 | 647 |
| 4. 1984 | X X X X | X X X X | 8,763 | 9,476 | 6,128 | 2,921 | 3,737 | 1,931 | 1,534 | 673 |
| 5. 1985 | X X X X | X X X X | X X X X | 14,647 | 8,045 | 6,233 | 2,737 | 1,003 | 728 | 563 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 34,063 | 15,417 | 4,465 | 3,900 | 1,634 | 1,336 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 19,430 | 6,381 | 2,604 | 1,700 | 2,349 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 7,123 | 2,426 | 1,147 | 1,188 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 970 | 1,292 | 724 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 869 | 1,778 |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 472 |

## SCHEDULE P - PART 6H - OTHER LIABILITY

| 1. Prior | 387,834 | 345,905 | 92,846 | 37,956 | 11,066 | 142,981 | 322,560 | 61,060 | 64,940 | 115,770 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2. 1982 | 36,067 | 35,742 | 24,800 | 32,419 | 27,908 | 39,703 | 24,239 | 12,832 | 15,686 | 15,442 |
| 3. 1983 | X X X X | 32,075 | 25,941 | 16,780 | 27,907 | 29,944 | 21,366 | 18,695 | 18,887 | 17,066 |
| 4. 1984 | X X X X | X X X X | 32,604 | 15,843 | 28,248 | 26,429 | 19,051 | 16,820 | 19,748 | 30,433 |
| 5. 1985 | X X X X | X X X X | X X X X | 31,685 | 29,797 | 39,146 | 15,415 | 13,604 | 12,020 | 31,070 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 30,095 | 35,672 | 28,762 | 17,399 | 19,304 | 30,948 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 41,680 | 61,608 | 24,547 | 30,966 | 34,536 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 43,247 | 31,622 | 26,681 | 21,456 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 34,032 | 23,360 | 21,561 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 45,090 | 27,968 |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 43,466 |

## SCHEDULE P - PART 6I - SPECIAL PROPERTY (FIRE, ALLIED LINES, INLAND MARINE, EARTHQUAKE, GLASS, BURGLARY AND THEFT)

| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 24,066 | 7,955 | 7,264 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 17,684 | 3,956 |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 15,440 |

## SCHEDULE P - PART 6J - AUTO PHYSICAL DAMAGE

| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 71,934 | 33,454 | 12,653 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 63,433 | 16,662 |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 69,254 |

## SCHEDULE P - PART 6K - FIDELITY, SURETY, FINANCIAL GUARANTY, MORTGAGE GUARANTY

| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 34,868 | 26,956 | 18,454 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 8,676 | 4,453 |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 7,091 |

MOAC000569

83
Form 3

83
Form 3

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS

..........................................................
(Name)

### SCHEDULE P - PART 6L - OTHER (INCLUDING CREDIT, ACCIDENT AND HEALTH)

| 1 Years In Which Losses Were Incurred | BULK AND INCURRED BUT NOT REPORTED RESERVES ON LOSSES AND ALLOCATED EXPENSES AT YEAR END (000 OMITTED) | | | | | | | | | |
| | 2 1982 | 3 1983 | 4 1984 | 5 1985 | 6 1986 | 7 1987 | 8 1988 | 9 1989 | 10 1990 | 11 1991 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 16 | 2 | 2 |
| 2. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 33 | 2 |
| 3. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 11 |

### SCHEDULE P - PART 6M - INTERNATIONAL

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 1982 | | | | | | | | | | |
| 3. 1983 | X X X X | X X X X | | | | | | | | |
| 4. 1984 | X X X X | X X X X | | | | | | | | |
| 5. 1985 | X X X X | X X X X | X X X X | | | | | | | |
| 6. 1986 | X X X X | X X X X | X X X X | | | | | | | |
| 7. 1987 | X X X X | X X X X | X X X X | | | | | | | |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | | | | | |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | | |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | | |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | | |

### SCHEDULE P - PART 6N - REINSURANCE A

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | 6,505 | 1,839 | 6,947 | 812 | |
| 2. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 4,348 | 682 | 750 | |
| 3. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 31,165 | 4,860 | |
| 4. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 8,663 | |

### SCHEDULE P - PART 6O - REINSURANCE B

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | 29,065 | 25,271 | 12,480 | 13,513 | |
| 2. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 20,786 | 19,227 | 11,066 | |
| 3. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 39,088 | 11,830 | |
| 4. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 26,393 | |

### SCHEDULE P - PART 6P - REINSURANCE C

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | 9,259 | 4,672 | 6,376 | 4,716 | |
| 2. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 6,066 | 6,064 | 2,432 | |
| 3. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 3,163 | 6,972 | |
| 4. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 8,624 | |

### SCHEDULE P - PART 6Q - REINSURANCE D

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | | | | | | | | | | |
| 2. 1982 | | | | | | | | | | |
| 3. 1983 | X X X X | X X X X | | | | | | | | |
| 4. 1984 | X X X X | X X X X | | | | | | | | |
| 5. 1985 | X X X X | X X X X | X X X X | | | | | | | |
| 6. 1986 | X X X X | X X X X | X X X X | | | | | | | |
| 7. 1987 | X X X X | X X X X | X X X X | | | | | | | |

### SCHEDULE P - PART 6R - PRODUCTS LIABILITY

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Prior | 50,829 | 53,446 | 29,878 | 29,677 | 139,166 | 66,453 | 162,435 | 194,424 | 175,608 | 358,066 |
| 2. 1982 | 7,635 | 5,636 | 2,686 | 4,536 | 9,508 | 18,848 | 13,983 | 11,804 | 12,606 | |
| 3. 1983 | X X X X | 5,065 | 3,708 | 4,067 | 7,661 | 14,185 | 10,498 | 13,290 | 9,424 | 7,310 |
| 4. 1984 | X X X X | X X X X | 6,277 | 9,266 | 8,384 | 10,877 | 50,836 | 11,878 | 10,306 | 8,600 |
| 5. 1985 | X X X X | X X X X | X X X X | 9,286 | 6,400 | 6,034 | 2,657 | 3,362 | 2,371 | 2,052 |
| 6. 1986 | X X X X | X X X X | X X X X | X X X X | 35,658 | 10,787 | 8,904 | 2,923 | 3,309 | 2,096 |
| 7. 1987 | X X X X | X X X X | X X X X | X X X X | X X X X | 18,199 | 14,606 | 2,744 | 8,628 | 4,643 |
| 8. 1988 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 23,827 | 11,823 | 10,060 | 6,304 |
| 9. 1989 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 19,061 | 15,024 | 9,817 |
| 10. 1990 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 24,385 | 15,893 |
| 11. 1991 | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | X X X X | 20,972 |

MOAC000570

84
Form 2

84
Form 2

CONSOLIDATED ANNUAL STATEMENT FOR THE YEAR 1991 OF THE ALLSTATE INSURANCE COMPANY AND ITS AFFILIATED FIRE AND CASUALTY INSURERS
..................................................
(Name)

## SCHEDULE P INTERROGATORIES

1.  Computation of excess statutory reserves over statement reserves. See Instructions for explanation and formulas.

    (a) Auto Liability (private passenger and commercial)

    |      |        |          |      |      |        |         |       |            |
    |------|--------|----------|------|------|--------|---------|-------|------------|
    | 1991 | $0 (   | 75.0%)   |      | 1990 | $0 (   | 74.0%)  |       |            |
    | 1989 | $0 (   | 75.0%)   |      |      |        |         | Total | $0         |

    (b) Other Liability and Products Liability

    |      |        |          |      |      |        |         |       |            |
    |------|--------|----------|------|------|--------|---------|-------|------------|
    | 1991 | $0 (   | 75.0%)   |      | 1990 | $0 (   | 75.0%)  |       |            |
    | 1989 | $0 (   | 75.0%)   |      |      |        |         | Total | $0         |

    (c) Medical Malpractice

    |      |        |          |      |      |        |         |       |            |
    |------|--------|----------|------|------|--------|---------|-------|------------|
    | 1991 | $0 (   | 75.0%)   |      | 1990 | $0 (   | 75.0%)  |       |            |
    | 1989 | $0 (   | 75.0%)   |      |      |        |         | Total | $0         |

    (d) Workers' Compensation

    |      |        |          |      |      |        |         |       |            |
    |------|--------|----------|------|------|--------|---------|-------|------------|
    | 1991 | $0 (   | 65.0%)   |      | 1990 | $0 (   | 65.0%)  |       |            |
    | 1989 | $0 (   | 65.0%)   |      |      |        |         | Total | $0         |

    (e) Credit                                                                Total    $2,607,579

    (f) All lines Total (Report here and Page 3)                              Total    $2,607,579

2.  Claims-made policies; Schedule P — Part 5.

    State the amount of current year premiums earned on claims-made policies.  If this amount is more than $100,000 and greater than 5% of current year premiums
    earned in that line, then you must complete Schedule P — Part 5; see instructions.

    | (a) Commercial Multiple Peril  | (i) claims-made premiums  |           | Yes [ ] No [ X ] | $100,292 |
    |                                | (ii) Part 5 required      |           |                  |          |
    | (b) Medical Malpractice        | (i) claims-made premiums  |           | Yes [ ] No [ X ] | $0       |
    |                                | (ii) Part 5 required      |           |                  |          |
    | (c) Other Liability            | (i) claims-made premiums  |           | Yes [ ] No [ X ] | $10,991  |
    |                                | (ii) Part 5 required      |           |                  |          |
    | (d) Products Liability         | (i) claims-made premiums  |           | Yes [ ] No [ X ] | $0       |
    |                                | (ii) Part 5 required      |           |                  |          |

3.  The term "loss expense" includes all payments for legal expenses, including attorney's and witness fees and court costs, salaries and expenses of investiga-
    tors, adjusters and field men, rents, stationery, telegraph and telephone charges, postage, salaries and expenses of office employees, home office expenses
    and all other payments under or on account of such injuries, whether the payments are allocated to specific claims or are unallocated. Are they so reported
    in this statement?                                                                                   Answer:   Yes [ X ] No [ ]

4.  The unallocated loss expense payments paid during the most recent calendar year should be distributed to the various years in which losses were incurred as
    follows: (1) 45% to the most recent year, (2) 5% to the next most recent year, and (3) the balance to all years, including the most recent, in proportion
    to the amount of loss payments paid for each year during the most recent calendar year. If the distribution in (1) or (2) produces an accumulated distribu-
    tion in such year in excess of 10% of the premiums earned for such year, disregarding all distributions made under (2), such accumulated distribution
    should be limited to 10% of premiums earned and the balance distributed in accordance with (3). Are they so reported in this statement?   Answer:   Yes [ X ] No [ ]

5.  Do any lines in Schedule P include reserves which are reported gross of any discount to present value of future payments, but are reported net of such
    discounts on page 30?                                                                                          Yes [ ] No [ X ]

    If yes, proper reporting must be made in the Notes to Financial Statements, as specified in the Instructions. Also, the discounts must be reported to
    Schedule P — Part 1, columns 30 and 31.

    Schedule P must be completed gross of nontabular discounting. Work papers relating to discount calculations must be available for examination upon request.

    Discounting is allowed only if expressly permitted by the state insurance department to which this Annual Statement is being filed.

6.  What were the net premiums in force at the end of the year for:
    (in thousands of dollars)

    | (a) Fidelity | ($55)    |
    | (b) Surety   | $41,713  |

7.  Claim count information is reported [check one]                                  (a) per claim        X
    If not the same in all years, explain in question 8.                            (b) per claimant

8.  The information provided in Schedule P will be used by many persons to estimate the adequacy of the current loss and expense reserves, among other things.
    Are there any especially significant events, coverage, retention or accounting changes which have occurred which must be considered when making such
    analyses. (An extended statement may be attached)? NO. ............................................
    ..................................................................................................
    ..................................................................................................
    ..................................................................................................
    ..................................................................................................
    ..................................................................................................
    ..................................................................................................

MOAC000571

# Exhibit 8 - MOAC

91 19 6169



## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**PROCESSED BY**

29/26

AUG 15 1991

FORM 10-Q

**DISCLOSURE INCORPORATED**

_X_   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
FOR THE QUARTERLY PERIOD ENDED JUNE 30, 1991

OR

___   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

Commission file number 1-416

## S E A R S,   R O E B U C K   A N D   C O.
(Exact name of registrant as specified in its charter)

New York                          36-1750680
(State of Incorporation) (I.R.S. Employer Identification No.)

Sears Tower, Chicago, Illinois            60684
(Address of principal executive offices)    (Zip Code)

Registrant's telephone number, including area code: 312/875-2500

Registrant (1) has filed all reports required to be filed by
Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing
requirements for the past 90 days.

Yes__x__       No_____

As of July 31, 1991, the Registrant had 343,963,928 common shares,
$.75 par value, outstanding.

*89 pages*

*Exhibit Index on page 26*

## Exhibit
## 8-MOAC

MOAC000388

Sears, Roebuck and Co.
Index to Quarterly Report on Form 10-Q
June 30, 1991

Page

Part I  -  Financial Information.

Item 1.  Financial Statements.

Consolidated Statements of Income - Three and Six
Months Ended June 30, 1991 and 1990 (unaudited).          1

Consolidated Statements of Financial Position -
June 30, 1991 and 1990 (unaudited) and
December 31, 1990.                                        2

Consolidated Statements of Cash Flows - Six Months
Ended June 30, 1991 and 1990 (unaudited).                3

Notes to Consolidated Financial Statements
(unaudited).                                             4

Summarized Statements of Income of Business Groups -
Three and Six Months Ended June 30, 1991 and
1990 (unaudited).

Sears Merchandise Group                              6

Allstate Insurance Group                            7

Dean Witter Financial Services Group                8

Coldwell Banker Real Estate Group                   9

Independent Certified Public Accountants' Review
Report.                                            10

Item 2.  Management's Discussion and Analysis of
Financial Condition and Results of Operations.          11

Part II -  Other Information.

Item 4.  Submission of Matters to a Vote of Security Holders.    22

Item 6.  Exhibits and Reports on Form 8-K.                       22

MOAC000389

- 1 -

## PART I. FINANCIAL INFORMATION
### ITEM 1. FINANCIAL STATEMENTS
SEARS, ROEBUCK AND CO.
CONSOLIDATED STATEMENTS OF INCOME

| (millions, except per share data) | Three Months Ended June 30 (Unaudited) 1991 | Three Months Ended June 30 (Unaudited) 1990 | Six Months Ended June 30 (Unaudited) 1991 | Six Months Ended June 30 (Unaudited) 1990 |
|---|---|---|---|---|
| **Operating revenues** | | | | |
| Sears Merchandise Group | $ 7,650.3 | $ 7,875.6 | $ 14,276.5 | $ 14,715.7 |
| Allstate Insurance Group | 4,809.4 | 4,530.4 | 9,592.4 | 8,922.5 |
| Dean Witter Financial Services Group | 1,217.4 | 1,150.8 | 2,406.6 | 2,246.8 |
| Coldwell Banker Real Estate Group | 437.7 | 357.9 | 759.0 | 677.5 |
| Corporate | 50.6 | 31.9 | 101.9 | 61.5 |
| Intergroup transactions | (75.4) | (94.9) | (162.6) | (166.5) |
| Total operating revenues | 14,090.0 | 13,851.7 | 26,973.8 | 26,457.5 |
| **Operating expenses** | | | | |
| Costs and expenses | 12,937.8 | 12,793.8 | 24,875.4 | 24,559.8 |
| Interest | 790.1 | 838.4 | 1,624.3 | 1,656.5 |
| Total operating expenses | 13,727.9 | 13,632.2 | 26,499.7 | 26,216.3 |
| Operating income | 362.1 | 219.5 | 474.1 | 241.2 |
| Other income (loss) | (18.7) | 24.7 | 66.9 | 11.4 |
| Income from continuing operations before income taxes, minority interest and equity in net income of unconsolidated companies | 343.4 | 244.2 | 541.0 | 252.6 |
| Income taxes (benefit) | | | | |
| Current operations | 42.0 | 7.6 | 7.9 | (74.8) |
| Deferred tax asset adjustment | 64.1 | - | 102.6 | - |
| Minority interest and equity in net income of unconsolidated companies | 2.0 | 1.3 | 11.5 | 6.3 |
| Income from continuing operations | 239.3 | 237.9 | 442.0 | 333.7 |
| Discontinued operations- gain on disposal, net of tax expense of $5.5 | - | - | - | 10.5 |
| Net income | $ 239.3 | $ 237.9 | $ 442.0 | $ 344.2 |
| **Net income consists of:** | | | | |
| Group income (loss): | | | | |
| Sears Merchandise Group | $ 156.9 | $ 110.0 | $ 142.8 | $ 72.6 |
| Allstate Insurance Group | 75.7 | 142.2 | 250.8 | 335.4 |
| Dean Witter Financial Services Group | 90.6 | 58.2 | 168.7 | 118.9 |
| Coldwell Banker Real Estate Group | (3.1) | 7.3 | 37.9 | (26.2) |
| Corporate and other | (80.8) | (79.8) | (158.2) | (156.5) |
| Net income | $ 239.3 | $ 237.9 | $ 442.0 | $ 344.2 |
| **Net income per share:** | | | | |
| Income from continuing operations | $ 0.70 | $ 0.69 | $ 1.29 | $ 0.97 |
| Discontinued operations | - | - | - | 0.03 |
| Net income | $ 0.70 | $ 0.69 | $ 1.29 | $ 1.00 |
| Cash dividends per share | $ .50 | $ .50 | $ 1.00 | $ 1.00 |
| Average shares outstanding | 343.8 | 343.0 | 343.6 | 342.9 |

See accompanying notes and related Summarized Statements of Income of Business Groups.

003

- 2 -

## SEARS, ROEBUCK AND CO.
## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

| (millions) | June 30 (Unaudited) 1991 | June 30 (Unaudited) 1990 | December 31 1990 |
|---|---|---|---|
| **Assets** | | | |
| **Investments** | | | |
| Bonds, mortgage-backed securities and redeemable preferred stocks, at amortized cost (market $28,256.1, $24,473.0 and $26,749.9) | $ 27,511.8 | $ 24,116.8 | $ 26,292.3 |
| Mortgage loans | 9,166.0 | 6,353.9 | 7,209.3 |
| Common and preferred stocks, at market (cost $2,592.9, $2,235.2 and $2,433.7) | 2,757.1 | 2,452.3 | 2,386.3 |
| Real estate | 2,750.2 | 2,450.6 | 2,787.2 |
| Total investments | 42,185.1 | 35,373.6 | 38,675.1 |
| **Receivables** | | | |
| Retail customer | 13,462.6 | 14,459.3 | 15,230.4 |
| Discover Card | 8,552.6 | 7,879.9 | 8,610.6 |
| Brokerage | 3,076.5 | 3,332.0 | 3,842.5 |
| Insurance premium installments | 1,811.7 | 1,690.8 | 1,726.3 |
| Consumer finance notes | 1,250.0 | 1,427.9 | 1,467.2 |
| Other | 3,080.4 | 2,254.3 | 2,939.0 |
| Total receivables | 31,233.8 | 31,044.2 | 33,816.0 |
| Property and equipment, net | 5,958.9 | 5,555.2 | 5,850.4 |
| Cash and invested cash | 4,486.4 | 2,696.2 | 3,967.3 |
| Merchandise inventories | 4,347.5 | 4,423.3 | 4,074.0 |
| Securities purchased under agreements to resell | 2,985.2 | 3,294.1 | 2,269.5 |
| Trading account securities, at market | 1,262.9 | 1,271.5 | 1,181.0 |
| Cash segregated under government regulations | 1,143.2 | 1,010.2 | 1,250.1 |
| Deferred income taxes | 499.7 | - | 581.6 |
| Other assets | 4,930.4 | 4,510.2 | 4,587.8 |
| Total assets | $ 99,033.1 | $ 89,178.5 | $ 96,252.8 |
| **Liabilities** | | | |
| Insurance reserves | $ 28,364.2 | $ 23,273.1 | $ 25,750.2 |
| Short-term borrowings | 14,316.2 | 14,515.8 | 15,314.0 |
| Long-term debt | 13,514.9 | 10,634.2 | 12,636.4 |
| Deposits and advances | 8,119.9 | 6,758.4 | 7,882.9 |
| Accounts payable and other liabilities | 7,507.3 | 6,841.7 | 7,882.3 |
| Unearned revenues | 6,208.2 | 6,010.0 | 6,227.8 |
| Brokerage payables | 3,736.5 | 3,761.7 | 4,579.1 |
| Securities sold under agreements to repurchase | 3,469.7 | 3,684.1 | 2,656.2 |
| Securities sold but not yet purchased, at market | 693.1 | 634.4 | 500.1 |
| Deferred income taxes | - | 117.3 | - |
| Total liabilities | 85,930.0 | 76,230.7 | 83,429.0 |
| **Shareholders' equity** | | | |
| Common shares ($.75 par value) | 289.4 | 289.1 | 289.1 |
| Capital in excess of par value | 2,143.3 | 2,137.9 | 2,137.9 |
| Retained income (Note 2) | 13,025.3 | 12,712.4 | 12,927.1 |
| Treasury stock (at cost) | (1,747.1) | (1,765.8) | (1,765.8) |
| Deferred ESOP expense | (755.3) | (593.5) | (777.7) |
| Unrealized net capital gains (losses) on marketable equity securities | 118.3 | 149.9 | (12.9) |
| Cumulative translation adjustments | 29.2 | 17.8 | 26.1 |
| Total shareholders' equity | 13,103.1 | 12,947.8 | 12,823.8 |
| Total liabilities and shareholders' equity | $ 99,033.1 | $ 89,178.5 | $ 96,252.8 |
| Total shares outstanding | 344.0 | 343.1 | 343.1 |

See accompanying notes and related Summarized Statements of Income of Business Groups.  The Consolidated Statement of Financial Position at December 31, 1990 has been taken from the audited Consolidated Financial Statements of that date.

MOAC000391

- 3 -

## SEARS, ROEBUCK AND CO.
## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Six Months Ended June 30 (Unaudited) | |
|---|---|---|
| (millions) | 1991 | 1990 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income | $ 442.0 | $ 344.2 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation, amortization and other noncash items | 462.0 | 420.6 |
| Provisions for uncollectible accounts | 617.9 | 448.3 |
| Gains on sale of property and investments | (128.2) | (193.4) |
| Increase in insurance reserves | 2,614.0 | 2,425.9 |
| Change in deferred taxes | 10.7 | (263.3) |
| Decrease in retail customer receivables | 1,382.9 | 853.7 |
| Increase in merchandise inventories | (269.4) | (72.5) |
| Change in net matched agreements to resell or repurchase securities | 88.4 | (36.9) |
| Decrease (increase) in net trading account securities | 111.1 | (368.1) |
| Increase in other operating assets | (113.3) | (370.8) |
| Decrease in other operating liabilities | (1,288.6) | (195.5) |
| Net cash provided by operating activities | 3,929.5 | 2,992.2 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Proceeds from sales and maturities of investments | 2,480.2 | 1,608.5 |
| Purchases of investments | (3,937.3) | (3,219.4) |
| Collections on mortgage-backed securities, mortgage loans and consumer finance notes | 1,361.1 | 598.9 |
| Purchases and originations of mortgage-backed securities, mortgage loans and consumer finance notes | (2,574.0) | (1,474.8) |
| Proceeds from sales of property and equipment | 43.0 | 26.6 |
| Purchases of property and equipment | (513.5) | (502.5) |
| Decrease (increase) in Discover Card receivables | (116.0) | 227.3 |
| Net cash used in investing activities | (3,256.5) | (2,735.4) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from long-term debt | 1,446.7 | 949.7 |
| Repayments of long-term debt | (534.8) | (401.8) |
| Proceeds from advances from FHLB | 786.0 | 330.0 |
| Repayments of advances from FHLB | (727.2) | (190.0) |
| Increase (decrease) in deposits | 178.2 | (1,567.7) |
| Change in net unmatched agreements to resell or repurchase securities | 9.4 | 107.5 |
| Net change in short-term borrowings, primarily 90 days or less | (1,000.3) | 1,809.7 |
| Repayment from (advances to) ESOP | 6.6 | (584.5) |
| Common shares issued for employee stock plans | 24.4 | 10.4 |
| Dividends paid to shareholders, net of reinvested amounts | (343.3) | (337.4) |
| Net cash provided by (used in) financing activities | (154.3) | 125.9 |
| Effect of exchange rate changes on cash | 0.4 | (0.9) |
| Net increase in cash and invested cash | $ 519.1 | $ 381.8 |
| Cash and invested cash at December 31, 1990 and 1989 | $ 3,967.3 | $ 2,314.4 |
| Cash and invested cash at June 30, 1991 and 1990 | $ 4,486.4 | $ 2,696.2 |

See accompanying notes and related Summarized Statements of Income of Business Groups.

MOAC000392

- 4 -

## SEARS, ROEBUCK AND CO.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. **Consolidated Financial Statements**

   The Consolidated Statements of Financial Position as of
June 30, 1991 and 1990, the related Consolidated Statements of Income for
the three- and six-month periods then ended and the Consolidated
Statements of Cash Flows for the six-month periods then ended are
unaudited. The interim financial statements reflect all adjustments
(except as discussed in footnote 3, consisting only of normal recurring
accruals) which are, in the opinion of management, necessary for a fair
statement of the results for the interim periods presented. The
consolidated financial statements and the summarized Group statements of
income should be read in conjunction with the consolidated financial
statements and notes thereto included in the Sears, Roebuck and Co.
(Sears) 1990 Annual Report to Shareholders and Annual Report on Form
10-K. The results of operations for the interim periods should not be
considered indicative of results to be expected for the full year.

   Certain reclassifications have been made in the 1990 financial
statements to conform to current accounting classifications.

2. **Dividend Restrictions**

   As disclosed in note 15 (page 30) to the Consolidated Financial
Statements contained in Sears 1990 Annual Report to Shareholders and
Annual Report on Form 10-K, under terms of indentures entered into in
1981 and thereafter, Sears cannot take specified actions, including the
declaration of cash dividends, which would cause its consolidated
unencumbered assets, as defined, to fall below 150 percent of its
consolidated liabilities, as defined. At June 30, 1991, approximately
$9.6 billion in retained income could be paid in dividends to
shareholders under these indentures.

3. **Income Taxes**

   The income tax provision for the first half of 1991 includes a
$102.6 million charge due to the company's inability to fully recognize
its deferred tax assets due to restrictions imposed by Statement of
Financial Accounting Standards No. 96, "Accounting for Income Taxes."
During the second quarter, the Financial Accounting Standards Board
issued an exposure draft of a proposed statement revising the accounting
for income taxes. This revision allows full recognition of the company's
deferred tax assets and would eliminate the deferred tax charge to
income. The new rules, which are expected to be in effect by 1992, would
allow Sears to recover the charges taken prior to implementation.

- 5 -

## SEARS, ROEBUCK AND CO.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

4.    Corporate

Corporate operations include revenues and expenses which are of an
overall holding company nature, including that portion of administrative
costs and interest which is not allocated to the company's business
groups.  The Corporate statements of income consist of:

| (millions) | Three Months Ended June 30 (Unaudited) 1991 | 1990 | Six Months Ended June 30 (Unaudited) 1991 | 1990 |
|---|---|---|---|---|
| Revenues | $   50.6 | $   31.9 | $  101.9 | $   61.5 |
| Costs and expenses | | | | |
| Interest | 133.0 | 109.6 | 260.2 | 199.6 |
| Operating expenses | 29.8 | 20.4 | 61.5 | 53.8 |
| Total costs and expenses | 162.8 | 130.0 | 321.7 | 253.4 |
| Operating loss | (112.2) | (98.1) | (219.8) | (191.9) |
| Other loss | (21.6) | (27.9) | (43.4) | (55.4) |
| Loss before income tax benefit | (133.8) | (126.0) | (263.2) | (247.3) |
| Income tax benefit | 54.5 | 49.9 | 107.4 | 98.0 |
| Net corporate expense | (79.3) | (76.1) | (155.8) | (149.3) |
| Equity in net income of business groups | 318.6 | 314.0 | 597.8 | 493.5 |
| Consolidated net income | $  239.3 | $  237.9 | $  442.0 | $  344.2 |

MOAC000394

- 6 -

### SEARS, ROEBUCK AND CO.
### SEARS MERCHANDISE GROUP
### SUMMARIZED STATEMENTS OF INCOME

| (millions) | Three Months Ended June 30 (Unaudited) | | Six Months Ended June 30 (Unaudited) | |
|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 |
| **Revenues** | | | | |
| Merchandise sales and services | $ 6,885.4 | $ 7,133.8 | $12,725.4 | $13,232.7 |
| Credit revenues | 764.9 | 741.8 | 1,551.1 | 1,483.0 |
| Total revenues | 7,650.3 | 7,875.6 | 14,276.5 | 14,715.7 |
| **Costs and expenses** | | | | |
| Cost of sales*, buying and occupancy | 4,791.2 | 4,949.0 | 8,954.0 | 9,308.9 |
| Selling and administrative | 2,134.3 | 2,313.4 | 4,153.5 | 4,435.8 |
| Provision for uncollectible accounts | 210.0 | 137.5 | 394.6 | 253.5 |
| Interest | 255.3 | 301.1 | 549.9 | 611.6 |
| Total costs and expenses | 7,390.8 | 7,701.0 | 14,052.0 | 14,609.8 |
| Operating income | 259.5 | 174.6 | 224.5 | 105.9 |
| Other income | 3.7 | 7.8 | 3.9 | 8.1 |
| Income before income taxes, minority interest and equity in net income of unconsolidated companies | 263.2 | 182.4 | 228.4 | 114.0 |
| Income taxes | 108.3 | 73.4 | 96.9 | 46.7 |
| Minority interest and equity in net income of unconsolidated companies | 2.0 | 1.0 | 11.3 | 5.3 |
| Group income | $ 156.9 | $ 110.0 | $ 142.8 | $ 72.6 |

See notes to consolidated financial statements.

*The LIFO increments to cost of sales to adjust for the effects of inflation on inventory were $12.3 million and $12.1 million pretax for the three months ended June 30, 1991 and 1990, respectively, and $22.8 million and $21.8 million pretax for the six months ended June 30, 1991 and 1990, respectively.

MOAC000395

- 7 -

### SEARS, ROEBUCK AND CO.
### ALLSTATE INSURANCE GROUP
### SUMMARIZED STATEMENTS OF INCOME

| (millions) | Three Months Ended June 30 (Unaudited) | | Six Months Ended June 30 (Unaudited) | |
|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 |
| **Revenues** | | | | |
| Property-liability insurance premiums earned | $ 3,803.6 | $ 3,532.3 | $ 7,486.7 | $ 6,974.8 |
| Life insurance premium income and contract charges | 262.8 | 310.8 | 621.4 | 574.7 |
| Investment income, less investment expense | 740.7 | 631.4 | 1,451.1 | 1,229.1 |
| Realized capital gains | 2.3 | 55.9 | 33.2 | 143.9 |
| Total revenues | 4,809.4 | 4,530.4 | 9,592.4 | 8,922.5 |
| **Costs and expenses** | | | | |
| Property-liability insurance claims and claims expense | 3,216.0 | 3,007.8 | 6,243.6 | 5,922.5 |
| Life insurance policy benefits | 487.5 | 463.9 | 1,055.7 | 866.7 |
| Policy acquisition costs | 769.5 | 752.3 | 1,524.1 | 1,474.6 |
| Other operating costs and expenses | 268.3 | 229.3 | 533.4 | 435.0 |
| Total costs and expenses | 4,741.3 | 4,453.3 | 9,356.8 | 8,698.8 |
| Income from continuing operations before income taxes and equity in net income of unconsolidated companies | 68.1 | 77.1 | 235.6 | 223.7 |
| **Income tax (benefit)** | | | | |
| Current operations | (71.7) | (64.8) | (117.6) | (100.2) |
| Deferred tax asset adjustment | 64.1 | - | 102.6 | - |
| Equity in net income of unconsolidated companies | - | 0.3 | 0.2 | 1.0 |
| Income from continuing operations | 75.7 | 142.2 | 250.8 | 324.9 |
| Discontinued operations- gain on disposal, net of tax expense of $5.5 | - | - | - | 10.5 |
| Group income | $    75.7 | $   142.2 | $   250.8 | $   335.4 |

ɔ09

See notes to consolidated financial statements.

MOAC000396

- 8 -

### SEARS, ROEBUCK AND CO.
### DEAN WITTER FINANCIAL SERVICES GROUP
### SUMMARIZED STATEMENTS OF INCOME

| (millions) | Three Months Ended June 30 (Unaudited) 1991 | 1990 | Six Months Ended June 30 (Unaudited) 1991 | 1990 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Interest | $  540.6 | $  561.0 | $ 1,087.4 | $ 1,114.4 |
| Commissions | 171.5 | 168.3 | 360.3 | 339.6 |
| Asset management | 129.0 | 123.2 | 251.9 | 242.6 |
| Trading | 111.3 | 95.7 | 222.7 | 173.9 |
| Investment banking | 53.9 | 49.6 | 82.3 | 99.9 |
| Other operating revenues | 211.1 | 153.0 | 402.0 | 276.4 |
| Total revenues | 1,217.4 | 1,150.8 | 2,406.6 | 2,246.8 |
| **Costs and expenses** | | | | |
| Interest | 272.7 | 322.3 | 563.7 | 627.1 |
| Personnel | 340.8 | 322.1 | 682.7 | 648.6 |
| Provision for loan losses | 111.5 | 102.0 | 201.3 | 180.6 |
| Other operating costs and expenses | 341.5 | 300.8 | 678.5 | 578.6 |
| Total costs and expenses | 1,066.5 | 1,047.2 | 2,126.2 | 2,034.9 |
| Operating income | 150.9 | 103.6 | 280.4 | 211.9 |
| Income taxes | 60.3 | 45.4 | 111.7 | 93.0 |
| Group income | $   90.6 | $   58.2 | $   168.7 | $   118.9 |

See notes to consolidated financial statements.

MOAC000397

- 9 -

## SEARS, ROEBUCK AND CO.
## COLDWELL BANKER REAL ESTATE GROUP
## SUMMARIZED STATEMENTS OF INCOME

| (millions) | Three Months Ended June 30 (Unaudited) 1991 | 1990 | Six Months Ended June 30 (Unaudited) 1991 | 1990 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Real estate commissions | $ 193.3 | $ 172.2 | $ 295.4 | $ 302.3 |
| Real estate operations | 45.0 | 37.9 | 92.2 | 75.4 |
| Interest | 139.0 | 106.5 | 264.4 | 221.5 |
| Ancillary fees and other | 60.4 | 41.3 | 107.0 | 78.3 |
| Total revenues | 437.7 | 357.9 | 759.0 | 677.5 |
| **Costs and expenses** | | | | |
| Commissions and direct costs | 152.7 | 137.2 | 250.4 | 244.6 |
| Operating and administrative | 153.1 | 141.4 | 287.9 | 285.8 |
| Interest | 134.2 | 111.0 | 263.9 | 228.8 |
| Total costs and expenses | 440.0 | 389.6 | 802.2 | 759.2 |
| Operating loss | (2.3) | (31.7) | (43.2) | (81.7) |
| Gain on sale of property | 0.9 | 46.1 | 109.5 | 45.6 |
| Equity in income (loss) of real estate joint ventures | (1.7) | (1.3) | (3.1) | (1.9) |
| Income (loss) before income taxes | (3.1) | 13.1 | 63.2 | (38.0) |
| Income taxes (benefit) | - | 5.8 | 25.3 | (11.8) |
| Group income (loss) | $ (3.1) | $ 7.3 | $ 37.9 | $ (26.2) |

311

See notes to consolidated financial statements.

MOAC000398

- 10 -

## SEARS, ROEBUCK AND CO.

### INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS' REVIEW REPORT

To the Shareholders and Board of Directors
   of Sears, Roebuck and Co.:

We have made a review of the Consolidated Statements of Financial Position of
Sears, Roebuck and Co. as of June 30, 1991 and 1990, the Consolidated
Statements of Income for the three- and six-month periods then ended and the
Consolidated Statements of Cash Flows for the six-month periods then ended, in
accordance with standards established by the American Institute of Certified
Public Accountants.

A review of interim financial information consists principally of obtaining an
understanding of the system for the preparation of interim financial
information, applying analytical procedures to financial data and making
inquiries of persons responsible for financial and accounting matters.  It is
substantially less in scope than an audit conducted in accordance with
generally accepted auditing standards, the objective of which is the
expression of an opinion regarding the financial statements taken as a whole.
Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that
should be made to the consolidated financial statements referred to above for
them to be in conformity with generally accepted accounting principles.

We have previously audited, in accordance with generally accepted auditing
standards, the Consolidated Statement of Financial Position of Sears, Roebuck
and Co. as of December 31, 1990, and the related Consolidated Statements of
Income, Shareholders' Equity and Cash Flows for the year then ended (not
presented herein); and in our report dated February 15, 1991, we expressed an
unqualified opinion on those consolidated financial statements.  In our
opinion, the information set forth in the accompanying Consolidated Statement
of Financial Position as of December 31, 1990, is fairly stated, in all
material respects, in relation to the Consolidated Statement of Financial
Position from which it has been derived.

*Deloitte & Touche*

Chicago, Illinois
August 8, 1991

2

MOAC000399

- 11 -

## ITEM 2. - SEARS, ROEBUCK AND CO.
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS
## THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Consolidated Results

#### Operating Results

Consolidated operating revenues totaled $14.09 billion for the second quarter of 1991 and $26.97 billion for the first six months of 1991, increasing 1.7 percent and 2.0 percent from the comparable 1990 periods.  The Sears Merchandise Group and the Allstate Insurance Group continued to be the dominant revenue producers with combined revenues comprising 88.4 percent of total revenues for the second quarter and 88.5 percent for the first six months of 1991.

Interest expense decreased 5.8 percent to $790.1 million for the second quarter of 1991 and 1.9 percent to $1.62 billion for the first six months of 1991 compared with the respective prior year periods.  The decreases for both periods were attributable to reduced interest rates, partially offset by higher average debt balances.

Operating income for the second quarter was $362.1 million in 1991 compared with $219.5 million in 1990.  For the six-month period, operating income rose 96.6 percent to $474.1 million in 1991 from $241.2 million in 1990.  The improved results for both periods were primarily due to lower selling and administrative expense at the Sears Merchandise Group, partially offset by lower revenues, and an increase in net interest income and credit card operating revenues at Dean Witter Financial Services Group.

Other income (loss) was an $18.7 million loss ($12.3 million after taxes) for the second quarter of 1991 compared with income of $24.7 million ($14.1 million after taxes) in 1990.  For the six-month period, other income was $66.9 million ($42.2 million after taxes) compared with $11.4 million ($6.9 million after taxes) in 1990.  The change between years for both periods primarily resulted from the timing of Coldwell Banker Real Estate Group property sales. Included in the 1991 amounts were pretax gains from Coldwell Banker property sales of $.9 million and $109.5 million for the second quarter and six months, respectively, compared with pretax gains of $46.1 million and $45.6 million recorded in the comparable 1990 periods.

Pretax income, after excluding tax-exempt income, resulted in income taxes on current operations of $42.0 million and $7.9 million for the second quarter and first six months of 1991, respectively, compared with income taxes of $7.6 million and a tax benefit of $74.8 million recorded in the comparable 1990 periods.  The deferred tax asset adjustments of $64.1 million and $102.6 million for the second quarter and first six months of 1991 resulted from the company's inability to fully recognize its deferred tax assets under provisions of Statement of Financial Accounting Standards No. 96, "Accounting for Income

MOAC000400

- 12 -

### SEARS, ROEBUCK AND CO.
### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
### CONDITION AND RESULTS OF OPERATIONS
### THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

#### Consolidated Results

Taxes". For the full year, the 1991 deferred tax asset adjustment is expected to be approximately $200 million.

During the second quarter, the Financial Accounting Standards Board issued an exposure draft of a proposed statement revising the accounting for income taxes. This revision allows full recognition of the company's deferred tax assets and would eliminate the deferred tax charge to income. The new rules, which are expected to be in effect by 1992, would allow Sears to recover the charges taken prior to implementation.

Income from continuing operations was $239.3 million, or $.70 per share, in the second quarter of 1991 compared with $237.9, or $.69 per share, for the second quarter of 1990. For the first six months, income from continuing operations was $442.0 million, or $1.29 per share, compared to $333.7 million, or $.97 per share, in the prior year. Income from discontinued operations of $10.5 million for the first six months of 1990 resulted from the favorable development of reserves related to Allstate's group life-health operation.

Net income in the second quarter of 1991 was $239.3 million, or $.70 per share, compared with $237.9 million, or $.69 per share, in the prior year. Net income for the first six months of 1991 was $442.0 million, or $1.29 per share, compared to $344.2 million, or $1.00 per share, in 1990.

#### Liquidity and Capital Resources

Cash provided by the company's operating activities totaled $3.93 billion for the first six months of 1991 compared with $2.99 billion for the same period of 1990. The fluctuation in cash provided by operating activities between comparable 1991 and 1990 periods resulted primarily from changes in retail customer receivables, Dean Witter's trading account position, Allstate's insurance reserves and merchandise inventories. The decrease in retail customer receivables was due to greater customer repayments. The change in the trading account position was influenced by market conditions. Changes in insurance reserves were influenced by growth in both investment oriented products and property-liability premiums. The decrease in inventory reflected tighter inventory controls.

MOAC000401

- 13 -

### SEARS, ROEBUCK AND CO.
### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
### CONDITION AND RESULTS OF OPERATIONS
### THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

#### Consolidated Results

Retail customer receivables, net of sold accounts, were $13.46 billion at June 30, 1991 as compared with $15.23 billion at December 31, 1990. The ratio of Sears Merchandise Group domestic credit sales to domestic merchandising gross sales was 57.6 percent and 58.5 percent for the first six months of 1991 and 1990, respectively. Sears, through its wholly owned subsidiary, Sears Receivables Financing Group, Inc., had net sales of $1.16 billion of Sears credit account pass-through trust certificates in the first six months of 1991, compared with sales of $1.25 billion in the prior year period. The net proceeds from the sales were used to reduce short-term borrowings.

Cash used in investing activities totaled $3.26 billion and $2.74 billion for the first six months of 1991 and 1990, respectively. The increase in cash used for investing activities was primarily due to an increase in purchases and originations of mortgage loans, partially offset by increased collections, and Discover Card receivables.

Discover Card receivables, net of sold accounts, were $8.55 billion at June 30, 1991 compared with $8.61 billion at December 31, 1990. In the first six months of 1991, $600 million of Discover Card pass-through trust certificates were sold through Discover Receivables Financing Group, Inc., an indirect wholly owned subsidiary of Sears. In the comparable period of the prior year, $1.10 billion of Discover Card pass-through trust certificates were sold. The net proceeds from the sales were used to reduce short-term borrowings.

Cash used in financing activities totaled $154.3 million for the first six months of 1991 compared with cash provided of $125.9 million in 1990. The fluctuation between years was primarily due to completion in the funding of the Employee Stock Ownership Plan offset by net reductions in outstanding debt. The company continues to focus on lengthening the term of its funding. Short-term debt was reduced by approximately $1 billion primarily from the sale of retail customer receivables, refinancing with longer term debt and, to a lesser extent, an increase in deposits.

MOAC000402

- 14 -

### SEARS, ROEBUCK AND CO.
### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
### CONDITION AND RESULTS OF OPERATIONS
### THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

#### Sears Merchandise Group

Sears Merchandise Group revenues for the second quarter of 1991 were $7.65 billion, a decrease of 2.9 percent from the $7.88 billion reported for the second quarter of 1990. For the six months ended June 30, 1991, revenues were $14.28 billion, a decrease of 3.0 percent from the comparable period in 1990. Domestic merchandise revenues were $6.04 billion in the second quarter and $11.19 billion year to date, down 3.3 percent in both periods. Current year results in both the quarter and six-month periods reflected sales decreases in home fashions and home appliances, which are areas particularly hard hit by the continuing recession. Partially offsetting these decreases were gains in the sales of women's apparel, automotive accessories, home computers and lawn and garden equipment. Second quarter domestic credit revenues rose 3.8 percent to $675.9 million, while six-month revenues increased 5.4 percent to $1.37 billion. The improvement in both periods was primarily due to higher gross customer receivables balances, partially offset by the sale of credit accounts through the use of asset-backed securities. International revenues decreased 4.2 percent to $932.7 million for the quarter and decreased 6.9 percent to $1.72 billion for the first six months. The results for both periods reflected the impact of unfavorable Canadian economic conditions.

Cost of sales, buying and occupancy expense as a percent of merchandise sales and service was 69.6 percent in the second quarter of 1991, compared with 69.4 percent in 1990. For the six months ended June 30, 1991 and 1990, the ratios were 70.4 percent and 70.3 percent, respectively. The quarter and six-month results reflected lower initial gross margins which were partially offset by reduced merchandise liquidation and transportation costs.

Selling and administrative expense decreased $179.1 million in the second quarter of 1991, to 27.9 percent of revenues from 29.4 percent for the comparable 1990 quarter. For the six months ended June 30, 1991, selling and administrative expense decreased $282.3 million, to 29.1 percent of revenues compared with 30.1 percent for the same period in 1990. Reductions in payroll and benefits, distribution and advertising expenses were the primary contributors to the improvement in both periods, reflecting the impact of ongoing cost reduction programs. The decrease in payroll and benefits included a $16.1 million pension curtailment gain.

The provision for uncollectible accounts was $210.0 million in the second quarter and $394.6 million for the six months ended June 30, 1991, compared with $137.5 million and $253.5 million, respectively, in the comparable prior year periods. The increase reflected the continued unfavorable trend in customer bankruptcies resulting from current economic conditions.

016

MOAC000403

- 15 -

## SEARS, ROEBUCK AND CO.
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS
## THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Sears Merchandise Group

Interest expense for the second quarter was $255.3 million this year compared with $301.1 million in the same period in 1990, and for the first six months was $549.9 million this year compared with $611.6 million last year. The reduction was primarily due to lower average interest rates.

The following summarizes the contribution to income of Merchandising, Credit and International.

| (millions) | Three Months ended June 30 Net Income | | Six Months ended June 30 Net Income (Loss) | |
|---|---|---|---|---|
| | 1991 | 1990 | 1991 | 1990 |
| Merchandising | $  59.4 | $  17.3 | $ (43.1) | $ (116.9) |
| Credit | 94.9 | 84.9 | 195.9 | 181.7 |
| International | 2.6 | 7.8 | (10.0) | 7.8 |
| Merchandise Group | $ 156.9 | $ 110.0 | $ 142.8 | $ 72.6 |

In December 1990, the Financial Accounting Standards Board issued Technical Bulletin 90-1, "Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts." The Merchandise Group adopted the Technical Bulletin prospectively in 1990. Application of the Technical Bulletin guidelines increased after-tax earnings $10.9 million in the second quarter of 1991, and $21.0 million for the six months ended June 30, 1991.

Due to traditional consumer buying patterns, merchandise sales in the first quarter are typically lower than in other quarterly periods. This generally results in a higher ratio of fixed costs to sales and a lower ratio of operating income to sales as compared with other periods.

Domestic merchandising inventories on a FIFO basis were $4.50 billion at June 30, 1991, compared with $4.53 billion at June 30, 1990 and $4.18 billion at December 31, 1990. As of June 30, domestic merchandise inventories on a LIFO basis were $3.74 billion this year, $3.77 billion last year and $3.45 billion at December 31, 1990.

As of June 30, 1991, there were 864 domestic department stores and 907 specialty stores in operation. During the second quarter, domestic merchandising opened two stores in new markets and relocated two stores. Specialty stores increased by a net of two stores during the same period. Total square footage as of June 30, 1991 was 127.9 million, compared with 126.6 million and 127.7 million as of June 30, 1990 and December 31, 1990.

- 16 -

## SEARS, ROEBUCK AND CO.
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS
## THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Allstate Insurance Group

Revenues for the Allstate Insurance Group totaled $4.81 billion for the second quarter of 1991 and $9.59 billion for the first six months, increases of 6.2 percent and 7.5 percent, respectively, over the comparable prior year periods. Income from continuing operations, before the deferred tax asset adjustment, was $139.8 million for the second quarter and $353.4 million for the first half of 1991 compared with $142.2 million and $324.9 million for the same periods last year. Net income after the deferred tax asset adjustment for 1991 was $75.7 million in the second quarter and $250.8 million for the first six months compared with $142.2 million and $335.4 million for the same periods of 1990. The first half of 1990 included $10.5 million of income from the discontinued group life-health operations.

### Property-Liability Operations

Net premiums written were $3.76 billion and $7.57 billion for the three- and six-month periods of 1991, up 2.3 percent and 3.0 percent, respectively, over the same periods last year. In the second quarter of 1991, Allstate had a one-time $216.7 million reduction of premiums written by deferring the recognition of premiums received in advance until the effective date of the policies. This change was made to be consistent with a change in regulatory accounting and did not affect premiums earned or net income. If the former method had been continued, the three- and six-month rates of increase in premiums written would have been 8.2 percent and 5.9 percent, respectively. Growth in average premiums contributed slightly more to the growth in premiums written than higher unit sales. Premiums earned for the property-liability operations increased $271.3 million or 7.7 percent to $3.80 billion for the second quarter of 1991 and $511.9 million or 7.3 percent to $7.49 billion for the first half.

Underwriting losses were $349.4 million in the second quarter and $611.7 million in the first six months compared with underwriting losses of $370.5 million and $678.8 million for the same periods last year. The combined ratio decreased 1.3 points to 109.2 in the second quarter and 1.5 points to 108.2 in the first half of 1991 compared with the respective 1990 periods. Most of the improvement for the six-month period was due to favorable trends in the number of claims reported and increased average premiums which were partially offset by continuing increases in average claim costs for auto injury coverages and less favorable results in property coverages.

MOAC000405

- 17 -

## SEARS, ROEBUCK AND CO.
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS
## THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Allstate Insurance Group

Investment income was $345.2 million and $683.4 million for the three- and six-month periods of 1991, respectively, compared with $323.2 million and $634.2 million for the same periods of 1990. Improvement in investment income followed improved cash flow from insurance operations despite lower interest rates in the current period. Realized capital gains from the sale of investments, after income taxes, totaled $7.7 million and $21.6 million for the second quarter and first half of this year, respectively, versus $34.4 million and $84.0 million for the same periods last year. Property-liability income before the deferred tax asset adjustment was $99.0 million and $265.4 million for the three- and six-month periods of 1991 compared with $93.6 million and $227.3 million in the same periods of 1990. Income after the deferred tax asset adjustment was $34.9 million and $162.8 million for the second quarter and first half of 1991.

### Pending Legal Proceedings

As described in the 1990 Annual Report to Shareholders and Annual Report on Form 10-K, the automobile insurance industry has been under pressure from various government regulators and legislators to reduce, or freeze, premiums at levels that do not correspond with underlying costs. This creates severe pressures on profitability since the increased costs of litigation and medical treatment, combined with rising automobile repair costs, continue to drive up the price of providing automobile insurance coverage.

Although the breadth of this activity has diminished, management expects adverse legislative and regulatory activity to continue in a limited number of states. For example, in California and North Carolina, Allstate is challenging regulatory actions that would result in refunds of auto premiums to policyholders under certain conditions. In Massachusetts, Allstate is involved in litigation challenging certain costs which the regulatory authorities are seeking to impose upon Allstate in connection with Allstate's withdrawal from that state's automobile insurance business as of June 30, 1989.

Allstate believes that the law of the United States, and of essentially all states, generally assures that a regulated insurer must be granted the opportunity to earn a fair and reasonable return from its automobile insurance business. Allstate is and will continue vigorously to pursue relief from adverse government actions through the regulatory administrative processes, and in the courts.

While the aggregate dollar amounts involved in these regulatory and legal actions cannot be determined with certainty, the amounts at issue could be significant. An adverse final determination of one or more of the above-mentioned matters could have a material impact on earnings, however, liquidity and capital resources are not expected to be materially affected. Management believes that it is unlikely that such a determination will be made at any time in the foreseeable future. Allstate continues to believe that its conduct has been proper, and that any liability that might result from the resolution of these matters will not have a material effect on shareholders' equity.

MOAC000406

- 18 -

## SEARS, ROEBUCK AND CO.
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
## CONDITION AND RESULTS OF OPERATIONS
## THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Allstate Insurance Group

#### Life Operations

Premium income and contract charges as measured under generally accepted accounting principles for the life insurance operations totaled $262.8 million for the quarter and $621.4 million for the first half compared with $310.8 million and $574.7 million for last year. Most lines of business showed healthy increases for the second quarter of 1991 compared with 1990, except premium income from pension products which was significantly lower and caused the overall decrease. Life insurance statutory premiums from continuing operations, which include premiums and deposits received for all products, were $1.04 billion and $2.54 billion in the three- and six-month periods of 1991, respectively, compared with $1.07 billion and $2.33 billion for those periods last year. Investment oriented product sales comprise most of the statutory revenue.

Assets under management increased $850.3 million and $2.03 billion during the second quarter and first half, respectively, of 1991 and total $15.22 billion at June 30, 1991 compared with $11.38 billion at June 30, 1990. Continued strong growth of assets under management is the major factor which caused investment income before income taxes to increase 28.3 percent to $395.5 million in the second quarter and to increase 29.0 percent to $767.7 million in the first half of 1991 compared with 1990.

Realized capital losses after income taxes were $6.2 million in the second quarter compared with realized capital gains after taxes of $2.5 million for the same period last year. Realized capital gains after taxes for the first six months of 1991 and 1990 were $.3 million and $11.0 million. Life insurance income from continuing operations was $40.8 million and $88.0 million for the three- and six-month periods of 1991 compared with $48.6 million and $97.6 million for the same periods of 1990. The second quarter of 1990 included a $4.9 million after tax gain from the sale of Allstate's personal health business.

MOAC000407

- 19 -

## SEARS, ROEBUCK AND CO.
### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
### THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Dean Witter Financial Services Group

Dean Witter Financial Services Group revenues for the second quarter and first six months of 1991 were $1.22 billion and $2.41 billion, respectively. This represents an increase of 5.8 percent over the $1.15 billion reported in the second quarter of 1990 and an increase of 7.1 percent over the $2.25 billion reported for the first six months of 1990. The Group reported net income of $90.6 million and $168.7 million for the second quarter and first six months of 1991 as compared with net income of $58.2 million and $118.9 million for the comparable periods of 1990.

### Securities Activities

Net interest income for the second quarter and first six months of 1991 was $37.1 million and $76.0 million, reflecting increases of 2.5 percent and 3.8 percent over the comparable periods of 1990. These increases were due to improved spreads earned on repurchase and resell agreements, as well as customer margin lending.

Operating revenues for the second quarter and first six months of 1991 were $500.8 million and $980.0 million, reflecting increases of 6.4 percent and 7.0 percent over the comparable periods of 1990. Commission revenues increased 1.9 percent and 6.1 percent, respectively, for the second quarter and first six months, due to higher activity in listed securities. Asset management revenues increased 4.7 percent and 3.8 percent for the second quarter and first six months due to continued growth in mutual fund assets. Trading revenues increased 16.3 percent and 28.1 percent for the second quarter and first six months due to higher equity and fixed income trading activity. Investment banking revenues increased 8.7 percent and decreased 17.6 percent, respectively, for the second quarter and first six months due to the fluctuation of fee income recorded in various underwriting activities.

Operating costs and expenses for the second quarter and first six months of 1991 were $463.6 million and $921.4 million, representing increases of 4.3 percent and 5.0 percent over the comparable periods of 1990. These increases reflect the growth in operating revenue for the respective periods.

Securities activities recorded net income of $42.4 million and $76.0 million, for the second quarter and first six months of 1991 as compared with $32.4 million and $57.1 million for the comparable periods of 1990.

J21

MOAC000408

- 20 -

## SEARS, ROEBUCK AND CO.
### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
### CONDITION AND RESULTS OF OPERATIONS
### THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Dean Witter Financial Services Group

#### Credit Services Activities

Net interest income for the second quarter and first six months of 1991 was $230.8 million and $447.7 million, respectively, reflecting increases of 14.0 percent and 8.1 percent over the comparable periods of 1990.  These increases were due to the higher level of receivables and lower average interest rates on borrowings, partially offset by the additional sale of receivables through the use of asset-backed securities.

Operating revenues for the second quarter and first six months of 1991 were $176.0 million and $339.2 million, reflecting increases of 47.5 percent and 56.8 percent over the comparable periods of 1990.  The increases were due primarily to servicing fees related to the additional sales of receivables. Operating revenues were also favorably affected by growth in credit card activities.

The provision for loan losses of $103.5 million and $191.5 million for the second quarter and first six months of 1991 increased 4.3 percent and 8.9 percent over the comparable periods of 1990.  These increases primarily reflect higher charge-offs partially offset by higher recoveries.  Other operating expenses for the second quarter and first six months of 1990 were $226.7 million and $449.6 million, respectively, and increased 25.0 percent and 26.8 percent as compared to the comparable periods of 1990.  These increases were due primarily to growth of credit card activities.

Credit Services activities recorded net income of $48.2 million and $92.7 million for the second quarter and first six months of 1991, compared with $25.8 million and $61.8 million for the respective periods of 1990.

MOAC000409

- 21 -

## SEARS, ROEBUCK AND CO.
### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
#### THREE- AND SIX-MONTH PERIODS ENDED JUNE 30, 1991 AND 1990

### Coldwell Banker Real Estate Group

Revenues for the Coldwell Banker Real Estate Group totaled $437.7 million for the second quarter of 1991 and $759.0 million for the first six months, increases of 22.3 percent and 12.0 percent, respectively, over the comparable prior year periods. After bottoming in January this year, the weak residential market improved and in May, home sales exceeded the prior year for the first time. The Mortgage Group reported a 37.8 percent increase in revenues during the second quarter and a 25.9 percent increase during the first six months, primarily due to increased origination fees and interest income. Loan production and purchases totaled $4.0 billion during the first six months of 1991, $2.2 billion higher than the same period last year. Residential revenues increased 12.9 percent in the second quarter to $223.5 million, with six-month revenues approximating the prior year comparable period. The second quarter increase reflects improved market conditions and the acquisition of a major Northeastern residential brokerage firm in February, significantly increasing Coldwell Banker's market share in the Northeast. The Residential Group continued to manage its market presence in strategic metropolitan areas by closing selected company owned offices and converting others to franchise status. At the end of June, the Residential affiliate network had expanded to 1,418 offices. Homart Development Co. revenues, primarily shopping center and office building rents, increased $7.0 million and $16.6 million compared with the second quarter and first six months of last year. Improved office occupancy and shopping center acquisitions in 1990 accounted for the increase.

Total costs and expenses increased 12.9 percent in the second quarter of 1991. Residential commission expense, which varies in relation to commission revenue, rose 10.2 percent. Operating and administrative expenses rose 8.3 percent in response to higher mortgage production costs resulting from the significant increase in mortgage production volume. Interest expense increased 20.9 percent as a result of carrying costs associated with additional Homart properties and a larger loan portfolio balance due to higher production volume within the Sears Mortgage Group. For the first six months, total costs and expenses increased 5.7 percent as cost containment at Residential partially offset the rise in operating cost at Homart and costs related to increased production volume at the Sears Mortgage Group.

Gains on sale of property on an after tax basis were $0.5 million for the second quarter and $68.6 million for the first half of 1991, as compared with $27.5 million and $27.2 million for the same periods in 1990. The 1991 gain resulted primarily from the sale of a wholly owned shopping center in the first quarter. In 1990, gains on sale of property were primarily from the sale of a partial interest in a shopping center in the second quarter.

A $3.1 million net loss was recorded in the second quarter of 1991 compared with net income of $7.3 million in the second quarter of 1990. For the six-month period, net income totaled $37.9 million in 1991 compared with a $26.2 million net loss in 1990. Operating results improved at Residential and Mortgage for both periods in 1991, while a difference in the timing of property sales at Homart caused significant fluctuations in net income compared with the second quarter and first six months of 1990.

- 22 -

## PART II. OTHER INFORMATION

Item 4.    Submission of Matters to a Vote of Security Holders.

The Registrant held its Annual Meeting of Shareholders in Chicago on May 9, 1991.

The following persons were elected as directors in Class C of the Board of Directors:  Edward A. Brennan, Sybil C. Mobley and Edgar B. Stern, Jr.  Each such director received 239,114,153 votes for election, and 6,134,455 votes were withheld as to each director.

The terms of the following directors continued after the Annual Meeting:  Warren L. Batts, Albert V. Casey, E. Mandell de Windt, Norma Pace, Nancy C. Reynolds, Clarence B. Rogers, Jr. and Donald H. Rumsfeld.

Item 6.    Exhibits and Reports on Form 8-K.

(a)  Exhibits.

An Exhibit Index has been filed as part of this Report on Page E-1.

(b)  Reports on Form 8-K.

Registrant filed a Current Report dated a) April 18, 1991 (Items 5 and 7) containing statements of income for the three months ended March 31, 1990 and 1991; b) April 22, 1991 (Items 5 and 7); c) May 6, 1991 (Items 5 and 7); and d) June 26, 1991 (Items 5 and 7).

324

MOAC000411

- 23 -

## SIGNATURE

Pursuant to the requirements of the Securities
Exchange Act of 1934, the Registrant has duly
caused this report to be signed on its behalf
by the undersigned thereunto duly authorized.


                                    Sears, Roebuck and Co.
                                        (Registrant)


August 13, 1991        By  _____
                           John S. Vivian
                           Vice President and
                           Comptroller

                           (Principal Accounting
                           Officer and duly authorized
                           officer of Registrant)

MOAC000412

E-1

**EXHIBIT INDEX**
**SEARS, ROEBUCK AND CO.**
**QUARTER ENDED JUNE 30, 1991**

**Exhibit No.**                                                              **Sequentially**
                                                                            **Numbered Page**

4.      Registrant hereby agrees to furnish the
        Commission, upon request, with the instruments
        defining the rights of holders of each issue of
        long-term debt of the Registrant and its
        consolidated subsidiaries.

12.(a).  Computation of ratio of income to fixed charges               27
        (excluding interest on savings deposits) for
        Sears, Roebuck and Co. and consolidated
        subsidiaries for each of the five years ended
        December 31, 1990, and for the six- and
        twelve-month periods ended June 30, 1991.

12.(b).  Computation of ratio of income to fixed charges               28
        (including interest on savings deposits) for
        Sears, Roebuck and Co. and consolidated
        subsidiaries for each of the five years ended
        December 31, 1990, and for the six- and
        twelve-month periods ended June 30, 1991.

15.     Acknowledgement of awareness from                              29
        Deloitte & Touche concerning unaudited interim
        financial information.

026

MOAC000413

# disclosure
## Information Services, Inc.

**5161 River Road
Bethesda, MD 20816
(301) 951-1300**

# EXHIBITS FOLLOW

MOAC000414

Exhibit 12(a)

## COMPUTATION OF RATIO OF INCOME TO FIXED CHARGES
### (EXCLUDING INTEREST ON SAVINGS DEPOSITS)
### SEARS, ROEBUCK AND CO. AND CONSOLIDATED SUBSIDIARIES

| | Twelve Months Ended June 30, 1991 (unaudited) | Six Months Ended June 30, 1991 (unaudited) | Year Ended December 31 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 1990 | 1989 | 1988 | 1987 | 1986 |
| | | | (millions, except ratios) | | | | |
| **Fixed Charges** | | | | | | | |
| Interest and amortization of debt discount and expense on all indebtedness | $3,337.9 | $1,624.3 | $3,370.1 | $3,224.1 | $2,937.4 | $2,720.6 | $2,653.3 |
| Deduct interest on savings deposits | (702.2) | (305.4) | (718.7) | (717.3) | (544.5) | (471.5) | (433.5) |
| Add interest element implicit in rentals | 320.5 | 163.0 | 304.0 | 269.1 | 254.9 | 223.8 | 203.8 |
| | 2,956.2 | 1,481.9 | 2,955.4 | 2,775.9 | 2,647.8 | 2,472.9 | 2,423.6 |
| Interest capitalized | 46.4 | 25.0 | 43.1 | 38.8 | 40.6 | 39.4 | 30.4 |
| Total fixed charges | $3,002.6 | $1,506.9 | $2,998.5 | $2,814.7 | $2,688.4 | $2,512.3 | $2,454.0 |
| **Income** | | | | | | | |
| Income from continuing operations | $1,000.0 | $442.0 | $891.7 | $1,445.8 | $1,032.3 | $1,726.2 | $1,335.6 |
| Deduct undistributed net income of unconsolidated companies | 13.1 | 1.5 | 10.2 | (2.7) | 0.8 | (16.2) | (4.9) |
| | 1,013.1 | 443.5 | 901.9 | 1,443.1 | 1,033.1 | 1,710.0 | 1,330.7 |
| **Add** | | | | | | | |
| Fixed charges (excluding interest capitalized) | 2,956.2 | 1,481.9 | 2,955.4 | 2,775.9 | 2,647.8 | 2,472.9 | 2,423.6 |
| Income taxes (benefit) | (35.7) | 110.5 | (221.0) | 352.8 | 53.5 | 348.1 | 443.8 |
| Income before fixed charges and income taxes | $3,933.6 | $2,035.9 | $3,636.3 | $4,571.8 | $3,734.4 | $4,531.0 | $4,198.1 |
| Ratio of income to fixed charges | 1.31 | 1.35 | 1.21 | 1.62 | 1.39 | 1.80 | 1.71 |

027

MOAC000415

Exhibit 12(b)

## COMPUTATION OF RATIO OF INCOME TO FIXED CHARGES
### (INCLUDING INTEREST ON SAVINGS DEPOSITS)
### SEARS, ROEBUCK AND CO. AND CONSOLIDATED SUBSIDIARIES

| | Twelve Months Ended June 30, 1991 (unaudited) | Six Months Ended June 30, 1991 (unaudited) | Year Ended December 31 (millions, except ratios) | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 1990 | 1989 | 1988 | 1987 | 1986 |
| **Fixed Charges** | | | | | | | |
| Interest and amortization of debt discount and expense on all indebtedness | $3,337.9 | $1,624.3 | $3,370.1 | $3,224.1 | $2,937.4 | $2,720.6 | $2,653.3 |
| Add interest element implicit in rentals | 320.5 | 163.0 | 304.0 | 289.1 | 254.9 | 223.8 | 203.8 |
| | 3,658.4 | 1,787.3 | 3,674.1 | 3,493.2 | 3,192.3 | 2,944.4 | 2,857.1 |
| Interest capitalized | 46.4 | 25.0 | 43.1 | 38.8 | 40.6 | 39.4 | 30.4 |
| Total fixed charges (including interest on savings deposits) | $3,704.8 | $1,812.3 | $3,717.2 | $3,532.0 | $3,232.9 | $2,983.8 | $2,887.5 |
| **Income** | | | | | | | |
| Income from continuing operations | $1,000.0 | $442.0 | $991.7 | $1,445.8 | $1,032.3 | $1,726.2 | $1,335.6 |
| Deduct undistributed net income of unconsolidated companies | 13.1 | 1.5 | 10.2 | (2.7) | 0.8 | (16.2) | (4.9) |
| | 1,013.1 | 443.5 | 901.9 | 1,443.1 | 1,033.1 | 1,710.0 | 1,330.7 |
| **Add** | | | | | | | |
| Fixed charges (excluding interest capitalized) | 3,658.4 | 1,787.3 | 3,674.1 | 3,493.2 | 3,192.3 | 2,944.4 | 2,857.1 |
| Income taxes (benefit) | (35.7) | 110.5 | (221.0) | 352.8 | 53.5 | 348.1 | 443.8 |
| Income before fixed charges and income taxes | $4,635.8 | $2,341.3 | $4,355.0 | $5,289.1 | $4,278.9 | $5,002.5 | $4,631.6 |
| Ratio of income to fixed charges (including interest on savings deposits) | 1.25 | 1.29 | 1.17 | 1.50 | 1.32 | 1.68 | 1.60 |

MOAC000416

Exhibit 15

To the Shareholders and Board of Directors of Sears, Roebuck and Co.:

We have made review, in accordance with standards established by the American Institute of Certified Public Accountants, of the unaudited interim financial information of Sears, Roebuck and Co. for the three- and six-month periods ended June 30, 1991 and 1990, as indicated in our report dated August 8, 1991; because we did not perform an audit, we expressed no opinion on that information.

We are aware that our report, referred to above, which is included in your Quarterly Report on Form 10-Q for the quarter ended June 30, 1991, is incorporated by reference in Registration Statement Nos. 2-44449, 2-64879, 2-80037, 33-18081, 33-23793, 33-29458, 33-32008, 33-32568, 33-35021, 33-37427, 33-39724 and 33-41485 of Sears, Roebuck and Co., Registration Statement Nos. 33-11100 and 33-32170 of Sears, Roebuck and Co. and Dean Witter Reynolds Inc. Employee Retirement Investment Plan, Registration Statement Nos. 33-31009 and 33-36993 of Sears, Roebuck and Co. and The Savings and Profit Sharing Fund of Sears Employees and Registration Statement No. 33-40056 of Discover Credit Corp.

We also are aware that the aforementioned report, pursuant to Rule 436(c) of the General Rules and Regulations under the Securities Act of 1933, is not considered a part of a registration statement prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of Sections 7 and 11 of that Act.

*Deloitte & Touche*

Chicago, Illinois
August 8, 1991

MOAC000417

# EXHIBIT 10 - MOAC

David W. Dykhouse (dwdykhouse@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Tel: (212) 336-2000
Fax: 9212) 336-2222

Thomas J. Flynn (tflynn@larkinhoffman.com)
LARKIN HOFFMAN DALY & LINDGREN, LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Tel: (952) 835-3800
Fax: (952) 896-3333

*Attorneys for MOAC Mall Holding LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |

**MOAC MALL HOLDINGS LLC'S REQUESTS FOR ADMISSION FROM**
**TRANSFORM HOLDCO LLC**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, Inc. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**Exhibit**
**10-MOAC**

MOAC000122

MOAC Mall Holdings LLC ("MOAC"), by and through its undersigned counsel, hereby requests and demands that Transform Holdco LLC (the "Buyer" or "Transform"), a party to the contested motion in the above-captioned case of the Debtor to assume and assign certain designatable leases (Doc. No. 3298), as evidenced by and acknowledged in Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases (Doc. No. 3654), admit or deny the following requests for admission within thirty days after service under Bankruptcy Rule 7036, incorporating Fed. R. Civ. P. 36, and permitted in this contested matter by Bankruptcy Rule 9014. MOAC will seek an award of expenses, including attorney fees, under Bankruptcy Rule 7036, incorporating Fed. R. Civ. P. 37, incurred in proving the truth of any of the requests that are denied.

## DEFINITIONS

1.    "And" and "or" refer to both their conjunctive and disjunctive meanings.

2.    "All" and "any" mean "each and every" as well as "any one."

3.    "Assignee" means Transform Leaseco LLC or any other intended assignee, pursuant to the Debtor's pending motion to assume and assign the Lease, and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

4.    "Communication" means any contact whatsoever and any transmission or exchange of words, numbers, graphic material, or other information, either orally, electronically, or in writing, whether made, received, or participated in, and includes without limitation any conversation, correspondence, letter, note, memorandum, inter- or intra-office correspondence, telephone call, telegraph, telegram, telex, telecopy, facsimile, electronic mail, text message,

MOAC000123

internet communication, telefax, cable, electronic message, tape recording, discussion, face-to-face meeting, or conference or meeting of any kind whether in person, by audio, video, telephone, or in any other form.

5.     "Buyer," "Transform," "you," or "your" means Transform Holdco LLC and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

6.     "Debtor," "Debtors," or "Sears" means any of the debtors in any of the cases jointly administered with the above captioned Chapter 11 case or identified in footnote 1 of this document and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

7.     "Mall of America" means the mall in Bloomington, Minnesota, popularly known as the Mall of America®.

8.     "MOAC" means MOAC Holdings LLC and any other persons or entities acting on its behalf, including but not limited to its affiliates, parents, subsidiaries, successors, predecessors, current and former employees, representatives, independent contractors, associates, attorneys, accountants, consultants, advisors, agents, owners, officers, and directors.

9.     The "Lease" means the lease between Sears and MOAC, identified with Store # 1722 on Doc. No. 3654-1 in the above captioned matter.

10.     The "Leased Space" means the space subject to the Lease.

MOAC000124

11.    "Relating to" means to have to do with, to be of importance to, to involve, or in some manner, direct or indirect, to evidence, define, describe, or explain. The phrase is intended broadly, but not in a way designed to seek information that is irrelevant, or beyond the scope authorized by Fed. R. Civ. P. 26. Any objection on the ground that the request is overbroad, based solely on the use of one or the other of these terms, is inappropriate because that meaning is not intended. The term should be understood and read in its common, dictionary-sense meaning.

## INSTRUCTIONS

The following instructions apply to each specific request for admission unless otherwise explicitly stated.

1.    You must specifically admit or deny each request; any request to which you do not respond will be deemed admitted.

2.    If you cannot admit or deny a request, you must set forth the reasons why you cannot do so.

3.    If you respond to a request with anything other than an unqualified admission, you must set forth any objections to the request.

4.    A denial shall fairly meet the substance of the requested admission.

5.    When good faith requires you to qualify your answer, or deny only part of a request, you must specify the part of the request that is admitted and qualify or deny the remainder.

6.    You may not give lack of information or knowledge as a reason for failing to admit or deny a request, unless you state that you have made a reasonable inquiry and the information known or readily obtainable by you is insufficient to enable you to admit or deny the request.

MOAC000125

7.      You may not object to a request solely on the grounds that the request presents a genuine issue of material fact for trial.

8.      The singular and masculine form of a noun or pronoun includes the plural, feminine, or neuter form, where appropriate.

9.      The past tense includes the present tense where the meaning is not distorted and the verb form of a noun or pronoun may be used, as appropriate in a particular context.

10.     Unless specifically defined herein, all words and terms used herein shall be construed and interpreted according to ordinary custom, usage, and meaning.

11.     As set forth in Fed. R. Civ. P. 26(e), these requests are deemed to be continuing in nature and you are required to supplement your responses upon receipt or discovery of additional information or documents pertinent to any of the propounded requests.

## REQUESTS FOR ADMISSION

REQUEST NO. 1:

Admit that Mall of America is a mall and shopping center, as shopping center is understood to mean with regard to 11 U.S.C. § 365(b)(3).

REQUEST NO. 2:

Admit that Sears entered into the Lease with MOAC for the Leased Space in Mall of America on May 30, 1991.

REQUEST NO. 3:

Admit that Sears operated a retail store in all three floors of the Leased Space from the date Mall of America opened, on or about August 11, 1992, until the store discontinued operations in connection with the above captioned bankruptcy.

REQUEST NO. 4:

Admit that there is currently no retail or other tenant operating any service open to Mall of America customers in the Leased Space.

MOAC000126

REQUEST NO. 5:

Admit that the financial condition of the Assignee is not similar to or better than the financial condition of Sears on or about May 30, 1991.

REQUEST NO. 6:

Admit that the operating performance of the Assignee is not similar to or better than the operating performance of Sears on or about May 30, 1991.

REQUEST NO. 7:

Admit that neither you nor, to the best of your knowledge, the Debtor have provided information regarding the financial condition or operating performance of Sears on or about May 30, 1991, to MOAC or the Court in support of the pending motion to assume and assign the Lease.

REQUEST NO. 8:

Admit that the Assignee proposes to operate with a "smaller footprint" of fewer stores, as described in Doc. No. 3654, than the Debtor operated on or about May 30, 1991.

REQUEST NO. 9:

Admit that you do not currently plan for Transform Leaseco LLC to operate as a retail distributor.

REQUEST NO. 10:

Admit that any Assignee annual retail sales are less than the annual retail sales of Sears on or about May 30, 1991.

REQUEST NO. 11:

Admit that neither you nor the Assignee propose to operate any retail store in the Leased Space without subletting or assigning the Lease to another entity.

REQUEST NO. 12:

Admit that you have not provided to MOAC or the Court the identity, financial condition, or operating performance of any proposed tenant that would operate a retail store in the Leased Space in support of the pending motion to assume and assign the Lease.

REQUEST NO. 13:

Admit that you have not provided any assurance that all three floors of the Leased Space will be open to Mall of America customers for retail shopping within a reasonable period if the Court approves the pending motion to assume and assign the Lease.

MOAC000127

<u>REQUEST NO. 14:</u>

    Admit that assumption and assignment of the Lease is not necessary to support Transform's retail operations for Transform to maintain its financial condition.

<u>REQUEST NO. 15:</u>

    Admit that Transform's retail operations are not sufficient to maintain Transform's financial condition, which is dependent upon assumption and assignment of the Lease.

Dated:  May 17, 2019        Respectfully submitted,

                */e/ Thomas J. Flynn*

                Thomas J. Flynn (30570)
                Larkin Hoffman Daly & Lindgren, Ltd.
                8300 Norman Center Drive
                Suite 1000
                Minneapolis, Minnesota  55437-1060
                (952) 835-3800
                tflynn@larkinhoffman.com

                Admitted *pro hac vice* on December 26, 2018

                *Attorneys for MOAC Mall Holdings LLC*

MOAC000128

4847-0231-3111, v. 1

MOAC000129

**Beeby, Alexander J.**

| | |
|---|---|
| **From:** | Barefoot, Luke A. <lbarefoot@cgsh.com> |
| **Sent:** | Friday, May 17, 2019 4:00 PM |
| **To:** | Rice, Gina M.; O'Neal, Sean A. |
| **Cc:** | Flynn, Thomas J.; Beeby, Alexander J. |
| **Subject:** | RE: MOAC Mall Holdings LLC's Requests for Admission and Interrogatories  |  SDNY Bankr. Case No. 18-23538 (jointly administered) |

Thank you for the service copies.  I reached out to Tom directly about these untimely pleadings when they hit the docket and look forward to discussing with him.

—

**Luke A. Barefoot**
Cleary Gottlieb Steen & Hamilton LLP
Assistant: jdwulet@cgsh.com
One Liberty Plaza, New York NY 10006
T: +1 212 225 2829
lbarefoot@cgsh.com  | clearygottlieb.com

---

**From:** Rice, Gina M. [mailto:grice@larkinhoffman.com]
**Sent:** Friday, May 17, 2019 4:56 PM
**To:** Barefoot, Luke A. <lbarefoot@cgsh.com>; O'Neal, Sean A. <soneal@cgsh.com>
**Cc:** Flynn, Thomas J. <tflynn@larkinhoffman.com>; Beeby, Alexander J. <abeeby@larkinhoffman.com>
**Subject:** MOAC Mall Holdings LLC's Requests for Admission and Interrogatories | SDNY Bankr. Case No. 18-23538 (jointly administered)

Dear Messrs. Barefoot and O'Neal,

On behalf of Tom Flynn, attorney for MOAC Mall Holdings LLC, please find attached and served upon you the following:

1. MOAC Mall Holdings LLC's Requests for Admission from Transform Holdco LLC and
2. MOAC Mall Holdings LLC's Interrogatories to Transform Holdco LLC.

Thank you,
Gina

**Gina M. Rice**
**Legal Administrative Assistant**
direct | 952-896-3382
fax     | 952-896-3333

8300 Norman Center Drive
Suite 1000
Minneapolis, MN 55437-1060

**Larkin Hoffman**
ATTORNEYS

www.larkinhoffman.com

MOAC000067

**CONFIDENTIALITY NOTICE:**

INFORMATION IN THIS MESSAGE, INCLUDING ANY ATTACHMENTS, IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE.  This message may be an Attorney-Client communication from the law firm of Larkin Hoffman Daly & Lindgren Ltd., and as such is privileged and confidential.  If you are not an intended recipient of this message, or an agent responsible for delivering it to an intended recipient, you are hereby notified that you have received this message in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you received this message in error, please notify the sender immediately, delete the message, and return any hard copy print-outs.  No legal advice is being provided or implied via this communication unless you are (1) a client of Larkin Hoffman Daly & Lindgren Ltd., and (2) an intended recipient of this message.

This message may have been sent to you using encrypted delivery. If you reply to an encrypted email, your email provider may deliver the response with encryption. [Forwarding this message may not provide the same encryption safeguards, depending on the email services being used. By doing so, you may unknowingly expose the sensitive content to others via the Internet.]


This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

MOAC000068

# Exhibit 11 - MOAC



**DLA Piper LLP (US)**
444 West Lake Street
Suite 900
Chicago, Illinois 60606-0089
www.dlapiper.com

Richard A. Chesley
Richard.Chesley@dlapiper.com
T  312.368.3430
F  312.630.5330

July 26, 2019
*VIA UPS*

Thomas J. Flynn
Larkin Hoffman Daly & Lindgren, Ltd.
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota  55437-1060

Re:    **Mall of America / Transform Holdco LLC**

Dear Tom:

It was nice seeing you earlier this week at the settlement meeting. Although it did not end with a deal, we feel significant progress was made, and we look forward to continuing our discussions.

In that vein, we have prepared the enclosed responses to the discovery requests originally served on Transform Holdco LLC.  We did not receive the request until you noted this in your latest Objection, and wanted to provide these to you as soon as possible.  Please let us know if you have any questions.

Sincerely,

Richard A. Chesley

Enclosures

cc:    Rachel Ehrlich Albanese, Esq.

Exhibit
**11-MOAC**

MOAC000069

DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
Telephone: (212) 335-4500
Richard A. Chesley
R. Craig Martin
Rachel Ehrlich Albanese

*Attorneys for Transform Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* : | |
| : | **Case No. 18-23538 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Jointly Administered)** |

---------------------------------------------------------- x

### TRANSFORM HOLDCO'S OBJECTIONS AND RESPONSES TO
### MOAC MALL HOLDINGS LLC'S INTERROGATORIES TO THE BUYER

Pursuant to Federal Rule of Civil Procedure 33 and Federal Rule of Bankruptcy Procedure

7033, Transform Holdco LLC (the "Buyer") respectfully responds and objects as follows to the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1

MOAC000070

Interrogatories issued by MOAC Mall Holdings LLC ("MOAC") to the Buyer on May 17, 2019

(the "Interrogatories").

## RESERVATION OF RIGHTS

1.      The Buyer submits these responses and objections subject to, without intending to

waive, and expressly preserving: (a) any objections as to the competence, relevance, materiality,

privilege, and/or admissibility into evidence of any response herein; (b) the right to object to other

discovery procedures involving or relating to the subject matter of the Interrogatories; and (c) the

right to revise, correct, supplement or clarify the responses or any of the objections herein at any

time.

2.      The Buyer does not admit, adopt, or acquiesce in any factual or legal contention,

assertion, assumption, characterization, or implication contained in the Interrogatories. By

responding to the Interrogatories, the Buyer does not intend to waive, and does not waive, any

defenses to the Interrogatories or any other demand or subpoena, or any case brought by MOAC

or any other party.

3.      Buyer intends no incidental or implied admissions by its responses to the

Interrogatories.  Whether the Buyer has answered or objected to any particular Interrogatory

should not be interpreted as an admission that the Buyer accepts or admits the existence of any

fact(s) set out or assumed by such Interrogatory, that such answer or objection constitutes

admissible evidence or that requests for similar information will be treated in a similar fashion.

## GENERAL OBJECTIONS

These General Objections are incorporation into each specific response below as if they

were fully repeated therein.

1.      The Buyer objects to the Interrogatories, including without limitation, the

2

MOAC000071

"Definitions" and "Instructions" therein, to the extent they purport to impose on the Buyer

obligations different from, broader than, or otherwise inconsistent with those imposed by the

Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the local rules of

the United States Bankruptcy Court for the Southern District of New York, and/or any other rules,

applicable case law, or other court orders governing the proper scope, timing, and extent of

discovery in this proceeding.   The Buyer further objects to the extent that such definitions or

instructions purport to enlarge, expand, or alter in any way the plain meaning and scope of any

specific Interrogatory where such enlargement, expansion, or alteration renders the Interrogatory

vague, ambiguous, overbroad, unduly burdensome, harassing, or incomprehensible, or where such

enlarged, expanded, or altered Interrogatory seeks information that is not relevant to the claim or

defense of any party.

    2.      The Buyer objects to the Interrogatories to the extent they seek information not in

the Buyer's possession, custody, or control and/or not obtainable by means of a reasonably diligent

search, including, without limitation, information from documents or things that are not maintained

by the Buyers in the ordinary course of business, or that are not reasonably accessible due to undue

burden or cost.

    3.      The Buyer objects to the Interrogatories to the extent they seek legal conclusions

or require the Buyer to form a legal conclusion in order to provide a response.

    4.      The Buyer objects to the Interrogatories to the extent they seek information not

relevant to the subject matter of this pending matter or to the claims or defenses of any party, not

proportional to the needs of the pending matter, or otherwise outside the proper scope of discovery,

and/or constitute an improper "fishing expedition."

    5.      The Buyer objects to the Interrogatories to the extent they seek the disclosure of

3

MOAC000072

information that was prepared in anticipation of litigation; constitutes attorney work product; discloses the mental impressions, conclusions, opinions, or legal theories of any attorneys for the Buyer; contains confidential attorney-client communications; is subject to a common interest privilege; and/or is otherwise privileged, protected, or subject to exemption from disclosure under any applicable privileges, laws, or rules. If any privileged information is disclosed pursuant to the Interrogatories, the disclosure is inadvertent and the privilege is not waived.

6.      The Buyer objects to the Interrogatories to the extent they seek information beyond the scope of what was maintained in the ordinary course of business, as irrelevant and disproportionate to the needs of the pending matter. The above-captioned matter relates to a 1991 lease regarding the property located at 2000 NE Court, Bloomington Minnesota.

7.      The Buyer objects to the Interrogatories as unduly burdensome to the extent that the information requested is within the knowledge of MOAC or is within the public domain or otherwise equally available to MOAC and the Buyer and thus more conveniently obtained from MOAC's own files or other sources.

8.      The Buyer objects to the Interrogatories to the extent they seek the production of documents in violation of Rule 33 of the Federal Rules of Civil Procedure and Bankruptcy Rule 7033. Further, the Buyer objects to the definition of "document" as overbroad, unduly burdensome and irrelevant as the definition of "document" does not apply to any of MOAC's Interrogatories. The Buyer's responses will comply with the requirements of the Federal Rules of Civil Procedure.

9.      The Buyer objects to the definition of "and" and "or" as vague, ambiguous, overbroad and unduly burdensome.

10.     The Buyer objects to the Interrogatories insofar as they seek the production of "all" or "any" information concerning any given subject, on the ground that it is impracticable and

4

MOAC000073

otherwise unduly burdensome for the Buyer to locate and review every conceivable responsive document, even documents stored electronically. The Buyer's responses will comply with the requirements of the Federal Rules of Civil Procedure.

11. The Buyer objects to the definition of "assignee" as vague, ambiguous, overbroad and unduly burdensome.

12. The Buyer objects to the definition of "communication" as overbroad and unduly burdensome to the extent it requires the Buyer to search for and produce information conveyed by, *inter alia*, direct conversations, dialogues, discussions, interviews, telegrams, telexes, and cables.

13. The Buyer objects to the definition of "Buyer," "Sears," "you," or "your" as vague, ambiguous, overbroad and unduly burdensome.

14. The Buyer objects to the definition of "describe" as vague, ambiguous, overbroad and unduly burdensome.

15. The Buyer objects to the numerous definitions of "identify" as duplicative, overbroad and unduly burdensome to the extent these definitions impose a burden not required under the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and/or any other rules, applicable case law, or other court orders. The Buyer further objects to the numerous definitions of "identify" as irrelevant and incomprehensible to the extent that they do not pertain to any of MOAC's Interrogatories. The Buyer's responses will comply with the requirements of the Federal Rules of Civil Procedure.

16. The Buyer objects to the definition of "lease" as vague, ambiguous, overbroad and unduly burdensome. As relates to the above-captioned matter, the Buyer defines "lease" to refer to the ground lease for the property located at 2000 NE Court, Bloomington Minnesota.

17. The Buyer objects to the definition of "MOAC" as overbroad and unduly

5

MOAC000074

burdensome.  The Buyer further objects to the extent that the definition calls for a legal conclusion.

18.    The Buyer objects to the definition of "person" as vague, ambiguous, overbroad and unduly burdensome.

19.    The Buyer objects to the definition of "relating to" as vague, ambiguous, overbroad, unduly burdensome and irrelevant and incomprehensible to the extent that they do not pertain to any of MOAC's Interrogatories.

20.    The Buyer objects to Instruction number 2 to the extent it imposes a burden not required under the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and/or any other rules, applicable case law, or other court orders.  The Buyer's responses will comply with the requirements of the Federal Rules of Civil Procedure.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

Subject to and without waiving the above General Objections, the Buyer objects and/or responds to each specific Interrogatory as follows:

### INTERROGATORY NO. 1

Identify all persons answering or assisting in answering these interrogatories.

### RESPONSE TO INTERROGATORY NO. 1

Subject to and without waiving the General Objections, Jane Borden answered these Interrogatories with the assistance of Buyer's counsel, [and the responses to the Interrogatories are based upon her personal knowledge and her review of relevant documents provided by the Buyer's agents].

### INTERROGATORY NO. 2

For each request for admission not fully admitted in response to MOAC Mall Holdings LLC's Requests for Admission from Transform Holdco LLC, served with these interrogatories,

6

EAST\167943027.3

MOAC000075

please describe the explanation for your response.

## RESPONSE TO INTERROGATORY NO. 2

In addition to the foregoing General Objections, the Buyer objects to this Interrogatory as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter.  In accordance with Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be derived from inspection of business records produced to date and the Buyer's Reply.

## INTERROGATORY NO. 3

Describe the financial condition of Sears on or about May 30, 1991.

## RESPONSE TO INTERROGATORY NO. 3

In addition to the foregoing General Objections, Buyer objects to the extent that the information sought by this Interrogatory regarding the financial condition of Sears on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and Buyer. *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).

## INTERROGATORY NO. 4

Describe the operating performance of Sears on or about May 30, 1991.

## RESPONSE TO INTERROGATORY NO. 4

In addition to the foregoing General Objections, the Buyer objects to the extent that the information sought by this Interrogatory regarding the financial condition of Sears on or about May 30, 1991 is within the public domain or otherwise equally available to MOAC and the Buyer. *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).

EAST\167943027.3

MOAC000076

**INTERROGATORY NO. 5**

Describe the current financial condition of the Assignee.

**RESPONSE TO INTERROGATORY NO. 5**

Subject to and without waiving the foregoing General Objections and in accordance with Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be derived from inspection of the consolidated business records and agreements produced to date and the Buyer's Reply.

**INTERROGATORY NO. 6**

Describe the current operating performance of the Assignee.

**RESPONSE TO INTERROGATORY NO. 6**

Subject to and without waiving the foregoing General Objections and in accordance with Federal Rule of Civil Procedure 33(d), the answer to this Interrogatory may be derived from inspection of business records produced to date and the Buyer's Reply.

**INTERROGATORY NO. 7**

Describe Assignee's proposed use for the Leased Space, including, but not limited to the identification of proposed tenant or tenants, which portion, if not all, of the Lease Space each tenant would use, and when that portion would be occupied by the proposed tenant and open to Mall of America customers.

**RESPONSE TO INTERROGATORY NO. 7**

Subject to and without waiving the foregoing General Objections, the Buyer intends to take the assignment of the Lease subject to all of its terms and sublease all three floors of Sears' space at the Mall.

*[Remainder of page left intentionally blank.]*

8

MOAC000077

Dated: July 26, 2019

New York, New York

/s/ Richard A. Chesley

DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
Telephone (212) 335-4500
Richard A. Chesley
R. Craig Martin
Rachel Ehrlich Albanese

*Attorneys for Transform Holdco LLC*

9

MOAC000078

DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
Telephone: (212) 335-4500
Richard A. Chesley
R. Craig Martin
Rachel Ehrlich Albanese

*Attorneys for Transform Holdco LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

In re                                                          :        **Chapter 11**
                                                              :
**SEARS HOLDINGS CORPORATION,** *et al.,*     :
                                                              :        **Case No. 18-23538 (RDD)**
                                                              :
            Debtors.[1]                                   :        **(Jointly Administered)**

------------------------------------------------------- x

### TRANSFORM HOLDCO'S OBJECTIONS AND RESPONSES TO
### MOAC MALL HOLDINGS LLC'S REQUESTS FOR ADMISSION FROM THE BUYER

Pursuant to Federal Rule of Civil Procedure 36 and Federal Rule of Bankruptcy Procedure

7036, Transform Holdco LLC (the "Buyer") respectfully responds and objects as follows to the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

MOAC000079

Requests for Admissions (the "RFAs") issued by MOAC Mall Holdings LLC ("MOAC") to Debtors on May 17, 2019.

## RESERVATION OF RIGHTS

1.      The Buyer submits these responses and objections subject to, without intending to waive, and expressly preserving: (a) any objections as to the competence, relevance, materiality, privilege, and/or admissibility into evidence of any response herein; (b) the right to object to other discovery procedures involving or relating to the subject matter of the RFAs; and (c) the right to revise, correct, supplement or clarify the responses or any of the objections herein at any time.

2.      The Buyer does not admit, adopt, or acquiesce in any factual or legal contention, assertion, assumption, characterization, or implication contained in the RFAs. By responding to the RFAs, the Buyer does not intend to waive, and does not waive, any defenses to the RFAs or any other demand or subpoena, or any case brought by MOAC or any other party.

3.      Buyer intends no incidental or implied admissions by its responses to the RFAs. Whether the Buyer has answered or objected to any particular RFA should not be interpreted as an admission that the Buyer accepts or admits the existence of any fact(s) set out or assumed by such RFA, that such answer or objection constitutes admissible evidence or that requests for similar information will be treated in a similar fashion.

## GENERAL OBJECTIONS

These General Objections are incorporated into each specific response below as if they were fully repeated therein.

1.      The Buyer objects to the RFAs, including without limitation, the "Definitions" and "Instructions" therein, to the extent they purport to impose on the Buyer obligations different from, broader than, or otherwise inconsistent with those imposed by the Federal Rules of Civil

EAST\167863267.4

MOAC000080

Procedure, the Federal Rules of Bankruptcy Procedure, the local rules of the United States Bankruptcy Court for the Southern District of New York, and/or any other rules, applicable case law, or other court orders governing the proper scope, timing, and extent of discovery in this proceeding. The Buyer further objects to the extent that such definitions or instructions purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific RFA where such enlargement, expansion, or alteration renders the RFA vague, ambiguous, overbroad, unduly burdensome, harassing, or incomprehensible, or where such enlarged, expanded, or altered RFA seeks information that is not relevant to the claim or defense of any party.

2.    The Buyer objects to the RFAs to the extent they seek information not in the Buyer's possession, custody, or control and/or not obtainable by means of a reasonably diligent search, including, without limitation, information from documents or things that are not maintained by the Buyers in the ordinary course of business, or that are not reasonably accessible due to undue burden or cost.

3.    The Buyer objects to the RFAs to the extent they seek legal conclusions or require the Buyer to form a legal conclusion in order to provide a response.

4.    The Buyer objects to the RFAs to the extent they seek information not relevant to the subject matter of this pending matter or to the claims or defenses of any party, not proportional to the needs of the pending matter, or otherwise outside the proper scope of discovery, and/or constitute an improper "fishing expedition."

5.    The Buyer objects to the RFAs to the extent they seek the disclosure of information that was prepared in anticipation of litigation; constitutes attorney work product; discloses the mental impressions, conclusions, opinions, or legal theories of any attorneys for the Buyer; contains confidential attorney-client communications; is subject to a common interest privilege;

MOAC000081

and/or is otherwise privileged, protected, or subject to exemption from disclosure under any applicable privileges, laws, or rules. If any privileged information is disclosed pursuant to the RFAs, the disclosure is inadvertent and the privilege is not waived.

6.      The Buyer objects to the RFAs to the extent they seek information beyond the scope of what was maintained in the ordinary course of business, as irrelevant and disproportionate to the needs of the pending matter. The above-captioned matter relates to a 1991 lease regarding the property located at 2000 NE Court, Bloomington Minnesota.

7.      The Buyer objects to the RFAs as unduly burdensome to the extent that the information requested is within the knowledge of MOAC or is within the public domain or otherwise equally available to MOAC and the Buyer and thus more conveniently obtained from MOAC's own files or other sources.

8.      The Buyer objects to the definition of "and" and "or" as vague, ambiguous, overbroad and unduly burdensome.

9.      The Buyer objects to the RFAs insofar as they seek the production of "all" or "any" information concerning any given subject, on the ground that it is impracticable and otherwise unduly burdensome for the Buyer to locate and review every conceivable responsive document, even documents stored electronically. The Buyer's responses will comply with the requirements of the Federal Rules of Civil Procedure.

10.     The Buyer objects to the definition of "assignee" as vague, ambiguous, overbroad and unduly burdensome.

11.     The Buyer objects to the definition of "communication" as overbroad and unduly burdensome and irrelevant as it fails to relate to any RFA.

12.     The Buyer objects to the definition of "lease" as vague, ambiguous, overbroad and

MOAC000082

unduly burdensome.  As relates to the above-captioned matter, the Buyer defines "lease" to refer to the ground lease for the property located at 2000 NE Court, Bloomington Minnesota.

13.     The Buyer objects to the definition of "relating to" as vague, ambiguous, overbroad, unduly burdensome and irrelevant and incomprehensible to the extent that they do not pertain to any of MOAC's RFAs.

## OBJECTIONS AND RESPONSES TO SPECIFIC RFAS

Subject to and without waiving the above General Objections, the Buyer objects and/or responds to each specific RFA as follows:

## RFA NO. 1

Admit that Mall of America is a mall and shopping center, as shopping center is understood to mean with regard to 11 U.S.C. § 365(b)(3).

## RESPONSE TO RFA NO. 1

Subject to and without waiving the General Objections, the Buyer admits that Mall of America is a mall and shopping center, as shopping center is understood to mean with regard to 11 U.S.C. § 365(b)(3).

## RFA NO. 2

Admit that Sears entered into the Lease with MOAC for the Leased Space in Mall of America on May 30, 1991.

## RESPONSE TO RFA NO. 2

Subject to and without waiving the General Objections, the Buyer admits that, based upon reasonable inquiry, Sears entered into the Lease with MOAC for the Leased Space in Mall of America on May 30, 1991.

MOAC000083

**RFA NO. 3**

Admit that Sears operated a retail store in all three floors of the Leased Space from the date Mall of America opened, on or about August 11, 1992, until the store discontinued operations in connection with the above captioned bankruptcy.

**RESPONSE TO RFA NO. 3**

In addition to the foregoing General Objections, the Buyer objects to this RFA because it is irrelevant and fails to relate to the inquiry. Notwithstanding the foregoing, subject to and without waiving the General Objections, the Buyer admits that Sears operated a retail store in all three floors of the Leased Space from the date Mall of America opened, on or about August 11, 1992, until the store discontinued operations in connection with the above captioned bankruptcy. The Buyer's response is based on publicly available information and the Buyer reserves its rights to supplement or amend this response.

**RFA NO. 4**

Admit that there is currently no retail or other tenant operating any service open to Mall of America customers in the Leased Space.

**RESPONSE TO RFA NO. 4**

Subject to and without waiving the General Objections, the Buyer admits that there is currently no retail or other tenant operating any service open to Mall of America customers in the Leased Space.

**RFA NO. 5**

Admit that the financial condition of the Assignee is not similar to or better than the financial condition of Sears on or about May 30, 1991.

MOAC000084

**RESPONSE TO RFA NO. 5**

In addition to the foregoing General Objections, the Buyer objects to the use of "similar to or better" in this RFA because it is vague and ambiguous, not defined anywhere in the RFA, and seeking a legal conclusion regarding an ultimate issue in the case. Buyer further objects to this RFA as the financial condition or operating performance of Sears on or about May 30, 1991 is within the public domain or is otherwise equally available to MOAC and Buyer, and MOAC can therefore draw its own conclusions. *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).

**RFA NO. 6**

Admit that the operating performance of the Assignee is not similar to or better than the operating performance of Sears on or about May 30, 1991.

**RESPONSE TO RFA NO. 6**

In addition to the foregoing General Objections, the Buyer objects to the use of "similar to or better" because it is vague and ambiguous, , and seeks a legal conclusion regarding an ultimate issue in the case. Buyer further objects to this RFA as the financial condition or operating performance of Sears on or about May 30, 1991 is within the public domain or is otherwise equally available to MOAC and Buyer, and MOAC can therefore draw its own conclusions. *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).

**RFA NO. 7**

Admit that neither you nor, to the best of your knowledge, the Debtor have provided information regarding the financial condition or operating performance of Sears on or about May

MOAC000085

30, 1991, to MOAC or the Court in support of the pending motion to assume and assign the Lease.

## RESPONSE TO RFA NO. 7

The Buyer lacks sufficient information to admit or deny this request.  In addition to the foregoing General Objections, the Buyer objects to this RFA as the financial condition or operating performance of Sears on or about May 30, 1991 is within the public domain, and MOAC can therefore draw its own conclusions. *See* Sears, Roebuck & Co., Annual Report (Form 10-K) (Mar. 31, 1992); Sears, Roebuck & Co., Quarterly Report for the Quarterly Period Ended June 30, 1991 (Form 10-Q) (Aug. 16, 1991).

## RFA NO. 8

Admit that the Assignee proposes to operate with a "smaller footprint" of fewer stores, as described in Doc. No. 3654, than the Debtor operated on or about May 30, 1991.

## RESPONSE TO RFA NO. 8

Subject to and without waiving the General Objections, the Buyer admits that the Assignee proposes to operate with a "smaller footprint" of fewer stores, as described in Doc. No. 3654, than the Debtor operated on or about May 30, 1991.

## RFA NO. 9

Admit that you do not currently plan for Transform Leaseco LLC to operate as a retail distributor.

## RESPONSE TO RFA NO. 9

In addition to the foregoing General Objections, the Buyer objects to the definition of "distributor" as vague, ambiguous, overbroad and unduly burdensome.  Buyer further objects to this RFA to the extent that it fails to distinguish Transform Leaseco LLC from other affiliates of the Buyer.

EAST\167863267.4

MOAC000086

**RFA NO. 10**

Admit that any Assignee annual retail sales are less than the annual retail sales of Sears on or about May 30, 1991.

**RESPONSE TO RFA NO. 10**

In addition to the foregoing General Objections, the Buyer objects to this RFA as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Buyer further objects to this RFA to the extent that it fails to distinguish Transform Leaseco LLC from other affiliates of the Buyer. Notwithstanding the foregoing, subject to and without waiving the General Objections, the Buyer admits that any Assignee annual retail sales are less than the annual retail sales of Sears on or about May 30, 1991.

**RFA NO. 11**

Admit that neither you nor the Assignee propose to operate any retail store in the Leased Space without subletting or assigning the Lease to another entity.

**RESPONSE TO RFA NO. 11**

Subject to and without waiving the General Objections, the Buyer admits that the Buyer intends to adhere to the provision of the Lease and sublet and/or assign the Lease or portions thereof.

**RFA NO. 12**

Admit that you have not provided to MOAC or the Court the identity, financial condition, or operating performance of any proposed tenant that would operate a retail store in the Leased Space in support of the pending motion to assume and assign the Lease.

MOAC000087

**RESPONSE TO RFA NO. 12**

In addition to the foregoing General Objections, the Buyer objects to this RFA as irrelevant, vague and ambiguous, unduly burdensome, and disproportionate to the needs of the pending matter. Buyer also objects to the definition of "tenant" as vague, ambiguous, overbroad and unduly burdensome. Notwithstanding the foregoing, subject to and without waiving the General Objections, the Buyer admits that due to the circumstances of the Objections and the efforts of MOAC to hinder the efforts to sublease or assign the Lease, at the present time no proposed tenant(s) has been selected.

**RFA NO. 13**

Admit that you have not provided any assurance that all three floors of the Leased Space will be open to Mall of America customers for retail shopping within a reasonable period if the Court approves the pending motion to assume and assign the Lease.

**RESPONSE TO RFA NO. 13**

Subject to and without waiving the General Objections, the Buyer denies that the Buyer has not provided any assurance that all three floors of the Leased Space will be open to Mall of America customers for retail shopping within a reasonable period if the Court approves the pending motion to assume and assign the Lease.

**RFA NO. 14**

Admit that assumption and assignment of the Lease is not necessary to support Transform's retail operations for Transform to maintain its financial condition.

MOAC000088

**RESPONSE TO RFA NO. 14**

In addition to the foregoing General Objections, the Buyer objects to this RFA as irrelevant, vague and ambiguous in its use of the term "necessary", unduly burdensome, and disproportionate to the needs of the pending matter.

**RFA NO. 15**

Admit that Transform's retail operations are not sufficient to maintain Transform's financial condition, which is dependent upon assumption and assignment of the Lease.

**RESPONSE TO RFA NO. 15**

In addition to the foregoing General Objections, the Buyer objects to this RFA as irrelevant, vague and ambiguous in its use of the term "sufficient", unduly burdensome, and disproportionate to the needs of the pending matter.

Dated: July 26, 2019
New York, New York

/s/ Richard A. Chesley
DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
Telephone (212) 335-4500
Richard A. Chesley
R. Craig Martin
Rachel Ehrlich Albanese

*Attorneys for Transform Holdco LLC*

MOAC000089

# Exhibit 14 - MOAC

# United States
# Securities and Exchange Commission
### Washington, D.C. 20549

## FORM 10-K

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Fiscal Year Ended February 3, 2018**

or

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Commission file number 000-51217, 001-36693**

# SEARS HOLDINGS CORPORATION
#### (Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **20-1920798** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| **3333 Beverly Road, Hoffman Estates, Illinois** | **60179** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: (847) 286-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, par value $0.01 per share** | **The NASDAQ Stock Market** |
| **Warrants to Purchase Common Stock** | **The NASDAQ Stock Market** |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such response) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐   Accelerated filer ☒   Non-accelerated filer (Do not check if a smaller reporting company) ☐

Smaller reporting company ☐   Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

On March 16, 2018, the registrant had 107,957,410 shares of common stock outstanding. The aggregate market value (based on the closing price of the Registrant's common stock for stocks quoted on the NASDAQ Global Select Market) of shares of the Registrant's common stock owned by non-affiliates as of the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $200 million.

**Documents Incorporated By Reference**

Part III of this Form 10-K incorporates by reference certain information from the Registrant's definitive proxy statement relating to our Annual Meeting of Stockholders to be held on May 9, 2018 (the "2018 Proxy Statement"), which will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Form 10-K relates.

Exhibit
14-MOAC

MOAC000663

## PART I

**Item 1.      Business**

### General

Sears Holdings Corporation ("Holdings") is the parent company of Kmart Holding Corporation ("Kmart") and Sears, Roebuck and Co. ("Sears"). Holdings (together with its subsidiaries, "we," "us," "our," or the "Company") was formed as a Delaware corporation in 2004 in connection with the merger of Kmart and Sears (the "Merger") on March 24, 2005. We are an integrated retailer with significant physical and intangible assets, as well as virtual capabilities enabled through technology. At February 3, 2018, we operated a national network of stores with 1,002 full-line and specialty retail stores in the United States operating through Kmart and Sears. Further, we operate a number of websites under the sears.com and kmart.com banners which offer millions of products and provide the capability for our members and customers to engage in cross-channel transactions such as *free store pickup; buy in store/ship to home; and buy online, return in store.*

We are also the home of Shop Your Way®, a free membership program that connects its members to personalized products, programs and partners that help them save time and money every day. Through an extensive network of national and local partners, members can shop thousands of their favorite brands, dine out and access an array of exclusive partners like Uber® and fuboTV® to earn CASHBACK in points to redeem for savings on future purchases at Sears, Kmart, Lands' End and at ShopYourWay.com. The Sears MasterCard with Shop Your Way® features an industry-leading 5-3-2-1 rewards offer, where members can earn rewards points on all purchases everywhere they shop.

The Company is a leading home appliance retailer, as well as a leader in tools, lawn and garden, fitness equipment, automotive repair and maintenance, and is a significant player in the rapidly emerging connected solutions market. We offer key proprietary brands including Kenmore® and DieHard®, as well as Craftsman® branded product offerings. Our Kenmore and DieHard brands are also now available on Amazon.com. We also maintain a broad apparel and home offering including such well-known labels as Jaclyn Smith®, Joe Boxer®, Route 66®, Cannon®, Adam Levine® and Levi's® and also offer Lands' End® merchandise in some of our Full-line stores. We are the nation's No. 1 provider of appliance and product repair services, with over five million service calls made annually.

The retail industry is changing rapidly. The progression of the Internet, mobile technology, social networking and social media is fundamentally reshaping the way we interact with our core customers and members. As a result, we are transitioning to a member-centric company. Our focus continues to be on our core customers, our members, and finding ways to provide them value and convenience through Integrated Retail and our Shop Your Way membership platform. We have invested significantly in our membership program, our online ecommerce platforms and the technology needed to support these initiatives.

### Business Segments

We operate in two reportable segments, Kmart and Sears Domestic. Financial information, including revenues, operating loss, total assets and capital expenditures for each of these business segments is contained in Note 17 of Notes to Consolidated Financial Statements. Information regarding the components of revenue for Holdings is included in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations as well as Note 17 of Notes to Consolidated Financial Statements.

### *Kmart*

At February 3, 2018, the Company operated a total of 432 Kmart stores across 47 states, Guam, Puerto Rico and the U.S. Virgin Islands. This store count consists of 431 discount stores, averaging 94,000 square feet, and one Super Center, approximately 185,000 square feet. Most Kmart stores are one-floor, free-standing units that carry a wide array of products across many merchandise categories, including consumer electronics, seasonal merchandise, outdoor living, toys, lawn and garden equipment, food and consumables and apparel, including products sold under such well-known labels as Craftsman, Jaclyn Smith, Adam Levine, Joe Boxer, Basic Editions and certain proprietary Sears branded products (such as Kenmore and DieHard) and services. We also offer an assortment of major

MOAC000664

appliances, including Kenmore-branded products, in all of our locations. There are 183 Kmart stores that also operate in-store pharmacies. The Super Center combines a full-service grocery along with the merchandise selection of a discount store. There are also three Sears Auto Centers operating in Kmart stores, offering a variety of professional automotive repair and maintenance services, as well as a full assortment of automotive accessories. Kmart offers a layaway program, which allows members and customers to cost-effectively finance their purchases both in-store and online. In addition, our members and customers have the ability to buy online and pick up in store via mygofer.com, kmart.com or shopyourway.com. Kmart also sells its products through its kmart.com website and provides members and customers enhanced cross-channel options such as buying through a mobile app or online and picking up merchandise in one of our Kmart or Sears Full-line stores.

*Sears Domestic*

At February 3, 2018, Sears Domestic operations consisted of the following:

- Full-line Stores—547 stores located across 49 states and Puerto Rico, primarily mall-based locations averaging 159,000 square feet. Full-line stores offer a wide array of products and service offerings across many merchandise categories, including appliances, consumer electronics/connected solutions, tools, sporting goods, outdoor living, lawn and garden equipment, certain automotive services and products, such as tires and batteries, home fashion products, as well as apparel, footwear, jewelry and accessories for the whole family. Our product offerings include our proprietary Kenmore, DieHard, WallyHome, Bongo, Covington, Simply Styled, Everlast, Metaphor, Roebuck & Co., Outdoor Life and Structure brand merchandise, and other brand merchandise such as Craftsman, Roadhandler and Levi's. Lands' End, Inc. continues to operate 151 "store within a store" departments inside Sears Domestic Full-line locations. We also have 423 Sears Auto Centers operating in association with Full-line stores. In addition, there are 19 free-standing Auto Centers that operate independently of Full-line stores. Sears extends the availability of its product selection through the use of its sears.com and shopyourway.com websites, which offer an assortment of home, apparel and accessory merchandise and provide members and customers the option of buying through a mobile app or online and picking up their merchandise in one of our Sears Full-line or Kmart stores.

- Specialty Stores—23 specialty stores (primarily consisting of the 19 free-standing Auto Centers noted above) located in free-standing, off-mall locations or high-traffic neighborhood shopping centers, including three DieHard Auto Centers - two in Detroit and one in San Antonio. Specialty stores also include Sears Appliances and Mattresses stores in Ft. Collins, Colorado, Camp Hill, Pennsylvania, Pharr, Texas and Honolulu, Hawaii.

- Commercial Sales—We sell Kenmore appliances to home builders and property managers through Kenmore Direct, the business-to-business sales organization of KCD Brands. Kenmore Direct operates using a number of sales channels including an Amazon Business sales account. We also sell a wide assortment of appliance brands including luxury brands, parts and services to builders, developers, designers, among other commercial and residential customers through Monark Premium Appliance Co., which includes California Builder Appliances, Inc. (d/b/a Monark Premium Appliance Co. of California), Florida Builder Appliances, Inc.  (d/b/a Monark Premium Appliance Co.) and Starwest, LLC. (d/b/a Monark Premium Appliance Co. of Arizona).

- Home Services—Product Repair Services, the nation's No. 1 provider of appliance and product repair services, is a key element in our active relationship with nearly 30 million households. With approximately 5,200 service technicians making over five million service calls annually, this business delivers a broad range of retail-related residential and commercial services across all 50 states, Puerto Rico, Guam and the Virgin Islands under either the Sears Parts & Repair Services or A&E Factory Service trade names. Commercial and residential customers can obtain parts and repair services for all major brands of products within the appliances, lawn and garden equipment, consumer electronics, floor care products, and heating and cooling systems categories. We also provide repair parts with supporting instructions for "do-it-yourself" members and customers through our searspartsdirect.com website. This business also offers protection agreements, home warranties and Kenmore and Carrier brand residential heating and cooling systems. Home Services also includes home improvement services (primarily siding, windows, cabinet refacing, kitchen remodeling, roofing, carpet and upholstery cleaning, air duct

MOAC000665

cleaning, and garage door installation and repair) provided through Sears Home Improvement and Sears Home & Business Franchises.

- Delivery and Installation—Provides both home delivery and retail installation services for Holdings' retail operations with over three million deliveries and installation calls made annually. Also includes Innovel Solutions, which provides delivery services for third party customers.

## Real Estate Transactions

In the normal course of business, we consider opportunities to purchase leased operating properties, as well as offers to sell owned, or assign leased, operating and non-operating properties. These transactions may, individually or in the aggregate, result in material proceeds or outlays of cash. In addition, we review leases that will expire in the short term in order to determine the appropriate action to take.

Further information concerning our real estate transactions is contained in Note 11 of Notes to Consolidated Financial Statements.

## Trademarks and Trade Names

The KMART® and SEARS® trade names, service marks and trademarks, used by us both in the United States and internationally, are material to our retail and other related businesses.

We sell proprietary branded merchandise under a number of brand names that are important to our operations. Our KENMORE® and DIEHARD® brands are among the most recognized proprietary brands in retailing. These marks are the subject of numerous United States and foreign trademark registrations. Other well recognized Company trademarks and service marks include ATHLETECH®, BLUELIGHT®, COVINGTON®, ROEBUCK & CO.®, SHOP YOUR WAY®, SMART SENSE®, STRUCTURE®, THOM MCAN®, and WALLY®, which also are registered or are the subject of pending registration applications in the United States. Generally, our rights in our trade names and marks continue so long as we use them.

## Seasonality

The retail business is seasonal in nature, and we generate a high proportion of our revenues, operating income and operating cash flows during the fourth quarter of our year, which includes the holiday season. As a result, our overall profitability is heavily impacted by our fourth quarter operating results. Additionally, in preparation for the fourth quarter holiday season, we significantly increase our merchandise inventory levels, which are financed from operating cash flows, credit terms received from vendors and borrowings under our domestic credit agreement (described in the "Uses and Sources of Liquidity" section below). Fourth quarter reported revenues accounted for approximately 26% of total reported revenues in 2017, 27% of total reported revenues in 2016 and 29% of total reported revenues in 2015. See Note 19 of Notes to Consolidated Financial Statements for further information on revenues earned by quarter in 2017 and 2016.

## Competition

Our business is subject to highly competitive conditions. We compete with a wide variety of retailers, including other department stores, discounters, home improvement stores, consumer electronics dealers, auto service providers, specialty retailers, wholesale clubs, as well as many other retailers operating on a national, regional or local level in the United States. Online and catalog businesses, which handle similar lines of merchandise, also compete with us. Walmart, Target, Kohl's, J.C. Penney, Macy's, The Home Depot, Lowe's, Best Buy and Amazon are some of the national retailers and businesses with which we compete. The Home Depot and Lowe's are major competitors in relation to our home appliance business, which accounted for approximately 16% of our 2017, 15% of our 2016 and 15% of our 2015 reported revenues. Success in these competitive marketplaces is based on factors such as price, product assortment and quality, service and convenience, including availability of retail-related services such as access to credit, product delivery, repair and installation. Additionally, we are influenced by a number of factors, including, but not limited to, the cost of goods, consumer debt availability and buying patterns, economic conditions, customer preferences, inflation, currency exchange fluctuations, weather patterns, and

MOAC000666

catastrophic events. Item 1A in this Annual Report on Form 10-K contains further information regarding risks to our business.

**Employees**

At February 3, 2018, subsidiaries of Holdings had approximately 89,000 employees in the United States and U.S. territories. This employee count includes part-time employees.

**Our Website; Availability of SEC Reports and Other Information**

Our corporate website is located at searsholdings.com. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to these reports are available, free of charge, through the "SEC Filings" portion of the Investors Home section of our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission ("SEC").

The Corporate Governance Guidelines of our Board of Directors, the charters of the Audit, Compensation and Nominating and Corporate Governance Committees of the Board of Directors, our Code of Conduct and the Board of Directors Code of Conduct are available in the "Corporate Governance" portion of the Investors Home section of searsholdings.com. References to our website address do not constitute incorporation by reference of the information contained on such website, and the information contained on the website is not part of this document.

MOAC000667

**Item 1A.        Risk Factors**

Our operations and financial results are subject to various risks and uncertainties, including those described below, which could adversely affect our business, results of operations and financial condition.

**We cannot predict whether our plans to enhance our financial flexibility and liquidity to fund our transformation will be successful.**

We are continuing to pursue a transformation strategy and to explore potential initiatives to enhance our financial flexibility and liquidity. We have incurred significant losses and experienced negative operating cash flows for the past several years, and accordingly we have taken a number of actions to fund our continued transformation and meet our obligations, including: the amendment and extension of our revolving credit facility; the extension of our first lien term loan facility from June 2018 to January 2019 (with a right on our part to further extend such maturity, subject to the satisfaction of certain conditions, to July 2019); the entrance into the first lien term loan facility due 2020, the second lien term loan facility due 2020 and the second lien line of credit loan facility due 2020, the amendment of the senior secured letter of credit facility; the extension of our real estate term loan facility from July 2017 to July 2018; the entrance into the real estate term loan facility due 2020, the incremental real estate term loan facility due 2018 and the intellectual property/ground lease term loan facility due 2020; the private exchange offers relating to our senior secured notes and senior unsecured notes, the negotiated exchanges of other indebtedness; the entrance into the REMIC real estate term loan facility due December 2018 and the REMIC mezzanine loan facility due 2020; the sale of the Craftsman brand; the rights offering and sale-leaseback transaction with Seritage Growth Properties; the separation of our Lands' End subsidiary; the Sears Canada rights offering; the rights offering for senior unsecured notes with warrants; and various real estate transactions. As a result, we are, and we expect to continue to be, highly leveraged. We expect to pursue other near-term actions to bolster liquidity. If we continue to incur losses, additional actions may be required to further enhance our financial flexibility and liquidity. The success of our initiatives is subject to risks and uncertainties with respect to market conditions and other factors that may cause our actual results, performance or achievements to differ materially from our plans. We cannot assure that cash flows and other internal and external sources of liquidity will at all times be sufficient for our cash requirements. If necessary, we may need to consider further actions and steps to improve our cash position, mitigate any potential liquidity shortfall, pursue additional sources of liquidity, and reduce costs. There can be no assurance that these actions would be successful. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, there can be no assurance that the evaluation and/or completion of any potential transactions will not have a negative impact on our other businesses.

We cannot predict the outcome of any actions to generate liquidity, whether such actions would generate the expected liquidity as currently planned, or the availability of additional debt financing. The specific actions taken or assets involved, the timing, and the overall amount will depend on a variety of factors, including market conditions, interest in specific assets, valuations of those assets and our underlying operating performance.

If we continue to experience operating losses and we are not able to generate additional liquidity through the mechanisms described above or through some combination of other actions, including real estate or other asset sales, while not expected, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. If we are unable to secure such additional funds, we may not be able to meet our obligations as they become due. Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business.

**Certain factors, including changes in market conditions and our credit ratings, may continue to limit our access to capital markets and other financing sources and materially increase our borrowing costs.**

In addition to credit terms from vendors, our liquidity needs are funded by our operating cash flows and borrowings under our credit agreements and commercial paper program, asset sales and access to capital markets. The availability of financing depends on numerous factors, including economic and market conditions, our operating performance, our credit ratings, and lenders' assessments of our prospects and the prospects of the retail industry in

6

MOAC000668

general. Changes in these factors may affect our cost of financing, liquidity and our ability to access financing sources, including our commercial paper program and possible second lien indebtedness that is permitted under the domestic revolving credit facility, with respect to each of which we have no lender commitments. Rating agencies revise their ratings for the companies that they follow from time to time. Several ratings agencies have previously downgraded the credit rating on certain of our outstanding debt instruments and may further downgrade or otherwise revise such ratings in the future. In addition, our ratings may be withdrawn in their entirety at any time.

The Company's domestic credit facility currently provides up to $2.5 billion of lender commitments, $1.5 billion of which are revolving commitments. Our ability to borrow funds under this facility is limited by a borrowing base determined by the value, from time to time, of eligible inventory and certain accounts receivable. The value of these eligible assets has not always been sufficient to support borrowings of up to the full amount of the commitments under this facility, and we have not always had full access to the facility, but rather have had access to a lesser amount determined by the borrowing base. A decline in the value of eligible assets has also resulted in our inability to borrow up to the full amount of second lien indebtedness permitted by the domestic credit facility as our second-lien borrowings are limited by a borrowing base requirement under the indenture that governs our senior secured notes due 2018. The domestic revolving credit facility imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement. The domestic credit facility also effectively limits full access to the facility if our fixed charge ratio at the last day of any fiscal month is less than 1.0 to 1.0. As of February 3, 2018, our fixed charge ratio continues to be less than 1.0 to 1.0. If availability under the domestic revolving credit facility were to fall below 10%, the Company would be required to test the fixed charge coverage ratio, and would not comply with the facility, and the lenders under the facility could demand immediate payment in full of all amounts outstanding and terminate their obligations under the facility. In addition, the domestic credit facility provides that in the event we make certain prepayments of indebtedness, for a period of one year thereafter we must maintain availability under the facility of at least 12.5%, and it prohibits certain other prepayments of indebtedness. Moreover, if the borrowing base (as calculated pursuant to the indenture relating to our 6 5/8% senior secured notes due 2019, which were issued in March 2018 (the "New Senior Secured Notes")) falls below the principal amount of the New Senior Secured Notes plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for the New Senior Secured Notes on the last day of any two consecutive quarters beginning with the second quarter of our 2018 fiscal year, it could trigger an obligation to offer to repurchase all outstanding New Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest.

The lenders under our various credit facilities may not be able to meet their commitments if they experience shortages of capital and liquidity. Disruptions or turmoil in the financial markets could reduce our ability to meet our capital requirements. There can be no assurance that our ability to otherwise access the credit markets will not be adversely affected by changes in the financial markets and the global economy.

**Our business results and ability to fund our transformation depend on our ability to achieve cost savings initiatives and complete our previously announced restructuring program.**

In 2017, we initiated a restructuring program targeted to deliver at least $1.25 billion in annualized cost savings. Under the restructuring program, we reduced our corporate overhead, more closely integrated our Sears and Kmart operations and improved our merchandising, supply chain and inventory management. The savings also included cost reductions resulting from the closure of 303 Kmart and 132 Sears stores. In January 2018, we identified an additional $200 million of cost savings, unrelated to store closings. However, if we are unable to deliver the additional cost reductions, while continuing to invest in business growth, our financial results could be adversely impacted. Our ability to successfully manage and execute these initiatives and realize expected savings and benefits in the amounts and at the times anticipated is important to our business success, and any failure to do so, which could result from our inability to successfully execute plans, changes in global or regional economic conditions, competition, changes in the industries in which we compete, unanticipated costs or charges and other factors described herein, could adversely affect our business, financial condition and results of operations. As part of our overhead reduction, we have reduced our corporate and operations headcount, including management level, distribution and field employees. These reductions, as well as employee attrition, could result in the potential loss of specific knowledge relating to our company, operations and industry that could be difficult to replace. Also, we now operate with fewer employees, who have assumed additional duties and responsibilities. The restructuring program and workforce changes may negatively impact communication, morale, management cohesiveness and effective

MOAC000669

decision-making, which could have an adverse impact on our business operations, customer experience, sales and results of operations.

**The lack of willingness of our vendors to do business with us or to provide acceptable payment terms could negatively impact our liquidity and/or reduce the availability of products or services we seek to procure.**

We depend on our vendors to provide us with financing on our purchases of inventory and services. From time to time, certain of our vendors have sought to limit the availability of vendor credit to us or to modify the other terms under which they sell to us, or both, which has negatively impacted our liquidity. In addition, the inability of vendors to access liquidity, or the insolvency of vendors, could lead to their failure to deliver inventory or other services. Certain of our vendors finance their operations and/or reduce the risk associated with collecting accounts receivable from us by selling or "factoring" the receivables or by purchasing credit insurance or other forms of protection from loss associated with our credit risks. The ability of our vendors to do so is subject to the perceived credit quality of the Company. Such vendors could be limited in their ability to factor receivables or obtain credit protection in the future because of our perceived financial position and creditworthiness, which could reduce the availability of products or services we seek to procure, increase the cost to us of those products and services, or both.

We have ongoing discussions concerning our liquidity and financial position with the vendor community and third parties that offer various credit protection services to our vendors. The topics discussed have included such areas as pricing, payment terms and ongoing business arrangements. As of the date of this report, we have not experienced any significant disruption in our access to merchandise or our operations due to vendors slowing or ceasing merchandise shipments or requiring or conditioning the sale or shipment of merchandise on new payment terms or other assurances. However, there can be no assurances that there will not be a future disruption, and such circumstances could have a negative effect on our business, financial condition and results of operations.

**If we are unable to compete effectively in the highly competitive retail industry, our business and results of operations could be materially adversely affected.**

The retail industry is highly competitive with few barriers to entry. We compete with a wide variety of retailers, including other department stores, discounters, home improvement stores, appliances and consumer electronics retailers, auto service providers, specialty retailers, wholesale clubs, online and catalog retailers and many other competitors operating on a national, regional or local level. Some of our competitors are actively engaged in new store expansion or increasing their online presence. Online and catalog businesses, which handle similar lines of merchandise, and some of which are not required to collect sales taxes on purchases made by their customers, also compete with us. Competition may intensify as competitors enter into business combinations or alliances. We also experience significant competition from promotional activities of our competitors, and some competitors may be able to devote greater resources to sourcing, promoting and selling their products. In this competitive marketplace, success is based on factors such as price, advertising, product assortment, quality, service, reputation and convenience.

Our success depends on our ability to differentiate ourselves from our competitors with respect to shopping convenience, a quality assortment of available merchandise, functionality of digital channels, and superior customer service and experience. We must also successfully respond to our members' and customers' changing tastes and expectations. The performance of our competitors, as well as changes in their pricing policies, marketing activities, new store openings, online presence, use of purchasing data and other business strategies, could have a material adverse effect on our business, financial condition and results of operations.

8

MOAC000670

**If we fail to offer merchandise and services that our members and customers want, our sales may be limited, which would reduce our revenues and profits.**

In order for our business to be successful, we must identify, obtain supplies of, and offer to our members and customers, attractive, innovative and high-quality merchandise. Our products and services must satisfy the desires of our members and customers, whose preferences may change in the future. Our sales and operating results depend in part on our ability to predict consumer demand for products and services we sell, availability of merchandise, product trends, and our members' and customers' purchasing habits, tastes and preferences. If we misjudge these predictions, our relationship with our members and customers may be negatively impacted, and we may be faced with excess inventories of some products, which may impact our sales or require us to sell the merchandise we have obtained at lower prices, and missed opportunities for products and services we chose not to offer. In addition, merchandise misjudgments may adversely impact the perception or reputation of our company, which could result in declines in member and customer loyalty and vendor relationships. These factors could have a negative effect on our business, financial condition and results of operations.

**If our integrated retail strategy to transform into a member-centric retailer is not successful, our business and results of operations could be adversely affected.**

We are seeking to transform into a member-centric retailer through our integrated retail strategy, which is based on a number of initiatives, including our Shop Your Way program, that depend on, among other things, our ability to respond quickly to ongoing technology developments and implement new ways to understand and rely on the data to interact with our members and customers and our ability to provide attractive, convenient and consistent online and mobile experiences for our members. We must anticipate and meet our members' and customers' evolving expectations, while counteracting developments by our competitors and striving to deliver a seamless experience across all of our sales channels. We may need to adjust our strategic initiatives depending on our members' and customers' reactions to and level of engagement with our initiatives. Failure to execute these initiatives or provide our members with positive experiences may result in a loss of active members, failure to attract new members and lower than anticipated sales. There is no assurance that our initiatives and strategies will improve our operating results.

**If we do not successfully manage our inventory levels, our operating results will be adversely affected.**

We must maintain sufficient inventory levels to operate our business successfully. However, we also must guard against accumulating excess inventory as we seek to minimize out-of-stock levels across all product categories and to maintain in-stock levels. We obtain a significant portion of our inventory from vendors located outside the United States. Some of these vendors require lengthy advance notice of our requirements in order to be able to supply products in the quantities we request. This usually requires us to order merchandise, and enter into purchase order contracts for the purchase and manufacture of such merchandise, well in advance of the time these products will be offered for sale. As a result, we may experience difficulty in responding quickly to a changing retail environment, which makes us vulnerable to changes in price and demand. If we do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, our inventory levels will not be appropriate and our results of operations may be negatively impacted.

**Our business has been and will continue to be affected by worldwide economic conditions; an economic downturn, a renewed decline in consumer-spending levels and other conditions, including inflation and changing prices of energy, could lead to reduced revenues and gross margins, and negatively impact our liquidity.**

Many economic and other factors are outside of our control, including consumer and commercial credit availability, consumer confidence and spending levels, as well as the impact of payroll tax and medical cost increases on U.S. consumers, recession, inflation, deflation, employment levels, housing sales and remodels, interest rates, tax rates, rates of economic growth, fiscal and monetary government policies, consumer debt levels, consumer debt payment behaviors, fuel costs and other challenges currently affecting the global economy, the full impact of which on our business, results of operations and financial condition cannot be predicted with certainty. These economic conditions adversely affect the disposable income levels of, and the credit available to, our members and customers, which could lead to reduced demand for our merchandise. Increases in fuel and energy costs may have a

9

MOAC000671

significant impact on our operations. We require significant quantities of fuel for the vehicles used by technicians in our home services business, and we are exposed to the risk associated with variations in the market price for petroleum products. We could experience a disruption in energy supplies, including our supply of gasoline, as a result of factors that are beyond our control, which could have an adverse effect on our business. Certain of our vendors also could experience increases in the cost of various raw materials, such as cotton, oil-related materials, steel and rubber, which could result in increases in the prices that we pay for merchandise, particularly apparel, appliances and tires. Domestic and international political events also affect consumer confidence. The threat, outbreak or escalation of terrorism, civil unrest, military conflicts or other hostilities could lead to a decrease in consumer spending. Any of these events and conditions could inhibit sales or cause us to increase inventory markdowns and promotional expenses, thereby reducing our gross margins.

**Failure to execute effective advertising efforts may adversely impact our financial performance.**

Effective advertising and marketing efforts play a crucial role in maintaining high customer traffic both in store and online. We are focused on developing new marketing initiatives and maintaining effective promotional strategies that target further growth in our business. Failure to execute effective advertising efforts to attract new customers or retain existing customers may adversely impact our financial performance.

**Our business results may be negatively impacted as a result of the recapture rights included in the Master Leases in connection with the Seritage transaction and JV transactions.**

In 2015, we entered into various sale-lease back transactions with respect to certain of our real properties with Seritage Growth Properties ("Seritage") and certain joint ventures we formed with affiliates of Simon Property Group, Inc., General Growth Properties, Inc. and the Macerich Company (collectively, the "JVs"). In connection with the Seritage transaction and JV transactions, Holdings entered into agreements with Seritage and the JVs pursuant to which Holdings leased 255 of the properties (the "Master Leases"). The Master Leases include recapture provisions that allow Seritage or the JVs, as applicable, to reclaim approximately 50% of the space within these properties (subject to certain exceptions, including reclamation rights as to 100% of the space at 21 properties, and further subject to a lease termination payment by Seritage), in addition to all of the automotive care centers which are free-standing or attached as "appendages," and all outparcels or outlots, as well as certain portions of parking areas and common areas. While we believe these provisions are generally beneficial for Holdings as they facilitate the transformation of our physical stores, potentially enable us to rationalize our footprint by reducing the space we occupy in a given location, and provide us with substantial flexibility in how we manage our store network moving forward, if we are unable to successfully manage and execute our plans to operate our stores in the smaller footprint, our business, financial condition and results of operations could be adversely impacted. Additionally, the recapture rights are within the control of Seritage and the JVs and we cannot predict the timing on which the recapture rights may be exercised, if at all, or whether the timing of any such exercise of these rights will align well with the timing of our transformation, which could create disruptions in our operations.

**Potential liabilities in connection with the separations of Sears Hometown and Outlet Stores and Lands' End or other asset transactions may arise under fraudulent conveyance and transfer laws and legal capital requirements.**

With respect to the separations of our Sears Hometown and Outlet Stores and Lands' End, Inc. subsidiaries, the sale of real estate assets to real estate investment trusts and other third parties, the sale of the Craftsman brand, and any future dispositions of other similar assets, if the Company, Lands' End, or any asset purchaser subsequently fails to pay its creditors or enters insolvency proceedings, the transaction may be challenged under U.S. federal, U.S. state and foreign fraudulent conveyance and transfer laws, as well as legal capital requirements governing distributions and similar transactions. If a court were to determine under these laws that, (a) at the time of the transaction, the entity in question: (1) was insolvent; (2) was rendered insolvent by reason of the transaction; (3) had remaining assets constituting unreasonably small capital; (4) intended to incur, or believed it would incur, debts beyond its ability to pay these debts as they matured; or (b) the transaction in question failed to satisfy applicable legal capital requirements, the court could determine that the transaction was voidable, in whole or in part. Subject to various defenses, the court could then require the Company, Lands' End, the respective purchaser, or other recipients of value in connection with any such transaction, as the case may be, to turn over value to other entities

MOAC000672

involved in the transaction and contemplated transactions for the benefit of unpaid creditors. The measure of insolvency and applicable legal capital requirements will vary depending upon the jurisdiction whose law is being applied.

**Certain dividend payments received by us from Sears Canada Inc., and other transactions involving Sears Canada Inc., may be subject to challenge.**

In 2012 and 2013, we received dividend payments from our former subsidiary, Sears Canada Inc. ("Sears Canada") in the aggregate amount of $295 million. The payments of these dividends by Sears Canada, as well as "the surrender by Sears Canada of its exclusive right to use the Craftsman trademark in Canada in connection with the sale by Holdings of the Craftsman business to Stanley Black & Decker in March 2017," have been identified by the court-appointed monitor for Sears Canada in connection with its bankruptcy liquidation as potential "transactions of interest" subject to review. In addition, the Canadian bankruptcy court has appointed a litigation advisor to investigate and potentially recommend claims relating to dividend payments made by Sears Canada. In the event that a court of competent jurisdiction were to determine that any dividend payments made by, or other transactions involving, Sears Canada were subject to recapture, we could suffer financial liability, which could have a materially adverse impact on our liquidity or financial condition.

**We rely extensively on computer systems to implement our integrated retail strategy, process transactions, summarize results and otherwise manage our business. Disruptions in these systems could harm our ability to run our business.**

Given the significance of our online and mobile capabilities, our collection and use of data to create personalized experiences, and the number of individual transactions we have each year, including in our stores, it is critical that we maintain uninterrupted operation of our computer and communications hardware and software systems, some of which are based on end-of-life or legacy technology, operate with minimal or no vendor support and are otherwise difficult to maintain. Our systems are subject to damage or interruption from power outages, computer and telecommunications failures, computer viruses, worms, other malicious computer programs, denial-of-service attacks, security breaches, catastrophic events such as fires, tornadoes, hurricanes, acts of terrorism and usage errors by our employees. If our systems are damaged, breached or cease to function properly, we may have to make a significant investment to repair or replace them, and we may suffer loss of critical data and interruptions or delays in our operations. Operating legacy systems subjects us to inherent costs and risks associated with maintaining, upgrading and replacing these systems and retaining sufficiently skilled personnel to maintain and operate the systems, demands on management time, and other risks and costs. Any material interruption in our computer operations may have a material adverse effect on our business or results of operations, including on our Shop Your Way program and participation in or engagement with that program. We are pursuing initiatives to transform our information technology processes and systems. These initiatives are highly complex and include replacing legacy systems, upgrading existing systems, and acquiring new systems and hardware with updated functionality. The risk of disruption is increased in periods when such complex and significant systems changes are undertaken.

**If we do not maintain the security of our member and customer, associate or company information, we could damage our reputation, incur substantial additional costs and become subject to litigation.**

The protection of member, customer, employee, and company data is critical to the Company. We have systems and processes in place that are designed to protect information and protect against security and data breaches as well as fraudulent transactions and other activities. Nevertheless, cyber-security risks such as malicious software and attempts to gain unauthorized access to data are rapidly evolving and becoming increasingly sophisticated. Techniques or software used to gain unauthorized access, and/or disable, degrade or harm our systems may be difficult to detect or scope for prolonged periods of time, and we may be unable to anticipate these techniques or put in place protective or preventive measures. These attempts to gain unauthorized access could lead to disruptions in our systems, unauthorized release of confidential or otherwise protected information or corruption of data. If individuals are successful in infiltrating, breaking into, disrupting, damaging or otherwise stealing from the computer systems of the Company or its third-party providers we may have to make a significant investment to fix or replace them, we may suffer interruptions in our operations in the interim, we may face costly litigation,

MOAC000673

government investigations, government enforcement actions, fines and/or lawsuits, the ability for our members to earn or redeem points in our Shop Your Way program may be impacted or halted, and our reputation with our members and customers may be significantly harmed. There is no guarantee that the procedures that we have implemented to protect against unauthorized access to secured data are adequate to safeguard against all data security breaches. A data security breach or any failure by us to comply with applicable privacy and information security laws and regulations could result in a loss of customer or member confidence and negatively impact our business, including our Shop Your Way program, and our results of operations. Moreover, a data security breach could require us to devote significant management resources to address the problems created by the breach and to expend significant additional resources to upgrade further the security measures that we employ to guard against such breaches, which could disrupt our business, operations and financial condition.

**We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business operations.**

As a retailer that accepts payments using a variety of methods, including credit and debit cards, PayPal, and gift cards, the Company is subject to rules, regulations, contractual obligations and compliance requirements, including payment network rules and operating guidelines, data security standards and certification requirements, and rules governing electronic funds transfers. The regulatory environment related to information security and privacy is increasingly rigorous, with new and constantly changing requirements applicable to our business, and compliance with those requirements could result in additional costs or accelerate these costs. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which could increase over time and raise our operating costs. We rely on third parties to provide payment processing services, including the processing of credit cards, debit cards, and other forms of electronic payment. If these companies become unable to provide these services to us, or if their systems are compromised, it could disrupt our business.

The Payment Card Industry ("PCI") has established standards for securing payment card data through the PCI Data Security Standards ("DSS"). The Company is required to conduct an annual assessment with a PCI Qualified Security Assessor to assess compliance with the PCI DSS. Based on the 2016 assessment, the Company was determined to be non-compliant with PCI DSS. For 2017, we delivered 6 out of 7 compliant reports for PCI. The only outstanding report for automotive is to be delivered in the first quarter of 2018 as has been agreed upon with the relevant processor and card brands. While the Company took corrective actions which allowed it to regain compliance with PCI DSS, there can be no assurance that the Company will achieve compliance in the future. A failure to achieve compliance with PCI DSS could result in the incurrence of fines, penalties or other liabilities by the Company.

**Due to the seasonality of our business, our annual operating results would be adversely affected to a heightened degree if our business performs poorly in the fourth quarter.**

Due to the seasonality of our business, our operating results vary considerably from quarter to quarter. We generate a high proportion of revenues, operating income and operating cash flows during the fourth quarter of our year, which includes the holiday season. In addition, our Company incurs significant additional expenses for inventory, advertising and employees in the period leading up to the months of November and December in anticipation of higher sales volume in the fourth quarter. As a result, our fourth quarter operating results significantly impact our annual operating results. Our fourth quarter operating results may fluctuate significantly, based on many factors, including holiday spending patterns and weather conditions.

**Our sales may fluctuate for a variety of reasons, which could adversely affect our results of operations.**

Our business is sensitive to customers' spending patterns, which in turn are subject to prevailing economic conditions. Our sales and results of operations have fluctuated in the past, and we expect them to continue to fluctuate in the future. A variety of other factors affect our sales and financial performance, including:

- actions by our competitors, including opening of new stores in our existing markets or changes to the way these competitors go to market online;
- our ability to integrate and deliver an attractive online retail experience;
- seasonal fluctuations due to weather conditions;
- changes in our merchandise strategy and mix;

MOAC000674

- changes in population and other demographics; and
- timing of our promotional events.

Accordingly, our results for any one quarter are not necessarily indicative of the results to be expected for any other quarter, and comparable store sales for any particular future period may increase or decrease. For more information on our results of operations, see Management's Discussion and Analysis of Financial Condition and Results of Operations in Item 7 of this Annual Report on Form 10-K.

**We rely on foreign sources for significant amounts of our merchandise, and our business may therefore be negatively affected by the risks associated with international trade.**

We depend on a large number of products produced in foreign markets. We face risks, including reputational risks, associated with sourcing, purchasing, and the delivery of merchandise originating outside the United States, including:

- potential economic and political instability in countries where our suppliers are located;
- increases in shipping costs;
- manufacturing and transportation delays and interruptions, including without limitation, delays and interruptions resulting from labor slowdowns, strikes, or other disruptions at any port where merchandise we purchase enters the U.S.;
- the availability of raw materials to suppliers;
- supplier financial instability;
- supplier compliance with applicable laws, including labor and environmental laws, and with our global compliance program for suppliers and factories;
- merchandise safety and quality issues, adverse fluctuations in currency exchange rates; and
- changes in U.S. and foreign laws affecting the importation and taxation of goods, including duties, tariffs and quotas, or changes in the enforcement of those laws.

U.S. foreign trade policies, trade restrictions, other impositions on imported goods, trade sanctions imposed on certain countries, the limitation on the importation of certain types of goods or of goods containing certain materials from other countries, and other factors relating to foreign trade are beyond our control. These and other factors affecting our suppliers and our access to products could adversely affect our results of operations.

**We rely on third parties to provide us with services in connection with the administration of certain aspects of our business.**

We have entered into agreements with third-party service providers (both domestic and overseas) to provide processing and administrative functions over a broad range of areas, and we may continue to do so in the future. These areas include finance and accounting, information technology, including IT development, call center, human resources and procurement functions. Services provided by third parties could be interrupted as a result of many factors, such as acts of God or contract disputes, and any failure by third parties to provide us with these services on a timely basis or within our service level expectations and performance standards could result in a disruption of our business. In addition, to the extent we are unable to maintain our outsourcing arrangements, we could incur substantial costs, including costs associated with hiring new employees or finding an alternative outsourced solution. Moreover, the Company cannot make any assurances that it would be able to arrange for alternate or replacement outsourcing arrangements on terms as favorable as the Company's existing agreements, if at all. Any inability on the part of the Company to do so could negatively affect our results of operations. These outsourcing arrangements also carry the risk that the Company will fail to adequately retain the significant internal historical knowledge of our business and systems that is transferred to the service providers as the employment of the Company's personnel who possess such knowledge ends.

**We could incur charges due to impairment of goodwill, intangible and long-lived assets.**

At February 3, 2018, we had goodwill and intangible asset balances of $1.4 billion, which are subject to periodic testing for impairment. Our long-lived assets, primarily stores, also are subject to periodic testing for impairment. A significant amount of judgment is involved in the periodic testing. Failure to achieve sufficient levels of cash flow within our reporting unit, or sales of our branded products or cash flow generated from operations at

MOAC000675

individual store locations could result in impairment charges for goodwill and intangible assets or fixed asset impairment for long-lived assets, which could have a material adverse effect on our reported results of operations. Impairment charges, if any, resulting from the periodic testing are non-cash. A significant decline in the property fair values could result in long-lived asset impairment charges. See Notes 12 and 13 of Notes to Consolidated Financial Statements for further information.

**Our failure to attract or retain employees, including key personnel, may disrupt our business and adversely affect our financial results.**

Our business is dependent on our ability to attract, develop, and retain qualified employees, many of whom are entry-level or part-time positions with historically high turnover rates. Our ability to meet our labor needs and control labor costs is subject to external factors such as unemployment levels, prevailing wage rates, collective bargaining efforts, health care and other benefit costs, changing demographics, and our reputation within the labor market. If we are unable to attract and retain adequate numbers and an appropriate mix of qualified employees, the quality of service we provide to our customers may decrease and our financial performance may be adversely affected. Further, we depend on the contributions of key personnel, including Edward S. Lampert, our Chairman and Chief Executive Officer, and other key employees, for our future success. Over the past several years, the departures of a number of our executive officers have caused disruptions to, and uncertainty in, our business and operations. Future changes in our senior management team or the departures of other key employees may further disrupt our business and materially adversely affect our results of operations.

**Affiliates of our Chairman and Chief Executive Officer, whose interests may be different than your interests, exert substantial influence over our Company.**

Affiliates of Edward S. Lampert, our Chairman and Chief Executive Officer, collectively own approximately 49% of the outstanding shares of our common stock at February 3, 2018. These affiliates are controlled, directly or indirectly, by Mr. Lampert. Accordingly, these affiliates, and thus Mr. Lampert, have substantial influence over many, if not all, actions to be taken or approved by our stockholders, including the election of directors and any transactions involving a change of control.

The interests of these affiliates, which have investments in other companies, including Seritage and our former subsidiaries, Sears Hometown and Outlet Stores, Inc., Lands' End, Inc. and Sears Canada, may from time to time diverge from the interests of our other stockholders, particularly with regard to new investment opportunities. This substantial influence may also have the effect of discouraging offers to acquire our Company because the consummation of any such acquisition would likely require the consent of these affiliates.

In addition, as of February 3, 2018, these affiliates collectively hold approximately $1.8 billion of our outstanding indebtedness. As long as these affiliates continue to hold significant amounts of our indebtedness, such affiliates' interests may be different than those of our other stockholders and debtholders.

**We may be unable to protect or preserve the image of our brands and our intellectual property rights, which could have a negative impact on our business.**

We regard our copyrights, service marks, trademarks, trade dress, trade secrets, patents and similar intellectual property as critical to our success, particularly those that relate to our private branded merchandise. As such, we rely on trademark and copyright law, patent law, trade secret protection and confidentiality agreements with our associates, consultants, vendors, and others to protect our proprietary rights. Nevertheless, the steps we take to protect our proprietary rights may be inadequate. If we are unable to protect or preserve the value of our trademarks, copyrights, trade secrets, patents or other proprietary rights for any reason, or if we fail to maintain the image of our brands due to merchandise and service quality issues, actual or perceived, adverse publicity, governmental investigations or litigation, or other reasons, our brands and reputation could be damaged and we could lose members and customers.

14

**Our sales and operating results could be adversely affected by product safety concerns or claims concerning the services we offer.**

If our merchandise offerings do not meet applicable safety standards or consumer expectations regarding safety, we could experience decreased sales, increased costs, and exposure to reputational risk and personal injury, death, or property damage claims related to such merchandise. Such matters may require us to take actions such as product recalls and could give rise to government enforcement actions. We also provide various services to our members and customers, which could also give rise to such claims and government actions. Although we maintain liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all. Reputational damage caused by, and claims arising from, real or perceived product safety concerns or from the services we offer could negatively affect our business and results of operations.

**We may be subject to periodic litigation and other regulatory proceedings. These proceedings may be affected by changes in laws and government regulations or changes in the enforcement thereof.**

From time to time, we may be involved in lawsuits and regulatory actions relating to our business, certain of which may be in jurisdictions with reputations for aggressive application of laws and procedures against corporate defendants. Some of these actions have the potential for significant statutory penalties, and compensatory, treble or punitive damages. Our pharmacy, home services and grocery businesses, in particular, are subject to numerous federal, state and local regulations, and a significant change in, or noncompliance with, these regulations could have a material adverse effect on our compliance costs and results of operations. We are impacted by trends in litigation, including class-action allegations brought under various consumer protection and employment laws, including wage and hour laws, patent infringement claims, and investigations and actions that are based on allegations of untimely compliance or noncompliance with applicable regulations or statutes. Due to the inherent uncertainties of litigation and regulatory proceedings, we cannot accurately predict the ultimate outcome of any such proceedings. An unfavorable outcome could have a material adverse impact on our business, financial condition, and results of operations. In addition, regardless of the outcome of any litigation or regulatory proceedings, these proceedings could result in substantial costs and may require that we devote substantial resources to defend our Company. Further, changes in governmental regulations both in the United States and in the other countries where we operate could have adverse effects on our business and subject us to additional regulatory actions. For a description of current legal proceedings, see Item 3, Legal Proceedings, as well as Note 18 of Notes to Consolidated Financial Statements in this Annual Report on Form 10-K.

**Our pension and postretirement benefit plan obligations are currently underfunded, and we may have to make significant cash payments to some or all of these plans, which would reduce the cash available for our businesses.**

We have unfunded obligations under our domestic pension and postretirement benefit plans. The funded status of our pension plans is dependent upon many factors, including returns on invested assets, the level of certain market interest rates and the discount rate used to determine pension obligations. Unfavorable returns on the plan assets or unfavorable changes in applicable laws or regulations could materially change the timing and amount of required plan funding, which would reduce the cash available for our businesses. In addition, a decrease in the discount rate used to determine pension obligations could result in an increase in the valuation of pension obligations, which could affect the reported funding status of our pension plans and future contributions, as well as the periodic pension cost in subsequent years. Moreover, unfavorable regulatory action could materially change the timing and amount of required plan funding and negatively impact our business operations and impair our business strategy.

On March 18, 2016, we entered into a five-year pension plan protection and forbearance agreement (the "PPPFA") with the Pension Benefit Guaranty Corporation ("PBGC"), pursuant to which the Company has agreed to continue to protect, or "ring-fence," pursuant to customary covenants, the assets of certain special purpose subsidiaries (the "Relevant Subsidiaries") holding real estate and/or intellectual property assets. Also under the agreement, the Relevant Subsidiaries granted PBGC a springing lien on the ring-fenced assets, which lien will be triggered only by (a) failure to make required contributions to the Company's pension plans (the "Plans"), (b)

MOAC000677

prohibited transfers of ownership interests in the Relevant Subsidiaries, (c) termination events with respect to the Plans, or (d) bankruptcy events with respect to the Company or certain of its material subsidiaries.

In connection with the closing of our sale of the Craftsman brand, we agreed to grant the PBGC a lien on, and subsequently contribute to the Plans, the value of the $250 million cash payment payable to the Company on the third anniversary of the Craftsman closing. We subsequently sold the right to receive such payment to a third-party purchaser and deposited the proceeds from such sale into an escrow for the benefit of the Plans. We also granted a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Plans. We also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension funding obligations through the end of 2019, and agreed to certain other amendments to the PPPFA.

In November 2017, we entered into an amendment to the PPPFA that allowed the Company to pursue the monetization of 138 of our properties that were subject to a ring-fence arrangement created under the PPPFA. In March 2018, the Company closed on the Secured Loan and the Mezzanine Loan, which transactions released the properties from the ring-fence arrangement. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of the Plans. Under our agreement with the PBGC, the escrowed amount will also be contributed to the Plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019. Following such transactions, the Company has been relieved of contributions to the Plans for approximately two years (other than the contributions from escrow described above and a $20 million supplemental payment due in the second quarter of 2018). The ultimate amount of pension contributions could be affected by factors such as changes in applicable laws, as well as financial market and investment performance and demographic changes.

The Company will continue to make required contributions to the Plans, the scheduled amounts of which are not, other than as described above, affected by the arrangement. Under the PPPFA, the PBGC has agreed to forbear from initiating an involuntary termination of the Plans, except upon the occurrence of specified conditions, one of which is based on the aggregate market value of the Company's issued and outstanding stock. As of the date of this report, the Company's stock price is such that the PBGC would be permitted to cease forbearance. The PBGC has been given notice in accordance with the terms of the PPPFA and has not communicated any intention to cease its forbearance; however, if the PBGC were to initiate an involuntary termination of the Plans, our financial condition could be materially and adversely affected.

**We may not realize the full anticipated benefits of the Craftsman sale transaction.**

We may not realize the full anticipated benefits of the Craftsman sale transaction (the "Craftsman Sale"), in which case our business, financial results or operations could be adversely affected. Under the terms of our Acquired IP License Agreement with Stanley Black & Decker, we have the right to continue to use the Licensed IP (as defined in such agreement) and sell Craftsman-branded products in certain distribution channels. If the license is terminated, or if the terms of the license agreement are otherwise modified, we may not be able to continue to market, procure or sell Craftsman-branded products on favorable terms or at all, and our business may be adversely affected.

**Our failure to comply with federal, state, local and international laws, or changes in these laws could adversely affect our results of operations.**

Our business is subject to a wide array of laws and regulations. If we fail to comply with applicable laws and regulations, we could be subject to legal risk, including government enforcement action and class action civil litigation that could increase our cost of doing business. Changes in the regulatory environment regarding topics such as privacy and information security, product safety, environmental protection, payment methods and related fees, responsible sourcing, supply chain transparency, wage and hour laws, health care mandates and other applicable laws and regulations could also cause our compliance costs to increase and adversely affect our results of operations.

Our performance could further be impacted by changes in legislation, trade policies and agreements, energy and environmental standards, and tax laws and regulations. The current U.S. Administration has signaled that it may alter trade agreements and terms with foreign countries, and recently limited trade by announcing upcoming tariffs

MOAC000678

on imported steel and aluminum and imposing tariffs and quotas on imports of residential washers from certain foreign countries. These restrictions and tariffs, as well as future additional tariffs and/or quotas, on products that we import may require that we raise our prices, which could result in decreased sales. Further, changes in environmental and energy efficiency standards and regulations applicable to products that we develop and/or sell, and potential changes in the size and availability of tax incentives applicable to such products, may impact the types, characteristics, and consumer interest in such products, which may negatively impact our results of operations. Moreover, future legislation or regulations, including environmental matters, product certification, product liability, tariffs, duties, taxes, tax incentives and other matters, may impact our results. Major developments in tax policy or trade relations, such as the imposition of unilateral tariffs on imported products, could have a material adverse effect on our business, results of operations and liquidity.

**Weather conditions and natural disasters may impact consumer shopping patterns and could adversely affect our results of operations.**

Significant weather conditions where our stores are located could negatively affect the Company's business and results of operations. Heavy snowfall, ice storms, rainstorms or other extreme weather conditions over a prolonged period could make it difficult for our members and customers to travel to our stores, thus leading to decreased sales. Our business is also susceptible to unseasonable weather conditions, such as unseasonably warm temperatures during the winter season or cool weather during the summer season, which could reduce demand for certain inventory and compromise our efforts to predict and manage inventory levels effectively. In addition, extreme weather conditions could result in disruption or delay of production and delivery of materials and products in our supply chain. In addition, natural disasters such as hurricanes, tornadoes and earthquakes, or a combination of these or other factors, could damage or destroy our facilities or make it difficult for members and customers to travel to our stores, thereby negatively affecting our business and results of operations as well as causing us to incur significant expenses to repair or replace such facilities.

**Our stock price has been and may continue to be volatile.**

The market price of our common stock has fluctuated substantially and may continue to fluctuate significantly. Future announcements or disclosures concerning us or any of our competitors, our strategic initiatives, our sales and profitability, any quarterly variations in actual or anticipated operating results or comparable sales, any failure to meet analysts' expectations and sales of large blocks of our common stock, among other factors, could cause the market price of our common stock to fluctuate substantially.

**Increases in employee wages and the cost of employee benefits could impact our financial results and cash flow.**

Our expenses relating to employee health benefits are significant. Increases in minimum wages or unfavorable changes in the cost of such benefits could negatively affect our financial results and cash flow. Healthcare costs have risen significantly in recent years, and various legislative and private sector initiatives regarding healthcare reform have resulted, and could continue to result, in significant changes to the U.S. healthcare system. Due to the breadth and complexity of the healthcare reform legislation, and the potential for change in this regard under the current U.S. Administration, we are unable at this time to fully determine the impact that further healthcare reform will have on our employee health benefit plans.

**Item 1B.    Unresolved Staff Comments**

Not applicable.

MOAC000679

**Item 2.    Properties**

The following table summarizes the locations of our Kmart and Sears Domestic stores at February 3, 2018:

| State / Territory | Kmart | Sears Domestic Full-line Stores | Specialty Stores |
|---|---|---|---|
| Alabama | — | 2 | — |
| Alaska | — | 3 | — |
| Arizona | 4 | 12 | — |
| Arkansas | 2 | 2 | — |
| California | 55 | 70 | 3 |
| Colorado | 4 | 9 | 1 |
| Connecticut | 3 | 6 | — |
| Delaware | 4 | 3 | — |
| Florida | 20 | 45 | 1 |
| Georgia | 6 | 13 | — |
| Hawaii | 2 | 4 | 1 |
| Idaho | 3 | 4 | — |
| Illinois | 12 | 21 | 4 |
| Indiana | 12 | 10 | — |
| Iowa | 9 | 5 | — |
| Kansas | 3 | 2 | — |
| Kentucky | 5 | 4 | — |
| Louisiana | 4 | 8 | — |
| Maine | 4 | 3 | — |
| Maryland | 11 | 15 | — |
| Massachusetts | 9 | 17 | — |
| Michigan | 15 | 17 | 1 |
| Minnesota | 5 | 6 | — |
| Mississippi | 2 | 3 | 1 |
| Missouri | 5 | 8 | — |
| Montana | 5 | 1 | — |
| Nebraska | 1 | 4 | — |
| Nevada | 5 | 5 | 1 |
| New Hampshire | 4 | 5 | — |
| New Jersey | 17 | 16 | 1 |
| New Mexico | 7 | 4 | — |
| New York | 30 | 28 | 3 |
| North Carolina | 15 | 16 | — |
| North Dakota | 5 | 2 | — |
| Ohio | 14 | 19 | — |
| Oklahoma | 2 | 3 | — |
| Oregon | 5 | 6 | 1 |
| Pennsylvania | 47 | 23 | 2 |
| Rhode Island | — | — | — |
| South Carolina | 6 | 6 | — |
| South Dakota | 1 | 2 | — |
| Tennessee | 7 | 13 | — |
| Texas | 3 | 46 | 2 |
| Utah | 1 | 2 | — |
| Vermont | 2 | 1 | — |
| Virginia | 6 | 16 | — |
| Washington | 6 | 16 | 1 |
| West Virginia | 7 | 3 | — |
| Wisconsin | 7 | 8 | — |
| Wyoming | 4 | 1 | — |
| Puerto Rico | 21 | 9 | — |
| U.S. Virgin Islands | 4 | — | — |
| Guam | 1 | — | — |
| Totals | 432 | 547 | 23 |

MOAC000680

|  | Kmart | Sears Domestic | |
|---|---|---|---|
|  |  | Full-line Stores | Specialty Stores |
| Owned | 48 | 243 | 16 |
| Leased | 384 | 304 | 7 |
| February 3, 2018 | 432 | 547 | 23 |

In addition, at February 3, 2018, we had 30 domestic supply chain distribution centers, of which 10 were owned and 20 were leased with remaining lease terms ranging up to 10 years. Of the total, six primarily support Kmart stores, 20 primarily support Sears stores and four support both Sears and Kmart stores. We also had 400 domestic store warehouses, customer call centers and service facilities (including 20 facilities related to our Monark Premium Appliance Co. of California, Monark Premium Appliance Co., and Monark Premium Appliance Co. of Arizona businesses), most of which are leased for terms ranging from one to six years or are part of other facilities included in the above table. Many of our facilities are also used to support our online channels.

Our principal executive offices are located on a 200-acre site owned by us at the Prairie Stone office park in Hoffman Estates, Illinois. The complex consists of six interconnected office buildings totaling approximately two million gross square feet of office space. We also own an 86,000 square foot office building in Troy, Michigan. We operate numerous buying offices throughout the world that procure product internationally, as well as an information technology center in Pune, India.

A description of our leasing arrangements and commitments appears in Note 14 of Notes to Consolidated Financial Statements.

## Item 3.        Legal Proceedings

See Part II, Item 8, Financial Statements—Notes to Consolidated Financial Statements, Note 18—Legal Proceedings, for additional information regarding legal proceedings, which information is incorporated herein by this reference.

## Item 4.        Mine Safety Disclosures

Not applicable.

MOAC000681

## EXECUTIVE OFFICERS OF THE REGISTRANT

The following table and information sets forth the names of our executive officers, their current positions and offices with the Company, the date they first became executive officers of the Company, their current ages, and their principal employment during the past five years.

| Name | Position | Date First Became an Executive Officer | Age |
|------|----------|----------------------------------------|-----|
| Edward S. Lampert | Chairman of the Board and Chief Executive Officer | 2013 | 55 |
| Robert A. Riecker | Chief Financial Officer | 2012 | 53 |
| Julie Ainsworth | Chief People Officer | 2017 | 46 |
| J. Mitchell Bowling | Chief Executive Officer, Sears Home Services | 2017 | 51 |
| Leena Munjal | Chief Digital Officer | 2013 | 41 |
| Robert (B.J.) Naedele | Chief Commercial Officer, Shop Your Way | 2017 | 39 |
| Perry (Dean) Schwartz | President, Hardlines | 2017 | 49 |
| Stephen L. Sitley | General Counsel and Chief Compliance Officer | 2017 | 54 |

Mr. Lampert has served as Chairman of the Company's Board of Directors since 2004 and as our Chief Executive Officer since February 2013. He also is the Chairman and Chief Executive Officer of ESL Investments, Inc., which he founded in April 1988.

Mr. Riecker was appointed to his current position in April 2017, and had served as Controller and Head of Capital Markets Activities since October 2016. He joined the Company as Assistant Controller in October 2005 and served as Vice President and Assistant Controller from May 2007 to October 2011. From October 2011 until his election as Vice President, Controller and Chief Accounting Officer in January 2012, he served as the Company's Vice President, Internal Audit.

Ms. Ainsworth joined the Company in March 2017 as Chief People Officer. Prior to joining the Company, she was Chief Executive Officer of celectiv LLC, a recruiting platform for technology-based companies, which she co-founded in 2014. From 2010 until 2013 she served as President of Warranty Division and Chief Marketing Officer of North American Services Division of Centrica plc, an energy and services company.

Mr. Bowling joined the Company in November 2017 as Chief Executive Officer, Sears Home Services. Prior to joining the Company, he served as Senior Vice President and Chief Operating Officer of Apollo Education Group, a leading provider of higher education for working adults, from December 2013 until April 2017, and prior to that, served as Senior Vice President and General Manager of New Businesses at Comcast, a global telecommunications provider, from 2009 until 2013.

Ms. Munjal was appointed to her current position in January 2018. She previously served as Senior Vice President, Customer Experience and Integrated Retail, since October 2012. She was appointed as Divisional Vice President, Integrated Retail and Member Experience, in July 2011 and was promoted to Vice President in June 2012. From October 2009 to June 2011, she served as Divisional Vice President, and Chief of Staff, Office of the Chairman, and served as Chief of Staff, Office of the CEO, from November 2007 to November 2009. Ms. Munjal joined Sears as Director, Information Technology, in March 2003.

Mr. Naedele joined the Company in March 2017. Prior to joining the Company, he served in a variety of roles with Nike, Inc., a company engaged in the design, development, marketing and sales of athletic gear and apparel, which he joined in July 2008, most recently as Vice President, Strategic Growth Initiatives from March 2016 until February 2017, and prior to that as Vice President, Global Brand Marketing from July 2014 until March 2016 and Global Business General Manager from July 2012 until July 2014.

Mr. Schwartz was appointed to his current position in April 2017.  He previously served as President, Tools, Lawn & Garden, Fitness, Sporting Goods and Children's Entertainment from January 2017 until April 2017, as Vice President, Tools and Lawn & Garden from August 2016 until January 2017, as Vice President, Tools from May 2013 until August 2016, and as Vice President, Lawn & Garden from March 2009 until May 2013.

20

MOAC000682

Mr. Sitley was appointed General Counsel in November 2017 and became Chief Compliance Officer in December 2017. From June 2016 until November 2017, he served as Vice President, Human Resources Operations, Compliance and Associate Relations, and prior to that, was Deputy General Counsel, Litigation and Employment from June 2011 until June 2016.

MOAC000683

**PART II**

Item 5.        **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Holdings' common stock is quoted on The NASDAQ Stock Market under the ticker symbol SHLD. There were 9,502 shareholders of record at March 16, 2018. The quarterly high and low sales prices for Holdings' common stock are set forth below.

| | Fiscal Year 2017 | | | |
| | Sears Holdings | | | |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Common stock price | | | | |
| High | $ 14.32 | $ 11.49 | $ 9.63 | $ 5.85 |
| Low | $ 5.50 | $ 6.20 | $ 5.48 | $ 2.31 |

| | Fiscal Year 2016 | | | |
| | Sears Holdings | | | |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Common stock price | | | | |
| High | $ 19.12 | $ 16.55 | $ 18.18 | $ 13.84 |
| Low | $ 14.05 | $ 10.52 | $ 10.50 | $ 7.08 |

Holdings has not paid cash dividends over the two most recent fiscal years and does not expect to pay cash dividends in the foreseeable future.

**Equity Compensation Plan Information**

The following table reflects information about securities authorized for issuance under our equity compensation plans at February 3, 2018.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans* |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | — | 3,778,115 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | — | — | 3,778,115 |

---

\*        Represents shares of common stock that may be issued pursuant to our 2013 Stock Plan. Awards under the 2013 Stock Plan may be restricted stock, stock unit awards, incentive stock options, nonqualified stock options, stock appreciation rights, or certain other stock-based awards. The 2013 Stock Plan also allows common stock of Holdings to be awarded in settlement of an incentive award under the Sears Holdings Corporation Umbrella Incentive Program (and any incentive program established thereunder). The shares shown exclude shares covered by an outstanding plan award that, subsequent to February 3, 2018, ultimately are not delivered on an unrestricted basis (for example, because the award is forfeited, canceled, settled in cash or used to satisfy tax withholding obligations).

MOAC000684

**Stock Performance Graph**

*Comparison of Five-Year Cumulative Stockholder Return*

The following graph compares the cumulative total return to stockholders on Holdings' common stock from February 1, 2013 through February 2, 2018, the last trading day before the end of fiscal year 2017, based on the market prices at the last trading day before the end of each fiscal year through and including fiscal year 2017, with the return on the S&P 500 Index, the S&P 500 Retailing Index and the S&P 500 Department Stores Index for the same period. The graph assumes an initial investment of $100 on February 1, 2013 in each of our common stock, the S&P 500 Index, the S&P Retailing Index and the S&P 500 Department Stores Index. The graph further assumes reinvestment of the value of: (i) subscription rights to purchase shares of common stock of Sears Hometown and Outlet Stores, Inc. on September 13, 2012, the ex-distribution date of the distribution of such rights to Holdings' shareholders; (ii) common shares of Sears Canada on November 13, 2012, the distribution date of such shares to Holdings' shareholders; (iii) shares of Lands' End on April 7, 2014, the ex-distribution date of the distribution of such shares to Holdings' shareholders; (iv) subscription rights to purchase shares of common stock of Sears Canada on October 17, 2014, the ex-distribution date of the distribution of such rights to Holdings' shareholders; (v) subscription rights to purchase up to $625 million in aggregate principal amount of 8% senior unsecured notes due 2019 and warrants to purchase shares of Holdings' common stock on November 3, 2014, the ex-distribution date of the distribution of such rights to Holdings' shareholders; and (vi) subscription rights to purchase shares of common stock of Seritage Growth Properties on June 12, 2015, the distribution date of such rights to Holdings' shareholders.

The S&P 500 Retailing Index consists of companies included in the S&P 500 Index in the broadly defined retail sector, which includes competing retailers of softlines (apparel and domestics) and hardlines (appliances, electronics and home improvement products), as well as food and drug retailers. The S&P 500 Department Stores Index consists primarily of department stores that compete with our full-line stores.



| | Feb 1, 2013 | Jan 31, 2014 | Jan 30, 2015 | Jan 29, 2016 | Jan 27, 2017 | Feb 2, 2018 |
|---|---|---|---|---|---|---|
| Sears Holdings | $100.00 | $ 76.49 | $ 88.75 | $ 56.75 | $ 24.84 | $   7.87 |
| S&P 500 Index | $100.00 | $120.29 | $137.39 | $136.47 | $164.93 | $202.57 |
| S&P 500 Retailing Index | $100.00 | $125.31 | $150.49 | $175.76 | $208.37 | $294.43 |
| S&P 500 Department Stores Index | $100.00 | $116.05 | $144.80 | $104.42 | $ 84.22 | $103.54 |

23

MOAC000685

*Purchase of Equity Securities*

During the quarter ended February 3, 2018, we did not repurchase any shares of our common stock under our common share repurchase program. At February 3, 2018, we had approximately $504 million of remaining authorization under the program.

| | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Average Price Paid per Share for Publicly Announced Program | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|---|
| October 29, 2017 to November 25, 2017 | — | $ — | — | $ — | |
| November 26, 2017 to December 30, 2017 | — | — | — | — | |
| December 31, 2017 to February 3, 2018 | — | — | — | — | |
| Total | — | $ — | — | $ — | $ 503,907,832 |

---

[1] Consists entirely of 0 shares acquired from associates to meet withholding tax requirements from the vesting of restricted stock.

[2] Our common share repurchase program was initially announced on September 14, 2005 and has a total authorization since inception of the program of $6.5 billion, including the authorizations to purchase up to an additional $500 million of common stock on each of December 17, 2009 and May 2, 2011. The program has no stated expiration date.

The Amended Domestic Credit Agreement (described in Management's Discussion and Analysis of Financial Condition and Results of Operations - Uses and Sources of Liquidity section below) limits our ability to make restricted payments, including dividends and share repurchases, subject to specified exceptions that are available if, in each case, no event of default under the credit facility exists immediately before or after giving effect to the restricted payment. These include exceptions that require that projected availability under the credit facility, as defined, is at least 15%, exceptions that may be subject to certain maximum amounts and an exception that requires that the restricted payment is funded from cash on hand and not from borrowings under the credit facility. Further, the Amended Domestic Credit Agreement includes customary covenants that restrict our ability to make dispositions, prepay debt and make investments, subject, in each case, to various exceptions. The Amended Domestic Credit Agreement also imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement and a requirement that the fixed charge ratio at the last day of any quarter be not less than 1.0 to 1.0.

24

MOAC000686

**Item 6.    Selected Financial Data**

The table below summarizes our recent financial information. The data set forth below should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations in Item 7 and our Consolidated Financial Statements and notes thereto in Item 8.

| *dollars in millions, except per share data* | **Fiscal** | | | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2015** | **2014** | **2013** |
| **Summary of Operations** | | | | | |
| Revenues[1] | $ 16,702 | $ 22,138 | $ 25,146 | $ 31,198 | $ 36,188 |
| Domestic comparable store sales % | (13.5)% | (7.4)% | (9.2)% | (1.8)% | (3.8)% |
| Net loss from continuing operations attributable to Holdings' shareholders | (383) | (2,221) | (1,129) | (1,682) | (1,365) |
| **Per Common Share** | | | | | |
| Basic: | | | | | |
| Net loss from continuing operations attributable to Holdings' shareholders | $ (3.57) | $ (20.78) | $ (10.59) | $ (15.82) | $ (12.87) |
| Diluted: | | | | | |
| Net loss from continuing operations attributable to Holdings' shareholders | $ (3.57) | $ (20.78) | $ (10.59) | $ (15.82) | $ (12.87) |
| Holdings' book value per common share | $ (34.54) | $ (35.71) | $ (18.40) | $ (8.93) | $ 16.34 |
| **Financial Data** | | | | | |
| Total assets | $ 7,262 | $ 9,362 | $ 11,337 | $ 13,185 | $ 18,234 |
| Long-term debt | 2,199 | 3,470 | 1,971 | 2,878 | 2,531 |
| Long-term capital lease obligations | 50 | 103 | 137 | 210 | 275 |
| Capital expenditures | 80 | 142 | 211 | 270 | 329 |
| Adjusted EBITDA[2] | (562) | (808) | (836) | (718) | (487) |
| Number of stores | 1,002 | 1,430 | 1,672 | 1,725 | 2,429 |

_____

[1]   We follow a retail-based financial reporting calendar. Accordingly, the fiscal year ended February 3, 2018 contained 53 weeks, while all other years presented contained 52 weeks.

[2]   See "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for a reconciliation of this measure to GAAP and a discussion of management's reasoning for using such measure. The periods presented were impacted by certain significant items, which affected the comparability of amounts reflected in the above selected financial data. For 2017, 2016 and 2015, these significant items are discussed within Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations." 2014 results include the impact of domestic pension expense of $89 million, store closings and severance of $224 million, other expenses of $50 million and the results of Lands' End and Sears Canada that were included in the results of operations prior to the separations of $(10) million and $71 million, respectively. 2013 results include the impact of domestic pension expense of $162 million, domestic store closings and severance of $130 million, and the results of Lands' End and Sears Canada that were included in the results of our operations prior to the separations of $(150) million and $(3) million, respectively. Both 2014 and 2013 also included charges related to impairments, as well as gains on sales of assets.

MOAC000687

**Item 7.**         **Management's Discussion and Analysis of Financial Condition and Results of Operations**

We have divided our Management's Discussion and Analysis of Financial Condition and Results of Operations into the following six sections:

- Overview of Holdings
- Results of Operations:

    *Fiscal Year*

    *Holdings' Consolidated Results*

    *Business Segment Results*

- Analysis of Consolidated Financial Condition
- Contractual Obligations and Off-Balance Sheet Arrangements
- Application of Critical Accounting Policies and Estimates
- Cautionary Statement Regarding Forward-Looking Information

The discussion that follows should be read in conjunction with the Consolidated Financial Statements and notes thereto included in Item 8.

**OVERVIEW OF HOLDINGS**

Holdings, the parent company of Kmart and Sears, was formed in connection with the March 24, 2005 merger of these two companies. We are an integrated retailer with significant physical and intangible assets, as well as virtual capabilities enabled through technology. We operate a national network of stores, with 1,002 full-line and specialty retail stores in the United States, operating as Kmart and Sears. Further, we operate a number of websites under the sears.com and kmart.com banners which offer millions of products and provide the capability for our members and customers to engage in cross-channel transactions such as *free store pickup; buy in store/ship to home; and buy online, return in store.* We are also the home of Shop Your Way[®], a free membership program that connects its members to personalized products, programs and partners that help them save time and money every day. Through an extensive network of national and local partners, members can shop thousands of their favorite brands, dine out and access an array of exclusive partners to earn points to redeem for savings on future purchases at Sears, Kmart, Lands' End and at ShopYourWay.com.

We conduct our operations in two business segments: Kmart and Sears Domestic. The nature of operations conducted within each of these segments is discussed within the Business Segments section of Item 1 in this Annual Report on Form 10-K. Our business segments have been determined in accordance with accounting standards regarding the determination, and reporting, of business segments.

**RESULTS OF OPERATIONS**

**Fiscal Year**

Our fiscal year end is the Saturday closest to January 31 each year. Fiscal year 2017 consisted of 53 weeks. Fiscal years 2016 and 2015 consisted of 52 weeks. Unless otherwise stated, references to years in this report relate to fiscal years rather than to calendar years.

MOAC000688

**Holdings' Consolidated Results**

Holdings' consolidated results of operations for 2017, 2016 and 2015 are summarized as follows:

| *dollars in millions, except per share data* | **2017** | **2016** | **2015** |
|---|---|---|---|
| **REVENUES** | | | |
| Merchandise sales | $ 13,409 | $ 18,236 | $ 20,936 |
| Services and other | 3,293 | 3,902 | 4,210 |
| Total revenues | 16,702 | 22,138 | 25,146 |
| **COSTS AND EXPENSES** | | | |
| Cost of sales, buying and occupancy - merchandise sales | 11,349 | 15,184 | 16,817 |
| Gross margin dollars - merchandise sales | 2,060 | 3,052 | 4,119 |
| *Gross margin rate - merchandise sales* | *15.4%* | *16.7%* | *19.7%* |
| Cost of sales and occupancy - services and other | 1,826 | 2,268 | 2,519 |
| Gross margin dollars - services and other | 1,467 | 1,634 | 1,691 |
| *Gross margin rate - services and other* | *44.5%* | *41.9%* | *40.2%* |
| Total cost of sales, buying and occupancy | 13,175 | 17,452 | 19,336 |
| Total gross margin dollars | 3,527 | 4,686 | 5,810 |
| *Total gross margin rate* | *21.1%* | *21.2%* | *23.1%* |
| Selling and administrative | 5,131 | 6,109 | 6,857 |
| *Selling and administrative expense as a percentage of total revenues* | *30.7%* | *27.6%* | *27.3%* |
| Depreciation and amortization | 332 | 375 | 422 |
| Impairment charges | 142 | 427 | 274 |
| Gain on sales of assets | (1,648) | (247) | (743) |
| Total costs and expenses | 17,132 | 24,116 | 26,146 |
| Operating loss | (430) | (1,978) | (1,000) |
| Interest expense | (539) | (404) | (323) |
| Interest and investment loss | (12) | (26) | (62) |
| Other income | — | 13 | — |
| Loss before income taxes | (981) | (2,395) | (1,385) |
| Income tax benefit | 598 | 174 | 257 |
| Net loss | (383) | (2,221) | (1,128) |
| Income attributable to noncontrolling interests | — | — | (1) |
| **NET LOSS ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (383) | $ (2,221) | $ (1,129) |
| **NET LOSS PER COMMON SHARE ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | | | |
| Diluted loss per share | $ (3.57) | $ (20.78) | $ (10.59) |
| Diluted weighted average common shares outstanding | 107.4 | 106.9 | 106.6 |

MOAC000689

References to comparable store sales amounts within the following discussion include sales for all stores operating for a period of at least 12 full months, including remodeled and expanded stores, but excluding store relocations and stores that have undergone format changes. Comparable store sales amounts include sales from sears.com and kmart.com shipped directly to customers. These online sales resulted in a negative impact to our comparable store sales results of approximately 70 basis points and 20 basis points for 2017 and 2016, respectively. In addition, comparable store sales have been adjusted for the change in the unshipped sales reserves recorded at the end of each reporting period, which resulted in a benefit of 30 basis points in 2017 and did not have any impact in 2016.

Comparable store sales results for 2017 were calculated based on the 52-week period ended January 27, 2018 as compared to the comparable 52-week period in the prior year, while comparable store sales results for 2016 were calculated based on the 52-week period ended January 28, 2017 as compared to the comparable 52-week period in the prior year.

### 2017 Compared to 2016

#### Net Loss Attributable to Holdings' Shareholders

We recorded a net loss attributable to Holdings' shareholders of $383 million ($3.57 loss per diluted share) and $2.2 billion ($20.78 loss per diluted share) for 2017 and 2016, respectively. The decrease in net loss for the year primarily reflected an increase in gain on sales of assets, a decrease in selling and administrative expenses and an increase in income tax benefit, partially offset by a decline in gross margin, which was primarily driven by the decline in revenues. Our results for 2017 and 2016 were affected by a number of significant items.

In addition to our net loss attributable to Holdings' shareholders determined in accordance with Generally Accepted Accounting Principles ("GAAP"), for purposes of evaluating operating performance, we use Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA").

Adjusted EBITDA was determined as follows:

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net loss attributable to Holdings per statement of operations | $ (383) | $ (2,221) | $ (1,129) |
| Income attributable to noncontrolling interests | — | — | 1 |
| Income tax benefit | (598) | (174) | (257) |
| Interest expense | 539 | 404 | 323 |
| Interest and investment loss | 12 | 26 | 62 |
| Other income | — | (13) | — |
| Operating loss | (430) | (1,978) | (1,000) |
| Depreciation and amortization | 332 | 375 | 422 |
| Gain on sales of assets | (1,648) | (247) | (743) |
| Impairment charges | 142 | 427 | 274 |
| Before excluded items | (1,604) | (1,423) | (1,047) |
| Closed store reserve and severance | 462 | 384 | 98 |
| Pension expense | 656 | 288 | 229 |
| Other[1] | 2 | 31 | (64) |
| Amortization of deferred Seritage gain | (78) | (88) | (52) |
| Adjusted EBITDA | $ (562) | $ (808) | $ (836) |

[1] Consisted of items associated with legal matters, expenses associated with natural disasters, transaction costs associated with strategic initiatives, one-time credits from vendors and other expenses.

MOAC000690

Adjusted EBITDA for our segments was as follows:

| | | 2017 | | | 2016 | | | 2015 | |
|---|---|---|---|---|---|---|---|---|---|
| *millions* | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
| Operating income (loss) per statement of operations | $ 367 | $ (797) | $ (430) | $(530) | $ (1,448) | $(1,978) | $(292) | $ (708) | $(1,000) |
| Depreciation and amortization | 60 | 272 | 332 | 71 | 304 | 375 | 72 | 350 | 422 |
| Gain on sales of assets | (881) | (767) | (1,648) | (181) | (66) | (247) | (185) | (558) | (743) |
| Impairment charges | 16 | 126 | 142 | 22 | 405 | 427 | 14 | 260 | 274 |
| Before excluded items | (438) | (1,166) | (1,604) | (618) | (805) | (1,423) | (391) | (656) | (1,047) |
| Closed store reserve and severance | 281 | 181 | 462 | 318 | 66 | 384 | 86 | 12 | 98 |
| Pension expense | — | 656 | 656 | — | 288 | 288 | — | 229 | 229 |
| Other[1] | (23) | 25 | 2 | 15 | 16 | 31 | 43 | (107) | (64) |
| Amortization of deferred Seritage gain | (11) | (67) | (78) | (17) | (71) | (88) | (11) | (41) | (52) |
| Adjusted EBITDA | $(191) | $ (371) | $ (562) | $(302) | $ (506) | $ (808) | $(273) | $ (563) | $ (836) |
| % to revenues | *(3.4)%* | *(3.3)%* | *(3.4)%* | *(3.5)%* | *(3.8)%* | *(3.6)%* | *(2.7)%* | *(3.8)%* | *(3.3)%* |

[1] Consisted of items associated with legal matters, expenses associated with natural disasters, transaction costs associated with strategic initiatives, one-time credits from vendors and other expenses.

The following tables set forth the impact each excluded item used in calculating Adjusted EBITDA had on specific income and expense amounts reported in our Consolidated Statements of Operations during the years 2017, 2016 and 2015.

*millions*

| **Other Excluded Items:** | **Year Ended February 3, 2018** | | | | |
|---|---|---|---|---|---|
| | Closed store reserve and severance | Pension expense | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 227 | $ — | $ — | $ (78) | $ 149 |
| Selling and administrative impact | 235 | 656 | 2 | — | 893 |
| Total | $ 462 | $ 656 | $ 2 | $ (78) | $ 1,042 |

*millions*

| **Other Excluded Items:** | **Year Ended January 28, 2017** | | | | |
|---|---|---|---|---|---|
| | Closed store reserve and severance | Pension expense | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 226 | $ — | $ (33) | $ (88) | $ 105 |
| Selling and administrative impact | 158 | 288 | 64 | — | 510 |
| Total | $ 384 | $ 288 | $ 31 | $ (88) | $ 615 |

*millions*

| **Other Excluded Items:** | **Year Ended January 30, 2016** | | | | |
|---|---|---|---|---|---|
| | Closed store reserve and severance | Pension expense | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 44 | $ — | $ (146) | $ (52) | $ (154) |
| Selling and administrative impact | 54 | 229 | 82 | — | 365 |
| Total | $ 98 | $ 229 | $ (64) | $ (52) | $ 211 |

[1] Consisted of items associated with legal matters, expenses associated with natural disasters, transaction costs associated with strategic initiatives, one-time credits from vendors and other expenses.

MOAC000691

Adjusted EBITDA is computed as net loss attributable to Sears Holdings Corporation appearing on the Statements of Operations excluding income attributable to noncontrolling interests, income tax benefit, interest expense, interest and investment loss, other income, depreciation and amortization, gain on sales of assets and impairment charges. In addition, it is adjusted to exclude certain significant items as set forth below. Our management uses Adjusted EBITDA to evaluate the operating performance of our businesses, as well as executive compensation metrics, for comparable periods. Adjusted EBITDA should not be used by investors or other third parties as the sole basis for formulating investment decisions as it excludes a number of important cash and non-cash recurring items.

While Adjusted EBITDA is a non-GAAP measurement, management believes that it is an important indicator of ongoing operating performance, and useful to investors, because:

- EBITDA excludes the effects of financings and investing activities by eliminating the effects of interest and depreciation costs;

- Management considers gains/(losses) on the sale of assets to result from investing decisions rather than ongoing operations; and

- Other significant items, while periodically affecting our results, may vary significantly from period to period and have a disproportionate effect in a given period, which affects comparability of results. We have adjusted our results for these items to make our statements more comparable and therefore more useful to investors as the items are not representative of our ongoing operations and reflect past investment decisions.

These other significant items included in Adjusted EBITDA are further explained as follows:

- Closed store reserve and severance – We are transforming our Company to a less asset-intensive business model. Throughout this transformation, we continue to make choices related to our stores, which could result in sales, closures, lease terminations or a variety of other decisions.

- Pension expense – Contributions to our pension plans remain a significant use of our cash on an annual basis. Cash contributions to our pension and postretirement plans are separately disclosed on the cash flow statement. While the Company's pension plan is frozen, and thus associates do not currently earn pension benefits, we have a legacy pension obligation for past service performed by Kmart and Sears associates. The annual pension expense included in our statement of operations related to these legacy domestic pension plans was relatively minimal in years prior to 2009. However, due to the severe decline in the capital markets that occurred in the latter part of 2008, and the resulting abnormally low interest rates, which continue to persist, our domestic pension expense was $656 million in 2017, $288 million in 2016 and $229 million in 2015. Pension expense is comprised of interest cost, expected return on plan assets and recognized net loss and other. This adjustment eliminates the entire pension expense from the statement of operations to improve comparability. Pension expense is included in the determination of net loss.

As further described in Note 7 of Notes to Consolidated Financial Statements, settlement charges also impacted pension expense in 2017. In conjunction with executing two separate agreements to purchase group annuity contracts in May 2017 and August 2017, the Company recorded non-cash charges of $200 million and $203 million, respectively, during the second and third quarters of 2017 for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement. In addition, in conjunction with a lump sum offer completed in 2017, the Company recorded a non-cash charge of $76 million for losses previously accumulated in other comprehensive income (loss), which was recognized through the statement of operations immediately upon settlement during the fourth quarter of 2017.

MOAC000692

The components of the adjustments to EBITDA related to pension expense were as follows:

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Components of net periodic expense: | | | |
| Interest cost | $ 180 | $ 227 | $ 210 |
| Expected return on plan assets | (190) | (202) | (249) |
| Settlements | 479 | — | — |
| Recognized net loss and other | 187 | 263 | 268 |
| Net periodic expense | $ 656 | $ 288 | $ 229 |

In accordance with GAAP, we recognize on the balance sheet actuarial gains and losses for defined benefit pension plans annually in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement during a fiscal year. For income statement purposes, these actuarial gains and losses are recognized throughout the year through an amortization process. The Company recognizes in its results of operations, as a corridor adjustment, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets. Accumulated gains/losses that are inside the 10% corridor are not recognized, while accumulated actuarial gains/losses that are outside the 10% corridor are amortized over the "average future service" of the population and are included in the recognized net loss and other line item above.

Actuarial gains and losses occur when actual experience differs from the estimates used to allocate the change in value of pension plans to expense throughout the year or when assumptions change, as they may each year. Significant factors that can contribute to the recognition of actuarial gains and losses include changes in discount rates used to remeasure pension obligations on an annual basis or upon a qualifying remeasurement, differences between actual and expected returns on plan assets and other changes in actuarial assumptions. Management believes these actuarial gains and losses are primarily financing activities that are more reflective of changes in current conditions in global financial markets (and in particular interest rates) that are not directly related to the underlying business and that do not have an immediate, corresponding impact on the benefits provided to eligible retirees. For further information on the actuarial assumptions and plan assets referenced above, see Management's Discussion and Analysis of Financial Condition and Results of Operations - Application of Critical Accounting Policies and Estimates - Defined Benefit Pension Plans, and Note 7 of Notes to Consolidated Financial Statements.

- Other – Consisted of items associated with legal matters, expenses associated with natural disasters, transaction costs associated with strategic initiatives, one-time credits from vendors and other expenses.

- Amortization of deferred Seritage gain – A portion of the gain on the Seritage transaction and certain other sale-leaseback transactions were deferred and will be recognized in proportion to the related rent expense, which is a component of cost of sales, buying and occupancy in the Consolidated Statements of Operations, over the lease terms. Management considers the amortization of the deferred Seritage gain to result from investing decisions rather than ongoing operations.

*Revenues and Comparable Store Sales*

Total revenues decreased $5.4 billion, or 24.6%, to $16.7 billion in 2017 compared to 2016 primarily driven by the decline in merchandise sales of $4.8 billion. The decline in merchandise sales included a decrease of approximately $3.2 billion as a result of having fewer Kmart and Sears Full-line stores in operation. For the full year, comparable store sales declined 13.5%, which contributed to $1.9 billion of the revenue decline relative to the prior year. The Company recognized approximately $189 million of revenues during the 53rd week of 2017. Services and other revenues declined $609 million during 2017 as compared to 2016, primarily driven by a decline in service-related revenues of approximately $295 million, as well as a decline in revenues from Sears Hometown and Outlet Stores, Inc. ("SHO") of approximately $208 million during 2017 as compared to 2016.

Kmart comparable store sales declined 11.4% for the full year primarily driven by declines in the pharmacy, grocery & household, home, drugstore, consumer electronics and apparel categories. Sears Domestic comparable

MOAC000693

store sales for the year declined 15.2% primarily driven by decreases in the home appliances, apparel, consumer electronics and lawn & garden categories.

*Gross Margin*

Total gross margin declined $1.2 billion to $3.5 billion in 2017 as compared to the prior year primarily as a result of the above noted decline in sales, as well as a slight decline in gross margin rate, as the decline in gross margin rate for merchandise sales was partially offset by an improvement in gross margin rate for services and other. Gross margin for 2017 and 2016 included charges of $227 million and $226 million, respectively, related to store closures. Gross margin for 2017 and 2016 also included credits of $78 million and $88 million, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction, while 2016 also included one-time vendor credits of $33 million.

As compared to the prior year, Kmart's gross margin rate for 2017 increased 10 basis points, while Sears Domestic's gross margin rate decreased 60 basis points. Gross margin for Kmart and Sears Domestic were negatively impacted by expenses associated with store closures. Excluding the impact of significant items as noted in the Adjusted EBITDA tables, Kmart's gross margin rate would have improved 60 basis points in 2017 as compared to the prior year, while Sears Domestic's gross margin rate would have been flat to the prior year. The improvement in Kmart's gross margin rate was primarily driven by margin rate improvement in the apparel, home and drugstore categories, partially offset by a decline in the pharmacy category. Sears Domestic's gross margin rate for 2017 reflects improvement in the apparel category, which was offset by declines in the home appliances and tools categories. Kmart experienced lower clearance markdowns and Shop Your Way points expense, partially offset by an increase in promotional markdowns, while Sears Domestic experienced lower clearance markdowns, offset by an increase in both promotional markdowns and Shop Your Way points expense.

In addition, as a result of the Seritage and JV transactions, 2017 and 2016 included additional rent expense of approximately $169 million and $197 million, respectively. Due to the structure of the leases, we expect that our cash rent obligations to Seritage and the joint venture partners will decline, over time, as space in these stores is recaptured. From the inception of the Seritage transaction to date, we have received recapture notices on 55 properties and we also exercised our right to terminate the lease on 56 properties.

*Selling and Administrative Expenses*

Selling and administrative expenses decreased $978 million to $5.1 billion in 2017 from $6.1 billion in 2016 and included significant items, as noted in the Adjusted EBITDA tables, which aggregated to an expense of $893 million and $510 million for 2017 and 2016, respectively. Excluding these items, selling and administrative expenses declined $1.4 billion, primarily due to a decrease in payroll expense. In addition, advertising expense also declined as we continued to shift away from traditional advertising to use of Shop Your Way points expense, which is included within gross margin.

Selling and administrative expenses as a percentage of total revenues ("selling and administrative expense rate") were 30.7% and 27.6% for 2017 and 2016, respectively, as the decreases in overall selling and administrative expenses were more than offset by the above noted decline in revenues.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $43 million during 2017 to $332 million, as compared to 2016, primarily due to having fewer assets to depreciate.

*Impairment Charges*

We recorded impairment charges of $142 million in 2017, which consisted of impairment of $72 million related to the Sears trade name, as well as $70 million related to the impairment of long-lived assets. We recorded impairment charges of $427 million in 2016, which consisted of impairment of $381 million related to the Sears trade name, as well as $46 million related to the impairment of long-lived assets. Impairment charges recorded in both years are described further in Notes 1 and 13 of Notes to Consolidated Financial Statements.

MOAC000694

*Gain on Sales of Assets*

We recorded total gains on sales of assets of $1.6 billion in 2017 and $247 million in 2016, which were primarily attributable to several significant real estate transactions. The gains recorded during 2017 included gains of $708 million recognized on the sale or amendment and lease terminations of 95 locations, $492 million recognized on the Craftsman Sale, $253 million as a result of recapture and lease termination activity and two stores that qualified for sales recognition and sale-leaseback accounting and $79 million related to other asset sales. Gains on sales of assets are described further in Note 11 of Notes to Consolidated Financial Statements.

*Operating Loss*

We recorded an operating loss of $430 million and $2.0 billion in 2017 and 2016, respectively. The operating loss for 2017 included significant items, as noted in the Adjusted EBITDA tables, which totaled $1.0 billion, while operating loss for 2016 included significant items which totaled $615 million. Both 2017 and 2016 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the decrease in operating loss in 2017 was primarily driven by the decrease in selling and administrative expenses, partially offset by the decline in gross margin noted above.

*Interest Expense*

We incurred $539 million and $404 million in interest expense during 2017 and 2016, respectively. The increase is due to an increase in average outstanding borrowings in 2017, as well as an increase in the annual weighted-average interest rate for our borrowings.

*Interest and Investment Loss*

We recorded interest and investment loss of $12 million during 2017 compared to $26 million during 2016. Interest and investment loss is described further in Note 6 of Notes to Consolidated Financial Statements.

*Income Taxes*

We recorded an income tax benefit of $598 million in 2017 compared with an income tax benefit of $174 million in 2016. Our effective tax rate for 2017 was a benefit of 61.0% compared to a benefit of 7.3% for 2016. On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code that affected our fiscal year ended February 3, 2018, including, but not limited to, (1) reducing the U.S. federal corporate tax rate to 21%, (2) requiring a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries that is payable over eight years and (3) various other miscellaneous changes that are effective in fiscal 2017. With the lower U.S. federal corporate rate effective beginning January 1, 2018, our U.S. federal corporate tax rate for fiscal 2017 is a blended rate of 33.717%. The income tax benefit for the period ended February 3, 2018 included a tax benefit of approximately $470 million related to the impacts of the Tax Act. In addition to the impact of the Tax Act, the Company also realized a significant tax benefit during 2017 on the reversal of deferred taxes mainly related to the Craftsman Sale, but also related to indefinite-life assets associated with property sold. Our tax rate in 2017 continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic and foreign jurisdictions where it is more likely than not that such benefits would be realized. In addition, 2017 was negatively impacted by foreign branch taxes and state income taxes.

During 2016, the Company realized a significant tax benefit on the deferred taxes related to the partial impairment of the Sears trade name. In addition, the Company recorded a tax benefit related to the net gain on pension and other postretirement benefits in continuing operations and a corresponding tax expense of the same amount in other comprehensive income. Also, the application of the requirements for accounting for income taxes, after consideration of our valuation allowance, caused a significant variation in the typical relationship between income tax expense and pretax income. Our tax rate in 2016 reflected the effect of not recognizing the benefit of current period losses in certain domestic and foreign jurisdictions where it was not more likely than not that such benefits would be realized. In addition, 2016 was negatively impacted by foreign branch taxes and state income taxes.

MOAC000695

### *2016 Compared to 2015*

#### *Net Loss Attributable to Holdings' Shareholders*

We recorded a net loss attributable to Holdings' shareholders of $2.2 billion ($20.78 loss per diluted share) and $1.1 billion ($10.59 loss per diluted share) for 2016 and 2015, respectively. The increase in net loss for the year primarily reflected a decline in gross margin, which was driven by a decline in both revenues and gross margin rate, partially offset by a decrease in selling and administrative expenses.

#### *Revenues and Comparable Store Sales*

Total revenues decreased $3.0 billion, or 12.0%, to $22.1 billion in 2016, as compared to revenues of $25.1 billion in 2015, primarily driven by the decline in merchandise sales of $2.7 billion. The decline in merchandise sales included a decrease of $1.3 billion as a result of having fewer Kmart and Sears Full-line stores in operation. For the full year, comparable store sales declined 7.4%, which contributed to $1.4 billion of the revenue decline relative to the prior year. Services and other revenues declined $308 million during 2016 as compared to 2015, primarily driven by a decline in service-related revenues of approximately $30 million, as well as a decline in revenues from SHO of approximately $238 million during 2016 as compared to 2015.

Kmart comparable store sales declined 5.3% for the full year primarily driven by declines in the grocery & household, consumer electronics and pharmacy categories. Sears Domestic comparable store sales for the year declined 9.3% primarily driven by decreases in the home appliances, apparel and consumer electronics categories.

#### *Gross Margin*

Total gross margin declined $1.1 billion to $4.7 billion in 2016 from $5.8 billion in 2015 as a result of the above noted decline in sales, as well as a decline in gross margin rate, as the decline in gross margin rate for merchandise sales was partially offset by an improvement in gross margin rate for services and other. Gross margin for 2016 included one-time vendor credits of $33 million, as well as a credit of $88 million related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction, while 2015 included one-time vendor credits of $146 million, as well as a credit of $52 million related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction. Gross margin for 2016 and 2015 also included charges of $226 million and $44 million, respectively, related to store closures.

As compared to the prior year, Kmart's gross margin rate for 2016 declined 310 basis points. Excluding significant items primarily related to store closures as noted in the Adjusted EBITDA tables, Kmart's gross margin rate would have declined 130 basis points with margin rate declines experienced across most categories, most notably in the apparel, grocery & household, drugstore, home and pharmacy categories. Sears Domestic's gross margin rate for 2016 decreased 130 basis points. Excluding the impact of significant items in both years primarily related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction, one-time vendor credits and store closures, Sears Domestic's gross margin rate declined 60 basis points, with the most notable decreases experienced in the apparel, home appliances and footwear categories. The decline in margin rate experienced in both Kmart and Sears Domestic is primarily attributable to increased markdowns, including an increase in Shop Your Way points expense.

In addition, as a result of the Seritage and JV transactions, 2016 and 2015 included additional rent expense and assigned sub-tenant rental income of approximately $197 million and $133 million, respectively.

#### *Selling and Administrative Expenses*

Selling and administrative expenses decreased $748 million to $6.1 billion in 2016 from $6.9 billion in 2015 and included significant items, as noted in the Adjusted EBITDA tables, which aggregated to an expense of $510 million and $365 million for 2016 and 2015, respectively. Excluding these items, selling and administrative expenses declined $893 million, primarily due to a decrease in payroll expense. In addition, advertising expense also declined as we continued to shift away from traditional advertising to use of Shop Your Way points expense, which is included within gross margin.

MOAC000696

Selling and administrative expenses as a percentage of total revenues ("selling and administrative expense rate") were 27.6% and 27.3% for 2016 and 2015, respectively, as the decreases in overall selling and administrative expenses were more than offset by the above noted decline in revenues.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $47 million during 2016 to $375 million, as compared to 2015, primarily due to having fewer assets to depreciate.

*Impairment Charges*

We recorded impairment charges of $427 million in 2016, which consisted of impairment of $381 million related to the Sears trade name, as well as $46 million related to the impairment of long-lived assets. We recorded impairment charges of $274 million in 2015, which consisted of impairment of $180 million related to the Sears trade name, as well as $94 million related to the impairment of long-lived assets. Impairment charges recorded in both years are described further in Notes 1 and 13 of Notes to Consolidated Financial Statements.

*Gain on Sales of Assets*

We recorded total gains on sales of assets of $247 million in 2016 and $743 million in 2015, which were primarily attributable to several significant real estate transactions. The gains recorded in 2015 included $508 million recognized in connection with the joint venture transactions and the sale-leaseback transaction with Seritage. Gains on sales of assets recorded in both years are described further in Note 11 of Notes to Consolidated Financial Statements.

*Operating Loss*

We recorded an operating loss of $2.0 billion and $1.0 billion in 2016 and 2015, respectively. The operating loss for 2016 included significant items, as noted in the Adjusted EBITDA tables, which totaled $615 million, while operating loss for 2015 included significant items which totaled $211 million. Both 2016 and 2015 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the decrease in operating loss in 2016 was primarily driven by the decrease in selling and administrative expenses, partially offset by the decline in gross margin noted above.

*Interest Expense*

We incurred $404 million and $323 million in interest expense during 2016 and 2015, respectively. The increase is due to an increase in average outstanding borrowings in 2016.

*Interest and Investment Loss*

We recorded interest and investment loss of $26 million during 2016 compared to interest and investment loss of $62 million during 2015. Interest and investment income loss is described further in Note 6 of Notes to Consolidated Financial Statements.

*Income Taxes*

We recorded an income tax benefit of $174 million in 2016 compared with an income tax benefit of $257 million in 2015. Our effective tax rate for 2016 was a benefit of 7.3% compared to a benefit of 18.6% for 2015. During 2016, the Company realized a significant tax benefit on the deferred taxes related to the partial impairment of the Sears trade name. In addition, the Company recorded a tax benefit related to the net gain on pension and other postretirement benefits in continuing operations and a corresponding tax expense of the same amount in other comprehensive income. Also, the application of the requirements for accounting for income taxes, after consideration of our valuation allowance, caused a significant variation in the typical relationship between income tax expense and pretax income. Our tax rate in 2016 reflected the effect of not recognizing the benefit of current period losses in certain domestic and foreign jurisdictions where it was not more likely than not that such benefits would be realized. In addition, 2016 was negatively impacted by foreign branch taxes and state income taxes.

MOAC000697

The 2015 rate was favorably impacted by the significant tax benefit realized on the deferred taxes related to indefinite-life assets associated with the property sold in the transaction with Seritage and the tax benefit realized on the deferred taxes related to the partial impairment of the Sears trade name. These items were partially offset by foreign branch taxes and state income taxes.

## Business Segment Results

### Kmart

Kmart results and key statistics were as follows:

| dollars in millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Total revenues | $ 5,618 | $ 8,650 | $ 10,188 |
| Comparable store sales % | (11.4)% | (5.3)% | (7.3)% |
| Cost of sales, buying and occupancy | 4,601 | 7,093 | 8,042 |
| Gross margin dollars | 1,017 | 1,557 | 2,146 |
| Gross margin rate | 18.1 % | 18.0 % | 21.1 % |
| Selling and administrative | 1,455 | 2,175 | 2,537 |
| Selling and administrative expense as a percentage of total revenues | 25.9 % | 25.1 % | 24.9 % |
| Depreciation and amortization | 60 | 71 | 72 |
| Impairment charges | 16 | 22 | 14 |
| Gain on sales of assets | (881) | (181) | (185) |
| Total costs and expenses | 5,251 | 9,180 | 10,480 |
| Operating income (loss) | $ 367 | $ (530) | $ (292) |
| Adjusted EBITDA | $ (191) | $ (302) | $ (273) |
| Total Kmart stores | 432 | 735 | 941 |

## 2017 Compared to 2016

### Revenues and Comparable Store Sales

Kmart's revenues decreased by $3.0 billion to $5.6 billion in 2017, primarily due to the effect of having fewer stores in operation, which accounted for approximately $2.4 billion of the decline. Revenues were also impacted by a decrease in comparable store sales of 11.4%, which accounted for approximately $689 million of the decline. The Company recognized approximately $64 million of revenues during the 53rd week of 2017. The decline in comparable store sales was primarily driven by declines in the pharmacy, grocery & household, home, drugstore, consumer electronics and apparel categories.

### Gross Margin

Kmart generated $1.0 billion in gross margin in 2017 compared to $1.6 billion in 2016. The decrease in Kmart's gross margin is due to the above noted decrease in sales, partially offset by an increase in gross margin rate. Gross margin included charges related to store closures of $154 million and $187 million in 2017 and 2016, respectively, as well as credits of $11 million and $17 million in 2017 and 2016, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Kmart's gross margin rate increased 10 basis points to 18.1% in 2017 from 18.0% in 2016. Excluding the impact of significant items, as noted in the Adjusted EBITDA tables, Kmart's gross margin rate would have improved 60 basis points in 2017 as compared to the prior year, primarily driven by margin rate improvement in the apparel, home and drugstore categories, partially offset by a decline in the pharmacy category. Kmart experienced lower clearance markdowns and Shop Your Way points expense, partially offset by an increase in promotional markdowns.

36

MOAC000698

In addition, as a result of the Seritage and JV transactions, 2017 and 2016 included additional rent expense of approximately $21 million and $35 million, respectively.

*Selling and Administrative Expenses*

Kmart's selling and administrative expenses decreased $720 million in 2017. Selling and administrative expenses included significant items, as noted in the Adjusted EBITDA tables, which aggregated to expense of $104 million and $146 million for 2017 and 2016, respectively. Excluding these items, selling and administrative expenses decreased $678 million primarily due to decreases in payroll and advertising expenses.

Kmart's selling and administrative expense rate was 25.9% in 2017 and 25.1% in 2016 and increased primarily as a result of lower expense leverage due to the sales decline noted above.

*Impairment charges*

Kmart recorded impairment charges of $16 million and $22 million in 2017 and 2016, respectively, related to the impairment of long-lived assets. Impairment charges recorded during 2017 and 2016 are further described in Note 13 of Notes to Consolidated Financial Statements.

*Gain on Sales of Assets*

Kmart recorded total gains on sales of assets of $881 million and $181 million in 2017 and 2016, respectively. The gains recorded during 2017 included gains of $492 million recognized on the Craftsman Sale, $164 million recognized on the sale or amendment and lease terminations of 43 locations, $43 million as a result of recapture and lease termination activity and $79 million related to other asset sales. Gains on sales of assets are described further in Note 11 of Notes to Consolidated Financial Statements.

*Operating Income (Loss)*

Kmart recorded operating income of $367 million in 2017 as compared to an operating loss of $530 million in 2016. Operating income for 2017 included significant items, as noted in the Adjusted EBITDA tables, which totaled $247 million, while operating loss for 2016 included significant items which totaled $316 million. Both 2017 and 2016 also included gains on sales of assets, as well as charges related to impairments. Taking these significant items into consideration, the decrease in Kmart's operating loss was primarily driven by the decrease in selling and administrative expenses, partially offset by a decline in gross margin noted above.

***2016 Compared to 2015***

*Revenues and Comparable Store Sales*

Kmart's revenues decreased by $1.5 billion to $8.7 billion in 2016, primarily due to the effect of having fewer stores in operation, which accounted for approximately $1.0 billion of the decline. Revenues were also impacted by a decrease in comparable store sales of 5.3%, which accounted for approximately $477 million of the decline. The decline in comparable store sales was primarily driven by declines in the grocery & household, consumer electronics and pharmacy categories.

*Gross Margin*

Kmart generated $1.6 billion in gross margin in 2016 compared to $2.1 billion in 2015. The decrease in Kmart's gross margin is due to the above noted decrease in sales, as well as a decline in gross margin rate. Gross margin included significant items which aggregated to expense of $170 million and $28 million for 2016 and 2015, respectively.

Kmart's gross margin rate declined 310 basis points to 18.0% in 2016 from 21.1% in 2015. Excluding the impact of significant items primarily related to store closures, as noted in the Adjusted EBITDA tables, Kmart's gross margin rate would have declined 130 basis points due to margin rate declines experienced across most

MOAC000699

categories, most notably in the apparel, grocery & household, drugstore, home and pharmacy categories driven by increased markdowns, including an increase in Shop Your Way points expense.

In addition, as a result of the Seritage and JV transactions, 2016 and 2015 included additional rent expense and assigned sub-tenant rental income of approximately $35 million and $25 million, respectively.

*Selling and Administrative Expenses*

Kmart's selling and administrative expenses decreased $362 million in 2016. Selling and administrative expenses included significant items, as noted in the Adjusted EBITDA tables, which aggregated to expense of $146 million and $90 million for 2016 and 2015, respectively. Excluding these items, selling and administrative expenses decreased $418 million primarily due to decreases in payroll and advertising expenses.

Kmart's selling and administrative expense rate was 25.1% in 2016 and 24.9% in 2015 and increased primarily as a result of lower expense leverage due to the sales decline noted above.

*Impairment charges*

Kmart recorded impairment charges of $22 million and $14 million in 2016 and 2015, respectively, related to the impairment of long-lived assets. Impairment charges recorded during 2016 and 2015 are further described in Note 13 of Notes to Consolidated Financial Statements.

*Gain on Sales of Assets*

Kmart recorded total gains on sales of assets of $181 million and $185 million in 2016 and 2015, respectively. Gains on sales of assets recorded in both years are described further in Note 11 of Notes to Consolidated Financial Statements.

*Operating Loss*

Kmart recorded an operating loss of $530 million in 2016 as compared to $292 million in 2015. Operating loss for 2016 included significant items, as noted in the Adjusted EBITDA tables, which totaled $316 million, while operating loss for 2015 included significant items which totaled $118 million. Both 2016 and 2015 also included gains on sales of assets, as well as charges related to impairments. Taking these significant items into consideration, the decrease in Kmart's operating loss was primarily driven by the decrease in selling and administrative expenses, partially offset by a decline in gross margin.

MOAC000700

**Sears Domestic**

Sears Domestic results and key statistics were as follows:

| dollars in millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Total revenues | $ 11,084 | $ 13,488 | $ 14,958 |
| Comparable store sales % | (15.2)% | (9.3)% | (11.1)% |
| Cost of sales, buying and occupancy | 8,574 | 10,359 | 11,294 |
| Gross margin dollars | 2,510 | 3,129 | 3,664 |
| Gross margin rate | 22.6 % | 23.2 % | 24.5 % |
| Selling and administrative | 3,676 | 3,934 | 4,320 |
| Selling and administrative expense as a percentage of total revenues | 33.2 % | 29.2 % | 28.9 % |
| Depreciation and amortization | 272 | 304 | 350 |
| Impairment charges | 126 | 405 | 260 |
| Gain on sales of assets | (767) | (66) | (558) |
| Total costs and expenses | 11,881 | 14,936 | 15,666 |
| Operating loss | $ (797) | $ (1,448) | $ (708) |
| Adjusted EBITDA | $ (371) | $ (506) | $ (563) |
| Number of: | | | |
| Full-line stores | 547 | 670 | 705 |
| Specialty stores | 23 | 25 | 26 |
| Total Sears Stores | 570 | 695 | 731 |

### 2017 Compared to 2016

#### Revenues and Comparable Store Sales

Sears Domestic's revenues decreased by $2.4 billion to $11.1 billion in 2017 as compared to 2016. This decline in revenues was primarily driven by a decrease in comparable store sales of 15.2%, which accounted for $1.2 billion of the decline, and the effect of having fewer Full-line stores in operation, which accounted for $760 million of the decline. The decline in Sears Domestic comparable store sales was primarily driven by decreases in the home appliances, apparel, consumer electronics and lawn & garden categories. The Company recognized approximately $125 million of revenues during the 53rd week of 2017. In addition, we also experienced a decline in revenues from SHO of approximately $208 million during 2017 as compared to 2016.

#### Gross Margin

Sears Domestic generated gross margin of $2.5 billion and $3.1 billion in 2017 and 2016, respectively, which included charges related to store closures of $73 million and $39 million in 2017 and 2016, respectively. Gross margin also included credits of $67 million and $71 million in 2017 and 2016, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction, while 2016 also included one-time vendor credits of $33 million.

Sears Domestic's gross margin rate for the year declined 60 basis points to 22.6% in 2017 from 23.2% in 2016. Excluding the impact of significant items in both years primarily related to store closures, the amortization of the deferred gain on sales of assets associated with the Seritage transaction and one-time vendor credits, Sears Domestic's gross margin rate in 2017 would have been flat to the prior year, which reflects improvement in the apparel category, which was offset by declines in the home appliances and tools categories. Sears Domestic experienced lower clearance markdowns, offset by an increase in both promotional markdowns and Shop Your Way points expense.

MOAC000701

In addition, as a result of the Seritage and JV transactions, 2017 and 2016 included additional rent expense of approximately $148 million and $162 million, respectively.

*Selling and Administrative Expenses*

Sears Domestic's selling and administrative expenses decreased $258 million in 2017 as compared to 2016 and included significant items, as noted in the Adjusted EBITDA tables, which aggregated to $789 million and $364 million for 2017 and 2016, respectively. Excluding these items, selling and administrative expenses decreased $683 million, primarily due to decreases in payroll and advertising expenses.

Sears Domestic's selling and administrative expense rate was 33.2% in 2017 and 29.2% in 2016 and increased as the above noted expense reduction was more than offset by the decline in sales noted above.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $32 million during 2017 to $272 million, as compared to 2016, primarily due to having fewer assets to depreciate.

*Impairment Charges*

Sears Domestic recorded impairment charges of $126 million in 2017 which consisted of impairment of $72 million related to the Sears trade name, as well as $54 million related to the impairment of long-lived assets. We recorded impairment charges of $405 million in 2016 which consisted of impairment of $381 million related to the Sears trade name, as well as $24 million related to the impairment of long-lived assets. Impairment charges recorded in both years are described further in Notes 1 and 13 of Notes to Consolidated Financial Statements.

*Gain on Sales of Assets*

Sears Domestic recorded total gains on sales of assets of $767 million and $66 million in 2017 and 2016, respectively. The gains recorded during 2017 included gains of $544 million recognized on the sale or amendment and lease terminations of 52 locations and $210 million as a result of recapture and lease termination activity and two stores that qualified for sales recognition and sale-leaseback accounting. Gains on sales of assets are described further in Note 11 of Notes to Consolidated Financial Statements.

*Operating Loss*

Sears Domestic reported an operating loss of $797 million in 2017 compared to $1.4 billion in 2016. Sears Domestic's operating loss in 2017 included significant items, as noted in the Adjusted EBITDA tables, which totaled $795 million, while operating loss for 2016 included significant items which totaled $299 million. Both 2017 and 2016 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the decrease in Sears Domestic's operating loss in 2017 was driven by the decrease in selling and administrative expenses, partially offset by the decline in gross margin noted above.

***2016 Compared to 2015***

*Revenues and Comparable Store Sales*

Sears Domestic's revenues decreased by $1.5 billion to $13.5 billion in 2016 as compared to 2015. This decline in revenues was primarily driven by a decrease in comparable store sales of 9.3%, which accounted for $890 million of the decline, and the effect of having fewer Full-line stores in operation, which accounted for $241 million of the decline. The decline in Sears Domestic comparable store sales was primarily driven by decreases in the home appliances, apparel and consumer electronics categories. In addition, we also experienced a decline in revenues from SHO of approximately $238 million during 2016 as compared to 2015.

MOAC000702

*Gross Margin*

Sears Domestic generated gross margin of $3.1 billion and $3.7 billion in 2016 and 2015, respectively, which included significant items which aggregated to additional gross margin of $65 million and $182 million for 2016 and 2015, respectively.

Sears Domestic's gross margin rate for the year declined 130 basis points to 23.2% in 2016 from 24.5% in 2015. Excluding the impact of significant items in both years primarily related to the amortization of the deferred gain on sales of assets associated with the Seritage transaction, one-time vendor credits and store closures, s noted in the Adjusted EBITDA tables, Sears Domestic's gross margin rate declined 60 basis points, with the most notable decreases experienced in the apparel, home appliances and footwear categories driven by increased markdowns, including an increase in Shop Your Way points expense.

In addition, as a result of the Seritage and JV transactions, 2016 and 2015 included additional rent expense and assigned sub-tenant rental income of approximately $162 million and $108 million, respectively.

*Selling and Administrative Expenses*

Sears Domestic's selling and administrative expenses decreased $386 million in 2016 as compared to 2015 and included significant items, as noted in the Adjusted EBITDA tables, which aggregated to $364 million and $275 million for 2016 and 2015, respectively. Excluding these items, selling and administrative expenses decreased $475 million, primarily due to decreases in payroll and advertising expenses.

Sears Domestic's selling and administrative expense rate was 29.2% in 2016 and 28.9% in 2015 and increased as the above noted expense reduction was more than offset by the decline in sales noted above.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $46 million during 2016 to $304 million, as compared to 2015, primarily due to having fewer assets to depreciate.

*Impairment Charges*

Sears Domestic recorded impairment charges of $405 million in 2016 which consisted of impairment of $381 million related to the Sears trade name, as well as $24 million related to the impairment of long-lived assets. We recorded impairment charges of $260 million in 2015 which consisted of impairment of $180 million related to the Sears trade name, as well as $80 million related to the impairment of long-lived assets. Impairment charges recorded in both years are described further in Notes 1 and 13 of Notes to Consolidated Financial Statements.

*Gain on Sales of Assets*

Sears Domestic recorded total gains on sales of assets of $66 million and $558 million in 2016 and 2015, respectively. The gains recorded in 2015 included $371 million recognized in connection with the joint venture transactions and the sale-leaseback transaction with Seritage. Gains on sales of assets recorded in both years are described further in Note 11 of Notes to Consolidated Financial Statements.

*Operating Loss*

Sears Domestic reported an operating loss of $1.4 billion in 2016 compared to $708 million in 2015. Sears Domestic's operating loss in 2016 included significant items, as noted in the Adjusted EBITDA tables, which totaled $299 million, while operating loss for 2015 included significant items which totaled $93 million. Both 2016 and 2015 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the decrease in Sears Domestic's operating loss in 2016 was driven by the decrease in selling and administrative expenses, partially offset by the above noted decline in gross margin.

MOAC000703

## ANALYSIS OF CONSOLIDATED FINANCIAL CONDITION

### Cash Balances

Our cash and cash equivalents include all highly liquid investments with original maturities of three months or less at the date of purchase. Our cash balances as of February 3, 2018 and January 28, 2017 are detailed in the following table.

| *millions* | February 3, 2018 | January 28, 2017 |
|---|---|---|
| Cash and equivalents | $ 113 | $ 196 |
| Cash posted as collateral | 4 | 3 |
| Credit card deposits in transit | 65 | 87 |
| Total cash and cash equivalents | 182 | 286 |
| Restricted cash | 154 | — |
| Total cash balances | $ 336 | $ 286 |

We had total cash balances of $336 million and $286 million at February 3, 2018 and January 28, 2017, respectively.

At various times, we have posted cash collateral for certain outstanding letters of credit and self-insurance programs. Such cash collateral is classified within cash and cash equivalents given we have the ability to substitute letters of credit at any time for this cash collateral and it is therefore readily available to us. Our invested cash may include, from time to time, investments in, but not limited to, commercial paper, federal, state and municipal government securities, floating-rate notes, repurchase agreements and money market funds. Cash amounts held in these short-term investments are readily available to us. Credit card deposits in transit include deposits in transit from banks for payments related to third-party credit card and debit card transactions. The Company classifies cash balances that are legally restricted pursuant to contractual arrangements as restricted cash. The restricted cash balance relates to amounts deposited into an escrow for the benefit of our pension plans.

We classify outstanding checks in excess of funds on deposit within other current liabilities and reduce cash balances when these checks clear the bank on which they were drawn. Outstanding checks in excess of funds on deposit were $74 million and $29 million as of February 3, 2018 and January 28, 2017, respectively.

### Operating Activities

The Company used $1.8 billion of cash in its operations during 2017, $1.4 billion during 2016 and $2.2 billion during 2015. Our primary source of operating cash flows is the sale of goods and services to customers, while the primary use of cash in operations is the purchase of merchandise inventories and the payment of operating expenses. We used more cash in operations in 2017 compared to 2016 primarily due to declines in merchandise payables and other liabilities, partially offset by a decline in merchandise inventories. We used less cash in operations in 2016 compared to 2015 primarily due to a decrease in our net inventory.

Merchandise inventories were $2.8 billion and $4.0 billion, respectively, at February 3, 2018 and January 28, 2017, while merchandise payables were approximately $0.6 billion and $1.0 billion, respectively, at February 3, 2018 and January 28, 2017. Our inventory balances decreased approximately $1.2 billion primarily due to both store closures and improved productivity. Sears Domestic inventory decreased in virtually all categories, with the most notable decreases in the apparel, tools and home appliances categories. Kmart inventory decreased in all categories with the most notable decreases in the apparel, home, drugstore and grocery & household categories.

### Investing Activities

We generated net cash flows from investing activities of $1.9 billion in 2017, $244 million in 2016 and $2.5 billion in 2015.

For 2017, net cash flows from investing activities consisted of cash proceeds from the sale of properties and investments of $1.1 billion, proceeds from the Craftsman Sale of $572 million and proceeds from the sale of

MOAC000704

receivables of $293 million, partially offset by cash used for capital expenditures of $80 million. For 2016, net cash flows from investing activities primarily consisted of cash proceeds from the sale of properties and investments of $386 million, partially offset by cash used for capital expenditures of $142 million. For 2015, net cash flows from investing activities primarily consisted of cash proceeds from the sale of properties and investments of $2.7 billion, partially offset by cash used for capital expenditures of $211 million. Proceeds from the sales of properties and investments in 2015 included approximately $2.6 billion of net proceeds from the Seritage transaction.

We spent $80 million, $142 million and $211 million during 2017, 2016 and 2015, respectively, for capital expenditures. Capital expenditures during all three years primarily included investments in online and mobile shopping capabilities, enhancements to the Shop Your Way platform, information technology infrastructure and store maintenance.

We anticipate 2018 capital expenditure levels to be similar to 2017 levels. In the normal course of business, we consider opportunities to purchase leased operating properties, as well as offers to sell owned, or assign leased, operating and non-operating properties. These transactions may, individually or in the aggregate, result in material proceeds or outlays of cash and cause our capital expenditure levels to vary from period to period. In addition, we review leases that will expire in the short term in order to determine the appropriate action to take with respect to them.

**Financing Activities**

During 2017, the Company used net cash flows in financing activities of $2 million, which consisted of debt repayments of $1.4 billion and the payment of debt issuance costs of $43 million, offset by proceeds from debt issuances of $1.0 billion, an increase in short-term borrowings of $271 million and $106 million of net cash proceeds received from sale-leaseback financing transactions.

During 2016, we generated net cash flows from financing activities of $1.2 billion, which consisted of proceeds from debt issuances of $2.0 billion and $71 million of net cash proceeds received from a sale-leaseback financing transaction for five Sears Full-line stores and two Sears Auto Centers that have continuing involvement, partially offset by a decrease in short-term borrowings of $797 million, debt repayments of $66 million and the payment of debt issuance costs of $51 million.

During 2015, the Company used net cash flows in financing activities of $364 million, which consisted of debt repayments of $1.4 billion, of which $927 million was the purchase of Senior Secured Notes pursuant to the tender offer and $400 million was the repayment of the secured short-term loan, the payment of debt issuance costs of $50 million related to the amendment and extension of our Domestic Credit Facility and fees related to the tender offer related to our Senior Secured Notes. These uses of cash were partially offset by an increase in short-term borrowings of $583 million and $508 million of net cash proceeds from sale-leaseback financing, which consisted of $426 million of proceeds from the JV transactions received during 2015 and $82 million of proceeds received in 2015 related to four joint venture properties that have continuing involvement.

During 2017, 2016 and 2015, we did not repurchase any of our common shares under our share repurchase program. The common share repurchase program was initially announced in 2005 and had a total authorization since inception of the program of $6.5 billion. At February 3, 2018, we had approximately $504 million of remaining authorization under the program. The common share repurchase program has no stated expiration date and share repurchases may be implemented using a variety of methods, which may include open market purchases, privately negotiated transactions, block trades, accelerated share repurchase transactions, the purchase of call options, the sale of put options or otherwise, or by any combination of such methods.

**Uses and Sources of Liquidity**

Our primary need for liquidity is to fund working capital requirements of our businesses, capital expenditures and for general corporate purposes, including debt repayments and pension plan contributions. The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows experienced over the past several years. These actions included:

MOAC000705

- The completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility, including:

  ◦ a $750 million Senior Secured Term Loan (the "2016 Term Loan") under its domestic credit facility maturing in July 2020;

  ◦ a $500 million real estate loan facility in April 2016 (the "2016 Secured Loan Facility"), initially maturing in July 2017, initially extended to January 2018, subsequently extended to April 2018, and then further extended to July 2018, subject to the payment of an extension fee;

  ◦ an additional $500 million real estate loan facility in January 2017 (the "2017 Secured Loan Facility"), maturing in July 2020;

  ◦ a Second Lien Credit Agreement in September 2016, pursuant to which the Company borrowed $300 million under a term loan (the "Second Lien Term Loan"), maturing in July 2020;

  ◦ an amendment in July 2017 to the Second Lien Credit Agreement to provide for the creation of a $500 million uncommitted second-lien line of credit loan facility under which the Company may borrow line of credit loans (the "Line of Credit Loans"), and a subsequent amendment to that facility to extend the maximum duration of the Line of Credit Loans from 180 days to 270 days and permit total borrowings of up to $600 million;

  ◦ a Letter of Credit and Reimbursement Agreement in December 2016, originally providing for up to a $500 million secured standby letter of credit facility (the "LC Facility") from certain affiliates of ESL Investments, Inc. ("ESL");

  ◦ a $200 million real estate loan facility (the "Incremental Loans") in October 2017, with the Incremental Loans maturing in April 2018, with the option to extend to July 2018, subject to the extension of the 2016 Secured Loan Facility;

  ◦ the extension of the maturity date of the initial $1.0 billion term loan (the "Term Loan") under our Amended Domestic Credit Agreement from June 2018 to January 2019 (with a right of the borrowers thereunder to further extend such maturity, subject to the satisfaction of certain conditions, to July 2019);

  ◦ amendments to our Amended Domestic Credit Agreement and certain other indebtedness which reduced the aggregate revolver commitments from $1.971 billion to $1.5 billion, but also implemented other modifications to covenants and reserves against the domestic credit facility borrowing base that improved net liquidity, and increased the maximum permissible short-term borrowings of the Company from $750 million to $1.25 billion;

  ◦ a Term Loan Credit Agreement in January 2018 providing for a secured term loan facility (the "Term Loan Facility"), secured by substantially all of the unencumbered intellectual property of the Company and its subsidiaries, other than intellectual property relating to the Kenmore and DieHard brands, as well as by certain real property interests, in each case subject to certain exclusions. An aggregate principal amount of $250 million was borrowed with the ability to borrow an additional $50 million against the same collateral;

  ◦ an amendment to the indenture governing our 6 5/8% Senior Secured Notes due 2018 to increase the maximum permissible borrowings secured by inventory to 75% of book value of such inventory from 65% and defer the collateral coverage test for purposes of the repurchase offer covenant in the indenture to restart it with the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018);

  ◦ an amendment to the March 2016 Pension Plan Protection and Forbearance Agreement (the "PPPFA") with the Pension Benefit Guaranty Corporation (the "PBGC") providing for the release of 138 of our properties from a ring-fence arrangement created under our five-year PPPFA in exchange for the payment of approximately $407 million into the Sears pension plans. This agreement provides the Company with financial flexibility through the ability to monetize properties, and, in addition, provides funding relief from contributions to the pension plans for the next two years; and

44

MOAC000706

- various commercial paper issuances to meet short-term liquidity needs, with the maximum amount outstanding during fiscal 2017 of $160 million.

- Achievement of $1.25 billion in annualized cost savings in 2017 as part of the restructuring program announced earlier this year. Actions taken to realize the annualized cost savings have included simplification of the organizational structure of Holdings, streamlining of operations, reducing unprofitable categories and the closure of under-performing stores. In 2017, we closed approximately 435 stores, and an additional 103 stores previously announced for closure are expected to be closed by the end of the first quarter of 2018. As a result of these actions, the Company has begun to see improvement in the operations in fiscal 2017, as the restructuring program actions, including the closing of unprofitable stores, have begun to take effect.

- The sale of the Craftsman brand to Stanley Black & Decker for consideration consisting of cash payments and a royalty.

- Sales of properties and investments for proceeds of $1.1 billion and $386 million in 2017 and 2016, respectively.

On March 8, 2018, the Company secured an additional $100 million incremental real estate loan (the "Second Incremental Loan"), pursuant to an amendment to the Second Amended and Restated Loan Agreement, dated as of October 18, 2017, with JPP, LLC and JPP II, LLC, entities affiliated with ESL Investments, Inc. The Second Incremental Loan is secured by the same real estate properties as the 2017 Secured Loan Facility, and certain properties under the previous Incremental Loans outstanding, and matures in July 2020. The Company used the proceeds from the Incremental Loan for general corporate purposes.

In March 2018, the Company also closed on the $200 million Secured Loan and the $240 million Mezzanine Loan, both as defined in Note 3 of Notes to Consolidated Financial Statements, in connection with the release of 138 of our properties from the ring-fence arrangement with the PBGC as described above. The properties, which have an aggregate appraised value of nearly $980 million, serve as collateral for the Secured Loan, and the Mezzanine Loan is secured by pledge of the equity interests in the direct parent company of the entities that own such properties. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. The Mezzanine Loan Agreement, as defined in Note 3 of Notes to Consolidated Financial Statements, contains an uncommitted accordion feature pursuant to which we may incur additional loans of not more than $200 million in aggregate, subject to certain conditions, including that such additional loans not exceed an amount equal to the principal amount of the Secured Loan repaid. The Company expects to pay down the Secured Loan over the next three to six months using proceeds generated from the sale of the underlying properties.

In February 2018, the Company commenced private exchange offers for its outstanding 8% Senior Unsecured Notes Due 2019 and 6 5/8% Senior Secured Notes Due 2018 (the "Exchange Offers"), pursuant to which it offered to (1) issue in exchange for its outstanding 8% Senior Unsecured Notes Due 2019 (the "Old Senior Unsecured Notes") new 8% Senior Unsecured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option (the "New Senior Unsecured Notes"), and (2) issue in exchange for its outstanding 6 5/8% Senior Secured Notes Due 2018 (the "Old Senior Secured Notes") new 6 5/8% Senior Secured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option (the "New Senior Secured Notes"). The Exchange Offers expired on March 15, 2018. Approximately $214 million aggregate principal amount of the Old Senior Unsecured Notes and approximately $170 million aggregate principal amount of the Old Senior Secured Notes were validly tendered, accepted and canceled in the Exchange Offers, and the Company issued a like principal amount of New Senior Unsecured Notes and New Senior Secured Notes. The New Senior Unsecured Notes and New Senior Secured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at conversion prices of $8.33 and $5.00, respectively, per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period. In connection with the closing of the Exchange Offers, the Company also obtained the requisite consent of holders of Old Senior Secured Notes to adopt amendments to the indenture governing those notes to eliminate substantially all of the restrictive covenants and certain events of default in the indenture, and make the liens securing senior second lien obligations, including the new Senior

45

Secured Notes and the Second Lien Term Loan described below, effectively senior to the liens securing junior second lien obligations, including the Old Senior Secured Notes.

Also in connection with the closing of the Exchange Offers, the Company entered into an amendment to its Second Lien Credit Agreement. The amendment provides the Company with the option to pay interest on its outstanding $300 million principal amount Second Lien Term Loan in kind, and also provides that the Company's obligation under the Second Lien Term Loan is convertible into common stock of the Company, on the same conversion terms as the New Senior Secured Notes. Also in connection with the closing of the Exchange Offers, the Company's subsidiary, Sears Roebuck Acceptance Corp. ("SRAC"), consummated a private exchange with certain third parties of approximately $100 million in principal amount of senior unsecured notes issued by SRAC maturing between 2027 and 2043 and bearing interest at rates between 6.50% and 7.50% per annum, pursuant to which SRAC issued a like principal amount of new unsecured notes (the "SRAC Exchange Notes"). The SRAC Exchange Notes mature in March 2028 and bear interest at a rate of 7.0% per annum, and provide the Company with the option to pay such interest in kind at an interest rate of 12.0% per annum. The SRAC Exchange Notes are also guaranteed by the same subsidiaries of the Company that guarantee the New Senior Secured Notes.

On March 21, 2018, we obtained a $125 million FILO term loan (the "FILO Loan") from JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Thomas J. Tisch, under our Amended Domestic Credit Agreement. The Company received approximately $122 million in net proceeds from the FILO Loan, which proceeds were using to reduce outstanding borrowings under our revolving credit facility. The FILO Loan has a maturity date of July 20, 2020, which is the same maturity date as the Company's revolving credit facility commitments, and does not amortize.

In addition to pursuing several transactions to adjust our capital structure in order to enhance our liquidity and financial position, the Company is also taking incremental actions to further streamline operations to drive profitability, including cost reductions of $200 million on an annualized basis in 2018 unrelated to store closures.

In addition to the actions taken above, the Company has other resources available to support its operations. Our domestic credit facility permits us up to $2.0 billion of second lien loan capacity (of which $1.1 billion was utilized at February 3, 2018) outside the credit agreement, all depending on the applicable and available borrowing base as defined in our applicable debt agreements, as well as our ability to secure commitments from lenders. We also have the ability to obtain longer-term secured financing maturing outside of the domestic credit facility maturity date which would not be subject to borrowing base limitations (see Note 3 of Notes to Consolidated Financial Statements). Other options available to us, which we will evaluate and execute as appropriate, include refinancing existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

We also continue to explore ways to unlock value across a range of assets, including entering into or renegotiating commercial arrangements, and exploring ways to maximize the value of our Home Services, Innovel and Sears Auto Centers businesses, as well as our Kenmore and DieHard brands, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings to realize significant growth. We expect to continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio and exploring potential asset sales, in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

We expect to continue to face a challenging competitive environment. While we continue to focus on our overall profitability, including managing expenses, we reported a loss in 2017, and were required to fund cash used in operating activities with cash from investing and financing activities. If we continue to experience operating losses, and we are not able to generate additional liquidity through the actions described below or through some combination of other actions, including real estate or other asset sales, while not expected, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such

MOAC000708

deficiency. As of February 3, 2018, we are in a deferral period of the collateral coverage test and the calculation restarts in the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018). Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business.

We believe the following actions, some of which we expect, subject to our governance processes, to include related party participation and funding, are probable of occurring and will be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements:

- Sales of the properties securing the $200 million Secured Loan to fund the repayment of such Secured Loan;
- Additional borrowings under the Mezzanine Loan Agreement and the Term Loan Facility;
- Renegotiation of certain commercial arrangements;
- Monetization of the Kenmore brand;
- Extension of maturities beyond March 2019 of Line of Credit Loans under the Second Lien Credit Agreement, the 2016 Secured Loan Facility, the Incremental Secured Loan Facility and the LC Facility and the Term Loan under the Amended Domestic Credit Agreement;
- Additional borrowings secured by real estate assets or borrowings under the short-term basket; and
- Further restructurings to help manage expenses and improve profitability.

The PPPFA contains certain limitations on our ability to sell assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA. We expect that the actions outlined above will further enhance our liquidity and financial flexibility and we expect that these actions will be executed in alignment with the anticipated timing of our liquidity needs.

Our outstanding borrowings at February 3, 2018 and January 28, 2017 were as follows:

| *millions* | February 3, 2018 | January 28, 2017 |
|---|---|---|
| Short-term borrowings: | | |
| Unsecured commercial paper | $ — | $ — |
| Secured borrowings | 271 | — |
| Line of credit loans | 500 | — |
| Incremental loans | 144 | — |
| Long-term debt, including current portion: | | |
| Notes, term loan and debentures outstanding | 3,145 | 4,018 |
| Capitalized lease obligations | 72 | 145 |
| Total borrowings | $ 4,132 | $ 4,163 |

MOAC000709

We fund our peak sales season working capital needs through our domestic revolving credit facility and commercial paper markets and secured short-term debt.

| millions | | 2017 | | 2016 |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Maximum daily amount outstanding during the period | $ | 799 | $ | 1,150 |
| Average amount outstanding during the period | | 374 | | 334 |
| Amount outstanding at period-end | | 271 | | — |
| Weighted average interest rate | | 6.2% | | 4.6% |
| | | | | |
| Unsecured commercial paper: | | | | |
| Maximum daily amount outstanding during the period | $ | 160 | $ | 250 |
| Average amount outstanding during the period | | 26 | | 106 |
| Amount outstanding at period-end | | — | | — |
| Weighted average interest rate | | 9.1% | | 7.9% |
| | | | | |
| Line of credit loans: | | | | |
| Maximum daily amount outstanding during the period | $ | 500 | $ | — |
| Average amount outstanding during the period | | 214 | | — |
| Amount outstanding at period-end | | 500 | | — |
| Weighted average interest rate | | 10.2% | | —% |

Information about our Domestic Credit Agreement, Letter of Credit Facility, Secured Loan and Mezzanine Loan, Term Loan Facility, 2017 Secured Loan Facility, 2016 Secured Loan Facility, Second Lien Credit Agreement, Old Senior Secured Notes and New Senior Secured Notes, Old Senior Unsecured Notes and New Senior Unsecured Notes, Unsecured Commercial Paper, Secured Short-Term Loan and Wholly-owned Insurance Subsidiary and Intercompany Securities is included in Note 3 of Notes to Consolidated Financial Statements.

*Domestic Pension Plans Funding*

Contributions to our pension plans remain a significant use of our cash on an annual basis. While the Company's pension plans are frozen, and thus associates do not currently earn pension benefits, the Company has a legacy pension obligation for past service performed by Kmart and Sears associates. During 2017, we contributed $295 million to our domestic pension plans, including amounts contributed from the escrow created pursuant to the PPPFA. We estimate that our minimum pension funding obligations will be approximately $280 million in 2018 (excluding the $20 million supplemental payment described below) and approximately $276 million in 2019. As previously noted, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the value of the $250 million cash payment payable to the Company on the third anniversary of the Craftsman closing (the "Craftsman Receivable"). During the 13 weeks ended July 29, 2017, we sold the Craftsman Receivable to a third-party purchaser, and deposited the proceeds into an escrow for the benefit of our pension plans. We subsequently contributed a portion of the proceeds received from the sale of the Craftsman Receivable to our pension plans, which contribution was credited against the Company's minimum pension funding obligations in 2017. Under our agreement with the PBGC, the remaining proceeds will also be contributed to our pension plans, and when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019.

The Company also agreed to grant a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also

MOAC000710

agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension obligations through the end of 2019.

In November 2017, the Company announced an amendment to the PPPFA that allowed the Company to pursue the monetization of 138 of our properties that were subject to a ring-fence arrangement created under the PPPFA. In March 2018, the Company closed on the Secured Loan and the Mezzanine Loan, which transactions released the properties from the ring-fence arrangement. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. Under our agreement with the PBGC, the escrowed amount will also be contributed to our pension plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019 described above. Following such transactions, the Company has been relieved of contributions to our pension plans for approximately two years (other than the contributions from escrow described above and a $20 million supplemental payment due in the second quarter of 2018). The ultimate amount of pension contributions could be affected by factors such as changes in applicable laws, as well as financial market and investment performance and demographic changes.

49

MOAC000711

## Contractual Obligations and Off-Balance Sheet Arrangements

Information concerning our obligations and commitments to make future payments under contracts such as debt and lease agreements, and under contingent commitments, is aggregated in the following table.

| | | Payments Due by Period | | | | |
|---|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Within 1 Year** | **1-3 Years** | **3-5 Years** | **After 5 Years** | **Other** |
| *millions* | | | | | | |
| Operating leases | $ 2,839 | $ 537 | $ 807 | $ 534 | $ 961 | $ — |
| Short-term borrowings | 915 | 915 | — | — | — | — |
| Capital lease obligations | 115 | 28 | 21 | 8 | 58 | — |
| Royalty license fees[1] | 60 | 36 | 24 | — | — | — |
| Other | 2 | 2 | — | — | — | — |
| Pension funding obligations[2] | 1,682 | 280 | 485 | 431 | 486 | — |
| Long-term debt including current portion and interest | 4,155 | 1,222 | 2,381 | 40 | 512 | — |
| Liability and interest related to uncertain tax positions[3] | 181 | — | — | — | — | 181 |
| Total contractual obligations | $ 9,949 | $ 3,020 | $ 3,718 | $ 1,013 | $ 2,017 | $ 181 |

[1] We pay royalties under various merchandise license agreements, which are generally based on sales of products covered under these agreements. We currently have license agreements for which we pay royalties, including those to use Joe Boxer and Everlast. Royalty license fees represent the minimum the Company is obligated to pay, regardless of sales, as guaranteed royalties under these license agreements.

[2] In March 2018, the Company contributed approximately $282 million to our pension plans and deposited $125 million into an escrow for the benefit of our pension plans, both from proceeds of the Secured Loan and the Mezzanine Loan. The remaining proceeds from the sale of the Craftsman Receivable are also held within an escrow for the benefit of our pension plans. Under our agreement with the PBGC, these escrowed amounts will be contributed to our pension plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019. As a result of these transactions, the Company has been relieved of contributions to our pension plans for approximately two years (other than the contributions from escrow described above and a $20 million supplemental payment due in the second quarter of 2018). See Note 7 of Notes to Consolidated Financial Statements for further information.

[3] At February 3, 2018, our uncertain tax position liability and gross interest payable were $130 million and $51 million, respectively. We are unable to reasonably estimate the timing of liabilities and interest payments arising from uncertain tax positions in individual years due to the uncertainties in the timing of the effective settlement of tax positions.

## Other Commercial Commitments

We issue various types of guarantees in the normal course of business. We had the following guarantees outstanding at February 3, 2018:

| *millions* | Bank Issued | SRAC Issued | Other | Total |
|---|---|---|---|---|
| Standby letters of credit | $ 647 | $ 6 | $ — | $ 653 |
| Commercial letters of credit | — | 31 | — | 31 |
| Secondary lease obligations and performance guarantee | — | — | 164 | 164 |

MOAC000712

The secondary lease obligations relate to certain store leases that have been assigned and previously divested Sears businesses. The secondary lease obligations represent the maximum potential amount of future payments, including renewal option periods pursuant to the lease agreements. We remain secondarily liable if the primary obligor defaults.

MOAC000713

**Application of Critical Accounting Policies and Estimates**

In preparing the financial statements, certain accounting policies require considerable judgment to select the appropriate assumptions to calculate financial estimates. These estimates are complex and subject to an inherent degree of uncertainty. We base our estimates on historical experience, terms of existing contracts, evaluation of trends and other assumptions that we believe to be reasonable under the circumstances. We continually evaluate the information used to make these estimates as our business and the economic environment change. Although the use of estimates is pervasive throughout the financial statements, we consider an accounting estimate to be critical if:

- it requires assumptions to be made about matters that were highly uncertain at the time the estimate was made; and

- changes in the estimate that are reasonably likely to occur from period to period or different estimates that could have been selected would have a material effect on our financial condition, cash flows or results of operations.

Management believes the current assumptions and other considerations used to estimate amounts reflected in the financial statements are appropriate. However, if actual experience differs from the assumptions and the considerations used in estimating amounts, the resulting changes could have a material adverse effect on our consolidated results of operations, and in certain situations, could have a material adverse effect on our financial condition.

Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of our Board of Directors and the Audit Committee has reviewed the disclosure presented below relating to the selection of these estimates.

The following is a summary of our most critical policies and estimates. See Note 1 of Notes to Consolidated Financial Statements for a listing of our other significant accounting policies.

*Valuation of Inventory*

Our inventory is valued at the lower of cost or market determined primarily using the retail inventory method ("RIM"). RIM is an averaging method that is commonly used in the retail industry. To determine inventory cost under RIM, inventory at its retail selling value is segregated into groupings of merchandise having similar characteristics, which are then converted to a cost basis by applying specific average cost factors for each grouping of merchandise. Cost factors represent the average cost-to-retail ratio for each merchandise group based upon the year purchasing activity for each store location. Accordingly, a significant assumption under the retail method is that inventory in each group is similar in terms of its cost-to-retail relationship and has similar turnover rates. Management monitors the content of merchandise in these groupings to prevent distortions that would have a material effect on inventory valuation.

RIM inherently requires management judgment and certain estimates that may significantly affect the ending inventory valuation, as well as gross margin. Among others, two significant estimates used in inventory valuation are the level and timing of permanent markdowns (clearance markdowns used to clear unproductive or slow-moving inventory) and shrinkage. Amounts are charged to cost of sales, buying and occupancy at the time the retail value of inventory is reduced through the use of permanent markdowns.

Factors considered in the determination of permanent markdowns include current and anticipated demand, customer preferences, age of the merchandise, fashion trends and weather conditions. In addition, inventory is also evaluated against corporate pre-determined historical markdown cadences. When a decision is made to permanently markdown merchandise, the resulting gross margin reduction is recognized in the period the markdown is recorded. The timing of the decision, particularly surrounding the balance sheet date, can have a significant effect on the results of operations.

Shrinkage is estimated as a percentage of sales for the period from the date of the last physical inventory to the end of the year. Physical inventories are taken annually for all stores and inventory records are adjusted accordingly. The shrinkage rate from the most recent physical inventory, in combination with historical experience, is used as the basis for the shrinkage accrual following the physical inventory.

52

MOAC000714

*Self-insurance Reserves*

We use a combination of third-party insurance and/or self-insurance for a number of risks including workers' compensation, asbestos, environmental, automobile, warranty, product and general liability claims. General liability costs relate primarily to litigation that arises from store operations. Self-insurance reserves include actuarial estimates of both claims filed and carried at their expected ultimate settlement value and claims incurred but not yet reported. Our estimated claim amounts are discounted using a rate with a duration that approximates the duration of our self-insurance reserve portfolio. Our liability reflected in the Consolidated Balance Sheets represents an estimate of the ultimate cost of claims incurred at the balance sheet date. In estimating this liability, we utilize loss development factors based on Company-specific data to project the future development of incurred losses. Loss estimates are adjusted based upon actual claims settlements and reported claims. These projections are subject to a high degree of variability based upon future inflation rates, litigation trends, legal interpretations, benefit level changes and claim settlement patterns. Although we do not expect the amounts ultimately paid to differ significantly from our estimates, self-insurance reserves could be affected if future claim experience differs significantly from the historical trends and the actuarial assumptions. A 10% change in our self-insurance reserves would have impacted net loss by approximately $65 million.

*Defined Benefit Pension Plans*

The fundamental components of accounting for defined benefit pension plans consist of the compensation cost of the benefits earned, the interest cost from deferring payment of those benefits into the future and the results of investing any assets set aside to fund the obligation. Such retirement benefits were earned by associates ratably over their service careers. Therefore, the amounts reported in the income statement for these retirement plans have historically followed the same pattern. Accordingly, changes in the obligations or the value of assets to fund them have been recognized systematically and gradually over the associate's estimated period of service. The largest drivers of losses or charges in recent years have been the discount rate used to determine the present value of the obligation and the actual return on pension assets. We recognize the changes by amortizing experience gains/losses in excess of the 10% corridor into expense over the associated service period.

The Company's actuarial valuations utilize key assumptions including discount rates and expected returns on plan assets. We are required to consider current market conditions, including changes in interest rates and plan asset investment returns, in determining these assumptions. The determination of our obligations and expense for pension benefits is dependent upon certain assumptions used in calculating such amounts. Key assumptions used in the actuarial valuations include the discount rate, expected long-term rate of return on plan assets and mortality rate assumptions. To determine the discount rate used in the development of the benefit obligation and net periodic benefit cost, a cash flow matching analysis of the expected future benefit payments is performed. In addition to considering the results that cash flow matching produces, the Company gives consideration to changes in industry benchmark yield curve rates. Actuarial assumptions may differ materially from actual results due to changing market and economic conditions, changes in investment strategies, higher or lower withdrawal rates, and longer or shorter life spans of participants. For further information, see Note 7 of Notes to Consolidated Financial Statements.

The actual and expected return on plan assets for 2017, 2016 and 2015 were as follows:

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Actual return on plan assets | 7.98% | 16.08% | (7.35)% |
| Expected return on plan assets | 6.50% | 6.50% | 7.00 % |

The Sears Holdings Corporation Investment Committee is responsible for the investment of the assets of Holdings' domestic pension plans. The Investment Committee, made up primarily of select members of senior management, has appointed a non-affiliated third party professional to advise the Investment Committee with respect to the assets of Holdings' domestic pension plans. The plans' overall investment objective is to provide a long-term return that, along with Company contributions, is expected to meet future benefit payment requirements. A long-term horizon has been adopted in establishing investment policy such that the likelihood and duration of investment losses are carefully weighed against the long-term potential for appreciation of assets. The plans' investment policies require investments to be diversified across individual securities, industries, market

MOAC000715

capitalization and valuation characteristics. In addition, various techniques are utilized to monitor, measure and manage risk.

For purposes of determining the periodic expense of our defined benefit plans, we use the fair value of plan assets as the market related value. A one-percentage-point change in the assumed discount rate would have the following effects on the pension liabilities:

| millions | 1 percentage-point Increase | | 1 percentage-point Decrease | |
|---|---|---|---|---|
| Effect on interest cost component | $ | 20 | $ | (26) |
| Effect on pension benefit obligation | $ | (384) | $ | 460 |

### Income Taxes

We account for income taxes according to accounting standards for such taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the book basis and tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. If future utilization of deferred tax assets is uncertain, the Company may record a valuation allowance against its deferred tax assets. Our accounting policies related to the valuation allowance are further described in Note 1 of Notes to Consolidated Financial Statements. After consideration of evidence regarding the ability to realize our deferred tax assets, we established a valuation allowance against deferred income tax assets in 2017, 2016 and 2015. For the year ended February 3, 2018, the valuation allowance decreased by $1.3 billion of which an increase of $62 million was recorded through other comprehensive income. The Company continues to monitor its operating performance and evaluate the likelihood of the future realization of these deferred tax assets.

Significant management judgment is required in determining our provision for income taxes, deferred tax assets and liabilities and the valuation allowance recorded against our net deferred tax assets, if any. Management considers estimates of the amount and character of future taxable income in assessing the likelihood of realization of deferred tax assets. Our actual effective tax rate and income tax expense could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, tax planning and the Company's forecasted financial condition and results of operations in future periods. Although management believes current estimates are reasonable, actual results could differ from these estimates.

Domestic and foreign tax authorities periodically audit our income tax returns. These audits include questions regarding our tax filing positions, including the timing and amount of deductions and the allocation of income among various tax jurisdictions. In evaluating the exposures associated with our various tax filing positions, we record reserves in accordance with accounting standards for uncertain tax positions. A number of years may elapse before a particular matter, for which we have established a reserve, is audited and fully resolved. Management's estimates at the date of the financial statements reflect our best judgment, giving consideration to all currently available facts and circumstances. As such, these estimates may require adjustment in the future, as additional facts become known or as circumstances change. For further information, see Note 10 of Notes to Consolidated Financial Statements.

### Goodwill and Intangible Asset Impairment Assessments

At both February 3, 2018 and January 28, 2017, we had goodwill balances of $269 million. At February 3, 2018 and January 28, 2017, we had intangible asset balances of $1.2 billion and $1.5 billion, respectively. The Company evaluates the carrying value of goodwill and intangible assets for possible impairment under accounting standards governing goodwill and other intangible assets. Our accounting policies related to goodwill and intangible asset impairment assessments are further described in Note 1 of Notes to Consolidated Financial Statements.

### Goodwill Impairment Assessments

Our goodwill balance relates to our Home Services business. We did not record any goodwill impairment charges in 2017, 2016 or 2015.

MOAC000716

The use of different assumptions, estimates or judgments in either step of the goodwill impairment testing process, such as the estimated future cash flows of the reporting unit, the discount rate used to discount such cash flows, or the estimated fair value of the reporting unit's tangible and intangible assets and liabilities, could significantly increase or decrease the estimated fair value of the reporting unit or its net assets. At the 2017 annual impairment test date, the conclusion that no indication of goodwill impairment existed for the reporting unit would not have changed had the test been conducted assuming: (1) a 100 basis point increase in the discount rate used to discount the aggregate estimated cash flows of the reporting unit to its net present value in determining their estimated fair values; and/or (2) a 100 basis point decrease in the estimated sales growth rate and/or terminal period growth rate.

Based on our sensitivity analysis, we do not believe that the remaining recorded goodwill balance is at risk of impairment at the reporting unit at the end of the year because the fair value is in excess of the carrying value and not at risk of failing step one. However, goodwill impairment charges may be recognized in future periods in the reporting unit to the extent changes in factors or circumstances occur, including deterioration in the macroeconomic environment, retail industry or in the equity markets, which includes the market value of our common shares, deterioration in our performance or our future projections, or changes in our plans for the reporting unit.

*Intangible Asset Impairment Assessments*

The majority of our indefinite-lived intangible assets relate to the Sears, Kenmore and DieHard trade names. In 2017, 2016 and 2015, we recorded impairment related to the Sears trade name of $72 million, $381 million and $180 million, respectively, which reduced the carrying value to $359 million at February 3, 2018 and $431 million at January 28, 2017.

The use of different assumptions, estimates or judgments in our intangible asset impairment testing process, such as the estimated future cash flows of assets and the discount rate used to discount such cash flows, could significantly increase or decrease the estimated fair value of an asset, and therefore, impact the related impairment charge. At the 2017 annual impairment test date, the above-noted conclusion that no indication of intangible asset impairment existed at the test date for the Kenmore and DieHard trade names would have changed had the test been conducted assuming: (1) a 100 basis point increase in the discount rate used to discount the aggregate estimated cash flows of our assets to their net present value in determining their estimated fair values (without any change in the aggregate estimated cash flows of our intangibles); (2) a 100 basis point decrease in the terminal period growth rate; (3) a 10% decrease in the revenue growth rate for fiscal year 2018; or (4) a 10 basis point decrease in the royalty rate applied to the forecasted net sales stream of our assets and would have resulted in a potential impairment of up to $99 million under any combination of those scenarios. Also, the above-noted impairment related to the Sears trade name would have changed under any combination of those scenarios and would have resulted in potential incremental impairment of up to $102 million.

We believe the impairment charges of $72 million, $381 million and $180 million in 2017, 2016 and 2015, respectively, are appropriate based on the judgments and estimates used in our analysis. We do not believe that the other indefinite-lived intangible balances are impaired at the end of the year because the fair values are in excess of the carrying values based on our analysis. However, further indefinite-lived intangible impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including deterioration in the macroeconomic environment, retail industry, deterioration in our performance or our future projections, if actual results are not consistent with our estimates and assumptions used in the analysis, or changes in our plans for one or more indefinite-lived intangible assets. We will continue to monitor for such changes in facts or circumstances, which may be indicators of potential impairment triggers, and may result in impairment charges in the future, which could be material to our results of operations.

## Impairment of Long-Lived Assets

In accordance with accounting standards governing the impairment or disposal of long-lived assets, the carrying value of long-lived assets, including property and equipment and definite-lived intangible assets, is evaluated whenever events or changes in circumstances indicate that a potential impairment has occurred relative to a given asset or assets. Our accounting policies related to long-lived asset impairment assessments are further described in Note 1 of Notes to Consolidated Financial Statements. As a result of this impairment testing, the

MOAC000717

Company recorded impairment charges of $70 million, $46 million and $94 million during 2017, 2016 and 2015, respectively. Our impairment testing includes uncertainty because it requires management to make assumptions and to apply judgment to estimate future cash flows and asset fair values. If actual results are not consistent with our estimates and assumptions used in estimating future cash flows and asset fair values, we may be exposed to additional impairment charges in the future, which could be material to our results of operations.

**New Accounting Pronouncements**

See Note 1 of Notes to Consolidated Financial Statements for information regarding new accounting pronouncements.

*CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION*

Certain statements made in this Annual Report on Form 10-K and in other public announcements by us contain forward-looking statements within the meaning of the Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995. Forward-looking statements include information concerning our future financial performance, business strategy, plans, goals and objectives. Statements preceded or followed by, or that otherwise include, the words "believes," "expects," "anticipates," "intends," "estimates," "plans," "forecast," "is likely to" and similar expressions or future or conditional verbs such as "will," "may" and "could" are generally forward-looking in nature and not historical facts. Such statements are based upon the current beliefs and expectations of the Company's management and are subject to significant risks and uncertainties, many of which are beyond the Company's control, which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Actual results may differ materially from those set forth in the forward-looking statements.

The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: our ability to offer merchandise and services that meet our customers and members' needs; our ability to successfully implement our integrated retail strategy to transform our business; our ability to successfully manage our inventory levels; initiatives to improve our liquidity through inventory management and other actions; our substantial level of indebtedness and related debt service obligations and restrictions imposed by covenants in our debt agreements, vendors' lack of willingness to provide acceptable payment terms or otherwise restricting financing to purchase inventory or services; possible limits on our access to our domestic credit facility, which is subject to a borrowing base limitation and a springing fixed charge coverage ratio covenant, capital markets and other financing sources, including additional second lien financings, with respect to which we do not have commitments from lenders; our ability to successfully achieve our plans to generate liquidity through potential transactions or otherwise; our ability to achieve cost savings initiatives; our failure to implement and execute an effective advertising and marketing strategy; potential liabilities in connection with the separations of Sears Hometown and Outlet Stores and Lands' End and disposition of a portion of our ownership interest in Sears Canada or other transactions; failure to realize the anticipated benefits from the Craftsman Sale; payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business operations; the impact of seasonal buying patterns, including seasonal fluctuations due to weather conditions, which are difficult to forecast with certainty; fluctuations in our sales due to changes in customers' spending patterns and prevailing economic conditions; risks and uncertainties related to the Seritage transaction and the amendment and extension of our credit facility, such as the impact of the evaluation of any such transaction on our other businesses; our dependence on sources outside the United States for significant amounts of our merchandise; our reliance on third parties to provide us with services in connection with the administration of certain aspects of our business and the transfer of significant internal historical knowledge to such parties; impairment charges for goodwill and intangible assets or fixed-asset impairment for long-lived assets; our ability to attract, motivate and retain key executives and other associates; the substantial influence exerted over the Company by affiliates of our Chairman and Chief Executive Officer, whose interests may diverge from other stockholders' interests; our ability to protect or preserve the image of our brands and our intellectual property; the outcome of pending and/or future legal proceedings; our failure to comply with federal, state, local and international laws, or changes in these laws; and the timing, amount and other risks related to required pension plan funding.

MOAC000718

Certain of these and other factors are discussed in more detail in Part I, Item 1A of this Annual Report on Form 10-K. While we believe that our forecasts and assumptions are reasonable, we caution that actual results may differ materially. We intend the forward-looking statements to speak only as of the time made and do not undertake to update or revise them as more information becomes available, except as required by law.

**Item 7A.      Quantitative and Qualitative Disclosures about Market Risk**

We face market risk exposure in the form of interest rate risk. This market risk arises from our debt obligations.

*Interest Rate Risk*

We manage interest rate risk through the use of fixed and variable-rate funding. All debt securities are considered non-trading. At February 3, 2018, 42% of our debt portfolio was variable rate. Based on the size of this variable rate debt portfolio at February 3, 2018, which totaled approximately $1.8 billion, an immediate 100 basis point change in interest rates would have affected annual pretax funding costs by $18 million. These estimates do not take into account the effect on income resulting from invested cash or the returns on assets being funded. These estimates also assume that the variable rate funding portfolio remains constant for an annual period and that the interest rate change occurs at the beginning of the period.

MOAC000719

**Item 8.**    **Financial Statements and Supplementary Data**

| | Page |
|---|---|
| Consolidated Statements of Operations for the years ended February 3, 2018, January 28, 2017 and January 30, 2016 | 59 |
| Consolidated Statements of Comprehensive Income (Loss) for the years ended February 3, 2018, January 28, 2017 and January 30, 2016 | 60 |
| Consolidated Balance Sheets at February 3, 2018 and January 28, 2017 | 61 |
| Consolidated Statements of Cash Flows for the years ended February 3, 2018, January 28, 2017 and January 30, 2016 | 62 |
| Consolidated Statements of Deficit for the years ended February 3, 2018, January 28, 2017 and January 30, 2016 | 63 |
| Notes to Consolidated Financial Statements | 64 |
| Schedule II—Valuation and Qualifying Accounts | 135 |
| Management's Annual Report on Internal Control over Financial Reporting | 136 |
| Report of Independent Registered Public Accounting Firm | 137 |

MOAC000720

## SEARS HOLDINGS CORPORATION
### Consolidated Statements of Operations

| dollars in millions, except per share data | 2017 | 2016 | 2015 |
|---|---|---|---|
| **REVENUES** | | | |
| Merchandise sales | $ 13,409 | $ 18,236 | $ 20,936 |
| Services and other[1][2] | 3,293 | 3,902 | 4,210 |
| Total revenues | 16,702 | 22,138 | 25,146 |
| **COSTS AND EXPENSES** | | | |
| Cost of sales, buying and occupancy - merchandise sales[3] | 11,349 | 15,184 | 16,817 |
| Cost of sales and occupancy - services and other[1] | 1,826 | 2,268 | 2,519 |
| Total cost of sales, buying and occupancy | 13,175 | 17,452 | 19,336 |
| Selling and administrative | 5,131 | 6,109 | 6,857 |
| Depreciation and amortization | 332 | 375 | 422 |
| Impairment charges | 142 | 427 | 274 |
| Gain on sales of assets | (1,648) | (247) | (743) |
| Total costs and expenses | 17,132 | 24,116 | 26,146 |
| Operating loss | (430) | (1,978) | (1,000) |
| Interest expense | (539) | (404) | (323) |
| Interest and investment loss | (12) | (26) | (62) |
| Other income | — | 13 | — |
| Loss before income taxes | (981) | (2,395) | (1,385) |
| Income tax benefit | 598 | 174 | 257 |
| Net loss | (383) | (2,221) | (1,128) |
| Income attributable to noncontrolling interests | — | — | (1) |
| **NET LOSS ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (383) | $ (2,221) | $ (1,129) |
| **NET LOSS PER COMMON SHARE ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | | | |
| Basic loss per share | $ (3.57) | $ (20.78) | $ (10.59) |
| Diluted loss per share | $ (3.57) | $ (20.78) | $ (10.59) |
| Basic weighted average common shares outstanding | 107.4 | 106.9 | 106.6 |
| Diluted weighted average common shares outstanding | 107.4 | 106.9 | 106.6 |

[1] Includes merchandise sales to Sears Hometown and Outlet Stores, Inc. ("SHO") of $918 million, $1.1 billion and $1.3 billion in 2017, 2016 and 2015, respectively. Pursuant to the terms of the separation, merchandise is sold to SHO at cost.

[2] Includes revenue from Lands' End, Inc. ("Lands' End") for retail services and rent for Lands' End Shops at Sears, participation in the Shop Your Way program and corporate shared services of $47 million, $52 million and $59 million in 2017, 2016 and 2015, respectively.

[3] Includes rent expense (consisting of straight-line rent expense offset by amortization of a deferred gain on sale-leaseback) of $70 million, $83 million and $49 million in 2017, 2016, and 2015, respectively, and installment expenses of $43 million, $64 million and $40 million in 2017, 2016 and 2015, respectively, pursuant to the master lease with Seritage Growth Properties ("Seritage").

See accompanying Notes to Consolidated Financial Statements.

MOAC000721

## SEARS HOLDINGS CORPORATION
### Consolidated Statements of Comprehensive Income (Loss)

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net loss | $ (383) | $ (2,221) | $ (1,128) |
| Other comprehensive income (loss) | | | |
| Pension and postretirement adjustments, net of tax | 478 | 366 | 113 |
| Currency translation adjustments, net of tax | 2 | — | (1) |
| Dissolution of noncontrolling interest | — | (7) | — |
| Total other comprehensive income | 480 | 359 | 112 |
| Comprehensive income (loss) | 97 | (1,862) | (1,016) |
| Comprehensive (income) loss attributable to noncontrolling interests | — | 7 | (1) |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ 97 | $ (1,855) | $ (1,017) |

See accompanying Notes to Consolidated Financial Statements.

MOAC000722

## SEARS HOLDINGS CORPORATION
### Consolidated Balance Sheets

| millions | | February 3, 2018 | | January 28, 2017 |
|---|---|---:|---|---:|
| ASSETS | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 182 | $ | 286 |
| Restricted cash | | 154 | | — |
| Accounts receivable[1] | | 343 | | 466 |
| Merchandise inventories | | 2,798 | | 3,959 |
| Prepaid expenses and other current assets[2] | | 335 | | 285 |
| Total current assets | | 3,812 | | 4,996 |
| Property and equipment | | | | |
| Land | | 659 | | 770 |
| Buildings and improvements | | 2,432 | | 2,954 |
| Furniture, fixtures and equipment | | 868 | | 1,133 |
| Capital leases | | 151 | | 224 |
| Gross property and equipment | | 4,110 | | 5,081 |
| Less accumulated depreciation and amortization | | (2,381) | | (2,841) |
| Total property and equipment, net | | 1,729 | | 2,240 |
| Goodwill | | 269 | | 269 |
| Trade names and other intangible assets | | 1,168 | | 1,521 |
| Other assets | | 284 | | 336 |
| **TOTAL ASSETS** | $ | 7,262 | $ | 9,362 |
| LIABILITIES | | | | |
| Current liabilities | | | | |
| Short-term borrowings[3] | $ | 915 | $ | — |
| Current portion of long-term debt and capitalized lease obligations[4] | | 968 | | 590 |
| Merchandise payables | | 576 | | 1,048 |
| Other current liabilities[5] | | 1,568 | | 1,956 |
| Unearned revenues | | 641 | | 748 |
| Other taxes | | 247 | | 339 |
| Total current liabilities | | 4,915 | | 4,681 |
| Long-term debt and capitalized lease obligations[6] | | 2,249 | | 3,573 |
| Pension and postretirement benefits | | 1,619 | | 1,750 |
| Deferred gain on sale-leaseback | | 362 | | 563 |
| Sale-leaseback financing obligation | | 247 | | 235 |
| Other long-term liabilities | | 1,467 | | 1,641 |
| Long-term deferred tax liabilities | | 126 | | 743 |
| Total Liabilities | | 10,985 | | 13,186 |
| Commitments and contingencies | | | | |
| DEFICIT | | | | |
| Sears Holdings Corporation deficit | | | | |
| Preferred stock, 20 shares authorized; no shares outstanding | | — | | — |
| Common stock $0.01 par value; 500 shares authorized; 108 and 107 shares outstanding, respectively | | 1 | | 1 |
| Treasury stock—at cost | | (5,820) | | (5,891) |
| Capital in excess of par value | | 9,063 | | 9,130 |
| Retained deficit | | (5,895) | | (5,512) |
| Accumulated other comprehensive loss | | (1,072) | | (1,552) |
| Total Deficit | | (3,723) | | (3,824) |
| **TOTAL LIABILITIES AND DEFICIT** | $ | 7,262 | $ | 9,362 |

[1] Includes $28 million and $81 million at February 3, 2018 and January 28, 2017, respectively, of net amounts receivable from SHO, $1 million and $14 million of amounts receivable from Seritage at February 3, 2018 and January 28, 2017, respectively, and $1 million of net amounts receivable from Lands' End at February 3, 2018.

[2] Includes $6 million of prepaid rent to Seritage at February 3, 2018.

[3] Includes balances held by related parties of $645 million at February 3, 2018 related to our Line of Credit Loans and Incremental Loans (each as defined in Note 3). See Notes 3 and 15 for further information.

[4] Includes balances held by related parties of $146 million and $216 million at February 3, 2018 and January 28, 2017, respectively, related to our 2016 Secured Loan Facility for both periods and also related to our Senior Secured Notes at February 3, 2018. See Note 3 for defined terms.

[5] Includes $1 million of net amounts payable to Lands' End and $11 million of amounts payable to Seritage at January 28, 2017.

[6] Includes balances held by related parties of $1.5 billion and $1.7 billion at February 3, 2018 and January 28, 2017, respectively, related to our Subsidiary Notes, Senior Unsecured Notes, Second Lien Term Loan, 2016 Term Loan and 2017 Secured Loan Facility for both periods and also related to our Term Loan Facility at February 3, 2018 and our Senior Secured Notes at January 28, 2017. See Note 3 for defined terms and Notes 3 and 15 for further information.

See accompanying Notes to Consolidated Financial Statements.

MOAC000723

### SEARS HOLDINGS CORPORATION
### Consolidated Statements of Cash Flows

| millions | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | | | | |
| Net loss | $ | (383) | $ | (2,221) | $ | (1,128) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | | |
| Deferred tax valuation allowance | | (1,395) | | 836 | | 217 |
| Tax benefit resulting from Other Comprehensive Income allocation | | — | | (71) | | — |
| Depreciation and amortization | | 332 | | 375 | | 422 |
| Impairment charges | | 142 | | 427 | | 274 |
| Gain on sales of assets | | (1,648) | | (247) | | (743) |
| Pension and postretirement plan contributions | | (312) | | (334) | | (311) |
| Pension plan settlements | | 479 | | — | | — |
| Mark-to-market adjustments of financial instruments | | 17 | | 15 | | 66 |
| Amortization of deferred gain on sale-leaseback | | (78) | | (88) | | (52) |
| Amortization of debt issuance costs and accretion of debt discount | | 124 | | 81 | | 60 |
| Other | | (36) | | | | |
| Change in operating assets and liabilities (net of acquisitions and dispositions): | | | | | | |
| Deferred income taxes | | 778 | | (987) | | (519) |
| Merchandise inventories | | 1,144 | | 1,213 | | (229) |
| Merchandise payables | | (472) | | (526) | | (47) |
| Income and other taxes | | (108) | | 80 | | (95) |
| Other operating assets | | 51 | | (52) | | 54 |
| Other operating liabilities | | (477) | | 118 | | (136) |
| Net cash used in operating activities | | (1,842) | | (1,381) | | (2,167) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | | | |
| Proceeds from sales of property and investments[1] | | 1,109 | | 386 | | 2,730 |
| Proceeds from Craftsman Sale | | 572 | | — | | — |
| Proceeds from sales of receivables[2] | | 293 | | — | | — |
| Purchases of property and equipment | | (80) | | (142) | | (211) |
| Net cash provided by investing activities | | 1,894 | | 244 | | 2,519 |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | | | |
| Proceeds from debt issuances[3] | | 1,020 | | 2,028 | | — |
| Repayments of debt[4] | | (1,356) | | (66) | | (1,405) |
| Increase (decrease) in short-term borrowings, primarily 90 days or less | | 271 | | (797) | | 583 |
| Proceeds from sale-leaseback financing[1] | | 106 | | 71 | | 508 |
| Debt issuance costs[5] | | (43) | | (51) | | (50) |
| Net cash provided by (used in) financing activities | | (2) | | 1,185 | | (364) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | | 50 | | 48 | | (12) |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | | 286 | | 238 | | 250 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF YEAR | $ | 336 | $ | 286 | $ | 238 |
| SUPPLEMENTAL INFORMATION: | | | | | | |
| Capital lease obligation incurred | $ | — | $ | 25 | $ | 6 |
| Supplemental Cash Flow Data: | | | | | | |
| Income taxes paid, net of refunds | $ | 37 | $ | 23 | $ | 45 |
| Cash interest paid[6] | | 412 | | 275 | | 252 |
| Unpaid liability to acquire equipment and software | | 10 | | 18 | | 27 |

[1] Holdings received cash proceeds of $2.7 billion ($2.6 billion, net of closing costs) from the Seritage transaction (including $745 million and $297 million, respectively, received from ESL Investments, Inc. and its affiliates ("ESL") and Fairholme Capital Management, LLC and its affiliates ("Fairholme")), and $429 million ($426 million, net of closing costs) from the JV transactions. Proceeds from the Seritage transaction are included in proceeds from sales of property and investments ($2.6 billion), and proceeds from sale-leaseback financing ($82 million) for 2015. Proceeds from the JV transactions are included in proceeds from sale-leaseback financing ($426 million) for 2015. See Note 11 for further information and defined terms.

[2] Proceeds in 2017 include $63 million from JPP, LLC and JPP II, LLC, entities affiliated with ESL (as defined in Note 1), for the sale of receivables.

[3] Proceeds in 2017 and 2016, respectively, include amounts from related parties of $876 million in connection with the Term Loan Facility, Line of Credit Loans and Incremental Loans and $1.3 billion received from the 2017 Secured Loan Facility, 2016 Secured Loan Facility, 2016 Term Loan and Second Lien Term Loan. See Notes 3 and 15 for further information and defined terms.

[4] Repayments in 2017 and 2015, respectively, include $345 million to related parties in connection with the 2017 Secured Loan Facility, 2016 Secured Loan Facility, Incremental Loans, 2016 Term Loan and Line of Credit Loans and $400 million of the Secured Short-Term Loan with related parties and $482 million of Senior Secured Notes tendered by related parties, respectively. See Notes 3 and 15 for further information and defined terms.

[5] Includes one-time extension fees equal to $5 million to JPP, LLC and JPP II, LLC, entities affiliated with ESL during 2017. See Note 3 for further information.

[6] Cash interest paid includes $180 million, $94 million and $83 million interest paid to related parties related to our borrowings in 2017, 2016 and 2015, respectively. See Notes 3 and 15 for further information.

See accompanying Notes to Consolidated Financial Statements.

MOAC000724

## SEARS HOLDINGS CORPORATION
### Consolidated Statements of Deficit

**Deficit Attributable to Holdings' Shareholders**

| dollars and shares in millions | Number of Shares | Common Stock | Treasury Stock | Capital in Excess of Par Value | Retained Deficit | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Total |
|---|---|---|---|---|---|---|---|---|
| Balance at January 31, 2015 | 107 | $ 1 | $ (5,949) | $ 9,189 | $ (2,162) | $ (2,030) | $ 6 | $ (945) |
| Comprehensive loss | | | | | | | | |
| Net loss | — | — | — | — | (1,129) | — | 1 | (1,128) |
| Pension and postretirement adjustments, net of tax | — | — | — | — | — | 113 | — | 113 |
| Currency translation adjustments, net of tax | — | — | — | — | — | (1) | — | (1) |
| Total Comprehensive Loss | | | | | | | | (1,016) |
| Stock awards | — | — | 16 | (16) | — | — | — | — |
| Associate stock purchase | — | — | 5 | — | — | — | — | 5 |
| Balance at January 30, 2016 | 107 | $ 1 | $ (5,928) | $ 9,173 | $ (3,291) | $ (1,918) | 7 | $ (1,956) |
| Comprehensive loss | | | | | | | | |
| Net loss | — | — | — | — | (2,221) | — | — | (2,221) |
| Pension and postretirement adjustments, net of tax | — | — | — | — | — | 366 | — | 366 |
| Dissolution of noncontrolling interest | — | — | — | — | — | — | (7) | (7) |
| Total Comprehensive Loss | | | | | | | | (1,862) |
| Stock awards | — | — | 29 | (30) | — | — | — | (1) |
| Reclassification of warrants | — | — | — | (13) | — | — | — | (13) |
| Associate stock purchase | — | — | 8 | — | — | — | — | 8 |
| Balance at January 28, 2017 | 107 | $ 1 | $ (5,891) | $ 9,130 | $ (5,512) | $ (1,552) | — | $ (3,824) |
| Comprehensive income | | | | | | | | |
| Net loss | — | — | — | — | (383) | — | — | (383) |
| Pension and postretirement adjustments, net of tax | — | — | — | — | — | 478 | — | 478 |
| Currency translation adjustments, net of tax | — | — | — | — | — | 2 | — | 2 |
| Total Comprehensive Income | | | | | | | | 97 |
| Stock awards | 1 | — | 63 | (67) | — | — | — | (4) |
| Associate stock purchase | — | — | 8 | — | — | — | — | 8 |
| Balance at February 3, 2018 | 108 | $ 1 | $ (5,820) | $ 9,063 | $ (5,895) | $ (1,072) | — | $ (3,723) |

See accompanying Notes to Consolidated Financial Statements.

MOAC000725

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements**

## NOTE 1—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Nature of Operations, Consolidation and Basis of Presentation

Sears Holdings Corporation ("Holdings") is the parent company of Kmart Holding Corporation ("Kmart") and Sears, Roebuck and Co. ("Sears"). Holdings (together with its subsidiaries, "we," "us," "our," or the "Company") was formed as a Delaware corporation in 2004 in connection with the merger of Kmart and Sears (the "Merger"), on March 24, 2005. We are an integrated retailer with 1,002 full-line and specialty retail stores in the United States, operating through Kmart and Sears. We operate in two reportable segments: Kmart and Sears Domestic.

The consolidated financial statements include all majority-owned subsidiaries in which Holdings exercises control. Investments in companies in which Holdings exercises significant influence, but which we do not control (generally 20% to 50% ownership interest), are accounted for under the equity method of accounting. Investments in companies in which we have less than a 20% ownership interest and do not exercise significant influence are accounted for at cost. All intercompany transactions and balances have been eliminated.

### Fiscal Year

Our fiscal year ends on the Saturday closest to January 31 each year. Fiscal year 2017 consisted of 53 weeks. Fiscal years 2016 and 2015 consisted of 52 weeks. Unless otherwise stated, references to years in this report relate to fiscal years rather than to calendar years.

### Pension Benefit Guaranty Corporation Agreement

On March 18, 2016, we entered into a five-year pension plan protection and forbearance agreement (the "PPPFA") with the Pension Benefit Guaranty Corporation ("PBGC"), pursuant to which the Company has agreed to continue to protect, or "ring-fence," pursuant to customary covenants, the assets of certain special purpose subsidiaries (the "Relevant Subsidiaries") holding real estate and/or intellectual property assets. Also under the agreement, the Relevant Subsidiaries granted the PBGC a springing lien on the ring-fenced assets, which lien will be triggered only by (a) failure to make required contributions to the Company's pension plans (the "Plans"), (b) prohibited transfers of ownership interests in the Relevant Subsidiaries, (c) termination events with respect to the Plans, or (d) bankruptcy events with respect to the Company or certain of its material subsidiaries. In November 2017, the Company announced an amendment to the PPPFA which is further described below and in Note 7. Under the PPPFA, the PBGC has agreed to forbear from initiating an involuntary termination of the Plans, except upon the occurrence of specified conditions, one of which is based on the aggregate market value of the Company's issued and outstanding stock. As of the date of this report, the Company's stock price is such that the PBGC would be permitted to cease forbearance. The PBGC has been given notice in accordance with the terms of the PPPFA and has not communicated any intention to cease its forbearance. In November 2017, we entered into an amendment to the PPPFA which provided for the release of 138 of our properties from a ring-fence arrangement, which is further described below and in Note 7. In March 2018, we closed on the $200 million Secured Loan and the $240 million Mezzanine Loan, both as defined in Note 3, in connection with the release of 138 properties from the ring-fence arrangement with the PBGC.

### Craftsman Brand Sale

On January 5, 2017, Holdings announced that it had entered into a definitive agreement under which Stanley Black & Decker would purchase the Craftsman brand from Holdings (the "Craftsman Sale"). On March 8, 2017, the Company closed its sale of the Craftsman brand to Stanley Black & Decker. The transaction provides Stanley Black & Decker with the right to develop, manufacture and sell Craftsman-branded products outside of Holdings and Sears Hometown & Outlet Stores, Inc. distribution channels. As part of the agreement, Holdings is permitted to continue to offer Craftsman-branded products, sourced from existing suppliers, through its current retail channels via a perpetual license from Stanley Black & Decker, which will be royalty-free for the first 15 years after closing and royalty-bearing thereafter.

The Company received an initial upfront payment of $525 million, subject to closing costs and an adjustment for working capital changes, at closing. In addition, Stanley Black & Decker will pay a further $250 million in cash

MOAC000726

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

in three years (the "Craftsman Receivable") and Holdings will receive payments of between 2.5% and 3.5% on new Stanley Black & Decker sales of Craftsman products made during the 15 year period following the closing. In connection with the Craftsman Sale, we recognized a gain in our Kmart segment of $492 million within gain on sales of assets in the Consolidated Statements of Operations during 2017, and initially established a receivable of $234 million for the net present value of the Craftsman Receivable. During the 13 weeks ended July 29, 2017, we sold the Craftsman Receivable to a third-party purchaser.

In connection with the closing of the Craftsman Sale, Holdings reached an agreement with the PBGC pursuant to which the PBGC consented to the sale of the Craftsman-related assets that had been "ring-fenced" under the PPPFA and certain related transactions. As a condition to obtaining this consent, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the value of the Craftsman Receivable, with such payments being fully credited against certain of the Company's minimum pension funding obligations in 2017, 2018 and 2019.

The Company also granted a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension funding obligations through the end of 2019, and agreed to certain other amendments to the PPPFA.

### Uses and Sources of Liquidity

Our primary need for liquidity is to fund working capital requirements of our businesses, capital expenditures and for general corporate purposes, including debt repayments and pension plan contributions. The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows experienced over the past several years. These actions included:

- The completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility, including:

  ◦ a $750 million Senior Secured Term Loan (the "2016 Term Loan") under its domestic credit facility maturing in July 2020;

  ◦ a $500 million real estate loan facility in April 2016 (the "2016 Secured Loan Facility"), initially maturing in July 2017, initially extended to January 2018, subsequently extended to April 2018, and then further extended to July 2018, subject to the payment of an extension fee;

  ◦ an additional $500 million real estate loan facility in January 2017 (the "2017 Secured Loan Facility"), maturing in July 2020;

  ◦ a Second Lien Credit Agreement in September 2016, pursuant to which the Company borrowed $300 million under a term loan (the "Second Lien Term Loan"), maturing in July 2020;

  ◦ an amendment in July 2017 to the Second Lien Credit Agreement to provide for the creation of a $500 million uncommitted second-lien line of credit loan facility under which the Company may borrow line of credit loans (the "Line of Credit Loans"), and a subsequent amendment to that facility to extend the maximum duration of the Line of Credit Loans from 180 days to 270 days and permit total borrowings of up to $600 million;

  ◦ a Letter of Credit and Reimbursement Agreement in December 2016, originally providing for up to a $500 million secured standby letter of credit facility (the "LC Facility") from certain affiliates of ESL Investments, Inc. ("ESL");

  ◦ a $200 million real estate loan facility (the "Incremental Loans") in October 2017, with the Incremental Loans maturing in April 2018, with the option to extend to July 2018, subject to the extension of the 2016 Secured Loan Facility;

65

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

- ◦ the extension of the maturity date of the initial $1.0 billion term loan (the "Term Loan") under our Amended Domestic Credit Agreement from June 2018 to January 2019 (with a right of the borrowers thereunder to further extend such maturity, subject to the satisfaction of certain conditions, to July 2019);

- ◦ amendments to our Amended Domestic Credit Agreement and certain other indebtedness which reduced the aggregate revolver commitments from $1.971 billion to $1.5 billion, but also implemented other modifications to covenants and reserves against the domestic credit facility borrowing base that improved net liquidity, and increased the maximum permissible short-term borrowings of the Company from $750 million to $1.25 billion;

- ◦ a Term Loan Credit Agreement in January 2018 providing for a secured term loan facility (the "Term Loan Facility"), secured by substantially all of the unencumbered intellectual property of the Company and its subsidiaries, other than intellectual property relating to the Kenmore and DieHard brands, as well as by certain real property interests, in each case subject to certain exclusions. An aggregate principal amount of $250 million was borrowed with the ability to borrow an additional $50 million against the same collateral;

- ◦ an amendment to the indenture governing our 6 5/8% Senior Secured Notes due 2018 to increase the maximum permissible borrowings allowed by inventory to 75% of book value of such inventory from 65% and defer the collateral coverage test for purposes of the repurchase offer covenant in the indenture to restart it with the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018);

- ◦ an amendment to the PPPFA with the PBGC providing for the release of 138 of our properties from a ring-fence arrangement created under our five-year PPPFA in exchange for the payment of approximately $407 million into the Sears pension plans. This agreement provides the Company with financial flexibility through the ability to monetize properties, and, in addition, provides funding relief from contributions to the pension plans for the next two years; and

- ◦ various commercial paper issuances to meet short-term liquidity needs, with the maximum amount outstanding during fiscal 2017 of $160 million.

- Achievement of $1.25 billion in annualized cost savings in 2017 as part of the restructuring program announced earlier this year. Actions taken to realize the annualized cost savings have included simplification of the organizational structure of Holdings, streamlining of operations, reducing unprofitable categories and the closure of under-performing stores. In 2017, we closed approximately 435 stores, and an additional 103 stores previously announced for closure are expected to be closed by the end of the first quarter of 2018. As a result of these actions, the Company has begun to see improvement in the operations in fiscal 2017, as the restructuring program actions, including the closing of unprofitable stores, have begun to take effect.

- The sale of the Craftsman brand to Stanley Black & Decker for consideration consisting of cash payments and a royalty.

- Sales of properties and investments for proceeds of $1.1 billion and $386 million in 2017 and 2016, respectively.

On March 8, 2018, the Company secured an additional $100 million incremental real estate loan (the "Second Incremental Loan"), pursuant to an amendment to the Second Amended and Restated Loan Agreement, dated as of October 18, 2017, with JPP, LLC and JPP II, LLC, entities affiliated with ESL Investments, Inc. The Second Incremental Loan is secured by the same real estate properties as the 2017 Secured Loan Facility, and certain properties under the previous Incremental Loans outstanding, and matures in July 2020. The Company used the proceeds from the Incremental Loan for general corporate purposes.

In March 2018, the Company also closed on the $200 million Secured Loan and the $240 million Mezzanine Loan, both as defined in Note 3, in connection with the release of 138 of our properties from the ring-fence arrangement with the PBGC as described above. The properties, which have an aggregate appraised value of nearly $980 million, serve as collateral for the Secured Loan, and the Mezzanine Loan is secured by pledge of the equity interests in the direct parent company of the entities that own such properties. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. The Mezzanine Loan Agreement, as defined in Note 3, contains an uncommitted accordion feature pursuant to which we may incur additional loans of not more than $200 million in

MOAC000728

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

aggregate, subject to certain conditions, including that such additional loans not exceed an amount equal to the principal amount of the Secured Loan repaid. The Company expects to pay down the Secured Loan over the next three to six months using proceeds generated from the sale of the underlying properties.

In February 2018, the Company commenced private exchange offers for its outstanding 8% Senior Unsecured Notes Due 2019 and 6 5/8% Senior Secured Notes Due 2018 (the "Exchange Offers"), pursuant to which it offered to (1) issue in exchange for its outstanding 8% Senior Unsecured Notes Due 2019 (the "Old Senior Unsecured Notes") new 8% Senior Unsecured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option (the "New Senior Unsecured Notes"), and (2) issue in exchange for its outstanding 6 5/8% Senior Secured Notes Due 2018 (the "Old Senior Secured Notes") new 6 5/8% Senior Secured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option (the "New Senior Secured Notes"). The Exchange Offers expired on March 15, 2018. Approximately $214 million aggregate principal amount of the Old Senior Unsecured Notes and approximately $170 million aggregate principal amount of the Old Senior Secured Notes were validly tendered, accepted and canceled in the Exchange Offers, and the Company issued a like principal amount of New Senior Unsecured Notes and New Senior Secured Notes. The New Senior Unsecured Notes and New Senior Secured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at conversion prices of $8.33 and $5.00, respectively, per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period. In connection with the closing of the Exchange Offers, the Company also obtained the requisite consent of holders of Old Senior Secured Notes to adopt amendments to the indenture governing those notes to eliminate substantially all of the restrictive covenants and certain events of default in the indenture, and make the liens securing senior second lien obligations, including the new Senior Secured Notes and the Second Lien Term Loan described below, effectively senior to the liens securing junior second lien obligations, including the Old Senior Secured Notes.

Also in connection with the closing of the Exchange Offers, the Company entered into an amendment to its Second Lien Credit Agreement. The amendment provides the Company with the option to pay interest on its outstanding $300 million principal amount Second Lien Term Loan in kind, and also provides that the Company's obligation under the Second Lien Term Loan is convertible into common stock of the Company, on the same conversion terms as the New Senior Secured Notes. Also in connection with the closing of the Exchange Offers, the Company's subsidiary, Sears Roebuck Acceptance Corp. ("SRAC"), consummated a private exchange with certain third parties of approximately $100 million in principal amount of senior unsecured notes issued by SRAC maturing between 2027 and 2043 and bearing interest at rates between 6.50% and 7.50% per annum, pursuant to which SRAC issued a like principal amount of new unsecured notes (the "SRAC Exchange Notes"). The SRAC Exchange Notes mature in March 2028 and bear interest at a rate of 7.0% per annum, and provide the Company with the option to pay such interest in kind at an interest rate of 12.0% per annum. The SRAC Exchange Notes are also guaranteed by the same subsidiaries of the Company that guarantee the New Senior Secured Notes.

On March 21, 2018, we obtained a $125 million FILO term loan (the "FILO Loan") from JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Thomas J. Tisch, under our Amended Domestic Credit Agreement. The Company received approximately $122 million in net proceeds from the FILO Loan, which proceeds were using to reduce outstanding borrowings under our revolving credit facility. The FILO Loan has a maturity date of July 20, 2020, which is the same maturity date as the Company's revolving credit facility commitments, and does not amortize.

In addition to pursuing several transactions to adjust our capital structure in order to enhance our liquidity and financial position, the Company is also taking incremental actions to further streamline operations to drive profitability, including cost reductions of $200 million on an annualized basis in 2018 unrelated to store closures.

In addition to the actions taken above, the Company has other resources available to support its operations. Our domestic credit facility permits us up to $2.0 billion of second lien loan capacity (of which $1.1 billion was utilized at February 3, 2018) outside the credit agreement, all depending on the applicable and available borrowing base as defined in our applicable debt agreements, as well as our ability to secure commitments from lenders. We also have the ability to obtain longer-term secured financing maturing outside of the domestic credit facility maturity date which would not be subject to borrowing base limitations (see Note 3 of Notes to Consolidated Financial Statements). Other options available to us, which we will evaluate and execute as appropriate, include refinancing

MOAC000729

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

We also continue to explore ways to unlock value across a range of assets, including entering into or renegotiating commercial arrangements, and exploring ways to maximize the value of our Home Services, Innovel and Sears Auto Centers businesses, as well as our Kenmore and DieHard brands, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings to realize significant growth. We expect to continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio and exploring potential asset sales, in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

We expect to continue to face a challenging competitive environment. While we continue to focus on our overall profitability, including managing expenses, we reported a loss in 2017, and were required to fund cash used in operating activities with cash from investing and financing activities. If we continue to experience operating losses, and we are not able to generate additional liquidity through the actions described below or through some combination of other actions, including real estate or other asset sales, while not expected, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such deficiency. As of February 3, 2018, we are in a deferral period of the collateral coverage test and the calculation restarts in the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018). Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business.

We believe the following actions, some of which we expect, subject to our governance processes, to include related party participation and funding, are probable of occurring and will be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements:

- Sales of the properties securing the $200 million Secured Loan to fund the repayment of such Secured Loan;
- Additional borrowings under the Mezzanine Loan Agreement and the Term Loan Facility;
- Renegotiation of certain commercial arrangements;
- Monetization of the Kenmore brand;
- Extension of maturities beyond March 2019 of Line of Credit Loans under the Second Lien Credit Agreement, the 2016 Secured Loan Facility, the Incremental Secured Loan Facility, and the LC Facility and the Term Loan under the Amended Domestic Credit Agreement;
- Additional borrowings secured by real estate assets or borrowings under the short-term basket; and
- Further restructurings to help manage expenses and improve profitability.

The PPPFA contains certain limitations on our ability to sell assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA. We expect that the actions outlined above will further enhance our liquidity and financial flexibility and we expect that these actions will be executed in alignment with the anticipated timing of our liquidity needs.

## Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions about future events. The estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as reported amounts of revenues and expenses during the reporting period. We evaluate our estimates and assumptions on an ongoing basis using historical experience and other factors that management believes to be reasonable under the circumstances. Adjustments to estimates and assumptions are made when facts and circumstances dictate. As future events and their effects cannot be determined

MOAC000730

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

with absolute certainty, actual results may differ from the estimates used in preparing the accompanying consolidated financial statements. Significant estimates and assumptions are required as part of determining inventory and accounts receivable valuation, estimating depreciation, amortization and recoverability of long-lived assets, establishing self-insurance, warranty, legal and other reserves, performing goodwill and intangible impairment analyses, and in establishing valuation allowances on deferred income tax assets and reserves for tax examination exposures, and calculating retirement benefits.

**Cash and Cash Equivalents**

Cash equivalents include all highly liquid investments with original maturities of three months or less at the date of purchase. The Company classifies cash balances that are legally restricted pursuant to contractual arrangements as restricted cash. The restricted cash balance relates to amounts deposited into an escrow for the benefit of our pension plans. We also include deposits in-transit from banks for payments related to third-party credit card and debit card transactions within cash equivalents. The deposits in-transit balances included within cash equivalents were $65 million and $87 million at February 3, 2018 and January 28, 2017, respectively.

We classify outstanding checks in excess of funds on deposit within other current liabilities and reduce cash and cash equivalents when these checks clear the bank on which they were drawn. Outstanding checks in excess of funds on deposit included in other current liabilities were $74 million and $29 million at February 3, 2018 and January 28, 2017, respectively.

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the Consolidated Balance Sheets that sum to the total of the same such amounts shown in the Consolidated Statements of Cash Flows at February 3, 2018 and January 28, 2017, respectively.

| millions | February 3, 2018 | January 28, 2017 |
|---|---:|---:|
| Cash and equivalents | $ 113 | $ 196 |
| Cash posted as collateral | 4 | 3 |
| Credit card deposits in transit | 65 | 87 |
| Total cash and cash equivalents | 182 | 286 |
| Restricted cash | 154 | — |
| Total cash balances | $ 336 | $ 286 |

**Allowance for Doubtful Accounts**

We provide an allowance for doubtful accounts based on both historical experience and a specific identification basis. Allowances for doubtful accounts on accounts receivable balances were $35 million and $37 million at February 3, 2018 and January 28, 2017, respectively. Our accounts receivable balance on our Consolidated Balance Sheet is presented net of our allowance for doubtful accounts and is comprised of various vendor-related and customer-related accounts receivable, including receivables related to our pharmacy operations.

**Merchandise Inventories**

Merchandise inventories are valued at the lower of cost or market. For Kmart and Sears Domestic, cost is primarily determined using the retail inventory method ("RIM"). Kmart merchandise inventories are valued under the RIM using primarily a first-in, first-out ("FIFO") cost flow assumption. Sears Domestic merchandise inventories are valued under the RIM using primarily a last-in, first-out ("LIFO") cost flow assumption.

Inherent in the RIM calculation are certain significant management judgments and estimates including, among others, merchandise markons, markups, markdowns and shrinkage, which significantly impact the ending inventory valuation at cost, as well as resulting gross margins. The methodologies utilized by us in our application of the RIM are consistent for all periods presented. Such methodologies include the development of the cost-to-retail ratios, the groupings of homogenous classes of merchandise, the development of shrinkage and obsolescence reserves, the accounting for price changes and the computations inherent in the LIFO adjustment (where applicable).

69

MOAC000731

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

Management believes that the RIM provides an inventory valuation that reasonably approximates cost and results in carrying inventory at the lower of cost or market.

Approximately 58% of consolidated merchandise inventories are valued using LIFO. To estimate the effects of inflation on inventories, we utilize external price indices determined by an outside source, the Bureau of Labor Statistics. If the FIFO method of inventory valuation had been used instead of the LIFO method, merchandise inventories would have been $31 million higher at February 3, 2018 and $33 million higher at January 28, 2017. During 2017 and 2016, a reduction in inventory quantities resulted in a liquidation of applicable LIFO inventory quantities carried at lower costs in prior years. This LIFO liquidation resulted in a decrease in cost of sales of approximately $6 million and $12 million in 2017 and 2016, respectively.

**Vendor Rebates and Allowances**

We receive rebates and allowances from certain vendors through a variety of programs and arrangements intended to offset our costs of promoting and selling certain vendor products. These vendor payments are recognized and recorded as a reduction to the cost of merchandise inventories when earned and, thereafter, as a reduction of cost of sales, buying and occupancy as the merchandise is sold. Upfront consideration received from vendors linked to purchases or other commitments is initially deferred and amortized ratably to cost of sales, buying and occupancy over the life of the contract or as performance of the activities specified by the vendor to earn the fee is completed.

**Property and Equipment**

Property and equipment are recorded at cost, less accumulated depreciation. Additions and substantial improvements are capitalized and include expenditures that materially extend the useful lives of existing facilities and equipment. Maintenance and repairs that do not materially improve or extend the lives of the respective assets are expensed as incurred.

Depreciation expense, which includes depreciation on assets under capital leases, is recorded over the estimated useful lives of the respective assets using the straight-line method for financial statement purposes, and accelerated methods for tax purposes. The range of lives are generally 20 to 50 years for buildings, 3 to 10 years for furniture, fixtures and equipment, and 3 to 5 years for computer systems and computer equipment. Leasehold improvements are depreciated over the shorter of the associated lease term or the estimated useful life of the asset. Depreciation expense included within depreciation and amortization expense reported in the Consolidated Statements of Operations was $328 million, $370 million and $415 million for the years ended February 3, 2018, January 28, 2017 and January 30, 2016, respectively.

Primarily as a result of store closing actions, certain property and equipment are considered held for sale. The value of assets held for sale was $70 million and $96 million at February 3, 2018 and January 28, 2017, respectively. These assets were included in prepaid expenses and other current assets in the Consolidated Balance Sheets at February 3, 2018 and January 28, 2017 at the lower of their historical net book value or their estimated fair value, less estimated costs to sell. We expect to sell the properties within a year and we continually remarket them. The majority of assets held for sale are held within the Sears Domestic segment.

**Impairment of Long-Lived Assets and Costs Associated with Exit Activities**

In accordance with accounting standards governing the impairment or disposal of long-lived assets, the carrying value of long-lived assets, including property and equipment, is evaluated whenever events or changes in circumstances indicate that a potential impairment has occurred relative to a given asset or assets. Factors that could result in an impairment review include, but are not limited to, a current period cash flow loss combined with a history of cash flow losses, current cash flows that may be insufficient to recover the investment in the property over the remaining useful life, or a projection that demonstrates continuing losses associated with the use of a long-lived asset, significant changes in the manner of use of the asset or significant changes in business strategies. An impairment loss is recognized when the estimated undiscounted cash flows expected to result from the use of the asset plus net proceeds expected from disposition of the asset (if any) are less than the carrying value of the asset. When an impairment loss is recognized, the carrying amount of the asset is reduced to its estimated fair value as determined based on quoted market prices or through the use of other valuation techniques. See Note 13 for further information regarding long-lived asset impairment charges recorded.

MOAC000732

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

We account for costs associated with location closings in accordance with accounting standards pertaining to accounting for costs associated with exit or disposal activities. As such, we record a liability for costs associated with location closings, which includes employee severance and other liquidation fees when management makes the decision to exit a location. We record a liability for future lease costs (net of estimated sublease income) when we cease to use the location.

**Goodwill, Trade Names and Related Impairments**

Trade names acquired as part of the Merger account for the majority of our intangible assets recognized in the Consolidated Balance Sheet. The majority of these trade name assets, such as Sears and Kenmore, are expected to generate cash flows indefinitely, do not have estimable or finite useful lives and, therefore, are accounted for as indefinite-lived assets not subject to amortization. Certain intangible assets, including favorable lease rights, have estimable, finite useful lives, which are used as the basis for their amortization. The estimated useful lives of such assets are determined using a number of factors, including the demand for the asset, competition and the level of expenditure required to maintain the cash flows associated with the asset.

Our goodwill results from the Merger. We perform an annual goodwill impairment test at the last day of our November accounting period each year and assess the need to update the tests between annual tests if events or circumstances occur that would more likely than not reduce the fair value of the reporting unit or an indefinite-lived intangible asset below its carrying amount. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in our expected future cash flows; a sustained, significant decline in our stock price and market capitalization; a significant adverse change in legal factors or in the business climate; unanticipated competition; and the testing for recoverability of a significant asset group within the reporting unit. Any adverse change in these factors could have a significant impact on the recoverability of these assets and could have a material impact on our consolidated financial statements.

*Goodwill Impairment Assessments*

Our goodwill balance relates to our Home Services business. The goodwill impairment test involves a two-step process. The first step is a comparison of the reporting unit's fair value to its carrying value. We estimate fair value using the best information available, using a discounted cash flow model, commonly referred to as the income approach. The income approach uses the reporting unit's projection of estimated operating results and cash flows that is discounted using a weighted-average cost of capital that reflects current market conditions appropriate for the reporting unit. The projection uses management's best estimates of economic and market conditions over the projected period, including growth rates in sales, costs, estimates of future expected changes in operating margins and cash expenditures. Other significant estimates and assumptions include terminal value growth rates, future estimates of capital expenditures and changes in future working capital requirements. We were unable to use a market approach due to there being no market comparables.

If the carrying value of the reporting unit is higher than its fair value, there is an indication that impairment may exist and the second step must be performed to measure the amount of impairment loss, if any. The amount of impairment is determined by comparing the implied fair value of reporting unit goodwill to the carrying value of the goodwill in the same manner as if the reporting unit was being acquired in a business combination. See Note 12 for further information.

*Intangible Asset Impairment Assessments*

We consider the income approach when testing intangible assets with indefinite lives for impairment on an annual basis. We utilize the income approach, specifically the relief from royalty method, for analyzing our indefinite-lived assets. This method is based on the assumption that, in lieu of ownership, a firm would be willing to pay a royalty in order to exploit the related benefits of this asset class. The relief from royalty method involves two steps: (1) estimation of reasonable royalty rates for the assets; and (2) the application of these royalty rates to a net sales stream and discounting the resulting cash flows to determine a value. We multiplied the selected royalty rate by the forecasted net sales stream to calculate the cost savings (relief from royalty payment) associated with the assets.

MOAC000733

## SEARS HOLDINGS CORPORATION
### Notes to Consolidated Financial Statements—(Continued)

The cash flows are then discounted to present value by the selected discount rate and compared to the carrying value of the assets.

In our quarterly reports on Form 10-Q filed during 2017, the Company disclosed that if its results continued to decline it could result in revisions in management's estimates of the fair value of the Company's trade names and may result in impairment charges. As a result of recently announced store closures and the further decline in revenue experienced in the fourth quarter at Sears Domestic, our analysis indicated that the fair value of the Sears trade name was less than its carrying value. Accordingly, we recorded impairment related to the Sears trade name during 2017 of $72 million, which reduced the carrying value to $359 million at February 3, 2018. We also recorded impairment charges of $381 million and $180 million in 2016 and 2015, respectively. See Note 12 for further information.

**Fair Value of Financial Instruments**

We determine the fair value of financial instruments in accordance with standards pertaining to fair value measurements. Such standards define fair value and establish a framework for measuring fair value in GAAP. Under fair value measurement accounting standards, fair value is considered to be the exchange price in an orderly transaction between market participants to sell an asset or transfer a liability at the measurement date. We report the fair value of financial assets and liabilities based on the fair value hierarchy prescribed by accounting standards for fair value measurements, which prioritizes the inputs to valuation techniques used to measure fair value into three levels.

Financial instruments that potentially subject the Company to concentration of credit risk consist principally of temporary cash investments and accounts receivable. We place our cash and cash equivalents in investment-grade, short-term instruments with high quality financial institutions and, by policy, limit the amount of credit exposure in any one financial instrument.

**Self-insurance Reserves**

We are self-insured for certain costs related to workers' compensation, asbestos, environmental, automobile, warranty, product and general liability claims. We obtain third-party insurance coverage to limit our exposure to certain of these self-insured risks. A portion of these self-insured risks is managed through a wholly-owned insurance subsidiary. Our liability reflected in the Consolidated Balance Sheet, classified within other liabilities (current and long-term), represents an estimate of the ultimate cost of claims incurred at the balance sheet date. In estimating this liability, we utilize loss development factors based on Company-specific data to project the future development of incurred losses. Loss estimates are adjusted based upon actual claims settlements and reported claims. The liabilities for self-insured risks are discounted to their net present values using an interest rate which is based upon the expected duration of the liabilities. Expected payments as of February 3, 2018 were as follows:

| *millions* | |
|---|---:|
| 2018 | $ 148 |
| 2019 | 100 |
| 2020 | 74 |
| 2021 | 54 |
| 2022 | 42 |
| Later years | 311 |
| Total undiscounted obligation | 729 |
| Less—discount | (83) |
| Net obligation | $ 646 |

**Loss Contingencies**

Under accounting standards, loss contingency provisions are recorded for probable losses at management's best estimate of a loss, or when a best estimate cannot be made, the minimum amount in the estimated range is

MOAC000734

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

recorded. These estimates are often initially developed substantially earlier than the ultimate loss is known, and the estimates are refined each accounting period, as additional information is known.

**Revenue Recognition**

Revenues include sales of merchandise, services and extended service contracts, net commissions earned from leased departments in retail stores, delivery and handling revenues related to merchandise sold, and fees earned from co-branded credit card programs. We recognize revenues from retail operations at the later of the point of sale or the delivery of goods to the customer. Direct to customer revenues are recognized when the merchandise is delivered to the customer. Revenues from product installation and repair services are recognized at the time the services are provided. Revenues from the sale of service contracts and the related direct acquisition costs are deferred and amortized over the lives of the associated contracts, while the associated service costs are expensed as incurred.

We earn revenues through arrangements with third-party financial institutions that manage and directly extend credit relative to our co-branded credit card programs. The third-party financial institutions pay us for generating new accounts and sales activity on co-branded cards, as well as for selling other financial products to cardholders. We recognize these revenues in the period earned, which is when our related performance obligations have been met. We sell gift cards to customers at our retail stores and through our direct to customer operations. The gift cards generally do not have expiration dates. Revenues from gift cards are recognized when (i) the gift card is redeemed by the customer, or (ii) the likelihood of the gift card being redeemed by the customer is remote (gift card breakage) based on historical redemption patterns and we determine that we do not have a legal obligation to remit the value of the unredeemed gift cards to the relevant jurisdictions.

Revenues from merchandise sales and services are reported net of estimated returns and allowances and exclude sales taxes. The reserve for returns and allowances is calculated as a percentage of sales based on historical return percentages. Estimated returns are recorded as a reduction of sales and cost of sales. We defer the recognition of layaway sales and profit until the period in which the customer takes possession of the merchandise.

**Cost of Sales, Buying and Occupancy**

Cost of sales, buying and occupancy are comprised principally of the costs of merchandise, buying, warehousing and distribution (including receiving and store delivery costs), retail store occupancy costs, product repair, and home service and installation costs, customer shipping and handling costs, vendor allowances, markdowns and physical inventory losses.

The Company has a Shop Your Way program in which customers earn points on purchases which may be redeemed to pay for future purchases. The expense for customer points earned is recognized as customers earn them and recorded in cost of sales.

During 2016 and 2015, respectively, the Company received $33 million and $146 million related to one-time credits from vendors associated with prior supply arrangements, which have been reflected as credits within cost of sales, buying and occupancy in the Consolidated Statements of Operations.

**Selling and Administrative Expenses**

Selling and administrative expenses are comprised principally of payroll and benefits costs for retail and corporate employees, occupancy costs of corporate facilities, advertising, pre-opening costs and other administrative expenses.

**Pre-Opening Costs**

Pre-opening and start-up activity costs are expensed in the period in which they occur.

**Advertising Costs**

Advertising costs are expensed as incurred, generally the first time the advertising occurs, and amounted to $415 million, $684 million and $850 million for 2017, 2016 and 2015, respectively. These costs are included within selling and administrative expenses in the Consolidated Statements of Operations.

MOAC000735

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Income Taxes**

We provide deferred income tax assets and liabilities based on the estimated future tax effects of differences between the financial and tax basis of assets and liabilities based on currently enacted tax laws in effect for the year in which the differences are expected to reverse. The tax balances and income tax expense recognized by us are based on management's interpretation of the tax laws of multiple jurisdictions. Income tax expense also reflects our best estimates and assumptions regarding, among other things, the level of future taxable income, tax planning, and any valuation allowance. Future changes in tax laws, changes in projected levels of taxable income, tax planning, and adoption and implementation of new accounting standards could impact the effective tax rate and tax balances recorded by us. In evaluating our ability to recover our deferred tax assets within the jurisdiction from which they arise, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies, and results of recent operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pre-tax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. In evaluating the objective evidence that historical results provide, we consider cumulative operating income (loss) over the past three years. These assumptions require significant judgment about the forecasts of future taxable income.

Income tax expense or benefit from continuing operations is generally determined without regard to other categories of earnings, such as discontinued operations and other comprehensive income ("OCI"). An exception is provided in the authoritative accounting guidance when there is income from categories other than continuing operations and a loss from continuing operations in the current year. In this case, the tax benefit allocated to continuing operations is the amount by which the loss from continuing operations reduces the tax expense recorded with respect to the other categories of earnings, even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year losses, income from other sources, including gain from pension and other postretirement benefits recorded as a component of OCI or the creation of a deferred tax liability through additional paid-in capital for the book to tax difference for the original issue discount relating to the $625 million 8% senior unsecured notes due 2019, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets.

**Stock-based Compensation**

We account for stock-based compensation arrangements in accordance with accounting standards pertaining to share-based payment transactions, which requires us to both recognize as expense the fair value of all stock-based compensation awards (which includes stock options, although there were no options outstanding in 2017) and to classify excess tax benefits associated with share-based compensation deductions as cash from financing activities rather than cash from operating activities. We recognize compensation expense as awards vest on a straight-line basis over the requisite service period of the award.

**Earnings Per Common Share**

Basic earnings per common share is calculated by dividing net income attributable to Holdings' shareholders by the weighted average number of common shares outstanding for each period. Diluted earnings per common share also includes the dilutive effect of potential common shares, exercise of stock options, warrants and the effect of restricted stock when dilutive.

**New Accounting Pronouncements**

*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*

In February 2018, the Financial Accounting Standards Board ("FASB") issued an accounting standards update which allows a reclassification from accumulated other comprehensive income to retained earnings for stranded tax effects resulting from the Tax Cuts and Jobs Act. This update is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. The amendments in this update should be applied either in the period of adoption or retrospectively to each period (or periods) in which the

74

MOAC000736

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

effect of the change in the U.S. federal corporate income tax rate in the Tax Cuts and Jobs Act is recognized. We are currently evaluating the effect the update will have on our consolidated financial statements.

*Compensation - Retirement Benefits*

In March 2017, the FASB issued an accounting standards update which requires an employer to report the service cost component in the same line item or items as other compensation costs arising from services rendered by the pertinent employees during the period. It also requires the other components of net periodic pension cost and net periodic postretirement benefit cost to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations, if one is presented. This update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied retrospectively. We are currently evaluating the effect the update will have on our consolidated financial statements.

*Goodwill*

In January 2017, the FASB issued an accounting standards update which simplifies the test for goodwill impairment. To address concerns over the cost and complexity of the two-step goodwill impairment test, the amendments in this update remove the second step of the test. An entity will apply a one-step quantitative test and record the amount of goodwill impairment as the excess of a reporting unit's carrying amount over its fair value, not to exceed the total amount of goodwill allocated to the reporting unit. The new guidance does not amend the optional qualitative assessment of goodwill impairment. This update is effective for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company adopted the update in the fourth quarter of 2017. The adoption of the new standard did not have an impact on our consolidated financial statements.

*Business Combinations*

In January 2017, the FASB issued an accounting standards update which clarifies the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of businesses. The amendments in this update provide a screen to determine when a set is not a business. The screen requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated. If the screen is not met, the amendments in this update require that to be considered a business, a set must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. This update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied prospectively. We are currently evaluating the effect the updates will have on our consolidated financial statements.

*Statement of Cash Flows*

In November 2016, the FASB issued accounting standards updates which address diversity in practice in the classification and presentation of changes in restricted cash in the statement of cash flows. The amendments in this update require that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and restricted cash. Therefore, restricted cash should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. These updates are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the updates must be applied using a retrospective transition method to each period presented. The Company adopted the update in the first quarter of 2017. The adoption of the new standard impacted the presentation of the Condensed Consolidated Statements of Cash Flows.

MOAC000737

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

*Consolidation - Interests held through related parties that are under common control*

In October 2016, the FASB issued an accounting standards update to amend the accounting standards on how a reporting entity that is the single decision maker of a variable interest entity ("VIE") should treat indirect interests in the entity held through related parties that are under common control with the reporting entity when determining whether it is the primary beneficiary of that VIE. The primary beneficiary of a VIE is the reporting entity that has a controlling financial interest in a VIE and, therefore, consolidates the VIE. A reporting entity has an indirect interest in a VIE if it has a direct interest in a related party that, in turn, has a direct interest in the VIE. Under the amendments, a single decision maker is not required to consider indirect interests held through related parties that are under common control with the single decision maker to be the equivalent of direct interests in their entirety. Instead, a single decision maker is required to include those interests on a proportionate basis consistent with indirect interests held through other related parties. The Company adopted the update in the first quarter of 2017. The adoption of the new standard did not have an impact on the Company's consolidated financial position, results of operations or cash flows.

*Income Taxes - Intra-entity transfers of assets other than inventory*

In October 2016, the FASB issued an accounting standards update to improve the accounting for the income tax consequences of intra-entity transfers of assets other than inventory. Current accounting standards prohibit the recognition of current and deferred income taxes for an intra-entity asset transfer until the asset has been sold to an outside party. In addition, interpretations of this guidance have developed in practice for transfers of certain intangible and tangible assets. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes in accounting standards. To more faithfully represent the economics of intra-entity asset transfers, the amendments in this update require that entities recognize the income tax consequences of an intra-entity transfer of an asset other than inventory when the transfer occurs. The amendments in this update do not change accounting standards for the pre-tax effects of an intra-entity asset transfer under accounting standards applicable to consolidation, or for an intra-entity transfer of inventory. The update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted as of the beginning of an annual reporting period. The amendments in this update should be applied on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. We are currently evaluating the effect the update will have on our consolidated financial statements.

*Statement of Cash Flows - Classification of Certain Cash Receipts and Cash Payments*

In August 2016, the FASB issued accounting standards updates which address diversity in practice in how certain cash receipts and cash payments are presented and classified in the statement of cash flows, including: debt prepayment or debt extinguishment costs; settlement of zero-coupon debt instruments or other debt instruments with coupon interest rates that are insignificant in relation to the effective interest rate of the borrowing; contingent consideration payments made after a business combination; proceeds from the settlement of insurance claims; proceeds from the settlement of corporate-owned life insurance policies; distributions received from equity method investees; beneficial interests in securitization transactions; and separately identifiable cash flows and application of the predominance principle. These updates are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied using a retrospective transition method to each period presented. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. We are currently evaluating the effect the update will have on our consolidated financial statements.

*Leases*

In February 2016, the FASB issued an accounting standards update which replaces the current lease accounting standard. The update will require, among other items, lessees to recognize a right-of-use asset and a lease liability for most leases. Extensive quantitative and qualitative disclosures, including significant judgments made by management, will be required to provide greater insight into the extent of revenue and expense recognized and expected to be recognized from existing contracts. The update is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. The new standard must be

MOAC000738

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

adopted using a modified retrospective transition, and provides for certain practical expedients. Transition will require application of the new guidance at the beginning of the earliest comparative period presented. We are currently evaluating the effect the update will have on our consolidated financial statements, and expect the update will have a material impact on our consolidated financial statements.

*Fair Value Measurements*

In May 2015, the FASB issued an accounting standards update which requires certain investments measured at net asset value to be removed from the fair value hierarchy categorization and presented as a single reconciling line item between the fair value of the pension plans assets and the amounts reported in the fair value hierarchy table. The Company adopted the update in fiscal 2016. The adoption of the new standard did not have an impact on the Company's consolidated financial position, results of operations, or cash flows.

*Presentation of Financial Statements - Going Concern*

In August 2014, the FASB issued an accounting standards update which requires management to assess whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the entity's ability to continue as a going concern within one year after the financial statements are issued. If substantial doubt exists, additional disclosures are required. This update was effective for the Company's annual period ended January 28, 2017. The Company's assessment of our ability to continue as a going concern is further discussed in the "Uses and Sources of Liquidity" paragraph above. The adoption of the new standard did not have a material impact on the Company's consolidated financial position, results of operations, cash flows or disclosures.

*Revenue from Contracts with Customers*

In May 2014, the FASB issued an accounting standards update which replaces the current revenue recognition standards. Subsequently, the FASB has also issued accounting standards updates which clarify the guidance. The new revenue recognition standard provides a five-step analysis of transactions to determine when and how revenue is recognized. The core principle is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This standard was initially released as effective for fiscal years beginning after December 15, 2016; however, the FASB has decided to defer the effective date of this accounting standard update for one year. Early adoption of the update is permitted, but not before the original date for fiscal years beginning after December 15, 2016. The update may be applied retrospectively for each period presented or as a cumulative-effect adjustment at the date of adoption.

The Company has completed its evaluation of the standard and will apply the update retrospectively for each period presented, beginning in the first quarter of 2018. Based on our assessment, we determined the adoption will impact the accounting for our Shop Your Way program, revenues from gift cards and merchandise returns. The expense for Shop Your Way points is currently recognized as customers earn them and recorded in cost of sales. The new guidance will require the Company to allocate the transaction price to products and points on a relative standalone selling price basis, deferring the portion of revenue allocated to the points and recognizing a contract liability for unredeemed points. The change in the accounting for the Shop Your Way program will reduce revenue by approximately 2.7% and 2.6% in 2017 and 2016, respectively, but will have no impact on gross margin. The new guidance will also change the timing of recognition of the unredeemed portion of our gift cards, which is currently recognized using the remote method. The new guidance will require application of the proportional method. The Company currently reports revenues from merchandise sales net of estimated returns. The new guidance will require the Company to record both an asset and a liability for anticipated customer returns. These changes will not have a material impact on the Company's consolidated financial position, results of operations, or cash flows, with the exception of the Shop Your Way program described above.

## NOTE 2—SEARS CANADA

At both February 3, 2018 and January 28, 2017, the Company was the beneficial holder of approximately 12 million, or 12%, of the common shares of Sears Canada. Sears Canada filed for court protection and in July 2017 trading of its common shares was suspended. Accordingly, we recognized other-than-temporary impairment of $12

MOAC000739

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

million within interest and investment loss in our Consolidated Statements of Operations during 2017. Our equity method investment in Sears Canada was $17 million at January 28, 2017, and was included within other assets in the Consolidated Balance Sheets. The fair value of our equity method investment in Sears Canada was determined based on quoted market prices for its common stock. Our equity method investment in Sears Canada was valued using Level 1 measurements as defined in Note 5.

## NOTE 3—BORROWINGS

Total borrowings outstanding at February 3, 2018 and January 28, 2017 were $4.1 billion and $4.2 billion, respectively. At February 3, 2018, total short-term borrowings were $915 million, consisting of secured borrowings, line of credit loans and incremental loans. At January 28, 2017, we had no short-term borrowings outstanding. The weighted-average annual interest rate paid on short-term borrowings was 8.0% in 2017 and 5.4% in 2016.

Long-term debt was as follows:

| ISSUE | February 3, 2018 | | January 28, 2017 | |
|---|---|---|---|---|
| *millions* | | | | |
| SEARS ROEBUCK ACCEPTANCE CORP. | | | | |
| 6.50% to 7.50% Notes, due 2027 to 2043 | $ | 284 | $ | 327 |
| Term Loan (Credit Facility), $1.0B due 2019 | | 391 | | 963 |
| 2016 Term Loan (Credit Facility), $750M due 2020 | | 559 | | 726 |
| Second Lien Term Loan (Credit Facility), $300M due 2020 | | 294 | | 292 |
| SEARS HOLDINGS CORP. | | | | |
| 8% Secured Loan Facility, due 2018 | | 251 | | 494 |
| 6.625% Senior Secured Notes, due 2018 | | 303 | | 303 |
| 8% Senior Unsecured Notes, due 2019 | | 483 | | 428 |
| 8% Secured Loan Facility, due 2020 | | 374 | | 485 |
| Term Loan Facility (Credit Facility), $300M due 2020 | | 206 | | — |
| CAPITALIZED LEASE OBLIGATIONS | | 72 | | 145 |
| Total long-term borrowings | | 3,217 | | 4,163 |
| Current maturities | | (968) | | (590) |
| Long-term debt and capitalized lease obligations | $ | 2,249 | $ | 3,573 |
| Weighted-average annual interest rate on long-term debt | | 7.6% | | 7.2% |

The fair value of long-term debt, excluding capitalized lease obligations, was $2.8 billion at February 3, 2018 and $4.0 billion at January 28, 2017. The fair value of our debt was estimated based on quoted market prices for the same or similar issues or on current rates offered to us for debt of the same remaining maturities. Our long-term debt instruments are valued using Level 2 measurements as defined in Note 5.

MOAC000740

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

At February 3, 2018, long-term debt maturities for the next five years and thereafter were as follows:

| millions | |
|---|---:|
| 2018 | $ 979 |
| 2019 | 637 |
| 2020 | 1,471 |
| 2021 | 3 |
| 2022 | 3 |
| Thereafter | 312 |
| Total maturities | 3,405 |
| Unamortized debt discount | (152) |
| Unamortized debt issuance costs | (36) |
| Long-term debt, net of discount & debt issuance costs | $ 3,217 |

*Interest*

Interest expense for years 2017, 2016 and 2015 was as follows:

| millions | 2017 | 2016 | 2015 |
|---|---:|---:|---:|
| COMPONENTS OF INTEREST EXPENSE | | | |
| Interest expense [1] | $ 377 | $ 288 | $ 223 |
| Amortization of debt issuance costs | 58 | 31 | 25 |
| Accretion of debt discount | 66 | 50 | 35 |
| Accretion of self-insurance obligations at net present value | 19 | 16 | 19 |
| Accretion of lease obligations at net present value | 19 | 19 | 21 |
| Interest expense | $ 539 | $ 404 | $ 323 |

[1] Includes paid-in-kind interest of $1 million for 2017.

*Unsecured Commercial Paper*

We borrow through the commercial paper markets. At both February 3, 2018 and January 28, 2017, we had no commercial paper borrowings outstanding.

*Secured Short-Term Loan*

On September 15, 2014, the Company, through Sears, Sears Development Co. and Kmart Corporation ("Short-Term Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into a $400 million secured short-term loan (the "Short-Term Loan"') with JPP II, LLC and JPP, LLC (collectively, the "Lenders"), entities affiliated with ESL. Proceeds of the Short-Term Loan were used for general corporate purposes.

The Short-Term Loan was originally scheduled to mature on December 31, 2014, and was subsequently amended and extended. We repaid the Short-Term Loan during 2015, resulting in no balance outstanding at February 3, 2018 or January 28, 2017.

*Letter of Credit Facility*

On December 28, 2016, the Company, through Sears Roebuck Acceptance Corp. ("SRAC") and Kmart Corporation (together with SRAC, the "Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into the Letter of Credit and Reimbursement Agreement (the "LC Facility") providing for a $500 million secured standby letter of credit facility (of which $271 million was committed at February 3, 2018) from the Lenders, with Citibank, N.A., serving as administrative agent and issuing bank (the "Issuing Bank").

79

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

In August 2017, the Company executed amendments to the LC Facility. The amendments, among other things, extended the maturity to December 28, 2018, eliminated the unused portion of the facility and released the real estate collateral that secured the original LC Facility. The amended LC Facility also permits the Lenders to syndicate all or a portion of their commitments under the facility to other lenders, of which $138 million has been syndicated to unaffiliated third party lenders as of February 3, 2018.

The amended LC Facility is guaranteed by the same subsidiaries of the Company that guarantee the obligations under the Amended Domestic Credit Agreement, as defined below. The amended LC Facility is secured by substantially the same collateral as the Amended Domestic Credit Agreement. The amended LC Facility contains a borrowing base calculation, pursuant to which the borrowers are required to cash collateralize the LC Facility if the aggregate obligations under the Amended Domestic Credit Agreement, amended LC Facility and certain other cash management and similar obligations exceed the Modified Borrowing Base, as defined in the amended LC Facility, as of the end of any calendar month.

To secure their obligation to participate in letters of credit issued under the LC Facility, the lenders under the LC Facility are required to maintain cash collateral on deposit with the Issuing Bank in an amount equal to 102% of the commitments under the LC Facility (the "Lender Deposit"). The Borrowers paid the Lenders an upfront fee equal to 1.00% of the aggregate amount of the Lender Deposit. In addition, the Borrowers are required to pay a commitment fee on the average daily amount of the Lender Deposit (as such amount may be increased or decreased from time to time) equal to the Eurodollar Rate (as defined under the Amended Domestic Credit Facility) plus 11.0%, as well as certain other fees. In the event of reductions of the commitments under the LC Facility or a termination of the LC Facility prior to the six month anniversary of the effective date of the amendments, under certain circumstances the Borrowers will be required to pay an early reduction/termination fee equal to the commitment fee that would have accrued with respect to the reduced or terminated commitments from the date of reduction or termination until the six month anniversary.

The LC Facility includes certain representations and warranties, affirmative and negative covenants and other undertakings, which are subject to important qualifications and limitations set forth in the LC Facility. The LC Facility also contains certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If an event of default occurs, the Lenders may terminate all or any portion of the commitments under the LC Facility, require the Borrowers to cash collateralize the LC Facility and/or exercise any rights they might have under any of the related facility documents (including against the collateral), subject to certain limitations. At February 3, 2018 and January 28, 2017, respectively, we had $271 million and $200 million of letters of credit outstanding under the LC Facility.

*Secured Loan and Mezzanine Loan*

On March 14, 2018, the Company, through SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC (collectively, the "Secured Loan Borrowers"), entities wholly-owned and controlled indirectly by the Company, entered into a Credit Agreement (the "Credit Agreement") with the lenders party thereto (collectively, the "Secured Lenders"). The Credit Agreement provides for a $200 million term loan (the "Secured Loan") that is secured by the Secured Loan Borrowers' interests in 138 real properties that were released from a ring-fence arrangement with the PBGC. The Secured Loan matures on December 14, 2018. The Company used the proceeds of the Secured Loan to make a contribution to the Company's pension plans and for general corporate purposes.

Also on March 14, 2018, the Company, through SRC Sparrow 2 LLC (the "Mezzanine Loan Borrower"), an entity wholly-owned and controlled indirectly by the Company, entered into a Mezzanine Loan Agreement (the "Mezzanine Loan Agreement") with the Lenders, entities affiliated with ESL. The Mezzanine Loan Agreement provides for a $240 million term loan (the "Mezzanine Loan") that is secured by a pledge of the equity interests in SRC O.P. LLC, the direct parent company of the entities that own the 138 real properties that secure the obligations of the Secured Loan Borrowers under the Credit Agreement. The Mezzanine Loan matures on July 20, 2020. The Company used the proceeds of the Mezzanine Loan to make a contribution to the Company's pension plans.

The Mezzanine Loan Agreement contains an uncommitted accordion feature pursuant to which the Mezzanine Loan Borrower may incur additional loans ("Additional Mezzanine Loans") of not more than $200 million in aggregate, subject to certain conditions set forth in the Mezzanine Loan Agreement and the Credit Agreement,

MOAC000742

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

including that the Additional Mezzanine Loans shall not exceed an amount equal to the principal amount of the Secured Loan repaid by the Secured Loan Borrowers.

The Secured Loan and the Mezzanine Loan are both guaranteed by the Company and certain of its subsidiaries. The Secured Loan bears interest at an annual interest rate of LIBOR plus 6.5% for the first three months the Secured Loan is outstanding, LIBOR plus 7.5% for the fourth through the sixth month the Secured Loan is outstanding and LIBOR plus 8.5% for the seventh through the ninth month the Secured Loan is outstanding. Accrued interest is payable monthly during the term of the Secured Loan. The Mezzanine Loan bears interest at an annual interest rate of LIBOR plus 11.0%, with accrued interest payable monthly during the term of the Mezzanine Loan. The Company paid an upfront commitment fee of 1.5% of the principal amount of the Secured Loan, and paid an arrangement fee. The Mezzanine Borrowers paid an upfront commitment fee equal to 1.8% of the principal amount of the Mezzanine Loan.

To the extent permitted under other debt of the Company or its affiliates, the Secured Loan and the Mezzanine Loan may be prepaid at any time in whole or in part, without penalty or premium. The Secured Loan Borrowers are required to apply the net proceeds of the sale of any real property collateral for the Secured Loan to repay the Secured Loan. Following repayment in full of the Secured Loan, the Mezzanine Loan Borrower is required to apply the net proceeds of the sale of any real property that served as collateral for the Secured Loan to repay the Mezzanine Loan.

The Credit Agreement and the Mezzanine Loan Agreement include certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The Credit Agreement and the Mezzanine Loan Agreement have certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Secured Loan Lenders and the Mezzanine Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have (including against the collateral), and require the Secured Loan Borrowers or Mezzanine Loan Borrower to pay a default interest rate of 2.0% in excess of the base interest rate.

*Term Loan Facility*

On January 4, 2018, the Borrowers entered into a Term Loan Credit Agreement (the "Term Loan Credit Agreement") providing for a secured term loan facility (the "Term Loan Facility") from the Lenders, entities affiliated with ESL. The Term Loan Facility is guaranteed by the Company and certain of its subsidiaries that guarantee the Company's other material debt or own material intellectual property. The Term Loan Facility is secured by substantially all of the unencumbered intellectual property of the Company and its subsidiaries, other than intellectual property relating to the Kenmore and DieHard brands, as well as by certain real property interests, in each case subject to certain exclusions. On January 4, 2018, $100 million was borrowed under the Term Loan Facility. The Term Loan Facility also contains an uncommitted incremental loan feature that, subject to the satisfaction of certain conditions, including the consent of the Agent, would permit up to an additional $200 million to be borrowed from other counterparties and secured by the same collateral as the initial loan under the Term Loan Facility. An additional $30 million was borrowed under the Term Loan Facility on January 19, 2018.

On January 29, 2018, the Company entered into an Amendment to the Term Loan Credit Agreement (the "Amendment"), pursuant to which an additional $20 million was borrowed from the Lenders and a further $60 million was borrowed from certain unaffiliated lenders, bringing the total amount borrowed under the Term Loan Facility to $210 million at February 3, 2018. The Amendment, among other changes, separates the loans under the Term Loan Facility into two tranches. On February 26, 2018, the Company entered into another amendment to the Term Loan Credit Agreement pursuant to which an additional $40 million was borrowed from the Lenders.

The loans under the Term Loan Facility bear interest at a weighted average annual interest rate of LIBOR plus 12.5%, which during the first year must be paid in kind by capitalizing interest. The loans under the Term Loan Facility mature on July 20, 2020. The Company used the proceeds of the Term Loan Facility for general corporate purposes. No upfront or arrangement fees were paid in connection with the Term Loan Facility. The loans under the Term Loan Facility are prepayable without premium or penalty.

81

MOAC000743

### SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

The Term Loan Facility includes certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the intellectual property and real property collateral. The Term Loan Facility has certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have (including against the collateral), and require the Borrowers to pay a default interest rate.

At February 3, 2018, the carrying value of the Term Loan Facility, net of the remaining debt issuance costs, was $206 million. The carrying value includes paid-in-kind interest of $1 million at February 3, 2018.

*2017 Secured Loan Facility*

On January 3, 2017, the Company, through Sears, Kmart Stores of Illinois LLC, Kmart of Washington LLC and Kmart Corporation (collectively, "2017 Secured Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, obtained a $500 million real estate loan facility (the "2017 Secured Loan Facility") from the Lenders, entities affiliated with ESL. On January 3, 2017, $321 million was funded under the 2017 Secured Loan Facility, and an additional $179 million was drawn by the Company prior to January 28, 2017. The 2017 Secured Loan Facility matures on July 20, 2020. The Company used the proceeds of the 2017 Secured Loan Facility for general corporate purposes.

During October 2017, the Company, through the 2017 Secured Loan Borrowers and SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC (collectively, "Incremental Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into amended and restated loan agreements (the "Incremental Loans") with the Lenders, entities affiliated with ESL. The Company borrowed $200 million pursuant to the Incremental Loans, and used the proceeds for general corporate purposes. The Incremental Loans mature on April 23, 2018, except that if the maturity date of the 2016 Secured Loan Facility (as defined below) is extended to July 6, 2018, then the Incremental Loans will mature on July 6, 2018.

On March 8, 2018, the Company, through the 2017 Secured Loan Borrowers and SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc. and Troy Coolidge No. 13, LLC (collectively, "Second Incremental Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into a second amendment to the Incremental Loans (the "Second Amendment") with the Lenders, entities affiliated with ESL. Pursuant to the Second Amendment, the Second Incremental Loan Borrowers borrowed an additional $100 million from the Lenders (the "Second Incremental Loan") and used the proceeds for general corporate purposes. The Second Incremental Loan matures on July 20, 2020.

Initially, the 2017 Secured Loan Facility had an annual base interest rate of 8%, with accrued interest payable monthly during the term of the 2017 Secured Loan Facility. Pursuant to the Second Amendment, the interest rate increased to LIBOR plus 9%. The Borrowers paid an upfront commitment fee equal to 1.0% of the full principal amount of the 2017 Secured Loan Facility and paid a funding fee equal to 1.0% of the amounts drawn under the 2017 Secured Loan Facility at the time such amounts were drawn. The Incremental Loans have an annual interest rate of 11%, with accrued interest payable monthly. The Second Incremental Loan has an annual interest rate of LIBOR plus 9%, with accrued interest payable monthly. No upfront or funding fees were paid in connection with the Incremental Loans or Second Incremental Loan.

The 2017 Secured Loan Facility, Incremental Loans and Second Incremental Loan are guaranteed by the Company and certain of its subsidiaries, and were secured by a first priority lien on 69 real properties owned by the 2017 Secured Loan Borrowers and Incremental Loan Borrowers and guarantors at inception of the 2017 Secured Loan Facility, and an additional 7 real properties owned by the Incremental Loan Borrowers at inception of the Incremental Loans. In certain circumstances, the Lenders and the 2017 Secured Loan Borrowers, Incremental Loan Borrowers and Second Incremental Loan Borrowers may elect to substitute one or more properties as collateral. To the extent permitted under other debt of the Company or its affiliates, the 2017 Secured Loan Facility may be prepaid at any time in whole or in part, without penalty or premium. The 2017 Secured Loan Borrowers are required to apply the net proceeds of the sale of any real property collateral for the 2017 Secured Loan Facility to repay the

MOAC000744

## SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

loan. The Company used proceeds of $116 million to pay interest and a portion of the 2017 Secured Loan Facility and $55 million to pay interest and a portion of the Incremental Loans during 2017.

The 2017 Secured Loan Facility, Incremental Loans and Second Incremental Loan include certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The 2017 Secured Loan Facility, Incremental Loans and Second Incremental Loan have certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the 2017 Secured Loan Facility, Incremental Loan or Second Incremental Loan documents (including against the collateral), and require the 2017 Secured Loan Borrowers, Incremental Loan Borrowers or Second Incremental Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%.

The carrying value of the 2017 Secured Loan Facility, net of the remaining debt issuance costs, was $374 million and $485 million at February 3, 2018 and January 28, 2017, respectively. The carrying value of the Incremental Loans, net of the remaining debt issuance costs, was $144 million at February 3, 2018. The Incremental Loans are included within short-term borrowings in the Consolidated Balance Sheets for all periods presented.

### 2016 Secured Loan Facility

On April 8, 2016, the Company, through Sears, Sears Development Co., Innovel, Big Beaver of Florida Development, LLC and Kmart Corporation (collectively, "2016 Secured Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, obtained a $500 million real estate loan facility (the "2016 Secured Loan Facility") from JPP, LLC, JPP II, LLC, and Cascade Investment, LLC (collectively, the "2016 Secured Loan Lenders"). JPP, LLC and JPP II, LLC are entities affiliated with ESL. The first $250 million of the 2016 Secured Loan Facility was funded on April 8, 2016 and the remaining $250 million was funded on April 22, 2016. The funds were used to reduce outstanding borrowings under the Company's asset-based revolving credit facility and for general corporate purposes. The 2016 Secured Loan Facility had an original maturity date of July 7, 2017. In May 2017, the Company reached an agreement to extend the maturity of $400 million of the 2016 Secured Loan Facility to January 2018, with options to further extend the maturity of the loan for up to an additional six months, to July 6, 2018, subject to the satisfaction of certain conditions and the payment of certain fees. On November 21, 2017, the Company notified the 2016 Secured Loan Lenders of its exercise of the first such option to extend the maturity to April 6, 2018, subject to the payment of an extension fee on January 8, 2018, which fee was paid on January 8, 2018. On February 5, 2018, the Company notified the 2016 Secured Loan Lenders of its exercise of the second such option to extend the maturity to July 6, 2018, subject to the payment of an extension fee on April 6, 2018. The 2016 Secured Loan Facility is included within current portion of long-term debt in the Consolidated Balance Sheets for all periods presented. The carrying value of the 2016 Secured Loan Facility, net of the remaining debt issuance costs, was $251 million and $494 million at February 3, 2018 and January 28, 2017, respectively.

The 2016 Secured Loan Facility has an annual base interest rate of 8%, with accrued interest payable monthly during the term of the 2016 Secured Loan Facility. The 2016 Secured Loan Borrowers paid an upfront commitment fee equal to 1.0% of the full principal amount of the 2016 Secured Loan Facility and paid a funding fee equal to 1.0% at the time such amounts were drawn. In connection with the May 2017 maturity extension, the Company paid a one-time extension fee equal to $8 million to the extending lenders.

The 2016 Secured Loan Facility is guaranteed by the Company and was originally secured by a first priority lien on 21 real properties owned by the 2016 Secured Loan Borrowers. The 2016 Secured Loan Facility includes customary representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral.

The 2016 Secured Loan Facility has customary events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the 2016 Secured Loan Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the 2016 Secured Loan Facility documents (including

MOAC000745

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

against the collateral), and require the 2016 Secured Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%. The 2016 Secured Loan Facility may be prepaid at any time in whole or in part, without penalty or premium and $250 million of proceeds from real estate transactions was used to pay interest and a portion of the loan during the 2017.

*Domestic Credit Agreement*

The Borrowers and Holdings are party to an amended and restated credit agreement (the "Amended Domestic Credit Agreement") with a syndicate of lenders. Pursuant to the Amended Domestic Credit Agreement, the Borrowers have borrowed two senior secured term loan facilities having original principal amounts of $1.0 billion and $750 million (the "Term Loan" and "2016 Term Loan," respectively). The Amended Domestic Credit Agreement currently provides for a $1.5 billion asset-based revolving credit facility (the "Revolving Facility") with a $1.0 billion letter of credit sub-facility, which matures on July 20, 2020. The Term Loan had an original maturity of June 30, 2018 and the 2016 Term Loan matures on July 20, 2020. In December 2017, the Company entered into an agreement to extend the maturity of the Term Loan to January 20, 2019, with the option to further extend the maturity to July 20, 2019, subject to certain conditions, including payment of an extension fee equal to 2.0% of the principal amount of the Term Loan outstanding at the time of such extension. The Amended Domestic Credit Agreement includes an accordion feature that allows the Borrowers to use, subject to borrowing base requirements, existing collateral for the facility to obtain up to $1.0 billion of additional borrowing capacity, of which $750 million was utilized for the 2016 Term Loan (described below). The Amended Domestic Credit Agreement also includes a FILO tranche feature that allows up to an additional $500 million of borrowing capacity and allows Holdings and its subsidiaries to undertake short-term borrowings outside the facility up to $1.0 billion. In February 2018, the Borrowers entered into an amendment that increased the size of the general debt basket to $1.25 billion.

Revolving advances under the Amended Domestic Credit Agreement bear interest at a rate equal to, at the election of the Borrowers, either the London Interbank Offered Rate ("LIBOR") or a base rate, in either case plus an applicable margin dependent on Holdings' consolidated leverage ratio (as measured under the Amended Domestic Credit Agreement). The margin with respect to borrowings ranges from 3.50% to 4.00% for LIBOR loans and from 2.50% to 3.00% for base rate loans. The Amended Domestic Credit Agreement also provides for the payment of fees with respect to issued and undrawn letters of credit at a rate equal to the margin applicable to LIBOR loans and a commitment fee with respect to unused amounts of the Revolving Facility at a rate equal to 0.625% per annum.

The Revolving Facility is in place as a funding source for general corporate purposes and is secured by a first lien on substantially all of our domestic inventory and credit card and pharmacy receivables, and is subject to a borrowing base formula to determine availability. The Revolving Facility is guaranteed by all domestic subsidiaries of Holdings that own inventory or credit card or pharmacy receivables. The Revolving Facility also permits aggregate second lien indebtedness of up to $2.0 billion, of which $1.1 billion in second lien notes were outstanding at February 3, 2018, resulting in $896 million of permitted second lien indebtedness, subject to limitations contained in our other outstanding indebtedness. If, through asset sales or other means, the value of the above eligible assets is not sufficient to support borrowings of up to the full amount of the commitments under this facility, we will not have full access to the facility, but rather could have access to a lesser amount determined by the borrowing base. Such a decline in the value of eligible assets also could result in our inability to borrow up to the full amount of second lien indebtedness permitted by the domestic credit facility, but rather we could be limited to borrowing a lesser amount determined by the borrowing base as calculated pursuant to the terms of such indenture.

The Term Loan bears interest at a rate equal to, at the election of the Borrowers, either LIBOR (subject to a 1.00% LIBOR floor) or a base rate, plus an applicable margin for LIBOR loans of 4.50% and for base rate loans of 3.50%. Currently, the Borrowers are required to repay the Term Loan in quarterly installments of $2.5 million, with the remainder of the Term Loan maturing January 20, 2019, subject to the right of the Borrowers to extend the maturity to July 20, 2019. Additionally, the Borrowers are required to make certain mandatory repayments of the Term Loan from excess cash flow (as defined in the Amended Domestic Credit Agreement). The Term Loan may be prepaid in whole or part without penalty. The Term Loan is secured by the same collateral as the Revolving Facility on a pari passu basis with the Revolving Facility, and is guaranteed by the same subsidiaries of the Company that guarantee the Revolving Facility. At February 3, 2018 and January 28, 2017, respectively, we had borrowings of $400 million and $970 million under the Term Loan, and carrying value, net of the remaining discount and debt issuance costs, of $391 million and $963 million. During the fourth quarter, the Company paid down the Term Loan

MOAC000746

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

by $325 million, reducing the outstanding balance, and bringing our total Term Loan repayment during 2017 to approximately $570 million. The Company made additional repayments in 2018 of $97 million through the date of this report. A portion of the proceeds received from the Craftsman Sale were also used to reduce outstanding borrowings under the Term Loan.

Amounts borrowed pursuant to the 2016 Term Loan bear interest at a rate equal to LIBOR plus 750 basis points, subject to a 1.00% LIBOR floor. The Company received approximately $722 million in net proceeds from the 2016 Term Loan, which proceeds were used to reduce outstanding borrowings under its asset-based revolving credit facility. The 2016 Term Loan has a maturity date of July 20, 2020, which is the same maturity date as the Company's revolving credit facility commitments, and does not amortize. The 2016 Term Loan is subject to a prepayment premium of 2% of the aggregate principal amount of the 2016 Term Loan prepaid on or prior to April 8, 2017 and 1% of the aggregate principal amount of the 2016 Term Loan prepaid after April 8, 2017 and on or prior to April 8, 2018. The obligations under the Amended Domestic Credit Agreement, including the 2016 Term Loan, are secured by a first lien on substantially all of the domestic inventory and credit card and pharmacy receivables of the Company and its subsidiaries and aggregate advances under the Amended Domestic Credit Agreement are subject to a borrowing base formula. The carrying value of the 2016 Term Loan, net of the remaining discount and debt issuance costs, was $559 million and $726 million at February 3, 2018 and January 28, 2017, respectively. A portion of the proceeds received from the Craftsman Sale were used to reduce outstanding borrowings under the 2016 Term Loan.

The Amended Domestic Credit Agreement limits our ability to make restricted payments, including dividends and share repurchases, subject to specified exceptions that are available if, in each case, no event of default under the credit facility exists immediately before or after giving effect to the restricted payment. These include exceptions that require that projected availability under the credit facility, as defined, to be at least 15%, exceptions that may be subject to certain maximum amounts and an exception that requires that the restricted payment is funded from cash on hand and not from borrowings under the credit facility. Further, the Amended Domestic Credit Agreement includes customary covenants that restrict our ability to make dispositions, prepay debt and make investments, subject, in each case, to various exceptions. The Amended Domestic Credit Agreement also imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement and a requirement that the fixed charge ratio at the last day of any quarter be not less than 1.0 to 1.0. As of February 3, 2018, our fixed charge ratio continues to be less than 1.0 to 1.0, and we are subject to these other requirements based on our availability. If availability under the domestic revolving credit facility were to fall below 10%, the Company would be required to test the fixed charge coverage ratio, and would not comply with the facility, and the lenders under the facility could demand immediate payment in full of all amounts outstanding and terminate their obligations under the facility. In addition, the domestic credit facility provides that in the event we make certain prepayments of indebtedness, for a period of one year thereafter we must maintain availability under the facility of at least 12.5%, and it prohibits certain other prepayments of indebtedness.

At February 3, 2018, we had $271 million of Revolving Facility borrowings, and at January 28, 2017, we had no borrowings outstanding under the Revolving Facility. We had $377 million and $464 million at February 3, 2018 and January 28, 2017, respectively, of letters of credit outstanding under the Revolving Facility. At February 3, 2018 and January 28, 2017, the amount available to borrow under the Revolving Facility was $69 million and $165 million, respectively, which reflects the effect of the springing fixed charge coverage ratio covenant and the borrowing base limitation. The majority of the letters of credit outstanding are used to provide collateral for our insurance programs.

*Second Lien Credit Agreement*

On September 1, 2016, the Company, SRAC, and Kmart Corporation (together with SRAC, the "ABL Borrowers") entered into a Second Lien Credit Agreement with the Lenders thereunder, entities affiliated with ESL, pursuant to which the ABL Borrowers borrowed $300 million under a term loan (the "Second Lien Term Loan"). The Company received net proceeds of $291 million, which were used for general corporate purposes.

The maturity date for the Second Lien Term Loan is July 20, 2020 and the Second Lien Term Loan will not amortize. The Second Lien Term Loan bears interest at a rate equal to, at the election of the ABL Borrowers, either LIBOR (subject to a 1.00% floor) or a specified prime rate ("Base Rate"), in either case plus an applicable margin. The margin with respect to the Second Lien Term Loan is 7.50% for LIBOR loans and 6.50% for Base Rate loans.

MOAC000747

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

The Second Lien Credit Agreement was amended on July 7, 2017, providing an uncommitted line of credit facility under which subsidiaries of the Company may from time to time borrow line of credit loans ("Line of Credit Loans") with maturities less than 180 days, subject to applicable borrowing base limitations, in an aggregate principal amount not to exceed $500 million at any time outstanding. In February 2018, the Second Lien Credit Agreement was further amended to, among other things, increase the maximum aggregate principal amount of the Line of Credit Loans to $600 million, extend the maximum duration of the Line of Credit Loans to 270 days and increase the size of the general debt basket to $1.25 billion. During 2017, the Company received aggregate proceeds of $610 million from the issuance of Line of Credit Loans from various lenders, some of which are entities affiliated with ESL, Bruce R. Berkowitz, and Thomas J. Tisch. The Company made repayments of $110 million during 2017, some of which were to related parties. See Note 15 for further information. The proceeds were used for the repayment of indebtedness and general corporate purposes.

The Second Lien Credit Agreement was further amended on January 9, 2018. This amendment amended the borrowing base definition in the Second Lien Credit Agreement to increase the advance rate for inventory to 75% from 65% and also deferred the collateral coverage test for purposes of the mandatory repayment covenant in the Second Lien Credit Agreement such that no such mandatory repayment can be required until the end of the third quarter of 2018. In connection with the closing of the Exchange Offers, the Company also entered into an amendment to its Second Lien Credit Agreement. The amendment provides the Company with the option to pay interest on its outstanding $300 million principal amount Second Lien Term Loan in kind, and also provides that the Company's obligation under the term loan is convertible into common stock of the Company, on the same conversion terms as the New Senior Secured Notes.

Following consummation of the Exchange Offers, the Company's obligations under the Second Lien Credit Agreement are secured on a pari passu basis with the Company's obligations under that certain Indenture, dated as of March 20, 2018, pursuant to which the Company issued its New Senior Secured Notes (defined below). The collateral includes inventory, receivables and other related assets of the Company and its subsidiaries which are obligated on the Second Lien Term Loan and the New Senior Secured Notes. The Second Lien Credit Agreement is guaranteed by all domestic subsidiaries of the Company that guarantee the Company's obligations under its existing Revolving Facility.

The Second Lien Credit Agreement includes representations and warranties, covenants and other undertakings, and events of default that are substantially similar to those contained in the Amended Domestic Credit Agreement. The Second Lien Credit Agreement requires the ABL Borrowers to prepay amounts outstanding under the Amended Domestic Credit Agreement and/or the Second Lien Credit Agreement in order to avoid a Collateral Coverage Event (as defined below). The carrying value of the Second Lien Term Loan, net of the remaining debt issuance costs, was $294 million and $292 million at February 3, 2018 and January 28, 2017, respectively. The carrying value of the Line of Credit Loans was $500 million at February 3, 2018.

*Old Senior Secured Notes and New Senior Secured Notes*

In October 2010, we sold $1.0 billion aggregate principal amount of senior secured notes (the "Old Senior Secured Notes"), which bear interest at 6 5/8% per annum and mature on October 15, 2018. Concurrent with the closing of the sale of the Old Senior Secured Notes, the Company sold $250 million aggregate principal amount of Old Senior Secured Notes to the Company's domestic pension plan in a private placement, none of which remain in the domestic pension plan as a result of the Tender Offer discussed below. The Old Senior Secured Notes are guaranteed by certain subsidiaries of the Company and are secured by a security interest in certain assets consisting primarily of domestic inventory and receivables (the "Collateral"). The lien that secures the Old Senior Secured Notes is junior in priority to the liens on such assets that secure obligations under the Amended Domestic Credit Agreement, as well as certain other first priority lien obligations, and, following consummation of the Exchange Offers, obligations under the indenture relating to the New Senior Secured Notes. The Company used the net proceeds of this offering to repay borrowings outstanding under a previous domestic credit agreement on the settlement date and to fund the working capital requirements of our retail businesses, capital expenditures and for general corporate purposes. Prior to consummation of the Exchange Offers, the indenture under which the Old Senior Secured Notes (the "Old Senior Secured Notes Indenture") were issued contained restrictive covenants that, among other things, (1) limited the ability of the Company and certain of its domestic subsidiaries to create liens and enter into sale and leaseback transactions and (2) limited the ability of the Company to consolidate with or merge

MOAC000748

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

into, or sell other than for cash or lease all or substantially all of its assets to, another person. The indenture also provided for certain events of default, which, if any were to occur, would permit or require the principal and accrued and unpaid interest on all the then outstanding Senior Secured Notes to be due and payable immediately. In connection with the consummation of the Exchange Offers, we entered into a supplemental indenture to the Old Senior Secured Notes Indenture that eliminated substantially all of the restrictive covenants and certain events of default in the Old Senior Secured Notes Indenture. The supplemental indenture, among other things, eliminated the obligation of the Company to offer to repurchase all outstanding Old Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if the borrowing base (as calculated pursuant to the indenture) falls below the principal value of the Old Senior Secured Notes plus any other indebtedness for borrowed money that is secured by liens on the Collateral for two consecutive quarters or upon the occurrence of certain change of control triggering events. The Company may call the Old Senior Secured Notes at a premium based on the "Treasury Rate" as defined in the indenture, plus 50 basis points.

On August 3, 2015, the Company commenced a tender offer (the "Tender Offer") to purchase for cash up to $1.0 billion principal amount of its Old Senior Secured Notes, which expired on August 28, 2015. Approximately $936 million principal amount of the Old Senior Secured Notes were validly tendered and not validly withdrawn in the Tender Offer. Holders who validly tendered and did not validly withdraw Old Senior Secured Notes at or prior to the early tender date of August 14, 2015 received total consideration of $990 per $1,000 principal amount of Old Senior Secured Notes that were accepted for purchase, which included an early tender payment of $30 per $1,000 principal amount of Old Senior Secured Notes accepted for purchase, plus accrued and unpaid interest up to, but excluding, the settlement date. Holders who validly tendered and did not validly withdraw Old Senior Secured Notes after the early tender date but at or prior to the expiration date of August 28, 2015 received total consideration of $960 per $1,000 principal amount of Old Senior Secured Notes accepted for purchase, plus accrued and unpaid interest up to, but excluding, the settlement date.

We accounted for the Tender Offer in accordance with accounting standards applicable to extinguishment of liabilities and debt modifications and extinguishments. Accordingly, we de-recognized the net carrying amount of Old Senior Secured Notes of $929 million (comprised of the principal amount of $936 million, offset by unamortized debt issuance costs and discount of $7 million), and the reacquisition cost was $929 million.

On January 9, 2018, the Company and certain of its subsidiaries entered into a Fourth Supplemental Indenture (the "Supplemental Indenture") with Wilmington Trust, National Association, as successor trustee and collateral agent, amending the Old Senior Secured Notes Indenture. The Supplemental Indenture amended the borrowing base definition in the Old Senior Secured Notes Indenture to increase the advance rate for inventory to 75% from 65%. The Supplemental Indenture also defers the collateral coverage test for purposes of the repurchase offer covenant in the Indenture and restarts it with the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018).

The carrying value of Old Senior Secured Notes, net of the remaining discount and debt issuance costs, was $303 million and $303 million at February 3, 2018 and January 28, 2017, respectively. The carrying value of Old Senior Secured Notes is included within current portion of long-term debt in the Consolidated Balance Sheets at February 3, 2018.

In February 2018, the Company commenced the Exchange Offers pursuant to which it offered to issue in exchange for its outstanding Senior Secured Notes new 6 5/8% Senior Secured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option. The Exchange Offers expired on March 15, 2018. Approximately $169.8 million principal amount of the Senior Secured Notes were validly tendered, accepted and canceled, including $20 million principal amount of Old Senior Secured Notes held by ESL, and the Company issued a like principal amount of New Senior Secured Notes. The New Senior Secured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at a conversion price of $5.00 per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period. The New Senior Unsecured Notes bear interest at a rate of 6.625% per annum and the Company will pay interest semi-annually on April 15 and October 15 of each year, which interest may, at the option of the Company, be paid in kind. The New Senior Secured Notes mature in October 2019.

MOAC000749

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

The New Senior Secured Notes are guaranteed by certain subsidiaries of the Company and are secured by a security interest in the Collateral. The lien that secures the New Senior Secured Notes is junior in priority to the liens on such assets that secure obligations under the Amended Domestic Credit Agreement, as well as certain other first priority lien obligations, and senior to the lien on such assets that secure obligations under the Old Senior Secured Notes Indenture. The indenture under which the New Senior Secured Notes (the "New Senior Secured Notes Indenture") were issued contains restrictive covenants that, among other things, (1) limit the ability of the Company and certain of its domestic subsidiaries to create liens and enter into sale and leaseback transactions and (2) limit the ability of the Company to consolidate with or merge into, or sell other than for cash or lease all or substantially all of its assets to, another person. The New Senior Secured Notes Indenture also provides for certain events of default, which, if any were to occur, would permit or require the principal and accrued and unpaid interest on all the then outstanding New Senior Secured Notes to be due and payable immediately. The New Senior Secured Notes Indenture also requires the Company to offer to repurchase all outstanding New Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if the borrowing base (as calculated pursuant to the indenture) falls below the principal value of the New Senior Secured Notes plus any other indebtedness for borrowed money that is secured by liens on the Collateral for two consecutive quarters or upon the occurrence of certain change of control triggering events.

*Old Senior Unsecured Notes and New Senior Unsecured Notes*

On October 20, 2014, the Company announced its Board of Directors had approved a rights offering allowing its stockholders to purchase up to $625 million in aggregate principal amount of 8% senior unsecured notes due 2019 and warrants to purchase shares of its common stock. The subscription rights were distributed to all stockholders of the Company as of October 30, 2014, the record date for this rights offering, and every stockholder had the right to participate on the same terms in accordance with its pro rata ownership of the Company's common stock, except that holders of the Company's restricted stock that was unvested as of the record date received cash awards in lieu of subscription rights. This rights offering closed on November 18, 2014 and was oversubscribed.

Accordingly, on November 21, 2014, the Company issued $625 million aggregate original principal amount of 8% senior unsecured notes due 2019 (the "Old Senior Unsecured Notes") and received proceeds of $625 million which were used for general corporate purposes. The Old Senior Unsecured Notes are the unsecured and unsubordinated obligations of the Company and rank equal in right of payment with the existing and future unsecured and unsubordinated indebtedness of the Company. The Old Senior Unsecured Notes bear interest at a rate of 8% per annum and the Company will pay interest semi-annually on June 15 and December 15 of each year. The Old Senior Unsecured Notes are not guaranteed.

We accounted for the Old Senior Unsecured Notes in accordance with accounting standards applicable to distinguishing liabilities from equity and debt with conversion and other options. Accordingly, we allocated the proceeds received for the Senior Unsecured Notes based on the relative fair values of the Old Senior Unsecured Notes and warrants, which resulted in a discount to the notes of approximately $278 million. The fair value of the Old Senior Unsecured Notes and warrants was estimated based on quoted market prices for the same issues using Level 1 measurements as defined in Note 5. The discount is being amortized over the life of the Old Senior Unsecured Notes using the effective interest method with an effective interest rate of 11.55%. Approximately $55 million and $44 million of the discount was amortized during 2017 and 2016, respectively. The remaining discount was approximately $140 million and $195 million at February 3, 2018 and January 28, 2017, respectively. The carrying value of the Old Senior Unsecured Notes net of the remaining discount and debt issuance costs was approximately $483 million and $428 million at February 3, 2018 and January 28, 2017, respectively.

In February 2018, the Company commenced the Exchange Offers, pursuant to which it offered to issue in exchange for its outstanding Senior Unsecured Notes new 8% Senior Unsecured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option. The Exchange Offers expired on March 15, 2018. Approximately $214 million principal amount of the Old Senior Unsecured Notes were validly tendered, accepted and canceled, including $187.6 million principal amount of Old Senior Unsecured Notes by ESL, and the Company issued a like principal amount of New Senior Unsecured Notes. The New Senior Unsecured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at a conversion price of $8.33 per share of common stock, and are mandatorily

MOAC000750

### SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period.

The New Senior Unsecured Notes are the unsecured and unsubordinated obligations of the Company and rank equal in right of payment with the existing and future unsecured and unsubordinated indebtedness of the Company. The New Senior Unsecured Notes bear interest at a rate of 8% per annum and the Company will pay interest semi-annually on June 15 and December 15 of each year, which interest may, at the option of the Company, be paid in kind. The Senior Unsecured Notes are not guaranteed.

*Cash Collateral*

We post cash collateral for certain self-insurance programs. We continue to classify the cash collateral posted for self-insurance programs as cash and cash equivalents due to our ability to substitute letters of credit for the cash at any time at our discretion. At February 3, 2018 and January 28, 2017, $4 million and $3 million of cash, respectively, was posted as collateral for self-insurance programs.

*Wholly-owned Insurance Subsidiary and Intercompany Securities*

We have numerous types of insurable risks, including workers' compensation, product and general liability, automobile, warranty, asbestos and environmental claims and the extended service contracts we sell to our customers. Certain of the associated risks are managed through Holdings' wholly-owned insurance subsidiary, Sears Reinsurance Company Ltd. ("Sears Re"), a Bermuda Class 3 insurer.

In accordance with applicable insurance regulations, Sears Re holds marketable securities to support the insurance coverage it provides. Sears has utilized two securitization structures to issue specific securities in which Sears Re has invested its capital to fund its insurance obligations. In November 2003, Sears formed a Real Estate Mortgage Investment Conduit, or REMIC. The real estate associated with 138 properties was contributed to indirect wholly-owned subsidiaries of Sears, and then leased back to Sears. The contributed stores were mortgaged and the REMIC issued to wholly-owned subsidiaries of Sears (including Sears Re) $1.3 billion (par value) of securities (the "REMIC Securities") that were secured by the mortgages and collateral assignments of the store leases. Payments to the holders on the REMIC Securities were funded by the lease payments. In March 2018, in connection with the Credit Agreement and Mezzanine Loan Agreement described above, the REMIC was unwound and the REMIC Securities were extinguished.

In May 2006, a subsidiary of Holdings contributed the rights to use the Kenmore, Craftsman and DieHard trademarks in the U.S. and its possessions and territories to KCD IP, LLC, an indirect wholly-owned subsidiary of Holdings. KCD IP, LLC has licensed the use of the trademarks to subsidiaries of Holdings, including Sears and Kmart. Asset-backed securities with a par value of $1.8 billion (the "KCD Securities") were issued by KCD IP, LLC and subsequently purchased by Sears Re, the collateral for which includes the trademark rights and royalty income. Payments to the holders on the KCD Securities are funded by the royalty payments. In connection with the Craftsman Sale, KCD Securities with par value of $900 million were redeemed in March 2017.

The issuers of the REMIC Securities and KCD Securities and the owners of these real estate and trademark assets are bankruptcy remote, special purpose entities that are indirect wholly-owned subsidiaries of Holdings. Cash flows received from rental streams and licensing fee streams paid by Sears, Kmart, other affiliates and third parties, are used for the payment of fees and interest on these securities, through the extinguishment of the REMIC Securities in March 2018. Since the inception of the REMIC and KCD IP, LLC, the REMIC Securities and the KCD Securities have been entirely held by our wholly-owned consolidated subsidiaries, through the extinguishment of the REMIC Securities in March 2018. At February 3, 2018 and January 28, 2017, respectively, the net book value of the securitized trademark rights was approximately $0.7 billion and $1.0 billion. The net book value of the securitized real estate assets was approximately $0.5 billion and $0.6 billion at February 3, 2018 and January 28, 2017, respectively.

MOAC000751

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Trade Creditor Matters*

We have ongoing discussions concerning our liquidity and financial position with the vendor community and third parties that offer various credit protection services to our vendors. The topics discussed have included such areas as pricing, payment terms and ongoing business arrangements. As of the date of this report, we have not experienced any significant disruption in our access to merchandise or our operations.

## NOTE 4—FINANCIAL GUARANTEES

*Financial Guarantees*

We issue various types of guarantees in the normal course of business. We had the following guarantees outstanding at February 3, 2018:

| millions | Bank Issued | SRAC Issued | Other | Total |
|---|---|---|---|---|
| Standby letters of credit | $ 647 | $ 6 | $ — | $ 653 |
| Commercial letters of credit | — | 31 | — | 31 |
| Secondary lease obligations | — | — | 164 | 164 |

The secondary lease obligations related to certain store leases that have been assigned and previously divested Sears businesses. The secondary lease obligations represent the maximum potential amount of future payments, including renewal option periods pursuant to the lease agreements. We remain secondarily liable if the primary obligor defaults.

## NOTE 5—FAIR VALUE OF FINANCIAL ASSETS AND LIABILITIES

We determine fair value of financial assets and liabilities based on the following fair value hierarchy, which prioritizes the inputs to valuation techniques used to measure fair value into three levels:

**Level 1 inputs** – unadjusted quoted prices in active markets for identical assets or liabilities that we have the ability to access. An active market for the asset or liability is one in which transactions for the asset or liability occur with sufficient frequency and volume to provide ongoing pricing information.

**Level 2 inputs** – inputs other than quoted market prices included in Level 1 that are observable, either directly or indirectly, for the asset or liability. Level 2 inputs include, but are not limited to, quoted prices for similar assets or liabilities in an active market, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs other than quoted market prices that are observable for the asset or liability, such as interest rate curves and yield curves observable at commonly quoted intervals, volatilities, credit risk and default rates.

**Level 3 inputs** – unobservable inputs for the asset or liability.

MOAC000752

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

Cash and cash equivalents, accounts receivable, merchandise payables, short-term borrowings and accrued liabilities are reflected in the Consolidated Balance Sheets at cost, which approximates fair value due to the short-term nature of these instruments. The fair value of our equity method investment in Sears Canada is disclosed in Note 2. The fair value of our long-term debt is disclosed in Note 3. The fair value of pension and other postretirement benefit plan assets is disclosed in Note 7.

*Assets and Liabilities that are Measured at Fair Value on a Nonrecurring Basis*

Assets and liabilities that are measured at fair value on a nonrecurring basis relate primarily to our tangible fixed assets, goodwill and other intangible assets, which are remeasured when the derived fair value is below carrying value on our Consolidated Balance Sheets. For these assets, we do not periodically adjust carrying value to fair value except in the event of impairment. When we determine that impairment has occurred, we measure the impairment and adjust the carrying value as discussed in Note 1. With the exception of the indefinite-lived intangible asset impairments and fixed asset impairments described in Note 12 and Note 13, respectively, we had no significant remeasurements of such assets or liabilities to fair value during 2017 and 2016.

All of the fair value remeasurements were based on significant unobservable inputs (Level 3). Fixed asset fair values were derived based on discussions with real estate brokers, review of comparable properties, if available, and internal expertise related to the current marketplace conditions. Inputs for the goodwill and intangible asset analyses included discounted cash flow analyses, comparable marketplace fair value data, as well as management's assumptions in valuing significant tangible and intangible assets, as described in Note 1, Summary of Significant Accounting Policies.

## NOTE 6—INTEREST AND INVESTMENT LOSS

The following table sets forth the components of interest and investment loss as reported in our Consolidated Statements of Operations:

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Interest income on cash and cash equivalents | $ 2 | $ 1 | $ 1 |
| Other investment loss | (14) | (27) | (63) |
| Total | $ (12) | $ (26) | $ (62) |

*Interest Income on Cash and Cash Equivalents*

We recorded interest income of $2 million, $1 million and $1 million in 2017, 2016 and 2015, respectively, primarily related to interest earned on cash and cash equivalents. These cash and cash equivalents consist of highly liquid investments with original maturities of three months or less at the date of purchase. Our invested cash may include, from time to time, investments in, but not limited to, commercial paper, federal, state and municipal government securities, floating-rate notes, repurchase agreements and money market funds. All invested cash amounts are readily available to us.

*Other Investment Loss*

Other investment loss primarily includes income or loss generated by (and sales of investments in) certain real estate joint ventures and other equity investments in which we do not have a controlling interest. During 2017, 2016 and 2015, respectively, the investment loss from equity investments included a loss of $17 million, $35 million and $59 million.

MOAC000753

**SEARS HOLDINGS CORPORATION**

Notes to Consolidated Financial Statements—(Continued)

**NOTE 7—BENEFIT PLANS**

We sponsor a number of pension and postretirement benefit plans. We account for our retirement programs in accordance with employers' accounting for defined benefit pension and other postretirement plans under Generally Accepted Accounting Principles ("GAAP"). GAAP requires that amounts recognized in financial statements be determined using an actuarial basis. As a result, our pension benefit programs are based on a number of statistical and judgmental assumptions that attempt to anticipate future events and are used in calculating the expense and liability related to our plans each year at January 31. These assumptions include, but are not limited to, discount rates used to value liabilities, assumed rates of return on plan assets, actuarial assumptions relating to retirement age and participant turnover, and mortality rates. The actuarial assumptions we use may differ significantly from actual results. These differences may result in a material impact to the amount of net periodic benefit cost to be recorded in our consolidated financial statements in the future.

Expenses for retirement and savings-related benefit plans were as follows:

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pension plans | $    657 | $    289 | $    230 |
| Postretirement benefits | — | 28 | (2) |
| Total | $    657 | $    317 | $    228 |

*Retirement Savings Plans*

Holdings sponsors retirement savings plans for employees meeting service eligibility requirements. The Company does not match employee contributions.

*Other Benefit Plans*

Certain full-time and part-time employees of Kmart and Sears are eligible to participate in noncontributory defined benefit plans after meeting age and service requirements. Effective January 31, 1996 and January 1, 2006, respectively, the Kmart tax-qualified defined benefit pension plan and the Sears domestic pension plan were frozen and associates no longer earn additional benefits under the plan. The Kmart tax-qualified defined benefit pension plan was merged with and into the Sears domestic pension plan effective as of January 30, 2008. The merged plan was renamed as the Sears Holdings Pension Plan ("SHC Domestic plan") and Holdings accepted sponsorship of the SHC Domestic plan effective as of that date.

Pension benefits are based on length of service, compensation and, in certain plans, social security or other benefits. Funding for the various plans is determined using various actuarial cost methods.

In addition to providing pension benefits, Sears provides employees and retirees certain medical benefits. These benefits provide access to medical plans. Certain Sears retirees are also provided life insurance benefits. To the extent we share the cost of the retiree medical benefits with retirees, such cost sharing is based on years of service and year of retirement. Sears' postretirement benefit plans are not funded. We have the right to modify or terminate these plans. Effective December 31, 2014, the Company amended its retiree medical plan to eliminate Company subsidies to the plan.

*Pension Plan Amendment*

Effective December 1, 2016, the Sears Holdings Pension Plan was amended to change its plan year from a calendar year end to a November 30th year end, to spin off a new Sears Holdings Pension Plan 2 ("Plan 2") and to rename the Sears Holdings Pension Plan as Sears Holdings Pension Plan 1 ("Plan 1"). In conjunction with these amendments, the Company requested that the Internal Revenue Service ("IRS") approve the foregoing change in plan year and to approve a change in actuarial funding method in connection with the spin-off and change in plan year. The Company has received IRS approval of both changes.

MOAC000754

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Pension Plan Settlements*

In May 2017, the Company executed an irrevocable agreement to purchase a group annuity contract from Metropolitan Life Insurance Company ("MLIC"), under which MLIC will pay future pension benefit payments to approximately 51,000 retirees from Plan 2. The agreement calls for a transfer of approximately $515 million of Plan 2's benefit obligations to MLIC. This action had an immaterial impact on the funded status of our total pension obligations, but reduced the size of the Company's combined pension plan, reduced future cost volatility, and reduced future plan administrative expenses. Due to the annuity purchase, we were required to remeasure our pension obligations. In connection with the remeasurement, we updated the effective discount rate assumption to 3.85% as of May 31, 2017. The annuity purchase resulted in a non-cash charge of $200 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement during the 13 week period ending July 29, 2017.

In August 2017, the Company reached another agreement with MLIC to annuitize an additional $512 million of its pension liability, under which MLIC will pay future pension benefit payments to an additional approximately 20,000 retirees from Plan 2. This action had an immaterial impact on the funded status of our total pension obligations, but reduced the size of the Company's combined pension plan, reduced future cost volatility, and reduced future plan administrative expenses. Due to the annuity purchase, we were required to remeasure our pension obligations. In connection with the remeasurement, we updated the effective discount rate assumption to 3.75% as of August 31, 2017. This annuity purchase resulted in a non-cash charge of $203 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations immediately upon settlement during the 13 week period ending October 28, 2017.

Effective August 25, 2017, the Company amended Plan 2, primarily related to lump sum benefit eligibility, and began notifying certain former employees of the Company of its offer to pay those employees' pension benefit in lump sum. Former employees eligible for the voluntary lump sum payment option are generally those who are vested traditional formula participants of Plan 2 who terminated employment prior to January 1, 2017 and who have not yet started receiving monthly payments of their pension benefits. The Company offered the one-time voluntary lump sum window in an effort to reduce its long-term pension obligations and ongoing annual pension expense. This voluntary offer was made to approximately 20,000 eligible terminated vested participants representing approximately $300 million of the Company's total qualified pension plan liabilities. Eligible participants had until November 1, 2017 to make their election. The Company made payments of approximately $209 million to employees who made the election and funded the payments from existing assets of Plan 2. This lump sum offer resulted in a non-cash charge of $76 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations immediately upon settlement during the 14 week period ending February 3, 2018.

MOAC000755

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Pension Plans*

| millions | 2017 | 2016 |
|---|---|---|
| Change in projected benefit obligation: | | |
| Beginning balance | $ 5,165 | $ 5,265 |
| Interest cost | 180 | 227 |
| Actuarial loss | 227 | 108 |
| Benefits paid | (316) | (435) |
| Settlements | (1,249) | — |
| Other | (4) | — |
| Balance at the measurement date | $ 4,003 | $ 5,165 |
| | | |
| Change in assets at fair value: | | |
| Beginning balance | $ 3,567 | $ 3,189 |
| Actual return on plan assets | 231 | 499 |
| Company contributions | 295 | 314 |
| Benefits paid | (316) | (435) |
| Settlements | (1,249) | — |
| Balance at the measurement date | $ 2,528 | $ 3,567 |
| Net amount recognized | $ (1,475) | $ (1,598) |

The accumulated benefit obligation for the SHC Domestic plan was $4.0 billion at February 3, 2018 and $5.2 billion at January 28, 2017.

*Postretirement Benefit Obligations*

| millions | 2017 | 2016 |
|---|---|---|
| Change in accumulated postretirement benefit obligation: | | |
| Beginning balance | $ 168 | $ 143 |
| Interest cost | 6 | 5 |
| Plan participants' contributions | — | — |
| Benefits paid | (17) | (19) |
| Actuarial loss | 1 | 9 |
| Other | — | 30 |
| Balance at the measurement date | $ 158 | $ 168 |
| | | |
| Change in plan assets at fair value: | | |
| Beginning of year balance | $ — | $ — |
| Company contributions | 17 | 19 |
| Plan participants' contributions | — | — |
| Benefits paid | (17) | (19) |
| Balance at the measurement date | $ — | $ — |
| Funded status | $ (158) | $ (168) |

The current portion of our liability for postretirement benefit obligations is $16 million, which we expect to pay during fiscal 2018.

94

MOAC000756

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

Weighted-average assumptions used to determine plan obligations were as follows:

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pension benefits: |  |  |  |
| Discount rate | 3.75% | 4.15% | 4.50% |
| Postretirement benefits: |  |  |  |
| Discount rate | 3.60% | 3.85% | 4.00% |

The decrease in the discount rate in 2017 resulted in an increase in the 2017 year-end pension obligation of approximately $229 million.

*Net Periodic Benefit Cost*

The components of net periodic benefit cost were as follows:

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pension benefits: |  |  |  |
| Interest cost | $  180 | $  227 | $  211 |
| Expected return on plan assets | (190) | (202) | (249) |
| Settlements | 479 | — | — |
| Recognized net loss and other | 188 | 264 | 268 |
| Net periodic benefit cost | $  657 | $  289 | $  230 |
| Postretirement benefits: |  |  |  |
| Interest cost | $  6 | $  5 | $  5 |
| Recognized net loss and other | (6) | 23 | (7) |
| Net periodic benefit cost | $  — | $  28 | $  (2) |

Weighted-average assumptions used to determine net cost were as follows:

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Pension benefits: |  |  |  |
| Discount Rate[1] | 4.15% | 4.50% | 3.70% |
| Return of plan assets | 6.50% | 6.50% | 7.00% |
| Postretirement benefits: |  |  |  |
| Discount Rate | 3.85% | 4.00% | 3.30% |

[1] In connection with the annuitizations noted above, we updated the effective discount rate assumption to 3.85% as of May 31, 2017 and to 3.75% as of August 31, 2017 for Plan 2.

95

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

For purposes of determining the periodic expense of our defined benefit plans, we use the fair value of plan assets as the market-related value. A one-percentage-point change in the assumed discount rate would have the following effects on the pension liability:

| millions | 1 percentage-point Increase | | 1 percentage-point Decrease | |
|---|---|---|---|---|
| Effect on interest cost component | $ | 20 | $ | (26) |
| Effect on pension benefit obligation | $ | (384) | $ | 460 |

Approximately $146 million of the unrecognized net losses in accumulated other comprehensive income are expected to be amortized as a component of net periodic benefit cost during 2018.

*Investment Strategy*

The Investment Committee, made up of select members of senior management, has delegated to a non-affiliated third party professional, as a limited-purpose named fiduciary, the authority to provide certain investment-related services with respect to the assets of Holdings' domestic pension plans. The plans' overall investment objective is to provide a long-term return that, along with Company contributions, is expected to meet future benefit payment requirements. A long-term horizon has been adopted in establishing investment policy such that the likelihood and duration of investment losses are carefully weighed against the long-term potential for appreciation of assets. The plans' investment policy requires investments to be diversified across individual securities, industries, market capitalization and valuation characteristics. In addition, various techniques are utilized to monitor, measure and manage risk.

Domestic plan assets were invested in the following classes of securities:

| | Plan Assets at | |
|---|---|---|
| | February 3, 2018 | January 28, 2017 |
| Equity securities | 36% | 35% |
| Fixed income and other debt securities | 63 | 63 |
| Other | 1 | 2 |
| Total | 100% | 100% |

The domestic plans' target allocation is determined by taking into consideration the amounts and timing of projected liabilities, our funding policies and expected returns on various asset classes. At February 3, 2018, the plans' target asset allocation was 35% equity and 65% fixed income. To develop the expected long-term rate of return on assets assumption, we considered the historical returns and the future expectations for returns for each asset class, as well as the target asset allocation of the pension portfolio.

MOAC000758

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Future Cash Flows of Benefit Plans*

Information regarding expected future cash flows for the SHC Domestic plan is as follows:

| *millions* | | |
|---|---|---:|
| **Pension benefits:** | | |
| Employer contributions: | | |
| 2018 (expected) | $ | 280 |
| Expected benefit payments: | | |
| 2018 | $ | 334 |
| 2019 | | 308 |
| 2020 | | 298 |
| 2021 | | 291 |
| 2022 | | 283 |
| 2023-2027 | | 1,289 |
| **Postretirement benefits:** | | |
| Employer contributions: | | |
| 2018 (expected) | $ | 16 |
| Expected employer contribution for benefit payments: | | |
| 2018 | $ | 16 |
| 2019 | | 17 |
| 2020 | | 17 |
| 2021 | | 16 |
| 2022 | | 15 |
| 2023-2027 | | 58 |

*Domestic Pension Plans Funding*

Contributions to our pension plans remain a significant use of our cash on an annual basis. While the Company's pension plan is frozen, and thus associates do not currently earn pension benefits, the Company has a legacy pension obligation for past service performed by Kmart and Sears associates. During 2017, we contributed $295 million to our domestic pension plans, including amounts contributed from the escrow created pursuant to the PPPFA. We estimate that our minimum pension funding obligations will be $280 million in 2018 (excluding the $20 million supplemental payment described below) and approximately $276 million in 2019. As discussed in Note 1, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the Craftsman Receivable. During the second quarter of 2017, we sold the Craftsman Receivable to a third-party purchaser, and deposited the proceeds into an escrow for the benefit of our pension plans. We subsequently contributed a portion of the proceeds received from the sale of the Craftsman Receivable to our pension plans, which contribution was credited against the Company's minimum pension funding obligations in 2017. Under our agreement with the PBGC, the remaining proceeds will also be contributed to our pension plans, and when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019.

The Company also agreed to grant a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension obligations through the end of 2019.

In November 2017, the Company announced an amendment to the PPPFA that allowed the Company to pursue the monetization of 138 of our properties that were subject to a ring-fence arrangement created under the PPPFA. In

MOAC000759

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

March 2018, the Company closed on the Secured Loan and the Mezzanine Loan, which transactions released the properties from the ring-fence arrangement. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. Under our agreement with the PBGC, the escrowed amount will also be contributed to our pension plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019 described above. Following such transactions, the Company has been relieved of contributions to our pension plans for approximately two years (other than the contributions from escrow described above and a $20 million supplemental payment due in the second quarter of 2018). The ultimate amount of pension contributions could be affected by factors such as changes in applicable laws, as well as financial market and investment performance and demographic changes.

*Fair Value of Pension Plan Assets*

The following table presents our plan assets using the fair value hierarchy at February 3, 2018 and January 28, 2017:

| millions | Investment Assets at Fair Value at February 3, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Total | Level 1 | Level 2 | Level 3 |
| Equity securities: | | | | |
| U.S. companies | $ 727 | $ 720 | $ — | $ 7 |
| International companies | 164 | 164 | — | — |
| U.S. registered investment companies | 6 | 6 | — | — |
| Fixed income securities: | | | | |
| Corporate bonds and notes | 1,423 | — | 1,423 | — |
| Sears Holdings Corporation 2016 Term Loan | 77 | — | 77 | — |
| Mortgage-backed and asset-backed | 9 | — | 6 | 3 |
| Other | (3) | — | (3) | — |
| Total investment assets at fair value | $ 2,403 | $ 890 | $ 1,503 | $ 10 |
| Cash | 4 | | | |
| Accounts receivable | 39 | | | |
| Accounts payable | (28) | | | |
| Investments measured at NAV: | | | | |
| Cash equivalents and short-term investments | 110 | | | |
| Net assets available for plan benefits | $ 2,528 | | | |

MOAC000760

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

| millions | | Total | | Level 1 | | Level 2 | | Level 3 |
|---|---|---|---|---|---|---|---|---|
| | | **Investment Assets at Fair Value at January 28, 2017** | | | | | | |
| Equity securities: | | | | | | | | |
| U.S. companies | $ | 980 | $ | 978 | $ | — | $ | 2 |
| International companies | | 224 | | 224 | | — | | — |
| U.S. registered investment companies | | 3 | | 3 | | — | | — |
| Fixed income securities: | | | | | | | | |
| Corporate bonds and notes | | 1,994 | | — | | 1,994 | | — |
| Sears Holdings Corporation 2016 Term Loan | | 100 | | — | | 100 | | — |
| Mortgage-backed and asset-backed | | 3 | | — | | 1 | | 2 |
| Other | | 1 | | — | | 1 | | — |
| Ventures and partnerships | | 1 | | — | | — | | 1 |
| Total investment assets at fair value | $ | 3,306 | $ | 1,205 | $ | 2,096 | $ | 5 |
| Cash | | 8 | | | | | | |
| Accounts receivable | | 65 | | | | | | |
| Accounts payable | | (69) | | | | | | |
| Investments measured at NAV: | | | | | | | | |
| Cash equivalents and short-term investments | | 257 | | | | | | |
| Net assets available for plan benefits | $ | 3,567 | | | | | | |

Equity securities, which include common and preferred stocks, are actively traded and valued at the closing price reported in the active market in which the security is traded and are assigned to Level 1.

Fixed income securities are assigned to Level 2 as they are primarily valued by institutional bid evaluation, which determines the estimated price a dealer would pay for a security and which is developed using proprietary models established by the pricing vendors for this purpose.

Certain mortgage-backed and other asset-backed debt securities are assigned to Level 3 based on the relatively low position in the preferred hierarchy of the pricing source. Valuation of the Plan's non-public limited partnerships requires significant judgment by the general partners due to the absence of quoted market value, inherent lack of liquidity, and the long-term nature of the assets, and may result in fair value measurements that are not indicative of ultimate realizable value. Our Level 3 assets, including activity related to our Level 3 assets, are immaterial.

Collective short-term investment funds are stated at net asset value (NAV) as determined by the investment managers and have not been classified in the fair value hierarchy. Investment managers value the underlying investments of the funds at amortized cost, which approximates fair value.

MOAC000761

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

## NOTE 8—EARNINGS PER SHARE

The following table sets forth the components used to calculate basic and diluted loss per share attributable to Holdings' shareholders. Warrants, restricted stock awards and restricted stock units, totaling 2 thousand shares in 2016 and 5 million shares in 2015 were not included in the computation of diluted loss per share attributable to Holdings' shareholders because the effect of their inclusion would have been anti-dilutive.

| *millions, except earnings per share* | 2017 | 2016 | 2015 |
|---|---|---|---|
| Basic weighted average shares | 107.4 | 106.9 | 106.6 |
| Dilutive effect of restricted stock awards, restricted stock units and warrants | — | — | — |
| Diluted weighted average shares | 107.4 | 106.9 | 106.6 |
| Net loss attributable to Holdings' shareholders | $ (383) | $ (2,221) | $ (1,129) |
| Loss per share attributable to Holdings' shareholders: | | | |
| Basic | $ (3.57) | $ (20.78) | $ (10.59) |
| Diluted | $ (3.57) | $ (20.78) | $ (10.59) |

## NOTE 9—EQUITY

*Stock-based Compensation*

We account for stock-based compensation using the fair value method in accordance with accounting standards regarding share-based payment transactions. We do not currently have an employee stock option plan and at February 3, 2018, there are no outstanding options. Compensation expense related to stock-based compensation arrangements was immaterial during 2017, 2016 and 2015.

We granted restricted stock awards and restricted stock units to certain associates. These restricted stock awards and restricted stock units typically vest in zero to three years from the date of grant, provided the grantee remains employed by us at the vesting date. The fair value of these awards and units is equal to the market price of our common stock on the date of grant. We do not currently have a broad-based program that provides for restricted stock awards or restricted stock units on an annual basis. Changes in restricted stock awards and restricted stock units for 2017, 2016 and 2015 were as follows:

| | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|
| (Shares in thousands) | Shares | Weighted-Average Fair Value on Date of Grant | Shares | Weighted-Average Fair Value on Date of Grant | Shares | Weighted-Average Fair Value on Date of Grant |
| Beginning of year balance | 151 | $ 28.89 | 60 | $ 42.88 | 73 | $ 45.82 |
| Granted | 606 | 7.15 | 384 | 16.87 | 198 | 31.26 |
| Vested | (623) | 8.10 | (293) | 16.00 | (200) | 32.01 |
| Forfeited | (119) | 25.27 | — | — | (11) | 51.39 |
| End of year balance | 15 | $ 42.09 | 151 | $ 28.89 | 60 | $ 42.88 |

| *millions* | 2017 | 2016 | 2015 |
|---|---|---|---|
| Aggregate fair value of shares granted based on weighted average fair value at date of grant | $ 4 | $ 6 | $ 6 |
| Aggregate fair value of shares vesting during period | 4 | 4 | 6 |
| Aggregate fair value of shares forfeited during period | 1 | — | — |

100

MOAC000762

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

Approximately 15,000 shares of the 15,000 shares of unvested restricted stock and restricted stock units outstanding at February 3, 2018 are scheduled to vest during 2018, subject to satisfaction of applicable vesting conditions.

*Common Share Repurchase Program*

From time to time, we repurchase shares of our common stock under a common share repurchase program authorized by our Board of Directors. The common share repurchase program was initially announced in 2005 with a total authorization since inception of the program of $6.5 billion. During 2017, 2016 and 2015, we repurchased no shares of our common stock under our common share repurchase program. At February 3, 2018, we had approximately $504 million of remaining authorization under our common share repurchase program.

The share repurchase program has no stated expiration date and share repurchases may be implemented using a variety of methods, which may include open market purchases, privately negotiated transactions, block trades, accelerated share repurchase transactions, the purchase of call options, the sale of put options or otherwise, or by any combination of such methods.

*Accumulated Other Comprehensive Loss*

The following table displays the components of accumulated other comprehensive loss:

| millions | February 3, 2018 | January 28, 2017 | January 30, 2016 |
|---|---|---|---|
| Pension and postretirement adjustments (net of tax of $(225), $(225) and $(296), respectively) | $ (1,071) | $ (1,549) | $ (1,915) |
| Currency translation adjustments (net of tax of $0 for all periods presented) | (1) | (3) | (3) |
| Accumulated other comprehensive loss | $ (1,072) | $ (1,552) | $ (1,918) |

Pension and postretirement adjustments relate to the net actuarial loss on our pension and postretirement plans recognized as a component of accumulated other comprehensive loss.

*Income Tax Expense Allocated to Each Component of Other Comprehensive Income (Loss)*

Income tax expense allocated to each component of other comprehensive income (loss) was as follows:

| millions | 2017 | | |
|---|---|---|---|
| | Before Tax Amount | Tax Expense | Net of Tax Amount |
| Other comprehensive income | | | |
| Pension and postretirement adjustments | | | |
| Experience loss | $ (182) | $   — | $ (182) |
| Less: cost of settlements | 479 | — | 479 |
| Less: recognized net loss and other included in net periodic benefit cost[1] | 181 | — | 181 |
| Pension and postretirement adjustments, net of tax | 478 | — | 478 |
| Currency translation adjustments | 2 | — | 2 |
| Total other comprehensive income | $ 480 | $   — | $ 480 |

101

MOAC000763

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

| | 2016 | | |
| millions | Before Tax Amount | Tax Expense | Net of Tax Amount |
| --- | --- | --- | --- |
| Other comprehensive income | | | |
| Pension and postretirement adjustments | | | |
| Experience gain | $  181 | $  (71) | $  110 |
| Less: recognized net loss and other included in net periodic benefit cost[1] | 256 | — | 256 |
| Pension and postretirement adjustments, net of tax | 437 | (71) | 366 |
| Dissolution of noncontrolling interest | (7) | — | (7) |
| Total other comprehensive income | $  430 | $  (71) | $  359 |

[1] Included in the computation of net periodic benefit expense. See Note 7 to the Consolidated Financial Statements.

| | 2015 | | |
| millions | Before Tax Amount | Tax Expense | Net of Tax Amount |
| --- | --- | --- | --- |
| Other comprehensive income | | | |
| Pension and postretirement adjustments | | | |
| Experience loss | $  (148) | $  — | $  (148) |
| Less: recognized net loss and other included in net periodic benefit cost[1] | 261 | — | 261 |
| Pension and postretirement adjustments, net of tax | 113 | — | 113 |
| Currency translation adjustments | (1) | — | (1) |
| Total other comprehensive income | $  112 | $  — | $  112 |

[1] Included in the computation of net periodic benefit expense. See Note 7 to the Consolidated Financial Statements.

*Issuance of Warrants to Purchase Common Stock*

On November 21, 2014, the Company issued an aggregate of approximately 22 million warrants pursuant to the exercise of rights in the rights offering for $625 million in aggregate principal amount of 8% Senior Unsecured Notes due 2019 and warrants to purchase shares of its common stock. The exercise price and the number of shares of common stock issuable upon exercise of a warrant are both subject to adjustment in certain circumstances. As of October 31, 2015, each warrant, when exercised, will entitle the holder thereof to purchase 1.11 shares of the Company's common stock at an exercise price of $25.686 per share under the terms of the warrant agreement, adjusted from the previously disclosed one share of the Company's common stock at an exercise price of $28.41 per share. The exercise price is payable in cash or by surrendering Old Senior Unsecured Notes or New Senior Unsecured Notes, in each case with a principal amount at least equal to the exercise price. The warrants may be exercised at any time after November 24, 2014. Unless earlier exercised, the warrants will expire on December 15, 2019.

We accounted for the warrants in accordance with accounting standards applicable to distinguishing liabilities from equity and debt with conversion and other options. Accordingly, the warrants have been classified as additional paid-in capital in the Consolidated Balance Sheets based on the relative fair value of the warrants and the related 8% Senior Unsecured Notes due 2019 at the time of issuance. We monitor changes in circumstances that could cause the classification of the warrants to change. The fair value of the warrants and the related 8% Senior Unsecured Notes due 2019 was estimated based on quoted market prices for the same issues using Level 1 measurements as defined in Note 5.

MOAC000764

**SEARS HOLDINGS CORPORATION**

Notes to Consolidated Financial Statements—(Continued)

## NOTE 10—INCOME TAXES

| *millions* | 2017 | 2016 | 2015 |
|---|---|---|---|
| Loss before income taxes: | | | |
| U.S. | $ (1,012) | $ (2,429) | $ (1,420) |
| Foreign | 31 | 34 | 35 |
| Total | $ (981) | $ (2,395) | $ (1,385) |
| | | | |
| Income tax benefit: | | | |
| Current: | | | |
| Federal | $ 9 | $ 13 | $ 11 |
| State and local | (3) | 16 | 20 |
| Foreign | 13 | 18 | 17 |
| Total current | 19 | 47 | 48 |
| | | | |
| Deferred: | | | |
| Federal | (429) | (87) | (239) |
| State and local | (187) | (134) | (66) |
| Foreign | (1) | — | — |
| Total deferred | (617) | (221) | (305) |
| Total | $ (598) | $ (174) | $ (257) |

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Effective tax rate reconciliation: | | | |
| Federal income tax rate (benefit rate) | (33.7)% | (35.0)% | (35.0)% |
| State and local tax (benefit) net of federal tax benefit | (11.8) | (3.0) | (1.8) |
| Federal tax rate change | (22.6) | — | — |
| Federal and state valuation allowance | 21.2 | 41.1 | 37.4 |
| Land and indefinite-lived intangibles | (12.1) | (0.2) | (16.9) |
| Impairment of indefinite-lived trade names | (1.8) | (6.0) | (4.9) |
| Loss disallowance | — | — | 3.5 |
| Tax credits | (0.4) | (0.3) | (0.7) |
| Resolution of income tax matters | (0.8) | — | (0.3) |
| Adjust foreign statutory rates | (1.0) | 0.1 | (0.3) |
| Repatriation toll charge | 1.8 | — | — |
| Tax benefit resulting from other comprehensive income allocation | — | (2.9) | — |
| Other | 0.2 | (1.1) | 0.4 |
| | (61.0)% | (7.3)% | (18.6)% |

MOAC000765

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

| millions | February 3, 2018 | January 28, 2017 |
|---|---|---|
| Deferred tax assets and liabilities: | | |
| Deferred tax assets: | | |
| Federal benefit for state and foreign taxes | $ 117 | $ 148 |
| Accruals and other liabilities | 142 | 135 |
| Net operating loss carryforwards | 1,736 | 2,255 |
| Pension and postretirement benefit plans | 972 | 1,244 |
| Property and equipment | 139 | 231 |
| Deferred income | 266 | 479 |
| Credit carryforwards | 899 | 875 |
| Other | 208 | 218 |
| Total deferred tax assets | 4,479 | 5,585 |
| Valuation allowance | (4,187) | (5,519) |
| Net deferred tax assets | 292 | 66 |
| | | |
| Deferred tax liabilities: | | |
| Trade names/Intangibles | 285 | 573 |
| Inventory | 105 | 193 |
| Other | 28 | 43 |
| Total deferred tax liabilities | 418 | 809 |
| Net deferred tax liability | $ (126) | $ (743) |

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code that will affect our fiscal year ended February 3, 2018, including, but not limited to, (1) reducing the U.S. federal corporate tax rate to 21%, (2) requiring a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries that is payable over eight years, and (3) various other miscellaneous changes that are effective in fiscal 2017. With the lower U.S. federal corporate rate effective beginning January 1, 2018, our U.S. federal corporate tax rate for 2017 is a blended rate of 33.717%.

In addition to the 21% reduced federal corporate tax rate, the Tax Act also establishes new tax laws that will affect fiscal 2018, including, but not limited to, (1) the creation of the base erosion anti-abuse tax ("BEAT"), a new minimum tax; (2) a general elimination of U.S. federal income taxes on dividends from foreign subsidiaries; (3) a new provision designed to tax global intangible low-taxed income ("GILTI"); (4) a new limitation on deductible interest expense; (5) limitations on the deductibility of certain executive compensation; (6) limitations on the use of foreign tax credits ("FTCs") to reduce the U.S. income tax liability; and (7) limitations on net operating losses ("NOLs") generated in tax years beginning after December 31, 2017, to 80% of taxable income with indefinite carryovers.

The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. In accordance with SAB 118, a company must reflect the income tax effects of those aspects of the Tax Act for which the accounting under accounting standards applicable to income taxes is complete. To the extent that a company's accounting for certain income tax effects of the Tax Act is incomplete but is able to determine a reasonable estimate, it must record a provisional estimate in the financial statements. If a company cannot determine a provisional estimate to be included in the financial statements, it should continue to apply accounting standards applicable to income taxes on the basis of the provisions of the tax laws that were in effect immediately before the enactment of the Tax Act.

104

MOAC000766

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

The income tax benefit for the period ended February 3, 2018 included a tax benefit of approximately $470 million related to the impacts of the Tax Act. The impacts of the Tax Act primarily consist of a net benefit for the corporate rate reduction of $222 million, a net tax benefit for the valuation allowance release of $270 million, and a net expense for the transition tax of $11 million.

For various reasons that are discussed below, our accounting for the following elements of the Tax Act is incomplete. However, we were able to make reasonable estimates of certain effects and, therefore, recorded provisional adjustments as follows:

*Reduction of U.S. federal corporate tax rate*: As a result of the reduced corporate rate, our deferred tax assets, liabilities and valuation allowance decreased. Further, as we had a net deferred tax liability after valuation allowance, these decreases resulted in a deferred income tax benefit of $222 million for the year ended February 3, 2018. While we were able to make a reasonable estimate of the impact of the reduction in the corporate rate, it may be affected by other analyses related to the Tax Act, including, but not limited to, our calculation of deemed repatriation of deferred foreign income and state tax effect of adjustments made to federal temporary differences.

*Deemed Repatriation Transition Tax:* The Deemed Repatriation Transition Tax ("Transition Tax") is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of certain of our foreign subsidiaries. To determine the amount of the Transition Tax, we must determine, in addition to other factors, the amount of post-1986 E&P of the relevant subsidiaries, as well as the amount of non-U.S. income taxes paid on such earnings. We are able to make a reasonable estimate of the Transition Tax and recorded a provisional Transition Tax obligation of $6 million and a provisional withholding tax obligation of $11 million. As a result of our valuation allowance on NOLs, only the $11 million withholding tax obligation resulted in a current tax expense. However, we are continuing to gather additional information to more precisely compute the amount of the Transition Tax.

*Valuation Allowances:* The Company assessed whether its valuation allowance analyses are affected by various aspects of the Tax Act (e.g., deemed repatriation of deferred foreign income, new categories of FTCs, and other miscellaneous provisions of the Tax Act), any corresponding determination of the need for or change in a valuation allowance is also provisional.

*Global Intangible Low Taxes Income (GILTI):* The Tax Act creates a new requirement that certain income (i.e., GILTI) earned by controlled foreign corporations ("CFCs") must be included currently in the gross income of the CFC's U.S. shareholder. GILTI is the excess of the shareholder's "net CFC tested income" over the net deemed tangible income return, which is currently defined as the excess of (1) 10% of the aggregate of the U.S. shareholder's pro rata share of the qualified business asset investment of each CFC with respect to which it is a U.S. shareholder over (2) the amount of certain interest expense taken into account in the determination of net CFC-tested income.

Because of the complexity of the new GILTI tax rules, we are continuing to evaluate this provision of the Tax Act and the application of accounting standards applicable to income taxes. In accordance with accounting standards applicable to income taxes, we are allowed to make an accounting policy choice of either (1) treating taxes due on future U.S. inclusions in taxable income related to GILTI as a current-period expense when incurred (the "period cost method") or (2) factoring such amounts into a company's measurement of its deferred taxes (the "deferred method"). We selected the period cost method.

Income tax expense or benefit from continuing operations is generally determined without regard to other categories of earnings, such as discontinued operations and other comprehensive income ("OCI"). An exception is provided in the authoritative accounting guidance when there is income from categories other than continuing operations and a loss from continuing operations in the current year. In this case, the tax benefit allocated to continuing operations is the amount by which the loss from continuing operations reduces the tax expense recorded with respect to the other categories of earnings, even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year losses, income from other sources, including gain from pension and other postretirement benefits recorded as a component of OCI and creation of a deferred tax liability through additional paid in capital, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets. As a result, for the year ended January 28, 2017, the Company recorded a tax expense of $71 million in OCI related to the net gain on pension and other postretirement benefits, and recorded a corresponding tax benefit of $71 million in continuing operations. The Company did not have this situation for the year ended February 3, 2018.

105

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

Accounting standards for income taxes require that deferred tax assets and liabilities be recognized using enacted tax rates for the effect of temporary differences between the financial reporting and tax bases of recorded assets and liabilities. Accounting standards also require that deferred tax assets be reduced by a valuation allowance if it is more likely than not that some portion of or all of the deferred tax asset will not be realized.

Management assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. A significant piece of objective negative evidence evaluated was the cumulative loss incurred over the three-year periods ended February 3, 2018, January 28, 2017 and January 30, 2016. Such objective evidence limits the ability to consider other subjective evidence such as our projections for future income.

On the basis of this analysis and the significant negative objective evidence, the Company has a valuation allowance to record only the portion of the deferred tax asset that more likely than not will be realized. For the year ended January 30, 2016, the valuation allowance increased by $279 million of which $63 million was recorded through other comprehensive income. For the year ended January 28, 2017, the valuation allowance increased by $762 million of which $3 million was recorded through other comprehensive income and paid in capital. For the year ended February 3, 2018, the valuation allowance decreased by $1.3 billion, primarily due to the reduction of the U.S. corporate tax rate from 35% to 21% and the re-characterization of future net operating losses to indefinite life resulting in a valuation allowance release of 80% of our remaining indefinite life deferred tax liability. Included within the net decrease in the valuation allowance was an increase of $62 million recorded through other comprehensive income.

At February 3, 2018 and January 28, 2017, we had a valuation allowance of $4.2 billion and $5.5 billion, respectively. The amount of the deferred tax asset considered realizable, however, could be adjusted in the future if estimates of future taxable income during the carryforward period are reduced or increased, or if the objective negative evidence in the form of cumulative losses is no longer present and additional weight may be given to subjective evidence such as our projections for growth. We will continue to evaluate our valuation allowance in future years for any change in circumstances that causes a change in judgment about the realizability of the deferred tax asset.

At the end of 2017 and 2016, respectively, we had a federal and state net operating loss ("NOL") deferred tax asset of $1.7 billion and $2.3 billion, which will expire predominately between 2019 and 2037. We have credit carryforwards of $899 million, which will expire between 2018 and 2037.

In connection with the Craftsman Sale in the first quarter of 2017, the Company realized a tax benefit of $101 million on the deferred taxes related to the indefinite-life intangible for the trade name sold to Stanley Black & Decker. In addition, the Company incurred a taxable gain of approximately $963 million. There was no federal income tax payable resulting from the taxable gain due to the utilization of NOL tax attributes of approximately $361 million with a valuation allowance release of the same amount. However, there was state income tax of $4 million payable after the utilization of state tax attributes.

In July, 2016, the Company sold shares of an investment for $106 million. The sale resulted in a U.S. taxable gain of $105 million, but no current income tax is payable due to the utilization of NOL attributes of $37 million with a valuation allowance release of the same amount.

On July 7, 2015, Holdings completed the Seritage transaction. As part of the transaction, Holdings sold 235 properties to Seritage along with Holdings' 50% interests in the JVs, which hold an additional 31 properties (See Note 11 for additional information and defined terms).

In connection with the Seritage transaction and the JV transactions, the Company realized a tax benefit of $229 million on the deferred taxes related to the indefinite-life assets associated with the property sold. In addition, the Company incurred a taxable gain of approximately $2.2 billion, taking into account any related party loss disallowance, on these transactions. There was no federal income tax payable resulting from the taxable gain due to the utilization of NOL tax attributes of approximately $856 million with a valuation allowance release of the same amount. However, there was a minor amount of state and city income tax payable of $4 million after the utilization of state and city tax attributes. As a result of all the effects from the Seritage transaction and the JV transactions in 2015, the impact to the net valuation allowance was a release of approximately $500 million.

106

MOAC000768

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Accounting for Uncertainties in Income Taxes*

We are present in a large number of taxable jurisdictions, and at any point in time, can have audits underway at various stages of completion in any of these jurisdictions. We evaluate our tax positions and establish liabilities for uncertain tax positions that may be challenged by federal, foreign and/or local authorities and may not be fully sustained, despite our belief that the underlying tax positions are fully supportable. Unrecognized tax benefits are reviewed on an ongoing basis and are adjusted in light of changing facts and circumstances, including progress of tax audits, developments in case law, and closing of statute of limitations. Such adjustments are reflected in the tax provision as appropriate. While we do not expect material changes, it is possible that the amount of unrecognized benefit with respect to our uncertain tax positions will significantly increase or decrease within the next 12 months related to the audits described above. At this time, our estimated range of impact on the balance of unrecognized tax benefits for 2018 is a change of $1 million to $14 million, which would impact the effective tax rate by $1 million to $11 million. A reconciliation of the beginning and ending amount of gross unrecognized tax benefits ("UTB") is as follows:

| | Federal, State and Foreign Tax | | |
| millions | February 3, 2018 | January 28, 2017 | January 30, 2016 |
|---|---|---|---|
| Gross UTB Balance at Beginning of Period | $ 142 | $ 137 | $ 131 |
| Tax positions related to the current period: | | | |
| Gross increases | 20 | 12 | 14 |
| Gross decreases | — | — | — |
| Tax positions related to prior periods: | | | |
| Gross increases | — | — | — |
| Gross decreases | (26) | — | — |
| Settlements | (1) | — | — |
| Lapse of statute of limitations | (5) | (7) | (8) |
| Gross UTB Balance at End of Period | $ 130 | $ 142 | $ 137 |

At the end of 2017, we had gross unrecognized tax benefits of $130 million. Of this amount, $103 million would, if recognized, impact our effective tax rate, with the remaining amount being comprised of unrecognized tax benefits related to indirect tax benefits. During 2017 and 2016, the gross unrecognized tax benefits increased by $20 million and $12 million, respectively, due to current year accruals for existing tax positions. We expect that our unrecognized tax benefits could decrease up to $10 million over the next 12 months for tax audit settlements and the expiration of the statute of limitations for certain jurisdictions.

We classify interest expense and penalties related to unrecognized tax benefits and interest income on tax overpayments as components of income tax expense. At February 3, 2018 and January 28, 2017, the total amount of interest and penalties recognized within the related tax liability in our Consolidated Balance Sheet was $51 million ($40 million net of federal benefit) and $61 million ($40 million net of federal benefit), respectively. The total amount of net interest benefit recognized in our Consolidated Statements of Operations was $6 million in 2017. The total amount of net interest expense recognized in our Consolidated Statements of Operations was $3 million and $4 million in 2016 and 2015, respectively.

We file income tax returns in both the United States and various foreign jurisdictions. The U.S. Internal Revenue Service ("IRS") has completed its examination of all federal tax returns of Holdings through the 2009 return, and all matters arising from such examinations have been resolved. In addition, Holdings and Sears are under examination by various state, local and foreign income tax jurisdictions for the years 2003 through 2016, and Kmart is under examination by such jurisdictions for the years 2006 through 2016.

MOAC000769

SEARS HOLDINGS CORPORATION

Notes to Consolidated Financial Statements—(Continued)

## NOTE 11—REAL ESTATE TRANSACTIONS

*Gain on Sales of Assets*

We recognized $1.6 billion, $247 million and $743 million in gains on sales of assets during 2017, 2016 and 2015, respectively. These gains were primarily a result of several real estate transactions. Real estate transactions in 2017 included properties that served as collateral for our real estate facilities for which proceeds of $250 million, $116 million and $55 million were used to pay interest and a portion of the 2016 Secured Loan Facility, 2017 Secured Loan Facility and Incremental Loans, respectively. Gains in 2017 also included a gain of $492 million in connection with the Craftsman Sale, which is further described in Note 1.

*Seritage transaction and JV transactions*

On April 1, 2015, April 13, 2015, and April 30, 2015, Holdings and General Growth Properties, Inc. ("GGP"), Simon Property Group, Inc. ("Simon") and The Macerich Company ("Macerich"), respectively, announced that they entered into three distinct real estate joint ventures (collectively, the "JVs"). Holdings contributed 31 properties to the JVs where Holdings currently operates stores (the "JV properties"), in exchange for a 50% interest in the JVs and $429 million in cash ($426 million, net of closing costs) (the "JV transactions"). The JV transactions valued the JV properties at $858 million in the aggregate.

On July 7, 2015, Holdings completed its rights offering and sale-leaseback transaction (the "Seritage transaction") with Seritage Growth Properties ("Seritage"), an independent publicly traded real estate investment trust ("REIT"). As part of the Seritage transaction, Holdings sold 235 properties to Seritage (the "REIT properties") along with Holdings' 50% interest in the JVs. Holdings received aggregate gross proceeds from the Seritage transaction of $2.7 billion ($2.6 billion, net of closing costs). The Seritage transaction was partially financed through the sale of common shares and limited partnership units, totaling $1.6 billion, including $745 million received from ESL and its affiliates and $297 million received from Fairholme and its affiliates as further described in Note 15. The Seritage transaction valued the REIT properties at $2.3 billion in the aggregate.

In connection with the Seritage transaction and JV transactions, Holdings entered into agreements with Seritage and the JVs under which Holdings initially leased 255 of the properties (the "Master Leases"), with the remaining properties being leased by Seritage to third parties. Holdings has closed 19 stores pursuant to recapture notices from Seritage or the JVs and 56 stores pursuant to lease terminations. An additional 11 stores will close in 2018 pursuant to recapture notices from Seritage or the JVs. Also, in July 2017, Seritage sold a 50% joint venture interest in five of the properties and Holdings will pay rent to the new landlord.

We accounted for the Seritage transaction and JV transactions in accordance with accounting standards applicable to real estate sales and sale-leaseback transactions. We determined that the Seritage transaction qualifies for sales recognition and sale-leaseback accounting. Because of our initial ownership interest in the JVs and continuing involvement in the properties, we determined that the JV transactions, which occurred in the first quarter of 2015, did not initially qualify for sale-leaseback accounting and, therefore, accounted for the JV transactions as financing transactions and, accordingly, recorded a sale-leaseback financing obligation of $426 million and continued to report the real property assets on our Condensed Consolidated Balance Sheets at May 2, 2015. Upon the sale of our 50% interest in the JVs to Seritage, the continuing involvement through an ownership interest in the buyer-lessor no longer existed, and Holdings determined that the JV transactions then qualified for sales recognition and sale-leaseback accounting, with the exception of four properties for which we had continuing involvement as a result of an obligation to redevelop the stores for a third-party tenant and pay rent on behalf of the third-party tenant until it commences rent payments to the JVs.

With the exception of the four properties that had continuing involvement, in accordance with accounting standards related to sale-leaseback transactions, Holdings recognized any loss on sale immediately, any gain on sale in excess of the present value of minimum lease payments immediately, and any remaining gain was deferred and will be recognized in proportion to the related rent expense over the lease term. Holdings received aggregate net proceeds of $3.1 billion for the Seritage transaction and JV transactions. The carrying amount of property and equipment, net and lease balances related to third-party leases that were assigned to Seritage and the JVs was $1.5 billion at July 7, 2015, of which $1.3 billion was recorded in our Sears Domestic segment and $175 million in our Kmart segment. Accordingly, during the second quarter of 2015, Holdings recognized an immediate net gain of $508

108

# SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

million within gain on sales of assets in the Consolidated Statements of Operations for 2015, comprised of a gain for the amount of gain on sale in excess of the present value of minimum lease payments, offset by a loss for properties where the fair value was less than the carrying value and the write-off of lease balances related to third-party leases that were assigned to Seritage and the JVs, as shown in the table below.

| | 2015 | | |
| millions | Kmart | Sears Domestic | Sears Holdings |
|---|---|---|---|
| Gain | $ 154 | $ 471 | $ 625 |
| Loss | (17) | (100) | (117) |
| Immediate Net Gain | $ 137 | $ 371 | $ 508 |

The remaining gain of $894 million was deferred and will be recognized in proportion to the related rent expense, which is a component of cost of sales, buying and occupancy, in the Consolidated Statements of Operations, over the lease term.

During 2017 and 2016, respectively, Holdings recorded gains of $253 million and $72 million related to recapture and termination activity in connection with REIT properties and JV properties. The Master Leases provide Seritage and the JVs rights to recapture 100% of certain stores. The Master Leases also provide Seritage and the JVs a recapture right with respect to approximately 50% of the space within the stores at the REIT properties and JV properties (subject to certain exceptions), in addition to all of the automotive care centers, all outparcels or outlots, and certain portions of parking areas and common areas, except as set forth in the Master Leases, for no additional consideration. As space is recaptured pursuant to the recapture right, Holdings' obligation to pay rent is reduced proportionately. Accordingly, Holdings recognizes gains equal to the unamortized portion of the gain that had previously been deferred which exceeds the present value of minimum lease payments, as reduced due to recapture activity. The Master Leases also provide Holdings certain rights to terminate the Master Leases with respect to REIT properties or JV properties that cease to be profitable for operation. In order to terminate the Master Lease for a certain property, Holdings must make a payment to Seritage or the JV of an amount equal to one year of rent (together with taxes and other expenses) with respect to such property. The Company recognizes the corresponding expenses for termination payments to Seritage when we notify Seritage of our intention to terminate the leases and the stores are announced for closure. We recorded expense of $24 million and $21 million for termination payments to Seritage in 2017 and 2016, respectively, of which $11 million was reported as an amount payable to Seritage at January 28, 2017.

Holdings also recorded immediate gains of $40 million during the 2017, for the amount of gains on sale in excess of the present value of minimum lease payments for two of the properties that were previously accounted for as financing transactions. As the redevelopment at the stores had been completed and the third-party tenant had commenced rent payments to the JVs, the Company determined that the continuing involvement no longer existed and that the properties qualified for sales recognition and sale-leaseback accounting.

*Sale-leaseback financing transactions*

Holdings received cash proceeds for sale-leaseback financing transactions of $106 million, $71 million and $508 million in 2017, 2016 and 2015, respectively, including the Seritage transaction and JV transactions in 2015, as further described above. We accounted for the other transactions as financing transactions in accordance with accounting standards applicable to sale-leaseback transactions as a result of other forms of continuing involvement, including an earn-out provision and the requirement to prepay rent for one year. Accordingly, Holdings recorded a sale-leaseback financing obligation of $247 million and $235 million, at February 3, 2018 and January 28, 2017, respectively, which is classified as a long-term sale-leaseback financing obligation in the Consolidated Balance Sheets. The sale-leaseback financing obligation related to the four properties that had continuing involvement decreased to $70 million at February 3, 2018 as two of the properties qualified for sales recognition and sale-leaseback accounting as further described above. We continued to report real property assets of $66 million and $96 million at February 3, 2018 and January 28, 2017, respectively, in our Consolidated Balance Sheets, which are included in our Sears Domestic segment. The obligation for future minimum lease payments at February 3, 2018 is $59 million over the lease terms, and $6 million in 2018, $11 million in 2019, $9 million in 2020, $6 million in

MOAC000771

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

2021, $6 million in 2022 and $21 million thereafter, excluding $6 million was that was prepaid upon closing the transactions.

*Other real estate transactions*

In addition to the Seritage transaction, JV transactions and other sale-leaseback financing transactions described above, we recorded gains on the sales of assets for other items described as follows.

During 2017, we recorded gains on the sales of assets of $544 million recognized on the sale or amendment and lease termination of 48 Sears Full-line stores and four non-retail locations in our Sears Domestic segment for which we received $711 million cash proceeds. During 2017, we also recorded gains on the sales of assets of $164 million recognized on the sale or amendment and lease termination of 41 Kmart stores and two non-retail locations in our Kmart segment for which we received $190 million cash proceeds.

During 2016, we recorded gains on the sales of assets of $15 million recognized on the sale of two Sears Full-line stores for which we received $27 million of cash proceeds, $12 million recognized on the sale of one distribution center for which we received $23 million of cash proceeds and $10 million on the sale of one Kmart store for which we received $10 million of cash proceeds.

During 2015, we recorded gains on the sales of assets of $83 million recognized on the sale of one Sears Full-line store for which we received $102 million of cash proceeds, $90 million of which was received during the third quarter of 2014. As the leaseback ended and the remaining cash proceeds of $12 million were received during 2015, we recognized the gain that had previously been deferred. We also recorded gains on the sales of assets of $86 million recognized on the sale of two Sears Full-line stores for which we received $96 million of cash proceeds, and $10 million recognized on the surrender and early termination of one Kmart store lease.

Certain sales of our properties had leaseback arrangements. We determined that the transactions with leaseback arrangements qualify for sales recognition and sale-leaseback accounting. In accordance with accounting standards related to sale-leaseback transactions, Holdings recognized any loss on sale immediately, any gain on sale in excess of the present value of minimum lease payments immediately, and any remaining gain was deferred and will be recognized in proportion to the related rent expense over the lease term. At February 3, 2018 and January 28, 2017, respectively, $138 million and $132 million of the deferred gain on sale-leaseback is classified as current within other current liabilities, and $362 million and $563 million is classified as long-term deferred gain on sale-leaseback in the Consolidated Balance Sheets. For the other transactions, we determined that we have surrendered substantially all of our rights and obligations, and, therefore, immediate gain recognition is appropriate.

Holdings recorded rent expense in connection with sale-lease back transactions with gains that were initially deferred and are being recognized in proportion to the related rent expense over the lease term of $82 million, $96 million and $68 million in 2017, 2016 and 2015, respectively, in cost of sales, buying and occupancy in the Consolidated Statements of Operations. Rent expense consisted of straight-line rent expense offset by amortization of a deferred gain on sale-leaseback, as shown in the table below.

| millions | 2017 | | | 2016 | | | 2015 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
| Straight-line rent expense | $ 20 | $ 140 | $ 160 | $ 32 | $ 152 | $ 184 | $ 20 | $ 100 | $ 120 |
| Amortization of deferred gain on sale-leaseback | (11) | (67) | (78) | (17) | (71) | (88) | (11) | (41) | (52) |
| Rent expense | $ 9 | $ 73 | $ 82 | $ 15 | $ 81 | $ 96 | $ 9 | $ 59 | $ 68 |

110

MOAC000772

SEARS HOLDINGS CORPORATION

Notes to Consolidated Financial Statements—(Continued)

## NOTE 12—GOODWILL AND INTANGIBLE ASSETS

The following summarizes our intangible assets at February 3, 2018 and January 28, 2017, respectively, the amortization expenses recorded for the years then ended, as well as our estimated amortization expense for the next five years and thereafter.

|  | February 3, 2018 | | January 28, 2017 | |
| --- | --- | --- | --- | --- |
| millions | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Amortizing intangible assets: | | | | |
| Favorable lease rights | $  121 | $  44 | $  143 | $  52 |
| Non-amortizing intangible assets: | | | | |
| Trade names | 1,091 | — | 1,430 | — |
| Total | $ 1,212 | $  44 | $ 1,573 | $  52 |

**Annual Amortization Expense**

| | |
| --- | --- |
| 2017 | $  4 |
| 2016 | 5 |
| 2015 | 7 |

**Estimated Amortization**

| | |
| --- | --- |
| 2018 | $  3 |
| 2019 | 3 |
| 2020 | 3 |
| 2021 | 3 |
| 2022 | 3 |
| Thereafter | 56 |

Goodwill is the excess of the purchase price over the fair value of the net assets acquired in business combinations accounted for under the purchase method. Goodwill is recorded at Sears Domestic and had a balance of $269 million at both February 3, 2018 and January 28, 2017.

As described in Summary of Significant Accounting Policies in Note 1, goodwill and indefinite-lived intangible assets are not amortized but require testing for potential impairment, at a minimum on an annual basis, or when indications of potential impairment exist. As a result of our annual testing of indefinite-lived intangible assets, we recorded impairment related to the Sears trade name of $72 million, $381 million and $180 million in 2017, 2016 and 2015, respectively, which reduced the carrying value to $359 million at February 3, 2018 and $431 million at January 28, 2017. The impairment is recorded at Sears Domestic and included within impairment charges on our Consolidated Statements of Operations.

## NOTE 13—STORE CLOSING CHARGES, SEVERANCE COSTS AND IMPAIRMENTS

*Store Closings and Severance*

During 2017, 2016 and 2015, respectively, we closed 303, 206 and 38 stores in our Kmart segment and 123, 37 and 12 stores in our Sears Domestic segment. An additional 66 stores in our Kmart segment and 40 stores in our Sears Domestic segment will close during the first quarter of 2018 that we previously announced would close. We also made the decision to close one domestic supply chain distribution center in our Sears Domestic segment during 2016.

MOAC000773

## SEARS HOLDINGS CORPORATION

### Notes to Consolidated Financial Statements—(Continued)

In accordance with accounting standards governing costs associated with exit or disposal activities, expenses related to future rent payments for which we no longer intend to receive any economic benefit are accrued for when we cease to use the leased space and have been reduced for any estimated sublease income. We expect to record additional charges of approximately $55 million during 2018 related to stores we had previously made the decision to close, but have not yet closed.

Store closing costs and severance recorded for 2017, 2016 and 2015 were as follows:

| millions | Markdowns[1] | | Severance Costs[2] | | Lease Termination Costs[2] | | Other Charges[2] | | Impairment and Accelerated Depreciation[3] | | Total Store Closing Costs | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kmart | $ | 154 | $ | 25 | $ | 80 | $ | 22 | $ | 19 | $ | 300 |
| Sears Domestic | | 73 | | 58 | | 40 | | 10 | | 21 | | 202 |
| Total 2017 costs | $ | 227 | $ | 83 | $ | 120 | $ | 32 | $ | 40 | $ | 502 |
| | | | | | | | | | | | | |
| Kmart | $ | 187 | $ | 28 | $ | 71 | $ | 32 | $ | 13 | $ | 331 |
| Sears Domestic | | 39 | | 13 | | 5 | | 9 | | 7 | | 73 |
| Total 2016 costs | $ | 226 | $ | 41 | $ | 76 | $ | 41 | $ | 20 | $ | 404 |
| | | | | | | | | | | | | |
| Kmart | $ | 39 | $ | 16 | $ | 21 | $ | 10 | $ | 1 | $ | 87 |
| Sears Domestic | | 5 | | 21 | | (15) | | 1 | | 2 | | 14 |
| Total 2015 costs | $ | 44 | $ | 37 | $ | 6 | $ | 11 | $ | 3 | $ | 101 |

---

[1] Recorded within cost of sales, buying and occupancy in the Consolidated Statements of Operations.

[2] Recorded within selling and administrative in the Consolidated Statements of Operations. Lease termination costs are net of estimated sublease income, and include the reversal of closed store reserves for which the lease agreement has been terminated and the reversal of deferred rent balances related to closed stores.

[3] 2017, 2016 and 2015 costs are recorded within depreciation and amortization on the Consolidated Statements of Operations.

Store closing cost accruals of $261 million, $216 million and $180 million at February 3, 2018, January 28, 2017 and January 30, 2016, respectively, were as shown in the table below. Store closing accruals included $126 million, $122 million and $81 million within other current liabilities and $135 million, $94 million and $99 million within other long-term liabilities in the Consolidated Balance Sheets at February 3, 2018, January 28, 2017 and January 30, 2016, respectively.

| millions | Severance Costs | | Lease Termination Costs | | Other Charges | | Total | |
|---|---|---|---|---|---|---|---|---|
| Balance at January 30, 2016 | $ | 58 | $ | 114 | $ | 8 | $ | 180 |
| Store closing costs | | 41 | | 85 | | 41 | | 167 |
| Payments/utilizations/other | | (45) | | (55) | | (31) | | (131) |
| Balance at January 28, 2017 | | 54 | | 144 | | 18 | | 216 |
| Store closing costs | | 83 | | 162 | | 32 | | 277 |
| Store closing capital lease obligations | | — | | 33 | | — | | 33 |
| Payments/utilizations/other | | (88) | | (139) | | (38) | | (265) |
| Balance at February 3, 2018 | $ | 49 | $ | 200 | $ | 12 | $ | 261 |

112

MOAC000774

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Impairment of Long-Lived Assets*

As described in the Summary of Significant Accounting Policies in Note 1, we performed impairment tests of certain of our long-lived assets during 2017, 2016 and 2015 (principally the value of land, buildings and other fixed assets associated with our stores). As a result of this impairment testing, the Company recorded impairment charges as shown in the table below.

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Kmart | $ 16 | $ 22 | $ 14 |
| Sears Domestic | 54 | 24 | 80 |
| Sears Holdings | $ 70 | $ 46 | $ 94 |

## NOTE 14—LEASES

We lease certain stores, office facilities, warehouses, computers and transportation equipment.

Operating and capital lease obligations are based upon contractual minimum rents and, for certain stores, amounts in excess of these minimum rents are payable based upon specified percentages of sales. Contingent rent is accrued over the lease term, provided that the achievement of the specified sales level that triggers the contingent rental is probable. Certain leases include renewal or purchase options.

Rental expense for operating leases was as follows:

| millions | 2017 | 2016 | 2015 |
|---|---|---|---|
| Minimum rentals | $666 | $739 | $713 |
| Percentage rentals | 5 | 7 | 8 |
| Less-Sublease rentals | (43) | (51) | (46) |
| Less-Amortization of deferred gain on sale-leaseback | (78) | (88) | (52) |
| Total | $550 | $607 | $623 |

Minimum lease obligations, excluding taxes, insurance and other expenses payable directly by us, for leases in effect at February 3, 2018, were as follows:

| millions | Minimum Lease Commitments | |
|---|---|---|
| | Capital | Operating |
| 2018 | $ 28 | $ 537 |
| 2019 | 15 | 439 |
| 2020 | 6 | 368 |
| 2021 | 4 | 297 |
| 2022 | 4 | 237 |
| Later years | 58 | 961 |
| Total minimum lease payments | 115 | 2,839 |
| Less minimum sublease income | | (92) |
| Net minimum lease payments | | $ 2,747 |
| Less: | | |
| Estimated executory costs | (4) | |
| Interest at a weighted average rate of 4.9% | (39) | |
| Capital lease obligations | 72 | |
| Less current portion of capital lease obligations | (22) | |
| Long-term capital lease obligations | $ 50 | |

113

SEARS HOLDINGS CORPORATION

Notes to Consolidated Financial Statements—(Continued)

**NOTE 15—RELATED PARTY DISCLOSURE**

Mr. Lampert is our Chief Executive Officer and Chairman of our Board of Directors. Mr. Lampert is also the Chairman and Chief Executive Officer of ESL. ESL owned approximately 49% of our outstanding common stock at February 3, 2018 (excluding shares of common stock that ESL may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock).

Bruce R. Berkowitz was a member of our Board of Directors from February 2016 through October 2017. Mr. Berkowitz serves as the Chief Investment Officer of Fairholme Capital Management, LLC, an investment adviser registered with the SEC, and is the President and a Director of Fairholme Funds, Inc., a SEC-registered investment company providing investment management services to three mutual funds (together with Fairholme Capital Management, LLC and other affiliates, "Fairholme"). Fairholme owned approximately 18% of our outstanding common stock at February 3, 2018 (excluding shares of common stock that Fairholme may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock).

Thomas J. Tisch has been an independent member of our Board of Directors since 2005. Mr. Tisch owned approximately 3% of our outstanding common stock at February 3, 2018.

*Unsecured Commercial Paper*

During 2017 and 2016, ESL and its affiliates held unsecured commercial paper issued by SRAC, an indirect wholly-owned subsidiary of Holdings. For the commercial paper outstanding to ESL, the weighted average of each of maturity, annual interest rate, and principal amount outstanding for this commercial paper was 8 days, 8.22% and $28 million and 21 days, 7.87% and $100 million, respectively, in 2017 and 2016. The largest aggregate amount of principal outstanding to ESL at any time since the beginning of 2017 was $160 million and $3 million of interest was paid by SRAC to ESL during 2017.

During 2016, Fairholme and its affiliates held unsecured commercial paper issued by SRAC. For the commercial paper outstanding to Fairholme, the weighted average of each of maturity, annual interest rate, and principal amount outstanding for this commercial paper was 63 days, 7.42% and $1 million in 2016.

The commercial paper purchases were made in the ordinary course of business on substantially the same terms, including interest rates, as terms prevailing for comparable transactions with other persons, and did not present features unfavorable to the Company.

*Secured Short-Term Loan*

In September 2014, the Company, through the Short-Term Borrowers, entities wholly-owned and controlled, directly or indirectly by the Company, entered into the $400 million Short-Term Loan with the Short-Term Lender, entities affiliated with ESL and Fairholme. The Company repaid the Short-Term Loan during 2015, resulting in no balance outstanding at February 3, 2018 or January 28, 2017. See Note 3 for additional information regarding the Short-Term Loan.

*LC Facility*

On December 28, 2016, the Company, through the Borrowers, entered into the LC Facility, which was subsequently amended in August 2017, and which provides for the amended LC Facility. At February 3, 2018, and January 28, 2017, we had $271 million and $200 million, respectively, of letters of credit outstanding under the LC Facility, which amounts were initially committed by entities affiliated with ESL, and the Lenders under the LC Facility maintain cash collateral on deposit with the Issuing Bank of $133 million and $204 million at February 3, 2018 and January 28, 2017, respectively. As of February 3, 2018, $138 million of the amount originally committed by entities affiliated with ESL under the LC Facility has been syndicated to unaffiliated third party lenders. See Note 3 for additional information regarding the LC Facility, as amended.

*Term Loan Facility*

On January 4, 2018, the Company, through the Borrowers, obtained a $300 million loan facility from the Lenders, entities affiliated with ESL. At February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL,

MOAC000776

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

held $151 million of principal amount of the Term Loan Facility. See Note 3 for additional information regarding the Term Loan Facility.

### 2017 Secured Loan Facility

On January 3, 2017, the Company, through the 2017 Secured Loan Borrowers, obtained a $500 million real estate loan facility from the Lenders, entities affiliated with ESL. At February 3, 2018 and January 28, 2017, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $384 million and $500 million of principal amount of the 2017 Secured Loan Facility, respectively. Approximately $116 million of proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2017 Secured Loan Facility, all of which were repaid to entities affiliated with ESL. During October 2017, the Company, through the Incremental Loan Borrowers, obtained Incremental Loans totaling $200 million from the Lenders. At February 3, 2018, JPP LLC and JPP II, LLC, held $145 million of principal amount of the Incremental Loans. Approximately $55 million of proceeds received from real estate transactions were used to reduce outstanding borrowings under the Incremental Loans, all of which were repaid to entities affiliated with ESL. See Note 3 for additional information regarding the 2017 Secured Loan Facility and Incremental Loans.

### 2016 Secured Loan Facility

In April 2016, the Company, through the 2016 Secured Loan Borrowers, obtained a $500 million real estate loan facility from the 2016 Secured Loan Lenders, some of which are entities affiliated with ESL. At February 3, 2018 and January 28, 2017, entities affiliated with ESL held $126 million and $216 million, respectively, of principal amount of the 2016 Secured Loan Facility. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2016 Secured Loan Facility, of which $89 million was repaid to entities affiliated with ESL. See Note 3 for additional information regarding the 2016 Secured Loan Facility, as amended.

### 2016 Term Loan

In April 2016, the Company, through the ABL Borrowers, obtained a $750 million senior secured term loan under the Amended Domestic Credit Agreement with a syndicate of lenders, including $146 million (net of original issue discount) from JPP, LLC and JPP II, LLC, entities affiliated with ESL, and $100 million from the Company's domestic pension plans. At February 3, 2018, JPP LLC and JPP II, LLC, and the Company's domestic pension plans held $38 million and $77 million, respectively, of principal amount of the 2016 Term Loan. At January 28, 2017, JPP LLC and JPP II, LLC, and the Company's domestic pension plans held $150 million and $100 million, respectively, of principal amount of the 2016 Term Loan. As disclosed in Note 3, a portion of the proceeds received from the Craftsman Sale were used to reduce outstanding borrowings under the 2016 Term Loan, of which $36 million and $24 million was repaid to JPP LLC and JPP II, LLC, and the Company's domestic pension plans, respectively. See Note 3 for additional information regarding the 2016 Term Loan.

### Second Lien Credit Agreement

In September 2016, the Company, through the ABL Borrowers, obtained a $300 million Second Lien Term Loan from the Lenders, entities affiliated with ESL. At both February 3, 2018 and January 28, 2017, JPP LLC and JPP II, LLC, held $300 million of principal amount of the Second Lien Term Loan.

Additionally, as further discussed in Note 3, in July 2017, the Company amended its Second Lien Credit Agreement to create an additional Line of Credit Facility. The Company received $610 million in net proceeds from Line of Credit Loans during 2017, including $480 million, $25 million and $20 million from ESL and its affiliates, Mr. Berkowitz and his affiliates, and Mr. Tisch and his affiliates, respectively, which also represents the principal amount of Line of Credit Loans held by ESL and its affiliates and Mr. Tisch and his affiliates at February 3, 2018. The Company made repayments of $25 million during 2017 to Mr. Berkowitz and his affiliates. See Note 3 for additional information regarding the Second Lien Credit Agreement, as amended.

MOAC000777

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*Old Senior Secured Notes*

At February 3, 2018 and January 28, 2017, Mr. Lampert and ESL held an aggregate of approximately $20 million and $11 million, respectively, of principal amount of the Company's Old Senior Secured Notes. Mr. Lampert and ESL tendered approximately $165 million of the Company's Old Senior Secured Notes in the Offer, which is further discussed in Note 3.

At January 28, 2017, Fairholme held an aggregate of approximately $46 million of principal amount of the Company's Old Senior Secured Notes, respectively. Fairholme tendered approximately $207 million of the Company's Old Senior Secured Notes in the Tender Offer, which is further discussed in Note 3.

*Subsidiary Notes*

At January 28, 2017, Mr. Lampert and ESL held an aggregate of $3 million of principal amount of unsecured notes issued by SRAC (the "Subsidiary Notes").

At February 3, 2018 and January 28, 2017, Fairholme held an aggregate of $9 million and $14 million, respectively, of principal amount of the Subsidiary Notes.

*Old Senior Unsecured Notes and Warrants*

At both February 3, 2018 and January 28, 2017, Mr. Lampert and ESL held an aggregate of approximately $188 million of principal amount of the Company's Old Senior Unsecured Notes, and 10,033,472 warrants to purchase shares of Holdings' common stock at both February 3, 2018 and January 28, 2017.

At February 3, 2018 and January 28, 2017, respectively, Fairholme held an aggregate of approximately $336 million and $357 million of principal amount of the Company's Old Senior Unsecured Notes, and 5,768,185 and 6,713,725 warrants to purchase shares of Holdings' common stock.

At both February 3, 2018 and January 28, 2017, Mr. Tisch held an aggregate of approximately $10 million of principal amount of the Company's Old Senior Unsecured Notes, and 136,272 warrants to purchase shares of Holdings' common stock.

*Sears Canada*

ESL owns approximately 45% of the outstanding common shares of Sears Canada (based on publicly available information as of July 27, 2017).

*Lands' End*

ESL owns approximately 67% of the outstanding common stock of Lands' End (based on publicly available information as of January 24, 2018). Holdings and certain of its subsidiaries entered into a transition services agreement in connection with the spin-off pursuant to which Lands' End and Holdings agreed to provide, on an interim, transitional basis, various services, including but not limited to, tax services, logistics services, auditing and compliance services, inventory management services, information technology services and continued participation in certain contracts shared with Holdings and its subsidiaries, as well as agreements related to Lands' End Shops at Sears and participation in the Shop Your Way program. The majority of the services under the transition services agreement with Lands' End have expired or been terminated. In July 2016, the Company and Lands' End executed an agreement pursuant to which the Company will provide foreign buying office support and sourcing services to Lands' End. The agreement expires on June 30, 2020.

Amounts due to or from Lands' End are non-interest bearing, and generally settled on a net basis. Holdings invoices Lands' End on at least a monthly basis. At February 3, 2018, Holdings reported a net amount receivable from Lands' End of $1 million within accounts receivable in the Consolidated Balance Sheets. At January 28, 2017, Holdings reported a net amount payable to Lands' End of $1 million within other current liabilities in the Consolidated Balance Sheets. Amounts related to revenue from retail services and rent for Lands' End Shops at Sears, participation in the Shop Your Way program and corporate shared services were $60 million, $65 million and $69 million, respectively, during 2017, 2016 and 2015. The amounts Lands' End earned related to call center services and commissions were $2 million, $10 million and $10 million, respectively, during 2017, 2016 and 2015.

116

MOAC000778

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

*SHO*

ESL owns approximately 58% of the outstanding common stock of SHO (based on publicly available information as of November 8, 2017). Holdings and certain of its subsidiaries engage in transactions with SHO pursuant to various agreements with SHO which, among other things: (1) govern the principal transactions relating to the rights offering and certain aspects of our relationship with SHO following the separation; (2) establish terms under which Holdings and certain of its subsidiaries will provide SHO with services; and (3) establish terms pursuant to which Holdings and certain of its subsidiaries will obtain merchandise for SHO.

These agreements were originally made in the context of a parent-subsidiary relationship and were negotiated in the overall context of the separation. In May 2016, the Company and SHO agreed to changes to a number of their related agreements, including extending the merchandise and services agreement until February 1, 2020.

A summary of the nature of related party transactions involving SHO is as follows:

•   SHO obtains a significant amount of its merchandise from the Company. We have also entered into certain agreements with SHO to provide logistics, handling, warehouse and transportation services. SHO also pays a royalty related to the sale of Kenmore, Craftsman and DieHard products and fees for participation in the Shop Your Way program.

•   SHO receives commissions from the Company for the sale of merchandise made through www.sears.com, extended service agreements, delivery and handling services and credit revenues.

•   The Company provides SHO with shared corporate services. These services include accounting and finance, human resources and information technology.

Amounts due to or from SHO are non-interest bearing, settled on a net basis, and have payment terms of 10 days after the invoice date. The Company invoices SHO on a weekly basis. At February 3, 2018 and January 28, 2017, Holdings reported a net amount receivable from SHO of $28 million and $81 million, respectively, within accounts receivable in the Consolidated Balance Sheets. Amounts related to the sale of inventory and related services, royalties, and corporate shared services were $1.0 billion, $1.2 billion and $1.5 billion, respectively, during 2017, 2016 and 2015. The net amounts SHO earned related to commissions were $66 million, $82 million and $91 million, respectively, during 2017, 2016 and 2015. Additionally, the Company has guaranteed lease obligations for certain SHO store leases that were assigned as a result of the separation. See Note 4 for further information related to these guarantees.

Also in connection with the separation, the Company entered into an agreement with SHO and the agent under SHO's secured credit facility, whereby the Company committed to continue to provide services to SHO in connection with a realization on the lender's collateral after default under the secured credit facility, notwithstanding SHO's default under the underlying agreement with us, and to provide certain notices and services to the agent, for so long as any obligations remain outstanding under the secured credit facility.

*Seritage*

ESL owns approximately 7.2% of the total voting power of Seritage, and approximately 43.5% of the limited partnership units of Seritage Growth Properties, L.P. (the "Operating Partnership"), the entity that now owns the properties sold by the Company in the Seritage transaction and through which Seritage conducts its operations (based on publicly available information as of December 27, 2017). Mr. Lampert is also currently the Chairman of the Board of Trustees of Seritage. Fairholme owns approximately 11% of the outstanding Class A common shares of Seritage and 100% of the outstanding Class C non-voting common shares of Seritage (based on publicly available information as of February 14, 2018).

In connection with the Seritage transaction as described in Note 11, Holdings entered into the Master Leases with Seritage. The initial amount of aggregate annual base rent under the Master Leases is $134 million for the REIT properties, with increases of 2% per year beginning in the second lease year. At February 3, 2018, Holdings reported prepaid rent of $6 million within prepaid expenses and other current assets in the Consolidated Balance Sheets. Holdings recorded rent expense of $70 million, $83 million and $49 million in cost of sales, buying and occupancy for 2017, 2016 and 2015, respectively. Rent expense consists of straight-line rent expense of $117 million, $142

117

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

million and $84 million, offset by amortization of a deferred gain recognized pursuant to the sale and leaseback of properties from Seritage of $47 million, $59 million and $35 million for 2017, 2016 and 2015, respectively.

In addition to base rent under the Master Leases, Holdings pays monthly installment expenses for property taxes and insurance at all REIT properties where Holdings is a tenant and installment expenses for common area maintenance, utilities and other operating expenses at REIT properties that are multi-tenant locations where Holdings and other third parties are tenants. The initial amount of aggregate installment expenses under the Master Leases was $70 million, based on estimated installment expenses, and currently is $41 million as a result of recapture activity and reconciling actual installment expenses. Holdings paid $43 million, $64 million and $40 million for 2017, 2016 and 2015, respectively, recorded in cost of sales, buying and occupancy.

At February 3, 2018 and January 28, 2017, respectively, Holdings reported an amount receivable from Seritage of $1 million and $14 million within accounts receivable in the Consolidated Balance Sheets. Holdings reported an amount payable to Seritage of $11 million within other current liabilities in the Consolidated Balance Sheets at January 28, 2017.

## NOTE 16—SUPPLEMENTAL FINANCIAL INFORMATION

Other long-term liabilities at February 3, 2018 and January 28, 2017 consisted of the following:

| millions | February 3, 2018 | January 28, 2017 |
|---|---|---|
| Unearned revenues | $ 539 | $ 639 |
| Self-insurance reserves | 491 | 535 |
| Other | 437 | 467 |
| Total | $ 1,467 | $ 1,641 |

The Company sells service contracts that provide for preventative maintenance and repair/replacement coverage on consumer products over periods of time ranging from 12 to 144 months. Revenues from the sale of service contracts, and the related direct acquisition costs, are deferred and amortized on a straight-line basis over the lives of the associated contracts, while the associated service costs are expensed as incurred. The table below shows activity related to unearned revenues for service contracts, which are recorded within unearned revenues and other long-term liabilities in the Consolidated Balance Sheets.

| millions | Unearned Revenues |
|---|---|
| Balance at January 30, 2016 | $ 1,405 |
| Sales of service contracts | 855 |
| Revenue recognized on existing service contracts | (961) |
| Balance at January 28, 2017 | 1,299 |
| Sales of service contracts | 691 |
| Revenue recognized on existing service contracts | (876) |
| Balance at February 3, 2018 | $ 1,114 |

118

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

**NOTE 17—SUMMARY OF SEGMENT DATA**

These reportable segment classifications are based on our business formats, as described in Note 1. The Kmart format represents both an operating and reportable segment. The Sears Domestic reportable segment consists of the aggregation of several business formats. These formats are evaluated by our Chief Operating Decision Maker ("CODM") to make decisions about resource allocation and to assess performance.

Each of these segments derives its revenues from the sale of merchandise and related services to customers, primarily in the United States. The merchandise and service categories are as follows:

(i)    Hardlines—consists of home appliances, consumer electronics, lawn & garden, tools & hardware, automotive parts, household goods, toys, housewares and sporting goods;

(ii)    Apparel and Soft Home—includes women's, men's, kids', footwear, jewelry, accessories and soft home;

(iii)    Food and Drug—consists of grocery & household, pharmacy and drugstore;

(iv)    Service—includes repair, installation and automotive service and extended contract revenue; and

(v)    Other—includes revenues earned in connection with our agreements with SHO and Lands' End, as well as online commissions, licensed business revenues, wholesale revenues, rental income and credit revenues.

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| _millions_ | | **Kmart** | | **Sears Domestic** | | **Sears Holdings** |
| Merchandise sales | | | | | | |
| Hardlines | $ | 1,550 | $ | 5,656 | $ | 7,206 |
| Apparel and Soft Home | | 2,096 | | 2,182 | | 4,278 |
| Food and Drug | | 1,918 | | 7 | | 1,925 |
| Total merchandise sales | | 5,564 | | 7,845 | | 13,409 |
| Services and other | | | | | | |
| Services | | 4 | | 1,811 | | 1,815 |
| Other | | 50 | | 1,428 | | 1,478 |
| Total services and other | | 54 | | 3,239 | | 3,293 |
| Total revenues | | 5,618 | | 11,084 | | 16,702 |
| Costs and expenses: | | | | | | |
| Cost of sales, buying and occupancy - merchandise sales | | 4,592 | | 6,757 | | 11,349 |
| Cost of sales and occupancy - services and other | | 9 | | 1,817 | | 1,826 |
| Total cost of sales, buying and occupancy | | 4,601 | | 8,574 | | 13,175 |
| Selling and administrative | | 1,455 | | 3,676 | | 5,131 |
| Depreciation and amortization | | 60 | | 272 | | 332 |
| Impairment charges | | 16 | | 126 | | 142 |
| Gain on sales of assets | | (881) | | (767) | | (1,648) |
| Total costs and expenses | | 5,251 | | 11,881 | | 17,132 |
| Operating income (loss) | $ | 367 | $ | (797) | $ | (430) |
| Total assets | $ | 1,576 | $ | 5,686 | $ | 7,262 |
| Capital expenditures | $ | 18 | $ | 62 | $ | 80 |

119

MOAC000781

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

| millions | 2016 Kmart | 2016 Sears Domestic | 2016 Sears Holdings |
|---|---|---|---|
| Merchandise sales | | | |
| Hardlines | $ 2,445 | $ 7,126 | $ 9,571 |
| Apparel and Soft Home | 3,044 | 2,522 | 5,566 |
| Food and Drug | 3,088 | 11 | 3,099 |
| Total merchandise sales | 8,577 | 9,659 | 18,236 |
| Services and other | | | |
| Services | 9 | 2,101 | 2,110 |
| Other | 64 | 1,728 | 1,792 |
| Total services and other | 73 | 3,829 | 3,902 |
| Total revenues | 8,650 | 13,488 | 22,138 |
| Costs and expenses: | | | |
| Cost of sales, buying and occupancy - merchandise sales | 7,075 | 8,109 | 15,184 |
| Cost of sales and occupancy - services and other | 18 | 2,250 | 2,268 |
| Total cost of sales, buying and occupancy | 7,093 | 10,359 | 17,452 |
| Selling and administrative | 2,175 | 3,934 | 6,109 |
| Depreciation and amortization | 71 | 304 | 375 |
| Impairment charges | 22 | 405 | 427 |
| Gain on sales of assets | (181) | (66) | (247) |
| Total costs and expenses | 9,180 | 14,936 | 24,116 |
| Operating loss | $ (530) | $ (1,448) | $ (1,978) |
| Total assets | $ 2,134 | $ 7,228 | $ 9,362 |
| Capital expenditures | $ 43 | $ 99 | $ 142 |

120

MOAC000782

# SEARS HOLDINGS CORPORATION

## Notes to Consolidated Financial Statements—(Continued)

| | 2015 | | |
|---|---|---|---|
| millions | Kmart | Sears Domestic | Sears Holdings |
| Merchandise sales | | | |
| Hardlines | $ 2,936 | $ 7,915 | $ 10,851 |
| Apparel and Soft Home | 3,434 | 2,907 | 6,341 |
| Food and Drug | 3,735 | 9 | 3,744 |
| Total merchandise sales | 10,105 | 10,831 | 20,936 |
| Services and other | | | |
| Services | 13 | 2,127 | 2,140 |
| Other | 70 | 2,000 | 2,070 |
| Total services and other | 83 | 4,127 | 4,210 |
| Total revenues | 10,188 | 14,958 | 25,146 |
| Costs and expenses: | | | |
| Cost of sales, buying and occupancy - merchandise sales | 8,023 | 8,794 | 16,817 |
| Cost of sales and occupancy - services and other | 19 | 2,500 | 2,519 |
| Total cost of sales, buying and occupancy | 8,042 | 11,294 | 19,336 |
| Selling and administrative | 2,537 | 4,320 | 6,857 |
| Depreciation and amortization | 72 | 350 | 422 |
| Impairment charges | 14 | 260 | 274 |
| Gain on sales of assets | (185) | (558) | (743) |
| Total costs and expenses | 10,480 | 15,666 | 26,146 |
| Operating loss | $ (292) | $ (708) | $ (1,000) |
| Total assets | $ 3,059 | $ 8,278 | $ 11,337 |
| Capital expenditures | $ 42 | $ 169 | $ 211 |

## NOTE 18—LEGAL PROCEEDINGS

We are a defendant in several lawsuits containing class or collective action allegations in which the plaintiffs are current and former hourly and salaried associates who allege violations of various wage and hour laws, rules and regulations pertaining to alleged misclassification of certain of our employees, the failure to pay overtime, and/or the failure to pay for missed meal and rest periods, and other payroll violations. The complaints generally seek unspecified monetary damages, injunctive relief, or both. Further, certain of these proceedings are in jurisdictions with reputations for aggressive application of laws and procedures against corporate defendants. We also are a defendant in putative class action or representative lawsuits in California relating to alleged failure to comply with California laws pertaining to certain operational, marketing, and pricing practices. The California laws alleged to have been violated in each of these lawsuits provide the potential for significant statutory penalties. At this time, the Company is not able to either predict the outcome of these lawsuits or reasonably estimate a potential range of loss with respect to the lawsuits.

We are subject to various other legal and governmental proceedings and investigations, including some involving the practices and procedures in our more highly regulated businesses. Some matters contain class action allegations, environmental and asbestos exposure allegations and other consumer-based, regulatory claims, each of which may seek compensatory, punitive or treble damage claims (potentially in large amounts), as well as other types of relief. At this time, the Company is not able to either predict the outcome of these lawsuits or reasonably estimate a potential range of loss with respect to these lawsuits.

In accordance with accounting standards regarding loss contingencies, we accrue an undiscounted liability for those contingencies where the incurrence of a loss is probable and the amount can be reasonably estimated, and we

MOAC000783

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

disclose the amount accrued and the amount of a reasonably possible loss in excess of the amount accrued, if such disclosure is necessary for our financial statements to not be misleading. We do not record liabilities when the likelihood that the liability has been incurred is probable but the amount cannot be reasonably estimated, or when the liability is believed to be only reasonably possible or remote.

Because litigation outcomes are inherently unpredictable, our evaluation of legal proceedings often involves a series of complex assessments by management about future events and can rely heavily on estimates and assumptions. If the assessments indicate that loss contingencies that could be material to any one of our financial statements are not probable, but are reasonably possible, or are probable, but cannot be estimated, then we disclose the nature of the loss contingencies, together with an estimate of the range of possible loss or a statement that such loss is not reasonably estimable. While the consequences of certain unresolved proceedings are not presently determinable, and an estimate of the probable and reasonably possible loss or range of loss in excess of amounts accrued for such proceedings cannot be reasonably made, an adverse outcome from such proceedings could have a material effect on our earnings in any given reporting period. However, in the opinion of our management, after consulting with legal counsel, and taking into account insurance and reserves, the ultimate liability related to current outstanding matters is not expected to have a material effect on our financial position, liquidity or capital resources.

## NOTE 19—QUARTERLY FINANCIAL INFORMATION (UNAUDITED)

| | 2017 | | | |
|---|---|---|---|---|
| *millions, except per share data* | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| Revenues | $ 4,301 | $ 4,365 | $ 3,660 | $ 4,376 |
| Cost of sales, buying and occupancy | 3,371 | 3,394 | 2,958 | 3,452 |
| Selling and administrative | 1,267 | 1,369 | 1,339 | 1,156 |
| Net income (loss) attributable to Holdings' shareholders | 244 | (251) | (558) | 182 |
| Basic net income (loss) per share attributable to Holdings' shareholders | 2.28 | (2.34) | (5.19) | 1.69 |
| Diluted net income (loss) per share attributable to Holdings' shareholders | 2.28 | (2.34) | (5.19) | 1.69 |

| | 2016 | | | |
|---|---|---|---|---|
| *millions, except per share data* | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| Revenues | $ 5,394 | $ 5,663 | $ 5,029 | $ 6,052 |
| Cost of sales, buying and occupancy | 4,217 | 4,403 | 4,067 | 4,765 |
| Selling and administrative | 1,503 | 1,484 | 1,543 | 1,579 |
| Net loss attributable to Holdings' shareholders | (471) | (395) | (748) | (607) |
| Basic net loss per share attributable to Holdings' shareholders | (4.41) | (3.70) | (6.99) | (5.67) |
| Diluted net loss per share attributable to Holdings' shareholders | (4.41) | (3.70) | (6.99) | (5.67) |

Per share amounts for each quarter are required to be computed independently and may not equal the amount computed for the total year. In the first quarter of 2017, we recorded a gain on the Craftsman Sale of $492 million. Refer to Note 1 for more information related to the Craftsman Sale. In addition, in the fourth quarter of 2017, the income tax benefit included a tax benefit of approximately $470 million related to the impacts of the Tax Act. Refer to Note 10 for more information. In the fourth quarter of 2017 and 2016, we recorded impairment related to the Sears trade name of $72 million and $381 million, respectively. Refer to Note 12 for more information related to these impairment charges.

MOAC000784

**SEARS HOLDINGS CORPORATION**

Notes to Consolidated Financial Statements—(Continued)

**NOTE 20—GUARANTOR/NON-GUARANTOR SUBSIDIARY FINANCIAL INFORMATION**

At February 3, 2018, the principal amount outstanding of the Company's 6 5/8% senior secured notes due 2018 was $303 million. These notes were issued in 2010 by Sears Holdings Corporation ("Parent"). The Old Senior Secured Notes are guaranteed by certain of our 100% owned domestic subsidiaries that own the collateral for the Senior Secured Notes, as well as by Sears Holdings Management Corporation and SRAC (the "guarantor subsidiaries"). The following condensed consolidated financial information presents the Condensed Consolidating Balance Sheets at February 3, 2018 and January 28, 2017, and the Condensed Consolidating Statements of Operations, the Consolidating Statements of Comprehensive Income (Loss) and the Condensed Consolidating Statements of Cash flows for 2017, 2016 and 2015 of (i) Parent; (ii) the guarantor subsidiaries; (iii) the non-guarantor subsidiaries; (iv) eliminations and (v) the Company on a consolidated basis.

The principal elimination entries relate to investments in subsidiaries and intercompany balances and transactions including transactions with our wholly-owned non-guarantor insurance subsidiary. The Company has accounted for investments in subsidiaries under the equity method. The guarantor subsidiaries are 100% owned directly or indirectly by the Parent and all guarantees are joint, several and unconditional. Additionally, the notes are secured by a security interest in certain assets consisting primarily of domestic inventory and credit card receivables of the guarantor subsidiaries, and consequently may not be available to satisfy the claims of the Company's general creditors. Certain investments primarily held by non-guarantor subsidiaries are recorded by the issuers at historical cost and are recorded at fair value by the holder.

123

MOAC000785

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Balance Sheet**
**February 3, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash and cash equivalents | $ — | $ 152 | $ 30 | $ — | $ 182 |
| Restricted cash | 154 | — | — | | 154 |
| Intercompany receivables | — | — | 27,993 | (27,993) | — |
| Accounts receivable | — | 322 | 21 | — | 343 |
| Merchandise inventories | — | 2,798 | — | — | 2,798 |
| Prepaid expenses and other current assets | 309 | 899 | 478 | (1,351) | 335 |
| Total current assets | 463 | 4,171 | 28,522 | (29,344) | 3,812 |
| Total property and equipment, net | — | 1,043 | 686 | — | 1,729 |
| Goodwill and intangible assets | — | 346 | 1,189 | (98) | 1,437 |
| Other assets | 179 | 1,331 | 1,159 | (2,385) | 284 |
| Investment in subsidiaries | 8,790 | 27,752 | — | (36,542) | |
| TOTAL ASSETS | $ 9,432 | $ 34,643 | $ 31,556 | $ (68,369) | $ 7,262 |
| Current liabilities | | | | | |
| Short-term borrowings | $ 144 | $ 937 | $ — | $ (166) | $ 915 |
| Current portion of long-term debt and capitalized lease obligations | 303 | 897 | — | (232) | 968 |
| Merchandise payables | — | 576 | — | — | 576 |
| Intercompany payables | 11,099 | 16,894 | — | (27,993) | — |
| Other current liabilities | 16 | 1,941 | 1,448 | (949) | 2,456 |
| Total current liabilities | 11,562 | 21,245 | 1,448 | (29,340) | 4,915 |
| Long-term debt and capitalized lease obligations | 1,991 | 2,734 | — | (2,476) | 2,249 |
| Pension and postretirement benefits | — | 1,616 | 3 | — | 1,619 |
| Deferred gain on sale-leaseback | — | 360 | 2 | — | 362 |
| Sale-leaseback financing obligation | — | 158 | 89 | — | 247 |
| Long-term deferred tax liabilities | — | — | 349 | (223) | 126 |
| Other long-term liabilities | — | 1,131 | 514 | (178) | 1,467 |
| Total Liabilities | 13,553 | 27,244 | 2,405 | (32,217) | 10,985 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (4,121) | 7,399 | 29,151 | (36,152) | (3,723) |
| Total Equity (Deficit) | (4,121) | 7,399 | 29,151 | (36,152) | (3,723) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 9,432 | $ 34,643 | $ 31,556 | $ (68,369) | $ 7,262 |

124

MOAC000786

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Balance Sheet**
**January 28, 2017**

| _millions_ | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
|   Cash and cash equivalents | $ — | $ 260 | $ 26 | $ — | $ 286 |
|   Intercompany receivables | — | — | 27,415 | (27,415) | — |
|   Accounts receivable | — | 441 | 25 | | 466 |
|   Merchandise inventories | — | 3,959 | — | — | 3,959 |
|   Prepaid expenses and other current assets | 23 | 692 | 856 | (1,286) | 285 |
|   Total current assets | 23 | 5,352 | 28,322 | (28,701) | 4,996 |
| Total property and equipment, net | — | 1,504 | 736 | — | 2,240 |
| Goodwill and intangible assets | — | 360 | 1,528 | (98) | 1,790 |
| Other assets | 4 | 285 | 931 | (884) | 336 |
| Investment in subsidiaries | 9,110 | 26,703 | — | (35,813) | — |
|   TOTAL ASSETS | $ 9,137 | $ 34,204 | $ 31,517 | $ (65,496) | $ 9,362 |
| Current liabilities | | | | | |
|   Short-term borrowings | $ — | $ 108 | $ — | $ (108) | $ — |
|   Current portion of long-term debt and capitalized lease obligations | — | 1,189 | — | (599) | 590 |
|   Merchandise payables | — | 1,048 | — | — | 1,048 |
|   Intercompany payables | 11,830 | 15,585 | — | (27,415) | — |
|   Other current liabilities | 17 | 2,479 | 1,219 | (672) | 3,043 |
|   Total current liabilities | 11,847 | 20,409 | 1,219 | (28,794) | 4,681 |
| Long-term debt and capitalized lease obligations | 1,215 | 3,160 | — | (802) | 3,573 |
| Pension and postretirement benefits | — | 1,746 | 4 | — | 1,750 |
| Deferred gain on sale-leaseback | — | 563 | — | — | 563 |
| Sale-leaseback financing obligation | — | 235 | — | — | 235 |
| Long-term deferred tax liabilities | 48 | — | 724 | (29) | 743 |
| Other long-term liabilities | — | 808 | 1,038 | (205) | 1,641 |
|   Total Liabilities | 13,110 | 26,921 | 2,985 | (29,830) | 13,186 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (3,973) | 7,283 | 28,532 | (35,666) | (3,824) |
|   Total Equity (Deficit) | (3,973) | 7,283 | 28,532 | (35,666) | (3,824) |
|   TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 9,137 | $ 34,204 | $ 31,517 | $ (65,496) | $ 9,362 |

125

MOAC000787

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Statement of Operations**
**For the Year Ended February 3, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 13,375 | $ — | $ 34 | $ 13,409 |
| Services and other | — | 3,303 | 2,283 | (2,293) | 3,293 |
| Total revenues | — | 16,678 | 2,283 | (2,259) | 16,702 |
| Cost of sales, buying and occupancy - merchandise sales | 1 | 11,237 | — | 111 | 11,349 |
| Cost of sales and occupancy - services and other | — | 2,228 | 876 | (1,278) | 1,826 |
| Total cost of sales, buying and occupancy | 1 | 13,465 | 876 | (1,167) | 13,175 |
| Selling and administrative | (27) | 5,409 | 841 | (1,092) | 5,131 |
| Depreciation and amortization | — | 270 | 62 | — | 332 |
| Impairment charges | — | 70 | 72 | — | 142 |
| Gain on sales of assets | (486) | (1,142) | (20) | — | (1,648) |
| Total costs and expenses | (512) | 18,072 | 1,831 | (2,259) | 17,132 |
| Operating income (loss) | 512 | (1,394) | 452 | — | (430) |
| Interest expense | (600) | (994) | (19) | 1,074 | (539) |
| Interest and investment income (loss) | 45 | 195 | 412 | (664) | (12) |
| Income (loss) before income taxes | (43) | (2,193) | 845 | 410 | (981) |
| Income tax (expense) benefit | 232 | 765 | (399) | — | 598 |
| Equity (deficit) in earnings in subsidiaries | (982) | 460 | — | 522 | — |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (793) | $ (968) | $ 446 | $ 932 | $ (383) |

126

MOAC000788

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Statement of Operations**
**For the Year Ended January 28, 2017**

| *millions* | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 18,218 | $ — | $ 18 | $ 18,236 |
| Services and other | — | 3,985 | 2,796 | (2,879) | 3,902 |
| Total revenues | — | 22,203 | 2,796 | (2,861) | 22,138 |
| Cost of sales, buying and occupancy - merchandise sales | — | 15,104 | — | 80 | 15,184 |
| Cost of sales and occupancy - services and other | — | 2,824 | 1,056 | (1,612) | 2,268 |
| Total cost of sales, buying and occupancy | — | 17,928 | 1,056 | (1,532) | 17,452 |
| Selling and administrative | 6 | 6,506 | 926 | (1,329) | 6,109 |
| Depreciation and amortization | — | 303 | 72 | — | 375 |
| Impairment charges | — | 46 | 381 | — | 427 |
| Gain on sales of assets | — | (343) | (2) | 98 | (247) |
| Total costs and expenses | 6 | 24,440 | 2,433 | (2,763) | 24,116 |
| Operating income (loss) | (6) | (2,237) | 363 | (98) | (1,978) |
| Interest expense | (385) | (645) | (13) | 639 | (404) |
| Interest and investment income (loss) | 20 | 152 | 441 | (639) | (26) |
| Other income (loss) | 13 | — | (217) | 217 | 13 |
| Income (loss) before income taxes | (358) | (2,730) | 574 | 119 | (2,395) |
| Income tax (expense) benefit | 28 | 529 | (383) | — | 174 |
| Equity (deficit) in earnings in subsidiaries | (2,010) | 5 | — | 2,005 | — |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (2,340) | $ (2,196) | $ 191 | $ 2,124 | $ (2,221) |

127

MOAC000789

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Statement of Operations**
**For the Year Ended January 30, 2016**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 20,925 | $ — | $ 11 | $ 20,936 |
| Services and other | — | 4,339 | 2,861 | (2,990) | 4,210 |
| Total revenues | — | 25,264 | 2,861 | (2,979) | 25,146 |
| Cost of sales, buying and occupancy - merchandise sales | — | 16,749 | — | 68 | 16,817 |
| Cost of sales and occupancy - services and other | — | 3,070 | 1,131 | (1,682) | 2,519 |
| Total cost of sales, buying and occupancy | — | 19,819 | 1,131 | (1,614) | 19,336 |
| Selling and administrative | 3 | 7,322 | 897 | (1,365) | 6,857 |
| Depreciation and amortization | — | 350 | 72 | — | 422 |
| Impairment charges | — | 94 | 180 | — | 274 |
| Gain on sales of assets | — | (735) | (8) | — | (743) |
| Total costs and expenses | 3 | 26,850 | 2,272 | (2,979) | 26,146 |
| Operating income (loss) | (3) | (1,586) | 589 | — | (1,000) |
| Interest expense | (265) | (481) | (83) | 506 | (323) |
| Interest and investment income (loss) | (19) | 44 | 419 | (506) | (62) |
| Income (loss) before income taxes | (287) | (2,023) | 925 | — | (1,385) |
| Income tax (expense) benefit | 115 | 480 | (338) | — | 257 |
| Equity (deficit) in earnings in subsidiaries | (956) | 158 | — | 798 | — |
| Net income (loss) | (1,128) | (1,385) | 587 | 798 | (1,128) |
| Income attributable to noncontrolling interests | — | — | — | (1) | (1) |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (1,128) | $ (1,385) | $ 587 | $ 797 | $ (1,129) |

128

MOAC000790

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Consolidating Statement of Comprehensive Income (Loss)**
**For the Year Ended February 3, 2018**

| *millions* | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net income (loss) | $ (793) | $ (968) | $ 446 | $ 932 | $ (383) |
| Other comprehensive income: | | | | | |
| Pension and postretirement adjustments, net of tax | — | 478 | — | — | 478 |
| Unrealized net gain, net of tax | 6 | — | 45 | (51) | — |
| Currency translation adjustments, net of tax | — | — | 2 | — | 2 |
| Total other comprehensive income | 6 | 478 | 47 | (51) | 480 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ (787) | $ (490) | $ 493 | $ 881 | $ 97 |

129

MOAC000791

SEARS HOLDINGS CORPORATION

**Notes to Consolidated Financial Statements—(Continued)**

**Consolidating Statement of Comprehensive Income (Loss)**
**For the Year Ended January 28, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net income (loss) | $(2,340) | $ (2,196) | $ 191 | $ 2,124 | $ (2,221) |
| Other comprehensive income: | | | | | |
| Pension and postretirement adjustments, net of tax | — | 366 | — | — | 366 |
| Dissolution of noncontrolling interest | — | — | (7) | — | (7) |
| Unrealized net gain, net of tax | — | — | 122 | (122) | — |
| Total other comprehensive income | — | 366 | 115 | (122) | 359 |
| Comprehensive income (loss) | (2,340) | (1,830) | 306 | 2,002 | (1,862) |
| Comprehensive income attributable to noncontrolling interest | — | — | — | 7 | 7 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $(2,340) | $ (1,830) | $ 306 | $ 2,009 | $ (1,855) |

130

MOAC000792

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Consolidating Statement of Comprehensive Income (Loss)**
**For the Year Ended January 30, 2016**

| *millions* | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net income (loss) | $ (1,128) | $ (1,385) | $ 587 | $ 798 | $ (1,128) |
| Other comprehensive income (loss): | | | | | |
| Pension and postretirement adjustments, net of tax | — | 113 | — | — | 113 |
| Currency translation adjustments, net of tax | — | — | (1) | — | (1) |
| Unrealized net loss, net of tax | — | (3) | (65) | 68 | — |
| Total other comprehensive income (loss) | — | 110 | (66) | 68 | 112 |
| Comprehensive income (loss) | (1,128) | (1,275) | 521 | 866 | (1,016) |
| Comprehensive loss attributable to noncontrolling interest | — | — | — | (1) | (1) |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ (1,128) | $ (1,275) | $ 521 | $ 865 | $ (1,017) |

131

MOAC000793

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended February 3, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $   1 | $  (2,404) | $   682 | $   (121) | $  (1,842) |
| Proceeds from sales of property and investments | — | 1,093 | 16 | — | 1,109 |
| Proceeds from Craftsman Sale | 572 | — | — | — | 572 |
| Proceeds from sales of receivables | 293 | — | — | — | 293 |
| Purchases of property and equipment | — | (70) | (10) | — | (80) |
| Net investing with Affiliates | (934) | — | (563) | 1,497 | — |
| Net cash provided by (used in) investing activities | (69) | 1,023 | (557) | 1,497 | 1,894 |
| Proceeds from debt issuances | 410 | 610 | — | — | 1,020 |
| Repayments of long-term debt | (171) | (1,185) | — | — | (1,356) |
| Increase in short-term borrowings, primarily 90 days or less | — | 271 | — | — | 271 |
| Proceeds from sale-leaseback financing | — | 106 | — | — | 106 |
| Debt issuance costs | (17) | (26) | — | — | (43) |
| Intercompany dividend | — | — | (121) | 121 | — |
| Net borrowing with Affiliates | — | 1,497 | — | (1,497) | — |
| Net cash provided by (used in) financing activities | 222 | 1,273 | (121) | (1,376) | (2) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 154 | (108) | 4 | — | 50 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | — | 260 | 26 | — | 286 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF YEAR | $   154 | $   152 | $   30 | $   — | $   336 |

132

MOAC000794

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended January 28, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 244 | $ (2,137) | $ 820 | $ (308) | $ (1,381) |
| Proceeds from sales of property and investments | — | 273 | 113 | — | 386 |
| Purchases of property and equipment | — | (133) | (9) | — | (142) |
| Net investing with Affiliates | (239) | — | (627) | 866 | — |
| Net cash provided by (used in) investing activities | (239) | 140 | (523) | 866 | 244 |
| Proceeds from debt issuances | — | 2,028 | — | — | 2,028 |
| Repayments of long-term debt | — | (65) | (1) | — | (66) |
| Decrease in short-term borrowings, primarily 90 days or less | — | (797) | — | — | (797) |
| Proceeds from sale-leaseback financing | — | 71 | — | — | 71 |
| Debt issuance costs | (5) | (46) | — | — | (51) |
| Intercompany dividend | — | — | (308) | 308 | — |
| Net borrowing with Affiliates | — | 866 | — | (866) | — |
| Net cash provided by (used in) financing activities | (5) | 2,057 | (309) | (558) | 1,185 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | — | 60 | (12) | — | 48 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | — | 200 | 38 | — | 238 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF YEAR | $ — | $ 260 | $ 26 | $ — | $ 286 |

133

MOAC000795

**SEARS HOLDINGS CORPORATION**

**Notes to Consolidated Financial Statements—(Continued)**

**Condensed Consolidating Statement of Cash Flows**
**For the Year Ended January 30, 2016**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 395 | $ (3,021) | $ 938 | $ (479) | $ (2,167) |
| Proceeds from sales of property and investments | — | 2,725 | 5 | — | 2,730 |
| Purchases of property and equipment | — | (202) | (9) | — | (211) |
| Net investing with Affiliates | (395) | — | (446) | 841 | — |
| Net cash provided by (used in) investing activities | (395) | 2,523 | (450) | 841 | 2,519 |
| Repayments of long-term debt | — | (1,403) | (2) | — | (1,405) |
| Increase in short-term borrowings, primarily 90 days or less | — | 583 | — | — | 583 |
| Proceeds from sale-leaseback financing | — | 508 | — | — | 508 |
| Debt issuance costs | — | (50) | — | — | (50) |
| Intercompany dividend | — | — | (479) | 479 | — |
| Net borrowing with Affiliates | — | 841 | — | (841) | — |
| Net cash provided by (used in) financing activities | — | 479 | (481) | (362) | (364) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | — | (19) | 7 | — | (12) |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | — | 219 | 31 | — | 250 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF YEAR | $ — | $ 200 | $ 38 | $ — | $ 238 |

134

MOAC000796

**Sears Holdings Corporation**
**Schedule II-Valuation and Qualifying Accounts**
**Years 2017, 2016 and 2015**

| millions | Balance at beginning of period | | Additions charged to costs and expenses | | (Deductions) | | Balance at end of period |
|---|---|---|---|---|---|---|---|
| Allowance for Doubtful Accounts[1]: | | | | | | | |
| 2017 | $ | 37 | $ | 7 | $ | (9) | $ | 35 |
| 2016 | | 34 | | 9 | | (6) | | 37 |
| 2015 | | 25 | | 10 | | (1) | | 34 |
| Allowance for Deferred Tax Assets[2]: | | | | | | | |
| 2017 | $ | 5,519 | $ | 86 | $ | (1,418) | $ | 4,187 |
| 2016 | | 4,757 | | 1,000 | | (238) | | 5,519 |
| 2015 | | 4,478 | | 603 | | (324) | | 4,757 |

---

[1]    Charges to the account are for the purposes for which the reserves were created.

[2]    In 2017, the deferred tax assets and liabilities, along with the valuation allowance, decreased due to the reduction in the corporate income tax rate from 35% to 21% pursuant to the Tax Act. In addition, the pension liability and other federal and state deferred tax assets decreased during the year.

MOAC000797

### MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The management of Sears Holdings Corporation is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting at February 3, 2018. In making its assessment, management used the criteria set forth in the *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The assessment included the documentation and understanding of the Company's internal control over financial reporting. Management evaluated the design effectiveness and tested the operating effectiveness of internal controls over financial reporting to form its conclusion.

Based on this evaluation, management concluded that, at February 3, 2018, the Company's internal control over financial reporting is effective to provide reasonable assurance that the Company's financial statements are fairly presented in conformity with generally accepted accounting principles.

Deloitte & Touche LLP, independent registered public accounting firm, has reported on the effectiveness of the Company's internal control over financial reporting at February 3, 2018, as stated in their report included herein.

MOAC000798

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of Sears Holdings Corporation

**Opinions on the Financial Statements and Internal Control over Financial Reporting**

We have audited the accompanying consolidated balance sheets of Sears Holdings Corporation and subsidiaries (the "Company") as of February 3, 2018 and January 28, 2017, the related consolidated statements of operations, comprehensive income (loss), deficit, and cash flows, for each of the three years in the period ended February 3, 2018, and the related notes and the schedule listed in the Index at Item 8 (collectively referred to as the "financial statements"). We also have audited the Company's internal control over financial reporting as of February 3, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of February 3, 2018 and January 28, 2017, and the results of its operations and its cash flows for each of the three years in the period ended February 3, 2018, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of February 3, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by COSO.

**Basis for Opinions**

The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on these financial statements and an opinion on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the financial statements included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures to respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made

MOAC000799

only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ DELOITTE & TOUCHE LLP

Deloitte & Touche LLP
Chicago, Illinois
March 23, 2018

We have served as the Company's auditor since 2005.

138

MOAC000800

**Item 9.        Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

### Item 9A. Controls and Procedures

Our management, with the participation of our principal executive and principal financial officers, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Annual Report on Form 10-K (the "Evaluation Date"). Based on this evaluation, the principal executive and principal financial officers concluded that, as of the Evaluation Date, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate to allow timely decisions regarding required disclosure.

In addition, based on that evaluation, no changes in our internal control over financial reporting have occurred during our last quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Management's annual report on internal control over financial reporting and the report of our independent registered public accounting firm appears in Part II, Item 8. Financial Statements and Supplementary Data of this Annual Report on Form 10-K.

### Item 9B.    Other Information

Not applicable.

139

MOAC000801

## PART III

**Item 10.        Directors, Executive Officers and Corporate Governance**

Information required by this Item 10 with respect to members of our Board of Directors and our Audit Committee will be included under the headings "Election of Directors," "Election of Directors - Committees of the Board of Directors," and "Corporate Governance - Director Independence" of our definitive proxy statement for our annual meeting of stockholders to be held on May 9, 2018 (the "2018 Proxy Statement") and is incorporated herein by reference. Information required by this Item 10 with respect to Section 16(a) beneficial ownership reporting compliance will be included under the heading "Other Information - Section 16(a) Beneficial Ownership Reporting Compliance" of the 2018 Proxy Statement and is incorporated herein by reference.

The information required by this Item 10 regarding the Company's executive officers is set forth under the heading Executive Officers of the Registrant in Part I of this Annual Report on Form 10-K and is incorporated herein by reference.

Holdings has adopted a Code of Conduct, which applies to all employees, including our principal executive officer, principal financial officer and principal accounting officer, and a Code of Conduct for its Board of Directors. Directors who are also officers of Holdings are subject to both codes of conduct. Each code of conduct is a code of ethics as defined in Item 406 of SEC Regulation S-K. The codes of conduct are available in the "Investors - Corporate Governance" section of our website at *www.searsholdings.com.* Any amendment to, or waiver from, a provision of the codes of conduct will be posted to the above-referenced website.

There were no material changes to the process by which stockholders may recommend nominees to the Board of Directors during the last year.

**Item 11.        Executive Compensation**

Information regarding named executive officer and director compensation will be included under the headings "Executive Compensation," "Compensation of Directors," and "Compensation Committee Report" of the 2018 Proxy Statement and is incorporated herein by reference.

**Item 12.        Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Information regarding security ownership of certain beneficial owners and management will be included under the heading "Amount and Nature of Beneficial Ownership" of the 2018 Proxy Statement and is incorporated herein by reference.

See also Equity Compensation Plan Information in Item 5 of this Report for a discussion of securities authorized for issuance under equity compensation plans.

**Item 13.        Certain Relationships and Related Transactions, and Director Independence**

Information regarding certain relationships and related transactions and director independence will be included under the headings "Certain Relationships and Transactions," "Review and Approval of Transactions with Related Persons" and "Corporate Governance" of the 2018 Proxy Statement and is incorporated herein by reference.

**Item 14.        Principal Accounting Fees and Services**

Information regarding principal accountant fees and services will be included under the heading "Independent Registered Public Accounting Firm Fees" of the 2018 Proxy Statement and is incorporated herein by reference.

MOAC000802

## PART IV

**Item 15.        Exhibits, Financial Statement Schedules**

(a)        The following documents are filed as part of this report:

1.        *Financial Statements*

Financial statements filed as part of this Annual Report on Form 10-K are listed under Item 8.

2.        *Financial Statement Schedule*

The financial statement schedule filed as part of this Annual Report on Form 10-K is listed under Item 8.

The separate financial statements and summarized financial information of majority-owned subsidiaries not consolidated and of 50% or less owned persons have been omitted because they are not required pursuant to conditions set forth in Rules 3-09 and 1-02(w) of Regulation S-X.

All other schedules have been omitted because they are not required under the instructions contained in Regulation S-X because the information called for is contained in the financial statements and notes thereto.

(b)    *Exhibits*

An "Exhibit Index" has been filed as part of this Report beginning on Page E-1 and is incorporated herein by this reference.

Certain of the agreements incorporated by reference into this report contain representations and warranties and other agreements and undertakings by us and third parties. These representations and warranties, agreements and undertakings have been made as of specific dates, may be subject to important qualifications and limitations agreed to by the parties to the agreement in connection with negotiating the terms of the agreement, and have been included in the agreement for the purpose of allocating risk between the parties to the agreement rather than to establish matters as facts. Any such representations and warranties, agreements, and undertakings have been made solely for the benefit of the parties to the agreement and should not be relied upon by any other person.

**Item 16.        Form 10-K Summary**

None.

MOAC000803

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SEARS HOLDINGS CORPORATION

By:    /S/   ROBERT A. RIECKER

Name:    Robert A. Riecker

Title:    *Chief Financial Officer*

Date: March 23, 2018

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities stated and on the dates indicated.

| Signature | Capacity | Date |
|---|---|---|
| /S/ EDWARD S. LAMPERT<br>Edward S. Lampert | Director, Chairman of the Board of Directors, and Chief Executive Officer (principal executive officer) | March 23, 2018 |
| /S/ ROBERT A. RIECKER<br>Robert A. Riecker | Chief Financial Officer (principal financial officer and principal accounting officer) | March 23, 2018 |
| /S/ PAUL G. DEPODESTA<br>Paul G. DePodesta | Director | March 23, 2018 |
| /S/ KUNAL S. KAMLANI<br>Kunal S. Kamlani | Director | March 23, 2018 |
| /S/ WILLIAM C. KUNKLER, III<br>William C. Kunkler, III | Director | March 23, 2018 |
| /S/ ANN N. REESE<br>Ann N. Reese | Director | March 23, 2018 |
| /S/ THOMAS J. TISCH<br>Thomas J. Tisch | Director | March 23, 2018 |

142

MOAC000804

## EXHIBIT INDEX

2.1    Purchase and Sale Agreement, dated as of January 5, 2017, by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. (incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K, dated January 5, 2017, filed on January 10, 2017 (File No. 001-36693)).

2.2    First Amendment to Purchase and Sale Agreement, dated April 13, 2017, by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. (incorporated by reference to Exhibit 10.6 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).

2.3    Second Amendment to Purchase and Sale Agreement, dated July 28, 2017, by and between Sears Holdings Corporation and Stanley Black & Decker (incorporated by reference to Exhibit 2.1 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended July 29, 2017 (File No. 001-36693)).

3.1    Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K, dated March 24, 2005, filed on March 24, 2005 (File No. 000-51217)).

3.2    Amended and Restated By-Laws (incorporated by reference to Exhibit 3.2 to Registrant's Current Report on Form 8-K, dated January 22, 2014, filed on January 24, 2014 (File No. 000-51217)).

4.1    Registrant hereby agrees to furnish to the Commission, upon request, the instruments defining the rights of holders of each issue of long-term debt of Registrant and its consolidated subsidiaries.

4.2    Indenture, dated as of October 12, 2010, among Sears Holdings Corporation, the guarantors party thereto and Wells Fargo Bank, National Association, as Trustee and Collateral Agent (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated October 12, 2010, filed on October 15, 2010 (File No. 000-51217)).

4.3    Fourth Supplemental Indenture, dated as of January 9, 2018, among Sears Holdings Corporation, the guarantors party thereto and Wilmington Trust, National Association, as successor trustee and collateral agent (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated January 4, 2018, filed January 10, 2018 (File No. 001-36693)).

4.4    Fifth Supplemental Indenture, dated as of March 20, 2018, among Sears Holdings Corporation, the guarantors party thereto and Wilmington Trust, National Association, as successor trustee and collateral agent (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed March 23, 2018 (File No. 001-36693)).

4.5    Indenture, dated as of March 20, 2018, by and among Sears Holdings Corporation, the guarantors party thereto and Computershare Trust Company, N.A. (including form of note) (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed March 23, 2018 (File No. 001-36693)).

4.6    Amended and Restated Security Agreement, dated as of March 20, 2018, among Sears Holdings Corporation, the guarantors party thereto and National Association, as Collateral Agent (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed on March 23, 2018 (File No. 001-36693)).

4.7    Second Amended and Restated Intercreditor Agreement, dated as of March 20, 2018, by and among Bank of America, N.A. and Wells Fargo Bank, National Association as ABL Agents, and Wilmington Trust, National Association, as trustee (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed on March 23, 2018 (File No. 001-36693)).

4.8    Registration Rights Agreement, dated as of October 12, 2010, by and among Sears Holdings Corporation and the guarantors party thereto and Banc of America Securities LLC (incorporated by reference to Exhibit 4.4 to Registrant's Current Report on Form 8-K, dated October 12, 2010, filed on October 15, 2010 (File No. 000-51217)).

4.90    Indenture, dated as of November 21, 2014, by and between Sears Holdings Corporation and Computershare Trust Company, N.A., as Trustee (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated November 21, 2014, filed on November 21, 2014 (File No. 001-36693)).

E-1

MOAC000805

4.10     First Supplemental Indenture, dated as of November 21, 2014, by and between Sears Holdings Corporation and Computershare Trust Company, N.A., as Trustee (including form of note) (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated November 21, 2014, filed on November 21, 2014 (File No. 001-36693)).

4.11     Second Supplemental Indenture, dated as of March 20, 2018, by and by and between Sears Holdings Corporation and Computershare Trust Company, N.A., as Trustee (including form of note) (incorporated by reference to Exhibit 4.4 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed on March 23, 2018 (File No. 001-36693)).

4.12     Warrant Agreement, dated as of November 21, 2014, by and between Sears Holdings Corporation, Computershare Inc. and Computershare Trust Company, N.A., as Warrant Agent (including form of warrant certificate) (incorporated by reference to Exhibit 4.3 to Registrant's Current Report on Form 8-K, dated November 21, 2014, filed on November 21, 2014 (File No. 001-36693)).

10.1     Guarantee executed by Sears, Roebuck and Co. under the Indenture, dated as of May 15, 1995, between Sears Roebuck Acceptance Corp. and JP Morgan Chase Bank (successor to The Chase Manhattan Bank, N.A.), as supplemented by the First Supplemental Indenture, dated as of November 3, 2003 (incorporated by reference to Exhibit 4(g) to Sears Roebuck Acceptance Corp.'s Quarterly Report on Form 10-Q for the fiscal quarter ended September 27, 2003 (File No. 001-04040)).

10.2     Guarantee executed by Sears, Roebuck and Co. under the Indenture, dated as of October 1, 2002, between Sears Roebuck Acceptance Corp. and BNY Midwest Trust Company, as supplemented by the First Supplemental Indenture, dated as of November 3, 2003 (incorporated by reference to Exhibit 4(h) to Sears Roebuck Acceptance Corp.'s Quarterly Report on Form 10-Q for the fiscal quarter ended September 27, 2003 (File No. 001-04040)).

10.3     Guarantee, dated as of November 3, 2003, by Sears, Roebuck and Co. of the commercial paper master notes of Sears Roebuck Acceptance Corp. (incorporated by reference to Exhibit 10.38 to Sears, Roebuck and Co.'s Annual Report on Form 10-K for the fiscal year ended January 3, 2004 (File No. 001-00416)).

10.4     Third Amended and Restated Credit Agreement, dated as of July 21, 2015, between Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, the lenders party thereto, and Bank of America, N.A., as agent (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended August 1, 2015 (File No. 001-36693))(1).

10.5     First Amendment to Third Amended and Restated Credit Agreement, dated April 8, 2016, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders party thereto and Bank of America, N.A., as agent (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated April 8, 2016, filed on April 12, 2016 (File No. 001-36693)).

10.6     Second Amendment to Third Amended and Restated Credit Agreement, dated February 10, 2017, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders party thereto and Bank of America, N.A., as agent (incorporated by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 28, 2017 (File No. 001-36693)).

10.7     Third Amendment to Third Amended and Restated Credit Agreement, dated as of December 12, 2017, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders party thereto and Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated December 12, 2017, filed December 12, 2017 (File No. 001-36693)).

10.8     Fourth Amendment to Third Amended and Restated Credit Agreement, dated as of February 7, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders party thereto, the issuing lenders party thereto, Bank of America, N.A., as administrative agent and collateral agent, and Wells Fargo Bank, National Association, as co-collateral agent (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated February 7, 2018, filed February 13, 2018 (File No. 001-36693)).

MOAC000806

10.9    Confirmation, Ratification and Amendment of Ancillary Loan Documents, dated April 8, 2016, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, certain of their respective subsidiaries and Bank of America, N.A., as administrative agent for its own benefit and the benefit of the other Credit Parties (as defined in the amendment to the Credit Agreement) (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K, dated April 8, 2016, filed on April 12, 2016 (File No. 001-36693)).

10.10    Third Amended and Restated Guarantee and Collateral Agreement, dated as of July 21, 2015, among Sears Holdings Corporation, Sears, Roebuck and Co., Sears Roebuck Acceptance Corp., Kmart Holding Corporation, Kmart Corporation and certain of their respective subsidiaries, as Grantors, and Bank of America, N.A., Wells Fargo Bank, National Association and General Electric Capital Corporation, as Co-Collateral Agents (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended August 1, 2015 (File No. 001-36693)).

10.11    Loan Agreement, dated as of September 15, 2014, by and between Sears, Roebuck and Co., Sears Development Co., Kmart Corporation, JPP II, LLC and JPP, LLC (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended November 1, 2014 (File No. 001-36693)).

10.12    Guaranty, dated as of September 15, 2014, by and between Sears Holdings Corporation, JPP II, LLC and JPP, LLC (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended November 1, 2014 (File No. 001-36693)).

10.13    Amendment to Loan Agreement, dated as of February 25, 2015, by and between JPP II, LLC, JPP, LLC, Sears Roebuck and Co., Sears Development Co. and Kmart Corporation (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated February 26, 2015, filed on February 26, 2015 (File No. 001-36693)).

10.14    Amended and Restated Program Agreement, dated as of July 15, 2003, amended and restated as of November 3, 2003, by and between Sears, Roebuck and Co., Sears Intellectual Property Management Company and Citibank (USA) N.A. (incorporated by reference to Exhibit 10(a) to Sears, Roebuck and Co.'s Quarterly Report on Form 10-Q for the fiscal quarter ended September 27, 2003 (File No. 001-00416)).

10.15    Terms Sheet For Revision of Program Agreement Between Sears, Roebuck and Co. and Citibank USA, N.A., dated April 29, 2005 (incorporated by reference to Exhibit 10.40 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 30, 2005 (File No. 000-51217)).

10.16    Sears Holdings Corporation Director Compensation Program, as amended (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 1, 2010 (File No. 000-51217)).**

10.17    Sears Holdings Corporation 2013 Stock Plan (incorporated by reference to Appendix A to Registrant's Proxy Statement dated March 28, 2013 (File No. 000-51217)).**

10.18    Sears Holdings Corporation Amended and Restated Umbrella Incentive Program (incorporated by reference to Appendix C to Registrant's Proxy Statement dated March 28, 2013 (File No. 000-51217)).**

10.19    Amendment to the Performance Measures under the Amended and Restated Sears Holdings Corporation Umbrella Incentive Program (incorporated by reference to Appendix B to Registrant's Proxy Statement dated March 28, 2013 (File No. 000-51217)).**

10.20    Form of Sears Holdings Corporation Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended July 30, 2011 (File No. 000-51217)).**

10.21    Form of Sears Holdings Corporation Restricted Stock Award Agreement: Terms and Conditions (incorporated by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K for the fiscal year ended February 1, 2014 (File No. 000-51217)).**

10.22    Form of Sears Holdings Corporation Restricted Stock Unit Award Agreement: Terms and Conditions (incorporated by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K for the fiscal year ended February 1, 2014 (File No. 000-51217)).**

MOAC000807

10.23    Form of Cash Right - Addendum to Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 28, 2012 (File No. 000-51217)).**

10.24    Form of Cash Award - Addendum to Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated September 28, 2012, filed on September 28, 2012 (File No. 000-51217)).**

10.25    Form of Cash Award - Addendum to Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated November 30, 2012, filed on November 30, 2012 (File No. 000-51217)).**

10.26    Sears Holdings Corporation Long-Term Incentive Program, effective April 27, 2011 (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 30, 2011 (File No. 000-51217)).**

10.27    Sears Holdings Corporation Cash Long-Term Incentive Plan (Amended and Restated Effective April 10, 2015) (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 2, 2015 (File No. 001-36693)).**

10.28    Sears Holdings Corporation Annual Incentive Plan (Amended and Restated Effective April 10, 2015) (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 2, 2015 (File No. 001-36693)).**

10.29    2015 Additional Definitions under Sears Holdings Corporation Annual Incentive Plan (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 2, 2015 (File No. 001-36693)).**

10.30    2013 Additional Definitions under Sears Holdings Corporation Long-Term Incentive Program (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K, dated February 12, 2013, filed on February 19, 2013 (File No. 000-51217)).**

10.31    2014 Additional Definitions under Sears Holdings Corporation Long-Term Incentive Program (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 3, 2014 (File No. 000-51217)).**

10.32    2015 Additional Definitions under Sears Holdings Corporation Long-Term Incentive Program (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 2, 2015 (File No. 001-36693)).**

10.33    Form of LTIP Award Agreement (incorporated by reference to Exhibit 10.32 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 31, 2015 (File No. 001-36693).**

10.34    Form of Cash Award - Addendum to Restricted Stock Award(s) (Lands' End Make-Whole) (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 3, 2014 (File No. 000-51217)).**

10.35    Form of Cash Award - Addendum to Restricted Stock Unit Award(s) (Lands' End Make-Whole) (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 3, 2014 (File No. 000-51217)).**

10.36    Form of Cash Award - Addendum to Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated October 22, 2014, filed on October 22, 2014 (File No. 001-36693)).**

10.37    Form of Cash Right - Addendum to Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated November 7, 2014, filed on November 7, 2014 (File No. 001-36693)).**

10.38    Form of Cash Right - Addendum to Restricted Stock Award(s) and Restricted Stock Unit Awards (Seritage Make-Whole) (incorporated by reference to Exhibit 10.36 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 30, 2016 (File No. 001-36693).**

MOAC000808

10.39    Form of Executive Severance Agreement (incorporated by reference to Exhibit 10.29 to Registrant's Annual Report on Form 10-K for the fiscal year ended February 1, 2014 (File No. 000-51217)).**

10.40    Form of letter from Registrant to Edward S. Lampert relating to employment dated March 18, 2013 (incorporated by reference to Exhibit 10.30 to Registrant's Annual Report on Form 10-K for the fiscal year ended February 2, 2013 (File No. 000-51217)).**

10.41    Addendum, dated as of April 21, 2014, to letter from Registrant to Edward S. Lampert relating to employment dated March 18, 2013 (Lands' End Make-Whole) (incorporated by reference to Exhibit 10.6 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended May 3, 2014 (File No. 000-51217)).**

10.42    Letter Agreement, dated January 28, 2016, by and between the Company and Edward S. Lampert (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated January 28, 2016, filed on February 3, 2016 (File No. 001-36693)).**

10.44    Letter from Registrant to Girish Lakshman relating to employment dated June 11, 2015 (incorporated by reference to Exhibit 10.42 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 30, 2016 (File No. 001-36693)).**

10.45    Letter from Registrant to Stephan Zoll relating to employment dated March 23, 2016 (incorporated by reference to Exhibit 10.46 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 28, 2017 (File No. 001-36693)).**

10.46    Executive Severance Agreement, dated March 24, 2016, by and between the Company and Stephan Zoll (incorporated by reference to Exhibit 10.47 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 28, 2017 (File No. 001-36693)).**

10.47    Letter from Registrant to Jason M. Hollar relating to employment dated as of September 18, 2014 (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended October 29, 2016 (File No. 001-36693)).**

10.48    Letter from Registrant to Jason M. Hollar relating to employment dated as of October 13, 2016 (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated October 13, 2016, filed on October 14, 2016 (File No. 001-36693)).**

10.49    Letter from Registrant to Robert A. Riecker, dated as of August 27, 2015 (incorporated by reference to Exhibit 10.12 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).**

10.50    Special Retention Award Agreement, dated August 27, 2015, by and between Sears Holdings Corporation and Robert A. Riecker (incorporated by reference to Exhibit 10.13 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).**

10.51    Letter from Registrant to Robert A. Riecker, dated as of August 15, 2016 (incorporated by reference to Exhibit 10.14 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).**

10.52    Letter from Registrant to Robert A. Riecker, dated as of October 13, 2016 (incorporated by reference to Exhibit 10.15 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).**

10.53    Letter from Registrant to Robert A. Riecker, dated as of April 21, 2017 (incorporated by reference to Exhibit 10.16 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).**

*10.54    Letter from Registrant to Perry D. Schwartz, dated as of August 15, 2016.**

*10.55    Letter from Registrant to Perry D. Schwartz, dated as of January 31, 2017. **

*10.56    Letter from Registrant to Perry D. Schwartz, dated as of June 21, 2017. **

*10.57    Letter from Registrant to Robert Naedele, dated as of January 19, 2017.**

MOAC000809

*10.58    Letter from Registrant to Leena Munjal, dated as of January 29, 2014.**

*10.59    Letter from Registrant to Leena Munjal, dated as of January 8, 2018.**

*10.60    Special Retention Award Agreement, dated January 8, 2018, by and between Sears Holdings Corporation and Leena Munjal.**

10.61    Master Lease by and among Seritage SRC Finance LLC, Seritage KMT Finance LLC, Kmart Operations, LLC, and Sears Operations, LLC, dated as of July 7, 2015 (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated July 7, 2015, filed on July 13, 2015 (File No. 001-36693)).

10.62    Pension Plan Protection and Forbearance Agreement, dated as of March 18, 2016, by and between Sears Holdings Corporation, certain of its subsidiaries and Pension Benefit Guaranty Corporation (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated March 18, 2016, filed on March 24, 2016 (File No. 001-36693).(1)

10.63    Consent, Waiver and Amendment, dated as of March 8, 2017, by and between Sears Holdings Corporation, certain of its subsidiaries and Pension Benefit Guaranty Corporation (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated March 8, 2017, filed March 9, 2017 (File No. 001-36693)).

10.64    Amendment No. 1 to Consent, Waiver and Amendment, dated as of June 29, 2017, among Sears Holdings Corporation, the subsidiaries of Sears Holdings Corporation party thereto and Pension Benefit Guaranty Corporation (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended July 29, 2017 (File No. 001-36693)).

10.65    REMIC Amendment to PPPFA, Craftsman Consent and Other Transaction Documents, dated as of November 7, 2017, by and among Sears Holdings Corporation, certain of its subsidiaries and Pension Benefit Guaranty Corporation (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated November 7, 2017, filed November 14, 2017 (File No. 001-36693)).

10.66    Loan Agreement, dated April 8, 2016, by and among JPP, LLC, JPP II, LLC, Cascade Investment, L.L.C., Sears, Roebuck and Co., Sears Development Co., Innovel Solutions, Inc., Big Beaver of Florida Development, LLC and Kmart Corporation (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated April 8, 2016, filed on April 12, 2016 (File No. 001-36693)).

10.67    Amended and Restated Loan Agreement, dated as of May 22, 2017, between Sears, Roebuck and Co., Innovel Solutions, Inc., Big Beaver of Florida Development, LLC and Kmart Corporation, as Borrowers, and JPP, LLC, JPP II, LLC and Cascade Investment, L.L.C., as Initial Lenders (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated May 22, 2017, filed on May 24, 2017 (File No. 001-36693)).

10.68    Amendment, dated July 3, 2017, to Amended and Restated Loan Agreement, dated as of May 22, 2017, between Sears, Roebuck and Co., Innovel Solutions, Inc., Big Beaver of Florida Development, LLC and Kmart Corporation, as Borrowers, and JPP, LLC, JPP II, LLC and Cascade Investment, L.L.C., as Initial Lenders (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended July 29, 2017 (File No. 001-36693)).

10.69    Second Amendment to Amended and Restated Loan Agreement, dated as of October 25, 2017, among Sears Roebuck and Co., Sears Development Co., Innovel Solutions Inc., Big Beaver of Florida Development, LLC and Kmart Corporation, collectively as borrower, and JPP, LLC, JPP II, LLC and Cascade Investment, L.L.C. collectively as initial lenders (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated October 25, 2017, filed on October 30, 2017 (File No. 001-36693)).

10.70    Second Lien Credit Agreement, dated as of September 1, 2016, between Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated September 1, 2016, filed on September 2, 2016 (File No. 001-36693)).

MOAC000810

10.71    First Amendment to Second Lien Credit Agreement, dated as of July 7, 2017, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated July 7, 2017, filed on July 7, 2017 (File No. 001-36693)).

10.72    Second Amendment to Second Lien Credit Agreement, dated as of January 9, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, the guarantors party thereto, the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated January 4, 2018, filed January 10, 2018 (File No. 001-36693)).

10.73    Third Amendment to Second Lien Credit Agreement, dated as of February 7, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto, and JPP, LLC, as administrative and collateral administrator (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated February 7, 2018, filed February 13, 2018 (File No. 001-36693)).

10.74    Fourth Amendment to Second Lien Credit Agreement, dated as of March 20, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto, and JPP, LLC, as administrative and collateral administrator (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed on March 23, 2018 (File No. 001-36693)).

10.75    Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial institutions party thereto from time to time as L/C Lenders, and Citibank, N.A., as Administrative Agent and Issuing Bank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated December 28, 2016, filed on December 30, 2016 (File No. 001-36693)).

10.76    First Amendment dated March 2, 2017, to Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial institutions party thereto from time to time as L/C Lenders, and Citibank, N.A., as Administrative Agent and Issuing Bank (incorporated by reference to Exhibit 10.60 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 28, 2017 (File No. 001-36693)).

10.77    Second Amendment, dated August 1, 2017, to Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial institutions party thereto from time to time as L/C Lenders, and Citibank, N.A., as Administrative Agent and Issuing Bank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated August 1, 2017, filed on August 3, 2017 (File No. 001-36693)).

10.78    Third Amendment, dated August 9, 2017, to Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial institutions party thereto from time to time as L/C Lenders, and Citibank, N.A., as Administrative Agent and Issuing Bank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated August 9, 2017, filed on August 10, 2017 (File No. 001-36693)).

*10.79    Fourth Amendment, dated December 13, 2017, to Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the financial institutions party thereto from time to time as L/C Lenders, and Citibank, N.A., as Administrative Agent and Issuing Bank.

10.80    Loan Agreement, dated as of January 3, 2017, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC and Kmart Corporation, collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated January 3, 2017, filed on January 4, 2017 (File No. 001-36693)).

MOAC000811

10.81    Omnibus Amendment, dated as of January 12, 2017, to Loan Documents and Request for Advance to Loan Agreement, dated as of January 3, 2017 among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC and Kmart Corporation, collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.59 to Registrant's Annual Report on Form 10-K for the fiscal year ended January 28, 2017 (File No. 001-36693)).

10.82    Amended and Restated Loan Agreement, dated as of October 4, 2017, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc. and Troy Coolidge No. 13, LLC collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated October 4, 2017, filed on October 5, 2017 (File No. 001-36693)).

10.83    Second Amended and Restated Loan Agreement, dated as of October 18, 2017, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC, collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated October 18, 2017, filed on October 19, 2017 (File No. 001-36693)).

10.84    Amendment to Second Amended and Restated Loan Agreement, dated as of October 25, 2017, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC, collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated October 25, 2017, filed on October 30, 2017 (File No. 001-36693)).

10.85    Second Amendment to Second Amended and Restated Loan Agreement, dated as of March 8, 2018, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc. and Troy Coolidge No. 13, LLC collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated March 8, 2018, filed on March 14, 2018 (File No. 001-36693)).

10.86    Term Loan Credit Agreement, dated as of January 4, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto from time to time, and JPP, LLC, as administrative and collateral agent   (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated January 4, 2018, filed January 10, 2018 (File No. 001-36693)).

*10.87    Term Increase Amendment No. 1 to the Term Loan Credit Agreement, dated as of January 19, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto from time to time, and JPP, LLC, as administrative and collateral agent, each term increase lender and each of the other loan parties party thereto.

10.88    Amendment to Term Loan Credit Agreement, dated as of January 29, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders and other entities party thereto, and JPP, LLC, as administrative and collateral agent (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated January 29, 2018, filed February 1, 2018 (File No. 001-36693)).

10.89    Third Amendment to Term Loan Credit Agreement, dated as of February 7, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K, dated February 7, 2018, filed February 13, 2018 (File No. 001-36693)).

MOAC000812

*10.90    Fourth Amendment to Term Loan Credit Agreement dated as of February 26, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto from time to time, and JPP, LLC, as administrative agent and collateral administrator.

*10.91    Credit Agreement, dated as of March 14, 2018, among SRC O.P. LLC, SRC Facilities LLC and SR Real Estate (TX), LLC, as the borrowers, the lenders party thereto, UBS AG, Stamford Branch, LLC, as administrative agent, and UBS Securities LLC, as lead arranger and bookrunner.

*10.92    Mezzanine Loan Agreement, dated as of March 14, 2018, among SRC Sparrow 2 LLC, as borrower, JPP, LLC and JPP II, LLC, as lenders, and JPP, LLC, as administrative agent.

10.93    Acquired IP License Agreement, dated as of March 8, 2017, by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated March 8, 2017, filed March 9, 2017 (File No. 001-36693)).

10.94    Letter, dated April 6, 2017, amending Acquired IP License Agreement, dated as of March 8, 2017, by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended April 29, 2017 (File No. 001-36693)).

10.95    Fifth Amendment to Third Amended and Restated Credit Agreement, dated as of March 21, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders party thereto, Bank of America, N.A., as administrative agent, and the other parties thereto (incorporated by reference to Exhibit 10.4 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed March 23, 2018 (File No. 001-36693)).

10.96    Sixth Amendment to Third Amended and Restated Credit Agreement, dated as of March 21, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders party thereto, Bank of America, N.A., as administrative agent, and the other parties thereto (incorporated by reference to Exhibit 10.5 to Registrant's Current Report on Form 8-K, dated March 20, 2018, filed March 23, 2018 (File No. 001-36693)).

*12    Computation of ratio of earnings to fixed charges for Registrant and consolidated subsidiaries.

*21    Subsidiaries of the Registrant.

*23    Consent of Deloitte & Touche LLP.

*31.1    Certifications of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

*31.2    Certifications of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

*32.1    Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

*32.2    Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101    The following financial information from the Annual Report on Form 10-K for the fiscal year ended February 3, 2018, formatted in XBRL (eXtensible Business Reporting Language) and furnished electronically herewith: (i) the Consolidated Statements of Operations for the fiscal years ended February 3, 2018, January 28, 2017 and January 30, 2016; (ii) the Consolidated Statements of Comprehensive Loss for the fiscal years ended February 3, 2018, January 28, 2017 and January 30, 2016; (iii) the Consolidated Balance Sheets at February 3, 2018 and January 28, 2017; (iv) the Consolidated Statements of Cash Flows for the fiscal years ended February 3, 2018, January 28, 2017 and January 30, 2016; (v) the Consolidated Statements of Equity (Deficit) for the fiscal years ended February 3, 2018, January 28, 2017 and January 30, 2016; and (vi) the Notes to Consolidated Financial Statements, tagged as blocks of text and including detailed tags.

E-9

MOAC000813

\*      Filed herewith

\*\*    A management contract or compensatory plan or arrangement required to be filed as an exhibit to this report pursuant to Item 15(b) of Form 10-K.

(1)    Confidential treatment was granted as to omitted portions of this Exhibit. The omitted material has been filed separately with the Securities and Exchange Commission.

MOAC000814

# Exhibit 15 - MOAC

10-Q 1 shldq22018.htm 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED AUGUST 4, 2018**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 000-51217, 001-36693**

# SEARS HOLDINGS CORPORATION
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **20-1920798** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **3333 BEVERLY ROAD, HOFFMAN ESTATES, ILLINOIS** | **60179** |
| (Address of principal executive offices) | (Zip Code) |

### Registrant's Telephone Number, Including Area Code: (847) 286-2500

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒     No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐  Accelerated filer ☒  Non-accelerated filer (Do not check if a smaller reporting company) ☐  Smaller reporting company ☐
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐     No ☒

As of September 7, 2018, the registrant had 108,992,750 common shares, $0.01 par value, outstanding.



**SEARS HOLDINGS CORPORATION**
**INDEX TO QUARTERLY REPORT ON FORM 10-Q**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

|  |  |  | Page |
|---|---|---|---|
| **PART I – FINANCIAL INFORMATION** | | | |
| Item 1. | Financial Statements | | |
| | Condensed Consolidated Statements of Operations (Unaudited) for the 13 and 26 Weeks Ended August 4, 2018 and July 29, 2017 | | 3 |
| | Condensed Consolidated Statements of Comprehensive Loss (Unaudited) for the 13 and 26 Weeks Ended August 4, 2018 and July 29, 2017 | | 4 |
| | Condensed Consolidated Balance Sheets (Unaudited) at August 4, 2018, July 29, 2017 and February 3, 2018 | | 5 |
| | Condensed Consolidated Statements of Cash Flows (Unaudited) for the 26 Weeks Ended August 4, 2018 and July 29, 2017 | | 6 |
| | Condensed Consolidated Statements of Deficit (Unaudited) for the 26 Weeks Ended August 4, 2018 and July 29, 2017 | | 7 |
| | Notes to Condensed Consolidated Financial Statements (Unaudited) | | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 69 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 94 |
| Item 4. | Controls and Procedures | | 94 |
| **PART II – OTHER INFORMATION** | | | |
| Item 1. | Legal Proceedings | | 95 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 95 |
| Item 6. | Exhibits | | 95 |

# SEARS HOLDINGS CORPORATION
## Condensed Consolidated Statements of Operations
(Unaudited)

PART I. FINANCIAL INFORMATION

*Item 1. Financial Statements*

|  | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| *millions, except per share data* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| **REVENUES** | | | | |
| Merchandise sales | $ 2,428 | $ 3,414 | $ 4,640 | $ 6,743 |
| Services and other[1][2] | 754 | 864 | 1,433 | 1,734 |
| Total revenues | 3,182 | 4,278 | 6,073 | 8,477 |
| **COSTS AND EXPENSES** | | | | |
| Cost of sales, buying and occupancy - merchandise sales[3] | 2,055 | 2,815 | 3,954 | 5,594 |
| Cost of sales and occupancy - services and other[1] | 425 | 491 | 812 | 980 |
| Total cost of sales, buying and occupancy | 2,480 | 3,306 | 4,766 | 6,574 |
| Selling and administrative | 864 | 1,123 | 1,770 | 2,344 |
| Depreciation and amortization | 66 | 83 | 133 | 170 |
| Impairment charges | 77 | 5 | 91 | 20 |
| Gain on sales of assets | (103) | (380) | (268) | (1,121) |
| Total costs and expenses | 3,384 | 4,137 | 6,492 | 7,987 |
| Operating income (loss) | (202) | 141 | (419) | 490 |
| Interest expense | (188) | (123) | (354) | (251) |
| Interest and investment income (loss) | 2 | (12) | 3 | (14) |
| Other loss | (139) | (246) | (172) | (292) |
| Loss before income taxes | (527) | (240) | (942) | (67) |
| Income tax (expense) benefit | 19 | (10) | 10 | 62 |
| **NET LOSS ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (508) | $ (250) | $ (932) | $ (5) |
| **NET LOSS PER COMMON SHARE ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | | | | |
| Basic loss per share | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Diluted loss per share | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Basic weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |
| Diluted weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |

[1] Includes merchandise sales to Sears Hometown and Outlet Stores, Inc. ("SHO") of $197 million and $257 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $381 million and $511 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively. Pursuant to the terms of the separation, merchandise is sold to SHO at cost.

[2] Includes revenue from Lands' End, Inc. ("Lands' End") for retail services and rent for Lands' End Shops at owned Sears locations, participation in the Shop Your Way® program and corporate shared services of $7 million and $12 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $16 million and $24 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively.

[3] Includes rent expense (consisting of straight-line rent expense offset by amortization of a deferred gain on sale-leaseback) of $13 million and $19 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $27 million and $38 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively, pursuant to the master lease with Seritage Growth Properties ("Seritage"). Also includes installment expenses of $9 million and $12 million for the 13 weeks ended August 4, 2018 and July 29, 2017, respectively, and $18 million and $24 million for the 26 weeks ended August 4, 2018 and July 29, 2017, respectively.

See accompanying notes.

3

**SEARS HOLDINGS CORPORATION**
**Condensed Consolidated Statements of Comprehensive Income (Loss)**
(Unaudited)

| *millions* | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Net loss | $ (508) | $ (250) | $ (932) | $ (5) |
| Other comprehensive income | | | | |
| Pension and postretirement adjustments, net of tax | 218 | 127 | 254 | 177 |
| Currency translation adjustments, net of tax | (1) | — | — | 1 |
| Total other comprehensive income | 217 | 127 | 254 | 178 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ (291) | $ (123) | $ (678) | $ 173 |

See accompanying notes.

MOAC000818

# SEARS HOLDINGS CORPORATION
## Condensed Consolidated Balance Sheets
(Unaudited)

| *millions* | | August 4, 2018 | | July 29, 2017 | | February 3, 2018 |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | $ | 193 | $ | 212 | $ | 182 |
| Restricted cash | | 248 | | 230 | | 154 |
| Accounts receivable[1] | | 327 | | 370 | | 343 |
| Merchandise inventories | | 2,714 | | 3,433 | | 2,798 |
| Prepaid expenses and other current assets[2] | | 386 | | 334 | | 346 |
| Total current assets | | 3,868 | | 4,579 | | 3,823 |
| Property and equipment (net of accumulated depreciation and amortization of $2,276, $2,676 and $2,381) | | 1,444 | | 1,969 | | 1,729 |
| Goodwill | | 269 | | 269 | | 269 |
| Trade names and other intangible assets | | 1,090 | | 1,249 | | 1,168 |
| Other assets | | 266 | | 301 | | 284 |
| **TOTAL ASSETS** | $ | 6,937 | $ | 8,367 | $ | 7,273 |
| LIABILITIES | | | | | | |
| Current liabilities | | | | | | |
| Short-term borrowings[3] | $ | 1,254 | $ | 546 | $ | 915 |
| Current portion of long-term debt and capitalized lease obligations[4] | | 196 | | 1,052 | | 968 |
| Merchandise payables | | 487 | | 670 | | 576 |
| Other current liabilities[5] | | 1,474 | | 1,700 | | 1,575 |
| Unearned revenues | | 652 | | 704 | | 641 |
| Other taxes | | 214 | | 302 | | 247 |
| Total current liabilities | | 4,277 | | 4,974 | | 4,922 |
| Long-term debt and capitalized lease obligations[6] | | 3,504 | | 2,405 | | 2,249 |
| Pension and postretirement benefits | | 1,164 | | 1,731 | | 1,619 |
| Deferred gain on sale-leaseback | | 305 | | 455 | | 362 |
| Sale-leaseback financing obligation | | 347 | | 230 | | 247 |
| Unearned revenues | | 853 | | 593 | | 539 |
| Other long-term liabilities | | 770 | | 992 | | 935 |
| Long-term deferred tax liabilities | | 119 | | 643 | | 126 |
| Total Liabilities | | 11,339 | | 12,023 | | 10,999 |
| Commitments and contingencies | | | | | | |
| DEFICIT | | | | | | |
| Total Deficit | | (4,402) | | (3,656) | | (3,726) |
| **TOTAL LIABILITIES AND DEFICIT** | $ | 6,937 | $ | 8,367 | $ | 7,273 |

[1] Includes $22 million, $25 million and $28 million of net amounts receivable from SHO, and $1 million, $4 million and $1 million of amounts receivable from Seritage at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. Also includes $1 million of net amounts receivable from Lands' End at July 29, 2017 and February 3, 2018.

[2] Includes $6 million prepaid rent to Seritage at both August 4, 2018 and February 3, 2018.

[3] Includes balances held by related parties of $525 million, $245 million and $645 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, related to our Line of Credit Loans for all periods presented and also our Incremental Loans at February 3, 2018. See Note 2 for defined terms and Notes 2 and 11 for further information.

[4] Includes balances held by related parties of $131 million and $146 million at July 29, 2017 and February 3, 2018, respectively, related to our 2016 Secured Loan Facility for both periods and also our Old Senior Secured Notes at February 3, 2018. See Note 2 for defined terms and Notes 2 and 11 for further information.

[5] Includes $9 million and $24 million of amounts payable to Seritage at August 4, 2018 and July 29, 2017, respectively.

[6] Includes balances held by related parties of $2.3 billion, $1.6 billion and $1.5 billion at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, related to our Subsidiary Notes, Old Senior Unsecured Notes, Second Lien Term Loan, and 2016 Term Loan for all periods presented, our Consolidated Secured Loan Facility, FILO Loan, Mezzanine Loan, Additional Mezzanine Loans, New Senior Secured Notes and New Senior Unsecured Notes at August 4, 2018, our Term Loan Facility at August 4, 2018 and February 3, 2018, our 2017 Secured Loan Facility at July 29, 2017 and February 3, 2018, and our Old Senior Secured Notes at July 29, 2017. See Note 2 for defined terms and Notes 2 and Note 11 for further information.

See accompanying notes.

MOAC000819

## SEARS HOLDINGS CORPORATION
### Condensed Consolidated Statements of Cash Flows
(Unaudited)

|  | 26 Weeks Ended | |
|---|---|---|
| *millions* | **August 4, 2018** | **July 29, 2017** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (932) | $ (5) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Deferred tax valuation allowance | — | (200) |
| Tax benefit resulting from Other Comprehensive Income allocation | (27) | — |
| Depreciation and amortization | 133 | 170 |
| Impairment charges | 91 | 20 |
| Gain on sales of assets | (268) | (1,121) |
| Pension and postretirement plan contributions | (343) | (134) |
| Pension plan settlements | 108 | 200 |
| Payment for insurance transaction | (208) | — |
| Proceeds from Citibank amendment | 425 | — |
| Mark-to-market adjustments of financial instruments | — | 17 |
| Amortization of deferred gain on sale-leaseback | (34) | (40) |
| Amortization of debt issuance costs and accretion of debt discount | 64 | 62 |
| Non-cash PIK interest | 37 | — |
| Other | — | (36) |
| Change in operating assets and liabilities (net of acquisitions and dispositions): | | |
| Deferred income taxes | (8) | 99 |
| Merchandise inventories | 84 | 509 |
| Merchandise payables | (89) | (378) |
| Income and other taxes | (22) | (24) |
| Other operating assets | 65 | 52 |
| Other operating liabilities | (112) | (329) |
| Net cash used in operating activities | (1,036) | (1,138) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from sales of property and investments | 322 | 569 |
| Proceeds from Craftsman Sale | — | 572 |
| Proceeds from sales of receivables[1] | — | 293 |
| Purchases of property and equipment | (32) | (41) |
| Net cash provided by investing activities | 290 | 1,393 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from debt issuances[2] | 1,235 | 330 |
| Repayments of debt[3] | (869) | (717) |
| Increase in short-term borrowings, primarily 90 days or less | 389 | 216 |
| Proceeds from sale-leaseback financing | 130 | 89 |
| Debt issuance costs[4] | (34) | (17) |
| Net cash provided by (used in) financing activities | 851 | (99) |
| NET INCREASE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 105 | 156 |
| **TOTAL CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF YEAR** | 336 | 286 |
| **TOTAL CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF PERIOD** | $ 441 | $ 442 |
| Supplemental Cash Flow Data: | | |
| Income taxes paid, net of refunds | $ 12 | $ 28 |
| Cash interest paid[5] | 223 | 196 |

MOAC000820

| | | |
|---|---|---|
| Unpaid liability to acquire equipment and software | 10 | 6 |
| PIK interest included within other operating liabilities | 11 | — |

(1) Proceeds in 2017 include $63 million from JPP, LLC and JPP II, LLC, entities affiliated with ESL (as defined in Note 1), for the sale of receivables.

(2) Proceeds in 2018 include $891 million from related parties in connection with the Consolidated Secured Loan Facility, FILO Loan, Mezzanine Loan, Additional Mezzanine Loans, Line of Credit Loans and additional borrowings from the 2017 Secured Loan Facility. Proceeds in 2017 include $245 million from related parties in connection with the Line of Credit Loans. See Notes 2 and 11 for further information.

(3) Repayments in 2018 include $67 million to related parties in connection with the Term Loan Facility, 2017 Secured Loan Facility, Incremental Loans and 2016 Secured Loan Facility. Repayments in 2017 include $183 million to related parties in connection with the 2017 Secured Loan Facility, 2016 Secured Loan Facility and 2016 Term Loan. See Notes 2 and 11 for further information.

(4) Includes fees related to our borrowings of $13 million paid to related parties during the 26 weeks ended August 4, 2018. Includes a one-time extension fee equal to $4 million to JPP, LLC and JPP II, LLC, entities affiliated with ESL (as defined in Note 1) during the 26 weeks ended July 29, 2017. See Note 2 for further information.

(5) Cash interest paid includes $103 million and $82 million interest paid to related parties related to our borrowings during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively. See Notes 2 and 11 for further information.

See accompanying notes.

6

MOAC000821

## SEARS HOLDINGS CORPORATION
### Condensed Consolidated Statements of Deficit
(Unaudited)

| | | | | | | Deficit Attributable to Holdings' Shareholders | | | |
|---|---|---|---|---|---|---|---|---|---|
| *dollars and shares in millions* | Number of Shares | | Common Stock | | Treasury Stock | Capital in Excess of Par Value | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Total |
| Balance at January 28, 2017 | 107 | $ | 1 | $ | (5,891) $ | 9,130 $ | (5,519) $ | (1,552) $ | (3,831) |
| Comprehensive income | | | | | | | | | |
| Net loss | — | | — | | — | — | (5) | — | (5) |
| Pension and postretirement adjustments, net of tax | — | | — | | — | — | — | 177 | 177 |
| Currency translation adjustments, net of tax | — | | — | | — | — | — | 1 | 1 |
| Total Comprehensive Income | | | | | | | | | 173 |
| Stock awards | — | | — | | 27 | (28) | — | — | (1) |
| Associate stock purchase | — | | — | | 3 | — | — | — | 3 |
| Balance at July 29, 2017 | 107 | $ | 1 | $ | (5,861) $ | 9,102 $ | (5,524) $ | (1,374) $ | (3,656) |
| Balance at February 3, 2018 | 108 | $ | 1 | $ | (5,820) $ | 9,063 $ | (5,898) $ | (1,072) $ | (3,726) |
| Comprehensive loss | | | | | | | | | |
| Net loss | — | | — | | — | — | (932) | — | (932) |
| Pension and postretirement adjustments, net of tax | — | | — | | — | — | — | 254 | 254 |
| Currency translation adjustments, net of tax | — | | — | | — | — | — | — | — |
| Total Comprehensive Loss | | | | | | | | | (678) |
| Stock awards | 1 | | — | | 97 | (103) | — | — | (6) |
| Associate stock purchase | — | | — | | 8 | — | — | — | 8 |
| Balance at August 4, 2018 | 109 | $ | 1 | $ | (5,715) $ | 8,960 $ | (6,830) $ | (818) $ | (4,402) |

See accompanying notes.

MOAC000822

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## NOTE 1—BASIS OF PRESENTATION

Sears Holdings Corporation ("Holdings") is the parent company of Kmart Holding Corporation ("Kmart") and Sears, Roebuck and Co. ("Sears"). Holdings (together with its subsidiaries, "we," "us," "our," or the "Company") was formed as a Delaware corporation in 2004 in connection with the merger of Kmart and Sears (the "Merger"), on March 24, 2005. We are an integrated retailer with 866 full-line and specialty retail stores as of August 4, 2018 in the United States, operating through Kmart and Sears. We operate under two reportable segments: Kmart and Sears Domestic.

These interim unaudited Condensed Consolidated Financial Statements have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC"). Accordingly, they do not include all of the information and footnotes required in annual consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America. In the opinion of management, all adjustments (which include normal recurring adjustments) considered necessary for a fair presentation have been included. Operating results for the interim period are not necessarily indicative of the results that may be expected for the full fiscal year. The retail business is seasonal in nature, and we generate a high proportion of our revenues and operating cash flows during the fourth quarter of our fiscal year, which includes the holiday season. These interim financial statements and related notes should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

## Citibank Amendment

In May 2018, the Company entered into an amendment to the program agreement with Citibank, N.A. (the "Citibank Amendment"), pursuant to which Citibank offers Sears proprietary and co-branded credit cards and administers the associated credit card program (the "Program"). The Citibank Amendment provides for a five year extension (through November 2, 2025) of our 15-year co-brand and private label credit card relationship along with long-term marketing arrangements that include ongoing enhancements to the Shop Your Way MasterCard rewards program.

The Citibank Amendment removes Sears' credit cards, other than Sears' proprietary cards, not enrolled in a rewards program or enrolled in the "Thank You" rewards program (the "TY/NR Portfolio") from the Program. Under a separate marketing agreement entered into in conjunction with the Citibank Amendment, the Company will continue to receive payments from Citibank in respect of the TY/NR Portfolio, which payments will be determined substantially consistent with how such payments were determined under the Program prior to the Citibank Amendment through December 31, 2020 and will thereafter be based on total sales for the TY/NR Portfolio. Credit cards in the TY/NR Portfolio will continue to be accepted in Sears' sales channels. The Citibank Amendment provides for the Company to continue to receive payments from Citibank in respect of the remaining card portfolio under the Program, which payments will be determined substantially consistent with how such payments were determined under the Program prior to the Citibank Amendment through December 31, 2020 and will thereafter be based on new account spend and total sales for the credit card portfolio.

The Citibank Amendment removes the Company's right to purchase, or arrange for a third party to purchase, Program-related assets in certain circumstances, including upon termination or expiry of the Program, except that the Company will have such right if it elects to extend the Program through November 2, 2027, subject to the satisfaction of the performance conditions, and the Program continues through such date, or in certain circumstances if Sears terminates the Program Agreement because of an uncured material breach of Citibank's obligations thereunder. Sears will have no right to purchase the TY/NR Portfolio being removed from the Program.

Pursuant to the Citibank Amendment, Citibank paid Sears $425 million, and Sears funded a reserve for the benefit of Citibank in the amount of $25 million through an irrevocable standby letter of credit from a third party financial institution. The Company accounted for the Citibank Amendment in accordance with accounting standards applicable to revenue from contracts with customers. The Company initially deferred the $425 million received for the Citibank Amendment and will recognize the revenue over the term of the Program as we satisfy the related performance obligation over time. During the 26 weeks ended August 4, 2018, the Company recognized revenues of $14 million, and expects to recognize revenue of $57 million within the next 12 months and $354 million of revenue

8

MOAC000823

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

thereafter. The Company has accordingly included these amounts within current and long-term unearned revenues, respectively.

**Adoption of Accounting Standards Update: *Revenue from Contracts with Customers***

In May 2014, the Financial Accounting Standards Board ("FASB") issued accounting standards updates which replace the current revenue recognition standards. Subsequently, the FASB has also issued accounting standards updates which clarify the guidance. The new revenue recognition standard provides a five-step analysis of transactions to determine when and how revenue is recognized. The core principle is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The updates may be applied retrospectively for each period presented or as a cumulative-effect adjustment at the date of adoption.

The Company adopted the update in the first quarter of 2018 using the full retrospective method, and, therefore, comparative financial statements of prior years have been adjusted to apply the new standard retrospectively. The adoption impacted the accounting for our Shop Your Way® program, revenues from gift cards and merchandise returns. The expense for Shop Your Way points was previously recognized as customers earned points and recorded within cost of sales. The new guidance requires the Company to allocate the transaction price to products and points on a relative standalone selling price basis, deferring the portion of revenue allocated to the points and recognizing a contract liability for unredeemed points. The change in the accounting for the Shop Your Way program reduced revenue, but had no impact to gross margin. The new guidance also changed the timing of recognition of the unredeemed portion of our gift cards, which was previously recognized using the remote method. The new guidance requires application of the proportional method. The Company reports revenues from merchandise sales net of estimated returns. The new guidance requires the Company to record both an asset and a liability for anticipated customer returns.

The Company elected the following practical expedients with respect to accounting standards for revenue from contracts with customers:

- The Company elected not to disclose the aggregate amount of the transaction price allocated to remaining performance obligations for its contracts that are one year or less, as the revenue is expected to be recognized within the next year;

- The Company has applied the accounting guidance using the portfolio approach as we believe that the effects of applying the guidance to the portfolio would not differ materially from applying the guidance to the individual contracts within that portfolio;

- For completed contracts, the Company has elected to not restate contracts that begin and end within the same annual reporting period;

- For completed contracts that have variable consideration, the Company has elected to use the transaction price at the date the contract was completed rather than estimating variable consideration amounts in the comparative reporting periods;

- The Company applied the update retrospectively for each period presented, but for all reporting periods presented before the date of initial application, the Company elected not to disclose the amount of the transaction price allocated to the remaining performance obligations or an explanation of when the entity expects to recognize that amount as revenue;

- For contracts that were modified before the beginning of the earliest reporting period, the Company has elected to not retrospectively restate the contract for those contract modifications and there was no aggregate effect of modifications that occurred before the beginning of the earliest period.

The Company has made an accounting policy election to exclude from the measurement of transaction price all taxes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction and collected by the Company from a customer (sales tax, value added tax, etc.).

The Company has made an accounting policy election to account for shipping and handling activities performed after a customer obtains control of the good as activities to fulfill the promise to transfer the good.

9

MOAC000824

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

The following financial statement line items for the periods presented were affected by the adoption of the new standard. Operating income for the 13- and 26- week periods ended July 29, 2017 also contains the impact of the accounting standards update related to classification of net periodic pension cost, of $246 million and $292 million, respectively. Also, retained deficit as of January 31, 2016 increased from $3,291 million, as originally reported, to $3,310 million as a result of the adoption of the new standard.

*Condensed Consolidated Statement of Operations*

| | 13 Weeks Ended | | |
| | July 29, 2017 | | |
| *millions, except per share data* | As Originally Reported | As Adjusted | Effect of Adoption of New Standard |
|---|---|---|---|
| Merchandise sales | $ 3,498 | $ 3,414 | $ (84) |
| Services and other | 867 | 864 | (3) |
| Cost of sales, buying and occupancy - merchandise sales | 2,902 | 2,815 | (87) |
| Operating (loss) income | (106) | 141 | 247 |
| Net loss attributable to Holdings' Shareholders | (251) | (250) | 1 |
| Basic loss per share | (2.34) | (2.33) | 0.01 |

| | 26 Weeks Ended | | |
| | July 29, 2017 | | |
| *millions, except per share data* | As Originally Reported | As Adjusted | Effect of Adoption of New Standard |
|---|---|---|---|
| Merchandise sales | $ 6,927 | $ 6,743 | $ (184) |
| Services and other | 1,739 | 1,734 | (5) |
| Cost of sales, buying and occupancy - merchandise sales | 5,785 | 5,594 | (191) |
| Operating income | 196 | 490 | 294 |
| Net loss attributable to Holdings' Shareholders | (7) | (5) | 2 |
| Basic loss per share | (0.07) | (0.05) | 0.02 |

10

MOAC000825

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

*Condensed Consolidated Balance Sheets*

| millions | January 28, 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Originally Reported | | As Adjusted | | Effect of Adoption of New Standard | |
| Prepaid expenses and other current assets | $ | 285 | $ | 300 | $ | 15 |
| Other current liabilities | | 1,956 | | 1,971 | | 15 |
| Other long-term liabilities | | 1,002 | | 1,009 | | 7 |
| Total Deficit | | (3,824) | | (3,831) | | (7) |

| millions | July 29, 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Originally Reported | | As Adjusted | | Effect of Adoption of New Standard | |
| Prepaid expenses and other current assets | $ | 318 | $ | 334 | $ | 16 |
| Other current liabilities | | 1,686 | | 1,700 | | 14 |
| Other long-term liabilities | | 985 | | 992 | | 7 |
| Total Deficit | | (3,651) | | (3,656) | | (5) |

| millions | February 3, 2018 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Originally Reported | | As Adjusted | | Effect of Adoption of New Standard | |
| Prepaid expenses and other current assets | $ | 335 | $ | 346 | $ | 11 |
| Other current liabilities | | 1,568 | | 1,575 | | 7 |
| Other long-term liabilities | | 928 | | 935 | | 7 |
| Total Deficit | | (3,723) | | (3,726) | | (3) |

*Condensed Consolidated Statements of Cash Flows*

| millions | 26 Weeks Ended July 29, 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Originally Reported | | As Adjusted | | Effect of Adoption of New Standard | |
| Net loss | $ | (7) | $ | (5) | $ | 2 |
| Change in other operating liabilities | | (327) | | (329) | | (2) |

The Company's accounting policies, as updated from our Annual Report on Form 10-K for the year ended February 3, 2018, pursuant to the adoption of the new standard, are as follows.

*Revenue Recognition*

Revenues from contracts with customers include sales of merchandise, services and extended service contracts, delivery and handling revenues related to merchandise sold, and fees earned from co-branded credit card programs. Revenue is measured based on the amount of fixed consideration that we expect to receive, reduced by estimates for variable consideration such as returns and promotional discounts. Revenue also excludes any amounts collected on behalf of third parties, including sales taxes. In arrangements where we have multiple performance obligations, the transaction price is allocated to each performance obligation using the relative stand-alone selling price. We generally determine stand-alone selling prices based on the prices charged to customers or using expected cost plus a

11

MOAC000826

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

margin. We generally receive payments from customers for sales of merchandise, extended service contracts, product installation, and delivery and handling at the point of sale and payments from customers for services, fees from co-branded credit card programs and agreements with SHO and Lands' End when the performance obligations are satisfied.

We recognize revenues from retail operations upon the transfer of control of the goods to the customer. The Company satisfies its performance obligation at the point of sale for retail store transactions and upon delivery for online transactions. We defer the recognition of layaway sales and profit until the period in which the customer takes possession of the merchandise, which is when our related performance obligation has been satisfied. For retail store and online transactions where the Company has not transferred control of the goods to the customer at the end of the period, the performance obligation is generally satisfied in the following reporting period.

Revenues from the sale of service contracts and the related direct acquisition costs are deferred and amortized over the lives of the associated contracts, while the associated service costs are expensed as incurred. The Company satisfies its performance obligations for service contracts over time as the Company is obligated to perform the related services over the contract period, while payment from the customer is generally received at the inception of the service contract. Revenues from product installation and repair services are recognized at the time the services are provided, which is also when the Company has satisfied its performance obligations.

Revenues earned in connection with our agreements with SHO and Lands' End are earned upon the transfer of control of merchandise or the satisfaction of the service performance obligation.

The Company has a Shop Your Way program in which customers earn points on purchases which may be redeemed to pay for future purchases. Points earned pursuant to the Shop Your Way program represent performance obligations and the Company allocates revenue between the merchandise or service and Shop Your Way points based on the relative stand-alone selling price of each performance obligation. The Company uses a portfolio approach and the expected cost plus margin approach to determine the stand-alone selling price of Shop Your Way points. The Company's assessment also incorporates our estimate of Shop Your Way points that we expect will not be redeemed (breakage) based on historical redemption patterns. Revenue related to Shop Your Way points is initially deferred and recognized when the points are redeemed or expire. The Company expects to recognize revenue related to the Shop Your Way points performance obligation within one year from when the points are earned by the customer.

We sell gift cards to customers at our retail stores and through our direct to customer operations. The gift cards generally do not have expiration dates. Revenues from gift cards are recognized when the gift card is redeemed by the customer. The Company also recognizes the estimated value of gift cards we expect will not be redeemed (gift card breakage) as revenue in proportion to the redemption of gift cards based on historical redemption patterns when we determine that we do not have a legal obligation to remit the value of the unredeemed gift cards to the relevant jurisdictions.

We also earn revenues through arrangements with third-party financial institutions that manage and directly extend credit relative to our co-branded credit card programs. The third-party financial institutions pay us for generating new accounts and sales activity on co-branded cards, as well as for selling other financial products to cardholders. We recognize these revenues over time as our related performance obligations have been satisfied.

Revenues from merchandise sales are reported net of estimated returns and exclude sales taxes. The typical return period is 30 days and the refund liability for returns is calculated as a percentage of sales based on historical return percentages. Estimated returns are recorded as a reduction of sales and cost of sales. We offer assurance-type warranties on certain Kenmore®, Craftsman®, and DieHard® branded products, as well as on certain services, that we do not consider performance obligations.

*Cost of Sales, Buying and Occupancy*

Cost of sales, buying and occupancy are comprised principally of the costs of merchandise, buying, warehousing and distribution (including receiving and store delivery costs), retail store occupancy costs, product repair, and home service and installation costs, customer shipping and handling costs, vendor allowances, markdowns and physical inventory losses.

12

MOAC000827

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Pension Benefit Guaranty Corporation Agreement**

On March 18, 2016, we entered into a five-year pension plan protection and forbearance agreement (the "PPPFA") with the Pension Benefit Guaranty Corporation ("PBGC"), pursuant to which the Company has agreed to continue to protect, or "ring-fence," pursuant to customary covenants, the assets of certain special purpose subsidiaries (the "Relevant Subsidiaries") holding real estate and/or intellectual property assets. Also under the agreement, the Relevant Subsidiaries granted the PBGC a springing lien on the ring-fenced assets, which lien will be triggered only by (a) failure to make required contributions to the Company's pension plans (the "Plans"), (b) prohibited transfers of ownership interests in the Relevant Subsidiaries, (c) termination events with respect to the Plans, or (d) bankruptcy events with respect to the Company or certain of its material subsidiaries. Under the PPPFA, the PBGC has agreed to forbear from initiating an involuntary termination of the Plans, except upon the occurrence of specified conditions, one of which is based on the aggregate market value of the Company's issued and outstanding stock. As of the date of this report, the Company's stock price is such that the PBGC would be permitted to cease forbearance. The PBGC has been given notice in accordance with the terms of the PPPFA and has not communicated any intention to cease its forbearance.

In November 2017, we entered into an amendment to the PPPFA which provided for the release of 138 of our properties from a ring-fence arrangement, which is further described below and in Note 5.

In August 2018, we entered into an amendment to the PPPFA which provided for the release of 12 of our properties from a ring fence arrangement, which had originally been granted in connection with the Craftsman Sale, as defined below, in exchange for a contribution of $32 million into an escrow for the benefit of our pension plans (the "Required Deposit"). The Required Deposit was made on August 30, 2018, using funds generated from the sale and leaseback of one of the 12 properties.

**Craftsman Brand Sale**

On March 8, 2017, the Company closed its sale of the Craftsman brand to Stanley Black & Decker (the "Craftsman Sale"). The transaction provides Stanley Black & Decker with the right to develop, manufacture and sell Craftsman-branded products outside of Holdings and Sears Hometown & Outlet Stores, Inc. distribution channels. As part of the transaction, Holdings is permitted to continue to offer Craftsman-branded products, sourced from existing suppliers, through its current retail channels via a perpetual license from Stanley Black & Decker, which will be royalty-free for the first 15 years after closing and royalty-bearing thereafter.

The Company received an initial upfront payment of $525 million, subject to closing costs and an adjustment for working capital changes, at closing. In addition, Stanley Black & Decker will pay a further $250 million in cash in three years (the "Craftsman Receivable") and Holdings will receive payments of between 2.5% and 3.5% on new Stanley Black & Decker sales of Craftsman products made during the 15 year period following the closing. In connection with the Craftsman Sale, we recognized a gain in our Kmart segment of $492 million within gain on sales of assets in the Condensed Consolidated Statements of Operations for the 26 weeks ended July 29, 2017, and initially established a receivable of $234 million for the net present value of the Craftsman Receivable. During the 13 weeks ended July 29, 2017, we sold the Craftsman Receivable to a third-party purchaser.

In connection with the closing of the Craftsman Sale, Holdings reached an agreement with the PBGC pursuant to which the PBGC consented to the sale of the Craftsman-related assets that had been "ring-fenced" under the PPPFA and certain related transactions. As a condition to obtaining this consent, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the value of the Craftsman Receivable, with such payments being fully credited against certain of the Company's minimum pension funding obligations in 2017, 2018 and 2019.

The Company also granted a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension funding obligations through the end of 2019 and agreed to certain other amendments to the PPPFA. The real estate assets were released from the ring-fence arrangement in August 2018 as described above and in Note 5.

13

MOAC000828

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Cash and Cash Equivalents and Restricted Cash**

Our cash and cash equivalents include all highly liquid investments with original maturities of three months or less at the date of purchase. The Company classifies cash balances that are legally restricted pursuant to contractual arrangements as restricted cash. The restricted cash balance relates to amounts deposited in escrow for the benefit of our pension plans at each of August 4, 2018, July 29, 2017 and February 3, 2018.

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the Condensed Consolidated Balance Sheets that sum to the total of the same such amounts shown in the Condensed Consolidated Statements of Cash Flows as of August 4, 2018, July 29, 2017 and February 3, 2018.

| millions | August 4, 2018 | | July 29, 2017 | | February 3, 2018 | |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 110 | $ | 121 | $ | 113 |
| Cash posted as collateral | | 5 | | 4 | | 4 |
| Credit card deposits in transit | | 78 | | 87 | | 65 |
| Total cash and cash equivalents | | 193 | | 212 | | 182 |
| Restricted cash | | 248 | | 230 | | 154 |
| Total cash balances | $ | 441 | $ | 442 | $ | 336 |

**Depreciation Expense**

Depreciation expense included within depreciation and amortization reported in the Condensed Consolidated Statements of Operations was $65 million and $82 million for the 13 week periods ended August 4, 2018 and July 29, 2017, respectively, and $131 million and $168 million for the 26 week periods ended August 4, 2018 and July 29, 2017, respectively.

**Liquidity**

We need liquidity to fund both working capital requirements of our businesses and necessary capital expenditures as well as to be available for general corporate purposes, including debt repayments and pension plan contributions. We have experienced losses and negative cash flows for a number of years and while we continue to focus on our overall profitability, including managing expenses, we have continued to incur operating losses in the second quarter and first half of 2018, and continued to fund cash used in operating activities with cash from investing and financing activities. In addition, we will be required to fund a debt payment of $134 million during October 2018, in addition to $668 million of other debt maturing in the next twelve months.

*Recent Sources of Incremental Liquidity*

The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows from operations experienced over the past several years. These actions can be broadly broken down into three categories: (i) financing transactions; (ii) asset sales; and (iii) operational streamlining, including store closings. These financing activities have included the completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility. The actions relative to our assets have included transactions to monetize the value of certain assets such as the sale of the Craftsman brand to Stanley Black & Decker in the first quarter of 2017 for consideration consisting of upfront cash payments and a future royalty stream, sales of properties and investments for proceeds of $1.1 billion in fiscal 2017, and an amendment to our credit card program agreement with Citibank, N.A. which resulted in a payment to the Company of $425 million during the second quarter of 2018. Streamlining actions have included a restructuring program announced at the beginning of 2017 (which produced cost savings during that year and into 2018) and the closure of 137 stores during 2018, and an additional 149 stores that will close during the second half of 2018. The Company intends to take further actions to streamline operations in 2018 to achieve additional cost reductions unrelated to store closures.

14

MOAC000829

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

In addition to previous actions taken, the Company may access other sources of liquidity to support its operations. For instance, we are permitted to obtain longer-term secured financing maturing outside of the maturity date of our domestic credit facility which would not be subject to borrowing base limitations (see Note 2 of Notes to Consolidated Financial Statements). Other options which may be available to us, which we will evaluate and seek to execute as appropriate, include refinancing existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

*Asset Monetization*

A special committee of the board of directors (the "Board") of the Company (the "Special Committee") is overseeing a formal process to explore the sale of our Kenmore brand and related assets, the Sears Home Improvement Products business of the Sears Home Services division and the Parts Direct business of the Sears Home Services division (collectively, the "Sale Assets"). As previously reported, the Board received a letter from ESL Investments, Inc. ("ESL") expressing the view that the Company should pursue a divestiture of the Sale Assets in order to maximize their value, and expressing interest in participating as a purchaser of all or a portion of the Sale Assets should the Company do so. The Board established the Special Committee, which consists solely of independent directors, and is advised by independent advisors, to evaluate any proposals that may be received from ESL with respect to the Sale Assets, to actively solicit third-party interest in the Sale Assets, and to explore any other alternatives with respect to the Sale Assets that may maximize value for the Company. On August 14, 2018 the Special Committee received a non-binding proposal letter from ESL to acquire the Kenmore brand and related assets and the Sears Home Improvement Products business of the Sears Home Services division, each subject to various conditions including obtaining debt financing, and, in the case of Kenmore, obtaining equity financing on terms acceptable to ESL. The Special Committee is evaluating the proposal, and potentially other proposals as part of its formal process.

We also continue to explore ways to unlock value across a range of other assets and to maximize the value of our Sears Home Services, Innovel and Sears Auto Centers businesses, as well as our DieHard brand, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings.

Our efforts also continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio, as we look to de-lever our balance sheet, provide liquidity and continue in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

*Actions to Address Liquidity Needs*

The following actions, which are intended to fund liquidity needs over the next twelve months, are in various stages of completion as of the date of this filing. We believe these actions, some of which we expect, subject to our governance processes, including the process being overseen by the Special Committee, to include related party participation and funding and, in the case of Sale Assets that are sold to ESL, subject to approval by a majority of the disinterested stockholders of Holdings, if completed, would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements.

- Sales of properties securing the remaining principal amount of the Secured Loans to fund the repayment of such Secured Loans;

- Additional borrowings under the Mezzanine Loan Agreement, Term Loan Facility and the Consolidated Secured Loan Facility;

- Monetization of the Sale Assets;

- Extension of maturities beyond September 2019 of Line of Credit Loans under the Second Lien Credit Agreement;

- Additional borrowings secured by real estate assets, borrowings under the short-term basket, or other borrowings;

- Amendments to the terms of certain of our financing arrangements, including to allow interest on some of our debt to paid-in-kind;

15

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

- Further evaluation and right-sizing of our store base, including evaluation of our business categories; and

- Further restructurings to help manage expenses and improve profitability, including additional store closures and the accomplishments of our planned cost savings initiatives.

While we believe that completion of these actions would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements, these actions have not been fully executed as of the date of this report and certain of the actions have not received necessary approvals (including but not limited to approval of the Special Committee and approval of a majority of the disinterested stockholders of the Company in the case of certain proposed transactions with ESL), and/or are at too early of a stage in the process to be considered probable of occurring under applicable accounting guidance as of the date of this report. Accordingly, because we cannot at this time conclude that these actions are probable of occurring under such accounting standards, substantial doubt is deemed to exist about our ability to continue as a going concern. The Company continues to move forward with these proposed actions, including the process being overseen by the Special Committee, and discussions with lenders, in order to complete these actions. The Company believes that completion of these actions, or in some cases substantial progress towards such completion, would alleviate or eliminate the substantial doubt. The Company will continue to reevaluate this assessment.

The PPPFA contains certain limitations on our ability to sell assets, including the Kenmore brand and related assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA and the ability to utilize related party borrowings to provide liquidity when there are short-term delays in the closing of transactions.

The success of the foregoing actions is subject to various risks, uncertainties and other factors, including market conditions, interest in specific assets and our ability to close the sales of assets at valuations and within time frames that are acceptable to us, our ability to effectively and timely execute the above actions to improve the operating performance of our businesses and, in certain cases, the approval and participation of third parties, including our creditors and the PBGC.

If we continue to experience operating losses and we are not able to generate additional liquidity through the actions described above or through some combination of other actions, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement or other financing agreement. Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such deficiency. As of August 4, 2018, our borrowing base was below the above threshold, and if our borrowing base is below the above threshold at the end of our third quarter of 2018, it would trigger an obligation to repurchase or repay second lien debt, in an amount equal to the excess of our funded debt secured by liens on our inventory as of November 3, 2018 over the borrowing base. If we fail to make such repurchase or repayment, we would be in violation of our covenants under our Second Lien Credit Agreement and the indenture relating to our New Senior Secured Notes.

### Sears Canada

At each of August 4, 2018, July 29, 2017 and February 3, 2018, the Company was the beneficial holder of approximately 12 million, or 12%, of the common shares of Sears Canada. In July 2017, Sears Canada filed for court protection and trading of its common shares was suspended. Accordingly, we recognized other-than-temporary impairment of $12 million, thereby reducing the carrying value to zero, within interest and investment loss in our Condensed Consolidated Statements of Operations during the 13- and 26- weeks ended July 29, 2017.

16

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

## NOTE 2—BORROWINGS

Total borrowings were as follows:

| millions | August 4, 2018 | July 29, 2017 | February 3, 2018 |
|---|---|---|---|
| Short-term borrowings: | | | |
| Secured borrowings | $ 660 | $ 216 | $ 271 |
| Line of credit loans | 570 | 330 | 500 |
| Incremental loans | — | — | 144 |
| Secured loan | 24 | — | — |
| Long-term debt, including current portion: | | | |
| Notes and debentures outstanding | 3,639 | 3,360 | 3,145 |
| Capitalized lease obligations | 61 | 97 | 72 |
| Total borrowings | $ 4,954 | $ 4,003 | $ 4,132 |

The fair value of long-term debt, excluding capitalized lease obligations, was $3.5 billion at August 4, 2018, $3.3 billion at July 29, 2017 and $2.8 billion at February 3, 2018. The fair value of our debt was estimated based on quoted market prices for the same or similar issues or on current rates offered to us for debt of the same remaining maturities. Our long-term debt instruments are valued using Level 2 measurements as defined in Note 5 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

*Letter of Credit Facility*

On December 28, 2016, the Company, through Sears Roebuck Acceptance Corp. ("SRAC") and Kmart Corporation (together with SRAC, the "Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into the Letter of Credit and Reimbursement Agreement (the "LC Facility") providing for a $500 million secured standby letter of credit facility (of which $271 million was committed at August 4, 2018) from JPP, LLC and JPP II, LLC, entities affiliated with ESL (collectively, the "Lenders"), with Citibank, N.A., serving as administrative agent and issuing bank.

In August 2017, the Company executed amendments to the LC Facility. The amendments, among other things, extended the maturity to December 28, 2018, eliminated the unused portion of the facility and released the real estate collateral that secured the original LC Facility. The amended LC Facility also permits the Lenders to syndicate all or a portion of their commitments under the facility to other lenders, of which $165 million has been syndicated to unaffiliated third party lenders as of August 4, 2018. In April 2018, the Company executed amendments to the LC Facility, which extended the maturity to December 28, 2019.

The amended LC Facility is guaranteed by the same subsidiaries of the Company that guarantee the obligations under the Amended Domestic Credit Agreement, as defined below. The amended LC Facility is secured by substantially the same collateral as the Amended Domestic Credit Agreement. The amended LC Facility contains a borrowing base calculation, pursuant to which the borrowers are required to cash collateralize the LC Facility if the aggregate obligations under the Amended Domestic Credit Agreement, amended LC Facility and certain other cash management and similar obligations exceed the Modified Borrowing Base, as defined in the amended LC Facility, as of the end of any calendar month.

To secure their obligation to participate in letters of credit issued under the LC Facility, the lenders under the LC Facility are required to maintain cash collateral on deposit with the Issuing Bank in an amount equal to 102% of the commitments under the LC Facility (the "Lender Deposit"). The Borrowers paid the Lenders an upfront fee equal to 1.00% of the aggregate amount of the Lender Deposit, and in connection with the extension of the maturity of the LC Facility in April 2018, the Borrowers paid the Lenders an upfront fee equal to 0.50% of the aggregate amount of the Lender Deposit. In addition, the Borrowers are required to pay a commitment fee on the average daily amount of the Lender Deposit (as such amount may be increased or decreased from time to time) equal to the Eurodollar Rate (as defined under the Amended Domestic Credit Facility) plus 11.0%, as well as certain other fees. The Borrowers are also required to pay a fee equal to 0.50% of the aggregate amount of the Lender Deposit in connection with the

17

### SEARS HOLDINGS CORPORATION
#### Notes to Condensed Consolidated Financial Statements—(Continued)
#### (Unaudited)

termination of the LC Facility, whether at maturity or otherwise, or of any reduction in the amount of the Lenders' commitments under the LC Facility.

The LC Facility includes certain representations and warranties, affirmative and negative covenants and other undertakings, which are subject to important qualifications and limitations set forth in the LC Facility. The LC Facility also contains certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If an event of default occurs, the Lenders may terminate all or any portion of the commitments under the LC Facility, require the Borrowers to cash collateralize the LC Facility and/or exercise any rights they might have under any of the related facility documents (including against the collateral), subject to certain limitations. At each of August 4, 2018, July 29, 2017 and February 3, 2018, we had $271 million of letters of credit outstanding under the LC Facility.

*Secured Loan and Mezzanine Loan*

On March 14, 2018, the Company, through SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC (collectively, the "Secured Loan Borrowers"), entities wholly-owned and controlled indirectly by the Company, entered into a Credit Agreement (the "Credit Agreement") with the lenders party thereto (collectively, the "Secured Lenders"). The Credit Agreement provides for a $200 million term loan (the "Secured Loan") that was initially secured by the Secured Loan Borrowers' interests in 138 real properties that were released from a ring-fence arrangement with the PBGC. The Secured Loan had an original maturity date of December 14, 2018. The Company used the proceeds of the Secured Loan to make a contribution to the Company's pension plans and for general corporate purposes.

Also on March 14, 2018, the Company, through SRC Sparrow 2 LLC (the "Mezzanine Loan Borrower"), an entity wholly-owned and controlled indirectly by the Company, entered into a Mezzanine Loan Agreement (the "Mezzanine Loan Agreement") with the Lenders, entities affiliated with ESL. The Mezzanine Loan Agreement provides for a $240 million term loan (the "Mezzanine Loan") that is secured by a pledge of the equity interests in SRC O.P. LLC, the direct parent company of the entities that own the 138 real properties that initially secured the obligations of the Secured Loan Borrowers under the Credit Agreement. The Mezzanine Loan matures on July 20, 2020. The Company used the proceeds of the Mezzanine Loan to make a contribution to the Company's pension plans.

The Mezzanine Loan Agreement contains an uncommitted accordion feature pursuant to which the Mezzanine Loan Borrower may incur additional loans ("Additional Mezzanine Loans") subject to certain conditions set forth in the Mezzanine Loan Agreement and the Credit Agreement. During the first half of 2018, the Company obtained Additional Mezzanine Loans of $273 million.

On June 29, 2018, the Secured Loan Borrowers entered into a Second Amendment to the Credit Agreement with the Secured Lenders that increased the loan-to-value cap applicable to the aggregate principal amount of the Secured Loan, the Mezzanine Loan and the Additional Mezzanine Loans that may be incurred under the Credit Agreement and the Mezzanine Loan Agreement from 55% to 69%. The Mezzanine Loan Agreement was also amended to make a conforming change to the loan-to-value cap to increase such cap from 55% to 69%. No upfront or other fees were paid by the Secured Loan Borrowers in connection with these amendments.

On August 31, 2018, the Secured Loan Borrowers entered into a Third Amendment to the Credit Agreement with the Secured Lenders pursuant to which the Secured Loan Borrowers borrowed an additional $113 million from the Secured Lenders (together with the original $200 million term loan, the "Secured Loans"), which was used for general corporate purposes. The Secured Loans are secured by the Secured Loan Borrowers' interests in 119 real properties. The Secured Loans mature on August 30, 2019. The Company paid an upfront commitment fee of 2.75% of the additional borrowings.

The Secured Loans, the Mezzanine Loan and the Additional Mezzanine Loans are guaranteed by the Company and certain of its subsidiaries. The Secured Loan originally had interest at an annual interest rate of LIBOR plus 6.5% for the first three months the Secured Loan is outstanding, LIBOR plus 7.5% for the fourth through the sixth month the Secured Loan is outstanding and LIBOR plus 8.5% for the seventh through the ninth month the Secured Loan is outstanding. The Secured Loans will bear interest at an annual interest rate of LIBOR plus 6.5% for the first four months following the Third Amendment to the Credit Agreement, LIBOR plus 7.5% for the fifth through eighth

18

### SEARS HOLDINGS CORPORATION
#### Notes to Condensed Consolidated Financial Statements—(Continued)
#### (Unaudited)

month, and LIBOR plus 8.5% for the ninth through twelve month. Accrued interest is payable monthly during the term of the Secured Loans. The Mezzanine Loan and the Additional Mezzanine Loans bear interest at an annual interest rate of LIBOR plus 11.0%, with accrued interest payable monthly during the term of the Mezzanine Loan and the Additional Mezzanine Loans. The Company paid an upfront commitment fee of 1.5% of the principal amount of the Secured Loan, and paid an arrangement fee. The Mezzanine Borrowers paid upfront commitment fees equal to 1.8% of the principal amount of the Mezzanine Loan and the Additional Mezzanine Loans.

To the extent permitted under other debt of the Company or its affiliates, the Secured Loans, the Mezzanine Loan and the Additional Mezzanine Loans may be prepaid at any time in whole or in part, without penalty or premium. The Secured Loan Borrowers are required to apply the net proceeds of the sale of any real property collateral for the Secured Loans to repay the Secured Loans. Following repayment in full of the Secured Loans, the Mezzanine Loan Borrower is required to apply the net proceeds of the sale of any real property that served as collateral for the Secured Loans to repay the Mezzanine Loan and the Additional Mezzanine Loans. The Company used proceeds of $170 million to pay a portion of the Secured Loan during the 26 weeks ended August 4, 2018.

The Credit Agreement and the Mezzanine Loan Agreement include certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The Credit Agreement and the Mezzanine Loan Agreement have certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Secured Loan Lenders and the Mezzanine Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have (including against the collateral), and require the Secured Loan Borrowers or Mezzanine Loan Borrower to pay a default interest rate of 2.0% in excess of the base interest rate.

At August 4, 2018, the carrying value of the Secured Loan, net of the remaining debt issuance costs, was $24 million. The Secured Loan is included within short-term borrowings in the Condensed Consolidated Balance Sheets at August 4, 2018. At August 4, 2018, the carrying value of the Mezzanine Loan, net of the remaining debt issuance costs, was $230 million. At August 4, 2018, the carrying value of the Additional Mezzanine Loans, net of the remaining debt issuance costs, was $269 million.

*Term Loan Facility*

On January 4, 2018, the Borrowers entered into a Term Loan Credit Agreement (the "Term Loan Credit Agreement") providing for a secured term loan facility (the "Term Loan Facility") from the Lenders, entities affiliated with ESL. The Term Loan Facility is guaranteed by the Company and certain of its subsidiaries that guarantee the Company's other material debt or own material intellectual property. The Term Loan Facility is secured by substantially all of the unencumbered intellectual property of the Company and its subsidiaries, other than intellectual property relating to the Kenmore and DieHard brands, as well as by certain real property interests, in each case subject to certain exclusions. On January 4, 2018, $100 million was borrowed under the Term Loan Facility. The Term Loan Facility also contains an uncommitted incremental loan feature that, subject to the satisfaction of certain conditions, including the consent of the Agent, would permit up to an additional $200 million to be borrowed from other counterparties and secured by the same collateral as the initial loan under the Term Loan Facility. An additional $30 million was borrowed under the Term Loan Facility on January 19, 2018.

On January 29, 2018, the Company entered into an Amendment to the Term Loan Credit Agreement (the "Term Loan Facility Amendment"), pursuant to which an additional $20 million was borrowed from the Lenders and a further $60 million was borrowed from certain unaffiliated lenders, bringing the total amount borrowed under the Term Loan Facility to $210 million at February 3, 2018. The Term Loan Facility Amendment, among other changes, separates the loans under the Term Loan Facility into two tranches. On February 26, 2018, the Company entered into another amendment to the Term Loan Credit Agreement pursuant to which an additional $40 million was borrowed from the Lenders.

The loans under the Term Loan Facility bear interest at a weighted average annual interest rate of LIBOR plus 12.5%, which during the first year must be paid in kind by capitalizing interest. The loans under the Term Loan Facility mature on July 20, 2020. The Company used the proceeds of the Term Loan Facility for general corporate purposes. No upfront or arrangement fees were paid in connection with the Term Loan Facility. The loans under the

MOAC000834

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

Term Loan Facility are prepayable without premium or penalty. The Company used proceeds of $30 million to pay interest and a portion of the Term Loan Facility during the 26 weeks ended August 4, 2018.

The Term Loan Facility includes certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the intellectual property and real property collateral. The Term Loan Facility has certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have (including against the collateral), and require the Borrowers to pay a default interest rate.

At August 4, 2018 and February 3, 2018, the carrying value of the Term Loan Facility, net of the remaining debt issuance costs, was $233 million and $206 million, respectively. The carrying value includes paid-in-kind interest of $15 million and $1 million at August 4, 2018 and February 3, 2018, respectively.

*Consolidated Secured Loan Facility*

On June 4, 2018, the Company, through the Incremental Loan Borrowers (as defined below), entered into a Third Amended and Restated Loan Agreement (the "Consolidated Loan Agreement") with the 2016 Secured Loan Lenders (as defined below), which amends and restates the Second Amended and Restated Loan Agreement, dated as of October 18, 2017. In connection with the Consolidated Loan Agreement, the 2016 Secured Loan Lenders made an additional advance in an aggregate principal amount of approximately $186 million, which was used to repay the loans outstanding under the 2016 Secured Loan Facility and terminate the agreement. In connection therewith, the mortgages on the 13 real properties securing the 2016 Secured Loan Facility were released and these properties were pledged as collateral for the loan under the Consolidated Loan Agreement (the "Consolidated Secured Loan Facility"). After giving effect to the additional advance, the aggregate principal amount of the loan outstanding under the Consolidated Loan Agreement as of June 4, 2018 was approximately $779 million. The Consolidated Secured Loan Facility matures on July 20, 2020.

On September 12, 2018, the Company, through the Incremental Loan Borrowers, entered into a First Amendment to the Consolidated Loan Agreement with the 2016 Secured Loan Lenders, pursuant to which certain of the Incremental Loan Borrowers (the "Additional Advance Borrowers") received an additional advance in aggregate principal amount of $75 million (the "Additional Advance") and granted the 2016 Secured Loan Lenders a first priority lien on an additional 20 real properties. No Incremental Loan Borrower other than the Additional Advance Borrowers shall have any liabilities or obligations in connection with the Additional Advance.

After giving effect to the Additional Advance, the aggregate principal amount of the loan outstanding under the Consolidated Loan Agreement as of September 12, 2018 was approximately $831 million. Approximately $108 million of Consolidated Secured Loan Facility, which as of closing of the Additional Advance was held by Cascade Investment, LLC, is structured as a "first out" tranche evidenced by promissory note "A" ("Note A") and bears interest at LIBOR plus 6.50% per annum. The remainder of Consolidated Secured Loan Facility is evidenced by promissory note "B" ("Note B"), which as of closing of the Additional Advance was held by JPP, LLC and JPP II, LLC, entities affiliated with ESL, and bears interest at LIBOR plus 9.00% per annum. The Consolidated Secured Loan Facility matures on July 20, 2020.

The Incremental Loan Borrowers paid approximately $1.6 million in upfront fees to the 2016 Secured Loan Lenders in connection with the Consolidated Loan Agreement and the Additional Advance Borrowers paid approximately $0.4 million in upfront fees to the 2016 Secured Loan Lenders in connection with the Additional Advance. In addition, to the extent any portion of the loan evidenced by Note A remains outstanding on March 12, 2019, the Incremental Loan Borrowers must pay the holder of Note A an additional fee of 1.00% of the principal amount outstanding under Note A as of such date, and to the extent any portion of the loan evidenced by Note A remains outstanding on September 12, 2019, the Incremental Loan Borrowers must pay the holder of Note A an additional fee of 2.00% of the principal amount outstanding under Note A as of such date.

The Incremental Loan Borrowers have the right, at any time prior to October 15, 2018, to request an additional advance under the Consolidated Loan Agreement in an amount not to exceed $50 million. The making of any such additional advance and the amount thereof shall be subject to the 2016 Secured Loan Lenders' sole discretion and the payment of an origination fee equal to 0.5% of the amount so advanced. If no such additional advance is made,

20

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

or if an additional advance is made in an amount less than $50 million, the 2016 Secured Loan Lenders shall reasonably promptly release their liens on certain of the additional 20 real properties pledged in connection with the Additional Advance.

The Consolidated Secured Loan Facility is guaranteed by the Company and, after giving effect to the Additional Advance, is secured by a first priority lien on 88 real properties owned or leased by the Incremental Loan Borrowers, which includes real property that initially secured the 2017 Secured Loan Facility, Incremental Loans and 2016 Secured Loan Facility. To the extent permitted under other debt of the Company or its affiliates, the Consolidated Secured Loan Facility may be prepaid at any time in whole or in part, without penalty or premium. The Incremental Loan Borrowers are required to apply the net proceeds of the sale of any real property collateral to repay the Consolidated Secured Loan Facility. Any such prepayments or repayments will be applied first to Note A until Note A is repaid in full, and then to Note B, provided, that the holder of Note A shall have the right to waive any such prepayment or repayment (other than in connection with a repayment of the Consolidated Secured Loan Facility in full at maturity or any other prepayment in full or repayment in full of the Consolidated Secured Loan Facility), in which case (x) such prepayment or repayment shall be applied to Note B and (y) such amount shall reduce the principal amount of indebtedness deemed outstanding under Note A solely for the purpose of calculating the delayed origination fees described above. The Company used proceeds of $23 million to pay interest and a portion of the Consolidated Secured Loan Facility during the 26 weeks ended August 4, 2018.

The Consolidated Loan Agreement includes certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The Consolidated Loan Agreement has certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the 2016 Secured Loan Lenders may declare all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the Consolidated Secured Loan Facility documents (including against the collateral), and require the Incremental Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%.

The carrying value of the Consolidated Secured Loan Facility, net of the remaining debt issuance costs, was $748 million at August 4, 2018.

*2017 Secured Loan Facility*

On January 3, 2017, the Company, through Sears, Kmart Stores of Illinois LLC, Kmart of Washington LLC and Kmart Corporation (collectively, "2017 Secured Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, obtained a $500 million real estate loan facility (the "2017 Secured Loan Facility") from the Lenders, entities affiliated with ESL. On January 3, 2017, $321 million was funded under the 2017 Secured Loan Facility, and an additional $179 million was drawn by the Company prior to January 28, 2017. The 2017 Secured Loan Facility had an original maturity of July 20, 2020. The Company used the proceeds of the 2017 Secured Loan Facility for general corporate purposes.

During October 2017, the Company, through the 2017 Secured Loan Borrowers and SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC (collectively, "Incremental Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into amended and restated loan agreements (the "Incremental Loans") with the Lenders, entities affiliated with ESL. The Company borrowed $200 million pursuant to the Incremental Loans, and used the proceeds for general corporate purposes. The Incremental Loans had an original maturity of July 6, 2018.

On March 8, 2018, the Company, through the 2017 Secured Loan Borrowers and SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc. and Troy Coolidge No. 13, LLC (collectively, "Second Incremental Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, entered into a second amendment to the Incremental Loans (the "Second Amendment") with the Lenders, entities affiliated with ESL. Pursuant to the Second Amendment, the Second Incremental Loan Borrowers borrowed an additional $100 million from the Lenders, which had an original maturity of July 20, 2020 and had the same terms as the 2017 Secured Loan Facility, as amended. The Company used the proceeds for general corporate purposes.

21

MOAC000836

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

On June 4, 2018, the 2017 Secured Loan Facility and Incremental Loans were amended and restated by the Consolidated Loan Agreement described above.

Initially, the 2017 Secured Loan Facility had an annual base interest rate of 8%, with accrued interest payable monthly during the term of the 2017 Secured Loan Facility. Pursuant to the Second Amendment, the interest rate increased to LIBOR plus 9%. The Borrowers paid an upfront commitment fee equal to 1.0% of the full principal amount of the 2017 Secured Loan Facility and paid a funding fee equal to 1.0% of the amounts drawn under the 2017 Secured Loan Facility at the time such amounts were drawn. The Incremental Loans had an annual interest rate of 11%, with accrued interest payable monthly. No upfront or funding fees were paid in connection with the Incremental Loans or the Second Amendment.

The 2017 Secured Loan Facility and Incremental Loans were guaranteed by the Company and certain of its subsidiaries, and were secured by a first priority lien on 69 real properties owned by the 2017 Secured Loan Borrowers and Incremental Loan Borrowers and guarantors at inception of the 2017 Secured Loan Facility, and an additional seven real properties owned by the Incremental Loan Borrowers at inception of the Incremental Loans. In certain circumstances, the Lenders and the 2017 Secured Loan Borrowers, Incremental Loan Borrowers and Second Incremental Loan Borrowers were permitted to substitute one or more properties as collateral. To the extent permitted under other debt of the Company or its affiliates, the 2017 Secured Loan Facility was permitted to be prepaid at any time in whole or in part, without penalty or premium. The 2017 Secured Loan Borrowers were required to apply the net proceeds of the sale of any real property collateral for the 2017 Secured Loan Facility to repay the loan. The Company used proceeds of $20 million and $39 million to pay interest and a portion of the 2017 Secured Loan Facility during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively, and $6 million to pay interest and a portion of the Incremental Loans during the 26 weeks ended August 4, 2018.

The 2017 Secured Loan Facility and Incremental Loans included certain representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral. The 2017 Secured Loan Facility and Incremental Loans had certain events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there was an event of default, the Lenders may have declared all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the 2017 Secured Loan Facility or Incremental Loan documents (including against the collateral), and required the 2017 Secured Loan Borrowers, Incremental Loan Borrowers or Second Incremental Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%.

The carrying value of the 2017 Secured Loan Facility, net of the remaining debt issuance costs, was $446 million and $374 million at July 29, 2017 and February 3, 2018, respectively. The carrying value of the Incremental Loans, net of the remaining debt issuance costs, was $144 million at February 3, 2018. The Incremental Loans were included within short-term borrowings in the Condensed Consolidated Balance Sheets at February 3, 2018.

*2016 Secured Loan Facility*

On April 8, 2016, the Company, through Sears, Sears Development Co., Innovel, Big Beaver of Florida Development, LLC and Kmart Corporation (collectively, "2016 Secured Loan Borrowers"), entities wholly-owned and controlled, directly or indirectly by the Company, obtained a $500 million real estate loan facility (the "2016 Secured Loan Facility") from JPP, LLC, JPP II, LLC, and Cascade Investment, LLC (collectively, the "2016 Secured Loan Lenders"). JPP, LLC and JPP II, LLC are entities affiliated with ESL. The first $250 million of the 2016 Secured Loan Facility was funded on April 8, 2016 and the remaining $250 million was funded on April 22, 2016. The funds were used to reduce outstanding borrowings under the Company's asset-based revolving credit facility and for general corporate purposes. The 2016 Secured Loan Facility had an original maturity date of July 7, 2017. In May 2017, the Company reached an agreement to extend the maturity of $400 million of the 2016 Secured Loan Facility to January 2018, with options to further extend the maturity of the loan for up to an additional six months, to July 6, 2018, subject to the satisfaction of certain conditions and the payment of certain fees. On November 21, 2017, the Company notified the 2016 Secured Loan Lenders of its exercise of the first such option to extend the maturity to April 6, 2018, subject to the payment of an extension fee on January 8, 2018, which fee was paid on January 8, 2018. On February 5, 2018, the Company notified the 2016 Secured Loan Lenders of its exercise of the second such option to extend the maturity to July 6, 2018, subject to the payment of an extension fee on April 6,

22

MOAC000837

# SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

2018, which fee was paid on April 6, 2018. The 2016 Secured Loan Facility was included within current portion of long-term debt in the Condensed Consolidated Balance Sheets at July 29, 2017 and February 3, 2018. The carrying value of the 2016 Secured Loan Facility, net of the remaining debt issuance costs, was $258 million and $251 million at July 29, 2017 and February 3, 2018, respectively. As noted above, on June 4, 2018, the Company repaid all loans outstanding under the 2016 Secured Loan Facility, and terminated the agreement.

The 2016 Secured Loan Facility had an annual base interest rate of 8%, with accrued interest payable monthly during the term of the 2016 Secured Loan Facility. The 2016 Secured Loan Borrowers paid an upfront commitment fee equal to 1.0% of the full principal amount of the 2016 Secured Loan Facility and paid a funding fee equal to 1.0% at the time such amounts were drawn. In connection with the May 2017 maturity extension, the Company paid a one-time extension fee equal to $8 million to the extending lenders.

The 2016 Secured Loan Facility was guaranteed by the Company and was originally secured by a first priority lien on 21 real properties owned by the 2016 Secured Loan Borrowers. The 2016 Secured Loan Facility included customary representations and warranties, indemnities and covenants, including with respect to the condition and maintenance of the real property collateral.

The 2016 Secured Loan Facility had customary events of default, including (subject to certain materiality thresholds and grace periods) payment default, failure to comply with covenants, material inaccuracy of representation or warranty, and bankruptcy or insolvency proceedings. If there is an event of default, the 2016 Secured Loan Lenders may have declared all or any portion of the outstanding indebtedness to be immediately due and payable, exercise any rights they might have under any of the 2016 Secured Loan Facility documents (including against the collateral), and required the 2016 Secured Loan Borrowers to pay a default interest rate equal to the greater of (i) 2.5% in excess of the base interest rate and (ii) the prime rate plus 1%. The 2016 Secured Loan Facility was permitted to be prepaid at any time in whole or in part, without penalty or premium. The 2016 Secured Loan Borrowers were required to apply the net proceeds of the sale of any real property collateral for the 2016 Secured Loan Facility to repay the loan. The Company used proceeds of $67 million and $238 million to pay interest and a portion of the 2016 Secured Loan Facility during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively.

*Domestic Credit Agreement*

The Borrowers and Holdings are party to an amended and restated credit agreement (the "Amended Domestic Credit Agreement") with a syndicate of lenders. Pursuant to the Amended Domestic Credit Agreement, the Borrowers have borrowed two senior secured term loan facilities having original principal amounts of $1.0 billion and $750 million (the "Term Loan" and "2016 Term Loan," respectively). The Amended Domestic Credit Agreement currently provides for a $1.5 billion asset-based revolving credit facility (the "Revolving Facility") with a $1.0 billion letter of credit sub-facility, which matures on July 20, 2020. The Term Loan had an original maturity of June 30, 2018 and the 2016 Term Loan matures on July 20, 2020. In December 2017, the Company entered into an agreement to extend the maturity of the Term Loan to January 20, 2019, with the option to further extend the maturity to July 20, 2019, subject to certain conditions, including payment of an extension fee equal to 2.0% of the principal amount of the Term Loan outstanding at the time of such extension. The Amended Domestic Credit Agreement includes an accordion feature that allows the Borrowers to use, subject to borrowing base requirements, existing collateral for the facility to obtain up to $1.0 billion of additional borrowing capacity, of which $750 million was utilized for the 2016 Term Loan (described below). The Amended Domestic Credit Agreement also includes a FILO tranche feature that allows up to an additional $500 million of borrowing capacity and allows Holdings and its subsidiaries to undertake short-term borrowings outside the facility up to $1.0 billion. In February 2018, the Borrowers entered into an amendment that increased the size of the general debt basket to $1.25 billion.

23

MOAC000838

# SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

On March 21, 2018, the Company, through the Borrowers, entered into a fifth amendment (the "Fifth Amendment") and a sixth amendment (the "Sixth Amendment") to the Amended Domestic Credit Agreement pursuant to which the Borrowers borrowed a $125 million FILO term loan (the "FILO Loan") and made certain other changes to the Amended Domestic Credit Agreement. The FILO Loan matures on July 20, 2020. The FILO Loan bears interest at a rate per annum equal to the Eurodollar Rate plus a margin of 8.50% (subject to a floor of 1.50%) (or a base rate plus a margin of 7.50%). The Borrowers are required to pay an early repayment premium of the greater of a make-whole through eight months and 3.00% in the event the FILO Loan is repaid within the first year, and 2.00% in the event the FILO Loan is repaid within the second year. The FILO Loan is guaranteed by the same guarantors and secured by the same assets as the existing loans under the Amended Domestic Credit Agreement, but ranks junior in right of recovery from the collateral relative to such existing loans. The Company paid a fee of 2.25% of the FILO Loan to the initial lenders of the FILO Loan. The initial lenders of the FILO Loan include JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Thomas J. Tisch. The Company received approximately $122 million in net proceeds from the FILO Loan, which proceeds were using to reduce outstanding borrowings under our revolving credit facility. The carrying value of the FILO Loan, net of the remaining discount and debt issuance costs, was $122 million at August 4, 2018.

Revolving advances under the Amended Domestic Credit Agreement bear interest at a rate equal to, at the election of the Borrowers, either the London Interbank Offered Rate ("LIBOR") or a base rate, in either case plus an applicable margin dependent on Holdings' consolidated leverage ratio (as measured under the Amended Domestic Credit Agreement). The margin with respect to borrowings ranges from 3.50% to 4.00% for LIBOR loans and from 2.50% to 3.00% for base rate loans. The Amended Domestic Credit Agreement also provides for the payment of fees with respect to issued and undrawn letters of credit at a rate equal to the margin applicable to LIBOR loans and a commitment fee with respect to unused amounts of the Revolving Facility at a rate equal to 0.625% per annum.

The Revolving Facility is in place as a funding source for general corporate purposes and is secured by a first lien on substantially all of our domestic inventory and credit card and pharmacy receivables, and is subject to a borrowing base formula to determine availability. The Revolving Facility is guaranteed by all domestic subsidiaries of Holdings that own inventory or credit card or pharmacy receivables. The Revolving Facility also permits aggregate second lien indebtedness of up to $2.0 billion, of which $1.1 billion in second lien indebtedness was outstanding at August 4, 2018, resulting in $0.9 billion of permitted second lien indebtedness, subject to limitations contained in our other outstanding indebtedness. If, through asset sales or other means, the value of the above eligible assets is not sufficient to support borrowings of up to the full amount of the commitments under this facility, we will not have full access to the facility, but rather could have access to a lesser amount determined by the borrowing base. Such a decline in the value of eligible assets also could result in our inability to borrow up to the full amount of second lien indebtedness permitted by the domestic credit facility, but rather we could be limited to borrowing a lesser amount determined by the borrowing base as calculated pursuant to the terms of such indenture.

The Term Loan bears interest at a rate equal to, at the election of the Borrowers, either LIBOR (subject to a 1.00% LIBOR floor) or a base rate, plus an applicable margin for LIBOR loans of 4.50% and for base rate loans of 3.50%. Currently, the Borrowers are required to repay the Term Loan in quarterly installments of $2.5 million, with the remainder of the Term Loan maturing January 20, 2019, subject to the right of the Borrowers to extend the maturity to July 20, 2019. Additionally, the Borrowers are required to make certain mandatory repayments of the Term Loan from excess cash flow (as defined in the Amended Domestic Credit Agreement). The Term Loan may be prepaid in whole or part without penalty. The Term Loan is secured by the same collateral as the Revolving Facility on a pari passu basis with the Revolving Facility, and is guaranteed by the same subsidiaries of the Company that guarantee the Revolving Facility. At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, we had borrowings of $98 million, $727 million and $400 million under the Term Loan, and carrying value, net of the remaining discount and debt issuance costs, of $94 million, $723 million and $391 million. The Company repaid the Term Loan during August 2018, resulting in no borrowings outstanding as of the date of this report. A portion of the proceeds received from the Craftsman Sale were used to reduce outstanding borrowings under the Term Loan during 2017.

Amounts borrowed pursuant to the 2016 Term Loan bear interest at a rate equal to LIBOR plus 750 basis points, subject to a 1.00% LIBOR floor. The Company received approximately $722 million in net proceeds from the 2016 Term Loan, which proceeds were used to reduce outstanding borrowings under its asset-based revolving credit facility. The 2016 Term Loan has a maturity date of July 20, 2020, which is the same maturity date as the Company's revolving credit facility commitments, and does not amortize. The 2016 Term Loan is subject to a prepayment

24

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

premium of 2% of the aggregate principal amount of the 2016 Term Loan prepaid on or prior to April 8, 2017 and 1% of the aggregate principal amount of the 2016 Term Loan prepaid after April 8, 2017 and on or prior to April 8, 2018. The obligations under the Amended Domestic Credit Agreement, including the 2016 Term Loan, are secured by a first lien on substantially all of the domestic inventory and credit card and pharmacy receivables of the Company and its subsidiaries and aggregate advances under the Amended Domestic Credit Agreement are subject to a borrowing base formula. The carrying value of the 2016 Term Loan, net of the remaining discount and debt issuance costs, was $561 million, $555 million and $559 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. A portion of the proceeds received from the Craftsman Sale were also used to reduce outstanding borrowings under the 2016 Term Loan during 2017.

The Amended Domestic Credit Agreement limits our ability to make restricted payments, including dividends and share repurchases, subject to specified exceptions that are available if, in each case, no event of default under the credit facility exists immediately before or after giving effect to the restricted payment. These include exceptions that require that projected availability under the credit facility, as defined, to be at least 15%, exceptions that may be subject to certain maximum amounts and an exception that requires that the restricted payment is funded from cash on hand and not from borrowings under the credit facility. Further, the Amended Domestic Credit Agreement includes customary covenants that restrict our ability to make dispositions, prepay debt and make investments, subject, in each case, to various exceptions. The Amended Domestic Credit Agreement also imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement and a requirement that the fixed charge ratio at the last day of any quarter be not less than 1.0 to 1.0. As of August 4, 2018, our fixed charge ratio continues to be less than 1.0 to 1.0, and we are subject to these other requirements based on our availability. If availability under the domestic revolving credit facility were to fall below 10%, the Company would be required to test the fixed charge coverage ratio, and would not comply with the facility, and the lenders under the facility could demand immediate payment in full of all amounts outstanding and terminate their obligations under the facility. In addition, the domestic credit facility provides that in the event we make certain prepayments of indebtedness, for a period of one year thereafter we must maintain availability under the facility of at least 12.5%, and it prohibits certain other prepayments of indebtedness.

At August 4, 2018, July 29, 2017 and February 3, 2018, we had $660 million, $216 million and $271 million, respectively, of Revolving Facility borrowings and $120 million, $389 million and $377 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, of letters of credit outstanding under the Revolving Facility. At August 4, 2018, July 29, 2017 and February 3, 2018, the amount available to borrow under the Revolving Facility was $98 million, $191 million and $69 million, respectively, which reflects the effect of the springing fixed charge coverage ratio covenant and the borrowing base limitation. The majority of the letters of credit outstanding are used to provide collateral for our insurance programs.

*Second Lien Credit Agreement*

On September 1, 2016, the Company, SRAC, and Kmart Corporation (together with SRAC, the "ABL Borrowers") entered into a Second Lien Credit Agreement with the Lenders thereunder, entities affiliated with ESL, pursuant to which the ABL Borrowers borrowed $300 million under a term loan (the "Second Lien Term Loan"). The Company received net proceeds of $291 million, which were used for general corporate purposes.

The maturity date for the Second Lien Term Loan is July 20, 2020 and the Second Lien Term Loan will not amortize. The Second Lien Term Loan bears interest at a rate equal to, at the election of the ABL Borrowers, either LIBOR (subject to a 1.00% floor) or a specified prime rate ("Base Rate"), in either case plus an applicable margin. The margin with respect to the Second Lien Term Loan is 7.50% for LIBOR loans and 6.50% for Base Rate loans.

The Second Lien Credit Agreement was amended on July 7, 2017, providing an uncommitted line of credit facility under which subsidiaries of the Company may from time to time borrow line of credit loans ("Line of Credit Loans") with maturities less than 180 days, subject to applicable borrowing base limitations, in an aggregate principal amount not to exceed $500 million at any time outstanding. In February 2018, the Second Lien Credit Agreement was further amended to, among other things, increase the maximum aggregate principal amount of the Line of Credit Loans to $600 million, extend the maximum duration of the Line of Credit Loans to 270 days and increase the size of the general debt basket to $1.25 billion. During 2017, the Company received aggregate proceeds of $610 million from the issuance of Line of Credit Loans from various lenders, some of which are entities affiliated with ESL, Bruce R. Berkowitz, and Thomas J. Tisch. The Company made repayments of $110 million during 2017,

25

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

some of which were to related parties. During 2018, the Company received an additional $70 million from the issuance of Line of Credit Loans from ESL. See Note 11 for further information. The proceeds were used for the repayment of indebtedness and general corporate purposes.

The Second Lien Credit Agreement was further amended on January 9, 2018. This amendment amended the borrowing base definition in the Second Lien Credit Agreement to increase the advance rate for inventory to 75% from 65% and also deferred the collateral coverage test for purposes of the mandatory repayment covenant in the Second Lien Credit Agreement such that no such mandatory repayment can be required until the end of the third quarter of 2018. In connection with the closing of the Exchange Offers, the Company also entered into an amendment to its Second Lien Credit Agreement. The amendment provides the Company with the option to pay interest on its outstanding $300 million principal amount Second Lien Term Loan in kind, and also provides that the Company's obligation under the term loan is convertible into common stock of the Company, on the same conversion terms as the New Senior Secured Notes (as defined below).

Following consummation of the Exchange Offers, the Company's obligations under the Second Lien Credit Agreement are secured on a pari passu basis with the Company's obligations under that certain Indenture, dated as of March 20, 2018, pursuant to which the Company issued its New Senior Secured Notes. The collateral includes inventory, receivables and other related assets of the Company and its subsidiaries which are obligated on the Second Lien Term Loan and the New Senior Secured Notes. The Second Lien Credit Agreement is guaranteed by all domestic subsidiaries of the Company that guarantee the Company's obligations under its existing Revolving Facility.

On July 5, 2018, the Company and the other parties thereto entered into a Fifth Amendment (the "Second Lien Credit Agreement Amendment") to the Second Lien Credit Agreement. The Second Lien Credit Agreement Amendment provides for the incurrence by the Company of approximately $45 million of alternative tranche line of credit loans (the "New Loans") in exchange for a like principal amount of the Company's outstanding 6 5/8% Senior Secured Notes due 2018, which notes were canceled.

The New Loans mature on October 15, 2018, which was the same maturity date of the Old Senior Secured Notes (as defined below). Amounts outstanding under the New Loans may be prepaid at any time, subject to a make-whole prepayment premium. The New Loans bear interest at a rate equal to 6 5/8% per annum, which was the same rate as the Old Senior Secured Notes. Interest on the New Loans is payable from April 15, 2018 on the maturity date of the New Loans. The New Loans otherwise generally have similar terms to the existing loans under the Second Lien Credit Agreement; provided that the lenders under the New Loans benefit from certain additional covenants. The New Loans are guaranteed by SRAC, Kmart and the other subsidiaries of the Company that guarantee the existing loans under the Second Lien Credit Agreement and are secured by the same assets of the Company and its subsidiaries that secure the existing loans under the Second Lien Credit Agreement.

The Second Lien Credit Agreement includes representations and warranties, covenants and other undertakings, and events of default that are substantially similar to those contained in the Amended Domestic Credit Agreement. The Second Lien Credit Agreement requires the ABL Borrowers to prepay amounts outstanding under the Amended Domestic Credit Agreement and/or the Second Lien Credit Agreement in order to avoid a Collateral Coverage Event (as defined below). The carrying value of the Second Lien Term Loan, net of the remaining debt issuance costs, was $308 million, $293 million and $294 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. The carrying value includes paid-in-kind interest of $12 million at August 4, 2018. The carrying value of the Line of Credit Loans, including the New Loans, was $570 million, $330 million and $500 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively.

*Old Senior Secured Notes and New Senior Secured Notes*

In October 2010, we sold $1.0 billion aggregate principal amount of senior secured notes (the "Old Senior Secured Notes"), which bear interest at 6 5/8% per annum and mature on October 15, 2018. Concurrent with the closing of the sale of the Old Senior Secured Notes, the Company sold $250 million aggregate principal amount of Old Senior Secured Notes to the Company's domestic pension plan in a private placement, none of which remain in the domestic pension plan as a result of the Tender Offer discussed below. The Old Senior Secured Notes are guaranteed by certain subsidiaries of the Company and are secured by a security interest in certain assets consisting primarily of domestic inventory and receivables (the "Collateral"). The lien that secures the Old Senior Secured Notes is junior in

26

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

priority to the liens on such assets that secure obligations under the Amended Domestic Credit Agreement, as well as certain other first priority lien obligations, and, following consummation of the Exchange Offers, obligations under the indenture relating to the New Senior Secured Notes. The Company used the net proceeds of this offering to repay borrowings outstanding under a previous domestic credit agreement on the settlement date and to fund the working capital requirements of our retail businesses, capital expenditures and for general corporate purposes. Prior to consummation of the Exchange Offers, the indenture under which the Old Senior Secured Notes (the "Old Senior Secured Notes Indenture") were issued contained restrictive covenants that, among other things, (1) limited the ability of the Company and certain of its domestic subsidiaries to create liens and enter into sale and leaseback transactions and (2) limited the ability of the Company to consolidate with or merge into, or sell other than for cash or lease all or substantially all of its assets to, another person. The indenture also provided for certain events of default, which, if any were to occur, would permit or require the principal and accrued and unpaid interest on all the then outstanding Old Senior Secured Notes to be due and payable immediately. In connection with the consummation of the Exchange Offers, we entered into a supplemental indenture to the Old Senior Secured Notes Indenture that eliminated substantially all of the restrictive covenants and certain events of default in the Old Senior Secured Notes Indenture. The supplemental indenture, among other things, eliminated the obligation of the Company to offer to repurchase all outstanding Old Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if the borrowing base (as calculated pursuant to the indenture) falls below the principal value of the Old Senior Secured Notes plus any other indebtedness for borrowed money that is secured by liens on the Collateral for two consecutive quarters or upon the occurrence of certain change of control triggering events. The Company may call the Old Senior Secured Notes at a premium based on the "Treasury Rate" as defined in the indenture, plus 50 basis points.

On January 9, 2018, the Company and certain of its subsidiaries entered into a Fourth Supplemental Indenture (the "Supplemental Indenture") with Wilmington Trust, National Association, as successor trustee and collateral agent, amending the Old Senior Secured Notes Indenture. The Supplemental Indenture amended the borrowing base definition in the Old Senior Secured Notes Indenture to increase the advance rate for inventory to 75% from 65%. The Supplemental Indenture also defers the collateral coverage test for purposes of the repurchase offer covenant in the Indenture and restarts it with the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018).

The carrying value of Old Senior Secured Notes, net of the remaining discount and debt issuance costs, was $89 million, $303 million and $303 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. The carrying value of Old Senior Secured Notes is included within current portion of long-term debt in the Condensed Consolidated Balance Sheets at August 4, 2018.

In February 2018, the Company commenced the Exchange Offers pursuant to which it offered to issue in exchange for its outstanding Senior Secured Notes new 6 5/8% Senior Secured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option. The Exchange Offers expired on March 15, 2018. Approximately $169.8 million principal amount of the Senior Secured Notes were validly tendered, accepted and canceled, including $20 million principal amount of Old Senior Secured Notes held by ESL, and the Company issued a like principal amount of New Senior Secured Notes. The New Senior Secured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at a conversion price of $5.00 per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period. The New Senior Secured Notes bear interest at a rate of 6.625% per annum and the Company will pay interest semi-annually on April 15 and October 15 of each year, which interest may, at the option of the Company, be paid in kind. The New Senior Secured Notes mature in October 2019.

The New Senior Secured Notes are guaranteed by certain subsidiaries of the Company and are secured by a security interest in the Collateral. The lien that secures the New Senior Secured Notes is junior in priority to the liens on such assets that secure obligations under the Amended Domestic Credit Agreement, as well as certain other first priority lien obligations, and senior to the lien on such assets that secure obligations under the Old Senior Secured Notes Indenture. The indenture under which the New Senior Secured Notes (the "New Senior Secured Notes Indenture") were issued contains restrictive covenants that, among other things, (1) limit the ability of the Company and certain of its domestic subsidiaries to create liens and enter into sale and leaseback transactions and (2) limit the ability of the Company to consolidate with or merge into, or sell other than for cash or lease all or substantially all of its assets

27

MOAC000842

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

to, another person. The New Senior Secured Notes Indenture also provides for certain events of default, which, if any were to occur, would permit or require the principal and accrued and unpaid interest on all the then outstanding New Senior Secured Notes to be due and payable immediately. The New Senior Secured Notes Indenture also requires the Company to offer to repurchase all outstanding New Senior Secured Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if the borrowing base (as calculated pursuant to the indenture) falls below the principal value of the New Senior Secured Notes plus any other indebtedness for borrowed money that is secured by liens on the Collateral for two consecutive quarters or upon the occurrence of certain change of control triggering events. As of August 4, 2018, our borrowing base was below the above threshold, and if our borrowing base is below the above threshold at the end of our third quarter of 2018, it would trigger an obligation to repurchase or repay second lien debt, in an amount equal to the excess of our funded debt secured by liens on our inventory as of November 3, 2018 over the borrowing base.

The carrying value of New Senior Secured Notes, net of the remaining discount and debt issuance costs, was $175 million at August 4, 2018. The carrying value includes paid-in-kind interest of $6 million at August 4, 2018.

*Old Senior Unsecured Notes and New Senior Unsecured Notes*

On October 20, 2014, the Company announced its Board of Directors had approved a rights offering allowing its stockholders to purchase up to $625 million in aggregate principal amount of 8% senior unsecured notes due 2019 and warrants to purchase shares of its common stock. The subscription rights were distributed to all stockholders of the Company as of October 30, 2014, the record date for this rights offering, and every stockholder had the right to participate on the same terms in accordance with its pro rata ownership of the Company's common stock, except that holders of the Company's restricted stock that was unvested as of the record date received cash awards in lieu of subscription rights. This rights offering closed on November 18, 2014 and was oversubscribed.

Accordingly, on November 21, 2014, the Company issued $625 million aggregate original principal amount of 8% senior unsecured notes due 2019 (the "Old Senior Unsecured Notes") and received proceeds of $625 million which were used for general corporate purposes. The Old Senior Unsecured Notes are the unsecured and unsubordinated obligations of the Company and rank equal in right of payment with the existing and future unsecured and unsubordinated indebtedness of the Company. The Old Senior Unsecured Notes bear interest at a rate of 8% per annum and the Company will pay interest semi-annually on June 15 and December 15 of each year. The Old Senior Unsecured Notes are not guaranteed.

We accounted for the Old Senior Unsecured Notes in accordance with accounting standards applicable to distinguishing liabilities from equity and debt with conversion and other options. Accordingly, we allocated the proceeds received for the Old Senior Unsecured Notes based on the relative fair values of the Old Senior Unsecured Notes and warrants, which resulted in a discount to the notes of approximately $278 million. The fair value of the Old Senior Unsecured Notes and warrants was estimated based on quoted market prices for the same issues using Level 1 measurements as defined in Note 5 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018. The discount is being amortized over the life of the Old Senior Unsecured Notes using the effective interest method with an effective interest rate of 11.55%. Approximately $24 million and $26 million of the discount was amortized during the 26 week periods ended August 4, 2018 and July 29, 2017, respectively. The remaining discount was approximately $71 million, $169 million and $140 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. The carrying value of the Old Senior Unsecured Notes, net of the remaining discount and debt issuance costs, was approximately $340 million, $454 million and $483 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively.

In February 2018, the Company commenced the Exchange Offers, pursuant to which it offered to issue in exchange for its outstanding Senior Unsecured Notes new 8% Senior Unsecured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option. The Exchange Offers expired on March 15, 2018. Approximately $214 million principal amount of the Old Senior Unsecured Notes were validly tendered, accepted and canceled, including $187.6 million principal amount of Old Senior Unsecured Notes by ESL, and the Company issued a like principal amount of New Senior Unsecured Notes. The New Senior Unsecured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at a conversion price of $8.33 per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period.

28

MOAC000843

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

The New Senior Unsecured Notes are the unsecured and unsubordinated obligations of the Company and rank equal in right of payment with the existing and future unsecured and unsubordinated indebtedness of the Company. The New Senior Unsecured Notes bear interest at a rate of 8% per annum and the Company will pay interest semi-annually on June 15 and December 15 of each year, which interest may, at the option of the Company, be paid in kind. The New Senior Unsecured Notes are not guaranteed.

The Company allocated $45 million of the remaining discount from the Old Senior Unsecured Notes to the New Senior Unsecured Notes. Approximately $8 million of the discount was amortized during the 26 week period ended August 4, 2018. The remaining discount was approximately $37 million at August 4, 2018. The carrying value of the New Senior Unsecured Notes, net of the remaining discount and debt issuance costs, was approximately $185 million at August 4, 2018. The carrying value includes paid-in-kind interest of $9 million at August 4, 2018.

*Wholly-owned Insurance Subsidiary and Intercompany Securities*

We have numerous types of insurable risks, including workers' compensation, product and general liability, automobile, warranty, asbestos and environmental claims and the extended service contracts we sell to our customers. Certain of the associated risks are managed through Holdings' wholly-owned insurance subsidiary, Sears Reinsurance Company Ltd. ("Sears Re"), a Bermuda Class 3 insurer.

In accordance with applicable insurance regulations, Sears Re holds marketable securities to support the insurance coverage it provides. Sears has utilized two securitization structures to issue specific securities in which Sears Re has invested its capital to fund its insurance obligations. In November 2003, Sears formed a Real Estate Mortgage Investment Conduit, or REMIC. The real estate associated with 138 properties was contributed to indirect wholly-owned subsidiaries of Sears, and then leased back to Sears. The contributed properties were mortgaged and the REMIC issued to wholly-owned subsidiaries of Sears (including Sears Re) $1.3 billion (par value) of securities (the "REMIC Securities") that were secured by the mortgages and collateral assignments of the store leases. Payments to the holders on the REMIC Securities were funded by the lease payments. In March 2018, in connection with the Credit Agreement and Mezzanine Loan Agreement described above, the REMIC was unwound and the REMIC Securities were extinguished.

In May 2006, a subsidiary of Holdings contributed the rights to use the Kenmore, Craftsman and DieHard trademarks in the U.S. and its possessions and territories to KCD IP, LLC, an indirect wholly-owned subsidiary of Holdings. KCD IP, LLC has licensed the use of the trademarks to subsidiaries of Holdings, including Sears and Kmart. Asset-backed securities with a par value of $1.8 billion (the "KCD Securities") were issued by KCD IP, LLC and subsequently purchased by Sears Re, the collateral for which includes the trademark rights and royalty income. Payments to the holders on the KCD Securities are funded by the royalty payments. In connection with the Craftsman Sale, KCD Securities with par value of $900 million were redeemed in March 2017.

The issuers of the REMIC Securities and KCD Securities and the owners of these real estate and trademark assets are bankruptcy remote, special purpose entities that are indirect wholly-owned subsidiaries of Holdings. Cash flows received from rental streams and licensing fee streams paid by Sears, Kmart, other affiliates and third parties, are used for the payment of fees and interest on these securities, through the extinguishment of the REMIC Securities in March 2018. Since the inception of the REMIC and KCD IP, LLC, the REMIC Securities and the KCD Securities have been entirely held by our wholly-owned consolidated subsidiaries, through the extinguishment of the REMIC Securities in March 2018. At each of August 4, 2018, July 29, 2017 and February 3, 2018, the net book value of the securitized trademark rights was approximately $0.7 billion. The net book value of the securitized real estate assets was approximately $0.6 billion and $0.5 billion at July 29, 2017 and February 3, 2018, respectively.

*Trade Creditor Matters*

We have ongoing discussions concerning our liquidity and financial position with the vendor community and third parties that offer various credit protection services to our vendors. The topics discussed have included such areas as pricing, payment terms and ongoing business arrangements. As of the date of this report, we have not experienced any significant disruption in our access to merchandise or our operations.

29

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

## NOTE 3—STORE CLOSING CHARGES, SEVERANCE COSTS, IMPAIRMENTS AND REAL ESTATE TRANSACTIONS

*Store Closings and Severance*

We closed five stores in our Kmart segment and 24 stores in our Sears Domestic segment during the 13 week period ended August 4, 2018, and 72 stores in our Kmart segment and 65 stores in our Sears Domestic segment during the 26 week period ended August 4, 2018. An additional 43 stores in our Kmart segment and 106 stores in our Sears Domestic segment will close during the second half of 2018 that we previously announced would close.

We closed 14 stores in our Kmart segment and seven stores in our Sears Domestic segment during the 13 week period ended July 29, 2017, and 125 stores in our Kmart segment and 51 stores in our Sears Domestic segment during the 26 week period ended July 29, 2017.

In accordance with accounting standards governing costs associated with exit or disposal activities, expenses related to future rent payments for which we no longer intend to receive any economic benefit are accrued for when we cease to use the leased space and have been reduced for any estimated sublease income. We expect to record additional charges of approximately $75 million during 2018 related to stores that we had previously made the decision to close, but have not yet closed.

Store closing costs and severance recorded for the 13- and 26- week periods ended August 4, 2018 and July 29, 2017 were as follows:

| millions | Markdowns[1] | | Severance Costs[2] | | Lease Termination Costs[2] | | Other Charges[2] | | Impairment and Accelerated Depreciation[3] | | Total Store Closing Costs | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kmart | $ | 17 | $ | 1 | $ | (7) | $ | 2 | $ | — | $ | 13 |
| Sears Domestic | | 26 | | 10 | | 9 | | 6 | | 10 | | 61 |
| Total for the 13 week period ended August 4, 2018 | $ | 43 | $ | 11 | $ | 2 | $ | 8 | $ | 10 | $ | 74 |
| | | | | | | | | | | | | |
| Kmart | $ | 68 | $ | 8 | $ | (18) | $ | 10 | $ | 4 | $ | 72 |
| Sears Domestic | | 21 | | 23 | | 10 | | 6 | | 4 | | 64 |
| Total for the 13 week period ended July 29, 2017 | $ | 89 | $ | 31 | $ | (8) | $ | 16 | $ | 8 | $ | 136 |
| | | | | | | | | | | | | |
| Kmart | $ | 14 | $ | 2 | $ | 22 | $ | 3 | $ | 1 | $ | 42 |
| Sears Domestic | | 38 | | 13 | | 40 | | 8 | | 13 | | 112 |
| Total for the 26 week period ended August 4, 2018 | $ | 52 | $ | 15 | $ | 62 | $ | 11 | $ | 14 | $ | 154 |
| | | | | | | | | | | | | |
| Kmart | $ | 78 | $ | 13 | $ | (2) | $ | 13 | $ | 5 | $ | 107 |
| Sears Domestic | | 26 | | 34 | | 35 | | 7 | | 9 | | 111 |
| Total for the 26 week period ended July 29, 2017 | $ | 104 | $ | 47 | $ | 33 | $ | 20 | $ | 14 | $ | 218 |

---

[1] Recorded within cost of sales, buying and occupancy in the Condensed Consolidated Statements of Operations.
[2] Recorded within selling and administrative in the Condensed Consolidated Statements of Operations. Lease termination costs are net of estimated sublease income, and include the reversal of closed store reserves for which the lease agreement has been terminated and the reversal of deferred rent balances related to closed stores.
[3] Recorded within depreciation and amortization in the Condensed Consolidated Statements of Operations.

30

MOAC000845

# SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

Store closing costs and severance accruals of $246 million, $228 million and $261 million at August 4, 2018, July 29, 2017 and February 3, 2018 respectively, were as shown in the table below. Store closing accruals included $123 million, $128 million and $126 million within other current liabilities and $123 million, $100 million and $135 million within other long-term liabilities in the Condensed Consolidated Balance Sheets at August 4, 2018, July 29, 2017, and February 3, 2018, respectively.

| millions | Severance Costs | | Lease Termination Costs | | Other Charges | | Total | |
|---|---|---|---|---|---|---|---|---|
| Balance at July 29, 2017 | $ | 48 | $ | 162 | $ | 18 | $ | 228 |
| Store closing costs | | 36 | | 109 | | 12 | | 157 |
| Store closing capital lease obligations | | — | | 8 | | — | | 8 |
| Payments/utilizations | | (35) | | (79) | | (18) | | (132) |
| Balance at February 3, 2018 | | 49 | | 200 | | 12 | | 261 |
| Store closing costs | | 15 | | 72 | | 11 | | 98 |
| Payments/utilizations | | (29) | | (69) | | (15) | | (113) |
| Balance at August 4, 2018 | $ | 35 | $ | 203 | $ | 8 | $ | 246 |

*Long-Lived Assets and Indefinite-Lived Intangible Assets*

In accordance with accounting standards governing the impairment or disposal of long-lived assets, we performed an impairment test of certain of our long-lived assets due to events and changes in circumstances during the 13- and 26- week periods ended August 4, 2018 that indicated an impairment might have occurred. As a result of impairment testing, the Company recorded impairment charges of $8 million, which was recorded within the Sears Domestic segment during the 13 week period ended August 4, 2018, and $22 million, of which $16 million and $6 million were recorded within the Sears Domestic and Kmart segments, respectively, during the 26 week period ended August 4, 2018.

As a result of impairment testing, the Company recorded impairment charges of $5 million, of which $2 million and $3 million were recorded within the Sears Domestic and Kmart segments, respectively, during the 13 week period ended July 29, 2017, and $20 million, of which $12 million and $8 million were recorded within the Sears Domestic and Kmart segments, respectively, during the 26 week period ended July 29, 2017.

In our quarterly report on Form 10-Q filed for the first quarter of 2018, the Company disclosed that impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including changes that occur as a result of the formal process of the Special Committee to explore the sale of the Sale Assets. On August 14, 2018, the Special Committee received a non-binding proposal from ESL to acquire the Kenmore brand and related assets for $400 million, which is below the carrying value of the Kenmore trade name at August 4, 2018. The Special Committee is evaluating the non-binding proposal, and potentially other proposals, as part of its formal process. In addition to receipt of the non-binding proposal, due to the decline in revenues Kenmore experienced in the first half of 2018, we determined indications of potential impairment exist with respect to the Kenmore trade name and accordingly performed an impairment assessment. The fair value determined as a result of our impairment assessment was derived using the relief from royalty method, which is a specific application of the discounted-cash-flow method, which is a form of the income approach. The relief from royalty method requires inputs considered level 3 under the fair value hierarchy and assumptions related to projected revenues; assumed royalty rates that could be payable if the Company did not own the asset; and a discount rate. These estimates include assumptions that are based on historical data, management forecasts, and a variety of external sources. As a result of our impairment assessment, we recorded an impairment charge related to the Kenmore trade name of $69 million during the 13- and 26- week periods ended August 4, 2018. The impairment is recorded within the Sears Domestic segment and included within impairment charges on our Condensed Consolidated Statement of Operations.

Further indefinite-lived intangible impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including deterioration in the macroeconomic environment, retail industry,

MOAC000846

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

deterioration in our performance or our future projections, if actual results are not consistent with our estimates and assumptions used in the analysis, or changes in our plans for one or more indefinite-lived intangible assets, including changes that occur as a result of the formal process of the Special Committee to explore the sale of the Sale Assets, such as if the Special Committee were to accept an offer for the acquisition of the Kenmore trade name at a price less than its carrying value. Further, our business is seasonal in nature, and we generate a higher portion of our revenues and operating cash flows during the fourth quarter of our fiscal year, which includes the holiday season. The intangible asset impairment analysis is particularly sensitive to changes in the projected revenue growth rate and the assumed weighted-average cost of capital. Changes to these key assumptions could result in revisions of management's estimates of the fair value of the indefinite-lived intangible assets and could result in impairment charges in the future, which could be material to our results of operations. We will continue to monitor for such changes in facts or circumstances, which may be indicators of potential impairment triggers, and may result in impairment charges in the future, which could be material to our results of operations.

*Gain on Sales of Assets*

We recognized $268 million and $1.1 billion in gains on sales of assets during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively, which were primarily a result of several real estate transactions. Real estate transactions in 2018 included properties that served as collateral for our real estate facilities for which proceeds of $316 million were used to pay interest and a portion of the Secured Loan, Term Loan Facility, 2016 Secured Loan Facility, 2017 Secured Loan Facility, Incremental Loans and Consolidated Secured Loan Facility. Real estate transactions in 2017 included properties that served as collateral for our real estate facilities for which proceeds of $277 million were used to pay interest and a portion of the 2016 Secured Loan Facility and 2017 Secured Loan Facility. Gains in 2017 also included a gain of $492 million in connection with the Craftsman Sale, which is further described in Note 1.

*Seritage Transaction and JV Transactions*

On April 1, 2015, April 13, 2015 and April 30, 2015, Holdings and General Growth Properties, Inc. ("GGP"), Simon Property Group, Inc. ("Simon") and The Macerich Company ("Macerich"), respectively, announced that they entered into three distinct real estate joint ventures (collectively, the "JVs"). Holdings contributed 31 properties to the JVs where Holdings currently operates stores (the "JV properties"), in exchange for a 50% interest in the JVs and $429 million in cash ($426 million, net of closing costs) (the "JV transactions"). The JV transactions valued the JV properties at $858 million in the aggregate.

On July 7, 2015, Holdings completed its rights offering and sale-leaseback transaction (the "Seritage transaction") with Seritage Growth Properties ("Seritage"), an independent publicly traded real estate investment trust ("REIT"). As part of the Seritage transaction, Holdings sold 235 properties to Seritage (the "REIT properties") along with Holdings' 50% interest in the JVs. Holdings received aggregate gross proceeds from the Seritage transaction of $2.7 billion ($2.6 billion, net of closing costs). The Seritage transaction valued the REIT properties at $2.3 billion in the aggregate.

In connection with the Seritage transaction and JV transactions, Holdings entered into agreements with Seritage and the JVs under which Holdings initially leased 255 of the properties (the "Master Leases"), with the remaining properties being leased by Seritage to third parties. Holdings has closed 39 stores pursuant to recapture notices from Seritage or the JVs and 65 stores pursuant to lease terminations. An additional 33 stores will close in 2018 pursuant to lease terminations and recapture notices. Also, in July 2017, Seritage sold a 50% joint venture interest in five of the properties and Holdings will pay rent to the new landlord.

We accounted for the Seritage transaction and JV transactions in accordance with accounting standards applicable to real estate sales and sale-leaseback transactions. We determined that the Seritage and JV transactions qualify for sales recognition and sale-leaseback accounting, with the exception of four properties for which we had continuing involvement as a result of an obligation to redevelop the stores for a third-party tenant and pay rent on behalf of the third-party tenant until it commenced rent payments to the JVs.

With the exception of the four properties that had continuing involvement, in accordance with accounting standards related to sale-leaseback transactions, Holdings recognized any loss on sale immediately, any gain on sale in excess of the present value of minimum lease payments immediately, and any remaining gain was deferred and will be

32

MOAC000847

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

recognized in proportion to the related rent expense over the lease term. Accordingly, during the second quarter of 2015, Holdings recognized an immediate net gain of $508 million within gain on sales of assets in the Consolidated Statement of Operations for 2015. The remaining gain of $894 million was deferred and will be recognized in proportion to the related rent expense, which is a component of cost of sales, buying and occupancy, in the Condensed Consolidated Statements of Operations, over the lease term.

During the 13- and 26- weeks ended August 4, 2018, respectively, Holdings recorded gains of $28 million and $68 million related to recapture and termination activity in connection with REIT properties and JV properties. During the 13- and 26- weeks ended July 29, 2017, respectively, Holdings recorded gains of $36 million and $78 million related to recapture and termination activity in connection with REIT properties and JV properties. The Master Leases provide Seritage and the JVs rights to recapture 100% of certain stores. The Master Leases also provide Seritage and the JVs a recapture right with respect to approximately 50% of the space within the stores at the REIT properties and JV properties (subject to certain exceptions), in addition to all of the automotive care centers, all outparcels or outlots, and certain portions of parking areas and common areas, except as set forth in the Master Leases, for no additional consideration. As space is recaptured pursuant to the recapture right, Holdings' obligation to pay rent is reduced proportionately. Accordingly, Holdings recognizes gains equal to the unamortized portion of the gain that had previously been deferred which exceeds the present value of minimum lease payments, as reduced due to recapture activity. The Master Leases also provide Holdings certain rights to terminate the Master Leases with respect to REIT properties or JV properties that cease to be profitable for operation. In order to terminate the Master Lease for a certain property, Holdings must make a payment to Seritage or the JV of an amount equal to one year of rent (together with taxes and other expenses) with respect to such property. The Company recognizes the corresponding expenses for termination payments to Seritage when we notify Seritage of our intention to terminate the leases and the stores are announced for closure. We recorded expense of $9 million and $20 million for termination payments to Seritage during the 13- and 26- weeks ended August 4, 2018, respectively, and $24 million during the 26 weeks ended July 29, 2017, of which $9 million and $24 million was reported as amounts payable to Seritage at August 4, 2018 and July 29, 2017, respectively.

Holdings also recorded immediate gains of $40 million during 2017, of which $17 million and $40 million was recorded during the 13- and 26- weeks ended July 29, 2017, respectively, for the amount of gains on sale in excess of the present value of minimum lease payments for two of the properties that were previously accounted for as financing transactions. As the redevelopment at the stores had been completed and the third-party tenant had commenced rent payments to the JVs, the Company determined that the continuing involvement no longer existed and that the properties qualified for sales recognition and sale-leaseback accounting.

*Sale-Leaseback Financing Transactions*

Holdings received cash proceeds for sale-leaseback financing transactions of $130 million and $89 million during the 26 weeks ended August 4, 2018 and July 29, 2017, respectively. We accounted for the other transactions as financing transactions in accordance with accounting standards applicable to sale-leaseback transactions as a result of other forms of continuing involvement, including an earn-out provision and the requirement to prepay rent for one year. Accordingly, Holdings recorded a sale-leaseback financing obligation of $347 million, $230 million and $247 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, which is classified as a long-term sale-leaseback financing obligation in the Condensed Consolidated Balance Sheets. The sale-leaseback financing obligation related to the four properties that had continuing involvement decreased to $70 million at February 3, 2018 as two of the properties qualified for sales recognition and sale-leaseback accounting as further described above. Additionally, Holdings recorded immediate gains of $21 million during the 26 weeks ended August 4, 2018 for three properties that were previously accounted for as financing transactions as the leaseback ended and it was determined that sales recognition was appropriate. We continued to report real property assets of $100 million, $62 million and $66 million at August 4, 2018, July 29, 2017 and February 3, 2018, respectively, in our Condensed Consolidated Balance Sheets, which are included in our Sears Domestic segment.

*Other Real Estate Transactions*

In addition to the Seritage transaction, JV transactions and other sale-leaseback financing transactions described above, we recorded gains on the sales of assets for other significant items described as follows.

33

MOAC000848

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

During the 13 week period ended August 4, 2018, we recorded gains on the sales of assets of $48 million recognized on the sale or amendment and lease termination of 16 Sears Full-line stores and two non-retail locations in our Sears Domestic segment for which we received $116 million cash proceeds. During the 13 week period ended August 4, 2018, we also recorded gains on the sales of assets of $23 million recognized on the sale or amendment and lease termination of three Kmart stores in our Kmart segment for which we received $33 million cash proceeds.

During the 26 week period ended August 4, 2018, we recorded gains on the sales of assets of $117 million recognized on the sale or amendment and lease termination of 25 Sears Full-line stores and six non-retail locations in our Sears Domestic segment for which we received $227 million cash proceeds. During the 26 week period ended August 4, 2018, we also recorded gains on the sales of assets of $40 million recognized on the sale or amendment and lease termination of 12 Kmart stores in our Kmart segment for which we received $51 million cash proceeds.

During the 13 week period ended July 29, 2017, we recorded gains on the sales of assets of $250 million recognized on the sale or amendment and lease termination of nine Sears Full-line stores in our Sears Domestic segment for which we received $276 million cash proceeds. During the 13 week period ended July 29, 2017, we also recorded gains on the sales of assets of $12 million recognized on the sale or amendment and lease termination of one Kmart store in our Kmart segment for which we received $20 million cash proceeds.

During the 26 week period ended July 29, 2017, we recorded gains on the sales of assets of $346 million recognized on the sale or amendment and lease termination of 12 Sears Full-line stores in our Sears Domestic segment for which we received $380 million cash proceeds. During the 26 week period ended July 29, 2017, we also recorded gains on the sales of assets of $40 million recognized on the sale or amendment and lease termination of two Kmart stores in our Kmart segment for which we received $48 million cash proceeds.

Certain sales of our properties had leaseback arrangements. We determined that the transactions with leaseback arrangements qualify for sales recognition and sale-leaseback accounting. In accordance with accounting standards related to sale-leaseback transactions, Holdings recognized any loss on sale immediately, any gain on sale in excess of the present value of minimum lease payments immediately, and any remaining gain was deferred and will be recognized in proportion to the related rent expense over the lease term. At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, $161 million, $156 million and $138 million of the deferred gain on sale-leaseback is classified as current within other current liabilities, and $305 million, $455 million, $362 million is classified as long-term deferred gain on sale-leaseback in the Condensed Consolidated Balance Sheets. For the other transactions, we determined that we have surrendered substantially all of our rights and obligations, and, therefore, immediate gain recognition is appropriate.

Holdings recorded rent expense at properties with leaseback arrangements that have deferred gains of $14 million and $22 million within cost of sales, buying and occupancy in the Condensed Consolidated Statements of Operations for the 13 week periods ended August 4, 2018 and July 29, 2017, respectively, and $30 million and $44 million for the 26 week periods ended August 4, 2018 and July 29, 2017, respectively. Rent expense consisted of straight-line rent expense offset by amortization of deferred gain on sale-leaseback, as shown in the tables below.

| _millions_ | 13 Weeks Ended August 4, 2018 | | | 13 Weeks Ended July 29, 2017 | | |
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
|---|---|---|---|---|---|---|
| Straight-line rent expense | $ 5 | $ 25 | $ 30 | $ 5 | $ 36 | $ 41 |
| Amortization of deferred gain on sale-leaseback | (3) | (13) | (16) | (2) | (17) | (19) |
| Rent expense | $ 2 | $ 12 | $ 14 | $ 3 | $ 19 | $ 22 |

| _millions_ | 26 Weeks Ended August 4, 2018 | | | 26 Weeks Ended July 29, 2017 | | |
| | Kmart | Sears Domestic | Sears Holdings | Kmart | Sears Domestic | Sears Holdings |
|---|---|---|---|---|---|---|
| Straight-line rent expense | $ 9 | $ 55 | $ 64 | $ 11 | $ 73 | $ 84 |
| Amortization of deferred gain on sale-leaseback | (5) | (29) | (34) | (6) | (34) | (40) |
| Rent expense | $ 4 | $ 26 | $ 30 | $ 5 | $ 39 | $ 44 |

MOAC000849

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

## NOTE 4—EQUITY

*Loss per Share*

The following table sets forth the components used to calculate basic and diluted loss per share attributable to Holdings' shareholders.

| | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| *millions, except loss per share* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Basic weighted average shares | 108.5 | 107.3 | 108.3 | 107.2 |
| Diluted weighted average shares | 108.5 | 107.3 | 108.3 | 107.2 |
| Net loss attributable to Holdings' shareholders | $ (508) | $ (250) | $ (932) | $ (5) |
| Loss per share attributable to Holdings' shareholders: | | | | |
| Basic | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Diluted | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |

*Accumulated Other Comprehensive Loss*

The following table displays the components of accumulated other comprehensive loss:

| *millions* | August 4, 2018 | July 29, 2017 | February 3, 2018 |
|---|---|---|---|
| Pension and postretirement adjustments (net of tax of $(198), $(225), and $(225), respectively) | $ (817) | $ (1,372) | $ (1,071) |
| Currency translation adjustments (net of tax of $0 for all periods presented) | (1) | (2) | (1) |
| Accumulated other comprehensive loss | $ (818) | $ (1,374) | $ (1,072) |

Pension and postretirement adjustments relate to the net actuarial loss on our pension and postretirement plans recognized as a component of accumulated other comprehensive loss.

*Income Tax Expense Allocated to Each Component of Other Comprehensive Income*

Income tax expense allocated to each component of other comprehensive income was as follows:

| | 13 Weeks Ended August 4, 2018 | | | 13 Weeks Ended July 29, 2017 | | |
|---|---|---|---|---|---|---|
| *millions* | Before Tax Amount | Tax Expense | Net of Tax Amount | Before Tax Amount | Tax Expense | Net of Tax Amount |
| Other comprehensive income | | | | | | |
| Pension and postretirement adjustments[1] | $ 245 | $ (27) | $ 218 | $ 127 | $ — | $ 127 |
| Currency translation adjustments | (1) | — | (1) | — | — | — |
| Total other comprehensive income | $ 244 | $ (27) | $ 217 | $ 127 | $ — | $ 127 |

| | 26 Weeks Ended August 4, 2018 | | | 26 Weeks Ended July 29, 2017 | | |
|---|---|---|---|---|---|---|
| *millions* | Before Tax Amount | Tax Expense | Net of Tax Amount | Before Tax Amount | Tax Expense | Net of Tax Amount |
| Other comprehensive income | | | | | | |
| Pension and postretirement adjustments[1] | $ 281 | $ (27) | $ 254 | $ 177 | $ — | $ 177 |
| Currency translation adjustments | — | — | — | 1 | — | 1 |
| Total other comprehensive income | $ 281 | $ (27) | $ 254 | $ 178 | $ — | $ 178 |

[1] Included in the computation of net periodic benefit expense. See Note 5 to the Condensed Consolidated Financial Statements.

MOAC000850

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

## NOTE 5—BENEFIT PLANS

*Pension and Postretirement Benefit Plans*

We provide benefits to certain associates who are eligible under various defined benefit pension plans, contributory defined benefit pension plans and other postretirement plans, primarily retiree medical benefits. For purposes of determining the periodic expense of our defined benefit plans, we use the fair value of plan assets as the market related value. The following table summarizes the components of total net periodic benefit expense, recorded within other loss in the Condensed Consolidated Statements of Operations, for our retirement plans:

| | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| millions | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Components of net periodic expense: | | | | |
| Interest cost | $ 37 | $ 45 | $ 74 | $ 98 |
| Expected return on plan assets | (41) | (46) | (81) | (103) |
| Amortization of experience losses[1] | 142 | 247 | 178 | 297 |
| Net periodic expense | $ 138 | $ 246 | $ 171 | $ 292 |

[1] Amortization of the experiences losses for the 13- and 26- weeks ended August 4, 2018 includes $108 million as a result of the lump sum settlement described below. Amortization of experience losses for the 13- and 26- weeks ended July 29, 2017 includes $200 million as a result of the pension annuity purchase described below.

*Contributions*

During the 13- and 26- week periods ended August 4, 2018, we made total contributions of $57 million and $343 million, respectively, to our pension and postretirement plans, including amounts contributed from the escrow created pursuant to the PPPFA. During the 13- and 26- week periods ended July 29, 2017, we made total contributions of $65 million and $134 million, respectively, to our pension and postretirement plans. We anticipate making aggregate contributions to our defined benefit and postretirement plans of approximately $219 million over the remainder of 2018. As discussed in Note 1, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the Craftsman Receivable. During the second quarter of 2017, we sold the Craftsman Receivable to a third-party purchaser, and deposited the proceeds into an escrow for the benefit of our pension plans, which contribution was credited against the Company's minimum pension funding obligations in 2017. Under our agreement with the PBGC, the remaining proceeds will also be contributed to our pension plans, and when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019.

The Company also agreed to grant a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension obligations through the end of 2019, which were released from the ring-fence arrangement in August 2018 in exchange for a contribution of $32 million into an escrow for the benefit of our pension plans.

In November 2017, the Company announced an amendment to the PPPFA that allowed the Company to pursue the monetization of 138 of our properties that were subject to a ring-fence arrangement created under the PPPFA. In March 2018, the Company closed on the Secured Loan and the Mezzanine Loan, which transactions released the properties from the ring-fence arrangement. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. Under our agreement with the PBGC, the escrowed amount will also be contributed to our pension plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019 described above. Following such transactions, the Company has been relieved of contributions to our pension plans for approximately two years (other than the contributions from escrow described above and a $20 million

MOAC000851

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

supplemental payment made during the second quarter of 2018). The ultimate amount of pension contributions could be affected by factors such as changes in applicable laws, as well as financial market and investment performance and demographic changes.

*Pension Plan Settlements*

Effective April 27, 2018, the Company amended its domestic pension plans, primarily related to lump sum benefit eligibility, and began notifying certain former employees of the Company of its offer to pay those employees' pension benefit in a lump sum. Former employees eligible for the voluntary lump sum payment option are generally those who are vested traditional formula participants of Plan 1 and Plan 2 who terminated employment prior to January 1, 2018, and who have not yet started receiving monthly payments of their pension benefits. The Company offered the one-time voluntary lump sum window in an effort to reduce its long-term pension obligations and ongoing annual pension expense. This voluntary offer was made to approximately 12,000 eligible terminated vested participants representing approximately $550 million of the Company's total qualified pension plan liabilities. Eligible participants had until July 1, 2018 to make their election. The Company made payments of approximately $315 million and $28 million to employees who made the election and funded the payments from existing assets of Plan 1 and Plan 2, respectively. The lump sum offer resulted in a non-cash charge of $108 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations immediately upon settlement during the 13 week period ending August 4, 2018.

In May 2017, the Company executed an irrevocable agreement to purchase a group annuity contract from Metropolitan Life Insurance Company ("MLIC"), under which MLIC will pay future pension benefit payments to approximately 51,000 retirees from Plan 2. The agreement calls for a transfer of approximately $515 million of Plan 2's benefit obligations to MLIC. This action had an immaterial impact on the funded status of our total pension obligations, but reduced the size of the Company's combined pension plan, reduced future cost volatility, and reduced future plan administrative expenses. Due to the annuity purchase, we were required to remeasure our pension obligations. In connection with the remeasurement, we updated the effective discount rate assumption to 3.85% as of May 31, 2017. The annuity purchase resulted in a non-cash charge of $200 million for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement during the 13 week period ending July 29, 2017.

**NOTE 6—INCOME TAXES**

We had gross unrecognized tax benefits of $135 million at August 4, 2018, $153 million at July 29, 2017 and $130 million at February 3, 2018. Of the amount at August 4, 2018, $107 million would, if recognized, impact our effective tax rate, with the remaining amount being comprised of unrecognized tax benefits related to gross temporary differences or any other indirect benefits. During the 13- and 26- weeks ended August 4, 2018, gross unrecognized tax benefits increased by $3 million and $5 million, respectively, due to state activity. During the 13- and 26- weeks ended July 29, 2017, gross unrecognized tax benefits increased by $3 million and $11 million, respectively, due to state activity. We expect that our unrecognized tax benefits could decrease by as much as $9 million over the next 12 months for tax audit settlements and the expiration of the statute of limitations for certain jurisdictions.

We classify interest expense and penalties related to unrecognized tax benefits and interest income on tax overpayments as components of income tax expense. At August 4, 2018, July 29, 2017 and February 3, 2018, the total amount of interest and penalties included in our tax accounts in our Condensed Consolidated Balance Sheet was $57 million ($45 million net of federal benefit), $67 million ($44 million net of federal benefit) and $51 million ($40 million net of federal benefit), respectively. The total amount of net interest expense (net of federal benefit) recognized as part of income tax expense in our Condensed Consolidated Statements of Operations was $2 million for each of the 13 weeks ended August 4, 2018 and July 29, 2017, and $4 million for each of the 26 periods ended August 4, 2018 and July 29, 2017.

We file income tax returns in both the United States and various foreign jurisdictions. The U.S. Internal Revenue Service ("IRS") has completed its examination of all federal tax returns of Holdings through the 2009 return, and all matters arising from such examinations have been resolved. In addition, Holdings and Sears are under examination

MOAC000852

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

by various state, local and foreign income tax jurisdictions for the years 2003 through 2016, and Kmart is under examination by such jurisdictions for the years 2006 through 2016.

At the end of 2017, we had a federal and state net operating loss ("NOL") deferred tax asset of $1.7 billion, which will expire predominately between 2019 and 2037. We have credit carryforwards of $899 million, which will expire between 2018 and 2037.

In connection with the Craftsman Sale in the first quarter of 2017, the Company realized a tax benefit of $101 million on the deferred taxes related to the indefinite-life intangible for the trade name sold to Stanley Black & Decker. In addition, the Company incurred a taxable gain of approximately $963 million. There was no federal income tax payable resulting from the taxable gain due to the utilization of NOL tax attributes of approximately $361 million with a valuation allowance release of the same amount. However, there was state income tax of $4 million payable after the utilization of state tax attributes.

At February 3, 2018, we had a valuation allowance of $4.2 billion. The amount of the deferred tax asset considered realizable, however, could be adjusted in the future if estimates of future taxable income during the carryforward period are reduced or increased, or if objective negative evidence in the form of cumulative losses is no longer present and additional weight may be given to subjective evidence such as our projections for growth. We will continue to evaluate our valuation allowance for any change in circumstances that causes a change in judgment about the realizability of the deferred tax asset.

Income tax expense or benefit from continuing operations is generally determined without regard to other categories of earnings, such as discontinued operations and other comprehensive income ("OCI"). An exception is provided in the authoritative accounting guidance when there is income from categories other than continuing operations and a loss from continuing operations in the current year. In this case, the tax benefit allocated to continuing operations is the amount by which the loss from continuing operations reduces the tax expense recorded with respect to the other categories of earnings, even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year losses, income from other sources, including gain from pension and other postretirement benefits recorded as a component of OCI, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets. As a result, for the second quarter ended August 4, 2018, the Company recorded a tax expense of $27 million in OCI related to the gain on pension and other postretirement benefits, and recorded a corresponding tax benefit of $27 million in continuing operations.

The application of the requirements for accounting for income taxes in interim periods, after consideration of our valuation allowance, causes a significant variation in the typical relationship between income tax expense and pretax accounting income. As such, for the 13 weeks ended August 4, 2018 and July 29, 2017, our effective income tax rates were a benefit of 3.6% and an expense of 4.2%, respectively, and for the 26 weeks ended August 4, 2018 and July 29, 2017, our effective tax rates were a benefit of 1.1% and 92.5%, respectively. Our tax rate continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic jurisdictions where it is not more likely than not that such benefits would be realized. The 2018 rate reflects the impacts of the valuation allowance release through continuing operations creating a tax benefit with the offsetting tax expense reflected in OCI as discussed earlier, a tax benefit on the deferred taxes related to the partial impairment of the Kenmore trade name, and the Tax Cuts and Jobs Act, including the federal rate of 21%, the effect of taxes on foreign earnings and changes to previously deductible expenses. In addition, the 13- and 26- weeks ended August 4, 2018 were positively impacted by the reversal of deferred taxes related to indefinite-life assets associated with property sales and negatively impacted by foreign branch taxes and state income taxes. During the first quarter of 2017, the Company realized a significant tax benefit on the reversal of deferred taxes related to the Craftsman Sale.

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cut and Jobs Act (the "Tax Act"). The Tax Act made broad and complex changes to the U.S. tax code that will affect our years ending February 3, 2018 and February 2, 2019, including, but not limited to, (1) reducing the U.S. federal corporate tax rate to 21%, (2) requiring a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries that is payable over eight years and (3) various other miscellaneous changes that are effective in 2017. With the lower U.S. federal corporate rate effective beginning January 1, 2018, our U.S. federal corporate tax rate for 2017 was a blended rate of 33.717% and for 2018 is the statutory rate of 21%.

38

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

In addition to the 21% reduced federal corporate tax rate, the Tax Act also established new laws that will affect 2018, including, but not limited to, (1) the creation of the base erosion anti-abuse tax ("BEAT"), a new minimum tax; (2) a general elimination of U.S. federal income taxes on dividends from foreign subsidiaries; (3) a new provision designed to tax global intangible low-taxed income ("GILTI"); (4) a new limitation on deductible interest expense; (5) limitations on the deductibility of certain executive compensation; (6) limitations on the use of foreign tax credits ("FTCs") to reduce the U.S. income tax liability; and (7) limitations on net operating losses ("NOLs") generated in tax years beginning after December 31, 2017, to 80% of taxable income with indefinite carryovers.

The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. In accordance with SAB 118, a company must reflect the income tax effects of those aspects of the Tax Act for which the accounting under accounting standards applicable to income taxes is complete. To the extent that a company's accounting for certain income tax effects of the Tax Act is incomplete but is able to determine a reasonable estimate, it must record a provisional estimate in the financial statements. If a company cannot determine a provisional estimate to be included in the financial statements, it should continue to apply accounting standards applicable to income taxes on the basis of the provisions of the tax laws that were in effect immediately before the enactment of the Tax Act.

The income tax benefit for the period ended February 3, 2018 included a tax benefit of $470 million related to the impacts of the Tax Act. The impacts of the Tax Act primarily consist of a net benefit for the corporate rate reduction of $222 million, a net tax benefit for the valuation allowance release of $270 million, and a net expense for the transition tax of $11 million.

For various reasons discussed below, our accounting for the following elements of the Tax Act is incomplete as of the year ending February 3, 2018 and the second quarter of 2018. We will continue to refine our calculations as additional analysis is completed. However, we were able to make reasonable estimates of certain effects and, therefore, recorded provisional adjustments as follows:

*Reduction of U.S. federal corporate tax rate:* As a result of the reduced corporate rate, our deferred tax assets, liabilities, and valuation allowance decreased. Further, as we had a net deferred tax liability after valuation allowance, these decreases resulted in a deferred income tax benefit of $222 million for the year ended February 3, 2018. While we were able to make a reasonable estimate of the impact of the reduction in the corporate rate, it may be affected by other analysis related to the Tax Act, including, but not limited to, our calculation of deemed repatriation of deferred foreign income and state tax effect of adjustments made to federal temporary differences. We have not adjusted our provisional tax benefit of $222 million recorded at February 3, 2018 as of the second quarter of 2018.

*Valuation Allowances:* The Company assessed whether its valuation allowance analyses are affected by various aspects of the Tax Act (e.g., deemed repatriation of deferred foreign income, new categories of FTC's, and other miscellaneous provisions of the Tax Act), any corresponding determination of the need for a change in a valuation allowance is also provisional. We have not adjusted our provisional net tax benefit of $270 million at February 3, 2018 as of the second quarter of 2018.

*Global Intangible Low Taxes Income:* The Tax Act creates a new requirement that certain income (i.e., GILTI) earned by controlled foreign corporations ("CFCs") must be included in the gross income of the CFC's U.S. shareholder. GILTI is the excess of the shareholder's "net CFC tested income" over the net deemed tangible income return, which is currently defined as the excess of (1) 10% of the aggregate of the U.S. shareholder's pro rate share of the qualified business asset investment of each CFC with respect to which it is a U.S. shareholder over (2) the amount of certain interest expense taken into account in the determination of net CFC-tested income.

Because of the complexity of the new GILTI tax rules, we are continuing to evaluate this provision of the Tax Act and the application of accounting standards applicable to income taxes. In accordance with accounting standards applicable to income taxes, we are allowed to make an accounting policy choice of (1) treating taxes due on future U.S. inclusions in taxable income related to GILTI as a current-period expense when incurred (the "period cost method") or (2) factoring such amounts into a company's measurement of its deferred taxes (the "deferred method"). We selected the period cost method in the year ending February 3, 2018. We have estimated that our GILTI tax for the year ending February 2, 2019 will be $3 million and have included it in our annual effective tax rate ("AETR")

39

MOAC000854

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

calculation. While the estimated GILTI inclusion will increase our taxable income by $12.4 million, it results in no income tax payable due to the utilization of NOL attributes of $3 million with a valuation allowance release of the same amount. We will continue to refine our calculations throughout 2018.

*Deemed Repatriation Transition Tax*: The Deemed Repatriation Transition Tax ("Transition Tax") is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of certain of our foreign subsidiaries. To determine the amount of the Transition Tax, we must determine, in addition to other factors, the amount of post-86 E&P of the relevant subsidiaries, as well as the amount of non-U.S. income taxes paid on such earnings. We were able to make a reasonable estimate of the Transition Tax and recorded a provisional Transition Tax obligation of $6 million and a provisional withholding tax obligation of $11 million at February 3, 2018. As a result of our valuation allowance on NOLs, only the $11 million withholding tax obligation resulted in a current tax expense. While we are continuing to gather additional information to more precisely compute the amount of the Transition Tax, we did not adjust our estimate of the provisional Transition Tax as of the second quarter of fiscal 2018.

*Other Tax Act Provisions:* The Company's AETR also reflects the impact of other Tax Act provisions, including, but not limited to, the new limitation on deductible interest expense, limitations on the deductibility of certain executive compensation, and the disallowance of certain miscellaneous provisions.

## NOTE 7—SUMMARY OF SEGMENT DATA

These reportable segment classifications are based on our business formats, as described in Note 1. The Kmart format represents both an operating and reportable segment. The Sears Domestic reportable segment consists of the aggregation of several business formats. These formats are evaluated by our Chief Operating Decision Maker ("CODM") to make decisions about resource allocation and to assess performance.

Each of these segments derives its revenues from the sale of merchandise and related services to customers, primarily in the United States. The merchandise and service categories, which represent revenues from contracts with customers, are as follows. The other category includes revenues from contracts with customers, as described below, and also includes rental revenues.

(i)  Hardlines—consists of home appliances, consumer electronics, lawn & garden, tools & hardware, automotive parts, household goods, toys, housewares and sporting goods;

(ii)  Apparel and Soft Home—includes women's, men's, kids', footwear, jewelry, accessories and soft home;

(iii)  Food and Drug—consists of grocery & household, pharmacy and drugstore;

(iv)  Service—includes repair, installation and automotive service and extended contract revenue; and

(v)  Other—includes revenues earned in connection with our agreements with SHO and Lands' End, as well as credit revenues and rental revenues.

40

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

| | 13 Weeks Ended August 4, 2018 | | |
|---|---|---|---|
| *millions* | Kmart | Sears Domestic | Sears Holdings |
| Merchandise sales | | | |
|     Hardlines | $ 242 | $ 1,196 | $ 1,438 |
|     Apparel and Soft Home | 307 | 400 | 707 |
|     Food and Drug | 281 | 2 | 283 |
|        Total merchandise sales | 830 | 1,598 | 2,428 |
| Services and other | | | |
|     Services | 1 | 406 | 407 |
|     Other | 9 | 338 | 347 |
|        Total services and other | 10 | 744 | 754 |
|        Total revenues | 840 | 2,342 | 3,182 |
| Costs and expenses | | | |
|     Cost of sales, buying and occupancy - merchandise sales | 679 | 1,376 | 2,055 |
|     Cost of sales and occupancy - services and other | 1 | 424 | 425 |
|        Total cost of sales, buying and occupancy | 680 | 1,800 | 2,480 |
|     Selling and administrative | 192 | 672 | 864 |
|     Depreciation and amortization | 9 | 57 | 66 |
|     Impairment charges | — | 77 | 77 |
|     Gain on sales of assets | (25) | (78) | (103) |
|        Total costs and expenses | 856 | 2,528 | 3,384 |
| Operating loss | $ (16) | $ (186) | $ (202) |
| Total assets | $ 1,619 | $ 5,318 | $ 6,937 |
| Capital expenditures | $ 8 | $ 10 | $ 18 |

41

MOAC000856

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

| | | 13 Weeks Ended July 29, 2017 | | |
| --- | --- | --- | --- | --- |
| *millions* | | Kmart | Sears Domestic | Sears Holdings |
| Merchandise sales | | | | |
|     Hardlines | $ | 426 | $ 1,521 | $ 1,947 |
|     Apparel and Soft Home | | 511 | 462 | 973 |
|     Food and Drug | | 493 | 1 | 494 |
|         Total merchandise sales | | 1,430 | 1,984 | 3,414 |
| Services and other | | | | |
|     Services | | 1 | 476 | 477 |
|     Other | | 11 | 376 | 387 |
|         Total services and other | | 12 | 852 | 864 |
|         Total revenues | | 1,442 | 2,836 | 4,278 |
| Costs and expenses | | | | |
|     Cost of sales, buying and occupancy - merchandise sales | | 1,161 | 1,654 | 2,815 |
|     Cost of sales and occupancy - services and other | | 1 | 490 | 491 |
|         Total cost of sales, buying and occupancy | | 1,162 | 2,144 | 3,306 |
|     Selling and administrative | | 323 | 800 | 1,123 |
|     Depreciation and amortization | | 14 | 69 | 83 |
|     Impairment charges | | 3 | 2 | 5 |
|     Gain on sales of assets | | (79) | (301) | (380) |
|         Total costs and expenses | | 1,423 | 2,714 | 4,137 |
| Operating income | $ | 19 | $ 122 | $ 141 |
| Total assets | $ | 2,019 | $ 6,348 | $ 8,367 |
| Capital expenditures | $ | 3 | $ 16 | $ 19 |

42

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

| millions | | 26 Weeks Ended August 4, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | Kmart | | Sears Domestic | | Sears Holdings |
| Merchandise sales | | | | | | |
|     Hardlines | $ | 441 | $ | 2,257 | $ | 2,698 |
|     Apparel and Soft Home | | 607 | | 761 | | 1,368 |
|     Food and Drug | | 571 | | 3 | | 574 |
|       Total merchandise sales | | 1,619 | | 3,021 | | 4,640 |
| Services and other | | | | | | |
|     Services | | 2 | | 783 | | 785 |
|     Other | | 16 | | 632 | | 648 |
|       Total services and other | | 18 | | 1,415 | | 1,433 |
|       Total revenues | | 1,637 | | 4,436 | | 6,073 |
| Costs and expenses | | | | | | |
|     Cost of sales, buying and occupancy - merchandise sales | | 1,320 | | 2,634 | | 3,954 |
|     Cost of sales and occupancy - services and other | | 4 | | 808 | | 812 |
|       Total cost of sales, buying and occupancy | | 1,324 | | 3,442 | | 4,766 |
|     Selling and administrative | | 443 | | 1,327 | | 1,770 |
|     Depreciation and amortization | | 18 | | 115 | | 133 |
|     Impairment charges | | 6 | | 85 | | 91 |
|     Gain on sales of assets | | (65) | | (203) | | (268) |
|       Total costs and expenses | | 1,726 | | 4,766 | | 6,492 |
| Operating loss | $ | (89) | $ | (330) | $ | (419) |
| Total assets | $ | 1,619 | $ | 5,318 | $ | 6,937 |
| Capital expenditures | $ | 16 | $ | 16 | $ | 32 |

43

MOAC000858

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

| | 26 Weeks Ended July 29, 2017 | | |
| --- | --- | --- | --- |
| *millions* | Kmart | Sears Domestic | Sears Holdings |
| Merchandise sales | | | |
|    Hardlines | $ 792 | $ 2,949 | $ 3,741 |
|    Apparel and Soft Home | 1,024 | 931 | 1,955 |
|    Food and Drug | 1,045 | 2 | 1,047 |
|      Total merchandise sales | 2,861 | 3,882 | 6,743 |
| Services and other | | | |
|    Services | 2 | 944 | 946 |
|    Other | 26 | 762 | 788 |
|      Total services and other | 28 | 1,706 | 1,734 |
|      Total revenues | 2,889 | 5,588 | 8,477 |
| Costs and expenses | | | |
|    Cost of sales, buying and occupancy - merchandise sales | 2,341 | 3,253 | 5,594 |
|    Cost of sales and occupancy - services and other | 5 | 975 | 980 |
|      Total cost of sales, buying and occupancy | 2,346 | 4,228 | 6,574 |
|    Selling and administrative | 715 | 1,629 | 2,344 |
|    Depreciation and amortization | 27 | 143 | 170 |
|    Impairment charges | 8 | 12 | 20 |
|    Gain on sales of assets | (676) | (445) | (1,121) |
|      Total costs and expenses | 2,420 | 5,567 | 7,987 |
| Operating income | $ 469 | $ 21 | $ 490 |
| Total assets | $ 2,019 | $ 6,348 | $ 8,367 |
| Capital expenditures | $ 9 | $ 32 | $ 41 |

44

MOAC000859

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

## NOTE 8—SUPPLEMENTAL FINANCIAL INFORMATION

Other long-term liabilities at August 4, 2018, July 29, 2017 and February 3, 2018 consisted of the following:

| millions | August 4, 2018 | July 29, 2017 | February 3, 2018 |
|---|---|---|---|
| Self-insurance reserves | 351 | 533 | 491 |
| Other | 419 | 459 | 444 |
| Total | $ 770 | $ 992 | $ 935 |

The Company accounted for the Insurance Transaction in accordance with accounting standards applicable to extinguishment of liabilities. The Company determined that it has been legally released from being the primary obligor under certain workers' compensation and auto per occurrence deductible losses. Accordingly, we accounted for the Insurance Transaction as an extinguishment, and de-recognized the related self-insurance reserves and recognized a loss of $27 million, for the difference between the cash paid and the carrying value of related self-insurance reserves, within selling and administrative in the Condensed Consolidated Statement of Operations for the 26 week period ended August 4, 2018.

The Company sells service contracts that provide for preventative maintenance and repair/replacement coverage on consumer products over periods of time ranging from 12 to 144 months. Revenues from the sale of service contracts, and the related direct acquisition costs, are deferred and amortized on a straight-line basis over the lives of the associated contracts, while the associated service costs are expensed as incurred. The Company satisfies its performance obligations for service contracts over time as we are obligated to perform the related services over the contract period, while payment from the customer is generally received at the inception of the service contract.

The table below shows activity related to unearned revenues for service contracts, which are recorded within current and long-term unearned revenues in the Condensed Consolidated Balance Sheets. During the 26 weeks ended August 4, 2018, the Company recognized revenues of $347 million that were included within unearned revenues at February 3, 2018. During the 26 weeks ended July 29, 2017, the Company recognized revenues of $401 million that were included within unearned revenues at January 28, 2017. The Company expects to recognize revenue of $560 million within the next 12 months and $480 million of revenue thereafter and has accordingly included these amounts within current and long-term unearned revenues, respectively.

| millions | Unearned Revenues |
|---|---|
| Balance at July 29, 2017 | $ 1,219 |
| Sales of service contracts | 325 |
| Revenue recognized on existing service contracts | (430) |
| Balance at February 3, 2018 | 1,114 |
| Sales of service contracts | 310 |
| Revenue recognized on existing service contracts | (384) |
| Balance at August 4, 2018 | $ 1,040 |

Deferred acquisition costs included $41 million, $45 million and $41 million within prepaid expenses and other current assets and $133 million, $152 million and $141 million within other assets in the Condensed Consolidated Balance Sheets at August 4, 2018, July 29, 2017 and February 3, 2018, respectively. Amortization of deferred acquisition costs included within selling and administrative expense in the Condensed Consolidated Statements of Operations was $25 million and $27 million for the 13 week periods ended August 4, 2018 and July 29, 2017, respectively, and $51 million and $54 million for the 26 week periods ended August 4, 2018 and July 29, 2017, respectively.

During the second quarter of 2018, the Company identified an error in its footnote disclosures related to deferred acquisition costs. The amount of current and non-current deferred acquisition costs previously disclosed in the first quarter 2018 footnote were $145 million and $268 million as of February 3, 2018, respectively. The Company evaluated the materiality of the misstated footnote disclosure and concluded that it was immaterial to prior periods.

45

MOAC000860

SEARS HOLDINGS CORPORATION
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

The Company has revised the disclosure of deferred acquisition costs at February 3, 2018 above, which had no impact on our condensed consolidated financial statements.

## NOTE 9—LEGAL PROCEEDINGS

We are a defendant in several lawsuits containing class or collective action allegations in which the named plaintiffs are former associates who allege violations of various wage and hour laws under California law, including alleged misclassification, failure to pay for every hour worked, failure to pay for missed meal and rest periods, and other violations of the California Labor Code. The complaints generally seek unspecified monetary damages, injunctive relief, or both. Further, certain of these proceedings are in jurisdictions with reputations for aggressive application of laws and procedures against corporate defendants. We also are a defendant in putative class action or representative lawsuits in California relating to alleged failure to comply with California laws pertaining to certain operational, marketing, and pricing practices. The California laws alleged to have been violated in each of these lawsuits provide the potential for significant statutory penalties. At this time, the Company is not able to either predict the outcome of these lawsuits or reasonably estimate a potential range of loss with respect to the lawsuits.

We are subject to various other legal and governmental proceedings and investigations, including some involving the practices and procedures in our more highly regulated businesses. Some matters contain class action allegations, environmental and asbestos exposure allegations and other consumer-based, regulatory claims, each of which may seek compensatory, punitive or treble damage claims (potentially in large amounts), as well as other types of relief. At this time, the Company is not able to either predict the outcome of these lawsuits or reasonably estimate a potential range of loss with respect to these lawsuits.

In accordance with accounting standards regarding loss contingencies, we accrue an undiscounted liability for those contingencies where the incurrence of a loss is probable and the amount can be reasonably estimated, and we disclose the amount accrued and the amount of a reasonably possible loss in excess of the amount accrued, if such disclosure is necessary for our financial statements to not be misleading. We do not record liabilities when the likelihood that the liability has been incurred is probable but the amount cannot be reasonably estimated, or when the liability is believed to be only reasonably possible or remote.

Because litigation outcomes are inherently unpredictable, our evaluation of legal proceedings often involves a series of complex assessments by management about future events and can rely heavily on estimates and assumptions. If the assessments indicate that loss contingencies that could be material to any one of our financial statements are not probable, but are reasonably possible, or are probable, but cannot be estimated, then we disclose the nature of the loss contingencies, together with an estimate of the range of possible loss or a statement that such loss is not reasonably estimable. While the likelihood that unresolved proceedings are not presently determinable, and an estimate of the probable and reasonably possible loss or range of loss in excess of amounts accrued for such proceedings cannot be reasonably made, an adverse outcome from such proceedings could have a material effect on our earnings in any given reporting period. However, in the opinion of our management, after consulting with legal counsel, and taking into account insurance and reserves, the ultimate liability related to current outstanding matters is not expected to have a material effect on our financial position or capital resources.

## NOTE 10—RECENT ACCOUNTING PRONOUNCEMENTS

*Compensation - Retirement Benefits*

In August 2018, the FASB issued an accounting standards update which modifies disclosure requirements for defined benefit and postretirement plans. This update is effective for fiscal years beginning after December 15, 2020, with early adoption permitted. The amendments in this update should be applied on a retrospective basis to all periods presented. We are currently evaluating the effect the update will have on our disclosures.

*Fair Value Measurements*

In August 2018, the FASB issued an accounting standards update which modifies disclosure requirements on fair value measurements. This update is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value

46

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial fiscal year of adoption. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted upon issuance of this Update. An entity is permitted to early adopt any removed or modified disclosures upon issuance of this Update and delay adoption of the additional disclosures until their effective date. We are currently evaluating the effect the update will have on our disclosures.

*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*

In February 2018, the FASB issued an accounting standards update which allows a reclassification from accumulated other comprehensive income to retained earnings for stranded tax effects resulting from the Tax Cuts and Jobs Act. This update is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. The amendments in this update should be applied either in the period of adoption or retrospectively to each period (or periods) in which the effect of the change in the U.S. federal corporate income tax rate in the Tax Cuts and Jobs Act is recognized. We are currently evaluating the effect the update will have on our consolidated financial statements.

*Accounting for Certain Financial Instruments with Down Round Features*

In July 2017, the FASB issued an accounting standards update which changes the classification analysis of certain equity-linked financial instruments (or embedded features) with down round features. When determining whether certain financial instruments should be classified as liabilities or equity instruments, a down round feature no longer precludes equity classification when assessing whether the instrument is indexed to an entity's own stock. The amendments also clarify existing disclosure requirements for equity-classified instruments. As a result, a freestanding equity-linked financial instrument (or embedded conversion option) no longer would be accounted for as a derivative liability at fair value as a result of the existence of a down round feature. For freestanding equity classified financial instruments, the amendments require entities that present earnings per share to recognize the effect of the down round feature when it is triggered. The update is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018, with early adoption is permitted. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Compensation - Retirement Benefits*

In March 2017, the FASB issued an accounting standards update which requires an employer to report the service cost component in the same line item or items as other compensation costs arising from services rendered by the pertinent employees during the period. It also requires the other components of net periodic pension cost and net periodic postretirement benefit cost to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations, if one is presented. This update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied retrospectively. The Company adopted the update in the first quarter of 2018. The adoption of the new standard reduced selling and administrative and increased other loss in the Condensed Consolidated Statements of Operations by $246 million and $292 million for the 13- and 26- weeks ended July 29, 2017, respectively.

*Business Combinations*

In January 2017, the FASB issued an accounting standards update which clarifies the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of businesses. The amendments in this update provide a screen to determine when a set is not a business. The screen requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated. If the screen is not met, the amendments in this update require that to be considered a business, a set must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. This update is

MOAC000862

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied prospectively. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Income Taxes - Intra-Entity Transfers of Assets Other Than Inventory*

In October 2016, the FASB issued an accounting standards update to improve the accounting for the income tax consequences of intra-entity transfers of assets other than inventory. Current accounting standards prohibit the recognition of current and deferred income taxes for an intra-entity asset transfer until the asset has been sold to an outside party. In addition, interpretations of this guidance have developed in practice for transfers of certain intangible and tangible assets. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes in accounting standards. To more faithfully represent the economics of intra-entity asset transfers, the amendments in this update require that entities recognize the income tax consequences of an intra-entity transfer of an asset other than inventory when the transfer occurs. The amendments in this update do not change accounting standards for the pre-tax effects of an intra-entity asset transfer under accounting standards applicable to consolidation, or for an intra-entity transfer of inventory. The update is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted as of the beginning of an annual reporting period. The amendments in this update should be applied on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Statement of Cash Flows - Classification of Certain Cash Receipts and Cash Payments*

In August 2016, the FASB issued accounting standards updates which address diversity in practice in how certain cash receipts and cash payments are presented and classified in the statement of cash flows, including: debt prepayment or debt extinguishment costs; settlement of zero-coupon debt instruments or other debt instruments with coupon interest rates that are insignificant in relation to the effective interest rate of the borrowing; contingent consideration payments made after a business combination; proceeds from the settlement of insurance claims; proceeds from the settlement of corporate-owned life insurance policies; distributions received from equity method investees; beneficial interests in securitization transactions; and separately identifiable cash flows and application of the predominance principle. These updates were effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The amendments in the update must be applied using a retrospective transition method to each period presented. The Company adopted the update in the first quarter of 2018. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

*Leases*

In February 2016, the FASB issued an accounting standards update which replaces the current lease accounting standard. The update will require, among other items, lessees to recognize a right-of-use asset and a lease liability for most leases. Extensive quantitative and qualitative disclosures, including significant judgments made by management, will be required to provide greater insight into the extent of revenue and expense recognized and expected to be recognized from existing contracts. The new standard provides for certain practical expedients. The update is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. In July 2018, the FASB issued an update which provides an additional transition method allowing entities to only apply the new lease standard in the year of adoption. The update also provides a practical expedient for lessors to combine non-lease components with related lease components if certain conditions are met. We have selected our leasing software solution and are in the process of identifying changes to our business processes, systems and controls to support adoption of the new standard in fiscal 2019. We are currently evaluating the effect the update will have on our consolidated financial statements, and expect the update will have a material impact on our consolidated financial statements.

48

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

*Revenue from Contracts with Customers*

In May 2014, the FASB issued an accounting standards update which replaces the current revenue recognition standards. Subsequently, the FASB has also issued accounting standards updates which clarify the guidance. As discussed in Note 1, the Company adopted the update in the first quarter of 2018 using the full retrospective adoption method. See Note 1 for further information.

*Other Income - Gains and Losses from the De-recognition of Non-financial assets*

In May 2014, the FASB also issued Subtopic 610-20 as part of the accounting standards update *Revenue from Contracts with Customers*. Subsequently, the FASB issued accounting standards updates which clarify the guidance. The update provides guidance on the recognition and measurement of transfers of non-financial assets to parties that are not customers and amends or supersedes existing guidance within accounting standards related to intangible assets and real estate sales on determining the gain or loss recognized upon de-recognition of a non-financial asset. The effective date of the update is aligned with the requirements in the new revenue standard. The amendments in this update may be applied using a full or modified retrospective adoption method. The Company adopted the update in the first quarter of 2018 using the modified retrospective adoption method to contracts not complete at the adoption date. The adoption of the new standard did not have an impact on our condensed consolidated financial statements.

## NOTE 11—RELATED PARTY DISCLOSURE

Mr. Lampert is Chairman of our Board of Directors and is the Chairman and Chief Executive Officer of ESL. Additionally, on February 1, 2013, Mr. Lampert became our Chief Executive Officer, in addition to his role as Chairman of the Board. ESL owned approximately 49% of our outstanding common stock at August 4, 2018 (excluding shares of common stock that ESL may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock and through debt conversion features).

Bruce R. Berkowitz was a member of our Board of Directors from February 2016 through October 2017. Mr. Berkowitz serves as the Chief Investment Officer of Fairholme Capital Management, LLC, an investment adviser registered with the SEC, and is the President and a Director of Fairholme Funds, Inc., a SEC-registered investment company providing investment management services to three mutual funds (together with Fairholme Capital Management, LLC and other affiliates, "Fairholme"). Fairholme owned approximately 16% of our outstanding common stock at August 4, 2018 (excluding shares of common stock that Fairholme may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock).

Thomas J. Tisch has been an independent member of our Board of Directors since 2005. Mr. Tisch owned approximately 3% of our outstanding common stock at August 4, 2018 (excluding shares of common stock that Mr. Tisch may acquire within 60 days upon the exercise of warrants to purchase shares of our common stock and through debt conversion features).

*Unsecured Commercial Paper*

During the 26 week periods ended August 4, 2018 and July 29, 2017, ESL and its affiliates held unsecured commercial paper issued by SRAC, an indirect wholly-owned subsidiary of Holdings. For the commercial paper outstanding to ESL, the weighted average of each of maturity, annual interest rate and principal amount outstanding was 7.0 days, 11% and $8 million and 8.1 days, 8% and $58 million, respectively, during the 26 week periods ended August 4, 2018 and July 29, 2017. The largest aggregate amount of principal outstanding to ESL at any time since the beginning of 2018 was $50 million, and $0.4 million of interest was paid by SRAC to ESL during the 26 week period ended August 4, 2018.

The commercial paper purchases were made in the ordinary course of business on substantially the same terms, including interest rates, as terms prevailing for comparable transactions with other persons, and did not present features unfavorable to the Company.

49

MOAC000864

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

*LC Facility*

On December 28, 2016, the Company, through the Borrowers, entered into the LC Facility, which was subsequently amended in August 2017. At each of August 4, 2018, July 29, 2017 and February 3, 2018, we had $271 million of letters of credit outstanding under the LC Facility. The letters of credit outstanding under the LC Facility were initially committed by entities affiliated with ESL, and the Lenders maintain cash collateral on deposit with the Issuing Bank of $108 million. $165 million of the amount originally committed under the LC Facility has been syndicated to unaffiliated third party lenders as of August 4, 2018. See Note 2 for additional information regarding the LC Facility, as amended.

*FILO Loan*

On March 21, 2018, the Company, through the Borrowers, obtained the FILO Loan. The initial lenders of the FILO Loan include JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Mr. Tisch. At August 4, 2018, JPP LLC and JPP II, LLC and Benefit Street 2018 LLC, respectively, held $70 million and $25 million of principal amount of the FILO Loan.

*Mezzanine Loan and Additional Mezzanine Loans*

On March 14, 2018, the Company, through the Mezzanine Loan Borrower, entered into the Mezzanine Loan Agreement with the Lenders, entities affiliated with ESL. The Mezzanine Loan Agreement contains an uncommitted accordion feature pursuant to which the Mezzanine Loan Borrower may incur Additional Mezzanine Loans, subject to certain conditions. At August 4, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $463 million of aggregate principal amount of Mezzanine Loan and Additional Mezzanine Loans.

*Term Loan Facility*

On January 4, 2018, the Company, through the Borrowers, obtained a $300 million loan facility from the Lenders, entities affiliated with ESL. At August 4, 2018 and February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $150 million and $151 million, respectively, of principal amount of the Term Loan Facility. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the Term Loan Facility, of which $11 million were repaid to entities affiliated with ESL. See Note 2 for additional information regarding the Term Loan Facility.

*Consolidated Secured Loan Facility*

On June 4, 2018, the Company, through the Incremental Loan Borrowers, entered into the Consolidated Loan Agreement with the 2016 Secured Loan Lenders, which amends and restates the Second Amended and Restated Loan Agreement, dated as of October 18, 2017, and terminates the 2016 Secured Loan Facility. The Consolidated Secured Loan Facility matures on July 20, 2020, and a portion of the Consolidated Secured Loan Facility, as evidenced by Note B, as of closing was held by JPP, LLC and JPP II, LLC, entities affiliated with ESL. At August 4, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $686 million of principal amount of the Consolidated Secured Loan Facility. See Note 2 for additional information regarding the Consolidated Secured Loan Facility.

*2017 Secured Loan Facility*

On January 3, 2017, the Company, through the 2017 Secured Loan Borrowers, obtained a $500 million real estate loan facility from the Lenders, entities affiliated with ESL. On March 8, 2018, the Company borrowed an additional $100 million from the Lenders, which had an original maturity of July 20, 2020 and had the same terms as the 2017 Secured Loan Facility, as amended. At July 29, 2017 and February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $461 million and $384 million of principal amount of the 2017 Secured Loan Facility, respectively. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2017 Secured Loan Facility during the 26 weeks ended August 4, 2018, of which $17 million was repaid to entities affiliated with ESL. Approximately $39 million of proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2017 Secured Loan Facility during the 26 weeks ended July 29, 2017, all

50

MOAC000865

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

of which were repaid to entities affiliated with ESL. During October 2017, the Company, through the Incremental Loan Borrowers, obtained Incremental Loans totaling $200 million from the Lenders. At February 3, 2018, JPP LLC and JPP II, LLC, entities affiliated with ESL, held $145 million of principal amount of the Incremental Loans. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the Incremental Loans during the 26 weeks ended August 4, 2018, of which $6 million was repaid to entities affiliated with ESL. On June 4, 2018, the 2017 Secured Loan Facility and Incremental Loans were amended and restated by the Consolidated Loan Agreement described above. See Note 2 for additional information regarding the 2017 Secured Loan Facility, Incremental Loans and Consolidated Secured Loan Facility.

*2016 Secured Loan Facility*

In April 2016, the Company, through the 2016 Secured Loan Borrowers, obtained a $500 million real estate loan facility from the 2016 Secured Loan Lenders, some of which are entities affiliated with ESL. At July 29, 2017 and February 3, 2018, entities affiliated with ESL held $131 million and $126 million, respectively, of principal amount of the 2016 Secured Loan Facility. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2016 Secured Loan Facility during the 26 weeks ended August 4, 2018, of which $33 million was repaid to entities affiliated with ESL. Proceeds received from real estate transactions were used to reduce outstanding borrowings under the 2016 Secured Loan Facility during the 26 weeks ended July 29, 2017, of which $84 million were repaid to entities affiliated with ESL. On June 4, 2018, the 2016 Secured Loan Facility was terminated by the Consolidated Loan Agreement described above. See Note 2 for additional information regarding the 2016 Secured Loan Facility, as amended, and Consolidated Secured Loan Facility.

*2016 Term Loan*

In April 2016, the Company, through the ABL Borrowers, obtained a $750 million senior secured term loan under the Amended Domestic Credit Agreement with a syndicate of lenders, including $146 million (net of original issue discount) from JPP, LLC and JPP II, LLC, entities affiliated with ESL, and $100 million from the Company's domestic pension plans. At August 4, 2018, the Company's domestic pension plans held $76 million of principal amount of the 2016 Term Loan. At July 29, 2017 and February 3, 2018, JPP LLC and JPP II, LLC, and the Company's domestic pension plans, respectively, held $114 million and $76 million, respectively, and $38 million and $77 million, respectively, of principal amount of the 2016 Term Loan. As disclosed in Note 2, a portion of the proceeds received from the Craftsman Sale were used to reduce outstanding borrowings under the 2016 Term Loan during the 26 weeks ended July 29, 2017, of which $36 million and $24 million was repaid to JPP LLC and JPP II, LLC, and the Company's domestic pension plans, respectively. See Note 2 for additional information regarding the 2016 Term Loan.

*Second Lien Credit Agreement*

In September 2016, the Company, through the ABL Borrowers, obtained a $300 million Second Lien Term Loan from the Lenders, entities affiliated with ESL. At each of August 4, 2018, July 29, 2017 and February 3, 2018, JPP LLC and JPP II, LLC held $300 million of principal amount of the Second Lien Term Loan.

Additionally, as further discussed in Note 2, in July 2017, the Company amended its Second Lien Credit Agreement to create an additional $500 million Line of Credit Facility. The Company received $610 million in net proceeds from Line of Credit Loans during 2017, including $480 million, $25 million and $20 million from ESL and its affiliates, Mr. Berkowitz and his affiliates, and Mr. Tisch and his affiliates, respectively, which also represents the principal amount of Line of Credit Loans held by Mr. Berkowitz and his affiliates at July 29, 2017, by Mr. Tisch and his affiliates at August 4, 2018, July 29, 2017 and February 3, 2018 and by ESL and its affiliates at February 3, 2018. ESL and its affiliates held $200 million principal amount of Line of Credit Loans at July 29, 2017. During the 13 weeks ended May 5, 2018, the Company received an additional $70 million proceeds from Line of Credit Loans from ESL and its affiliates, bringing the principal amount of Line of Credit Loans held by ESL and its affiliates to $505 million at August 4, 2018. The Company made repayments of $25 million during 2017 to Mr. Berkowitz and his affiliates. See Note 2 for additional information regarding the Second Lien Credit Agreement, as amended.

51

MOAC000866

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

*Old Senior Secured Notes and New Senior Secured Notes*

At July 29, 2017 and February 3, 2018, Mr. Lampert and ESL held an aggregate of approximately $11 million and $20 million of principal amount of the Company's Old Senior Secured Notes. At August 4, 2018, Mr. Lampert and ESL held an aggregate of approximately $21 million of principal amount of the Company's New Senior Secured Notes.

At July 29, 2017 Fairholme held an aggregate of approximately $46 million of principal amount of the Company's Old Senior Secured Notes.

*Subsidiary Notes*

At July 29, 2017, Mr. Lampert and ESL held an aggregate of $3 million of principal amount of unsecured notes issued by SRAC (the "Subsidiary Notes").

At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, Fairholme held an aggregate of $8 million, $14 million and $9 million of principal amount of Subsidiary Notes.

*Old Senior Unsecured Notes and Warrants and New Senior Unsecured Notes and Warrants*

At both July 29, 2017 and February 3, 2018, Mr. Lampert and ESL held an aggregate of approximately $188 million of principal amount of the Company's Old Senior Unsecured Notes, and 10,033,472 warrants to purchase shares of Holdings' common stock.

At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, Fairholme held an aggregate of approximately $330 million, $362 million and $336 million of principal amount of the Company's Old Senior Unsecured Notes, and 5,560,517, 6,648,050 and 5,768,185 warrants to purchase shares of Holdings' common stock.

At both July 29, 2017 and February 3, 2018, Mr. Tisch and his affiliates held an aggregate of approximately $10 million of principal amount of the Company's Old Senior Unsecured Notes. At July 29, 2017 and February 3, 2018, respectively, Mr. Tisch and his affiliates held 697,204 and 465,599 warrants to purchase shares of Holdings' common stock.

At August 4, 2018, Mr. Lampert and ESL held an aggregate of approximately $195 million of principal amount of the Company's New Senior Unsecured Notes and 10,033,472 warrants to purchase shares of Holdings' common stock. At August 4, 2018, Mr. Tisch and his affiliates held an aggregate of approximately $11 million of principal amount of the Company's New Senior Unsecured Notes and 465,599 warrants to purchase shares of Holdings' common stock.

*Sears Canada*

ESL owns approximately 45% of the outstanding common shares of Sears Canada (based on publicly available information as of July 27, 2017).

*Lands' End*

ESL owns approximately 67% of the outstanding common stock of Lands' End (based on publicly available information as of January 24, 2018). Holdings and certain of its subsidiaries entered into a transition services agreement in connection with the spin-off pursuant to which Lands' End and Holdings agreed to provide, on an interim, transitional basis, various services, including but not limited to, tax services, logistics services, auditing and compliance services, inventory management services, information technology services and continued participation in certain contracts shared with Holdings and its subsidiaries, as well as agreements related to Lands' End Shops at Sears and participation in the Shop Your Way program. The majority of the services under the transition services agreement with Lands' End have expired or been terminated. In July 2016, the Company and Lands' End executed an agreement pursuant to which the Company will provide foreign buying office support and sourcing services to Lands' End. The agreement expires on June 30, 2020.

Amounts due to or from Lands' End are non-interest bearing, and generally settled on a net basis. Holdings invoices Lands' End on at least a monthly basis. At both July 29, 2017 and February 3, 2018, Holdings reported a net amount receivable from Lands' End of $1 million within accounts receivable in the Condensed Consolidated Balance Sheet.

52

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

Amounts related to revenue from retail services and rent for Lands' End Shops at Sears, participation in the Shop Your Way program and corporate shared services were $10 million and $15 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $21 million and $30 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017. The amounts Lands' End earned related to call center services and commissions were $1 million for the 13 week period ended August 4, 2018 and $1 million and $2 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017.

*SHO*

ESL owns approximately 58% of the outstanding common stock of SHO (based on publicly available information as of November 8, 2017). Holdings and certain of its subsidiaries engage in transactions with SHO pursuant to various agreements with SHO which, among other things, (1) govern the principal transactions relating to the rights offering and certain aspects of our relationship with SHO following the separation, (2) establish terms under which Holdings and certain of its subsidiaries will provide SHO with services, and (3) establish terms pursuant to which Holdings and certain of its subsidiaries will obtain merchandise for SHO.

These agreements were originally made in the context of a parent-subsidiary relationship and were negotiated in the overall context of the separation. In May 2016, the Company and SHO agreed to changes to a number of their related agreements, including extending the merchandise and services agreement until February 1, 2020.

A summary of the nature of related party transactions involving SHO is as follows:

- SHO obtains a significant amount of its merchandise from the Company. We have also entered into certain agreements with SHO to provide logistics, handling, warehouse and transportation services. SHO also pays a royalty related to the sale of Kenmore, Craftsman and DieHard products and fees for participation in the Shop Your Way program.

- SHO receives commissions from the Company for the sale of merchandise made through www.sears.com, extended service agreements, delivery and handling services and credit revenues.

- The Company provides SHO with shared corporate services. These services include accounting and finance and information technology.

Amounts due to or from SHO are non-interest bearing, settled on a net basis, and have payment terms of 10 days after the invoice date. The Company invoices SHO on a weekly basis. At August 4, 2018, July 29, 2017 and February 3, 2018, Holdings reported a net amount receivable from SHO of $22 million, $25 million and $28 million, respectively, within accounts receivable in the Condensed Consolidated Balance Sheets. Amounts related to the sale of inventory and related services, royalties, and corporate shared services were $219 million and $286 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $424 million and $567 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017. The net amounts SHO earned related to commissions were $16 million and $19 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $31 million and $36 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017. Additionally, the Company has guaranteed lease obligations for certain SHO store leases that were assigned as a result of the separation. See Note 4 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018 for further information related to these guarantees.

Also in connection with the separation, the Company entered into an agreement with SHO and the agent under SHO's secured credit facility, whereby the Company committed to continue to provide services to SHO in connection with a realization on the lender's collateral after default under the secured credit facility, notwithstanding SHO's default under the underlying agreement with us, and to provide certain notices and services to the agent, for so long as any obligations remain outstanding under the secured credit facility.

MOAC000868

## SEARS HOLDINGS CORPORATION
### Notes to Condensed Consolidated Financial Statements—(Continued)
### (Unaudited)

*Seritage*

ESL owns approximately 6.2% of the total voting power of Seritage, and approximately 43.5% of the limited partnership units of Seritage Growth Properties, L.P. (the "Operating Partnership"), the entity that now owns the properties sold by the Company in the Seritage transaction and through which Seritage conducts its operations (based on publicly available information as of May 7, 2018). Mr. Lampert is also currently the Chairman of the Board of Trustees of Seritage. Fairholme owns approximately 4.9% of the outstanding Class A common shares of Seritage and 100% of the outstanding Class C non-voting common shares of Seritage (based on publicly available information as of March 16, 2018).

In connection with the Seritage transaction as described in Note 3, Holdings entered into the Master Leases with Seritage. The initial amount of aggregate annual base rent under the master lease was $134 million for the REIT properties, with increases of 2% per year beginning in the second lease year. At both August 4, 2018 and February 3, 2018, Holdings reported prepaid rent of $6 million within prepaid expenses and other current assets in the Condensed Consolidated Balance Sheets. Holdings recorded rent expense of $13 million and $19 million, respectively, in cost of sales, buying and occupancy for the 13 week periods ended August 4, 2018 and July 29, 2017. Rent expense consists of straight-line rent expense of $20 million and $32 million, respectively, offset by amortization of a deferred gain recognized pursuant to the sale and leaseback of properties from Seritage of $7 million and $13 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017.

Holdings recorded rent expense of $27 million and $38 million, respectively, in cost of sales, buying and occupancy for the 26 week periods ended August 4, 2018 and July 29, 2017. Rent expense consists of straight-line rent expense of $43 million and $64 million, respectively, offset by amortization of a deferred gain recognized pursuant to the sale and leaseback of properties from Seritage of $16 million and $26 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017.

In addition to base rent under the Master Leases, Holdings pays monthly installment expenses for property taxes and insurance at all REIT properties where Holdings is a tenant and installment expenses for common area maintenance, utilities and other operating expenses at REIT properties that are multi-tenant locations where Holdings and other third parties are tenants. The initial amount of aggregate installment expenses under the Master Leases was $70 million, based on estimated installment expenses, and currently is $37 million as a result of recapture activity and reconciling actual installment expenses. Holdings paid $9 million and $12 million, respectively, for the 13 week periods ended August 4, 2018 and July 29, 2017, and $18 million and $24 million, respectively, for the 26 week periods ended August 4, 2018 and July 29, 2017, recorded in cost of sales, buying and occupancy. At August 4, 2018, July 29, 2017 and February 3, 2018, respectively, Holdings reported an amount receivable from Seritage of $1 million, $4 million and $1 million within accounts receivable in the Condensed Consolidated Balance Sheets.

54

MOAC000869

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

## NOTE 12—GUARANTOR/NON-GUARANTOR SUBSIDIARY FINANCIAL INFORMATION

At August 4, 2018, the principal amount outstanding of the Old Senior Secured Notes and New Senior Secured Notes was $264 million, including paid-in-kind interest. The Old Senior Secured Notes were issued in 2010 by Sears Holdings Corporation ("Parent"). The Old Senior Secured Notes and New Senior Secured Notes are guaranteed by certain of our 100% owned domestic subsidiaries that own the collateral for the Old Senior Secured Notes and New Senior Secured Notes, as well as by Sears Holdings Management Corporation and SRAC (the "guarantor subsidiaries"). The following condensed consolidated financial information presents the Condensed Consolidating Balance Sheets at August 4, 2018, July 29, 2017 and February 3, 2018, the Condensed Consolidating Statements of Operations and the Condensed Consolidating Statements of Comprehensive Income (Loss) for the 13- and 26- week periods ended August 4, 2018 and July 29, 2017, and the Condensed Consolidating Statements of Cash Flows for the 26 week periods ended August 4, 2018 and July 29, 2017 of (i) Parent; (ii) the guarantor subsidiaries; (iii) the non-guarantor subsidiaries; (iv) eliminations and (v) the Company on a consolidated basis.

The principal elimination entries relate to investments in subsidiaries and intercompany balances and transactions including transactions with our wholly-owned non-guarantor insurance subsidiary. The Company has accounted for investments in subsidiaries under the equity method. The guarantor subsidiaries are 100% owned directly or indirectly by the Parent and all guarantees are joint, several and unconditional. Additionally, the notes are secured by a security interest in certain assets consisting primarily of domestic inventory and credit card receivables of the guarantor subsidiaries, and consequently may not be available to satisfy the claims of the Company's general creditors. Certain investments primarily held by non-guarantor subsidiaries are recorded by the issuers at historical cost and are recorded at fair value by the holder.

55

MOAC000870

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

**Condensed Consolidating Balance Sheet**
**August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash and cash equivalents | $ — | $ 159 | $ 34 | $ — | $ 193 |
| Restricted cash | 248 | — | — | — | 248 |
| Intercompany receivables | — | — | 29,162 | (29,162) | — |
| Accounts receivable | 2 | 301 | 24 | — | 327 |
| Merchandise inventories | — | 2,714 | — | — | 2,714 |
| Prepaid expenses and other current assets | 234 | 866 | 690 | (1,404) | 386 |
| Total current assets | 484 | 4,040 | 29,910 | (30,566) | 3,868 |
| Total property and equipment, net | — | 847 | 597 | — | 1,444 |
| Goodwill and intangible assets | — | 337 | 1,120 | (98) | 1,359 |
| Other assets | 185 | 1,320 | 962 | (2,201) | 266 |
| Investment in subsidiaries | 8,356 | 28,136 | — | (36,492) | — |
| TOTAL ASSETS | $ 9,025 | $ 34,680 | $ 32,589 | $ (69,357) | $ 6,937 |
| Current liabilities | | | | | |
| Short-term borrowings | $ — | $ 1,440 | $ 24 | $ (210) | $ 1,254 |
| Current portion of long-term debt and capitalized lease obligations | 89 | 477 | — | (370) | 196 |
| Merchandise payables | — | 487 | — | — | 487 |
| Intercompany payables | 11,094 | 18,068 | — | (29,162) | — |
| Other current liabilities | 15 | 1,871 | 1,313 | (859) | 2,340 |
| Total current liabilities | 11,198 | 22,343 | 1,337 | (30,601) | 4,277 |
| Long-term debt and capitalized lease obligations | 2,608 | 2,644 | 499 | (2,247) | 3,504 |
| Pension and postretirement benefits | — | 1,162 | 2 | — | 1,164 |
| Deferred gain on sale-leaseback | — | 290 | 15 | — | 305 |
| Sale-leaseback financing obligation | — | 128 | 219 | — | 347 |
| Long-term deferred tax liabilities | — | — | 350 | (231) | 119 |
| Unearned revenues | — | 603 | 415 | (165) | 853 |
| Other long-term liabilities | — | 703 | 67 | — | 770 |
| Total Liabilities | 13,806 | 27,873 | 2,904 | (33,244) | 11,339 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (4,781) | 6,807 | 29,685 | (36,113) | (4,402) |
| Total Equity (Deficit) | (4,781) | 6,807 | 29,685 | (36,113) | (4,402) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 9,025 | $ 34,680 | $ 32,589 | $ (69,357) | $ 6,937 |

56

MOAC000871

**SEARS HOLDINGS CORPORATION**
Notes to Condensed Consolidated Financial Statements—(Continued)
(Unaudited)

**Condensed Consolidating Balance Sheet**
**July 29, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash and cash equivalents | $ — | $ 180 | $ 32 | $ — | $ 212 |
| Restricted cash | 230 | — | — | — | 230 |
| Intercompany receivables | — | — | 27,871 | (27,871) | — |
| Accounts receivable | — | 350 | 20 | — | 370 |
| Merchandise inventories | — | 3,433 | — | — | 3,433 |
| Prepaid expenses and other current assets | 31 | 677 | 432 | (806) | 334 |
| Total current assets | 261 | 4,640 | 28,355 | (28,677) | 4,579 |
| Total property and equipment, net | — | 1,262 | 707 | — | 1,969 |
| Goodwill and intangible assets | — | 355 | 1,261 | (98) | 1,518 |
| Other assets | 405 | 1,304 | 1,532 | (2,940) | 301 |
| Investment in subsidiaries | 9,302 | 27,717 | — | (37,019) | — |
| TOTAL ASSETS | $ 9,968 | $ 35,278 | $ 31,855 | $ (68,734) | $ 8,367 |
| Current liabilities | | | | | |
| Short-term borrowings | $ — | $ 689 | $ — | $ (143) | $ 546 |
| Current portion of long-term debt and capitalized lease obligations | — | 1,052 | — | — | 1,052 |
| Merchandise payables | — | 672 | (2) | — | 670 |
| Intercompany payables | 11,416 | 16,455 | — | (27,871) | — |
| Other current liabilities | 37 | 2,147 | 1,133 | (611) | 2,706 |
| Total current liabilities | 11,453 | 21,015 | 1,131 | (28,625) | 4,974 |
| Long-term debt and capitalized lease obligations | 2,130 | 3,036 | — | (2,761) | 2,405 |
| Pension and postretirement benefits | — | 1,727 | 4 | — | 1,731 |
| Deferred gain on sale-leaseback | — | 455 | — | — | 455 |
| Sale-leaseback financing obligation | — | 141 | 89 | — | 230 |
| Long-term deferred tax liabilities | 48 | — | 738 | (143) | 643 |
| Unearned revenues | — | 305 | 481 | (193) | 593 |
| Other long-term liabilities | — | 913 | 79 | — | 992 |
| Total Liabilities | 13,631 | 27,592 | 2,522 | (31,722) | 12,023 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (3,663) | 7,686 | 29,333 | (37,012) | (3,656) |
| Noncontrolling interest | — | — | — | — | — |
| Total Equity (Deficit) | (3,663) | 7,686 | 29,333 | (37,012) | (3,656) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 9,968 | $ 35,278 | $ 31,855 | $ (68,734) | $ 8,367 |

57

MOAC000872

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Balance Sheet**
**February 3, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets | | | | | |
| Cash and cash equivalents | $ — | $ 152 | $ 30 | $ — | $ 182 |
| Restricted cash | 154 | — | — | | 154 |
| Intercompany receivables | — | — | 27,993 | (27,993) | — |
| Accounts receivable | — | 322 | 21 | | 343 |
| Merchandise inventories | — | 2,798 | — | | 2,798 |
| Prepaid expenses and other current assets | 309 | 910 | 478 | (1,351) | 346 |
| Total current assets | 463 | 4,182 | 28,522 | (29,344) | 3,823 |
| Total property and equipment, net | — | 1,043 | 686 | | 1,729 |
| Goodwill and intangible assets | — | 346 | 1,189 | (98) | 1,437 |
| Other assets | 179 | 1,331 | 1,159 | (2,385) | 284 |
| Investment in subsidiaries | 8,787 | 27,774 | — | (36,561) | — |
| TOTAL ASSETS | $ 9,429 | $ 34,676 | $ 31,556 | $ (68,388) | $ 7,273 |
| Current liabilities | | | | | |
| Short-term borrowings | $ 144 | $ 937 | $ — | $ (166) | $ 915 |
| Current portion of long-term debt and capitalized lease obligations | 303 | 897 | — | (232) | 968 |
| Merchandise payables | — | 576 | — | | 576 |
| Intercompany payables | 11,099 | 16,894 | — | (27,993) | — |
| Other current liabilities | 16 | 1,970 | 1,426 | (949) | 2,463 |
| Total current liabilities | 11,562 | 21,274 | 1,426 | (29,340) | 4,922 |
| Long-term debt and capitalized lease obligations | 1,991 | 2,734 | — | (2,476) | 2,249 |
| Pension and postretirement benefits | — | 1,616 | 3 | | 1,619 |
| Deferred gain on sale-leaseback | — | 360 | 2 | | 362 |
| Sale-leaseback financing obligation | — | 158 | 89 | | 247 |
| Long-term deferred tax liabilities | — | — | 349 | (223) | 126 |
| Unearned revenues | — | 271 | 446 | (178) | 539 |
| Other long-term liabilities | — | 867 | 68 | | 935 |
| Total Liabilities | 13,553 | 27,280 | 2,383 | (32,217) | 10,999 |
| EQUITY (DEFICIT) | | | | | |
| Shareholder's equity (deficit) | (4,124) | 7,396 | 29,173 | (36,171) | (3,726) |
| Noncontrolling interest | — | — | — | | — |
| Total Equity (Deficit) | (4,124) | 7,396 | 29,173 | (36,171) | (3,726) |
| TOTAL LIABILITIES AND EQUITY (DEFICIT) | $ 9,429 | $ 34,676 | $ 31,556 | $ (68,388) | $ 7,273 |

58

MOAC000873

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 13 Weeks Ended August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 2,416 | $ — | $ 12 | $ 2,428 |
| Services and other | 1 | 766 | 528 | (541) | 754 |
| Total revenues | 1 | 3,182 | 528 | (529) | 3,182 |
| Cost of sales, buying and occupancy - merchandise sales | 1 | 2,028 | — | 26 | 2,055 |
| Cost of sales and occupancy - services and other | — | 521 | 215 | (311) | 425 |
| Total cost of sales, buying and occupancy | 1 | 2,549 | 215 | (285) | 2,480 |
| Selling and administrative | 3 | 918 | 187 | (244) | 864 |
| Depreciation and amortization | — | 53 | 13 | — | 66 |
| Impairment charges | — | — | 77 | — | 77 |
| Gain on sales of assets | — | (80) | (23) | — | (103) |
| Total costs and expenses | 4 | 3,440 | 469 | (529) | 3,384 |
| Operating income (loss) | (3) | (258) | 59 | — | (202) |
| Interest expense | (205) | (278) | (75) | 370 | (188) |
| Interest and investment income | 56 | 117 | 218 | (389) | 2 |
| Other loss | — | (139) | — | — | (139) |
| Income (loss) before income taxes | (152) | (558) | 202 | (19) | (527) |
| Income tax (expense) benefit | — | 27 | (8) | — | 19 |
| Equity (deficit) in earnings in subsidiaries | (337) | 98 | — | 239 | — |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (489) | $ (433) | $ 194 | $ 220 | $ (508) |

59

MOAC000874

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 13 Weeks Ended July 29, 2017**

| *millions* | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 3,406 | $ — | $ 8 | $ 3,414 |
| Services and other | — | 885 | 563 | (584) | 864 |
| Total revenues | — | 4,291 | 563 | (576) | 4,278 |
| Cost of sales, buying and occupancy - merchandise sales | — | 2,795 | — | 20 | 2,815 |
| Cost of sales and occupancy - services and other | — | 584 | 220 | (313) | 491 |
| Total cost of sales, buying and occupancy | — | 3,379 | 220 | (293) | 3,306 |
| Selling and administrative | (33) | 1,229 | 210 | (283) | 1,123 |
| Depreciation and amortization | — | 67 | 16 | — | 83 |
| Impairment charges | — | 5 | — | — | 5 |
| (Gain) loss on sales of assets | 6 | (386) | — | — | (380) |
| Total costs and expenses | (27) | 4,294 | 446 | (576) | 4,137 |
| Operating income (loss) | 27 | (3) | 117 | — | 141 |
| Interest expense | (154) | (237) | (4) | 272 | (123) |
| Interest and investment income (loss) | 28 | 64 | 168 | (272) | (12) |
| Other loss | — | (246) | — | — | (246) |
| Income (loss) before income taxes | (99) | (422) | 281 | — | (240) |
| Income tax (expense) benefit | — | 21 | (31) | — | (10) |
| Equity (deficit) in earnings in subsidiaries | (151) | 176 | — | (25) | — |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (250) | $ (225) | $ 250 | $ (25) | $ (250) |

60

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 26 Weeks Ended August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 4,619 | $ — | $ 21 | $ 4,640 |
| Services and other | 1 | 1,446 | 1,045 | (1,059) | 1,433 |
| Total revenues | 1 | 6,065 | 1,045 | (1,038) | 6,073 |
| Cost of sales, buying and occupancy - merchandise sales | 1 | 3,894 | — | 59 | 3,954 |
| Cost of sales and occupancy - services and other | — | 998 | 427 | (613) | 812 |
| Total cost of sales, buying and occupancy | 1 | 4,892 | 427 | (554) | 4,766 |
| Selling and administrative | 6 | 1,873 | 375 | (484) | 1,770 |
| Depreciation and amortization | — | 106 | 27 | — | 133 |
| Impairment charges | — | 11 | 80 | — | 91 |
| Gain on sales of assets | — | (187) | (81) | — | (268) |
| Total costs and expenses | 7 | 6,695 | 828 | (1,038) | 6,492 |
| Operating income (loss) | (6) | (630) | 217 | — | (419) |
| Interest expense | (387) | (564) | (91) | 688 | (354) |
| Interest and investment income | 89 | 176 | 445 | (707) | 3 |
| Other loss | — | (172) | — | — | (172) |
| Income (loss) before income taxes | (304) | (1,190) | 571 | (19) | (942) |
| Income tax (expense) benefit | — | 61 | (51) | — | 10 |
| Equity (deficit) in earnings in subsidiaries | (609) | 357 | — | 252 | — |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (913) | $ (772) | $ 520 | $ 233 | $ (932) |

61

MOAC000876

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Operations**
**For the 26 Weeks Ended July 29, 2017**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Merchandise sales | $ — | $ 6,730 | $ — | $ 13 | $ 6,743 |
| Services and other | — | 1,756 | 1,161 | (1,183) | 1,734 |
| Total revenues | — | 8,486 | 1,161 | (1,170) | 8,477 |
| Cost of sales, buying and occupancy - merchandise sales | — | 5,547 | — | 47 | 5,594 |
| Cost of sales and occupancy - services and other | — | 1,188 | 443 | (651) | 980 |
| Total cost of sales, buying and occupancy | — | 6,735 | 443 | (604) | 6,574 |
| Selling and administrative | (32) | 2,515 | 427 | (566) | 2,344 |
| Depreciation and amortization | — | 138 | 32 | — | 170 |
| Impairment charges | — | 20 | — | — | 20 |
| Gain on sales of assets | (486) | (635) | — | — | (1,121) |
| Total costs and expenses | (518) | 8,773 | 902 | (1,170) | 7,987 |
| Operating income (loss) | 518 | (287) | 259 | — | 490 |
| Interest expense | (271) | (458) | (8) | 486 | (251) |
| Interest and investment income (loss) | 38 | 103 | 331 | (486) | (14) |
| Other loss | — | (292) | — | — | (292) |
| Income (loss) before income taxes | 285 | (934) | 582 | — | (67) |
| Income tax (expense) benefit | — | 150 | (88) | — | 62 |
| Equity (deficit) in earnings in subsidiaries | (290) | 349 | — | (59) | — |
| **NET INCOME (LOSS) ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (5) | $ (435) | $ 494 | $ (59) | $ (5) |

62

MOAC000877

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 13 Weeks Ended August 4, 2018**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (489) | $ | (433) | $ | 194 | $ | 220 | $ | (508) |
| Other comprehensive income (loss) | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | — | | 218 | | — | | — | | 218 |
| Currency translation adjustments, net of tax | | — | | — | | (1) | | — | | (1) |
| Unrealized net loss, net of tax | | (8) | | — | | — | | 8 | | — |
| Total other comprehensive income (loss) | | (8) | | 218 | | (1) | | 8 | | 217 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (497) | $ | (215) | $ | 193 | $ | 228 | $ | (291) |

63

MOAC000878

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 13 Weeks Ended July 29, 2017**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (250) | $ | (225) | $ | 250 | $ | (25) | $ | (250) |
| Other comprehensive income | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | — | | 127 | | — | | — | | 127 |
| Total other comprehensive income | | — | | 127 | | — | | — | | 127 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (250) | $ | (98) | $ | 250 | $ | (25) | $ | (123) |

64

MOAC000879

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 26 Weeks Ended August 4, 2018**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (913) | $ | (772) | $ | 520 | $ | 233 | $ | (932) |
| Other comprehensive income (loss) | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | — | | 254 | | — | | — | | 254 |
| Currency translation adjustments, net of tax | | — | | — | | — | | — | | — |
| Unrealized net gain (loss), net of tax | | (8) | | — | | 3 | | 5 | | — |
| Total other comprehensive income (loss) | | (8) | | 254 | | 3 | | 5 | | 254 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (921) | $ | (518) | $ | 523 | $ | 238 | $ | (678) |

65

MOAC000880

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Comprehensive Income (Loss)**
**For the 26 Weeks Ended July 29, 2017**

| millions | Parent | | Guarantor Subsidiaries | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) | $ | (5) | $ | (435) | $ | 494 | $ | (59) | $ | (5) |
| Other comprehensive income | | | | | | | | | | |
| Pension and postretirement adjustments, net of tax | | — | | 177 | | — | | — | | 177 |
| Currency translation adjustments, net of tax | | — | | — | | 1 | | — | | 1 |
| Unrealized net gain, net of tax | | — | | — | | 26 | | (26) | | — |
| Total other comprehensive income | | — | | 177 | | 27 | | (26) | | 178 |
| Comprehensive income (loss) attributable to Holdings' shareholders | $ | (5) | $ | (258) | $ | 521 | $ | (85) | $ | 173 |

66

MOAC000881

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Cash Flows**
**For the 26 Weeks Ended August 4, 2018**

| millions | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 8 | $ (1,170) | $ 126 | $ — | $ (1,036) |
| Proceeds from sales of property and investments | — | 160 | 162 | — | 322 |
| Purchases of property and equipment | — | (28) | (4) | — | (32) |
| Net investing with Affiliates | (245) | (94) | (795) | 1,134 | — |
| Net cash provided by (used in) investing activities | (245) | 38 | (637) | 1,134 | 290 |
| Proceeds from debt issuances | 327 | 195 | 713 | — | 1,235 |
| Repayments of long-term debt | (88) | (611) | (170) | — | (869) |
| Increase in short-term borrowings, primarily 90 days or less | — | 389 | — | — | 389 |
| Proceeds from sale-leaseback financing | — | 130 | — | — | 130 |
| Debt issuance costs | (2) | (4) | (28) | — | (34) |
| Net borrowing with Affiliates | 94 | 1,040 | — | (1,134) | — |
| Net cash provided by financing activities | 331 | 1,139 | 515 | (1,134) | 851 |
| NET INCREASE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 94 | 7 | 4 | — | 105 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | 154 | 152 | 30 | — | 336 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF PERIOD | $ 248 | $ 159 | $ 34 | $ — | $ 441 |

67

**SEARS HOLDINGS CORPORATION**
**Notes to Condensed Consolidated Financial Statements—(Continued)**
**(Unaudited)**

**Condensed Consolidating Statement of Cash Flows**
**For the 26 Weeks Ended July 29, 2017**

| *millions* | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (11) | $ (1,436) | $ 309 | $ — | $ (1,138) |
| Proceeds from sales of property and investments | — | 569 | — | — | 569 |
| Proceeds from Craftsman sale | 572 | — | — | — | 572 |
| Proceeds from sales of receivables | 293 | — | — | — | 293 |
| Purchases of property and equipment | — | (36) | (5) | — | (41) |
| Net investing with Affiliates | (582) | — | (298) | 880 | — |
| Net cash provided by (used in) investing activities | 283 | 533 | (303) | 880 | 1,393 |
| Proceeds from debt issuances | — | 330 | — | — | 330 |
| Repayments of long-term debt | (39) | (678) | — | — | (717) |
| Increase in short-term borrowings, primarily 90 days or less | — | 216 | — | — | 216 |
| Proceeds from sale-leaseback financing | — | 89 | — | — | 89 |
| Debt issuance costs | (3) | (14) | — | — | (17) |
| Net borrowing with Affiliates | — | 880 | — | (880) | — |
| Net cash provided by (used in) financing activities | (42) | 823 | — | (880) | (99) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 230 | (80) | 6 | — | 156 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH BEGINNING OF YEAR | — | 260 | 26 | — | 286 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH END OF PERIOD | $ 230 | $ 180 | $ 32 | $ — | $ 442 |

68

MOAC000883

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion should be read in conjunction with Part II, Item 7 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

## OVERVIEW OF HOLDINGS

Holdings, the parent company of Kmart and Sears, was formed in connection with the March 24, 2005 merger of these two companies. We are an integrated retailer with significant physical and intangible assets, as well as virtual capabilities enabled through technology. We operate a national network of stores with 866 full-line and specialty retail stores in the United States as of August 4, 2018, operating as Kmart and Sears. Further, we operate a number of websites under the Sears.com and Kmart.com banners, which offer millions of products and provide the capability for our members and customers to engage in cross-channel transactions such as *free store pickup; buy in store/ship to home; and buy online, return in store.* We are also the home of Shop Your Way®, a free membership program that connects its members to personalized products, programs and partners that help them save time and money every day. Through an extensive network of national and local partners, members can shop thousands of their favorite brands, dine out and access an array of exclusive partners to earn points to redeem for savings on future purchases at Sears, Kmart, Lands' End and at ShopYourWay.com.

We conduct our operations in two business segments: Kmart and Sears Domestic. The nature of operations conducted within each of these segments is discussed within the "Business Segments" section of Item 1 of our Annual Report on Form 10-K for the fiscal year ended February 3, 2018. Our business segments have been determined in accordance with accounting standards regarding the determination, and reporting, of business segments.

69

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*CONSOLIDATED RESULTS OF OPERATIONS*

| | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| *millions, except per share data and percentages* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| **REVENUES** | | | | |
| Merchandise sales | $ 2,428 | $ 3,414 | $ 4,640 | $ 6,743 |
| Services and other | 754 | 864 | 1,433 | 1,734 |
| Total revenues | 3,182 | 4,278 | 6,073 | 8,477 |
| **COSTS AND EXPENSES** | | | | |
| Cost of sales, buying and occupancy - merchandise sales | 2,055 | 2,815 | 3,954 | 5,594 |
| Gross margin dollars - merchandise sales | 373 | 599 | 686 | 1,149 |
| *Gross margin rate - merchandise sales* | *15.4%* | *17.5%* | *14.8%* | *17.0%* |
| Cost of sales and occupancy - services and other | 425 | 491 | 812 | 980 |
| Gross margin dollars - services and other | 329 | 373 | 621 | 754 |
| *Gross margin rate - services and other* | *43.6%* | *43.2%* | *43.3%* | *43.5%* |
| Total cost of sales, buying and occupancy | 2,480 | 3,306 | 4,766 | 6,574 |
| Total gross margin dollars | 702 | 972 | 1,307 | 1,903 |
| *Total gross margin rate* | *22.1%* | *22.7%* | *21.5%* | *22.4%* |
| Selling and administrative | 864 | 1,123 | 1,770 | 2,344 |
| *Selling and administrative expense as a percentage of total revenues* | *27.2%* | *26.3%* | *29.1%* | *27.7%* |
| Depreciation and amortization | 66 | 83 | 133 | 170 |
| Impairment charges | 77 | 5 | 91 | 20 |
| Gain on sales of assets | (103) | (380) | (268) | (1,121) |
| Total costs and expenses | 3,384 | 4,137 | 6,492 | 7,987 |
| Operating income (loss) | (202) | 141 | (419) | 490 |
| Interest expense | (188) | (123) | (354) | (251) |
| Interest and investment income (loss) | 2 | (12) | 3 | (14) |
| Other loss | (139) | (246) | (172) | (292) |
| Loss before income taxes | (527) | (240) | (942) | (67) |
| Income tax (expense) benefit | 19 | (10) | 10 | 62 |
| **NET LOSS ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | $ (508) | $ (250) | $ (932) | $ (5) |
| **NET LOSS PER COMMON SHARE ATTRIBUTABLE TO HOLDINGS' SHAREHOLDERS** | | | | |
| Basic loss per share | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Diluted loss per share | $ (4.68) | $ (2.33) | $ (8.61) | $ (0.05) |
| Basic weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |
| Diluted weighted average common shares outstanding | 108.5 | 107.3 | 108.3 | 107.2 |

MOAC000885

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

References to comparable store sales amounts within the following discussion include sales for all stores operating for a period of at least 12 full months, including remodeled and expanded stores, but excluding store relocations and stores that have undergone format changes. Comparable store sales amounts include sales from sears.com and kmart.com shipped directly to customers. These online sales resulted in a benefit to our comparable store sales of 50 basis points for both the 13- and 26- week periods ended August 4, 2018, and a negative impact to our comparable store sales of 70 basis points for both the 13- and 26- week periods ended July 29, 2017. In addition, comparable store sales have been adjusted for the change in the unshipped sales reserves recorded at the end of each reporting period, which resulted in a negative impact of approximately 50 basis points for both the 13- and 26- week periods ended August 4, 2018, respectively. The change in unshipped sales reserves resulted in a benefit of approximately 60 basis points and 40 basis points, respectively, for the 13- and 26- week periods ended July 29, 2017.

Our fiscal 2018 second quarter and first half was comprised of the 13- and 26- week periods, respectively, ended August 4, 2018, while our fiscal 2017 second quarter and first half was comprised of the 13- and 26- week periods, respectively, ended July 29, 2017. This one week shift in sales had no impact on the comparable store sales results reported herein due to the fact that for purposes of reporting comparable store sales for the second quarter, weeks 14 through 26 for fiscal 2018 have been compared to weeks 15 through 27 of fiscal 2017, and for purposes of reporting comparable sales for the first half, weeks one through 26 for fiscal 2018 have been compared to weeks two through 27 of fiscal 2017, thereby eliminating the impact of the one week shift.

### *Net Loss Attributable to Holdings' Shareholders, Net Loss per Share and Adjusted EBITDA*

We recorded a net loss attributable to Holdings' shareholders of $508 million, or $4.68 loss per diluted share, and $250 million, or $2.33 loss per diluted share, for the second quarter of 2018 and 2017, respectively. For the first half, we recorded a net loss attributable to Holdings' shareholders of $932 million, or $8.61 loss per diluted share, and $5 million, or $0.05 loss per diluted share, in 2018 and 2017, respectively.

In addition to our net loss attributable to Holdings' shareholders determined in accordance with Generally Accepted Accounting Principles ("GAAP"), for purposes of evaluating operating performance, we use Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA").

Adjusted EBITDA was determined as follows:

| | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
| millions | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Net loss attributable to Holdings per statement of operations | $ (508) | $ (250) | $ (932) | $ (5) |
| Income tax expense (benefit) | (19) | 10 | (10) | (62) |
| Interest expense | 188 | 123 | 354 | 251 |
| Interest and investment loss | (2) | 12 | (3) | 14 |
| Other loss | 139 | 246 | 172 | 292 |
| Operating income (loss) | (202) | 141 | (419) | 490 |
| Depreciation and amortization | 66 | 83 | 133 | 170 |
| Gain on sales of assets | (103) | (380) | (268) | (1,121) |
| Impairment charges | 77 | 5 | 91 | 20 |
| Before excluded items | (162) | (151) | (463) | (441) |
| Closed store reserve and severance | 64 | 128 | 140 | 204 |
| Other[1] | 2 | (24) | 20 | (9) |
| Amortization of deferred Seritage gain | (16) | (19) | (34) | (40) |
| Adjusted EBITDA | $ (112) | $ (66) | $ (337) | $ (286) |

[1] The 13-week period ended August 4, 2018 consisted of items associated with natural disasters, as well as transaction costs associated with strategic initiatives, while the 26-week period ended August 4, 2018 consisted of items associated with an insurance transaction and natural disasters, as well as transaction costs associated with strategic initiatives. The 13- and 26-

71

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

week periods ended July 29, 2017 consisted of items associated with legal matters and transaction costs associated with strategic initiatives.

Adjusted EBITDA for our segments was as follows:

| | 13 Weeks Ended | | | | | | |
|---|---|---|---|---|---|---|---|
| | August 4, 2018 | | | July 29, 2017 | | | |
| millions | Kmart | Sears Domestic | Sears Holdings | | Kmart | Sears Domestic | Sears Holdings |
| Operating income (loss) per statement of operations | $ (16) | $ (186) | $ (202) | | $ 19 | $ 122 | $ 141 |
| Depreciation and amortization | 9 | 57 | 66 | | 14 | 69 | 83 |
| Gain on sales of assets | (25) | (78) | (103) | | (79) | (301) | (380) |
| Impairment charges | — | 77 | 77 | | 3 | 2 | 5 |
| Before excluded items | (32) | (130) | (162) | | (43) | (108) | (151) |
| Closed store reserve and severance | 13 | 51 | 64 | | 68 | 60 | 128 |
| Other[1] | (12) | 14 | 2 | | (24) | — | (24) |
| Amortization of deferred Seritage gain | (3) | (13) | (16) | | (2) | (17) | (19) |
| Adjusted EBITDA | $ (34) | $ (78) | $ (112) | | $ (1) | $ (65) | $ (66) |
| % to revenues | (4.0)% | (3.3)% | (3.5)% | | (0.1)% | (2.3)% | (1.5)% |

| | 26 Weeks Ended | | | | | | |
|---|---|---|---|---|---|---|---|
| | August 4, 2018 | | | July 29, 2017 | | | |
| millions | Kmart | Sears Domestic | Sears Holdings | | Kmart | Sears Domestic | Sears Holdings |
| Operating income (loss) per statement of operations | $ (89) | $ (330) | $ (419) | | $ 469 | $ 21 | $ 490 |
| Depreciation and amortization | 18 | 115 | 133 | | 27 | 143 | 170 |
| Gain on sales of assets | (65) | (203) | (268) | | (676) | (445) | (1,121) |
| Impairment charges | 6 | 85 | 91 | | 8 | 12 | 20 |
| Before excluded items | (130) | (333) | (463) | | (172) | (269) | (441) |
| Closed store reserve and severance | 41 | 99 | 140 | | 102 | 102 | 204 |
| Other[1] | (12) | 32 | 20 | | (24) | 15 | (9) |
| Amortization of deferred Seritage gain | (5) | (29) | (34) | | (6) | (34) | (40) |
| Adjusted EBITDA | $ (106) | $ (231) | $ (337) | | $ (100) | $ (186) | $ (286) |
| % to revenues | (6.5)% | (5.2)% | (5.5)% | | (3.5)% | (3.3)% | (3.4)% |

[1] The 13-week period ended August 4, 2018 consisted of items associated with natural disasters, as well as transaction costs associated with strategic initiatives, while the 26-week period ended August 4, 2018 consisted of items associated with an insurance transaction and natural disasters, as well as transaction costs associated with strategic initiatives. The 13- and 26- week periods ended July 29, 2017 consisted of items associated with legal matters and transaction costs associated with strategic initiatives.

MOAC000887

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

The following tables set forth the impact each excluded item used in calculating Adjusted EBITDA had on specific income and expense amounts reported in our Consolidated Statements of Operations during the 13- and 26- weeks ended August 4, 2018 and July 29, 2017.

*millions*

| | 13 Weeks Ended August 4, 2018 | | | |
|---|---|---|---|---|
| Other Excluded Items: | Closed store reserve and severance | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 43 | $ — | $ (16) | $ 27 |
| Selling and administrative impact | 21 | 2 | — | 23 |
| Total | $ 64 | $ 2 | $ (16) | $ 50 |

*millions*

| | 13 Weeks Ended July 29, 2017 | | | |
|---|---|---|---|---|
| Other Excluded Items: | Closed store reserve and severance | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 89 | $ — | $ (19) | $ 70 |
| Selling and administrative impact | 39 | (24) | — | 15 |
| Total | $ 128 | $ (24) | $ (19) | $ 85 |

*millions*

| | 26 Weeks Ended August 4, 2018 | | | |
|---|---|---|---|---|
| Other Excluded Items: | Closed store reserve and severance | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 52 | $ — | $ (34) | $ 18 |
| Selling and administrative impact | 88 | 20 | — | 108 |
| Total | $ 140 | $ 20 | $ (34) | $ 126 |

*millions*

| | 26 Weeks Ended July 29, 2017 | | | |
|---|---|---|---|---|
| Other Excluded Items: | Closed store reserve and severance | Other[1] | Amortization of deferred Seritage gain | Total |
| Gross margin impact | $ 104 | $ — | $ (40) | $ 64 |
| Selling and administrative impact | 100 | (9) | — | 91 |
| Total | $ 204 | $ (9) | $ (40) | $ 155 |

[1] The 13- week period ended August 4, 2018 consisted of items associated with natural disasters, as well as transactions costs associated with strategic initiatives, while the 26- week period ended August 4, 2018 consisted of items associated with an insurance transaction and natural disasters, as well as transaction costs associated with strategic initiatives. The 13- and 26- week periods ended July 29, 2017 consisted of items associated with legal matters and transaction costs associated with strategic initiatives.

Adjusted EBITDA is computed as net loss attributable to Sears Holdings Corporation appearing on the Statements of Operations excluding income attributable to noncontrolling interests, income tax (expense) benefit, interest expense, interest and investment loss, other loss, depreciation and amortization, gain on sales of assets and impairment charges. In addition, it is adjusted to exclude certain significant items as set forth below. Our management uses Adjusted EBITDA to evaluate the operating performance of our businesses, as well as executive compensation metrics, for comparable periods. Adjusted EBITDA should not be used by investors or other third parties as the sole basis for formulating investment decisions as it excludes a number of important cash and non-cash recurring items.

While Adjusted EBITDA is a non-GAAP measurement, management believes that it is an important indicator of ongoing operating performance, and useful to investors, because:

MOAC000888

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

- EBITDA excludes the effects of financings and investing activities by eliminating the effects of interest and depreciation costs;

- Management considers gains/(losses) on the sale of assets to result from investing decisions rather than ongoing operations; and

- Other significant items, while periodically affecting our results, may vary significantly from period to period and have a disproportionate effect in a given period, which affects comparability of results. We have adjusted our results for these items to make our statements more comparable and therefore more useful to investors as the items are not representative of our ongoing operations and reflect past investment decisions.

Pension expense is recorded within other loss, which is excluded from Adjusted EBITDA, and further explained as follows:

- Pension expense – Contributions to our pension plans remain a significant use of our cash on an annual basis. Cash contributions to our pension and postretirement plans are separately disclosed on the cash flow statement. While the Company's pension plans are frozen, and thus associates do not currently earn pension benefits, we have a legacy pension obligation for past service performed by Kmart and Sears associates. The annual pension expense included in our statement of operations related to these legacy domestic pension plans was relatively minimal in years prior to 2009. However, due to the severe decline in the capital markets that occurred in the latter part of 2008, and the resulting abnormally low interest rates, which continue to persist, our pension and postretirement benefit expense was $657 million in 2017, $317 million in 2016 and $228 million in 2015. Pension expense is comprised of interest cost, expected return on plan assets and recognized net loss and other. This adjustment eliminates total net periodic benefit from the statement of operations to improve comparability. Pension expense is included in the determination of net loss.

In conjunction with executing a lump sum settlement offer in April 2018, the Company recorded non-cash charges of $108 million during the second quarter of 2018, for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement. Also, in conjunction with executing an agreement to purchase group annuity contracts in May 2017, the Company recorded non-cash charges of $200 million during the second quarter of 2017, for losses previously accumulated in other comprehensive income (loss), which were recognized through the statement of operations upon settlement.

The components of net periodic expense were as follows:

| | | 13 Weeks Ended | | | 26 Weeks Ended | | |
|---|---|---|---|---|---|---|---|
| *millions* | | August 4, 2018 | | July 29, 2017 | | August 4, 2018 | July 29, 2017 |
| Components of net periodic expense: | | | | | | | |
| Interest cost | $ | 37 | $ | 45 | $ | 74 | $ 98 |
| Expected return on plan assets | | (41) | | (46) | | (81) | (103) |
| Amortization of experience losses | | 142 | | 247 | | 178 | 297 |
| Net periodic expense | $ | 138 | $ | 246 | $ | 171 | $ 292 |

In accordance with GAAP, we recognize on the balance sheet actuarial gains and losses for defined benefit pension plans annually in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement during a fiscal year. For income statement purposes, these actuarial gains and losses are recognized throughout the year through an amortization process. The Company recognizes in its results of operations, as a corridor adjustment, any unrecognized actuarial net gains or losses that exceed 10% of the larger of projected benefit obligations or plan assets. Accumulated gains/losses that are inside the 10% corridor are not recognized, while accumulated actuarial gains/losses that are outside the 10% corridor are amortized over the "average future service" of the population and are included in the recognized net loss and other line item above.

74

MOAC000889

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Actuarial gains and losses occur when actual experience differs from the estimates used to allocate the change in value of pension plans to expense throughout the year or when assumptions change, as they may each year. Significant factors that can contribute to the recognition of actuarial gains and losses include changes in discount rates used to remeasure pension obligations on an annual basis or upon a qualifying remeasurement, differences between actual and expected returns on plan assets and other changes in actuarial assumptions. Management believes these actuarial gains and losses are primarily financing activities that are more reflective of changes in current conditions in global financial markets (and in particular interest rates) that are not directly related to the underlying business and that do not have an immediate, corresponding impact on the benefits provided to eligible retirees. For further information on the actuarial assumptions and plan assets referenced above, see Management's Discussion and Analysis of Financial Condition and Results of Operations - Application of Critical Accounting Policies and Estimates - Defined Benefit Pension Plans, and Note 7 of Notes to Consolidated Financial Statements included in our Annual Report on Form 10-K for the fiscal year ended February 3, 2018.

These other significant items included in Adjusted EBITDA are further explained as follows:

- Closed store reserve and severance – We are transforming our Company to a less asset-intensive business model. Throughout this transformation, we continue to make choices related to our stores, which could result in sales, closures, lease terminations or a variety of other decisions.

- Other – Consisted of items associated with an insurance transaction, natural disasters, legal matters and transaction costs associated with strategic initiatives.

- Amortization of deferred Seritage gain – A portion of the gain on the Seritage transaction and certain other sale-leaseback transactions were deferred and will be recognized in proportion to the related rent expense, which is a component of cost of sales, buying and occupancy in the Consolidated Statements of Operations, over the lease terms. Management considers the amortization of the deferred Seritage gain to result from investing decisions rather than ongoing operations.

**13-week period ended August 4, 2018 compared to the 13-week period ended July 29, 2017**

*Revenues and Comparable Store Sales*

Total revenues decreased $1.1 billion to $3.2 billion for the second quarter of 2018 compared to the prior year second quarter, primarily driven by the decrease in merchandise sales of $986 million. The decline in merchandise sales was primarily driven by having fewer Kmart and Sears Full-line stores in operation, which accounted for approximately $824 million of the decline, as well as a 3.9% decline in comparable store sales during the quarter, which accounted for approximately $92 million of the decline. Services and other revenues declined $110 million for the second quarter of 2018, primarily driven by a decline in service-related revenues of approximately $70 million, as well as a decline in revenues from Sears Hometown and Outlet Stores, Inc. ("SHO") of approximately $65 million.

Kmart comparable store sales declined 3.7% during the second quarter of 2018 primarily driven by declines in the pharmacy, grocery & household and drugstore categories. Kmart also experienced positive comparable store sales in several categories including apparel, toys and footwear. Sears Domestic comparable store sales decreased 4.0% during the second quarter of 2018, primarily driven by decreases in the home appliances, mattresses, and consumer electronics categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel, footwear and jewelry.

*Gross Margin*

Total gross margin decreased $270 million to $702 million for the second quarter of 2018, as compared to the prior year second quarter, primarily due to the above noted decline in sales, as well as a decline in gross margin rate for merchandise sales. Gross margin for the second quarter of 2018 included charges related to store closures of $43 million, compared to $89 million for the second quarter of 2017. Gross margin for the quarter also included credits of $16 million and $19 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

75

MOAC000890

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Kmart's gross margin rate for the second quarter declined 40 basis points compared to the prior year second quarter, while Sears Domestic's gross margin rate declined 130 basis points for the quarter. Gross margin for Kmart and Sears Domestic were negatively impacted by expenses associated with store closures. Excluding the impact of significant items noted in our Adjusted EBITDA tables, Kmart's gross margin rate would have declined 330 basis points, while the second quarter of 2017 included additional rent expense of $15 million. The decline in Kmart's gross margin rate was primarily due to lower margins in the apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy category. The decline in Sears Domestic's gross margin rate was primarily due to a gross margin rate decline in the home appliances category. Both formats experienced an increase in promotional activity during the second quarter of 2018 compared to the prior year quarter, including an increase in Shop Your Way points.

In addition, as a result of the Seritage and JV transactions, the second quarter of 2018 included additional rent expense of approximately $29 million while the second quarter of 2017 included additional rent expense of approximately $44 million. Due to the structure of the leases, we expect that our cash rent obligations to Seritage and the joint venture partners will decline, over time, as space in these stores is recaptured. From the inception of the Seritage transaction to the end of our second quarter, we have received recapture notices on 64 properties and also exercised our right to terminate the lease on 75 properties.

*Selling and Administrative Expenses*

Selling and administrative expenses decreased $259 million in the second quarter of 2018 compared to the prior year, as expense reductions were realized as a result of the strategic actions to improve our operational efficiencies and reduce costs.

The second quarters of 2018 and 2017 included significant items related to store closings and severance, items associated with natural disasters, legal matters and transaction costs associated with strategic initiatives which aggregated to expense of $23 million and $15 million, respectively. Excluding these items, selling and administrative expenses declined $267 million from the prior year quarter primarily due to a decrease in payroll expense. In addition, advertising expense also declined as we shift away from traditional advertising to use of Shop Your Way points, which is included within gross margin.

Our selling and administrative expenses as a percentage of total revenues ("selling and administrative expense rate") was 27.2% for the second quarter of 2018, compared to 26.3% in the prior year, and increased due to the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $17 million in the second quarter of 2018 to $66 million, primarily due to having fewer assets to depreciate.

*Impairment Charges*

We recorded impairment charges of $77 million in the second quarter of 2018, which included impairment of $69 million related to the Kenmore trade name, as well as $8 million related to the impairment of long-lived assets. We recorded impairment charges of $5 million during the second quarter of 2017, related to the impairment of long-lived assets. Impairment charges recorded are described further in Note 3 of Notes to Condensed Consolidated Financial Statements.

*Gain on Sales of Assets*

We recorded total gains on sales of assets for the quarter of $103 million in 2018 and $380 million in 2017, which were primarily a result of several real estate transactions. The gains recorded during 2018 included gains of $71 million recognized on the sale or amendment and lease termination of 21 locations and $28 million as a result of recapture and lease termination activity. The gains recorded during 2017 included $262 million recognized on the sale of nine Sears Full-line stores and one Kmart store and $53 million of gains as a result of recapture activity and one store that qualified for sales recognition and sale-leaseback accounting in the second quarter. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

MOAC000891

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Operating Income (Loss)*

The Company reported an operating loss of $202 million in the second quarter of 2018 compared to operating income of $141 million in the second quarter of 2017. Operating loss for the second quarter of 2018 and operating income for the second quarter of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $50 million and $85 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gain on sales of assets. Taking these significant items into consideration, the increase in operating loss in 2018 was primarily driven by the overall decline in gross margin noted above, partially offset by the decrease in selling and administrative expenses.

*Interest and Investment Gain (Loss)*

We recorded an interest and investment gain of $2 million during the second quarter of 2018 compared to a loss of $12 million during the second quarter of 2017. The second quarter of 2017 included a loss of $12 million related to our equity investment in Sears Canada.

*Income Taxes*

Our effective tax rate for the second quarter of 2018 was a benefit of 3.6% compared to an expense rate of 4.2% in the prior year second quarter. The application of the requirements for accounting for income taxes in interim periods, after consideration of our valuation allowance, causes a significant variation in the typical relationship between income tax expense and pretax income. Our tax rate in 2018 continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic jurisdictions where it is not more likely than not that such benefits would be realized. The 2018 rate reflects the impacts of the valuation allowance release through continuing operations, relating to the gain on pension and other postretirement benefits, creating a tax benefit with the offsetting tax expense reflected in OCI, a tax benefit on the deferred taxes related to the partial impairment of the Kenmore trade name and the Tax Cuts and Jobs Act, including the federal tax rate of 21%, the effect of taxes on foreign earnings and changes to previously deductible expenses. The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. We made reasonable estimates of certain effects of the Tax Act and recorded provisional adjustments for fiscal 2017 which we will continue to refine throughout fiscal 2018. In addition, the second quarter of 2018 was positively impacted by the reversal of deferred taxes related to indefinite-life assets associated with property sales and negatively impacted by foreign branch taxes and state income taxes. During the first quarter of 2017, the Company realized a significant tax benefit on the reversal of deferred taxes related to the Craftsman Sale. In addition, during the second quarter of 2017, the Company realized a tax benefit on the reversal of deferred taxes related to indefinite-life assets associated with property sold during the quarter.

***26-week period ended August 4, 2018 compared to the 26-week period ended July 29, 2017***

*Revenues and Comparable Store Sales*

Total revenues decreased $2.4 billion to $6.1 billion for the first half of 2018, as compared to revenues of $8.5 billion for the first half of 2017, primarily driven by the decrease in merchandise sales of $2.1 billion. The decrease in revenue was primarily driven by the effect of having fewer Kmart and Sears Full-line stores in operation, which accounted for $1.6 billion of the decline, as well as a decrease in comparable store sales of 8.2% during the first half of 2018, which accounted for $391 million of the revenue decline. Services and other revenues declined $301 million during the first half of 2018 as compared to the first half of 2017, primarily driven by a decline in service-related revenues of approximately $161 million, as well as a decline in revenues from SHO of approximately $141 million during the first half of 2018 compared to the first half of 2017.

Kmart comparable store sales decreased 7.1%, primarily driven by declines experienced in the pharmacy, grocery & household, drugstore and sporting good categories. Kmart did experience positive comparable stores sales in several categories including apparel, toys, jewelry and footwear. Sears Domestic comparable store sales decreased 8.9%, primarily driven by decreases in the home appliances, lawn & garden, mattresses and consumer electronics

77

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel and jewelry.

*Gross Margin*

Total gross margin decreased $596 million to $1.3 billion for the first half of 2018, as compared to the prior year, primarily due to the above noted decline in sales, as well as a decline in gross margin rate for merchandise sales. Gross margin for the first half of 2018 included charges related to store closures of $52 million, compared to $104 million for the first half of 2017. Gross margin for the first half also included credits of $34 million and $40 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

As compared to the prior year period, Kmart's gross margin rate for the first half of 2018 improved 30 basis points, while Sears Domestic's gross margin rate declined 190 basis points. Gross margin for Kmart and Sears Domestic were negatively impacted by expenses associated with store closures. Excluding the impact of significant items noted in the Adjusted EBITDA tables, Kmart's gross margin rate would have declined 160 basis points, while Sears Domestic's gross margin rate would also have declined 160 basis points. The decline in Kmart's gross margin rate was primarily driven by apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy category. The decline in Sears Domestic's gross margin rate was primarily driven by rate declines in the apparel and home appliances categories.

In addition, as a result of the Seritage and JV transactions, the first half of 2018 and 2017 included additional rent expense of approximately $61 million and $89 million, respectively. Due to the structure of the leases, we expect that our cash rent obligations to Seritage and the joint venture partners will decline, over time, as space in these stores is recaptured. From the inception of the Seritage transaction to the end of our second quarter, we have received recapture notices on 64 properties and also exercised our right to terminate the lease on 75 properties.

*Selling and Administrative Expenses*

Selling and administrative expenses decreased $574 million in the first half of 2018 compared to the first half of 2017, as expense reductions were realized as a result of the strategic actions to improve our operational efficiencies and reduce costs.

The first half of 2018 and 2017 included significant items related to store closings and severance, items associated with an insurance transaction, natural disasters, legal matters and transaction costs associated with strategic initiatives which aggregated to expense of $108 million and $91 million, respectively. Excluding these items, selling and administrative expenses in 2018 declined $591 million from the first half of the prior year primarily due to a decrease in payroll expense. In addition, advertising expense also declined as we shift away from traditional advertising to use of Shop Your Way points, which is included within gross margin.

Our selling and administrative expense rate was 29.1% for the first half of 2018, compared to 27.7% in the prior year, and increased as the decrease in expenses noted above was more than offset by the decline in revenues.

78

MOAC000893

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $37 million in the first half of 2018 to $133 million, primarily due to having fewer assets to depreciate.

*Impairment Charges*

We recorded impairment charges of $91 million during the first half of 2018, which included impairment of $69 million related to the Kenmore trade name, as well as $22 million related to the impairment of long-lived assets. We recorded impairment charges of $20 million during the first half of 2017, related to the impairment of long-lived assets. Impairment charges recorded are described further in Note 3 of Notes to Condensed Consolidated Financial Statements.

*Gain on Sales of Assets*

We recorded total gains on sales of assets of $268 million and $1.1 billion for the first half of 2018 and 2017, respectively. The gains recorded during 2018 included gains of $157 million recognized on the sale or amendment and lease termination of 43 locations, $68 million as a result of recapture and lease termination activity and $21 million that was previously deferred for three stores that qualified for sales recognition and sale-leaseback accounting. The gains recorded during 2017 included a gain of $492 million recognized on the Craftsman Sale, in addition to $386 million recognized on the sale of 12 Sears Full-line stores and two Kmart stores and $118 million of gains as a result of recapture and lease termination activity and two stores that qualified for sales recognition and sale-leaseback accounting in the first half. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

The Company reported an operating loss of $419 million in the first half of 2018 as compared to operating income of $490 million in the first half of 2017. Operating loss for the first half of 2018 and operating income for the first half of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $126 million and $155 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in operating loss in 2018 was primarily driven by the overall decline in gross margin noted above, partially offset by the decrease in selling and administrative expenses.

*Interest and Investment Gain (Loss)*

We recorded an interest and investment gain of $3 million during the first half of 2018 compared to a loss of $14 million during the first half of 2017. The first half of 2017 included a loss of $17 million related to our equity investment in Sears Canada.

*Income Taxes*

Our effective tax rate for the first half of 2018 was a benefit rate of 1.1% compared to a benefit rate of 92.5% for the first half of 2017. The application of the requirements for accounting for income taxes in interim periods, after consideration of our valuation allowance, causes a significant variation in the typical relationship between income tax expense and pretax income. Our tax rate in 2018 continues to reflect the effect of not recognizing the benefit of current period losses in certain domestic jurisdictions where it is not more likely than not that such benefits would be realized. The 2018 rate reflects the impacts of the valuation allowance release through continuing operations, relating to the gain on pension and other postretirement benefits, creating a tax benefit with the offsetting tax expense reflected in OCI, a tax benefit on the deferred taxes related to the partial impairment of the Kenmore trade name and the Tax Cuts and Jobs Act, including the federal tax rate of 21%, the effect of taxes on foreign earnings and changes to previously deductible expenses. The SEC staff issued Staff Accounting Bulletin ("SAB") 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting in accordance with accounting standards applicable to income taxes. We made reasonable estimates of certain effects

MOAC000894

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

of the Tax Act and recorded provisional adjustments for fiscal 2017 which we will continue to refine throughout fiscal 2018. In addition, the first half of 2018 was positively impacted by the reversal of deferred taxes related to indefinite-life assets associated with property sales and negatively impacted by foreign branch taxes and state income taxes. During the first half of 2017, the Company realized a significant tax benefit on the reversal of deferred taxes related to the Craftsman Sale.

80

MOAC000895

**SEARS HOLDINGS CORPORATION**
13 and 26 Weeks Ended August 4, 2018 and July 29, 2017

*SEGMENT OPERATIONS*

The following discussion of our business segment results is organized into two reportable segments: Kmart and Sears Domestic.

**Kmart**

Kmart results and key statistics were as follows:

| | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| *millions, except number of stores* | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| Total revenues | $ 840 | $ 1,442 | $ 1,637 | $ 2,889 |
| Cost of sales, buying and occupancy | 680 | 1,162 | 1,324 | 2,346 |
| Gross margin dollars | 160 | 280 | 313 | 543 |
| *Gross margin rate* | *19.0%* | *19.4%* | *19.1%* | *18.8%* |
| Selling and administrative | 192 | 323 | 443 | 715 |
| *Selling and administrative expense as a percentage of total revenues* | *22.9%* | *22.4%* | *27.1%* | *24.7%* |
| Depreciation and amortization | 9 | 14 | 18 | 27 |
| Impairment charges | — | 3 | 6 | 8 |
| Gain on sales of assets | (25) | (79) | (65) | (676) |
| Total costs and expenses | 856 | 1,423 | 1,726 | 2,420 |
| Operating income (loss) | $ (16) | $ 19 | $ (89) | $ 469 |
| Adjusted EBITDA | $ (34) | $ (1) | $ (106) | $ (100) |
| Number of stores | | | 360 | 610 |

*13-week period ended August 4, 2018 compared to the 13-week period ended July 29, 2017*

*Revenues and Comparable Store Sales*

For the quarter, Kmart's revenues decreased by $602 million to $840 million in 2018, primarily due to the effect of having fewer stores in operation, which accounted for approximately $536 million of the decline, as well as the decrease in comparable store sales of 3.7%, which accounted for approximately $34 million of the decline.

The decline in comparable store sales for the quarter was primarily driven by declines in the pharmacy, grocery & household and drugstore categories. Kmart also experienced positive comparable store sales in several categories including apparel, toys and footwear.

*Gross Margin*

For the quarter, Kmart generated total gross margin dollars of $160 million in 2018 compared to $280 million in 2017. Gross margin for the second quarter included charges of $17 million and $68 million in 2018 and 2017, respectively, related to store closures. Gross margin for the second quarter also included credits of $3 million and $2 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Kmart's gross margin rate for the quarter declined 40 basis points to 19.0% in 2018 from 19.4% in 2017. Excluding the impact of significant items recorded in gross margin during the quarter, Kmart's gross margin rate would have declined 330 basis points. The decline in Kmart's gross margin rate was primarily due to lower margins in the apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy

81

MOAC000896

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

category. Kmart experienced an increase in promotional activity during the second quarter of 2018 compared to the prior year quarter, including an increase in Shop Your Way points.

In addition, as a result of the Seritage and JV transactions, the second quarter of 2018 and 2017 included additional rent expense of approximately $4 million and $5 million, respectively.

*Selling and Administrative Expenses*

For the quarter, Kmart's selling and administrative expenses decreased $131 million in 2018 as compared to the second quarter in 2017. Selling and administrative expenses for the second quarter of 2018 and 2017 were impacted by significant items related to store closures, as well as legal matters, which aggregated to income of $16 million in 2018 and $24 million in 2017. Excluding these items, selling and administrative expenses decreased $139 million primarily due to decreases in payroll and advertising expenses.

Kmart's selling and administrative expense rate for the quarter was 22.9% in 2018 and 22.4% in 2017 and increased due to the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Gain on Sales of Assets*

Kmart recorded a total gain on sales of assets for the quarter of $25 million and $79 million in 2018 and 2017, respectively, which were primarily a result of several real estate transactions. The gains recorded in the second quarter of 2018 included gains of $23 million recognized on the sale or amendment and lease termination of three locations. The gains recorded in the second quarter of 2017 included $12 million recognized on the sale of one Kmart store and $3 million of gains as a result of recapture activity. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the quarter, Kmart recorded an operating loss of $16 million and operating income of $19 million in 2018 and 2017, respectively. Operating loss for the second quarter of 2018 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating income of $2 million, while operating income for the second quarter of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $42 million. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in Kmart's operating loss in 2018 was primarily driven by the decline in Kmart's gross margin noted above, partially offset by a decrease in selling and administrative expenses.

***26-week period ended August 4, 2018 compared to the 26-week period ended July 29, 2017***

*Revenues and Comparable Store Sales*

For the first half of 2018, Kmart's revenues decreased by $1.3 billion to $1.6 billion, primarily due to the effect of having fewer stores in operation, which accounted for approximately $1.1 billion of the decline, as well as the decrease in comparable store sales, which accounted for approximately $130 million of the decline.

Comparable store sales decreased 7.1%, primarily driven by declines experienced in the pharmacy, grocery & household, drugstore and sporting good categories. Kmart did experience positive comparable stores sales in several categories including apparel, toys, jewelry and footwear.

*Gross Margin*

For the first half of 2018, Kmart generated $313 million in gross margin compared to $543 million in the first half of 2017. The decrease in Kmart's gross margin dollars is due to a decrease in revenues, as well as a decrease in gross margin rate. Gross margin for the first half of the year included charges of $14 million and $78 million in 2018 and 2017, respectively, related to store closures. Gross margin for the first half of the year also included credits of $5 million and $6 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

MOAC000897

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Kmart's gross margin rate for the first half of the year improved 30 basis points to 19.1% in 2018 from 18.8% in 2017. Excluding the impact of significant items recorded in gross margin during the first half of the year, Kmart's gross margin rate would have declined 160 basis points primarily driven by apparel, grocery & household and drugstore categories, partially offset by an improvement in the pharmacy category.

In addition, as a result of the Seritage and JV transactions, the first half of 2018 and 2017 included additional rent expense of approximately $8 million and $11 million, respectively.

*Selling and Administrative Expenses*

For the first half of 2018, Kmart's selling and administrative expenses decreased $272 million as compared to the first half of 2017. Selling and administrative expenses for the first half of 2018 and 2017 were impacted by significant items related to store closings and severance, as well as legal matters, which aggregated to expense of $15 million in 2018 and $0 million in 2017. Excluding these items, selling and administrative expenses decreased $287 million primarily due to decreases in payroll and advertising expenses.

Kmart's selling and administrative expense rate for the first half was 27.1% and 24.7% in 2018 and 2017, respectively, and increased primarily due to the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Gain on Sales of Assets*

Kmart recorded a total gain on sales of assets for the first half of $65 million and $676 million in 2018 and 2017, respectively. The gains recorded in the first half of 2018 included gains of $40 million recognized on the sale or amendment and lease termination of 12 locations. The gains recorded in the first half of 2017 included a gain of $492 million recognized on the Craftsman Sale, in addition to $40 million recognized on the sale of two Kmart stores and $30 million of gains as a result of recapture and lease termination activity. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the first half of the year, Kmart recorded an operating loss of $89 million in 2018, compared to operating income of $469 million in 2017. Operating loss for the first half of 2018 and operating income for the first half of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $24 million in 2018 and $72 million in 2017. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in Kmart's operating loss in 2018 was primarily driven by the decline in Kmart's gross margin noted above, partially offset by a decrease in selling and administrative expenses.

83

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

**Sears Domestic**

Sears Domestic results and key statistics were as follows:

| | 13 Weeks Ended | | 26 Weeks Ended | |
| --- | --- | --- | --- | --- |
| | August 4, 2018 | July 29, 2017 | August 4, 2018 | July 29, 2017 |
| *millions, except number of stores* | | | | |
| Total revenues | $ 2,342 | $ 2,836 | $ 4,436 | $ 5,588 |
| Cost of sales, buying and occupancy | 1,800 | 2,144 | 3,442 | 4,228 |
| Gross margin dollars | 542 | 692 | 994 | 1,360 |
| *Gross margin rate* | *23.1%* | *24.4%* | *22.4%* | *24.3%* |
| Selling and administrative | 672 | 800 | 1,327 | 1,629 |
| *Selling and administrative expense as a percentage of total revenues* | *28.7%* | *28.2%* | *29.9%* | *29.2%* |
| Depreciation and amortization | 57 | 69 | 115 | 143 |
| Impairment charges | 77 | 2 | 85 | 12 |
| Gain on sales of assets | (78) | (301) | (203) | (445) |
| Total costs and expenses | 2,528 | 2,714 | 4,766 | 5,567 |
| Operating income (loss) | $ (186) | $ 122 | $ (330) | $ 21 |
| Adjusted EBITDA | $ (78) | $ (65) | $ (231) | $ (186) |
| Number of: | | | | |
| Full-line stores | | | 482 | 619 |
| Specialty stores | | | 24 | 21 |
| Total Sears Domestic Stores | | | 506 | 640 |

**13-week period ended August 4, 2018 compared to the 13-week period ended July 29, 2017**

*Revenues and Comparable Store Sales*

For the quarter, Sears Domestic's revenues decreased by $494 million to $2.3 billion. The decline in revenue was primarily driven by the effect of having fewer Full-line stores in operation, which accounted for approximately $288 million of the decline, as well as a decrease in comparable store sales of 4.0%, which accounted for $58 million of the decline. Sears Domestic's revenues also included a decline in service-related revenues of approximately $70 million, as well as a decline in revenues from SHO of approximately $65 million.

The decline in comparable store sales for the quarter was primarily driven by decreases in the home appliances, mattresses, and consumer electronics categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel, footwear and jewelry.

*Gross Margin*

For the quarter, Sears Domestic generated gross margin dollars of $542 million in 2018, compared to $692 million in 2017. Gross margin for the second quarter included charges of $26 million and $21 million in 2018 and 2017, respectively, related to store closures. Gross margin for the second quarter also included credits of $13 million and $17 million in 2018 and 2017, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Sears Domestic's gross margin rate for the quarter declined 130 basis points to 23.1% in 2018 from 24.4% in 2017. Excluding the impact of significant items recorded in gross margin during the quarter, Sears Domestic's gross margin rate would have declined 80 basis points primarily due to the gross margin rate decline in the home

84

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

appliances category. Sears Domestic experienced an increase in promotional activity during the second quarter of 2018 compared to the prior year quarter, including an increase in Shop Your Way points.

In addition, as a result of the Seritage and JV transactions, the second quarter of 2018 and 2017 included additional rent expense of approximately $25 million and $39 million, respectively.

*Selling and Administrative Expenses*

For the quarter, Sears Domestic's selling and administrative expenses decreased $128 million in 2018 as compared to the prior year. Selling and administrative expenses for the second quarter of 2018 and 2017 were impacted by significant items related to store closures and severance, items associated with natural disasters and transaction costs associated with strategic initiatives, which aggregated to expense of $39 million and $39 million, respectively. Excluding these items, selling and administrative expenses decreased $128 million primarily due to decreases in payroll expense and advertising expenses.

Sears Domestic's selling and administrative expense rate for the quarter was 28.7% in 2018 and 28.2% in 2017 and increased primarily due to the decline in revenues, as well as the overall increase in expenses noted above.

*Gain on Sales of Assets*

Sears Domestic recorded a total gain on sales of assets for the quarter of $78 million and $301 million in 2018 and 2017, respectively. The gains recorded in the second quarter of 2018 included gains of $48 million recognized on the sale or amendment and lease termination of 18 locations and $28 million as a result of recapture and lease termination activity. The gains recorded in the second quarter of 2017 included $250 million recognized on the sale of nine Sears Full-line stores and $50 million of gains as a result of recapture activity and one store that qualified for sales recognition and sale-leaseback accounting in the second quarter. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the quarter, Sears Domestic reported an operating loss of $186 million and operating income of $122 million in 2018 and 2017, respectively. Sears Domestic's operating loss for the second quarter of 2018 and operating income for the second quarter of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $52 million and $43 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the increase in operating loss at Sears Domestic in 2018 was primarily driven by the decline in gross margin noted above, partially offset by a decrease in selling and administrative expenses.

**26-week period ended August 4, 2018 compared to the 26-week period ended July 29, 2017**

*Revenues and Comparable Store Sales*

For the first half of 2018, Sears Domestic's revenues decreased by $1.2 billion to $4.4 billion. The decline in revenue was primarily driven by the effect of having fewer Full-line stores in operation, which accounted for approximately $534 million of the decline, as well as a decrease in comparable store sales of 8.9%, which accounted for approximately $261 million of the decline. Sears Domestic's revenues also included a decline in service-related revenues of approximately $161 million, as well as a decline in revenues from SHO of approximately $141 million.

Comparable store sales for the first half of 2018 declined primarily driven by decreases in the home appliances, lawn & garden, mattresses and consumer electronics categories, as well as declines at Sears Auto Centers. Sears Domestic also experienced positive comparable store sales in several categories including apparel and jewelry.

*Gross Margin*

For the first half of the year, Sears Domestic generated gross margin dollars of $1.0 billion and $1.4 billion in 2018 and 2017, respectively. Gross margin for the first half of the year included charges of $38 million and $26 million in 2018 and 2017, respectively, related to store closures. Gross margin for the first half of 2018 and 2017 also included

85

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

credits of $29 million and $34 million, respectively, related to the amortization of the deferred gain on sale of assets associated with the Seritage transaction.

Sears Domestic's gross margin rate for the first half of the year declined 190 basis points to 22.4% in 2018 from 24.3% in 2017. Excluding the impact of significant items recorded in gross margin during the first half of 2018 and 2017, Sears Domestic's gross margin rate would have declined 160 basis points primarily due to rate declines in the apparel and home appliances categories.

In addition, as a result of the Seritage and JV transactions, the first half of 2018 and 2017 included additional rent expense of approximately $53 million and $78 million, respectively.

*Selling and Administrative Expenses*

For the first half of the year, Sears Domestic's selling and administrative expenses decreased $302 million in 2018 as compared to the prior year. Selling and administrative expenses for the first half of 2018 and 2017 were impacted by significant items related to store closures and severance, items associated with an insurance transaction, natural disasters and transaction costs associated with strategic initiatives, which aggregated to expense of $93 million and $91 million, respectively. Excluding these items, selling and administrative expenses decreased $304 million in the first half of 2018 primarily due to decreases in payroll and advertising expenses.

Sears Domestic's selling and administrative expense rate for the first half of the year was 29.9% in 2018 and 29.2% in 2017 and increased as a result of the decline in revenues, partially offset by the overall decrease in expenses noted above.

*Depreciation and Amortization*

Depreciation and amortization expense decreased by $28 million in the first half of 2018 to $115 million, primarily due to having fewer assets to depreciate.

*Gain on Sales of Assets*

Sears Domestic recorded a total gain on sales of assets of $203 million and $445 million for the first half of 2018 and 2017, respectively. The gains recorded in the first half of 2018 included gains of $117 million recognized on the sale or amendment and lease termination of 31 locations, $68 million as a result of recapture and lease termination activity and $21 million that was previously deferred for three stores that qualified for sales recognition and sale-leaseback accounting. The gains recorded in the first half of 2017 included gains of $346 million recognized on the sale of 12 Sears Full-line stores and $88 million of gains as a result of recapture and lease termination activity and two stores that qualified for sales recognition and sale-leaseback accounting in the first half. See Note 3 of Notes to Condensed Consolidated Financial Statements for further discussion of the gain on sales of assets.

*Operating Income (Loss)*

For the first half of the year, Sears Domestic reported an operating loss of $330 million and operating income of $21 million in 2018 and 2017, respectively. Sears Domestic's operating loss for the first half of 2018 and operating income for the first half of 2017 included significant items, as noted in the Adjusted EBITDA tables, which aggregated to operating expense of $102 million and $83 million, respectively. Both 2018 and 2017 also included charges related to impairments, as well as gains on sales of assets. Taking these significant items into consideration, the operating loss in 2018 was primarily driven by the decline in gross margin noted above, partially offset by a decrease in selling and administrative expenses.

86

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

**ANALYSIS OF CONSOLIDATED FINANCIAL CONDITION**

**Cash Balances**

Our cash and cash equivalents include all highly liquid investments with original maturities of three months or less at the date of purchase. Our cash balances as of August 4, 2018, July 29, 2017 and February 3, 2018 are detailed in the following table.

| millions | August 4, 2018 | | July 29, 2017 | | February 3, 2018 | |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 110 | $ | 121 | $ | 113 |
| Cash posted as collateral | | 5 | | 4 | | 4 |
| Credit card deposits in transit | | 78 | | 87 | | 65 |
| Total cash and cash equivalents | | 193 | | 212 | | 182 |
| Restricted cash | | 248 | | 230 | | 154 |
| Total cash balances | $ | 441 | $ | 442 | $ | 336 |

We had total cash balances of $441 million at August 4, 2018, compared to $442 million at July 29, 2017 and $336 million at February 3, 2018.

At various times, we have posted cash collateral for certain outstanding letters of credit and self-insurance programs. Such cash collateral is classified within cash and cash equivalents given that we have the ability to substitute letters of credit at any time for this cash collateral and it is therefore readily available to us. Our invested cash may include, from time to time, investments in, but not limited to, commercial paper, federal, state and municipal government securities, floating-rate notes, repurchase agreements and money market funds. Cash amounts held in these short-term investments are readily available to us. Credit card deposits in transit include deposits in transit from banks for payments related to third-party credit card and debit card transactions. The Company classifies cash balances that are legally restricted pursuant to contractual arrangements as restricted cash. The restricted cash balance relates to amounts deposited into an escrow for the benefit of our pension plans at each of August 4, 2018, July 29, 2017 and February 3, 2018.

We classify outstanding checks in excess of funds on deposit within other current liabilities and reduce cash balances when these checks clear the bank on which they were drawn. Outstanding checks in excess of funds on deposit were $66 million, $61 million and $74 million as of August 4, 2018, July 29, 2017 and February 3, 2018, respectively.

**Operating Activities**

During the first half of 2018, we used net cash in operating activities of $1.0 billion compared to $1.1 billion in the first half of 2017. Our primary source of operating cash flows is the sale of goods and services to customers, while the primary use of cash in operations is the purchase of merchandise inventories and the payment of operating expenses. We used less cash in operations for the first half of 2018 compared to the prior year primarily due to declines in merchandise payables and other liabilities, partially offset by a reduction in merchandise inventories. In addition, the Company received $425 million from Citibank pursuant to the Amendment as discussed in Note 1 of Notes to Condensed Consolidated Financial, and made payments of $208 million in connection with a commercial arrangement related to our insurance program.

Merchandise inventories were $2.7 billion and $3.4 billion at August 4, 2018 and July 29, 2017, respectively, while merchandise payables were $487 million and $670 million at August 4, 2018 and July 29, 2017, respectively. Our merchandise inventory balances at August 4, 2018 decreased approximately $719 million from the prior year third quarter due to both store closures and improved productivity. Sears Domestic inventory decreased in virtually all categories, with the most notable decreases in the apparel, tools and outdoor living categories. Kmart inventory also decreased in virtually all categories, with the most notable decreases in the apparel, drugstore, home, pharmacy and grocery & household categories.

MOAC000902

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

### Investing Activities

During the first half of 2018, we generated net cash flows from investing activities of $290 million, which consisted of cash proceeds from the sale of properties and investments of $322 million, partially offset by cash used for capital expenditures of $32 million. During the first half of 2017, we generated net cash flows from investing activities of $1.4 billion, which consisted of cash proceeds from the Craftsman Sale of $572 million, from the sale of properties and investments of $569 million and from the sale of receivables of $293 million, partially offset by cash used for capital expenditures of $41 million.

### Financing Activities

For the first half of 2018, we generated net cash flows from financing activities of $851 million, which primarily consisted of proceeds of $513 million from borrowings under the Mezzanine Loan Agreement, $287 million of additional borrowings from the 2017 Secured Loan Facility, which includes an additional $186 million of borrowings under the Consolidated Secured Loan facility, $200 million from the Secured Loan and $125 million from the FILO Loan, as well as an increase in short-term borrowings of $389 million. These proceeds were partially offset by repayments of debt of $869 million, primarily repayments of amounts outstanding under the Company's Term Loan, the 2016 Secured Loan Facility, the Secured Loan, the 2017 Secured Loan Facility, the Line of Credit Loans and the Term Loan Facility. During the first half of 2017, we used net cash flows in financing activities of $99 million, which primarily consisted of repayments of debt of $717 million, primarily repayments of amounts outstanding under the Company's term loan, the 2016 Secured Loan Facility and the 2017 Secured Loan Facility, partially offset by proceeds of $330 million from the Line of Credit Loans, as well as an increase in short-term borrowings of $216 million.

### Liquidity

We need liquidity to fund both working capital requirements of our businesses and necessary capital expenditures as well as to be available for general corporate purposes, including debt repayments and pension plan contributions. We have experienced losses and negative cash flows for a number of years and while we continue to focus on our overall profitability, including managing expenses, we have continued to incur operating losses in the second quarter and first half of 2018, and continued to fund cash used in operating activities with cash from investing and financing activities. In addition, we will be required to fund a debt payment of $134 million during October 2018, in addition to $668 million of other debt maturing in the next twelve months.

*Recent Sources of Incremental Liquidity*

The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows from operations experienced over the past several years. These actions can be broadly broken down into three categories: (i) financing transactions; (ii) asset sales; and (iii) operational streamlining, including store closings. These financing activities have included the completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility. The actions relative to our assets have included transactions to monetize the value of certain assets such as the sale of the Craftsman brand to Stanley Black & Decker in the first quarter of 2017 for consideration consisting of upfront cash payments and a future royalty stream, sales of properties and investments for proceeds of $1.1 billion in fiscal 2017, and an amendment to our credit card program agreement with Citibank, N.A. which resulted in a payment to the Company of $425 million during the second quarter of 2018. Streamlining actions have included a restructuring program announced at the beginning of 2017 (which produced cost savings during that year and into 2018) and the closure of 137 stores during 2018, and an additional 149 stores that will close during the second half of 2018. The Company intends to take further actions to streamline operations in 2018 to achieve additional cost reductions unrelated to store closures.

In addition to previous actions taken, the Company may access other sources of liquidity to support its operations. For instance, we are permitted to obtain longer-term secured financing maturing outside of the maturity date of our domestic credit facility which would not be subject to borrowing base limitations (see Note 2 of Notes to Consolidated Financial Statements). Other options which may be available to us, which we will evaluate and seek to

88

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

execute as appropriate, include refinancing existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

*Asset Monetization*

A special committee of the board of directors (the "Board") of the Company (the "Special Committee") is overseeing a formal process to explore the sale of our Kenmore brand and related assets, the Sears Home Improvement Products business of the Sears Home Services division and the Parts Direct business of the Sears Home Services division (collectively, the "Sale Assets"). As previously reported, the Board received a letter from ESL Investments, Inc. ("ESL") expressing the view that the Company should pursue a divestiture of the Sale Assets in order to maximize their value, and expressing interest in participating as a purchaser of all or a portion of the Sale Assets should the Company do so. The Board established the Special Committee, which consists solely of independent directors, and is advised by independent advisors, to evaluate any proposals that may be received from ESL with respect to the Sale Assets, to actively solicit third-party interest in the Sale Assets, and to explore any other alternatives with respect to the Sale Assets that may maximize value for the Company. On August 14, 2018 the Special Committee received a non-binding proposal letter from ESL to acquire the Kenmore brand and related assets and the Sears Home Improvement Products business of the Sears Home Services division, each subject to various conditions including obtaining debt financing, and, in the case of Kenmore, obtaining equity financing on terms acceptable to ESL. The Special Committee is evaluating the proposal, and potentially other proposals as part of its formal process.

We also continue to explore ways to unlock value across a range of other assets and to maximize the value of our Sears Home Services, Innovel and Sears Auto Centers businesses, as well as our DieHard brand, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings.

Our efforts also continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio, as we look to de-lever our balance sheet, provide liquidity and continue in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

*Actions to Address Liquidity Needs*

The following actions, which are intended to fund liquidity needs over the next twelve months, are in various stages of completion as of the date of this filing. We believe these actions, some of which we expect, subject to our governance processes, including the process being overseen by the Special Committee, to include related party participation and funding and, in the case of Sale Assets that are sold to ESL, subject to approval by a majority of the disinterested stockholders of Holdings, if completed, would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements.

- Sales of properties securing the remaining principal amount of the Secured Loans to fund the repayment of such Secured Loans;

- Additional borrowings under the Mezzanine Loan Agreement, Term Loan Facility and the Consolidated Secured Loan Facility;

- Monetization of the Sale Assets;

- Extension of maturities beyond September 2019 of Line of Credit Loans under the Second Lien Credit Agreement;

- Additional borrowings secured by real estate assets, borrowings under the short-term basket, or other borrowings;

- Amendments to the terms of certain of our financing arrangements, including to allow interest on some of our debt to paid-in-kind;

- Further evaluation and right-sizing of our store base, including evaluation of our business categories; and

- Further restructurings to help manage expenses and improve profitability, including additional store closures and the accomplishments of our planned cost savings initiatives.

MOAC000904

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

While we believe that completion of these actions would be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements, these actions have not been fully executed as of the date of this report and certain of the actions have not received necessary approvals (including but not limited to approval of the Special Committee and approval of a majority of the disinterested stockholders of the Company in the case of certain proposed transactions with ESL), and/or are at too early of a stage in the process to be considered probable of occurring under applicable accounting guidance as of the date of this report. Accordingly, because we cannot at this time conclude that these actions are probable of occurring under such accounting standards, substantial doubt is deemed to exist about our ability to continue as a going concern. The Company continues to move forward with these proposed actions, including the process being overseen by the Special Committee, and discussions with lenders, in order to complete these actions. The Company believes that completion of these actions, or in some cases substantial progress towards such completion, would alleviate or eliminate the substantial doubt. The Company will continue to reevaluate this assessment.

The PPPFA contains certain limitations on our ability to sell assets, including the Kenmore brand and related assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA and the ability to utilize related party borrowings to provide liquidity when there are short-term delays in the closing of transactions.

The success of the foregoing actions is subject to various risks, uncertainties and other factors, including market conditions, interest in specific assets and our ability to close the sales of assets at valuations and within time frames that are acceptable to us, our ability to effectively and timely execute the above actions to improve the operating performance of our businesses and, in certain cases, the approval and participation of third parties, including our creditors and the PBGC.

If we continue to experience operating losses and we are not able to generate additional liquidity through the actions described above or through some combination of other actions, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement or other financing agreement. Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such deficiency. As of August 4, 2018, our borrowing base was below the above threshold, and if our borrowing base is below the above threshold at the end of our third quarter of 2018, it would trigger an obligation to repurchase or repay second lien debt, in an amount equal to the excess of our funded debt secured by liens on our inventory as of November 3, 2018 over the borrowing base. If we fail to make such repurchase or repayment, we would be in violation of our covenants under our Second Lien Credit Agreement and the indenture relating to our New Senior Secured Notes.

Our outstanding borrowings at August 4, 2018, July 29, 2017 and February 3, 2018 were as follows:

| millions | August 4, 2018 | July 29, 2017 | February 3, 2018 |
|---|---|---|---|
| Short-term borrowings: | | | |
| Secured borrowings | $ 660 | $ 216 | $ 271 |
| Line of credit loans | 570 | 330 | 500 |
| Incremental loans | — | — | 144 |
| Secured loan | 24 | — | — |
| Long-term debt, including current portion: | | | |
| Notes and debentures outstanding | 3,639 | 3,360 | 3,145 |
| Capitalized lease obligations | 61 | 97 | 72 |
| Total borrowings | $ 4,954 | $ 4,003 | $ 4,132 |

MOAC000905

**SEARS HOLDINGS CORPORATION**
13 and 26 Weeks Ended August 4, 2018 and July 29, 2017

We fund our peak sales season working capital needs through our domestic revolving credit facility and commercial paper markets and secured short-term debt.

| millions | 13 Weeks Ended | | | | 26 Weeks Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | August 4, 2018 | | July 29, 2017 | | August 4, 2018 | | July 29, 2017 | |
| Secured borrowings: | | | | | | | | |
| Maximum daily amount outstanding during the period | $ | 937 | $ | 629 | $ | 937 | $ | 629 |
| Average amount outstanding during the period | | 703 | | 524 | | 600 | | 366 |
| Amount outstanding at period-end | | 660 | | 216 | | 660 | | 216 |
| Weighted average interest rate | | 6.9% | | 6.0% | | 6.8% | | 6.0% |
| | | | | | | | | |
| Unsecured commercial paper: | | | | | | | | |
| Maximum daily amount outstanding during the period | $ | 31 | $ | 160 | $ | 50 | $ | 160 |
| Average amount outstanding during the period | | 3 | | 56 | | 9 | | 39 |
| Amount outstanding at period-end | | — | | — | | — | | — |
| Weighted average interest rate | | 12.8% | | 8.3% | | 12.3% | | 8.2% |
| | | | | | | | | |
| Line of credit loans: | | | | | | | | |
| Maximum daily amount outstanding during the period | $ | 570 | $ | 330 | $ | 570 | $ | 330 |
| Average amount outstanding during the period | | 557 | | 54 | | 558 | | 27 |
| Amount outstanding at period-end | | 570 | | 330 | | 570 | | 330 |
| Weighted average interest rate | | 11.4% | | 9.0% | | 11.2% | | 9.0% |

See the following sections in Note 2 of Notes to Condensed Consolidated Financial for information about our domestic revolving credit facility and commercial paper markets and secured short-term debt: "Domestic Credit Agreement" (which includes a discussion of our Term Loan and 2016 Term Loan), "Letter of Credit Facility," "Consolidated Secured Loan Facility," "2017 Secured Loan Facility," "2016 Secured Loan Facility," "Second Lien Credit Agreement," "Old Senior Secured Notes and New Senior Secured Notes," "Old Senior Unsecured Notes and New Senior Unsecured Notes," and "Wholly-owned Insurance Subsidiary and Intercompany Securities."

*Intangible Asset Impairment Assessment*

We continue to monitor our performance and further indefinite-lived intangible impairment charges may be recognized in future periods to the extent changes in factors or circumstances occur, including deterioration in the macroeconomic environment, retail industry, deterioration in our performance or our future projections, if actual results are not consistent with our estimates and assumptions used in our impairment assessments, or changes in our plans for one or more indefinite-lived intangible assets, including changes that occur as a result of the formal process of the Special Committee to explore the sale of the Sale Assets, such as if the Special Committee were to accept an offer for the acquisition of the Kenmore trade name at a price less than its carrying value. Further, our business is seasonal in nature, and we generate a higher portion of our revenues and operating cash flows during the fourth quarter of our fiscal year, which includes the holiday season. The intangible asset impairment analysis is particularly sensitive to changes in the projected revenue growth rate and the assumed weighted-average cost of capital. Changes to these key assumptions could result in revisions of management's estimates of the fair value of the indefinite-lived intangible assets and could result in impairment charges in the future, which could be material to our results of operations.

**Recent Accounting Pronouncements**

See Part I, Item 1, "Financial Statements – Notes to Condensed Consolidated Financial Statements," Note 10 – "Recent Accounting Pronouncements," for information regarding new accounting pronouncements.

MOAC000906

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION*

Certain statements made in this Quarterly Report on Form 10-Q and in other public announcements by us contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995. Forward-looking statements include information concerning our future financial performance and liquidity, business strategy, plans, goals and objectives. Statements preceded or followed by, or that otherwise include, the words "believes," "expects," "anticipates," "intends," "estimates," "plans," "forecast," "is likely to" and similar expressions or future or conditional verbs such as "will," "may" and "could" are generally forward-looking in nature and not historical facts. Such statements are based upon the current beliefs and expectations of the Company's management and are subject to significant risks and uncertainties, many of which are beyond the Company's control, which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Actual results may differ materially from those set forth in the forward-looking statements.

The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: our ability to effectively and timely execute financing and asset sale transactions and other actions to enhance our financial flexibility and liquidity to successfully fund our transformation; changes in market conditions and our credit rating, which may continue to limit our access to capital markets and other financing sources and materially increase our borrowing costs; our ability to achieve cost savings initiatives; vendors' lack of willingness to do business with us or to provide acceptable payment terms or otherwise restricting financing to purchase inventory or services; our ability to effectively compete in a highly competitive retail industry; our ability of offer merchandise and services that our member and customers want; our ability to successfully implement our integrated retail strategy to transform our business into a member-centric retailer; our ability to successfully manage our inventory levels; initiatives to improve our liquidity through inventory management and other actions; the process being overseen by the Special Committee to explore the sale of the Sale Assets, including the result of any required vote of a majority of the disinterested stockholders of Holdings; the effect of worldwide economic conditions, an economic downturn, a renewed decline in customers' spending patterns, inflation and changing prices of energy; our failure to execute effective advertising efforts; the negative impact as a result of the recapture rights included in the Master Leases in connection with the Seritage transaction and the JV transactions; potential liabilities in connection with the separation of Sears Hometown and Outlet Stores and Lands' End or other asset transactions which may arise under fraudulent conveyance and transfer laws and legal capital requirements; the review and challenge of certain dividend payments received by us from Sears Canada, Inc. and other transactions involving Sears Canada, Inc.; disruptions to our computer systems which are used to implement our integrated retail strategy, process transactions, summarize results and otherwise manage our business; our ability to maintain the security of our members and customers, associate or company information; payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business operations; the impact of the seasonality of our business and customers spending patterns on the annual operating results; our dependence on sources outside the United States for significant amounts of our merchandise, which may be impacted by changes in U.S. and international trade regulations, including new or increased duties, tariffs, retaliatory tariffs, trade limitations and termination or renegotiation of the North American Free Trade Agreement; our reliance on third parties to provide us with services in connection with the administration of certain aspects of our business; impairment charges for goodwill and intangible assets or fixed-asset impairment for long-lived assets; our ability to attract, motivate and retain key executives and other associates; the substantial influence exerted over the Company by affiliates of our Chairman and Chief Executive Officer, whose interests may diverge from other stockholders' interests; our ability to protect or preserve the image of our brands and our intellectual property rights; the effect of product safety concerns or claims concerning the services we offer; the outcome of pending and/or future legal proceedings, including shareholder litigation, changes in laws and government regulations, product liability, patent infringement and qui tam claims and proceedings with respect to which the parties have reached a preliminary settlement; the timing, amount and other risks related to the pension and postretirement benefit plan obligations; our failure to realize the anticipated benefits of the Craftsman sale; our failure to comply with federal, state, local and international laws; consumer spending impacted by weather conditions and natural disasters; the volatility of our stock price; and increases in employee wages and the cost of employee benefits.

92

MOAC000907

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

Certain of these and other factors are discussed in more detail in our Annual Report on Form 10-K for the fiscal year ended February 3, 2018 and in our other filings with the Securities and Exchange Commission, which may be accessed through the Commission's website at www.sec.gov.

While we believe that our forecasts and assumptions are reasonable, we caution that actual results may differ materially. We intend the forward-looking statements to speak only as of the time made and do not undertake to update or revise them as more information becomes available, except as required by law.

93

MOAC000908

**SEARS HOLDINGS CORPORATION**
**13 and 26 Weeks Ended August 4, 2018 and July 29, 2017**

*Item 3. Quantitative and Qualitative Disclosures About Market Risk*

We face market risk exposure in the form of interest rate risk. This market risk arises from our debt obligations.

*Interest Rate Risk*

We manage interest rate risk through the use of fixed and variable-rate funding. All debt securities are considered non-trading. At August 4, 2018, 67% of our debt portfolio was variable rate. Based on the size of this variable rate debt portfolio at August 4, 2018, which totaled approximately $3.3 billion, an immediate 100 basis point change in interest rates would have affected annual pretax funding costs by $33 million. These estimates do not take into account the effect on income resulting from invested cash or the returns on assets being funded. These estimates also assume that the variable rate funding portfolio remains constant for an annual period and that the interest rate change occurs at the beginning of the period.

*Item 4. Controls and Procedures*

Our management, with the participation of our principal executive and financial officers, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report (the "Evaluation Date"). Based on this evaluation, the principal executive and financial officers concluded that, as of the Evaluation Date, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate to allow timely decisions regarding required disclosure.

In addition, based on that evaluation, no changes in our internal control over financial reporting have occurred during our last quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

94

MOAC000909

## SEARS HOLDINGS CORPORATION

PART II. OTHER INFORMATION

*Item 1. Legal Proceedings*

See Part I, Item 1, "Financial Statements—Notes to Condensed Consolidated Financial Statements," Note 9—"Legal Proceedings," for additional information regarding legal proceedings, which information is incorporated herein by this reference.

*Item 2. Unregistered Sales of Equity Securities and Use of Proceeds*

The following table provides information about shares of common stock we acquired during the second quarter of 2018. During the 13-week period ended August 4, 2018, we did not repurchase any shares of our common stock under our common share repurchase program. At August 4, 2018, we had approximately $504 million of remaining authorization under the program.

| | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[1] | Average Price Paid per Share for Publicly Announced Program | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|---|
| May 6, 2018 to June 2, 2018 | 1,161 | $ 2.28 | — | $ — | |
| June 3, 2018 to July 7, 2018 | — | — | — | — | |
| July 8, 2018 to August 4, 2018 | — | — | — | — | |
| Total | 1,161 | $ 2.28 | — | $ — | $ 503,907,832 |

[1]  Our common share repurchase program was initially announced on September 14, 2005 and has a total authorization since inception of the program of $6.5 billion, including the authorizations to purchase up to an additional $500 million of common stock on each of December 17, 2009 and May 2, 2011. The program has no stated expiration date.

The Amended Domestic Credit Agreement limits our ability to make restricted payments, including dividends and share repurchases, subject to specified exceptions that are available if, in each case, no event of default under the credit facility exists immediately before or after giving effect to the restricted payment. These include exceptions that require that projected availability under the credit facility, as defined, is at least 15%, exceptions that may be subject to certain maximum amounts and an exception that requires that the restricted payment is funded from cash on hand and not from borrowings under the credit facility. Further, the Amended Domestic Credit Agreement includes customary covenants that restrict our ability to make dispositions, prepay debt and make investments, subject, in each case, to various exceptions. The Amended Domestic Credit Agreement also imposes various other requirements, which take effect if availability falls below designated thresholds, including a cash dominion requirement and a requirement that the fixed charge ratio at the last day of any quarter be not less than 1.0 to 1.0.

*Item 6. Exhibits*

Certain of the agreements filed with or incorporated by reference into this report contain representations and warranties and other agreements and undertakings by us and third parties. These representations and warranties, agreements and undertakings have been made as of specific dates, may be subject to important qualifications and limitations agreed to by the parties to the agreement in connection with negotiating the terms of the agreement, and have been included in the agreement for the purpose of allocating risk between the parties to the agreement rather than to establish matters as facts. Any such representations and warranties, agreements, and undertakings have been made solely for the benefit of the parties to the agreement and should not be relied upon by any other person.

(b)    Exhibits

MOAC000910

## SEARS HOLDINGS CORPORATION
### EXHIBIT INDEX

3.1    Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K, dated March 24, 2005, filed on March 24, 2005 (File No. 000-51217)).

3.2    Second Amended and Restated By-Laws (incorporated by reference to Exhibit 3.2 to Registrant's Current Report on Form 8-K, dated May 8, 2018, filed on May 10, 2018 (File No. 001-36693)).

10.1    Third Amended and Restated Loan Agreement, dated as of June 4, 2018, among Sears Roebuck and Co., Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC, collectively as borrower, and JPP, LLC and JPP II, LLC, collectively as initial lender (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated June 4, 2018, filed on June 4, 2018 (File No. 001-36693)).

10.2    Second Amendment to Credit Agreement, dated as of June 29, 2018, among SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as the borrowers, the lenders party thereto and UBS AG, Stamford Branch, as administrative agent (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated June 29, 2018, filed on July 6, 2018 (File No. 001-36693)).

10.3    Fifth Amendment to Mezzanine Loan Agreement, dated as of June 29, 2018, between SRC Sparrow 2 LLC, as borrower, and JPP, LLC, as administrative agent (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated June 29, 2018, filed on July 6, 2018 (File No. 001-36693)).

10.4    Fifth Amendment to Second Lien Credit Agreement, dated as of July 5, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto, and JPP, LLC, as administrative agent and collateral administrator (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K, dated June 29, 2018, filed on July 6, 2018 (File No. 001-36693)).

*10.5    Clarification and Correction to Sixth Amendment to Third Amended and Restated Credit Agreement, dated as of June 4, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the lenders party thereto, Bank of America, N.A., as administrative agent, and the other parties thereto.

*10.6    Schedules, Exhibits and Amendments to the Amended and Restated Program Agreement, dated as of July 15, 2003, amended and restated as of November 3, 2003, by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation (as successor in interest to Sears Intellectual Property Management Company) and Citibank, N.A. (as successor in interest to Citibank (South Dakota), N.A., which was successor in interest to Citibank (USA, N.A.)) (1)

*10.7    Sixth Amendment to Mezzanine Loan Agreement, dated as of July 25, 2018, between SRC Sparrow 2 LLC, as borrower, and JPP, LLC, as administrative agent.

10.8    Amendment to Transaction Documents, dated as of August 30, 2018, by and among Sears Holdings Corporation, certain of its subsidiaries and Pension Benefit Guaranty Corporation (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated August 30, 2018, filed on September 4, 2018 (File No. 001-36693)).

10.9    Third Amendment to Credit Agreement, dated as of August 31, 2018, among SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as the borrowers, the lenders party thereto and UBS AG, Stamford Branch, as administrative agent (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K, dated August 30, 2018, filed on September 4, 2018 (File No. 001-36693)).

*31.1    Certifications of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

*31.2    Certifications of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

E-1

MOAC000911

## SEARS HOLDINGS CORPORATION
### EXHIBIT INDEX

*32.1    Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

*32.2    Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101    The following financial information from the Quarterly Report on Form 10-Q for the fiscal quarter ended August 4, 2018, formatted in XBRL (eXtensible Business Reporting Language) and furnished electronically herewith: (i) the Condensed Consolidated Statements of Operations (Unaudited) for the 13 and 26 weeks ended August 4, 2018 and July 29, 2017; (ii) the Condensed Consolidated Statements of Comprehensive Loss (Unaudited) for the 13 and 26 weeks ended August 4, 2018 and July 29, 2017; (iii) the Condensed Consolidated Balance Sheets (Unaudited) as of August 4, 2018, July 29, 2017 and February 3, 2018; (iv) the Condensed Consolidated Statements of Cash Flows (Unaudited) for the 26 weeks ended August 4, 2018 and July 29, 2017; (v) the Condensed Consolidated Statements of Deficit (Unaudited) for the 26 weeks ended August 4, 2018 and July 29, 2017; and (vi) the Notes to the Condensed Consolidated Financial Statements (Unaudited).

_____

*    Filed herewith

(1)    Confidential treatment was requested as to omitted portions of this Exhibit. The omitted material has been filed separately with the Securities and Exchange Commission.

E-2

MOAC000912

### SEARS HOLDINGS CORPORATION

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SEARS HOLDINGS CORPORATION

Date: September 13, 2018

| | | |
|---|---|---|
| By: | | /s/   ROBERT A. RIECKER |
| | **Name:** | **Robert A. Riecker** |
| | **Title:** | **Chief Financial Officer*** |

*Mr. Riecker is signing this report both as a duly authorized officer and as the principal accounting officer.

E-3

MOAC000913

# Transcript of August 23, 2019

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION, et al.,

8

9          Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    August 23, 2019

17                    10:16 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

Page 2

1    HEARING re Continuance from 8/22/2019 and Evidentiary

2    Hearing on MOAC Mall Holding

3    LLCs Objections

4

5    MOAC Mall Holding LLC's Objection to Supplemental Notice of

6    Cure Costs and Potential Assumption and Assignment of

7    Executory Contracts and Unexpired Leases in Connection with

8    Global Sale Transaction (document #2199)

9

10   MOAC Mall Holding LLC's Second Supplemental and Amended: (I)

11   Objections to Debtor's Notice of Assumption and Assignment

12   of Additional Designatable Leases, and (II) Objection to

13   Debtor's Stated Cure Amount (document #3501)

14

15   MOAC Mall Holding LLC's Third Supplemental and Amended: (I)

16   Objections to Debtor's Notice of Assumption and Assignment

17   of Additional Designatable Leases (document #3926)

18

19   MOAC Mall Holding LLC's Fourth Supplemental (I) Objections

20   to Reply to Debtor's Notice of Assumption and Assignment of

21   Additional Designatable Leases, and (II) Objection to

22   Debtor's Stated Cure Amount (document #4450)

23

24

25

Page 3

1   Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I)

2   Objection to Supplemental Notice of Cure Costs and Potential

3   Assumption and Assignment of Executory Contracts and

4   Unexpired Leases in Connection with Global Sale Transaction;

5   (II) Second Supplemental and Amended: (A) Objections to

6   Debtor's Notice of Assumption and Assignment of Additional

7   Designatable Leases, and (B) Objection to Debtor's Stated

8   Cure Amount; and (III) Third Supplemental and Amended

9   Objections to Debtor's Notice of Assumption and Assignment

10   of Additional Designatable Leases (document #4454)

11

12   So Ordered Stipulation Signed on 5/13/2019 By and Among

13   Sellers, Buyer, and Landlord (MOAC Mall Holding LLC) (I)

14   Extending Time Under Section 11 U.S.C. Section 365(d)(4) for

15   Lease of Nonresidential Real Property and (II) Setting

16   Briefing Schedule (document #3823)

17

18   Declaration of Rich Hoge Supporting MOAC Mall Holdings LLC's

19   Third Supplemental and Amended Objections to Debtor's Notice

20   of Assumption and Assignment of Additional Designatable

21   Leases (document #3927)

22

23   Stipulation and Order signed on 6/25/2019 By and Among

24   Sellers, Buyer, and MOAC Mall Holding LLC Extending Time

25   Under 11 U.S.C. § 365(d)(4) For Lease of Nonresidential Real

Page 4

1    Property(document #4354, 4687)

2

3    Declaration of Thomas J. Flynn in Support of 4450 Fourth

4    Supplemental Objection (document #4451)

5

6    Stipulation of Agreed Exhibits Regarding Assumption and

7    Assignment of the MOAC Lease Filed by Thomas J. Flynn

8    (document #4864)

9

10   Stipulation of Facts Not in Dispute Regarding Assumption and

11   Assignment of the MOAC Lease Filed by Thomas J. Flynn

12   (document #4865)

13

14   Transform Holdco LLCs Supplemental Reply and Cross-Motion

15   to; (A) Strike MOAC Mall Holdings LLCs Fourth Supplemental

16   (I) Objections and Reply to Debtors Notice of Assumption and

17   Assignment of Additional Designatable Leases, and (II)

18   Objection to Debtors Stated Cure Amount; and (B) Permit Late

19   Filed Responses to Requests for Admission (document #4867)

20

21   Declaration of Louis W. Frillman in Opposition to the

22   Proposed Assumption and Assignment of the MOAC Lease

23   (document #4874)

24

25

1   Declaration of Raphael Ghermezian in Opposition to the

2   Proposed Assumption and Assignment of the MOAC Lease filed

3   by Thomas J. Flynn (document #4875)

4

5   Declaration of Richard Hoge in Opposition to the Proposed

6   Assumption and Assignment of the MOAC Lease filed by Thomas

7   J. Flyrui (document #4876)

8

9   Declaration - Evidentiary Hearing Declaration of Roger A.

10   Puerto In Support of Transform Holdco LLCs Reply to MOAC

11   Mall Holdings LLCs (I) Objection to Supplemental Notice of

12   Cure Costs and Potential Assumption and Assignment of

13   Executory Contracts and Unexpired Leases in Connection with

14   Global Sale Transaction; (II) Second Supplemental and

15   Amended: (A) Objections to Debtors Notice of Assumption and

16   Assignment of Additional Designatable Leases, and (B)

17   Objection to Debtors Stated Cure Amount; and (III) Third

18   Supplemental and Amended Objections to Debtors Notice of

19   Assumption and Assignment of Additional Designatable Leases

20   (document #4879)

21

22

23

24

25

Page 6

1    Declaration - Evidentiary Hearing Declaration of Michael

2    Jerbich In Support of Transform Holdco LLCs Reply to MOAC

3    Mall Holdings LLCs (I) Objection to Supplemental Notice of

4    Cure Costs and Potential Assumption and Assignment of

5    Executory Contracts and Unexpired Leases in Connection with

6    Global Sale Transaction; (II) Second Supplemental and

7    Amended: (A) Objections to Debtors Notice of Assumption and

8    Assignment of Additional Designatable Leases, and (B)

9    Objection to Debtors Stated Cure Amount; and (III) Third

10    Supplemental and Amended Objections to Debtors Notice of

11    Assumption and Assignment of Additional Designatable Leases

12    (document #4880)

13

14    Opposition Brief MOAC Mall Holdings LLC's Pre-Evidentiary

15    Hearing Brief Regarding the Proposed Assumption and

16    Assignment of the MOAC Lease filed by Thomas J. Flynn

17    (document #4889)

18

19    Transform Holdco LLC's Amended Supplemental Reply and Cross-

20    Motion to Strike MOAC Mall Holding LLC's Pre-Evidentiary

21    Hearing Brief Regarding The Proposed Assumption and

22    Assignment of the MOAC Lease (document #4903)

23

24

25

1   MOAC Mall Holdings LLC's Reply Objecting to Transform Holdco

2   LLC's Motion to (A) Strike MOAC's July 8 Supplemental

3   Objection and (B) Permit Late Responses to Requests for

4   Admissions (document #4915)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  ANGELINE J. HWANG

9

10   DLA PIPER LLP

11        Attorneys for Transform Holdco LLC

12        1251 Avenue of the Americas

13        New York, NY 10020

14

15   BY:  ALANA M. FRIEDBERG

16        RACHEL EHRLICH ALBANESE

17        RICHARD A. CHESLEY

18        R. CRAIG MARTIN

19

20   PATTERSON BELKNAP WEBB & TYLER LLP

21        1133 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  DAVID W. DYKHOUSE

25

```
 1   WITNESSES:

 2   MICHAEL JERBICH

 3   RAPHAEL GHERMEZIAN

 4   LOUIS FRILLMAN

 5   ROGER PUERTO

 6

 7   ALSO PRESENT TELEPHONICALLY:

 8

 9   ALIX BROZMAN

10   TAYLOR B. HARRISON

11   WILLIAM S. HOLSTE

12   HOC RI KIM

13   TERESA LII

14   SHIRIN MAHKAMOVA

15   CHRIS STAUBLE

16

17

18

19

20

21

22

23

24

25
```

Page 10

```
 1                    P R O C E E D I N G S
 2             THE COURT:  Okay, good morning.  In re Sears
 3    Holdings Corp et al?
 4             MR. CHESLEY:  Your Honor, Richard Chesley, Rachel
 5    Albanese, Craig Martin, and Alana Friedberg on behalf of
 6    Transform.  We're here on the only matter today, which is
 7    the Mall of America assumption and assignment motion.  We've
 8    spoken to Debtors' counsel in light of the nature of this
 9    proceeding, discussed with Debtors' counsel just moving
10    forward, so.  Unless the Court has any procedural issues,
11    our position on this, Your Honor, in terms of how we would
12    like to proceed today, obviously, a substantial amount of
13    information has been presented to the Court.  There are
14    stipulated facts that are agreed exhibits.  We'll have five
15    witnesses whose directs have been submitted by declaration.
16             We believe the issues have been fully formed, and
17    with the Court's approval, we would like to simply proceed
18    with the evidentiary presentation.  At that point, we can
19    address argument or any other matters the Court would like.
20    At that point, we think we could do this much more
21    efficiently and effectively today, and again, I don't think
22    there's any surprises to the Court as to what the issues
23    are.
24             THE COURT:  Okay.  Well, I normally do not take
25    opening arguments, so my normal practice would be to do just
```

Page 11

1   that, move to the evidence.  There is, in the record, fairly

2   recently submitted, a pair of pleadings in which the parties

3   are jousting over the effect of Transform's responding to

4   the request to admit only on July 26th and the application

5   of Rule 36 incorporated by 7036 of the Bankruptcy Rules.  To

6   that fact, as well as Transform's motion to strike the

7   fourth supplemental objection and pre-hearing memorandum of

8   law submitted by Mall of America Corp, or MOAC, I have the

9   parties' pleadings on those matters.  I can consider them

10  now or later.

11          MR. CHESLEY:  Your Honor, we think, in light of

12  the evidence that's already been presented and will be

13  presented, we think those could be addressed at the end if

14  that would be acceptable to the Court.

15          THE COURT:  Okay.  I don't know who's speaking for

16  MOAC.

17          MR. FLYNN:  Right.  Good morning, Your Honor.  My

18  name is Tom Flynn.  I'm representing the lender, MOAC.

19          THE COURT:  Okay.

20          MR. FLYNN:  I'm here with Alex Beeby and David

21  Dykhouse.  We would be curious to know the answer to the

22  question on the admissions that were (indiscernible) on the

23  hearing today, but whatever the Court desires on that

24  (indiscernible).

25          THE COURT:  Okay, well, I understand that

Page 12

1    curiosity because, obviously, if the Debtor has deigned to

2    admit certain things that may short the evidentiary

3    presentation, it's complicated somewhat by the fact that the

4    parties have stipulated facts, which, in many ways, go to

5    the admissions anyway.  But I guess the short answer is

6    that, in keeping with the terms of Rule 7036, I believe I

7    can permit the amendment even after the fact, or

8    retroactively, to extend the time to respond.

9         That standard is not subject to the excusable

10   neglect Pioneer standard that is incorporated in other

11   extensions of time.  It still has to be for cause, although

12   that requires a balancing of some basis for why it wasn't

13   submitted timely, i.e., if it was intentionally not

14   submitted timely, to thwart discovery or create a false

15   impression in the opponent's mind as to what was at issue in

16   the case.  Or, as relatedly, the movant, under Rule 36,

17   while seeking to enforce that rule, was in the Court to be

18   truly prejudiced in presenting its case by the delay.  I

19   obviously would not grant such retroactive extension, or

20   such a retroactive extension.

21        But I don't believe those types of facts pertain

22   here.  It appears to be that the delay was inadvertent, not

23   part of a strategy, that the parties were actively engaged

24   throughout the process, and most importantly, I don't

25   believe that MOAC was unduly prejudiced by the delay.  Most

Page 13

1   of the admissions that are sought are actually agreed to, at

2   this point.  A couple of them were confusing to me, and

3   would be hard to decide what they meant in the first place.

4   I think the two that may or may not be at issue, although,

5   frankly, the stipulated facts may reflect this too, and it's

6   really more of a legal interpretation as to what 365(b)3

7   provides when it seeks a comparison between financial

8   operating condition at the time the lease was entered into

9   and the present time, would be Request Nos. 5 and 6, where

10  there's: "An admission of the financial condition of the

11  assignee is not similar to or better than the financial

12  condition of Sears owner about May 30, 1991."  And Request

13  No. 6: "Admit that the operating performance of the assignee

14  is not similar to or better than the operating performance

15  of Sears owner about May 30, 1991."

16          At one level, I think that, based on one reading

17  of the relevant provision of § 365(b)3, I believe the facts

18  establish that, but based on another reading, which

19  Transform has always made clear is its interpretation, it

20  wouldn't be deemed admitted.  So, in any event, this doesn't

21  appear to be the type of factual issue properly covered by a

22  request to admit in any event.  As I said, almost all of the

23  other requests to admit I think are pretty well established

24  already by the stipulated facts or not raised as a factual

25  issue.  For example, Request No. 9" "Admit that you do not

Page 14

 1   currently plan for Transform Lease Co., LLC. to operate as a

 2   retail distributor."  There are a number like that.

 3          The ones that I question, again, as to whether

 4   they're factual, since they contain terms that are really

 5   more aptly construed as a matter of law would be Request No.

 6   13, and the last two, 14 and 15, which I think go to issues

 7   that really are not at issue in the matter, which go to

 8   those -- just to remind you all: "Admit that assumption and

 9   assignment of the lease is not necessary to support

10   Transform's retail operations for Transform to maintain its

11   financial condition."

12          And then Request No. 15 says: "Admit that

13   Transform's retail operation are not sufficient to maintain

14   Transform's financial condition, which is dependent upon

15   assumption and assignment of the lease."  I'm not really

16   sure what that -- those actually are asking for, but in any

17   event, I don't think they're -- I can't imagine a timely

18   response to -- I don't even know what -- I'll go back.  I

19   don't know what it would mean to deem those be admitted.

20   So, I'm going to grant Transform's request to extend,

21   retroactively, the time for it to have responded to the

22   requests for admission.

23          As far as Transform's request that the fourth

24   supplemental objection and the pre-hearing memorandum be

25   stricken, the pre-hearing memorandum is just that.  It's a

Page 15

1    memorandum.  It really doesn't raise any new issues.  It

2    cites cases that have already been cited and that I could

3    have looked up anyway, if they had not previously been

4    cited.  So, that's not stricken, for what it's worth.  It's

5    another issue as to whether that's part of the cure, as it

6    really was not contemplated by the case management order,

7    but I won't keep it out of the record.

8              As far as the fourth supplemental objection is

9    concerned, I don't believe it raises any particularly

10   surprising issues for Transform.  It didn't move the playing

11   field.  I think it just elaborated on the grounds for MOAC's

12   objection to assumption and assignment to Transform.  If I'm

13   missing something there, Mr. Chesley, you can tell me, but

14   it just seems to me that, again, it's adding detail to

15   arguments that have previously been made, as opposed to, for

16   example, what counsel tried to do yesterday in another

17   assumption and assignment objection is, during oral

18   argument, raise a wholly new basis for objecting to the

19   assignment.

20             MR. CHESLEY:  Your Honor, I don't think there's

21   anything new in there as to the fourth.  It really related

22   to the issues of the request to admit, so we're ready to

23   proceed.

24             THE COURT:  Okay.  All right, so, that's my ruling

25   on those two motions.

1        MR. CHESLEY:  Thank you, Your Honor.  Unless the

2   Court has anything further, any questions for us, we would

3   move to our first witness.

4        THE COURT:  All right, that's fine.

5        MR. CHESLEY:  Transform's first witness would be

6   Michael Jerbich.  And Your Honor, for ease of the witnesses,

7   we put the exhibit binder as well as each of their

8   declarations on the witness stand.

9        THE COURT:  Okay.

10        MR. CHESLEY:  And Ms. Albanese will address Mr.

11   Jerbich's testimony.

12        THE COURT:  Okay.  Would you raise your right

13   hand, please?

14        MR. JERBICH:  Yeah, sure.

15        THE COURT:  Do you swear or affirm to tell the

16   truth, the whole truth, and nothing but the truth, so help

17   you God?

18        MR. JERBICH:  I do.

19        THE COURT:  And could you spell your name for the

20   record, please?

21        MR. JERBICH:  Michael, M-I-C-H-A-E-L, Jerbich, J

22   as in jam, E-R-B as in boy, I-C-H.

23        THE COURT:  Okay.  Good morning.  Mr. Jerbich, you

24   submitted a declaration in this case, in this proceeding in

25   connection with the assumption and assignment of the Mall of

Page 17

1   America lease dated August 18th, 2019.  It's intended to be

2   your direct testimony in this matter.  Sitting here today,

3   would this still constitute your direct testimony?

4           MR. JERBICH:  Yes, it would.

5           THE COURT:  And there's nothing that you would

6   change in it?

7           MR. JERBICH:  No, there is not.

8           THE COURT:  Okay.  All right, so, Mr. Flynn, you

9   can proceed with cross.

10          MR. FLYNN:  Thank you, Your Honor.

11            CROSS-EXAMINATION OF MICHAEL JERBICH

12  BY MR. FLYNN:

13  Q    Mr. Jerbich, my name's Tom Flynn.  I think we've met

14  before once already.

15  A    Correct.

16  Q    I'll be referring to my client as either the Mall of

17  America, MOAC, or the landlord.  Is that okay?

18  A    Sure.

19  Q    They mean basically the same thing.  I understand that

20  you submitted a declaration here today and you think that

21  that declaration primarily relying on the Reicher

22  declaration, provides substantial financial information

23  regarding the ability of Transform HoldCo to meet its

24  financial obligations for the proposed and assumed leases,

25  is that right?

1    A    I'm not sure I understand what you're asking there.

2    Q    Well, in Paragraph 6 of your declaration --

3    A    Okay.

4    Q    -- if you remember that.

5    A    I just didn't hear what the question was.

6    Q    For financial information concerning adequate assurance

7    of future performance, you're relying primarily on the

8    Reicher declaration.  Is that correct?

9    A    Correct.

10   Q    Have you read the Reicher declaration and it's

11   attachments and exhibits?

12   A    I have.

13   Q    Is there any other -- there is no other financial

14   information in your declaration referred to that would

15   support adequate assurance of future performance, is that

16   correct?

17   A    No other testimony regarding adequate assurance?

18   Q    No financial information, other than that contained in

19   the Reicher declaration.

20   A    There's no other financial information, no.

21   Q    Have you reviewed the exhibits to the Reicher

22   declaration?  That would be the balance sheet and the other

23   exhibits, have you done that?

24   A    I've seen them, yes.

25   Q    Are you relying on that information?

1    A    For the adequate assurance?

2    Q    Yes.

3    A    In part.

4    Q    Is there any other financial information that you

5    referred to in your declaration that you --

6    A    There's nothing else referred to in my declaration, no.

7    Q    Just a minute.  Now, in the Reicher declaration, you're

8    familiar with the fact -- did you read the whole declaration

9    including what was filed in the Court by Mr. Reicher?

10   A    I've reviewed it.  I would imagine I've read the whole

11   thing.  Do you know which area this is?  Is there something

12   specific you're going to ask about that, so I can find it in

13   here?

14   Q    Yes.  I just wonder if you've read it.

15   A    I've read it.

16   Q    In that declaration, Mr. Reicher states that the

17   failure -- he talks about selected number of leases that you

18   would like to -- that your company would like to assume and

19   assign.  Is that correct?

20   A    Yeah, I think we've assumed, now 656 out of 660, yes.

21   Q    Did you put anything in your declaration about that?

22   A    Somewhere in there.  It said 660 leases.

23   Q    And they've been assumed and assigned?  Where did it

24   say that in the declaration?

25            THE COURT:  I'm sorry, Mr. Flynn.  When you say

Page 20

1    assumed and assigned, you mean assumed by the Sears Debtors

2    and assigned to Transform or to be assigned by Transform to

3    someone else?

4            MR. FLYNN:  To be assigned by Transform to someone

5    else.  Thank you, Your Honor.

6    A    Oh, I misunderstood that, I apologize.  What's the

7    question?

8    Q    Did you put any information about what's been assumed

9    and assigned by Transform to someone else in your

10   declaration?

11   A    To someone else, I don't believe the declaration -- I'd

12   have to look at it closely.  I know there's a section of the

13   declaration that talks about how many leases we were

14   assuming.

15   Q    In the declaration, Mr. Reicher states, if you remember

16   --

17   A    Oh, I thought you were asking my declaration.  I

18   apologize.

19   Q    Well, I'm talking about what you're relying on for

20   adequate assurance and in the Reicher declaration, the

21   failure to assume and assign these leases, according to him,

22   would be the end of Sears.  Did you know that he said that?

23   Do you remember that he said that?

24   A    I don't recall that exact phrase but if it's in the

25   declaration, I'm sure it's in the declaration.

Page 21

1   Q    Has Transform assumed and assigned all of the leases,

2   do you have anything about that in the declaration, in your

3   declaration?

4   A    May I view the copy of my declaration just to review?

5   There was a section in there regarding assuming the leases.

6          THE COURT:  Do you want to show him his

7   declaration?

8   A    I just don't have it in front -- I can grab it, if you

9   like.  I don't know --

10  Q    I have a marked up copy here that --

11         MR. CHESLEY:  The small binder.

12         MR. JERBICH:  Oh, it is the small binder.  I

13  apologize.

14         MR. FLYNN:  It's in the small binder.

15         MS. ALBANESE:  They're alphabetical, number is

16  one.

17         MR. JERBICH:  Okay, thank you.

18  A    I recall a reference in my declaration about the 660

19  leases.

20         MR. CHESLEY:  Your Honor, can I just point the

21  witness to Paragraph 4?  I don't think we need to -- I'm

22  sorry, Paragraph 5.

23         MR. JERBICH:  Right, okay.

24  A    (indiscernible) "sought to assume and assign

25  approximately 660 retail and non-retail leases to

Page 22

1    Transform."

2    Q    It doesn't say anything about what -- how many have

3    been successfully assumed or assigned, does it?

4    A    This does not say that.

5    Q    Yes.

6    A    But I thought I was aware that there were only three

7    now that aren't.

8    Q    Do you have any evidence to support that, besides your

9    word here today?

10   A    I don't have a document to support that, if that's what

11   you're asking.  I just --

12   Q    So there's no exhibit and there's nothing in your

13   testimony --

14          THE COURT:  I'm sorry, again.

15          MR. FLYNN:  Excuse me.

16          THE COURT:  When you say, "assumed and assigned" -

17   -

18          MR. FLYNN:  Right.

19          THE COURT:  -- you mean by the Debtors to

20   Transform or by Transform to someone else?

21          MR. FLYNN:  By Transform to someone else?

22          THE COURT:  All right, because there's -- I mean,

23   the docket of the case reflects the number of leases that

24   have been assigned by the Debtors to Transform.

25          MR. FLYNN:  Yeah, it's Transform to someone else.

1    A    And that's what I was referring to.

2    Q    And there's still assignments to be done?  Is that

3    right?

4    A    From Transform to third parties?

5    Q    Yes.

6    A    Potentially.

7    Q    Including this one, here today, right?

8    A    No.  This could be subleased.  I don't think this needs

9    to be assigned.

10   Q    You're seeking assume --

11   A    We're seeking assume -- maybe I'm not understanding the

12   legal distinction, so if you can -- we're seeking to assume

13   this lease, for the Debtor to assume it and assign it to

14   Transform.

15   Q    Right.

16   A    Right.

17   Q    So, there's leases that haven't been assumed and

18   assigned, is that correct?

19   A    I believe three.

20   Q    In any case, you don't know for sure, and you have no

21   documents or evidence to support that?

22   A    Well, I think -- I mean, I guess we can scour the

23   docket, but I thought there were only -- I thought there

24   were only three that were not thus far assumed by Sears and

25   assigned to Transform.

Page 24

```
 1    Q    And how many are assigned -- how many of the -- there's

 2    only three and you didn't testify to that in your --

 3              MS. ALBANESE:  Objection, Your Honor.  I think Mr.

 4    Flynn is conflating the assumption by Sears and assignment

 5    to Transform with Transform's subsequent assignment of those

 6    leases and confusing the witness.

 7              MR. FLYNN:  All right.

 8    Q    At any rate, have you reviewed the balance sheet

 9    contained in the Reicher declaration?  Did you review that?

10    A    I'm not an accountant.  I have reviewed it, but I'm not

11    a --

12    Q    You've testified, did you not, that that information is

13    sufficient to give the Mall of America assurance -- the

14    required assurances of future performance.  That information

15    was sufficient.  You testified to that, didn't you?

16    A    I did.  I have.

17    Q    And if you're not an accountant --

18    A    I'm not an accountant.

19    Q    -- and you have no particular skill or ability to

20    review that or understand it, (indiscernible) it, is that

21    what you're saying?

22    A    That's not at all what I'm saying.  I don't think I

23    said I have no particular --

24    Q    Did you review it?

25    A    I did review it, yes.
```

1    Q    Okay, and you're not an accountant.  Did you prepare or

2    help prepare those accounting statements?

3    A    I did not.

4          MR. FLYNN:  Excuse me, Your Honor.

5    Q    I'd like you to take a look at MOAC Exhibit 12.

6    A    I have it in front of me.

7    Q    Would you turn to the balance sheet, which is, I

8    believe, the -- I don't believe there is a balance sheet on

9    Exhibit 12, is there?  I think there is.

10         THE COURT:  Well, it's about four pages in.  We

11   refer to the draft, Consolidated HoldCo, Transform

12   Consolidated HoldCo balance sheet?

13         MR. FLYNN:  Yes.  Yes.

14         THE COURT:  It's right before the organizational

15   chart.

16   A    Page MOAC 00008.

17   Q    Okay.  Thank you.

18   A    Okay.

19   Q    You're relying on that, in part, for your assurance of

20   adequate performance in the future?

21   A    In part.

22   Q    And do you have any other financial information, either

23   referred to in your testimony as far as --

24   A    I don't think there was any other financial information

25   referred to in my testimony, other than the fact that the

Page 26

1   REA only requires, a subtenant of ours, a $50 million

2   dollars net worth.

3   Q     That's not financial information, that's --

4   A     Okay.

5   Q     So, this is the exclusive financial information you're

6   relying on?  This attachments to the Reicher declaration in

7   Exhibit --

8   A     Yes.

9   Q     The balance sheet is not -- has not been, according to

10  what -- and this is what you're relying on -- it hasn't been

11  completed.  You understand that?  Did you read that?

12  A     Where are you referring to when you asked me to read

13  that?

14  Q     Well, let's start with the top line.  It says "draft".

15  A     Correct.  It does say "draft".

16  Q     What does "draft" mean to you?  That's the final

17  document that -- or does that mean somebody has done a

18  draft?

19  A     "Draft" to me means draft, yeah.

20  Q     So, this isn't the final.  This is an initial, or

21  draft.  This has not been completed.  Is that the way you

22  read it?

23  A     I read it -- I think the document speaks for itself.

24  Q     Yeah, I do too.  So, could a reasonable person read

25  that and say, well, this isn't anything final.  This is

Page 27

1    simply an initial draft.

2              MS. ALBANESE:  Objection, Your Honor.

3              THE COURT:  Sorry?

4              MS. ALBANESE:  Objection, Your Honor.  I think the

5    witness has answered the question and he's badgering him.

6              THE COURT:  That's fair.  Well, I don't know if

7    he's badgering, but it's redundant, at this point.

8    Q    Did you read the footnotes to the balance sheet, sir?

9    Did you?

10   A    Yes.

11   Q    Does that indicate that the numbers could change?

12   A    It says it's subject to change.

13   Q    All right, it says it's subject to change?  Okay.  Did

14   your testimony indicate that you -- did you ever get a final

15   draft?  You never did, did you?  Of this balance sheet, did

16   you?

17   A    I don't believe I've gotten a document beyond what I

18   have here.

19   Q    The footnotes say, in part, "Please note this draft is

20   based upon schedules," okay?  "And may be adjusted."  Is

21   that right?

22   A    It does say, "Please note this draft is based upon

23   schedules of APA," yes.

24   Q    And is subject to change?

25             THE COURT:  He already answered that one.

Page 28

1   Q    Is this something that you're claiming we can rely upon

2   as adequate assurance of future performance?  Is that your

3   testimony here today?  That we can look at this and rely

4   upon this?

5   A    I think 650-some odd other landlords have, yes.

6   Q    What -- what --

7         MR. FLYNN:  I ask that to be stricken.

8         THE COURT:  No, I won't strike that.

9         MR. FLYNN:  All right.

10  Q    We'll get to that in a minute, but so, we're supposed

11  to -- the Mall of America is supposed to be assured when it

12  doesn't have a final balance sheet that's subject to change?

13  That's supposed to assure us?  Are you serious about that?

14  A    Well, in addition to the security that we offered you,

15  yes.

16  Q    So, just a minute, here.  I'd like you to refer to that

17  part of the exhibit that talks about adequate assurance

18  information, marked as MOA007, okay?  Do you have that in

19  front of you?

20  A    I have the binder open to MOAC-7, yes.

21  Q    What does that purport to show?

22  A    It's a Form 10-k.

23  Q    It shows -- I'm talking -- or it's talking about the

24  same thing, this --

25  A    Oh, no, I apologize.  I'm -- what page are you

Page 29

1   referring to, then?

2   Q    It's 007.

3         THE COURT:  It's the same exhibit --

4         MR. JERBICH:  Oh, the same exhibit.  I turned to

5   (indiscernible).

6         THE COURT:  Right, not Exhibit 7.  It's the same

7   one that you were in, but just a page before.

8         MR. JERBICH:  All right.

9   A    Okay.

10  Q    By the way, a question about the balance sheet.  Has

11  that been -- has the balance sheet been signed by anyone?

12  Is there any indication that's been signed by a CPA or

13  anybody else that would certify to it?

14  A    I'm not certain of that.

15  Q    I'm going back to the balance sheet.  Has that been

16  signed by anyone?

17  A    I just answered.  I'm not certain of that.

18  Q    Going back to Page 007, you're familiar with this.

19  You're reviewed this, I assume?

20  A    Again, I've looked at all the exhibits.

21  Q    All right, all right.  Did you read the disclaimer in

22  that?

23  A    I'm sure in my review I reviewed it at some point.

24  Q    So, on its face, this -- your financial information

25  says that it's unreliable, doesn't it?

1    A    I'd have to read it to see if that's an accurate

2    characterization.

3    Q    You haven't read this before?

4    A    I said I read it, but I'd like to refresh myself.

5    Q    Well, let me help you.  Let me read portions of it.

6    A    Please.

7    Q    "This letter includes projections, forecasts, and

8    forward-looking statements which refer to Transform's and

9    can be," quote, "no assurance as to Transform or the

10   company's future performance."  That's what it says.  Do you

11   see that in there?

12   A    I do see that in there.

13   Q    Are we supposed to be -- well, I'll let that -- it goes

14   on to state that: "This financial interest (indiscernible)

15   speaks only to the relevant date," and they assume, "no

16   obligation to update it."  Did you read that portion of the

17   disclaimer?

18   A    Yeah, I believe I mentioned I read all of it.  So.

19   Q    We have received no updates, and nor are they promising

20   to give us any, and you don't prepare these things.  Is that

21   right?

22   A    There's three questions in, if you want to break it

23   down.  You haven't received an update to the question or?

24   Q    I'll ask another question.  They also go on to state

25   they "have no duty to advise any person that any of the

Page 31

1    conclusions in the letter, and the declaration, have

2    changed," right?

3    A    You're asking whether it says that?

4    Q    Yes.

5    A    I don't see that specific language, but if you point me

6    to it, I'm sure I'll find it.

7              THE COURT:  I can read it.

8              MR. FLYNN:  Thank you.

9              MR. JERBICH:  Thank you.

10   Q    It goes on to state: "This letter," and they're talking

11   about the Reicher declaration, I believe.

12   A    Okay.

13   Q    "and its attachments, is not intended to provide the

14   basis for any decision on any transaction."  Did you read

15   that part of it?

16   A    Again, I've read the entire thing.

17   Q    I assume you don't dispute your own document.  That's

18   what it means, doesn't it?

19   A    I think this is an exhibit to Mr. Reicher's

20   declaration, not mine.

21   Q    Then you don't endorse Mr. Reicher?  You don't think

22   he's --

23   A    I didn't say that at all.

24   Q    You don't endorse your own --

25             MS. ALBANESE:  Objection, Your Honor.

1          MR. JERBICH:  That's silly.

2          MS. ALBANESE:  The witness didn't say that.

3          THE COURT:  Look, I've read it.  I get your point.

4          MR. FLYNN:  Thank you.

5          THE COURT:  I've read similar language attached to

6    disclosure statements, 10-ks, et cetera.  You can move on.

7          MR. FLYNN:  All right.  Well, this was provided to

8    us to give us assurance.

9          THE COURT:  Ultimately, it's my decision, sir.

10   But I get your point.

11         MR. FLYNN:  All right.

12         MR. JERBICH:  Along with a one-year letter of

13   credit.

14   Q    I do want to -- and I'll make this short, one more

15   section.  This document, it says: "The recipient should make

16   its own independent basis and legal decisions based upon the

17   information and advice and the recipient's own judgments

18   concerning the adequacy of this disclosure."  Isn't that

19   what it says?

20   A    Can you point me to the exact sentence you're referring

21   to?

22   Q    Second from the last.

23         THE COURT:  Actually, the third to the last.

24   A    Yes, it does say that.

25   Q    Does the Mall of America, then, I assume you're telling

1    us is allowed to make its own decision about the adequacy of

2    this information.

3    A    I think that's probably boilerplate language to a

4    financial statement that talks about forward-looking

5    thoughts and what have you.

6    Q    So, that's just meaningless?

7              MS. ALBANESE:  Your Honor, objection.  I think

8    it's --

9              THE COURT:  It's meaningless in the context of my

10   determination as to whether there's adequate assurance of

11   future performance.

12             MR. FLYNN:  Sure.

13             THE COURT:  So, yes.  The answer is yes.  It's

14   meaningless.

15             MR. FLYNN:  All right.  Thank you, Your Honor.

16             THE COURT:  Okay.  Obviously, the Debtor and

17   Transform have the burden of proof.

18   Q    You understand that you have to prove not only

19   financial wherewithal but you have to prove proof of

20   adequate -- of performance, not only financial but operating

21   performance.  Is that right?

22   A    In what sense?

23   Q    You understand that the Court requires you to prove

24   financial wherewithal and operating performance.  You don't

25   understand that or you do, or?

1   A    I'm aware of adequate assurance as far as

2   (indiscernible) of future performance.

3   Q    Just so we're clear, Transform Co. is not going to

4   operate a store at the Mall of America, is that right?

5   A    Correct.  It's an asset of Transform Co., correct.

6   Q    There will be no operations or operating performance by

7   Transform Co. at the Mall of America, is that right?

8   A    Our plan is not to operate.  That is correct.

9   Q    As you sit here today, do you know -- do you have a

10  tenant ready to take over that space and operate in it?

11  A    As I sit here today, I have interest from multiple

12  tenants, but it's a process that takes time.

13  Q    So, you have no tenant, at today's hearing, that would

14  take over and operate in that space?

15  A    Today?  Literally today?  No.

16  Q    Yes, literally today.  All right.  There's nothing in

17  your testimony submitted to the Court by declaration that

18  indicates any evidence or discussion how Transform Co. will

19  or a hypothetical tenant might operate from the premises, is

20  that correct?

21  A    Can you be more specific with your question?  I'm not

22  sure I'm understanding it.

23  Q    Well, you have nobody that's going to operate in the

24  premises as you sit here today.

25  A    You asked me that earlier if I have a tenant today and

Page 35

1    I said no.

2    Q    You're unable to show today anybody that could be --

3    because you have no one.

4    A    I don't think that's an accurate characterization of

5    what I said at all.  The lease is significantly below

6    market, we're paying $10 (indiscernible).

7             THE COURT:  All right, just stop.  Sir, you don't

8    need to ask the same question three times.

9             MR. FLYNN:  You bet.  Yes, Your Honor.

10   Q    There's no one that -- you did say --

11            MR. FLYNN:  That's all I have, Your Honor.  Thank

12   you.

13            THE COURT:  Okay.  I would like to follow-up on

14   one of Mr. Flynn's question.

15            MR. JERBICH:  Sure.

16            THE COURT:  You're not an actual employee of

17   TransCo, right?  You work -- you're a consultant for them?

18            MR. JERBICH:  Correct.

19            THE COURT:  Has Transform, excuse me, placed any

20   limitations on you as far as the types of tenants that you

21   are soliciting?

22            MR. JERBICH:  No.

23            THE COURT:  None?  So, if --

24            MR. JERBICH:  I mean, to the extent, obviously,

25   within the parameters of the lease, the REA.

1          THE COURT:  But no other limitations?

2          MR. JERBICH:  No.

3          THE COURT:  As far as who the types of prospective

4    tenants that you are speaking with, what, generically, what

5    sorts of businesses are they in?  How would they use the

6    space?

7          MR. JERBICH:  We've had dialogue with an

8    international retailer that's expressed interest in one of

9    the floors.  A national retailer as well.  And there are

10   really opportunities even beyond that.

11         THE COURT:  Okay.  Such as?

12         MR. JERBICH:  Well, could be healthcare use,

13   there's a tech center being built nearby coming up.  It's a

14   73-year lease, Your Honor, so there's -- sky's the limit,

15   honestly.

16         THE COURT:  Well, it's a shopping mall, right?

17         MR. JERBICH:  It is.

18         THE COURT:  So, what would be the basis for it

19   being used for office purposes?  I'm assuming that's what

20   you mean when you say a tech center.

21         MR. JERBICH:  I just used it as an anecdotal

22   example.  There is office in the mall as well, right now.

23         THE COURT:  Of what size?  I mean, is it like back

24   offices for the Mall of America Corp. or office --

25         MR. JERBICH:  I want to say -- there's a full

Page 37

```
 1    campus building, 40- to 60,000sf of office space.  I don't

 2    have the exact size, Your Honor, but it's -- that wouldn't

 3    be a primary plan.  The primary plan would be for a retailer

 4    but we don't want to limit it because it's not limited

 5    within the REA.

 6              THE COURT:  Okay.

 7              MS. ALBANESE:  Your Honor, may I have a couple --

 8              THE COURT:  Sure, if you want -- a redirect?

 9              MS. ALBANESE:  -- minutes to redirect?  Yeah.

10              THE COURT:  Sure.

11              MS. ALBANESE:  Thank you.

12               REDIRECT EXAMINATION OF MICHAEL JERBICH

13    BY MS. ALBANESE:

14    Q    Mr. Jerbich, can you describe what the lease requires

15    the tenant to pay and the additional security that you

16    mentioned that Transform has offered to MOAC?

17              THE COURT:  Well, I have that in his direct

18    testimony.

19              MS. ALBANESE:  Okay.

20              MR. JERBICH:  Okay.

21              MS. ALBANESE:  Okay.

22    Q    Just one point of clarification.  You had mentioned

23    that it was a one-year letter of credit, but I believe

24    that's not accurate.  Can you just clarify what the one-year

25    security --
```

1    A    We would escrow a one-year security with taxes, CAM,

2    insurance, and rent.

3    Q    Okay, which adds up to?

4    A    About $1.2 million.  $1.1m, $1.2m.

5    Q    Thank you.

6    A    Full financial obligation.

7    Q    Okay.  Thank you, Mr. Jerbich.

8          THE COURT:  Any redirect?

9          RECROSS-EXAMINATION OF MICHAEL JERBICH

10   BY MR. FLYNN:

11   Q    You know, there is an office building attached to the

12   mall.  It's not in the mall.  Is that correct?  Do you know

13   that?

14   A    It's attached, okay.

15   Q    It's not --

16   A    It's on the campus.

17   Q    It's not in the mall.

18   A    It's on the campus, correct.

19   Q    There's also hotels attached to the mall, but not in

20   the mall.

21   A    Okay.

22   Q    And you are required, according to your own testimony,

23   to be limited to a first-class retail operation not inimical

24   to the mall.  You quoted that in your own testimony, is that

25   right?

Page 39

1    A    Not -- yeah, and I walked many malls in the last year

2    and there's a variety of uses within a mall in 2019.  In

3    first-class malls.

4    Q    In your declaration, did you give any testimony -- you

5    didn't give any testimony other than -- you can -- how you

6    would protect the mix of retail clients at the mall.  How

7    you would do that.  You didn't give any testimony to that

8    effect.

9    A    I didn't because I do not believe our REA or lease

10   requires us to.

11   Q    Well --

12   A    In fact, it specifically allows us for virtually any

13   lawful use.

14   Q    "Retail not inimical to the mall."

15   A    Not inimical to the mall, correct.

16   Q    And also, the lease requires that any use be in harmony

17   with the other tenants in the mall.  Is that right?  Is that

18   right?

19   A    Can you point me to that specific portion of the REA?

20   Q    Prohibitions, on Part D of the lease.  Have you read

21   the lease?

22   A    Can you tell me which MOAC tab that is?

23        MR. CHESLEY:  It's 1.

24        MR. JERBICH:  It's 1?

25   Q    Tab 1.  In the -- excuse me, it's in the REA.

Page 40

1   A    Okay.

2           MR. CHESLEY:  So, 3.

3           MR. JERBICH:  Three, thank you.

4   Q    Page 55.  Prohibitions.

5   A    Yeah, I'm reading it.  It says: "in harmony with the

6   development of operation of a first-class regional shopping

7   center containing," and it goes: "air conditioned mall,

8   hotels, family entertainment center, not limited to the

9   following," and it goes on.  Is there a specific -- we don't

10  plan on putting (indiscernible).

11  Q    You understand that whatever you put in there has to be

12  in harmony with the rest of the mall.  You understand that,

13  correct?

14  A    It says: "which use or operation is obnoxious to or out

15  of harmony with the development or operation of a first-

16  class regional mall."  We have no intention of doing

17  anything that's not in line with what a first-class mall

18  would have.

19  Q    But you have no proposal for anybody that -- all right.

20          MR. FLYNN:  That's all I have.

21  A    It's a 73-year lease.  We don't have one today, we said

22  that.

23          MS. ALBANESE:  Your Honor, just one point.  I just

24  wanted to point the witness to Section 22(c) of the REA just

25  to clarify one point that Mr. Flynn had said, and that's on

Page 41

```
 1   --
 2              THE COURT:  Well, you mean ask him a question
 3   about it or you just want to point it out?
 4              REDIRECT EXAMINATION OF MICHAEL JERBICH
 5   BY MS. ALBANESE:
 6   Q    Does the REA permit non-retail use?  Could you look at
 7   Section 22(c) of the REA?
 8   A    Do you have a page on that, Rachel?
 9   Q    It's 126 of the REA.
10   A    As I look, I do recall reading that it does, but let me
11   confirm.  That is correct.
12              MS. ALBANESE:  Thank you.
13              MR. FLYNN:  What section?  Excuse me, what --
14              MS. ALBANESE:  22(c) of the REA.
15              MR. FLYNN:  What page?
16              MS. ALBANESE:  Page 126.
17              MR. FLYNN:  Okay.  Just so they're clear, the only
18   non-retail activity you can do there is as reasonably
19   incidental to your retail activity.  That's what it says.
20              MR. JERBICH:  I mean, just in the mall itself, you
21   have a Crayola exhibit, you have a roller coaster, you have
22   a miniature golf course.
23              MR. FLYNN:  I'm talking about what you're bound
24   by.  This REA --
25              THE COURT:  This provision, i.e., Provision 22(d).
```

Page 42

1          MR. JERBICH:  And so, what was your question

2     again?  I apologize.

3          MR. FLYNN:  You're bound by this and it does --

4          MR. JERBICH:  We're bound by the REA, yes.

5          MR. FLYNN:  And it requires only non-retail

6     activities that are reasonably incidental to a retail

7     activity.  For instance, an ATM machine or something like

8     that.  That's all it was.  You're required to do retail.

9          MR. JERBICH:  I don't believe that's --

10         MR. FLYNN:  Well, we can --

11         MR. JERBICH:  -- that we're required to do retail

12    there.

13         THE COURT:  Well, you all can point me to the

14    relevant sections.  Okay, any more questions?  All right,

15    you can step down, sir.

16         MR. JERBICH:  Thank you, Your Honor. .

17         MR. CHESLEY:  Next witness, Your Honor, is Roger

18    Puerto, and Mr. Martin will handle his testimony.

19         THE COURT:  Okay.  Would you raise your right

20    hand, please?  Do you swear or affirm to tell the truth, the

21    whole truth and nothing but the truth, so help you God?

22         MR. PUERTO:  I do.

23         THE COURT:  Could you spell your name for the

24    record?

25         MR. PUERTO:  R-O-G-E-R, last name Puerto.  P as in

Page 43

1    Paul, U-E-R-T-O.

2              THE COURT:  Mr. Puerto, you submitted the

3    declaration dated August 18th, intended to be your direct

4    testimony in this proceeding.  Sitting here today, is there

5    anything that you'd like to change in it?

6              MR. PUERTO:  No.

7              THE COURT:  And you understand it is your direct

8    testimony?

9              MR. PUERTO:  Yes.

10             THE COURT:  Okay.  All right.  Any cross?

11             MR. FLYNN:  Your Honor, I'd like to voir dire the

12   witness for the purpose of making an objection.

13             MR. MARTIN:  Your Honor, before -- just a

14   housekeeping matter before that.  Craig Martin, for the

15   record.  Paragraph 7 and one sentence of Paragraph 8 were

16   redacted and filed under seal, and we've discussed with the

17   witness, and I've discussed with Mr. Flynn that the key

18   parts there are the actual numbers, so we may use the

19   terminology -- the numbers in Paragraph 7 or the number in

20   Paragraph 8 so that we can avoid actually stating the sealed

21   information and not have to worry about sealing the

22   courtroom or taking any further action.

23             THE COURT:  Okay.  That's your understanding too,

24   Mr. Flynn?

25             MR. FLYNN:  Yes, Your Honor.

1              THE COURT:  Okay.  All right, so, you can go

2      ahead.

3                        VOIR DIRE OF ROGER PUERTO

4      BY MR. FLYNN:

5      Q     In Paragraph 7, you state that: "appraisals were

6      conducted," is that correct?

7      A     Yes.

8      Q     Did you do those appraisals?

9      A     No.

10     Q     Have those -- those appraisals haven't been submitted

11     into evidence to the Court?

12     A     Not to my knowledge.

13             MR. FLYNN:  I move to strike references to the

14     appraisals as hearsay.

15             MR. MARTIN:  Would you like a response, Your

16     Honor?

17             THE COURT:  Sure.

18             MR. MARTIN:  Initial point is, we're not offering

19     Mr. Puerto as an expert on valuation.  We're offering him as

20     a fact witness.  He is stating that he is aware that

21     appraisals have been done and an aggregate value reflect the

22     amount of value represented, and certainly, the testimony is

23     then designed to reflect the process that he's undertaking

24     to maximize that value.  And I believe is testimony will be

25     focused on his actions and his increase in that value.  And

Page 45

1    so, we're not offering the fact of the appraisals for the

2    truth of the matter asserted, but just that they've been

3    done and they create a -- as a matter of fact, that they

4    have been done; as a matter of fact, they contain an

5    aggregate value.  So, I would request that the Court permit

6    the statements in Paragraph 7.

7               THE COURT:  Okay.  Well, he's clearly not offered

8    as an expert on valuation and I won't take this -- these

9    dollar amounts as the value of the portfolio but simply as

10   evidence that Transform believes that it has a valuable

11   portfolio and that it's seeking to realize it.

12              MR. FLYNN:  Thank you, Your Honor.

13   Q    I would also like to talk about Paragraph 8.  You

14   testified that Transform could sell over -- or excuse me, a

15   certain dollar amount, that's the second sentence in Part 8.

16              MR. FLYNN:  I would move that removed -- object to

17   that as speculation and not a fact.

18              MR. MARTIN:  Would you like a response to that,

19   Your Honor?

20              MR. FLYNN:  And we could tie these together, Your

21   Honor.  And it goes on to say in addition, Transform could

22   potentially sell, and then it gives a number, worth of

23   unencumbered property as well.  That is pure speculation.  I

24   move it be stricken.

25              THE COURT:  Well, you can ask him about it and how

1    he came up with that.  I don't see it as pure speculation.

2    I mean, you can question him on the basis for why he

3    believes that.

4            MR. FLYNN:  All right.

5            THE COURT:  And again, knowing that he's not an

6    expert.

7            MR. FLYNN:  Well.  And again, I would -- well, if

8    --

9    Q    You are attempting to sell certain assets of TransCo,

10   is that right?  Or monetize them?  Is that what you're

11   trying to do?

12   A    Yes.

13   Q    Has that been completed?

14   A    No, it says it's potentially what could be sold over

15   the next six months, so they have not been completed.

16   Q    But as you sit here today under oath, you have no idea

17   what you're going to sell, isn't that right?

18   A    No, I have an idea based on the numbers that I put in

19   the declaration based on the pipeline of deals that I have,

20   or in the process of negotiating with various buyers.  They

21   could or could not happen.  But, based on a degree of

22   certainty, I'm comfortable saying in the next six months,

23   this is what we can sell, based on the pipeline and just in

24   general, the way I've been selling real estate for the past

25   18 months prior.

Page 47

1    Q    But you don't know for a fact that that's going to

2    happen, as you sit here today in Court under oath?

3    A    It's not -- I don't know for a fact.  It's real estate.

4    Anything could change in a single day.

5    Q    Thank you.

6    A    Yeah.

7    Q    And then you say --

8            MR. FLYNN:  I would like to raise an objection to

9    Paragraph No. 9, Your Honor.

10   Q    Therein, you state that: "The Mall of America, MOAC, as

11   a landlord, is rarely concerned with the ability of

12   Transform to meet its continued financial obligations.

13   Rather, they are principally concerned with extracting

14   value."

15   A    That's my opinion.

16   Q    You don't know that.  That's not a fact.

17   A    I don't know the specific mall, but in general, based

18   on how I've sold real estate, that is usually the case.  No,

19   I don't --

20           MR. FLYNN:  I would move to strike that is pure,

21   inappropriate opinion about the mind of my client.

22           THE COURT:  Well, it's also the opinion of several

23   (indiscernible) decisions by bankruptcy judges, so I'll deny

24   that motion.

25   Q    Are you in charge of getting tenants at the mall?  Are

Page 48

```
 1    you working with Mr. Jerbich on that, or?

 2    A    No, I'm not in charge of getting tenants.

 3    Q    The mall will testify that they'll put an anchor tenant

 4    in there for almost no rent.  Would they make a lot of money

 5    and grab the equity out of your lease?  Does that make them

 6    evil or inappropriate?

 7    A    No, but it's possible they'll save on co-tenancy issues

 8    that would have to, if they didn't put a department store

 9    there.  And that could be significant.

10    Q    But we know that Transform Co. cannot afford to put an

11    anchor tenant in there because the rent would be so low,

12    they couldn't make any money on it.  Isn't that right?

13    A    Well, we don't have to put an anchor tenant in there.

14    Q    Well, you can't afford to.

15              MR. MARTIN:  Your Honor, objection.  Assumes facts

16    not in evidence and it's asking for financial --

17              THE COURT:  No, I know -- differently, is it your

18    -- based on your experience, Mr. Puerto, would, quote, "an

19    anchor tenant" only be likely to agree to a long-term

20    sublease of this space at issue if it paid de minimis rent?

21              MR. PUERTO:  If an anchor tenant was not going to

22    pay rent here and there was the demand to put the anchor

23    tenant there, it would likely go there because it's a great

24    property, great mall.

25              THE COURT:  No, I'm saying something differently.
```

1           MR. PUERTO:  Sorry, can you rephrase the question,

2     then?

3           THE COURT:  Obviously, if you offered de minimis

4     rent, that would be attractive.  But if you were, instead,

5     offering a substantial rent.  I don't even know what that

6     would be, but a substantial rent --

7           MR. PUERTO:  Right, right, I understand.

8           THE COURT:  -- is it conceivable that any anchor

9     tenant would take that deal?

10           MR. PUERTO:  If you were to put a significant

11     amount of capital into it to support the rent.  I mean, it's

12     -- it, again, comes down to the real estate, the quality,

13     where it's located, for an anchor to make a decision to be

14     there.  There's not that many anchors today that are taking

15     177,000sf.  You know, the highest and best use for this real

16     estate is probably not an anchor.  For them, it could be,

17     but for us, it likely would not be, because we look for

18     tenants that would pay higher rents.

19           THE COURT:  Okay.  I phrased that question as I

20     thought you were asking it, but you can go ahead.

21           MR. FLYNN:  No, that's...

22     Q    So, Transform Co. would like to reap the benefits of

23     the equity in this lease by getting highest rents as

24     possible and keep the difference.  Is that right?

25     A    It's -- if we wanted to maximize value in the real

1    estate, that would be the process to undertake.

2    Q    If there was an anchor tenant available for de minimis

3    rent, that'd be an excellent fit for the mall, you wouldn't

4    agree to that, would you?

5    A    Not if it didn't maximize the value of the real estate.

6    Q    Yeah, right.  So, you're interested, primarily, in

7    getting money.  Not necessarily the mall, as I think it was

8    concluded.

9    A    Can you rephrase that?  Sorry.

10              MR. FLYNN:  Never mind.  I have no further

11   questions, Your Honor.

12              THE COURT:  Okay.  Any redirect?

13              MR. MARTIN:  No, Your Honor.

14              THE COURT:  Okay.  You can step down.

15              MR. PUERTO:  Thank you.

16              MR. CHESLEY:  That would conclude Transform's

17   evidence, Your Honor.

18              THE COURT:  Okay.  And obviously, I have the

19   agreed exhibit --

20              MR. CHESLEY:  Agreed exhibits which have been

21   admitted and stipulated as fact.  Yes, Your Honor.

22              THE COURT:  Okay.  You may proceed with your

23   witnesses.

24              MR. FLYNN:  Your Honor, we'd like to move, at this

25   time, under Rule 52, for partial findings against the

Page 51

1   Plaintiff -- against the Debtor.  They have failed in their

2   burden of proof; which they admit they have to prove

3   adequate assurance of future financial ability and adequate

4   assurance of future performance.  They -- performance means

5   not financial performance, it means operational performance.

6   Is the tenant able to drive tenants to the mall?  Do they

7   have a substantial advertising budget?  Do they -- and this

8   is all cited in the cases, which I'm sure you could read or

9   are well aware of.

10         THE COURT:  Actually, I have not seen that cited

11   in a case, so I'd like you to cite them to me.

12         MR. FLYNN:  Can I have the brief?  Well, I will

13   cite those.  I will -- we have filed a brief with the Court,

14   which has these cases in there.

15         THE COURT:  Well, then you better cite me to the

16   specific provisions in the cases, because I didn't see that.

17         MR. FLYNN:  Well, all right.

18         MAN:  You don't have to do it now.

19         MR. FLYNN:  All right.  There are a number of

20   cases that we've cited, and I can go quickly through them,

21   including the Third Circuit, which requires adequate -- that

22   performance drive -- to do a number of things to aid or fit

23   in with the harmony of the mall and the tenant mix.  They

24   have given no evidence that they're able to comply with

25   what's required for tenant mix.  They've given not -- that

1    is a requirement under the code.  They are required to show

2    operating performance equal to -- similar to that Sears at

3    the time they entered into the lease.  We went into that

4    extensively in our briefs, operating performance, and they

5    have presented no operating performance because they don't

6    intend to operate.  They're going to try to find somebody to

7    operate, and all we can do is speculate on what operation

8    performance might be in the future.

9            However, I see nothing in the code that says they

10   can prove that at a future date.  They have to prove today

11   what the operating performance will be.  They can do certain

12   things at a future date.  If they are dark, they get some

13   reasonable time to reopen.  But they can't come into court

14   today and say, don't worry about operating performance or

15   tenant mix.  We'll fix that later.  And those are rights in

16   addition to the rights under any lease, because they don't

17   refer to the -- they're required to be in a lease or

18   (indiscernible).

19           THE COURT:  You're aware that there are several

20   cases in this District that disagree with that latter

21   proposition, including in re Ames Department Stores, 127

22   B.R. 744, (Bk. SDNY 1991)?

23           MR. FLYNN:  I'm aware that there's a mix in case

24   law on this, but there's no -- the operating performance is

25   a requirement of the code, and they presented nothing, and

1   cannot present anything because they're not going to

2   operate.  It's not something.  They presented nothing.  They

3   have nothing to present.  They don't have a tenant to go in

4   there.  They just say, let us rent it and trust us.  We'll

5   do this -- we'll fix -- don't worry, it'll be okay.  We have

6   no evidence of anything.  They are required to show, first

7   of all, they gave us the Reicher declaration, which had

8   exhibits.  We only got the exhibits, and the exhibits given

9   to us for adequate assurance state right on them that they

10  can't be relied upon for any reason and cannot be used for

11  assurance of anything.  That word is used.

12          They simply have no current -- it's unbelievable

13  to me that they can't provide financial information, which

14  is adequate, appropriate, and makes some sense.  They have -

15  - we read that; we can't even believe it.  What are we

16  supposed to -- what are we supposed to be assured about?  We

17  are the opposite of assured.  The Reicher himself said if

18  they don't sign all these leases, they're going to go out of

19  business.  We don't know the status of the business or what

20  happened to the assignments.

21          THE COURT:  Do you dispute that, in addition to

22  the $10 a month rent, the aggregate amount payable under the

23  lease, with a reasonable estimate for the taxes, is

24  approximately $1.1m to $1.2m a year?

25          MR. FLYNN:  Yes, we do.  That's approximately

1    correct.  That's correct.

2            THE COURT:  I'm sorry, you do dispute that or you

3    do --

4            MR. FLYNN:  We do agree with that.

5            THE COURT:  Okay.

6            MR. FLYNN:  And, just a minute here, Your Honor.

7    So, we don't know how -- and if the Court wants to rule that

8    they don't have to be equal to or similar to Sears, our

9    position is, they haven't come close -- they haven't really

10   proven anything.  They have no adequate, reasonable,

11   appropriate financial evidence.  They have no evidence at

12   all about operations of any kind, and in fact, specifically

13   state they're not going to operate and may not have to -- in

14   their briefs and in their declarations, for as much as two

15   years, this thing will be dark, and they can do anything

16   they want.  We can go through all the provisions in the

17   code.  There's many others that weren't -- but have been

18   submitted in the exhibits, that limit their ability on what

19   they can do with that property, even under the lease.

20           There's many others that weren't -- but have been

21   submitted in the exhibits, that limit their ability on what

22   they can do with that property, even under the lease.  But

23   in any case, they haven't come close to meeting the burden

24   of proof that gives adequate assurance of future financial

25   performance and operating.

1          THE COURT:  Under the lease, do they have to

2     operate a store?

3          MR. FLYNN:  Yes.  I think they do, but they might

4     have time.

5          THE COURT:  And what provision -- I'll read it at

6     -- obviously, the lease incorporates the REA.  What

7     provision are you relying on for that?

8          MR. FLYNN:  I'm going to let my partner, Mr.

9     Beeby, kind of go through the lease provisions and the REA

10    provisions if the Court has questions about those.

11         THE COURT:  Okay.

12         MR. BEEBY:  Good morning, Your Honor.  My name is

13    Alex Beeby.  I'm also at Larkin Hoffman.  With regard to

14    remaining dark, and I'm sure you've read all of the

15    pleadings, and there is reference to the idea that the Sears

16    space can go dark in the REA, which is true: it can go dark.

17    But the REA does not necessarily permit the space to stay

18    dark.  With regard to the provision that allows the space to

19    go dark, and let's see here, I believe it's Page 143 of the

20    REA, which is Section 25(d)4, explicitly says that: "At all

21    times," which, just to put it into context, it says: "After

22    the major operating period of Sears," this is after the

23    initial 15 years, "Sears shall have the right without

24    developer's consent but at all times subject to the

25    applicable provisions of Article 22 hereof to vacate the

Page 56

1    lease," and then it goes onto the 50 million aspect, which

2    I'm sure will come up later.

3            If we turn back to Article 22, that is

4    specifically incorporated into that provision, I believe it

5    is on -- let's see, here.  Let me find the exact page, here.

6    That section starts, 22(c), starts on Page 123 of the REA.

7    And then on 126, which was referenced previously on the

8    stand, it requires that the use be not -- this is where the

9    section comes up, for any use or purpose -- "shall not be

10   used for any purpose other than retail purposes customarily

11   found in a closed mall shopping center, and non-retail

12   activities customary incidental thereto, or such use and

13   purposes that are not compatible and consistent with, and

14   are not detrimental, injurious, or inimical to the operation

15   of a first-class regional shopping center on each of the

16   three levels thereof."

17           While the REA does permit, at least temporary,

18   going dark, at some point, it's going to run into, within a

19   reasonable period of time, it's going to run into violating

20   this other provision that is explicitly incorporated into

21   Provision 25 of the -- or Article 25 of the REA and become

22   detrimental, injurious, and inimical to the operation of a

23   first-class shopping center.

24           THE COURT:  Okay, but that says that Sears and its

25   successors and assigns, right, it's not just Sears,

Page 57

1  "successors and assigns, shall not use the Sears building or

2  Sears tract for any use or purpose other than retail

3  purposes customarily found in and enclosed mall," and then

4  with the proviso, and then, in the language, "and are not

5  detrimental, injurious, or inimical to the operation of a

6  first-class regional shopping center," which precedes the

7  proviso.  So, then you go back to my question.  Sears

8  doesn't -- you don't have to have a Sears store there.  You

9  don't have to operate a Sears store there.  There has to be,

10  subject to the going dark right, which is -- you argue

11  there's some time limitation on it, although it doesn't

12  specify that, it just -- it gives the landlord two years to

13  exercise an option.

14         MR. BEEBY:  With regard to the third floor, yes,

15  correct.

16         THE COURT:  Right, right.  And then there's this

17  proviso that the assigns and/or Sears shall not use the

18  building other than for retail purposes, you know, as you

19  just read.

20         MR. BEEBY:  Right, right.  Yep, exactly.  And that

21  Section 9(d), which is that harmony provision, talks about

22  that.  that is a further definition or explanation of what

23  inimical -- what types of uses would be inimical, and then

24  there's a whole list of actually explicitly excluded uses as

25  well.

1              THE COURT:  Right.  That's the one that excludes -

2      -

3              MR. BEEBY:  Well, above it in Section C -- this is

4      Page 55 of the REA.

5              THE COURT:  Right.

6              MR. BEEBY:  Above it, it explicitly prohibits uses

7      for and office building, and then down below, it prohibits,

8      yeah, mobile home, trailer court park, auto body shop, pet

9      shops, that kind of stuff.

10             THE COURT:  Right.

11             MR. BEEBY:  Yup.

12             THE COURT:  But there's no provision, for example,

13     that says that there has to be an anchor store.

14             MR. BEEBY:  Well, you know, I think that does

15     actually come into play, here.

16             THE COURT:  Okay.

17             MR. BEEBY:  When you look at the aspect of what is

18     harmonious to the operation of a first-class shopping center

19     and what's going to impact the rest of the building, that

20     Section 22(a) puts into context that this space is being

21     envisioned as a department store, and then there are

22     provisions within --

23             THE COURT:  Does it?  Where does it say that?

24     (indiscernible) sophisticated partners (indiscernible).

25             MR. BEEBY:  Yeah, Section 22(a), which is on Page

Page 59

1    15, Covenance of Majors.  It talks about the parties agree

2    that it is in their mutual best interest the stores of the

3    majors be developed and maintained as department stores, and

4    this is key: "as an integral part of the shopping center to

5    permit the shopping center to contain a combination of

6    occupants which represent a sound and balanced

7    diversification of merchandise."

8            THE COURT:  But can you -- all right.

9            MR. BEEBY:  And at this point, I'm restricting

10   myself, I should say, to what is on the record at this point

11   because we're dealing with a motion on partial findings.

12           THE COURT:  Right.  But A is followed by B and C,

13   which deal with the specific anchor stores.

14           MR. BEEBY:  Yes, you're correct, Your Honor.  And

15   it provides the context.

16           THE COURT:  These are four very sophisticated

17   parties.  I would have thought that if the intention of C

18   was that an anchor store always be maintained,

19   notwithstanding the right to assign or sublet, they would

20   have said that.

21           MR. BEEBY:  Well, Your Honor, there's also other

22   provisions that come into play that would, absent the

23   bankruptcy-type setting, in which -- which, under the

24   bankruptcy-type setting, as the -- Transform has argued

25   would be a prohibition on assignments, but there are other

Page 60

1     provisions that could, absent this scenario, be used to

2     acquire that property back, if it was being held dark.

3             THE COURT:  Oh, acquire it back, yes.

4             MR. BEEBY:  Right.

5             THE COURT:  I understand that.  (indiscernible).

6             MR. BEEBY:  Right, and then be able to maintain

7     that control.

8             THE COURT:  But I actually read -- this is a

9     question for Transform's counsel.  I actually read

10    Transform, in one of its pleadings, stating that it is

11    prepared to live with the buyback option.

12            MR. CHESLEY:  Correct, Your Honor.  We will abide

13    by it.

14            THE COURT:  I mean, there are -- you're right,

15    there are cases that say that buyback options are

16    invalidated by 365, but I think they've said they won't

17    press that point.

18            MR. BEEBY:  And I would have to defer to -- with

19    regard to that...

20            THE COURT:  Okay.  All right.

21            MR. CHESLEY:  Your Honor --

22            THE COURT:  I don't think counsel's finished.  I

23    think he just was --

24            MR. CHESLEY:  Okay, I'm sorry.  I thought we were

25    done.

Page 61

1          THE COURT:  -- referring to his colleague to walk

2     me through the lease and the REA.

3          MR. FLYNN:  I would argue, too, for what it's

4     worth, is the decode itself in I think a number of the

5     cases, and we'll cite them, do not -- it doesn't say what's

6     in the lease.  It doesn't say or require that it be

7     protected by their lease.  It's an additional requirement

8     put in by Congress, if you intend to use Chapter 11, to get

9     these transactions done this way.  And they have chosen

10    Chapter 11 to get these transactions done this way.  They

11    are bound by the strict, reasonable readings of the law.

12    And whether or not it's in a lease, they are required to

13    show that they have adequate financial wherewithal and a

14    plan that makes some sense, and performance.  And they

15    simply can't do it, because there's nobody to be put in

16    there at this point and they don't know what will happen.

17         THE COURT:  Well, if the lease lets them operate

18    in a specific way, you're saying nevertheless, the Court

19    should provide some other gloss on operation?

20         MR. FLYNN:  Yes, and the thinking of that --

21         THE COURT:  Yeah?  Do you have any case that takes

22    that view?

23         MR. FLYNN:  Yeah, there's a number of them, but

24    they say --

25         THE COURT:  Okay, I just -- I'd be happy to be

Page 62

1    cited to one.

2                MR. FLYNN:  All right, yes, Your Honor.  I have it

3    marked up here on our brief.

4                THE COURT:  Okay.

5                MR. FLYNN:  The Casual Male, 120 B.R. 264 is one.

6    They require In Re Rikel, which was cited often, involved a

7    lease that allowed it to go dark.  I have the cite here, but

8    -- and the Court said, we're going to make you open within

9    six month, and you have to have a tenant that the landlord

10   will agree to.

11               THE COURT:  That's how you read Rikel?

12               MR. FLYNN:  Yes, I do.

13               THE COURT:  All right.  Okay.

14               MR. FLYNN:  Yes, I do.  In fact --

15               THE COURT:  So it's just the cases you cited in

16   your brief, no other cases for me?

17               MR. FLYNN:  I think there are other cases.  We

18   could come up with more, but that's a good start.  And

19   there's a Third Circuit case and -- so, yeah.

20               THE COURT:  Okay.

21               MR. FLYNN:  And others cited.  And Rikel, yeah,

22   involved a landlord that, the premises go dark, and the code

23   -- they sit under the -- because we think in the legislative

24   history, which we also supply to the Court, we have some

25   (indiscernible) cases in state that because landlords,

Page 63

1    they're taking rights away from them, special provisions

2    have been made for shopping centers to give them rights back

3    that they might not otherwise have, and it doesn't refer to

4    anything in a lease or protecting --

5             THE COURT:  Well, it does refer to the benefit of

6    the bargain, which one assumes is the contract they entered

7    into.  That's what the legislative history refers to.

8             MR. FLYNN:  Well, yeah, and it also refers to

9    destroying malls with improper mix of clients, destroying --

10   they -- no evidence of proper mix, and no evidence of

11   anything under -- they simply said, here's some financials

12   that aren't very worthy right on their face.  And then they

13   say, don't worry, we'll get a tenant.  Don't worry, it will

14   all work.  They have failed to date to meet their burden of

15   proof.

16           The cases are worried about whether or not a

17   tenant that they're proposing will be put into bankruptcy or

18   not have -- the tenant will go bankrupt.  We have no idea

19   who the tenant's going to be, so we have no idea if the

20   tenant is going to have actual financial wherewithal.

21   Because the damage is not that Transform necessarily go

22   bankrupt, but whoever they put in would go bankrupt.

23           THE COURT:  Well --

24           MR. FLYNN:  They've kind of jumped the rail

25   because they're not doing it the normal way.  They're taking

1    the assignment of it first and then saying, don't worry,

2    we'll get a real tenant later.  And so, when it's good for

3    them to say, you know, we're the tenant, they say that, and

4    they say, when it's not good for them, they say well, it's

5    this other person that we're going to get in the future.

6    Don't worry about it.  And so, which is it?

7                We are concerned about the tenant, we are

8    concerned there is no tenant, we are -- if it's going to

9    operate or do anything there.  We are concerned about the

10   tenant's ability to pay their rent, to go bankrupt, to do a

11   high-class job, to be -- we're concerned about all of that.

12   That's fine.  They have presented no evidence of what they

13   intend to do, except they say there's a lot of things we

14   could do, pretty much when and if we want.

15               THE COURT:  Is there a limitation in the lease on

16   the financial wherewithal of a prospective S&E or subtenant?

17               MR. FLYNN:  I don't know.  There's a -- I don't

18   believe there is.  However, however, the code does require

19   that.

20               THE COURT:  Well, and then I suppose -- I mean,

21   maybe I'm anticipating Transform's argument, but they will

22   say, I believe, that MOAC can rely on the restriction in

23   Paragraph 22C that it be consistent and compatible with the

24   operation of the first-class regional shopping center.  I'm

25   assuming that would include that if someone purports to be a

1   first-class operator, or an operator whose store would be

2   consistent for a first-class shopping center, that would

3   include some financial wherewithal.

4           MR. FLYNN:  Yes, yes.  And, but the point is, we

5   don't know who that is today.

6           THE COURT:  Well, no, but if they provide it, then

7   you could say, no, these people aren't -- they're not

8   consistent with the operation of a first-class shopping

9   center.

10          MR. FLYNN:  That's true, except I see nothing, and

11  our position would be that there's nothing in the code that

12  allows them to show (indiscernible) to that in the future.

13  They are required to show that today --

14          THE COURT:   Well, they're required under the

15  lease to show you in the future -- they would be.

16          MR. FLYNN:  There are many requirements in the

17  future under the lease.

18          THE COURT:  Right.

19          MR. FLYNN:  I'm referring to the code, and the

20  code doesn't say, don't worry about it, you can show later

21  whether they'll be adequate, there will be a proper mix.

22  Don't worry about it.

23          THE COURT:  Okay.

24          MR. FLYNN:  We'll leave that go.

25          THE COURT:  All right, but that just comes back to

1    the issue as to whether 365(b)(3) requires the Court to

2    determine, separate and apart from the contract, pursuant to

3    which adequate assurance of performance has to be shown --

4    or under which adequate assurance of future performance has

5    to be shown, i.e. that contract, that you have to look into,

6    generally, issues as to what makes up a proper mix or

7    balance in a shopping center, for example.

8            MR. FLYNN:  Well, and you've got to do that today,

9    and --

10           THE COURT:  Well, that's where we have a dispute,

11   I guess.

12           MR. FLYNN:  Okay.

13           THE COURT:  Again, I have yet to see a case that

14   says that, and I've seen several that go the other way.

15           MR. FLYNN:  So there are many cases that say that

16   you have to show how the tenant will drive customers to the

17   mall.

18           THE COURT:  Show me one.

19           MR. FLYNN:  I'll quote from it.

20           THE COURT:  Okay.

21           MR. FLYNN:  Just a minute, Your Honor.  One of the

22   leading cases -- I apologize, Your Honor.

23           THE COURT:  Okay.

24           MR. FLYNN:  In Re Joshua Slocum, that's a 922 F.2d

25   1801, (Third Circuit 1990), Congress in 1978, and again in

Page 67

1   '84, placed additional restrictions on assignment of

2   shopping center leases in order to protect the rights of

3   lessors and -- and here's the key phrase -- the center's

4   tenants.  And then it says, Congress -- and it doesn't say,

5   unless they (indiscernible) or didn't in the lease.

6   Congress recognized that -- of the unusual situation where a

7   lease assignment affects not only the lessor, but an

8   assignment shopping center to lease to an outside party can

9   have significant detrimental impact on others.  Okay?  So we

10  don't know what the impact will be unless we know --

11          THE COURT:  I read Joshua Slocum.

12          MR. FLYNN:  Okay.

13          THE COURT:  The issue that we're discussing is not

14  dealt with in Joshua Slocum.  Those are general statements

15  of the purpose of the law.

16          MR. FLYNN:  Okay.  All right, Your Honor.  And,

17  again, In Re Rikel, it says specifically that even though

18  there's no -- there's a go dark -- they're allowed to go

19  dark, they should -- they have to reopen within a reasonable

20  time and required them to do so within six months.

21          THE COURT:  But there was a specific prohibition

22  in the lease in Rikel about going dark.

23          MR. FLYNN:  Right.  Right.

24          THE COURT:  So, again, the issue (indiscernible)

25  there as to whether 365(b)(3) imposes conditions on the

1    parties that they didn't already bargain for.

2         MR. FLYNN:  In Rikel, I believe it had -- the

3    tenant had the right to go dark and the Court there

4    specifically said, you've got to open up.  I'm sure that

5    that's the case.  It specifically said that.  And in fact,

6    it's been acknowledged by the other side, and they've

7    offered to open up within two years in their pleadings.

8         Again, Casual Male states, and I quote, "The

9    assignee should have similar operating and financial

10   performance when all factors, including advertising,

11   aggressiveness, profit margins, growth potential, and other

12   indicia are weighed."  It doesn't say, just look at can they

13   pay the rent.  We don't protect tenants when we just say,

14   well, all they got to do is pay the rent, and that's what

15   Congress was intending to protect.  And I believe -- I

16   believe -- the Third Circuit has also agreed to that.

17        But they also concerned in -- about whether or not

18   a tenant will go bankrupt in the space again, and that would

19   be inimical to the mall and cause -- and that's under the

20   Bankruptcy Code.  They require that you show that the tenant

21   not be likely to go bankrupt, the one operating there.  If

22   there's another bankruptcy of that tenant, we are going to

23   be in trouble again.  We have no evidence of what they

24   intend to do and what tenant they have.  They have none.

25   They're allowed to just skip by all that and just say, don't

1    worry, we'll get you -- and just go by your lease.  We have

2    rights today that we would like to enforce, and we think

3    they're bound to comply with those rights.

4              THE COURT:  Okay.

5              MR. FLYNN:  Thank you, Your Honor.

6              MR. CHESLEY:  Your Honor, may I have just one

7    moment to confer with my client?

8              THE COURT:  Sure.

9              MR. CHESLEY:  Thank you.  Thank you, Your Honor,

10   for the courtesy.  Your Honor, may I propose that, to make

11   this even more efficient, we are happy to take their three

12   declarations without cross and go right to argument.  That

13   way, I can argue against the motion to dismiss on the

14   pleadings, as well as put our substantive argument before

15   the Court.  At this point, there's nothing that additional

16   cross from those three witnesses will add to the Court's

17   deliberation.

18             THE COURT:  Okay.

19             MR. CHESLEY:  Thank you, Your Honor.

20             THE COURT:  So let me just --

21             MR. CHESLEY:  Yes.

22             THE COURT:  I think what I would like to do before

23   you do that, though, is the following.  I have the

24   declarations by Mr. Frillman, Mr. Ghermezian, G-H-E-R-M-E-Z-

25   I-A-N, Mr. Hoge, H-O-G-E.  Are each of those gentlemen here,

1    present?

2              MAN 2:  Yes, Your Honor.

3              MAN 3:  Yes, Your Honor.

4              THE COURT:  Okay.  So, you can sit down.  I'm not

5    going to put each of you on the stand and go through what I

6    did to introduce each of the Debtor's -- Transform's two

7    witnesses, but I want you to consider that you're under oath

8    when I ask you all three of  these questions.

9              Each of you has submitted a declaration on behalf

10   of MOAC in this proceeding, and I have them in the exhibit

11   book.  They were submitted as your direct testimony in this

12   proceeding.  Being here today, would that continue to be

13   your direct testimony?  And, if not, is there anything that

14   you would like to change in the declarations?

15             MR. FRILLMAN:  No.

16             THE COURT:  No for Mr. --

17             MR. FRILLMAN:  Frillman.

18             THE COURT:  -- Frillman, so your direct is

19   testimony not going to change.

20             MR. HOGE:  Mr. Hoge.

21             THE COURT:  Mr. Hoge, I'm sorry, I mispronounced

22   your name.

23             MR. HOGE:  That's okay.

24             THE COURT:  Same answer?

25             MR. HOGE:  Same answer.

Page 71

```
 1              THE COURT:  Mr. Ghermezian?
 2              MR. GHERMEZIAN:  I'd like to explain, and I'd like
 3    to add to what I've submitted.
 4              THE COURT:  You'd like to add something to it?
 5              MR. GHERMEZIAN:  Yes.
 6              THE COURT:  Okay.
 7              MR. GHERMEZIAN:  I want to explain
 8    (indiscernible).
 9              THE COURT:  Are there -- do you want to talk to
10    him first, before he does that?  This is not a correction?
11    This is just an addition?
12              MR. GHERMEZIAN:  (indiscernible) more explain
13    (indiscernible) more (indiscernible).
14              THE COURT:  Do you want to have him supplement it?
15              MR. FLYNN:  Yes, Your Honor.
16              THE COURT:  Okay, so can you take the stand, sir?
17    Okay, I know I essentially did this already for you, but I'm
18    going to ask you to raise your right hand and I'm going to
19    put you under oath.  Do you swear or affirm to tell the
20    truth, the whole truth, and nothing but the truth, so help
21    you God?
22              MR. GHERMEZIAN:  I do affirm, yes.
23              THE COURT:   And it's Raphael G-H-E-R-M-E-Z-I-A-N?
24              MR. GHERMEZIAN:  That's correct.
25              THE COURT:  Okay, so do you want to ask him -- I
```

Page 72

1   understand, Mr. Ghermezian, that you wish to add to or

2   supplement your declaration that's otherwise serving as your

3   direct testimony?

4          MR. GHERMEZIAN:  That's right.

5          THE COURT:  Okay.

6          DIRECT EXAMINATION OF RAPHAEL GHERMEZIAN

7   BY MR. FLYNN:

8   Q   Okay, Mr. Ghermezian, how would you like to supplement

9   that, please?  Go ahead.

10  A   I just want to explain, Your Honor, there is a

11  misunderstanding here.

12         THE COURT:  You have to speak a little louder,

13  sir.

14  A   This is clear now?

15  Q   Yes.

16  A   I just want it clear that there is big misunderstanding

17  here.  The misunderstanding is that Mall of America is not

18  the shopping center.  It is not (indiscernible) usual or --

19         THE COURT:  If you're basing it on my language,

20  shopping center is the term that Congress uses in the

21  Bankruptcy Code.  I appreciate that it's not an A&P or a,

22  you know, shopping center like that.  I appreciate that it

23  has its own characteristics.  I'm just using that term

24  because that's the term Congress uses generically, and the

25  parties have all agreed that it fits within that term.

Page 73

1   A     Yeah, just please, you know, let me go ahead and

2   explain.  First of all, Mall of America is not a shopping

3   center.  It's a tourist attraction.  It draws -- Time

4   Magazine took a survey and explained and recorded that Mall

5   of America, there was more tourists (indiscernible) than

6   Disneyland, Epcot, and Grand Canyon combined.  The Mall of

7   America is a golden goose of Minnesota.  It lays golden eggs

8   of $3 billion annually for Minnesota, hires 13,000 people --

9   13,000 people.  It's -- I believe it is a huge asset of

10  Minnesota and the city that we are in.  If it fails, if it

11  fails, it would be a big loss to the state is what I think

12  the Court should consider.

13  Let me explain.  When we made this deal with Sears

14  Corporation, it was a huge corporation.  It was never

15  anticipated that one day, they were going to go bankrupt and

16  some scavengers are coming there and (indiscernible).  I'm

17  just going to make the best money I want only.  What I'm

18  trying to impress upon Your Honor is that the word

19  appropriate and the word -- what was the other they used,

20  appropriate and customary -- in this case is not -- is

21  different.  It has to be specific to this project.  What is

22  appropriate and customary for this project is that if Sears

23  does not operate as a department store, or if it does not

24  operate, it's closed door, it actually is right, actually

25  right, to a number of tenants, to terminate a lease.

1   Now, when these tenants, when these tenants today, the

2   retail situation in the country is very, very precarious.

3   It's very sensitive, and if tenants go, they go under

4   certain percentage, under 80 percent, which is very likely

5   to happen, as a result of that, almost every other tenant in

6   the project can leave.

7   Now, today, they may not leave that fast, but this gives

8   them an excuse to leave.  If the tenant leaves, the shopping

9   center is finished.  And, believe me, it's not

10  inconceivable.  They are leasing today (indiscernible).

11  They location where Sears today is, is at the end of two

12  malls.  On every corner similar to that, you have to have

13  (indiscernible) a department store.  City of Bloomington is

14  spending $270 million of their own money to build a project

15  attached to the mall.  If this mall fails, and believe me,

16  what happens to Sears can actually bring the mall down to

17  nothing.  This is not an exaggeration; it is real.  It's

18  true, this can happen.

19  I think in this situation, you should (indiscernible) a

20  special interpretation for appropriate and customary in this

21  case.  Appropriate and customary in this case is only

22  (indiscernible).  I think they should -- if you are not

23  going to disallow the assignment, and if you're going to let

24  them have the assignment, I think you should have a limited

25  time as to when they have to lease this, and it has to be

1    limited to department stores, because if we don't have a

2    department store, the mall could go down, because this is

3    the term in many of the leases.

4    Also, I think we should have an absolute right in this case

5    of approving (indiscernible).  Now, this really is not only

6    to add --

7              THE COURT:  So I'm going to cut you off, because

8    you're really just giving me legal argument at this point.

9              MR. GHERMEZIAN:  I know.

10             THE COURT:  Okay.  Do you wish to cross-examine?

11             MR. CHESLEY:  I'm sorry, Your Honor, I think I

12   have to just on a couple points.

13             THE COURT:  Okay.

14              CROSS EXAMINATION OF RAPHAEL GHERMEZIAN

15   BY MR. CHESLEY:

16   Q    Just briefly, Mr. Ghermezian -- actually, good

17   afternoon.  Quickly, with respect to department stores in

18   the mall, am I correct there was a Bloomingdale's in the

19   mall that closed in 2012?

20   A    Yes.  We had four department stores, but our

21   contractual obligation to the tenants was only three.  So

22   Bloomingdale's didn't have any effect, but Sears will

23   actually bring the mall down.

24   Q    Thank you, I'll -- let me -- if you could just answer

25   my question, I would appreciate it.  There was a

Page 76

1   Bloomingdale's in the mall that closed in 2012, correct?

2   A    Yes.

3   Q    And that was replaced by a combination of several

4   different stores, correct?

5   A    Yeah, because we had no obligation to have four

6   department stores, only three department stores.

7   Q    To answer my question, the Bloomingdale's space was

8   carved up into several different new tenants, correct?

9   A    That's correct.

10  Q    Including the Crayola Experience, correct?

11  A    Yes.

12  Q    And the Bloomingdale's store closed in 2012, correct?

13  A    Yes.

14  Q    And that space was finally fully sublet by 2016, May of

15  that year, correct?

16  A    I don't believe.  I think we gradually leased this

17  space.

18  Q    When did the Crayola Experience open?

19  A    I don't know, I think like a couple years ago.

20  Q    Okay.  Now, you described this Sears location at the

21  end of two courts.  That's a valuable store location, isn't

22  it?

23  A    It's not a valuable store location.  It's an important

24  position for the mall because every leg of the mall survives

25  by the anchor that is anchoring those legs.  Now, Sears is

1    anchoring two legs of the mall, and if Sears goes dark and

2    stays dark long, or -- that's why we said that whatever

3    you're doing that lease, it cannot be injurious to us, and

4    it cannot harm us.  This will harm completely.  Really,

5    really, I'm telling you, there is the chance of better than

6    80 percent that (indiscernible) if Sears brings tenants

7    other than department store or goes dark and stays dark for

8    a long time.

9    Q    You want the location back, don't you?

10   A    I want the location back because I (indiscernible)

11   department store there.

12   Q    In fact, you're in negotiation with a department store

13   to take this space, aren't you?

14   A    Pardon?

15   Q    Aren't you in negotiations with another department

16   store to take the space?

17   A    Yes.

18   Q    And, Mr. Ghermezian, am I right?  In your declaration,

19   you refer to that there were many tenant leases at the mall

20   that require that a department store be operated in the

21   Sears space, correct?

22   A    Yes, that is --

23   Q    Those are called co-tenancy clauses, aren't they?

24   A    I believe (indiscernible), yes.  We have to have the

25   department store, or else they can terminate their lease.

Page 78

1   And today, because of (indiscernible), the chances are very

2   high that we would get (indiscernible).

3   Q    So in fact, that will impact you, the landlord, if

4   there is not a department store operating in the Sears

5   location, correct?

6   A    Not just the landlord, the project itself, the

7   viability of the whole project.

8   Q    Well, there are tenants that can either cut their lease

9   payments or cancel their leases if in fact there isn't a

10  department store in there, correct?

11  A    They can tell me they leave, yeah.

12  Q    Yeah.  Sears isn't party to any of those co-tenancy

13  provisions, are they?

14  A    What happens in Sears cannot be injurious, it says in

15  the lease, cannot be injurious to the mall and cannot -- it

16  has to be compatible.  It has (indiscernible) with the other

17  tenants.  So the only thing that will be compatible and will

18  not injure the mall is going to be a department store, and

19  there are lots of department stores.  You can have Sacks,

20  you can Neiman Marcus, you can have Bloomingdale would still

21  today come back, because they have had the situation, the

22  tenants left and they come back 10 years later.  Today, the

23  situation in Minnesota (indiscernible) that.  You can have

24  Bealls, you can have (indiscernible), you can have -- I can

25  give you a list of 10 department stores.  And, believe me,

1   we can make a deal with one of them.  I can make a deal for

2   you, and it can have all the benefit (indiscernible).

3   (indiscernible) yours, but they have to -- whatever cost

4   there is involved, you have to share with us (indiscernible)

5   the cost.

6           MR. CHESLEY:  Your Honor, I'd like to move to

7   strike that answer as simply not responsive to the question.

8           MR. GHERMEZIAN:  What was the question?

9           THE COURT:  I won't do that.  That's --

10          MR. FLYNN:  Thank you, Your Honor.

11  Q    Just so I'm clear, you do not want any of these other

12  tenants to invoke their co-tenancy provisions.

13  A    That's right.  That's the argument.

14  Q    Thank you.  Nothing further.

15          RE-DIRECT EXAMINATION OF RAPHAEL GHERMEZIAN

16  BY MR. FLYNN:

17  Q    Are there available anchor tenants that go into that

18  space?  Are they available?

19  A    Yes.

20  Q    Okay.  Are the anchor tenants generally -- would that

21  be best for the space and best for the mix of the mall?

22  A    That is not just best.  I think that it absolutely

23  essential for the mall because it's in an anchor position,

24  and tenants in both legs that leased this position, they are

25  dependent on who is in there (indiscernible) anchor tenant.

1    And we have an obligation to tenants in the mall, in

2    writing, that this -- that we have to have three department

3    stores.  That's why, when Bloomingdale's left, we didn't

4    care, because the obligation was only three.

5    Q    Right.  Are you willing to rent to an anchor tenant for

6    very low rent, and even possibly pay an anchor tenant to

7    come to the mall?

8    A    Basically, I'm willing to lease to an anchor tenant for

9    no money, no rent, nothing.  And (indiscernible), I mean, to

10   the extent I'm prepared to actually pay a tenant and

11   guarantee them that they make a profit.  In other words, if

12   they lose, I pay them money every year for the rest of the

13   lease to just (indiscernible) yeah.

14   Q    And is that the current market for anchor tenants?  Is

15   that pretty much what you have?

16   A    Yes, (indiscernible) sign anchor tenants, they will

17   actually guarantee -- guarantee -- that they're going to

18   make a $4 to $8 million profit every year.  In other words,

19   if they don't make that, it have to come out of our pocket.

20   And they're negotiating now that a tenant (indiscernible)

21   also guaranteed them that they're going to make profit, and

22   they're only giving us a percentage (indiscernible).

23   Q    All right.  Thank you.  Anything further?

24   A    No.

25   Q    Thank you.

Page 81

1           THE COURT:  Okay, you can step down, sir.  Okay,

2      so --

3           MR. FLYNN:  Excuse me, Your Honor?  May I talk to

4      my witnesses?  We may want to address issues that were

5      brought up that aren't in their declarations.

6           MR. CHESLEY:  I would object to that, Your Honor,

7      on -- and I don't want to be too technical here, but their

8      direct was on.  I did not cross.  We gave Mr. Ghermezian the

9      benefit of the doubt there, which maybe we shouldn't have,

10     but we did.  But to now allow an additional direct, when

11     we've decided no need to cross, I think is actually

12     improper.

13          THE COURT:  Well, you're saying you're putting

14     them on in rebuttal?

15          MR. FLYNN:  They brought up issues and made --

16          THE COURT:  I'm just asking if you'd put them on

17     in rebuttal.

18          MR. FLYNN:  I'm putting on my case.  I'm putting

19     them on in my case.

20          THE COURT:  No, no, that's a different story.

21          MR. FLYNN:  All right.

22          THE COURT:  I would let you put them on in

23     rebuttal to, you know, the statements that were made on

24     cross by the Transform witness.

25          MR. FLYNN:  Yes, Your Honor, essentially that's

1    correct.  It is correct.

2              THE COURT:  We got into this position because Mr.

3    Chesley wanted to cut through to final argument on this,

4    rather than having two oral arguments.  I guess I'll have to

5    give you my ruling on your motion based on the Debtor's

6    pleading then, unless you want to just defer that to the

7    end.

8              MR. FLYNN:  Yes, Your Honor, we will defer to the

9    end.

10             THE COURT:  Okay.  All right.  Very well.  So you

11   can put them on in rebuttal, or some -- you don't have to

12   put them all on, whoever you want to put on in rebuttal.

13             MR. FLYNN:  Mr. Frillman?

14             THE COURT:  Please sit down.  I'll swear you in,

15   even though you're probably already viewing yourself as

16   sworn in.  Would you raise your right hand, please?  Do you

17   swear or affirm to tell the truth, the whole truth, and

18   nothing but the truth, so help you God?

19             MR. FRILLMAN:  I do.

20             THE COURT:  And it's F-R-I-L-L-M-A-N?

21             MR. FRILLMAN:  Yes, sir.

22             THE COURT:  Louis Frillman.

23             MR. FRILLMAN:  Yes, sir.

24             THE COURT:  Okay.

25                 DIRECT EXAMINATION OF LOUIS FRILLMAN

Page 83

1    BY MR. FLYNN:

2    Q    Well, Mr. Frillman, you were in the Court this morning

3    when testimony was given by the Transform (indiscernible),

4    is that correct?

5    A    Yes, sir.

6    Q    Did anything that you heard from them change your mind

7    about your opinion?

8    A    No.

9    Q    Did they raise any issues not addressed in your

10   declaration that you'd like to elaborate on?

11             MR. CHESLEY:  Your Honor, I'm going to object.

12   This is not rebuttal, Your Honor, with all due respect.

13             MR. FLYNN:  He's going to discuss issues not

14   raised in his declaration, brought up this morning.  That's

15   rebuttal.

16             THE COURT:  Well, you can answer the question.  I

17   may cut you off, depending on what you're saying, okay?

18   A    Can you repeat, sir?

19   Q    Did you hear anything this morning that was said in the

20   testimony that was not addressed in your declaration, either

21   at all or sufficiently, that you would like to comment

22   further on?

23   A    Yes.

24   Q    What areas would that be?

25             MR. CHESLEY:  Same objection, Your Honor.

1          THE COURT:  Well, let me hear the answer first.

2     A     There's a -- somebody said the word confusion or

3     misunderstanding, Mr. Ghermezian, I think.  The documents

4     that have been presented to the Court and that we reviewed

5     as a part of this process are a presentation of the so-

6     called financial condition of the operating entity known as

7     Transform or Transform Co, which is going to hold assets

8     that have evolved out of the Sears bankruptcy.  And that

9     means stores, 425, which I guess is now reduced to about

10    400, operating stores doing something with the Sears brand

11    name and trademark, and that's posited as the, you know, as

12    the underlying argument to allow this process to go forward.

13         THE COURT:  I'm sorry, this is not rebuttal.  I

14    don't know where you're going, but this is something,

15    frankly, that is legal argument.  It mischaracterizes the

16    direct testimony, and I'm going to not allow it.  This is

17    ridiculous, honestly.

18         MR. FLYNN:  Is there --

19         THE COURT:  The direct testimony was that they

20    were a real estate company, and that's what your Counsel is

21    relying on in saying that this motion shouldn't be granted.

22    There was no testimony about the 425 stores, or anything

23    like that, that wasn't something that you could have

24    addressed in your declaration.

25         So, just, enough.  Is there anything else you want

1    to address, besides that point?

2              MR. FRILLMAN:  Whatever else I'd have to say

3    evolves from that, because that was a part of the financial

4    statements that were presented.

5              THE COURT:  All right, fine.  You can step down.

6              MR. FLYNN:   May I talk to Mr. Hoge before I

7    decide what I'm going to --

8              THE COURT:  Sure.

9              MR. FLYNN:  (indiscernible), Your Honor.

10             THE COURT:  Okay, fine, thank you.  All right,

11   would anyone benefit from a five-minute break?

12             MR. CHESLEY:  I probably would, Your Honor.

13             THE COURT:  All right, so I'll be back at -- let's

14   make it 10.

15             MR. CHESLEY:  Thank you, Your Honor, and we should

16   be brief.  Thank you.

17             (Recess)

18             THE COURT:  Please be seated.  Okay, we're back on

19   the record in In Re Sears Holdings Corp.

20             MR. CHESLEY:  Thank you, Your Honor.  Apologize;

21   it's just a little bit easier to use it from the lectern.

22             THE COURT:  Sure.

23             MR. CHESLEY:  Your Honor, at this point, we would

24   provide a very brief closing, as well as address the motion

25   for judgement on the pleadings that was brought by the

Page 86

1    landlord's Counsel.

2            Through the actual motion, Your Honor, the Debtors

3    are seeking authority to assume and assign the lease for the

4    Mall of America store, to transform Leaseco, the wholly

5    owned subsidiary of Transform Holdco, the acquirer or the

6    majority of the Debtor's assets, pursuant to the global

7    sales transaction.

8            Before going on, Your Honor, I think it's

9    important to clarify a point that was made repeatedly by

10   Counsel for the landlord, and that related to the Reiker

11   declaration and statement with respect to what will occur if

12   the leases are not assumed and assigned to Transform.  I

13   think as the Court is aware, that obviously were the assets

14   that were acquired, and of course that was a critical part

15   of the bargain and, as the evidence has made clear, all but

16   three of those leases have now been assumed and assigned to

17   Transform.

18           The landlord, Your Honor, has strenuously objected

19   on multiple occasions to the assignment to Transform, with a

20   variety of arguments.  But most critically, what they're

21   attempting to do is to rewrite the lease to what they wanted

22   the lease and the REA to provide when Sears constructed this

23   store on its own nickel in 1991.  The reading of this lease

24   and the leading of the REA, Your Honor, we believe

25   authorized the assumption of the lease, pursuant to Section

Page 87

1    365(b)(3), and I am going to articulate why we believe we've

2    met those standards.

3            First of all, the arguments that are advanced by

4    Mall of America ignore two fundamental precepts.  First,

5    365(b)(3) is not a standard to be viewed in the abstract.

6    The provisions words, the Third Circuit noted, in In Re

7    Joshua Slocum, craft it as a shield to remedy three problems

8    caused by shopping centers and their solvent tenants, by the

9    administration of the bankruptcy estate.  First was the

10   hardship caused by vacancy or partial occupancy?  Second was

11   uncertainty of whether the landlord will continue to receive

12   rent, and third, disruption to tenant mix in the shopping

13   center.

14           The provisions were not, however, drafted as a

15   (indiscernible) for landlords to defeat the assumption and

16   assignment of the lease to a new entity, or unilaterally

17   veto or claim a veto right on an assumption and an

18   assignment that fully complies with a lease in the

19   Bankruptcy Code.  And what is critical to the issues before

20   the Court today is that Section 365(b)(3) is, again, not an

21   abstract standard.  Rather, as the Court noted in In Re Ames

22   Department Store, 127 B.R. at 752, the legislative history

23   of 365(b)(3), "makes clear that the provision was designed

24   to ensure that the lessor and other tenants maintain the

25   benefit of  the original bargain with the Debtor."  As the

Page 88

1    Court also made clear in Ames, the Court's analysis under

2    365(b)(3) must be focused on the parties' contractual

3    undertakings, not general notions of assignability and

4    tenant mix.

5              Transform is only seeking today, Your Honor, to

6    obtain the benefit of the bargain that Sears entered into in

7    1991.  Now, again, the legislative history underlying

8    365(b)(3) makes clear that the enhanced statutory

9    protections are not intended to block a new purchaser from

10   acquiring the leasehold, but rather, looks squarely at the

11   economic viability of the assignee.  As the Court in Service

12   Merchandise confirmed adequate assurances to be evaluated,

13   "on a commercially reasonable standard based upon the

14   information available at the time."

15             To that end, the mall's protests aside, they do

16   not, nor can they, contend, as  the Court in Joshua Slocum

17   was principally concerned with, whether there is any

18   uncertainty as to whether Transform will be able to pay the

19   leasehold cost of approximately $1.1 million a year.  Not

20   only has this been confirmed by the witnesses today, but to

21   reduce any economic risk to the mall, Transform has agreed

22   to not only provide a guarantee, but to place one year of

23   leasehold costs into an escrow to protect the mall from any

24   economic risk.

25             THE COURT:  Can I interrupt you there?

1          MR. CHESLEY:  Yes, Your Honor.

2          THE COURT:  it would appear, under the case law

3     pertaining to non-shopping center leases, leases where

4     365(b)(3) doesn't apply, that the adequate assurance offered

5     would be sufficient.  365(b)(3), though, throws arguably

6     additional factors into the analysis.  It begins by saying,

7     for purposes of Paragraph 1 of this subsection and Paragraph

8     2B of Subsection F, which both require adequate assurance of

9     future performance, adequate assurance of future performance

10    of a lease of real property in a shopping center includes

11    adequate assurance, A, of the source of rent and other

12    consideration due under a lease, and in the case of an

13    assignment, that the financial condition and operating

14    performance of the proposed assignee and its guarantors, if

15    any, shall be similar to the financial condition and

16    operating performance of the Debtor and its guarantors, if

17    any, as of the time the Debtor became the lessee under the

18    lease.

19          So I appreciate it uses the word similar, but it

20    creates a test that isn't in the general case law, namely,

21    if you look at the financial condition and operating

22    performance of the Debtor and its guarantors, if any, when

23    they entered into the lease, which was here, 1991, and see

24    whether that's similar to the financial condition and

25    operating performance of the assignee.  So the case law does

1    have -- that applies to this section does have the language

2    you quoted about, you know, no reasonable  landlord would

3    feel like it was jeopardized here, but they also go through

4    some analysis, at least, of the condition of the Debtor when

5    it entered into the lease, compared to the financial

6    condition of the assignee.

7           They usually employ, for the first part of that

8    analysis, for public companies, 10-Ks and 10-Qs.  For the

9    second part, if there is a 10-K or 10-Q, they'll look at

10   that; if not, they'll look at projections and testimony.

11   And for new special-purpose entities, they'll look at the

12   experience of the principal, and sometimes, although not

13   always, the not just professed commitment by the principal,

14   but financial stake of the principal in the enterprise.

15          So, assuming for the moment that that exercise

16   needs to be gone through, that you don't just look at -- you

17   don't just read similar to say similar in assuring

18   performance, whereas, you know, you could say, well

19   performance is just assured, you don't need to go father,

20   are you arguing beyond that?  Are you arguing that there is

21   financial information that I should look at?

22          MR. CHESLEY:  Your Honor, we're -- let me break it

23   down into a couple -- answer that in a couple of ways.  One,

24   with respect to the financial information that has been

25   presented, you have that.  You have the stipulations.  I'm

Page 91

```
1   not going to sit here and say that Transform is Sears of

2   1991.  But what the evidence before the Court is, it is the

3   same operating entity that existed, in effect, before

4   bankruptcy -- the same people --

5            THE COURT:  But that's before bankruptcy.

6            MR. CHESLEY:  Correct, Your Honor.  Obviously,

7   Sears in 1991 is not the same group of individuals that were

8   running the business prior to October of last year.  But I

9   think in looking at that standard, Your Honor, I think there

10  are a couple of things that are critical.  One is the

11  legislative history underlying it, and the legislative

12  history made clear that, "The provision of 364(b)(3)(a) was

13  intended to prevent a shopping center lease from being

14  assigned to another business in poor financial condition."

15  There are, to my knowledge Your Honor -- and I'm happy to be

16  corrected, which I often am -- no cases that we have read

17  that interpret similar under 365(b)(3)(a).  It is not an

18  issue that has been litigated nor reported on.

19           THE COURT:  Well, there are courts that talk about

20  -- they combine, as I said, the notion of no reasonable

21  landlord would feel jeopardized with proportionate health.

22  Not that the tenant necessarily be as large  -- the

23  prospective new tenant as large as the Debtor was when it

24  entered into the lease, but that at least be proportionately

25  as healthy.
```

1           MR. CHESLEY:  Well, and Your Honor, to that end,

2      as the exhibit from Mr. Frillman confirmed, shareholder

3      equity, at least from the information that was available, is

4      about $2 billion for Transform.  That was the information

5      that was made available.  It is not what Sears was, but it

6      is also, as the Court knows, a diversified company that is

7      real estate, it is brand, it is ancillary services, it is

8      operating approximately 400 -- actually, 425 retail stores,

9      so it is a viable entity that meets the standard set forth

10     in the code.

11          And I think what's also critical, and this goes

12     back to the Ames Department Store line of cases, which I'd

13     like to talk about in a minute, but what Ames made very,

14     very clear is, in looking at the standards, you have to look

15     at the lease.  And the expectation of these parties when

16     they entered into this lease in 1991 was very clear, that

17     Sears had to operate a retail store for 15 years.  After the

18     termination of that operating period, Sears had broad

19     rights, and we'll talk about going dark, to assume, to

20     assign, and had great flexibility for this space.  That was

21     what was bargained for.

22          What was also bargained for was, at the time, an

23     agreement by the parties as to what level of financial

24     assurance the landlord would be looking at, to the extent

25     that Sears wanted to offload or transfer or assign this

1     property to a third party.  And what Section 25 of the REA

2     made abundantly clear is, to the extent that occurs, Sears

3     has no further liability if that party has shareholder

4     equity of at least $50 million.

5              So, looking at the standards under the code,

6     looking at what the parties absolutely understood at the

7     time as to what would suffice, I think to, in effect, hide

8     behind a strict reading that is not similar, but is

9     absolute, and to compare apples to -- 1991 apples to 2019

10    oranges, Your Honor, I don't think is what the framers of

11    the code contemplated, and in fact, not one that we see in

12    any of the case law that we have relied upon.

13             THE COURT: And what about the reference to

14    operating performance, as well as financial performance?

15             MR. CHESLEY:  Well, operating performance is --

16    Sears is -- Transform is operating Sears stores.  Transform

17    is operating K-Mart stores.

18             THE COURT:  Although not here.

19             MR. CHESLEY:  But here, they're not required to

20    operate a store.

21             THE COURT:  So it's the same contract reference

22    point.

23             MR. CHESLEY:  Absolutely, you have to look at the

24    contract.  And I think that's really the point here, and

25    that's not what -- if you heard the argument and you heard

Page 94

1    the testimony, that's not what the mall is concerned about.

2    What we heard today is, what they're really concerned about

3    is what happens when Transform finds replacement tenants.

4    First of all, as we have confirmed to the Court and the

5    landlord, we intend to comply with all provisions of the

6    lease and the REA.  We're not asking for any relief from

7    those provisions, nor do we believe any is necessary here,

8    based upon the language of the lease and the REA.

9            And so, further to that, Your Honor, if in fact --

10   and this is where the concepts got conflated -- if in fact

11   the Court is willing to allow the lease to be assumed and

12   assigned and for Transform to, in effect, retain the value

13   that it bargained for, then at that point, if it attempts to

14   assume and assign, or sublease to a third party, it has to

15   comply with the lease.  And if it doesn't, nothing here

16   today is vitiating any of the landlord's rights.

17   Unfortunately, those will not be articulated by Your Honor,

18   but likely in a court in Minnesota, but that's all we're

19   seeking to do, is to maintain the benefit of that bargain.

20           THE COURT:  Okay.  There's a provision in the

21   lease, 6.3, sale by tenant to landlord.

22           MR. CHESLEY:  Yes, Your Honor.

23           THE COURT:  And it says, in the event that at any

24   time, and from time to time after the expiration of the

25   Sears operating period, which I think everyone agrees is

1    expired, right --

2             MR. CHESLEY:  Yes, Your Honor.

3             THE COURT:  -- because it was 15 years from 1991,

4    until the term expires, tenant decides to cease and ceases

5    to operate a store in the tenant building, and further

6    determines to sell, exchange, or otherwise transfer its

7    interest in the lease premises, tenant shall, by giving

8    landlord notice first offer, and then there's this fair

9    market value right to exercise that offer.  So if Transform

10   finds a tenant, not for the whole three floors, but let's

11   say for a significant portion of one floor, is it prepared

12   to live with this provision?

13             MR. CHESLEY:  We are prepared to live with Section

14   6.3.  And in fact, Your Honor, we have to.  If you look at

15   6.3C, big C, it's a tough agreement to get through, but it

16   makes very clear that -- parties may have been prescient, I

17   don't know.  But Paragraph 6.3 does not apply to a transfer

18   in a reorganization or a bankruptcy process.  But on the top

19   of Page 17, the foregoing provisions of 6.3 remain binding

20   on the transferee.  We agree that this will be binding on

21   the transferee.

22             THE COURT:  Okay.

23             MR. CHESLEY:  So, Your Honor --

24             THE COURT:  So --

25             MR. CHESLEY:  Yes, I'm sorry.

1          THE COURT:  This is a question for both of you,

2     both sides.  Again, I'm just thinking ahead in practical

3     terms.  Obviously, Mr. Ghermezian was quite concerned about

4     the effect of Transform's assigning a portion of the space

5     to a tenant or a sub-tenant that he believes would

6     jeopardize the -- either the mix of the mall or the mall

7     itself in some way, separate and apart from not being a

8     specifically excluded tenant.  And we have the general

9     language that has also been referred to, you know, first

10    class retail mall in 22.  But I'm just, in my own head,

11    playing this through.  If you find any tenant, then he can

12    exercise this right, right?

13         MR. CHESLEY:  Yes, Your Honor.

14         THE COURT:  It's not limited to the -- you don't

15    have to wait until you've sublet everything.  It's any

16    tenant.

17         MR. CHESLEY:  Yes, Your Honor, he has that right.

18    That's what the parties negotiated in 1991.

19         THE COURT:  Okay.  Okay.

20         MR. CHESLEY:  So, Your Honor -- I'm sorry.

21         THE COURT:  Well, I -- does Mall of America Corp

22    disagree with that?  Well, maybe it's not even a

23    disagreement.  I guess it's a representation that's been

24    made.

25         MR. FLYNN:  No, Your Honor.

1          THE COURT:  Okay.

2          MR. FLYNN:  We think they're bound by that.

3          THE COURT:  Okay.  All right.

4          MR. CHESLEY:  Just briefly, Your Honor, going back

5     to the other factors that have been relied upon here, and

6     turning back to Joshua Slocum, there have been a lot of

7     claims about the harm that's going to befall this mall if

8     the Court grants this motion.  Again, we have to look back

9     at the lease and what rights were contractually given to

10    Sears in 1991, and as the REA and the lease made clear, any

11    assign -- assignees, excuse me, or transferee.

12          The court in service merchandise again made clear

13    were the lease provisions afford the tenant broad use and

14    assignment rights.  The tenant effectively, quote, has free

15    control of the space, which as the court in service

16    merchandise noted met the standards 365(b)(3) as to the

17    issues raised in that case in the Middle District of

18    Tennessee.

19          A lot of conversation here about the requirement

20    to maintain an anchor or department store.  Again, we just

21    turn to the REA.  This isn't hard.  Section 22(c) of the REA

22    has a very specific detailed provision of the obligations of

23    Sears to maintain a department store for the first 15 years

24    of the lease.  Thereafter, the REA goes into substantial

25    discussions about what Sears' rights are, which we have

Page 98

1     talked about substantially.  But most importantly, it states

2     that Sears further covenants and agrees -- this is on Page

3     125 -- that during the remaining term of the REA, after the

4     expiration of the major operating period, it then goes on to

5     provide that.  We've gone through this language repeatedly.

6     I will not do it again.  Sears could use this for retail

7     purposes customarily found in --

8                    THE COURT:  But Sears --

9                    MR. CHESLEY:  -- an enclosed mall.

10                   THE COURT:  Sears and its assignees.

11                   MR. CHESLEY:  And its assignee.  Its successors

12    and assigns.  It says it shall not, except for, and those

13    are the retail activities, non-retail activities customarily

14    incidental thereto, quote, or such other uses and purposes

15    that are compatible and consistent with the regional --

16    first-class regional shopping center.  That's all we're

17    seeking to do, which is to protect that benefit of the

18    bargain, but there is nothing here -- there is no reading of

19    the REA or of the lease that crafts any obligation of Sears

20    or Transform, if this motion is granted, to continue to

21    operate a department store, much like Mr. Ghermezian

22    admitted with respect to the Bloomingdale's store, which was

23    cut up into several tenants over a four-year period.

24                   As to the issue of going dark, while again the

25    landlord claims about the harm of Sears remaining dark under

Page 99

1    the lease, beginning in 2006 we have the absolute right to

2    cease operating in the store.  As the district court made

3    clear in affirming this court's ruling in Great Atlantic &

4    Pacific Tea Company, while, quote, the store being dark

5    undoubtedly has a deleterious effect on the landlord, the

6    possibility that the store would go dark was contemplated

7    and permitted under the lease.

8              And as to tenant mix and the mall's claim that the

9    mall is finely curated retail and hospitality venue, again,

10   the lease which controls makes clear that Sears can operate,

11   or its assignee or transferee can operate within these broad

12   parameters.

13             As the court in Ames made clear again,

14   365(b)(3)(d) refers to contractual protections and not

15   undefined notions of tenant mix.  Quote, it would be

16   anomalous to interpret Section 365(b)(3)(d) to preclude

17   assumption in assignment of a lease where the lease itself

18   affords unfettered rights to assign in some way.

19             No mistake here, Your Honor.  We've made this

20   clear.  I'm not going to -- I don't need to make it again.

21   We will comply with the terms of the lease.  We will protect

22   the landlord from any economic risk and are incentivized, as

23   everybody is, to bring in replacement tenants as quickly as

24   we can to this center.  That's the benefit of our bargain.

25             In the end, Your Honor, is the declarations filed

Page 100

 1    by the mall plainly indicate the dispute really isn't about

 2    adequate assurance.  It's about control.  The mall wishes to

 3    rid itself of the economic terms of the lease it

 4    contractually bound itself to so it can capture and realize

 5    the economic benefits of this lease, which everybody

 6    acknowledges is in a first-class shopping center, and hand

 7    select a preferred tenant that will protect it from the

 8    claims of other tenants rather than afford the Debtors and

 9    Transform the benefit of its party.

10         Transference request, if the Court honored the

11    benefit of the bargain, does not in the words of the Mall of

12    America's CEO make us a scavenger, indeed, as the district

13    court noted in A&P, quote, while the landlord's desire to

14    get out of a lease is understandable, Section 365 affords no

15    relief to a landlord simply because it might have the

16    opportunity to rent the premises at higher rents to others

17    and otherwise seek to escape the benefit of its bargain.

18    That's all we're seeking here today, Your Honor.  Thank you.

19         THE COURT:  Are you -- in some ways, although the

20    proposed assumption and assignment of this lease was part of

21    the overall asset purchase agreement in which Transform

22    bought substantially all of the assets of the Debtors and

23    propose to continue to use most of those assets.  But in

24    some ways, this is -- this lease fits more into the

25    situations where a Debtor entered into -- enters into a

Page 101

1    designation rights agreement and for valuable consideration

2    sells the right to a third-party real estate company to

3    designate leases for assumption and assignment, usually to

4    third parties.

5              MR. CHESLEY:  Right.

6              THE COURT:  Are you aware of any cases in the

7    shopping center context where these types of issues have

8    arisen in the context of a designation --

9              MR. CHESLEY:  Of a designation rights, Your Honor?

10             THE COURT:  Yeah.

11             MR. CHESLEY:  None that are published.  There were

12   several that we were involved with that were not.

13             THE COURT:  But no published decisions.

14             MR. CHESLEY:  No.

15             THE COURT:  All right.

16             MR. CHESLEY:  And there shouldn't be a different

17   standard, Your Honor.

18             THE COURT:  Well, I mean, it goes to operations.

19   You know, a real estate company that's buying designation

20   rights isn't necessarily going to be operating --

21             MR. CHESLEY:  Right.

22             THE COURT:  -- the stores, for example.

23             MR. CHESLEY:  Well, this is -- as the evidence is

24   before the Court -- it's the nature of this business.  It is

25   a hybrid.  It is a retailer.  It is a real estate company.

1    And again, we'd continue to operate.

2              THE COURT:  Well, it's the nature of Transform's

3    business.

4              MR. CHESLEY:  Yes.

5              THE COURT:  Not necessarily Sears'.

6              MR. CHESLEY:  Correct.

7              THE COURT:  Although Sears owned a big lease

8    portfolio, and for the last several years has been selling

9    leases.

10             MR. CHESLEY:  Exactly.  That's part of the value

11   that we purchased.

12             THE COURT:  Are -- is the -- is MOAC aware of any

13   recorded decisions in the designation rights context?

14             MR. FLYNN:  No, Your Honor, not to date.

15             THE COURT:  Okay.  All right. I was -- I couldn't

16   find any either.  Okay.

17             MR. CHESLEY:  Thank you, Your Honor.

18             THE COURT:  Do you want to say anything in

19   response?

20             MR. FLYNN:  No.  Yes, Your Honor.  I would state

21   that he was citing 365(b).  The mere collection of rent is

22   not the only thing that's required as a court thing.  We

23   have to go further than that.

24             I would agree that there's been no financial

25   information of any reliable sort that has presented

Page 103

1   whatsoever in this case by its own words, number one, and

2   requires to be similar to that of Sears in 1991.  There has

3   been no evidence by any expert financial person.  In fact,

4   the only evidence submitted by an expert financial was ours,

5   who said it's not anywhere near.

6          There has been no evidence of performance.  They

7   don't intend to perform.  They are going to leave it dark.

8   We don't know how long they are, and we are -- and obviously

9   those provisions -- I mean, I -- respecting the Ames court,

10  there is obvious that those kinds of provisions are not

11  required to be in the contract in order to protect the

12  landlord.  So that's part of it, and it seems to make some

13  people jar their nerves when they say, well, why are you

14  better off in bankruptcy than you might be outside of

15  bankruptcy?  And the answer is because Congress said that.

16  And they didn't say it ambiguously.  In fact, amended it to

17  reemphasize it at least once or twice in the last 20 years.

18          And we have no idea today what's going in that

19  space.  We have no idea of the performance ability of the

20  tenant.  We have no idea -- and there -- and I cited cases

21  to say more -- to talk about you got -- because typically

22  what happens is you have a tenant, and they don't have what

23  -- and this is a little bit of a hybrid situation, just

24  exactly what you said.

25          And we have rights under the code, which we would

Page 104

1    like to enforce today, and that is require them to show what

2    it is, the proper financial information, not -- and what

3    they said, that's what they gave us, and what they gave us

4    had disclaimers all over it saying don't rely on this.  It

5    just -- I don't know what we're supposed to do, not believe

6    it?  We're supposed to say, well, we know what they really

7    mean.  They didn't mean anything they said on that financial

8    statement.  They meant that it was really worth a lot of

9    money.  We have no idea what that really meant, and they

10   said don't rely on it.  And it certainly can't be used as

11   assurance of anything.  It said it right on their document,

12   so we're supposed to know that they don't mean that.

13          So they didn't present anything about adequate

14   assurance of any kind, and especially about whether or not

15   it's similar to or -- to Sears' financial position in 1991,

16   nothing.  And it's really important.

17          We are not -- we don't want the equity in that

18   lease.  What we want is a successful mall, and they will not

19   and cannot -- and they say if they don't make -- they don't

20   get the money out of this thing, give it to somebody who

21   would be appropriate to a mall because they can't get the

22   rent out of that.  They'd have to give -- the current market

23   for any kind of major tenant is you pay them to come in.

24   They're not going to do that, so they're going to try to

25   chop it up.  And every time -- they have to prove today, I

Page 105

1    think -- it will be our position -- what that is, who they

2    are, whether they fit with the tenant mix, and they

3    presented no evidence of that.  Zero.

4         And they -- and I get the argument that they say

5    they can.  We would disagree with that vociferously.

6         THE COURT:  What's your responses to the fact that

7    the parties agreed in Section 6.3 to give the landlord the

8    protection of a fair market right of first offer?

9         MR. FLYNN:  I think that that is wonderful they're

10   agreeing to do that.  We didn't know for sure that they

11   were, and we understand that now they are.  Our position is

12   that we have rights in this courtroom today in addition to

13   that, and we would like them to be recognized.

14        THE COURT:  But as far as the economic impact on

15   the mall is concerned, either -- or the -- you know; however

16   you express that, either in the property itself or the

17   effect of tenants on the whole mall, the landlord does have

18   the course under the lease.

19        MR. FLYNN:  Yes.  However, we read it as saying in

20   bankruptcy that they have a limited period of time.  They

21   don't have 70 years to try to rip that space out.  They

22   can't leave it dark for an unusually -- as I believe

23   (indiscernible) said, even though in the lease it allowed

24   them to go dark.  And we would like some protections from

25   that because if it sits there empty and they can't rent it,

Page 106

1    and the only people that will come in there will not pay

2    them enough rent, even though they'd be wonderful tenants

3    there, we have a -- they're calling us.  We want all the

4    money.  We're willing to pay money to get somebody in there.

5           I think -- but they might not have a tenant, or

6    they might hold out for 70 years.  What -- we're here in

7    bankruptcy.  We have more rights than that, and that

8    Congress gave us those, and we're worried about those

9    issues.  So at a minimum, we'd need some period of time that

10   want this to not go dark.  At a minimum, we'd like to

11   reserve our right to buy them out if it's -- yes, but we

12   have other rights here today, and we don't think they

13   presented any evidence on those other issues.

14           And it's very clear, obviously the courts have

15   given us rights beyond what are contained in our contract.

16   There's no contract in the world that says you can't assign

17   this lease unless you have same or similar to the -- I

18   think; maybe they do -- to Sears.  They don't -- they didn't

19   prove that.

20           Anyway, we would like our rights recognized here

21   in this court today, and yes, we feel the -- once they

22   assume the lease, they are bound by all its terms, but they

23   claim they could rent it.

24           There are a number of provisions in the lease that

25   maybe perhaps we'll have to litigate in the future about

Page 107

1   what they can and can't do because we disagree about those.

2   But I think -- I appreciate the court considering that our

3   rights today is important to us.  And --

4           THE COURT:  Sorry to interrupt.  In Mr.

5   Ghermezian's testimony, he did not know when the form of

6   Bloomingdale's space was fully sublet, but you did testify

7   that the store was closed in 2012.  Is there anything in the

8   record to show when the first subleasing or tenancy was?

9           MR. FLYNN:  No, Your Honor.

10          THE COURT:  Oh.

11          MR. FLYNN:  And just as an aside.  I don't think

12  it's controversial.  It isn't -- still isn't sold but

13  rented.

14          THE COURT:  Well, I'm more focusing on the --

15          MR. FLYNN:  Yeah.

16          THE COURT:  -- buyout provision.

17          MR. FLYNN:  Right.

18          THE COURT:  I mean, I -- let me pose this question

19  to the Debtor, all right, to Transform.  Is Transform

20  prepared to put some outside date on its first assignment of

21  the property or subletting of the property?  I mean, the

22  prospect of just standing there and torturing MOAC for 73

23  years is, you know, obviously not a welcome one.

24          MR. CHESLEY:  Well, it makes no economic sense for

25  us either at $1 million a year.  If I could talk really

1    briefly with Mr. (indiscernible), I can probably answer this

2    relatively quickly --

3              THE COURT:  Okay.

4              MR. CHESLEY:  -- Your Honor.  If I can.

5              Your Honor, I think it's consistent with the

6    declaration as well.  We could certainly live with the two-

7    year outside date provided that we don't get interference

8    from the landlord.  If we've got the ability to go out and

9    bring people in -- I'm not asking them to bend over

10   backwards but, again, not interfere with our ability to

11   sublet.

12             THE COURT:  Two years to sublet some -- or assign

13   some portion of this thing.

14             MR. CHESLEY:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. FLYNN:  Your Honor, may I address that?

17             THE COURT:  Sure.

18             MR. FLYNN:  That may be very little solace.

19   There's three huge floors there.  They could -- are they

20   going to sublet --

21             THE COURT:  No, I understand that, but I'm

22   focusing -- you don't have to -- I'm not asking you to agree

23   with me.  I'm focusing on 6.3.  If they sublet any, you

24   know, any other than, you know, on, you know, a tobacco

25   stand or something -- if they sublet anything, 6.3 kicks in,

1    and the landlord --

2              MR. FLYNN:  Yeah.

3              THE COURT:  -- isn't stuck then.

4              MR. FLYNN:  Right.

5              THE COURT:  Then they can do something.

6              MR. FLYNN:  And we do appreciate that.

7              MR. CHESLEY:  And similar, Your Honor -- I'm

8    sorry.

9              MR. FLYNN:  Excuse me.  Giving them two years, is

10   it the whole thing?  Is it by floor?

11             THE COURT:  No, no, no.  My question was any -- no

12   -- anything other than immaterial portion.

13             MR. CHESLEY:  The only point I was going to add to

14   that, Your Honor, is Section 6.3 also has a second clause

15   that deals with if we're not able to, and we can simply

16   submit that to evaluation.

17             THE COURT:  Right.  Wait.  I'm sorry.  Say that --

18             MR. CHESLEY:  Section 6.3 has two clauses, Your

19   Honor.

20             THE COURT:  Right.

21             MR. CHESLEY:  The first clause -- I'm sorry.  I

22   don't have it front of me, but the first clause refers to if

23   we find -- basically are looking to transfer it to a third

24   party.

25             THE COURT:  Right.

Page 110

1          MR. CHESLEY:  There's that -- there's that

2     provision.  And if we can't --

3          THE COURT:  Then you have the fair market value.

4          MR. CHESLEY:  Exactly, through two appraisers.

5          THE COURT:  Maybe I have it -- let -- if you'll

6     just give me a second to read this more carefully.

7          Oh, well, you know what?  I'm sorry.  This

8     provision -- I was really just focusing on the first offer

9     point, but there is a second point.  So if we can just look

10    through this together.

11         In the event that at any time and from time to

12    time after the expiration of the Sears operating period and

13    until the term expires, tenant decides to cease and ceases

14    to operate a store from the tenant building and further

15    determines to sell, exchange, or otherwise transfer its

16    interest in lease premises, tenant shall by giving landlord

17    notice first offer to landlord the right to purchase the

18    same at the price offered to tenant pursuant to a

19    (indiscernible) offer, or if no such offer has been made to

20    tenant at a price equal to the fair market value --

21         So it seems to me that subject to, you know, some

22    modest time that courts give assignees to, in essence, get

23    their act together after an assignment where the

24    assignor/Debtor had ceased to operate, the market value

25    kicks in right away under this provision.  You don't have to

1    get a first offer.  It just kicks in right away.

2              MR. CHESLEY:  Yeah.  I believe Your Honor is --

3    Your Honor is reading it correctly.  There are two

4    requirements at the front end:  ceasing operation and

5    further determines to sell, exchange, or otherwise transfer.

6              THE COURT:  But that's happened, right

7              MR. CHESLEY:  We are --

8              THE COURT:  I mean, that's the whole -- that's the

9    whole purpose --

10             MR. CHESLEY:  We are very much at that.

11             THE COURT:  -- of the two declarations.

12             MR. CHESLEY:  And so, again, to the point of --

13             THE COURT:  So you don't have to wait at all, in

14   other words.  You know?  I mean --

15             MR. CHESLEY:  We would certainly like the ability

16   to see -- you know, again, to finish up what we could.

17             THE COURT:  I understand, but this provision seems

18   to suggest the other one.  I mean, unless you're saying that

19   this is an anti-assignment provision, and I don't think you

20   were saying that.

21             MR. CHESLEY:  No.

22             THE COURT:  Because I think this fair market kicks

23   in right away.

24             MR. CHESLEY:  Mr. Martin pointed out, again,

25   ceasing to operate, if we are a real estate company, is

Page 112

```
 1    different than operating a store.

 2             THE COURT:  No, but this is a store.  Ceases --

 3    and cease to operate a store.

 4             MR. CHESLEY:  Right, a store in the tenant

 5    building --

 6             THE COURT:  Yeah.

 7             MR. CHESLEY:  -- and further determines the sale.

 8             THE COURT:  Right.  So I think all we're talking

 9    about here is who gets the fair market value.  All the rest

10    of it -- I mean, it's in the landlord's control.  I

11    understand your arguments about the statute.  You don't have

12    to -- but ultimately, in terms of value --

13             MR. CHESLEY:  We agree this is about the value,

14    Your Honor.

15             THE COURT:  Right.  I mean, and the parties agreed

16    to a mechanism to deal with it in which MOAC can say, well,

17    there's no value here because we have to pay a tenant, and

18    Transform would say there's enormous value here.

19             MR. CHESLEY:  We agree, Your Honor.

20             THE COURT:  Okay.  All right. All right.  Anything

21    else?

22             MR. FLYNN:  Nothing, Your Honor.

23             THE COURT:  Okay.  I have before me a motion by

24    the -- technically by the Debtors in this case to assume and

25    assign a lease with now Mall of America Corporation, or
```

Page 113

1    MOAC, of a substantial portion of the mall operated by the

2    Mall of America in Minnesota.  The assignee is Transform

3    Holdco, and the assignment is part of the consideration --

4    that is seeking the assumption of assignment is part of the

5    consideration supporting Transform Holdco's purchase price

6    under the asset purchase agreement between the Debtors and

7    Transform.

8            The landlord, MOAC, objected to the assumption of

9    assignment, asserting that it does not comply with the

10   applicable requirements of Section 363(b) and Section

11   363(f), which pertains to assignments of the bankruptcy

12   code.

13           The parties have stipulated to a number of key

14   facts here, which are agreed and part of the evidentiary

15   submissions by the parties.

16           In addition, I have an agreed set of exhibits as

17   well, which include the lease and the amended and restated

18   reciprocal easement and operating agreement portions of

19   which are incorporated into the lease, which the parties

20   refer to as the REA.

21           I also have testimony from two witnesses for

22   Transform and three from MOAC.  Notwithstanding that

23   substantial evidentiary record, the merits of the issues

24   before me come down largely to disputed interpretations of

25   the applicable requirements under Sections 365(b)(3) as

1    incorporated and 365(f).  365(b)(3) was enacted by Congress

2    to provide additional protection for landlords and, under

3    appropriate circumstances, other tenants in what Congress

4    defined as shopping centers.

5           There is no dispute between the parties that the

6    Mall of America is in fact a shopping center as defined in

7    -- or for purposes of, rather -- Section 365(b)(3) and

8    therefore that Section 365(b)(3) would apply.

9           That provision is introduced by the following.

10   For the purposes of Paragraph 1 of this section and

11   Paragraph 2B of subsection F as an aside, each of which

12   require adequate assurance of future performance of a lease

13   that is being assumed.  Adequate assurance of future

14   performance of a lease of real property in a shopping center

15   includes adequate assurance, and then four different

16   included types of adequate assurance are listed.

17          That provision doesn't exclude or exempt Debtors

18   and their assignees from providing adequate assurance

19   generally under 365(b)(1) and (f)(2)(b), but it adds the

20   four enumerated additions.

21          I should preface the remainder of this ruling by

22   noting, as stated aptly by former bankruptcy Judge Gerber in

23   In re Ames Department Stores Inc., 348 B.R. 91, 98 (Bankr.

24   S.D.N.Y. 2006), quote, in a legislative judgment built into

25   the code, Congress has determined that subject only to

1    certain statutory safeguards, the value of a Debtor's leases

2    should go to the Debtor's creditors and that leases can be

3    sold to achieve that end, with or without landlord consent.

4    That theme runs throughout the caselaw, interpreting

5    Sections 365, including, as noted by the district court and

6    (indiscernible) LLC the A&P, In re A&P 472 B.R. 666, 679

7    (Bankr. S.D.N.Y. 2012).

8              It's also important to note that the four

9    protections specifically provided for in connection with

10   adequate assurance of future performance of a shopping

11   center lease is with respect to just that:  adequate

12   assurance of future performance of a lease of real property,

13   i.e. the focus is on performance of a lease in the future.

14             Before turning to those sections, I should note

15   the following.  Based on the record before me, it is clear

16   that Transform, the assignee, separate and apart from those

17   four sections has, in fact, provided adequate assurance of

18   future performance of the lease.

19             The caselaw is clear when dealing with adequate

20   assurance generally that the Court should employ a pragmatic

21   analysis as to whether sufficient assurance has been

22   provided that the lease will be performed in the non-

23   shopping-center context that focuses generally on the

24   ability to pay rent on a going-forward basis, both the

25   specific rent and other financial performance such as

Page 116

1    payment of taxes, common area maintenance charges, and the

2    like, which are either denominated as rent or a separate

3    financial obligation under the lease.

4         It is not an absolute guarantee but rather focuses

5    on whether performance is likely, i.e. more probable than

6    not.  See generally in re M. Fine Lumbar Co. 383 B.R. 565,

7    573 (Bankr. E.D.N.Y. 2008) and the cases cited therein.

8         And yet outside of the (b)(3) context, it is

9    routinely held that adequate assurance can be shown in large

10   measure simply by the fact that the lease itself is a

11   favorable lease, i.e. favorable to the tenant, and has

12   significant value.  The theory being that even if the tenant

13   defaults, the landlord will not be damaged because it will

14   be able to reap the value of the then-terminated lease, at

15   Page 573.

16        In addition, courts very typically look to some

17   form or other of security deposit, either in the form of a

18   letter of credit, escrow agreement, or deposit with the

19   landlord.  If necessary, they go further to examine the

20   assignees financial condition, although they are perfectly

21   willing to accept a newly formed entity as an assignee,

22   particularly where there is a sufficient security deposit or

23   escrow, and the newly formed assignee is run by a principle

24   that has substantial experience in whatever business the

25   assignee intends to conduct and has a financial stake in

1    that business succeeding.

2            Here, it appears clear to me that this lease is a

3    very favorable lease.  The stated rent under the lease is

4    $10 a year.  Parties agree that the aggregate monetary

5    obligation of the tenant, which includes an obligation to

6    pay its share of taxes and other common charges and fees, is

7    somewhere between 1,000,001 and 1,000,002 annually.

8            The assignee has committed to put into escrow, and

9    it would obviously have to be an escrow that has no strings

10   attached to it other than the occurrence of nonpayment that

11   sum of money.

12           In addition, it's clear to me from the record and,

13   in addition, documents with which I can take -- of which is

14   could take judicial notice of the docket of this case that

15   the assignees' senior management has extensive experience in

16   marketing and selling Sears' real property, including

17   favorable leases.

18           In addition, although I don't believe under the

19   circumstances this would be necessary for finding adequate

20   assurance for future performance under Section 365(b)(1) and

21   (f)(2)(b), it appears to me that Transform has successfully

22   completed substantial financings with respect to both its

23   operating portfolio and its real estate portfolio.

24           While I do not believe I can accept as whole --

25   however wholly the statement in the draft consolidated

Page 118

1    financial statement offered by Transform as part of its

2    showing of adequate assurance of future performance that it

3    has in excess of 250 million of equity.  I do believe that

4    it has substantial equity and that it's highly likely that

5    that equity exceeds $50 million.  I cannot believe that

6    third-party lenders would provide the level of financing

7    that they have to transform without at least that level of

8    solvency.

9           The legal support for all of the foregoing

10   discussion of the applicable standard, in addition to the M.

11   Fine Lumber case that I just cited can be found in numerous

12   cases which focus on the foregoing types of adequate

13   assurance, and the fundamental focus on the assignee's

14   ability to pay rent, as stated by the District Court in In

15   Re Sanshoe Worldwide Corp. 139 B.R. 585, 592  (S.D.N.Y.

16   1992). See also In Re Citrus Tower Boulevard Imaging Center,

17   LLC., 2012 Bankr. LEXIS 2208 at Pages 15 through 20, (Bankr.

18   N.D. Ga. Apr. 2, 2012), In Re Bygaph, Inc., 56 B.R. 596

19   (Bankr. S.D.N.Y), In Re Westview 74th Street Drug Corp., 59

20   B.R. 747, 755 (Bankr. S.D.N.Y. 1986), and In Re Casual Male

21   Corp, 120 B.R. 256, 264 (Bankr. D. Mass. 1990).

22          The party dispute therefore hinges on the meaning

23   and purpose of Section 365(b)(3) and how and/or whether it

24   adds additional requirements beyond those that I've already

25   found are met for adequate assurance of future performance.

Page 119

1    Both sides recognize that the legislative history of this

2    section is fairly substantial.  It recognized the harm to

3    landlords, and through them other tenants, non-Debtor

4    tenants in shopping centers which are operated on an

5    integrated basis that could result from the assignment of a

6    lease of real property for one portion of the center.

7            Legislative history also makes it clear, however,

8    that the underlying purpose of the provision, consistent

9    with the notion of adequate assurance for future performance

10   of a lease generally is that both sides, including the

11   landlord, get the benefit of their bargain, which I believe

12   it goes without saying, is the bargain memorialized in their

13   lease.

14           It is also the case, which is well-recognized,

15   that Section 365(b)(3), as is the case with Section

16   365(b)(1) and (f)(2)(B), is subject to another provision of

17   Section 365, 365(e), which in essence invalidates with

18   respect to an assumption or an assumption and assignment the

19   efficacy of provisions conditioned on the insolvency or

20   financial condition of the Debtor any time before the

21   closing of the case, the commencement of the case under this

22   title, or the appointment of or taking possession by a

23   trustee in a case under this title, with exceptions stated

24   further on in the section.

25           However, although that section does find some

1    important interpretation in case law that the parties have

2    cited, it is not really at issue in the present dispute

3    before me, which really hinges again on what the effect of

4    Section 365(b)(3) has on what I've already found is adequate

5    assurance of future performance by the assignee.

6         That dispute really falls into two categories:

7    first, the landlord points to Section 365(b)(3)(A), which

8    states, again with the lead-in, that adequate assurance of

9    future performance of a lease of real property in a shopping

10   center includes adequate assurance, A, of the source of

11   rent, and other consideration due under such lease, and in

12   the case of an assignment, that the financial condition and

13   operating performance of the proposed assignee and its

14   guarantors, if any, shall be similar to the financial

15   condition and operating performance of the Debtor and its

16   guarantors, if any, as of the time the Debtor became the

17   lessee under the lease.

18        Sears became the lessee under the lease in 1991.

19   It's undisputed that its operating performance at that time

20   and financial condition generically is superior to the

21   financial condition and operating performance of Transform.

22   Sears at that time had over 3000 stores.  Its business as a

23   whole, as evidenced by the public financial filings in the

24   record showed a far more substantially -- far and larger

25   business than Transform has.  Under the asset purchase

Page 121

1    agreement, Transform acquired roughly 600 leased locations,

2    of which it proposed to operate approximately 425, which it

3    has now reduced to approximately 400.

4         Moreover, with respect to this particular leased

5    property, Transform does not propose to operate the property

6    as Sears initially would operate it.  Rather, Transform is

7    quite clear in stating that it is taking, proposing to take

8    the assignment for the sole purpose of reassigning or

9    subletting the space at a profit.  That is, to take

10   advantage of the economic value of the lease.

11        There are not a lot of cases construing this

12   provision.  In fact, I have found only three.  Each of them

13   makes it clear that it is to be construed not in a

14   mechanical way, but rather consistent with the underlying

15   charge as set forth in the preface to it, the general

16   language in Section 365(b)(3) which again refers to adequate

17   assurance of future performance of the lease itself.  The

18   District Court for the Southern District of New York

19   affirmed the determination by the Bankruptcy Court of In Re

20   Ames Department Stores, Inc. 2003 U.S. District LEXIS 3150

21   (S.D.N.Y., March 5, 2003), in which Judge Gerber concluded

22   that the assignee had satisfied this subsection.

23        As the District Court stated, quote, "The Landlord

24   further argues that Judge Gerber 'erroneously appl[ied]

25   financial aspects of [the May 19, 1999] financial

Page 122

1    statement,'" that is, the statement when the lease was

2    originally entered into, "'selectively to emphasize

3    'similarity' while ignoring other aspects in which enormous

4    differences in financial condition and operating

5    performances were evident.'

6            The Landlord argues that comparison of Debtor's

7    'per-store sales and profit' to Building 19's," as the

8    assignees, "'completely disregard[s] the incomparable

9    difference in financial depth and resources which [Debtor]

10   had.'  The Landlord goes on to argue that a finding of

11   "similarity" under 365(b)(3)(A) requires that 'big box'

12   'tenants' should be replaced by other 'big box' tenants."

13           The District Court then goes on to say again, I'm

14   still quoting, "the landlord's arguments find no support in

15   the case law.  In support of its argument, defendant cites

16   language in In Re Casual Male Corp, 120 B.R. 256 (Bankr. D.

17   Mass. 1990) that the financial condition and operating

18   performance of [the assignee] must be at least as strong as

19   was the Debtors' [at the time the lease was executed].

20           But In re Casual Male does not stand for the

21   proposition that a Bankruptcy Court cannot apply a

22   proportional comparison of the financial health of the

23   assignee and the Debtor; indeed, the Court in that case

24   specifically compared the ratio of the assignee's assets to

25   current liabilities at the time of the assignment to the

Page 123

1   Debtor's ratio of assets to liabilities on the date the

2   Debtor acquired the lease.

3           The court in In re Casual Male," I'm still

4   quoting, "went on to hold that since the assignee was

5   recently incorporated, its operating performance was

6   dependent on the business experience of its sole owner and

7   operator. Accordingly, the Court found the strength of the

8   owner-operator's experience compared favorably to the actual

9   strength of the Debtor's operations.  Thus, the Casual Male

10  court's determination of the similarity of profitability and

11  operating performance in no way relied upon a construction

12  of the statute to require the same gross profits and

13  performance between assignee and Debtor in that case."

14          I'll note also that in the Casual Male Corp case

15  cited by the Ames Court, the Bankruptcy Court's focus was

16  based on "the statute's prime purpose to provide adequate

17  assurance for the future payment of rent." And the Court

18  found, as I've already found, that that issue was not in

19  reasonable doubt.

20          A similar approach was taken by the District Court

21  in Ramco-Gershenson Properties L.P. v. Service Merchandise

22  Company, 293 B.R. 169 (M.D. Tenn. 2003).  There, the Court

23  concluded, based on a number of factors, including

24  guarantees and fairly limited financial disclosure, that "a

25  reasonable landlord would have been adequately assured of

Page 124

1    future operating performance."

2              This issue, i.e. the meaning of Section

3    365(b)(3)(A) bleeds over into the second issue that the

4    parties disagree on, which is whether the Court should read

5    the four requirements in Section 365(b)(3) separate and

6    independent from the party's lease from which adequate

7    assurance of future performance is at issue.  Transform

8    contends that these provisions must be read, and cabined by

9    the parties' actual agreement, says the purpose of the

10   statute is to give not only the Debtor the rights of 365,

11   but the landlord the benefits of its bargain.

12             MOAC contends to the contrary, that these are

13   separate requirement, independent from what the parties

14   agreed to.  This issue is relevant as to what Congress

15   intended in Section 365(b)(3)(A) in part because under the

16   lease at issue, it is clear that after the first 15 years of

17   the lease, and by the way, the lease with extensions runs

18   for a total of 100 years, but after the first 15 years, the

19   tenant, its successors and assigns, is subject to certain

20   very weak limitations, free itself to cease operating, and

21   to assign its rights.  The parties imposed a specific

22   prohibition in Section 25 of the lease, that the tenant have

23   $50 million of shareholder equity, far less, I believe than

24   Sears had when it entered into the lease, at least according

25   to its public financial statements or financial filings in

Page 125

1    1991.

2          If -- and when I say Section 25, I'm referring to

3    the Rea, which is incorporated -- that particular section is

4    incorporated into the lease.  According to the proposed

5    assignee, Transform, I should look at the reference to

6    financial and operational performance, in light of what the

7    parties actually agreed to and determined was relevant to

8    the right to assign.  The landlord states that the contract

9    between the parties is essentially irrelevant.

10          I conclude, for purposes of this section, as well

11   as the other three subsections of 365(b)(3) that each

12   requires reference back to the party's actual agreement, and

13   that Congress did not create independent requirements that

14   would not go to actual assurance of future performance, but

15   rather wanted to focus the Court on, obviously still subject

16   to Section 365(e), taking into account the landlord's rights

17   under the lease, as implicated by these four subsections.

18          The case law in support of that view is extensive

19   and persuasive.  Perhaps the best analysis is again in the

20   Ames Department Stores bankruptcy case, this time appearing

21   at In Re Ames Department Stores 127 B.R. 744 (Bankr.

22   S.D.N.Y. 1991).  In that opinion, the Court was not

23   interpreting Section 365(b)(3)(A), but rather (b)(3)(D),

24   which states that adequate assurance of future performance

25   of a lease of real property, a shopping center, includes

Page 126

1      adequate assurance, that assumption or assignment of such

2      lease will not destroy any tenant mix or balance in such

3      shopping center.

4               In the Ames opinion, former Bankruptcy Judge

5      Bushman notes again that the entire section is prefaced by a

6      reference to adequate assurance of future performance of

7      such contract of the lease itself obviously with the focus

8      on the lease.  He then noted the purpose of the statute,

9      which was to protect the bargain between the parties, and

10     finally noted the general bankruptcy law principal that

11     unless specifically provided for in the Bankruptcy Code,

12     bankruptcy does not rewrite the parties' non-bankruptcy

13     bargained-for rights.

14               He concludes, "where there is no indication of any

15     intention by Congress to do anything other than hold a

16     shopping center Debtor-Tenant to its bargain with a landlord

17     and to leave intact the property interests of debtor and

18     landlord as set forth in that bargain, the Courts should not

19     imply an additional non-bargained-for term. To construe the

20     statute in the manner urged by," in that case the landlord,

21     "would be 'a flight of redistributive fancy.'"  That appears

22     at Page 753.

23               That case law has been followed rather uniformly

24     since then, including by the District Court in In Re A&P,

25     472 B.R. 678 through 679, again in connection with the

Page 127

1   tenant mix issue, and In Re Toys R Us Property Company, 2019

2   Bankr. LEXIS 440 at Page 13 (Bankr. E.D. Va., Feb. 11,

3   2019).  The landlord has contended that there are other

4   cases going in the opposite direction and imposing a

5   separate requirement that would not appear in the parties'

6   lease under Section 365(b)(3).

7          Namely, it asserts In Re Rickel Home Centers, 240

8   B.R. 826, appeal dismissed, 209 F. 3d. 291, 3rd Cir. 2000,

9   cert denied, 531 U.S. 873 2000.  And In Re Casual Male

10  Corp., 120 B.R. 256.  A close reading of those cases does

11  not really support that contention.  In Rickel Home Centers,

12  the primary purpose of the court throughout, in response to

13  various landlords' objections in a shopping center context,

14  to an assignment whereby the assignee would only occupy a

15  certain part of the store, the store would go dark for a

16  period of time, and the like, was as to the application of

17  365(e) to those contractual restrictions.  And the Court

18  concluded that, with limited exceptions, 365(e) should in

19  fact, apply to invalidate those contractual restrictions, as

20  a restraint based on the Debtor's financial condition of the

21  right to assign.

22          One of the three landlords raised an objection,

23  again under 365(b)(3)(d), based on not its contractual

24  provision, but the general notion that tenant mix must be

25  maintained, even if there is no such contract.  The Court

Page 128

1    concluded that under 365(e), the proposed assignee should be

2    given a reasonable time to sublet the premises, which the

3    subtenant agreed, in addition to stating that it would do so

4    as quickly as possible, would be the specific time period

5    that it stated it could do it in, which was, the assignee

6    proffered six months.  The Court accepted that commitment

7    and overruled the objection.

8              But it first noted, although it did not have to

9    rule on this basis, "The Court notes that the Bethlehem

10   lease does not contain any provision prohibiting going dark

11   to this extent.  Net cannot argue that the assignment from

12   the Debtor to Staples will interfere with any provision of

13   the Bethlehem lease."  It then went on to conclude that in

14   any event, that I'm by which the assignee would be taking to

15   sublet the premises was not unreasonable.

16             In Casual Male, the focus of the Court, as I

17   stated, was on Section 365(b)(3)(A), but given the deposit

18   of six months' rent in advance, and the support by the

19   newly-formed tenants' principal, as well as working capital

20   loan from its principal, that was sufficient similar

21   financial condition and operating performance.  One cannot

22   take away from that decision, which of course would not be

23   controlling precedent on me anyway, the belief that Congress

24   created a new standard in Section 365(b)(3), that would

25   override the parties' own agreement as a limitation on

Page 129

1   assumption and assignment.

2           I will note one other case, In Re TSW Stores of

3   Nanuet, Inc., 34 B.R. 299 (Bankr. S.D.N.Y. 1983), in which

4   the Court again interpreted a restrictive use covenant and

5   then went on to hold that it appeared in this situation

6   there would be economic detriment to the landlord based on

7   the respective assignee's stated intention to vary that

8   covenant or breach it.

9           I conclude therefore that based on my general --

10  my findings with respect generally to adequate assurance of

11  future performance, the differences in financial condition

12  and operating performance are not such as to preclude the

13  assignment of this lease, which has its own limitations on

14  assignment in it, which I have found the Debtor and the

15  assignee have satisfied.

16          For the record, I also conclude that if that legal

17  determination is incorrect, and that the case law is cited

18  and follow on the grounds of stare decisis is incorrect,

19  then the financial condition and operating performance of

20  Transform is not similar to Sears in 1991.  Transform has

21  not carried its burden to show, for example, that the ratio

22  as far as its financial health, is the same, notwithstanding

23  that it has shown that it's sufficiently financially

24  healthy, when coupled with the favorable nature of the lease

25  and deposit of an amount equal to the annual projected

Page 130

1    monetary payment under the lease, that it is sufficiently

2    healthy.

3              There's no issue as to percentage rent under the

4    lease, and I believe I've already addressed the tenant mix

5    point.  But let me reiterate that there's no specific

6    provision in the lease, other than a broad provision in

7    Section 22(c) as to Sears and its assignee's right to use

8    and assign the property, limiting tenant mix.  Such broad

9    provisions are well-recognized as not precluding an

10   assignment generally in the shopping center context.  See

11   Ramco-Gershenson Properties L.P. v. Service Merchandise

12   Company, 293 B.R. 169, for example.  The lease also has very

13   broad rights pertaining to use restrictions after the major

14   operating period, or the tenant operating period, which the

15   parties agree has already expired.  And I do not believe

16   that given that Transform will be bound by those broad use

17   restrictions, and acknowledges it will be, that it's

18   violating them as an assignee.

19             My determination with respect to the effect of

20   365(b)(3) is guided with respect to this lease by one other

21   consideration.  Based on the testimony before me, it appears

22   to me that the landlord's main, if not primary, if not only,

23   rather, concern is not necessarily to affirmatively usurp

24   the value of the lease for its own benefit, as is the case

25   in most of the cases cited, where the lease is favorable,

Page 131

1    and the landlord has objected.

2            Rather, it appears to me that the landlord desires

3    to control the property for the aggregate benefit of itself,

4    which may mean that it would cut another very favorable

5    lease to an anchor tenant.  That does, in the abstract, fit

6    into or conform with Congress's overall concern when

7    enacting Section 365(b)(3), that the Court take into account

8    the overall effect of the assignment on the shopping center

9    and the landlord's interest in it.

10           However, consistent with my view and the Court's

11   view, generally, that 365(b)(3) is to be interpreted in

12   light of and limited by the parties' actual agreement, I

13   note that Section 6.3 of the lease provides that "in the

14   event that at any time, and from time to time after the

15   expiration of the Sears operating period," which again has

16   expired, "and until the term expires, the tenant decides to

17   cease, and ceases to operate a store in the tenant

18   building," which we know has occurred, "and further

19   determines to sell, exchange, or otherwise transfer its

20   interest in the leased premises," which we also know has

21   occurred, "tenants shall, by giving landlord notice, first

22   offer to landlord the right to purchase the same, one, at

23   the price offered to tenant pursuant to a bona fide offer in

24   a good faith, arms' length transaction, when a prospective

25   purhcaser-assingee, unrelated to tenant, and on the same

Page 132

1    terms and conditions offered to tenant, or two, if no such

2    offer has been made to tenant at a price equal to the fair

3    market value of tenant's leasehold estate, including the

4    value of its improvements.

5         And the parties then set forth a half-page

6    mechanism of how that fair market value would be determined.

7    It has often been held that rights of first offer are among

8    the types of provisions and leases that trigger Section

9    365(e)'s prohibition on, or exemption from performance by a

10   Debtor of provisions based on the Debtor's financial

11   condition, that would preclude or prevent assignment, or as

12   found in 365(f).  Here, Transform has chosen not to make

13   such an argument.  Rather, it is stated on the record, it

14   accepts that if it becomes the assignee of this lease, it

15   will be bound by al the terms of the lease, including this

16   provision.  Well, let me back up.  It is confirmed on the

17   record it will be bound by this provision.

18        It appears clear to me then, first that the

19   parties actually, in keeping with their sophistication,

20   contemplated an event like this, and spelled out their

21   bargain as to what would happen in Section 6.3.  And

22   secondly, that the landlord in this section bargained for a

23   measure of control in the event, which is what has occurred

24   here, that the tenant ceases to operate a store in the

25   property, and is looking to sell the leased premises.

Page 133

1          So it actually does, in fact, have the control

2     that it has stated, is its primary concern.  And the issue

3     then is simply, I believe, one where the parties are

4     fighting over who has the right to the fair market value of

5     the estate:  the Debtor, by selling it to Transform, that is

6     the leasehold estate:  the Debtor, by selling it to

7     Transform, or the landlord, by convincing the Court that its

8     interpretation of 365(b)(3) preclude such an assignment.

9     So, if Congress did, in fact, intend those provisions to, in

10    the balance, between giving value to a Debtor and its

11    creditors, and protecting the landlord, provide additional

12    requirements, the parties' contract in fact does protect the

13    landlord, while preserving the fair market value for the

14    Debtor through an assignment to Transform.

15          I also will note finally that transform has

16    represented on the record today that even if the landlord

17    does not take up the -- or not exercise its right, under

18    Section 6.3, it will not hold the landlord in suspense over

19    tis commencement of reletting the premises for the full term

20    of the lease, which has 73 more years to run, but rather

21    will cap the outside date by which it will at least commence

22    reletting the premises for two years on the condition that

23    the landlord will not interfere with its marketing process.

24          The testimony is certainly not ample on this

25    topic.  I have the declarations of Transform's witnesses, as

Page 134

1   well as the cross-examination of Mr. Ghermezian, but it

2   appears to me that two years is not an unreasonable amount

3   of time for a property like this to enter into at least one

4   material sublease or assignment, which again, subject to the

5   broad, or, well, their phrase, weak restrictions in the

6   lease, Sears and its assignees have an absolute right to do.

7   That testimony reflects a judgment first by Transform's

8   witness, that such a period is a reasonable one, as well as

9   the testimony on cross-examination that it took years, in

10  the plural, to sublet the premises after the closing of the

11  Bloomingdale's store at the mall.

12         So in light of all of that, I conclude that the

13  objection should be denied, and that the assumption and

14  assignment motion should be granted.  It is again, subject

15  to the representations made on the record today by Transform

16  with respect to the operation of 6.3 of the lease, and the

17  initial subletting of a portion of the premises within two

18  years, on the condition that the landlord not interfere.  So

19  I'll ask Transform's counsel to submit an order to stipulate

20  that ruling.

21         MR. CHELSEY:  We will, Your Honor.  We will

22  obviously pass that by counsel (indiscernible).  Thank you,

23  Your Honor.

24         THE COURT:  Okay, you don't need to formally

25  settle it, but you should circulate it to MOAC's counsel.

Page 135

1            MR. CHELSEY:  We will, Your Honor.  Thank you.

2            THE COURT:  Thank you.

3            (Whereupon these proceedings were concluded at

4    2:25 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1                        C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6

7

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  August 28, 2019

| & | | |
|---|---|---|

**&**   8:3,20 99:3

**0**

**00008**   25:16
**007**   29:2,18

**1**

**1**   39:23,24,25 89:7
  107:25 114:10,19
  117:20 119:16
**1,000,001**   117:7
**1,000,002**   117:7
**1.1**   88:19
**1.1m**   38:4 53:24
**1.2**   38:4
**1.2m**   53:24
**1.2m.**   38:4
**10**   28:22 32:6 35:6
  53:22 78:22,25
  85:14 90:8,8,9,9
  117:4
**100**   124:18
**10020**   8:13
**10036**   8:22
**10153**   8:6
**10601**   1:14
**10:16**   1:17
**11**   3:14,25 61:8,10
  127:2
**1133**   8:21
**11501**   136:23
**12**   25:5,9
**120**   62:5 118:21
  122:16 127:10
**123**   56:6
**125**   98:3
**1251**   8:12
**126**   41:9,16 56:7
**127**   52:21 87:22
  125:21
**13**   14:6 127:2
**13,000**   73:8,9

**139**   118:15
**14**   14:6
**143**   55:19
**15**   14:6,12 55:23
  59:1 92:17 95:3
  97:23 118:17
  124:16,18
**169**   123:22 130:12
**17**   95:19
**177,000sf**   49:15
**18**   46:25
**18-23538**   1:3
**1801**   66:25
**18th**   17:1 43:3
**19**   121:25
**19's**   122:7
**1978**   66:25
**1983**   129:3
**1986**   118:20
**1990**   66:25 118:21
  122:17
**1991**   13:12,15
  52:22 86:23 88:7
  89:23 91:2,7
  92:16 93:9 95:3
  96:18 97:10 103:2
  104:15 120:18
  125:1,22 129:20
**1992**   118:16
**1999**   121:25

**2**

**2**   70:2 92:4 114:19
  117:21 118:18
  119:16
**20**   103:17 118:17
**2000**   127:8,9
**2003**   121:20,21
  123:22
**2006**   99:1 114:24
**2008**   116:7
**2012**   75:19 76:1
  76:12 107:7 115:7
  118:17,18

**2016**   76:14
**2019**   1:16 17:1
  39:2 93:9 127:1,3
  136:25
**209**   127:8
**2199**   2:8
**22**   40:24 41:7,14
  41:25 55:25 56:3
  56:6 58:20,25
  96:10 97:21 130:7
**2208**   118:17
**22c**   64:23
**23**   1:16
**240**   127:7
**248**   1:13
**25**   55:20 56:21,21
  93:1 124:22 125:2
**250**   118:3
**256**   118:21 122:16
  127:10
**264**   62:5 118:21
**26th**   11:4
**270**   74:14
**28**   136:25
**291**   127:8
**293**   123:22 130:12
**299**   129:3
**2:25**   135:4
**2b**   89:8 114:11

**3**

**3**   13:6,17 40:2
  66:1 67:25 70:3
  73:8 87:1,5,20,23
  88:2,8 89:4,5
  91:12,17 97:16
  99:14,16 113:25
  114:1,7,8 116:8
  118:23 119:15
  120:4,7 121:16
  122:11 124:3,5,15
  125:11,23,23
  127:6,23 128:17
  128:24 130:20

**131**:7,11 133:8
**30**   13:12,15
**300**   1:13 136:22
**3000**   120:22
**3150**   121:20
**330**   136:21
**34**   129:3
**348**   114:23
**3501**   2:13
**36**   11:5 12:16
**363**   113:10,11
**364**   91:12
**365**   3:14,25 13:6
  13:17 60:16 66:1
  67:25 87:1,5,20
  87:23 88:2,8 89:4
  89:5 91:17 97:16
  99:14,16 100:14
  102:21 113:25
  114:1,1,7,8,19
  115:5 117:20
  118:23 119:15,16
  119:17,17 120:4,7
  121:16 122:11
  124:3,5,10,15
  125:11,16,23
  127:6,17,18,23
  128:1,17,24
  130:20 131:7,11
  132:9,12 133:8
**3823**   3:16
**383**   116:6
**3926**   2:17
**3927**   3:21
**3d**   127:8
**3rd**   127:8

**4**

**4**   3:14,25 21:21
  55:20 80:18
**40**   37:1
**400**   84:10 92:8
  121:3

| | | a | |
|---|---|---|---|
| **425** 84:9,22 92:8 121:2 | **6.3.** 95:14 108:23 132:21 | | **acquiring** 88:10 |
| **4354** 4:1 | **6.3c** 95:15 | **a&p** 72:21 100:13 115:6,6 126:24 | **act** 110:23 |
| **440** 127:2 | **6/25/2019** 3:23 | **abide** 60:12 | **action** 43:22 |
| **4450** 2:22 4:3 | **60,000sf** 37:1 | **ability** 17:23 | **actions** 44:25 |
| **4451** 4:4 | **600** 121:1 | 24:19 47:11 51:3 | **actively** 12:23 |
| **4454** 3:10 | **650** 28:5 | 54:18,21 64:10 | **activities** 42:6 |
| **4687** 4:1 | **656** 19:20 | 103:19 108:8,10 | 56:12 98:13,13 |
| **472** 115:6 126:25 | **660** 19:20,22 | 111:15 115:24 | **activity** 41:18,19 |
| **4864** 4:8 | 21:18,25 | 118:14 | 42:7 |
| **4865** 4:12 | **666** 115:6 | **able** 51:6,24 60:6 | **actual** 35:16 |
| **4867** 4:19 | **678** 126:25 | 88:18 109:15 | 43:18 63:20 86:2 |
| **4874** 4:23 | **679** 115:6 126:25 | 116:14 | 123:8 124:9 |
| **4875** 5:3 | | **absent** 59:22 60:1 | 125:12,14 131:12 |
| **4876** 5:7 | **7** | **absolute** 75:4 93:9 | **add** 69:16 71:3,4 |
| **4879** 5:20 | **7** 28:20 29:6 43:15 | 99:1 116:4 134:6 | 72:1 75:6 109:13 |
| **4880** 6:12 | 43:19 44:5 45:6 | **absolutely** 79:22 | **adding** 15:14 |
| **4889** 6:17 | **70** 105:21 106:6 | 93:6,23 | **addition** 28:14 |
| **4903** 6:22 | **7036** 11:5 12:6 | **abstract** 87:5,21 | 45:21 52:16 53:21 |
| **4915** 7:4 | **73** 36:14 40:21 | 131:5 | 71:11 105:12 |
| | 107:22 133:20 | **abundantly** 93:2 | 113:16 116:16 |
| **5** | **744** 52:22 125:21 | **accept** 116:21 | 117:12,13,18 |
| **5** 13:9 21:22 | **747** 118:20 | 117:24 | 118:10 128:3 |
| 121:21 | **74th** 118:19 | **acceptable** 11:14 | **additional** 2:12,17 |
| **5/13/2019** 3:12 | **752** 87:22 | **accepted** 128:6 | 2:21 3:6,10,20 |
| **50** 26:1 56:1 93:4 | **753** 126:22 | **accepts** 132:14 | 4:17 5:16,19 6:8 |
| 118:5 124:23 | **755** 118:20 | **account** 125:16 | 6:11 37:15 61:7 |
| **52** 50:25 | **767** 8:5 | 131:7 | 67:1 69:15 81:10 |
| **531** 127:9 | | **accountant** 24:10 | 89:6 114:2 118:24 |
| **55** 40:4 58:4 | **8** | 24:17,18 25:1 | 126:19 133:11 |
| **56** 118:18 | **8** 7:2 43:15,20 | **accounting** 25:2 | **additions** 114:20 |
| **565** 116:6 | 45:13,15 80:18 | **accurate** 30:1 | **address** 10:19 |
| **573** 116:7,15 | **8/22/2019** 2:1 | 35:4 37:24 136:4 | 16:10 81:4 85:1 |
| **585** 118:15 | **80** 74:4 77:6 | **achieve** 115:3 | 85:24 108:16 |
| **59** 118:19 | **826** 127:8 | **acknowledged** | **addressed** 11:13 |
| **592** 118:15 | **84** 67:1 | 68:6 | 83:9,20 84:24 |
| **596** 118:18 | **873** 127:9 | **acknowledges** | 130:4 |
| | | 100:6 130:17 | **adds** 38:3 114:19 |
| **6** | **9** | **acquire** 60:2,3 | 118:24 |
| **6** 13:9,13 18:2 | **9** 13:25 47:9 57:21 | **acquired** 86:14 | **adequacy** 32:18 |
| **6.3** 94:21 95:17,19 | **91** 114:23 | 121:1 123:2 | 33:1 |
| 105:7 108:25 | **922** 66:24 | **acquirer** 86:5 | **adequate** 18:6,15 |
| 109:14,18 131:13 | **98** 114:23 | | 18:17 19:1 20:20 |
| 133:18 134:16 | | | 25:20 28:2,17 |

33:10,20 34:1
51:3,3,21 53:9,14
54:10,24 61:13
65:21 66:3,4
88:12 89:4,8,9,11
100:2 104:13
114:12,13,15,16
114:18 115:10,11
115:17,19 116:9
117:19 118:2,12
118:25 119:9
120:4,8,10 121:16
123:16 124:6
125:24 126:1,6
129:10
**adequately**
123:25
**adjusted** 27:20
**administration**
87:9
**admission** 4:19
13:10 14:22
**admissions** 7:4
11:22 12:5 13:1
**admit** 11:4 12:2
13:13,22,23,25
14:8,12 15:22
51:2
**admitted** 13:20
14:19 50:21 98:22
**advance** 128:18
**advanced** 87:3
**advantage** 121:10
**advertising** 51:7
68:10
**advice** 32:17
**advise** 30:25
**affirm** 16:15
42:20 71:19,22
82:17
**affirmatively**
130:23

**affirmed** 121:19
**affirming** 99:3
**afford** 48:10,14
97:13 100:8
**affords** 99:18
100:14
**afternoon** 75:17
**aggregate** 44:21
45:5 53:22 117:4
131:3
**aggressiveness**
68:11
**ago** 76:19
**agree** 48:19 50:4
54:4 59:1 62:10
95:20 102:24
108:22 112:13,19
117:4 130:15
**agreed** 4:6 10:14
13:1 50:19,20
68:16 72:25 88:21
105:7 112:15
113:14,16 124:14
125:7 128:3
**agreeing** 105:10
**agreement** 92:23
95:15 100:21
101:1 113:6,18
116:18 121:1
124:9 125:12
128:25 131:12
**agrees** 94:25 98:2
**ahead** 44:2 49:20
72:9 73:1 96:2
**aid** 51:22
**air** 40:7
**al** 1:7 10:3 132:15
**alana** 8:15 10:5
**albanese** 8:16
10:5 16:10 21:15
24:3 27:2,4 31:25
32:2 33:7 37:7,9
37:11,13,19,21

40:23 41:5,12,14
41:16
**alex** 11:20 55:13
**alix** 9:9
**allow** 81:10 84:12
84:16 94:11
**allowed** 33:1 62:7
67:18 68:25
105:23
**allows** 39:12
55:18 65:12
**alphabetical**
21:15
**ambiguously**
103:16
**amended** 2:10,15
3:5,8,19 5:15,18
6:7,10,19 103:16
113:17
**amendment** 12:7
**america** 10:7 11:8
17:1,17 24:13
28:11 32:25 34:4
34:7 36:24 47:10
72:17 73:2,5,7
86:4 87:4 96:21
112:25 113:2
114:6
**america's** 100:12
**americas** 8:12,21
**ames** 52:21 87:21
88:1 92:12,13
99:13 103:9
114:23 121:20
123:15 125:20,21
126:4
**amount** 2:13,22
3:8 4:18 5:17 6:9
10:12 44:22 45:15
49:11 53:22
129:25 134:2
**amounts** 45:9

**ample** 133:24
**analysis** 88:1 89:6
90:4,8 115:21
125:19
**anchor** 48:3,11,13
48:19,21,22 49:8
49:13,16 50:2
58:13 59:13,18
76:25 79:17,20,23
79:25 80:5,6,8,14
80:16 97:20 131:5
**anchoring** 76:25
77:1
**anchors** 49:14
**ancillary** 92:7
**anecdotal** 36:21
**angeline** 8:8
**annual** 129:25
**annually** 73:8
117:7
**anomalous** 99:16
**answer** 11:21 12:5
33:13 70:24,25
75:24 76:7 79:7
83:16 84:1 90:23
103:15 108:1
**answered** 27:5,25
29:17
**anti** 111:19
**anticipated** 73:15
**anticipating**
64:21
**anybody** 29:13
35:2 40:19
**anyway** 12:5 15:3
106:20 128:23
**apa** 27:23
**apart** 66:2 96:7
115:16
**apologize** 20:6,18
21:13 28:25 42:2
66:22 85:20

appeal 127:8
appear 13:21 89:2
  127:5
appeared 129:5
appearing 125:20
appears 12:22
  117:2,21 126:21
  130:21 131:2
  132:18 134:2
appl 121:24
apples 93:9,9
applicable 55:25
  113:10,25 118:10
application 11:4
  127:16
applies 90:1
apply 89:4 95:17
  114:8 122:21
  127:19
appointment
  119:22
appraisals 44:5,8
  44:10,14,21 45:1
appraisers 110:4
appreciate 72:21
  72:22 75:25 89:19
  107:2 109:6
approach 123:20
appropriate
  53:14 54:11 73:19
  73:20,22 74:20,21
  104:21 114:3
approval 10:17
approving 75:5
approximately
  21:25 53:24,25
  88:19 92:8 121:2
  121:3
apr 118:18
aptly 14:5 114:22
area 19:11 116:1
areas 83:24

aren't 22:7
arguably 89:5
argue 57:10 61:3
  69:13 122:10
  128:11
argued 59:24
argues 121:24
  122:6
arguing 90:20,20
argument 10:19
  15:18 64:21 69:12
  69:14 75:8 79:13
  82:3 84:12,15
  93:25 105:4
  122:15 132:13
arguments 10:25
  15:15 82:4 86:20
  87:3 112:11
  122:14
arisen 101:8
arms 131:24
article 55:25 56:3
  56:21
articulate 87:1
articulated 94:17
aside 88:15
  107:11 114:11
asked 26:12 34:25
asking 14:16 18:1
  20:17 22:11 31:3
  48:16 49:20 81:16
  94:6 108:9,22
aspect 56:1 58:17
aspects 121:25
  122:3
asserted 45:2
asserting 113:9
asserts 127:7
asset 34:5 73:9
  100:21 113:6
  120:25
assets 46:9 84:7
  86:6,13 100:22,23

122:24 123:1
assign 19:19
  20:21 21:24 23:13
  59:19 86:3 92:20
  92:25 94:14 97:11
  99:18 106:16
  108:12 112:25
  124:21 125:8
  127:21 130:8
assignability 88:3
assigned 19:23
  20:1,2,2,4,9 21:1
  22:3,16,24 23:9
  23:18,25 24:1
  86:12,16 91:14
  94:12
assignee 13:11,13
  68:9 88:11 89:14
  89:25 90:6 98:11
  99:11 113:2
  115:16 116:21,23
  116:25 117:8
  120:5,13 121:22
  122:18,23 123:4
  123:13 125:5
  127:14 128:1,5,14
  129:15 130:18
  132:14
assignee's 118:13
  122:24 129:7
  130:7
assignees 97:11
  98:10 110:22
  114:18 116:20
  117:15 122:8
  134:6
assigning 96:4
assignment 2:6,11
  2:16,20 3:3,6,9,20
  4:7,11,17,22 5:2,6
  5:12,16,19 6:4,8
  6:11,16,22 10:7
  14:9,15 15:12,17

15:19 16:25 24:4
  24:5 64:1 67:1,7,8
  74:23,24 86:19
  87:16,18 89:13
  97:14 99:17
  100:20 101:3
  107:20 110:23
  111:19 113:3,4,9
  119:5,18 120:12
  121:8 122:25
  126:1 127:14
  128:11 129:1,13
  129:14 130:10
  131:8 132:11
  133:8,14 134:4,14
assignments 23:2
  53:20 59:25
  113:11
assignor 110:24
assigns 56:25 57:1
  57:17 98:12
  124:19
assingee 131:25
assume 19:18
  20:21 21:24 23:10
  23:11,12,13 29:19
  30:15 31:17 32:25
  86:3 92:19 94:14
  106:22 112:24
assumed 17:24
  19:20,23 20:1,1,8
  21:1 22:3,16
  23:17,24 86:12,16
  94:11 114:13
assumes 48:15
  63:6
assuming 20:14
  21:5 36:19 64:25
  90:15
assumption 2:6
  2:11,16,20 3:3,6,9
  3:20 4:6,10,16,22
  5:2,6,12,15,19 6:4

6:7,11,15,21 10:7
14:8,15 15:12,17
16:25 24:4 86:25
87:15,17 99:17
100:20 101:3
113:4,8 119:18,18
126:1 129:1
134:13
**assurance** 18:6,15
18:17 19:1 20:20
24:13 25:19 28:2
28:17 30:9 32:8
33:10 34:1 51:3,4
53:9,11 54:24
66:3,4 89:4,8,9,11
92:24 100:2
104:11,14 114:12
114:13,15,16,18
115:10,12,17,20
115:21 116:9
117:20 118:2,13
118:25 119:9
120:5,8,10 121:17
123:17 124:7
125:14,24 126:1,6
129:10
**assurances** 24:14
88:12
**assure** 28:13
**assured** 28:11
53:16,17 90:19
123:25
**assuring** 90:17
**atlantic** 99:3
**atm** 42:7
**attached** 32:5
38:11,14,19 74:15
117:10
**attachments**
18:11 26:6 31:13
**attempting** 46:9
86:21

**attempts** 94:13
**attorneys** 8:4,11
**attraction** 73:3
**attractive** 49:4
**august** 1:16 17:1
43:3 136:25
**authority** 86:3
**authorized** 86:25
**auto** 58:8
**available** 50:2
79:17,18 88:14
92:3,5
**avenue** 8:5,12,21
**avoid** 43:20
**aware** 22:6 34:1
44:20 51:9 52:19
52:23 86:13 101:6
102:12

**b**

**b** 1:21 3:7 4:18
5:16 6:8 7:3 9:10
13:6,17 16:22
59:12 66:1 67:25
87:1,5,20,23 88:2
88:8 89:4,5 91:12
91:17 97:16 99:14
99:16 102:21
113:10,25 114:1,7
114:8,19,19 116:8
117:20,21 118:23
119:15,16,16
120:4,7 121:16
122:11 124:3,5,15
125:11,23,23
127:6,23 128:17
128:24 130:20
131:7,11 133:8
**b.r.** 52:22 62:5
87:22 114:23
115:6 116:6
118:15,18,20,21
122:16 123:22
125:21 126:25

127:8,10 129:3
130:12
**back** 14:18 29:15
29:18 36:23 56:3
57:7 60:2,3 63:2
65:25 77:9,10
78:21,22 85:13,18
92:12 97:4,6,8
125:12 132:16
**backwards**
108:10
**badgering** 27:5,7
**balance** 18:22
24:8 25:7,8,12
26:9 27:8,15
28:12 29:10,11,15
66:7 126:2 133:10
**balanced** 59:6
**balancing** 12:12
**bankr** 114:23
115:7 116:7
118:17,17,19,20
118:21 122:16
125:21 127:2,2
129:3
**bankrupt** 63:18
63:22,22 64:10
68:18,21 73:15
**bankruptcy** 1:1
1:12,23 11:5
47:23 59:23,24
63:17 68:20,22
72:21 84:8 87:9
87:19 91:4,5
95:18 103:14,15
105:20 106:7
113:11 114:22
121:19 122:21
123:15 125:20
126:4,10,11,12,12
**bargain** 63:6 68:1
86:15 87:25 88:6
94:19 98:18 99:24

100:11,17 119:11
119:12 124:11
126:9,16,18
132:21
**bargained** 92:21
92:22 94:13
126:13,19 132:22
**based** 13:16,18
27:20,22 32:16
46:18,19,21,23
47:17 48:18 82:5
88:13 94:8 115:15
123:16,23 127:20
127:23 129:6,9
130:21 132:10
**basically** 17:19
80:8 109:23
**basing** 72:19
**basis** 12:12 15:18
31:14 32:16 36:18
46:2 115:24 119:5
128:9
**bealls** 78:24
**beeby** 11:20 55:9
55:12,13 57:14,20
58:3,6,11,14,17
58:25 59:9,14,21
60:4,6,18
**befall** 97:7
**beginning** 99:1
**begins** 89:6
**behalf** 10:5 70:9
**belief** 128:23
**believe** 10:16 12:6
12:21,25 13:17
15:9 20:11 23:19
25:8,8 27:17
30:18 31:11 37:23
39:9 42:9 44:24
53:15 55:19 56:4
64:18,22 68:2,15
68:16 73:9 74:9
74:15 76:16 77:24

78:25 86:24 87:1
94:7 104:5 105:22
111:2 117:18,24
118:3,5 119:11
124:23 130:4,15
133:3
**believes** 45:10
46:3 96:5
**belknap** 8:20
**bend** 108:9
**benefit** 63:5 79:2
81:9 85:11 87:25
88:6 94:19 98:17
99:24 100:9,11,17
119:11 130:24
131:3
**benefits** 49:22
100:5 124:11
**best** 49:15 59:2
73:17 79:21,21,22
125:19
**bet** 35:9
**bethlehem** 128:9
128:13
**better** 13:11,14
51:15 77:5 103:14
**beyond** 27:17
36:10 90:20
106:15 118:24
**big** 72:16 73:11
95:15 102:7
122:11,12
**billion** 73:8 92:4
**binder** 16:7 21:11
21:12,14 28:20
**binding** 95:19,20
**bit** 85:21 103:23
**bk** 52:22
**bleeds** 124:3
**block** 88:9
**bloomingdale**
78:20

**bloomingdale's**
75:18,22 76:1,7
76:12 80:3 98:22
107:6 134:11
**bloomington**
74:13
**body** 58:8
**boilerplate** 33:3
**bona** 131:23
**book** 70:11
**bought** 100:22
**boulevard** 118:16
**bound** 41:23 42:3
42:4 61:11 69:3
97:2 100:4 106:22
130:16 132:15,17
**box** 122:11,12
**boy** 16:22
**brand** 84:10 92:7
**breach** 129:8
**break** 30:22 85:11
90:22
**brief** 6:14,15,21
51:12,13 62:3,16
85:16,24
**briefing** 3:16
**briefly** 75:16 97:4
108:1
**briefs** 52:4 54:14
**bring** 74:16 75:23
99:23 108:9
**brings** 77:6
**broad** 92:18 97:13
99:11 130:6,8,13
130:16 134:5
**brought** 81:5,15
83:14 85:25
**brozman** 9:9
**budget** 51:7
**build** 74:14
**building** 37:1
38:11 57:1,18
58:7,19 95:5

110:14 112:5
122:7 131:18
**built** 36:13 114:24
**burden** 33:17
51:2 54:23 63:14
129:21
**bushman** 126:5
**business** 53:19,19
91:8,14 101:24
102:3 116:24
117:1 120:22,25
123:6
**businesses** 36:5
**buy** 106:11
**buyback** 60:11,15
**buyer** 3:13,24
**buyers** 46:20
**buying** 101:19
**buyout** 107:16
**bygaph** 118:18

**c**

**c** 8:1 10:1 16:21
16:22 40:24 41:7
41:14 56:6 58:3
59:12,17 95:15
97:21 130:7 136:1
136:1
**cabined** 124:8
**called** 77:23 84:6
**calling** 106:3
**cam** 38:1
**campus** 37:1
38:16,18
**cancel** 78:9
**canyon** 73:6
**can't** 14:17 48:14
52:13 53:10,13,15
**cap** 133:21
**capital** 49:11
128:19
**capture** 100:4
**care** 80:4

**carefully** 110:6
**carried** 129:21
**carved** 76:8
**case** 1:3 12:16,18
15:6 16:24 22:23
23:20 47:18 51:11
52:23 54:23 61:21
62:19 66:13 68:5
73:20 74:21,21
75:4 81:18,19
89:2,12,20,25
93:12 97:17 103:1
112:24 117:14
118:11 119:14,15
119:21,21,23
120:1,12 122:15
122:23 123:13,14
125:18,20 126:20
126:23 129:2,17
130:24
**caselaw** 115:4,19
**cases** 15:2 51:8,14
51:16,20 52:20
60:15 61:5 62:15
62:16,17,25 63:16
66:15,22 91:16
92:12 101:6
103:20 116:7
118:12 121:11
127:4,10 130:25
**casual** 62:5 68:8
118:20 122:16,20
123:3,9,14 127:9
128:16
**categories** 120:6
**cause** 12:11 68:19
**caused** 87:8,10
**cease** 95:4 99:2
110:13 112:3
124:20 131:17
**ceased** 110:24
**ceases** 95:4
110:13 112:2

131:17 132:24

**ceasing** 111:4,25

**center** 36:13,20
40:7,8 56:11,15
56:23 57:6 58:18
59:4,5 64:24 65:2
65:9 66:7 67:2,8
72:18,20,22 73:3
74:9 87:13 89:3
89:10 91:13 98:16
99:24 100:6 101:7
114:6,14 115:11
115:23 118:16
119:6 120:10
125:25 126:3,16
127:13 130:10
131:8

**center's** 67:3

**centers** 63:2 87:8
114:4 119:4 127:7
127:11

**ceo** 100:12

**cert** 127:9

**certain** 12:2 29:14
29:17 45:15 46:9
52:11 74:4 115:1
124:19 127:15

**certainly** 44:22
104:10 108:6
111:15 133:24

**certainty** 46:22

**certified** 136:3

**certify** 29:13

**cetera** 32:6

**chance** 77:5

**chances** 78:1

**change** 17:6 27:11
27:12,13,24 28:12
43:5 47:4 70:14
70:19 83:6

**changed** 31:2

**chapter** 61:8,10

**characteristics**
72:23

**characterization**
30:2 35:4

**charge** 47:25 48:2
121:15

**charges** 116:1
117:6

**chart** 25:15

**chelsey** 134:21
135:1

**chesley** 8:17 10:4
10:4 11:11 15:13
15:20 16:1,5,10
21:11,20 39:23
40:2 42:17 50:16
50:20 60:12,21,24
69:6,9,19,21
75:11,15 79:6
81:6 82:3 83:11
83:25 85:12,15,20
85:23 89:1 90:22
91:6 92:1 93:15
93:19,23 94:22
95:2,13,23,25
96:13,17,20 97:4
98:9,11 101:5,9
101:11,14,16,21
101:23 102:4,6,10
102:17 107:24
108:4,14 109:7,13
109:18,21 110:1,4
111:2,7,10,12,15
111:21,24 112:4,7
112:13,19

**chop** 104:25

**chosen** 61:9
132:12

**chris** 9:15

**cir** 127:8

**circuit** 51:21
62:19 66:25 68:16
87:6

**circulate** 134:25

**circumstances**
114:3 117:19

**cite** 51:11,13,15
61:5 62:7

**cited** 15:2,4 51:8
51:10,20 62:1,6
62:15,21 103:20
116:7 118:11
120:2 123:15
129:17 130:25

**cites** 15:2 122:15

**citing** 102:21

**citrus** 118:16

**city** 73:10 74:13

**claim** 87:17 99:8
106:23

**claiming** 28:1

**claims** 97:7 98:25
100:8

**clarification**
37:22

**clarify** 37:24
40:25 86:9

**class** 38:23 39:3
40:6,16,17 56:15
56:23 57:6 58:18
64:11,24 65:1,2,8
96:10 98:16 100:6

**clause** 109:14,21
109:22

**clauses** 77:23
109:18

**clear** 13:19 34:3
41:17 72:14,16
79:11 86:15 87:23
88:1,8 91:12
92:14,16 93:2
95:16 97:10,12
99:3,10,13,20
106:14 115:15,19
117:2,12 119:7
121:7,13 124:16

**circulate** 132:18

**clearly** 45:7

**client** 17:16 47:21
69:7

**clients** 39:6 63:9

**close** 54:9,23
127:10

**closed** 56:11
73:24 75:19 76:1
76:12 107:7

**closely** 20:12

**closing** 85:24
119:21 134:10

**coaster** 41:21

**code** 52:1,9,25
54:17 62:22 64:18
65:11,19,20 68:20
72:21 87:19 92:10
93:5,11 103:25
113:12 114:25
126:11

**colleague** 61:1

**collection** 102:21

**combination** 59:5
76:3

**combine** 91:20

**combined** 73:6

**come** 52:13 54:9
54:23 56:2 58:15
59:22 62:18 78:21
78:22 80:7,19
104:23 106:1
113:24

**comes** 49:12 56:9
65:25

**comfortable**
46:22

**coming** 36:13
73:16

**commence** 133:21

**commencement**
119:21 133:19

**comment** 83:21
**commercially**
  88:13
**commitment**
  90:13 128:6
**committed** 117:8
**common** 116:1
  117:6
**companies** 90:8
**company** 19:18
  84:20 92:6 99:4
  101:2,19,25
  111:25 123:22
  127:1 130:12
**company's** 30:10
**compare** 93:9
**compared** 90:5
  122:24 123:8
**comparison** 13:7
  122:6,22
**compatible** 56:13
  64:23 78:16,17
  98:15
**completed** 26:11
  26:21 46:13,15
  117:22
**completely** 77:4
  122:8
**complicated** 12:3
**complies** 87:18
**comply** 51:24
  69:3 94:5,15
  99:21 113:9
**conceivable** 49:8
**concepts** 94:10
**concern** 130:23
  131:6 133:2
**concerned** 15:9
  47:11,13 64:7,8,9
  64:11 68:17 88:17
  94:1,2 96:3
  105:15

**concerning** 18:6
  32:18
**conclude** 50:16
  125:10 128:13
  129:9,16 134:12
**concluded** 50:8
  121:21 123:23
  127:18 128:1
  135:3
**concludes** 126:14
**conclusions** 31:1
**condition** 13:8,10
  13:12 14:11,14
  84:6 89:13,15,21
  89:24 90:4,6
  91:14 116:20
  119:20 120:12,15
  120:20,21 122:4
  122:17 127:20
  128:21 129:11,19
  132:11 133:22
  134:18
**conditioned** 40:7
  119:19
**conditions** 67:25
  132:1
**conduct** 116:25
**conducted** 44:6
**confer** 69:7
**confirm** 41:11
**confirmed** 88:12
  88:20 92:2 94:4
  132:16
**conflated** 94:10
**conflating** 24:4
**conform** 131:6
**confusing** 13:2
  24:6
**confusion** 84:2
**congress** 61:8
  66:25 67:4,6
  68:15 72:20,24
  103:15 106:8

114:1,3,25 124:14
  125:13 126:15
  128:23 133:9
**congress's** 131:6
**connection** 2:7
  3:4 5:13 6:5 16:25
  115:9 126:25
**consent** 55:24
  115:3
**consider** 11:9
  70:7 73:12
**consideration**
  89:12 101:1 113:3
  113:5 120:11
  130:21
**considering** 107:2
**consistent** 56:13
  64:23 65:2,8
  98:15 108:5 119:8
  121:14 131:10
**consolidated**
  25:11,12 117:25
**constitute** 17:3
**constructed** 86:22
**construction**
  123:11
**construe** 126:19
**construed** 14:5
  121:13
**construing** 121:11
**consultant** 35:17
**contain** 14:4 45:4
  59:5 128:10
**contained** 18:18
  24:9 106:15
**containing** 40:7
**contemplated**
  15:6 93:11 99:6
  132:20
**contend** 88:16
**contended** 127:3
**contends** 124:8,12

**contention** 127:11
**context** 33:9
  55:21 58:20 59:15
  101:7,8 102:13
  115:23 116:8
  127:13 130:10
**continuance** 2:1
**continue** 70:12
  87:11 98:20
  100:23 102:1
**continued** 47:12
**contract** 63:6 66:2
  66:5 93:21,24
  103:11 106:15,16
  125:8 126:7
  127:25 133:12
**contracts** 2:7 3:3
  5:13 6:5
**contractual** 75:21
  88:2 99:14 127:17
  127:19,23
**contractually**
  97:9 100:4
**contrary** 124:12
**control** 60:7 97:15
  100:2 112:10
  131:3 132:23
  133:1
**controlling**
  128:23
**controls** 99:10
**controversial**
  107:12
**conversation**
  97:19
**convincing** 133:7
**copy** 21:4,10
**corner** 74:12
**corp** 10:3 11:8
  36:24 85:19 96:21
  118:15,19,21
  122:16 123:14
  127:10

**corporation** 1:7
73:14,14 112:25
**correct** 17:15 18:8
18:9,16 19:19
23:18 26:15 34:5
34:5,8,20 35:18
38:12,18 39:15
40:13 41:11 44:6
54:1,1 57:15
59:14 60:12 71:24
75:18 76:1,4,8,9
76:10,12,15 77:21
78:5,10 82:1,1
83:4 91:6 102:6
**corrected** 91:16
**correction** 71:10
**correctly** 111:3
**cost** 79:3,5 88:19
**costs** 2:6 3:2 5:12
6:4 88:23
**couldn't** 48:12
**counsel** 10:8,9
15:16 60:9 84:20
86:1,10 134:19,22
134:25
**counsel's** 60:22
**country** 74:2
136:21
**couple** 13:2 37:7
75:12 76:19 90:23
90:23 91:10
**coupled** 129:24
**course** 41:22
86:14 105:18
128:22
**court** 1:1,12 10:2
10:10,13,19,22,24
11:14,15,19,23,25
12:17 15:24 16:2
16:4,9,12,15,19
16:23 17:5,8 19:9
19:25 21:6 22:14
22:16,19,22 25:10

25:14 27:3,6,25
28:8 29:3,6 31:7
32:3,5,9,23 33:9
33:13,16,23 34:17
35:7,13,16,19,23
36:1,3,11,16,18
36:23 37:6,8,10
37:17 38:8 41:2
41:25 42:13,19,23
43:2,7,10,23 44:1
44:11,17 45:5,7
45:25 46:5 47:2
47:22 48:17,25
49:3,8,19 50:12
50:14,18,22 51:10
51:13,15 52:13,19
53:21 54:2,5,7
55:1,5,10,11
56:24 57:16 58:1
58:5,8,10,12,16
58:23 59:8,12,16
60:3,5,8,14,20,22
61:1,17,18,21,25
62:4,8,11,13,15
62:20,24 63:5,23
64:15,20 65:6,14
65:18,23,25 66:1
66:10,13,18,20,23
67:11,13,21,24
68:3 69:4,8,15,18
69:20,22 70:4,16
70:18,21,24 71:1
71:4,6,9,14,16,23
71:25 72:5,12,19
73:12 75:7,10,13
79:9 81:1,13,16
81:20,22 82:2,10
82:14,20,22,24
83:2,16 84:1,4,13
84:19 85:5,8,10
85:13,18,22 86:13
87:20,21 88:1,11
88:16,25 89:2

91:2,5,19 92:6
93:13,18,21 94:4
94:11,18,20,23
95:3,22,24 96:1
96:14,19,21 97:1
97:3,8,12,15 98:8
98:10 99:2,13
100:10,13,19
101:6,10,13,15,18
101:22,24 102:2,5
102:7,12,15,18,22
103:9 105:6,14
106:21 107:2,4,10
107:14,16,18
108:3,12,15,17,21
109:3,5,11,17,20
109:25 110:3,5
111:6,8,11,13,17
111:22 112:2,6,8
112:15,20,23
115:5,20 118:14
121:18,19,23
122:13,21,23
123:3,7,15,17,20
123:22 124:4
125:15,22 126:24
127:12,17,25
128:6,9,16 129:4
131:7 133:7
134:24 135:2
**court's** 69:16 88:1
99:3 123:10,15
131:10
**courtesy** 69:10
**courtroom** 43:22
105:12
**courts** 76:21
91:19 106:14
110:22 116:16
126:18
**court's** 10:17
**covenance** 59:1

**covenant** 129:4,8
**covenants** 98:2
**covered** 13:21
**cpa** 29:12
**craft** 87:7
**crafts** 98:19
**craig** 8:18 10:5
43:14
**crayola** 41:21
76:10,18
**create** 12:14 45:3
125:13
**created** 128:24
**creates** 89:20
**credit** 32:13 37:23
116:18
**creditors** 115:2
133:11
**critical** 86:14
87:19 91:10 92:11
**critically** 86:20
**cross** 4:14 6:19
17:9,11 43:10
69:12,16 75:10,14
81:8,11,24 134:1
134:9
**curated** 99:9
**cure** 2:6,13,22 3:2
3:8 4:18 5:12,17
6:4,9 15:5
**curiosity** 12:1
**curious** 11:21
**current** 53:12
80:14 104:22
122:25
**currently** 14:1
**customarily** 56:10
57:3 98:7,13
**customary** 56:12
73:20,22 74:20,21
**customers** 66:16
**cut** 75:7 78:8 82:3
83:17 98:23 131:4

**d**

**d**  1:22 3:14,25
  10:1 39:20 41:25
  55:20 57:21 99:14
  99:16 118:21
  122:16 125:23
  127:23
**damage**  63:21
**damaged**  116:13
**dark**  52:12 54:15
  55:14,16,16,18,19
  56:18 57:10 60:2
  62:7,22 67:18,19
  67:22 68:3 77:1,2
  77:7,7 92:19
  98:24,25 99:4,6
  103:7 105:22,24
  106:10 127:15
  128:10
**date**  30:15 52:10
  52:12 63:14
  102:14 107:20
  108:7 123:1
  133:21 136:25
**dated**  17:1 43:3
**david**  8:24 11:20
**day**  47:4 73:15
**de**  48:20 49:3 50:2
**deal**  49:9 59:13
  73:13 79:1,1
  112:16
**dealing**  59:11
  115:19
**deals**  46:19
  109:15
**dealt**  67:14
**debtor**  12:1 23:13
  33:16 51:1 87:25
  89:16,17,22 90:4
  91:23 100:25
  107:19 110:24
  119:3,20 120:15
  120:16 122:9,23

123:2,13 124:10
  126:16,17 128:12
  129:14 132:10
  133:5,6,10,14
**debtor's**  2:11,13
  2:16,20,22 3:6,7,9
  3:19 70:6 82:5
  86:6 115:1,2
  122:6 123:1,9
  127:20 132:10
**debtors**  1:9 4:16
  4:18 5:15,17,18
  6:7,9,10 8:4 20:1
  22:19,24 86:2
  100:8,22 112:24
  113:6 114:17
  122:19
**debtors'**  10:8,9
**decide**  13:3 85:7
**decided**  81:11
**decides**  95:4
  110:13 131:16
**decision**  31:14
  32:9 33:1 49:13
  128:22
**decisions**  32:16
  47:23 101:13
  102:13
**decisis**  129:18
**declaration**  3:18
  4:3,21 5:1,5,9,9
  6:1,1 10:15 16:24
  17:20,21,22 18:2
  18:8,10,14,19,22
  19:5,6,7,8,16,21
  19:24 20:10,11,13
  20:15,17,20,25,25
  21:2,3,4,7,18 24:9
  26:6 31:1,11,20
  34:17 39:4 43:3
  46:19 53:7 70:9
  72:2 77:18 83:10
  83:14,20 84:24

86:11 108:6
**declarations**  16:8
  54:14 69:12,24
  70:14 81:5 99:25
  111:11 133:25
**decode**  61:4
**deem**  14:19
**deemed**  13:20
**defaults**  116:13
**defeat**  87:15
**defendant**  122:15
**defer**  60:18 82:6,8
**defined**  114:4,6
**definition**  57:22
**degree**  46:21
**deigned**  12:1
**delay**  12:18,22,25
**deleterious**  99:5
**deliberation**
  69:17
**demand**  48:22
**denied**  127:9
  134:13
**denominated**
  116:2
**deny**  47:23
**department**  48:8
  52:21 58:21 59:3
  73:23 74:13 75:1
  75:2,17,20 76:6,6
  77:7,11,12,15,20
  77:25 78:4,10,18
  78:19,25 80:2
  87:22 92:12 97:20
  97:23 98:21
  114:23 121:20
  125:20,21
**dependent**  14:14
  79:25 123:6
**depending**  83:17
**deposit**  116:17,18
  116:22 128:17
  129:25

**depth**  122:9
**describe**  37:14
**described**  76:20
**designatable**  2:12
  2:17,21 3:7,10,20
  4:17 5:16,19 6:8
  6:11
**designate**  101:3
**designation**  101:1
  101:8,9,19 102:13
**designed**  44:23
  87:23
**desire**  100:13
**desires**  11:23
  131:2
**destroy**  126:2
**destroying**  63:9,9
**detail**  15:14
**detailed**  97:22
**determination**
  33:10 121:19
  123:10 129:17
  130:19
**determine**  66:2
**determined**
  114:25 125:7
  132:6
**determines**  95:6
  110:15 111:5
  112:7 131:19
**detriment**  129:6
**detrimental**  56:14
  56:22 57:5 67:9
**developed**  59:3
**developer's**  55:24
**development**  40:6
  40:15
**dialogue**  36:7
**didn't**  15:10 18:5
  24:2,15 31:23
  32:2 39:5,7,9 48:8
  50:5 51:16

**difference** 49:24
122:9
**differences** 122:4
129:11
**different** 73:21
76:4,8 81:20
101:16 112:1
114:15
**differently** 48:17
48:25
**dire** 43:11 44:3
**direct** 17:2,3
37:17 43:3,7
70:11,13,18 72:3
72:6 79:15 81:8
81:10 82:25 84:16
84:19
**direction** 127:4
**directs** 10:15
**disagree** 52:20
96:22 105:5 107:1
124:4
**disagreement**
96:23
**disallow** 74:23
**disclaimer** 29:21
30:17
**disclaimers** 104:4
**disclosure** 32:6,18
123:24
**discovery** 12:14
**discuss** 83:13
**discussed** 10:9
43:16,17
**discussing** 67:13
**discussion** 34:18
118:10
**discussions** 97:25
**dismiss** 69:13
**dismissed** 127:8
**disneyland** 73:6
**dispute** 4:10
31:17 53:21 54:2

66:10 100:1 114:5
118:22 120:2,6
**disputed** 113:24
**disregard** 122:8
**disruption** 87:12
**distinction** 23:12
**distributor** 14:2
**district** 1:2 52:20
97:17 99:2 100:12
115:5 118:14
121:18,18,20,23
122:13 123:20
126:24
**diversification**
59:7
**diversified** 92:6
**dla** 8:10
**docket** 22:23
23:23 117:14
**document** 2:8,13
2:17,22 3:10,16
3:21 4:1,4,8,12,19
4:23 5:3,7,20 6:12
6:17,22 7:4 22:10
26:17,23 27:17
31:17 32:15
104:11
**documents** 23:21
84:3 117:13
**doesn't** 13:20
15:1 22:2 28:12
29:25 31:18 57:8
57:11
**doing** 40:16 63:25
77:3 84:10
**dollar** 45:9,15
**dollars** 26:2
**don't** 12:21 20:24
21:8 30:20 31:5
31:17,21,21,24
33:24 35:7 37:4
40:9,21 46:1
47:19 52:5,14,16

53:5,18 134:24
**door** 73:24
**doubt** 81:9 123:19
**draft** 25:11 26:14
26:15,16,18,19,19
26:21 27:1,15,19
27:22 117:25
**drafted** 87:14
**drain** 1:22
**draws** 73:3
**drive** 51:6,22
66:16
**drug** 118:19
**due** 83:12 89:12
120:11
**duty** 30:25
**dykhouse** 8:24
11:21

**e**

**e** 1:21,21 8:1,1
10:1,1 16:21,22
42:25 43:1 69:24
69:24,25 71:23,23
119:17 125:16
127:17,18 128:1
132:9 136:1
**e.d.** 127:2
**e.d.n.y.** 116:7
**earlier** 34:25
**ease** 16:6
**easement** 113:18
**easier** 85:21
**economic** 88:11
88:21,24 99:22
100:3,5 105:14
107:24 121:10
129:6
**ecro** 1:25
**effect** 11:3 39:8
75:22 91:3 93:7
94:12 96:4 99:5
105:17 120:3
130:19 131:8

**effectively** 10:21
97:14
**efficacy** 119:19
**efficient** 69:11
**efficiently** 10:21
**eggs** 73:7
**ehrlich** 8:16
**either** 17:16 25:22
78:8 83:20 96:6
102:16 105:15,16
107:25 116:2,17
**elaborate** 83:10
**elaborated** 15:11
**emphasize** 122:2
**employ** 90:7
115:20
**employee** 35:16
**empty** 105:25
**enacted** 114:1
**enacting** 131:7
**enclosed** 57:3
98:9
**endorse** 31:21,24
**enforce** 12:17
69:2 104:1
**engaged** 12:23
**enhanced** 88:8
**enormous** 112:18
122:3
**ensure** 87:24
**enter** 134:3
**entered** 13:8 52:3
63:6 88:6 89:23
90:5 91:24 92:16
100:25 122:2
124:24
**enterprise** 90:14
**enters** 100:25
**entertainment**
40:8
**entire** 31:16 126:5
**entities** 90:11

entity 84:6 87:16 91:3 92:9 116:21
enumerated 114:20
envisioned 58:21
epcot 73:6
equal 52:2 54:8 110:20 129:25 132:2
equity 48:5 49:23 92:3 93:4 104:17 118:3,4,5 124:23
erroneously 121:24
escape 100:17
escrow 38:1 88:23 116:18,23 117:8,9
especially 104:14
essence 110:22 119:17
essential 79:23
essentially 71:17 81:25 125:9
establish 13:18
established 13:23
estate 46:24 47:3 47:18 49:12,16 50:1,5 84:20 87:9 92:7 101:2,19,25 111:25 117:23 132:3 133:5,6
estimate 53:23
et 1:7 10:3 32:6
evaluated 88:12
evaluation 109:16
event 13:20,22 14:17 94:23 110:11 128:14 131:14 132:20,23
everybody 99:23 100:5
evidence 11:1,12 22:8 23:21 34:18

44:11 45:10 48:16 50:17 51:24 53:6 54:11,11 63:10,10 64:12 68:23 86:15 91:2 101:23 103:3 103:4,6 105:3 106:13
evidenced 120:23
evident 122:5
evidentiary 2:1 5:9 6:1,14,20 10:18 12:2 113:14 113:23
evil 48:6
evolved 84:8
evolves 85:3
exact 20:24 32:20 37:2 56:5
exactly 57:20 102:10 103:24 110:4
exaggeration 74:17
examination 17:11 37:12 38:9 41:4 72:6 75:14 79:15 82:25 134:1 134:9
examine 75:10 116:19
example 13:25 15:16 36:22 58:12 66:7 101:22 129:21 130:12
exceeds 118:5
excellent 50:3
exceptions 119:23 127:18
excess 118:3
exchange 95:6 110:15 111:5 131:19

exclude 114:17
excluded 57:24 96:8
excludes 58:1
exclusive 26:5
excusable 12:9
excuse 22:15 25:4 35:19 39:25 41:13 45:14 74:8 81:3 97:11 109:9
executed 122:19
executory 2:7 3:3 5:13 6:5
exempt 114:17
exemption 132:9
exercise 57:13 90:15 95:9 96:12 133:17
exhibit 16:7 22:12 25:5,9 26:7 28:17 29:3,4,6 31:19 41:21 50:19 70:10 92:2
exhibits 4:6 10:14 18:11,21,23 29:20 50:20 53:8,8,8 54:18,21 113:16
existed 91:3
expectation 92:15
experience 48:18 76:10,18 90:12 116:24 117:15 123:6,8
expert 44:19 45:8 46:6 103:3,4
expiration 94:24 98:4 110:12 131:15
expired 95:1 130:15 131:16
expires 95:4 110:13 131:16

explain 71:2,7,12 72:10 73:2,13
explained 73:4
explanation 57:22
explicitly 55:20 56:20 57:24 58:6
express 105:16
expressed 36:8
extend 12:8 14:20
extending 3:14,24
extension 12:19 12:20
extensions 12:11 124:17
extensive 117:15 125:18
extensively 52:4
extent 35:24 80:10 92:24 93:2 128:11
extracting 47:13

**f**

f 1:21 82:20 89:8 113:11 114:1,11 114:19 117:21 119:16 127:8 132:12 136:1
f.2d 66:24
face 29:24 63:12
fact 11:6 12:3,7 19:8 25:25 39:12 44:20 45:1,3,4,17 47:1,3,16 50:21 54:12 62:14 68:5 77:12 78:3,9 93:11 94:9,10 95:14 103:3,16 105:6 114:6 115:17 116:10 121:12 127:19 133:1,9,12
factors 68:10 89:6 97:5 123:23

**facts**  4:10 10:14
  12:4,21 13:5,17
  13:24 48:15
  113:14
**factual**  13:21,24
  14:4
**failed**  51:1 63:14
**fails**  73:10,11
  74:15
**failure**  19:17
  20:21
**fair**  27:6 95:8
  105:8 110:3,20
  111:22 112:9
  132:2,6 133:4,13
**fairly**  11:1 119:2
  123:24
**faith**  131:24
**falls**  120:6
**false**  12:14
**familiar**  19:8
  29:18
**family**  40:8
**fancy**  126:21
**far**  14:23 15:8
  23:24 25:23 34:1
  35:20 36:3 105:14
  120:24,24 124:23
  129:22
**fast**  74:7
**father**  90:19
**favorable**  116:11
  116:11 117:3,17
  129:24 130:25
  131:4
**favorably**  123:8
**feb**  127:2
**feel**  90:3 91:21
  106:21
**fees**  117:6
**fide**  131:23
**field**  15:11

**fifth**  8:5
**fighting**  133:4
**filed**  4:7,11,19 5:2
  5:6 6:16 19:9
  43:16 51:13 99:25
**filings**  120:23
  124:25
**final**  26:16,20,25
  27:14 28:12 82:3
**finally**  76:14
  126:10 133:15
**financial**  13:7,10
  13:11 14:11,14
  17:22,24 18:6,13
  18:18,20 19:4
  25:22,24 26:3,5
  29:24 30:14 33:4
  33:19,20,24 38:6
  47:12 48:16 51:3
  51:5 53:13 54:11
  54:24 61:13 63:20
  64:16 65:3 68:9
  84:6 85:3 89:13
  89:15,21,24 90:5
  90:14,21,24 91:14
  92:23 93:14
  102:24 103:3,4
  104:2,7,15 115:25
  116:3,20,25 118:1
  119:20 120:12,14
  120:20,21,23
  121:25,25 122:4,9
  122:17,22 123:24
  124:25,25 125:6
  127:20 128:21
  129:11,19,22
  132:10
**financially**  129:23
**financials**  63:11
**financing**  118:6
**financings**  117:22
**find**  19:12 31:6
  52:6 56:5 96:11

  102:16 109:23
  119:25 122:14
**finding**  117:19
  122:10
**findings**  50:25
  59:11 129:10
**finds**  94:3 95:10
**fine**  16:4 64:12
  85:5,10 116:6
  118:11
**finely**  99:9
**finish**  111:16
**finished**  60:22
  74:9
**first**  13:3 16:3,5
  38:23 39:3 40:6
  40:15,17 53:6
  56:15,23 57:6
  58:18 64:1,24
  65:1,2,8 71:10
  73:2 84:1 87:3,4,9
  90:7 94:4 95:8
  96:9 97:23 98:16
  100:6 105:8 107:8
  107:20 109:21,22
  110:8,17 111:1
  120:7 124:16,18
  128:8 131:21
  132:7,18 134:7
**fit**  50:3 51:22
  105:2 131:5
**fits**  72:25 100:24
**five**  10:14 85:11
**fix**  52:15 53:5
**flexibility**  92:20
**flight**  126:21
**floor**  57:14 95:11
  109:10
**floors**  36:9 95:10
  108:19
**flynn**  4:3,7,11 5:3
  6:16 11:17,18,20
  17:8,10,12,13

  19:25 20:4 21:14
  22:15,18,21,25
  24:4,7 25:4,13
  28:7,9 31:8 32:4,7
  32:11 33:12,15
  35:9,11 38:10
  40:20,25 41:13,15
  41:17,23 42:3,5
  42:10 43:11,17,24
  43:25 44:4,13
  45:12,16,20 46:4
  46:7 47:8,20
  49:21 50:10,24
  51:12,17,19 52:23
  53:25 54:4,6 55:3
  55:8 61:3,20,23
  62:2,5,12,14,17
  62:21 63:8,24
  64:17 65:4,10,16
  65:19,24 66:8,12
  66:15,19,21,24
  67:12,16,23 68:2
  69:5 71:15 72:7
  79:10,16 81:3,15
  81:18,21,25 82:8
  82:13 83:1,13
  84:18 85:6,9
  96:25 97:2 102:14
  102:20 105:9,19
  107:9,11,15,17
  108:16,18 109:2,4
  109:6,9 112:22
**flynn's**  35:14
**flyrui**  5:7
**focus**  115:13
  118:12,13 123:15
  125:15 126:7
  128:16
**focused**  44:25
  88:2
**focuses**  115:23
  116:4

**focusing** 107:14
108:22,23 110:8
**follow** 35:13
129:18
**followed** 59:12
126:23
**following** 40:9
69:23 114:9
115:15
**footnotes** 27:8,19
**forecasts** 30:7
**foregoing** 95:19
118:9,12 136:3
**form** 28:22 107:5
116:17,17
**formally** 134:24
**formed** 10:16
116:21,23 128:19
**former** 114:22
126:4
**forth** 92:9 121:15
126:18 132:5
**forward** 10:10
30:8 33:4 84:12
115:24
**found** 56:11 57:3
98:7 118:11,25
120:4 121:12
123:7,18,18
129:14 132:12
**four** 25:10 59:16
75:20 76:5 98:23
114:15,20 115:8
115:17 124:5
125:17
**fourth** 2:19 4:3,15
11:7 14:23 15:8
15:21
**framers** 93:10
**frankly** 13:5
84:15
**free** 97:14 124:20

**friedberg** 8:15
10:5
**frillman** 4:21 9:4
69:24 70:15,17,17
70:18 82:13,19,21
82:22,23,25 83:2
85:2 92:2
**front** 21:8 25:6
28:19 109:22
111:4
**full** 36:25 38:6
133:19
**fully** 10:16 76:14
87:18 107:6
**fundamental** 87:4
118:13
**further** 16:2
43:22 50:10 57:22
79:14 80:23 83:22
93:3 94:9 95:5
98:2 102:23
110:14 111:5
112:7 116:19
119:24 121:24
131:18
**future** 18:7,15
24:14 25:20 28:2
30:10 33:11 34:2
51:3,4 52:8,10,12
54:24 64:5 65:12
65:15,17 66:4
89:9,9 106:25
114:12,13 115:10
115:12,13,18
117:20 118:2,25
119:9 120:5,9
121:17 123:17
124:1,7 125:14,24
126:6 129:11

**g**

**g** 10:1 42:25 69:24
69:25 71:23

**ga** 118:18
**general** 46:24
47:17 67:14 88:3
89:20 96:8 121:15
126:10 127:24
129:9
**generally** 66:6
79:20 114:19
115:20,23 116:6
119:10 129:10
130:10 131:11
**generically** 36:4
72:24 120:20
**gentlemen** 69:25
**gerber** 114:22
121:21,24
**gershenson**
123:21 130:11
**getting** 47:25 48:2
49:23 50:7
**ghermezian** 5:1
9:3 69:24 71:1,2,5
71:7,12,22,24
72:1,4,6,8 75:9,14
75:16 77:18 79:8
79:15 81:8 84:3
96:3 98:21 134:1
**ghermezian's**
107:5
**give** 24:13 30:20
32:8 39:4,5,7 63:2
78:25 82:5 104:20
104:22 105:7
110:6,22 124:10
**given** 51:24,25
53:8 83:3 97:9
106:15 128:2,17
130:16
**gives** 45:22 54:24
57:12 74:7
**giving** 75:8 80:22
95:7 109:9 110:16
131:21 133:10

**global** 2:8 3:4
5:14 6:6 86:6
**gloss** 61:19
**go** 12:4 14:6,7,18
30:24 44:1 48:23
49:20 51:20 53:3
53:18 54:16 55:9
55:16,16,19 57:7
62:7,22 63:18,21
63:22 64:10 65:24
66:14 67:18,18
68:3,18,21 69:1
69:12 70:5 72:9
73:1,15 74:3,3
75:2 79:17 84:12
90:3,19 99:6
102:23 105:24
106:10 108:8
115:2 116:19
125:14 127:15
**god** 16:17 42:21
71:21 82:18
**goes** 30:13 31:10
40:7,9 45:21 56:1
77:1,7 92:11
97:24 98:4 101:18
119:12 122:10,13
**going** 14:20 19:12
29:15,18 34:3,23
46:17 47:1 48:21
52:6 53:1,18
54:13 55:8 56:18
56:18,19 57:10
58:19 62:8 63:19
63:20 64:5,8
67:22 68:22 70:5
70:19 71:18,18
73:15,17 74:23,23
75:7 78:18 80:17
80:21 83:11,13
84:7,14,16 85:7
86:8 87:1 91:1
92:19 97:4,7

98:24 99:20
101:20 103:7,18
104:24,24 108:20
109:13 115:24
127:4 128:10
**golden** 73:7,7
**golf** 41:22
**good** 10:2 11:17
16:23 55:12 62:18
64:2,4 75:16
131:24
**goose** 73:7
**gotshal** 8:3
**gotten** 27:17
**grab** 21:8 48:5
**gradually** 76:16
**grand** 73:6
**grant** 12:19 14:20
**granted** 84:21
98:20 134:14
**grants** 97:8
**great** 48:23,24
92:20 99:3
**gross** 123:12
**grounds** 15:11
129:18
**group** 91:7
**growth** 68:11
**guarantee** 80:11
80:17,17 88:22
116:4
**guaranteed** 80:21
**guarantees**
123:24
**guarantors** 89:14
89:16,22 120:14
120:16
**guess** 12:5 23:22
66:11 82:4 84:9
96:23
**guided** 130:20

**h**

**h** 16:21,22 69:24
69:25 71:23
**half** 132:5
**hand** 16:13 42:20
71:18 82:16 100:6
**handle** 42:18
**happen** 46:21
47:2 61:16 74:5
74:18 132:21
**happened** 53:20
111:6
**happens** 74:16
78:14 94:3 103:22
**happy** 61:25
69:11 91:15
**hard** 13:3 97:21
**hardship** 87:10
**harm** 77:4,4 97:7
98:25 119:2
**harmonious** 58:18
**harmony** 39:16
40:5,12,15 51:23
57:21
**harrison** 9:10
**hasn't** 26:10
**haven't** 23:17
30:3 44:10 54:9,9
54:23
**head** 96:10
**health** 91:21
122:22 129:22
**healthcare** 36:12
**healthy** 91:25
129:24 130:2
**hear** 18:5 83:19
84:1
**heard** 83:6 93:25
93:25 94:2
**hearing** 2:1,2 5:9
6:1,15,21 11:7,23
14:24,25 34:13

**hearsay** 44:14
**held** 60:2 116:9
132:7
**help** 16:16 25:2
30:5 42:21 71:20
82:18
**hereof** 55:25
**he's** 27:5,7 31:22
44:23 45:7 46:5
**hide** 93:7
**high** 64:11 78:2
**higher** 49:18
100:16
**highest** 49:15,23
**highly** 118:4
**hinges** 118:22
120:3
**hires** 73:8
**history** 62:24 63:7
87:22 88:7 91:11
91:12 119:1,7
**hoc** 9:12
**hoffman** 55:13
**hoge** 3:18 5:5
69:25 70:20,20,21
70:23,25 85:6
**hold** 84:7 106:6
123:4 126:15
129:5 133:18
**holdco** 3:1 4:14
5:10 6:2,19 7:1
8:11 17:23 25:11
25:12 86:5 113:3
**holdco's** 113:5
**holding** 2:2,5,10
2:15,19 3:13,24
6:20
**holdings** 1:7 3:1
3:18 4:15 5:11 6:3
6:14 7:1 10:3
85:19
**holste** 9:11

**home** 58:8 127:7
127:11
**hon** 1:22
**honestly** 36:15
84:17
**honor** 10:4,11
11:11,17 15:20
16:1,6 17:10 20:5
21:20 24:3 25:4
27:2,4 31:25 33:7
33:15 35:9,11
36:14 37:2,7
40:23 42:16,17
43:11,13,25 44:16
45:12,19,21 47:9
48:15 50:11,13,17
50:21,24 54:6
55:12 59:14,21
60:12,21 62:2
66:21,22 67:16
69:5,6,9,10,19
70:2,3 71:15
72:10 73:18 75:11
79:6,10 81:3,6,25
82:8 83:11,12,25
85:9,12,15,20,23
86:2,8,18,24 88:5
89:1 90:22 91:6,9
91:15 92:1 93:10
94:9,17,22 95:2
95:14,23 96:13,17
96:20,25 97:4
99:19,25 100:18
101:9,17 102:14
102:17,20 107:9
108:4,5,14,16
109:7,14,19 111:2
111:3 112:14,19
112:22 134:21,23
135:1
**honored** 100:10
**hospitality** 99:9

hotels   38:19 40:8
housekeeping
   43:14
huge   73:9,14
   108:19
hwang   8:8
hybrid   101:25
   103:23
hyde   7:25 136:3,8
hypothetical
   34:19

**i**

i.e.   12:13 41:25
   66:5 115:13 116:5
   116:11 124:2
idea   46:16,18
   55:15 63:18,19
   103:18,19,20
   104:9
ied   121:24
ignore   87:4
ignoring   122:3
ii   2:12,21 3:5,15
   4:17 5:14 6:6
iii   3:8 5:17 6:9
imagine   14:17
   19:10
imaging   118:16
immaterial
   109:12
impact   58:19 67:9
   67:10 78:3 105:14
implicated   125:17
imply   126:19
important   76:23
   86:9 104:16 107:3
   115:8 120:1
importantly
   12:24 98:1
imposed   124:21
imposes   67:25
imposing   127:4

impress   73:18
impression   12:15
improper   63:9
   81:12
improvements
   132:4
inadvertent   12:22
inappropriate
   47:21 48:6
incentivized
   99:22
incidental   41:19
   42:6 56:12 98:14
include   64:25
   65:3 113:17
included   114:16
includes   30:7
   89:10 114:15
   117:5 120:10
   125:25
including   19:9
   23:7 51:21 52:21
   68:10 76:10 115:5
   117:16 119:10
   123:23 126:24
   132:3,15
incomparable
   122:8
inconceivable
   74:10
incorporated   11:5
   12:10 56:4,20
   113:19 114:1
   123:5 125:3,4
incorporates   55:6
incorrect   129:17
   129:18
increase   44:25
independent
   32:16 124:6,13
   125:13
indicate   27:11,14
   100:1

indicates   34:18
indication   29:12
   126:14
indicia   68:12
indiscernible
   11:22,24 21:24
   24:20 29:5 30:14
   34:2 35:6 40:10
   47:23 52:18 58:24
   58:24 60:5 62:25
   65:12 67:5,24
   71:8,12,13,13
   72:18 73:5,16
   74:10,13,19,22
   75:5 77:6,10,24
   78:1,2,16,23,24
   79:2,3,4,25 80:9
   80:13,16,20,22
   83:3 85:9 87:15
   105:23 108:1
   110:19 115:6
   134:22
individuals   91:7
information   10:13
   17:22 18:6,14,18
   18:20,25 19:4
   20:8 24:12,14
   25:22,24 26:3,5
   28:18 29:24 32:17
   33:2 43:21 53:13
   88:14 90:21,24
   92:3,4 102:25
   104:2
inimical   38:23
   39:14,15 56:14,22
   57:5,23,23 68:19
initial   26:20 27:1
   44:18 55:23
   134:17
initially   121:6
injure   78:18
injurious   56:14
   56:22 57:5 77:3

78:14,15
insolvency   119:19
instance   42:7
insurance   38:2
intact   126:17
integral   59:4
integrated   119:5
intend   52:6 61:8
   64:13 68:24 94:5
   103:7 133:9
intended   17:1
   31:13 43:3 88:9
   91:13 124:15
intending   68:15
intends   116:25
intention   40:16
   59:17 126:15
   129:7
intentionally
   12:13
interest   30:14
   34:11 36:8 59:2
   95:7 110:16 131:9
   131:20
interested   50:6
interests   126:17
interfere   108:10
   128:12 133:23
   134:18
interference
   108:7
international   36:8
interpret   91:17
   99:16
interpretation
   13:6,19 74:20
   120:1 133:8
interpretations
   113:24
interpreted   129:4
   131:11
interpreting
   115:4 125:23

**interrupt**  88:25
  107:4
**introduce**  70:6
**introduced**  114:9
**invalidate**  127:19
**invalidated**  60:16
**invalidates**
  119:17
**invoke**  79:12
**involved**  62:6,22
  79:4 101:12
**irrelevant**  125:9
**isn't**  26:20 32:18
  46:17 48:12
**issue**  12:15 13:4
  13:21,25 14:7
  15:5 48:20 66:1
  67:13,24 91:18
  98:24 120:2
  123:18 124:2,3,7
  124:14,16 127:1
  130:3 133:2
**issues**  10:10,16,22
  14:6 15:1,10,22
  48:7 66:6 81:4,15
  83:9,13 87:19
  97:17 101:7 106:9
  106:13 113:23
**it'll**  53:5
**it's**  12:3 13:5
  14:25 15:4,4,14
  17:1 18:10 20:24
  20:25 21:14 22:25
  25:10,14 27:7,12
  27:13 28:22,23
  29:2,3,6,25 32:9
  33:8,9,13 34:5,12
  36:13,16 37:2,4
  38:12,14,15,16,17
  38:18 39:23,24,25
  40:21 41:9 45:11
  46:14 47:3,3,22
  48:7,16,23 49:11

49:13,25 53:2,12
  55:19 56:18,19,25
**i'd**  20:11 25:5
  28:16 30:1,4
  43:11 51:11
**i'll**  14:18 17:16
  30:13,24 31:6
  32:14 47:23 55:5
**i'm**  11:18,20
  14:15,20 15:12
  18:1 19:25 20:19
  20:25 21:21 22:14
  23:11 24:10,10,18
  24:22 28:23,25
  29:14,15,17,23
  31:6 34:1,21,22
  36:19 40:5 41:23
  46:22 48:2,25
  51:8 52:23 54:2
  55:8,13,14 56:2
  59:9 60:24
**i've**  18:24 19:10
  19:10,15 27:17
  29:20 31:16 32:3
  32:5 43:17 46:24
  47:18

**j**

**j**  4:3,7,11 5:3,7
  6:16 8:8 16:21
**jam**  16:22
**jar**  103:13
**jeopardize**  96:6
**jeopardized**  90:3
  91:21
**jerbich**  6:2 9:2
  16:6,14,18,21,21
  16:23 17:4,7,11
  17:13 21:12,17,23
  29:4,8 31:9 32:1
  32:12 35:15,18,22
  35:24 36:2,7,12
  36:17,21,25 37:12
  37:14,20 38:7,9

39:24 40:3 41:4
  41:20 42:1,4,9,11
  42:16 48:1
**jerbich's**  16:11
**job**  64:11
**joshua**  66:24
  67:11,14 87:7
  88:16 97:6
**jousting**  11:3
**judge**  1:23 114:22
  121:21,24 126:4
**judgement**  85:25
**judges**  47:23
**judgment**  114:24
  134:7
**judgments**  32:17
**judicial**  117:14
**july**  7:2 11:4
**jumped**  63:24

**k**

**k**  28:22 90:9
  93:17
**keep**  15:7 49:24
**keeping**  12:6
  132:19
**key**  43:17 59:4
  67:3 113:13
**kicks**  108:25
  110:25 111:1,22
**kim**  9:12
**kind**  54:12 55:9
  58:9 63:24 104:14
  104:23
**kinds**  103:10
**know**  11:15,21
  14:18,19 19:11
  20:12,22 21:9
  23:20 27:6 34:9
  38:11,12 47:1,3
  47:16,17 48:10,17
  49:5,15 53:19
  54:7 57:18 58:14
  61:16 64:3,17

65:5 67:10,10
  71:17 72:22 73:1
  75:9 76:19 81:23
  84:11,14 90:2,18
  95:17 96:9 101:19
  103:8 104:5,6,12
  105:10,15 107:5
  107:23 108:24,24
  108:24 110:7,21
  111:14,16 131:18
  131:20
**knowing**  46:5
**knowledge**  44:12
  91:15
**known**  84:6
**knows**  92:6
**ks**  32:6 90:8

**l**

**l**  16:21 82:20,20
**l.p.**  123:21 130:11
**landlord**  3:13
  17:17 47:11 57:12
  62:9,22 78:3,6
  86:10,18 87:11
  90:2 91:21 92:24
  94:5,21 95:8
  98:25 99:5,22
  100:15 103:12
  105:7,17 108:8
  109:1 110:16,17
  113:8 115:3
  116:13,19 119:11
  120:7 121:23
  122:6,10 123:25
  124:11 125:8
  126:16,18,20
  127:3 129:6 131:1
  131:2,21,22
  132:22 133:7,11
  133:13,16,18,23
  134:18
**landlord's**  86:1
  94:16 100:13

112:10 122:14
125:16 130:22
131:9
**landlords** 28:5
  62:25 87:15 114:2
  119:3 127:13,22
**language** 31:5
  32:5 33:3 57:4
  72:19 90:1 94:8
  96:9 98:5 121:16
  122:16
**large** 91:22,23
  116:9
**largely** 113:24
**larger** 120:24
**larkin** 55:13
**late** 4:18 7:3
**law** 11:8 14:5
  52:24 61:11 67:15
  89:2,20,25 93:12
  120:1 122:15
  125:18 126:10,23
  129:17
**lawful** 39:13
**lays** 73:7
**lead** 120:8
**leading** 66:22
  86:24
**lease** 3:15,25 4:7
  4:11,22 5:2,6 6:16
  6:22 13:8 14:1,9
  14:15 17:1 23:13
  35:5,25 36:14
  37:14 39:9,16,20
  39:21 40:21 48:5
  49:23 52:3,16,17
  53:23 54:19,22
  55:1,6,9 56:1 61:2
  61:6,7,12,17 62:7
  63:4 64:15 65:15
  65:17 67:5,7,8,22
  69:1 73:25 74:25
  77:3,25 78:8,15

80:8,13 86:3,21
86:22,23,25 87:16
87:18 89:10,12,18
89:23 90:5 91:13
91:24 92:15,16
94:6,8,11,15,21
95:7 97:9,10,13
97:24 98:19 99:1
99:7,10,17,17,21
100:3,5,14,20,24
102:7 104:18
105:18,23 106:17
106:22,24 110:16
112:25 113:17,19
114:12,14 115:11
115:12,13,18,22
116:3,10,11,14
117:2,3,3 119:6
119:10,13 120:9
120:11,17,18
121:10,17 122:1
122:19 123:2
124:6,16,17,17,22
124:24 125:4,17
125:25 126:2,7,8
127:6 128:10,13
129:13,24 130:1,4
130:6,12,20,24,25
131:5,13 132:14
132:15 133:20
134:6,16
**leaseco** 86:4
**leased** 76:16
  79:24 121:1,4
  131:20 132:25
**leasehold** 88:10
  88:19,23 132:3
  133:6
**leases** 2:7,12,17
  2:21 3:4,7,10,21
  4:17 5:13,16,19
  6:5,8,11 17:24
  19:17,22 20:13,21

21:1,5,19,25
22:23 23:17 24:6
53:18 67:2 75:3
77:19 78:9 86:12
86:16 89:3,3
101:3 102:9 115:1
115:2 117:17
132:8
**leasing** 74:10
**leave** 65:24 74:6,7
  74:8 78:11 103:7
  105:22 126:17
**leaves** 74:8
**lectern** 85:21
**ledanski** 7:25
  136:3,8
**left** 78:22 80:3
**leg** 76:24
**legal** 13:6 23:12
  32:16 75:8 84:15
  118:9 129:16
  136:20
**legislative** 62:23
  63:7 87:22 88:7
  91:11,11 114:24
  119:1,7
**legs** 76:25 77:1
  79:24
**lender** 11:18
**lenders** 118:6
**length** 131:24
**lessee** 89:17
  120:17,18
**lessor** 67:7 87:24
**lessors** 67:3
**letter** 30:7 31:1,10
  32:12 37:23
  116:18
**let's** 26:14 55:19
  56:5
**level** 13:16 92:23
  118:6,7

**levels** 56:16
**lexis** 118:17
  121:20 127:2
**liabilities** 122:25
  123:1
**liability** 93:3
**light** 10:8 11:11
  125:6 131:12
  134:12
**lii** 9:13
**limit** 36:14 37:4
  54:18,21
**limitation** 57:11
  64:15 128:25
**limitations** 35:20
  36:1 124:20
  129:13
**limited** 37:4 38:23
  40:8 74:24 75:1
  96:14 105:20
  123:24 127:18
  131:12
**limiting** 130:8
**line** 26:14 40:17
  92:12
**list** 57:24 78:25
**listed** 114:16
**literally** 34:15,16
**litigate** 106:25
**litigated** 91:18
**little** 72:12 85:21
  103:23 108:18
**live** 60:11 95:12
  95:13 108:6
**llc** 3:13,24 8:11
  14:1 115:6 118:17
**llc's** 2:5,10,15,19
  3:1,1,18 6:14,19
  6:20 7:1,2
**llcs** 2:3 4:14,15
  5:10,11 6:2,3
**llp** 8:3,10,20

**loan** 128:20
**located** 49:13
**location** 74:11
76:20,21,23 77:9
77:10 78:5
**locations** 121:1
**long** 48:19 77:2,8
103:8
**look** 20:12 25:5
28:3 32:3 41:6,10
49:17 58:17 66:5
68:12 89:21 90:9
90:10,11,16,21
92:14 93:23 95:14
97:8 110:9 116:16
125:5
**looked** 15:3 29:20
**looking** 30:8 33:4
91:9 92:14,24
93:5,6 109:23
132:25
**looks** 88:10
**lose** 80:12
**loss** 73:11
**lot** 48:4 64:13
97:6,19 104:8
121:11
**lots** 78:19
**louder** 72:12
**louis** 4:21 9:4
82:22,25
**low** 48:11 80:6
**lumbar** 116:6
**lumber** 118:11

**m**

**m** 8:15 16:21
69:24 71:23 82:20
116:6 118:10
**m.d.** 123:22
**machine** 42:7
**magazine** 73:4
**mahkamova** 9:14

**main** 130:22
**maintain** 14:10,13
60:6 87:24 94:19
97:20,23
**maintained** 59:3
59:18 127:25
**maintenance**
116:1
**major** 55:22 98:4
104:23 130:13
**majority** 86:6
**majors** 59:1,3
**making** 43:12
**male** 62:5 68:8
118:20 122:16,20
123:3,9,14 127:9
128:16
**mall** 2:2,5,10,15
2:19 3:1,13,18,24
4:15 5:11 6:3,14
6:20 7:1 10:7 11:8
16:25 17:16 24:13
28:11 32:25 34:4
34:7 36:16,22,24
38:12,12,17,19,20
38:24 39:2,6,14
39:15,17 40:7,12
40:16,17 41:20
47:10,17,25 48:3
48:24 50:3,7 51:6
51:23 56:11 57:3
66:17 68:19 72:17
73:2,4,6 74:15,15
74:16 75:2,18,19
75:23 76:1,24,24
77:1,19 78:15,18
79:21,23 80:1,7
86:4 87:4 88:21
88:23 94:1 96:6,6
96:10,21 97:7
98:9 99:9 100:1,2
100:11 104:18,21
105:15,17 112:25

113:1,2 114:6
134:11
**mall's** 88:15 99:8
**malls** 39:1,3 63:9
74:12
**man** 51:18 70:2,3
**management** 15:6
117:15
**manges** 8:3
**manner** 126:20
**march** 121:21
**marcus** 78:20
**margins** 68:11
**marked** 21:10
28:18 62:3
**market** 35:6
80:14 95:9 104:22
105:8 110:3,20,24
111:22 112:9
132:3,6 133:4,13
**marketing** 117:16
133:23
**mart** 93:17
**martin** 8:18 10:5
42:18 43:13,14
44:15,18 45:18
48:15 50:13
111:24
**mass** 118:21
122:17
**material** 134:4
**matter** 1:5 10:6
14:5,7 17:2 43:14
45:2,3,4
**matters** 10:19
11:9
**maximize** 44:24
49:25 50:5
**mean** 14:19 17:19
20:1 22:19,22
23:22 26:16,17
35:24 36:20,23
41:2,20 46:2

49:11 60:14 64:20
80:9 101:18 103:9
104:7,7,12 107:18
107:21 111:8,14
111:18 112:10,15
131:4
**meaning** 118:22
124:2
**meaningless** 33:6
33:9,14
**means** 26:19
31:18 51:4,5 84:9
**meant** 13:3 104:8
104:9
**measure** 116:10
132:23
**mechanical**
121:14
**mechanism**
112:16 132:6
**meet** 17:23 47:12
63:14
**meeting** 54:23
**meets** 92:9
**memorandum**
11:7 14:24,25
15:1
**memorialized**
119:12
**mentioned** 30:18
37:16,22
**merchandise** 59:7
88:12 97:12,16
123:21 130:11
**mere** 102:21
**merits** 113:23
**met** 17:13 87:2
97:16 118:25
**michael** 6:1 9:2
16:6,21 17:11
37:12 38:9 41:4
**middle** 97:17

**million** 26:1 38:4
56:1 74:14 80:18
88:19 93:4 107:25
118:3,5 124:23
**mind** 12:15 47:21
50:10 83:6
**mine** 31:20
**mineola** 136:23
**miniature** 41:22
**minimis** 48:20
49:3 50:2
**minimum** 106:9
106:10
**minnesota** 73:7,8
73:10 78:23 94:18
113:2
**minute** 19:7 28:10
28:16 54:6 66:21
85:11 92:13
**minutes** 37:9
**mischaracterizes**
84:15
**mispronounced**
70:21
**missing** 15:13
**mistake** 99:19
**misunderstanding**
72:11,16,17 84:3
**misunderstood**
20:6
**mix** 39:6 51:23,25
52:15,23 63:9,10
65:21 66:6 79:21
87:12 88:4 96:6
99:8,15 105:2
126:2 127:1,24
130:4,8
**moa007** 28:18
**moac** 2:2,5,10,15
2:19 3:1,13,18,24
4:7,11,15,22 5:2,6
5:10 6:2,14,16,20
6:22 7:1 11:8,16

11:18 12:25 17:17
25:5,16 28:20
37:16 39:22 47:10
64:22 70:10
102:12 107:22
112:16 113:1,8,22
124:12
**moac's** 7:2 134:25
**moac's** 15:11
**mobile** 58:8
**modest** 110:22
**moment** 69:7
90:15
**monetary** 117:4
130:1
**monetize** 46:10
**money** 48:4,12
50:7 73:17 74:14
80:9,12 104:9,20
106:4,4 117:11
**month** 53:22 62:9
**months** 46:15,22
46:25 67:20 128:6
128:18
**morning** 10:2
11:17 16:23 55:12
83:2,14,19
**motion** 4:14 6:20
7:2 10:7 11:6
47:24 59:11 69:13
82:5 84:21 85:24
86:2 97:8 98:20
112:23 134:14
**motions** 15:25
**movant** 12:16
**move** 11:1 15:10
16:3 32:6 44:13
45:16,24 47:20
50:24 79:6
**moving** 10:9
**multiple** 34:11
86:19

**mutual** 59:2

**n**

**n** 8:1 10:1 69:25
71:23 82:20 136:1
**n.d.** 118:18
**name** 11:18 16:19
42:23,25 55:12
70:22 84:11
**name's** 17:13
**nanuet** 129:3
**narotam** 1:25
**national** 36:9
**nature** 10:8
101:24 102:2
129:24
**near** 103:5
**nearby** 36:13
**necessarily** 50:7
55:17 63:21 91:22
101:20 102:5
130:23
**necessary** 14:9
94:7 116:19
117:19
**need** 21:21 35:8
81:11 90:19 99:20
106:9 134:24
**needs** 23:8 90:16
**neglect** 12:10
**negotiated** 96:18
**negotiating** 46:20
80:20
**negotiation** 77:12
**negotiations**
77:15
**neiman** 78:20
**nerves** 103:13
**net** 26:2 128:11
**never** 27:15 50:10
73:14
**nevertheless**
61:18

**new** 1:2 8:6,13,22
15:1,18,21 76:8
87:16 88:9 90:11
91:23 121:18
128:24
**newly** 116:21,23
128:19
**nickel** 86:23
**non** 21:25 41:6,18
42:5 56:11 89:3
98:13 115:22
119:3 126:12,19
**nonpayment**
117:10
**nonresidential**
3:15,25
**normal** 10:25
63:25
**normally** 10:24
**nos** 13:9
**note** 27:19,22
115:8,14 123:14
129:2 131:13
133:15
**noted** 87:6,21
97:16 100:13
115:5 126:8,10
128:8
**notes** 126:5 128:9
**notice** 2:5,11,16
2:20 3:2,6,9,19
4:16 5:11,15,18
6:3,7,10 95:8
110:17 117:14
131:21
**noting** 114:22
**notion** 91:20
119:9 127:24
**notions** 88:3
99:15
**notwithstanding**
59:19 113:22
129:22

[number - opportunities]                                                    Page 21

**number** 14:2
  19:17 21:15 22:23
  43:19 45:22 51:19
  51:22 61:4,23
  73:25 103:1
  106:24 113:13
  123:23
**numbers** 27:11
  43:18,19 46:18
**numerous** 118:11
**ny** 1:14 8:6,13,22
  136:23

**o**

**o** 1:21 10:1 42:25
  43:1 69:25 136:1
**oath** 46:16 47:2
  70:7 71:19
**object** 45:16 81:6
  83:11
**objected** 86:18
  113:8 131:1
**objecting** 7:1
  15:18
**objection** 2:5,12
  2:21 3:2,7 4:4,18
  5:11,17 6:3,9 7:3
  11:7 14:24 15:8
  15:12,17 24:3
  27:2,4 31:25 33:7
  43:12 47:8 48:15
  83:25 127:22
  128:7 134:13
**objections** 2:3,11
  2:16,19 3:5,9,19
  4:16 5:15,18 6:7
  6:10 127:13
**obligation** 30:16
  38:6 75:21 76:5
  80:1,4 98:19
  116:3 117:5,5
**obligations** 17:24
  47:12 97:22

**obnoxious** 40:14
**obtain** 88:6
**obvious** 103:10
**obviously** 10:12
  12:1,19 33:16
  35:24 49:3 50:18
  55:6 86:13 91:6
  96:3 103:8 106:14
  107:23 117:9
  125:15 126:7
  134:22
**occasions** 86:19
**occupancy** 87:10
**occupants** 59:6
**occupy** 127:14
**occur** 86:11
**occurred** 131:18
  131:21 132:23
**occurrence**
  117:10
**occurs** 93:2
**october** 91:8
**odd** 28:5
**offer** 95:8,9 105:8
  110:8,17,19,19
  111:1 131:22,23
  132:2,7
**offered** 28:14
  37:16 45:7 49:3
  68:7 89:4 110:18
  118:1 131:23
  132:1
**offering** 44:18,19
  45:1 49:5
**office** 36:19,22,24
  37:1 38:11 58:7
**offices** 36:24
**offload** 92:25
**oh** 20:6,17 21:12
  28:25 29:4 60:3
  107:10 110:7
**okay** 10:2,24
  11:15,19,25 15:24

16:9,12,23 17:8
  17:17 18:3 21:17
  21:23 25:1,17,18
  26:4 27:13,20
  28:18 29:9 31:12
  33:16 35:13 36:11
  37:6,19,20,21
  38:3,7,14,21 40:1
  41:17 42:14,19
  43:10,23 44:1
  45:7 49:19 50:12
  50:14,18,22 53:5
  54:5 55:11 56:24
  58:16 60:20,24
  61:25 62:4,13,20
  65:23 66:12,20,23
  67:9,12,16 69:4
  69:18 70:4,23
  71:6,16,17,25
  72:5,8 75:10,13
  76:20 79:20 81:1
  81:1 82:10,24
  83:17 85:10,18
  94:20 95:22 96:19
  96:19 97:1,3
  102:15,16 108:3
  108:15 112:20,23
  134:24
**old** 136:21
**once** 17:14 103:17
  106:21
**ones** 14:3
**open** 28:20 62:8
  68:4,7 76:18
**opening** 10:25
**operate** 14:1 34:4
  34:8,10,14,19,23
  52:6,7 53:2 54:13
  55:2 57:9 61:17
  64:9 73:23,24
  92:17 93:20 95:5
  98:21 99:10,11
  102:1 110:14,24

111:25 112:3
  121:2,5,6 131:17
  132:24
**operated** 77:20
  113:1 119:4
**operating** 13:8,13
  13:14 33:20,24
  34:6 52:2,4,5,11
  52:14,24 54:25
  55:22 68:9,21
  78:4 84:6,10
  89:13,16,21,25
  91:3 92:8,18
  93:14,15,16,17
  94:25 98:4 99:2
  101:20 110:12
  112:1 113:18
  117:23 120:13,15
  120:19,21 122:4
  122:17 123:5,11
  124:1,20 128:21
  129:12,19 130:14
  130:14 131:15
**operation** 14:13
  38:23 40:6,14,15
  52:7 56:14,22
  57:5 58:18 61:19
  64:24 65:8 111:4
  134:16
**operational** 51:5
  125:6
**operations** 14:10
  34:6 54:12 101:18
  123:9
**operator** 65:1,1
  123:7
**operator's** 123:8
**opinion** 47:15,21
  47:22 83:7 125:22
  126:4
**opponent's** 12:15
**opportunities**
  36:10

**opportunity**
100:16
**opposed** 15:15
**opposite** 53:17
127:4
**opposition** 4:21
5:1,5 6:14
**option** 57:13
60:11
**options** 60:15
**oral** 15:17 82:4
**oranges** 93:10
**order** 3:23 15:6
67:2 103:11
134:19
**ordered** 3:12
**organizational**
25:14
**original** 87:25
**originally** 122:2
**outside** 67:8
103:14 107:20
108:7 116:8
133:21
**overall** 100:21
131:6,8
**override** 128:25
**overruled** 128:7
**owned** 86:5 102:7
**owner** 13:12,15
123:6,8

**p**

**p** 8:1,1 10:1 42:25
**pacific** 99:4
**page** 25:16 28:25
29:7,18 40:4 41:8
41:15,16 55:19
56:5,6 58:4,25
95:19 98:2 116:15
126:22 127:2
132:5
**pages** 25:10
118:17

**paid** 48:20
**pair** 11:2
**paragraph** 18:2
21:21,22 43:15,15
43:19,20 44:5
45:6,13 47:9
64:23 89:7,7
95:17 114:10,11
**parameters** 35:25
99:12
**pardon** 77:14
**park** 58:8
**part** 12:23 15:5
19:3 25:19,21
27:19 28:17 31:15
39:20 45:15 59:4
84:5 85:3 86:14
90:7,9 100:20
102:10 103:12
113:3,4,14 118:1
124:15 127:15
**partial** 50:25
59:11 87:10
**particular** 24:19
24:23 121:4 125:3
**particularly** 15:9
116:22
**parties** 11:2 12:4
12:23 23:4 59:1
59:17 68:1 72:25
88:2 92:15,23
93:6 95:16 96:18
101:4 105:7
112:15 113:13,15
113:19 114:5
117:4 120:1 124:4
124:9,13,21 125:7
125:9 126:9,12
127:5 128:25
130:15 131:12
132:5,19 133:3,12
**parties'** 11:9

**partner** 55:8
**partners** 58:24
**parts** 43:18
**party** 67:8 78:12
93:1,3 94:14
100:9 101:2
109:24 118:6,22
**party's** 124:6
125:12
**pass** 134:22
**patterson** 8:20
**paul** 43:1
**pay** 37:15 48:22
49:18 64:10 68:13
68:14 80:6,10,12
88:18 104:23
106:1,4 112:17
115:24 117:6
118:14
**payable** 53:22
**paying** 35:6
**payment** 116:1
123:17 130:1
**payments** 78:9
**people** 65:7 73:8,9
91:4 103:13 106:1
108:9
**percent** 74:4 77:6
**percentage** 74:4
80:22 130:3
**perfectly** 116:20
**perform** 103:7
**performance**
13:13,14 18:7,15
24:14 25:20 28:2
30:10 33:11,20,21
33:24 34:2,6 51:4
51:4,5,5,22 52:2,4
52:5,8,11,14,24
54:25 61:14 66:3
66:4 68:10 89:9,9
89:14,16,22,25
90:18,19 93:14,14

93:15 103:6,19
114:12,14 115:10
115:12,13,18,25
116:5 117:20
118:2,25 119:9
120:5,9,13,15,19
120:21 121:17
122:18 123:5,11
123:13 124:1,7
125:6,14,24 126:6
128:21 129:11,12
129:19 132:9
**performances**
122:5
**performed** 115:22
**period** 55:22
56:19 92:18 94:25
98:4,23 105:20
106:9 110:12
127:16 128:4
130:14,14 131:15
134:8
**permit** 4:18 7:3
12:7 41:6 45:5
55:17 56:17 59:5
**permitted** 99:7
**person** 26:24
30:25 64:5 103:3
**persuasive** 125:19
**pertain** 12:21
**pertaining** 89:3
130:13
**pertains** 113:11
**pet** 58:8
**phrase** 20:24 67:3
134:5
**phrased** 49:19
**pioneer** 12:10
**pipeline** 46:19,23
**piper** 8:10
**place** 13:3 88:22
**placed** 35:19 67:1

plainly 100:1
plains 1:14
plaintiff 51:1
plan 14:1 34:8
 37:3,3 40:10
 61:14
play 58:15 59:22
playing 15:10
 96:11
pleading 82:6
pleadings 11:2,9
 55:15 60:10 68:7
 69:14 85:25
please 16:13,20
 27:19,22 30:6
 42:20 72:9 73:1
 82:14,16 85:18
plural 134:10
pm 135:4
pocket 80:19
point 10:18,20
 13:2 21:20 27:7
 29:23 31:5 32:3
 32:10,20 37:22
 39:19 40:23,24,25
 41:3 42:13 44:18
 56:18 59:9,10
 60:17 61:16 65:4
 69:15 75:8 85:1
 85:23 86:9 93:22
 93:24 94:13
 109:13 110:9,9
 111:12 130:5
pointed 111:24
points 75:12
 120:7
poor 91:14
portfolio 45:9,11
 102:8 117:23,23
portion 30:16
 39:19 95:11 96:4
 108:13 109:12
 113:1 119:6

134:17
portions 30:5
 113:18
pose 107:18
posited 84:11
position 10:11
 54:9 65:11 76:24
 79:23,24 82:2
 104:15 105:1,11
possession 119:22
possibility 99:6
possible 48:7
 49:24 128:4
possibly 80:6
potential 2:6 3:2
 5:12 6:4 68:11
potentially 23:6
 45:22 46:14
practical 96:2
practice 10:25
pragmatic 115:20
pre 6:14,20 11:7
 14:24,25
precarious 74:2
precedent 128:23
precedes 57:6
precepts 87:4
preclude 99:16
 129:12 132:11
 133:8
precluding 130:9
preface 114:21
 121:15
prefaced 126:5
preferred 100:7
prejudiced 12:18
 12:25
premises 34:19,24
 62:22 95:7 100:16
 110:16 128:2,15
 131:20 132:25
 133:19,22 134:10
 134:17

prepare 25:1,2
 30:20
prepared 60:11
 80:10 95:11,13
 107:20
prescient 95:16
present 9:7 13:9
 53:1,3 70:1
 104:13 120:2
presentation
 10:18 12:3 84:5
presented 10:13
 11:12,13 52:5,25
 53:2 64:12 84:4
 85:4 90:25 102:25
 105:3 106:13
presenting 12:18
preserving 133:13
press 60:17
pretty 13:23
 64:14 80:15
prevent 91:13
 132:11
previously 15:3
 15:15 56:7
price 110:18,20
 113:5 131:23
 132:2
primarily 17:21
 18:7 50:6
primary 37:3,3
 127:12 130:22
 133:2
prime 123:16
principal 90:12
 90:13,14 126:10
 128:19,20
principally 47:13
 88:17
principle 116:23
prior 46:25 91:8
probable 116:5

probably 33:3
 49:16 82:15 85:12
 108:1
problems 87:7
procedural 10:10
proceed 10:12,17
 15:23 17:9 50:22
proceeding 10:9
 16:24 43:4 70:10
 70:12
proceedings
 135:3 136:4
process 12:24
 34:12 44:23 46:20
 50:1 84:5,12
 95:18 133:23
professed 90:13
proffered 128:6
profit 68:11 80:11
 80:18,21 121:9
 122:7
profitability
 123:10
profits 123:12
prohibiting
 128:10
prohibition 59:25
 67:21 124:22
 132:9
prohibitions
 39:20 40:4
prohibits 58:6,7
project 73:21,22
 74:6,14 78:6,7
projected 129:25
projections 30:7
 90:10
promising 30:19
proof 33:17,19
 51:2 54:24 63:15
proper 63:10
 65:21 66:6 104:2

**properly** 13:21
**properties** 123:21
  130:11
**property** 3:15 4:1
  45:23 48:24 54:19
  54:22 60:2 89:10
  93:1 105:16
  107:21,21 114:14
  115:12 117:16
  119:6 120:9 121:5
  121:5 125:25
  126:17 127:1
  130:8 131:3
  132:25 134:3
**proportional**
  122:22
**proportionate**
  91:21
**proportionately**
  91:24
**proposal** 40:19
**propose** 69:10
  100:23 121:5
**proposed** 4:22 5:2
  5:5 6:15,21 17:24
  89:14 100:20
  120:13 121:2
  125:4 128:1
**proposing** 63:17
  121:7
**proposition** 52:21
  122:21
**prospect** 107:22
**prospective** 36:3
  64:16 91:23
  131:24
**protect** 39:6 67:2
  68:13,15 88:23
  98:17 99:21 100:7
  103:11 126:9
  133:12
**protected** 61:7

**protecting** 63:4
  133:11
**protection** 105:8
  114:2
**protections** 88:9
  99:14 105:24
  115:9
**protests** 88:15
**prove** 33:18,19,23
  51:2 52:10,10
  104:25 106:19
**proven** 54:10
**provide** 31:13
  53:13 61:19 65:6
  85:24 86:22 88:22
  98:5 114:2 118:6
  123:16 133:11
**provided** 32:7
  108:7 115:9,17,22
  126:11
**provides** 13:7
  17:22 59:15
  131:13
**providing** 114:18
**provision** 13:17
  41:25,25 55:5,7
  55:18 56:4,20,21
  57:21 58:12 87:23
  91:12 94:20 95:12
  97:22 107:16
  110:2,8,25 111:17
  111:19 114:9,17
  119:8,16 121:12
  127:24 128:10,12
  130:6,6 132:16,17
**provisions** 51:16
  54:16 55:9,10,25
  58:22 59:22 60:1
  63:1 78:13 79:12
  87:6,14 94:5,7
  95:19 97:13 103:9
  103:10 106:24
  119:19 124:8

**proviso** 57:4,7,17
  133:9
**proviso** 57:4,7,17
  133:9
**public** 90:8
  120:23 124:25
**published** 101:11
  101:13
**puerto** 5:10 9:5
  42:18,22,25,25
  43:2,6,9 44:3,19
  48:18,21 49:1,7
  49:10 50:15
**purchase** 100:21
  110:17 113:5,6
  120:25 131:22
**purchased** 102:11
**purchaser** 88:9
**pure** 45:23 46:1
  47:20
**purhcaser** 131:25
**purport** 28:21
**purports** 64:25
**purpose** 43:12
  56:9,10 57:2
  67:15 90:11 111:9
  118:23 119:8
  121:8 123:16
  124:9 126:8
  127:12
**purposes** 36:19
  56:10,13 57:3,18
  89:7 98:7,14
  114:7,10 125:10
**pursuant** 66:2
  86:6,25 110:18
  131:23
**put** 16:7 19:21
  20:8 40:11 46:18
  48:3,8,10,13,22
  49:10 55:21 61:8
  61:15 63:17,22
  69:14 70:5 71:19
  81:16,22 82:11,12

130:9 132:8,10
  133:9
**proviso** 57:4,7,17
**public** 90:8
  120:23 124:25
**published** 101:11
  101:13
**puerto** 5:10 9:5
  42:18,22,25,25
  43:2,6,9 44:3,19
  48:18,21 49:1,7
  49:10 50:15
82:12 107:20
  117:8
**puts** 58:20
**putting** 40:10
  81:13,18,18

**q**

**qs** 90:8
**quality** 49:12
**quarropas** 1:13
**question** 11:22
  14:3 18:5 20:7
  27:5 29:10 30:23
  30:24 34:21 35:8
  35:14 41:2 42:1
  46:2 49:1,19 57:7
  60:9 75:25 76:7
  79:7,8 83:16 96:1
  107:18 109:11
**questions** 16:2
  30:22 42:14 50:11
  55:10 70:8
**quickly** 51:20
  75:17 99:23 108:2
  128:4
**quite** 96:3 121:7
**quote** 30:9 48:18
  66:19 68:8 97:14
  98:14 99:4,15
  100:13 114:24
  121:23
**quoted** 38:24 90:2
**quoting** 122:14
  123:4

**r**

**r** 1:21 8:1,18 10:1
  16:22 42:25,25
  43:1 69:24 71:23
  82:20 127:1 136:1
**rachel** 8:16 10:4
  41:8
**rai** 1:25
**rail** 63:24

**raise** 15:1,18
16:12 42:19 47:8
71:18 82:16 83:9
**raised** 13:24
83:14 97:17
127:22
**raises** 15:9
**ramco** 123:21
130:11
**raphael** 5:1 9:3
71:23 72:6 75:14
79:15
**rarely** 47:11
**rate** 24:8
**ratio** 122:24 123:1
129:21
**rdd** 1:3
**rea** 26:1 35:25
37:5 39:9,19,25
40:24 41:6,7,9,14
41:24 42:4 55:6,9
55:16,17,20 56:6
56:17,21 58:4
61:2 86:22,24
93:1 94:6,8 97:10
97:21,21,24 98:3
98:19 113:20
125:3
**read** 18:10 19:8
19:10,14,15 26:11
26:12,22,23,24
27:8 29:21 30:1,3
30:4,5,16,18 31:7
31:14,16 32:3,5
39:20 51:8 53:15
55:5,14 57:19
60:8,9 62:11
67:11 90:17 91:16
105:19 110:6
124:4,8
**reading** 13:16,18
40:5 41:10 86:23
93:8 98:18 111:3

127:10
**readings** 61:11
**ready** 15:22 34:10
**real** 3:15,25 46:24
47:3,18 49:12,15
49:25 50:5 64:2
74:17 84:20 89:10
92:7 101:2,19,25
111:25 114:14
115:12 117:16,23
119:6 120:9
125:25
**realize** 45:11
100:4
**really** 13:6 14:4,7
14:15 15:1,6,21
36:10 54:9 75:5,8
77:4,5 93:24 94:2
100:1 104:6,8,9
104:16 107:25
110:8 120:2,3,6
127:11
**reap** 49:22 116:14
**reason** 53:10
**reasonable** 26:24
52:13 53:23 54:10
56:19 61:11 67:19
88:13 90:2 91:20
123:19,25 128:2
134:8
**reasonably** 41:18
42:6
**reassigning** 121:8
**rebuttal** 81:14,17
81:23 82:11,12
83:12,15 84:13
**recall** 20:24 21:18
41:10
**receive** 87:11
**received** 30:19,23
**recess** 85:17
**recipient** 32:15

**recipient's** 32:17
**reciprocal** 113:18
**recognize** 119:1
**recognized** 67:6
105:13 106:20
119:2,14 130:9
**record** 11:1 15:7
16:20 42:24 43:15
59:10 85:19 107:8
113:23 115:15
117:12 120:24
129:16 132:13,17
133:16 134:15
136:4
**recorded** 73:4
102:13
**recross** 38:9
**redacted** 43:16
**redirect** 37:8,9,12
38:8 41:4 50:12
**redistributive**
126:21
**reduce** 88:21
**reduced** 84:9
121:3
**redundant** 27:7
**reemphasize**
103:17
**refer** 25:11 28:16
30:8 52:17 63:3,5
77:19 113:20
**reference** 21:18
55:15 93:13,21
125:5,12 126:6
**referenced** 56:7
**references** 44:13
**referred** 18:14
19:5,6 25:23,25
96:9
**referring** 17:16
23:1 26:12 29:1
32:20 61:1 65:19
125:2

**refers** 63:7,8
99:14 109:22
121:16
**reflect** 13:5 44:21
44:23
**reflects** 22:23
134:7
**refresh** 30:4
**regard** 55:13,18
57:14 60:19
**regarding** 4:6,10
6:15,21 17:23
18:17 21:5
**regional** 40:6,16
56:15 57:6 64:24
98:15,16
**reicher** 17:21 18:8
18:10,19,21 19:7
19:9,16 20:15,20
24:9 26:6 31:11
31:21 53:7,17
**reicher's** 31:19
**reiker** 86:10
**reiterate** 130:5
**related** 15:21
86:10
**relatedly** 12:16
**relatively** 108:2
**reletting** 133:19
133:22
**relevant** 13:17
30:15 42:14
124:14 125:7
**reliable** 102:25
**relied** 53:10 93:12
97:5 123:11
**relief** 94:6 100:15
**rely** 28:1,3 64:22
104:4,10
**relying** 17:21 18:7
18:25 20:19 25:19
26:6,10 55:7
84:21

remain 95:19
remainder 114:21
remaining 55:14
98:3,25
remedy 87:7
remember 18:4
20:15,23
remind 14:8
removed 45:16
rent 38:2 48:4,11
48:20,22 49:4,5,6
49:11 50:3 53:4
53:22 64:10 68:13
68:14 80:5,6,9
87:12 89:11
100:16 102:21
104:22 105:25
106:2,23 115:24
115:25 116:2
117:3 118:14
120:11 123:17
128:18 130:3
rented 107:13
rents 49:18,23
100:16
reopen 52:13
67:19
reorganization
95:18
repeat 83:18
repeatedly 86:9
98:5
rephrase 49:1
50:9
replaced 76:3
122:12
replacement 94:3
99:23
reply 2:20 3:1
4:14,16 5:10 6:2
6:19 7:1
reported 91:18

represent 59:6
representation
96:23
representations
134:15
represented 44:22
133:16
representing
11:18
request 11:4 13:9
13:12,22,25 14:5
14:12,20,23 15:22
45:5 100:10
requests 4:19 7:3
13:23 14:22
require 61:6 62:6
64:18 68:20 77:20
89:8 104:1 114:12
123:12
required 24:14
38:22 42:8,11
51:25 52:1,17
53:6 61:12 65:13
65:14 67:20 93:19
102:22 103:11
requirement 52:1
52:25 61:7 97:19
124:13 127:5
requirements
65:16 111:4
113:10,25 118:24
124:5 125:13
133:12
requires 12:12
26:1 33:23 37:14
39:10,16 42:5
51:21 56:8 66:1
103:2 122:11
125:12
reserve 106:11
resources 122:9
respect 75:17
83:12 86:11 90:24

98:22 115:11
117:22 119:18
121:4 129:10
130:19,20 134:16
respecting 103:9
respective 129:7
respond 12:8
responded 14:21
responding 11:3
response 14:18
44:15 45:18
102:19 127:12
responses 4:19
7:3 105:6
responsive 79:7
rest 40:12 58:19
80:12 112:9
restated 113:17
restraint 127:20
restricting 59:9
restriction 64:22
restrictions 67:1
127:17,19 130:13
130:17 134:5
restrictive 129:4
result 74:5 119:5
retail 14:2,10,13
21:25,25 38:23
39:6,14 41:6,18
41:19 42:5,6,8,11
56:10,11 57:2,18
74:2 92:8,17
96:10 98:6,13,13
99:9
retailer 36:8,9
37:3 101:25
retain 94:12
retroactive 12:19
12:20
retroactively 12:8
14:21
review 21:4 24:9
24:20,24,25 29:23

reviewed 18:21
19:10 24:8,10
29:19,23 84:4
rewrite 86:21
126:12
ri 9:12
rich 3:18
richard 5:5 8:17
10:4
rickel 127:7,11
rid 100:3
ridiculous 84:17
right 11:17 15:24
16:4,12 17:8,25
21:23 22:18,22
23:3,7,15,16 24:7
25:14 27:13,21
28:9 29:6,8,21,21
30:21 31:2 32:7
32:11 33:15,21
34:4,7,16 35:7,17
36:16,22 38:25
39:17,18 40:19
42:14,19 43:10
44:1 46:4,10,17
48:12 49:7,7,24
50:6 51:17,19
53:9 55:23 56:25
57:10,16,16,20,20
58:1,5,10 59:8,12
59:19 60:4,6,14
60:20 62:2,13
63:12 65:18,25
67:16,23,23 68:3
69:12 71:18 72:4
73:24,25 75:4
77:18 79:13 80:5
80:23 81:21 82:10
82:16 85:5,10,13
87:17 95:1,9
96:12,12,17 97:3
99:1 101:2,5,15
101:21 102:15

104:11 105:8
106:11 107:17,19
109:4,17,20,25
110:17,25 111:1,6
111:23 112:4,8,15
112:20,20 125:8
127:21 130:7
131:22 133:4,17
134:6
**rights** 52:15,16
63:1,2 67:2 69:2,3
92:19 94:16 97:9
97:14,25 99:18
101:1,9,20 102:13
103:25 105:12
106:7,12,15,20
107:3 124:10,21
125:16 126:13
130:13 132:7
**rikel** 62:6,11,21
67:17,22 68:2
**rip** 105:21
**risk** 88:21,24
99:22
**road** 136:21
**robert** 1:22
**roger** 5:9 9:5
42:17 44:3
**roller** 41:21
**room** 1:13
**roughly** 121:1
**routinely** 116:9
**rule** 11:5 12:6,16
12:17 50:25 54:7
128:9
**rules** 11:5
**ruling** 15:24 82:5
99:3 114:21
134:20
**run** 56:18,19
116:23 133:20
**running** 91:8

**runs** 115:4 124:17

**s**

**s** 8:1 9:11 10:1
122:8 132:9
**s&e** 64:16
**s.d.n.y** 118:19
**s.d.n.y.** 114:24
115:7 118:15,20
121:21 125:22
129:3
**sacks** 78:19
**safeguards** 115:1
**sale** 2:8 3:4 5:14
6:6 94:21 112:7
**sales** 86:7 122:7
**sanshoe** 118:15
**satisfied** 121:22
129:15
**save** 48:7
**saying** 24:21,22
46:22 48:25 61:18
64:1 81:13 83:17
84:21 89:6 104:4
105:19 111:18,20
119:12
**says** 14:12 26:14
27:12,13 29:25
30:10 31:3 32:15
32:19 40:5,14
41:19 46:14 52:9
55:20,21 56:24
58:13 66:14 67:4
67:17 78:14 94:23
98:12 106:16
124:9
**scavenger** 100:12
**scavengers** 73:16
**scenario** 60:1
**schedule** 3:16
**schedules** 27:20
27:23
**scour** 23:22

**sdny** 52:22
**seal** 43:16
**sealed** 43:20
**sealing** 43:21
**sears** 1:7 10:2
13:12,15 20:1,22
23:24 24:4 52:2
54:8 55:15,22,23
56:24,25 57:1,2,7
57:8,9,17 73:13
73:22 74:11,16
75:22 76:20,25
77:1,6,21 78:4,12
78:14 84:8,10
85:19 86:22 88:6
91:1,7 92:5,17,18
92:25 93:2,16,16
94:25 97:10,23
98:2,6,8,10,19,25
99:10 102:7 103:2
104:15 106:18
110:12 120:18,22
121:6 124:24
129:20 130:7
131:15 134:6
**sears'** 97:25 102:5
117:16
**seated** 85:18
**second** 2:10 3:5
5:14 6:6 32:22
45:15 87:10 90:9
109:14 110:6,9
124:3
**secondly** 132:22
**section** 3:14,14
20:12 21:5 32:15
40:24 41:7,13
55:20 56:6,9
57:21 58:3,20,25
86:25 87:20 90:1
93:1 95:13 97:21
99:16 100:14
105:7 109:14,18

113:10,10 114:7,8
114:10 117:20
118:23 119:2,15
119:15,17,24,25
120:4,7 121:16
124:2,5,15,22
125:2,3,10,16,23
126:5 127:6
128:17,24 130:7
131:7,13 132:8,21
132:22 133:18
**sections** 42:14
113:25 115:5,14
115:17
**security** 28:14
37:15,25 38:1
116:17,22
**see** 30:1,11,12
31:5 46:1 51:16
52:9 55:19 56:5
65:10 66:13 89:23
93:11 111:16
116:6 118:16
130:10
**seek** 100:17
**seeking** 12:17
23:10,11,12 45:11
86:3 88:5 94:19
98:17 100:18
113:4
**seeks** 13:7
**seen** 18:24 51:10
66:14
**select** 100:7
**selected** 19:17
**selectively** 122:2
**sell** 45:14,22 46:9
46:17,23 95:6
110:15 111:5
131:19 132:25
**sellers** 3:13,24
**selling** 46:24
102:8 117:16

133:5,6
**sells** 101:2
**senior** 117:15
**sense** 33:22 53:14
61:14 107:24
**sensitive** 74:3
**sentence** 32:20
43:15 45:15
**separate** 66:2
96:7 115:16 116:2
124:5,13 127:5
**serious** 28:13
**service** 88:11
97:12,15 123:21
130:11
**services** 92:7
**serving** 72:2
**set** 92:9 113:16
121:15 126:18
132:5
**setting** 3:15 59:23
59:24
**settle** 134:25
**share** 79:4 117:6
**shareholder** 92:2
93:3 124:23
**sheet** 18:22 24:8
25:7,8,12 26:9
27:8,15 28:12
29:10,11,15
**shield** 87:7
**shirin** 9:14
**shop** 58:8
**shopping** 36:16
40:6 56:11,15,23
57:6 58:18 59:4,5
63:2 64:24 65:2,8
66:7 67:2,8 72:18
72:20,22 73:2
74:8 87:8,12 89:3
89:10 91:13 98:16
100:6 101:7 114:4
114:6,14 115:10

115:23 119:4
120:9 125:25
126:3,16 127:13
130:10 131:8
**shops** 58:9
**short** 12:2,5 32:14
**show** 21:6 28:21
35:2 52:1 53:6
61:13 65:12,13,15
65:20 66:16,18
68:20 104:1 107:8
129:21
**showed** 120:24
**showing** 118:2
**shown** 66:3,5
116:9 129:23
**shows** 28:23
**side** 68:6
**sides** 96:2 119:1
119:10
**sign** 53:18 80:16
**signed** 3:12,23
29:11,12,16
**significant** 48:9
49:10 67:9 95:11
116:12
**significantly** 35:5
**silly** 32:1
**similar** 13:11,14
32:5 52:2 54:8
68:9 74:12 89:15
89:19,24 90:17,17
91:17 93:8 103:2
104:15 106:17
109:7 120:14
123:20 128:20
129:20
**similarity** 122:3
122:11 123:10
**simply** 10:17 27:1
45:9 53:12 61:15
63:11 79:7 100:15
109:15 116:10

133:3
**single** 47:4
**sir** 27:8 32:9 35:7
42:15 71:16 72:13
81:1 82:21,23
83:5,18
**sit** 34:9,11,24
46:16 47:2 62:23
70:4 82:14 91:1
**sits** 105:25
**sitting** 17:2 43:4
**situation** 67:6
74:2,19 78:21,23
103:23 129:5
**situations** 100:25
**six** 46:15,22 62:9
67:20 128:6,18
**size** 36:23 37:2
**skill** 24:19
**skip** 68:25
**sky's** 36:14
**slocum** 66:24
67:11,14 87:7
88:16 97:6
**small** 21:11,12,14
**solace** 108:18
**sold** 46:14 47:18
107:12 115:3
**sole** 121:8 123:6
**soliciting** 35:21
**solutions** 136:20
**solvency** 118:8
**solvent** 87:8
**somebody** 26:17
52:6 84:2 104:20
106:4
**somewhat** 12:3
**sonya** 7:25 136:3
136:8
**sophisticated**
58:24 59:16
**sophistication**
132:19

**sorry** 19:25 21:22
22:14 27:3 49:1
50:9 54:2 60:24
70:21 75:11 84:13
95:25 96:20 107:4
109:8,17,21 110:7
**sort** 102:25
**sorts** 36:5
**sought** 13:1 21:24
**sound** 59:6
**source** 89:11
120:10
**southern** 1:2
121:18
**space** 34:10,14
36:6 37:1 48:20
55:16,17,18 58:20
68:18 76:7,14,17
77:13,16,21 79:18
79:21 92:20 96:4
97:15 103:19
105:21 107:6
121:9
**speak** 72:12
**speaking** 11:15
36:4
**speaks** 26:23
30:15
**special** 63:1 74:20
90:11
**specific** 19:12
31:5 34:21 39:19
40:9 47:17 51:16
59:13 61:18 67:21
73:21 97:22
115:25 124:21
128:4 130:5
**specifically** 39:12
54:12 56:4 67:17
68:4,5 96:8 115:9
122:24 126:11
**specify** 57:12

speculate 52:7
speculation 45:17
  45:23 46:1
spell 16:19 42:23
spelled 132:20
spending 74:14
spoken 10:8
squarely 88:10
stake 90:14
  116:25
stand 16:8 56:8
  70:5 71:16 108:25
  122:20
standard 12:9,10
  87:5,21 88:13
  91:9 92:9 101:17
  118:10 128:24
standards 87:2
  92:14 93:5 97:16
standing 107:22
staples 128:12
stare 129:18
start 26:14 62:18
starts 56:6,6
state 30:14,24
  31:10 44:5 47:10
  53:9 54:13 62:25
  73:11 102:20
stated 2:13,22 3:7
  4:18 5:17 6:9
  114:22 117:3
  118:14 119:23
  121:23 128:5,17
  129:7 132:13
  133:2
statement 33:4
  86:11 104:8
  117:25 118:1
  122:1,1
statements 25:2
  30:8 32:6 45:6
  67:14 81:23 85:4
  124:25

states 1:1,12
  19:16 20:15 68:8
  98:1 120:8 125:8
  125:24
stating 43:20
  44:20 60:10 121:7
  128:3
status 53:19
statute 112:11
  123:12 124:10
  126:8,20
statute's 123:16
statutory 88:8
  115:1
stauble 9:15
stay 55:17
stays 77:2,7
step 42:15 50:14
  81:1 85:5
stipulate 134:19
stipulated 10:14
  12:4 13:5,24
  50:21 113:13
stipulation 3:12
  3:23 4:6,10
stipulations 90:25
stop 35:7
store 34:4 48:8
  55:2 57:8,9 58:13
  58:21 59:18 65:1
  73:23 74:13 75:2
  76:12,21,23 77:7
  77:11,12,16,20,25
  78:4,10,18 86:4
  86:23 87:22 92:12
  92:17 93:20 95:5
  97:20,23 98:21,22
  99:2,4,6 107:7
  110:14 112:1,2,3
  112:4 122:7
  127:15,15 131:17
  132:24 134:11

stores 52:21 59:2
  59:3,13 75:1,17
  75:20 76:4,6,6
  78:19,25 80:3
  84:9,10,22 92:8
  93:16,17 101:22
  114:23 120:22
  121:20 125:20,21
  129:2
story 81:20
strategy 12:23
street 1:13 118:19
strength 123:7,9
strenuously 86:18
stricken 14:25
  15:4 28:7 45:24
strict 61:11 93:8
strike 4:15 6:20
  7:2 11:6 28:8
  44:13 47:20 79:7
strings 117:9
strong 122:18
stuck 109:3
stuff 58:9
sub 96:5
subject 12:9 27:12
  27:13,24 28:12
  55:24 57:10
  110:21 114:25
  119:16 124:19
  125:15 134:4,14
sublease 48:20
  94:14 134:4
subleased 23:8
subleasing 107:8
sublet 59:19 76:14
  96:15 107:6
  108:11,12,20,23
  108:25 128:2,15
  134:10
subletting 107:21
  121:9 134:17

submissions
  113:15
submit 109:16
  134:19
submitted 10:15
  11:2,8 12:13,14
  16:24 17:20 34:17
  43:2 44:10 54:18
  54:21 70:9,11
  71:3 103:4
subsection 89:7,8
  114:11 121:22
subsections
  125:11,17
subsequent 24:5
subsidiary 86:5
substantial 10:12
  17:22 49:5,6 51:7
  97:24 113:1,23
  116:24 117:22
  118:4 119:2
substantially 98:1
  100:22 120:24
substantive 69:14
subtenant 26:1
  64:16 128:3
succeeding 117:1
successful 104:18
successfully 22:3
  117:21
successors 56:25
  57:1 98:11 124:19
suffice 93:7
sufficient 14:13
  24:13,15 89:5
  115:21 116:22
  128:20
sufficiently 83:21
  129:23 130:1
suggest 111:18
suite 136:22
sum 117:11

**superior** 120:20
**supplement** 71:14
  72:2,8
**supplemental** 2:5
  2:10,15,19 3:2,5,8
  3:19 4:4,14,15
  5:11,14,18 6:3,6
  6:10,19 7:2 11:7
  14:24 15:8
**supply** 62:24
**support** 4:3 5:10
  6:2 14:9 18:15
  22:8,10 23:21
  49:11 118:9
  122:14,15 125:18
  127:11 128:18
**supporting** 3:18
  113:5
**suppose** 64:20
**supposed** 28:10
  28:11,13 30:13
  53:16,16 104:5,6
  104:12
**sure** 14:16 16:14
  17:18 18:1 20:25
  23:20 29:23 31:6
  33:12 34:22 35:15
  37:8,10 44:17
  51:8 55:14 56:2
  68:4 69:8 85:8,22
  105:10 108:17
**surprises** 10:22
**surprising** 15:10
**survey** 73:4
**survives** 76:24
**suspense** 133:18
**swear** 16:15 42:20
  71:19 82:14,17
**sworn** 82:16

**t**

**t** 43:1 136:1,1
**tab** 39:22,25

**take** 10:24 25:5
  34:10,14 45:8
  49:9 69:11 71:16
  77:13,16 117:13
  117:14 121:7,9
  128:22 131:7
  133:17
**taken** 123:20
**takes** 34:12 61:21
**talk** 45:13 71:9
  81:3 85:6 91:19
  92:13,19 103:21
  107:25
**talked** 98:1
**talking** 20:19
  28:23,23 31:10
  41:23 112:8
**talks** 19:17 20:13
  28:17 33:4 57:21
  59:1
**taxes** 38:1 53:23
  116:1 117:6
**taylor** 9:10
**tea** 99:4
**tech** 36:13,20
**technical** 81:7
**technically**
  112:24
**telephonically** 9:7
**tell** 15:13 16:15
  39:22 42:20 71:19
  78:11 82:17
**telling** 32:25 77:5
**temporary** 56:17
**tenancy** 48:7
  77:23 78:12 79:12
  107:8
**tenant** 34:10,13
  34:19,25 37:15
  48:3,11,13,19,21
  48:23 49:9 50:2
  51:6,23,25 52:15
  53:3 62:9 63:13

  63:17,18,20 64:2
  64:3,7,8 66:16
  68:3,18,20,22,24
  74:5,8 77:19
  79:25 80:5,6,8,10
  80:20 87:12 88:4
  91:22,23 94:21
  95:4,5,7,10 96:5,5
  96:8,11,16 97:13
  97:14 99:8,15
  100:7 103:20,22
  104:23 105:2
  106:5 110:13,14
  110:16,18,20
  112:4,17 116:11
  116:12 117:5
  124:19,22 126:2
  126:16 127:1,24
  130:4,8,14 131:5
  131:16,17,23,25
  132:1,2,4
**tenant's** 63:19
  64:10 132:3
**tenants** 34:12
  35:20 36:4 39:17
  47:25 48:2 49:18
  51:6 67:4 68:13
  73:25 74:1,1,3
  75:21 76:8 77:6
  78:8,17,22 79:12
  79:17,20,24 80:1
  80:14,16 87:8,24
  94:3 98:23 99:23
  100:8 105:17
  106:2 114:3 119:3
  119:4 122:12,12
  128:19 131:21
**tenn** 123:22
**tennessee** 97:18
**teresa** 9:13
**term** 48:19 72:20
  72:23,24,25 75:3
  95:4 98:3 110:13

  126:19 131:16
  133:19
**terminate** 73:25
  77:25
**terminated**
  116:14
**termination** 92:18
**terminology**
  43:19
**terms** 10:11 12:6
  14:4 96:3 99:21
  100:3 106:22
  112:12 132:1,15
**test** 89:20
**testified** 24:12,15
  45:14
**testify** 24:2 48:3
  107:6
**testimony** 16:11
  17:2,3 18:17
  22:13 25:23,25
  27:14 28:3 34:17
  37:18 38:22,24
  39:4,5,7 42:18
  43:4,8 44:22,24
  70:11,13,19 72:3
  83:3,20 84:16,19
  84:22 90:10 94:1
  107:5 113:21
  130:21 133:24
  134:7,9
**thank** 16:1 17:10
  20:5 21:17 25:17
  31:8,9 32:4 33:15
  35:11 37:11 38:5
  38:7 40:3 41:12
  42:16 45:12 47:5
  50:15 69:5,9,9,19
  75:24 79:10,14
  80:23,25 85:10,15
  85:16,20 100:18
  102:17 134:22
  135:1,2

that'd   50:3
that's   11:12 15:4
  15:5,24 16:4
  22:10 23:1 24:22
  26:3,3,16 27:6
  28:12,13 29:12
  30:1,10 31:17
  32:1 33:3,6 34:23
  35:4,11 36:8,19
  37:24 40:17,20,25
  41:19 42:8,9
  43:23 45:15 47:1
  47:15,16 49:21
  53:25 54:1 58:1
theme   115:4
theory   116:12
thereof   56:16
thereto   56:12
  98:14
there's   10:22
  13:10 15:20 17:5
  18:20 19:6 20:12
  22:12,12,22 23:2
  23:17 24:1 30:22
  33:10 34:16 35:10
  36:13,14,25 38:19
  39:2 49:14 52:23
  52:24 54:17,20
  57:11,16,24 58:12
  59:21
they'll   48:3,7
they're   14:4,17
  21:15 31:10 41:17
  51:24 52:6,17
  53:1,18 54:13
they've   19:23
  45:2 51:25 60:16
thing   17:19 19:11
  28:24 31:16 54:15
  78:17 102:22,22
  104:20 108:13
  109:10

things   12:2 30:20
  51:22 52:12 64:13
  91:10
think   10:20,21
  11:11,13 13:4,16
  13:23 14:6,17
  15:11,20 17:13,20
  19:20 21:21 23:8
  23:22 24:3,22
  25:9,24 26:23
  27:4 28:5 31:19
  31:21 33:3,7 35:4
  50:7 55:3 58:14
  60:16,22,23 61:4
  62:17,23 69:2,22
  73:11 74:19,22,24
  75:4,11 76:16,19
  79:22 81:11 84:3
  86:8,13 91:9,9
  92:11 93:7,10,24
  94:25 97:2 105:1
  105:9 106:5,12,18
  107:2,11 108:5
  111:19,22 112:8
thinking   61:20
  96:2
third   2:15 3:8,19
  5:17 6:9 23:4
  32:23 51:21 57:14
  62:19 66:25 68:16
  87:6,12 93:1
  94:14 101:2,4
  109:23 118:6
thomas   4:3,7,11
  5:3,6 6:16
thought   20:17
  22:6 23:23,23
  49:20 59:17 60:24
thoughts   33:5
three   22:6 23:19
  23:24 24:2 30:22
  35:8 40:3 56:16
  69:11,16 70:8

75:21 76:6 80:2,4
  86:16 87:7 95:10
  108:19 113:22
  121:12 125:11
  127:22
throws   89:5
thwart   12:14
tie   45:20
time   3:14,24 12:8
  12:11 13:8,9
  14:21 34:12 50:25
  52:3,13 55:4
  56:19 57:11 67:20
  73:3 74:25 77:8
  88:14 89:17 92:22
  93:7 94:24,24,24
  104:25 105:20
  106:9 110:11,11
  110:12,22 119:20
  120:16,19,22
  122:19,25 125:20
  127:16 128:2,4
  131:14,14,14
  134:3
timely   12:13,14
  14:17
times   35:8 55:21
  55:24
tis   133:19
title   119:22,23
tobacco   108:24
today   10:6,12,21
  11:23 17:2,20
  22:9 23:7 28:3
  34:9,11,15,15,16
  34:24,25 35:2
  40:21 43:4 46:16
  47:2 49:14 52:10
  52:14 65:5,13
  66:8 69:2 70:12
  74:1,7,10,11 78:1
  78:21,22 87:20
  88:5,20 94:2,16

100:18 103:18
  104:1,25 105:12
  106:12,21 107:3
  133:16 134:15
today's   34:13
tom   11:18 17:13
top   26:14 95:18
topic   133:25
torturing   107:22
total   124:18
tough   95:15
tourist   73:3
tourists   73:5
tower   118:16
toys   127:1
tract   57:2
trademark   84:11
trailer   58:8
transaction   2:8
  3:4 5:14 6:6 31:14
  86:7 131:24
transactions   61:9
  61:10
transco   35:17
  46:9
transcribed   7:25
transcript   136:4
transfer   92:25
  95:6,17 109:23
  110:15 111:5
  131:19
transferee   95:20
  95:21 97:11 99:11
transference
  100:10
transform   3:1
  4:14 5:10 6:2,19
  7:1 8:11 10:6
  13:19 14:1,10
  15:10,12 17:23
  20:2,2,4,9 21:1
  22:1,20,20,21,24
  22:25 23:4,14,25

[transform - view]                                                                Page 32

24:5 25:11 30:9
33:17 34:3,5,7,18
35:19 37:16 45:10
45:14,21 47:12
48:10 49:22 59:24
60:10 63:21 81:24
83:3 84:7,7 86:4,5
86:12,17,19 88:5
88:18,21 91:1
92:4 93:16,16
94:3,12 95:9
98:20 100:9,21
107:19,19 112:18
113:2,5,7,22
115:16 117:21
118:1,7 120:21,25
121:1,5,6 124:7
125:5 129:20,20
130:16 132:12
133:5,7,14,15
134:15
**transform's** 64:21
70:6 96:4 102:2
133:25 134:7,19
**transform's** 11:3
11:6 14:10,13,14
14:20,23 16:5
24:5 30:8 50:16
60:9
**tried** 15:16
**trigger** 132:8
**trouble** 68:23
**true** 55:16 65:10
74:18 136:4
**truly** 12:18
**trust** 53:4
**trustee** 119:23
**truth** 16:16,16,16
42:20,21,21 45:2
71:20,20,20 82:17
82:17,18
**try** 52:6 104:24
105:21

**trying** 46:11
73:18
**tsw** 129:2
**turn** 25:7 56:3
97:21
**turned** 29:4
**turning** 97:6
115:14
**twice** 103:17
**two** 13:4 14:6
15:25 54:14 57:12
68:7 70:6 74:11
76:21 77:1 82:4
87:4 108:6,12
109:9,18 110:4
111:3,11 113:21
120:6 132:1
133:22 134:2,17
**tyler** 8:20
**type** 13:21 59:23
59:24
**types** 12:21 35:20
36:3 57:23 101:7
114:16 118:12
132:8
**typically** 103:21
116:16

**u**

**u** 43:1
**u.s.** 1:23 121:20
127:9
**u.s.c.** 3:14,25
**ultimately** 32:9
112:12
**unable** 35:2
**unbelievable**
53:12
**uncertainty** 87:11
88:18
**undefined** 99:15
**underlying** 84:12
88:7 91:11 119:8
121:14

**understand** 11:25
17:19 18:1 24:20
26:11 33:18,23,25
40:11,12 43:7
49:7 60:5 72:1
105:11 108:21
111:17 112:11
**understandable**
100:14
**understanding**
23:11 34:22 43:23
**understood** 93:6
**undertake** 50:1
**undertaking**
44:23
**undertakings**
88:3
**undisputed**
120:19
**undoubtedly** 99:5
**unduly** 12:25
**unencumbered**
45:23
**unexpired** 2:7 3:4
5:13 6:5
**unfettered** 99:18
**unfortunately**
94:17
**uniformly** 126:23
**unilaterally** 87:16
**united** 1:1,12
**unreasonable**
128:15 134:2
**unrelated** 131:25
**unreliable** 29:25
**unusual** 67:6
**unusually** 105:22
**update** 30:16,23
**updates** 30:19
**urged** 126:20
**use** 36:5,12 39:13
39:16 40:14 41:6
43:18 49:15 56:8

56:9,12 57:1,2,17
61:8 85:21 97:13
98:6 100:23 129:4
130:7,13,16
**uses** 39:2 57:23,24
58:6 72:20,24
89:19 98:14
**usual** 72:18
**usually** 47:18 90:7
101:3
**usurp** 130:23

**v**

**v** 123:21 130:11
**va** 127:2
**vacancy** 87:10
**vacate** 55:25
**valuable** 45:10
76:21,23 101:1
**valuation** 44:19
45:8
**value** 44:21,22,24
44:25 45:5,9
47:14 49:25 50:5
94:12 95:9 102:10
110:3,20,24 112:9
112:12,13,17,18
115:1 116:12,14
121:10 130:24
132:3,4,6 133:4
133:10,13
**variety** 39:2 86:20
**various** 46:20
127:13
**vary** 129:7
**venue** 99:9
**veritext** 136:20
**veto** 87:17,17
**viability** 78:7
88:11
**viable** 92:9
**view** 21:4 61:22
125:18 131:10,11

**viewed** 87:5
**viewing** 82:15
**violating** 56:19
    130:18
**virtually** 39:12
**vitiating** 94:16
**vociferously**
    105:5
**voir** 43:11 44:3

**w**

**w** 4:21 8:24
**wait** 96:15 109:17
    111:13
**walk** 61:1
**walked** 39:1
**want** 21:6 30:22
    32:14 36:25 37:4
    37:8 41:3 54:16
    64:14 70:7 71:7,9
    71:14,25 72:10,16
    73:17 77:9,10
    79:11 81:4,7 82:6
    82:12 84:25
    102:18 104:17,18
    106:3,10
**wanted** 40:24
    49:25 82:3 86:21
    92:25 125:15
**wants** 54:7
**wasn't** 12:12
**way** 26:21 29:10
    46:24 61:9,10,18
    63:25 66:14 69:13
    96:7 99:18 121:14
    123:11 124:17
**ways** 12:4 90:23
    100:19,24
**we've** 81:11 87:1
    98:5 99:19 108:8
**weak** 124:20
    134:5
**webb** 8:20

**weighed** 68:12
**weil** 8:3
**welcome** 107:23
**went** 52:3 123:4
    128:13 129:5
**weren't** 54:17,20
**westview** 118:19
**we'd** 50:24
**we'll** 10:14 28:10
    52:15 53:4,5
**we're** 10:6 15:22
    23:11,12 28:10
    34:3 35:6 42:4,11
    44:18,19 45:1
    59:11
**we've** 10:7 17:13
    19:20 36:7 43:16
    51:20
**whatsoever** 103:1
**what's** 20:6,8
    51:25 58:19
**wherewithal**
    33:19,24 61:13
    63:20 64:16 65:3
**white** 1:14
**wholly** 15:18 86:4
    117:25
**who's** 11:15
**william** 9:11
**willing** 80:5,8
    94:11 106:4
    116:21
**wish** 72:1 75:10
**wishes** 100:2
**witness** 16:3,5,8
    21:21 24:6 27:5
    32:2 40:24 42:17
    43:12,17 44:20
    81:24 134:8
**witnesses** 9:1
    10:15 16:6 50:23
    69:16 70:7 81:4
    88:20 113:21

133:25
**wonder** 19:14
**wonderful** 105:9
    106:2
**won't** 15:7 28:8
    45:8 60:16
**word** 22:9 53:11
    73:18,19 84:2
    89:19
**words** 80:11,18
    87:6 100:11 103:1
    111:14
**work** 35:17 63:14
**working** 48:1
    128:19
**world** 106:16
**worldwide** 118:15
**worried** 63:16
    106:8
**worry** 43:21
    52:14 53:5 63:13
    63:13 64:1,6
    65:20,22 69:1
**worth** 15:4 26:2
    45:22 61:4 104:8
**worthy** 63:12
**wouldn't** 13:20
    37:2 50:3
**writing** 80:2

**x**

**x** 1:4,10

**y**

**yeah** 16:14 19:20
    22:25 26:19,24
    30:18 37:9 39:1
    40:5 47:6 50:6
    58:8,25 61:21,23
    62:19,21 63:8
    73:1 76:5 78:11
    78:12 80:13
    101:10 107:15
    109:2 111:2 112:6

**year** 32:12 36:14
    37:23,24 38:1
    39:1 40:21 53:24
    76:15 80:12,18
    88:19,22 91:8
    98:23 107:25
    108:7 117:4
**years** 54:15 55:23
    57:12 68:7 76:19
    78:22 92:17 95:3
    97:23 102:8
    103:17 105:21
    106:6 107:23
    108:12 109:9
    124:16,18,18
    133:20,22 134:2,9
    134:18
**yep** 57:20
**yesterday** 15:16
**york** 1:2 8:6,13,22
    121:18
**you'd** 43:5
**you're** 18:1,7 19:7
    19:12 20:19 22:11
    23:10 24:17,21
    25:1,19 26:5,10
    28:1 29:18,19
    31:3 32:20,25
    35:2,16,17 41:23
    42:3,8 46:10,17
    50:6 52:19 59:14
    60:14
**you've** 19:14
    24:12 55:14
**yup** 58:11

**z**

**z** 69:24 71:23
**zero** 105:3