UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

In re                                                   :
                                                        :      **Chapter 11**
SEARS HOLDINGS CORPORATION, *et al.*,   :
                                                        :      **Case No. 18-23538 (RDD)**
                                                        :
                 Debtors.[1]                            :      **(Jointly Administered)**
-------------------------------------------------------------- x

## DEBTORS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors and*            Dated: October 1, 2019
*Debtors in Possession*                New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

FACTS ..............................................................................................................................7

    **A.**    General Background ................................................................................7

    **B.**    Negotiations with Holders of Administrative Expense Claims ..............................7

    **C.**    Terms of the Administrative Expense Claims Consent Program ...........................8

    **D.**    The Opt-In/Opt-Out Procedures .................................................................14

ARGUMENT ...................................................................................................................16

I.    Administrative Expense Claims Consent Program is an Appropriate
Implementation of Section 2.1 of the Plan........................................................................16

    **A.**    Deemed Consent to the Administrative Expense Claims Consent Program
is Permitted Under Section 1141(a) of the Bankruptcy Code...............................17

II.    Out of an Abundance of Caution, to the Extent the Court Considered the
Administrative Expense Claims Program as Requiring Approval as a Settlement,
The Administrative Expense Claims Consent Program Satisfies the 9019 Standard........21

    **A.**    The 9019 Standard ....................................................................................21

    **B.**    The Administrative Expense Claims Consent Program Satisfies the 9019
Standard Under the *Iridium* Factors...........................................................24

III.    Supplemental Objections Should Be Overruled ...............................................................26

    **A.**    Transform's Statements Regarding Its Position on the APA Disputes are
Irrelevant to Confirmation ........................................................................26

    **B.**    The Record Will Demonstrate that the Plan Satisfies Section 1129(a)(9).............26

    **C.**    Administrative Creditors Fare Much Worse In a Chapter 7 Liquidation ..............27

    **D.**    The Plan Was Proposed in Good Faith, Which Is Supported by the Record.........28

    **E.**    Mien Co. Objecting Parties' Objection to Third Party Releases and
Misplaced Objection to a "Discharge Provision" Should be Overruled................28

CONCLUSION.................................................................................................................29

**Exhibits**

**Exhibit A**: Administrative Expense Claims Consent Program Term Sheet
**Exhibit B**: Proposed Confirmation Order
**Exhibit C**: Redline of Proposed Confirmation Order

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'sn Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *dismissing appeal*,
  371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 54 F.3d 420 (2d Cir. 2008) .........................................22

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994), *dismissing appeal*,
  177 B.R. 791 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ....................................................22

*In re Calpine Corp.*,
  No. 05-60200 BRL, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007)............................20

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) .....................................................................................20

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983).....................................................................................................22

*Davidson Kempner Capital Mgmt. LP v. Official Comm. of Unsecured Creditors*
  *(In re Motors Liquidation Co.)*,
  Case No. 16 Civ. 6927 (PKC), 2017 WL 3491970 (S.D.N.Y. Aug. 14, 2017)......................23

*In re Delphi Corp.*,
  No. 05-44481, 2009 WL 973130 (Bankr. S.D.N.Y. Apr. 2, 2009)..........................................23

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) .................................................................................21

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992).....................................................................................................21

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) .................................................................................19

*In re Hibbard Brown & Co.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) .................................................................................22

*JPMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009), *appeal dismissed*,
  449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012) ........................................23

*Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*,
  585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019) .................19

WEIL:\97210168\1\73217.0004

*In re MF Glob. Inc.*,
No. 11–2790 MG, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012), *appeal dismissed*,
No. 11–2790, 2013 WL 652421 (S.D.N.Y. Feb. 22, 2013) ...................................................22

*Motorola Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ...........................................................................................23, 24

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) ..............................................................................................21

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ....................................................................................22

*In re Remsen Partners, Ltd.*,
294 B.R. 557 (Bankr. S.D.N.Y. 2002) (Drain, J.) .................................................................22

*In re Republic Airways Holdings Inc.*,
No. 16-10429 (SHL), 2016 WL 2616717 (Bankr. S.D.N.Y. May 3, 2016) .....................21, 22

*Republic Supply v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) ..............................................................................................18

*In re Residential Capital, LLC*,
497 B.R. 720 (Bankr. S.D.N.Y. 2013) .................................................................22, 23, 24, 25

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016) ......................................................................21, 22, 24

*In re Spielfogel*,
211 B.R. 133 (Bankr. E.D.N.Y. 1997) ..................................................................................22

*In re SunEdison, Inc.*,
576 B.R. 453 (Bankr. S.D.N.Y. 2017) ..................................................................................20

*In re Teligent, Inc.*,
282 B.R. 765 (Bankr. S.D. N.Y. 2002) .................................................................................21

**Docketed Opinions & Transcripts**

*In re 21st Century Oncology Holdings, Inc.*,
No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 9, 2018), (ECF No. 926) ...................................19

*In re Cenveo, Inc.*,
Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 16, 2018), (ECF No. 687) ......................19

*In re Ditech Holding Corp.*,
No. 19-10412 (JLG) (Bankr. S.D.N.Y. Aug. 28, 2019), (ECF No. 1240) ...............................19

*In re Tops Holding II Corp.*,
    Case No. 18-22279 (RDD), Hr'g Tr. (Bankr. S.D.N.Y. Sept. 27, 2018) (ECF No. 760)..18, 19

*In re Toys "R" Us, Inc.*,
    No. 17-34665 (KLP) (Bankr. E.D. Va. Jul. 17, 2018) (ECF No. 3814) ..................................20

*In re Toys "R" Us, Inc.*,
    *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP)
    (Bankr. E.D. Va. Aug. 8, 2018), (ECF No. 4083) ..................................................20

## Statutes & Rules

11 U.S.C. § 1123 ....................................................................................................21

11 U.S.C. § 1129 ...............................................................................1, 4, 15, 26, 29

11 U.S.C. § 1141 ....................................................................................................18

Fed. R. Bankr. P. 3019 ...........................................................................................16

Fed. R. Bankr. P. 9019 ......................................................................................21, 24

WEIL:\97210168\1\73217.0004

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] submit this supplemental Memorandum of Law (the "**Supplemental Memorandum**") and *Supplemental Declaration of Brian J. Griffith in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Liquidation of Sears Holdings Corporation and its Affiliated Debtors* (the "**Supplemental Griffith Declaration**"), filed contemporaneously herewith, in support of confirmation of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated September 13, 2019 (ECF No. 5139) (as may be further modified, amended, or supplemented, the "**Plan**"), including the Plan Supplement, dated July 26, 2019 and August 2, 2019 (ECF Nos. 4632, 4703) (as the same may be amended, modified, supplemented, or restated, the "**Plan Supplement**"), pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

## PRELIMINARY STATEMENT

1.     The Debtors continue to march toward confirmation of these massive and highly complex chapter 11 cases with added support and consensus.  After weeks of rigorous negotiations, the Debtors are pleased to announce that they have successfully reached agreement with an ad hoc group of administrative creditors collectively holding approximately $35 million in asserted Administrative Expense Claims (the "**Ad Hoc Vendor Group**") and the Creditors' Committee on the treatment of Administrative Expense Claims (the "**Administrative Expense Claims Consent Program**"), as described herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, Disclosure Statement (each as defined herein), the *Debtors' Memorandum of Law in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 5144) (the "**Confirmation Brief**"), or the Confirmation Order as applicable.

WEIL:\97210168\1\73217.0004

2.    Pursuant to the Administrative Expense Claims Consent Program, and as further detailed herein, each holder of an Administrative Expense Claim who *affirmatively opts in* to the Administrative Expense Claims Consent Program (the "**Opt-In Settled Admin Claims**") will be entitled to a pro rata share of an initial cash distribution of $20 million (the "**Initial Cash Pool**") on or about December 1, 2019 (the "**Initial Distribution Date**").[3]  Further, each holder of an Administrative Expense Claim who does not *opt out* of the Administrative Expense Claims Consent Program (the "**Non Opt-Out Settled Admin Claims**," together with the Opt-In Settled Admin Claims, the "**Settled Administrative Expense Claims**") in accordance with the Opt-In/Opt-Out Procedures (defined below) will be entitled to an accelerated distribution (subject to certain reserves necessary to continue to administer the Estates and pursue affirmative Estate litigation).  Settled Administrative Expense Claims will also benefit from expedited reconciliation of the Allowed amount of their Administrative Expense Claim, to be completed within 30 days from the applicable deadline with an opportunity to settle preference claims and assurance that any distributions made to holders of Administrative Expense Claims who settle cannot be clawed back. In exchange for these benefits, holders of Claims who do not timely opt out of the Administrative Expense Claims Consent Program, including the Settled Administrative Expense Claims, will agree to receive cash equal to 75% of their Allowed Administrative Expense Claim amount in full and final satisfaction of such Claim.

3.    In addition, in a showing of good faith and as part of the negotiations with the Ad Hoc Vendor Group, but under no requirement to do so, the Debtors and the Creditors'

---

[3] The Distributions made from the Initial Cash Pool on the Initial Distribution Date (the "**Initial Distribution**") shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claim.  The Initial Distribution will not be available to holders who do not agree with the Debtors on the Allowed amount of the Opt-In Settled Admin Claim.  Such holders will be deemed to hold a Non Opt-Out Settled Admin Claim (defined below).

Committee professionals have agreed to transfer $2 million from the Carve Out Account to help fund the Initial Distribution—thus "sharing the cost" of waiting to monetize the Debtors' significant litigation assets and understanding the significant benefits of the Administrative Expense Claims Consent Program.  Further, as part of the negotiations with the Ad Hoc Vendor Group, the Debtors and the Creditors' Committee have also agreed to reduce the litigation reserve funding to $15 million to allow Administrative Expense Claimants to receive an accelerated distribution on the Initial Distribution Date; but, such reserve must be funded at $25 million before future distributions following the Initial Distribution can be made.  Further, pursuant to the Administrative Expense Claims Consent Program, after the Confirmation Date, a representative of holders of Administrative Expense Claims will serve alongside the Debtors' Restructuring Committee and the Creditors' Committee, with respect to certain matters as set forth in the Administrative Expense Claims Consent Program to ensure, among other things, a fair and expedient process to claims resolution and emergence.

4.    Of course, all holders of Administrative Expense Claims will be given an adequate opportunity to opt-out of the Administrative Expense Claims Consent Program and retain the right to payment in full on account of their Claims as set forth in Section 2.1 of the Plan (such claim, a "**Non-Settled Admin Claim**").

5.    By the Debtors' count, the Debtors have now successfully resolved issues with the Ad Hoc Vendor Group (which initially objected to the Plan), the Creditors' Committee, and PBGC.  All such parties now support the confirmation of the Debtors' Plan.  The proposed Administrative Expense Claims Consent Program is intended to reduce protracted and expensive litigation with holders of Administrative Expense Claims, and secures an expedient path forward. The Debtors believe that limited estate resources are better allocated directly to stakeholder

3

recoveries via the Administrative Expense Claims Consent Program, rather than expended on costly litigation on plan confirmation and claims allowance.

6.    But to be clear, confirmation of the Plan is not dependent on the Administrative Expense Claims Consent Program.  As described in detail in the Confirmation Brief and supporting declarations, the Debtors' current estimation of the total amount of Claims required to be paid by the Effective Date is approximately $176 million.  *See* Confirmation Brief, ¶ 150; Murphy Decl., ¶¶ 28-31.  The Debtors will present evidence in support of confirmation and have constructed a plan that will allow the Debtors to pay Administrative Expense Claims in full upon the monetization of their Assets and Causes of Action, including preference recoveries, potential settlements with insurers with respect to claims against the D&O Policy, and certain prepetition related party transaction claims against ESL and other parties.  As stated in the Griffith Declaration, the Debtors believe there are sufficient Assets to pay administrative, secured, and priority Claims in full on the Effective Date.  *See* Griffith Decl., ¶¶ 76-78.  Although the Debtors are not relying on the Administrative Expense Claims Consent Program to satisfy section 1129(a)(9) of the Bankruptcy Code, the Administrative Expense Claims Consent Program will further reduce the Debtors' Administrative Expense Claim burden and accelerate the Debtors' ability to satisfy secured, priority, and Administrative Expense Claims so as to reduce costs and provide an opportunity for participating creditors to receive an earlier payout.

7.    Importantly, the Administrative Expense Claims Consent Program is a by-product of hard-fought, intense arm's-length negotiations among the Debtors, the Ad Hoc Vendor Group, and the Creditors' Committee (collectively, the "**Administrative Expense Claims Consent Program Parties**").  The Administrative Expense Claims Consent Program is a fair and reasonable compromise of Administrative Expense Claims, and through a consensual resolution,

4

provides for yet another proponent of the Debtors' Plan. The only alternative to the Plan—conversion to cases under chapter 7 of the Bankruptcy Code—would be far worse for administrative and other creditors, because:

- As demonstrated by the Liquidation Analysis, administrative creditors at Sears, Roebuck and Co. and Sears Holdings Corporation are likely to never recover in a chapter 7, and Kmart Corporation ("**Kmart Corp.**") administrative creditors are at major risk of substantially reduced recoveries on their Administrative Expense Claims;

- Distributions to holders of Administrative Expense Claims at Kmart Corp. will be even more delayed and are at material risk due to: (i) the additional costs and expenses that would be incurred by the Estates on account of fees of a chapter 7 trustee and retention of new professionals (the existing professionals of the Debtors are not expected to continue to be retained by a chapter 7 trustee), (ii) the delay and erosion of value of the Debtors' assets that would be caused due to the need of the newly appointed chapter 7 trustee(s) and its professionals to familiarize themselves with the assets and liabilities of the Debtors, (iii) the reduced recoveries that would be caused by pressure on the chapter 7 trustee(s) to settle and expedite recoveries, and (iv) because the chapter 7 trustee(s) would have to assume the defense of the 507(b) Appeal, the trustee(s) and its professionals will likely incur extensive costs to get up to speed on the substantial record of this disputes and there is a significantly higher likelihood that the trustee may not be successful on appeal as compared to the Debtors and their professionals. If the chapter 7 trustee is not successful, any Allowed 507(b) Claim would reduce, on a dollar for dollar basis, recoveries for junior creditors;

- Administrative Expense Claimants would likely have to wait for the receipt of proceeds of litigation to realize any recoveries (as opposed to the immediate payments being offered under the Administrative Expense Claims Consent Program); and

- Administrative Expense Claimants would have to expend substantial litigation costs defending against the chapter 7 trustee who would likely seek to recover substantial payments made during the preference period to administrative creditors without the benefit of any payments on the Administrative Expense Claims and an opportunity to quickly settle preference actions as offered by the Administrative Expense Claims Consent Program.

8.     The Debtors believe that the Administrative Expense Claims Consent Program is fair and reasonable under the facts and circumstances of these cases and should be

WEIL:\97210168\1\73217.0004

approved.  Moreover, as this program is merely a vehicle for claimants to consensually agree to different treatment consistent with the Plan, approval as a legal matter is straightforward.

9.      The Debtors' respectfully request entry of an order substantially in the form attached as **Exhibit B** hereto confirming the Plan and the settlements and implementation mechanisms reflected therein, including the Administrative Expense Claims Consent Program (the "**Proposed Confirmation Order**").   A redline of the Proposed Confirmation Order to the proposed confirmation order filed by the Debtors on September 13, 2019 (ECF No. 5142) is attached hereto as **Exhibit C**.

10.     Certain parties have filed "supplemental" pleadings in response to the Plan *over a month after* the Plan Confirmation Objection Deadline passed on August 2, 2019, without Bankruptcy Court authorization.[4]   The arguments raised in the Supplemental Objections are already adequately addressed in the Confirmation Brief.  However, the Debtors briefly respond herein to certain of the objections raised.  All objections to the Plan should be overruled and the Plan confirmed.

---

[4] Supplemental responses to the Plan were filed by Santa Rosa Mall, LLC ("**Santa Rosa**") on September 9, 2019 (ECF No. 5088) (the "**Santa Rosa Supplemental Objection**"), by ("**ESL**") together with Transform Holdco LLC ("**Transform**," and together with ESL, "**ESL/Transform**") on September 19, 2019, (ECF No. 5192) (the "**ESL/Transform Supplemental Objection**"), and by Mien Co. Ltd., Helen Andrews, Strong Progress Garment Company, Ltd., Samil Solutions, Shanghai Fochier, Purcell Murray, A&A HK Industrial, Mingle Fashion, Mansheen Industries, Ltd, AMW Vietnam Co. Ltd., Auxo International Ltd., and Holdsun Group Ltd, Beauty Gem, Inc. (the "**Mien Co. Objecting Parties**") on September 30, 2019 (only three (3) days before the Confirmation Hearing) (ECF No. 5266) (the "**Mien Co. Supplemental Objection**") (together with the Santa Rosa Supplemental Objection and the ESL/Transform Supplemental Objection, and any joinders and supporting declarations filed with respect thereto, the "**Supplemental Objections**").

## FACTS[5]

### A.    General Background

11.    The Debtors respectfully refer the Court to the Griffith Declaration, Murphy Declaration, Transier Declaration, and Voting Certification[6] filed on September 13, 2019 (ECF Nos. 5148, 5149, 5146, 5137), the Supplemental Griffith Declaration filed contemporaneously herewith, and the record of these chapter 11 cases for facts that bear on confirmation of the Plan.  Any testimony and other declarations that may be adduced or submitted at or in connection with the Confirmation Hearing are incorporated herein as if fully set forth.

### B.    Negotiations with Holders of Administrative Expense Claims

12.    Since late August, 2019, the Debtors and the Creditors' Committee have been conducting good-faith, arm's length negotiations with the Ad Hoc Vendor Group on the terms of a proposed implementation mechanism for allowing the holders of Administrative Expense Claims to accept less than 100 cents on the dollar.  The Debtors have engaged in numerous calls and two (2) in-person meetings with the Ad Hoc Vendor Group and the Creditors' Committee, and exchanged multiple proposals and diligence materials.  The Ad Hoc Vendor Group represents a significant portion of the Administrative Expense Claims pool—approximately 18% of all Administrative Expense Claims estimated to be Allowed—and the members of the Ad Hoc Vendor Group have the same incentives as other similarly situated creditors.  *See* Supplemental Griffith Decl., ¶ 4.

---

[5] The pertinent facts set forth in the Disclosure Statement, the Plan, Confirmation Brief, and the other pleadings and declarations filed by the Debtors are also incorporated herein as if fully set forth herein.

[6] The Debtors have directed Prime Clerk to reflect in their records that each of the following claimants has properly elected to opt-out of the Releases: Simmons Company, Serta, Serta, Inc., Simmons Caribbean Bedding, Inc., Serta Incorporated, Simmons Bedding, Inc., Simmons Bedding Company and their parent or related subsidiaries.  For the avoidance of doubt, the foregoing claimants are not 'Releasing Parties' as defined in Section 15.9(b) of the Plan.

13.     In connection with these negotiations, the Debtors and their advisors conducted an extensive review and analysis of the Claims asserted by the members of the Ad Hoc Vendor Group.  The Debtors shared this analysis with the Ad Hoc Vendor Group and the Creditors' Committee and engaged in multiple diligence discussions with respect thereto.  On September 13, 2019, the Debtors publicly filed the Debtors' initial proposal to the Ad Hoc Vendor Group.  *See* Confirmation Brief, Exhibit B.  In light of the progressing negotiations and understanding the benefits of an agreement with the administrative creditors, the Debtors agreed to adjourn the Confirmation Hearing by approximately two weeks to October 3, 2019 to give the Administrative Expense Claims Consent Program Parties more time to negotiate and finalize an agreement. Following an in-person meeting on September 23, 2019 and additional exchanges of proposals and diligence materials, the Debtors, the Creditors' Committee, and the Ad Hoc Vendor Group agreed in part to the Administrative Expense Claims Consent Program, and additional negotiations continued.  On October 1, 2019, the Debtors, the Creditors' Committee, and the Ad Hoc Vendor Group reached agreement and executed the term sheet setting forth the Administrative Expense Claims Consent Program (the "**Administrative Expense Claims Consent Program Term Sheet**"), attached hereto as **Exhibit A**.  *See* Supplemental Griffith Decl., ¶ 5.

C.     **Terms of the Administrative Expense Claims Consent Program**

14.     The material terms of the Administrative Expense Claims Consent Program are summarized below.[7]  All holders of Administrative Expense Claims will be provided notice of the Administrative Expense Claims Consent Program and an opportunity to participate in the benefits provided thereunder.

---

[7] This summary is qualified in its entirety by reference to the Administrative Expense Claims Consent Program Term Sheet.  To the extent that this summary conflicts with the actual terms of the Administrative Expense Claims Consent Program Term Sheet, the Administrative Expense Claims Consent Program Term Sheet will control.

| Provision | Administrative Expense Claims Consent Program Terms |
|---|---|
| **Litigation Funding/Cash Reserve** | Within three (3) business days after entry of the Confirmation Order and contemporaneously with funding of the Segregated Account and the Initial Cash Pool, the Debtors shall have set aside (i) $15 million in a segregated account (the "**Litigation Funding Account**") for the funding of litigation associated with the Jointly Asserted Causes of Action (as defined in the proposed Confirmation Order) (the "**Litigation Funding**") and (ii) $5 million of additional cash in a segregated account the ("**Cash Reserve Account**") for post-Confirmation estate costs including, without limitation, U.S. Trustee Fees, operating costs of the Debtors, and additional professional fees of the Debtors' and the Creditors' Committee not otherwise included in the Carve-Out Account as of the entry of the Confirmation Order (the "**Cash Reserve**"). |
| **Funding from the Carve-Out Account** | Within three (3) business days after entry of the Confirmation Order, the Debtors shall transfer a minimum of $2 million from the Carve-Out Account (the "**Carve-Out Contribution**") into a separately segregated account ("**Segregated Account**") to be used solely on account of the Initial Distribution and subsequent distributions to holders of Settled Administrative Expense Claims. |
| **Recovery** | Pursuant to the terms of the Administrative Expense Claims Consent Program, holders of Settled Administrative Expense Claims shall receive recoveries from Net Proceeds of Total Assets other than the Litigation Funding and the Cash Reserve in the following manner and in the following order of priority until such time as the holders of Settled Administrative Expense Claims receive a recovery of 75% on account of their Settled Administrative Expense Claims: <br><br> *First*, each holder of an Opt-In Settled Admin Claims, i.e. an Allowed Administrative Expense Claim against the Debtors that *affirmatively opts-in*[8] to the Administrative Expense Claims Consent Program, shall receive: <br><br> • its pro rata share of the Initial Distribution[9] capped at 75% of the Allowed Administrative Expense Claim (the percentage recovery, the "**Initial Recovery**"); provided, that, the Initial Distribution shall only be available to |

---

[8]  For the avoidance of doubt, holders of Administrative Expense Claims who execute the Administrative Expense Claims Consent Program Term Sheet shall be deemed holders of Opt-In Settled Admin Claims.

[9]  The Initial Distribution from the Initial Cash Pool of $20 million inclusive of the Carve-Out Contribution is to be held in the Segregated Account and made available on the Initial Distribution Date for holders of Opt-In Settled Admin Claims. Within three (3) business days following entry of the Confirmation Order, $15 million inclusive of the Carve-Out Contribution shall be funded by the Debtors into the Initial Cash Pool, with an additional $5 million funded by the Debtors into the Initial Cash Pool on or before the Initial Distribution Date. The Cash Pool shall be placed in the Segregated Account and used solely for the purpose of funding the Settled Administrative Expense Claims as provided for in the Administrative Expense Claims Consent Program Term Sheet.

WEIL:\97210168\1\73217.0004

holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claims; provided, further, that, holders who do not agree with the Debtors on the Allowed amount of the Opt-In Settled Admin Claim shall be deemed to hold a Non Opt-Out Settled Admin Claim; and

- consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Opt-In Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of an Opt-In Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

After the Initial Distribution, a Second Distribution to Settled Administrative Expense Claims shall not occur until each of the following conditions is met: (i) a total of $25 million has been funded into the Litigation Funding Account in the aggregate, (ii) there has been a funding of $10 million in the aggregate in the Cash Reserve Account and (iii) the Segregated Account has an additional $10 million in cash (together, the "**Minimum Conditions**").

*Second*, once the Minimum Conditions are satisfied, each holder of a Non Opt-Out Settled Admin Claim, i.e. a holder of an Allowed Administrative Expense Claim against the Debtors that ***does not opt-out*** of the Administrative Expense Claims Consent Program shall then receive:

- its pro rata share of the Second Distribution[10] capped at 75% of the Allowed Administrative Expense Claim; and

---

[10]    "**Second Distribution**" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery.

- consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Opt-Out Deadline; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Non Opt-Out Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of a Non Opt-Out Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

*Third*, after the Second Distribution, all Net Proceeds of Total Assets other than the Litigation Funding and the Cash Reserve shall be made available for Distributions on account of all Settled Administrative Expense Claims up to 75% of the consensually agreed-upon Allowed Settled Administrative Expense Claim ("**Settled Administrative Expense Claims Payout**").

*Fourth*, after the Settled Administrative Expense Claims Payout and upon the Effective Date of the Plan, holders of Administrative Expense Claims who opt-out of the Administrative Expense Claims Consent Program (the "**Non-Settled Administrative Expense Claims**") shall receive Distributions on account of their Non-Settled Administrative Expense Claims to the extent Allowed; provided, that, for the avoidance of doubt, (i) for all Settled Administrative Expense Claims (unless otherwise agreed among the Debtors, the Creditors' Committee and the holder of such Settled Administrative Expense Claim) and (ii) for all Non-Settled Administrative Expense Claims, the Debtors and/or the Liquidating Trust (a) shall prosecute all Claims and Causes of Action arising under chapter 5 to the fullest extent and (b) reserve all rights to object to any and all Non-Settled Administrative Expense Claims on any basis.

*Fifth*, upon the occurrence of the Effective Date and after the (i) Settled Administrative Expense Claims Payout, and (ii) Distributions on account of Allowed Non-Settled Administrative Expense Claims, all Net Proceeds of Total Assets shall be governed by the terms of the Plan and the Liquidating Trust Agreement.

| | |
|---|---|
| **Minimum Cash Reserve** | Notwithstanding anything to the contrary contained in the Administrative Expense Claims Consent Program Term Sheet, (a) prior to the Effective Date, and once the Cash Reserve Account has been funded with $10 million in the aggregate, the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative (as defined below, and collectively, the "**Pre-Effective Date Committee**"), and (b) after the Effective Date, the Liquidating Trust Board shall commence a telephonic meeting no less than every thirty (30) days to review, among other things, the status of the reconciliation of Administrative Expense Claims, as well as the latest budget and variance reporting of the Debtors; provided, that, in the interim, the Debtors shall provide, among other things, weekly budget and variance reporting, as well as an accounting of the Total Assets and any Net Proceeds derived therefrom to the Pre-Effective Date Committee on a confidential basis.  After the Initial Distribution Date, to the extent the Pre-Effective Date Committee deems it necessary to fund the Cash Reserve Account with additional funds beyond the initial $10 million in the aggregate, and prior to additional Distributions being made to holders of Allowed Administrative Expense Claims, the Cash Reserve Account shall be funded by the Debtors in an amount agreed to by the Pre-Effective Date Committee; provided, that, should the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative, not agree to the amount of sufficient operating cash (to be funded into the Cash Reserve Account), after taking into account an amount to maintain the legal and fiduciary obligations of the Debtors, or Estate representatives, as applicable, any of the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative may seek assistance (including on an emergency basis) from the Bankruptcy Court for a prompt resolution of the issue; provided, however, that, in no event, shall the Debtors' Restructuring Committee or the Creditors' Committee request or seek funding in excess of an amount that would cause the Cash Reserve Account to exceed (at any time) more than $10 million; provided, further, that, should the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative seek Bankruptcy Court intervention as set forth above, no further funding of the Cash Reserve Account from Net Proceeds from Total Assets shall occur unless (i) all parties agree to a partial funding, or (ii) the Bankruptcy Court enters an order allowing for further funding. |
| **No Disgorgement** | Any distributions made on account of Settled Administrative Expense Claims shall not be subject to disgorgement, including without limitation, upon any conversion or dismissal of the Chapter 11 Cases. Further, upon entry of the Confirmation Order and approval of the Administrative Expense Claims Consent Program, all Settled Administrative Expense Claims shall be Allowed against the Debtors in these Chapter 11 Cases on a consolidated basis, or upon any conversion or dismissal of the Chapter 11 Cases. |
| **Maximum Recovery** | For the avoidance of doubt, Distributions in respect of a Settled Administrative Expense Claim shall not exceed 75% of the amount of |

| | the Allowed Settled Administrative Expense Claim; provided, that, in no scenario shall percentage recoveries on account of Allowed General Unsecured Claims exceed percentage recoveries on account of Settled Administrative Expense Claims. |
|---|---|
| **Admin Representative on the Debtors' Restructuring Committee** | Upon entry of the Confirmation Order, a representative of holders of Administrative Expense Claims (the "**Admin Representative**") (selected solely by the holders of Administrative Expense Claims, including the Ad Hoc Vendor Group) shall serve alongside the Debtors' Restructuring Committee and the Creditors' Committee to work through 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions and to ensure an expedient and fair process to claims resolution and emergence. The Admin Representative will also serve on the Pre-Effective Date Committee as set forth above in the Minimum Cash Reserve description and will be entitled to applicable insurance coverage provided and paid for by the Debtors, as well as protections from appropriate exculpation to the extent allowed for by law. The Admin Representative shall also receive reasonable compensation as determined by the Debtors, Creditors' Committee, and Ad Hoc Vendor Group. |
| **Support of the Debtors' Plan** | The non-Debtor Administrative Expense Claims Consent Program Parties shall, at no further cost to the Administrative Expense Claims Consent Program Parties (severally and not jointly): <ol><li>use good faith efforts to implement the Administrative Expense Claims Consent Program;</li><li>support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate confirmation of the Plan, including withdrawing any applicable objections and any other pleading inconsistent with the Administrative Expense Claims Consent Program and/or confirmation of the Plan; provided, that, to the extent the Bankruptcy Court does not approve the Administrative Expense Claims Consent Program, the Debtors shall cause the confirmation hearing to be adjourned to a date and time that is reasonably acceptable to the Debtors, Creditors' Committee, and counsel for the Ad Hoc Vendor Group, and the rights of all Administrative Expense Claims Consent Program Parties are reserved, including the rights of the non-Debtor Administrative Expense Claims Consent Program Parties to contest Confirmation;</li><li>support the confirmation of the Plan and not object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan; provided, that, the same proviso in paragraph 2 shall apply;</li><li>vote all Claims to Accept the Plan if applicable;</li></ol> |

13

| | |
|---|---|
| | 5. not use, assign, convey, grant, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Settled Administrative Expense Claims, provided that, once the Confirmation Order is entered, holders of Settled Administrative Expense Claim may transfer Settled Administrative Expense Claims (i) to any holder of Settled Administrative Expense Claims or (ii) to a party that delivers a joinder, in the form attached to the Administrative Expense Claims Consent Program Term Sheet as Exhibit 1, to the Debtors, Weil Gotshal & Manges LLP and Akin Gump Strauss Hauer & Feld LLP (in accordance with the notice provisions in the Plan) at least two (2) business days prior to the settlement of the relevant transfer; with respect to any transfers effectuated in accordance with clause (ii) above, such transferee shall be deemed a holder of a Settled Administrative Expense Claim; for the avoidance of doubt, any Administrative Expense Claims purchased by a holder of Settled Administrative Expense Claims shall be deemed subject to the terms of the Administrative Expense Claims Consent Program; and<br><br>6. not object to or opt out of any release included in the Administrative Expense Claims Consent Program. |
| **Releases** | The Administrative Expense Claims Consent Program shall include certain consensual releases of Claims and Causes of Action amongst the Administrative Expense Claims Consent Program Parties; for the avoidance of doubt, the Administrative Expense Claims Consent Program shall not release any Specified Causes of Action. |

### D.    The Opt-In/Opt-Out Procedures

15.    The Administrative Expense Claims Consent Program also provides all holders of Administrative Expense Claims—except the members of the Ad Hoc Vendor Group—the ability to opt out of the Administrative Expense Claims Consent Program pursuant to the following procedures (the "**Opt-In/Opt-Out Procedures**"):

a. Upon entry of the Order, Prime Clerk LLC will: (a) send both an (i) opt-in ballot (the "**Opt-In Ballot**") and (ii) opt-out ballot (the "**Opt-Out Ballot**") to (x) all parties that have filed an Administrative Expense Claim or filed an application for administrative expense in the Debtors' Chapter 11 Cases and (y) any party that was exempted from filing an Administrative Expense Claim but the Debtors are aware of such Claim; and (b) publish a notice of the Administrative Expense Claims Consent Program in the national edition of the *New York Times*.

The Opt-Out Ballot clearly states that any party that exercises its right to opt out will **not** be entitled to any recovery from the

Administrative Expense Claims Consent Program and that any party that does not opt out of the Administrative Expense Claims Consent Program will be bound by its terms, including to support a Plan.

b.  Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 17 days from the date of service to submit an Opt-In Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-In Ballot.

c.  Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 33 days from the date of service (the "**Opt-Out Deadline**") to submit an Opt-Out Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-Out Ballot.

d.  The Opt-In/Opt-Out Procedures may be modified with the written consent, including e-mail (such consent not to unreasonably be withheld), of all of the Administrative Expense Claims Consent Program Parties to facilitate the opt-out process.

16.    Any party that does not affirmatively opt out, following the procedures approved by the Court, will be deemed to accept the Administrative Expense Claims Consent Program and will receive its pro rata share of the consideration contemplated thereby (to the extent there are no objections to the Claim).  For purposes of the Plan confirmation process, holders of Administrative Expense Claims' acceptance of and consent to the Administrative Expense Claims Consent Program by not opting out of the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code.  The Debtors believe this is appropriate and permitted by governing authority as discussed below.

15

**ARGUMENT**

## I.    ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM IS AN APPROPRIATE IMPLEMENTATION OF SECTION 2.1 OF THE PLAN

17.    The Administrative Expense Claims Consent Program does not change the treatment of Administrative Expense Claims under the Plan—holders of Administrative Expense Claims are still entitled to be paid in full in cash on the Effective Date if they opt out of the Administrative Expense Claims Consent Program.  *See* Plan, § 2.1(a).[11]

18.    However, as expressly contemplated by Section 2.1(a) of the Plan, holders of Administrative Expense Claims may "[agree] . . . to less favorable treatment" including by not opting-out of the Administrative Expense Claims Consent Program.  Pursuant to Section 9.7(a) of the Plan, the Administrative Expense Claims Consent Program is simply a means for implementing Section 2.1 of the Plan which provides that holders of Administrative Expense Claims may agree to less than 100% payment of their Claims:

> Except to the extent that a holder of an Allowed Administrative Expense Claim agrees with the Debtors (subject to the consent of the Creditors' Committee, not to be unreasonably withheld) prior to the Effective Date, or the Liquidating Trust after the Effective Date, to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive, in final satisfaction, settlement, release, and discharge of such Claim from the respective Debtor or Liquidating Trust, as applicable, Cash in an amount equal to such Allowed Administrative Expense Claim on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Distribution Date

---

[11] The Debtors submit that no resolicitation of the Plan on account of the Administrative Expense Claims Consent Program is required because the Administrative Expense Claims Consent Program does not adversely change the treatment of any creditor.  *See* Bankruptcy Rule 3019.    Conversely, the Administrative Expense Claims Consent Program clearly benefits all other creditors as the Debtors' Administrative Expense Claims will be reduced, and any holder of an Administrative Expense Claim who does not wish to participate in the Administrative Expense Claims Consent Program has the opportunity to opt out and receive payment in full on account of their Claim.

WEIL:\97210168\1\73217.0004

after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

*See* Plan, § 2.1(a) (emphasis added).

19.    Section 9.7(a) of the Plan provides that the Debtors may take all actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan:

> The Debtors or the Liquidating Trustee, as applicable, subject to any approvals or direction of the Liquidating Trust Board as set forth in the Liquidating Trust Agreement, may take all actions to execute, deliver, file, or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the Liquidating Trust Interests to be issued pursuant hereto without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Plan Debtor or the Liquidating Trustee shall be authorized to certify or attest to any of the foregoing activities.

*See* Plan, § 9.7(a) (emphasis added).

### A.    Deemed Consent to the Administrative Expense Claims Consent Program is Permitted Under Section 1141(a) of the Bankruptcy Code

20.    The Opt-In/Opt-Out Procedures can be approved under applicable law.  As described above, the Opt-In/Opt-Out Procedures will provide holders of Administrative Expense Claims with notice and ample opportunity to opt-out of the Administrative Expense Claims Consent Program (33 days).  Any party that does not affirmatively opt out, following the procedures approved by the Court, will be deemed to accept the Administrative Expense Claims Consent Program and will receive its pro rata share of the consideration contemplated thereby (to the extent there are no objections to the claim).

21.    Approving the Opt-In/Opt-Out Procedures here is analogous to the approval of third-party releases by this Court and several others in this district where, as here, parties are provided with an "opt out" mechanism that includes proper notice of the consequences of not

17

opting out and those who did not opt out were deemed to be bound by the releases. Holders of

Administrative Expense Claims should likewise be bound by the Administrative Expense Claims

Consent Program here. Section 1141(a) of the Bankruptcy Code provides that "[e]xcept as

provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind

the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is

impaired under the plan and whether or not such creditor . . . has accepted the plan." 11 U.S.C.

§1141(a). As this Court noted in *In re Tops Holding II Corp.*, even if a creditor is not deemed to

have consented to certain plan provisions as a matter of contract law, section 1141(a) of the

Bankruptcy Code binds creditors to a plan's provisions—in this case, including the Administrative

Expense Claims Consent Program contained therein—if creditors receive proper notice but fail to

object to confirmation of the plan (or in this case, fail to opt out of the Administrative Expense

Claims Consent Program):

> But I firmly believe that Congress intended Chapter 11 plans to be
> broader than [a contract] and the effect of a Chapter 11 plan to be
> broader than that one-on-one agreement. And that's clearly laid out
> in [section] 1141 of the Bankruptcy Code. It gives people a last
> chance to object to a plan. And if they don't object and the plan is
> confirmed, it's binding on them, its terms are. And that's in one
> section of [section] 1141, and that's separate and [a]part from
> dealing with their claims. The whole plan is binding on them.
>
> * * *
>
> So I think as long as you had – let's assume you only had the
> injunction and not the release, which is kind of belt and suspenders,
> actual consensual release. In my view if someone doesn't object to
> that injunction and it's clearly described to them and its effect is
> clearly described to them, it's binding. And frankly, I think they've
> consented to it because they didn't object in terms of the Bankruptcy
> Code. And I think Congress looked at it this way. Because all they
> do is require those types of provisions to be put in bold so people
> know what its consequence is.
>
> So I think the law is clear, and it was reaffirmed by the Supreme
> Court in *Travelers*. But it goes back to the Fifth Circuit in *Republic*

WEIL:\97210168\1\73217.0004

> *Supply v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987), where, you know, if
> you don't object and the plan is confirmed, you have to live with it.
>
> * * *
>
> [I]f [the Debtors] want to bind people who don't vote, I think [they
> are] perfectly within [their] rights to tell them, if you don't vote, you
> will be bound by this plan under 1141(a) unless you object and
> defeat the plan on that basis. And I think that's perfectly – I think
> Congress understood that.  Because Chapter 11 plans are collective;
> they're broader than a contract. They have more force than a
> contract.

*See In re Tops Holding II Corp.*, Case No. 18-22279 (RDD), Hr'g Tr. at 33:25-34:8, 34:9-24, 35:6-

13 (Bankr. S.D.N.Y. Sept. 27, 2018) (ECF No. 760); *see also, Lawski v. Frontier Ins. Grp., LLC*

*(In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018) ("References to chapter

11 plans as contracts or agreements – while useful for purposes of interpreting plans . . . – are only

by analogy, however.  The binding effect of a chapter 11 plan is in fact premised on statutory and

common law claim preclusion. . . . First, in addition to providing for the discharge of a reorganizing

debtor under a chapter 11 plan, section 1141 of the Bankruptcy Code prescribes the binding nature

of a confirmed plan.") (citations omitted), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019); Hr'g Tr. at 94:13-

17, 96:8-15, 140:20-22, *In re Cenveo, Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 16,

2018), (ECF No. 687) (approving third-party releases as consensual where abstaining or rejecting

creditors were required to opt out of such releases); Hr'g Tr. at 43:6-11, *In re 21st Century*

*Oncology Holdings, Inc.*, No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 9, 2018), (ECF No. 926)

(confirming plan and approving third-party releases on a consensual basis from creditors that

abstained from voting or voted to reject the plan but did not opt out of the releases on their ballots);

Memorandum Decision on Confirmation, *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr.

S.D.N.Y. Aug. 28, 2019), (ECF No. 1240) (finding consent to third party releases where abstaining

parties did not opt out of third party releases on the ballot); *In re Genco Shipping & Trading Ltd.*,

513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) ("First, the Court will permit releases with respect to any affected party that consented to grant the releases or may be deemed to have done so through its ability to 'check the box' on the Plan ballots. That includes those parties who voted in favor of the Plan and those who voted to reject the Plan but failed to opt out from granting the release provisions.") (citations omitted); *In re Calpine Corp.*, No. 05-60200 BRL, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving third party releases on a consensual basis where "[s]uch releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan, who abstain from voting and choose not to opt out of the releases" and finding that such releases are consensual).[12] Accordingly, the Administrative Expense Claims Consent Program is consensual as to those parties who do not opt out and should be approved as proposed.

22. Further, the Opt-In/Opt-Out Procedures are similar to the opt-out procedures approved by the Bankruptcy Court for the Eastern District of Virginia in *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Jul. 17, 2018) (ECF No. 3814) ("***Toys***"). In *Toys*, the Court approved opt-out procedures that provided for mailing a notice of the settlement agreement to administrative claim holders within three (3) days of entry of the order approving the settlement. The notice provided each claimant with the opportunity to affirmatively opt-out of the settlement within sixteen (16) days and forego treatment under the terms of the approved settlement agreement. *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018), (ECF No. 4083). Similarly here, the Debtors propose to send the Opt-Out Ballot to holders

---

[12] *But see In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) (finding that failure to object to or reject the plan is insufficient to constitute consent to third-party releases for abstaining creditors); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (holding that "inaction" by abstaining creditors was insufficient to constitute consent to third-party releases).

WEIL:\97210168\1\73217.0004

of Administrative Expense Claims upon entry of the Confirmation Order.  The Opt-Out Ballot and

the publication notice of the Administrative Expense Claims Consent Program provides claimants

with sufficient notice of the Administrative Expense Claims Consent Program, explains the

treatment holders of Administrative Expense Claims will receive under the program, and provides

an opportunity to affirmatively opt-out of becoming a party to the Administrative Expense Claims

Consent Program within thirty (33) days from the date of service. *See also In re Teligent, Inc.*,

282 B.R. 765 (Bankr. S.D. N.Y. 2002) (confirming chapter 11 plan where administrative claimants

that did not respond to solicitation by administratively insolvent debtors to agree to accept part

payment on their claims would be deemed, by their silence, to have consented to treatment of less

than 100% payment proposed by debtors).

## II.    OUT OF AN ABUNDANCE OF CAUTION, TO THE EXTENT THE COURT CONSIDERED THE ADMINISTRATIVE EXPENSE CLAIMS PROGRAM AS REQUIRING APPROVAL AS A SETTLEMENT, THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM SATISFIES THE 9019 STANDARD

23.    The Administrative Expense Claims Consent Program is in the best interest

of the Debtors and their estates and should be approved under the Bankruptcy Rule 9019 standard

(the "**9019 Standard**") (to the extent applicable).

### A.    The 9019 Standard

24.    Section 1123(b)(3) of the Bankruptcy Code provides that a "plan may

provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the

estate."  11 U.S.C. § 1123(b)(3).  Courts have broad authority to approve compromises and

settlements as they allow the estate to avoid the expenses and burdens associated with litigating

claims. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992).

The decision to approve a particular compromise lies within the sound discretion of the Court.  *See*

*In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256-57 (Bankr. S.D.N.Y. 2016); *In re Republic*

WEIL:\97210168\1\73217.0004

*Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *3 (Bankr. S.D.N.Y. May 3, 2016); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992)). The Court's discretion must be exercised "in light of the general public policy favoring settlements." *Republic Airways*, 2016 WL 2616717, at *3 (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and . . . in the best interests of the [debtor's] estate." *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (citations and internal quotation marks omitted), *dismissing appeal*, 177 B.R. 791 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

25.     A settlement need not result in the best possible outcome for the debtor, but must not fall beneath "the lowest point in the range of reasonableness." *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (citation omitted); *In re Adelphia Commc'sn Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007) ("A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'"), *dismissing appeal*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 54 F.3d 420 (2d Cir. 2008); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997) (citing *In re W.T. Grant Co.*, 699 F.2d at 608). It is a "rare case" that a settlement will not meet this standard. *In re Remsen Partners, Ltd.*, 294 B.R. 557, 571 (Bankr. S.D.N.Y. 2002) (Drain, J.); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. at 257 ("Indeed, '[i]f courts required settlements to be perfect, they would seldom be approved.'"). Said differently, a debtor is not required to have obtained the best possible outcome before a settlement may be approved. Furthermore, the business judgment of the debtor in recommending the settlement

should factor into the court's analysis. *Republic Airways*, 2016 WL 2616717, at *3; *In re Residential Capital, LLC*, 497 B.R. 720, 750 (Bankr. S.D.N.Y. 2013); *In re MF Glob. Inc.*, No. 11–2790 MG, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (citing J*PMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012)), *appeal dismissed*, No. 11–2790, 2013 WL 652421 (S.D.N.Y. Feb. 22, 2013); *see also In re Delphi Corp.*, No. 05-44481, 2009 WL 973130, at *2 (Bankr. S.D.N.Y. Apr. 2, 2009).

26.    Courts in the Second Circuit consider the so-called "*Iridium* factors" to evaluate if a settlement is fair and equitable, including:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) the paramount interests of creditors, including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) "the extent to which the settlement is the product of arm's-length bargaining."

*Motorola Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). Courts conduct a balancing test of the *Iridium* factors in its review of a settlement. *See In re Residential Capital, LLC*, 497 B.R. at 750 ("In the Second Circuit, *Iridium* directs courts to balance seven interrelated factors in determining whether a settlement is fair and equitable."); *see also Davidson Kempner Capital Mgmt. LP v. Official Comm. of Unsecured Creditors (In re Motors Liquidation Co.)*, Case No. 16 Civ. 6927 (PKC), 2017 WL 3491970, at *9 (S.D.N.Y. Aug. 14, 2017) ("Balancing all of these factors, the bankruptcy court found that the Settlement was 'within the range of reasonableness and should be approved.'").

WEIL:\97210168\1\73217.0004

B.    **The Administrative Expense Claims Consent Program Satisfies the 9019 Standard Under the *Iridium* Factors**

27.    The Administrative Expense Claims Consent Program is fair, equitable, in the best interests of the Debtors' estates, appropriate in the Debtors' business judgment, and falls within the reasonable range of outcomes and should be approved.  *See* Supplemental Griffith Decl., ¶ 8.

28.    *First*, the Administrative Expense Claims Consent Program provides for the compromise and settlement of all Administrative Expense Claims where the claimants do not opt-out, for 75% of the allowed amount of such Claims, which the Debtors would otherwise be required to pay in full.   Further, the Administrative Expense Claims Consent Program resolves all objections to the Plan filed by holders of Settled Administrative Expense Claims, including the Ad Hoc Vendor Group that collectively holds 18% of all estimated Administrative Expense Claims. *See* Supplemental Griffith Decl., ¶ 9.

29.    *Second*, the Administrative Expense Claims Consent Program permits the Debtors to forego time-consuming litigation in connection with the Plan and the allowance of settled Administrative Expense Claims.   The limited Estate resources are better utilized and maximized by a settlement with the Administrative Expense Claimants and the Estates are better served by not wasting fees on protracted litigation but rather allocating funds for distributions to creditors.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 306 ("The evidence demonstrates that litigation of the [claims] would likely be lengthy and protracted and would entail significant costs and risks to the Company with little reward."); *Residential Capital*, 497 B.R. at 734 ("Absent the Settlement Agreement, the Debtors would face complex and lengthy litigation . . . .").  *See* Supplemental Griffith Decl., ¶ 9.

30.     ***Third***, the Administrative Expense Claims Consent Program is in the best interests of creditors as a whole.  Pursuant to the Administrative Expense Claims Consent Program, holders of Administrative Expense Claims have agreed to a 25% waiver on the satisfaction of the allowed claims thereby reducing the Debtors' overall Administrative Expense Claims burden and resulting in greater recoveries for junior creditors pursuant to the Plan.  *See Residential Capital*, 497 B.R. at 751 (holding that the settlement was "clearly in the best interest of the creditors of the estates—it will resolve significant claims against the estates for far less than the amounts asserted . . . .").  The Administrative Expense Claims Consent Program also allows the Debtors to satisfy obligations under the Plan and go effective on a faster timeline, to the benefit of all creditors.  Moreover, holders of Administrative Expense Claims who do not opt out of the Administrative Expense Claims Consent Program will receive accelerated distributions and avoid the risks of conversion to a chapter 7—primarily, significantly reduced recoveries for administrative creditors of Kmart Corp. and likely no recoveries for other administrative creditors of the other Debtors.  *See* Supplemental Griffith Decl., ¶ 10.

31.     ***Fourth***, the participation and support of the Creditors' Committee is additional evidence of the justification and fairness of the Administrative Expense Claims Consent Program.  *See* Supplemental Griffith Decl., ¶ 9.

32.     ***Fifth***, and ***Sixth***, the Debtors, Creditors' Committee, and the Ad Hoc Vendor Group are each represented by competent and experienced professionals and the Administrative Expense Claims Consent Program is the product of good-faith arm's-length bargaining.  *See* Supplemental Griffith Decl., ¶ 9.

33.     For the foregoing reasons, the Administrative Expense Claims Consent Program easily falls above the lowest point in the range of reasonableness and should be approved.

## III.    SUPPLEMENTAL OBJECTIONS SHOULD BE OVERRULED

34.    The Supplemental Objections—filed *over a month* after the Plan Confirmation Objection—essentially re-hash the arguments raised in the original objections and have either already been addressed in the Confirmation Brief or should be overruled.  The Debtors have revised the Plan to address ESL/Transform's additional responses raised to the provisions of the Plan.  Although the Debtors believe that the Confirmation Brief adequately responds to the remaining objections raised in the Supplemental Objections, the Debtors briefly respond to the certain of the objections herein.

### A.    Transform's Statements Regarding Its Position on the APA Disputes are Irrelevant to Confirmation

35.    First, unsurprisingly, ESL/Transform disagrees with the Debtors' characterization of the amount of Administrative Expense Claims that Transform is liable for and the amount of cash Transform still owes the Debtors under the Asset Purchase Agreement.  *See* ESL/Transform Supplemental Obj., ¶¶ 3-6.  ESL/Transform concedes that "these matters need not be resolved by the Court at this time in connection with confirmation."  *See* ESL/Transform Supplemental Obj., ¶ 6.  The Debtors agree.  The Debtors have appropriately factored the APA Disputes into their administrative claims analysis and the APA Disputes should be prosecuted in the context of that litigation, not at confirmation.

### B.    The Record Will Demonstrate that the Plan Satisfies Section 1129(a)(9)

36.    Without citing any legal basis in support of its position, ESL/Transform asserts that the Court should find that the requirements of section 1129(a)(9) are not met because the Plan relies on the receipt of certain litigation recoveries to pay Administrative Expense Claims.  *See* ESL/Transform Supplemental Obj., ¶ 7.  The Mien Co. Supplemental Objection similarly alleges, also without citing a legal basis, that Mien Co. Objecting Parties should not be required to

wait to be paid in full, and takes issue with the Plan's reliance on litigation proceeds.  *See* Mien

Co. Supplemental Obj., ¶¶ 2, 4-6. The Debtors have provided significant briefing on this issue in

the Confirmation Brief, and will not re-hash those issues herein.   In sum, payment of all

Administrative Expense Claims is an Effective Date issue, not a Confirmation Date issue and entry

of the Confirmation Order prior to the monetization of distributable proceeds is appropriate under

the circumstances of these cases and in line with this Court and other Courts that have previously

approved chapter 11 plans containing contingencies.  *See* Confirmation Brief, ¶¶ 156-191; 228-

234, 242-244.  Moreover, the proposed Administrative Expense Claims Consent Program should

reduce the total administrative obligations and accelerate the occurrence of the Effective Date.

Holders of Administrative Expense Claims, including the Mien Co. Objecting Parties, can opt out

of the Administrative Expense Claims Consent Program if they so choose and in doing so *will be*

*entitled to payment in full on the Effective Date*, as the Bankruptcy Code requires.

### C.    Administrative Creditors Fare Much Worse In a Chapter 7 Liquidation

37.    The Mien Co. Objecting Parties incorrectly suggest that they could receive

a 27% distribution upon the Confirmation Date assuming $50.1 million in unrestricted cash and

$180 million in administrative claims, and that they are entitled to "certainty" under the

Bankruptcy Code.  *See* Mien Co. Supplemental Obj., ¶¶ 3, 6.   However, the assumptions

underlying this assertion are wrong and demonstrate just how uninformed the Mien Co. Objecting

Parties are.  Administrative creditors are only entitled to payment in full on the Effective Date in

a chapter 11 plan.  As described in paragraph 7 above and as demonstrated by the Liquidation

Analysis, if the Debtors' cases converted to cases under chapter 7 of the Bankruptcy Code,

administrative creditors at almost all Debtors other than Kmart Corp. would almost certainly

receive nothing, and administrative creditors at Kmart Corp. could receive significantly reduced

and delayed recoveries.  The Plan and the Administrative Expense Claims Consent Program is the

WEIL:\97210168\1\73217.0004

best chance for administrative creditors to receive a substantial recovery on their Administrative

Expense Claims.

### D.    The Plan Was Proposed in Good Faith, Which Is Supported by the Record

38.    The Mien Co. Objecting Parties make inflammatory statements to suggest

that because estate professionals are being paid in full in these chapter 11 cases (in accordance

with the DIP Order), the Plan has been proposed in bad faith.  *See* Mien Co. Supplemental

Obj., ¶¶ 7-9.  This is absurd.  The Debtors and their professionals have built a compelling record

over the course of these chapter 11 cases, have negotiated with all parties in good faith throughout

the cases, and have proposed the Plan with the goal of maximizing value and providing recoveries

to creditors.  As described in great detail in the Confirmation Brief, the payment of Fee Claims in

full from the Carve-Out Account contained in the Plan was approved by the Court as part of the

DIP Order—which is final and non-appealable—and this treatment is merely being incorporated

into the Plan.  *See* Confirmation Brief, ¶¶ 262-268.  Had the Carve-Out not been originally

permitted by the Court, the professionals would have had to decide whether to continue to provide

representation in these chapter 11 case or seek to withdraw from such representation.  The

substitution of such professionals would undoubtedly cost these Estates substantial institutional

knowledge and cannot be in the best interest of the stakeholders.  Further, the Mien Co. Objecting

Parties' attempt chosen quotations from a deposition of Moshin Meghji are completely out of

context and do nothing to support the objector's point.

### E.    Mien Co. Objecting Parties' Objection to Third Party Releases and Misplaced Objection to a "Discharge Provision" Should be Overruled

39.    Finally, the Mien Co. Objecting Parties reiterate their objection to the

breadth of the Third Party Releases in the Plan and erroneously argue that the Plan should not

provide a discharge.  *See* Mien Co. Supplemental Obj., ¶¶ 10, 11.  Once again, the Mien Co.

WEIL:\97210168\1\73217.0004

Objecting Parties are misguided about what the Plan actually provides.  As already stated in the

Confirmation Brief in response to Mien Co.'s original objection, the Plan *does not* provide a

discharge.  *See, e.g.*, Confirmation Brief, Exhibit A, 18(c).  Further, third parties had the ability to

opt out of the Third Party Release, and only voting creditors are proposed to be bound by the Third

Party Release—thus, as non-voting creditors, holders of Administrative Expense Claims are not

subject to the Third Party Release.

## **CONCLUSION**

40.    The Plan complies with all of the requirements of section 1129 of the

Bankruptcy Code, the Objections should be overruled, and the Plan should be confirmed.

Dated:  New York, New York
      October 1, 2019

    /s/ Sunny Singh
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York  10153
    Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007
    Ray C. Schrock, P.C.
    Jacqueline Marcus
    Garrett Fail
    Sunny Singh

    *Attorneys for Debtors*
    *and Debtors in Possession*

**Exhibit A**

**Administrative Expense Claims Consent Program Term Sheet**

EXECUTION VERSION

# SEARS HOLDINGS CORPORATION, *ET AL.*
## ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM TERM SHEET

October 1, 2019

This Administrative Expense Claims Consent Program Term Sheet sets forth the material terms with respect to a proposed consent program for all Administrative Expense Claims by and amongst Sears Holdings Corporation and each of its debtor affiliates (collectively, the "**Debtors**")[1] and certain holders of Administrative Expense Claims (the "**Administrative Expense Claims Consent Program**"). Pursuant to the Creditors' Committee Settlement,[2] the Creditors' Committee maintains consent rights with regard to the treatment of Administrative Expense Claims under the Plan (as defined below), and are supportive of the terms provided by this Administrative Expense Claims Consent Program Term Sheet. The Administrative Expense Claims Consent Program is subject in all respects to the negotiation and execution of this Administrative Expense Claims Consent Program Term Sheet.

**THIS ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM TERM SHEET SHALL BE EFFECTIVE AND BINDING UPON EACH OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM PARTIES HERETO UPON THE FIRST BUSINESS DAY ON WHICH COUNTERPART SIGNATURE PAGES SHALL HAVE BEEN EXECUTED AND THE BANKRUPTCY COURT SHALL HAVE ENTERED THE CONFIRMATION ORDER CONFIRMING THE PLAN AND APPROVING THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM.**

---

[1]   The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

[2]   Capitalized terms used herein shall have the meaning ascribed to such terms in the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 5139] (as may be further amended or supplemented, the "**Plan**").

| **Administrative Expense Claims Consent Program Terms** | |
|---|---|
| **Administrative Expense Claims Consent Program** | As soon as reasonably practicable, the Debtors, the Creditors' Committee, and the members of the ad hoc group of administrative expense claimants (the "**Ad Hoc Vendor Group**") shall execute this term sheet (the "**Administrative Expense Claims Consent Program Term Sheet**" and all parties thereto, the "**Administrative Expense Claims Consent Program Parties**") in connection with the treatment of their respective administrative expense claims ("**Settled Administrative Expense Claims**") and that provides for a construct for all Administrative Expense Claims (as defined below).<br><br> "**Administrative Expense Claims**" shall be as defined in the Plan, but shall include 503(b)(1) and 503(b)(9) Claims, excluding any amounts paid by Transform on account thereof (including amounts that otherwise would have been 503(b)(9) Claims but were paid as part of cure obligations in connection with assumed and assigned contracts).<br><br>The Administrative Expense Claims Consent Program, including the Opt-In/Opt-Out Procedures and the Opt-In Ballot and Opt-Out Ballot (each as defined below), shall be approved upon entry of the confirmation order (the "**Confirmation Order**").  The terms of this Administrative Expense Claims Consent Program shall be incorporated into the Confirmation Order.<br><br>Any distributions made on account of Settled Administrative Expense Claims shall not be subject to disgorgement, including without limitation, upon any conversion or dismissal of the Chapter 11 Cases.  Further, upon entry of the Confirmation Order and approval of the Administrative Expense Claims Consent Program, all Settled Administrative Expense Claims shall be Allowed against the Debtors in these Chapter 11 Cases on a consolidated basis, or upon any conversion or dismissal of the Chapter 11 Cases. |
| **Notice of Administrative Expense Claims Consent Program and Allowed Administrative Expense Claims** | The *Notice of Allowed Administrative Expense Claims*, in the form reasonably acceptable to the Debtors, the Creditors' Committee, and the Ad Hoc Vendor Group, shall be filed by the Debtors on October 1, 2019, contemporaneously with the *Notice of Administrative Expense Claims Consent Program*, which shall include the executed Administrative Expense Claims Consent Program Term Sheet as an exhibit. |
| **Supplemental Brief ISO Confirmation** | A supplemental brief in support of confirmation ("**Supplemental Brief**") shall be filed in advance of the confirmation hearing.  The Supplemental Brief shall describe the Administrative Expense Claims Consent Program and the Opt-In/Opt-Out Procedures (as defined below), including the Opt-In Ballot and Opt-Out Ballot.  The Ad Hoc Vendor Group shall have a reasonable opportunity to review the Supplemental Brief and comment on the Confirmation Order with respect to any language relating to the Administrative Expense Claims Consent Program before it is filed to ensure that the Administrative Expense Claims Consent Program and the Opt-in/Opt-Out Procedures are consistent with this Administrative Expense Claims Consent Program Term Sheet. |

| Litigation Funding/Cash Reserve | Within three (3) business days of entry of the Confirmation Order and contemporaneously with funding of the Segregated Account and the Initial Cash Pool (each as defined below), the Debtors shall have set aside (i) $15 million in a segregated account (the "**Litigation Funding Account**") for the funding of litigation associated with the Jointly Asserted Causes of Action (as defined in the proposed Confirmation Order) (the "**Litigation Funding**") and (ii) $5 million of additional cash in a segregated account the ("**Cash Reserve Account**") for post-Confirmation estate costs including, without limitation, U.S. Trustee Fees, operating costs of the Debtors, and additional professional fees of the Debtors' and the Creditors' Committee not otherwise included in the Carve-Out Account as of the entry of the Confirmation Order (the "**Cash Reserve**"). |
|---|---|
| **Funding from the Carve-Out Account** | Within three (3) business days of entry of the Confirmation Order, the Debtors shall transfer a minimum of $2 million from the Carve-Out Account (the "**Carve-Out Contribution**") into a separately segregated account ("**Segregated Account**") to be used solely on account of the Initial Distribution (as defined below) and subsequent distributions to holders of Settled Administrative Expense Claims. |
| **Recovery** | Pursuant to the terms of the Administrative Expense Claims Consent Program, holders of Settled Administrative Expense Claims shall receive recoveries from Net Proceeds of Total Assets other than the Litigation Funding and the Cash Reserve (as more fully set forth herein) in the following manner and in the following order of priority until such time as the holders of Settled Administrative Expense Claims receive a recovery of 75% on account of their Settled Administrative Expense Claims: <br><br> *First*, each holder of an Allowed Administrative Expense Claim against the Debtors that *affirmatively opts-in* (the "**Opt-In Settled Admin Claims**")[3] to the Administrative Expense Claims Consent Program, shall receive: <br><br> • its pro rata share of the Initial Distribution[4] capped at 75% of the Allowed Administrative Expense Claim (the percentage recovery, the "**Initial Recovery**"); provided, that, the Initial Distribution shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claims; provided, further, that, holders who do not agree with the Debtors on the Allowed amount of the Opt-In Settled Admin Claim shall be deemed to hold a Non Opt-Out Settled Admin Claim; and <br><br> • consensual reconciliation of the Allowed amount of Opt-In |

[3]    For the avoidance of doubt, holders of Administrative Expense Claims who execute this Administrative Expense Claims Consent Program Term Sheet shall be deemed holders of Opt-In Settled Admin Claims.

[4]    "**Initial Distribution**" shall mean Distributions made from a cash pool of $20 million inclusive of the Carve-Out Contribution ("**Initial Cash Pool**") to be held in the Segregated Account and made available on or about December 1, 2019 (the "**Initial Distribution Date**") for holders of Opt-In Settled Admin Claims.  Within three (3) business days following entry of the Confirmation Order, $15 million inclusive of the Carve-Out Contribution shall be funded by the Debtors into the Initial Cash Pool, with an additional $5 million funded by the Debtors into the Initial Cash Pool on or before the Initial Distribution Date.  The Cash Pool shall be placed in the Segregated Account and used solely for the purpose of funding the Settled Administrative Expense Claims as provided for in this Administrative Expense Claims Consent Program Term Sheet.

Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Opt-In Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of an Opt-In Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

After the Initial Distribution, a Second Distribution (as defined below) to Settled Administrative Expense Claims shall not occur until each of the following conditions is met: (i) a total of $25 million has been funded into the Litigation Funding Account in the aggregate,[5] (ii) there has been a funding of $10 million in the aggregate in the Cash Reserve Account, and (iii) the Segregated Account has an additional $10 million in cash (together, the "**Minimum Conditions**").[6]

***Second***, once the Minimum Conditions are satisfied, each holder of an Allowed Administrative Expense Claim against the Debtors that ***does not opt-out*** (the "**Non Opt-Out Settled Admin Claims**," together with the Opt-In Settled Admin Claims, shall be considered Settled Administrative Expense Claims (as defined above)) of the Administrative Expense Claims Consent Program shall then receive:

- its pro rata share of the Second Distribution[7] capped at 75% of the Allowed Administrative Expense Claim; and

- consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Opt-Out Deadline; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Non Opt-Out Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-

---

[5]   For the avoidance of doubt, following the Effective Date, any additional funding for the Jointly Asserted Causes of Action and/or other Preserved Causes of Action shall be determined by the Liquidating Trust Board in accordance with the terms of the Plan and the Liquidating Trust Agreement.

[6]   For the avoidance of doubt, following the Initial Distribution of $20 million in cash, it shall be a requirement that the Cash Reserve Account is funded by the Debtors with an additional $5 million, for a total of $10 million in the aggregate of available cash and the Segregated Account has at least an additional $10 million in cash prior to any further Distributions on account of Settled Administrative Expense Claims.

[7]   "**Second Distribution**" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery; provided, that, for the avoidance of doubt, there shall be no Second Distribution until the Cash Reserve Account is funded by the Debtors with an additional $5 million, for a total of $10 million in the aggregate. For the avoidance of doubt, the Litigation Funding Account shall in no event be funded by more than $25 million up to and including the Effective Date.

|  | upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of a Non Opt-Out Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

***Third***, after the Second Distribution, all Net Proceeds of Total Assets other than the Litigation Funding and the Cash Reserve (as more fully set forth herein) shall be made available for Distributions on account of all Settled Administrative Expense Claims up to 75% of the consensually agreed-upon Allowed Settled Administrative Expense Claim ("**Settled Administrative Expense Claims Payout**").[8]

***Fourth***, after the Settled Administrative Expense Claims Payout and upon the Effective Date of the Plan, holders of Administrative Expense Claims who opt-out of the Administrative Expense Claims Consent Program (the "**Non-Settled Administrative Expense Claims**") shall receive Distributions on account of their Non-Settled Administrative Expense Claims to the extent Allowed; provided, that, for the avoidance of doubt, (i) for all Settled Administrative Expense Claims (unless otherwise agreed among the Debtors, the Creditors' Committee and the holder of such Settled Administrative Expense Claim) and (ii) for all Non-Settled Administrative Expense Claims, the Debtors and/or the Liquidating Trust (a) shall prosecute all Claims and Causes of Action arising under chapter 5 to the fullest extent and (b) reserve all rights to object to any and all Non-Settled Administrative Expense Claims on any basis.

***Fifth,*** upon the occurrence of the Effective Date and after the (i) Settled Administrative Expense Claims Payout, and (ii) Distributions on account of Allowed Non-Settled Administrative Expense Claims, all Net Proceeds of Total Assets shall be governed by the terms of the Plan and the Liquidating Trust Agreement. |
| **Minimum Cash Reserve** | Notwithstanding anything to the contrary contained herein, (a) prior to the Effective Date, and once the Cash Reserve Account has been funded with $10 million in the aggregate, the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative (as hereinafter defined) (collectively, the "**Pre-Effective Date Committee**"), and (b) after the Effective Date, the Liquidating Trust Board shall commence a telephonic meeting no less than every thirty (30) days to review, among other things, the status of the reconciliation of Administrative Expense Claims, as well as the latest budget and variance reporting of the Debtors; provided, that, in the interim, the Debtors shall provide, among other things, weekly budget and variance reporting, as well as an accounting of the Total Assets and any Net Proceeds derived therefrom to the Pre-Effective Date Committee on a confidential basis.  After the Initial Distribution Date, to the extent the Pre-Effective Date Committee deems it necessary to fund the Cash Reserve Account with additional funds beyond the |

---

[8]    Additional distributions shall be made to holders of Settled Administrative Expense Claims at all times when cash on hand (not including the Litigation Funding and the Cash Reserve) is $10 million, or if deemed earlier by the Pre-Effective Date Committee, and until such times as these claims have been paid in full (up to 75%) pursuant to the terms of this Administrative Expense Claims Consent Program Term Sheet.

| | |
|---|---|
| | initial $10 million in the aggregate, and prior to additional Distributions being made to holders of Allowed Administrative Expense Claims, the Cash Reserve Account shall be funded by the Debtors in an amount agreed to by the Pre-Effective Date Committee; provided, that, should the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative, not agree to the amount of sufficient operating cash (to be funded into the Cash Reserve Account), after taking into account an amount to maintain the legal and fiduciary obligations of the Debtors, or Estate representatives, as applicable, any of the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative may seek assistance (including on an emergency basis) from the Bankruptcy Court for a prompt resolution of the issue; provided, however, that, in no event, shall the Debtors' Restructuring Committee or the Creditors' Committee request or seek funding in excess of an amount that would cause the Cash Reserve Account to exceed (at any time) more than $10 million; provided, further, that, should the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative seek Bankruptcy Court intervention as set forth above, no further funding of the Cash Reserve Account from Net Proceeds from Total Assets shall occur unless (i) all parties agree to a partial funding, or (ii) the Bankruptcy Court enters an order allowing for further funding. |
| **Maximum Recovery** | For the avoidance of doubt, Distributions in respect of a Settled Administrative Expense Claim shall not exceed 75% of the amount of the Allowed Settled Administrative Expense Claim; provided, that, in no scenario shall percentage recoveries on account of Allowed General Unsecured Claims exceed percentage recoveries on account of Settled Administrative Expense Claims. |
| **Opt-In/Opt-Out Procedures** | The Debtors propose the following procedures to solicit opt-ins and opt-outs:<br><br>1.    Upon entry of the Order, Prime Clerk LLC will: (a) send both an (i) opt-in ballot (the "**Opt-In Ballot**") and (ii) opt-out ballot (the "**Opt-Out Ballot**") to (x) all parties that have filed an Administrative Expense Claim or filed an application for administrative expense in the Debtors' Chapter 11 Cases and (y) any party that was exempted from filing an Administrative Expense Claim but the Debtors are aware of such claim; and (b) publish a notice of the Administrative Expense Claims Consent Program in the national edition of the *New York Times*. The Opt-In Ballot and Opt-Out Ballot will be sent to the address provided on such Administrative Expense Claim form or application for administrative expense or, if no such form exists, the address on the Debtors' books and records. The Opt-Out Ballot will clearly state that any party that exercises its right to opt out will not be entitled to any recovery from the Administrative Expense Claims Consent Program and that any party that does not opt out of the Administrative Expense Claims Consent Program will be bound by its terms, including to support a Plan.<br><br>2.    Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 17 days from the date of service to submit an Opt-In Ballot in either electronic or paper |

|  | form, in each case following the procedures set forth on the Opt-In Ballot. |
|  | 3.     Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 33 days from the date of service (the "**Opt-Out Deadline**") to submit an Opt-Out Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-Out Ballot. |
|  | 4.     The Opt-Out Procedures may be modified with the written consent, including e-mail (such consent not to unreasonably be withheld), of all of the Administrative Expense Claims Consent Program Parties to facilitate the opt-out process. |
| **Admin Representative on the Debtors' Restructuring Committee** | Pursuant to the Administrative Expense Claims Consent Program and upon entry of the Confirmation Order, a representative of holders of Administrative Expense Claims (the "**Admin Representative**") (selected solely by the holders of Administrative Expense Claims, including the Ad Hoc Vendor Group) shall serve alongside the Debtors' Restructuring Committee and the Creditors' Committee to work through 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions and to ensure an expedient and fair process to claims resolution and emergence.  The Admin Representative shall also serve on the Pre-Effective Date Committee as set forth above in the Minimum Cash Reserve description and will be entitled to applicable insurance coverage provided and paid for by the Debtors, as well as protections from appropriate exculpation to the extent allowed for by law.  The Admin Representative shall also receive reasonable compensation as determined by the Debtors, Creditors' Committee, and Ad Hoc Vendor Group. |
| **Support of the Debtors' Plan** | Pursuant to the Administrative Expense Claims Consent Program, the non-Debtor Administrative Expense Claims Consent Program Parties shall, at no further cost to the Administrative Expense Claims Consent Program Parties (severally and not jointly): |
|  | 1.     use good faith efforts to implement this Administrative Expense Claims Consent Program; |
|  | 2.     support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate confirmation of the Plan, including withdrawing any applicable objections and any other pleading inconsistent with the Administrative Expense Claims Consent Program and/or confirmation of the Plan; provided, that, to the extent the Bankruptcy Court does not approve the Administrative Expense Claims Consent Program, the Debtors shall cause the confirmation hearing to be adjourned to a date and time that is reasonably acceptable to the Debtors, Creditors' Committee, and counsel for the Ad Hoc Vendor Group, and the rights of all Administrative Expense Claims Consent Program Parties are reserved, including the rights of the non-Debtor Administrative Expense Claims Consent Program Parties to contest Confirmation; |

| | |
|---|---|
| | 3.    support the confirmation of the Plan and not object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan; provided, that, the same proviso in paragraph 2 shall apply;<br><br>4.    vote all Claims to Accept the Plan if applicable;<br><br>5.    not use, assign, convey, grant, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Settled Administrative Expense Claims, provided that, once the Confirmation Order is entered, holders of Settled Administrative Expense Claim may transfer Settled Administrative Expense Claims (i) to any holder of Settled Administrative Expense Claims or (ii) to a party that delivers a joinder, in the form attached hereto as Exhibit 1, to the Debtors, Weil Gotshal & Manges LLP and Akin Gump Strauss Hauer & Feld LLP (in accordance with the notice provisions in the Plan) at least two (2) business days prior to the settlement of the relevant transfer; with respect to any transfers effectuated in accordance with clause (ii) above, such transferee shall be deemed a holder of a Settled Administrative Expense Claim; for the avoidance of doubt, any Administrative Expense Claims purchased by a holder of Settled Administrative Expense Claims shall be deemed subject to the terms of this Administrative Expense Claims Consent Program; and<br><br>6.    not object to or opt out of any release included in this Administrative Expense Claims Consent Program. |
| **Releases** | The Administrative Expense Claims Consent Program shall include certain consensual releases of Claims and Causes of Action amongst the Administrative Expense Claims Consent Program Parties; for the avoidance of doubt, the Administrative Expense Claims Consent Program shall not release any Specified Causes of Action. |

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties execute this Settlement Term Sheet as of the date first written above.

**SEARS HOLDINGS CORP. on behalf of itself and its co-debtors and debtors-in-possession**

By: _____

*Its duly authorized representative*

Name: Mohsin Meghji
Title: Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties execute this Settlement Term Sheet as of the date first written above.

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF SEARS
HOLDINGS CORP. AND ITS CO-DEBTORS
AND DEBTORS-IN-POSSESSION**

By: _____

*Its duly authorized representative*

Name: Philip Dublin

Title: Partner, Akin Gump Strauss Hauer & Feld LLP
Counsel to the Official Committee of
Unsecured Creditors

IN WITNESS WHEREOF, the Parties execute this Administrative Expense Claims Consent Program Term Sheet as of the date first written above.

**ADMINISTRATIVE EXPENSE CLAIM HOLDER**

By: _____
*Its duly authorized representative*

Firm / Vendor: Whitebox Asymmetric Partners, LP
Name: Mark Strefling
Title: Partner & CEO

IN WITNESS WHEREOF, the Parties execute this Administrative Expense Claims Consent Program Term Sheet as of the date first written above.

**ADMINISTRATIVE EXPENSE CLAIM HOLDER**

By: _____

*Its duly authorized representative*

Firm / Vendor: Whitebox Multi-Strategy Partners, LP
Name: Mark Strefling
Title: Partner & CEO

IN WITNESS WHEREOF, the Parties execute this Administrative Expense Claims Consent Program Term Sheet as of the date first written above.

**ADMINISTRATIVE EXPENSE CLAIM HOLDER**

By:    *Robert J Koltai*

*Its duly authorized representative*

Firm / Vendor:  Hain Capital Investors Master Fund, Ltd.
             By:  Koltai Company Advisors, LLC
Name:   Robert J Koltai

Title:    Managing Member

**<u>Exhibit 1</u>**

JOINDER

[Attached.]

## JOINDER TO ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Administrative Expense Claims Consent Program Term Sheet, dated as of [●], 2019, by and among the Debtors with the consent of the Creditors' Committee, and the members of the Ad Hoc Vendor Group, and agrees to be bound by the terms and conditions of the Administrative Expense Claims Consent Program, and shall be deemed a "holder of a Settled Administrative Expense Claim" under the terms of the Administrative Expense Claims Consent Program Term Sheet.

The Transferee hereby agrees to be bound by the terms and conditions of the Administrative Expense Claims Consent Program to the same extent a transferor was thereby bound. This Joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. Capitalized terms not otherwise defined in this Joinder shall have the meanings assigned to such terms in the Administrative Expense Claims Consent Program Term Sheet.

**Amount of Administrative Expense Claim(s).**

$_____

**TRANSFEREE**

_____
Name

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Date Completed

## **Exhibit B**

**Proposed Confirmation Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                           :
In re                                      :          **Chapter 11**
                                           :
**SEARS HOLDINGS CORPORATION,** *et al.*,  :          **Case No. 18-23538 (RDD)**
                                           :
        **Debtors.**[1]                    :          **(Jointly Administered)**
                                           :
------------------------------------------------------------------x

### ORDER (I) CONFIRMING MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS AND (II) GRANTING RELATED RELIEF

Upon the filing by Sears Holdings Corporation and its affiliated debtors (collectively, the "**Debtors**") of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4476) (as amended, supplemented, or modified in accordance with its terms, the "**Plan**"),[2] and the Court previously

---

[1]    The Debtors in the Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]    Capitalized terms used in this order (this "**Confirmation Order**") but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy

having approved the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated May 28, 2019 (ECF No. 4042) (as transmitted to parties in interest, and as modified by the *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated July 9, 2019 (ECF No. 4478), the "**Disclosure Statement**" and the Debtors having filed the *Notice of Filing of Exhibits to the Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, whereby the Plan Settlement Liquidation Analysis and the Toggle Plan Liquidation Analysis were annexed thereto, on May 28, 2019 (ECF No. 4060) (each, as further amended or modified)) and the solicitation procedures related to the Disclosure Statement and the solicitation of acceptances and rejections of the Plan, in each case pursuant to the *Order (I) Approving Disclosure Statement, (II) Establishing Notice and Objection Procedures for Confirmation of the Plan, (III) Approving Solicitation Packages and Procedures for Distribution Thereof, (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan, and (V) Granting Related Relief* (ECF No. 4392) (the "**Disclosure Statement Order**"); and the Debtors having served the Disclosure Statement on the Holders of Claims and Interests pursuant to the Disclosure Statement Order, *see Affidavit of Service* (ECF No. 4443); and the Debtors having filed the documents comprising the Plan Supplement on July 26, 2019, August 2, 2019, and October 1, 2019 (ECF Nos. 4632, 4703, 5295) (as may be further amended or supplemented, the "**Plan Supplement**"); and this Court having considered the record in the Chapter 11 Cases, the stakeholder support for the Plan evinced on the record and in the *Declaration of Craig E. Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast*

---

Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

*on the Second Amended Joint Plan of Sears Holdings Corporation and Its Affiliated Debtors*,

filed on September 13, 2019 (ECF No. 5137) (the "**Voting Certification**"), the compromises and

settlements embodied in and contemplated by the Plan, the briefs and arguments regarding

confirmation of the Plan, the evidence regarding confirmation of the Plan, and a hearing on

confirmation of the Plan having commenced on October 3, 2019 [and continued thereafter] (the

"**Confirmation Hearing**"); and after due deliberation:

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    The Court has jurisdiction over the Chapter 11 Cases pursuant to

28 U.S.C. §§ 157(a)-(b) and 1334(b), and venue is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The Plan satisfies the requirements for confirmation of section 1129 of the

Bankruptcy Code by a preponderance of evidence.

C.    The Plan was solicited in good faith and in compliance with applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order.  The

Debtors participated in good faith and in compliance with the applicable provisions of the

Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered

under the Plan, and therefore are entitled to the protections of section 1125(e) of the Bankruptcy

Code.

D.    The Plan has been proposed in good faith and not by any means forbidden

by law.  In so finding, this Court has considered the totality of the circumstances of these cases,

the formulation and negotiation of the Plan and all modifications thereto, the Plan Settlement, the

---

[3]    All findings of fact and conclusions of law announced by this Court at the Confirmation Hearing in relation to
confirmation of the Plan are hereby incorporated into this Confirmation Order to the extent not inconsistent
herewith.  Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion
of law, shall also constitute a conclusion of law.  Each conclusion of law set forth or incorporated herein, to the
extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

WEIL:\97210100\1\73217.0004

PBGC Settlement, the Creditors' Committee Settlement, and the Administrative Expense Claims Consent Program (as defined below). The Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.

E.    The Plan is "fair and equitable" with respect to the Classes that are impaired and are deemed to reject the Plan, because no Class senior to any rejecting Class is being paid more in full and the Plan does not provide a recovery on account of any Claim or Interest that is junior to such rejecting Classes unless and until such rejecting Class is paid in full.

F.    The releases contained in Section 15.9 of the Plan are an essential component of the Plan and appropriate. The Third Party Release contained in Section 15.9(b) of the Plan is consensual because all parties to be bound by such release were entitled to vote, given due and adequate notice of the release and sufficient opportunity and instruction to elect to opt out of such release if they rejected the Plan or abstained from voting on the Plan. Good and valid justification have been demonstrated in support of the Debtor Release and the PBGC Release. Accordingly, the releases contained in Section 15.9 of the Plan are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims or Causes of Action released by Section 15.9 of the Plan; (c) in the best interests of the Debtors, their Estates, the Liquidating Trust, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; and (e) given and made after due notice and opportunity for hearing.

G.    The exculpation provided by Section 15.10 the Plan for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of these cases.

H.    The Plan does not discriminate unfairly among the different classes of unsecured creditors because grounds and justifications exist for treating the classes differently in

4

these cases, including implementation of the Global Settlement, including the Plan Settlement and the PBGC Settlement.

I.    The Plan is dependent upon and incorporates the terms of compromises and settlements, which include the Plan Settlement, the PBGC Settlement, and the Creditors' Committee Settlement, which settlements were negotiated in good faith and at arm's length and are each, individually essential elements of the Plan.  The Plan Settlement, the PBGC Settlement, and the Creditors' Committee Settlement are fair, equitable, reasonable, and in the best interests of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and satisfy the standards for approval under Bankruptcy Rule 9019.

J.    The Administrative Expense Claims Consent Program was negotiated at arm's length and in good faith among the Administrative Expense Claims Consent Program Parties (as defined below), and is a proper exercise of the Debtors' business judgment.  Those parties who do not opt out shall be deemed to have consented to the treatment set forth in the Administrative Expense Claims Consent Program pursuant to Section 2.1 of the Plan.  The Administrative Expense Claims Consent Program is fair, equitable, reasonable, and in the best interest of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and, to the extent applicable, satisfies the standards for approval under Bankruptcy Rule 9019. The Opt-In/Opt-Out Procedures, as described herein, provide adequate procedures to solicit opt-out votes from Holders of Administrative Expense Claims with respect to the Administrative Expense Claims Consent Program.

K.    The DIP Order has not been terminated and continues to govern.  The Debtors have acted in good faith in funding the Carve-Out Account and amounts held therein

5

shall be available only for the payment of Allowed Professional Fees in accordance with the DIP Order.

L.    This Court may properly retain jurisdiction over the matters set forth in Article XVI of the Plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED THAT:**

**A.    Confirmation of the Plan**

1.    The Plan and each of its provisions is approved and the Plan is confirmed pursuant to section 1129 of the Bankruptcy Code.

2.    Any and all objections to and reservations of rights in respect of the Plan that have not been withdrawn, waived or resolved prior to the Confirmation Hearing are hereby denied and overruled on the merits with prejudice.

3.    The documents contained in the Plan Supplement, and any amendments, modifications and supplements thereto, are integral to the Plan and are approved by the Court, the Debtors and the Liquidating Trust, as applicable, are authorized to take all actions required under the Plan and the Plan Supplement to effectuate the Plan and the transactions contemplated therein including, without limitation, the implementation of the Wind Down in connection with the Plan.

4.    The terms of the Plan including the Plan Supplement and the Liquidating Trust Agreement, and the exhibits thereto are incorporated herein by reference and are an integral part of the Plan and this Confirmation Order.  The terms of the Plan, the Plan Supplement, the Liquidating Trust Agreement, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan

6

Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of this Court that all such documents are approved in their entirety.

5.       Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules.  The solicitation of votes on the Plan and the Solicitation Packages complied with the solicitation procedures in the Disclosure Statement Order, were appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules.  The Debtors solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

6.       This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan.

7.       Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign or other governmental agency is directed and authorized to accept for filing and/or recording any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

WEIL:\97210100\1\73217.0004

8.      The compromises and settlements set forth in the Plan are approved, including, but not limited to, the PBGC Settlement, the Plan Settlement, and the Creditors' Committee Settlement, and will be effective immediately and binding on all parties in interest on the Effective Date.

9.      The amendments and modifications to the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4476) since the filing thereof and incorporated into the Plan, are approved, including ECF No. 5293 (attached hereto as **Exhibit A**), in accordance with section 1127(a) of the Bankruptcy Code and Rule 3019(a) of the Bankruptcy Rules.   Pursuant to Bankruptcy Rule 3019, these Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

10.      Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be effective immediately on the Effective Date without further order or action by this Court, any of the parties to such release, or any other Entity: (a) Injunction (Section 15.8); (b) Debtor Release (Section 15.9(a)); (c) Third Party Release (Section 15.9(b)); (d) PBGC Release (Section 15.9(c)); and (e) Exculpation (Section 15.10).

11.      In accordance with the Plan and pursuant to this Confirmation Order, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan.

WEIL:\97210100\1\73217.0004

12.     On the Effective Date, all Liquidating Trust Assets of the Debtors shall be transferred to the Liquidating Trust in accordance with Article X of the Plan and all Debtors shall be dissolved without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder(s) or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities. All directors and officers of the dissolved Debtors shall be deemed to have resigned in their capacity as of the Effective Date.

13.     Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and, in the case of a Secured Claim, satisfaction in accordance with the Plan of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trust and its successors and assigns.  All Holders of Secured Claims are directed to cooperate with the Debtors or the Liquidating Trust, as the case may be, in implementing this paragraph and any administrative details relating thereto.

14.     The Debtors shall file on the docket a notice of the imminent occurrence of the Effective Date no later than twenty (20) days prior to such occurrence of the Effective Date.

15.     The Debtors shall cause to be served a notice of the entry of this Confirmation Order and occurrence of the Effective Date (the "**Confirmation Notice**"), upon (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC, and (b) such additional

persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the Effective Date, or as soon as reasonably practicable thereafter.  The Debtors shall cause the Confirmation Notice to be published in *The New York Times* within seven (7) business days after the Effective Date, or as soon as practicable thereafter.

**B.      Immediate Designation of the Litigation Designees and the Granting of Standing for Prosecution of the Jointly Asserted Causes of Action**

16.     Pursuant to sections 105(a), 363(b), 1103(c) and 1109(b) of the Bankruptcy Code, the Creditors' Committee shall be granted joint standing with the Debtors and is hereby authorized to investigate, commence, prosecute, settle and otherwise dispose of (i) the Specified Causes of Actions, (ii) other Preserved Causes of Action against the ESL Parties, (iii) all Claims and Causes of Action asserted in the pending Adversary Proceeding captioned *Sears Holdings Corp. v. Lampert*, Adv. Proc. No. 19-08250 (RDD) (Bankr. S.D.N.Y.) (the "**Adversary Proceeding**") and/or any other Claims or Causes of Action ancillary thereto, including, *inter alia*, additional Claims or Causes of Action related to the subject matter of the Adversary Proceeding (including Claims or Causes of Action asserted in an amended complaint and Claims and Causes of Action asserted in one or more separate proceedings) and (iv) Claims or Causes of Action against insurance carriers related to coverage for claims asserted in the Adversary Proceeding or a related proceeding (all of the Claims and Causes of Action addressed in this paragraph, collectively, the "**Jointly Asserted Causes of Action**") jointly with the Debtors for the benefit of the Debtors' Estates and creditors in accordance with the terms of the Plan with the full rights and privileges attendant thereto.

17.     The investigation, prosecution and/or settlement or other disposal of the Jointly Asserted Causes of Action shall be subject to the oversight of designees selected by the Debtors and the Creditors' Committee (the "**Litigation Designees**").  Specifically, the Litigation

WEIL:\97210100\1\73217.0004

Designees shall comprise (a) Patrick J. Bartels, (b) Eugene I. Davis, and (c) Raphael T. Wallander, as the Creditors' Committee's designees, and (x) Alan J. Carr and (y) William L. Transier, as the Debtors' designees, which designees shall become the initial members of the Liquidating Trust Board upon the Effective Date pursuant to Section 10.6(a) of the Plan. Any Litigation Designee who succeeds an initial Creditors' Committee designee shall be considered a Creditors' Committee designee and any Litigation Designee who succeeds an initial Debtor designee shall be considered a Debtor designee. For the avoidance of doubt, the Litigation Designees shall have all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date of the Plan in respect of the Jointly Asserted Causes of Action, including, *inter alia*, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Jointly Asserted Causes of Action pursuant to the terms of the Liquidating Trust Agreement applicable to the Liquidating Trust Board (including, for the avoidance of doubt, section 6.5(c) of the Liquidating Trust Agreement), which terms are incorporated herein by reference and shall govern the acts, conduct and rights of the Litigation Designees prior to the Effective Date.

18.     The Litigation Designees will have the sole and exclusive right to propose any settlement of the Jointly Asserted Causes of Action in accordance with the terms of the Liquidating Trust Agreement; *provided* that any such settlement shall be subject to approval by this Court after notice and hearing.

19.     The authority of the Litigation Designees shall be effective immediately upon entry of this Confirmation Order and shall remain and continue in full force and effect until the Effective Date. The service of the Litigation Designees shall be governed by the conditions

WEIL:\97210100\1\73217.0004

to be applicable to the members of the Liquidating Trust Board set forth in Section 6.5(c)(i)-(v) of the Liquidating Trust Agreement.

20.     Sections 6.5(e), 6.5(f), 6.5(g), 6.5(h), and 6.5(i) of the Liquidating Trust Agreement shall be applicable to the Litigation Designees and govern the operation of the Litigation Designees in the same manner they are intended to govern operation of the Liquidating Trust Board.

21.     [The Litigation Designees shall be compensated as follows: [_____].]

22.     In accordance with the terms of the Plan and the Liquidating Trust Agreement, Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") shall be retained as primary litigation counsel to act on behalf of the Litigation Designees to investigate, commence, prosecute, and otherwise litigate the Jointly Asserted Causes of Action.  In addition, without further order of this Court, the Litigation Designees may retain such additional professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Initial Litigation Designees to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Jointly Asserted Causes of Action) (collectively with Akin Gump, the "**Litigation Professionals**").   The Litigation Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Debtors, the Creditors' Committee, the U.S. Trustee and the Litigation Designees, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Litigation Professionals, the Litigation Designees and/or

12

the Litigation Professionals may request that this Court resolve the dispute.  The Debtors are

authorized to pay compensation for services rendered or reimbursement of expenses incurred by

the Litigation Professionals immediately upon entry of this Confirmation Order in the ordinary

course and without the need for approval of this Court, subject to the approval of the Litigation

Designees.

23.    The protections to be granted to members of the Liquidating Trust Board

and the Trust Professionals under Article VIII of the Liquidating Trust Agreement (Reliance,

Liability, and Indemnification) shall be equally applicable to the Litigation Designees and the

Litigation Professionals for actions taken or not taken by the Litigation Designees and the

Litigation Professionals in their capacities as such with respect to their administration and pursuit

of the Jointly Asserted Causes of Action.

24.    Pursuant to Federal Rule of Evidence 502(d), any attorney client privilege,

work product privilege, or other privilege or immunity attaching to any documents or

communications (whether written or oral) (the "**Privileges**" protecting "**Privileged**

**Information**") in the possession of the Debtors (including the Restructuring Subcommittee, any

pre-petition or post-petition committee or subcommittee of the board of directors or equivalent

governing body of any of the Debtors and their predecessors, and the Debtors' appointees on the

Litigation Designees) or any of their employees, representatives, attorneys or advisors

(collectively, the "**Debtor Privilege Parties**") may be shared with Akin Gump, the Creditors'

Committee, the Litigation Designees appointed by the Creditors' Committee or any of their

respective representatives, attorneys or advisors (collectively, the "**Creditor Privilege Parties**,"

and together with the Debtor Privilege Parties, the "**Privilege Parties**") on either or both a joint

representation or common interest privilege basis without waiver of the relevant underlying

13

privilege; similarly, any Privileged Information in possession of the Creditor Privilege Parties may be shared with the Debtor Privilege Parties on either or both a joint representation or common interest privilege basis without waiver of the relevant underlying privilege; *provided*, *however*, that the ability of the Debtor Privilege Parties to share information protected by any Privilege, if any, held by the Related Party Transaction Subcommittee of the Audit Committee of the Sears Holdings Board of Directors and/or the Special Committee of the Sears Holdings Board of Directors created on or about April 28, 2018 shall be subject to later determination.

25.    Subject to the limitations of paragraph 24 above, the Litigation Designees shall have the exclusive authority and sole discretion to maintain the Privileges and keep the privileged material confidential, or waive the Privileges and/or disclose and/or use in litigation of the Jointly Asserted Causes of Action, or any proceeding Privileged Information.

26.    Subject to the limitations of paragraph 24 above, the Privilege Parties shall take all necessary steps to effectuate the sharing of such Privileges and to provide to the Litigation Designees without the necessity of a subpoena all information subject to a Privilege in their respective possession, custody, or control.  The Litigation Designees are further expressly authorized to formally or informally request or subpoena documents, testimony, or other information that would constitute Privileged Information from any persons, including attorneys, professionals, consultants, and experts, and no such person may object to the production to the Litigation Designees of such Privileged Information on the basis of a Privilege.  Unless and until the Litigation Designees makes a determination to waive any Privilege, Privileged Information shall be produced solely to the Litigation Designees.

27.    If a Privilege Party, the Litigation Designees, any of their respective employees, professionals, or representatives or any other person inadvertently produces or

14

discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Designees of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

28.     To the maximum extent permitted by applicable law, the Litigation Designees will not have or incur, and shall be released and exculpated from any claim, obligation, suit, judgment, damages, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Confirmation Date, in each Litigation Designee's limited capacity as such, in connection with or arising out of its responsibilities set forth herein, except for acts or omissions that constitute fraud, gross negligence, criminal misconduct or willful misconduct as determined by a Final Order.  Further, the Litigation Designees will be entitled to applicable insurance coverage provided and paid for by the Debtors.

## C.     The Liquidating Trust

29.     The formation, rights, powers, duties, structure, obligations and other matters pertaining to the Liquidating Trust shall be governed by Article X of the Plan and the Liquidating Trust Agreement.

30.     On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, the Liquidating Trust Assets shall be transferred by the Debtors (and deemed transferred) to the Liquidating Trust free and clear of all liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) for the benefit of the Liquidating Trust Beneficiaries, without the need for any Entity to take any further action or obtain any approval.  Thereupon, the Debtors shall

15

have no interest in the Liquidating Trust Assets or the Liquidating Trust. On the Effective Date, the Liquidating Trust shall be authorized as the representative of the Estates to investigate, sue, settle and otherwise administer the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and the Plan.

31.    Upon the Effective Date, the Liquidating Trust is authorized and empowered, without further approval of this Court or any other party, to take such actions and to perform such acts as may be necessary, desirable or appropriate to implement the issuance of the Liquidating Trust Interests in accordance with the Plan and the Liquidating Trust Agreement, and to execute and deliver all agreements, documents, securities, instruments and certificates relating thereto. All Liquidating Trust Interests issued by the Liquidating Trust pursuant to the provisions of the Plan and the Liquidating Trust Agreement shall be deemed to be duly authorized, validly issued, fully paid and non-assessable.

32.    On the Effective Date, pursuant to and as further provided in the Plan and the Liquidating Trust Agreement, all of the Debtors' respective rights, titles and interests in any Privileges (as defined in the Liquidating Trust Agreement) related in any way to the Liquidating Trust Assets and the purpose of the Liquidating Trust shall be treated as provided in the Plan and the Liquidating Trust Agreement.

33.    The Liquidating Trustee may, with the approval of, or at the direction of, the Liquidating Trust Board, invest Cash (including any earnings thereon or proceeds therefrom); provided, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings or other controlling authorities. All monies and other assets received by the Liquidating Trustee as Liquidating Trust Assets

16

(including the proceeds thereof as a result of investment in accordance with Section 6.9 of the Liquidating Trust Agreement) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Liquidating Trust Beneficiaries, and shall not be segregated from other Liquidating Trust Assets, unless and to the extent required by the Plan.

**D.    Certain Executory Contract and Unexpired Nonresidential Leases Matters**

34.    Notwithstanding anything to the contrary in the Plan, the Definitive Documents, the Plan Supplement, any other documents related to any of the foregoing, or this Confirmation Order, nothing shall modify the rights, if any, of any holder of Claims or any current or former party to an executory contract, whether currently or previously executory, or lease of non-residential real property to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (i) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease(s) with the Debtors, or any successors to the Debtors, under the Plan; (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Liquidating Trust, or any successors of the Debtors.

35.    In accordance with the lease rejection notice filed on July 12, 2019 (ECF No. 4535), and the *Order Approving the Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* entered on August 14, 2019 (ECF No. 4836), notwithstanding anything to the contrary in the Plan, the leases for stores located in Pembroke Pines, Florida, Staten Island, New York, and Willowbrook, Wayne, New Jersey (Store Nos. 1775, 1624, and 1434, respectively) will be deemed rejected as of September

17

30, 2019, and the lease for the store located in Northridge, California (Store No. 1508) will be deemed rejected as of January 31, 2020.

36.     In accordance with the so-ordered stipulations extending the time under section 365(d)(4) of the Bankruptcy Code to assume and assign the leases pertaining to Store Nos. 3667, 8290, 1018, and 3127 (the "**Leases**"), entered on September 5, August 30, August 5, and September 5, 2019 respectively, (ECF Nos. 5072, 5038, 4747, and 5068), and the orders granting such relief (ECF Nos. 4580, 4581, and 4687), notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Leases shall not be deemed rejected as of the Effective Date.

37.     Nothing in the Plan alters any of the terms and provisions of the Construction, Operation, and Reciprocal Easement Agreement, recorded on April 2, 1974, and the Supplemental Agreement for the Hilltop Shopping Center, as referenced in the *LBG Hilltop LLC's Objection to Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliates; and Declaration of Carol Chow*, filed at ECF No. 4680.

38.     [For the avoidance of doubt, the property that is the subject of the ongoing adversary proceeding captioned *Transform Holdco LLC v. Sears Holdings Corporation*, 19-08288 (the "**Fort Lauderdale Action**") seeking the transfer of deeds related to property in Fort Lauderdale, Florida, shall be subject to any and all rights asserted on such property by Transform Holdco LLC in that action.  In addition, the parties are in discussions relating to the transfer of additional parcels of real property relating the following locations:  Glendale, CA (Store No. 1088), Bishop, CA (Store No. 7756), Hialeah, FL (Store No. 31930), and Durham, NC (Store No. 1475) (collectively, the "**Potentially Transferrable Property Interests**").  Each of the parties' rights with respect to the aforementioned actions and properties are hereby fully

preserved, including, without limitation that the transfer of each of (x) the property subject to the Fort Lauderdale Action, and (y) the Potentially Transferrable Property Interests to the Liquidating Trust shall be subject to any and all rights that may be asserted on such property interests by Transform Holdco LLC or its affiliates.][4]

E.    **Certain Governmental Unit Matters**

39.    As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in the Plan or this Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors, their Estates, or the Liquidating Trust are entitled to under the Bankruptcy Code, if any.    The discharge, release, and injunction provisions contained in the Plan and this Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to this Confirmation Order, pursuing any police or regulatory action.

40.    Accordingly, notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, nothing in the Plan or this Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Confirmation Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors, their Estates, or the Liquidating Trust under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Confirmation Date.    Nor shall anything in this Confirmation Order or the Plan:    (i) enjoin or otherwise bar any Governmental Unit from asserting or

---

[4] The Debtors and Transform are still in the process of negotiating the language in this paragraph.

enforcing, outside this Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Confirmation Order, the Plan, or the Bankruptcy Code.

41.    Moreover, nothing in this Confirmation Order or the Plan shall release or exculpate any non-debtor, including any Released Parties and/or Exculpated Parties, from any liability to any Governmental Unit, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in this Confirmation Order or the Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-debtor for any liability whatsoever; *provided*, *however*, that the foregoing sentence shall not (x) limit the scope of discharge, if any, granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

42.    Nothing contained in the Plan or this Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors, their Estates, or the Liquidating Trust, nor shall the Plan or this Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan or this Confirmation Order be deemed to have conferred jurisdiction upon this Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

43.    Notwithstanding anything contained in the Plan, this Confirmation Order, and any implementing Plan documents, nothing shall (i) preclude the United States Securities

20

and Exchange Commission (the "**SEC**") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

**F.        Toggle Plan Reservation of Rights**

44.        In the event this Court does not approve the Plan Settlement, the Debtors or the Liquidating Trustee, as applicable, shall provide notice to all parties in interest not less than thirty (30) days prior to allowing or making any distribution on account of any postpetition Intercompany Claims, and all parties rights are reserved with respect to (i) setoff of postpetition Intercompany Claims and (ii) the amount and allowance of all prepetition and postpetition Intercompany Claims.

**G.        Texas Taxing Authorities**

45.        To the extent that the Texas Taxing Authorities[5] are entitled to interest under section 506(b) of the Bankruptcy Code, the Texas Taxing Authorities shall receive interest from the Commencement Date through the Effective Date, and from the Effective Date through payment in full at the state statutory rate, pursuant to sections 506(b), 511, and 1129 of the Bankruptcy Code.

**H.        Village of Hoffman Estates Reservation of Rights**

46.        Notwithstanding Section 10.3 of the Plan or anything else to the contrary in the Plan or Plan Supplement, including the Liquidating Trust Agreement, the Village of

---

[5]    The "**Texas Taxing Authorities**" are Anderson County, Bastrop County, Bell TAD, Bosque County, Bowie CAD, Brazos County, Brown CAD, Burnet CAD, Cherokee County, Cherokee CAD, City of Waco, *et al.*, Comal County, Coryell County, Denton County, Erath County, Guadalupe County, Harrison CAD, Harrison County, Hays County, Henderson County, Jasper County Tax Units, Mexia I.S.D., Midland CAD, Taylor CAD, Terry CAD, Wharton County, and Williamson County.

WEIL:\97210100\1\73217.0004

Hoffman Estates Reserves the right to dispute that any property that the Village of Hoffman Estates has jurisdiction over does not benefit from section 1146(a) of the Bankruptcy Code and the Debtors or the Liquidating Trust, as applicable, reserves the right to dispute the same.

## I.    Team Worldwide Reservation of Rights

47.    Notwithstanding anything else herein, nothing in the Plan or this Confirmation Order shall be deemed or construed to impact, impair, affect, determine, release, waive, modify, limit or expand: (i) the terms and conditions of any supply agreement (collectively, the "**Supply Agreements**") between a party (an "**Indemnifying Party**") and a Debtor containing a provision or clause that purports to create an obligation of the Indemnifying Party to indemnify, defend against, reimburse, fund, or otherwise be responsible for any liabilities, damages, losses, or costs associated with any potential claims, suits, actions, or other proceedings seeking judgment against the Debtor or its affiliates (the "**Indemnity Obligations**"); (ii) any of the rights, remedies, defenses to coverage and other defenses of any party under or in respect of any Supply Agreements; (iii) subject to the proviso set forth in the next paragraph, any claims, actions, rights to payment or other similar claims held by Team Worldwide Corporation ("**Team Worldwide**") against any Debtor if covered by the Indemnity Obligations (the "**Covered Claims**"), and (iv) any claims, actions, rights to payment or other similar claims held by Team Worldwide against the Buyer, as a result of post-closing infringement claims. All such rights, remedies, and defenses are expressly reserved and preserved.

48.    Notwithstanding anything in the Plan or this Confirmation Order, Team Worldwide is authorized to pursue, in any court of competent jurisdiction, a determination of liability (the "**Infringement Liability**") of the Covered Claims against the Debtors to final judgment and to enforce any resulting judgment against the Indemnifying Parties (the "**Coverage**

22

Lawsuit"); provided, however, that Team Worldwide shall not pursue payment of any Covered Claims from the Debtors or their estates or the Liquidating Trust and shall waive collection of any and all amounts owed to Team Worldwide not satisfied by any Indemnifying Party resulting from all claims filed against the Debtors relating thereto.

49.     Following the commencement of the Coverage Lawsuit, the Debtors and/or the Liquidating Trustee shall provide notice to the Indemnifying Parties of the Covered Claims and take such further action reasonably required under the Supply Agreements to have the Indemnifying Parties perform their Indemnity Obligations; provided, however, that (i) neither the Debtors nor the Liquidating Trust  shall be obligated to pay or be liable for any out-of-pocket costs or expenses in connection with such action, and/or (ii) neither the Debtors nor the Liquidating Trust shall be obligated to participate in the Coverage Lawsuit.  For the avoidance of doubt, and subject in all respects to (i) and (ii) in the preceding sentence, the Debtors or the Liquidation Trust, as applicable, may be named as a nominal defendant in the Coverage Lawsuit.

**J.      233 S. Wacker, LLC**

50.     Except as provided by the Stipulation, Agreement, and Order Granting Limited Relief from the Automatic Stay (233 S. Wacker, LLC) (ECF No. 2849), notwithstanding any provision of the Plan or this Confirmation Order to the contrary, 233 S. Wacker, LLC is permitted to continue to assert, prosecute, litigate, liquidate, and/or settle its counterclaim and its claims against the Debtors, their estates, and any successors thereto in Case No. 2016-CH-10308 pending in the Circuit Court of Cook County, Illinois, Chancery Division and reserves all rights in connection with such proceeding and any payment obligated to be made in connection therewith.  For the avoidance of doubt, the Debtors, their estates and any successor in interest, including, without limitation, the Liquidating Trust, reserve all rights with respect to any claims

WEIL:\97210100\1\73217.0004

or counterclaims asserted in connection with the action referenced in the preceding sentence and any and all obligations in connection therewith.

## K.    Administrative Expense Claims

51.    Any motion for allowance or payment of an Administrative Expense Claim that is pending or filed after the date of the entry of this Confirmation Order (i) shall be adjourned until a date as determined by the Debtors (in consultation with the Creditors' Committee) or the Liquidating Trust (as applicable) and in consultation with the applicable claimant and subject to this Court's availability, and (ii) shall be treated as a proof of an Administrative Expense Claim.    Any discovery requests in connection with any Administrative Expense Claim shall be adjourned indefinitely, unless the Debtors have objected to the allowance of such Administrative Expense Claim.    Notwithstanding anything in the Bar Date Order, any scheduled or requested hearings pursuant to the 503(b)(9) Claim Procedures (as defined in the Bar Date Order) are hereby cancelled.

## L.    Administrative Expense Claims Consent Program

52.    The compromise and settlement of Administrative Expense Claims (as defined in the Plan, including 503(b)(1) and 503(b)(9) Claims, but excluding any amounts paid by Transform on account thereof—including any amounts that otherwise would have been 503(b)(9) Claims but were paid as part of cure obligations in connection with assumed and assigned contracts) and the treatment thereof (the "**Administrative Expense Claims Consent Program**") by and amongst Debtors and their estates, the Creditors' Committee, a certain ad hoc group of holders of Administrative Expense Claims (the "**Ad Hoc Vendor Group**") (together the "**Administrative Expense Claims Consent Program Parties**"), as described herein, is hereby approved:

24

a.    ***Settled Administrative Expense Claims Recovery.***  Pursuant to the terms of the Administrative Expense Claims Consent Program, holders of Settled Administrative Expense Claims (defined below) shall receive recoveries from Net Proceeds of Total Assets other than the Litigation Funding and the Cash Reserve (as more fully set forth herein) in the following manner and in the following order of priority until such time as the holders of Settled Administrative Expense Claims receive a recovery of 75% on account of their Settled Administrative Expense Claims:

(1)    ***First***, each holder of an Allowed Administrative Expense Claim against the Debtors that ***affirmatively opts-in*** (the "**Opt-In Settled Admin Claims**")[6] to the Administrative Expense Claims Consent Program shall receive: (i) its pro rata share of the Initial Distribution[7] capped at 75% of the Allowed Administrative Expense Claim (the percentage recovery, the "**Initial Recovery**"); provided, that, the Initial Distribution shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors and the Creditors' Committee to the Allowed amount of the Opt-In Settled Admin Claims; provided, further, that, holders who do not agree with the Debtors and the Creditors' Committee on the Allowed amount of the Opt-In Settled Admin Claim shall be deemed to hold a Non Opt-Out Settled Admin Claim; and (ii) consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Opt-In Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of an Opt-In Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

---

[6]    For the avoidance of doubt, holders of Administrative Expense Claims who execute the Administrative Expense Claims Consent Program Term Sheet, filed at ECF No. 5292, shall be deemed holders of Opt-In Settled Admin Claims.

[7]    "**Initial Distribution**" shall mean Distributions made from a cash pool of $20 million inclusive of the Carve-Out Contribution  ("**Initial Cash Pool**") to be held in the Segregated Account and made available on or about December 1, 2019 (the "**Initial Distribution Date**") for holders of Opt-In Settled Admin Claims.  Within three (3) business days following entry of the Confirmation Order, $15 million inclusive of the Carve-Out Contribution shall be funded by the Debtors into the Initial Cash Pool, with an additional $5 million funded by the Debtors into the Initial Cash Pool on or before the Initial Distribution Date.  The Cash Pool shall be placed in the Segregated Account and used solely for the purpose of funding the Settled Administrative Expense Claims as provided for in the Administrative Expense Claims Consent Program Term Sheet.

(2)    After the Initial Distribution, a Second Distribution (as defined below) to Settled Administrative Expense Claims shall not occur until each of the following conditions is met:  (i) a total of $25 million has been funded into the Litigation Funding Account in the aggregate,[8] (ii) there has been a funding of $10 million in the aggregate in the Cash Reserve Account, and (iii) the Segregated Account has an additional $10 million in cash (together, the "**Minimum Conditions**").[9]

(3)    ***Second***, once the Minimum Conditions are satisfied, each holder of an Allowed Administrative Expense Claim against the Debtors that ***does not opt-out*** (the "**Non Opt-Out Settled Admin Claims**," together with the Opt-In Settled Admin Claims, shall be considered "**Settled Administrative Expense Claims**") of the Administrative Expense Claims Consent Program shall then receive (i) its pro rata share of the Second Distribution[10] capped at 75% of the Allowed Administrative Expense Claim; and (ii) consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Opt-Out Deadline; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Non Opt-Out Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of a Non Opt-Out Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

(4)    ***Third***, after the Second Distribution, all Net Proceeds of Total Assets other than the Litigation Funding and the Cash

---

[8]    For the avoidance of doubt, following the Effective Date, any additional funding for the Jointly Asserted Causes of Action and/or other Preserved Causes of Action shall be determined by the Liquidating Trust Board in accordance with the terms of the Plan and the Liquidating Trust Agreement.

[9]    For the avoidance of doubt, following the Initial Distribution, it shall be a requirement that the Cash Reserve Account have $10 million in available cash and the Segregated Account has at least an additional $10 million in cash prior to any further distributions on account of Settled Administrative Expense Claims.

[10]    "**Second Distribution**" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery; provided, that, for the avoidance of doubt, there shall be no Second Distribution until the Cash Reserve Account has been funded with the $10 million in the aggregate.  For the avoidance of doubt, the Litigation Funding Account shall in no event be funded by more than $25 million up to and including the Effective Date.

26

Reserve (as more fully set forth herein) shall be made available for Distributions on account of Settled Administrative Expense Claims up to 75% of the consensually agreed-upon Allowed Settled Administrative Expense Claim ("**Settled Administrative Expense Claims Payout**").[11]

(5)     *Fourth*, after the Settled Administrative Expense Claims Payout and upon the Effective Date of the Plan, holders of Administrative Expense Claims who opt-out of the Settlement Agreement (the "**Non-Settled Administrative Expense Claims**") shall receive Distributions on account of their Non-Settled Administrative Expense Claims to the extent Allowed; provided, that, for the avoidance of doubt, (i) for all Settled Administrative Expense Claims (unless otherwise agreed among the Debtors, the Creditors' Committee and the holder of such Settled Administrative Expense Claim) and (ii) for all Non-Settled Administrative Expense Claims, the Debtors and/or the Liquidating Trust (a) shall prosecute all Claims and Causes of Action arising under chapter 5 to the fullest extent and (b) reserve all rights to object to any and all Non-Settled Administrative Expense Claims on any basis.

(6)     *Fifth*, upon the occurrence of the Effective Date and after the (i) Settled Administrative Expense Claims Payout, and (ii) Distributions on account of Allowed Non-Settled Administrative Expense Claims, all Net Proceeds of Total Assets shall be governed by the terms of the Plan and the Liquidating Trust Agreement.

(7)     Notwithstanding anything to the contrary contained herein, (a) prior to the Effective Date, and once the Cash Reserve Account has been funded with $10 million in the aggregate, the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative (as hereinafter defined) (collectively, the "**Pre-Effective Date Committee**"), and (b) after the Effective Date, the Liquidating Trust Board shall commence a telephonic meeting no less than every thirty (30) days to review, among other things, the status of the reconciliation of Administrative Expense Claims, as well as the latest budget and variance reporting of the Debtors; provided, that, in the interim, the Debtors shall provide, among other things, weekly budget and variance reporting, as well as an accounting of the Total Assets and any Net Proceeds derived therefrom to the Pre-Effective Date Committee on a confidential basis.  After the Initial Distribution Date, to

---

[11]   Additional distributions shall be made to holders of Settled Administrative Expense Claims at all times when cash on hand is $10 million and until such times as these claims have been paid in full (up to 75%) pursuant to the terms of the Settlement Term Sheet.

27

the extent the Pre-Effective Date Committee deems it necessary to fund the Cash Reserve Account with additional funds beyond the initial $10 million in the aggregate, and prior to additional Distributions being made to holders of Allowed Administrative Expense Claims, the Cash Reserve Account shall be funded by the Debtors in an amount agreed to by the Pre-Effective Date Committee; provided, that, should the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative, not agree to the amount of sufficient operating cash (to be funded into the Cash Reserve Account), after taking into account an amount to maintain the legal and fiduciary obligations of the Debtors, or Estate representatives, as applicable, any of the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative may seek assistance (including on an emergency basis) from the Bankruptcy Court for a prompt resolution of the issue; provided, however, that, in no event, shall the Debtors' Restructuring Committee or the Creditors' Committee request or seek funding in excess of an amount that would cause the Cash Reserve Account to exceed (at any time) more than $10 million; provided, further, that, should the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative seek Bankruptcy Court intervention as set forth above, no further funding of the Cash Reserve Account from Net Proceeds from Total Assets shall occur unless (i) all parties agree to a partial funding, or (ii) the Bankruptcy Court enters an order allowing for further funding.

(8)     For the avoidance of doubt, Distributions in respect of a Settled Administrative Expense Claim shall not exceed 75% of the amount of the Allowed Settled Administrative Expense Claim; provided, that, in no scenario shall percentage recoveries on account of Allowed General Unsecured Claims exceed percentage recoveries on account of Settled Administrative Expense Claims.

b.     ***Administrative Expense Claims Representative***. Pursuant to the Administrative Expense Claims Consent Program and upon entry of the Confirmation Order, a representative of holders of Administrative Expense Claims (the "**Admin Representative**") (selected solely by the holders of Administrative Expense Claims, including the Ad Hoc Vendor Group) shall serve alongside the Debtors' Restructuring Committee and the Creditors' Committee to work through 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions and to ensure an expedient and fair process to claims resolution and emergence (the "**Scope of Mandate**"). The Admin Representative shall also serve on the Pre-Effective Date Committee as set forth above with such Scope of Mandate, and will be entitled to applicable insurance coverage provided and paid for by the Debtors. To the maximum extent permitted by law, the Admin Representative will not

WEIL:\97210100\1\73217.0004

have or incur, and shall be released and exculpated from any claim, obligation, suit, judgment, damages, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the date the Admin Representative joins the Debtors' Restructuring Committee or Pre-Effective Date Committee, as applicable, in its limited capacity, in connection with or arising out of its Scope of Mandate, solely to the extent occurring in its capacity as the Admin Representative, except for acts or omissions of the Admin Representative that constitute fraud, gross negligence, criminal misconduct or willful misconduct as determined by a Final Order. The Admin Representative shall also receive reasonable compensation as determined by the Debtors, Creditors' Committee, and the Ad Hoc Vendor Group.

c.  ***Funding from the Carve-Out Account.*** Within three (3) business days of entry of the Confirmation Order, the Debtors shall transfer a minimum of $2 million from the Carve-Out Account (the "**Carve-Out Contribution**") into a separately segregated account ("**Segregated Account**") to be used solely on account of the Initial Distribution (as defined below) and subsequent distributions to holders of Settled Administrative Expense Claims.

d.  ***Litigation Funding / Cash Reserve.*** Within three (3) business days of entry of the Confirmation Order and contemporaneously with funding of the Segregated Account and the Initial Cash Pool (each as defined below), the Debtors shall have set aside (i) $15 million in a segregated account (the "**Litigation Funding Account**") for the funding of litigation associated with the Jointly Asserted Causes of Action (as defined in the proposed Confirmation Order) (the "**Litigation Funding**") and (ii) $5 million of additional cash in a segregated account (the "**Cash Reserve Account**") for post-Confirmation estate costs including, without limitation, additional professional fees of the Debtors' and the Creditors' Committee not included in the Carve-Out Account as of the entry of the Confirmation Order (the "**Cash Reserve**").

e.  ***Agreements of the Holders of Settled Administrative Expense Claims***. Holders of Settled Administrative Expense Claims shall at no further cost (severally and not jointly): (1) use good faith efforts to implement the Administrative Expense Claims Consent Program; (2) support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate confirmation of the Plan, including withdrawing any applicable objections and any other pleading inconsistent with the Administrative Expense Claims Consent Program and/or confirmation of the Plan; provided, that, to the extent the Bankruptcy Court does not approve the Administrative Expense Claims Consent Program, the Debtors shall cause the confirmation hearing to be adjourned to a date and time that is reasonably acceptable to the Debtors, Creditors' Committee, and counsel for the Ad Hoc Vendor Group, and the rights of all Settlement Parties are reserved, including the rights of the non-Debtor Settlement Parties to contest Confirmation; (3) support the confirmation of the

29

Plan and not object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan; provided, that, the same proviso in paragraph 2 shall apply; (4) vote all Claims to Accept the Plan if applicable; (5) not use, assign, convey, grant, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Settled Administrative Expense Claims, provided that, once the Confirmation Order is entered, holders of Settled Administrative Expense Claim may transfer Settled Administrative Expense Claims (i) to any holder of Settled Administrative Expense Claims or (ii) to a party that delivers a joinder, in the form attached hereto as Exhibit 1, to the Debtors, Weil Gotshal & Manges LLP and Akin Gump Strauss Hauer & Feld LLP (in accordance with the notice provisions in the Plan) at least two (2) business days prior to the settlement of the relevant transfer; with respect to any transfers effectuated in accordance with clause (ii) above, such transferee shall be deemed a holder of a Settled Administrative Expense Claim; for the avoidance of doubt, any Administrative Expense Claims purchased by a holder of Settled Administrative Expense Claims shall be deemed subject to the terms of the Administrative Expense Claims Consent Program; and (6) not object to or opt out of any release included in the Administrative Expense Claims Consent Program.

f.      ***Releases***.  The Administrative Expense Claims Consent Program shall include certain consensual releases of Claims and Causes of Action amongst the Settlement Parties; for the avoidance of doubt, the Administrative Expense Claims Consent Program shall not release any Specified Causes of Action.

53.      The Opt-In/Opt-Out Procedures, as described below, are approved.  The

Opt-In/Opt-Out Procedures may be modified with the written consent (such consent not to

unreasonably be withheld) of all of the Administrative Expense Claims Consent Program Parties

to facilitate the opt-in and opt-out processes.

a.      Upon entry of the Order, Prime Clerk LLC will: send both an (i) opt-in ballot (the "**Opt-In Ballot**") and (ii) opt-out ballot (the "**Opt-Out Ballot**") to (x) all parties that have filed an Administrative Expense Claim or filed an application for administrative expense in the Debtors' Chapter 11 Cases and (y) any party that was exempted from filing an Administrative Expense Claim but the Debtors are aware of such Claim; the Opt-In Ballot and Opt-Out Ballot will be sent to the address provided on such Administrative Expense Claim form or application for administrative expense or, if no such form exists, the address on the Debtors' books and records;

b.      Upon entry of the Confirmation Order, Prime Clerk LLC shall cause the notice of the Administrative Expense Claims Consent

30

Program (the "**Administrative Expense Claims Consent Program Notice**"), substantially in the form attached hereto as **Exhibit B**, to be published in *The New York Times*;

c.  Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 17 days from the date of service to submit an Opt-In Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-In Ballot; and

Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 33 days from the date of service (the "**Opt-Out Deadline**") to submit an Opt-Out Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-Out Ballot (together, the "**Opt-In/Opt-Out Procedures**").

54.     The Opt-In Ballot and the Opt-Out Ballot, substantially in the form attached hereto as **Exhibit C**, are hereby approved.  The Opt-Out Ballot clearly states that any party that exercises its right to opt out will not be entitled to any recovery from the Administrative Expense Claims Consent Program and that any party that does not opt out of the Administrative Expense Claims Consent Program will be bound by its terms, including to support a Plan.

55.     To the extent a holder of an Allowed Administrative Expense Claim **does not properly opt out** of the Administrative Expense Claims Consent Program, such holder shall be deemed to have agreed (a) to be bound by the terms of the Administrative Expense Claims Consent Program, (b) to support the Plan, and (c) that such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code.

56.     Any Distributions made on account of Settled Administrative Expense Claims shall not be subject to disgorgement, including without limitation, upon any conversion

31

or dismissal of the Chapter 11 Cases.  Further, upon entry of this Confirmation Order, all Settled

Administrative Expense Claims shall be Allowed against the Debtors in these Chapter 11 Cases

on a consolidated basis, or upon any conversion or dismissal of the Chapter 11 Cases.

**M.      Insurance Policy Matters**

57.      For the avoidance of doubt, pursuant to Section 13.4 of the Plan,

notwithstanding anything to the contrary in the Plan, the Definitive Documents, the Plan

Supplement, any other documents related to any of the foregoing, and this Confirmation Order,

the automatic stay of section 362(e) of the Bankruptcy Code and the injunctions set forth in the

Plan, to the extent applicable, shall be deemed lifted without further order of this Court, solely to

permit former directors and officers of Sears Canada to make claims under any D&O Policy and

any insurers to make related payments under such policies with respect to such claims.

58.      For the avoidance of doubt, Insurance Contracts assumed by the Debtors

and assigned to Transform as authorized by order of the Bankruptcy Court pursuant to the Asset

Purchase Agreement are not subject to section 13.4 of the Plan.

**N.      Miscellaneous**

59.      In the event of any conflict between the terms and provisions in the Plan

and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other

instrument or document created or executed pursuant to the Plan, or any order (other than this

Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements,

or amendments to any of the foregoing), the Plan shall govern and control; *provided* that, in the

event of a conflict between the Liquidating Trust Agreement, on the one hand, and any of the

Plan, the Plan Supplement or the Definitive Documents, on the other hand, the Liquidating Trust

Agreement shall govern and control in all respects relating to the Liquidating Trust; *provided*

*further* that, in the event of a conflict between this Confirmation Order, on the one hand, and any

of the Plan, the Plan Supplement (other than as set forth herein with respect to the Liquidating

Trust Agreement), the Definitive Documents, on the other hand, this Confirmation Order shall

govern and control in all respects.

60.    The continued payment of Allowed Professional Fees from the Carve-Out

Account in accordance with the DIP Order and the *Order Authorizing Procedures for Interim*

*Compensation and Reimbursement of Expenses of Professionals* (ECF No. 796) is hereby

approved.

61.    Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of

this Confirmation Order will be effective and enforceable immediately upon its entry.

62.    Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and

notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this

Court, except as otherwise provided in the Plan or herein, shall retain jurisdiction over all matters

arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by

law, including, but not limited to, the matters set forth in Article XVI of the Plan.

63.    Except as otherwise may be provided in the Plan or herein, notice of all

subsequent pleadings in these cases after the Effective Date shall be limited to the following

parties: (i) the Liquidating Trust and its counsel; (ii) the U.S. Trustee; and (iii) any party known

to be directly affected by the relief sought.

Dated: _____, 2019
           White Plains, New York


                                        _____
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

33

**Exhibit A**

**Plan**

## **Exhibit B**

**Administrative Expense Claims Consent Program Notice**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                                            :
**In re**                                                   :          **Chapter 11**
                                                            :
**SEARS HOLDINGS CORPORATION,** *et al.,*                   :          **Case No. 18-23538 (RDD)**
                                                            :
                                **Debtors.**[1]              :          **(Jointly Administered)**
                                                            :
----------------------------------------------------------------x

## NOTICE OF ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM
## AND OPT-IN / OPT-OUT PROCEDURES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that:

1.        On [●], 2019, the *Order Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation And Its Affiliated Debtors* (ECF No. [●]) (the "**Confirmation Order**") was entered by the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York (the "**Court**").[2]

2.        The Confirmation Order approves the Administrative Expense Claims Consent Program, the Opt-In/Opt-Out Procedures, the opt-in ballot (the "**Opt-In Ballot**"), and the opt-out ballot (the "**Opt-Out Ballot**") attached as Exhibit D and Exhibit E, respectively, to the Confirmation Order.

3.        All Holders of Administrative Expense Claims who **(i) affirmatively *opt-in* to the Administrative Expense Claims Consent Program or (ii) *do not opt-out* of the Administrative Expense Claims Consent Program** (together, the "**Settled Admin Claims**") will receive the treatment described in paragraph 52(a) of the Confirmation Order, including a maximum recovery of **75%** of the Allowed amount of their Settled Admin Claims:[3]

> a.    Holders of Allowed Administrative Expense Claims **who affirmatively opt-in** (the "**Opt-In Settled Admin Claims**") to the Administrative Expense Claims Consent Program on a timely basis shall receive, among other things: (i) their pro rata share of $20 million ("**Initial Cash Pool**"), on or about December 1, 2019 (the percentage recovery, the "**Initial Recovery**"); provided, that, such $20 million shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claims, provided, further, that, holders who do not agree with the Debtors on the Allowed amount of Opt-In Settled Admin Claims shall be deemed to hold a Non Opt-Out Settled Admin Claim (defined below); and (ii) consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot.

> b.    Subject to the satisfaction of the Minimum Conditions,[4] holders of Administrative Expense Claims that **do not timely opt out** of the Administrative Expense Claims Consent Program (the "**Non Opt-Out Settled Admin Claims**") shall receive, among other things: (i) their pro rata share of the Second Distribution[5] capped at 75% of the Allowed Administrative Expense Claim; and (ii) consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confirmation Order or the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. [●]) (as may be amended from time to time, the "**Plan**").

[3] This statement is qualified in its entirety by reference to paragraph 52(a) of the Confirmation Order.

[4] "**Minimum Conditions**" means (i) funding of a total of $25 million into the Litigation Funding Account in the aggregate, (ii) a funding of $10 million in the aggregate in the Cash Reserve Account, and (iii) until the Segregated Account has an additional $10 million in cash.

[5] "**Second Distribution**" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery; provided, that, for the avoidance of doubt, there shall be no Second Distribution until the Minimum Conditions are satisfied.

WEIL:\97186373\9\73217.0004

date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Opt-Out Deadline.

c.   The Debtors and the Creditors' Committee may, on a case-by-case basis, also waive or settle any preference action for Settled Admin Claims.

d.   Thereafter, holders of Settled Admin Claims shall receive pro rata distribution on account of Settled Admin Claims up to 75% of the consensually agreed up amount.

4.       All Holders of Administrative Expense Claims *who do not opt out* of the Administrative Expense Claims Consent Program will be deemed to be satisfied in full on account of such claim once they have received payment in cash equal to 75% of the Allowed amount of such Administrative Expense Claim.   Holders of Administrative Expense Claims' consent to the Administrative Expense Claims Consent Program will also be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code.

5.       Settled Administrative Expense Claims will benefit from expedited reconciliation of the Allowed amount of their Administrative Expense Claim, to be completed within 30 days from the applicable deadline with an opportunity to settle preference claims and assurance that any distributions made to holders of Administrative Expense Claims who settle cannot be clawed back.

6.       Holders of Administrative Expense Claims who affirmatively opt-out of the Administrative Expense Claims Consent Program (the "**Non-Settled Administrative Expense Claims**") will retain the right to receive payment of the Allowed 100% of their Administrative Expense Claims, but payment of their Administrative Expense Claims shall be made on the later of the Effective Date and the date when such Administrative Expense Claim is Allowed in accordance with the Plan.[6]

7.       All holders of Administrative Expense Claims shall receive an Opt-In Ballot and an Opt-Out Ballot.

8.       To **opt-in** to the Administrative Expense Claims Consent Program, holders of Administrative Expense Claims must complete and return to Prime Clerk LLC (the "**Claims and Noticing Agent**") so that the Opt-In Ballot is **actually received on or before [DATE], 2019, at 4:00 p.m.**, prevailing Eastern Time.

9.       To **opt-out** of the Administrative Expense Claims Consent Program, holders of Administrative Expense Claims must complete and return to the Claims and Noticing Agent so that the Opt-Out Ballot is **actually received on or before [DATE], 2019, at 4:00 p.m.**, prevailing Eastern Time.

10.      **If you do not take any action, you will be deemed to be bound by the Administrative Expense Claims Consent Program, but not entitled to any benefits that will be provided to Holders of Administrative Expense Claims who timely opt in to the Administrative Expense Claims Consent Program, *i.e.*, you will not participate in the Initial Distribution.**

---

[6] This sentence is qualified by reference to Section 2.1 of the Plan.

11.     Any party that believes they are a holder of an Administrative Expense Claim but did not receive an Opt-In Ballot or Opt-Out Ballot may request either such ballot from the Claims and Noticing Agent at (844) 384-4460 or searsinfo@PrimeClerk.com, and both ballots are available for download at https://restructuring.primeclerk.com/sears.

> Copies of the Confirmation Order, the Plan, the Opt-In Ballot, the Opt-Out Ballot, and related documents may be obtained by request to the Claims and Noticing Agent at (844) 384-4460 or searsinfo@PrimeClerk.com, and are available for download at https://restructuring.primeclerk.com/sears.

Dated:  _____, 2019
        New York, New York

_____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Attorneys for Debtors*
*and Debtors in Possession*

4

**<u>Exhibit C</u>**

**Opt-In/Opt-Out Ballots**

WEIL:\97210100\1\73217.0004

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
SEARS HOLDINGS CORPORATION, et al.,       :    Case No. 18-23538 (RDD)
                                          :
            Debtors.¹                     :    (Jointly Administered)
                                          :
-----------------------------------------------------------------x
```

NOTICE OF
(I) BALLOT TO OPT-IN TO ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM AND
(II) BALLOT TO OPT-OUT OF ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS CAREFULLY BEFORE
COMPLETING THE (I) OPT-IN BALLOT ATTACHED HERETO AS EXHIBIT A OR
(II) THE OPT-OUT BALLOT ATTACHED HERETO AS EXHIBIT B.

IF YOU DO NOT TAKE ANY ACTION, YOU WILL BE DEEMED TO BE BOUND BY THE
ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, BUT NOT ENTITLED TO THE
BENEFITS THAT WILL BE PROVIDED TO HOLDERS OF ADMINSTRATIVE EXPENSE CLAIMS
WHO TIMELY OPT IN TO THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, AS
DESCRIBED BELOW.

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order Directing Joint Administration of Related Chapter 11 Cases* (ECF No. 118). The location of the Debtors' service address is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

---

**IN ORDER FOR YOUR OPT-IN BALLOT TO BE EFFECTIVE,
THE OPT-IN BALLOT MUST BE ACTUALLY RECEIVED BY
[DATE], 2019, AT 4:00 P.M. (PREVAILING EASTERN TIME)
(THE "CONSENT PROGRAM OPT-IN DEADLINE").**

FAILURE TO OPT-IN TO THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM
BY COMPLETING AND TIMELY SUBMITTING AN OPT-IN BALLOT MEANS YOU WILL NOT BE
ENTITLED PARTICIPATE IN TO THE INITIAL DISTRIBUTION (AS DEFINED HEREIN).

BUT, IF YOU DO NOT TIMELY SUBMIT AN OPT-OUT BALLOT, YOU WILL STILL BE BOUND BY
THE ADMINISTRATIVE EXPENSE CLAIM CONSENT PROGRAM.

---

**IN ORDER FOR YOUR OPT-OUT TO BE EFFECTIVE,
THE OPT-OUT BALLOT MUST BE ACTUALLY RECEIVED BY
[DATE], 2019, AT 4:00 P.M. (PREVAILING EASTERN TIME)
(THE "CONSENT PROGRAM OPT-OUT DEADLINE").[2]**

FAILURE TO OPT-OUT OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM
BY COMPLETING AND TIMELY SUBMITTING AN OPT-OUT BALLOT WILL
BIND YOU TO THE TERMS OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM.

---

On [DATE], 2019, the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order confirming the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* [ECF No. [•]] (the "**Plan**"),[3] approving, among other things, a proposed consent program for holders of Administrative Expense Claims (the "**Administrative Expense Claims Consent Program**") by and among the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), the Creditors' Committee and the Ad Hoc Vendor Group[4] [ECF No. [•]] (the "**Confirmation Order**").[5]

You are receiving the opt-in ballot (the "**Opt-In Ballot**"), attached hereto as **Exhibit A**, and the opt-out ballot (the "**Opt-Out Ballot**" and together with the Opt-In Ballot, the "**Election Ballots**"), attached hereto as **Exhibit B**, because, as a Holder of an Administrative Expense Claim,[6] you are entitled to opt-in to or opt-out of the Administrative Expense Claims Consent Program.

**If you do not take any action, you will be deemed to be bound by the Administrative Expense Claims Consent Program, but not entitled to any benefits that will be provided to Holders of Administrative Expense Claims who timely opt in to the Administrative Expense Claims Consent Program, namely, participation in an initial distribution of $20 million on or about December 1, 2019 to all holders of Administrative Expense Claims who opt in to the Administrative Expense Claims Consent Program.**

All Holders of Administrative Expense Claims (other than the Ad Hoc Vendor Group that is deemed to have opted in) have an option to opt-in to or opt-out of the Administrative Expense Claims Consent Program and releases

---

[2] The Consent Program Opt-In Deadline and Consent Program Opt-Out Deadline are together referred to as the "**Consent Program Election Deadlines**."

[3] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confirmation Order or the Plan.

[4] The "**Ad Hoc Vendor Group**" means collectively, Whitebox Asymmetric Partners, LP, Whitebox Multi-Strategy Partners, LP, Hain Capital Investors Master Fund, Ltd., and Cherokee Debt Acquisition, LLC.

[5] Copies of the Plan, Confirmation Order, and the Administrative Expense Claims Consent Program Term Sheet may be accessed free of charge by visiting the website maintained by the Debtors' agent, Prime Clerk, LLC (the "**Claims and Noticing Agent**") at https://restructuring.primeclerk.com/sears.

[6] Specifically, you are receiving the Election Ballots because either (i) the Debtors believe you may be a Holder of an Administrative Expense Claim as of [DATE], 2019 or (ii) you filed a proof of Administrative Expense Claim, filed a motion seeking allowance of an Administrative Expense Claim, or have otherwise asserted an Administrative Expense Claim in these Chapter 11 Cases.

WEIL:\97199745\9\73217.0004

contained therein. **The Creditors' Committee and the Debtors recommend that you <u>affirmatively opt-in</u> to and do <u>not</u> opt-out the Administrative Expense Claims Consent Program.**

All holders of Allowed Administrative Expense Claims **that affirmatively opt-in** (the "**Opt-In Settled Admin Claims**") to the Administrative Expense Claims Consent Program shall receive, among other things:[7]

- Their pro rata share of $20 million ("**Initial Cash Pool**"), capped at 75% of the Allowed Administrative Expense Claim, on or about December 1, 2019 (the percentage recovery, the "**Initial Recovery**"); <u>provided</u>, <u>that</u>, such $20 million shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claims, <u>provided</u>, <u>further</u>, <u>that</u>, holders who do not agree with the Debtors and the Creditors' Committee on the Allowed amount of Opt-In Settled Admin Claims shall be deemed to hold a Non Opt-Out Settled Admin Claim; and

- consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of service; <u>provided</u>, <u>that</u>, to the extent the Debtors, the Creditors' Committee, and the holder of the Opt-In Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of an Opt-In Settled Admin Claim; <u>provided</u>, <u>further</u>, <u>that</u>, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis (the "**Expedited Reconciliation**").

All Holders of an Allowed Administrative Expense Claim against the Debtors who **<u>neither timely (i) opts-in to the Administrative Expense Claims Consent Program nor (ii) opts-out of the Administrative Expense Claims Consent Program</u>** (the "**Non Opt-Out Settled Admin Claims**," and together with the Opt-In Settled Admin Claims, the "**Settled Administrative Expense Claims**") shall receive, among other things:

- its pro rata share of the Second Distribution, capped at 75% of the Allowed Administrative Expense Claim; and

- Expedited Reconciliation to be completed within 30 days from the date of service; <u>provided</u>, <u>that</u>, to the extent the Debtors, the Creditors' Committee, and the holder of the Non Opt-Out Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of a Non Opt-Out Settled Admin Claim; <u>provided</u>, <u>further</u>, <u>that</u>, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

**All Holders of Administrative Expense Claims who do not opt out of the Administrative Expense Claims Consent Program will be deemed to be satisfied in full on account of such claim once they have received payment in cash equal to 75% of the Allowed amount of such Administrative Expense Claim. Any Distributions made on account of Settled Administrative Expense Claims shall not be subject to disgorgement, including without limitation, upon any conversion or dismissal of the Chapter 11 Cases. And upon entry of the Confirmation Order, all Settled Administrative Expense Claims shall be Allowed against the Debtors in these Chapter 11 Cases on a consolidated basis, or upon any conversion or dismissal of the Chapter 11 Cases**

Pursuant to the Administrative Expense Claims Consent Program, holders bound by the Administrative Expense Claims Consent Program shall be paid in the following order of priority: (1) Holders of Opt-In Settled Admin Claims of their pro rata share of the Initial Cash Pool; (2) Holders of Non Opt-Out Settled Admin Claims of their pro rata share up to a percentage recovery equal to the Initial Recovery; and (3) all Holders bound by the Administrative Expense Claims Consent Program of the remaining unpaid amount of their Allowed Administrative Expense Claims capped at 75% such Allowed Administrative Expense Claim.

Each Holder of a Settled Administrative Expense Claim also agrees (1) to support the Plan; and (2) that acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan,

---

[7] The following is an illustrative summary of the benefits of the Administrative Expense Claims Consent Program and is qualified in its entirety by reference to the applicable provisions in the Confirmation Order.

WEIL:\97199745\9\73217.0004

acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code, and agreement to provides the releases included in the Administrative Expense Claims Consent Program.

In order to **opt-in** to the Administrative Expense Claims Consent Program, you must complete, execute, and submit your Opt-In Ballot to the Claims and Noticing Agent so that your Opt-In Ballot is <u>actually</u> <u>received</u> by the Claims and Noticing Agent on or before the Consent Program Opt-In Deadline, which is **[DATE], 2019, at 4:00 p.m.**, **prevailing Eastern Time**.

In order to **opt-out** of the Administrative Expense Claims Consent Program, you must complete, execute, and submit your Opt-Out Ballot to the Claims and Noticing Agent so that your Opt-Out Ballot is <u>actually</u> <u>received</u> by the Claims and Noticing Agent on or before the Consent Program Opt-Out Deadline, which is **[DATE], 2019, at 4:00 p.m.**, **prevailing Eastern Time**.

If you opt-out of the Administrative Expense Claims Consent Program, you will retain the right to receive payment of the Allowed 100% of your Administrative Expense Claim, but payment of your Administrative Expense Claim shall be the later of the Effective Date and when such Administrative Expense Claim is Allowed.[8]

Should you wish to obtain a copy of the Plan, Confirmation Order, the Administrative Expense Claims Consent Program Term Sheet, or any other documents in these Chapter 11 Cases, you should contact the Debtors' Claims and Noticing Agent, Prime Clerk LLC by: (a) visiting the Debtors' restructuring website at: <u>https://restructuring.primeclerk.com/sears</u>; (b) writing to Sears Admin. Exp. Consent Program Ballot Processing, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232; and/or (c) emailing **searsinfo@primeclerk.com**.   You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

**<u>You are strongly encouraged to review the Administrative Expense Claims Consent Program Term Sheet and the Plan before you make an election.  You may wish to seek legal advice concerning the Administrative Expense Claims Consent Program and this Opt-In Ballot.</u>**

**<u>Acceptable Methods to Complete and Submit Your Election Ballots.</u>**  You may elect to opt-in to or opt-out of the Administrative Expense Claims Consent Program by completing and submitting (i) an electronic Opt-In Ballot or Opt-Out Ballot through the dedicated, online portal maintained by the Claims and Noticing Agent ("**E-Ballot**") or (ii) one of the paper-copy Election Ballots (the "**Paper Election Ballots**").  In either case (E-Ballot or Paper Election Ballots), you must submit your Opt-In Ballot or Opt-Out Ballot to the Claims and Noticing Agent so that it is <u>actually</u> <u>received</u> by the Claims and Noticing Agent on or before the respective Consent Program Election Deadlines.

---

[8] This sentence is qualified by reference to Section 2.1 of the Plan.

WEIL:\97199745\9\73217.0004

## EXHIBIT A

**OPT-IN BALLOT**

**PLEASE FOLLOW THESE INSTRUCTIONS FOR SUBMITTING YOUR <u>OPT-IN ELECTION</u>. IF YOU ELECT TO OPT-IN TO THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, PLEASE COMPLETE, SIGN, DATE, AND TRANSMIT THIS OPT-IN BALLOT SO THAT IT IS _ACTUALLY RECEIVED_ BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE [DATE], 2019, AT 4:00 P.M. (PREVAILING EASTERN TIME)**

**YOU MAY RETURN YOUR OPT-IN BALLOT IN THE PRE-ADDRESSED, PRE-PAID RETURN ENVELOPE PROVIDED OR VIA FIRST CLASS MAIL, HAND DELIVERY, OR OVERNIGHT COURIER, TO:**

**SEARS ADMIN. EXP. CONSENT PROGRAM BALLOT PROCESSING
C/O PRIME CLERK LLC
850 THIRD AVENUE, SUITE 412
BROOKLYN, NEW YORK 11232**

| To Submit Your Opt-In Ballot Via E-Ballot |
|---|

To submit your Opt-In via E-Ballot, visit https://restructuring.primeclerk.com/sears. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Opt-In Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your electronic Opt-In Ballot:

**Unique E-Ballot ID#:** _____

E-Ballot is the sole manner in which Opt-In will be accepted via electronic or online transmission. Opt-In Ballots submitted by facsimile, email or other means of electronic transmission will not be valid. Any Opt-In submitted through E-Ballot with the Holder's electronic signature will be deemed to be immediately legally valid and effective

Please complete and submit an electronic Opt-In Ballot for each E-Ballot ID# you receive, as applicable.

Holders who cast an Opt-In using E-Ballot should NOT also submit a Paper Copy.

| To Submit Your Opt-In Ballot Via Paper Copy |
|---|

To submit your Opt-In via Paper Opt-In Ballot, complete items 1, 2, and 3 below and submit your Paper Opt-In Ballot in the pre-addressed, pre-paid return envelope provided or by first-class mail, hand delivery, or overnight courier to:

Sears Admin. Exp. Consent Program Ballot Processing
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, New York 11232

<u>Item 1</u>. **Amount of Administrative Expense Claim(s).**

The undersigned hereby certifies that as of the date of completion of this Opt-In Ballot, the undersigned asserts it was the Holder of an Administrative Expense Claim(s) in the following aggregate amount:[1]

$ _____

---

[1] This amount should represent the amount of your previously-asserted Administrative Expense Claim(s). If the Debtors do not have a specific Administrative Expense Claim amount on file for you, the box in Item 1 of this Opt-In Ballot will be blank. For reference purposes, you should insert the relevant amount of your alleged Administrative Expense Claim; however, for the avoidance of doubt, this Opt-In Ballot is not to be used to assert your Administrative Expense Claim(s). For more information about asserting an Administrative Expense Claim(s), visit the Debtors' case

WEIL:\97199745\9\73217.0004

**Item 2. Administrative Expense Claims Consent Program Election.** You may elect to opt-in to the Administrative Expense Claims Consent Program by checking the box below and returning this Opt-In Ballot to the Claims and Noticing Agent on or before the Consent Program Opt-In Deadline pursuant to the instructions set forth herein. If you return this Opt-In Ballot but do not check the box below or do not return this Opt-In Ballot, you will not be entitled to the Initial Distribution. If you submit multiple Opt-In Ballots, your last timely received Opt-In Ballot shall control. Election to withhold consent is at your option.

☐ **THE HOLDER OF THE ADMINISTRATIVE EXPENSE CLAIM(S) SET FORTH IN ITEM 1 ELECTS TO OPT-IN TO THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM.**

**Item 3. Acknowledgments.** By signing this Opt-In Ballot, the undersigned Holder of an Administrative Expense Claim(s) identified in Item 1 above certifies that (i) it is the Holder of the Administrative Expense Claim(s) identified in Item 1 above or (ii) it has full power and authority to act on behalf of the Holder of the Administrative Expense Claim(s) identified in Item 1 above.

_____
Name

_____
Social Security or Federal Tax I.D. No. (optional)

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Date Completed

**If you elect to opt-in to the Administrative Expense Claims Consent Program, please return your Opt-In Ballot promptly.** If you have any questions regarding this Opt-In Ballot or the procedures for opting out, please contact the Debtors' Claims and Noticing Agent, by: (a) visiting the Debtors' restructuring website at: https://restructuring.primeclerk.com/sears; (b) writing to Sears Admin. Exp. Consent Program Ballot Processing, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232; and/or (c) emailing **searsinfo@primeclerk.com**.

> If the Claims and Noticing Agent does **not** actually receive the Opt-In Form on or before [DATE], 2019, at 4:00 p.m., prevailing Eastern Time indicating your intent to opt-in to the Administrative Expense Claims Consent Program (and if the Consent Program Opt-In Deadline is not extended), your opt-in election will not be effective.

---

website: https://restructuring.primeclerk.com/sears. The Debtors reserve the right to dispute and validate the amount of your asserted Administrative Expense Claim(s).

**<u>EXHIBIT B</u>**

**OPT-OUT BALLOT**

**PLEASE FOLLOW THESE INSTRUCTIONS FOR SUBMITTING YOUR** <u>OPT-OUT ELECTION</u>**.  IF YOU ELECT TO OPT-OUT OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, PLEASE COMPLETE, SIGN, DATE, AND TRANSMIT THIS OPT-OUT BALLOT SO THAT IT IS** *ACTUALLY RECEIVED* **BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE** <u>[DATE], 2019,</u> **AT 4:00 P.M. (PREVAILING EASTERN TIME)**

**IF YOU WOULD LIKE TO RECEIVE THE BENEFITS OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM AND DO NOT WISH TO OPT-OUT OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, YOU DO NOT NEED TO TAKE ANY FURTHER ACTION AT THIS TIME.**

**YOU MAY RETURN YOUR OPT-OUT BALLOT IN THE PRE-ADDRESSED, PRE-PAID RETURN ENVELOPE PROVIDED OR VIA FIRST CLASS MAIL, HAND DELIVERY, OR OVERNIGHT COURIER, TO:**

**SEARS ADMIN. EXP. CONSENT PROGRAM BALLOT PROCESSING**
**C/O PRIME CLERK LLC**
**850 THIRD AVENUE, SUITE 412**
**BROOKLYN, NEW YORK 11232**

---

**To Submit Your Opt-Out Ballot Via E-Ballot**

To submit your Opt-Out via E-Ballot, visit https://restructuring.primeclerk.com/sears.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Opt-Out Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your electronic Opt-Out Ballot:

**Unique E-Ballot ID#:** _____

E-Ballot is the sole manner in which Opt-Out will be accepted via electronic or online transmission.  Opt-Out Ballots submitted by facsimile, email or other means of electronic transmission will not be valid.  Any Opt-Out submitted through E-Ballot with the Holder's electronic signature will be deemed to be immediately legally valid and effective

Please complete and submit an electronic Opt-Out Ballot for each E-Ballot ID# you receive, as applicable.

Holders who cast an Opt-Out using E-Ballot should NOT also submit a Paper Copy.

**To Submit Your Opt-Out Ballot Via Paper Copy**

To submit your Opt-Out via Paper Opt-Out Ballot, complete items 1, 2, and 3 below and submit your Paper Opt-Out Ballot in the pre-addressed, pre-paid return envelope provided or by first-class mail, hand delivery, or overnight courier to:

Sears Admin. Exp. Consent Program Ballot Processing
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, New York 11232

WEIL:\97199745\9\73217.0004

**Item 1.  Amount of Administrative Expense Claim(s).**

The undersigned hereby certifies that as of the date of completion of this Opt-Out Ballot, the undersigned asserts it was the Holder of an Administrative Expense Claim(s) in the following aggregate amount:[1]

$ _____

**Item 2. Administrative Expense Claims Consent Program Election.** You may elect to opt-out of the Administrative Expense Claims Consent Program by checking the box below and returning this Opt-Out Ballot to the Claims and Noticing Agent on or before the Consent Program Opt-Out Deadline pursuant to the instructions set forth herein.  If you return this Opt-Out Ballot but do not check the box below or do not return this Opt-Out Ballot, you will be bound by the Administrative Expense Claims Consent Program.  If you submit multiple Opt-Out Ballots, your last timely received Opt-Out Ballot shall control.  Election to withhold consent is at your option.

☐  **THE HOLDER OF THE ADMINISTRATIVE EXPENSE CLAIM(S) SET FORTH IN ITEM 1 ELECTS TO OPT-OUT OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM.**

**Item 3. Acknowledgments.** By signing this Opt-Out Ballot, the undersigned Holder of an Administrative Expense Claim(s) identified in Item 1 above certifies that (i) it is the Holder of the Administrative Expense Claim(s) identified in Item 1 above or (ii) it has full power and authority to act on behalf of the Holder of the Administrative Expense Claim(s) identified in Item 1 above.

_____
Name

_____
Social Security or Federal Tax I.D. No. (optional)

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Telephone Number

_____
Email Address

_____
Date Completed

---

[1] This amount should represent the amount of your previously-asserted Administrative Expense Claim(s).  If the Debtors do not have a specific Administrative Expense Claim amount on file for you, the box in Item 1 of this Opt-Out Ballot will be blank.  For reference purposes, you should insert the relevant amount of your alleged Administrative Expense Claim; however, for the avoidance of doubt, this Opt-Out Ballot is not to be used to assert your Administrative Expense Claim(s).  For more information about asserting an Administrative Expense Claim(s), visit the Debtors' case website: https://restructuring.primeclerk.com/sears.  The Debtors reserve the right to dispute and validate the amount of your asserted Administrative Expense Claim(s).

WEIL:\97199745\9\73217.0004

**If you elect to opt-out of the Administrative Expense Claims Consent Program, please return your Opt-Out Ballot promptly.**   If you have any questions regarding this Opt-Out Ballot or the procedures for opting out, please contact the Debtors' Claims and Noticing Agent, by: (a) visiting the Debtors' restructuring website at: https://restructuring.primeclerk.com/sears; (b) writing to Sears Admin. Exp. Consent Program Ballot Processing, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232; and/or (c) emailing **searsinfo@primeclerk.com**.

> If the Claims and Noticing Agent does **not** actually receive the Opt-Out Ballot on or before [DATE], 2019, at 4:00 p.m., prevailing Eastern Time indicating your intent to opt-out of the Administrative Expense Claims Consent Program (and if the Consent Program Opt-Out Deadline is not extended), your opt-out election will not be

WEIL:\97199745\9\73217.0004

**Exhibit C**

**Redline of Proposed Confirmation Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
In re                                                        :        **Chapter 11**
                                                             :
**SEARS HOLDINGS CORPORATION,** *et al.*,                    :        **Case No. 18-23538 (RDD)**
                                                             :
       **Debtors.**[1]                                       :        **(Jointly Administered)**
                                                             :
-------------------------------------------------------------x

### ORDER (I) CONFIRMING MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS AND (II) GRANTING RELATED RELIEF

Upon the filing by Sears Holdings Corporation and its affiliated debtors (collectively, the "**Debtors**") of the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4476) (as amended, supplemented, or modified in accordance with its terms, the "**Plan**") which is annexed hereto as Exhibit A,,[2] and the Court previously having approved the *Disclosure Statement for Second*

---

[1]    The Debtors in the Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]    Capitalized terms used in this order (this "**Confirmation Order**") but not otherwise defined herein shall have

*Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated May 28, 2019 (ECF No. 4042) (as transmitted to parties in interest, and as modified by the *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, dated July 9, 2019 (ECF No. 4478), the "**Disclosure Statement**" and the Debtors having filed the *Notice of Filing of Exhibits to the Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, whereby the Plan Settlement Liquidation Analysis and the Toggle Plan Liquidation Analysis were annexed thereto, on May 28, 2019 (ECF No. 4060) (each, as further amended or modified)) and the solicitation procedures related to the Disclosure Statement and the solicitation of acceptances and rejections of the Plan, in each case pursuant to the *Order (I) Approving Disclosure Statement, (II) Establishing Notice and Objection Procedures for Confirmation of the Plan, (III) Approving Solicitation Packages and Procedures for Distribution Thereof, (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan, and (V) Granting Related Relief* (ECF No. 4392) (the "**Disclosure Statement Order**"); and the Debtors having served the Disclosure Statement on the Holders of Claims and Interests pursuant to the Disclosure Statement Order, *see Affidavit of Service* (ECF No. 4443); and the Debtors having filed the documents comprising the Plan Supplement on July 26, 2019 ~~and~~, August 2, 2019, and October 1, 2019 (ECF Nos. 4632, 4703, 5295) (as may be further amended or supplemented, the "**Plan Supplement**"); and this Court having considered the record in the Chapter 11 Cases, the stakeholder support for the Plan evinced on the record and in the *Declaration of Craig E. Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and*

---

the meanings ascribed to such terms in the Plan or Disclosure Statement.  Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

2

*Tabulation of Ballots Cast on the Second Amended Joint Plan of Sears Holdings Corporation and Its Affiliated Debtors*, filed on September 13, 2019 (ECF No. 5137) (the "**Voting Certification**"), the compromises and settlements embodied in and contemplated by the Plan, the briefs and arguments regarding confirmation of the Plan, the evidence regarding confirmation of the Plan, and a hearing on confirmation of the Plan having commenced on ~~September 18~~October 3, 2019 [and continued thereafter] (the "**Confirmation Hearing**"); and after due deliberation:

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and venue is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The Plan satisfies the requirements for confirmation of section 1129 of the Bankruptcy Code by a preponderance of evidence.

C.    The Plan was solicited in good faith and in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order.  The Debtors participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered under the Plan, and therefore are entitled to the protections of section 1125(e) of the Bankruptcy Code.

D.    The Plan has been proposed in good faith and not by any means forbidden by law.  In so finding, this Court has considered the totality of the circumstances of these cases, the formulation and negotiation of the Plan and all modifications thereto, the Plan Settlement,

---

[3]    All findings of fact and conclusions of law announced by this Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order to the extent not inconsistent herewith.  Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law.  Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

the PBGC Settlement, ~~and~~ the Creditors' Committee Settlement, and the Administrative Expense Claims Consent Program (as defined below).  The Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.

E.    The Plan is "fair and equitable" with respect to the Classes that are impaired and are deemed to reject the Plan, because no Class senior to any rejecting Class is being paid more in full and the Plan does not provide a recovery on account of any Claim or Interest that is junior to such rejecting Classes unless and until such rejecting Class is paid in full.

F.    The releases contained in Section 15.9 of the Plan are an essential component of the Plan and appropriate.  The Third Party Release contained in Section 15.9(b) of the Plan is consensual because all parties to be bound by such release were entitled to vote, given due and adequate notice of the release and sufficient opportunity and instruction to elect to opt out of such release if they rejected the Plan or abstained from voting on the Plan.  Good and valid justification have been demonstrated in support of the Debtor Release and the PBGC Release.  Accordingly, the releases contained in Section 15.9 of the Plan are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims or Causes of Action released by Section 15.9 of the Plan; (c) in the best interests of the Debtors, their Estates, the Liquidating Trust, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; and (e) given and made after due notice and opportunity for hearing.

G.    The exculpation provided by Section 15.10 the Plan for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of these cases.

4

H.   The Plan does not discriminate unfairly among the different classes of unsecured creditors because grounds and justifications exist for treating the classes differently in these cases, including implementation of the Global Settlement, including the Plan Settlement and the PBGC Settlement.

I.   The Plan is dependent upon and incorporates the terms of compromises and settlements, which include the Plan Settlement, the PBGC Settlement, and the Creditors' Committee Settlement, which settlements were negotiated in good faith and at arm's length and are each, individually essential elements of the Plan.  The Plan Settlement, the PBGC Settlement, and the Creditors' Committee Settlement are fair, equitable, reasonable, and in the best interests of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and satisfy the standards for approval under Bankruptcy Rule 9019.

J.   The Administrative Expense Claims Consent Program was negotiated at arm's length and in good faith among the Administrative Expense Claims Consent Program Parties (as defined below), and is a proper exercise of the Debtors' business judgment.  Those parties who do not opt out shall be deemed to have consented to the treatment set forth in the Administrative Expense Claims Consent Program pursuant to Section 2.1 of the Plan.  The Administrative Expense Claims Consent Program is fair, equitable, reasonable, and in the best interest of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and, to the extent applicable, satisfies the standards for approval under Bankruptcy Rule 9019. The Opt-In/Opt-Out Procedures, as described herein, provide adequate procedures to solicit opt-out votes from Holders of Administrative Expense Claims with respect to the Administrative Expense Claims Consent Program.

K.  ~~J.~~ The DIP Order has not been terminated and continues to govern. The Debtors have acted in good faith in funding the Carve-Out Account and amounts held therein shall be available only for the payment of Allowed Professional Fees in accordance with the DIP Order.

L.  ~~K.~~ This Court may properly retain jurisdiction over the matters set forth in Article XVI of the Plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED THAT:**

**A.    Confirmation of the Plan**

1.    The Plan and each of its provisions is approved and the Plan is confirmed pursuant to section 1129 of the Bankruptcy Code.

2.    Any and all objections to and reservations of rights in respect of the Plan that have not been withdrawn, waived or resolved prior to the Confirmation Hearing are hereby denied and overruled on the merits with prejudice.

3.    The documents contained in the Plan Supplement, and any amendments, modifications and supplements thereto, are integral to the Plan and are approved by the Court, the Debtors and the Liquidating Trust, as applicable, are authorized to take all actions required under the Plan and the Plan Supplement to effectuate the Plan and the transactions contemplated therein including, without limitation, the implementation of the Wind Down in connection with the Plan.

4.    The terms of the Plan including the Plan Supplement and the Liquidating Trust Agreement, and the exhibits thereto are incorporated herein by reference and are an integral part of the Plan and this Confirmation Order.  The terms of the Plan, the Plan

Supplement, the Liquidating Trust Agreement, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date. The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of this Court that all such documents are approved in their entirety.

5.     Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules. The solicitation of votes on the Plan and the Solicitation Packages complied with the solicitation procedures in the Disclosure Statement Order, were appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules. The Debtors solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

6.     This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan.

7.     Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign or other governmental agency

7

is directed and authorized to accept for filing and/or recording any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

8.      The compromises and settlements set forth in the Plan are approved, including, but not limited to, the PBGC Settlement, the Plan Settlement, and the Creditors' Committee Settlement, and will be effective immediately and binding on all parties in interest on the Effective Date.

9.      The amendments and modifications to the *Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4476) since the filing thereof and incorporated into the Plan, are approved, including ECF No. ~~5139~~5293 (attached hereto as **Exhibit A)**, in accordance with section 1127(a) of the Bankruptcy Code and Rule 3019(a) of the Bankruptcy Rules.  Pursuant to Bankruptcy Rule 3019, these Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

10.     Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be effective immediately on the Effective Date without further order or action by this Court, any of the parties to such release, or any other Entity: (a) Injunction (Section 15.8); (b) Debtor Release (Section 15.9(a)); (c) Third Party Release (Section 15.9(b)); (d) PBGC Release (Section 15.9(c)); and (e) Exculpation (Section 15.10).

11.     In accordance with the Plan and pursuant to this Confirmation Order, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the

8

Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan.

12.     On the Effective Date, all Liquidating Trust Assets of the Debtors shall be transferred to the Liquidating Trust in accordance with Article X of the Plan and all Debtors shall be dissolved without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder(s) or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities.  All directors and officers of the dissolved Debtors shall be deemed to have resigned in their capacity as of the Effective Date.

13.     Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and, in the case of a Secured Claim, satisfaction in accordance with the Plan of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trust and its successors and assigns.  All Holders of Secured Claims are directed to cooperate with the Debtors or the Liquidating Trust, as the case may be, in implementing this paragraph and any administrative details relating thereto.

14.     The Debtors shall file on the docket a notice of the imminent occurrence of the Effective Date no later than twenty (20) days prior to such occurrence of the Effective Date.

15.    ~~14.~~ The Debtors shall cause to be served a notice of the entry of this Confirmation Order~~, substantially in the form attached hereto as **Exhibit** ~~B~~~~and occurrence of the Effective Date~~ (the "**Confirmation Notice**"), upon (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC, and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the ~~entry of this Confirmation Order~~Effective Date, or as soon as reasonably practicable thereafter.  The Debtors shall cause the Confirmation Notice to be published in *The New York Times* within seven (7) business days after the ~~entry of this Confirmation Order~~Effective Date, or as soon as practicable thereafter.

**B.    Immediate Designation of the Litigation Designees and the Granting of Standing for Prosecution of the Jointly Asserted Causes of Action**

16.    ~~15.~~ Pursuant to sections 105(a), 363(b), 1103(c) and 1109(b) of the Bankruptcy Code, the Creditors' Committee shall be granted joint standing with the Debtors and is hereby authorized to investigate, commence, prosecute, settle and otherwise dispose of (i) the Specified Causes of Actions, (ii) other Preserved Causes of Action against the ESL Parties, (iii) all Claims and Causes of Action asserted in the pending Adversary Proceeding captioned *Sears Holdings Corp. v. Lampert*, Adv. Proc. No. 19-08250 (RDD) (Bankr. S.D.N.Y.) (the "**Adversary Proceeding**") and/or any other Claims or Causes of Action ancillary thereto, including, *inter alia*, additional Claims or Causes of Action related to the subject matter of the Adversary Proceeding (including Claims or Causes of Action asserted in an amended complaint and Claims and Causes of Action asserted in one or more separate proceedings) and (iv) Claims or Causes of Action against insurance carriers related to coverage for claims asserted in the Adversary Proceeding or a related proceeding (all of the Claims and Causes of Action addressed

in this paragraph, collectively, the "**Jointly Asserted Causes of Action**") jointly with the Debtors for the benefit of the Debtors' Estates and creditors in accordance with the terms of the Plan with the full rights and privileges attendant thereto.

17.    16. The investigation, prosecution and/or settlement or other disposal of the Jointly Asserted Causes of Action shall be subject to the oversight of designees selected by the Debtors and the Creditors' Committee (the "**Litigation Designees**").   Specifically, the Litigation Designees shall comprise (a) Patrick J. Bartels, (b) Eugene I. Davis, and (c) Raphael T. Wallander, as the Creditors' Committee's designees, and (x) Alan J. Carr and (y) William L. Transier, as the Debtors' designees, which designees shall become the initial members of the Liquidating Trust Board upon the Effective Date pursuant to Section 10.6(a) of the Plan.  Any Litigation Designee who succeeds an initial Creditors' Committee designee shall be considered a Creditors' Committee designee and any Litigation Designee who succeeds an initial Debtor designee shall be considered a Debtor designee.  For the avoidance of doubt, the Litigation Designees shall have all rights and entitlements to be afforded to the Liquidation Trust Board on the Effective Date of the Plan in respect of the Jointly Asserted Causes of Action, including, *inter alia*, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Jointly Asserted Causes of Action pursuant to the terms of the Liquidating Trust Agreement applicable to the Liquidating Trust Board (including, for the avoidance of doubt, section 6.5(c) of the Liquidating Trust Agreement), which terms are incorporated herein by reference and shall govern the acts, conduct and rights of the Litigation Designees prior to the Effective Date.

18.    17. The Litigation Designees will have the sole and exclusive right to propose any settlement of the Jointly Asserted Causes of Action in accordance with the terms of

11

the Liquidating Trust Agreement; *provided* that any such settlement shall be subject to approval by this Court after notice and hearing.

19. ~~18.~~ The authority of the Litigation Designees shall be effective immediately upon entry of this Confirmation Order and shall remain and continue in full force and effect until the Effective Date. The service of the Litigation Designees shall be governed by the conditions to be applicable to the members of the Liquidating Trust Board set forth in Section 6.5(c)(i)-(v) of the Liquidating Trust Agreement.

20. ~~19.~~ Sections 6.5(e), 6.5(f), 6.5(g), 6.5(h), and 6.5(i) of the Liquidating Trust Agreement shall be applicable to the Litigation Designees and govern the operation of the Litigation Designees in the same manner they are intended to govern operation of the Liquidating Trust Board.

21. ~~20.~~ [The Litigation Designees shall be compensated as follows: [_____].]

22. ~~21.~~ In accordance with the terms of the Plan and the Liquidating Trust Agreement, Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") shall be retained as primary litigation counsel to act on behalf of the Litigation Designees to investigate, commence, prosecute, and otherwise litigate the Jointly Asserted Causes of Action. In addition, without further order of this Court, the Litigation Designees may retain such additional professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Initial Litigation Designees to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Jointly Asserted Causes of Action) (collectively with Akin Gump, the "**Litigation Professionals**"). The Litigation Professionals shall be required to submit reasonably detailed invoices on a monthly

12

basis to the Debtors, the Creditors' Committee, the U.S. Trustee and the Litigation Designees, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses.  In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Litigation Professionals, the Litigation Designees and/or the Litigation Professionals may request that this Court resolve the dispute.  The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred by the Litigation Professionals immediately upon entry of this Confirmation Order in the ordinary course and without the need for approval of this Court, subject to the approval of the Litigation Designees.

23.    22.  The protections to be granted to members of the Liquidating Trust Board and the Trust Professionals under Article VIII of the Liquidating Trust Agreement (Reliance, Liability, and Indemnification) shall be equally applicable to the Litigation Designees and the Litigation Professionals for actions taken or not taken by the Litigation Designees and the Litigation Professionals in their capacities as such with respect to their administration and pursuit of the Jointly Asserted Causes of Action.

24.    23.  Pursuant to Federal Rule of Evidence 502(d), any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) (the "**Privileges**" protecting "**Privileged Information**") in the possession of the Debtors (including the Restructuring Subcommittee, any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors, and the Debtors' appointees on the Litigation Designees) or any of their employees, representatives, attorneys or advisors

13

(collectively, the "**Debtor Privilege Parties**") may be shared with Akin Gump, the Creditors'

Committee, the Litigation Designees appointed by the Creditors' Committee or any of their

respective representatives, attorneys or advisors (collectively, the "**Creditor Privilege Parties**,"

and together with the Debtor Privilege Parties, the "**Privilege Parties**") on either or both a joint

representation or common interest privilege basis without waiver of the relevant underlying

privilege; similarly, any Privileged Information in possession of the Creditor Privilege Parties

may be shared with the Debtor Privilege Parties on either or both a joint representation or

common interest privilege basis without waiver of the relevant underlying privilege; *provided*,

*however*, that the ability of the Debtor Privilege Parties to share information protected by any

Privilege, if any, held by the Related Party Transaction Subcommittee of the ~~Restructuring~~Audit

Committee of the Sears Holdings Board of Directors and/or the Special Committee of the Sears

Holdings Board of Directors created on or about April 28, 2018 shall be subject to later

determination.

25.    ~~24.~~ Subject to the limitations of paragraph ~~23~~ 24 above, the Litigation

Designees shall have the exclusive authority and sole discretion to maintain the Privileges and

keep the privileged material confidential, or waive the Privileges and/or disclose and/or use in

litigation of the Jointly Asserted Causes of Action, or any proceeding Privileged Information.

26.    ~~25.~~ Subject to the limitations of paragraph ~~23~~ 24 above, the Privilege

Parties shall take all necessary steps to effectuate the sharing of such Privileges and to provide to

the Litigation Designees without the necessity of a subpoena all information subject to a

Privilege in their respective possession, custody, or control.  The Litigation Designees are further

expressly authorized to formally or informally request or subpoena documents, testimony, or

other information that would constitute Privileged Information from any persons, including

14

attorneys, professionals, consultants, and experts, and no such person may object to the production to the Litigation Designees of such Privileged Information on the basis of a Privilege. Unless and until the Litigation Designees makes a determination to waive any Privilege, Privileged Information shall be produced solely to the Litigation Designees.

27. 26. If a Privilege Party, the Litigation Designees, any of their respective employees, professionals, or representatives or any other person inadvertently produces or discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Designees of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

28. To the maximum extent permitted by applicable law, the Litigation Designees will not have or incur, and shall be released and exculpated from any claim, obligation, suit, judgment, damages, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Confirmation Date, in each Litigation Designee's limited capacity as such, in connection with or arising out of its responsibilities set forth herein, except for acts or omissions that constitute fraud, gross negligence, criminal misconduct or willful misconduct as determined by a Final Order. Further, the Litigation Designees will be entitled to applicable insurance coverage provided and paid for by the Debtors.

## C.      The Liquidating Trust

29.      27. The formation, rights, powers, duties, structure, obligations and other matters pertaining to the Liquidating Trust shall be governed by Article X of the Plan and the Liquidating Trust Agreement.

30.      28. On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, the Liquidating Trust Assets shall be transferred by the Debtors (and deemed transferred) to the Liquidating Trust free and clear of all liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) for the benefit of the Liquidating Trust Beneficiaries, without the need for any Entity to take any further action or obtain any approval.  Thereupon, the Debtors shall have no interest in the Liquidating Trust Assets or the Liquidating Trust.  On the Effective Date, the Liquidating Trust shall be authorized as the representative of the Estates to investigate, sue, settle and otherwise administer the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and the Plan.

31.      29. Upon the Effective Date, the Liquidating Trust is authorized and empowered, without further approval of this Court or any other party, to take such actions and to perform such acts as may be necessary, desirable or appropriate to implement the issuance of the Liquidating Trust Interests in accordance with the Plan and the Liquidating Trust Agreement, and to execute and deliver all agreements, documents, securities, instruments and certificates relating thereto.  All Liquidating Trust Interests issued by the Liquidating Trust pursuant to the provisions of the Plan and the Liquidating Trust Agreement shall be deemed to be duly authorized, validly issued, fully paid and non-assessable.

32.      30. On the Effective Date, pursuant to and as further provided in the Plan and the Liquidating Trust Agreement, all of the Debtors' respective rights, titles and interests in

16

any Privileges (as defined in the Liquidating Trust Agreement) related in any way to the Liquidating Trust Assets and the purpose of the Liquidating Trust shall be treated as provided in the Plan and the Liquidating Trust Agreement.

33.    ~~31.~~ The Liquidating Trustee may, with the approval of, or at the direction of, the Liquidating Trust Board, invest Cash (including any earnings thereon or proceeds therefrom); provided, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings or other controlling authorities.  All monies and other assets received by the Liquidating Trustee as Liquidating Trust Assets (including the proceeds thereof as a result of investment in accordance with Section 6.9 of the Liquidating Trust Agreement) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Liquidating Trust Beneficiaries, and shall not be segregated from other Liquidating Trust Assets, unless and to the extent required by the Plan.

**D.    Certain Executory Contract and Unexpired Nonresidential Leases Matters**

34.    ~~32.~~ Notwithstanding anything to the contrary in the Plan, the Definitive Documents, the Plan Supplement, any other documents related to any of the foregoing, or this Confirmation Order, nothing shall modify the rights, if any, of any holder of Claims or any current or former party to an executory contract, whether currently or previously executory, or lease of non-residential real property to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (i) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease(s) with the Debtors, or any successors to the Debtors, under the

17

Plan; (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Liquidating Trust, or any successors of the Debtors.

35. 33. In accordance with the lease rejection notice filed on July 12, 2019 (ECF No. 4535), and the *Order Approving the Rejection of Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* entered on August 14, 2019 (ECF No. 4836), notwithstanding anything to the contrary in the Plan, the leases for stores located in Pembroke Pines, Florida, Staten Island, New York, and Willowbrook, Wayne, New Jersey (Store Nos. 1775, 1624, and 1434, respectively) will be deemed rejected as of September 30, 2019, and the lease for the store located in Northridge, California (Store No. 1508) will be deemed rejected as of January 15 31, 2020.

36. 34. In accordance with the so-ordered stipulations seeking to extending the time under section 365(d)(4) of the Bankruptcy Code to assume and assign the leases pertaining to Store Nos. 3667, 8290, 1018, and 3127 (the "**Leases**"), filed on July 9, 2019 and July 23, 2019, entered on September 5, August 30, August 5, and September 5, 2019 respectively, (ECF Nos. 4498 5072, 4499 5038, 4747, and 4607 5068), and the orders granting such relief (ECF Nos. 4580, 4581, and 4687), notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Leases shall not be deemed rejected as of the Effective Date.

37. Nothing in the Plan alters any of the terms and provisions of the Construction, Operation, and Reciprocal Easement Agreement, recorded on April 2, 1974, and the Supplemental Agreement for the Hilltop Shopping Center, as referenced in the *LBG Hilltop*

*LLC's Objection to Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliates; and Declaration of Carol Chow*, filed at ECF No. 4680.

38.    [For the avoidance of doubt, the property that is the subject of the ongoing adversary proceeding captioned *Transform Holdco LLC v. Sears Holdings Corporation*, 19-08288 (the "**Fort Lauderdale Action**") seeking the transfer of deeds related to property in Fort Lauderdale, Florida, shall be subject to any and all rights asserted on such property by Transform Holdco LLC in that action.  In addition, the parties are in discussions relating to the transfer of additional parcels of real property relating the following locations:  Glendale, CA (Store No. 1088), Bishop, CA (Store No. 7756), Hialeah, FL (Store No. 31930), and Durham, NC (Store No. 1475) (collectively, the "**Potentially Transferrable Property Interests**").  Each of the parties' rights with respect to the aforementioned actions and properties are hereby fully preserved, including, without limitation that the transfer of each of (x) the property subject to the Fort Lauderdale Action, and (y) the Potentially Transferrable Property Interests to the Liquidating Trust shall be subject to any and all rights that may be asserted on such property interests by Transform Holdco LLC or its affiliates.][4]

E.    **Certain Governmental Unit Matters**

39.    35. As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in the Plan or this Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors, their Estates, or the Liquidating Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Plan and this Confirmation Order are not intended and shall not be

---

[4] The Debtors and Transform are still in the process of negotiating the language in this paragraph.

construed to bar any Governmental Unit from, subsequent to this Confirmation Order, pursuing

any police or regulatory action.

40.    36. Accordingly, notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, nothing in the Plan or this Confirmation Order shall

discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that

is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of

any Governmental Unit arising on or after the Confirmation Date; (3) any valid right of setoff or

recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the

Debtors, their Estates, or the Liquidating Trust under police or regulatory statutes or regulations

to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity

owns, operates or leases after the Confirmation Date.  Nor shall anything in this Confirmation

Order or the Plan:    (i) enjoin or otherwise bar any Governmental Unit from asserting or

enforcing, outside this Court, any liability described in the preceding sentence; or (ii) divest any

court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any

Governmental Unit are discharged or otherwise barred by this Confirmation Order, the Plan, or

the Bankruptcy Code.

41.    37. Moreover, nothing in this Confirmation Order or the Plan shall release

or exculpate any non-debtor, including any Released Parties and/or Exculpated Parties, from any

liability to any Governmental Unit, including but not limited to any liabilities arising under the

Internal Revenue Code, the environmental laws, or the criminal laws against the Released

Parties and/or Exculpated Parties, nor shall anything in this Confirmation Order or the Plan

enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against

any non-debtor for any liability whatsoever; *provided*, *however*, that the foregoing sentence shall

not (x) limit the scope of discharge, if any, granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

42. 38. Nothing contained in the Plan or this Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors, their Estates, or the Liquidating Trust, nor shall the Plan or this Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of thisthe Plan, nor shall anything in thisthe Plan or this Confirmation Order be deemed to have conferred jurisdiction upon this Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

43. 39. Notwithstanding anything contained in the Plan, this Confirmation Order, and any implementing Plan documents, nothing shall (i) preclude the United States Securities and Exchange Commission (the "**SEC**") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

F.    **Toggle Plan Reservation of Rights**

44. 40. In the event this Court does not approve the Plan Settlement, the Debtors or the Liquidating Trustee, as applicable, shall provide notice to all parties in interest not less than thirty (30) days prior to allowing or making any distribution on account of any postpetition Intercompany Claims, and all parties rights are reserved with respect to (i) setoff of

postpetition Intercompany Claims and (ii) the amount and allowance of all prepetition and postpetition Intercompany Claims.

## G.    Texas Taxing Authorities

45.    41.    To the extent that the Texas Taxing Authorities[4] [5] are entitled to interest under section 506(b) of the Bankruptcy Code, the Texas Taxing Authorities shall receive interest from the Commencement Date through the Effective Date, and from the Effective Date through payment in full at the state statutory rate, pursuant to sections 506(b), 511, and 1129 of the Bankruptcy Code.

## H.    Village of Hoffman Estates Reservation of Rights

46.    42.    Notwithstanding Section 10.3 of the Plan or anything else to the contrary in the Plan or Plan Supplement, including the Liquidating Trust Agreement, the Village of Hoffman Estates Reserves the right to dispute that any property that the Village of Hoffman Estates has jurisdiction over does not benefit from section 1146(a) of the Bankruptcy Code and the Debtors or the Liquidating Trust, as applicable, reserves the right to dispute the same.

## I.    Team Worldwide Reservation of Rights

47.    43.    Notwithstanding anything else herein, nothing in the Plan or this Confirmation Order shall be deemed or construed to impact, impair, affect, determine, release, waive, modify, limit or expand: (i) the terms and conditions of any supply agreement (collectively, the "**Supply Agreements**") between a party (an "**Indemnifying Party**") and a Debtor containing a provision or clause that purports to create an obligation of the Indemnifying Party to indemnify, defend against, reimburse, fund, or otherwise be responsible for any

---

[45] [—] The "**Texas Taxing Authorities**" are Anderson County, Bastrop County, Bell TAD, Bosque County, Bowie CAD, Brazos County, Brown CAD, Burnet CAD, Cherokee County, Cherokee CAD, City of Waco, *et al.*, Comal County, Coryell County, Denton County, Erath County, Guadalupe County, Harrison CAD, Harrison County, Hays County, Henderson County, Jasper County Tax Units, Mexia I.S.D., Midland CAD, Taylor CAD, Terry CAD, Wharton County, and Williamson County.

liabilities, damages, losses, or costs associated with any potential claims, suits, actions, or other proceedings seeking judgment against the Debtor or its affiliates (the "**Indemnity Obligations**"); (ii) any of the rights, remedies, defenses to coverage and other defenses of any party under or in respect of any Supply Agreements; (iii) subject to the proviso set forth in the next paragraph, any claims, actions, rights to payment or other similar claims held by Team Worldwide Corporation ("**Team Worldwide**") against any Debtor if covered by the Indemnity Obligations (the "**Covered Claims**"), and (iv) any claims, actions, rights to payment or other similar claims held by Team Worldwide against the Buyer, as a result of post-closing infringement claims. All such rights, remedies, and defenses are expressly reserved and preserved.

48. 44. Notwithstanding anything in the Plan or this Confirmation Order, Team Worldwide is authorized to pursue, in any court of competent jurisdiction, a determination of liability (the "**Infringement Liability**") of the Covered Claims against the Debtors to final judgment and to enforce any resulting judgment against the Indemnifying Parties (the "**Coverage Lawsuit**"); provided, however, that Team Worldwide shall not pursue payment of any Covered Claims from the Debtors or their estates or the Liquidating Trust and shall waive collection of any and all amounts owed to Team Worldwide not satisfied by any Indemnifying Party resulting from all claims filed against the Debtors relating thereto.

49. 45. Following the commencement of the Coverage Lawsuit, the Debtors and/or the Liquidating Trustee shall provide notice to the Indemnifying Parties of the Covered Claims and take such further action reasonably required under the Supply Agreements to have the Indemnifying Parties perform their Indemnity Obligations; provided, however, that (i) neither the Debtors nor the Liquidating Trust  shall be obligated to pay or be liable for any out-

23

of-pocket costs or expenses in connection with such action, and/or (ii) neither the Debtors nor

the Liquidating Trust shall be obligated to participate in the Coverage Lawsuit. For the

avoidance of doubt, and subject in all respects to (i) and (ii) in the preceding sentence, the

Debtors or the Liquidation Trust, as applicable, may be named as a nominal defendant in the

Coverage Lawsuit.

**J.    233 S. Wacker, LLC**

50. 46. Except as provided by the Stipulation, Agreement, and Order Granting

Limited Relief from the Automatic Stay (233 S. Wacker, LLC) (ECF No. 2849), notwithstanding

any provision of the Plan or this Confirmation Order to the contrary, 233 S. Wacker, LLC is

permitted to continue to assert, prosecute, litigate, liquidate, and/or settle its counterclaim and its

claims against the Debtors, their estates, and any successors thereto in Case No. 2016-CH-10308

pending in the Circuit Court of Cook County, Illinois, Chancery Division and reserves all rights

in connection with such proceeding and any payment obligated to be made in connection

therewith. For the avoidance of doubt, the Debtors, their estates and any successor in interest,

including, without limitation, the Liquidating Trust, reserve all rights with respect to any claims

or counterclaims asserted in connection with the action referenced in the preceding sentence and

any and all obligations in connection therewith.

**K.    Administrative Expense Claims**

51. 47. Any motion for allowance or payment of an Administrative Expense

Claim that is pending or filed after the date of the entry of this Confirmation Order (i) shall be

adjourned until a date as determined by the Debtors (in consultation with the Creditors'

Committee) or the Liquidating Trust (as applicable) and in consultation with the applicable

claimant and subject to this Court's availability, and (ii) shall be treated as a proof of an

24

Administrative Expense Claim.  Any discovery requests in connection with any Administrative

Expense Claim shall be adjourned indefinitely, unless the Debtors have objected to the

allowance of such Administrative Expense Claim.  Notwithstanding anything in the Bar Date

Order, any scheduled or requested hearings pursuant to the 503(b)(9) Claim Procedures (as

defined in the Bar Date Order) are hereby cancelled.

**L.**      **Administrative Expense Claims Consent Program**

52.      The compromise and settlement of Administrative Expense Claims (as

defined in the Plan, including 503(b)(1) and 503(b)(9) Claims, but excluding any amounts paid

by Transform on account thereof—including any amounts that otherwise would have been

503(b)(9) Claims but were paid as part of cure obligations in connection with assumed and

assigned contracts) and the treatment thereof (the "**Administrative Expense Claims Consent**

**Program**") by and amongst Debtors and their estates, the Creditors' Committee, a certain ad hoc

group of holders of Administrative Expense Claims (the "**Ad Hoc Vendor Group**") (together

the "**Administrative Expense Claims Consent Program Parties**"), as described herein, is

hereby approved:

a.      ***Settled Administrative Expense Claims Recovery.***  Pursuant to the
terms of the Administrative Expense Claims Consent Program,
holders of Settled Administrative Expense Claims (defined below)
shall receive recoveries from Net Proceeds of Total Assets other
than the Litigation Funding and the Cash Reserve (as more fully
set forth herein) in the following manner and in the following
order of priority until such time as the holders of Settled
Administrative Expense Claims receive a recovery of 75% on
account of their Settled Administrative Expense Claims:

(1)      ***First***, each holder of an Allowed Administrative Expense
Claim against the Debtors that ***affirmatively opts-in*** (the
"**Opt-In Settled Admin Claims**")[6] to the Administrative
Expense Claims Consent Program shall receive: (i) its pro

---

[6]      For the avoidance of doubt, holders of Administrative Expense Claims who execute the Administrative
Expense Claims Consent Program Term Sheet, filed at ECF No. 5292, shall be deemed holders of Opt-In
Settled Admin Claims.

rata share of the Initial Distribution[7] capped at 75% of the Allowed Administrative Expense Claim (the percentage recovery, the "**Initial Recovery**"); provided, that, the Initial Distribution shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors and the Creditors' Committee to the Allowed amount of the Opt-In Settled Admin Claims; provided, further, that, holders who do not agree with the Debtors and the Creditors' Committee on the Allowed amount of the Opt-In Settled Admin Claim shall be deemed to hold a Non Opt-Out Settled Admin Claim; and (ii) consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Opt-In Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of an Opt-In Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

(2)    After the Initial Distribution, a Second Distribution (as defined below) to Settled Administrative Expense Claims shall not occur until each of the following conditions is met:  (i) a total of $25 million has been funded into the Litigation Funding Account in the aggregate,[8] (ii) there has been a funding of $10 million in the aggregate in the Cash Reserve Account, and (iii) the Segregated Account has an additional $10 million in cash (together, the "**Minimum Conditions**").[9]

---

[7]  "**Initial Distribution**" shall mean Distributions made from a cash pool of $20 million inclusive of the Carve-Out Contribution  ("**Initial Cash Pool**") to be held in the Segregated Account and made available on or about December 1, 2019 (the "**Initial Distribution Date**") for holders of Opt-In Settled Admin Claims.  Within three (3) business days following entry of the Confirmation Order, $15 million inclusive of the Carve-Out Contribution shall be funded by the Debtors into the Initial Cash Pool, with an additional $5 million funded by the Debtors into the Initial Cash Pool on or before the Initial Distribution Date.  The Cash Pool shall be placed in the Segregated Account and used solely for the purpose of funding the Settled Administrative Expense Claims as provided for in the Administrative Expense Claims Consent Program Term Sheet.

[8]  For the avoidance of doubt, following the Effective Date, any additional funding for the Jointly Asserted Causes of Action and/or other Preserved Causes of Action shall be determined by the Liquidating Trust Board in accordance with the terms of the Plan and the Liquidating Trust Agreement.

[9]  For the avoidance of doubt, following the Initial Distribution, it shall be a requirement that the Cash Reserve Account have $10 million in available cash and the Segregated Account has at least an additional $10 million in cash prior to any further distributions on account of Settled Administrative Expense Claims.

(3)    *Second*, once the Minimum Conditions are satisfied, each holder of an Allowed Administrative Expense Claim against the Debtors that *does not opt-out* (the "**Non Opt-Out Settled Admin Claims**," together with the Opt-In Settled Admin Claims, shall be considered "**Settled Administrative Expense Claims**") of the Administrative Expense Claims Consent Program shall then receive (i) its pro rata share of the Second Distribution[10] capped at 75% of the Allowed Administrative Expense Claim; and (ii) consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Opt-Out Deadline; provided, that, to the extent the Debtors, the Creditors' Committee, and the holder of the Non Opt-Out Settled Admin Claim are unable to consensually resolve the Allowed amount, such resolution shall be subject to reconciliation on an agreed-upon schedule as reasonably agreed to by the Debtors, the Creditors' Committee, and the applicable holder of a Non Opt-Out Settled Admin Claim; provided, further, that, for the avoidance of doubt, any waiver or settlement of any preference action shall be considered on a case-by-case basis.

(4)    *Third*, after the Second Distribution, all Net Proceeds of Total Assets other than the Litigation Funding and the Cash Reserve (as more fully set forth herein) shall be made available for Distributions on account of Settled Administrative Expense Claims up to 75% of the consensually agreed-upon Allowed Settled Administrative Expense Claim ("**Settled Administrative Expense Claims Payout**").[11]

(5)    *Fourth*, after the Settled Administrative Expense Claims Payout and upon the Effective Date of the Plan, holders of Administrative Expense Claims who opt-out of the Settlement Agreement (the "**Non-Settled Administrative Expense Claims**") shall receive Distributions on account of their Non-Settled Administrative Expense Claims to the extent Allowed; provided, that, for the avoidance of doubt, (i) for all Settled Administrative Expense Claims (unless otherwise agreed among the Debtors, the Creditors' Committee and the holder of such Settled Administrative

---

[10]   "**Second Distribution**" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery; provided, that, for the avoidance of doubt, there shall be no Second Distribution until the Cash Reserve Account has been funded with the $10 million in the aggregate. For the avoidance of doubt, the Litigation Funding Account shall in no event be funded by more than $25 million up to and including the Effective Date.

[11]   Additional distributions shall be made to holders of Settled Administrative Expense Claims at all times when cash on hand is $10 million and until such times as these claims have been paid in full (up to 75%) pursuant to the terms of the Settlement Term Sheet.

Expense Claim) and (ii) for all Non-Settled Administrative Expense Claims, the Debtors and/or the Liquidating Trust (a) shall prosecute all Claims and Causes of Action arising under chapter 5 to the fullest extent and (b) reserve all rights to object to any and all Non-Settled Administrative Expense Claims on any basis.

(6)     *Fifth*, upon the occurrence of the Effective Date and after the (i) Settled Administrative Expense Claims Payout, and (ii) Distributions on account of Allowed Non-Settled Administrative Expense Claims, all Net Proceeds of Total Assets shall be governed by the terms of the Plan and the Liquidating Trust Agreement.

(7)     Notwithstanding anything to the contrary contained herein, (a) prior to the Effective Date, and once the Cash Reserve Account has been funded with $10 million in the aggregate, the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative (as hereinafter defined) (collectively, the "**Pre-Effective Date Committee**"), and (b) after the Effective Date, the Liquidating Trust Board shall commence a telephonic meeting no less than every thirty (30) days to review, among other things, the status of the reconciliation of Administrative Expense Claims, as well as the latest budget and variance reporting of the Debtors; provided, that, in the interim, the Debtors shall provide, among other things, weekly budget and variance reporting, as well as an accounting of the Total Assets and any Net Proceeds derived therefrom to the Pre-Effective Date Committee on a confidential basis.  After the Initial Distribution Date, to the extent the Pre-Effective Date Committee deems it necessary to fund the Cash Reserve Account with additional funds beyond the initial $10 million in the aggregate, and prior to additional Distributions being made to holders of Allowed Administrative Expense Claims, the Cash Reserve Account shall be funded by the Debtors in an amount agreed to by the Pre-Effective Date Committee; provided, that, should the Debtors' Restructuring Committee, together with the Creditors' Committee and Admin Representative, not agree to the amount of sufficient operating cash (to be funded into the Cash Reserve Account), after taking into account an amount to maintain the legal and fiduciary obligations of the Debtors, or Estate representatives, as applicable, any of the Debtors' Restructuring Committee, Creditors' Committee, or the Admin Representative may seek assistance (including on an emergency basis) from the Bankruptcy Court for a prompt resolution of the issue; provided, however, that, in no event, shall the Debtors' Restructuring Committee or the Creditors' Committee request or seek funding in excess of an amount that would cause the Cash Reserve Account to exceed (at any time) more than $10 million; provided, further, that, should the Debtors' Restructuring Committee,

28

Creditors' Committee, or the Admin Representative seek Bankruptcy Court intervention as set forth above, no further funding of the Cash Reserve Account from Net Proceeds from Total Assets shall occur unless (i) all parties agree to a partial funding, or (ii) the Bankruptcy Court enters an order allowing for further funding.

(8)    For the avoidance of doubt, Distributions in respect of a Settled Administrative Expense Claim shall not exceed 75% of the amount of the Allowed Settled Administrative Expense Claim; provided, that, in no scenario shall percentage recoveries on account of Allowed General Unsecured Claims exceed percentage recoveries on account of Settled Administrative Expense Claims.

b.    ***Administrative Expense Claims Representative***.  Pursuant to the Administrative Expense Claims Consent Program and upon entry of the Confirmation Order, a representative of holders of Administrative Expense Claims (the "**Admin Representative**") (selected solely by the holders of Administrative Expense Claims, including the Ad Hoc Vendor Group) shall serve alongside the Debtors' Restructuring Committee and the Creditors' Committee to work through 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions and to ensure an expedient and fair process to claims resolution and emergence (the "**Scope of Mandate**").  The Admin Representative shall also serve on the Pre-Effective Date Committee as set forth above with such Scope of Mandate, and will be entitled to applicable insurance coverage provided and paid for by the Debtors.  To the maximum extent permitted by applicable law, the Admin Representative will not have or incur, and shall be released and exculpated from any claim, obligation, suit, judgment, damages, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the date the Admin Representative joins the Debtors' Restructuring Committee or Pre-Effective Date Committee, as applicable, in its limited capacity, in connection with or arising out of its Scope of Mandate, solely to the extent occurring in its capacity as the Admin Representative, except for acts or omissions of the Admin Representative that constitute fraud, gross negligence, criminal misconduct or willful misconduct as determined by a Final Order.  The Admin Representative shall also receive reasonable compensation as determined by the Debtors, Creditors' Committee, and the Ad Hoc Vendor Group.

c.    ***Funding from the Carve-Out Account.***  Within three (3) business days of entry of the Confirmation Order, the Debtors shall transfer a minimum of $2 million from the Carve-Out Account (the "**Carve-Out Contribution**") into a separately segregated account ("**Segregated Account**") to be used solely on account of the Initial Distribution (as defined below) and subsequent distributions to holders of Settled Administrative Expense Claims.

d.    *Litigation Funding / Cash Reserve.*  Within three (3) business days of entry of the Confirmation Order and contemporaneously with funding of the Segregated Account and the Initial Cash Pool (each as defined below), the Debtors shall have set aside (i) $15 million in a segregated account (the "**Litigation Funding Account**") for the funding of litigation associated with the Jointly Asserted Causes of Action (as defined in the proposed Confirmation Order) (the "**Litigation Funding**") and (ii) $5 million of additional cash in a segregated account the ("**Cash Reserve Account**") for post-Confirmation estate costs including, without limitation, additional professional fees of the Debtors' and the Creditors' Committee not included in the Carve-Out Account as of the entry of the Confirmation Order (the "**Cash Reserve**").

e.    *Agreements of the Holders of Settled Administrative Expense Claims*.  Holders of Settled Administrative Expense Claims shall at no further cost (severally and not jointly): (1) use good faith efforts to implement the Administrative Expense Claims Consent Program; (2) support and take all commercially reasonable actions necessary or reasonably requested by the Debtors to facilitate confirmation of the Plan, including withdrawing any applicable objections and any other pleading inconsistent with the Administrative Expense Claims Consent Program and/or confirmation of the Plan; provided, that, to the extent the Bankruptcy Court does not approve the Administrative Expense Claims Consent Program, the Debtors shall cause the confirmation hearing to be adjourned to a date and time that is reasonably acceptable to the Debtors, Creditors' Committee, and counsel for the Ad Hoc Vendor Group, and the rights of all Settlement Parties are reserved, including the rights of the non-Debtor Settlement Parties to contest Confirmation; (3) support the confirmation of the Plan and not object to, delay, interfere, impede, or take any other action to delay, interfere, or impede, directly or indirectly, with the confirmation of the Plan; provided, that, the same proviso in paragraph 2 shall apply; (4) vote all Claims to Accept the Plan if applicable; (5) not use, assign, convey, grant, transfer, hypothecate, or otherwise dispose of, in whole or in part, any Settled Administrative Expense Claims, provided that, once the Confirmation Order is entered, holders of Settled Administrative Expense Claim may transfer Settled Administrative Expense Claims (i) to any holder of Settled Administrative Expense Claims or (ii) to a party that delivers a joinder, in the form attached hereto as Exhibit 1, to the Debtors, Weil Gotshal & Manges LLP and Akin Gump Strauss Hauer & Feld LLP (in accordance with the notice provisions in the Plan) at least two (2) business days prior to the settlement of the relevant transfer; with respect to any transfers effectuated in accordance with clause (ii) above, such transferee shall be deemed a holder of a Settled Administrative Expense Claim; for the avoidance of doubt, any Administrative Expense Claims purchased by a holder of Settled Administrative Expense Claims shall be deemed subject to the terms of the Administrative Expense Claims Consent Program; and (6) not object to or opt out

of any release included in the Administrative Expense Claims Consent Program.

f.       ***Releases***.  The Administrative Expense Claims Consent Program shall include certain consensual releases of Claims and Causes of Action amongst the Settlement Parties; for the avoidance of doubt, the Administrative Expense Claims Consent Program shall not release any Specified Causes of Action.

53.     The Opt-In/Opt-Out Procedures, as described below, are approved.  The Opt-In/Opt-Out Procedures may be modified with the written consent (such consent not to unreasonably be withheld) of all of the Administrative Expense Claims Consent Program Parties to facilitate the opt-in and opt-out processes.

a.       Upon entry of the Order, Prime Clerk LLC will: send both an (i) opt-in ballot (the "**Opt-In Ballot**") and (ii) opt-out ballot (the "**Opt-Out Ballot**") to (x) all parties that have filed an Administrative Expense Claim or filed an application for administrative expense in the Debtors' Chapter 11 Cases and (y) any party that was exempted from filing an Administrative Expense Claim but the Debtors are aware of such Claim; the Opt-In Ballot and Opt-Out Ballot will be sent to the address provided on such Administrative Expense Claim form or application for administrative expense or, if no such form exists, the address on the Debtors' books and records;

b.       Upon entry of the Confirmation Order, Prime Clerk LLC shall cause the notice of the Administrative Expense Claims Consent Program (the "**Administrative Expense Claims Consent Program Notice**"), substantially in the form attached hereto as **Exhibit B**, to be published in *The New York Times*;

c.       Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 17 days from the date of service to submit an Opt-In Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-In Ballot; and

Unless otherwise agreed to in writing (including e-mail) by the Administrative Expense Claims Consent Program Parties, holders of Administrative Expense Claims will have 33 days from the date of service (the "**Opt-Out Deadline**") to submit an Opt-Out Ballot in either electronic or paper form, in each case following the procedures set forth on the Opt-Out Ballot (together, the "**Opt-In/Opt-Out Procedures**").

54.    The Opt-In Ballot and the Opt-Out Ballot, substantially in the form attached hereto as **Exhibit C**, are hereby approved.  The Opt-Out Ballot clearly states that any party that exercises its right to opt out will not be entitled to any recovery from the Administrative Expense Claims Consent Program and that any party that does not opt out of the Administrative Expense Claims Consent Program will be bound by its terms, including to support a Plan.

55.    To the extent a holder of an Allowed Administrative Expense Claim **does not properly opt out** of the Administrative Expense Claims Consent Program, such holder shall be deemed to have agreed (a) to be bound by the terms of the Administrative Expense Claims Consent Program, (b) to support the Plan, and (c) that such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code.

56.    Any Distributions made on account of Settled Administrative Expense Claims shall not be subject to disgorgement, including without limitation, upon any conversion or dismissal of the Chapter 11 Cases.  Further, upon entry of this Confirmation Order, all Settled Administrative Expense Claims shall be Allowed against the Debtors in these Chapter 11 Cases on a consolidated basis, or upon any conversion or dismissal of the Chapter 11 Cases.

**M.**    ~~L.~~ **Insurance Policy Matters**

57.    ~~48.~~ For the avoidance of doubt, pursuant to Section 13.4 of the Plan, notwithstanding anything to the contrary in the Plan, the Definitive Documents, the Plan Supplement, any other documents related to any of the foregoing, and this Confirmation Order, the automatic stay of section 362(e) of the Bankruptcy Code and the injunctions set forth in the

32

Plan, to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit former directors and officers of Sears Canada to make claims under any D&O Policy and any insurers to make related payments under such policies with respect to such claims.

58. 49. For the avoidance of doubt, Insurance Contracts assumed by the Debtors and assigned to Transform as authorized by order of the Bankruptcy Court pursuant to the Asset Purchase Agreement are not subject to section 13.4 of the Plan.

**N. M. Miscellaneous**

59. 50. In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan, or any order (other than this Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan shall govern and control; *provided* that, in the event of a conflict between the Liquidating Trust Agreement, on the one hand, and any of the Plan, the Plan Supplement or the Definitive Documents, on the other hand, the Liquidating Trust Agreement shall govern and control in all respects relating to the Liquidating Trust; *provided further* that, in the event of a conflict between this Confirmation Order, on the one hand, and any of the Plan, the Plan Supplement (other than as set forth herein with respect to the Liquidating Trust Agreement), the Definitive Documents, on the other hand, this Confirmation Order shall govern and control in all respects.

60. 51. The continued payment of Allowed Professional Fees from the Carve-Out Account in accordance with the DIP Order and the *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 796) is hereby approved.

61.   ~~52.~~ Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.

62.   ~~53.~~ Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article XVI of the Plan.

63.   ~~54.~~ Except as otherwise may be provided in the Plan or herein, notice of all subsequent pleadings in these cases after the Effective Date shall be limited to the following parties: (i) the Liquidating Trust and its counsel; (ii) the U.S. Trustee; and (iii) any party known to be directly affected by the relief sought.

Dated: _____, 2019
     White Plains, New York

 

               _____
               THE HONORABLE ROBERT D. DRAIN
               UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Plan**

**Exhibit B**

**Administrative Expense Claims Consent Program Notice**

**Exhibit C**

**Opt-In/Opt-Out Ballots**