**Hearing Date:  October 23, 2019 at 10:00 am (ET)**
**Objection Deadline:  October 16, 2019 at 4:00 pm (ET)**

Edward L. Schnitzer
**Montgomery McCracken Walker & Rhoads LLP**
437 Madison Ave
New York, New York  10022
(212) 551-7781
eschnitzer@mmwr.com

*Attorneys for Hankook Tire America Corp.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                :

In re:                             :        Chapter 11
                                  :

SEARS HOLDINGS CORPORATION, *et al.,*     :        Case No. 18-23538 (RDD)
                                  :

               Debtors.          :        (Jointly Administered)
                                  :
---------------------------------------------------------------x

### HANKOOK TIRE AMERICA CORP.'S MOTION FOR RELIEF FROM (A) THE ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF; AND (B) RELATED SALE AND ASSUMPTION/ASSIGNMENT PLEADINGS AND ORDERS

**TO THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

Hankook Tire America Corp., by and through its undersigned counsel, submits this

motion (the "Motion"), pursuant to Fed. R. Civ. P. 60, made applicable herein by Fed. R. Bankr.

P. 9024, for relief from the *Order (I) Approving the Asset Purchase Agreement Among Sellers*

*and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens,*

*Claims Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain*

*Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief,*

[Dkt. No. 2507] (the "Sale Order"), and related pleadings including the *Order Approving Global Bidding Procedures and Granting Related Relief* [Dkt. No. 816], the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transactions* [Dkt. No. 1774], and the *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* [Dkt. No. 3008]

In support of the Motion, Hankook respectfully submits the declarations of Terry Smouter (the "Smouter Decl."), Samara Buckner (the "Buckner Decl.") and Mi Sook Kim (the "Kim Decl."), as well as the exhibits attached to such declarations, filed contemporaneously with this Motion.  Hankook further requests that this Court, pursuant to rule 201 of the Federal Rules of Evidence, take judicial notice, of twelve (12) docket entries:

(1)    Docket No. 429, Debtors' Motion for Approval of Global Bidding Procedures;

(2)    Docket No. 503, Affidavit of Service of Docket No. 429;

(3)    Docket No. 816, Order Approving Global Bidding Procedure and Granting Related Relief;

(4)    Docket No. 869, Affidavit of Service of Docket No. 816;

(5)    Docket No. 862, Notice of Filing Global Bidding Procedures Process Letter;

(6)    Docket No. 895, Affidavit of Service of Docket No. 862;

(7)    Docket No. 900, Affidavit of Service of Docket No. 807;

(8)    Docket No. 1730, Notice of Successful Bidder and Sale Hearing;

(9)    Docket No. 1774, Supplement Notice of Cure Costs;

(10)    Docket No. 1969, Affidavit of Service of Docket No. 1730;

(11)    Docket No. 2162, Affidavit of Service of pages 1-14 of Docket No. 1730; and

(12)   Docket No. 2752, Affidavit of Service of the Bar Date
Notice.

## PRELIMINARY STATEMENT

1.      Relief from the Sale Order and related pleadings is appropriate because, despite Hankook doing business with Sears for over two years since Hankook moved its headquarters to Nashville, Tennessee in July/August 2016, Sears failed to serve any notice in this case on Hankook at Hankook's correct address, including notices of the Motion requesting the Sale Order. Hankook received no notice of the sale or sale terms and no notice of the cure amount. By not providing Hankook with adequate actual notice of the sale and sale terms, including that the sale was intended to strip Hankook of its recoupment and set-off rights, the Sale Order violated Hankook's right to due process and deprived Hankook of the opportunity to object and assert that its recoupment rights cannot be stripped as the underlying amounts owed to the Debtors are inextricably linked to the sums owed by the Debtors to Hankook. Likewise, for the pleadings setting a cure amount for the Supply Agreement, not only did Hankook not receive actual notice of the pleadings setting a cure amount for the Supply Agreement, the Supply Agreement was not in fact assumed by Debtors or assigned to Transform.

2.      Relief is also appropriate because (i) the Court can interpret its own Sale Order as not applying to Hankook, (ii) it was a mistake of law to enjoin defensive rights of recoupment in the Sale Order, (iii) Hankook's failure to object to the Sale Order was excusable neglect, or (iv) for other cause justifying relief.

## JURISDICTION AND VENUE

3.        This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334 and Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (M), and (N).

## RELEVANT BACKGROUND

**A.        The Supply Agreement and History of Dealings Between Hankook and Sears**

4.        Hankook is a tire manufacturer. Smouter Decl. ¶ 3. Hankook sold tires to Sears,

Roebuck, and Co. ("Sears") for years pursuant to a certain Supply Agreement[1] entered into May

1, 2016 and amended twice. Smouter Decl. ¶ 6, Ex. 1. The Second Amendment was effective

February 1, 2018 and extended the contract term through January 31, 2019, when the Supply

Agreement expired by its terms. *Id.* Under the Supply Agreement, Hankook agreed to supply

tires to Sears and Hankook agreed to "meet an order fulfillment service of at least 95% for

delivery of any quantity ordered by Buyer [Sears] under a 13-week forecast," which forecast was

required to include the regions/distribution centers where Hankook should warehouse the tires in

order to fulfill projected orders. *Id.,* § 3.B.  Hankook "commit[ted] to supplying all quantities

reflected in Buyer's 13-week advance forecast," *id.,* §3.D., and agreed to "manage its internal

ordering, manufacturing and fulfillment process to achieve Buyer's established service level"

and to "at all times … maintain inventory of merchandise in quantities that Seller deems

necessary to fulfill Purchase Orders," *id.,* §3.B. Sears was not bound by the forecast, but placed

actual orders by purchase order. *Id.,* §3.B. Sears could order more than the forecasted amount,

but Hankook's "obligation to deliver increases in quantities … [was] limited to using 'all

commercially reasonable efforts.'" *Id.* As long as Sears' orders were equal to or less than the

---

[1]        All undefined capitalized terms used herein shall have the meaning ascribed to them in the accompanying
declarations.

forecast, Hankook was required to accept the order. *Id., §3.D.* If Hankook failed to meet a certain fill rate in a quarter, Sears would earn a percentage allowance (subsidy) on products purchased that quarter, to be collected by debit memo. *Id.*

5.     Purchase Orders set the quantities, shipment dates, specifications and other information concerning the Products. *Id., §3.A.* Prices were set by the Supply Agreement and could be amended by Hankook at any time for future orders with 60 days' notice. *Id., §3G.* The Supply Agreement supplied terms for product returns, *id., §3M and 3O,* and delivery, invoicing and payment, *id., §4.*

6.     Section 5 of the Supply Agreement provided for "Seller's Support," which includes various rebates and other credits related to marketing and promotional support, customer support, merchandising support, new product launch support and similar programs. *Id., §5.* Under the Seller's Support sections, Sears could earn credits based on a percentage of its purchases during a quarter. *Id.* Each subsection in Section 5 provides for payment of the particular type of Seller's Support via credit memo to be issued quarterly, except that Section 5G states "Buyer will collect all rebates and other support provided under this section at the end of each retail fiscal calendar quarter by debit memo." *Id.* Hankook's standard method of providing Seller's Support is to issue credit memos, which could be applied against open invoices. Smouter Decl. ¶ 9.

7.     Section 5H of the Agreement provided that at the termination or expiration of the Agreement, the parties would net out amounts owed by Buyer/Sears against any Seller's Support owed by Seller/Hankook, and that Hankook would pay Sears the Seller's Support, "net of any amounts then owing from Buyer to Seller that remain unpaid, … promptly following

reconciliation of all final outstanding amounts owing hereunder….” Smouter Decl. ¶ 5 and 14,

Ex. 1, §5H. Section 5H further provided:

> For the avoidance of doubt, all withheld Seller's Support will be
> deemed exclusively the property of Seller and not Buyer until such
> amounts are actually paid by Seller to Buyer, and Buyer will have
> no rights therein except the right to receive such amounts when
> and only to the extent they become payable to Buyer under this
> Section 5H following the final reconciliation process described
> above. The rights reserved by Seller in this Section 5.H are in
> addition to and not a limitation of Seller's general rights of
> recoupment.

*Id.*

The Supply Agreement expired by its terms on January 31, 2019. *Id.*, §2. As of January 31, 2019,

Sears owed Hankook $1,043,026.82 for tires supplied under the Supply Agreement, but for

which Sears had not paid Hankook. Smouter Decl. ¶ 7; Buckner Decl. ¶ 4. Rather than run

quarterly Seller's Support calculations, as provided in the Supply Agreement, Sears ran the

calculations at the end of the contract term. On January 24, 2019, Sears sent an email to Hankook

attaching "promotional agreements" for the "2018 subsidies" totaling $665,503.89 (the "Subsidy

Credits"). Smouter Decl., ¶¶ 10, 11 Exs. 2 & 3. The Subsidy Credits relate back to various types

of Seller's Support allowed by the Supply Agreement and state that they apply to the period of

February 4, 2018 – February 2, 2019. Smouter Decl., ¶ 12 Ex. 3. They identify the Vendor as

Hankook with the correct Nashville address and mistakenly identify the Factor as Hana

Financial.[2] *Id.* The Subsidy Credits relate to, and are based on, the $1,043,026.82 in unpaid

invoices, among others. Buckner Decl. ¶ 4, Ex. A; Smouter Decl. ¶ 5.

8.      At Sears' request, Hankook's representative, Terry Smouter, approved the

Subsidy Credits and returned them to Sears by email on January 31, 2019, stating:

---

[2]      Hana Financial did not factor Hankook's invoices to Sears or provide other services to Hankook in relation
to Sears in 2018 or 2019. Buckner Decl. ¶¶ 6-8.

> I have also attached the subsidy credits for 2018 (total of
> $665,503.89). These credits will go toward your open invoices to
> reduce your open balance. It appears that Sears still owes $376K
> after 2018 subsidy credits are applied. …

Smouter Decl. ¶ 13, Ex. 2. Mr. Smouter's email signature line contained Hankook's correct

Nashville address. Smouter Decl. ¶ 13, Ex. 2. Pursuant to Section 5H of the Supply Agreement,

at the January 31 expiration of the Supply Agreement, Hankook performed the netting function

which resulted in no amount being owed and payable for the Subsidy Credits. *Id.* Instead, Sears

still owed Hankook $377,522.93.

**B.**     **The Section 363(f) Sale to Transform**

9.     Sears and multiple affiliates (collectively, "Sears" or the "Debtors") filed petitions

for relief under chapter 11 in this Court on October 15, 2018 (the "Petition Date"). On November

1, 2018, the Debtors filed a motion seeking approval of global bidding procedures (the "Sale

Motion"). *See* Sale Motion [Dkt No. 492]]. The Sale Motion makes no mention of Debtors'

intent to request sale of assets free of other parties' rights of recoupment and set off. In its Sale

Motion, Debtors requested the Court approve certain "Global Bidding Procedures," which

included, among other things, a definition of the "Sale Notice Parties," which included "all of the

persons and entities entitled to notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules")." Id. at p. 70. Sears did not serve this Sale Motion on

Hankook. See Docket No. 503.

10.     The Sale Motion was approved by this Court on November 19, 2019 (the "Global

Procedures Order"). The Global Procedures Order [Dkt. No. 816] makes no mention of Debtors'

intent to request sale of assets free of other parties' rights of recoupment and set off, nor does the

Notice of Filing Global Bidding Procedures Process Letter [Dkt. No. 862]. Sears did not serve

the Global Procedures Order or the Notice of Filing Global Bidding Procedures Process Letter on

Hankook (*see* Affidavits of Service [Dkt. Nos. 869 and 862]).

11.    Pursuant to the Global Procedures Order and the auction that was held, Transform

Holdco LLC ("Transform") was declared the winning bidder on January 14, 2019.  Pursuant to

the Global Procedures Order, the Debtors were to serve on the "Sale Notice Parties (including

each Counterparty to a Proposed Assumed Contract (as hereinafter defined)" the Notice of

Auction Results within 2 business days of the Auction. The Auction was completed and

successful bidder announced on Monday, January 14, 2019 and the APA was signed on January

17, 2019. *See* Docket No. 1774.  Debtors did not attempt to serve Hankook until January 24,

2019, more than a week after the deadline set forth in the Global Procedures Order.  *See*

Affidavit of Service [Dkt. No. 2162]. Even that notice was sent to the wrong address. *Id.*

Furthermore, although the proposed sale order set forth, for the first time, the Debtors' intent to

request sale of assets free and clear of other parties' rights of recoupment and setoff, the Notice

served on Hankook's incorrect address did not include a copy of the proposed sale order. *Id.*

(service only included pages 1-14 and 261 of the Notice).

12.    The sale is governed by an Asset Purchase Agreement Dated as of January 17,

2019 (the "APA") and the Sale Order entered on February 8, 2019.  The APA defines the assets

sold to Transform as "Acquired Assets," which included executory contracts to be assumed and

assigned by Debtors ("Assigned Agreements") and various forms of receivables ("Acquired

Receivables").

13.    In the Sale Order, the Court made the following findings of fact and conclusions

of law:

> Debtors may sell the Acquired Assets that are owned by the
> Debtors *free and clear of all liens, claims* (including those that

constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), *rights,* liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, *rights of offset or recoupment,* royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, *off-sets, recoupments,* claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances *and other interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets owned by them, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to,* any acts or omissions, obligations, demands, guaranties, rights, *contractual commitments,* restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, any claims under, or trusts or liens created by, PACA, and any derivative, vicarious, transferee or successor liability claims, alter ego claims, de facto merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or nonstatutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the effective time of the Closing and for each Assigned Agreement (subject to the payment of Cure Costs as required under section 365(b) of the Bankruptcy Code), the applicable Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the transfer of any of the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities; *(collectively, excluding any Assumed Liabilities, the "Claims"),* because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied; provided, however, that, nothing herein shall be deemed,

or construed as, a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets. .... *Those holders of Claims who did not timely object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.* Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors. *All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.*

Sale Order, ¶ R, pp. 16-17; *see also* ¶ 19, pages 37-41. Thus, the Sale Order purported to transfer Acquired Assets to Transform "free and clear of … rights of offset or recoupment … and other interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets owned by them, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments . . . ." *Id.* Further, Persons having Claims against Debtors or the Acquired Assets were enjoined from asserting such Claims against Transform or the Acquired Assets. *Id.*

14.    The Sale Order later expressly carved out and preserved setoff or recoupment rights and other affirmative defenses held by (1) parties to Assigned Agreements that timely filed an objection to preserve such right or defense and (2) any party that timely filed an objection and is an obligor under any Acquired Receivable "pursuant to the terms of the contracts giving rise to

10

such Acquired Receivables and/or applicable law, whether or not such contracts are being

assumed and assigned by the Debtors to the Buyer, including without limitation, any valid return,

refund and credit rights; all amounts owing under the MSA; allowances; rebates; credits; credit

memos; and accruals under such contracts." Sale Order, ¶ 19, pages 38-40.

## C.    **Cure Notice for Incomplete Assumption/Assignment**

15.    In the Supplemental Notice of Cure Costs and Potential Assumption and

Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale

Transactions [Dkt. No. 1774], Debtors included Hankook's Supply Agreement as one that

"*potentially* could be assumed and assigned to the Successful Bidder in connection with the

Global Asset Sale Transaction," and Debtors designated the cure amount as $0.  However,

Debtors never filed a subsequent Notice of Assumption and Assignment of Additional Executory

Contracts identifying the Supply Agreement as an executory contract *actually* to be assumed and

assigned. (*See, e.g.,* Doc. No. 3973).

## D.    **Failed Service on Hankook**

16.    Hankook was not provided and did not receive actual notice of any of the sale-

related pleadings or the cure notice and other assumption/assignment pleadings relating to the

Supply Agreement. In July 2016, Hankook relocated its corporate headquarters from 1450

Valley Road, Wayne, New Jersey 07470 to 333 Commerce Street, Suite 600, Nashville,

Tennessee 37201. Kim Decl. ¶ 4. Hankook sent all customers a letter dated July 20, 2016

informing them of Hankook's new address, effective August 1, 2016 (the "Relocation Letter").

*Id.* ¶ 5, Ex. A. Since Sears was Hankook's customer in July 2016, the Relocation Letter would

have been sent to Sears.  *Id.* ¶ 6.

17.     By August 2016, all Hankook invoices issued to Sears included Hankook's new

Nashville, Tennessee corporate address.  Buckner Decl., ¶ 9, Ex. B. Invoices issued to Sears in

the 90 days before the Petition Date also contained Hankook's Nashville, Tennessee address. *Id.*

Hankook issued hundreds of similar invoices to Sears in the 2016 – 2018 timeframe. *Id.*  Credit

memos issues by Hankook contained Hankook's Nashville, Tennessee address.  Smouter Decl.,

¶ 21, Ex. 5.  Additionally, Hankook's email correspondence with Sears in the 90 days before the

Petition Date contained Hankook's Nashville address.  Smouter Decl. ¶ 19, Ex. 6.  Subsidy

credits generated by Sears in September of 2017 contained Hankook's Nashville, Tennessee

address.  Smouter Decl., ¶ 20, Ex. 4.  The Subsidy Credits that Sears generated in January 2019

contain Hankook's correct Nashville address. Smouter Decl., ¶ 18, Ex. 3.  Hankook's email

correspondence with Sears concerning the Subsidy Credits contained Hankook's Nashville,

Tennessee address.  Smouter Decl. ¶ 10, Ex. 2.

18.     Hankook did not receive *any* notices of pleadings filed, orders entered, or notices

generated in the Sears bankruptcy case. Kim Decl. ¶ 7; Buckner Decl. ¶ 10; Smouter Decl. ¶ 20.

It would not have received any because Sears mailed notices to Hankook, if at all, at its long-out-

of-date New Jersey corporate address, or care of Hana Financial, an unrelated third party. *See

e.g.,* Affidavit of Service [Dkt. No. 900]; Affidavit of Service [Dkt. No. 2752], p. 1554. Sears did

not attempt to serve any notices to Hankook at its correct Nashville address. *See, generally,*

Affidavits of Service referred to in the Motion.

19.     Sears did not even attempt to serve any of the sale pleadings on Hankook until

January 24, 2019 when it mailed some pages of the Notice of Successful Bidder and Sale

Hearing [Dkt. No. 1730] and Supplemental Notice of Cure Costs and Potential Assumption and

Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale

Transactions [Dkt. No. 1774] to the incorrect New Jersey address. *See, e.g.,* Affidavit of Service [Dkt. No. 2162]. According to that Affidavit, Sears only included the first 14 pages and page 261 of docket No. 1730 in its service package to Hankook's incorrect address. Those few pages did not include the proposed Sale Order, which is the only place in any of its sale pleadings that Sears mentioned that persons' defensive rights of recoupment and set-off might be enjoined if the person failed to object to the sale. Therefore, not only did Sears not provide Hankook with actual notice of the asset sale delivered to Hankook's correct address, Sears did not even attempt to provide Hankook with actual notice that Sears was seeking to enjoin Hankook's defensive rights of recoupment and set-off might be enjoined.[3]

20.    Hankook only learned of the Sale Order and its potential impact on Hankook's rights in May 2019, when Transform demanded payment of the $665,503.89 in Subsidy Credits and refused to recognize Hankook's recoupment rights. Smouter Decl. ¶ 16. That was three months after the sale transaction was consummated (and a month after the claims bar date). Since then, Hankook has worked diligently to learn what has occurred in the Sears bankruptcy case and what might have affected Hankook's rights.

**RELIEF REQUESTED**

21.    By this Motion, Hankook seeks relief from the Sale Order and any related sale pleadings to the extent any such pleading relate to Hankook and purport to strip Hankook of its rights of recoupment and set-off or have any effect on Hankook's Supply Agreement, and grant such additional relief as is equitable and just.

---

[3]    Moreover, even if addressed correctly the notice served by overnight mail on January 24 would not have been received by Hankook until Friday, January 25, a day before the sale objection deadline of 4:00 p.m. on Saturday, January 26. *See* Affidavit of Service [Dkt. No. 2162]. Hankook submits that such notice does not meet constitutional muster, particularly where a party is seeking to enjoin a million dollar defense.

## ARGUMENT

22.    Hankook is entitled to relief from the Sale Order.  The Court may interpret the
Sale Order as inapplicable to Hankook's Supply Agreement and Subsidy Credits, and therefore,
not having any effect on Hankook's recoupment and set-off rights. To the extent the Sale Order
applies to Hankook, the Court should hold that Hankook was not given constitutionally adequate
notice of the Sale Order and, therefore, its due process rights were violated. In the alternative, the
Court may grant Hankook relief from the Sale Order under Rule 9024 for mistake of law,
excusable neglect, and other reasons.

### A.    Interpretation of the Sale Order

23.    As an initial matter, the Court may interpret its Sale Order as not applying to
Hankook's Supply Agreement or the Subsidy Credits. A bankruptcy court has jurisdiction to
interpret and enforce its own orders.  *See In Matter of Motor Liquidation Co.*, 829 F.3d 135, 153
(2d Cir. 2016); *In re Lyondell Chem. Co.*, 445 B.R. 277, 287–88 (Bankr. S.D.N.Y. 2011).
Moreover, the Court expressly retained in the Sale Order "exclusive jurisdiction to, among other
things, interpret, enforce and implement the terms and provisions of this Sale Order and the
Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder …, to
adjudicate disputes related to this Sale Order or the Asset Purchase Agreement (and such other
related agreements, documents or other instruments) and to enforce the injunctions set forth
herein." Sale Order, ¶ 58.

24.    In addition to the due process concerns discussed below, in order for Hankook to
be subject to the Sale Order, Hankook's purportedly stripped recoupment rights would have to
attach to an Acquired Receivable. Either Hankook's Supply Agreement would have to be an
"Assigned Agreement" or the Subsidy Credits would have to be an "Acquired Receivable."
Neither form of Acquired Asset applies to Hankook.

1.     **The Supply Agreement is an Excluded Asset**

25.     The Supply Agreement is an Excluded Asset, not an Assigned Agreement. Sears and Hankook did business under their Supply Agreement until it expired by its terms on January 31, 2019.  Under the terms of the sale and as a matter of law, Transform did not acquire the Supply Agreement or any rights under it. Under the APA, "any Contract that is not an Assigned Agreement" is an "Excluded Asset." Section 2.2(a). Section 2.2 provides: "Nothing herein shall be deemed to sell, transfer, assign, convey or deliver, or cause to be sold, transferred, assigned, conveyed or delivered, any right, title or interest of Sellers in, to or under the Excluded Assets."

26.     Sears included a general request to assume and assign not-yet-identified executory contracts in connection with its asset sale in its Sale Motion filed on November 1, 2018.  *See* Sale Motion [Dkt. No. 429]. The approved assumption and assignment procedures required Sears to first file and serve a Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction, including all contracts that might be assumed and assigned and an amount that Sears alleged to be the cure amount. *See* Supplemental Notice of Cure Costs [Dkt. No. 1774].  After that, Transform had to inform Debtor of its designations, at which time Debtor would file a Notices of Assumption and Assignment of Additional Executory Contracts identifying those contracts actually being assumed and assigned. *See id.*

27.     Sears identified Hankook's Supply Agreement in a Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction, which Sears filed on January 23, 2019. *See* Supplemental Notice of Cure Costs [Dkt. No. 1774]. Pursuant to the procedure set by the Sale Order, Sears filed multiple Notices of Assumption and Assignment of Additional Executory

Contracts, identifying the contracts that Transform designated for assignment. (*See, e.g.,* Doc. No. 3973). As none of the Notices of Assumption and Assignment of Additional Executory Contracts filed with the Court identified the Hankook Supply Agreement as one that Transform wanted to be assumed and assigned to it, Transform and Debtors did not take the second step toward assumption and assignment of the Supply Agreement. Since Transform and Debtors did not take the steps necessary to make the Supply Agreement "an Assigned Agreement," it is an "Excluded Asset" under the Section 2.2(a) of the APA.[4]

28.      Furthermore, as a matter of law, Sears could not assume the Supply Agreement at the time of the Sale or after because it was no longer executory in nature.  Contracts that expire by their terms prior to the debtor assuming them cannot still be assumed.  *See In re Child World, Inc.*, 147 B.R. 847, 851-2 (Bankr. SDNY 1992); *In re Spectrum Info. Techs., Inc.*, 193 B.R. 400, 404 (Bankr. EDNY 1996); s*ee also In re Penn Traffic Co.*, 524 F.3d 373, 381-2 (2nd Cir. 2008) (Noting the line of cases stating that post-petition events, including expiration of the contract, may render a previously executory contract non-executory at the time of proposed assumption.). The Supply Agreement expired by its terms on January 31, 2019, prior to the February 8, 2019 entry of the Sale Order and subsequent closing of the sale.

**2.      The Subsidy Credits are Not an Acquired Receivable**

29.      The Subsidy Credits are not an Acquired Receivable under the APA. The APA states that Acquired Assets include the Acquired Receivables. *See* APA § 2.1. The APA does not identify all Acquired Receivables.  The APA defines "Acquired Receivables" to include the "Specified Receivables", which definition refers to the account receivables set forth on Schedule

---

[4]      Since the Supply Agreement was never assumed by Debtors, the Court also should not enforce the Debtors' statement of $0 cure amount in Doc. No. 1774. Bankruptcy Code § 365 provides for curing monetary defaults in connection with assuming executory contracts. It does not provide a summary mechanism for declaratory judgment regarding breaches of contract when no contract is being assumed.

1.1(k). *See* APA § 1.1, Definitions.  Schedule 1.1(k) refers to Annex 11.  Annex 11 is a one-page list of Assumed Vendor Receivables with some specific multi-million-dollar receivables and a catch-all for "All Other Receivables" totaling $30 million. No additional information about "All Other Receivables" was provided in the sale pleadings, so Hankook cannot know whether Subsidy Credits were intended to be among "All Other Receivables." However, Transform has demanded payment of the Subsidy Credits suggesting that Transform believes them to be among the "All Other Receivables" and thus an Acquired Receivable and an Acquired Asset.[5] Such cannot be the case.

30.    First, under the parties' contract, the Subsidy Credits never became Sears' property so they cannot be a transferrable receivable. The Supply Agreement under which the Subsidy Credits arose provides as follows:

> For the avoidance of doubt, all withheld Seller's Support will be deemed exclusively the property of Seller and not Buyer until such amounts are actually paid by Seller to Buyer, and Buyer will have no rights therein except the right to receive such amounts when and only to the extent they become payable to Buyer under this Section 5.H following the final reconciliation process described above. The rights reserved by Seller in this Section 5.H are in addition to and not a limitation of Seller's general rights of recoupment.

When the Subsidy Credits were calculated at the expiration of the Supply Agreement in January 2019, Sears still owed Hankook $1,043,026.82 for tires supplied to Sears under the Supply Agreement but for which Sears had not paid Hankook. The Supply Agreement specifically provides for a final account reconciliation at the Agreement's expiration, and this reconciliation resulted in the amount Sears owed Hankook exceeding the value of the Subsidy Credits by $337,522.93. The Subsidy Credits never became "payable" to Sears or Sears' "property" under

---

[5]    Hankook requests the Court require Transform to prove that the Subsidy Credits were included in "All Other Receivables" at the time of the Sale.

§ 5H of the Supply Agreement, and thus they were not an account receivable that could be transferred to Transform.

31.    Second, as a matter of law, the Debtor had no interest in the Subsidy Credits as of the entry of the Sale Order on February 8, 2019, and thus could not transfer any interest to Transform. "[F]unds subject to recoupment are not the debtor's property." *In re Malinowski,* 156 F.3d 131, 133 (2d Cir. 1998) (distinguishing setoff from recoupment in that setoff is subject to § 553 and the automatic stay; whereas, recoupment is not); *accord United Structures v. G.R.G. Eng'g*, 9 F.3d 996, 999 (1st Cir. 1993) ("[A] debtor has, in a sense, no right to funds subject to recoupment."). Hankook's recoupment rights result in no value to the Subsidy Credits as they are dwarfed by the sums due and owing to Hankook under the Supply Agreement.

32.    Had Sears assumed and assigned the Supply Agreement to Transform, it could not have kept and transferred the Subsidy Credit benefit of the Supply Agreement while avoiding its corresponding obligation under the Supply Agreement to pay for goods supplied to it. "[A] debtor may not assume the favorable aspects of a contract (post-petition payments) and reject the unfavorable aspects of the same contract (the obligation to repay pre-petition over-payments by means of "recoupment")." *In re Sims*, 1997 WL 33475212, at *2 (Bankr. C.D. Ill. Feb. 3, 1997) (quoting *Lee v. Schweiker,* 739 F.2d 870 (3d Cir.1984)); *c.f. In re Stratman*, 217 B.R. 250, 252–53 (Bankr. S.D. Ill. 1998) (Recoupment is exempt from the automatic stay as a matter of fairness: "a debtor cannot hide behind the automatic stay to protect himself from the burden of such contract while reaping the benefits of the same contract.")(citations omitted). Sears and Transform should not now be allowed to reap the benefits of the Supply Agreement (without assuming it and curing the $1,043,026.82 of defaults) while avoiding Sears' obligations by re-characterizing the Subsidy Credits as accounts receivable.

B.      **The Sale Order Violated Hankook's Due Process Rights**

33.     To the extent the Sale Order might apply to Hankook and affect Hankook's

recoupment and set-off rights (which is contrary to the law in this jurisdiction, as discussed in

Section II.C.1., below), the Court should not enforce the Sale Order against Hankook because

Hankook was denied due process.

34.     Due process "entitles potential claimants to actual notice of the bankruptcy

proceedings" if the debtor knew or reasonably should have known about the claims. *Motors*

*Liquidation Co.*, 829 F.3d at 159. Specifically, in section 363 sales, procedural due process

requires that known claimants be given actual notice by direct mail or some equivalent, not mere

publication notice. *See id.* at 160-61.

35.     11 U.S.C. § 342(c)(2)(A) requires that notices be sent to the address designated by

the creditor, as follows:

> If, within the 90 days before the commencement of a voluntary
> case, a creditor supplies the debtor in at least 2 communications
> sent to the debtor with the current account number of the debtor
> and the address at which such creditor requests to receive
> correspondence, then any notice required by this title to be sent by
> the debtor to such creditor shall be sent to such address and shall
> include such account number.

For over two years, including specifically in the 90 days before the Petition Date, Hankook

provided invoices and other correspondence to Sears with Hankook's correct Nashville,

Tennessee address. *See* Buckner Decl. ¶ 9, Ex. B; Smouter Decl. ¶¶ 19-22, Exs. 4-6; Kim Decl.

¶ 6, Ex. A.

36.     As explained above, Debtors failed to provide Hankook with actual notice of any

of the sale pleadings or the cure notice. Sears mailed notices to Hankook's long-out-of-date New

Jersey address despite regularly dealing with Hankook for over two years at Hankook's

Nashville address. Sears also demonstrated on January 24, 2019 that it knew Hankook's correct

Nashville address, because that is the address on the Subsidy Credit forms it drafted (the same address that Sears has also identified in the 2017 Subsidy credits it created). Notably, it is those very same Subsidy Credits, with Hankook's Nashville, Tennessee address, that Sears was purportedly attempting to sell to Transform. Additionally, in none of Sears' failed service attempts did Sears include notice that Sears was seeking to enjoin Hankook's defensive rights of recoupment and set-off.

37.     Whether due process also requires a showing of prejudice has not been decided by the Second Circuit. *Id.* at 162. To the extent prejudice is required, Hankook was prejudiced by the lack of actual notice of the section 363 sale and that the proposed sale order might strip Hankook of its recoupment and set-off rights as to the $665,503.89 in credits. Inability to have objections to a section 363 sale heard by the court or to negotiate revisions to a sale with debtors were found by the Second Circuit to constitute prejudice in *In Matter of Motor Liquidation Company*. *See* 829 F.3d at 163-166. Likewise, in this case, had Hankook received actual notice in time to object to the terms of the Sale Order, the Court might have deleted language from the proposed Sale Order purporting to strip Hankook of its recoupment and set-off rights, or Debtors may have agreed to preserve such rights specifically for Hankook as they did for several other creditors. *See, e.g.,* Sale Order, ¶ 19, pp. 37-41.

38.     Loss of its recoupment and set-off rights could mean that Hankook in addition to the loss of the $1,043,026.82 that the Debtors owe Hankook under the Supply Agreement, Hankook could be forced to pay Transform $665,503.89 in Subsidy Credits supposedly "earned" under the Supply Agreement, some of which relate to the very same $1,043,026.82 of unpaid invoices. This double loss is prejudicial to Hankook.

39.    In *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.,* 209 F.3d 252, 260 (3d

Cir. 2000), the Third Circuit found under similar circumstances that notice of a section 363(f)

sale was constitutionally inadequate and violated a creditor's due process rights. In *Folger*,

debtors filed petitions for relief under chapter 11 and simultaneously filed a motion, pursuant to

sections 363 and 365, for approval of the sale of substantially all of their assets and the

assumption and assignment of certain contracts to newly-formed Folger. *Id.* at 255. The notice of

the sale motion stated that the sale would be "free and clear" of all claims and other "interests"

that could be asserted against debtors, and that a list of contracts to be assumed and assigned

would be provided. *Id.* The bankruptcy court approved the sale, and creditor DeMatteis'

contracts were specifically excluded from the list of contracts to be assumed/assigned. *Id.* at 255-

56. DeMatteis did not become aware of the exclusion until after the sale. *Id.* at 255. Although

DeMatteis was listed on the affidavit of service of the sale motion, DeMatteis claimed not to

have received the official notice, but to have received an incomplete version by fax from another

party. *Id.* at 255. DeMatteis' employee stated in an affidavit that "he did not understand the

Debtor's accounts receivable to include monies claimed by the Debtors but denied by DeMatteis

because of nonperformance of contracts," so DeMatteis did not object to the sale. *Id.*

40.    The Third Circuit held that even if "interest" under section 363(f) included

affirmative defenses such as recoupment (which it held otherwise, *see* additional discussion of

*Folger* below), the notice to creditor DeMatteis "was insufficient to give it notice that by failing

to object it was waiving its affirmative defenses." *Id.* at 264. In so holding, the court focused on

the content of the notice, not service; however, the same rationale applies.

41.    The Third Circuit noted that section 363(f) required "notice and a hearing," and

that Rules 6004 and 2002 require at least 20 days' notice by mail to all parties in interest, *see*

2002(a)(2), and that sufficient notice includes the terms and conditions of sale, *see* 2002(c). *Id.* at

264-65. The court further noted that "[d]ue process requires 'notice reasonably calculated, under

all the circumstances, to apprize interested parties of the pendency of the action and afford them

an opportunity to present their objections.'" *Id.* at 265 (quoting *Mullane v. Central Hanover

Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). To comport with due process, notice must also

"be of such nature as to reasonably convey the required information." *Id.*

42.     The Third Circuit then applied these rules and constitutional considerations to the

notice at issue, which provided that the proposed sale of assets would be "free and clear of all

liens, mortgages, security interests, encumbrances, liabilities, claims or any other interests, of

any nature." *Id.* Noting that it had already held that "any other interests" does not include

defenses, the court found significant that nowhere in the notice did it expressly state that

affirmative defenses would be waived. *Id.* The court found the notice to be "constitutionally

infirm." *Id.* The court further found that with the exclusion of the DeMatteis-debtor contracts

from the sale, "DeMatteis reasonably believed that its rights would not be affected by the

proposed sale." *Id.* The court found that the facts did not support a finding that DeMatteis waived

its affirmative defenses by failing to object; therefore, the court held that DeMatteis was entitled

to raise its recoupment and other defenses in collection actions by the asset purchaser, Folger. *Id.*

43.     This court should hold the same as to Sears' constitutionally inadequate notice to

Hankook of the sale pleadings and cure notice and allow Hankook to raise its defenses of

recoupment and set-off against any attempt by Transform or Debtors to enforce any term of the

Supply Agreement or collect the Subsidy Credits.

C.    **Relief from the Sale Order Pursuant to Rule 9024**

44.    To the extent the Court finds that the Sale Order applies to Hankook, the Court

may grant Hankook relief from the Sale Order pursuant to Fed. R. Bankr. P. 9024, which

incorporates by reference Fed. R. Civ. P. 60. "Properly applied, Rule 60(b) strikes a balance

between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*,

793 F.2d 58, 61 (2nd Cir. 1986). It "should be broadly construed to do 'substantial justice,'"

while not "lightly reopen[ing]" final judgments. *Id.*

45.    Grounds for relief from an order include:

    (1)    mistake, inadvertence, surprise, or excusable neglect;

    (2)    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

    (3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

    (4)    the judgment is void;

    (5)    the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

    (6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Rule 60 motions must be made "within a reasonable time – and for

reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date

of the proceeding." Fed. R. Civ. P. 60(c)(1). Hankook timely makes its Motion for relief well

within a year of the February 8, 2019 entry of the Sale Order and within a reasonable time from

learning about the Sale Order and its purported effect on Hankook's rights in May 2019.[6]

---

[6]    Since learning of the Sale Order and Transform's assertion, Hankook has acted diligently and expeditiously in investigating the matter.  Hankook has previously alerted the Debtors and Transform to its contentions in an attempt to resolve the dispute without court intervention.

Hankook requests relief under reasons (1) "mistake, inadvertence, surprise or excusable neglect" and (6) "any other reason that justifies relief."

### 1.  Mistake of Law: Section 363(f) Sales Do Not Extinguish Rights of Recoupment

46.      "Mistake" applies to any mistake, even a court's own mistake of law or fact.  *See In re 310 Assocs.*, 346 F.3d 31, 34-35 (2d Cir. 2003).  Generally, when seeking relief from an order due to a court's mistake of law, Second Circuit jurisprudence recommends that the motion be filed within the time limit to appeal so as to avoid an end-run around the time limit to appeal. *See id.* at 35. However, in this case Hankook lacked notice of the Sale Order within the time limit to appeal, so Hankook respectfully requests the Court now consider its mistake of law as reason to grant Hankook relief from the Sale Order.

### (a)    Hankook's Recoupment Rights

47.      "While not defined in the Bankruptcy Code, the Code contemplates and accepts the equitable doctrine of recoupment. Recoupment is essentially a right to reduce the amount of a claim." *In re Sweet N Sour 7th Ave. Corp.,* 431 B.R. 63, 70–71 (Bankr. S.D.N.Y. 2010) (citing 5 Collier on Bankruptcy & 553.10) (15th ed. rev. 2004)). The "purpose [of recoupment] is to do justice viewing one transaction as a whole." *In re Malinowski,* 156 F.3d at 133 (citing *United Structures,* 9 F.3d at 999). "[A] counterclaim seeking a set off or recoupment is properly conceptualized as a defense, arising out of the transaction that grounds the main action . . . ." *U.S. v. Forma,* 42 F.3d 759, 765 (2d Cir.1994) (quoting *Bull v. U.S.,* 295 U.S. 247, 262 (1935), and collecting cases); *see also In re Drexel Burnham Lambert Grp., Inc.,* 113 B.R. 830, 854 (Bankr. S.D.N.Y. 1990) ("[R]ecoupment [in bankruptcy] is purely defensive, or in the nature of a common law defense, and not a separate cause of action or weapon of offense." (internal citation and quotation marks omitted)).

48.    In determining whether a party has the right of recoupment, the court must apply

nonbankruptcy, state law. *Westinghouse Credit Corp., Inc. v. D'Urso,* 278 F.3d 138, 146 (2d Cir.

2002) (citing *N.Y. State Elec. & Gas Co. v. McMahon (In re McMahon),* 129 F.3d 93, 96 (2d Cir.

1997)). In this case, Hankook and Sears chose Illinois law to govern their Supply Agreement, the

agreement which gave rise to Sears' debts to Hankook and the corresponding Subsidy Credits.

*See* Supply Agmt. § 8.M.

49.    Under Illinois law, "recoupment is a common law doctrine whereby a defendant

can respond to a plaintiff's claim with a counterclaim arising from the same transaction which

serves to abate or reduce the plaintiff's claim." *In re Prochnow*, 474 B.R. 607, 615–16 (Bankr.

C.D. Ill. 2011), *aff'd,* 467 B.R. 656 (C.D. Ill. 2012)(citing *In re Klingberg Schools*, 68 B.R. 173,

178 (N.D. Ill. 1986)). In bankruptcies, "recoupment is essentially a defense to the debtor's

claim," though it may be asserted by counterclaim. *Id.*; *see also In re Chapman*, 265 B.R. 796,

807 (Bankr. N.D. Ill. 2001). Generally, for recoupment to apply "the transaction upon which the

debtor's claim is based must be so closely intertwined with the creditor's claim that the amount

of the former cannot be fairly determined without resolving the latter." *Id.; see also In re

Chapman*, 265 B.R. at 807 (In the recoupment defense, "equity demands that the debtor's claim

cannot be considered without taking account of the creditor's claim."); *In re A&C Elec. Co., Inc.*,

211 B.R. 268, 273-74 (Bankr. N.D. Ill. 1997)("Recoupment is a mechanism by which a party

may calculate the proper amounts due from it by offsetting obligations which arise from the

same transaction and which are essentially a defense to the debtor's claim."). More specifically,

Illinois law requires two factors: 1) the claims must arise from a single contract or transaction,

and 2) there must be some type of "overpayment" whether accidentally made or contractually

made. *In re Stratman*, 217 B.R. 250, 252 (Bankr. S.D. Ill. 1998).

50.     Illinois does not require that claims arise out of the "*identical* transaction," but requires instead a "logical relationship" between the two claims, focusing on the parties' agreement. *In re Health Mgt. Ltd. Partn.*, 336 B.R. 392, 396 (Bankr. C.D. Ill. 2005)(rejecting the "overly-restrictive requirement" that the claims arise out of the identical transaction.). Here, both the Subsidy Credits and Sears' obligation to pay Hankook for purchases arise under the Supply Agreement. The Subsidy Credits are essentially rebates of a percentage amount of the purchases made by Sears under the Supply Agreement. The Subsidy Credits included rebates for the $1,043,026.82 in purchases for which Sears never paid. Implicit in the concept of a rebate is that the party receiving the rebate first pay the party granting the rebate. Sears' right to the Subsidy Credits cannot be separated from Sears' obligation to pay for the purchases giving rise to the Subsidy Credits.  Therefore, irrefutably, the Subsidy Credits bear a "logical relationship" to Hankook's claim for payment for purchases.

51.     "Overpayment" is also not strictly construed for recoupment purposes by Illinois courts or under Illinois law. "Overpayments" have been recognized and recoupments found to be proper in the following circumstances, among others:

(i)     commissions owed to the debtor under a real estate associate agreement could be recouped against business expenses owed by the debtor to the real estate agency under the same agreement, *see In re Prochnow*, 474 B.R. at 616;

(ii)    money expended pre-petition by creditor tenant for repairs could be recouped against rent due the landlord thereafter; the claim for repair costs and the claim for rent arose under the same lease, and the court found that it would be inequitable for the landlord to receive rent without compensating tenant for the repairs, *see In re Flagstaff Realty Assocs.*, 60 F.3d 1031 (3d Cir. 1995), *cited as instructive in In re A&C Elec. Co., Inc.*, 211 B.R. 268, 273-74 (Bankr. N.D. Ill. 1997));

(iii)   CBS made prepetition advances to debtor singer George Jones, and CBS was permitted to recoup the advances from royalties accruing post-petition, where the contract specifically

provided for advance and subsequent recoupment from royalties and the court found that they arose under the same transaction, *see Waldschmidt v CBS*, 14 B.R. 309 (M.D. Tenn. 1981), *cited in In re Klingberg Schools*, 68 B.R. 173, 178–79 (N.D. Ill. 1986), *aff'd*, 837 F.2d 763 (7th Cir. 1988));

(iv) where creditor overpaid debtor prepetition for the purchase of oil under a supply contract, creditor could recoup the overpayments from post-petition payments owed to debtor where post-petition sales were made pursuant to the same supply contract, *see In re B&L Oil Co.*, 782 F.2d 155 (10th Cir. 1986), *cited in In re Klingberg Schools*, 68 B.R. at 178–79); and

(v) where agreement between insurance company and healthcare provider contemplated insurer's payment of net covered charges, and insurer initially paid the full price but after routine account reconciliations factoring in contract allowances, the insurer would recoup any overpayments from amounts then owed, *see In re Health Mgt. Ltd. Partn.*, 336 B.R. 392, 395-97 (Bankr. C.D. Ill. 2005).

In this case, the overpayment was Hankook's delivery of $1,043,026.82 in goods to Sears pursuant to the Supply Agreement for which Sears did not pay.

52.     Recoupment of the Subsidy Credits is proper under applicable Illinois law because the Subsidy Credits and Sears' payment obligations arose under the same agreement and Hankook "overpaid" Sears by delivering a million dollars in goods for which Sears did not pay. Additionally, the Supply Agreement expressly provides for the netting out of these amounts at expiration of the contract.

> **(b)     Section 363(f) Sales Do Not Extinguish Defensive Rights of Recoupment**

53.     To the extent the Sale Order purports to transfer assets "free and clear" of Hankook's rights of recoupment, the order is in error. Under section 363(f), the Debtors may sell property "free and clear of any *interest* in such property of an entity" under certain conditions, which are not at issue. 11 U.S.C. § 363(f) (emphasis added). Sales of assets under section 363(f) cannot be made "free and clear" of rights of recoupment, which are not "interests."

54.     The Bankruptcy Code does not define the concept of "interest" under section

363(f). *Motors Liquidation Co.*, 829 F.3d at 154 (citation omitted). When considering the

meaning and extent of section 363(f) "interest" in *Motors Liquidation*, the Second Circuit

determined that "interests" are limited to "claims [that] may be barred under Chapter 11

generally," rationalizing as follows:

> Though § 363(f) does not expressly invoke the Chapter 11
> definition of "claims," *see* 11 U.S.C. § 101(5), it makes sense to
> "harmonize" Chapter 11 reorganizations and § 363 sales "to the
> extent permitted by the statutory language…." Here, the
> bankruptcy court's power to bar "claims" in a quick § 363 sale is
> plainly no broader than its power in a traditional Chapter 11
> reorganization. *Compare* 11 U.S.C § 363(f) ("free and clear of any
> interest in such property"), *with* § 11 U.S.C. § 1141(c)("free and
> clear of all claims and interests).

*Id.* at 155-56 (certain citations omitted).

55.     "A claim is (1) a right to payment (2) that arose before the filing of the petition."

*Motors Liquidation*, 829 F.3d at 156 (citing 11 U.S.C. § 101(5), *Pension Ben. Guar. Corp. v.*

*Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009)). Although "claim" is defined broadly in the

Code, it "requires an enforceable obligation of the debtor to pay the claimant." *Folger Adam*

*Sec., Inc.*, 209 F.3d at 260 (citing *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S.

552, 559 (1990)).

56.     In line with the standard and rationale of the Second Circuit in *Motors*

*Liquidation* for determining the scope "interests"*,* several courts, including the Southern District

of New York, have held that recoupment rights are defensive in nature and not "interests" or

"claims" that may be stripped in a section 363(f) sale. *See, e.g., Folger Adam Sec., Inc.*, 209 F.3d

at 260-61 (Holding that a right of recoupment is "not extinguished by a § 363(f) sale."); *Hispanic*

*Indep. TV Sales, LLC v. Kaza Azteca Am. Inc.*, 2012 WL 1079959, at *4–5 (S.D.N.Y. Mar. 30,

2012)("[S]ales pursuant to 363(f) do not extinguish affirmative defenses," and "recoupment is a

28

defense."); *Hispanic Indep. TV Sales, LLC v. Una Vez Mas, LP*, 973 N.Y.S.2d 60, 61 (N.Y. App.

Div. 1st Dept. 2013)("The affirmative defense of recoupment is not an "interest" that is

extinguishable by a "free and clear" sale under the Bankruptcy Code." (citing *Folger Adam*

*Security*, 209 F.3d at 260–261)); *In re Lawrence United Corp.*, 221 B.R. 661, 669 (Bankr.

N.D.N.Y. 1998)(Holding that the right of recoupment is not a "claim" and "does not even fall

under the broadest interpretation of an 'interest' in property;" therefore, "recoupment is not an

"interest" in property for section 363(f) purposes."); *cf. Daewoo Intern. (Am.) Corp. Creditor Tr.*

*v. SSTS Am. Corp.*, 2003 WL 21355214, at *5 (S.D.N.Y. June 11, 2003)("[R]ecoupment is not a

"claim" within the meaning of the Bankruptcy Code and this right is, as a general mater,

unaffected by the debtor's discharge" or Chapter 11 plan.); *In re McMahon*, 129 F.3d at 96

("While a 'setoff' is subject to the automatic stay provision of 11 U.S.C. § 362, a recoupment is

not.").

57.     The holding that recoupment rights are not extinguished in a section 363(f) sale is

consistent with the finding of the Second Circuit that "funds subject to recoupment are not the

debtor's property." *In re Malinowski,* 156 F.3d at 133 (Distinguishing setoff from recoupment in

that setoff is subject to § 553 and the automatic stay; whereas, recoupment is not.); *accord*

*United Structures,* 9 F.3d at 999 ("[A] debtor has, in a sense, no right to funds subject to

recoupment.").

58.     The facts and issues before the Court are similar to those examined by the Third

Circuit in *Folger Adam Security*. 209 F.3d 252. In *Folger*, creditor DeMatteis subcontracted to

supply security equipment for a construction project, then further subcontracted with the two

debtors to supply certain materials and equipment. *Id.* at 254. After supplying all the requested

materials, the two debtors claimed that DeMatteis owed them $310,648 and $59,798.67, which

DeMatteis refused to pay, claiming that debtors had breached their contracts. *Id.* at 254-55.

Shortly thereafter, on February 6, 1996, debtors filed petitions for relief under chapter 11 and

simultaneously filed a motion, pursuant to sections 363 and 365, for approval of the sale of

substantially all of their assets and the assumption and assignment of certain contracts to newly-

formed Folger. *Id.* at 255. The notice of the sale motion stated that the sale would be "free and

clear" of all claims and other "interests" that could be asserted against debtors, and that a list of

contracts to be assumed and assigned would be provided. *Id.* The bankruptcy court approved the

sale to Folger. *Id.* at 255-56. DeMatteis' contracts were specifically excluded from the list of

contracts to be assumed/assigned. *Id.* at 255.

59.     A few weeks after the sale, DeMatteis filed proofs of claims in debtors' cases

based on debtors' breaches of their contracts. *Id.* at 256. Debtors objected, claiming that the sale

order transferred debtors' accounts receivables from DeMatteis to Folger "free and clear" of all

rights of setoff, recoupment, counterclaim and other defenses and claims. *Id.* DeMatteis

responded, disagreeing with debtors' "re-characterization of the executory contracts (which were

specifically excluded from the sale) as 'accounts receivable.'" *Id.* The bankruptcy court

disallowed and expunged DeMatteis' claims. *Id.* After losing in the district court, DeMatteis

appealed to the Third Circuit. *Id.*

60.     Before the Third Circuit were the issues of (i) whether "interest" under section

363(f) includes affirmative defenses to claims, such as recoupment, and (ii) whether DeMatteis

had received constitutionally adequate notice that it would lose its defenses if it did not object to

the sale. *Id.* at 253-54. As to the first issue, the Circuit court considered statutory construction

and examined prior cases in which courts had tried to define the scope of the term "interest"

under section 363(f). *Id.* at 257-263. The court rejected Folger's assertion that DeMatteis'

recoupment defense was the equivalent of a "claim." The court agreed with a line of cases holding that recoupment is a defense and not a claim in the bankruptcy context, including *In re Lawrence United Corp.* from the Bankruptcy Court for the Northern District of New York, 221 B.R. 661, and shared the *Lawrence United Corp.* holding that recoupment rights are not extinguished by a section 363(f) sale. *Id.* at 260-261. The Third Circuit explained:

> Although the Bankruptcy Code's definition of claim is broad, a claim requires an enforceable obligation of the debtor to pay the claimant. Here DeMatteis is not seeking to recover money on an enforceable obligation of Folger, but rather, is asserting only defenses to claims by Folger. Indeed, a defense seeks to diminish a claim or to defeat recovery rather than to share in it.

*Id.* at 260 (citations omitted). The court further noted the void of cases holding to the contrary. *Id.* at 261.

61.     Since the defensive right of recoupment cannot be extinguished by a section 363(f) sale, the Court should grant Hankook relief from the Sale Order due to mistake of law and hold that Hankook's recoupment rights were not extinguished and any claim Transform may have on the Subsidy Credits is subject to Hankook's recoupment rights.

## 2.     **Excusable Neglect**

62.     The Court may also grant Hankook relief based on "excusable neglect." "Excusable neglect" entails an equitable inquiry, guided by the general principal that "bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, [with] the overriding goal of ensuring the success of the reorganization." *Pioneer Inv. Servs. Co. v. Brunswick Assocs, Ltd. P'ship*, 507 U.S. 380, 389 (1993) (discussing the excusable neglect factors of Rule 9006(b) and Rule 60(b) in the context of a Rule 9006(b) matter). The court should consider all relevant circumstances surrounding the party's failure to act. *Id.* at 395. For purposes of Rule 60(b), "'excusable neglect' is understood to encompass

situations in which the failure to comply with a filing deadline is attributable to negligence." *Id.*
at 394. In such case, the focus becomes whether the neglect is "excusable," an equitable analysis.
*Id.* at 395.

63.    Factors relevant to whether neglect is "excusable" include: (i) the danger of
prejudice to the debtor, (ii) the length of the delay and its potential impact on the bankruptcy
proceedings, (iii) the reason for the delay, including whether it was within the reasonable control
of the movant, and (iv) whether the movant acted in good faith. *Id.* at 395.  Although whether the
delay was within the reasonable control of the movant is a factor, "excusable neglect" is "not
limited to situations where the failure to timely file is due to circumstances beyond the control of
the filer." *Pioneer*, 507 U.S. at 391.  Instead, it "encompass[es] situations in which the failure to
comply with a filing deadline is attributable to negligence." *Id.* at 394.

64.    In *Pioneer*, the Supreme Court concluded, in the absence of bad faith and
prejudice to the debtor or to judicial administration, that an ambiguous notice of a claims bar
date required a finding of excusable neglect. 507 U.S. at 398-99.  The Court must find similarly
here where Hankook received *no* notice of the sale pleadings or any other notice in this case.
There is no prejudice to the Debtors as Hankook's request for relief is limited to its defensive
assertion of rights of recoupment, such relief would not affect the validity of the sale transaction,
and Hankook seeks no affirmative recovery from Debtors. Relief granted now will in no way
impact the bankruptcy proceedings. Hankook's delay was outside its control as it lacked any
notice of the sale prior to the Court-imposed objection deadline. Hankook has at all times acted
in good faith.  Therefore, in addition to relief on due process grounds, the Court may grant
Hankook relief based on excusable neglect.

### 3.   Any Other Reason That Justifies Relief

65.    The Rule 60(b)(6) factor, "any other reason that justifies relief," is "properly invoked only when there are extraordinary circumstances justifying relief, when the judgment may work an extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." *Nemaizer*, 793 F.2d at 63 (internal citations omitted). This rule recognizes that at times "the interest in finality of litigation must yield where the interests of justice would make unfair the strict application of [the Court's] rules." *In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353, 357-58 (2nd Cir. 2013) (quoting *Gondeck v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26-27 (1965)).

66.    Hankook also requests relief under this sixth factor.  Since Hankook received no notice of the Sale Motion, the cure notice, related pleadings or even of the 341 Notice and Bar Date Notice, Hankook's failure to object to the relief requested in the Sale Motion or the cure notice cannot be seen to be due to Hankook's neglect or negligence. To the extent the other factors for relief are found not to apply, Hankook requests the Court grant it relief under this factor.

## CONCLUSION

67.     Hankook respectfully requests the Court grant it relief from the Sale Order and related pleadings/orders to the extent they relate to Hankook and purport to strip Hankook of its rights of recoupment and set-off, or have any effect on Hankook's Supply Agreement, and grant such additional relief as is equitable and just.

Dated: October 2, 2019
         New York, New York

**MONTGOMERY McCRACKEN WALKER & RHOADS LLP**

*/s/ Edward L. Schnitzer*
Edward L. Schnitzer
437 Madison Ave
New York, New York  10022
T: (212) 867-9500
E: eschnitzer@mmwr.com