# Exhibit 1

# Supply Agreement for Auto Tires

## May 1, 2016

This **Supply Agreement for Auto Tires** (this "**Agreement**") is between **Sears, Roebuck and Co.**, a New York corporation ("**Sears**"), its subsidiaries and affiliates, and **Hankook Tire America Corp.**, a New Jersey corporation ("**Seller**"). Sears, its subsidiaries and affiliates together are referred to in this Agreement as "**Buyer**."

### Terms and Conditions

Buyer and Seller agree as follows:

**1.**     *Vendor Agreement*.  This Agreement is a "Vendor Agreement" under the Universal Terms and Conditions between Seller and Buyer (the "**UTC**"). The UTC, including all documents incorporated into the UTC by reference, is incorporated into this Agreement by reference and is binding on Seller and Buyer as if it was repeated in full below. Capitalized terms that are used but not defined in this Agreement are defined in the UTC.

**2.**     *Term*.  The term of this Agreement (the "**Term**") begins on May 1, 2016 (the "**Effective Date**") and expires, unless sooner terminated under this Agreement, through January 31, 2017 after the Effective date (the "**Expiration Date**"). This Agreement applies to Products (defined in Section 3.A) shipped on or after the Effective Date and before the Expiration Date, including those for which Buyer placed the order before the Effective Date.

**3.**     *Supply Obligation; Purchase Orders; Pricing; Category Management; Etc.*

**3.A**     *Supply Obligation*.  Buyer may order and purchase from Seller the Merchandise listed on Appendix 3.A (the "**Products**"), by issuing Purchase Orders. Seller will supply and sell the Products to Buyer in accordance with the Purchase Orders and this Agreement. The Purchase Orders will indicate the quantities, shipment dates, Specifications and other information concerning the Products that Buyer may determine.

**3.B**     *Order Forecasts*. Seller will meet an order fulfillment service of at least 95% for delivery of any quantity ordered by Buyer under a 13-week advance forecast. Buyer's 13 week advance forecast must be broken down by TDC to determine where Hankook must warehouse the products in order to meet Sears' 13 week advance forecast.   The quantities shown in the 13-week forecast notice are not binding upon Buyer; Buyer is bound only by Purchase Orders transmitted to Seller up to four days before the time of delivery at Seller's US distribution center. Buyer may alter its order quantities from those reflected in the 13-week forecast notice, however Seller's obligation to deliver increases in quantities from those stated in the 13-week forecast notice are limited to using "all commercially reasonable efforts" to supply the additional quantities. Seller agrees to manage its internal ordering, manufacturing and fulfillment process to achieve Buyer's established service level. At all times, Seller shall maintain inventory of merchandise in quantities that Seller deems necessary to fulfill Purchase Orders in accordance with the established service level. For any order not delivered on time, Seller will give priority filling Buyer's late-fulfilled orders for stock in Seller's supply system.

**3.C**     *Good Faith Purchase Estimate.* Buyer estimates in good faith that its Product purchases from Seller in 2016 will total approximately $28,000,000. This good faith estimate is not a minimum purchase commitment and is not enforceable against Buyer in any way. In making this good faith estimate, Buyer has assumed that it will continue to operate in a

manner similar to its current business model and strategy and through roughly the same number of retail outlets and the same sales channels (e.g., including commercial sales and on-line).

**3.D    *Fill Rate Failure Allowance.*** Seller commits to supplying all quantities reflected in Buyer's 13-week advance forecast. Buyer's 13-week advance forecast is to be in line with Buyer's rolling 12-month forecast quantity. If Buyer's 13-week advance forecast is not in line with the rolling 12-month forecast, Seller and Buyer may discuss to increase or decrease (or revise) the 13-week advance forecast quantity.

Seller's obligation to supply arises when Buyer issues an order. Seller must accept any order from Buyer that states a quantity equal to or less than Buyer's 13-week advance Forecast quantity for that delivery week. If Seller at any time learns of information indicating that it will not be able to meet the production or shipment requirements for quantities shown in Buyer's 13-week forecast, Seller shall notify Buyer promptly in writing. If for any reason Seller is unable to ship Product under the terms of Buyer's order, Seller must immediately notify Buyer in writing, but in no event later than 5 business days after order. Under no circumstances will Buyer be obligated to pay for any undelivered Product in excess of the quantities contained in Buyer's 13-week advance forecast. The fill rate will be measured weekly.

If Seller fails to meet a fill rate of 95% of all units in each SKU ordered for delivery in each month (as determined by Buyer's retail fiscal accounting calendar) within a retail fiscal quarter (as determined by Buyer's retail fiscal accounting calendar), Buyer will receive 0.1% allowance (subsidy) on all of Buyer's Product purchases from Seller during the quarter. Buyer will collect the allowance by debit memo at the end of the quarter during which the month of Seller's failure to meet the fill rate occurred. In no instance will the allowance collectable by Buyer under this paragraph exceed 0.1% of purchases during the quarter, even if Seller has failed to meet the fill rate in more than one month during the quarter.

Seller and Buyer shall have periodic discussions regarding Service Levels and collaborate as necessary due to changing business needs.

**3.E    *Hankook RoadHandler®***. Seller shall continue to supply the co-branded tire product line, branded as Hankook RoadHandler, using Buyer's existing registered trademark RoadHandler. Section 6, Intellectual Property, and Section 7, Co-Branded Product, describe the parties' rights and obligations concerning the branding aspects of this production in greater detail. Seller shall retain full ownership of the tread patterns in the Co-Branded Product (as defined in Section 7). Seller shall use a sidewall design and markings that are distinctive and unique to the Co-Branded Product production. Seller shall obtain Buyer's prior written approval for the sidewall design and markings, which approval will not be unreasonably withheld. The terms referenced above will also govern any additional extensions of the Hankook RoadHandler co-branded product that Buyer and Seller agree to develop.

**3.F    *Ordering By Affiliates***. Other Affiliates and franchisees of Buyer may purchase Products from Seller under this Agreement if Seller accepts a Purchase Order from such Affiliate or franchisee for such Products. Any Affiliate or franchisee who issues a Purchase Order that is accepted by Seller is deemed to be "Buyer" hereunder for purposes of such purchase, and Seller will look solely to such Affiliate or franchisee (and not to Sears or Kmart) for satisfaction of any liability arising under or relating to such Purchase Order. Buyer may disclose a copy of this Agreement to its Affiliates and franchisees, subject to their agreeing to be bound generally by the confidentiality provisions hereof.

**3.G** *Invoice Prices*.

**3.F.i** *Invoice Prices*. Seller will sell to Buyer each Product at the invoice price for the Product listed in Appendix 3.A (together with the adjusted prices described in the next sentence, the "**Invoice Prices**").

**3.F.ii** *Price Adjustments.* Invoice prices for the Products will be as set forth in Seller's Invoice Price List for Buyer in effect as of May 4, 2014. Seller warrants to Buyer that the prices charged under this Agreement do not violate the Robinson-Patman Act. Seller's Invoice Price List will be provided separately and is subject to change from time to time. Seller may not increase Invoice Prices on placed tire orders; Seller's price increases will be applied to tire orders placed no earlier than 60 days after the price increase announcement. Seller's price increase announcement must state the specific price increase percentage for each Sears item number. Seller recognizes that changes to pricing may result in assortment changes and order cancellations. Correspondingly, Seller shall immediately notify Buyer of any price decreases that Seller makes generally with its other major customers, and will implement such decreases with Buyer immediately.

Buyer and Seller will negotiate in good faith prices for products not listed on Appendix 3.A that Buyer purchases from Seller, if any, and the new products ("**New Products**") immediately will become Products and the negotiated prices immediately will become Invoice Prices for all purposes of this Agreement.

**3.F.iii.** *Backorder Pricing.* Seller will hold backorders for 60 days; Buyer may cancel any backorders not delivered within 60 days at Seller's U.S. distribution center. Backorders received by Buyer within 60 days of order will receive the price in effect at the time of the original order, unless there is a reduction in price. If Seller has reduced the price of any item, Seller will invoice Buyer the lower amount.

**3.H** *Category Management*. Seller at all times will maintain and make available to Buyer Product assortments that are current, competitively relevant, and compelling to Buyer's customers. Seller will meet with Buyer at least quarterly to determine the overall sales and margin productivity of Buyer's Product assortments. Buyer and Seller agree to work together to reduce all inventory held at Sears Auto Centers or TDCs for more than seven months.

**3.I** *Change in Tire Product Screen*. Seller shall provide Buyer with a monthly update of discontinued tire items in Buyer's stocked inventory assortment as well as newly introduced tire items in Seller's product screen.

**3.J** *Tracking and Accounting Support*. Seller will provide reasonable quarterly reporting and other information relating to Product pricing and tracking, and will provide reasonable accounting support with respect to Product delivery and Seller's compliance with this Agreement.

**3.K** *Manufacturing Information.* Attached is the list of all manufacturing facilities and locations that produce Product for Seller under this Agreement. *(Attachment C)*

**3.L** *Product Treadwear Warranties.* In addition to all other quality and warranty obligations of Seller under this Agreement and the UTC, Seller will honor the following treadwear mileage warranties (in accordance with Section 3.L below):

- RoadHandler Touring: 100,000 miles,
- RoadHandler Sport: 50,000 miles, and
- Hankook RoadHandler HT:
  - P-Metric: 70,000 miles
  - LT-Metric: 40,000 miles

**3.M** ***Customer Product Returns.*** Seller will use the Lakin defects and warranty returns process as described in Appendix 3.L. If Lakin confirms that the returned products qualified for warranty adjustment per Seller's warranty adjustment policy, Seller will refund the cost of the warranty returned product to Buyer, which is determined by multiplying the percentage of usable tread by the invoice price (unless otherwise noted in an RGA file prior to inspection). Buyer may take the refund based on Lakin's communication confirming the warranty adjustment, by credit memo. All Lakin inspections are subject to Seller's review and confirmation.

**3.N** ***30-Day Ride Guarantee.*** Seller agrees to reimburse Buyer for its purchase cost of tires returned by Buyer's customers under Buyer's "30-day Ride Guarantee" (applicable to Hankook RoadHandler, Hankook RoadHandler Sport and Hankook RoadHandler H/T only). Seller shall compensate Buyer for these returns independently of the customer product returns processed under Section 3.L.

**3.O** ***Buyer's Product Returns.***

i) All special order Product that Buyer has not sold within 90 days from the date of shipment is acceptable to return to a Seller's distribution center. All unused tire returns must be pre-authorized with a return merchandise authorization code (RA #). Buyer will be responsible for all transportation charges to the Buyer's primary Seller distribution center. Returns once pre-authorized will be paid at the original price.

ii) All mislabeled products will be returned to a Seller distribution center. All mislabeled returns will be pre-authorized with a return merchandise authorization code (RA #). Seller will be responsible for all transportation charges for the return of mislabeled products.

**4.** ***Delivery; Payment Terms.***

**4.A** ***F.O.B. Point.*** Seller will deliver all the Products F.O.B. point of shipment with title and responsibility passing to Buyer upon his will-call or Seller's delivery of Product to the carrier providing transportation to the Buyer, all in accordance with Buyer's Vendor Information Guide. "F.O.B." means that at Seller's expense Seller will at the F.O.B. point load the Products on the carrier's trailers in accordance with, the terms and conditions of this Agreement (including Section 5). Buyer at its expense will contract for the carriage of the Products from the F.O.B. point. Seller is solely responsible for any damage to merchandise caused by improper loading or improper packaging.

**4.B** ***Special Order Shipping.*** Seller will ship special order Merchandise to Buyer's store (or other destination designated by Buyer in writing) via UPS, billed to Buyer's UPS account. Seller will give Buyer a 5% freight credit on all special order tire orders, issued quarterly on a separate credit memo. UPS 3rd Party shipments will be billed via Buyer's UPS account.

**4.C**     ***Returns Shipping***. Buyer shall have the risk of loss or damage to return Merchandise that is returned to Seller, to the point of delivery by Buyer's contracted carrier. All Product returns must be pre-authorized with a return goods authorization ("RGA").

**4.D**     ***Vendor-to-Store Fulfillment***. Seller shall continue to support Buyer's initiative for "Vendor-to-Store" Product fulfillment ("V2S") for Hankook brand national products, excluding Hankook RoadHandler and other programmed and stocked SKUs. The V2S program enables the Seller to ship Product to the Sears store according to the order data provided in the retail customer's on-line (sears.com) order. The Seller will periodically provide Buyer an inventory feed of all of Seller's tire lines and sizes supplied under this Agreement. V2S participation includes, among other things, use of Buyer's electronic data interchange processes ("EDI") for all V2S transactions.

**4.E**     ***Late or Other Non-Compliant Deliveries***. Seller acknowledges that the Vendor Guide requires it to pay Administrative Fees (as that term is used in the Vendor Guide) for Seller's late or otherwise non-compliant deliveries of the Products. If any Promotional Product is not delivered on time, Seller also will pay to Buyer an amount equal to Buyer's Lost Profit for the Promotional Product, which Buyer may collect via Buyer's debit memo. A "Promotional Product" is a Product that Buyer will offer to its customers as part of a future promotion and Buyer notifies Seller of that fact. Buyer's "Lost Profit" will equal Buyer's projected selling price for the Promotional Product during the promotional period minus the Promotional Product's Invoice Price, multiplied by the difference between (i) the Promotional Product quantity subject to Purchase Orders and (ii) the Promotional Product quantity that Seller delivered on time.

**4.F**     ***Payment Terms***. Seller will invoice Buyer for the Products via Electronic Data Interchange or the successor system that Buyer designates no earlier than the date the invoiced Products depart the F.O.B. point. Buyer will initiate payment by electronic funds transfer for the undisputed portion of each invoice on a "Net 30" basis. If the day payment is due is a Saturday, Sunday, or legal holiday Buyer will initiate payment on the next banking day. Payments initiated within these time periods are deemed to be timely made.

**5.**     ***Seller's Support.***

**5.A**     ***Marketing and Promotional Support.*** Seller will provide Buyer Marketing Support rebates and Promotional Support rebates on Buyer's purchases of Hankook RoadHandler from Seller to be paid quarter during the month following the close of each fiscal quarter via credit memo calculated on net purchases (total Purchase Orders less returns). The rebates will be 3% for Marketing Support and 3% for Promotional Support on purchases made from the Effective Date through January 31, 2017. Hankook shall have the right to audit RoadHandler marketing and promotional activities funded by the rebate money issued via credit memo to Buyer**.**

**5.B**     ***Customer Support Fund.*** In addition to the marketing and promotional support described above, Seller shall pay Buyer quarterly via credit memo a Consumer Support Fund calculated as follows:

- Special Order Items (not regularly stocked at TDCs)
    - See Section 4.B

- Programmed/Stocking Items (excluding RoadHandler)
  - o 2% Rebate on Optimo H724 and RH12 (based on stocked SKUs)
  - o 3% Freight credit on Optimo H724 and RH12 after 2% Rebate (based on stocked SKUs)

RoadHandler Support will be based on purchases at cost for one year from first invoice date by segment. Seller shall have right to audit RoadHandler marketing and promotional activities funded by the rebate money issued via credit memo to Buyer.

**5.C    *Promotional Event Support.*** Seller will pay to Buyer certain fixed amounts, via credit memo, to cover specific promotional activities and support funds as follows:

- $250,000 – Black Friday
- $100,000 – Memorial Day
- $100,000 – July 4
- $100,000 – Sears Days (in April)
- $100,000 – Sears Days (in October)
- $100,000 – Labor Day

**5.D    *Travel Expense Support.*** Seller agrees to reimburse Buyer its reasonable actual travel expenses for periodic visits to Seller's facilities or any possible new locations in conjunction with Seller's and Buyer's Automotive programs and vendor field visits, provided that such travel is approved in advance and in writing by both parties. Reasons for travel would include current program evaluation, solving any issues that arise and promoting the product line in the market place. Buyer will make travel arrangements in accordance with its travel policy and will be booked through its corporate travel agent to ensure all discounts and restrictions are used, provided that the amount of such expenses must be within the monetary limits of Buyer's travel policy. Annual travel expenses to be reimbursed by Seller will not exceed $15,000 for each 12 month period (starting the Effective Date or any anniversary of the Effective Date) while this Agreement is in effect, however if Buyer incurs travel expenses for purposes of this paragraph exceeding $15,000 in each of the 12-month periods of this agreement, Seller shall reimburse such additional travel expenses up to an additional $15,000 per year.

**5.E    *Merchandising Support.*** Within 15 days after the end of each fiscal calendar quarter, Seller shall pay Buyer a Merchandising Support payment in an amount equal to 4% of the invoice price of all Products delivered to and received by Buyer in that quarter. Seller's payment will be administered through Buyer's Promotional Allowance ("PA") agreement system, and Seller shall execute and deliver all agreements and documents reasonably requested by Buyer for that purpose. Seller may offer other promotional discounts, from time to time, on certain product categories or part numbers based on market conditions. These promotional specials will be sent under separate cover and will describe all available discounts, conditions, and the calculation method.

**5.F    *New Product Launch Support.*** Seller shall provide Buyer product launch support for the introduction of any new Hankook branded tire line (i.e., not included RoadHandler) that results in the close-out or phase-out of an existing Hankook brand tire line previously assorted by Buyer in Sears Auto Centers, in an amount to be negotiated by Buyer and Seller in each case. In addition, Seller shall accept the return of all tires in Buyer's inventory at the time of the new product launch, of the tire line being replaced. Buyer agrees to approve new item setups within three weeks of notification from Seller. Seller agrees to notify Buyer prior to

building new items in the IMA system. Notification will include support of the load in of new items into the Sears IMA system and supply of completed new items worksheets to Buyer for processing.

  **5.G**  *Payment by Debit Memo*. Buyer will collect all rebates and other support provided under this section at the end of each retail fiscal calendar quarter by debit memo.

  **6.**  *Intellectual Property*.

  **6.A *Work Product.*** Subject to the further terms of this Section, as between Buyer and Seller, all tangible or intangible property developed or prepared exclusively for Buyer prior to and during the Term, including marketing materials, advertising materials, point-of-sale displays, warranty card information, owners' manuals, studies, research, software, Website graphics, Website content support videos, Website content, files data, notes, copies, abstracts, summaries, customer names, addresses and other materials relating to any of the Products and all drafts and versions thereof, whether prepared, developed or created by Seller, Buyer or any third party, whether used or unused (collectively, "Sears Properties"), shall be exclusively owned by Buyer. Seller acknowledges and agrees that Buyer, its employees, subsidiaries, successors, agents and assigns and any other acting with its permission or under its authority, and without any limitation as to time  within the United States, U.S. Virgin Islands and Puerto Rico, have the right to use, publish, reproduce, alter, prepare derivative works and otherwise lawfully use the Sears Properties for art, advertising, trade or any other lawful purpose whatsoever, in or through any media or combination of media, now existing or yet to be invented, without any obligation or liability to Seller. Seller shall not, nor shall it permit any third party to disclose or provide any Sears Properties to any person other than Buyer without Buyer's written consent. Seller shall place Buyer's copyright notice in such locations and styles as Buyer may direct. Upon Buyer's written request, Seller further agrees to sign and deliver to Buyer any and all documents and do any and all other things Buyer reasonably deems to be helpful in documenting, effectuating or otherwise protecting Buyer's rights in and to the Sears Properties.

  **6.B *Work Made-For Hire***. Seller acknowledges and agrees that all Sears Properties are deemed "works made-for hire" as that term may be defined from time to time in Section 101 of the Copyrights Act, 17 U.S.C. Section 101 (or any successor thereto), that Buyer is deemed the author or creator of the Sears Properties, and that Buyer is the exclusive owner of all right, title and interest, including the copyrights and any and all other intellectual property rights in the Sears Properties.  If, for any reason, any of the Sears Properties are not found to have been created as a work made-for-hire, Seller hereby assigns to Buyer all right, title and interest, including the copyrights and any and all other intellectual property rights, in the Sears Properties. Seller further agrees to sign and deliver to Buyer any and all further documents Buyer reasonably deems to be helpful in documenting, effectuating or recording the foregoing assignment and those documents that, in Buyer's sole judgment and discretion, may determine necessary to protect Buyer's rights to the copyrights of the Sears Properties or necessary to carry out the purposes of intent of this Agreement.

  **6.C *Original Work***.  Seller represents and warrants that all Work done by Seller for Buyer under this Agreement is original or that Seller has obtained all rights necessary to its unrestricted use by Buyer in any manner and over any period of time, excepting those limitations or restrictions that Seller fully discloses in writing to Buyer at the time the Work is created, which restriction shall be binding on Buyer. Seller agrees to secure for Buyer all third party consents, releases and contracts necessary to evidence that Buyer has obtained the right to use any Work and contracts necessary to evidence that Buyer has obtained the right to use any Work

provided by Seller under this Agreement. If Seller retains any individual or company other than an employee of Seller to produce any Work solely and exclusively for Buyer, Seller shall ensure that all copyrights in the Work are assigned to Buyer. "Work" is defined as marketing materials, including advertising materials, point-of-sale displays, packaging, owner's manuals, Website contents, Website graphics and Website support materials.

**6.D  *Seller Intellectual Property***.  Seller represents and warrants that it is the sole and exclusive owner of and owns all right, title and interest in and to, or it possesses a valid license or other right to use and sublicense, all patents and patent applications, trademarks, copyrights, trade secrets and other intellectual property associated with the Products (all such rights, licenses and ownership interests are collectively called the "Seller Intellectual Property Rights"). Seller further represents and warrants that to the best of its knowledge, the manufacture, use and sale of the Products does not violate nor is it alleged to violate any patent, patent application, trademark, copyright, trade secret or other intellectual property right of any third party. Seller retains all Seller Intellectual Property Rights. This provision will survive the termination of the Agreement.

**6.E  *Sears Trademarks and Trade Dress***.  Seller acknowledges that (i) the Sears trademark, and any other trademarks, service marks or trade names Buyer uses in connection with its operations or any Products (collectively, the "Sears Marks"), and (ii) any trademarks, slogans, logos, phrases, or names developed by Buyer or jointly developed hereunder ("Additional Marks") constitute valuable intellectual property solely and exclusively owned by Buyer.  During the Term, Buyer hereby grants to Seller a non-exclusive, license fee free, limited license to use the Sears Marks and Additional Marks for the sole purpose of affixing the Sears Marks or the Additional Marks into (i) any Products Seller supplies to Buyer, in accordance with Buyer's instructions, and (ii) any Sears Properties developed, prepared or supplied by or on behalf of Seller relating to any Products, including advertising materials, promotional materials, point-of-sale displays or packaging. The foregoing license is personal to Seller, and Seller shall not grant sublicenses under such license to any other unaffiliated person or entity, except with Buyer's written permission.

## 7.      *Co-Branded Product*

**7.A      *Seller's Grant of License***.  Unless otherwise provided herein, Seller hereby grants to Buyer a royalty-free, non-exclusive license to use the marks in the United States, U.S. Virgin Islands and Puerto Rico  ("Seller's Marks") in connection with the marketing, advertisement, promotion, distribution, sale and other use relating to the touring tire manufactured by or for Seller, which will comprise Buyer's RoadHandler trademark and the Seller's Marks and be co-branded as the Hankook RoadHandler tire ("Co-Branded Product").

**7.B      *Seller's Representations and Warranties***.  Seller represents and warrants that: (a) it is the exclusive owner of the Seller's Marks; (b) to the best if its knowledge, the Seller's Marks do not infringe on the intellectual property rights of any party; and (c) it has the full authority to grant Buyer the rights described herein.

**7.C      *Ownership of the Seller's Marks***.  Buyer recognizes Seller's ownership of the Seller's Marks.  Any goodwill associated with Buyer's use of the Seller's Marks shall inure to Seller's benefit.  Buyer will not represent that it has any right, title or interest in and to the Seller's Marks other than the rights granted herein.  Buyer agrees that it will not challenge Seller's intellectual property rights to the Seller's Marks, nor attempt to secure rights that could

interfere with Seller's intellectual property rights in the Seller's Marks. Buyer will not represent that Seller is a sponsor, partner or joint venturer with Buyer.

**7.D** *Infringement of Seller's Marks*. In the event that Buyer learns of any infringement or threatened infringement of the Seller's Marks, or any unfair competition, passing-off or dilution with respect to same, Buyer shall promptly notify Seller giving particulars thereof. Notwithstanding the foregoing, Buyer is not obligated to monitor or police use of the Seller's Marks by third parties. Buyer's use of Seller's Marks shall be in compliance with Seller's guidelines. Whenever the Products are marketed by a third party under authority of Buyer, such third party shall not be deemed a third party for the purpose of this paragraph and Buyer shall be obligated to and responsible to ascertain use of Seller's Marks are in accordance with Seller's guideline.

**7.E** *Cessation of Use*. Except as otherwise provided in this Section 7.E, both parties shall, upon the expiration of the Term or the termination of this Agreement, immediately discontinue the marketing, advertisement, promotion, distribution, sale and/or other use of the other party's Marks and shall not again use the other party's Marks.

**7.F** *Sales of Co-Branded Product*. Seller shall not sell the Co-Branded product to anyone other than Buyer, except as stated in Section 7.G. In the event Buyer fails or refuses to purchase all of the Remnants (products for which Buyer issued a Purchase Order but failed or refused to accept delivery) at the price then in effect, Seller is authorized and directed to sell the Remnants at the price then in effect or negotiated or at such other price Seller may be able to achieve. Seller may also resell Co-Branded Products with cosmetic defects but only if all Co-Branded trademarks and labels have been removed so that the Products can no longer be identified as Co-Branded Products.

**7.G** *Sales of the Co-Branded Product after Expiration or Termination*. Upon the expiration of the Term or termination of this Agreement, Buyer shall have the right to distribute, sell or otherwise dispose of the Co-Branded products it has on hand and the Co-Branded products it has on order or through a mutually agreeable program for disposal of the tires. Buyer shall also have the right to use the Seller's Marks in connection with the marketing, advertisement and promotion of such inventory. All obligations of Buyer and Seller which expressly or by their nature survive through the end of the sell-off period described in this Section, will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement and until the end of the sell-off period described in this Section. Additionally, Buyer agrees to purchase the Co-Branded Product in Seller's inventory produced by Seller in reliance upon Buyer's 13-week forecast at prices currently in effect with a negotiated discount of not less than 20%. Buyer may purchase all of Seller's U.S. based stock, on water stock, stock in production and stock produced at Seller's factories that exceed the quantities reflected in Buyer's 13-week forecast at a negotiated mutually agreed price. If both parties cannot reach a mutually agreed price for such stock, Seller reserves the right to sell the stock in markets outside of the United States, U.S. Virgin Islands and Puerto Rico.

**8.** *Miscellaneous*.

**8.A** *Consideration*. Buyer has given, and Seller has received and accepted, adequate, good, and valuable consideration for this Agreement. Buyer's adequate, good, and valuable consideration includes the mutual covenants, obligations, and promises herein and the following (which separately and together have enabled Seller to execute and deliver this Agreement and have assisted and will assist Seller's performance of its obligations under this

Agreement): (1) Buyer, one of the U.S.'s largest broadlines retailers, has at great length discussed and upon reasonable request during the Term will discuss its business needs with Seller for the purpose of enabling Seller to make compelling business proposals to Buyer; (2) Buyer has entered into negotiations with Seller that culminated in the execution and delivery of this Agreement, which gives Seller certain advantages over other manufacturers of auto tires; (3) Buyer has provided and upon reasonable request during the Term will provide information to Seller about Buyer's operations; (4) in this Agreement Buyer agrees to purchase a minimum quantity of $100 of Product during the Term; and (5) in this Agreement Buyer agrees with Seller to negotiate in good faith to determine the price for products not listed on Appendix 3.A that Buyer purchases from Seller, if any. Seller has bargained for and will receive material benefits, interests, rights, and value from Buyer through such consideration and that Seller is not entitled to and would not have received such benefits, interests, rights, and value, absent this Agreement. This Agreement is legally binding; and Seller will not, directly or indirectly, plead or otherwise assert in any manner in any litigation, arbitration, mediation, or other dispute-resolution proceeding that this Agreement is invalid, void, voidable, revocable, terminable, or otherwise unenforceable for lack or insufficiency of consideration; and by this Agreement irrevocably waives and will be estopped from pleading or asserting, directly or indirectly, any cause of action, claim, defense, right, or prayer for relief to such effect. Each of Seller's waivers in this Section 9.A is reasonable and made with Seller's full knowledge of its significance and consequences.

**8.B     *SPRS*.**  Unless otherwise indicated in this Agreement all calculations and measurements with respect to Buyer's purchases and sale of Products, average retail selling prices, and similar information will be measured in units or dollars, as the context requires, and determined by reference to SPRS or any successor system implemented by Buyer.

**8.C     *Representations and Warranties*.**  Buyer and Seller each represents and warrants to the other that (i) it has the right, power and authority to grant the rights provided in this Agreement and to perform its obligations under this Agreement, and (ii) its execution, delivery, and performance of this Agreement have been duly authorized and will not violate any other agreement, restriction, or law to which it is a party or by which it is bound.

**8.D     *Notices*.**  Notices under this Agreement are sufficient if given by nationally recognized overnight courier service, certified mail (return receipt requested), facsimile with electronic confirmation or personal delivery to the other party at the address below:

|  |  |
|---|---|
| *If to Buyer:* | *If to Seller:* |
| Sears, Roebuck and Co. | Hankook Tire America Corp. |
| 3333 Beverly Road, E2-105B | 1450 Valley Road |
| Hoffman Estates, IL  60179 | Wayne, NJ 07470 |
| Attn: Director Merchandising – Tires | Attn: Sr. Account Manager |
| Facsimile:  (847) 286-6691 | Facsimile: (973) 633-0028 |

With a copy to:

| | |
|---|---|
| Sears Holdings Management Corporation | Dae-Ki Min, Esq. |
| 3333 Beverly Road | 27 Dillingham Place |
| Hoffman Estates, IL  60179 | Englewood Cliffs, NJ 07632 |
| Attn:  Assistant General Counsel – Automotive | Facsimile: (201)894-8081 |
| Facsimile:  (847) 286-0266 | |

Notice is effective (i) when delivered personally, (ii) three business days after being sent by certified mail, (iii) on the business day after sent by a nationally recognized courier service, or (iv) on the business day after sent by facsimile with electronic confirmation to the sender. A party may change its notice address by giving notice in accordance with this Section 8.D.

**8.E**    ***Publicity***. Seller will not make reference to, or disclose the existence or terms of this Agreement or any other information regarding Seller's supply of the Products to Buyer in any advertising, promotional or sales activity or publicity release, or otherwise, unless Buyer gives its prior written consent to such action and the materials to be published. If Seller is required to make any disclosure about this Agreement under any law, Seller will give Buyer a reasonable opportunity to review the content of the disclosure and will incorporate, to the extent legally permitted, all reasonable modifications to the disclosure that Buyer may request.

**8.F**    ***Injunctive Relief***.  Breach by Seller of Section 7.F of this Agreement will cause Buyer and its affiliates irreparable harm for which Buyer and its affiliates have no adequate remedies at law.  Accordingly, Buyer and its affiliates are entitled to injunctive relief for all breaches by Seller of this Agreement.  Seller waives all claims for damages by reason of the wrongful issuance of an injunction and acknowledges that its only remedy in that case is the dissolution of the injunction.  Seller waives all rights it may have to require Buyer to post a bond in connection with all such relief.

**8.G**    ***Relationship of the Parties***.  The relationship of Seller and its employees, agents, and contractors to Buyer is at all times that of independent contractors, and Seller will not represent Buyer as Buyer's agent, employee, or partner in any manner. Seller has no authority to enter into any contract or incur any expense or obligation in Buyer's name.

**8.H**    ***Federal Contracting Requirement***.  As a federal contractor, Buyer is subject to affirmative action and other federal contracting requirements, and is required to include those requirements in its subcontracts. Therefore, this Agreement incorporates by reference, and Seller will comply with, the following provisions of Title 48 of the Code of Federal Regulations: 52-219.8, Utilization of Small Business Concerns, 52.222-26, Equal Opportunity; 52.222-35, Affirmative Action for Special Disabled and Vietnam Era Veterans; 52.222-36, Affirmative Action for Handicapped Workers; and 52.244-6, Subcontracts for Commercial Items and Commercial Components. Seller acknowledges that Buyer is committed to helping bring small business, small disadvantaged businesses, and women-owned businesses into the American economic system. In furtherance of this goal, if Seller uses the services of subcontractors, Seller will use reasonable efforts to involve qualified small, small disadvantaged, and women-owned sources in its selection process.

**8.I**    ***Entire Agreement***.  This Agreement, which includes the UTC, the Vendor Guide, and each of the Appendices that are attached, comprises the entire agreement and understanding between Buyer and Seller with respect to the Products. All prior and contemporaneous claims, representations, discussions, RFPs, proposals, and negotiations relating

to the Products are merged in this Agreement. This Agreement cannot be supplemented, modified, or amended except by a written instrument signed by duly authorized representatives of Buyer and Seller. This Agreement supersedes and Buyer will not be bound by any "disclaimers" or "click to approve" terms or conditions now or hereafter contained in any web site used by Buyer in connection with the Products or this Agreement. This Agreement is binding upon and inures to the benefit of the successors, representatives and permitted assigns of Buyer and Seller.

**8.J    *Survival*.**  All obligations of Buyer and Seller that expressly or by their nature survive the expiration or termination of this Agreement, including the obligation of either party to pay any amounts accrued hereunder, will continue in full force and effect beyond the expiration or termination of this Agreement and until they are satisfied or by their nature expire.

**8.K    *No Waiver*.**  The terms, covenants and conditions of this Agreement may be waived only by a written instrument signed by the party waiving compliance. Any party's failure to require performance of any provision will not affect that party's right to enforce that or any other provision at a later date. No waiver of any condition or breach of any provision, term, or covenant in this Agreement, whether by conduct or otherwise, in any one or more instances will be construed as an additional or continuing waiver of that or any other condition or breach of that or another provision, term, or covenant of this Agreement.

**8.L    *Interpretation and Construction*.**  In this Agreement (1) "include," "includes," and "including" are inclusive and mean, respectively, "include without limitation," "includes without limitation," and "including without limitation," (2) numbered "Section" references refer to Sections of this Agreement unless otherwise specified, (3) Section headings are for convenience only and will have no interpretive value, (4) all references to a number of days means calendar days unless otherwise specified and all references to months or years mean calendar months or years, (5) all references to $ or Dollars mean U.S. Dollars. Seller and Buyer intend that this Agreement be construed without any construction against the drafter.

**8.M    *Governing Law*.**  This Agreement is governed by Illinois law without reference or regard to conflict of law provisions or other laws of any jurisdiction that would apply the laws of any jurisdiction other than the State of Illinois. The rights and obligations of Buyer and Seller in this Agreement will not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

**SEARS, ROEBUCK AND CO.**
**By: Sears Holdings Management Corporation,**
**its agent**

By: _____
Name: _____
Title: _____

**HANKOOK TIRE AMERICA CORP.**

By: _Shawn Danlen_____
Name: _Shawn Danlen_____
Title: _SVP_____

## APPENDIX 3.A

### The Products; Invoice Prices

| Seller Item # | Buyer Item # | Description | Invoice Price |
|---|---|---|---|
| | | Hankook RoadHandler tires | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**APPENDIX**

## Sears / Lakin Tire Adjustment Guidelines

### Tire Adjustment Tags

- ♦ Approved tires with illegible tags will be identified by store number 549X
- ♦ The condition of the tire will supersede the reason for removal
- ♦ If the stock number or description on the tag is incorrect but the tire is adjustable, Lakin will correct and submit the tire for credit on behalf of Sears under the corrected stock number and reason

### Mileage Warranties

Tires covered under a SAG mileage warranty will be submitted to the manufacturer for credit unless otherwise notified by Sears

Tires covered under a manufacturer mileage warranty sold at SAG can be submitted for mileage. O.E. tires carry no mileage warranty

### Criteria

- ♦ 3/32nds or less tread remaining in the lowest area
- ♦ Tread depth varies less than 2/32nds across the tire
- ♦ Actual miles driven are less than warranty as indicated on tag
- ♦ SAG or manufacturers mileage warranty on tires being removed
- ♦ Beginning, and current mileage documented on tag

### Ride Complaint Tires

- ♦ Tires must be within the first 2/32nds of usable tread wear
- ♦ *Limited to first 12 month or 2/32nds, whichever comes first*
- ♦ **Tires must be worn evenly, no alignment, cupping ext.**
- ♦ No credit given for tires removed for improper balancing
- ♦ No credit given for tires removed for miss-application
- ♦ **Limited to four tires per vehicle/transaction**

### Manufacturers Referrals

Note: This will include tires replaced when the manufacturer has made an exception to the normal tire warranty guidelines, customer sat, road hazard, or tires worn out with no mileage warranty are a couple of examples.

- • Tires replaced for an abnormal condition require an RGA# from the manufacturer, an abnormal condition will be anything not covered under the written warranty

Weather Cracking – See attached examples of weather cracking for guidelines of what is acceptable.

Figure 1 – Illustrates acceptable cracking

Figure 2 – Illustrates the far end of normal weather cracking. If the cracking is more severe than this example, it should be submitted for credit.

## Non-Stocked Items Special Handling

Class control numbers are used to receive and sell tires when there is no Sears stock number. Since these are generic numbers, in addition to the normal documentation from the adjustment tags, it will be necessary to manually document additional information from the tire as listed.

- *Manufacturer's Brand*
- *Size, speed rating, load range and sidewall description*
- *Department of Transportation (DOT)*

This data will be transmitted monthly with the adjustment data for Sears. Sears will send these files to the manufacturers to acquire cost which will be included in the debit memo under the manufacturers appropriate class control number.

## Sears class control numbers

| Manufacturer | Passenger | Truck |
|---|---|---|
| BFGoodrich | 95101 | 95201 |
| Bridgestone | 95102 | 95202 |
| Cooper | 95112 | 95212 |
| Dunlop | 95105 | 95205 |
| Falken | 95111 | 95211 |
| Firestone | 95108 | 95208 |
| Hankook | 95116 | 95216 |
| Goodyear | 95103 | 95203 |
| Conti/Gen | 95104 | 95204 |
| Kelly | 95107 | 95207 |
| Michelin | 95100 | 95200 |
| Pirelli | 95110 | 95210 |
| Nan Kang | 95109 | 95209 |
| Sumitomo | 95115 | N/A |
| Yokohama | 95106 | 95206 |
| Misc. Light Truck | | 95010 |

## Note on RGA #'s

All tires submitted with RGA # on the tag will need to have that RGA number included in the data feed sent to Sears monthly. If the RGA # and any of the following are the same, the RGA# is fictitious (Associate #, Store #, Item #, Item # or 123455). All other RGA #'s should be treated as legitimate and the burden placed on the manufacturer to prove otherwise.

## Comments section of tags

This area of the tag is utilized to communicate additional information on why the tire was removed from service. This area could contain an approval number or code from the manufacturer; generally this will occur when the store has used the wrong reason code when removing the tire/tires.

Acceptable – "PC525410" (This is a legitimate RGA#)
UN-acceptable – "Approved RGA from Hankook" (This is a statement, not an approval)

## Road Hazard Tires

All road hazard tires are to be shipped along with other adjustments. These tires will be inspected and documented. If an adjustable condition is found, the tire will be presented for credit to the manufacturer.

Illegible Tags

## Reason Submitted Codes

These codes are to be used to document the actual reason the store removed the tire. Under no circumstances shall a tire adjusted at the store for one reason be documented as another.

Example: Tire adjusted at the store for Road Hazard, inspection of tire determines that there was a manufacturer's defect. Tire is documented as an "H" Road Hazard adjustment but submitted as a "12" Separation – Tread.

Codes

| | |
|---|---|
| Damage (New) | "D" |
| Road Hazard | "H" |
| Manufacturers Defect | "M" |
| Other | "O" |
| Ride Complaint | "R" |
| Customer Satisfaction | "S" |
| Treadwear | "T" |
| Recall | "R" |
| Illegible Tag | "I" |

## Reason Approve / Decline

The actual condition of the tire and reason for approval or denial will be documented utilizing the following codes.

| Reason Approved/Declined | Code | Disposition |
|---|---|---|
| No RGA# | 0 | Declined |
| Not warranted | 1 | Declined |
| No defect | 2 | Declined |
| Excessive wear | 3 | Declined |
| Road Hazard | 4 | Declined |
| Impact Break | 5 | Declined |
| Mechanical wear | 6 | Declined |
| Improper inflation | 7 | Declined |
| Improper tag | 8 | Declined |
| Install damage | 9 | Declined |
| Tread > 2/32 | 10 | Declined |
| Excessive age | 11 | Declined |
| Separation-Tread | 12 | Approved |
| Separation-Bead | 13 | Approved |
| Separation-Sidewall | 14 | Approved |
| Cracking-Tread | 15 | Approved |
| Cracking-Bead | 16 | Approved |
| Cracking-Sidewall | 17 | Approved |
| Inner liner defect | 18 | Approved |
| Other Defect | 19 | Approved |
| Premature wear | 20 | Approved |
| Ride Complaint | 21 | Approved |
| Damage (New) | 22 | Approved |
| Approved RGA# | 23 | Approved |
| Authorized Recall | 99 | Approved |



**Figure 1**



**Figure 2**

# AMENDMENT
## To Supply Agreement for Auto Tires dated May 1, 2016

This amendment is dated February 24, 2017 and is between Sears, Roebuck and Co. ("**Buyer**") and Hankook Tire America Corp., a New Jersey corporation ("**Seller**").

**Background.** Buyer and Seller are parties to the Supply Agreement for Auto Tires dated May 1, 2016, (the "**Agreement**"). The parties desire to amend the Agreement to extend its term and make certain additional changes.  Terms in this Amendment that are not defined below are defined as in the Agreement.

**In consideration** of the parties' mutual promises, covenants, and agreements, the parties, intending to be legally bound, amend the Agreement as follows:

1.  In Section 2 (Term), the Expiration Date is changed from January 31, 2017 to January 31, 2018.

2.  New Section 3.G (Laufenn) is inserted as follows:

    ***3.G. Laufenn.***  Seller shall supply and Buyer shall purchase and assort in its stocked inventory Seller's Laufenn HT P & LT Metric size tires in the following target sizes:

    P Metric

    | | | | |
    |---|---|---|---|
    | 265-70-17NR | 255-70-16NR | 225-70-16NR | 265-65-17NR |
    | 235-70-16NR | 265-75-16NR | 245-70-16NR | 245-70-17NR |
    | 265-70-16NR | 245-75-16NR | 235-65-17NR | 225-75-16NR |
    | 245-65-17NR | 225-70-15NR | 215-70-16NR | 225-65-17NR |
    | 235-60-18NR | 235-65-18NR | 245-60-18NR | 255-65-18NR |
    | 265-60-18NR | 275-65-18NR | | |

    LT Metric

    | | | | |
    |---|---|---|---|
    | 245-75-16E | 265-75-16E | 235-85-16E | 225-75-16E |
    | 265-70-17E | 245-75-17E | 235-80-17E | |

3.  Section 5.A. (Marketing and Promotional Support) is deleted and replaced by the following:

    **5.A**  ***Marketing and Promotional Support.***  Seller will provide Buyer Marketing Support rebates and Promotional Support rebates on Buyer's purchases of Hankook RoadHandler and Laufenn from Seller to be paid quarter during the month following the close of each fiscal quarter via credit memo calculated on net purchases (total Purchase Orders less returns). The rebates will be 3% for Marketing Support and 3% for Promotional Support on purchases made from the Effective Date through January 31, 2018. Hankook

1

shall have the right to audit RoadHandler and Laufenn marketing and promotional activities funded by the rebate money issued via credit memo to Buyer.

4. Appendix 3.A is deleted in its entirety and replaced with the amended Appendix 3.A attached hereto.

5. Section 8.M (Governing Law) is restated and incorporated into this Amendment, as if set forth fully herein.

6. All provisions of the Agreement remain as originally written except as previously modified in writing by the parties.

Executed by the parties' authorized representatives.

**BUYER:**
SEARS, ROEBUCK AND CO.

By: _____
Name: _Jane Burnham_____
Title: __VP Genn_____
Date: February _24_, 2017

**SELLER:**
HANKOOK TIRE AMERICA CORP.

By: _____
Name: Shawn Denlein
Title: SVP
Date: February _22_, 2017

2

#523430

## APPENDIX 3.A. (Amended)

### Product and Prices

| Seller Item # | Sears Item # | Description | | Invoice Price |
|---|---|---|---|---|
| 1017227 | 36155 | X-FIT HT | 225/70R15 | $ 68.58 |
| 1017229 | 36156 | X-FIT HT | 235/70R16 | $ 69.24 |
| 1017230 | 36157 | X-FIT HT | 255/70R16 | $ 80.51 |
| 1017231 | 36158 | X-FIT HT | 265/70R16 | $ 78.38 |
| 1017228 | 36159 | X-FIT HT | 245/75R16 | $ 65.26 |
| 1017233 | 36160 | X-FIT HT | 225/65R17 | $ 69.60 |
| 1017234 | 36161 | X-FIT HT | 235/65R17 | $ 75.82 |
| 1017235 | 36162 | X-FIT HT | 245/65R17 | $ 84.00 |
| 1017232 | 36163 | X-FIT HT | 245/70R17 | $ 78.75 |
| 1016781 | 36164 | X-FIT HT | 265/70R17 | $ 83.66 |
| 1017236 | 36165 | X-FIT HT | 235/65R18 | $ 81.57 |
| 1017237 | 36166 | X-FIT HT | 235/60R18 | $ 85.07 |
| 1017238 | 36167 | X-FIT HT | 245/60R18 | $ 86.21 |
| 1019688 | 36168 | X-FIT HT | 215/70R16 | $ 64.05 |
| 1019690 | 36169 | X-FIT HT | 225/70R16 | $ 56.58 |
| 1019692 | 36170 | X-FIT HT | 225/75R16 | $ 57.74 |
| 1019694 | 36171 | X-FIT HT | 245/70R16 | $ 67.07 |
| 1019556 | 36172 | X-FIT HT | 265/75R16 | $ 69.82 |
| 2020465 | 36173 | X-FIT HT | LT225/75R16 | $ 70.82 |
| 2020467 | 36174 | X-FIT HT | LT235/85R16 | $ 81.08 |
| 2020469 | 36175 | X-FIT HT | LT245/75R16 | $ 81.16 |
| 2020462 | 36176 | X-FIT HT | LT265/75R16 | $ 88.43 |
| 1019696 | 36177 | X-FIT HT | 265/65R17 | $ 78.13 |
| 2020471 | 36178 | X-FIT HT | LT235/80R17 | $ 88.97 |
| 2020473 | 36179 | X-FIT HT | LT245/75R17 | $ 92.48 |
| 2020475 | 36180 | X-FIT HT | LT265/70R17 | $ 94.87 |
| 1019698 | 36181 | X-FIT HT | 255/65R18 | $ 86.02 |
| 1019700 | 36182 | X-FIT HT | 265/60R18 | $ 88.31 |
| 1019702 | 36183 | X-FIT HT | 275/65R18 | $ 86.92 |

#523430

**AMENDMENT #2**
**To Supply Agreement for Auto Tires dated May 1, 2016**

This Amendment #2 ("Amendment") is to be effective February 1, 2018 ("Effective date") between Sears, Roebuck and Co., a New York corporation, its subsidiaries and affiliates ("**Sears**") and Hankook Tire America Corp., a New Jersey corporation ("**Seller**"). Sears, its subsidiaries and affiliates together are referred to in this agreement as "**Buyer.**"

WHEREAS, Buyer and Seller are parties to a Supply Agreement for Auto Tires dated May 1, 2016 (the "**Original Agreement**") that was amended by the Amendment to Supply Agreement for Auto Tires dated February 24, 2017 ("**First Amendment**") (the Original Agreement and First Amendment are collectively referred to herein as the "**Agreement**.")

WHEREAS, the parties desire to amend the Agreement to extend its term and make certain changes as set forth below;

NOW THEREFORE, in consideration of the parties' mutual promises, covenants, and agreements, the parties, intending to be legally bound, amend the Agreement as follows:

1. **Section 2 ("Term").** Section 2 of the Agreement is deleted in its entirety and replaced with the following:

   The term of this Agreement (the "**Term**") begins on May 1, 2016 (the "Effective Date") and expires, unless sooner terminated under this Agreement, on January 31, 2019 (the "**Expiration Date**"). This Agreement applies to Products (defined in Section 3.A) shipped on or after the Effective Date and before the Expiration Date, including those for which Buyer placed the order before the Effective Date."

2. **Section 3.C ("Good Faith Purchase Estimate").** Section 3.C of the Agreement is deleted in its entirety.

3. **Section 3.E ("Hankook Roadhandler").** Section 3.E of the Agreement is deleted in its entirety.

4. **Section 3.M ("Customer Product Returns").** The first sentence in Section 3.M is deleted in its entirety and replaced with the following:

   "Seller will use the Lakin and/or Liberty defects and warranty returns process as described in Appendix 3.L. If Lakin and/or Liberty confirms that the returned products qualified for warranty adjustment per Seller's warranty adjustment policy, Seller will refund the cost of the warranty returned product to Buyer,

#537683

which is determined by multiplying the percentage of usable tread by the invoice price (unless otherwise noted in an RGA file prior to inspection). Buyer may take the refund based on Lakin and/or Liberty's communication confirming the warranty adjustment, by credit memo. All Lakin and/or Liberty's and/or Liberty inspections are subject to Seller's review and confirmation.

5. **Section 4.F ("Payment Terms")**. Section 3.E of the Agreement is deleted in its entirety and replaced with the following:

"Seller will invoice Buyer for the Products via Electronic Data Interchange or the successor system that Buyer designates no earlier than the date invoiced Products depart the F.O.B. point. Buyer will initiate payment by electronic funds transfer for the undisputed portion of each invoice five (5) days after receipt of goods by Buyer at Buyer's Tire Distribution Center (TDC), plus existing float days including EFT. If the day payment is due is a Saturday, Sunday, or legal holiday Buyer will initiate payment on the next banking day. Subject to timely payment in accordance with the foregoing, Buyer will be entitled to a 4% discount on Seller's invoices for Products received by Buyer until the Expiration Date. Payments initiated within these time periods are deemed to be timely made.

6. **Section 5.A ("Marketing and Promotional Support")**. Section 5.A of the Agreement is deleted in its entirety and replaced with the following:

"Seller will provide Buyer Marketing Support rebates and Promotional Support rebates on Buyer's purchases of Hankook Roadhandler and Laufenn from Seller to be paid quarterly during the month following the close of each fiscal quarter via credit memo calculated on net purchases (total Purchase Orders less returns). The rebates will be 3% for Marketing Support and 3% for Promotional Support on purchases made from the Effective Date through the Expiration Date. Seller shall have the right to audit Roadhandler and Laufenn marketing and promotional activities funded by the rebate money issues via credit memo to Buyer."

7. **Section 5.C ("Promotional Event Support").** Section 5.C is deleted in its entirety and replaced with the following:

"Seller will pay to Buyer certain fixed amounts to paid quarterly during the month following the close of each fiscal quarter via credit memo calculated on net purchases (total Purchase Orders less returns) as follows:

2

| Tire Type | Subsidy Period | Subsidy Amount |
|---|---|---|
| LH01/LH41 (G-Fit, S-Fit) | January 1, 2018 to June 30,2018 | $2.00 per tire |
| LD01 (X-Fit) | January 1, 2018 to June 30,2018 | $4.00 per tire |

| Tire Type | Subsidy Period | Subsidy Amount |
|---|---|---|
| LH01/LH41 (G-Fit, S-Fit) | July 1, 2018 to January 31,2019 | $1.00 per tire |
| LD01 (X-Fit) | July 1, 2018 to January 31,2019 | $1.25 per tire |

Buyer will be entitled to an additional 1.25% discount on Seller's invoices for all Hankook and Laufenn purchases.

8. **Section 5.H ("Withheld Payments Balance").** A new Section 5.H is added to the Agreement as follows:

**Withheld Payments Balance**. During the Term and for a period of up to six months following termination or expiration of the Agreement, and notwithstanding any contrary provision under this Section 5, Seller may withhold payments otherwise owed to Buyer under Section 5 ("Seller's Support") of the Agreement up to a maximum of $500,000.00. All Seller Support that becomes due in excess of that maximum amount shall be paid by Seller as stated in Section 5. Six months after termination or expiration of the Agreement, Seller shall pay Buyer the entire withheld balance, net of any amounts then owing from Buyer to Seller that remain unpaid. Such payment will be made promptly following reconciliation of all final outstanding amounts owing hereunder, and in any event within fifteen (15) days thereof. For the avoidance of doubt, all withheld Seller's Support will be deemed exclusively the property of Seller and not Buyer until such amounts are actually paid by Seller to Buyer, and Buyer will have no rights therein except the right to receive such amounts when and only to the extent they become payable to Buyer under this Section 5.H following the final reconciliation process described above. The rights reserved by Seller in this Section 5.H are in addition to and not a limitation of Seller's general rights of recoupment.

9. **Section 8.N ("Receivables Insurance").** A new Section 8.N is added to the Agreement as follows:

#537683

"During the Term, Seller will continue to attempt to secure receivables credit insurance for Buyer's payments on commercially reasonable terms, and if it is able to do so, it will secure such insurance and will so notify Buyer in writing."

10. **The Parties' Continuing Obligation to Keep Terms Confidential.** Buyer and Seller agree that the terms of this Amendment are Proprietary Information of Buyer, which Seller is restricted from disclosing under Section 16 (Confidentiality) of the UTC. Buyer and Seller agree that the terms of this Amendment shall be confidential and, except as set forth elsewhere in this Paragraph, will not be disclosed to any third party at any time, except Seller's attorney. Section 16 of the UTC is restated and incorporated into this Amendment as if fully set forth herein.

11. Section 8.M (Governing Law) is restated and incorporated into this Amendment, as if set forth fully herein.

12. All capitalized terms appearing in this Amendment shall have the meaning which they have in the Agreement unless otherwise defined herein.

13. Except to the extent specifically provided to the contrary in this Amendment, all terms and conditions of the Agreement shall remain in full force and effect, without modification or limitation.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment on the date first above written.

**BUYER:**
SEARS, ROEBUCK AND CO.

By: M. chal Mc Carthy
Name: Michael McCarthy
Title: VP G+M
Date: 6/12/18

**SELLER:**
HANKOOK TIRE AMER. ICA CORP.

By: _____
Name: JAMES ZICK NB
Title: SENIOR DIRECTOR
Date: 6/6/2018

4

#537683