Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   Sears Holdings Corporation,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street

14                  White Plains, NY 10601-4140

15

16                  August 22, 2019

17                  10:11 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  JUSTIN WALKER

Page 2

1    HEARING re Notice of Agenda of Matters Scheduled for Hearing

2    on August 22, 2019 at 10:00 a.m.

3

4    Objection of Prep Hanover Real Estate LLC to Proposed Cure

5    Amount and Potential Assumption and Assignment of Unexpired

6    Lease in Connection with Global Sale Transaction (document

7    #1903)

8

9    Cure Objection of Alan Robbins, Benderson Development

10   Company LLC, Brookfield Properties REIT, Inc., Gray

11   Enterprises, LP, Graziadio Investment Company, Gregory

12   Greenfield & Associates, Ltd., LBA Realty LLC, LF2 Rock

13   Creek LP, Nassimi Realty LLC, Regency Centers, L.P., Site

14   Centers Corp., Spigel Properties, The Woodmont Company, and

15   Weingarten Realty Investors Relating to Debtors' Notices of

16   Assumption and Assignment of Additional Designatable Leases

17   in Connection with the Global Sale Transactions (related

18   document(s)3299, 3298, 3211) filed by Robert L. LeHane on

19   behalf of The Woodmont Company, Spigel Properties, Nassimi

20   Realty LLC, LF2 Rock Creek LP, Graziadio Investment Company,

21   Alan Robbins, Benderson Development Company LLC, Brookfield

22   Property REIT Inc., Gray Enterprises, Gregory Greenfield &

23   Associates, Ltd., LBA Realty LLC, Regency Centers Corp.,

24   SITE Centers Corp., Weingarten Realty

25   Investors (document #3553)

Page 3

1    Objection of Alan Robbins, Benderson Development Company

2    LLC, Brookfield Property REIT Inc., Gray Enterprises, LP,

3    Graziadio Investment Company, Gregory Greenfield &

4    Associates, Ltd., LF2 Rock Creek, LP, LBA Realty, LLC,

5    Nassimi Realty LLC, Realty Income Corp., Regency Centers

6    Corp., Site Centers Corp., Spigel Properties, The Woodmont

7    Company, and Weingarten Realty Investors to Notices of

8    Assumption and Assignment of Additional Designatable Leases

9    (related document(s)3299, 3298) filed by Robert L. LeHane on

10   behalf of Alan Robbins, Benderson Development Company LLC,

11   Brookfield Property REIT Inc., Gray Enterprises, Graziadio

12   Investment Company, Gregory Greenfield & Associates, Ltd.,

13   LBA Realty LLC, LF2 Rock Creek LP, Nassimi Realty LLC,

14   Realty Income Corp., Regency Centers Corp., SITE Centers

15   Corp., Spigel Properties, The Woodmont Company, Weingarten

16   Realty Investors (document #3558)

17

18

19   Motion to Authorize:  Motion of Debtors for Modification of

20   Retiree Benefits (document #4635)

21

22   Declaration of William Murphy In Support of Motion of

23   Debtors (document #4636)

24

25   Objection to Motion Objection of Retirees Committee to

Page 4

1   Debtors Motion for Modification of Retiree Benefits (related

2   document(s)4635)

3

4   Joinder of Official Committee of Unsecure Creditors

5   (document #4887)

6

7   Joinder of Secretary of Labor in Opposition (document #4762)

8

9

10  Notice of Assignment of Unexpired Leases of Nonresidential

11  Real Property (document #4763)

12

13  Objection to Motion filed by David R Taxin on behalf of 5525

14  S. Soto St. Associates (document #4829)

15

16  Objection (related document(s)4763) filed by Kenneth

17  Friedman on behalf of 51st Street Fruitland Ave., LLC

18  (document #4883)

19

20  Debtors' Omnibus Reply (document #4902)

21

22

23  Motion for Allowance and Payment of Administrative Expense

24  filed by Christopher Matthew Hemrick on behalf of GroupBy

25  USA, Inc. (document #3404)

Page 5

1    Debtors' Omnibus Objection to Vendors Motions for Allowance

2    and Payment of Administrative Expense Claims (document

3    #4854)

4

5    Reply to Motion (related document(s)3404) filed by

6    Christopher Matthew Hemrick on behalf of GroupBy USA, Inc.

7    (document #4935)

8

9    Motion to Allow and Compel Payment of Administrative Expense

10   Claim Under 11 U.S.C. section 503(b) for Services Provided

11   to the Debtor Post-Petition filed by Kathleen M. Aiello on

12   behalf of Aspen Marketing Services, Inc. (document #4001)

13

14   Debtors' Omnibus Objection to Vendors Motions for Allowance

15   and Payment of Administrative Expense Claims (document#4854)

16

17   Joinder to the Replies of Alpine Creations Ltd. and Weihai

18   Liznqiao International Coop. Group Co., Ltd. to Debtors'

19   Omnibus Objection to Vendors' Motions for Allowance and

20   Payment of Administrative Expense Claims (document #4904)

21

22   Joinder of Aspen Marketing Services, Inc. To Responses to

23   Debtors' Omnibus Objection to Vendors' Motions For Allowance

24   and Payment of Administrative Expense Claims (document

25   #4918)

1    Motion of MaxColor for Payment of Administrative Expenses

2    filed by Jason Louis Libou (document #4176)

3

4    Debtors' Omnibus Objection (document #4854)

5

6

7    Motion to Compel Payment of Administrative Expenses filed by

8    H. Bruce Bronson, Jr. on behalf of M&S Landscaping Inc

9    (document #4306)

10

11   Debtors' Omnibus Objection (document #4854)

12

13

14   Motion to Allow- Notice of Motion and Motion of Alpine

15   Creations Ltd. To Allow and Compel Payment of Administrative

16   Expense claim Under 11 U.S.C. Sections 503(b)(1) And

17   503 (b)(9)(document #4631)

18

19   Debtors' Omnibus Objection (document #4854)

20

21   Alpine Creations Ltd.'s Reply (document #4893)

22

23   Joinder to the Replies of Alpine Creations Ltd. and Weihai

24   Liznqiao International Coop. Group Co., Ltd to Debtors'

25   Omnibus Objection to Vendors' Motions for Allowance and

1    Payment of Administrative Expense Claims (document #4904)

2

3    Joinder of Aspen Marketing Services, Inc. To Responses to

4    Debtors' Omnibus Objection (document #4918)

5

6

7    Motion for Payment of Administrative Expenses

8    (document #4689)

9

10   Debtors' Omnibus Objection (document #4854)

11

12

13   Motion for Payment of Administrative Expenses Notice of

14   Motion of Weihai Lianqiao International Coop. Group Co., Ltd

15   To Allow and Compel Payment of Administrative Expense Claims

16   Under 11 U.S.C. 503(b)(1) AND 503 (b)(9) (document #4706)

17

18   Debtors' Omnibus Objection (document #4854)

19

20   Joinder to the Replies of Alpine Creations Ltd. and Weihai

21   Liznqiao International Coop. Group Co., Ltd to the Debtors'

22   Omnibus Objection to Vendors' Motions for Allowance and

23   Payment of Administrative Expense Claims (document #4904)

24

25   Weihai Liznqiao International Coop. Group Co., Ltd's Reply

1    to Debtors' Omnibus Objection (document #4900)

2

3    Joinder of Aspen Marketing Services, Inc. To Responses to

4    Debtors' Omnibus Objection (document #4918)

5

6

7    Motion to Allow/Motion of Vehicle Services Group, LLC d/b/a

8    Rotary, a Dover Company, for Allowance and Payment of

9    Administrative Claim Under 11 U.S.C. 503(b)(1) and 503

10   (b)(9)(document #4728)

11

12   Debtors' Omnibus Objection (document #4854)

13

14   Joinder to the Replies of Alpine Creations Ltd. and Weihai

15   Liznqiao International Coop. Group Co., Ltd. to Debtors'

16   Omnibus Objection to Vendors' Motions for Allowance and

17   Payment of Administrative Expense Claims(document #4904)

18

19   Joinder of Aspen Marketing Services, Inc. To Responses to

20   Debtors' Omnibus Objection (document #4918)

21

22

23   Objection to Notice of Assumption and Assignment of

24   Additional Designatable Leases and to Proposed Cure Amount

25   filed by Dana S. Plon on behalf of Pennsee, LLC. (document

Page 9

1    #3392)

2

3

4    Objection of Vornado Realty L.P. and Certain of its

5    Wholly-Owned and Controlled Subsidiaries, as Landlord, to

6    Debtors' Notice of Cure Costs and Potential Assumption and

7    Assignment of Executory Contracts and Unexpired Leases in

8    Connection with Global Sale Transaction (related document(s)

9    1731) filed by Jennifer L. Rodburg on behalf of One Penn

10   Plaza LLC, 770 Broadway Owner LLC, Vornado Realty L.P.

11   (document #2109)

12

13   Statement of Joinder by Vornado Realty L.P. and Certain of

14   its Wholly-Owned and Controlled Subsidiaries in the

15   Objection of Various Landlords to Notices of Filing Revised

16   Proposed Order (I) Authorizing the Asset Purchase Agreement

17   Among Sellers and Buyer, (II) Authorizing the Sale of

18   Certain of the Debtors' Assets Free and Clear of Liens,

19   Claims, Interests and Encumbrances, (III) Authorizing the

20   Assumption and Assignment of Certain Executory Contracts,

21   and Leases in Connection Therewith and (IV) Granting Related

22   Relief (related document(s)2380) filed by Jennifer L.

23   Rodburg on behalf of 770 Broadway Owner LLC, One Penn Plaza

24   LLC, Vornado Realty L.P. (document #2422)

25

1   Objection (Supplemental) of Vornado Realty L.P. and Certain

2   of its Wholly-Owned and Controlled Subsidiaries, as

3   Landlord, to Transform Holdco LLC's Notice of Assumption and

4   Assignment of Additional Designatable Leases (related

5   documents(s) 3298) filed by Jennifer L. Rodburg on behalf of

6   770 Broadway Owner LLC, One Penn Plaza LLC, Vornado Realty

7   L.P. (document #3529)

8

9

10   MOAC Mall Holding LLC's Objection to Supplemental Notice of

11   Cure Costs and Potential Assumption and Assignment of

12   Executory Contracts and Unexpired Leases in Connection with

13   Global Sale Transaction filed by David W. Dykhouse on behalf

14   of MOAC Mall Holding LLC. (document #2199)

15

16   Objection to 3298 Notice filed by Thomas J. Flynn on behalf

17   of MOAC Mall Holding LLC. (document #3501)

18

19   Objection MOAC Mall Holdings LLC's Third Supplemental And

20   Amended Objections to Debtor's Notice of Assumption and

21   Assignment of Additional Designatable Leases (document

22   #3926)

23

24   Objection Fourth Supplemental (related document(s) 3298)

25   filed by Thomas J. Flynn on behalf of MOAC Mall Holding LLC.

Page 11

1   (document #4450)

2

3   Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I)

4   Objection to Supplemental Notice of Cure Costs and Potential

5   Assumption and Assignment of Executory Contracts and

6   Unexpired Leases in Connection with Global Sale Transaction;

7   (II) Second Supplemental and Amended: (A) Objections to

8   Debtor's Notice of Assumption and Assignment of Additional

9   Designatable Leases, and (B) Objection to Debtor's Stated

10  Cure Amount; and (III) Third Supplemental and Amended

11  Objections to Debtor's Notice of Assumption and Assignment

12  of Additional Designatable Leases (document #4454)

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Abigail Bayne

Page 12

```
 1    A P P E A R A N C E S :

 2

 3    WEIL, GOTSHAL & MANGES, LLP

 4        Attorneys for Sears Holdings Corporation and affiliates

 5        767 Fifth Avenue

 6        New York NY 10153-0119

 7

 8    BY:  JACQUELINE MARCUS, ESQUIRE

 9        GARRETT FAIL, ESQUIRE

10

11    CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Transform Holdco and its affiliates

13        One Liberty Plaza

14        New York, NY 10006-1470

15

16    BY:  LUKE BAREFOOT, ESQUIRE

17

18    DLA PIPER LLP

19        Attorneys for Transform Holdco

20        1251 Avenue of the Americas

21        New York, NY 10020-1104

22

23    BY:  RACHEL EHRLICH ALBANESE, ESQUIRE

24

25
```

1   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

2        Attorneys for Graziadio and WR Raleigh

3        3 Embarcadero Center, 12th Floor

4        San Francisco, CA 94111-4074

5

6   BY: IVAN GOLD, ESQUIRE

7

8   HUNTON ANDREWS KURTH LLP

9        Attorneys for Henry Shahery

10        200 Park Avenue

11        New York, NY 10166

12

13   BY: PAUL SILVERSTEIN, ESQUIRE

14

15   DAHAN & NOWICK, LLP

16        Attorneys for 5525 South Soto Street Associates

17        123 Main Street, 9th Floor

18        White Plains, NY 10601

19

20   BY:  DAVID R. TAXIN, ESQUIRE

21

22

23

24

25

1    BRONSON LAW OFFICES, P.C.

2         Attorney for M&S Landscaping, LLC

3         480 Mamaroneck Avenue

4         Harrison, NY 10528

5

6    BY:  H. BRUCE BRONSON, JR., ESQUIRE

7

8    WALSH PIZZI O'REILLY FALANGA, LLP

9         Attorneys for Group By USA, Inc.

10        Three Gateway Center

11        100 Mulberry Street, 15th Floor

12        Newark, NJ 07102

13

14   BY: CHRISTOPHER MATTHEW HEMRICK, ESQUIRE

15

16   WACHTEL MISSRY, LLC

17        Attorneys for MaxColor, LLC

18        885 2nd Avenue

19        New York, NY 10017

20

21   BY:  JASON LOUIS LIBOU, ESQUIRE

22

23

24

25

Page 15

1    TARTER, KRINSKY & DROGIN, LLP

2         Attorneys for Alpine Creations, Ltd.

3         1350 Broadway

4         New York, NY 10018

5

6    BY:  ROCCO CAVALIERE, ESQUIRE

7

8    MONTGOMERY MCCRACKEN, ATTORNEYS AT LAW

9         Attorneys for Vehicle Service Group, LLC

10        437 Madison Avenue

11        New York, NY 10022

12

13   BY:  EDWARD SCHNITZER, ESQUIRE

14

15   THE SARACHEK LAW FIRM

16        Attorneys for Mingle Fashion, Ltd.

17        101 Park Avenue, Floor 27

18        New York, NY, 10178-3099

19

20   BY:  JOSEPH SARACHEK, ESQUIRE

21

22

23

24

25

1    ALSO PRESENT TELEPHONICALLY:

2

3    MANATT, PHELPS & PHILLIPS, LLP

4         Attorneys for 51st Street Fruitland LLC

5         11355 W. Olympic Blvd.

6         Los Angeles, CA 90064

7

8    BY:  CARL GRUMER, ESQUIRE

9

10   LAW OFFICE OF SAUL REISS, PC

11        Attorney for Henry Shahery

12        2800 28th Street, Suite 328

13        Santa Monica, CA 90405

14

15   BY:  SAUL REISS, ESQUIRE

16

17   NEALE BENDER YOO & BRILL, LLP

18        Attorneys for Weihai Lianqiao International Coop. Group

19        Co., Ltd.

20        10250 Constellation Boulevard, Suite 1700

21        Los Angeles, CA 90067

22

23   BY:  TODD ARNOLD, ESQUIRE

24

25

Page 17

1                    P R O C E E D I N G S

2           THE COURT:  Okay.  Good morning.  In re: Sears

3    Holdings Corp, et al.

4           MS. MARCUS:  Good morning, your Honor.  Jacqueline

5    Marcus, Weil, Gotshal & Manges, on behalf of Sears Holdings

6    Corporation.  Your Honor, before we get started with the

7    agenda this morning, I wanted to take things a little bit

8    out of order.  Item number 3 on the agenda is the Motion of

9    the Debtors for modification of retiree benefits.  As the

10   court knows, and for the record, we just had a chambers

11   conference at which attorneys for the debtors, the

12   creditors' committee and the retiree committee participated,

13   and we agreed that that motion would be adjourned.  We are

14   going to check with your Court -- excuse me, with your

15   clerk -- as to date, sometime before the confirmation

16   hearing.  So with that adjournment, your Honor, I think

17   there are several people in the courtroom that would like to

18   be excused.

19           THE COURT:  Okay.  That's fine.  And the purpose

20   of the adjournment is for the discussion and analysis -- or

21   analysis and discussion.  So I'll confirm or look upon the

22   TA that you submitted some time ago.  You have a

23   contested -- you brought in half of an exhibit from the

24   confirmation hearing for that motion.  And if there's a

25   settlement of the 1114 issues you could proceed by notice of

1    presentment.  We won't need that half-day adjourn date for

2    that.  I just want to make sure that you and the retiree

3    committee have thought carefully on how to send that notice

4    out to the parties to the Securion contract.

5              MS. MARCUS:  We'll do that, your Honor.  And we

6    have the information.  So it -- being optimistic, we'll

7    start assembling that so that we'd be able to provide notice

8    promptly, when we settle.

9              THE COURT:  Okay.  Very well.  Thank you.

10             MS. MARCUS:  Thank you, your Honor.

11             THE COURT:  All right.  So everyone who is here on

12   the 1114 matter doesn't need to stay.  You could stay if you

13   want to, but there's no reason to.

14             UNIDENTIFIED SPEAKER:  Thank you, your Honor.

15             UNIDENTIFIED SPEAKER:  Thank you, your Honor.

16             THE COURT:  Okay.

17             MS. MARCUS:  Turning to the agenda, your Honor,

18   the first matter on the agenda is an uncontested

19   lease-related matter, and that's going to be handled by Luke

20   Barefoot from Cleary on behalf of Transform.

21             THE COURT:  Okay.

22             MR. BAREFOOT:  Good morning, your Honor.  Luke

23   Barefoot from Cleary Gottlieb Steen & Hamilton for Transform

24   Holdco and its affiliates.  Your Honor, before we move into

25   the lease matters that are up for hearing today, with your

Page 19

1    Honor's permission I'd like to give you a brief status

2    update of where we are on lease assumption --

3              THE COURT:  Sure.

4              MR. BAREFOOT:  -- maybe by way of providing your

5    Honor and all the parties comfort that we are reaching the

6    end of the road with respect to contested lease assumption

7    matters.

8              THE COURT:  Okay.

9              MR. BAREFOOT:  Since our mega hearing on May 13th,

10   we've reached resolution with landlords with respect to

11   assumption and assignment of leases covering a total of 42

12   locations.  Just to break that down a little, this court has

13   already entered orders governing assumption and assignment

14   with respect to 26 of those locations.

15             We have on notice of presentment a consensual

16   assumption and assignment order, for which the objection

17   deadline will pass today, that governs another 13 locations,

18   and then there are three locations that are on the hearing

19   today where we've reached resolutions with the landlords and

20   where, with your Honor's permission, we would propose to

21   just submit those consensual orders, which are substantially

22   in the form of the orders this Court has already entered to

23   your Honor's chambers electronically.

24             THE COURT:  Okay.

25             MR. BAREFOOT:  Those two -- those three locations

1    -- excuse me -- are agenda item number one, which is Store

2    1243 in Hanover, Massachusetts, and then agenda item number

3    14, which covers two stores locations in Manhattan; Store

4    Number 7749 and 7777.

5            THE COURT:  Okay.

6            MR. BAREFOOT:  Where that leaves us now, your

7    Honor, is with only six leases left, where -- six locations

8    left -- where we do not yet have consensual resolution.  One

9    of those is set down for hearing tomorrow; the Mall of

10   America dispute.  We're in the process of negotiating

11   substantive agreements with respect to an additional two of

12   those landlords for the stores in Baldwin Hills, Colorado

13   [sic] and the distribution center in Brighton, Colorado.

14   We've extended the 365(d)(4) deadline for both of those

15   stores.  We do not expect to need the hearing dates that we

16   have set down for those and are very optimistic that we'll

17   be able to submit those on notice of presentment.

18           THE COURT:  Have you let Ms. Lee know that,

19   because that would free up time for things like that the

20   1114 matter.

21           MR. BAREFOOT:  Your Honor, those are on -- those

22   are set down for omnibus hearing dates.  We will communicate

23   with Ms. Lee to make sure that there's no confusion about

24   that, but there's not a separate or substantial amount of

25   time set down for those.

Page 21

1           THE COURT:  Okay.  All right.

2           MR. BAREFOOT:  That leaves two additional leases

3    where you'll be hearing from Counsel for those, which is

4    being handled by DLA Piper, where there's going to be a

5    status conference today to set down an evidentiary hearing

6    for the stores in Raleigh, North Carolina and Temple City,

7    California.

8           And then the last of those six remaining items is

9    the contested matter that we have today with respect to the

10   store in Philadelphia, Pennsylvania, which is agenda item

11   number 13.

12          THE COURT:  Okay.

13          MR. BAREFOOT:  So with your Honor's permission,

14   it's slightly out of order, but I propose to turn to agenda

15   item number 13.

16          THE COURT:  Okay.  Now, I appreciate the update.

17   Let me say two things, and maybe it's less onerous given

18   that -- it looks like there's really a very small number of

19   potentially contested matters pertaining to assumption and

20   assignment to Transform.

21          The first is that there are several -- we

22   discovered several motion to seal on the docket that weren't

23   noticed to chambers by e-mail related to motions for

24   assumption and assignment.  You know, and it may be that

25   those are all moot at this point because you've reached

Page 22

1    agreements with people and you didn't need to go ahead to

2    litigate, but I would ask -- and it may not be your firm.

3    It may be DOJ Piper, but, you know, it -- someone -- DLA

4    Piper, excuse me -- someone should look at it at the docket

5    to see the motions to seal, that have not yet been

6    addressed.

7              That isn't the one that Ms. Albanese sent to

8    chambers earlier this week connected with MOAC; that's a

9    separate -- I'm aware of that one, 'cause that was e-mailed

10   to chambers, but there are a few that were not e-mailed to

11   us.  Maybe they're moot, in which case, it's fine; they can

12   be withdrawn.  But if they're still live, you should e-mail

13   the --  you know, following procedure on the chambers' Web

14   site for motion to seal, which includes e-mailing them to

15   chambers.

16             MR. BAREFOOT:  Understood, your Honor.  We'll

17   coordinate and address that promptly.

18             THE COURT:  All right.  And then the second point,

19   and this is not to be critical, 'cause I appreciate that the

20   primary focus of both the assignee and the landlords is

21   where it should be, which is on potentially negotiating a

22   solution to the cure and adequate objections.  But where

23   those negotiations don't end up in an agreement, and there

24   is going to be a contested matter before the Court, we just

25   need more organization of the underlying materials so that

1   we could prepare for the contested hearing -- the

2   evidentiary hearing.

3           Like you did with the hearing on store in Los

4   Angeles, with the declarations, the evidence book, and

5   everything submitted not, you know, 4:00 p.m. the day before

6   the hearing, but at least a day before the hearing so we can

7   focus on the issue and prepare for the hearing.

8           And maybe this just means that when you're

9   negotiating with the remaining parties, you have to say,

10  look, this is our drop-dead date; it's not the day of the

11  hearing, it's two days before, so we can get all the

12  materials to the judge.

13          MR. BAREFOOT:  Understood, your Honor.

14          THE COURT:  Okay.  And I think the other side in

15  these disputes knows this in each case, 'cause they're

16  represented by counsel that's been active in these cases.

17  But, again, my practice is to take the direct testimony by

18  declaration and read exhibits, you know, any disputed

19  exhibits be in a separate binder, and all of those things to

20  chambers so that we can prepare for the hearing and know

21  what the real issues are.

22          MR. BAREFOOT:  Understood, your Honor.

23          THE COURT:  Again, I'm not being critical, because

24  I much prefer you all settle these things, but just when

25  it's not going to turn out that way, we just need that extra

Page 24

1    time for the preparation for an evidentiary hearing.

2             MR. BAREFOOT:  We will make sure to do that, your

3    Honor.

4             THE COURT:  Okay.  All right.  So you wanted to

5    turn to the Pennsee matter, the Philadelphia store?

6             MR. BAREFOOT:  Correct, your Honor; agenda item

7    number 13.

8             THE COURT:  Okay.

9             MR. BAREFOOT:  Your Honor, on this lease, the

10   lease was originally designated on April 19th for assumption

11   and assignment to Transform Leaseco, LLC.  The landlord's

12   counsel filed a cure cost objection on April 26th, raising a

13   discrete number of issues.  Since that time,

14   Transform -- time to assume and assign the lease under

15   365(d)(4) was extended several times and will now expire at

16   the end of August.

17            Since that time, counsel for Pennsee has withdrawn

18   and no replacement counsel has been -- has accompanied or

19   been identified to Transform.  That leaves us in a position

20   where we need to move forward with the assumption and

21   assignment before the expiration of the 365(d)(4) deadline,

22   and in any event, as set forth in our reply, your Honor, we

23   believe that all of the issues that were raised in the April

24   26th objection by prior counsel have either been resolved or

25   addressed through the form of order and this Court's prior

Page 25

1    rulings on substantially similar leases.

2              THE COURT:  And that's as set forth in the reply?

3              MR. BAREFOOT:  That's correct, your Honor.  There

4    are four discrete issues in that reply, and I'm happy to

5    tick through them, if that would be helpful.

6              THE COURT:  Well, let me just ask; is anyone here

7    for Pennsee, for the landlord of the Philadelphia store; the

8    Roosevelt Boulevard, Philadelphia store?  All right.  I'm

9    not aware of signing an order authorizing counsel to

10   withdraw under Rule 2090-1, or local rule 2090-1.  Maybe

11   that was the case, but ...

12             MR. BAREFOOT:  Your Honor, there was an order

13   entered --

14             THE COURT:  I did authorize it?  Okay.  All right.

15             MR. BAREFOOT:  That's correct, at docket item

16   4808.  It was entered on August 9th.

17             THE COURT:  August 9th.  So it's been over ten

18   days.  I mean, they're always on notice to the client, so

19   the client should have known that ...

20             MR. BAREFOOT:  Your Honor, we had been advised

21   sometime before that counsel intended to withdraw and have

22   inquired several times about successor counsel and have

23   not received any responses.

24             THE COURT:  All right.  So why don't you go

25   through the issues.  And I've reviewed the objection, which

1    was fairly nebulous, and then the reply, which dealt with

2    the issues raised in the objection.

3              MR. BAREFOOT:  Certainly, your Honor.  The first

4    issue is cure.  Counsel did not in their objection raise any

5    current defaults or amounts that were due and payable as of

6    the time of the objection, and instead raised only the

7    potential that there would be reconciliations or common area

8    maintenance that would subsequently become due, but related

9    in whole or in part to a reassignment time period.

10             Consistent with all the other orders we've

11   provided, our form of order makes clear that if those

12   amounts subsequently become due, Transform will pay them

13   when due in accordance with the terms of the lease, even if

14   they partially relate to reassignment time periods.

15             THE COURT:  All right.  And we want to make that

16   clear.

17             MR. BAREFOOT:  Correct, your Honor.

18             THE COURT:  So that aspect of the cure objection

19   is overruled or denied.

20             MR. BAREFOOT:  The second issue that it raised,

21   your Honor, was the need for insurance certifications that

22   were required under the terms of the lease.  Those

23   certifications were delivered to counsel and, prior to her

24   withdrawal, she did confirm that they were acceptable to the

25   landlord.

Page 27

1            THE COURT:  They were sent on the 8th?

2            MR. BAREFOOT:  Correct, your Honor.

3            THE COURT:  Right.

4            MR. BAREFOOT:  The third issue is restrictive

5    covenants, consistent with any landlord that objected on

6    stripping of restrictive covenants, the proposed order is

7    clear that Transform will perform in accordance with the

8    lease and that there will be no interference or modification

9    to any restrictive covenants that are applicable.

10           THE COURT:  That was also stated in the reply.

11           MR. BAREFOOT:  And then, finally, your Honor,

12   counsel raised inadequate assurance objection.  Subsequent

13   to that April 26th objection, the landlord received the same

14   adequate assurance package that every other landlord

15   received, including balance sheet information, a form of

16   guarantee for Transform Midco, an organizational chart and

17   certain other related materials that your Honor has seen.

18   Following the provision of that information, we received no

19   follow-up requests for information or additional details

20   concerning adequate assurance of future performance.

21           THE COURT:  Just to be clear, the objection said

22   merely that they hadn't gotten anything yet and then you

23   sent it afterwards.

24           MR. BAREFOOT:  That's fair, your Honor.  And after

25   sending that, we received no further requests or anything of

1    the like.

2            THE COURT:  Right.  They also -- one last point

3    raised in the cure objection was they said that there might

4    be issues with garbage pickup or vandalism, but they didn't

5    really identify what they were and, again, that's -- again,

6    part of -- if those can be identified and they're now at

7    cure amount, then Transform is obligated under the order to

8    pay them, or to cure -- or fix them.

9            MR. BAREFOOT:  That's correct, your Honor.  And

10   Transform was aware of certain garbage issues that they have

11   now resolved, and as of this hearing, Transform is not aware

12   of any other current issues that would constitute violations

13   or defaults under the lease.

14           THE COURT:  Okay.  All right.  So I will overrule

15   the objection in full and enter the standard assignment

16   order -- assumption and assignment order than you could

17   e-mail to chambers.

18           MR. BAREFOOT:  Very good, your Honor.  We'll

19   submit that electronically.

20           THE COURT:  Okay.

21           MR. BAREFOOT:  I'll turn the podium back over to

22   Ms. Marcus.

23           THE COURT:  Okay.

24           MR. BAREFOOT:  Thank you.  Oh, I apologize, your

25   Honor.  Excuse me.  The next item on the agenda was not for

1    Ms. Marcus; it was for Rachel Albanese from DLA Piper and

2    Ivan Gold from Allen Matkins concerning the status

3    conference on Graziadio and Raleigh, North Carolina.

4            THE COURT:  Yes.  Right.

5            MR. BAREFOOT:  Apologies, your Honor.

6            THE COURT:  That's no problem.

7            MS. ALBANESE:  Good morning, your Honor.

8            THE COURT:  Good morning.

9            MS. ALBANESE:  Rachel Albanese of DLA Piper on

10   behalf of Transform with respect to certain real estate

11   matters.

12           Today's conference is on the assumption and

13   assignment of two leases with landlords Graziadio and

14   Weingarten Realty, relating to stores in Temple City,

15   California and Raleigh, North Carolina respectively.

16           THE COURT:  Right.

17           MS. ALBANESE:  As Mr. Barefoot said, Mr. Gold is

18   here on behalf of those landlords.  The matter has been

19   briefed and the parties are proceeding on a dual track of

20   settlement discussions and also preparation for a potential

21   evidentiary hearing.

22           THE COURT:  Okay.  Well, it's sort of been

23   briefed.  It's kind of a moving target.  It's not clear to

24   me -- and I don't want you to get into the settlement

25   discussions -- and apropos of what I just said, what you

1    would tell me today might not end up to be the issues that

2    would all come before me in a contested hearing.

3           But I think you need to let me know, again, at

4    least a day before a contested hearing what the remaining

5    issues are, because the objection, as was fine because it

6    was an early --

7           MR. BAREFOOT:  May.

8           THE COURT:  -- it was a long time ago; let's put

9    it that way.  It was an early -- in response to the notice

10   of -- that it was a designated lease, raised fairly

11   amorphously adequate assurance, and then cure.  Cure, I

12   think, has been a subject of discussion back and forth.  I

13   just need to know, again, if you're going to have a contest,

14   what's left; is it adequate assurance?  If so, what aspect?

15   And if it's cure, again, what's the discrete issue or issues

16   that the parties are fighting over, because ...

17          MS. ALBANESE:  Understood, your Honor, and we'll

18   coordinate to make that clear to chambers before.

19          THE COURT:  Okay.  All right.  And I saw you

20   nodding when I was talking about, you know, the -- my

21   procedure for having the direct testimony and the witness

22   here for cross and the joint exhibit book and the like,

23   so ...

24          MR. GOLD:  Yes, your honor.  And for the record,

25   Ivan Gold of Allen Matkins for Graziadio and WR Raleigh.

Page 31

1      You previously admitted me pro hoc vice at docket 1222.

2              Completely agree with your Honor's comments.  Our

3      contemplation, we've been in communication with Ms. Lee

4      regarding a potential date in October.  We will have a

5      further a (d)(4) extension that tracks that.

6              THE COURT:  Okay.

7              MR. GOLD:  Our contemplation, as Ms. Albanese

8      acknowledged, you know, we are dual-tracking -- settlement

9      discussions at both locations are active.  But as your Honor

10     noted, you know, some of our briefing in this goes back to

11     January.

12             THE COURT:  Right.

13             MR. GOLD:  And the most recent is May.  We do

14     have -- actually, we had declarations on file, but we're

15     primarily focused on the shopping center standard at both

16     locations.

17             THE COURT:  Uh-huh.

18             MR. GOLD:  It's our contemplation on both sides

19     that we would in advance of the hearing -- and it would be

20     potentially more than the day or two even --

21             THE COURT:  Well, I hope so.

22             MR. GOLD:  -- your Honor, is we contemplate kind

23     of a scheduling stipulation that would provide us with the

24     opportunity, both sides, to update our briefing and focus,

25     just preview of coming attractions -- there is no use issue;

Page 32

1    it's Kmart to Kmart.  There's no tenant mix issues; Kmart to

2    Kmart.

3            We have a pretty discrete adequate assurance

4    issue, (b)(3)(a) versus (f) versus (l) of 365 that's kind of

5    hinted at in the briefing you've seen so far, but,

6    obviously, we would tighten that up for your Honor based on

7    the evidence at discovery.

8            I think the reply -- with apologizes to DLA -- I

9    think it kind of overstates where we are in discovery; we

10   are proceeding.  We just agreed on a confidentiality

11   protocol.  So a few more things are going, and not

12   elaborate --

13           THE COURT:  Okay.

14           MR. GOLD:  -- discovery; it's pretty focused.  But

15   our contemplation is we've been offered a couple dates in

16   October after your Honor is back.  We would put a

17   stipulation together --

18           (Microphone feedback.)

19           THE COURT:  Can you fix the mike?  You did

20   something with the microphone, if you can just ...

21           MR. GOLD:  Don't touch.

22           THE COURT:  There we go.  Great.  Thank you.

23           MR. GOLD:  I should probably ask for permission to

24   approach.  So Counsel requires --

25           THE COURT:  Is there still a cure dispute?

1      MR. GOLD:  To be very precise, your Honor, as to

2  Graziadio, as to prepetition cure, there is no dispute; the

3  parties have agreed on the amount.  There's actually an

4  accumulated post-petition issue that is being addressed

5  directly.  And similar to what Mr. Barefoot -- there are

6  ways to clean that up even if it's not resolved at the time

7  of the hearing.

8      THE COURT:  Right.

9      MR. GOLD:  Similar issue with the Weingarten

10  location in Raleigh.  I don't believe there is a prepetition

11  cure amount, but there are some post-petition -- strictly

12  monetary, so we're not dealing with, you know, covenant --

13  fact intensive covenant defaults.

14      THE COURT:  Okay.  I appreciate that.

15      MR. GOLD:  So something that we could say, this is

16  what's in dispute.  We could escrow it easily, provided

17  for --

18      THE COURT:  Okay.

19      MR. GOLD:  -- in an order or a stipulation.  We

20  also contemplate stipulated facts.

21      THE COURT:  Okay.  So primarily with --

22      MR. GOLD:  The least documents, and stuff --

23      THE COURT:  So primarily -- if it comes to me,

24  it's going to be on a discrete adequate assurance issue or

25  two.

```
 1              MR. GOLD:  Yes, sir.  And it's -- I think we're

 2    looking, your Honor, at half the day, I believe --

 3              THE COURT:  Yeah, that sounds like it would

 4    probably be right.

 5              MR. GOLD:  -- even for the two locations, I think

 6    the aggregate would be four witnesses.

 7              THE COURT:  Okay.

 8              MR. GOLD:  Okay?  So, if we may, we'll continue to

 9    work with Ms. Lee.  She's targeted -- the first of the dates

10    is October 10th.

11              THE COURT:  Okay.

12              MR. GOLD:  I'll probably firm that up, maybe as

13    soon as this afternoon, just checking with one or two final

14    witnesses now.

15              THE COURT:  Okay.

16              MR. GOLD:  Okay.

17              THE COURT:  You have anything to add,

18    Ms. Albanese, or ...

19              MS. ALBANESE:  No, your Honor.  Thank you.

20              THE COURT:  Okay.

21              MS. ALBANESE:  I just wanted to mention that we

22    appreciate your Honor affording us time tomorrow --

23              THE COURT:  Okay.

24              MS. ALBANESE:  -- for the Mall of America matter.

25              THE COURT:  Sure.
```

1           MS. ALBANESE:  And we'll be ready to jump into the

2    evidentiary.

3           THE COURT:  Okay.  And we have everything on that

4    now, including the redacted stuff?

5           MS. ALBANESE:  You have everything from our

6    perspective --

7           THE COURT:  Okay.

8           MS. ALBANESE:  -- and even though there's a ton of

9    paper, we don't contemplate that it will take more than two

10   hours.

11          THE COURT:  Okay.  All right.  Very well.  Thank

12   you.

13          MS. ALBANESE:  Thank you.

14          MR. GOLD:  Thank you, your Honor.

15          MS. MARCUS:  Your Honor, since we've dealt with

16   number three already, the next item on the agenda number

17   four --

18          THE COURT:  Right.

19          MS. MARCUS:  The notice of assignment of the

20   debtors filed on August 6, 2019, it's ECF No. 4763 -- excuse

21   me; Jacqueline Marcus again, for the record, for the

22   debtors.

23          THE COURT:  Okay.  And this is the Soto--

24          MS. MARCUS:  That's correct.

25          THE COURT:  -- Associates and Fruitland Avenue

Page 36

1    warehouse and parking lot notice, right?

2              MS. MARCUS:  Exactly, your Honor.

3              THE COURT:  Okay.

4              MS. MARCUS:  So the lease is to be sold to

5    Mr. Shahery under the assignment agreement, to include a

6    master lease and related sublease, for, as you noted, two

7    parcels; the warehouse and the parking lot.  The landlords

8    for the two properties are different, and as reflected on

9    the agenda, they've each objected to the proposed assignment

10   on the basis that they haven't been provided with adequate

11   assurance of future performance.

12             I wanted to take a moment to explain why we're

13   here today discussing assignment of two leases that already

14   have been assumed by the debtors.  Because the 365(d)(4)

15   deadline was looming and the Vernon leases clearly had

16   value, the debtors decided back in May to assume the leases,

17   even though at that time they didn't have a buyer in hand

18   for the property.  The court approved the assumption by

19   order dated April 23rd; that's ECF No. 3314.  The assumption

20   order laid out a procedure that would apply if the debtors

21   later sought to assign the Vernon leases, and the notice of

22   assignment was filed pursuant to that assumption order.

23             Over the course of the past several weeks since we

24   filed the notice, Mr. Shahery has provided both landlords

25   with a substantial amount of information about his

Page 37

1    wherewithal to satisfy the obligations under the leases, and

2    the debtors and Mr. Shahery's attorneys have responded to

3    numerous inquiries requiring -- regarding Mr. Shahery's

4    performance of his obligations under the two subleases, and

5    his intentions going forward.

6            Most importantly, Mr. Shahery has agreed to

7    provide additional adequate assurance to the two landlords,

8    and because the leases are different, the proposals are

9    different.  For the warehouse landlord, 5525 South Soto

10   Street associates, he's offered to provide an irrevocable

11   letter of credit from Comerica Bank in the amount of

12   $700,000, which is sufficient to cover the tenant

13   obligations for rent and real estate taxes for a 12-month

14   period, and that would be renewable every 12 months.

15           For the parking lot landlord, 51st Street

16   financial -- excuse me -- 51st Street Fruitland Avenue, LLC,

17   he's offered to provide a deposit in the amount of 12

18   month's rent under the lease, or $8400.  And notably, your

19   Honor, I think it bears emphasizing that the lease

20   obligations for the parking lot are $700 a month.

21           Together with the reply in support of the notice

22   of assignment, the debtors filed the notice, the declaration

23   of William Gallagher, a managing director of M-III Partners,

24   LP, the debtor's financial adviser.  Mr. Gallagher has been

25   primarily responsible for real estate related issues during

1     these cases.  Copies of the adequate assurance information

2     provided by Mr. Shahery are attached to Mr. Gallagher's

3     information.  And subsequent to the filing of the Gallagher

4     declaration, Mr. Shahery provided both landlords with

5     another letter from Deutsche Bank, which reflects additional

6     assets of $11 million.

7              We also filed yesterday a declaration that

8     attaches several of the letters as well as his views as to

9     why he's more than able to perform the obligations under the

10    leases.

11             The debtors believe, your Honor, that the security

12    offered by Mr. Shahery, together with his record of timely

13    payments since he took possession of the premises in August

14    of 2018 and the below market nature of the master leases all

15    lead to the conclusion that both landlords have been

16    provided with adequate assurance of future performance, and

17    that's without even taking into account Mr. Shahery's

18    substantial liquid assets.

19             Your Honor, the debtors and Mr. Shahery have spent

20    a lot of time and money over the past weeks trying to

21    demonstrate that the landlords have adequate assurance.  The

22    response to the landlords each time was they want more and

23    more and more.  And what we think is going on here is that

24    the landlords are trying to defeat the debtor's assignment

25    of the leases because the market value for the premises

Page 39

1    exceeds the rent provided under the master leases.

2              Rather than allowing the debtors to benefit on the

3    arbitrage between the rental rate and the market value, the

4    landlords are trying to defeat the assignment and

5    appropriate that value for themselves, but the case law

6    makes it abundantly clear that that's not permitted.  As far

7    as back as 1980, shortly after the enactment of the

8    bankruptcy code, Judge Goetz noted in re Sapolin Paints,

9    Inc., 5 B.R. 412 (Bankr. E.D.N.Y. 1980), "Landlord's fear is

10   not realistic.  He's seeking to use the legislative concern

11   that landlords be fully protected to bring about precisely

12   the kind of windfall that the statute was intended to

13   prevent."  And we think the same is true here, your Honor.

14             The debtors request that the Court overrule the

15   objections and approve the assignment to Mr. Shahery.

16             THE COURT:  Okay.

17             MR. SILVERSTEIN:  Good morning, your Honor.  Paul

18   Silverstein, Hunton Andrews Kurth, for Henry Shahery.

19             THE COURT:  Good morning.

20             MR. SILVERSTEIN:  Good morning.  On the phone, I

21   believe, is Henry Shahery, and his counsel and my co-

22   counsel, Saul Reiss; they're both calling in from Los

23   Angeles.

24             THE COURT:  Okay.

25             MR. SILVERSTEIN:  They may have something to add

Page 40

1    at some point.  This should be a very simple matter, as it

2    involves assignments of assumed leases.  Everything

3    Ms. Marcus said is correct.  In April, the court authorized

4    the debtors to assume two leases; a warehouse lease and a

5    parking lot lease.  The assumption order provides that the

6    debtors could assign these leases and would file a notice of

7    assignment.  Mr. Shahery is paying the debtors $5.25 million

8    on assignment.

9              THE COURT:  He wasn't the subtenant?

10             MR. SILVERSTEIN:  He is the existing subtenant.

11             THE COURT:  That's right.

12             MR. SILVERSTEIN:  He is.

13             THE COURT:  He is -- he was and is the subtenant.

14             MR. SILVERSTEIN:  Correct.  Under the warehouse

15   lease, the debtor pays the lessor $59,000 a month; my client

16   pays the debtor $160,000.  Under the parking lot lease, the

17   debtor pays the lessor $700 per month -- which I don't think

18   you can get a parking spot in Manhattan for $700 a month --

19   but my client pays the debtor $4,000 a month.  And, then, my

20   client has paid all required rents and other shortages under

21   the leases.

22             For adequate assurance, as Ms. Marcus said, we've

23   offered a letter of credit for one year's rent on the

24   warehouse lease -- that's $700,000.  We've offered --

25             THE COURT:  I'm sorry; you did something.

1           MR. SILVERSTEIN:  I did something?

2           THE COURT:  No, no.  You did something just to

3    make the sound stop.  I don't know what it was, but you did

4    it.

5           UNKNOWN SPEAKER:  It keeps -- it's getting

6    feedback from --

7           THE COURT:  From something up above?

8           UNKNOWN SPEAKER:  -- over there.  It keeps ...

9           THE COURT:  Okay.  All right.

10          UNKNOWN SPEAKER:  -- move a little bit closer, it

11   could ...

12          THE COURT:  Yeah.  I don't mind Counsel coming

13   closer.  That's fine.

14          MR. SILVERSTEIN:  Can I follow you and walk?

15          UNKNOWN SPEAKER:  Yeah; 'cause it's just that we

16   keep getting feedback from up there.  I apologize.  Thanks

17   for walking.

18          MR. SILVERSTEIN:  We should be -- that's fine.

19   So we've offered the $700,000 letter of credit and the $8400

20   deposit -- I think it's the deposit or letter -- deposit.

21   That's more than enough.  And I think the case law cited in

22   Marcus' pleading basically said that the facts that it's a

23   below-market lease in and of itself is evidence that there's

24   adequate assurance.  More of -- I don't know if your Honor

25   had a chance to read the declaration we filed yesterday?

1          THE COURT:  I did.

2          MR. SILVERSTEIN:  You did.  Okay.  And, look --

3    Mr. Shahery is a very wealthy individual who has in this

4    declaration shown two sources of assets; roughly $30 million

5    on deposit in cash at two banks with $20 million lines of

6    credit in both of those two banks.  He's also stated he has

7    no debt -- I think he has a mortgage on a house in Beverly

8    Hills -- but no unsecured debt, no liabilities, owns

9    substantial real estate holdings.

10          He can certainly confirm to your Honor that his

11   declaration is true and what he says is true, and to drag

12   him out from Los Angeles to New York to testify to that

13   seems a little bit absurd to me, but, you know, your Honor

14   will deal with that how your Honor sees fit.

15          The objections are really disingenuous.  The

16   warehouse lessor seems to want to change or modify the

17   lease, which is just not on the table.  Mr. Shahery will

18   step into the shoes of the debtor, and he'll be subject to

19   the rights and the obligations and the liabilities that

20   exist presently under the lease; he'll step right into the

21   debtor's shoes.

22          The parking lot lessor, among other things -- and

23   by the way, backing up.  The warehouse lessor's objections,

24   it's a one liner; it says, "We object."  It says nothing.

25   The parking lot lessors -- the $700 a month parking lot

Page 43

1   lessor's objection raises for the first time that there

2   might be environmental problems on this parking lot.  The

3   debtor used to own that parking lot.  The debtor sold it to

4   the parking lot lessor -- this is, like, over a 50-, 60-year

5   period; never has there been in a suggestion by anyone in

6   history of that parking lot that there's been environmental

7   issues.  But, in any event, Mr. Shahery still assumes the

8   obligations under the lease as the lease is written.

9          So it just seems like this is a little over the

10   top to even be arguing about adequate assurance given the

11   circumstances.  If your Honor has a view that the $30

12   million in cash and the $20 million in letter of credit in

13   two banks alone -- there are other banks where Mr. Shahery

14   has money, okay?  There are other assets that he has, but he

15   doesn't believe that it's necessary for him to basically

16   say, "I own this, I own this, I own that."  It's typically

17   not done in this type of situation like that.  But my

18   suggestion is that if your Honor would like to hear from

19   Mr. Shahery and ask him if what he said is his declaration

20   is true, you might do that.  We've done that before, I

21   think.  I remember --

22          THE COURT:  Well, why don't we just wait a minute.

23          MR. SILVERSTEIN:  Okay.

24          THE COURT:  I'll hear what the landlord --

25          MR. SILVERSTEIN:  Give it --

1          THE COURT:  -- has to say.

2          MR. SILVERSTEIN:  But apropos to that type of

3     testimony, I will tell you that I've done that before in --

4     before Judge Wizmur in Camden when Hilton was buying Bally

5     Reno and we had Hilton on the phone.  Your Honor was in a

6     case with me -- I think Presidio Oil -- where Don Evans, if

7     you remember, the Commerce Secretary under George W. --

8          THE COURT:  The guy who called everyone "buddy".

9          MR. SILVERSTEIN:  Yes, the guy who called everyone

10    buddy.  Exactly.

11         THE COURT:  Okay.

12         MR. SILVERSTEIN:  Was also put on the phone --

13         THE COURT:  I think he called me Judge Buddy at

14    one point.

15         MR. SILVERSTEIN:  On the phone when the Judge was

16    asking questions about his financial wherewithal.  But, yes,

17    he did call everyone buddy.  Yes.  Your memory is just --

18         THE COURT:  Okay.  All right.  Well, let's hold

19    off on telephonic testimony for a second.

20         MR. SILVERSTEIN:  Thank you.

21         THE COURT:  I'll hear from the landlord's Counsel

22    first.

23         MR. TAXIN:  Thank you, your Honor.  David R. Taxin

24    of Dahan and Nowick --

25         THE COURT:  Right.

1          MR. TAXIN:  -- Counsel for the warehouse lessor.

2     My client has owned the property and ground leased it to

3     Sears for the last 50 years; the lease is from 1947.

4          My client generally leases to large retailers or

5     investors throughout the United States.  Mr. Shahery is a

6     very small, private company.  Sears was the largest retailer

7     in the United States.  Preliminarily, my client was advised

8     by a specific debtor in the process that it had bid two and

9     a quarter million dollars more than Mr. Shahery had bid, and

10    that that bidder is, in fact, backed by one of the largest

11    pension funds in the United States, having tens of billions

12    of dollars.  So my first question -- and I had raised this

13    to Sears' counsel, is why are we here at this particular

14    stage if someone had come in and offered two and a quarter

15    million dollars more for their bid?  And that entity is

16    obviously extremely qualified financially.

17          THE COURT:  Okay.  Well, that wasn't a basis to

18    the objection, but this is a motion for leave to assign.  So

19    were there higher and better offers for the property?

20          MR. TAXIN:  Your Honor, there was another

21    discussion from another institution that indicated on a

22    preliminary basis that they were willing to pay more.  But

23    that offer was subject to a 60-day due diligence, and the

24    concern on our part was that there was a roof that needs

25    substantial repair, and that once due diligence was

Page 46

1    completed, that offer would be reduced  by the amount of the

2    repair.  And, in addition, that offer was contingent upon

3    the other entity buying the property from the landlord and

4    we didn't know whether that was likely at all.

5              THE COURT:  Okay.  All right.

6              MR. TAXIN:  I didn't know anything about the other

7    entity buying the property as part of the offer, but my

8    client was aware and actually spoke to the party who made

9    the offer, who called them at the property.  So my -- I

10   don't --

11             THE COURT:  Apparently he made an offer to buy the

12   property, though, at that time?

13             MR. TAXIN:  No, he didn't offer to buy the --

14             THE COURT:  Okay.  All right.

15             MR. TAXIN:  -- property, but I don't think 60 days

16   is that long a period of time for due diligence, for a two

17   and a quarter million dollar differential.

18             THE COURT:  No, it's just -- it's more the concern

19   of what they find.

20             MR. TAXIN:  Well, what if they -- if they found

21   something is nothing to say that they wouldn't have

22   continued with their offer.  But rather than taking that --

23             THE COURT:  Well, nothing to say that they would

24   have.

25             MR. TAXIN:  No.  We don't -- no one can say --

Page 47

1            THE COURT:  Right.

2            MR. TAXIN:  With any degree of guarantee whether

3    or not they would have, but --

4            THE COURT:  Okay.

5            MR. TAXIN:  -- I, to be honest, I feel that is an

6    offer that should be considered, or should have been

7    considered, or should still be considered by Sears.  With

8    regard to the current offer in terms of adequate assurance,

9    we didn't file any more specific objections with this Court,

10   but would do so prior to an evidentiary hearing, but we did

11   make Sears aware on a regular basis of what some of our

12   concerns were.  We sent a number of e-mails to Sears and

13   Mr. Shahery containing questions as to the financial

14   circumstances, we've asked for financial statements.

15           Now, if Mr. Shahery has lines of credit at a

16   bank -- which he does, presumably has submitted financial

17   statements to the bank.  All we have, basically, are

18   one-line letters from banks saying it's has "X" number of

19   dollars in the bank, but we don't know what his other

20   commitments are -- what his business commitments are.  So we

21   asked for that.

22           I take issue with the fact that we didn't agree to

23   maintain the confidentiality of those records.  They were

24   very limited exceptions, which we noted to Sears, but we

25   never heard back, other than to say that Mr. Shahery didn't

Page 48

1    feel that he was required to provide any further financial

2    information because what he showed was enough.  So we don't

3    feel that is, and we're asking for financial statements.

4            There were some other issues that came up in that

5    Sears had indicated in their notice that the assignee was

6    Mr. Shahery, but, in fact, the contract -- which wasn't even

7    sent to us along with the notice -- we had to ask for the

8    contract -- was to Mr. Shahery or assignee.  So we raised

9    with Sears our objection to the fact that if Mr. Shahery

10   were to take it through an assignee, then that would leave

11   us exposed.  Mr. Shahery, as I understand, has agreed to

12   take this personally, which is the way that he has it

13   subleased from Sears.  So that -- assuming that that's still

14   the case and still a fact, would resolve that portion of the

15   objection, which we filed.

16           The other major part of this is the roof, and

17   Sears as the landlord to Mr. Shahery has the obligation to

18   repair and/or replace of roof.  Sears and Mr. Shahery, I

19   believe, have each agreed that the roof needs to be

20   replaced, not simply repaired, and the lowest estimate that

21   we saw when we asked for Sears to the documents, was two and

22   a half million dollars.  So part of what we asked for from

23   Mr. Shahery in connection with the objections, which we

24   noted to Sears, was either some kind of construction escrow

25   so that we'll know that when Mr. Shahery's lease it up,

Page 49

1  we're going to get the premises back in good and tenantable

2  condition, rather than with a roof that's leaking, et

3  cetera, and/or a letter of credit that would provide, say,

4  for two and a half million dollars to assure that he would

5  do the roof work that was necessary for the premises, so

6  that when we ultimately get the premises back in three,

7  five, or -- three, eight, or thirteen years, that we would

8  have a roof that works.

9          THE COURT:  What is the remaining term of the

10  lease?

11          MR. TAXIN:  The remaining term is three years, but

12  there's two five-year options on it.  So it goes to around

13  April 2022 and then there's two five-year options; first to

14  '27 and to '32.  So those were some of the issues which we

15  posed.

16          THE COURT:  Well, are there any other ones?

17          MR. TAXIN:  Pardon me?

18          THE COURT:  Are there any other ones?

19          MR. TAXIN:  Those -- the lack of financial

20  documentation, which we feel is necessary, the fact that

21  there was a higher offer, which we believe should be

22  explored, the fact that he should be on the lease

23  personally, and the security for the $700,000 plus

24  undertakings regarding the roof were certain of the issues.

25  We obviously need to know that there's insurance insuring

Page 50

1   the landlord, the owner of the property, that presumably we

2   would have prior to the time that they had a closing.  So --

3             THE COURT:  Is that a requirement in the lease?

4             MR. TAXIN:  Yes.  They have to insure the

5   property.

6             THE COURT:  Okay.  Okay.

7             MR. TAXIN:  Sears currently insures the property

8   and has general liability naming the landlord the owner of

9   the property.  So those are some of the issues and -- that

10   we were --

11             THE COURT:  Had you raised the insurance issue

12   before just now?

13             MR. TAXIN:  I don't know that I raised this with

14   Sears.  I was --

15             THE COURT:  Raise it with anybody?

16             MR. TAXIN:  -- raising -- I raised it with my

17   client and we were --

18             THE COURT:  All right.  So I'm going to disregard

19   that.

20             MR. TAXIN:  -- working -- no, we were working --

21             THE COURT:  Look, this is not a moving target,

22   sir.  Give me a break.

23             MR. TAXIN:  No, no.  But we were working on a

24   possible --

25             THE COURT:  Look, if you're concerned about

Page 51

1   insurance, you raise the issue.  I literally have a one-page

2   objection dated August 13th --

3            MR. TAXIN:  Yes, you do.

4            THE COURT:  -- and it just says, "The debtors have

5   failed to provide adequately assurance of future

6   performance."

7            MR. TAXIN:  Well, because they hadn't.  They just

8   provided a one-line typed letter.

9            THE COURT:  But you've got to say what it is.

10           MR. TAXIN:  I told Sears what it is.

11           THE COURT:  Not the insurance.  So then I'm not

12   going to consider that issue.

13           MR. TAXIN:  Well, there has to be an issue that

14   they have to cover us under the lease if they're going to

15   take assignment of the lease.

16           THE COURT:  But you've given no indication that

17   that's not going to happen.

18           MR. TAXIN:  No, I don't know whether or not that

19   will happen.  I don't even know --

20           THE COURT:  All right.  So I don't take -- I

21   don't -- no objections.

22           MR. TAXIN:  No.  There are some of the other

23   issues which I have raised which I am raising with you --

24           THE COURT:  All right.  --

25           MR. TAXIN:  -- which I've raised with Sears

1    progressively over the last several days.

2              THE COURT:  All right.  This is not an iterative

3    process; it comes to an end --

4              MR. TAXIN:  No, I understand, and I've raised --

5              THE COURT:  -- and it's come to an end today.

6              MR. TAXIN:  -- I've raised issues with Sears.

7    What I'm asking --

8              THE COURT:  No; but are there any others?

9              MR. TAXIN:  These are the issues that I've raised.

10             THE COURT:  Okay.  Okay.  All right.

11             MR. TAXIN:  I'm asking for a hearing on these

12   issues.

13             THE COURT:  Well, you haven't raised the insurance

14   issue with Sears until this very moment.  What is Mr.

15   Shahery paying for this lease?

16             MR. TAXIN:  For the lease to my client?

17             THE COURT:  Yeah.

18             MR. TAXIN:  Well, Sears is paying the -- what is

19   he paying Sears?

20             MS. MARCUS:  $5.2 million for the two leases.

21             THE COURT:  $5.2 million for the two leases.

22             MR. TAXIN:  For the two leases.

23             THE COURT:  And what is the estimated cost of

24   repair on the roof?

25             MS. MARCUS:  Your Honor, I would like to address

Page 53

1    the roof issue, if I may.  I --

2              THE COURT:  Okay.  All right.  I just want to go

3    back to what the landlord believes the estimated cost of

4    repair on the roof is.

5              MR. TAXIN:  Sears told us that minimum costs was

6    two and a half million dollars.  They sent us documents;

7    they're probably in the papers that Mr. Gallagher presented.

8              MR. SILVERSTEIN:  Your Honor, can I interject on

9    that issue?

10             THE COURT:  Okay.  No, no, no.  I just want to --

11   yes.  Both of you can respond, but I --

12             MR. SILVERSTEIN:  But on that specific issue?

13             THE COURT:  Well, I just want -- are you -- you

14   have anything more on this?

15             MR. TAXIN:  No.

16             THE COURT:  Okay.  All right.  So now I'll hear --

17             MR. SILVERSTEIN:  First I'm going to lead on the

18   roof, if I may.

19             THE COURT:  Okay.  All right.

20             MR. SILVERSTEIN:  My understanding -- and Mr.

21   Reiss may want to jump in -- my understanding is that there

22   were various discussions between Sears and Mr. Shahery with

23   respect to repairs of the roof which Sears was obligated to

24   do.  They were getting various estimates back and forth.

25   And there are various things that need to be done to the

Page 54

1    roof which the lessee under the client lease is obligated to

2    do.

3              Mr. Shahery will be obligated to do that; that

4    will be his obligation.  Whether it costs, you know, X-

5    dollars or Y-dollars or two X-dollars or two XY-dollars, it

6    doesn't matter; he's going to have to do what's necessary to

7    be done to be in compliance with the lease.  The --

8              THE COURT:  But he doesn't have an estimate at

9    this point?

10             MR. SILVERSTEIN:  There are various estimates for

11   different things.  The question is, does it need a new roof,

12   does it need to be repaired?  I don't know the details.  Mr.

13   Reiss may want to be heard, and I know Ms. Marcus wants to

14   be heard first.

15             MS. MARCUS:  If I may go first?

16             MR. SILVERSTEIN:  Please.  I'm sorry.

17             THE COURT:  Okay.

18             MS. MARCUS:  Your Honor, starting with the roof

19   issue, I think that Mr. Taxin may have overstated where we

20   are on the roof and, basically, the debtor did go out and

21   obtain estimates for what it would cost to replace the roof.

22             THE COURT:  Okay.

23             MS. MARCUS:  The lease requires -- my

24   understanding is the lease requires that the roof be

25   maintained; it doesn't require the roof to be replaced.  So

Page 55

1    as the assignee of the lease, Mr. Shahery would have to

2    comply with the terms of the lease -- all of terms of the

3    lease -- including maintaining the roof.  If he determines

4    that repair is more appropriate than replacement, then

5    that's his prerogative and he and the already can fight

6    about that as to what the lease requires.

7            THE COURT:  Is it fair to say that what the

8    landlord's Counsel said as far as the estimate to repair was

9    accurate to -- not repair; replace -- two and a half

10   million?

11           MS. MARCUS:  Yes, that's accurate information; it

12   did come from the debtors.

13           THE COURT:  All right.  And I'm assuming that's

14   the outside cost because replacing is generally more

15   expensive than repairing.

16           MS. MARCUS:  That's right, your Honor.  And a

17   substantial investment has already been made by Mr. Shahery

18   in making repairs; he paid one million two at the inception

19   of the lease that was used by Sears to make certain repairs

20   to the property, and there was also $800,000 more that was

21   spent over the course of the past year.

22           MR. SILVERSTEIN:  $2 million.

23           THE COURT:  How long has he been the subtenant?

24           MS. MARCUS:  He signed the lease in December of

25   2017 and posted the $1.2 million deposit, but the work was

1    then done between January and August, and he actually took

2    possession --

3              THE COURT:  And is he using the warehouse?  He's

4    not just warehousing the warehouse; he's using it?

5              MR. SILVERSTEIN:  Yes.

6              MS. MARCUS:  Yes, yes, your Honor.

7              MR. TAXIN:  He's using the warehouse.

8              MS. MARCUS:  Yes, your Honor.

9              THE COURT:  Okay.  All right.

10             MR. SILVERSTEIN:  And landlord will do whatever

11   necessary to maintain the roof as required under the lease.

12             THE COURT:  Right.  Okay.  All right.

13             MS. MARCUS:  If I may address the other issues --

14             THE COURT:  Okay.

15             MS. MARCUS:  -- raised by Mr. Taxin?  With respect

16   to insurance, I know you don't want to hear about it, but

17   Mr.  Shahery has provided a certificate of insurance.

18             THE COURT:  All right.

19             MS. MARCUS:  There's some question about whose

20   name it's in, but there is insurance, and there will be

21   insurance, and he'll comply with his obligations under the

22   lease.

23             With respect to whether he is --

24             THE COURT:  And will that include -- does the

25   lease require the landlord be a named insurer, or --

1           MS. MARCUS:  Yes, it does.

2           THE COURT:  Okay.  All right.

3           MS. MARCUS:  And that is the -- the certificate

4    does have the landlord as a named insured --

5           THE COURT:  Okay.

6           MS. MARCUS:  -- for the two properties.  With

7    respect to the issue about whether the assignee would be

8    Mr. Shahery or an assignment, the lease fail -- assignee,

9    excuse me -- the lease fail agreement does give him that

10   option, but he has agreed in the context of these

11   discussions to waive the ability to have somebody else take

12   an assignment.  And if your Honor wants your order to say

13   that it must be him personally, we're fine with that, and I

14   think Mr. Shahery is fine with that.

15          MR. SILVERSTEIN:  Mr. Shahery is fine with that

16   also, your Honor.

17          THE COURT:  Okay.

18          MS. MARCUS:  Getting back to the issue of the

19   competing bid, I have a couple of responses.  I already

20   advised the court that the debtors were concerned about the

21   due diligence period and whether the deal -- the alleged

22   other deal -- would ever come to fruition.  But in addition

23   to that, the land -- it's not really the landlord's

24   prerogative to say there's somebody better out there who I

25   would rather have as my tenant.

Page 58

1          THE COURT:  That's a different issue, the "rather

2     have"; I agree with you.  The only issue is whether it's an

3     exercise of good business judgment to assign the lease for

4     this price.

5          MS. MARCUS:  Exactly right.  And the debtor has

6     thought about it, the debtor consulted with the

7     professionals for the unsecured creditors committee, the

8     real estate advisers as well, and they concluded

9     collectively that selling the property to Mr. Shahery was a

10    good business decision.

11         THE COURT:  You're representing that the

12    alternative offer was contingent in addition on the landlord

13    selling the property?  Why would they buy the lease if the

14    landlord was going to sell the property?

15         MS. MARCUS:  I'm looking at -- Mr. Gallagher would

16    have more information.  But my understanding was that they

17    wanted to do a major redevelopment of the site.  I'm not

18    sure, frankly, because we never got that far, but there were

19    a number of conditions, which created a concern on the

20    debtor's part.

21         THE COURT:  So it may not have been a sale of the

22    property, then; it may have been a modification of the lease

23    to enable those things to happen?

24         MS. MARCUS:  May I have a minute, your Honor?

25         THE COURT:  You want to talk to your client?

Page 59

1          MR. TAXIN:  Your Honor, if I may --

2          THE COURT:  Let me just -- just wait a second.

3          MS. MARCUS:  I'm going to modify my testimony a

4    little bit, your Honor.  We believe, based on conversations

5    with our broker, that the competing bidder was making the

6    offer on the lease because they ultimately wanted to buy the

7    property.  I'm not even sure there was a written offer, but

8    our understanding was that that's what they were trying to

9    orchestrate, and that's what led to the concern.  I don't

10   think there was anything specifically that said it was

11   contingent upon purchasing the property.

12         THE COURT:  Okay.

13         MS. MARCUS:  But, your Honor, just in conclusion,

14   you know, the contingent nature and having the due diligence

15   out, in effect, was the biggest concern for the debtors.

16         THE COURT:  And what was the proposal?

17         MS. MARCUS:  It was a 60-day period.

18         THE COURT:  No, I'm sorry; what was the stated

19   proposal subject to the conditions?

20         MS. MARCUS:  I think it was approximately --

21         MR. SILVERSTEIN:  Seven and a half.

22         MS. MARCUS:  -- Seven and a half million dollars.

23         THE COURT:  So two million more.

24         MS. MARCUS:  A little over two million more.

25         THE COURT:  Okay.  Okay.  All right.  Anything

Page 60

1    more?

2              MR. GRUMER:  Yes, your Honor.  Carl Grumer --

3              THE COURT:  Okay.  Go ahead.

4              MR. GRUMER:  -- I'm sorry.

5              THE COURT:  On the phone?  You can go ahead.

6              MR. GRUMER:  Carl Grumer -- sorry, Carl Grumer for

7    51st Fruitland Avenue; that's the parking lot landlord.  And

8    I wanted to address what was in our papers and what was in

9    the reply papers.  There were a number of misapprehensions

10   going on here.

11             THE COURT:  Can I interrupt --

12             MR. GRUMER:  First of all, we --

13             THE COURT:  I'm sorry, Mr. Grumer; can I interrupt

14   you for a second?

15             MR. GRUMER:  Sure.

16             THE COURT:  I wanted to finish up with the

17   main -- warehouse lease first.  So give Counsel --

18             MR. GRUMER:  Okay.  I'm sorry.

19             THE COURT:  -- for the warehouse landlord the

20   opportunity to close on that, and then we'll turn to the

21   parking lot.

22             MR. TAXIN:  Well, only this --

23             MR. GRUMER:  Okay.  I'm sorry, your Honor.

24             MR. TAXIN:  -- your Honor, only this, that upon

25   expiration of the lease, we're supposed to receive the

Page 61

1    property back in good condition, and we want to be assured

2    that if Mr. Shahery has this assignment, that when his lease

3    ultimately is up, we're going to be getting it back in good

4    condition.  And that doesn't mean that the roof, which is

5    about, maybe 50 or 75 years old possibly now, will just

6    patched.  So that's why Sears and he both were looking at

7    and agreeing to the replacement idea.  Thank you.

8              THE COURT:  All right.  So now let's turn to the

9    parking lot.  Mr. Grumer?

10             MR. GRUMER:  Thank you, your Honor.  First of all,

11   there was a statement made that we just kept asking for more

12   and more and more information; that is not accurate.  We

13   have been receiving more and more information, but never the

14   information that we requested, which was very simple; the

15   financial statements.  A balance sheet, a profit and loss,

16   cash flow, to show what the cash needs of the debtor, the

17   size of his operations, what the proportion of -- access to

18   cash they have is related to their cash needs; pretty, you

19   know, garden variety standard stuff on a lease assignment.

20   We have not gotten that.

21             There is an implication, maybe even a statement,

22   in Mr. Shahery's declaration that the "objector's attorney,"

23   "objector's counsel" -- I'm not sure which objector --

24   refused to sign a -- some kind of nondisclosure agreement,

25   although the declaration is just a little vague in that

Page 62

1    regard.  That never happened.  Nobody ever brought up that

2    subject.

3            We asked for a financial statement and we were

4    told we weren't going to get one.  Nowhere did anybody offer

5    to give us one if they were a nondisclosure agreement, we

6    would be willing to enter into an nondisclosure agreement,

7    to obtain a financial statement, which is what we've been

8    asking for all along and have not been getting.  We think

9    that's fairly standard and we should entitled to just get

10   the entire financial picture to determine the assignee's

11   ability to perform under the lease.

12           And this has been focusing on the amount of the

13   rent; that's not the issue here.  The amount much the rent

14   is modest -- $750 per month.  What's the bigger issue here

15   is the indemnities, under the lease, which includes

16   indemnities, not only for personal injury, but for

17   environmentally issues that might arise.

18           And one problem here is we don't know what purpose

19   the property is going to be put after the assignment.  The

20   lease that we have attached has a, what purports to be a use

21   clause, but the use clause just basically allows any lawful

22   use.  So the assignee could be doing just about anything

23   with the property or with the adjacent warehouse, which I

24   understand has a similar provision, and it could cause

25   environmental issues now or two years from now or five years

1    now; we don't know.  And that could be a substantial number.

2             And we just want to get a handle on what the

3    finances are, not only what, you know, assets there might be

4    but what debt there might be; obviously that's a major issue

5    in terms of any assignees financial condition.

6             There's also an issue as to the insurance which we

7    did raise with the debtor.  And we received initially

8    some -- well, we received five -- a total of five

9    certificates of insurance, four of which, the named

10   insurance is Sears.  Why we got those, I'm not even sure,

11   because, obviously, if there were to be an assignment, Sears

12   would be out of the picture.

13            And the fifth one, the insured was a company

14   called Shason, Inc., S-H-A-S-O-N, not Mr. Shahery, and the

15   landlord was named as an additional insured, for claims

16   arising out of the operation by the named insured.  Well,

17   first the named insured was Shason, who is not going to have

18   any operations at the property, so that certificate is of no

19   value because it insures us for operations by some entity

20   that's not going to operate the property.

21            Mr. Shahery's declaration said that they would

22   give us a proper insurance certificate and we've been asking

23   for one; we haven't gotten it.  So that's something we, you

24   know, we need, but most importantly, we really need a

25   financial statement to evaluate the entire financial

Page 64

1    picture.  And we've asked for it, and had we'd been asked

2    for a nondisclosure agreement, we'd have been agreeable, and

3    I'm telling everybody now that we would be agreeable, but we

4    were never asked.  And we think we're entitled to that and

5    we will give the debtor the protection -- excuse me, the

6    assignee -- the problems it needs, but we simply want the

7    basic financial information that any landlord would ask for

8    in connection with an assignment.

9            MS. MARCUS:  Jacqueline Marcus again, your Honor.

10   With respect to the nondisclosure agreement -- okay, I won't

11   even go there.

12           THE COURT:  I don't -- look, as far as the

13   nondisclosure agreement is concerned, I think for purpose of

14   this hearing, it's irrelevant.

15           MR. FAIL:  With respect to the financial

16   statement, I think what's a difference here -- and I would

17   concede that normally you would get a financial statement

18   before from an entity that is the assignee, and normally you

19   want to do that to make sure that the entity is not an empty

20   shell and has the wherewithal to meet the obligations under

21   the lease.  Here we have, I think, the unusual situation

22   that Mr. Shahery personally is the assignee, and, therefore,

23   his personal assets are at risk, and that ameliorates the

24   financial statement issue.

25           With respect to Mr. Shahery's position on

Page 65

1    providing more information about his liabilities, I'm going

2    to turn that one to Mr. Silverstein because we've been

3    trying to get that and his issue more than ours.

4            With respect to the use of the property, the

5    property -- I believe we've confirmed that the property

6    going forward -- it is a parking lot and it is going to be

7    used as a parking lot and to the extent that it's necessary

8    for the Court to reflect that in the proposed order, I think

9    people would be fine with that; there no intent to change

10   the use of the property.  And I don't believe there's been

11   an indemnification claim ever made or any personal property

12   or personal liability insurance or environmental issues ever

13   over the history of this lease, so I really think that

14   that's a nonissue.

15           THE COURT:  Okay.

16           MR. SILVERSTEIN:  Thank you, your Honor.  Paul

17   Silverstein, for the record.  Just to supplement, Mr.

18   Shahery's declaration reflects what his liabilities are, and

19   the answer is he has no unsecured debt and his only secured

20   debt is a mortgage on his home in Beverly Hills.  So I don't

21   know what more there is to say.  With $30 million in cash in

22   two banks and an aggregate in $20 million in lines of credit

23   from those two banks alone, -- and that's just -- that's not

24   the whole thing; that's just a -- you know, two examples of

25   how much he has in two banks.  That should be more than

Page 66

1    sufficient.

2              With respect to Shason, Inc., that's a wholly

3    owned subsidiary that's a guarantor under the parking lot

4    lease.  The certificate of insurance or whatever will be

5    changed to reflect him individually; that's fine.  We

6    offered to do that, and that's not an issue.  So I don't

7    think there are any issues.

8              And, again, with the parking lot lease, the debtor

9    can correct me if I'm wrong, but my understanding is that

10   the debtor used to own the parking lot lease, the debtor

11   sold the parking lot lease to the current owner, and there's

12   never been issues with respect to, you know, its use under

13   the lease.  Whatever the lease said --

14             THE COURT:  Is Marcus right, that there's no

15   intention to use it other than as a parking lot?

16             MR. SILVERSTEIN:  That is my understanding, but

17   Mr. Reiss and Mr. Shahery are both on the phone; if I'm

18   incorrect, they should correct me.  Gentlemen, are you

19   there?

20             MR. REISS:  Your Honor, this is Saul Reiss in Los

21   Angeles with Mr. Henry Shahiri.

22             MR. SILVERSTEIN:  Can you talk a little louder,

23   Saul?

24             MR. REISS:  Yes.  I'm Counsel for Mr. Shahery.

25   And this -- the parking lot is a parking lot.  That's all

Page 67

1    it's ever been, and it's all it ever will be.

2              THE COURT:  Okay.

3              MR. SILVERSTEIN:  Thank you, your Honor.

4              THE COURT:  And Mr. Shahery is prepared to change

5    the insured to him personally?

6              MR. SILVERSTEIN:  Absolutely.

7              THE COURT:  As the -- since he's now going to be

8    the --

9              MR. SILVERSTEIN:  Absolutely, without question.

10             THE COURT:  -- the lessee?

11             MR. SILVERSTEIN:  Yes.  And you have been so

12   provided, your Honor.

13             THE COURT:  Okay.

14             MR. REISS:  The reason Shason got the certificate,

15   your Honor, was it in fact occupies all of the space on the

16   warehouse and the parking lot and, therefore, it is the

17   insured -- it is the operating company that business takes

18   place there.  Mr. Shahery owns all of it.  It's a company

19   that's been in existence for 101 years.

20             THE COURT:  Okay.  All right.  Anything else?

21             MR. GRUMER:  Well, your Honor, just in closing, we

22   still would like to see the financial statements and verify

23   the debt.  You know, if nothing else, any debt to -- if

24   there's any debt owing to the banks, for where there are

25   deposits there would be, and, under California Law, bankers

Page 68

1    write-off offset, so essentially they are secured -- a

2    bankers lien.  So whether Mr. Shahery knows or not, that

3    would be certainly a secured debt.

4           And, of course, if those lines of credit are drawn

5    down, every dollar that is drawn down is another dollar of

6    debt, which would be secured.

7           So we still would like to see the financial

8    statement.  It's, as I said, it's fairly standard.  And the

9    reason why we shouldn't be able to, ask Mr. Shahery sort of

10   indicated in his declaration, that with a proper

11   nondisclosure agreement, he would be willing, so we would

12   like to get that.  But in addition, it sounds like we have

13   heard three things here that would be in an order that would

14   clarify matters, which is that the property will not be used

15   as anything other than a parking lot, Mr. Shahery would

16   waive any right to assign the lease or to the rights under

17   the lease purchase agreement to any entity --

18           THE COURT:  I didn't hear that, and I doubt he's

19   saying that.

20           MR. GRUMER:  -- and that the fifth -- pardon?

21           THE COURT:  He is.

22           MS. MARCUS:  It's under the lease purchase

23   agreement he would waive, not the right to assign the

24   lease --

25           THE COURT:  Under the lease purchase agreement;

1    not the lease itself.  I understand.  Okay.  Go ahead, sir.

2              MR. GRUMER:  Right.  No, the lease purchase

3    agreement.  And, third, that the certificate of insurance

4    will be amended to list I guess, both Shason and

5    Mr. Shahery, sounds like.  But that certainly Mr. Shahery

6    will be added as a named insured so that our rights as an

7    additional insured would cover any operations by Mr.

8    Shahery.  But we still would like to see that financial

9    statement so at least we can valuate it, and if it's as

10   stunning as we are told, then it shouldn't be a problem.

11             MR. SILVERSTEIN:  And, your Honor, Mr. Reiss or

12   Mr. Shahery --

13             THE COURT:  It doesn't need to be as stunning as

14   their told under the case law for a lease of this nature.

15   This is a total waste of time and money.

16             All right.  I have before me a motion by one of

17   the debtors in this case to assign its rights under two

18   leases to Henry Shahery, their leases of contiguous property

19   in Vernon, California.

20             One is a lease of a warehouse where the landlord

21   is 5525 South Soto Street Associates, and the other is a

22   lease of a parking lot where the landlord is 51st Fruitland

23   Avenue, LLC.  Each lease had previously been assumed by the

24   debtor, and that decision was based on the debtor's belief

25   that it was an exercise of good business judgment to do so,

1      even the debtor itself was going out of business, because

2      the leases were favorable leases, that is they were valuable

3      to the debtor; they were below market, in other words.

4              It now seeks to assign the lease under Section 365

5      of the bankruptcy code to Mr. Shahery for five and a half?

6              MS. MARCUS:  5.2.

7              THE COURT:  $5,250,000, obviously, bearing out its

8      view that the leases are indeed valuable and under market.

9              Mr. Shahery, or rather his business, currently is

10     the subtenant under both of those property, and the

11     subleases provide for payment of substantially more rent to

12     the debtor than the debtor pays to the landlord or

13     landlords.  The bankruptcy code requires as a condition to

14     the debtor's right to assign a lease, among other

15     conditions, none of which are challenged here, that the

16     assignee provide adequate assurance of future performance

17     under the lease.

18             That term "adequate assurance of future

19     performance" is not defined in the bankruptcy code, but the

20     courts have taken a pragmatic approach on a fact based case

21     by case analysis in determining whether the requirement has

22     been met.  It does not require an absolute guarantee of

23     performance, but, rather, it must simply appear that the

24     rent will be paid and other lease obligations met.  The

25     emphasis is on protection.  In re M. Fine Lumber Co., Inc.,

Page 71

1   383 B.R. 565, 572, 573 (Bankr. E.D.N.Y.) as well as in re

2   Westview 74th Street Drug Corp., 59 B.R. 747, 754 (Bankr.

3   S.D.N.Y. 1986).  The primary focus is on the assurance that

4   the landlord will be protected with respect to the payment

5   of rent under the lease, in re Sanshoe Worldwide Corp. 139

6   B.R. 585, 592 (S.D.N.Y. 1992), as well as the foregoing

7   cases.

8           Although it's a fact-based inquiry, "to determine

9   whether a landlord is adequately assured, courts look to a

10  nonexclusive list of factors, including the debtor's payment

11  history, or in this case this subtenant's payment history,

12  the extent and history of default, presence of a guarantee

13  and/or a security deposit, evidence of profitability, a plan

14  with earmarked funds exclusively for the landlord, the

15  general outlook of the debtor's industry, or, in this case,

16  the assignee's industry, and whether the lease is at or

17  below the prevailing market rate; Androse Associates of

18  Allaire, LLC v. A&P, in re A&P 472 B.R. 666, 675 (S.D.N.Y

19  2012).

20          Here in each case, the foregoing factors and the

21  general purpose and policy behind the adequate assurance

22  condition to assignment of a lease under 2nd.365 of the

23  bankruptcy code are satisfied.  First, and perhaps most

24  importantly, the two leases are significantly below market.

25  That fact alone has been a primary consideration in a number

Page 72

1    of cases supporting the determination that is adequate

2    assurance in provided, namely, or logically, if a lease is

3    substantially below market it's highly unlikely, even in the

4    event of a default and termination of a lease that the

5    landlord would be able to promptly re-let the lease, or re-

6    let the property.  See, for example, again in re M. Fine

7    Lumber Co., Inc., 383 B.R. 565, 573and in re General Oil

8    Distributors, Inc., 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1986).

9              Here the landlord is paying $5.25 million to

10   maintain the lease; that's far in excess of any lengthy

11   period of rent under either lease in the event that the

12   landlord finds itself in a default situation under either

13   lease.  Moreover, that amount is roughly double the outside

14   amount necessary to deal with the roof issue, with respect

15   to the warehouse, i.e., a full replacement of the roof as

16   estimated and as asserted by the landlord would be

17   approximately $2.1 million.

18             In addition, Mr. Shahery has been the subtenant on

19   these two properties for approximately two years, and has

20   never missed any rental payments to the debtors,

21   notwithstanding the fact that those rental payments are

22   substantially larger than the rental payments that he would

23   have to make to the landlord under either lease.

24             Finally, the landlord has agreed -- I'm sorry, the

25   proposed assignee, Mr. Shahery, has agreed to post a letter

Page 73

1    of credit for the benefit of the warehouse landlord and a

2    deposit for the benefit of the parking lot landlord, in each

3    case, for the amount of a full year's rent.  Far lesser

4    deposits have served as adequate assurance in other cases

5    and it appears clear to me that such a deposit of a full

6    year's rent in each case of a highly favorable lease to the

7    tenant is almost overkill as adequate assurance.  See in re

8    Citrus Tower Boulevard Imaging Center, LLC Bankruptcy N.D.

9    Georgia, 2012, Bankruptcy Lexus 2208, April 2, 2012 at page

10   18 through 19 where six months' rent was offered, and in re

11   Westview 74th Street Drug Corp., 59 B.R. 755, where two

12   months' security deposit was offered, as well as in re

13   Casual Male Corp., 120 B.R. 256, 264, where a six months'

14   letter of credit was offered.

15           Given all of the foregoing, as well as the

16   committees by the landlord on the record to change its

17   insurance -- I'm sorry; I keep saying landlord -- committee

18   by the assignee on the record to change the insurance policy

19   to cover as an insured, not only the entity that's currently

20   operating as the subtenant at the property, but the

21   respective assignee who is the owner of that company, and

22   the landlord's agreement -- I'm sorry, the assignee's

23   agreement -- to be personally the tenant on the landlord --

24   on the lease in each instance, therefore, I'm subjecting his

25   own financial wherewithal directly.

Page 74

1          And, finally, the prospective assignee's agreement

2     to use the parking lot only as a parking lot.  It appears to

3     me that to the extent there were legitimate concerns --

4     there were legitimate concerns that is raised by the

5     prospective landlords as to the presence of an assignee

6     other than Mr. Shahery directly, the potential use of the

7     parking lot for the something else that might create

8     environmental or other hazards, and the potential gap of

9     insurance coverage have all been sufficiently addressed.  I

10    will note that it's fairly common in lease assignment cases

11    for the assignee to be a special purpose or single purpose

12    entity created for the purpose of taking the assignment;

13    that is often not a bar to the assignment on the basis of a

14    lack of adequate assurance if the principle of the assignee

15    either has sufficient financial resources or sufficient

16    experience of running the underlying business, as well as

17    either a logical or personal commitment to do so in a way

18    that does not subject that business to ruin, and thereby

19    causing the special purpose entity to default on the lease,

20    or where the lease itself is highly favorable.  See, for

21    example, in re Bygaph, Inc., 56 B.R. 596, (Bankr. S.D.N.Y.

22    1986) at pages 605 through 606, and in re Casual Male Corp.,

23    120 B.R., 256.

24          Given all of the foregoing, I believe it's not

25    necessary to have an evidentiary hearing whereby Mr. Shahery

Page 75

1    would be cross-examined on the accuracy of the affidavit

2    that he submitted recently with regard to his own personal

3    financial wherewithal.  What has been offered as adequate

4    assurance is enough.  So I will deny each of the objections

5    and on the additional agreements that were set forth on the

6    record today, find that there is sufficient adequate

7    assurance to warrant the assignment to Mr. Shahery.

8              I also conclude that although it was not a basis

9    for any written objection, the warehouse landlord's

10   objection that the assignment shouldn't be made because

11   there is a potential higher and better offer for the lease

12   should be denied.

13             The decision whether to assume or reject the lease

14   and then order to assign an assumed lease is one committed

15   to a business judgment standard, not the corporate law

16   business judgment standard with all its permutations

17   developed over the years, but as enunciated by the Second

18   Circuit, and in re Orion's Pictures Corp., 4 F.3d 1095 and

19   1099, in which the Second Circuit said, "In reviewing a

20   debtor's decision to assume a lease, and similarly, to

21   assign it, the bankruptcy court places itself in the

22   position of the debtor in possession and determines whether

23   assuming it would be a good business decision or a bad one,

24   i.e. where it's to the estate's economic advantage."

25             Frankly, it's already been established that the

Page 76

1    decision to assume the lease was to the debtor's economic

2    advantage, because I already authorized that assumption.

3    The issue now is whether the assignment to Mr. Shahery,

4    which is not subject to any additional due diligence or

5    conditions for $5,250,000 is an exercise of good business

6    judgment.

7           It has been represented to me that this has been

8    reviewed, not only by the debtor's real estate professionals

9    and counsel, but also by a very active creditor's committee

10   that is counting every penny in this case.  It was noticed

11   for approval and there were no objections by any party and

12   interest except for the oral objection at this hearing by

13   the landlord, who conceitedly admitted that it did not know

14   the terms of the other offer, but merely that a

15   communication was made to the landlord by a prospective

16   offeror for the lease, that the debtor has confirmed was for

17   a higher place; over $2 million more.

18          The debtor has explained that it did not accept

19   that offer because it was a conditional offer; it was

20   conditioned on 60 days of due diligence.  Normally, just on

21   its face, that would be not enough to turn down an offer

22   unless the debtor needed cash immediately.  However, it

23   appears to me there are two important considerations,

24   informing the debtor's business judgment.

25          First, it's conceded that the roof on the

Page 77

1     warehouse needs, at a minimum, work, and may need to be

2     replaced.  That generally is a fairly expensive proposition.

3     The record today reflects that the outside amount could be

4     in excess of $2 million, if it were to be repaired -- I'm

5     sorry, not repaired, but replaced.

6            Secondly, it appears based on the debtor's

7     representations to me, and they have no reason to have

8     misrepresented it given that Mr. Shahery is not an insider

9     of the debtors, that the alternative prospective assignee

10    had an interest in redeveloping the whole property.  That

11    interest combined with a potential due diligence outweighs,

12    or, to my mind, at least, would raise the distinct risk that

13    the bidder, having gotten its foot in the door, would

14    promptly engage in negotiations with the landlord, which

15    could well lead to irrigating a significant amount of the

16    profit that the debtor would be receiving for assignment of

17    the lease to the landlord for agreeing to modifications to

18    the lease, and/or resolution of the roof issue.

19           All things considered, then, I don't believe that

20    the delay by the debtor to consider that offer is warranted

21    when it has the firm, unconditional offer by Mr. Shahery in

22    hand.  Given the relatively modest monetary difference

23    between the two offers which, as I said, would be put at

24    serious risk given the conditionality of the higher offer.

25           In part, I'm basing that decision, not only on my

1    own assessment, but also on the fact that the creditor's

2    committee and no other party and interest has raised a

3    concern about the debtor's decision to choose the Shahery

4    proposal for the assignment.

5              So I'll ask the debtors to submit the order

6    granting the motion.  You should, in addition, reflecting

7    the representations made on the record, put in the language

8    reflecting the commitments by the landlord that have been

9    set on the record.

10             MR. SILVERSTEIN:  Thank you, your Honor.

11             MS. MARCUS:  Thank you.  We'll do that, your

12   Honor.

13             THE COURT:  Thank you.

14             MR. GRUMER:  Will Counsel be stipulating the

15   proposed order?

16             MS. MARCUS:  Of course.

17             THE COURT:  I think that's what you were asking,

18   too.  So, yes.

19             MS. MARCUS:  Of course, we will.

20             THE COURT:  Yeah.  It does not have to be settled

21   on formal notice, but you should be circulating the order

22   for Counsel both to the warehouse and parking lot landlords

23   before you submit it to chambers.

24             MR. TAXIN:  Thank you, your Honor.

25             MR. GRUMER:  Thank you, your Honor.

1          MR. REISS:  Thank you, your Honor.

2          (Off the record.)

3          MR. FAIL:  Good morning, your Honor.  For the

4     record, Garrett Fail, Weil, Gotshal & Manges for the

5     Debtors.  Are you ready to proceed with the next items?

6          THE COURT:  Yes, sure.

7          MR. FAIL:  Thank you, your Honor.  So the next

8     items on the agenda are under section 3, which we've titled

9     collectively the administrative expense matters.  There are

10    eight items on the agenda today.  Your Honor, we filed --

11    the debtors filed an objection to these collectively at

12    Docket 4854.  The objection addressed 11 motions.  Following

13    our filing of the objection, roughly a quarter or three of

14    the parties have asked to adjourn, and, your Honor, we would

15    note and you may already know, that there were a number of

16    other motions that were on the docket, very similar, that

17    agreed or requested to adjourn, so the objection wasn't

18    required to them.

19         These eight motions are a small subset in dollar

20    and number of all potential administrative and/or priority

21    claims.  They are a small subset of the parties that filed

22    claims to date, and it's a subset, as I mentioned of parties

23    that have filed motions.

24         Your Honor, as we set forth plainly in the

25    objection, we don't think that individual movements are

Page 80

1    entitled to a determination that their claims are allowed or

2    to force the debtors to reconcile or object to their claims.

3    Any one of them ahead of others, especially on, you know, a

4    14-day time period.  Under the circumstances of the cases

5    and prior confirmation of the plan, we also set forth that

6    the movements are not entitled to immediate payment of any

7    administrative claims.  So for those two reasons, and as set

8    forth more fully in the objection and based on the

9    circumstances of the case, which your Honor is clearly aware

10   of, we've asked that the motions be denied without

11   prejudice.

12           As is clear from the docket and the record, the

13   debtors have begun but certainly not completed the

14   reconciliation of all of the pre-petition claims that have

15   asserted priority.  We're evaluating and working with the

16   creditors' committee on additional ones.  We filed three

17   omnibus objections to several hundred claims asserting many

18   millions of dollars.  There are additional objections that

19   will come.

20           And consistent with the approach, your Honor, as

21   taken with respect to the prior motions, the process of "me

22   first," "just me," "mine is just a small claim," isn't one

23   that's sustainable or judicial efficient.  Your Honor has

24   set up claims procedures in these cases which are consistent

25   with other procedures in many, many other mega cases where

Page 81

1    the debtors control the timing of objections and then

2    subsequently the setting of evidentiary hearing to the

3    extent required.  It's done to allow the debtors time to

4    evaluate, negotiate, and plan the most efficient way

5    forward, rather than to respond in a Whac-A-Mole fashion to

6    parties that seek to have their claims allowed for trading

7    purposes or otherwise.

8              I'm happy to answer any questions, your Honor.

9              THE COURT:  Well, the debtors are approaching

10   confirmation.  The confirmation hearing is scheduled for

11   September 18th, I think.

12             MR. FAIL:  I believe that's right, your Honor.

13             THE COURT:  Obviously, there's a requirement under

14   Section 1129A to forming a plan that the plan provide for

15   the payment of allowed administrative expenses --

16             MR. FAIL:  The draft of the plan that's on file,

17   that's been approved for solicitation, and that was

18   solicited and does provide for that, your Honor.

19             THE COURT:  Well, my question is how does the

20   debtor's claim review process and objection process tie into

21   the requirements of Section 1129 (a)(9), which says, again,

22   "Except to the extent the holder of a particular claim has

23   agreed to a different treatment, the plan provides that the

24   holder will receive cash on the effective date"?

25             MR. FAIL:  Sure.

Page 82

1          THE COURT:  I mean, obviously, if you have an

2     objection pending, it's not an allowed claim yet, but it

3     wasn't clear to me that your procedure contemplated those

4     objections being filed before the confirmation hearing.

5          MR. FAIL:  We are endeavoring to file objections

6     on a rolling basis in advance of confirmation.  That will

7     address a subset, your Honor.  I will also add that, you

8     know, obviously, today is not a confirmation hearing.

9     Certain of these parties have filed confirmation objections

10    and other pleadings throughout the case as have other

11    parties.

12          The administrative burden -- you know, our burden

13    to satisfy the requirements of confirmation will be

14    addressed and, we believe, met at the confirmation hearing.

15    As is typical in many, many cases, you know, a bar date

16    won't be set until pursuant to the confirmation order for

17    administrative claims, so the debtors have estimates, the

18    debtors will satisfy their burden, and certainly not

19    precluding any opportunities to speak with and negotiate

20    with administrative creditors between now and the

21    confirmation hearing.

22          THE COURT:  Right.

23          MR. FAIL:  But the alternative, your Honor, which

24    is being proposed by the creditors, is that because they've

25    asked, we either need to respond or accept a default does

Page 83

1    not seem to be appropriate, especially given, as we've

2    already demonstrated in objections to hundreds of claims for

3    hundreds of millions of dollars, accepting filed claims or

4    asserted claims cannot be the answer.  It is certainly not

5    in the best interests of the estates generally or any other

6    creditor.

7            The debtor's motivation and job and duty is to

8    ensure that appropriate parties are paid amounts to which

9    they're entitled, and the debtors are not prepared to allow

10   the claims and -- I note what was put in the reply that the

11   debtor didn't address in their objection the specifics of

12   these particular motions, and, therefore, we didn't do

13   enough, and therefore their claim should be allowed.  But,

14   your Honor, that's asking the debtors to take the bait.  The

15   debtors are saying they shouldn't be forced to reconcile one

16   small claim ahead of the largest, or one individual bespoke

17   claim when a number of claims could be addressed at the same

18   time.

19           And the debtors didn't take the bait.  We didn't

20   go through and say, okay, we just have a little bit of an

21   issue here.  We haven't completed our preference review.  We

22   haven't completed, you know, a number of other things that I

23   think the Court would expect the debtors to do before

24   granting an allowed administrative claim.  Your Honor is

25   aware that we've already completed the sale, employees have

Page 84

1    been transferred to Transform, access to records and

2    employees are pursuant to those documents, and given ongoing

3    litigation, are not immediate and perhaps not ideal, but

4    those are the circumstances under which we're operating.

5            And the alternative to denying the request, which

6    is to allow parties to play gotcha or to set a time

7    limitation that's inconsistent with the plan.  The plan that

8    we proposed and solicited votes on provides for

9    approximately subject to extensions which are regularly

10   granted in mega cases.  It just doesn't make any sense to

11   the debtors.

12           THE COURT:  And I guess it's implicit of what you

13   said, but I just want to get it out.  The debtors,

14   therefore, intend to show at the confirmation hearing that

15   subject to any agreements by administrative expense

16   claimants to defer payments, they will have sufficient cash

17   at confirmation to enable payment of the estimated aggregate

18   amount of allowed administrative expenses.

19           MR. FAIL:  Your Honor, I'll say the debtors are

20   prepared to meet the requirements for confirmation of the

21   plan of the confirmation hearing, and under your Honor's

22   question and would respectfully suggest that isn't the

23   necessary -- that isn't the issue before the Court today.

24   These motions seek allowance of eight party's claims for

25   roughly, you know, 2- to $4 million out of the estimated --

Page 85

1      it's a small fraction of what was, you know, at dispute

2      under the EPA of what were administrative claims that were

3      supposed to be paid by one party, perhaps the other, of

4      503(b)(9) claims that were estimated.  So I just think that

5      they're two distinct issues and the creditors that are

6      raising the issues today are doing so in an attempt to exert

7      pressure of plan objections by filing other objections to

8      other motions.  We're aware by virtue of their filing these

9      motions that they've asserted claims; we'll be prepared to

10     address those claims in the proper due course.

11               THE COURT:  Okay.

12               MR. FAIL:  Thank you, your Honor.

13               THE COURT:  Uh-huh.

14               MR. BRONSON:  Your Honor, Bruce Bronson in behalf

15     of M&S Landscaping.  My client is a small landscaping and

16     general contractor who provided essential services to Sears

17     and was promised to be paid on an ongoing basis post-

18     confirmation.  He has a claim of about $276,000.  It's for

19     things like repairing the roof, fixing drains, maintaining

20     the assets.

21               And this hearing was to be on for July, I was

22     asked to adjourn it, you know, so that maybe in August

23     there'd be a better idea of what was going on, and I can't

24     understand why so many dollars in legal fees can be paid out

25     and, you know, it should be pari passu  with the other

Page 86

1   administrative costs, and my client can't collect what we

2   should have been getting on an ongoing basis.

3          He lays money out for his employees, he's laid

4   money out for materials, and the bills are relatively small

5   each one of them, but they're specific; gate motor not

6   working; he comes in and replaces it.  Roof leaks, he comes

7   in and he fixes the roof.  And I don't understand why he'd

8   be convinced to do this work on behalf of Sears to maintain

9   the properties and not be able to get paid.

10          THE COURT:  Okay.

11          MR. BRONSON:  Thank you, your Honor.

12          MR. HEMRICK:  Good morning, your Honor.  Chris

13   Hemrick, Walsh Pizzi O'Reilly Falanga on behalf of GroupBy

14   USA, Inc.  your Honor, for present purposes, I just wanted

15   to point out that my client performed third party IT and

16   e-commerce services supporting the debtor's online retail

17   platform from January through March of this year in the

18   amount of $420,000 --

19          THE COURT:  And that's pursuant to an executory

20   contract?

21          MR. HEMRICK:  That's correct, your Honor, and I'm

22   happy to go into the details of the claim, but just in

23   response to what the debtors just represented, those

24   services -- we filed a motion to enforce our rights in

25   April, originally set for the May omnibus hearing.

Page 87

1           The debtors had almost four months to respond to

2    our claim.  There were certain discussions that were had,

3    and we agreed that the debtor would put its response to our

4    motion in an advance of today's hearing on August 15th, and

5    what we got was, well, generally I see it referred to as a

6    non-objection.  It's just not clear to me what the disputed

7    issues are with respect to the facts underlying our claim.

8           There was a post-petition in January, there was a

9    notice of assumption that our contract was designated as

10   subject to assumption and assignment.  Our client, I think,

11   more than reasonable expected -- relied on that, expected

12   the debtor wanted services continued.  There has been no

13   dispute to our post-petition invoicing.  The services

14   weren't objected to --

15           THE COURT:  Was it assumed and assigned?

16           MR. HEMRICK:  The contract was rejected.

17           THE COURT:  It was rejected.

18           MR. HEMRICK:  But there are cases cited in our

19   papers from the southern district and elsewhere; Bethlehem

20   Steel is a Southern District Case that made clear that

21   post-petition services provided pre-rejection are entitled

22   to administrative expense data.

23           So, you know, if there are issues that the debtors

24   have with our claim, you know, I expected to hear them after

25   four months in anticipation of this hearing, but I didn't

Page 88

1    hear any issues.  So I just don't see a reason why this

2    issue can't be resolved, even if it's just the allowance of

3    the claim, putting immediate payment to the side.  And to

4    the extent we get there today, your Honor, I'm happy to walk

5    through the claim, but I wanted to make those preliminary

6    remarks.

7               THE COURT:  Okay.  Let me -- Mr. Fail, the

8    debtor's response in reference to orders of the court

9    setting forth claim procedures.  I'm familiar with the order

10   setting forth procedures for section 503(b)(9) claims.  I'm

11   also familiar with an order dealing with the debtor's

12   objection to claims, although I don't think that covers

13   administrative expenses, but maybe I'm missing something.

14   And then, of course, there's the general procedures order in

15   the case, which -- that is the case management order, which

16   deals with when an evidentiary hearing is scheduled and the

17   like.  But is there some order I'm missing, as far as --

18               MR. FAIL:  Your Honor, I'm not sure that the

19   supplement procedures orders don't cover it.  I think the

20   503(b)(9) are just prepetition claims.  Prepetition claims

21   are subject to the --

22               THE COURT:  Right.

23               MR. FAIL:  -- the claims, objections, or --

24               THE COURT:  But this claim -- it's not a 503(b)(9)

25   claim.  It's a --

1        MR. FAIL:  They're alleging a post-petition admin

2    claim.

3            THE COURT:  Right.

4            MR. FAIL:  This is no different than what I

5    described, someone saying, "But I just want mine.  I told

6    you a while ago that I wanted my payment."

7            THE COURT:  There are two different issues.

8            MR. FAIL:  Right.

9            THE COURT:  There's the issue of allowance --

10           MR. FAIL:  Yes.

11           THE COURT:  -- and then there's the issue of

12   payment.

13           MR. FAIL:  Yes.

14           THE COURT:  And Counsel said, well, at least my

15   claim should be allowed.

16           MR. FAIL:  Sure.  Your Honor, that's all they're

17   asking for.

18           THE COURT:  The 503(b)(9) order lays out a

19   procedure for dealing with those claims, and says that there

20   wouldn't be any other procedure.

21           MR. FAIL:  The procedure for administrative claims

22   will be that any administrative claims not paid pursuant to

23   a confirmation order, there will be an administrative claims

24   bar date and the claims procedures would apply to -- they're

25   not restricted to prepetition claims.

Page 90

1          There's no procedure that says parties can seek a

2      motion which a declaratory judgment or a demand for money,

3      which would require an adversary proceeding, not a motion

4      and 14-days' notice to say, here's what I'm owed.  But more

5      importantly, your Honor, the fact that group B, group I, has

6      said, "I just want mine done and the gardener just wants his

7      done."  You know, they're different in the first

8      instance -- one may be able to see if the lawn was mowed,

9      but in terms of the contract that was ultimately rejected,

10     perhaps that's a sign that value wasn't given or equal to

11     what the cost was; it may be that, it may not -- and there

12     may be facts -- I know that there are factual issues with

13     regard to at least some of the parties that have filed

14     motions where we don't believe that the value being sought

15     in the claim, that the debtors got the value for that.  And

16     to set an after the official deadline by which the debtors

17     are required or otherwise pay the administrative price for

18     allegations just doesn't make sense.  We know we have to

19     reconcile.

20          THE COURT:  Now, again, I'm not talking about

21     payment.  I'm just talking about --

22          MR. FAIL:  But allowance -- our position is that

23     once there is an administrative claims bar date that's set,

24     they'll be treated as claims in these cases.  We have our

25     books and records of our accounts payable that have not been

1   paid.  We have the issue ongoing with Transform as to what

2   obligations were assumed.  We're checking to see what

3   obligations were paid by Transform.  There's that set of

4   issues.

5            THE COURT:  Well, the first issue isn't an issue

6   anymore, except on appeal.

7            MR. FAIL:  Right, we've had.  So over the course

8   of when these motions were filed and during the cases --

9            THE COURT:  Right.

10           MR. FAIL:  -- there were those issues.

11           THE COURT:  Right.

12           MR. FAIL:  There are also issues --

13           THE COURT:  So, for example, when this motion was

14   filed in April, we were three-plus months away from

15   determination who was going to pick this up --

16           MR. FAIL:  Yeah.  Correct.

17           THE COURT:  -- i.e. the debtor or Transform.

18           MR. FAIL:  Correct.

19           THE COURT:  Which I just decided on July 31st.

20           MR. FAIL:  Your Honor's recollection is better

21   than mine.  I'll stipulate to that.

22           THE COURT:  Well, actually, that's not true; I

23   decided the super priority claim at that point.  I think

24   I --

25           MR. FAIL:  There are a lot of issues that are

Page 92

1    interwoven.

2           THE COURT:  I think I decided the other issue

3    judge July with the 166 million loss.

4           MR. FAIL:  Your Honor, we're not delaying for any

5    purpose other than to do the right thing, to ensure that

6    creditors that have not been paid are treated similarly.  We

7    intend to engage in discussions with administrative

8    creditors so that debtors can meet their burden for

9    confirmation.

10          These parties are a subset of the potential

11   creditors that are out there similarly situated and the

12   debtors are just trying to ensure that they're limited

13   assets go to the proper parties.  There are parties who have

14   asserted administrative expense claims for amounts that we

15   don't believe are entitled to administrative priority.  We

16   filed hundreds of objections to hundreds of millions of

17   dollars to date, we're processing others, but additional

18   information is required, and that analysis is ongoing,

19   including with respect to preference and including with

20   respect to investigation of whether, for example, the

21   debtors told certain parties to stop performing or that the

22   contracts would be rejected.

23          There are parties that have asserted royalty fees

24   for minimum guarantees for a longer period that are

25   substantially more than claims have been asserted.  There

1    are thousands of claims out there.  And with all due respect

2    to ever one of the creditors, the debtors are charged with

3    most efficiently administrating these estates.  And the

4    first-come, first-served model is often not the most

5    efficient.  And the repeat attempts by certain parties, the

6    first, second, third come, isn't helping the situation.

7    We're spending time --

8            THE COURT:  Okay.  Can I interrupt you just for a

9    second?

10           MR. FAIL:  Of course, your Honor.

11           THE COURT:  Okay.  Sorry.  I was going to ask

12   someone to look on the docket when that order was entered.

13   The order dealing with the APA's interpretation of picking

14   up the accounts payable.  Do you remember that?

15           UNKNOWN SPEAKER:  Your Honor, I'm happy to address

16   that, if you'd like .

17           THE COURT:  Just give me the date.

18           UNKNOWN SPEAKER:  Your Honor, that dispute has not

19   been finally resolved, because the obligations, if any, to

20   Transform --

21           THE COURT:  Oh, that's right.  I gave an oral

22   ruling, but ...

23           UNKNOWN SPEAKER:  That's correct, your Honor.  But

24   it's subject to dollar for dollar reduction, based on

25   shortfalls and specified receivables --

1                THE COURT:  All right.  Do you remember when that

2       oral ruling was?

3                UNKNOWN SPEAKER:  It was in late July.

4                THE COURT:  Late July.

5                UNKNOWN SPEAKER:  I don't remember the exact date,

6       your Honor.

7                THE COURT:  And there's no order yet?

8                UNKNOWN SPEAKER:  That's correct.  That is

9       correct.

10               THE COURT:  All right.  All right.

11               UNKNOWN SPEAKER:  It's ongoing reconciliation.

12               THE COURT:  So that's not been finalized yet.

13               UNKNOWN SPEAKER:  And there may ultimately, your

14      Honor, be no obligations for Transform depending on the

15      deducts or shortfalls and specified receivables and prepaid

16      inventory.

17               THE COURT:  Okay.

18               MR. FAIL:  And, finally, your Honor, even the

19      simplest ones, even the simplest administrative claims

20      may -- the debtors may engage in conversations that effect,

21      you know, with all administrative creditors, and we're using

22      the time between now and confirmation to administer these

23      dates most efficiently.  We just think that granting these

24      motions does not serve the interests of the estate; it would

25      be entirely punitive.

Page 95

1          And, your Honor, we respectfully request these

2     motions can't be requested today.  At most, they could be

3     deferred, but we requested that they be denied without

4     prejudice, which is all we've asked for.  That allowance not

5     be granted today, that payment can't be approved today.

6          THE COURT:  Okay.  I was just --

7          MR. FAIL:  Sure.

8          THE COURT:  -- responding to the one issue that

9     the GroupBy USA had raised as far as timing.

10         MR FAIL:  Sure, your Honor.

11         MR. HEMRICK:  Your Honor, just briefly.

12    Regardless of who is responsible ultimately for picking it

13    up, to me that's a separate issue from whether the claim can

14    be allowed.

15         THE COURT:  I totally disagree, sir.  Why would we

16    spend countless hours litigating with the debtor if a third

17    party is going to pay for it?  That's a total waste of time;

18    your client's money, debtor's money, the creditor's money,

19    and my time.

20         MR. HEMRICK:  So, but in that instance, your

21    Honor, who is responsible for objecting to the claim; is

22    that -- is it the debtor's?

23         THE COURT:  Exactly.  That's the point.  You're

24    right.  Who is?  We don't know yet.  I have addressed that

25    issue as far as I can and given a ruling on it, and the

Page 96

1    parties are now doing the calculations.  So your fight may

2    be with Transform or may be with the debtor.  I don't see

3    how the debtor can be faulted for "sitting on your motion

4    since April," given the existence of those issues.

5              MR. HEMRICK:  All right.  Very well, your Honor.

6              MR. LIBOU:  Good morning, your Honor.  Jason

7    Libou, Wachtel Missry, LLC.  I represent administrative

8    creditor MaxColor, LLC in connection with this motion for

9    allowance and payment of administrative expenses, docket

10   number 4176.  This is a relatively small claim compared to

11   some of the other claims we've discussed.  This is for a

12   503(b)(1) and(b)(9) claims, for goods that were sold --

13             THE COURT:  But (b)(9) is covered by my order.

14             MR. LIBOU:  (b)(9) is covered by the order.  So

15   with respect to the (b)(1) claims, there's were claims for

16   goods that were sold that were necessary for preservation of

17   the estate.  You know, we were told that a check was issued

18   for payment of these claims and that it was then stuck in

19   transit.  We have been unable to get, you know, any kind of

20   confirmation regarding that check or what actually happened

21   to it.  But with respect to the (b)(9) claims that

22   concerned --

23             THE COURT:  I'm not going to hear that today.  I

24   issued an order on that.

25             MR. LIBOU:  On the (b)(1) claims.

1            THE COURT:  And your motions are consistent with

2     that order.

3            MR. LIBOU:  Right.  So for the (b)(1) claims --

4            THE COURT:  It's dated --

5            MR. LIBOU:  This is from July.  We were asked to

6     adjourn the motion.

7            THE COURT:  No, no, the order is dated

8     February 22, 2019.

9            MR. LIBOU:  Okay.  Yes, so those claims could be

10    addressed in accordance with that order.

11            THE COURT:  Okay.

12            MR. LIBOU:  With the respect to the (b)(1) portion

13    of the claims, we request these claims be allowed if not,

14    you know, order to be paid, but if not, that they be

15    allowed.

16            THE COURT:  I just, you know, again, I don't --

17    for each of these, the debtor has not objected on the merits

18    of the claim.  In a normal case, usually a rather smaller

19    case than this one, if someone isn't paid for doing the

20    landscaping or delivering goods post-petition, they make a

21    motion for payment of the administrative expense.  And if

22    the debtor doesn't object to the merits of the motion, the

23    claim is allowed and then there's the second issue of when

24    it's paid.

25            This case is unusual in two respects; the first is

1    there is a substantial issue as to whether these types of

2    claims are to be paid by the buyer, Transform, under the

3    APA, or the debtor.  And that issue was joined in July.  I

4    gave a ruling on it that required further calculation and

5    further work, which is being done.

6              Secondly, this isn't a normal case, in part

7    because in light of the first issue, and in part because

8    perhaps even if Transform is obligated to pay a big chunk of

9    these claims, the debtor may be administratively insolvent,

10   in which case, it needs to step back and look very carefully

11   at all these claims as a group and decide how to proceed

12   with them.  I gather, although I've not read the plan, that

13   the plan proposes a mechanism for dealing with

14   administrative expenses, including their allowance or

15   disallowance, and if the plan is confirmed, that will

16   govern -- that procedure will govern -- because it's the

17   plan.

18             To me, both of those considerations strongly argue

19   for not getting into piecemeal determination of the

20   allowance of these claims today.

21             Lastly, under the case management order, this

22   hasn't been noticed as an evidentiary hearing.  Now, they

23   haven't objected, so I understand everyone's argument, which

24   is, you know, no objection, it should be allowed.  On the

25   other hand, I think there is a legitimate excuse for not

1    objecting, which is why should they spend the money doing

2    the analysis and objecting if Transform is liable for it.

3    So it seems to me that I shouldn't be dealing with the

4    merits here at this point.

5            And I understand that it's incredibly frustrating

6    to each of your clients, and as far as I know, they're all

7    deserving.  You know, there's the famous line about

8    Dartmouth School, "but there are those who love it".  Well,

9    it's a small client, but they're all like that, you know?

10   I'm sure Michigan and Penn State and Yale all say the same

11   things about themselves, you know, as well as Daniel Webster

12   saying it about Dartmouth.

13           So I just -- it's a very unfortunate situation; I

14   appreciate that.  But I think the debtors actually are doing

15   what they can to deal with it.  We had a lengthy hearing on

16   super priority claims asserted by ESL and Cyrus and the

17   indenture trustee that would have primed all of your

18   clients, for example, to the extent that Transform didn't

19   pick it up.  We had that completed on July 31st and a

20   proceeding on the APA issues was, I think, a couple of weeks

21   before then.

22           So it's not as if the debtors are just, you know,

23   going out for a pack of cigarettes and they're never coming

24   back; they're really working on this.  I don't know what

25   more to say on those two points.

Page 100

1           MR. LIBOU:  Thank you, your Honor.

2           THE COURT:  Okay.

3           MR. CAVALIERE:  May I briefly be heard, your

4    Honor?

5           THE COURT:  Sure.

6           MR. CAVALIERE:  Your Honor, Rocco Cavaliere,

7    Tarter, Krinsky & Drogin On behalf of Alpine Creations, Ltd.

8    Your Honor, there are some statements in the objection, and

9    also today, with respect to some creditors doing an Enron,

10   if you will, and a Whac-A-Mole kind of situation.

11          THE COURT:  Right.

12          MR. CAVALIERE:  I've been watching these --

13          THE COURT:  I'm sorry, what is your client again;

14   which one?

15          MR. CAVALIERE:  Alpine creations, Ltd.  I

16          THE COURT:  Okay.  All right.

17          MR. CAVALIERE:  I've watched --

18          THE COURT:  I don't see you -- well, look, the

19   only ones who are doing Whac-A-Mole, I think, are the

20   503(b)(9) folks, because there's a specific order dealing

21   with that.  You are certainly to entitled to file a motion

22   saying our client is owed an administrative expense for -- I

23   think Alpine was --

24          MR. CAVALIERE:  Alpine is -- we have a

25   $202,000 503(b)(1) claim and a 677,000 503(b)(9) --

Page 101

1          THE COURT:  So you were doing Whac-A-Mole on the

2     (b)(9), but on the other one, you know, I understand that

3     point.  But, again, it just doesn't seem to tie into the

4     reality of the case, unless I'm missing something.  I don't

5     think there's any order that precludes you from the

6     administrative expense claim the way you did on the

7     503(b)(1).

8          MR. CAVALIERE:  That is correct, your Honor.  And

9     with respect to the 503(b)(9), the procedure ordered in

10    respect of that suggest that if all parties were to file

11    administrative 503(b)(9) claims for claim reconciliation.

12    But in my view, it was not intended to me that we have to

13    wait an unlimited period of time, any until after

14    confirmation for the debtor to weigh in on these.  The

15    intent of it was file your proof of claim form and at some

16    point the debtor would look at it.  In fact, at an earlier

17    period in this case, there was a winner's motion -- March

18    15th, debtor's counsel filed a motion and said that the

19    503(b)(9) aspect should be adjourned until May or June.  It

20    wasn't necessarily to be adjourned until an unlimited period

21    of time.  We specifically waited, your Honor, not to file

22    our motions early in this case because we thought that it

23    made no sense --

24          THE COURT:  Well, that was for any pending

25    503(b)(9) motions.  Not -- I mean, that's a specific --

Page 102

1   paragraph 20 says that, "pending 503(b)(9) motions be

2   adjourned to a date no later than 60 days after the general

3   bar date."

4           MR. CAVALIERE:  Okay.  All right.  My point, what

5   I just really want to say, your Honor, we could have filed

6   our 503(b)(1) motion as well earlier.  We decided to wait

7   because, as your Honor pointed out, there were some

8   significant disputes.  But once the 507(b) dispute got

9   resolved, and we are in the pendency of having a

10  confirmation hearing just a few weeks away in which these

11  claims should be allowed, it's a little less work for the

12  debtors to do to estimate these claims.  All they need to do

13  is review these --

14          THE COURT:  Well, they're going to estimate --

15  they have to estimate them for purpose of confirmation, to

16  assure me -- unless people are going to say, "I'll wait

17  pursuant to a payment schedule."  But that's a different

18  story.  And, again, why should they -- I mean, one of the

19  reasons they sold to Transform was so Transform would pick

20  up these types of claims, so why should they be doing the

21  work?  Now, I know there are other provisions of the

22  agreement that may be an offset, and that's what I left

23  open, because I think both sides didn't quite get it right

24  in their calculations, and I've been told they're furiously

25  trying to figure out how to do it.  And I said if they

Page 103

1    couldn't do it, I'd appoint an examiner that helped them and

2    helped me decide.

3          So, again, this is an unusual situation.  I mean,

4    it's --

5          MR. CAVALIERE:  I understand.  There are limited

6    resources, your Honor, and my client is just frustrated;

7    they've been waiting for payment for a long time --

8    patiently waiting.  We decided to bring this before the

9    Court.

10          THE COURT:  Right.

11          MR. CAVALIERE:  On the other hand, there are

12   precious resources that are still going out the door to

13   other parties, which my client is frustrated about as well.

14   We are concerned about preserving estate resources --

15          THE COURT:  Well, I'm not aware of a whole lot.

16          MR. CAVALIERE: -- no money should be going out the

17   door, and we'll wait like everybody else to get paid at the

18   same time.

19          THE COURT:  Okay.  I do think that I've seen

20   certain motions to seal that if -- your last statement was a

21   reference to the payment of professional fees, there is

22   enough in the future that hasn't been paid yet to cover

23   administrative insolvency issues there, if they arise.

24          MR. CAVALIERE:  I certainly hope so.  I think when

25   your Honor asked earlier to Mr. Fail whether there would be

Page 104

1    a reserve, it wasn't 100 percent clear whether there would

2    be a reserve for all --

3            THE COURT:  Well, that's a confirmation issue.

4            MR. CAVALIERE:  That's correct.

5            THE COURT:  I understand.

6            MR. CAVALIERE:  But there was no representation on

7    the record that suggested that -- to assure the court that

8    there would be.

9            THE COURT:  That may be, but, again, we're going

10   to hear that next month --

11           MR. CAVALIERE:  Okay.  Thank you, your Honor.

12           THE COURT:  -- September 18th.

13           MR. SCHNITZER:  Good afternoon, your Honor.

14   Edward Schnitzer from Montgomery McCracken on behalf of

15   Vehicle Service Group, LLC.  Our motion was 4728.  I just

16   wanted to make three points, your Honor.  One, to the extent

17   there was a suggestion that the motion was improper, I do

18   think it is permitted under 503(b).  Your Honor, I

19   understand --

20           THE COURT:  Well, again, unless it's a -- but

21   yours, I don't think, was a 503(b)(9), right?

22           MR. SCHNITZER:  Ours had a small 503(b)(9)

23   section, but --

24           THE COURT:  Okay.  All right.

25           MR. SCHNITZER:  -- but the bulk, the 170,000, was

1   503(b)(1).

2           THE COURT:  Okay.

3           MR. SCHNITZER:  Your Honor, I did want to note,

4   those goods and services were provided back in January, and

5   I know you've expressed you understood this.  From my

6   client's perspective, they provided this in January to a

7   debtor in bankruptcy.  They did expect to get paid in the

8   ordinary course of business.  We're not seven months later,

9   and it sounds like another six months from now.  So as

10  you've expressed, your Honor, that's frustrating from my

11  client's point of view.

12          And the last thing, your Honor, I wanted to

13  address, if you are not inclined to grant the motion, either

14  even in just the sense of allowing the claim, your Honor, I

15  would ask that it not be missed, even without prejudice, but

16  instead it be adjourned and be kept --

17          THE COURT:  Yeah, I don't see a reason to dismiss.

18  I mean, you filed it; I think it just should be adjourned.

19          MR. SCHNITZER:  Your Honor, the debtors are have

20  said --

21          THE COURT:  And I think the hearing -- well, at

22  the confirmation hearing would be the time for me to decide

23  when it should be adjourned to; it should adjourned to after

24  the confirmation hearing, but I should be able to decide

25  then how long and under what circumstances.

1              I'm looking for my notes on yours --

2              MR. SCHNITZER:  It was originally ten in the

3    original agenda, but I think it moved in the amended --

4              THE COURT:  -- Vehicle Services Group.  Right.

5    It's just my own memo on this.  So this is part of an

6    executory contract, too.

7              MR. SCHNITZER:  Correct.  That was rejected

8    subsequently.

9              THE COURT:  So, I mean, again, I think the debtors

10   are kind of doing a priority triaging on these types of

11   claims, but there's a whole group of claims that fall into

12   executory contract claims, where you look at the -- that

13   aren't landlord claims -- where you look at whether, you

14   know, they really got the value that's in the contract.

15   There's a whole separate set of ones as far as just vend or

16   agreements, where you look at just the invoices and are they

17   accurate --

18             MR. SCHNITZER:  Understood.

19             THE COURT:  That's a whole separate group of

20   people that look at that.  So I'm assuming that they're

21   doing that type of, you know, siloing or whatever buzzword

22   you want to do on those types of analyses.

23             MR. SCHNITZER:  Understood, your Honor.  Another

24   client has received an e-mail from them, asking for

25   information to reconcile 503(b)(9), so I don't doubt they're

Page 107

1    doing something.

2              THE COURT:  Okay.

3              MR. SCHNITZER:  Thank you, your Honor.

4              THE COURT:  All right.

5              MR. SARACHECK:  I'll be brief, Judge.

6              MR. ARNOLD:  Good morning, your Honor.  Todd

7    Arnold of Neale Bender Yoo & Brill appearing on behalf of

8    Weihai Lianqiao.

9              THE COURT:  Okay.  Good morning.

10             MR. ARNOLD:  At the risk of beating a dead horse,

11   I have many of the same points.  I just wanted to note for

12   the Court that attached to our reply as Exhibit 1 is the

13   e-mail string that I had with debtor's Counsel, starting six

14   months ago, when we tried to engage in a process with the

15   debtor to try to reconcile the administrative claims that

16   were asserted in the motion.  We got no response from the

17   debtor, which led to us being, in our opinion, forced to

18   file the motion for allowance of the administrative claim,

19   especially with confirmation upcoming.

20             I think it's a little disingenuous for the debtors

21   to worry about a race to the courthouse for administrative

22   creditors that are supplying goods post-petition and to pay

23   those claims, but not to have the same concern for

24   professionals that rushed into court and protected their

25   ability to have their claims allowed, at least on an interim

1   basis, and that seem to be continuing to be paid at least at

2   80 percent.

3          My client is willing to give up the request to

4   have his claim paid right now.  We understand that it will

5   have to be paid in accordance with the plan if it's

6   confirmed, but we do think that in light of our efforts to

7   try to reconcile the claim for six months, not in response

8   to that effort and not on substantive response to the

9   motion, that the claim should at least be allowed.

10          THE COURT:  Well, again, the February 22nd order

11   covers the 503(b)(9) claims and most of this claim falls in

12   that category.  The rest is the post-petition goods which,

13   again, I've already ruled, covered by the APAs, subject to

14   the fact that there may be set offs on the APA.  So, I mean,

15   I'm not hearing anything different on that.

16          MR. ARNOLD:  Understood, your Honor.  Again, I

17   don't see any opposition on the 503(b)(1).  I understand the

18   issue about Transform possibly being required or responsible

19   to pay part of them.

20          On the 503(b)(9), the court order said in the

21   procedures for reconciliation and allowance of 503(b)(9)

22   claims, the order on Docket Number 2676, at paragraph 19,

23   indicates that 19B, "if the debtors and the lender can't

24   reach agreement regarding a 503(b)(9) claim, the debtor will

25   schedule the matter for hearing by the court no later than

Page 109

1    60 days after being requested to do so, by the lender.

2              THE COURT:  Okay.  Was that done?

3              MR. ARNOLD:  My e-mail string with the debtor's

4    counsel is attached to our reply, docket number 4900 at

5    Exhibit 1.  And on February 25th, I sent an e-mail

6    referencing order 2676 and asking for reconciliation of a

7    503(b)(9) claim.

8              THE COURT:  Did you ask them to schedule the

9    hearing?

10             MR. ARNOLD:  I did not specifically ask to

11   schedule the hearing, but I clearly ask for --

12             THE COURT:  Okay.

13             MR. ARNOLD:  -- reconciliation and didn't hear

14   anything back.

15             THE COURT:  All right.  Well, I mean; okay.

16   That's what that provision requires.  As far as the --

17   again, as far as the professional fees, A, is on an interim

18   basis, and, B, 20 percent of each fees is a lot of money.

19             MR. FAIL:  And C, your Honor, subject to a -- the

20   secured lender is collateral.  It's entirely different.

21             THE COURT:  It's subject to a carve-out beyond

22   that, but  I'm just saying I think that well, the concern

23   generally is a real one, I think under the facts, and at

24   least my understanding of the possible risk of

25   administrative insolvency, the facts don't require changing

Page 110

1    the compensation procedures order.

2              MR. SARACHECK:  Can I be heard, your Honor?

3              THE COURT:  Sure.

4              MR. ARNOLD:  Understood, your Honor.  I

5    appreciated the chance to be heard, and, obviously, I think

6    you're hearing from a lot of the administrative creditors'

7    frustration, which the Court is acknowledging.  I appreciate

8    that is a bad situation, as it has been with many of these

9    large retailer cases.

10             THE COURT:  Okay.

11             MR. SARACHEK:  Your Honor, Joseph Sarachek on

12   behalf of Mingle Fashion.  This claim is clearly a 503(b)(1)

13   claim.  It was post-petition goods.  It's $44,000.

14             Sears in Hong Kong acknowledged that this was a

15   post-petition order, post-petition goods, and, again, like

16   the others, all we want, as the claim allowed, we

17   recognize -- and I will say my client is very, very

18   sophisticated and said to me the other day, "Explain me

19   this, Mr. Sarachek, aren't I on the same level as attorneys

20   and other professionals in this case?"  They actually went

21   back and read your order.  And this carve-out is actually

22   the money of unsecured creditors.  So they said, why are

23   professionals getting paid --

24             THE COURT:  Well, they are an unsecured creditor.

25             MR. SARACHEK:  Understood.  But they are pari

Page 111

1    passu -- They should be pari passu-- and they -- yesterday,

2    we, actually, at our client's request filed an objection to

3    the latest set of the applications that were filed.  We

4    don't think any further fee applications should be

5    approved -- no further money should be approved until it's

6    shown that this case is administratively insolvent.

7           The debtors, Transform, various parties, have all

8    said that there's a reasonable likelihood -- and, your

9    Honor, you know that the parties are having discussions,

10   myself, there's 50 million in 503(b) -- we're all having

11   discussions with the uninsured creditors committee, with the

12   debtor; we all need to be brought together to get -- prior

13   to September 18th -- to get a real fix on the number, the

14   number that we're not being given, your Honor, and you

15   really need to hear this, is, hey, if the 503(b)(9) is $180

16   million dollars and the 503(b)(1) number is $60 million, is

17   there $240 million dollars available to pay those

18   administrative creditor his?  And we're getting the run

19   around, all of us, collectively.

20           And I say all of us on the creditor's side.  We're

21   being told, well, Transform has the information.  We don't

22   have the information, this, that the other -- we need the

23   Court's intervention.  We need a mediator --

24           THE COURT:  Well, I have the hearing scheduled for

25   September 18th; that's the -- the debtors have that booked.

Page 112

1          MR. SARACHEK:  But prior to that, we --

2          THE COURT:  Well, clearly, allowing a $47,840

3     claim is not going to help them.

4          MR. SARACHEK:  It's not going to -- well, I get

5     that, your Honor.  The issue -- we're the pimple on the

6     elephant's back.

7          THE COURT:  The aggregate administrative expenses

8     is not the pimple on the elephant's back; it's a very

9     important thing.

10          MR. SARACHEK:  No, no.  We're -- the $47,000 is

11    the pimple.

12          THE COURT:  No, but what I'm saying is I think the

13    issue that is really of legitimate concern that you've just

14    raised is an issue that, obviously, I have to have a really

15    good record on for confirmation.  And as these debtors and

16    the committee know, because they've done it hundreds, if not

17    thousands of times, it's a good idea to develop that record

18    well before, and if you need to, because it's important to

19    reduce the number of objections and/or maybe a build a

20    consensus; share.  They know that.  But, again, literally on

21    the 31st, I decided issues involving hundreds of millions of

22    dollars, so --

23          MR. SARACHEK:  Understood.

24          THE COURT:  -- so they couldn't really have given

25    you that number before the 31st, because they didn't know

Page 113

1    how it was going to come out.  So, you know, I'm assuming

2    that there will be that level of disclosure before then, and

3    if there isn't, I need to decide it at the confirmation

4    hearing, which isn't very far away.

5              MR. SARACHEK:  No, it's not far away at all.

6              THE COURT:  Okay.

7              MR. SARACHEK:  Thank you.

8              THE COURT:  Okay.

9              MR. HERZ:  Your Honor, I won't belabor prior

10   points.  My name is Michael Herz of Fox Rothchild on behalf

11   of Aspen Marketing Services.  Just to -- I share in all the

12   other concerns that have been mentioned today.

13             My client filed a motion to allow and compel

14   payment of an administrative expense claim under 503(b)(1).

15   It was filed on May 23rd under docket number 4001.  My

16   client provided marketing services back in December 2018 and

17   January 2019.  It thought at the time it would get paid in

18   the ordinary course, so it's been waiting for a while.  The

19   invoices for the services are all of two pages.  We had

20   contact with debtor's counsel in early June to adjourn the

21   original return date at the end of June, on the

22   understanding that there'd be discussions in the interim.

23   My understanding, there has been no discussions until the

24   omnibus objection was filed.

25             Again, we share the concerns -- my client, as

Page 114

1    others have noted, are simply looking to have his claim

2    allowed at this point -- payment would be nice, obviously --

3    but to have the claim allowed would, under the

4    circumstances, be understandable.

5              I also share your Honor's concerns.  You mentioned

6    earlier about the 1129(a)(9) issues approaching

7    confirmation.  I know you asked Counsel about that and it

8    seems like it's unclear how that will be addressed as we get

9    towards confirmation, which is steadily approaching.  So I

10   would join everyone else who has appeared today and ask the

11   motions not be denied and the claims be allowed, if

12   possible, and that the confirmation issues be taken into

13   consideration as we approach confirmation, which is coming

14   up very soon.  Thank you.

15             THE COURT:  Okay.  Okay.  Anything else?  All

16   right.  I have several motions by parties in interest in

17   this case, asserting a right to payment of an administrative

18   expense under 503(b)(1), or (b)(9), or both, from one or

19   more of the debtors.  The dollar amount in the aggregate is

20   about $4 million.  Clearly, the dollar amount in the

21   aggregate of all estimated unpaid administrative expenses in

22   this case on the upside is far greater than that number.

23             As I said earlier, there is an order, and it has

24   been in place in this case since February 22nd, governing

25   procedures for the submission, consideration, and

Page 115

1    determination, if necessary by the Court, of administrative

2    expense claims under 503(b)(9) of the bankruptcy code.

3    There is no order specifically dealing with administrative

4    expense claims or motions under 503(b)(1) of the bankruptcy

5    code, with the exception of the amended case management

6    order, which is -- I think, is only relevant here in the

7    sense that the initial hearing on any motion is

8    presumptively as stated in that order, paragraph -- well,

9    it's presumptively stated in that order as an

10   non-evidentiary hearing subject to specific requests to hold

11   an evidentiary hearing.  And there's no bar generally under

12   the bankruptcy code of rules on a right to seek payment of a

13   post-petition administrative expense.

14            However, ultimately, the court, in managing its

15   docket, has a great deal of discretion in deciding how to

16   deal with litigation, particularly where that litigation may

17   involve a large number of claims, and it is, as evidenced by

18   the 503(b)(9) order, quite common in large Chapter 11 cases

19   where there are a large number of potentially contested

20   claims for procedures to be developed to deal with them.

21   For example, in this case, there are procedures for dealing

22   with personal injury claims and the like, as there are in

23   other cases.

24            The debtor has objected to each of these motions

25   on two grounds.  First, it asserts that the Court should not

1    hear the merits of the motions, given that they comprise

2    only a small number of administrative expense claims within

3    a much larger universe of such claims that need to be

4    reviewed, potentially negotiated, and/or investigated and

5    then dealt with, if necessary, by the Court, all in an

6    orderly fashion.

7            If that were the only consideration, I might put

8    more fire to the debtor's feet to do that process now,

9    particularly given the high priority of administrative

10   expenses and the adverse effect on administrative expenses

11   creditors of not being paid.  However, this case presents

12   certain unusual facts that, to my mind, justify the debtor's

13   position on dealing with the specific motions and the

14   inevitable fact that if I dealt with those motions today on

15   the merits, I would have to inevitably have to deal with

16   them with hundreds more, I believe, in the near future, and

17   of course the debtors would have to do so in advance of

18   that.

19           As I said during oral argument, there is a

20   significant issue as to whether the debtor, or the debtors,

21   on the one hand, or the buyers substantially and all of

22   their assets, Transform is responsible for paying a

23   substantial amount of these types of claims.  That issue was

24   raised promptly after the asset purchase agreement was

25   closed -- in fact, it was raised before then -- although

1    then in the summary proceeding context as discussed by Orion

2    Pictures when I asked to approve the associate purchase

3    agreement -- but that issue is not yet resolve, although the

4    Court has issued oral rulings that several constrain the

5    remaining open issues which are still being calculated.  And

6    that was in July.

7          In addition, the debtors faced hundreds of

8    millions of dollars of super priority claims under Section

9    507 -- I'm sorry, 502(b)(7)-- I'm sorry, 503(b)(7) for

10   diminution and collateral value, which would have made a lot

11   of the -- if I had determined those claims in a particular

12   way -- would have guided the debtor and the Court in

13   determining how to liquidate of more junior administrative

14   expense claims.  That issue was decided only on July 31st.

15         So I don't fault the debtors for not yet having

16   developed an overall approach to dealing with these types of

17   claims so that they could specifically deal with these

18   several motions before me on the merits as well as the

19   inevitable large number of administrative expense claim

20   allowance motions that would follow.

21         I have the hearing on confirmation of the debtors

22   chapter 11 plan coming on September 18th; at least it's

23   currently scheduled.  It was adjourned from today, actually,

24   in light of my prior rulings that I've already mentioned, as

25   well as the need now, in light of those prior rulings, to

Page 118

1    address the administrative expense claims among other

2    reasons for the adjournment.  And I trust that the debtor

3    and their professionals and the committee and its

4    professionals, will, in fact, be doing that over the next --

5    a little under three weeks.  And if they don't have a proper

6    record at that time and want to proceed, there will be a

7    problem, or, if they don't have a proper record and they

8    want some more time to develop one, including in culmination

9    with groups of administrative expense creditors, they'll

10   probably get such an adjournment.  But I don't believe it

11   would make sense in managing a docket of this case, even

12   taking into account the adverse economic effect of

13   nonpayment on the individual claimants, to decide these

14   motions on the merits at this point or, rather, to compel

15   the debtors between now and an evidentiary hearing that I

16   would have on them, to submit a supplemental briefing.

17           The other basis for the debtor's objection is to

18   the second aspect of each the motions, which each seek not

19   only allowance, but immediate payment of the administrative

20   expense.  The code doesn't actually specify when an

21   allowable administrative expense should be paid, although it

22   does set an outside date, absent the administrative expense

23   creditors for payment, i.e., as provided in

24   Section 1129(a)(9) of the plan as a condition to the

25   effective date of a plan.

1           And the question of whether an administrative

2   expense should be paid sooner than that is well recognized

3   to be left to the discretion of the bankruptcy court; see in

4   re Baptist Medical Center of New York, Inc., 52 B.R. 417,

5   421 (E.D.N.Y. 1985), affirmed 7/91 F 2nd, 973, (Second

6   circuit 1986), and the cases cited therein, including, and

7   then thereafter by other circuit courts, including the 9th

8   Circuit, the 11th Circuit, and in re Colortext Industries,

9   Inc., 19 F.3rd, 1371, 1384, 11th Circuit, 1994.

10          Generally speaking, courts are perfectly

11  comfortable with and, in fact, often direct immediate

12  payment if there are no issues as to administrative

13  insolvency and/or there is no need to go through a process,

14  as one often does, particularly with Section 503(b)(9)

15  claims for investigating, analyzing, negotiating, and

16  ultimately decided whether to allow or not such claims, if

17  there in a large number.  See, for example, in re Pudgie's

18  Development of NY, Inc., 239 B.R. 688, 692-93, (S.D.N.Y.

19  1999) as well as in re Korea Chosun Daily Times, 337

20  B.R. 773, Bankruptcy (E.D.N.Y. 2005).

21          On the other hand, where there are issues or

22  doubts, at least as to whether the estate will ultimately

23  prove to be administratively solvent, it's fairly routine to

24  defer payment of administrative expenses until that issue is

25  decided, id. see also in re Chi-Chi's, Inc., 305 B.R. 396,

Page 120

```
 1    401002, (Bankr. D. Delaware, 2004.)

 2              I believe given all the facts here, even if I were

 3    to allow these claims today, which I'm not doing, it would

 4    be inappropriate to direct immediate payment, given issues

 5    regarding administrative insolvency that the claimants

 6    themselves have raised in one context or another, as well as

 7    that are -- the Court is well aware -- present in this case,

 8    although the debtors do believe they will be able to satisfy

 9    1129 (a)(10) -- I'm sorry, (a)(9) -- at the confirmation

10    hearing.

11              So I will adjourn these motions.  The date for the

12    motions should be fixed after the confirmation hearing.  And

13    in light of the record, the confirmation including the 1129

14    (a)(9), showing that the debtor's make and my sense of the

15    process that they are proposing to continue their

16    investigation and liquidation of claims.

17              And I want to be clear, notwithstanding the issues

18    pertaining to the Transform agreement and the 503(b)(7)

19    super priority claim, the debtor have been working on the

20    liquidation of priority claims as detailed in their

21    response; it's just that that work is not complete.

22              So that's my ruling on this matter.  I don't

23    believe I need an order, since I'm just adjourning the

24    motions; I'm not denying them.  So if one thinks there needs

25    to be an order, they can suggest submitting one, but I don't
```

1     think there needs to be one at this point.

2             MR. FAIL:  Thank you, your Honor.  That concludes

3     today's agenda.  And we do appreciate your time, as always.

4             THE COURT:  Okay.  Great.  Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 122

```
 1                    I N D E X

 2

 3                    RULINGS

 4                                        Page      Line

 5

 6   Motion to Authorize:  Motion of Debtors for Modification of

 7   Retiree Benefits (document #4635)

 8   Objection to Motion Objection of Retirees Committee to

 9   Debtors Motion for Modification of Retiree Benefits (related

10   document(s)4635)

11

12   Adjourned                               18          19

13

14   Cure Objection of Alan Robbins, Benderson Development

15   Company LLC, Brookfield Properties REIT, Inc., Gray

16   Enterprises, LP, Graziadio Investment Company, Gregory

17   Greenfield & Associates, Ltd., LBA Realty LLC, LF2 Rock

18   Creek LP, Nassimi Realty LLC, Regency Centers, L.P., Site

19   Centers Corp., Spigel Properties, The Woodmont Company, and

20   Weingarten Realty Investors Relating to Debtors' Notices of

21   Assumption and Assignment of Additional Designatable Leases

22   in Connection with the Global Sale Transactions (related

23   document(s)3299, 3298, 3211) filed by Robert L. LeHane on

24   behalf of The Woodmont Company, Spigel Properties, Nassimi

25   Realty LLC, LF2 Rock Creek LP, Graziadio Investment Company,
```

Page 123

1    Alan Robbins, Benderson Development Company LLC, Brookfield

2    Property REIT Inc., Gray Enterprises, Gregory Greenfield &

3    Associates, Ltd., LBA Realty LLC, Regency Centers Corp.,

4    SITE Centers Corp., Weingarten Realty Investors

5    (document #3553)

6

7    Overruled                                    28        12

8

9    Objection to Motion filed by David R Taxin on behalf of 5525

10   S. Soto St. Associates (document #4829)

11

12   Objection (related document(s)4763) filed by Kenneth

13   Friedman on behalf of 51st Street Fruitland Ave., LLC

14   (document #4883)

15

16   Denied                                       75         6

17

18   Motion for Allowance and Payment of Administrative Expense

19   filed by Christopher Matthew Hemrick on behalf of GroupBy

20   USA, Inc. (document #3404)

21

22   Debtors' Omnibus Objection to Vendors Motions for Allowance

23   and Payment of Administrative Expense Claims (document

24   #4854)

25

Page 124

1    Reply to Motion (related document(s)3404) filed by

2    Christopher Matthew Hemrick on behalf of GroupBy USA, Inc.

3    (document #4935)

4

5    Motion to Allow and Compel Payment of Administrative Expense

6    Claim Under 11 U.S.C. section 503(b) for Services Provided

7    to the Debtor Post-Petition filed by Kathleen M. Aiello on

8    behalf of Aspen Marketing Services, Inc. (document #4001)

9

10   Debtors' Omnibus Objection to Vendors Motions for Allowance

11   and Payment of Administrative Expense Claims (document#4854)

12

13   Joinder to the Replies of Alpine Creations Ltd. and Weihai

14   Liznqiao International Coop. Group Co., Ltd. to Debtors'

15   Omnibus Objection to Vendors' Motions for Allowance and

16   Payment of Administrative Expense Claims (document #4904)

17

18   Joinder of Aspen Marketing Services, Inc. To Responses to

19   Debtors' Omnibus Objection to Vendors' Motions For Allowance

20   and Payment of Administrative Expense Claims (document

21   #4918)

22

23   Motion of Max Color for Payment of Administrative Expenses

24   filed by Jason Louis Libou (document #4176)

25

Page 125

1    Debtors' Omnibus Objection (document #4854)

2

3    Motion to Compel Payment of Administrative Expenses filed by

4    H. Bruce Bronson, Jr. on behalf of M&S Landscaping Inc

5    (document #4306)

6

7    Debtors' Omnibus Objection (document #4854)

8

9    Motion to Allow- Notice of Motion and Motion of Alpine

10   Creations Ltd. To Allow and Compel Payment of Administrative

11   Expense claim Under 11 U.S.C. Sections 503(b)(1) And 503

12   (b)(9)(document #4631)

13

14   Debtors' Omnibus Objection (document #4854)

15

16   Alpine Creations Ltd.'s Reply (document #4893)

17

18   Joinder to the Replies of Alpine Creations Ltd. and Weihai

19   Liznqiao International Coop. Group Co., Ltd to Debtors'

20   Omnibus Objection to Vendors' Motions for Allowance and

21   Payment of Administrative Expense Claims (document #4904)

22

23   Joinder of Aspen Marketing Services, Inc. To Responses to

24   Debtors' Omnibus Objection (document #4918)

25

1    Motion for Payment of Administrative Expenses(document

2    #4689)

3

4    Debtors' Omnibus Objection (document #4854)

5

6    Motion for Payment of Administrative Expenses Notice of

7    Motion of Weihai Lianqiao International Coop. Group Co., Ltd

8    To Allow and Compel Payment of Administrative Expense Claims

9    Under 11 U.S.C. 503(b)(1) AND 503 (b)(9) (document #4706)

10

11   Debtors' Omnibus Objection (document #4854)

12

13   Joinder to the Replies of Alpine Creations Ltd. and Weihai

14   Liznqiao International Coop. Group Co., Ltd to the Debtors'

15   Omnibus Objection to Vendors' Motions for Allowance and

16   Payment of Administrative Expense Claims (document #4904)

17

18   Weihai Liznqiao International Coop. Group Co., Ltd's Reply

19   to Debtors' Omnibus Objection (document #4900)

20

21   Joinder of Aspen Marketing Services, Inc. To Responses to

22   Debtors' Omnibus Objection (document #4918)

23

24   Motion to Allow/Motion of Vehicle Services Group, LLC d/b/a

25   Rotary, a Dover Company, for Allowance and Payment of

Page 127

1   Administrative Claim Under 11 U.S.C. 503(b)(1) and 503

2   (b)(9)(document #4728)

3

4   Debtors' Omnibus Objection (document #4854)

5

6   Joinder to the Replies of Alpine Creations Ltd. and Weihai

7   Liznqiao International Coop. Group Co., Ltd. to Debtors'

8   Omnibus Objection to Vendors' Motions for Allowance and

9   Payment of Administrative Expense Claims(document #4904)

10

11  Ruling                                          114      12

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

1                C E R T I F I C A T I O N

2

3        I, Abigail Bayne, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    **Abigail**      Digitally signed by Abigail Bayne
                       DN: cn=Abigail Bayne, o, ou,
                       email=digital1@veritext.com,
                       c=US
7    **Bayne**        Date: 2019.08.27 15:24:19 -04'00'

8    Abigail Bayne

9

10

11

12

13

14

15

16

17

18

19    Veritext Legal Solutions

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23

24    Date:  August 26, 2019

25