Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION, et al.,

8

9          Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  August 23, 2019

17                  10:16 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

Page 2

1    HEARING re Continuance from 8/22/2019 and Evidentiary

2    Hearing on MOAC Mall Holding

3    LLCs Objections

4

5    MOAC Mall Holding LLC's Objection to Supplemental Notice of

6    Cure Costs and Potential Assumption and Assignment of

7    Executory Contracts and Unexpired Leases in Connection with

8    Global Sale Transaction (document #2199)

9

10   MOAC Mall Holding LLC's Second Supplemental and Amended: (I)

11   Objections to Debtor's Notice of Assumption and Assignment

12   of Additional Designatable Leases, and (II) Objection to

13   Debtor's Stated Cure Amount (document #3501)

14

15   MOAC Mall Holding LLC's Third Supplemental and Amended: (I)

16   Objections to Debtor's Notice of Assumption and Assignment

17   of Additional Designatable Leases (document #3926)

18

19   MOAC Mall Holding LLC's Fourth Supplemental (I) Objections

20   to Reply to Debtor's Notice of Assumption and Assignment of

21   Additional Designatable Leases, and (II) Objection to

22   Debtor's Stated Cure Amount (document #4450)

23

24

25

Page 3

1    Transform Holdco LLC's Reply to MOAC Mall Holdings LLC's (I)

2    Objection to Supplemental Notice of Cure Costs and Potential

3    Assumption and Assignment of Executory Contracts and

4    Unexpired Leases in Connection with Global Sale Transaction;

5    (II) Second Supplemental and Amended: (A) Objections to

6    Debtor's Notice of Assumption and Assignment of Additional

7    Designatable Leases, and (B) Objection to Debtor's Stated

8    Cure Amount; and (III) Third Supplemental and Amended

9    Objections to Debtor's Notice of Assumption and Assignment

10   of Additional Designatable Leases (document #4454)

11

12   So Ordered Stipulation Signed on 5/13/2019 By and Among

13   Sellers, Buyer, and Landlord (MOAC Mall Holding LLC) (I)

14   Extending Time Under Section 11 U.S.C. Section 365(d)(4) for

15   Lease of Nonresidential Real Property and (II) Setting

16   Briefing Schedule (document #3823)

17

18   Declaration of Rich Hoge Supporting MOAC Mall Holdings LLC's

19   Third Supplemental and Amended Objections to Debtor's Notice

20   of Assumption and Assignment of Additional Designatable

21   Leases (document #3927)

22

23   Stipulation and Order signed on 6/25/2019 By and Among

24   Sellers, Buyer, and MOAC Mall Holding LLC Extending Time

25   Under 11 U.S.C. § 365(d)(4) For Lease of Nonresidential Real

1    Property(document #4354, 4687)

2

3    Declaration of Thomas J. Flynn in Support of 4450 Fourth

4    Supplemental Objection (document #4451)

5

6    Stipulation of Agreed Exhibits Regarding Assumption and

7    Assignment of the MOAC Lease Filed by Thomas J. Flynn

8    (document #4864)

9

10   Stipulation of Facts Not in Dispute Regarding Assumption and

11   Assignment of the MOAC Lease Filed by Thomas J. Flynn

12   (document #4865)

13

14   Transform Holdco LLCs Supplemental Reply and Cross-Motion

15   to; (A) Strike MOAC Mall Holdings LLCs Fourth Supplemental

16   (I) Objections and Reply to Debtors Notice of Assumption and

17   Assignment of Additional Designatable Leases, and (II)

18   Objection to Debtors Stated Cure Amount; and (B) Permit Late

19   Filed Responses to Requests for Admission (document #4867)

20

21   Declaration of Louis W. Frillman in Opposition to the

22   Proposed Assumption and Assignment of the MOAC Lease

23   (document #4874)

24

25

Page 5

1    Declaration of Raphael Ghermezian in Opposition to the

2    Proposed Assumption and Assignment of the MOAC Lease filed

3    by Thomas J. Flynn (document #4875)

4

5    Declaration of Richard Hoge in Opposition to the Proposed

6    Assumption and Assignment of the MOAC Lease filed by Thomas

7    J. Flyrui (document #4876)

8

9    Declaration - Evidentiary Hearing Declaration of Roger A.

10   Puerto In Support of Transform Holdco LLCs Reply to MOAC

11   Mall Holdings LLCs (I) Objection to Supplemental Notice of

12   Cure Costs and Potential Assumption and Assignment of

13   Executory Contracts and Unexpired Leases in Connection with

14   Global Sale Transaction; (II) Second Supplemental and

15   Amended: (A) Objections to Debtors Notice of Assumption and

16   Assignment of Additional Designatable Leases, and (B)

17   Objection to Debtors Stated Cure Amount; and (III) Third

18   Supplemental and Amended Objections to Debtors Notice of

19   Assumption and Assignment of Additional Designatable Leases

20   (document #4879)

21

22

23

24

25

1   Declaration - Evidentiary Hearing Declaration of Michael

2   Jerbich In Support of Transform Holdco LLCs Reply to MOAC

3   Mall Holdings LLCs (I) Objection to Supplemental Notice of

4   Cure Costs and Potential Assumption and Assignment of

5   Executory Contracts and Unexpired Leases in Connection with

6   Global Sale Transaction; (II) Second Supplemental and

7   Amended: (A) Objections to Debtors Notice of Assumption and

8   Assignment of Additional Designatable Leases, and (B)

9   Objection to Debtors Stated Cure Amount; and (III) Third

10  Supplemental and Amended Objections to Debtors Notice of

11  Assumption and Assignment of Additional Designatable Leases

12  (document #4880)

13

14  Opposition Brief MOAC Mall Holdings LLC's Pre-Evidentiary

15  Hearing Brief Regarding the Proposed Assumption and

16  Assignment of the MOAC Lease filed by Thomas J. Flynn

17  (document #4889)

18

19  Transform Holdco LLC's Amended Supplemental Reply and Cross-

20  Motion to Strike MOAC Mall Holding LLC's Pre-Evidentiary

21  Hearing Brief Regarding The Proposed Assumption and

22  Assignment of the MOAC Lease (document #4903)

23

24

25

1    MOAC Mall Holdings LLC's Reply Objecting to Transform Holdco

2    LLC's Motion to (A) Strike MOAC's July 8 Supplemental

3    Objection and (B) Permit Late Responses to Requests for

4    Admissions (document #4915)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for the Debtors

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  ANGELINE J. HWANG

 9

10   DLA PIPER LLP

11        Attorneys for Transform Holdco LLC

12        1251 Avenue of the Americas

13        New York, NY 10020

14

15   BY:  ALANA M. FRIEDBERG

16        RACHEL EHRLICH ALBANESE

17        RICHARD A. CHESLEY

18        R. CRAIG MARTIN

19

20   PATTERSON BELKNAP WEBB & TYLER LLP

21        1133 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  DAVID W. DYKHOUSE

25
```

```
 1   WITNESSES:

 2   MICHAEL JERBICH

 3   RAPHAEL GHERMEZIAN

 4   LOUIS FRILLMAN

 5   ROGER PUERTO

 6

 7   ALSO PRESENT TELEPHONICALLY:

 8

 9   ALIX BROZMAN

10   TAYLOR B. HARRISON

11   WILLIAM S. HOLSTE

12   HOC RI KIM

13   TERESA LII

14   SHIRIN MAHKAMOVA

15   CHRIS STAUBLE

16

17

18

19

20

21

22

23

24

25
```

Page 10

1                    P R O C E E D I N G S

2            THE COURT:  Okay, good morning.  In re Sears

3     Holdings Corp et al?

4            MR. CHESLEY:  Your Honor, Richard Chesley, Rachel

5     Albanese, Craig Martin, and Alana Friedberg on behalf of

6     Transform.  We're here on the only matter today, which is

7     the Mall of America assumption and assignment motion.  We've

8     spoken to Debtors' counsel in light of the nature of this

9     proceeding, discussed with Debtors' counsel just moving

10    forward, so.  Unless the Court has any procedural issues,

11    our position on this, Your Honor, in terms of how we would

12    like to proceed today, obviously, a substantial amount of

13    information has been presented to the Court.  There are

14    stipulated facts that are agreed exhibits.  We'll have five

15    witnesses whose directs have been submitted by declaration.

16            We believe the issues have been fully formed, and

17    with the Court's approval, we would like to simply proceed

18    with the evidentiary presentation.  At that point, we can

19    address argument or any other matters the Court would like.

20    At that point, we think we could do this much more

21    efficiently and effectively today, and again, I don't think

22    there's any surprises to the Court as to what the issues

23    are.

24            THE COURT:  Okay.  Well, I normally do not take

25    opening arguments, so my normal practice would be to do just

Page 11

1   that, move to the evidence.  There is, in the record, fairly

2   recently submitted, a pair of pleadings in which the parties

3   are jousting over the effect of Transform's responding to

4   the request to admit only on July 26th and the application

5   of Rule 36 incorporated by 7036 of the Bankruptcy Rules.  To

6   that fact, as well as Transform's motion to strike the

7   fourth supplemental objection and pre-hearing memorandum of

8   law submitted by Mall of America Corp, or MOAC, I have the

9   parties' pleadings on those matters.  I can consider them

10  now or later.

11          MR. CHESLEY:  Your Honor, we think, in light of

12  the evidence that's already been presented and will be

13  presented, we think those could be addressed at the end if

14  that would be acceptable to the Court.

15          THE COURT:  Okay.  I don't know who's speaking for

16  MOAC.

17          MR. FLYNN:  Right.  Good morning, Your Honor.  My

18  name is Tom Flynn.  I'm representing the lender, MOAC.

19          THE COURT:  Okay.

20          MR. FLYNN:  I'm here with Alex Beeby and David

21  Dykhouse.  We would be curious to know the answer to the

22  question on the admissions that were (indiscernible) on the

23  hearing today, but whatever the Court desires on that

24  (indiscernible).

25          THE COURT:  Okay, well, I understand that

Page 12

1    curiosity because, obviously, if the Debtor has deigned to

2    admit certain things that may short the evidentiary

3    presentation, it's complicated somewhat by the fact that the

4    parties have stipulated facts, which, in many ways, go to

5    the admissions anyway.  But I guess the short answer is

6    that, in keeping with the terms of Rule 7036, I believe I

7    can permit the amendment even after the fact, or

8    retroactively, to extend the time to respond.

9            That standard is not subject to the excusable

10   neglect Pioneer standard that is incorporated in other

11   extensions of time.  It still has to be for cause, although

12   that requires a balancing of some basis for why it wasn't

13   submitted timely, i.e., if it was intentionally not

14   submitted timely, to thwart discovery or create a false

15   impression in the opponent's mind as to what was at issue in

16   the case.  Or, as relatedly, the movant, under Rule 36,

17   while seeking to enforce that rule, was in the Court to be

18   truly prejudiced in presenting its case by the delay.  I

19   obviously would not grant such retroactive extension, or

20   such a retroactive extension.

21           But I don't believe those types of facts pertain

22   here.  It appears to be that the delay was inadvertent, not

23   part of a strategy, that the parties were actively engaged

24   throughout the process, and most importantly, I don't

25   believe that MOAC was unduly prejudiced by the delay.  Most

Page 13

1  of the admissions that are sought are actually agreed to, at

2  this point.  A couple of them were confusing to me, and

3  would be hard to decide what they meant in the first place.

4  I think the two that may or may not be at issue, although,

5  frankly, the stipulated facts may reflect this too, and it's

6  really more of a legal interpretation as to what 365(b)3

7  provides when it seeks a comparison between financial

8  operating condition at the time the lease was entered into

9  and the present time, would be Request Nos. 5 and 6, where

10  there's: "An admission of the financial condition of the

11  assignee is not similar to or better than the financial

12  condition of Sears owner about May 30, 1991."  And Request

13  No. 6: "Admit that the operating performance of the assignee

14  is not similar to or better than the operating performance

15  of Sears owner about May 30, 1991."

16        At one level, I think that, based on one reading

17  of the relevant provision of § 365(b)3, I believe the facts

18  establish that, but based on another reading, which

19  Transform has always made clear is its interpretation, it

20  wouldn't be deemed admitted.  So, in any event, this doesn't

21  appear to be the type of factual issue properly covered by a

22  request to admit in any event.  As I said, almost all of the

23  other requests to admit I think are pretty well established

24  already by the stipulated facts or not raised as a factual

25  issue.  For example, Request No. 9" "Admit that you do not

1    currently plan for Transform Lease Co., LLC. to operate as a

2    retail distributor."  There are a number like that.

3            The ones that I question, again, as to whether

4    they're factual, since they contain terms that are really

5    more aptly construed as a matter of law would be Request No.

6    13, and the last two, 14 and 15, which I think go to issues

7    that really are not at issue in the matter, which go to

8    those -- just to remind you all: "Admit that assumption and

9    assignment of the lease is not necessary to support

10   Transform's retail operations for Transform to maintain its

11   financial condition."

12           And then Request No. 15 says: "Admit that

13   Transform's retail operation are not sufficient to maintain

14   Transform's financial condition, which is dependent upon

15   assumption and assignment of the lease."  I'm not really

16   sure what that -- those actually are asking for, but in any

17   event, I don't think they're -- I can't imagine a timely

18   response to -- I don't even know what -- I'll go back.  I

19   don't know what it would mean to deem those be admitted.

20   So, I'm going to grant Transform's request to extend,

21   retroactively, the time for it to have responded to the

22   requests for admission.

23           As far as Transform's request that the fourth

24   supplemental objection and the pre-hearing memorandum be

25   stricken, the pre-hearing memorandum is just that.  It's a

1    memorandum.  It really doesn't raise any new issues.  It

2    cites cases that have already been cited and that I could

3    have looked up anyway, if they had not previously been

4    cited.  So, that's not stricken, for what it's worth.  It's

5    another issue as to whether that's part of the cure, as it

6    really was not contemplated by the case management order,

7    but I won't keep it out of the record.

8              As far as the fourth supplemental objection is

9    concerned, I don't believe it raises any particularly

10   surprising issues for Transform.  It didn't move the playing

11   field.  I think it just elaborated on the grounds for MOAC's

12   objection to assumption and assignment to Transform.  If I'm

13   missing something there, Mr. Chesley, you can tell me, but

14   it just seems to me that, again, it's adding detail to

15   arguments that have previously been made, as opposed to, for

16   example, what counsel tried to do yesterday in another

17   assumption and assignment objection is, during oral

18   argument, raise a wholly new basis for objecting to the

19   assignment.

20             MR. CHESLEY:  Your Honor, I don't think there's

21   anything new in there as to the fourth.  It really related

22   to the issues of the request to admit, so we're ready to

23   proceed.

24             THE COURT:  Okay.  All right, so, that's my ruling

25   on those two motions.

Page 16

1          MR. CHESLEY:  Thank you, Your Honor.  Unless the

2     Court has anything further, any questions for us, we would

3     move to our first witness.

4          THE COURT:  All right, that's fine.

5          MR. CHESLEY:  Transform's first witness would be

6     Michael Jerbich.  And Your Honor, for ease of the witnesses,

7     we put the exhibit binder as well as each of their

8     declarations on the witness stand.

9          THE COURT:  Okay.

10          MR. CHESLEY:  And Ms. Albanese will address Mr.

11     Jerbich's testimony.

12          THE COURT:  Okay.  Would you raise your right

13     hand, please?

14          MR. JERBICH:  Yeah, sure.

15          THE COURT:  Do you swear or affirm to tell the

16     truth, the whole truth, and nothing but the truth, so help

17     you God?

18          MR. JERBICH:  I do.

19          THE COURT:  And could you spell your name for the

20     record, please?

21          MR. JERBICH:  Michael, M-I-C-H-A-E-L, Jerbich, J

22     as in jam, E-R-B as in boy, I-C-H.

23          THE COURT:  Okay.  Good morning.  Mr. Jerbich, you

24     submitted a declaration in this case, in this proceeding in

25     connection with the assumption and assignment of the Mall of

Page 17

1    America lease dated August 18th, 2019.  It's intended to be

2    your direct testimony in this matter.  Sitting here today,

3    would this still constitute your direct testimony?

4              MR. JERBICH:  Yes, it would.

5              THE COURT:  And there's nothing that you would

6    change in it?

7              MR. JERBICH:  No, there is not.

8              THE COURT:  Okay.  All right, so, Mr. Flynn, you

9    can proceed with cross.

10             MR. FLYNN:  Thank you, Your Honor.

11                CROSS-EXAMINATION OF MICHAEL JERBICH

12   BY MR. FLYNN:

13   Q    Mr. Jerbich, my name's Tom Flynn.  I think we've met

14   before once already.

15   A    Correct.

16   Q    I'll be referring to my client as either the Mall of

17   America, MOAC, or the landlord.  Is that okay?

18   A    Sure.

19   Q    They mean basically the same thing.  I understand that

20   you submitted a declaration here today and you think that

21   that declaration primarily relying on the Reicher

22   declaration, provides substantial financial information

23   regarding the ability of Transform HoldCo to meet its

24   financial obligations for the proposed and assumed leases,

25   is that right?

1    A    I'm not sure I understand what you're asking there.

2    Q    Well, in Paragraph 6 of your declaration --

3    A    Okay.

4    Q    -- if you remember that.

5    A    I just didn't hear what the question was.

6    Q    For financial information concerning adequate assurance

7    of future performance, you're relying primarily on the

8    Reicher declaration.  Is that correct?

9    A    Correct.

10   Q    Have you read the Reicher declaration and it's

11   attachments and exhibits?

12   A    I have.

13   Q    Is there any other -- there is no other financial

14   information in your declaration referred to that would

15   support adequate assurance of future performance, is that

16   correct?

17   A    No other testimony regarding adequate assurance?

18   Q    No financial information, other than that contained in

19   the Reicher declaration.

20   A    There's no other financial information, no.

21   Q    Have you reviewed the exhibits to the Reicher

22   declaration?  That would be the balance sheet and the other

23   exhibits, have you done that?

24   A    I've seen them, yes.

25   Q    Are you relying on that information?

1   A      For the adequate assurance?

2   Q      Yes.

3   A      In part.

4   Q      Is there any other financial information that you

5   referred to in your declaration that you --

6   A      There's nothing else referred to in my declaration, no.

7   Q      Just a minute.  Now, in the Reicher declaration, you're

8   familiar with the fact -- did you read the whole declaration

9   including what was filed in the Court by Mr. Reicher?

10  A      I've reviewed it.  I would imagine I've read the whole

11  thing.  Do you know which area this is?  Is there something

12  specific you're going to ask about that, so I can find it in

13  here?

14  Q      Yes.  I just wonder if you've read it.

15  A      I've read it.

16  Q      In that declaration, Mr. Reicher states that the

17  failure -- he talks about selected number of leases that you

18  would like to -- that your company would like to assume and

19  assign.  Is that correct?

20  A      Yeah, I think we've assumed, now 656 out of 660, yes.

21  Q      Did you put anything in your declaration about that?

22  A      Somewhere in there.  It said 660 leases.

23  Q      And they've been assumed and assigned?  Where did it

24  say that in the declaration?

25          THE COURT:  I'm sorry, Mr. Flynn.  When you say

Page 20

1    assumed and assigned, you mean assumed by the Sears Debtors

2    and assigned to Transform or to be assigned by Transform to

3    someone else?

4            MR. FLYNN:  To be assigned by Transform to someone

5    else.  Thank you, Your Honor.

6    A    Oh, I misunderstood that, I apologize.  What's the

7    question?

8    Q    Did you put any information about what's been assumed

9    and assigned by Transform to someone else in your

10   declaration?

11   A    To someone else, I don't believe the declaration -- I'd

12   have to look at it closely.  I know there's a section of the

13   declaration that talks about how many leases we were

14   assuming.

15   Q    In the declaration, Mr. Reicher states, if you remember

16   --

17   A    Oh, I thought you were asking my declaration.  I

18   apologize.

19   Q    Well, I'm talking about what you're relying on for

20   adequate assurance and in the Reicher declaration, the

21   failure to assume and assign these leases, according to him,

22   would be the end of Sears.  Did you know that he said that?

23   Do you remember that he said that?

24   A    I don't recall that exact phrase but if it's in the

25   declaration, I'm sure it's in the declaration.

1    Q    Has Transform assumed and assigned all of the leases,

2    do you have anything about that in the declaration, in your

3    declaration?

4    A    May I view the copy of my declaration just to review?

5    There was a section in there regarding assuming the leases.

6         THE COURT:  Do you want to show him his

7    declaration?

8    A    I just don't have it in front -- I can grab it, if you

9    like.  I don't know --

10   Q    I have a marked up copy here that --

11        MR. CHESLEY:  The small binder.

12        MR. JERBICH:  Oh, it is the small binder.  I

13   apologize.

14        MR. FLYNN:  It's in the small binder.

15        MS. ALBANESE:  They're alphabetical, number is

16   one.

17        MR. JERBICH:  Okay, thank you.

18   A    I recall a reference in my declaration about the 660

19   leases.

20        MR. CHESLEY:  Your Honor, can I just point the

21   witness to Paragraph 4?  I don't think we need to -- I'm

22   sorry, Paragraph 5.

23        MR. JERBICH:  Right, okay.

24   A    (indiscernible) "sought to assume and assign

25   approximately 660 retail and non-retail leases to

Page 22

1    Transform."

2    Q    It doesn't say anything about what -- how many have

3    been successfully assumed or assigned, does it?

4    A    This does not say that.

5    Q    Yes.

6    A    But I thought I was aware that there were only three

7    now that aren't.

8    Q    Do you have any evidence to support that, besides your

9    word here today?

10   A    I don't have a document to support that, if that's what

11   you're asking.  I just --

12   Q    So there's no exhibit and there's nothing in your

13   testimony --

14            THE COURT:  I'm sorry, again.

15            MR. FLYNN:  Excuse me.

16            THE COURT:  When you say, "assumed and assigned" -

17   -

18            MR. FLYNN:  Right.

19            THE COURT:  -- you mean by the Debtors to

20   Transform or by Transform to someone else?

21            MR. FLYNN:  By Transform to someone else?

22            THE COURT:  All right, because there's -- I mean,

23   the docket of the case reflects the number of leases that

24   have been assigned by the Debtors to Transform.

25            MR. FLYNN:  Yeah, it's Transform to someone else.

1    A    And that's what I was referring to.

2    Q    And there's still assignments to be done?  Is that

3    right?

4    A    From Transform to third parties?

5    Q    Yes.

6    A    Potentially.

7    Q    Including this one, here today, right?

8    A    No.  This could be subleased.  I don't think this needs

9    to be assigned.

10   Q    You're seeking assume --

11   A    We're seeking assume -- maybe I'm not understanding the

12   legal distinction, so if you can -- we're seeking to assume

13   this lease, for the Debtor to assume it and assign it to

14   Transform.

15   Q    Right.

16   A    Right.

17   Q    So, there's leases that haven't been assumed and

18   assigned, is that correct?

19   A    I believe three.

20   Q    In any case, you don't know for sure, and you have no

21   documents or evidence to support that?

22   A    Well, I think -- I mean, I guess we can scour the

23   docket, but I thought there were only -- I thought there

24   were only three that were not thus far assumed by Sears and

25   assigned to Transform.

Page 24

1   Q    And how many are assigned -- how many of the -- there's

2   only three and you didn't testify to that in your --

3            MS. ALBANESE:  Objection, Your Honor.  I think Mr.

4   Flynn is conflating the assumption by Sears and assignment

5   to Transform with Transform's subsequent assignment of those

6   leases and confusing the witness.

7            MR. FLYNN:  All right.

8   Q    At any rate, have you reviewed the balance sheet

9   contained in the Reicher declaration?  Did you review that?

10  A    I'm not an accountant.  I have reviewed it, but I'm not

11  a --

12  Q    You've testified, did you not, that that information is

13  sufficient to give the Mall of America assurance -- the

14  required assurances of future performance.  That information

15  was sufficient.  You testified to that, didn't you?

16  A    I did.  I have.

17  Q    And if you're not an accountant --

18  A    I'm not an accountant.

19  Q    -- and you have no particular skill or ability to

20  review that or understand it, (indiscernible) it, is that

21  what you're saying?

22  A    That's not at all what I'm saying.  I don't think I

23  said I have no particular --

24  Q    Did you review it?

25  A    I did review it, yes.

1    Q    Okay, and you're not an accountant.  Did you prepare or

2    help prepare those accounting statements?

3    A    I did not.

4         MR. FLYNN:  Excuse me, Your Honor.

5    Q    I'd like you to take a look at MOAC Exhibit 12.

6    A    I have it in front of me.

7    Q    Would you turn to the balance sheet, which is, I

8    believe, the -- I don't believe there is a balance sheet on

9    Exhibit 12, is there?  I think there is.

10        THE COURT:  Well, it's about four pages in.  We

11   refer to the draft, Consolidated HoldCo, Transform

12   Consolidated HoldCo balance sheet?

13        MR. FLYNN:  Yes.  Yes.

14        THE COURT:  It's right before the organizational

15   chart.

16   A    Page MOAC 00008.

17   Q    Okay.  Thank you.

18   A    Okay.

19   Q    You're relying on that, in part, for your assurance of

20   adequate performance in the future?

21   A    In part.

22   Q    And do you have any other financial information, either

23   referred to in your testimony as far as --

24   A    I don't think there was any other financial information

25   referred to in my testimony, other than the fact that the

1    REA only requires, a subtenant of ours, a $50 million

2    dollars net worth.

3    Q    That's not financial information, that's --

4    A    Okay.

5    Q    So, this is the exclusive financial information you're

6    relying on?  This attachments to the Reicher declaration in

7    Exhibit --

8    A    Yes.

9    Q    The balance sheet is not -- has not been, according to

10   what -- and this is what you're relying on -- it hasn't been

11   completed.  You understand that?  Did you read that?

12   A    Where are you referring to when you asked me to read

13   that?

14   Q    Well, let's start with the top line.  It says "draft".

15   A    Correct.  It does say "draft".

16   Q    What does "draft" mean to you?  That's the final

17   document that -- or does that mean somebody has done a

18   draft?

19   A    "Draft" to me means draft, yeah.

20   Q    So, this isn't the final.  This is an initial, or

21   draft.  This has not been completed.  Is that the way you

22   read it?

23   A    I read it -- I think the document speaks for itself.

24   Q    Yeah, I do too.  So, could a reasonable person read

25   that and say, well, this isn't anything final.  This is

Page 27

1    simply an initial draft.

2            MS. ALBANESE:  Objection, Your Honor.

3            THE COURT:  Sorry?

4            MS. ALBANESE:  Objection, Your Honor.  I think the

5    witness has answered the question and he's badgering him.

6            THE COURT:  That's fair.  Well, I don't know if

7    he's badgering, but it's redundant, at this point.

8    Q    Did you read the footnotes to the balance sheet, sir?

9    Did you?

10   A    Yes.

11   Q    Does that indicate that the numbers could change?

12   A    It says it's subject to change.

13   Q    All right, it says it's subject to change?  Okay.  Did

14   your testimony indicate that you -- did you ever get a final

15   draft?  You never did, did you?  Of this balance sheet, did

16   you?

17   A    I don't believe I've gotten a document beyond what I

18   have here.

19   Q    The footnotes say, in part, "Please note this draft is

20   based upon schedules," okay?  "And may be adjusted."  Is

21   that right?

22   A    It does say, "Please note this draft is based upon

23   schedules of APA," yes.

24   Q    And is subject to change?

25           THE COURT:  He already answered that one.

1   Q    Is this something that you're claiming we can rely upon

2   as adequate assurance of future performance?  Is that your

3   testimony here today?  That we can look at this and rely

4   upon this?

5   A    I think 650-some odd other landlords have, yes.

6   Q    What -- what --

7            MR. FLYNN:  I ask that to be stricken.

8            THE COURT:  No, I won't strike that.

9            MR. FLYNN:  All right.

10  Q    We'll get to that in a minute, but so, we're supposed

11  to -- the Mall of America is supposed to be assured when it

12  doesn't have a final balance sheet that's subject to change?

13  That's supposed to assure us?  Are you serious about that?

14  A    Well, in addition to the security that we offered you,

15  yes.

16  Q    So, just a minute, here.  I'd like you to refer to that

17  part of the exhibit that talks about adequate assurance

18  information, marked as MOA007, okay?  Do you have that in

19  front of you?

20  A    I have the binder open to MOAC-7, yes.

21  Q    What does that purport to show?

22  A    It's a Form 10-k.

23  Q    It shows -- I'm talking -- or it's talking about the

24  same thing, this --

25  A    Oh, no, I apologize.  I'm -- what page are you

Page 29

1  referring to, then?

2  Q    It's 007.

3            THE COURT:  It's the same exhibit --

4            MR. JERBICH:  Oh, the same exhibit.  I turned to

5  (indiscernible).

6            THE COURT:  Right, not Exhibit 7.  It's the same

7  one that you were in, but just a page before.

8            MR. JERBICH:  All right.

9  A    Okay.

10  Q    By the way, a question about the balance sheet.  Has

11  that been -- has the balance sheet been signed by anyone?

12  Is there any indication that's been signed by a CPA or

13  anybody else that would certify to it?

14  A    I'm not certain of that.

15  Q    I'm going back to the balance sheet.  Has that been

16  signed by anyone?

17  A    I just answered.  I'm not certain of that.

18  Q    Going back to Page 007, you're familiar with this.

19  You're reviewed this, I assume?

20  A    Again, I've looked at all the exhibits.

21  Q    All right, all right.  Did you read the disclaimer in

22  that?

23  A    I'm sure in my review I reviewed it at some point.

24  Q    So, on its face, this -- your financial information

25  says that it's unreliable, doesn't it?

Page 30

1    A    I'd have to read it to see if that's an accurate

2    characterization.

3    Q    You haven't read this before?

4    A    I said I read it, but I'd like to refresh myself.

5    Q    Well, let me help you.  Let me read portions of it.

6    A    Please.

7    Q    "This letter includes projections, forecasts, and

8    forward-looking statements which refer to Transform's and

9    can be," quote, "no assurance as to Transform or the

10   company's future performance."  That's what it says.  Do you

11   see that in there?

12   A    I do see that in there.

13   Q    Are we supposed to be -- well, I'll let that -- it goes

14   on to state that: "This financial interest (indiscernible)

15   speaks only to the relevant date," and they assume, "no

16   obligation to update it."  Did you read that portion of the

17   disclaimer?

18   A    Yeah, I believe I mentioned I read all of it.  So.

19   Q    We have received no updates, and nor are they promising

20   to give us any, and you don't prepare these things.  Is that

21   right?

22   A    There's three questions in, if you want to break it

23   down.  You haven't received an update to the question or?

24   Q    I'll ask another question.  They also go on to state

25   they "have no duty to advise any person that any of the

1    conclusions in the letter, and the declaration, have

2    changed," right?

3    A    You're asking whether it says that?

4    Q    Yes.

5    A    I don't see that specific language, but if you point me

6    to it, I'm sure I'll find it.

7              THE COURT:  I can read it.

8              MR. FLYNN:  Thank you.

9              MR. JERBICH:  Thank you.

10   Q    It goes on to state: "This letter," and they're talking

11   about the Reicher declaration, I believe.

12   A    Okay.

13   Q    "and its attachments, is not intended to provide the

14   basis for any decision on any transaction."  Did you read

15   that part of it?

16   A    Again, I've read the entire thing.

17   Q    I assume you don't dispute your own document.  That's

18   what it means, doesn't it?

19   A    I think this is an exhibit to Mr. Reicher's

20   declaration, not mine.

21   Q    Then you don't endorse Mr. Reicher?  You don't think

22   he's --

23   A    I didn't say that at all.

24   Q    You don't endorse your own --

25             MS. ALBANESE:  Objection, Your Honor.

Page 32

1          MR. JERBICH:  That's silly.

2          MS. ALBANESE:  The witness didn't say that.

3          THE COURT:  Look, I've read it.  I get your point.

4          MR. FLYNN:  Thank you.

5          THE COURT:  I've read similar language attached to

6    disclosure statements, 10-ks, et cetera.  You can move on.

7          MR. FLYNN:  All right.  Well, this was provided to

8    us to give us assurance.

9          THE COURT:  Ultimately, it's my decision, sir.

10   But I get your point.

11         MR. FLYNN:  All right.

12         MR. JERBICH:  Along with a one-year letter of

13   credit.

14   Q    I do want to -- and I'll make this short, one more

15   section.  This document, it says: "The recipient should make

16   its own independent basis and legal decisions based upon the

17   information and advice and the recipient's own judgments

18   concerning the adequacy of this disclosure."  Isn't that

19   what it says?

20   A    Can you point me to the exact sentence you're referring

21   to?

22   Q    Second from the last.

23         THE COURT:  Actually, the third to the last.

24   A    Yes, it does say that.

25   Q    Does the Mall of America, then, I assume you're telling

Page 33

```
 1    us is allowed to make its own decision about the adequacy of

 2    this information.

 3    A    I think that's probably boilerplate language to a

 4    financial statement that talks about forward-looking

 5    thoughts and what have you.

 6    Q    So, that's just meaningless?

 7             MS. ALBANESE:  Your Honor, objection.  I think

 8    it's --

 9             THE COURT:  It's meaningless in the context of my

10    determination as to whether there's adequate assurance of

11    future performance.

12             MR. FLYNN:  Sure.

13             THE COURT:  So, yes.  The answer is yes.  It's

14    meaningless.

15             MR. FLYNN:  All right.  Thank you, Your Honor.

16             THE COURT:  Okay.  Obviously, the Debtor and

17    Transform have the burden of proof.

18    Q    You understand that you have to prove not only

19    financial wherewithal but you have to prove proof of

20    adequate -- of performance, not only financial but operating

21    performance.  Is that right?

22    A    In what sense?

23    Q    You understand that the Court requires you to prove

24    financial wherewithal and operating performance.  You don't

25    understand that or you do, or?
```

Page 34

1   A    I'm aware of adequate assurance as far as

2   (indiscernible) of future performance.

3   Q    Just so we're clear, Transform Co. is not going to

4   operate a store at the Mall of America, is that right?

5   A    Correct.  It's an asset of Transform Co., correct.

6   Q    There will be no operations or operating performance by

7   Transform Co. at the Mall of America, is that right?

8   A    Our plan is not to operate.  That is correct.

9   Q    As you sit here today, do you know -- do you have a

10  tenant ready to take over that space and operate in it?

11  A    As I sit here today, I have interest from multiple

12  tenants, but it's a process that takes time.

13  Q    So, you have no tenant, at today's hearing, that would

14  take over and operate in that space?

15  A    Today?  Literally today?  No.

16  Q    Yes, literally today.  All right.  There's nothing in

17  your testimony submitted to the Court by declaration that

18  indicates any evidence or discussion how Transform Co. will

19  or a hypothetical tenant might operate from the premises, is

20  that correct?

21  A    Can you be more specific with your question?  I'm not

22  sure I'm understanding it.

23  Q    Well, you have nobody that's going to operate in the

24  premises as you sit here today.

25  A    You asked me that earlier if I have a tenant today and

1    I said no.

2    Q    You're unable to show today anybody that could be --

3    because you have no one.

4    A    I don't think that's an accurate characterization of

5    what I said at all.  The lease is significantly below

6    market, we're paying $10 (indiscernible).

7            THE COURT:  All right, just stop.  Sir, you don't

8    need to ask the same question three times.

9            MR. FLYNN:  You bet.  Yes, Your Honor.

10   Q    There's no one that -- you did say --

11           MR. FLYNN:  That's all I have, Your Honor.  Thank

12   you.

13           THE COURT:  Okay.  I would like to follow-up on

14   one of Mr. Flynn's question.

15           MR. JERBICH:  Sure.

16           THE COURT:  You're not an actual employee of

17   TransCo, right?  You work -- you're a consultant for them?

18           MR. JERBICH:  Correct.

19           THE COURT:  Has Transform, excuse me, placed any

20   limitations on you as far as the types of tenants that you

21   are soliciting?

22           MR. JERBICH:  No.

23           THE COURT:  None?  So, if --

24           MR. JERBICH:  I mean, to the extent, obviously,

25   within the parameters of the lease, the REA.

1          THE COURT:  But no other limitations?

2          MR. JERBICH:  No.

3          THE COURT:  As far as who the types of prospective

4    tenants that you are speaking with, what, generically, what

5    sorts of businesses are they in?  How would they use the

6    space?

7          MR. JERBICH:  We've had dialogue with an

8    international retailer that's expressed interest in one of

9    the floors.  A national retailer as well.  And there are

10   really opportunities even beyond that.

11         THE COURT:  Okay.  Such as?

12         MR. JERBICH:  Well, could be healthcare use,

13   there's a tech center being built nearby coming up.  It's a

14   73-year lease, Your Honor, so there's -- sky's the limit,

15   honestly.

16         THE COURT:  Well, it's a shopping mall, right?

17         MR. JERBICH:  It is.

18         THE COURT:  So, what would be the basis for it

19   being used for office purposes?  I'm assuming that's what

20   you mean when you say a tech center.

21         MR. JERBICH:  I just used it as an anecdotal

22   example.  There is office in the mall as well, right now.

23         THE COURT:  Of what size?  I mean, is it like back

24   offices for the Mall of America Corp. or office --

25         MR. JERBICH:  I want to say -- there's a full

1    campus building, 40- to 60,000sf of office space.  I don't

2    have the exact size, Your Honor, but it's -- that wouldn't

3    be a primary plan.  The primary plan would be for a retailer

4    but we don't want to limit it because it's not limited

5    within the REA.

6              THE COURT:  Okay.

7              MS. ALBANESE:  Your Honor, may I have a couple --

8              THE COURT:  Sure, if you want -- a redirect?

9              MS. ALBANESE:  -- minutes to redirect?  Yeah.

10             THE COURT:  Sure.

11             MS. ALBANESE:  Thank you.

12              REDIRECT EXAMINATION OF MICHAEL JERBICH

13   BY MS. ALBANESE:

14   Q   Mr. Jerbich, can you describe what the lease requires

15   the tenant to pay and the additional security that you

16   mentioned that Transform has offered to MOAC?

17             THE COURT:  Well, I have that in his direct

18   testimony.

19             MS. ALBANESE:  Okay.

20             MR. JERBICH:  Okay.

21             MS. ALBANESE:  Okay.

22   Q   Just one point of clarification.  You had mentioned

23   that it was a one-year letter of credit, but I believe

24   that's not accurate.  Can you just clarify what the one-year

25   security --

Page 38

1  A    We would escrow a one-year security with taxes, CAM,

2  insurance, and rent.

3  Q    Okay, which adds up to?

4  A    About $1.2 million.   $1.1m, $1.2m.

5  Q    Thank you.

6  A    Full financial obligation.

7  Q    Okay.   Thank you, Mr. Jerbich.

8          THE COURT:   Any redirect?

9      RECROSS-EXAMINATION OF MICHAEL JERBICH

10  BY MR. FLYNN:

11  Q    You know, there is an office building attached to the

12  mall.   It's not in the mall.   Is that correct?   Do you know

13  that?

14  A    It's attached, okay.

15  Q    It's not --

16  A    It's on the campus.

17  Q    It's not in the mall.

18  A    It's on the campus, correct.

19  Q    There's also hotels attached to the mall, but not in

20  the mall.

21  A    Okay.

22  Q    And you are required, according to your own testimony,

23  to be limited to a first-class retail operation not inimical

24  to the mall.   You quoted that in your own testimony, is that

25  right?

Page 39

```
1    A    Not -- yeah, and I walked many malls in the last year

2    and there's a variety of uses within a mall in 2019.  In

3    first-class malls.

4    Q    In your declaration, did you give any testimony -- you

5    didn't give any testimony other than -- you can -- how you

6    would protect the mix of retail clients at the mall.  How

7    you would do that.  You didn't give any testimony to that

8    effect.

9    A    I didn't because I do not believe our REA or lease

10   requires us to.

11   Q    Well --

12   A    In fact, it specifically allows us for virtually any

13   lawful use.

14   Q    "Retail not inimical to the mall."

15   A    Not inimical to the mall, correct.

16   Q    And also, the lease requires that any use be in harmony

17   with the other tenants in the mall.  Is that right?  Is that

18   right?

19   A    Can you point me to that specific portion of the REA?

20   Q    Prohibitions, on Part D of the lease.  Have you read

21   the lease?

22   A    Can you tell me which MOAC tab that is?

23           MR. CHESLEY:  It's 1.

24           MR. JERBICH:  It's 1?

25   Q    Tab 1.  In the -- excuse me, it's in the REA.
```

1   A     Okay.

2             MR. CHESLEY:  So, 3.

3             MR. JERBICH:  Three, thank you.

4   Q     Page 55.  Prohibitions.

5   A     Yeah, I'm reading it.  It says: "in harmony with the

6   development of operation of a first-class regional shopping

7   center containing," and it goes: "air conditioned mall,

8   hotels, family entertainment center, not limited to the

9   following," and it goes on.  Is there a specific -- we don't

10  plan on putting (indiscernible).

11  Q     You understand that whatever you put in there has to be

12  in harmony with the rest of the mall.  You understand that,

13  correct?

14  A     It says: "which use or operation is obnoxious to or out

15  of harmony with the development or operation of a first-

16  class regional mall."  We have no intention of doing

17  anything that's not in line with what a first-class mall

18  would have.

19  Q     But you have no proposal for anybody that -- all right.

20            MR. FLYNN:  That's all I have.

21  A     It's a 73-year lease.  We don't have one today, we said

22  that.

23            MS. ALBANESE:  Your Honor, just one point.  I just

24  wanted to point the witness to Section 22(c) of the REA just

25  to clarify one point that Mr. Flynn had said, and that's on

```
 1    --

 2               THE COURT:  Well, you mean ask him a question

 3    about it or you just want to point it out?

 4               REDIRECT EXAMINATION OF MICHAEL JERBICH

 5    BY MS. ALBANESE:

 6    Q    Does the REA permit non-retail use?  Could you look at

 7    Section 22(c) of the REA?

 8    A    Do you have a page on that, Rachel?

 9    Q    It's 126 of the REA.

10    A    As I look, I do recall reading that it does, but let me

11    confirm.  That is correct.

12               MS. ALBANESE:  Thank you.

13               MR. FLYNN:  What section?  Excuse me, what --

14               MS. ALBANESE:  22(c) of the REA.

15               MR. FLYNN:  What page?

16               MS. ALBANESE:  Page 126.

17               MR. FLYNN:  Okay.  Just so they're clear, the only

18    non-retail activity you can do there is as reasonably

19    incidental to your retail activity.  That's what it says.

20               MR. JERBICH:  I mean, just in the mall itself, you

21    have a Crayola exhibit, you have a roller coaster, you have

22    a miniature golf course.

23               MR. FLYNN:  I'm talking about what you're bound

24    by.  This REA --

25               THE COURT:  This provision, i.e., Provision 22(d).
```

1             MR. JERBICH:  And so, what was your question

2    again?  I apologize.

3             MR. FLYNN:  You're bound by this and it does --

4             MR. JERBICH:  We're bound by the REA, yes.

5             MR. FLYNN:  And it requires only non-retail

6    activities that are reasonably incidental to a retail

7    activity.  For instance, an ATM machine or something like

8    that.  That's all it was.  You're required to do retail.

9             MR. JERBICH:  I don't believe that's --

10            MR. FLYNN:  Well, we can --

11            MR. JERBICH:  -- that we're required to do retail

12   there.

13            THE COURT:  Well, you all can point me to the

14   relevant sections.  Okay, any more questions?  All right,

15   you can step down, sir.

16            MR. JERBICH:  Thank you, Your Honor. .

17            MR. CHESLEY:  Next witness, Your Honor, is Roger

18   Puerto, and Mr. Martin will handle his testimony.

19            THE COURT:  Okay.  Would you raise your right

20   hand, please?  Do you swear or affirm to tell the truth, the

21   whole truth and nothing but the truth, so help you God?

22            MR. PUERTO:  I do.

23            THE COURT:  Could you spell your name for the

24   record?

25            MR. PUERTO:  R-O-G-E-R, last name Puerto.  P as in

1   Paul, U-E-R-T-O.

2            THE COURT:  Mr. Puerto, you submitted the

3   declaration dated August 18th, intended to be your direct

4   testimony in this proceeding.  Sitting here today, is there

5   anything that you'd like to change in it?

6            MR. PUERTO:  No.

7            THE COURT:  And you understand it is your direct

8   testimony?

9            MR. PUERTO:  Yes.

10            THE COURT:  Okay.  All right.  Any cross?

11            MR. FLYNN:  Your Honor, I'd like to voir dire the

12   witness for the purpose of making an objection.

13            MR. MARTIN:  Your Honor, before -- just a

14   housekeeping matter before that.  Craig Martin, for the

15   record.  Paragraph 7 and one sentence of Paragraph 8 were

16   redacted and filed under seal, and we've discussed with the

17   witness, and I've discussed with Mr. Flynn that the key

18   parts there are the actual numbers, so we may use the

19   terminology -- the numbers in Paragraph 7 or the number in

20   Paragraph 8 so that we can avoid actually stating the sealed

21   information and not have to worry about sealing the

22   courtroom or taking any further action.

23            THE COURT:  Okay.  That's your understanding too,

24   Mr. Flynn?

25            MR. FLYNN:  Yes, Your Honor.

Page 44

```
 1              THE COURT:  Okay.  All right, so, you can go

 2    ahead.

 3                    VOIR DIRE OF ROGER PUERTO

 4    BY MR. FLYNN:

 5    Q    In Paragraph 7, you state that: "appraisals were

 6    conducted," is that correct?

 7    A    Yes.

 8    Q    Did you do those appraisals?

 9    A    No.

10    Q    Have those -- those appraisals haven't been submitted

11    into evidence to the Court?

12    A    Not to my knowledge.

13              MR. FLYNN:  I move to strike references to the

14    appraisals as hearsay.

15              MR. MARTIN:  Would you like a response, Your

16    Honor?

17              THE COURT:  Sure.

18              MR. MARTIN:  Initial point is, we're not offering

19    Mr. Puerto as an expert on valuation.  We're offering him as

20    a fact witness.  He is stating that he is aware that

21    appraisals have been done and an aggregate value reflect the

22    amount of value represented, and certainly, the testimony is

23    then designed to reflect the process that he's undertaking

24    to maximize that value.  And I believe is testimony will be

25    focused on his actions and his increase in that value.  And
```

Page 45

1    so, we're not offering the fact of the appraisals for the

2    truth of the matter asserted, but just that they've been

3    done and they create a -- as a matter of fact, that they

4    have been done; as a matter of fact, they contain an

5    aggregate value.  So, I would request that the Court permit

6    the statements in Paragraph 7.

7            THE COURT:  Okay.  Well, he's clearly not offered

8    as an expert on valuation and I won't take this -- these

9    dollar amounts as the value of the portfolio but simply as

10   evidence that Transform believes that it has a valuable

11   portfolio and that it's seeking to realize it.

12           MR. FLYNN:  Thank you, Your Honor.

13   Q    I would also like to talk about Paragraph 8.  You

14   testified that Transform could sell over -- or excuse me, a

15   certain dollar amount, that's the second sentence in Part 8.

16           MR. FLYNN:  I would move that removed -- object to

17   that as speculation and not a fact.

18           MR. MARTIN:  Would you like a response to that,

19   Your Honor?

20           MR. FLYNN:  And we could tie these together, Your

21   Honor.  And it goes on to say in addition, Transform could

22   potentially sell, and then it gives a number, worth of

23   unencumbered property as well.  That is pure speculation.  I

24   move it be stricken.

25           THE COURT:  Well, you can ask him about it and how

1   he came up with that.  I don't see it as pure speculation.

2   I mean, you can question him on the basis for why he

3   believes that.

4            MR. FLYNN:  All right.

5            THE COURT:  And again, knowing that he's not an

6   expert.

7            MR. FLYNN:  Well.  And again, I would -- well, if

8   --

9   Q    You are attempting to sell certain assets of TransCo,

10   is that right?  Or monetize them?  Is that what you're

11   trying to do?

12   A    Yes.

13   Q    Has that been completed?

14   A    No, it says it's potentially what could be sold over

15   the next six months, so they have not been completed.

16   Q    But as you sit here today under oath, you have no idea

17   what you're going to sell, isn't that right?

18   A    No, I have an idea based on the numbers that I put in

19   the declaration based on the pipeline of deals that I have,

20   or in the process of negotiating with various buyers.  They

21   could or could not happen.  But, based on a degree of

22   certainty, I'm comfortable saying in the next six months,

23   this is what we can sell, based on the pipeline and just in

24   general, the way I've been selling real estate for the past

25   18 months prior.

1   Q    But you don't know for a fact that that's going to

2   happen, as you sit here today in Court under oath?

3   A    It's not -- I don't know for a fact.  It's real estate.

4   Anything could change in a single day.

5   Q    Thank you.

6   A    Yeah.

7   Q    And then you say --

8        MR. FLYNN:  I would like to raise an objection to

9   Paragraph No. 9, Your Honor.

10  Q    Therein, you state that: "The Mall of America, MOAC, as

11  a landlord, is rarely concerned with the ability of

12  Transform to meet its continued financial obligations.

13  Rather, they are principally concerned with extracting

14  value."

15  A    That's my opinion.

16  Q    You don't know that.  That's not a fact.

17  A    I don't know the specific mall, but in general, based

18  on how I've sold real estate, that is usually the case.  No,

19  I don't --

20        MR. FLYNN:  I would move to strike that is pure,

21  inappropriate opinion about the mind of my client.

22        THE COURT:  Well, it's also the opinion of several

23  (indiscernible) decisions by bankruptcy judges, so I'll deny

24  that motion.

25  Q    Are you in charge of getting tenants at the mall?  Are

Page 48

1    you working with Mr. Jerbich on that, or?

2    A    No, I'm not in charge of getting tenants.

3    Q    The mall will testify that they'll put an anchor tenant

4    in there for almost no rent.  Would they make a lot of money

5    and grab the equity out of your lease?  Does that make them

6    evil or inappropriate?

7    A    No, but it's possible they'll save on co-tenancy issues

8    that would have to, if they didn't put a department store

9    there.  And that could be significant.

10    Q    But we know that Transform Co. cannot afford to put an

11    anchor tenant in there because the rent would be so low,

12    they couldn't make any money on it.  Isn't that right?

13    A    Well, we don't have to put an anchor tenant in there.

14    Q    Well, you can't afford to.

15                MR. MARTIN:  Your Honor, objection.  Assumes facts

16    not in evidence and it's asking for financial --

17                THE COURT:  No, I know -- differently, is it your

18    -- based on your experience, Mr. Puerto, would, quote, "an

19    anchor tenant" only be likely to agree to a long-term

20    sublease of this space at issue if it paid de minimis rent?

21                MR. PUERTO:  If an anchor tenant was not going to

22    pay rent here and there was the demand to put the anchor

23    tenant there, it would likely go there because it's a great

24    property, great mall.

25                THE COURT:  No, I'm saying something differently.

Page 49

1          MR. PUERTO:  Sorry, can you rephrase the question,

2     then?

3          THE COURT:  Obviously, if you offered de minimis

4     rent, that would be attractive.  But if you were, instead,

5     offering a substantial rent.  I don't even know what that

6     would be, but a substantial rent --

7          MR. PUERTO:  Right, right, I understand.

8          THE COURT:  -- is it conceivable that any anchor

9     tenant would take that deal?

10         MR. PUERTO:  If you were to put a significant

11    amount of capital into it to support the rent.  I mean, it's

12    -- it, again, comes down to the real estate, the quality,

13    where it's located, for an anchor to make a decision to be

14    there.  There's not that many anchors today that are taking

15    177,000sf.  You know, the highest and best use for this real

16    estate is probably not an anchor.  For them, it could be,

17    but for us, it likely would not be, because we look for

18    tenants that would pay higher rents.

19         THE COURT:  Okay.  I phrased that question as I

20    thought you were asking it, but you can go ahead.

21         MR. FLYNN:  No, that's...

22    Q    So, Transform Co. would like to reap the benefits of

23    the equity in this lease by getting highest rents as

24    possible and keep the difference.  Is that right?

25    A    It's -- if we wanted to maximize value in the real

1    estate, that would be the process to undertake.

2    Q    If there was an anchor tenant available for de minimis

3    rent, that'd be an excellent fit for the mall, you wouldn't

4    agree to that, would you?

5    A    Not if it didn't maximize the value of the real estate.

6    Q    Yeah, right.  So, you're interested, primarily, in

7    getting money.  Not necessarily the mall, as I think it was

8    concluded.

9    A    Can you rephrase that?  Sorry.

10            MR. FLYNN:  Never mind.  I have no further

11   questions, Your Honor.

12            THE COURT:  Okay.  Any redirect?

13            MR. MARTIN:  No, Your Honor.

14            THE COURT:  Okay.  You can step down.

15            MR. PUERTO:  Thank you.

16            MR. CHESLEY:  That would conclude Transform's

17   evidence, Your Honor.

18            THE COURT:  Okay.  And obviously, I have the

19   agreed exhibit --

20            MR. CHESLEY:  Agreed exhibits which have been

21   admitted and stipulated as fact.  Yes, Your Honor.

22            THE COURT:  Okay.  You may proceed with your

23   witnesses.

24            MR. FLYNN:  Your Honor, we'd like to move, at this

25   time, under Rule 52, for partial findings against the

1    Plaintiff -- against the Debtor.  They have failed in their

2    burden of proof; which they admit they have to prove

3    adequate assurance of future financial ability and adequate

4    assurance of future performance.  They -- performance means

5    not financial performance, it means operational performance.

6    Is the tenant able to drive tenants to the mall?  Do they

7    have a substantial advertising budget?  Do they -- and this

8    is all cited in the cases, which I'm sure you could read or

9    are well aware of.

10           THE COURT:  Actually, I have not seen that cited

11   in a case, so I'd like you to cite them to me.

12           MR. FLYNN:  Can I have the brief?  Well, I will

13   cite those.  I will -- we have filed a brief with the Court,

14   which has these cases in there.

15           THE COURT:  Well, then you better cite me to the

16   specific provisions in the cases, because I didn't see that.

17           MR. FLYNN:  Well, all right.

18           MAN:  You don't have to do it now.

19           MR. FLYNN:  All right.  There are a number of

20   cases that we've cited, and I can go quickly through them,

21   including the Third Circuit, which requires adequate -- that

22   performance drive -- to do a number of things to aid or fit

23   in with the harmony of the mall and the tenant mix.  They

24   have given no evidence that they're able to comply with

25   what's required for tenant mix.  They've given not -- that

Page 52

1    is a requirement under the code.  They are required to show

2    operating performance equal to -- similar to that Sears at

3    the time they entered into the lease.  We went into that

4    extensively in our briefs, operating performance, and they

5    have presented no operating performance because they don't

6    intend to operate.  They're going to try to find somebody to

7    operate, and all we can do is speculate on what operation

8    performance might be in the future.

9            However, I see nothing in the code that says they

10   can prove that at a future date.  They have to prove today

11   what the operating performance will be.  They can do certain

12   things at a future date.  If they are dark, they get some

13   reasonable time to reopen.  But they can't come into court

14   today and say, don't worry about operating performance or

15   tenant mix.  We'll fix that later.  And those are rights in

16   addition to the rights under any lease, because they don't

17   refer to the -- they're required to be in a lease or

18   (indiscernible).

19           THE COURT:  You're aware that there are several

20   cases in this District that disagree with that latter

21   proposition, including in re Ames Department Stores, 127

22   B.R. 744, (Bk. SDNY 1991)?

23           MR. FLYNN:  I'm aware that there's a mix in case

24   law on this, but there's no -- the operating performance is

25   a requirement of the code, and they presented nothing, and

Page 53

1    cannot present anything because they're not going to

2    operate.  It's not something.  They presented nothing.  They

3    have nothing to present.  They don't have a tenant to go in

4    there.  They just say, let us rent it and trust us.  We'll

5    do this -- we'll fix -- don't worry, it'll be okay.  We have

6    no evidence of anything.  They are required to show, first

7    of all, they gave us the Reicher declaration, which had

8    exhibits.  We only got the exhibits, and the exhibits given

9    to us for adequate assurance state right on them that they

10   can't be relied upon for any reason and cannot be used for

11   assurance of anything.  That word is used.

12          They simply have no current -- it's unbelievable

13   to me that they can't provide financial information, which

14   is adequate, appropriate, and makes some sense.  They have -

15   - we read that; we can't even believe it.  What are we

16   supposed to -- what are we supposed to be assured about?  We

17   are the opposite of assured.  The Reicher himself said if

18   they don't sign all these leases, they're going to go out of

19   business.  We don't know the status of the business or what

20   happened to the assignments.

21          THE COURT:  Do you dispute that, in addition to

22   the $10 a month rent, the aggregate amount payable under the

23   lease, with a reasonable estimate for the taxes, is

24   approximately $1.1m to $1.2m a year?

25          MR. FLYNN:  Yes, we do.  That's approximately

1     correct.  That's correct.

2             THE COURT:  I'm sorry, you do dispute that or you

3     do --

4             MR. FLYNN:  We do agree with that.

5             THE COURT:  Okay.

6             MR. FLYNN:  And, just a minute here, Your Honor.

7     So, we don't know how -- and if the Court wants to rule that

8     they don't have to be equal to or similar to Sears, our

9     position is, they haven't come close -- they haven't really

10    proven anything.  They have no adequate, reasonable,

11    appropriate financial evidence.  They have no evidence at

12    all about operations of any kind, and in fact, specifically

13    state they're not going to operate and may not have to -- in

14    their briefs and in their declarations, for as much as two

15    years, this thing will be dark, and they can do anything

16    they want.  We can go through all the provisions in the

17    code.  There's many others that weren't -- but have been

18    submitted in the exhibits, that limit their ability on what

19    they can do with that property, even under the lease.

20            There's many others that weren't -- but have been

21    submitted in the exhibits, that limit their ability on what

22    they can do with that property, even under the lease.  But

23    in any case, they haven't come close to meeting the burden

24    of proof that gives adequate assurance of future financial

25    performance and operating.

1            THE COURT:  Under the lease, do they have to

2    operate a store?

3            MR. FLYNN:  Yes.  I think they do, but they might

4    have time.

5            THE COURT:  And what provision -- I'll read it at

6    -- obviously, the lease incorporates the REA.  What

7    provision are you relying on for that?

8            MR. FLYNN:  I'm going to let my partner, Mr.

9    Beeby, kind of go through the lease provisions and the REA

10   provisions if the Court has questions about those.

11           THE COURT:  Okay.

12           MR. BEEBY:  Good morning, Your Honor.  My name is

13   Alex Beeby.  I'm also at Larkin Hoffman.  With regard to

14   remaining dark, and I'm sure you've read all of the

15   pleadings, and there is reference to the idea that the Sears

16   space can go dark in the REA, which is true: it can go dark.

17   But the REA does not necessarily permit the space to stay

18   dark.  With regard to the provision that allows the space to

19   go dark, and let's see here, I believe it's Page 143 of the

20   REA, which is Section 25(d)4, explicitly says that: "At all

21   times," which, just to put it into context, it says: "After

22   the major operating period of Sears," this is after the

23   initial 15 years, "Sears shall have the right without

24   developer's consent but at all times subject to the

25   applicable provisions of Article 22 hereof to vacate the

1    lease," and then it goes onto the 50 million aspect, which

2    I'm sure will come up later.

3            If we turn back to Article 22, that is

4    specifically incorporated into that provision, I believe it

5    is on -- let's see, here.  Let me find the exact page, here.

6    That section starts, 22(c), starts on Page 123 of the REA.

7    And then on 126, which was referenced previously on the

8    stand, it requires that the use be not -- this is where the

9    section comes up, for any use or purpose -- "shall not be

10   used for any purpose other than retail purposes customarily

11   found in a closed mall shopping center, and non-retail

12   activities customary incidental thereto, or such use and

13   purposes that are not compatible and consistent with, and

14   are not detrimental, injurious, or inimical to the operation

15   of a first-class regional shopping center on each of the

16   three levels thereof."

17           While the REA does permit, at least temporary,

18   going dark, at some point, it's going to run into, within a

19   reasonable period of time, it's going to run into violating

20   this other provision that is explicitly incorporated into

21   Provision 25 of the -- or Article 25 of the REA and become

22   detrimental, injurious, and inimical to the operation of a

23   first-class shopping center.

24           THE COURT:  Okay, but that says that Sears and its

25   successors and assigns, right, it's not just Sears,

Page 57

1    "successors and assigns, shall not use the Sears building or

2    Sears tract for any use or purpose other than retail

3    purposes customarily found in and enclosed mall," and then

4    with the proviso, and then, in the language, "and are not

5    detrimental, injurious, or inimical to the operation of a

6    first-class regional shopping center," which precedes the

7    proviso.  So, then you go back to my question.  Sears

8    doesn't -- you don't have to have a Sears store there.  You

9    don't have to operate a Sears store there.  There has to be,

10   subject to the going dark right, which is -- you argue

11   there's some time limitation on it, although it doesn't

12   specify that, it just -- it gives the landlord two years to

13   exercise an option.

14            MR. BEEBY:  With regard to the third floor, yes,

15   correct.

16            THE COURT:  Right, right.  And then there's this

17   proviso that the assigns and/or Sears shall not use the

18   building other than for retail purposes, you know, as you

19   just read.

20            MR. BEEBY:  Right, right.  Yep, exactly.  And that

21   Section 9(d), which is that harmony provision, talks about

22   that.  that is a further definition or explanation of what

23   inimical -- what types of uses would be inimical, and then

24   there's a whole list of actually explicitly excluded uses as

25   well.

1            THE COURT:  Right.  That's the one that excludes -

2    -

3            MR. BEEBY:  Well, above it in Section C -- this is

4    Page 55 of the REA.

5            THE COURT:  Right.

6            MR. BEEBY:  Above it, it explicitly prohibits uses

7    for and office building, and then down below, it prohibits,

8    yeah, mobile home, trailer court park, auto body shop, pet

9    shops, that kind of stuff.

10           THE COURT:  Right.

11           MR. BEEBY:  Yup.

12           THE COURT:  But there's no provision, for example,

13   that says that there has to be an anchor store.

14           MR. BEEBY:  Well, you know, I think that does

15   actually come into play, here.

16           THE COURT:  Okay.

17           MR. BEEBY:  When you look at the aspect of what is

18   harmonious to the operation of a first-class shopping center

19   and what's going to impact the rest of the building, that

20   Section 22(a) puts into context that this space is being

21   envisioned as a department store, and then there are

22   provisions within --

23           THE COURT:  Does it?  Where does it say that?

24   (indiscernible) sophisticated partners (indiscernible).

25           MR. BEEBY:  Yeah, Section 22(a), which is on Page

Page 59

1    15, Covenance of Majors.  It talks about the parties agree

2    that it is in their mutual best interest the stores of the

3    majors be developed and maintained as department stores, and

4    this is key: "as an integral part of the shopping center to

5    permit the shopping center to contain a combination of

6    occupants which represent a sound and balanced

7    diversification of merchandise."

8              THE COURT:  But can you -- all right.

9              MR. BEEBY:  And at this point, I'm restricting

10   myself, I should say, to what is on the record at this point

11   because we're dealing with a motion on partial findings.

12             THE COURT:  Right.  But A is followed by B and C,

13   which deal with the specific anchor stores.

14             MR. BEEBY:  Yes, you're correct, Your Honor.  And

15   it provides the context.

16             THE COURT:  These are four very sophisticated

17   parties.  I would have thought that if the intention of C

18   was that an anchor store always be maintained,

19   notwithstanding the right to assign or sublet, they would

20   have said that.

21             MR. BEEBY:  Well, Your Honor, there's also other

22   provisions that come into play that would, absent the

23   bankruptcy-type setting, in which -- which, under the

24   bankruptcy-type setting, as the -- Transform has argued

25   would be a prohibition on assignments, but there are other

Page 60

1  provisions that could, absent this scenario, be used to

2  acquire that property back, if it was being held dark.

3          THE COURT:  Oh, acquire it back, yes.

4          MR. BEEBY:  Right.

5          THE COURT:  I understand that.  (indiscernible).

6          MR. BEEBY:  Right, and then be able to maintain

7  that control.

8          THE COURT:  But I actually read -- this is a

9  question for Transform's counsel.  I actually read

10 Transform, in one of its pleadings, stating that it is

11 prepared to live with the buyback option.

12         MR. CHESLEY:  Correct, Your Honor.  We will abide

13 by it.

14         THE COURT:  I mean, there are -- you're right,

15 there are cases that say that buyback options are

16 invalidated by 365, but I think they've said they won't

17 press that point.

18         MR. BEEBY:  And I would have to defer to -- with

19 regard to that...

20         THE COURT:  Okay.  All right.

21         MR. CHESLEY:  Your Honor --

22         THE COURT:  I don't think counsel's finished.  I

23 think he just was --

24         MR. CHESLEY:  Okay, I'm sorry.  I thought we were

25 done.

Page 61

1           THE COURT:  -- referring to his colleague to walk

2    me through the lease and the REA.

3           MR. FLYNN:  I would argue, too, for what it's

4    worth, is the decode itself in I think a number of the

5    cases, and we'll cite them, do not -- it doesn't say what's

6    in the lease.  It doesn't say or require that it be

7    protected by their lease.  It's an additional requirement

8    put in by Congress, if you intend to use Chapter 11, to get

9    these transactions done this way.  And they have chosen

10   Chapter 11 to get these transactions done this way.  They

11   are bound by the strict, reasonable readings of the law.

12   And whether or not it's in a lease, they are required to

13   show that they have adequate financial wherewithal and a

14   plan that makes some sense, and performance.  And they

15   simply can't do it, because there's nobody to be put in

16   there at this point and they don't know what will happen.

17          THE COURT:  Well, if the lease lets them operate

18   in a specific way, you're saying nevertheless, the Court

19   should provide some other gloss on operation?

20          MR. FLYNN:  Yes, and the thinking of that --

21          THE COURT:  Yeah?  Do you have any case that takes

22   that view?

23          MR. FLYNN:  Yeah, there's a number of them, but

24   they say --

25          THE COURT:  Okay, I just -- I'd be happy to be

Page 62

1    cited to one.

2              MR. FLYNN:  All right, yes, Your Honor.  I have it

3    marked up here on our brief.

4              THE COURT:  Okay.

5              MR. FLYNN:  The Casual Male, 120 B.R. 264 is one.

6    They require In Re Rikel, which was cited often, involved a

7    lease that allowed it to go dark.  I have the cite here, but

8    -- and the Court said, we're going to make you open within

9    six month, and you have to have a tenant that the landlord

10   will agree to.

11             THE COURT:  That's how you read Rikel?

12             MR. FLYNN:  Yes, I do.

13             THE COURT:  All right.  Okay.

14             MR. FLYNN:  Yes, I do.  In fact --

15             THE COURT:  So it's just the cases you cited in

16   your brief, no other cases for me?

17             MR. FLYNN:  I think there are other cases.  We

18   could come up with more, but that's a good start.  And

19   there's a Third Circuit case and -- so, yeah.

20             THE COURT:  Okay.

21             MR. FLYNN:  And others cited.  And Rikel, yeah,

22   involved a landlord that, the premises go dark, and the code

23   -- they sit under the -- because we think in the legislative

24   history, which we also supply to the Court, we have some

25   (indiscernible) cases in state that because landlords,

Page 63

1    they're taking rights away from them, special provisions

2    have been made for shopping centers to give them rights back

3    that they might not otherwise have, and it doesn't refer to

4    anything in a lease or protecting --

5                THE COURT:  Well, it does refer to the benefit of

6    the bargain, which one assumes is the contract they entered

7    into.  That's what the legislative history refers to.

8                MR. FLYNN:  Well, yeah, and it also refers to

9    destroying malls with improper mix of clients, destroying --

10   they -- no evidence of proper mix, and no evidence of

11   anything under -- they simply said, here's some financials

12   that aren't very worthy right on their face.  And then they

13   say, don't worry, we'll get a tenant.  Don't worry, it will

14   all work.  They have failed to date to meet their burden of

15   proof.

16               The cases are worried about whether or not a

17   tenant that they're proposing will be put into bankruptcy or

18   not have -- the tenant will go bankrupt.  We have no idea

19   who the tenant's going to be, so we have no idea if the

20   tenant is going to have actual financial wherewithal.

21   Because the damage is not that Transform necessarily go

22   bankrupt, but whoever they put in would go bankrupt.

23               THE COURT:  Well --

24               MR. FLYNN:  They've kind of jumped the rail

25   because they're not doing it the normal way.  They're taking

Page 64

1    the assignment of it first and then saying, don't worry,

2    we'll get a real tenant later.  And so, when it's good for

3    them to say, you know, we're the tenant, they say that, and

4    they say, when it's not good for them, they say well, it's

5    this other person that we're going to get in the future.

6    Don't worry about it.  And so, which is it?

7            We are concerned about the tenant, we are

8    concerned there is no tenant, we are -- if it's going to

9    operate or do anything there.  We are concerned about the

10   tenant's ability to pay their rent, to go bankrupt, to do a

11   high-class job, to be -- we're concerned about all of that.

12   That's fine.  They have presented no evidence of what they

13   intend to do, except they say there's a lot of things we

14   could do, pretty much when and if we want.

15           THE COURT:  Is there a limitation in the lease on

16   the financial wherewithal of a prospective S&E or subtenant?

17           MR. FLYNN:  I don't know.  There's a -- I don't

18   believe there is.  However, however, the code does require

19   that.

20           THE COURT:  Well, and then I suppose -- I mean,

21   maybe I'm anticipating Transform's argument, but they will

22   say, I believe, that MOAC can rely on the restriction in

23   Paragraph 22C that it be consistent and compatible with the

24   operation of the first-class regional shopping center.  I'm

25   assuming that would include that if someone purports to be a

Page 65

1    first-class operator, or an operator whose store would be

2    consistent for a first-class shopping center, that would

3    include some financial wherewithal.

4              MR. FLYNN:  Yes, yes.  And, but the point is, we

5    don't know who that is today.

6              THE COURT:  Well, no, but if they provide it, then

7    you could say, no, these people aren't -- they're not

8    consistent with the operation of a first-class shopping

9    center.

10             MR. FLYNN:  That's true, except I see nothing, and

11   our position would be that there's nothing in the code that

12   allows them to show (indiscernible) to that in the future.

13   They are required to show that today --

14             THE COURT:   Well, they're required under the

15   lease to show you in the future -- they would be.

16             MR. FLYNN:  There are many requirements in the

17   future under the lease.

18             THE COURT:  Right.

19             MR. FLYNN:  I'm referring to the code, and the

20   code doesn't say, don't worry about it, you can show later

21   whether they'll be adequate, there will be a proper mix.

22   Don't worry about it.

23             THE COURT:  Okay.

24             MR. FLYNN:  We'll leave that go.

25             THE COURT:  All right, but that just comes back to

Page 66

1    the issue as to whether 365(b)(3) requires the Court to

2    determine, separate and apart from the contract, pursuant to

3    which adequate assurance of performance has to be shown --

4    or under which adequate assurance of future performance has

5    to be shown, i.e. that contract, that you have to look into,

6    generally, issues as to what makes up a proper mix or

7    balance in a shopping center, for example.

8              MR. FLYNN:  Well, and you've got to do that today,

9    and --

10             THE COURT:  Well, that's where we have a dispute,

11   I guess.

12             MR. FLYNN:  Okay.

13             THE COURT:  Again, I have yet to see a case that

14   says that, and I've seen several that go the other way.

15             MR. FLYNN:  So there are many cases that say that

16   you have to show how the tenant will drive customers to the

17   mall.

18             THE COURT:  Show me one.

19             MR. FLYNN:  I'll quote from it.

20             THE COURT:  Okay.

21             MR. FLYNN:  Just a minute, Your Honor.  One of the

22   leading cases -- I apologize, Your Honor.

23             THE COURT:  Okay.

24             MR. FLYNN:  In Re Joshua Slocum, that's a 922 F.2d

25   1801, (Third Circuit 1990), Congress in 1978, and again in

Page 67

1    '84, placed additional restrictions on assignment of

2    shopping center leases in order to protect the rights of

3    lessors and -- and here's the key phrase -- the center's

4    tenants.  And then it says, Congress -- and it doesn't say,

5    unless they (indiscernible) or didn't in the lease.

6    Congress recognized that -- of the unusual situation where a

7    lease assignment affects not only the lessor, but an

8    assignment shopping center to lease to an outside party can

9    have significant detrimental impact on others.  Okay?  So we

10   don't know what the impact will be unless we know --

11           THE COURT:  I read Joshua Slocum.

12           MR. FLYNN:  Okay.

13           THE COURT:  The issue that we're discussing is not

14   dealt with in Joshua Slocum.  Those are general statements

15   of the purpose of the law.

16           MR. FLYNN:  Okay.  All right, Your Honor.  And,

17   again, In Re Rikel, it says specifically that even though

18   there's no -- there's a go dark -- they're allowed to go

19   dark, they should -- they have to reopen within a reasonable

20   time and required them to do so within six months.

21           THE COURT:  But there was a specific prohibition

22   in the lease in Rikel about going dark.

23           MR. FLYNN:  Right.  Right.

24           THE COURT:  So, again, the issue (indiscernible)

25   there as to whether 365(b)(3) imposes conditions on the

Page 68

1    parties that they didn't already bargain for.

2            MR. FLYNN:  In Rikel, I believe it had -- the

3    tenant had the right to go dark and the Court there

4    specifically said, you've got to open up.  I'm sure that

5    that's the case.  It specifically said that.  And in fact,

6    it's been acknowledged by the other side, and they've

7    offered to open up within two years in their pleadings.

8            Again, Casual Male states, and I quote, "The

9    assignee should have similar operating and financial

10   performance when all factors, including advertising,

11   aggressiveness, profit margins, growth potential, and other

12   indicia are weighed."  It doesn't say, just look at can they

13   pay the rent.  We don't protect tenants when we just say,

14   well, all they got to do is pay the rent, and that's what

15   Congress was intending to protect.  And I believe -- I

16   believe -- the Third Circuit has also agreed to that.

17           But they also concerned in -- about whether or not

18   a tenant will go bankrupt in the space again, and that would

19   be inimical to the mall and cause -- and that's under the

20   Bankruptcy Code.  They require that you show that the tenant

21   not be likely to go bankrupt, the one operating there.  If

22   there's another bankruptcy of that tenant, we are going to

23   be in trouble again.  We have no evidence of what they

24   intend to do and what tenant they have.  They have none.

25   They're allowed to just skip by all that and just say, don't

1   worry, we'll get you -- and just go by your lease.  We have

2   rights today that we would like to enforce, and we think

3   they're bound to comply with those rights.

4                THE COURT:  Okay.

5                MR. FLYNN:  Thank you, Your Honor.

6                MR. CHESLEY:  Your Honor, may I have just one

7   moment to confer with my client?

8                THE COURT:  Sure.

9                MR. CHESLEY:  Thank you.  Thank you, Your Honor,

10  for the courtesy.  Your Honor, may I propose that, to make

11  this even more efficient, we are happy to take their three

12  declarations without cross and go right to argument.  That

13  way, I can argue against the motion to dismiss on the

14  pleadings, as well as put our substantive argument before

15  the Court.  At this point, there's nothing that additional

16  cross from those three witnesses will add to the Court's

17  deliberation.

18                THE COURT:  Okay.

19                MR. CHESLEY:  Thank you, Your Honor.

20                THE COURT:  So let me just --

21                MR. CHESLEY:  Yes.

22                THE COURT:  I think what I would like to do before

23  you do that, though, is the following.  I have the

24  declarations by Mr. Frillman, Mr. Ghermezian, G-H-E-R-M-E-Z-

25  I-A-N, Mr. Hoge, H-O-G-E.  Are each of those gentlemen here,

1    present?

2            MAN 2:  Yes, Your Honor.

3            MAN 3:  Yes, Your Honor.

4            THE COURT:  Okay.  So, you can sit down.  I'm not

5    going to put each of you on the stand and go through what I

6    did to introduce each of the Debtor's -- Transform's two

7    witnesses, but I want you to consider that you're under oath

8    when I ask you all three of  these questions.

9            Each of you has submitted a declaration on behalf

10   of MOAC in this proceeding, and I have them in the exhibit

11   book.  They were submitted as your direct testimony in this

12   proceeding.  Being here today, would that continue to be

13   your direct testimony?  And, if not, is there anything that

14   you would like to change in the declarations?

15           MR. FRILLMAN:  No.

16           THE COURT:  No for Mr. --

17           MR. FRILLMAN:  Frillman.

18           THE COURT:  -- Frillman, so your direct is

19   testimony not going to change.

20           MR. HOGE:  Mr. Hoge.

21           THE COURT:  Mr. Hoge, I'm sorry, I mispronounced

22   your name.

23           MR. HOGE:  That's okay.

24           THE COURT:  Same answer?

25           MR. HOGE:  Same answer.

1            THE COURT:  Mr. Ghermezian?

2            MR. GHERMEZIAN:  I'd like to explain, and I'd like

3    to add to what I've submitted.

4            THE COURT:  You'd like to add something to it?

5            MR. GHERMEZIAN:  Yes.

6            THE COURT:  Okay.

7            MR. GHERMEZIAN:  I want to explain

8    (indiscernible).

9            THE COURT:  Are there -- do you want to talk to

10   him first, before he does that?  This is not a correction?

11   This is just an addition?

12           MR. GHERMEZIAN:  (indiscernible) more explain

13   (indiscernible) more (indiscernible).

14           THE COURT:  Do you want to have him supplement it?

15           MR. FLYNN:  Yes, Your Honor.

16           THE COURT:  Okay, so can you take the stand, sir?

17   Okay, I know I essentially did this already for you, but I'm

18   going to ask you to raise your right hand and I'm going to

19   put you under oath.  Do you swear or affirm to tell the

20   truth, the whole truth, and nothing but the truth, so help

21   you God?

22           MR. GHERMEZIAN:  I do affirm, yes.

23           THE COURT:   And it's Raphael G-H-E-R-M-E-Z-I-A-N?

24           MR. GHERMEZIAN:  That's correct.

25           THE COURT:  Okay, so do you want to ask him -- I

Page 72

```
 1    understand, Mr. Ghermezian, that you wish to add to or

 2    supplement your declaration that's otherwise serving as your

 3    direct testimony?

 4              MR. GHERMEZIAN:  That's right.

 5              THE COURT:  Okay.

 6              DIRECT EXAMINATION OF RAPHAEL GHERMEZIAN

 7    BY MR. FLYNN:

 8    Q    Okay, Mr. Ghermezian, how would you like to supplement

 9    that, please?  Go ahead.

10    A    I just want to explain, Your Honor, there is a

11    misunderstanding here.

12              THE COURT:  You have to speak a little louder,

13    sir.

14    A    This is clear now?

15    Q    Yes.

16    A    I just want it clear that there is big misunderstanding

17    here.  The misunderstanding is that Mall of America is not

18    the shopping center.  It is not (indiscernible) usual or --

19              THE COURT:  If you're basing it on my language,

20    shopping center is the term that Congress uses in the

21    Bankruptcy Code.  I appreciate that it's not an A&P or a,

22    you know, shopping center like that.  I appreciate that it

23    has its own characteristics.  I'm just using that term

24    because that's the term Congress uses generically, and the

25    parties have all agreed that it fits within that term.
```

1    A    Yeah, just please, you know, let me go ahead and

2    explain.  First of all, Mall of America is not a shopping

3    center.  It's a tourist attraction.  It draws -- Time

4    Magazine took a survey and explained and recorded that Mall

5    of America, there was more tourists (indiscernible) than

6    Disneyland, Epcot, and Grand Canyon combined.  The Mall of

7    America is a golden goose of Minnesota.  It lays golden eggs

8    of $3 billion annually for Minnesota, hires 13,000 people --

9    13,000 people.  It's -- I believe it is a huge asset of

10   Minnesota and the city that we are in.  If it fails, if it

11   fails, it would be a big loss to the state is what I think

12   the Court should consider.

13   Let me explain.  When we made this deal with Sears

14   Corporation, it was a huge corporation.  It was never

15   anticipated that one day, they were going to go bankrupt and

16   some scavengers are coming there and (indiscernible).  I'm

17   just going to make the best money I want only.  What I'm

18   trying to impress upon Your Honor is that the word

19   appropriate and the word -- what was the other they used,

20   appropriate and customary -- in this case is not -- is

21   different.  It has to be specific to this project.  What is

22   appropriate and customary for this project is that if Sears

23   does not operate as a department store, or if it does not

24   operate, it's closed door, it actually is right, actually

25   right, to a number of tenants, to terminate a lease.

Page 74

1    Now, when these tenants, when these tenants today, the

2    retail situation in the country is very, very precarious.

3    It's very sensitive, and if tenants go, they go under

4    certain percentage, under 80 percent, which is very likely

5    to happen, as a result of that, almost every other tenant in

6    the project can leave.

7    Now, today, they may not leave that fast, but this gives

8    them an excuse to leave.  If the tenant leaves, the shopping

9    center is finished.  And, believe me, it's not

10   inconceivable.  They are leasing today (indiscernible).

11   They location where Sears today is, is at the end of two

12   malls.  On every corner similar to that, you have to have

13   (indiscernible) a department store.  City of Bloomington is

14   spending $270 million of their own money to build a project

15   attached to the mall.  If this mall fails, and believe me,

16   what happens to Sears can actually bring the mall down to

17   nothing.  This is not an exaggeration; it is real.  It's

18   true, this can happen.

19   I think in this situation, you should (indiscernible) a

20   special interpretation for appropriate and customary in this

21   case.  Appropriate and customary in this case is only

22   (indiscernible).  I think they should -- if you are not

23   going to disallow the assignment, and if you're going to let

24   them have the assignment, I think you should have a limited

25   time as to when they have to lease this, and it has to be

Page 75

1    limited to department stores, because if we don't have a

2    department store, the mall could go down, because this is

3    the term in many of the leases.

4    Also, I think we should have an absolute right in this case

5    of approving (indiscernible).  Now, this really is not only

6    to add --

7              THE COURT:  So I'm going to cut you off, because

8    you're really just giving me legal argument at this point.

9              MR. GHERMEZIAN:  I know.

10             THE COURT:  Okay.  Do you wish to cross-examine?

11             MR. CHESLEY:  I'm sorry, Your Honor, I think I

12   have to just on a couple points.

13             THE COURT:  Okay.

14             CROSS EXAMINATION OF RAPHAEL GHERMEZIAN

15   BY MR. CHESLEY:

16   Q    Just briefly, Mr. Ghermezian -- actually, good

17   afternoon.  Quickly, with respect to department stores in

18   the mall, am I correct there was a Bloomingdale's in the

19   mall that closed in 2012?

20   A    Yes.  We had four department stores, but our

21   contractual obligation to the tenants was only three.  So

22   Bloomingdale's didn't have any effect, but Sears will

23   actually bring the mall down.

24   Q    Thank you, I'll -- let me -- if you could just answer

25   my question, I would appreciate it.  There was a

Page 76

1   Bloomingdale's in the mall that closed in 2012, correct?

2   A    Yes.

3   Q    And that was replaced by a combination of several

4   different stores, correct?

5   A    Yeah, because we had no obligation to have four

6   department stores, only three department stores.

7   Q    To answer my question, the Bloomingdale's space was

8   carved up into several different new tenants, correct?

9   A    That's correct.

10  Q    Including the Crayola Experience, correct?

11  A    Yes.

12  Q    And the Bloomingdale's store closed in 2012, correct?

13  A    Yes.

14  Q    And that space was finally fully sublet by 2016, May of

15  that year, correct?

16  A    I don't believe.  I think we gradually leased this

17  space.

18  Q    When did the Crayola Experience open?

19  A    I don't know, I think like a couple years ago.

20  Q    Okay.  Now, you described this Sears location at the

21  end of two courts.  That's a valuable store location, isn't

22  it?

23  A    It's not a valuable store location.  It's an important

24  position for the mall because every leg of the mall survives

25  by the anchor that is anchoring those legs.  Now, Sears is

```
 1    anchoring two legs of the mall, and if Sears goes dark and

 2    stays dark long, or -- that's why we said that whatever

 3    you're doing that lease, it cannot be injurious to us, and

 4    it cannot harm us.  This will harm completely.  Really,

 5    really, I'm telling you, there is the chance of better than

 6    80 percent that (indiscernible) if Sears brings tenants

 7    other than department store or goes dark and stays dark for

 8    a long time.

 9    Q    You want the location back, don't you?

10    A    I want the location back because I (indiscernible)

11    department store there.

12    Q    In fact, you're in negotiation with a department store

13    to take this space, aren't you?

14    A    Pardon?

15    Q    Aren't you in negotiations with another department

16    store to take the space?

17    A    Yes.

18    Q    And, Mr. Ghermezian, am I right?  In your declaration,

19    you refer to that there were many tenant leases at the mall

20    that require that a department store be operated in the

21    Sears space, correct?

22    A    Yes, that is --

23    Q    Those are called co-tenancy clauses, aren't they?

24    A    I believe (indiscernible), yes.  We have to have the

25    department store, or else they can terminate their lease.
```

1    And today, because of (indiscernible), the chances are very

2    high that we would get (indiscernible).

3    Q    So in fact, that will impact you, the landlord, if

4    there is not a department store operating in the Sears

5    location, correct?

6    A    Not just the landlord, the project itself, the

7    viability of the whole project.

8    Q    Well, there are tenants that can either cut their lease

9    payments or cancel their leases if in fact there isn't a

10   department store in there, correct?

11   A    They can tell me they leave, yeah.

12   Q    Yeah.  Sears isn't party to any of those co-tenancy

13   provisions, are they?

14   A    What happens in Sears cannot be injurious, it says in

15   the lease, cannot be injurious to the mall and cannot -- it

16   has to be compatible.  It has (indiscernible) with the other

17   tenants.  So the only thing that will be compatible and will

18   not injure the mall is going to be a department store, and

19   there are lots of department stores.  You can have Sacks,

20   you can Neiman Marcus, you can have Bloomingdale would still

21   today come back, because they have had the situation, the

22   tenants left and they come back 10 years later.  Today, the

23   situation in Minnesota (indiscernible) that.  You can have

24   Bealls, you can have (indiscernible), you can have -- I can

25   give you a list of 10 department stores.  And, believe me,

1    we can make a deal with one of them.  I can make a deal for

2    you, and it can have all the benefit (indiscernible).

3    (indiscernible) yours, but they have to -- whatever cost

4    there is involved, you have to share with us (indiscernible)

5    the cost.

6              MR. CHESLEY:  Your Honor, I'd like to move to

7    strike that answer as simply not responsive to the question.

8              MR. GHERMEZIAN:  What was the question?

9              THE COURT:  I won't do that.  That's --

10             MR. FLYNN:  Thank you, Your Honor.

11   Q    Just so I'm clear, you do not want any of these other

12   tenants to invoke their co-tenancy provisions.

13   A    That's right.  That's the argument.

14   Q    Thank you.  Nothing further.

15             RE-DIRECT EXAMINATION OF RAPHAEL GHERMEZIAN

16   BY MR. FLYNN:

17   Q    Are there available anchor tenants that go into that

18   space?  Are they available?

19   A    Yes.

20   Q    Okay.  Are the anchor tenants generally -- would that

21   be best for the space and best for the mix of the mall?

22   A    That is not just best.  I think that it absolutely

23   essential for the mall because it's in an anchor position,

24   and tenants in both legs that leased this position, they are

25   dependent on who is in there (indiscernible) anchor tenant.

Page 80

1    And we have an obligation to tenants in the mall, in

2    writing, that this -- that we have to have three department

3    stores.  That's why, when Bloomingdale's left, we didn't

4    care, because the obligation was only three.

5    Q    Right.  Are you willing to rent to an anchor tenant for

6    very low rent, and even possibly pay an anchor tenant to

7    come to the mall?

8    A    Basically, I'm willing to lease to an anchor tenant for

9    no money, no rent, nothing.  And (indiscernible), I mean, to

10   the extent I'm prepared to actually pay a tenant and

11   guarantee them that they make a profit.  In other words, if

12   they lose, I pay them money every year for the rest of the

13   lease to just (indiscernible) yeah.

14   Q    And is that the current market for anchor tenants?  Is

15   that pretty much what you have?

16   A    Yes, (indiscernible) sign anchor tenants, they will

17   actually guarantee -- guarantee -- that they're going to

18   make a $4 to $8 million profit every year.  In other words,

19   if they don't make that, it have to come out of our pocket.

20   And they're negotiating now that a tenant (indiscernible)

21   also guaranteed them that they're going to make profit, and

22   they're only giving us a percentage (indiscernible).

23   Q    All right.  Thank you.  Anything further?

24   A    No.

25   Q    Thank you.

1          THE COURT:  Okay, you can step down, sir.  Okay,

2     so --

3          MR. FLYNN:  Excuse me, Your Honor?  May I talk to

4     my witnesses?  We may want to address issues that were

5     brought up that aren't in their declarations.

6          MR. CHESLEY:  I would object to that, Your Honor,

7     on -- and I don't want to be too technical here, but their

8     direct was on.  I did not cross.  We gave Mr. Ghermezian the

9     benefit of the doubt there, which maybe we shouldn't have,

10    but we did.  But to now allow an additional direct, when

11    we've decided no need to cross, I think is actually

12    improper.

13         THE COURT:  Well, you're saying you're putting

14    them on in rebuttal?

15         MR. FLYNN:  They brought up issues and made --

16         THE COURT:  I'm just asking if you'd put them on

17    in rebuttal.

18         MR. FLYNN:  I'm putting on my case.  I'm putting

19    them on in my case.

20         THE COURT:  No, no, that's a different story.

21         MR. FLYNN:  All right.

22         THE COURT:  I would let you put them on in

23    rebuttal to, you know, the statements that were made on

24    cross by the Transform witness.

25         MR. FLYNN:  Yes, Your Honor, essentially that's

Page 82

1    correct.  It is correct.

2              THE COURT:  We got into this position because Mr.

3    Chesley wanted to cut through to final argument on this,

4    rather than having two oral arguments.  I guess I'll have to

5    give you my ruling on your motion based on the Debtor's

6    pleading then, unless you want to just defer that to the

7    end.

8              MR. FLYNN:  Yes, Your Honor, we will defer to the

9    end.

10             THE COURT:  Okay.  All right.  Very well.  So you

11   can put them on in rebuttal, or some -- you don't have to

12   put them all on, whoever you want to put on in rebuttal.

13             MR. FLYNN:  Mr. Frillman?

14             THE COURT:  Please sit down.  I'll swear you in,

15   even though you're probably already viewing yourself as

16   sworn in.  Would you raise your right hand, please?  Do you

17   swear or affirm to tell the truth, the whole truth, and

18   nothing but the truth, so help you God?

19             MR. FRILLMAN:  I do.

20             THE COURT:  And it's F-R-I-L-L-M-A-N?

21             MR. FRILLMAN:  Yes, sir.

22             THE COURT:  Louis Frillman.

23             MR. FRILLMAN:  Yes, sir.

24             THE COURT:  Okay.

25                 DIRECT EXAMINATION OF LOUIS FRILLMAN

1    BY MR. FLYNN:

2    Q    Well, Mr. Frillman, you were in the Court this morning

3    when testimony was given by the Transform (indiscernible),

4    is that correct?

5    A    Yes, sir.

6    Q    Did anything that you heard from them change your mind

7    about your opinion?

8    A    No.

9    Q    Did they raise any issues not addressed in your

10   declaration that you'd like to elaborate on?

11             MR. CHESLEY:  Your Honor, I'm going to object.

12   This is not rebuttal, Your Honor, with all due respect.

13             MR. FLYNN:  He's going to discuss issues not

14   raised in his declaration, brought up this morning.  That's

15   rebuttal.

16             THE COURT:  Well, you can answer the question.  I

17   may cut you off, depending on what you're saying, okay?

18   A    Can you repeat, sir?

19   Q    Did you hear anything this morning that was said in the

20   testimony that was not addressed in your declaration, either

21   at all or sufficiently, that you would like to comment

22   further on?

23   A    Yes.

24   Q    What areas would that be?

25             MR. CHESLEY:  Same objection, Your Honor.

1          THE COURT:  Well, let me hear the answer first.

2     A    There's a -- somebody said the word confusion or

3     misunderstanding, Mr. Ghermezian, I think.  The documents

4     that have been presented to the Court and that we reviewed

5     as a part of this process are a presentation of the so-

6     called financial condition of the operating entity known as

7     Transform or Transform Co, which is going to hold assets

8     that have evolved out of the Sears bankruptcy.  And that

9     means stores, 425, which I guess is now reduced to about

10    400, operating stores doing something with the Sears brand

11    name and trademark, and that's posited as the, you know, as

12    the underlying argument to allow this process to go forward.

13         THE COURT:  I'm sorry, this is not rebuttal.  I

14    don't know where you're going, but this is something,

15    frankly, that is legal argument.  It mischaracterizes the

16    direct testimony, and I'm going to not allow it.  This is

17    ridiculous, honestly.

18         MR. FLYNN:  Is there --

19         THE COURT:  The direct testimony was that they

20    were a real estate company, and that's what your Counsel is

21    relying on in saying that this motion shouldn't be granted.

22    There was no testimony about the 425 stores, or anything

23    like that, that wasn't something that you could have

24    addressed in your declaration.

25         So, just, enough.  Is there anything else you want

1    to address, besides that point?

2           MR. FRILLMAN:  Whatever else I'd have to say

3    evolves from that, because that was a part of the financial

4    statements that were presented.

5           THE COURT:  All right, fine.  You can step down.

6           MR. FLYNN:   May I talk to Mr. Hoge before I

7    decide what I'm going to --

8           THE COURT:  Sure.

9           MR. FLYNN:  (indiscernible), Your Honor.

10          THE COURT:  Okay, fine, thank you.  All right,

11   would anyone benefit from a five-minute break?

12          MR. CHESLEY:  I probably would, Your Honor.

13          THE COURT:  All right, so I'll be back at -- let's

14   make it 10.

15          MR. CHESLEY:  Thank you, Your Honor, and we should

16   be brief.  Thank you.

17          (Recess)

18          THE COURT:  Please be seated.  Okay, we're back on

19   the record in In Re Sears Holdings Corp.

20          MR. CHESLEY:  Thank you, Your Honor.  Apologize;

21   it's just a little bit easier to use it from the lectern.

22          THE COURT:  Sure.

23          MR. CHESLEY:  Your Honor, at this point, we would

24   provide a very brief closing, as well as address the motion

25   for judgement on the pleadings that was brought by the

Page 86

1    landlord's Counsel.

2              Through the actual motion, Your Honor, the Debtors

3    are seeking authority to assume and assign the lease for the

4    Mall of America store, to transform Leaseco, the wholly

5    owned subsidiary of Transform Holdco, the acquirer or the

6    majority of the Debtor's assets, pursuant to the global

7    sales transaction.

8              Before going on, Your Honor, I think it's

9    important to clarify a point that was made repeatedly by

10   Counsel for the landlord, and that related to the Reiker

11   declaration and statement with respect to what will occur if

12   the leases are not assumed and assigned to Transform.   I

13   think as the Court is aware, that obviously were the assets

14   that were acquired, and of course that was a critical part

15   of the bargain and, as the evidence has made clear, all but

16   three of those leases have now been assumed and assigned to

17   Transform.

18             The landlord, Your Honor, has strenuously objected

19   on multiple occasions to the assignment to Transform, with a

20   variety of arguments.   But most critically, what they're

21   attempting to do is to rewrite the lease to what they wanted

22   the lease and the REA to provide when Sears constructed this

23   store on its own nickel in 1991.   The reading of this lease

24   and the leading of the REA, Your Honor, we believe

25   authorized the assumption of the lease, pursuant to Section

Page 87

1    365(b)(3), and I am going to articulate why we believe we've

2    met those standards.

3          First of all, the arguments that are advanced by

4    Mall of America ignore two fundamental precepts.  First,

5    365(b)(3) is not a standard to be viewed in the abstract.

6    The provisions words, the Third Circuit noted, in In Re

7    Joshua Slocum, craft it as a shield to remedy three problems

8    caused by shopping centers and their solvent tenants, by the

9    administration of the bankruptcy estate.  First was the

10   hardship caused by vacancy or partial occupancy?  Second was

11   uncertainty of whether the landlord will continue to receive

12   rent, and third, disruption to tenant mix in the shopping

13   center.

14         The provisions were not, however, drafted as a

15   (indiscernible) for landlords to defeat the assumption and

16   assignment of the lease to a new entity, or unilaterally

17   veto or claim a veto right on an assumption and an

18   assignment that fully complies with a lease in the

19   Bankruptcy Code.  And what is critical to the issues before

20   the Court today is that Section 365(b)(3) is, again, not an

21   abstract standard.  Rather, as the Court noted in In Re Ames

22   Department Store, 127 B.R. at 752, the legislative history

23   of 365(b)(3), "makes clear that the provision was designed

24   to ensure that the lessor and other tenants maintain the

25   benefit of  the original bargain with the Debtor."  As the

Page 88

1    Court also made clear in Ames, the Court's analysis under

2    365(b)(3) must be focused on the parties' contractual

3    undertakings, not general notions of assignability and

4    tenant mix.

5            Transform is only seeking today, Your Honor, to

6    obtain the benefit of the bargain that Sears entered into in

7    1991.  Now, again, the legislative history underlying

8    365(b)(3) makes clear that the enhanced statutory

9    protections are not intended to block a new purchaser from

10   acquiring the leasehold, but rather, looks squarely at the

11   economic viability of the assignee.  As the Court in Service

12   Merchandise confirmed adequate assurances to be evaluated,

13   "on a commercially reasonable standard based upon the

14   information available at the time."

15           To that end, the mall's protests aside, they do

16   not, nor can they, contend, as  the Court in Joshua Slocum

17   was principally concerned with, whether there is any

18   uncertainty as to whether Transform will be able to pay the

19   leasehold cost of approximately $1.1 million a year.  Not

20   only has this been confirmed by the witnesses today, but to

21   reduce any economic risk to the mall, Transform has agreed

22   to not only provide a guarantee, but to place one year of

23   leasehold costs into an escrow to protect the mall from any

24   economic risk.

25           THE COURT:  Can I interrupt you there?

1          MR. CHESLEY:  Yes, Your Honor.

2          THE COURT:  it would appear, under the case law

3    pertaining to non-shopping center leases, leases where

4    365(b)(3) doesn't apply, that the adequate assurance offered

5    would be sufficient.  365(b)(3), though, throws arguably

6    additional factors into the analysis.  It begins by saying,

7    for purposes of Paragraph 1 of this subsection and Paragraph

8    2B of Subsection F, which both require adequate assurance of

9    future performance, adequate assurance of future performance

10   of a lease of real property in a shopping center includes

11   adequate assurance, A, of the source of rent and other

12   consideration due under a lease, and in the case of an

13   assignment, that the financial condition and operating

14   performance of the proposed assignee and its guarantors, if

15   any, shall be similar to the financial condition and

16   operating performance of the Debtor and its guarantors, if

17   any, as of the time the Debtor became the lessee under the

18   lease.

19          So I appreciate it uses the word similar, but it

20   creates a test that isn't in the general case law, namely,

21   if you look at the financial condition and operating

22   performance of the Debtor and its guarantors, if any, when

23   they entered into the lease, which was here, 1991, and see

24   whether that's similar to the financial condition and

25   operating performance of the assignee.  So the case law does

1    have -- that applies to this section does have the language

2    you quoted about, you know, no reasonable  landlord would

3    feel like it was jeopardized here, but they also go through

4    some analysis, at least, of the condition of the Debtor when

5    it entered into the lease, compared to the financial

6    condition of the assignee.

7              They usually employ, for the first part of that

8    analysis, for public companies, 10-Ks and 10-Qs.  For the

9    second part, if there is a 10-K or 10-Q, they'll look at

10   that; if not, they'll look at projections and testimony.

11   And for new special-purpose entities, they'll look at the

12   experience of the principal, and sometimes, although not

13   always, the not just professed commitment by the principal,

14   but financial stake of the principal in the enterprise.

15             So, assuming for the moment that that exercise

16   needs to be gone through, that you don't just look at -- you

17   don't just read similar to say similar in assuring

18   performance, whereas, you know, you could say, well

19   performance is just assured, you don't need to go father,

20   are you arguing beyond that?  Are you arguing that there is

21   financial information that I should look at?

22             MR. CHESLEY:  Your Honor, we're -- let me break it

23   down into a couple -- answer that in a couple of ways.  One,

24   with respect to the financial information that has been

25   presented, you have that.  You have the stipulations.  I'm

1    not going to sit here and say that Transform is Sears of

2    1991.  But what the evidence before the Court is, it is the

3    same operating entity that existed, in effect, before

4    bankruptcy -- the same people --

5              THE COURT:  But that's before bankruptcy.

6              MR. CHESLEY:  Correct, Your Honor.  Obviously,

7    Sears in 1991 is not the same group of individuals that were

8    running the business prior to October of last year.  But I

9    think in looking at that standard, Your Honor, I think there

10   are a couple of things that are critical.  One is the

11   legislative history underlying it, and the legislative

12   history made clear that, "The provision of 364(b)(3)(a) was

13   intended to prevent a shopping center lease from being

14   assigned to another business in poor financial condition."

15   There are, to my knowledge Your Honor -- and I'm happy to be

16   corrected, which I often am -- no cases that we have read

17   that interpret similar under 365(b)(3)(a).  It is not an

18   issue that has been litigated nor reported on.

19             THE COURT:  Well, there are courts that talk about

20   -- they combine, as I said, the notion of no reasonable

21   landlord would feel jeopardized with proportionate health.

22   Not that the tenant necessarily be as large  -- the

23   prospective new tenant as large as the Debtor was when it

24   entered into the lease, but that at least be proportionately

25   as healthy.

1            MR. CHESLEY:  Well, and Your Honor, to that end,

2     as the exhibit from Mr. Frillman confirmed, shareholder

3     equity, at least from the information that was available, is

4     about $2 billion for Transform.  That was the information

5     that was made available.  It is not what Sears was, but it

6     is also, as the Court knows, a diversified company that is

7     real estate, it is brand, it is ancillary services, it is

8     operating approximately 400 -- actually, 425 retail stores,

9     so it is a viable entity that meets the standard set forth

10    in the code.

11            And I think what's also critical, and this goes

12    back to the Ames Department Store line of cases, which I'd

13    like to talk about in a minute, but what Ames made very,

14    very clear is, in looking at the standards, you have to look

15    at the lease.  And the expectation of these parties when

16    they entered into this lease in 1991 was very clear, that

17    Sears had to operate a retail store for 15 years.  After the

18    termination of that operating period, Sears had broad

19    rights, and we'll talk about going dark, to assume, to

20    assign, and had great flexibility for this space.  That was

21    what was bargained for.

22            What was also bargained for was, at the time, an

23    agreement by the parties as to what level of financial

24    assurance the landlord would be looking at, to the extent

25    that Sears wanted to offload or transfer or assign this

1    property to a third party.  And what Section 25 of the REA

2    made abundantly clear is, to the extent that occurs, Sears

3    has no further liability if that party has shareholder

4    equity of at least $50 million.

5              So, looking at the standards under the code,

6    looking at what the parties absolutely understood at the

7    time as to what would suffice, I think to, in effect, hide

8    behind a strict reading that is not similar, but is

9    absolute, and to compare apples to -- 1991 apples to 2019

10   oranges, Your Honor, I don't think is what the framers of

11   the code contemplated, and in fact, not one that we see in

12   any of the case law that we have relied upon.

13             THE COURT: And what about the reference to

14   operating performance, as well as financial performance?

15             MR. CHESLEY:  Well, operating performance is --

16   Sears is -- Transform is operating Sears stores.  Transform

17   is operating K-Mart stores.

18             THE COURT:  Although not here.

19             MR. CHESLEY:  But here, they're not required to

20   operate a store.

21             THE COURT:  So it's the same contract reference

22   point.

23             MR. CHESLEY:  Absolutely, you have to look at the

24   contract.  And I think that's really the point here, and

25   that's not what -- if you heard the argument and you heard

Page 94

1    the testimony, that's not what the mall is concerned about.

2    What we heard today is, what they're really concerned about

3    is what happens when Transform finds replacement tenants.

4    First of all, as we have confirmed to the Court and the

5    landlord, we intend to comply with all provisions of the

6    lease and the REA.  We're not asking for any relief from

7    those provisions, nor do we believe any is necessary here,

8    based upon the language of the lease and the REA.

9            And so, further to that, Your Honor, if in fact --

10   and this is where the concepts got conflated -- if in fact

11   the Court is willing to allow the lease to be assumed and

12   assigned and for Transform to, in effect, retain the value

13   that it bargained for, then at that point, if it attempts to

14   assume and assign, or sublease to a third party, it has to

15   comply with the lease.  And if it doesn't, nothing here

16   today is vitiating any of the landlord's rights.

17   Unfortunately, those will not be articulated by Your Honor,

18   but likely in a court in Minnesota, but that's all we're

19   seeking to do, is to maintain the benefit of that bargain.

20           THE COURT:  Okay.  There's a provision in the

21   lease, 6.3, sale by tenant to landlord.

22           MR. CHESLEY:  Yes, Your Honor.

23           THE COURT:  And it says, in the event that at any

24   time, and from time to time after the expiration of the

25   Sears operating period, which I think everyone agrees is

1    expired, right --

2            MR. CHESLEY:  Yes, Your Honor.

3            THE COURT:  -- because it was 15 years from 1991,

4    until the term expires, tenant decides to cease and ceases

5    to operate a store in the tenant building, and further

6    determines to sell, exchange, or otherwise transfer its

7    interest in the lease premises, tenant shall, by giving

8    landlord notice first offer, and then there's this fair

9    market value right to exercise that offer.  So if Transform

10   finds a tenant, not for the whole three floors, but let's

11   say for a significant portion of one floor, is it prepared

12   to live with this provision?

13           MR. CHESLEY:  We are prepared to live with Section

14   6.3.  And in fact, Your Honor, we have to.  If you look at

15   6.3C, big C, it's a tough agreement to get through, but it

16   makes very clear that -- parties may have been prescient, I

17   don't know.  But Paragraph 6.3 does not apply to a transfer

18   in a reorganization or a bankruptcy process.  But on the top

19   of Page 17, the foregoing provisions of 6.3 remain binding

20   on the transferee.  We agree that this will be binding on

21   the transferee.

22           THE COURT:  Okay.

23           MR. CHESLEY:  So, Your Honor --

24           THE COURT:  So --

25           MR. CHESLEY:  Yes, I'm sorry.

1            THE COURT:  This is a question for both of you,

2     both sides.  Again, I'm just thinking ahead in practical

3     terms.  Obviously, Mr. Ghermezian was quite concerned about

4     the effect of Transform's assigning a portion of the space

5     to a tenant or a sub-tenant that he believes would

6     jeopardize the -- either the mix of the mall or the mall

7     itself in some way, separate and apart from not being a

8     specifically excluded tenant.  And we have the general

9     language that has also been referred to, you know, first

10    class retail mall in 22.  But I'm just, in my own head,

11    playing this through.  If you find any tenant, then he can

12    exercise this right, right?

13            MR. CHESLEY:  Yes, Your Honor.

14            THE COURT:  It's not limited to the -- you don't

15    have to wait until you've sublet everything.  It's any

16    tenant.

17            MR. CHESLEY:  Yes, Your Honor, he has that right.

18    That's what the parties negotiated in 1991.

19            THE COURT:  Okay.  Okay.

20            MR. CHESLEY:  So, Your Honor -- I'm sorry.

21            THE COURT:  Well, I -- does Mall of America Corp

22    disagree with that?  Well, maybe it's not even a

23    disagreement.  I guess it's a representation that's been

24    made.

25            MR. FLYNN:  No, Your Honor.

1          THE COURT:  Okay.

2          MR. FLYNN:  We think they're bound by that.

3          THE COURT:  Okay.  All right.

4          MR. CHESLEY:  Just briefly, Your Honor, going back

5     to the other factors that have been relied upon here, and

6     turning back to Joshua Slocum, there have been a lot of

7     claims about the harm that's going to befall this mall if

8     the Court grants this motion.  Again, we have to look back

9     at the lease and what rights were contractually given to

10    Sears in 1991, and as the REA and the lease made clear, any

11    assign -- assignees, excuse me, or transferee.

12         The court in service merchandise again made clear

13    were the lease provisions afford the tenant broad use and

14    assignment rights.  The tenant effectively, quote, has free

15    control of the space, which as the court in service

16    merchandise noted met the standards 365(b)(3) as to the

17    issues raised in that case in the Middle District of

18    Tennessee.

19         A lot of conversation here about the requirement

20    to maintain an anchor or department store.  Again, we just

21    turn to the REA.  This isn't hard.  Section 22(c) of the REA

22    has a very specific detailed provision of the obligations of

23    Sears to maintain a department store for the first 15 years

24    of the lease.  Thereafter, the REA goes into substantial

25    discussions about what Sears' rights are, which we have

Page 98

1    talked about substantially.  But most importantly, it states

2    that Sears further covenants and agrees -- this is on Page

3    125 -- that during the remaining term of the REA, after the

4    expiration of the major operating period, it then goes on to

5    provide that.  We've gone through this language repeatedly.

6    I will not do it again.  Sears could use this for retail

7    purposes customarily found in --

8              THE COURT:  But Sears --

9              MR. CHESLEY:  -- an enclosed mall.

10             THE COURT:  Sears and its assignees.

11             MR. CHESLEY:  And its assignee.  Its successors

12   and assigns.  It says it shall not, except for, and those

13   are the retail activities, non-retail activities customarily

14   incidental thereto, quote, or such other uses and purposes

15   that are compatible and consistent with the regional --

16   first-class regional shopping center.  That's all we're

17   seeking to do, which is to protect that benefit of the

18   bargain, but there is nothing here -- there is no reading of

19   the REA or of the lease that crafts any obligation of Sears

20   or Transform, if this motion is granted, to continue to

21   operate a department store, much like Mr. Ghermezian

22   admitted with respect to the Bloomingdale's store, which was

23   cut up into several tenants over a four-year period.

24             As to the issue of going dark, while again the

25   landlord claims about the harm of Sears remaining dark under

1    the lease, beginning in 2006 we have the absolute right to

2    cease operating in the store.  As the district court made

3    clear in affirming this court's ruling in Great Atlantic &

4    Pacific Tea Company, while, quote, the store being dark

5    undoubtedly has a deleterious effect on the landlord, the

6    possibility that the store would go dark was contemplated

7    and permitted under the lease.

8             And as to tenant mix and the mall's claim that the

9    mall is finely curated retail and hospitality venue, again,

10   the lease which controls makes clear that Sears can operate,

11   or its assignee or transferee can operate within these broad

12   parameters.

13            As the court in Ames made clear again,

14   365(b)(3)(d) refers to contractual protections and not

15   undefined notions of tenant mix.  Quote, it would be

16   anomalous to interpret Section 365(b)(3)(d) to preclude

17   assumption in assignment of a lease where the lease itself

18   affords unfettered rights to assign in some way.

19            No mistake here, Your Honor.  We've made this

20   clear.  I'm not going to -- I don't need to make it again.

21   We will comply with the terms of the lease.  We will protect

22   the landlord from any economic risk and are incentivized, as

23   everybody is, to bring in replacement tenants as quickly as

24   we can to this center.  That's the benefit of our bargain.

25            In the end, Your Honor, is the declarations filed

Page 100

1   by the mall plainly indicate the dispute really isn't about

2   adequate assurance.  It's about control.  The mall wishes to

3   rid itself of the economic terms of the lease it

4   contractually bound itself to so it can capture and realize

5   the economic benefits of this lease, which everybody

6   acknowledges is in a first-class shopping center, and hand

7   select a preferred tenant that will protect it from the

8   claims of other tenants rather than afford the Debtors and

9   Transform the benefit of its party.

10          Transference request, if the Court honored the

11  benefit of the bargain, does not in the words of the Mall of

12  America's CEO make us a scavenger, indeed, as the district

13  court noted in A&P, quote, while the landlord's desire to

14  get out of a lease is understandable, Section 365 affords no

15  relief to a landlord simply because it might have the

16  opportunity to rent the premises at higher rents to others

17  and otherwise seek to escape the benefit of its bargain.

18  That's all we're seeking here today, Your Honor.  Thank you.

19          THE COURT:  Are you -- in some ways, although the

20  proposed assumption and assignment of this lease was part of

21  the overall asset purchase agreement in which Transform

22  bought substantially all of the assets of the Debtors and

23  propose to continue to use most of those assets.  But in

24  some ways, this is -- this lease fits more into the

25  situations where a Debtor entered into -- enters into a

Page 101

1    designation rights agreement and for valuable consideration

2    sells the right to a third-party real estate company to

3    designate leases for assumption and assignment, usually to

4    third parties.

5              MR. CHESLEY:  Right.

6              THE COURT:  Are you aware of any cases in the

7    shopping center context where these types of issues have

8    arisen in the context of a designation --

9              MR. CHESLEY:  Of a designation rights, Your Honor?

10             THE COURT:  Yeah.

11             MR. CHESLEY:  None that are published.  There were

12   several that we were involved with that were not.

13             THE COURT:  But no published decisions.

14             MR. CHESLEY:  No.

15             THE COURT:  All right.

16             MR. CHESLEY:  And there shouldn't be a different

17   standard, Your Honor.

18             THE COURT:  Well, I mean, it goes to operations.

19   You know, a real estate company that's buying designation

20   rights isn't necessarily going to be operating --

21             MR. CHESLEY:  Right.

22             THE COURT:  -- the stores, for example.

23             MR. CHESLEY:  Well, this is -- as the evidence is

24   before the Court -- it's the nature of this business.  It is

25   a hybrid.  It is a retailer.  It is a real estate company.

Page 102

1    And again, we'd continue to operate.

2              THE COURT:  Well, it's the nature of Transform's

3    business.

4              MR. CHESLEY:  Yes.

5              THE COURT:  Not necessarily Sears'.

6              MR. CHESLEY:  Correct.

7              THE COURT:  Although Sears owned a big lease

8    portfolio, and for the last several years has been selling

9    leases.

10             MR. CHESLEY:  Exactly.  That's part of the value

11   that we purchased.

12             THE COURT:  Are -- is the -- is MOAC aware of any

13   recorded decisions in the designation rights context?

14             MR. FLYNN:  No, Your Honor, not to date.

15             THE COURT:  Okay.  All right. I was -- I couldn't

16   find any either.  Okay.

17             MR. CHESLEY:  Thank you, Your Honor.

18             THE COURT:  Do you want to say anything in

19   response?

20             MR. FLYNN:  No.  Yes, Your Honor.  I would state

21   that he was citing 365(b).  The mere collection of rent is

22   not the only thing that's required as a court thing.  We

23   have to go further than that.

24             I would agree that there's been no financial

25   information of any reliable sort that has presented

Page 103

1    whatsoever in this case by its own words, number one, and

2    requires to be similar to that of Sears in 1991.  There has

3    been no evidence by any expert financial person.  In fact,

4    the only evidence submitted by an expert financial was ours,

5    who said it's not anywhere near.

6           There has been no evidence of performance.  They

7    don't intend to perform.  They are going to leave it dark.

8    We don't know how long they are, and we are -- and obviously

9    those provisions -- I mean, I -- respecting the Ames court,

10   there is obvious that those kinds of provisions are not

11   required to be in the contract in order to protect the

12   landlord.  So that's part of it, and it seems to make some

13   people jar their nerves when they say, well, why are you

14   better off in bankruptcy than you might be outside of

15   bankruptcy?  And the answer is because Congress said that.

16   And they didn't say it ambiguously.  In fact, amended it to

17   reemphasize it at least once or twice in the last 20 years.

18          And we have no idea today what's going in that

19   space.  We have no idea of the performance ability of the

20   tenant.  We have no idea -- and there -- and I cited cases

21   to say more -- to talk about you got -- because typically

22   what happens is you have a tenant, and they don't have what

23   -- and this is a little bit of a hybrid situation, just

24   exactly what you said.

25          And we have rights under the code, which we would

Page 104

1    like to enforce today, and that is require them to show what

2    it is, the proper financial information, not -- and what

3    they said, that's what they gave us, and what they gave us

4    had disclaimers all over it saying don't rely on this.  It

5    just -- I don't know what we're supposed to do, not believe

6    it?  We're supposed to say, well, we know what they really

7    mean.  They didn't mean anything they said on that financial

8    statement.  They meant that it was really worth a lot of

9    money.  We have no idea what that really meant, and they

10   said don't rely on it.  And it certainly can't be used as

11   assurance of anything.  It said it right on their document,

12   so we're supposed to know that they don't mean that.

13           So they didn't present anything about adequate

14   assurance of any kind, and especially about whether or not

15   it's similar to or -- to Sears' financial position in 1991,

16   nothing.  And it's really important.

17           We are not -- we don't want the equity in that

18   lease.  What we want is a successful mall, and they will not

19   and cannot -- and they say if they don't make -- they don't

20   get the money out of this thing, give it to somebody who

21   would be appropriate to a mall because they can't get the

22   rent out of that.  They'd have to give -- the current market

23   for any kind of major tenant is you pay them to come in.

24   They're not going to do that, so they're going to try to

25   chop it up.  And every time -- they have to prove today, I

Page 105

1    think -- it will be our position -- what that is, who they

2    are, whether they fit with the tenant mix, and they

3    presented no evidence of that.  Zero.

4           And they -- and I get the argument that they say

5    they can.  We would disagree with that vociferously.

6           THE COURT:  What's your responses to the fact that

7    the parties agreed in Section 6.3 to give the landlord the

8    protection of a fair market right of first offer?

9           MR. FLYNN:  I think that that is wonderful they're

10   agreeing to do that.  We didn't know for sure that they

11   were, and we understand that now they are.  Our position is

12   that we have rights in this courtroom today in addition to

13   that, and we would like them to be recognized.

14          THE COURT:  But as far as the economic impact on

15   the mall is concerned, either -- or the -- you know; however

16   you express that, either in the property itself or the

17   effect of tenants on the whole mall, the landlord does have

18   the course under the lease.

19          MR. FLYNN:  Yes.  However, we read it as saying in

20   bankruptcy that they have a limited period of time.  They

21   don't have 70 years to try to rip that space out.  They

22   can't leave it dark for an unusually -- as I believe

23   (indiscernible) said, even though in the lease it allowed

24   them to go dark.  And we would like some protections from

25   that because if it sits there empty and they can't rent it,

Page 106

1    and the only people that will come in there will not pay

2    them enough rent, even though they'd be wonderful tenants

3    there, we have a -- they're calling us.  We want all the

4    money.  We're willing to pay money to get somebody in there.

5            I think -- but they might not have a tenant, or

6    they might hold out for 70 years.  What -- we're here in

7    bankruptcy.  We have more rights than that, and that

8    Congress gave us those, and we're worried about those

9    issues.  So at a minimum, we'd need some period of time that

10   want this to not go dark.  At a minimum, we'd like to

11   reserve our right to buy them out if it's -- yes, but we

12   have other rights here today, and we don't think they

13   presented any evidence on those other issues.

14           And it's very clear, obviously the courts have

15   given us rights beyond what are contained in our contract.

16   There's no contract in the world that says you can't assign

17   this lease unless you have same or similar to the -- I

18   think; maybe they do -- to Sears.  They don't -- they didn't

19   prove that.

20           Anyway, we would like our rights recognized here

21   in this court today, and yes, we feel the -- once they

22   assume the lease, they are bound by all its terms, but they

23   claim they could rent it.

24           There are a number of provisions in the lease that

25   maybe perhaps we'll have to litigate in the future about

Page 107

1   what they can and can't do because we disagree about those.

2   But I think -- I appreciate the court considering that our

3   rights today is important to us.  And --

4              THE COURT:  Sorry to interrupt.  In Mr.

5   Ghermezian's testimony, he did not know when the form of

6   Bloomingdale's space was fully sublet, but you did testify

7   that the store was closed in 2012.  Is there anything in the

8   record to show when the first subleasing or tenancy was?

9              MR. FLYNN:  No, Your Honor.

10              THE COURT:  Oh.

11              MR. FLYNN:  And just as an aside.  I don't think

12   it's controversial.  It isn't -- still isn't sold but

13   rented.

14              THE COURT:  Well, I'm more focusing on the --

15              MR. FLYNN:  Yeah.

16              THE COURT:  -- buyout provision.

17              MR. FLYNN:  Right.

18              THE COURT:  I mean, I -- let me pose this question

19   to the Debtor, all right, to Transform.  Is Transform

20   prepared to put some outside date on its first assignment of

21   the property or subletting of the property?  I mean, the

22   prospect of just standing there and torturing MOAC for 73

23   years is, you know, obviously not a welcome one.

24              MR. CHESLEY:  Well, it makes no economic sense for

25   us either at $1 million a year.  If I could talk really

1    briefly with Mr. (indiscernible), I can probably answer this

2    relatively quickly --

3              THE COURT:  Okay.

4              MR. CHESLEY:  -- Your Honor.  If I can.

5              Your Honor, I think it's consistent with the

6    declaration as well.  We could certainly live with the two-

7    year outside date provided that we don't get interference

8    from the landlord.  If we've got the ability to go out and

9    bring people in -- I'm not asking them to bend over

10   backwards but, again, not interfere with our ability to

11   sublet.

12             THE COURT:  Two years to sublet some -- or assign

13   some portion of this thing.

14             MR. CHESLEY:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. FLYNN:  Your Honor, may I address that?

17             THE COURT:  Sure.

18             MR. FLYNN:  That may be very little solace.

19   There's three huge floors there.  They could -- are they

20   going to sublet --

21             THE COURT:  No, I understand that, but I'm

22   focusing -- you don't have to -- I'm not asking you to agree

23   with me.  I'm focusing on 6.3.  If they sublet any, you

24   know, any other than, you know, on, you know, a tobacco

25   stand or something -- if they sublet anything, 6.3 kicks in,

Page 109

1    and the landlord --

2                 MR. FLYNN:  Yeah.

3                 THE COURT:  -- isn't stuck then.

4                 MR. FLYNN:  Right.

5                 THE COURT:  Then they can do something.

6                 MR. FLYNN:  And we do appreciate that.

7                 MR. CHESLEY:  And similar, Your Honor -- I'm

8    sorry.

9                 MR. FLYNN:  Excuse me.  Giving them two years, is

10   it the whole thing?  Is it by floor?

11                THE COURT:  No, no, no.  My question was any -- no

12   -- anything other than immaterial portion.

13                MR. CHESLEY:  The only point I was going to add to

14   that, Your Honor, is Section 6.3 also has a second clause

15   that deals with if we're not able to, and we can simply

16   submit that to evaluation.

17                THE COURT:  Right.  Wait.  I'm sorry.  Say that --

18                MR. CHESLEY:  Section 6.3 has two clauses, Your

19   Honor.

20                THE COURT:  Right.

21                MR. CHESLEY:  The first clause -- I'm sorry.  I

22   don't have it front of me, but the first clause refers to if

23   we find -- basically are looking to transfer it to a third

24   party.

25                THE COURT:  Right.

1            MR. CHESLEY:  There's that -- there's that

2    provision.  And if we can't --

3            THE COURT:  Then you have the fair market value.

4            MR. CHESLEY:  Exactly, through two appraisers.

5            THE COURT:  Maybe I have it -- let -- if you'll

6    just give me a second to read this more carefully.

7            Oh, well, you know what?  I'm sorry.  This

8    provision -- I was really just focusing on the first offer

9    point, but there is a second point.  So if we can just look

10   through this together.

11           In the event that at any time and from time to

12   time after the expiration of the Sears operating period and

13   until the term expires, tenant decides to cease and ceases

14   to operate a store from the tenant building and further

15   determines to sell, exchange, or otherwise transfer its

16   interest in lease premises, tenant shall by giving landlord

17   notice first offer to landlord the right to purchase the

18   same at the price offered to tenant pursuant to a

19   (indiscernible) offer, or if no such offer has been made to

20   tenant at a price equal to the fair market value --

21           So it seems to me that subject to, you know, some

22   modest time that courts give assignees to, in essence, get

23   their act together after an assignment where the

24   assignor/Debtor had ceased to operate, the market value

25   kicks in right away under this provision.  You don't have to

Page 111

1    get a first offer.  It just kicks in right away.

2            MR. CHESLEY:  Yeah.  I believe Your Honor is --

3    Your Honor is reading it correctly.  There are two

4    requirements at the front end:  ceasing operation and

5    further determines to sell, exchange, or otherwise transfer.

6            THE COURT:  But that's happened, right

7            MR. CHESLEY:  We are --

8            THE COURT:  I mean, that's the whole -- that's the

9    whole purpose --

10           MR. CHESLEY:  We are very much at that.

11           THE COURT:  -- of the two declarations.

12           MR. CHESLEY:  And so, again, to the point of --

13           THE COURT:  So you don't have to wait at all, in

14    other words.  You know?  I mean --

15           MR. CHESLEY:  We would certainly like the ability

16    to see -- you know, again, to finish up what we could.

17           THE COURT:  I understand, but this provision seems

18    to suggest the other one.  I mean, unless you're saying that

19    this is an anti-assignment provision, and I don't think you

20    were saying that.

21           MR. CHESLEY:  No.

22           THE COURT:  Because I think this fair market kicks

23    in right away.

24           MR. CHESLEY:  Mr. Martin pointed out, again,

25    ceasing to operate, if we are a real estate company, is

Page 112

1      different than operating a store.

2             THE COURT:  No, but this is a store.  Ceases --

3      and cease to operate a store.

4             MR. CHESLEY:  Right, a store in the tenant

5      building --

6             THE COURT:  Yeah.

7             MR. CHESLEY:  -- and further determines the sale.

8             THE COURT:  Right.  So I think all we're talking

9      about here is who gets the fair market value.  All the rest

10     of it -- I mean, it's in the landlord's control.  I

11     understand your arguments about the statute.  You don't have

12     to -- but ultimately, in terms of value --

13            MR. CHESLEY:  We agree this is about the value,

14     Your Honor.

15            THE COURT:  Right.  I mean, and the parties agreed

16     to a mechanism to deal with it in which MOAC can say, well,

17     there's no value here because we have to pay a tenant, and

18     Transform would say there's enormous value here.

19            MR. CHESLEY:  We agree, Your Honor.

20            THE COURT:  Okay.  All right. All right.  Anything

21     else?

22            MR. FLYNN:  Nothing, Your Honor.

23            THE COURT:  Okay.  I have before me a motion by

24     the -- technically by the Debtors in this case to assume and

25     assign a lease with now Mall of America Corporation, or

1    MOAC, of a substantial portion of the mall operated by the

2    Mall of America in Minnesota.  The assignee is Transform

3    Holdco, and the assignment is part of the consideration --

4    that is seeking the assumption of assignment is part of the

5    consideration supporting Transform Holdco's purchase price

6    under the asset purchase agreement between the Debtors and

7    Transform.

8             The landlord, MOAC, objected to the assumption of

9    assignment, asserting that it does not comply with the

10   applicable requirements of Section 363(b) and Section

11   363(f), which pertains to assignments of the bankruptcy

12   code.

13            The parties have stipulated to a number of key

14   facts here, which are agreed and part of the evidentiary

15   submissions by the parties.

16            In addition, I have an agreed set of exhibits as

17   well, which include the lease and the amended and restated

18   reciprocal easement and operating agreement portions of

19   which are incorporated into the lease, which the parties

20   refer to as the REA.

21            I also have testimony from two witnesses for

22   Transform and three from MOAC.  Notwithstanding that

23   substantial evidentiary record, the merits of the issues

24   before me come down largely to disputed interpretations of

25   the applicable requirements under Sections 365(b)(3) as

Page 114

1    incorporated and 365(f).  365(b)(3) was enacted by Congress

2    to provide additional protection for landlords and, under

3    appropriate circumstances, other tenants in what Congress

4    defined as shopping centers.

5            There is no dispute between the parties that the

6    Mall of America is in fact a shopping center as defined in

7    -- or for purposes of, rather -- Section 365(b)(3) and

8    therefore that Section 365(b)(3) would apply.

9            That provision is introduced by the following.

10   For the purposes of Paragraph 1 of this section and

11   Paragraph 2B of subsection F as an aside, each of which

12   require adequate assurance of future performance of a lease

13   that is being assumed.  Adequate assurance of future

14   performance of a lease of real property in a shopping center

15   includes adequate assurance, and then four different

16   included types of adequate assurance are listed.

17           That provision doesn't exclude or exempt Debtors

18   and their assignees from providing adequate assurance

19   generally under 365(b)(1) and (f)(2)(b), but it adds the

20   four enumerated additions.

21           I should preface the remainder of this ruling by

22   noting, as stated aptly by former bankruptcy Judge Gerber in

23   In re Ames Department Stores Inc., 348 B.R. 91, 98 (Bankr.

24   S.D.N.Y. 2006), quote, in a legislative judgment built into

25   the code, Congress has determined that subject only to

Page 115

1    certain statutory safeguards, the value of a Debtor's leases

2    should go to the Debtor's creditors and that leases can be

3    sold to achieve that end, with or without landlord consent.

4    That theme runs throughout the caselaw, interpreting

5    Sections 365, including, as noted by the district court and

6    (indiscernible) LLC the A&P, In re A&P 472 B.R. 666, 679

7    (Bankr. S.D.N.Y. 2012).

8              It's also important to note that the four

9    protections specifically provided for in connection with

10   adequate assurance of future performance of a shopping

11   center lease is with respect to just that:  adequate

12   assurance of future performance of a lease of real property,

13   i.e. the focus is on performance of a lease in the future.

14             Before turning to those sections, I should note

15   the following.  Based on the record before me, it is clear

16   that Transform, the assignee, separate and apart from those

17   four sections has, in fact, provided adequate assurance of

18   future performance of the lease.

19             The caselaw is clear when dealing with adequate

20   assurance generally that the Court should employ a pragmatic

21   analysis as to whether sufficient assurance has been

22   provided that the lease will be performed in the non-

23   shopping-center context that focuses generally on the

24   ability to pay rent on a going-forward basis, both the

25   specific rent and other financial performance such as

Page 116

1    payment of taxes, common area maintenance charges, and the

2    like, which are either denominated as rent or a separate

3    financial obligation under the lease.

4        It is not an absolute guarantee but rather focuses

5    on whether performance is likely, i.e. more probable than

6    not.  See generally in re M. Fine Lumbar Co. 383 B.R. 565,

7    573 (Bankr. E.D.N.Y. 2008) and the cases cited therein.

8        And yet outside of the (b)(3) context, it is

9    routinely held that adequate assurance can be shown in large

10   measure simply by the fact that the lease itself is a

11   favorable lease, i.e. favorable to the tenant, and has

12   significant value.  The theory being that even if the tenant

13   defaults, the landlord will not be damaged because it will

14   be able to reap the value of the then-terminated lease, at

15   Page 573.

16       In addition, courts very typically look to some

17   form or other of security deposit, either in the form of a

18   letter of credit, escrow agreement, or deposit with the

19   landlord.  If necessary, they go further to examine the

20   assignees financial condition, although they are perfectly

21   willing to accept a newly formed entity as an assignee,

22   particularly where there is a sufficient security deposit or

23   escrow, and the newly formed assignee is run by a principle

24   that has substantial experience in whatever business the

25   assignee intends to conduct and has a financial stake in

Page 117

1    that business succeeding.

2           Here, it appears clear to me that this lease is a

3    very favorable lease.  The stated rent under the lease is

4    $10 a year.  Parties agree that the aggregate monetary

5    obligation of the tenant, which includes an obligation to

6    pay its share of taxes and other common charges and fees, is

7    somewhere between 1,000,001 and 1,000,002 annually.

8           The assignee has committed to put into escrow, and

9    it would obviously have to be an escrow that has no strings

10   attached to it other than the occurrence of nonpayment that

11   sum of money.

12          In addition, it's clear to me from the record and,

13   in addition, documents with which I can take -- of which is

14   could take judicial notice of the docket of this case that

15   the assignees' senior management has extensive experience in

16   marketing and selling Sears' real property, including

17   favorable leases.

18          In addition, although I don't believe under the

19   circumstances this would be necessary for finding adequate

20   assurance for future performance under Section 365(b)(1) and

21   (f)(2)(b), it appears to me that Transform has successfully

22   completed substantial financings with respect to both its

23   operating portfolio and its real estate portfolio.

24          While I do not believe I can accept as whole --

25   however wholly the statement in the draft consolidated

Page 118

1    financial statement offered by Transform as part of its

2    showing of adequate assurance of future performance that it

3    has in excess of 250 million of equity.  I do believe that

4    it has substantial equity and that it's highly likely that

5    that equity exceeds $50 million.  I cannot believe that

6    third-party lenders would provide the level of financing

7    that they have to transform without at least that level of

8    solvency.

9          The legal support for all of the foregoing

10   discussion of the applicable standard, in addition to the M.

11   Fine Lumber case that I just cited can be found in numerous

12   cases which focus on the foregoing types of adequate

13   assurance, and the fundamental focus on the assignee's

14   ability to pay rent, as stated by the District Court in In

15   Re Sanshoe Worldwide Corp. 139 B.R. 585, 592  (S.D.N.Y.

16   1992). See also In Re Citrus Tower Boulevard Imaging Center,

17   LLC., 2012 Bankr. LEXIS 2208 at Pages 15 through 20, (Bankr.

18   N.D. Ga. Apr. 2, 2012), In Re Bygaph, Inc., 56 B.R. 596

19   (Bankr. S.D.N.Y), In Re Westview 74th Street Drug Corp., 59

20   B.R. 747, 755 (Bankr. S.D.N.Y. 1986), and In Re Casual Male

21   Corp, 120 B.R. 256, 264 (Bankr. D. Mass. 1990).

22          The party dispute therefore hinges on the meaning

23   and purpose of Section 365(b)(3) and how and/or whether it

24   adds additional requirements beyond those that I've already

25   found are met for adequate assurance of future performance.

Page 119

1    Both sides recognize that the legislative history of this

2    section is fairly substantial.  It recognized the harm to

3    landlords, and through them other tenants, non-Debtor

4    tenants in shopping centers which are operated on an

5    integrated basis that could result from the assignment of a

6    lease of real property for one portion of the center.

7           Legislative history also makes it clear, however,

8    that the underlying purpose of the provision, consistent

9    with the notion of adequate assurance for future performance

10   of a lease generally is that both sides, including the

11   landlord, get the benefit of their bargain, which I believe

12   it goes without saying, is the bargain memorialized in their

13   lease.

14          It is also the case, which is well-recognized,

15   that Section 365(b)(3), as is the case with Section

16   365(b)(1) and (f)(2)(B), is subject to another provision of

17   Section 365, 365(e), which in essence invalidates with

18   respect to an assumption or an assumption and assignment the

19   efficacy of provisions conditioned on the insolvency or

20   financial condition of the Debtor any time before the

21   closing of the case, the commencement of the case under this

22   title, or the appointment of or taking possession by a

23   trustee in a case under this title, with exceptions stated

24   further on in the section.

25          However, although that section does find some

Page 120

1    important interpretation in case law that the parties have

2    cited, it is not really at issue in the present dispute

3    before me, which really hinges again on what the effect of

4    Section 365(b)(3) has on what I've already found is adequate

5    assurance of future performance by the assignee.

6          That dispute really falls into two categories:

7    first, the landlord points to Section 365(b)(3)(A), which

8    states, again with the lead-in, that adequate assurance of

9    future performance of a lease of real property in a shopping

10   center includes adequate assurance, A, of the source of

11   rent, and other consideration due under such lease, and in

12   the case of an assignment, that the financial condition and

13   operating performance of the proposed assignee and its

14   guarantors, if any, shall be similar to the financial

15   condition and operating performance of the Debtor and its

16   guarantors, if any, as of the time the Debtor became the

17   lessee under the lease.

18          Sears became the lessee under the lease in 1991.

19   It's undisputed that its operating performance at that time

20   and financial condition generically is superior to the

21   financial condition and operating performance of Transform.

22   Sears at that time had over 3000 stores.  Its business as a

23   whole, as evidenced by the public financial filings in the

24   record showed a far more substantially -- far and larger

25   business than Transform has.  Under the asset purchase

1    agreement, Transform acquired roughly 600 leased locations,

2    of which it proposed to operate approximately 425, which it

3    has now reduced to approximately 400.

4              Moreover, with respect to this particular leased

5    property, Transform does not propose to operate the property

6    as Sears initially would operate it.  Rather, Transform is

7    quite clear in stating that it is taking, proposing to take

8    the assignment for the sole purpose of reassigning or

9    subletting the space at a profit.  That is, to take

10   advantage of the economic value of the lease.

11             There are not a lot of cases construing this

12   provision.  In fact, I have found only three.  Each of them

13   makes it clear that it is to be construed not in a

14   mechanical way, but rather consistent with the underlying

15   charge as set forth in the preface to it, the general

16   language in Section 365(b)(3) which again refers to adequate

17   assurance of future performance of the lease itself.  The

18   District Court for the Southern District of New York

19   affirmed the determination by the Bankruptcy Court of In Re

20   Ames Department Stores, Inc. 2003 U.S. District LEXIS 3150

21   (S.D.N.Y., March 5, 2003), in which Judge Gerber concluded

22   that the assignee had satisfied this subsection.

23             As the District Court stated, quote, "The Landlord

24   further argues that Judge Gerber 'erroneously appl[ied]

25   financial aspects of [the May 19, 1999] financial

1   statement,'" that is, the statement when the lease was

2   originally entered into, "'selectively to emphasize

3   'similarity' while ignoring other aspects in which enormous

4   differences in financial condition and operating

5   performances were evident.'

6           The Landlord argues that comparison of Debtor's

7   'per-store sales and profit' to Building 19's," as the

8   assignees, "'completely disregard[s] the incomparable

9   difference in financial depth and resources which [Debtor]

10  had.'  The Landlord goes on to argue that a finding of

11  "similarity" under 365(b)(3)(A) requires that 'big box'

12  'tenants' should be replaced by other 'big box' tenants."

13          The District Court then goes on to say again, I'm

14  still quoting, "the landlord's arguments find no support in

15  the case law.  In support of its argument, defendant cites

16  language in In Re Casual Male Corp, 120 B.R. 256 (Bankr. D.

17  Mass. 1990) that the financial condition and operating

18  performance of [the assignee] must be at least as strong as

19  was the Debtors' [at the time the lease was executed].

20          But In re Casual Male does not stand for the

21  proposition that a Bankruptcy Court cannot apply a

22  proportional comparison of the financial health of the

23  assignee and the Debtor; indeed, the Court in that case

24  specifically compared the ratio of the assignee's assets to

25  current liabilities at the time of the assignment to the

Page 123

1    Debtor's ratio of assets to liabilities on the date the

2    Debtor acquired the lease.

3            The court in In re Casual Male," I'm still

4    quoting, "went on to hold that since the assignee was

5    recently incorporated, its operating performance was

6    dependent on the business experience of its sole owner and

7    operator. Accordingly, the Court found the strength of the

8    owner-operator's experience compared favorably to the actual

9    strength of the Debtor's operations.  Thus, the Casual Male

10   court's determination of the similarity of profitability and

11   operating performance in no way relied upon a construction

12   of the statute to require the same gross profits and

13   performance between assignee and Debtor in that case."

14           I'll note also that in the Casual Male Corp case

15   cited by the Ames Court, the Bankruptcy Court's focus was

16   based on "the statute's prime purpose to provide adequate

17   assurance for the future payment of rent." And the Court

18   found, as I've already found, that that issue was not in

19   reasonable doubt.

20           A similar approach was taken by the District Court

21   in Ramco-Gershenson Properties L.P. v. Service Merchandise

22   Company, 293 B.R. 169 (M.D. Tenn. 2003).  There, the Court

23   concluded, based on a number of factors, including

24   guarantees and fairly limited financial disclosure, that "a

25   reasonable landlord would have been adequately assured of

Page 124

1    future operating performance."

2          This issue, i.e. the meaning of Section

3    365(b)(3)(A) bleeds over into the second issue that the

4    parties disagree on, which is whether the Court should read

5    the four requirements in Section 365(b)(3) separate and

6    independent from the party's lease from which adequate

7    assurance of future performance is at issue.  Transform

8    contends that these provisions must be read, and cabined by

9    the parties' actual agreement, says the purpose of the

10   statute is to give not only the Debtor the rights of 365,

11   but the landlord the benefits of its bargain.

12         MOAC contends to the contrary, that these are

13   separate requirement, independent from what the parties

14   agreed to.  This issue is relevant as to what Congress

15   intended in Section 365(b)(3)(A) in part because under the

16   lease at issue, it is clear that after the first 15 years of

17   the lease, and by the way, the lease with extensions runs

18   for a total of 100 years, but after the first 15 years, the

19   tenant, its successors and assigns, is subject to certain

20   very weak limitations, free itself to cease operating, and

21   to assign its rights.  The parties imposed a specific

22   prohibition in Section 25 of the lease, that the tenant have

23   $50 million of shareholder equity, far less, I believe than

24   Sears had when it entered into the lease, at least according

25   to its public financial statements or financial filings in

Page 125

1      1991.

2            If -- and when I say Section 25, I'm referring to

3      the Rea, which is incorporated -- that particular section is

4      incorporated into the lease.  According to the proposed

5      assignee, Transform, I should look at the reference to

6      financial and operational performance, in light of what the

7      parties actually agreed to and determined was relevant to

8      the right to assign.  The landlord states that the contract

9      between the parties is essentially irrelevant.

10           I conclude, for purposes of this section, as well

11     as the other three subsections of 365(b)(3) that each

12     requires reference back to the party's actual agreement, and

13     that Congress did not create independent requirements that

14     would not go to actual assurance of future performance, but

15     rather wanted to focus the Court on, obviously still subject

16     to Section 365(e), taking into account the landlord's rights

17     under the lease, as implicated by these four subsections.

18           The case law in support of that view is extensive

19     and persuasive.  Perhaps the best analysis is again in the

20     Ames Department Stores bankruptcy case, this time appearing

21     at In Re Ames Department Stores 127 B.R. 744 (Bankr.

22     S.D.N.Y. 1991).  In that opinion, the Court was not

23     interpreting Section 365(b)(3)(A), but rather (b)(3)(D),

24     which states that adequate assurance of future performance

25     of a lease of real property, a shopping center, includes

Page 126

1    adequate assurance, that assumption or assignment of such

2    lease will not destroy any tenant mix or balance in such

3    shopping center.

4          In the Ames opinion, former Bankruptcy Judge

5    Bushman notes again that the entire section is prefaced by a

6    reference to adequate assurance of future performance of

7    such contract of the lease itself obviously with the focus

8    on the lease.  He then noted the purpose of the statute,

9    which was to protect the bargain between the parties, and

10   finally noted the general bankruptcy law principal that

11   unless specifically provided for in the Bankruptcy Code,

12   bankruptcy does not rewrite the parties' non-bankruptcy

13   bargained-for rights.

14         He concludes, "where there is no indication of any

15   intention by Congress to do anything other than hold a

16   shopping center Debtor-Tenant to its bargain with a landlord

17   and to leave intact the property interests of debtor and

18   landlord as set forth in that bargain, the Courts should not

19   imply an additional non-bargained-for term. To construe the

20   statute in the manner urged by," in that case the landlord,

21   "would be 'a flight of redistributive fancy.'"  That appears

22   at Page 753.

23         That case law has been followed rather uniformly

24   since then, including by the District Court in In Re A&P,

25   472 B.R. 678 through 679, again in connection with the

1    tenant mix issue, and In Re Toys R Us Property Company, 2019

2    Bankr. LEXIS 440 at Page 13 (Bankr. E.D. Va., Feb. 11,

3    2019).   The landlord has contended that there are other

4    cases going in the opposite direction and imposing a

5    separate requirement that would not appear in the parties'

6    lease under Section 365(b)(3).

7            Namely, it asserts In Re Rickel Home Centers, 240

8    B.R. 826, appeal dismissed, 209 F. 3d. 291, 3rd Cir. 2000,

9    cert denied, 531 U.S. 873 2000.  And In Re Casual Male

10   Corp., 120 B.R. 256.  A close reading of those cases does

11   not really support that contention.  In Rickel Home Centers,

12   the primary purpose of the court throughout, in response to

13   various landlords' objections in a shopping center context,

14   to an assignment whereby the assignee would only occupy a

15   certain part of the store, the store would go dark for a

16   period of time, and the like, was as to the application of

17   365(e) to those contractual restrictions.  And the Court

18   concluded that, with limited exceptions, 365(e) should in

19   fact, apply to invalidate those contractual restrictions, as

20   a restraint based on the Debtor's financial condition of the

21   right to assign.

22           One of the three landlords raised an objection,

23   again under 365(b)(3)(d), based on not its contractual

24   provision, but the general notion that tenant mix must be

25   maintained, even if there is no such contract.  The Court

1   concluded that under 365(e), the proposed assignee should be

2   given a reasonable time to sublet the premises, which the

3   subtenant agreed, in addition to stating that it would do so

4   as quickly as possible, would be the specific time period

5   that it stated it could do it in, which was, the assignee

6   proffered six months.  The Court accepted that commitment

7   and overruled the objection.

8           But it first noted, although it did not have to

9   rule on this basis, "The Court notes that the Bethlehem

10  lease does not contain any provision prohibiting going dark

11  to this extent.  Net cannot argue that the assignment from

12  the Debtor to Staples will interfere with any provision of

13  the Bethlehem lease."  It then went on to conclude that in

14  any event, that I'm by which the assignee would be taking to

15  sublet the premises was not unreasonable.

16          In Casual Male, the focus of the Court, as I

17  stated, was on Section 365(b)(3)(A), but given the deposit

18  of six months' rent in advance, and the support by the

19  newly-formed tenants' principal, as well as working capital

20  loan from its principal, that was sufficient similar

21  financial condition and operating performance.  One cannot

22  take away from that decision, which of course would not be

23  controlling precedent on me anyway, the belief that Congress

24  created a new standard in Section 365(b)(3), that would

25  override the parties' own agreement as a limitation on

Page 129

1    assumption and assignment.

2            I will note one other case, In Re TSW Stores of

3    Nanuet, Inc., 34 B.R. 299 (Bankr. S.D.N.Y. 1983), in which

4    the Court again interpreted a restrictive use covenant and

5    then went on to hold that it appeared in this situation

6    there would be economic detriment to the landlord based on

7    the respective assignee's stated intention to vary that

8    covenant or breach it.

9            I conclude therefore that based on my general --

10   my findings with respect generally to adequate assurance of

11   future performance, the differences in financial condition

12   and operating performance are not such as to preclude the

13   assignment of this lease, which has its own limitations on

14   assignment in it, which I have found the Debtor and the

15   assignee have satisfied.

16           For the record, I also conclude that if that legal

17   determination is incorrect, and that the case law is cited

18   and follow on the grounds of stare decisis is incorrect,

19   then the financial condition and operating performance of

20   Transform is not similar to Sears in 1991.  Transform has

21   not carried its burden to show, for example, that the ratio

22   as far as its financial health, is the same, notwithstanding

23   that it has shown that it's sufficiently financially

24   healthy, when coupled with the favorable nature of the lease

25   and deposit of an amount equal to the annual projected

1    monetary payment under the lease, that it is sufficiently

2    healthy.

3            There's no issue as to percentage rent under the

4    lease, and I believe I've already addressed the tenant mix

5    point.  But let me reiterate that there's no specific

6    provision in the lease, other than a broad provision in

7    Section 22(c) as to Sears and its assignee's right to use

8    and assign the property, limiting tenant mix.  Such broad

9    provisions are well-recognized as not precluding an

10   assignment generally in the shopping center context.  See

11   Ramco-Gershenson Properties L.P. v. Service Merchandise

12   Company, 293 B.R. 169, for example.  The lease also has very

13   broad rights pertaining to use restrictions after the major

14   operating period, or the tenant operating period, which the

15   parties agree has already expired.  And I do not believe

16   that given that Transform will be bound by those broad use

17   restrictions, and acknowledges it will be, that it's

18   violating them as an assignee.

19           My determination with respect to the effect of

20   365(b)(3) is guided with respect to this lease by one other

21   consideration.  Based on the testimony before me, it appears

22   to me that the landlord's main, if not primary, if not only,

23   rather, concern is not necessarily to affirmatively usurp

24   the value of the lease for its own benefit, as is the case

25   in most of the cases cited, where the lease is favorable,

1    and the landlord has objected.

2            Rather, it appears to me that the landlord desires

3    to control the property for the aggregate benefit of itself,

4    which may mean that it would cut another very favorable

5    lease to an anchor tenant.  That does, in the abstract, fit

6    into or conform with Congress's overall concern when

7    enacting Section 365(b)(3), that the Court take into account

8    the overall effect of the assignment on the shopping center

9    and the landlord's interest in it.

10            However, consistent with my view and the Court's

11    view, generally, that 365(b)(3) is to be interpreted in

12    light of and limited by the parties' actual agreement, I

13    note that Section 6.3 of the lease provides that "in the

14    event that at any time, and from time to time after the

15    expiration of the Sears operating period," which again has

16    expired, "and until the term expires, the tenant decides to

17    cease, and ceases to operate a store in the tenant

18    building," which we know has occurred, "and further

19    determines to sell, exchange, or otherwise transfer its

20    interest in the leased premises," which we also know has

21    occurred, "tenants shall, by giving landlord notice, first

22    offer to landlord the right to purchase the same, one, at

23    the price offered to tenant pursuant to a bona fide offer in

24    a good faith, arms' length transaction, when a prospective

25    purhcaser-assingee, unrelated to tenant, and on the same

Page 132

1    terms and conditions offered to tenant, or two, if no such

2    offer has been made to tenant at a price equal to the fair

3    market value of tenant's leasehold estate, including the

4    value of its improvements.

5              And the parties then set forth a half-page

6    mechanism of how that fair market value would be determined.

7    It has often been held that rights of first offer are among

8    the types of provisions and leases that trigger Section

9    365(e)'s prohibition on, or exemption from performance by a

10   Debtor of provisions based on the Debtor's financial

11   condition, that would preclude or prevent assignment, or as

12   found in 365(f).  Here, Transform has chosen not to make

13   such an argument.  Rather, it is stated on the record, it

14   accepts that if it becomes the assignee of this lease, it

15   will be bound by al the terms of the lease, including this

16   provision.  Well, let me back up.  It is confirmed on the

17   record it will be bound by this provision.

18             It appears clear to me then, first that the

19   parties actually, in keeping with their sophistication,

20   contemplated an event like this, and spelled out their

21   bargain as to what would happen in Section 6.3.  And

22   secondly, that the landlord in this section bargained for a

23   measure of control in the event, which is what has occurred

24   here, that the tenant ceases to operate a store in the

25   property, and is looking to sell the leased premises.

Page 133

1           So it actually does, in fact, have the control

2       that it has stated, is its primary concern.  And the issue

3       then is simply, I believe, one where the parties are

4       fighting over who has the right to the fair market value of

5       the estate:  the Debtor, by selling it to Transform, that is

6       the leasehold estate:  the Debtor, by selling it to

7       Transform, or the landlord, by convincing the Court that its

8       interpretation of 365(b)(3) preclude such an assignment.

9       So, if Congress did, in fact, intend those provisions to, in

10      the balance, between giving value to a Debtor and its

11      creditors, and protecting the landlord, provide additional

12      requirements, the parties' contract in fact does protect the

13      landlord, while preserving the fair market value for the

14      Debtor through an assignment to Transform.

15              I also will note finally that transform has

16      represented on the record today that even if the landlord

17      does not take up the -- or not exercise its right, under

18      Section 6.3, it will not hold the landlord in suspense over

19      tis commencement of reletting the premises for the full term

20      of the lease, which has 73 more years to run, but rather

21      will cap the outside date by which it will at least commence

22      reletting the premises for two years on the condition that

23      the landlord will not interfere with its marketing process.

24              The testimony is certainly not ample on this

25      topic.  I have the declarations of Transform's witnesses, as

Page 134

1    well as the cross-examination of Mr. Ghermezian, but it

2    appears to me that two years is not an unreasonable amount

3    of time for a property like this to enter into at least one

4    material sublease or assignment, which again, subject to the

5    broad, or, well, their phrase, weak restrictions in the

6    lease, Sears and its assignees have an absolute right to do.

7    That testimony reflects a judgment first by Transform's

8    witness, that such a period is a reasonable one, as well as

9    the testimony on cross-examination that it took years, in

10   the plural, to sublet the premises after the closing of the

11   Bloomingdale's store at the mall.

12           So in light of all of that, I conclude that the

13   objection should be denied, and that the assumption and

14   assignment motion should be granted.  It is again, subject

15   to the representations made on the record today by Transform

16   with respect to the operation of 6.3 of the lease, and the

17   initial subletting of a portion of the premises within two

18   years, on the condition that the landlord not interfere.  So

19   I'll ask Transform's counsel to submit an order to stipulate

20   that ruling.

21           MR. CHELSEY:  We will, Your Honor.  We will

22   obviously pass that by counsel (indiscernible).  Thank you,

23   Your Honor.

24           THE COURT:  Okay, you don't need to formally

25   settle it, but you should circulate it to MOAC's counsel.

Page 135

1              MR. CHELSEY:  We will, Your Honor.   Thank you.

2              THE COURT:   Thank you.

3              (Whereupon these proceedings were concluded at

4        2:25 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1                       C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya
      Landanski Hyde
          Digitally signed by Sonya
          Landanski Hyde
          DN: cn=Sonya Landanski Hyde, o,
          ou, email=digital1@veritext.com,
          c=US
7         Date: 2019.08.28 15:43:13 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 28, 2019