Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 18-23538-rdd

5

6   - - - - - - - - - - - - - - - - - - - - -x

7

8   In the Matter of:

9

10   SEARS HOLDINGS CORPORATION, et al.,

11

12               Debtors.

13

14   - - - - - - - - - - - - - - - - - - - - -x

15

16               United States Bankruptcy Court

17               300 Quarropas Street, Room 248

18               White Plains, New York 10601

19

20               October 3, 2019

21               10:32 AM

22

23   B E F O R E:

24   HON. ROBERT D. DRAIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    18-23538-rdd Sears Holdings Corporation, et al.

2    Ch 11

3    10:00 AM

4

5    HEARING re Modified Second Amended Joint Chapter 11 Plan of

6    Sears Holdings Corporation and Its Affiliated Debtors (ECF

7    #5293)

8

9    Limited Objection and Reservation of Rights of Liberty

10   Mutual Insurance Company (ECF #3989)

11

12   Objection to Confirmation of Plan filed by Mark A. Frankel

13   on behalf of 233 S. Wacker, LLC (ECF #4668)

14

15   Objection of Tannor Capital Advisors LLC (ECF #4673)

16

17   Limited Objection of Winners Industry Co. (ECF #4678)

18

19   UST's Objection (ECF #4681)

20

21   Objection of Acadia Realty Limited Partnership (ECF #4684)

22

23   Objection of Mario Aliano (ECF #4690)

24

25   Objection of Alpine Creations Ltd (ECF #4700)

Page 3

1

2   Objection of Retiree Committee (ECF #4702)

3

4   Objection of Carl Ireland, Administrator of the Estate of

5   James Garbe (ECF #4707)

6

7   Objection of Weihai Lianqiao International Coop. Group Co.,

8   Ltd. (ECF #4708)

9

10   Limited Objection of PeopleReady, Inc. (ECF #4709)

11

12   Objection of A.O. Smith Corporation's Joinder to Objection

13   of Alpine Creations Ltd. (ECF #4712)

14

15   Objection of Community School District 300 (ECF #4713)

16

17   Objection of Santa Rosa Mall (ECF #4714)

18

19   Objection of Mien Co. Ltd. (ECF #4716)

20

21   Objection of Everlast World's Boxing Headquarters Corp. (ECF

22   #4717)

23

24   Limited Objection of and Reservation of Rights of ESL

25   Investments Inc. and Transform Holdco LLC (ECF #4718)

Page 4

1

2      Redacted Declaration of Chelsey Rosenbloom in Support

3      Limited Objection and Reservation Rights of ESL Investments,

4      Inc. and Transform Holdco LLC (ECF 4719)

5

6      Objection of Edgewell Personal Care PR Inc. (ECF #4720)

7

8      Objection of Whitebox Asymmetric Partners, LP (ECF #4721)

9

10     Objection of Wilmington Trust, National Association, as

11     Indenture Trustee (ECF #4724)

12

13     Objection of Vehicle Service Group, LLC (ECF #4725)

14

15     Amended Objection of Mien Co. Ltd. (ECF #4726)

16

17     Objection of Pearl Global Industries, Ltd. (ECF #4730)

18

19     Limited Objection of Cyrus Capital Partners, L.P. (ECF

20     #4731)

21

22     Limited Objection and Reservation of Rights of ESL

23     Investments Inc. and Transform Holdco LLC (ECF #4759)

24

25     Objection of Team Worldwide Corporation (ECF #4773)

Page 5

1

2    Joinder of Twentieth Century Fox Home Entertainment LLC (ECF

3    #4780)

4

5    Supplemental Objection of Wilmington Trust, N.C. (ECF #4785)

6

7    Limited Objection of and Reservation of Rights of ESL

8    Investments Inc. and Transform Holdco LLC (ECF #4786)

9

10   Joinder of Mien Co. Ltd. to Limited Objection of and

11   Reservation of Rights of ESL Investments Inc. and Transform

12   Holdco LLC (ECF #4801)

13

14   Joinder of Schumacher Electric Corporation (ECF 4861)

15

16   Supplemental Objection of Community Unit School District 300

17   to Confirmation (ECF #5005)

18

19   Joinder of Aspen Marketing Services, Inc. to Objection of

20   Alpine Creations Ltd. (ECF #5041)

21

22   Joinder of Groupby USA, Inc. (ECF #5048)

23

24   Santa Rosa Mall, LLC's Supplemental Objection (ECF #5088)

25

Page 6

1   Supplemental Response of ESL (ECF #5192)

2

3   Supplemental Objection of Mien Co. Ltd. (ECF #5266)

4

5   Joinder of EPI Printers, Inc. (ECF #5271)

6

7   Joinder of BST International Ltd to Supplemental Objection

8   Mein Co. Ltd (ECF #5273)

9

10  Joinder of EPI Partners, Inc. (ECF #5274)

11

12  Objection of Mien Co. Ltd., et al. [ECF No. 5277]

13

14  Joinder by Edgewell Personal Care Puerto Rico Inc. (ECF

15  #5283)

16

17  Joinder by Eric Jay Ltd (ECF #5285)

18

19  Joinder by A.O. Smith Corporation (ECF #5286)

20

21  Joinder by Weihai Lianqiao International Coop. Group Co.,

22  Ltd (ECF 5287)

23

24  Joinder of Peral Global Industries, Ltd (ECF 5289)

25

Page 7

1    Joinder of BH North American Corporation (ECF #5290)

2    10:59 AM

3    18-23538-rdd Sears Holdings Corporation Ch. 11

4

5    HEARING re Motion of Debtors for Modification of Retiree

6    Benefits [ECF No. 4635]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Lisa Beck, Sheila Orms, Sherri Breach,

25   Jamie Gallagher and William Garling

Page 8

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3        Attorneys for Debtors and Debtors in Possession

4        767 Fifth Avenue

5        New York, NY 10153

6

7    BY:  JACQUELINE MARCUS, ESQ.

8        RAY C. SCHROCK, ESQ.

9        SUNNY SINGH, ESQ.

10        NATASHA S. HWANGPO, ESQ.

11        JARED R. FRIEDMANN, ESQ.

12

13    WEIL, GOTSHAL & MANGES LLP

14        Attorneys for Debtors and Debtors in Possession

15        200 Crescent Court

16        Suite 300

17        Dallas, TX 75201

18

19    BY:  JAKE RUTHERFORD, ESQ.

20        PAUL R. GENENDER, ESQ.

21

22

23

24

25

Page 9

1   AKIN GUMP STRAUSS HAUER & FELD LLP

2       Attorneys for the Official Committee of Unsecured

3        Creditors

4       One Bryant Place

5       New York, NY 10036

6

7   BY:  PHILIP C. DUBLIN, ESQ.

8       SARA L. BRAUNER, ESQ.

9       ZACH LANIER, ESQ.

10

11  U.S. DEPARTMENT OF JUSTICE

12      Office of the United States Trustee

13      U.S. Federal Office Building

14      201 Varick Street

15      Suite 1006

16      New York, NY 10014

17

18  BY:  PAUL K. SCHWARTZBERG, AUST

19

20

21

22

23

24

25

Page 10

```
 1   U.S. DEPARTMENT OF JUSTICE

 2         United States Attorney's Office

 3         Southern District of New York

 4         86 Chambers Street

 5         New York, NY 10007

 6

 7   BY:  PETER ARONOFF, AUSA

 8

 9   U.S. DEPARTMENT OF LABOR

10         Office of the Solicitor

11         200 Constitution Avenue, NW

12         Room N-4611

13         Washington, DC 20210

14

15   BY:  LEONARD H. GERSON, ESQ.

16

17   PENSION BENEFIT GUARANTY CORPORATION

18         Office of the General Counsel

19         1200 K Street NW

20         Washington, DC 20005

21

22   BY:  GARTH D. WILSON, ESQ.

23

24

25
```

Page 11

1   LOCKE LORD LLP

2        Attorneys for Pension Benefit Guaranty Corporation

3        111 South Wacker Drive

4        Chicago, IL 60606

5

6   BY:  BRIAN A. RAYNOR, ESQ.

7

8   ALSTON & BIRD LLP

9        Attorneys for Twentieth Century Fox Home

10        Entertainment LLC

11        90 Park Avenue

12        New York, NY 10016

13

14   BY:  ANTHONY L. GREENE, ESQ.

15

16   ARCHER & GREINER, P.C.

17        Attorneys for Community Unit School District 300

18        630 Third Avenue

19        New York, NY 10017

20

21   BY:  ALLEN G. KADISH, ESQ.

22

23

24

25

Page 12

1   ASHFORD SCHAEL LLC

2        Attorneys for Creditor, Shinn Fu America

3        100 Quimby Street

4        Suite 1

5        Westfield, NJ 07090

6

7   BY:  COURTNEY A. SCHAEL, ESQ. (TELEPHONICALLY)

8

9   BALLARD SPAHR LLP

10       Attorneys for Creditor, Brixmor Property Group

11       919 North Market Street

12       11th Floor

13       Wilmington, DE 19801

14

15  BY:  LESLIE C. HEILMAN, ESQ. (TELEPHONICALLY)

16       CHANTELLE D. MCCLAMB, ESQ. (TELEPHONICALLY)

17

18  BUCHANAN INGERSOLL & ROONEY PC

19       640 Fifth Avenue

20       9th Floor

21       New York, NY 10019

22

23  BY:  KEITH A. LAZERE, ESQ.

24

25

Page 13

1    CLEARY GOTTLIEB STEEN & HAMILTON LLP

2         Attorneys for ESL Investments, Inc.

3         One Liberty Plaza

4         New York, NY 10006

5

6    BY:  THOMAS J. MOLONEY, ESQ.

7         SEAN O'NEAL, ESQ.

8

9    DAVIDOFF HUTCHER & CITRON LLP

10        Attorneys for Creditors, Pearl Global Industries, Ltd.,

11   Eric Jay, Ltd. and

12        605 Third Avenue

13        New York, NY 10158

14

15   BY:  DAVID H. WANDER, ESQ.

16

17   DIAMOND MCCARTHY LLP

18        Attorneys for Creditor, Team Worldwide

19        295 Madison Avenue

20        27th Floor

21        New York, NY 10017

22

23   BY:  CHARLES M. RUBIO, ESQ. (TELEPHONICALLY)

24

25

Page 14

1    FERRAIUOLI LLC

2         Attorneys for Creditor, Santa Rosa Mall LLC

3         221 Ponce de León Avenue

4         5th Floor

5         San Juan, PR 00917

6

7    BY:   SONIA E. COLON, ESQ. (TELEPHONICALLY)

8

9    FOLEY & LARDNER LLP

10        Attorneys for Ad Hoc Group of Admin Claimants

11        90 Park Avenue

12        New York, NY 10016

13

14   BY:   PAUL J. LABOV, ESQ.

15        ERIKA MORABITO, ESQ.

16

17   FOX ROTHSCHILD LLP

18        Attorneys for Aspen Marketing, Inc.

19        101 Park Avenue

20        17th Floor

21        New York NY 10178

22

23   BY:   KATHLEEN M. AIELLO, ESQ. (TELEPHONICALLY)

24

25

Page 15

```
1    GENSBURG CALANDRIELLO & KANTER, PC

2         Attorneys for Community Unit School District 300

3         200 West Adams Street

4         Suite 2425

5         Chicago, IL 60606

6

7    BY:  MATTHEW T. GENSBURG, ESQ.

8

9    HALPERIN BATTAGLIA BENZIJA, LLP

10        Attorneys for Carl Ireland, Administrator of the Estate

11         of James Garbe

12        40 Wall Street

13        37th Floor

14        New York, NY 10005

15

16   BY:  DONNA H. LIEBERMAN, ESQ.

17

18   LEVENE NEALE BENDER YOO & BRILL, LLP

19        Attorneys for Creditor, Weihai Lianqiao International

20         Coop. Group. Co.

21        10250 Constellation Blvd.

22        Suite 1700

23        Los Angeles, CA 90067

24

25   BY:  TODD M. ARNOLD, ESQ. (TELEPHONICALLY)
```

```
 1    MCKOOL SMITH, P.C.

 2         Attorneys for Winners Industry Co., Ltd.

 3         One Bryant Park

 4         47th Floor

 5         New York, NY 10036

 6

 7    BY:  H. JEFFREY SCHWARTZ, ESQ.

 8

 9    MILBANK LLP

10         Attorneys for Cyrus Capital Partners, L.P.

11         2029 Century Park East

12         33rd Floor

13         Los Angeles, CA 90067

14

15    BY:  THOMAS R. KRELLER, ESQ.

16         ERIC R. REIMER, ESQ.

17

18    ROGERS LAW OFFICES

19         Attorneys for Creditor, Serta Simmons Bedding, LLC

20         The Equitable Building

21         100 Peachtree Street

22         Suite 1950

23         Atlanta, GA 30303

24

25    BY:  ELLEN ROGERS, ESQ. (TELEPHONICALLY)
```

1

2    THE SARACHEK LAW FIRM

3         Attorneys for Mien Co. Ltd., Helen Andrews, Strong

4          Progress Garment Factory Company, Ltd., Samil

5          Solutions, Shanghai Fochier, Purcell Murry, A&A HK

6          Industrial, Mingle Fashion Limited Mansheen

7          Industries, Ltd., AMW Vietnam Co. Ltd., Holdsun Group

8          Ltd., Auxo International Ltd. and Beauty Gem, Inc.

9         101 Park Avenue

10        27th Floor

11        New York, NY. 10178

12

13   BY:  JOSEPH E. SARACHEK, Esq.

14

15   SEYFARTH SHAW LLP

16        Attorneys for Wilmington Trust, National Association,

17         as Indenture Trustee

18        620 Eighth Avenue

19        New York, NY 10018

20

21   BY:  EDWARD M. FOX, ESQ.

22

23

24

25

1   TARTER KRINSKY & DROGIN

2        Attorneys for Creditor, Alpine Creations Ltd.

3        1350 Broadway

4        New York, NY 10018

5

6   BY:  ROCCO A. CAVALIERE, ESQ. (TELEPHONICALLY)

7

8   TOGUT, SEGAL & SEGAL LLP

9        Attorneys for Tannor Capital Advisors

10        One Penn Plaza

11        New York, NY 10119

12

13   BY:  MINTA NESTER, ESQ.

14

15   VEDDER PRICE LLP

16        Attorneys for Village Hoffman Estates and NorthStar

17         Recovery Group

18        1633 Broadway

19        31st Floor

20        New York, NY 10019

21

22   BY:  MICHAEL L. SCHEIN, ESQ.

23

24

25

Page 19

1    WALSH PIZZI O'REILLY FALANGA LLP

2         Attorneys for Creditor, Groupby USA, Inc.

3         Three Gateway Center

4         100 Mulberry Street

5         15th Floor

6         Newark, NJ 07102

7

8    BY:  CHRISTOPHER M. HEMRICK, ESQ. (TELEPHONICALLY)

9

10   WOLLMUTH MAHER & DEUTSCH LLP

11        Attorneys for the Retirees Committee

12        One Gateway Center

13        Newark, NJ 07102

14

15   BY:  JAMES N. LAWLOR, ESQ.

16

17   ZIMMERMAN LAW OFFICES, P.C.

18        Attorneys for Movant, Mario Aliano

19        77 West Washington St

20        Suite 1220

21        Chicago, IL 60602

22

23   BY:  SHARON A. HARRIS, ESQ. (TELEPHONICALLY)

24

25

```
 1                P R O C E E D I N G S

 2              THE COURT:  Okay.  Good morning.  In re Sears

 3     Holdings Corporation.  I'm sorry I kept you waiting.  I had

 4     some last minute filings that I wanted to go through and

 5     think about.

 6              MS. MARCUS:  Good morning, Your Honor.  Jacqueline

 7     Marcus of Weil Gotshal & Manges, LLP on behalf of Sears

 8     Holdings Corporation and its affiliated debtors.

 9              THE COURT:  Good morning.

10              MS. MARCUS:  Before we get to the main event, Your

11     Honor, the confirmation hearing, as we advised chambers last

12     night, we'd like to start with what's number 2 on the agenda

13     which is the motion of the debtors for modification of

14     retiree benefits --

15              THE COURT:  Right.

16              MS. MARCUS:  -- ECF number 4635 which is now

17     uncontested.

18              You have a packed courtroom, Your Honor, so I'll

19     be brief.

20              The debtors filed their 1114 motion and the

21     supporting declaration of William Murphy on July 29th.

22     Since that time, the debtors, with input from the creditors'

23     committee, have gone back and forth with the retiree

24     committee and continue to modify the proposal.  And within

25     the past 24 hours, I'm happy to report that the debtors, the
```

Page 21

1    retiree committee and the creditors' committee have reached

2    an agreement on a revised proposal.

3              I have, Your Honor, a revised version of the order

4    together with a blackline and the exhibit to the blackline

5    reflects the changes to the proposal.  If I may approach?

6              THE COURT:  Okay.

7              MS. MARCUS:  The salient terms of the proposal are

8    as follows, and I will be brief:

9              The effective date of the termination of the

10   retiree plan is March 15th, 2019.  On the effective date of

11   the Chapter 11 plan, the debtors will establish an

12   administrative reserve in the amount of $3 million for the

13   benefit of retirees who are members of the class covered by

14   the 2001 stipulation of settlement whose benefits were not

15   paid by Securian.

16             The estate of each member of the class that died

17   between March 15th and the date of entry of the order, we

18   call them for purposes of the proposal "The recently

19   deceased members" -- who filed a proof of claim will have an

20   allowed administrative expense claim in the amount of his or

21   her benefits under the retiree plan that can share in that

22   reserve fund.  If its filed and allowed claims exceed $3

23   million, the claimant will share pro rata and any remaining

24   claim for benefits will be a general unsecured claim.  And

25   conversely, if there are remaining funds after the payment

Page 22

1    of all the filed and allowed claims then those funds would

2    be transferred to the liquidating trust and be available for

3    payment of general unsecured claims.

4            The debtors and the creditors' committee will have

5    the right to dispute the filed claims but they have waived

6    the argument that the benefits have not vested.  And the

7    proposed administrative claims will not be part of the

8    administrative claim settlement that the debtors have

9    announced.

10            Each member of the class who is not what we've

11   called a recently deceased member and who files a proof of

12   claim by a date to be agreed to will have a general

13   unsecured claim in the Sears Roebuck case in an amount equal

14   to the lesser of his or her benefits under the plan and

15   $10,500.  We believe that setting the cap at that level will

16   mean that all but about 650 of the retirees would have a

17   claim in the full amount of their benefits.

18            Finally, Your Honor, even though they're not

19   technically members of the class covered by the stipulation,

20   the proposal does cover what we've described previously as

21   the grandfathered disableds as well as the retirees whose

22   benefits were less than $5,000.  And they, if they file

23   claims, will have general unsecured claims subject to the

24   same cap of 10,500 at an aggregate cap of 16.9 million.

25            The last element of the proposal is that the

Page 23

1    retiree committee will withdraw its confirmation objection

2    and support confirmation of the Chapter 11 plan.

3         The debtors believe, Your Honor, that with the

4    consent of the retiree committee, which is the authorized

5    representative of the retirees, we've satisfied the

6    requirements for modification of benefits as provided in

7    Section 1114(e)(1)(B).  Nevertheless, we also think we meet

8    the requirements for modification under Section 1114(f) by

9    making a proposal that provides for modification of the plan

10   that is necessary to permit confirmation of the Chapter 11

11   plan and ensures that all creditors, the debtors and all

12   affected parties are treated fairly and equitably.

13        Accordingly, Your Honor, the debtors request that

14   the Court grant the motion and enter the revised form of the

15   order which includes the proposal.

16        THE COURT:  Okay.  There's a lot of people.  There

17   you are.

18        The retiree committee is on board with this

19   resolution, I'm assuming, as well as the DOL?

20        MR. LAWLOR:  Yes, Your Honor.  James Lawlor for

21   the retirees committee.

22        Yes.  We support this.  It was a collaborative

23   effort and it was longer than we anticipated but we did the

24   best we could and we appreciate the debtors' cooperation.

25        THE COURT:  Okay.  And this reflects the due

1    diligence that the parties --

2              MR. LAWLOR:  Yes, Your Honor.

3              THE COURT:  -- conducted as far as actuarial

4    information and --

5              MR. LAWLOR:  Yes, Your Honor.

6              THE COURT:  -- other due diligence?

7              MR. LAWLOR:  That was -- the biggest delay was we

8    spent a significant amount of time working with the debtors

9    to try to get as much information as we could and we

10   extrapolated as best we could and we came up with this

11   proposal.

12             THE COURT:  Okay.  And I'm assuming nothing turned

13   up to suggest that other parties, unlike the primary

14   beneficiaries to this proposal, had protection from

15   termination at will?

16             MR. LAWLOR:  Right.  Your Honor, the only

17   information we were able to find was the stipulation of

18   settlement.  There was no other indication of vested

19   benefits as far as we know.

20             THE COURT:  Okay.  Very well.  Thank you.

21             MR. LAWLOR:  Thank you.

22             MR. GERSON:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MR. GERSON:  Leonard Gerson, Department of Labor.

25             Glad the settlement has been reached.  My one

Page 25

1    concern is that these retirees, the beneficiaries, are not

2    your typical administrative claimants.  They haven't had

3    recent contact, most likely, with Sears.  Who knows where

4    their insurance policy might be?  It's going to be not an

5    easy matter resolving the individual claims.  So I would

6    hope that some sort of provision get made, particularly

7    possibly with the office of the liquidating trust, to make

8    sure that there's somebody specifically identified to deal

9    with this problem because they're not typical administrative

10   claimants.

11              THE COURT:  Okay.

12              MR. GERSON:  And I don't know whether that can be

13   memorialized in the order or --

14              THE COURT:  Do you mean that they would have like

15   one point of contact, in essence --

16              MR. GERSON:  Yes.  And to be recog --

17              THE COURT:  -- among the staff for the liquidating

18   trust?

19              MR. GERSON:  Yes.

20              THE COURT:  Just like, I'm assuming, at this

21   point, they have one contact or one set of people that they

22   contact if they have a question.

23              MR. GERSON:  Yes.

24              THE COURT:  Okay.  All right.

25              MR. GERSON:  Thank you.

1          MS. MARCUS:  Your Honor, we haven't quite settled

2     on the form of the notice but we're going to work with the

3     retiree committee and the creditors' committee in terms of

4     the notice --

5          THE COURT:  Right.

6          MS. MARCUS:  -- what the appropriate date will be.

7     And we can include a person to be designated as the point of

8     contact.

9          THE COURT:  Okay.  That seems to be appropriate as

10    opposed to building it into an order.  The notice is

11    important to lay this out.  And it's an obvious aspect of

12    that notice that they have someone that they can call or

13    e-mail or write to if they have a question about what they

14    need to do to get the benefits under the settlement; if

15    there's an objection to their claim, how to deal with that,

16    et cetera.

17         MS. MARCUS:  We'll make sure that's in there, Your

18    Honor.

19         THE COURT:  Okay.  All right.  Does anyone have

20    anything more to say on this matter?

21         All right.  I had prepared for this matter as if

22    it was going to be litigated and I don't mind that it was

23    settled, late as it was.  Looking at the requirements under

24    Section 1114(f), it's clear to me that Congress contemplated

25    such -- in fact, mandated such negotiations.  And they often

Page 27

1    result in last minute agreements.

2            It appears to be here that the retirees were well

3    represented as were the debtors and that these negotiations

4    were at arm's length, didn't unduly favor any particular

5    group of retirees given the underlying legal rights of the

6    respective retirees, and that the settlement is a fair

7    resolution of the dispute that was going to be tried by me

8    today, which I am -- on which I was pretty well focused.

9    And this appears to me to be a reasonable settlement in

10   light of all the issues.

11           MS. MARCUS:  Thank you, Your Honor.

12           THE COURT:  Okay.

13           MR. LAWLOR:  Thank you, Your Honor.

14           THE COURT:  Thanks.

15           MR. SCHROCK:  Good morning, Your Honor.  Ray

16   Schrock, Weil Gotshal, for the debtors.

17           The next matter on the agenda is the debtors'

18   confirmation hearing, their second amended plan.

19           Your Honor, in terms of how we proceed, I'd like

20   to propose that I walk through what objections have been

21   resolved so that we can deal with those.  And then we would

22   propose to move straight into the evidence.

23           Now I know the U.S. trustee did file a pleading

24   within the last day that said that they thought the time was

25   short between filing the administrative consent program

Page 28

1    materials and moving forward with confirmation.  Your Honor,

2    I think if you want to address that upfront, I'm happy to do

3    so.  But otherwise, I'd like to move forward and get on with

4    the hearing.

5              THE COURT:  Okay.  I think it's worth addressing

6    preliminarily --

7              MR. SCHROCK:  Okay.

8              THE COURT:  -- and then seeing where we are at

9    that point.

10             MR. SCHROCK:  Okay.  Your Honor, in terms of --

11   and I'll ask the other parties that are moving in support of

12   the plan also to rise here.

13             In terms of where we are, these issues have been

14   teed up, frankly, for months.  We have the support of the

15   official unsecured creditors' committee, the PBGC.  Of

16   course, the estates are moving forward.  We've now struck a

17   deal on a consent program with a core group and the largest

18   group we could frankly find of administrative claimants.

19   And now we have the support of the official committee of

20   retirees.

21             The administrative consent program is

22   fundamentally designed so that parties, after receiving

23   notice, can decide whether or not they want to opt in to the

24   settlement and that they're going to have 17 days after

25   entry of the confirmation order for that to happen.  And

Page 29

1    they can decide 33 days after entry of the confirmation

2    order if they'd like to opt out.

3              And, really, fundamentally, everything that we're

4    doing here from the participation of the professionals

5    contributing funds from the carve-out, which is voluntary,

6    putting money aside and kind of tiering out these things,

7    these are all implementation issues associated with a plan.

8              Now one could argue that the issue of binding

9    someone with consent associated with the failure to opt out,

10   that that issue -- that certainly, that issue is before the

11   Court today and it's based upon materials that we filed just

12   a couple of days ago.  Now I believe, Your Honor, that given

13   where we are and given the need to move expeditiously with

14   confirmation, we would submit that that issue should be teed

15   up for argument today.  However, if Your Honor had

16   reservations about that particular issue on the binding

17   consent, my suggestion would be let's get all the evidence

18   in today.  Let's deal with every issue that we can.  And if

19   we need to put off a few days for that last issue on the

20   consent, we could certainly do that.  But, Your Honor, we're

21   prepared -- you know, all of these claimants -- and, listen,

22   I feel like this is a bit like -- you know, we're trying to

23   find a way to end these cases and it's not easy.  We're

24   striking as many deals as we can.  The idea of going to some

25   sort of further mediation and continuing to allow -- you

Page 30

1    know, every day that goes by, there's more pleadings that

2    are filed.  And we have to have a stopping mechanism.  The

3    only way that's going to happen is through entry of the

4    confirmation order.

5            And it is -- listen, it's very tough sledding for

6    the debtors.  And getting this hearing through, getting the

7    relief in the order, it's a value maximizing proposition.

8    We'd like the opportunity to put on that case.  And it's

9    basically -- it's a winddown mechanism to distribute the

10   proceeds of the estate.  We are very ready and I think

11   everybody who says, listen, this is a surprise or something,

12   we have been trying to keep people informed.  We've relied

13   on the administrative -- the ad hoc administrative claimants

14   to keep some of the other admins informed.  But it's a --

15   listen, we think it's a reasonable resolution.  And the fact

16   that you have consent -- the failure to opt out being deemed

17   consent is completely consistent with applicable law in

18   other circumstances.

19           THE COURT:  Okay.  Well, I think the debtors have

20   been clear that while they are proposing this resolution

21   mechanism as additional support for confirmation of the

22   plan, they are prepared to show that the plan satisfies

23   1129(a) and, to the extent relevant, (b) --

24           MR. SCHROCK:  Correct.

25           THE COURT:  -- even without it.  That's right,

Page 31

1    right?

2            MR. SCHROCK:  That is correct, Your Honor.

3            THE COURT:  Okay.  Okay.

4            MR. SCHROCK:  Okay.

5            MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

6    for the U.S. trustee's office.

7            That was -- the point Your Honor just made was one

8    of the points I was going to bring up.  This isn't necessary

9    for confirmation according to the debtors.  And we are

10   concerned about the notice to the admin creditors.  Not only

11   is the consent issue upfront right now, Your Honor, as

12   opposed to down the line, but also, there is an impact on

13   the admin creditors that opt out or don't opt in as they're

14   now put behind other creditors.  And that may impact their

15   ability to get (indiscernible).  We believe that notice

16   should be provided to those creditors to allow them to come

17   in if they want.  And --

18           THE COURT:  Notice of what, though?

19           MR. SCHWARTZBERG:  Notice of this new procedure

20   that was filed after close of business on October 1st.

21           THE COURT:  Well, there are two different types of

22   notice.  The debtor has given notice that -- you know, back

23   in July that it's seeking to confirm the plan.  And clearly,

24   that was sufficient to inform administrative expense

25   creditors that they have rights, as all creditors do, to

Page 32

1    object to the plan.  And there have been a number of

2    objections, under 1129(a), from the administrative expense

3    creditors.

4           So I guess, as far as notice is concerned, the

5    debtors are proposing notice of this procedure.  And there

6    may be issues with respect to what that notice says, how

7    informative it is.  But as far as -- that's not the notice

8    you're talking about, right?  You're talking about the

9    notice of approving this procedure today.

10          MR. SCHWARTZBERG:  Correct, Your Honor.  People --

11   or administrative creditors might not approve of the

12   procedure.  They might not approve of the deemed consent.

13   They might not approve of the --

14          THE COURT:  No.  But the -- let's leave that

15   aside.  I think that the debtors have already said that's

16   something that can be discussed later in the hearing.

17          But I guess, the -- as I read it, the proposal,

18   the proposed agreement, with the settling administrative

19   expense creditors is not a simple we will take 25 percent

20   less.  It says that with respect to the 25 percent -- I'm

21   sorry -- with respect to the 75 percent that we are

22   asserting, we get certain first money out.  And I guess,

23   you're suggesting that that affects the rights of the other

24   creditors?

25          MR. SCHWARTZBERG:  Puts them behind both the opt-

1    in creditors and those that --

2              THE COURT:  Well, but again, if they can opt in

3    also, affirmatively opt in, then they're not behind them,

4    right?

5              MR. SCHWARTZBERG:  But --

6              THE COURT:  So, to me, they have that right, too.

7    It's not like the people who have settled are looking to get

8    an exclusive right.  Anyone can opt in.  So, to me, that's

9    not a disparate treatment issue.  You know?  It's one thing

10   to make sure the notice is right so that people know enough

11   to make an informed decision or a reasonably informed

12   decision.  But if they have the same right to opt in, I'm

13   not sure there's an issue there.

14             MR. SCHWARTZBERG:  All right.  Thank you, Your

15   Honor.

16             THE COURT:  I mean, if they didn't, I would

17   certainly understand your point.

18             And that leaves the issue of the third option, if

19   you will, which is either you could opt out, you could opt

20   in, but there's something in between, which is you don't do

21   anything but you get certain rights but you also get a

22   certain -- you don't get exactly the same treatment.  But

23   Mr. Schrock said we can discuss that as we go along.  And I

24   think that's part of the notice and part of the -- you know,

25   the mechanic as opposed to the underlying legal right to get

Page 34

1    additional notice to focus on whether this changes the plan.

2    See, fundamentally, I don't think this changes the plan.  I

3    guess that's what I'm (indiscernible).

4              MR. SCHWARTZBERG:  I guess, also, Your Honor, just

5    to point out, it's not necessary for today.  We don't know

6    what arguments admin creditors are going to make.  So to

7    give them less than 48 hours notice --

8              THE COURT:  Admin creditors will make any argument

9    they want to.  I mean, I've had no -- I have no doubt about

10   that having read the objections.  So that's not really the

11   point.  I think the point is, objectively, rationally, other

12   than issues about the adequacy of the notice, a deal with 18

13   percent of them that lets every other 82 percent of them

14   have the same deal, to me, is -- that doesn't change

15   anything.  That's just making it clear that some people have

16   made a deal that is open to everybody.  So I just don't --

17   what are they going to say that actually is worth listening

18   to in response to that?

19             MR. SCHWARTZBERG:  Your Honor, not being in their

20   shoes, I don't know what their argument's going to be.

21             THE COURT:  Well, I know, but it just doesn't

22   compute to me.  So I'm going to go ahead with the hearing.

23   Again, with the caveat that I think we do need to focus on

24   the notice that's given to this group and the mechanism for

25   it.  And also, you know, the third category, if you will,

Page 35

1    the abstain category.

2            MR. SCHWARTZBERG:  All right.  Thank you, Your

3    Honor.

4            THE COURT:  Okay.

5            MR. WANDER:  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. WANDER:  David Wander of Davidoff Hutcher &

8    Citron.  I represent three creditors today:  Pearl Global

9    Industries, Eric Jay and (indiscernible) Company.

10           Pearl Global is a foreign vendor and it's affected

11   by this administrative claim settlement.  Eric Jay is a

12   domestic vendor.

13           I filed two declarations, Your Honor, in

14   connection with the negotiations that have been going on

15   recently.  I attended a chambers call with Your Honor the

16   other week.  And I just want to correct some things on the

17   record or make them clear and in response to some comments

18   the debtors' counsel made.

19           First of all, the largest group in number of

20   administrative creditors were not included in the

21   negotiations.  You have two groups.  One group is comprised

22   of a bunch of claims traders.  They purchased claims in the

23   case presumably at some kind of a discount.  They're larger

24   in number -- in the amount of the claims they may represent,

25   30, $40 million in claims, or to about half a dozen of them.

Page 36

1    The other vendor group has in excess of 50 vendors and, in

2    round numbers, the claims are approximately 15, $20 million.

3    A lot of them are the foreign vendors.

4            Other than an initial meeting, a settlement

5    meeting, that both ad hoc groups attended and we were given

6    a confidential term sheet, there's been no further

7    negotiations with the largest group of ad hoc vendors.  And

8    the proposed confidential settlement agreement shortly

9    thereafter was filed as an exhibit to the plan.

10           So, first, to be clear, most of the administrative

11   creditors have not been parties to the negotiations.  And

12   the settlement adversely affects them.  And honestly, Judge

13   --

14           THE COURT:  How?

15           MR. WANDER:  I'll tell you how.

16           THE COURT:  'Cause your declarations didn't say

17   that.

18           MR. WANDER:  Well, Your Honor, first --

19           THE COURT:  Didn't say the reason.  It just made

20   the statement.

21           MR. WANDER:  First of all, Your Honor, we received

22   the document that, close to midnight --

23           THE COURT:  No.  How does it adversely affect

24   them?

25           MR. WANDER:  Sure.  I'll address that, Your Honor.

1              THE COURT:  Okay.

2              MR. WANDER:  First of all, it's -- two ways.  The

3    first way the U.S. trustee's office noted, which is an

4    automatic opt-in wherein administrative creditor with an

5    allowed claim is entitled to get 100 cents under the

6    Bankruptcy Code, under the automatic opt-in, they may get 75

7    cents of an allowed claim.  So that's a fatal flaw in the

8    mechanism right there.

9              The second flaw and the second prejudice is it

10   takes a certain amount of available cash that should be

11   available for all the administrative creditors and it locks

12   those funds up for the settling creditors.  And for that

13   reason, it prejudices the group.  So --

14             THE COURT:  But you still have -- the debtors are

15   still going to be making their showing today and you've

16   already objected, twice in fact, that they can't make the

17   showing that they'll satisfy 1129(a)(9).  So --

18             MR. WANDER:  But we're saying, Judge, even under

19   any construct of confirmation with this construct of

20   settlement, it's taking cash and it's saying if you settle,

21   you get it on December 1.  If you don't settle, the cash may

22   not be there -- the cash is not there for you.  And it could

23   be the only cash that, in the end, is available for the

24   creditors.

25             THE COURT:  But again, you have your objection

Page 38

1    where you can try to convince me that -- and the debtors

2    have the burden of proof so they have to convince in light

3    of your objection -- that on the effective date, the cash

4    won't be there to pay those who don't opt in.

5              MR. WANDER:  Well, Your Honor, so the effective

6    date, we don't know when that's --

7              THE COURT:  Well, that's the confirmation issue.

8    But this settlement doesn't affect that.

9              MR. WANDER:  Yes.  What it does is, it takes cash

10   that's available before the plan goes effective --

11             THE COURT:  Right.

12             MR. WANDER:  -- and it gives that cash to the

13   settling creditors.

14             THE COURT:  Okay.

15             MR. WANDER:  So if you don't settle --

16             THE COURT:  So it varies that the -- it's proposed

17   as a means to get people paid before the effective date.

18   And if people want to get paid before the effective date in

19   a reduced amount, they can opt in.  If they want to wait,

20   assuming that I confirm the plan, which we're on for today

21   to decide, they could wait to get the full amount.  What is

22   that -- I mean, I --

23             MR. WANDER:  Let me explain --

24             THE COURT:  To me, that's just not --

25             MR. WANDER:  Here -- let me explain, Your Honor.

1    So -- and I'll focus on Pearl Global.  The debtor recently

2    filed their tenth omnibus objection to the claims and that

3    included an objection to Pearl Global's -- one of their

4    503(b)(9) claims.

5              THE COURT:  Okay.

6              MR. WANDER:  But they did not object in full.  The

7    claim, in round numbers, Your Honor, is $450,000.  After the

8    objection, round numbers, they say my client has an allowed

9    claim of $350,000.

10              THE COURT:  Okay.

11              MR. WANDER:  So my client should be entitled to

12    get paid its undisputed allowed administrative claim.

13    There's funds to pay it.  The debtor is going to --

14              THE COURT:  No, no, no.  It is entitled to get

15    paid it on the effective date.

16              MR. WANDER:  So creditors --

17              THE COURT:  If it wants to take at a discount and

18    get paid before the effective date, some portion, it can

19    negotiate with the debtor to do that.

20              MR. WANDER:  But an allowed administrative

21    claimant is not supposed to have to wait until an effective

22    date --

23              THE COURT:  Absolutely wrong.  The case law is

24    entirely clear that while, in the ordinary course, where

25    there are no issues of administrative insolvency, a debtor

Page 40

1    should be paying its administrative expenses as they come

2    due.  In fact, if there is an issue of administrative

3    insolvency, or the claims are still being worked out, it

4    needs to wait.  And that's why I'm assuming this group is

5    compromising because they don't want to wait.  But that's

6    the law and you're not going to convince me otherwise.

7    That's the Second Circuit on down.

8            MR. WANDER:  Right.  So, as Your Honor said, that

9    the debtor can and should pay --

10           THE COURT:  No, I didn't say that.

11           MR. WANDER:  Let me finish, Your Honor.

12           THE COURT:  I said that's -- no.

13           MR. WANDER:  In the ordinary course --

14           THE COURT:  Look, I'm not going to reargue that

15   point with you.  You're just wrong on that point.

16           MR. WANDER:  In the ordinary course --

17           THE COURT:  No one is entitled to be paid 100

18   cents on the dollar today.  Period.

19           MR. WANDER:  I didn't say today.

20           THE COURT:  Well, you just did.

21           MR. WANDER:  No.  What I'm --

22           THE COURT:  You said because they have an allowed

23   claim of $350,000, they're entitled to be paid today and pay

24   someone else 75 percent, or some portion of that, capped at

25   75 percent today, violates your client's rights.  And the

Page 41

1    answer to that is no, it does not --

2             MR. WANDER:  What I'm saying is --

3             THE COURT:  -- particularly when they have the

4    option to take the same treatment.

5             MR. WANDER:  What I'm saying is, allowed --

6    undisputed administrative claims -- and this includes just

7    simple post-petition claims from October, November, December

8    of 2018 -- were entitled and should have been paid in the

9    ordinary course of business.  That's the point that I was

10   picking up from what Your Honor said.

11            THE COURT:  Look, if that's what you're telling

12   your client, they're being misinformed.  They're not

13   entitled to be paid in full.  They took that risk when they

14   extended the trade credit.  It's that simple.  So don't tell

15   them otherwise.  They're entitled to be paid in full on the

16   effective date.

17            MR. WANDER:  Right.  So if the funds that are

18   available to pay allowed administrative claims if the

19   effective date is pushed out for a year or two --

20            THE COURT:  That's the confirmation argument you

21   made in two objections to the plan.

22            MR. WANDER:  And --

23            THE COURT:  I will get to that.  This is a

24   different issue we're discussing today --

25            MR. WANDER:  Okay.

 1          THE COURT:  -- right now.

 2          MR. WANDER:  Your Honor, as I said, I think that

 3   it prejudices two things.  One, we haven't had enough time

 4   to even read the papers in support of it.  The opt-in

 5   provision, we submit, is patently improper.  And as I'm

 6   saying, Your Honor, they're taking available cash and

 7   they're saying if you settle under their construct, the cash

 8   will be there.  If you have an allowed claim and it's

 9   December 2nd, the cash is gone.  And that's just not fair,

10   Your Honor.

11          THE COURT:  Okay.  All right.  Well, I don't

12   really see how adjourning this hearing will change the

13   statements you just made.

14          MR. WANDER:  Well, one further thing.

15          THE COURT:  No.  How would adjourning the hearing

16   add any new light or color to those statements?

17          MR. WANDER:  I'll tell you, Your Honor.  Counsel

18   for the debtor made a comment about further mediation would

19   not make any sense.  I wrote that down.  I just want Your

20   Honor to be aware that yesterday, I was contacted by the

21   attorneys for ESL and Transform who indicated that they were

22   ready, willing and able to attend mediation of --

23          THE COURT:  Mr. Wander, please.  These are the

24   people that are being sued for over $2 billion.  I think you

25   just have to take the offer to put things off with a grain

Page 43

```
 1    of salt.

 2              Now go back to my question.  What additional facts

 3    will be elucidated other than the hope that -- or the

 4    leverage that you would obtain as a result of an

 5    adjournment, including with respect to claim allowance as

 6    well as settlement, to enable me to evaluate this

 7    settlement?  We have the information, which you've had for

 8    months now, in the declarations.  You say they've had to be

 9    updated because of various rulings by the Court and the like

10    regarding the company's asset and liability position.

11    That's not going to change except the assets will be

12    smaller, right?  There's no additional information you need

13    to evaluate the objection to the settlement which is that

14    those who opt in to the settlement will be getting

15    potentially, and maybe more than potentially, a greater

16    recovery on their administrative expense than those who opt

17    out.

18              MR. WANDER:  Well, actually, Your Honor, the

19    information that we get has been changing every --

20              THE COURT:  All right.  But it's not going to

21    change any more than what it is today except for the fact

22    that there may be one more ruling by me for more expenses

23    incurred in terms of an all-hands mediation.  It's not going

24    to change in any other way.  And I can factor that into

25    account.
```

1           MR. WANDER:  Well, Your Honor, as I said, if the

2    effective date is going to be pushed out and the only money

3    that very likely may be available is the money that's going

4    to go on December 1, all of the other administrative

5    creditors who are not even included in this are going to be

6    prejudiced because the funds are going to be gone --

7           THE COURT:  No.  That's the -- no.  I'm sorry.

8    You're just repeating yourself on this.  That's the case

9    that you can make in objecting to the debtors' plan.  You've

10   had all that information to the extent you had it.  And they

11   have the burden of proof on showing that they won't be

12   prejudiced.  So let's get on with it.

13          MR. WANDER:  Okay, Your Honor.  Thank you.

14          MR. SCHROCK:  Thanks, Your Honor.  Again, Ray

15   Schrock, Weil Gotshal, for the debtors.

16          Your Honor, can I go through just quickly which

17   objections have been resolved?

18          THE COURT:  Yes.  And I know we have a crowded

19   courtroom.  I also have a number of people on the phone.

20          MR. SCHROCK:  Yes.

21          THE COURT:  And if you are representing an

22   objectant and Mr. Schrock says your objection's been

23   resolved and you disagree with that, you need to speak up.

24   And I wouldn't mind if you also state, yes, we agree with

25   him but I'm not going to require that.  I'm assuming that

Page 45

1    there may be some people whose objections were resolved who

2    decided that they don't want to spend the money on a lawyer

3    to hear it all over again --

4              MR. SCHROCK:  All right, Your Honor.  Just so --

5              THE COURT:  -- and, therefore, won't be on the

6    phone or in the courtroom to tell me that the objection's

7    been resolved.

8              MR. SCHROCK:  I apologize, Your Honor.  I was just

9    going to say that when I go through these resolved

10   objections, I'll note the ECF number and I'll also note the

11   reference on the agenda --

12             THE COURT:  Okay.

13             MR. SCHROCK:  -- so the parties can follow along.

14             So the first one that's been noted as resolved is

15   the Liberty Mutual Insurance Company.  That's at ECF number

16   3989.  And that's at 1(A) in the agenda.  That's resolved.

17             THE COURT:  Okay.  And this is -- it's resolved by

18   the plan just basically saying that a surety program --

19             MR. SCHROCK:  Correct.

20             THE COURT:  -- runs through until it runs out by

21   its own terms?

22             MR. SCHROCK:  Yes.

23             THE COURT:  Okay.

24             MR. SCHROCK:  The next one's 223 South Wacker,

25   LLC.  That's at ECF number 4668.  That's at 1(B).  We've

Page 46

1    included language in the confirmation order to resolve the

2    objection.

3              THE COURT:  Right.  And, in essence, here, the

4    conformation order states that the plan injunction doesn't

5    enjoin 223 South Wacker to the extent it has the rights

6    under its stipulation from proceeding with the litigation --

7              MR. SCHROCK:  Correct.

8              THE COURT:  -- involving the sculpture.

9              MR. SCHROCK:  And the next one that's been

10   resolved, Your Honor, is LBG Hilltop, LLC.

11             THE COURT:  Can I stop you there for a second?

12             MR. SCHROCK:  Sure.

13             THE COURT:  223 South Wacker also, arguably,

14   objected that the plan wasn't feasible to the extent that it

15   was counting on a $4 million projected recovery.  I'm not

16   sure that really was part of the objection but is anyone

17   from the objectant here to prosecute that or on the phone?

18             MR. SCHROCK:  No.  We understood it was all --

19             THE COURT:  I think -- I mean, their main issue

20   was they just wanted to continue with litigation --

21             MR. SCHROCK:  Okay.

22             THE COURT:  -- to the extent they're able to.

23             MR. SCHROCK:  And again, Your Honor, LBG Hilltop,

24   LLC, which is at ECF number 4680, has been resolved.  We

25   have confirmed here with Transform that the landlord for the

Page 47

1   lease was assigned to Transform subject to the Hilltop REA

2   and other applicable restrictive covenants.  But we also

3   added in paragraph 37 to the confirmation order that

4   "Nothing in the Plan alters the terms and provisions of the

5   Construction, Operation and Reciprocal Easement Agreement".

6          Next one, Your Honor, it's on the chart, it's

7   number 7.  It's Acadia Realty Limited Partnership.  It's at

8   ECF number 4684, on the agenda as 1(F).  We have resolved

9   this -- they had a few objections.  We've resolved these by

10  adding to paragraph 34 of the order that notwithstanding

11  anything in the documents -- anything in the plan or the

12  other related documents affect the rights "to any executory

13  contract, whether current or previously executory, or a

14  lease of non-residential real property to assert any right

15  of setoff or recoupment".

16          THE COURT:  Right.  And this is an objection that

17  was raised by a number of parties --

18          MR. SCHROCK:  Yes.

19          THE COURT:  -- that you could read the plan

20  injunction and maybe other provisions as precluding setoff

21  or recoupment.  And the debtors were making it clear that

22  that is not the case.

23          MR. SCHROCK:  Yes.

24          THE COURT:  I think you also have agreed to treat

25  all of the landlords, as defined in that objection, as

1      having opted out of the release?

2               MR. SCHROCK:  That's correct, Your Honor.

3               THE COURT:  Okay.

4               MR. SCHROCK:  Yeah.  We treated them all as opting

5      out.

6               THE COURT:  Right.

7               MS. HEILMAN:  Your Honor, if I may --

8               THE COURT:  Yes.  Go ahead.

9               MS. HEILMAN:  -- on the phone?  Your Honor, Leslie

10     Heilman on behalf of Ballard Spahr on behalf of the Acadia

11     Realty Limited Partnership Group landlord.  The statements

12     on the record, I've confirmed that we are resolved --

13              THE COURT:  Okay.

14              MS. HEILMAN:  -- with the changes.

15              THE COURT:  Thank you.

16              MS. HEILMAN:  Thank you.

17              MR. SCHROCK:  Okay.  Next, we go to number 11 on

18     the chart which was the official committee of retirees --

19              THE COURT:  Right.

20              MR. SCHROCK:  -- which we've just addressed.  It's

21     1(I).  And as set forth on the record by Ms. Marcus, that

22     has been resolved.

23              THE COURT:  Okay.

24              MR. SCHROCK:  Next, we're going to number 15 on

25     the chart which is McDonald's Corporation, which is at 1(WW)

1    in the agenda.  This is regarding, you know, an outstanding

2    cure issue.  And a stipulation and proposed order resolving

3    this objection was filed on the docket on October 3rd at ECF

4    number --

5                 THE COURT:  Well, not October 3rd.  Was it,

6    really?

7                 MR. SCHROCK:  It was at 5303.

8                 THE COURT:  I mean, that's today.  Was it just

9    filed?

10                MR. SCHROCK:  Yesterday.  Oh, sorry --

11                THE COURT:  Oh, okay.

12                MR. SCHROCK:  -- the 2nd.

13                THE COURT:  All right.

14                MR. SCHROCK:  October 2nd.

15                THE COURT:  So that's resolved.

16                MR. SCHROCK:  That's resolved.

17                THE COURT:  Okay.  Very well.  I mean, this was

18    just a cure reservation anyway, I think.  So --

19                MR. SCHROCK:  Right.  Yeah.  I don't think it --

20                THE COURT:  Okay.

21                MR. SCHROCK:  -- was going to be fatal.

22                Your Honor, I believe that number 16 on the

23    objection chart, Community Unit School District 300, which

24    is at 1(M), has been resolved.

25                THE COURT:  Okay.

1          MR. SCHROCK:  My understanding is that they'll be

2     withdrawing all objections to the plan.  And there's an

3     agreement where, essentially, five million of the EDA

4     proceeds will be going to the estate, two million will be

5     returned.  They're going to withdraw all proofs of claims --

6          THE COURT:  Returned to the school district or --

7          MR. SCHROCK:  Yes.

8          MR. FRIEDMANN:  Your Honor, Jared Friedmann, from

9     Weil Gotshal.

10          It's a more complicated settlement agreement than

11     we had hoped for.  And while we finalized it literally just

12     this morning on the way in -- and a copy, I think, was

13     provided, too.  But the idea is that there was a 2017 EDA

14     funds that were $7.1 million that had not yet been

15     distributed.

16          THE COURT:  Right.

17          MR. FRIEDMANN:  We reached an agreement with the

18     school district where the Village will disburse $5.1 million

19     to the debtors.  The other two million dollars will go to

20     the school district.

21          THE COURT:  Okay.

22          MR. FRIEDMANN:  It also resolves a number of other

23     issues allowing them to withdraw their plan objection with

24     certain carve-outs.  They're releasing also claims relating

25     to prior years of distributions as it relates to the

Page 51

```
 1   debtors.  They're maintaining claims they may have against

 2   the Village and other third parties.

 3              THE COURT:  Okay.

 4              MR. FRIEDMANN:  But it allows --

 5              THE COURT:  In any event, there's a --

 6              MR. FRIEDMANN:  There's a deal which allows us to

 7   get money and get out --

 8              THE COURT:  Okay.

 9              MR. FRIEDMANN:  -- which was the goal.

10              THE COURT:  All right.  Very well.  When I focus

11   on return, it is because I'm fully aware that there's an

12   intermediary here that's actually holding the money and I

13   just wanted to make sure I knew where the money -- when you

14   say return, where I was going.  But the record's clear on

15   that.

16              MR. FRIEDMANN:  All right.  Thank you.

17              MR. GENSBURG:  Good morning, Your Honor.  Matthew

18   Gensburg on behalf of the school district.

19              THE COURT:  Good morning.

20              MR. GENSBURG:  We do have an agreement.  The

21   Village is a party to the agreement for some of the clauses

22   that involve what they need to do.  It was just filed today

23   and I think is set up for approval by the Court after notice

24   sometime next week.

25              THE COURT:  Okay.
```

Page 52

1          MR. GENSBURG:  There is one paragraph that I do

2     want to highlight.  There's paragraph 11 -- and there's two

3     paragraphs, actually.  So paragraph 11, Your Honor, says

4     that we're withdrawing our -- thank you -- withdrawing our

5     claims -- cure objections but then it says we're not

6     withdrawing any cure objections that we're asserting them.

7     The fact of the matter is, is cure objections are being

8     preserved and the ability to argue that the EDA agreement

9     cannot be assumed and assigned because of violations to that

10    agreement are being preserved.

11          I've been exchanging e-mails with Mr. Friedmann.

12    I think we both understand what the intent was.  We may have

13    to clarify that language but that's the intent.

14          The other thing I wanted to highlight to the Court

15    is it does provide the automatic stay will be modified to

16    the extent it's applicable because of the resolution that

17    states not asserting an interest in these assets any longer

18    and that the Court will defer -- rule on the cure issues to

19    allow the state court to resolve the underlying state law

20    issues that are also implicated by the cure issues.  And

21    that's, I believe, in paragraph 15.

22          THE COURT:  I had earlier lifted the stay in part.

23    And this lifts it further?  Is that the contemplation?

24          MR. GENSBURG:  No -- yeah.  Actually, Your Honor,

25    I think it was -- you abstained in the 1334(c) --

```
 1              THE COURT:  To what was already going on.

 2              MR. GENSBURG:  Yes.  And so this relates exactly

 3      to that.  It doesn't really change anything but we --

 4              THE COURT:  Right.

 5              MR. GENSBURG:  -- just clarified that point with

 6      respect to the cure and the 365 issues.

 7              THE COURT:  Okay.  All right.  Very well.

 8              MR. GENSBURG:  Thank you, Judge.

 9              THE COURT:  Thank you.

10              MR. SCHROCK:  Okay.  So that's I and 1(M).

11              Number -- pardon me.

12          (Pause)

13              MR. SCHROCK:  I think we just have a partial

14      resolution -- you know, frankly -- ESL still has a number of

15      pending objections.  So I'll just note what's resolved

16      during the course --

17              THE COURT:  Okay.

18              MR. SCHROCK:  -- of oral argument.

19              The item number 21 in the objection chart, which

20      is at ECF number 4721, item 1(XX), has been resolved.  Those

21      are -- well, it's one of the Whitebox objection.  That is --

22      they're one of the parties to the administrative claim

23      consent program.

24              THE COURT:  Right.  Okay.  So the Whitebox

25      objection is resolved.
```

1          MR. SCHROCK:  It's resolved in totality, yes.

2          THE COURT:  Okay.

3          MR. SCHROCK:  Let's see if we have any more here

4    through the Court's -- and I believe, Your Honor, that wraps

5    it up.  The remainder, at least of this moment, remain

6    outstanding.  And I think what we would like to do at this

7    time, Your Honor, is just move straight to the evidence.

8          THE COURT:  Okay.  I'll note, though, that at

9    least with respect to some of the objections that were

10   resolved, the debtors have proposed clarifying language not

11   just for those objections but similar objections that you

12   haven't stated were resolved that, for example, make it

13   clear that the plan injunction doesn't --

14         MR. SCHROCK:  Affect the setoff and recoupment.

15         THE COURT:  -- preclude setoff or setoff -- setoff

16   or recoupment or somehow circumvent cure obligations or

17   assignment and assumption orders or previously lifted -- or

18   where the stay was previously lifted or the Court had

19   already previously abstained.  It doesn't rewrite past

20   history.

21         MR. SCHROCK:  Correct.

22         THE COURT:  So those agreements by the debtors are

23   not limited to the people who actually said yes to the

24   debtors.

25         Okay.  So why don't we move -- unless anyone has

Page 55

1   anything further to say on resolved objections, why don't we

2   move to the rest of the confirmation hearing?

3            MR. SCHROCK:  Okay.  Yeah.  Your Honor, I think I

4   can handle the first one here.  It's -- the first witness we

5   have a -- the declaration of Prime Clerk from Mr. Craig

6   Johnson.  It's at ECF number 5137.  And we'd like to move

7   his declaration into evidence.

8            THE COURT:  Okay.  Does anyone wish to cross-

9   examine Mr. Johnson?

10           Okay.  And this was on noticing and --

11           MR. SCHROCK:  Balloting.

12           THE COURT:  -- balloting?

13           MR. SCHROCK:  Yes.

14           THE COURT:  Okay.  I will accept that declaration

15   as his direct testimony.

16       (Declaration of Craig E. Johnson of Prime Clerk LLC re

17   solicitation of votes and tabulation of ballots received in

18   evidence)

19           MR. SCHROCK:  Okay.  Thanks, Your Honor.

20           I'm going to turn the podium over to my partner,

21   Mr. Genender.

22           MR. GENENDER:  Good morning, Your Honor.  Paul

23   Genender, Weil, Gotshal & Manges, for the debtors.

24           We have three witnesses to call -- three

25   additional witnesses to call this morning.  The first we

Page 56

1    would call would be Bill Transier, Your Honor.  His

2    declaration has been filed on September 13th, 2019, at ECF

3    number 5146.

4                THE COURT:  Okay.

5                MR. GENENDER:  He's in the courtroom, Your Honor.

6                THE COURT:  Okay.  Mr. Transier, could you take

7    the stand, please?

8          (Pause)

9                THE COURT:  Would you raise your right hand,

10   please?

11         (Witness sworn)

12               THE COURT:  And it's William T-R-A-N-S-I-E-R?

13               THE WITNESS:  Yes, sir.

14               THE COURT:  Okay.  So, Mr. Transier, I have the

15   declaration of yours dated September 13, 2019 which is

16   intended to be your direct testimony in this confirmation

17   hearing.  Sitting here today, is there anything in it that

18   you wish to change?

19               THE WITNESS:  No.  No, sir.

20               THE COURT:  And you understand that it's your

21   direct testimony?

22               THE WITNESS:  Yes.

23         (Declaration of William Transier, dated 9/13/19,

24   submitted as direct testimony received in evidence)

25               THE COURT:  Okay.  Does anyone want to

Page 57

1    cross-examine Mr. Transier?

2            MR. WANDER:  Yes, Your Honor.

3            THE COURT:  Okay.

4        (Pause)

5                    CROSS-EXAMINATION

6    BY MR. WANDER:

7    Q    Good morning, Mr. Transier.  My name is David Wander of

8    Davidoff Hutcher & Citron.  And I represent the -- three of

9    the objecting creditors.

10       Mr. Transier, you're going to be a member of the

11   liquidating trust board, correct?

12   A    Yes.  I've been asked to join them.

13   Q    Okay.  Now on October 1, in the evening, the debtor

14   filed document 5292, Notice of Filing of Revised Plan

15   Supplement in Connection with Modified Second Amended Joint

16   Chapter 11 plan of Sears Holdings Corporation and its

17   Affiliated Debtors.  Annexed to that document is an Annex B

18   which is page 58 and 60.  And it says "Liquidating Trust

19   Board Member Compensation.  (a) Base Compensation:  The

20   base" -- and I'm quoting now.  "The base compensation of

21   each member of the Liquidating Trust Board shall be [dollar

22   sign] [blank] per member, which amount shall be paid in

23   twelve equal installments on a monthly basis in advance."

24   And it has footnote 5.  And footnote 5 says, "Note to Draft:

25   The annual base compensation of each member of the

Page 58

```
 1    Liquidating Trust Board shall be disclosed prior to the

 2    Confirmation Hearing."

 3         Can you tell me how much is the base compensation of

 4    each member of the liquidating trust board?

 5    A    I cannot.  It's my understanding that that is still

 6    being discussed with the UCC.  And I'm not aware of what

 7    that compensation is.

 8    Q    You have no knowledge at all of what the possible

 9    ranges of the compensation would be?

10    A    I don't at this time, no.

11    Q    Do you have any idea what the minimum amount or the

12    maximum amount --

13              MR. GENENDER:  Objection, Your Honor.  He just

14    answered that question.

15              THE WITNESS:  I do not.

16    BY MR. WANDER:

17    Q    Okay.  And do you know why the annual base compensation

18    of each member has not been disclosed prior to the

19    confirmation hearing?

20    A    I think that there has been extensive discussions of

21    two of the other members that are proposed to the

22    liquidating trust board with counsel for the UCC.  And I

23    have not been party to those conversations.

24    Q    Okay.  Paragraph (b) of this Annex B is labeled

25    "Incentive Compensation".  Can you describe the incentive
```

1    compensation to which you might be entitled?

2    A    I cannot.  I think that's part of the discussions,

3    ongoing discussions, about what the compensation should be.

4    And I know that it's an open item in the confirmation

5    briefing that will be filled in due course.

6    Q    There's a third item.  It's just a footnote 6.  Do you

7    know if there's any other compensation that's being

8    discussed other than the base compensation and the incentive

9    compensation?

10   A    I don't believe that there is.

11              MR. WANDER:  Okay.  Thank you.

12              THE COURT:  Okay.  Does anyone else have any

13   questions for Mr. Transier?

14              Okay.  You can step down, sir.  Thank you.

15              THE WITNESS:  Thank you, Your Honor.

16              MR. GENENDER:  Your Honor, may Mr. Transier be

17   excused?

18              THE COURT:  Yes.

19              MR. GENENDER:  Your Honor, as a housekeeping

20   matter, the parties have submitted to Your Honor joint

21   exhibits.  And I would like to formally move them -- offer

22   them into evidence for record purposes.

23              THE COURT:  Well, when you say the parties, who --

24              MR. GENENDER:  The debtors and we certainly worked

25   with Wilmington Trust.  And I believe the administrative

Page 60

1   claimants.

2           THE COURT:  Okay.  All right.  That's fine.  They

3   are agreed deemed admitted.

4           MR. GENENDER:  Thank you.

5       (Joint exhibits of debtors, Wilmington Trust and

6   administrative claimants received in evidence)

7           MR. GENENDER:  Your Honor, next, the debtors would

8   call Brian Griffith.  He submitted two declarations, one on

9   September 13th, 2019, docket 5148, and one on October 1,

10  2019, a supplemental declaration at 5297.

11          THE COURT:  Okay.

12          MR. GENENDER:  And he's in the courtroom, Your

13  Honor.

14          THE COURT:  Okay.  Would you come up to the stand,

15  please?

16      (Pause)

17          THE COURT:  Would you raise your right hand?

18      (Witness sworn)

19          THE COURT:  And it's B-R-I-A-N, G-R-I-F-F-I-T-H?

20          THE WITNESS:  Correct.

21          THE COURT:  Okay.  So, Mr. Griffith, you've

22  submitted two declarations as your direct testimony in this

23  confirmation hearing.  One's dated September 13th and then

24  you have a supplemental declaration dated October 1st.

25  Sitting here today, is there anything in them that you would

Page 61

```
 1    wish to change as your direct testimony?

 2              THE WITNESS:  No, Your Honor.

 3              THE COURT:  Okay.  Very well.

 4         (Declarations of Brian Griffith, dated 9/13/19 and

 5    10/1/19, respectively, submitted as direct testimony

 6    received in evidence)

 7              THE COURT:  Does anyone wish to cross-examine Mr.

 8    Griffith?

 9              MR. FOX:  Your Honor, Edward Fox from Seyfarth

10    Shaw on behalf of Wilmington Trust.

11              Your Honor, I just want to note, I'm not going to

12    cross-examine Mr. Griffith but we did take his deposition

13    and designated portions of his deposition which Your Honor

14    has.

15              THE COURT:  That's part of the exhibit book.

16              MR. FOX:  Yeah.  I'm sorry?

17              MR. GENENDER:  They're not in the exhibit book.

18    They were --

19              THE COURT:  But it's part of the agreed exhibits?

20    I want to make sure I have them, that's all.

21              MR. GENENDER:  My understanding is they were

22    submitted to the Court, Your Honor, yes.

23              THE COURT:  Okay.

24              MR. FOX:  So we'll rest on that, Your Honor.

25              THE COURT:  All right.  That's fine.
```

Page 62

1          Does anyone else have questions for Mr. Griffith?

2     (Pause)

3                    CROSS-EXAMINATION

4  BY MR. WANDER:

5  Q    Good morning, Mr. Griffith.  David Wander of Davidoff

6  Hutcher & Citron.

7          First, I'd like to ask you the questions that I asked

8  Mr. Transier.  Are you familiar with the annual base

9  compensation of each member of the liquidating trust board?

10  A    I'm not, no.

11  Q    But have you been involved in any of the negotiation?

12  A    I have not.

13  Q    In paragraph -- I'm looking at your declaration,

14  document number 5148.  And if I could turn your attention to

15  paragraph 14, you state in the first sentence, "Further, I

16  understand the Debtors may require the proceeds of, among

17  other things, the ESL Litigation (defined below) to fund

18  payments under the Plan."  Do you see where I'm referring

19  to?

20  A    Yes.

21  Q    Okay.  It's possible that the debtors will not receive

22  any funds as a result of the ESL litigation, correct?

23  A    It's possible.  But we're also saying that it's not

24  necessarily required.

25          (Pause)

1   Q    Now in paragraph 55 of your declaration, it refers to

2   "Cash on Hand".  Do you see that?

3   A    Yes.

4   Q    Okay.  And it talks about approximately $50.1 million

5   in unrestricted cash on September 21.  Do you see that?

6   A    I do.

7   Q    And as of today, approximately how much is the

8   unrestricted cash?

9   A    Approximately 46 million, 46 and a half.

10  Q    And what happened to that four million approximate

11  dollars?

12  A    I believe it was used to fund the professional fee

13  carve-out account.

14  Q    Thank you.  And footnote 6 makes a reference to the

15  carve-account.  Do you see that?

16          THE COURT:  You mean, footnote -- I'm sorry.

17  Footnote 6 in what -- in that paragraph or --

18          MR. WANDER:  On that page.  On page 29 of document

19  5148 right below paragraph 55, there's a footnote 6.

20          THE COURT:  Right.

21  BY MR. WANDER:

22  Q    And it says, "This does not include the Carve-Out

23  Account".  Do you see where I'm reading?

24  A    Yes.

25  Q    And approximately how much money is in the carve-out

1    account as of today?

2    A    Approximately, I think it's around $50 million.

3         (Pause)

4    Q    Now in paragraph 56 of your declaration, you discuss

5    additional asset proceeds.  Do you see that on your

6    declaration?

7    A    I do.

8    Q    Okay.  And you talk about, "n addition to the cash on

9    hand, additional assets of the Estates include a total of

10   $130.4 million".  Do you see that?

11   A    I do.

12   Q    And the first line -- or the first item you mention is

13   the "Calder Net Proceeds".  As of today, how much do you

14   expect the estate to recover from the Calder net proceeds?

15   A    We are still in negotiations with the Calder parties on

16   that deal.  I think, as we say in my testimony, it's --

17   could be from $10 million potentially 8 million depending on

18   how we settle with the other parties.

19   Q    What's the lowest amount that's possible?

20   A    We haven't come to a final conclusion so I don't know.

21   Q    No.  But what is the -- is a high and a low.  What is

22   the lowest amount possible based upon your current

23   negotiations?

24   A    I mean, it's hard to say.  We don't have a final

25   agreement yet.  So we're not -- it isn't -- I'm not sure I'm

1    following the question.

2    Q    Well, has there been any offer by the other side to

3    give the estate x dollars?

4    A    They've offered six million but we're not willing to

5    accept that because we have, we think, a much better case

6    pursuing what we've laid out here.

7    Q    And how long do you expect those negotiations to take?

8    A    Again, it's very hard to say.  We're in active

9    negotiations with them.  But we have not come to a

10   settlement yet.

11   Q    And how long have you been having active negotiations?

12   A    I'd say the last month.

13   Q    The next line item is real estate proceeds, 13.1

14   million.  Do you see that?

15   A    I do.

16   Q    And as of today, what's your best estimate of the real

17   estate proceeds?

18   A    Same as what we have in here.

19   Q    The next line item is de minimis assets $5.3 million.

20   Do you see that?

21   A    I do.

22   Q    And as of today, what's your best estimate as to the de

23   minimis assets to be recovered?

24   A    I still believe the number we have in here is

25   conservative.  We've heard numbers that could be as much as

Page 66

1    10 million but we're not relying on that.  I believe it's 5

2    million in the near term recoveries.

3    Q    And the next line item is 2017 EDA funds.  As of today,

4    what's your best estimate of that as additional asset

5    proceeds?

6    A    It's the same.  It was already discussed this morning.

7    It's 5.1 million.

8    Q    Okay.  The next line item is Transform 503(b)(9)

9    obligations, $97 million.  Do you see that?

10   A    I do.

11   Q    And as of today, what's your best estimate on the

12   recovery from Transform on 503(b)(9) obligations?

13   A    The same as what's in my declaration.

14   Q    You're expecting Transform to pay $97 million in

15   503(b)(9) claims?

16   A    That would be my expectation, yes.

17   Q    Okay.  And have -- has the debtor given Transform a

18   list of the 503(b)(9) obligations that the debtor would

19   expect Transform to pay?

20   A    I believe they've seen the list of the 503(b)(9)

21   claimants.  Not anything that specifically speaks to this 97

22   million directly but they understand, I think, the

23   mechanics.

24   Q    No.  My question is has the debtor given Transform a

25   list of the 503(b)(9) claims that the debtor believes

Page 67

1   Transform should be paying?

2   A    We have not split the 503(b)(9) obligations between

3   what we would be retaining and what Transform would be

4   responsible for paying, no.

5   Q    Okay.  So the debtor -- I want to be clear on this.

6   The debtor has not given a list to -- if Transform said it

7   would pay the $97 million today, has the debtor given

8   Transform a list of the 503(b)(9) claims that Transform

9   should be paying with that $97 million?

10   A    Not to my knowledge.

11   Q    Okay.  So the debtor has not given Transform a list of

12   the 503(b)(9) claims that the debtor believes Transform

13   should pay, is that correct?

14          MR. GENENDER:  Your Honor, I think I've heard it

15   four times.

16          THE WITNESS:  Yeah.  I thought we've answered it.

17          THE COURT:  Yes.

18   BY MR. WANDER:

19   Q    Now if you can turn your attention to paragraph 61 of

20   your declaration.

21   A    Okay.

22   Q    It has a heading "Transform 503(b)(9) Obligations".  Do

23   you see that?

24   A    I do.

25   Q    Now in the last sentence, you refer to the $97 million

Page 68

1    on account of 503(b)(9) claims.  Do you see that?

2    A     I do.

3    Q     But then  you go on to say, "which may be offset

4    depending on how the Specified Receivable and Prepaid

5    Inventory issues are resolved".  Do you see that?

6    A     I do.

7    Q     And can you explain that?

8    A     This is subject to ongoing litigation with Transform

9    under the EPA.  So there is still the opportunity and

10   potential that there is some type of reduction to the

11   obligation they're required to take.  Our position is that

12   we still have the right to (indiscernible) and position on

13   these amounts.

14   Q     Well, how much is Transform saying should be offset

15   based upon specified receivables?

16   A     I don't know the number off the top of my head but I

17   think it's rather large.

18   Q     Approximately.

19   A     It may be 50 to 60 million.

20   Q     And how much is the prepaid inventory issue,

21   approximately?

22   A     I think it might be about five million.

23   Q     Isn't it true that Transform has taken the position

24   that it doesn't owe any of that $97 million on account of

25   the 503(b)(9) claims?

1    A    It's possible.

2    Q    Isn't that Transform's position that it doesn't owe any

3    money on the 503(b)(9)?

4    A    There are a lot of open items on the litigation with

5    Transform.  I don't know the exact position they're taking

6    on that.

7    Q    So as of today, would it be fair to say that it's

8    unclear whether the debtor will receive any of the $97

9    million?

10   A    I'd be speculating.  I don't know.  This is what we

11   believe is still owed to the estate.

12   Q    Well, would you be speculating that the debtor would

13   recover the $97 million?

14   A    It's open to litigation at this point.  So I don't have

15   an answer on that.

16   Q    If you could turn your attention to paragraph 67 in

17   your declaration.  Now this relates to recoveries of

18   preferential transfers, correct?

19   A    That's right.

20   Q    And you're estimating a recovery range -- you put down

21   $100 million as reasonable?

22   A    That's right.

23   Q    And of that $100 million, how much do you project the

24   debtor will recover by the end of 2019?

25   A    Hard to say.  I think that's really based on what the

Page 70

1    preference actions and the preference firms are able to

2    bring in over the next three months.  Again, I'd be

3    speculating on the exact amount in the next two to three

4    months.

5    Q    Okay.  Well, what's your best guess to the nearest 10

6    million of what the recovery by the end of the year?  Do you

7    have any idea?

8    A    Fifteen to twenty million would be just a guess.

9    Q    Oh, I don't want you to guess.

10   A    Okay.  I don't have a --

11   Q    So do you have any --

12   A    I don't have a great idea, no.

13   Q    Sure.  Okay.  And without guessing, can you tell me how

14   much in preference recoveries you believe the debtor will

15   recover in 2020?

16   A    I believe what we are anticipating is another 60

17   million or so.

18   Q    In 2020?

19   A    Yes.  I think that's correct.

20   Q    Okay.  And what about in 2021?  Approximately, how much

21   of the $100 million are you going to recover -- the debtors'

22   estate will recover or the liquidating trust will recover in

23   2021?

24   A    It would be the balance of whatever we just laid out

25   for 2019/2020.  So the balance would be in 2021.  So maybe

Page 71

1    that's another $20 million.

2    Q    Okay.  So is it your testimony that you believe the

3    debtor will recover all of the potential preference

4    recoveries totaling $100 million by the end of 2021?

5    A    That would be my assumption, yes.

6    Q    Okay.  Now what do you base that assumption on?  And

7    let me tell you why I'm curious about this.  I'm negotiating

8    a settlement with one of the companies that has been

9    retained by the debtor.  It's a 2010 bankruptcy, I believe,

10   PCD Communications.  And we're still finalizing the

11   settlement and it's about eight years later.  So I'm trying

12   to understand why you think --

13              THE COURT:  Is that testimony, Mr. Wander?

14              MR. WANDER:  No.  That was --

15              THE COURT:  Do we need to say when the demand was

16   made and when the complaint was filed and all of those

17   points, too?

18   BY MR. WANDER:

19   Q    Well, in your estimate of the recovery by 2021, does

20   that assume complaints will be filed, answers, discovery,

21   trials on ordinary course of business defenses and

22   everything will be completed by 2021 resulting in $100

23   million recovery?

24   A    It's based on the discussions we've had internally and

25   with the preference firms that we've retained.

Page 72

1    Q    Okay.  So the record's clear, you expect it all to be

2    completed by the end of 2021.

3              MR. GENENDER:  Objection.  Restates his testimony.

4    He said that's his assumption.  He's misstating his

5    testimony.

6              THE WITNESS:  We've been more focused over the

7    last -- over the next, call it 12 to 15 months.  So anything

8    past that period, it is my assumption but I don't know

9    exactly.

10   BY MR. WANDER:

11   Q    No.  It's possible that the preference litigation could

12   go on for five years, isn't it?

13   A    Anything's possible, yes.

14   Q    Is it possible that it would go on for five years as it

15   would be completed in two?

16   A    I'd be speculating.  I don't know.

17   Q    Well, is your testimony that in the analysis of the

18   other large bankruptcy cases that was done that the

19   litigation -- the preference litigation is usually concluded

20   in about less than three years?

21   A    I'd say the majority of the preference recoveries are.

22   I don't know the tail on the last pieces of it but the

23   majority of it is, to my understanding.

24   Q    How long do you think the ESL litigation might take?

25   A    It all depends on if there's potential settlements

Page 73

1    involved, what happens with the D&O policy recoveries, and

2    ultimately if there's a settlement with ESL.

3    Q    So as of today, you have no idea how long it might

4    take.

5    A    I'd be speculating.  I don't know.

6    Q    Now if you could turn your attention to paragraph 75.

7    And there's a heading above that, "Claims to be Satisfied".

8    Do you see where I'm referring to?

9    A    I do.

10   Q    And in the second line of the first sentence, it refers

11   to the -- I'll just read the beginning part:

12       "As detailed in the Murphy Declaration, the Debtors,

13   with the assistance of their financial advisors, have been

14   carefully tracking administrative expense claims (including

15   503(b)(9) claims)" -- do you see where I'm reading?

16   A    Yes.

17   Q    How do you think the debtor and its financial advisors

18   have been doing so far with respect to carefully tracking

19   administrative expense claims?

20   A    As I think it says here, this is more detailed in the

21   Murphy declaration.  He's been in charge of handling most of

22   the claims side of this analysis.

23   Q    Okay.  I'll save some questions then for Mr. Murphy

24   instead of asking you on that.

25       Now if you could look at paragraph 76 of your

1   declaration, you state in the middle, " I believe the

2   Debtors will be able to satisfy Administrative Expense

3   Claims, Secured Claims".  Do you see where I'm reading?

4   A    I do.

5   Q    Okay.  And what year do you believe the debtors will

6   likely be able to satisfy all allowed administrative expense

7   claims?

8   A    Again, that's to be determined.  It could take months.

9   It could take slightly longer than months.  We have five or

10   six kind of major items that are still in play for the

11   estate --

12   Q    It could take some --

13   A    -- that we'll decide.

14   Q    I'm sorry.  I didn't mean to interrupt.

15   A    So, first of all is how many administrative claims will

16   actually be allowed.  We have not gotten to that point yet.

17   So we don't know the size of that pool precisely.  How many

18   of those that are actually allowed will opt in to the admin

19   consent program?  When do the preference dollars come in as

20   you talked about?  What happens with the ESL litigation and

21   D&O settlements?  And just all the other remnant asset

22   recoveries, how quickly can we bring those in?

23   Q    Now so the preference recoveries are approximately $100

24   million.  That sounds pretty important in order to get

25   administrative claims paid.  Would you agree?

1   A    It'll depend on the size of the ultimate pool and what

2   happens with the other four or five areas we just laid out.

3   But it's possible that could be material, yes.

4   Q    Right.  And getting those preference recoveries could

5   go into at least 2021, correct?

6   A    The tail piece of it, potentially.

7   Q    And the ESL litigation can take several years, correct?

8   A    It'll depend on what we were able to settle and how

9   quickly.

10  Q    Well, so as of today, you have no idea whether you'll

11  be able to pay --

12              MR. WANDER:  Oh, strike that.

13  BY MR. WANDER:

14  Q    Now allowed administrative claims, there are a bunch of

15  disputes over administrative claims, aren't there?

16  A    That's correct.

17  Q    Like hundreds of millions of dollars in disputes?

18  A    It depends.  Again, this is probably better covered

19  under the Murphy declaration.

20  Q    Well, you've read the Murphy declaration, right?

21  A    I have.

22  Q    Right.  And doesn't it refer to over a billion dollars

23  in administrative claims being filed?

24  A    I'd have to refer to the Murphy declaration.  I don't

25  have it -- I don't believe I have it in front of me.

Page 76

1   Q    Well, do you recall in the Murphy declaration, it

2   indicating that most of the objections to administrative

3   claims have not been filed?

4              MR. GENENDER:  Your Honor, I'm going to object.

5   He's outside the scope of his direct.  And he will have a

6   chance to ask Mr. Murphy these questions.  So foundation,

7   Your Honor.

8              MR. WANDER:  Well, Your Honor, I believe he --

9              THE COURT:  Well, paragraph 76 says "Based on my

10  understanding of the Murphy and Transier declarations".  So

11  --

12             MR. GENENDER:  If I could have a copy of it, I

13  could respond.  But --

14             THE COURT:  Right.

15             MR. GENENDER:  -- I didn't understand there were

16  tons of duplicate claims --

17             THE COURT:  So you can --

18             MR. GENENDER:  -- that were filed.  I don't know

19  the basis to --

20             THE COURT:  Yeah.  You could --

21             MR. GENENDER:  -- these numbers.

22             THE COURT:  One of you should provide him with a

23  copy.

24             MR. WANDER:  Oh.  I'll save those questions for

25  Mr. -- are you saying Mr. Murphy is better equipped to

Page 77

1   respond to that?

2           MR. GENENDER:  He can respond to his own

3   declaration, yes.

4           MR. WANDER:  Well -- okay.

5   BY MR. WANDER:

6   Q    I'd like to turn your attention to the last couple of

7   paragraphs starting with paragraph 88.  And it refers to the

8   carve-out account.

9        Now there's a reference in paragraph 88 to a

10  termination notice.  Do you see that?

11  A    I do see it, yes.

12  Q    Can you explain that to me, how this carve-out account

13  works and the funding and the termination notice?

14  A    My understanding, as long as there were secured claims

15  outstanding for the estate that we'd be operating under the

16  DIP order.  And to the extent that that was to be

17  terminated, somebody would have to file a termination notice

18  of that order.

19  Q    And who would be the party to send or file this

20  termination notice?

21  A    I don't know.

22  Q    Well, are you saying that until the termination notice

23  was sent or filed then every week funds would be taken out

24  of the debtors' accounts and put into the carve-out account?

25  A    As long as the order was still in place, yes.

1    Q    Okay.  So how could that procedure end as a practical

2    matter in this case?

3    A    Somebody would file a termination notice.

4    Q    And who is that?

5    A    I don't know.

6    Q    Do you know who would know?

7    A    I don't.

8    Q    So until this termination notice is filed by someone,

9    we don't know who, every week funds get taken out of the

10   debtors' accounts and fund the carve-out account, is that

11   it?

12   A    As long as secured claims are outstanding, yes.

13   Q    And what secured claims are still outstanding?

14   A    My understanding is it was the intercompany claims that

15   were being processed post-petition.

16   Q    So there are no claims other than intercompany claims,

17   no secured claims currently outstanding.

18   A    To my knowledge, those are the ones that I've been

19   relying on, yes.

20   Q    Okay.  So if the remaining secured claims are

21   intercompany claims, wouldn't then that be the debtor who

22   would say there are no secured claims outstanding and would

23   submit a termination notice?

24   A    But they were outstanding.  So we wouldn't submit a

25   termination notice.

1   Q     Okay.

2             MR. WANDER:  No further questions.  Thank you.

3             THE COURT:  Okay.  Does anyone else want to

4   cross-examine Mr. Griffith?

5             Mr. Griffith, paragraph 77 of your declaration,

6   the second sentence, says "I believe the Debtors have

7   sufficient Assets to pay all Administrative Expense Claims

8   as of the Effective Date and require at most a short delay

9   of the Effective Date to allow for the monetization of

10  significant assets".

11            Can you put any more flesh on what you mean by a

12  short delay?

13            THE WITNESS:  As I said earlier, I would say it's

14  several months, but potentially longer depending upon the

15  tentative five major items that we've laid out as what's

16  going to make us be able to take to the restructuring

17  committee what would actually be -- put us in a position to

18  go effective.

19            THE COURT:  Assuming that the administrative

20  expenses and 503(b)(9) claims are liquidated, i.e., fixed,

21  the amount is fixed --

22            THE WITNESS:  Yes.

23            THE COURT:  -- as per Mr. Murphy's declaration, so

24  you take that variable out of the equation.  How does that

25  affect your assumption regarding the several months delay

Page 80

1    and what assets you need to fill the gap?

2            THE WITNESS:  On that basis, I think what we would

3    be requiring is, based on the conversations with the

4    preference firms and their experience, that could probably

5    take nine months of preference recoveries as long as we also

6    are working towards a settlement with the D&O policies and

7    if the recovery on the kind of the remnant assets that we

8    have out there that we believe will all take less than a

9    year to kind of recover.

10           THE COURT:  So the shortfall is what?  About 100

11   million?  I'm just trying to figure out.  Assuming Mr.

12   Murphy's estimates are reasonably accurate, between cash on

13   hand and --

14           THE WITNESS:  Between the cash on hand and the

15   other assets outside of --

16           THE COURT:  Right.

17           THE WITNESS:  -- the ESL litigation and the

18   preference?  Is that the question?

19           THE COURT:  Yes.

20           THE WITNESS:  Yeah.  I think that shortfall is

21   probably -- I'll call it about 100 to 120 million.

22           THE COURT:  So other than the miscellaneous

23   assets, you need recovery from some litigation source of

24   approximately, what, 15 million, roughly?  Twenty million?

25   I'm just trying to get a sense of it.

Page 81

1            THE WITNESS:  It would be between any further --

2    we assume right now no further dollars come in on the APA

3    Transform litigation.  So between that, between the ESL

4    litigation and the preference actions, we would probably

5    need a little over 100 to 120 million would be my estimate.

6            THE COURT:  Okay.  Okay.  I'll let you -- I just

7    want to ask a couple more questions.

8            Can you turn to your October 1 declaration?

9        (Pause)

10            THE COURT:  If you go to paragraph 5, you note

11    that you were "personally involved in the negotiations of

12    the Administrative Expense Claim Consent Program".  And then

13    in the next sentence, the second sentence of that paragraph,

14    it says:

15            "Over the course of these negotiations, the

16    Debtors shared this analysis with the Ad Hoc Vendor Group

17    and the Creditors' Committee and engaged in multiple

18    diligence discussions in respect to [the] analysis."

19            And the analysis was -- I believe you're referring

20    back to the first sentence where it says "where extensive

21    review and analysis was conducted of the Claims asserted by

22    the members of the Ad Hoc Vendor Group".

23            You see that?

24            THE WITNESS:  Yes.

25            THE COURT:  So were the discussions just about

Page 82

1    their claims and the merits of their claims against the

2    debtors or was the analysis broader and more along the lines

3    of what you've just been questioned about and that are in

4    your declarations, i.e., the timing of payments, the

5    ultimate likelihood of receipt of payments versus claims?

6              THE WITNESS:  The initial focus was on the ad hoc

7    group's claims --

8              THE COURT:  Right.

9              THE WITNESS:  -- and understanding how quickly we

10   could get to some type of resolution with them on what would

11   potentially be an allowed claim.

12             THE COURT:  Right.

13             THE WITNESS:  And then a potential, you know,

14   consent amount where they might be willing to reduce.  And

15   then from there, we did do some other analysis around if we

16   were able to get other portions of the admin claimants to

17   accept a similar plan, what would that mean in terms of what

18   do we need to recover from all the assets and how quickly

19   can we go effective.

20             THE COURT:  Okay.  So some of the due diligence

21   discussions were about the topics that you've just been

22   questioned about.

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  Were they materially different

25   than what you have in your declaration and what you've just

1    been questioned about?

2            THE WITNESS:  No, Your Honor.

3            THE COURT:  Okay.  Okay.

4    BY MR. WANDER:

5    Q    Picking up on what the judge was just asking about,

6    were you directly involved in the negotiations with the

7    other ad hoc group?

8    A    I was, yes.

9    Q    Okay.  And isn't it true that there was a concern by

10   the ad hoc group that the funds available on December 1 may

11   be the only funds that would be available for administrative

12   claims?

13   A    Not that I'm aware of.  I don't recall that.

14   Q    Okay.  So I got back up because I forgot about your

15   supplemental declaration from the other day, so I just want

16   to --

17           MR. GENENDER:  Your Honor, I object.  He sat down.

18           THE COURT:  I think -- I really don't think you

19   can raise that at this point.

20           MR. WANDER:  I can't ask one question about his

21   other declaration?  I apologize, the other supplemental

22   declaration?

23           THE COURT:  Go ahead, that's fine.

24   BY MR. WANDER:

25   Q    I'm looking at your supplemental declaration that's

Page 84

1    Document 5297 filed on October 1, 2019.  And in paragraph

2    five -- strike that.  That was the Judge's paragraph.

3        In paragraph 9, which is on page 5 of 6, six lines from

4    the bottom you state in the middle, "I believe that the

5    administrative expense claims consent program allows the

6    debtors to forgo time consuming litigation in connection

7    with the plan and the allowance of settled administrative

8    expense claims."

9        Now, are you -- what litigation are you referring to?

10   A    Disputing the amount of the allowed claims.

11   Q    Okay.  Now, you don't expect all of the administrative

12   vendor creditors to be caught in the settlement.  It would

13   be fair to say will be some people who don't opt in?

14   A    I would agree with that, yes.

15   Q    Okay.  So isn't one of the outstanding litigation

16   issues, what we've been referring to as the World Imports

17   issue?

18   A    I believe it is, but again this is probably for the

19   Murphy declaration.

20   Q    Well, can you explain the World Imports issue?

21   A    Again, that's probably better described by Mr. Murphy.

22   Q    Well, isn't it true that the World Imports issue which

23   it pertains to approximately $30 million in foreign vendor

24   claims?

25               MR. GENENDER:  Your Honor, I'm going to object,

Page 85

```
 1    there's lack of foundation and it's way beyond one question.

 2              THE COURT:  I think you should talk to Mr. Murphy

 3    about this.

 4              MR. WANDER:  I'll save it for Mr. Murphy, Your

 5    Honor.

 6              THE COURT:  Okay.

 7              MR. WANDER:  Thank you.

 8              THE COURT:  Does anyone else want to cross-

 9    examine?

10              (No response)

11              THE COURT:  You can step down.

12              MR. GENENDER:  Your Honor, may I do brief

13    redirect?

14              THE COURT:  Oh, I'm sorry, I didn't know you had

15    any.  Yes, go ahead.

16              MR. GENENDER:  I'm not normally so patient, Your

17    Honor.

18                         REDIRECT EXAMINATION

19    BY MR. GENENDER:

20    Q    Mr. Griffith, let me hit a couple of points.  Do you

21    under -- with respect to 503(b)(9) claims, do you understand

22    that the debtors have objected to substantially all of those

23    claims?

24    A    I do.

25    Q    And that the debtors are working on resolving the
```

Page 86

1   remainder of them?

2   A    Yes.

3   Q    So that in your mind is there a possibility that there

4   may not be 503(b)(9) claims?

5   A    Very minimal to, yes, it's possible.

6   Q    So that would eliminate the discussion you had about

7   the 97 million, that wouldn't even be an issue; is that

8   fair?

9   A    That's right.

10  Q    Thank you.  You were asked some questions about the

11  preference recoveries and the timing.  Did you rely on the

12  professionals, the preference firms, as stated set forth in

13  your declaration for that testimony?

14  A    It was part of it, yes.

15  Q    I want to go to some of the questions that -- I'm going

16  to refer you to your declaration starting with paragraph 62

17  and walk you through a couple of things.  I take that back,

18  paragraph 55.

19       Your -- would you agree, Mr. Murphy (sic), that your

20  declaration address --

21            THE COURT:  Mr. Griffith.

22            MR. GENENDER:  I'm jumping ahead, Your Honor,

23  thank you.

24  BY MR. GENENDER:

25  Q    Mr. Griffith, would you agree that your declaration

Page 87

1   sets forth various sources of funds.

2   A    Yes.

3   Q    I'd like to go through and add those up to clarify the

4   record if that's okay, please.  Starting with paragraph 55,

5   you address cash on hand.

6   A    Yes.

7   Q    50.1 million.

8   A    Correct.

9   Q    As of that date, right?

10  A    Yes.

11  Q    Paragraph 56 you address total additional proceeds,

12  130.4 million.

13  A    Yes.

14  Q    And then you in paragraph 57, 58, 59, 60 and 61 address

15  those elements, correct?

16  A    That's correct.

17  Q    And then you address additional litigation proceeds in

18  the paragraphs thereafter with respect to the preference

19  actions in the ESL litigation; is that right?

20  A    Yes.

21  Q    And to the extent there are claims allowed, did you

22  personally handle that process, administrative claims,

23  excuse me?

24  A    Not personally, no.

25  Q    Mr. Murphy did, right?

Page 88

```
 1    A     Correct.

 2    Q     And you reviewed his declaration?

 3    A     I did.

 4    Q     And you understand that -- do you defer to whatever his

 5    conclusions were and observations were as to what if any

 6    administrative claim shortfall there existed, right?

 7    A     That's correct.

 8    Q     All right.  And do you understand from reading his

 9    declaration that he has a view that there may not be an

10    administrative claim shortfall at all?

11    A     I do.

12    Q     If that were the case, how much money would the estate

13    need to meet a shortfall that doesn't exist?

14    A     None.

15          MR. GENENDER:  Thank you.  One second, Your Honor.

16          Nothing further, Your Honor, thank you.

17          THE COURT:  Okay.

18          MR. WANDER:  Your Honor, briefly?

19          THE COURT:  Sure.

20                    RECROSS-EXAMINATION

21    BY MR. WANDER:

22    Q     You were just asked some questions about 503(b)(9)

23    claims I believe, correct?

24    A     Yes.

25    Q     I thought Mr. Murphy was the one who had that
```

Page 89

1    information based on your earlier testimony when I was

2    asking you very similar questions.

3              MR. GENENDER:  Your Honor --

4              THE COURT:  No, he said he wasn't going to deal

5    with the 503(b)(9) claims --

6              MR. WANDER:  Right, but --

7              THE COURT:  -- he was going to rely on Murphy.

8    BY MR. WANDER:

9    Q    I believe that counsel just asked you about the

10   503(b)(9) claims --

11             THE COURT:  No, he didn't.

12   Q    -- and asked whether objections to most of those claims

13   has been filed.

14             MR. GENENDER:  I asked if there were objections to

15   the claims.

16             THE COURT:  He's just focusing on the assets.

17             MR. WANDER:  Okay.  I thought he was -- counsel

18   was eliciting important testimony from him on the 503(b)(9)

19   issue that I agreed not to ask him about.

20             THE COURT:  As far as objections are concerned,

21   I'll listen to Mr. Murphy.

22             MR. WANDER:  Okay.  Thank you, Your Honor.

23             THE COURT:  Objections to the 503(b)(9) claims

24   that have been filed.

25             Okay.  You can step down.

Page 90

1              THE WITNESS:  Thank you.

2              MR. GENENDER:  Your Honor, at this time the

3      debtors would call William Murphy who submitted a

4      declaration on September 13th, 2019 at ECF No. 5149.

5              THE COURT:  Okay.  If you can take a seat, please.

6              Would you raise your right hand, please?

7         (Witness sworn)

8              THE COURT:  And it's William M-U-R-P-H-Y?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  So, Mr. Murphy, you've

11     submitted a declaration intended to be your direct testimony

12     in this confirmation hearing that's dated September 13,

13     2019.  Sitting here today is there anything that you wish to

14     change in it as your direct testimony?

15             THE WITNESS:  No, Your Honor.

16             THE COURT:  Okay.  All right.  Does anyone wish to

17     cross-examine Mr. Murphy?

18             MR. FOX:  Your Honor, Edward Fox from Seyfarth

19     Shaw on behalf of Wilmington Trust, we also designated

20     portions of the deposition testimony of Mr. Murphy and the

21     debtors made cross designations.  And I believe you have

22     those and we rest on that.

23             THE COURT:  Okay.

24             MS. LIEBERMAN:  Good afternoon, Your Honor, Donna

25     Lieberman, Halperin Battaglia Benzija for Relator Carl

Page 91

1    Ireland, who's the administrator of the Estate of James

2    Garbe.

3                        CROSS-EXAMINATION

4    BY MS. LIEBERMAN:

5    Q    Mr. Murphy, could I ask you to look at your

6    declaration --

7    A    Yeah.

8    Q    -- specifically paragraph 29 and in paragraph 55?

9         Mr. Murphy, do you see in those paragraphs that you've

10   indicated that the estimate for secured claims is $18

11   million?

12   A    Yes.

13   Q    Has anything changed in those estimates to your

14   knowledge?

15   A    No.

16   Q    Do you know what secured claims are included in those

17   estimates?

18   A    Your client's claim.

19   Q    Are any -- and obviously jointly my client and the

20   United States, any other secured claims in there -- in those

21   -- in that $18 million?

22   A    No.

23   Q    Mr. Murphy, do you know if the debtors have enough cash

24   on hand to reserve for those secured claims?

25   A    Yes, they --

Page 92

1   Q    Yes, you know or you --

2   A    The debtors -- but there's other demands for the cash

3   that the debtors have on hand.

4   Q    I'm not sure I understand.  Do you anticipate that when

5   this -- when the plan goes effective that the debtors will

6   have enough cash on hand?

7   A    Yes, when the plan goes effective, debtors will have

8   enough cash on hand.

9   Q    And do the debtors currently have enough cash on hand

10  to reserve $18 million for the secured claim?

11  A    The current plan would be to make sure that the funds

12  are available as of the effective date, which we believe

13  they're going to be available.

14  Q    Mr. Murphy, are you generally familiar with the

15  administrative claims procedures settlement that recently

16  got filed?

17  A    Yes.

18  Q    Are you aware that that contemplates $20 million being

19  put in a segregated account?

20  A    Yes.

21  Q    Will that affect the availability of the debtors to

22  reserve for the secured claims?

23  A    No.

24  Q    So even with that $20 million being segregated solely

25  for opt in administrative claimants, the debtors have

Page 93

```
 1   sufficient money to reserve $18 million for these secured

 2   claims?

 3   A     As of the effective date, yes.

 4   Q     What about as of the current date?

 5   A     No.

 6             MS. LIEBERMAN:  No further questions, Your Honor.

 7             THE COURT:  Okay.  Does anyone else want to cross-

 8   examine Mr. Murphy?

 9                      CROSS-EXAMINATION

10   BY MR. WANDER:

11   Q     Mr. Murphy, my name is David Wander of Davidoff Hutcher

12   & Citron.  I'm going to first ask you the questions that I

13   asked others but no one seems to know and this has to do

14   with the compensation of the liquidating trust board

15   members.

16        Can you tell me how much is being discussed for the

17   annual based compensation?

18   A     I'm not involved with that, so no.

19   Q     And who is?

20   A     I don't know.

21   Q     Okay.  Do you have any idea about the incentive

22   compensation?

23   A     I'm not involved with those discussions.

24   Q     Do you know who would know about that?

25   A     No.
```

1    Q    I'm going to start out with the question that I was

2    asking Mr. Griffith regarding the administrative expense

3    claim settlement.  And I was referring to paragraph 9 of his

4    declaration, document 5297.  And he said, "I believe that

5    the administrative expense claims consent program allows the

6    debtors to forego time consuming litigation in connection

7    with the plan and the allowance of settled administrative

8    expense claims."

9         Can you describe the time consuming litigation that

10   this settlement will make unnecessary?

11   A    If you don't mind, can you repeat the paragraph that I

12   want to read here?

13   Q    Sure.  It's paragraph 9 and it starts six lines from

14   the bottom, we're in the middle of the page, it says, "I

15   believe that the administrative claims."  Do you see where

16   I'm referring to?

17   A    I see the statement, yes.

18   Q    And you see the reference to time consuming litigation?

19   A    Yes.

20   Q    Okay.  Other than the objection to the plan by the

21   Foley & Lardner firm, what time consuming litigation is

22   going to be resolved by this settlement construct?

23   A    To the extent administrative claimants opt in there's a

24   procedure to review the claims and go forward with the

25   consent program.

1   Q    Well, would it be fair to say that it's very likely not

2   all of the administrative claimants with 503(b)(9) claims

3   and the foreign vendors who have those claims are going to

4   opt in?

5   A    That would be speculation.  I don't know what they'll

6   be thinking about.

7   Q    Well, isn't one of the litigation issues that remain

8   unresolved that we refer to as the World Imports issue?

9   A    That's -- that will be one of the issues as part of the

10  objections that will be filed.

11  Q    Right.  And can you explain what the World Imports

12  issue is?

13  A    I'm not an attorney, but as a businessman, my

14  understanding it's using a receipt date based on port of

15  origin versus a domestic receipt date.

16  Q    Okay.  And that relates to approximately $30 million of

17  foreign vendor claims?

18  A    I'd have to add up the claims.  The 30 million I'm

19  aware of is the amount of claims that -- the dollar amount

20  that's, you know, our estimated objection amounts to be

21  objected to.

22  Q    Okay.  Now, the World Imports issue is not resolved in

23  any way by the settlement, correct, it's still out there?

24  A    That's correct.

25  Q    There are also litigation issues with many of the same

Page 96

1    vendors having to do with prepetition orders of goods that

2    were delivered post-petition, correct?

3    A    Correct.

4    Q    And the administrative claim settlement doesn't resolve

5    those litigation issues with regard to creditors who do not

6    opt in, correct?

7    A    Correct.

8    Q    So the time consuming litigation relating to 503(b)(9)

9    claims and even 503(b)(1) claims of the foreign vendors are

10   not resolved by the settlement, correct?

11   A    It's a consent program and it's -- it allows a process

12   where we're able to agree to allowed amounts outside of the

13   court process.

14   Q    But as long as all the creditors haven't opted in, the

15   time consuming litigation --

16          THE COURT:  It's a tautology, you settle/you

17   settle, you don't/you don't.  I get that, Mr. Wander, we

18   don't need to spend more time on this.

19          MR. WANDER:  Okay.  I'll move on, Your Honor.

20          THE COURT:  Plus which as Mr. Murphy says there is

21   a mechanism for specifically exchanging information and I

22   guess progressing a possible settlement with people who

23   haven't immediately settled.

24   BY MR. WANDER:

25   Q    Now, you're a senior director of M3 Partners, correct?

Page 97

1    A    Correct.

2    Q    And how long has M3 been involved with Sears?

3    A    My understanding is for several years.

4    Q    And can you describe M3's role with Sears prior to the

5    bankruptcy filing?

6    A    I cannot.

7    Q    Wasn't M3 involved in maintaining and overseeing the

8    books and records of Sears prior to the bankruptcy?

9    A    I joined M3 in December, so I'm not aware of any events

10   prior to that.

11   Q    December of what year?

12   A    2018.

13   Q    So you have no knowledge of M3's involvement in the

14   debtors' books and records prior to the bankruptcy filing?

15   A    That's correct.

16   Q    I'd like to direct your attention to paragraph 20 of

17   your declaration which is on page 11.  Three lines from the

18   bottom in the middle you state, "Among other things we found

19   that historical intercompany data was incomplete and at

20   times inaccurate creating a possibility of inaccurate

21   results by orders of magnitude."

22       What do you mean by orders of magnitude?

23   A    The total intercompany due to or due from receivable

24   and payables as of the filing date again netted even at this

25   level, exceeded $100 billion.  As we evaluated the host

Page 98

1   petition intercompany balances, we found entries that

2   depending on which account you looked at may have had

3   adjustments in the tens and hundreds of millions of dollars

4   and it took -- it takes to summarize that data particularly

5   historically is magnitudes of millions and billions of

6   dollars.

7   Q    So when you used the phrase order of magnitude, meaning

8   a large amount?

9   A    Yes.

10   Q    Okay.  And you continue after the phrase orders of

11   magnitude, you mention antiquated accounting systems.  Do

12   you see that?

13   A    Yes.

14   Q    And so those would be the accounting systems that Sears

15   was maintaining for the several years before the bankruptcy

16   when M3 was involved in the company, correct?

17   A    Yes.

18   Q    Do you know -- strike that.

19        Because you weren't with M3, you wouldn't know what --

20   prior to December 2018, you don't know or do you, why they

21   maintain this -- continued to maintain an antiquated

22   accounting system?

23   A    M3 wasn't maintaining.  The firm was not maintaining

24   the systems.  The debtor, these are the debtors' systems.

25   Q    Right.  So what was M3's role though with respect to

Page 99

 1   Sears in those couple of years before the bankruptcy when

 2   Sears had an antiquated accounting system?

 3            THE COURT:  He's already answered this, he doesn't

 4   know.  He got here -- you asked him five questions about

 5   this.

 6            MR. WANDER:  Okay.

 7   BY MR. WANDER:

 8   Q    Now, if you turn to page 12 of your declaration, there

 9   -- and in particular footnote 5.  Okay.  You refer to how

10   information is recorded currently, correct, and you refer to

11   this People Soft Oracle system.

12   A    Yes.

13   Q    Okay.  Now, the last sentence in that footnote you

14   state, "this process is cumbersome and extremely time

15   consuming."  Can you explain what you mean?

16   A    To evaluate the post-petition intercompany activity, we

17   work with the now transformed accountants and this was a

18   three or four month process to summarize post-petition

19   intercompany activity that was being monitored on a bi-

20   weekly basis.

21        To summarize that data was a pretty intensive effort on

22   their part and it was cumbersome and time consuming just for

23   three or four month period that we were tracking -- you

24   know, the debtor process was being tracked as part of the

25   DIP loan agreement.

Page 100

1   Q     And how accurate has that process been?

2   A     Accurate enough that we've concluded we -- it was

3   better to do a plan settlement than to utilize the

4   intercompany activity even though we had millions of data --

5   millions of lines of data to -- that they summarized to

6   identify intercompany receivable and payable activity

7   between debtors.

8         There was -- we were never able to get down to the raw

9   data of receivables and activity between both -- any

10  particular debtor, due to the volume of the data.

11  Q     You're talking now about the debtors' currently

12  accounting, correct?  The problems you were just talking

13  about is now the current post-petition data; isn't that

14  correct?

15  A     The issue is more the volume of the data in summarizing

16  that data.

17  Q     The issue is not at all reconciling the data?

18  A     And reconciling it.

19  Q     Right.  There are major problems the debtor has faced

20  reconciling the data post-petition, correct?

21  A     Which is the current -- what I'm referring to

22  specifically is the intercompany activities.

23  Q     Now, I'd like to turn your attention to paragraph 28 on

24  page 16 of your declaration and there's a heading, claims

25  analysis.

Page 101

1   A     Okay.

2   Q     Okay.  Now, the debtors have asked the Court to set a

3   bar date for the filing of certain claims, correct?

4   A     Yes, they did.

5   Q     And the debtor asked the Court for a bar date for

6   503(b)(9) claims, correct?

7   A     Correct.

8   Q     And the debtors asked the Court to set a bar date for

9   unsecured claims, correct?

10  A     It was the same date I understand.

11  Q     The debtors have not asked the Court to set a date for

12  administrative claims under 503(b)(9) claims, correct?

13  A     That's my understanding.

14  Q     And that's been a deliberate choice by the debtor not

15  to seek that bar date; isn't that correct?

16  A     An administrative claim bar date has not been set as

17  far as the discussions of whether or not to file it.  That's

18  out of my realm of expertise.

19  Q     Okay.  Well, why would the debtor have the Court set a

20  bar date for unsecured claims and 503(b)(9) --

21            THE COURT:  He just said he doesn't know.

22            MR. WANDER:  I'm sorry?

23            THE COURT:  He just said he doesn't know, Mr.

24  Wander.

25  BY MR. WANDER:

Page 102

1    Q    There could be a lot of administrative claims that have

2    not been filed, correct?

3    A    I guess anything is possible.

4    Q    Well, there hasn't been a bar date, there could be

5    hundreds of millions of administrative claims that haven't

6    been filed, correct?

7    A    You want my professional opinion?

8    Q    I'm asking whether the fact that the debtor has not an

9    administrative claims bar date could result in there being

10   hundreds of millions of dollars of administrative claims to

11   be filed in the case.

12   A    My opinion it's unlikely.

13   Q    Well, hasn't there been additional administrative

14   claims being filed last week, the week before?  Every week

15   don't we see additional administrative claims being filed?

16   A    I believe so, yes.

17   Q    Have you been adding up those additional administrative

18   claims that have been filed in your calculations of the

19   total administrative claims that may be allowed in this

20   case?

21   A    Yes.  Most of them currently are -- they're included in

22   the accounts payable that's been outstanding since February

23   11th.

24   Q    You're saying all of the claims that have been filed

25   recently are listed in the debtors' books as being

Page 103

1    outstanding payables?

2    A    I have to look at all of those motions you're referring

3    to to know whether I'm accurately answering your question,

4    but the ones that I've looked at, I find that they're in the

5    accounts payable.

6    Q    And which ones are those?

7    A    I'd have to go back and look at the documents.  I just

8    know that as I look at documents and I look at particular

9    claims when asked, I've found that they've also been in the

10   accounts payable.

11   Q    Well, is it your testimony that administrative claims

12   that have been filed in the past two weeks, you've checked

13   and determined that they were listed in the debtors' books

14   as payables?

15   A    No, I can't say that.

16   Q    Now, I'd like to turn your attention to paragraph 29

17   which talks about outstanding claims.

18          THE COURT:  I'm sorry, before we go to that, can I

19   just ask you, Mr. Murphy, you have a paragraph in your

20   declaration, paragraph 41 that states "other administrative

21   expense claims" that's the heading for it.  And it has a

22   chart and the first box in the chart says "claims filed to

23   date."  And then you deduct from it objections filed and

24   anticipated objections claims to be expunged upon

25   confirmation, and then, plus additional amounts related to

1     post-petition pre-closing accounts payable --

2              THE WITNESS:  Correct.

3              THE COURT:  -- 30 million.

4              Is that 30 million the accounts payable that you

5     -- I mean, to put it differently the heading here is claims

6     filed to date, but then you say plus additional amounts

7     related to post-petition pre-closing amounts payable.  Are

8     those -- is that 30 million derived at looking at the

9     debtors' accounts payable books or claims that have actually

10    been filed?

11             THE WITNESS:  It's the former, the --

12             THE COURT:  Accounts payable books.

13             THE WITNESS:  -- records of accounts payable.

14             THE COURT:  So this claims filed to date is not

15    just the claims filed, but also you're looking at the

16    accounts payable records.

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Okay.  So even if someone hadn't filed

19    a claim, the accounts payable records if they show 30

20    million that's what you put down here.

21             THE WITNESS:  Correct.

22             THE COURT:  Okay.

23    BY MR. WANDER:

24    Q    Well again, is it your testimony that the

25    administrative claims that have been filed in the last two

Page 105

1    weeks you cross-referenced and determined they were included

2    in the $30 million of payables?

3              MR. GENENDER:  Asked and answered, Your Honor.  In

4    response to your question, Your Honor, he just answered it.

5              THE WITNESS:  As I answered prior, no.

6    Q    Right.  So your response to the Judge's question you

7    indicated that the $30 million covered possible additional

8    administrative claims but you just said you haven't checked

9    claims that haven't been filed in the past two weeks.

10             THE COURT:  All right.  Let me, do you have

11   confidence in the debtors' books and records that they

12   reflect accurately the accounts payable?

13             THE WITNESS:  Yes.

14             THE COURT:  So if someone filed a bogus claim and

15   it didn't show up in the accounts payable you wouldn't count

16   it, right?

17             THE WITNESS:  That's correct.

18             THE COURT:  All right.  Let's move on.

19             MR. WANDER:  Look --

20             THE COURT:  No, that's enough.  I mean, honestly.

21   BY MR. WANDER:

22   Q    With regard to the chart the Court was just referring

23   to it talks about $1.157 billion in claims filed to date,

24   correct?

25   A    Correct.

Page 106

1   Q    Okay.  And then it refers to, it subtracts the $17.3

2   million of objections filed to date.

3   A    Yes.

4   Q    Okay.  But no order's been entered by the Court

5   disallowing those $17.3 million of claims, has there been?

6   A    They've been filed recently.  They have not had final

7   court orders.

8   Q    Right.  And there's actually not even been any hearing

9   on it so far, correct?

10  A    Not that I'm aware of.

11  Q    Okay.  And then you subtract $44 million in additional

12  anticipated objections.  So not only is there no order filed

13  disallowing those $44 million of claims, the debtor hasn't

14  even filed the objections, correct?

15  A    Correct.

16  Q    So those would be deemed allowed -- to be allowed

17  pending the filing of an objection, correct?

18  A    No.

19  Q    A proof of claim filed --

20          THE COURT:  It's a legal issue.

21          MR. WANDER:  Okay.

22  BY MR. WANDER:

23  Q    So going back to paragraph 29 where it refers to

24  outstanding claims, in subsection A you refer to the

25  503(b)(9) claims.  Do you see that?

Page 107

1    A    Yes.

2    Q    Now, you say zero when taking into account transforms

3    obligations under Section 2.3(k)(IV) of the APA.  Do you see

4    that?

5    A    Yes.

6    Q    And can you explain how you get the -- well, what's the

7    -- prior to taking the number down to zero, what's the

8    starting number that you have for the 503(b)(9) claims?

9    A    90 million.

10   Q    Okay.  And did you analyze the 503(b)(9) claims using

11   what I'll refer to as the World Imports analysis or a point

12   of origin analysis?

13   A    We used the debtors' records and their -- the debtors'

14   records and how the debtor recorded the merchandise on its

15   books and records, you know, the receipt date that they

16   used.

17   Q    But do you know what is meant when I refer to the World

18   Imports analysis?

19           MR. GENENDER:  Asked and answered, Your Honor.

20           THE COURT:  No, you can answer that question, do

21   you know of that?

22           THE WITNESS:  Yes.

23   BY MR. WANDER:

24   Q    Okay.  Now, is there a list -- has the debtor compiled

25   the list of 503(b)(9) claims using the point of origin and

Page 108

1   503(b)(9) claims using a World Imports analysis?

2   A    No, there's one reconciliation per vendor and the match

3   of the debtors' records to the claimant's records were based

4   on the debtors' receipt dates.

5   Q    And the receipt date being when?  How did you determine

6   the receipt date?

7   A    The receipt date for foreign vendors was the port of

8   origin.

9   Q    Okay.  And what's the difference in amount between

10  using the point of origin and using the World Imports

11  analysis, to the nearest $5 million?

12  A    We didn't do that analysis to answer that question.  If

13  you take the objections that the debtors ultimately will

14  have against the import vendors and you say that all of the

15  import vendor claims are based on a different date than the

16  debtors' date, then that objection is in excess of $30

17  million, that difference.

18  Q    So if it was determined that the World Imports analysis

19  is the proper way to analyze the receipt date to the foreign

20  vendor claims there'd be an additional approximate $30

21  million in 503(b)(9) claims, correct?

22  A    There's additional analysis that would have to be

23  completed comparing the different receipt dates to the

24  debtors' records.

25  Q    And that might be another $30 million, correct?

Page 109

1    A    Depending on the analysis.

2    Q    Right.  I'm saying if the analysis went the other way,

3    not the way the debtor would like it to go, that analysis

4    would end up being another $30 million in foreign vendor

5    503(b)(9) claims; isn't that correct?

6    A    I haven't done that analysis --

7              THE COURT:  Well, I'm sorry --

8              THE WITNESS:  -- so I can't answer the question.

9              THE COURT:  -- I'm not sure I understand whether

10   you understand the question.  Or I understand what you just

11   said, Mr. Murphy.

12              I think what I heard you say is that if you look

13   at the amount of the claims of foreign vendors that the

14   debtors have objected to or will object to its roughly 30

15   million that's at issue.

16              THE WITNESS:  Yes.

17              THE COURT:  Is it your testimony that not all of

18   that 30 million in dispute is attributable to the so-called

19   World Imports issue?

20              THE WITNESS:  Yes, Your Honor, thank you.

21              THE COURT:  Okay.  So some might be because even

22   at point of delivery as opposed to point of origin it might

23   be outside 503(b)(9)?

24              THE WITNESS:  Yes, Your Honor.

25              THE COURT:  Okay.  So the outside would be 30

Page 110

```
 1    million --
 2              THE WITNESS:  Yes.
 3              THE COURT:  -- if all the issues were related to
 4    the so-called World Imports issue, the outside amount, the
 5    aggregate, but you don't know how much within that 30
 6    million would be specifically attributable to the World
 7    Imports?
 8              THE WITNESS:  Yes, Your Honor, thank you.
 9              THE COURT:  Okay.  All right.
10    BY MR. WANDER:
11    Q    But you don't know the difference in amount?
12              THE COURT:  No, I just said that.
13              MR. WANDER:  Okay.
14    Q    So I believe that originally Transform was under the
15    APA going to pick up approximately 139 million in 503(b)(9)
16    claims?
17    A    Yes.
18    Q    And then that number got reduced to 97 million subject
19    to possible offsets, correct?
20    A    Yes.
21    Q    And those offsets include a dispute over inventory,
22    correct?
23    A    Yes.
24    Q    And it also includes a dispute over receivables,
25    correct?
```

Page 111

1    A    Correct.

2    Q    And Transform has asserted offsets to the full $97

3    million, correct?

4    A    I don't know if I would say full amount, but they are

5    substantial.  They have a substantial -- a claim of

6    substantial reduction.

7    Q    Okay.  Well, approximately how much reduction, to the

8    nearest $10 million?

9    A    60.

10   Q    So the 97 million minus the 60 would mean they would

11   just pick up 37 million?

12   A    That would be the math.

13   Q    Okay.  So there could be -- then what you have in

14   paragraph 29(a) you have a zero, the number could be 60

15   million?

16   A    Well, subject to that litigation the number could be

17   higher.

18   Q    And when do you expect that litigation to be completed?

19   A    I have no idea.

20   Q    And as of today, you have no idea as to how much of the

21   503(b)(9) claims Transform may be legally obligated to pay;

22   isn't that correct?

23   A    Where I stand today they're obligated to pay the 90

24   million that we estimate would be the 503(b)(9) claims.

25   Q    Are you saying you completely discounted all the

Page 112

1    offsets for inventory and receivables?

2    A    I'm not involved in that specific detail.

3    Q    So you don't know?

4    A    My understanding is it's still a litigated and open

5    issue.

6    Q    Correct.

7    A    As far as I know right now we have a claim against them

8    for the 90 million and 503(b)(9).

9    Q    Do you have any idea how Transform is doing these days

10   financially?

11   A    No.

12   Q    No idea?

13   A    I understand that as any retail operation there's, you

14   know, they're in retail.  But I'm not following their

15   financial performance.

16   Q    Well, isn't it true that the debtor has serious

17   concerns about Transform's ability to pay any amount that

18   the Court might deem it liable to pay under the APA?

19           MR. GENENDER:  Your Honor, that's beyond the scope

20   of his direct.

21           MR. WANDER:  Well --

22           THE COURT:  That's true.

23           MR. WANDER:  Your Honor, he has a zero amount

24   which indicates that Transform is going to pick up all of

25   those 503(b)(9) claims, could be up to $97 million of an

Page 113

 1    offset.

 2              THE COURT:  But he's already answered, he didn't

 3    really examine Transform's ability to pay.  So there's

 4    nothing more to go into.

 5    BY MR. WANDER:

 6    Q    Well so Transform may not be able to pay any of the

 7    503(b)(9) claims even if it's deemed illegally obligated to;

 8    isn't that true?

 9              MR. GENENDER:  Objection, misstates the testimony.

10              THE COURT:  Well, you can answer it, you've

11    answered the question.  It's not misstated testimony, just

12    answer the question.

13              THE WITNESS:  If Transform is unable to make

14    payments then that's an issue.

15    BY MR. WANDER:

16    Q    And isn't it true that as of today the debtor has

17    serious concerns about Transform's financial ability to make

18    any payments of monies that may be deemed owed under the

19    APA?

20    A    It has to be a concern.

21    Q    It's a very big concern right now, isn't it?

22    A    I don't know their records, so I can't tell you whether

23    it's a big concern or a small concern.

24    Q    No, I'm talking about, isn't the debtor very concerned

25    as of today about Transform's financial ability to pay any

Page 114

1    amount the Judge deems is owed under the APA?

2    A    I'm not party to those discussions.  I would be

3    concerned about any party being able to make payments, but

4    as far as that statement, I can't answer that.

5    Q    So you have not been involved in any discussions with

6    the debtor concerning Transform's financial ability to pay

7    and concerns by the debtor that it doesn't have the money?

8    Is that your testimony, you haven't been involved in any

9    such discussions?

10   A    I can't say we haven't had a sidebar discussion by a

11   water cooler that there's, you know, a potential issue for

12   any particular company or particular in retail.

13   Q    Well, what about not in the water cooler, what about in

14   a conference room in negotiations with the ad hoc claimants?

15   A    I would think it would be a statement that anyone would

16   have a concern about.

17   Q    Okay.  Well, is it that anyone would have a concern

18   about Transform in particular knowing what might be known

19   about their financial condition today?

20   A    Yes.

21   Q    Now, in paragraph 31 of your declaration, you refer to

22   filed claims objections for approximately $710 million.  Do

23   you see that?

24   A    Yes.

25   Q    Okay.  And based upon orders entered by this Court that

Page 115

1    a final and non-appealable, how much of those $710 million

2    in claim objections of claims have been disallowed?

3    A    I'm not aware of any court orders yet addressing the

4    710 million.

5    Q    Because those claim objections have only been recently

6    filed.

7    A    Correct.

8    Q    And the debtor has another $5.8 billion of claims to be

9    filed in the future.

10   A    Yes.

11   Q    Okay.  Now, if it's taken this long to file $710

12   million of these claims, how long do you think it's going to

13   take for the additional $5.8 billion in claims to be filed?

14   A    I'd have to go through the detail, I believe a

15   substantial amount of those dollars would be addressed upon

16   confirmation of a plan.

17   Q    Okay.  So let's take out the intercompany claims that

18   would be -- is that what you're referring to, claims that

19   would be addressed by the plan confirmation?

20   A    No, that would be multiple better and duplicate claims.

21   Q    Okay.  So excluding those, how long do you think it

22   will take for all of these additional claim objections to be

23   filed, the ones that need to be filed and won't be expunged

24   as a result of confirmation?

25   A    Well, it includes a legal process.  I'd have to discuss

Page 116

1    it with counsel, but my --

2                THE COURT:  Is this all the claims including

3    unsecured claims in 31?  31 is all the claims, right, not

4    just admins?  Can we focus just on the admins is all we care

5    about?

6                MR. WANDER:  Your Honor, looking at paragraph 29

7    which defines the outstanding claims, which is what

8    paragraph 31 is about, and it doesn't seem to include

9    unsecured claims.

10               THE COURT:  I don't know, that was my question.

11               THE WITNESS:  The majority of the billions of

12   dollars would be the debt that's been addressed as far as

13   the Transform transaction and duplicates.

14   BY MR. WANDER:

15   Q    Right.  So I'm talking about just outstanding claims,

16   not unsecured claims, the ones referred to in paragraph 31,

17   approximately how long do you believe it'll take for all of

18   those claims to first get filed?

19   A    It's probably several months.

20   Q    Okay.  And when you say several, two to three?

21   A    I would think no more, but you know, it's going to be

22   coordinating with counsel.

23   Q    Now which counsel will be filing those claims?  Would

24   that be the debtors' counsel or would that be counsel for

25   the liquidating trust or both?

Page 117

1    A    The debtors' counsel, is my understanding.

2    Q    And approximately how long do you estimate those claim

3    objections will be litigated until the final resolution?

4    A    It all depends on whether we are able to settle before

5    having to go through a full court process or not.

6    Q    Right.  But if you have this large amount of claims to

7    be filed and then litigated, approximately how long do you

8    think that's going to take?

9    A    When you're talking about a large number of claims to

10   be filed, what are you referring to?

11   Q    I'm referring to the claims that you're referring to in

12   paragraph 31; all the claims, administrative types of claims

13   that have to get funded fully in order for the plan to go

14   effective.

15   A    My -- from my experience and looking at these claims, I

16   would expect us to be able to file the claims over the next

17   couple of months.

18   Q    Right.  But my question -- we went through that.  My

19   question now is how long do you project the process will

20   take for those claims to be litigated so that you now know

21   how much allowed administrative claims have to be funded in

22   order for the plan to go effective?  That could take several

23   years; isn't that true?

24   A    It could, but I don't -- in this case I don't -- you

25   know, it all depends on how fast we process the claims and

1    the discussions through the court.

2    Q    Right.  And some of those claims relate to the World

3    Imports issue, correct?

4    A    Yes, with regard --

5    Q    That may need to be litigated not just in this court

6    but either party may lose and take an appeal, correct?

7    A    Anything's possible.

8    Q    But isn't it likely that this claims adjudication

9    process just dealing with administrative claims can take

10   several years.

11   A    That wouldn't be our intent.

12   Q    I'm not talking about your intent, isn't it likely that

13   the claims adjudication process of all of these tens if not

14   hundreds of millions of dollars in numerous claims can

15   likely take several years.

16   A    I'm not equipped to answer that question.

17   Q    Okay.  Do you know why there's been no bar dates for

18   administrative claims filed in this case?

19   A    No.

20   Q    Isn't it true that the debtors deliberately decided not

21   to file an administrative claims bar date motion?

22           THE COURT:  I'm have déjà vu all over again.  We

23   spent ten minutes on this.

24           MR. WANDER:  I thought he was the one who was --

25           THE COURT:  No, you asked him.

Page 119

```
 1              MR. GENENDER:  It just feels like it was yesterday

 2       but --

 3              THE COURT:  You asked him already.

 4       BY MR. WANDER:

 5       Q    Now, I hope I didn't ask you this one --

 6              MR. GENENDER:  I'll take the ender.

 7              THE COURT:  Go ahead, Mr. Wander.

 8       Q    If you'd turn to paragraph 44.  So in paragraph 44, you

 9       refer to $44 million of anticipated objections and it talks

10       about reclassified.  Can you explain that?

11       A    Yes.  Looking at the remaining claims that have been

12       filed after duplicates, there were about 44 million of open

13       issues and looking at those claims our view is that the

14       majority of them will be reclassified to general unsecured

15       claims, assuming the amounts are agreed to.

16       Q    When you say assuming the amounts are agreed to, you

17       mean the creditor who filed the claim agrees?

18       A    A claim was filed with an amount.

19       Q    Right.

20       A    The debtor doesn't necessarily agree with the total

21       dollar amounts, but to the extent they agree with the

22       amounts, the belief is that they would be reclassified as

23       general unsecured.

24       Q    Right.  But the creditors may disagree and those are

25       $44 million that have to be possibly litigated, they haven't
```

Page 120

1    been filed yet, correct?

2    A    You mean the objections have not been filed?

3    Q    Right.

4    A    Correct.

5    Q    And do any of those $44 million refer to 503(b)(9)

6    claims by vendors in the Sears Marketplace?

7    A    No.

8    Q    Okay.  Now, what about the chart above on page 23 where

9    it lists the first, second, third, fourth, fifth, sixth,

10   seventh and eighth claim omnibus claim objections, do any of

11   those relate to 503(b)(9) claims filed by the Sears

12   Marketplace vendors?

13   A    They may.  I know that's an issue.  I just -- I

14   couldn't tell you which particular objection relates to

15   that.

16   Q    Sure, I'm not penning you down as to which one.  Now,

17   when you say the word issue, can you explain what issue

18   there is with regards to those claims?

19   A    I would be inarticulate, so I know that the Marketplace

20   -- the vendors determined to be a Marketplace vendor have --

21   we've -- have been identified with vendors without a

22   503(b)(9) claim.

23   Q    Okay.  But the Sears Marketplace vendors, they -- a lot

24   of them filed 503(b)(9) claims, correct?

25   A    Correct.

Page 121

1  Q    And they -- the creditors claim that the debtors

2  through their customer the -- or through the party that

3  bought the goods from the Sears Marketplace, the vendors are

4  claiming that those goods should be deemed received by the

5  debtors within 20 days of the bankruptcy, correct?

6  A    That would be their assertion.

7  Q    Right.  And the debtors claiming if they were

8  considered to be drop ship, that would not be a 503(b)(9)

9  claim, correct?

10  A    I believe that's the issue.

11  Q    All right.  And that's an issue that has to be

12  litigated, correct?

13  A    The objections have to be litigated, correct.

14  Q    And that legal issue relating to the Sears Marketplace

15  claims have to be litigated.

16  A    Yes.

17  Q    Now, if you could turn to paragraph 46 of your

18  declaration where you talked about priority claims.  You

19  reference $2.37 billion in priority claims filed to date,

20  correct?

21  A    Correct.

22  Q    And objections filed to date are only $14.7 million,

23  correct?

24  A    Correct.

25  Q    And have any orders been entered by the Court

Page 122

1    disallowing any of those $14.7 million of claims?

2    A    Not that I'm aware of.

3    Q    Okay.  And there's another $1.55 billion in claim

4    objections for priority claims.

5    A    Yes.

6    Q    And do you have any idea how many claimants we're

7    talking about?

8    A    There's -- it's probably 50 to 60.  There's one claim

9    for a billion two.

10   Q    Okay.  So the 50 or 60 would cover some $350 million?

11   A    Yes, 320 million.

12   Q    And who's going to file those claims?  Is that going to

13   be the debtors' counsel or the committee or the liquidating

14   trust counsel?

15   A    My understanding would be debtors' counsel.

16   Q    Okay.  Now, the committee's counsel they have certain

17   review or consent rights relating to these claim objections;

18   isn't that correct?

19   A    I have to go back to the disclosure statement and the

20   plan to answer that question.

21   Q    Okay.  So sitting here today, you do not know whether

22   both law firms are going to be involved in the claim

23   objections for the priority claims?

24   A    I do not.

25   Q    And sitting here today, do you know whether both firms

Page 123

1   will be involved in the objections to the administrative

2   claims?

3   A    My understanding is we're coordinating, but the debtors

4   are going to be filing the objections.

5   Q    Well, when you say coordinating, doesn't that mean and

6   isn't it true that both law firms are going to be involved

7   in all of these claim objections?

8   A    I don't believe so.  We -- the debtors are going to be

9   filing the objections from what I understand, but this is --

10  you're getting into discussions about what counsels are

11  deciding, and you know, I'm not driving that bus.

12  Q    Is there a budget for Weil Gotshal handling all of

13  these claim objections and I'm referring to administrative

14  claims and priority claims that you've stated debtors'

15  counsel will be filing?

16  A    There are estimates for professional fees, but I'm not

17  aware of a budget.

18  Q    Okay.  Well, right now I just want to focus on debtors'

19  counsel who you've indicated will be prosecuting these claim

20  objections.  Is there a round number to the nearest $10

21  million that are going to be needed for the legal fees of

22  debtors' counsel for all of these administrative and

23  priority claim objections?

24  A    You'll have to ask counsel.

25  Q    Well, I'm asking you because you're the witness.

Page 124

1   A    I don't have that, no, I can't answer that question.

2   Q    Okay.  You're the one who's supposed to be able to

3   determine the assets, the liabilities if there's -- you're

4   the numbers guy, right?

5   A    I'm an accountant.  I'm also addressing the claims.

6   Q    Among the three witnesses, you're the numbers guy;

7   isn't that true?

8   A    I'm one of the three numbers guys.

9   Q    Okay.  Can you turn to Exhibit A --

10  A    A as in --

11        THE COURT:  I'm sorry, are we moving off the

12  priority claims?

13        MR. WANDER:  Oh, I'm moving off the whole main

14  declaration.  I'm going to --

15        THE COURT:  Okay.  I had a question, Mr. Murphy.

16  On the priority claims --

17        THE WITNESS:  Yeah.

18        THE COURT:  -- if you go to page 24 the chart

19  there, it says "Mias (ph) anticipated objections $1.55

20  billion".

21        THE WITNESS:  Yes.

22        THE COURT:  What is the analysis behind that?  I

23  mean, what is the basis for the objection, just that they

24  checked the wrong box or are there legal issues involved?

25        THE WITNESS:  One claim -- an individual filed a

Page 125

1    claim on behalf of a pension plan for a billion two.

2              THE COURT:  Okay.

3              THE WITNESS:  And that should be addressed with

4    the PGC settlement.

5              THE COURT:  Okay.  And the other roughly 300

6    million?

7              THE WITNESS:  The others, there's -- they're

8    primarily litigation, lawsuits, like slip and fall claims.

9    There's -- at least -- in that, there's a couple of $100

10   million lawsuit claims that are covered by insurance.

11   They're -- you know, someone bought a, you know, piece of a

12   shirt or something and it caught fire and they're going to

13   have a hundred million dollar claim against the debtors.

14             THE COURT:  Okay.

15             THE WITNESS:  That's the type of claims that are

16   in there.

17             THE COURT:  Okay.  So to your knowledge, do any of

18   these claims represent complex issues as to whether someone

19   has a priority or not, leaving aside the merits of the

20   amount, just as to whether there's a priority or not?

21             THE WITNESS:  Based on my experience in looking at

22   all the claims my sense was no, but you know, in discussions

23   with counsel and some of the claims that I was not familiar

24   with.

25             THE COURT:  Okay.

Page 126

1    BY MR. WANDER:

2    Q    Can you describe what you would consider a complex

3    issue relating to these claims?

4    A    It would be a priority claim.  Most of the priority

5    claims relate to either employee or tax issues.

6             THE COURT:  You mean legitimate ones?

7             THE WITNESS:  Legitimate, yes.  So it would be a

8    priority claim that I'm not familiar with that was may

9    appear to be either a tax or some type of employee related

10   claim that I would discuss with counsel as to whether, you

11   know, it's complicated or not.

12   BY MR. WANDER:

13   Q    Well, you were answering the Judge's question about

14   complex claims.  Would you consider tax issues in connection

15   with priority claims to be complex issues or not complex

16   issues?

17   A    It could be complex.

18   Q    Got it, thank you.

19        I'd like to turn your attention to Exhibit A to your

20   declaration.  Now, I honestly couldn't understand the chart

21   and some of the print is really small so I'm going to need

22   your help walking me through it and understanding what it

23   means.

24        So can you first read note 11 into the record?

25   A    This is page 30 of 75?

1    Q    Yes.

2    A    So note 11 says, "reductions in column E, reduce and

3    allow represent debtors' estimated reductions to filed

4    claims for the following:  Some or all of the invoices of

5    the following invoices have been paid or satisfied through

6    credits or returns or the debtors' record show the receipt

7    date of the merchandise was before 9/25 or after" it should

8    be 10/14, 2018 "or allowed by the Court."

9    Q    What do you -- what's meant by "merchandise received

10   after 10/14/18"?  Is that relating to prepetition orders

11   that were received post-petition?

12   A    Well, after 10/14 would be post-petition, correct.

13   Q    But you're making a reduction for goods received post-

14   petition.  Aren't goods received post-petition supposed to

15   be paid?

16   A    Yes, that's correct.  The reductions primarily relate

17   to amounts received prior to 9/25.

18   Q    Okay.  But you also -- I'm trying to understand the

19   deduction for amounts received after 10/14 and I'm trying to

20   understand if that has anything to do with goods ordered

21   prepetition that were received post-petition.

22   A    No.

23   Q    Okay.  So can -- excuse me.

24   A    When you say ordered, are you saying invoiced?

25   Q    I'm saying ordered.  So here, are you familiar with the

Page 128

1    motion the debtors filed, one of the first day motions I

2    think it's Document 14, and it included a request to have

3    $162 million of goods ordered prepetition but delivered

4    post-petition allowed as administrative expenses?

5    A    No, I'm not.

6    Q    Okay.  Does your analysis of allowed administrative

7    claims take into account any of the goods ordered

8    prepetition that were delivered post-petition?

9    A    Our analysis revolves around goods invoiced and

10   received pre or post-petition and for the 503(b)(9) period,

11   between that 25 -- that 20-day period between 9/25 and

12   10/14.  When you say ordered, you can order something a year

13   in advance.  Until it's invoiced, it's not an obligation of

14   the company.

15   Q    Well, when the debtor uses the word ordered as in

16   prepetition goods ordered, do you know whether the debtor is

17   referring to the invoice date or another date?

18   A    I wasn't around when that motion was prepared.

19   Q    Okay.  You don't know how much of the $162 million in

20   goods referred to in the debtors' motion at Document 14 have

21   been actually paid, do you?

22   A    I'm not familiar with that.

23   Q    Do you know who would have that information?

24   A    The debtors', Transform's accounting groups, their

25   accounts payable group, whoever was involved with the

Page 129

1   development of that particular motion.

2   Q    So can you walk me through in the column that has note

3   11 and going down you have 503(b)(9) claims high paren note

4   9 and that's a $32 million number, and then 503(b)(9) claims

5   low note $966 million number.  Can you explain that?

6   A    Those are estimates at the time this was put together

7   of reductions to the 503(b)(9) claims that we were currently

8   estimating based on our reconciliation effort.

9   Q    Okay.  Now, with this page in mind, I'd like you to

10  skip five pages to page 35 of 75.

11  A    Okay.

12  Q    And now this is your analysis of the 503(b)(9) claims?

13  A    Yes.

14  Q    And first, tell me what are those bottom line numbers,

15  where it says Transform, max Transform current estimate and

16  there's 155 million and there's 90 million.

17  A    I think the reference to Transform is an incorrect

18  reference.  It should be max 503(b)(9) and current estimate

19  503(b)(9).

20  Q    So I should just strike the word Transform?

21  A    Correct.

22  Q    Now, the current estimate, whose estimate is that?

23  A    The debtors'.

24  Q    And this is an estimate based on July 15, 2019?

25  A    Correct.

Page 130

```
 1    Q    And what's the current estimate, the max and current?

 2    A    Current estimate is 90 million.

 3    Q    And what's the max?

 4    A    On this schedule it says 155.

 5    Q    No, that's as of July 15.  I'm asking you what is the

 6    max estimate as of today.  You said the $90 million becomes

 7    99 million, right?

 8    A    Well, I said the 90 is still 90.

 9    Q    Oh, sorry, I apologize.  So there hasn't been any

10    change in the current estimate?

11    A    Based on objections filed it might go -- it might be

12    slightly lower.

13    Q    Okay.  So after duplicates, I'm looking at the top, and

14    if it's okay with you I'm going to use round numbers.

15    A    Sure.

16    Q    So the total surviving filed claims is approximately

17    $209 million, right?

18    A    Correct.

19    Q    And then you're subtracting approximately 4.8 million

20    beneath that, correct?

21    A    Correct.

22    Q    And the comment says, "Those claims identified in

23    reclassification group."

24    A    Yes.

25    Q    Okay.  But there's been no -- are these -- does this
```

Page 131

1    relate to claim objections that have been filed seeking to

2    reclassify?

3    A    That was as of July 15th.  That was before the

4    objections had been filed.

5    Q    So there's obviously no order disallowing any of these

6    $4.8 million claims?

7    A    These were all estimates.

8    Q    Okay.  So the next one is the Marketplace vendors.  Are

9    those the claims that we were talking about before?

10   A    Yes.

11   Q    And again that's just an estimate, it doesn't have

12   anything to do with any filed claims?

13   A    Correct.  Let me rephrase that.  That relates to the

14   filed claims that we're --

15   Q    I'm sorry --

16   A    -- proposing that would be the objection.

17   Q    Okay.  It doesn't relate to any objections.

18   A    Correct.

19   Q    Okay.  And then the next line item is 19 million is

20   being deducted for a domestic 503(b)(9) claims, correct?

21   A    Correct.

22   Q    And again, no objections have been filed.  This is just

23   -- is it the debtors' estimate or M3's estimate, whose

24   estimate is this?

25   A    This is the estimate that M3 analysis has come up with.

Page 132

1   Q    How would you say M3 is doing so far in this case since

2   the beginning in estimating administrative insolvency?

3   A    Rephrase the question.

4   Q    Do you think M3 has been giving accurate information to

5   the Court on the administrative solvency or insolvency of

6   the estate as the case has been going on?

7   A    I'm not sure what we've been providing with regards to

8   that, but any information we have provided is accurate.

9   Q    Okay.  Well, when the disclosure statement was filed,

10  wasn't M3 projecting there would be a surplus of funds on

11  hand and all of the allowed administrative claims would be

12  paid in full and it'd go effective very quickly?

13  A    You have to show me the sections in the disclosure

14  statement that you're referring to.

15  Q    You don't remember that M3 was saying in connection

16  with the disclosure statement that there's a surplus, not a

17  big surplus, but there was a surplus?

18  A    I don't recall that particular statement, you would

19  have to point me to that section in the disclosure statement

20  you're referring to.

21  Q    No, I'm just asking your recollection --

22          THE COURT:  He's answered that question, so --

23          MR. WANDER:  Okay.  I'll move on, Your Honor.

24          THE COURT:  -- you should move on, if you want to

25  show him the disclosure statement, if you want to.

Page 133

1          (Pause)

2               MR. WANDER:  May I approach, Your Honor?

3               THE COURT:  No, I have a copy.

4          (Pause)

5     BY MR. WANDER:

6     Q    Showing you -- can you identify this document?  It says

7     Admin Solvency Tracker.

8               THE COURT:  I'm sorry, I thought you were going to

9     show him the disclosure statement.  You're referring to some

10    other document?

11              MR. WANDER:  I believe this was in connection with

12    the disclosure statement.

13              THE COURT:  Is it part of the disclosure

14    statement?  Otherwise, you need to give it to me because I'm

15    looking at the disclosure statement.

16         (Pause)

17    BY MR. WANDER:

18    Q    Now, at the bottom left there looks like a logo for M3.

19    A    Yes.

20    Q    Okay.  So was this document prepared by M3?

21    A    Yes.

22    Q    And this document is M3's estimate of administrative

23    solvency at a certain point in time in this case, correct?

24    I see it's dated, is that June 4, 2019?

25    A    Yes, that's the date, June 4, 2019.

Page 134

1   Q   Okay.  So as of June 4, 2019 M3 was telling the Court

2   that the estate looked to be administratively solvent by

3   which number should I use, is it the 7 million, the 34 or

4   the 40?

5          THE COURT:  Was this document actually filed on

6   the docket or provided to the Court?

7          MR. GENENDER:  It's Exhibit C, Your Honor.

8          THE COURT:  To the disclosure statement.  Okay.

9   Great.

10          MR. GENENDER:  It's ECF No. 4478.

11          THE COURT:  Okay.  So do you remember the

12  question?

13          THE WITNESS:  I have the question, you know, I'm

14  not the one that prepared the document.

15  BY MR. WANDER:

16  Q   Well, the bottom line number it says at the bottom

17  solvency or gap.  So this is indicating the estate would be

18  solvent, correct?

19  A   This is indicating that there's 7 million of excess

20  cash between the claims at the top of the page and the

21  assets at the bottom of the page.

22  Q   But this was M3 analyzing the financials as of June 4th

23  and stating that the estate was administratively solvent by

24  $7 million, correct?

25  A   Yes.

Page 135

1    Q    Okay.  And how does that number look today?  How far

2    off was M3, a $100 million, $50 million?

3    A    You'd have to -- I'd have to do an analysis.  I didn't

4    prepare this schedule, but the -- there's a significant

5    number of events that have occurred since then that are

6    impacting these numbers.

7    Q    So M3's prediction when this document was filed was

8    pretty far off, wasn't it, where we are today?

9    A    The estimates are different today than they are in this

10   schedule.

11   Q    Well, when you say different today, better or worse?

12   A    Worse.

13   Q    And a lot worse, aren't they?

14   A    If you look at one of the significant items is in

15   Transform liabilities assumed column $139 million.  That's a

16   significant adjustment there, a significant impact to the

17   numbers to where we are today.

18   Q    Is that the only significant impact to the numbers or

19   are there other numbers here that seem to be off?

20   A    I would have to do the analysis line-by-line.

21   Q    I will not ask you to do that right now.

22          MR. WANDER:  No further questions, Your Honor.

23          THE COURT:  Okay.  Does anyone else have any

24   cross?

25          (No response)

Page 136

```
 1              THE COURT:  Redirect?

 2              MR. GENENDER:  Thank you, Your Honor.  Paul

 3    Genender for the debtors.

 4                     REDIRECT EXAMINATION

 5    BY MR. GENENDER:

 6    Q    Mr. Murphy, the document you were just shown, can you

 7    turn to page 272 of it, which is Exhibit C to the disclosure

 8    statement of July 9th?  Do you see the note 35 on that page

 9    at the bottom?

10    A    Yes.  Do you want me to read it?

11    Q    Yes.  Do you see it?  Yes, please.

12    A    "Preference firms still conducting diligence related to

13    potential preference recoveries."

14    Q    And on the prior page, correspondingly there's a dash

15    there, correct?

16    A    That's correct.

17              MR. GENENDER:  I have no further questions.

18              THE COURT:  Okay.  You can step down.

19              MR. GENENDER:  Your Honor, that concludes the

20    debtors' presentation of evidence in connection with

21    confirmation.

22              THE COURT:  Okay.  Does anyone have any -- do any

23    of the objectors have any evidence that they want to

24    introduce besides the joint exhibit book and the agreed

25    deposition designations?
```

Page 137

```
 1        (No response)

 2             THE COURT:  No?  Okay.  It's 1:30.  It's probably

 3   a good time to take a break, and then I'll come back and

 4   hear oral argument on the debtor's request for confirmation.

 5             I just mention the deposition designations.  I

 6   think unless they're quoted in your objection or in your

 7   response to objection, you should save some portion of your

 8   oral argument to tell me why they're important as opposed to

 9   just assuming that I'll divine that by looking at the

10   deposition.

11             But why don't we come back here -- it's 1:30 now.

12   Why don't we come back here at 2:30?

13        (Recess from 1:32 p.m. until 2:33 p.m.)

14             THE COURT:  Please be seated.  Okay.  Good

15   afternoon.  We're back on the record in In Re: Sears

16   Holdings Corporation.

17             MR. SCHROCK:  Good afternoon, Your Honor.  Ray

18   Schrock, Weil Gotshal for the debtors.

19             Your Honor, I took the liberty of putting a

20   presentation on the bench and with your clerk.  And we'll

21   try and keep it to the points.  Of course, if you would like

22   to direct me in any particular direction as we're moving

23   along here, I'm happy to address anything, any questions

24   that you may have.

25             THE COURT:  Okay.
```

1          MR. SCHROCK:  So, Your Honor, we've now concluded

2     the evidence and, you know, we would submit that the

3     evidence is nearly undisputed.  There's no one that has

4     really challenged the recoveries.  Certainly, with regard to

5     Mr. Transier, his testimony regarding the litigation is

6     wholly unrefuted.

7          Regarding Mr. Griffith, no one has challenged the

8     recoveries and what we call the sources side.  Mr. Griffith,

9     you know, testified to the sources, Mr. Murphy largely to

10    the uses.  And no one really challenged the sources side,

11    aside from the ESL APA pick up of the 503(b)(9)s which I

12    will discuss.

13         On the uses side, we think the Court should find

14    Mr. Murphy's testimony extremely credible.  He has been the

15    person on the front lines dealing with these claims day to

16    day.  He knows them.  It's a significant amount of work.  I

17    think the parties tried to poke holes in his testimony, but

18    we believe that that testimony is also largely

19    uncontroverted.

20         I will note that, of course, none of the objectors

21    presented any evidence as to why the debtors could not

22    satisfy the confirmation standards, but, you know, it is our

23    burden.

24         So moving along in the deck, Your Honor, you know,

25    we believe that the evidence has demonstrated that we will

Page 139

1    be able to pay administrative expense claims.  That's

2    largely a lot of the objections that we heard, that the plan

3    is otherwise feasible in accordance with 1129(a)(11).  And

4    we will discuss the global settlement and the -- you know,

5    comprised of the PBGC, the plan settlement and the

6    creditors' committee settlement and why we believe those

7    meet the standards.  And there has been uncontroverted

8    testimony in support of those.

9            On Slide 5 we do note -- and, again, we -- I'm

10   sure that the evidence is consistent with this, that the

11   debtor's estimate will be about approximately 210 to 278

12   million in outstanding claims that have to be paid on the

13   effective date of when such claims would be allowed.

14           We believe we have about $173 million in assets

15   plus the proceeds from litigation.  And I do want to note

16   that no one really challenged the testimony of Mr. Griffith

17   and the analysis that we put in to the preference

18   litigation.  I mean, that is not speculative litigation.

19   The testimony is uncontroverted.  Nobody even challenged,

20   you know, the -- there was not one question around the

21   amount.

22           Those litigation actions will constitute -- will

23   come from preference actions, ESL litigation, DNO litigation

24   coupled with the ESL litigation, which were tenants of the

25   APA sale.

1          We are highly confident that confirming these

2     cases at this juncture and allowing litigation to proceed,

3     it's the best outcome that we could ask for in these cases.

4     We've already come a long way in terms of being able to sell

5     these assets of going concerns, frankly, against all odds.

6     And to be able to conclude these cases, we think, in an

7     efficient fashion is the responsible thing to do and it will

8     also maximize recoveries and minimize claims.

9          Conversely, we think the alternative is really not

10    a real alternative at all, conversion to Chapter 7 in likely

11    one of the largest Chapter 7's in history and failure to

12    confirm the plan as we meander around and allow litigation

13    to continue to consume the valuable resources of the estate.

14    Confirmation is the most efficient outcome and we believe

15    should be granted.

16          On the mechanics, I want to do this for the Court,

17    but also for the parties in interest, that to address the

18    potential brief gap between confirmation and the effective

19    date, we have five litigation designees that we have

20    selected to oversee the litigation.  The debtor's

21    designee -- and this is on page 7 of the deck -- are Alan

22    Carr and William Transier.  The creditors' committee's

23    designees are Patrick Bartels (ph), Jean Davis and Ralph

24    Wallender (ph).

25          In the interim, those designees shall have the

Page 141

1    rights and entitlements with respect to jointly asserted

2    causes of action and any protections granted to the members

3    of the liquidating trust board.

4         We don't know what the compensation is.  I know

5    there was some questions around that.  It's not settled, but

6    as soon as it's settled, should the Court confirm the plan,

7    we will file -- we would file a notice for parties.

8    1129(a)(5) requires that we, you know, disclose to the

9    extent known.

10        THE COURT:  Well, can I -- you may be getting into

11   this, but I would like to focus on it.

12        MR. SCHROCK:  Sure.

13        THE COURT:  The plan is currently -- if I were to

14   confirm the plan today --

15        MR. SCHROCK:  Yes.

16        THE COURT:  -- and enter the confirmation order on

17   Tuesday --

18        MR. SCHROCK:  Yes.

19        THE COURT:  -- in looking at conditions precedent

20   to the effective date, which is at page 73 of the plan, the

21   first one is the disclosure statement order shall have been

22   entered.  Well, that's occurred.

23        MR. SCHROCK:  Yes.

24        THE COURT:  The plan supplement shall have been

25   filed.  And you're saying that the compensation of the

Page 142

1      board, the trust board doesn't need to be in that or --

2                THE COURT:  It's just not settled yet, Your

3      Honor.

4                THE COURT:  Right.

5                MR. SCHROCK:  So to the extent known, but, yes, we

6      would expect that it would be settled before we would

7      emerge.

8                THE COURT:  Okay.  So that is something that would

9      be a condition to the effective date, right?

10               MR. SCHROCK:  Yes.

11               THE COURT:  Confirmation order shall have been

12     entered in satisfactory form.  Definitive documents should

13     be in form as such is reasonably acceptable.  KCD shall have

14     waived its assertion to an administrative expense.  I'm

15     going to skip F and H.  I'll go to G and H.  All government

16     approvals shall have been obtained, and the carve out, as

17     provided for by the plan, should be fully funded.

18               And then -- I mean, those could occur promptly.

19               MR. SCHROCK:  Yes.

20               THE COURT:  So then we have F, which says all

21     actions, documents and agreements necessary to implement and

22     consummate the plan shall have been effected or executed and

23     binding.

24               So I guess it's really just the, in a way the

25     fortuity that you don't have the compensation worked out

Page 143

```
 1    yet.  But that could be worked out in a matter of days, too.

 2                MR. SCHROCK:  It could.

 3                THE COURT:  So once the plan goes effective, you

 4    have to pay all the allowed administrative expenses --

 5                MR. SCHROCK:  That's correct.

 6                THE COURT:  -- under the Code --

 7                MR. SCHROCK:  Correct.

 8                THE COURT:  -- except as otherwise agreed.

 9                MR. SCHROCK:  Correct.

10                THE COURT:  So conceivably that -- conceivably you

11    could go effective but for perhaps F in this list --

12                MR. SCHROCK:  Yes.  Correct.

13                THE COURT:  -- you know, by the end of next week

14    or the following week, a short time.  But that wouldn't

15    work.  I couldn't confirm the plan if that was going to

16    occur.

17                MR. SCHROCK:  That's right, Your Honor.

18                THE COURT:  So are you -- so when it says, all

19    actions necessary to implement the plan have been

20    effected --

21                MR. SCHROCK:  Yes.

22                THE COURT:  -- are you basically saying that,

23    well, that means that we have to have the cash.  Until we

24    have the cash sufficient to pay the allowed administrative

25    expenses and/or as they have been agreed to be paid --
```

```
 1            MR. SCHROCK:  Yes.

 2            THE COURT:  -- this means we're not going to go

 3   effective.

 4            MR. SCHROCK:  That's the way we read it, Judge.

 5            THE COURT:  Okay.

 6            MR. SCHROCK:  And, you know, certainly the

 7   conditions precedent are waivable.  But when we've talked

 8   about this issue with the restructuring committee and how

 9   this will work, we filed many objections to administrative

10   claims.  We think we have a very good construct for, you

11   know, frankly, incentivizing people to come into an early,

12   earlier potential for payment and that's going to really --

13   we think -- we actually believe that will really save a lot

14   of money in terms of encouraging people to want to have an

15   allowed claim to be able to share in that.

16            But, frankly, we want to make sure that we can

17   also -- we don't want to go effective and then the moment,

18   you know, we go effective we're not able to pay everything

19   that we're --

20            THE COURT:  Well --

21            MR. SCHROCK:  -- agreeing to have.

22            THE COURT:  -- I wouldn't confirm --

23            MR. SCHROCK:  So we're tracking --

24            THE COURT:  -- the plan if I knew you were going

25   to go effective next week --
```

Page 145

1              MR. SCHROCK:  Yes.  Yes.

2              THE COURT:  -- because I couldn't.

3              MR. SCHROCK:  Yes.  Yes.  So we're --

4              THE COURT:  So --

5              MR. SCHROCK:  -- we're definitely very mindful of

6    that.  And the restructuring committee, in fact, when we,

7    you know, last met just a couple of days ago said that they

8    wanted to -- you know, they're still -- they are a very

9    diligent group.  They want to go effective as soon as

10   possible.  I think everybody does.  But they're really

11   pressing people.  They're pressing the preference firms, you

12   know, making sure that there's going to be those complaints

13   filed --

14             THE COURT:  Right.

15             MR. SCHROCK:  -- in the very near term.  And

16   they're pressing us on the objections, and they pressed us

17   to -- you know, on the admin claim consent program.  They

18   want to go effective as soon as possible.  We think that we

19   can go effective within a few months, as early as, you know,

20   within a few months.  But we're mindful that we're not going

21   to sit here in Chapter 11 waiting for an effective date to

22   occur for an extended period of time.  That --

23             THE COURT:  So how --

24             MR. SCHROCK:  -- doesn't help anyone.

25             THE COURT:  And I understand that.  The Code, as I

Page 146

1    read it, but I'm happy to hear objectors on this, doesn't

2    put an outside date on going effective.

3              MR. SCHROCK:  We noticed that, Your Honor.

4              THE COURT:  Well, and it -- that's consistent with

5    many plans, particularly plans that require third party

6    approvals --

7              MR. SCHROCK:  Right.

8              THE COURT:  -- late approvals, approvals by boards

9    to close transactions, approval by State AG's offices for

10   transfers of non-profit property, and all sorts of things

11   like that.  Courts have nevertheless confirmed plans knowing

12   that that process might be several months long.

13             At the same time, I think Courts have a natural

14   reluctance just to have an open-ended period --

15             MR. SCHROCK:  Uh-huh.

16             THE COURT:  -- for those types of things to occur.

17   There's no real limitation on that here.

18             MR. SCHROCK:  Uh-huh.  Would --

19             THE COURT:  And it -- I mean, other than one that

20   I might impose.  But --

21             MR. SCHROCK:  We --

22             THE COURT:  -- there's nothing in the plan that

23   puts a limit on that.

24             MR. SCHROCK:  Yeah.  We're sensitive to that, Your

25   Honor, and we thought that your -- you may suggest that we

1    check in, frankly, once a quarter or once every, you know,

2    some --

3            THE COURT:  With a progress report on getting --

4            MR. SCHROCK:  Yeah, a progress report on how are

5    we doing toward -- because we want people to know what --

6    you know, we're going to make reporting.  But we want people

7    to know what kind of progress are we making, what kind of

8    claims are outstanding, are we, you know, in fact, you know,

9    progressing toward the effective date.  And, you know, and

10   that's something that, you know, Mr. Dublin, in fact,

11   suggested as a way to have a nice check on the process to

12   ensure that, you know, everybody's doing their job and

13   we're, in fact, moving expeditiously towards emergence.

14           THE COURT:  Okay.  Well, I just wanted to raise

15   the issue so that everyone could be focusing on it.  And I

16   wanted to make sure I was reading the plan you were, that

17   this provision, 14.1 --

18           MR. SCHROCK:  Yes.

19           THE COURT:  -- really does -- I mean, it is kind

20   of tautological.  But you don't get to the effective date

21   until you can achieve the effective date without the plan

22   collapsing.

23           MR. SCHROCK:  Right.

24           THE COURT:  Okay.

25           MR. SCHROCK:  All right.

Page 148

1               THE COURT:  So, anyway, you were starting to go

2      into the mechanics of the --

3               MR. SCHROCK:  Yes.  Towards the interim mechanics

4      that --

5               THE COURT:  Right.

6               MR. SCHROCK:  -- that those parties will be there.

7      So we will have one that, you know, is really the

8      restructuring subcommittee --

9               THE COURT:  Well, can I interrupt you again, then?

10              MR. SCHROCK:  Of course.  Anytime.

11              THE COURT:  If I confirm the plan --

12              MR. SCHROCK:  Yes.

13              THE COURT:  -- it doesn't yet go effective.

14              MR. SCHROCK:  Yes.

15              THE COURT:  So who -- the liquidation trust isn't

16     in effect yet.  It's still the estate.  So that's why you

17     have the litigation designees.

18              MR. SCHROCK:  That's correct, Your Honor.  So the

19     litigation designees we are granting standing and allowing,

20     you know, allowing that litigation to progress.  The

21     restructuring committee would still oversee the

22     administration of the estates until the effective date.

23              THE COURT:  All right.  Okay.

24              MR. SCHROCK:  With the -- of course as we'll get

25     to, with the administrative consent program we propose to

Page 149

1    appoint, you know, as another member effectively to serve

2    alongside the restructuring committee and to ensure that

3    we're making progress, assist with the reconciliation of the

4    claims, and to really give them a voice to make sure that

5    we're -- they're getting the benefit of --

6              THE COURT:  So on that point, and I appreciate

7    that the parties have been working on this sort of around

8    the clock.  But that person --

9              MR. SCHROCK:  Uh-huh.

10             THE COURT:  -- how is he or she selected?  There's

11   a suggestion that it's a vote, but I can't see how you would

12   do the vote.  How is it -- how are they selected?

13             MR. SCHROCK:  That's a great question, Your Honor.

14   We left it to the admin -- to the ad hoc group --

15             THE COURT:  Okay.

16             MR. SCHROCK:  -- frankly, to make the selection.

17   They were the ones who negotiated the transaction and I

18   imagine they will talk to -- they'll talk to their fellow

19   administrative claimants and come up with a person.

20             THE COURT:  Okay.  So there's a minimum 17-day --

21             MR. SCHROCK:  Correct.

22             THE COURT:  -- period to opt in.

23             MR. SCHROCK:  Correct.

24             THE COURT:  So I guess maybe they would look at

25   who opt in, who opts in and then poll those folks as to who

Page 150

1    would be the --

2              MR. SCHROCK:  That's right.

3              THE COURT:  -- who would be the designee.  Someone

4    is nodding in the background.  Is that on behalf of the ad

5    hoc group?  That's --

6              MR. SCHROCK:  Yes.  Ms. --

7              THE COURT:  -- that's what you were thinking of?

8              MR. SCHROCK:  Ms. Morabito.

9              THE COURT:  Okay.

10             MR. SCHROCK:  Okay.  That reminds me that during

11   the break I can confirm that Tannor Capital Advisors, LLC,

12   which is Number 3 in the objectants, are at ECF 4673 --

13             THE COURT:  Right.

14             MR. SCHROCK:  They've agreed to withdraw their

15   objection and they're going to be an opt-in party to the

16   administrative claims consent program.

17             THE COURT:  Okay.

18             MR. SCHROCK:  So the Court can confirm the plan.

19             THE COURT:  All right.  Someone is standing up

20   behind you to perhaps confirm that.

21             MS. NESTER:  Good afternoon, Your Honor.  Minta

22   Nester, Togut, Segal & Segal, counsel for Tannor.  I just

23   wanted to confirm what counsel has said; that, yes, provided

24   that the term sheet is approved as is or with no material

25   modifications that would impact Mr. Tannor's claims, we

1    would be prepared to opt in and, in connection with that,

2    withdraw the confirmation objection.

3              THE COURT:  Okay.  Thank you.

4              MR. SCHROCK:  Sorry about that.  Forgot to do that

5    for --

6        (Pause)

7              MR. SCHROCK:  Your Honor, just quickly I would

8    like to talk about the global settlement and what the

9    standard is and what some of the benefits of it are.  It's

10   on Slide 10.

11             You know, we're talking about something that must

12   fall within the lowest point in the range of reasonableness.

13   The global settlement is compromised of the PBGC settlement,

14   the creditors' committee settlement, and the plan

15   settlement.

16             The plan settlement, which I note nobody has

17   frankly challenged on the evidence, is a settlement, a

18   substantive consolidation rather than a substantive

19   consolidation of the debtors.  This is a settlement that's

20   in line with other settlements of this issue in this and

21   other circuits.

22             And what Mr. Murphy's testimony really elucidated

23   was that we tried to -- you know, when you went back and

24   really saw how long is this going to take to reconcile all

25   of these claims and how would it be possible, compounded by

Page 152

1   the fact that you have to get -- transform to allow us to do

2   this, you know, they're still an operating enterprise and

3   have us be able to do this, it really -- we never like to

4   say it was borderline impossible, but it certainly was

5   getting there.

6           And, you know, we all believed, I think, the

7   creditors' committee, the debtors, that it would be a

8   massive waste of resources to be able to do that.  And

9   that's what really gave rise to, you know, in part the

10  discussions with the PBGC settlement that we outline on page

11  12.

12          And the key terms of that -- and, you know, we

13  haven't talked about it in a long time, but the -- you know,

14  they are the largest creditor in these estates.  They

15  receive one consolidated $800 million allowed general

16  unsecured claim in satisfaction of approximately $1.4

17  billion in general unsecured claims that could be asserted

18  by the PBGC at each debtor.

19          The PBGC receives a liquidating trust priority

20  interest consisting of the first 97.5 million in net

21  proceeds, you know, after satisfaction in full of senior

22  claims, specified causes of action and other causes of

23  action, namely preference claims.

24          They have and agreed to vote in favor of the plan

25  and a consensual termination of the pension plans.  They're

1    also assisting with the KCD waiver, and there's a mutual

2    release provision.

3             The benefits are outlined on Slide 13.  We think

4    that it's really beyond dispute that that settlement is a

5    key aspect of the plan and something that we believe is in

6    all parties' interests.

7             THE COURT:  Okay.  Just to -- their priority

8    interest is as an unsecured creditor.

9             MR. SCHROCK:  That's correct.  So, yes, as an

10   unsecured creditor.  That's correct.

11            THE COURT:  Right.  So the --

12            MR. SCHROCK:  So it's not a priority --

13            THE COURT:  -- the admins come before.

14            MR. SCHROCK:  Yes, they do.

15            THE COURT:  Right.

16            MR. SCHROCK:  Yes, they do.

17            THE COURT:  Okay.  I saw some --

18            MR. SCHROCK:  We were careful to note that.

19            THE COURT:   I saw some expense lawyers looking

20   around frantically on that.

21            MR. SCHROCK:  Yes.  No.  The PBGC is not jumping

22   in front of the administrative claims.

23            THE COURT:  Okay.

24            MR. SCHROCK:  That's correct.

25            The plan settlement which we've, you know, already

Page 154

1    discussed in part is outlined in the briefing.  Unless Your

2    Honor has, you know, specific questions around the plan

3    settlement I'm going to, you know, forego, you know, an

4    explicit presentation on those topics.

5              THE COURT:  Well, the plan settlement is really

6    part of the --

7              MR. SCHROCK:  The settlement of substantive

8    consolidation.

9              THE COURT:  Yeah.  It's all -- it's really all

10   interlinked.

11             MR. SCHROCK:  It is.

12             THE COURT:  You have the --

13             MR. SCHROCK:  It is all interlinked.

14             THE COURT:  -- PBGC settlement, the so-called plan

15   settlement, which is the plan substantive consolidation that

16   adjusts certain recoveries in light of the perceived

17   unfairness of just having a flat substantive consolidation,

18   and finally mechanisms for dealing with the liquidating

19   trust.

20             MR. SCHROCK:  That's correct, Your Honor.  They

21   all build on one another.  You know, it's that the plan

22   settlement was the starting point, you know, coupled with

23   the PBGC settlement, it's provided the basis for the

24   unsecured creditors' committee settlement.

25             THE COURT:  Okay.

1           MR. SCHROCK:  Mr. Murphy gave undisputed testimony

2    around the benefits of the plan settlement.  We think that,

3    you know, there's really nothing on the record to say

4    otherwise.  We've gone through some of the, you know, some

5    of the real monetary benefits.  But without that initial

6    settlement, the plan settlement, without the PBGC settlement

7    we wouldn't be before Your Honor seeking confi9mation of the

8    plan today.  And we are grateful that they decided to

9    support the estate, both at the APA hearing and now here at

10   the plan because they really did provide us a pathway to get

11   these cases concluded, should Your Honor confirm the plan.

12           The creditors' committee settlement, which came to

13   this summer, they've agreed to support the plan including

14   the PBGC settlement.  And on page 20 we talk about that

15   issues regarding post-effective date governance, which have

16   all been settled now, as well as the creditors' committee

17   settlement will have been -- provided certain consent

18   rights.

19           Now we've walked through in the briefing all the

20   9019 standards around these various settlements, but I think

21   that since the debtors and the creditors' committee have

22   come to peace, you know, we have been, you know, kind of

23   single minded in terms of prosecuting the plan and trying to

24   get these cases to conclusion, but it has not been easy.

25   They have been a good partner.

Page 156

1         1129(a)(9), which has gotten a lot of focus, you

2    know, provides for persons holding allowed claims, the type

3    of priority under 507(a) to receive specified cash payments.

4    The plan provides for full payment of all those allowed

5    security and priority claims.  We did have an objection

6    talking about the requirement of a secured creditor.  They

7    want a cash reserve as of the confirmation date,

8    effectively.

9         And, Your Honor, we are not going to go effective

10   without paying our secured claims.  There was certainly no

11   reserve that was put in place prior to this point.  We've

12   got a mechanism through the administrative claims consent

13   program to bring people in to get earlier payment.  We don't

14   think that there's a requirement that while you're still in

15   Chapter 11 and prior to the effective date that we have to

16   put up a cash reserve.  It's the debtors' cash.  We're

17   paying administrative claims.  We're moving forward.  But at

18   the time of emergence, we will have the $19 million actually

19   reserved and we don't have an issue doing that.

20         THE COURT:  Well, I'm sorry.  There are two

21   different -- I think there are two different issues there.

22   There's the issue of reserves for administrative

23   expenses  --

24         MR. SCHROCK:  Uh-huh.

25         THE COURT:  -- which, to me, is more of an issue

Page 157

1    of feasibility than a legal requirement to provide a

2    reserve.  But you did have an objection by at least one

3    creditor that I believe was given a replacement lien or a

4    lien?

5              MR. SCHROCK:  Correct.

6              THE COURT:  And I think their rights may be

7    different in that the lien has to be protected.  It may not

8    need to be a cash reserve, but I think you need to protect

9    the lien --

10             MR. SCHROCK:  Okay.

11             THE COURT:  -- under the --

12             MR. SCHROCK:  We could --

13             THE COURT:  -- well, either -- under --

14             MR. SCHROCK:  You're saying come up with

15   another --

16             THE COURT:  -- under 362 --

17             MR. SCHROCK:  -- form of security.

18             THE COURT:  -- under 362(d)(1) ultimately and 361.

19   This is the Mr. Ireland --

20             MR. SCHROCK:  Yes.  That's right.

21             THE COURT:  -- and the U.S.

22             MR. SCHROCK:  That's right.

23             THE COURT:  So --

24             MR. SCHROCK:   We can certainly, I think --

25             THE COURT:  I mean, there are a lot of --

1            MR. SCHROCK:  There are a lot of different ways to

2     do it.

3            THE COURT:  Well, free assets, you know.

4            MR. SCHROCK:  Yes.

5            THE COURT:  So I see that.  But I think there's a

6     separate adequate protection obligation there.

7            MR. SCHROCK:  Okay.

8            THE COURT:  Or if there isn't right there, there

9     would be as soon as they move to lift the stay, so.

10           MR. SCHROCK:  Understood.

11           So with that, Your Honor, let us huddle after I

12    sit down and we'll talk about, you know, how we're going to

13    address that.  But I'm --

14           THE COURT:  Okay.

15           MR. SCHROCK:  -- I'm not surprised to hear you say

16    that.

17           Now in terms of the estimate of claims to be

18    satisfied, you know, there was quite a bit of, you know,

19    back and forth with Mr. Wander over, you know, the number of

20    proofs of claims and which have been objected at this very

21    point.  Like any complex Chapter 11 case, we have 23,000

22    proofs of claim that have been filed.  To say that we've

23    reconciled every single proof of claim would not be true.

24           We have certainly done everything we can up to

25    this point to have -- and, you know, the restructuring

1    committee has demanded it, that we were, you know, careful

2    about where we were on admin solvency throughout these

3    cases.  This is the first, you know, one of the first cases

4    certainly where I've, you know, been kind of hammering on

5    that issue from, really from the first day of the case and

6    we set up the wind down accounts.

7              But when you take into account the claims

8    reconciliation process and the objections' process, the

9    standing amount of the claims required to be paid on the

10   effective date is approximately $86 million, which we

11   believe because you if you look at the 503(b)(9)'s -- and I

12   know parties can argue, well, geez, there's still some

13   litigation outstanding on the 503(b)(9)'s.  It's undeniable

14   there is an APA contractual provision that says they have to

15   pay it.  Okay.  If there's something that parties want to

16   put into evidence to say why that's a bad -- that's a bad

17   assumption, right now we have a court-approved order coupled

18   with, you know, the requirement for them to pay the

19   503(b)(9) claims.

20             There's 50 million other administrative claims and

21   18 million in priority (indiscernible) claims, 18 million in

22   secured claims.

23             THE COURT:  And 3 million of other priority, I

24   guess.

25             MR. SCHROCK:  That's right.  Three million of

Page 160

1    other priority claims, that's right, with the settlement in

2    particular.

3              But, you know, we felt as a team and with the

4    restructuring committee that this was not a case where we

5    needed to file an administrative claims bar date.  When you

6    actually sold all the assets in February and, you know, you

7    have the accounts payable, you have the records, an

8    administrative claims bar date, in our judgment, was simply

9    going to generate a bunch of claims that we would then have

10   to object to and deal with over the course of the next

11   several months.

12             So it was, in fact, a very deliberate effort I

13   would say --

14             THE COURT:  Well, let me just follow through on

15   that.

16             MR. SCHROCK:  Sure.

17             THE COURT:  Mr. Murphy had in his administrative

18   expense claims estimate chart $30 million just based on the

19   accounts payable.

20             MR. SCHROCK:  Yes.

21             THE COURT:  It's certainly conceivable to me that

22   a fairly large portion of that involves amounts payable

23   where there hasn't yet been an administrative expense motion

24   or claim filed.

25             So how would the debtors deal with that?  Would

Page 161

1    they just ignore it or would they -- are they going to make

2    them payable if -- you know, depending on whether someone

3    opts in?

4                Well, first of all, would they get notice of the

5    opt in, just if they have filed a claim, if they just are on

6    the payables list?

7                MR. SCHROCK:  Yes.  To the extent we would be --

8    we're giving specific notice to all known creditors.

9                THE COURT:  So that would include not only those

10   who file claims, but who are listed on the accounts payable

11   of the book --

12               MR. SCHROCK:  Yes.

13               THE COURT:  -- on the books and records?

14               MR. SCHROCK:  Yes.

15               THE COURT:  So then let's assume that they don't

16   opt in.

17               MR. SCHROCK:  Yes.

18               THE COURT:  As I under -- and you're going to

19   explain this later, but as I understand that consent

20   program, they get treated as an administrative expense

21   creditor, but they don't have the right to certain dollars

22   out first.  They will get paid in full --

23               MR. SCHROCK:  Yes.

24               THE COURT:  -- on the effective date.  Does that

25   include those who don't file an administrative expense

Page 162

1    motion, who just appear on the debtors' books and records as

2    having an account payable?

3              MR. SCHROCK:  Well, they are certainly going to --

4    it's a fair point.  They are certainly going to have to --

5    we're not going to go looking for people to pay on

6    administrative expense claims.  We are -- we have estimated,

7    you know, what we think is payable.

8              THE COURT:  Right.

9              MR. SCHROCK:  If parties --

10             THE COURT:  No.  But what I'm saying, if you -- if

11   they're on your account payables list --

12             MR. SCHROCK:  Yes.  If we think we owe them, yes,

13   then they're --

14             THE COURT:  Then you'll pay them.

15             MR. SCHROCK:  -- they're going to get paid.

16             THE COURT:  Okay.

17             MR. SCHROCK:  Absolutely.

18             THE COURT:  All right.

19             MR. SCHROCK:  Yes.  If they're -- if we believe we

20   owe them, we have a record of it and we're liable for it

21   under the terms of the APA, we're going to be, you know --

22             THE COURT:  And there's nothing to stop anyone

23   from -- who has done business with Sears or fallen down in a

24   Sears store to call up Sears and say, am I on your accounts

25   payable lists.  And if you say no, then they can file an

Page 163

1    administrative expense at least up through the effective

2    date.

3         MR. SCHROCK:  Certainly.  Up through the effective

4    date.  Yes, Your Honor.

5         THE COURT:  Okay.  So I'm not troubled by the lack

6    of an administrative claims bar date then because you don't

7    -- I don't see how you -- why you would necessarily need

8    one.

9         MR. SCHROCK:  Yeah.  Our judgment was that it

10   would simply generate a lot of claims reconciliation work.

11        THE COURT:  I mean, oddly the fact that there is a

12   delayed effective date --

13        MR. SCHROCK:  Right.

14        THE COURT:  -- argues for not having to do it.

15   You would -- if you were going to go effective tomorrow, I

16   would be wondering why you hadn't done it because the cash

17   might all be gone.

18        MR. SCHROCK:  Right.  But -- and, Your Honor, when

19   -- especially here where we sold all of the assets primarily

20   other than the remnant assets in --

21        THE COURT:  Well, there's no ongoing --

22        MR. SCHROCK:  Yeah.  There's no ongoing

23   enterprise.

24        THE COURT:  -- accrual.  Right.

25        MR. SCHROCK:  Your Honor, we talked and went

Page 164

1    through the estimate of available funds.  I don't think that

2    those are really in dispute as I highlighted earlier.  I hit

3    the preference actions, which, you know, we're hopeful that

4    those will be even larger than what we put the estimates on.

5    But, you know, these are -- we undertook, we set the

6    preference firms to say, listen, what can we count on, what

7    can we do.

8              And we had, you know, Mr. Griffith tested against

9    other cases.  We think that that evidence is, you know,

10   valuable to the Court in showing that it's not speculative

11   around the preference proceeds.

12             We highlight some of his testimony on pages -- on

13   page 28.  And I want to note and make clear that although we

14   do think the ESL litigation proceeds will be significant,

15   we're not counting on ESL litigation proceeds, you know, to

16   go effective.  I want to be clear on that.  This -- you

17   know, when you run through the numbers, when you run through

18   the claims reconciliation, you know, we're -- if that comes

19   in, great, but it's certainly not a requirement in order to

20   go effective.  And the math, you know, in the declaration

21   certainly bears that out.

22             Just let me hit on the administrative consent

23   program for a few minutes and I'm going to ask --

24             THE COURT:  Well, can I go back, I'm sorry, to the

25   available funds?

Page 165

1              MR. SCHROCK:  Yeah.

2              THE COURT:  In looking at the summary of available

3      funds --

4              MR. SCHROCK:  Yeah.

5              THE COURT:  -- in Mr. Griffith's declaration --

6              MR. SCHROCK:  Uh-huh.

7              THE COURT:  -- that was before I ruled on the cash

8      in transit.

9              MR. SCHROCK:  You're talking about that was in

10     Exhibit C to the disclosure statement?

11             THE COURT:  No.  His declaration.

12             MR. SCHROCK:  Yeah.  Okay.

13             THE COURT:  I don't -- he -- there's -- I think it

14     was fairly recently I ruled that 22 and a half million

15     dollars suspended was the debtors' property under the APA.

16     How is that taken into account in that chart?

17             MR. SCHROCK:  Hold on just a second.

18             THE COURT:  Are the debtors already holding that

19     money and, therefore, it's not -- you know, it's already in

20     the cash position and --

21             MR. SCHROCK:  I believe that's right, Your Honor,

22     that we are --

23             THE COURT:  -- ESL was just wanting it back?

24             MR. SCHROCK:  That's right.  It wasn't something

25     we had to give back.

Page 166

1             THE COURT:  But were you counting it?  I couldn't

2    tell whether --

3             MR. SCHROCK:  Yeah.

4             THE COURT:  -- that was being counted.

5             MR. SCHROCK:  Yes.  I believe -- it is counted, I

6    believe, on the cash on hand.

7        (Pause)

8             MR. SINGH:  Your Honor, Sunny Singh on behalf of

9    the debtors.  Just one clarification.  The cash in transit

10   is not included in the cash on hand.  So we do have the

11   $50.1 million.

12            THE COURT:  Separate from that.

13            MR. SINGH:  Right, separate and apart.  The 22 and

14   a half, really the argument around that was ESL had an

15   argument that -- against -- excuse me -- Transform, that the

16   166 that Your Honor -- remember the 166 issue, that there's

17   -- you know, they have an obligation to pay those payables,

18   that the 22 and a half was a deduct to that which Your Honor

19   ruled against.  So it was not incremental cash.  It was

20   related to the deduct portion.

21            THE COURT:  But who has the money?

22            MR. SINGH:  They have the cash, right, because

23   they have our bank account.  So they have that 22.1.

24            THE COURT:  But you're entitled to it.

25            MR. SINGH:  Well, that's the issue of dispute, I

1      think, that's --

2                THE COURT:  No.  I already ruled on that.

3                MR. SINGH:  No.  Once -- it's subject to the

4      reconciliation, right, and you've ruled on the portion that

5      -- you ruled on the portion that it's not a deduct and it's

6      subject to the reconciliation of what we're owed versus what

7      they're owed.

8                THE COURT:  That's on the other open issues.

9                MR. SINGH:  That's correct.  This -- yeah.  So

10     that's -- I'm sorry.

11               THE COURT:  All right.

12               MR. SINGH:  We'll try --

13               THE COURT:  Just --

14               MR. SINGH:  -- maybe --

15               THE COURT:  No one mentioned it, so I wanted to

16     make sure how it factors in.

17               MR. SCHROCK:  Yeah.  I mean --

18               THE COURT:  And there was discussion, for example,

19     that there's, you know, a ten to $15 million estimated high

20     and low on the receivables and prepaid inventory issues,

21     which brought the 139 down to 99, but it could lower than --

22     90, but it could go lower than that.  But was -- I guess my

23     question was, would it go lower after application of the 22

24     some million or is that, you know, something that would be

25     set off first before you reduce the, you know, the rest of

Page 168

1    the 139 for the 503(b)(9) claims?

2              MR. FRIEDMANN:  Yeah.  It's an additional

3    incremental money -- it's an amount that's still out there.

4    So it's one of the three issues that Your Honor deferred to

5    be examine -- that go to an examiner was this idea that

6    there was a cash in transit along with other --

7              THE COURT:  Right.

8              MR. FRIEDMANN:  -- monies that we believe --

9              THE COURT:  Well, but I didn't need the --

10             MR. FRIEDMANN:  -- belong to the estate.

11             THE COURT:  -- examiner on cash in transit.  I

12   ruled on that one.

13             MR. FRIEDMANN:  Well, the issue I think is that

14   they've argued that that should be offset against other

15   items.

16             THE COURT:  Well, but they were first arguing that

17   they got it and now they don't.  So --

18             MR. FRIEDMANN:  Right.  I mean --

19             THE COURT:  -- I mean, it's -- that's fine to have

20   it be offset, but it's not being -- in other words, there

21   was testimony by Mr. Griffith that his estimates of the

22   available funds included $90 million for 503(b)(9) claims,

23   and there's some back and forth about whether that should be

24   further reduced because of the accounts receivable prepaid

25   inventory disputes.

Page 169

1                    MR. FRIEDMANN:  Correct.

2                    THE COURT:  But would also, I guess, either there

3       or because the money is fundable somewhere else be increased

4       by the 22 and a half million?

5                    MR. FRIEDMANN:  Yeah.  The answer is yes.  So

6       there --

7                    THE COURT:  All right.

8                    MR. FRIEDMANN:  -- would be additional money

9       available to the estate in the event --

10                   THE COURT:  Right.

11                   MR. FRIEDMANN:  -- that the examiner looked at the

12      -- has also included the checks that were written pre-

13      closing that got cash on the books post-closing and vice

14      versa.  So, yeah, there's all the issues with the

15      reconciliation of the offsets which would be incremental in

16      addition to the money we currently have on hand that right

17      now is --

18                   THE COURT:  Right.  But I've already decided that

19      one issue.  You don't need anyone else to decide it except

20      maybe on appeal.  I've decided that issue on the 22 and a

21      half million.

22                   MR. O'NEAL:  And, Your Honor, Sean O'Neal for

23      Transform.  I think Mr. Singh was correct.  I think that

24      cash in transit issue related to the 166 and also related to

25      the DIP shortfall amount.  And what we're in discussions now

Page 170

1    with the debtors and we've got proposed orders going back

2    and forth is to have an expert or an examiner --

3              THE COURT:  Well, that's --

4              MR. O'NEAL:  -- look at the reconciliation.

5              THE COURT:  -- that's fine.  I understand they are

6    open issues.

7              MR. O'NEAL:  Certainly.

8              THE COURT:  I just wanted to just fix on the

9    record that that issue, the cash in transit issue, isn't

10   open anymore.  It's something that Transform may be able to

11   set off against --

12             MR. O'NEAL:  Correct, Your Honor.

13             THE COURT:  -- but the testimony, I guess, may

14   well have indicated that there wasn't anything to set that

15   off against except for the 90 million that --

16             MR. O'NEAL:  And, Your Honor, there's a --

17             THE COURT:  -- the debtor was assuming would go to

18   503(b)(9) claims.

19             MR. O'NEAL:  And there's a disagreement.  And we

20   didn't actually engage on the $97 million issue because I

21   think they -- the debtors have been clear in their

22   declarations that they're not counting on that money for

23   purposes of the effective date.  So --

24             THE COURT:  Okay.

25             MR. O'NEAL:  -- we didn't feel the need to

Page 171

1    challenge that.

2              THE COURT:  All right.  Okay.

3              MR. SINGH:  Your Honor, the other thing I would

4    just point out, in Mr. Griffith's declaration, paragraph 73,

5    he walks through the impact and, basically, for purposes of

6    the numbers that are in his declaration or Mr. Schrock has

7    reviewed the 50 million, we've just ignored, you know, for

8    example, what's coming in from Transform in respect with

9    those disputes.

10             THE COURT:  No.  I understand.  But --

11             MR. SINGH:  Yeah.

12             THE COURT:  -- one of those disputes has been

13   resolved.

14             MR. SINGH:  Yes.

15             THE COURT:  So there was no reason to ignore that

16   one.

17             MR. SINGH:  Well, it was a timing issue.  When he

18   filed the declaration --

19             THE COURT:  I understand.  I'm saying --

20             MR. SINGH:  Yeah.  And now we can --

21             THE COURT:  -- today there's no reason toe --

22             MR. SINGH:  -- I think take into account --

23             THE COURT:  -- ignore it.

24             MR. SINGH:  -- that we have additional --

25             THE COURT:  Right.

Page 172

1                   MR. SINGH:  -- money subject to the reconciliation

2      -- subject to their --

3                   THE COURT:  Okay.

4                   MR. SINGH:  -- offset on this.

5                   THE COURT:  All right.  Okay.  All right.

6                   MR. SCHROCK:  All right.  I think that's clear.

7             Your Honor, on the administrative expense claims

8      consent program, and I should first note we did present

9      evidence and we believe we don't need the administrative

10     expense claim consent program in order to go effective.  Our

11     agreement with the ad hoc group is, however, is that if for

12     whatever reason Your Honor wasn't inclined to allow us to

13     implement that program, that they've kind of put their

14     swords down and agreed to support confirmation, they would

15     want to be able to raise those issues.  And we said, if that

16     happens, we don't think it's going to happen, but if it

17     happens we'll agree to adjourn it.

18             So I just wanted to note that for the record.

19                   THE COURT:  Okay.

20                   MR. SCHROCK:  Although we are -- you know, we do

21     believe the evidence supports approving the plan without

22     that program.  I think that they certainly wanted to make

23     sure that I mentioned that.

24             This program -- this was a difficult thing to put

25     together.  We had a lot of competing groups that wanted a

1    dialogue with the debtors.  We chose the largest group.  I

2    think the fact that they may have --

3            THE COURT:  In dollar amount?

4            MR. SCHROCK:  Yes, in terms of dollar amount.  And

5    they were a manageable group, you know, for us to be able to

6    deal with.  There were three primary clients.  You know,

7    trying to deal with, you know, 50 creditors, it's just like

8    dealing with a bondholder group.  You know, you have to have

9    a steering committee of some sort to -- in order to get

10   traction.

11           I do believe that those parties will ultimately,

12   you know, come into the program should Your Honor approve

13   the confirmation of the plan.  But we really think that this

14   was nothing but upside for the estate and provides a very

15   good incentive for parties to come into it.

16           So, you know, broadly speaking, this plan will

17   have, you know, parties who affirmatively opt in or do not

18   opt out because of the settled claims, will receive a max

19   recovery of 75 percent of the allowed amount of their

20   claims.  So each holder of an allowed admin claim that opts

21   in, then the 17 days after entry of the confirmation order

22   shall receive a pro rata share of 20 million on or about

23   December 1st, 2019 and consensual resolution of that amount

24   within 30 days from the date of the receipt of the opt in

25   form.

Page 174

```
 1                THE COURT:  Well, can we --

 2                MR. SCHROCK:  Yes.

 3                THE COURT:  -- stop on that point?

 4                MR. SCHROCK:  Sure.

 5                THE COURT:  I want to make sure I understand.  If

 6      you opt in, in addition to getting your pro rata share of

 7      the 20 million capped at a 75 percent recovery, how is your

 8      -- how is the amount of your claim treated?  Is it deemed

 9      allowed?  I didn't think it was.

10                MR. SCHROCK:  Yeah.  We --

11                THE COURT:  I thought I heard you say that your

12      claim would be allowed in 30 days and I didn't follow that.

13                MR. SCHROCK:  I think we have to work with them to

14      --

15                THE COURT:  To go over the merits of the claim.

16                MR. SCHROCK:  -- to go over the merits of the

17      claim.

18                THE COURT:  All right.

19                MR. SCHROCK:  And then we consensually agree on

20      the amount.  And so when Mr. Wander was --

21                THE COURT:  Well, but what if you -- but if you

22      don't -- but if you don't consensually agree, then it's left

23      up to the Court?  That's how I would look at it.

24                MR. SCHROCK:  Yeah.  I believe yes, Your Honor,

25      that, you know, 30 days --
```

Page 175

1                THE COURT:  But there's a real effort to try to --

2                MR. SCHROCK:  Yes.

3                THE COURT:  -- to sit down and go through the

4       numbers and --

5                MR. SCHROCK:  And we think that --

6                THE COURT:  -- agree on what makes sense and agree

7       to disagree on what doesn't make sense.

8                MR. SCHROCK:  Yeah.  And I think that's what's

9       going to save -- when we talk about the significant

10      litigation expense, parties who want to get paid quicker --

11      and we are, you know, we're going to be very reasonable in

12      terms of sitting down, especially for parties who are

13      coming, you know, coming in to the settlement.  Sometimes

14      there's preference recovery and we have to balance, you

15      know, those issues where you have to look at, can we -- you

16      know, how is it going to effect the ultimate recovery to the

17      estates.  And so we won't be able to reach an agreement on

18      every single instance.

19               But there's going to be a real effort here to try

20      and get those claims consensually resolved.  We're

21      contemplating hiring a smaller firm, not Weil Gotshal, to do

22      the, you know, administrative claims reconciliation.  We

23      will, you know, be happy to assist because we know a lot

24      about the company and have been working there.  But we think

25      it would be more cost effective to have a different firm

Page 176

1   assist with some of those negotiations.

2           THE COURT:  And when you refer to administrative

3   claims reconciliation, there's obviously been a fair amount

4   of work done already --

5           MR. SCHROCK:  Yes.

6           THE COURT:  -- on the claims, particularly the

7   larger ones.

8           MR. SCHROCK:  Yes.

9           THE COURT:  So the reconciliation is more sitting

10  down with your sleeves rolled up and talking to the other

11  side and going through the numbers?

12          MR. SCHROCK:  Going through the numbers, having

13  preference counsel, you know, involved to the extent that,

14  you know, because there's a -- you know, there's a waiver

15  that would be contemplated.  So you have to look at that

16  side of it as well.

17          THE COURT:  Okay.

18          MR. SCHROCK:  But, you know, we're organized.  You

19  know, we're prepared to do it.

20          THE COURT:  So it's not starting from scratch.

21  It's building on --

22          MR. SCHROCK:  No.

23          THE COURT:  -- the work that Mr. Murphy and his

24  group --

25          MR. SCHROCK:  Yes.

Page 177

1          THE COURT:  -- has been doing.

2          MR. SCHROCK:  And Mr. Murphy and his group,

3    they -- I mean, they really do know the claims.  They're

4    living with them every day.

5          For parties who don't timely opt out, but don't

6    opt in, they are going to receive their pro rata share of

7    the second distribution basically to catch them up.  And

8    then of course parties who don't want to be part of the

9    settlement, they can just opt out.  They'll get paid 100

10   cents, you know, on the effective date, the later of

11   effective date and when their claim is actually allowed.

12         THE COURT:  So can I interrupt you again?

13         MR. SCHROCK:  Of course.

14         THE COURT:  This is a -- what is the rationale

15   behind that middle group or having that middle group?  I

16   mean, it's -- you know, opting in you check a box.

17         MR. SCHROCK:  Right.

18         THE COURT:  Opting out you check a box.  The

19   middle group doesn't do anything.

20         MR. SCHROCK:  The middle group --

21         THE COURT:  Why --

22         MR. SCHROCK:  -- we were --

23         THE COURT:  Why have them?

24         MR. SCHROCK:  So we were sensitive to, you know,

25   discriminatory treatment issues.  If you're going to deem

Page 178

1    somebody to consent effectively by not taking an action to

2    affirmatively opt out, that we wanted to make sure that

3    those parties, you know, basically, you know, could still

4    participate, you know, in the settlement itself.  And we

5    thought that, you know, requiring an affirmative act, much

6    like on a ballad to actually, you know, get out of this --

7    get out of the consent program was a fair way to deal

8    with --

9              THE COURT:  Yeah.  But why put them -- why have a

10   third group?  Why not just have opt ins and opt outs?  I'm

11   struggling with the rationale for that third group which

12   does get --

13             MR. SCHROCK:  Uh-huh.

14             THE COURT:  -- not as good treatment as the first

15   group and you don't know whether they're going to have as

16   good treatment ultimately as the second group or not.

17             MR. SCHROCK:  Well, the way -- from the estate's

18   perspective, we looked at it and said we think that if you

19   send a notice out to everyone and it's adequate notice and

20   you don't take an action to actually opt out, that

21   consistent with the applicable law, you know, in this

22   circuit, including this court, that that's actually consent

23   to come into the program.

24             THE COURT:  No.  I understand --

25             MR. SCHROCK:  And so we want the --

```
 1                THE COURT:  Look, there's a separate --

 2                MR. SCHROCK:  We would like to get the 25 percent

 3    discount.

 4                THE COURT:  Well, okay.  So it's to get the 25

 5    percent discount.

 6                MR. SCHROCK:  That's the benefit to the estate, of

 7    course.  Yes.

 8                THE COURT:  But there's a -- but they're not

 9    getting the first payment.

10                MR. SCHROCK:  But they're getting the second

11    distribution.  So they're catching up with the same group

12    who, you know, like affirmatively opted in.  And it's a --

13                THE COURT:  Well, when you say catch up, are they

14    always behind or do they catch up --

15                MR. SCHROCK:  No.  They catch up with the second

16    distribution and then --

17                THE COURT:  So they're pro rata with the first

18    people --

19                MR. SCHROCK:  Correct.

20                THE COURT:  -- as part of the second distribution.

21                MR. SCHROCK:  That's correct.

22                But this is a similar mechanism that's, you know,

23    been used in at least, you know, the Toys case.  We think

24    that if the notice is adequate, it's fair to ask parties,

25    you know, listen, you're going to get a, you know, an
```

Page 180

1   earlier payment if you just fail to take an action.  And it

2   is consent, you know, we believe under applicable law.

3            THE COURT:  And the reconciliation process, the

4   claims liquidation allowance process, that starts for that

5   second group when, after the first one is done with or --

6            MR. SCHROCK:  I mean, we're going to have to spend

7   a lot of time between now and December 1st on -- depending

8   on how many people come in, I think, with the first group.

9   If resources allow us to keep reconcile -- we've got

10  objections on file which has been the impetus for

11  reconciling a lot of the other administrative claims that

12  are -- that we're aware of or that are on file with the

13  Court.

14           So I would say it's -- I want to say that that's

15  something that's going on now, but certainly will be at a

16  much more intense focus after December 1st.

17           THE COURT:  All right.  I didn't see this three

18  group mechanism in the Toys "R" Us construct or in the

19  Teligent construct.  It was really just --

20           MR. SCHROCK:  Right.

21           THE COURT:  -- you know, opt in or opt out.

22           MR. SCHROCK:  Right.

23           THE COURT:  Well, no.  Teligent had the deemed --

24           MR. SCHROCK:  Yeah.  They had the deemed --

25           THE COURT:  -- the deemed agreement.

1           MR. SCHROCK:  Yeah.

2           THE COURT:  But there was no -- there were only

3    two treatments.

4           MR. SCHROCK:  Right.  Right.

5           THE COURT:  So to me if you're going to have a

6    deemed opt in, the explanation needs to be -- the context

7    needs to be set quite clearly, not just the context of what

8    it is that or how the agreement works as a mechanical

9    matter, i.e., the opt ins, the affirmative opt ins get their

10   share of the first distribution, pro rata up to the 75

11   percent recovery and first look at as far as the

12   reconciliation process, and the second group then catches up

13   in the second distribution and gets looked at.  And then the

14   opt outs get paid when they get paid on the effective date.

15          But I think it's important to have some basic

16   information shared with them as to the, you know, as to the

17   economic consequences of making these decisions.  You know,

18   I mean we just had a lengthy hearing on when the -- when you

19   would normally expect to get paid --

20          MR. SCHROCK:  Yes.

21          THE COURT:  -- a hundred cents on your claim.  And

22   I think people should have a sense of that, if they're going

23   to make that type of decision.

24          For example, there is some risk, I suppose,

25   although hearing the evidence I don't think it's a very

Page 182

1    large one, but some risk that if you neither opted out nor

2    opted in you might not get paid --

3              MR. SCHROCK:  Right.

4              THE COURT:  -- as much as the first group.

5              So I think you have to come up with something to

6    lay that out.  And a fair amount of that has already been

7    laid out in the charts that support -- not the exhibits, but

8    the charts within the declarations of --

9              MR. SCHROCK:  Uh-huh.

10             THE COURT:  -- Mr. Griffith and Mr. Murphy.  But I

11   just don't see how --

12             MR. SCHROCK:  You want them to be getting some

13   more context and make a better --

14             THE COURT:  I think so.  Yeah.

15             MR. SCHROCK:  -- decision.

16             THE COURT:  I mean, that's why I asked Mr.

17   Griffith, because he referred to due diligence as part of

18   the negotiations.

19             MR. SCHROCK:  Right.

20             THE COURT:  I'm assuming that the group that

21   settled on the consent program didn't just do it blindly.

22   They asked you what's available --

23             MR. SCHROCK:  Yes.

24             THE COURT:  -- you know, the timing, et cetera, et

25   cetera.

Page 183

1              MR. SCHROCK:  Right.

2              THE COURT:  I mean, you could certainly point them

3     to his -- to those declarations.  But I think a paragraph or

4     two that lays out the expected timing.

5              To put it differently, the more you're relying on

6     preference recoveries in the ESL DNO litigation --

7              MR. SCHROCK:  Right.

8              THE COURT:  -- the more you're going to have to

9     wait.

10             MR. SCHROCK:  Right.

11             THE COURT:  And you may be willing to wait for

12    that extra 25 percent.

13             MR. SCHROCK:  Right.  They're almost -- I'm

14    picturing it.  It's something almost like risk factors --

15             THE COURT:  Yeah.

16             MR. SCHROCK:  -- associated with each choice.

17             THE COURT:  Correct.  And the reason I raise the

18    intermediate choice --

19             MR. SCHROCK:  Uh-huh.

20             THE COURT:  -- was to me that's the hardest one to

21    handicap.

22             MR. SCHROCK:  Yeah.

23             THE COURT:  Now it may be that someone's just not

24    paying any attention and they don't deserve any notice

25    because they're not paying any attention.  But --

Page 184

1          MR. SCHROCK:  Right.

2          THE COURT:  -- at the same time you're not really

3     relying on that.  You're relying on the fact that you're

4     giving them an actual choice to make, what's the legal basis

5     for it at least.

6          MR. SCHROCK:  Well, should Your Honor -- we could

7     certainly draft something that -- and come up with

8     something, I believe, for that should you --

9          THE COURT:  I mean, for example, in Teligent it

10    was clear that if they didn't make this choice --

11         MR. SCHROCK:  Right.

12         THE COURT:  -- they would get nothing.

13         MR. SCHROCK:  Right.

14         THE COURT:  So that's really easy.  That's a

15    really easy risk factor.

16         MR. SCHROCK:  Right.  We can't say that.

17         THE COURT:  You can't say that.

18         MR. SCHROCK:  Right.  Right.

19         THE COURT:  But I think that without --

20         MR. SCHROCK:  Right.  There's a risk, though, that

21    you could get substantial delayed payment and, you know,

22    there's some risk that you may not get anything --

23         THE COURT:  Right.

24         MR. SCHROCK:  -- or get a reduced amount.

25         THE COURT:  Right.

Page 185

1           MR. SCHROCK:  Yeah.  I think that we can certainly

2      draft that and we'll have our -- I know -- I get what you're

3      looking for, Judge.  We'll put something together on that.

4           THE COURT:  So can I -- I go back to maybe a more

5      fundamental question, which is I guess ultimately the one

6      the U.S. trustee raised initially, which is why seek

7      confirmation now when you won't be going effective for some

8      time?  I'm assuming the answer is that you could now give

9      assurance to all of these administrative expense creditors

10     that this is it.

11          MR. SCHROCK:  This is it.

12          THE COURT:  The plan's confirmed.  You could see

13     your recovery and you have a fairly simple choice, which is

14     opt in, don't do anything, or opt out.  But you know that

15     there won't be any other contingencies because --

16          MR. SCHROCK:  Right.

17          THE COURT:  -- other than what's been -- what is

18     disclosed to you in the election form because the plan has

19     been confirmed.

20          MR. SCHROCK:  And we think that there's a

21     substantial administrative expense savings, you know, by

22     just kind of going into that mode, whether -- we're not

23     going to be dealing with the onslaught of frankly an

24     administrative claim request that parties aren't going to be

25     trying to -- plan related litigation obviously is off the

Page 186

1    table.

2              THE COURT:  Right.

3              MR. SCHROCK:  We're just purely in kind of just

4    the wind down estate mode where the cases are still open.

5              THE COURT:  Okay.

6              MR. SCHROCK:  Your Honor, as to feasibility, we do

7    think that, you know, that consistent with the law we've

8    made our showing.  We've carried our burden.  Feasibility is

9    not a guaranteed, you know, success, a reasonable

10   probability.  And we think that with the unrefuted evidence

11   in front of the Court that -- about what we already have,

12   about what we expect to have and all of the work we've done

13   around the claims, that we can certainly say we have a

14   reasonable probability, and more than that, to be able to go

15   effective.  And that is certainly everybody's single mission

16   to be able to do that.

17             I think that, you know, I'll save the remainder of

18   my comments for any other -- for rebuttal in terms of any

19   other arguments that are posed in opposition to

20   confirmation.  But I know the ad hoc claimants and a couple

21   of other parties in support of confirmation wanted to stand

22   up and say a few words.

23             THE COURT:  Okay.

24             MS. MORABITO:  Good afternoon, Your Honor.  Erika

25   Morabito at Foley & Lardner on behalf of the ad hoc vendor

Page 187

1    group.

2          THE COURT:  Good afternoon.

3          MS. MORABITO:  And I refer to that group as it's

4    defined in the administrative expense claim program.  But to

5    be clear, our group is comprised really primarily of three

6    creditors:  Whitebox Asymmetric Partners, Cherokee Debt

7    Acquisition and Hain Capital.

8          Together they've asserted about $35 million in

9    administrative claims.  But in addition to these clients, we

10   also have original holders of claims.  And I think that's an

11   important distinction because I don't think that was clear

12   on some of the pleadings that we've seen recently.

13         It's difficult to stand here today, to be honest

14   with you.  On one hand we're very proud of what we've

15   accomplished recently and the fact that the debtors have a

16   plan that we believe does give the best chance of recovery

17   to the admins.  But on the other hand, we're really all

18   trying to, I think, make best of a very difficult situation.

19         A lot of things happened good in this case that

20   people forget.  Everybody wants to talk about conversion.

21   And this case did get vendors paid.  It did get landlords

22   paid.  And people were employed for a much longer time than

23   they had been in the past.

24         But the case took a turn for the worse.  We know

25   that.  That's why we're here.  Obviously, it's been a domino

1  effect since then with people pointing fingers at each other

2  and a lot of inter-creditor fighting.  And these are all

3  factors that were taken into account when we decided to

4  ultimately agree to an administrative expense program.

5            And I think it's important from a timing

6  standpoint in terms of when we got involved and why we got

7  involved.  We entered our appearance on July 9th.  That's

8  important because a lot of stuff in this case had happened

9  previously.  And the reason we got involved and the reason

10 we got calls from administrative creditors primarily was

11 because it was almost very similar to what happened in Toys

12 R Us when we were called there and asked to see if we

13 couldn't somehow get involved and see if we could bridge a

14 gap so the plan could be confirmed and that we could at

15 least try to help to get a recovery for the administrative

16 creditors.

17           The other reason that date is important, Your

18 Honor, is July 10th we got a call from Mr. Wander and his

19 group, and I sat here this morning and was a little

20 disappointed and offended by some of the statements that

21 were made.  And the reason I say that today is because we

22 have a ton of admin creditors that are listening in on this

23 call, and there's a lot of administrative creditors in this

24 courtroom today who don't have the benefit of understanding

25 the diligence and the process and what was involved to

1    getting to an agreement such as the one that's been reached

2    and set forth before Your Honor today.

3            We've been contacted by a lot of them to

4    understand what the process was and how the Court was

5    involved and the diligence that was done, a lot of the

6    questions that you asked Mr. Griffith and Mr. Schrock just a

7    few minutes ago.

8            And so I do want to walk the Court through that

9    because I do think for those that are listening and those

10   that are considering whether or not it is in their best

11   interest to opt in, all they really heard today is kind of a

12   one-sided view of that.

13           We were contacted by Mr. Wander on July 10th, and

14   since that time in this three months I think maybe there's a

15   been a couple or a handful of days that have gone by that we

16   have not been on the phone with him or his group or Mr.

17   Sarachek and his group.  We saw this as a combined effort

18   and an opportunity to join forces to see if we couldn't find

19   a mechanism and a way to be able to get some sort of cash

20   distributed to the administrative creditors.

21           Along those lines, because maybe we are the larger

22   firm and we have greater resources and because our clients

23   had greater resources, we were sort of pushed out in front

24   and asked if we could kind of plow the path.  And we did

25   that, and our clients paid for that.  And nobody cared at

1    that time that some of our clients were claims purchasers.

2    It made sense to them because we had a mechanism and an

3    avenue to be able to get a seat at the table.

4           We have taken depositions in this case.  We have

5    appeared at depositions in this case.  We have shared

6    transcripts.  We have entered a common interest agreement

7    with them.  They knew about the agreement, not just by when

8    the filing occurred.  They knew about the details and the

9    terms of an agreement that we were considering reaching way

10   before we saw the filing last night.  They didn't ultimately

11   know what the final terms were because we didn't agree to

12   the final terms of the settlement until the 11th hour.

13          But I think it's disingenuous for Mr. Wander to

14   make a representation to other admin creditors who are

15   listening that this was somehow some behind closed doors

16   deal that was struck with a couple of admin creditors who

17   had the largest claims, and that he and his clients and

18   constituents weren't involved in the process because, to the

19   contrary, they were.

20          We said we got involved on July 7th.  On July 9th,

21   we filed -- I'm sorry -- on August 2nd, we filed our

22   objection, which is docket number 4721, to confirmation.

23   And like other admin creditors at that time, we did not

24   think that keeping this plan going was in the best interest

25   of the estate.  And we were certainly an advocate of

Page 191

1    conversion or some sort of mechanism that would allow for a

2    recovery.  But watching an estate diminish in resources was

3    not something that our clients wanted either.

4              Frankly, when we had the first chamber conference

5    on September -- let me see when that was -- on September

6    9th, we -- the biggest concern that we had was how do we

7    really get a seat at the table.  We weren't getting a lot of

8    love.  I think we were considered the Johnnie come lately by

9    the committee and some of the other professionals.  But we

10   needed an opportunity and a wedge to be able to get --

11             THE COURT:  Well, there's no love in bankruptcy,

12   so.

13             MS. MORABITO:  Fair enough.

14             And so we did.  And so we had a judge's chamber's

15   conference on September 12th.  And Your Honor said at that

16   point that we would have a seat at the table, not just us

17   but the administrative creditors.

18             And it was really after that point, and I think

19   the message was received by all parties, that we needed to

20   work harder.  We needed to try to come together at this

21   juncture in the case and try to make something better or

22   good out of something that wasn't what any of us intended

23   when this case began.

24             And so we did and we entered into real settlement

25   discussions.  And while those settlement discussions, as Mr.

Page 192

1    Schrock said, might have been led by Foley after that point,

2    like we said they -- all of the admin creditors that we were

3    dealing with, including Mr. Wander and Mr. Sarachek's groups

4    were involved.

5            Additionally, we have had several administrative

6    creditors call us throughout this process to try to get a

7    sense of whether or not what we were considering doing made

8    sense to them.

9            On September 23rd, we had a second meeting with

10   Weil Gotshal and that meeting lasted virtually all day.  And

11   that was when we worked on a construct and a settlement that

12   we thought would be something that was much better than what

13   you saw was attached to their -- it was attached as a

14   construct presented with a confirmation brief which was

15   Exhibit B filed on September 13th, 2019.  That was the

16   original construct we had, versus where we are today and the

17   difference in what the construct is.

18           We walked away feeling pretty optimistic at that

19   meeting on September 23rd, but we knew there was still more

20   work to be done.  We circled back and we talked to the other

21   administrative creditors again, and while they were grateful

22   at that time for the work that's been -- that had been done

23   and the additional items that we got as part of a

24   concession, they still wanted more.

25           And so, again, we went back and we continued to

Page 193

1    negotiate.  What we did get, and I think you saw this in the

2    debtors' pleadings, was we got a confirmation hearing

3    adjourned, which is why we went to the new dates of the 27th

4    of September and October 3rd.  And that was really well

5    intended, I think, by all the professionals to see if we

6    could reach some sort of compromise such that we could be

7    here today sitting on the same side as opposed to being

8    allies.

9            Ultimately, though, and sadly, I think, the

10   interests of the admins diverged when our philosophy is that

11   a settlement means there's compromise and it means you don't

12   get everything that you want.  These claims in this case are

13   very unique.  What may be beneficial to one creditor is not

14   necessarily beneficial to another.

15           For example we hear a lot about the World Imports

16   case.  Not all creditors have World Imports case issues.

17   And to those creditors that don't have World Import case

18   issues, it would be disadvantageous to them for the debtors

19   to take a blanket position on a theory of law that could

20   ultimately then negate or significantly -- I'm sorry --

21   which would ultimately, if the debtors lost, increase the

22   amount of claims that would come into the estate and

23   significantly reduce the recoveries that could go to the

24   other admins.

25           Like that you also had the preferences.  Not all

1    claimants had preferences.  So asking the debtors to enter

2    into a settlement agreement that meant that the debtors

3    could have no defenses or minimal defenses to claims at the

4    end of the day is not advantageous to all of the admins.

5    You would be forced with an unknown number of claims and

6    very limited cash.

7              So why did we enter into the administrative

8    expense claim program?  First, the debtors set this forth in

9    their materials, but really what we were looking at is, is

10   conversion better or worse for the administrative creditors

11   than what we have now with this program.  And when we looked

12   at the alternative versus what we were able to get from this

13   program, it was pretty clear that conversion certainly was a

14   far less better option than what this program offered.

15             First of all, conversion was too risky.  There was

16   incredible potential downside to all the claimants.  Many of

17   the creditors again talking about how they had different

18   interests.  Some of these creditors only have claims against

19   certain debtors and not other debtors.

20             What this program allows is the claim which

21   essentially is akin to a claim against a substantially

22   consolidated debtor, so that if you have a claim against one

23   of the debtors, it's a claim against all, and then there's a

24   mechanism for payment.

25             If you went in to a Chapter 7 conversion there

Page 195

1   would be a big risk there that if you did not have claims

2   against anybody other than K-Mart, you may not have an

3   opportunity to get your claim paid.

4           Moreover, if there was a preference action against

5   you, you could find yourself in the horrible position

6   whereby you don't have claims against the only solvent

7   debtor, but yet you're subject to preferences.  So you could

8   ultimately end up owing the estate money.

9           You also had the issue with respect to litigation.

10  While the debtors don't rely, for purposes of being able to

11  meet the standards of 1129(a)(9) for purposes of

12  confirmation on recoveries from Transform or ESL, the admin

13  creditors are certainly hoping that the debtors are

14  successful with that because that's going to be a large

15  number that would come in and would be available for

16  distributions to the admins and possibly unsecureds.

17          If you convert to a 7, we believe that it

18  jeopardizes the current litigation that's pending against

19  Transform and ESL.  It would require delay in the litigation

20  and a substitution of counsel possibly that may not have the

21  same institutional knowledge that the debtors and Akin has.

22          Comparatively let's look at the admin expense

23  program.  One of the biggest things we wanted to get, and

24  Your Honor hit on this earlier, was $20 million, we wanted

25  some component of cash.  And the reason we came up with $20

Page 196

1   million was we looked at it as at least ten percent of what

2   they believed could be the outside number in terms of

3   administrative claims.  So $20 million was roughly assuming

4   that you had $200 million administrative claims.

5              That's something that if this case converted to a

6   7 they wouldn't have.  And you heard Mr. Griffith testify

7   today that they have about $50 million in cash.  The estate

8   isn't getting more flush with cash.  There is a large

9   dependent on recoveries, both from preference actions and

10  also from litigation.  So cash is premium right now.  And so

11  to get the debtors to agree to segregate $20 million into a

12  fund so that it would be available for the admin creditors

13  we thought was an enormous benefit.

14             Secondly, we've always approached this with

15  everybody needs to share in this.  And so both the debtors'

16  counsel as well as the committee's counsel did agree to put

17  $2 million of their current carve out into this segregated

18  account to make it available for admins.

19             The other thing that we kept hearing from admins

20  when we went to negotiate this was that it was very

21  important to them, and they didn't understand the concept of

22  the creditors' committee having 20 -- having the

23  availability of $25 million up front in their view that

24  could be distributed to administrative creditors.  And they

25  felt like that number was too big.

1          And so one of the things that we asked for was

2    could there be a delay in time such that they could still

3    have sufficient funds to litigate the claims against ESL and

4    Transform, but could they free up some of that cash now so

5    that the administrative creditors could also get a portion

6    of that.  And ultimately that was another big part of the

7    agreement.

8          The other thing that I think is important and,

9    frankly, a reason why it took us as late as it did to get to

10   an agreement that we were ultimately able to file on

11   December -- I'm sorry -- on October 1 was the administrative

12   expense claims representative.

13         This is so important and I can't underestimate

14   that.  We keep hearing people talk about what the

15   restructuring committee is going to do and that there's

16   going to be clearly a period of lapse between confirmation

17   and the effective date.  And the administrative creditors

18   are concerned that if there is no representation for them at

19   a level that involves both the claims reconciliation process

20   and also distributions to administrative creditors pursuant

21   to this program, that they won't be treated fairly or it

22   won't be done efficiently, or that what we're going to see

23   is just additional fees going to professionals.

24         So while everybody seemed to be on board, meaning

25   all of the parties that were negotiating the construct at

Page 198

1    least with respect to having a representative, the biggest

2    disagreement was the role that that representative would

3    play.  And in our view this couldn't be window dressing.  It

4    needed to be somebody that really had the ability to be able

5    to make decisions on behalf of the admins and potentially

6    participate in some of the decisions as it relates to

7    reconciliation, including the World Imports case.

8            So I would direct Your Honor's attention to the

9    debtors' supplemental memorandum of law, which is

10   document -- I'm sorry -- docket entry 5296.  And if you turn

11   to -- on the top, it says page 78 and 79 of 140.  This is

12   part of the construct that I think those administrative

13   creditors that have concern about how this process is going

14   to work and to make sure that it's fair and efficient really

15   need to see.

16           The first one is on page 27 at the bottom, which

17   would be page 78 of 140 of docket 5296.  And this talks

18   about the appointment of the administrative representative

19   and that it would be done after confirmation.  And the

20   important part of this is, if you read halfway through

21   paragraph 7, it says that this administrative  -- let's see:

22           "Prior to the effective date, and once the cash

23   reserve account has been funded with 10 million in the

24   aggregate, the debtors' restructuring committee together

25   with the creditors' committee and admin representative will

1    commence a telephonic meeting no less than every 30 days to

2    review, among other things, the status of the reconciliation

3    of administrative expense claims as well as the latest

4    budget and variance reporting of the debtors, provided that

5    in the interim the debtors shall provide, among other

6    things, weekly budgets, various reporting, as well as an

7    accounting of the total assets and any net proceeds derived

8    there from to the pre-effective date committee on a

9    confidential basis."

10           Additionally, this administrative representative

11   who will be, as Your Honor pointed out, how are they going

12   to be selected?  Once we do have the opt in group and people

13   are able to weigh in on who that representative will be,

14   they will be appointed.  And this is important because

15   here's where we get to paragraph V on page 28.

16           "This person shall serve alongside the debtors'

17   restructuring committee and the creditors' committee to work

18   through 503(b)(9) and 503(b)(1) issues regarding inducement,

19   date of receipt, port of origin, and any exposure on account

20   of preference actions, and to ensure and expedite a fair

21   process to claims resolution in emergence."

22           Each of those elements were specifically chosen

23   because it addressed the issues of (indiscernible).  So

24   while we couldn't get the debtors to agree to take a blanket

25   position on a legal theory because it could have both

Page 200

1    positive and negative consequences to admin creditors based

2    on your claim, we at least got a representative involved

3    that could look at those issues fairly.

4           Additionally, and this was important, the admin

5    representative will be entitled to applicable insurance

6    coverage.  They will have adequate compensation provided and

7    paid for by the debtors.  And that's important.  We don't

8    want someone there that basically is a figurehead and

9    doesn't have any teeth to do anything.

10          By having them to be adequately compensated, we

11   believe that will provide or at least for the opportunity to

12   have somebody on there that can represent the interest of

13   the admins.

14          Secondly, the other role of this person which is

15   really important is to help the admins to get comfortable

16   with understanding that there's going to be costs going

17   forward in this case, but it's not going to be an evergreen

18   account.  It's not going to be one carve out of this

19   transitioning over to a post-confirmation carve out whereby

20   the estates and the professionals have free will to use

21   whatever money they need to to prosecute the cases and the

22   claims.

23          What this person does is to the extent that a

24   distribution is wanting to be held up to pay to the admins

25   because the estate believes that they need additional cash

1    to be able to resolve or respond to pending motions in the

2    case, it can't just be done by those representatives without

3    input from the admin.  And by input I mean they have to

4    agree unanimously that if a distribution, a further

5    distribution to admins is to be held up in favor of putting

6    more money into the operational costs of the estate, which

7    includes professional fees, then those parties would need to

8    come before the Court and the Court would have an

9    opportunity to make a decision as to whether or not it's

10   more appropriate to give distributions to admin creditors or

11   if the estate needs additional funds.

12          So each of those were heavily negotiated.  Those

13   were things that we thought were extremely important.  And

14   we read a declaration yesterday, again, that made it seem as

15   though we just cut a deal and had our claims allowed and

16   that's why we entered into this settlement.

17          If I haven't said enough already to show that

18   that's true, this last provision about having a claims

19   representative --

20          THE COURT:  Well, not true you mean.

21          MS. MORABITO:  Yeah.  Not true.  You're right.

22          To have this claims representative involved in the

23   reconciliation process has absolutely nothing to do with us

24   now because we went through an extensive reconciliation

25   process with Mr. Murphy, also with the representatives from

Page 202

```
1    the committee and specifically FTI.  We had a large discount

2    given on our claims and yet again we still agreed to only

3    get up to 75 percent by opting in.

4             When we asked for this admin expense claim to be

5    involved in reconciliation it was certainly not to benefit

6    my clients because our claims have already been reconciled.

7    Yet our clients are the ones that paid the legal fees to go

8    through and ask for these additional items for other

9    administrative creditors.

10            So I can't emphasize enough that this was a highly

11   negotiated program that we do believe ultimately benefits

12   the administrative creditors.

13            Unfortunately, though, we heard today, we saw from

14   the objections, we saw from the declarations that this is

15   just still not enough for other admin creditors.  I'm

16   hopeful though and cautiously optimistic.  We've -- now that

17   we've talked to a couple of people today and we spoke to a

18   couple of people yesterday, we do believe that pretty soon

19   you are going to see relatively quickly several

20   administrative creditors opting in now that they understand

21   the construct and how the negotiation process worked.

22            Again, at the end of the day there's a lot of

23   emotion now.  There's a lot of strong personalities.  This

24   is a difficult case.  I think to sort of echo what Mr. Shock

25   said, which is we're trying to make the best of a difficult
```

Page 203

1    situation and we can't come to another scenario whereby this

2    isn't in the best interest of the estate and the best

3    interest of the administrative creditors.

4            I don't have anything else, Your Honor.  If you

5    have any questions, I'm happy to answer any questions about

6    the program itself.

7            THE COURT:  Okay.  No.  I don't think so.

8            MS. MORABITO:  Thank you.

9            THE COURT:  Thanks.

10       (Pause)

11           MR. DUBLIN:  Good afternoon, Your Honor.  Phil

12   Dublin, Akin Gump, on behalf of the committee.  I'll be

13   brief.

14           THE COURT:  Good afternoon.

15           MR. DUBLIN:  We've been -- Your Honor has been at

16   this for a long time and has about 300 admin creditors that

17   probably still want to say something about the program that

18   the ad hoc group's counsel just went through.

19           I just want to highlight a couple of things,

20   acknowledging that what we're looking to do here is a little

21   unorthodox with confirming the plan and not really being

22   sure when we're going to go effective subject to the types

23   of situations that Your Honor referenced where there's

24   regulatory pools and things of that nature which sometimes

25   leave companies in bankruptcy for a while, while they wait

Page 204

1    to go effective.

2            We've been at this since -- for about just about a

3    year.  Obviously, a lot of contentious issues before Your

4    Honor and with the debtors and with Transform.  We were

5    able, shortly after the disclosure statement hearing, to put

6    our differences aside with the debtors and jointly pursue

7    the path that got us to where we are today.

8            There were a number of changes made to the plan

9    right before the disclosure statement hearing that address a

10   number of the committee's concerns with respect to the

11   proposed substantive consolidation as well as with respect

12   to the PBGC settlement.

13           One of the things I want to highlight about the

14   PBGC settlement, which at least a couple of creditors I

15   think have raised issues within propriety of is as greater

16   proceeds come in from the causes of action there are

17   benefits to unsecured creditors from the PBGC settlement

18   because their claim is essentially reduced from their

19   original $1.4 billion claim that they were seeking to have.

20           The creditors' committee has been bullish on the

21   causes of action.  That will be pursued jointly by the

22   debtors and the committee pre-effective date, and by the

23   trust post-effective date.  And we expect the proceeds

24   ultimately -- that will ultimately come in will be

25   greatly -- excuse me -- will be much greater than was put

Page 205

1    forth in the disclosure statement which generally are

2    conservative numbers to ensure that the plan is feasible and

3    satisfies the best interest of creditors' test and the like.

4         The path forward is not going to be easy.  We know

5    that the estates are up against an adversary in ESL and

6    other well healed defendants.  And it was important that we

7    have appropriate financing to pursue those causes of action.

8    And part of the compromise with the admin creditors was to

9    reduce the initial cash available to pursue the litigation

10   to $15 million.  But there is a mechanism to get that back

11   up to $25 million once -- in advance of going effective in

12   the aggregate.

13        So some of that money will be used.  It's not

14   going to get replenished and become evergreen.  But in the

15   aggregate there will have been $25 million available in the

16   first instance for the pursuit of those causes of action.

17        We believe that the agreement that's been reached

18   with the admin creditors is beneficial to everybody.  I

19   think that our pleading that we submitted in connection with

20   confirmation and the liquidation analysis made clear that a

21   substantial number of admin creditors will get no recovery

22   in these cases if these cases are converted.

23        Mr. Schrock highlighted that confirming the plan

24   now will save administrative expenses.  We agree with that

25   wholeheartedly.  Everyday there are numerous motions being

Page 206

1    filed for payment of admin expenses.  The agreement that's

2    been reached sets forth the path forward and the options

3    available for admin creditors to get paid sooner or to wait

4    and get 100 cents.  And that is purely voluntary and

5    available for them.

6           Just to highlight a couple of other things, we've

7    had recent conversations with counsel for the estates that

8    are pursuing the preference actions.  We expect upwards of

9    200 complaints to be filed before the end of the month.

10   That process is ongoing.  There's been a lot of work.

11   There's been about 140 settlements already.  So that's

12   something that has been bringing funds into the estate as

13   part of the cash that's available now and we expect it to

14   continue to come in.

15          We heard earlier about the $5.1 million that's

16   coming in from the school district.  And we expect most of

17   those assets to be monetized very quickly.  We are all

18   incentivized to go effective as soon as possible, and we

19   think that working together with the debtors and the

20   administrative expense representative, we will get to that

21   goal very quickly.

22          With that, Your Honor, unless you have any

23   comments, I will reserve some time to respond to any

24   objections to the extent necessary.

25          THE COURT:  Okay.  Thanks.

Page 207

1          MR. DUBLIN:  Thank you.

2      (Pause)

3          MR. RAYNOR:  Good afternoon, Your Honor.  Brian

4   Raynor from Locke Lord on behalf of the Pension Benefit

5   Guarantee Corporation.  In comparison, I'll be very brief

6   with my comments.

7          PBGC is the largest unsecured creditor in this

8   case with upwards of $1.7 billion in claims.  Those claims

9   are joint and several against all of the debtors.  So to put

10  it mildly, PBGC has a lot of -- a lot on the line in these

11  cases.  We have had some severe disagreements with the

12  debtors and at times with some of the professionals for the

13  committee on a number of issues, including the sale, the

14  rights to the KCD admin claims, the amount of the PBGC

15  claims, the termination of the pension plans, the plan

16  structure, the toggle, the settlement of Subcon, and the K-

17  Mart premium.

18          Despite all these disagreements we worked at arm's

19  length to settle them with the debtors' professionals.  The

20  PBGC didn't get everything that it wants.  The debtors

21  didn't get everything that they want.  But ultimately it was

22  a building block for a global settlement and a framework for

23  these cases to reach some sort of finality.

24          We think this framework is fair.  We think it

25  offers finality, and we think that it is clearly better than

Page 208

1    the alternative which would be a Chapter 7 liquidation.

2            As the largest creditor in these cases PBGC asks

3    that the plan be confirmed and that confirmation incorporate

4    the global settlement.

5            THE COURT:  Okay.

6            MR. RAYNOR:  Thank you, Your Honor.

7            THE COURT:  Thank you.

8        (Pause)

9            MS. LIBERMAN:  Sadly, Your Honor, you're now going

10   to hear some objections.

11           THE COURT:  Yes.

12           MS. LIBERMAN:  Donna Lieberman for Relator Carl

13   Ireland.  Your Honor, I note that counsel to our

14   co-mortgagee, the United States, is here today as well from

15   the U.S. Attorney's Office.

16           I will keep it brief.  I very much appreciate the

17   Court's comments about the lien having to be protected.  We

18   objected to the sale of our collateral.  We got a

19   replacement lien.  We also got, to the extent of diminution

20   in that lien, a super priority administrative claim with

21   respect to all of the debtors' assets.

22           We've filed a motion seeking a determination of

23   our claim and payment of our claim.  Your Honor, we filed a

24   very narrow objection and in some respects it's not an

25   original one.  Like many others we want to know that the

Page 209

1    money is there or will be there in the very near term.

2              We have a somewhat unusual situation, Your Honor,

3    though.  The debtors' response to our objection, and in its

4    initial confirmation brief was that no creditors junior to

5    us would receive a distribution unless our claim could be

6    reserved for or paid.

7              We then learned yesterday morning that there is a

8    proposal, and it's very much a plan proposal.  These are not

9    ordinary course payments.  But there is a proposal to induce

10   administrative claimants to come to the table.  And it

11   involves $20 million going into a segregated account within

12   days of this Court entering a confirmation order.

13             Your Honor, respect -- with all due respect to the

14   debtors we believe that our client has a superior claim and

15   essentially the debtor is paying others ahead of our client

16   without adequately reserving for our client and without

17   paying our client.

18             THE COURT:  Well, you have a superior claim to the

19   extent that your collateral has diminished, right?

20             MS. LIBERMAN:  True.  But we also have a unique

21   claim, Your Honor, because as --

22             THE COURT:  Well, but where's the evidence that

23   your collateral is diminished?

24             MS. LIBERMAN:  But we -- we're also in an unusual

25   situation.  I guess you heard the testimony as far as the

Page 210

1    debtors are aware and Mr. Murphy addressed.  We are the only

2    secured claim out there that the debtors are kind of

3    conceding they think is valid.  And they're not making any

4    provision to protect us.  They're -- you know, they're --

5    you know, one way or the other it appears they're giving us

6    a valueless lien.

7             THE COURT:  Well, I don't understand that.  You

8    have a lien on all of the assets.

9             MS. LIBERMAN:  No.  We have -- the replacement

10   lien is limited to the proceeds of --

11            THE COURT:  All right.  So you have --

12            MS. LIBERMAN:  -- our collateral.

13            THE COURT:  -- a right, though, for adequate

14   protection --

15            MS. LIBERMAN:  Yes.

16            THE COURT:  -- yet you could look to all the

17   assets for that, right?

18            MS. LIBERMAN:  But our concern, Your Honor, is the

19   assets are being diminished, not just in the ordinary

20   course, but with $20 million being moved into --

21            THE COURT:  But does that --

22            MS. LIBERMAN:  -- an account --

23            THE COURT:  -- does that leave you without

24   adequate protection?  That's really the underlying issue.

25   And I am having a hard time seeing that given the other

Page 211

 1    assets.

 2                MS. LIBERMAN:  Your Honor, I -- respectfully I

 3    disagree.  What we've been hearing all day is the debtors

 4    don't have as much cash as they would like.  They don't have

 5    the cash --

 6                THE COURT:  Cash isn't the only --

 7                MS. LIBERMAN:  -- to go effective.

 8                THE COURT:  -- asset.

 9                MS. LIBERMAN:  They're hopeful that things will

10    improve.  And it's all very uncertain.  We still don't know

11    that this case is administratively solvent.

12                THE COURT:  It doesn't have to be administratively

13    solvent.  You're first.  It just has to be solvent to the

14    tune of $18 million.

15                MS. LIBERMAN:  But, Your Honor, that's why I'm

16    concerned about $20 million --

17                THE COURT:  No, but --

18                MS. LIBERMAN:  -- and I can --

19                THE COURT:  I know your concerned, but you need to

20    show me why you're not adequately protected with all the

21    other assets.  All the other assets add up to like before

22    the litigation far more than your client is owed.

23                MS. LIEBERMAN:  Your Honor, we are simply asking

24    that the debtors --

25                THE COURT:  Why don't you sit down with the

Page 212

1    debtors and work out an adequate protection stipulation

2    where your lien extends to the other assets first?  I mean,

3    Mr. Schrock said he was aware of that.  I -- this is

4    circular.  I know you're concerned.  Right now, you don't

5    really have anything more than a superpriority claim,

6    although it is a superpriority claim.

7            But I don't see why, if they're going to be using

8    your collateral, you're not entitled to a replacement lien

9    on -- if it's not cash, than something that's on its face

10   worth a lot more than $18 million.

11           MS. LIEBERMAN:  Your Honor, we would be delighted

12   to discuss that with the debtors.  To date, we've had no

13   success.

14           THE COURT:  Okay.  I think that would satisfy the

15   objection as far as I'm concerned, based on this record,

16   because I do believe that eventually -- and as far as just

17   the 18 million is concerned, really rather soon that money

18   will come in.

19           MR. SCHWARTZ:  Well, we're happy to sit down and

20   work that out, Your Honor.

21           THE COURT:  Okay.

22           MS. LIEBERMAN:  Thank you, Your Honor.

23           MR. SCHWARTZ:  Your Honor, good afternoon.

24   Jeffrey Schwartz, McKool Smith, on behalf of Winners

25   Limited, an administrative expense claimant.

Page 213

```
 1              Very briefly, Your Honor, we have -- Winners has a

 2    strong concern about a plan going effective without a

 3    further review by the court as to feasibility.  We filed an

 4    objection.  Our --

 5              THE COURT:  I just had the review.  That's why

 6    I've been here since 10 o'clock --

 7              MR. SCHWARTZ:  No --

 8              THE COURT:  -- 10:30.  I mean, what more review do

 9    you want me to do?

10              MR. SCHWARTZ:  Okay.  Well, in terms of going

11    effective.  A plan -- confirming a plan, per se, has no

12    legal significance.  It is accepted when it goes effective,

13    then it has legal significance.  Thus far, Winners'

14    experience in this case is that -- filed our motion for the

15    administrative expense on December 21, 2018.  We appeared

16    before the Court on April 14th and were not heard.  Then we

17    appeared before the Court on May 21st, and -- with just a

18    simple legal question as to the proposed 503(b)(1)(A).  Your

19    Honor ruled against us.  Your Honor instructed debtor's

20    counsel to submit an order accordingly, and to just share

21    the order but not require Winners' consent.  And there's

22    some other parties involved in this.

23              To date, debtor's counsel has not submitted the

24    order to you.  So this is five months later.  We've had some

25    discussions with them and there was circulation of a draft
```

Page 214

1    order, but the debtor told us that -- debtor's counsel told

2    us, who's sitting here, that they didn't see the value in

3    following the Court's instructions to submit the order.

4              UNIDENTIFIED SPEAKER:  I'm sure we didn't say

5    that.

6              MR. SCHWARTZ:  Okay, well -- we have the --

7              THE COURT:  Can you give me a copy of your

8    objection?  I'm looking for it here in the binder.

9              MR. SCHWARTZ:  Yes.  It is -- what was before you

10   on May 21st --

11             THE COURT:  No, no, your plan objection.

12             MR. SCHWARTZ:  Oh --

13             THE COURT:  If you don't have an extra copy, I'll

14   just keep looking for it.

15             UNIDENTIFIED SPEAKER:  Your Honor, we do.  We can

16   hand it up.

17             UNIDENTIFIED SPEAKER:  May I approach?

18             THE COURT:  Sure.  Thank you.  All right.  None of

19   this is in your objection.  So your objection is based on

20   1129 and 11(a)(9) and (a)(11).

21             MR. SCHWARTZ:  Feasibility.

22             THE COURT:  Yes.

23             MR. SCHWARTZ:  Yeah.

24             THE COURT:  All right.  So let's get to that, sir.

25             MR. SCHWARTZ:  Okay.  So our issue is that there

Page 215

1    will not be money -- the debtors -- this 503(b)(9) claims

2    procedures program, there were no negotiations.  There was

3    no contact.  It was to delay allowing the claim, delay us

4    from going to an appellate tribunal on that issue.

5            THE COURT:  Can we focus on the issues in front of

6    me?  I'm going to say it one more time, sir, or else I'll

7    ask you to move on.

8            MR. SCHWARTZ:  Okay.

9            THE COURT:  1129(a)(9) and 1129(a)(11), those were

10   the two issues you raised in your three -- two and a half

11   page objection.

12           MR. SCHWARTZ:  Right.  And our --

13           THE COURT:  Now, let's focus on those.

14           MR. SCHWARTZ:  -- issue is that  we will -- that

15   there will not be money in this trust to pay, even if we

16   succeed in getting the claim, the Winners' claim allowed,

17   and we'll have the money in the trust --

18           THE COURT:  And what is the basis?  And what is

19   your basis for saying that?

20           MR. SCHWARTZ:  Because Your Honor has said in

21   April and in May, there will be an estimation proceeding.

22   There's no expert witness as to the value of the preference

23   claims, an 80 percent assumption of preference claims is

24   certainly not in my experience --

25           THE COURT:  That's not an 80 percent assumption of

1   preference claims.  It's about a 15 percent assumption.

2             MR. SCHWARTZ:  And the other --

3             THE COURT:  Bud do you disagree with that?  Should

4   we go to the declaration and look at that?

5             MR. SCHWARTZ:  Well, I'll accept that I saw

6   something earlier that it was a much higher number.  The

7   other point is --

8             THE COURT:  Well, it isn't.  I mean --

9             MR. SCHWARTZ:  On the --

10             THE COURT:  -- you can't just go throwing things

11   out like that.  I mean, honestly.

12             MR. SCHWARTZ:  On the 503(b)(1)(a), and this is

13   feasibility --

14             THE COURT:  Right.

15             MR. SCHWARTZ:  -- the debtor had filed something

16   which said that that amount, if the debtor -- if the Court

17   ruled against the debtors and the -- and if we prevailed and

18   others similarly situated prevailed, it would be a $64

19   million incremental obligation, administrative expense to

20   the estate.  We may prevail if we get an order --

21             THE COURT:  Being on appeal.

22             MR. SCHWARTZ:  On appeal.  We may prevail.  And I

23   don't -- and I would urge on the Court --

24             THE COURT:  I would urge you to think of

25   something, sir.

1            MR. SCHWARTZ:  Yes, sir.

2            THE COURT:  What is the alternative to not

3     confirming a plan based on your argument of administrative

4     insolvency?  It's conversion of the case, correct?

5            MR. SCHWARTZ:  That's one option.  Another option

6     is at least before the plan goes effective, we actually see

7     that there's -- what these claims, administrative claims are

8     as allowed, and what the real results on preference

9     recoveries in so far --

10           THE COURT:  But that's what I spent the first ten

11    minutes of this hearing on.  Those were my first questions.

12    When does the plan go effective?  Only when you know you can

13    make the payments you need to make.

14           MR. SCHWARTZ:  And what I'm saying to -- Winners'

15    position --

16           THE COURT:  What you're saying to me is you, in

17    essence, want to stay all of that until your appeal is

18    determined.  So, in essence, you're flipping the argument on

19    an appellate bond in favor of letting your appeal go forward

20    on an issue you've lost on below.

21           MR. SCHWARTZ:  I'd rather have you decide -- my

22    client would rather have you decide whether it's proper for

23    the plan to go effective.  That's all I'm saying.

24           THE COURT:  But it's not -- it's --

25           MR. SCHWARTZ:  Confirmation is one thing, but its

1    effective date -- that's the request.

2              THE COURT:  All right.  This was not -- either in

3    your objection, but are you basically saying that as part of

4    the quarterly reporting mechanism to the Court, perhaps with

5    status conferences on proceeding towards the effective date,

6    the debtors would say, "We're ready to go effective now in

7    the notice of that conference."  And the parties who review

8    that on the docket could say, "Why are you ready to go

9    effective?  You still have all of these claims to be

10   liquidated."  Correct?  Is that what you're suggesting?

11   Because that makes sense to me.  That's part of the review

12   process.

13             MR. SCHWARTZ:  All I'm trying to say is --

14             THE COURT:  Okay.

15             MR. SCHWARTZ:  -- I trust you --

16             THE COURT:  Right.  Right.  All right, fine.  I

17   understand that.

18             MR. SCHWARTZ:  Right.

19             THE COURT:  But I'm telling you right now, though,

20   that's not a backdoor way to get a stay pending appeal.

21             MR. SCHWARTZ:  I'm not seeking to appeal anything.

22             THE COURT:  All right.

23             MR. SCHWARTZ:  There's not even an order entered

24   yet.

25             THE COURT:  Well, I know, but I'm just

Page 219

1    contemplating that argument being made.  But I understand

2    the other point, and I think that's part of what I was

3    raising with Mr. Schrock and what he said he's been talking

4    about with Mr. Dublin.  SO I understand that argument.

5                    MR. SCHWARTZ:  That's exactly what we're seeking,

6    Your Honor.  Thank you so very much.

7                    THE COURT:  Thank you.

8                    MR. SINGH:  Your Honor, Sunny Singh.  If I could

9    just make one point on that.  Just so Your Honor is aware,

10   in paragraph 14 of the proposed order, in response to

11   something ESL had raised, we do say we'll give 20 days'

12   notice before going effective --

13                    THE COURT:  All right.  Well --

14                    MR. SINGH:  -- so the parties will have a chance

15   to address that issue.

16                    THE COURT:  -- but I say --

17                    MR. SINGH:  Broad notice.

18                    THE COURT:  -- but you could build that into a

19   reporting process.

20                    MR. SINGH:  Yes.  We will report on it, and of

21   course, we will give that final notice before.

22                    THE COURT:  Okay.  Okay.

23                    MR. WANDER:  Good afternoon, Your Honor.  I have a

24   bunch of comments, but I'll be fairly brief.  First of all,

25   I want to thank the Foley and Lardner attorneys, Erica

Page 220

1      Morabito and Paul Labov.  They were great working with and I

2      think they're fabulous lawyers.  And maybe if I was in their

3      position with their clients, I might have agreed to the

4      construct, because they should do what's best for their

5      clients.

6             Let me tell you what's really where things fell

7      apart and how I see things, which may be different than --

8      obviously than the professionals, maybe different than Your

9      Honor.  But let me tell you what my problem is in the case

10     where we are today.

11            I don't see why the vendors who provided the goods

12     within 20 days of the bankruptcy, and during the bankruptcy,

13     should be so far behind the professionals.  And where I

14     think I lost my seat at the negotiating table is I made a

15     statement that I guess is kind of heresy in some of these

16     cases.  I said, "Maybe the lawyers shouldn't get the next

17     dollars."  Maybe the professionals, who in my rough numbers,

18     Judge, have gotten around $150 million, and administrative

19     creditors with undisputed claims have gotten zero.

20            THE COURT:  No, I understand that point, but --

21            MR. WANDER:  And --

22            THE COURT:  But what you're dealing with here are

23     two things, I think.  One is the DIP order and the

24     professionals' rights under it, and the other is just a

25     matter of negotiation.

Page 221

1           MR. WANDER:  So --

2           THE COURT:  But the negotiation is with the DIP

3    order as a background, because normally or often when this

4    issue arises, and fortunately it doesn't arise that often,

5    but it does arise in cases, the administrative expense

6    creditors, including the professionals who are still owed

7    money, look at each other and say, "All right.  What's going

8    to happen if this case converts?  And who's going to be hurt

9    most by that?"  And they'll work out some agreement between

10   themselves or among themselves.

11          That plays into any situation like this.  And it's

12   not necessarily a forgiveness, it's just, you know, a timing

13   issue often.  But on top of that here, you have the final

14   order, a DIP order.  So that changes that leverage a bit.

15          MR. WANDER:  Let's talk about the DIP order, if I

16   may.

17          THE COURT:  Okay.

18          MR. WANDER:  And I apologize, Judge.  I was not

19   involved in the case in the first day motions.

20          THE COURT:  All right.

21          MR. WANDER:  But --

22          THE COURT:  This isn't a first day order.  This is

23   an order issued on due notice.

24          MR. WANDER:  No, no, but -- so my general

25   understanding is in a Chapter 11 case, the administrative

Page 222

1      creditors get paid in the ordinary course of business, and

2      my understanding is 503(b)(9) vendors can actually be paid

3      in the ordinary course of business.  There was a motion in

4      this case to pay $162 million of vendor claims.  These are

5      the vendors who are shipping to a company that some of them

6      that was financially troubled, some may not, but I believe

7      that the bankruptcy code and courts want to incentivize

8      vendors to continue to ship.  Otherwise, we'll have Chapter

9      11 cases filed and there's no inventory.

10             So we say to the vendors, and Congress actually

11     said when they amended the Bankruptcy Code in BAPCPA 2005

12     and have 503(b)(9), they basically -- Congress said not only

13     are the vendors and all of the creditors who provide goods

14     and services during the case supposed to be at the top of

15     the waterfall chain, so to speak, but also those who are

16     providing goods into a financially troubled company should

17     also be protected.

18             So in the end, and again bankruptcy there are two

19     principles that I always keep reading about, one, it's a

20     Court of Equity; and the other is we're here to pay

21     creditors.  This is not a reorganization case.  No one's

22     talking about Sears as it filed on the filing date

23     reorganizing.  It sold substantially all of its assets.

24             Now, the administrative creditors don't get a

25     committee in the beginning of the case.  There's no one

Page 223

1    really speaking with them.  So to afford them in the Court,

2    and so you have a situation where debtor's counsel

3    negotiates with the DIP lender this order that seems to

4    guarantee the professionals getting 100 cents on the dollar.

5    They're protected -- 80 cents every week it's taken out like

6    clockwork.

7             THE COURT:  Well, that's a separate order.

8             MR. WANDER:  Okay.

9             THE COURT:  I'm focusing on the DIP order.

10            MR. WANDER:  Well, so we have a situation where

11   the professionals to date have been paid approximately $150

12   million.  There's $100 million in cash that's there.  Do I

13   want the -- that's 50 million in the carve-out and they have

14   50.1 in available cash.  So there's $100 million.  And what

15   things boil down to is I said, "I think we should put a hold

16   on the professionals getting paid, and let's take that

17   money, and let's pay undisputed allowed administrative

18   claims."

19            Now, maybe that's a crazy idea that 150 million to

20   the professionals, zero to those allowed claimants, another

21   100 million is really a simple choice.  Do we then make it

22   250 million, basically, because it's 50 in the carve-out?

23   You're going to take 25 plus 10 for the liquidating trust.

24   What the Foley people negotiated of to take 20 million out,

25   basically the -- where it's coming from is just going to be

Page 224

1    replenished by December 1.  So they still get the 25 million

2    funding of the trust, plus the 10 million.

3              And I simply said, "I don't think the

4    professionals should be guaranteed 100 cents while the

5    allowed administrative vendor creditors have gotten zero."

6    So maybe that's completely wrong, and if so, that's just --

7              THE COURT:  Well, you haven't addressed the order.

8              MR. WANDER:  Well, you know, Judge, in order for

9    them not to be able to take out the money each week, there

10   has to be a notice given that there's some type of

11   termination.  But the only one to give that notice -- well,

12   the witnesses didn't even know who gives the notice.  It

13   seems to be that the debtor would have to give a notice --

14             THE COURT:  Well, but we're at the point where

15   they will give the notice because the plan is going to be

16   confirmed and those entities will not have their claims

17   anymore.

18             MR. WANDER:  Well, and then the $100 million has

19   now been disbursed.  So if Your Honor confirms this plan,

20   then it's 200 -- and in round numbers, Judge, it's 250

21   million to the professionals, and it's zero --

22             THE COURT:  No, no, it's not 100.  It's 50.

23             MR. WANDER:  In the carve-out, but you're also

24   taking another 25 million --

25             THE COURT:  But that's for the future.  That's to

1   litigate with.

2           MR. WANDER:  Again, that's -- and by the way, part

3   of the litigation is against the administrative creditors.

4   So if you have an allowed administrative claim, because you

5   gave goods and services to the debtor, even during the

6   bankruptcy.  I'm not talking about (indiscernible) or

7   anything, there are people who provided goods and services

8   during the bankruptcy.  They have not been paid.

9           So -- and now, some of them is subject to

10  objections and preference claims.

11          THE COURT:  That's how it works.  You know,

12  there's nothing wrong with --

13          MR. WANDER:  So --

14          THE COURT:  It's just a -- preferences are not

15  immoral on either side.  This is how the code is written.

16  Look, I'm sorry, you can't just sort of come up here and

17  give me sort of general notions about fairness without

18  actually looking at the parties' underlying rights.

19          Now, it may be that there is some argument to be

20  made on your -- on the first point that I raised, which is

21  in any situation like this, there's usually a negotiation,

22  because no one really wants the case to convert.  And so

23  parties focus on that.  And sometimes people give on their

24  rights just to defer.

25          But these other points are just points that I

Page 226

1    think probably just confuse people and make them think that

2    they have rights when they don't have rights.  And that's a

3    disservice to them.

4              MR. WANDER:  Well, Judge --

5              THE COURT:  You know, you don't have a right not

6    to be sued for a preference.

7              MR. WANDER:  I'm not saying that, Judge.

8              THE COURT:  Well, I think you were.  I think you

9    were saying it's really bad that these people might be sued

10   for a preference.  Well, too bad.  You know, it's in the

11   code.  So what do you say?  Obviously, they don't like it,

12   but it's perfectly fine for them to be sued if you satisfy

13   Rule 11 and there's a rational basis that you could recover.

14   There's nothing wrong with that.

15             MR. WANDER:  I wasn't --

16             THE COURT:  I just -- you know, and --

17             MR. WANDER:  I wasn't saying there's something --

18             THE COURT:  And there's nothing wrong with relying

19   on a final order that says that this money will be held in

20   trust and no one else can get it.  And I'd like to focus on

21   that language.  If there's something I'm missing, you should

22   tell me about it, but --

23             MR. WANDER:  I was --

24             THE COURT:  -- paragraph 21 of the DIP order sets

25   out this carve-out reserve, a carve-out account, and it says

Page 227

1    that it'll be held in trust and notwithstanding anything to

2    the contrary in this or any other Court order, the carve-out

3    account in the amounts on deposit or the carve-out account

4    shall be available and used only to satisfy obligations of

5    professional persons benefiting from the carve-out.  How do

6    you get around that?

7                MR. WANDER:  I'll tell you how, Your Honor.  If at

8    the beginning of the case you were told that --

9                THE COURT:  So you're saying the order was fraud?

10   There was fraud on the Court?

11               MR. WANDER:  That's not what I said.

12               THE COURT:  Well, okay.  So then I'm not going to

13   relive history.  The order is what it is.

14               MR. WANDER:  I'm trying to address.

15               THE COURT:  All right.

16               MR. WANDER:  I'm trying to answer Your Honor's

17   question.

18               THE COURT:  Okay.  All right.  It was odd that

19   you'd say if I was told at the beginning of the case,

20   because we're not there anymore.  We're here.

21               MR. WANDER:  Right.  And what I was -- what I'm

22   saying, Your Honor, is -- and hindsight is 20/20.  And

23   Courts sometimes can revisit orders.  If Your Honor --

24               THE COURT:  On what basis?

25               MR. WANDER:  Your Honor -- if it was told at the

Page 228

1    beginning of the case that we may end up with a huge hole in

2    paying administrative creditors during the case their

3    allowed claims, I submit Your Honor might rethink whether

4    the $50 million that's in this carve-out --

5              THE COURT:  I would rethink under Rule 9024,

6    right?  So what are the grounds under Rule 9024 to vacate

7    that order, which adopts Rule 60 of the civil rules?

8              MR. WANDER:  Your Honor, at the time it was

9    entered, administrative creditors were not being told they

10   weren't going to be paid.

11             THE COURT:  But they weren't told they weren't.  I

12   just -- Mr. Wander, this isn't -- this is -- I don't believe

13   this is productive.  Let's go through Rule 9024 together.

14   Why don't we do that?  Mistake, inadvertent surprise, or

15   inexcusable neglect.  I'm sorry.  Is that what you'd be

16   relying on?  Mistake, inadvertent surprise, or inexcusable

17   neglect?

18             MR. WANDER:  Well, mature --

19             THE COURT:  Newly discovered evidence that with

20   reasonable diligence could not have been discovered in time

21   to move for a new trial, fraud.

22             MR. WANDER:  Well, Judge --

23             THE COURT:  Judgment is void, the judgment has

24   been satisfied.

25             MR. WANDER:  Your Honor, it's sure surprising

Page 229

1   right now that we have a hole of over $100 million of

2   administrative insolvency.  I'm just telling Your Honor --

3           THE COURT:  But the point of a carve-out is to

4   deal with that issue.  I think it contemplates.  There's no

5   reason to have a carve-out other than if you're worried

6   about that very issue.  So if anyone was worried about it,

7   they could've stood up and said, "For example, you know,

8   this isn't the type of carve-out you should be granting,

9   Judge.  Instead, it should be a 506(c) carve-out.  So in

10  fact, some amount of the expenses should actually be

11  deducted from the secured creditor's claim."

12          MR. WANDER:  And --

13          THE COURT:  You know, things like that.  But to

14  say that this order should be vacated based on the now

15  reality of what was then the possibility for which the

16  carve-out was expressly negotiated, which in the event of an

17  administrative insolvency or the risk of that, this doesn't

18  seem to make a lot of sense to me.

19          MR. WANDER:  Well, here, Your Honor, and I don't

20  know if this rises to fraud, but it may get close to it is

21  if the debtor filed a motion in the beginning of the case

22  and said to $162 million of vendors, "We're going to pay you

23  those claims," those vendors have no reason to object to --

24          THE COURT:  Well, look --

25          MR. WANDER:  -- any type --

```
 1              THE COURT:  -- I'm going to cut this off right

 2     here.  In your objection and in the record today, there has

 3     been no attempt to make any effort to vacate that order in

 4     any respect.  So to me, this is just not germane.  Why are

 5     we even dealing with this?  If you really seriously felt

 6     this, it should be in the pleadings --

 7              MR. WANDER:  Judge --

 8              THE COURT:  -- or in the record.

 9              MR. WANDER:  Judge, we -- objections have been

10     filed on the fee issue --

11              THE COURT:  You said the creditors should give up

12     their rights.  That's what you have said.  They should give

13     up their rights under the DIP order and --

14              MR. WANDER:  No, I'm --

15              THE COURT:  -- without a basis for it.

16              MR. WANDER:  What I'm saying is there should be a

17     balancing.  Why should the administrative vendors --

18              THE COURT:  That's a separate issue.  That's an

19     equitable issue.  That's the negotiations.

20              MR. WANDER:  Correct.

21              THE COURT:  That's not a legal issue.

22              MR. WANDER:  So as an equitable issue where we are

23     today, when you have 162 million --

24              THE COURT:  All right.  So you're just basically

25     negotiating in the open on this, right?  Because that's all
```

1    we're talking about is the negotiation over it.

2              MR. WANDER:  No --

3              THE COURT:  So what -- in your mind, what would it

4    take?  To give up all the money?  I mean, what -- there's --

5    it just doesn't --

6              MR. WANDER:  No, I wasn't talking about giving up.

7    I'm not saying the 80 percent, the 150 million they've

8    received they should give up.  I did not say that, Your

9    Honor.  I am not saying that.

10             THE COURT:  But you --

11             MR. WANDER:  I'm talking --

12             THE COURT:  But you're basically just negotiating

13   right now, right?  That's really what's going on.

14             MR. WANDER:  No, I'm saying what's wrong --

15             THE COURT:  So what's the legal basis for the

16   argument?

17             MR. WANDER:  I'm saying what's wrong with this

18   plan is there is $100 million of cash.  That's what I'm

19   saying, number one.  While I do not think a conversion is a

20   great result, for administrative creditors under this plan,

21   a conversion to a Chapter 7, where the trustee has $100

22   million and can pursue all of the litigation to bring in the

23   additional assets, which will probably take several years,

24   very likely could be better for the administrative

25   creditors, particularly the ones of the K-Mart estate.

1        THE COURT:  I'm sorry, what is the difference

2   between having 100 million and 25 million?  I mean, it's a

3   big litigation budget, 100 million.

4        MR. WANDER:  No.  What I'm saying is the trustee

5   can distribute those funds.  Instead of the hundred -- would

6   it hurt the professionals if it got converted?  Yes.  They

7   don't get necessarily the 20 percent holdback.  Would it be

8   good for other creditors if a trustee was able to distribute

9   that $50 million?  Yes.  It might be good, and better, for

10  administrative creditors, particularly of the K-Mart estate

11  --

12       THE COURT:  Have you made that case anywhere to me

13  as to how that works?  I mean, the debtor had laid out

14  pretty carefully in their liquidation analysis the argument

15  that at least most of the administrative expense creditors,

16  particularly after you factor in not only the cost of coming

17  up to speed by a Chapter 7 trustee, as well as the Chapter 7

18  trustee administrative expenses, including the cost of the

19  trustee herself, the cost of going through all of the

20  accompanying claims and litigating those issues, they make a

21  pretty compelling case that whereas on the evidence before

22  me, whether you accept the claims program or you wait until

23  the effective date and get paid in full, you will get paid

24  in full.

25       So I think what you're saying to me is that you'll

Page 233

1    get some more money now and maybe not get paid in full.  At

2    least that's what their Chapter 11 analysis shows me.

3              MR. WANDER:  Well, actually what --

4              THE COURT:  Can you point to something that shows

5    different?

6              MR. WANDER:  I think what their Chapter 7 analysis

7    shows, and what the creditor's committee argued before they

8    made their deal, was the K-Mart estate is the ones who would

9    probably get 100 cents.  So administrative creditors in the

10   K-Mart estate, in a Chapter 7, probably would get 100 cents

11   on the dollar.  That's what I believe their liquidation now

12   shows.

13             THE COURT:  When?

14             MR. WANDER:  What?

15             THE COURT:  When?

16             MR. WANDER:  Okay, so when?  So when will the plan

17   go effective based on the testimony?  Now --

18             THE COURT:  No -- well, let's put it differently.

19   Almost by definition, the plan would go effective before

20   there would be a distribution in a Chapter 7 case, right?

21             MR. WANDER:  No.  There could be in term

22   distributions, a Chapter 7 trustee can pay undisputed

23   allowed claims with an order from Your Honor --

24             THE COURT:  From what source, given the

25   intercompany claim analysis that would have to take place?

Page 234

```
 1                   MR. WANDER:  I don't believe there's any bar in a

 2    Chapter 7 trustee distributing --

 3                   THE COURT:  That wasn't my question.  If you

 4    really don't know what the intercompany claims are,

 5    including secured claims, how do you make an interim

 6    distribution?  What trustee would do that?

 7                   MR. WANDER:  They --

 8                   THE COURT:  For the risks that she would face?

 9                   MR. WANDER:  Well, I believe we -- based upon what

10    the committee has set forth, and the debtor's liquidation

11    analysis, I believe the K-Mart estate is administratively

12    solvent.

13                   THE COURT:  But their --

14                   MR. WANDER:  And it may hurt other administrative

15    creditors --

16                   THE COURT:  But you're not focusing on the

17    intercompany claims, of which under the DIP order they are

18    secured and superpriority claims, so --

19                   MR. WANDER:  I am.  I'm saying the funds would be

20    going to the K-Mart estate, based upon the disclosure

21    statement, the K-Mart estate is the one where all the money

22    would go to.  If you're an administrative creditor, and I'm

23    sure there are some who have claims against K-Mart but not

24    Sears.  Some like my clients have claims against both.

25    Their claims could be paid very quickly, 100 cents in the K-
```

Page 235

1    Mart estate by the Chapter 7 trustee, there doesn't seem to

2    be any dispute of the papers filed with the disclosure

3    statement and the committee's filings that the K-Mart estate

4    is the solvent one.

5              So yes, in a Chapter 7, administrative creditors

6    for the K-Mart --

7              THE COURT:  Is there a dispute on that?  And if

8    there isn't, is it solvent all the way after doing the

9    intercompany claims reconciliation analysis?

10              MR. WANDER:  I --

11              THE COURT:  No, I'm asking counsel for the company

12    and the committee.

13              MR. SINGH:  Your Honor, Sunny Singh for the

14    debtors.  We don't necessarily think -- there is a dispute

15    on that because we don't necessarily think that K-Mart would

16    absolutely be administratively solvent.  If you take the

17    post-petition intercompany analysis that we were able to do,

18    yes, K-Mart is entitled to those intercompany claims.  But

19    we believe, as we've assumed in our liquidation analysis,

20    that there would be inter-estate liquidation.  And after

21    that, it's unclear how much K-Mart would recover, but --

22              THE COURT:  There would be what?  Inter what?

23              MR. SINGH:  Excuse me, litigation.  I used the

24    wrong word.  Inter-estate litigation between the three to

25    say there should be substantive consolidation or there

Page 236

1    should not be substantive consolidation.  And after that,

2    we're not saying that K-Mart is absolutely administratively

3    solvent in a hypothetical liquidation scenario.  What we're

4    saying is it's pretty clear that only K-Mart would be able

5    to pay something to administrative creditors in that

6    scenario.

7              MR. WANDER:  So in that situation, a trustee could

8    distribute an interim distribution of 50 cents.  It may not

9    be the 100 cents.  I understand what he just said.  But

10   that's the solvent estate.

11             So K-Mart administrative creditors very likely

12   would do better in a Chapter 7.  But let me talk about --

13             THE COURT:  I don't -- I guess I don't agree with

14   that, based on the evidence I've actually had.  And just

15   saying he -- she could make a 50 cent distribution.

16   Trustees are very conservative people.  They face liability

17   for letting money go out too early.  If they're being sued

18   by the Mr. Foxes of the world, no offense, that all these

19   other companies have claims against them, they're not going

20   to make it into a distribution.  They're going to have that

21   litigation play out.

22             MR. WANDER:  You'll still probably have that

23   resolved as soon as this plan will go effective.  And let me

24   just deal with the --

25             THE COURT:  I disagree with that completely.

Page 237

1          MR. WANDER:  But let me deal with that issue, Your

2     Honor.  Because we have the testimony of the three witnesses

3     --

4          THE COURT:  And the -- I'm sorry, the

5     administrative claims would include the professionals claims

6     that you say wouldn't get paid.  They would be part of that.

7          MR. WANDER:  Right.  But they wouldn't be able to

8     get additional distribution until the other administrative

9     creditors caught up.  So okay, they would get 80 cents.

10    They may not get 100 cents, but the professionals, I don't

11    believe we're getting more --

12         THE COURT:  Caught up on what?

13         MR. WANDER:  If you're an administrative creditor

14    of K-Mart and you've gotten zero so far and the

15    professionals have gotten 80 cents, then I believe the

16    administrative creditors with allowed claims would be

17    entitled to get 80 percent because it would go pro rata --

18         THE COURT:  I don't understand that argument

19    either.  They've been paid under the order that says that

20    it's going to them and only to them.

21         MR. WANDER:  Correct.

22         THE COURT:  So it --

23         MR. WANDER:  So I'm saying the additional money,

24    the $50 million carve-out in the Chapter 7 would go to the

25    Chapter 7 trustee.

Page 238

1          THE COURT:  To go to admin expenses.

2          MR. WANDER:  Correct.

3          THE COURT:  So it existed at that time.

4          MR. WANDER:  And --

5          THE COURT:  Why would you have a lookback?  Again,

6     you're just ignoring the order.  This is the difference

7     between equities and a negotiation on the one side and legal

8     claims and rights on the other.  You know, at some point

9     when you're negotiating, you've got to face reality.

10          MR. WANDER:  I understand, Your Honor, but if the

11    bankruptcy code says that administrative creditors are

12    supposed to be paid in the ordinary course, I think there's

13    something inherently wrong --

14          THE COURT:  No, no, I'm not talking about

15    inherently wrong.  I'm talking about rights under a specific

16    order and specific provisions of the code.  So let's just

17    move off of inherently wrong or inequitable.

18          MR. WANDER:  Okay.  So let me talk about some of

19    the testimony, because when we had chambers -- a few

20    chambers conference ago and it was brought up that it may

21    take a while for this plan to be effective, I think -- and I

22    pointed out, we may be talking years, I think Your Honor had

23    a reaction of, "I'm not confirming a plan that may not go

24    effective for years."

25          I believe -- I'm not saying a chambers conference

1    is binding, I'm just setting the stage for the testimony.

2    The testimony, Mr. Schrock said no one poked holes in it.  I

3    respectfully disagree.  I think I poked the Grand Canyon in

4    it.  These people have no basis for the numbers coming in,

5    the numbers going out.

6              THE COURT:  I don't agree with that.

7              MR. WANDER:  Meaning the claims and the assets.

8              THE COURT:  Look, are we talking about feasibility

9    now?

10             MR. WANDER:  Yes.

11             THE COURT:  Because I think that's what we are

12   talking about it.

13             MR. WANDER:  Yes.

14             THE COURT:  So why is this a "visionary scheme,"

15   which seems to be the one phrase that all courts that deal

16   with 1129 (a)(11) find is something that is not feasible?

17   Why is this a visionary scheme?

18             MR. WANDER:  Well, the question right now is when

19   will it be feasible?  So I submit this plan, based upon the

20   testimony of billions -- hundreds of millions, and maybe --

21   you know, I use the word billions, you know, not too loosely

22   because, you know, one billion two is a lot.  Most of the

23   claims haven't been filed.  None of them have been

24   litigated.  There are serious legal issues.  There are

25   serious factual issues.  My client has an inducement claim.

Page 240

1    I haven't even been able to get going with discovery.

2              You're talking about years of litigation on the

3    administrative claims.  So if the -- it will be years for

4    money to come in based upon preference recoveries, likely

5    with the ESO litigation.  So it'll be years for the

6    preference recoveries and the funds to come in to pay

7    administrative claims.  It'll take years to determine the

8    universe of the administrative claims.

9              So we have a plan that may be effective in easily

10   three years.  And between that time, you are simply going to

11   have more of the funds being used on litigation against the

12   administrative --

13             THE COURT:  When would they not be used in a

14   conversion?  Same funds would be used, right?

15             MR. WANDER:  I think a Chapter 7 trustee is going

16   to be less likely to have the litigation against the

17   administrative creditors.  Yes, we want the --

18             THE COURT:  What's that -- why?  What's that based

19   on?

20             MR. WANDER:  Because -- I'll tell you why.  A

21   Chapter 7 trustee is going to have fiduciary duties to

22   everyone.  And he probably is going to look at the

23   administrative creditors differently than the lawyers for

24   the creditors committee.  See, if you're under -- the lawyer

25   for the creditors committee and the liquidating trust, every

Page 241

1    dollar you give to the administrative creditors is one less

2    dollar to the unsecured creditors.  I get that.  That's who

3    they represent.

4            If you're a trustee, you're not representing the

5    unsecured creditors.

6            THE COURT:  The litigation group is not the

7    creditors committee.

8            MR. WANDER:  Okay.  So the -- they fought over who

9    would control it, and the creditors committee won.  They get

10   the three votes versus the tooth of the debtor.  And there

11   was a big brouhaha --

12           THE COURT:  And you have the --

13           MR. WANDER:  Let's see --

14           THE COURT:  -- consenting admin creditor

15   representative.

16           MR. WANDER:  I'm sorry?

17           THE COURT:  You have the consenting admin creditor

18   representative, and you need the unanimity on expending

19   extra money.  And if you don't have it, you come back to me.

20           MR. WANDER:  Okay.  So --

21           THE COURT:  So you have three versus two to begin

22   with, in terms of numbers, as far as committee and other

23   fiduciaries.  I just --

24           MR. WANDER:  What I was saying -- I was trying to

25   explain the dynamics --

Page 242

1          THE COURT:  I know, but I'm reacting to that by

2    saying I don't see the dynamics the way you do, given where

3    we are at this moment.

4          MR. WANDER:  Well, first of all, because there's

5    an -- the administrative creditors, the two groups, were

6    aligned up to a point.  It's natural at a certain point they

7    would not be aligned because if you're claims traders and

8    you don't have the world imports issue --

9          THE COURT:  That issue can be decided quite

10   quickly.  It's a pure legal issue.  To some extent, I've

11   already dealt with it.  It's just -- you know, that's just

12   not -- no trustee would just give up on that issue.

13         MR. WANDER:  I'm not saying a trustee would give

14   up.  I'm saying --

15         THE COURT:  Well, so that's fine, but --

16         MR. WANDER:  No.  A trustee would look at it

17   differently.  He would not look at --

18         THE COURT:  A trustee would, I think, actually in

19   a case of this magnitude, be very reluctant to settle that

20   issue.  It would be a brave trustee that would settle it,

21   particularly in a settlement that was favorable on the side

22   that I think you wouldn't want to come out on.  It's just --

23   you know, it's not --

24         MR. WANDER:  Your Honor, fine.  I make that point

25   -- I don't believe if you don't confirm the plan today, I

Page 243

1    don't think the world comes to an end.  I don't believe the

2    only alternative is conversion.

3            What's happened here is everything is being pushed

4    based upon can we pay the lawyers for another week.  And --

5            THE COURT:  Where's that in the record?

6            MR. WANDER:  Well, Judge, if we just had a --

7            THE COURT:  The lawyers are going to get -- I

8    mean, lawyers will be incurring the funds to do the work

9    that you acknowledge needs to get done no matter what.

10           MR. WANDER:  Okay.  So if we just had an

11   administrative claims settlement construct less than 48

12   hours ago, it has an automatic opt in.  And I would say if

13   there's one thing I would request that Your Honor change, is

14   not to have the automatic opt in.  It's patently unfair to

15   foreign vendors.  You have people in Asia, other places who

16   are the main suppliers.  They don't have lawyers.  They're

17   not going to understand what the notice is.

18           It's unfair and I submit as the U.S. Trustee's

19   Office in their objection said, "Contrary to the bankruptcy

20   code, to have them -- by doing nothing, automatically not

21   getting 100 cents and getting a" --

22           THE COURT:  That's not how this -- that's not what

23   this settlement provides for.

24           MR. WANDER:  I believe --

25           THE COURT:  I'm sorry.  I'm sorry.  We're talking

Page 244

1    about the deemed opt ins where they --

2              MR. WANDER:  Right.  It's --

3              THE COURT:  -- were deemed to agree to 75 percent.

4              MR. WANDER:  Yeah.  If there's just one thing that

5    I submit should be --

6              THE COURT:  All right.  Although you're doing that

7    for someone other than your client, right?  Because your

8    client knows how to read and they've hired you, so that's

9    really just --

10             MR. WANDER:  Correct.  I'm saying --

11             THE COURT:  Okay.

12             MR. WANDER:  -- they're a lot -- I'm saying based

13   upon my discussions with a lot of --

14             THE COURT:  You know, let's -- I don't need to

15   hear from you on this point.  You don't have standing on

16   that point.

17             MR. WANDER:  I may not have -- well, Your Honor --

18             THE COURT:  You don't.  You don't have standing on

19   that point.  You're pleading the cause of someone that you

20   don't represent.

21             MR. WANDER:  Who doesn't have a lawyer, who --

22             THE COURT:  Fine.  I get that.  I've already taken

23   that into account.  But you don't have standing on it.

24             MR. WANDER:  Your Honor, if you -- if Your Honor

25   doesn't confirm the plan today, I don't believe that means

Page 245

1   things go into a Chapter 7 conversion.

2            THE COURT:  No, I'm sure it wouldn't because

3   people would then negotiate more and that's what you want.

4   You want to negotiate.  But I have no confidence that your

5   clients or you would ever agree to anything that actually is

6   reasonable.

7            MR. WANDER:  Well, I don't think that's a fair

8   comment, Your Honor.

9            THE COURT:  Well, you've just said that the

10  professionals should give up $50 million.  That makes no

11  sense.  I mean, I wouldn't if I were them.  I have better

12  rights than that.  They might be persuaded to give up

13  something more, but not that.

14           MR. WANDER:  Your Honor --

15           THE COURT:  So I would suggest that maybe you make

16  a reasonable proposal to them on that score.

17           MR. WANDER:  Your Honor, I respectfully disagree

18  as to that --

19           THE COURT:  Well, I was giving you a chance to

20  actually get some money in.  But if you're not willing to

21  take it, then that's fine.

22           MR. WANDER:  Your Honor, as I said, we lost our

23  seat at the table --

24           THE COURT:  No, Mr. -- Mr. Wander, listen to me

25  carefully.  I'm giving you a chance to get something more.

1   Just telling you that what you are asking for is

2   unreasonable.  Listen to what I am saying.  You won't have

3   this chance for very long.  I'm suggesting we maybe take a

4   break and talk to them about it.

5            MR. WANDER:  Well, so, Judge, you brought that up.

6   So yesterday, the debtor reached out to me --

7            THE COURT:  No, no, I --

8            MR. WANDER:  Okay.

9            THE COURT:  Hold on.  That's -- I'm saying that to

10  you.  You should finish the rest of your argument, all

11  right?

12           MR. WANDER:  Your Honor, sure.  I don't believe

13  that the debtor has met its burden.  I don't believe that

14  the testimony by the witnesses was credible.  I don't

15  believe --

16           THE COURT:  But why?

17           MR. WANDER:  I'll tell you why, because they

18  haven't factored in the length of time it will take for the

19  funds to come in under any realistic scenario with hundreds,

20  if not thousands of claim objections --

21           THE COURT:  Right.  But can we stop there?  If

22  it's a time argument.  Again, I have two sections of the

23  code, right?  1129(a)(9), which is the section that requires

24  unless otherwise agreed, that administrative expense claims

25  be allowed on the effective date.  Or if they're not -- if

Page 247

1    they're objected to then as soon as they're allowed.  And

2    then I have 1129(a)(11), which is the feasibility section.

3    As far as (a)(9) is concerned, there's nothing in the code

4    or the case law that says that a plan has to go effective by

5    a date certain, some specific date.  So time isn't really

6    relevant to (a)(9).  It is relevant to (a)(11) but not to

7    (a)(9).

8            So unless you can point to me for something, I'm

9    going to move to (a)(11).  I don't see it as relevant to

10   (a)(9).  It's not there.

11           MR. WANDER:  Your Honor, most --

12           THE COURT:  Congress could have easily said, "But

13   in no event shall the effective date be later than X, or

14   later than Y if it's conditioned upon regulatory approval,"

15   or something like that.

16           MR. WANDER:  Right.  And Your Honor mentioned that

17   example of regulatory approval.  And very often, we need a

18   third party to approve, so we can't go effective for that

19   reason.

20           THE COURT:  Congress doesn't limit it that way.

21           MR. WANDER:  I understand.  But I don't believe

22   the case law supports extending the effective date four

23   years --

24           THE COURT:  What --

25           MR. WANDER:  -- simply to have litigation

Page 248

1    recoveries.

2              THE COURT:  Give me a case.  Give me a case.

3              MR. WANDER:  I don't have one offhand.

4              THE COURT:  All right.  So let's move to

5    feasibility, because that's --

6              MR. WANDER:  Sure.

7              THE COURT:  -- I think, the relevant issue.

8              MR. WANDER:  Okay.

9              THE COURT:  Feasibility.  I can't confirm a plan

10   that fails the feasibility test.  And generally speaking,

11   what the courts turn to is, is the plan premised on

12   visionary schemes or unduly risky or unreasonable or

13   improbable assumptions, including litigation assumptions,

14   although it doesn't have to be limited to litigation.  It

15   could be the hockey stick projection.

16             Unlike the cases that the parties have cited that

17   dealt with litigation that was highly improbable, including

18   one litigation that the party had already lost and had on

19   appeal, the litigation we're talking about here is in two

20   forms, as far as bringing assets into the estate.  Form one

21   is preference litigation.  As far as I'm concerned, I have

22   uncontroverted evidence that there is a more than reasonable

23   likelihood that there will be at least 100 million in

24   preference recoveries where the estimate is that that's

25   about 10 or 15 percent of what was determined to be, you

1       know, subject to demand.

2               In my experience in dealing with preference cases,

3       10 or 15 percent is a pretty good estimate when you look at

4       the whole ball of wax of demands.  It's also my experience

5       that those cases are hardly ever litigated beyond the

6       complaint stage.  Every now and then you get to a motion for

7       summary judgment and generally speaking, because there are

8       serious factual issues usually.  If it's gone that long,

9       that's denied, and then the parties settle.

10              This is not just my experience.  This is the

11      experience in case after case, where there are thousands of

12      potential litigation preference claims.  And then when you

13      go to the ESL litigation, this is something that extremely

14      well-informed parties on the creditors committee's side, and

15      the debtor's side through the special committee, looked at

16      extensively and took into account when negotiating the

17      transformed deal.  And they -- the one thing they insisted

18      on is that those claims not be released.

19              And based on my review of the complaint and the

20      summary of those claims, they are real claims.  They are not

21      visionary schemes.  So what is not feasible here in terms of

22      actually achieving the effective date?

23              MR. WANDER:  Sure.  So I fully support the estate

24      going after ESL and Mr. Lamper (ph).  I'm all for that,

25      Judge.  What they believe those who've analyzed it, what

Page 250

1    they believe would likely be recovered is a separate issue.

2    Now, I'm not saying you don't do the litigation, because

3    instead of 2 billion, you're only going to recover 50

4    million or 150 million, hey go sue them.  Prosecute the

5    lawsuit.  Bring in the 150 million.

6              But there's nothing in the record that can give

7    the Court any comfort as to what that number will be and

8    when it will be achieved.

9              THE COURT:  Does that mean the ultimate

10   collection?

11             MR. WANDER:  Correct.  Correct.

12             THE COURT:  Okay.

13             MR. WANDER:  The amount and the collectability are

14   two issues that I'm told --

15             THE COURT:  Well, as far as the amount, I have the

16   complaint and I have the analysis of the transfers that are

17   being attacked.  So that is in the record.

18             MR. WANDER:  There's the complaint.  I'm not --

19             THE COURT:  And there's this summary of the

20   transfers that are the subject of the complaint.

21             MR. WANDER:  Right, but I believe a summary of the

22   transfers doesn't set forth whatever the defenses are going

23   to be.  It says --

24             THE COURT:  Look, I have been reviewing litigation

25   claims since 1984.  I can do that, particularly when I know

1    that two extremely experienced litigation firms have done it

2    also and have said, "Over my dead body will these claims be

3    settled in the transform negotiations."

4            MR. WANDER:  Right.  And I --

5            THE COURT:  I understand their collectability

6    point, but that's, you know --

7            MR. WANDER:  Well, let's talk about that.  So

8    first of all, I was fully supportive of the --

9            THE COURT:  I don't care whether you're fully

10   supportive.  I just -- look --

11           MR. WANDER:  Not giving a release was one thing.

12   I agree.  They shouldn't have given the release.  I'm glad

13   they held out.  It's a separate thing as to how much are we

14   going to collect.

15           THE COURT:  Right.

16           MR. WANDER:  That's what I'm saying.  I'm saying

17   the evidence --

18           THE COURT:  You don't need a lot here.  You really

19   don't need a lot.  The shortfall is somewhere between 35 and

20   $100 million.

21           MR. WANDER:  Well, I submit based upon the

22   testimony that's not correct.  And I don't believe they

23   really established it.  When I asked them about the various

24   claims, the witnesses really didn't know much about it.

25   They don't even know about the $162 million that was

Page 252

1   promised to the vendors.  I've asked I don't know how many -

2   - how much has been paid.  Judge, it could be 162 million

3   that should be added.  It could be $1.  But they did not

4   know.  That's my point.

5           When I asked them about all the claim objections,

6   how can you assume you're winning everything?  I understand

7   what Your Honor's comments were at the May 21 hearing on the

8   world imports, but they don't know.  They have no idea how

9   that litigation will pan out.

10          THE COURT:  Well, I do.  I mean, come on.  Look,

11  as far as the claim objections, every single big case -- I

12  mean, as far as -- most of the claims that are being

13  objected to in those charts are duplicates or in connection

14  with priority claims.  People who think priority -- I might

15  as well check that box because it's really important to me.

16  That's not what priority claim really means under 507.

17          MR. WANDER:  I'm not dealing with the -- I didn't

18  attack their --

19          THE COURT:  Well, you did a bit --

20          MR. WANDER:  No, no, no --

21          THE COURT:  -- until I -- anyway.  In any event, I

22  just -- look --

23          MR. WANDER:  I'm talking about the testimony.

24  That's what I'm talking about, Judge.  I'm talking about the

25  record before the Court.

Page 253

1              THE COURT:  I understand, but as far as the claims

2    that they're talking about, and I bumped -- you heard me say

3    it.  I bumped it up from the 35 to, you know, over 100.  And

4    I think that swing takes into account the potential that

5    some of these claim objections may raise issues that are not

6    -- no brainers, that the people won't just default, which is

7    what happens with about 99 percent of omnibus claim

8    objections, and they'll actually litigate them.

9              But to say that it's just out -- you know, I

10   should just disregard the testimony, I don't have a basis

11   for that.

12             MR. WANDER:  No.  I'm talking about the testimony.

13   I had no problem with them knocking off $1 billion from a

14   roughly a billion two in the administrative claims.  I

15   didn't challenge that.  They're smart enough to know what a

16   duplicate claim is.  I get that.

17             I was talking about when they got it down to 200

18   million, I'm basically saying, "You're at 200 million.

19   You're not at 30.  You're not at 60.  You're not at 90."

20             THE COURT:  So 30 is the shortfall.  That's the

21   low end of the shortfall, 35 million.  And the high end is -

22   - so --

23             MR. WANDER:  I'm talking about the record.

24             THE COURT:  I agree.  I understand.

25             MR. WANDER:  I'm talking about the testimony.

Page 254

1        THE COURT:  No, but I'm doing -- I'm going through

2   that and I'm saying to you that I'm not necessarily

3   accepting that the shortfall here is $35 million based on

4   their estimate of 50 million of allowed administrative

5   expenses, and 90 million that will net out to zero with the

6   section 2 -- asset purchase agreement, but that it could be

7   well higher.  There could be another easily 70 million hire.

8        MR. WANDER:  Or it could be another 100 million --

9        THE COURT:  No.  Well, another 100 million on top

10  of the 100?

11       MR. WANDER:  Yeah.  I'll tell you why.

12       THE COURT:  All right.

13       MR. WANDER:  If I may.

14       THE COURT:  It would be 270 million.

15       MR. WANDER:  If I may.

16       THE COURT:  All right.

17       MR. WANDER:  And again, it's their burden to

18  satisfy.  So let me tell you the numbers.

19       THE COURT:  All right.

20       MR. WANDER:  Okay.  162 million of vendor claims

21  that they said they would pay, prepetition orders, post-

22  petition delivery.  It's in their motion.  If they didn't

23  pay it, that's $162 million of potential more administrative

24  claims.

25       THE COURT:  Well, the big word is potential,

Page 255

1    because then you have to show a lot of other facts,

2    including that they -- people actually relied on that in

3    making deliveries, and that they didn't pay --

4            MR. WANDER:  No, that's a different claim.  I'm

5    not up to that.  That's the inducement claim.  I'm talking

6    about their motion where they said to Your Honor in the

7    papers that, "We have $162 million of goods in transit.  And

8    if we don't give the vendors the comfort of the

9    administrative claim, they will demand that we reissue" --

10           THE COURT:  I'm going to stop you right there.

11   The authority I gave was authorization to make the payment.

12   I didn't direct them to make the payment.  So it is an

13   inducement claim.  So let's move on from that.

14           MR. WANDER:  Okay.  So there's 162 --

15           THE COURT:  Outside, the outside amounts.

16           MR. WANDER:  Right.

17           THE COURT:  Well, so --

18           MR. WANDER:  And so I asked them --

19           THE COURT:  But you've got to discount that.

20           MR. WANDER:  But they don't know how many of them

21   have been paid.  It's their burden.  So that's the first

22   number, Judge.

23           THE COURT:  Okay.

24           MR. WANDER:  It's their burden.

25           THE COURT:  Right.

Page 256

```
 1              MR. WANDER:  And I asked them about it.  They

 2     didn't even know about the issue.

 3              THE COURT:  But the issue is a specific factual

 4     issue, which is who -- it's not a basis for an objection to

 5     claims.

 6              MR. WANDER:  They haven't factored it into their

 7     analysis.

 8              THE COURT:  No, but they have looked at the claims

 9     that were filed, all right?  And you'd think that if someone

10     really believed that they were defrauded, they would file a

11     claim on that basis.  So they looked at the claims that were

12     filed and they looked at their accounts payable.

13              So the analysis you're asking them to make isn't

14     an analysis that they should be making at this point.

15              MR. WANDER:  Yes.  They could've --

16              THE COURT:  Look, we're going to move on from

17     this.

18              MR. WANDER:  Okay.

19              THE COURT:  I'm just -- sorry, Mr. Wander.  This

20     is --

21              MR. WANDER:  Well, Your Honor, the -- it gets back

22     to the administrative bar order.

23              THE COURT:  No, it -- I'm sorry.  There's no

24     reason to have an administrative bar order.

25              MR. WANDER:  It's in the plan.
```

1                 THE COURT:  I've already found that.  There's no

2       need to have an administrative claims bar order here.

3                 MR. WANDER:  I'm just saying it's in the plan.

4       It's just to the record in Section 1.2.  I'm looking at

5       document 5293, filed October 1, 2019, in the definition

6       section of 1.12.  It's administrative expense claims bar

7       date, means the date fixed by the Bankruptcy Court as the

8       deadline to file administrative expense claims, et cetera.

9                 THE COURT:  And I haven't fixed on.  And I see no

10      reason to fix one.

11                MR. WANDER:  Your Honor, I'd submit, based upon

12      the record, this plan will likely not go effective at the

13      least, for several years, if at all.  I think that based on

14      the testimony -- and they have the burden -- the witnesses

15      did not have a good handle on the claims against the estate.

16      They assume all of the objections, the reclassifications.

17      They win on every issue, and there are no orders disallowing

18      the claims.

19                They made a deal -- an issue in addressing an

20      objection by, I think, Transform ESL, where they're not

21      counting their claims in 507(b) because they said, We have

22      an order disallowing it.  So, those claims are not in the

23      analysis.

24                Well, we can't say that to them and then say are,

25      We don't have orders on all of these claim objections, but

Page 258

1      we're going to give you everything that we've objected to

2      and that we're thinking of objecting to, and we're assuming

3      the money is gone --

4                THE COURT:  But I just told you, I'm adding on

5      more money to that number, and they have added to it just

6      for that very reason.

7                MR. WANDER:  And I think that based the -- based

8      upon the testimony, that there's no way of knowing within a

9      hundred million dollars of what that number is.  Based on

10     the record, based upon what the witnesses have said.

11               THE COURT:  I have a slightly lower number.  I put

12     another 70 on it.  And you're putting, I guess, 170 on it.

13               MR. WANDER:  Because there are hundreds of

14     millions of dollars of claims that haven't even been filed,

15     and so --

16               THE COURT:  Now, let's just stop right there.

17     They're counting the accounts payable.  What other claims

18     are you talking about?

19               MR. WANDER:  Judge --

20               THE COURT:  They have their records of who their

21     vendors are and those are the accounts payable.  What else

22     is there?

23               MR. WANDER:  Judge, with all due respect to those

24     professionals, I don't believe, based upon their track

25     record in the case of the numbers they've been giving, that

Page 259

1    they are reliable figures.  They simply said, Yes, and we

2    took that into account.

3              THE COURT:  No, no, no.  He testified that the

4    number is right off of their accounts payable; that's how he

5    came up with that number.  Those are the accounts payable.

6              MR. WANDER:  Judge, in the claim objections that

7    have been filed in the past two weeks, and they were not

8    able to --

9              THE COURT:  That's a separate point.  I want to go

10   back to the point where you said that they're not taking

11   into account countless claims that will be filed.

12             MR. WANDER:  Yep.  Because you're talking about

13   just simple payables.  What I'm saying is every re-

14   classification --

15             THE COURT:  No.  What else is there in what is to

16   be filed, other than -- what is to be paid are the payables

17   that haven't already been filed.

18             MR. WANDER:  Oh, there's the 503(b)(9) claims.

19   There's 50 --

20             THE COURT:  There's a bar date for that, right?

21             MR. WANDER:  So, they'd just assume --

22             THE COURT:  No, I'm talking about -- you said

23   there were -- I'm questioning your credibility.  You just

24   said to me that there are countless claims that are to be

25   filed that they haven't counted.

Page 260

1    So, what claims that are to be filed, have they not counted,

2    other than you said payables, which they have counted.  So,

3    what else is there?

4              MR. WANDER:  They counted as they went.

5              THE COURT:  No, no.  Payables are payables.  They

6    counted those.

7              MR. WANDER:  No, I'm --

8              THE COURT:  I'm talking about what you told me:

9    There are many countless claims to be filed.

10             MR. WANDER:  Right.

11             THE COURT:  So, are you backing off of that now?

12   Are you saying that there really aren't countless claims to

13   be filed?

14             MR. WANDER:  No, it's in their chart.

15             THE COURT:  Is there anything beyond that?

16   Because that's really what you just said to me, there are

17   countless claims beyond what they have said in their chart

18   are to be filed.

19             MR. WANDER:  No, I didn't say not in their chart.

20   I'm saying in their chart there are hundreds of millions of

21   dollars of claims relating to administrative claims -- it's

22   defined as outstanding claims -- hundreds of millions of

23   dollars of claims, objections that have been filed, and even

24   more that haven't been filed, that they assume they win each

25   one.  That's how --

1            THE COURT:  How can you object to a claim that

2    hasn't been filed?

3            MR. WANDER:  No, no, no.  Their claim objections

4    haven't been filed.  If I misspoke, I apologize.

5    There are hundreds of millions of dollars of claim

6    objections filed --

7            THE COURT:  All right.  Let's go through the

8    chart.  Let's do it.  I mean, I guess we have to.

9    Sorry, Mr. Fox.  We'll probably get to you tomorrow, all

10   right.

11       (Pause.)

12           THE COURT:  All right.  I'm looking at Mr.

13   Murphy's declaration.  Do you have that there?

14           MR. WANDER:  One moment, Your Honor.

15       (Pause.)

16           THE COURT:  Okay.  So, on Page 21 he has his

17   503(b)(9) chart.  On Page 23 he has the other expense chart.

18           MR. WANDER:  Okay.

19           THE COURT:  In Paragraph 44 he says, "Additional

20   anticipated objections totaling 44 million are expected to

21   be filed."  Not hundreds of millions -- 44 million, all

22   right -- and that's for a re-classification.

23           MR. WANDER:  Right.  So, starting on Page --

24           THE COURT:  Well, let's just focus on that.  Do

25   you have --

Page 262

```
 1              MR. WANDER:  I was going to start on 71.

 2              THE COURT:  So, as far as the to-be-filed

 3    objections on re-classification --

 4              MR. WANDER:  Are you talking about the forty-four

 5    million-dollar number?

 6              THE COURT:  Yes.

 7              MR. WANDER:  Yeah.

 8              THE COURT:  Right.  Right.

 9              MR. WANDER:  Okay.  So, that's 44 million.

10              THE COURT:  Right.

11              MR. WANDER:  I would --

12              THE COURT:  For re-classification.  So, as you

13    know, it is difficult to establish an administrative

14    expense.  I think as you also know, people often check the

15    administrative expense box or whatever --

16              MR. WANDER:  I believe that a lot of these -- the

17    issues within this have to do with the received date.

18    Not --

19              THE COURT:  No, that's fine.

20              MR. WANDER:  And I want you to know that the

21    receive date is not only for foreign vendors.  My other

22    client --

23              THE COURT:  I understand the issue, all right.

24    So, that's 44 million.

25              MR. WANDER:  Okay.
```

1              THE COURT:  And then we have the pending

2       objections, right --

3              MR. WANDER:  Which page is Your Honor on?

4              THE COURT:  -- which is at the top of that page.

5       So, I don't see hundreds of millions there.  I see an

6       outside amount of 44 million.

7              MR. WANDER:  Well, Your Honor, if we could -- you

8       first pointed to Page 21 --

9              THE COURT:  Well, let's deal with 23 first, the

10      admins.

11             MR. WANDER:  Okay.  That is also on Page 21.

12             THE COURT:  Well, that's dealing with the

13      503(b)(9)s.

14             MR. WANDER:  Right.

15             THE COURT:  So, let's deal with the other admins

16      first.

17             MR. WANDER:  Okay.  So, I'm looking at

18      Paragraph 41 --

19             THE COURT:  Right.

20             MR. WANDER:  -- okay.  So, they have minus

21      objections filed to date, 17.3.

22             THE COURT:  Right.

23             MR. WANDER:  And my point is there's no order

24      disallowing those claims.

25             THE COURT:  That's fine.  But almost half of those

Page 264

1    are claims that are objected to -- well, 10 million --

2    actually 11 million are claims that are objected to because

3    they're satisfied, all right.  That's --

4            MR. WANDER:  I'm not talking about those.

5            THE COURT:  Well, you just said that there are 17

6    million that are pending, and you're basically telling me

7    that since I haven't granted them, I should ignore them.

8    I'm not going to ignore a claim objection on the basis that

9    it's satisfied until I see some evidence that, no, we

10   haven't been satisfied, and, generally speaking, in my

11   experience, when people like MIII object to claims and while

12   (indiscernible) signs off on it, they have a valid basis for

13   saying it's satisfied; similarly, for amended and

14   superseding.  So, that's all that this is.

15           MR. WANDER:  No.  The -- I don't --

16           THE COURT:  This 17,329,000, which you say I

17   shouldn't count because the order hasn't been entered yet.

18   So, let's get off of that.  Then we're talking about the 44

19   million that is to be objected to.  And I understand that we

20   don't have a lot of information on that.  I appreciate that.

21           MR. WANDER:  Your Honor, the 17.3 million --

22           THE COURT:  Yes?

23           MR. WANDER:  -- okay, I didn't see where it says

24   that those are claims that have been satisfied.

25           THE COURT:  It's on the chart on Page 23.

1            MR. WANDER:  Correct.  So --

2            THE COURT:  Type:  Satisfied, 7.883 million.

3    Seventh one:  Amended superseding, 975,000.  Eighth:

4    Duplicate, 4.8 million.  Sixth:  Satisfied, 3.66 million.

5            MR. WANDER:  Okay.  So, then we have the line

6    items for the second --

7            THE COURT:  That's not being counted.

8            MR. WANDER:  There's no number there.

9            THE COURT:  I know.  It's not being counted.

10           MR. WANDER:  It's not listed.

11           THE COURT:  I agree.  It's not being counted.

12   Look, there are a lot of people here.  This is not making a

13   whole lot of sense to me.  So, let's move to the big item

14   here, which is the billion -- one billion seventy-five

15   million claims expunged upon confirmation, right.

16           MR. WANDER:  Which paragraph, Your Honor?

17           THE COURT:  In the chart on Page 22.  That's how

18   you get the 1.157 billion down to 50 million.  So, do you

19   have any reason to say that those would not be expunged on

20   confirmation --

21           MR. WANDER:  Your Honor, --

22           THE COURT:  -- because they're filed against every

23   single debtor?

24           MR. WANDER:  The second line item is minus

25   additional anticipated --

1          THE COURT:  Wait.  That's what I started with.

2    You're trying to get me to say it was something other than

3    that 44 million, and we spent the last five minutes showing

4    that there isn't.

5          MR. WANDER:  They have the -- there's the $30

6    million --

7          THE COURT:  Under payables, yes.

8          MR. WANDER:  -- and then I was pointing out on the

9    prior page on 21, which is the first page that Your Honor

10   mentioned, that's the 503(b)(9).

11         THE COURT:  Well, I'm first dealing with your

12   statement that there are hundreds of millions of

13   administrative expenses that they're not counting.  I don't

14   see it.  At most, they're not counting 44 million.  If you

15   give them no credit -- and you're saying that they should

16   have none for saying that they intend to object to them.

17         MR. WANDER:  Judge, there are three groups.

18         THE COURT:  And I intend to discount that 44

19   million and say that they probably won't be able to object

20   to all of successfully.  So, let's move to Page 21.  That's

21   the 503(b)(9)s.  There, you have a couple of legal issues.

22         MR. WANDER:  So, this --

23         THE COURT:  Is there anything else?

24         MR. WANDER:  So, you have 36 million of claims

25   that they say reclassified --

Page 267

1          THE COURT:  Right.

2          MR. WANDER:  -- that basically, I believe, relates

3   to delivery dates, which is a disputed issue --

4          THE COURT:  Right.

5          MR. WANDER:  -- and not just for foreign vendors.

6          THE COURT:  Right.

7          MR. WANDER:  And then there's another -- the fifth

8   claim objection is another $20 million, and then it says

9   below that, "Additional anticipated objections totaling 105

10  million and there's another 35 million of reclassified and

11  then there's 60 million of reduced and allow, which, again,

12  means someone may have said it's an administrative claim --

13         THE COURT:  I'm sorry, let me just --

14         MR. WANDER:  Sure.  I'm on Paragraph 38.  And I'm

15  not counting late-filed.  I'm taking reclassified, reduce,

16  and allow.  So, that's 95 million.

17         THE COURT:  I'm sorry.  Reclassified, 36 --

18         MR. WANDER:  Reclassified, 35 million, I think

19  that is.

20         THE COURT:  Well, I'm looking at the chart.

21         MR. WANDER:  Okay.  That's a separate 36, Your

22  Honor.  In the chart --

23         THE COURT:  Okay.

24         MR. WANDER:  So, that's 36,087,000.  Those are

25  claim objections that have been filed very recently and no

Page 268

```
1    ruling.

2              THE COURT:  Right.

3              MR. WANDER:  And below is another 35 million of

4    reclassified.

5              THE COURT:  Right.

6              MR. WANDER:  So, that's 71.  Then there's 60

7    million in the reduce and allow; that's another 60 --

8              THE COURT:  That's just -- look, to me, that's

9    accounting.

10             MR. WANDER:  No, because, for example, with my

11   client Pearl Global, it has an administrative -- a 503(b)(9)

12   claim in rough numbers, 450,000, and their objection says it

13   should be allowed at 350,000.  So, they're taken off

14   100,000, but I have no idea why.

15             THE COURT:  Well, I hope you do.

16             MR. WANDER:  They haven't said anything.

17             THE COURT:  Well, it's probably because of the

18   purchase orders --

19             MR. WANDER:  Judge, I'm simply --

20             THE COURT:  -- of what was provided.

21             MR. WANDER:  -- saying --

22             THE COURT:  All right.  So, they have anticipated

23   objections of 105 million, although, 10 of that is late --

24             MR. WANDER:  So, I wasn't counting that.

25             THE COURT:  All right.  So --
```

Page 269

```
 1              MR. WANDER:  So, you have the 95 there.

 2              THE COURT:  Right.

 3              MR. WANDER:  You have the thirty-six oh eight

 4   seven above.  You have the reclassified, the fifth objection

 5   is 20 -- this is the 503(b)(9).  You then have the ones we

 6   went through before, the 44 million that Your Honor was

 7   discounting.

 8              THE COURT:  Right.

 9              MR. WANDER:  And I said there's also 162 million

10   that's out there unknown.  So, that's where I came up with

11   the additional hundred thousand -- hundred million dollars

12   that --

13              THE COURT:  Well, and I came up with 70.

14              MR. WANDER:  No, no.  But I'm saying on top of

15   that, because --

16              THE COURT:  So, 270, even though these numbers add

17   up to 240?

18              MR. WANDER:  Plus the 162 that's not on the chart.

19              THE COURT:  I mean, that's -- look, I've already

20   concluded that that is just -- I don't know what that is.

21   That's not a basis to argue any --

22              MR. WANDER:  I'm saying it doesn't potentially --

23              THE COURT:  But it's not a claim.  It's nothing.

24   It's nothing, other than these claims.  You can't double

25   count that.  It's nothing.
```

1              MR. WANDER:  I'm not double-counting.  These are

2      claims --

3              THE COURT:  No, they're not claims.  They've not

4      been asserted on top of these claims.

5              MR. WANDER:  Well, I agree that they haven't been

6      asserted again.  There hasn't been a bar date that would cut

7      these.

8              THE COURT:  Look, the only basis for those claims,

9      other than them showing up in the debtors' books and records

10     or having been filed, is that they were defrauded.  And I

11     would think that someone who felt that they were defrauded

12     would have filed a claim.

13             So, going through all of these numbers, you're

14     counting -- unless your basing it on that 162,000 -- 162

15     million, excuse me -- that the debtors lose on all of these

16     claim objections and to-be-filed claim objections, and I'm

17     basically cutting it in and a half -- actually a little less

18     in a couple categories -- and that's why instead of being

19     170 million on the outside, I basically said 100.

20             So, you know, just -- you know, which is what was

21     the debtor's outside, which, to me, I think was a reasonable

22     projection.

23             MR. WANDER:  Again -- okay.  Your Honor, I'm --

24     based upon the testimony, I don't believe that they have

25     shown --

```
 1              THE COURT:  Well, we disagree on that point and

 2     we've just spent 20 minutes going through it and I believe

 3     it even more so now.  So, enough of that.  I'm sorry to be

 4     abrupt with you, Mr. Wander.

 5              MR. WANDER:  No, that's fine, Your Honor.

 6              So, the -- as I said before, if there was one

 7     thing that should be changed, it's the automatic opt-in and

 8     I also believe that it's improper that they haven't

 9     disclosed the compensation as the amended documents say --

10              THE COURT:  Well, they're going to have to do that

11     before I sign off on the order.  And I think Mr. Schrock

12     knows that.

13              MR. WANDER:  And I think there should be an

14     opportunity --

15              THE COURT:  Well, on notice.  Yeah, on notice.

16              MR. WANDER:  Okay.  Because it has, in addition --

17              THE COURT:  I understand.

18              MR. WANDER:  Thank you, Your Honor.

19              THE COURT:  Okay.

20              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

21     for the U.S. Trustee's Office.  I'll be quick.

22              THE COURT:  Okay.

23              MR. SCHWARTZBERG:  Your Honor, we filed an

24     objection -- two points.  The only point I want to raise at

25     this point is the 1143(d) -- I think I got the Code section
```

Page 272

1    right --  where the debtors are getting both in this case, a

2    release -- I think as they are defined as a released

3    party -- as well as the injunction.  Parties are enjoined

4    from going after the debtor --

5            THE COURT:  Except to enforce the plan.

6            MR. SCHWARTZBERG:  Excuse me, Your Honor?

7            THE COURT:  Except to enforce the plan.

8            MR. SCHWARTZBERG:  The injunction.  Combining the

9    injunction, Your Honor, and release, we believe is akin to a

10   discharge.  If --

11           THE COURT:  I don't understand that.  I mean the

12   whole purpose of the plan is that the parties are bound by

13   it, assuming it goes effective, and --

14           MR. SCHWARTZBERG:  Well, after the assets are all

15   transferred to the litigation trust, you're just left with a

16   shell.

17           THE COURT:  I understand that, but 1140 --

18           MR. SCHWARTZBERG:  41(d)(3).

19           THE COURT:  No, I'm focusing on a different

20   section -- 1141.  Except as provided in Subsections (b)(2)

21   and (b)(3), the provisions of a confirmed plan bind the

22   debtor, et cetera, et cetera, et cetera, including the

23   creditors, whether or not such creditors, equity, security

24   holders, or general partners have accepted the plan.

25           So, if the injunction simply means that people's

1    rights to go after the debtor is limited to as long as the

2    plan is ongoing, enforcing the plan just would seem to be

3    completely consistent with 1141(a).  All you're doing with

4    the injunction is preventing people to ignore -- from

5    ignoring the plan and going around the plan.

6              MR. SCHWARTZBERG:  Well, I --

7              THE COURT:  Now, as far as the release point is

8    concerned, it seems to me that, again, the release should

9    apply to the debtor, only to the extent that the plan is

10   operative, right?

11             MR. SCHWARTZBERG:  Uh-huh.

12             THE COURT:  I'm not sure that's the case here in

13   looking at it, but I think it's worth clarifying that point.

14             But other than that, I don't see why this is an

15   issue.  I mean, I -- if you didn't have this, the debtor

16   would have to sue everybody for breaching the plan if they

17   went in and tried to collect.  You know, if some creditor

18   said, I'm unhappy with my result under the plan, an

19   unsecured creditor, so they go and try to collect the money

20   that's in the trust.

21             MR. SCHWARTZBERG:  Your Honor, we're not objecting

22   to the injunction as it applies to the trust (indiscernible)

23   as it applies to the debtor's property, but as is applied --

24             THE COURT:  But the property is going into the

25   trust.  I don't understand --

Page 274

1            MR. SCHWARTZBERG:  Well, only to the debtor's

2    shell, Your Honor, after all the assets are transferred.

3            THE COURT:  But what does it matter?

4            MR. SCHWARTZBERG:  At that point, we're concerned

5    about trafficking in an empty shell.

6            THE COURT:  But that certainly didn't come out of

7    the objection.

8            MR. SINGH:  Your Honor, I'm rising -- not to

9    interrupt --

10           THE COURT:  (Indiscernible) brief.

11           MR. SINGH:  But just one clarification that people

12   might be misreading.  The release provision specifically

13   carves out the debtor.

14           THE COURT:  Right.

15           MR. SINGH:  So, the debtors are not getting a

16   release.  They, as you said, are just relying on the

17   injunction.  It's in 10.6(b)(3), you know, as to who's

18   getting a release.  Each of the release parties

19   parenthetical, other than the debtors --

20           MR. SCHWARTZBERG:  Okay.  Because --

21           MR. SINGH:  -- because they just get the

22   injunction --

23           MR. SCHWARTZBERG:  Section 1.135 includes the

24   definition of released parties.

25           THE COURT:  No, then it says, Other than --

Page 275

1          MR. SINGH:  It's other than the debtors in the

2     operative release section.

3          THE COURT:  Okay.

4          MR. SINGH:  It's just the injunction for the

5     debtors.

6          THE COURT:  But, again, I just don't --

7          MR. SINGH:  Other than that, Your Honor, I don't

8     want to belabor the point.

9          THE COURT:  I mean, there's one case on this.  The

10    Judge's colleague in the Southern District of Texas pretty

11    rudely disagreed with him, and without being rude, I

12    disagree with him, too.  I just think In re ASR 2401

13    Fountain -- whatever it's called -- Fountainview, I think,

14    LLC, 2515 LexisNexis 1783, Page 15, (Bankr. S.D. Tex.

15    May. 29, 2015) actually got it right in (indiscernible) or

16    it's really dicta anyway, since the plan wasn't going to be

17    confirmed in the first place and the judge was just pretty

18    mad about the release provisions in the plan.  I think went

19    overboard on this point.  Didn't really focus on 1141(a).

20          Is there any indication that there's going to be

21    some sort of sale of --

22          MR. SCHWARTZBERG:  No, Your Honor.

23          THE COURT:  Okay.  So, I don't -- I mean, look,

24    obviously, there's a separate provision of the Code that

25    talks about tax avoidance and the like or any other

Page 276

1    provision violating the law.  I just don't have that in the

2    record, so I'm don't -- I'm going to overrule that part of

3    the objection.

4            MR. SCHWARTZBERG:  And I'll rely on my pleadings

5    on the nondebtor release.

6            THE COURT:  Another nondebtor release.  It's --

7    the debtors have treated everyone who's objected on that

8    basis and anyone who opted out as being not bound by the

9    release, and as far as I'm concerned, that's enough.  I

10   mean, I think the notice was very clear, and, again, I don't

11   believe that where clearly I have jurisdiction under the

12   case law, which the debtors have cited, including the

13   CareOne case, that there's any basis to not object to a plan

14   where the release language is clear and then come back later

15   and say, Oh, you know, this provision of the plan should be

16   carved out.

17           I think a plan is much broader than a contract, as

18   the debtor's brief said.  So, I will overrule that

19   objection, too.

20           MR. SCHWARTZBERG:  Thank you.

21           THE COURT:  Anyone else?

22           MS. SCHAEL:  Your Honor, I'm on the telephone.

23   Can I be heard?

24           THE COURT:  Sure.

25           MS. SCHAEL:  Courtney Schael, on behalf of Shinn

Page 277

1    Fu.  We filed an objection to confirmation going into the

2    other objections by the administrative creditors.

3              I just wanted to -- I tend to agree with Mr.

4    Wander on the disconnect with the 503(b) claims.  The

5    testimony was that they're going to rely on their accounts

6    payable books and records to determine what those claims

7    are.  But very early on in the case, I was informed by the

8    debtor's counsel that they consider any of the post-petition

9    deliveries, so prepetition orders to be unsecured claims.

10             And I think the testimony was a little vague on

11   this, but it seemed to indicate that those post-petition

12   payables, books and records of the debtors would not include

13   those claims --

14             THE COURT:  No, I --

15             MS. SCHAEL:  -- of creditors who --

16             THE COURT:  -- I didn't take the testimony to

17   suggest that.

18             What I was focusing on, and what I asked Mr.

19   Murphy about was the specific item in the chart in his

20   declaration that had $30 million of other claims.  And I

21   took those to be current accounts payable, not claims that

22   have been asserted already or the like.  That's just

23   covering the remaining accounts payable.

24             They're not cutting -- in other words, I did not

25   take his testimony to mean that they're somehow only looking

1    at their accounts payable for the post-petition period and

2    saying that's the ambit of claims.  They have to deal with

3    it, and I think he has dealt with the claims that have been

4    asserted, including, claims in transit, et cetera -- goods

5    in transit, and the like, for the prepetition hearing.

6           MS. SCHAEL:  I guess the disconnect that I'm

7    having is if delivered goods post-petition and sent the

8    debtor an invoice and said we have a post-petition claim,

9    here's our bill.  And then this plan gets confirmed and we

10   go forward with the procedure that they're talking about

11   now, those creditors will never have an administrative bar

12   date to file an administrative claim, that the debtor has

13   already, at least, represented to my client that they

14   consider those claims unsecured and there would be no

15   process, where my client, having not filed a claim, would

16   even know that the debtor was going to write it off and

17   treat it as unsecured because it was from a prepetition

18   order.

19          THE COURT:  Well, they can always file an

20   administrative expense, always.

21          MS. SCHAEL:  Yeah.  My other concern was the

22   proposed settlement with the ad hoc committee.  Given the

23   lack of notice and that the Debtor has indicated that it's

24   not required under confirmation of the plan, I would ask the

25   Court to adjourn approval of that so that the parties have a

1    chance to review it and file objections in the appropriate

2    time period.

3              THE COURT:  Well, the objection would only be that

4    it's too good, right?  It's too good a settlement for the

5    administrative creditors who are the beneficiaries of it?

6    I'm not trying to be facetious, but I think the objection

7    would be that the debtors have made a bad deal and it's too

8    good for the administrative expense creditors that have

9    signed onto it.

10             MS. SCHAEL:  Exactly.  I think the creditors --

11             THE COURT:  All right.  So, but if your client has

12   the right to opt into it, as well, then what's the problem?

13             MS. SCHAEL:  Because under the Code -- the problem

14   is, under the Code, my client is entitled to 100 percent

15   payment on the effective date.

16             THE COURT:  No.  But I'm just focusing on the

17   notice point.  What's there to -- you will have an

18   appropriate time to review it and determine to determine

19   whether you want to opt into it.  So, I don't understand why

20   you would need more notice to determine whether it was too

21   good or not as far as objecting to it, as long as you have

22   the chance to object to it.

23             MS. SCHAEL:  I'm talking about objecting to it,

24   the whole settlement as a whole.  If there's any chance that

25   creditors that opt-out of the settlement will not get paid

Page 280

1    100 percent at the end of the day, then the creditors who

2    opt-in are getting treated better than the creditors who

3    waited.  I mean, they're effectively circumventing the Code

4    that requires in the plan confirmation, that creditors get

5    paid 100 cents on the dollar to the settlement.

6              THE COURT:  Okay.  I've heard --

7              MS. SCHAEL:  There's also problems with the

8    objecting procedures.  I think the debtor purposefully --

9    and knowing we didn't file the orders on the administrative

10   claim issue, because now that you have the door left open

11   where they can resolve claims anywhere they see fit.  They

12   can -- some people might get the benefit of -- well, the

13   Court's in a "behind the door" settlement, some creditors

14   might not.

15             With this procedure that's in place, nobody is

16   going to know if another creditor got a better deal and got,

17   you know, and gets a (indiscernible) from another creditor.

18   It's all going to be done (indiscernible) and -- excuse me,

19   I have a slight cold here -- and the creditors won't be

20   treated the same.

21             Those are the types of things that I think parties

22   should have the right to review the settlement and to look

23   at the entire construct of it and object to it on those --

24   on points like those.

25             THE COURT:  Well, under liquidation procedures --

Page 281

1    I guess this is a question for Mr. Schrock -- what is the

2    check on the debtors cutting a sweetheart deal with someone?

3            MR. SCHROCK:  Your Honor, there's an

4    administrative claims representative that's on the

5    restructuring committee or serving alongside.  You've got,

6    certainly, the creditors' committee is still in place.

7            But all we do, frankly, now as an estate, is, you

8    know, we're reconciling claims as fiduciaries.  And when it

9    comes to administrative claims, those are things that,

10   frankly, you know, any debtor is doing all the time.  We're

11   going to be recording --

12           THE COURT:  Well, there's a claims procedures

13   order in place in the case --

14           MR. SCHROCK:  Yes.

15           THE COURT:  -- right?  Is that what you would

16   follow or would there be -- I mean, obviously there's a

17   separate procedure for sharing information, having Ruby the

18   parties who are entitled to, you know, review that analysis;

19   otherwise, would you be following the claims procedures.

20           MR. SCHROCK:  Well, not with regard to

21   administrative claims, no --

22           THE COURT:  No?  All right.

23           MR. SCHROCK:  -- Your Honor.  I mean, we would --

24   you know, if people want some additional -- we have

25   reporting that's going on in accordance with the settlement.

Page 282

1    We have the administrative claims rep and we felt that that

2    was, frankly, sufficient.

3              I'd look at it this way, if we didn't have the

4    settlement and all this is, is an opt-in settlement, the

5    debtors would be reconciling administrative claims in the

6    ordinary course as they prepare for the effective date.  So,

7    I didn't understand why we need to put, like, another check

8    on it simply because we had an opt-in process.

9              THE COURT:  Well, that's why I was asking about

10   the claims procedures order.  You're saying that doesn't --

11   I haven't looked at it -- that doesn't apply to admins?

12             MR. SCHROCK:  That's correct.

13             THE COURT:  So, then you're just guided by 9019.

14             MR. SCHROCK:  Right.

15             THE COURT:  And I guess there's certain agreements

16   that are significant enough that you would need to notice

17   them up under 9019 and the rest you wouldn't.

18             MR. SCHROCK:  Right.

19             THE COURT:  And that would still apply -- and that

20   wouldn't change under this order?

21             MR. SCHROCK:  That's correct, Your Honor.

22             THE COURT:  You know, you could do them a notice

23   of presentment, but it would only be things that were out of

24   the ordinary course.

25             Okay.  All right.

Page 283

1                    MR. SARACHEK:  Your Honor, Joe Sarachek.  I

2      represent 15 administrative creditors.  The bulk of them are

3      foreign creditors.

4                    And while I want to thank Ms. Morabito for her

5      efforts and really hard work in negotiating this, I think

6      it's important that the Court know that she represents --

7      the only people that have signed onto this are trade claim

8      purchasers and they are all purchasers of domestic Claims.

9                    And the issue, really, that I'm going to say where

10     there's discrimination here and where I have a lot of

11     concern under 11-2099, is that foreign trade vendors -- and

12     I'm not going to repeat all of what Mr. Wander said -- but

13     foreign trade vendors who are seeing this settlement -- and

14     we haven't even been able to get the settlement to all of

15     our creditors -- we're in China, Vietnam, India -- they're

16     going to be -- the practical reality of this settlement is

17     that there's going to be a preponderance of sales claims.

18                   And just to give you a sense, the bid from one of

19     Ms. Morabito's clients last week, what time this was still

20     being negotiated, was 20 cents, okay, which tells you that

21     everybody -- like, we're all adults here, we all know that

22     the debtor is administratively, let's call it on the line of

23     being administratively insolvent or is administratively

24     insolvent, and the practical effect of that agreement is

25     going to be that vendors, particularly foreign vendors are

Page 284

1    going to be compelled to basically take cash now.

2            THE COURT:  Why?

3            MR. SARACHEK:  Because they're going to see what

4    amounts to a pool of cash that is, let's call it 10 percent,

5    as Ms. Morabito said, and there's just like an inherent

6    discrimination in the plan with this settlement agreement --

7            THE COURT:  They would have the right to opt-in.

8            MR. SARACHEK:  I get it, but, by the way, many of

9    those vendors' claims -- and, again, I'm not debating world

10   imports -- have been objected to already.  I will tell

11   you --

12           THE COURT:  Okay.  But they still get -- but --

13   I'm sorry -- they still have the right to opt-in.

14           MR. SARACHEK:  I understand, but in reality, you

15   are faced with two choices:  you sell your claim or,

16   basically, you compromise your claim at a considerable

17   discount and opt-in.  And that's --

18           THE COURT:  Well, you have -- you have another

19   choice:  you can opt-out.

20           MR. SARACHEK:  You can opt-out and get no cash

21   and, basically, be in a situation -- and most of these

22   vendors, just to it's clear, continue to supply transform,

23   which brings me to my next point, which is I really don't

24   see -- the elephant in the room here is ESL.  Had they paid

25   the 503(b)(9) claims, these people would have money in their

Page 285

1    pocket.

2            THE COURT:  Yes.

3            MR. SARACHEK:  Money that they were counting on in

4    their pocket.  And, Your Honor, I just don't see --

5            THE COURT:  By the way, that's why I was somewhat

6    skeptical when M3's projections were being attacked, because

7    I understand your point.

8            MR. SARACHEK:  I'm not attacking them.

9            THE COURT:  No, I understand.

10           MR. SARACHEK:  But, as you know, I also moved for

11   a mediation hearing and I know everyone laughs at it and so

12   on and so forth, but there have been other big cases with

13   contentious issues, okay, where mediation has brought about

14   a result.

15           And the reality is that these vendors, who have

16   been the lifeblood of Sears when it was going on, these

17   vendors need to be paid.  They need the cash.  They will --

18   I have many clients who are, themselves, on the verge of

19   insolvency.

20           So, mediation -- and I don't see the need for

21   confirmation today.  We're not talking about going effective

22   today.

23           Our hearing is on the 23rd.  My -- and I would

24   urge the Court to bring the parties together -- ESL, as

25   well -- because at the end of the day, that's the elephant

Page 286

```
 1    until the room.  That's where, ultimately, do we really have

 2    to wait three years?  Do we have to burn -- and no offense

 3    meant to akin or anyone else -- do we have to burn $20

 4    million in legal fees?

 5            It doesn't make sense to me.  It doesn't make

 6    sense to my clients.  We need all parties around the table

 7    to negotiate a resolution, and not a resolution that gives

 8    clients 10 cents.

 9            As you know, these foreign manufacturers, they're

10    not working on huge margins in today's marketplace --

11    they're not -- so they can't afford to take 10 cents,

12    20 cents -- they can't afford it.  And they're the real

13    victims here.

14            THE COURT:  Well, I believe the evidence shows

15    that if they don't opt-in, they will get 100 cents,

16    eventually.  There's a time issue and there's a risk issue

17    but given the litigation backdrop here that you're referring

18    to -- and I thought about this carefully -- I'm a firm

19    proponent of mediation; I served as a mediator in a number

20    of large cases -- I don't see a basis for a mediation here

21    that would involve ESL in any sort of meaningful settlement,

22    at this point.  It's not in their interests to do it.  If I

23    were representing them, I wouldn't do it.

24            MR. SARACHEK:  But it is in their --

25            THE COURT:  No, it isn't.  It's not in their
```

Page 287

1    interests at this point.

2            MR. SARACHEK:  Because their former Board is being

3    sued.  Lawyers -- there's a hundred-fifty-million-dollar D&O

4    policy there.

5            THE COURT:  I saw that.  It's not in their

6    interests --

7            MR. SARACHEK:  Seritage --

8            THE COURT:  -- you know, at this point in the case

9    to settle for an amount that is actually warranted solely to

10   provide people with cash now.  It's not advantageous to do

11   it.

12           And I don't see the mediation succeeding, and I

13   see the burning of a lot of cash in the meantime, to learn

14   that result, which I can predict.  I put myself, mentally,

15   as if I were the mediator in that conference room.  It ain't

16   going to happen.

17           The mediation that might happen is the one that I

18   suggested to Mr. Wander about half an hour ago -- that might

19   happen -- and the parties are perfectly capable of

20   negotiating that result.

21           MR. SARACHEK:  I will tell you, Your Honor,

22   respectfully, one reason ESL should mediate is because

23   they're not getting trade credit today.

24           THE COURT:  They should mediate, but then hold out

25   for a ridiculously low sum.  I'm not going to let that

Page 288

1    happen.

2              MR. SARACHEK:  And it's -- by the way, the fact

3    that ESL is not getting trade credit today is affecting the

4    future of new Sears.

5              THE COURT:  That's a separate issue.

6              MR. SARACHEK:  I understand, but we're talking

7    about why to mediate.

8              THE COURT:  And they may well want to deal with

9    your clients on -- they may want to deal with your clients

10   on that basis, but, clearly, the mediation that you're

11   talking about is one where they would raise all of these

12   other issues in the litigation and it would either not go

13   anywhere or there would be pressure for a deal that just

14   isn't warranted from the estate's point of view.

15             The other points that you're making are legitimate

16   points and they're points that, certainly, Transform should

17   think about, but that affects Transform's business going

18   forward, not the claims against ESL.

19             MR. SARACHEK:  Thank you, Your Honor.

20             THE COURT:  Before we -- we've been just dealing

21   with the admins.  Are there any other people with admin,

22   (a)(9), or (a)(11) objections that want to be heard?

23             Okay.  I --

24             MR. ARNOLD:  Your Honor, this is Tom Arnold,

25   appearing telephonically, on behalf of Weihai Lianqiao.  I

1    just wanted to state my appearance on the record so our

2    objection wasn't waived.

3              THE COURT:  Okay.  All right.

4              MS. ROGERS:  Your Honor, this is Beth Rogers for

5    Serta Simmons Bedding Company.  I also wanted to state our

6    objection on the record so it wouldn't be waived.

7              THE COURT:  Okay.  You know, there are many other

8    people who joined in other objections.  If those objections

9    that they've joined in have been settled, I'm not sure what

10   their status is, but by taking people or acknowledging

11   people on the record, I'm not conferring on them anything

12   more than their rights as a joining party.

13             MR. GREENE:  Good afternoon, Your Honor.  Anthony

14   Greene, from Alston & Bird, on behalf of 20th Century Fox

15   Entertainment.

16             We joined in an objection that was settled, but we

17   were not part of the settlement, so our objection still

18   stands.

19             THE COURT:  Well, I'm not sure about that.

20   Frankly, if you join in something and then people have

21   settled it, what have you joined in?  Something that's been

22   settled.

23             I'm not ruling on that today, but I'm just saying

24   when people stand up and say, I'm here to note my rights on

25   the record, the rights are only the rights that you have as

Page 290

1    a party that's joined.

2            MR. GREENE:  Understood.  Thank you.

3            THE COURT:  Okay.  I did not understand, before we

4    get to other objections, while you only have 17 days to opt-

5    in and 33 days to opt-out, particularly, given that there

6    are foreign creditors and we're dealing with a deemed opt-

7    in, why can't there just be the 30 days for everybody?

8            MR. SCHROCK:  Just so I understand -- Ray Schrock

9    from Weil Gotshal, for the debtors -- so, you're saying, why

10   couldn't we have the same time limit for everyone?

11           THE COURT:  Yes.  Yeah.

12           MR. SCHROCK:  I suppose we could.  That would be

13   fine.

14           THE COURT:  And, particularly, since I think the

15   opt-outs and the opt-ins will have focused on it --

16           MR. SCHROCK:  Right.

17           THE COURT:  -- but the noes -- no responses at all

18   may not focus on it --

19           MR. SCHROCK:  Yes.

20           THE COURT:  -- and I'd rather give them a little

21   more time so they could talk --

22           MR. SCHROCK:  Sure.

23           THE COURT:  -- to someone about it.

24           MS. MORABITO:  Your Honor, Erika Morabito, on

25   behalf of the ad hoc.

Page 291

1            We have no problem with that.  I think the intent

2     was just so that we could get an administrative

3     representative --

4            THE COURT:  Going.

5            MS. MORABITO:  -- from the point of sooner, rather

6     than later.

7            THE COURT:  Okay.  But I think that's -- I'd

8     rather have the group who are in better informed.

9            MR. SCHROCK:  Okay.

10            THE COURT:  Okay.

11        (Pause.)

12            MR. FOX:  Good afternoon, Your Honor.  Edward Fox,

13     from Seyfarth Shaw, on behalf of the Wilmington Trust

14     National Association, as indenture trustee and filing agent.

15            Your Honor, shifting gears to a slightly different

16     set of issues, I want to address my counts mainly to the

17     what is sometimes known as, I guess what was originally

18     known as the substantive consolidation settlement.  It has

19     more recently been known as the plan settlement, and now,

20     seemingly, Murphy into some other settlements.

21            I want to begin, though, by just pointing out the

22     fact of how the voting broke down here.  I know we have in

23     the record the declaration, with respect to voting, and it

24     has a chart attached to it, which is in very small print --

25     we blew it up and I can share it with you if you'd like --

Page 292

1    but I think it's important to know that despite the -- you

2    know, the phraseology in the confirmation brief and among

3    the debtor's comments, I think the reality is that this plan

4    was crushed, with respect to the unsecured creditors in

5    Class 4 in a couple of instances, where they were the

6    guaranteed claims, I think it was in Kmart, Illinois, and

7    Washington.

8                It was rejected by the unsecured creditors that 30

9    of the debtor entities --

10               THE COURT:  Any dollar amount?

11               MR. FOX:  In dollar amount.

12               THE COURT:  Not in number, but in dollar amount,

13   because of the guaranteed claims.

14               MR. FOX:  Well, whatever those claims were -- in

15   most cases, as I was saying, according to the chart, they

16   were listed as unsecured claims in Class 4.

17               Just to go through a few of the significant

18   debtors in the case, at Kmart, 83 million accepted, 302

19   million rejected.  It was a 78 percent rejection.

20               THE COURT:  In number or dollar amount?

21               MR. FOX:  That's in dollar amount.

22               THE COURT:  But in number, it was?

23               MR. FOX:  So, probably flipped slightly the other

24   way.

25               THE COURT:  Well, it was like 87, wasn't it, 87

Page 293

```
 1    percent of the number accepted?

 2              MR. FOX:  I can --

 3              THE COURT:  In any event, the dollar amount

 4    rejected.  I get that.

 5              MR. FOX:  Right.  And at Kmart Holding

 6    Corporation, there was 93 percent rejection that amounted to

 7    6 percent acceptance --

 8              THE COURT:  In dollar amount?

 9              MR. FOX:  In dollar amount.

10              THE COURT:  So, obviously, this is not an accepted

11    class.  So, substantive consolidation can't be based on

12    1129(a), acceptance.

13              MR. FOX:  Yes, that's right.

14              THE COURT:  Okay.

15              MR. FOX:  So, the debtors could cram the plan

16    down, but when you get to the question, the real question of

17    whether or not the substantive consolidation settlement

18    should be approved, then that's where the Iridium factors,

19    the paramount interests of creditors and their views,

20    becomes important.  And I think that's what these numbers

21    reflect.

22              And even at some -- and, remember, we're talking

23    about a substantive consolidation.  In many of these

24    situations -- many of these cases, the Kmart creditors would

25    get a greater recovery.  The Sears creditors would probably
```

Page 294

1   get no recovery, absent substantive consolidation, and even

2   the notice, for instance, of Sears Holding Corporation, the

3   vote to reject was 74 in amount versus 25 percent in an

4   amount to accept, with 595 million voting to reject.

5           And at Sears Roebuck Acceptance Corp., the

6   rejection was 667 million rejected, which was an 88 percent

7   rejection.

8           THE COURT:  But these are all the same guarantee

9   creditors, right?

10          MR. FOX:  Well --

11          THE COURT:  So, they're voting their interests

12  across the board, aren't they?

13          MR. FOX:  Well, I'm not sure.  They're not the

14  same dollar amount at every plan -- at every debtor.

15          As I said, for instance, Sears Roebuck, it's 667

16  million rejected.  Sears Holdings is 595 million.  Sears

17  Roebuck, 340 million rejected for 75 percent.

18          There's probably overlap in many of these cases,

19  but there's, obviously, more of what I consider rejected,

20  and in some cases, I think they may not have even had

21  guarantee claims.  I just don't know.

22          But the point is, at the significant debtors, the

23  unsecured claims, that class did not accept this plan

24  because they didn't have -- they didn't get the votes on the

25  amount.

1              And of the 22 accepting debtors, the largest

2       amount of accepting unsecured creditors was $1.7 million,

3       and that was at Max Irving.

4              So, as I said, the voting results are particularly

5       important here because of the third Iridium factor, which

6       considers the paramount interest of creditors, including

7       each affected class' relative benefits and the degree to

8       which creditors either do not object to or affirmatively

9       support the proposed settlement.

10             And in the 30 of the most significant debtors with

11      the most substantial claims, by far, the unsecured creditors

12      who would be affected by this settlement rejected -- their

13      class is rejected.

14             And I believe as we walk through this --

15             THE COURT:  Well, you know what?  It's late and I

16      do want Mr. Wander to talk to Mr. Schrock about what I

17      suggested.  So, I want you as a representative of indenture

18      trustee to think about the consequences of a rejection and

19      how your beneficiaries would react to that, and I'll resume

20      next week.

21             UNIDENTIFIED SPEAKER:  I'm tired of hypotheticals.

22             THE COURT:  People, try to negotiate in person.  I

23      have the record here.  You're representing an indenture

24      trustee.  I don't get it.  I don't get your point.

25             I don't see any alternative, other than

Page 296

1    liquidation here, or a negotiation, and you've had your

2    chance to negotiate.  So, I want to give Mr. Wander a chance

3    to do something realistic with the professionals and,

4    frankly, I could meet with you and give you my idea of what

5    I think would be realistic and I want to see the notice that

6    would go to the admins and maybe a memorialization of some

7    of the points that we've otherwise laid, and we'll resume

8    with more argument on this, but -- put your money where your

9    mouth, as far as the indenture trustee is concerned.  If you

10   want it, you could have it.

11        (Whereupon, these proceedings were concluded at 5:54

12   p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 297

  1                         I N D E X

  2

  3                     T E S T I M O N Y

  4

  5     WITNESS                EXAM BY             PAGE       LINE

  6     William Transier       Mr. Wander          57          5

  7     Brian Griffith         Mr. Wander          62          3

  8     Brian Griffith         Mr. Genender        85          18

  9     Brian Griffith         Mr. Wander          88          20

 10     William Murphy         Ms. Lieberman       91          3

 11     William Murphy         Mr. Wander          93          9

 12     William Murphy         Mr. Genender       136          4

 13

 14                      R U L I N G S

 15

 16     DESCRIPTION                                PAGE       LINE

 17     Court will enter an order approving         26         10

 18       Debtor's proposed settlement with

 19       retiree committee

 20

 21

 22

 23

 24

 25
```

Page 298

1                      I N D E X, cont'd

2

3                      E X H I B I T S

4    NO.      DESCRIPTION                      ID.      EVID.

5    ---      Declaration of Craig E. Johnson of  ---        54

6              Prime Clerk LLC re solicitation of

7              votes and tabulation of ballots

8    ---      Declaration of William Transier,    ---        55

9              dated 9/13/19, submitted as

10             direct testimony

11   ---      Declaration of Brian Griffith,      ---        60

12             dated 9/13/19, submitted as

13             direct testimony

14   ---      Supplemental declaration of Brian   ---        60

15             Griffith, dated 10/1/19, submitted

16             as direct testimony

17

18   FOR THE DEBTOR/WILMINGTON TRUST/ADMINISTRATIVE CLAIMANTS:

19   Joint exhibits                             ---        59

20

21

22

23

24

25

Page 299

```
 1               C E R T I F I C A T I O N

 2

 3   We, Lisa Beck, Sheila Orms, Sherri Breach, Jamie Gallagher

 4   and William Garling certify that the foregoing transcript is

 5   a true and accurate record of the proceedings.

 6   Lisa Beck        Digitally signed by Lisa Beck
                      DN: cn=Lisa Beck, o, ou,
                      email=digital1@veritext.com, c=US
 7                    Date: 2019.10.07 16:00:30 -04'00'
     _____

 8   Lisa Beck

     Sheila Orms      Digitally signed by Sheila Orms
 9                    DN: cn=Sheila Orms, o, ou,
                      email=digital1@veritext.com, c=US
                      Date: 2019.10.07 16:01:16 -04'00'
10   Sheila Orms

     Sherri L Breach  Digitally signed by Sherri L Breach
11                    DN: cn=Sherri L Breach, o, ou,
                      email=digital1@veritext.com, c=US
                      Date: 2019.10.07 16:07:04 -04'00'
12   Sherri L. Breach (CERT**D-397)

13   AAERT Certified Reporter & Transcriber

     Jamie Gallagher  Digitally signed by Jamie Gallagher
14                    DN: cn=Jamie Gallagher, o, ou,
                      email=digital1@veritext.com, c=US
                      Date: 2019.10.07 16:10:19 -04'00'
15   Jamie Gallagher

     William Garling  Digitally signed by William Garling
16                    DN: cn=William Garling, o, ou,
                      email=digital1@veritext.com, c=US
                      Date: 2019.10.07 16:11:56 -04'00'
17   William Garling

18

19   Date:  October 7, 2019

20

21   Veritext Legal Solutions

22   330 Old Country Road

23   Suite 300

24   Mineola, NY 11501

25
```