Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   October 7, 2019

17                   1:07 PM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

1    HEARING re Notice of Hearing : Notice of Continuation of

2    Hearing on Confirmation of Modified Second Amended Joint

3    Chapter 11 Plan of Sears Holdings Corporation and Its

4    Affiliated Debtors

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    AKIN GUMP STRAUSS HAUER & FELD LLP

4         Attorneys for Unsecured Creditors Committee

5         One Bryant Park

6         New York, NY 10036

7

8    BY:  PHILIP C. DUBLIN

9         SARA L. BRAUNER

10         ZACH LANIER

11

12    WEIL, GOTSHAL & MANGES LLP

13         Attorneys for the Debtors

14         767 Fifth Avenue

15         New York, NY 10153

16

17    BY:  JARED R. FRIEDMANN

18         JACQUELINE MARCUS

19         SUNNY SINGH

20

21

22

23

24

25

Page 4

1   WEIL, GOTSHAL & MANGES LLP

2          Attorneys for the Debtors

3          200 Crescent Court, Suite 300

4          Dallas, TX 75201

5

6   BY:  PAUL R. GENENDER

7

8   MILBANK, TWEED, HADLEY & MCCLOY LLP

9          Attorneys for Cyrus Capital

10         28 Liberty Street

11         New York, NY 10005

12

13  BY:  THOMAS R. KRELLER

14

15  DAVIDOFF HUTCHER & CITRON LLP

16         Attorneys for Pearl Global

17         605 Third Avenue

18         New York, NY 10158

19

20  BY:  DAVID H. WANDER

21

22

23

24

25

Page 5

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2        Attorneys for Transform Holdco LLC

3        One Liberty Plaza

4        New York, NY 10006

5

6   BY:  THOMAS J. MOLONEY

7

8   LOCKE LORD LLP

9        Attorneys for Pension Benefit Guaranty Corp.

10        111 South Wacker Drive

11        Chicago, IL 60606

12

13   BY:  BRIAN A. RAYNOR

14

15   WILMER CUTLER PICKERING HALE and DORR LLP

16        Attorneys for ESL in the Litigation

17        7 World Trade Center

18        250 Greenwich Street

19        New York, NY 10007

20

21   BY:  PHILIP D. ANKER

22

23

24

25

Page 6

1    THE SARACHEK LAW FIRM

2         Attorneys for Mien Co. Ltd., Helen Andrews, Strong

3         Progress Garment Factory Company, Ltd., Samil

4         Solutions, Shanghai Fochier, Purcell Murry, A&A HK

5         Industrial, Mingle Fashion Limited Mansheen Industries,

6         Ltd., AMW Vietnam Co. Ltd., Holdsun Group Ltd.,

7         Auxo International Ltd., Beauty Gem, Inc., and Meenu

8         Creations LLP

9         101 Park Avenue, 27th Floor

10        New York, NY 10178

11

12    BY:  JOSEPH E. SARACHECK

13

14    FOLEY & LARDNER LLP

15        Attorneys for the Ad Hoc Admin Group

16        90 Park Avenue

17        New York, NY 10016

18

19    BY:  PAUL J. LABOV

20

21

22

23

24

25

Page 7

1    VEDDER PRICE LLP

2         Attorneys for Village Hoffman Estates & North Star

3         Group Services

4         1633 Broadway, 31st Floor

5         New York, NY 10019

6

7    BY:  MICHAEL L. SCHEIN

8

9    SEYFARTH SHAW LLP

10        Attorneys for Wilmington Trust National Association, as

11        Indenture Trustee

12        620 Eighth Avenue

13        New York, NY 10018

14

15   BY:  EDWARD M. FOX

16

17   ALSO PRESENT TELEPHONICALLY:

18

19   LEE J. ROHN

20   SOMA BISWAS

21   CATHERINE LOTEMPIO

22   LIGEE GU

23   RONALD GOLD

24   DUSTIN SMITH

25   ROCCO CAVALIERE

1   BRYAN CIMALA

2   KIMBERLY GIANIS

3   THERESE SCHEUER

4   RICK SZAMBEL

5   BARBARA WALANCIK

6   COURTNEY SCHAEL

7   RACHEL ALBANESE

8   EMILY HOLT

9   MAEGHAN MCLOUGHLIN

10   ARLENE ALVES

11   ALANA FRIEDBERG

12   DAN SHARNAH

13   ANTHONY GREENE

14   KATHLEEN AIELLO

15   STEVEN KOSSON

16   TERESA LII

17   BRYANT OBERG

18   ALIX BROZMAN

19   MINTA NESTER

20   ANDREW THAU

21   MATTHEW KOCH

22   SAM ASHURAEY

23   LESLIE HEILMAN

24   CATHERINE HEITZENRATER

25   WILLIAM HOLSTE

1   ALLEN KADISH

2   HOO RI KIM

3   ROBERT KOLTAI

4   JULIE MAY

5   BEN MINKOFF

6   MICHAEL MITTELMAN

7   JASON JANJANA

8   SUNNY SINGH

9   JOSEPH SZYDLO

10   SHARON HARRIS

11   SHELLEY KINSELLA

12   RONALD SPINNER

13   ROBERT FITZGERALD

14   BETH ROGERS

15   LINDA RIFFKIN

16   PAUL SCHWARTZBERG

17   GUSTAVO CHICO-BARRIS

18   SONIA COLON

19   JOHN BRINGARDNER

20

21

22

23

24

25

1                    P R O C E E D I N G S

2    THE COURT:  Okay.  Good afternoon.  In Re: Sears Holdings

3    Corporation, et al.

4              MR. SINGH:  Good afternoon, Your Honor.  Sunny

5    Singh, Weil Gotshal, on behalf of the Debtors.

6              Your Honor, we're here for the continued

7    confirmation hearing.  Before we pick up with where we left

8    off, I thought I could give the Court with some updates.  We

9    do have at least one resolution I'd like to announce, as

10   well as some other matters.

11             THE COURT:  Okay.

12             MR. SINGH:  So, Your Honor, following the hearing

13   last week, I would like to report that we have settled the

14   objection filed by Pearl Global Industries, with Mr. Wander,

15   who is here.  I'm just going to recite the terms of the

16   parties' agreement and I'll ask him to just confirm.

17             Your Honor, Pearl Global Industries will receive

18   an allowed claim of $1,130,000 without offset or deduction.

19   That's an administrative expense claim.  That's reduced,

20   Your Honor, from something in excess of $1.5 million that

21   had been asserted.

22             There will be a waiver, by the estate, of any

23   potential preference claims against Pearl.  An additional $1

24   million, Your Honor, will be contributed from the carveout

25   to the estate for distribution in the initial distribution.

Page 11

 1    So, Your Honor, under the consent program we had the initial

 2    distribution of $20 million, so now that will be $21 million

 3    and it will include this additional increment of $1 million

 4    from the carveout.

 5                THE COURT:  Okay.

 6                MR. SINGH:  In addition, Pearl agrees, excuse me,

 7    that it will opt-in to the consent program and that it now

 8    withdraws its objection and supports confirmation of the

 9    plan.

10                Your Honor, those are the terms with Mr. Wander.

11    Maybe I'll just ask him to confirm in case I missed anything

12    or --

13                MR. WANDER:  That's correct, Your Honor.

14                THE COURT:  Okay.  Was --

15                MR. SINGH:  So, Your Honor, that issue is

16    resolved.  I would just like --

17                THE COURT:  Was the assessment of Pearl's claim

18    and preference risk done on an assessment of the merits?

19                MR. SINGH:  Yes, Your Honor.  So as I mentioned,

20    Mr. Wander's client, Pearl, had asserted a claim of an

21    administrative expense at -- in excess of $1.5 million.  So

22    over the weekend, and finally last hearing, we considered,

23    you know, the validity of his claims.  He had -- you know,

24    they had somewhat of a world import issue, also inducement

25    arguments with respect to 503(b)(1), which were sort of

Page 12

1    legal disputes between us and we think we've resolved those

2    at a fair place.

3            We also did look at, obviously, the preference

4    exposure, you know, that has -- that Pearl had, took that

5    into consideration, as well as the incremental $1 million

6    coming in from the carveout.  And, Your Honor, we did review

7    all of that with the Creditors Committee, Akin Gump, in

8    particular and, you know, everybody's signed off and on

9    board as to where those issues have now landed.

10           THE COURT:  Okay.  And did -- was that preference

11   resolution consistent with the analysis by the firms that

12   had been retained to do the --

13           MR. SINGH:  Yes, they were -- we were coordinating

14   with them every step of the way, and it took into account,

15   sort of, you know, what potential defenses could be

16   asserted, and at the end of the day what we thought the

17   exposure really could be.  So yes, we -- you know, that was

18   in complete coordination with the ASK firm.

19           THE COURT:  Okay.

20           MR. SINGH:  So, Your Honor, we think we've landed

21   in a good spot there.  Just one or two other changes I would

22   just like to note, with respect to the consent program.

23   Your Honor, following the hearing last week, and some of the

24   concerns the Court raised with respect to those creditors,

25   administrative expense creditors, who neither opt-in, nor

Page 13

1    opt-out of the settlement, so that sort of third class we

2    were talking about.  So, Your Honor, we've changed the

3    consent program so that those parties now, their aggregate

4    recovery, instead of being capped at 75 cents of the allowed

5    amount of their administrative expense claim, they would be

6    capped at 80 percent of the allowed amount of their

7    administrative expense claim.

8            So you've really got, sort of, three categories of

9    administrative expense creditors.  Those who affirmatively

10   opt-in.  And we've made the opt-in timing the same for both,

11   so everybody gets 33 days to opt-in or opt-out.  Those who

12   affirmatively opt-in will get the benefit of the initial

13   distribution, they will also get -- but they will be capped

14   at 75 cents of the allowed amount of their claim.  The

15   second category, who neither opt-in nor opt-out, they will

16   be bound by the administrative expense consent program but

17   they will have their aggregate recovery capped at 80 cents.

18   And although they won't participate in the initial

19   distribution, the second distribution first has to go to

20   true them up to the initial recovery.  And then finally,

21   anybody who opts-out, of course, will retain their rights

22   under the plan to be paid in full, a hundred percent of the

23   allowed amount of their claim on the later of the effective

24   date or the date that the claim actually becomes allowed.

25           So we've made those changes and we did file a

1   proposed confirmation order that reflects those changes,

2   Your Honor.  We'll have some more clean up based upon what I

3   announced earlier.  And we also did file a revised form of

4   notice that would go out, and Your Honor has a copy of those

5   and we can review those towards the end, if Your Honor would

6   like to.

7           But that basically takes into account some of the

8   issues that you had raised and also just making it clear, we

9   included a chart that sort of makes it clear, you know, what

10  happens if you are in the opt-in category, what happens if

11  you're in the opt-out, and what happens if you're, you know,

12  in neither opt-in or opt-out.  So hopefully that's much

13  clearer.  And we added, you know, some of the information

14  from the declarations, in particular, about estate assets,

15  et cetera.

16          THE COURT:  And the risk factor discussion?

17          MR. SINGH:  Right, exactly.  We updated all of

18  that.

19          And Judge, just a couple of other changes or

20  issues we're working through.  ESL and Cyrus had asked us to

21  just make clear that the segregation of funds that we've

22  been talking about in connection with the litigation trust

23  funding, that's the $25 million and the 10 million, they are

24  going to send us some language and we may just recite it in

25  the record later, but I just wanted the Court to know that

1    we're talking through that to make it clear that it's not --

2    those assets, although they're being put in segregated

3    accounts, they remain the property of the estate, they're

4    not, sort of, being removed as you would think of maybe

5    carveout funds that go to a trust fund, but they're sort of

6    available --

7              THE COURT:  That's consistent with the language

8    you've already offered up that --

9              MR. SINGH:  Correct.  Paragraph --

10             THE COURT:  -- distribution into the trust doesn't

11   --

12             MR. SINGH:  Exactly.  It's Paragraph 59 of the

13   proposed confirmation order.

14             THE COURT:  Okay.

15             MR. SINGH:  And then I think Cyrus had requested

16   additional notice, which we've agreed to.  Just 20 days, we

17   would provide notice.  So we put in, you know, the sort of

18   reporting prior to the effective date, we would also add in,

19   you know, prior to make any post-effective date

20   distributions, we'll provide parties-in-interest with 20

21   days' notice so they have an opportunity to know that.

22             THE COURT:  Just the first distribution?

23             MR. SINGH:  Just -- well, any distribution

24   following the effective date.

25             THE COURT:  Oh, okay.

Page 16

1               MR. SINGH:  Yeah.

2               THE COURT:  All right.

3               MR. SINGH:  So, Your Honor, those are some of the

4       changes we're working through, I just wanted to give the

5       Court an update before we started with the balance of the

6       hearing.  But I'm happy to proceed however you'd like at

7       this point.

8               THE COURT:  All right.  Well, I've seen those

9       documents, I also saw the proposed fourth supplement that

10      has the proposed terms for the --

11              MR. SINGH:  Oh, yes, I failed to mention --

12              THE COURT:  -- liquidation trustee's --

13              MR. SINGH:  Yes.  We did file --

14              THE COURT:  -- compensation?

15              MR. SINGH:  Exactly.  I failed to mention.  I

16      apologize.

17              We did file the proposed compensation for the

18      litigation trustees.  That would kick in, Your Honor, should

19      you enter the confirmation order, basically on the

20      confirmation date, because those individuals are stepping in

21      as litigation designees, you know, as soon as the

22      confirmation order is entered, other than with respect to

23      the preference claims, because that's outside of their

24      mandate.  But then post-effective date it, sort of, would

25      include the preference claims.  But we did file that,

1    parties have three weeks to object.  We have extra copies if

2    anybody didn't see it.  We filed it just this morning before

3    the hearing.  And so that is now always been on file, and we

4    took it out of the confirmation order.

5              THE COURT:  Okay.

6              MR. SINGH:  Okay.  Thank you, Your Honor.

7              THE COURT:  Okay.  So I think where we left off

8    Mr. Fox was speaking.  And I have to say, at the end of a

9    very long hearing, I think I did a disservice to Mr. Fox.

10   He's always been a very aggressive advocate, but never

11   untethered from reality.  And I hope he didn't have an

12   existential moments over the weekend where he doubted that,

13   but in any event, if you did, I'm sorry if you did.

14             MR. FOX:  Actually, Your Honor, I thought you

15   handed me the keys.  Thank you.

16             THE COURT:  Well, then maybe you did.

17             MR. FOX:  Thank you, Your Honor.  I appreciate

18   that.  It was a long day.

19             I do want to just make a couple of preliminary

20   comments before I get back to the argument.  One, I want to

21   be clear, Wilmington Trust is the indentured trustee for the

22   6-and-5/8th percent senior secured notes to 2010.  That's

23   the capacity in which I appear today, not on behalf of

24   anybody else.

25             And just so it's clear, in case there's any

1    confusion, ESL does not own any of how to notes.  And -- so

2    I'll leave it at that.

3          Secondly, Your Honor, just as a preliminary

4    matter, as they say in public speaking, tell them what

5    you're going to say, say it, and then then tell them what

6    you said.  So I started into the argument about the

7    settlement, but I want to be clear, and I'm going to say

8    this at the end, that there is a plan here that Your Honor

9    could confirm, assuming that the other issues that have been

10   raised by others are addressed, that does not require the

11   plan settlement to be approved.  And in fact, the very fact

12   that that plan exists I think may make it impossible for the

13   Court to approve the plan settlement, but I'll come to that

14   a little bit later.

15         To get back to it, Your Honor, the -- in making a

16   determination as to whether the facts the Debtors have

17   elicited satisfy the requirements to confirm the -- or to

18   approve the planned settlement, the Court must also look to

19   the Debtors' action in this case, not just to the

20   declarations that have been offered into evidence.  And

21   we've included, in the exhibits, the documentation that

22   shows those actions.

23         In particular, Your Honor, on February 9th, 2019,

24   the Debtors announced a settlement with the PBGC that -- to

25   allow the PBGC an $80 million priority claim and an $800

Page 19

1    million unsecured claim.  Notably, that agreement provided

2    that the Debtors would not seek to substantively consolidate

3    the Debtors' estates.  Following that, on April 17th, 2019,

4    the Debtors filed a plan, which again, did not provide for

5    substantive consolidation of these cases.  It wasn't until

6    May 16th, a month later, that the Debtors filed an amended

7    plan which purported to settle substantive consolidation by

8    substantively consolidating the Debtors.

9              And according to the confirmation brief, pursuant

10   to the plan settlement, the PBGC agreed to settle

11   substantive consolidation issues under the plan, that's at

12   Paragraph 261 of Docket 5144.  So it seems, at least in the

13   initial go round, or the initial rollout of the substantive

14   consolidation settlement, it was allegedly a settlement

15   between the Debtors and the PBGC over an issue that was not

16   in dispute between them since they had both agreed not to do

17   that and the Debtor had filed a plan that provided that it

18   would not do that.

19             So a debtor can settle or compromise a -- you

20   know, can enter into settlements and compromises, but the

21   definition of settlement or compromise requires that there

22   be an active dispute.  So at least at that time, with

23   respect to the PBGC, there was not.

24             So -- and when we asked Mr. Murphy, and your

25   comment -- your request before the lunch break on Thursday

Page 20

1   was that we provide you with the specific areas of testimony

2   that we had designated from the deposition, so I'll do that

3   as I go through, but Mr. Murphy didn't know what dispute the

4   Debtors referred to in the disclosure statement for the

5   amended plan either.

6              When he was asked about that, this is on Page 72,

7   Line 11 of the deposition testimony that was designated, the

8   question was:  "So it says discuss below, after filing the

9   initial plan and disclosure statement on April 17th, 2019,

10  the Debtors and the PBGC agreed to certain modifications to

11  the PBGC settlement in exchange for the settlement of

12  disputes and potential litigation regarding whether the

13  Debtors should be substantively consolidated.  Do you know

14  what disputes this is referring to?"  Answer: "Specifically,

15  I was relying on counsel for the detailed disputes.  At a

16  high level it's their claim for substantial unsecured debt

17  and administrative debt claims."  Question:  "Whose claims?"

18  Answer:  "The PBGC."  Question:  "Well, it refers to a

19  settlement of disputes and potential litigation regarding

20  whether the Debtor should be substantive consolidated.  So

21  who are the parties to that dispute; do you know?"  Answer:

22  "I'd have to rely on counsel for that specific answer."

23  Question:  "So you don't know what dispute and you don't

24  know who the parties were; is that correct?" Answer:  "I'm

25  not sure what specifically.  This says settlement of

Page 21

1    disputes and potential litigation, and I'm taking it at face

2    value.   There were disputes and litigation.   I'm not -- I'm

3    providing financial information analysis -- and analysis

4    with regards to any settlement offers."

5              Mr. Genender:   "To be fair, he's just asking if

6    you know who the parties to this -- to the dispute

7    referenced understand that language are."   Mr. Fox:   "That's

8    correct."   Mr. Genender:   "If you don't know, he's asked --

9    answer I don't know."

10             Mr. Murphy didn't know why the Debtors decided to

11   file a substantive consolidation plan on May 16th, 2019

12   either and he was involved in that decision.   Again, he was

13   asked -- I asked him:   "Between April 17th, 2019 and May 16,

14   2019, what changed that led to the Debtors to file a

15   substantive consolidation plan rather than the

16   nonconsolidation plan filed on April 17th?   What changed in

17   that one-month period?"   Answer:   "I can't answer."   Mr.

18   Genender:   "To be fair, he asked you to rephrase it, you

19   repeated it.   Just to be fair, he asked you to rephrase it."

20   By Mr. Fox:   "Do you understand my question, Mr. Murphy?"

21   Answer:   "Yes."   Question:   "Is there some reason why you

22   can't answer it?"   Answer:   "Basically I wasn't involved in

23   the high-level discussions regarding that final decision."

24             He then went on, though, to provide that it

25   appears that the real problem was the administrative

Page 22

1    insolvency of Debtors other than Kmart.  So I asked him:

2    "So far as you know, is it fair to say -- is it fair to say,

3    as far as you know, sitting here today, nothing changed

4    between April 17th, 2019 and May 16, 2019 that caused the

5    Debtors to switch from a nonconsolidation plan to

6    substantive consolidation plan?"  Mr. Genender:  "I'm going

7    to object.  That misstates his testimony and lack of

8    foundation."  Answer:  "I'd have to reflect on that period

9    of time and what I have in my declaration to see if there's

10   a better answer than say other than during that 30 days

11   there was additional analysis and discussions.  It's an

12   evolving process.  That's as far as I could go."

13         Question:  "What additional analysis are you

14   referring to?"  Answer:  "The intercompany analysis, the

15   waterfall effect of where a value is landing with regards to

16   each Debtor."  Question:  "When you say the analysis of

17   where value is landing, how is that relevant to the analysis

18   of whether you find -- filed a substantive consolidation

19   plan or not?"  Answer:  "Based on the information and the

20   analysis of the intercompany waterfall.  If you looked at

21   the deconsolidation liquidation analysis, the value at the

22   end of the waterfall was substantially ending up in the

23   Kmart corporation entity."  Question:  "So is it fair to say

24   that the problem became that there were a bunch of

25   administratively insolvent Debtors on a standalone basis,

1   after you did your analysis, and maybe Kmart and some others

2   that were administratively solvent?"  Mr. Genender:

3   "Objection to form."  Answer:  "Hypothetically, based on

4   that analysis, yes."

5           Despite the fact that Mr. Murphy was not involved

6   in the decision to change to a substantive consolidation

7   plan, although he's their witness on this, and the real

8   problem was administrative solvency of some Debtors, the

9   Debtors used Mr. Murphy to try to justify substantive

10  consolidation.  Mr. Murphy enumerates what he says are other

11  factors for substantive consolidation, and that's at

12  Paragraph 24 of his declaration.

13          But when I asked him if he knew what the factors

14  for substantive consolidation were, he couldn't answer and

15  he said he's not a lawyer.  The question was:  "How do you

16  know what the factors are for consolidation?"  Mr. Genender:

17  "He answered questions about the facts."  Mr. Fox:  "I'm not

18  asking that."  Question:  "You can answer."  Answer:

19  "Please rephrase the question. I just don't want to make a

20  legal -- I'm not a lawyer, so I'm not going to answer a

21  legal question."

22          Mr. Murphy asserts, in his declaration, that

23  Creditors dealt with Debtors on a consolidated basis.  And

24  that's one of the two prongs in the Augie/Restivo Test, as

25  you know, to determine whether or not substantive

Page 24

1    consolidation is appropriate.  But he really has no basis

2    for his assertion.  First of all, the loans specifically

3    indicate who the borrowers and the guarantors are.

4            The question, this is at Page 126 of his

5    deposition:  "When you say the creditors, and you refer to

6    the lenders, particularly dealt with Sears as a consolidated

7    company, isn't it the case that all the loans specifically

8    indicate who the borrower is, or who the guarantors are of

9    those loans?"  Mr. Genender:  "Objection.  Form."  Answer:

10   "Yes."

11           And the trade creditors had written contractors,

12   but Mr. Murphy never even looked at them, he just determined

13   that they must have been confused.  On Page 72 of the

14   deposition, Question:  "Mr. Murphy, take a look at Page 13

15   of your declaration that's been marked as Exhibit 6, if you

16   would."  Answer:  "Okay."  Question:  "In Paragraph 24, at

17   the bottom of that page, you say, at the second sentence of

18   subparagraph A, 'Many Creditors conducted business primarily

19   with three Debtors, Sears Holding, Sears Roebuck and Kmart

20   Corporation.'  Do you see that?"  Answer:  "Yes."  Question:

21   "Then you say, at the bottom of that paragraph, 'Sears

22   Roebuck purchased a significant amount of the store

23   merchandise, both in sold Sears and Kmart stores, right?"

24   Answer: "Yes."

25           Question:  "When the Debtor entered into their

Page 25

1   transactions that are referenced here with whichever

2   Creditor, and I'm not talking about loans now, I'm just

3   talking about trade, were there written contracts, or

4   purchase orders, or invoices pursuant to which those goods

5   and services were purchased?"  Answer:  "Yes."  Question:

6   "Okay.  And did those invoices, or contracts or purchase

7   orders list the name of the Debtor which was buying the

8   goods or services?"  Answer:  "Yeah, I don't know."

9   Question:  "You don't know?"  Answer:  "For specific

10  invoices for that the Debtors specifically did I didn't get

11  into that detail."  Question:  "Never looked at that?"

12  Answer:  "No, not for this, no."  Question:  "Not for any

13  part of your substantive consolidation analysis?"  Answer:

14  "No."

15          Now, we did take a look, just randomly, at a

16  couple of proofs of claim that are on the docket and in fact

17  the proofs of claim have attached to them specific invoices

18  which specifically have the legal name of the legal entity

19  that purchased them.  We included four of them, it's Joint

20  Exhibit 57, 58, 59 and 60, which specifically indicate who

21  those entities are dealing with.

22          And then what we did was we found entities where

23  the same entity filed different proofs of claim against

24  different entities, because they had different claim -- they

25  had different contracts that specifically name those

Page 26

1    different entities.  So what appears to be to be the case is

2    the Debtor made an assumption about this, or Mr. Murphy did,

3    but never actually looked and in fact the evidence would

4    seem to suggest otherwise.

5           Mr. Murphy also indicated, though, that the

6    financing method that the Debtors were using was not unusual

7    for a large public company.  Page 174 of his declaration, I

8    asked him -- I said, "Now turn to Page 14, if you would of

9    Exhibit 6, at the bottom of the page in Paragraph F.  Do you

10   see that?"  Answer: "Yes."  Question:  "So it says there,

11   'Financing was provided principally through Sears Holdings

12   or Sears Roebuck Acceptance Corp with the majority of the

13   remaining Debtors providing guarantees of the debt.  Funds

14   were centralized and available for all entities.'  Do you

15   see that?"  Answer: "Yes."  Question:  "Okay.  Is this

16   unusual in terms of the large public company operation that

17   has outstanding loans?  Is this description unusual?"

18   Answer:  "Not in my experience."

19          Now, Mr. Murphy says, in his declaration in

20   Paragraph 24, at Pages 14 to 15, there are a number of

21   factors which are satisfied to show that there may have been

22   confusion among the Creditors as to what entities they were

23   dealing with, and it's the usual list of overlapping board

24   members, a central office, centralized operations, et

25   cetera, you know, tax statements, consolidated financial

Page 27

1    statements being filed, all those things.  First of all,

2    with respect to tax returns, they're required to file

3    consolidated tax returns and they're required, by SEC rules,

4    a public company is, to file consolidated financial

5    statements.

6             But the problem with all this is that, among other

7    things, the Debtors knew all of this when they got the PBGC

8    deal which was in early 2019.  It was just figured out after

9    filing the plan in April, or even after agreeing in February

10   who the directors were of which entities, where the offices

11   were located, which is in Huffman Estates, as the world

12   knows, or, you know, that they had centralized financial

13   reporting, Treasury, HR, Tax Planning, Real Estate

14   Management, Internal Audit, et cetera.  All of that was

15   known, that was no secret to anybody.  So nothing changed

16   between the time that the Debtors filed their -- at least

17   with respect to this prong of substantive consolidation,

18   with respect to the issue of Creditors not understanding who

19   they were dealing with.

20            And I think it's also important to note that this

21   was a public company that filed financial statements, and

22   you can take judicial notice of those, the fact that it was

23   very clear to everybody, or anybody who bothered to look,

24   that they had outstanding loans, that those loans were

25   guaranteed at multiple entities within the Debtors.  The

Page 28

1    documents are actually in the SEC files.  That they had

2    multiple, you know, obligations of each of the entities to

3    the PBGC as part of the control group.  This wasn't any

4    surprise to anybody, or certain not to other -- to trade

5    creditors or others who dealt with a single entity, when

6    they decided to enter into agreements, or make loans, or

7    sell goods and services to any of these debtor entities.

8           Now, with respect to the analysis of hopeless

9    entanglement, Mr. Murphy, and I think you've heard this now,

10   testified that he joined M3 in December of 2018, which was

11   three months after the bankruptcy cases were commenced, but

12   perhaps more importantly, he hasn't done this type of an

13   analysis before.  When I asked him, at Page 40 of his

14   declaration, "Have you done this sort of analysis at other

15   companies besides the Sears Debtors?"  Mr. Genender:

16   "Objection."  Answer:  "I would say there are very few

17   people who've done this type of analysis.  There are a few,

18   very few companies the size of Sears with the methodology

19   they used for using intercompany accounting to track all

20   their activities, certainly not the size of the company.

21   This is -- I've done second intercompany analyses for other

22   liquidation analyses for other companies, never the size of

23   this one."  And then at Page 41, Question:  "All right.  Let

24   me ask it this way.  Have you ever performed a similar

25   analysis of intercompany claims at a company the size of

1    Sears, laying aside the volume of transactions?"  Answer:

2    "No."

3            Now, Mr. Murphy claims that there were potential

4    difficulties in reviewing financial records --

5            THE COURT:  I'm not sure what that question --

6            MR. FOX:  I'm sorry?

7            THE COURT:  That question didn't seem to make any

8    sense to me.  I mean, is there any such entity?

9            MR. FOX:  There may be.

10           THE COURT:  It would seem to be almost

11   inconceivable that there'd be a company like Sears that

12   wouldn't have the same types of intercompany transactions --

13           MR. FOX:  Well --

14           THE COURT:  -- because Sears has these three main

15   operating centers.  But anyway, you can go ahead.

16           MR. FOX:  Mr. Murphy claimed a potential

17   difficulty in reviewing the financial records and in fact

18   that was not actually the case.  When Mr. Murphy looked at

19   post-petition financials, and found what appeared to be

20   incorrect entries, it turned out that Sears could show him

21   where those entries had been corrected.

22           So at Page 31 he testified, Question:  "So those

23   adjustments that you concluded Sears had entered incorrectly

24   during the post-petition period?"  Answer:  "Those were

25   adjustments when we queried, we followed up with the

Page 30

1    company, that the company said, oh, that was incorrect,

2    here's where we corrected it."  Question:  "And were their

3    corrections accurate?"  Answer:  "They appeared accurate

4    based on their responses.  Again, as far as the intercompany

5    activity was concerned, for the accountant perspective, if

6    the debit and credits matched, and their explanation for

7    what the correction was meant to be, then we moved forward.

8    We made sure we either identified the correction in our

9    overall matrix to make sure we weren't grossing up

10   receivables and payables this far, or due to and due froms

11   from a company sense for our net results."  Question:

12   "Well, what I'm trying to understand is did you find errors

13   in work that Sears had done that were not corrected?"

14   Answer:  "No."

15          And Mr. Murphy's conclusion was that the activity

16   was -- that the activity he summarized was consistent with

17   the balance sheet.  So on Page 39, when I asked, "Well, you

18   said it was a process for you to understand how the

19   intercompany transactions were recorded on the balance sheet

20   and how the balance sheet damages would match up.  So my

21   question is, after you went through that process to

22   understand this, what did you finally determine?"  Mr.

23   Genender:  "The balance sheet changes, you said damages."

24   Mr. Fox:  "I'm sorry, changes."  Mr. Genender:  "Objection.

25   Form."  Answer:  "Our conclusion was that the activity we

Page 31

1   were summarizing by debtor entity for due to and due from,

2   based on the methodology of the company the Debtors used to

3   aggregate the various entries, was consistent with what was

4   reported in the balance sheet."

5           Mr. Murphy's analysis left him with an 80 to 90

6   percent confidence level of the post-petition intercompany

7   balances.  And on Page 54 when I asked, "Now turning to Page

8   3 of Exhibit 1, you say that after you receive -- you

9   reviewed analysis and discussions with Sears management, you

10  have an 80 to 90 percent confidence level of a current

11  intercompany post-petition activity as a reasonable

12  indication of the due from and due to balances amongst the

13  Debtors; is that correct?"  Mr. Genender:  "Objection.

14  Form."  Answer:  "That's what I stated.  Yes."  Question:

15  "And what's the due from and due to balances amongst the

16  Debtors on just a post-petition basis, right?"  I'm sorry,

17  let me read that again.  Question:  "And that's the due from

18  and due to balances amongst the Debtors on just a post-

19  petition basis, right?"  Answer:  "Yes."

20          Now, Mr. Murphy complains, in his declaration, as

21  did the Debtors in their disclosure statement from May,

22  starting in May, which seems, in some cases, to word-for-

23  word mirror what Mr. Murphy's declaration then said in

24  September, but he refers to an antiquated system, but

25  nevertheless basically admitted it does not affect the

Page 32

1    company's accounting.  It simply was problematic for him

2    because he couldn't push a button and get a query of what

3    all the intercompany transfers were, so that he could look

4    at them and review the history.

5              Question, this is on Page 57, starting on

6    Line 6:  "Now, in the next point underneath that, as part of

7    the second bullet point, it says 'Legacy accounting systems

8    are not adequately robust in our view.  What do you mean by

9    that?"  Answer:  "They're not modern, they're antiquated and

10   we weren't able to request a summary of intercompany

11   transactions that made it easy to understand the activity

12   between all entities."  Question:  "You were not able to

13   obtain this for most petition activity?"  Answer:

14   "Correct."

15             Question: "Well, does the fact that the accounting

16   system is what you call antiquated mean that it does not

17   correctly keep track of the company's accounting?"  Answer:

18   "No, I'm not saying that."  And he went on.

19             And on Page 56, Question: "But to go back to my

20   question, does the fact that the accounting system is, as

21   you call it, antiquated, mean that it was not properly

22   handling the accounting for the Debtors?"  Answer: "That's a

23   conclusion for the auditors.  For a consolidated financial

24   statement, you have to talk to their auditors about that

25   type of question.  My point was more specifically to

1    intercompany transactions."

2              Question: "Well, because the accounting system is

3    antiquated, are you saying that sometimes it added two plus

4    two to equal five instead of four?  Are you saying it was

5    adding or subtracting incorrectly?"  The Answer: "No."

6              On Page 6 he's continuing.  Question: "And if you

7    -- if this antiquated accounting system is not keeping

8    proper track of the books and records, would you expect that

9    the auditors would not be able to issue an opinion?"  Mr.

10   Genender: "Objection."

11             Question: "Of the annual audit."  Mr. Genender:

12   "Objection, form."  Answer: "That's my understanding."

13             Question: "What's you understanding?"  Answer:

14   "For public accountants on a consolidated -- on a

15   consolidated financial statement which they are opining on,

16   they had to have comfort that the consolidated financial

17   statements met their requirements as far as generally

18   accepted accounting principles."

19             Question: "And you're not aware that the

20   accounting statements did not meet the requirements, right?"

21   Mr. Genender: "Objection, form."  Answer: "If they provided

22   clean opinions, then that would be an indication that they

23   were okay for the consolidated financial statements."

24             Question on Page 62:  "Are you aware that the

25   company's outside auditors provided anything other than

Page 34

1   clean opinions?"  Mr. Genender: "Asked and answered

2   (indiscernible)."  Answer: "I don't know."  Question: "I'm

3   sorry."  Answer: "I don't know."

4           Now, the other thing is that this all related to

5   the post-petition activity, which is what Mr. Murphy was

6   really looking at.  Mr. Murphy didn't really analyze

7   prepetition accounting activity.

8           When I asked him on Page 91 of his deposition

9   transcript, Question: "You previously, as I understood your

10  testimony, were talking about your analysis of post-petition

11  intercompany transactions.  Was there also an analysis that

12  you conducted of prepetition intercompany activity?"

13  Answer: "Yes."

14          Question: "Okay.  And was that part of the same

15  analysis you conducted with respect to the post-petition

16  activity that we've already talked about, or was that a

17  separate analysis?"  Answer: "With regards to the

18  prepetition analysis, there wasn't an organized effort

19  similar to what we did with the post-petition detail."

20          The prepetition analysis was simply limited to

21  responding to questions about what Mr. Murphy referred to as

22  the due to/due from by Debtor, by which he means on the

23  intercompany basis, which Debtors owed money to which other

24  Debtors, and which Debtors were owed money by other Debtors.

25          And so when I asked him about that starting at

1    Page 93, Question: "You said in your prior answer that you

2    responded to questions that came up.  As I understood your

3    prior answer, and I'm paraphrasing, it's my understanding

4    that you were responding to questions that came up with

5    respect to prepetition intercompany activity.  My question

6    is was your analysis of prepetition intercompany activity

7    limited to responding to those questions that came up, or

8    was it more expansive than that?"  Mr. Genender: "Objection,

9    form."  Answer: "It was more to respond to questions based

10   on our observations of the prepetition balances from looking

11   at the balance sheet."

12           Question: "And what questions were those?"

13   Answer: "Primarily questions regarding what type of effort

14   would we need to perform in order to break out the

15   prepetition balances so that we understood the due to/due

16   forms by Debtor."

17           Question: "And did you prepare any kind of written

18   analysis that would set forth that analysis?"  Mr. Genender:

19   "Objection, form."  Question: "Or that effort?"  Answer:

20   "No."

21           Question: "And do you know when that analysis was

22   undertaken?"  Answer: "Which analysis?"

23           Question: "The one you're referring to of the

24   questions that came up with respect to prepetition

25   activity."  Answer: "That occurred over the period from

Page 36

1    January through the filing of this claim."

2            Question: "And that was May 16th?"  Answer: "Yes."

3            Now, with respect to the inter -- in the

4    disclosure statement, the -- and this is the May 16th, and

5    it's pretty much the same since then, the Debtors have

6    indicated the -- pointed to the fact that intercompany

7    amounts were netted out.

8            When I asked Mr. Murphy about that, Question:

9    "Let's see.  Go to 11 -- go to 10 lines from the bottom of

10   Page 53 -- and this -- that was of the May 16th version of

11   the disclosure statement.  And the sentence in the middle

12   starts in the middle of the page, says while the Debtors'

13   accounting systems identifies the entities to which

14   intercompany payables are due or for which intercompany

15   receivables are due in the ordinary course, the millions of

16   entries are netted automatically by the accounting system

17   and are not summarized by Debtor.  Do you see that

18   sentence?"  Answer: "Yes."

19           Question: "Okay.  Is that sentence accurate?"

20   Answer: "Yes."

21           The point is that the Debtors did in fact keep

22   track of their intercompany accounts, and they did in fact

23   net them out.  Typically what you'll find is that that's not

24   the case.

25           Mr. Murphy didn't analyze or, I believe,

Page 37

1    understand the interplay between the intercompany claims and

2    the cash management system.  If you look at the Debtors'

3    schedules, they'll either show in Schedule AB intercompany

4    obligations owed to a particular Debtor or in Schedule EF

5    intercompany obligations owed by that Debtor entity.  And in

6    some cases, there are some Debtors that neither have a

7    receivable -- an intercompany receivable or an intercompany

8    payable.

9            What these ultimately are, to the extent they even

10   have -- either have a receivable or payable is an obligation

11   effectively to the centralized cash management system.  And

12   when I asked Mr. Murphy about that, this is at Page 99.  I

13   asked him:  "When you say not settled, do you mean did not

14   hand cash around to settle those; is that what you mean?"

15   Answer: "In its simplest form.  But the bottom line is that

16   they did not either collect on the receivables or pay on the

17   payable."

18           Question: "To each other?"  Answer: "Correct."

19           Question: "But they kept track of how much each

20   one owed to each other one, and they did, and they netted

21   those out, right?"  Mr. Genender: "Objection, form."

22   Answer: "In the millions of transactions that relied on the

23   balancing, the general ledger balancing effort by the, you

24   know, the information systems, millions -- billions of

25   transactions, that as long as those transactions netted to

Page 38

1    zero on a consolidated basis, the company moved on to the

2    next period.  Where the difficulty arises is when you want

3    to now separate the intercompany transactions from one big

4    bucket that needs to net to zero to individual Debtors."

5             Question: "Well, if I owe you a dollar, and you

6    owe Mr. Genender a dollar, and Mr. Genender owes me a

7    dollar, are you saying that it's not appropriate for us to

8    just agree that nobody owes anybody anything because we

9    netted those transactions, or do we actually have to pass

10   the dollar around to each of us to settle the transaction?"

11   Mr. Genender: "Objection to form."  Answer: "Under that

12   example, if we all agreed to settle that way, then that

13   would be the settlement.  But if you owed me a dollar, in a

14   one-dollar example, it's actually too simple.  If you owed

15   me a dollar but that dollar went to a bunch of other

16   creditors and I have no money to pay Mr. Genender, then it's

17   not fair.  He's not going to receive any recovery from his

18   payable or receivable from me."

19            Question: "Okay.  But the Debtors' records reflect

20   the fact that some Debtors are in the deficit position,

21   correct?"  Answer: "On a net basis, correct."  Okay.

22            Question: "And they just simply don't have the

23   ability to pay their creditors.  That's what it means to be

24   bankrupt, right?"  Mr. Genender: "Objection, form."  Answer:

25   "You're going to have to rephrase that question as to how

Page 39

1    I'm supposed to answer that with regards to intercompany."

2           Question: "Well, it's the case that on some of the

3    schedules that the Debtors filed, some of them have

4    intercompany receivables that are owed to them, and some of

5    them have intercompany payables that they owe to other

6    Debtors, and some of them have neither intercompany

7    receivables nor intercompany payables, correct?"  Answer: "I

8    couldn't answer that because that analysis was not done."

9           Question: "Well, the Debtors filed schedules and

10   statements under penalty of perjury that say exactly that.

11   Are you saying those are not true?"  Mr. Genender:

12   "Objection, form.  Argumentative.  Come on."  Answer: "The

13   schedules were filed based on the best information the

14   company had -- the Debtors had at that time, and those were

15   net balances."

16          Question: "Right.  Does that mean they're not

17   accurate?"  Answer: "That means that the detail didn't

18   identify each individual Debtor."

19          The Debtor had a -- Question: "The Debtor had an

20   integrated cash management system, correct?"  Answer:

21   "That's my understanding."

22          Question: "And all the cash from all the different

23   Debtors float up into the integrated cash management system,

24   correct?"  "Again, my understanding."

25          Question: "Okay.  So if Debtors put cash into that

1    system, or -- then they'd get a credit.  And if they took

2    cash out of that system on a net basis, they'd owe a

3    payable, correct?"  Answer:  "Correct."

4           Question: "Okay.  And effectively, aren't all

5    those intercompany payables and receivables simply claims

6    against the integrated cash management system and the funds

7    that are available there?"  Mr. Genender: "Objection, form."

8    Answer: "You've got to rephrase that because I'm not sure

9    what that question is for."

10          Question: "Do you not understand the question?"

11   Answer: "No, I don't."

12          Question: "Okay.  The Debtors kept books and

13   records of intercompany activity, correct?"  Answer:

14   "Correct."

15          Question: "Okay.  But the Debtors did not -- did

16   not settle between themselves on a periodic basis by

17   actually transferring cash or property, correct?"  Answer:

18   "Correct."

19          Question: "They simply kept track of their books

20   of those transfers, correct?"  Answer: "Correct."

21          Question: "Okay.  To the extent that the Debtors

22   were dealing with cash and they were running a retail

23   business, so cash would come in every day, they sold

24   product, all that cash went into a single cash management

25   system, correct?"  Mr. Genender: "Objection, form."  Answer:

Page 41

1    "Yes."

2            Question: "Okay.  And the Debtors' accounting

3    system would keep track of which entities would put cash

4    into that accounting system, into that cash management

5    system, correct?"  Answer: "I'm not an expert on that

6    system, so whether the system provided, quote, and I'm not

7    sure what you mean by system, but whether the system

8    provided the detail or individuals had to gather

9    information, which is my understanding, and book entries,

10   you know, they did it to the best of their abilities."

11           Question: "Okay.  And if the Debtors took cash out

12   of the system or bills were paid on their behalf, then the

13   Debtors' books and records would record the fact that

14   whichever particular Debtor was benefited by that owed a

15   payable for that benefit, correct?"  Answer: "It would be

16   the ideal system.  Whether the Sears -- I didn't audit their

17   systems to know specifically how all the transactions were

18   recorded."

19           In other words, Mr. Murphy's testifying that he

20   can't figure out which Debtors owe money to which other

21   Debtors or which Debtors are owed money, and he's worried

22   that they may not be able to pay each other off, but he

23   doesn't understand anything, apparently, about the cash

24   management system because that wasn't within his area of

25   expertise or his area of responsibility, I should say. So he

Page 42

1    doesn't seem to understand, or the Debtors don't want to

2    talk about the fact that these are all claims into and out

3    of the cash management system, the centralized pot of money.

4            And, in fact, he had testified previously -- and I

5    think I read that portion where he said the Debtors that

6    needed money would take -- you know, there were -- there

7    were borrowers and guarantors, and entities that needed

8    money would take it out.  But the Debtors recorded all this

9    information, so it's available.

10           THE COURT:  But I guess it's an integrated cash

11   management system, so they net out an aggregate amount, but

12   not Debtor by Debtor.  It goes out of the system to whoever

13   needs it, but it doesn't show -- it doesn't match up who

14   gets it and who put it in.

15           MR. FOX:  No, it does.  Your Honor, it's the same

16   as if you put your money in a bank.  The bank then lends

17   that money out to a whole bunch of people.  You don't know

18   who they are.  And most of them hopefully pay it back.

19           THE COURT:  But as far as intercompany claims go

20   --

21           MR. FOX:  Mh hmm.

22           THE COURT:  -- I don't -- I don't know whether I

23   have a claim against, if you bank at my bank, you or anyone

24   else.  I just have a claim against the bank.

25           MR. FOX:  That's right.

1            THE COURT:  On an integrated basis.

2            MR. FOX:  And that's exactly what was happening

3     here.

4            THE COURT:  So how do you track the intercompany

5     claims that way?

6            MR. FOX:  They kept track of who put money, who

7     took money out.

8            THE COURT:  Yeah, but not -- out of the integrated

9     system but not vis-à-vis each entity.

10           MR. FOX:  That's all there was though.

11           THE COURT:  I know.  That's -- I guess that's why

12    I'm saying that doesn't seem to be a ready way to determine

13    which entity owes the other entity as opposed to sort of a

14    general cash management system on a net basis.

15           MR. FOX:  All the borrowers owe it to the bank,

16    and all the -- all the --

17           THE COURT:  Right.

18           MR. FOX:  -- lenders are owed by the --

19           THE COURT:  But if that's -- but the bank is

20    consolidated.  That's all of -- all of the Debtors.

21           MR. FOX:  Mh hmm.

22           THE COURT:  So to me, the testimony you were

23    reading doesn't show an ability to break out which Debtor

24    owes which other Debtor.  It just shows which Debtor is net

25    negative and net positive against a collective bank.

Page 44

1            MR. FOX:  That's right, and that's all you need to

2    know because they --

3            THE COURT:  Well, I'm not sure about that.  If the

4    money that K-Mart puts in goes 90 percent to Sears X and 5

5    percent to Sears Y and 2 percent to Sears Z, and 1 percent

6    to (indiscernible), how do you work out the intercompany

7    claims among those entities?

8            MR. FOX:  Those entities that have a net payable

9    have to pay money back into the centralized pot to the

10   extent that they can, and they do.  Then the creditors with

11   the net receivable get to take their money out.

12           THE COURT:  Of what, though?  Because --

13           MR. FOX:  Out of that centralized pot.

14           THE COURT:  But then it's centralized.

15           MR. FOX:  Yes.  It's --

16           THE COURT:  It's not -- the assets -- you're --

17   that presumes the substantive consolidation of the assets

18   but not the liabilities.

19           MR. FOX:  It's not -- but they kept track of it.

20           THE COURT:  Of what?

21           MR. FOX:  They kept track of, in a sense, the

22   centralized bank account.

23           THE COURT:  I get that.

24           MR. FOX:  Right.

25           THE COURT:  But --

Page 45

1              MR. FOX:  So --

2              THE COURT:  Again, if you look at the assets of

3    one of the Sears entities, in a -- in a non-substantive

4    consolidation context, those assets would include the claims

5    of that entity against each of the other entities because

6    each of them -- it wouldn't matter if they were all solvent.

7    But if they're not solvent, then it depends on whose claim

8    -- whose claim is against who.

9              You know, if one entity on perhaps a net basis

10   neither owes nor is owed on a consolidated basis through the

11   integrated system but it owes a lot of money to an entity

12   that can't pay it and is owed a lot of money by another

13   entity that can pay it, you can see how that would be

14   different than the flipside of that, which is it owes a lot

15   of money to a company that it can pay, but it collects from

16   a company that can't pay it at all.

17             MR. FOX:  But the point is that the company's

18   systems have already netted all those amounts.

19             THE COURT:  Only as far as the company as a whole

20   is concerned, not again each entity.

21             MR. FOX:  No, they have netted it against each

22   entity.  And, in fact, the Debtors have said exactly that.

23             THE COURT:  Well, that -- maybe I'm missing --

24   see, I thought --

25             MR. FOX:  But --

1        THE COURT:  What I took away from it is that

2   there's a net amount owed to the bank.

3        MR. FOX:  Yes.

4        THE COURT:  And a net amount owed by the bank in

5   some instances.

6        MR. FOX:  Mh hmm.

7        THE COURT:  But not entity by entity.

8        MR. FOX:  Because they've netted it entity by

9   entity, leaving claims against the bank or amounts owed to

10  the bank.

11       THE COURT:  But the --

12       MR. FOX:  So --

13       THE COURT:  I think the net -- entity-by-entity

14  netting is as against each entity as against the whole, not

15  as against each entity separately.

16       MR. FOX:  But the point -- the ultimate point is

17  that we know who has to put money in, assuming they have it,

18  and who gets to take money out.

19       THE COURT:  That's what -- that's the part I'm

20  missing.  I don't see -- if you're saying they take it out

21  of the common pot, then again it seems to me that you're

22  substantively -- you're presuming substantive consolidation

23  of assets but not liabilities.

24       MR. FOX:  No, because they know who owes what to

25  the pot and who's entitled to what from the pot.

1           THE COURT:  But it -- but it's the common --

2           MR. FOX:  In other words, they know --

3           THE COURT:  But it's the common pot.  It's not the

4    individual Debtors owing each other.

5           MR. FOX:  I understand your point, Your Honor, but

6    I'm suggesting -- and I don't know a quicker way to -- a

7    better way to say it.  We shouldn't -- we don't need to get

8    hung up on which entity owes to which other entity when

9    that's all been addressed within the system, leaving simple

10   claims to and from the centralized pot.

11          THE COURT:  But that may make sense if everyone

12   gets paid the same from everyone, but that's not what

13   happens here.  So I think you would -- clearly, there would

14   be creditors of individual entities that would want to say,

15   I want to make sure my entity gets paid by the entity that I

16   actually lent to.  And actually, you don't really show any

17   lending to an entity because it all goes through the common

18   pot.

19          MR. FOX:  What you ultimately want to wind up is

20   getting the money back that you're owed.

21          THE COURT:  But by -- but by whom?  But the money

22   back you're owed is by the bank.  I don't --

23          MR. FOX:  Yes.

24          THE COURT:  Again, when I lend to Chase by putting

25   my money in Chase Bank --

Page 48

```
 1              MR. FOX:  Right.

 2              THE COURT:  -- I don't -- I get it back from

 3    Chase.  I don't get it back from each individual account at

 4    Chase.

 5              MR. FOX:  That's correct.

 6              THE COURT:  But this -- but this is not that type

 7    of situation because you're talking about individual Debtors

 8    owing each other --

 9              MR. FOX:  That's --

10              THE COURT:  -- as opposed to the -- to the company

11    bank, which combines it all.

12              MR. FOX:  Well, based --

13              THE COURT:  And you have to unscramble all that to

14    determine who owes who.

15              MR. FOX:  Well, actually, based on Mr. Murphy's

16    testimony, that's not exactly right that monies that -- if

17    they needed money, they took it out.  If they had money,

18    they put it in.  It all went into the centralized system.

19    It -- Sears Roebuck didn't say, hey, K-Mart, you need some

20    money?  Here you go.  If K-Mart needed money, it went to the

21    treasury and took it out of the cash management system to

22    pay its bills.

23              THE COURT:  But who -- but who would it get paid

24    from now?

25              MR. FOX:  It would get --
```

1               THE COURT:  You would say it would get paid from

2       the main pot.

3               MR. FOX:  Yes.

4               THE COURT:  So how do you -- so that's the only

5       intercompany claim you're counting.

6               MR. FOX:  That's -- yes, and the intercompany --

7       the Debtors that have intercompany obligations have to put

8       money in and -- to the extent that they have it, and the

9       entities that are -- have intercompany receivables would

10      then get to take their -- that money out.  And if there's

11      not enough, they would do it on a pro rata basis, which is

12      what we would always do.  You don't need to go back and look

13      at every single transaction for the last five years or 10

14      years or, as Mr. Murphy seemed to think, 100 years because

15      Sears is that old in order to sort this out.  It's been

16      sorted, and you can -- you can determine that.

17              Now, and in fact, you know, Mr. Murphy didn't seem

18      to know that the Debtors don't have separate bank accounts

19      with which to settle up intercompany accounts.  They just

20      leave it to the pot.  So at Page 111 when I asked, "That

21      disclosure statement says the Debtors believe there would be

22      significant difficulties and enormous costs that would be

23      borne by the estates in order to disentangle the prepetition

24      intercompany claims on a Debtor-by-debtor basis, which would

25      deplete the recoveries for all creditors and cause

Page 50

1   unnecessary and costly delays in the confirmation of the

2   plan and distributions to creditors; do you see that

3   statement?" Answer: "Yes."

4          Question: "Why would -- as far as you know, why

5   would it be necessary to disentangle the prepetition

6   intercompany claims on a Debtor-by-debtor basis?"  Answer:

7   "On a Debtor-by-debtor basis -- because the numbers that are

8   reflected in the books and records are on a net basis, they

9   do not reflect those receivables that may or may not be

10  collectible on a Debtor-by-debtor basis from each Debtor or

11  non-Debtor entity in order to pay or which Debtor may be

12  able to pay its particular payables.  Those are net

13  numbers."

14         Question: "Do any of the Debtor have separate bank

15  accounts other than the concentration account?"  Answer: "I

16  don't know the answer to that question.  I wasn't involved

17  with the treasury."

18         Question: "Okay.  Do any of the Debtors hold or

19  have bank accounts that are used really for anything other

20  than to have funds flow up to the concentration account?"

21  Answer: "Again, I don't have firsthand knowledge of that."

22         He's making assumptions that he can know the due

23  from and due to, and that if he knew that, somehow it would

24  make a difference.  And the point is it would not because

25  that's not the way the Debtors operated, which he admits is

Page 51

1    not an unusual way for companies like this to operate.

2            There is further -- he prepared -- and has -- and

3    the Debtors have offered no analysis showing the cost to

4    disentangle other than to say how difficult it would be.  So

5    when I asked him -- make sure I have the right page.

6            Question -- it's the top of Page 113.  "Now, this

7    statement refers to the enormous cost that would be borne in

8    order to disentangle.  Do you see that phrase, enormous

9    cost?"  The Answer: "Yes."

10           Question: "Is there an analysis that was prepared

11   that shows what the cost would be expected to be?"  Answer:

12   "Not that I'm aware of."

13           So while they make the assertion that it would be

14   an enormous cost, the never actually prepared any analysis.

15           Now, Mr. Murphy asserts -- not that he's qualified

16   to do so -- that there's a 75 percent chance of substantive

17   consolidation.  That's his opinion, obviously, and he's not

18   an expert as we've qualified as such.  And, in fact, he

19   really has no idea.

20           So when I asked him on Page 146 of his deposition,

21   Question: "Let me ask you my question again, which is what's

22   the basis for your assumption that there's a 75 percent risk

23   of interstate, intercreditor litigation?"  Mr. Genender:

24   "Objection, form.  Asked and answered."  Answer:  "I don't

25   know how to answer it any way other than how I just did."

Page 52

1          Question: "How did you come up with 75 percent?"

2    Answer: "We basically -- we looked at the factors that we

3    established based on experience and then putting all the

4    challenges that we saw for executing a deconsolidated plan

5    as substantial and made an approximation that there would be

6    a 75-percent risk that should be applied."

7          Question: "Who is we?  You said we."  Answer: "The

8    M-III team in discussions of the litigation challenges that

9    would exist in trying to prosecute this."

10          Question: "Does the M-III -- do you have

11    experience assessing the risk of litigation of substantive

12    consolidation?"  Answer: "I'm not a lawyer.  I do not."

13          Question: "Does anybody else at M-III have

14    experience assessing the risk of litigation of substantive

15    consolidation?"  Mr. Genender: "Objection, form."  Answer:

16    "I don't know."

17          So the result, though, based on that analysis, is

18    that in a non-consolidation plan, K-Mart guarantee claims --

19    which our noteholders have, as do many others -- would get a

20    recovery at K-Mart of, according to the Debtors, of 7.02

21    percent.  And then the substantive consolidation plan, as

22    purposed, the recovery would be 2.77 percent, and that's a

23    significant difference, Your Honor.  And that's why we're

24    here.

25          Now, the -- there is an enhancement that was

Page 53

1    finally negotiated -- I assume between the Debtors and the

2    Creditors Committee.  We were not party to any of those

3    discussions -- that there's a 7.6 percent enhancement for K-

4    Mart guarantees.

5            Now, the Debtors cite a number of cases where

6    substantive consolidation was approved.  Largely, those are

7    lists for the purpose of establishing that these sorts of

8    issues have been compromised.  And most of them don't really

9    -- first of all, it seems in most of those cases that the

10   Debtors cite that the Creditors overwhelmingly seem to

11   approve the plan, which is not entirely the case here.  And

12   -- but there's not a lot more information about the

13   circumstances and whether the particular percentages or the

14   ultimate determination of how the assets were divided up is

15   set forth.

16           But too, there is some indication, and those are

17   the Enron case and the WorldCom case.  And in Enron, the

18   Creditors received 70 percent of what they would recover

19   without substantive consolidation from their own entity and

20   plus 30 percent of what they would recover on a

21   substantively consolidated basis.  And guaranteed claims got

22   a 50 percent recovery.

23           And that's a case where there were massive

24   restatements, and you can take judicial notice of that.  And

25   the people running that entity were convicted of crimes,

Page 54

1    involved in representing that entity, and you can take

2    judicial notice of that.  And yet the chance of substantive

3    consolidation was only 70 percent, and guarantees got 50

4    percent.

5            In contrast, here the Debtors -- Mr. Murphy,

6    without knowledge, is asserting there's a 75 percent chance

7    of substantive consolidation and that the enhancement for

8    guarantee claims would only be 7.6 percent, and otherwise

9    we'd lose the balance of the value of that.

10           Secondly --

11           THE COURT:  Of course, there was a lot more money

12   to spend in Enron than there is here on that fight.

13           MR. FOX:  Well, nobody got 100 cents.

14           THE COURT:  No.  But there was a lot more money to

15   spend on the lawyers for fighting that issue, ultimately.

16           MR. FOX:  Well, the point there as here was to

17   obviate that fight, was to avoid that.

18           In WorldCom, the other one where the numbers are

19   available in the decisions, the MCI pre-merger, unsecured

20   creditors, received 42 percent of their allowed claims, and

21   the MCI senior noteholders recovered 80 cents on the dollar,

22   while the WorldCom unsecured creditors got new common stock

23   in 18 percent of their allowed claims.

24           And again, that was a case where it was so

25   hopelessly entangled that the Debtors claimed that they

Page 55

1    could not prepare schedules and statements for each of the

2    Debtor entities.  And yet here, we're being told that

3    there's a 75 percent chance and that the recoveries should

4    be grossly limited.

5         It -- just as a matter of fact, as a matter of

6    equity and exercising the Court's discretion, I would argue

7    that there's a slim, if any, case for substantive

8    consolidation and that what's been put on the table is

9    grossly unfair, particularly to the guarantee claimants, and

10   that may reflect why the vote by -- apparently by those

11   creditors seems to be overwhelmingly negative.

12        THE COURT:  Well, again, the numbers voting was

13   overwhelmingly in favor as the dollar amount was less.

14        MR. FOX:  I understand that, Your Honor.

15        THE COURT:  That's how Judge Funk in Winn-Dixie

16   evaluated it in terms of numbers of those actually voting as

17   opposed to the dollar amount.

18        MR. FOX:  I understand.  I would simply say that

19   the code requires both of those things.  But to the extent

20   that we believe -- and I think we do, or Your Honor seems to

21   -- that those voting no, to reject the plan, were holders of

22   guaranteed claims that, I think, does reflect their view of

23   this, their concern about this, and the adverse effect that

24   that has on them.

25        Now, I want to just talk briefly about the PBGC

Page 56

1    settlement, and then I went to get back to the plan itself.

2            The PBGC settlement currently is that they would

3    get a $97.5 million priority claim up from $80 million and

4    an $800 million unsecured claim.  The -- because of the

5    (indiscernible) Fabricators case, which the Creditors

6    Committee raised in their objection to the disclosure

7    statement of the May plan, typically the view would be that

8    the PBGC is not entitled to a priority claim.  The

9    explanation largely in this case seems to be that,

10   nevertheless, it's an appropriate disposition of their

11   claims because they were going to use their best efforts to

12   cause KCD to give up its administrative claim of 140 -- of

13   potentially $146 million on a post-petition basis.

14           The problem is there's nothing that I can find --

15   in the record at least, in either the Debtors' brief or the

16   PBGC's -- that shows how the PBGC actually has the ability

17   to control or cause KCD to actually do anything with respect

18   to that claim.

19           So while there's the assertion that that's the

20   case and that that's the justification, there's no

21   indication that they're actually able to accomplish that.

22   And our understanding is that because Transform bought those

23   KCD notes, that if anybody had the ability to do that, it

24   would be Transform, which we understand they did, not the

25   PBGC.

1              So we're -- we just don't see the justification.

2      But I think the more -- perhaps for this purpose, as I'll

3      get to, more important point really is that the PBGC was

4      willing to take the $80 million claim.  And, yes, they

5      traded that when the Debtors wanted to shift to substantive

6      consolidation.  But I'll come back to that in a minute when

7      we talk about what plan you could or should confirm.

8              We also raised issues, which I don't think I need

9      to belabor, about the appropriate classification of the

10     claim and whether the Plaintiff was fair and equitable

11     giving the way -- given the way the PBGC's claim has been

12     classified.

13             But, I mean, the fact that it's joint in several

14     claim, so are the guaranteed claims effectively.  That

15     really doesn't make much difference.

16             The point, though, that I think ultimately you can

17     take away from this -- and this is an important point -- is

18     that you can actually confirm a plan today assuming you deal

19     with the other objections -- you're comfortable the other

20     objections have been satisfied.  And that plan is the toggle

21     plan.  There's no need to approve the substantive

22     consolidation settlement because the toggle plan can be

23     confirmed right now.

24             Now, that plan is a pot plan, and the creditors of

25     each Debtor entity receive their pro rata percentage based

Page 58

1    on the amount that their claims against whichever entity

2    bear to the total of all claims against all of the Debtors.

3    So, in effect, it follows what the Debtors have been doing

4    all along, which is to keep all their money in one place and

5    to have claims from various entities against that particular

6    one pot of money.

7            The difference is that the holders of guarantee

8    claims don't see their rights decimated.  So, you know, they

9    did the right thing to make sure that they would be

10   protected, and now that's just being taken away from them

11   under the terms of the settlement to which they clearly have

12   not agreed but which will have a tremendous effect on them.

13           And the entire justification for the settlement is

14   to avoid all this litigation, which so far has not occurred,

15   and nobody seemingly wanted it to occur.  The PBGC was

16   opposed to it.  The Creditors Committee expressed their

17   opposition to it, to substantive consolidation.  The Debtors

18   were opposed to it too until they changed their minds.

19           So I'm not sure who's out there pushing in favor

20   of substantive consolidation.  But regardless, the plan, the

21   toggle plan, is confirmable right now without the

22   settlement, and I would suggest that it would become an

23   abusive discretion to approve of a subs native consolidation

24   settlement given the fact that the toggle plan has the votes

25   and could be confirmed.

1          So there's no real necessity at this point to

2     approve it other than to cause harm to the guarantee claims,

3     help a class of claimants who I think fairly knew what they

4     were getting into, knew that the guarantees were there, knew

5     what they were up against, knew who they were trading with,

6     and somehow now we've decided that under the guise of a

7     substantive consolidation settlement of a non-existent

8     dispute that somehow they should be favored at this point.

9          Two other points.  We had raised an issue about

10    the way in which Section 9.2(a) had been drafted and whether

11    it really carried into effect the -- at least the 7.6

12    percent additional recovery from K-Mart guarantees.

13    Finally, the Debtors corrected the plan, in this October 1

14    version from last Monday, and resolved that problem.

15         The last point relates to indentured trustees'

16    fees and how those get treated under the plan.  The plan

17    says -- and it's different than the liquidating trust

18    agreement.  So the plan says that the Debtors and the

19    Creditors Committee will negotiate over the treatment of

20    indentured trustees' fees, but under no circumstances will

21    indentured trustees' fees incurred in connection with

22    objecting to the plan, to the disclosure statement, to the

23    sale, or a bunch of other things -- there's a laundry list -

24    -- be paid.

25         The liquidating trust agreement then says that in

Page 60

1    return for indentured trustees agreeing to make the

2    distributions to their holders on behalf of the liquidating

3    trust, that in payment for that service, they will be paid

4    their fees not just for that service but all of their fees

5    since the inception of the case -- except, however, not the

6    laundry list of these other activities objecting to the

7    plan, to the disclosure statement, the sale, etc.

8           If the Debtors want to pay indentured trustees the

9    reasonable amount of their fees, we're all for it.  We'd

10   never say no.  But when the Debtors start to pick and choose

11   which activities they will or will not pay for that occurred

12   during the case, we see that as a significant problem, and

13   it has the potential -- we're not suggesting that that's the

14   case here, but it certainly has the potential to cause

15   indentured trustees to potentially temper their views about

16   how they're going to do their jobs based on whether they

17   will or won't get paid because of language like this.

18           And I -- we believe that Your Honor ought not

19   start to head down that slippery slope and allow that kind

20   of a provision to be put in the plan.  If they want to pay,

21   fine.  Great.  If they don't, then they don't have to.  If

22   they want to pay the reasonable fees, that's fine too.  But

23   when they start picking and choosing among specific issues

24   that were litigated or not, then we see that as

25   inappropriate.

Page 61

1           And we would note that there are several

2     indentured trustees on the Creditors Committee.  They may

3     well have participated -- we don't know, but they may well

4     have participated in the determinations to cause the

5     Creditors Committee to do those very things that the Debtors

6     and the Committee say they don't want the Debtor to pay for.

7     So we believe that provision should be changed.

8           But, as I said, short of that, Your Honor, we

9     believe that Your Honor can approve a plan today, but that

10    plan is the toggle plan.  It is not the substantive

11    consolidation settlement, which we do not believe there's

12    either a basis for either as a matter of fact or, quite

13    frankly, as a matter of law.

14          Thank you.

15          THE COURT:  Okay.  Does anyone who's objected to

16    confirmation have anything more to say on substantive

17    consolidation?  No?  So why don't we deal with that specific

18    point with the Debtors' response?

19          MR. SCHROCK:  Good afternoon, Your Honor.  Ray

20    Schrock, Weil Gotshal for the Debtors.

21          Your Honor, I'll try to take some of these just in

22    turn in which they were made.

23          As to the arguments around the PBGC settlement

24    that the Debtors had, you know, effectively changed their

25    mind between February and May, there were ongoing

Page 62

1    negotiations with the -- with the PBGC and, in fact, the

2    unsecured Creditors Committee.

3              Those parties, we -- in the meantime, we were also

4    doing the intercompany claims analysis which, as we

5    highlighted, took approximately two and a half months just

6    to review, you know, the majority of the post-petition

7    period.  And it became clear to us during that period that

8    it was going to be, frankly, impossible to review the

9    literally billions of transactions that went into -- that

10   went into the intercompany claims pool.

11             And if I can summarize Mr. Fox's argument around

12   the cash pool, as I heard it, I think it was because the

13   Debtors used a centralized cash management system and

14   consolidated their assets, they can't substantively

15   consolidate.  But I would submit to you that's the whole

16   point.  There was -- and as detailed in Mr. Murphy's

17   declaration at Paragraphs 22, you know, there was a

18   centralized cash management system.  There was an ability

19   for us to know if there's a net payable, you know, due and

20   owing from the cash management system.  But that's not the

21   point.  You have to know who it was due from and to in order

22   to be able to track, you know, that analysis.

23             So as the uncontroverted testimony here supports,

24   the intercompany balances are consolidated for all

25   intercompany transactions recorded for each Debtor over

Page 63

1   time, aggregated into one net balance of either a receivable

2   or a payable for each Debtor that it collectively has with

3   all the other entities, and is recorded as the net

4   receivable or payable.  That is the way this cash management

5   system works.

6           Asking these estates with limited funds to go back

7   and try and, you know, untangle that, frankly, we don't

8   think that you can do it.

9           THE COURT:  Well, Mr. Fox says you don't need to

10  untangle it.  You just -- you just, you know, if the cash --

11  under the cash management system, K-Mart is owed X and Sears

12  Roebuck is owed Y and, you know, Sears Insurance Services is

13  owed Z, you just have the money -- again, distributions run

14  through that system and net it out as to each estate.

15          MR. SCHROCK:  That, to me, sounds like substantive

16  consolidation.  I mean, when I pull it apart, you're talking

17  about a centralized pool of assets from which everybody has

18  either a net payable or receivable due from.  I don't

19  understand how you can call it anything other than that.  I

20  mean, the receivables and payables were -- they were -- they

21  were substantively consolidated for all intents and

22  purposes.  You just have -- you have to have a transaction

23  net due and owing to the actual entity.  Otherwise, I think

24  that, you know, you're having parties act for -- as parties

25  becomes insolvent, your acting parties act as conduits for,

1    you know, frankly, fraudulent conveyances, preferences, and

2    a whole mess of other items that we noted in our brief and

3    as well as Mr. Murphy noted in his declaration.

4              There's little doubt here that the creditor

5    entanglement prong of the Augie/Restivo test is the one

6    certainly that we found to be most prevalent here, creditor

7    reliant.  I think there were facts that were going both

8    ways.

9              We did outline on Page 136 of our brief for

10   several pages, you know, what some of those tos and fros

11   are, but I will say that what's really missing from Mr.

12   Fox's argument and was missing from the record is that

13   Wilmington Trust had the opportunity and the ability to

14   present contrary evidence.  It is our burden to prove up the

15   settlement within a lowest range of reasonableness, but

16   there's nothing here as there were in other cases in which

17   he cited about parties going and arguing that you can

18   actually pull these entities apart.  And I submit it's just

19   not possible.  You know, this is a 125-year-old company.  It

20   has been operated on a consolidated basis, as far as we can

21   tell, forever.  And certainly since it's merger with K-Mart

22   in the early 2000s, it's been operating out of three primary

23   entities.

24              But as to the percent chance that Mr. Murphy gives

25   substantive consolidation, Mr. Murphy's not a lawyer.  Mr.

Page 65

1    Murphy takes the facts, presents those facts, and then it's

2    up to the lawyers to make the arguments around how those

3    facts are then applied to the law.  That is what we've done

4    in the context of this brief, and that's certainly what the

5    parties did in negotiating the premiums that are payable on

6    account of guarantee claims.

7              But, Your Honor, there's little doubt that the

8    facts are here for a sub con.  They're uncontroverted.

9    There's some deposition testimony that has been highlighted,

10   I think in a rather confusing manner, to suggest that Mr.

11   Murphy didn't understand the nature of a sub con analysis.

12   I think that his -- certainly his declaration suggests

13   otherwise.

14             As to the Trustee, we're happy to have the

15   Trustees rely, frankly, on their charging lien if that's the

16   way the Court wants to -- wants to deal with that issue.  We

17   are -- we're also, you know, not in a position where we can,

18   you know, go forward with a toggle plan.

19             And I think what Mr. Fox really meant on the

20   toggle plan was confirm a plan for the Debtors that are able

21   to, and for everybody else, I guess they liquidate and go

22   into a Chapter 7.

23             But the -- you know, the toggle plan under -- you

24   know, on Page 50 in Section 9.2(e) notes that in the event

25   the bankruptcy court does not approve the plan settlement,

Page 66

1    the plan shall, subject to the reasonable consent of the

2    PBGC and the Creditors Committee revert to a joint plan of

3    liquidation for each Debtor, a toggle plan.

4              Now, the PBGC is here.  They've certainly made

5    clear to us, and one of the reasons that we couldn't strike

6    the deal around the non-sub con plan is because the PBGC in

7    the Court's settlement discussions indicated that they would

8    not consent to the toggle plan.  They're the largest

9    creditor of these estates.  It's certainly something that we

10   took into account in formulating the settlement.  But I'm

11   happy to answer any other questions the Court has.

12             THE COURT:  What is -- what is or was the power of

13   the PBGC to cause KCD to pursue the $146 million

14   administrative expense claim?

15             MR. SCHROCK:  Your Honor, as I recall, there's

16   three directors that are on the KCD board.  The one

17   independent director that is on KCD serves at the pledger of

18   the PBGC.  We're still working with them around getting the

19   actual -- getting the admin claim, you know, waived.  We're

20   confident that, in fact, we will.  But, you know, those are

21   the -- you know, there's been some issues just around,

22   frankly, just some of the legal fees that have incurred at

23   KCD, so there's ongoing negotiations associated with that.

24   But they've certainly been holding up their end of the

25   bargain as to -- as to KCD.  But that is a waivable

Page 67

1    condition, certainly, too, to the effective date as well.

2              THE COURT:  Which is?

3              MR. SCHROCK:  The waiver of the KCD administrative

4    claim.

5              THE COURT:  Well, except the feasibility estimates

6    don't have $146 million in it.

7              MR. SCHROCK:  That's correct, Your Honor.  That's

8    not our anticipation as to how that's going to play out, and

9    we've certainly been working toward that.  And, in fact,

10   it's just a matter of time before we -- before we get that

11   claim waived.

12             THE COURT:  Okay.  The other two directors have

13   indicated that they're prepared to approve the waiver?

14             MR. SCHROCK:  That's correct, Your Honor.

15             THE COURT:  Okay.  Okay.

16             MR. SCHROCK:  Okay.

17             THE COURT:  Someone behind you wants to speak.

18             MR. RAYNOR:  Good afternoon, Your Honor.  Brian

19   Raynor of Locke Lord on behalf of the Pension Benefit

20   Guaranty Corporation.  I just wanted to add a little bit of

21   flesh to the nature of the waiver.

22             Prior to the bankruptcy case, a number of Debtors

23   and PBGC entered into agreement where PBGC was able to

24   appoint, to identify or select one of the three managers at

25   KCD, the independent manager.  Also --

Page 68

1          THE COURT:  And that was part of a pre-bankruptcy

2     settlement with the PBGC.

3          MR. RAYNOR:  That's correct, but as of the

4     bankruptcy filing and as of today, that independent manager

5     is still there, and KCD is not a -- is not a bankrupt

6     entity.

7          THE COURT:  Right.

8          MR. RAYNOR:  Also, the way the structure works is

9     that there are essentially two creditors at KCD.  One was

10    the holder of the KCD notes, and one was Pension Benefit

11    Guaranty Corporation by virtue of it joining several claims.

12    So in connection with the sale, the eventual noteholders

13    waived their claims to any admin claim that was approving at

14    KCD, which leaves PBGC as the only entity at that claim, so

15    there was essentially a derivative claim for the rights of

16    the administrative expense claim at KCD, and there are

17    definitely disputes around the bankruptcy filing as to

18    PBGC's asserting that amount, and it was one of a number of

19    disputes with the Debtors that was eventually settled

20    pursuant to the PBGC's settlement.

21          And I'll also say that there have been discussions

22    with the Debtors about making sure that that claim is

23    waived, and those are -- assuming that the plan settlement

24    goes effective -- that is not going to be a problem.  PBGC

25    will be lending its support to that waiver any way possible.

Page 69

1          THE COURT:  As the only creditor of KCD.

2          MR. RAYNOR:  That's correct.

3          THE COURT:  Okay.  And was Mr. Schrock correct

4    that PBGC is not consenting to the pivot, to the toggle

5    plan?

6          MR. RAYNOR:  That's correct, Your Honor.  We

7    submitted a ballot in support of the plan, but the toggle

8    would be --

9          THE COURT:  I managed to use two financial clichés

10   in one clause, but --

11         MR. RAYNOR:  That's correct, Your Honor.

12         THE COURT:  Okay.  All right.  Thank you.

13         MR. O'NEIL:  Just really quickly, Your Honor, Sean

14   O'Neil, Cleary Gottlieb on behalf of Transform.  Actually,

15   Transform owns the KCD notes, so I just -- I just wanted to

16   make it clear that Transform, as the holder of the KCD

17   notes, is also a creditor of KCD.  I don't -- I don't think

18   there's any dispute about that.  I just wanted --

19         THE COURT:  But I thought -- well, I was just told

20   that it's part of the sale, the right to assert that -- or

21   to look to that claim was waived.

22         MR. O'NEIL:  Correct.

23         THE COURT:  Okay.

24         MR. O'NEIL:  But --

25         THE COURT:  So you're creditor, but you're not

Page 70

1    looking to that asset.

2         MR. O'NEIL:  But we've waived the -- we've said

3    that we would do the same thing that PBGC has said it will

4    do.

5         THE COURT:  Okay.

6         MR. O'NEIL:  Thank you, Your Honor.

7         THE COURT:  All right.

8         MR. DUBLIN:  Good afternoon, Your Honor.  Phil

9    Dublin, Akin Gump, on behalf of the Committee.  I just want

10   to touch on two points and expand on things that Mr. Schrock

11   said, first with respect to substantive consolidation.

12         I think Mr. Fox's description of the cash

13   management system and its impact on substantive

14   consolidation oversimplified the issue.  Each time money

15   goes into the centralized cash management system, money then

16   goes out somewhere.  And Mr. Schrock touched on this,

17   whether the cash management entity is a mere conduit and you

18   have to then determine where each dollar went and who each

19   dollar went in from and where it went to awards to determine

20   proper intercompany claims is an issue that is being settled

21   as part of the plan settlement.

22         And if you ignore that issue, as Mr. Schrock

23   alluded to, when you have every entity inside the structure

24   insolvent and you have K-Mart, for example, sending a dollar

25   into the cash management system and the cash management

Page 71

1      system sending that dollar out to Sears, Sears Roebuck, K-

2      Mart can look through for the immediate transferee of the

3      initial transferee to try to get back the value that it

4      transferred out, creating fraudulent transfer claims all

5      over the places inside of the Sears corporate structure,

6      which creates the same intercompany conundrum as if the

7      centralized cash management system didn't exist.

8               So I think just looking at money in and money

9      going out and only looking at the cash management entity as

10     to who owes moony to the various entities is just not giving

11     the proper oversight analysis with respect to the issue at

12     play.

13              THE COURT:  But you don't know who owes money to

14     various entities.  You owe -- you know what the cash

15     management system shows the cash management system owes to

16     each entity.

17              MR. DUBLIN:  And that's the point, Your Honor.  As

18     K-Mart puts money in, that's a fraud -- that -- as a -- into

19     the insolvent cash management entity, that's a fraudulent

20     conveyance because it's not getting it back.  It's putting

21     100-cent dollars in, and it's getting an unsecured claim

22     back.  That's not worth the value that it put into the cash

23     management system.

24              The cash management system then sends that dollar

25     out to another entity inside the structure.  Then K-Mart

Page 72

1      would have a claim to the immediate transferee of the

2      initial transferee, the initial transferee being the cash

3      management entity, and the immediate transferee of the cash

4      management entity being somebody else inside the Sears

5      structure creating another intercompany claim.

6              THE COURT:  And why wouldn't the ultimate, just

7      netting through the cash management system itself, solve

8      that problem, just saying that --

9              MR. DUBLIN:  Because then you get the different --

10     then you have the entity that put in the 100-cent dollar is

11     not getting back the value for its 100-cent dollars because

12     it's then looking -- the cash management entity is then

13     looking to Roebuck to pay back what it owes, and Roebuck

14     doesn't have 100-cent dollars to put back in, so you have

15     the creditors being disadvantageous.

16             THE COURT:  Or it would be collecting from one of

17     the other ones that owes -- that is healthier.

18             MR. DUBLIN:  Correct.  Then you have entities all

19     competing for that same pot of cash, and the entity that put

20     the money in not getting back what it would otherwise be

21     entitled to.

22             THE COURT:  Okay.

23             MR. DUBLIN:  On the point with respect to the

24     Trustee's fees, that was a point that was --

25             THE COURT:  It seems like it should just be the

Page 73

1    charging lien.

2              MR. DUBLIN:  The way it was worked out was that if

3    the trustee wants to help with the distractions, this is

4    what they can get.  If they don't want to help out, they

5    don't have to take it, and they can execute on their

6    charging lien.

7              THE COURT:  Well, when you say help, I mean, it's

8    more than just makes the distributions.  It's also not

9    objecting to confirmation (indiscernible).

10             MR. DUBLIN:  Exactly.  And also trying to figure

11   out where all the money goes, and working with DTC, and

12   making all the appropriate --

13             THE COURT:  So --

14             MR. DUBLIN:  -- distributions to various

15   noteholders.

16             THE COURT:  Let me make sure I understand then.

17   The Debtor is prepared to say that -- and the Committee is

18   prepared to support not only the charging lien but also the

19   actual distribution money being paid on top of the charging

20   lien, for distribution services.  So if they're going to be

21   facilitating the distribution, they get paid for that up

22   front, as opposed to a charging lien?  And they have a

23   charging lien for everything else?

24             MR. DUBLIN:  Well, they would -- they would get

25   their -- they have two things, that the indenture trustee

Page 74

1    would have there to help facilitate distributions when

2    they're actually made, and none of the money that would go

3    to pay Trustee fees would happen (indiscernible) actually

4    have money to make distributions.

5    One, they would be paid for their costs and expenses

6    occurred during the case in consideration for being the

7    disbursing agent for the trust when noteholders are entitled

8    to distributions.  And then the de minimis -- the additional

9    costs that are incurred in actually making those

10   distributions, they would be paid as well.  Ultimately, you

11   have a difficult construct of figuring out how you're going

12   to make distributions to public noteholders without the use

13   of the trustees, which they're not obligated to do.

14           And the -- if a trustee doesn't want to act as the

15   --

16           THE COURT:  But I'm sorry, just on the first point

17   there.

18           MR. DUBLIN:  Yep.

19           THE COURT:  I want to make sure I understand.

20   They get -- they get their reasonable fees and expenses from

21   what's incurred during the case for acting as the --

22   facilitating distributions.  But that -- would that include,

23   for example, objection to the disclosure statement?

24           MR. DUBLIN:  No.

25           THE COURT:  No.

1             MR. DUBLIN:  It would not.

2             THE COURT:  So what would it include?

3             MR. DUBLIN:  It's --

4             THE COURT:  Just being there to field phone calls?

5             MR. DUBLIN:  And being the trust -- like the role

6      that the Trustee plays.

7             THE COURT:  Just as the normal Trustee.

8             MR. DUBLIN:  Correct.

9             THE COURT:  Okay.

10            MR. DUBLIN:  Right, the administrative function

11     that the Trustee plays.

12            THE COURT:  Okay.  So it wouldn't cover -- let's

13     assume that instead of objecting to the plan, the indentured

14     trustee not only didn't sit quietly but actually spent

15     $100,000 writing a brief in support of the plan, that

16     wouldn't have been compensated either because that's not

17     your normal thing?

18            MR. DUBLIN:  Nobody did that --

19            THE COURT:  Well --

20            MR. DUBLIN:  -- so we didn't have to -- it's not

21     an issue that had to be faced by the estate.

22            THE COURT:  Okay.  All right.

23            MR. DUBLIN:  Thank you, Your Honor.

24            THE COURT:  Okay.

25            MR. FOX:  Your Honor, if I may.

1            THE COURT:  Sure.

2            MR. FOX:  Your Honor, there's a few of Mr.

3    Schrock's points in terms of the ongoing review.  The

4    written analysis, and this is again in the deposition

5    testimony of Mr. Murphy, was finished on April 17th, which

6    is the day they filed the non-consolidation plan.  Mr.

7    Murphy did testify that they continued to do some additional

8    work and basically answer questions after that.  Their

9    primary analysis of the, you know, the intercompany

10   accounting was done at that time.

11           THE COURT:  But that's the post-petition --

12           MR. FOX:  Yes.

13           THE COURT:  -- analysis?  Yes.

14           MR. FOX:  Yes.

15           THE COURT:  Okay.

16           MR. FOX:  And basically, I mean, although he said

17   they didn't actually extrapolate, that's effectively what

18   they did.  There wasn't --

19           THE COURT:  But to me, you are pointing to the

20   fact that one of the reasons that the parties moved to a

21   substantive consolidation plan and then a substantive

22   consolidation settlement was because of the effect of non-

23   consolidation on various Debtors where there would be a

24   larger administrative insolvency.

25           And I guess I'm less troubled by that because it

1    would seem to me that in the normal case where that doesn't

2    pertain, you wouldn't -- you wouldn't get into these types

3    of issues because the transfers actually do net out in 100-

4    cent dollars whereas in an insolvency situation, they don't.

5    Plus, what you're spending, 100-cent dollars, to fight over

6    fractional-dollar disputes, and that doesn't make sense to

7    me either.

8              MR. FOX:  Well, I guess it depends whether they're

9    your fractional dollars in dispute --

10             THE COURT:  Well --

11             MR. FOX:  -- or somebody else's.

12             THE COURT:  I appreciate it's a different on the

13   upside between 7 percent and 2 and --

14             MR. FOX:  2.7.

15             THE COURT:  -- 2.7 percent or 2.77 percent.  And

16   albeit, that's a difference of $23 million, but that's on

17   the -- the 2.7 is, of course, a bump up from 1.85 and you're

18   spending several million dollars to have that fight.

19             MR. FOX:  Well, I would look at it this way, and I

20   think this is -- in my view, there's a fundamental

21   difference between this sort of a "settlement" and a

22   settlement of a two-party dispute, if you will.

23             THE COURT:  Well, no, I appreciate that, but the

24   caselaw is clear that you can settle substantive

25   consolidation with some people who are unhappy about it.

Page 78

1          MR. FOX:  Well, okay, so --

2          THE COURT:  It just has to be reasonably fair.

3          MR. FOX:  Well, A, I would suggest this is not,

4    but more importantly, Your Honor, I don't think that that

5    settlement of the issue of substantive consolidation allows

6    the Debtors to throw in everything including -- every other

7    problem in the case including the kitchen sink and then call

8    it, well, substantive consolidation because that --

9          THE COURT:  You mean the PBGC settlement.

10         MR. FOX:  Well not just -- laying aside that for a

11   minute, just the fact that some entities are

12   administratively insolvent and others may not be, okay,

13   that's a problem, but does that justify substantive

14   consolidation?  Is that one of the factors that the Second

15   Circuit identified in Augie/Restivo?

16         THE COURT:  Well, if you run out of the money --

17   well, actually, it is identified in the cases that have that

18   issue.  The Republic case and the Winn-Dixie case both talk

19   about cost of the litigation over substantive consolidation,

20   rendering the whole issue academic.

21         MR. FOX:  But -- well, the cost is one thing. But

22   whether one estate is dealing with the administrative

23   insolvency of certain Debtor entities is a whole different

24   question.

25         THE COURT:  I understand, but --

1            MR. FOX:  So --

2            THE COURT:  But again, it -- I mean, it's not like

3    Kmart is rolling in dough.

4            MR. FOX:  Well, by all accounts, they eventually

5    will be and we all hope --

6            THE COURT:  Well, eventually is one thing, yes.

7            MR. FOX:  -- for that day.

8            THE COURT:  But not in the cost of litigating

9    these.  I'm talking about today, litigating these issues.

10            MR. FOX:  Well --

11            THE COURT:  And --

12            MR. FOX:  There was --

13            THE COURT:  You say that the Court -- the Debtors

14    can't wrap all of these problems into a settlement and I

15    agree with that, but the PBGC settlement at this point is

16    premised upon substantive consolidation under the plan, and

17    if you add $146 million of admin costs, that just --

18            MR. FOX:  Well, the PBGC --

19            THE COURT:  -- a deal killer.

20            MR. FOX:  I don't think the PBGC settlement,

21    despite counsel's representation, can really be used as an

22    excuse to stay with substantive consolidation.  The -- what

23    the plan provides in 9.2E is that the PBGC would have to

24    approve it and it would have to be reasonable, determining

25    whether to approve it or not.

1               Given the fact that the PBGC already entered into

2     a settlement in February -- we have signed terms sheets that

3     are in the record agreeing to not -- in fact, they didn't

4     want to consolidate -- for them to now say oh, we do, I

5     think it would be a little hard for them to suggest that

6     they're going to object to it based on -- that they would be

7     reasonable in refusing to agree to that.  If Your Honor

8     approves the PBGC settlement separately, so be it.  We can

9     still have the toggle plan.

10              THE COURT:  Well, no.  They have the right to veto

11    the toggle plan.

12              MR. FOX:  They don't have an absolute right.  They

13    have to act reasonably and I'm suggesting they would not,

14    especially given the fact they previously agreed to this

15    and, as counsel admitted, they voted in favor of this in

16    every class.  That's the class the Debtor is relying on.

17              THE COURT:  But that's circular because they voted

18    in a situation where they have this consent right.  It's not

19    like they voted and then it could be imposed on.

20              MR. FOX:  But the exercise has to be reasonable.

21              THE COURT:  Well, why is it unreasonable for PBGC

22    to say, we don't want months of litigation and several of

23    these Debtors to go into Chapter 7?

24              MR. FOX:  No, no, no.  There would not be months

25    of litigation and they would not go into a Chapter 7.  You'd

Page 81

1    confirm the toggle plan.

2           THE COURT:  No, but the toggle plan is just --

3    it's only for those entities, because it's an entity by

4    entity plan.

5           MR. FOX:  It's all of the --

6           THE COURT:  It's only for the entities that can

7    actually confirm the plan.  I would have to have whole new

8    hearings.  I mean, the plan actually contemplates that, is

9    that you give notice and then you have, like, the whole

10   separate hearings or objection to the entity by entity plan.

11          MR. FOX:  Well, the Debtors' confirmation brief

12   dropped a footnote to suggest something like that, but I

13   don't think the plan itself said --

14          THE COURT:  Well, no.  I think it actually is

15   worded that way.

16          MR. FOX:  Your Honor, the vote --

17          THE COURT:  I mean, how could I confirm individual

18   plans without going through the individual confirmation

19   standards for each entity, including A9 and A11?  I don't

20   think I could.

21          MR. FOX:  You -- that's right, Your Honor, but the

22   funds -- just like the funds are available to confirm the

23   consolidated plan, the same funds are available.  Instead of

24   being gifted, they'd be lent as -- the plan provides that

25   the solvent entities would lend to the insolvent in order to

Page 82

1    get this done.  There are --

2             THE COURT:  And how do we know which is which,

3    then?  So we're back to that same litigation again.

4             MR. FOX:  No, it's not litigation.  They'd either

5    have the funds at the effective date to make the payment of

6    the administrative expense --

7             THE COURT:  I can pretty much guarantee you that

8    when each individual case was noticed for confirmation,

9    there would be someone equally talented as you on the other

10   side saying, my Debtor is actually a net winner when you do

11   the analysis.  And they're going to be paying me, not Kmart.

12            MR. FOX:  If they can make that case, God bless

13   them, but I don't --

14            THE COURT:  Well, that's the point is that --

15            MR. FOX:  No --

16            THE COURT:  -- we'll be spending all the next

17   several months doing that with the litigation costs when $1

18   or $2 million in the settlement means a lot.

19            MR. FOX:  Your Honor -- well, losing 60 percent of

20   what would otherwise be one's recovery means a lot and --

21            THE COURT:  Well --

22            MR. FOX:  -- and the --

23            THE COURT:  If you assume that that's actually

24   what you would recover.

25            MR. FOX:  Well, based on -- well, we're all basing

Page 83

1    everything on the Debtors' assumptions.  Now, if the

2    Creditors' Committee hits a home run, then maybe it'll be a

3    lot more than the Debtor assumed and lower percentages will

4    nevertheless not matter.  The toggle plan itself, just to be

5    clear, it's a pot plan to begin with and it -- and the

6    Debtors effectively lend to each other to make sure they're

7    all administratively -- to pay their administrative

8    expenses.

9           In effect, it contains elements of substantive

10   consolidation already.  We're not challenging that.  But

11   this is just -- the sub con settlement is just a bridge too

12   far.  It's wildly excessive, particularly under these

13   circumstances.  Now, let me just move on because I

14   appreciate the opportunity to respond to the points.

15          The point about the netting and Mr. Schrock said

16   that the Debtors can't determine who owes what to whom, the

17   point again is, you don't need to.  And in fact, the toggle

18   plan, the pot plan, you don't need to, either because

19   everybody's just getting out of the pot.  The fact --

20          THE COURT:  But, again, in fact you just said it.

21   That's in essence, a substantive consolidation.

22          MR. FOX:  No, well, what it really does --

23          THE COURT:  On the asset side.

24          MR. FOX:  Well, you could view it that way, but

25   effectively what it does is follows exactly the way the

Page 84

1    Debtors ran their business and the way everybody did

2    business with the Debtors.  It's, in a sense, the fairest

3    way because it follows what was going on and what everybody

4    was dealing with.  The --

5            THE COURT:  But it's a black box, so how could you

6    say everyone was dealing with it?  It's a black box.  It

7    goes in.  Everyone was dealing with it on the assumption

8    that each of these entities would be good for the whole

9    amount.

10           MR. FOX:  That's why people extend credit.

11           THE COURT:  So they didn't account for each

12   transaction as to who benefitted from what.  But now that it

13   matters, it seems to be that a more nuanced approach is

14   appropriate, which is what they've come up with.

15           MR. FOX:  Well, what they've come up with is an

16   approach that takes it all out of the guarantee claims.

17           THE COURT:  Well, it gives the guarantors

18   something.

19           MR. FOX:  Not much.

20           THE COURT:  Well --

21           MR. FOX:  And it doesn't even reflect if there's a

22   25 percent chance.  It doesn't even reflect that.  And

23   compared to 50 percent in Enron, I mean --

24           THE COURT:  I'm sorry, why doesn't it reflect the

25   25 percent?

1            MR. FOX:  Well, it's a 7.6 percent enhancement.

2    If you have -- for a Kmart guarantee claim, now that they

3    fixed the plan.

4            THE COURT:  Well, it goes --

5            MR. FOX:  9.2(a)(7), I think.

6            THE COURT:  It goes from -- I'm sorry, from 7.7 to

7    11.6?

8            MR. FOX:  I'm not sure what you're looking at,

9    Your Honor.

10            THE COURT:  The recovery.

11            MR. FOX:  Oh, the disclosure statement?

12            THE COURT:  Well, the various charts.  They're all

13    basically the same, but it -- before the settlement, the

14    recovery by the non-ESL guarantee claims would be $7.7

15    million projected and under the settlement, it goes to 11.6.

16    So that's a little over $4 million.

17            MR. FOX:  Well, I'm not sure how they came up

18    that.  As I say, the --

19            THE COURT:  Well, the --

20            MR. FOX:  -- plan itself provides for the 7.6

21    percent enhancement on the recovery.  So putting aside the

22    dollar amount, that's the enhancement to negate the adverse

23    impact on the guarantee claims that we have against Kmart

24    that we would lose.  That's what the plan provides.  I can't

25    speak to their analysis.  And their analysis makes various

1    assumptions.

2            THE COURT:  I'm sorry.  Under a deconsolidated

3    plan, it's a little under $31 million, is the recovery.

4    They discount that by 75 percent to $7.7, so they are giving

5    you the 25 percent.  You don't think of it as a gift, but

6    they're giving you the 25 percent and then they're adding on

7    top of that $3.9 million which is about 10 percent more of

8    the $30.9 million, a little over that, 11 percent more.

9            MR. FOX:  Yeah, I'm not sure how they --

10            THE COURT:  So totally -- so the total amount is

11    like 33 -- I'm sorry, 36 percent recovery.

12            MR. FOX:  Your Honor, I'm not sure how -- I don't

13    have that in front of me.  I'm not sure how you're getting -

14    -

15            THE COURT:  Well, I mean, I think that --

16            MR. FOX:  But I --

17            THE COURT:  I mean, that's -- I think I'm doing

18    the math right.

19            MR. FOX:  That may be.  All I'm saying is that

20    when you look at the plan itself in 9.2(a)(vii), the

21    enhancement is you get, then, 7.6 percent of your recovery

22    on account of your guarantee claim.  You don't get 25 --

23            THE COURT:  Oh, well, yeah, because you're not

24    expected to get anything anyway.  I mean, you expect to get

25    a very little amount, but the enhancement isn't -- I mean,

Page 87

1    I'm just focusing on the fact that you're saying that the

2    bump up here is miniscule.  Maybe in terms of dollar amount

3    it is small, but you're talking about small projected

4    recoveries anyway because the Debtors are being conservative

5    here on litigation recoveries and again, it's a 25 percent

6    recovery and then you add another 10 percent onto what you'd

7    be getting under a consolidated plan.

8           MR. FOX:  Well, as I said, I was referring to the

9    percent of the -- recovery percentages.  If I could, I just

10   want to address the last points about the Trustee's fees

11   that Mr. Dublin raised.  In order for a Trustee to exercise

12   his charging lien, it must make the distribution.

13          THE COURT:  Right.

14          MR. FOX:  Otherwise, it can't assert.

15          THE COURT:  Right.

16          MR. FOX:  And it's entitled under the rules to

17   receive the distribution for exactly that purpose.

18          THE COURT:  Right.

19          MR. FOX:  So --

20          THE COURT:  No, but they're prepared to pay on top

21   of your charging lien, so you don't have to hold back the

22   distribution -- it's really for the benefit of the

23   noteholders -- your distribution charges.

24          MR. FOX:  Yeah.

25          THE COURT:  Your normal charges --

1           MR. FOX:  We --

2           THE COURT:  -- for being an indentured Trustee, so

3    that's on top of the charging lien.

4           MR. FOX:  Right.  Well, ordinarily the fees to

5    actually do the distribution or charge separately to the

6    estate --

7           THE COURT:  No --

8           MR. FOX:  -- and they're paid.  But what the

9    Debtor -- what the plan and the liquidation trust agreement

10   provide is much more than that.

11          THE COURT:  I understand, and I don't -- I agree

12   with you.  I think the deathtrap aspect of it isn't

13   appropriate, but I will interpret that provision to say that

14   if the Trustee just does its normal duties, the noteholders

15   won't be charged for those through the charging lien.

16   They'll pay you directly for that so that every dollar that

17   you get after that you can pay them or assert some other

18   charging lien for whatever else you've got in the case.

19          MR. FOX:  So it's just the actual distribution

20   cost --

21          THE COURT:  Well, I don't know if it's that.  I

22   mean, there may be other things your client did during the

23   case, like field phone calls or keep lists or, I don't know.

24   I don't know what else to --

25          MR. FOX:  Right.

1              THE COURT:  Indentured Trustees normally get paid

2      a ridiculously low amount of money for those types of

3      things, so I'm assuming it's not a lot, but maybe they do

4      something.  I don't know.

5              MR. FOX:  Well, okay, because the language that's

6      in the --

7              THE COURT:  But --

8              MR. FOX:  -- now is not that --

9              THE COURT:  I agree with that.

10             MR. FOX:  That's everything they did.  If they

11     spent 1,000 hours reading every document that was filed --

12             THE COURT:  I agree.

13             MR. FOX:  -- but never took a position, the plan

14     and the liquidation trust agreement would pay them for all

15     of that work.

16             THE COURT:  Well, that doesn't make sense.

17             MR. FOX:  Well, that's what it provides.

18             THE COURT:  Okay.  All right.

19             MR. FOX:  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MR. SCHROCK:  Your Honor, just really quickly for

22     the record.  I think it's important to note that when

23     Wilmington Trust makes these arguments, as they noted,

24     they're making for the 2L notes which are payments

25     subordinated, the $89 million that's at the bottom tranche,

1    so as you may recall --

2              THE COURT:  So the recoveries are going to be low

3    to begin with.

4              MR. FOX:  Your Honor --

5              THE COURT:  They're subordinated as liens and to

6    other debt, but --

7              MR. FOX:  Only the liens are subordinated.

8              THE COURT:  Yeah.

9              MR. FOX:  The debt is not.

10             THE COURT:  But we're talking about projected low

11   recoveries for all unsecured creditors.

12             MR. FOX:  Right.

13             THE COURT:  So to complain that it's only a 7.7

14   percent recovery, it's lower for the other unsecured

15   creditors by about 50 percent of that, so it's not -- I

16   think you're mixing apples and oranges, Mr. Fox, as far as

17   the bump up as part of the sub con settlement is concerned.

18   No one else has a substantive consolidation issue?  I don't

19   think so.  All right.  I...

20             MR. KRELLER:  Your Honor, Thomas Kreller from

21   Millbank, LLP for Cyrus Capital.

22             THE COURT:  Okay.

23             MR. KRELLER:  I actually do have a few other

24   issues.

25             THE COURT:  No, I know, but I'm wondering if you

1    have a substantive consolidation --

2              MR. KRELLER:  I don't have a substantive --

3              THE COURT:  Okay.  So I'm going to rule on that

4    issue now.  I have before me in the plan a proposal under

5    which -- under the plan the Debtors would be substantively

6    consolidated under the Court's general equitable powers,

7    which is well recognized in the Second Circuit including In

8    RE:  Augie/Restivo Baking Company, Limited, 860 F.2d. 515,

9    518 Note 1 (Second Circuit, 1988).

10             Substantive consolidation is the effect of

11   consolidating the assets and liabilities of multiple Debtors

12   and treating them as if the liabilities were owed by and the

13   assets held by a single legal entity.  In the course of

14   satisfying the liabilities of the consolidated Debtors form

15   the common pool of assets, other company claims are

16   eliminated and guarantees from co-debtors -- unsecured

17   guarantees, that is -- are disregarded.

18             In RE:  Republic Airways Holdings, Inc., 565 B.R.

19   710, 716 (Bankruptcy S.D.N.Y. 2017) and In RE:  WorldCom,

20   Inc., 2003 Bankruptcy Lexus 1401 (Bankruptcy S.D.N.Y.

21   October 31, 2003).

22             While the Court has considerable discretion in

23   ordering substantive consolidation, the Circuit has made it

24   clear that the power should be used sparingly because of the

25   possibility of unfair treatment of creditors who have dealt

Page 92

1    solely with that Debtor without knowledge of its

2    interrelationship with others.  Chemical Bank, New York

3    Trust Company v. Kheel, K-H-E-E-L, 369 F.2d. 845, 847

4    (Second Circuit 1966).

5            Courts apply multiple factors in determining

6    whether substantive consolidation is appropriate but the

7    Circuit in Augie/Restivo distilled those considerations into

8    two primary or critical inquiries phrased in the

9    disjunctive, i.e., whether "creditor dealt with the entities

10   as a single economic unit and did not rely on their separate

11   identity in extending credit," or separately, the affairs of

12   the Debtors are so entangled, consolidation will benefit all

13   creditors.  Augie/Restivo, 860 F.2d. 518.

14           Substantive consolidation, given its equitable

15   basis is not a black and white or all or nothing result.

16   The Courts look at whether the proposed consolidation will

17   yield an equitable treatment of creditors without any undue

18   prejudice to any particular group, In RE:  Food Fair Inc.,

19   10 B.R. 123, 127 (Bankruptcy S.D.N.Y. 1981) and Republic

20   Airways Holdings, 585 B.R. at 716 and should apply the

21   remedy in a practical manner.

22           Thus, it quoted, "It is well accepted that

23   substantive consolidation is a flexible concept and that a

24   principal question is whether creditors are adversely

25   affected by consolidation, and if so, whether the adverse

1    effects can be eliminated or otherwise dealt with," id.,

2    Page 717.

3             It is also the case, consistent with the point I

4    just made that substantive consolidation can be proposed in

5    the form of a settlement of substantive consolidation issues

6    or issues pertaining to substantive consolidation under

7    Bankruptcy Rule 9019 and there are numerous cases that apply

8    the substantive consolidation in the context of aw related

9    settlement analysis that is applying the so-called iridium

10   factors or TMT Ferry factors applicable to analysis of a

11   proposed settlement as set forth in In RE:  Iridium

12   Operating, LLC, 478 F.3d. 452, 462, citing among other

13   cases, In RE:  TMT Trailer Ferry, 390 U.S. at 424.

14            In the substantive consolidation context, in

15   addition to the Republic Airways case that I've previously

16   cited, such an approach applying a settlement analysis as

17   well as substantive consolidation analysis was undertaken in

18   In RE:  Winn-Dixie Stores, 356 B.R. 239 (Bankruptcy N.D.

19   Florida 2006) as well as in a number of reported and

20   unreported decisions cited in the Debtors' brief -- reply

21   brief in support of substantive consolidation, albeit that

22   those settlements did not have extensive analysis.

23            They include, though, In RE:  WorldCom, Inc. that

24   I previously cited as well as the Enron confirmation ruling

25   that is cited in the Debtors' reply memorandum where a

Page 94

1    substantive consolidation analysis which at the confirmation

2    hearing took up a lot of time and argument, was resolved on

3    a consensual basis except for some relatively modest

4    remaining objections and dealt with in about a page-and-a-

5    half of a 200-page decision.

6              Obviously, in approving or in considering a

7    settlement, particularly in the context of substantive

8    consolidation being among the settled issues, the Court

9    needs to ensure that the settlement isn't unduly at the

10   expense of a party or parties who are not on board with the

11   settlement and who are affirmatively objecting to it.

12   Nevertheless, I can clearly approve a settlement where not

13   every affected creditor consents.

14             That's the case under the substantive

15   consolidation caselaw as well as the settlement caselaw,

16   even where a class does not accept a settlement.  Again, see

17   In RE:  Winn-Dixie Stores, 356 B.R. at 249.

18             The settlement here is complicated by the fact

19   that it is not only a proposed settlement of substantive

20   consolidation issues, or issues pro and con in favor of

21   substantive consolidation, but also incorporates a complex

22   settlement between the Debtors and the PBGC, their largest

23   creditor.

24             That settlement as originally proposed by the

25   Debtors and PBGC in a terms sheet did not contemplate

Page 95

1    substantive consolidation, but as ultimately proposed, while

2    it contains or contemplates the possibility of a non-

3    substantive consolidation plan, i.e., the so-called toggle

4    plan, a switch to the toggle plan requires the consent not

5    to be unreasonably withheld of PBGC and the Official

6    Unsecured Creditors' Committee which joined in the PBGC

7    settlement in its ultimate version.

8          The PBGC in the settlement substantially

9    compromises its claims and looks for one consolidated

10   recovery.  In addition, and importantly here, the PBGC

11   agrees to use its best efforts to cause a non-Debtor

12   subsidiary of the Debtors, KCD, not to pursue a $146 million

13   administrative expense claim against the Debtors.

14          I believe on the record before me, it is clear

15   that PBGC not only has the requisite influence to cause that

16   to occur given that the independent director of KCD was

17   subject to the nomination by PBGC and PBGC is currently the

18   only creditor of KCD that would have an interest through KCD

19   in such a claim or on KCD pursuing such a claim.  Clearly,

20   if PBGC, as is stated on the record today, informs KCD's

21   board that it has no desire to have KCD collect on their

22   claim, it's highly likely that the KCD board would not

23   pursue the claim.

24          The record of this confirmation hearing generally

25   makes it clear that the Debtors' current cash position would

Page 96

1    not let them emerge from bankruptcy until various events

2    occur in the future that would enable them to pay allowed

3    administrative expenses in full or as agreed by the

4    administrative expense creditors holding allowed

5    administrative expenses, in compliance with Section

6    1129(a)(9) of the Bankruptcy Code.  That is the case even

7    without a $146 million administrative expense claim.

8            To add that administrative expense onto the

9    Debtors' balance sheet would raise very serious feasibility

10   issues for these Debtors, in all likelihood causing most and

11   perhaps all of them, including the entity that apparently

12   the objector, Wilmington Trust, looks to most prominently,

13   the Kmart Debtors, to be rendered administratively

14   insolvent.

15           So the PBGC settlement is important.  It appears,

16   based on the record before me, that the final version of

17   that settlement was negotiated with the administrative claim

18   position of these cases or these Debtors well in mind.  I

19   believe that was a good faith and rational and reasonable

20   basis for the negotiation of the settlement and that the two

21   are, in fact, properly linked, that is the substantive

22   consolidation settlement and the PBGC settlement.

23           PBGC's counsel has represented that it is not

24   prepared to waive its right to object to switching to a

25   debtor-by-debtor so-called toggle plan and given the facts

Page 97

1    before me, that insistence does not appear to me to be

2    unreasonable.

3           In evaluating a settlement, the Court considers,

4    as laid out by the Second Circuit in Iridium and WorldCom

5    and TMT Trailer Ferry, one, the balance between the

6    litigation's possibility of success and the settlement's

7    future benefits, the likelihood of complex and protracted

8    litigation with its attendant expense, inconvenience, and

9    delay, including the difficulty in collecting on the

10   judgment, the paramount interests of the creditors including

11   each affected class's relative benefits and the degree to

12   which creditors either do not object to or affirmatively

13   support the proposed settlement, whether other parties in

14   interest support the settlement, the competency and

15   experience of counsel supporting and the experience and

16   knowledge of the Bankruptcy Court judge -- well, this is on

17   appeal, obviously -- reviewing the settlement, the nature

18   and breadth of releases to be obtained by officers and

19   directors and the extent to which the settlement is the

20   product of arm's length bargaining.

21          Obviously, in any multifactor test, certain

22   factors simply don't apply and some factors may, under the

23   particular -- or in the particular context, be more

24   important than others.  In addition, as laid out by the

25   Iridium Court, the paramount determination in reviewing the

Page 98

1    settlement, if this issue exists, is whether the settlement

2    violates some other fundamental principle of the Bankruptcy

3    Code including, as was the case in Iridium, the fair and

4    equitable absolute priority rule.

5           That does not appear to me to be the case here, so

6    I will look at the other factors in the context of

7    substantive consolidation analysis.  It is clear to me that

8    there is a material, legitimate dispute that good lawyers

9    could pursue for a long and expensive time over whether

10   these Debtors should be substantively consolidated or not.

11   Frankly, it does not appear to me that the first of the two

12   Augie/Restivo prongs raises much of an issue.

13          At least while these Debtors were solvent, the

14   creditors dealt with them on an independent basis, by and

15   large, including Wilmington Trust where there were separate

16   guarantees of the notes for which Wilmington Trust is the

17   Trustee as well as trade creditors who had agreements with

18   specific Debtor entities.

19          On the other hand, the Debtors had a fundamentally

20   fairly simple cash management system where their receipts

21   were swept on a daily basis into a concentration account, in

22   essence consolidated, and only net balances were maintained

23   so you would have multiple Debtors contributing or borrowing

24   from the concentration account without any easily

25   implemented way to determine which Debtors could, in effect,

Page 99

1    be said to be making transfers to which other Debtors and

2    vice versa.

3              It is clear to me from Mr. Murphy's declaration

4    that tracing those types of transactions between the

5    entities as opposed to a net amount owing to the group would

6    be complex, lengthy, and very expensive, and ultimately

7    fraught with uncertainty.

8              Even in the two-and-a-half months spent in tracing

9    post-petition transactions on a debtor-by-debtor basis, Mr.

10   Murphy testified credibly that he had only a 80 to 90

11   percent level of confidence that that tracing was accurate

12   and, of course, that was an expensive and lengthy process

13   just for the slightly under one-year period of this case,

14   although at that time it was, I guess, probably about 10

15   months or even shorter since I believe it was completed in

16   May.

17             That problem highlights the very real likelihood

18   that in a fully contested substantive consolidation case,

19   the second prong in the Augie/Restivo analysis, which again,

20   is an independent basis for substantive consolidation, would

21   be found.  Again, although that prong is sometimes loosely

22   referred to in briefs and even in some cases as requiring an

23   impossibility of disentangling the corporate affairs, that's

24   not how the Circuit phrases it.  Again, it's phrased as the

25   affairs of the Debtors are so entangled, consolidation will

Page 100

1    benefit all creditors.

2         And it is clear that where the Court believes that

3    the cost of conducting such an investigation,

4    reconciliation, and audit will be prohibitive in the context

5    of the case, the Court will approve a reasonable substantive

6    consolidation settlement.  See In RE:  Republic Airways

7    Holdings, 565 B.R. at 719 and In RE:  Winn-Dixie Stores at

8    Page 750 -- I'm sorry, 356 B.R. at Page 250.

9         Again, the context here is not something that,

10   when the parties dealt with -- when the creditors dealt with

11   these Debtors pre-bankruptcy, they reasonably contemplated,

12   which is that there would be such a thin margin on

13   administrative expense solvency that enforcing intercompany

14   claims debtor by debtor as opposed to simply netting out

15   those claims through the cash management system against an

16   overall solvent business would be meaningful.

17        It appears to me, therefore, that settling

18   substantive consolidation issues on an assumption that it

19   would be likely on a 75 percent basis that the Court would

20   ultimately direct substantive consolidation is reasonable in

21   light of the Iridium factors pertaining to the costs, risks,

22   and delay of litigation.

23        The parties negotiating the settlement were

24   clearly fiduciaries for all the Debtors as well as the

25   Debtors unsecured creditors, on the one hand, that is, the

Page 101

1   Debtors themselves and the Unsecured Creditors' Committee

2   and the PBGC on the other, the Debtors' largest creditor and

3   also a member of the Creditors' Committee.

4         I believe not only were the professionals

5   negotiating that substantive consolidation settlement

6   capable and experienced, but actually acting in good faith

7   and respect of all the Debtors including Debtors that could

8   make an argument that they would be unduly harmed by the

9   substantive consolidation.

10        The plan went out for a vote and generally was

11  accepted, but there are classes of unsecured creditors of

12  certain Debtors that have rejected the plan under Section

13  1129(a)(8) on the dollar threshold; although, as set forth

14  in the ballot declarations, in terms of numbers of those

15  voting, the majority -- actually, a super majority in each

16  rejecting class -- accepted the plan.  So at best, it

17  appears to me that the paramount interests of creditors and

18  their support of the settlement, at best for Wilmington

19  Trust, is neutral.

20        No other creditor has objected to substantive

21  consolidation; although, of course, Wilmington Trust is

22  speaking as an indentured Trustee for a group of creditors,

23  some of whom, however, are very well-heeled and have not

24  made their own separate objection.  And the creditors in the

25  rejecting classes in terms of numbers of those voting,

Page 102

1    again, have by a large majority accepted the plan which was

2    a factor that the Winn-Dixie Stores opinion took into

3    account as a positive, 356 B.R. at 249 through 250.

4           As I noted, substantive consolidation being an

5    equitable remedy and a flexible concept, the Court has the

6    power to approve adjustments to substantive consolidation

7    that would relieve those who would otherwise be unduly

8    prejudiced by the consolidation of, at least, the undue

9    amount of the prejudice.  That is the case under this plan

10   which provides that certain holders of claims at estates

11   that appear to be more solvent than others will have a bump-

12   up in their recovery.

13          That chart is laid out in the Debtors' reply

14   memorandum as well as Mr. Murphy's declaration.  As a

15   percentage matter, the bump-up is meaningful and I believe

16   when taking into account the relatively modest recoveries of

17   all unsecured creditors that are projected and the benefits

18   of the interlinked PBGC settlement, particularly the KCD

19   resolution which would, if not approved, substantially

20   reduce down to nearly nothing the recoveries by the bump-up

21   creditors against their then deconsolidated, more solvent

22   Debtors.

23          The bump-up is sufficient to adequately protect

24   creditors that have multiple sources of recovery that would

25   have those sources eliminated or reduced to one under a

Page 103

1    strict substantive consolidation plan.  Again, the

2    alternative would be, I believe, a necessity to open up

3    confirmation for individual Debtors on a debtor-by-debtor

4    basis which then would require as part of the 1129(a)(9) and

5    1129(a)(11) feasibility analyses to do an analysis on a

6    debtor-by-debtor basis of intercompany claims.

7           And by intercompany claims, I don't mean claims

8    against the common pot through the consolidation account,

9    but rather a debtor-by-debtor, transfer-by-transfer

10   analysis.  I believe that would be prohibitively expensive

11   based on the facts before me and the Debtors' current cash

12   positions on a debtor-by-debtor basis.

13          As far as the prohibitively expensive aspect of

14   it, there is no dollar estimate of what it would cost, but I

15   do accept as credible Mr. Murphy's testimony that based on

16   the two-and-a-half months' effort to do such an analysis

17   with respect to the post-petition period, to do a

18   comprehensive analysis on the prepetition period would be

19   extremely expensive, and prohibitively so given the Debtors'

20   cash position.

21          It would, to my mind, simply lead to another

22   settlement after all of the estate's assets would be reduced

23   and the KCD claim laid on top of the Debtors' balance

24   sheets, which would benefit no one.  Given the ultimate

25   flexibility that I have based on an across the board benefit

Page 104

1    analysis, it appears to me, therefore, under the caselaw

2    that the substantive consolidation/PBGC settlement is

3    warranted here, so I will deny Wilmington Trust's objection

4    on that basis.

5            Wilmington Trust also objected on the grounds that

6    separately classifying the PBGC violated Section 1122 and

7    1123 of the Bankruptcy Code and/or arguably meant that the

8    plan was not being pursued in good faith under Section

9    1129(a)(3).  I find, to the contrary, that given PBGC's

10   unusual rights against the Debtors and its power with

11   respect to KCD, it was entirely reasonable and appropriate

12   to classify it separately.  Lumping it in with other

13   unsecured creditors would've, in fact, skewed those classes.

14           Indeed, it appears to me, given the size of PBGC's

15   claims, it may have well results in the rejecting classes

16   voting in favor of -- being deemed to have voted in favor of

17   the plan in certain of the Debtor entities, which wouldn't

18   have been right anyway, given PBGC's unique position in the

19   case, including its rights, explicit and implicit, with

20   respect to KCD.  Given that it was properly classified, the

21   1129(a)(3) objection would not fly, either.

22           Finally, Wilmington Trust objects to a provision

23   in the plan which is somewhat differently worded in the

24   liquidation trust agreement regarding the payment of its

25   reasonable fees and expenses.  Frankly, to my mind, there is

Page 105

1    some confusion on how those provisions work.  It is clear to

2    me, however, that both sides agree that Wilmington can be

3    limited to its charging lien and that the Debtors' estates

4    do not have to separately in a legal manner pay its fees and

5    expenses.

6           I think the confirmation order should be made

7    clear that under the plan, the Debtors' estates will pay

8    Wilmington Trust's legal fees and expenses regardless of

9    whether it opposes any action that the Debtors take, but

10   that such payment shall be only in the discretion of the

11   Debtors and the Debtors can limit such payment to the

12   ordinary and customary work that an indentured Trustee does

13   outside of a bankruptcy case, including in facilitating

14   distributions and answering questions.

15          The reason for that limitation is that I think it

16   is -- there should be no question that an indentured Trustee

17   should feel free to raise any legitimate objection or make

18   any legitimate statement in support of an action by a Debtor

19   in bankruptcy and should not be forced to decide whether to

20   do so based on whether its fees will be paid or not by the

21   Debtors' estate.

22          Okay.  So I think we have, then, Cyrus.

23          MR. KRELLER:  Good afternoon, Your Honor.  Thomas

24   Kreller of Millbank, LLP on behalf of Cyrus Capital

25   Partners.

1              THE COURT:  Afternoon.

2              MR. KRELLER:  Your Honor, just for -- just as a

3    reminder, Cyrus is the holder of unsecured claims in the

4    approximate amount -- in something like $600 million against

5    various Debtors.  By virtue of those claims, I believe Cyrus

6    is next to PBGC, the biggest unsecured creditor in these

7    cases.  We also have a disputed 507(b) claim, disputed and

8    under appeal from your ruling disallowing that claim.

9              Your Honor, I'll be relatively brief, recognizing

10   that at least most of the horse just left the barn.  We --

11             THE COURT:  Well, again, you -- I asked you.

12   You're not -- you didn't deal with substantive

13   consolidation, so you're -- I haven't dealt with your issues

14   yet.

15             MR. KRELLER:  I understand that, Your Honor.

16             THE COURT:  Okay.

17             MR. KRELLER:  But clearly, the approval of those

18   settlements, it leads a long way towards confirmation.

19             THE COURT:  Right.

20             MR. KRELLER:  That's my only point.

21             THE COURT:  Okay.

22             MR. KRELLER:  And so I'm not going to belabor

23   those particular arguments.  I do want to state, for the

24   record, our objections still stand, and notwithstanding our

25   attempting to work with the Debtors and others on language

Page 107

1    in the confirmation order that are under discussion, some

2    points I'll talk about, our doing so doesn't constitute a

3    withdrawal of our objection.  Our objections still stand,

4    Your Honor.  We don't believe this plan should be confirmed.

5    We think the estates are hopelessly administratively

6    insolvent and likely will be at least for a very long time.

7           The plan -- this plan is not the simple waterfall

8    plan that Mr. Schrock has been touting for months now.  It

9    has become a bit of a Frankenstein monster with various

10   funds being diverted in various directions that are not

11   necessarily consistent with a simple waterfall plan.  And,

12   Your Honor, I'd note, obviously already you've approved the

13   PBGC settlement and the substantive consolidation

14   settlement, so I won't get into the how the effects of

15   those, a bit of a shell game going there on some of that

16   stuff, but the other --

17           THE COURT:  Well, if it's a shell game, you

18   should've raised the issues.  I'm going to say it again.  Do

19   you really want to go over it?  I mean, do you have new

20   facts to raise on those issues?

21           MR. KRELLER:  No, I don't, Your Honor.

22           THE COURT:  So what's the -- so how is it a shell

23   game?

24           MR. KRELLER:  Your Honor, the other piece of the

25   diversion of funds is the $25 million that's going out to

Page 108

1    essentially serve as a retainer for the Committee

2    professionals and that UCC settlement as well is a bit

3    suspect because all that was really resolved there was which

4    law firm was going to represent the Trust in the litigation

5    and --

6         THE COURT:  It's not a big settlement as far as

7    I'm concerned, although it's important to get done.  I agree

8    with that.

9         MR. KRELLER:  Well, Your Honor, well -- I want to

10   talk about the $25 million in a minute.  It's not a big

11   settlement.  It certainly doesn't appear to have had any

12   benefit for the creditors or their recovery.  The

13   beneficiary of that settlement appears to be Akin Gump.

14        THE COURT:  Wait, the $25 million or --

15        MR. KRELLER:  Yes.

16        THE COURT:  -- so, you stated -- is that even in

17   your objection?  I don't think you raised that in your

18   objection.

19        MR. KRELLER:  I don't know that I did, Your Honor.

20        THE COURT:  No, you didn't.

21        MR. KRELLER:  But the --

22        THE COURT:  So what is the point?  I mean, you're

23   saying that the Debtors should not have a litigation fund to

24   pursue their complaint?

25        MR. KRELLER:  I'm not saying that, Your Honor.

Page 109

1      I'm saying --

2                THE COURT:  Okay.

3                MR. KRELLER:  -- that those funds coming out of

4      the estate ahead of potentially administrative claimants

5      isn't appropriate and I would question the magnitude of that

6      fund given the fact that the work has already been done and

7      paid for twice by the estates to both the UCC's

8      investigation and the special committee of the board's

9      investigation.

10               But, Your Honor, I'm not standing her to belabor

11     any of these points.

12               THE COURT:  Well, good, because they're not in

13     your objection.

14               MR. KRELLER:  You have your record.  You've made

15     the assessment.  Apparently, the Debtors have cleared the

16     lowest rung on the range of reasonableness and so I'll move

17     on, Your Honor.  The point that I really want to address is

18     kind of the metaphysical question that you were dealing with

19     a bit on Thursday and less so today which is, what happens

20     when you have a confirmed plan that may not go effective for

21     a prolonged period of time, and I think that's the upshot of

22     even the Debtors' own testimony on there.

23               I don't believe any of their witnesses could give

24     you any real sense of how long it would be before there

25     would actually be funds sufficient to pay the administrative

Page 110

1    claims, so Your Honor, my view is it's probably closer to

2    three years than three months, but that will be what it will

3    be.

4            The issue of a confirmed but not yet effective

5    plan, though, Your Honor, gives rise to a handful of issues

6    and these really come up in the proposed confirmation order

7    and we've been discussing these with Debtors' counsel and we

8    have -- I think we've had agreement on a couple and we still

9    have some outstanding, but I think they're important.  Your

10   Honor, when the plan is confirmed but not yet effective,

11   nothing really changes in terms of the Debtor.  The Debtor

12   is a Debtor in Possession.  The plan is not actionable or

13   implementable and the parties simply wait in the status quo,

14   waiting for the effective date.

15           That leaves the Debtors remaining as Debtors in

16   Possession.  It leaves the UCC in place with its rights and

17   duties and the case, essentially, proceeds as it is with

18   ordinary course transactions being permitted under the code,

19   but anything outside the ordinary course or any

20   extraordinary creditor distributions to await the effective

21   date of the plan.

22           That structure, that confirm and wait for

23   effective date the Debtors have proposed conceptually works

24   and occurs in other cases, but the notion there is that

25   essentially the money doesn't start moving until the

Page 111

1    effective date occurs because you don't have an effective

2    plan.  Now, in the administrative expense settlement that

3    got announced earlier last week, there's -- that created

4    this wrinkle where the Debtors actually start to move money.

5              They start to fund $20 million into the litigation

6    to be earmarked, to be segregated into the litigation trust

7    or into litigation activities.  Your Honor, we don't believe

8    the segregation is appropriate or necessary, but if those

9    words are going to be used, we think it ought to be clear

10   that they are without prejudice to the rights of any of the

11   creditors to pursue those funds as assets of the estate.

12             THE COURT:  Okay.

13             MR. KRELLER:  The --

14             THE COURT:  I thought the proposed order actually

15   made it clear that this was estate -- this continued to be

16   estate property, it was not property held in trust or

17   anything like that.

18             MR. KRELLER:  Well, it doesn't go quite that far.

19   It does say it's estate property.

20             THE COURT:  Right.

21             MR. KRELLER:  But the very notion that it's

22   somehow being segregated or that segregation is appropriate

23   leads to the implication that somehow rights are being

24   affected.  And, Your Honor, in our view --

25             THE COURT:  It's $15 million, right?  It's not --

Page 112

1          MR. KRELLER:  It's -- I believe it's $20 million.

2     It's 15 and then 5 coming out of one of the -- out of the

3     winddown account.

4          THE COURT:  Right.  Okay.

5          MR. KRELLER:  And then that's subject to top up

6     from first assets in to get it up to 25.

7          THE COURT:  Right.  Okay.

8          MR. KRELLER:  So certainly, the implication is

9     that those funds are being set aside, segregated, ear

10    marked, which sounds to me -- and I don't see anything in

11    the documents that gives me great comfort otherwise -- that

12    they're being removed one step further away from creditors

13    and potential creditor distributions than other assets or

14    cash the estates may have.

15         And, Your Honor, I would submit that during the

16    post-confirmation, pre-effective date period, there's no

17    reason for that money to move and there's no reason for

18    creditors' rights to be impaired or potentially impaired by

19    virtue of the segregation of those funds.  The professionals

20    will remain.  They'll be doing the work they do.  The estate

21    professionals will be subject to ordinary course fee

22    procedures in these cases and they'll have access to the

23    carveout and the other accounts that they have for their

24    benefit.

25         There's no reason to move this money.  They'll do

Page 113

1    the work.  They'll do whatever they're doing in the

2    litigation at the direction of the litigation designees, but

3    somehow setting this money aside to the potential prejudice

4    of creditors is a problem and it's premature.  That money

5    was always going to be funded under the plan on the

6    effective date, but somehow this provision pulling it

7    forward to the confirmation order found its way into the

8    administrative claims settlement, an issue that appears to

9    be completely unrelated but nonetheless is significant.

10            We've proposed language and there's some language

11   going back and forth to try to make clear and amplify and

12   extend upon the Debtors' draft language about the funds

13   being estate funds, but we don't have agreement there yet,

14   Your Honor, and that language ought to be protective of

15   creditors and it ought to make clear that those funds,

16   whether they're in the estate as estate funds or whether the

17   plan goes effective and those funds go into the litigation

18   trust, that they are litigation trust assets that are

19   subject to the claims and rights of creditors to creditor

20   distributions.

21            That money ought to be available to creditors, if

22   it hasn't been expended.

23            THE COURT:  So what is the language you're

24   proposing?

25            MR. KRELLER:  Your Honor, I can -- well, we don't

Page 114

1    have agreement on the language and there's, I guess, a

2    couple of different sets of language going back and forth.

3    I had proposed language last -- earlier this morning to the

4    Debtors which they rejected and ESL's counsel had proposed

5    language to that effect that's been circulating during the

6    hearing and that's been rejected as well.

7           Your Honor, I'll look for -- if you give me a

8    moment, I'll look for my...  The language, Your Honor, and

9    this is language that ESL and Cyrus would live with, and

10   that language is, "for the avoidance of doubt and

11   notwithstanding anything to the contrary contained in the

12   plan or the liquidating trust agreement, in the event that

13   any disputed claim ultimately becomes an allowed claim," --

14   and it's defined as a subsequently allowed claim --

15   "including by reason of any appeals of any orders of this

16   Court disallowing such claim, nothing in the confirmation

17   order, plan, or the liquidating trust agreement limits the

18   ability of the holder of any such subsequently allowed claim

19   to assert a claim including a priority claim or to obtain a

20   recovery from any liquidating trust assets to satisfy such

21   subsequently allowed claim including, without limitation,

22   the funds in the litigation funding --

23           THE COURT:  That's quite different than what you

24   were just talking to me about.  That's basically saying that

25   even after -- the liquidating trust doesn't go into

Page 115

1    existence until the plan actually goes effective.

2            MR. KRELLER:  Correct.

3            THE COURT:  So that doesn't work.  I can see why

4    they rejected that.

5            MR. KRELLER:  Well, Your Honor, it's at both

6    points in time, though.

7            THE COURT:  No.

8            MR. KRELLER:  The liquidating trust assets are

9    defined as the assets that in the liquidating trust and

10   available for distributions to creditors.

11           THE COURT:  I think you're going to have to divide

12   up the two.  I mean, there's a fundamental issue that was

13   raised in your objection, was that you wanted a reserve for

14   the claim that I had already ruled on.  To me, that seemed

15   to be contrary to the caselaw and flipping the whole notion

16   of who should be posting a bond for a stay pending appeal.

17           But I thought you were going on a very different

18   tack here, which is that pending the effective date, the

19   money is property of the estate and is not being held in

20   trust or otherwise.  I mean --

21           MR. KRELLER:  And that's --

22           THE COURT:  I have no problem with that.  It's not

23   being held in trust, right?

24           MR. SCHROCK:  Your Honor, we have language in the

25   confirmation order that says that.  It's Paragraph 57.

1          THE COURT:  Well, does it say it's not being held

2     in trust?

3          MR. SCHROCK:  Yeah, Your Honor, I'll just read it.

4     It says, "For the avoidance of doubt, the funds in the

5     litigation funding account and the cash reserve account

6     shall remain property of the estates and after the effective

7     date, liquidating trust assets provided that use of such

8     funds shall be subject to plan and/or liquidating trust

9     agreement and the funds in the cash reserve account shall be

10    subject to the administrative expense claims consent

11    program."

12         THE COURT:  Okay.  So, look, if -- dealing with

13    the post-effective date aspect of this, I think you all

14    should just stay away from.  I mean, that all -- it's all

15    wrapped up in issues of mootness and appeal and all those

16    sorts of things.  Seeking a stay, which hasn't been sought

17    because there's nothing to seek a stay of because the plan

18    hasn't been confirmed.  I think you should just focus on the

19    pre-effective date period.

20         And I mean, as long as it's clear that this money

21    is property of the estate and not being held in trust...

22         MR. KRELLER:  Your Honor, it ought not be held in

23    trust in the post-effective date period.  I --

24         THE COURT:  Well, if the plan provides for that

25    level of funding, it's not held in trust but that's what the

Page 117

1   plan would provide for.

2            MR. KRELLER:  The cash will, to the extent it's

3   not been consumed, that cash will be a liquidating trust

4   asset that ought --

5            THE COURT:  Right.

6            MR. KRELLER:  -- to be available to creditors.

7            THE COURT:  If the plan says to the contrary, and

8   literally no one has objected on that basis, I don't see why

9   -- except for ESL, the target of the litigation.  You know -

10  -

11           MR. KRELLER:  The --

12           THE COURT:  -- I guess the answer is, tough.  The

13  plan controls.  I --

14           MR. KRELLER:  Well, Your Honor, this issue came

15  about because of how this provision found its way into the

16  administrative expense settlement.  And so the notion that

17  no one objected to it, the money was always going to be an

18  effective date issue; otherwise, everything was staying in

19  the estate.  And all we're looking for in terms of the post-

20  effective date period is clarification that there's no

21  intention that the liquidating trust assets including those

22  funds would somehow be withheld from creditors with allowed

23  claims.

24           THE COURT:  Well --

25           MR. KRELLER:  If it gets used up, it gets used up

1   and it's not there.  But if it is there and creditors

2   including administrative creditors, have claims assertible

3   against that money, they should have that right to be able

4   to pursue those funds and not --

5           THE COURT:  Well --

6           MR. KRELLER:  -- have the professionals play keep-

7   away with them.

8           THE COURT:  But it's -- the money is being --

9   well, when you say used up, what do you mean?  I mean,

10  obviously --

11          MR. KRELLER:  Spent on --

12          THE COURT:  It will be --

13          MR. KRELLER:  Spend on professionals.

14          THE COURT:  If it's not spent on professionals,

15  then yes, it goes over to the general uses, but I guess I...

16          MR. KRELLER:  Your Honor, I'm actually surprised

17  this is controversial with the Debtors and the UCC.

18          THE COURT:  It's controversial for the post-

19  effective date period and I understand their position

20  entirely on that point.  As far as the pre-effective date

21  period is concerned, saying that it's property of the estate

22  and not being held in trust is enough.  You don't need to

23  specify who has a right to it under what circumstances.

24  Everyone would have a right to it, pre-bankruptcy, if

25  there's circumstances that would give you a right to it.

Page 119

1                    MR. KRELLER:  I --

2                    THE COURT:  I mean, pre-effective date.

3                    MR. KRELLER:  That's my position, Your Honor,

4      which is why I don't understand the --

5                    THE COURT:  Well, the language you read me also

6      covered the post-effective date.

7                    MR. KRELLER:  It does, but --

8                    THE COURT:  Well, but it shouldn't.

9                    MR. KRELLER:  What is the purpose of the

10     segregation if, in fact, they remain estate assets --

11                   THE COURT:  Because you want to keep track of it.

12                   MR. KRELLER:  -- subject to creditor claims?

13                   THE COURT:  You want to know where it is.  You

14     know what?  It's psychological, frankly.  That's what it is.

15     And I think who is objecting -- I think the people who are

16     objecting to this are experiencing the psychological effect

17     which, I think, was intended.  That's why litigation budgets

18     are largely created, just for that reason.

19                   MR. KRELLER:  Your Honor --

20                   THE COURT:  So I don't --

21                   MR. KRELLER:  Your Honor, as the second largest

22     unsecured creditors in the case and potentially with a 507,

23     we stand to benefit probably more than most from successful

24     -- from the successes of the litigation trust.

25                   THE COURT:  Well, you're also --

Page 120

1          MR. KRELLER:  So --

2          THE COURT:  -- an investor in Transform and could

3     be -- that investment could be hurt by adverse litigation

4     against Transform's controlling party, so look.  It's fine

5     that you're a large creditor.  I get that.  But I don't see

6     anyone else complaining about this language.  It just

7     doesn't -- it's property of the estate.  It's there, yes.

8     Everyone knows that it's intended to be used post-effective

9     date to litigate with.

10          And if the rulings against your clients are

11     reversed or if I confirm the plan, the plan confirmation

12     order is reversed, we'll be in a different environment.  But

13     that presumes all sort of things that I can't deal with at

14     this point, including your burden to get a stay of various

15     orders and maybe have to post a bond and all those sorts of

16     things.  I think you're basically trying to get the bond

17     flipped on its head here by having the debtor, in essence,

18     post the bond.

19          At least that's what the objection was all about

20     and I'm setting up a reserve.  It just doesn't --

21          MR. KRELLER:  Well --

22          THE COURT:  Doesn't compute.

23          MR. KRELLER:  Your Honor, I'll -- on this point,

24     the reason that nobody else has objected to this is because

25     this showed up at midnight in a Tuesday night filing last

Page 121

1     week that --

2             THE COURT:  Well --

3             MR. KRELLER:  That was the first point in time in

4     which any money was going to move --

5             THE COURT:  But it's not moving.

6             MR. KRELLER:  -- pre-effective date

7             THE COURT:  It's not moving.  It's clear that it's

8     property of the estate, not being held in trust.  It's under

9     this rubric because everyone knows that's what this is

10    intended to do ultimately when the plan goes effective and

11    it was part of the negotiation of the administrative claims

12    settlement procedures for the party to know where the money

13    was going to be ultimately.  But it's not -- it's

14    psychological.  It has no legal consequences.

15            MR. KRELLER:  Your Honor, with that statement from

16    you that it -- that the segregation has no legal

17    consequences --

18            THE COURT:  Pre-effective.

19            MR. KRELLER:  -- I'll stop talking about --

20            THE COURT:  Okay.  Pre-effective.

21            MR. KRELLER:  -- that issue.

22            THE COURT:  Okay.

23            MR. KRELLER:  On the reserve issue, the plan

24    provides that disputed claims reserves shall be provided on

25    the effective date for disputed claims.  The 507(b) claims

Page 122

1    are disputed claims because they are not the subject of a

2    final order.  The plain reading, the words of the plan, are

3    what would entitle us to a reserve.

4              THE COURT:  There's not --

5              MR. KRELLER:  And now, Your Honor, I don't think

6    that's --

7              THE COURT:  There's no stay of my order.

8              MR. KRELLER:  There is no stay of your order, but

9    it is not a final order.

10             THE COURT:  I --

11             MR. KRELLER:  But, Your Honor, that's not for

12   today, either.  That only becomes relevant if there is an

13   effective date coming where there's actually money to deal

14   with and the appeal might be in a different -- those --

15             THE COURT:  It may well be --

16             MR. KRELLER:  -- claims might be in a different

17   status --

18             THE COURT:  But I'm certainly not --

19             MR. KRELLER:  -- at that point in time.

20             THE COURT:  I'm not setting a reserve at this

21   point.

22             MR. KRELLER:  I'm not asking you to, Your Honor.

23             THE COURT:  Okay.

24             MR. KRELLER:  I interpret the plan as it's

25   written.

Page 123

1          THE COURT:  Okay.  I'm not sure whether a reserve

2    is required at any point, but I think at this point, it's

3    not appropriate to order one and it does seem to me that

4    Judge Farnan is right on here in In RE:  Oakwood Homes

5    Corp., 329 B.R. 19.

6          MR. KRELLER:  Your Honor, I think the facts of

7    that case were a bit different.  I think that that claim,

8    the request for a disputed claims reserve was actually

9    denied in those cases.  I think there was a different

10   procedural posture.  It wasn't just simply a disputed claim

11   for plan purposes.  But again, Your Honor, that's not --

12   that's actually not a confirmation issue for today.  It's an

13   effective date issue for the flow of funds, what the flow of

14   funds looks like in the event that there are funds to flow.

15          THE COURT:  Okay.

16          MR. KRELLER:  Your Honor, a couple of other

17   points. I had simply -- I had requested of the Debtors a

18   fairly simple sentence or two basically stating that in the

19   confirmation order that pending the plan effective date,

20   Debtors remain as Debtors in Possession with all of their

21   rights and obligations and subject to the requirements of

22   the Bankruptcy Code and the Bankruptcy Rules and other

23   applicable law, while in the estates and while as Debtors in

24   Possession.

25          That language was rejected out of hand.  I don't

Page 124

1    quite understand that.  It appears to be that that is, I

2    think the reality and that's what I hear you saying as well.

3              THE COURT:  Right.

4              MR. KRELLER:  And, Your Honor, I --

5              THE COURT:  I mean, that's the law.

6              MR. KRELLER:  It is, Your Honor, but in a case

7    where these Debtors may be operating as Debtors in

8    Possession for a long time before a plan ever goes

9    effective, it would seem to me that a simple statement in

10   the confirmation order --

11             THE COURT:  We don't need that.  I mean, then

12   (indiscernible) start incorporating specific provisions of

13   the bankruptcy code and it's just --

14             MR. KRELLER:  The language --

15             THE COURT:  The law is clear on this point.

16             MR. KRELLER:  That's fine, Your Honor.  We had

17   also asked, there's a provision and it's been beefed up in

18   the order for advance notice of the anticipated occurrence

19   of the effective date.

20             THE COURT:  Right.

21             MR. KRELLER:  Twenty days' notice with a 10-day

22   period to -- for parties to object if they have issues with

23   that.

24             THE COURT:  Right.

25             MR. KRELLER:  We had proposed that a similar

Page 125

1   notice provision go in with respect to post-effective date -

2   -

3           THE COURT:  That's --

4           MR. KRELLER:  -- future distributions.

5           THE COURT:  And I asked Mr. Singh that.  I think

6   that's in there now, you said?

7           MR. SCHROCK:  We put in the 20 days, Your Honor.

8           THE COURT:  For each distribution?

9           MR. SCHROCK:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. SCHROCK:  Well, we didn't put in, you know,

12  the rights to object and the like.

13          THE COURT:  Just the notice?

14          MR. SCHROCK:  Just the notice.

15          THE COURT:  In 20 days.

16          MR. SCHROCK:  Correct.

17          MR. SINGH:  Your Honor, there's actually a 30-day

18  provision already in the plan and the trust agreement.

19          THE COURT:  Okay.  I don't think there should be -

20  -

21          MR. SINGH:  For future --

22          THE COURT:  -- any implications that you can't

23  come in and say, they're making payments that they shouldn't

24  be making or whatever.

25          MR. KRELLER:  I'll accept that, Your Honor.  I

Page 126

1    have not --

2              THE COURT:  I mean, there's only one reason to

3    give notice, which is someone complains.

4              MR. DUBLIN:  It's in the definition of

5    distribution.  It says 30 days' advance notice.

6              MR. KRELLER:  Okay.

7              MR. DUBLIN:  You get an extra 10.

8              MR. KRELLER:  Your Honor, the confirmation order

9    in various places contains provision approving things like

10   the plan supplement documents and finding those and

11   approving those documents.  I had suggested language that

12   simply said those -- only those documents that are in

13   existence and on file as of the date of the confirmation

14   order are you approving.  And again --

15             THE COURT:  I can't approve something I haven't

16   seen.

17             MR. KRELLER:  Well, Your Honor, that -- that

18   seemed to be the case to me as well, but I do think, again,

19   given the potentially prolonged lag, I think that would be a

20   clarification that would be worth having.

21             THE COURT:  Well, I mean, there -- this wasn't a

22   provision I focused on, but I'm assuming the plan supplement

23   and related documents are defined in a way so it's not

24   including documents that would be submitted in the future

25   unless they're amendments that don't have any material

Page 127

1    adverse effect on anybody.

2                MR. KRELLER:  I don't know whether they are or

3    not, Your Honor.

4                THE COURT:  No --

5                MR. KRELLER:  But there's -- you have a long --

6                THE COURT:  That's how it should be.

7                MR. KRELLER:  You have a long period of time with

8    --

9                THE COURT:  I know, but --

10               MR. KRELLER:  -- with potentially --

11               THE COURT:  I'm not going to approve anything I

12   haven't seen.

13               MR. KRELLER:  I understand, Your Honor.

14               THE COURT:  Okay.

15               MR. KRELLER:  Nor should you be asked to, but

16   that's --

17               THE COURT:  All right.

18               MR. KRELLER:  -- the way the language reads --

19               MR. SINGH:  Your Honor, can assure you, we're not

20   --

21               THE COURT:  Well, when I go through it, I'll -- if

22   there's an issue there, I'll strike that out.

23               MR. KRELLER:  Thank you, Your Honor.

24               THE COURT:  Okay.

25               MR. KRELLER:  And then, Your Honor, I would just

Page 128

1   note in Paragraph 24, I believe, of the draft order, there's

2   actually a provision that allows the Debtors to be -- and

3   this, again, is in our limbo pre-effective date period --

4   that would allow the Debtors to be paying litigation

5   professionals subject to monthly invoices and it looks to be

6   something that -- again, I think this is just inadvertence -

7   - because we're still in the cases at that point in time,

8   those professionals should just be getting paid under the

9   existing fee --

10          THE COURT:  Under the fee order.

11          MR. KRELLER:  Under the fee order.

12          THE COURT:  Right.

13          MR. KRELLER:  And there's no reason that that

14   would -- should change on confirmation --

15          THE COURT:  Okay.

16          MR. KRELLER:  -- of the plan.

17          THE COURT:  No, that's fine.  Again, it's not a

18   limbo period.  It's, as you said, the Debtor is the Debtor

19   in Possession and this litigation committee has been created

20   to deal with the committee -- I mean, deal with the

21   litigation.  Similarly, there's the reporting mechanism on

22   the claims settlement, but those are things that I'm

23   approving.

24          MR. SINGH:  To the extent it was unclear, we so

25   stipulate.

Page 129

1          THE COURT:  Okay. All right.

2          MR. KRELLER:  That's all I have --

3          THE COURT:  Okay.

4          MR. KRELLER:  -- Your Honor.  Thank you.

5          THE COURT:  And we've confirmed that Cyrus is not

6  a releasing party, right?

7          MR. KRELLER:  Right, Your Honor.

8          THE COURT:  Okay.

9          MR. KRELLER:  Correct, Your Honor.

10          THE COURT:  Okay.  So, I mean, are there -- I

11  don't think there are any other objections in your

12  objection.  Is there something that is raised that I should

13  address?

14          MR. KRELLER:  No, Your Honor.  I believe we

15  covered it all.

16          THE COURT:  Okay.  All right, thanks.

17          MR. MOLONEY:  Good afternoon, Your Honor.  Tom

18  Moloney on behalf ESL.

19          THE COURT:  Afternoon.

20          MR. MOLONEY:  Your Honor, we filed two objections.

21  The first one related to the plan and I think that was,

22  essentially, worked out so the plan actually doesn't really

23  prejudice the ability of a subsequently allowed creditor to

24  participate fully.  We filed the second objection when saw

25  the plan supplement and I think Your Honor is right.  There

Page 130

1    are two points in time that are relevant.

2              There's a point in time when we're still basically

3    in the same status that we are now which is a Debtor in

4    Possession status and as to that point in time, I think Your

5    Honor's statement that they've created an account but it

6    doesn't -- just a nominal account and it has no trust

7    significant, if Paragraph 57 of their order said that, we

8    wouldn't be objecting.  It doesn't say that.  It says it

9    shall be property of the estate subject to this liquidating

10   trust agreement which had provisions which include not only

11   a single --

12             THE COURT:  But that's subject -- that doesn't go

13   into effect until confirmation.

14             MR. MOLONEY:  I don't know what --

15             THE COURT:  I mean, I'm sorry, the effective date.

16             MR. MOLONEY:  I don't know what that means for --

17   then for it to be part of the order, though, at this point -

18   -

19             THE COURT:  Well, it's a confirmation order, so

20   when it goes effective, the liquidation trust goes

21   effective.  Before that, it's not.

22             MR. MOLONEY:  Okay, so then I'll just go to the

23   second part of the argument, what happens then.

24             THE COURT:  Okay.

25             MR. MOLONEY:  But for point of clarity, then,

Page 131

1    because I think that it's a mistake to walk away from this

2    podium, I think, without having perfect clarity --

3              THE COURT:  Okay.

4              MR. MOLONEY:  For a point of clarity, unless and

5    until they actually confirm a plan, whatever money they put

6    into --

7              THE COURT:  Unless and until it goes effective.

8              MR. MOLONEY:  It goes effective, until -- have an

9    effective plan, whatever they want to call this account

10   they're setting up, it remains property of the estate and

11   remains subject to the rights of potentially secured

12   creditors and potentially priority creditors who have a

13   higher priority than administrative -- (indiscernible)

14   administrative claims.  So now we go to future

15   (indiscernible).  Your Honor, admittedly, this is a place

16   holder point.

17             It's not for -- and we did not seek a reserve and

18   we're not asking you to stay anything.  But this is a

19   liquidating plan.  Under the code, 1145, they are not

20   entitled to a discharge so they can't get a de facto

21   discharge of our priority claim by playing some game through

22   a trust agreement.  So once they're in this future world, if

23   we do, in that future world, prevail and Your Honor, I

24   understand that they don't think we'll prevail.  Probably

25   Your Honor doesn't think we'll prevail.

Page 132

1          But, you know, I'm always an optimist and so I

2     think there's a chance we'll prevail.  And we come back down

3     here and we say, well, Judge, we actually have a secured

4     claim.  We can trace our proceeds to this account.  Or,

5     Judge, we have a super priority claim and we have higher

6     priority than whatever other use they want to use the money

7     in this account.  I don't think at that point in time they

8     can say, well, sorry, if the liquidating trust wants to use

9     that money, so for you to fund a lawsuit against yourself,

10    they should be allowed to do that.

11         I don't think the plan can provide for that

12    outcome.  I don't think it legally can provide for that

13    outcome.

14         THE COURT:  Well, I guess certainly if the plan

15    were confirmed, you would have to get two reversals, right?

16    You'd have to reverse the claims order and confirmation.

17    But you're saying it shouldn't be confirmed in the first

18    place?

19         MR. MOLONEY:  No, I'm not, Your Honor.  All --

20    what I'm saying is, I don't need -- I don't think I need to

21    challenge this plan in any respect.  I think the plan as

22    drafted is fine and I don't think I -- I can pursue my

23    appeal.  I (indiscernible) claim.  I can come back and live

24    in the regime that exists post-confirmation of a liquidating

25    pot plan.  This is not a case where, Your Honor, there's a

Page 133

1    new business and it needs to have a clean balance sheet --

2              THE COURT:  No, but this is --

3              MR. MOLONEY:  -- and it can't have contingent

4    liabilities.

5              THE COURT:  Look, I think it's -- I ruled on this

6    issue on the U.S. Trustee's objection.  I don't believe that

7    the -- I guess you're saying the plan injunction is,

8    effectively, a discharge?

9              MR. MOLONEY:  No, I'm not arguing that.

10             THE COURT:  You're not.

11             MR. MOLONEY:  I'm saying it's just a supplement

12   that they put out.  It's only -- it's not the plan at all.

13   I don't have a problem with the plan at all.  The plan

14   supplement, which they now incorporate into this order,

15   purports to give to this litigation trust board discretion

16   to set aside on an evergreen basis $25 million or more into

17   an account which no one can get a hold of but them.

18             THE COURT:  But if -- so then the issue is, I

19   think, a fairly technical one.

20             MR. MOLONEY:  Right.

21             THE COURT:  Which is, I think -- I'll go back to

22   what I said earlier.  I think you would need to have the

23   reversal of two orders.

24             MR. MOLONEY:  No.

25             THE COURT:  You would have to have the reversal of

Page 134

1    the -- well, depends on the timing.  But let's say that the

2    plan went effective before there was a determination on the

3    appeal on the 507(b) issue.

4              MR. MOLONEY:  Right.

5              THE COURT:  The plan -- if the plan did go

6    effective, then.

7              MR. MOLONEY:  I don't see why we need any

8    reversals, Your Honor.  We just --

9              THE COURT:  Well --

10             MR. MOLONEY:  -- come right back down and assert

11   our claim, if it's allowed.

12             THE COURT:  I'm not sure of that.  I think you

13   might need a reversal of the plan, too, of the confirmation

14   order.

15             MR. MOLONEY:  Not if I'm successful right now.

16   Not if I'm successful --

17             THE COURT:  well, but you just said you don't --

18             MR. MOLONEY:  -- right now in getting Your Honor -

19   -

20             THE COURT:  But you just said you don't mind if

21   the plan is confirmed.

22             MR. MOLONEY:  Correct.  It's just the plan

23   supplement provision.

24             THE COURT:  But that's --

25             MR. MOLONEY:  If the plan supplement provision is

Page 135

1    consistent with the plan, I don't have a problem with the

2    plan.  The plan supplement provision, what is says, Your

3    Honor, in the plan supplement, it says the litigation board

4    has the right to create a $25 million entitlement or such

5    ever amount as they want, whatever they want.  And that -- I

6    want to be clear, if that happens and it's just these three

7    guys --

8              THE COURT:  But the --

9              MR. MOLONEY:  -- sitting there decided that they

10   don't want to pay a particular creditor and they'd rather

11   have the money available to pursue a pipe dream litigation,

12   then I don't think I should have to pay for it.

13             THE COURT:  But the plan itself contemplated

14   funding of the litigation trust.

15             MR. MOLONEY:  I have no problem with that, Your

16   Honor.

17             THE COURT:  So what's the distinction?

18             MR. MOLONEY:  The distinction is that the money

19   that's available depends on what's the money that's

20   available.  They just cannot cut off the rights -- the plan

21   doesn't create money, right?  The plan doesn't create

22   assets.  The plan just says, whatever money is here is for

23   use in these purposes.  And so if there is no money to fund

24   this trust, that's not my problem, all due respect.

25             And certainly if I have a super priority claim and

Page 136

1   I say, you're going to have to pay me before you -- you can

2   go ahead and fund the trust.  You can go out and get -- find

3   litigation funding or you can go out and find a contingency

4   lawyer to do this because there's no way that if this was a

5   viable claim it couldn't be funded a million ways other than

6   stealing my money.

7            THE COURT:  Is this in your supplemental

8   objection?

9            MR. MOLONEY:  Yes, Your Honor.

10           THE COURT:  Where?

11           MR. MOLONEY:  Exactly.

12           THE COURT:  I don't --

13           MR. MOLONEY:  This is exactly the part.  We made

14  this so we wanted clarity that these funds -- Paragraph 6.

15  "ESL, of course, recognizes it will have no right to payment

16  unless it prevails on appeal, but should ESL prevail, its

17  ability to collect on traceable collateral proceeds or to

18  assert a 507(b) statutory priority claim cannot lawfully be

19  compromised by these self-help measures in the plan trust

20  agreement."  That's our position.

21           And this is not -- there's nothing in the

22  Bankruptcy Code that authorizes you to do this.  They're not

23  held in the discharge.  There's nothing in the Bankruptcy

24  Code that says --

25           THE COURT:  But this doesn't have anything to do

1    with the discharge.

2            MR. MOLONEY:  Effectively, it's a billed --

3    pertained to discharge because it's aimed at one group of

4    creditors.  It's to say, look, if they don't want to pay

5    you, they have a right sitting there in the liquidated trust

6    not to pay you.  Even though you have a priority claim and

7    you've won an appeal and the Bankruptcy Code says you should

8    be paid ahead of everybody else, if they don't want to do

9    it, they don't have to.

10           THE COURT:  The only thing I'm grappling with is,

11   again, if you just appeal the -- well, if you just have the

12   appeal that's currently on file.

13           MR. MOLONEY:  Correct.

14           THE COURT:  And you don't appeal confirmation,

15   then there's a -- or you do appeal confirmation, there's all

16   separate standard for dealing with that type of appeal --

17           MR. MOLONEY:  Yeah, but I don't see --

18           THE COURT:  -- that deals with mootness and those

19   sorts of --

20           MR. MOLONEY:  Yeah.  I don't see why I have to be

21   involved in that at all.  I really have no interest in it.

22           THE COURT:  Because it's the plan.

23           MR. MOLONEY:  But the plan doesn't -- with all due

24   respect, Your Honor.  I'm fine with the plan.  This is a

25   trust supplement agreement filed at 2:00 in the morning the

Page 138

1    day before a hearing that contains other provisions that are

2    not in the plan.

3              THE COURT:  Well, we should look at -- we should

4    at the disclosure too.  What does the disclosure statement

5    say on the funding of the plan?

6              MR. SINGH:  Your Honor, I believe it -- you know,

7    we'll get the specific page reference.  But I know it

8    references the liquid- -- you know, the liquidating trust

9    with approximately $25 million in it for --

10             THE COURT:  Yeah.  I mean, the settlement that

11   came out recently cut back on that.

12             MR. SINGH:  Right.

13             THE COURT:  Didn't add to it.

14             MR. SINGH:  Right.

15             MR. MOLONEY:  But the language in the trust

16   agreement makes it evergreen, Your Honor.  There's nothing

17   in that disclosure statement that says they can do it on an

18   evergreen basis.

19             MR. SINGH:  This seems like an equitable move.

20             MR. MOLONEY:  It's not an equitable move.

21             THE COURT:  I understand if you're modifying the

22   plan, including how it's described in the disclosure

23   statement.  You certainly can describe generally in the

24   disclosure statement documents that are filed later, if

25   they're consistent with that, then that's what I would be

Page 139

1    confirming.  So maybe it's the evergreen feature.  I don't,

2    you know -- I think they contemplated 20 million -- I think

3    it's --

4              MR. MOLONEY:  As a practical matter, $25 million

5    is probably going to be spent before I ever can get back

6    down here, so I'm really more concerned with the evergreen.

7              THE COURT:  Well, I doubt that.  I doubt it would

8    be all spent, although when litigators, as I say, breathe on

9    a file, it's $50,000.  I'm looking for the disclosure

10   statement reference to this at this point.  I think it's --

11             MR. SINGH:  Your Honor, first of all, I don't

12   think it's an evergreen.  I think it's a one-time funding.

13             THE COURT:  Okay.

14             MR. MOLONEY:  It's what it says.

15             MR. SINGH:  Oh, Your Honor, it's in Page -- excuse

16   me -- it's Page 3 of the disclosure statement where we talk

17   about the litigation assets.  So I'll read the two

18   sentences: "Upon the transfer of the liquidating trust

19   assets, the Debtors shall have no interest in or with

20   respect to the liquidating trust assets or liquidating

21   trust.  The Debtors estimate that the liquidating trust will

22   be funded with approximately $25 million on the effective

23   date," which relates to this issue of segregation, which we

24   disclosed.

25             MR. MOLONEY:  Okay.  That makes my point for me,

Page 140

1    Your Honor.  But before I get there, if I --

2            THE COURT:  But why?  That's the plan that -- I

3    mean, why is that -- look, again --

4            MR. MOLONEY:  It doesn't say a word about it being

5    segregated from other creditors.  It doesn't say --

6            THE COURT:  No, but it'll be transferred to the

7    trust, so that's --

8            MR. MOLONEY:  The trust is for the benefit of the

9    creditors, right, not for the benefit -- I thought it was

10    for the benefit of the creditors, not for the benefit of the

11    three trustees and professionals.

12            THE COURT:  No, but it says it's funded with the -

13    - can you read the sentence again, Mr. Singh?

14            MR. SINGH:  Yes.  Again, Page 3: "Debtors estimate

15    that the liquidating trust will be funded with approximately

16    $25 million on the effective date."

17            THE COURT:  Okay.  All right.

18            MR. MOLONEY:  If they have the money and there's

19    no prior claim to it, they can fund it; I have no problem

20    with that.

21            THE COURT:  Okay.

22            MR. MOLONEY:  But if they don't -- but if we have

23    a prior claim, we should be able to object to that, and we

24    shouldn't have to object to the plan.

25            THE COURT:  No.  I think you should -- I think you

Page 141

1    do have to seek a stay if you're saying that this funding

2    shouldn't happen.  I think the $25 million is clearly for

3    litigation purposes, right?  It's not for distribution

4    purposes.

5         MR. SINGH:  Absolutely, Your Honor.  And if you

6    read the definitions throughout the plan, they make clear

7    that what we are distributing is net proceeds, which allows

8    the directors the discretion every time they go to make a

9    distribution to decide how much they want to hold back for

10   going forward purposes.

11        THE COURT:  Right.

12        MR. SINGH:  I feel like we're being penalized that

13   we actually went out and said well, it'll be $25 million,

14   what everybody's been told.

15        THE COURT:  I agree with you, Mr. Moloney, that if

16   the effective date occurs and subsequently, the 507 is

17   reversed and you have -- you can trace your claim to the

18   funds, et cetera, that you should be able to go after them.

19   But I think you will need, in addition to getting that order

20   reversed, you would have to get either a stay or you'd have

21   to get the confirmation order reversed.  Because I think

22   that clear context of this plan is that the funding, subject

23   to, you know, the appeal issues, is for litigation purposes.

24        MR. MOLONEY:  Your Honor, can I just raise an

25   issue then?  The document that they actually filed, which

Page 142

1    says that --

2              THE COURT:  This is the supplement.

3              MR. MOLONEY:   The supplement, in Paragraph B --

4    I'm reading from Paragraph B on Page 4, it's 1.3(b).  It's

5    what we quoted in our objection.  It says that, "In addition

6    to that there should be set outside $25 million, is it

7    provided, however, that the funding may be increased from

8    time to time during the term of litigation trust, from the

9    proceeds of the liquidating trust assets, or from such other

10   sources as may be determined in the sole discretion of the

11   liquidating trust board."

12             I read that as evergreen language.  That, where it

13   says that, "funding may be increased from time to time

14   during the term of the litigation trust, from the proceeds

15   of the liquidating trust assets, or from such other sources

16   as may be determined in the sole discretion of the

17   litigation trust board."

18             I read that -- I don't read that as being

19   consistent at all with the disclosure of, we may have $25

20   million.  This says that we're going to have a reprise of

21   what happened under the DIP order where they're going to say

22   there's a special account set aside and they're going to put

23   all money in there.  And it's going to just frustrate our

24   rights to get paid if we win our appeal, and that will not

25   be right.

Page 143

1          THE COURT:  But, again, you can -- right now,

2     there's no allowed claim, all right?  So if you win on

3     appeal, it depends on whether the plan has been confirmed

4     and gone effective as to whether and how you could get that

5     money back.  It's not just based on winning on the appeal

6     necessarily, because if the plan is confirmed and goes

7     effective, it's binding, it's terms are binding.

8          MR. MOLONEY:  Correct.  But today is the day when

9     I have a chance to tell Your Honor that I shouldn't have to

10    -- and I have to tell Your Honor because I can't appeal your

11    ruling, with all due respect, unless I make the case today

12    and you disagree, which you're quite entitled to do.  But I

13    have to make the case that perhaps that this particular

14    provision is overreaching and I shouldn't have to include

15    this in my appellate brief; the fact that they've created a

16    liquidating trust fund, which they built a wall -- build a

17    wall around.

18          THE COURT:  But your only basis for going after

19    that provision on a legitimate basis is that the money is

20    more properly distributed on account of a claims that I said

21    it can't be distributed on.

22          MR. MOLONEY:  Well, at the moment -- actually I

23    think at the moment --

24          THE COURT:  Right.  And so --

25          MR. MOLONEY:  At the moment, our administrative

Page 144

1    claimants who also could be prejudiced by these provisions.

2            THE COURT:  But they don't -- they haven't

3    objected.  In fact, they negotiated a reduction of the

4    initial funding instead because they want the lawsuit to go

5    ahead against your clients.

6            MR. MOLONEY:  I don't know that that -- I don't

7    know -- I don't know --

8            THE COURT:  And everyone else did too.  Every

9    single administrative objector who objected said, we don't

10   want to cut back on the litigation against ESL.  So I think

11   --

12           MR. MOLONEY:  I think -- you know, Your Honor, I

13   think you got to take that with a grain of sale, right?

14           THE COURT:  Well, no.  I mean, if I'm going to

15   take any grains of salt, it's ESL saying there shouldn't be

16   so much money to sue me with.

17           MR. MOLONEY:  Well, they're not going to get --

18   they're not --

19           THE COURT:  So, I mean, the only issue is --

20           MR. MOLONEY:  They're not getting more money from

21   their lawsuit, Your Honor, so why would they care?

22           THE COURT:  All right.

23           MR. MOLONEY:  I mean, as you said, they've

24   objected on the administrative claim and they're getting

25   paid a discount on administrative claim and so, they're

Page 145

```
 1    done.  So what'll -- they don't have a -- they didn't throw

 2    in a kicker.

 3              THE COURT:  No, no, that's not true.  There are

 4    plenty of people who are not going to do the settlement and

 5    they're going to wait and get their hundred cents.

 6              MR. MOLONEY:  Those people have not -- I've not

 7    heard from in court saying --

 8              THE COURT:  Well, because they're not unhappy with

 9    the result.  But, again, it's an easy thing on your brief,

10    which says that to get my remedy, we have to reverse this

11    provision of the plan and go after it.  It's pretty easy.

12    And I don't, frankly, even see mootness because it's there,

13    it's sitting there.

14              MR. MOLONEY:  Thank you, Your Honor.

15              THE COURT:  So, you know, so if you asked for a

16    stay, you'd have -- you probably wouldn't get one because it

17    wouldn't be moot.  You wouldn't have to post a bond; you

18    just go forward.

19              MR. MOLONEY:  Exactly, Your Honor.  Thank you.

20              THE COURT:  Okay, all right.

21              MR. ANKER:  Your Honor, Philip Anker, Wilmer

22    Cutler Pickering Hale and Door.  We represent ESL in the

23    litigation that will occur.  And I apologize first for tag-

24    teaming you.

25              THE COURT:  All right.
```

1           MR. ANKER:  And I want to say in interest of full

2    disclosure that I want to give an explanation.

3           THE COURT:  Well, I'm sorry, this is the --

4           MR. ANKER:  Fraudulent transfer.

5           THE COURT:  So ESL as defendant.

6           MR. ANKER:  Correct.

7           THE COURT:  As opposed to --

8           MR. ANKER:  We represent ESL, Mr. Lampert and

9    related entities.

10          THE COURT:  As opposed to Appellant.

11          MR. ANKER:  Pardon me, Your Honor?

12          THE COURT:  As opposed to Appellant.

13          MR. ANKER:  Correct, Your Honor.

14          THE COURT:  Okay.

15          MR. ANKER:  We're also on the appeal brief.  But,

16   yes, Your Honor.  I'm here in a different capacity.

17          THE COURT:  Okay.

18          MR. ANKER:  And I want to raise an issue, to be

19   candid, it's not in any objection, but it arises out of the

20   revised administrative claim notice filed this morning.

21          THE COURT:  Right.

22          MR. ANKER:  I didn't see it until I got here at

23   noon.

24          THE COURT:  Okay.

25          MR. ANKER:  And Your Honor obviously was concerned

Page 147

1    about disclosure, and my only -- I am rising solely on

2    disclosure.

3              THE COURT:  Okay.

4              MR. ANKER:  In the quote/unquote, "risk factors",

5    the Debtors now say -- and I can point you to the page, but

6    I think you read it today, so I don't think I have to --

7    that, quote, "The Debtors believe they will receive

8    significant recoveries" end quote, from the proceeds of

9    various litigation, including that against my client.

10             THE COURT:  All right.

11             MR. ANKER:  And that they believe, having done an

12   investigation, that the claims are, quote, "highly

13   meritorious" end quote.  And this is obviously a document

14   going out under the imprimatur of a court notice.

15             THE COURT:  No, I read that.  And I think it

16   should say that the prospective -- the current and

17   prospective defendants in that litigation disagree with this

18   assessment and the ultimate result is unknowable at this

19   time.

20             MR. ANKER:  Your Honor, that's fine.  I was going

21   to say, I was surprised by all of this because in the

22   disclosure statement, there was nothing of the kind.  There

23   was simply a statement that they did an investigation and

24   then they filed suit, and then there was a paragraph setting

25   forth our position.

Page 148

1          THE COURT:  Okay.

2          MR. ANKER:  And our position, including that many

3     of the claims here are time barred, there are releases.

4          THE COURT:  Right.  No, that's fine.

5          MR. ANKER:  Your Honor noted today that many of

6     the creditors, when they were dealing with this Debtor, must

7     have thought the Debtor was solvent because they separate --

8     dealt with separate Debtors.  We also noted there that if

9     you look at the market evidence, including where the market

10    price of the stock was, it was in the billions upon billions

11    of dollars.  But that's not for today.

12          I was going to suggest the following language, but

13    I'm happy to have your language, and I'm happy to take out

14    adjectives if they take out adjectives.  I was going to say

15    ESL thinks the claims are entirely meritless, and we think

16    the Debtors will receive recoveries of nothing because that

17    is what we think.

18          THE COURT:  All right.

19          MR. ANKER:  But either way, I'm happy to have it.

20    The only other point I would add, Your Honor, and I leave

21    this to you -- I have two other points.  One is this is

22    coming under the imprimatur of a court notice, and I think

23    they were emboldened, frankly, by some of what occurred last

24    Thursday.

25          I think it would be appropriate to add a sentence

1    that simply says, the Court has obviously not heard any

2    legal argument or heard any evidence and it's not endorsing

3    anyone's view with respect to the litigation.

4            THE COURT:  This is -- I think it just can say

5    there can be no assurance of any recovery.

6            MR. ANKER:  Okay.  Your Honor, the last comment I

7    make, and this, I really rise only as an Officer of the

8    Court.  It's not -- frankly, if this were true, it might be

9    good for us.  There's a paragraph on D&O insurance that

10   says, and the key language here is in bold and italics:

11   "There is at least 150 million of available directors and

12   liability insurance that provides a source of recovery to

13   the Debtor plaintiffs in the subcommittee adversary

14   complaint against various parties."

15           With that were the case, and maybe it will be.

16   Let me tell you the facts as I interpret them, and you can

17   decide what disclosure you think is appropriate.  It is true

18   that the annual policy limit -- so for the 2015 year,

19   separately for 2016, separately for 2017 -- is 150 million.

20   But first, defense costs go against it.  And there is, right

21   now, litigation pending, both in state court in Illinois and

22   state court in New York, involving disputes between insurers

23   that D&Os are now being caught in.  One litigation, D&Os

24   have commenced, one has been commenced by the insurers, in

25   which they point to different years.  One, the primary

Page 150

1    insurance, Excel with respect to 2015 says, we are

2    exhausted.

3           Because one of the things you will hear when you

4    get into this litigation is there was a settlement of

5    litigation relating to Seritage with full releases granted,

6    you'll have to assess the effect of those releases.  But it

7    says it is already between that and the Sears Canada

8    litigation fully paid $15 million, so that policy is drawing

9    down to 135 million, and it says that is the only policy

10   that could conceivably bill a year that could conceivably

11   respond.

12          So if that's right, we're down to 135 million

13   right now, and defense costs are going every day against it.

14   And at the end of the day when the Debtor has a war chest of

15   25 million for itself alone and there's not just ESL, but

16   lots and lots of different defendants here, they will go

17   through that D&O insurance, at least a good amount of it, I

18   suspect.

19          Another insurer says, oh no, no, it isn't the 2015

20   policy -- because they're the second in line, this is QBE --

21   it is the 2018 current policy, '17 policy -- '18 policy,

22   excuse me, that applies; that's the one that's triggered.

23   Not surprisingly, QBE is not in that, but Excel is; it would

24   have the first 15.

25          So here's the real truth.  There may be 150

Page 151

1    million in insurance, minus defense costs; there may be 135

2    million, minus defense costs.  Maybe we can say that some

3    claims are covered by 2018, some are covered by 2015.  But

4    one thing is for sure: the insurers are fighting right now

5    paying anything.

6              THE COURT:  Well, that's the case --

7              MR. ANKER:  And so, this disclosure --

8              THE COURT:  -- with any insurance policy, frankly.

9              MR. ANKER:  Your Honor, that's right, that's

10   exactly right.  But this is a disclosure to foreign --

11             THE COURT:  No, that's fair.  No, I agree with

12   that.

13             MR. ANKER:  This is completely --

14             THE COURT:  So I think you should tone down that

15   description and refer to insurers disclaiming certain

16   coverage.

17             MR. ANKER:  And I would be happy to work with Mr.

18   Singh or others for a disclosure that is accurate.

19             THE COURT:  Okay.

20             MR. ANKER:  But this is simply overstated.  And I

21   rose just for those two reasons for disclosure.

22             THE COURT:  Well, I don't know.  I mean, having

23   dealt with insurers for too long, it's always good to remind

24   them of the risks of improperly disclaiming coverage too.

25             MR. ANKER:  Understood, Your Honor.  Thank you.

Page 152

1              THE COURT:  Okay.

2              MR. DUBLIN:  Your Honor, Phil Dublin for the

3      record for the Committee.  We've done analysis on the

4      Committee's side.  We actually believe there may be more

5      than $150 million in insurance.

6              THE COURT:  That's fine.

7              MR. DUBLIN:  I just wanted to clarify Mr. Anker's

8      comments.

9              THE COURT:  I think dollars to doughnuts, some

10     insurer is going to take a different position.

11             MR. DUBLIN:  Oh, I'm sure about that.

12             MR. ANKER:  We too think there may be more

13     insurance.

14             THE COURT:  Right, okay.

15             MR. ANKER:  The (indiscernible) of statement there

16     is.

17             THE COURT:  No, that's fair.  You don't want to

18     just fix the amount.  I think you need to say that certain

19     insurers have disclaimed some portion of the coverage.  And

20     I wouldn't say in excess; I would just say approximately.

21             MR. ANKER:  And we understand that a sentence will

22     be added, Your Honor, in light of your prior remarks that

23     ESL --

24             THE COURT:  Right, strongly disputes all of the

25     claims and there's no assurance of any recovery.

Page 153

```
 1                MR. SINGH:  That's fair.

 2                MR. ANKER:  We'll go with your language.

 3                MR. SINGH:  That's fine.

 4                THE COURT:  Okay.  All right.

 5                MR. FOX:  Your Honor, if I may?

 6                THE COURT:  Yes.

 7                MR. FOX:  Just two points with respect to the

 8     order.  Edward Fox, Wilmington Trust.  First, the paragraph

 9     8 in the proposed order, it's not clear whether the Debtors

10     are saying that the compromises in settlements are effective

11     immediately, meaning now, or immediately upon the effective

12     date.  In other language, in other paragraphs, it means on

13     the effective date.  I don't know what the intention was

14     here.

15                The second point, because we're getting a little

16     bit pregnant, so it's helpful to know what and when.

17                MR. SINGH:  Your Honor, I apologize.  We can

18     clarify this.  It's supposed to be on the effective date,

19     with the exception, I would say, obviously of the

20     administrative expense consent program, which is happening

21     now.

22                THE COURT:  Well, it says they're approved, and

23     then it says will be effective immediately on all parties-

24     in-interest on the effective date.

25                MR. FOX:  It's a little ambiguous.  It was
```

1    ambiguous to me as to whether effective immediately, stop

2    there, or it was then modified by on the effective date.

3              THE COURT:  I think effecting and binding are the

4    same thing.

5              MR. SINGH:  Right.

6              MR. FOX:  Well, binding -- okay.

7              MR. SINGH:  It's an important -- we'll add --

8              THE COURT:  Well, you can put on the effective

9    date in front, and on the effective date will be effective

10   and binding immediately.

11             MR. FOX:  That'd be fine.

12             MR. SINGH:  Right.  And with the exception, of

13   course, of the administrative program.

14             THE COURT:  Right, of the administrative claims.

15             MR. SINGH:  Right.

16             MR. FOX:  And then the other point, Your Honor, I

17   just wanted to clarify in your ruling with respect to the

18   indentured trustees fees.  In that, the argument was

19   different than the way you phrased it in your decision,

20   which related specifically -- and seemingly only -- to

21   Wilmington Trust.  So I just want to make sure it was not

22   your intention to treat us differently than the other

23   indentured trustees are proposed -- were proposed to be

24   treated.

25             THE COURT:  Well, they didn't object.

1          MR. FOX:  No, no, no.  Then they'd be treated

2     better than us; that that was the problem, they were being

3     treated differently, meaning better.

4          THE COURT:  All right.  I understand that point.

5     That provision should be modified to just provide for the

6     charging lien and the reasonable fees and expenses for

7     routine ordinary course matters, not any litigation either

8     pro or against the plan.

9          MR. FOX:  Thank you, Your Honor.

10          THE COURT:  I mean, the other folks, I'm assuming,

11     didn't incur those costs because they're not here.

12          MR. FOX:  I'm sure that they incurred costs.  I

13     mean, several --

14          THE COURT:  But not the litigation costs.

15          MR. FOX:  Two of them were on the Committee, so

16     I'm sure --

17          THE COURT:  No, but that's -- but that's -- look,

18     if you're on the Committee, that's routine bankruptcy -- I'm

19     just -- I wanted -- your objection really went to, there

20     shouldn't be a penalty for litigating.

21          MR. FOX:  Right.

22          THE COURT:  But that should cover -- there

23     shouldn't be anything for litigating; that's the way you get

24     rid of the penalty.  There's no plus for litigating or

25     negative for litigating.  So, for example, if you guys had

Page 156

1     stood up and filed a 50-page brief in favor of the plan,

2     that shouldn't get paid for under this provision, nor should

3     the objection get paid for.  Everything else that you

4     normally do would get paid for.

5          MR. FOX:  Okay.  I think we can make that work.

6          THE COURT:  Okay.  Because, again, you didn't want

7     to -- the notion was, this should not be a damper on your

8     litigation rights.

9          MR. FOX:  Yes, that's correct.

10         THE COURT:  Okay.

11         MR. SARACHEK:  Your Honor, Joe Sarachek for me and

12    other 15 trade creditors, trade vendors.

13         THE COURT:  Right.

14         MR. SARACHEK:  And particularly in light of the

15    fact that Mr. Wander, who was shepherding along with me this

16    trade ad hoc trade vendor committee.  This -- we filed it

17    last night and delivered to the Court, really in response to

18    a colloquy between you and Mr. Wander about the professional

19    fee carveout.  We spent an extensive amount of time over the

20    weekend looking at this issue.

21         And we think there's a serious issue there as to

22    whether, after February 11th, the professional had the right

23    to a carveout.  We think that number amounts to some $50

24    million, and it's at Docket No. 5332.  We would ask -- and

25    the Court indicated at the hearing on Thursday that you were

Page 157

1    prepared to sit down with the parties and -- I don't know if

2    you used the word mediate, but you certainly spoke to Mr.

3    Wander.  And, again, Mr. -- there's probably 50 to 60

4    members of this ad hoc trade vendor committee, as opposed to

5    trade claims purchasers who have settled to date.

6           So this is a serious issue.  It goes to good

7    faith.  We spent a considerable amount of time looking at

8    it.  And to the extent that the report -- well, over the

9    week --

10          THE COURT:  I mean, not by the objection deadline,

11   although others raised the objection.

12          MR. SARACHEK:  But what I'd ask, Your Honor, is we

13   see the train is going down the tracks.  But whatever the

14   confirmation order might say, to the extent that this issue

15   can be tabled and determined later, it's a significant

16   issue, Judge.  It's a significant amount of money.  There's

17   a real -- there's a legitimate question in the documents.

18   In fact, there was no budget after February 11th.  There was

19   no budget after February 11th that was approved by any other

20   party.  Prior to that date, of course, there was a secured

21   creditor.

22          And so, we would ask that this issue -- and I get

23   it, the hour is late, but this is a significant amount of

24   money.  And just to give you a sense on 180 million of

25   administrative claims, this would amount to 25 cents if

1   those claims were allowed in full.

2          THE COURT:  Well, what you're asking is the same

3   thing Mr. Wander was asking, which I told him last Friday

4   was unrealistic given the parties' rights under the DIP

5   agreement.  That being said, I do believe that there should

6   be -- and that this should be put in a notice -- some

7   additional forbearance on immediate payment by the

8   professionals in the case.  But it's nowhere close to what

9   you've suggested, which is everything.  And that would be

10  part of my ruling.

11         MR. SARACHEK:  Okay.  Thank you, Your Honor.

12         THE COURT:  Okay.  Frankly, I think it would go to

13  just align the administrative creditors better.  I'm sure

14  that will not necessarily endear me to your partners, but --

15         MR. SCHROCK:  Yeah.  I mean, Your Honor, may I be

16  heard on the issue?

17         THE COURT:  Sure.

18         MR. SCHROCK:  Okay.  It's certainly, you know,

19  this is obv- -- it's an important issue to the

20  professionals.  We -- and when we came into these cases, we,

21  you know, on behalf of our partners and our law firms, you

22  know, and consistent with the requirements in the Code, we

23  said we will do so, we'll perform these services provided

24  that we have the protection of this carveout.  And that's

25  the basis upon which, you know, we went to, you know, our

1    firms and did that; as opposed to, when you talk about

2    fairness, an administrative expense creditor extending

3    unsecured credit to Sears, we certainly -- we look at the

4    order, we think it's plain on its face.

5           This is the specific circumstance in which we have

6    negotiated for this protection.  And because we went, and we

7    had made, frankly, another concession that we didn't even

8    think we were required to make, to try and solve an

9    administrative expense creditor objection.  I feel like, you

10   know, now we're being thrown in with all other admin claims

11   and the carveout for which we negotiated, Your Honor, is,

12   you know, effectively going to be put on hold.

13          And I just want to say for the record, you know,

14   listen, we stand by our disclosure, we stand by what we've

15   done in the case.  There's been billions of dollars of

16   administrative claims paid in these cases.  And now, for

17   some reason, you know, the 150 that's being paid to the

18   professionals are being singled out and parties are plucking

19   at those.  And I --

20          THE COURT:  I'm focusing at -- I'm focusing on the

21   -- a portion of the 50 that's currently being held, which I

22   think mostly came in after the sale.

23          MR. SCHROCK:  It did, Your Honor.

24          THE COURT:  Right.  And I think a portion of that

25   should -- the collection, their portion of that should be

Page 160

1     deferred.

2               MR. SCHROCK:  Your Honor, I don't have a lot of

3     success changing your mind on these sorts of issues.  But I

4     will say that when you're talking about --

5               THE COURT:  I'll put it in this context.  It's

6     really the same context that Judge Sontchi dealt with in

7     Molycorp.  I understand there are carveouts and there are

8     provisions in DIP orders that provide how money is to be

9     spent on professional fees.  But there's a separate

10    requirement under the plan that the plan be feasible.

11              MR. SCHROCK:  Certainly.

12              THE COURT:  And while I generally believe that the

13    projections that the Debtors have provided are reasonable

14    under the circumstances.  There's $100 million swing even

15    in those projections -- I'm sorry, not 100 million -- a $65

16    million swing even in those projections of an administrative

17    shortfall.  And if you get beyond those -- and my view is

18    the higher end was probably another 10 or million above

19    that.  I kept saying I think that the high end was 70

20    million more, and I think you guys are at 65, 55, that

21    range.  The emergent state is going to be considerably

22    delayed because you're not just dealing with preference

23    claims and liquidating the dogs and cats, which are well in

24    the process of being liquidated.

25              MR. SCHROCK:  Right.  Well, you know, there is --

1    there's still an interim comp order that's in effect.  There

2    are certainly no final fee applications that are in front of

3    the court --

4              THE COURT:  No, I understand.

5              MR. SCHROCK:  -- in front of the court.

6              THE COURT:  I understand.  And that's -- I mean,

7    that's another point I would make.

8              MR. SCHROCK:  Thank --

9              THE COURT:  Which is --

10             MR. SCHROCK:  You know, if --

11             THE COURT:  -- if I'm going to have a holdback, I

12   can do it now or I can do it later.  I think it probably

13   makes sense to do it now as part of a finding on

14   feasibility.  I mean, I'm just going to the chart here, if I

15   can.  The shortfall, as projected, ranges from 36.5 million

16   to 104.5 million.  So I can see, even with the claims

17   settlement, that that goes up another, you know, $7- to $10

18   million.

19             And more importantly, the low hanging fruit on the

20   preference claims is probably in that 36 to 50 million

21   range.  And I think it would be a good thing for this

22   company to go effective at that point, rather than having to

23   win bigger preference claims.  Now, that's the legal

24   analysis.  Because it's a feasibility analysis, there is a

25   related appearance analysis, which may not a whole lot,

1    except for the fact that -- whereas, I think it's really a

2    disserve to the professionals to say they've been paid --

3    they shouldn't have been paid $150 million because they

4    actually really helped bring about the recovery that exists

5    here.

6            But we're not there yet, we're not at the end game

7    yet, and I would probably, in your next fee application,

8    probably have a callback in light of that.  My inclination

9    is to combine both of them now and have a $10 million

10   holdback.

11           MR. SCHROCK:  And, Your Honor --

12           THE COURT:  Actually, 9 million because 1 million

13   was added in.  And I think that is approximately on the 50

14   percent, at least puts at risk kind of the same amount that

15   the claim program puts at risk on the 50 million.  I think

16   up until the closing date, and some period thereafter,

17   there's absolutely no question.

18           And although there's not a lot of case law on

19   this, I think the US Flow case, In re. US Flow Corp., 332

20   B.R. 792 (Bankr. W.D. Mich. 2005) basically.  I think that

21   money is gone, as far as other creditors are concerned.

22   It's not property of the estate, it's gone, there's a true

23   carveout, et cetera.  I think once the debt was paid down, I

24   know there's the desegregated account in trust, et cetera,

25   but you still have to go effective.  And I think, for me to

```
 1    make my feasibility finding, that's -- that's called for.

 2              MR. SCHROCK:  And, Your Honor, listen, you're the

 3    Judge obviously.  We want the plan confirmed.  And if Your

 4    Honor determines that a holdback of $10 million is

 5    appropriate from the carveout account --

 6              THE COURT:  Well, a total amount, because you

 7    probably contributed 3, would be another 9.

 8              MR. SCHROCK:  Right.

 9              THE COURT:  And it's from the carveout account,

10    which is, you know, all the professionals.

11              MR. SCHROCK:  Yes.

12              THE COURT:  I guess that would be done pro rata.

13              MR. SCHROCK:  And, Your Honor, I think obviously

14    that's fair.  But what I don't want to have happen is,

15    listen, my firm --

16              THE COURT:  And have that keep happening?  No.

17              MR. SCHROCK:  We need a finding that the order is

18    final.

19              THE COURT:  That's the legal -- that's the legal

20    context; it's to find feasibility.

21              MR. SCHROCK:  Right.

22              THE COURT:  And a reasonable time for the

23    effective date to occur.

24              MR. SCHROCK:  Right.  But to continue that -- you

25    know, while we're still performing services --
```

Page 164

```
 1                THE COURT:  No, no.

 2                MR. SCHROCK:  -- and parties are still challenging

 3       a DIP order from --

 4                THE COURT:  I'm frontloading --

 5                MR. SCHROCK:  -- a year ago?

 6                THE COURT:  I'm frontloading the ruling in the

 7       context of a feasibility ruling.

 8                MR. SCHROCK:  Okay.

 9                THE COURT:  Not in the context of unfairness or

10       Rule 60; that's not going to fly.

11                MR. SCHROCK:  Okay.

12                THE COURT:  But I believe that 50 percent -- I'm

13       sorry, the 50 million that's sitting in that account today,

14       this amount should be held back.  The fee order still

15       operates going forward, et cetera.  I would not expect there

16       to be, you know, further holdbacks.

17                MR. SCHROCK:  Okay.

18                THE COURT:  Because this is simply to ensure that

19       you get to the effective date within a reasonable time.

20                MR. SCHROCK:  Thank you, Your Honor.

21                THE COURT:  Okay.  Well, I appreciate your saying

22       thank you.  It's not an easy give.

23                MR. SCHROCK:  That's all I could think of to say.

24       No, thank you would be -- but we'll take it.

25                THE COURT:  It's, you know, unfortunately, it's a
```

Page 165

1   lot of money, but it's something that I actually see pretty

2   often in cases, smaller cases, and it's to confirm the plan.

3   It's not for general -- it's not a reflection on the work

4   that was done, just as the fact that allowed administrative

5   claims are not getting paid right now is not a reflection

6   that they're not owed their allowed amount.

7           But I think, given the testimony and my

8   understanding of the timing on realizing remaining assets, I

9   think the ESL litigation will either go quickly or take a

10  long time, and so you'll be the preference litigation.  Even

11  though you have, I think, generally realistic estimates

12  between 11 and 23 percent recoveries, the low hanging fruit

13  is probably going to be, you know, about $50 million, and

14  you need that 10 to sort of get there.

15          MR. SCHROCK:  That makes sense, Your Honor, and

16  know the preference firms are preparing to file most of the

17  lawsuits.  I think the court staff was in a bit of a state

18  of shock.  By the end, there's about 2,000 preference

19  actions that are going to be filed here over the next couple

20  of days.

21          THE COURT:  All right.  Okay.  I asked on Friday

22  if there were any other objections besides the 1129(a)(9)

23  and (a)(11) objections, and no one spoke up other than the

24  people who are here today and spoke up today.

25          In my review of the objections, there were a

Page 166

1    couple that I don't think the Debtors' counsel told me were

2    resolved when we started the hearing on Friday.  But it

3    seems to me that, looking through them -- looking through

4    them, a couple might not be either resolved or have raised

5    another issue.  And I'm thinking of Santa Rosa Mall, who

6    complains about some -- I didn't really understand the

7    objection -- complained about a settlement and somehow it

8    wasn't properly noticed.

9            Is anyone on for Santa Rosa Mall?  They were the

10   ones that hung up?  Oh, the whole line just died?  Yeah, you

11   can do that?  Thanks.

12           THE COURT:  Okay.  This is Judge Drain again.  The

13   line -- yes.  This is Judge Drain again.  When the call-in

14   line died, I was starting to say that when the Debtors

15   recited at the start of the confirmation hearing on Friday

16   the plan objections that had been resolved and withdrawn, it

17   appeared to me that most of the remaining objections dealt

18   with either 1129(a)(9) or 1129(a)(11), which I've addressed.

19   I have addressed the handful of objections that I've

20   addressed today that didn't deal with those issues, and also

21   addressed the U.S. Trustee's objection on Friday.

22           It appears to me in going through the other

23   objections, there may be some objections by parties that

24   have not been formally settled that do not pertain to the

25   issues that I've already addressed.  But I'm not sure, so

Page 167

1  I'm going to just go through these quickly.  And if you're

2  on the phone, you should speak up to let me know if this is

3  still a live objection that you want to argue.

4          The first one is the objection of Mario Aliano.

5          MS. HARRIS:  Your Honor, this is Sharon Harris.

6  I'm on the phone on behalf of Mario Aliano.

7          THE COURT:  Yes.

8          MS. HARRIS:  And that's correct that my objection

9  has not been addressed yet.  If I could briefly just address

10  the Court?

11          THE COURT:  Okay.

12          MS. HARRIS:  Mr. Aliano has a Class 4 general

13  unsecured claim.  And if the plan is confirmed, he would get

14  a pro rata share, although not set forth in Section 4.4.

15  Aliano voted to reject the plan and filed an objection,

16  which is very narrow.

17          As a really quick background, he's the plaintiff

18  in a civil action that obtained a judgment against Sears.

19  Sears then appealed it, and there's an appeal bond to cover

20  the judgment, plus one year of interest.  We agreed to only

21  seek the amount of the appeal bond, and the matter is fully

22  briefed on appeal in the Illinois Appellate Court.  And

23  also, we have been working with Sears and Transform on a

24  stipulation whereby Transform would be substituted in as the

25  defendant in the Illinois action in place of Sears.

Page 168

1           The issue is, we filed a motion to lift the

2     automatic stay, which was previously presented to the court

3     and continued to October 23rd.  And the objection to the

4     Chapter 11 plan is that if the plan is confirmed, then

5     Aliano would only be able to get the pro rata share.  And

6     all the stays that are in effect would remain in full force

7     and effect, which would effectively deny our motion to lift

8     the stay without being heard on the merits.  Plus, we'd like

9     to make sure that our motion to lift the stay is heard on

10    the merits, and that Aliano's civil action is carved out so

11    the stay is not confirmed for his case.

12           THE COURT:  So can the Debtors confirm that the

13    stay motion will still be considered and that the bond

14    doesn't go away as a result of the plan?

15           MR. FAIL:  Your Honor, Garrett Fail,

16    Weil, Gotshal for the record.  The automatic stay will

17    remain in effect, as will parties' ability to seek relief

18    from the stay for cause.  And we are working with counsel

19    for Mr. Aliano to try to resolve it by stipulation with all

20    the parties.

21           THE COURT:  And the bond -- the bond will still be

22    outstanding.  This bond will still be posted.  The

23    confirmation doesn't --

24           MR. FAIL:  The Debtors are taking no steps

25    whatsoever with respect to it, so it'll be outstanding to

1    the extent it was outstanding.

2              THE COURT:  Right.  If there's some resolution

3    among all the parties, then the bond will be involved in

4    that.  But the confirmation and effective date of the plan

5    doesn't change the status of the bond.

6              MR. FAIL:  Correct, Your Honor.

7              THE COURT:  Okay.  And similarly, it doesn't

8    change the fact that if Mr. Aliano wants to proceed with a

9    lift stay motion, he can do that.

10             MR. FAIL:  Correct, Your Honor.  We're hopeful

11   that this'll be resolved.  We've worked with Transform and

12   with --

13             THE COURT:  But even if it isn't.

14             MR. FAIL:  Even if it isn't the motion will go

15   forward and we'll deal with it at that point, Your Honor.

16             THE COURT:  All right.  So, I mean, I frankly

17   wouldn't -- didn't view the plan as changing those rights.

18   I think the record is clear on that effect.  If you want to

19   send language to that effect to Weil, Gotshal, you can do

20   that.  But I don't -- I didn't read the plan as somehow

21   causing the bond to disappear or the stay motion to be moot.

22             MS. HARRIS:  Okay.  Thank you, Your Honor.

23             THE COURT:  Okay.

24             MR. FAIL:  Thank you, Your Honor.

25             THE COURT:  Alpine Creations, I think is now --

Page 170

1    it's clear that they are not a releasing party, and I

2    believe the other objection was an 1129(a)(11) and a (9)

3    objection.

4              MR. CAVALIERE:  Your Honor, Rocco Cavaliere at

5    Tarter Krinsky on behalf of Alpine Creations.  I actually

6    just got cutoff for five minutes and I just heard you

7    speaking about my objection.  I just signed back on.

8              THE COURT:  Right.  I just wanted to -- I just

9    wanted to make sure that this is -- if there's anything left

10   at this point on the objection that I haven't already ruled

11   on or confirmed that the plan addressed?

12             MR. CAVALIERE:  Your Honor, I think we had raised

13   a minor objection with respect to our setoff recoupment, and

14   there's some language that was circulated that is

15   acceptable.

16             THE COURT:  Okay.

17             MR. CAVALIERE:  The only objections that remain

18   are with respect to 1129(a)(9) and (11).

19             THE COURT:  All right.  So I've ruled on those,

20   although I may have to fight a little bit at the end.  Carl

21   Island -- Ireland.  Was that -- were the parties able to

22   resolve that with some adequate protection language?

23             MR. SINGH:  Your Honor, we're working on some

24   language to stipulate to the discussion.

25             THE COURT:  Replacement lien?

Page 171

1          MR. SINGH:  Yeah, exactly, to provide the

2    replacement lien on all assets.  I don't know if they're

3    here, but we've exchanged language and we'll take care of

4    that, Your Honor.

5          THE COURT:  Okay.  All right.  I think

6    (indiscernible) International was an 1129 objection, (a)(9)

7    and (a)(11), if anyone's on if there's anything else that

8    I'm missing.

9          PeopleReady wanted clarification that its contract

10   is not deem objected since it's subject to the pending

11   assumption notice.  Has that been resolved?

12         MR. SINGH:  Your Honor, that issue I don't think

13   is open.  I understand that Transform is negotiating

14   directly with that counterparty.

15         THE COURT:  All right.  Well, so -- but as far as

16   you're concerned, is it being deemed rejected under the plan

17   or did you -- since there's a pending notice, I guess it's

18   only when that's withdrawn that it is.

19         MR. SINGH:  Correct.  It's on an assumption notice

20   that was proposed to be assumed, so the plan is not

21   impacting the issue.

22         THE COURT:  All right.  So if someone -- if

23   someone who's a party, a non-debtor contract party, and

24   there's a pending assumption motion --

25         MR. SINGH:  Right.

Page 172

1           THE COURT:  -- the plan doesn't reject.

2           MR. SINGH:  Correct.

3           THE COURT:  You would separate reject if their

4    assumption notice is withdrawn.

5           MR. SINGH:  That's correct.

6           THE COURT:  Okay.  All right.  Santa Rosa Mall.  I

7    don't know if you heard me or whether the call conked out.

8    I didn't -- some of the points have been resolved, i.e.

9    Santa Rosa is not a releasing party.  And I believe Santa

10   Rosa -- well, I'm not sure if there's anything left, let me

11   just put it that way, given the stipulation of voluntary

12   dismissal of its claims in the adversary proceeding.  Is

13   there -- is counsel for Santa Rosa on the phone?

14          MR. CHICO:  Yes, Your Honor.  Good afternoon.

15   Gustavo Chico on behalf of Santa Rosa.

16          THE COURT:  Is there anything left to the

17   objection, other than clarification that Santa Rosa is not a

18   releasing party?

19          MR. CHICO:  Right.  That's basically what we're

20   trying to get a clarification on that.  We were often --

21          THE COURT:  Well, that's clear.  The Debtors are

22   treating all parties who objected on the basis of a third-

23   party release, or of course, who opted out, as a non-

24   releasing party.

25          MR. CHICO:  Right.  And our concern was regarding

Page 173

1    the injunction provision in Section 15.8 of the plan.  The

2    way it's drafted, it seems that parties will be -- Santa

3    Rosa or any party will be injuncted from collecting or

4    otherwise recovering by any means or manner, whether

5    directly or indirectly.  And since we're trying to pursue

6    our claim against the insurance carriers from the insurance

7    company, that that may be construed as an indirect action

8    against the Debtor, and that's why we wanted that

9    clarification.

10           THE COURT:  All right.  Well, I don't read the

11   injunction as protecting third parties.

12           MR. SINGH:  That's right, Your Honor.  It's just

13   for implementation of the plan as it relates to the Debtors.

14           THE COURT:  As it relates to the Debtors.

15           MR. SINGH:  Right.

16           THE COURT:  I think maybe the thing to do is

17   simply to send a letter and I'll put it on the docket to

18   Santa Rosa confirming that.

19           MR. SINGH:  Sure, we can do that, Your Honor.

20           THE COURT:  Okay.

21           MR. CHICO:  Thank you.

22           THE COURT:  Okay.  Edgewell Personal Care, in

23   addition to the 1129(a)(9) and (11), objected on the basis

24   that it's not clear whether its contract is assumed or

25   rejected, and is arguing that it was a de facto assumption,

Page 174

1    which isn't true -- I mean, there's no de facto assumption

2    under the Bankruptcy Code.  But can you clarify whether it's

3    being assumed or rejected as of the confirmation date?

4              MR. SINGH:  One second, Your Honor.

5              THE COURT:  Okay.

6              MR. SINGH:  Your Honor, my understanding with

7    respect to this agreement is that it's not an executory --

8              THE COURT:  Not an executory contract.

9              MR. SINGH:  Right, as of today.  So I think there

10   may just be a dispute with respect to whether or not we've

11   assumed or rejected it, which may have to happen.

12             THE COURT:  All right.  Well, you've done neither,

13   right, at this point?

14             MR. SINGH:  Right, we've done neither; that's

15   exactly right.

16             THE COURT:  So my ruling is, you have to either do

17   -- let me back up.  There's no such thing as a de facto

18   assumption or rejection while you're in bankruptcy prior to

19   the confirmation date.

20             MR. SINGH:  Right.

21             THE COURT:  If the plan is confirmed and it goes

22   effective and you've done nothing, the contract, to the

23   extent it's executory, rides through.

24             MR. SINGH:  No, Your Honor.  The plan says it's

25   rejected if we've done nothing.

Page 175

```
 1              THE COURT:  If you've done nothing.

 2              MR. SINGH:  Right.

 3              THE COURT:  Okay, correct.  So if there's not been

 4   a notice of assumption, it will be deemed rejected.

 5              MR. SINGH:  Correct.

 6              THE COURT:  All right.

 7              MR. SINGH:  And I guess they can try to argue

 8   whatever they want later.

 9              THE COURT:  Well, you can't argue that there's a

10   de facto assumption.

11              MR. SINGH:  Right, because that issue, you've

12   ruled on.

13              THE COURT:  Right.  See, among other authorities,

14   In re. Child World, Inc., 147 B.R. 847 (Bankr. S.D.N.Y.

15   1992), but also the plain language of Section 365.  So I

16   don't know if Edgewell's counsel is on the phone.  But,

17   consequently as a consequence of the plan's confirmation and

18   there being no assumption notice, it's deemed rejected to

19   the extent it is executory.

20              MR. SINGH:  Right.

21              THE COURT:  That's an open issue too, whether it

22   is executory.  Vehicle Service Group, in addition to

23   1129(a)(9) and (a)(11) raise the third-party release point.

24   But the Debtors have confirmed that it is being treated as

25   opting out of the third-party release.  Is counsel for VSG
```

Page 176

1    on; is there any other issue that I missed here?  Okay.

2            I think we briefly addressed this, but Team

3    Worldwide Corporation, I think you've resolved it.

4            MR. SCHROCK:  It's resolved, Your Honor, yeah.

5            THE COURT:  Okay.  And that's correct, Team

6    Worldwide are you on?  No, okay.  All right.  Is there any

7    objection that I missed?  Okay.

8            Let me go back then to the 1129(a) findings.  I'm

9    prepared to make each of the findings that I need to make

10   under 1129(a) for confirmation of the plan.  I've already

11   ruled as far as the PBGC classification; that the plan

12   complies with the other provisions of the Bankruptcy Code as

13   far as classification is concerned.  With regard to the only

14   objection, I believe that was to classification, which was

15   to the classification of the PBGC claim.  There's clearly a

16   reasonable basis for classifying that claim separately,

17   given the PBGC's rights and position in the case.

18           I also find that the plan is proposed in good

19   faith under 1129(a)(3).  It's been proposed for a valid

20   bankruptcy purposes, and I believe is intended to and does

21   have the best chances of maximizing recoveries for creditors

22   here, and has been carefully thought through to do so in a

23   way that is fair in light of all the creditors' rights under

24   the applicable agreements and the Bankruptcy Code, including

25   the DIP agreement and order, the cash collateral order and

Page 177

1    the carveout provided for in it, including the language that

2    I've already referenced regarding the placement of the

3    carveout amounts in a segregated account and in trust solely

4    for the use of the professionals.

5              The only other objections on 1129(a) grounds were

6    on the requirement 1129(a)(9) that to be confirmed, a plan

7    must accept, to the extent of a particular claim has agreed

8    to a different treatment of such claim, provide that, with

9    respect to the claim of a kind specified in Section

10   507(a)(2) or 507(a)(3) of this title.  On the effective date

11   of the plan, the holder of such claim will receive on

12   account of such claim cash equal to the allowed amount of

13   such claim.

14             1129(a)(11) provides that the plan proponent must

15   show, as it must show with regard to all the 1129(a)

16   provisions by a preponderance of the evidence that, quote,

17   "Confirmation of the plan is not likely to be filed by the

18   liquidation or the need for further financial reorganization

19   of the Debtor or any successor to the Debtor under the plan,

20   unless such liquidation or reorganization is proposed in the

21   plan.

22             I'll note that Section 1129(a)(9) does not require

23   that confirmation of the plan be immediately followed by the

24   effective date of the plan.  It simply requires that on the

25   effective date of the plan, the plan provides for payment in

1    cash of the allowed amount of administrative expenses, with

2    the exception of those where the holder has agreed to a

3    different treatment of such claim.

4          Here, as with many plans, the Debtor has proposed

5    -- the Debtors are proposing that the Court confirm the

6    plan, knowing that there will be a hiatus while the Debtor

7    is still a debtor-in-possession until the plan goes

8    effective.  That is because there is a projected shortfall,

9    as of today, of between $36.5 and $104.5 million of cash

10   payments necessary to implement the plan, including payment

11   of projected allowed administrative expenses -- priority

12   tax, secured claims, and priority non-tax claims -- in light

13   of the Debtors' projection of sources beyond those that are

14   in hand.

15         Having reviewed the Declarations, including the

16   supplemental Griffith Declaration in support of confirmation

17   of the plan, I find that the witnesses testimony, including

18   on cross-examination, is credible and that the projections

19   are reasonable.  Nevertheless, they are just projections

20   and, as I said, they show a shortfall of between $36.5 and

21   $104.5 million if the plan were to go effective promptly

22   upon entry of the confirmation order, i.e. later this week,

23   for example.

24         Based on the total sources, however, I believe

25   that it is reasonable to project substantial recoveries in a

1    relatively brief period on the Debtors' preference claims

2    and/or settlements of administrative expenses that would

3    include a preference claim release in return for a reduction

4    of the administrative claim.  That would reduce that

5    shortfall dramatically.

6         I also believe, based on Mr. Transier's

7    Declaration, which was uncontroverted in my own review of

8    the Complaint attached to it, that the Debtors have

9    substantial potential claims against the defendants in that

10   adversary proceeding, which clearly will take longer to test

11   and potentially obtain recoveries on, but -- which have been

12   treated throughout these cases by the Debtors and the

13   Creditors' Committee, both represented by well-informed and

14   sophisticated counsel, as claims that should not be settled

15   for relatively small amounts.

16        However, that litigation, I believe, unless there

17   is a meaningful settlement of it in the relatively near

18   term, I think will take a substantial amount of time to

19   resolve, potentially two to four years, and I am reluctant

20   to delay the effective date of this plan that long.

21        So I am focused on the claims' side of the balance

22   sheet, the administrative claims' side of the balance sheet

23   and the other 100-cent dollar amounts that would need to be

24   paid, as well as the other assets besides the so-called ESL

25   litigation.  Based on the record before me and including the

Page 180

1    additional exception from the carveout that I've previously

2    discussed on the record of another $9 million, I believe

3    that the likelihood of satisfying Section 1129(a)(9) in the

4    relatively near term, i.e. in a matter of a few months, is

5    established.

6         I have additional comfort, besides the concession

7    I've asked of the professional here, in that conclusion from

8    the claims' resolution program that I am also approving

9    today and then would become effective today, which would

10   provide for incentives to settle claims for less than 100

11   cents on the dollar by administrative expense creditors.

12        It has been argued that that settlement has been

13   announced too promptly for proper review.  And, secondly,

14   that the, in essence, third tier of the settlement or

15   sandwich group in the settlement who neither affirmatively

16   opt out or opt in, are not really -- or I couldn't find

17   would be really agreeing, for purposes of 1129(a)(9), to

18   their treatment under the settlement.

19        As to the first point, I do not believe that the

20   settlement requires more notice to parties-in-interest

21   generally.  I say so because it appears to me to be a

22   reasonable resolution of a relatively simple issue, which is

23   that the Debtors lack sufficient cash to pay administrative

24   expense claims in full, but have agreed on a reasonable

25   mechanism supported by informed counsel on both sides -- and

1   that includes the Official Unsecured Creditors Committee --

2   as to the allocation of a meaningful amount of cash in

3   return for a discount for opting in to the settlement and a

4   second tier of meaningful cash, albeit it a later tier, for

5   doing nothing and obtaining a 5 percent greater maximum

6   recovery, as well as the option clearly to opt out and

7   simply wait for a full 100 percent recovery.

8           Given those options for administrative expense

9   creditors, I don't believe any administrative expense

10  creditor can criticize the settlement.  They have the option

11  either to be bound by it or not be bound by it.  And,

12  therefore, it's neither too good nor too poor, because both

13  options are available to them under it.  And I believe now,

14  they have more than sufficient time to review it to make

15  that choice, i.e. the 33 days plus the disclosure, as

16  modified on the record today, of the risk factors.

17          The second objection, as I noted, is that I should

18  not find that parties who neither affirmatively opt in nor

19  affirmatively opt out can be said to have agreed to the

20  settlements' treatment of that group for purposes of Section

21  1129(a)(9).  The agreement here is not the deemed agreement

22  that I've consistently found is proper to find, if there's

23  proper disclosure, under a plan, which has its own specific

24  treatment under Section 1141 of the Bankruptcy Code, i.e.

25  it's binding, the terms of the plan are binding on all

Page 182

1     parties.

2             The agreement here is an agreement under normal

3     contract law principles.  So the issue for me is can one

4     agree under normal contract law principles by implication or

5     non-action.  This issue was dealt with by Bankruptcy Judge

6     Bernstein in In re. Teligent, Inc., 282 B.R. 765 (Bankr.

7     S.D.N.Y. 2002), where he determined under those

8     circumstances that administrative expense creditors who did

9     not return a consent form would be deemed to agree, inferred

10    to agree, having been given the option to either object or

11    to affirmatively agree.

12            Judge Bernstein concluded with appropriate

13    disclosure, as there was here in an effort to provide enough

14    notice to parties to make a decision, that he could infer

15    agreement under applicable non-bankruptcy law, including the

16    Restatement (Second) of Contract, Section 69-1, which sets

17    forth exceptions to the rule that ordinarily an offeror

18    cannot treat silence or inaction as an acceptance.  The

19    exceptions where the offeree will be deemed to accept the

20    offer through silence are when he has a duty to speak and,

21    second, when the offeree's silence may constitute acceptance

22    where the offeror has stated his intention or given the

23    offeree reason to understand that he will do so, and the

24    offeree, in remaining silent and inactive, intends,

25    therefore, to accept the offer.

1            That latter principle, I believe, applies here,

2     although, frankly, Judge Bernstein applied the former too,

3     finding a duty to speak in the context of plan confirmation

4     where it would be clear to the party that the plan was being

5     confirmed in reliance on that construct, which is clearly

6     the case here because it is part of my 1129(a)(11) analysis

7     that at least some parties will neither opt in nor

8     affirmatively opt out of the settlement.

9            There's not a lot of case law on this issue, at

10    least one case.  In re. Real Wilson Enterprises,

11    (indiscernible) B.R. LEXIS 3997 (Bankr. E.D. Calif.

12    September 23, 2013) has disagreed with Teligent.  But I

13    believe it does so under quite different facts where the

14    choice was not laid out in a way that was laid out in

15    Teligent or here.  In re. Global Aircraft Solutions, Inc.,

16    2011 B.R. LEXIS 2063 (BAP 9th Circuit, May 11, 2011) relied

17    on the Restatement provision that I previously cited for a

18    deemed consent.  And there is precedent from the Toys 'R Us

19    case where a similar program, albeit one without a lengthy

20    opinion, but a bench ruling in favor of the same type of

21    notice and deemed consent.

22            Given that the Debtors are relying upon a

23    different treatment where there is silence than either of

24    the other two options where there was affirmatively

25    reaction, can that reliance carry through in this case,

Page 184

1    including in respective rulings on feasibility.  I believe

2    that under these circumstances, I can find agreement under

3    normal contract law principles.

4           So the only other finding I need to make is

5    against entities that have not objected to confirmation,

6    which is the cramdown finding, for those classes that have

7    not accepted the plan and certain Debtors.  It's clear from

8    the plan that no junior class is receiving any property

9    under the plan; and, consequently, the plan satisfies the

10   requirements of the cramdown of the unsecured non-voting

11   classes, as well as the equity classes.

12          I had I believe already ruled on the other

13   objections by the United States Trustee, and I will not

14   reiterate my ruling here on that, other than to note that

15   for the same reasons that I previously ruled, and certain

16   colleagues of mine have previously ruled.  I believe that in

17   connection with the plan with a disclosure statement ballot

18   and plan itself alert creditors that if they do not opt out

19   of a third-party release, they will be bound by that release

20   means that if they do not object to the release, they are

21   bound by the terms of the plan as provided in 11 U.S.C.

22   Section 141 of the Bankruptcy Code, i.e., the plan is more

23   than just a contract by analogy; it has its own statutory

24   and common law res judicata effects, including with respect

25   to any provision, including a release provision, as long as

Page 185

1    the release provision is drafted clearly and the option to

2    opt out is clear.

3              Here, the Debtors have treated not only those who

4    affirmatively opted out, but those who have actually

5    objected to confirmation on the basis of the third-party

6    releases, having opted out of the release.  The other

7    parties who have done nothing should be bound by the plan,

8    given the clarity of the release and the fact that it is not

9    unduly broad and, instead, is carefully tailored and has

10   authority for that proposition.  I'll simply refer to the

11   Debtors' reply memorandum of law, which cites my prior

12   rulings on that topic, as well as rulings by Judge Lane and

13   Judge Chapman.

14             So I think you need to make some relatively modest

15   changes to the confirmation order.  And you don't need to

16   formally settle those -- that draft, but you should

17   circulate it perhaps a day before the submission of it to

18   chambers.

19             I guess I should also say, although I said this

20   during oral argument on Friday.  Certain objectors have

21   questioned why one should proceed to confirmation now, as

22   opposed to waiting until more cash is brought into the

23   estate.  In my view, the Debtors and the Committee are

24   entirely correct in seeking confirmation at this point.  It

25   has helped to provide enough certainty and clarity for, at

Page 186

1    this point, the administrative expenses creditors primarily

2    to be ready to focus on a resolution of their claims, and

3    has further, I believe, and materially so, reduced the

4    continuing costs of these cases where uncertainty inevitably

5    would lead to more issues to be litigated, raised and

6    disposed of, with an eye to positioning the parties for an

7    ultimate confirmation fight.  It's better to have had that

8    fight over the last two days of hearings and be in a

9    position now where the Debtors have a clear path to going

10   effective.

11           MR. SCHROCK:  Thank you.  Thank you very much,

12   Your Honor.  On behalf of the Debtors and the Board, the

13   restructuring committee, and all the constituents, we really

14   do appreciate it.

15           I have one last just housekeeping item.  It's not

16   a matter for today.  But the ad hoc administrative

17   claimants, you know, we've incurred, you know, roughly

18   $700,000 in fees and, you know, getting to the consent

19   program here.  The Debtors and the Committee did agree that

20   they would support their motion for substantial contribution

21   up to $400,000.  I know that's not up for today, but I did

22   want to note that for the record because it is certainly

23   part of our agreement.

24           THE COURT:  Okay.  Well, as we made clear, until

25   the plan goes effective, all of the rules and principles of

Page 187

1   an ongoing Chapter 11 case applies, so I'm sure I'll have

2   that application in due course.  Okay.  All right.  Thank

3   you.

4            MR. SCHROCK:  This is Ms. Marcus.  If we could

5   just very quickly, I'm sorry.

6            THE COURT:  That's all right.

7            MS. MARCUS:  Sorry.  Sorry to keep everybody here

8   any longer.  Just very quickly, Your Honor.  As you know, we

9   had the 1114 hearing on Thursday.

10           THE COURT:  Right.

11           MS. MARCUS:  Your Honor ruled we submit an order.

12           THE COURT:  Right.  I sent an order in to be

13   entered last night.

14           MS MARCUS:  Perfect.  We haven't seen it yet.

15           THE COURT:  I read Mr. -- well, I sent in, like,

16   60 orders over the weekend, so they've been busy.  They'll

17   be entering it soon.  I read Mr. Gerson's letter, and I had

18   a very minor change to the order in light of the letter, but

19   I didn't redo the settlement.  And I think that was the

20   problematic aspect of the letter is there was some aspects

21   of the letter that really sought to redo that settlement,

22   and I wasn't going to do that.

23           MS. MARCUS:  Thank you, Your Honor.

24           THE COURT:  Okay.

25

1          (Whereupon these proceedings were concluded at

2     05:27 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 189

1                          C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                   Digitally signed by Sonya
                             Landanski Hyde
                             DN: cn=Sonya Landanski Hyde, o,
7    Landanski Hyde          ou, email=digital1@veritext.com,
                             c=US
                             Date: 2019.10.09 16:14:43 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 9, 2019