```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re                                              :
                                                   :    Chapter 11
SEARS HOLDINGS CORPORATION, et al.,                :
                                                   :    Case No. 18-23538 (RDD)
                                                   :
          Debtors.¹                                :    (Jointly Administered)
-------------------------------------------------------------x
```

## AFFIDAVIT OF PUBLICATION

I, Nora Hafez, depose and say that I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

This Affidavit of Publication includes sworn statements verifying that the Notice of Administrative Expense Claims Consent Program and Opt-In / Opt-Out Procedures as conformed for publication, was published in *The New York Times,* National Edition on October 17, 2019, as described on **Exhibit A** attached hereto.

Dated: October 18, 2019

_____
Nora Hafez

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on October 18, 2019, by Nora Hafez, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____

JAMES A. MAPPLETHORPE
Notary Public, State of New York
No. 01MA6370846
Qualified in New York County
Commission Expires February 12, 2022

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

SRF 36704

**Exhibit A**



620 8TH AVENUE - NEW YORK, NY 10018

# PROOF OF PUBLICATION

October 17, 2019

I, Shannon Schmidt, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

October 17, 2019 - (NYT + Natl) - pg. B3

Sworn before me the 17th day of Oct, 2019

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re SEARS HOLDINGS CORPORATION, et al., Debtors.[1]  Chapter 11  Case No. 18-23538 (RDD) (Jointly Administered)

**NOTICE OF ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM AND OPT-IN / OPT-OUT PROCEDURES**

**PLEASE TAKE NOTICE** that:

1. On October 15, 2019, the Order Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors (ECF No. 5370) (the "**Confirmation Order**") was entered by the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York (the "**Court**").[2]

2. The Confirmation Order approves the Administrative Expense Claims Consent Program, the Opt-In/Opt-Out Procedures, the opt-in ballot (the "**Opt-In Ballot**"), and the opt-out ballot (the "**Opt-Out Ballot**") attached as Exhibit C to the Confirmation Order.

3. All Holders of Administrative Expense Claims who (i) **affirmatively opt-in to the Administrative Expense Claims Consent Program or (ii) do not opt-out of the Administrative Expense Claims Consent Program** (together, the "**Settled Admin Claims**") will receive the treatment described in paragraph 52(a) of the Confirmation Order.[3]

a. Holders of Allowed Administrative Expense Claims **who affirmatively opt-in** (the "**Opt-In Settled Admin Claims**") to the Administrative Expense Claims Consent Program prior to the Opt-In/Opt-Out Deadline shall receive, among other things:

(i) their pro rata share of $21 million ("**Initial Cash Pool**"), on or about December 1, 2019 (the percentage recovery, the "**Initial Recovery**");

(ii) total recovery capped at 75% of the Allowed Administrative Expense Claim;

(iii) such $21 million shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claims;

(iv) consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; and

(v) holders who do not agree with the Debtors on the Allowed amount of Opt-In Settled Admin Claims shall be deemed to hold a Non Opt-Out Settled Admin Claim (defined below).

b. Subject to the satisfaction of the Minimum Conditions,[4] holders of Administrative Expense Claims that **do not affirmatively opt out** of the Administrative Expense Claims Consent Program (the "**Non Opt-Out Settled Admin Claims**") prior to the Opt-In/Opt-Out Deadline shall receive, among other things:

(i) their pro rata share of the Second Distribution,[5] which will be shared only by other holders of Non Opt-Out Settled Admin Claims until they have received a percentage of distribution on such Claims that is equal to the Initial Recovery provided to the holders of Opt-In Settled Admin Claims (together with the Initial Recovery, the "**Settled Administrative Expense Claims Recovery**");

(ii) total recovery capped at 80% of the Allowed Administrative Expense Claim; and

(iii) consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Out-In/Opt-Out Deadline.

c. The Debtors and the Creditors' Committee may, on a case-by-case basis, also waive or settle any preference action for Settled Admin Claims.

d. Thereafter, holders of Settled Admin Claims shall receive pro rata distribution on account of Settled Admin Claims up to the Settled Administrative Expense Claims Recovery (as applicable) of the consensually agreed up amount.

4. All Holders of Administrative Expense Claims **who opt in to the** Administrative Expense Claims Consent Program will be deemed to be satisfied in full on account of such claims once they have received payment in cash equal to 75% of the applicable Allowed Opt-In Settled Admin Claims and all Holders of Administrative Expense Claims **who do not opt out** of the Administrative Expense Claims Consent Program will be deemed to be satisfied in full on account of such claim once they have received payment in cash equal to 80% of the applicable Allowed Non Opt-Out Settled Admin Claims. Holders of Administrative Expense Claims' consent to the Administrative Expense Claims Consent Program will also be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code.

5. Settled Administrative Expense Claims will benefit from expedited reconciliation of the Allowed amount of their Administrative Expense Claim, to be completed within thirty (30) days from the applicable deadline with an opportunity to settle preference claims and assurance that any distributions made to holders of Administrative Expense Claims who settle cannot be clawed back. Upon any conversion of the chapter 11 cases, all Settled Administrative Expense Claims shall be Allowed against the Debtors on a consolidated basis.

6. Holders of Administrative Expense Claims who affirmatively opt-out of the Administrative Expense Claims Consent Program (the "**Non-Settled Administrative Expense Claims**") will retain the right to receive payment of the Allowed 100% of their Administrative Expense Claims, but payment of their Administrative Expense Claims shall occur on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim is Allowed, and (iii) the next Distribution Date after such Administrative Expense Claim is Allowed in accordance with the Plan. Holders of opt-out claims will not be entitled to participate in the Initial Distribution, the Second Distribution, or any further distribution until the Plan has become effective or the Settled Administrative Expense Claims have been satisfied.

7. All Holders of Administrative Expense Claims shall receive an Opt-In Ballot and an Opt-Out Ballot.

8. To **opt-in** to or **opt-out** of the Administrative Expense Claims Consent Program, Holders of Administrative Expense Claims must complete and return to Prime Clerk LLC (the "**Claims and Noticing Agent**") so that the Opt-In Ballot or Opt-Out Ballot is **actually received on or before November 18, 2019, at 4:00 p.m.**, prevailing Eastern Time.

9. **If you do not take any action, you will be deemed to be bound by the Administrative Expense Claims Consent Program, but not entitled to any benefits that will be provided to Holders of Administrative Expense Claims who timely opt in to the Administrative Expense Claims Consent Program, i.e., you will not participate in the Initial Distribution.**

10. Any party that believes they are a Holder of an Administrative Expense Claim but did not receive an Opt-In Ballot or Opt-Out Ballot may request either such ballot from the Claims and Noticing Agent at (844) 384-4460 or searsinfo@PrimeClerk.com, and both ballots are available for download at https://restructuring.primeclerk.com/sears.

Copies of the Confirmation Order, the Plan, the Opt-In Ballot, the Opt-Out Ballot, and related documents may be obtained by request to the Claims and Noticing Agent at (844) 384-4460 or searsinfo@PrimeClerk.com, and are available for download at https://restructuring.primeclerk.com/sears.

Dated: October 15, 2019, New York, New York
/s/ Sunny Singh   WEIL, GOTSHAL & MANGES LLP, 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007, Ray C. Schrock, P.C., Jacqueline Marcus, Garrett A. Fail, Sunny Singh, Attorneys for Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corpofation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SHe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confirmation Order or the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors (ECF No. 5293) (as may be amended from time to time, the "**Plan**").

[3] This statement is qualified in its entirety by reference to paragraph 52(a) of the Confirmation Order.

[4] "**Minimum Conditions**" means (i) funding of a total of $25 million into the Litigation Funding Account in the aggregate, (ii) a funding of $10 million in the aggregate in the Cash Reserve Account, and (iii) until the Segregated Account has an additional $10 million in cash.

[5] "**Second Distribution**" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery; provided, that, for the avoidance of doubt, there shall be no Second Distribution until the Minimum Conditions are satisfied.

## Prolific TV Producer Signs a Podcast Deal

By TIFFANY HSU and BEN SISARIO

Shonda Rhimes, the prolific television producer whose body of work includes the durable ABC drama "Grey's Anatomy," moved into the streaming world in 2017 when she signed a nine-figure deal to create shows for Netflix. Now, she is taking her talent for storytelling to the audio realm as the executive producer of new podcasts to be made in conjunction with the broadcast giant iHeartMedia.

Ms. Rhimes's production company, Shondaland, and iHeart announced the partnership, a three-year deal, on Wednesday. Under the arrangement, Ms. Rhimes will produce more than a dozen iHeartRadio original podcasts that will be available on the iHeartPodcast Network. With the deal, Shondaland has also started a new division, Shondaland Audio.

In addition to "Grey's Anatomy," a network stalwart since 2005, Ms. Rhimes and Shondaland were behind ABC's "Scandal" and "How to Get Away With Murder." For Netflix, Ms. Rhimes has said she plans to make at least eight new shows.

The first to go into production, "Bridgerton," a high-society soap



EMILY BERL FOR THE NEW YORK TIMES
Shonda Rhimes

set in Regency-era London, is based on a popular series of romance novels by Julia Quinn. With a cast that includes Julie Andrews and Regé-Jean Page, it is scheduled to start streaming on Netflix next year.

Ms. Rhimes is no podcasting rookie. In 2018, Shondaland created "Katie's Crib," a weekly podcast on motherhood, hosted by the "Scandal" actress Katie Lowes. That show will migrate to iHeart-Podcast under the new deal, which will include a show about a first lady and another featuring the comedian Ali Wentworth.

Shondaland is "just beginning our digital journey," Ms. Rhimes said in an email. Of the podcasting venture with iHeart, she said that "if the opportunity presents itself for some crossover with our friends at Netflix, we would certainly explore it."

Nearly a third of Americans ages 12 and up — about 90 million people — listen to podcasts at least once a month, up from 21 percent three years ago, according to a survey this year by Edison Research.

The 67 shows on NPR, the top podcast studio, were downloaded more than 151 million times last month, according to a ranking from the podcast measurement firm Podtrac. Ranked second was iHeartRadio, with 268 shows downloaded 147 million times. "The Daily," from The New York Times, is the most popular single podcast.

Commercial time on popular podcasts can fill up months in advance, advertisers have reported.

A report this summer from the Interactive Advertising Bureau and PwC estimated that advertising revenue hit $479.1 million last year.

Conal Byrne, the president of iHeartPodcast Network, said in an email that he expected Shondaland Audio to be especially appealing to "an engaged, smart female audience" as well as "top-tier, big, established brands" interested in advertising their wares.

Shondaland podcasts will have four commercials on average, he said — one at the beginning of each episode, two in the middle, and one at the end, each 30 to 60 seconds long.

The intimacy of podcasting is attractive to some advertisers. But as the medium has evolved, the trope of a host riffing on ad copy is no longer the only option. Ads for Shondaland Audio will use a process called dynamic insertion, which allows publishers to go with ads that target specific groups of listeners.

Platforms like Spotify, which once positioned itself exclusively as a music outlet, have crowded into podcasting. Spotify said this year that it had paid about $400 million for the podcast companies Gimlet Media, Anchor and Parcast.

The data on who is listening to a given show is murky, however, and podcasting platforms do not provide "sophisticated targeting tools on par with what Facebook and other digital platforms offer advertisers," according to an analysis by the venture capital firm Andreessen Horowitz.

On Wednesday, advertisers and media buyers gathered at the Manhattan office of the publishing company Meredith to preview programming and discuss sponsorship deals with podcasts from Slate, WNYC, Wondery and others.

Ira Glass, the host of the radio show and podcast "This American Life," went onstage to promote an upcoming Serial Productions show about racial integration in a Brooklyn school.

"There's just an intimacy to this medium," he said at the sold-out event, which was organized by the Interactive Advertising Bureau. "That kind of bond really carries over to the advertisers."

WarnerMedia said at the event that it would release several new podcasts in the coming months, including one about the disgraced financier Jeffrey Epstein featuring the CNN reporter Vicky Ward. This summer, Ms. Ward said her reporting on accusations of sexual misconduct against Mr. Epstein had been blocked from publication in Vanity Fair.

For years, iHeartMedia, which operates about 850 terrestrial radio stations in the United States, largely sat out the podcast revolution. Last year, it paid $55 million for Stuff Media, the producer of hit podcasts like "Stuff You Should Know." The company has also announced plans to translate shows like "Stuff You Should Know" into Spanish, Hindi, Portuguese, French and German, and to go into business with Blumhouse, the Hollywood studio behind horror films like "The Purge" and "Get Out."

Now, iHeart offers technology that allows podcast advertisers to "reach exactly who they want, at scale," said Mr. Byrne, the president of the company's podcasting division.

## A 'Sexy' Jumpsuit for Virgin's Space Tourists

By KENNETH CHANG

YONKERS, N.Y — Once there was the era of space-age fashion. Now the age of fashion for space has arrived.

On Wednesday, Virgin Galactic, the company started by Richard Branson to take people to the edge of space aboard a rocket-powered plane, is unveiling sleek, high-tech garments that passengers will wear during their trips.

They are not spacesuits like the ones that NASA astronauts put on for rocket launches and spacewalks. Rather, they are one-piece jumpsuits like those worn by military pilots, with a design that wouldn't be out of place on the bridge of the starship Enterprise. They come with fancy underwear to help maintain comfort during the trip up and down.

"I think every single person who goes to space will be delighted with it," Mr. Branson said in an interview. "I think the whole experience of going to space should be sexy. Our spaceships are sexy. Our mother ships are sexy. Our spaceport is sexy. And for younger people than myself, this suit is also sexy."

As part of the price of the ticket — the cost of a seat is currently $250,000 — the Virgin Galactic customers will get to keep their space clothes including the jumpsuits, underwear and boots.

The company introduced them with theatrical flair at an indoor skydiving facility, with dancers demonstrating the flexibility of the "base layer" garments worn under the flight suit. Then others showed off the full suit while performing flips as they hovered in the skydiving chamber.

Mr. Branson then walked in wearing his flight suit, although without doing any flips himself. "Coordination is definitely not one of my strong points," he said. "Watch out, for anyone else in the spaceship with me."

Virgin is not the only organization showing off new space wear. On Tuesday, NASA demonstrated two new spacesuits that will be used for its missions to the moon. While Virgin space wear conjures going boldly where no one has gone before, NASA's gear, which must function in more rugged environments beyond Earth's orbit, is drawn from familiar forms that have guided the space agency's engineers for decades.

The new NASA spacesuits will offer improvements over existing models for the men and women expected to wear them, including greater comfort and movement.

The other spacesuit, with a bright red, white and blue pattern, is called the exploration extravehicular mobility unit. That is what astronauts will wear as they explore the moon's surface.

At an event on Tuesday at NASA's headquarters in Washington, Kristine Davis, who works in the agency's spacesuit engineering efforts, showed how the new design makes it easier to walk, bend and twist.

"You remember Neil Armstrong and Buzz Aldrin, they bunnyhopped on the surface of the moon," said Jim Bridenstine, NASA's administrator. "Well, now we're actually going to be able to walk on the surface of the moon, which is very different than our suits in the past."

The suits are designed to work in temperatures ranging from 250 degrees Fahrenheit down to -250 degrees and potentially even colder places around the lunar South Pole, where NASA is aiming to send astronauts.

The other suit, in a bright orange fabric, is to be worn by astronauts during launch and re-entry to Earth inside Orion, NASA's crew capsule for deep-space travel. The suit provides protection and oxygen in case of an accident that causes the capsule to become depressurized.

Private companies other than Virgin have debuted their own novel takes on the spacesuit in recent years, each intended to clothe astronauts headed from Earth to the International Space Station.

SpaceX, which could start flying astronauts to the space station next year, sent a mannequin wearing its suit to orbit in March aboard the Crew Dragon spacecraft. The suit featured a 3D-printed helmet and a black and white design that seemed inspired by motorcycle racing suits.

Boeing, whose Starliner capsule will also travel to the station, unveiled its blue, zippered suit in 2017. It is about 10 pounds lighter than what astronauts wore on the space shuttle.

For its garments, Virgin Galactic enlisted Under Armour, the maker of high-performance sportswear, to develop the out-of-the-world garb. Virgin Galactic wants its passengers not only to look good but also to feel comfortable to fully appreciate the flight, which will soar to an altitude of more than 50 miles.

"They have to be fully present," said Randy Harward, senior vice president for advanced materials at Under Armour. "They can't be hot and sweaty and annoyed and itchy. They've got to be super comfortable."

Mr. Branson, who founded Virgin Galactic in 2004, had originally expected the company to start flying years ago. But progress was slow, and in 2014, the first of its space planes disintegrated during a test flight, killing a pilot. After making design changes in the second space plane, Virgin has completed other test flights successfully, the most recent in February.

Company officials now say, with increasing confidence, that next year Mr. Branson will finally get his ride on his space plane, taking off from Spaceport America in New Mexico. Then the first of more than 600 people who have signed up will follow.

"We're getting very, very close," said George Whitesides, chief executive of Virgin Galactic.

More people are interested. Mr. Branson said Norman Foster, the renowned 84-year-old architect who designed the futuristic-looking terminal at Spaceport America, "just wrote me a letter about three or four days ago, asking could we take him to space?"

Not all the passengers will be tourists. This month, Virgin Galactic announced that the Italian Air Force has signed a contract to fly three people and a package of experiments. "The tests conducted by the Air Force will be mostly aimed at studying the effects of acceleration, deceleration and microgravity on a human body," said Col. Gianmattia Somma, an Italian Air Force spokesman.

Each trip will last about 90 minutes, from takeoff to a gliding landing. Most of that time will transpire as the space plane is carried to an altitude of 50,000 feet by a larger carrier aircraft. After the space plane is dropped, its engine ignites. The most exciting part of weightlessness will last only about five minutes.

For the past year and a half, Under Armour designers at the company's research center in south

![Passengers will soar 50 miles above Earth in sleek Virgin Galactic spacesuits made by Under Armour.]

CALLA KESSLER/THE NEW YORK TIMES
Passengers will soar 50 miles above Earth in sleek Virgin Galactic spacesuits made by Under Armour.

### NASA also unveils a new spacesuit for its missions to the moon.

Baltimore have been putting together prototypes in a small section of the cavernous space, cordoned off by a tall red curtain.

They first made some design decisions. They considered a two-piece flight suit but settled on a more traditional one-piece configuration. "We didn't want to stray too far from that," said Nick Cienski, the senior innovation director for outdoor apparel at Under Armour.

That allowed something that looked "not too strange," but that was still fashionable, he said.

They settled on a palette of three blues and gold, colors selected from images of Earth backlit by the sun.

The first suit, for Mr. Branson, was completed last week. It took 10 people five days to construct it.

"It is the most labor intensive product we've ever made," Mr. Cienski said.

Under Armour's experience with making sportswear for top athletes with fabrics that wick away perspiration but still retain body heat helped with creating designs that can deal with the temperature swings a space tourist can expect. It also fits into the overall design that Virgin Galactic envisions.

"It's actually integrated into the seat system," Mr. Whitesides said. "It's a very holistic design. The suit fits into the seat which fits into the spaceship interior."

Each flight suit has a bounty of pockets for carrying mementos. On a gold rectangle inside the chest area of the flight suit, passengers could write a "personal mission statement" for why they want to go to space.

Padding on the shoulders of the flight suit cushion the harnesses that will hold the passengers to their seats through most of the flight. "There's a lot of small details we thought through," Mr. Cienski said.

Mr. Cienski is also working on the flight suits for the pilots, which will look different but incorporate many of the same features.

Like much of the technology needed for space, the extreme requirements pushed innovation. Under Armour was able to take advantage of tools it already had in the works, such as machines that spin threads of varying widths as they weave together the fabric. After demonstrating that they work for the flight suits, it can then deploy them for other products. The material used for the slipperlike boots for the Virgin Galactic passengers, for example, will soon show up in shoes for football players.

"The learning in this helped us prove it really does work, and we can find a path to commercialization," said Clay Dean, the chief innovation officer for Under Armour. "I think if you look at the original space program for NASA and the things it spawned in terms of developments that we never imagined, we're finding the same."

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
In re SEARS HOLDINGS    Chapter 11
CORPORATION, et al.,    Case No. 18-23538 (RDD)
Debtors.[1]    (Jointly Administered)
NOTICE OF ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM AND OPT-IN / OPT-OUT PROCEDURES
PLEASE TAKE NOTICE that:
1. On October 15, 2019, the Order Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors (ECF No. 5370) (the "Confirmation Order") was entered by the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York (the "Court").[2]
2. The Confirmation Order approves the Administrative Expense Claims Consent Program, the Opt-In/Opt-Out Procedures, the opt-in ballot (the "Opt-In Ballot"), and the opt-out ballot (the "Opt-Out Ballot") attached as Exhibit C to the Confirmation Order.
3. All Holders of Administrative Expense Claims who (i) affirmatively opt-in to the Administrative Expense Claims Consent Program or (ii) do not opt-out of the Administrative Expense Claims Consent Program (together, the "Settled Admin Claims") will receive the treatment described in paragraph 52(a) of the Confirmation Order:[3]
a. Holders of Allowed Administrative Expense Claims who affirmatively opt-in to the "Opt-In Settled Admin Claims") to the Administrative Expense Claims Consent Program prior to the Opt-In/Opt-Out Deadline shall receive, among other things:
(i) their pro rata share of $21 million ("Initial Cash Pool"), on or about December 1, 2019 (the percentage recovery, the "Initial Recovery");
(ii) total recovery capped at 75% of the Allowed Administrative Expense Claim;
(iii) such $21 million shall only be available to holders of Opt-In Settled Admin Claims who consensually agree with the Debtors to the Allowed amount of the Opt-In Settled Admin Claims;
(iv) consensual reconciliation of the Allowed amount of Opt-In Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1)) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the date of receipt of the Opt-In Ballot; and
(v) holders who do not agree with the Debtors on the Allowed amount of Opt-In Settled Admin Claims shall be deemed to hold a Non Opt-Out Settled Admin Claim (defined below).
b. Subject to the satisfaction of the Minimum Conditions,[4] holders of Administrative Expense Claims that do not affirmatively opt-out of the Administrative Expense Claims Consent Program (the "Non Opt-Out Settled Admin Claims") prior to the Opt-In/Opt-Out Deadline shall receive, among other things:
(i) their pro rata share of the Second Distribution,[5] which will be shared only by other holders of Non Opt-Out Settled Admin Claims until they have received a percentage of distribution on such Claims that is equal to the Initial Recovery provided to the holders of Opt-In Settled Admin Claims (together with the Initial Recovery, the "Settled Administrative Expense Claims Recovery");
(ii) total recovery capped at 80% of the Allowed Administrative Expense Claim; and
(iii) consensual reconciliation of the Allowed amount of Non Opt-Out Settled Admin Claims (including on account of 503(b)(9) and 503(b)(1)) issues regarding inducement, date of receipt, port of origin, etc., and any exposure on account of preference actions), to be completed within 30 days from the Out-In/Opt-Out Deadline.
c. The Debtors and the Creditors' Committee may, on a case-by-case basis, also waive or settle any preference action for Settled Admin Claims.
d. Thereafter, holders of Settled Admin Claims shall receive pro rata distribution on account of Settled Admin Claims up to the Settled Administrative Expense Claims Recovery (as applicable) of the consensually agreed up amount.
4. All Holders of Administrative Expense Claims who opt in to the Administrative Expense Claims Consent Program shall be deemed to be satisfied in full on account of such claims once they have received payment in cash equal to 75% of the applicable Allowed Opt-In Settled Admin Claims and all Holders of Administrative Expense Claims who do not opt out of the Administrative Expense Claims Consent Program will be deemed to be satisfied in full on account of such claim once they have received payment in cash equal to 80% of the applicable Allowed Non Opt-Out Settled Admin Claims. Holders of Administrative Expense Claims' consent to the Administrative Expense Claims Consent Program will also be deemed consent to the Plan and acceptance of the treatment under the Plan in satisfaction of section 1129(a)(9) of the Bankruptcy Code.
5. Settled Administrative Expense Claims will benefit from expedited reconciliation of the Allowed amount of their Administrative Expense Claim, to be completed within thirty (30) days from the applicable deadline with an opportunity to settle preference claims and assurance that any distributions made to holders of Administrative Expense Claims who settle cannot be clawed back. Upon any conversion of the chapter 11 cases, all Settled Administrative Expense Claims shall be Allowed against the Debtors in an additional $10 million in cash.
6. Holders of Administrative Expense Claims who affirmatively opt-out of the Administrative Expense Claims Consent Program (the "Non-Settled Administrative Expense Claims") will retain the right to receive payment of the Allowed 100% of their Administrative Expense Claims, but payment of their Administrative Expense Claims shall occur on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim is Allowed, and (iii) the next Distribution Date after such Administrative Expense Claim is Allowed, in accordance with the Plan. Holders of opt-out claims will not be entitled to participate in the Initial Distribution, the Second Distribution, or any further distribution until the Plan has become effective or the Settled Administrative Expense Claims have been satisfied.
7. To opt-in to or opt-out of the Administrative Expense Claims Consent Program, Holders of Administrative Expense Claims must complete and return to Prime Clerk LLC (the "Claims and Noticing Agent") so that the Opt-In Ballot or Opt-Out Ballot is actually received on or before November 18, 2019, at 4:00 p.m., prevailing Eastern Time.
8. If you do not take any action, you will be deemed to be bound by the Administrative Expense Claims Consent Program, but not entitled to any benefits that will be provided to Holders of Administrative Expense Claims who timely opt in to the Administrative Expense Claims Consent Program, i.e., you will not participate in the Initial Distribution.
9. If any party that believes they are a Holder of an Administrative Expense Claim but did not receive an Opt-In Ballot or Opt-Out Ballot may request either such ballot from the Claims and Noticing Agent at (844) 384-4460 or searsinfo@PrimeClerk.com, and both ballots are available for download at https://restructuring.primeclerk.com/sears.
Copies of the Confirmation Order, the Plan, the Opt-In Ballot, the Opt-Out Ballot, and related documents may be obtained by request to the Claims and Noticing Agent at (844) 384-4460 or searsinfo@PrimeClerk.com, and are available for download at https://restructuring.primeclerk.com/sears.
Dated: October 15, 2019, New York, New York
/s/ Sunny Singh_, WEIL, GOTSHAL & MANGES LLP, 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007, Ray C. Schrock, P.C., Jacqueline Marcus, Garrett A. Fail, Sunny Singh, Attorneys for Debtors and Debtors in Possession
[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings, Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Rover Brands Business Unit, LLC (f/k/a Sears Brands Business Unit Corporation) (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge 13, LLC (6664); Sun Holding Re Delight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.
[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Confirmation Order or the Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors (ECF No. 5293) (as may be amended from time to time, the "Plan").
[3] The treatment is qualified in its entirety by reference to paragraph 52(a) of the Confirmation Order.
[4] "Minimum Conditions" means (i) funding of a total of $25 million into the Litigation Funding Account in the aggregate, (ii) a funding of $10 million in the aggregate in the Cash Reserve Account, and (iii) until the Segregated Account has an additional $10 million in cash.
[5] "Second Distribution" shall mean Distributions made to holders of Non Opt-Out Settled Admin Claims up to a percentage recovery equal to the Initial Recovery; provided, that, for the avoidance of doubt, there shall be no Second Distribution until the Minimum Conditions are satisfied.

## 'Stranger Things' Helps Netflix Rebound in Third Quarter

By EDMUND LEE

Netflix has stemmed the bleeding. The streaming juggernaut overcame its rare moment of weakness from last quarter to add 6.8 million new customers, with 520,000 in the United States in the three months that ended in September.

The rebound, after a loss of 126,000 customers domestically earlier in the year, helped Netflix recover some investor confidence as it faces an onslaught of new streaming competitors.

The third-quarter results were slightly lower than the company's forecast. Netflix had been expected to add about seven million customers, with 800,000 in the United States. The stock jumped more than 8 percent in after-hours trading Wednesday. The company's market value had dropped since its last earnings announcement in July, with shares trading down more than 20 percent.

The company also reported a profit of $665 million on $5.2 billion in revenue.

Netflix, led by the chief executive, Reed Hastings, forecast a healthy rate of growth for the rest of the year. The company said it expected to add 7.6 million total new customers in the next quarter, with about 600,000 for the United States. That was below the



NETFLIX
"Stranger Things" drew 64 million viewers in its first four weeks.

9.4 million that Wall Street had expected and is an indication of the pending competition.

The third-quarter results benefited from Netflix's best-known series, "Stranger Things," which debuted its hugely anticipated third season over the Fourth of July weekend. The series drew 64 million viewers in the first four weeks it was available, according to the company.

Netflix, which started as a DVD-by-mail service, has become a dominant force in Hollywood, and its disruptive growth has reshaped the television landscape. It often outspends its rivals and has forced the industry's biggest players to embrace streaming as they abandon, albeit slowly, the pay-television model.

Netflix is the nation's largest digital television network, with over 158 million customers around the world, including 60 million in the United States.

That audience has become critically important as well-financed competitors wait in the wings. On Nov. 1, Apple plans to unveil its streaming product, Apple TV Plus; 11 days later, the Walt Disney Company intends to start Disney Plus, which will feature Marvel's biggest franchises, the complete "Star Wars" library and the Disney content vault.

In a cheeky marketing stunt, Disney owned Twitter for a few hours on Monday when it promoted its service on an epic Twitter thread with a seemingly endless string of titles (both famous and obscure) that will appear on Plus. Not to be outdone, Jennifer Aniston, who stars in Apple's new signature series, "The Morning Show," drew Instagram's attention Tuesday when she finally joined the social platform.

Both streamers will come stocked with original films and series, and both will cost about half the price of Netflix. (By early next year, Netflix will face another competitor: AT&T's HBO Max.)

The competition suggests that the more important consideration in its financial report is Netflix's expectation for the current quarter, which is also traditionally its most lucrative period with the most new subscribers.

But Netflix plans a new line of attack at the end of the year. It will release more than half a dozen high-profile features over the coming months, including its most ambitious screen effort to date, Martin Scorsese's "The Irishman," which cost $159 million.